```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3

       IN RE NATIONAL PRESCRIPTION      Hon. Dan A. Polster
 4     OPIATE LITIGATION
                                        MDL No. 2804
 5     THIS DOCUMENT APPLIES TO ALL     No. 17-MD-2804
       CASES
 6     _____/

 7

 8                  HIGHLY CONFIDENTIAL -
            SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
                       --  -- --
10
                 THURSDAY, JANUARY 17, 2019
11
                       --  -- --
12
            Videotaped Deposition of ARTHUR F. MORELLI,
13     held at the Law Offices of ROBBINS GELLER RUDMAN &
       DOWD LLP, 655 West Broadway Street, Suite 1900,
14     San Diego, California, beginning at 9:10 a.m., before
       Sandra Bunch VanderPol, FAPR, RMR, CRR, CALIFORNIA
15     CSR #3032
16                     --  -- --
17
18
19
20
21
22     _____
23              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
24                  Deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

---

Page 2

APPEARANCES:

MARK SAMSON, Esq.
KELLER ROHRBACK, LLP
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012-2643
(602) 248-0088
msamson@kellerrohrback.com
-and-
ALISON S. GAFFNEY, Esq.
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
(206) 623-1900
agaffney@kellerrohrback.com
Counsel for the MDL Plaintiffs

TRICIA HERZFELD, Esq.
BRANSTETTER, STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
Triciah@bsjfirm.com
Counsel for the Tennessee Plaintiffs

WILLIAM DAVISON, Esq.
MAX R. MAEROWITZ, Esq.
JUSTIN MANN, Esq. (Video/Realtime Stream)
ROPES & GRAY, LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-36
(617) 951-7330
william.davison@ropesgray.com
max.maerowitz@ropesgray.com
Justin.mann@ropesgray.com
Counsel for Defendant Mallinckrodt

(Appearances continued on next page)

---

Page 3

APPEARANCES:

DEVON MOBLEY-RITTER, Esq.
(Telephone/Video/Realtime Stream)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square
Palo Alto, California 94306-2112
(650) 632-4715
dmobleyritter@cov.com
Counsel for Defendant McKesson and the
Witness

RANDY S. GROSSMAN, Esq.
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121-3134
(858) 314-1200
rsgrossman@jonesday.com
Counsel for Defendant Walmart

GRETCHEN CALLAS, Esq.
JACKSON KELLY PLLC (Telphone/Video/Realtime
Stream)
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301-3202
(304) 340-1169
gcallas@jacksonkelly.com
Counsel for Defendant AmerisourceBergen

ERIC SHAPLAND, Esq. (Telephone/Video/Realtime
Stream)
ARNOLD & PORTER KAYE SCHOLER, LLP
44th Floor, 777 South Figueroa Street
Los Angeles, California 90017-5844
(213) 243-4120
eric.Shapland@arnoldporter.com
Counsel for Defendants Endo Pharmaceuticals,
Inc. and Endo Health Solutions, Inc.

(Appearances continued on next page)

---

Page 4

APPEARANCES (Continued)

Also Present:

RYAN WONG, Videographer

--o0o--

---

Page 5

I N D E X

Examination by:                          Page
    MR. SAMSON                            11
    MS. HERZFELD                          315
    MR. DAVISON                           384
    MR. SAMSON                            386

--o0o--

E X H I B I T S

Mallinckrodt-Morelli Exhibits            Page

Exhibit 1   Plaintiffs' Notice of Oral        11
    Videotaped Deposition of Art Morelli
    and Requests for Production of
    Documents
Exhibit 2   LinkedIn Profile of Art Morelli   28
Exhibit 2A  Curriculum Vitae of Arthur F.     32
    Morelli
Exhibit 3   Services Agreement dated 5/1/09   63
    between Covidien LTD and Arthur F.
    Morelli, Bates MNK-T1_0007918465 -
    471
Exhibit 4   Email chain dated 9/30/09 re "Art's   68
    Offer," Bates MNK-T1_0007918472 -
    473
Exhibit 5   PowerPoint Slides, "The Role of   72
    Medical Affairs," Bates
    MNK-T1_0000951589 (Native Format)
Exhibit 6   PowerPoint Slides, "Sales Force   134
    Training REMS and Safe Use," Bates
    MNK-T1_0000254831 - 859
Exhibit 7   Email dated 11/15/11 re "**URGENT -- 168
    ACTION REQUIRED **," Bates
    MNK-T1_0001475149 - 155
Exhibit 8   Email dated 5/17/11 to Morelli from   177
    Huels re "Promo Speaker's budget,"
    Bates MNK-T1_0003083466 - 470

---

Page 6

1    E X H I B I T S
2  Mallinckrodt-Morelli Exhibits        Page
3  Exhibit 9  Email chain dated 10/21/11 re    173
        "EEIFs," Bates MNK-T1_0001050849
4
   Exhibit 10  Email chain dated 4/5/11 re "Please  191
5       Review: JAMA Opioid Article - Media
        Holding Statement," Bates
6       MNK-T1_0001466751 - 753
7
   Exhibit 11  Email chain dated 4/26/11 re "REMOXY  201
8       Meets Primary Endpoints in Abuse
        Liability Study," Bates
9       MNK-T1_0000941559 - 563
10 Exhibit 12  Email chain dated 9/9/11 re "Gosy   212
        Dinner," Bates MNK-T1_0000958342 -
11      348
12 Exhibit 13  Email chain dated 6/20/11 re "Expert 222
        on the Call," Bates
13      MNK-T1_0000958361 - 362
14 Exhibit 14  Email chain dated 8/26/11 re "EOC   228
        Update," Bates MNK-T1_0001174025 -
15      027
16 Exhibit 15  Email chain dated 12/1/11 re      234
        "Journal Article on Characteristics
17      of HM Use," Bates MNK-T1_0005193922
        - 923
18
   Exhibit 16  Email chain dated 2/1/14 re "REMS  252
19      KAB Survey," Bates MNK-T1_0004604257
        - 259
20
   Exhibit 17  Email chain dated 10/27/09 re "FDA  263
21      REMS comments," Bates
        MNK-T1_0007324393 - 401
22
   Exhibit 18  Document titled, "Suspicious Order  276
23      Monitoring Team Charter," updated
        04/07/11, Bates MNK-T1_0000496062,
24      901 - 911
25 ///

Page 8

1    E X H I B I T S
2  Mallinckrodt-Morelli Exhibits        Page
3  Exhibit 27  Email chain dated 6/8/11 re     380
        "Materials for AATOD?" Bates
4       MNK-T1_0007094004 - 4006
5
6
7
8           --o0o--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1    E X H I B I T S
2  Mallinckrodt-Morelli Exhibits        Page
3  Exhibit 19  PowerPoint Slides - "EXALGO Risk   277
        Evaluation and Mitigation Strategy
4       Presentation," Bates
        MNK-T1_0002953165 (Native Format)
5
   Exhibit 20  PowerPoint Slides, "Medical Affairs, 302
6       Leading the Science of Safety, REMS
        Strategy, Development & Oversight
7       Team," no Bates
8  Exhibit 21  Email chain dated 4/28/11 re     304
        "Prescription Painkillers:
9       Companies Attempt Abuse-Proof
        Opioids - ABC News," Bates
10      MNK-T1_0006315956
11 Exhibit 22  Email dated 3/29/10 to Hasse from   320
        DeFusco re "News Expose OxyContin
12      Florida and Tennessee," Bates
        MNK-T1_0006317909
13
   Exhibit 23  Email chain dated 2/19/11 re "WSJ -  324
14      Fight Over a Fix for Florida Pill
        Mills," Bates MNK-T1_0007200216 -
15      218
16 Exhibit 24  Document titled, "EXALGO REMS Safety 334
        Advisory Board, December 8 - 9, 2011
17      Loews Hotel, Nashville, TN," Bates
        MNK-T1_0004298470 - 471
18
   Exhibit 25  Email exchange dated 10/8/09 re    341
19      "EXALGO REMS Implementation Core
        Team Meeting:  10.8.09 - Enrollment
20      Target Analytics Presentation," with
        PowerPoint slide attachment, Bates
21      MNK-T1_0007901956 - 957 (Native
        Format)
22
   Exhibit 26  Email dated 2/14/11 re "Abuse and   373
23      CARES Training Module," with
        PowerPoint attachment (Native
24      Format), Bates MNK-T1_0006314936 -
        937
25

Page 9

1        BE IT REMEMBERED that on Thursday, the 17th
2  day of January, 2019, commencing at the hour of
3  9:10 a.m. in the law offices of Robbins Geller
4  Rudman & Dowd LLP, 655 West Broadway Street,
5  Suite 1900, San Diego, California, before me,
6  Sandra Bunch VanderPol, a Certified Shorthand
7  Reporter in and for the State of California,
8  personally appeared.
9        ARTHUR F. MORELLI,
10 called as a witness (Mallinckrodt) who, having been
11 duly sworn, was thereupon examined and interrogated as
12 hereinafter set forth.
13         --o0o--
14     THE VIDEOGRAPHER:  We are now on the record.
15     My name is Ryan Wong.  I'm a videographer
16 for Golkow Litigation Services.  Today's date is
17 January 17th, 2019, and the time is 9:10 a.m.
18     This video deposition is being held in
19 San Diego, California, in the matter of National
20 Prescription Opiate Litigation, for the United States
21 District Court, Northern District of Ohio.
22     The deponent is Art Morelli.
23     Will counsel please identify themselves for
24 the record.
25     MR. SAMSON:  Mark Samson, of Keller

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  Rohrback, for the MDL plaintiffs.
2      MS. GAFFNEY:  Alison Gaffney, of Keller
3  Rohrback, also for the MDL plaintiffs.
4      MS. HERZFELD:  Tricia Herzfeld, of
5  Branstetter, Stranch & Jennings, for the Tennessee
6  plaintiffs.
7      MR. GROSSMAN:  Randy Grossman, Jones Day, on
8  behalf of Walmart.
9      MR. DAVISON:  William Davison, of Ropes &
10 Gray, on behalf of Mallinckrodt LLC, Spec GX, LLC,
11 and the witness.
12     MR. MAEROWITZ:  Max Maerowitz, on behalf of
13 the same defendants, of Ropes & Gray.
14     THE VIDEOGRAPHER:  On the phone?
15     MR. SHAPLAND:  Eric Shapland, on behalf of
16 the Endo and Par entities.
17     MS. CALLAS:  Gretchen Callas, with Jackson
18 Kelly, on behalf of AmerisourceBergen.
19     MS. MOBLEY-RITTER:  Devon Mobley-Ritter of
20 Covington & Burling, on behalf of McKesson.
21     THE VIDEOGRAPHER:  The court reporter is
22 Sandy VanderPol, and she will now swear in the
23 witness.
24     THE REPORTER:  Raise your right hand,
25 please.

Page 11

1      Do you solemnly swear or affirm that the
2  testimony you are about to give in this proceeding
3  will be the truth, the whole truth, and nothing but
4  the truth, so help you God?
5      THE WITNESS:  I do.
6            EXAMINATION
7  BY MR. SAMSON:
8      Q.   Good morning, Mr. Morelli.  Will you
9  state your full name for the record, please.
10     A.   Sure.  Arthur, A-r-t-h-u-r, F.
11 Morelli, M-o-r-e-l-l-i.
12     Q.   I've seen 3rd next to it sometimes.
13 Are you a 3rd?
14     A.   I'm not a 3rd, no.
15     MR. SAMSON:  Okay.  I will ask you about
16 that.
17          (Exhibit No. 1 was marked.)
18 BY MR. SAMSON:
19     Q.   Let me show you what's been marked as
20 Exhibit 1 to your deposition.  Have you seen this
21 before?  It's the notice of deposition.
22     A.   I have not, no.
23     Q.   Okay.  How many times have you been
24 deposed before?
25     A.   Once.

Page 12

1      Q.   Okay.  We will talk about that a
2  little later.
3      Let's go over a couple of ground rules for
4  depositions so that you and I can be sure we're on
5  the same page; okay?
6      A.   Okay.
7      Q.   First of all, even though this is an
8  informal setting, you're under the same oath, have
9  the same obligation to testify fully and accurately
10 and truthfully as if we were in front of a court; do
11 you understand that?
12     A.   I totally understand.
13     Q.   Okay.  You understand that what you
14 say today can be -- will be taken down and put into a
15 transcript form of your testimony, and that can be
16 used in various ways throughout the lawsuit?
17     A.   I understand, yes.
18     Q.   Now, because of that, it's important
19 that today isn't a bad day because of medication,
20 personal stress, any other reason for you to pull up
21 events from the past and tell us about them.  Is
22 today as good a day as any for that?
23     MR. DAVISON:  Objection to form.
24     THE WITNESS:  Today is a great day.
25     MR. SAMSON:  I think I have seen on some of

Page 13

1  your emails.
2      Q.   So one very important fact is when
3  lawyers ask witnesses in different pursuits, like
4  your own, questions, it may not come across to you as
5  understandable.  Do you understand you're not under
6  any obligation to try and guess what I'm asking you,
7  but only what you understand?
8      A.   I understand that, yeah.
9      Q.   Therefore, if you don't understand
10 the question, I will ask you to ask me to rephrase
11 it, ask me a question, "Do you mean X or Y?"  And I
12 will be happy to do that.  Will you take that
13 opportunity?
14     A.   I will do that.
15     Q.   Okay.  And as a corollary, if you
16 answer a question without being confused and bringing
17 it up to me, is it fair to assume that you understood
18 the question?
19     A.   That's fair.
20     Q.   And one thing we haven't gotten into,
21 but you're doing pretty well, you haven't done the
22 "uh-huh" and "uh-uh" yet for "yes" and "no."  But
23 just so the record is clear, unlike ordinary
24 conversation, when it's an affirmative or a positive,
25 no head shrugs or shoulder shrugs.  Answer audibly;

Page 14

1 okay?

2     A.   I will.

3     Q.   If I correct you, I am not

4 persecuting you. It's only to remind you to get back

5 into this mode of communication instead of what we

6 all do every day.

7     A.   I understand.

8     Q.   You can take a rest. It's not an

9 endurance contest. Please just ask me, and we will

10 take a break. The only corollary to that is if a

11 question is pending, please answer that question and

12 then say, "I'd like to take a break." Okay?

13     A.   Okay.

14     Q.   Throw-away question. Have you ever

15 been arrested or convicted of a felony?

16     A.   I have not.

17     Q.   Turn to page 4 of Exhibit 1.

18     A.   Okay.

19     Q.   And even though you didn't see this,

20 you see that there were -- there's a section about

21 requests for documents to be produced?

22     A.   Yes.

23     Q.   Okay. And the first one is a copy of

24 your current résumé or curriculum vitae.

25     A.   Yes.

Page 15

1     Q.   I received that this morning. So I

2 take it --

3     A.   Oh.

4     Q.   -- you did produce that to counsel?

5     A.   I sent it to counsel.

6     Q.   And then if you turn to the next

7 page, request for production No. 2 are:

8     (Reading) All documents, including

9     electronic data and email, in your

10     possession related in any way to any

11     defendants, manufacturer, marketing,

12     sale, distribution, suspicious order

13     monitoring and lobbying efforts, in

14     connection with its opioid business

15     (end of reading).

16     Did you look through your personal documents

17 to make sure you didn't have any responsive documents

18 to that request?

19     A.   I didn't, no.

20     THE VIDEOGRAPHER: Sorry, Counsel. I think

21 my Elmo is not working right now. Do you mind if we

22 go off the record to fix it real quick?

23     MR. SAMSON: No.

24     THE VIDEOGRAPHER: We are going off the

25 record. The time is 9:17 a.m.

Page 16

1     (Off the record.)

2     THE VIDEOGRAPHER: We are back on the

3 record. The time is 9:23 a.m.

4 BY MR. SAMSON:

5     Q.   Since you hadn't seen Request No. 2,

6 I take it you have not made a search for any

7 documents that might be responsive?

8     A.   I have not.

9     Q.   Let me ask you to go ahead and look

10 through whatever memorabilia you have, and this would

11 include emails on other servers that you've had with

12 anyone at Mallinckrodt or any of the other

13 manufacturers of opioids, reminisces you may have

14 written to sort of catalog your time in that area, or

15 anything else, and present them to William, your

16 counsel.

17     A.   Okay.

18     Q.   And then he will see about getting

19 them on to us; okay?

20     A.   Okay.

21     Q.   Look at No. 3:

22     (Reading) All documents you have

23     consulted or reviewed or plan to

24     consult in preparation for your

25     deposition and on which you will rely

Page 17

1     in any way during your deposition (end

2     of reading).

3     Are there any such documents responsive to

4 that request?

5     A.   I don't understand this. Is this a

6 question? I don't think it's grammatically correct.

7 I don't understand what you're asking me.

8     Have I looked at documents? Has counsel

9 given me documents to look at?

10     Q.   That's one way.

11     A.   Oh, yeah.

12     Q.   But since this is your personal

13 documents --

14     A.   Oh.

15     Q.   -- did you look through any box of

16 old things at home and found documents and looked

17 them over to prepare for your deposition?

18     A.   I looked at --

19     MR. DAVISON: Objection.

20     THE WITNESS: I looked at a few that I had

21 just to refresh my memory, because I haven't been in

22 this opioid space now for a couple of years.

23 BY MR. SAMSON:

24     Q.   Okay. And it looks to me, from the

25 records we received, that you left at the end of

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 2011, Mallinckrodt at least?
2     A.    Correct.
3     Q.    And have you been in the opioid space
4 in any professional endeavor since then?
5     A.    I have.
6     Q.    Okay.  We will talk about that later.
7     A.    Okay.
8     Q.    Again, if there's anything that you
9 have privately, that you looked into to prepare for
10 your deposition today, please go ahead and give it to
11 William.  Make a copy of it --
12     A.    Okay.
13     Q.    -- and give it to him.
14     You started to say that there might have
15 been something?
16     A.    Just -- just to refresh my -- my
17 memory and my -- kind of refresh what I had done in
18 terms of names, dates, places, projects, just kind of
19 very high level to reorient myself back into what
20 you're interested in finding out.
21     Q.    Okay.  And what documents did you
22 have at home that helped that process?
23     A.    Slide -- slide decks, compendia
24 reports that I receive from RADARS and other
25 organizations that track, you know, opioid use.

Page 19

1 Materials that I created for other clients that are
2 in the opioid space, just to kind of reorient myself
3 and -- because I'm not working in the opioid space,
4 and I haven't for a couple of years now.  Yeah.
5     Q.    When was the last time you worked in
6 the opioid space?
7     A.    Let's see.  I would say approximately
8 2013, '14 range.
9     Q.    And what were you doing in the 2013,
10 '14 range that was in the opioid space?
11     A.    I was consulting with companies who
12 were bringing out opioid products to market and were
13 interested in programs that would support the safe
14 and effective use of those products or -- and/or
15 helping them create a REMS that they think may have
16 been required, the FDA would require for those
17 products.
18     Q.    And which were those companies?
19     A.    Zogenics was one.
20     Q.    And what was Zogenics producing in
21 the opioid space?
22     A.    They had immediate-release
23 hydrocodone, analgesic single entity for chronic
24 pain.
25     Q.    A generic?

Page 20

1     A.    No.  A branded product.
2     Q.    What was the brand name?
3     A.    Zohydro.
4     Q.    And who else?
5     A.    Xcellerex.
6     Q.    And is that a stand-alone company
7 or --
8     A.    That's a stand-alone company.
9     Q.    And what was their product in the
10 opioid space?
11     A.    Yeah.  Their product was a combined
12 device, drug, sufentanil, a sublingual tablet being
13 developed for pain associated with medical
14 procedures, but only used in a structured setting
15 like a hospital or a clinic, medically supervised
16 setting, not -- not a prescription drug given to
17 patients to take home.
18     Q.    And, in your opinion, based on your
19 experience in the industry, that setting, in a
20 hospital I'm assuming it is --
21     A.    Hospital or clinic.
22     Q.    -- hospital or clinic with direct
23 observation of dose taking, is that less of a risk
24 for abuse, diversion, and some of the other problems
25 with the opiates --

Page 21

1     MR. DAVISON:  Objection to form.
2 BY MR. SAMSON:
3     Q.    -- than --
4     MR. DAVISON:  Sorry.
5 BY MR. SAMSON:
6     Q.    -- drugs given out to patients who
7 then take them on their own away from a clinic or
8 hospital setting?
9     MR. DAVISON:  Objection to form.
10     THE WITNESS:  I would say the risks are
11 different.  And the operationalization of the product
12 is very different.  The distribution is less broad.
13 There's other -- there's many differences.
14     One of the key ones is the distribution and
15 availability is less broad.  So in that sense, it
16 helps mitigate risk.  But there are other risks still
17 associated.  It's a very, very potent opioid,
18 sufentanil.  It's like ten to a hundred times more
19 potent than fentanyl.  It is very potent.
20 BY MR. SAMSON:
21     Q.    And then any other companies?
22     A.    Yes.  Sentynl Pharmaceuticals.
23     Q.    Like the person on watch?
24     A.    Y-L, Y-L at the end, yeah.
25     Q.    Okay.  And what was their product?

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1      A.    They had two opioid products.  One a
2  drug -- a fentanyl-based agent for breakthrough pain,
3  which I was not involved with.  And another oral
4  agent for severe -- moderately severe to severe pain
5  that I was involved with.  But my involvement with
6  Sentynl was very, very brief, and I resigned that
7  account.
8      Q.    Okay.  Did you have a difference of
9  opinion about how to approach the opioid space from
10 Sentynl's managing team?
11     A.    Yes, I did.
12     Q.    Okay.  And what was that difference
13 of opinion?
14     A.    That difference of opinion was, in my
15 perspective was, they were not serious about
16 implementing the safe use kinds of measures that I
17 was recommending.  And I have no tolerance for just
18 makeshift or make it look good but there's nothing
19 underneath it kind of approach.
20     Q.    Was it your suspicion in dealing with
21 Sentynl that they were more interested in selling the
22 product than assuring the safety of the product?
23     A.    Yes.
24     MR. DAVISON:  Objection to form.
25 ///

Page 23

1  BY MR. SAMSON:
2      Q.    And that is unacceptable to you in
3  any manufacturer, distributor, or seller in the
4  opioid space?
5      A.    Yes.
6      MR. DAVISON:  Objection to form.
7  BY MR. SAMSON:
8      Q.    What year was Zogenics, if you
9  recall?
10     A.    So kind of the sequence here.  It was
11 Xcellerex, Sentynl, and then Zogenics.
12     Q.    Okay.  In --
13     A.    More or less in the '12, '13, '14
14 kind of range.
15     Q.    I don't want to put words in your
16 mouth.  A year with each --
17     A.    No.
18     Q.    -- or shorter period with each?
19     A.    Quite long with Zogenics, medium with
20 Xcellerex, very short with Sentynl.
21     Q.    Okay.  Any -- any of the documents
22 that you refreshed your recollection with, do you
23 recall them specifically enough to describe them to
24 me?
25     MR. DAVISON:  Objection.  And to the extent

Page 24

1  it's documents that were provided by us to you, I'm
2  going to instruct you not to answer.
3      MR. SAMSON:  That's -- that's good.
4      Q.    You -- don't tell me the source.  But
5  if you recall an email of "X" date, you can tell me
6  that's something that you looked at to refresh your
7  recollection.
8      MR. DAVISON:  And I'm going to instruct you
9  not to answer if it's a document that I provided to
10 you.  That's the work -- protected by the work
11 product document.
12     If you recall specific documents that you
13 looked at on your own or your own documents, you can
14 share those documents with him.
15 BY MR. SAMSON:
16     Q.    Are you going to follow the
17 instruction not to answer that part of it?  I need to
18 ask you that for the record.
19     And then tell me about the ones that did not
20 come from counsel that you recall looking at.
21     A.    So a general description of a box and
22 stick map that I created to basically help people
23 understand where -- how it works in a patient
24 management setting with a physician dealing with --
25 potentially with patients and nonpatients, in terms

Page 25

1  of mitigating things like diversion, abuse, misuse,
2  overdose, and addiction.
3      Q.    Is -- is the map literally a map?  A
4  one page from a slide show?  Or is it a presentation
5  that shows how that system works?
6      A.    It's a one-page descriptive box and
7  stick map from -- from a slide deck that, you know,
8  I -- I spoke to them, you know, for 30, 40 minutes on
9  just that one slide to make sure they understood.
10     Q.    And was that for Zogenics or
11 Xcellerex or Sentynl or all three?
12     A.    It was for Zogenics.
13     Q.    Okay.  I take it that that slide show
14 still exists in your possession?
15     A.    Not sure.  Not sure.
16     Q.    Well, the --
17     A.    But that slide exists, I know that.
18     Q.    Okay.  Well, find whatever slides
19 exist and provide them to William; okay?
20     A.    Okay.
21     Q.    Any other specific documents not
22 given to you by counsel that you recall reviewing to
23 get back into the opioid space for your deposition
24 today?
25     A.    I would say that would be the

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  stand-out one that I -- that I recall that I went
2  through.
3      Q.   Was that box and stick of map
4  mitigation ever used at Mallinckrodt when you were
5  there?
6      A.   Not that I recall.
7      Q.   Okay. Let me get back to, you told
8  me you had been deposed one other time.
9      A.   Uh-huh.
10     Q.   When was that?
11     A.   It was approximately the year 2000,
12 2001.
13     Q.   And what did that -- why did you come
14 to be deposed?
15     A.   Say that --
16     Q.   Why did you come to be in a
17 deposition.
18     A.   Oh. It was concerning a lawsuit
19 about a company that I co-founded in the area of
20 bochalinum toxins, and it was about patent rights.
21     Q.   And that would have been Solstice?
22     A.   Solstice. Related to Solstice's
23 product, yes.
24     Q.   And Solstice was, as you said,
25 bochalinum toxin?

Page 27

1      A.   Type B.
2      Q.   So did opiates come up in that
3  deposition?
4      A.   No.
5      Q.   What's your current work address?
6      A.   5324 Ruette De Mer, San Diego,
7  California, 92130.
8      Q.   And who is your employer?
9      A.   Enlyton, E-n-l-y-t-o-n, Limited is
10 one employer. Another one is the Ohio State
11 University Cancer Center, specifically the Drug
12 Development Institute, the DDI, in Columbus, Ohio.
13     Q.   And I take it from your earlier
14 answers about opioid -- or opiate -- yeah, opioid
15 involvement, the OSU Cancer Center is not for
16 analgesia for cancer, but rather for actual treatment
17 for the underlying condition?
18     A.   Correct.
19     Q.   And what about Enlyton, same thing?
20 No -- no opioid or analgesic effect, but simply
21 projects that come up for whatever the medicines
22 involved are?
23     A.   Correct.
24     Q.   I saw -- let me show you, so you see
25 the same thing I see.

Page 28

1          (Exhibit No. 2 was marked.)
2  BY MR. SAMSON:
3      Q.   This is Exhibit 2 to your deposition.
4  And that's just me Googling you.
5      A.   Oh, yeah. Okay.
6      Q.   From LinkedIn. And then another hit
7  was with some outfit called Provident Partners.
8      A.   Yes.
9      Q.   What is Provident Partners?
10     A.   Provident Partners is a
11 Connecticut-based investment -- a company that looks
12 for investments in the -- in the energy, gas, water
13 area. And I'm an investor in Provident Partners, a
14 small investor.
15     Q.   And this had you on its page -- and
16 I'm sorry I didn't copy it -- but as, "Art Morelli,
17 expert in pharmaceutical finance."
18     Does Provident Partners do anything with any
19 kind of pharmaceuticals?
20     A.   Not today. But when I originally
21 invested, they were interested in a pharmaceutical
22 opportunity that helped patients comply and adhere to
23 their medication schedules. But that didn't
24 matriculate. So it's not existing anymore.
25     Q.   Was that the light or the beeper on

Page 29

1  top of the bottles?
2      A.   It was much more sophisticated than
3  that, but it's the same concept, yeah.
4      Q.   And are you still involved with
5  Provident Partners?
6      A.   Only as an investor.
7      Q.   Okay. What was your last date at
8  Mallinckrodt or Covidien? I will use Mallinckrodt,
9  but I mean, in your instance, based on where you were
10 working, Covidien?
11     A.   I think in 2011. Somewhere in the
12 year of 2011.
13     Q.   I will go over some documents later.
14 But if you will trust my memory.
15     A.   Okay.
16     Q.   There's a document in mid November
17 where you are telling your team, here's what we need
18 to do from -- for the rest of the year --
19     A.   Okay.
20     Q.   -- and now here's what we are going
21 to do. And it was Exalgo-based in the next, you
22 know, January through March.
23     And then I saw an email saying, not
24 good-bye, Art, but we loved seeing you, being with
25 you, like in late December. Does that give you any

Page 30

1  guidance?
2      MR. DAVISON: Objection to form.
3      THE WITNESS: I -- it doesn't really, no.
4      MR. SAMSON: Okay.
5      THE WITNESS: But I'm sure if you say it
6  happened, it happened. But I don't recall that.
7  BY MR. SAMSON:
8      Q.   But would the end of 2011, early 2012
9  be -- fit your memory of when you last worked there?
10     A.   It sounds about right. Yeah.
11     Q.   Okay. Did you meet with counsel for
12 Mallinckrodt to prepare for your deposition today?
13     A.   I did.
14     Q.   Okay. How many times?
15     A.   Twice.
16     Q.   And were those phone or in person?
17     A.   In person.
18     Q.   Here in San Diego?
19     A.   Yes.
20     Q.   And how long was the first meeting?
21     A.   About a day.
22     Q.   And I trust you were shown documents
23 at it?
24     A.   I was.
25     Q.   And then when was the second meeting?

Page 31

1      A.   Yesterday.
2      Q.   And in terms of timing, how long ago
3  was the first meeting?
4      A.   Mid December.
5      Q.   And when you say "a day," an
6  eight-hour session with counsel?
7      A.   Approximately, yes.
8      Q.   And then yesterday, how long did you
9  meet?
10     A.   About a day.
11     Q.   Another eight hours?
12     A.   Another eight hours, yes.
13     Q.   Were there any documents that you
14 were shown in that, that refreshed your independent
15 recollection of events back in the time frame?
16     A.   Yes.
17     Q.   Which ones?
18     MR. DAVISON: Objection. The documents that
19 we showed to Art are protected by the work product.
20     I'm not going to -- I'm going to instruct
21 you not to answer as to specific documents. If you
22 want to give him high-level categories, I will allow
23 that.
24     MR. SAMSON: We will have that battle later.
25     THE WITNESS: Okay.

Page 32

1  BY MR. SAMSON:
2      Q.   But are you going to follow that
3  instruction of your counsel?
4      A.   Absolutely. So the high level is, I
5  was shown a series of emails, some of which, you
6  know -- a series of email strings, some of which I
7  had an email within the string, some of which I
8  didn't. Some documents that we created as part of
9  the C.A.R.E.S. Alliance. And that's -- that's
10 basically it.
11     Q.   Other than counsel, in the time since
12 you left Mallinckrodt, have you met or spoken with
13 anyone about your time at Mallinckrodt?
14     A.   No.
15     MR. SAMSON: Okay. Now, you've got 2 in
16 front of you. Let me give you 2-A.
17     (Exhibit No. 2-A was marked.)
18 BY MR. SAMSON:
19     Q.   And this is a résumé that we received
20 today.
21     A.   Okay.
22     Q.   And is this something you did
23 yourself, I take it?
24     A.   I think someone did it for me,
25 actually.

Page 33

1      Q.   But it's current to the present?
2      A.   It's current, yes.
3      Q.   Okay. And both of these, 2 and 2-A,
4  show that your degree was a B.A. in biology from
5  Wabash College?
6      A.   Correct.
7      Q.   What year?
8      A.   1969.
9      Q.   And since a B.S. in biology usually
10 doesn't involve opioids, am I safe in saying that
11 that wasn't a focus of your education at Wabash?
12     A.   It was just a biology major and
13 chemistry minor. So it was heavy in science.
14     Q.   Okay. And then on 2-A, your résumé,
15 you say you did a business seminar for pharmaceutical
16 executives at UCLA Business School, Los Angeles,
17 California.
18     When was that?
19     A.   That would have been in the early
20 '90s.
21     Q.   Okay. And a seminar can extend from
22 a one-hour/one-day event to some sort of a
23 longer-lasting program. Which was this?
24     A.   They -- they were different. The
25 UCLA program was a two-day program.

Page 34

1    Q.    Okay.  And taught at UCLA?

2    A.    Yes.  Yes.

3    Q.    And in the early '90s, did it have

4 any focus on opioids?

5    A.    It did not.

6    Q.    And was it -- since it was for

7 pharmaceutical executives and also has business in

8 the title, was it more on the business end of

9 pharmaceutical industry?

10    A.    It was more on the analytical, on the

11 analytical aspects of pharmaceutical company

12 operations.

13    Q.    How one finds out if you're spending

14 more to produce the product that you're selling --

15    A.    No.

16    Q.    -- and that sort of thing?

17    A.    No.  It wasn't so much economics

18 based.  It was analytics related to product

19 development, product uptake, assessment of product

20 success, those kinds of things.

21    Q.    And then there's another, "Managing

22 Global Opportunities, U.S. and China," at the Harvard

23 Business School, a resident executive program.  When

24 did you take that?

25    A.    That was in the mid '90s.

Page 35

1    Q.    And, again, any focus or even mention

2 of opioids in that program?

3    A.    No.

4    Q.    And, again, length of time?  Is that

5 a whole semester or a day, two days?

6    A.    This was about a three-to-four-week

7 course that was taught at the Harvard -- in the

8 Harvard Business School and also in China.

9    Q.    And was the focus on

10 pharmaceutical -- when you hear China, you always

11 think of American companies thinking of opening

12 markets to the Chinese.

13    A.    Uh-huh.

14    Q.    Was that a focus of the program?

15    A.    It was --

16    MR. DAVISON:  Objection to form.

17    THE WITNESS:  It was part of the focus.  It

18 was how to -- how to operate, you know, either as a

19 company, a pharma company in China or in an export

20 relationship with a local partner in China.

21 BY MR. SAMSON:

22    Q.    And it was pharmaceutical based,

23 though?

24    A.    It was pharmaceutical based.

25    Q.    And I may have asked you this.  No

Page 36

1 opioid focus?

2    A.    No.

3    Q.    And then I have seen your

4 "Science-Based Approach to Risk Management" poster at

5 Pain Week Meeting in 2010.  And that would have been

6 the founding event of C.A.R.E.S.?  Did that come out

7 in conjunction with it?

8    A.    It was --

9    MR. DAVISON:  Objection to form.

10    THE WITNESS:  It was part of the prework,

11 predevelopment work for which tools would be

12 appropriate for inclusion into the C.A.R.E.S.

13 Alliance.

14    MR. SAMSON:  And, Ms. Court reporter,

15 C.A.R.E.S. is C, period, A, period, R, period, caps,

16 E, period, and then a small "S"?

17    THE WITNESS:  Big "S."

18    MR. SAMSON:  Big "S," period, and then

19 Alliance.

20    Q.    When I used that term, since you

21 picked it up that time without much trouble, I take

22 it that will be -- if I say C.A.R.E.S., you will know

23 I'm talking about the C.A.R.E.S. Alliance?

24    A.    I will.

25    Q.    All right.  Now, let's go to your

Page 37

1 work background, which I think tracks pretty well

2 between Exhibit 2, the LinkedIn, and 2-A, the résumé.

3 And both start with DuPont Pharmaceuticals in

4 Wilmington, Delaware.

5    A.    Right.

6    Q.    What were the drugs, the

7 pharmaceuticals that DuPont was selling in those

8 days?

9    A.    DuPont had a -- quite a broad range

10 of different products, from Coumadin, which you may

11 have heard of, which is for blood clots; Symmetrel

12 you may not have heard of, for influenza A and

13 Parkin-- -- Parkinsonian-like syndromes that people

14 can sometimes get; Percocet, which you've probably

15 heard of, which is an opioid, acetaminophen analgesic

16 compound; Percodan, you may not have heard of that,

17 but that's an oxycodone/aspirin combination.

18    And there were a few others, cough/cold type

19 products, but those were the main products that I

20 started with and cut my teeth on as an entry level

21 position into the pharmaceutical industry.

22    Q.    Okay.  And were you ever a detailer?

23    A.    I was.

24    Q.    Going out to physician offices?

25    A.    I did.  That's how I started.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1     Q.    And in that detailing work, did you
2 handle Percocet and Percodan?
3     A.    I did.
4     Q.    And the detailing side of marketing
5 and/or sales, however the company divides it, is
6 talking to the doctors and encouraging them to write
7 prescriptions for your company's products?
8     MR. DAVISON:  Objection to form.
9 BY MR. SAMSON:
10     Q.    True?
11     A.    It is. It's carrying a bag of
12 samples on the south side of Chicago. That's how I
13 started. And talking to doctors. If you want
14 a picture in your mind.
15     Q.    Got it. But --
16     A.    But no samples of Percocet.
17     Q.    You don't strike me as an imprudent
18 gentleman.
19     A.    Thank you.
20     Q.    So that does not surprise me.
21 But, basically, if you were -- were you not
22 selling Percodan and Percocet at the start on the
23 south side?
24     A.    I was. I was. I was talking to
25 doctors about those products, among other products.

Page 39

1     Q.    And explaining to them, here are the
2 uses of them, here is why they are better than
3 competitive product?
4     MR. DAVISON:  Objection to form.
5     THE WITNESS:  Not so much why they are
6 better from competitive products, but what the
7 indication was, what the dose is, what the data
8 supporting those products are. Because there were no
9 direct comparisons that we had, so we had to work
10 with what was the FDA-approved package insert.
11 BY MR. SAMSON:
12     Q.    Okay. And that stayed true the whole
13 time you were in the opioid space, was the package
14 insert for indications is a line you can't cross in
15 the detailing and marketing world?
16     A.    It is.
17     Q.    And then so, I take it, did you start
18 sometime earlier than 1990, then?
19     A.    I did. I started -- I started in
20 1990, actually -- I'm sorry. I started in 1980.
21 Yeah.
22     Q.    Okay.
23     A.    I didn't put it all on here because
24 it was too many pages. Yeah.
25     Q.    And how long were you in either that

Page 40

1 direct detailing end of things or still within pretty
2 much ordinary marketing of existing product?
3     MR. DAVISON:  Objection to form.
4     THE WITNESS:  So I was in that direct
5 detailing, that you described, for one to two years.
6 Then I was promoted to being a Hospital
7 Representative, also in Chicago. And I was a
8 Hospital Representative for three-ish -- three-ish
9 kind of years.
10     And then I became a District Manager in --
11 in Houston, Texas for a few years. Then I became a
12 District Manager of Hospital Representatives in South
13 Florida for one year. And then that picks up with
14 Director, Emerging Markets there in 1990. I was then
15 promoted into the home office for an international
16 sales and marketing position.
17 BY MR. SAMSON:
18     Q.    And in the hospital district manager
19 position in Florida, that would have been '89,
20 roughly?
21     A.    Roughly, yeah.
22     Q.    And what does a hospital-based
23 program rather than detailing at individual
24 physicians' offices or clinics, what's the difference
25 between those two?

Page 41

1     A.    So my team of sales representatives
2 visited institutions rather than doctors in their
3 offices and had -- did presentations and had
4 discussions with physicians who had a hospital-based
5 practice or were, you know, anesthesiologists who
6 operate -- you know, were in the operating room or
7 surgeons who were based in the operating room, rather
8 than family practice or general practice physicians
9 who were mainly office space.
10     Q.    And in 1989 in Florida, when you were
11 a DM of the hospital services, did you cover all of
12 Florida?
13     A.    Oh, I covered more than Florida.
14 Florida, parts of Georgia, parts of South Carolina.
15 Yeah.
16     Q.    In your time there, was there a
17 perception of an opioid epidemic in Florida and the
18 surrounding states?
19     A.    There was not.
20     MR. DAVISON:  Objection to form.
21     THE WITNESS:  There was not.
22 BY MR. SAMSON:
23     Q.    And at that time, since you would
24 have been familiar from your detailing work, was the
25 general rule of prescription of opioids per need?

Page 42

1    MR. DAVISON: Objection to form.
2    THE WITNESS: Are you talking about dosing,
3 p.r.n. dosing --
4    MR. SAMSON: Yes.
5    THE WITNESS: -- is that what you're asking
6 me?
7    MR. SAMSON: Uh-huh.
8    THE WITNESS: By some physicians, yes. Not
9 all.
10 BY MR. SAMSON:
11    Q.    Okay. And in the per-need era, there
12 was amongst physicians a fairly -- strike that.
13    Amongst physicians in that per-need period,
14 wasn't it true that physicians were reluctant to
15 prescribe opiates?
16    MR. DAVISON: Objection to form.
17    THE WITNESS: I can't comment on what all
18 physicians may have been thinking. But what I can
19 say is that p.r.n. dosing was often practiced by the
20 physicians that I spoke with, but not universally
21 practiced, as opposed to time-contingent dosing.
22 BY MR. SAMSON:
23    Q.    And one of the effects of per-need
24 dosing in general versus time contingent, is that in
25 the per-need model, there will generally be less

Page 43

1 milligrams of active molecule going to a patient in a
2 given period than when they are on it regular dose;
3 true?
4    MR. DAVISON: Objection to form.
5    THE WITNESS: Not necessarily true. Not
6 necessarily true. In an individual case, it could be
7 true or not true.
8 BY MR. SAMSON:
9    Q.    Okay. And why did you leave --
10 were -- when you were in emerging markets --
11    A.    Yes.
12    Q.    -- was that Percodan and Percocet --
13    A.    No.
14    Q.    -- or something else?
15    A.    Nonopioid products. All of our
16 nonopioid products.
17    Q.    Okay. And how about when you were
18 Director of New Product Planning, was that opioid
19 related or nonopioid?
20    A.    Nonopioid.
21    Q.    And then when you were Senior
22 Director of Marketing, was that opioid or nonopioid?
23    A.    Nonopioid.
24    Q.    Okay. Had Percocet and Percodan gone
25 elsewhere by then, or director of marketing just

Page 44

1 didn't do anything with them?
2    A.    It was a senior -- a Senior Director
3 of Marketing for the launch of a new product that I
4 was focused on. Percodan and Percocet were still
5 there, still products of the company, but I wasn't
6 involved with them.
7    Q.    And what was the new product?
8    A.    The new product was a drug for HIV,
9 Sustiva. First. And then it was a low molecular
10 weight heparin product for management of thrombosis.
11    Q.    Anticoagulation?
12    A.    Correct.
13    Q.    Okay. And then you went to Cardinal
14 Health here in San Diego?
15    A.    That's right.
16    Q.    In 2000?
17    A.    Right.
18    Q.    And what did you do after Cardinal
19 Health?
20    A.    So I was recruited to -- to join
21 Cardinal Health after 20 years at DuPont. And
22 Cardinal was developing a new business model to
23 partner up with Nascent, an emerging pharma and
24 biotech company, especially on the West Coast, in my
25 case. And Cardinal wanted to become more than just a

Page 45

1 drug distributor at that time. They wanted to become
2 a more integrated partner to provide other services
3 to the pharma industry, which would include, as it
4 says there, manufacturing unique dosage forms, sales
5 initiatives, marketing programs, et cetera. So that
6 was my job, to establish relationship with these
7 various companies.
8    Q.    Okay. And would that lead -- was the
9 hope that Cardinal, through a relationship, would
10 have a direct relationship with new drug company
11 that -- or new technology that came out and have a
12 favored position?
13    MR. DAVISON: Objection to form.
14    THE WITNESS: I'm not sure about a favored
15 position. I would say it's a more -- more broad and
16 in-depth relationship. You might say it is cross
17 selling. Yeah.
18 BY MR. SAMSON:
19    Q.    Okay. Was Cardinal distributing
20 opioids when you were there from 2000 to 2002?
21    A.    I assume, yes. But I wasn't involved
22 in the drug distribution part of Cardinal.
23    Q.    And so from your -- from what you
24 learned about opioids and how they were being used,
25 et cetera, did you gain any knowledge from -- at

Page 46

1 Cardinal from 2000 to 2002?
2      MR. DAVISON:  Objection to form.
3      THE WITNESS:  I gained knowledge, yeah.
4 BY MR. SAMSON:
5      Q.    And what was the knowledge you gained
6 during that time frame?
7      A.    Knowledge about all Cardinal's lines
8 of business.  But the one -- Cardinal's biggest line
9 of business, the one I was least involved with, is
10 the distribution business, a big distribution
11 business.  There's one other subcategory of
12 distribution that I was involved with, and that's
13 called third-party logistics.  That's a subset of
14 generalized drug distribution.
15      Q.    And what does that subset deal with?
16      A.    It deals with companies that are
17 small, emerging, that really aren't in a position to
18 establish a warehouse and distribution mechanism of
19 their own, so they -- they ask Cardinal to do it on
20 their behalf.  So Cardinal has a large warehouse
21 where they act as the company's warehouse and
22 distribution point.
23      Q.    Okay.
24      A.    Yeah.
25      Q.    And when you say "small companies,"

Page 47

1 small company's distributors or small company's
2 manufacturers, producers?
3      A.    Manufacturers, yeah.
4      Q.    And did you, in your time at DuPont
5 Pharmaceuticals, have anything to do with suspicious
6 order monitoring or order tracking, antidiversion?
7      A.    No.
8      Q.    Then you went to Elan
9 Biopharmaceuticals?  And where was that?
10      A.    Here in San Diego.
11      Q.    And was that a startup?
12      A.    No.
13      Q.    Okay.  It was established?
14      A.    Established.
15      Q.    Okay.  And you oversaw worldwide
16 operations, planning, for two lead pipeline products;
17 correct?
18      A.    Correct.
19      Q.    And one was Tysabri.  And is that
20 multiple sclerosis?
21      A.    That is multiple sclerosis.
22      Q.    And also a drug called Prialt in
23 pain?
24      A.    Right.
25      Q.    What was Prialt's active molecule?

Page 48

1      A.    Prialt was -- you're stumping me now.
2 I don't remember.  But it was a small peptide
3 injected through an implantable pump into chronic
4 pain patients.  It was a nonopioid adjunctive agent
5 to their pain management.
6      Q.    Do you recall, what was the risk
7 profile of Prialt?
8      MR. DAVISON:  Objection to form.
9      THE WITNESS:  Again, it's nonopioid.  So it
10 didn't have the opioid profile.  But it had certain
11 CNS side effects that frequently cropped up but were
12 manageable by better dosing, low dosing.  It was a
13 very, very low-dose drug.  It has to be accurately
14 dosed.  That's why that implantable intravenous pump
15 is the approach that -- that's used.
16 BY MR. SAMSON:
17      Q.    When -- I think when you were in
18 Mallinckrodt, but perhaps I'm wrong, they had an
19 intrathecal pump system; true?
20      MR. DAVISON:  Objection.
21      THE WITNESS:  Mallinckrodt.  I believe they
22 did, actually.
23 BY MR. SAMSON:
24      Q.    And was that opioid --
25      A.    It was nonopioid.

Page 49

1      Q.    -- in that instance?
2      That was a nonopioid?
3      A.    I believe it was nonopioid, yeah.
4      Q.    And in terms of the planning on the
5 campaign for -- had Prialt been launched before you
6 got there, or were you involved in the launch?  Since
7 it says "planning," it confuses me.
8      A.    I'm pretty sure I was involved in the
9 launch, yeah.  I definitely was involved in the
10 launch of Tysabri.
11      Q.    Okay.  And Tysabri, whatever great
12 effects it has on slowing the progression of multiple
13 sclerosis, it doesn't have anything to do with pain,
14 isn't used for pain?
15      A.    It's not indicated for pain.  Only
16 indirectly, if it would relieve symptoms.  But, no,
17 it's not -- it's not an indicated analgesic.
18      Q.    And in terms of launching Prialt, was
19 one of the features that you and Elan
20 Biopharmaceuticals presented to the target audience,
21 was that it was a nonopioid, so it didn't have the
22 opioid risks?
23      A.    Absolutely.  And it was opioid
24 sparing.  This is when -- the very beginning of the
25 opioid-sparing concept.

Page 50

1  Q.  And describe opioid sparing for me in
2  your terms?
3      A.  So to achieve -- achieve the goal of
4  therapy, which is analgesia, simplistically, you
5  could have two approaches.  One, dose opioids till
6  you reached analgesia; or, two, dose opioids plus an
7  adjunctive agent to reach analgesia with a lower
8  total dose of the opioid, which is always a goal of
9  therapy with opioids, is to achieve the goal of
10 therapy at the lowest possible dose.
11     Q.  And the thinking was at Elan, that
12 Prialt might be a stand-alone treatment, but
13 certainly if used with opioids, it would cause the
14 patient to need less opioids?
15     A.  Yes.
16     MR. DAVISON:  Objection.
17 BY MR. SAMSON:
18     Q.  And have you ever, in any of your
19 contacts with the opioid and pain space, found a
20 scientifically-supported idea that you believe in
21 that promotes the fact that somehow more opioids are
22 better --
23     MR. DAVISON:  Objection to form.
24 BY MR. SAMSON:
25     Q.  -- for a patient?

Page 51

1      MR. DAVISON:  Sorry.
2      THE WITNESS:  So unbridled, unbridled,
3  unlimited, more opioids are always better, is not
4  anything that anybody believes in today or really
5  practices today, as far as I know.
6  BY MR. SAMSON:
7      Q.  At some point was there such a
8  belief?
9      MR. DAVISON:  Objection to form.
10     THE WITNESS:  I don't really know what all
11 physicians did.  But it was more -- you might say it
12 was more common, based on the state of knowledge at
13 one point.
14 BY MR. SAMSON:
15     Q.  And when was that point?
16     A.  I can't recall exact.  But there's
17 been a shift in the thinking over -- over decades,
18 quite frankly.  A couple decades, yeah.
19     Q.  Well, when you were in the 1990s, we
20 were talking about per-need dosing --
21     A.  Right.
22     Q.  -- which -- and you said you couldn't
23 answer for all physicians, but physicians were a bit
24 leery of opioid usage for pain; true?
25     MR. DAVISON:  Objection to form.

Page 52

1      THE WITNESS:  I would say that physicians
2  are clearly concerned about the safety of their
3  patients, number one.  The FDA mandate is safety,
4  number one.
5      So all the responsible people, all the
6  adults in the room, put patient safety first.  And if
7  it's good enough for the FDA, it's good enough for
8  me.
9  BY MR. SAMSON:
10     Q.  Okay.  And you didn't notice from the
11 '90s through when you left Mallinckrodt, that, in
12 general, a lot more opioids were being used in the
13 pain space?
14     MR. DAVISON:  Objection to form.
15     THE WITNESS:  I don't have the data.  But
16 my -- my -- my belief is, yes.
17 BY MR. SAMSON:
18     Q.  So something was moving the medical
19 market, physicians, prescribers, because nobody can
20 get an opioid without a prescriber writing a script
21 for it; true?
22     MR. DAVISON:  Objection to form.
23 BY MR. SAMSON:
24     Q.  Before and after --
25     A.  Legally, yes.

Page 53

1      Q.  So that's not -- well taken.
2      A.  Yeah, the -- what was -- I will wait
3  for you to ask the next question.
4      Q.  Sure.  But at some point the
5  reluctance to prescribe opiates decreased; true?
6      MR. DAVISON:  Objection to form.
7      THE WITNESS:  I'm not sure.  Perhaps.  But I
8  wouldn't characterize it that way.
9  BY MR. SAMSON:
10     Q.  How would you characterize it?
11     A.  I would characterize it as the --
12 there was more of a recognition of patient pain,
13 chronic pain.  Patient chronic pain was becoming more
14 the incidence, and prevalence of chronic pain was
15 increasing.
16     You have got to remember, we're talking
17 about a fairly long period of time.  So you have an
18 aging population.  You have people with greater
19 incidence and a better understanding of the diagnosis
20 of chronic pain, and patients presenting to
21 physicians with the diagnosis of chronic pain.  That
22 pain is debilitating.  That pain is crushing to those
23 patients.  And physicians are going to meet the needs
24 of their patients, but in the context of safe
25 provision of therapy.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.    And do you believe that in, say, 2006
2 till you left in 2000- -- left Mallinckrodt in the
3 end of 2011, the balance had swung to where too many
4 opioids were being used, regardless of the underlying
5 pain?
6    MR. DAVISON:  Objection to form.
7    THE WITNESS:  Maybe in some cases.  I don't
8 really know.  But I can tell you this.  That during
9 the period that you -- the time period that you
10 identified, I, quite frankly, didn't follow what the
11 sales were, nor did I care.
12    What I cared about is whatever
13 prescriptions, opioid prescriptions that physicians
14 were going to write, that they were done in the
15 safest, most conservative possible way, and that
16 patients were treated -- their pain was treated
17 holistically, not papering over their problems with
18 more and more opioids.
19    Because, remember, pain is not a disease.
20 It's a symptom.  And it's a very potent symptom for a
21 patient to have to deal with, when you consider
22 disability, activities of daily living, their ability
23 to work, go to school, et cetera, et cetera.  So to
24 be able to put these patients in a -- in a better
25 situation where they can function in life without

Page 55

1 being debilitated by their pain or debilitated by
2 their opioid.  So it takes a very holistic,
3 systematic approach for physicians to be able to
4 provide that type of therapy.  It goes beyond just
5 writing more prescriptions.
6 BY MR. SAMSON:
7    Q.    Say I agree with you in terms of that
8 perfect system that you described.  For some reason
9 there were more and more opioid prescriptions being
10 written in that 200- -- 2000, early 2000s to the time
11 you left Mallinckrodt; true?
12    MR. DAVISON:  Objection to form.
13    THE WITNESS:  I don't doubt it.  But I don't
14 have the data.  I don't doubt it.
15 BY MR. SAMSON:
16    Q.    Okay.  Now let's move us to Solstice
17 Neuroscience in San Francisco.  This is the Botulinum
18 Type B?
19    A.    It is.
20    Q.    And you were a co-founder?
21    A.    I was.
22    Q.    And from 2004 to 2009, I'm assuming
23 you were not in the pain space?
24    A.    I was not.
25    Q.    And was the Botulinum -- Botulinum

Page 56

1 Toxin in play here being used for plastic surgery
2 effects or some deeper medical problems, or both?
3    A.    Deeper medical problems, not -- not
4 facial cosmetics.
5    Q.    Okay.  And what was the -- what was
6 Myobloc being developed for or imported to treat?
7    A.    A condition called cervical dystonia,
8 which is a contraction of muscles on one side of the
9 neck that causes patients to have their head in a
10 tilted position, and is very, very painful.
11    Q.    And since Botulinum is a -- actually
12 a muscle effective drug, putting it in would break
13 the cycle?
14    A.    That's the -- that's the intent, yes.
15    Q.    Okay.
16    A.    It's a paralytic agent, actually.
17    Q.    And so I'm confused.  Was it -- was a
18 cervical dystonia patient having constant contraction
19 of one side or the other of their cervical
20 musculature?
21    A.    Yes.  They would have an asymmetric
22 contraction of neck muscles on one side.  They would
23 walk around like this, in excruciating pain.  So you
24 would -- the physician would inject those muscles
25 with -- with bochalinum toxin, the muscles would

Page 57

1 gradually relax, and the patient's head would come
2 back to a more neutral position, close to if not
3 completely neutral.  And then the toxin wears off in
4 about 12 weeks, so the patient's condition would
5 return.  They would have to go back in for another
6 injection.  And they get cycled like that.
7    Q.    And is the pain simply from the
8 release -- or the pain relief simply from the release
9 of the contract -- constantly contracted muscles?
10    A.    I believe so.
11    Q.    As you guys understood it?
12    A.    As we understood it, yes.
13    Q.    Okay.  And then that lasted till
14 2009.  What ended the Solstice Neurosciences chapter
15 of Art Morelli's life?
16    A.    I founded the company.  I got the
17 commercial operations of the company going.  I raised
18 the money to -- I raised over $40 million of venture
19 capital money to get the company started.  That
20 product was a spin-out of Elan.
21    So I figured I had done my work.  I had no
22 further interest in working with the venture
23 capitalists that funded our company.  And so I left
24 the company, and then I joined -- I joined
25 Mallinckrodt --

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.    Did that --
2    A.    Cov- --
3    Q.    I'm sorry.  Go ahead.
4    A.    Covidien.
5    Q.    The fact that your other deposition
6  in life was about, I'm assuming, something to do with
7  the stock, the trademarks, whatever it is, of
8  Solstice, tells me something didn't go all that
9  happily as -- after you left or at the time you were
10  leaving?
11    A.    My --
12    MR. DAVISON:  Objection to form.
13    THE WITNESS:  -- resignation had nothing to
14  do with the deposition.
15  BY MR. SAMSON:
16    Q.    Okay.  And then you were simply a
17  fact witness to -- why were you at the deposition?
18    A.    I don't really know.  But I -- it was
19  about the intellectual property rights.  That's what
20  I remember.
21    Q.    Did you have an interest in the
22  intellectual property rights either asserted or
23  actual?
24    A.    Yes.  Because I was a stockholder in
25  the company.

Page 59

1    Q.    Okay.  And were you a plaintiff in
2  that suit that you got deposed in?
3    A.    A defendant.
4    Q.    A defendant?
5    A.    Yeah.
6    Q.    And what was the end result?
7    A.    It didn't resolve while I was there.
8  But subsequently I believe it resolved amicably in
9  some way.  But I don't know the details.
10    Q.    Okay.  All right.  So how did you
11  come to be hired by Covidien, slash, Mallinckrodt?
12    A.    I was recruited by the CEO at the
13  time.
14    Q.    Who was the CEO?
15    A.    Tim Wright.
16    Q.    How does he spell his name?
17    A.    W-r-i-g-h-t.
18    Q.    And did you and Mr. Wright have past
19  dealings?
20    A.    We did.  We worked at a couple
21  companies together.
22    Q.    A couple of the ones we've gone
23  through?
24    A.    Yes.
25    Q.    Which ones?

Page 60

1    A.    DuPont and Cardinal Health.
2    Q.    And did you approach Mr. Wright since
3  you were getting out of Solstice, or did Mr. Wright
4  approach you?
5    A.    I approached him.
6    Q.    And did you come to him with a --
7  some Covidien-specific vision or simply, I'm no
8  longer working here; do you have a spot for me?
9    A.    I would say it's somewhere in
10  between.  I came to him with a -- you know, proposed
11  that added to the senior management team, I would add
12  value to the company in a potential variety of ways.
13    Q.    Okay.
14    A.    Yeah.
15    Q.    Give me the variety of ways that you
16  would have told Mr. Wright you saw as potential
17  advantages to Covidien taking you on.
18    A.    Marketing.  Operations.  Improvement
19  in efficiencies.  That type of thing.
20    Q.    Okay.  And for a non-businessman like
21  me, marketing is devising strategies and tools to
22  increase a company's sales; is that true?  Or how
23  would you define it?
24    MR. DAVISON:  Objection to form.
25    THE WITNESS:  So marketing is a -- is a

Page 61

1  discipline where you -- it's definitely strategic,
2  where sales is tactical.
3       Marketing creates programs and projects,
4  initiatives that position products, educate
5  health-care providers on products, and, you know,
6  create -- create an environment where health-care
7  professionals, you know, desire to learn more about a
8  product and pique their interest on a product.
9  BY MR. SAMSON:
10    Q.    Okay.  And then what does sales do?
11    A.    Sales sells.  So sales drives
12  prescriptions.
13    Q.    Okay.
14    A.    New prescriptions, more
15  prescriptions, et cetera.
16    Q.    And the two, marketing and sales,
17  work together to hopefully increase the sales of a
18  company's whole line or specific products within the
19  company's line?
20    A.    Hopefully they work together.
21    Q.    Okay.  Operations.  What was
22  operations, when you said that was something you
23  thought you might bring to the Mallinckrodt table?
24    A.    It's kind of a catchall term.  It
25  could be a variety of things in various departments.

Page 62

1  I mean, I -- I've always been kind of a problem
2  solver. I'm a person that can analyze a situation
3  and create a plan for improvement if there are
4  problems, or just improvement if there aren't
5  problems.
6       And when I started there, I started in the
7  imaging agents' business, which was, you know,
8  faltering significantly. And I helped them for
9  awhile before getting into the Medical Affairs.
10      Q.   So is operations divorced from
11 marketing and sales and, say, product development on
12 the other side of things, or not?
13      A.   It could involve all those things or
14 some of those things, yeah.
15      Q.   Okay. And what about operations in
16 terms of how do we -- how do we produce "X" million
17 generic oxycodone tablets; is that operations or
18 manufacturing?
19      A.   That would be manufacturing.
20      MR. DAVISON: Objection to form.
21      THE WITNESS: Which, you know, I -- I'm not
22 a manufacturing guy. So I would have no idea how to
23 do that better. Yeah.
24 BY MR. SAMSON:
25      Q.   Okay. So -- and then improvements in

Page 63

1  efficiencies, that's a goal that could apply to
2  either our operations or marketing?
3       A.   It could.
4       Q.   Okay. Did you have some separate,
5  from operations or marketing, idea about improvement
6  in efficiencies when you gave that as a third
7  strength?
8       A.   I had absolutely no idea what they
9  needed in terms of operational efficiencies, but that
10 would have happened if I would have been engaged in
11 that particular area, which I wasn't.
12      Q.   Okay. And then Exhibit 2 --
13      MS. GAFFNEY: That would be 3.
14      MR. SAMSON: Oh, that's right. That would
15 be 3.
16      THE WITNESS: I've got a 2 here.
17      MR. SAMSON: You're right. We had a --
18 William screwed up our numbering system.
19      MR. DAVISON: I'm just trying to make your
20 life difficult here.
21      MR. SAMSON: But the résumé did help.
22      This is 3.
23           (Exhibit No. 3 was marked.)
24 BY MR. SAMSON:
25      Q.   Okay. This is -- what you have now

Page 64

1  is Exhibit 3. And this is a consultancy agreement.
2       So you were hired as a consultant?
3       A.   I was initially, yes.
4       Q.   And it says, if you turn to the very
5  last page, Exhibit 8, "Scope of Work." You will
6  perform leadership abilities, and in the area of
7  North American sales and marketing for the imaging
8  solutions business, and also provide expertise and
9  guidance to the imaging logistics function as
10 required.
11      A.   Correct.
12      Q.   And the imaging side -- was the
13 imaging in Covidien, too, or was it not part of
14 Covidien?
15      A.   It was part of it, yeah.
16      Q.   Okay. And this is CT and
17 radiographic imaging --
18      A.   Contrasting.
19      Q.   Contrasting, dyes?
20      A.   Dyes, contrast agents, et cetera.
21      Q.   And you said it was -- I forget the
22 term -- not in healthy shape?
23      A.   Not in healthy shape. It was going
24 down.
25      Q.   Why was that?

Page 65

1       A.   It's a long-term problem that they
2  had, where they did not really invest enough in the
3  business over a period of years to enhance their
4  product line enough to -- to continue as a growing
5  business. So they were being surpassed by
6  competitors who were investing in their imaging
7  products.
8       Q.   And you took up that work on May 1,
9  2009?
10      A.   Uh-huh.
11      Q.   Is that a "Yes"?
12      A.   Yes. That's a yes. I'm sorry.
13      Q.   And did you -- where was imaging
14 headquartered? St. Louis?
15      A.   St. Louis.
16      Q.   Did you move to St. Louis?
17      A.   I did. Not right away, but I did.
18 When I transitioned from a consultant, which was
19 this, to a full-time employee, I was required to move
20 to St. Louis, which I did.
21      Q.   Okay. And then -- so you worked --
22 and I'm going to show you -- I think that was October
23 26, was your -- of 2009, was your -- somewhere around
24 there was your actual hire date --
25      A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q.    -- as a nonconsultant.
2    So from May 1 through end of October of
3    2009, you worked on the imaging side?
4    A.    I did.
5    Q.    And did you have any contact with the
6    pain space at Covidien during that time?
7    MR. DAVISON:  Objection.
8    THE WITNESS:  I did not.
9    BY MR. SAMSON:
10    Q.    And how did things go?
11    MR. DAVISON:  Objection.
12    BY MR. SAMSON:
13    Q.    In terms of --
14    MR. DAVISON:  Sorry.
15    BY MR. SAMSON:
16    Q.    -- your impact on the imaging
17    business?
18    MR. DAVISON:  Objection to form.
19    THE WITNESS:  I think it was -- I would
20    characterize it as a bit shocking to them, what I
21    laid out and proposed.  And it wasn't a quick fix
22    type of approach, which is what they wanted.  But the
23    patient was too far gone at that point.  And what I
24    recommended, they were not willing to do.  And they
25    eventually divested the business.

Page 67

1    BY MR. SAMSON:
2    Q.    What were your recommendations in
3    global, you know, 30,000-foot?
4    A.    There were some -- I characterize it
5    as bottom-up types of recommendations to kind of
6    improve the day-to-day, and some top-down
7    recommendations to kind of improve it as a strategic
8    level.
9    They were very interested in the bottom up,
10    but they were not interested in the top down.  And
11    they didn't really -- they weren't comfortable making
12    investments in that business at that time.  And they
13    eventually divested the business.
14    Q.    And was imaging a place in which
15    there was competition to come up with new products,
16    or was it more, how do we keep our product with its
17    current market share and hopefully grow it?
18    A.    It was both.
19    Q.    Okay.  And were there any new
20    products in the pipeline in imaging, when you
21    started?
22    A.    Not that I recall.  If there were,
23    they were minor.
24    Q.    And none when you left?
25    A.    Not that I recall.  If there were,

Page 68

1    they were very minor.
2    MR. SAMSON:  Okay.  And then let's do No. 4,
3    and then I think we will probably be about ready for
4    a break.
5    MR. DAVISON:  That would be perfect.  I was
6    about to suggest that after this exhibit.
7        (Exhibit No. 4 was marked.)
8    BY MR. SAMSON:
9    Q.    And go ahead and review this,
10    Mr. Morelli.  I will apologize.  I didn't find a
11    traditional actual offer letter or agreement in your
12    personnel file.  But I did find this letter from --
13    or email strand from Lisa Britt and Herb Neuman about
14    hiring you.
15    First of all, let me ask you, in what we've
16    been through today, have I managed to get out any
17    meaningful experience you had in the pain space up to
18    being hired at Covidien as an employee?
19    MR. DAVISON:  Objection to form.
20    BY MR. SAMSON:
21    Q.    Did I miss anything?
22    A.    I will say you hit the high spots,
23    yeah.
24    Q.    Okay.
25    A.    Yeah.

Page 69

1    Q.    And that was pretty much Percodan and
2    Percocet at DuPont, and a nonopioid intrathecal at --
3    I forget which one of the companies.
4    A.    Elan.
5    Q.    Elan.
6    A.    No, there was one other one.  Because
7    it's not a controlled substance, it probably didn't
8    catch your eye.  But it's a product named Nubain
9    nalbuphine hydrochloride.  That was a Dupont product.
10    THE REPORTER:  What was the name again?
11    A.    Nubain, N-u-b-a-i-n, nalbuphine
12    hydrochloride.  That was an injectable analgesic, for
13    moderately severe to severe pain, used mainly in the
14    hospital, postoperative or intraoperative use.  But
15    it was a noncontrolled substance, but it was quite
16    potent.
17    And I was involved with sales and marketing
18    of that, basically, around the world.
19    Q.    And what --
20    A.    And that was dealing with
21    anesthesiologists and surgeons.
22    Q.    What class of drugs does Nubain fit
23    into it?  It's not an opioid; true?
24    A.    It would compare to -- compete with
25    and compare to morphine, a controlled substance, but

Page 70

1  Nubain was a noncontrolled substance.
2      Q.    And why was it noncontrolled if it --
3  are you saying its effects compared to morphine?
4      A.    Its efficacy.  Its pain-relieving
5  ability compared to morphine, but it didn't produce
6  the euphoria.
7      Q.    Okay.  Which reduced its risk, even
8  if it wasn't only used in hospital, of diversion and
9  abuse?
10     MR. DAVISON:  Objection.
11     THE WITNESS:  Absolutely.
12 BY MR. SAMSON:
13     Q.    And -- but I mean, do -- the opioids
14 all work with certain receptors?
15     A.    They do.
16     Q.    Ibuprofen and the rest of the NSAIDS
17 work with different receptors or the same receptors?
18     A.    Uh-huh.
19     Q.    What was nalbuphine doing in the body
20 to provide pain relief?
21     MR. DAVISON:  Objection to form.
22     THE WITNESS:  It was generally believed to
23 be a kappa agonist as opposed to a mu agonist, which
24 the -- you know Class 2 and 3 and morphine, and those
25 drugs, tend to be agonists at mu receptor.

Page 71

1      Morphine -- I mean nalbuphine was actually
2  an antagonist at the mu receptor, an agonist at the
3  kappa receptor.  That was the belief at that time.
4  BY MR. SAMSON:
5      Q.    Was nalbuphine ever a drug in which
6  abuse was a worry?
7      MR. DAVISON:  Objection to form.
8  BY MR. SAMSON:
9      Q.    Abuse by the patient?
10     MR. DAVISON:  Same objection.
11     THE WITNESS:  Quite the opposite.  If a
12 person who is tolerant or addicted on a morphine-like
13 drug would receive nalbuphine, it would precipitate
14 withdrawal because of the antagonistic effect at the
15 mu receptor.
16 BY MR. SAMSON:
17     Q.    Okay.  And, basically, pain relief,
18 no high?
19     MR. DAVISON:  Objection to form.
20     THE WITNESS:  Basically.
21 BY MR. SAMSON:
22     Q.    Okay.  Back to your letter.
23     A.    Right.
24     Q.    No. 4.  It appears you're being hired
25 into Medical Affairs at Mallinckrodt?

Page 72

1      A.    Correct.
2      Q.    Had you ever served in a Medical
3  Affairs Division, or whatever the correct subunit is,
4  of any other pain space company?
5      A.    No.
6      Q.    And from some documents we will look
7  at later -- or, here, let me give it to you right
8  now.  Can I have 5 -- what will now be 5, Allison.
9          (Exhibit No. 5 was marked.)
10         (Witness reviewing document.)
11 BY MR. SAMSON:
12     Q.    Had a chance to get through it?  As I
13 understand it, this was actually from a presentation
14 in 2011.  But I want you to turn to the second inside
15 page there.  Oops.  Too far.
16     A.    This one?
17     Q.    No, the one that --
18     A.    This one.
19     Q.    -- has the slide on, "Role on Medical
20 Affairs."
21     A.    Oh, I got it.  Okay.
22     Q.    When you joined Covidien's Medical
23 Affairs Department, was it your understanding that
24 Medical Affairs was responsible for providing
25 accurate medical and scientific information about

Page 73

1  Mallinckrodt products to the marketing and sales
2  staff based on, quote, evidence-based best practices
3  in health care, end quote?
4      A.    Yes.
5      Q.    So that was there before you, as
6  the --
7      A.    I'm not sure of the timing of all of
8  this.  But, yes, I believe that was the belief.
9  Knowing Herb Neuman like I do, I believe that's what
10 he believes.
11     Q.    And Mr. Neuman was the head of
12 Medical Affairs the entire time you were there?
13     A.    Chief Medical Officer, yes.
14     Q.    And is he an MDL or a Pharm.D, or
15 what's his medical qualification?
16     A.    MD, MBA.
17     Q.    And that, I take it from earlier
18 answers, suited Art Morelli, that we were going to
19 only act on evidence-based best practices in health
20 care to a tee?
21     A.    Yes.
22     Q.    Because, as you talked about both the
23 effects of pain and the potential poor effects of
24 opioids, you want to know what the drug is going to
25 do based on evidence, not guesswork, and you want to

Page 74

1   know what the risks are based on evidence and
2   guesswork, and you want to know how effective it is
3   based on evidence, not guesswork?
4           MR. DAVISON: Objection to form.
5           THE WITNESS: So, yes, but that's
6   incomplete. It's available evidence. It's good
7   evidence. It's reliable evidence. It's validated
8   evidence as opposed to anecdotal evidence, belief, or
9   practice.
10          And the bottom line on what is considered or
11  what is considered usable evidence by a
12  pharmaceutical company is what the FDA approves. If
13  the FDA doesn't adjudicate it, you really can't --
14  the marketing and sales organizations really can't
15  use evidence that hasn't been adjudicated by the
16  agency.
17          THE VIDEOGRAPHER: Sorry, Counsel. I just
18  got an email saying that people on the phone can't --
19  are disconnected or can't hear.
20          MR. SAMSON: Shall we take a break?
21          MR. DAVISON: Yes, let's take a break.
22          MR. SAMSON: We are getting close.
23          THE VIDEOGRAPHER: Off the record. The time
24  is 10:40 a.m.
25          (Recess taken.)

Page 75

1           THE VIDEOGRAPHER: We are back on the
2   record. The time is eleven o'clock a.m.
3   BY MR. SAMSON:
4       Q.   Mr. Morelli, let me ask you a couple
5   catch-up questions. First of all, you were talking
6   about DuPont having Percocet and Percodan?
7       A.   Yes.
8       Q.   Branded drugs?
9       A.   Yes.
10      Q.   At some point were they -- those
11  brands sold to Endo, or was Endo a division or some
12  other relative of DuPont?
13          MR. DAVISON: Objection to form.
14          Object to form.
15          THE WITNESS: I believe at one point DuPont
16  did divest some products to Endo in the very early
17  stages of Endo, yes. But I was not involved with
18  that at all.
19  BY MR. SAMSON:
20      Q.   Okay. And then let me ask you to
21  return to Exhibit 4 for just a second. And the
22  second page.
23      A.   Okay.
24      Q.   And you see here that Ms. Britt lists
25  the -- that wants to start you as early as Monday --

Page 76

1       A.   Oh, wait a second.
2       Q.   -- with the following non-negotiable
3   offer criteria.
4       A.   Yes.
5       Q.   Okay. Your base pay as
6   Vice President of Medical Affairs was going to be
7   ████?
8       A.   Correct.
9       Q.   And is that what it became even
10  though --
11      A.   That's what I started with, yes.
12      Q.   Okay. And did it go up from there
13  during your time at Covidien?
14      A.   It did.
15      Q.   Okay. When?
16      A.   Each year.
17      Q.   And by how much?
18      A.   In the three, four percent range, in
19  terms of base pay increases each year.
20      Q.   Okay. And then what does the
21  25 percent max at 15 no guarantee bonus opportunity
22  line refer to?
23          MR. DAVISON: Objection to form.
24          THE WITNESS: That's considered variable --
25  variable compensation, compensation that you are not

Page 77

1   guaranteed, but you may be able to achieve based on
2   performance or ability to achieve the objectives that
3   you were given in the context of the company's, you
4   know, financial health.
5   BY MR. SAMSON:
6       Q.   Okay. And does 25 percent bonus
7   opportunity, what -- what's max at 50? 50,000 or --
8       A.   Fifty percent.
9       Q.   Okay. So it could go --
10      A.   Of your base.
11      Q.   So it go from 25 to 50 percent?
12      A.   Right.
13      Q.   And no part of that scale was
14  guaranteed?
15      A.   Correct.
16      Q.   Okay. And did you get a bonus in
17  2009?
18      A.   I got -- I believe I got a bonus
19  every year I was on salary. You know, not as a
20  consultant, obviously. But yes.
21      Q.   And what was -- is there a fiscal
22  year for Covidien?
23      A.   It was a fiscal year.
24      Q.   And what was the start and end date?
25      A.   The start was -- April 1st was the

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  start, and March 31st was the end.
2      Q.   So you would have been in the program
3  roughly half a year --
4      A.   Yeah.  I think it was time adjusted.
5      Q.   -- in 2009?
6      MR. DAVISON:  Let him finish his question.
7      THE WITNESS:  Oh, I'm sorry.
8  BY MR. SAMSON:
9      Q.   In 2010 did you get a bonus?
10     A.   I did.
11     Q.   And was it 25 percent or more?
12     A.   My recollection is I maxed out on it
13  every year I was there.
14     Q.   Okay.
15     A.   Yeah.
16     Q.   So same answer for 2011?
17     A.   Yeah.
18     Q.   And were you told every year why you
19  got it?
20     A.   I was.
21     Q.   Okay.  And part of it, you said, was
22  overall company performance?
23     A.   So overall company performance would
24  create a pool of money.  And then the allocation of
25  those funds to individuals as part of their incentive

Page 79

1  comp would be based on their individual performance.
2      Q.   And I take it Mr. Neuman would have
3  judged your performance and then given you what, if
4  anything, he thought was yours from the bonus pool?
5      A.   Correct.
6      Q.   Was the pool set by a given
7  percentage, like profit, "X" percent of?
8      A.   I don't know.
9      MR. DAVISON:  Objection to form.
10  BY MR. SAMSON:
11     Q.   Okay.  Now, let's go back to
12  Exhibit 5.  And I've got it as page 3.  So it will
13  probably be on the front of -- it's a slide, "Medical
14  Affairs:  Key Players in Clinical Content."
15     A.   Yes.
16     Q.   And clinical content, what did that
17  mean on this slide?
18     MR. DAVISON:  Objection to form.
19     THE WITNESS:  It means the content that
20  was -- the content areas that various people were in
21  charge of.
22  BY MR. SAMSON:
23     Q.   And since this presentation is
24  called, "Field Sales Force Clinical Education" --
25     A.   Right.

Page 80

1      Q.   -- this would be the sector of field
2  sales force clinical instruction that each person or
3  each group here was responsible for?
4      A.   Right.  Yes.
5      Q.   And you are there.  And then
6  underneath you are the PPS Team, which I found
7  elsewhere as being pharmacovigilance and patient
8  safety team?
9      A.   Not pharmacovigilance.
10  Pharmacovigilance was Eddie Darton.
11     Q.   Okay.
12     A.   This was the Patient and Product
13  Safety Team, PPS.
14     Q.   Okay.  And in terms of both
15  teaching -- and would these be educating the sales
16  force, this presentation?
17     A.   It would be primarily new sales
18  representatives.
19     Q.   Does the evidence-based goal apply to
20  that function as well?
21     A.   Yes.
22     Q.   Okay.  And evidence base we
23  discussed, is scientifically and medically supported
24  by the evidence, real evidence, whether or not that
25  evidence reaches the conclusion that Covidien or Art

Page 81

1  Morelli may want to have it reach?
2      A.   Right.
3      MR. DAVISON:  Objection to form.
4  BY MR. SAMSON:
5      Q.   And basically do you believe that
6  statements made by Mallinckrodt about its products
7  should be judged by that standard?
8      MR. DAVISON:  Objection to form.
9      THE WITNESS:  Generally, yes.
10  BY MR. SAMSON:
11     Q.   Are there exceptions, where you would
12  abandon scientific/medical evidence or consensus and
13  just go by what would be a good thing to say about
14  the drug?
15     MR. DAVISON:  Objection to form.
16     THE WITNESS:  I can't think of any right
17  now.
18  BY MR. SAMSON:
19     Q.   So what did the Patient and Product
20  Safety Team entail in this side of clinical content?
21     A.   So we were -- my team, that was about
22  six, seven, or so people in that PPS Team, had the
23  responsibility of conceptualizing, creating,
24  submitting, and implementing the Exalgo REMS.  That
25  was job number one.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Number two, that same function for the
2 C.A.R.E.S. Alliance.
3    Number three was the publications --
4 publications team.
5    Number four was the investigator-sponsored
6 research team.
7    And the fifth one was the -- a program that
8 I created and initiated, was the Medical Affairs
9 Internal Lecture Series. So our team did all of
10 those things.
11    Q.    When did you start the Medical
12 Affairs internal lecture -- lecture series?
13    A.    Sometime early in my career in
14 Medical Affairs there, yeah.
15    Q.    Okay. So maybe in the last three
16 months of 2009, maybe in early 2010?
17    A.    Maybe, yeah.
18    Q.    Okay. Is -- at Mallinckrodt would
19 there be a list of what the Medical Affairs lecture
20 series consisted of?
21    A.    Yes.
22    MR. DAVISON: Objection to form.
23 BY MR. SAMSON:
24    Q.    How often were the lectures
25 presented?

Page 83

1    A.    Quarterly.
2    Q.    And what were the topics, as you
3 remember them now?
4    A.    They were a range of topics. Drug
5 addiction was a topic. I'm just -- the ones that I
6 remember, musculoskeletal pain was a topic. And
7 there were others. I can't think right now.
8    But these lectures were conducted on-site at
9 the corporate headquarters. They were videoed. And
10 those videos were made available to people who
11 couldn't attend.
12    Q.    And who were the invitees?
13    A.    The company at large. Anybody.
14    Q.    Okay. So it wasn't -- it was Medical
15 Affairs giving the lectures, but not giving them --
16    A.    Or sponsoring them. Sponsoring them.
17 We didn't give them, no. Outside experts,
18 physicians, scientists gave the lecture. We did not.
19    Q.    Okay. And then the sponsored
20 research component?
21    A.    What is that?
22    Q.    Yes.
23    A.    So various physicians, scientists,
24 would submit proposals of studies that they wanted us
25 to fund. We would evaluate which ones we were going

Page 84

1 to fund and which ones we weren't, because we
2 received far more than we were able to fund. And the
3 ones that we funded, we provided financial support to
4 the investigator to conduct those studies.
5    Q.    And in the time period where you were
6 on the Medical Affairs team, what percentage of those
7 submissions for possible funding were related to the
8 opioid pain space?
9    A.    There were -- there were some. There
10 were some, definitely. Yeah, I can't remember the
11 number.
12    Q.    Some 80 percent or some --
13    A.    Oh, no. I would say --
14    Q.    -- 20 percent?
15    A.    I would say about -- about
16 50 percent, I would say.
17    Q.    And of the however -- what would
18 50 percent, during your time there, of the opioid
19 pain space submissions be in a number, just a --
20    A.    Like number of studies?
21    MR. DAVISON: Objection.
22 BY MR. SAMSON:
23    Q.    Yes. Proposed studies.
24    A.    Yeah. How many would we receive?
25    Q.    Yes.

Page 85

1    A.    We might receive 20 or 30 proposed.
2 And we would fund maybe three to five, that kind of
3 number. That kind of range.
4    Q.    And although I'm not going to run you
5 through it today, I assume that somewhere at
6 Covidien/Mallinckrodt, there will be a budget for --
7    A.    There was a budget.
8    Q.    -- that line item?
9    MR. DAVISON: You've got to let him finish
10 the questions.
11    THE WITNESS: Okay. I'm sorry.
12 BY MR. SAMSON:
13    Q.    So we can see which ones were funded
14 and to what degree?
15    MR. DAVISON: Objection to form.
16    THE WITNESS: I don't know. Probably.
17 BY MR. SAMSON:
18    Q.    Okay. Carolinas we will talk about
19 and Exalgo REM we'll talk about.
20    A.    Okay.
21    Q.    Are those the major four functions
22 that Art Morelli and his PPS Team were involved in
23 during the entire time you were at Covidien as an
24 employee?
25    A.    I think it was five. But those were

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 the ones, yeah.
2     Q.    I got medical --
3     A.    Exalgo REMs.
4     Q.    Oh, okay, you are right.  It is five.
5     A.    Yeah.
6     Q.    We talked about three of them, and
7 then REMS and the other two.  That does add up to
8 five.
9     Was there anyone on your PPS Team that had
10 an MD degree?
11     A.    No.
12     Q.    Anyone on your PPS Team that had
13 hands-on experience in pain --
14     MR. DAVISON:  Objection to form.
15 BY MR. SAMSON:
16     Q.    -- treatment?
17     A.    No.
18     Q.    Anyone who was a researcher in either
19 opioids or pain in general?
20     A.    No.
21     Q.    Was there an outside source for your
22 team, then, to get that kind of scientific, slash,
23 medical input for your functions?
24     A.    Yes.
25     Q.    Who?

Page 87

1     A.    It was a panel of experts that we
2 worked with, along with one of my direct reports on
3 the team who was a Ph.D.  He was an epidemiologist.
4     Q.    And who was the Ph.D.?
5     A.    Bobby Clark.
6     Q.    And what part of the company was he
7 in?
8     A.    He was in my team.
9     Q.    Oh, he was on yours?
10     A.    Yes.
11     Q.    Okay.  What was -- his Ph.D. was
12 epidemiology?
13     A.    Yes.
14     Q.    And who else was on the panel of
15 experts?
16     A.    He wasn't one of the panel of
17 experts.
18     Q.    Okay.
19     A.    He was an employee.
20     The panel of experts was a group of people
21 that we selected for their -- for their experience,
22 their expertise, for their -- you know, a mix of
23 different perspectives.  Some physicians, some
24 addiction-ology, some pain educators, some
25 pharmacists, slash, lawyers, et cetera.

Page 88

1     Q.    Was a pain management doctor named
2 Webster, out of Utah, on the panel of experts?
3     A.    He was.
4     Q.    And he ran Lifeline or Lighthouse?
5 Lifetree?
6     A.    Lifetree.
7     Q.    And was he on the panel the whole
8 time you were there?
9     A.    Yes.
10     Q.    And he was there as a voice of
11 experience and integrity in the pain treatment
12 community?
13     MR. DAVISON:  Objection to form.
14     THE WITNESS:  Knowledge, experience, and
15 integrity, yes.
16 BY MR. SAMSON:
17     Q.    How -- what was the number?  You may
18 have given it to me.
19     A.    Of people on this panel?
20     Q.    Yeah.
21     A.    I'm saying between five and ten.
22     Q.    Okay.  Any other pain management
23 types, like Dr. Webster, whose name you recall --
24 names you recall, multiple?
25     A.    They were all involved with pain

Page 89

1 management of one aspect or another.  Either pain,
2 you know, treatment, pain education, pain -- you
3 know, pain patient interaction for addiction, things
4 like that.  Yeah.
5     Q.    Okay.  Any other names that you
6 recall?
7     A.    There's more names, if you want more.
8     Q.    Okay.  Yeah, please give me --
9     A.    So Deborah Gordon, who is a nurse
10 educator, out of Washington, University of
11 Washington.  David Brushwood, Pharm.D/lawyer out of
12 Florida at the time.  Steve Passik, an addiction
13 specialist, Ph.D.
14     Let's see.  Maybe more names will come to
15 me.  I can't remember right now.
16     Q.    You're doing pretty good.
17     A.    Thank you.
18     Q.    So you talked about the Exalgo REMS,
19 the C.A.R.E.S Alliance, the -- deciding what
20 submitted proposals would be sponsored research,
21 Medical Affairs lecture series, an in-house
22 production, and drug addiction for musculoskeletal
23 pain.  What was that one?
24     MR. DAVISON:  Objection to form.
25 ///

Page 90

BY MR. SAMSON:

1    Q.    Or did I write that down wrong?

2    A.    I don't -- no. It was treatment of musculoskeletal, that lecture.

3    Q.    Sorry. And was that a single lecture?

4    A.    Each of these are single lectures, yeah.

5    Q.    Okay. So of those five areas for your team during your time at Mallinckrodt, how much of your team time was spent on the Exalgo REMS?

6    A.    Early on, most of it. As things progressed forward, less time needed on that, more time needed on the C.A.R.E.S. Alliance.

7    Q.    Did those two always take up the majority of your team's time?

8    A.    They did.

9    Q.    So dealing with the proposals for research grants, a five percent or a ten percent or --

10   A.    I would say ten percent.

11   Q.    Okay. And then Medical Affairs lecture series?

12   A.    Five percent.

13   Q.    And the treating musculoskeletal pain

Page 91

1    lecture?

2    A.    No, that was -- those are just individual lectures, so that would all come under the lecture series.

3    Q.    So five percent for the lecture series?

4    A.    Yes.

5    Q.    And any other appreciable repeatable blocks of time spent --

6    A.    The investment of sponsored research, did you say that?

7    Q.    I did. And I thought you had said ten percent?

8    A.    Okay. Okay. So -- so do we have everything?

9          And then the rest of it is Exalgo REMS and the C.A.R.E.S. Alliance.

10   Q.    So roughly in the 85 percent range for those two?

11   A.    Something like that, yeah.

12   Q.    So did your PPS Team embrace both Covidien-branded pain space drugs as well as generics?

13   MR. DAVISON: Objection to form.

14   THE WITNESS: Specifically on, like, a named

Page 92

1    product basis, we had no involvement with generics.

2    MR. SAMSON: Okay.

3    THE WITNESS: However, the C.A.R.E.S. Alliance was about all of chronic pain and all of opioids, regardless of whose products they were, ours or somebody else's.

4    BY MR. SAMSON:

5    Q.    Okay. And was there -- what do you recall being Covidien's provision of information on generics to the C.A.R.E.S. Alliance?

6    MR. DAVISON: Objection to form.

7    THE WITNESS: There was no interaction between the C.A.R.E.S. Alliance effort and our generic drug production and distribution.

8    BY MR. SAMSON:

9    Q.    Okay. So C.A.R.E.S. Alliance took care of -- of whatever it was going to do with the generics without input from Medical Affairs at Covidien?

10   MR. DAVISON: Objection to form.

11   THE WITNESS: You have to rephrase that question. I don't understand it.

12   BY MR. SAMSON:

13   Q.    I'm trying to follow up, because you said C.A.R.E.S. Alliance dealt with generics and

Page 93

1    branded drugs.

2    MR. DAVISON: Objection to form.

3    BY MR. SAMSON:

4    Q.    True?

5    A.    So let me -- but not just Covidien's products. Covidien's products were irrelevant to the C.A.R.E.S. Alliance. It was -- we were agnostic as to whose products, the particular molecules were from. We were interested in safe and appropriate use and management of chronic pain no matter whose products were being used. It was best practices. It was like a best practices approach.

6    Q.    Okay. And what I'm trying to figure out is Covidien, you are aware the whole time you were an employee, sold generic opioids?

7    A.    Oh, yeah, I was aware of it.

8    Q.    Okay. And those were, certainly from 2009 to 2011, was not a trough in the nationwide sale of opioids of all sorts; true?

9    MR. DAVISON: Objection to form.

10   THE WITNESS: I have absolutely no idea what the sales of any of these products are or were.

11   BY MR. SAMSON:

12   Q.    That wasn't filtered back up to you guys to give you a focus on what we might need to do

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 in our scientifically-based, medical best evidence
2 role to decrease oversale, if there was such
3 oversale?
4     MR. DAVISON: Objection to form.
5     THE WITNESS: Absolutely not. It would be
6 the last people I would ask, people in the industry
7 anywhere, of a sales or marketing organization what
8 they think we need to do for patient safety. Okay.
9 BY MR. SAMSON:
10     Q. You speak as a veteran that knows --
11 has formed an impression that salesmen will sell --
12     MR. DAVISON: Objection.
13 BY MR. SAMSON:
14     Q. -- and are not interested in
15 hearing -- in hearing downsides of their product?
16     MR. DAVISON: Objection to form.
17 BY MR. SAMSON:
18     Q. Is that true?
19     A. So it's maybe true in some cases.
20 But you're not going to -- they're not a reliable
21 source of information on the global patient
22 management of pain. I wouldn't go to a sales rep to
23 ask a sales rep or a marketing director, how do you
24 think is best practices in patient diagnosis and
25 patient management? I would go to a physician or an

Page 95

1 expert in that field.
2     So what Mallinckrodt was selling up, down,
3 or sideways was of really no interest to me
4 whatsoever.
5 BY MR. SAMSON:
6     Q. I'm talking about, though, you're
7 developing tools; correct?
8     A. Correct.
9     Q. To avoid oversales of opiates, avoid
10 diversion and overdose deaths, and those sorts of
11 things, as best you can by developing tools for the
12 proper prescription of opioids; correct?
13     MR. DAVISON: Objection to form.
14     THE WITNESS: Correct. But incomplete. It
15 wasn't just about things to avoid. And there are
16 plenty of things to avoid. It was also about things
17 they should be done -- that should be done to better
18 manage patients and to reduce harm to patients.
19 BY MR. SAMSON:
20     Q. Okay. My question is, within
21 management, operations, and control, was there any
22 passing of that information from Medical Affairs, as
23 you developed it, to the generic sales force?
24     MR. DAVISON: Objection to form.
25     THE WITNESS: Absolutely not. I don't even

Page 96

1 think we had a generic sales force. I don't even
2 know what they had in generics.
3 BY MR. SAMSON:
4     Q. So at no point were you aware whether
5 Mallinckrodt's generic -- sales of generic opioids,
6 during the time you worked there, were miniscule
7 compared to their branded drugs?
8     MR. DAVISON: Objection to form.
9     THE WITNESS: I have no idea what their
10 generic sales were. I don't really know what the
11 branded sales were. It's not my job to know that. I
12 don't need to know that. I don't want to know that.
13 BY MR. SAMSON:
14     Q. Safe to say, then, that nobody on
15 your team doing its job, including C.A.R.E.S.
16 Alliance and trying to get the correct use of opioids
17 for pain control, ever did anything with
18 Mallinckrodt's either branded sales teams or generic
19 sales operatives?
20     A. Oh, we did --
21     MR. DAVISON: Objection to form.
22     THE WITNESS: We did plenty with the brand
23 sales team.
24     MR. SAMSON: Okay.
25     THE WITNESS: We did a lot with them.

Page 97

1     MR. SAMSON: Yeah. And I thought --
2     THE WITNESS: Yeah.
3     MR. SAMSON: -- I saw documents to that
4 effect.
5     Q. But nothing in terms of Medical
6 Affairs, Art Morelli controlling the problem of
7 opioids to the generic Mallinckrodt business, that
8 you were aware of?
9     MR. DAVISON: Objection to form.
10     THE WITNESS: Correct.
11 BY MR. SAMSON:
12     Q. Did anyone tell you that generics --
13 don't go to the generics, from higher management?
14     A. No one had to tell me.
15     MR. DAVISON: Objection.
16 BY MR. SAMSON:
17     Q. Because of why?
18     A. Because I know it's not appropriate.
19 It's not a fit. It doesn't -- they don't -- they are
20 not -- they are not structured to do anything with
21 it. And I don't care what -- they may have an
22 opinion, or whatever. Frankly, I don't care what it
23 is. I care what Herb Neuman and the FDA think and my
24 expert panel think.
25     Q. And that's you and Mallinckrodt

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 gathering what you believe to be a very balanced,
2 correct approach to this class of drugs, opioids, in
3 the treatment of pain and balancing all the factors;
4 true?
5     MR. DAVISON: Objection.
6     THE WITNESS: Not really true. So let me
7 kind of clarify for you.
8     MR. SAMSON: Okay.
9     THE WITNESS: So in the eyes of the FDA, a
10 balanced approach generally refers to risks and
11 benefits of a drug, any drug. That's what the FDA
12 requires, a balanced approach to physicians, benefit
13 and risk.
14     The C.A.R.E.S. Alliance and the Exalgo REMS
15 was nothing about benefit. It was all about risk
16 mitigation and optimizing therapy, of whatever drug
17 you might be using, by preventing harm to patients.
18 It was not balanced. It was imbalanced in favor of
19 safety.
20 BY MR. SAMSON:
21     Q. And that message, as far as you know,
22 was not in any way provided to the generic side of
23 Mallinckrodt opioid sales while you were there?
24     A. Correct.
25     MR. DAVISON: Objection.

Page 99

1 BY MR. SAMSON:
2     Q. Medical Affairs had a budget; true?
3 I'm assuming.
4     A. It did.
5     Q. And you told me that one part of that
6 budget that was under your team's responsibility were
7 the grant proposal decisions?
8     A. Yes.
9     Q. How about key opinion leaders,
10 speakers bureaus, or other things like that, were
11 those under your team or --
12     A. No.
13     Q. -- some other part --
14     A. Speakers bureaus, I had nothing to do
15 with speakers bureau. That's a commercial function,
16 with their own budget and their own process.
17     Q. Okay.
18     A. KOLs, only -- only the KOLs that were
19 on our advisory -- you know, safety advisory board
20 were the KOLs that I would be dealing with.
21     Q. And they were -- KOLs, in the general
22 sense, were not on Medical Affairs budget?
23     MR. DAVISON: Objection to form.
24 BY MR. SAMSON:
25     Q. Is that true or not?

Page 100

1     A. No. They would receive compensation
2 for serving on the C.A.R.E.S. Alliance panel of
3 experts that met quarterly.
4     Q. Okay. But did KOLs receive, to your
5 knowledge, from Mallinckrodt other payment for other
6 work that they might do?
7     A. I'm sure they did. I don't know.
8     Q. But not out of Medical Affairs
9 budget?
10     A. Not out of Medical Affairs, yeah.
11     Q. And that was -- is commercial a known
12 subentity? You said it was off of commercials.
13     A. They have a budget. They have a
14 budget line for, for example, speakers bureau. So
15 they give "X" number of lectures, you know, over the
16 course of the year at various places, and they pay
17 for that. I don't pay for that.
18     Q. Okay. Did you, or anyone else that
19 you know of at Medical Affairs, have anything to do
20 with picking the speakers?
21     MR. DAVISON: Objection to form.
22     THE WITNESS: I had nothing to do with it.
23 I don't know who else had stuff to do with it.
24 BY MR. SAMSON:
25     Q. Okay. In your term of 2009 to 2011,

Page 101

1 what was the budget for the grant proposals?
2     A. The grant proposals. I'm sorry. I
3 don't recall the number.
4     Q. But that --
5     A. But as a percent, you know, compared
6 to the whole budget, it was quite small.
7     Q. What -- what were the big chunks of
8 the Medical Affairs budget in your time?
9     MR. DAVISON: Objection to form.
10     THE WITNESS: Well, people's salaries, and
11 so forth. But apart from that --
12 BY MR. SAMSON:
13     Q. Can I call that overhead?
14     A. Yes, overhead. Apart from that, it
15 was -- the C.A.R.E.S. Alliance was a huge part of it.
16     Q. And do you recall yearly budget
17 figures from Medical Affairs budget to C.A.R.E.S.
18 Alliance, which was launched at Pain Week 2010, as I
19 recall?
20     A. I think so.
21     Q. And so it would have had some
22 developmental expense --
23     A. Right.
24     Q. -- prior?
25     What was the annual budget from Mallinckrodt

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 to C.A.R.E.S. Alliance?
2     A.   I can't give you an exact number, but
3 it was in -- it was multiple millions of dollars a
4 year. Not 20 -- not 20 million and not 1 million,
5 you know.
6     Q.   Somewhere between 20 and 2?
7     A.   Right. Yeah.
8     Q.   And was that simply -- Covidien owned
9 C.A.R.E.S. Alliance; true?
10     A.   Correct.
11     Q.   And Covidien owned the trademarking
12 of it; correct?
13     A.   Correct.
14     Q.   So was the 2 to 20 million, wherever
15 we find a budget document and come up with it, what
16 did that go to, as you understood it, within
17 C.A.R.E.S. Alliance?
18     A.   So it went to the creation and
19 production of the various tools that we provided to
20 health-care professionals. And each tool had, you
21 know, a developmental expense, a production expense,
22 et cetera. Not a distribution expense because that
23 was pretty small. But it had a development expense,
24 was the biggest part of it, and production expense.
25     It went to -- quite a bit went to

Page 103

1 educational programs, like webinars that we
2 conducted, to educate physicians in online webinars
3 about safe opioid practices. It went to a whole
4 program I developed called "Expert On Call," which
5 created the ability of physicians to call one-on-one
6 an expert in the field if they thought they needed
7 some, you know, additional insight into certain
8 problems they might be having with their patients.
9 And that was something we funded. And it went pretty
10 well.
11     Of course, that -- those conversations were
12 to be between the physician in their office and the
13 expert, wherever they would be, without any
14 participation by the commercial people. So it's a
15 peer doctor to doctor kind of thing.
16     Another one was "Meet the Expert Series."
17 So at various conventions -- you've probably been to
18 pharmaceutical exhibits at various medical societies.
19 You've been to that; right? And you go into the
20 exhibit --
21     Q.   Only in the veterinary market.
22     A.   Okay. So you go into the exhibit
23 room, and there's booths all over the place, right,
24 with advertising and sales reps running around. What
25 I did is I carved out a separate, cordoned-off area

Page 104

1 of a Medical Affairs portion of the booth where the
2 commercial people didn't -- couldn't go, and that was
3 staffed by our physicians, our pharmacists, and so
4 that they could ask -- the participants at the
5 meeting who were physicians could ask, you know,
6 questions about the drugs from a peer, a peer kind of
7 thing.
8     But what I added to that, that hadn't
9 happened before, it's called a "Meet the Expert." So
10 I would carve out a schedule, hour-by-hour schedule
11 of various experts from the -- you know, from the
12 pain community to sit there, and a doctor could walk
13 right up and have a one-on-one conversation unimpeded
14 by -- by anybody else, if they had any questions that
15 they wanted to ask, a Lynn Webster or a Steve Passik
16 or other people too.
17     So those are the kind of -- that's a flavor
18 for the kinds of programs. And I can tell you, they
19 are very expensive. But it's worthwhile.
20     Q.   And where did the ordinary speakers
21 budget come out of?
22     A.   Commercial.
23     Q.   And non-C.A.R.E.S. Alliance KOLs, or
24 the few KOLs that were under Medical Affairs, the
25 rest of those, where did that budget come out of?

Page 105

1     MR. DAVISON: Objection to form.
2     THE WITNESS: I don't recall there being a
3 separate KOL budget, but there were separate
4 non-C.A.R.E.S. Alliance, you know, activities that
5 some KOLs might participate in that they got
6 compensated for. But I wasn't involved with that.
7 Yeah.
8 BY MR. SAMSON:
9     Q.   Okay. About the Rx FMEA analyses?
10     A.   Right. So that was quite an -- quite
11 an expensive endeavor. So the Rx FMEA analysis, that
12 was done during the formation and creation of the
13 Exalgo REMS.
14     Are you familiar with Rx FMEA? Maybe you're
15 familiar with FMEA, Failure Mode and Effects
16 Analysis. Right.
17     So a Failure Mode and Effects Analysis is a
18 recognized process used to determine why things go
19 wrong in any system. It's often used in the nuclear
20 regulatory space. So it maps out a process. It
21 finds weak points in the process. It maps out the
22 severity and frequency of failure modes in the
23 process, and then it maps out specific solutions
24 against those failure modes to reduce the probability
25 of those failure modes taking place.

Page 106

1    So we did that exercise for the Exalgo REMS
2 to make sure we had more of a science-based approach
3 rather than a shooting-from-the-hip approach to the
4 things we wanted in our REMS.
5    Q.    Rather than thinking you knew what
6 was going to happen, you went through a very detailed
7 process --
8    A.    Right.
9    Q.    -- to identify failure modes and
10 sub-modes that contributed to them; correct?
11    A.    Exactly.
12    Q.    And then looked at those failures and
13 said, what can we possibly do to stop the failure
14 from happening, after you had already ranked from
15 least to worst the consequences of failure in that
16 particular mode?
17    A.    Yes.
18    MR. DAVISON:  Objection.
19 BY MR. SAMSON:
20    Q.    All right.  Were the Rx -- was the Rx
21 FMEA system and analysis ever applied to
22 Mallinckrodt's generics?
23    A.    Not to my knowledge.
24    You can't apply it to a product.  You have
25 to apply it to a system, a use system or an

Page 107

1 operational system.
2    Q.    Well, and --
3    A.    Like management of chronic pain,
4 would be a system you could apply it to.
5    Q.    Well, you certainly applied it to
6 Exalgo within --
7    A.    I did.
8    Q.    -- Medical Affairs; true?
9    A.    I did.  Well, the use of Exalgo in
10 the treatment of chronic pain.  Yeah.
11    Q.    But the use of generic oxycodone,
12 generic hydromorphone, any other generics that
13 Mallinckrodt was selling from your time, 2009 to
14 2011, into the opioid pain space, no effort at Rx
15 FMEA analysis was made; true?
16    MR. DAVISON:  Objection to form.
17    THE WITNESS:  Not to my knowledge.
18 BY MR. SAMSON:
19    Q.    If you were king, would you like to
20 have seen the same system applied to generics?
21    MR. DAVISON:  Objection to form.
22    THE WITNESS:  It potentially could have some
23 utility.  We made the FDA aware of what we were
24 doing, and they were very supportive of a
25 science-based approach because they are a

Page 108

1 science-driven FDA organization.  But the fact of the
2 matter is, the learnings from the Exalgo FMEA process
3 created insights and tools that are actually fairly
4 widely applicable across the opioid space.
5    So, you know, there's -- you could, you know
6 borrowed -- you know, borrowed ideas here are always
7 good.
8 BY MR. SAMSON:
9    Q.    But we're talking about a single
10 company --
11    A.    Right.
12    Q.    -- that applies them, because it
13 believes in them, to Exalgo; correct?
14    MR. DAVISON:  Objection to form.
15 BY MR. SAMSON:
16    Q.    The Rx?
17    A.    Uh-huh.
18    Q.    FMEA?
19    A.    Uh-huh.
20    Q.    At the same time, that same company
21 is selling generic opiates -- opioids and elects not
22 to apply the analysis to those; true?
23    MR. DAVISON:  Objection to form.
24    THE WITNESS:  What the decision-making
25 process was, the fact of the matter is, as far as I

Page 109

1 know, they didn't.  But what their decision-making
2 process was, I have no idea.  I was not involved with
3 it.
4 BY MR. SAMSON:
5    Q.    Okay.  Were -- did you have to get
6 FDA permission to develop and apply the Rx FMEA
7 analysis to Exalgo?
8    A.    No.
9    Q.    And do you know of any reason why one
10 would have to get FDA permission to do that for
11 generics?
12    A.    No.
13    MR. DAVISON:  Objection to form.
14 BY MR. SAMSON:
15    Q.    Let's go back to 2009, whether in
16 imaging -- joining in imaging --
17    A.    Where was I in 2009?
18    Q.    I know you were going to try and turn
19 around the imaging department for part of the era.
20    Were you aware there were a lot more opioids
21 being sold in America and people were becoming
22 concerned about it?
23    MR. DAVISON:  Objection to form.
24    THE WITNESS:  More than what?
25 ///

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 BY MR. SAMSON:
2     Q.    More than had been sold before?
3         MR. DAVISON:  Objection to form.
4         THE WITNESS:  Generally speaking, I would
5 say I had that impression.  I couldn't document it,
6 but I know -- what was more important to me was the
7 FDA was concerned about the safety.  The safety of
8 drugs in general.  And that's why REMS was a program
9 that they adopted.  And the first REMS were not
10 opioid REMS.  They were nonopioid products that had
11 serious risks.
12 BY MR. SAMSON:
13     Q.    Which ones?
14     A.    I will think of the name of the
15 product in a second.  But it was an acne product that
16 had a teratogenic risk.  And there are many classes
17 of drugs that have risks that are the FDA hot button
18 risks, beyond abuse and death and overdose, which is
19 an FDA hot button risk.
20         But teratogenicity is a hot button risk, and
21 liver function tests are a hot button.  And there's
22 many others.  But there are about seven or eight that
23 are their hot buttons.
24     Q.    In general terms, when you took the
25 job at Mallinckrodt in 2009, had you heard the term

Page 111

1 "opioid epidemic"?
2         MR. DAVISON:  Objection to form.
3         THE WITNESS:  I can't remember what I heard.
4 But I would say, yes.
5 BY MR. SAMSON:
6     Q.    And since you had been involved with
7 the opioids back in your DuPont days, that was
8 something that was different.  Was there an opioid
9 epidemic back in the days of DuPont's opioid drugs
10 when you were there?
11         MR. DAVISON:  Objection to form.
12 BY MR. SAMSON:
13     Q.    Identified as such in public
14 documents?
15     A.    Certainly not at a marquee, you know,
16 media level, no.  Not that I can recall.
17     Q.    And Percocet and Percodan were
18 abusible; correct?
19     A.    Very abusible.
20     Q.    Okay.  And what was the dose of
21 Percocet/Percodan?
22     A.    One to two tabs, Q 4-6h.
23     Q.    And what was the amount of active
24 ingredient in those one to two tabs?
25     A.    Approximately 5 milligrams.

Page 112

1     Q.    Okay.  When you came back into the
2 opioid space at Mallinckrodt, was it a surprise to
3 see people taking 30 milligrams of Oxycontin three,
4 four times a day?
5         MR. DAVISON:  Objection to form.
6         THE WITNESS:  It wasn't a surprise as much
7 as it meant to me, why?  Why were they on that level
8 of dose?
9 BY MR. SAMSON:
10     Q.    But it was certainly higher doses
11 than you had been used to in your earlier opioid
12 experience?
13     A.    Probably, yeah.
14     Q.    It seems to me, fair to say, that
15 your personal actions, while at Mallinckrodt, were to
16 better understand, and then hopefully influence for
17 better patient outcomes, this increased use of
18 opioids in the chronic and acute pain space?
19         MR. DAVISON:  Objection to form.
20         THE WITNESS:  More the chronic space.  But
21 really, the C.A.R.E.S. Alliance was opioids in
22 general in chronic pain.  And then the Exalgo REMS
23 was the safe use of Exalgo, you know, just Exalgo,
24 which is chronic pain.
25 ///

Page 113

1 BY MR. SAMSON:
2     Q.    Okay.  And to make evidence-based
3 decisions addressing opioids, during the time you
4 were at Mallinckrodt, do you agree that one thing
5 that's a real important factor is a
6 pain-and-science-based data on a given opioid's
7 effectiveness at relieving either the chronic pain or
8 the acute pain?
9         MR. DAVISON:  Objection to form.
10         THE WITNESS:  That's one thing.  It's not
11 the only thing that's important.  But that's one
12 thing that's important.
13 BY MR. SAMSON:
14     Q.    Because to the extent that the
15 medication doesn't really effectively relieve the
16 pain that it's being given for, it doesn't have
17 much -- as much benefit as that does; true?
18         MR. DAVISON:  Objection to form.
19         THE WITNESS:  That's true.  But you have to
20 understand that the only organization that's -- whose
21 opinion and whose belief really matters on that
22 particular question is the FDA.  To a pharmaceutical
23 company, that's the only thing that matters.  And
24 we -- we have to go on their judgment, not on our
25 judgment.

Page 114

BY MR. SAMSON:

Q. So, in your view, if the FDA says that this is an acceptable drug for medium to severe chronic pain, and you become aware of that it doesn't work for headache pain, or some other sort of pain, there's no bucking the FDA in terms of your analysis of the risk/benefit of that drug for a pain that may not be affected by it?

MR. DAVISON: Objection to form.

THE WITNESS: So in the case of headache, headache is a separate part of pain. Drugs that are indicated, generally speaking, for moderate to moderately severe pain, or even severe pain, are not indicated for the pain of headache. Headache has a different mechanism. So drugs have to be specifically indicated to treat headache.

So I wouldn't be able to tell you -- so if you have -- if you have a drug that's indicated for a moderately severe pain, you cannot promote it for headache. You don't have that indication.

So if you are receiving reports, which is the other part of your question, about people using a drug and getting certain results, that's basically a side effect that has to be reported to the agency in your Periodic Update Report. And the FDA looks at

Page 115

all of that.

BY MR. SAMSON:

Q. Okay. What about chronic low back pain, was that part of the FDA's indications on the label for Exalgo?

A. Chronic low back pain would be legal, would be a legal part of the indication, yeah -- legitimate. Legitimate part, yeah.

Q. So if Mallinckrodt was reading, as your department would, scientific publications in the pain world and saw that chronic low back pain was not showing very healthy evidence of being effective by the opioids, you think that there's no -- nothing that Mallinckrodt needs to do until the FDA makes it change the label to say, except not for low back pain, chronic low back pain?

MR. DAVISON: Objection to form.

THE WITNESS: So, Mark, anybody can do a study on anything they want and hopefully get it published. We can't be dancing around for every publication that comes out.

So we did the studies to approve Exalgo that the FDA required us to do. We met the standard of performance in terms of statistical significance to get the product approved. And I don't really recall

Page 116

all the pain conditions that were in that studied population. I believe there were some low back pain and osteoarthritis of the knee and other types of somatic pain, chronic pain. But if you have the indication, you promote based on indication.

If there's publications cropping up to support or deny what you're doing, you can't change what you're doing based on some random publication unless your label changes.

So you have to remember also that Exalgo was approved as a second-line drug, not a first-line drug. So it behooved Covidien, Mallinckrodt, to ensure that it was being used appropriately. I just want to show you how deep we dove on this thing.

So how are you going to know when you see your prescription data if it's being used as a second line? How are you going to know that? You don't know that. You don't know that unless you make an effort to find out.

So I commissioned a retrospective chart review of physician charts in a defined geographic area with high Exalgo use, done by a CRO, to see if the message was getting across to physicians, and they were documenting in the chart, that, in fact, they were using it to patients who were already

Page 117

tolerant -- excuse me, already tolerant to an opioid.

BY MR. SAMSON:

Q. And how --

A. And we did that study.

Q. And "tolerance" simply means they have been prescribed an opiate -- opioid at some point prior in their life and didn't have a bad reaction to it?

MR. DAVISON: Objection to form.

THE WITNESS: I don't know about the bad reaction. But they had to have been on an opioid of a certain potency for a certain amount of time. Because tolerance to the opioid is tolerance to the side effects. The FDA is worried with safety here, right.

MR. SAMSON: Right.

THE WITNESS: So they wanted to make sure that the patients being exposed to this drug had some level of tolerance, because it's a potent drug. So that tolerance is like an insurance policy, that you're not going to get a hyper reaction by the patient. So we did the data dive. It was very expensive. We can't do it across the whole country.

BY MR. SAMSON:

Q. And the --

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    A.    And it showed that --
2    Q.    I'm sorry.
3    A.    -- it was moderately -- you know, not
4  a hundred percent, obviously, but mostly it was being
5  used in the right way.
6    Q.    Where was that study done?
7    A.    I don't recall. I don't recall. But
8  it was somewhere in the east part of the
9  United States. That's what I remember.
10    Q.    And did that study have a name that
11  we can search through the multitude of documents?
12    A.    Oh, I don't recall. I don't recall.
13    Q.    In terms of the FDA approval test, do
14  you recall that one of the two studies was
15  bunionectomy?
16    MR. DAVISON: Objection to form.
17    THE WITNESS: I don't recall that, no.
18  BY MR. SAMSON:
19    Q.    How much do you think bunionectomy
20  predicts about effective pain relief in another
21  condition other than bone surgery?
22    MR. DAVISON: Objection to form.
23    THE WITNESS: I can't comment on that. I'm
24  not a health-care professional. But I can tell you
25  it's a standard study requested by the FDA in

Page 119

1  multiple drugs over multiple years.
2    So bunionectomy is one of their go-to
3  studies. But I don't know how comparable it is or
4  how incomparable it is. All I know is we got an
5  approved indication from the FDA. I'm not going to
6  go to school on what the FDA is telling me. I'm
7  going to believe them. I have got a lot of work to
8  do before I challenge the FDA.
9  BY MR. SAMSON:
10    Q.    And opioid tolerant is the -- is the
11  other side of that opioid naive?
12    A.    It is.
13    Q.    And did your deep dive study look at
14  whether or not in the use that was under the study,
15  the tolerance that you found or the physician wrote,
16  was a true second line? Like they have had opioid A
17  for this pain that they are here to see me about
18  today, or it isn't -- they had some opioid remotely
19  in the past and had no problem with it?
20    MR. DAVISON: Objection.
21  BY MR. SAMSON:
22    Q.    Either of those would show up as
23  opioid tolerant; correct?
24    MR. DAVISON: Objection to form.
25    THE WITNESS: No.

Page 120

1  BY MR. SAMSON:
2    Q.    No?
3    A.    The second one is not opioid
4  tolerant. If you're on opioids and then you're off
5  them for a fair amount of time, they wash out of your
6  system, and you lose the tolerance, and then you have
7  to re-establish tolerance. That would be the proper
8  way of looking at it.
9    Q.    Okay.
10    A.    If you're opioid tolerant last year,
11  it's not helping you this year.
12    Q.    And did your study ensure that opioid
13  tolerance was following that more restrictive
14  definition?
15    MR. DAVISON: Objection to form.
16    THE WITNESS: It was largely reassuring.
17  The results were largely reassuring that the message
18  was getting across.
19  BY MR. SAMSON:
20    Q.    So back to, if you get reports from
21  the outside medical literature that opioid A or B or
22  C does not appear to be very effective against a
23  certain type of pain, is it your testimony that
24  Medical Affairs at Mallinckrodt would not do anything
25  in response to that?

Page 121

1    MR. DAVISON: Objection to form.
2    THE WITNESS: So I am not the person in
3  Medical Affairs at Mallinckrodt who would be making
4  such a decision. It would be our Pharm.Ds and our
5  physicians, like on that chart, Eddie Darton and Herb
6  Neuman. Those would be the people who are doing it.
7  Not me. And I will just follow what they tell me.
8  BY MR. SAMSON:
9    Q.    And do you believe, based on your
10  devotion to ensuring the best possible use of opioids
11  in the pain space, that they would take notice of
12  that and deal with it in some way?
13    A.    I believe they would.
14    MR. DAVISON: Objection to form.
15    THE WITNESS: I believe they would, based --
16  BY MR. SAMSON:
17    Q.    Because that --
18    A.    -- on my interaction with them and my
19  confidence in their high standards of performance and
20  ethical behavior, that they absolutely would.
21    Q.    And because you personally believe
22  the more question there is about its effectiveness,
23  the less risk there has to be to make it a reasonable
24  decision to give that drug for that specific pain
25  type; true?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    MR. DAVISON:  Objection to form.
2    THE WITNESS:  I don't understand the
3 question.  Say that again.
4    MR. SAMSON:  Sure.
5    Q.    All of pain medication, and
6 especially opioid provision, is based on a balancing
7 of the risk -- expected risk and the expected
8 benefit?
9    A.    All drugs, but yes.
10    Q.    Correct.  And the opioid effect that
11 you're looking for in prescribing it is that it
12 reduces the patient's pain; true?
13    MR. DAVISON:  Objection to form.
14    THE WITNESS:  That's one of the things
15 you're looking for, yeah.  That's the primary thing
16 you're looking for.
17 BY MR. SAMSON:
18    Q.    What else?
19    A.    You're hoping -- you're hoping that
20 the patient, you know, also can return to ambulation,
21 can return to work, et cetera, et cetera.  Yeah.
22    Q.    Those are simply secondary effects?
23    A.    Those are secondary.
24    Q.    Of the absence of pain?
25    A.    Correct.

Page 123

1    Q.    Or decrease in pain?
2    A.    Correct.
3    Q.    So that's the benefit?
4    A.    Right.
5    Q.    Of an opioid, a contemplated opioid
6 prescription; correct?
7    A.    Correct.  Correct.
8    Q.    And the risks -- you know a long line
9 of them -- there's internal, you know, bad reactions,
10 not opioid tolerant, there's potential diversion,
11 there's overdose, there's depression of respiration,
12 there's a long and healthy list of risks to any
13 opioid prescription?
14    MR. DAVISON:  Objection to form.
15    THE WITNESS:  Yes.
16 BY MR. SAMSON:
17    Q.    So if the effectiveness is criticized
18 and may be less, that's going to make it harder to be
19 reasonable in prescribing the opioid because the
20 risks aren't going to change?  They are what they are
21 for a given patient; true?
22    MR. DAVISON:  Objection to form.
23    THE WITNESS:  So I understand what you're
24 saying, Mark, but that's not how I approach things.
25 Okay.

Page 124

1    Here's how I approach things in my
2 responsibility when I was at Mallinckrodt.  I have
3 nothing to do with the efficacy of the drug.  I can't
4 change the efficacy.  There's no program I can give a
5 physician, there's no tool I can give a physician to
6 make X, Y, Z drug more effective.
7    But what I can do, I can give physicians
8 tools and programs that can mitigate risk and prevent
9 harm.  That's what my focus was on.  I wasn't
10 involved in any balance.  I didn't care about the
11 balance.  That's for them to judge.  I cared about
12 preventing harm.
13 BY MR. SAMSON:
14    Q.    And to not question, but probably
15 affirm your belief in the way you went about your
16 job, you have to agree with me on a general level,
17 even though it wasn't your job, if the opioid is less
18 effective at reducing pain, the risk has got to go
19 down to make the balance in balance; correct?
20    MR. DAVISON:  Objection to form.
21 BY MR. SAMSON:
22    Q.    In a -- in a sane world of
23 prescription?
24    MR. DAVISON:  Same objection.
25    THE WITNESS:  In a theoretical construct

Page 125

1 that you've outlined, of course.  It would be true
2 for any drug.
3 BY MR. SAMSON:
4    Q.    I agree with you.  And -- okay.
5    Back to some generics questions, and you may
6 not know any answers.
7    Did you know, when you joined Covidien, that
8 Mallinckrodt sold both active pharmaceutical
9 agreements, the bulk materials to other
10 manufacturers?
11    A.    I did -- I was aware of that, yeah.
12    Q.    Did you ever have any duties in
13 Medical Affairs about that part of the business?
14    A.    The API business?
15    Q.    Yes.
16    A.    No, I did not.
17    Q.    And Mallinckrodt also used some of
18 the API that it made to manufacture generics?
19    A.    Right.
20    Q.    And sold those; correct?
21    A.    I believe so, yes.
22    Q.    Okay.  And do you know whether they
23 sold them to other manufacturers or simply directly
24 to -- through distributors to users?
25    MR. DAVISON:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 THE WITNESS: They sold them to other
2 manufacturers.
3 BY MR. SAMSON:
4 Q. Do you know whether they sold any
5 through distribution centers --
6 MR. DAVISON: Objection to form.
7 BY MR. SAMSON:
8 Q. -- for patient use?
9 MR. DAVISON: Sorry. Objection to form.
10 THE WITNESS: So you started talking about
11 API, and then you moved over to dosage form. So you
12 want to know about the API?
13 BY MR. SAMSON:
14 Q. No. Dosage.
15 A. Oh, dosage.
16 Q. The API, that's just obviously --
17 that's just going out in bulk powder and is going to
18 get made into whatever somebody else makes it into?
19 A. Yes. And that was a business they
20 had. So the Tylenol that you buy in the store, that
21 API is Mallinckrodt's -- or acetaminophen.
22 Q. They were, in fact, the world's
23 largest manufacturer of it; correct?
24 A. As far as other API, I don't know.
25 As far as dosage form of finish product or

Page 127

1 semi-finish product, I don't know.
2 Q. Okay. So you don't even know if
3 Mallinckrodt distributed, sold to distributors for
4 ongoing sale to patients, generics, opioids?
5 A. No.
6 MR. DAVISON: Objection to form.
7 BY MR. SAMSON:
8 Q. When you joined Mallinckrodt, had you
9 ever heard the term Oxy Express?
10 A. No.
11 Q. When did you first hear that term?
12 A. Right now. Today.
13 Q. Okay. You have no idea what that
14 means?
15 A. I have an idea what it means, but I
16 don't know if it's accurate or not.
17 Q. Okay. Tell me what you think it
18 means.
19 MR. DAVISON: Objection to form.
20 THE WITNESS: What I have a picture in my
21 mind is, you know, a string, a linkage of people
22 diverting and abusing drugs. That's the painting --
23 the picture it paints to me.
24 BY MR. SAMSON:
25 Q. All right. And you never heard of it

Page 128

1 applied to Florida pill mills and other sources, and
2 being driven up I-75 to the upper Midwest as well as
3 to Appalachia?
4 MR. DAVISON: Objection.
5 THE WITNESS: I am aware of pill mills, the
6 existence of pill mills, but I wasn't aware of the
7 term Oxy Express.
8 BY MR. SAMSON:
9 Q. Did anyone at Mallinckrodt, while you
10 were there, discuss especially Florida pill mills or
11 pill mills in general with you?
12 A. Absolutely.
13 Q. Who?
14 A. Oh, let me think. Well, we -- in our
15 training of sales reps, we train them as part of the
16 Medical Affairs portion of the training, we educated
17 them on what to look for in terms of pill mills; to
18 report those, and to stay away from those.
19 Q. Okay. And what were the indicia of
20 pill mills?
21 A. Generally speaking, lines out the
22 doors, license plates from various states in the
23 parking lot, doctor's office next to a pharmacy,
24 patients going through one after another, bing, bing,
25 bing, bing, in short periods of time. High patient

Page 129

1 flow, those types of things.
2 Q. Okay. Did you at Medical Affairs
3 follow up to see whether or not that instruction was
4 put to use?
5 MR. DAVISON: Objection to form.
6 THE WITNESS: We received reports, yeah. We
7 received such -- those reports.
8 BY MR. SAMSON:
9 Q. And did you receive both reports of
10 salespeople calling on pill mills and having to be
11 reinstructed, so to speak, that a place they were
12 going was a pill mill?
13 A. No.
14 MR. DAVISON: Objection.
15 THE WITNESS: We received reports of they
16 walked up -- or walked in and walked out.
17 BY MR. SAMSON:
18 Q. Ms. Cathy Jackson, who you remember,
19 maybe?
20 A. I don't, actually, but --
21 Q. Okay.
22 A. Yeah.
23 Q. -- told us --
24 A. Our paths may have crossed. I don't
25 know.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    Q.  -- told us last week that she thought
2  the ability of Florida physicians to both prescribe
3  and dispense opioids was one reason why Florida was a
4  hotbed for diversion.
5    Did you even know about that?
6  MR. DAVISON:  Objection to form.
7  THE WITNESS:  I know that the prescribing
8  and dispensing linkage, there was a big problem,
9  yeah.  But I don't know about the legal -- legality
10  of it.
11  BY MR. SAMSON:
12    Q.  And I think you testified earlier
13  that you really didn't even know how Exalgo sales
14  were going; is that --
15    A.  That's true.
16    Q.  -- correct?
17    Okay.  And didn't have any sense of how many
18  Mallinckrodt generic oxy opioids were being sold in
19  Florida or anywhere else?
20    A.  True.
21    Q.  True for the entire time you were
22  there?
23    A.  Yeah.
24    Q.  Never any conversations with
25  Mr. Neuman, perhaps, or anyone else in Medical

Page 131

1  Affairs about the opioid epidemic, whether your
2  guys's fault or other manufacturers' fault?
3  MR. DAVISON:  Objection to form.
4  THE WITNESS:  So I wasn't focused on fault.
5  I was focused on solutions and prevention, not on
6  fault.  There's plenty of fault, you know, that
7  people like to spread around and blame.  I'm focused
8  on solutions.
9    I'm not focused on why the -- who was
10  responsible for the cars crashing into one another.
11  I want antilock brakes and seatbelts and driver
12  training.
13  BY MR. SAMSON:
14    Q.  I understand that.  But you're also
15  not living outside of this world, and in particular
16  the United States, and you're working for a
17  pharmaceutical company.  It doesn't seem possible
18  that you did not have discussions while you were at
19  Mallinckrodt, slash, Covidien with other people in
20  Medical Affairs about the opioid epidemic?
21    A.  No, we discussed --
22  MR. DAVISON:  Objection to form.
23  THE WITNESS:  We discussed the opioid -- the
24  problems that existed in society related to opioids.
25  MR. SAMSON:  Okay.

Page 132

1  THE WITNESS:  And that's why we created the
2  C.A.R.E.S. Alliance, to help try to solve that
3  problem.  Because my experience with the opioid,
4  so-called opioid crisis, is it was another report,
5  another report, and another report as to how many
6  people are dying.  Not a report about what we are
7  going to do about it.  That's what I wanted to
8  create.  Do something about it.
9  BY MR. SAMSON:
10    Q.  It's fair to say, then, that what you
11  picked up, both inside and outside Mallinckrodt
12  during your time on Medical Affairs, convinced you
13  that the effects of whatever was happening in the
14  opioid space were enough to require you to try and
15  develop a countermeasure against it?
16  MR. DAVISON:  Objection to form.
17  THE WITNESS:  We have a massive problem.  We
18  have a massive problem that is taking place in this
19  country that's killing people.  Yes.  But sitting
20  here, and if it -- if the discussion, you know, in
21  some company somewhere never goes further than that,
22  we didn't do any good about it.  Right?  We just --
23  another rearticulation of the problem.
24    I was tired of rearticulating and
25  complaining about a terrible problem without trying

Page 133

1  to fix it.  I was going to be the start, an alliance,
2  of companies to work together to try to effect a
3  solution.
4  BY MR. SAMSON:
5    Q.  And Mallinckrodt supported it for
6  awhile; true?
7    A.  They supported it while I was there,
8  yes.
9    Q.  And yet you were only there a couple
10  of years?
11    A.  I can only do what I can do when I'm
12  there with the support of my team, Herb Neuman, and
13  the CEO, who supported it.
14    Q.  He did support it?
15    A.  He did.  That's why we got the budget
16  that we got.
17    Q.  And why did you leave?
18    A.  Frankly, I had had enough of living
19  in St. Louis when I was supporting a home in
20  San Diego.  And my wife, being in the Bay Area
21  helping with our daughter's childcare and
22  triangulate, you know, three households, I was
23  frankly tired of it.  And I hated St. Louis.  So I
24  wanted to get back to San Diego.
25    So I figured -- I felt that I had made a big

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 impact. I had done what I could do. I got this
2 program developed, launched, implemented. I had a
3 well-trained team that could carry on. So I figured
4 it was time. I'm not so young that I'm building my
5 career, you know.
6     Q. Okay.
7     MR. DAVISON: Mark, we have been going a
8 little over an hour. It is time for a break.
9     MR. SAMSON: Yes. Let's take a break.
10     THE VIDEOGRAPHER: We are going off the
11 record. The time is 12:14 p.m.
12     (Recess taken.)
13     THE VIDEOGRAPHER: We are back on the
14 record. The time is 12:30 p.m.
15     (Exhibit No. 6 was marked.)
16 BY MR. SAMSON:
17     Q. Mr. Morelli, you have in front of you
18 what has been marked as Exhibit 6, in which says that
19 it's a, "Sales Force Training REMS and Safe Use." Do
20 you see that?
21     A. Yes, I do.
22     Q. And your name is down there, along
23 with a Mr. Holman. Does that indicate you were
24 either the authors of this slide set or was going to
25 speak from it whenever it was in use this day?

Page 135

1     A. Yes. We were the authors of this
2 slide set, and Kevin reported to me. He was a member
3 of my team.
4     Q. Would this be a slide set and a
5 presentation that you gave only once, so that you
6 might remember the time and date, or would this have
7 been given several times?
8     MR. DAVISON: Objection to form.
9     THE WITNESS: So I would say this is -- as
10 it is right now, it may have been something we gave
11 once or a couple times. But pieces of this were
12 given multiple times.
13 BY MR. SAMSON:
14     Q. And as you were leafing through it,
15 you saw, as I did, there's a C.A.R.E.S. Alliance
16 portion near the end of it; correct?
17     A. That's right.
18     Q. And can you recall a time when you
19 gave the "Sales Force Training REMS and Safe Use,"
20 and specifically added a C.A.R.E.S. Alliance piece to
21 it for one reason or another?
22     A. Yes.
23     Q. When was that, and what was the
24 event?
25     A. So when -- when -- I don't remember

Page 136

1 the event. But when the program was fully flushed
2 out, fully ready to go, ready to launch, that's when
3 we added the C.A.R.E.S. Alliance. That was after the
4 REMS and the Exalgo, launch of Exalgo.
5     Q. Okay. And that date, launch of
6 Exalgo, 2010; if you recall?
7     A. I don't recall. I don't recall.
8     Q. Okay. I think we may run into it.
9     A. Yeah. Yeah.
10     Q. In a numbered form.
11     And when Exalgo launched in 2010, it was a
12 Covidien/Mallinckrodt-branded analgesic?
13     A. Yes.
14     Q. And an opioid?
15     A. Yes.
16     Q. Extended-release hydromorphone?
17     A. Yes.
18     Q. And was the OROS delivery system that
19 it was in, the way in which it became an extended
20 release instead of an immediate release?
21     A. Yes.
22     Q. And that was because the OROS system
23 created a hard shell capsule, not like a contact, but
24 something that was difficult to bite through at
25 least; correct?

Page 137

1     MR. DAVISON: Objection to form.
2     THE WITNESS: Yes, there's some data to
3 indicate it was quite hard to bite through.
4 BY MR. SAMSON:
5     Q. And then what it would do is allow --
6 once it was swallowed and into the digestive tract,
7 allow water to come in osmotically, which would then
8 expel the drug through a tiny laser-drilled hole
9 through the shell?
10     A. Yes.
11     Q. And some engineer figured out the
12 diameter so that that push of essentially IR,
13 immediate release, immediate activity, hydromorphone
14 would be bled out over a long time?
15     A. Yes. It wasn't the pharmacokinetics
16 of the molecule, it was the release kinetics from the
17 capsule.
18     Q. Perfect. So all I need to ask you --
19 and I get the engineering explanation.
20     So the REMS were part of -- which is risk,
21 evaluation, and mitigation strategy?
22     A. Right.
23     Q. And at that point those were required
24 for extended-release opioids, like Exalgo was going
25 to be, by the FDA?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    A.    Correct.
2    Q.    Immediate-release formations were not
3  forced to do REMS by the DEA or the FDA --
4    A.    It wouldn't be the DEA.
5    Q.    -- until 2015; do you know?
6    A.    I don't know the date, but it was
7  later.
8    Q.    It was after you left?
9    A.    It was.
10    Q.    And then C.A.R.E.S. Alliance came out
11  in the same general time frame as the launch of
12  Exalgo?
13    A.    Slightly thereafter, I believe.  But
14  I don't know.  Very close, yeah.
15    Q.    Okay.  And was the C.A.R.E.S.
16  Alliance your baby, so to speak, from the initial
17  concept, or was there a C.A.R.E.S. Alliance thought
18  process going on at Mallinckrodt, and then you came
19  and brought it to fruition?
20    A.    No.
21    MR. DAVISON:  Objection to form.
22    THE WITNESS:  It didn't exist until I
23  brought it to existence, yeah.
24  BY MR. SAMSON:
25    Q.    Okay.  And so you were basically the

Page 139

1  one who came up with that strategic vision and then
2  did the tactical, as you earlier said, parts of
3  putting it together, I'm assuming with other aid --
4  help from other people --
5    A.    Absolutely.
6    Q.    -- at Covidien?
7    A.    Right.
8    Q.    And one of the things that I've seen
9  in C.A.R.E.S. documents is that the increase in use
10  of opioids and resulting abuse, addiction, and deaths
11  have led to a backlash against the use of
12  prescription pain medicine and have adversely
13  affected pain treatment for legitimate pain patients.
14    Was that a concept, in your understanding,
15  why C.A.R.E.S. was something that needed to be done?
16    A.    A huge --
17    MR. DAVISON:  Objection to form.
18    THE WITNESS:  -- hugely important concept.
19  BY MR. SAMSON:
20    Q.    As a major manufacturer and seller
21  and even distributor of opioids, Mallinckrodt stood
22  to lose sales as a result of a, quote, backlash
23  against the use of prescription pain medicine, end
24  quote.  Is that true?
25    A.    I assume it could potentially be

Page 140

1  true.  But I can tell you that was not any motivation
2  of doing C.A.R.E.S. Alliance, was related to that
3  whatsoever.  That was not in my -- that was not in my
4  pitch to Herb and, you know, the CEO and the CFO to
5  get the money to do the program because, you know,
6  we're going to lose scripts.  That was not even in my
7  thinking.
8    Q.    Since you left sales long before
9  that, that doesn't surprise me.
10    What was the pitch --
11    MR. DAVISON:  Objection.
12  BY MR. SAMSON:
13    Q.    -- for?
14    MR. DAVISON:  Sorry.  I apologize.
15  BY MR. SAMSON:
16    Q.    What was the pitch to Herb -- and who
17  was the CEO, Mr. Wright?
18    A.    No, he was not the CEO.  It was --
19  his name was Matt Harbaugh, H-a-r-b-a-u-g-h.
20    So the pitch was, if you look at slide, in
21  essence -- these pages aren't numbered, but it's the
22  -847 MK number, that ends in -847.
23    Q.    And what does it --
24    A.    It says, "A concern we all have."
25    Q.    Okay.

Page 141

1    A.    "A responsibility we share and a
2  concern we all can champion."
3    Q.    And that became a fairly frequent
4  opening slide for C.A.R.E.S.?
5    A.    It's part of the essence of
6  C.A.R.E.S.
7    Q.    Okay.  And let me find it.
8    A.    It's about the middle.
9    MS. GAFFNEY:  They have the Bates number.
10    MR. SAMSON:  I don't have them.  That's the
11  real problem when you print them without it.
12    THE WITNESS:  You've got it.
13    MR. SAMSON:  There it is.  Bingo.
14    Q.    So the concern that you were pitching
15  to Mr. Neuman and Mr. Harbaugh was what?
16    A.    We have a -- there's a big problem
17  going on.  We have a big problem going on in this
18  country.  Everybody needs to be aware of the problem,
19  to understand what this problem is all about.  That's
20  the concern.
21    Q.    Okay.
22    A.    If you're not concerned about that,
23  you need to be.
24    Q.    And that --
25    A.    Then there was --

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1      Q.   What specific concern, the opioid use
2  in the country?
3      A.   Mainly deaths and addiction.
4      Q.   Okay.
5      A.   The two most serious outcomes of what
6  can happen with opioids, if you don't do them right.
7      Q.   Okay.  And then "A responsibility we
8  all share."  What was the responsibility?
9      A.   Responsibility is that -- is at two
10 levels.  One, we have a responsibility for our
11 products, to ensure that the physicians have
12 everything they need to use them safely and
13 appropriately.  That's one level.
14      The second responsibility, as a member of
15 the industry who sells opioids, we have a
16 responsibility to try to help others do the same
17 thing for their products.
18      Q.   Okay.
19      A.   And then --
20      Q.   Go ahead.  And then what is, "The
21 cause that we all can champion"?
22      A.   The cause is to actually try to do
23 something about it.
24      Q.   And that was the steps you took to
25 establish the C.A.R.E.S. Alliance?

Page 143

1      A.   Yes.
2      Q.   And the materials in the C.A.R.E.S.
3  Alliance?
4      A.   Right.
5      Q.   And that was in connection, or at
6  least temporal connection, with the launch of Exalgo;
7  correct?
8      A.   Correct.
9      MR. DAVISON:  Objection.
10 BY MR. SAMSON:
11      Q.   And did you believe that Exalgo, when
12 it was launched, was less susceptible to abuse due to
13 its ORO system than ordinary, for example, ER
14 Oxycontin?
15      A.   I don't believe we had head-to-head
16 kind of comparison data to indicate that.  I think we
17 had -- what I believe we did, as I remember, we just
18 went forward with the assumption that it could be
19 abused, and operated on that assumption.  In other
20 words, plan for the worst, hope for the best.
21      But we weren't going to mitigate what we
22 were doing because we had a capsule that was kind of
23 hard to chew.  We weren't going to back off because,
24 oh, it's hard to chew.  No.  We were going to do --
25 play it straight --

Page 144

1      Q.   Okay.
2      A.   -- in terms of the REMS.  The
3  Exalgo -- C.A.R.E.S. Alliance had nothing to do with
4  Exalgo per se.  But that was the REMS.
5      Q.   Okay.  And there's attached to -- was
6  there a strategic commercial aspect to your
7  identification of the C.A.R.E.S. Alliance strategy
8  that you gave to Mr. Neuman and Mr. Harbaugh as well?
9      A.   Yes, it is.
10      MR. DAVISON:  Objection to form.
11 BY MR. SAMSON:
12      Q.   Okay.  And if you will turn to --
13      A.   It's the umbrella slide.
14      Q.   That's it?
15      A.   Yeah.
16      Q.   Yeah.
17      A.   This is a strategic map, that's what
18 this is, the slide.
19      Q.   And it's called, "The C.A.R.E.S.
20 Alliance" on top?
21      A.   That's correct.  That's correct.
22      Q.   And I take it, this is an Art Morelli
23 designed document?
24      A.   Me and my team.
25      Q.   Okay.  And where you -- if you see

Page 145

1  basically, as I'm reading this document, it is moving
2  the company from "R," across to the right to "2B"?
3      A.   Where we are to where we want to be.
4      Q.   That's what I was taking from it, but
5  I don't know if there was some other --
6      A.   With respect to this particular
7  aspect of the business.
8      Q.   Correct.
9      A.   Yeah.
10      Q.   And this aspect of the business is
11 the opioid pain space?
12      A.   Correct.
13      Q.   And we see Exalgo is in the first
14 step, if -- if -- the arrows or arcs up above, on the
15 baseline of the big portion of the circle, are those
16 meant to be steps?  The --
17      A.   So the big arc is kind of the overall
18 strategy.
19      Q.   Correct.
20      A.   The sub arcs are kind of the
21 sequential steps in making the big leap.  Because the
22 big leap is too big to leap in one step.  You have
23 got to break it into three steps.  So that was the
24 thinking there.
25      Remember, this is a concept slide.  This is

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 a concept slide. And the fact that there are
2 products listed underneath there is illustrative as
3 to where our products -- because, remember, we have
4 to make sure our products are used safely, to the
5 degree we can, how they fit against the strategy.
6     Q.    Do you believe that you took this
7 slide or an earlier version of it with or without
8 C.A.R.E.S. Alliance language to your pitch of
9 Mr. Neuman and Mr. Harbaugh?
10     A.    I think it was an earlier version.
11 It may have been an earlier version.
12     Q.    Certainly the concept --
13     A.    The concept, yes.
14     Q.    -- would have been part of your pitch
15 to them?
16     A.    Right.
17     Q.    Correct?
18     A.    Right.
19     Q.    And so where we are -- I mean, the
20 two -- I don't know what OTCF -- or OTFC means,
21 over -- if the "C" was removed, it would be
22 over-the-counter something.
23     A.    I don't recall. I don't recall.
24     Q.    But Exalgo we certainly see?
25     A.    Right.

Page 147

1     Q.    And then I meant -- I recognize Ruby,
2 Zircon?
3     A.    Those are R&D products.
4     Q.    Exactly. Those were in reasonable
5 doubt still?
6     A.    But opioids.
7     Q.    Yes. And then PENNSAID was
8 intravenous acetomorphine?
9     A.    No. PENNSAID was a topical
10 nonsteroidal for knee pain. Knee pain.
11     Q.    Okay. Methadone was existing as a
12 generic --
13     A.    A generic, yeah.
14     Q.    -- for Mallinckrodt; correct?
15     A.    Right. But not -- not an analgesic.
16 It was addiction maintenance, methadone.
17     Q.    But methadone --
18     A.    It's the same methadone.
19     Q.    But methadone itself has analgesic --
20     A.    Oh, yeah.
21     Q.    -- properties?
22     A.    Absolutely.
23     Q.    But you guys were selling it more for
24 its --
25     A.    Abuse --

Page 148

1     Q.    -- abuse treatment --
2          MR. DAVISON: Let him finish the question.
3 BY MR. SAMSON:
4     Q.    -- treatment place; right?
5          MR. DAVISON: Objection to form.
6          THE WITNESS: Right.
7 BY MR. SAMSON:
8     Q.    And then back to your old land of
9 imaging. That was going to try and build the brand;
10 right?
11     A.    Right. That was -- I just included
12 the products there to show applicability across the
13 product range. If we were known for this ability,
14 you know.
15     Q.    Okay. And then the one that Exalgo
16 is completely -- or most visually related to is the
17 arc of demonstrating REMS excellence?
18     A.    Correct.
19     Q.    And that was something you were
20 already about, because you were working with the
21 Exalgo REMS?
22     A.    Correct.
23     Q.    And then what is -- is the "highly
24 compliant," are those prescribers, or what?
25     A.    No. That's a company.

Page 149

1     Q.    Okay. So that's you?
2     A.    Company attribute that we wanted to
3 be recognized for. And we would get there by
4 demonstrating excellence with REMS.
5     Q.    Okay.
6     A.    That was the thinking there.
7     Q.    And then PENNSAID, methadone, imaging
8 and Fentanyl Patch are in the next narrow rectangle.
9 And under that arc is, "Develop and launch C.A.R.E.S.
10 Alliance," which I'm not sure I see a lot of
11 connection between launching C.A.R.E.S. Alliance with
12 imaging, say.
13          MR. DAVISON: Objection to form.
14          THE WITNESS: It was just a way to -- it
15 probably really doesn't fit that much. It's just a
16 way to try to create the idea that this was a broad,
17 inclusive kind of effort that could apply to various
18 product lines, if we were recognized as a company
19 that's doing the right thing.
20 BY MR. SAMSON:
21     Q.    Okay. And the arc in that is,
22 "Develop and launch C.A.R.E.S. Alliance"; correct?
23     A.    Right.
24     Q.    Which is devoting resources to
25 getting a really accurate message about opioids

Page 150

1 across to everybody in the chain, other
2 manufacturers, prescribing physicians, hospital
3 groups that might be involved in the use of opioids,
4 and patients and their caregivers, like individual
5 caregivers at home, not -- not prescribers?
6        MR. DAVISON: Objection to form.
7        THE WITNESS: Ultimately, yes. But it takes
8 a while to get there.
9 BY MR. SAMSON:
10       Q.    Okay. Well, I take it that with your
11 wisdom in industry, you didn't pitch them at a
12 meeting and tell them we're going to have this in two
13 months?
14       A.    No.
15       Q.    Okay. So that's that step. And then
16 that gets to be -- is this a recognition of status of
17 Mallinckrodt in the -- in the strategy to be
18 recognized as trailblazers, by that end of that
19 second arc?
20       A.    Right.
21       Q.    Okay. And then "Partner and
22 Publish," that is to get outsiders within the space,
23 either prescribers, researchers, et cetera, to
24 publish favorably about Mallinckrodt --
25       A.    No. No.

Page 151

1        MR. DAVISON: Objection.
2 BY MR. SAMSON:
3        Q.    What is it?
4        A.    That was to publish mainly the
5 results of our programs, if there were a publication
6 here that is a scientific document to show that they
7 are achieving what we intended them to achieve.
8        Q.    Okay.
9        A.    And "partner" would be partner with
10 other outside groups outside of Mallinckrodt on some
11 of these initiatives.
12       Q.    Of these other pharmaceutical houses?
13       A.    It could be anybody. It could be a
14 pharmaceutical company. It could be a pain society.
15 It could be anything like that.
16       Q.    And then Ruby, Zercon, et cetera, are
17 put there in that little box, I'm assuming, because
18 they were a ways away?
19       A.    They were a ways away, yeah.
20       Q.    And so they would be hopefully
21 profiting by all these things when they were ready to
22 come out?
23       A.    Right.
24       Q.    And then if the strategic plan was
25 realized and Mallinckrodt got to where it wanted to

Page 152

1 be, then it would be recognized first as a leader in
2 the science of safety?
3        A.    Right.
4        Q.    And as you pointed out earlier, the
5 science of safety principles have existed at least
6 since nuclear reactors were developed. This would be
7 a leader in the science of prescription safety; is
8 that a fair addition?
9        A.    Yes.
10       Q.    And that --
11       A.    Mainly opioid. Yeah.
12       Q.    And that would lead to better patient
13 outcomes; correct?
14       A.    Right.
15       Q.    And that would lead to Mallinckrodt
16 being recognized as a leader in pain?
17       A.    Right.
18       Q.    And that would -- strike that.
19       Did you tell leadership that would be a good
20 position financially and otherwise for us to achieve?
21       A.    That would be a good position for us
22 to achieve in light of the massive problem that
23 exists in society. Someone -- it was the problem, my
24 analysis, my belief at the time, the problem was
25 screaming for leadership. And the FDA needed a

Page 153

1 friend.
2        Because we were going to be that friend, and
3 we were going to be that leader. That was my vision.
4        Q.    And if, in fact, all that came true,
5 you would be a -- a respected and, in quotes, good
6 member of big pharma?
7        A.    I think so.
8        Q.    Okay. I mean, that's -- that's what
9 the goal was?
10       A.    Absolutely.
11       Q.    That would be a marketing -- huge
12 marketing plus?
13       A.    Right.
14       MR. DAVISON: Objection to form.
15       THE WITNESS: I'd say a huge plus. A plus.
16 Don't confine it to marketing. It's a huge plus.
17 BY MR. SAMSON:
18       Q.    It would be --
19       A.    It would cascade across the
20 organization, yeah.
21       Q.    Okay. And it certainly wouldn't do
22 any harm for marketing if one occupied that position?
23       A.    It shouldn't.
24       MR. DAVISON: Objection to form.
25 ///

Page 154

1  BY MR. SAMSON:
2      Q.    And this plan, from what you've said
3  before, seems not to include directly generics?
4      A.    Right.  Remember, the C.A.R.E.S.
5  Alliance is not a product program.  I was putting
6  this lower line there to show how it would be
7  applicable -- of where its applicability would be
8  just in reference to our products, but in reference
9  to other products, too.  Because it's the principles
10 that are important, not the products.
11     But this was a general presentation.  So
12 this is an illustrative overview of what we're going
13 to try to do and where it is potentially applicable.
14     Q.    Okay.  Let me ask you to turn back
15 now to the "Sales Force Training in REMS and Safe
16 Use."
17     A.    Okay.
18     Q.    And let me ask a couple of questions.
19 I missed my little notes here.
20     A.    Okay.
21     Q.    As we talked about earlier, the
22 C.A.R.E.S. Alliance part of the strategy was launched
23 at Pain Week of 2010?
24     A.    Right.
25     Q.    Were you there?

Page 155

1      A.    I was there.
2      Q.    And Covidien owned the trademark and
3  basically the group; true?
4  MR. DAVISON: Objection to form.
5  BY MR. SAMSON:
6      Q.    C.A.R.E.S. Alliance?
7      A.    Yes.  Yes.  Yes.
8      Q.    Was that your idea to have it be a
9  Covidien owned for use in the strategic plan?
10     A.    At the beginning, yes.  But not
11 ultimately.  I was hoping it would involve others,
12 also.
13     Q.    Okay.
14     A.    Yeah.
15     Q.    And then were there members of
16 C.A.R.E.S., since it's called an alliance?  Or what
17 did you, Art Morelli, call them?
18 MR. DAVISON: Objection to form.
19 THE WITNESS:  The goal was to get members,
20 other members besides -- besides -- besides
21 Mallinckrodt, other members.  While I was there, we
22 didn't.  We talked about people-to-people
23 organizations about being a member, and endorsing
24 this, and endorsing that.  But to become a -- you
25 know, to help support it financially is another

Page 156

1  thing.
2      So we had a lot of support in word and
3  spirit, but not much support financially, which --
4  you know how it goes.
5  BY MR. SAMSON:
6      Q.    And did you reach out to outfits like
7  the American Academy of Pain Management?
8      A.    We did, yeah.
9      Q.    That was someone who you pitched on
10 membership?
11     A.    Right.
12     Q.    Were they one of the ones who weren't
13 willing to -- I mean, I can't imagine that this
14 wasn't in step with their ideas; right?
15     A.    We had some discussion.
16 MR. DAVISON: Objection to form.
17 THE WITNESS:  We had some discussions with
18 them, and they were supportive of what we were trying
19 to accomplish.  But they are an organization that
20 needs to raise money, too, through their memberships
21 and their various activities.  So they are not really
22 in a position to be able to give some of that money
23 away.
24     But we had a good working relationship.
25 Phil Saigh, who was the executive director of the

Page 157

1  APPM, and I had a good working relationship.
2  Actually my ex-student.  But he's a good guy.  They
3  are in Chicago.
4  BY MR. SAMSON:
5      Q.    And were they supported by
6  Mallinckrodt financially?
7      A.    I don't know.
8      Q.    Okay.  All of the taking -- you said
9  that sometimes, like a management meeting or
10 orthopedic meeting convention, Mallinckrodt would
11 take a large booth, and then would have a small
12 booth, or a portion of the booth put over to your
13 uses for C.A.R.E.S. Alliance?
14     A.    Right.  With a curtain -- the curtain
15 separator, and it would be Medical Affairs portion of
16 that small booth, and then a patient and product
17 safety portion of that small booth.
18     Q.    And when Mallinckrodt purchases such
19 convention space, that's financial support for
20 whatever the organization is --
21     A.    It is.
22     Q.    -- putting it out?
23     A.    It is.
24 MR. DAVISON: Objection to form.
25 ///

Highly Confidential - Subject to Further Confidentiality Review

Page 158

BY MR. SAMSON:

2     Q.    Any others who you require
3 pitching -- or require -- remember pitching about
4 C.A.R.E.S. Alliance, other than the AAPM?
5     A.    Pitching, not specifically. But I
6 remember presentations to other entities about what
7 we were doing to inform them about what we were
8 doing, and one of those was the FDA.
9     Q.    I take it, the FDA did not offer to
10 buy a membership?
11     MR. DAVISON: Objection.
12     THE WITNESS: They did not.
13 BY MR. SAMSON:
14     Q.    Anyone else who you recall making a
15 presentation to -- the FDA one was not to induce
16 interest in joining the Alliance?
17     A.    No.
18     Q.    Anyone else who the interest was
19 getting them interested in joining the Alliance?
20     A.    I don't recall any others, no.
21     Q.    So the American Academy of Pain
22 Management, would you say it's a fair description,
23 that being an organization that was focused on
24 keeping opioids available for patients with pain?
25     MR. DAVISON: Objection to form.

Page 159

1     THE WITNESS: No, not at all.
2 BY MR. SAMSON:
3     Q.    Okay. What is wrong with that?
4     A.    I think they were focused on best
5 practices in pain management.
6     Q.    Okay. And that was Dr. Webster's
7 outfit?
8     A.    Not his outfit, no. He was an
9 officer in it.
10     Q.    A member?
11     A.    For awhile. That was a rotating kind
12 of thing. Other physicians rotate through that
13 position. But, yes, he was involved with the AAPM,
14 as were other physicians that we worked with.
15     Q.    And do you believe that the AAPM was
16 generally oriented against stricter regulations or
17 restrictions on opioid use for chronic pain?
18     MR. DAVISON: Objection to form.
19     THE WITNESS: I have no idea what their
20 political or legislative, you know, plans were.
21 BY MR. SAMSON:
22     Q.    Okay. But AAPM, nor anyone else,
23 ever gave any money to support the goals and work of
24 C.A.R.E.S. other than Mallinckrodt?
25     A.    To the best of my knowledge, yes.

Page 160

1     Q.    While you were there?
2     A.    Yeah.
3     Q.    Let's turn back to Exhibit 6.
4     A.    Okay.
5     Q.    And I'm going to apologize ahead of
6 time. But if you will look, there's a car --
7     A.    Oh, yeah, the car slide.
8     Q.    Yeah.
9     A.    Okay.
10     Q.    You gave this presentation at least
11 once?
12     A.    I created this slide, and I gave this
13 presentation.
14     Q.    Okay. I don't quite understand it.
15     A.    Most people don't.
16     Q.    Okay. Can you give me the -- what
17 you would have said, if I was sitting in an audience
18 at -- getting sales force training for REMS and safe
19 use.
20     MR. DAVISON: Objection to form.
21     THE WITNESS: So this is a concept slide
22 intended to reinforce to our sales force and
23 marketing people why it is so important that their
24 physicians be fully trained on the safe use of
25 Exalgo. So I was trying to create something that

Page 161

1 related to what they did in their daily lives.
2     So I broke it into three levels. A Honda, a
3 Corvette, and a Ferrari. Most people relate to cars.
4 Right. Because I know everyone in that audience
5 drove a car.
6     So it -- the story went like this: How many
7 people in the audience have a driver's license? All
8 the hands went up.
9     How many people feel comfortable driving a
10 Honda? All the hands went up.
11     You need a lot of specialized training to
12 drive a Honda beyond just being a licensed driver?
13 No.
14     Okay. What if you were driving a Corvette,
15 that's a high-powered performance car. Don't you
16 think it would be a good idea if you had a little
17 more advanced training if you're driving a Corvette
18 around? Everyone said, yeah, yeah, I would probably
19 need a little training. Sure.
20     So then what if you were driving a
21 top-of-the-line Ferrari, and you wanted to fully
22 exploit the performability of that car, you're going
23 to need some training, some serious training, or you
24 will probably kill yourself.
25     So the analogy here is, APAP, opioid combo

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 products are the Hondas of the pain world, in terms
2 of complexity of use. They still have a lot of
3 problems associated with them. Your Honda -- you can
4 still kill yourself in a Honda, but most people know
5 how to use those drugs.
6      So if you go in to start to train doctors on
7 how to use those products, you're not going to get
8 anywhere because they already know how to use them,
9 more or less.
10 BY MR. SAMSON:
11     Q.    Can I interrupt for a second?
12     A.    Sure.
13     Q.    Having been in the pharma business,
14 don't you think that it's more accurate that the
15 doctors think they know how to use them more or less,
16 because they have been using them for years and they
17 have their own opinions on them?
18     A.    I think that would be --
19     MR. DAVISON: Objection to form.
20     THE WITNESS: -- accurate. Doctors think
21 they know everything. But to try to get their
22 attention on something they are really confident,
23 they use every day, and they are not getting a lot of
24 problems that they can see, it's going to be
25 difficult. I don't think impossible. And I wouldn't

Page 163

1 say they couldn't benefit from some additional, you
2 know, updating. Absolutely. But for the purposes of
3 this one, I was trying to create a continuum.
4      So, you know, you have long-acting opioids,
5 Opana, Oxycontin, Oxycontin, et cetera. Those are
6 more -- those are more high-performance products with
7 more risk. You can kill yourself easier, like in a
8 Corvette. So you need to know how to use these
9 things. You just don't throw 'em out there and
10 prescribe 'em. You need more diligence.
11     And then we have Exalgo, which is a
12 brand-new product that no one has ever used before.
13 It's a single entity opioid that's really potent,
14 more potent than these, Opana and oxy. So you
15 need more specialized training so that you don't run
16 off the road at 150 miles an hour.
17     That was the analogy I was trying to create.
18 Because what I was trying to do was get buy-in from
19 everybody of why we need to go beyond -- above and
20 beyond the call of duty on the Exalgo REMS.
21 BY MR. SAMSON:
22     Q.    Okay. Why is it -- the APAP combos,
23 are those -- whatever the opioid is involved, is that
24 an immediate release, in your diagraming here?
25     MR. DAVISON: Objection to form.

Page 164

1     THE WITNESS: It is. It's a Vicodin-like
2 product, yeah.
3 BY MR. SAMSON:
4     Q.    And then Opana and Oxycontin were
5 both -- Oxycontin, by the time you were giving this
6 presentation, was mostly in extended release,
7 although still available in immediate release?
8     A.    Right. And no -- no nonopioid
9 component to it. And that's very critical, actually.
10     Q.    Okay. And Opana, what molecule is
11 that?
12     A.    Oxymorphone.
13     Q.    And Exalgo was hydromorphone?
14     A.    Hydromorphone.
15     Q.    And Opana, extended release?
16     A.    Yes.
17     Q.    Okay. So why -- what's the step up?
18 You were talking about risk and need for more
19 training from the immediate release APAP combo to
20 Opana/Oxycontin?
21     MR. DAVISON: Objection to form.
22 BY MR. SAMSON:
23     Q.    Extended release?
24     A.    It's more opioid. It's used for a
25 longer period of time. All those factors increase

Page 165

1 risk and potential harm to patients.
2     Q.    Okay. And then on the risk side,
3 Opana was -- had risk deterrent features, not to the
4 FDA's level of allowing it to be abuse deterrent,
5 resistant labeling; true?
6     MR. DAVISON: Objection to form.
7 BY MR. SAMSON:
8     Q.    But it had some built-in attempts to
9 reduce risk from it; am I right?
10     MR. DAVISON: Objection to form.
11     THE WITNESS: I believe you're right.
12 BY MR. SAMSON:
13     Q.    Okay. And certainly Exalgo did;
14 correct?
15     A.    No. Not according to the FDA, no.
16     Q.    And, in fact, they never did
17 approve -- is it ADF or ADR labeling?
18     A.    ADF.
19     Q.    ADF?
20     A.    Yeah.
21     Q.    You never got to that; correct?
22     A.    Not while I was there, no.
23     Q.    So higher risk, more training; lower
24 risk, less training for sales --
25     A.    So there's a risk.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    MR. DAVISON: Objection to form.
2    THE WITNESS: There's a risk difference
3  here. There's also a familiarity difference. So
4  drugs that physicians are very familiar with,
5  moderately familiar with, unfamiliar with.
6    MR. SAMSON: Okay.
7    MR. DAVISON: Mark, we have been going
8  another 40 minutes. We're almost ready for lunch.
9    MR. SAMSON: Sure. Let's do it.
10    THE VIDEOGRAPHER: Going off the record.
11  The time is 1:11 p.m.
12    (Lunch recess taken at 1:11 p.m.)
13    --o0o--
14
15
16
17
18
19
20
21
22
23
24
25

Page 167

1  AFTERNOON SESSION                    1:54 P.M.
2    --o0o--
3    THE VIDEOGRAPHER: We are back on the
4  record. The time is 1:54 p.m.
5  BY MR. SAMSON:
6    Q.  Hi, Mr. Morelli.
7    A.  Hello.
8    Q.  Remember all the stuff we talked
9  about before the deposition, about how depositions go
10  on? No changes; okay?
11    A.  Correct.
12    Q.  Good. REMS were required by the FDA
13  for Exalgo; true?
14    A.  True.
15    Q.  Were the EEIFs that you guys put
16  together, the essential -- Exalgo essential
17  information forms --
18    A.  Right.
19    Q.  -- were those required by the FDA or
20  was that a Mallinckrodt decision?
21    A.  I believe it was required.
22    Q.  Okay. And what were the EEIFs meant
23  to do in terms of the FDA's program for REMS and
24  EEIFs?
25    MR. DAVISON: Objection to form.

Page 168

1    THE WITNESS: It was meant to create a
2  measurable, call it a metric, that physicians had
3  read the REMS and understood the REMS and really
4  understood the risks inherent with the product.
5    (Exhibit No. 7 was marked.)
6  BY MR. SAMSON:
7    Q.  And let me ask you to turn to
8  Exhibit 7, which is an email list -- or a couple of
9  e-mails back and forth, and then a longer list of
10  Ohio doctors.
11    A.  Right.
12    Q.  Have you had a chance to familiarize
13  yourself with that?
14    A.  I remember this campaign. I don't
15  remember this email, but I remember this campaign,
16  yeah.
17    Q.  Okay. And down at the bottom -- I
18  think it's -- is it Mr. Meyer or Ms. Meyer?
19    A.  Jay Meyer is a man, yeah.
20    Q.  Okay. Mr. Meyer says that he
21  promised you that he would get all the listed docs
22  EEIFs submitted?
23    A.  Correct.
24    Q.  And if you will look down under the
25  "All," is where he -- in the middle of the page.

Page 169

1    A.  Oh, yes. Yes.
2    Q.  He had a lengthy conversation with
3  Art, you; correct?
4    A.  Correct.
5    Q.  And Preston, who is --
6    A.  Preston -- Preston Walker, who worked
7  for me.
8    Q.  (Reading) As a result, I have
9       guaranteed we will obtain a completed
10       EEIF from all -- "all" in caps --
11       physicians listed with the exception
12       of Dr. Naum (end of reading).
13    My first question is, do you have any memory
14  of why Dr. Naum would not be part of this seemingly
15  global program?
16    A.  I have no idea.
17    MR. DAVISON: Objection to form.
18  BY MR. SAMSON:
19    Q.  Do you have any reason to remember
20  how these listed physicians were selected?
21    A.  Oh, yeah. These physicians were
22  physicians who were Exalgo prescribers but had not
23  completed an EEIF.
24    Q.  Okay. And is the fact that they are
25  all in Ohio simply because that was Mr. Meyer's area?

Page 170

1    A.    Yes.
2    Q.    And then in his email to you, he
3  says:
4        (Reading) The following physicians are
5        speakers, so I am guessing you can
6        have the EEIF completed relatively
7        quickly (end of reading).
8  And then a list of four physicians.
9    MR. DAVISON:  Objection to form.
10    THE WITNESS:  Okay.
11  BY MR. SAMSON:
12    Q.    And do you recall any of those four
13  listed physicians?
14    A.    I do not.
15    Q.    Okay.  He says they are speakers.  So
16  why -- knowing how Covidien works, why would speakers
17  be expected by Mr. Meyer to be guessing that those
18  guys would complete their EEIFs relatively quickly?
19    A.    You would think so.
20    MR. DAVISON:  Objection to form.
21    THE WITNESS:  You would think so.
22  BY MR. SAMSON:
23    Q.    Because?
24    A.    Well, they are speaking on the
25  product.  So if they are speaking on the product,

Page 171

1  they have to do -- they should complete the basics
2  regarding the product safety more than ever.
3    Q.    And any explanation that you recall
4  for why these four doctors wouldn't do that?
5    MR. DAVISON:  Objection to form.
6    THE WITNESS:  No.  More than likely, it's
7  inertia.
8  BY MR. SAMSON:
9    Q.    When they are listed as speakers, I
10  think you've told me that Medical Affairs didn't pay
11  for speakers; correct?
12    A.    Correct.
13    MR. DAVISON:  Objection.
14  BY MR. SAMSON:
15    Q.    Were speakers compensated by
16  Mallinckrodt out of some other budget?
17    MR. DAVISON:  Objection to form.
18    THE WITNESS:  Yes.
19  BY MR. SAMSON:
20    Q.    And which department was that?
21    A.    Commercial.
22    Q.    Okay.  And do you have an idea of --
23  if I, as a speaker, go to a pain management meeting
24  and am there sponsored by Covidien, what would I get
25  as a speaker?

Page 172

1    MR. DAVISON:  Objection.
2  BY MR. SAMSON:
3    Q.    If you have any idea.
4    A.    It really depends.  I don't know,
5  because I didn't deal with this.  But even if I had,
6  I wouldn't have remembered the number.
7    But it's -- it's -- there's certain
8  guidelines of what -- you can't, you know, pay them
9  $100,000 to give a one-hour talk.  I'm being very
10  exaggerating here.  There's a fair market value kind
11  of calculation.
12    There's various organizations, more so now
13  than then -- this is almost ten years ago -- that
14  require that the fees not be exorbitant, and in line
15  with other things that the doctor may be doing.  So,
16  yeah.
17    Q.    And those recent restrictions, or the
18  ones that might have been in place, were those
19  industry guidelines put together, or were those FDA
20  or some other entity guidelines?
21    MR. DAVISON:  Objection to form.
22    THE WITNESS:  Not FDA.  Those were industry
23  and Covidien's guidelines, which may or may not --
24  which likely are stricter than the industry
25  guidelines.  Because the industry guidelines are just

Page 173

1  that, guidelines.  Ours were firm lines, you know.
2  BY MR. SAMSON:
3    Q.    That essentially set limit of the
4  price one could pay a speaker to talk about a
5  Covidien product at a meeting, based on probably how
6  long it was, how long the presentation was?
7    A.    No.
8    MR. DAVISON:  Objection to form.
9    THE WITNESS:  No.  Based on a presentation.
10  They are all about the same length.  Yeah.
11        (Exhibit No. 9 was marked.)
12  BY MR. SAMSON:
13    Q.    Let's move to, out of order,
14  Exhibit 9.
15    A.    Exhibit 9.
16    MR. DAVISON:  Do we know the Bates number?
17  I am not sure which ones we have.  Yeah, I don't have
18  that one.
19    MR. MAEROWITZ:  We have Exhibit 8 and 7.
20    MR. SAMSON:  It would have been 6
21  originally.
22    MS. GAFFNEY:  Which document are you looking
23  at?
24    MR. SAMSON:  It's a one-pager.
25    Go off.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    THE VIDEOGRAPHER: We are going off the
2 record. The time is 2:03 p.m.
3    (Discussion held off the record.)
4    THE VIDEOGRAPHER: We are back on the
5 record. The time is 2:04 p.m.
6 BY MR. SAMSON:
7    Q.   All right. Mr. Morelli, this one is
8 another one about -- the "Re" line is EEIFs; correct?
9    A.   Right.
10    Q.   And then you're the person at the top
11 responding to the email at the bottom; correct?
12    A.   Correct.
13    Q.   And you wrote:
14    (Reading) That's correct. If they
15    have not written a script, we don't
16    need the EEIF. We already have
17    500-plus from non-Exalgo writers.
18    They don't count (end of reading).
19    Did I read that correctly?
20    A.   You did.
21    Q.   And Exalgo writers are people who
22 have written a prescription for Exalgo?
23    A.   Correct.
24    Q.   Why -- I mean, the EEIFs are a safety
25 tool; correct?

Page 175

1    A.   For Exalgo.
2    Q.   And why do the nonprescribers reading
3 of the safety information about Exalgo not count?
4    MR. DAVISON: Objection to form.
5    THE WITNESS: It doesn't count because the
6 direction from the FDA was to obtain compliance with
7 this -- with what's called an attestation that they
8 read the material. If a physician has no intention
9 of reading the material, is not interested in the
10 product, they have no reason to do the attestation.
11    So physicians are very sensitive about
12 signing their names to things --
13 BY MR. SAMSON:
14    Q.   Okay. But --
15    A.   -- and the reps want to get
16 signatures. So you have those things colliding.
17    Q.   Well -- and what I don't understand,
18 it's a safety tool; correct?
19    A.   For Exalgo.
20    Q.   For Exalgo?
21    A.   Yeah.
22    Q.   And the fact that I haven't written a
23 prescription to date doesn't really knock me out of
24 consideration as writing a prescription for it in the
25 future; correct?

Page 176

1    A.   Oh, absolutely. A physician can
2 prescribe whenever they feel like it. But it may be
3 that the doctor has no intention. If a doctor has an
4 intention, read it, fill it out. Absolutely.
5    Q.   But you guys weren't even going to
6 take them.
7    A.   Well, we took them. It's just that
8 we're -- they are not going to count in the tally
9 that the FDA is interested in, which is our
10 prescribers.
11    So if we had -- if we have a thousand
12 prescribers, and we have 800 completed EEIFs, that
13 will make them happy. But a thousand would be
14 better. But if we have 800 out of a thousand -- and,
15 oh, we have 500 other doctors who are not even
16 involved with Exalgo, they are not going to be
17 impressed by that. They want us to do things
18 according to the REMS.
19    Q.   And so not counting didn't count
20 against your, Mallinckrodt's, Exalgo percentage of
21 prescribing doctors who had actually filled out an
22 EEIF?
23    A.   Right.
24    Q.   And that was the only number that you
25 guys were concerned about?

Page 177

1    A.   But I'm like you, if a hundred other
2 people want to read the safety information on Exalgo
3 and fill out the form, I'm okay with it. But it's
4 just not going to count against the metric, you know.
5    Q.   But it does count to the general
6 safety awareness of the possible prescriber to have
7 read the EEIF.
8    A.   You could look at it that way, yeah.
9    (Exhibit No. 8 was marked.)
10 BY MR. SAMSON:
11    Q.   This will be No. 8. I think you
12 already have it, Mr. Morelli.
13    A.   I do. I think I do. Yeah, this one.
14    Q.   Before we get to the details of
15 Exhibit 8, REMS and EEIM were thought by the FDA for
16 extended release opiates to be -- in 2011 to be
17 important safety tools?
18    MR. DAVISON: Objection to form.
19    THE WITNESS: An important metric, amongst
20 other metrics, in terms of educating physicians on
21 the risks.
22 BY MR. SAMSON:
23    Q.   And the -- the goal of educating
24 physicians on the risk is to increase the safety of
25 the prescribers for whatever medications REMS and

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 EEIFs are involved; true?
2          MR. DAVISON: Objection to form.
3          THE WITNESS: To increase the knowledge of
4 the prescribers on safe use practices with respect to
5 Exalgo that we are recommending that they employ.
6 BY MR. SAMSON:
7          Q.    And the opposite of that, not reading
8 a REMS, not filling out -- reading or filling out an
9 EEIF, is prescription being written with less
10 information?
11         A.    Exactly.
12         MR. DAVISON: Objection.
13 BY MR. SAMSON:
14         Q.    And that's, in the way you view the
15 world, I think, less safe than an informed prescriber
16 writing a prescription of any of the opioids?
17         MR. DAVISON: Objection.
18         THE WITNESS: Yes.
19 BY MR. SAMSON:
20         Q.    And was there -- was the FDA, did it
21 ban REMS or EEIFs for generic immediate release --
22         MR. DAVISON: Object.
23 BY MR. SAMSON:
24         Q.    -- opioids?
25         MR. DAVISON: Objection to form.

Page 179

1          THE WITNESS: Did it ban?
2          MR. SAMSON: Yes.
3          THE WITNESS: No, not that I know.  Why
4 would they do that?
5 BY MR. SAMSON:
6          Q.    I mean, obviously, these are
7 informational tools.
8          A.    Right.
9          Q.    Which are good for any drug, whether
10 it be a multiple sclerosis drug or an opioid; true?
11         A.    Right.  But they are generally not
12 interchangeable.  They are product specific.
13         Q.    Oh, that -- I understand that.  But
14 just in -- it's not just an opioid tool, it's a
15 wider-spread tool for any prescribed medication?
16         A.    It's -- it's an adaptable tool that
17 could be adapted to any medication.
18         Q.    And there wasn't any ban from the FDA
19 on producing REMS or producing EEIFs on generic
20 opioids in 2011; true?
21         MR. DAVISON: Objection to form.
22         THE WITNESS: So REMS is regulation.  REMS
23 is regulatory.  So REMS are imposed or required.
24 By "imposed or required," I mean mandated by the
25 agency at their discretion.  And if they so deem that

Page 180

1 to be necessary, we have to implement it.
2 BY MR. SAMSON:
3          Q.    I understand.  But in generics,
4 especially -- except not all generics, but immediate
5 release --
6          A.    Right.
7          Q.    -- they weren't required until 2018;
8 correct?
9          A.    Right.
10         MR. DAVISON: Objection to form.
11         THE WITNESS: And even branded immediate
12 release were not required.  Because the Agency's
13 opinion was that they were less risky because they
14 were older products, that doctors were more familiar
15 with the risks, and they had been using for years.
16 So it didn't happen till later, till they realized
17 it's all one big problem.
18 BY MR. SAMSON:
19         Q.    And there was nothing to stop
20 Mallinckrodt, if it realized quicker than the FDA
21 that it's all one big problem, to add educational
22 materials concerning its immediate --
23 immediate-release generic opioids?
24         MR. DAVISON: Objection to form.
25         THE WITNESS: True.  But we went even bigger

Page 181

1 than that.  That would have been a big step.  We went
2 way bigger than that.  We did the C.A.R.E.S. Alliance
3 for all opioids, whether they were ours, generics,
4 branded, whoever -- whomever, whatever, to enforce
5 the principles, the principles of good pain
6 management, especially for chronic pain, and safe
7 medication uses, and the concept of protecting
8 patients from harm.
9          So we went bigger than that.  That's why you
10 got that big umbrella.
11 BY MR. SAMSON:
12         Q.    And in going bigger, did you make
13 sure that physicians who were prescribing
14 Mallinckrodt immediate-release opioids took advantage
15 of those programs, or did you simply have it out
16 there available?
17         MR. DAVISON: Objection to form.
18         THE WITNESS: We had it out there available.
19 And, quite frankly, we have no idea who's prescribing
20 the generics, because we don't -- we don't call on
21 them and detail doctors on generics and try and --
22 and inform them about the availability of generics
23 that we produce.
24         That's not how generic works.  It's done at
25 the pharmacy.  It's substituted at the pharmacy, no

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 matter what the doctor prescribes. So we don't
2 really know who would be a prescriber or not a
3 prescriber. That was my state of the -- maybe they
4 know now because they have better data now, but that
5 was my understanding of it.
6 BY MR. SAMSON:
7    Q.    And no one ever considered doing a
8 mailing to specialties that were involved in opioids,
9 like anesthesia, pain management, et cetera, to
10 inform them of similar information that you were
11 putting out for Exalgo through the REMS and the
12 EEIFs, for immediate-release generics that
13 Mallinckrodt sold?
14    MR. DAVISON: Objection to form.
15    THE WITNESS: We did a ton of
16 direct-to-physician and direct-to-pharmacy
17 communications by mailing and by -- whatever they
18 call it, fax, mass -- mass faxing on Exalgo. We went
19 beyond what we had to do, as required there. Like we
20 did it multiple times. But we would have to send it
21 to every physician in the United States. That's over
22 1.1 million DEA registrants.
23 BY MR. SAMSON:
24    Q.    My question isn't what you would have
25 had to do. You would have known, with your position

Page 183

1 at Mallinckrodt, about in the REMS world, correct, if
2 Mallinckrodt was interested in increasing that
3 program to include prescribers of immediately
4 released generic opioids; true?
5    MR. DAVISON: Objection to form.
6    THE WITNESS: If they were going to do
7 something, I would probably know about it, right.
8 BY MR. SAMSON:
9    Q.    And you never --
10    A.    I did not know about it. I did not
11 know about it.
12    Q.    We're getting back to conversation,
13 and I --
14    A.    Okay.
15    Q.    And I enjoy it as much as you do, but
16 we have to stay in the setting in which we find
17 ourselves.
18    You didn't know about it because nobody
19 asked you for your input on that front; correct?
20    MR. DAVISON: Objection to form.
21    THE WITNESS: Not that I recall. They
22 didn't ask for my input.
23 BY MR. SAMSON:
24    Q.    Exhibit 8 -- sorry to have gotten off
25 track -- this is an email from Mr. Keith Huels,

Page 184

1 May 17th, 2011. So within a year or a month or so of
2 when you joined Medical Affairs?
3    A.    Uh-huh.
4    Q.    And its subject line is, "Promo
5 Speaker's Budget."
6    A.    Right.
7    Q.    What are promo speakers?
8    A.    A speaker who gives promotional
9 talks.
10    Q.    And I'm going to end that sentence
11 with, for Covidien products; is that the correct
12 ending or --
13    A.    No. No.
14    Q.    -- not?
15    MR. DAVISON: Objection.
16    THE WITNESS: Or Exalgo. Or PENNSAID,
17 actually.
18 BY MR. SAMSON:
19    Q.    Either/or?
20    A.    Yes.
21    Q.    And forgive me if I am confused, but
22 I thought promo speakers weren't out of Medical
23 Affairs budget or --
24    A.    They were not. But we had oversight.
25 We had Medical Affairs oversight on the budget as a

Page 185

1 check that there were not irregularities in who was
2 getting paid what.
3    Q.    Now, as I -- and then there's
4 attached a long list of people or entities more --
5 some entities, some individual names?
6    A.    Correct.
7    Q.    And if you look back to the last
8 page, there's total invoices -- total invoices are
9 $1,852,858, up at the very top left.
10    A.    Yeah.
11    Q.    And then invoices and accruals are
12 $1,113,305?
13    A.    Right.
14    Q.    And then there's a Medical Affairs
15 accrual, hyphen, Selva, April, of 144,000?
16    A.    Okay.
17    Q.    Do you remember any of those?
18    A.    No. But I remember the overall
19 processes.
20    Q.    And what was the budget that would go
21 to promotion -- promo speakers in a full fiscal year
22 when were you there?
23    A.    I have no idea. I don't remember.
24    Q.    Okay.
25    A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    Q.    Let me go through -- ask you to go
2  through -- do you remember who Selva Group was?
3       A.    Selva was a -- I don't actually know.
4  I remember the name, that's all.
5       Q.    Okay.
6       A.    They had to do with speakers, though.
7       Q.    Okay.  Are some of these ones that
8  appear again and again, like Selva, Advanced
9  Health -- and I'm assuming ME went further out to --
10      A.    Yeah.
11      Q.    -- in the title -- were these bureaus
12  or --
13      A.    I think they were bureaus.  I think
14  they were bureaus or scheduling entities or
15  scheduling -- scheduling entities for the speakers.
16      Q.    And Paragon Rx International?
17      A.    Yeah, that was -- that was mine.
18  That was all under my budget.
19      Q.    And what --
20      A.    Paragon Rx, you were going to ask me?
21  I'm sorry.
22      Q.    What are they?  What is it?
23      A.    They're -- they're a consulting
24  company that I use for the Rx FMEA and other
25  consulting on REMS.

Page 187

1       Q.    And are they physicians or
2  nonphysicians or both?
3       A.    They are a mix of physicians,
4  pharmacists, and Pharm.Ds, and civilians.
5       Q.    And they can supply you with
6  speakers --
7       A.    No, not speakers.  Not speakers.  The
8  Rx FMEA and REMS -- REMS.  They are a company that
9  specialized in REMS creation and REMS implementation.
10      Q.    Why are they appearing on the promo
11  speakers' budget lines, then?
12      MR. DAVISON:  Objection to form.
13      THE WITNESS:  I don't think it's a -- I
14  think that's just a heading of the email.  They had
15  nothing to do with promo speakers, I can tell you
16  that.
17  BY MR. SAMSON:
18      Q.    Okay.  Did Selva Group have to do
19  with promo speakers?
20      A.    I believe they did, yeah.
21      Q.    How about Advanced Health ME,
22  whatever that's short for, do you recall --
23      A.    I don't recall them.
24      Q.    Okay.  So they might have been promo
25  speakers?

Page 188

1       MR. DAVISON:  Objection to form.
2       THE WITNESS:  I -- I don't know.
3  BY MR. SAMSON:
4       Q.    Okay.  Well, as far as Paragon Rx
5  International, you've told me that those -- those
6  amounts are probably them being paid to contribute to
7  the REMS and the Rx risk assessment?
8       A.    Yeah.  Yeah.  I can guarantee that
9  that's the case.
10      Q.    Okay.  And then if you look on the
11  next page, there's Schwartz MD?
12      A.    No, that -- I don't know what that
13  is.
14      Q.    Okay.  And Rosenblum, Stuart?
15      A.    I have no idea.
16      Q.    And Guernelli -- Guernelli?
17      A.    I don't know.  Sorry.
18      Q.    And then the rest we have already
19  talked about.
20      A.    Yeah.
21      Q.    And then the accrual balance, which
22  you're a better businessman than me, I'm assuming
23  these are amounts that the various listed entities
24  have coming but haven't been paid yet?
25      A.    Correct.

Page 189

1       Q.    And do you recognize Reichman, Ronald
2  P.?
3       A.    No.
4       Q.    How about Halley, Randall E.?
5       A.    I do.
6       Q.    What was Halley, Randall E.?
7       A.    He is a physician that conducted
8  clinical studies for us.
9       Q.    Clinical studies of Exalgo?
10      A.    Yeah.
11      Q.    And what kind of clinical studies?
12  Premarketing or post marketing?
13      A.    I'm sorry.  I'm going to have to
14  correct my answer.  I got him mixed up with another
15  physician.
16      He did not, to the best of my knowledge,
17  conduct clinical studies.  He was a -- I think he was
18  a speaker, actually.  Yeah.
19      Q.    Okay.  And then Selva's, Victor Byrd?
20      A.    Don't know.
21      Q.    Sharon Idan -- or Idan, Sharon?
22      A.    Don't know.
23      Q.    George Spyropoulos?
24      A.    Don't know.
25      Q.    David Medunick?

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    A.    Don't know.  Sorry.
2    Q.    Any of the other personal names that
3 follow there?  Why don't you just -- to save us time,
4 how about you scan the rest of the list --
5    A.    I'm scanning, yes.
6    Q.    -- and find any personal names --
7    A.    I'm scanning.
8    Q.    -- that you recognize or business
9 names, if we haven't already talked about them.
10   A.    Right.
11   Q.    There's Randall Halley again.
12   A.    No.  The only name I recognize on
13 here is Randall Halley.
14   Q.    And did you tell me what you thought
15 his role was?  I know you told --
16   A.    I think he was a speaker.  I think he
17 was a speaker.  That's what I think.
18   Q.    For Exalgo or --
19   A.    For Exalgo.
20   Q.    Okay.  Let me ask you something I
21 should have asked first.
22         You will see there's -- in the left-hand
23 column, there are PVs and OVs.  Does that mean
24 anything to you as an ex-Covidien?
25   A.    OV means nothing.

Page 191

1         PV is generally an abbreviation for
2 pharmacovigilance.  But it doesn't really fit in this
3 case.  So I don't know what it means here.
4    MR. SAMSON:  10, Sandy?
5    THE REPORTER:  Yes, Exhibit 10.
6         (Exhibit No. 10 was marked.)
7 BY MR. SAMSON:
8    Q.    Mr. Morelli, I will tell you, just to
9 orient you, this is a series of emails about an
10 expected release of a JAMA article on -- regarding
11 that opioid deaths are higher with higher dosing
12 patterns.
13   A.    Okay.
14   (Witness reviewing document.)
15   A.    Okay.
16   Q.    Do you recall this study coming out?
17   A.    No.
18   Q.    Okay.  Earlier we talked about the
19 old per-need dosing patterns.
20   A.    p.r.n.
21   Q.    p.r.n., correct.  And versus more
22 regular dosing of, especially, extended-release
23 opioids.
24   A.    So do you want me to address what you
25 just said, or what?

Page 192

1    Q.    Yes.
2    A.    So you can't --
3    MR. DAVISON:  Objection to form.
4    THE WITNESS:  You can't dose
5 extended-release opioids on a p r n. basis.  It's
6 contraindicated.  You dose them once a day or twice a
7 day.  That's it.
8 BY MR. SAMSON:
9    Q.    And I was -- you and I are on the
10 same page.
11   A.    Yeah.
12   Q.    On per need, the new regular dosing
13 pattern went over to extended release use of opioids;
14 correct?
15   MR. DAVISON:  Objection to form.
16   THE WITNESS:  I don't understand what you
17 mean, "the new regular dosing pattern."
18 BY MR. SAMSON:
19   Q.    Well, you --
20   A.    Extended release -- let's take Exalgo
21 as the example, is dose once a day.  That's the only
22 way it can be dosed.
23   Q.    Correct.
24   A.    Yeah.
25   Q.    And ER Oxycontin is dosed twice a

Page 193

1 day?
2    A.    Right.  Right.
3    Q.    There was a time when no opioids were
4 dosed once or twice a day but, rather, when you have
5 pain, ring your buzzer or tell me or take an
6 immediate-release tablet; correct?
7    A.    Yes, but --
8    MR. DAVISON:  Objection to form.
9    THE WITNESS:  -- none of those were
10 extended-release opioids that were ever dosed on a
11 p.r.n. basis.
12 BY MR. SAMSON:
13   Q.    So this study was looking at what you
14 and I had agreed on earlier was that the amount of
15 opioid that patients received with regular dosing was
16 generally higher than they received in a milligram
17 equivalent, or whatever, from per need; true?
18   MR. DAVISON:  Objection to form.
19   THE WITNESS:  I -- I don't know.  I don't
20 know.  It could have been higher.  It could have been
21 lower.  It's based on patient need.
22         So Freddie gets his dose when Freddie
23 requests his dose as opposed to the doctor saying
24 it's every four hours or every six hours.
25 ///

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 BY MR. SAMSON:
2 Q. Well, how are you weighing in on what
3 to do about this study if you didn't even read it?
4 MR. DAVISON: Objection to form.
5 THE WITNESS: Well, Nancy Stauder outlined
6 what the study was generally about, just like you
7 did. There's a huge overdose problem. So what
8 she -- she's a communication person.
9 MR. SAMSON: Okay.
10 THE WITNESS: She was recommending the use
11 of tools to aid physicians to prevent overdoses, no
12 matter how they dose the products, their general
13 methods.
14 And you can see there Covidien strongly
15 supports the need for appropriate screening,
16 prescribing, and use of all opioid medications.
17 That's our position. Because of that need, we
18 recently launched C.A.R.E.S. Alliance. This
19 initiative provides a number of tools and programs to
20 aid physicians, pharmacists, patients, and
21 stakeholders.
22 Among the items available at C.A.R.E.S.
23 Alliance are a urine drug screening guide, a patient
24 prescriber expectations, responsibilities form, and a
25 number of patient assessment tools.

Page 195

1 These are tools that are designed and had
2 been validated to solve -- help solve this problem
3 that this article is bringing out.
4 BY MR. SAMSON:
5 Q. Look at the first paragraph of her
6 response, her draft message. Okay?
7 A. Okay.
8 Q. The bolded, in fact, "The article is
9 attached for your awareness only."
10 A. Right.
11 Q. "You should not provide this to
12 physicians, nor should you use it in proactive
13 outreach."
14 A. Absolutely.
15 Q. And why is that?
16 A. Because it's Standard Operating
17 Procedure that the sales organization cannot pick up
18 some study, any study, that they want and use it in
19 their -- in their sales activities unless that study
20 has been approved for use by Medical Affairs. And
21 this isn't even out yet.
22 Q. Is there any indication that they're
23 going to ask you to approve it in this email string
24 on this exhibit?
25 MR. DAVISON: Objection to form.

Page 196

1 THE WITNESS: I don't know. I don't -- I
2 don't see that.
3 I see a draft message from a communications
4 person to the field informing them that data is going
5 to be released in JAMA, and nothing more. And if
6 they get questions on it, or someone is concerned
7 about the opioid problems, that rather than get in a
8 debate whether the article is right, wrong, up or
9 down, to refer that physician to the C.A.R.E.S.
10 Alliance tools to prevent the problems that are
11 highlighted in that article.
12 That's -- that's a responsive organization
13 to data being released that shows problems.
14 BY MR. SAMSON:
15 Q. And you don't think that the findings
16 of this study, because you never read it, showed
17 problems with the very kinds of opioids that
18 Mallinckrodt was selling?
19 MR. DAVISON: Objection to form.
20 THE WITNESS: Mark, no one denies there's
21 problems. We know there's problems. If there
22 weren't problems, we wouldn't have created the
23 C.A.R.E.S. Alliance. That's a response of a
24 responsible, concerned organization to provide tools
25 that physicians can actually use in their practice

Page 197

1 with actual real patients to prevent some of this
2 stuff or to help prevent some of this stuff.
3 BY MR. SAMSON:
4 Q. Are any of the C.A.R.E.S. Alliance
5 tools to encourage the physician, perhaps, to think
6 over whether or not this patient should be on
7 extended-release opioids?
8 A. Absolutely. Be on opioids at all.
9 Q. Okay. Now, the letter to the sales
10 force goes on that:
11 (Reading) If the doctor is willing to
12 talk with you after you give the
13 script -- that is the boldface
14 above -- proceed based on previous
15 guidance (end of reading).
16 Which I take it, is a kit that was dropped
17 off concerning C.A.R.E.S.?
18 MR. DAVISON: Objection to form.
19 THE WITNESS: I don't know. It could be.
20 It could be.
21 BY MR. SAMSON:
22 Q. Okay. (Reading) And then if
23 the clinician persists in wanting to
24 discuss the article, then they are
25 given another bold point -- boldface

Page 198

1 response (end of reading).

2 A. Right.

3 Q. And that's to:

4 (Reading) I'm unable to discuss it

5 further with you. Our Medical

6 Information Group is best suited to

7 talk with you. I'm happy to send your

8 inquiry to them for follow-up (end of

9 reading).

10 A. Precisely.

11 Q. And who would that go to in Medical

12 Affairs, if such an inquiry came in?

13 A. A group of mainly Pharm.Ds on the

14 front line of the phones, supervised by a physician,

15 Eddie Darton, who reports to Herb Neuman.

16 And what actually happens is Dr. Jones calls

17 in there and has a question; they field the question;

18 they give a verbal response immediately on the phone;

19 then they follow up with that physician with a letter

20 reiterating what they talked about; the citations

21 that Pharm.D is using as a basis for his answer and

22 copies of the studies that were cited.

23 Q. Okay. So somewhere in Covidien

24 document files in Medical Affairs will be notes,

25 letters, et cetera, responding to some physicians who

Page 199

1 may have called, if they didn't get put off by the

2 C.A.R.E.S. Alliance talk and actually wanted to

3 discuss the merits of the article?

4 MR. DAVISON: Objection to form.

5 THE WITNESS: I'm going to really push back

6 on this "put off" characterization. There's no

7 putting off.

8 We are giving the physician options.

9 Whatever that physician wants to do, we're on board

10 with it. If the physician wants to get into the

11 C.A.R.E.S. Alliance and adopt tools, we're good with

12 it. We will help them. If the physician wants to

13 talk to the Pharm.D people and Medical Information,

14 we're good with it. If they want to do both, we're

15 good would it. If they want to talk to Eddie Darton,

16 we're good with it. If they want to talk to Herb

17 Neuman, we're good with it. I guarantee they don't

18 want to talk to me.

19 But this is the process that we've

20 established. And this was just really reiterating --

21 there's nothing in here, this letter by Nancy

22 Stauder, that isn't SOP, basic operating procedures

23 within a pharmaceutical company. Because you can't

24 have reps talking about things they are not trained

25 on and not qualified to answer.

Page 200

1 BY MR. SAMSON:

2 Q. Okay. Back to the last real question

3 I asked you.

4 Should there be -- if there were any

5 physicians who wanted -- who were referred to Medical

6 Affairs, there should be letters, there should be --

7 A. Okay.

8 Q. -- records, explanations of what was

9 said to them about this article?

10 MR. DAVISON: Objection.

11 BY MR. SAMSON:

12 Q. And the issues in this article?

13 MR. DAVISON: Objection to form.

14 THE WITNESS: So it's better than that.

15 There's -- there's a bank of called SRLs, standard

16 response letters, that -- where we prespecified

17 typical questions that are likely to be asked and

18 preset responses, so the speed of response could be

19 even better. But there's going to be questions --

20 and there's maybe 20 or 30 of those. But there could

21 be questions that we didn't anticipate. Those --

22 those generate a fresh -- a fresh SRL. But that SRL

23 has to go through clearance and review and oversight

24 by physicians and signed off on ultimately by Herb.

25 So those are banked.

Page 201

1 BY MR. SAMSON:

2 Q. What is that bank called, if I wanted

3 to --

4 A. Standard response letters.

5 Q. Okay. And are they kept, do you

6 know, for any period of time?

7 A. I don't know.

8 Q. Okay.

9 A. Usually, I would think, pretty long.

10 MR. SAMSON: This one should be 9, but now

11 11.

12 (Exhibit No. 11 was marked.)

13 MR. SAMSON: Put 11 aside.

14 MS. GAFFNEY: Sorry about that.

15 THE WITNESS: Put 11 aside, okay.

16 MR. SAMSON: We have misnumbered it.

17 THE WITNESS: Okay.

18 MR. SAMSON: This will be 12.

19 THE WITNESS: I think it's the same number.

20 12 is the same as 11.

21 MR. SAMSON: Is it?

22 MS. GAFFNEY: Are we all set, then.

23 MR. SAMSON: Then we're okay.

24 Withdraw 12 for now. And I will put back

25 11.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    Q.   All right.  You have Exhibit 11 in
2  front of you.
3        MR. DAVISON:  Sorry, could I just make sure
4  we have all MNK-T1, underslash, 0000941559.  It's an
5  email from Art Morelli to Rod Novak and others on
6  April 26 --
7        THE WITNESS:  No, not from me.
8        MR. DAVISON:  Well, the very top one.  I'm
9  just trying --
10       THE WITNESS:  Oh, the very top one.
11       MR. DAVISON:  I'm just trying to make sure
12 we have the same document.  Thank you.  I apologize.
13       MS. GAFFNEY:  Thank you.
14       (Witness reviewing document.)
15 BY MR. SAMSON:
16       Q.   Mr. Morelli, this is April 2011.  So
17 I think you should have been there yet?
18       A.   I think so.  Yes, my name is on
19 there, so I was there, right.
20       Q.   And you -- do you recall Remoxy, a
21 competitive drug?
22       A.   I do, yeah.
23       Q.   And it was an ER generic oxycodone?
24       A.   I think it was.  I don't really
25 remember.  But it was -- its thing was its

Page 203

1  abuse-deterrent formulation.
2        Q.   And, in fact, this -- another report
3  in the literature coming out is about reaching an
4  endpoint in Remoxy's study of whether its drug really
5  was abuse deterrent in any form.
6        A.   Okay.
7        Q.   Is that what you get from the
8  article?
9        A.   I would have to really sit down and
10 look at it.  But it looks -- it looks like it is.
11 Because they are comparing the ER formulation of
12 Remoxy to the ER and immediate formulation of
13 oxycodone in terms of various parameters, mainly drug
14 liking.
15       So drug liking is a metric that you can
16 compare products for their abuse potential.
17       Q.   And for those of us who don't do
18 pharmaceutical research, is drug liking intended to
19 measure as a metric, "I like this not for its pain
20 relief effect but as a high," so to speak?
21       MR. DAVISON:  Objection to form.
22       THE WITNESS:  I'm not a scientist.  I
23 don't -- I'm not into this kind of research.  But
24 that's what I've been told.  I've heard that, yeah.
25 ///

Page 204

1  BY MR. SAMSON:
2        Q.   Okay.  And so do you remember who the
3  competitor was who made Remoxy?
4        A.   Pain Therapeutics, maybe.  I don't
5  know.  I think it is.
6        Q.   Fair enough.
7        A.   Yeah, it is.
8        Q.   Okay.
9        A.   It is.  Remoxy is a registered
10 trademark of Pain Therapeutics, Inc.
11       Q.   Okay.  And then if you will turn
12 to -- I think it will be the -- since yours are
13 copied on two sides, it will be -- page 1, 2 -- 3 at
14 the bottom, and then page 4 at the top.
15       A.   Okay.
16       Q.   Do you see the "Study Results" is the
17 boldfaced?
18       A.   Study results.  Oh, yes.  Yes.
19       Q.   Okay.  So read me, without that odd
20 gibberish at the start, symbols, the first finding
21 endpoint analysis.
22       A.   (Reading) Primary endpoint was
23            drug liking.  That was -- that was
24            testing.  As assessed by various
25            pharmacodynamic parameters.

Page 205

1            Thirty-two subjects were included.
2            Drug liking was significantly lower
3            for Remoxy, 40 milligrams whole --
4            that means uncrushed -- compared with
5            oxycodone immediate-release 40
6            milligrams or oxycodone immediate --
7            extended-release 40 or oxycodone
8            immediate-release 40 (end of reading).
9        Q.   And then what was the second finding?
10       A.   (Reading) Drug liking was
11            significantly lower for Remoxy
12            chewed -- this is crushing it up --
13            compared with ER oxy and -- crushed
14            and oxy IR 40 (end of reading).
15       Q.   And I'm assuming the reason we don't
16 see the IR 40 as being either crushed or chewed is
17 that with an IR, it's going to be available in
18 roughly the same amount of time, even without
19 crushing?
20       A.   It could be, yeah.
21       Q.   I mean --
22       A.   Makes sense.
23       Q.   And then the next finding was time to
24 peak drug liking, and that was also significantly
25 delayed?

Page 206

1    A.    Right.
2    Q.    And that was, again, Remoxy chewed
3 compared to oxycodone ER 40 milligrams crushed or
4 oxycodone IR?
5    A.    Right.
6    Q.    And then what were the secondary
7 endpoints?
8    A.    Drug high, good effects, chewing
9 duration, taste, texture assessments, and safety
10 assessments.  These endpoints generally demonstrated
11 the same consistency of effects observed in the
12 primary endpoints.
13    Q.    And that's -- in terms of you reading
14 that back when you were at Mallinckrodt, that's a
15 potentially useful-for-safety difference with this
16 new formulation; correct?
17    MR. DAVISON:  Objection to form.
18    THE WITNESS:  Potentially.
19 BY MR. SAMSON:
20    Q.    Okay.  And if its -- even at this
21 stage, without saying it is absolutely proven, do you
22 agree with me that that's good information for the
23 entire prescribing population to know on the level
24 that it's reported here?
25    MR. DAVISON:  Objection to form.

Page 207

1    THE WITNESS:  Yes.
2 BY MR. SAMSON:
3    Q.    And did Mallinckrodt have an
4 oxycodone extended release that had at this point any
5 abuse-deterrent attempts at all?
6    MR. DAVISON:  Objection to form.
7    THE WITNESS:  No, not to my knowledge.  But
8 I wasn't in R&D.  So I don't know what they had,
9 really.
10 BY MR. SAMSON:
11    Q.    But certainly not out in the sales
12 market?
13    A.    Oh, no, not out in the sales market.
14    Q.    And so a 40 milligram oxycodone
15 analog that has decreased drug liking and basically
16 gives you a decreased high, even if you chew it or
17 grind it up, could be a strong competitor for
18 Mallinckrodt's existing hydrocodone ER?
19    MR. DAVISON:  Objection to form.
20    THE WITNESS:  As long as the efficacy was,
21 you know, equivalent, yes.  All other things being
22 equal, abuse-deterrent formulations are one measure
23 that is -- mitigates risk to patients.
24 BY MR. SAMSON:
25    Q.    Okay.  And who was Jamie Harrell?

Page 208

1    A.    Jamie Harrell was basically the Chief
2 Commercial Officer.
3    Q.    Okay.  So she's not --
4    A.    It's a he.  It's a he.  But yeah.
5    Q.    It's a he?
6    A.    Yeah.
7    Q.    He's not in Medical Affairs?
8    A.    No.
9    Q.    Okay.  On the bottom of page 1 and
10 going over on to the top of page 2 is Mr. Harrell's
11 reaction.  Can you read that aloud from me.
12    A.    The whole part?
13    Q.    From "I suggest."
14    A.    (Reading) I suggest we create a
15    Competitive Project team to do a
16    deep dive on this product and build
17    out a training program for the field
18    to help them -- help position them in
19    the marketplace.  We need -- just
20    thinking and typing out loud, we need
21    to position them before they position
22    us (end of reading).
23    Q.    What did you take that "We need to
24 position them before they position us" to mean when
25 you read this stream?

Page 209

1    MR. DAVISON:  Objection to form.
2    THE WITNESS:  I had no -- I have no idea
3 what he meant by that.  But -- I don't know.  I don't
4 know what he was thinking.  There's no way I could
5 know that.
6 BY MR. SAMSON:
7    Q.    It's a guy in commercial?
8    A.    Right.
9    Q.    A competitor's drug may have an
10 advantage --
11    A.    I don't --
12    Q.    -- over Mallinckrodt's drug
13 because --
14    A.    Right.
15    Q.    -- it has demonstrated decreased drug
16 liking, and Mallinckrodt's competitive drug did not
17 have any abuse-deterrent formula; right?
18    A.    Right.
19    Q.    What -- commercial, is that above
20 marketing and sales, or part of it, or where?
21    A.    It's composed of marketing and sales.
22    Q.    So you're a veteran of the industry.
23 When he writes, "We need to position them before they
24 position us," after saying "We need to do a deep dive
25 on this," what did you take from that?

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1     MR. DAVISON: Objection. Asked and
2 answered.
3     THE WITNESS: I don't remember when it
4 happened. If you're asking me what I would take --
5 meaning I would put now, in retrospect?
6     MR. SAMSON: Yes.
7     THE WITNESS: I would say that -- Remoxy
8 wasn't on the market, so -- I don't know if it ever
9 reached the market, actually, for whatever reason.
10     I would say this is a commercial guy asking
11 for help, how to respond -- how to train salespeople
12 to respond to questions, if they get them, on this
13 new entry in the marketplace, which is what any
14 pharmaceutical company would do, rather than let reps
15 respond without being trained. He's asking for help.
16 That's how I interpret it. And he's asking for help
17 from Medical Affairs.
18 BY MR. SAMSON:
19     Q. How does that equate with "position
20 them before they position us"?
21     MR. DAVISON: Objection to form.
22     THE WITNESS: I don't know what he meant by
23 that. It's not something I would ever say.
24 BY MR. SAMSON:
25     Q. Okay. And then please read your

Page 211

1 response at the top of page 1.
2     A. (Reading) We are planning an
3     abuse liability (formulation and PK
4     aspects) consensus meeting with KOLs
5     leading to a pub or two. And we will
6     have details in a week or two (end of
7     reading).
8     Q. Were those KOLs supported by
9 Mallinckrodt?
10     A. Probably, yeah.
11     MR. DAVISON: Objection to form.
12 BY MR. SAMSON:
13     Q. Okay. And why were you so confident
14 that it might lead to a pub or two that might help
15 what was worrying Harrell about the new study?
16     MR. DAVISON: Objection to form.
17     THE WITNESS: Because it would be in a way
18 similar to what Pain Therapeutics has done here.
19 They have published data on their product. We could
20 publish data, if it exists, on our product. That's
21 what it means.
22 BY MR. SAMSON:
23     Q. Abuse-deterrence data on generic oxy
24 40 extended release, that would be a long hunt, don't
25 you think?

Page 212

1     MR. DAVISON: Objection to form.
2     THE WITNESS: I don't see this being
3 anything to do with generics. This is to do with
4 Exalgo. Jamie Harrell had nothing to do with
5 generics.
6 BY MR. SAMSON:
7     Q. What did -- what was his position in
8 commercial?
9     A. Branded -- branded products.
10     Q. Okay. All right.
11     A. Okay.
12     MR. SAMSON: That's that one.
13 The next one will be 12.
14     (Exhibit No. 12 was marked.)
15     MR. SAMSON: And this one, despite its
16 thickness, Mr. Morelli, is really only the first
17 page. And the rest I think are usage records or
18 prescribing records.
19     THE WITNESS: Okay.
20     (Witness reviewing document.)
21 BY MR. SAMSON:
22     Q. And in -- Ms. Tonilee?
23     A. Tonilee is her first name. Masters
24 is her second name.
25     Q. What was she -- was she in Medical

Page 213

1 Affairs?
2     A. Sales rep.
3     Q. Sales rep, okay.
4     And she apparently is setting you up for a
5 meeting with a Dr. Gosy, who apparently has a fairly
6 busy pain practice?
7     A. Right.
8     Q. (Reading) I want him to know the
9     safety with REMS and C.A.R.E.S.
10     program that he can receive for
11     utilizing more Exalgo (end of
12     reading).
13 Do you see that part?
14     A. Yes.
15     Q. And you were going to go have dinner
16 with Dr. Gosy --
17     A. Right.
18     Q. -- to accomplish whatever you were
19 going to accomplish with him?
20     MR. DAVISON: Objection to form.
21     THE WITNESS: To brief Dr. Gosy on the
22 Exalgo REMS and the C.A.R.E.S. Alliance.
23 BY MR. SAMSON:
24     Q. Okay. Was that a common part of your
25 job, to go meet individually with prescribers?

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    A.    No.  It was very uncommon.
2    Q.    Do you have any remembrance of
3 Dr. Gosy?
4    A.    So I travel to, I believe it was
5 New Jersey for this meeting.  Tonilee never showed up
6 for the meeting.  Stood me up.  And I was left at the
7 airport.
8         And when I spoke to her manager, who was
9 Gavin McGowan, he told me Tonilee Masters resigned
10 that day from the company.  So the dinner never
11 happened.
12   Q.    Well, that --
13   A.    I remember -- that's how I remember
14 this occasion, because it was so remarkable, quite
15 frankly.
16   Q.    Okay.  And although they may be
17 interchangeable, if you will look, were you going to
18 have dinner in Buffalo, New York --
19   A.    Maybe that was it.
20   Q.    So I couldn't tell -- you were going
21 to New Jersey?
22   A.    It was New York, yeah.
23   Q.    So the meeting never went off.  But
24 was such a meeting common for you --
25   A.    It was very rare.  It was very rare.

Page 215

1 I remember doing another one.
2         MR. DAVISON:  Let him finish his question.
3 BY MR. SAMSON:
4    Q.    -- for you to go out to meet with
5 individual physicians?  Was that common or rare?
6    A.    Rare.
7    Q.    And I think you told me, while I was
8 still asking the question, that you may have done it
9 one other time, that you can recall?
10   A.    Correct.
11   Q.    And where was that other time?
12   A.    Southern California.
13   Q.    And who did you go to meet with
14 directly as the prescriber in Southern California?
15   A.    I don't remember.
16   Q.    Do you remember a specialty?
17   A.    Pain.  It was pain.  A pain
18 specialist.  He was very, very short.  That's the
19 only thing I remember.
20   Q.    Okay.  In your email response to
21 Tonilee, you tell her:
22         (Reading) Thanks for the briefing.  I
23         prepared a summary of our most recent
24         data related to Exalgo misuse, abuse,
25         overdose and addiction (end of

Page 216

1 reading).
2 Correct?
3    A.    Correct.
4    Q.    "It will need to be communicated
5 verbally."  Why did it need to be communicated
6 verbally?
7    A.    Because that information is not in
8 raw form, it is not cleared to be distributed to
9 anybody we want.  This is -- these are actual
10 real-time reports into Medical Affairs of side
11 effects and problems.  So we just can't take a
12 report, a company report, and hand it out.  But we
13 can communicate, in essence, what it is saying.
14   Q.    Well, and, in fact, that's reporting
15 evidence that's not on the label that's been approved
16 by FDA; true?
17        MR. DAVISON:  Objection to form.
18        THE WITNESS:  I wouldn't say so, because
19 these are side effects that the physician -- that are
20 listed in the label as potential side effects.  Or
21 even if they are not, if they are idiosyncratic, you
22 know, out of left field kind of side effects, the
23 doctor has a right to know that this has been
24 reported.
25 ///

Page 217

1 BY MR. SAMSON:
2    Q.    And I'm assuming that what you were
3 eager to go show him were lack of side effects data?
4        MR. DAVISON:  Objection to form.
5        THE WITNESS:  I would -- was going to tell
6 him what the data said.
7 BY MR. SAMSON:
8    Q.    Okay.  But you wouldn't have been
9 anxious to do that if the reported side effect data
10 that was coming in was larger than what was on the
11 label; true?
12        MR. DAVISON:  Objection to form.
13        THE WITNESS:  I mean, it doesn't really
14 matter to me.  I'm going to report the data as the
15 data is and let the data speak for itself.
16 BY MR. SAMSON:
17   Q.    Say if --
18   A.    The only thing it needs to do is the
19 denominator.  This is a numerator.  He needs to know
20 what the denominator is.
21   Q.    And why couldn't that be given to him
22 in writing?
23   A.    It could have been.  It could have
24 been sent in an email, maybe.  But it's just more
25 personable to do it face to face.  He may have 17

Page 218

1  questions on what I tell him, so he may ask me. And
2  if he has further questions, maybe Eddie Darton has
3  to go see him.
4      Q.    And I didn't draft this email. You
5  did.
6      A.    Right.
7      Q.    "It will need to be communicated
8  verbally."
9      A.    Right. I'm not going to hand him the
10  raw data from our -- from our safety database.
11      Q.    But you're going to tell him that
12  same raw data?
13      A.    Right.
14      MR. DAVISON: Objection.
15  BY MR. SAMSON:
16      Q.    Okay. You weren't trying to get
17  around one of those things, like sales personnel
18  can't say anything other than what's on the label?
19      A.    I didn't want --
20      MR. DAVISON: Objection.
21      THE WITNESS: I didn't want to put the sales
22  rep in a position to do something that they are not
23  comfortable doing nor are they authorized to do.
24  That's why I was taking the heat off her, and I was
25  speaking with the physician.

Page 219

1  BY MR. SAMSON:
2      Q.    So you never met with Dr. Gosy?
3      A.    I did not.
4      Q.    So you left neither a verbal trail or
5  a written trail because the meeting never came off;
6  true?
7      MR. DAVISON: Objection.
8      THE WITNESS: It's not a question of a
9  trail. The meeting never came off.
10  BY MR. SAMSON:
11      Q.    Why did you need to see his
12  prescribing data to accomplish that mission?
13      MR. DAVISON: Objection to form.
14  BY MR. SAMSON:
15      Q.    The rest of the many pages of the
16  email.
17      A.    I don't even know what this -- oh, I
18  see.
19      Q.    It's the various opioid medications
20  and how much he's used --
21      A.    I didn't need to see it. I didn't
22  need to see it. She sent it to me.
23      Q.    Did you --
24      A.    It wouldn't make any difference to
25  me, quite frankly, what this data is. His question

Page 220

1  is about Exalgo.
2      Q.    If you look on the page that includes
3  Exalgo. Do you see it? It's right at the top.
4      A.    Oh, yeah, I see it.
5      Q.    You're now on the page.
6      A.    Right.
7      Q.    It doesn't appear that he is using
8  much Exalgo.
9      A.    I can't tell from --
10      MR. DAVISON: Objection.
11      THE WITNESS: -- this. I don't know what
12  these numbers means.
13  BY MR. SAMSON:
14      Q.    If you look down at "Generic for
15  immediate release," immediately below.
16      A.    It's probably the case.
17      Q.    It's probably the case that he wasn't
18  using it --
19      A.    Right.
20      Q.    -- which is in line with the original
21  email?
22      A.    Right. Right.
23      So here's how I interpret this. Here's a
24  physician who's a pain specialist. He treats a lot
25  of patients. He writes a lot of prescriptions for

Page 221

1  opioids, high-powered opioids. He's concerned about
2  the safety of the drugs that he's prescribing.
3      I'm there to provide information to him
4  related to the safety of the new drug on the block,
5  the one that he doesn't have much experience with, in
6  terms of what we are seeing and what's being reported
7  for our drug.
8      And the programs that we have in place, one
9  for Exalgo specifically, the REMS, and, two, for all
10  the other opioids he's prescribing, Vicodin and
11  Avinza, and all these others, that he could
12  potentially adopt in his practice and make his whole
13  practice safer.
14      And he's got all these PAs and NPs working
15  for him. Maybe set up a lecture, a lunch and learn
16  for them so that they can be exposed to these tools
17  and these programs, because they are going to be the
18  ones, more than likely, that are going to actually
19  implement it.
20      Q.    Did he ever become an Exalgo big
21  prescriber?
22      A.    I have no idea.
23      Q.    Just --
24      A.    I never heard of him again.
25      MR. DAVISON: We have been going another

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 hour and fifteen.  Can we take a break?
2      MR. SAMSON:  Yes.
3      MR. DAVISON:  Or is this short?
4      MR. SAMSON:  Well, I think this one is
5 pretty short.
6      MR. DAVISON:  Okay.
7      MR. SAMSON:  This will be 13.
8          (Exhibit No. 13 was marked.)
9      (Witness reviewing document.)
10 BY MR. SAMSON:
11     Q.    This takes up a program that you had
12 mentioned earlier in the day about, was it an
13 Exalgo-specific program when you launched it, the
14 "Expert on the Call"?
15     A.    Yes, this is an Exalgo-specific
16 program.
17     Q.    Okay.  And Ms. Blasser has seen the
18 PowerPoint for "Expert on the Call"?
19     A.    Right.
20     Q.    I take it that would have been a
21 PowerPoint Medical Affairs had put together?
22     A.    In a training program, yeah.
23     Q.    Okay.  And, basically, as I --
24 there's a couple more of these we will deal with.
25     It sounds like experts were recruited by

Page 223

1 Medical Affairs to be a participant in "Expert on the
2 Call," where they would get calls from outlying
3 physicians who had questions about Exalgo and could
4 talk to them; is that --
5      A.    That's exactly what it was.
6      Q.    Okay.  Were those experts on the call
7 paid?
8      A.    Yes.
9      Q.    How much?
10     A.    I don't remember.
11     Q.    Was it for a call or only a
12 successful call that resulted in an Exalgo script
13 being written?
14     A.    A call.
15     MR. DAVISON:  Objection to form.
16 BY MR. SAMSON:
17     Q.    And do you recall, was it a hundred
18 bucks for a call, or so much per minute, or any other
19 figure?
20     MR. DAVISON:  Objection to form.
21     THE WITNESS:  I don't recall how exactly we
22 calculated the honorarium, but there was an
23 honorarium.
24 BY MR. SAMSON:
25     Q.    Okay.  And am I safe in assuming that

Page 224

1 the experts were prescribing themselves Exalgo?
2      A.    I would say, for the most part, yes.
3 For obvious reasons, yeah.
4      Q.    And what are the obvious reasons to
5 you?  Because they may be different than mine.  But
6 they may be the same.
7      A.    A physician gains a lot of knowledge
8 when they actually use a product.  They have actual
9 experience.  And that it could be important to
10 another physician.  When physicians share information
11 doctor to doctor without a pharmaceutical company
12 interceding, they could be more frank or more, you
13 know, clear, clearly communicate with each other.
14     Q.    Well, and they are much more likely
15 to communicate favorably about Exalgo if they are
16 using it, true, just in the realm of human nature?
17     MR. DAVISON:  Objection to form.
18     THE WITNESS:  No.  I would say they would be
19 very honest.  The physicians I work with would be
20 very honest.
21 BY MR. SAMSON:
22     Q.    How many expert on the calls for
23 Exalgo were not prescribing Exalgo?
24     A.    I don't remember that.
25     Q.    Do you know --

Page 225

1      A.    Most of them -- I would say most of
2 them were prescribing Exalgo.
3      Q.    The --
4      A.    In fact, we -- we were -- we hoped
5 that they were so that they would have hands-on
6 experience, yeah.
7      Q.    What -- why would they be in a
8 program for a drug that they didn't use?
9      A.    Except to make money, I can't think
10 of another reason.  So that's why we wanted them to
11 be prescribers of Exalgo.
12     Q.    Okay.
13     A.    But we didn't -- we really didn't
14 enforce that, to make that an absolute, because then
15 it could be said that we were strong arming them to
16 become a prescriber by -- by providing an inducement.
17 So it really wasn't that clear-cut.
18     Q.    And Ms. Blasser greets you and says:
19     (Reading) I just saw the PowerPoint
20     for "Expert on the Call."  Program
21     looks awesome.  As we discussed at the
22     advanced training meeting (end of
23     reading) --
24     Which I'm assuming is probably where she saw
25 the program?

Highly Confidential – Subject to Further Confidentiality Review

Page 226

1    A.    Probably, yeah.
2    Q.    (Reading) -- I have a candidate
3    for this, Dr. Lance Yarus.  He has a
4    lot of experience writing Exalgo, is a
5    current KOL speaker with good reviews,
6    and is a well-respected orthopedic
7    surgeon/pain management physician in
8    Pennsylvania (end of reading).
9    Did I read that correctly?
10    A.    Uh-huh.
11    Q.    And you write back:
12    (Reading) Nice to hear from you.
13    Dr. Yarus could be a good fit for the
14    program if you believe he would
15    benefit from a consultation with a
16    pain specialist on the specifics of
17    rotating patients to Exalgo (end of
18    reading).
19    So did you believe that she was putting
20    Dr. Yarus forward as a caller into an "Expert on the
21    Call"?
22    A.    Yes.  A participant.
23    Q.    Okay.  And were callers in on the EOC
24    program given an honorarium or any --
25    A.    No.  No.

Page 227

1    Q.    Just got the information?
2    A.    Right.
3    Q.    For their benefit?
4    A.    Right.
5    Q.    And do you remember whether or not
6    Dr. Yarus took advantage of that opportunity?
7    A.    Of course I don't remember.  But I'm
8    thinking, from the communication on top, it looks
9    like he didn't.  But I can't be sure.
10    Q.    And what is it about Ms. Blasser
11    saying, "Please let me know your thoughts" --
12    A.    And then she said, "Never mind.  He
13    didn't understand my question."
14    I don't know who is "he."  I don't know who
15    is "he" that she is referring to.  It may have been
16    me, that I didn't understand her question.
17    But I don't recall this going any further or
18    whether it happened or didn't happen.  It could have
19    happened.
20    MR. SAMSON:  All right.  Let's take our
21    break.
22    MR. DAVISON:  Thank you.
23    THE VIDEOGRAPHER:  We are going off the
24    record.  The time is 3:16 p.m.
25    (Recess taken.)

Page 228

1    THE VIDEOGRAPHER:  We are back on the
2    record.  The time is 3:28 p.m.
3    THE REPORTER:  Next in order is 14.
4    MR. SAMSON:  14.
5    (Exhibit No. 14 was marked.)
6    (Witness reviewing document.)
7    BY MR. SAMSON:
8    Q.    Mr. Morelli, this one comes from
9    August of 2011 and is, again, on the EOC.  This time
10    an update.
11    A.    Right.
12    Q.    And that's the EOC program for
13    Exalgo; true?
14    A.    True.
15    Q.    And the first message from you on
16    page 2 --
17    A.    Yes.
18    Q.    -- sent August 20th, appears to be an
19    update showing two spreadsheets for -- are these the
20    marketing and sales force, or who is this original
21    report aimed at?
22    MR. DAVISON:  Objection to form.
23    THE WITNESS:  So the report was compiled by
24    Leah La Roux, as you see there, who is a Pharm.D in
25    our Medical Division of Medical Affairs.  And what

Page 229

1    Dr. -- Dr. Newman and I kind of agreed to, a bit on
2    the sly here, is we had Leah and other -- and other
3    health-care professionals secretly, secretly listen
4    in on these calls without divulging their presence,
5    to ensure that the information being communicated was
6    appropriate, not off the label of the product, unless
7    it was, you know, not related to the label.  Like one
8    doctor asked another doctor a doctor question, not a
9    product question, you know, which is always possible.
10    But in terms of the relevant product
11    information, we put in a little quality control here
12    to make sure that this wasn't going off the rails.
13    And you can see from Leah's -- Leah's feedback that
14    so far it's looking good.  That was the first email
15    that I wrote there.
16    BY MR. SAMSON:
17    Q.    Okay.  And, in fact, what
18    Ms. La Roux -- what you quoted her as saying, is,
19    quote:
20    (Reading) The majority of calls have
21    been extremely successful in educating
22    HCPs on the intricacies of Exalgo that
23    will lead to increased prescriber
24    confidence while promoting the safe
25    use of our product (end of reading).

Page 230

1 True?
2 A. True.
3 Q. And so promoting safe use of our
4 product is an admirable goal; true?
5 A. I think it's extremely admirable.
6 Q. And the other one increased
7 prescriber confidence while in Exalgo is a good
8 effect on corporate sales and, thus, success or
9 failure of Exalgo; true?
10 MR. DAVISON: Objection to form.
11 THE WITNESS: Correct.
12 BY MR. SAMSON:
13 Q. And then the next middle part was a
14 success story from Denver -- or from the Western
15 Regional Sales Director, from a Sales Specialist,
16 directing his number two opioid prescriber in the
17 territory and his number four, who happened to work
18 in the same office, to the "Expert on Call" program.
19 And after that talk, the doctor said he was ready to
20 prescribe Exalgo; true?
21 MR. DAVISON: Objection.
22 THE WITNESS: It seems so here, yes.
23 BY MR. SAMSON:
24 Q. And you write back:
25 (Reading) This is a phenomenal story.

Page 231

1 Thank you for sending it (end of
2 reading).
3 True?
4 A. I did, yes.
5 Q. Okay. And is that because the two
6 goals we talked about, in Ms. La Roux's report to
7 you, you could see being met? Here's someone getting
8 the use in intricacies of Exalgo explained to them,
9 and then turning around and writing them?
10 MR. DAVISON: Objection to form.
11 THE WITNESS: They're -- they're -- they're
12 different, but they are related. I'm not sure what
13 you're asking me, though.
14 BY MR. SAMSON:
15 Q. Well, tell me why they are different
16 but related.
17 MR. DAVISON: Objection to form.
18 THE WITNESS: So Leah -- the purpose of
19 Leah's communication here is to basically do some
20 quality control on the physicians, how they were
21 responding to the call-in doctors.
22 Whereas, Connie's forwarding this basically
23 commenting on Dr. Arnoff, that Dr. Arnoff was
24 effective -- effective in familiarizing this doctor
25 with Exalgo, who was previously unfamiliar. It

Page 232

1 may -- it was two doctors, actually. And Dr. Arnoff
2 was at that time, and still, a recognized, you know,
3 leader in pain management, a respected individual.
4 So that's -- that's how that worked, you know.
5 BY MR. SAMSON:
6 Q. But the outcome, that was part of you
7 saying it was a phenomenal story, was that the number
8 two prescriber and his nurse practitioner, who was
9 the number four prescriber in this region, who hadn't
10 been prescribing Exalgo, were now prescribing it?
11 A. Yeah.
12 MR. DAVISON: Objection to form.
13 BY MR. SAMSON:
14 Q. And you assume, because I think that
15 you never got to question those two physicians, that
16 the explanation given of the Exalgo's intricacies had
17 led them to open the door to wanting to prescribe it?
18 MR. DAVISON: Objection to form.
19 THE WITNESS: And -- of course. Of course.
20 But how to -- how to rotate patients on to Exalgo.
21 BY MR. SAMSON:
22 Q. Okay. That -- that was a specific
23 danger that the Exalgo intricacies presented; true?
24 MR. DAVISON: Objection to form.
25 THE WITNESS: It was -- it was a high risk

Page 233

1 area, but it was also an opportunity for patients
2 that weren't getting pain relief on their existing
3 analgesic.
4 So, remember, Exalgo is second line. So
5 only patients who are already -- have opioid
6 current -- current opioid experience are candidates
7 for Exalgo. So by definition, then, anybody that
8 goes on to Exalgo has to come off their current
9 opioid. That process is opioid rotation.
10 So how do you do that? How you do that is
11 pretty -- pretty delicate. The patient could be
12 either exposed to pain or could be exposed to
13 receiving too much drug, if it's not done properly,
14 because of a principle of incomplete cross tolerance.
15 BY MR. SAMSON:
16 Q. And Exalgo had a challenging, unset
17 time to add to that difficulty?
18 A. Slow.
19 Q. Yes.
20 A. Right.
21 Q. I mean, it -- it wasn't -- if I'm
22 taking IR molecule 1, and my doctor changes me to IR
23 molecule 2, I might still have a reaction to 2. But
24 in terms of getting 1 out of my system and 2 in
25 without causing the combination that may be dangerous

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 to me, there's not much trouble; correct?
2     MR. DAVISON: Objection to form.
3     THE WITNESS: There's not much?
4 BY MR. SAMSON:
5     Q.   Trouble compared to an Exalgo slow
6 onset --
7     A.   Oh, I see what you mean.
8     Q.   -- effect?
9     A.   Yeah, it's more complicated because
10 you have one drug that's fast onset, fast offset.
11 And you have the second drug, the one you're going
12 to, is slow onset.
13     So that's why, one of the reasons why we
14 have this program. Because this program -- that --
15 that intricacy, right. So here's -- that intricacy
16 requires a lot of expertise.
17     MR. SAMSON: 16. It was 14.
18     THE REPORTER: I'm up to 15.
19     MR. SAMSON: Oh, 15. You're right.
20       (Exhibit No. 15 was marked.)
21     (Witness reviewing document.)
22 BY MR. SAMSON:
23     Q.   This starts out, Exhibit 15, with an
24 email from Jeff Patrick. And what division was he
25 in?

Page 235

1     A.   Medical Affairs.
2     Q.   And did he answer to you directly or
3 to someone else?
4     A.   He answered to Herb.
5     Q.   And he's attached an article asking
6 whether anybody on your team had reviewed it;
7 correct?
8     A.   Correct.
9     Q.   And the article from its abstract is
10 hydromorphone being a molecule of particular
11 interest, given its subjective similarities to heroin
12 and tendency to be misused by -- misused by illicit
13 opioid users.
14     A.   Right.
15     Q.   Exalgo was hydromorphone?
16     A.   It was. It is.
17     Q.   Extended release because of its
18 capsule?
19     A.   Correct.
20     Q.   So I'm assuming, with Exalgo being
21 new to the market, an article that compared it to
22 heroin in misuse would not be welcomed at
23 Mallinckrodt?
24     MR. DAVISON: Objection to form.
25     THE WITNESS: It would be another piece of

Page 236

1 data that we have to take into account based on what
2 we're doing, yeah.
3 BY MR. SAMSON:
4     Q.   But in truth, in terms of promotion
5 and sales of Exalgo to prescribing physicians, you
6 would have issued that the article came out
7 differently than what its authors concluded; true?
8     MR. DAVISON: Objection to form.
9     THE WITNESS: No. No. I would hope that
10 the article would come out and the data would speak
11 for itself --
12     MR. SAMSON: Okay.
13     THE WITNESS: -- as it has here.
14 BY MR. SAMSON:
15     Q.   And what is the data speaking for
16 itself?
17     A.   It's just --
18     MR. DAVISON: Objection to form.
19     THE WITNESS: It's just basically saying
20 that something we already knew anyway. Hydromorphone
21 is a potent opioid. It produces, you know, a high
22 degree of liking amongst addicts or pre-addicts. And
23 that's just the facts.
24     So -- and that's my response, was we can't
25 wait around for all data that may come out years in

Page 237

1 the future. We have to continue with the pressure on
2 risk mitigation, because we don't know what's going
3 to happen. So we have to plan for the worst and keep
4 pushing the rock up the hill in terms of providing
5 ways to use this product safer.
6 BY MR. SAMSON:
7     Q.   And in the conclusions of the
8 abstract, it says:
9       (Reading) Additional investigations
10       into hydromorphone are warranted,
11       particularly given previous findings
12       regarding the prevalence of
13       non-medical use of this document and
14       its similarities to heroin (end of
15       reading).
16     And you took that, as you just said, to mean
17 that Exalgo seems different than a hydromorphone
18 immediate-release formulation in these aspects; true?
19     MR. DAVISON: Objection to form.
20     THE WITNESS: It's different in those
21 aspects.
22 BY MR. SAMSON:
23     Q.   And where -- what data did you have
24 to document that?
25     A.   There was -- there was no Exalgo in

Page 238

1 this study. This was a hydromorphone study.
2    Q.    Okay.
3    A.    So -- but the active ingredient of
4 Exalgo is hydromorphone. So what I was saying here
5 is, regardless of this data and regardless of the
6 differences of Exalgo, we have to stay on plan to
7 communicate ways to use this drug safer. It has
8 risks. It has serious risks that can be mitigated,
9 at least partially mitigated, by the use of accepted
10 tools and programs designed to mitigate that risk and
11 to protect patients from harm.
12    Q.    Okay. But your determination that
13 Exalgo is different than hydromorphone IR
14 formulations in the aspects of its appeal to its
15 similarity to heroin and its appeal to misuse by drug
16 abusers, there was no study that proved that; true?
17    MR. DAVISON: Objection to form.
18    THE WITNESS: No. And I didn't say there
19 was. I said Exalgo seems different.
20    MR. SAMSON: Okay.
21    THE WITNESS: From what I know about its
22 kinetics versus what the study drug was here, which
23 was immediate-release hydromorphone.
24    No one is denying the risk of Exalgo.
25 Nobody knows it better than me, and no one is

Page 239

1 championing doing something about it more than me and
2 my team.
3 BY MR. SAMSON:
4    Q.    But saying it's different from the IR
5 formulations in the study is simply a hope; true?
6    MR. DAVISON: Objection to form.
7    THE WITNESS: I don't think so. I think
8 it's different. Exalgo is not the same as
9 immediate-release hydromorphone. That's just a fact.
10 It doesn't mean it has no risk. It has plenty of
11 risks.
12    I designed a whole program to mitigate those
13 risks. We don't -- we're not dealing -- we're not
14 selling IR hydromorphone. We're selling Exalgo. And
15 my responsibility is to make Exalgo as safe as
16 humanly possible.
17 BY MR. SAMSON:
18    Q.    And in the pharmacokinetics, the
19 difference between Exalgo and IR hydromorphone is a
20 sharp peak in IR hydromorphone and a similar rise,
21 but then more of a plateau for Exalgo; true?
22    MR. DAVISON: Objection.
23    THE WITNESS: Slower. A much slower rise.
24 A much slower onset of effect.
25 ///

Page 240

1 BY MR. SAMSON:
2    Q.    Okay. And your suspicion is that if
3 tested for drug liking, that would show a difference
4 between IR hydromorphone?
5    A.    It could. It could not. I'm just
6 saying it's different. I'm not saying it's superior.
7 I'm not saying it's safer. I'm not saying it's less
8 abusible. I'm just saying it's different.
9    When we communicate information on Exalgo,
10 we're not communicating information on IR
11 hydromorphone. That's not our product.
12    Q.    And so "not according to wait for
13 definitive scientific proof that our, bracket,
14 Exalgo, end bracket, measures are effective, bracket,
15 in making a different outcome than IR hydromorphone,"
16 was not what you were talking about? You were
17 talking about, we have to keep on our program of
18 trying to decrease misuse of Exalgo?
19    A.    Precisely.
20    MR. DAVISON: Objection to form.
21 BY MR. SAMSON:
22    Q.    Let me ask you to turn back to
23 Exhibit 6.
24    A.    There it is again.
25    Q.    It will be the thickest one in your

Page 241

1 stack.
2    A.    Okay. Got it.
3    Q.    And this is the sales force training
4 REMS and safe use.
5    A.    Okay.
6    Q.    And I will ask you to turn to the
7 first actual slide instead of just the title slide.
8    A.    Okay.
9    Q.    The one on your left.
10    A.    Got it.
11    Q.    And this is a -- an address from
12 Dr. Lynn Webster addressed to the sales force.
13    A.    Right. It was a video.
14    Q.    Okay.
15    A.    A video.
16    Q.    We talked about Dr. Webster earlier.
17 You remembered his name?
18    A.    Yes.
19    Q.    And that he worked at Lifetree
20 Clinical Research and Pain Clinic?
21    A.    Right.
22    Q.    And why did you think he was a -- the
23 right person to address the sales force in terms
24 of -- I'm assuming this is -- since it's REMS and
25 safe use, it's Exalgo related?

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    A.    Yes.
2    Q.    Okay.  So why Dr. Webster?
3    A.    Because of his experience, his
4 knowledge, his rational approach to things, his
5 balanced approach, his concern for overall patient
6 care and well being, and he's very articulate.
7    Q.    Was he paid either through your
8 budget or some other budget to do the video that was
9 shown to this sales force?
10   A.    He was.
11   Q.    And which budget?
12   A.    Ours.  Medical Affairs.
13   Q.    Do you recall how much?
14   A.    No, I don't.
15   Q.    Okay.  At the time you left
16 Mallinckrodt, I'm assuming that that -- a video of
17 that presentation would have been available -- was
18 still there?
19   A.    I assume.
20   MR. DAVISON:  Objection to form.
21   THE WITNESS:  Don't know, though.  Yeah, we
22 used it multiple times, obviously.
23 BY MR. SAMSON:
24   Q.    And -- I think you told me earlier
25 that Dr. Webster was also active in the American

Page 243

1 Academy of Pain Management?
2    A.    He was.
3    Q.    Was on the board, or whatever their
4 directing body was, at one point or another?
5    A.    He was.
6    MR. DAVISON:  Objection to form.
7    THE WITNESS:  He also published a book,
8 "Avoiding Opioid Abuse While Managing Pain, A Guide
9 for Practitioners."  So he clearly thought about the
10 dichotomy, the risks, and the benefits.  We wanted
11 someone who was going to give, you know, a message
12 that's appropriate for sales representatives to hear.
13 BY MR. SAMSON:
14   Q.    Okay.  And was he, at any time while
15 you were at Mallinckrodt, a Covidien KOL, a key
16 opinion leader?
17   A.    He was a KOL for the safe use program
18 and the REMS program, not for commercial --
19 interaction with the commercial organization.
20   Q.    In that place as a KOL for REMS and
21 safe use, he would have been under your budget in
22 Medical Affairs?
23   A.    Yes.
24   Q.    And were there specific Exalgo budget
25 outlines in your Medical Affairs?

Page 244

1    A.    That I don't remember.
2    Q.    Did he or Lifetree get any grants
3 from Covidien that you know?
4    A.    He did one study for us with Exalgo
5 post approval.
6    Q.    And what was that study?
7    A.    So Dr. Webster submitted a study
8 proposal for funding, which we reviewed and decided
9 to fund, because we thought it was very crucial for
10 the safe use of the product.
11   Q.    And what was the subject of the said
12 study?
13   A.    The subject of the study was, what is
14 better for patients; to dose Exalgo once a day in the
15 morning, or to dose Exalgo once a day in the evening?
16 Whether there's any difference in terms of adverse
17 events based on those two dosage schedules with the
18 same dose.  And also evaluating pain on awakening.
19   So for patients with chronic pain, pain on
20 awakening, is a very poor measure.  Because if they
21 have pain on awakening, it's difficult for them to
22 start their day and to have a productive day, in
23 terms of their activities of daily living.
24   So pain on awakening versus a nighttime dose
25 or a morning dose.  So he -- he completed the study,

Page 245

1 and he published the study.
2    Q.    And what, if you recall, was the
3 general outcome of the study?
4    A.    The general outcome of the study was
5 pain on awakening was exactly the same, no
6 statistical difference.  However, the side effects
7 were different.
8    Q.    And what were the --
9    A.    There was more -- more indications of
10 respiratory depression dosed in the evening versus
11 dosed in the morning.
12   Q.    And did that research paper and
13 finding lead to any label changes, like asking the
14 FDA to let us say to dose it in the morning?
15   A.    It did not.  Because it wasn't really
16 powered.
17   Q.    Not enough participants?
18   A.    Yes.  It would have been -- a much
19 bigger study was needed.  But we incorporated that
20 into our educational materials.
21   Q.    Had -- at the time that you left
22 Mallinckrodt, had you personally met Dr. Webster?
23   A.    Oh, I've met Dr. Webster many times.
24   Q.    Okay.  And did you have a high
25 opinion of him?

Highly Confidential - Subject to Further Confidentiality Review

| | Page 246 |
|---|---|
| 1 | A.    Extremely high. |
| 2 | Q.    He developed a five-question survey |
| 3 | that he called, "The Opioid Risk Tool"? |
| 4 | A.    The ORT, O-R-T. |
| 5 | Q.    And you are a supporter of that tool? |
| 6 | A.    It was one of the tools in the |
| 7 | C.A.R.E.S. Alliance. |
| 8 | Q.    And he asserted that it would, quote, |
| 9 | predict accurately which individuals may develop |
| 10 | aberrant behaviors when prescribed opioids for |
| 11 | chronic pain; true? |
| 12 | MR. DAVISON:  Objection to form. |
| 13 | BY MR. SAMSON: |
| 14 | Q.    As you recall it? |
| 15 | A.    As I recall it. |
| 16 | Q.    And was the book -- or one of the |
| 17 | books that he published called, "The Painful Truth: |
| 18 | What Chronic Pain is Really Like, and Why it Matters |
| 19 | To Each of Us in Avoiding Opioid Abuse While Managing |
| 20 | Pain"? |
| 21 | A.    I don't know the book per se.  But it |
| 22 | sounds like something he would write. |
| 23 | Q.    Have you ever read his book?  Did you |
| 24 | read it back at the time? |
| 25 | A.    Not at the time, no. |

| | Page 247 |
|---|---|
| 1 | Q.    And not since? |
| 2 | A.    No. |
| 3 | Q.    Okay.  Were you aware Dr. Webster and |
| 4 | the Lifetree Clinic were investigated by the DEA for |
| 5 | over-prescribing opioids? |
| 6 | A.    I was aware of that. |
| 7 | MR. DAVISON:  Objection. |
| 8 | BY MR. SAMSON: |
| 9 | Q.    And apparently it was -- they had 20 |
| 10 | patients die from overdoses that led to the -- |
| 11 | A.    That was the contention. |
| 12 | MR. DAVISON:  Objection to form. |
| 13 | THE WITNESS:  That was the contention, as I |
| 14 | remember.  I don't remember the exact number.  But |
| 15 | there was a contention or an allegation, I guess is |
| 16 | the right word of that. |
| 17 | BY MR. SAMSON: |
| 18 | Q.    And do you recall that the DEA |
| 19 | reported that he was prescribing a staggering number |
| 20 | of opioid pills to patients under his care? |
| 21 | MR. DAVISON:  Objection to form. |
| 22 | THE WITNESS:  I don't recall that.  But |
| 23 | that's what those things usually are. |
| 24 | BY MR. SAMSON: |
| 25 | Q.    That's where what? |

| | Page 248 |
|---|---|
| 1 | A.    That's what the things are usually |
| 2 | about.  But I don't -- I don't recall. |
| 3 | Q.    Investigations? |
| 4 | A.    Yes.  I don't know what the actual |
| 5 | investigation was about. |
| 6 | Q.    In fact, there was someone, a |
| 7 | Lifetree patient, who overdosed in 2007 who was |
| 8 | taking as many as 32 pain pills a day in the year |
| 9 | before she died; do you recall that? |
| 10 | MR. DAVISON:  Objection to form. |
| 11 | THE WITNESS:  I do not know anything about |
| 12 | that. |
| 13 | BY MR. SAMSON: |
| 14 | Q.    Would -- there's another patient who |
| 15 | sought treatment for pain at Lifetree after a serious |
| 16 | car accident and multiple spine surgeries, quickly |
| 17 | became addicted to opioids, and was prescribed |
| 18 | increasing quantities of pills.  At the time of her |
| 19 | death, she was on seven different medications, |
| 20 | totaling approximately 600 pills a month.  Did you |
| 21 | hear of that? |
| 22 | MR. DAVISON:  Objection to form. |
| 23 | THE WITNESS:  No. |
| 24 | BY MR. SAMSON: |
| 25 | Q.    Another one who sought treatment from |

| | Page 249 |
|---|---|
| 1 | Lifetree for chronic low back pain and headaches died |
| 2 | at age 42 after Lifetree clinicians increased her |
| 3 | prescriptions to 14 different drugs, including |
| 4 | multiple opioids, for a total of 1,158 pills a month. |
| 5 | Were you aware of that? |
| 6 | A.    No. |
| 7 | MR. DAVISON:  Objection to form. |
| 8 | BY MR. SAMSON: |
| 9 | Q.    If those three stories were |
| 10 | consistent with the practices at Lifetree, would that |
| 11 | fit within Art Morelli's definition of a pill mill? |
| 12 | MR. DAVISON:  Objection to form. |
| 13 | THE WITNESS:  I hesitate to say "yes" or |
| 14 | "no," because pill mills are a very, very unique kind |
| 15 | of thing versus just garden variety, you know, |
| 16 | high-dose prescribing or over-prescribing, because of |
| 17 | the economic angle and the pharmacy combined with the |
| 18 | office angle. |
| 19 | So I wouldn't necessarily put that in a pill |
| 20 | mill box, no. |
| 21 | BY MR. SAMSON: |
| 22 | Q.    Since some of these things were in |
| 23 | 2007 and 2008, at least as reported, Dr. Webster |
| 24 | would have had them on his copy book at the time that |
| 25 | you were introducing him to your sales staff at |

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1 Covidien; true?
2        MR. DAVISON: Objection to form.
3        THE WITNESS: Chronologically, yes.
4 BY MR. SAMSON:
5        Q.   Did you know about any DEA
6 investigation or patient deaths at the time when you
7 were presenting him to the sales staff?
8        A.   I did not.
9        MR. DAVISON: Objection to form.
10 BY MR. SAMSON:
11        Q.   I take it, based on Art Morelli's
12 approach to truth and evidentiary-based results, had
13 you heard those things, you would have had them
14 investigated and found out the truth of them?
15        A.   Absolutely.
16        MR. DAVISON: Objection.
17 BY MR. SAMSON:
18        Q.   And if, in fact, patients at
19 Dr. Webster's clinic were getting as many as 32 pain
20 pills a day, would you be inviting him into
21 Mallinckrodt?
22        MR. DAVISON: Objection.
23        THE WITNESS: I can't judge. But that's a
24 lot of pills. So, you know, it would be a red flag.
25 ///

Page 251

1 BY MR. SAMSON:
2        Q.   600 pills a month, a real red flag?
3        A.   It --
4        MR. DAVISON: Objection.
5        THE WITNESS: It seems like a lot. I found
6 out about these allegations from a friend, who is
7 also a physician, way, way after that. Way after I
8 was gone.
9 BY MR. SAMSON:
10        Q.   Did you -- did you happen to call
11 anyone who you knew at Covidien, who was still there,
12 and say, my God, look at what -- I just learned this
13 stuff about Dr. Webster; is he still on staff?
14        A.   No, I did not.
15        MR. DAVISON: Objection.
16        MR. SAMSON: Let me withdraw it because
17 "staff" was poorly used.
18        Q.   Was he still in the Covidien orbit of
19 speakers?
20        A.   I haven't spoken --
21        MR. DAVISON: Objection.
22        THE WITNESS: -- to Dr. Webster since the
23 day I left Covidien.
24 BY MR. SAMSON:
25        Q.   Did you speak with anyone at Covidien

Page 252

1 to pass on the information you had heard? Because
2 I'm assuming what you heard did not qualify him, in
3 your eyes, as remaining a spokesperson for an
4 organization you were involved with?
5        MR. DAVISON: Objection.
6        THE WITNESS: I did not. I did not.
7        MR. SAMSON: 17?
8        THE REPORTER: I'm at 16.
9        MR. SAMSON: Oh, that's right. We're back
10 to 1.
11             (Exhibit No. 16 was marked.)
12 BY MR. SAMSON:
13        Q.   Mr. Morelli, this is a February
14 2011 --
15        A.   Okay.
16        Q.   -- about a REMS KAB survey, email
17 string.
18        (Witness reviewing document.)
19        A.   Ah, okay. Okay. I see this. I see
20 this. Okay.
21        Q.   Are you finished reading?
22        A.   I am.
23        Q.   Okay. Is this an episode that you
24 recall independently, now that you've read this email
25 string?

Page 253

1        A.   I do.
2        Q.   Okay. And if you'll turn to the
3 second page, the back of the first page for you, a
4 Tammy Spicer writes to Shawna Hawkins -- Hankins
5 about an experience she's just had with a nurse
6 practitioner in a pain management office.
7        A.   Right.
8        Q.   Who was Shawna Hankins? In Medical
9 Affairs or outside?
10        A.   District -- District Sales Manager in
11 the -- kind of the Arizona area.
12        Q.   And if you'll start reading for me in
13 the first paragraph after "Hi, Shawna." And you may
14 have already seen this, that sentence. The sentence
15 that starts with, "Ironically."
16        A.   She was -- she's saying she was
17 blindsided.
18        Q.   "With it."
19        Go ahead and just read it, please, for the
20 record.
21        A.   (Reading) Ironically I was
22           blindsided with it at no other than
23           Sandy Gallo's office, wherein I had
24           just gotten approval to mention Exalgo
25           in her office (end of reading).

Page 254

1     That part I don't understand.
2     Q.    Well, as I read it --
3     A.    I don't understand what was going on
4 here.
5     Q.    Okay.  Well, do you remember Sandy
6 Gallo as perhaps a high prescriber of --
7     A.    I don't remember.
8     Q.    -- or a big cheese in pain
9 management?
10    A.    I don't remember the name Sandy
11 Gallo, no.
12    Q.    So I'm assuming that what Ms. Spicer
13 is talking about, is that physicians may or may not
14 be interested in hearing about a new medication?
15    MR. DAVISON:  Objection to form.
16 BY MR. SAMSON:
17    Q.    Well, when I read, "I just got an
18 approval to mention Exalgo in her office," I'm
19 assuming Sandy Gallo has the power of which drug reps
20 she wants to let into her office and which drugs they
21 get to talk about.  Does that --
22    A.    It could be.
23    MR. DAVISON:  Objection to form.
24    THE WITNESS:  It could be.  I don't know.
25    MR. SAMSON:  Okay.

Page 255

1     THE WITNESS:  Yeah.
2 BY MR. SAMSON:
3     Q.    And then read on from, "To highlight
4 the document."
5     A.    "You can't give me a pen, and now
6 you're paying me for prescriptions."  Which, of
7 course, is not the case.
8     Q.    Hold on.  You skipped --
9     A.    Oh, I missed something.
10    Q.    You read through, "Mention Exalgo in
11 her office," in the first paragraph.  Start that next
12 sentence.
13    A.    (Reading) To highlight the
14          document, it's an offer to pain docs
15          for $100 per Rx up to ten, if they
16          write Exalgo and complete a survey.
17          It says it's cosponsored by Covidien,
18          though I saw no logos.  Her objections
19          were the following (end of reading).
20    Q.    And then, 1?
21    A.    (Reading) You can't even give me
22          a pen, and now you're paying me for
23          prescriptions?  You told me the FDA
24          and its concerns over REMS, why --
25          why -- why you could discuss Exalgo

Page 256

1          during lunch.  How exactly is this
2          going to affect your REMS -- which I
3          don't understand -- I have seen a lot
4          of cases where the surveys are paid
5          but never scripts.  This is going to
6          hurt the pain community.  I don't know
7          who else should see this, but we, as
8          sales reps, definitely need some kind
9          of official position on this.  My
10         apologies for having no idea how to
11         handle this one (end of reading).
12    Q.    Okay.  And then somehow Shawna
13 responds -- it says, "Shawna responds."  Oh, there it
14 is.  Or moves it up to you and Mr. Wickline?
15    A.    Yes.
16    Q.    Okay.  And says -- or to Mr. Wesler,
17 I guess is the "Mike" in --
18    A.    He's the Mike, yeah.
19    Q.    And wants to know where we landed on
20 this one with sending out a heads-up to the customer
21 facing teams?
22    A.    Yes.  In other words, inform them of
23 what's taking place.
24    Q.    Okay.  And then Ms. Kissinger chimes
25 in and says that Lori Macklin saw this in her

Page 257

1 territory last week too.
2     Do you remember a Lori Macklin?
3     A.    No, I don't.  I remember Kissinger
4 but not Lori Macklin.
5     Q.    Okay.  And then Mr. Wickline writes
6 to you.
7     A.    Right.
8     Q.    To say that it would appear that the
9 REMS survey is causing some concern among some of our
10 customers and catching the reps off guard.
11    A.    Right.
12    Q.    Well, first of all, was it true that
13 there was a hundred dollar per prescription of
14 Exalgo, up to ten, that a provider wrote as long as
15 they agreed to fill out a survey?
16    A.    No.
17    MR. DAVISON:  Objection to form.
18 BY MR. SAMSON:
19    Q.    Okay.  What was the program for --
20 I'm assuming this is a KAB survey?
21    A.    This is a KAB survey --
22    Q.    Which --
23    A.    -- required by the FDA.
24    Q.    Which stands for?
25    A.    Knowledge, attitude, and belief.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    Q.    Okay.  And so how did this message --
2  you're saying no one was offered a hundred dollars to
3  fill out that survey?
4    A.    Oh, no.  They were offered a hundred
5  dollars to fill out the survey.  Quite clearly.
6    Q.    Okay.  And were they required to have
7  written a prescription before they got the survey?
8    A.    That I don't --
9    Q.    A prescription for Exalgo?
10   A.    That I don't remember.  But I think
11 they were.  Because this was a REMS -- this was a
12 survey about KAB related to the product required
13 under the auspices of our REMS program.
14        And I -- my organization -- my team, Jenny
15 and my team, designed and implemented this.  We
16 purposely did not inform the sales force -- maybe in
17 retrospect that was a mistake -- because what we
18 didn't want is the sales force running into these
19 doctors and using this as a way to talk to the doctor
20 about stuff they don't need to be talking to the
21 doctor about.
22        This was needed to be a blind, straight
23 survey, the results of which -- the protocol for this
24 was approved by the FDA.  The sample size was
25 approved by the FDA.  And the FDA wants the results

Page 259

1  sent to them to review.
2    Q.    And did you tell the FDA that you
3  were going to pay people to fill out the survey?
4    A.    Yes.  And they approved the amount of
5  the payment under their guidelines.
6    Q.    And was it -- where did the up to ten
7  prescriptions per hundred dollars come from?
8    A.    I don't know.  Maybe what I'm
9  thinking, is maybe the guideline was the physician
10 should at least have ten patients or written ten
11 prescriptions on Exalgo to have a sufficient
12 experiential base to answer the survey properly.
13 That's the only thing I can think of.
14   Q.    And then they got a hundred bucks,
15 the physician, or did they get a larger amount?
16   A.    No, they got a hundred.
17       MR. DAVISON:  Objection.
18 BY MR. SAMSON:
19   Q.    And then later, up above, your
20 response is that:
21       (Reading) You agree with what you just
22       told me, the details of the REMS
23       assessment and the need for the KAB
24       survey at the manager's meeting (end
25       of reading).

Page 260

1        And I'm assuming that's you or somebody from
2  Medical Affairs --
3    A.    Right.
4    Q.    -- telling district managers,
5  regional managers --
6    A.    Both.
7    Q.    -- why it was, and they could then
8  pass that on to their people?
9    A.    Right.
10   Q.    Their respective people; correct?
11   A.    It would have been better, in
12 retrospect, to announce that the study was being
13 conducted, but don't give the names of the
14 physicians, but just a blanket 150 physicians across
15 the country are going to fill out a survey.  You
16 don't need to know who, what, when, why, or where,
17 because we don't want your sticky fingers inside this
18 survey.
19   Q.    Then, number two, which you said:
20       (Reading) Agree, would be to discuss
21       with sales, marketing and Medical
22       Affairs, advisability of a field
23       communication on the subject.  We can
24       prepare it (end of reading).
25   A.    Yes.

Page 261

1    Q.    She agreed with that?
2    A.    Jamie.  Jamie is a guy.  But, yeah,
3  he agreed with it.
4    Q.    Okay.  And then you thought address
5  it during breakouts at the NSM via sales management
6  at the PPS Team.
7    A.    Right.
8    Q.    Can you --
9    A.    National Sales Meeting, NSM.  PPS,
10 Patient Product Safety team.
11       So we had our people fan out to the
12 meetings, wherever they were held, to conduct this
13 breakout.
14   Q.    And basically you told them before
15 the next steps, that you had met your FDA and -- for
16 surveys of 150?
17   A.    Yes.  So we're not recruiting anymore
18 physicians.  Yeah.
19   Q.    But then you were going to have
20 another survey in a few months, in which the survey
21 respondents need to be different?
22   A.    Right.  So the requirement of the
23 agency is you do two surveys with "X" amount of time
24 in between.  But not the same doctors.  So they
25 compare the results in this to the results in this,

Page 262

1  two different surveys.
2      Q.    And no patient input in the survey
3  process?  I mean, patient surveys?
4      A.    That I don't recall.  There may have
5  been a thing in there where the physician had to ask
6  the patient a question.  I don't recall.  I'm pretty
7  sure it was just the doctor.
8      Q.    And then you see the black box, which
9  is --
10     A.    Yeah.
11     Q.    -- has been redacted.  As we saw
12 earlier, your social security number, or things like
13 that, are often redacted.
14        This one, William, puzzles me.  Do you
15 recall --
16     MR. DAVISON:  I mean, I don't recall --
17     MR. SAMSON:  -- by any chance, what --
18     MR. DAVISON:  -- off the top of my head.
19 You can take a look at our redaction logs that we
20 have produced on these items.
21     MR. SAMSON:  Okay.
22     Q.    I mean, given that your response and
23 answers about the survey are not -- and unless you
24 went to a lawyer in-house, wouldn't be privileged, do
25 you have any idea what else might have been on here?

Page 263

1      MR. DAVISON:  Objection.  I mean, you're
2  asking him to talk about something that's clearly
3  been redacted.  I think that's incredibly
4  inappropriate, to be honest, Mark.
5      MR. SAMSON:  Okay.
6      MR. DAVISON:  I'm going to instruct the
7  witness not to answer.
8      MR. SAMSON:  All right.  Let's go to No. 17.
9        (Exhibit No. 17 was marked.)
10     THE WITNESS:  I'm going to need a bio break
11 after this one.
12     MR. SAMSON:  You got it.
13     Do we have the attachment marked separately?
14     Let's reschedule your bio break.
15     THE WITNESS:  Okay.
16     THE VIDEOGRAPHER:  We are going off the
17 record.  The time is 4:19 p.m.
18     (Recess taken.)
19     THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 4:29 p.m.
21 BY MR. SAMSON:
22     Q.    Mr. Morelli, you now have what's been
23 marked as Exhibit 17 in front of you, which is a
24 single-page email and then attachments, which are the
25 FDA comments on the REMS documents.  And I'm assuming

Page 264

1  they are the REMS for Exalgo?
2      A.    Yes.  It says here this is Exalgo,
3  yeah.
4      Q.    Okay.  And the -- at the top
5  there's -- you're included in an email copied about
6  an invite to the meeting tomorrow.
7      A.    Uh-huh.
8      Q.    Do you recall a meeting on the FDA's
9  responses to Covidien's submission of REMS for
10 Exalgo?
11     A.    I do.
12     Q.    And did it take place in St. Louis?
13     A.    I don't remember.
14     Q.    Okay.  And who all do you recall
15 being at the meeting?
16     A.    Various people who are involved in
17 the formatting, the resubmission, the regulatory.  It
18 was a cross-functional group of many people in the
19 organization.
20     Q.    Given the slide show presentations
21 I've seen, and your earlier testimony, you held a
22 pretty high perch in the REMS for Exalgo world --
23     A.    I did.
24     Q.    -- within Covidien?
25     A.    I did.

Page 265

1      Q.    Do you recall there being any
2  dissension or blame given at the meeting to discuss
3  these?
4      MR. DAVISON:  Objection to form.
5      THE WITNESS:  I don't understand the
6  question.
7      MR. SAMSON:  Sure.
8      Q.    One can go to a business meeting, and
9  it will be a very cooperative meeting of however many
10 people are there to come up with a response to an
11 outside agency's criticism of some project that the
12 company has done.  You've been to meetings like that,
13 I assume?
14     A.    I have.
15     Q.    And there are other meetings at which
16 there's blame and dispute and disagreement on how
17 we're going to respond.  Do you -- you've been to
18 meetings like that?
19     A.    I have.
20     Q.    Do you recall whether this meeting,
21 about starting to respond to what the FDA had
22 responded to the submitted REMS, was one or the
23 other?
24     A.    So the tenor in this meeting was a
25 lot of excitement and a lot of interest to prepare a

Page 266

1 high-quality response as soon as possible.
2     Q. Okay. And you read then, and I think
3 you have read it again today, the FDA's response.
4     It's true that REMS are supposed to fully
5 and fairly explain the risks and benefits of the drug
6 to prescribers, pharmacists, caregivers, and
7 patients? That's the goal?
8     MR. DAVISON: Objection to form.
9     THE WITNESS: The goal -- you're reading
10 point 8 there on page --
11 BY MR. SAMSON:
12     Q. No, I was just reading -- that was
13 just a general statement.
14     A. Oh. The goal is to -- there are two
15 goals of the REMS: To inform patients and providers
16 about the potential for abuse, misuse, overdose and
17 addiction of Exalgo; and, two, to inform patients and
18 providers about the safe use of Exalgo in
19 opioid-tolerant patients. Those are the two goals of
20 the REMS.
21     Q. Okay. They are not -- REMS are not
22 intended to be promotional vehicles?
23     A. Absolutely not.
24     Q. And that was certainly in keeping
25 with your personal goal and Medical Affairs goal of

Page 267

1 presenting science and medicine-based, evidence-based
2 decision-making; true?
3     A. Yes. Yes.
4     Q. And promotion in marketing doesn't
5 belong in that either?
6     MR. DAVISON: Objection to form.
7     THE WITNESS: They don't belong in that
8 to -- to create any content or to influence content.
9 But they have to be aware of what's coming because
10 their sales rep and their marketing program has to be
11 such that it's promoting a product with a REMS. They
12 can't do anything against, in violation, or contra
13 against what the REMS is calling for.
14 BY MR. SAMSON:
15     Q. Okay. Turn in the FDA's response to
16 boldfaced B, "Specific Comments." And in number one
17 the FDA said:
18     (Reading) There's concern that the
19     proposed REMS materials minimize the
20     risks of Exalgo by omitting the
21     REMS-specific risk information within
22     the body of the letters and the
23     brochure (end of reading).
24     Do you see that?
25     A. Could you tell me where you're

Page 268

1 reading again. Oh, this stuff.
2     Q. B-1.
3     A. I see it now.
4     So this is -- there is the FDA going to
5 school on what we submitted and providing guidance on
6 how they want it changed.
7     Q. And they thought that how you
8 submitted or didn't submit, omitting REMS-specific
9 risk information within the body of the -- are those
10 patient letters or physician letters?
11     MR. DAVISON: Objection to form.
12     THE WITNESS: There's no patient letters.
13 There's letters to prescribers, pharmacies, and
14 professional associations. Yeah.
15     MR. SAMSON: Okay.
16     THE WITNESS: They wanted it strengthened.
17 BY MR. SAMSON:
18     Q. They wanted the risk sharing
19 strengthened in your letters to match the label?
20     A. Right. Right.
21     Q. Okay. And, in general terms,
22 minimizing the risk of a medication would be expected
23 to make it -- make more physicians want to prescribe
24 it because it has lower risk?
25     A. Uh-huh.

Page 269

1     MR. DAVISON: Objection to form.
2 BY MR. SAMSON:
3     Q. Is that a "Yes"?
4     A. That's a yes.
5     Q. Okay. And the FDA wanted
6 Mallinckrodt to change that about the REMS for
7 Exalgo?
8     A. They did.
9     Q. Okay. (Reading) Number two,
10     the proposed REMS materials present
11     the claim, quote, the adverse event
12     profile of once daily Exalgo is
13     typical of strong opioids, period, end
14     quote. The proposed claim minimizes
15     the risks associated with Exalgo
16     therapy (end of reading).
17     A. Eliminate this language.
18     Q. So the same thing as number one, a
19 criticism that the drafted REMS from Mallinckrodt
20 minimized or understated the risk, and that might
21 lead to inadvertent overuse on the part of
22 physicians?
23     MR. DAVISON: Objection to form.
24 BY MR. SAMSON:
25     Q. True?

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    A.    The FDA wanted us to change stuff in
2  the document. We're going to do exactly what they
3  want.
4    Q.    Do you see any other reason, other
5  than misleading physicians into underestimating the
6  risk, because the risk hasn't been spelled out in the
7  REMS materials for them, the FDA wanting this change?
8    MR. DAVISON: Objection.
9  BY MR. SAMSON:
10    Q.    Number two --
11    MR. DAVISON: Objection to form.
12    THE WITNESS: I see the thing that was going
13  on here, is this was plowing new ground for our
14  company. This was the first REMS that they ever
15  submitted. They don't have experience in doing it.
16  I didn't have experience in doing it. So we were
17  feeling our way along.
18    And that's why the FDA has a review process.
19  And whatever their specific comments are is exactly
20  what we're going to do.
21  BY MR. SAMSON:
22    Q.    And then, number three:
23    (Reading) The content and order of
24    presentation of the risk information
25    within the proposed REMS materials

Page 271

1    minimizes the risks associated with
2    Exalgo (end of reading).
3    And then they gave you an example of
4  presenting the most commonly reported adverse offense
5  on page 1, while the boxed label or warning -- label
6  warning isn't -- is presented on page 3 after the
7  signature line.
8    A.    Right. This is a format issue. They
9  prefer a format that puts the box warning more up
10  front, which is fine with me.
11    Q.    Did you draft these REMS?
12    A.    No. No. I provided some oversight.
13    This is the first REMS creation of an
14  opioid, long-acting opioid REMS that I was ever
15  involved with. And we took our best shot. That's
16  why the FDA has a review process, to keep everybody
17  on the straight and narrow.
18    Q.    Commonly reported adverse events,
19  what would those have included in Exalgo?
20    MR. DAVISON: Objection to form.
21    THE WITNESS: I don't recall.
22  BY MR. SAMSON:
23    Q.    Constipation?
24    A.    That's a typical opioid side effect.
25    Q.    And that is a commonly -- common one?

Page 272

1    A.    It is. Nausea and vomiting.
2    Q.    Nausea and vomiting. Any others that
3  would have been put on page 1?
4    MR. DAVISON: Objection to form.
5    THE WITNESS: Somnolence. Drowsiness would
6  be commonly reported side effects.
7  BY MR. SAMSON:
8    Q.    And the black box warning would have
9  addiction, overdose, death, respiratory depression;
10  correct?
11    A.    Correct.
12    Q.    And so those, for want of -- in a
13  layman's terms -- scarier risks are on page 3, and
14  the most common, but not really all that
15  life-threatening risks, are put on page 1; that's
16  what happened --
17    MR. DAVISON: Objection to form.
18  BY MR. SAMSON:
19    Q.    -- as you read this?
20    A.    It seems so. But we changed it.
21    Q.    Okay. Because the FDA made you?
22    MR. DAVISON: Objection to form.
23    THE WITNESS: The FDA requested that we did
24  it, and we did it.
25    MR. SAMSON: Okay.

Page 273

1    THE WITNESS: They were right.
2  BY MR. SAMSON:
3    Q.    No. 4:
4    (Reading) Mallinckrodt, in its draft,
5    left out the specific part of the
6    indications on the label that it
7    wasn't for -- Exalgo was not for acute
8    pain, mild pain, or pain that wasn't
9    expected to persist for an extensive
10    period of time (end of reading).
11    True?
12    A.    That's what it says here, yeah. It's
13  not for those patients.
14    Q.    Okay. And the effect of that, not
15  putting in those specific "Don't use it for A, B, and
16  C," is to potentially leave patients or prescribers
17  ignorant of the fact that it's not for those reasons?
18    MR. DAVISON: Objection to form.
19    THE WITNESS: No, you have to tell -- you
20  have to tell them what it's indicated for.
21  BY MR. SAMSON:
22    Q.    And in this instance, what it's --
23    A.    Not.
24    Q.    -- specifically not indicated for --
25    A.    It's always best.

Page 274

1      Q.   -- if the FDA in your label says you
2   need to mention these, not uses in your label; true?
3      A.   True.
4      Q.   And, again, Mallinckrodt submitted it
5   without the "don't use it for these things" part of
6   the label?
7         MR. DAVISON:  Objection to form.
8         THE WITNESS:  Apparently.
9   BY MR. SAMSON:
10     Q.   Number five and number seven, the FDA
11  decided that those two were promotional in tone?
12     A.   Yeah, they didn't like the word
13  "pleased."  That's not something you say in a
14  regulatory communication.
15     Q.   And that was in number five; right?
16     A.   Uh-huh.
17     Q.   And then what about in seven?
18        MR. DAVISON:  Objection to form.
19  BY MR. SAMSON:
20     Q.   I will read it to you:
21        (Reading) Remove the second paragraph
22        of the letters.  These claims and
23        presentation are promotional in tone
24        and focus on promoting the benefits of
25        the treatment rather than on educating

Page 275

1        about the serious risks of treatment,
2        period (end of reading).
3      A.   Uh-huh.
4      Q.   And, again, when you looked at this,
5   you agreed that the FDA was right to say --
6      A.   Totally right.
7      Q.   -- to take it out?
8      A.   The standard of performance in a
9   sales presentation is a balanced presentation, risks
10  and benefits.  That's not the standard here.  It's
11  only risks that are presented, not benefits.
12     Q.   Well, and to put benefits in under
13  those rules is to promote?
14     A.   Yeah, that's the way the FDA looks at
15  it.  And they are completely correct.
16     Q.   Okay.  And then if we go to number
17  eight in the D Section, there was a text box on top
18  of the letters, apparently?
19     A.   I don't remember the letters.  But if
20  they say there was, there was.
21     Q.   And the presentation of the
22  information within the box has a header, "Minimizes
23  the REMS risks associated with Exalgo."
24        And, again, the FDA in REMS didn't accept
25  what it viewed as Exalgo's drafting or layout that

Page 276

1   tended to minimize the risks?
2         MR. DAVISON:  Objection to form.
3   BY MR. SAMSON:
4      Q.   True?
5      A.   They requested changes, and we made
6   the changes.
7         MR. SAMSON:  Let's move to -- I will take a
8   wild guess -- 18.
9         THE REPORTER:  Yes.
10        THE WITNESS:  Are we done with this one?
11        MR. SAMSON:  Yes.  Unless somebody else may
12  have questions of you about it.
13              (Exhibit No. 18 was marked.)
14        MR. SAMSON:  That's it.
15        Counsel, this one is, as you'll see, is not
16  Bates consistent.  I wanted to just keep the number
17  of exhibits to a minimum.  There's a -- the first
18  page of Exhibit 18 is a stand-alone exhibit that just
19  came out of the documents as the suspicious ordinary
20  monitoring team charter.
21        The other one -- the rest of the pages of
22  this exhibit are from a different document in the
23  production.
24        And then let me give him, because it will
25  come to a question about it, 19.  That will be 19.

Page 277

1              (Exhibit No. 19 was marked.)
2         (Witness reviewing document.)
3   BY MR. SAMSON:
4      Q.   Ready, Mr. Morelli?
5      A.   I'm ready.
6      Q.   All right.  This is -- the first page
7   of 18 is a Suspicious Order Monitoring Team Charter,
8   and it shows as of updated 4-7-11 -- right next --
9   under the charter.
10     A.   Yep.
11     Q.   -- that you were listed as a member
12  of the Suspicious Order Monitoring Steering Committee
13  as of April 7, 2011.  Was that true?
14     A.   That was true.
15     Q.   Okay.  When were you appointed to
16  that team?
17     A.   I don't recall.  But during my stay
18  at Mallinckrodt.  I mean --
19     Q.   Were you on it when you were a
20  consultant?
21     A.   Oh, no.  No.
22     Q.   Okay.  So sometime after the end of
23  October, 2009, up to April of 2011, you would have
24  become a member?
25     A.   Probably.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.    Okay.  Before being appointed to the
2  Mallinckrodt Suspicious Order Monitoring Team, had
3  you ever served on a Suspicious Order Monitoring Team
4  before?
5    A.    No.
6    Q.    Ever had any contact with that in the
7  pharmaceutical business, suspicious order monitoring?
8    A.    I was aware it existed.  I was never
9  involved with it directly.
10    Q.    And what was your basic
11  understanding?
12    A.    Well, my basic understanding is the
13  whole supply chain process is an opportunity to limit
14  diversion.  Now, diversion is not within a REMS
15  program, because diversion is not an FDA program.
16  It's a DEA program.  But it's still important.
17    So that's -- that's my -- that's how it
18  involved me.  Because if it improves safety, I'm
19  interested in it.
20    Q.    And does safety involved in reducing
21  diversion, may not be to an individual patient being
22  prescribed medications and taking it that has safety
23  aspects around it, but the public safety?
24    MR. DAVISON:  Objection to form.
25    THE WITNESS:  The public safety, yeah.

Page 279

1  BY MR. SAMSON:
2    Q.    Do you recall how you were appointed
3  or by whom to the Suspicious Order Monitoring Team?
4    A.    It would have had to be Herb Neuman.
5    Q.    Do you remember replacing someone
6  else from Medical Affairs?
7    A.    No.
8    Q.    Did you ever learn that we always had
9  somebody from Medical Affairs on the Suspicious Order
10  Monitoring Team?
11    A.    I don't recall that, no.
12    Q.    Okay.  And it looks like the steering
13  committee, which is where you show up, had
14  once-a-quarter meetings?
15    A.    It sounds right, yeah.
16    Q.    Does that fit with your memory?
17    A.    It fits with my memory.
18    Q.    Do you have a memory of how many
19  times you remember going to the suspicious order
20  monitoring quarterly meeting?
21    A.    Maybe two -- maybe two or three
22  times.  Yeah.
23    Q.    And I don't see anybody else from
24  Medical Affairs that was on it, at least at this
25  point.  Was there ever any other -- when you were on

Page 280

1  the team, was there any other Medical Affairs person?
2    A.    Not to my knowledge, no.  And there
3  are none from this list that were Medical Affairs.
4    Q.    Okay.  What was your job or role on
5  the Suspicious Order Monitoring Team, if any?
6    A.    My role was to make the Suspicious
7  Order Monitoring Team aware of what we were doing on
8  the REMS side and the safe use side so they would
9  have awareness of that, and how it's relevant to the
10  overall vigilance of the company, how it fits with
11  the vigilance of the customer, of which the
12  suspicious order monitoring system is one program
13  for, you know, proper vigilance.
14    Q.    Okay.  And explain to me how you
15  explained to them that suspicious order monitoring
16  and accurate REMS, in the case of Exalgo, fit
17  together into one goal?
18    MR. DAVISON:  Objection to form.
19    THE WITNESS:  What I was trying to impress
20  upon the team is the need for granularity of data.
21    For example, drug distribution data to a
22  wholesaler or a warehouse might be interesting but
23  not particularly helpful.  Whereas, drug -- opioid
24  distribution to an individual pharmacy is much more
25  helpful.

Page 281

1    So, as I remember, we sometimes had access
2  to that level of detail, and sometimes we didn't.
3  And what that would show is an individual pharmacy in
4  X, Y, Z ZIP code of the United States would have a --
5  sort of an out-of-profile order, where they would
6  order ten, ten, ten, they would order a hundred, then
7  ten, ten.  So why did they order a hundred?  It could
8  be completely innocuous.  We don't know.
9    But then we're going to -- if we know that,
10  then we can go back to what the prescription data is,
11  which is ZIP-code based, and see if there's any
12  correlation.  We can go back to reports of pill mills
13  and reports of other suspicious activity because we
14  know who's prescribing and what they are prescribing.
15    So if we see -- if we see a dermatologist
16  prescribing massive amounts of opioids, we're going
17  to look into that.  We're not going to just let that
18  lay.  Or if we see a surgeon, to give an example, a
19  surgeon prescribing Exalgo, that's a big problem.  We
20  have to look into that.
21    So having more data gives us more
22  information and more insight.
23  BY MR. SAMSON:
24    Q.    And did you -- were you a voice for
25  more data, get whatever we can to show where our

Page 282

1  drugs are going?
2      MR. DAVISON: Objection to form.
3      THE WITNESS: I did -- I did deliver that
4  message. But people -- people generally got it.
5  They understood it, why they were doing what they
6  were doing.
7  BY MR. SAMSON:
8      Q.   Okay.  And I think you've answered
9  this indirectly by what you were talking about, you
10  know, a pharmacy, that's been ordering ten bottles,
11  ten bottles, ten bottles and then orders a hundred
12  bottles.
13      Do you recall, while you were on the
14  Suspicious Order Monitoring Team, that there were
15  triggers of purchase by, be it a clinic buying
16  directly or a distributor or a pharmacy, that would
17  trigger what was called a peculiar order?
18      MR. DAVISON: Objection to form.
19      THE WITNESS: I don't recall that, no.
20  BY MR. SAMSON:
21      Q.   Okay.  And peculiar orders would then
22  be looked at more closely to see if there was a
23  reasonable explanation for why it doubled; do you
24  recall that?
25      MR. DAVISON: Objection to form.

Page 283

1      THE WITNESS: I mean, that's the principle
2  upon which suspicious ordering is based.  But I don't
3  recall it happening, quite frankly.  It may have
4  happened, but I don't recall it happening.
5  BY MR. SAMSON:
6      Q.   Okay.  Do you recall that prior to
7  April 10th of 2010, Mallinckrodt had a ▮▮▮▮▮
8  ▮▮▮▮▮ -- ▮▮▮▮▮ of the monthly order of
9  the previous years as the triggering event?
10      A.   No.
11      MR. DAVISON: Objection to form.
12      THE WITNESS: I wasn't aware of that.
13  BY MR. SAMSON:
14      Q.   And having served on the Suspicious
15  Order Monitoring Committee -- and I will ask you to
16  assume that at one point Mallinckrodt did have a ▮
17  purchasing trigger point for peculiar and then
18  suspicious order investigation.  Can you make that
19  assumption for me?
20      MR. DAVISON: Objection to form.
21      THE WITNESS: Is it a hypothetical or what?
22      MR. SAMSON: Yeah.
23      THE WITNESS: Okay.
24  BY MR. SAMSON:
25      Q.   Since you don't know that that's what

Page 284

1  it was.
2      A.   Yeah.
3      Q.   Assuming that to be true, do you see
4  any reason, based on your years in the pharma
5  industry or your service on the Suspicious Order
6  Monitoring Team in the time you were at Mallinckrodt
7  from 2009 to 2011, when, as you put it, there was a
8  huge opioid problem, that it would make sense for the
9  Suspicious Order Monitoring Program to increase the
10  trigger to three times?
11      MR. DAVISON: Objection to form.
12      THE WITNESS: So here's -- here's how I look
13  at it.  You asked me based on my overall experience,
14  not specific in-depth suspicious order monitoring
15  experience or knowledge.  You're asking me just as a
16  principal, of a pharmaceutical person.
17      MR. SAMSON: Yes.
18      THE WITNESS: If -- if it was all going up
19  in concert, in terms of the distribution data, more
20  or less going up like this, kind of a mass effect, I
21  would be concerned.  But I would be less concerned
22  than the increase was a spike of increase here and a
23  spike of increase here and low here.  You know,
24  staccato kinds of increases would really alert me
25  because that means, what's different about these

Page 285

1  areas.
2      Because what I know -- I'm giving you the
3  value of my experience now.  What I know is there's
4  regional hot spots with abuse and misuse and
5  addiction and overdose.  It's not uniform across the
6  country.  There's hot spots and there's cold spots.
7  BY MR. SAMSON:
8      Q.   Were you aware, during your time at
9  Mallinckrodt, that for opioid abuse or use or
10  overuse, Florida was a hot spot?
11      MR. DAVISON: Objection to form.
12      THE WITNESS: Yes.  Because of pill mills.
13  BY MR. SAMSON:
14      Q.   And what other hot spots geographic
15  did you become aware of for the opioid pain space?
16      A.   West Virginia.  Kentucky.
17      Q.   How about Ohio?
18      A.   Ohio never stood out in my mind, no,
19  for some reason.
20      Q.   Okay.  Which other ones, then, did?
21      A.   Did I say Kentucky?
22      Q.   You did.
23      A.   Okay.  Kentucky, West Virginia,
24  Florida.  Those would be the main ones that would
25  stick out in my mind.

Page 286

1     Q.    Okay. I'm assuming that you don't
2 recall being around when the trigger point went from
3     ▇▇▇▇▇ previous annual monthly sales to ▇▇▇▇
4 ▇▇▇▇
5     MR. DAVISON: Objection to form.
6     THE WITNESS: I'm not even sure what trigger
7 point is. And I was not around when that happened.
8 I was not even aware it happened.
9 BY MR. SAMSON:
10     Q.    I'm calling it a trigger point. But
11 basically you've sort of identified yourself that
12 what you're doing in suspicious order monitoring is
13 looking at patterns and amount of purchase?
14     A.    Right. Right. That's exactly what
15 it is.
16     Q.    And then you've got to have some
17 level at which you say, I'm going to call this amount
18 two times as much --
19     A.    I see.
20     Q.    -- as the year before not likely to
21 just be variation that goes on in a -- all lines
22 are -- very few lines are straight, and they are
23 going to be going up and down day by day and week by
24 week, but if it gets to ▇▇▇▇, then I'm going to
25 look into it; do you recall that?

Page 287

1     A.    No, I don't recall.
2     MR. DAVISON: Objection to form.
3 BY MR. SAMSON:
4     Q.    And you certainly don't recall that
5 going from ▇▇ to ▇▇?
6     A.    No.
7     Q.    Okay. Assume that there is some
8 trigger or purchase level that would cause
9 Mallinckrodt's Suspicious Order Monitoring Committee
10 to call it a peculiar order and ask that it be looked
11 into. Okay?
12     MR. DAVISON: Objection to form.
13 BY MR. SAMSON:
14     Q.    That's a hypothetical. Yes? Can you
15 make that assumption?
16     A.    Yes. A hypothetical. If you're
17 making it a hypothetical, yes.
18     Q.    Would you send, based again on your
19 experience in pharma, a member of the sales team or
20 marketing team to determine whether or not the order
21 should be cleared?
22     MR. DAVISON: Objection to form.
23     THE WITNESS: I would not, no.
24 BY MR. SAMSON:
25     Q.    Why not?

Page 288

1     A.    Because they are not qualified to
2 make that determination. They are not senior enough
3 to make that determination. And, you know, I would
4 send someone who has knowledge and experience in the
5 area, and someone has a relationship with the
6 wholesaler -- wholesaler people. Because they know
7 where they sell stuff to. So I would rely on my
8 relationship with the wholesalers.
9     In my experience, wholesalers are always
10 willing to help their customers, because we're a
11 customer. So they are willing to help us, if it's a
12 reasonable request. That's why we have people in
13 wholesaler relations that have a long-standing
14 relationship with wholesalers, so they can
15 communicate with one another.
16     Q.    And would you let those wholesale
17 relationship people -- how do they build that
18 relationship, in the --
19     A.    They --
20     Q.    -- sales relationship with the
21 wholesalers?
22     A.    It's a --
23     MR. DAVISON: Objection to form.
24     THE WITNESS: It's a transactional
25 relationship. It's a contractual relationship. It's

Page 289

1 a long -- you know, tend to be longer-standing
2 relationships. And, you know, like any other
3 business relationship, there has to be a high degree
4 of trust.
5     And based on that, and I would -- I would
6 have a sit down with them and see what we can -- how
7 we can get inside this problem, to find out if it's
8 really a problem. Because maybe some other area has
9 gone -- dropped, you know. Because Dr. Lipschitz,
10 who was a big prescriber moved over to this one and
11 he left that one. So, you know, it's this kind of
12 thing. But I don't know. You have to look at the
13 data.
14 BY MR. SAMSON:
15     Q.    Okay. And do you recall ever being
16 told about or looking at the data of suspicious order
17 monitoring claims that needed investigation going up
18 or down in your time on the board or on the
19 committee?
20     A.    No, I do not.
21     Q.    As far as you know, it was just
22 flat --
23     MR. DAVISON: Objection.
24 BY MR. SAMSON:
25     Q.    -- what you were getting from a

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  quarterly meeting?
2      MR. DAVISON: Objection to form.
3      THE WITNESS: Basically. I didn't see any
4  massive red flags, and certainly none on Exalgo.
5  Because the volume was so low.
6  BY MR. SAMSON:
7      Q.   Did you get reports, either weekly,
8  monthly, quarterly, or anything about how suspicious
9  order monitoring programs were working?
10     A.   No.
11     Q.   As a member of the board?
12     A.   No, not that I remember.
13     Q.   I keep calling it the board.
14     A.   I know.
15     Q.   The team.
16     A.   The team, yeah.
17     Q.   Okay. Now, decreasing diversion --
18 although, as you pointed out, not an FDA thing --
19 that was an important Covidien goal; true?
20     A.   Very important.
21     Q.   And across all the opioids, not just
22 Exalgo?
23     A.   From the C.A.R.E.S. Alliance
24 perspective, absolutely across all the opioids.
25     Q.   Okay. And let me ask you to look at

Page 291

1  Exhibit 19 --
2      A.   Okay.
3      Q.   -- which you also have there. And I
4  will send you to -- it looks like I've got page 3 on
5  it.
6      A.   What does it look like?
7      Q.   That's -- that's not it. No.
8      A.   It looks like the back. Let's see
9  what you're --
10     Q.   This is, "Safe and Appropriate Use of
11 Opioids from C.A.R.E.S. Alliance."
12     MS. GAFFNEY: It's the back page.
13     THE WITNESS: Yeah, I got it. I think I
14 have it now.
15 BY MR. SAMSON:
16     Q.   All right. Now, "Introducing
17 C.A.R.E.S. Alliance."
18     A.   Right.
19     Q.   And there's a mission statement;
20 right?
21     A.   Yes.
22     Q.   And then there are objectives. And
23 read the first objective of the C.A.R.E.S. Alliance.
24     A.   (Reading) To ensure responsible
25       prescribing, dispensing, use and

Page 292

1        storage of opioid analgesics to avoid
2        misuse, abuse, addiction, diversion,
3        and overdose (end of reading).
4      Q.   So diversion is and was important to
5  Mallinckrodt?
6      A.   Absolutely.
7      Q.   Can you -- assuming that my
8  hypothetical is right, and Mallinckrodt increased the
9  increase of order necessary to cause investigation of
10 the order, how that possibly helped reduce diversion?
11     MR. DAVISON: Objection to form.
12     THE WITNESS: I don't think it necessarily
13 helped reduce or increase diversion. That's --
14 distributing drugs through a proper channel is not
15 diversion. It's when they -- diversion is the
16 possession of a drug by someone who is not authorized
17 to possess it.
18     Wholesalers are authorized to possess it.
19 Pharmacies are authorized to possess it. Patients
20 who have been prescribed are authorized to possess
21 it. Others are not. That's diversion.
22 BY MR. SAMSON:
23     Q.   Okay. So what do you call the pill
24 mill in Florida, where physician A is both dispensing
25 and prescribing opioids as fast as he or she can just

Page 293

1  for the profit of it?
2      MR. DAVISON: Objection to form.
3      THE WITNESS: It's not diversion. It's a
4  very serious problem. But technically it's not
5  diversion. It's -- it's overprescribing and improper
6  prescribing, is how I would characterize it. Yeah.
7  BY MR. SAMSON:
8      Q.   And would that be something that
9  Mallinckrodt had an interest, when you were there, in
10 identifying and stopping, if it could?
11     MR. DAVISON: Objection to form.
12     THE WITNESS: We did. We did. And we did
13 it, actually.
14 BY MR. SAMSON:
15     Q.   And why do you say, "we did it"?
16     A.   Because we had examples, and I can't
17 remember where, of sales reps reporting -- and this
18 is in the day of television quality pill mills. We
19 all saw the videos, right. Sat there in disbelief at
20 what we were watching. So it was fairly easy to
21 identify, quite frankly.
22     So we -- part of our training of our reps --
23 because they are the ones that are going out there,
24 they are the ones that are going to see these pill
25 mills, to report that pill mill and to stay out of

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 it.

2     Q.   Okay.  During your time as

3 Vice President of Medical Affairs at Mallinckrodt,

4 were you familiar with the phrase that an opioid

5 manufacturer needed to, quote, know its customer, end

6 quote?

7     MR. DAVISON:  Objection to form.

8     THE WITNESS:  The opioid manufacturer needed

9 to know its customer.  I never heard anyone say that,

10 no.

11 BY MR. SAMSON:

12     Q.   And you never heard, either, another

13 phrase, "You don't only have to know your customer

14 but also his customer"?

15     A.   No.

16     Q.   You would agree with me, though, that

17 in terms of safety in the opioid space, to the extent

18 Mallinckrodt had the ability to be aware of where its

19 distributors' customers might be selling its opioids

20 downstream, it would need to make use of that ability

21 to find out where its drugs were going?

22     MR. DAVISON:  Objection to form.

23     THE WITNESS:  Oh, of course.

24 BY MR. SAMSON:

25     Q.   All right.  Also if it had the

Page 295

1 ability on data that it had within its possession and

2 control, that it could use that to identify

3 downstream clients that might be buying from multiple

4 sources?

5     A.   Which does happen.

6     Q.   And would that be something that

7 Mallinckrodt would be all over?

8     MR. DAVISON:  Objection.  Sorry.  Objection

9 to form.

10     THE WITNESS:  It would be.

11 BY MR. SAMSON:

12     Q.   Were you ever aware of something

13 called charge-back data?

14     A.   Yes.

15     Q.   When did you become aware of that?

16     A.   Oh, years and years and years ago.

17     Q.   Prior to going to Mallinckrodt?

18     A.   Oh, long before.

19     Q.   And did you have any thought, while

20 you were there, that Mallinckrodt had

21 charge-back data that would give it insight into

22 where the drugs -- its drugs were ending up?

23     A.   No, I didn't.  I had no involvement

24 with the charge-back system at Mallinckrodt.

25     Q.   Sitting here, and based on your

Page 296

1 knowledge from other pharmaceutical uses, what is a

2 charge-back?

3     A.   A charge-back is a way to price

4 adjust for drugs that are sold at a certain price and

5 then reimbursed at a lesser price to keep the system

6 whole.  So it's a credit that the pharmaceutical

7 company issues.

8     Q.   And in a -- say Mallinckrodt sells

9 generic oxy to Cardinal at a given price.

10     A.   Right.

11     Q.   And then market factors influence

12 that for Cardinal to sell it, it's got to sell it at

13 a lower price, maybe even than it bought it.

14     A.   Yeah.

15     MR. DAVISON:  Objection to form.

16 BY MR. SAMSON:

17     Q.   And that's where charge-backs come

18 into the pharmaceutical instrument; is that true?

19     A.   That's right.

20     Q.   And that means that Cardinal informs

21 Mallinckrodt of the sale and how badly it got hurt,

22 and Mallinckrodt then makes what's called a

23 charge-back relief, so to speak, on what Cardinal

24 owes for the drugs; right?

25     MR. DAVISON:  Objection to form.

Page 297

1     THE WITNESS:  Right.

2 BY MR. SAMSON:

3     Q.   If we're dealing with opioids, when

4 Mallinckrodt would receive charge-back data from a

5 distributor, a customer of its, and received

6 charge-back data from another distributor, it would

7 have potentially a list of physicians or clinics who

8 were buying from both distributors; true?

9     MR. DAVISON:  Objection to form.

10     THE WITNESS:  Not physicians.  Physicians

11 don't buy opioids.  They prescribe them.

12     So the pharmacies would be purchasing the

13 opioids from the distributor, and those prescriptions

14 would be filled at those pharmacies.

15 BY MR. SAMSON:

16     Q.   And --

17     A.   Physicians cannot possess opioids

18 unless they have a special license to possess them.

19     Q.   Other than in Florida?

20     A.   I don't know about Florida.  Maybe

21 Florida is weird.  I don't know.

22     Q.   They are a dispensing state where the

23 physicians dispense.

24     A.   Controlled substances?

25     Q.   Oh, yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1      MR. DAVISON: Objection to form.
2  BY MR. SAMSON:
3      Q.   Wasn't that one of the big fuelers of
4  the Florida pill mills especially?
5      A.   That's not how I looked at it.
6      MR. DAVISON: Objection.
7  BY MR. SAMSON:
8      Q.   Well, assuming that Mallinckrodt had
9  that charge-back data -- which it would have;
10 correct?
11     MR. DAVISON: Objection to form.
12 BY MR. SAMSON:
13     Q.   From all of the places where it sold
14 its drug on the distributor label -- level?
15     A.   Probably --
16     MR. DAVISON: Objection to form.
17 BY MR. SAMSON:
18     Q.   And that charge-back data, the
19 Mallinckrodt direct customer has to give it,
20 Mallinckrodt, information about where those drugs
21 went; correct?
22     MR. DAVISON: Objection to form.
23     THE WITNESS: So if we had the data of which
24 pharmacies were buying which quantities of opioids,
25 that would be overall useful in tracking down where

Page 299

1  problems are occurring. We have the prescription
2  data already. We know who's prescribing. How much
3  they are prescribing. We know their ZIP code. We
4  know who they are. Okay. We already have that.
5      We don't have the patients, because we can't
6  have patient information. But we know the
7  prescriptions that are written by a given physician.
8      That's the most important information. It's
9  more important than charge-backs, because it's even
10 more granular, down to the physician level. So that
11 empowers us -- I'm talking Exalgo now -- that
12 empowers us to identify massive, you know, really
13 large and kind of unexpected levels of prescribing
14 or, even more importantly, prescribing activity by a
15 physician specialty who you would not expect would be
16 doing a lot of pain management, like a pediatrician.
17 But the complicating factor is, physician specialties
18 are recorded by their AMA specialty designation. So
19 that's how they did their training. It may not be
20 what they are practicing. Because they are still
21 licensed.
22     So it's not so simple that you see a
23 pediatrician prescribing Exalgo, and that's
24 automatically a problem. It could be a pediatrician
25 who is trained and now is a pain specialist.

Page 300

1  BY MR. SAMSON:
2      Q.   Okay. Do you see any reason not to
3  add charge-back data to that other data that you have
4  from the prescriptions itself?
5      MR. DAVISON: Objection to form.
6      THE WITNESS: I don't think it's
7  particularly helpful. But maybe I'm wrong. I'm not
8  a data analyst. Maybe there's another way to cut
9  this data that might be helpful. I just don't know.
10 BY MR. SAMSON:
11     Q.   Well, if Mallinckrodt was truly a
12 champion in eliminating the over-sale and overuse of
13 opioids in the time that you were there, wouldn't you
14 expect them to look into every possible way of
15 identifying misuse by identifying where large amounts
16 of their drugs were going?
17     MR. DAVISON: Objection to form.
18     THE WITNESS: That's what I would do. And
19 that's what I did with Exalgo. And that was my area
20 of responsibility. So that's what I will stand and
21 swear to.
22 BY MR. SAMSON:
23     Q.   Okay. And you did that because that
24 was consistent with your view of the responsibilities
25 of responsible pharmaceutical companies; correct?

Page 301

1      A.   True.
2      Q.   You didn't make that up as an Art
3  Morelli code of honor; did you?
4      MR. DAVISON: Objection to form.
5      THE WITNESS: No, I did not.
6  BY MR. SAMSON:
7      Q.   And you would expect any other
8  responsible member of the pharmaceutical industry to
9  do -- reach for the same goal that you were reaching
10 for; true?
11     MR. DAVISON: Objection to form.
12     THE WITNESS: I think you will get feedback
13 that I set very high standards when I worked at
14 Mallinckrodt for the work that I was overseeing or
15 personally doing.
16 BY MR. SAMSON:
17     Q.   Let's look at --
18     A.   Are we still on this slide deck here?
19     MR. SAMSON: No. You can put that away.
20 And let me see.
21     MS. GAFFNEY: Can we go off the record for a
22 second and get --
23     MR. SAMSON: Oh, get that. Okay. Let's go
24 off the record.
25     THE VIDEOGRAPHER: We are going off the

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  record. The time is 5:21 p.m.
2      (Recess taken.)
3          (Exhibit No. 20 was marked.)
4      THE VIDEOGRAPHER: We are back on the
5  record. The time is 5:30 p.m.
6  BY MR. SAMSON:
7      Q.  Mr. Morelli, you've got Exhibit 20 in
8  front of you. And I will tell you, for the record,
9  it's a portion, just to cut down on forest loss, of
10  the entire presentation. And I wanted to turn your
11  attention to the back page, which is headed, "Team
12  Membership."
13     A.  Uh-huh.
14     Q.  And this is a list people in Medical
15  Affairs in the first row; correct?
16     A.  Yes. Yes.
17     Q.  And it then says who does what on
18  Strategy and Development Team, Exalgo Implementation
19  Team, PENNSAID Implementation Team, and then Generic
20  Products Implementation Team.
21         Who -- it says everyone in PPS is in on the
22  Generic Products Implementation Team. Is that a REMS
23  team, or what? What's being implemented?
24     A.  Yeah, there were --
25     MR. DAVISON: Objection.

Page 303

1      THE WITNESS: There were certain generic
2  products that had certain FDA requirements for
3  certain things that we had to do. And that's --
4  that's what that was.
5  BY MR. SAMSON:
6      Q.  And then PV, what part of Medical
7  Affairs was that? I have forgotten if you told me.
8      A.  Pharmacovigilance.
9      Q.  And that was Danielle?
10     A.  Eddie and Danielle. Danielle is a
11  physician. Eddie is a pharmacist.
12     Q.  But specifically for generics
13  implementation?
14     A.  Oh. Danielle, yeah.
15     Q.  And that's, again, just to do with
16  the REMS? That was all that you guys had to do
17  with -- any generic that required REMS from the FDA?
18     A.  So, yes. Elements of safe use, put
19  it that way. Because this is so far back, some of
20  these -- it was before REMS -- REMS came in in 2007.
21  So it was pre -- pre-REMS, but it was still certain
22  safe use elements that we had to do, yeah.
23     Q.  Okay. But, I mean, 2007 you hadn't
24  even arrived at Mallinckrodt?
25     A.  Right. That's when the legislation

Page 304

1  came in. Yeah.
2      MR. SAMSON: All right. And now let me --
3      THE WITNESS: Are we done with this one?
4      MR. SAMSON: Yeah.
5      THE WITNESS: Oh, okay.
6      THE REPORTER: 21.
7          (Exhibit No. 21 was marked.)
8      (Witness reviewing document.)
9  BY MR. SAMSON:
10     Q.  Are you -- have you read it,
11  Mr. Morelli?
12     A.  I have.
13     Q.  This is an email string between
14  yourself and Rod Hughes with some other CCs on it?
15     A.  Yes.
16     Q.  And the subject line from Mr. Hughes
17  is, "Prescription Pain Killers, colon, Company's
18  Attempt Abuse Proof Opioids, ABC News." Correct?
19     A.  Correct.
20     Q.  And then Mr. Hughes writes to JoAnna
21  Schooler. Was she in Medical Affairs?
22     A.  No. She's a communications person.
23     Q.  (Reading) JoAnna, I am sure you
24        have this, but I wanted to highlight
25        this just in case. It is remarkable

Page 305

1      how Purdue has positioned their
2      product as abuse proof. They did this
3      by showing no data. The Exalgo
4      deterrent abuse features are just as
5      good, if not better, than Oxycontins.
6      In fact, that tablet also uses Polyox
7      as the excipient (end of reading).
8  Did I read that correctly?
9      A.  You did.
10     Q.  Was there Polyox in Exalgo?
11     A.  I don't recall. But I believe there
12  was.
13     Q.  Okay. And what, as you recall, was
14  the function of Polyox?
15     A.  It was an excipient.
16     Q.  Which means to?
17     A.  It was a nonactive ingredient, but
18  part of the formulation.
19     Q.  And what -- what did Polyox add to
20  the drug?
21     A.  I don't really know.
22     Q.  Did it make it more bioavailable?
23     A.  I don't know.
24     Q.  And you think Exalgo may have used it
25  as well?

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    A.    It may have.
2    Q.    Did it have any potential abuse
3 deterrent reason to be in either Oxycontin or in
4 Exalgo?
5    A.    I don't know.
6    MR. DAVISON: Objection to form.
7 BY MR. SAMSON:
8    Q.    All right. And your comment to what
9 Mr. Hughes wrote to JoAnna was:
10       (Reading) Another reminder of who we
11       are dealing with and why our industry
12       has the problems it does. We must
13       lead (end of reading).
14    A.    Right.
15    Q.    "We," Covidien?
16    A.    Correct.
17    Q.    "Who we were dealing with" was
18 Purdue?
19    A.    The industry in general, quite
20 frankly.
21    Q.    Okay. And why did you, Art Morelli,
22 believe that in 2000 -- 2011 the industry, the
23 pharmaceutical industry, or more narrowly the opioid
24 pain space -- which one were you targeting?
25    MR. DAVISON: Objection to form.

Page 307

1    THE WITNESS: Well, this email was about the
2 opioid pain space, but I was making a more general
3 statement.
4    MR. SAMSON: Okay.
5    THE WITNESS: Not to exclude opioids, but to
6 include them in that.
7 BY MR. SAMSON:
8    Q.    And explain to me your phrasing of,
9 "This is why our industry has problems"?
10    A.    Well, I don't have the primary
11 article here, so I really can't comment definitively
12 on -- on that.
13       But the overarching statement is, you don't
14 have an abuse deterrent indication. Don't try to
15 position your product as abuse deterrent.
16    Q.    Well, and from the Art Morelli who
17 has appeared today, don't make that statement without
18 showing data that supports it; correct?
19    A.    But even if you have --
20    MR. DAVISON: Objection to form.
21    THE WITNESS: -- even if you have data,
22 that's helpful, but it's not definitive. You have to
23 have the indication to promote and position your
24 product as abuse deterrent.
25 ///

Page 308

1 BY MR. SAMSON:
2    Q.    And so were you expressing your
3 frustration in having to be in competition with a
4 company who you thought ignored the principles of
5 pharmaceutical safety and reporting?
6    MR. DAVISON: Objection to form.
7    THE WITNESS: Not so much, no. I would just
8 think, rather than compare ourselves to other
9 companies, we just know what's right, and we have to
10 lead with what we know is right.
11 BY MR. SAMSON:
12    Q.    And what was the industrywide problem
13 that you were referencing?
14    MR. DAVISON: Objection to form.
15    THE WITNESS: Well, it's quite well known
16 that the perception, the public perception of the
17 pharmaceutical industry, is pretty low, and stunts
18 like this can't possibly be helpful. That's what I
19 was thinking of when I wrote this.
20 BY MR. SAMSON:
21    Q.    And Mr. Hughes wrote back that he
22 agreed?
23    A.    Right.
24    Q.    Did you ever sit down and have a
25 discussion with Mr. Hughes --

Page 309

1    A.    I don't recall.
2    Q.    -- about this series of events?
3    A.    I had many discussions with
4 Mr. Hughes, but not -- not specifically about this,
5 that I remember.
6    Q.    When you decided to leave
7 Mallinckrodt, part of it, you said, was not wanting
8 to remain in St. Louis; correct?
9    A.    It was. It was a big part. The
10 biggest part, actually.
11    Q.    Okay. You also, though, had -- were
12 just into the -- not the launch, but the development
13 of Exalgo; correct?
14    A.    Oh, no, it was after --
15    MR. DAVISON: Objection to form.
16    THE WITNESS: -- well after the launch.
17 BY MR. SAMSON:
18    Q.    And you put in the REMS?
19    A.    Put in the REMS. The REMS was
20 approved and in place. The C.A.R.E.S. Alliance was
21 fully developed and launched, because it launched in
22 2010 at the Pain Week meeting. And the team was in
23 place, established. And, you know, it's like, I
24 guess, leaving it -- leaving it at your peak kind of
25 concept.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 310

1    Q.   How did Exalgo do?  Did you keep
2  track of your little baby after you left?
3       MR. DAVISON:  Objection to form.
4       THE WITNESS:  Very, very lightly, if not at
5  all, you know.  Maybe in a discussion on the phone
6  with Herb here and there, but that would be -- that
7  would be about it.  I never saw data, or I never
8  really had any insights, you know.
9  BY MR. SAMSON:
10      Q.   Did you get enough information to
11  determine whether or not it had been a hit drug or a
12  so-so drug, or a drug that never quite caught on?
13      MR. DAVISON:  Objection to form.
14      THE WITNESS:  I can't comment on that.  I
15  don't know.
16  BY MR. SAMSON:
17      Q.   Is it still on the market?
18      A.   Genericized, yeah.  That I do know.
19      Q.   Genericized with the OROs or just
20  as --
21      A.   The OROs.  Generic OROs.
22      Q.   And what did you do immediately after
23  leaving Mallinckrodt?
24      A.   Immediately after Mallinckrodt, I
25  worked with Paragon Rx, the REMS development company,

---

Page 311

1  on various REMS projects that they had throughout the
2  industry.  Especially, almost inclusively, with
3  companies in California.
4       Q.   Any of them opioids, those REMS that
5  you were --
6       A.   Yeah.
7       Q.   -- getting together?
8       A.   Yeah, they were.
9       Q.   And were they branded opioids or were
10  they generics?
11      A.   Branded.
12      Q.   Have you ever had discussions of
13  going back to work for Covidien?
14      A.   No.
15      Q.   Has anyone else, that you had a good
16  working relationship, left Covidien and spoken to you
17  about it?
18      MR. DAVISON:  Objection to form.
19      THE WITNESS:  No.
20  BY MR. SAMSON:
21      Q.   You said that you had -- and maybe I
22  overheard it -- talks with Art [sic] Neuman, that you
23  would have brought something up if you knew about it.
24  Have you had discussions with -- is he Dr. Neuman?
25      A.   I've had many discussions with

---

Page 312

1  Dr. Neuman.  I've had many interactions with
2  Dr. Neuman.  And I've worked with Dr. Neuman or
3  subsequent projects.
4       Q.   Okay.  What have you worked with him
5  on?
6       A.   The Ohio State Initiative for Cancer.
7  At Enlyton, the Advanced Cancer Imaging Company.  I
8  think those are the only two.  And both of those are
9  kind of long, long duration kind of engagements.
10      Q.   Is Mr. Neuman still at Covidien?
11      A.   Oh, no.  He left after I did, but
12  soon after.
13      Q.   Did you ever trade stories about your
14  days at Covidien with Dr. Neuman?
15      A.   Sorry.  That's privileged and
16  confidential.
17      Q.   That's a new privilege that's not
18  recognized, but --
19      A.   We -- we're friends.  We're friends.
20  Our wives, our families, we're friends.
21      Q.   So I am assuming that you did have
22  talks with him in which you said -- unless you had no
23  frustrations during the time when you were at
24  Covidien -- here's what I couldn't take, or here's
25  what drove me crazy when I was at Covidien, telling

---

Page 313

1  it to Dr. Neuman?
2       A.   Very little --
3       MR. DAVISON:  Objection to form.
4       THE WITNESS:  Dr. Neuman moved to California
5  from St. Louis.  So we became, you know, closer to
6  each other on the map.  So there was more potential
7  to interact with each other.
8       He's in the Bay Area.  But his wife is a
9  doctor.  So we have a lot in common, and we're just
10  close friends.  And, you know, whenever you work
11  anywhere, there's always frustrations.  But that --
12  I'm at a level of experience where I can kind of roll
13  with the punches, so they don't bother me so much.
14  BY MR. SAMSON:
15      Q.   Having mentioned and spoken to you
16  today, it is, as you said in an earlier answer, that
17  you had a very high principle.  And one of the things
18  that I take away from being able to ask you questions
19  today, is that your personal approach to safety was,
20  it was an all-or-nothing, bottom-line thing that
21  pharmaceutical companies needed to address,
22  especially in the opioid space.
23      Did I get that right?
24      A.   I tried to do that --
25      MR. DAVISON:  Objection to form.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1 THE WITNESS: I tried to do that to the best
2 of my ability, yes.
3 BY MR. SAMSON:
4 Q. And was there ever any frustration
5 that Covidien was not as ardent about that as you
6 were?
7 MR. DAVISON: Objection to form.
8 THE WITNESS: I wouldn't -- I would say, no.
9 Whenever you're at a company and you're managing
10 projects that are big, expensive projects, there can
11 always be the potential for the feeling that, you
12 know, well, are they going to continue? That's just
13 the normal operations of things.
14 But Covidien -- what I was doing was
15 supported by Herb and the CEO, Tim Wright. I always
16 felt like I had really good support and belief in the
17 importance of what we were doing. So there were very
18 little on the frustration scale, quite frankly.
19 BY MR. SAMSON:
20 Q. And what you were doing, during the
21 time you were an employee, was all, if not
22 exclusively, greatly the majority in Exalgo; true?
23 A. It was, yeah.
24 Q. And the --
25 A. And the C.A.R.E.S. Alliance.

Page 315

1 Q. And you can't tell me, haven't been
2 able to tell me today, much about what was going on
3 in the generic opioid space, even with Mallinckrodt;
4 true?
5 A. I had very little interaction,
6 awareness, knowledge, with the generic business and
7 the people in the generic business.
8 MR. SAMSON: Let's go off the record for
9 just a second.
10 THE VIDEOGRAPHER: We are going off the
11 record. The time is 5:28 p.m. -- or 5:48 p.m.
12 (Recess taken.)
13 THE VIDEOGRAPHER: We are back on the
14 record. The time is 5:51 p.m.
15 EXAMINATION
16 BY MS. HERZFELD:
17 Q. Good afternoon, Mr. Morelli. How are
18 you doing?
19 A. Fine. How are you?
20 Q. Great. I am Tricia Herzfeld, and I
21 am an attorney representing the plaintiffs in
22 Tennessee.
23 Do you know anything about the Tennessee
24 litigation?
25 A. No.

Page 316

1 MS. HERZFELD: Okay. Before we get started,
2 I just want to lodge our usual objections as to late
3 production of documents in noncompliance with the MDL
4 protocol, and the other objections that we have
5 lodged in the other depositions. I would like to
6 renew them at this time.
7 MR. DAVISON: We disagree with your
8 characterization regarding our compliance with the
9 MDL protocol. We have complied. But we note your
10 objection.
11 MS. HERZFELD: Okay. Great. Now we will
12 move on.
13 Q. Okay. So you don't have any
14 awareness of the Tennessee litigation; do you, sir?
15 A. I do not.
16 Q. Okay. And you've been to Tennessee
17 before; is that correct?
18 A. I have been to Tennessee.
19 Q. And how many times would you say
20 you've been?
21 A. I've been to Tennessee once in my
22 life.
23 Q. Okay. And was that for work?
24 A. No.
25 Q. What was it for?

Page 317

1 A. My daughter's swim meet at the
2 University of Tennessee when she swam at Arizona
3 State.
4 Q. Oh, okay. Very good. You haven't
5 been to Tennessee for work?
6 A. Pardon me?
7 Q. You have not been to Tennessee for
8 work?
9 A. No.
10 Q. Okay. When you were talking earlier
11 about hot spots for pill mills, you mentioned
12 Florida, obviously, and then Kentucky and
13 West Virginia.
14 Would you consider both of those states to
15 be in Appalachia?
16 MR. DAVISON: Objection to form.
17 THE WITNESS: I don't know really.
18 BY MS. HERZFELD:
19 Q. Okay. I'm --
20 A. I think they might be, but, you
21 know --
22 Q. I will rephrase the question.
23 Would you consider to Kentucky and
24 West Virginia to both be states contained within
25 Appalachia?

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  A.  Yes.
2  Q.  Okay.  And would you consider
3 Tennessee to be part of the Appalachian region?
4  A.  No.
5  Q.  Have you heard at all of pill mills
6 being a hot spot in Tennessee?
7  A.  I have not.  No.
8  Q.  Do you recall having any
9 conversations with anyone about a particular opioid
10 abuse problems in Tennessee?
11  A.  I do not.
12  Q.  Do you know what neonatal abstinence
13 syndrome is?
14  A.  I do.
15  Q.  And what is it, to your knowledge?
16  A.  Neonatal abstinence syndrome is a
17 condition where a newborn goes through opioid
18 withdrawal because they were exposed in utero to the
19 mother's consumption of opioids.
20  Q.  And do you know what region of the
21 country has the highest number of any as per?
22  A.  No.  But I bet you're going to tell
23 me.
24  Q.  I'm asking if you know.  Do you know?
25  A.  No, I don't.

Page 319

1  Q.  Have you ever known?
2  A.  No.
3  Q.  Is that information you've ever
4 endeavored to obtain?
5  A.  No.
6  Q.  Would you be surprised to learn that
7 Tennessee is number two?
8  MR. DAVISON: Objection to form.
9  THE WITNESS: I would be neither surprised
10 or disappointed or anything.  It is what it is.  The
11 data is what it is.
12 BY MS. HERZFELD:
13  Q.  It probably isn't is what it is,
14 though, for those babies?
15  A.  No.
16  MR. DAVISON: Objection to form.
17  THE WITNESS: It doesn't minimize it at all.
18 It's a terrible thing.
19 BY MS. HERZFELD:
20  Q.  Have you ever seen videos of babies
21 going through withdrawal of opioids after being born?
22  A.  I have.  I have seen some videos
23 because of my work at DuPont with Narcan and Narcan
24 neonatal, which is used in that setting.  Yeah.
25  Q.  And how would you describe watching

Page 320

1 those videos of the babies after they are born?
2  MR. DAVISON: Objection.
3  THE WITNESS: Ghastly.
4 BY MR. SAMSON:
5  Q.  Ghastly?
6  A.  Ghastly.
7  Q.  Do you think they are in pain?
8  MR. DAVISON: Objection to form.
9  THE WITNESS: Don't know.  But they are in
10 distress certainly.
11 BY MS. HERZFELD:
12  Q.  You knew that there was an opioid
13 epidemic specifically in Florida; is that correct?
14  A.  No, it's not exactly correct.  I knew
15 there were a lot of pill mills.  The pill mills that
16 I was aware of were in Florida.  And there was an
17 opioid epidemic -- you know, the opioid problem was
18 more pervasive than just Florida.  Yeah.
19  MS. HERZFELD: Okay.  And I'm going to show
20 you -- what number are we on for exhibits?
21  THE REPORTER: 22.
22  MS. HERZFELD: We will this mark as No. 22.
23  (Exhibit No. 22 was marked.)
24 BY MS. HERZFELD:
25  Q.  Okay.  Mr. Morelli, what I have

Page 321

1 handed you here appears to be an email from a person
2 named Chris DuFusco.
3  Do you know who Chris DuFusco is?
4  A.  I do.
5  Q.  And who is Chris DuFusco?
6  A.  He is an employee at Mallinckrodt in
7 the -- I think in the Business Development, I think
8 is what he was in when I was there.
9  Q.  Okay.  In Business Development did he
10 handle any of the opioid products?
11  A.  No.
12  MS. HERZFELD: Okay.  And just for the folks
13 on the phone and the record, the Bates number on this
14 is MNK-T1, underscore, 0006317909.  It's a one-page
15 document.
16  Q.  And what is the date on this email,
17 Mr. Morelli?
18  A.  3/29/10.
19  Q.  And this email is sent to Debra
20 Hasse -- is it Hasse?  Hasse?
21  A.  Hasse.
22  Q.  To you and to David Silver; is that
23 right?
24  A.  Right.
25  Q.  And who is Debra Hasse?

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    A.    She was a coworker of Chris DuFusco.
2    Q.    Okay.  And so she was a Mallinckrodt
3  employee?
4    A.    Yes.
5    Q.    Okay.  And David Silver?
6    A.    He was the -- Debra and Chris
7  reported to David Silver.
8    Q.    Okay.  And so David Silver was also a
9  Mallinckrodt employee.
10    A.    He was.
11    Q.    Okay.  And this email was sent to the
12  three of you on March 29th, 2010; is that correct?
13    A.    That's correct.
14    Q.    Okay.  And do you have any reason to
15  think that this email wasn't sent to your email
16  address?
17    A.    No.  I'm sure it was.
18    Q.    Okay.  And what -- could you read the
19  subject for me there, please.
20    A.    Speak -- oh, the subject.  "A news
21  expose -- OxyContin Florida and Tennessee."
22    Q.    And then what does the email say?
23    A.    (Reading) I was speaking to one
24       of the folks I met from Grunenethal in
25       Portugal in the training class in

Page 323

1       Barcelona last week about our pain
2       products, and he mentioned a news
3       expose about the problems with the
4       abuse of Oxycontin in Florida and
5       Tennessee, and I thought you might
6       find it interesting (end of reading).
7    Q.    And then do you speak Spanish at all?
8    A.    I do not.
9    Q.    Okay.  And so underneath that it says
10  "Titulo," right, "Oxy Express"?  Is that what it
11  says?
12    A.    "Titulo:  Oxy Express - Repeticao."
13    Q.    Okay.  Very good.
14       And so do you know why it is that Chris
15  would have sent an email specifically to you, David
16  and Debra?
17    MR. DAVISON:  Objection to form.
18    THE WITNESS:  No, I don't know why he sent
19  it.
20  BY MS. HERZFELD:
21    Q.    Okay.  And did you respond to this
22  email?
23    A.    I do not recall.
24    Q.    Do you know if you ever had any
25  conversations with anyone where you looked into an

Page 324

1  oxy abuse program -- or an oxy abuse problem in
2  Tennessee?
3    MR. DAVISON:  Objection to form.
4    THE WITNESS:  I do not.
5  BY MS. HERZFELD:
6    Q.    Okay.  But according to this email,
7  which is 2010, at the very least, then, you had
8  received information about the Oxy Express involving
9  Florida and Tennessee; is that an accurate statement?
10    MR. DAVISON:  Objection to form.
11    THE WITNESS:  I received this, yeah, and
12  maybe other things that I was exposed to along the
13  way, yeah.
14  BY MS. HERZFELD:
15    Q.    Okay.  But at the very least, you
16  received this in 2010?
17    A.    I did.  I guess I did, yes.
18    Q.    Okay.  And can you think of anything
19  else you might have been exposed to along the way
20  that would have alerted you to an oxy abuse problem
21  in Tennessee?
22    A.    Just news releases, perhaps.
23    MS. HERZFELD:  I am going to show you what
24  we will mark as the next exhibit, 23.
25       (Exhibit No. 23 was marked.)

Page 325

1    MS. HERZFELD:  For folks on the phone, this
2  is MNK, hyphen, T1, underscore, 0007200216.  And it's
3  a -- one, two -- three-page document.
4    Q.    Okay.  Mr. Morelli, have you had a
5  moment to look over this email?
6    A.    Yes.  Generally, yes.  Not in detail.
7  But yes.
8    Q.    Okay.  Let's kind of just go through
9  it for one second.  I'm not going to ask you to know
10  everything in it.
11       Does this appear to be an email that was
12  sent from a person named Stephen Littlejohn to you on
13  February 19th, 2011?
14    A.    Yes.
15    Q.    Okay.  And it also copies JoAnna
16  Schooler; is that right?
17    A.    That's right.
18    Q.    And do you have any reason to believe
19  you didn't receive this email in the ordinary course
20  of business?
21    A.    No, I don't.
22    Q.    Okay.  And so the subject here is,
23  "Re: WSJ - Fight Over a Fix for Florida Pill Mills."
24       Do you see where it says that?
25    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    Q.    Okay.  And who is Stephen Littlejohn?
2    A.    Stephen Littlejohn is a -- what is
3  the VP of the Communications Department.
4    Q.    For Mallinckrodt?  For Mallinckrodt?
5    A.    Mallinckrodt, yeah.
6    Q.    Okay.  And who is JoAnna Schooler?
7    A.    She works in Littlejohn's department.
8    Q.    Okay.  So also a Mallinckrodt
9  employee?
10   A.    Yes.
11   Q.    Okay.  And so if you look at the
12 email that's being forwarded, it looks like it says,
13 "From JoAnna," kind of mid where the page is:
14        (Reading) FYI, more on the issue in
15        Florida and the ongoing state funding
16        debate.  Will make contact with a
17        reporter (end of reading).
18        And that's sent to a whole bunch of folks.
19 Do you see that?
20   A.    Uh-huh.
21   Q.    Is that a "Yes"?  Is that a "Yes"?
22   A.    That's a "Yes," yes.
23   Q.    Sorry.  I have to get you to say
24 "Yes" because "uh-huh" doesn't work on the
25 transcripts.

Page 327

1        And then it looks like you reply on -- at
2  8:50 in the morning and say, it looks like, just
3  shortly -- shortly there later -- and could you read
4  your response to JoAnna there.
5    A.    Yes.  (Reading) This article brings
6        out some excellent points pro and con
7        of PMPs.  The problems remain,
8        however.  I see here a way for us to
9        bring in a best practices orientation
10       rather than a good or bad approach and
11       an idea of changing the dialogue from
12       problem identification and blame to
13       solutions.  We need to contact Keith
14       Humphreys, the Stanford PMP researcher
15       named in the article.  Bobby and I can
16       do that.  Bobby is someone who works
17       for me.  Do you agree (end of
18       reading)?
19   Q.    Okay.
20   A.    And I reiterated, education,
21 collaboration, innovation, which is a strategy for
22 the C.A.R.E.S. Alliance.
23   Q.    Okay.  And so did you ever reach out
24 to the Stanford PMP researcher named in the article,
25 Keith Humphreys?

Page 328

1    A.    I don't recall doing that, no.
2    Q.    Okay.  And do you know if Bobby did?
3    A.    I don't know.
4    Q.    Okay.  Okay.  And then if you will go
5  down and actually read the article, get to the second
6  page here.  You believe, based on your email response
7  to this, that you did read this article, is that
8  right, sir, at the time?
9    A.    I believe I did, yeah.
10   Q.    Okay.  So I'm just going to kind of
11 bring you to some of those -- the more pertinent
12 points --
13   A.    Okay.
14   Q.    -- that I'm going to ask questions
15 about.
16        The very first line in the article says,
17 "Dateline Miami"; do you see that?  On the second
18 page.
19   A.    Yes.
20   Q.    Okay.  (Reading) Florida Governor
21       Rick Scott called to cancel a state
22       drug monitoring program starts an
23       uproar in Appalachian state, the state
24       that say that they're deluged with
25       illegally bought pills from South

Page 329

1        Florida pain clinics (end of reading).
2        Do you see where it says that.
3    A.    Uh-huh.  Uh-huh.
4    Q.    Is that a "Yes," sir?
5    A.    It is, yes.  I see it.
6    Q.    And so was there a concern from
7  Mallinckrodt about the PMP state drug monitoring
8  program?
9        MR. DAVISON:  Objection to form.
10       THE WITNESS:  I can't speak for
11 Mallinckrodt.  But I can tell you that I'm very -- I
12 would be very concerned about the cancellation of any
13 PMP program.  I'm very concerned about the lack of
14 utilization of PMPs around the country.
15       MS. HERZFELD:  Okay.
16       THE WITNESS:  And the delay, the various
17 problems with PMPs, that's one reason they are not
18 utilized, and they are underfunded, and they have
19 problems with their data and speed of updating, and
20 that's a barrier to adoption for physicians.  So they
21 are potentially a very valuable tool.
22 BY MS. HERZFELD:
23   Q.    Okay.  And then if you will move down
24 with me a little bit further.  It says, "Jason Henry,
25 for the Wall Street Journal."  About halfway.

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 Do you see there?
2 A. No. Where are you? Where are you?
3 Q. That's okay.
4 A. Oh, I see. The next one.
5 Q. Right there. Okay.
6 And then if you kind of keep going down, it
7 says:
8 (Reading) Pill mills have flourished
9 in Florida, especially in Broward
10 County, in recent years. Weak
11 standards governing who can set them
12 up, a lack of oversight by state
13 agencies, and the absence of
14 prescription monitoring programs have
15 contributed to the problems, said
16 Sherry Green, Chief Executive of the
17 of the nonprofit National Alliance For
18 Model States Drug Laws (end of
19 reading).
20 Did I read that correctly?
21 A. Yes.
22 Q. Do you agree with that?
23 A. I agree with that.
24 Q. Okay. Now the next one says:
25 (Reading) According to the Florida

Page 331

1 Attorney General's Office, clinics are
2 often cash-only enterprises, employing
3 doctors who write prescriptions for
4 painkillers without examining patients
5 (end of reading).
6 Do you see where it says that?
7 A. I do.
8 Q. And were you aware that was happening
9 at pill mills?
10 A. It happens. Yes, it does.
11 Q. And would you characterize situations
12 where that happens as a pill mill?
13 MR. DAVISON: Objection to form.
14 THE WITNESS: No, not necessarily. They
15 could be. But it's certainly improper.
16 BY MS. HERZFELD:
17 Q. And could contribute to the diversion
18 of opioids into the illegal drug market?
19 A. Absolutely yeah.
20 Q. And the next sentence there says:
21 (Reading) They have proved to be a
22 magnet for buyers in the southeast,
23 period. According to Frank Rapier,
24 Director of the Appalachian High
25 Intensity Drug Trafficking Area,

Page 332

1 Highway Patrol officers in hot spots,
2 like eastern Tennessee routinely stop
3 van loads of people returning from
4 Florida with fresh stockpiles of
5 prescription drugs (end of reading).
6 Did I read that correctly?
7 A. You did.
8 Q. And does this refresh your
9 recollection at all about whether Tennessee was
10 identified as a hot spot?
11 A. Yeah, a -- clearly what they are
12 saying here, it is.
13 Q. And had you heard of the Appalachian
14 High Intensity Drug Trafficking Area?
15 A. Never heard of it, no.
16 Q. And do you know who Frank Rapier is?
17 A. I do not.
18 Q. Have you ever had a conversation with
19 him?
20 A. I have not.
21 Q. Okay. But you agree with this
22 statement that Florida was a hot spot for those drugs
23 to be brought up into the illegal drug market?
24 MR. DAVISON: Objection to form.
25 THE WITNESS: I do agree.

Page 333

1 BY MS. HERZFELD:
2 Q. Okay. And specifically into the
3 illegal drug market in eastern Tennessee?
4 A. Yes.
5 MR. DAVISON: Objection to form.
6 THE WITNESS: That's what it says here. I
7 have no basis to disagree with it.
8 BY MS. HERZFELD:
9 Q. Okay. And then in the next line it
10 says:
11 (Reading) In West Virginia, state
12 Senator Evans Jenkins -- Evan Jenkins
13 said flights on discount airlines
14 between Huntington, West Virginia and
15 Fort Lauderdale, Florida have been
16 dubbed the Oxycontin Express (end of
17 reading).
18 And before I think we -- you had been asked
19 if you had heard the term Oxycontin Express or Oxy
20 Express. And I don't remember what you answer was?
21 A. I hadn't heard it.
22 Q. And had you heard of I-75 being
23 designated as the Oxy Express?
24 MR. DAVISON: Objection to form.
25 ///

Highly Confidential - Subject to Further Confidentiality Review

Page 334

BY MS. HERZFELD:

1  Q.   Or highway?

2  A.   I have not.

3  MS. HERZFELD: Okay. You can take this

4  document and set it aside, please.

5  THE WITNESS: Are we done with this one?

6  MS. HERZFELD: Yes.

7  THE WITNESS: Oh, okay.

8  MS. HERZFELD: I'm going to hand you the

9  next exhibit, which will be marked as Exhibit No. 24.

10  (Exhibit No. 24 was marked.)

11  MS. HERZFELD: Okay. For the record, this

12  is MNK-T1, underscore --

13  A.   I've got two of them.

14  MS. HERZFELD: Oh, you've got two. There

15  you go. Underscore 0004298470, and it's a two-page

16  document.

17  THE WITNESS: Uh-huh.

18  BY MS. HERZFELD:

19  Q.   Okay. Sir --

20  A.   I'm very familiar with this.

21  Q.   Okay. What is it, sir?

22  A.   So this is -- this is an agenda for a

23  quarterly REMS Safety Board meeting. These occurred

24  quarterly --

Page 335

1  Q.   Okay.

2  A.   -- with our panel of experts. We

3  presented data for their review and feedback and

4  action items that we would take and make into

5  actionable plans.

6  Q.   Okay. And if you will look here on

7  the very first page, the speaker that's assigned from

8  9:35 a.m. to 9:50 a.m., is that you?

9  A.   That's me.

10  Q.   Okay. And did you indeed speak at

11  this?

12  A.   I did.

13  Q.   Okay. And does this maybe refresh

14  your recollection as to whether you've been to

15  Tennessee for business?

16  A.   I forgot about Nashville. I've

17  been -- actually, I've been to Nashville many, many

18  times. I just completely forgot about it.

19  Q.   Oh, you have?

20  A.   Yeah.

21  Q.   You know, most people don't forget

22  Nashville so easily.

23  A.   I know. I'm really sorry, because

24  I've been to Nashville maybe ten times, and I just

25  blanked out.

Page 336

1  Q.   That's okay. So why don't you tell

2  me, other than this -- we will come back to this

3  agenda in just a second.

4  A.   Okay.

5  Q.   But the other times that you've been

6  to Nashville. Has that been for business or for

7  personal?

8  A.   Both. Mainly business. And when I

9  worked for Cardinal Health, Cardinal Health had a big

10  facility in Nashville.

11  Q.   Okay.

12  A.   It was a third-party logistics

13  distributor company, and I used to go there, you

14  know -- you know, a number of times.

15  Q.   Okay. And so when you were working

16  for Cardinal Health, and you would come to Nashville

17  for that distribution issue or meetings, did any of

18  that have to do with the diversion of opioids --

19  A.   No.

20  Q.   -- and prevention of diversion of

21  opioids?

22  A.   No.

23  Q.   Okay. Okay. And so other than your

24  time with Cardinal Health and other than personal

25  times, other than this meeting that we just talked

Page 337

1  about, have you been to Nashville for business

2  reasons for any other times?

3  A.   Not that I can remember, no.

4  Q.   Okay. And so let's go back to this

5  meeting then --

6  A.   Okay.

7  Q.   -- that you had here on April 8th and

8  9th, 2011, at the Loews Hotel in Nashville; is that

9  correct?

10  A.   That's correct.

11  Q.   Okay. And do you recall that Loews

12  being across the street from Vanderbilt University?

13  A.   I do.

14  MR. DAVISON: Objection.

15  THE WITNESS: Because I went running on the

16  campus.

17  BY MS. HERZFELD:

18  Q.   It's pretty, isn't it?

19  A.   Yes. Very beautiful.

20  Q.   Yes, very good. Okay.

21  Looking at this agenda, I see that it's you

22  speaking, and then we have some other folks. So I

23  just want to make sure I understand who they are.

24  I think there was already a discussion about

25  Lynn Webster, so I don't think we need to ask about

Page 338

1  Lynn.  That's the same Lynn Webster that was
2  discussed earlier; is that correct?
3      A.    Correct.
4      Q.    Okay.  And what Herbert Neuman, who
5  is --
6      A.    He's Chief Medical Officer of
7  Covidien.
8      Q.    Okay.
9      A.    My direct supervisor.
10     Q.    And so he would be a
11 Covidien/Mallinckrodt employee; is that right?
12     A.    Yes.
13     Q.    Okay.  And then Danielle Burroughs.
14 Who is Danielle Burroughs?
15     A.    Danielle was a pharmacist and worked
16 in Pharmacovigilance at Mallinckrodt.
17     Q.    And then Bobby Clark.  Who is Bobby
18 Clark?
19     A.    Bobby Clark is an epidemiologist who
20 was on my Patient and Product Safety Team.
21     Q.    Okay.  And not a Mallinckrodt
22 employee?
23     A.    Yes.
24     Q.    Was a Mallinckrodt or was not?
25     A.    He was.  He was.

Page 339

1      Q.    Okay.  And Julie Milford.  Who is
2  Julie Milford?
3      A.    I actually don't know.
4      Q.    Okay.
5      A.    Yeah.
6      Q.    How about Jenny Wang, MBA?
7      A.    Jenny Wang worked for me.  She's on
8  the Patient Product Safety Team.
9      Q.    So she would have been a Mallinckrodt
10 or Covidien employee?
11     A.    She's a Mallinckrodt employee.
12     Q.    Okay.  I think that covers everybody
13 that was on the list; does that sound correct?
14     A.    It does.
15     Q.    Okay.  And so the people who attended
16 this conference, would that have been just people
17 that were on your advisory board, or would it have
18 been open to other physicians or prescribers?
19     A.    No.  It was -- it was -- the purpose
20 of the meeting was to present data on the use, side
21 effects, reported problems, program success of the
22 Exalgo REMS and Exalgo to these experts for their --
23 to give them an opportunity to weigh in on the data
24 and give us their impressions of what was really
25 happening behind the data.  So they were interpreting

Page 340

1  the data.
2      Q.    Okay.  And who were the experts?
3      MR. DAVISON:  Objection to form.
4      THE WITNESS:  It was -- Debra Gordon was
5  one.  David Brushwood.  I think I went through this
6  before.  Do you want me to tell you who they were
7  or --
8  BY MS. HERZFELD:
9      Q.    Is it the same list you went through
10 before?
11     A.    It was, yeah.
12     Q.    Okay.
13     A.    And there were others.  I can't
14 remember all of them, but there were a few more,
15 yeah.
16     Q.    Okay.  And do you know if were any
17 Tennessee prescribers that were there?
18     A.    Oh, no, prescribers were not invited
19 to the meeting.
20     Q.    Okay.  Do you know if there was
21 anyone who was from Tennessee or based in Tennessee
22 that was at the meeting?
23     A.    At the time -- I don't know exactly,
24 but at the time Steve Passik may have been an
25 employee at Vanderbilt.  I know at one time his

Page 341

1  But I don't know if at this particular time he was
2  working at Vanderbilt.
3      MS. HERZFELD:  Okay.  You can set that
4  aside.
5      THE WITNESS:  Okay.
6      MS. HERZFELD:  Thank you, sir.
7      I'm going to hand you what we will mark as
8  collective Exhibit 25.
9          (Exhibit No. 25 was marked.)
10     MS. HERZFELD:  For the record, I just handed
11 Mr. Morelli what we have marked as Plaintiffs'
12 Exhibit 25.  The Bates number is MNK-T1, underscore,
13 0007901956.
14     It looks like I may have copied this email
15 twice.  So I don't know if you have got two pages or
16 one.  But it should be a one-page email with an
17 attachment.  And the attachment placeholder page is
18 MNK-T1, underscore, 0007901957.  So it's an email and
19 an attachment.
20     Q.    Okay.  Mr. Morelli, if you will just
21 take a look at the email for one second for me,
22 please.
23     Okay.  You see the email?
24     A.    I do.
25     Q.    Okay.  And this is an email that was

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  sent from Regina Ruben to you and it looks like a
2  whole bunch of other people.
3       A.    Right.
4       Q.    On October 8th, 2009; is that
5  correct?
6       A.    That's correct.
7       Q.    Okay.  And do you have any reason to
8  believe that you didn't receive this email in the
9  ordinary course of your business?
10      A.    No.
11      Q.    Okay.  So you believe that this email
12 is something that you received?
13      A.    I do.
14      Q.    Okay.  And so who is Regina Ruben?
15      A.    Regina Ruben is -- was an employee of
16 Paragon Rx, the coGnsulting firm we used to run
17 everybody through the Rx FMEA process in terms of
18 building safe use tools.
19      Q.    Okay.  And Jeremy Stamer, do you know
20 who that is?
21      A.    Jeremy Stamer is a Mallinckrodt
22 employee.  He's in the Prescription Data Analytics in
23 Mallinckrodt.
24      Q.    What does Prescription Data Analytics
25 do?

Page 343

1       A.    So data comes in through a data
2  service, and it's quite voluminous, and people like
3  Jeremy Stamer and his team would get inside the data
4  and kind of translate raw data into kind of usable,
5  actionable information, understandable information
6  rather than a page full of numbers.
7       Q.    Okay.
8       A.    Yeah.
9       Q.    Okay.  And if you look at this email,
10 it looks like Regina is forwarding something to you
11 and a bunch of other folks --
12      A.    Right.
13      Q.    -- where it says:
14            (Reading) Attached is Jeremy Stamer's
15            parameters from this morning's core
16            team CT.  Thanks, Regina (end of
17            reading).
18            Did I read that correctly?
19      A.    Yes.
20      Q.    And do you know what she's referring
21 to when she's talking about a core team TC?
22            MR. DAVISON:  Objection to form.
23            THE WITNESS:  I do not know what TC -- what
24 the context in which she's using TC.  Maybe it's core
25 team backwards or something.  I don't know.

Page 344

1  BY MS. HERZFELD:
2       Q.    Teleconference, maybe?
3       A.    It could be.  I think it's a
4  teleconference, yes.  Core team teleconference.
5  Because we did it verbally, and then he followed up
6  with the hard copies.  Yes, I think that's what it
7  is.
8       Q.    Okay.  And core team would be which
9  team?  Is that the Covidien Exalgo REMS?
10      A.    So let me just look at the "To" list.
11            So the "To" line on this cover memo -- oh,
12 wait.  So this is a laundry list of employees at
13 Paragon Rx and employees at Covidien who were
14 involved with the Rx FMEA process.
15      Q.    Okay.  Now, if you will flip with me
16 to the -- this is the attached -- I will submit to
17 you, this is the attachment we have printed out here,
18 the PowerPoint.
19            And let's take a look at the first page, the
20 title page here.  It says, "Exalgo REMS," which I
21 think we've talked about a lot already today, "A
22 Commercial Analytics Perspective."
23      A.    Right.
24      Q.    What is a commercial analytics
25 perspective?

Page 345

1            MR. DAVISON:  Objection to form.
2            THE WITNESS:  So in the process of operating
3  the REMS, operationalizing the REMS, we need to
4  collect data that tell us who's prescribing the
5  product, how much product is being prescribed, where
6  it's being prescribed, all those prescription data
7  analytics.  Because that data has to be presented to
8  the Exalgo REMS safety board.
9            MS. HERZFELD:  Okay.
10           THE WITNESS:  And that's data we use to try
11 to understand if the product is being used
12 appropriately, at least from a data analytics
13 perspective.  And if there's any hot spots or things
14 that look bad, we need to dig into that further.
15 BY MS. HERZFELD:
16      Q.    Okay.  Because that would be a
17 responsible thing for Mallinckrodt to do?
18      A.    Right.
19      Q.    If you have that data, you want to
20 dig into it further and find out if your product is
21 being abused or misused or diverted; is that right?
22           MR. DAVISON:  Objection to form.
23           THE WITNESS:  That's exactly right.
24 BY MS. HERZFELD:
25      Q.    The second page.  "Market Overview,

Page 346

1  Data and Information Needs, and Implementation
2  Strategy." Okay?
3       A.    Yes.
4       Q.    Flip to the next one. Okay. Then it
5  talks about market overview. Do you know what's
6  meant by "market overview"?
7       A.    Market overview is how the company
8  has segmented the market and where they are going to
9  send sales reps.
10      Q.    Okay.
11      A.    So part of -- part of -- part of
12 responsible -- responsible use is targeting the right
13 physicians, not targeting physicians who have no
14 reason by their specialty or by their practice to
15 prescribe Exalgo. A sales rep can't be in that
16 office because there's nothing good can come from
17 that, because they are not seeing chronic pain
18 patients.
19      Q.    Okay.
20      A.    At least on the surface.
21      Q.    Okay. So it says, "Market Overview
22 Prescribers." And then, "Targeting and Scope,
23 introducing Dr. Mark Murphy." Then "Pharmacies,
24 chains, independents, mail order, specialty and
25 hospital."

Page 347

1  So does that -- generally does that match
2  with your understanding of what the market was for
3  Mallinckrodt-branded opioid product?
4       A.    Yes.
5       Q.    Okay. Next page it talks about
6  market overview here and volume segmentation. Did I
7  read that correctly?
8       A.    Yes.
9       Q.    Okay. And then it talks about these
10 different product families, which I think you had
11 already discussed earlier, so I won't spend a lot of
12 time on that.
13      A.    Okay.
14      Q.    But suffice it to say, you've got
15 oxycodone, morphine, fentanyl and Opana. Did I
16 summarize that correctly?
17      A.    Oxycontin, yeah.
18      Q.    Okay.
19      A.    Morphine products. Fentanyl products
20 and Opana.
21      Q.    And then it talks about a prescriber
22 audience greater than 325,000 active prescribers. Do
23 you know what that means?
24      A.    That the -- the potential number of
25 prescribers who would be the called-on audience could

Page 348

1  be as large as that. But -- and these are the
2  metrics that we use to analyze that target market and
3  to break that target market down into more sub
4  targets, you might say.
5       Q.    Okay. And when you say "called on,"
6  is that sometimes also being referred to as being
7  detailed?
8       A.    It is.
9       Q.    Okay. And so then this breaks it
10 down by various deciles. And it looks like there's
11 ten different deciles; is that your understanding?
12      A.    Yeah, that's -- deciles are always in
13 tens, yeah.
14      Q.    Okay. So if people that are decile
15 ten for the prescriber, those would be the highest
16 prescribers?
17      A.    Right.
18      MR. DAVISON: Objection to form.
19 BY MS. HERZFELD:
20      Q.    Okay. Next one:
21      (Reading) Segmenting Physicians by
22           Product Use: Identifying physicians
23           predisposed to prescribing one
24           product, one product written
25           50 percent of the time or more (end of

Page 349

1           reading).
2  Did I read that correctly?
3       A.    You did.
4       Q.    Do you know what that means?
5       A.    Yes. It was -- it was trying to
6  create an understanding of which of those physicians
7  were essentially using one product or were
8  prescribing multiple products to their patient
9  population.
10      Q.    Okay. And when you --
11      A.    It depends on their habits and their
12 comfort level.
13      Q.    Okay. And so when you're talking
14 about products, is that opioid products or are you
15 looking at every single prescription?
16      A.    Oh, no, these are just long-acting
17 opioids.
18      Q.    Just long acting?
19      A.    Not opioids, long-acting opioids.
20      Q.    Long acting. Okay. Switch to the
21 next one.
22      "Segmentation Survey." So looking at this
23 one, there's among deciles ten to three, the spreader
24 segment is the largest.
25      Do you know what that means?

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    MR. DAVISON: Objection to form.
2    THE WITNESS: The spreader segment was a
3 descriptor intended to identify -- that went with the
4 segment that spread their use across product types,
5 as you can see there --
6    MS. HERZFELD: Okay.
7    THE WITNESS: -- as opposed to have dominant
8 of one or the other.
9 BY MS. HERZFELD:
10   Q.    Okay. I see. So there's spreaders
11 that you -- that will prescribe multiple opioids
12 within their practice --
13   A.    Right.
14   Q.    -- and then there's other folks that
15 were called more dominant groups, and they prefer
16 one?
17   A.    Right.
18   Q.    And so then that would make sense for
19 that second bullet which then says:
20       (Reading) Dominant groups: Oxycodone
21       prescribers are the most loyal, with
22       an average of 70 percent for Oxycontin
23       (end of reading).
24 Is that your --
25   A.    Yes.

Page 351

1    Q.    And your understanding is that's
2 accurate?
3    MR. DAVISON: Objection.
4    THE WITNESS: That's accurate.
5 BY MS. HERZFELD:
6    Q.    Okay. Next page.
7       (Reading) Manually tuning the
8       segmentation increases the overall
9       coverage of the market without
10       compromising the strategy (end of
11       reading).
12 Do you have any understanding of what that
13 means?
14   MR. DAVISON: Objection.
15   THE WITNESS: I just think it's saying that
16 you have the raw data, and then it's tweaked somehow
17 based on other criteria. But I don't recall this at
18 all, quite frankly.
19 BY MS. HERZFELD:
20   Q.    Okay. And when they're talking about
21 coverage of the market, is it coverage of the market
22 for sales?
23   MR. DAVISON: Objection to form.
24   THE WITNESS: Coverage of the market in
25 terms of the -- the intensity of prescribing, which

Page 352

1 is very important to us.
2    MS. HERZFELD: Okay.
3    THE WITNESS: And it's very important from a
4 safety perspective too.
5 BY MS. HERZFELD:
6    Q.    Okay. Why?
7    A.    Okay. So a high prescriber has the
8 potential to do more harm than a low prescriber.
9    Q.    Okay.
10   A.    So if I'm designing a safety program,
11 I'm going to focus -- first step out the door, I'm
12 going to focus on the highest prescribers of Exalgo,
13 because they have the potential to harm more patients
14 than someone who writes one prescription and doesn't
15 write another prescription for six months.
16       It could take a lot of energy and time and
17 money to get that physician that's in West Bemidji,
18 Minnesota to fill out the EEIF and read the REMS.
19 And when we go there, he says, I wrote one
20 prescription for Exalgo. I'm never writing another.
21       I'd rather go to Freddie Smith over here in
22 Indiana, who writes ten prescriptions a week, and put
23 my energy in on him in terms of education.
24   Q.    Okay.
25   A.    So it's -- it's a reflex -- it's a

Page 353

1 reflex based on what their prescribing activity is.
2    Q.    Okay.
3    A.    Does that make sense?
4    Q.    It does.
5       Moving forward. So then you have the next
6 one, which is this very colorful chart here. And
7 that's what that's talking about here --
8    A.    Yes.
9    Q.    -- right, the various deciles of
10 prescribers and what they tend to prescribe; is that
11 right?
12   A.    It is.
13   MR. DAVISON: Objection to form.
14 BY MS. HERZFELD:
15   Q.    Okay. And then switching to the next
16 page, "Sales Force Sizing."
17       Were you involved at all in determining the
18 sizes of the sales force?
19   A.    No.
20   Q.    Did anybody ever consult with you
21 about sizes of the sales force?
22   A.    No.
23   Q.    Okay. Switching to the next one.
24 Then it says, "Profile of a Target: Introducing
25 Dr. Murphy."

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 Do you know what a target is in this
2 context?
3 THE VIDEOGRAPHER: Counsel, your paper is
4 hitting your mic. Do you mind moving it up a bit.
5 MR. DAVISON: Sorry.
6 THE WITNESS: So this -- this is a profile
7 of a prescriber. It's an illustrative profile of a
8 prescriber and what that prescriber's prescription
9 activity is.
10 BY MS. HERZFELD:
11 Q. Okay. And when it says "a target,"
12 does that mean a sales target for Exalgo?
13 A. A sales target.
14 Q. Okay. You're ahead of me. I was on
15 this one. So I will switch to this one. Same page.
16 Now we're on the same page.
17 At the top it says, "Dr. Mark Murphy," and
18 then the prescriber ME, and a number. Do you know
19 what a prescriber ME is?
20 A. Medical education number.
21 Q. Okay. Is that a license number?
22 A. It's a designation that physicians
23 have that can be tracked. So it's a way to track
24 them.
25 Q. Okay. And then here it says, "Market

Page 355

1 decile 10"; is that right?
2 A. That's right.
3 Q. And that's the highest decile for
4 Mallinckrodt rankings; is that right?
5 A. That's right.
6 Q. And so what does that mean?
7 MR. DAVISON: Objection.
8 THE WITNESS: He's in the top -- he's in a
9 group of physicians who collectively prescribe -- let
10 me get this right -- ten percent of the -- the
11 highest prescribers in the top ten percent of
12 prescriptions.
13 So, in other words, there's -- so there's --
14 just make up a number 5,000 prescriptions. How many
15 doctors does it take to generate 5,000 prescriptions.
16 Well, the top ten percent, it only takes 32 of them.
17 The next decile may take 50, and the next, 250. So
18 the populations get bigger in each decile as you go
19 down.
20 BY MS. HERZFELD:
21 Q. So if I understand your testimony, so
22 this Dr. Mark Murphy would be in the group of the
23 highest prescribers of long-acting opioids?
24 A. The highest, yes.
25 Q. Okay. And so if I understood you

Page 356

1 correctly before, that means he is at the highest
2 possibility of doing the most harm?
3 MR. DAVISON: Objection to form.
4 THE WITNESS: Correct.
5 MS. HERZFELD: Okay. Okay.
6 THE WITNESS: That's how I look at it. The
7 sales guys look at it as this is the most -- place
8 where we can get the most prescriptions, because they
9 already believe in long-acting opioids, they have the
10 patients for long-acting opioids.
11 I look at it the flipside. I look at it,
12 you're right. That's why I have to get this Exalgo
13 REMS information and the Exalgo C.A.R.E.S. Alliance
14 information in there.
15 BY MS. HERZFELD:
16 Q. Okay. Okay. And then it says that
17 this -- this doctor's practice location is the
18 North Alabama Pain Services in Decatur, Alabama.
19 Do you know anything about the North Alabama
20 Pain Services in Decatur, Alabama?
21 A. No.
22 MR. DAVISON: Objection.
23 BY MS. HERZFELD:
24 Q. Okay. Switching to the next one. Is
25 this what you were talking about for specialty, it

Page 357

1 makes a difference for you?
2 A. Yes.
3 Q. Okay. And so what is Dr. Mark
4 Murphy's specialty, according to this chart?
5 A. Anesthesiology.
6 Q. And is anesthesiology the type of
7 practice you would expect to see a high prescribing
8 of opioids?
9 A. If they practice pain management.
10 Not all anesthesiologists practice pain management.
11 Some practice in the hospital, and they give
12 anesthesia during surgery. They would not be a
13 target.
14 But an anesthesiology, the other part of
15 anesthesia is they become a pain specialist and treat
16 patients with chronic pain.
17 Q. Okay. Switching to the next one.
18 And it talks about pharmacies. Do you know what this
19 chart -- or what this -- what this slide represents
20 here?
21 MR. DAVISON: Objection.
22 BY MS. HERZFELD:
23 Q. Let me back up.
24 A. Yeah.
25 Q. Do you know if Mallinckrodt was also

Page 358

1  looking at where a particular physician's
2  prescriptions were filled --
3        A.    Yes.
4        Q.    -- when making sales determinations?
5        A.    Yes.  Yes.
6        Q.    Okay.  And so in this case it looks
7  like, when profiling Dr. Mark Murphy, there's a
8  discussion about chain pharmacies, independent
9  pharmacies, mail order pharmacies, et cetera; is that
10  right?
11       MR. DAVISON:  Objection to form.
12       THE WITNESS:  I believe so.  I can't be sure
13  whether it's Mark Murphy or whether it's pharmacies
14  and chains in general.  I can't tell from this.
15  BY MS. HERZFELD:
16       Q.    Okay.  But, to your understanding,
17  Mallinckrodt did track where it is that various
18  physicians' prescriptions for Exalgo were being
19  filled?
20       A.    Right.  Because if -- yes, they did.
21  They did.
22       Q.    Okay.  And do you know why they
23  tracked that information?
24       A.    Sure.  Because if a physician in
25  Decatur, Alabama, and there's -- let's say there's

Page 359

1  one main pharmacy in Decatur, Alabama, writes a
2  script for Exalgo, and the patient takes it to the
3  Decatur, Alabama pharmacy and they don't have Exalgo,
4  that patient is extremely unhappy.  Because,
5  remember, that patient is in pain.
6        Q.    Right.
7        A.    So that patient is going back to the
8  doctor with a big complaint.
9        Q.    What about for the patients who
10  actually aren't in pain, that are just trying to get
11  the drugs from the doctors?
12       MR. DAVISON:  Objection to form.
13       THE WITNESS:  They can't get the drugs from
14  the doctors.  They can get a prescription from the
15  doctors.  They can't get the drugs from the doctors.
16  BY MS. HERZFELD:
17       Q.    They can get the drugs from the
18  pharmacies with a prescription written by the doctor;
19  is that correct?
20       A.    That's correct.  Our focus was on
21  proper prescribing.  That's the faucet that goes open
22  or closed.
23       Q.    Okay.  Then if you switch to the one
24  that says, "REMS Metrics and Tracks Data."  Do you
25  see that?

Page 360

1        A.    Right.  Right.
2        Q.    It talks about enrollment.  Do you
3  know what they were talking about here with
4  enrollment?
5        MR. DAVISON:  Objection to form.
6        THE WITNESS:  I believe it's enrollment in
7  the REMS, the Exalgo REMS.
8  BY MS. HERZFELD:
9        Q.    So is that the filling out the sheet
10  thing you talked about earlier?
11       A.    The EIIF, yeah.
12       Q.    Okay.  Is there anything more than
13  the EEIF?
14       A.    There's more, but it's -- so we --
15  what can we track?  We can track the EEIF because we
16  have it.  We can track their prescription activity
17  because we have it.
18       Q.    Okay.
19       A.    And then we justify those two against
20  each other.  And if we have a prescriber that doesn't
21  have an EEIF, you send people in there.
22       Q.    Okay.
23       A.    Yeah.
24       Q.    Okay.  So then we will just flip all
25  the way here to the end, "The Strategic Approach REMS

Page 361

1  Implementation."  And then there's this chart on the
2  very last page.  Do you see the chart?
3        A.    Uh-huh.
4        Q.    It's a very colorful chart?
5        A.    Thank you.
6        Q.    So I want to make sure -- did you
7  create this chart?
8        A.    Oh, God, no.
9        Q.    I wanted to just make sure that I
10  understand it.  So this goes -- we have the
11  physician, and then it says "Rx."
12       The physician writes the prescription to the
13  patient; is that right?
14       A.    Yes.
15       Q.    Okay.  And then the patient --
16  there's an arrow that goes to the pharmacy with Rx.
17  So does that mean fills the prescription?
18       A.    Fills the prescription at a pharmacy.
19       Q.    And then there's an arrow going the
20  other way with the pills?
21       A.    The pills go back to the patient.
22       Q.    Okay.  And then it has the
23  manufacturer sends the pills to the pharmacies.  Do
24  you see that?
25       A.    It leaves out a step there, because

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1 it goes to the wholesaler first. But effectively it
2 goes to the pharmacy.
3     Q.    Okay. And then on here, between the
4 pharmacy and the physician, there's a thing called
5 database. What's the database; do you know?
6     A.    The database is a representation of
7 all the data analytics that go on. It's not really a
8 box or a single thing. It's a global kind of thing.
9     Q.    Okay. And so it talks about
10 eligibility of prescriber and patient?
11    A.    Right.
12    Q.    Do you know what that is?
13    A.    That's the EEIF on -- on file for
14 that prescriber.
15    Q.    Okay.
16    A.    And --
17    Q.    And then going the other way from
18 pharmacy to database, it says, "Enroll pharmacy." Do
19 you know what that is?
20    A.    That, I believe, is a pharmacy that
21 reports -- reports data. Not all pharmacies do. But
22 today nearly all do.
23    Q.    Okay.
24    A.    Very high.
25    Q.    And then all the way at the bottom

Page 363

1 there's an arrow going from database to manufacturer,
2 and it says, "Eligibility of Pharmacy." Do you know
3 what that is?
4     MR. DAVISON: Objection to form.
5     THE WITNESS: That's a way for us to check
6 whether we're sending drugs indirectly, because we're
7 sending it through a number of steps, but ultimately
8 its destination is an eligible pharmacy, a real
9 pharmacy, a legitimate pharmacy.
10 BY MS. HERZFELD:
11    Q.    Because you would want to make
12 sure --
13    A.    Right.
14    Q.    -- that your drugs aren't getting to
15 an illegitimate pharmacy?
16    A.    Right.
17    Q.    And would you want to make sure that
18 your opioids aren't getting to doctors who are
19 prescribing them for inappropriate purposes?
20    A.    Exactly.
21    MR. DAVISON: Objection to form.
22 BY MS. HERZFELD:
23    Q.    And you want to make sure that your
24 opioids aren't getting into an illegal drug market
25 where they are being abused?

Page 364

1     MR. DAVISON: Objection to form.
2     THE WITNESS: Absolutely.
3 BY MS. HERZFELD:
4     Q.    Do you know anything about Dr. Mark
5 Murphy?
6     A.    No, nothing.
7     Q.    Do you know if Dr. Mark Murphy still
8 has a medical license now in Alabama?
9     A.    I have no idea.
10    MR. DAVISON: Objection.
11    THE WITNESS: I don't know if he was a real
12 doctor. It may have been made up just to illustrate
13 a point. I really don't know. This is an
14 educational setting, so it may not be real.
15 BY MS. HERZFELD:
16    Q.    So if Mark Murphy was real, do you
17 know if he ever filled out the REMS --
18    A.    I have no idea.
19    MR. DAVISON: Objection to form.
20    MS. HERZFELD: What's the objection?
21    MR. DAVISON: You're asking him to
22 speculate. He just told you he never heard the name
23 before.
24    MS. HERZFELD: I guess it's a good point.
25    Q.    What would happen if you asked a

Page 365

1 physician to fill out the REMS survey and they
2 didn't?
3     A.    What would happen or could happen?
4     Q.    Yes.
5     A.    A variety of things.
6     Q.    Okay.
7     A.    You know, I can give you a spectrum
8 of kind of the responses that we got. But that's --
9 that's what you're looking for?
10    Q.    Sure.
11    A.    Some would do it instantly.
12    Q.    Yep.
13    A.    Some would want to understand why
14 they are doing it. Some would say, come back another
15 day, and I'll do it. Some would say, I'm never going
16 to do it. Any others like that, you know, in that
17 neighborhood, yeah.
18    Q.    And so if someone was like, I'm never
19 going to do it or they came up with a million excuses
20 to never really turn it in, was that information that
21 you would collect?
22    A.    Oh, absolutely.
23    Q.    And is that information that you
24 would turn over to other folks at Mallinckrodt?
25    A.    Perhaps eventually. But we would

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 make multiple efforts to reason with the individual
2 physician. Or to get his staff to help do it often
3 works. You have to be crafty.
4     Q.    Do you think it could be suspicious
5 if a -- if a physician didn't want to share that
6 information?
7         MR. DAVISON: Objection to form.
8         THE WITNESS: It could be. It could be
9 the -- that the physician -- it's more than likely
10 the physician is suspicious about signing anything
11 that goes to a pharmaceutical company, you know.
12 BY MS. HERZFELD:
13     Q.    Couldn't it also be that the
14 physician doesn't want to share information about
15 their prescribing habits because perhaps they are not
16 legitimate?
17         MR. DAVISON: Objection to form.
18         THE WITNESS: It could be. But we have
19 their prescribing habits without or without the EEIF.
20 We don't need the EEIF to get them. And they
21 probably know that. But it's amazing, some don't
22 know.
23 BY MS. HERZFELD:
24     Q.    During your time at Mallinckrodt, did
25 you ever identify any prescribers that you suspected

Page 367

1 were prescribing for illegitimate purposes?
2     A.    I didn't. But we had multiple
3 instances of such kind of activity that we, you know,
4 flagged certain prescribers based on their
5 prescription activity, and sent in health-care
6 professionals to try to investigate not only their
7 prescribing activity, but adverse event occurrences,
8 where that -- the physician was -- you know, the
9 physician relevant to the patient that has a severe
10 adverse event.
11     Q.    Okay. And who would have been
12 responsible for that at Mallinckrodt?
13     A.    For going into the doctor's office?
14     Q.    Yes, sir.
15     A.    Usually Eddie Darton, who is a
16 physician, or one of our Pharm.Ds, depending upon the
17 severity and the location.
18     Q.    Okay. So I'm going to kind of then
19 shift just a little bit, because I want to make sure
20 that I understand it.
21         If I understood your testimony earlier, you
22 were talking about training of salespeople to detect
23 signs of diversion.
24     A.    Uh-huh.
25     Q.    Do I remember that correctly?

Page 368

1     A.    No, not to detect signs of diversion,
2 because they wouldn't really have that opportunity
3 except if it's a pill mill. We train them to detect
4 pill mills, which is something you can do visually
5 from the parking lot.
6     Q.    Okay. And who was responsible for
7 that training?
8     A.    Medical Affairs.
9     Q.    So that would have been in your
10 purview?
11     A.    More -- more the health-care
12 professionals and I would cooperate on it, yeah.
13     Q.    Okay. And was there -- was there a
14 program on training them?
15     A.    There was a complete training
16 program, yes, with videos and examples and pictures
17 and things, yeah.
18     Q.    Okay. So if I went to look in
19 Mallinckrodt's documents, I could find that
20 somewhere, a packet?
21     A.    I'm sure you could.
22     Q.    Do you know what it was called?
23     A.    No.
24     Q.    Okay. And so contained with that, in
25 the training of the salespeople to spot pill mills,

Page 369

1 we will call it that, if you're more comfortable with
2 that, do you know who specifically did the training
3 on that?
4     A.    I think we -- I did a lot of the rep
5 training on REMS and C.A.R.E.S. Alliance. So it's
6 more than likely I did some of it. But there was
7 follow-up from others in Medical Affairs.
8     Q.    Okay. And do you know who created
9 that program, where it came from?
10     A.    The training?
11     Q.    Yes, sir.
12     A.    We did. We did, yeah.
13     Q.    And do you know who Karen Harper is?
14     A.    I know the name. I don't know her
15 personally.
16     Q.    Did you consult with anyone on the
17 generic side of Mallinckrodt in developing those
18 signs to look for?
19     A.    No, we did not.
20     Q.    Where did you get the information
21 that you trained folks on, on how to spot pill mills?
22     A.    Just from data, literature, personal
23 experience, recommendations of experts. It's a
24 compilation of things, yeah.
25     Q.    And would those salespeople be

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1  trained just when they started or were there periodic
2  trainings?
3       A.   Both.  It's heavy when they start,
4  and then there's follow-up.  Training never stops in
5  pharmaceuticals because things change.
6       Q.   Okay.  And what was your sales force
7  instructed to do if they thought they had spotted
8  signs that there was a pill mill?
9       A.   Don't go in there.  Don't have
10 anything to do with them.  And report it to us.
11      Q.   Okay.  And what types of things were
12 they trained to look for?
13      MR. DAVISON:  Objection to form.
14      THE WITNESS:  A doctor's office next door or
15 contiguously constructed with a pharmacy.  Long lines
16 of patients outside the door of the physician's
17 office.  Patients spending five minutes or less in
18 the physician's office, coming out and going next
19 door to the pharmacy, filling a prescription and
20 getting -- getting in their car, driving away.  A
21 large number of out-of-state license plates --
22      THE VIDEOGRAPHER:  Is your phone buzzing?
23      THE WITNESS:  I'm sorry.  I thought I turned
24 it off.
25      Long lines of out-of-state license plates on

Page 371

1  cars.  Those types of things.
2  BY MS. HERZFELD:
3       Q.   Okay.  And so when you said they
4  should report it, who would they report it to?
5       A.   Generally to their management first.
6  That would get kicked up line and eventually would
7  end up at us, Medical Affairs.
8       Q.   Okay.  And what -- what type of
9  actions would be taken at Medical Affairs, if there
10 was such a report?
11      A.   First is avoidance, so that we
12 wouldn't have anything to do with it.  Make sure that
13 we weren't selling product into those pharmacies, we
14 weren't interacting with those physicians.
15      And I'm not sure how often it bubbled up to
16 reporting them to the medical Board.  But I know at
17 other companies that I consulted with on this same
18 kind of issue that had opioids, we reported them to
19 the Medical Board.  I can't remember if that happened
20 at Covidien or not.
21      Q.   And what about reports to the DEA
22 while you were at Covidien, do you know if those
23 occurred?
24      A.   I don't -- I don't know.
25      Q.   What about reports to Tennessee law

Page 372

1  enforcement, do you know if that occurred?
2       A.   I do not know.
3       Q.   Do you recall any events of anybody
4  reporting suspected pill mills or signs of diversion
5  in Tennessee during your time at Covidien?
6       A.   I do not, no.
7       Q.   Did Mallinckrodt have a "Do Not Call"
8  list?
9       A.   They did.
10      Q.   Okay.  And do you know if any
11 physicians from Tennessee were on that list?
12      A.   I do not know that.
13      Q.   Okay.  Do you know how many
14 physicians, approximately, were on that list?
15      A.   Without being named specifically,
16 there was a huge "Do Not Call" segment of the
17 prescribing -- potential prescribing population
18 because they didn't meet the standards that we set
19 for their specialty or their patient population.  So
20 there was no justification for having a sales rep in
21 there.
22      Q.   Okay.  So mostly you -- you folks
23 spent your time on the physicians that were
24 prescribing the highest level of long-acting opioids?
25      MR. DAVISON:  Objection to form.

Page 373

1       THE WITNESS:  And -- not just that.  And had
2  the right training.
3       So you're starting out with a select group
4  that's kind of automatic risk mitigation, because
5  these are pain experts as opposed to some doctor who
6  hasn't had the training, who is just a high
7  prescriber.  That's a danger.  That's a danger sign.
8  BY MS. HERZFELD:
9       Q.   So high prescribers of long-acting
10 opioids who had a specialty like pain management?
11      A.   Anesthesia, pain management,
12 et cetera, yeah.
13      Q.   And that's where most of the focus
14 was for sales?
15      A.   Right.
16      MS. HERZFELD:  Okay.  I think I understand
17 that now.  I've just got a little bit more for you.
18 My battery is going to run out.
19      We will mark this next one as Plaintiffs'
20 Exhibit 26.
21      (Exhibit No. 26 was marked.)
22 BY MS. HERZFELD:
23      Q.   I only have just a couple questions
24 more, so it might be easier if I just ask you the
25 questions first.

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    A.    Okay.
2    Q.    We will get you out of here a little
3 faster.
4    A.    Okay.
5    Q.    For the record, Exhibit 26 is Bates
6 No. MNK-T1, underscore, 0006314936, which is the
7 attachment that is -4937.
8    Okay.  If you will take a look at the first
9 page, which is the email, for me, sir.
10    A.    Yes, I have it.
11    Q.    Okay.  And this appears to be an
12 email that is sent from Preston Walker on -- to a
13 bunch of folks, and then copies Bobby Clark and you;
14 is that correct?
15    A.    That's correct.
16    Q.    Okay.  And it's dated 2-14-2011; is
17 that correct?
18    A.    That's correct.
19    Q.    Okay.  And do you have any reason
20 to -- do you believe that you received this email in
21 the regular course of your business?
22    A.    I do.
23    Q.    Okay.  So it says here, "PPF."  I
24 think you said what that meant earlier?
25    A.    Patient Product Safety Team.

Page 375

1    Q.    Okay.  (Reading) Bobby and I were
2    asked to put together an upcoming
3    advanced sales training.  Please
4    review the attached presentation and
5    return comments to me by COB on
6    Tuesday, 2-15-11.  Thanks, Preston
7    (end of reading).
8    Did I read that correctly?
9    A.    You did.
10    Q.    Now, let's just flip through this
11 thing here.
12    Okay.  If you will look at slide No. 9, at
13 page No. 9.  Did you create this document, sir?
14    A.    I did not.  I reviewed it.  I
15 participated in creating it, but I didn't actually
16 physically create it.
17    Q.    Okay.  If you will read for me what
18 it says on slide 9 here.
19    A.    (Reading) federal law enforcement
20    authorities in November 2009
21    dismantled the Florida drug
22    trafficking ring that had sent more
23    than 100,000 oxycodone tablets from
24    South Florida pain clinics to abusers
25    in Kentucky and North Carolina,

Page 376

1    Tennessee, Virginia, and West
2    Virginia.  At least 20 people were
3    indicted on distribution charges.  The
4    ring had allegedly operated for three
5    years and used at least four or five
6    clinic doctors per day -- per day to
7    obtain the drugs.  Members of the ring
8    shipped thousands of pills every day
9    by vehicle or overnight delivery
10    services and allegedly made at least
11    $5 million over three years (end of
12    reading).
13    Q.    And the citation for that is the
14 National Drug Treatment Assessment --
15    A.    Right.
16    Q.    -- is that correct?
17    A.    That is correct.
18    Q.    Do you know who the National Drug
19 Treatment Assessment is?
20    A.    It's --
21    Q.    Or what it is?
22    A.    Not exactly.  But it's a national
23 kind of initiative to address this problem.
24    Q.    Okay.  You consider it to be a
25 reliable source?

Page 377

1    A.    I don't know.  I can't comment on
2 that.  But I'm assuming it would be.
3    Q.    Do you have any reason to doubt what
4 you just read --
5    A.    Oh, no.  No, I have no reason to
6 doubt it.
7    Q.    So in this case, the information that
8 you just read talks about federal law enforcement
9 arresting people for engaging in a conspiracy to sell
10 190,000 oxycodone tablets; is that correct?
11    MR. DAVISON:  Objection to form.
12    THE WITNESS:  That's correct.
13 BY MS. HERZFELD:
14    Q.    Okay.  And it says that those were
15 coming from South Florida pain clinics to abusers in
16 Kentucky, North Carolina, and Tennessee; is that
17 right?
18    A.    That's correct.
19    Q.    And Virginia and West Virginia, just
20 to be complete?
21    A.    Yes.
22    Q.    Does that indicate to you that
23 oxycodone were going from South Florida pain clinics
24 into the illegal drug market in Tennessee?
25    A.    Absolutely.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1  Q.   Okay.  And it says:
2       (Reading) At least 20 people were
3       indicted.  The ring operated for three
4       years and used at least four or five
5       pain clinic doctors per day to obtain
6       the drugs (end of reading).
7  Is that right?
8  A.   Yes.
9  Q.   Okay.  And then it was talking --
10 before it was talking about pain clinics; is that
11 right?
12 A.   Yes.
13 Q.   So in this situation you had people,
14 doctors, who were pain management doctors at pain
15 clinics; is that right?
16 MR. DAVISON:  Objection to form.
17 THE WITNESS:  As I understand it, these
18 were -- this is -- this is basically the pill mill
19 practice.
20 BY MS. HERZFELD:
21 Q.   Okay.  So I guess my question is, if
22 you're talking about targeting folks for sales that
23 are high prescribers of long-acting opioids who are
24 also an appropriate -- an appropriate specialty, like
25 pain management, that could be a pill mill, they

Page 379

1  could be operating a pill mill or it could be
2  legitimate; is that right?
3  A.   Absolutely.
4  MR. DAVISON:  Objection.
5  BY MS. HERZFELD:
6  Q.   Okay.  And when you're targeting
7  them, do you know if they are a pill mill or a
8  legitimate operation?
9  A.   Not -- not initially.
10 MR. DAVISON:  Objection.
11 THE WITNESS:  We need to do more due
12 diligence to find that out, to verify that where they
13 are going is legitimate.  And the reps are trained
14 for telltale signs, that as I talked about before.
15 BY MS. HERZFELD:
16 Q.   Okay.  And what would happen if a rep
17 saw those signs and didn't report it?
18 MR. DAVISON:  Objection to form.
19 THE WITNESS:  And didn't report it.  And
20 then it was discovered later; is that what you mean?
21 MS. HERZFELD:  Yes.
22 THE WITNESS:  They'd be in a lot of trouble.
23 MS. HERZFELD:  Okay.  You can set this one
24 aside.
25 I have got one more, one more real quick.

Page 380

1  And so if it looks like you need to stop, just let me
2  know.  Okay?
3  THE VIDEOGRAPHER:  Okay.
4  MS. HERZFELD:  Okay.  Exhibit 27.  No. 27 --
5  it's actually 27 and 28.  So let's mark them at the
6  same time, if that's okay, because they kind of go
7  together.  We will just do 27 first.
8       (Exhibit No. 27 was marked.)
9  MS. HERZFELD:  I have handed you what we
10 have marked as Exhibit 27, which is an email Bates
11 No. MNK-T1, underscore, 0007094004, and it is a
12 three-page email, a three-page email chain.
13 Q.   Sir, is this an email that was sent
14 to you from Kevin Lenaburg on June 8th, 2011?
15 A.   Yes.
16 Q.   Okay.  And did you receive this email
17 in the ordinary course of your business?
18 A.   I assume I did, yes.
19 Q.   Okay.  And so my question about this
20 is actually pretty -- pretty easy.  If you will just
21 set this down for a second, and then we can talk
22 about it in a minute.
23 Do you know the book called "Defeat Chronic
24 Pain Now!"?
25 A.   I do.

Page 381

1  Q.   Have you ever read the book?
2  A.   I've read parts of it.  I have
3  perused it.  I haven't read it word for word.
4  Q.   Okay.  And did the C.A.R.E.S.
5  Alliance provide copies of "Defeat Chronic Pain Now!"
6  to prescribing physicians?
7  A.   We did, amongst other books, yes.
8  Q.   Okay.  What other books did you
9  prescribe -- did you provide?
10 A.   Dr. Fischman's book on "Risk
11 Management."  I think those are the two main ones
12 that we did, yeah.
13 Q.   Okay.  And other than prescribing
14 physicians, did "Defeat Chronic Pain Now!" go to
15 other folks as well?
16 A.   "Defeat Chronic Pain Now!" was a book
17 that we gave to physicians to give to their patients.
18 Q.   Okay.  And I should have asked you
19 before.  This is just an aside, and I'm sorry to kind
20 of go off a little bit.
21 When we were talking about detailing of
22 physicians, to your knowledge, did Mallinckrodt sales
23 folks also detail pharmacies?
24 A.   I don't know, really.
25 Q.   Okay.  Did you ever hear about,

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1 perhaps, Mallinckrodt detailing pharmacies to make
2 sure that they had Exalgo on their shelves in case a
3 physician wrote a prescription?
4     A.   I believe that --
5     MR. DAVISON:  Objection to form.
6     THE WITNESS:  I believe that happened, yeah.
7     MS. HERZFELD:  Okay.
8     THE WITNESS:  Initially, that's kind of up
9 front at the launch.  But once it's done, you don't
10 have to go back anymore.
11 BY MS. HERZFELD:
12     Q.   And did you have responsibility for
13 training sales folks to detail pharmacies?
14     A.   I did not, no.
15     Q.   Do you know who would have?
16     A.   The Sales Training Department.  Yeah.
17     Q.   Okay.  So we don't need to look at
18 this email, if you know that you already provided
19 "Defeat Chronic Pain Now!".
20     A.   Okay.
21     Q.   Looking at "Defeat Chronic Pain
22 Now!", it -- have you gone back and read "Defeat
23 Chronic Pain Now!" since you left Mallinckrodt?
24     A.   No.
25     MR. DAVISON:  Objection to form.

Page 383

1 BY MS. HERZFELD:
2     Q.   Okay.  Do you know if any of the
3 claims in "Defeat Chronic Pain Now!" have been
4 disproven?
5     A.   I do not know that.
6     Q.   They talk about pseudoaddiction in
7 "Defeat Chronic Pain Now!"; do you recall that?
8     A.   I do recall that.  Because
9 pseudoaddiction is an issue.
10     Q.   And what do you mean, it's an issue?
11     A.   I mean it's a concern that people
12 have, how to deal with people presenting with
13 pseudoaddiction.
14     Q.   And do you believe pseudoaddiction to
15 be a legitimate scientific --
16     A.   I'm not the one to judge that.  But
17 enough physicians tell me it's an issue -- or told me
18 at the time.  I don't talk about it now.  But told me
19 at the time it's something that they have to deal
20 with.
21     Q.   Do you know if that's true?
22     A.   I really don't know if it's true.
23     MR. DAVISON:  Objection.
24 BY MS. HERZFELD:
25     Q.   Do you know if pseudoaddiction

Page 384

1 actually exists?
2     MR. DAVISON:  Objection.
3     THE WITNESS:  I do not.
4 BY MS. HERZFELD:
5     Q.   Okay.  Did the FDA approve the label
6 for -- did the FDA approved label for Exalgo mention
7 anything about pseudoaddiction, to your knowledge?
8     A.   My -- my belief is they did not.
9     Q.   Okay.  And do you know if "Defeat
10 Chronic Pain Now!" is available online?
11     A.   I don't know.
12     MS. GAFFNEY:  I don't think I have anymore
13 questions.  Thank you very much, sir.
14     THE WITNESS:  You're welcome.
15     MR. DAVISON:  Go off the record.
16     THE VIDEOGRAPHER:  We are going off the
17 record.  The time is 6:58 p.m.
18     (Recess taken.)
19     THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 7:02 p.m.
21         EXAMINATION
22 BY MR. DAVISON:
23     Q.   Mr. Morelli, thank you for your time
24 so far.  I just have a couple of questions for you.
25     A.   Okay.

Page 385

1     Q.   What was your role on the Suspicious
2 Order Monitoring Team?
3     A.   My role was to inform them of what
4 the Patient and Product Safety Team was doing in
5 terms of the REMS -- Exalgo REMS and the C.A.R.E.S.
6 Alliance, to make them aware of what they were doing.
7     Q.   Did you have any involvement with
8 suspicious order monitoring of generic opioids?
9     A.   I did not.
10     Q.   Did you have any knowledge or
11 understanding of how the suspicious order monitoring
12 program for generic opioids worked at Mallinckrodt?
13     A.   Not really.
14     Q.   What was the goal of the sales force
15 at Mallinckrodt?
16     A.   To visit with prescribing physicians
17 and their target audience and inform them of the
18 risks and benefits of their promoted products.
19     Q.   During your time at Mallinckrodt, did
20 you have any role in charge-backs?
21     A.   I did not.
22     Q.   And do you have any understanding of
23 how charge-backs worked at Mallinckrodt?
24     A.   I do not.
25     MR. DAVISON:  Thanks.  Nothing further.

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  ///
2  ///
3           FURTHER EXAMINATION
4  BY MR. SAMSON:
5       Q.    You just were asked a question about
6  the sales force's task at Mallinckrodt.  Do you
7  recall that?
8       A.    Just now?
9       Q.    Yes.
10      A.    Yeah.
11      Q.    And that they were to mix with
12  doctors and give them risks and benefits; correct?
13      A.    Correct.
14      Q.    Did you have any role in following up
15  to see if the sales force stuck to that assigned task
16  or expanded their discussions with doctors?
17      A.    No.  But others did.
18      Q.    Who?
19      A.    The sales organization.  The Legal
20  Department.  Medical Affairs, other than me, and
21  et cetera.
22      MR. SAMSON:  Okay.  Nothing further.
23      MR. DAVISON:  Thank you.  I have nothing
24  further.
25      THE WITNESS:  Thank you.

Page 387

1       THE VIDEOGRAPHER:  This concludes the video
2  deposition of Art Morelli.  We are going off the
3  record at 7:04 p.m.
4       (The deposition was concluded at 7:04 p.m.)
5       --o0o--
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 388

1       Please be advised I have read the foregoing
2  deposition, and I state there are:
3  (Check one)  _____NO CORRECTIONS
4            _____CORRECTIONS PER ATTACHED
5
6
7  _____
8   ARTHUR F. MORELLI
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 389

1       DEPONENT'S CHANGES OR CORRECTIONS
2  Note:  If you are adding to your testimony, print the
3  exact words you want to add.  If you are deleting from
4  your testimony, print the exact words you want to
5  delete.  Specify with "Add" or "Delete" and sign this
6  form.
7  DEPOSITION OF:  ARTHUR F. MORELLI
8  CASE:  IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION
9  DATE OF DEPOSITION:  JANUARY 17, 2019
10 PAGE    LINE    CHANGE/ADD/REASON/DELETE
11 _____   _____   _____
12 _____   _____   _____
13 _____   _____   _____
14 _____   _____   _____
15 _____   _____   _____
16 _____   _____   _____
17 _____   _____   _____
18 _____   _____   _____
19 _____   _____   _____
20 _____   _____   _____
21 _____   _____   _____
22 _____   _____   _____
23 _____   _____   _____
24 DEPONENT'S SIGNATURE _____
25 DATE_____

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1        CERTIFICATE OF REPORTER

2     I, SANDRA BUNCH VANDER POL, a Certified

3  Shorthand Reporter, hereby certify that the witness in

4  the foregoing deposition was by me duly sworn to tell

5  the truth, the whole truth and nothing but the truth

6  in the within-entitled cause;

7     That said deposition was taken down in shorthand

8  by me, a disinterested person, at the time and place

9  therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12     That before completion of the deposition, review

13  of the transcript was requested.  If requested, any

14  changes made by the deponent (and provided to the

15  reporter) during the period allowed are appended

16  hereto.

17     I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22  DATED:  JANUARY 21, 2019

23            _____

            SANDRA BUNCH VANDER POL, CSR 3032

24

25