```
 1              UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

 2                    EASTERN DIVISION

 3   IN RE: NATIONAL           )   MDL No. 2804

     PRESCRIPTION OPIATE       )

 4   LITIGATION                )   Case No.

                               )   1:17-MD-2804

 5                             )

     THIS DOCUMENT RELATES TO  )   Hon. Dan A. Polster

 6   ALL CASES                 )

                               )

 7

 8

                  THURSDAY, DECEMBER 13, 2018

 9

10       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

11

12        Videotaped Deposition of DONALD STEVEN

13   MORSE, held at the Courtyard by Marriott

14   Hotel, 300 East 4th Street, Austin, Texas,

15   commencing at 8:11 a.m., on the above date,

16   before Susan Perry Miller, Registered

17   Diplomate Reporter, Certified Realtime

18   Reporter and Notary Public.

19

20

21              __ __ __

22            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

23               deps@golkow.com

24

25
```

```
 1     A P P E A R A N C E S :
 2         MCHUGH FULLER LAW GROUP
           BY:   MICHAEL J. FULLER, ESQUIRE
 3             mike@mchughfuller.com
               A.J. ELKINS, ESQUIRE
 4             aj@mchughfuller.com
           97 Elias Whiddon Road
 5         Hattiesburg, Mississippi 39402
           (601) 261-2220
 6         Counsel for MDL Plaintiffs
 7
 8         SIMMONS HANLY CONROY LLP
           BY:   RICK KROEGER, ESQUIRE
 9             rkroeger@simmonsfirm.com
           One Court Street
10         Alton, Illinois 62002
           (618) 259-2222
11         Counsel for MDL Plaintiffs
12
13         WILLIAMS & CONNOLLY LLP
           BY:   STEVEN M. PYSER, ESQUIRE
14             spyser@wc.com
               MATTHEW C. MONAHAN, ESQUIRE
15             mmonahan@wc.com
           725 Twelfth Street, N.W.
16         Washington, D.C. 20005
           (202) 434-5000
17         Counsel for Cardinal Health and The Witness
18
19         JONES DAY
           BY:   BRANDY H. RANJAN, ESQUIRE
20             branjan@jonesday.com
           325 John H. McConnell Boulevard
21         Suite 600
           Columbus, Ohio 43215
22         (614) 469-3939
           Counsel for Walmart
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2        REED SMITH LLP
          BY:  STAN PERRY, ESQUIRE
 3            sperry@reedsmith.com
          811 Main Street
 4        Suite 1700
          Houston, Texas 77002
 5        (713) 469-3800
          Counsel for AmerisourceBergen Drug
 6        Corporation
 7
 8        FOX ROTHSCHILD LLP
          BY:  STEPHAN A. CORNELL, ESQUIRE
 9            scornell@foxrothschild.com
              (via teleconference)
10        2700 Kelly Road
          Suite 300
11        Warrington, Pennsylvania 18976
          (215) 345-7500
12        Counsel for Prescription Supply
13
14        FOX ROTHSCHILD LLP
          BY:  MAURA L. BURKE, ESQUIRE
15            mburke@foxrothschild.com
              (via teleconference)
16        2000 Market Street
          20th Floor
17        Philadelphia, Pennsylvania 19103
          (215) 299-2000
18        Counsel for Validus Pharmaceuticals
19
20        COVINGTON & BURLING LLP
          BY:  MEGHAN MONAGHAN, ESQUIRE
21            mmonaghan@cov.com
              (via teleconference)
22        One City Center
          850 Tenth Street, N.W.
23        Washington, D.C. 20001
          (202) 662-6000
24        Counsel for McKesson Corporation
25
```

```
 1    A P P E A R A N C E S:
 2       ARNOLD & PORTER KAYE SCHOLER LLP
         BY:  CAITLIN MARTINI MIKA, ESQUIRE
 3            caitlin.mika@arnoldporter.com
              (via teleconference)
 4       70 West Madison Street
         Suite 4200
 5       Chicago, Illinois 60602
         (312) 583-2300
 6       Counsel for Endo Health Solutions
         Inc., Endo Pharmaceuticals Inc., Par
 7       Pharmaceutical, Inc. and Par
         Pharmaceutical Companies, Inc.
 8
 9       TUCKER ELLIS LLP
         BY:  ERICA M. JAMES, ESQUIRE
10            erica.james@tuckerellis.com
              (via teleconference)
11       950 Main Avenue
         Suite 1100
12       Cleveland, Ohio 44113
         (216) 592-5000
13       Counsel for Janssen Pharmaceuticals
         and Johnson & Johnson
14
15       COLLINSON DAEHNKE INLOW & GRECO
         BY:  AMANDA E. ROSENTHAL, ESQUIRE
16            amanda.rosenthal@cdiglaw.com
              (via teleconference)
17       2110 East Flamingo Road
         Suite 305
18       Las Vegas, Nevada 89119
         (702) 979-2132
19       Counsel for C&R Pharmacy
20
21       MARCUS & SHAPIRA LLP
         BY:  ZACHARY FENSTEMAKER, ESQUIRE
22            fenstemaker@marcus-shapira.com
              (via teleconference)
23       One Oxford Center
         35th Floor
24       Pittsburgh, Pennsylvania 15219
         (412) 471-3490
25       Counsel for HBC
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2        ALLAGAERT BERGER & VOGEL LLP
          BY:  MICHAEL S. VOGEL, ESQUIRE
 3            mvogel@abv.com
              (via teleconference)
 4        111 Broadway
          20th Floor
 5        New York, New York 10006
          (212) 571-0550
 6        Counsel for Rochester Drug
          Cooperative, Inc.
 7
 8        BAILEY & WYANT PLLC
          BY:  MICHAEL W. TAYLOR, ESQUIRE
 9            mtaylor@baileywyant.com
              (via teleconference)
10        500 Virginia Street East
          Suite 600
11        Charleston, West Virginia 25337
          (304) 345-4222
12        Counsel for West Virginia Board of
          Pharmacy
13
14     TRIAL TECHNICIAN:
15        GINA R. VELDMAN,
          Precision Trial Solutions
16
17     VIDEOGRAPHERS:
18        MEGHAN ENCINAS
          DALTON COLE
19        Golkow Litigation Services
20
       ALSO PRESENT:
21
          EDNA JOHNSON, McHugh Fuller Law
22        Group
23
                      --o0o--
24
25
```

```
 1                        INDEX
 2
      APPEARANCES                              2
 3
      PROCEEDINGS                             11
 4
 5
      EXAMINATION OF DONALD STEVEN MORSE:
 6
           BY MR. FULLER...................... 13
 7
           BY MR. PYSER...................... 331
 8
           BY MR. FULLER.................... 349
 9
10
      CERTIFICATE                            364
11
      ERRATA                                 366
12
      ACKNOWLEDGMENT OF DEPONENT             367
13
      LAWYER'S NOTES                         368
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS
                      DONALD STEVEN MORSE
 2                    December 13, 2018
 3    NUMBER              DESCRIPTION           PAGE
 4    Cardinal     P1.3892                        14
      Morse        August 2009 E-mail(s)
 5    Exhibit 1    w/Attachment(s)
                   CAH_MDL2804_00282303 -
 6                 CAH_MDL2804_00282336
 7    Cardinal     P1.4085                        39
      Morse        Government's Prehearing
 8    Exhibit 2    Statement
                   CAH_MDL_PRIORPROD_
 9                 DEA12_00000001 -
                   CAH_MDL_PRIORPROD_
10                 DEA12_00000054
11    Cardinal     P1.4016                        56
      Morse        Cardinal v. Holder,
12    Exhibit 3    Attachment 12 to
                   Defendant's Opposition to
13                 Plaintiff's Motion for
                   Preliminary Injunction
14                 [No Bates]
15    Cardinal     P1.4030                       115
      Morse        Cardinal v. Holder,
16    Exhibit 4    Attachment 26 to
                   Defendant's Opposition to
17                 Plaintiff's Motion for
                   Preliminary Injunction
18                 CardHe-001302 -
                   CardHe-001302
19
      Cardinal     P1.4017                       132
20    Morse        Cardinal v. Holder,
      Exhibit 5    Attachment 13 to
21                 Defendant's Opposition to
                   Plaintiff's Motion for
22                 Preliminary Injunction
                   [No Bates]
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS
 2
    Cardinal      P1.4019                      145
 3  Morse         Cardinal v. Holder,
    Exhibit 6     Attachment 15 to
 4                Defendant's Opposition to
                  Plaintiff's Motion for
 5                Preliminary Injunction
                  [No Bates]
 6
    Cardinal      P1.4226                      173
 7  Morse         Cardinal Health Standard
    Exhibit 7     Operating Procedures
 8                CAH_HOUSE-001004 -
                  CAH_HOUSE-001010
 9
    Cardinal      P1.4915                      177
10  Morse         21 CFR § 1301.74
    Exhibit 8     [No Bates]
11
    Cardinal      P1.4650                      235
12  Morse         collection of Drug
    Exhibit 9     Enforcement Administration
13                Letters
                  CAH_MDL2804_00061280 -
14                CAH_MDL2804_00061289
15  Cardinal      P1.3744                      253
    Morse         SOM Customer Purchase
16  Exhibit 10    Profile - Progression LLC
                  [No Bates]
17
    Cardinal      P1.3745                      244
18  Morse         March 2012 E-mail(s)
    Exhibit 11    w/Attachment(s)
19                CAH_MDL2804_02283167
                  CAH_MDL2804_02283198
20
    Cardinal      PowerPoint Slide: Objective  255
21  Morse         Review
    Exhibit 12    CAH_MDL2804_02087635
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  DEPOSITION EXHIBITS
 2
     Cardinal      P1.3729                      288
 3   Morse         Report: Cardinal Health
     Exhibit 13    Supply Chain Integrity,
 4                 Anti-Diversion Program
                   CAH_MDL2804_00706610 -
 5                 CAH_MDL2804_00706627
 6   Cardinal      P1.3769                      281
     Morse         December 2008 E-mail(s)
 7   Exhibit 14    w/Attachment(s)
                   CAH_MDL2804_00989013 -
 8                 CAH_MDL2804_00989015
 9   Cardinal      P1.3736                      290
     Morse         November 2010 E-mail(s)
10   Exhibit 15    w/Attachment(s)
                   CAH_MDL2804-00998054 -
11                 CAH_MDL2804-00998056
12   Cardinal      (Marked - Not Introduced)    ---
     Morse         (Retained by Mr. Fuller)
13   Exhibit 16
14   Cardinal      (Marked - Not Introduced)    ---
     Morse         (Retained by Mr. Fuller)
15   Exhibit 17
16   Cardinal      P1.4916                      314
     Morse         21 U.S.C. A § 801,
17   Exhibit 18    812 and 823
                   [No Bates]
18
     Cardinal      P1.4052                      319
19   Morse         Cardinal Document: Sales -
     Exhibit 19    Anti-Diversion Alert
20                 Signals
                   CAH_AKAG_0000323 -
21                 CAH_AKAG_0000325
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS

 2

     Cardinal      Cardinal v. Holder,          338
 3   Morse         Attachment 8 to Cardinal
     Exhibit 20    Health's Motion for
 4                 Preliminary Injunction
                   CAH_MDL_PRIORPROD_
 5                 DEA12_00014833 -
                   CAH_MDL_PRIORPROD_
 6                 DEA12_00014840
 7   Cardinal      2012 DEA MOA for CAH         357
     Morse         CAH_MDL2804_02465982 -
 8   Exhibit 21    CAH_MDL2804_02466053

 9
                        --o0o--
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS
 2           (December 13, 2018 at 8:11 a.m.)
 3              THE VIDEOGRAPHER:  We're on the
 4       record.  My name is Meghan Encinas.
 5       I'm a videographer for Golkow
 6       Litigation Services.  Today's date is
 7       December 13th, 2018, and the time is
 8       8:11 a.m.
 9              This deposition is being held
10       in Austin, Texas, in the matter of
11       National Prescription Opiate
12       Litigation MDL No. 2804.
13              The deponent is Donald Steven
14       Morse.
15              Will counsel please identify
16       themselves for the record.
17              MR. FULLER:  Mike Fuller on
18       behalf of the plaintiff.
19              MS. VELDMAN:  Gina Veldman on
20       behalf of the plaintiff.
21              MR. ELKINS:  A.J. Elkins for
22       the plaintiff.
23              MR. KROEGER:  Rick Kroeger for
24       the plaintiffs.
25              MR. PERRY:  Stan Perry, Reed
```

```
 1            Smith, for AmerisourceBergen Drug
 2            Corporation.
 3                 MR. MONAHAN:  Matthew Monahan,
 4            Williams & Connolly, on behalf of
 5            Cardinal Health.
 6                 MR. PYSER:  Steven Pyser,
 7            Williams & Connolly, on behalf of
 8            Cardinal Health and the witness.
 9                 THE REPORTER:  Those on the
10            phone, please?
11                 MR. CORNELL:  Steve Cornell for
12            Prescription Supply.
13                 MS. MIKA:  Caite Mika from
14            Arnold & Porter on behalf of Endo and
15            Par Pharmaceutical defendants.
16                 MS. MONAGHAN:  Meghan Monaghan
17            on behalf of McKesson.
18                 THE REPORTER:  Anyone else?
19                 MS. JAMES:  Erica James on
20            behalf of Janssen Pharmaceuticals and
21            Johnson & Johnson.
22                 MR. FULLER:  I'm sorry, who was
23            on behalf of Johnson & Johnson?
24                 MS. JAMES:  Erica James of
25            Tucker Ellis.
```

Highly Confidential - Subject to Further Confidentiality Review

1           MR. FULLER:  Thank you.

2           MS. ROSENTHAL:  Amanda

3      Rosenthal on behalf of C&R Pharmacy.

4           MS. BURKE:  Maura Burke on

5      behalf of Validus Pharmaceuticals.

6           MR. FENSTEMAKER:  Zach

7      Fenstemaker, Marcus & Shapira, on

8      behalf of HBC.

9           THE REPORTER:  Anyone else?

10          DONALD STEVEN MORSE,

11     having taken an oath to tell the truth, the

12     whole truth, and nothing but the truth,

13     testified as follows:

14                    EXAMINATION

15     BY MR. FULLER:

16          Q.    Mr. Morse, you started with

17     Cardinal in February of 2008.  Is that

18     correct?

19          A.    I believe it was March.

20          Q.    And you started -- what was

21     your position?

22          A.    For Cardinal Health, I was the

23     director of supply chain integrity,

24     anti-diversion.

25          Q.    Okay.  And let's bring up 3892,

Highly Confidential - Subject to Further Confidentiality Review

 1    please.

 2              (Cardinal-Morse Exhibit 1

 3         marked.)

 4              MR. FULLER:  For the record,

 5         Plaintiffs' Exhibit 1.  We need

 6         multiple copies.

 7              MR. PYSER:  Do you have a copy?

 8              MR. FULLER:  Yeah, all of them.

 9         Well, I guess we don't need four

10         copies since, for the record, we are

11         lacking in attendance today in person.

12              All right.  And, yeah, Gina, if

13         you'll go to the next page.  There you

14         go.

15    BY MR. FULLER:

16         Q.    So if you look at these

17    documents as we go through them today,

18    Mr. Morse, you'll see in the upper right-hand

19    corner of the document there will be a P1

20    number.

21              Do you see that?

22         A.    I do.

23         Q.    And this one is P1-3892, and

24    then each page is the page number after the

25    decimal point.

```
 1                      Do you see that?

 2         A.      I do.

 3         Q.      Okay.  So when I refer to a

 4    page, that's where I want you to look.  Some

 5    of them may have page numbers on the bottom

 6    as well.  Let's just try to disregard those

 7    and so everybody is on the same page.

 8                      Mr. Pyser, for example, knows

 9    this because he's been through, I don't know,

10    a bajillion depos with me already.

11                      MR. PYSER:  One or two.

12    BY MR. FULLER:

13         Q.      So that's what I'll be

14    referring to.  Okay?

15         A.      All right.

16         Q.      All right.  If you turn to the

17    second page of this document, it says "Supply

18    Chain Integrity" and it's a PowerPoint

19    presentation.

20                      Do you know who Mr. Mark

21    Hartman is?

22         A.      Yes.

23         Q.      And he was your boss' boss

24    during this time frame, correct?

25         A.      That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.        You reported to Mr. Moné.  Is

2    that correct?

3        A.        Yes.

4        Q.        And it's your understanding

5    that Mr. Moné reported to Mark Hartman.  Is

6    that fair?

7        A.        Yes.

8        Q.        Okay.  Have you seen this

9    presentation that Mark Hartman put together?

10        A.        Give me a moment.

11                (Document review by witness.)

12        A.        I don't recall ever reviewing

13    this document.

14    BY MR. FULLER:

15        Q.        Okay.  Turn to page 4 of this

16    document, if you would.  And you'll see

17    there, I believe, a picture of Mark Hartman?

18        A.        (Nods head.)

19        Q.        As he put it, a younger version

20    of Mark Hartman.

21        A.        Yep.

22        Q.        Does that appear to be Mark

23    Hartman --

24        A.        That's Mark Hartman.

25        Q.        -- at least back in the

1    2007-2008 time frame?

2         A.    When I knew him, he looked like

3    that.

4         Q.    Okay, fair enough.

5               And he's the senior vice

6    president, as it indicates, related to supply

7    chain integrity and regulatory operations and

8    joined Cardinal in 1998.  You're aware of

9    that, correct?

10        A.    Prior, no.  Now, yes.

11        Q.    Okay.  And it says he had

12   "Oversight of Cardinal Health's

13   pharmaceutical anti-diversion controls and

14   pedigree efforts."

15              Do you see that there?

16        A.    Yes.

17        Q.    And he was "Responsible for the

18   establishment and deployment of a robust

19   Quality System which ensures regulatory

20   compliance."

21              Did I read that correctly?

22        A.    You did.

23        Q.    And at the time, Cardinal had

24   27 pharmaceutical and 50 medical distribution

25   centers nationally.  Is that right?

1      A.    That's what this says.

2      Q.    And you also know that at the

3   time when you came into Cardinal, they had

4   recently had immediate suspension orders

5   issued to three of their distribution centers

6   and a fourth had voluntarily given up its

7   ability to distribute controlled substances

8   here in Texas, correct?

9         MR. PYSER:  Object to form.

10     A.    I became aware of that.

11  BY MR. FULLER:

12     Q.    Let's turn to the next page.

13  Do you see that, "Supply Chain Integrity"?

14  Do you have an understanding what that means,

15  Mr. Morse?

16     A.    In the context of Cardinal

17  Health, yes.

18     Q.    And can you explain to the jury

19  what your understanding of supply chain

20  integrity is?  And you can broaden it a

21  little bit and explain, what is the supply

22  chain as it relates to controlled substances?

23     A.    Okay.  As relates to controlled

24  substances?

25     Q.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1        A.        Okay.   Well, supply chain

2    integrity, there's a -- Cardinal is a

3    distributor and one piece of the supply

4    chain.   The supply chain will start with the

5    manufacturer, go through a wholesaler --

6        Q.        Such as Cardinal, correct?

7        A.        Such as Cardinal.   And then

8    from Cardinal, which also has other -- it's a

9    healthcare company that also makes -- oh,

10   goodness -- medical devices.   Part of their

11   services they provide are distribution of

12   drugs, including controlled substances.   They

13   distribute those to licensees who are allowed

14   to possess those drugs.

15       Q.        And when you say "licensees,"

16   you mean DEA registrants.   Is that correct?

17       A.        They would have to be DEA

18   registrants if a controlled substance was

19   involved.   If a controlled substance was not

20   involved, they would not necessarily have to

21   have that.

22       Q.        And for the purposes of my

23   questions in this deposition, we want to

24   focus on the controlled substance aspect of

25   it.   Is that fair?   Okay?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      That's fair.

 2            Q.      Okay.

 3                    MR. PYSER:  Object to form.

 4    BY MR. FULLER:

 5            Q.      And you're aware that this is a

 6    closed system, correct?  Meaning that not

 7    everybody can be a participant.

 8            A.      That's right.

 9            Q.      And that was the way that the

10    legislature or Congress designed this system,

11    because we're dealing, particularly with

12    controlled substances, with, quote/unquote,

13    "dangerous drugs."

14                    MR. PYSER:  Object to form.

15            A.      My definition of "dangerous

16    drugs" would not include that.

17    BY MR. FULLER:

18            Q.      So Controlled IIs, under your

19    definition, doesn't include dangerous drugs?

20                    MR. PYSER:  Object to form.

21            A.      I'm -- I'm using a definition

22    from the Texas State Board of Pharmacy.  A

23    dangerous drug is a drug that is -- is unsafe

24    for use by a patient without medical

25    supervision or prescribing.  Controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    substances, in the State of Texas, are a

2    subset of that.

3    BY MR. FULLER:

4        Q.    So under the federal

5    designation, does the definition of

6    controlled substances, Schedule IIs, include

7    dangerous drugs?  Or do you know?

8        A.    I do not know what the federal

9    requirement is.

10       Q.    Okay.  And during this time

11   that you were with Cardinal, you had

12   oversight across the entire country.  Isn't

13   that right?

14       A.    In my role, yes, because we

15   distributed across the country.

16       Q.    You weren't confined to Texas

17   by any means.

18       A.    No.

19       Q.    Okay.  Well, let's see what

20   Mr. Hartman has to say about supply chain

21   integrity.  And you'll see, we have this

22   screen up in front of us, this big screen.

23   Gina, to my right, she's going to follow

24   along and she's going to highlight certain

25   sections of the document and blow it up so it

Highly Confidential - Subject to Further Confidentiality Review

1    may be easier to read and see rather than the

2    version that's in front of us.

3         A.    Rather than here, okay.

4         Q.    Okay?  So "Supply Chain

5    Integrity is a holistic approach to the

6    supply chain ecosystem of an industry aimed

7    to create a safe and secure supply chain from

8    manufacturer to end user."

9              It's basically what you

10   described, correct?

11        A.    Yes.

12        Q.    Then again, and let me ask, are

13   you aware that Mr. Hartman changed positions

14   with Cardinal shortly before your arrival?

15   Back in December of 2007 he was brought into

16   the anti-diversion division because of these

17   ongoings with the license suspensions.

18              Are you aware of that?

19        A.    I was not aware of that.

20              MR. PYSER:  Object.  Object to

21        form.

22   BY MR. FULLER:

23        Q.    All right.  Are you aware that

24   his goal and objective was to revamp the

25   anti-diversion system that Cardinal was

1    operating?

2                    MR. PYSER:  Object to form.

3          Calls for speculation.

4          A.     I do not know why he was -- I

5    am not aware.

6    BY MR. FULLER:

7          Q.     Did you know that's one of the

8    things he was doing?

9          A.     At the time I got there, that's

10   one of the things he was doing.

11         Q.     Was it explained to you that --

12   well, we'll get to it in a second.

13                So Mr. Hartman says in this

14   presentation, "Cardinal began work in Supply

15   Chain Integrity as a response to leaks within

16   the pharmaceutical chain."

17                Now, you've never talked to

18   Mr. Hartman about this presentation, correct?

19         A.     No.

20         Q.     So let's go to Hartman Clip 3,

21   please.  And this clip will also play on the

22   screen in front of you, Mr. Morse.

23                (Whereupon, a video was played

24         aloud in the deposition room.)

25                MR. FULLER:  Sorry, wrong one.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Hartman Clip 3.
 2               MS. VELDMAN:  Sorry.
 3               MR. FULLER:  That's all right.
 4               (Whereupon, a video was played
 5          aloud in the deposition room,
 6          transcribed as follows.)
 7               "QUESTION:  Let's go back to
 8          3892.  It says here, 'Cardinal began
 9          work in supply chain integrity as a
10          response to leaks within the
11          pharmaceutical value chain.'  And
12          that's because when you were brought
13          in, Cardinal had leaks in their
14          system.  They had leaks in the supply
15          chain, right?
16               "ANSWER:  Yes.
17               "QUESTION:  And that was part
18          of what you were there to help
19          correct, isn't it?
20               "ANSWER:  Yes."
21               (Whereupon, the video playback
22          was terminated.)
23     BY MR. FULLER:
24          Q.    Now, Mr. Morse, were you made
25     aware that at the time of your coming in,
```

1    Cardinal had determined that it had leaks in

2    its supply chain, according to Mr. Hartman?

3         A.     I did not know that.

4         Q.     Does that surprise you to hear

5    that for the first time today?

6               Let me ask it differently.

7    Strike the question.

8               You were being brought into a

9    position in which you were providing

10   regulatory oversight to this supply chain in

11   preventing the diversion of controlled

12   substances, correct?

13        A.     Would you restate the question?

14        Q.     Sure.

15              When you were brought in, you

16   were being brought into a position to provide

17   regulatory oversight as it relates to

18   anti-diversion, correct?

19        A.     I had responsibility for a

20   piece of it, yes.

21        Q.     Okay.  And to enable you to do

22   your job, if there were predetermined leaks

23   in the system, wouldn't you want to know what

24   those were?

25              MR. PYSER:  Object to form.

```
 1              A.      I was not aware of any leaks --

 2    BY MR. FULLER:

 3              Q.      And I didn't say you were.

 4              A.      So I -- your question is?

 5              Q.      My question was, wouldn't you

 6    want to know?  If -- your job, as you just

 7    testified, is part of this anti-diversion

 8    mechanisms to prevent diversion of controlled

 9    substances, correct?

10                   MR. PYSER:  Object to form.

11              A.      A small piece of that, yes.

12    BY MR. FULLER:

13              Q.      Sure.

14              A.      But only a small piece.

15              Q.      And if part of what you're

16    doing is trying to prevent diversion and

17    there's, according to Mr. Hartman, leaks in

18    the system, wouldn't you want to know at

19    least what those were?

20                   MR. PYSER:  Object to form.

21              A.      I may have been told of those

22    leaks without calling them "leaks."

23    BY MR. FULLER:

24              Q.      Sure.  I'm not saying you were

25    or weren't.
```

1      A.      Yes, I would have liked to have

2  known.

3      Q.      I'm just saying, wouldn't you

4  want to know?

5      A.      I would need to know.

6      Q.      I mean, let's talk about it.  I

7  know, from the documents produced by your

8  counsel, a lot of what you did was

9  investigations of pharmacies, correct?

10      A.      Primary job.

11      Q.      And when you went out to the

12  pharmacy, you didn't just look at the here

13  and now.  You may look at prior data for that

14  pharmacy, correct, as part of the

15  investigative process?  Correct?

16      A.      Yes.

17      Q.      You may gather past sales

18  histories, right?  Dosage -- what do y'all

19  call it when you get the prior sales for the

20  pharmacy?

21      A.      What do you mean by "sales"?  I

22  mean, serious.  Is that money?  Is that

23  dosage units?

24      Q.      No, number of pills.

25      A.      Number of pills?  We had the

1    information from our system, yes.

2         Q.    And do you not, on a regular

3    basis, get the information from the pharmacy

4    as to their recent sales of controlled

5    substances as well as noncontrolled

6    substances?

7         A.    You request that information.

8         Q.    And what are those reports

9    called?

10        A.    From them?

11        Q.    Sure.

12        A.    I don't recall the name of

13   them.

14        Q.    The dosage usage?

15        A.    I do not recall.

16        Q.    Okay.  In any case, you pulled

17   prior information from these pharmacies,

18   correct?

19        A.    They provided prior information

20   to me.

21        Q.    Well, you asked for it.

22        A.    Yes.

23        Q.    You also do research on the

24   internet related to the pharmacies, correct?

25        A.    Yes.

1     Q.     As well as the pharmacists at

2     the building as well as potentially the owner

3     as well as potentially doctors that are main

4     prescribers for these pharmacies, right?

5     A.     At various times, yes.

6     Q.     And the reason you do that is

7     the more information you have, the better you

8     can effectuate your job, correct?

9     A.     Yes.

10     Q.     So if Cardinal knew they had

11     leaks in the system, that would be something

12     that you would want to have been told about,

13     correct?

14          MR. PYSER:  Object to form.

15     A.     Yes.

16     BY MR. FULLER:

17     Q.     And sitting here today, you

18     don't -- there's nothing that you remember

19     about being told about these potential leaks,

20     correct?

21          MR. PYSER:  Object to form.

22     A.     Not under the term "leaks."

23     BY MR. FULLER:

24     Q.     Sure.  Not saying you weren't

25     told; you just don't recollect sitting here

Highly Confidential - Subject to Further Confidentiality Review

1    today?

2         A.      Not under the term "leaks."

3         Q.      Fair enough.

4                 Turn to page 6 of the document.

5    And let me ask you, while we're bringing that

6    up, you're aware that this country is facing

7    an opioid epidemic, correct?

8         A.      It has been, yes.

9         Q.      You're aware that even back in

10   '06, '07, '08, your time frame of joining

11   Cardinal, we were in the throes of an opioid

12   epidemic, correct?

13        A.      I was aware of the epidemic in

14   the United States.

15        Q.      And did your knowledge of the

16   epidemic come from when you joined Cardinal

17   or did you already have preexisting knowledge

18   of the epidemic?

19        A.      Preexisting.

20        Q.      And how far -- strike that.

21                Let's look at the slide from

22   Mr. Hartman on page 6 of his presentation.

23   If you look at the bottom -- well, excuse me.

24   It says, "We're all responsible."

25                Do you see that there?  The

1    very top.  It's hard to see.  If you look on

2    the screen, Mr. Morse.

3          A.    Oh, there.  Okay.

4          Q.    Yeah.  Because it's not in

5    color, it makes it a little hard to see.

6                And it says at the bottom, he

7    says, "I don't know about you, but this stuff

8    scares me.  I have seven kids ranging from 28

9    to 13.  I'm living this issue of prescription

10   drug abuse at work and the fear of it at

11   home, and our kids are obviously finding ways

12   to get the drugs.  In many cases, it's coming

13   from illegitimate means."

14               You were aware that that was

15   going on in our country during this time

16   frame, even prior to this time frame,

17   correct, Mr. Morse?

18         A.    Yes.

19         Q.    And let's show a video that

20   Mr. Hartman inputted into this presentation.

21               (Whereupon, a video was played

22         aloud in the deposition room,

23         transcribed as follows.)

24               "MALE SPEAKER:  This yellow one

25         is for my postpartum depression.  This

```
 1          one, sciatica, whatever that is.  I

 2          got these after my hysterectomy and my

 3          prostatectomy, some ectomy.  And this

 4          guys is for the pain from my last hip

 5          replacement.  This orange one is...

 6              "VOICEOVER:  For teens, getting

 7          drugs can be as easy as opening your

 8          medicine cabinet.

 9              "FEMALE SPEAKER:  One night I

10          had taken maybe four different kinds

11          of pills.  I took Xanax, which was the

12          majority of what the pills were.  I

13          took a Roxy.  I took Percocets.

14              "VOICEOVER:  But once you're

15          in, all the different pills are dumped

16          into a pile or a bowl, something kids

17          call trail mix.

18              "FEMALE SPEAKER:  We put it on

19          the table.  We mix it up, and whatever

20          you got is what you got.

21              "VOICEOVER:  And what kids get

22          are fistfuls of pills.

23              "RAPPER:  Go on and slip me two

24          Xanax bars.  I'm ready to get fool.

25          Fifth of Crown to wash it down.  I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          downtown snapping rolls.  Ain't no

 2          shame up in my game.  In fact, I'm

 3          mentally deranged.  Oxy Cotton in my

 4          system.  Man, I'm feeling kinda

 5          strange.

 6               "TWO FEMALE SPEAKERS: Go on and

 7          slip me two Xanax bars.  I'm ready to

 8          get fool.  Fifth of Crown to wash it

 9          down.  I'm downtown snapping rolls.

10          Ain't no shame up in my game.  In

11          fact, I'm mentally deranged.  Oxy

12          Cotton in my system.  Man, I'm feeling

13          kinda strange.  Watch me choke about

14          this dope, Blueberry" --

15               (Whereupon the video playback

16          was terminated.)

17     BY MR. FULLER:

18          Q.    Are you aware, Mr. Morse, that

19     currently 2500 kids a day abuse prescription

20     pain medication for the first time?  Every

21     day in our country.

22               MR. PYSER:  Object to form.

23          A.    Would you repeat the question?

24     Am I aware?

25                         --oOo--
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. FULLER:

2         Q.    Yes, sir.

3         A.    I would not be aware of the

4    number.

5         Q.    Does that number shock you,

6    that in this country today, 2500 kids, just

7    today, while we're sitting here, will abuse

8    prescription pain meds for the first time?

9         A.    I would be shocked that kids

10   are using those medications inappropriately,

11   yes.

12             MR. PYSER:  I'm going to object

13        to form on the last one.

14             MR. FULLER:  Sure.

15   BY MR. FULLER:

16        Q.    Are you aware that as we sit

17   here today, 100 people will die due to

18   opioid-related overdoses?

19        A.    I don't know the number.

20             MR. PYSER:  Object to form.

21   BY MR. FULLER:

22        Q.    Does that number shock you?

23   While we're sitting here today doing this

24   deposition, over 100 people will die from

25   opioid-related overdoses.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  Object to form.

 2          A.     Does it shock me?

 3   BY MR. FULLER:

 4          Q.     Yes, sir.

 5          A.      It shouldn't happen.

 6          Q.      All right.  Let's turn to

 7   page 8.  And here's another slide from

 8   Mr. Hartman.  It's the Pharmaceutical Supply

 9   Chain - Diversion for Abuse.  And if you look

10   at his writings, the last paragraph he

11   does -- and again, it's blown up on the

12   screen for us -- says, "DEA estimates that

13   nearly 7 million Americans currently abuse

14   prescription drugs, up 80% from 2000.  10% of

15   high school seniors admit to abusing

16   painkillers.  Every day, 2500 youths (12-17)

17   abuse a prescription pain reliever for the

18   first time."

19                  That's quite disconcerting,

20   isn't it, Mr. Morse?

21          A.      The youths that are involved,

22   yes.

23          Q.      I mean, it's horrible what's

24   going on in our country.  Even back in

25   2006-2007, according to Mr. Hartman's
```

Highly Confidential - Subject to Further Confidentiality Review

1    PowerPoint.

2        A.    Where is the context?  Where

3    are these prescription pain medications

4    coming from?

5        Q.    And that's a great question.

6    So let's talk about this.  This isn't heroin

7    off the street, right?  This says it's

8    prescription pain meds.

9        A.    The way it's worded, it says

10   prescription pain medication.

11       Q.    This isn't cocaine, this isn't

12   marijuana, this isn't any of the illicit made

13   on the street.  This isn't meth, something we

14   can cook in our house, right?

15       A.    That's correct.

16       Q.    The prescription pain

17   medications have to come from a manufacturer,

18   correct?

19       A.    Yes.

20       Q.    This isn't something that Joe

21   Smith, the drug dealer, is making in his

22   house, right?

23       A.    Prescription pain -- yes,

24   that's correct.

25       Q.    It has to go through a

Highly Confidential - Subject to Further Confidentiality Review

1    wholesale distributor such as Cardinal,

2    right?

3         A.     In most cases, yes.

4         Q.     Through a pharmacy to an end

5    user.  Right?

6         A.     You left out something.

7         Q.     What have I left out?

8         A.     The end user to me is the

9    patient.

10        Q.     Yes.  I said to the pharmacy,

11   then to the end user.

12        A.     That end user received that

13   medication pursuant to a prescription from a

14   physician.  But the drug itself followed the

15   route as you've stated.

16        Q.     And are you aware that Cardinal

17   filled prescriptions that were not based on a

18   physician-patient relationship?

19        A.     Cardinal --

20             MR. PYSER:  Object to -- object

21        to form.

22             Go ahead and answer.

23        A.     Cardinal Health does not fill

24   prescriptions.

25                    --oOo--

1    BY MR. FULLER:

2         Q.    Are you aware that Cardinal was

3    providing opioids to pharmacies that it knew

4    or should have known were filling

5    prescriptions that were not based on a

6    legitimate doctor-patient relationship?

7         A.    I do not know that.

8         Q.    Are you aware, through any of

9    your investigations across the entire

10   country, of pharmacies that Cardinal was

11   providing, disbursing or dispensing pills to,

12   distributing pills to, that had been filling

13   fraudulent scripts?

14        A.    Not with certainty.

15        Q.    Okay.  We'll get to that later.

16              All right.  Let's go to 4085.

17              MR. PYSER:  Just for

18        Mr. Morse's benefit, when you're

19        finished with a document, just pile

20        them up over here.

21   BY MR. FULLER:

22        Q.    And Mr. Pyser is right, because

23   we may go back to some of these.  So if you

24   have them, and if he helps you keep them in

25   numerical order, that may be even easier.

1                    (Sotto voce discussion.)

2                    (Cardinal-Morse Exhibit 2

3          marked.)

4    BY MR. FULLER:

5          Q.    So the first document, which

6    is -- I'm sorry -- 3892, is going to be

7    Plaintiffs' Exhibit 1.  This is going to be

8    Plaintiffs' Exhibit 2, which is P1-4085.  And

9    again, like before, Mr. Morse, you'll see it

10   blown up on the screen.

11                  Have you seen this document

12   before today?  Government's Prehearing

13   Statement?

14         A.    I have not seen this document.

15         Q.    In the matter of Cardinal

16   Health vs. Attorney General Holder, are you

17   aware of that matter that is related to an

18   immediate suspension order that was executed

19   in Florida in February of 2012?

20         A.    I'm aware there was an order.

21         Q.    Okay.  And you're aware that

22   there was litigation related to that order?

23         A.    I was aware.

24         Q.    Were you aware that both

25   Cardinal employees, including your direct

1    report, Mr. Moné, provided declarations in

2    that matter?

3         A.    I did not, or I was not aware.

4         Q.    Fair enough.

5         A.    The way you stated it.

6         Q.    So this, in that litigation, is

7    the government's pretrial statement dated

8    February 22nd of 2012.

9              Do you see that?

10        A.    Yes.

11        Q.    Okay.  And if you'd turn to the

12   next page, it's going to be point 2, do you

13   see there it says, the "Issue"?  "Whether the

14   DEA should revoke the registration of

15   Cardinal Health Lakeland (Respondent)," so

16   whenever we see "Respondent" throughout this

17   document we'll know it's talking about

18   Cardinal Health Lakeland, okay?

19        A.    Okay.

20        Q.    "DEA Certificate of

21   Registration RC0182080 pursuant to 21 U.S.C.

22   2804(a)(4) [as read] and '23(b) and (e) and

23   deny any pending application for renewal or

24   modification of such registration, pursuant

25   to 21 U.S.C. 280 -- excuse me, 823(b) and

```
 1    (e)."

 2                 Did I read that correctly?

 3         A.      I don't see any differences.

 4         Q.      Okay.  And then it says,

 5    "Requested Relief.  The Government requests

 6    revocation of the Respondent's DEA

 7    Certificate of Registration," and it gives

 8    the number again, right?

 9         A.      Uh-huh.

10         Q.      And you're -- is that a yes?

11         A.      It is.

12         Q.      Okay.  And I apologize.  We've

13    just got to make sure we respond verbally.

14         A.      I understand.  I understand.

15         Q.      You're aware that during 2012,

16    Cardinal had -- the Lakeland facility, had

17    its DEA registration revoked for a second

18    time, correct?

19         A.      Yes.

20         Q.      Okay.  And just for your

21    background, so this is a pretrial statement

22    that was filed with the court based on a lot

23    of varying information.  And what we're going

24    to do is we're going to --

25         A.      Pretrial, okay.
```

1     Q.      -- we're going to walk through

2     some of this document because it's going to

3     get us to some facts and move us through some

4     set of different issues I want to talk to you

5     about, okay?

6     A.      Okay.

7     Q.      So we're going to be spending a

8     good bit of the day with this document.

9             Now, let's go back to -- yeah.

10    Let's go back to page 8.  And you see there

11    in the middle of the page, "In addition, DEA

12    offers a variety of conferences which are

13    open to DEA registrants, including

14    distributors.  In fact, the records indicate

15    that Cardinal Health sent three

16    representatives (including Mr. Moné and

17    Mr. Reardon)."  We already talked about

18    Mr. Moné.  You also know Mr. Reardon as well,

19    correct?

20    A.      I know him.

21    Q.      And what was his role in

22    relation to yours?

23    A.      Not in my area of control or

24    supervision at all, nor within my chain of

25    command.  I believe he was a vice president.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    His role --

 2         Q.      Did he also report, like

 3    Mr. Moné, to Mr. Hartman, to the best of your

 4    understanding?  Or do you know?

 5         A.      I do not know.

 6         Q.      Fair enough.

 7                 It says -- "to DEA's

 8    Pharmaceutical Conference on October 14 and

 9    15 of 2009.  This conference promotes a

10    close -- closer cooperation between the

11    pharmaceutical industry and the DEA."

12                 If you go down to the next

13    paragraph, it says, "The DEA also provides

14    presentations to and holds meetings with the

15    industry trade group, HDMA, or Healthcare

16    Distribution Management Association, of which

17    Cardinal is a member.  Between May 6 of 2008

18    and December 31st of 2011, DEA

19    representatives gave presentations to and

20    held meetings with the HDMA in Maryland, the

21    District of Columbia, Florida, and Virginia

22    on 11 occasions."

23                 Did you ever have an

24    opportunity to attend any of those meetings?

25         A.      No.
```

1      Q.      Did you have any meetings with

2   the DEA?

3      A.      Yes.

4      Q.      What meetings did you have with

5   the DEA, Mr. Morse?

6      A.      They came to the facility --

7      Q.      And when you say "the

8   facility," can you tell us which one?

9      A.      The facility would be the

10  corporate office.  I'm sorry.

11     Q.      Fair enough.

12     A.      Came to the corporate office.

13  The program was set up as a centralized

14  system.  We were aware of what was occurring

15  in all of the varying distribution centers.

16  We centralized the anti-diversion piece --

17     Q.      I'm sorry, you're not talking

18  about what the DEA did.  You're talking about

19  that Cardinal --

20     A.      Yes.  They came to Cardinal to

21  review the centralized process.  And there

22  were several people there to meet with them.

23  I was one of them.

24     Q.      Who else --

25     A.      I was one of the, I guess,

Highly Confidential - Subject to Further Confidentiality Review

1    subject matter experts there.

2         Q.    Who else was there from

3    Cardinal, if you can recollect?

4         A.    It wouldn't be a complete

5    recollection.

6         Q.    Give me what you can recall.

7    Was Mr. Moné there?

8         A.    Mr. Moné was there.

9         Q.    Do you recall whether

10   Mr. Hartman was there?

11        A.    This was in 2008?  Oh, wait,

12   no.  This discussion was -- I'm not sure that

13   Mr. Hartman was still with the company at the

14   time of this particular meeting.  I can't

15   remember exactly when it was.

16        Q.    So if Mr. Hartman wasn't there,

17   do we think it was later than 2010?

18        A.    I just don't remember.

19        Q.    Okay.

20        A.    Others -- I just don't

21   remember.

22        Q.    Do you remember what year this

23   meeting was?

24        A.    I do not remember.

25        Q.    Do you remember whether anyone

1    other than yourself and Mr. Moné was in

2    attendance?

3         A.    Nick Rausch was in attendance.

4    It was not a meeting where people were there

5    the entire time, so people called in when

6    they needed to be helped.  Nick Rausch was

7    there, I was there some.  Chris Forst was

8    there.  As far as names, that's all I can

9    remember.

10        Q.    And who was there from the DEA?

11        A.    I don't remember the names.

12        Q.    Do you remember how many of

13   them there were?  Was it more than one?

14        A.    Yes, more than one.

15        Q.    And this is the only time that

16   you met with the DEA?

17        A.    The only time I can recall.

18        Q.    Okay.  So let's go to page 9 of

19   this document, Cardinal Health's prior

20   suspension.  Do you see that section on

21   page 9?

22        A.    Yes.

23        Q.    Okay.  Now, you're aware, as we

24   talked about just a moment ago, of the prior

25   suspensions, are you not?

Highly Confidential - Subject to Further Confidentiality Review

1         A.     I was aware that they had

2    occurred.

3         Q.     And then if we read this, "The

4    DEA suspended operations at three Cardinal

5    Health distribution facilities, including

6    Respondent, through a series of Immediate

7    Suspension Orders (ISOs) issued between

8    November 28 of 2007 and January 30 of 2008

9    based on the DEA's conclusion that they

10   'failed to maintain effective controls

11   against diversion.'"

12              That would have been just

13   before your arrival at Cardinal.  Is that

14   correct?

15         A.     Correct.

16         Q.     If we turn the page, the next

17   full paragraph on that page, it says, "DEA

18   also issued an Order to Show Cause to revoke

19   the registration of Cardinal Health's

20   Stafford, Texas facility based on the

21   'failure to conduct appropriate due

22   diligence.'"

23              Do you see that there?

24         A.     I see it.

25         Q.     You're aware of that as well,

1    correct?

2         A.      From this document.

3         Q.      Were you not aware that there

4    was an order to show cause issued to the

5    Texas distribution center just prior to your

6    arrival at Cardinal?

7         A.      I would not have been aware of

8    that.

9         Q.      No one ever shared that

10   information, that --

11        A.      The information I had, that

12   three of them -- three facilities that had

13   their DEA registrations revoked.

14        Q.      And that was immediate

15   suspension orders, correct?

16        A.      Okay.  I'm not sure what you

17   call them.

18        Q.      Okay.  But that's where your

19   understanding is that the DEA took their

20   license or registration, correct?

21        A.      Yes.

22        Q.      Okay.  Well, I'll represent to

23   you an order to show cause is not an

24   immediate suspension order.  And in Stafford,

25   Texas, the DEA did not take their license.

1          It says, "In addition to the

2    three Cardinal Health distribution facilities

3    that received ISOs," or immediate suspension

4    orders, "the DEA also alleged Cardinal Health

5    'failed to maintain effective controls

6    against the diversion of controlled

7    substances' at three other facilities.  In

8    total, the DEA had reason to believe that 7

9    of Cardinal Health's 27 distribution

10   centers - roughly 25% - were not adhering to

11   their responsibilities as a registrant."

12          Do you see that there?

13          MR. PYSER:  Object to form for

14       the prelude to the question.

15       A.    I see it there.

16   BY MR. FULLER:

17       Q.    And did you not know that

18   before today?  Did no one ever share this

19   information to you when you came in to work

20   in the anti-diversion department at Cardinal

21   Health?

22       A.    Well, these allegations, I

23   believe that's what this is, isn't it

24   correct?  This is -- pre-hearing statements.

25   These are allegations.  I don't know whether

1    those are true.  All I know is that three

2    facilities --

3          Q.     I'm not asking you,

4    Mr. Morse --

5          A.     -- lost their registration.

6          Q.     -- whether it's true.

7                 MR. PYSER:  Counsel, please let

8          him finish his answer.

9          A.     I was aware that three

10   facilities had lost their registrations.

11   BY MR. FULLER:

12         Q.     Okay.  That's not what I'm

13   asking you, Mr. Morse.

14                I'm asking you if you know that

15   the DEA made allegations, made findings

16   related to 25% of Cardinal's distribution

17   centers in the effectiveness of controls

18   related to anti-diversion?

19         A.     Not until this time.

20                MR. PYSER:  Object to form.

21   BY MR. FULLER:

22         Q.     So even though you came with

23   whatever small piece of the anti-diversion

24   puzzle you had, no one had shared this

25   information before I shared it with you

Highly Confidential - Subject to Further Confidentiality Review

1    today, correct?

2         A.     Not in this detail.

3         Q.     Okay.  Well, this is just an

4    overview.  We'll get to the detail.

5              It says "Cardinal Health's 2008

6    Memorandum of Agreement with the DEA."  Are

7    you aware that they entered into a memorandum

8    agreement with the DEA, Mr. Morse?

9         A.     I was aware.

10        Q.     Have you reviewed that

11   document?  Let me strike that.  Let me ask it

12   differently.

13             Did you review that document

14   when it was entered back in 2008 as an

15   employee of Cardinal Health in the

16   anti-diversion department?

17        A.     I do not recall reviewing the

18   document.

19        Q.     Did someone give you an

20   educational seminar on the document and what

21   obligations Cardinal undertook based on that

22   document back in 2008?

23        A.     Seminar, no.  Discussion with

24   others, yes.

25        Q.     Who discussed it with you?

```
1          A.      Michael Moné.

2          Q.      And what did Mr. Moné tell you

3    about this 2008 memorandum agreement with the

4    DEA?

5          A.      He gave me the essentials that

6    I would need to fulfill my role.  That's all

7    I remember.

8          Q.      What were those essentials?

9    What did Mr. Moné tell you related to your

10   role in this memorandum agreement back from

11   2008?

12         A.      I can't recall all of that, no.

13         Q.      Can you recall any of it?

14         A.      There were obviously some

15   suspensions, that DEA made some allegations

16   that they were not fulfilling -- that

17   Cardinal was not fulfilling its role, and

18   that those allegations were something that --

19   that they directed through some kind of a

20   document that Cardinal agreed with to improve

21   their -- not improve, I guess.  Go to a

22   different way of monitoring our customers.

23   That started -- that was the reason I was

24   hired.

25         Q.      So -- and I'm a little
```

1    confused, because your main function at

2    Cardinal was the investigative side or site

3    visits related to pharmacies, right?

4         A.    To run -- yes.  To organize,

5    acquire and run a group of investigators,

6    yes.

7         Q.    And so you said Mr. Moné gave

8    you the essentials related to your part of

9    this puzzle.  So what were the actual

10    essentials that he gave you?

11         A.    That I would need to know to do

12    what I needed to do.  I didn't read the

13    document, so I'm not sure what pieces of that

14    he gave or didn't.

15         Q.    So when you say he gave you the

16    essentials related to this memorandum

17    agreement, you really don't know what he gave

18    you from the memorandum agreement because you

19    never saw the document, right?

20         A.    I never saw the document.

21         Q.    Fair enough.

22               Did you ever ask to see the

23    document?

24         A.    No.

25         Q.    Why not?  You had an

1    understanding at the time it was entered, and

2    I'll represent to you it was entered the

3    latter part of 2008, the time frame you would

4    have been at Cardinal, correct?

5         A.    If that time frame is correct,

6    yes.

7         Q.    You knew it was something that

8    Cardinal was doing to try to get in a

9    position to get its license to distribute

10   controlled substances back for these three or

11   four distribution centers, correct?

12        A.    Correct.

13        Q.    You knew at that point that

14   Cardinal, as you mentioned, was redoing, if

15   you will, the way it investigated -- or its

16   due diligence process, right?

17        A.    Yes.

18        Q.    So you never had the -- well,

19   let's back up.

20             In your role as an

21   investigator, information is power, right?

22             MR. PYSER:  Object to form.

23   BY MR. FULLER:

24        Q.    You need to have the right

25   information to conduct the appropriate

 1    investigation.  Can we agree on that?

 2         A.      The better the information, the

 3    better the investigation.

 4         Q.      And generally, the more

 5    information you have, the more of a full

 6    picture you can get.  Is that correct?

 7         A.      That would be correct.

 8         Q.      And so Cardinal had these

 9    allegations levied against them by the United

10    States Government related to 25% of its

11    distribution centers related to the

12    inappropriate distribution of controlled

13    substances and entered an agreement with the

14    U.S. Government about what obligations it was

15    going to undertake, and you didn't have an

16    opportunity or weren't given the opportunity

17    to review any of those documents, right?

18              MR. PYSER:  Object to form.

19         Misstates evidence.

20         A.    The --

21    BY MR. FULLER:

22         Q.      Were you given an opportunity

23    to review them?  That's all I want to know.

24         A.      I was not given.  It didn't

25    have to be given.  I wasn't given an

```
 1    opportunity.  I wasn't asked to read them.

 2         Q.    Did Mr. Moné -- well, there you

 3    go.  You were never asked to read them,

 4    right?  By Mr. Moné or Mr. Hartman or anybody

 5    else at Cardinal, were you?

 6         A.    No.

 7         Q.    No one ever asked you?

 8         A.    No.

 9         Q.    Okay.  Let's look at it, then.

10    Let's go to 4016, and I have my copy, I

11    think.

12         A.    Is that page 16, sir?

13         Q.    No, sir.  This is a new

14    document.

15         A.    Oh.

16         Q.    We were on Document 4065.  Now

17    we're going to 40 -- 4085, I'm sorry.

18              (Cardinal-Morse Exhibit 3

19         marked.)

20    BY MR. FULLER:

21         Q.    Mr. Pyser made me start too

22    early in the morning.  This is going to be

23    Plaintiffs' Exhibit 3, for the record.

24              Mr. Morse, P1-4016, if you look

25    at the first page, "Cardinal Health, Inc. vs.
```

1    Holder, Attachment 12 to the Defendants'

2    Opposition to Plaintiff's Motion for

3    Preliminary Injunction."

4             Do you see that?

5        A.    I see it.

6        Q.    That means a whole bunch of

7    gobbledegook to you, doesn't it?

8        A.    Yes, sir, it does.

9        Q.    All right.  If you turn to

10   page 2.  So it's Plaintiffs' Exhibit 3,

11   page 2.  You got that?

12       A.    Page 2.

13       Q.    Now --

14       A.    That's the page.

15       Q.    -- I'll tell you so we can try

16   to short-circuit some of this, if you flip

17   back to page 11 and 12 and look at those, and

18   the only thing I want you to confirm is that

19   I was right and this was entered into the

20   latter part of 2008, I think it's September

21   of 2008.  There's two pages because they

22   weren't signed together, they were signed

23   separately, between the Government and

24   Cardinal, Mr. Kerry Clark.

25             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      Yes.

2            Q.      And do you know who Mr. Kerry

3    Clark was during this time frame?

4            A.      No.

5            Q.      Do you not know that he was the

6    chairman and CEO of Cardinal Health?

7            A.      No.

8            Q.      So for at least my earlier

9    representation that the memorandum of

10   agreement was entered into in the latter part

11   of 2008, I was accurate on that, right?  And

12   this would have been a time frame that you

13   were employed there.

14           A.      Is this the memorandum of

15   understanding?

16           Q.      Well, if you look at the second

17   page, it says "Settlement and Release

18   Agreement" --

19           A.      Memorandum of Agreement, all

20   right.

21           Q.      -- "and Administrative

22   Memorandum of Agreement."

23                   Do you see that there?

24                   (Document review by witness.)

25           A.      Your question again?
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. FULLER:

2          Q.     I was right when I told you

3    earlier that this was entered in the latter

4    part of 2008 at a time you would have been

5    employed by Cardinal Health?

6          A.     This document was entered

7    during that time, yes.

8          Q.     And if you see in the

9    background -- and we're going to jump around

10   a few of these.  It says, "Cardinal is

11   registered with the DEA at 27 facilities as

12   distributors" --

13         A.     Where are we?

14         Q.     I'm sorry, second page.  The

15   background section.

16         A.     Background, okay.

17         Q.     Yes, sir.  You there now?

18         A.     I'm there.

19         Q.     All right.  And it says,

20   "Cardinal is registered with the DEA at

21   27 facilities as distributors of Controls II

22   through IVs, controlled substances under

23   provisions of the Comprehensive Drug Abuse

24   and Prevention Act of 1970."

25                Do you see that?

```
 1              A.     Yes.

 2              Q.     And then if you go to

 3     Exhibit A, which is on page -- starts on

 4     page 14, you'll see a listing on page 14 and

 5     page 15 of the 27 distribution centers that

 6     Cardinal operated during this time frame.

 7                     Do you see that there?

 8              A.     I see the list.

 9              Q.     Okay.  And those were the

10     distribution centers that you had a role in

11     providing the anti-diversion supervision for,

12     correct?

13                     MR. PYSER:  Object to form.

14              A.     No.

15     BY MR. FULLER:

16              Q.     Those were not the distribution

17     centers in which you oversaw the

18     distributions -- I shouldn't say oversaw --

19     that you assisted with the delivery to

20     pharmacies to try to prevent anti-diversion?

21              A.     These were the pharmacies that

22     were delivering prescription drugs, yes.

23              Q.     And I just want to --

24              A.     The answer -- the answer to

25     your question is yes.  Not supervised these
```

```
 1    facilities.  Clear?

 2         Q.    And your answer, I just want to

 3    make sure we're correct.  It says "These were

 4    the pharmacies."  These weren't the

 5    pharmacies; these were the distribution

 6    centers --

 7         A.    I'm sorry.

 8         Q.    -- which shipped to pharmacies.

 9    Is that right?

10         A.    That's correct.  That's

11    correct.

12         Q.    Okay.  I just want -- when

13    somebody is reading it in the record, I just

14    want to make sure that we're as accurate as

15    we can be.

16         A.    If that was me, that was

17    misspoken.

18         Q.    Okay.  And if you go back to

19    page 4 of this document, you see the

20    "Obligations of Cardinal"?

21         A.    Yes, I do.

22         Q.    And before today, you have not

23    seen this.  Is that right?

24         A.    The MOU?  This is the 2008 MOU

25    or MOA or whatever you call it.
```

1    Q.    I know what you're talking

2    about.  I mean, you testified earlier --

3    A.    I do not recall ever seeing

4    this.

5    Q.    Fair enough.

6         So under (a), it says,

7    "Cardinal agrees to maintain a compliance

8    program designed to detect and prevent the

9    diversion of controlled substances under the

10   CSA and applicable DEA regulations."

11        Do you see that?

12   A.    Yes.

13   Q.    Are you aware of what those

14   are, the CSA and applicable DEA regulations?

15   A.    The DEA regulations, yes.  The

16   CSA, I'm not sure I can point to a specific

17   section.

18   Q.    What is your understanding of

19   the regulatory requirement upon Cardinal

20   because it chose to become a registrant

21   related to the prevention of diversion of

22   controlled substances?

23        MR. PYSER:  Object to form.

24   BY MR. FULLER:

25   Q.    Yeah, and that was a bad

1    question.  Let me ask it differently.

2              No one forced it upon Cardinal

3    to become a registrant with the DEA, did

4    they?

5         A.    I would assume not.

6         Q.    Cardinal made a choice to

7    become a registrant and provide these

8    services that registrants can provide to

9    pharmacies and drugstores across the country,

10   correct?

11        A.    Yes.

12        Q.    I want to share a tidbit of

13   information and see if you had known this.

14             Did you know that Cardinal

15   strategically placed its distribution centers

16   so that it can cover most of the entire

17   United States of America within a 6-hour

18   drive from one of the distribution centers

19   somewhere around the country?

20        A.    The first part of your question

21   was did I know?  Not that rest of the

22   information, no.

23        Q.    What did you know?

24        A.    That they placed them where

25   they could be most efficient in the delivery

1    of the controlled substances -- of

2    prescription drugs.

3         Q.    I think it was Mr. Hartman that

4    relayed to me that -- and there's some

5    overlap and there's some areas that it

6    doesn't quite work out, but they were

7    strategically placing them so they could get

8    anywhere --

9         A.    Delivery.

10        Q.    -- within a 6-hour drive.

11        A.    That's important.

12        Q.    So there you go, you learned

13   something new.

14             MR. PYSER:  Object to form.

15             MR. FULLER:  Well, it was new.

16             MR. PYSER:  Just don't need the

17        commentary.

18   BY MR. FULLER:

19        Q.    So Cardinal took on this

20   obligation under the Controlled Substances

21   Act when it became a registrant, correct?

22        A.    Yes.

23        Q.    And what I want to know from

24   Mr. Morse is, what is your understanding what

25   that obligation is under the CSA and the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    applicable regulations?

 2         A.     As it applies to a compliance

 3    program to prevent --

 4         Q.     Anti-diversion, yes, sir.

 5         A.     To detect and prevent.

 6         Q.     And whether you want to start

 7    with the reg- --

 8         A.     It's three sentences.

 9         Q.     Three sentences, okay.  Hold

10    on.

11         A.     It's 21 CFR 1301.47(b), I

12    believe.

13         Q.     21 CFR -- go ahead.

14         A.     21 CFR 1301, I believe it's

15    .47(b).

16         Q.     I think it's 74?

17         A.     74(b)?

18         Q.     Yes, sir.

19         A.     Thank you.

20         Q.     And what's the requirement, to

21    your understanding, under 21 CFR 1301.74(b)?

22         A.     The requirements for Cardinal

23    under that section?

24         Q.     Yes, sir.  Yes, sir.

25                MR. PYSER:  Objection to this
```

1           line of questioning to the extent it's

2           a legal conclusion.

3           A.     That rule is interpreted by

4    attorneys, I'm not an attorney, but from a

5    non-attorney standpoint, looks like the

6    obligation I see in that is to design and

7    operate a system to identify suspicious

8    orders, and, when identified, report those to

9    DEA.  And I think it's a certain office,

10   geographically.

11   BY MR. FULLER:

12          Q.     Okay.  So it's your

13   understanding that the Code of Federal

14   Regulation under 1301.74(b), assuming I was

15   right and it's 74 and not 47 --

16          A.     74(b), that is correct.

17          Q.     -- was to design and operate a

18   system to identify suspicious orders.  That's

19   the first part of it, correct?

20          A.     That's an obligation.

21          Q.     Not only do we have to design

22   that system but we have to operate that

23   system, right?

24          A.     Yes.

25          Q.     Because you would agree with me

1    that it doesn't do any good to design it if

2    we're not going to operate it, correct?

3         A.    Yes.

4         Q.    Okay.  And then when our system

5    identifies a suspicious order, we have to

6    report that order to, I think you're right,

7    the local DEA office.

8         A.    Yes.  It says field divisional

9    office or something like that.

10        Q.    Something like that.  But we

11   have to report it to someone at the DEA,

12   whatever the person is that's required,

13   correct?

14        A.    A suspicious order has to be

15   reported to DEA.

16        Q.    Okay.  Do you know whether or

17   not Cardinal has an obligation to maintain

18   effective controls to prevent diversion of

19   controlled substances?

20             MR. PYSER:  Object to form.

21        A.    Where?

22   BY MR. FULLER:

23        Q.    I'm asking you whether you know

24   or not.

25        A.    Within their own facilities?

1    Absolutely.  Within the pharmacies,

2    hospitals, doctors that we distribute to?  I

3    don't see that in that rule.

4         Q.    So under your --

5         A.    Our responsibility is to have a

6    system, identify them and report them.

7    Suspicious orders.

8         Q.    And when we talk about

9    suspicious orders, what is your understanding

10   of what a suspicious order is?  Do you know?

11        A.    My understanding of a

12   suspicious order?  That's defined -- that's

13   defined in that rule in the last sentence.

14        Q.    So there's no question about

15   what it is.  Suspicious order is defined,

16   right?

17        A.    It's defined.  It's right

18   there.

19        Q.    Orders of abnormal size,

20   pattern and frequency, correct?

21        A.    Size, frequency and pattern,

22   yeah.  I think it's size, pattern and

23   frequency is the proper order.

24        Q.    And what we're looking for when

25   we talk about suspicious orders are orders

Highly Confidential - Subject to Further Confidentiality Review

1    that could be diverted.  We're looking for

2    suspicion of diversion, right?

3         A.    No, we're looking for

4    suspicious orders as that's defined right

5    there.

6         Q.    So we're not looking for orders

7    that potentially may be diverted.  Is that

8    your testimony to the jury?

9              MR. PYSER:  Object to form.

10        A.    That's not my testimony to the

11   jury.

12   BY MR. FULLER:

13        Q.    Well, so what are we looking

14   for when we're looking for suspicious orders?

15   Suspicious orders don't include orders that

16   may be diverted, or do they?

17        A.    That rule is very specific.  Of

18   unusual size, frequency, or deviating from

19   a -- substantially from a pattern.  It's very

20   clear.

21        Q.    No ambiguity in your mind,

22   right?

23        A.    Those are the things we should

24   be looking for.

25              MR. PYSER:  We've been going

```
1              about an hour.  Let's take a break.

2                   MR. FULLER:  That's fine.

3                   THE VIDEOGRAPHER:  Okay.  Off

4         the record at 9:13 a.m.  This

5         concludes Tape 1.

6                   (Recess taken, 9:13 a.m. to

7         9:27 a.m.)

8                   THE VIDEOGRAPHER:  All right,

9         stand by.  All right.  We're back on

10        the record at 9:27.  This begins

11        Tape 2.

12   BY MR. FULLER:

13        Q.    So, Mr. Morse, we just took a

14   break or just came back from a break, and I

15   think you and I were starting to discuss the

16   obligations upon Cardinal as it relates to

17   being a registrant for controlled substances,

18   correct?

19        A.    I believe that's where we were.

20        Q.    And you had explained to me

21   that under the Code of Federal Regulation,

22   Cardinal has obligations related to

23   suspicious orders which are orders of

24   abnormal size, pattern and frequency, whether

25   it's in that order or some other order,
```

1    correct?

2         A.    Identifying suspicious orders,

3    and that's how it's defined in that

4    particular rule.

5         Q.    And then I asked you about any

6    requirement to maintain effective controls

7    against diversion.

8              Do you remember that?

9         A.    Yes.

10        Q.    And you indicated -- well, let

11   me ask the question again because I'm not

12   sure that I recollect your full answer.

13             Does Cardinal have a regulatory

14   or statutory obligation to maintain effective

15   controls against diversion?

16             MR. PYSER:  Object to form.

17        A.    Yes.

18   BY MR. FULLER:

19        Q.    And what is your understanding

20   of that obligation?

21             MR. PYSER:  Object to form.

22        A.    Section 1301.74(b).

23   BY MR. FULLER:

24        Q.    And that's it?

25        A.    There are other requirements, I

1    understand, with respect to Cardinal

2    protecting the controlled substances that are

3    within their facilities, which is outside my

4    realm.

5         Q.    You have to speak up because I

6    can barely hear you.  And we've got a --

7              MR. PYSER:  Yeah, I think if

8         the folks on the phone --

9              MR. FULLER:  Make sure you're

10        muting your phone.  Sorry for

11        speaking --

12             MR. PYSER:  We're getting a lot

13        of feedback from somebody's phone.

14        A.    Where were we?

15   BY MR. FULLER:

16        Q.    I apologize.

17              Maintaining effective controls

18   against diversion, you were referring to

19   vault security and things like that, correct?

20        A.    Things well beyond what is

21   anti-diversion, so your question was very

22   broad.  So yes, we do have responsibilities

23   in those areas.

24        Q.    Fair enough.

25              So maintaining effective

1    controls against diversion, how does that

2    play into anti-diversion?

3         A.    To anti-diversion?  The

4    requirement, as I understand it, is spelled

5    out in that particular three-sentence rule.

6    It says we are to operate a system, plan --

7    design and operate a system to identify

8    suspicious orders, and then it defines

9    suspicious orders.

10         Q.    So in your mind, as a director

11    of anti-diversion, maintaining effective

12    controls against diversion only means

13    complying with CFR 1301.74(b), correct?

14         A.    That's my understanding of the

15    legal requirement but that would be a legal

16    question, I'm assuming.  But that's how my --

17    my understanding would be that's the legal

18    requirement.

19         Q.    Okay.  And you mentioned

20    earlier, I think, and I just want to make

21    sure that we're on the same page, all right?

22    I think earlier you testified that there was

23    other issues of maintaining effective

24    controls outside of anti-diversion.  Is that

25    correct?  Sort of the physical security, for

1    example, of the distribution center?

2         A.    Yes.  That would be, again,

3    diversion from a Cardinal facility.

4         Q.    But as it relates to

5    anti-diversion, the only requirement under

6    maintaining effective controls against

7    diversion is compliance with the suspicious

8    order requirements under the CFR?

9              MR. PYSER:  Object to form.

10        Object to the line of questioning.  It

11        calls for a legal conclusion.  Wait,

12        wait for me to finish before you begin

13        your answer.

14             Go ahead.  Go ahead.

15             THE WITNESS:  Are you finished?

16        Okay.

17

18        A.    That -- that rule is the rule

19   that we used, I used, in designing our

20   investigative process.  That's --

21   BY MR. FULLER:

22        Q.    That rule requires you to

23   report orders of abnormal size, pattern and

24   frequency.  Is that right?

25        A.    Suspicious orders of size --

1    unusual size, pattern or deviating from the

2    frequency.  Yes, I would say that's exactly

3    what it says.

4         Q.    Okay.

5               MR. PYSER:  Sorry.

6               (Discussion off the

7         stenographic record.)

8    BY MR. FULLER:

9         Q.    Okay.  So going back to 4016 on

10   page 4, in the agreement that Cardinal

11   entered with the U.S. Government says that

12   "Cardinal agrees to maintain a compliance

13   program designed to detect and prevent

14   diversion of controlled substances as

15   required under the CSA" -- you know that as

16   the Controlled Substance Act, is that

17   correct, Mr. Morse?

18        A.    I do.

19        Q.    -- "and applicable DEA

20   regulations."  Right?

21        A.    Yes.

22        Q.    It's not both or one or the

23   other, is it?

24        A.    The DEA -- that's correct, what

25   it says.

1    Q.    It says both.  It says "the CSA

2    and applicable DEA regulations."  Did I read

3    that correctly?

4    A.    You did.

5    Q.    That's what Cardinal agreed to,

6    at least according to this document.  And you

7    hadn't seen that before I showed it to you

8    today.  Is that fair?

9    A.    I don't remember ever having

10   reviewed it.

11   Q.    Okay.  Now, there's some other

12   agreements, but let's go to section (f),

13   which is on the next page.

14   A.    In this same section?

15   Q.    Yes, sir.

16   A.    Obligations?

17   Q.    So you see there it says,

18   "Cardinal agrees within 180 days of the

19   Effective Date of this Agreement," which we

20   know it was signed in September of '08,

21   correct?

22   A.    This was in '08.  I'm sorry,

23   I've got to refresh my memory here.

24   Q.    Fair enough.

25   A.    It was in '08, that's correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      September of '08, right?

2      A.      Yes.

3      Q.      Okay.  It says that "Cardinal

4   agrees within 180 days of the Effective Date

5   of this Agreement it will review

6   distributions of oxycodone, hydrocodone,

7   alprazolam and phentermine to retail

8   customers and pharma- -- excuse me -- and

9   physicians for the 18-month period

10   immediately preceding the execution of this

11   Agreement and identify any current customer

12   whose purchases of oxycodone, hydrocodone

13   alprazolam and phentermine exceeded the

14   thresholds established in its compliance

15   program on the date of such -- excuse me --

16   on the date of such review."

17              Do you see that?

18      A.      I see that.

19      Q.      Are you aware of whether

20   Cardinal did that?

21      A.      I am not aware.  I believe that

22   there were others responsible for that.

23      Q.      You weren't responsible for

24   this to the best of your recollection,

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      No.

 2            Q.      And what this -- if we go on,

 3      it says, "To the extent it has not otherwise

 4      done so, Cardinal shall conduct an

 5      investigation for each customer where such

 6      review reveals purchasing patterns

 7      substantially deviating from the normal

 8      purchasing patterns."

 9                    Do you see that?

10            A.      Yes.

11            Q.      And that's part of the

12      definition of "suspicious order," isn't it?

13      Size, pattern and frequency, correct?

14            A.      Please.  That's one of the

15      elements, yes.

16            Q.      Okay.  So what Cardinal was

17      required to do, and I know at least according

18      to you, you weren't involved, is that from

19      September of '08 they were to look back 18

20      months, which I think we can agree would take

21      us to sometime about March of '06, right?

22            A.      If the math is right.

23            Q.      And I do struggle with math.

24      But it would take us back to March of '06 for

25      our look-back where we have to review our
```

Highly Confidential - Subject to Further Confidentiality Review

1    customers for threshold breaches and

2    suspicious orders, right?

3         A.    Threshold breaches?

4         Q.    Yes, sir.  It says --

5         A.    Exceeds the thresholds, right.

6         Q.    -- "exceeds the thresholds" and

7    then review them for patterns substantially

8    deviating from normal purchasing patterns --

9         A.    Correct.

10        Q.    -- which would be suspicious

11   orders.

12        A.    Correct.

13        Q.    And then we need to take the

14   appropriate action as required by this

15   agreement.

16             Do you see that section there?

17        A.    I see that.

18        Q.    Okay.  But you don't have any

19   recollection and no one provided you with any

20   of this information, if it was done, correct?

21        A.    In my role, no.

22        Q.    Okay.  Let's turn to page 31 of

23   that same document.

24             And to your recollection,

25   Mr. Morse, you haven't seen any of the

1    immediate suspension orders or the order to

2    show cause that was issued here in Stafford,

3    Texas, correct?

4         A.    Not that I recall.

5         Q.    Okay.  And you don't know any

6    of the facts relating to those allegations

7    either, do you?

8         A.    Not that I recall.

9         Q.    In prepping for your

10    deposition, did you look at any of these

11    documents that are in front of you?  And by

12    "these documents," I mean this 2008

13    memorandum agreement and the attachments

14    thereto.

15             MR. PYSER:  Object to form.

16    I'm going to instruct you not to

17    answer the question.  You can't ask

18    the witness what he reviewed with

19    counsel.

20             MR. FULLER:  I didn't ask if he

21    reviewed it with counsel.  I just

22    asked if he reviewed it prior to his

23    deposition.  And I think I'm allowed

24    to ask that question.

25             MR. PYSER:  To the extent you

Highly Confidential - Subject to Further Confidentiality Review

1              reviewed any documents outside of

2              instructions from counsel or with

3              counsel, you can answer the question.

4         A.     No.

5    BY MR. FULLER:

6         Q.     No, you did not?

7         A.     I did not.

8         Q.     Okay.  So if you're on page 31,

9    this is -- it was issued January 30th, 2008.

10             Do you see that stamp on it?

11        A.     I do.

12        Q.     And it's in the matter of

13   Cardinal Health, and it gives the address in

14   Stafford, Texas.  Are you aware of where

15   Stafford, Texas is, Mr. Morse?

16        A.     Yes, roughly.

17        Q.     Okay.  And it says "Order to

18   Show Cause."  Do you see that?

19        A.     Yes.

20        Q.     And if you go down to number 2

21   in the allegations or the facts, it says,

22   "Registrant distributed massive amounts of

23   particular controlled substances to retail

24   pharmacy customers without maintaining

25   adequate controls to detect or prevent the

1    diversion of controlled substances."

2              Do you see that there?

3        A.    I see that.

4        Q.    Now, you agree, would you not,

5    that Cardinal has an obligation to maintain

6    effective controls or maintain adequate

7    controls to detect and prevent the diversion

8    of controlled substances, don't you?

9              MR. PYSER:  Object to form.

10       A.    They're required to follow the

11   requirements of that particular -- as that

12   relates to that particular regulation.

13   BY MR. FULLER:

14       Q.    So only identifying suspicious

15   orders, according to Mr. Morse.  Right?

16             MR. PYSER:  Object to form.

17       A.    Re- -- you said only

18   identifying.  No.

19   BY MR. FULLER:

20       Q.    Identifying --

21       A.    Identifying and reporting.

22       Q.    -- and reporting suspicious

23   orders.  So let me make sure that we're on

24   the same page and the jury understands.

25             According to Mr. Morse's

1    understanding, Cardinal has no obligation

2    under that regulation to prevent the shipment

3    of suspicious orders, or do they?

4                    MR. PYSER:  Object to form.

5          A.     That doesn't talk about

6    shipment.

7    BY MR. FULLER:

8          Q.     Okay.  Do you believe that, in

9    your role as a director of anti-diversion,

10   that maintaining effective controls against

11   diversion would include shipping orders that

12   have been deemed to be suspicious?

13                   MR. PYSER:  Object to form.

14         A.     My understanding was there was

15   a change in DEA guidance.

16   BY MR. FULLER:

17         Q.     I'm not asking about a change

18   in DEA guidance.  I'm asking Mr. Morse --

19         A.     Then I'll rely on the rule.

20         Q.     You'll rely on what?

21         A.     21 CFR 1304 -- 1301.74.

22         Q.     And based on that reading,

23   Mr. Morse's reading of that Code of Federal

24   Regulation, Cardinal did not have an

25   obligation to stop a shipment of a suspicious

```
 1    order that could be diverted, correct?

 2              MR. PYSER:  Object to form.

 3         Calls for a legal conclusion.

 4              You can answer.

 5              THE WITNESS:  I can answer?

 6              The definition of suspicious

 7         order, once an order was determined to

 8         be suspicious, Cardinal Health

 9         reported it.

10    BY MR. FULLER:

11         Q.    Did Cardinal still ship it?

12         A.    No.

13              MR. PYSER:  Object to form.

14         A.    Not while I was there.

15    BY MR. FULLER:

16         Q.    So under your time frame there,

17    as of at least February-March of 2008, it's

18    your understanding that Cardinal did not

19    ship --

20         A.    It's my understanding that they

21    stopped shipment when it was determined that

22    we have a -- have suspicious orders.

23         Q.    Prior to your time there, do

24    you know whether they shipped suspicious

25    orders?
```

1          A.      I can't speak to times before I

2     was there.

3          Q.      Do you not --

4               MR. PYSER:  Object to form.

5     BY MR. FULLER:

6          Q.      Did you not ask anybody what

7     the process was before your arrival or what

8     they were doing when you arrived?

9          A.      I think it was -- might have

10    been mentioned to me, but it was not germane

11    to the process that I was asked to be

12    involved with.

13         Q.      And that was the investigation

14    of pharmacies around the country, correct?

15         A.      As assigned.

16         Q.      When you say "as assigned,"

17    meaning whichever ones you are assigned to go

18    visit?

19         A.      Yes.

20         Q.      Okay.  So let's turn to the

21    next page, page 32.  Have you ever heard of

22    Richmond Pharmacy here in Texas?

23         A.      Which number are we?

24         Q.      Number 7 on that page.

25         A.      7, okay.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Richmond Pharmacy, have you

2     ever heard of that?

3          A.      It does not ring a bell.

4          Q.      Okay.  And again, this is

5     before your arrival and this is the earlier

6     memorandum agreement and immediate suspension

7     order, right?

8          A.      Correct.

9          Q.      Okay.  And Cardinal got this in

10    January of 2008, shortly before you began

11    your position with Cardinal, right?

12         A.      That's what the document shows,

13    yes.

14         Q.      Okay.  So number 7, "From

15    January 2nd, 2007 through September 11th,

16    2007, Registrant," meaning Cardinal,

17    "distributed approximately 1,381,500 dosage

18    units of hydrocodone to Richmond Pharmacy, or

19    approximately 160,000 dosage units each

20    month."

21               Is that -- based on your

22    experience, is that number abnormally large?

23         A.      Without the context, I cannot

24    answer that question.

25         Q.      And with context, you'd need to

 1    know the size of the pharmacy and the type of

 2    the pharmacy, right?

 3        A.    Among -- among others, yes.

 4        Q.    What other things would go into

 5    determining it?

 6        A.    At this time, I don't know what

 7    they used.

 8        Q.    I'm not asking at this time.

 9    I'm asking Mr. Morse -- I asked you if this

10    is abnormally large.  You said you need

11    context --

12        A.    I can't tell in this time --

13        Q.    Hold on, let me finish my

14    question.

15        A.    Pardon me.

16        Q.    You said you needed context and

17    I think I threw out there we need to know the

18    size of the pharmacy and the type, meaning

19    whether it's a retail, chain, hospital,

20    whatever, right?  Those are some of the

21    things that are considered when setting

22    thresholds for different types of pharmacies,

23    correct?

24        A.    Setting thresholds?  Setting of

25    thresholds was not done by my unit and my --

1    so I'm not sure exactly what all goes into

2    that.  I can't speak to it.

3         Q.    Okay.  When you did your

4    investigations, some of the things you looked

5    at is the type and the size of the pharmacy,

6    correct?

7         A.    Yes.

8         Q.    Okay.

9         A.    After this time.

10         Q.    Yeah, I don't care about time

11    frames right now.  All right?

12         A.    I do.

13         Q.    Well, let me ask you, was there

14    some significant change in pharmacies and

15    illicit drug use on the street that would

16    have changed what should be considered when

17    investigating a pharmacy?

18              MR. PYSER:  Object to form.

19         A.    Not that I can think of at this

20    point.

21    BY MR. FULLER:

22         Q.    Okay.  So Mr. Morse is going to

23    go investigate this pharmacy and he was going

24    to want to know the type of pharmacy,

25    correct?

1      A.      That would be one of the

2    things, yes.

3      Q.      Size of the pharmacy, right?

4      A.      Yes.

5      Q.      And you can base size on a

6    couple of different things.  You can base it

7    on number of scripts, dollars.  What did you

8    normally utilize when you're looking at the

9    size of the pharmacy?

10     A.      You're asking me to comment

11   on --

12     Q.      No, sir, right now --

13     A.      -- as I understand, this

14   section -- are you talking about my time or

15   the time in 2007?

16     Q.      Sir, I'm asking Mr. Morse --

17   listen to my question.  I'm asking if

18   Mr. Morse is going to go do an investigation,

19   I want to know what you would be looking at.

20   Okay?  What Mr. Morse would be looking at.

21           How many investigations have

22   you done over the years?  Hundreds, right?

23     A.      I've done quite a few.

24     Q.      Maybe even thousands.

25     A.      Me personally, no.  I ran the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    team.

 2          Q.     Can we stick with hundreds?

 3          A.     I ran the team, yes.

 4          Q.     Fair enough.

 5                 So I want to know what

 6    Mr. Morse would look at.  We talked about the

 7    type of pharmacy, and you agreed with that.

 8    We talked about the size, and I asked you

 9    specifically what factor did you use to

10    determine size; and your answer is?

11          A.     To determine size.  There are

12    sev- -- let me ponder that for a moment.

13                 We can get an indication of

14    size by what we sell to the customer, which

15    may or may not be complete -- complete what

16    the customer receives; the quantity or number

17    of prescriptions dispensed by the pharmacy,

18    which has to be self-reported; the -- when

19    we're on site, we can take a look at the

20    operation itself, how the pharmacy is run,

21    and what type of pharmacy it is, which would

22    help us determine the size and quantity that

23    they would need.

24                 So the question was

25    specifically how would I determine the size.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Those would be some of the indicators.

2         Q.      Okay.  And you're well aware

3    that you can request from a pharmacy a drug

4    utilization report, right?

5         A.      Yes.  You can request from the

6    pharmacy.

7         Q.      Sure.  And one of the red flags

8    in your industry is if they don't provide you

9    the information that you requested, it sets

10   off a red flag.  Correct?

11        A.      It would be an area of concern.

12        Q.      The policy and procedure --

13        A.      Yes.

14        Q.      -- at Cardinal was to get drug

15   utilization reports.

16        A.      Yes.

17        Q.      It was one of the things that

18   you required from most of your pharmacies.

19   Right?

20        A.      During my tenure, yes.

21        Q.      Because you want to know -- one

22   of the things we try to prevent is

23   distributor shopping, from them using

24   multiple distributors to get more than they

25   may need or may should have, correct?

```
1              A.      We can't get insight into other

2    distributors.  I'm not sure where -- how you

3    can -- from information of a dispensing

4    report, how you can determine where the drugs

5    came from.

6              Q.      Well, let me ask you this:  We

7    have Mike's Pharmacy you've been servicing

8    for a year, and you get a drug utilization

9    report and they've dispensed 50,000 oxycodone

10   in the past month but you've only distributed

11   them 10,000.  That would be a good indication

12   they're getting oxycodone from somewhere

13   else, right?

14             MR. PYSER:  Object to form.

15   BY MR. FULLER:

16             Q.      You're the investigator.

17             A.      Yes.

18             Q.      You're not going to let that

19   one get by you, are you?

20             A.      Yes, you're correct.

21             Q.      Okay.  So we can get an idea

22   from this information if they are distributor

23   shopping or using more than one distributor,

24   right?

25             A.      Provided the information
```

1    they've given to us in the report is

2    accurate.

3          Q.      Absolutely.  And that's part of

4    your job is to make sure you're getting the

5    best information you can.

6          A.      To request and try to get

7    the -- yes.  Yes.

8          Q.      Absolutely.

9          A.      But they -- the -- in the final

10   decision of what we receive, that rests in

11   the hands of that customer.

12         Q.      Sure.  Sure.

13         A.      What they actually provide.

14         Q.      All right.  So when we're

15   trying to determine size, we can look at the

16   drug utilization report, we can look at the

17   sales to Cardinal, if they have a sales

18   history with Cardinal, right?

19         A.      If they have a sales history.

20         Q.      What else do we want to know?

21         A.      With respect to?

22         Q.      Looking at a pharmacy, for

23   investigating a pharmacy.

24         A.      May I get clarification on the

25   question?  Are you asking what are the things

1    we try to look for in the entire

2    investigation, or are we just strictly

3    talking here about size?

4           Q.      Well, we started --

5           A.      You started on size.

6           Q.      -- by talking about the huge

7    amount of distribution that was going into

8    Richmond Pharmacy.

9           A.      Uh-huh.

10          Q.      And we talked about what we

11   would need to know and we talked about that

12   we would need to know the type of pharmacy.

13   We've talked about size, and now we

14   rabbit-trailed into size a little bit to

15   determine what factors we could consider when

16   we're looking at the size to try to figure

17   out the size, right?

18          A.      Yep.

19          Q.      And we talked about drug

20   utilization reports, we talked about the

21   sales to Cardinal, that kind of stuff,

22   correct?

23          A.      We're asking me about

24   information that I did during -- and was

25   required of my investigators during my time.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Yep.

2      A.      And trying to relate it back in

3   2007, and I don't know exactly what they did

4   in 2007.  I'm assuming they did some of that,

5   but that's a total assumption and I have no

6   earthly idea.  Excuse me.  No idea.

7      Q.      Mr. Morse, did you hear one

8   question where I asked you what they did in

9   2007?

10      A.      You premised it -- you premised

11   it on this.

12      Q.      Hold on.  But did I ask you

13   what Cardinal did in 2007?

14          MR. PYSER:  Object to form.

15   BY MR. FULLER:

16      Q.      I have not.

17          MR. PYSER:  Object to form.

18   BY MR. FULLER:

19      Q.      If you'll listen to my

20   question, this will go more smoothly and

21   we'll get out of here earlier.  But if you

22   rephrase my question a different way, that

23   doesn't work so well because then we're

24   not -- you're not answering what I'm asking.

25          So I'm asking what Mr. Morse

1    would do.  Now, you didn't come into the

2    position until 2008.  Completely understand

3    that.  You've made that abundantly clear, so

4    you can stop giving me the speech of "I

5    wasn't there in 2007, I don't know what

6    Cardinal did in 2007."  I get it.

7              But your job was an

8    investigator less than, I don't know, six

9    months, a year, so the pills going, at least

10   according to this, into Richmond ended in

11   September.  You were in your role less than

12   six months into the future, right?

13             MR. PYSER:  Object to form.

14        A.    I was in my role six months

15   into the future?

16   BY MR. FULLER:

17        Q.    Yeah.  You started with

18   Cardinal in six, seven, eight months --

19        A.    Right.

20        Q.    -- from then, right?

21        A.    Yeah.  I had to build an

22   investigative team.  We didn't have any

23   investigators.  We were working on it.

24        Q.    Well, fair enough.  You would

25   agree that Cardinal didn't have an

1    investigative team when you started.  It was

2    something that you had to build, correct?

3           A.    I don't know what they did

4    before.  They had a system.  They were

5    reviewing pharmacies and they were visiting

6    pharmacies.  I was asked to build a different

7    team.

8           Q.    So, Mr. Morse, are you changing

9    your testimony, and I'm reading it off the

10   record, that "We didn't have any

11   investigators, we were working on it"?

12              MR. PYSER:  Object to form.

13          A.    Misspoken.

14   BY MR. FULLER:

15          Q.    So you're changing your

16   testimony here.  That's fine, go ahead.

17          A.    It was mis -- it was a

18   misspeak.

19          Q.    So you had investigators?

20          A.    During my time, we were working

21   on putting together an investigative team.  I

22   did not have anybody come over from the

23   previous investigative team.

24          Q.    Do you know if there was a

25   previous investigative team?

1          A.      They had individuals that

2    visited pharmacies.   They had a program.

3    They had a process.   How it worked, how many

4    they had, I do not know.

5          Q.      So do you even know if they had

6    investigators?

7          A.      They had people that visited

8    pharmacies.

9          Q.      Not my question.

10          A.      I know that.

11          Q.      I didn't ask that.  I asked if

12    they had investigators.

13          A.      I don't know the term.

14                MR. PYSER:  Object to form.

15          A.      I don't know what they were

16    called.

17    BY MR. FULLER:

18          Q.      All right.  So, Mr. Morse, what

19    would Mr. Morse do next in investigating a

20    pharmacy?  We've talked about the type of

21    pharmacy, we've talked about the size.

22    What's next?

23          A.      Our role was to gather

24    information that was reviewed by others.  We

25    would be trying to gather information about

1    the pharmacy, including the size.  We'd want

2    to take a look at the pharmacy's location,

3    what's the availability of healthcare

4    physicians, prescribers.  We'd want to take a

5    look at the pharmacy's practices, the type of

6    pharmacy; is it a specialty pharmacy, is it a

7    clinic pharmacy, is it a community pharmacy

8    with sundries and everything else.

9              We'd want to take a look at, to

10   the extent we can, who the patients are, and

11   to the extent we can, where they come from.

12   We want to take a look at who the physicians

13   are that are prescribing the prescriptions

14   that are being dispensed by that pharmacy.

15        Q.    Sort of main prescribers?

16        A.    We're looking to see where

17   they're from.

18        Q.    Are you looking at anything

19   else?  Just where they're from?

20        A.    We would request of the

21   pharmacist -- at different times we requested

22   of pharmacists who their principal

23   prescribers were of controlled substances.

24        Q.    And you would do research on

25   those principal prescribers on some

```
 1    occasions, correct?

 2         A.      On some occasions.

 3         Q.      And that's an important part of

 4    collecting the information, right?

 5         A.      At times, that was considered

 6    an important part.

 7         Q.      So, again, I guess it goes back

 8    to what we started with at the beginning.

 9    You wanted to gather as much information as

10    you can on different areas of the pharmacy's

11    operations, and assuming that the pharmacy

12    will cooperate and provide some of that

13    information to you, as well as doing outside

14    searches, like you mentioned, wanting to know

15    where the patients are from.  You can look at

16    the car tags in the parking lot, right?

17         A.      Snapshot in time, yes.

18         Q.      You can -- if you find out the

19    prescribers, you can do Google searches on

20    the prescribers, correct?

21         A.      Yes.

22         Q.      You can run Google searches in

23    the local newspaper to find out if there's

24    been anything going on that may give any sort

25    of concern related to that particular
```

1    pharmacy, correct?

2         A.    Not something that we normally

3    did.

4         Q.    But you did it?

5         A.    On occasion.

6         Q.    Right.  I mean, it's an avenue,

7    and again, if the circumstances call for it,

8    you're going to utilize that.

9         A.    Exactly, if the circumstances

10   call for it.

11        Q.    Fair enough.  Fair enough.

12             So if we go on back to 4016, it

13   starts -- about halfway through the paragraph

14   at the end of the line, it starts "Registrant

15   distributed 66,000 doses."

16             Do you see that?  "Registrant

17   distributed 66,000 dosage units of

18   hydrocodone to Richmond Pharmacy on

19   September 4, 2007."

20             Do you see where I'm at,

21   Mr. Morse?

22        A.    Yes.

23        Q.    6,000 dosage units on

24   September 5th, that would be the next day,

25   correct?  4th and then the 5th, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.
 2          Q.     12,000 dosage units on
 3    September 6, 2007; 18,000 dosage units on
 4    September 7th; then 48,000 dosage units on
 5    September 10th; 24,000 dosage units on
 6    September 11th; 12,000 dosage units on
 7    September 12th.  That's a significant amount
 8    of hydrocodone going into one pharmacy.
 9               Can we at least agree to that?
10               MR. PYSER:  Object to form.
11          A.     Without knowing the
12    circumstances surrounding that pharmacy, I
13    cannot really make a judgment on the
14    quantities going into that pharmacy.
15    BY MR. FULLER:
16          Q.     Sure.  Well, we know -- let's
17    do the math the best we can real quick.
18          A.     Yeah, it's a large quantity.
19          Q.     So it's 70 -- so 66 and 60
20    gives us 72,000, right?  Plus another 12 gets
21    us 84,000, plus another 18 gives us 102,000
22    dosage units.  Then we add 48,000 to that so
23    that's 150,000 dosage units, and 24 and 12 is
24    36.  So we've got 186,000 dosage units of
25    hydrocodone into one pharmacy within less
```

1    than a week.  Right?

2         A.    That's what that appears to

3    show.

4         Q.    Seems on the high side.  Can we

5    agree?

6         A.    That's what that appears to

7    show.

8         Q.    Can we agree that what it shows

9    is that the amount of dosage units going into

10   Richmond Pharmacy within a week is on the

11   high side?

12        A.    It would be of -- something

13   that would need to be checked.

14        Q.    It would at least send up a red

15   flag and deserve an investigation, correct?

16             MR. PYSER:  Object to form.

17        A.    Resulting in an investigation?

18   It would be resulting in it being reviewed.

19   I'm not sure at that time whether that

20   involved an investigation.

21   BY MR. FULLER:

22        Q.    Whether it required a site

23   visit investigation may be a different story,

24   but at least an investigation as to why.

25        A.    It would be reviewed, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.
 2      BY MR. FULLER:
 3           Q.     How does a review -- what is a
 4      review, when you say "review"?  Tell the jury
 5      what you mean by "review."
 6           A.     At that time?
 7           Q.     No, sir.  I mean your
 8      terminology of "review" during your time when
 9      you worked at Cardinal.  What did "review"
10      mean to you?
11           A.     It passed up -- it was somebody
12      else's area of responsibility to review.
13           Q.     So you don't know what a review
14      entailed.
15           A.     The review of the dosage units
16      and the amount they go out to it, the setting
17      of thresholds, not within my area.
18           Q.     Well, you said it deserved a
19      review.
20           A.     Yes.  And I think it would
21      deserve a review, yes.  Who did it, what is
22      entailed, I do not know.
23           Q.     Would something like that
24      deserve a review or investigation from your
25      people?  Maybe not all the way going out to a
```

```
 1     site visit, but at least some looking into.

 2                MR. PYSER:  Object to form.

 3          A.     My people were investigators

 4     on-site.

 5     BY MR. FULLER:

 6          Q.     Okay.  So all your people did,

 7     including yourself, was investigations

 8     on-site, right?

 9          A.     When they were assigned.

10          Q.     And who sent you?  Who would

11     send you?

12          A.     Who would send us?

13          Q.     Yeah.

14          A.     Well, I would send my

15     investigators.  The orders or requests to

16     visit these pharmacies was sent to me by the

17     group that reviewed thresholds.

18          Q.     So Mr. Moné's people, right?

19          A.     Yes.

20          Q.     And I guess --

21          A.     I'm a Mr. Moné person too, but

22     it would not include what we were doing.

23          Q.     Right.  Others of Mr. Moné's

24     people.

25          A.     Exactly.
```

1    Q.    Could Mr. Hartman request you

2    look into a facility?

3    A.    It would have come through

4    Michael, but yes.

5    Q.    Okay.  What about -- do you

6    know a Gilberto -- and help me out with his

7    last name, starts with a Q.  I just refer to

8    him as GQ.

9    A.    I know who -- Quintero.

10    Q.    Quintero.

11    A.    I know him, and at this time --

12    Q.    He wasn't there, I'm aware.

13    I'm not asking if he was.

14    A.    Yes, he could -- it would go

15    through Michael, though.

16    Q.    But he could also request a

17    review, right?  If something got brought to

18    his attention that caused some sort of

19    concern?

20    A.    Anyone within the company that

21    was aware of some concern could voice that up

22    and that'd go to the person who feels like

23    that that would need to be a request and the

24    authority to request a visit, then it would

25    happen.  Go through Michael Moné.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  Fair enough.  Fair

 2    enough.

 3                All right.  So let's set that

 4    document aside for the moment and go back

 5    to --

 6                MR. PYSER:  If you're changing

 7          gears, let's just take a two-minute

 8          break.

 9                MR. FULLER:  We never do two

10          minutes, but we'll take a break

11          anyway.

12                MR. PYSER:  We'll do our best

13          effort.

14                THE VIDEOGRAPHER:  Off the

15          record at 10:05.

16                (Recess taken, 10:05 a.m. to

17          10:11 a.m.)

18                THE VIDEOGRAPHER:  All right,

19          stand by.  Okay.  We're back on the

20          record at 10:11.

21    BY MR. FULLER:

22          Q.    Okay.  So let's go to page 12

23    of Exhibit 2.  See, looky there, Mr. Pyser is

24    keeping them in order for you.

25                MR. FULLER:  Good job,
```

 1          Mr. Pyser.

 2          A.     I was doing it.

 3     BY MR. FULLER:

 4          Q.     Although he's not reminding you

 5     to take off your microphone.  Now he's

 6     batting 500, which is still great.  I mean,

 7     you'll still get into the Hall of Fame.

 8          A.     You said page 12 of Exhibit 2.

 9          Q.     Actually, let's go to page 11,

10     the page before.

11          A.     Okay.  Let me refamiliarize

12     myself with the time frames of this.  This

13     was February 2012.  And this is the

14     pre-hearing statement, okay.

15          Q.     Yeah.  Are you still working at

16     Cardinal now, Mr. Morse?

17          A.     No.

18          Q.     When did you leave?

19          A.     I retired -- my last day was

20     the end of January 2017.

21          Q.     Okay.  And what was your

22     position right before you retired?

23          A.     I'm not sure I really had a

24     title that I used, but I was working in a

25     different area from the anti-diversion

Highly Confidential - Subject to Further Confidentiality Review

```
1    controlled substance area and I was visiting

2    the wholesalers that we sell to for

3    compliance with an agreement that we get them

4    to sign at the beginning.

5         Q.    So a price diversion issue?

6         A.    It had some elements of that,

7    yes.

8         Q.    Fair enough.

9         A.    But the --

10        Q.    I'm sure we'll get to it.

11   We've got a lot of time, you and I.

12              All right, Mr. Morse, our

13   Document 4085, page 11, do you see that at

14   the bottom?

15        A.    Page 11, you said.

16        Q.    Yes, sir.

17        A.    Okay.  "Notice to Cardinal

18   Health of Diversion Problem."

19        Q.    "Problem," right?  Is that what

20   it says?

21        A.    That's what it says.

22        Q.    All right.  So let's turn to

23   the next page.  It says, "At the time of

24   initial investigation, Respondent's," which

25   means Cardinal's, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.  Let me look back to the
 2   date on this.  Okay.
 3          Q.    -- "Cardinal's top four
 4   pharmacy customers were Holiday CVS, LLC,
 5   doing business as CVS Pharmacy 219," and it
 6   gives the address, "Gulf Coast Pharmacy,"
 7   then gives the address, then "Holiday
 8   CVS, LLC," which d/b/a is CVS Pharmacy 5195,
 9   then gives the address, "and CareMed
10   Healthcare Corporation, doing business as
11   Brooks Pharmacy, located in Bonita Springs,
12   Florida."
13              Do you recollect that being
14   Cardinal's top four customers in Florida
15   during a period of time?
16          A.    It's not something that I would
17   be aware of necessarily.
18          Q.    Okay.
19          A.    I don't recall it.
20          Q.    You have no reason to disagree
21   with that, correct?
22          A.    I have no reason to disagree
23   with it.
24          Q.    Fair enough.
25              It says that "DEA has
```

1    communicated to Cardinal Health that it is

2    required to conduct its own due diligence on

3    its retail pharmacy chain customers."

4            Do you see that?

5       A.   Yes.

6       Q.   Now, Cardinal Health did

7    different due diligence on the retail chains

8    than it did retail independents, correct?

9       A.   Some of them.

10      Q.   Particularly -- let's try CVS.

11   How many CVSs did you visit in 2008?

12      A.   I visited none.

13      Q.   How many CVSs did you visit in

14   2009?

15      A.   I visited none.

16      Q.   How many CVS --

17      A.   Visit?  A visit, you're saying?

18      Q.   Investigative visit.

19      A.   Investigative visit.

20      Q.   On-site investigation.

21      A.   My team --

22      Q.   No, you.

23      A.   Me?

24      Q.   I want to know you.

25      A.   Me?  No, I don't remember

Highly Confidential - Subject to Further Confidentiality Review

1    visiting any CVSs.

2         Q.    How about in 2011, did you

3    visit any CVSs --

4         A.    Not that I recall.

5         Q.    -- for on-site investigation?

6         A.    Not that I recall.

7         Q.    Okay.  It says, "Specifically,

8    on July 28, 2009, DEA conducted a compliance

9    review of Cardinal Health's distribution

10   center located in Peabody, Massachusetts."

11              You know that Cardinal had a

12   Peabody, Massachusetts distribution center.

13   Is that right?

14        A.    Yes.

15        Q.    "DEA investigators asked the

16   distribution center for due diligence files

17   for a number of chain pharmacies, but

18   Cardinal Health could not produce the

19   requested due diligence files.  Consequently,

20   investigators spoke with Michael Moné,

21   Quality and Regulatory Affairs Vice

22   President, Anti-Diversion & Supply Chain

23   Services, Dublin, Ohio, via teleconference.

24              "During the teleconference,

25   Mr. Moné stated that Cardinal Health

1    communicated with the loss prevention

2    individuals of chain pharmacies when an order

3    is approaching or exceeding set thresholds

4    and maintains e-mail communications -- or

5    maintains e-mails of the communications."

6              Do you see that?

7         A.    I see it.

8         Q.    And that was the practice of

9    Cardinal during this time frame, right?  Is

10   to go through loss prevention and not conduct

11   independent site visits for these chain

12   pharmacies, particularly CVS.

13        A.    CVS, yes.

14        Q.    Okay.  Now, let me ask you,

15   because Cardinal differentiated between

16   retail independents and chain pharmacies,

17   right?

18        A.    I can't categorically say that

19   for all chain pharmacies.

20        Q.    Well, that was going to be my

21   next question.  What -- what was a criteria

22   for being considered a chain pharmacy versus

23   a retail independent?  Do you know?

24        A.    I do not know what Cardinal was

25   using to differentiate that.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.

2      A.      I don't know.

3      Q.      Fair enough.

4              Continuing on, it says, "DEA

5      Staff Coordinator Michael" -- Arapino?  No,

6      there's no N in it.  "DEA Staff Coordinator

7      Michael Arpaio communicated to Mr. Moné that

8      due diligence investigations must be

9      performed on all customers and chain

10     pharmacies -- chain pharmacies included, when

11     it appears that suspicious high-volume orders

12     are requested of controlled substances, and

13     questionnaires should be sent to the chains."

14              Do you see that?

15     A.      I see that.

16     Q.      Okay.  Now, particularly CVS,

17     Cardinal was not going to the pharmacies

18     themselves and not sending out these

19     questionnaires.  Cardinal was relying on loss

20     prevention within CVS to do the due diligence

21     and report back to Cardinal, correct?

22              MR. PYSER:  Object to form.

23     A.      That states that due diligence

24     investigations must be performed on all

25     customers.

Highly Confidential - Subject to Further Confidentiality Review

```
1     BY MR. FULLER:

2          Q.     Yes.  My question to you is

3     that Cardinal was not doing the due diligence

4     investigations on CVSs.  They were relying on

5     loss prevention department within CVS to do

6     that and report back, correct?

7          A.     Okay.

8                 MR. PYSER:  Object to form.

9                 You can answer.

10         A.     I don't believe that to be the

11    case.

12    BY MR. FULLER:

13         Q.     Okay.  Let's go to 4030.

14         A.     I'm sorry?  Is there another

15    document?

16         Q.     Yep.

17         A.     Oh, I'm sorry.

18                (Cardinal-Morse Exhibit 4

19         marked.)

20    BY MR. FULLER:

21         Q.     And if you'd turn to page 2 of

22    this document, it appears to be an e-mail

23    chain.  Do you see at the bottom of that

24    page, Mr. Paul Farley e-mails Mr. Moné?  This

25    is at September 30th, 2010, correct?
```

1        A.      That's the date.

2        Q.      And it says, "Michael, I'll

3    continue to try to reach you by phone but

4    wanted to recap my conversations with CVS

5    this morning.

6            "I spoke with Brian Whalen at

7    CVS a couple of times this morning regarding

8    Store 219 and other locations you referenced

9    at NACDS.  I also reviewed your slides with

10   him.  He tells me that he responded to

11   Cardinal last March on inquiries for these

12   same stores.  At that time, CVS experienced

13   an increase in sales of oxycodone due to DEA

14   closing stores in the area.  Again, earlier

15   this week, because of our request, he sent

16   another e-mail to LP" -- and I'll represent

17   to you it's loss prevention -- "asking them

18   to take a fresh look.  He received a response

19   yesterday that they have reviewed the stores'

20   activities and that they have been closely

21   monitoring Store 219 for a couple of weeks.

22   None of these stores show significant growth

23   or shrinkage issues.  Additionally, CVS has a

24   new attorney working with the DEA.  They

25   acknowledge that Florida has been cracking

1    down on 'pill mills' and that this is driving

2    more legitimate traffic to CVS stores.

3              He also says, "Brian will send

4    your slides over to LP for their review and

5    response.  They will not provide the doctor

6    or patient information you requested unless

7    it's requested by the DEA.  He was also quite

8    adamant about this.  He does not expect

9    Cardinal to interrupt service to CVS stores

10   since they have responded in the manner we

11   originally agreed upon when launching the SOM

12   program."

13             Do you know, before the

14   immediate suspension order came out in 2012,

15   whether Cardinal ever conducted a site visit

16   of CVS 219, Mr. Morse?

17        A.    I do not know.

18        Q.    If CVS is refusing to provide

19   information requested by Cardinal such as

20   doctor and patient information, like we

21   talked about earlier, that would send up a

22   red flag for Cardinal, would it not?

23             MR. PYSER:  Object to form.

24        A.    This decision to conduct a --

25                  --oOo--

```
 1    BY MR. FULLER:

 2         Q.     Mr. Morse, hold on.  My

 3    question is:  Would it not send up a red flag

 4    if a pharmacy fails to provide information

 5    that you requested?

 6               MR. PYSER:  Object to form.

 7    BY MR. FULLER:

 8         Q.     Earlier your testimony was,

 9    yes, it would.

10               MR. PYSER:  Object to form.

11         A.     If the -- I'm sorry, I'm going

12    to have to qualify this.

13    BY MR. FULLER:

14         Q.     You can answer yes or no but

15    explain your answer.

16         A.     I will.

17         Q.     Does it send up a red flag, yes

18    or no?

19         A.     Yes, it will send up a red

20    flag.

21         Q.     Fair enough.  Now you can

22    explain if you need to explain.

23               MR. PYSER:  Object to form.

24         A.     I'll stop right there.

25                    --oOo--
```

1    BY MR. FULLER:

2          Q.      Fair enough.

3                  And if you continue up into

4    Mr. Moné's response, he says, "OK to release

5    the CVS held orders for the weekend.  We will

6    work through another solution.  Please place

7    this e-mail into the repository."

8                  Do you see that?

9          A.      I see it.

10         Q.      So at least according to that,

11   if they followed what Mr. Moné had asked,

12   whatever orders were being held would have

13   been released, correct?

14         A.      Correct.

15         Q.      Okay.  Now -- well, we'll get

16   to it.

17                 Do you know, during this time

18   frame, which was 2010, whether you could

19   obtain from CVS dosage utilization reports?

20   Would they give them to you?

21         A.      They would not give them to --

22   well, my division would not have -- well,

23   they would request them but we could not get

24   them from CVS.

25         Q.      Would they give you patient or

```
 1    prescriber information?

 2          A.      No.

 3          Q.      Would they give you -- now,

 4    let's make sure we clarify, because with CVS

 5    it was a little bit of a different thing

 6    because you guys provided the Schedule IIs

 7    while they did their own Schedule IIIs,

 8    right?

 9          A.      They had their own warehouse --

10          Q.      So they did some of their own

11    distributions, is my point.

12          A.      Yes, they did some of their own

13    distributions.  They had their own warehouse.

14    Schedule IIs, I believe, came from us.

15          Q.      Right.  So one of the things

16    you know to look at in comparison when you're

17    looking for potential issues with diversion

18    is the percent of Schedule IIs versus all

19    controlleds as well as all prescriptions,

20    right?

21          A.      In a normal course of an

22    investigation, that's something we would like

23    to get.

24          Q.      Would CVS give you that

25    additional information so you could do that
```

```
 1    analysis?

 2         A.    I do not know about the

 3    controlled substance distribution from their

 4    warehouse.  I don't know whether that

 5    information could be provided to us or not.

 6         Q.    Did you ever ask for it?

 7         A.    I did not.

 8         Q.    Would that have been something

 9    that you would have wanted in conducting some

10    investigations?

11         A.    If I had a request to

12    inspect -- excuse me -- to have an

13    investigation on a CVS, yes.

14         Q.    Okay.

15         A.    For my team.

16         Q.    Right.  And as far as you know,

17    your team never got that information,

18    correct?

19         A.    My team did not get that

20    information.

21         Q.    Okay.  Let's go to the next

22    page, page 13.

23         A.    Which document are we on?

24         Q.    I'm sorry, we're switching up

25    again.  I apologize, we're going back to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    80 -- excuse me, 4085.

 2         A.    Exhibit?

 3         Q.    I think it's 2.

 4         A.    Gotcha.

 5         Q.    Yes.  And so you know, that's

 6    going to be our main fallback.  That will be

 7    the one we keep going back to today, okay?

 8         A.    Okay.  I'll just keep it out.

 9    And the page number?

10         Q.    13.

11         A.    Oh, 13.

12         Q.    Can you see in the middle of

13    the page it starts --

14         A.    Let me familiarize myself --

15         Q.    Sure.

16         A.    -- with the date on this

17    document.  February 12, 2012.  Okay.

18              Okay.

19         Q.    And just so I know for

20    questions' sake, when did your position

21    change to moving out of anti-diversion,

22    approximately?  You came in February-March

23    of 2008 --

24         A.    Oh, that was in October

25    of 2012.
```

1        Q.      Okay.  So to October 2012.  So

2    you were there most of 2008, '9, '10, '11,

3    and a good bit of '12.

4        A.      Yes.

5        Q.      In anti-diversion.

6        A.      Yes.

7        Q.      So about the middle of the

8    page, it says, "On July 7, 2011."  Do you see

9    that?  Page 13, make sure you've got 13

10   there.  I thought that page looked a little

11   different than the one I was looking at.

12       A.      Okay.

13       Q.      -- "DEA representatives from

14   DEA Headquarters and the Seattle Field

15   Division met with Cardinal Health at DEA

16   Headquarters to discuss the firm's theft and

17   loss reporting and conducting due diligence

18   to maintain effective controls against

19   diversion with respect to Cardinal Health's

20   Auburn, Washington distribution facility."

21           Do you remember this meeting at

22   all, Mr. Morse?

23       A.      I do not.

24       Q.      Is it safe to say, then, that

25   you did not partake in this meeting at DEA

1    headquarters?

2         A.    I did not.

3         Q.    Okay.  Do you remember anybody

4    relaying information to you after this

5    meeting of what transpired and what occurred

6    related to effective controls against

7    diversion and the due diligence requirements

8    for the Washington Auburn distribution

9    center?

10        A.    I do not recall.

11        Q.    It says, "DEA representatives

12   further advised Cardinal Health that, with

13   respect to their due diligence

14   responsibilities, Cardinal Health should

15   examine their Florida customers -

16   particularly Cardinal Health's retail chain

17   customers.  The DEA did not indicate that its

18   concern with Cardinal Health's Florida

19   distributions was limited only to Cardinal

20   Health's top few customers."

21             Did anybody come to you after

22   this meeting and say, "Hey, the DEA has given

23   us a warning to take a close look at our

24   retail chains in Florida.  Mr. Morse, can you

25   help us with that?"

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. PYSER:  Object to form.

2          A.     Help you with it?  Help you

3     with what?

4     BY MR. FULLER:

5          Q.     No, no.  I said -- let me reask

6     the question.

7          A.     Can I help you?

8          Q.     Did anybody come to you shortly

9     after this meeting and say, "The DEA has

10    warned us to look at our chain distributions,

11    our chain pharmacy distributions in Florida.

12    Mr. Morse, can you" --

13         A.     Very specific question.  No.

14         Q.     -- "can you help us with that?"

15         A.     No.

16         Q.     No one ever came and asked you

17    that?

18         A.     Not that specific question or

19    anything around that question.

20         Q.     That was going to be my next

21    question, when you say "Not that specific

22    question."

23         A.     No.  No.

24         Q.     Did anybody come to you around

25    this time frame and ask you particularly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about chains distribution?

 2         A.    No.  That --

 3         Q.    Go ahead.

 4         A.    No.

 5         Q.    Was there ever any discussion

 6    that you had with Mr. Moné or anybody else at

 7    Cardinal about your concerns with chain

 8    distributions?

 9               MS. RANJAN:  Object to form.

10               MR. PYSER:  Object to form.

11         A.    Repeat the question, please.

12    BY MR. FULLER:

13         Q.    Sure.

14               Did you ever voice any concerns

15    to anybody about the distributions going to

16    chains, chain pharmacies?

17               MS. RANJAN:  Object to form.

18         A.    I did not.

19    BY MR. FULLER:

20         Q.    Do you know of anybody that

21    did?

22         A.    The people that did would not

23    be from my area, but there are -- I can't

24    speculate to that, but that would have come

25    out of another area.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      When you say "another area,"

2    you mean another department within Cardinal

3    Health?

4        A.      Within -- under Michael's

5    purview.

6        Q.      And what department would that

7    be?

8        A.      Well, "department" was a poor

9    choice of terms on my part.

10       Q.      Well, what subdivision?

11       A.      It would have been the

12   pharmacists who were reviewing the threshold

13   events would be -- would be relaying to

14   DEA -- to DEA -- to Michael Moné the

15   information on what these pharmacies were

16   ordering.

17               I don't -- in the role of

18   managing the investigators, day-to-day tabs

19   on thresholds, quantities, were not within my

20   purview.

21       Q.      Okay.  But again, did you ever

22   hear of any of these people doing the

23   analysis, whatever they're called, raising

24   any concerns with chain pharmacies during

25   your time there at Cardinal?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. RANJAN:  Object to form.

 2                    MR. PYSER:  Object to form.

 3         A.     I can't remember that that

 4    actually happened.

 5    BY MR. FULLER:

 6         Q.     So is it fair -- strike that.

 7                So during your time at

 8    Cardinal, you heard nobody raise any concerns

 9    related to the distribution to chain

10    pharmacies, correct?

11                    MR. PYSER:  Object to form.

12         A.     Not officially.

13    BY MR. FULLER:

14         Q.     What about unofficially?

15         A.     Unofficially, discussions, made

16    it clear that the question was raised with

17    Michael, and this was through others who

18    reviewed those threshold reports, and that

19    Michael was making attempts to investigate

20    these pharmacies and get the information we

21    needed in different ways.

22         Q.     And when you say "the

23    information you needed," you're talking about

24    the information that you would normally have

25    for your independent pharmacies because you
```

1    would require them to give it to you,

2    correct?  Or at least some of that

3    information.

4         A.    The investigations of CVS

5    pharmacies did not involve my team.  Those

6    investigations were done from -- obviously

7    from these documents, was done by those that

8    were reviewing the quantities, the

9    thresholds, and those above my division.

10         Q.    Right.  Because as we've

11    already established, there wouldn't be site

12    visits, which your team did the site visits.

13         A.    Right.  So the communications

14    they had, I wouldn't necessarily be privy to.

15         Q.    So is it your understanding

16    that what Mr. Moné was trying to do was

17    gather the information that you would

18    generally have for your retail independents

19    for some of these chains, for example, CVS?

20              MS. RANJAN:  Object to form.

21              MR. PYSER:  Object to form.

22         A.    That would be my understanding.

23    BY MR. FULLER:

24         Q.    And you also understood that

25    CVS was a huge customer of Cardinal Health.

Highly Confidential - Subject to Further Confidentiality Review

```
1    It made up about 20% of the revenue for

2    Cardinal Health, correct?

3              MR. PYSER:  Object to form.

4         A.    I wouldn't necessarily be aware

5    of that.  I knew they were a big customer.

6    That's all I knew.

7    BY MR. FULLER:

8         Q.    Well, let's phrase it

9    differently.  You knew CVS was one of the

10   largest chains in the entire United States of

11   America.

12        A.    They had -- yeah.

13        Q.    Right?

14        A.    Yes.

15        Q.    And you knew Cardinal Health

16   had that business.

17        A.    Yes.

18        Q.    And as far as individual

19   customers goes, it was one of the biggest for

20   Cardinal during this time frame, correct?

21        A.    I was aware of that.

22        Q.    Okay.  So let's continue on

23   this page 13.  It says, "On August 23rd,

24   2011, DEA Headquarters -- Headquarters

25   representatives met with representatives of
```

Highly Confidential - Subject to Further Confidentiality Review

1    Mallinckrodt LLC."

2              Do you know who Mallinckrodt

3    is, Mr. Morse?

4         A.    If memory serves, I believe

5    Mallinckrodt is a manufacturer.

6         Q.    Absolutely correct.  It says,

7    "Mallinckrodt, a manufacturer" --

8         A.    Oh, it says right there, okay.

9         Q.    We just didn't get far enough

10   to give you the answer.

11             It says, "Mallinckrodt, a

12   manufacturer that sells oxycodone to

13   wholesale distributors, including Cardinal.

14   About three weeks after the meeting with the

15   DEA, on September 16th, 2011, Mallinckrodt

16   sent a letter to 43 distributors, including

17   Cardinal Health.  The letter stated that it

18   was no longer processing 'chargebacks' from

19   distributor sales of Mallinckrodt's products

20   to certain pharmacies, including Gulf Coast

21   Pharmacy, one of Respondent's top four

22   customers in Florida, which were identified

23   and included -- in an included Attachment."

24             Do you recall that occurring,

25   that Mallinckrodt told Cardinal that, "Hey,

1    we have concerns about the distributions at

2    Gulf Coast and we're no longer going to allow

3    them, or Cardinal, for that matter, to

4    participate in the chargeback system related

5    to sales to Gulf Coast"?

6              MR. PYSER:  Object -- object to

7         form.

8              Go ahead.

9         A.    I was aware of our discussion

10   that there was some discussions with

11   Mallinckrodt and they sent some information

12   to Cardinal.  Gulf Coast, I would have to say

13   no.

14             MR. FULLER:  Okay.  4017,

15        please.  4-0-1-7.  I don't think I

16        have my copy either.  I need their

17        copies first, please.

18             (Cardinal-Morse Exhibit 5

19        marked.)

20             MR. FULLER:  Here you go.

21   BY MR. FULLER:

22        Q.    All right.  And you see this

23   letter, as it mentions in the pretrial

24   statement, it was sent September 16 of 2011.

25             Do you see that?

 1          A.      Yes.

 2          Q.      And I'll represent to you that

 3     even though it's not addressed to Cardinal,

 4     at least according to that, and it's in

 5     the -- if you look at the first page, it's

 6     attached as part of the litigation going on

 7     related to the pretrial statement, okay?

 8          A.      What does that mean?

 9          Q.      It was filed with the court as

10     part of the official record.

11          A.      Okay.  Gotcha.

12          Q.      And then if you look at the

13     second paragraph -- well, let's back up.

14     Let's look at the first paragraph.  It says,

15     "As you are aware, all U.S. Drug Enforcement

16     Administration ('DEA') Registrants are

17     required by law to have a Suspicious Order

18     Monitoring Program in place to monitor sales

19     of controlled substances.  As a DEA

20     Registrant, Mallinckrodt, a Covidien" -- I'm

21     guessing how to pronounce it -- "Company

22     (hereinafter Mallinckrodt), has developed and

23     maintains a comprehensive program that

24     includes review of customer orders, IMS data

25     and chargeback information and, where

Highly Confidential - Subject to Further Confidentiality Review

1    appropriate, subsequent audits of

2    distributors' Suspicious Order Monitoring

3    Programs.

4              "Effective immediately,

5    Mallinckrodt will no longer process charge

6    backs from distributor sales of

7    Mallinckrodt's products to the pharmacies

8    identified in Attachment 1 hereto."

9              And if you turn the page,

10   there's four Florida pharmacies identified.

11   Do you see that?  One of them being Gulf

12   Coast Medical Pharmacy.

13        A.    Correct.

14        Q.    Which was one of your customers

15   at Cardinal, correct?

16        A.    Correct.

17        Q.    Okay.  Do you know of any

18   immediate action that Cardinal took based on

19   this warning given -- from Mallinckrodt?

20              MR. PYSER:  Object to form.

21        A.    I can't speak to this specific

22   letter, but letters received like this

23   resulted in a review of these customers that

24   were provided to us.

25                   --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BY MR. FULLER:

 2            Q.      Okay.

 3            A.      Some of those reviews very well

 4      ended up as requests to have an investigation

 5      by my investigators.

 6            Q.      And if your group or your team

 7      was requested to do an investigation, you

 8      would conduct that investigation and then

 9      there would be written reports related to

10      that investigation that would ultimately go

11      in the particular pharmacy's due diligence

12      file, correct?

13            A.      Yes.  Yes.

14            Q.      Okay.  We're going back to your

15      big document, 4085, still on page 14.  It

16      says, "Mallinckrodt met with Cardinal Health

17      on September 30th."

18            A.      Okay.

19            Q.      Which is shortly after that

20      letter came out, right?

21            A.      Yes.

22            Q.      "To discuss levels of sales of

23      Mallinckrodt's products to Cardinal Health in

24      Florida.  As part of the meeting, Mallinckrodt

25      gave Cardinal Health two lists - a list
```

Highly Confidential - Subject to Further Confidentiality Review

1    containing the top 20 pharmacies by volume

2    located in state and a second list based on

3    the top 20 pharmacies by volume located out

4    of state, based on Cardinal Health's

5    distributions of oxycodone 30-milligram and

6    oxy 15-milligram manufactured by

7    Mallinckrodt."

8              Now, let's back up for a

9    second.  You know that oxycodone in the 30s

10   and 15s are some of the heaviestly abused

11   dosage units for Oxycontin, correct?

12             MS. RANJAN:  Object to form.

13        A.    In this time frame, yes.

14   BY MR. FULLER:

15        Q.    Okay.  This September meeting

16   in 2011, were you made a part of that?  Did

17   you attend this meeting with Mallinckrodt at

18   Cardinal Health's offices?

19        A.    I don't recall being in the

20   meeting with Mallinckrodt present.

21        Q.    Do you recall anything that was

22   said related to this meeting?  It mentions

23   two lists that Mallinckrodt provided, top 20

24   pharmacies by volume in state --

25        A.    Yes.  Yes.

```
 1              Q.      -- as well as out of state of
 2    oxy 30 and 15s.  I would assume, and correct
 3    me if I'm wrong, that that may be a helpful
 4    tool for Cardinal to look at some of these
 5    pharmacies, right?
 6              MR. PYSER:  Object to form.
 7         A.      Yes.
 8              MR. PYSER:  Go ahead.
 9         A.      And it was.  Those lists were
10    reviewed by Michael Moné and others that I'm
11    not aware of, and they decided what type of
12    review they would get.  And I do know that we
13    visited some, if not most, if not all, of
14    those pharmacies.
15    BY MR. FULLER:
16         Q.      Okay.  At least that's your
17    rec- --
18         A.      A visited investigation, you
19    know, an on-boots investigation, my own
20    investigators.
21         Q.      And when you say Mr. Moné
22    reviewed those lists with others --
23         A.      I --
24         Q.      -- others in the
25    anti-diversion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Yes.

2          Q.     Maybe Mr. Hartman, depending --

3          A.     At this time, yeah.  With the

4     SVP, he may have.

5          Q.     Well, then I guess it may have

6     been Gilberto by this time.

7          A.     It's possible, yeah.

8          Q.     Okay.

9          A.     I'm not sure exactly when

10    Hartman left.

11         Q.     Sure.  Whatever that position

12    was, whoever was filling that position.

13         A.     Yeah.  From my role --

14         Q.     Fair enough.

15         A.     -- it came down to me, visit or

16    not, so...

17         Q.     And was it specifically

18    indicated to you which ones you were visiting

19    based on a review of this list?  How did you

20    know that you were visiting some on this

21    list, I guess is a better question, versus

22    reviewing for any other reason.

23         A.     I knew there was a list and I

24    was told that some of them are on that list.

25    I believe I may have even seen a list.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    don't know if this occurred more than once,

2    but I have seen a list.

3           Q.    Okay.  I only know of it

4    happening once.  I'm not saying it didn't

5    happen more.  You may be correct.  But you

6    believe at some point you saw the list; you

7    just weren't at this meeting?

8           A.    Yes.

9           Q.    Okay.  So --

10          MR. PYSER:  Hold on one second,

11          Steve.  Were you asking for your

12          jacket?

13          THE WITNESS:  Yes, I was.

14          MR. FULLER:  Absolutely.

15          MS. RANJAN:  It's a little bit

16          chilly here.  Although I like it cold.

17   BY MR. FULLER:

18          Q.    All right.  Is that better,

19   Mr. Morse?

20          A.    It's better.

21          Q.    Fair enough.

22          All right.  Still on page 14.

23   If we go to the bottom of the page,

24   "October 18, 2011, based on DEA's evaluation

25   of ARCOS" -- do you know what ARCOS data is?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.      Roughly.  Not in detail.

 2         Q.      -- "(described further below)

 3  data regarding the top distributions of

 4  oxycodone in the United States, DEA executed

 5  Administrative Inspection Warrants, or IAWs,

 6  on three of the Respondent's top four

 7  pharmacy Florida customers of oxycodone,"

 8  which was CVS 219, which we've already talked

 9  about a little bit, right?

10         A.      Yes.

11         Q.      That was one of the ones --

12         A.      I'm going to have to refer back

13  to it, but I believe -- if this was the ones

14  mentioned earlier, I'll say yes.

15         Q.      It was -- it was 219

16  specifically mentioned in that e-mail that we

17  looked at --

18         A.      5195, okay.

19         Q.      -- that Cardinal was apparently

20  asking for additional information, was

21  refused that information by CVS but told by

22  CVS it was clear to continue shipments.

23              Do you remember that?

24         A.      Fair enough.

25         Q.      Okay.  "Florida customer of
```

Highly Confidential - Subject to Further Confidentiality Review

 1    oxycodone CVS 219, CVS 5195, and CareMed.  At

 2    the time the IAW was executed at CareMed

 3    pharmacy, CareMed voluntarily surrendered its

 4    DEA registration for cause."

 5              You would agree with me that

 6    that's a very extreme step for the pharmacy

 7    to voluntarily give up its registration when

 8    it's been served just with an administrative

 9    inspection warrant, correct?

10              MR. PYSER:  Object to form.

11        A.    Yes.

12    BY MR. FULLER:

13        Q.    It goes on to say, "Shortly

14    thereafter, on November 5th, 2011, a federal

15    search warrant was executed at Gulf Coast

16    Pharmacy, after which Gulf Coast voluntarily

17    surrendered its DEA registration for cause."

18              Those are two customers of

19    Cardinal's that, when served just an

20    administrative inspection warrant, gathering

21    information warrant by the DEA, chose to

22    forgo the process and surrender their DEA

23    license, right?

24        A.    Yes.

25              MR. PYSER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. FULLER:

2        Q.    Again, as you mentioned, that's

3    a pretty significant step.

4              Let's go on.  "On October 26th,

5    2011, DEA executed an Administrative

6    Inspection Warrant at Respondent's location,"

7    referring to the Lakeland distribution

8    center.  You're aware that that was executed

9    during October of 2011, correct?

10       A.    I was aware that it was

11   executed.

12       Q.    You may not know this exact

13   date --

14             MR. PYSER:  Before you

15       answer -- hold on one second.  Before

16       you answer the question, you've got to

17       give me a chance to object.

18             THE WITNESS:  Thank you.

19             MR. PYSER:  And move to strike

20       the preface of the last question -- or

21       the question before the last question.

22   BY MR. FULLER:

23       Q.    And there's no indication here

24   that Cardinal voluntarily gave up its DEA

25   registration, is there?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      We're looking at the paragraph

2     on October 26th.

3          Q.      That first paragraph, yes, sir.

4          A.      This does not say that Cardinal

5     voluntarily gave up its registration.

6          Q.      Were you aware when this

7     administrative inspection warrant was served

8     that the DEA was suggesting that Cardinal was

9     failing to report suspicious orders?

10              MR. PYSER:  Object to form.

11          A.      I was not aware of that.

12     BY MR. FULLER:

13          Q.      Let's read on, then.  "The

14     affidavit supporting the warrant stated that

15     because 'DEA is investigating Cardinal

16     Health's top four customers to determine

17     whether the pharmacies are dispensing

18     controlled substances outside the scope of

19     their registration'" --

20          A.      Hold on.  Let me stop.  I need

21     to get where you are.

22          Q.      I'm sorry.

23          A.      October 26th -- okay.  So we're

24     back into this paragraph.  Okay, gotcha.

25          Q.      Yes, sir.  We just continued.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I'm here.
 2          Q.     And I'll back up a little bit.
 3   The "'DEA is investigating Cardinal Health's
 4   top four customers to determine whether the
 5   pharmacies are dispensing controlled
 6   substances outside the scope of their
 7   registration,' 'DEA also needs to -- excuse
 8   me -- also needs to determine whether
 9   Cardinal Health has failed to report
10   suspicious orders to the DEA.'  DEA
11   investigators gave Respondent a list of
12   documents that needed to be provided to the
13   DEA."
14              Were you at all involved in
15   that process, Mr. Morse?
16              MR. PYSER:  Object to form.
17          A.     In the process of collecting
18   those documents, no.
19   BY MR. FULLER:
20          Q.     Were you involved in this
21   process at all with the administrative
22   inspection warrant?
23          A.     No.
24          Q.     But you were made aware of
25   this, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     I knew when they went into the

2    facility.

3          Q.     Based on this immediate

4    inspection warrant -- excuse me,

5    administrative inspection warrant, were you

6    given any tasks to do related to the

7    pharmacies in Florida?

8          A.     I can't connect the two in my

9    mind.

10         Q.     Is it fair enough that you

11   don't recall --

12         A.     I don't recall.

13         Q.     -- being directed to do

14   anything?

15         A.     I do not recall.

16         Q.     Fair enough.

17                THE VIDEOGRAPHER:  We have

18         about 10 minutes left on the tape.

19                MR. FULLER:  Thank you.

20                So let's go ahead and go to

21         4019.

22                (Cardinal-Morse Exhibit 6

23         marked.)

24   BY MR. FULLER:

25         Q.     Mr. Morse, what you're going to
```

Highly Confidential - Subject to Further Confidentiality Review

1    see is that this is the Order to Show Cause

2    and Immediate Suspension of Registration that

3    was issued in February of 2012.

4              Have you seen this document

5    before?

6              (Document review by witness.)

7         A.   I do not recall ever having

8    seen this before.

9    BY MR. FULLER:

10        Q.   Okay.  This is entitled "In the

11   Matter of" -- you see it's by the U.S.

12   Department of Justice --

13        A.   Uh-huh.

14        Q.   -- Drug Enforcement

15   Administration?

16        A.   Okay.

17        Q.   "In the Matter of Cardinal

18   Health," and it gives a Lakeland address.

19              Do you see that?

20        A.   I do.

21        Q.   And it's an Order to Show Cause

22   and Immediate Suspension Order, and if you go

23   down to number 2 it says, "On September 30th

24   of 2008, Cardinal entered into an

25   Administrative Memorandum of Agreement, or

Highly Confidential - Subject to Further Confidentiality Review

1    MOA, with the DEA agreeing to 'maintain a

2    compliance program designed to detect and

3    prevent the diversion of controlled

4    substances as required under the CSA and

5    applicable DEA regulations.'"

6              That's the same thing we read,

7    that's the same quote we read out of the MOA,

8    right?

9         A.    It appears to be.

10        Q.    Okay.  And let's turn to the

11   next page and see what the DEA says that

12   Cardinal wasn't doing.  And if you go to the

13   allegations, under sub 4, paragraph (a), do

14   you see that section there?

15        A.    I do.

16        Q.    It says, "From January 1st,

17   2008 through" --

18        A.    May we pause?

19        Q.    Yes, sir.

20        A.    I would like to read 4.

21              (Document review by witness.)

22        A.    Thank you.

23   BY MR. FULLER:

24        Q.    It says, "From January 1st,

25   2008 through December 31st, 2011, the

1    Automation of Reports and Consolidation

2    Orders System, or ARCOS, data shows that

3    Cardinal's sales of oxycodone products to its

4    top four retail pharmacy customers exceeded

5    12.9 million dosage units."

6              Do you see that?  Underline

7    that.  12.9 million.  That's to four

8    pharmacies, right?

9         A.    The top -- yeah.

10        Q.    Top four customers --

11        A.    Yeah, yes.

12        Q.    -- in the state of Florida.

13   You were made aware of that after this came

14   out, right?

15             MR. PYSER:  Object to form.

16        A.    I was made aware of it after

17   they --

18   BY MR. FULLER:

19        Q.    When these allegations came out

20   by the DEA, weren't you made aware of this by

21   Cardinal?

22        A.    Yes.

23        Q.    Okay.  And then it goes on.

24   "In 2010 and 2011 alone, Cardinal sold

25   10.9 million dosage units of oxycodone to the

```
 1    top four customers.  From 2008 to 2009,

 2    Cardinal's sales to its top four retail

 3    pharmacy customers increased approximately

 4    803%."

 5              Mr. Morse, we can agree that an

 6    803% increase between two years in sales is a

 7    significant increase in sales, correct?

 8              MR. PYSER:  Object to form.

 9         A.    This is an allegation, is it

10    not?

11    BY MR. FULLER:

12         Q.    It is an allegation,

13    absolutely.

14         A.    Well, as an allegation, I would

15    have to say yeah, it's probably -- I would

16    agree with you because it's an allegation,

17    not a proven fact.  So...

18         Q.    Well, okay.  So did Cardinal

19    look into this and determine that that was

20    incorrect?

21              MR. PYSER:  Object to form.

22    BY MR. FULLER:

23         Q.    Do you know?

24         A.    I would not have known in my

25    role, no.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Do you --

2          A.      Necessarily.

3          Q.      We know at least two of the top

4     four --

5          A.      I don't know the four

6     pharmacies.

7          Q.      I'm sorry?

8          A.      I don't know which four

9     pharmacies we're looking at here.  Were those

10    the four that we looked at earlier?

11         Q.      It's the top four, still the

12    same top four.

13         A.      Okay.  Top four.

14         Q.      Two CVSs and CareMed.

15         A.      Okay.  Okay.  So --

16         Q.      Go ahead.

17         A.      Your question?

18         Q.      Yeah.  So, I mean, do you have

19    any reason to believe that's incorrect

20    information?

21         A.      It's an allegation.  I have no

22    earthly idea.  I can't figure it out.

23         Q.      Do you have any information,

24    does Mr. Morse know anything in his mind to

25    say that that's wrong, that the DEA, the

```
1     Department of Justice, got the math wrong in

2     doing the numbers?

3          A.     I can't say yes or no.

4          Q.     Well, no, no.  I'm asking if

5     Mr. Morse knows anything in his head, sitting

6     here today --

7          A.     No.

8          Q.     Okay.  If that is accurate --

9     and listen.  If you know something as to why

10    or how the Department of Justice was wrong

11    here, I want you to tell us so we can address

12    it now.

13               So if there's something that

14    you know that this information isn't

15    accurate, you need to share it with us now.

16    Now is my opportunity to ask you, so I'm

17    asking, Mr. Morse.  Is there anything that

18    you know that would indicate this information

19    is incorrect?

20         A.     No, not other than it being an

21    allegation, that I understand an allegation

22    is not proven.

23         Q.     You're right.  You're right.

24    It indicates that the information is coming

25    from the ARCOS data, which is data that the
```

Highly Confidential - Subject to Further Confidentiality Review

1    DEA would have to rely on Cardinal to report

2    accurately, right?

3          A.     I don't know who reports ARCOS.

4          Q.     You don't even know who reports

5    ARCOS?

6          A.     I think, looking at something

7    from previously, the registrants have to

8    report who they sell to.  So I'm assuming

9    that's the ARCOS report.

10         Q.     And the registrant in this

11   scenario would be Cardinal, correct?

12         A.     Yes, it would.

13         Q.     Okay.  So if there was a 203%

14   increase between 2008 and 2009, we can agree

15   that would be a significant increase,

16   correct?

17         A.     It's a large number.

18         Q.     We can also agree that

19   Cardinal, between 2010 and 2011, distributing

20   10.9 million dosage units to four pharmacies

21   in Florida is also a significant number,

22   correct?

23              MR. PYSER:  Object to form.

24         A.     It's a significant number, but

25   I don't know the context.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. FULLER:
 2          Q.     And we know Cardinal had at
 3     least some concerns about the CVS, right?
 4          A.     We know?
 5          Q.     We know.
 6          A.     I know?
 7          Q.     You know.
 8          A.     I know?
 9               MR. PYSER:  Object to form.
10     BY MR. FULLER:
11          Q.     We looked at the e-mail earlier
12     today when Cardinal was specifically asking
13     CVS -- yeah, CVS about 219.
14          A.     Uh-huh.
15          Q.     And we saw what was written
16     that came back from CVS's loss prevention
17     department that everything was fine, did we
18     not?  Do you want to go back to that exhibit?
19               MR. PYSER:  Object to form.
20          A.     I didn't see those documents,
21     so if those documents are accurate, then
22     Cardinal must have known.  I have no reason
23     to believe they weren't.  I have no reason to
24     believe they are.  Cardinal knew.
25                         --oOo--
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FULLER:

 2         Q.    Hold on.  Let's go back -- what

 3    exhibit was that?

 4         A.    Am I speaking to what I know?

 5         Q.    Don't worry.  No.  No, you are

 6    not limited to speaking to what you know.

 7              MR. PYSER:  Object to form.

 8    BY MR. FULLER:

 9         Q.    You're answering the

10    questions --

11              MR. PYSER:  Answer the

12         questions based on the best of your

13         knowledge.

14    BY MR. FULLER:

15         Q.    You're answering the questions

16    that I ask you.

17              MR. PYSER:  You can't answer

18         things that you don't know, which

19         seems to be what Counsel was implying.

20              MR. FULLER:  Where is my other

21         exhibit?

22              Could you pass me the exhibits,

23         Mr. Morse or Mr. Pyser?  It's

24         Exhibit 4, 4030.  It starts on page 2,

25         rolls on to page 3.  There you go.
```

Highly Confidential - Subject to Further Confidentiality Review

1                    Blow up the bottom of page 2,

2        please.

3    BY MR. FULLER:

4        Q.    Did we look at this e-mail

5    earlier from Paul Farley to Mr. Moné?

6        A.    We looked at it, yes.

7        Q.    And do you have any reason to

8    believe Mr. Paul Farley, an employee of

9    Cardinal, is lying?

10                   MR. PYSER:  Object to form,

11       misstates evidence.

12       A.    I don't know Paul Farley.

13   BY MR. FULLER:

14       Q.    Okay.  So you have no basis --

15       A.    So I have no basis.

16       Q.    Okay.  And you see the e-mail

17   is going to Mr. Moné, who you do know, who is

18   your direct report, correct?

19       A.    Yes.

20       Q.    Okay.  And it says, "I spoke

21   with Brian Whalen at CVS a couple of times

22   this morning regarding Store 219."  That's

23   the same store we looked at as being one of

24   the top four for Cardinal.

25       A.    219.

1          Q.      Right?

2          A.      Okay.

3          Q.      Is that right?

4          A.      It is.

5          Q.      Okay.  "And the other locations

6     you referenced at NACDS.  I also reviewed

7     your slides with him.  He tells me that he

8     responded to Cardinal last month on inquiries

9     for these same stores.  At that time CVS

10    experienced an increase in sales due to the

11    DEA closing stores in the area.  Again

12    earlier this week, because of the request, he

13    sent another e-mail to LP," loss prevention,

14    "asking them to take a fresh look.  He

15    received a response yesterday that they have

16    reviewed the stores' activity and they have

17    been closely monitoring Store 219 for a

18    couple of weeks.  None of these stores shows

19    significant growth or shrinkage issues."

20                 Right?  Did I read that

21    correctly?

22         A.      That's correct.

23         Q.      But according to the

24    allegations in the immediate suspension

25    order, there apparently has been a huge

```
 1    growth.  Right?

 2         A.      Apparently.

 3         Q.      And CVS tells us there's been

 4    no significant growth or shrinkage, at least

 5    according to the e-mail, right?

 6              MR. PYSER:  Object to form.

 7         A.      That's what the documents say.

 8    BY MR. FULLER:

 9         Q.      Well, let's look -- let's go to

10    4085, page 19.  I'm sorry, I should have

11    passed that back to you.  I apologize.

12              MR. FULLER:  Oh, got it.  Guys,

13         let's take a break.  She told me 10

14         minutes a little bit ago and we're

15         running out of tape.

16              MR. PYSER:  That's fine.

17              THE VIDEOGRAPHER:  Going off

18         the record at 11:07.  This is the end

19         of Tape 2.

20              (Recess taken, 11:07 a.m. to

21         11:27 a.m.)

22              THE VIDEOGRAPHER:  Okay, stand

23         by.  All right.  We're back on the

24         record at 11:27.  This begins Tape 3.

25                   --oOo--
```

```
 1    BY MR. FULLER:

 2         Q.    All right.  You don't have to

 3    worry about forgetting to take it off if you

 4    never put it on, Mr. Morse.

 5         A.    That works.

 6         Q.    So, Mr. Morse, we were just

 7    talking about CVS and the e-mail information

 8    that was relayed to Cardinal about the

 9    distribution or sales not growing at CVS 219.

10              Do you recollect that?

11         A.    That -- restate that.

12         Q.    We were just reviewing the

13    e-mail --

14         A.    Uh-huh.

15         Q.    -- from Cardinal, from Paul to

16    Mr. Moné, indicating that the information

17    passed from Cardinal with the Cardinal

18    facilities that -- excuse me, the CVS

19    facilities -- let me start it all over.

20              Mr. Moné, when we left to take

21    the break -- and you're not Mr. Moné.  You

22    get one call from David Cohen and you get all

23    flustered, I guess.  Who knows.  He may be

24    flattered, right?

25              All right.  So, Mr. Morse,
```

1    before we took a break, we had went back and

2    re-looked at the e-mail, which I think is

3    Exhibit 4 and may still be in front of you,

4    related to the information passed --

5         A.    Right.

6         Q.    -- from CVS to Cardinal --

7         A.    Yes.

8         Q.    -- related to several of CVS's

9    facilities and concerns apparently that

10   Cardinal had, and the information came back

11   that CVS had looked into it, that there

12   hadn't been any significant growth or

13   decrease, specifically mentioning CVS Store

14   219.  And Mr. Moné later that day releases

15   the orders, whatever orders were being held

16   at that time, based on those representations.

17   Right?

18        A.    It would appear so.

19        Q.    And also in that e-mail it was

20   relayed that CVS was refusing to provide

21   Cardinal with physician and patient

22   information as well, and you know that to be

23   a normal practice of CVS's.

24        A.    Yes.

25        Q.    So let's go back to Exhibit 2,

Highly Confidential - Subject to Further Confidentiality Review

1    which is 4085.  And let's go to page 19 of

2    that document.  This is the one that we've

3    been going through all morning, right?

4           A.    Uh-huh.

5           Q.    Is that a yes?

6           A.    Yes, it is.

7           Q.    Okay.

8           A.    Oh, I thought it was this one.

9           Q.    You see there --

10          A.    This is the one.

11          Q.    -- on page 19, if we look at

12    the bottom section, it says, "Respondent

13    exceeded its own thresholds (TH) in the

14    following instances."  And we have a section

15    there on CVS 219, correct?

16          A.    Yes.

17          Q.    And the time frame of that

18    e-mail relaying the information from CVS was

19    September of 2010.  Right?  The e-mail

20    exhibit that you looked at earlier,

21    Mr. Morse, not this document.  The e-mail

22    exhibit that you just put back.

23          A.    September of 2010, that's

24    correct.

25          Q.    Okay.  So let's look at CVS 219

1    at the bottom of page 19 here.  We can blow

2    it up.  And let's focus on that time frame

3    right before that e-mail.  So let's go to

4    April of 2010 and see what the information is

5    here.

6                April 2010, the dosage units

7    delivered were 156,580 with a threshold of

8    148,000.  Do you see that?

9         A.    Yes.

10        Q.    Now, remember, during this time

11   frame, at least according to the information

12   CVS provided back to Cardinal, is that there

13   was no growth going on at this time.  No

14   increase or decrease, right?

15        A.    That's correct.

16        Q.    That's what the e-mail said.

17        A.    Uh-huh.

18        Q.    And we have no reason to

19   disbelieve Paul, who wrote the e-mail to

20   Mr. Moné, do we?

21                MR. PYSER:  Object to form.

22   BY MR. FULLER:

23        Q.    Is that a no?

24        A.    Pardon?

25        Q.    We have no reason to disbelieve

1    that e-mail, do we?

2        A.    It's self-reporting.

3              MR. PYSER:  Object to form,

4        misstates evidence.

5    BY MR. FULLER:

6        Q.    I'm sorry, what did you say?

7        A.    What did I say?

8              MR. PYSER:  Well, according to

9        the court reporter --

10   BY MR. FULLER:

11       Q.    You said, "It's

12   self-reporting."

13       A.    Yeah.  It's self-reported by --

14       Q.    But the e-mail indicates the

15   information coming from CVS --

16       A.    Yes.

17       Q.    -- that there was no growth

18   reported.

19       A.    Yes, self-reported by CVS.

20             MR. PYSER:  Object to form,

21       misstates evidence.

22   BY MR. FULLER:

23       Q.    Okay.  So we know in

24   April 2010, Cardinal delivered 156,000 dosage

25   units.  Then in May of 2010, 172 dosage

Highly Confidential - Subject to Further Confidentiality Review

1    units.  And I'm rounding, Mr. Morse.  It's

2    actually 172,450, right?

3         A.    Correct.

4         Q.    Okay.  Then in June, 200,000

5    dosage units.  Do you see that?

6         A.    Yes.

7         Q.    You could agree with me that

8    they are increasing, are they not?

9         A.    Yes.

10        Q.    Numbers are getting larger.  I

11   mean, we started in April at 156,000.  Now

12   we've increased by 44,000 dosage units per

13   month.

14              So let's go to July.  207,000

15   dosage units for July of 2010.  Then in

16   August, 242,000.  In September, the month the

17   e-mail was actually sent, 281,000 dosage

18   units delivered to CVS 219.

19              Do you see that?

20        A.    I see it.

21        Q.    And you mentioned earlier about

22   having to look at CVS a little differently

23   and finding different ways to get the

24   information.  But this is Cardinal's sales to

25   CVS.  Cardinal would absolutely have access

1    to this information before Mr. Moné would

2    have pulled the holds on those orders and let

3    those pills be distributed to these

4    pharmacies, correct?

5              MR. PYSER:  Object to form.

6         A.    Yes.

7    BY MR. FULLER:

8         Q.    And while CVS may not consider

9    this an increase, the dosage units went from

10   156 to 281, almost doubled, didn't it?

11        A.    Close.

12        Q.    Let me ask, do you see an

13   inherent conflict with CVS providing the due

14   diligence for itself --

15             MR. PYSER:  Object to form.

16   BY MR. FULLER:

17        Q.    -- when it comes to controlled

18   substances?

19        A.    What CVS does --

20        Q.    My question is:  Whatever loss

21   prevention is doing, do you see an issue with

22   them policing theirselves in that regard?

23             MR. PYSER:  Object to form.

24        A.    That happens with all

25   pharmacies.

```
 1    BY MR. FULLER:

 2         Q.     But this is different, right?

 3         A.     We go to the pharmacies and ask

 4    them.  Now, this wasn't -- we had this

 5    information.

 6         Q.     You had this information.

 7         A.     This information is our

 8    information.

 9         Q.     Right.  You didn't have to go

10    to a pharmacy and ask them for this.

11    Cardinal would have had its own sales data,

12    undoubtedly, correct?

13         A.     Yes.

14         Q.     And if someone is doing proper

15    due diligence, one thing that you've said,

16    one thing that -- I mean, it's in all the

17    policies and procedures.  One thing you want

18    to look at is the sales history, if you have

19    it.  Right?

20         A.     Yes.

21         Q.     And Cardinal clearly had it for

22    CVS 219.

23         A.     Yes.

24         Q.     Cardinal, at least based on the

25    e-mail, clearly had concerns about 219,
```

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2          A.     Yes.

3          Q.     But yet it kept shipping more

4    and more and more controlled substance,

5    highly addictive medications, to 219, based

6    on CVS's representations that everything was

7    good, correct?

8                 MR. PYSER:  Object to form.

9          A.     I do not know what it was based

10   on.

11   BY MR. FULLER:

12         Q.     Well, at least according to the

13   e-mail that was sent that day -- hold on, let

14   me finish my question.

15                According to the e-mail,

16   information that came back, we see later the

17   same day in the chain Mr. Moné released the

18   orders.

19         A.     Yes, he did.

20         Q.     Okay.  Now, you don't know,

21   sitting here today, whether he did any other

22   due diligence, do you?

23         A.     That's the point I was going to

24   make.

25         Q.     And I knew where you were

1    going.  And that's fair.  But whatever due

2    diligence he did in justifying, with these

3    type of increases going on, we should see

4    that documented in the due diligence file to

5    justify that kind of move, correct?

6              MR. PYSER:  Object to form.

7         A.    In the investigative field,

8    yes.  With my investigators, yes.  With that

9    group, I would say yes.

10   BY MR. FULLER:

11        Q.    Because you have to follow

12   regulatory requirements, you want to see the

13   justification as to what decisions are being

14   made so that you can support those decisions

15   if anybody ever calls you out, whether it's

16   your supervisor or anybody else, correct?

17             MR. PYSER:  Object to form.

18        A.    Yes.

19   BY MR. FULLER:

20        Q.    That's certainly what you

21   required of your team of investigators, isn't

22   it?

23        A.    Yes.

24        Q.    That's what was instilled in

25   you from your higher-ups as well, correct?

1         A.      Yes.

2         Q.      Okay.  So let's go back to

3    page 17.  I'm only going two pages back.

4    Actually, let's go back to page 16, just so

5    we can get the title of the section.

6         A.      That's the bottom of the second

7    page?

8         Q.      It's actually the mid of that

9    page.  You see that, "Exponentially

10   Increasing High-Volume Sales"?

11        A.      I see it.

12        Q.      And one of the criteria for a

13   suspicious order is large sales volume,

14   right?  Increases in large sales volume,

15   right?

16        A.      It is.

17        Q.      Okay.  So let's turn to the

18   next page.

19              MR. PYSER:  I just want to put

20        on the record, as we have in prior

21        depositions, I have objections to the

22        use of this document and all questions

23        from it as hearsay.

24   BY MR. FULLER:

25        Q.      So let's look at the first

Highly Confidential - Subject to Further Confidentiality Review

1   paragraph and actually start at the second

2   sentence.  "Respondent's other Florida retail

3   pharmacies received, on average, 5,364 dosage

4   units per month from October 1 of 2008

5   through December 31, 2011, based on 66,286

6   pharmacies, which equates to 64,000 dosage

7   units annually.

8              "In contrast, CVS 5195 received

9   approximately 58,000 dosage units per month

10  from Respondent; CareMed received 59,264

11  dosage units per month from Respondent; Gulf

12  Coast received 96,664 dosage units per month

13  from Respondent; and CVS 219," who we've

14  talked about now, "received 137,994 dosage

15  units per month from Respondent."

16             Do you see that, Mr. Morse?

17  A.      I see it.

18  Q.      Now, Cardinal had standard

19  operating procedures, policies and

20  procedures, when it related to dealing with

21  controlled substances in its SOM program.  Is

22  that right?

23  A.      Would you state the question

24  again?

25  Q.      Yes.  Cardinal had SOPs,

1    standard operating procedures, related to its

2    SOM, suspicious order monitoring, program,

3    correct?

4         A.    Yes.

5         Q.    Okay.  And let's go to 4226.

6               Now, we talked earlier about

7    looking at sales history and sales volume and

8    things like that for particular pharmacies.

9    But would you agree with me, if we have a

10   particularly bad actor who's always ordered

11   or received an excessive amount, we don't

12   want to base it just on their sales history,

13   correct?  We want to look at other similarly

14   situated pharmacies to see what they're

15   getting as well.

16        A.    If we have access to that

17   information, yes.

18        Q.    Absolutely.

19              And Cardinal had the privilege

20   of servicing a lot of pharmacies in a lot of

21   different areas of the country, didn't they?

22        A.    They did.

23        Q.    And were there ever times where

24   you pulled or had -- in doing your

25   investigations, pulled information from

Highly Confidential - Subject to Further Confidentiality Review

1    similarly situated pharmacies to see how one

2    pharmacy may compare, to see if it's an

3    outlier, per se?

4          A.    I don't recall.  Maybe, maybe

5    not.

6          Q.    Is that something that would --

7          A.    Circumstance.

8          Q.    Is that something that would be

9    helpful in conducting investigations?

10         A.    In some circumstances, yes.

11         Q.    So, for example, we see the DEA

12   saying that the top four pharmacies have got

13   this huge amount of pills, correct?

14         A.    Correct.

15         Q.    Okay.  Now, we just did talk

16   about some averages based on this document,

17   but say that's the top four pharmacies, and

18   everybody else is right beneath them getting

19   just under that.  Well, that would support --

20   sort of support the distribution at the level

21   it was for the top four, right?

22              MR. PYSER:  Object to form.

23   BY MR. FULLER:

24         Q.    If other similarly situated

25   pharmacies are getting like deliveries or

Highly Confidential - Subject to Further Confidentiality Review

1    like orders.

2                MR. PYSER:  Object to form.

3    BY MR. FULLER:

4        Q.    Correct?

5        A.    From Cardinal?

6        Q.    Yeah.

7        A.    I'm not sure where else they're

8    getting their medications from.

9        Q.    No, no, no, and maybe my

10   question --

11       A.    That makes it hard for me to

12   make that decision, to answer that question.

13       Q.    No, maybe my -- hold on, let me

14   reask the question because maybe it was a

15   little confusing.

16       A.    Okay.

17       Q.    So if we have Pharmacy X that's

18   getting a million dosage units a month, that

19   seems like a lot, right?  You and I can

20   agree.

21                MR. PYSER:  Object to form.

22       A.    Depending on the circumstances.

23   BY MR. FULLER:

24       Q.    Yeah.

25       A.    It's a large number.

```
 1        Q.     But -- but if we are looking at
 2   other similarly situated pharmacies and
 3   they're getting 999,000 dosage units a month,
 4   well, that doesn't look that far out of whack
 5   anymore, does it, at a million?
 6              MR. PYSER:  Object to form.
 7        A.     Correct.
 8   BY MR. FULLER:
 9        Q.     But if we do that comparison
10   because we're looking at like pharmacies and
11   everybody else is only getting 10,000, well,
12   then, yeah, it's another red flag that there
13   may be something going on with this pharmacy
14   getting a million pills a month, correct?
15        A.     A red flag, yes.
16        Q.     Absolutely.
17              MR. PYSER:  Object.  Object to
18        form.
19   BY MR. FULLER:
20        Q.     So that was --
21              (Cardinal-Morse Exhibit 7
22        marked.)
23   BY MR. FULLER:
24        Q.     Part of my question here --
25   this is going to be --
```

1           MR. FULLER:  I'm sorry.  Madam

2      Court Reporter, did I mark and attach

3      all the other exhibits?

4           THE REPORTER:  Yes, sir.

5  BY MR. FULLER:

6      Q.    Okay.  So I'm up to Exhibit 7,

7  which is going to be Plaintiff's 4226.  And

8  this is a standard operating procedure for

9  Cardinal Health.  Do you see that, Mr. Morse?

10     A.    It is.

11     Q.    For pharmaceutical

12 distribution, right?

13     A.    Yes.

14     Q.    And what's the title of it on

15 the front in the box?

16     A.    "Detecting and Reporting

17 Suspicious Orders and Responding to Threshold

18 Events."

19     Q.    All right.  Have you ever seen

20 this policy or procedure or standard

21 operating procedure for Cardinal Health?

22     A.    It's not in the realm of

23 investigation, so, no, I do not recall ever

24 seeing or reading through this document.

25     Q.    Okay.  And if you'll turn --

Highly Confidential - Subject to Further Confidentiality Review

1    now, you know, though, that, as you testified

2    earlier, that Cardinal had standard operating

3    procedures for things such as this, correct?

4         A.    I knew they existed.

5         Q.    Okay.  And they kept them in

6    the standard course of business.  It was part

7    of their practice to have these standard

8    operating procedures.

9         A.    They kept coming back, yes.

10        Q.    Okay.  And if you'd turn to

11   page -- let's see -- page 4 of the document,

12   and you see it has on page 4 a couple of

13   bolded sections.  It has orders of unusual

14   size, orders of unusual frequency, and orders

15   that deviate substantially from the normal

16   ordering pattern.  And that's on page 4.

17        A.    I see it.

18        Q.    Okay.  And those are the three

19   qualifiers that you testified to earlier that

20   any one of them can make up a suspicious

21   order, right?  Based on the regulation.

22        A.    I believe there's an "or" in

23   there, yes.  I would say yes.

24        Q.    Okay.  So read to the jury

25   6.1.5, "Orders of unusual size."  Read that

1    sentence to the jury, if you would, please.

2         A.    "Orders of unusual size are

3    significantly larger than the orders normally

4    placed by the customer or by customers that

5    have a size and type of business that is

6    similar to the ordering customer's business."

7         Q.    So according to Cardinal's own

8    policies and procedures, we need to be able

9    to compare a customer when we're looking at

10   orders of unusual size to that customer's

11   history or similar customers' histories,

12   correct?

13        A.    Correct.

14        Q.    And that will do what we just

15   talked about a moment ago.  It will help us

16   to identify outliers, right?

17        A.    Yes.  Yes.

18        Q.    And if it's of a significant

19   larger, then it is a suspicious order

20   according to Cardinal's own definition.

21        A.    After reviewing all of the --

22   all of the factors around that particular

23   pharmacy, yes, it could be very well

24   considered that.

25        Q.    Well, hold on now.

```
 1                    MR. PYSER:  Object to form.
 2    BY MR. FULLER:
 3         Q.    Hold on.  Because you testified
 4    earlier that the CFR requirement, 21 CFR
 5    1301.74(b) --
 6         A.    Yes.
 7         Q.    -- in its definitions for
 8    suspicious orders --
 9         A.    You're correct.
10         Q.    -- was unusual size, unusual
11    frequency, or orders that deviate
12    substantially from the normal ordering
13    pattern, right?
14         A.    That's correct.  That's
15    correct.
16               (Cardinal-Morse Exhibit 8
17         marked.)
18    BY MR. FULLER:
19         Q.    That doesn't say in that
20    regulation -- you -- here, let's pull up
21    4915.  Because I want to give you that
22    regulation.  It's up on the screen already
23    and I'm going to give you a hard copy.  And I
24    want you to show me in that regulation,
25    because that's what you swore by, I want you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to show me in that regulation where it gives

 2    any indication --

 3              MR. FULLER:  Here you go,

 4        Mr. Pyser.

 5    BY MR. FULLER:

 6        Q.      -- where it gives any

 7    indication that you can consider other

 8    circumstances surrounding the pharmacy.  You

 9    show that to the jury.  You point -- just

10    point it out.  And Gina here, she'll

11    highlight it.  You point it out where it says

12    it.

13        A.      It does not.

14              MR. PYSER:  Object to form.

15    BY MR. FULLER:

16        Q.      But wait, didn't you testify

17    earlier that those were the three factors

18    that make up a suspicious order?

19              MR. PYSER:  Object to form,

20        asked and answered.

21    BY MR. FULLER:

22        Q.      That's what your testimony was,

23    right?

24        A.      Yes.

25        Q.      The record will be clear.
```

1      A.      Yes.

2      Q.      And Madam Court Reporter took

3  it down, we recorded it.  The jury has

4  already heard it.

5              So -- and according to

6  Cardinal's own policy, orders of unusual

7  size, which according to the regulation would

8  be a suspicious order, right?

9      A.      Yes.

10      Q.      Are significantly larger than

11  orders normally placed by the customer or --

12  right, "or"?  No, no, no, I'm reading from

13  your policy and procedure -- "or by customers

14  that have a size and type of business that is

15  similar to the ordering customer's business."

16      A.      Yes.  That's what it says.

17      Q.      Okay.  So I just want to make

18  sure I'm right, that when we're looking at

19  suspicious orders and trying to identify them

20  that we need to make sure that we identify or

21  determine what that criteria is.

22              And so when we're looking at

23  orders of unusual size, it's those with

24  significantly larger orders than their normal

25  ordering pattern or ordering patterns of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    other pharmacies of the same type and size,

 2    correct?

 3                MR. PYSER:  Object to form.

 4         A.    Correct.

 5    BY MR. FULLER:

 6         Q.    Okay.

 7         A.    According to this document, and

 8    the regulation.

 9         Q.    And that's what Cardinal had to

10    follow, right?  Cardinal had to follow the

11    regulation.

12         A.    Uh-huh.

13         Q.    Is that correct?

14         A.    That's correct.

15         Q.    Code of Federal Regulation

16    1301.74(b)?

17         A.    Yes.

18         Q.    We just had it up on the

19    screen?  Okay.

20                Then if you go in the policy

21    and procedure to 6.1.6, can you read that

22    section to us?

23         A.    "Orders of unusual frequency

24    are orders that significantly -- that occur

25    significantly more frequently than the orders
```

Highly Confidential - Subject to Further Confidentiality Review

1    normally placed by the ordering customer or

2    by customers that have a size and type of

3    business that is similar to the ordering

4    customer's business."

5        Q.    Okay.

6        A.    May I re-read that myself.

7              (Document review by witness.)

8    BY MR. FULLER:

9        Q.    I think you got it right.

10       A.    When I'm reading something, I'm

11   not always digesting it, so thank you.

12       Q.    I am the same way.  I am

13   exactly the same way.

14              So this, much like orders of

15   unusual size, says that we have to look at

16   orders that occur significantly more

17   frequently than normally placed orders,

18   either by that customer or by similarly

19   situated customers, correct?

20       A.    That's what it says.  Correct.

21       Q.    So, for example, if during your

22   time frame we looked at that Richmond

23   Pharmacy here in Texas that was ordering

24   large amounts every day, day after day, three

25   or four or five days, if that was unusual for

1    them, that would constitute a suspicious

2    order according to this definition, right?

3         A.    This would be used to determine

4    that, yes.

5         Q.    If it was unusual for similarly

6    situated pharmacies, it would also be a

7    suspicious order, even if they themselves

8    ordered all the time every day, right?

9              MR. PYSER:  Object to form.

10        A.    Restate the question, please.

11   BY MR. FULLER:

12        Q.    Sure.

13              Let's say Pharmacy XYZ, and

14   we're looking at just orders of unusual

15   frequency right now.

16        A.    Right.

17        Q.    That's a classification of

18   suspicious orders according to the

19   regulation.  That's your understanding,

20   correct?

21        A.    Yes.

22        Q.    Okay.  And that's what Cardinal

23   understood and had to comply with, right?

24        A.    Yes.

25        Q.    Okay.  So if we have Pharmacy

1    XYZ and it comes on as a new customer but has

2    always been ordering oxycodones every day,

3    even though it's normal for them, when we

4    compare that to other similarly situated

5    pharmacies and we see that ordering every day

6    is not normal, ABC, those orders would be

7    suspicious and they would need to be

8    reported, correct?

9              MR. PYSER:  Object to form.

10         A.    Those orders would be in orders

11   of interest.  Ordering every day in

12   quantities of 100 versus another pharmacy

13   ordering in quantities of 200, the ordering

14   every day, the pharmacy ordering 100 to fill

15   the same number of prescriptions would be

16   more frequently, so that has to be taken into

17   account also.

18   BY MR. FULLER:

19         Q.    Okay.  Let's -- help me out

20   here, so let's go back to 4915.  And I want

21   you to now show -- and Ms. Gina sitting here,

22   she'll highlight it -- you show us where in

23   this regulation that it talks about order of

24   interest.

25         A.    It doesn't.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.
 2   BY MR. FULLER:
 3        Q.     I mean, if you can point it out
 4   in there, let's talk about it.
 5        A.     It doesn't.
 6        Q.     So these are suspicious orders
 7   that it's defining in this regulation, right?
 8        A.     That's correct.
 9        Q.     And it says "orders of unusual
10   frequency," correct?  Isn't that what the
11   regulation says?
12        A.     That's the definition of a
13   suspicious order, correct.
14        Q.     Read it.  Read it.  Help me
15   out.  Let's look at it again, the last
16   sentence there.  "Suspicious orders include
17   orders of" --
18        A.     Unusual frequency.
19        Q.     Well, no, read all of them to
20   me and let's underline them as we go along.
21        A.     "Orders of unusual size, orders
22   deviating substantially from a normal pattern
23   and orders of unusual frequency."
24        Q.     Okay.  So if we have an order
25   of unusual frequency, either based on that
```

Highly Confidential - Subject to Further Confidentiality Review

1   pharmacy's history or when compared to other

2   similarly situated pharmacies, that would be

3   a suspicious order according to the

4   definition, correct?

5        A.     Once that is determined, yes.

6   It's an order of interest until it's reviewed

7   to determine whether or not that is indeed

8   true, to the best of our knowledge.

9        Q.     Well, if it's --

10       A.     Order of interest means that we

11  are reviewing it.

12       Q.     So that's not in the regulation

13  anywhere, is it?

14       A.     It's re- -- it's getting to the

15  point where it needs to be reviewed to

16  determine whether or not it is an order of

17  suspicion.

18            Like I mentioned a moment ago

19  with respect to this frequency, the frequency

20  of ordering can also be related to the sizes

21  that are being ordered.

22       Q.     And that may be true.  But the

23  policy and procedure says that orders of

24  unusual frequency are orders that occur

25  significantly more frequent than the orders

Highly Confidential - Subject to Further Confidentiality Review

1    normally placed, right?

2         A.    It goes further.  "By the

3    ordering customer or by customers that have a

4    size and type of business that is similar to

5    the ordering customer's business."

6              So unusual frequency could

7    be -- the way this is worded, in order to

8    review, become an order of interest, it's

9    going to be an order that is outside of that

10   pharmacy's ordering pattern, frequency, or

11   those of a similar size.  Those of a similar

12   size could very well be selling different

13   quantities.

14             That becomes an order of

15   interest.  The pharmacist who reviews this, I

16   have to let them speak to what they use to

17   make that determination.

18        Q.    Okay.  So is your testimony

19   that it's Cardinal's position that you may

20   have an order of unusual frequency that is

21   not a suspicious -- strike that.  Let me ask

22   it differently.

23             The regulation requires you to

24   report orders of unusual frequency, correct?

25   Yes or no?

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.      Yes, it does.

2         Q.      Okay.  And Cardinal has

3    provided its own internal definition for

4    orders of unusual frequency, correct?

5         A.      Correct.

6         Q.      And it's consistent with your

7    knowledge of what an order of unusual

8    frequency should be, right?

9         A.      Correct.

10        Q.      It's either compared to their

11   own purchasing history or others similarly

12   situated, right?

13        A.      Correct.

14        Q.      And if it falls into that -- if

15   it meets that definition, it should be

16   reported to the DEA, as you testified to

17   earlier, correct?

18        A.      Would you repeat the question?

19        Q.      Yes, sir.  If it's an order of

20   unusual frequency, it needs to be reported to

21   the DEA, right?

22        A.      Correct.

23        Q.      Okay.  Let's go to the last

24   one, the last bolded section on 4226, and

25   that's orders that deviate substantially from
```

Highly Confidential - Subject to Further Confidentiality Review

1    the normal ordering pattern.  Can you read

2    that one to us, Mr. Morse?

3         A.      "Orders that deviate

4    substantially from the normal ordering

5    pattern are orders that reflect a significant

6    deviation from the customer's normal orders

7    or that deviate substantially from the

8    ordering patterns of customers that have a

9    size and type of business that is similar to

10   the ordering customer's business."

11        Q.      And if that occurs that we have

12   orders that deviate based on that definition

13   substantially from the normal ordering

14   pattern, that would also need to be reported

15   to the DEA, correct?

16             MR. PYSER:  Object to form.

17        A.      That is -- that is correct.

18   BY MR. FULLER:

19        Q.      Okay.

20        A.      May I have -- pause for a

21   moment and go back and read what the context

22   of these rules -- this SOP.  It will take

23   just a second.

24        Q.      Sure.

25             (Document review by witness.)

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Okay.  If the context of

2     this -- the context within this SOP is we

3     have -- a threshold becomes an order of

4     interest.

5     BY MR. FULLER:

6          Q.      Okay.  So let's go back to the

7     regulation.

8          A.      May I finish my statement?

9          Q.      Oh, sure, I'm sorry.  I thought

10    you were done talking.

11         A.      No.  No, I was waiting on you.

12               In the context here, it says,

13    "The following orders are held or cut pending

14    review," it's under 6.1.1, "by QRA," and they

15    report any order that is deemed suspicious if

16    they meet one or more of these criteria.  And

17    that's the criteria that we have just been

18    talking about, orders of unusual size,

19    frequency, and normal ordering pattern.

20               The order -- an order of

21    interest -- maybe I misstated what an order

22    of interest was previously.  An order of

23    interest is one that you have not yet

24    determined whether it meets one of these, for

25    example, the threshold event, which is

Highly Confidential - Subject to Further Confidentiality Review

1     specifically what this SOP is just talking

2     about in this section.

3              Q.      Okay.

4              A.      When they reach a threshold

5     event, then they go through and determine,

6     are one of these things met.  And if they

7     are, it's reported.

8              Q.      Okay.  So let's -- let's talk

9     about that.  Let's go back to 4915.  It's up

10    on the screen in front of you.  The jury can

11    see it.

12             A.      Oh, uh-huh.

13             Q.      You show us in here where it

14    says you have to have a threshold event

15    before you can have a suspicious order.  Show

16    that -- point that out to the jury in the

17    regulation.  Because that's --

18             A.      It's not there.

19             Q.      Because that's what Cardinal

20    has to comply with, right?

21                     MR. PYSER:  Object to form.

22             Let me make my objection before you

23             answer the question.

24                     Go ahead.

25                     --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FULLER:

 2         Q.     That's what Cardinal has to

 3    comply with, correct?

 4                MR. PYSER:  Object to form.

 5    BY MR. FULLER:

 6         Q.     That's the law of the land,

 7    right?

 8         A.     That is correct.

 9         Q.     That's been enacted since 1971,

10    right?

11         A.     Uh-huh.

12         Q.     Is that a yes?

13         A.     Correct.

14         Q.     Okay.  That hasn't changed, has

15    it?  That regulation that's up there, CFR --

16         A.     The wording has not changed.

17         Q.     Correct.  21 CFR 1301.74(b).

18         A.     That's correct.

19         Q.     That requirement has been there

20    since you started and even after you left,

21    correct?

22         A.     The wording has not changed.

23         Q.     Nowhere in there does it

24    suggest or say or even reference an order of

25    interest, does it?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      No.

2          Q.      Does it say that you have to

3     have a threshold event before you can report

4     a suspicious order?

5          A.      It says in the first section --

6          Q.      My question is:  Does it say

7     that you have to have a threshold event --

8                  MR. PYSER:  Let him answer.

9          A.      Let me answer the question,

10    please.

11                 MR. PYSER:  Let him answer the

12         question before you ask your next

13         question.

14    BY MR. FULLER:

15         Q.      Okay.

16         A.      "The registrant shall design

17    and operate a system to disclose."  It

18    doesn't specify how that system is designed.

19    It says it must disclose -- it must be

20    designed and operate to disclose.

21                 Cardinal's internal process in

22    designing this program, which was done before

23    I ever came on board, used threshold events

24    as a trigger to review whether or not it met

25    any of those criteria.

1          And if it did, according to

2   this policy and procedure, they were

3   reported.

4        Q.    Great.  So let's turn back to

5   page 19.

6            MS. VELDMAN:  4085.

7   BY MR. FULLER:

8        Q.    4085, Exhibit 2.

9        A.    Page?

10       Q.    Page 19.

11       A.    Okay.  You tell the jury, for

12   CVS 219, how many of these events, these

13   threshold events, were reported to the DEA as

14   suspicious orders.  Do you know?

15            MR. PYSER:  Object to form.

16   BY MR. FULLER:

17       Q.    Just the ones for 219.

18       A.    I wouldn't know.  I would not

19   know.  Those happened -- the threshold events

20   are handled by the pharmacist group that

21   reviews the threshold events.  The threshold

22   events are reviewed by them and are -- excuse

23   me -- and are submitted to DEA by them.

24       Q.    So --

25       A.    I can't speak to -- I don't

1    know yes or no how many of these have been

2    reported.

3         Q.    So would it shock you to know

4    that none of them were reported?

5              MR. PYSER:  Object to form.

6         A.    If the process was being used,

7    you'd have to discuss that with them as to

8    why they weren't or not.  I -- shocked?  They

9    had their process.  I do not know what that

10   process was, so to be shocked would be,

11   I guess, inappropriate for me to be shocked.

12   BY MR. FULLER:

13        Q.    But look at the numbers.

14        A.    I know.

15        Q.    I mean, you have a quarter of a

16   million pills going into -- dosage units

17   going into a single pharmacy in a single

18   month.  What circumstances justify that?

19             MR. PYSER:  Object to form.

20   BY MR. FULLER:

21        Q.    Any?

22        A.    I can't answer that.

23        Q.    Why not?  You're the one that

24   investigated circumstances at the pharmacies,

25   right?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     I'm not the one that reviews
2     threshold events.
3          Q.     I'm not saying you are.
4          A.     I can't do that.
5          Q.     You investigate pharmacies,
6     right?
7          A.     We have boots on the ground.  I
8     gather information for others to make
9     decisions.
10          Q.     And you make recommendation as
11     to high risk or not high risk or medium risk
12     or low risk, right?
13          A.     Yes.
14          Q.     And so can you think of any
15     circumstances that justify a quarter of a
16     million pills going into a pharmacy?
17          A.     Those determinations will be
18     made by -- outside my area.  I cannot speak
19     to that with what they're -- what they
20     reviewed.
21          Q.     I'm not asking what they
22     reviewed.
23          A.     I have no earthly idea -- oh.
24          Q.     I'm asking you if you have any
25     idea what circumstances would justify, if you
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     can tell this jury any circumstances that you

2     believe would justify a quarter of a million

3     pills going into a single pharmacy in a

4     single month.

5            A.     Not without having --

6                   MR. PYSER:  Object -- hold on,

7            hold on.  Object to form, object to

8            form on the last three, four

9            questions.

10                  You've got to slow down.

11                  THE WITNESS:  Okay.

12                  MR. PYSER:  Let me make an

13           objection, if necessary, before you

14           answer the question.  Thank you.

15                  You can go ahead and answer the

16           question if you remember what the last

17           one was.

18    BY MR. FULLER:

19           Q.     Let's go to page 22.

20           A.     Would you state that last

21    question again?

22           Q.     No, I'm moving on.

23           A.     Okay.

24           Q.     Go to page 22.  Go to (iii).

25    "Respondent reported no suspicious orders at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    either of the CVS facilities (5195 or 219) or

 2    the independent retail pharmacies CareMed or

 3    Brooks, except for two suspicious orders made

 4    to the DEA on December 1, 2011, for

 5    CVS 19 [sic], well after the service of the

 6    Administrative Inspection Warrant."

 7              So Cardinal decided not to

 8    report CVS, apparently, until after getting

 9    served with a warrant by the DEA.  Right?

10              MR. PYSER:  Object to form.

11        A.    I don't know why they didn't

12    report.  I don't know why they reported.  I

13    can't speak to that.

14    BY MR. FULLER:

15        Q.    Right.  But clearly, they

16    didn't report until after they got served

17    with an immediate inspection warrant --

18        A.    That's correct.

19        Q.    -- on December 1st --

20        A.    That's correct.

21        Q.    -- 2011, right?

22        A.    According to that document,

23    yes.

24        Q.    You don't have any reason to

25    disagree with this document, do you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Are we -- are we in

 2     allegations, still, here?  I think we are.

 3                 What they did, I can't speak to

 4     with respect to why they didn't report those,

 5     if they reported those, or how many they

 6     reported.  I can't speak to that.

 7          Q.     Well, we know they reported two

 8     related to those four pharmacies.

 9          A.     That's what this document says.

10          Q.     But not until after being

11     served with an immediate inspection warrant

12     by the DEA.  And we saw earlier, right, that

13     this issue was being brought to their

14     attention.  We read about a meeting in

15     Washington where they asked about Florida

16     pharmacies and pay attention to the chains.

17     Remember that?

18                 MR. PYSER:  Object to form,

19          mischaracterizes.

20     BY MR. FULLER:

21          Q.     Do you remember that?

22          A.     Yes.

23          Q.     We talked about how Mallinckrodt

24     brought the letter related to Gulf Coast.

25     You remember that, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      All right.  So let's go to the

 3      next page, page 23.  "Following the service

 4      of the Administrative Inspection Warrant, or

 5      IAW, from January 1, 2012 to February 3rd,

 6      2012, the date of service of the Immediate

 7      Suspension Order" -- and you're aware and we

 8      looked at it earlier, that Cardinal got an

 9      immediate suspension order for the Lakeland

10      facility, correct?

11              A.      Yes.

12              Q.      -- "Cardinal reported 173

13      suspicious orders, none of which concerned

14      its top four retail pharmacy customers."

15                      Do you see that?

16              A.      I see it.

17              Q.      Do you know how many -- and

18      that's -- I'm sorry, January 1st of 2012 to

19      February 3rd, 2012, just over a month, right?

20              A.      Yes.

21              Q.      33 days or so.  Correct?

22              A.      Yes.

23              Q.      Report 173 suspicious orders.

24      Do you see that there?

25              A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Do you know how many they

2  reported in the three years earlier?

3      A.      No.

4      Q.      Any idea?

5      A.      No.

6      Q.      Well, let's go back a page.

7  Page 22, under section (i).  "From

8  October 1st, 2008" -- shortly after you

9  started with the company, right?

10      A.      Yes.

11      Q.      -- "through October 26, 2011,

12  Respondent reported only 41 suspicious orders

13  to the DEA."  41.  The whole state of

14  Florida, 41 suspicious orders.  And then

15  within a month they report 173 after they get

16  served with an administrative inspection

17  warrant?

18              MR. PYSER:  Object to form.

19  BY MR. FULLER:

20      Q.      I mean, can we agree it looks

21  like somebody may have been falling asleep at

22  the wheel?

23              MR. PYSER:  Object to form.

24      A.      I can't answer that.  I'm not

25  sure what they looked at.  It's not my area.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FULLER:

 2         Q.    Well, we know what they weren't

 3    looking at, right?

 4              MR. PYSER:  Object to form.

 5    BY MR. FULLER:

 6         Q.    We know they weren't visiting

 7    the CVS pharmacies, don't we?

 8              MR. PYSER:  Object to form,

 9         asked and answered.

10         A.    They were not visiting the

11    pharmacies, the CVS pharmacies.

12    BY MR. FULLER:

13         Q.    And not just in Florida.  That

14    was everywhere in the country, correct?

15              MR. PYSER:  Object to form.

16    BY MR. FULLER:

17         Q.    It was all CVSs.

18         A.    I can't -- I can't confirm

19    that, but it may or may not have been all

20    pharmacies -- all CVSs.

21         Q.    They weren't getting the sales

22    of Schedule IIIs or non-controlleds from CVS

23    either, were they?

24              MR. PYSER:  Object to form.

25         A.    Restate the question.
```

```
 1    BY MR. FULLER:
 2         Q.    Cardinal wasn't receiving the
 3    sales data that CVS had for whatever it was
 4    distributing to itself either, correct?
 5                MR. PYSER:  Object to form.
 6         A.    We established that in Florida
 7    earlier.
 8    BY MR. FULLER:
 9         Q.    Well --
10         A.    Yes.
11         Q.    I mean, it's CVS.  It's
12    everywhere.  They weren't getting prescriber
13    information either, correct?  I mean, they
14    said they were adamant about not providing
15    that.
16         A.    I do not know that for a fact.
17         Q.    Did your team ever get any?
18         A.    Do any CVS visits?
19         Q.    No, no.  Did you guys ever get
20    any prescriber information from CVS?
21         A.    Not that I am aware of.  They
22    may or may not have.
23         Q.    Did anybody in your team ever
24    get the sales data from CVSs anywhere?
25         A.    Not that I am aware of whether
```

```
1     they did or didn't.

2            Q.     Did your team ever get the drug

3     utilization reports for CVSs anywhere?

4            A.     Drug utilization report?

5            Q.     Yeah.  What's going out the

6     doors for the pharmacies -- from the

7     pharmacy.

8            A.     That's -- I wanted to be sure I

9     understood what you were talking about.  I

10    can't with -- I can't say yes or no to that.

11    I think a yes.

12           Q.     Do you remember any?

13           A.     I do not remember any.  Maybe,

14    maybe not.

15           Q.     Okay.  You don't remember any?

16           A.     No, I don't remember any.  I

17    never saw any.

18           Q.     So what causes you -- okay.

19    You never saw any, fair enough.

20           A.     How about that.

21           Q.     I got it.

22                  Let's go to page 29.  We see

23    here at the top, it says, "Based on

24    GS Carter's review of the due diligence

25    files, Respondent failed to conduct due
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diligence."  And GS Carter is Group

 2    Supervisor Carter, she's a DEA agent, I'll

 3    represent to you.

 4              It says, "At a minimum,

 5    Respondent never conducted a site visit for

 6    CVS 5195, absent an unidentified photo of CVS

 7    store located in Respondent's due diligence

 8    files, and relied upon by CVS to conduct its

 9    own due diligence."

10              You would agree with that, you

11    know of no site visits to CVS 5195, correct?

12        A.    Not an investigative site

13    visit, no.

14        Q.    Fair enough.

15              "Finally, GS Carter will

16    testify to a telephonic conversation she had

17    with Karen Gibbs, CVS corporate attorney, on

18    October 18, 2011, wherein GS Carter inquired

19    about the recent contact between CVS and

20    Cardinal Health, which precipitated a

21    suspicious order monitoring audit at CVS 5195

22    conducted by CVS District Pharmacy Supervisor

23    Jennifer" -- I'm going to go with Lalani,

24    L-A-L-A-N-I, "on October 14th, 2011.

25              "According to the conversation,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Ms. Gibbs stated that a representative from

 2    Respondent contacted CVS corporate office to

 3    report that Mallinckrodt had noticed high

 4    oxycodone sales to three Florida pharmacies

 5    and asked CVS to go out to these pharmacies

 6    and ensure that oxycodone purchases were

 7    legitimate."

 8              And again, that supports that

 9    CVS was doing their own due diligence,

10    correct?

11              MR. PYSER:  Object to form.

12         A.    At this particular pharmacy,

13    yes.

14    BY MR. FULLER:

15         Q.    And if we go back further to

16    page 33 -- well, let me ask.  So if -- and

17    you mentioned earlier that you've done a lot

18    of site visits, investigative visits on-site

19    at pharmacies.  If you go there and a manager

20    of the pharmacy is referring to himself as a

21    bouncer because customers get rowdy when the

22    pharmacist decides not to fill any more

23    prescriptions, that would be a concern,

24    right?  That would be a red flag?

25              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Not necessarily.

 2    BY MR. FULLER:

 3          Q.      Fair enough.

 4                  It wouldn't be a red flag if

 5    they're known as a bouncer because of people

 6    getting rowdy when they're told they're not

 7    going to get their prescriptions filled,

 8    particularly for controlled substances?

 9          A.      I've been on the receiving end

10    of some of that irritation when you don't

11    fill a prescription for a patient, that's --

12    that's correct.

13                  MR. PYSER:  Object to form.

14    BY MR. FULLER:

15          Q.      And that wouldn't send up a red

16    flag?

17                  MR. PYSER:  Object to form.

18    BY MR. FULLER:

19          Q.      That's my question.  Did you

20    have a general manager known as a -- a store

21    manager known as a bouncer because of those

22    issues?

23                  MR. PYSER:  Object to form.

24          A.      That would be of interest,

25    I guess, because what's the area that they're
```

1    in?  I have to know the context on that.

2    They may be in an area that's a tough area.

3              And is the bouncer -- let me

4    ask you a question here.  Is the bouncer --

5    well, I mean, let me rephrase that.  A

6    bouncer could be there just to handle

7    shoplifting or others in the pharmacy and

8    they also, when somebody gets irritated over

9    a prescription for whatever reason, takes

10   care of that situation.

11   BY MR. FULLER:

12        Q.    Were you also aware --

13        A.    Could be.

14        Q.    -- that Cardinal wasn't

15   notifying the DEA of suspicious orders but

16   they were focused on notifying of suspicious

17   customers when they were cutting them off?

18              MR. PYSER:  Object to form.

19   BY MR. FULLER:

20        Q.    Did anybody ever share that

21   with you?

22        A.    Once -- once we got to the

23   point of identifying a suspicious order, then

24   we notified them of the customer.  My role

25   was to notify DEA of the customer being shut

```
 1    off.  Whether it was reported to DEA, I

 2    don't -- I have no --

 3         Q.    Well, I mean, if you're telling

 4    DEA, that's sort of reporting it to DEA,

 5    right?

 6         A.    My role was to report the

 7    pharmacy.

 8         Q.    Oh, you would tell the

 9    pharmacy.

10         A.    Yeah.

11         Q.    I'm sorry.

12         A.    No, I would report the pharmacy

13    to DEA, that we had cut this particular

14    pharmacy -- we have discontinued the sale of

15    prescription products, specifically

16    controlled substances, to the pharmacy.

17         Q.    And was that the pattern that

18    Cardinal, when it reported a suspicious

19    order, that it was also discontinuing

20    services to the pharmacy?

21         A.    I can't say yes or no to that.

22    I don't know.

23         Q.    Are you aware of any suspicious

24    orders that were reported where the pharmacy

25    wasn't being terminated as a controlled
```

1    substance customer?

2        A.    I am not aware of any.  May or

3    may not have been.

4        Q.    So all of the ones that you are

5    aware of where suspicious orders were

6    reported over the years also involved cutting

7    off the customer from controlled substances,

8    correct?

9        A.    That's when I would have been

10   involved with it, yes.

11       Q.    Fair enough.

12             Let's go to page 36.  You see

13   Gulf Coast?  That's down in Fort Myers,

14   Florida, right?

15       A.    Sounds right.  I'm not sure if

16   it's Fort Myers, but yes --

17       Q.    You've been there, haven't you?

18       A.    Yes, I have been there, but --

19       Q.    Okay.

20       A.    -- the memory, Fort Myers, yes,

21   probably.  I don't know.

22       Q.    So if you'd turn to the next

23   page, it says, "A review of the ESOM" -- do

24   you know what ESOM stands for, Mr. Morse?

25   Does electronic monitor -- electronic system

1   suspicious order monitoring sound familiar?

2        A.     I'm not familiar with that

3   term.  I don't recall ever using or being

4   familiar with that term.

5        Q.     Fair enough.

6        A.     Is there another name for it,

7   maybe?

8        Q.     Nope.

9        A.     Okay.

10        Q.     It says, "A review of the ESOM

11   file for Gulf Coast revealed that of 61

12   shipments held for Gulf Coast, 52 shipments

13   were released, 9 shipments were cut by

14   Respondent, which consisted of four duplicate

15   orders and five cut orders."

16             Is it your understanding that

17   cut orders should be reported to the DEA as

18   suspicious?

19             MR. PYSER:  Object to form.

20        A.     I do not know.

21   BY MR. FULLER:

22        Q.     Well, do you know what a cut

23   order is?

24        A.     I guess I -- not definitively,

25   no.

```
 1          Q.     What do you believe a cut order

 2     is?

 3          A.     What I believe a cut order is?

 4          Q.     Yes, sir.

 5          A.     A guess?

 6          Q.     Go ahead.

 7          A.     No, sir.

 8                 MR. PYSER:  Object to form.

 9     BY MR. FULLER:

10          Q.     Tell us what your understanding

11     of cut order is.

12          A.     I do not know what a cut order

13     is.

14          Q.     So you have no idea what a cut

15     order is.

16                 MR. PYSER:  Object to form.

17     BY MR. FULLER:

18          Q.     When an order is cut?  Is that

19     right?

20                 MR. PYSER:  Object to form.

21          A.     When an order -- well, if you

22     say it that way, when an order is cut, then

23     that order did not go to the customer.

24     BY MR. FULLER:

25          Q.     And if an order is cut, should
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that be reported to the DEA?

 2              MR. PYSER:  Object to form.

 3    BY MR. FULLER:

 4         Q.    If you know.

 5         A.    I don't know the answer to

 6    that.  I don't know what --

 7         Q.    Fair enough.

 8         A.    -- what was reviewed.

 9         Q.    It says further down in that

10    paragraph, "Respondent did not make any

11    suspicious order reports to the DEA regarding

12    Gulf Coast, including with respect to the

13    five non-duplicate cut orders occurring on

14    April 17th, 2009; September 21st, 2009;

15    December 3rd, 2009; and October 4th, 2011."

16              Do you see that there?

17         A.    I do.

18         Q.    It mentions the cut orders and

19    they weren't reported, right?

20         A.    Those are the dates for the

21    five cut orders.  Okay, I see it.

22         Q.    It says, "Based on customer

23    files, Respondent conducted five" -- that

24    means Cardinal -- "conducted five QRA site

25    visits."
```

1          What's QRA stand for?

2     A.     Quality regulatory.

3     Q.     And Gulf Coast isn't a

4  CVS-owned pharmacy, right?

5     A.     Excuse me?

6     Q.     Gulf Coast is not a CVS-owned

7  pharmacy, is it?

8     A.     No.

9     Q.     It's not a chain, it's what's

10  called a retail independent, correct?

11     A.     Yes.

12     Q.     It says, "conducted five QRA

13  visits, four of which were conducted by

14  Mr. Moellering and one conducted by

15  Mr. Morse," who would be you, right?

16     A.     Yes.

17     Q.     And who is Mr. Moellering?

18     A.     He was the investigator for the

19  Florida area reporting to me.

20     Q.     And it says, "On August 12,

21  2008, Mr. Moellering conducted a site visit

22  wherein he noted the site was 'low risk for

23  diversion.'  On April 30, 2009,

24  Mr. Moellering conducted a second site visit

25  wherein he noted:  'Owner states higher cash

1    sales due to loss of insurance by customers;

2    reported hearsay from individuals claiming

3    that this pharmacy would only accept cash for

4    oxycodone and sold it by the pill.'"

5              That would be a red flag

6    indicator, would it not?

7         A.    Would be something to consider,

8    yes.

9         Q.    Why is that?  Why would it be

10   something to consider?  Because if we're

11   dealing in cash only, it's not running

12   through insurance companies anymore, correct?

13        A.    Yes.

14        Q.    And selling by the pill is

15   probably not filling a full prescription.  We

16   can agree on that as well, right?

17        A.    This is an allegation.

18        Q.    Well, it's --

19        A.    It was reported.  Is it true,

20   is it not.

21        Q.    It's information that one of

22   your investigators wrote in his report,

23   right?

24        A.    Right.  And he reported it as

25   hearsay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    He did.  But how else is he
2  going to report it?
3    A.    I don't understand the
4  question.
5    Q.    Well, how else is he going to
6  report it?  Hearsay is something that
7  somebody else said.  Mr. Moellering can't say
8  that they were only giving me one
9  prescription or one pill per prescription
10  because Mr. Moellering didn't get
11  prescriptions filled there, did he?
12    A.    Who are the individuals?  Okay.
13  If it's hearsay information, he had received
14  it from someone else is your definition of
15  hearsay information.
16    Q.    What's your definition of
17  hearsay information?
18    A.    I don't know the definition of
19  "hearsay information."
20    Q.    Okay.
21    A.    Hearsay information for me,
22  when I hear "hearsay," I think unreliable.
23  Sorry.
24    Q.    Okay.  No, that's fair.  That's
25  fair.  I mean, it probably was somebody

Highly Confidential - Subject to Further Confidentiality Review

1   unreliable.  It's probably someone seeking

2   drugs who said it to Mr. Moellering when he

3   was walking out of the drugstore.

4               MR. PYSER:  Object to form.

5       Move to strike.

6   BY MR. FULLER:

7       Q.    It says, "'Twice during the

8   interview, I specifically asked Mr. Green how

9   most of the customers paid for pain

10  medications.  He related some had insurance

11  while others have to pay cash due to losing

12  their insurance.  He would not say anything

13  about charging by the pill or accepting cash

14  only.'

15              "On December 11th,

16  Mr. Moellering conducted a third site visit.

17  He noted that" -- and let me ask, let me stop

18  there.  Why is he going back so many times in

19  such a relatively short time frame?

20      A.    He was requested to.

21      Q.    By whom?  Do you know who would

22  have made this request?

23      A.    It would have been the

24  pharmacist reviewing the threshold events or

25  Mister -- or as we've stated earlier,

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Moné.

2         Q.    It could have been anybody in

3    the hierarchy, right?

4         A.    Yes.

5         Q.    Because as you mentioned

6    earlier, I think, is if anybody had a

7    concern --

8         A.    It would filter through, yes.

9         Q.    Maybe even the PBC.  If the

10   sales rep had a concern, he could filter it

11   through as well, right?

12        A.    Others made the decision as to

13   if it needed to be visited.

14        Q.    Got it.

15             I'm sorry.  So "He would not

16   say anything"...

17             Okay.  I'm sorry.  "On

18   December 11th, 2009, Mr. Moellering conducted

19   a third visit.  He noted as per this

20   particular visit:  'Does not present a

21   significant risk for diversion.'  And on

22   October 5th, 2010, Mr. Moellering and

23   Mister" -- is that Moro?  Do you know who

24   that is?  And if you don't, that's fine.

25        A.    He's a sales rep, but that is a

Highly Confidential - Subject to Further Confidentiality Review

1    hazy recollection.

2         Q.    Okay.  "Mr. Moro conducted a

3    site visit.  Notes from the particular site

4    visit reflect the following:  'CAH, PBC'" --

5         A.    Stop.  Oh, Lenny Moro, I'm

6    sorry.  I saw Lenny, I thought this was a

7    different person.  I apologize.

8         Q.    Okay.

9         A.    So he is the pharmacy

10   salesperson.

11        Q.    Okay.  "'Lenny Moro, has

12   observed groups of white males and females

13   coming into the pharmacy during the late

14   afternoon visits to have their scripts

15   filled; they leave in small groups.'  The

16   report also stated:  'Owner requested an

17   increase in oxycodone thresholds even

18   higher - dispensing data revealed that

19   462,776 units of oxycodone dispensed within

20   two months.'  'I am not convinced that the

21   owner is being forthright pertaining to his

22   customers' -- customers' origin or residence.

23   I have requested permission to contact the

24   DEA to resolve this issue.'"

25              Do you recall Mr. Moellering

 1    requesting permission to contact the DEA?

 2         A.    Yes.

 3         Q.    Was he permitted to contact the

 4    DEA or do you recollect?

 5               MR. PYSER:  Object to form.

 6         A.    Yes.

 7    BY MR. FULLER:

 8         Q.    So he was allowed to call the

 9    DEA?  Fantastic.  Let's keep reading.  "High

10    risk of diversion."

11               MR. PYSER:  Object to form.

12    BY MR. FULLER:

13         Q.    "Despite Moellering's findings

14    and recommendations, Respondent," meaning

15    Cardinal, "did not contact DEA.  Respondent

16    not only continued to ship oxy 30-milligram

17    tablets to Gulf Coast, but subsequently

18    increased shipments shortly thereafter."

19               Now, this was his visit in

20    October, right?  October 5th.

21         A.    May I make a clarification,

22    then?  The question you asked me, did he

23    have -- was he given permission to contact

24    DEA.

25         Q.    Yep.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      He did so.  Once.

 2              Q.      And who gave him -- who had to

 3      give him permission?

 4              A.      This -- I did.  I did.  He

 5      asked me "Can I contact DEA," and I said yes.

 6              Q.      Okay.

 7              A.      This particular situation must

 8      be a different situation.  I don't remember

 9      this situation.

10              Q.      Oh, so you're talking about he

11      may have asked related to something else?

12              A.      I don't -- it was related to

13      Gulf Coast.

14              Q.      But it may be on a different

15      occasion?

16              A.      I don't know whether it was

17      prior to this, after this.  Obviously it

18      sounds like from this one it was not this

19      one.

20              Q.      Fair enough.  Fair enough.

21      So --

22              A.      Does that clarify any question?

23              Q.      Yes, sir.  Yes, sir.

24                      So this investigation was

25      conducted on October 5th, right, if you go
```

Highly Confidential - Subject to Further Confidentiality Review

1    back a page.

2         A.    Looks like that's October 5th,

3    yes.

4         Q.    So then on November 24th -- and

5    again, he rated this facility as high risk of

6    diversion, but then "On November 24th,

7    Respondent adjusted Gulf Coast's monthly

8    volumes of oxycodone from 141,000 to

9    207,200."

10              Do you see that?

11        A.    "Despite" -- I'd like to read

12   it here.  Where are we?  "With respect to

13   Mr. Moellering's" -- okay, there we go, I

14   gotcha.

15              (Document review by witness.)

16        A.    Okay, your question again?

17   BY MR. FULLER:

18        Q.    Well, my question is, in

19   October, one of your -- and granted, I've

20   looked through a lot of Cardinal documents.

21   It appears Mr. Moellering did a lot of

22   investigations for you and was based out of

23   Lakeland.  Is that right?

24        A.    Correct.

25        Q.    And seemed to be a relatively

Highly Confidential - Subject to Further Confidentiality Review

1    good investigator for Cardinal, correct?

2          A.    Correct.

3          Q.    And in October, he's asking to

4    call in the DEA and labeling this as a high

5    risk for diversion, citing all his reasons

6    for that.  And then in November -- again,

7    I guess it's not your department, but again,

8    in November, Cardinal again is increasing the

9    thresholds by another 25%.  Over 25%.  From

10   140 dosage units per month for oxycodone

11   alone to 207, right?

12         A.    Correct.

13         Q.    Well, let's -- does that cause

14   you any concern?  I mean, maybe there's a

15   disconnect between the people setting

16   thresholds and the people doing

17   investigation, because they're separate

18   department or separate areas, separate

19   persons, correct?

20         A.    The information -- no, that is

21   not correct.  Excuse me.

22         Q.    They're not separate persons?

23         A.    There's not a disconnect, speak

24   to that.  The --

25         Q.    So --

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      The reports go into the
2    customer's --
3          Q.      The due diligence file?
4          A.      -- the due diligence file, I
5    think, whatever we call it, so they're
6    available to the person reviewing threshold
7    events.
8          Q.      So the people that were
9    releasing the orders that we read about
10   earlier that are increasing these thresholds,
11   they have all this information at their
12   fingertips, right?
13              MR. PYSER:  Object to form.
14         A.      They can get this information.
15   BY MR. FULLER:
16         Q.      Now, you don't know sitting
17   here today whether they actually looked at it
18   or not, do you?
19         A.      I cannot.
20         Q.      Okay.  You would suspect, or
21   hope, at least, that if somebody is sending
22   you out there to do the investigations, that
23   they're going to use the information you give
24   them, right?
25              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      Correct.
 2    BY MR. FULLER:
 3           Q.      Okay.  Let's go on.  "With
 4    respect to Mr. Moellering's October 5th
 5    findings, the PDF customer file contained the
 6    following notations:  October 29th,
 7    Respondent stated:  'Review -- reviewed, no
 8    changes.'  On the same date, regarding the
 9    SOM oxycodone event of 147,700 [sic] for
10    October 2010, Respondent released the
11    shipment, stating:  'Not unreasonable, order
12    released, no threshold adjustment.'  By
13    releasing the shipment of 147,000 -- excuse
14    me -- 144,700, Respondent filled an order
15    that exceeded the monthly threshold for
16    Oxycontin of 141,000 then in effect for
17    Gulf" -- then in effect for Gulf Coast that
18    Respondent itself established.
19                I mean, somebody should have
20    been reading their file when they're doing
21    this, right?
22                MR. PYSER:  Object to form.
23    BY MR. FULLER:
24           Q.      Whoever is approving this
25    order.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I don't know if they did or

 2    didn't.

 3          Q.     Right.  But they sure should

 4    be.  You would agree with that, right?

 5                 MR. PYSER:  Object to form.

 6          A.     I don't know if they did or

 7    didn't.

 8    BY MR. FULLER:

 9          Q.     But they should be, correct?

10          A.     Information is available.

11                 MR. PYSER:  Object to form.

12          Before you answer the question, please

13          let me object if necessary.  Sorry to

14          interrupt your questioning.

15                 MR. FULLER:  That's all right.

16    BY MR. FULLER:

17          Q.     You don't know if they used it,

18    do you?

19          A.     No.

20          Q.     But they should?

21                 MR. PYSER:  Object to form.

22    BY MR. FULLER:

23          Q.     Can we agree on that?

24                 MR. PYSER:  Object to form.

25          A.     That's the way I believe our
```

1    system was set up, yes.

2    BY MR. FULLER:

3        Q.    At least it was supposed to

4    work that way, correct?

5        A.    Yes.

6        Q.    Okay.  Then "On

7    November 9th" -- this is, again, just a few

8    days later, "Mr. Morse" -- that would be you,

9    right?

10       A.    Yes.

11       Q.    -- "wrote a memorandum to the

12   file which stated:  'The primary prescribers

13   identified by the pharmacy -- pharmacy owner

14   are local, one exception being an orthopedic

15   surgeon.'"

16            Now, again, that's like the

17   information we talked about getting from CVS.

18   Sometimes it's helpful to gain that

19   information, correct?

20       A.    Correct.

21       Q.    Okay.  And then you say, "'Not

22   unreasonable.'  The fill -- the file further

23   reflected:  'Pharmacy is medium risk and

24   subject to close monitoring.'  On

25   January 28th, 2011, Gulf Coast owner, Jeff

1    Green, provided a survey response which

2    stated the limit needs to be raised to 450

3    bottles per week."

4              Did I read that right?

5              MR. FULLER:  Underline that.

6        A.    I see it.  You read it right.

7    BY MR. FULLER:

8        Q.    450 bottles a week.  100 bottle

9    count, that's how many pills.  That's 45,000

10   pills per week.

11       A.    Correct.

12       Q.    I mean, his request alone

13   should send up red flags, correct?

14             MR. PYSER:  Object to form.

15       A.    With -- without a context, I

16   would say, yes.  With a context, maybe not.

17   BY MR. FULLER:

18       Q.    And we need to know the

19   context.  We need to look at his due

20   diligence file and see the context.  We've

21   seen what Mr. Moellering has written about

22   them, right?

23       A.    Uh-huh.  Yes.

24       Q.    "High risk of diversion" is

25   what Mr. Moellering last wrote in October,

Highly Confidential - Subject to Further Confidentiality Review

1    isn't it?

2           A.      In October, yes.

3           Q.      "On February 17th, 2011, a site

4    visit conducted by Mr. Morse" -- now, this

5    time you're not just doing a memo to the

6    file; you're actually going out there, aren't

7    you?

8           A.      Yes.

9           Q.      Did you take Mr. Moellering

10   with you?  He had been out there four times

11   already.

12          A.      Not at this time.

13          Q.      Why not?  He had already been

14   out there a bunch.

15          A.      I spoke with Mr. Moellering.

16          Q.      Well, sure.

17          A.      And got the information I

18   needed from him to use in the investigation.

19   I went to see and did the investigation and

20   my visit based upon I wanted to have a

21   discussion with the owner.

22          Q.      And it says that you noted that

23   the pharmacy was medium risk for diversion.

24   "Nonetheless, Respondent increased Gulf

25   Coast's order thresholds 3 times in the

Highly Confidential - Subject to Further Confidentiality Review

 1    following four months.  The dates and amount

 2    of the adjustments are as follows."

 3         A.    Uh-huh.

 4         Q.    On April '11 it went from

 5    207,000 to 245.  Same month, at the end,

 6    April 27th, 2011, 245,000 to 265,000.  Then

 7    in May, on the 26th, 211,000 -- excuse me,

 8    2011, 265,000 to 317,000 dosage units in a

 9    month.

10              It says, "These increases

11    constitute a 65% increase in Cardinal's

12    authorized shipment volume of oxycodone over

13    a two-month period."

14              After the time you visited and

15    all these additional increases were going on,

16    was there any more visits that you're aware

17    of to Gulf Coast?

18         A.    On January -- no, I went on

19    February 17th of 2011.

20         Q.    And this is May.

21         A.    May --

22         Q.    I haven't seen any.  I'm just

23    wondering if you recollect anything.

24              MR. PYSER:  Object to form.

25         A.    I do not -- I do not recall

1    any.

2    BY MR. FULLER:

3        Q.    Okay.  And then we know, the

4    end of 2011, DEA comes and serves Mr. Green

5    with administrative inspection warrant and

6    Mr. Green voluntarily turns in his DEA

7    registration, doesn't he?

8        A.    Correct.

9        Q.    I mean, you knew that when it

10   happened, right?

11       A.    Correct.  We had determined at

12   that time -- prior to that time, we became

13   aware that Mister --

14       Q.    Green?

15       A.    -- Green -- is that the

16   pharmacy owner there -- had not been

17   forthright in his information he provided.

18   When that happened, he was terminated

19   immediately, once we realized the

20   self-reporting information he gave to us was

21   incorrect and not accurate.

22       Q.    Well, Mr. Moellering pointed

23   that out way back in October, didn't he?

24       A.    Let's go back and take a look

25   at it.  Where?

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Mr. Moellering, "I am not

2  convinced that the owner is being forthright

3  pertaining to his customers' origin or

4  residence."

5       A.      Yes.

6       Q.      "I have requested permission to

7  have DEA resolve this issue."

8       A.      Yes.

9       Q.      And it took --

10      A.      That is self-reported

11  information.

12      Q.      It took Cardinal another year?

13      A.      That's not the information that

14  we found to be inaccurate.  We have no way of

15  checking that information.  The --

16      Q.      And again, this goes back to a

17  fundamental question.  What were -- I mean,

18  let's go to our policies and procedures.

19  What were like, similarly situated pharmacies

20  getting?  Who compared that?  Because we know

21  we had threshold events.  We had them all the

22  time.

23      A.      The people who were reviewing

24  threshold events.

25      Q.      So that would be the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacy -- the pharmacist.  Weren't most of

 2    those people pharmacists?  Who reviewed

 3    threshold events?  Tell the jury.

 4         A.    I would think at that time --

 5         Q.    Anytime.  Give me them all.

 6    Best you can, at least.

 7         A.    I can only give you in my time

 8    there, and that would have been -- they were

 9    all pharmacists.

10         Q.    Tell me some of the names.

11         A.    The two I remember are Chris

12    Forst -- excuse me -- and Michael Moné.

13    Chris --

14         Q.    Okay.  What about --

15         A.    Chris Forst did have other

16    pharmacists who were helping him that I don't

17    remember the names or how many.

18         Q.    How about Anna-Soisson?  Is

19    that right, Anna-Soisson?

20         A.    That's one of them, yes.

21         Q.    Okay.  That's the only other

22    name I knew.

23         A.    But that was not the only one.

24    There was at least one other.

25         Q.    But you would agree with me,
```

1    based on the policies and procedures that we

2    saw, we should be able to look somewhere and

3    see that that comparison was done, right?

4                MR. PYSER:  Object to form.

5         A.    If the comparison was done,

6    yes, that's recorded in the --

7    BY MR. FULLER:

8         Q.    Due diligence file?

9         A.    No, it's recorded in the review

10   of threshold events.

11        Q.    Well, so my -- let's make sure

12   that you and I are on the same page.

13        A.    Maybe we're not talking about

14   the same thing, okay.

15        Q.    We have a pharmacy now that's

16   getting thresholds well over a quarter of a

17   million pills per month of oxycodone,

18   correct?

19        A.    Yes.

20        Q.    I'm asking, where would we look

21   to see that comparison that we read about in

22   the policies and procedures that compare

23   similarly situated pharmacies to see if we

24   have an outlier here with Gulf Coast?  And my

25   understanding of your testimony is that would

1    be the pharmacist threshold people --

2         A.    Yes.

3         Q.    -- that would do that type of

4    analysis.

5              MR. PYSER:  Object to form.

6              Go ahead and answer.

7         A.    Yes.

8    BY MR. FULLER:

9         Q.    Okay.  And we should see that

10   documented somewhere, that they did the --

11   again, like your investigations, that they

12   did this analysis, this is their findings and

13   this is how they're justifying increasing the

14   thresholds.

15             MR. PYSER:  Object to form.

16        A.    I cannot speak to where they

17   would have -- how they would have documented

18   it.

19   BY MR. FULLER:

20        Q.    No, but it should be documented

21   somewhere, right?

22             MR. PYSER:  Object to form.

23        A.    I would say yes.

24             MR. PYSER:  Let's --

25             MR. FULLER:  I want to take a

Highly Confidential - Subject to Further Confidentiality Review

```
 1          break and I'll get you the lunch

 2          things.

 3                  MR. PYSER:  Let's just break.

 4          It's almost 1:00 o'clock.  I think we

 5          can break for lunch.

 6                  MR. FULLER:  Yeah.

 7                  THE VIDEOGRAPHER:  Off the

 8          record at 12:47.  This concludes

 9          Tape 3.

10                  (Recess taken, 12:47 p.m. to

11          2:17 p.m.)

12                  THE VIDEOGRAPHER:  All right,

13          stand by.  Okay.  We are back on the

14          record at 2:17.  This begins Tape 4.

15  BY MR. FULLER:

16      Q.    All right, Mr. Morse.  This

17  document is going to need an exhibit sticker.

18                  (Cardinal-Morse Exhibit 9

19          marked.)

20                  MS. VELDMAN:  That was --

21                  MR. FULLER:  Sorry, 2650.  It's

22          going to be Plaintiffs' Exhibit 9 for

23          the record.

24  BY MR. FULLER:

25      Q.    These are three letters that
```

1    were sent to Cardinal by the DEA, by a

2    gentleman by the name of Joe Rannazzisi.

3              Have you ever seen any of these

4    letters before?  The first one is all the way

5    at the back.  It was sent on September 27th

6    of 2006.  The second one, which is virtually

7    identical to the first one, was sent on

8    February 7, 2007, and the final one,

9    December 27th, 2007 --

10        A.    Give me a moment to read them.

11        Q.    -- all produced to us by your

12   lawyers.

13        A.    Okay.

14              (Document review by witness.)

15   BY MR. FULLER:

16        Q.    Do you recall ever seeing

17   those?

18        A.    You say the first one and the

19   second one seem to be the same?  Do you know

20   what the differences were?  You said they

21   were essentially the same.

22        Q.    You're more than welcome to

23   take a look at them.  Do you recall ever

24   reviewing any of the letters from the DEA?

25        A.    I recall reviewing a letter

Highly Confidential - Subject to Further Confidentiality Review

1  from DEA.  I am not sure -- this is years

2  ago, of course.

3          Q.    Do you know what that letter --

4          A.    I don't remember if -- I don't

5  think it was this third one.  I believe it

6  was one or either of these first two from --

7  the earlier ones.

8          Q.    Okay.  Fair enough.

9                So if you look at the one from

10  September --

11          A.    I was given it just as

12  historical information at the time.

13          Q.    So that would have been around

14  the time you started?

15          A.    Yes.

16          Q.    Is that your recollection?

17          A.    Uh-huh.  Yes.

18          Q.    So let's look at the one from

19  September 27th of 2006.  Do you have that in

20  front of you?  It's page 7.

21          A.    Yes.

22          Q.    And it indicates U.S.

23  Department of Justice, Drug Enforcement

24  Administration, right?

25          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      September 27th, like I said,

 2   2006.  It says, "Dear Sir or Madam:  This

 3   letter is being sent to every commercial

 4   entity in the United States registered with

 5   the Drug Enforcement Administration, or DEA,

 6   to distribute controlled substances," and

 7   that would include Cardinal, to the best of

 8   your knowledge, for this time frame.  Is that

 9   right?

10           A.      Yes.

11           Q.      It says, "The purpose of this

12   letter is to reiterate the responsibilities

13   of controlled substance distributors in view

14   of the prescription drug abuse problem our

15   nation currently faces."

16              You agree that during this time

17   frame, our nation was in the throes of a

18   drug -- of a prescription drug abuse problem,

19   correct?

20           A.      Yes.

21           Q.      If you'll turn to the second

22   page, so you're on page 8 of this document,

23   and you'll see down there an indented section

24   that refers to the regulation that we've

25   looked at several times.  Do you see that?
```

1    It says, just above it, "The DEA regulations

2    require all distributors to report suspicious

3    orders of controlled substances.

4    Specifically, the regulations state in 21 CFR

5    3101.74(b)," and then it recites the

6    regulation that you've discussed earlier

7    today, correct?

8         A.    Correct.

9         Q.    And then it's states, "It bears

10   emphasis that the foregoing reporting

11   requirement is in addition to, and not in

12   lieu of, the general requirement under 21

13   U.S.C. 823(e), that a distributor maintain

14   effective controls against diversion."

15            Do you see that section?

16        A.    I do.

17        Q.    It then goes on to say, "Thus,

18   in addition to reporting all suspicious

19   orders, a distributor has a statutory

20   responsibility to exercise due diligence to

21   avoid filling suspicious orders that might be

22   diverted into other than legitimate medical,

23   scientific or industrial channels."

24            Do you see that?

25        A.    Yes.

1    Q.    Let me ask, generally, under 21

2    U.S.C. 823(e), do you agree that Cardinal has

3    an obligation to maintain effective controls

4    against diversion?

5              MR. PYSER:  Object to form.

6    A.    I'll take that this statement

7    is correct.

8    BY MR. FULLER:

9    Q.    Let's go to the paragraph above

10   where we started.  "The statutory factors DEA

11   must consider in deciding whether to revoke a

12   distributor's registration are set forth in

13   21 U.S.C. 823(e).  Listed first among these

14   factors is the duty of the distributors to

15   maintain effective controls against diversion

16   of controlled substances into other than

17   legitimate medical, scientific and industrial

18   channels."

19             Do you see that, Mr. Morse?

20   A.    I do.

21   Q.    And do you agree that Cardinal

22   has an obligation -- and let me stop for a

23   second.  Do you understand the difference

24   between the Code of Federal Regulation, which

25   we were looking at earlier, and the U.S.C.,

Highly Confidential - Subject to Further Confidentiality Review

1    which is the United States Code enacted by

2    Congress?

3              MR. PYSER:  Object to form.

4         A.    The first one is the statute.

5    The second one is the rules that are

6    promulgated pursuant to that statute under

7    the authority of that statute.

8    BY MR. FULLER:

9         Q.    So the United States Code, what

10   we're looking at now, here, being cited,

11   you're referring to it as "the statute."  Am

12   I understanding you correctly?

13        A.    That's U.S. Code I understand

14   to be the federal law, statute.

15        Q.    And I'm not disagreeing with

16   you.  You're absolutely right, actually.

17              And then the Code of Federal

18   Regulation, the regs that we looked at

19   earlier, you understand to be those regs

20   promulgated by the agency given authority to

21   do so in that particular area, correct?

22        A.    Under that Code, yes.

23              MR. PYSER:  Object to form.

24   BY MR. FULLER:

25        Q.    And 21 U.S.C. 823 you

```
 1    understand to be the Controlled Substance

 2    Act, correct?

 3               MR. PYSER:  Object to form.

 4         A.    I don't know that I remember

 5    the number.  There is a controlled -- a

 6    federal Controlled Substance Act.

 7    BY MR. FULLER:

 8         Q.    And do you recollect that the

 9    Controlled Substance Act applies to, amongst

10    others, wholesale distributors --

11         A.    I do.

12         Q.    -- such as Cardinal?

13         A.    Absolutely.

14         Q.    You would agree that Cardinal

15    needs to comply with the requirements of the

16    statutes set out in the Controlled Substance

17    Act, right?

18               MR. PYSER:  Object to form.

19         A.    I would say yes.

20    BY MR. FULLER:

21         Q.    Okay.  So according to the

22    letter from the DEA, at least in 2006, a

23    letter which you believe you were shown when

24    you began your job at Cardinal --

25         A.    I believe so.
```

1        Q.      -- Cardinal not only had an

2    obligation to comply with the regulations,

3    suspicious order monitoring, create and

4    implement a system and then report, and they

5    also need to comply with the Code of

6    Federal -- excuse me, the U.S. Code, the

7    actual law related to controlled substances,

8    correct?

9                MR. PYSER:  Object to form.

10       A.      I would say yes.

11   BY MR. FULLER:

12       Q.      And do you have knowledge -- is

13   it your -- strike that.

14               Is it your understanding that

15   Cardinal effectuated controls to maintain

16   systems to prevent diversion?

17       A.      Would you restate the question?

18       Q.      Yes.  Is it your understanding

19   that Cardinal took steps to maintain controls

20   to prevent diversion of --

21       A.      Yes.

22       Q.      -- controlled substances?

23       A.      Absolutely.

24               THE WITNESS:  Excuse me.

25               MR. PYSER:  Are you okay?  Do

Highly Confidential - Subject to Further Confidentiality Review

 1          you need a break?

 2   BY MR. FULLER:

 3          Q.     Are you all right?  Do you need

 4   something to drink?

 5          A.     No, it's the time of year.

 6   Allergies.

 7          Q.     Got it.  Got it.

 8                 All right.  Have you ever been

 9   to Woodstock, New York?

10          A.     No.

11          Q.     Do you know where it is?

12          A.     Not other than New York.

13          Q.     Well, it's in upstate New York

14   and the only reason I know that is I've got a

15   cousin who, for some ungodly reason, even

16   though he lives in the city, decided to go up

17   to Woodstock to get married.  Not that

18   there's anything wrong with him getting

19   married.  That's not the ungodly reason.  The

20   ungodly reason is why in Woodstock.

21                 Thank you.  So I've got

22   P1.3745, I'll pass along to Mr. Pyser.

23                 (Cardinal-Morse Exhibit 11

24        marked.)

25                 MS. VELDMAN:  1.3745.

```
 1              MR. FULLER:  I'm sorry.  3745.

 2        Oh, and it's marked as Plaintiffs'

 3        Exhibit 11.  I know I skipped 10.  10

 4        will come in a minute.

 5   BY MR. FULLER:

 6        Q.    Have you seen this document

 7   before, Mr. Pyser -- Mr. Pyser.

 8              Have you seen this document

 9   before, Mr. Morse?

10        A.    Give me a moment.

11        Q.    Well, you're on the e-mail,

12   right?

13        A.    Give me a moment.

14              What do you consider the

15   document, this or all of this?

16        Q.    Well, I'm going to gamble on

17   the whole thing.

18        A.    Okay.

19        Q.    Because the e-mail says it's

20   from you and it specifies the attachments.

21   And we printed out the attachments to the

22   e-mail as produced by the defendants.

23        A.    Gotcha.

24        Q.    Now, I'll tell you that there

25   are I think some sections that may be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    redacted.  For example, on page 5, you see

 2    that?  I think something was redacted from

 3    that page because it says "Redacted."  It's a

 4    guess.  I'm going out on a limb there.

 5              MR. PYSER:  Object to form.

 6              MR. FULLER:  What, that I'm

 7         going out on a limb?

 8              MR. PYSER:  For the sarcasm.

 9              MR. FULLER:  Oh.  Fair enough.

10         Sustained.

11              MR. PYSER:  I don't mind it in

12         this room.  I just don't want it in

13         there permanently.

14              MR. FULLER:  There you go.

15              THE WITNESS:  Let me start

16         through the e-mails real quickly.

17    BY MR. FULLER:

18         Q.    Yes, sir.  I'd like you to take

19    a look at the e-mail.  This appears to be an

20    e-mail that you drafted.  Is that right?

21         A.    I'm starting at the beginning.

22         Q.    Yes, sir.  I'm looking at the

23    very front page.  Do you see that?

24         A.    This was from me to

25    Mr. Whitmore.  Mr. Whitmore was an
```

```
 1    investigator, so this was a request to visit

 2    a facility.

 3         Q.    Okay.  So this e-mail, at least

 4    the top one on the page, was drafted by you,

 5    correct?

 6         A.    Yes, to Mister -- to Mr. Jerry

 7    Whitmore.

 8         Q.    Mr. Gerard Whitmore, who you

 9    said was an investigator, and you CC'd

10    Mr. Moné.  Is that right?  He's just below

11    Mr. Whitmore.

12         A.    Yes, I did.

13         Q.    And you sent it on March 20th

14    of 2012, correct?

15         A.    Yes.

16         Q.    And it says "Progression, FP,"

17    and gives a number -- oh, I'm sorry.  It says

18    "DEA Request - Woodstock" -- help me out with

19    that.  App- -- app- -- blah.

20         A.    I'm not sure where you're even

21    reading.

22         Q.    The subject line.

23         A.    The subject line?

24         Q.    Read the subject line to me.

25              MR. PYSER:  I think you're
```

Highly Confidential - Subject to Further Confidentiality Review

1          looking for the word apothecary.

2          A.      Apothecary.

3     BY MR. FULLER:

4          Q.      There you go, apothecary.

5          A.      It's a fancy word for pharmacy.

6          Q.      And it says "Attachments," and

7     it has several attachments there, correct?

8          A.      Yes.

9          Q.      Now, was it normal course that

10    when you were forwarding someone information

11    related to conducting an investigation, that

12    you would provide them with some information?

13         A.      Yes.

14         Q.      And then you write, "Jerry,"

15    and read it aloud to us.

16         A.      "Jerry, DEA has requested

17    hydrocodone purchase data from Kinray for

18    this customer.  Please visit ASAP.  A copy of

19    the Tableau file and the Kinray KAPQ file is

20    attached.  Check the hydrocodone usage,

21    especially the 10/325 strength."

22         Q.      Hydrocodone, we know the 10/325

23    was one of the more abused dosage units,

24    correct?

25              MS. RANJAN:  Object to form.

```
 1                    MR. PYSER:  Same objection.

 2         A.      Somebody say something to me?

 3    BY MR. FULLER:

 4         Q.      No, they were talking down

 5    there by themselves.  Don't worry about it.

 6         A.      Okay.  The 10/325?

 7         Q.      Yes, sir.

 8         A.      Yes.

 9         Q.      Okay.  And let's talk about

10    Tableau.  What's Tableau or "tab-blew"?  What

11    is that?

12         A.      If memory serves, that's the

13    document on the third page.

14         Q.      Now -- and that's what I

15    thought too, but what is the document on the

16    third page?  Is this something that you had

17    access to for certain pharmacies?

18              Let me back up.  Let me ask you

19    a different question, Mr. Morse.

20         A.      I'm still trying to answer your

21    first question unless you don't want the

22    answer.

23         Q.      Well, no, that's fine.  I was

24    just going to ask have you ever seen the

25    Tableau documents or do you normally use
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    them, because you look a little puzzled.
2         A.    Normally I would not see them.
3         Q.    Who would normally see them or
4    who utilized these documents, to the best of
5    your knowledge?
6              MR. FULLER:  Don't yawn,
7         Mr. Pyser.  It's too early.
8         A.    What's the date on this?  Is
9    there a date on this thing too?
10   BY MR. FULLER:
11        Q.    Well --
12        A.    Yeah, okay.  I am not that
13   familiar.  I have seen documents like this
14   that changed over time as we were able to get
15   additional information, on occasion.  But
16   this is not something that I normally
17   reviewed.
18        Q.    Who would have access to these
19   documents?  Do you know who used them?
20        A.    Well, the people that have
21   access to them would be the pharmacists that
22   were doing the threshold events, Michael
23   Moné, those, to get a snapshot of a pharmacy.
24        Q.    Well, and a snapshot over a
25   period of time, at least according to this
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    document, right?

2         A.     Yeah, yeah, it appears to be

3    over a period of time.

4         Q.     Okay.  So you, as an

5    investigator, didn't normally have ready

6    access unless somebody gave these to you or

7    something of that nature, correct?

8         A.     Yes, I would agree with that.

9         Q.     Okay.  So you're forwarding a

10   copy of the Tableau and then the Kinray

11   K-A-P-Q file, which I'm assuming is the

12   remainder of the file there.

13        A.     I have no idea what that stands

14   for.  This is a Kinray document.

15        Q.     Now, Cardinal did the

16   anti-diversion for Kinray.  Is that right?

17        A.     There was a time when Cardinal

18   purchased Kinray and --

19        Q.     Right.

20        A.     -- we -- yes, we assumed the

21   QRA portion at that time.

22        Q.     Okay.  And I'll represent to

23   you that this is after the purchase of

24   Kinray, okay?

25        A.     The date seems like it to me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.      Just for you to bear in mind.

2                      So if you go down to the bottom

3      of the page, the original e-mail is from

4      Mr. Rausch to you, Shirlene Justus and CC'd

5      to Mr. Moné, correct?

6              A.      Correct.

7              Q.      And Mr. Rausch says, "Steve -

8      per Michael's request, please schedule this

9      customer for a visit ASAP.  Attached please

10     find the Tableau file.

11                     "Shirlene - could you please

12     pull the KAPQ and print for Michael?

13                     "Thanks, Nick."  Right?

14             A.      Yes.

15             Q.      So we know at least at this

16     point that in March of 2012, Cardinal has

17     been asked for the hydrocodone sales to this

18     particular pharmacy, this Woodstock

19     Apothecary, correct?

20             A.      Yes.

21             Q.      And it appears that it's in

22     Woodstock, New York.  Right?

23             A.      Yes.  Yes.

24             Q.      And then here's -- pass --

25     yeah, I'll attach it anyways.
```

```
 1                   (Cardinal-Morse Exhibit 10

 2        marked.)

 3   BY MR. FULLER:

 4        Q.    So 3744 is going to be

 5   Plaintiffs' Exhibit 10.  This is a separate

 6   copy of the same thing.

 7              MR. FULLER:  Gina, can you pull

 8        it up.

 9   BY MR. FULLER:

10        Q.    Okay.  You have a

11   black-and-white copy, but if you'll look at

12   the screen, there's a color copy on the

13   screen, Mr. Morse.

14              Do you see that?

15        A.    Yes.

16        Q.    Does it appear to be the same

17   document?  It says at the top --

18        A.    As what I have here, yes.

19        Q.    -- "Progression LLC, Woodstock,

20   New York"?  Right?

21        A.    Yes.

22        Q.    Okay.  So a couple of things

23   that you tell me with your investigative

24   skills.  "Controlled Substance Distribution

25   by Drug Family," do you see that section at
```

1    the top in the middle?

2            MR. PYSER:   Object to form.

3        A.    Yes.

4    BY MR. FULLER:

5        Q.    What's the highest distributed

6    drug, at least according to this document?

7        A.    For the most recent four

8    months, hydrocodone.

9        Q.    Okay.  That would be considered

10   a red flag, would it not?

11       A.    Potentially.

12       Q.    And particularly the amount

13   that exceeds even oxycodone.  So you look at

14   oxycodone and it's between 10 and 20, and

15   then we see hydrocodone is over 40,000 dosage

16   units for the same time frame, right?

17       A.    That's correct on the numbers.

18       Q.    So let's continue down the

19   page.  Can you read that next section for me?

20   There it is blown up on the screen.  "Drug

21   family," can you read that?

22       A.    Yes.  "Drug Family Distribution

23   per Month by Strength."

24       Q.    And it focuses on hydrocodone.

25   Is that right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      This one focuses on

2     hydrocodone, yes.

3          Q.      And then if we look -- and

4     again, you can't tell in the black-and-white

5     that you're holding, but on the screen, what

6     is a majority of what's being distributed?

7          A.      I'm color blind, so I think

8     that's the 10/325.  Is that correct?  Is that

9     green, the light green?

10          Q.      Yes, sir.  I will represent to

11     you that you are correct.  That would be

12     another red flag.  Is that correct?

13          A.      Something to consider, yes.

14          Q.      And do you know whether

15     Cardinal actually kept or followed national

16     averages on what percentage of the highly

17     abused dosage units you would expect to see

18     at a particular pharmacy?

19          A.      I am not directly aware that

20     that occurred, but I can't say yea or nay.  I

21     believe it very well could have been.

22               MR. FULLER:  Okay.  We don't

23          have a P1.  You got it?

24               (Cardinal-Morse Exhibit 12

25          marked.)

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. FULLER:

2         Q.     This is going to be Plaintiffs'

3    Exhibit 12.  Mr. Pyser is going to provide

4    you a document, it's called "Objective

5    Review," and that's part of the system that

6    we try to use when we're looking for

7    anti-diversion, correct, is an objective

8    review?

9              MR. PYSER:  Object to form,

10        vague as to time frame.

11        A.     I've never seen anything like

12   this.

13   BY MR. FULLER:

14        Q.     Well, I'll tell you, it was

15   produced by --

16        A.     I've never seen anything like

17   this.

18        Q.     Fair enough.

19              And it indicates Cardinal

20   Health down in the bottom right, right?

21        A.     It does.

22        Q.     And so if you look at the top

23   two columns or the top two criteria --

24              MR. FULLER:  Now I need the top

25        line too, Gina.
```

```
 1                    MS. VELDMAN:  Oh, okay.

 2                    MR. FULLER:  Thank you.

 3    BY MR. FULLER:

 4         Q.    It says "Criteria," and then it

 5    has "National average, 95th percentile."  Do

 6    you have an understanding of what "95th

 7    percentile" means?

 8         A.    No.

 9         Q.    Okay.  If something is in the

10    95th percentile, it means it's in the top 5%.

11         A.    Okay.

12         Q.    All right?  So here --

13                    MR. PYSER:  Form.

14    BY MR. FULLER:

15         Q.    -- under the criteria, read the

16    first one aloud to us.

17         A.    "The percentage of oxycodone

18    15- and 30-milligram products."

19         Q.    And I'm sorry, maybe I missed

20    some of that.  It says "The percentage of

21    oxycodone that is oxy" --

22         A.    "That is oxycodone 15- and

23    30-milligram products."

24         Q.    And it says the "national" --

25         A.    It says "is," should be "are."
```

1    Q.    Fair enough.  And it says the

2    national average is what?

3    A.    It's like 22%.

4    Q.    And then the 95th percentile

5    would be anything above what?

6    A.    68%.

7    Q.    Okay.  And how about the next

8    criteria?

9    A.    "The percentage of hydrocodone

10   that is hydrocodone 10-milligram products."

11   Q.    And the national average is

12   what?

13   A.    33%.

14   Q.    And what is the 95th

15   percentile?

16   A.    73%.

17   Q.    So if we look back at our

18   Tableau document, and if you are correct that

19   the light green is the 10-milligram, it makes

20   up more than three-quarters of the pills

21   distributed during that time frame, correct?

22        MR. PYSER:  Object to form.

23   A.    It makes up three-quarters of

24   the prescription drugs controlled substances

25   that are listed here, that's correct.

1    BY MR. FULLER:

2         Q.    It makes up --

3         A.    I don't know if this percentage

4    equates to that percentage.  I'm not sure.

5         Q.    Right.

6         A.    I'm not sure what they're --

7    you know, 22% of what?  22% of controlled

8    substances, 22% of hydrocodone --

9         Q.    No, sir, hold on.

10        A.    I don't know what it is.

11        Q.    Well, read it.  The percentage

12   of oxycodone that is oxy 15- and 30-milligram

13   products.

14        A.    Okay.  Okay.

15        Q.    And the same for the hydro,

16   right?  The percentage of hydrocodone --

17        A.    You're correct, I missed that.

18   Thank you.

19        Q.    -- that is -- no, I just want

20   to clarify because it took me a couple of

21   times reading it too.

22        A.    Yeah.

23        Q.    And then if we look at our

24   Tableau document for this pharmacy in

25   Woodstock, in that section it is giving us

Highly Confidential - Subject to Further Confidentiality Review

1    the amount of hydrocodone dosage units and

2    the different types, correct?

3         A.    It is.

4         Q.    And we can see there that the

5    light green, which is the 10-milligram 325s,

6    makes up over three-quarters of the

7    hydrocodone being distributed from August

8    of 2011 through the end of the chart in

9    February of 2012, correct?

10        A.    It appears to be true.

11        Q.    And let me ask.  Here's the

12   question:  Was there -- and the reason this

13   is being looked at, at least according to the

14   e-mail, is because the DEA asked for

15   information, right?

16        A.    According to the e-mail, yes.

17        Q.    If we go back -- this isn't

18   something Cardinal picked up on on their own.

19   This is all being spurred, you're sending an

20   investigator out --

21        A.    Yes.

22        Q.    -- because someone is asking

23   for it because the DEA is asking for

24   hydrocodone sales to this particular

25   pharmacy, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      From that e-mail, that appears

2   to be correct.

3      Q.      Okay.

4              MR. PYSER:  Object to form.

5   BY MR. FULLER:

6      Q.      Now, the objective information

7   that we have, at least according to this

8   Tableau document that you forwarded to your

9   investigator, does send up some red flags,

10  doesn't it?

11     A.      Certainly.

12     Q.      But Cardinal had this

13  information on their own, right?

14     A.      I'm assuming that they do.

15  It's a Cardinal document.

16     Q.      Yes, sir.  And so is there a

17  system in place that you're aware of to

18  trigger something that Cardinal should look

19  into this before we had the DEA calling us,

20  asking for our hydrocodone sales to this

21  pharmacy?

22     A.      I can't answer that.  This

23  document here --

24     Q.      Yes, sir.

25     A.      -- which is 3744.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Yes, sir.

 2              A.    The SOM customer purchase

 3     profile, it has -- as we're looking at this

 4     document, I believe I am realizing why I

 5     don't recognize this document.  I believe

 6     this was as we progressed in improving our

 7     system continuously, we came to a point where

 8     we had this document.  So that's why I'm not

 9     all that familiar with it.

10              I -- if memory serves, this

11     came out very shortly before this, this time

12     frame.  Obviously at least four months

13     beforehand or we would not have had this

14     information.

15              Q.    You say four months.  It goes

16     all the way back to August of 2011.

17              A.    Well, I'm saying four months

18     because of what it says on this form at the

19     top on the controlled substance distribution.

20              Q.    Well, but if you look a little

21     further in the hydrocodone section, the chart

22     that you see up on the screen --

23                    MR. FULLER:  No.

24                    MS. VELDMAN:  You want it back?

25                    MR. FULLER:  Yes.  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. FULLER:

 2         Q.      -- that goes back to August of

 3     '11, right?  If you look up at the screen

 4     here.

 5         A.      Yes, that's correct.

 6         Q.      Okay.

 7         A.      That's correct, it does.

 8         Q.      So we at least know it went

 9     back to then.

10         A.      It at least went back

11     to four -- or this would be two, four, six,

12     seven.

13         Q.      And again --

14         A.      That they had the information.

15     I'm not sure when they started producing this

16     form.

17         Q.      But my point is:  Shouldn't

18     somebody be picking up on these type of

19     patterns, things that we know are potential

20     red flags?  I mean, Cardinal knows this,

21     right?

22             Let's be blunt.  It's a

23     multibillion dollar company that is very

24     sophisticated in the information that it had

25     and how to utilize information, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      It improved over the years,
2    yes.  It had -- it's always been reviewing.
3            Q.      Data?
4            A.      Data, exactly.
5            Q.      So it shouldn't take -- can we
6    at least agree that it shouldn't take the DEA
7    calling to ask for hydrocodone sales for us
8    to say, "Hey, this is something that needs to
9    be looked into"?
10           MR. PYSER:  Object to form.
11   BY MR. FULLER:
12           Q.      Right?
13           A.      That's reviewed by someone
14   else.  I would have to agree that that's
15   probably the case, but I don't know if it
16   occurred or not.  It very well may have.
17           Q.      It may have.
18           A.      Yes.
19           Q.      And if it had, we'd have an
20   earlier investigation, because at least on
21   this occasion when it got brought to their
22   attention, they decided to have you send out
23   an investigator, right?
24           A.      Exactly.
25           Q.      And had it happened earlier, an
```

1    investigator would have went out, we would

2    have that prior investigation also in this

3    Woodstock pharmacy file, correct?

4              MR. PYSER:  Object to form.

5         A.    Yes.

6    BY MR. FULLER:

7         Q.    So --

8         A.    Well, you say a previous visit

9    to the pharmacy?

10        Q.    Yeah -- no, no.

11        A.    I think that may be what we

12   have back here.  Some of this appears to be

13   visits by Kinray.  Kinray records.

14        Q.    Well, let's look at that.

15   Let's look at that, now that you mention it.

16   Let's look at -- and go to page 13.

17              You there?

18        A.    I'm here.

19        Q.    Okay.  So page 13 is a Kinray

20   Account Profile Questionnaire, K-A-P-O [sic].

21        A.    Yes.  That's a Q, I believe.

22   Okay.

23        Q.    Yeah, that would make sense,

24   questionnaire.  All right.  So I'm not the

25   brightest --

Highly Confidential - Subject to Further Confidentiality Review

1       A.      So now we know what a KAPQ is.

2       Q.      There it is.  And it's signed

3    on what date?  Looks like March 5th of 2010,

4    right?

5       A.      Yes.

6       Q.      Okay.  So if you turn through

7    that a couple of pages, there's a lot of

8    different information.  If you go to page 16.

9    Do you see that?

10      A.      I'm here, yes.

11      Q.      And read question 15 on that

12   page to us.

13      A.      "Are one or more practitioners

14   writing a disproportionate (large) share of

15   the prescriptions for controlled substances

16   being filled by this pharmacy?"

17      Q.      And it's marked "Yes," right?

18      A.      Marked "Yes."

19      Q.      And it asks for names?

20      A.      Gives two names.

21      Q.      And the first name is Wayne

22   Longmore.  Do you see that?

23      A.      I do.

24      Q.      Well, let's continue on.  Let's

25   see what other information that we have in

1    here.  Let's go back to page 26.

2          A.    You do realize from the letter,

3    the e-mail, that this KAPQ file is a Kinray

4    file that Shirlene Justus had to go to Kinray

5    to get.

6          Q.    Okay.  And Kinray at this time

7    is owned by Cardinal, right?

8          A.    Yes.  But in 3/31/13, we did

9    not have it in our records immediately

10   accessible.  It was still a totally different

11   system from ours and we were integrating it

12   at the time.  This is -- and I think 3/5/10,

13   I'm not sure exactly when we acquired Kinray.

14         Q.    Mr. Rausch didn't have to go to

15   Ms. Justus for that Tableau document.

16         A.    For that Tableau document, no.

17         Q.    Okay.

18         A.    This one, yes.

19         Q.    Okay.  So somebody did some

20   research on Dr. Wayne Longmore, M.D.,

21   profile.  Do you see that?  Page 26?

22         A.    It's 26 again?

23         Q.    Yes, sir.

24         A.    26.  Looks like it is, yes.

25   Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      And this was something that
 2   could easily be ran to check out what's going
 3   on with the heavy prescribers to some of
 4   these pharmacies, correct?
 5          A.      This was apparently done.
 6          Q.      And this is part of what the
 7   due diligence you taught your investigators
 8   to do as well, right?
 9          A.      At different times, this was
10   requested, yes.
11          Q.      As we stated earlier, the more
12   information to have, the better, correct?
13          A.      If it's useful.
14          Q.      Sure.
15                  So Wayne D. Longmore.  If you
16   turn to the next page, you'll see his medical
17   school.  What medical school did he go to?
18          A.      I'll get there in a second.
19   You didn't want to say the word, did you?
20   Dalhousie.
21          Q.      Do you know where Dalhousie
22   University --
23          A.      University Facility of
24   Medicine.  I do not have any idea.
25          Q.      That sounds a little weird,
```

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2              MR. PYSER:  Object to form.

3    BY MR. FULLER:

4         Q.    It may be right there next to

5    Princeton, I don't know.

6              MR. PYSER:  Object to form.

7    BY MR. FULLER:

8         Q.    Turn to the next page.  We have

9    the comments section.  Read the second

10   comment.

11        A.    The second comment?

12        Q.    Yes, sir.

13        A.    "He is a great drug pusher."

14        Q.    Great drug pusher.

15        A.    "Reviewer, Jack Anonymous."

16        Q.    And it's July 8 of 2010 is the

17   date on the entry, right?

18        A.    Yes.

19        Q.    And it says, "If you need

20   narcotics, this is the best doctor to see.

21   He will most definitely issue at least

22   50 Norco 10/35 [sic] per 7 days."  Right?

23             MR. PYSER:  Object to form.

24        A.    That's what it says.

25                   --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FULLER:

 2         Q.    So read the next entry,

 3    June 15th, 2010.

 4         A.    "Overprescribes hydrocodone, an

 5    addictive painkiller."

 6         Q.    And then the writer says, "My

 7    husband has addiction issues and this doc is

 8    easy to get drugs from."  Correct?

 9         A.    That's what it says.

10               MR. PYSER:  Object to form.

11    BY MR. FULLER:

12         Q.    And the issue we're having at

13    this point in time, or the concern we're

14    having, is DEA wants to know about

15    hydrocodone sales, and we see that over

16    three-quarters of what's being shipped in

17    hydrocodone is the same 10/325s mentioned in

18    the doctor information.

19         A.    In the first one, right.

20               MR. PYSER:  Objection, rule of

21         completeness.  Also leading.

22         A.    There's also additional

23    comments here by other patients.

24    BY MR. FULLER:

25         Q.    Oh, there absolutely is.
```

1        A.      And quite frankly, some are

2    glowing.

3        Q.      Some are glowing.

4        A.      This was also a time in 2010

5    that I'm not sure exactly when -- I don't

6    remember accurately when we acquired Kinray.

7    This was before Cardinal -- I do -- I believe

8    that this is before Cardinal had any

9    ownership in Kinray.  This is not a

10   Cardinal-type document at the beginning, and

11   this appears to be from 2010.

12               So I'm being asked to comment

13   on this document from a company that I

14   question whether we owned at the time.

15       Q.      Okay.  I'm sorry, Mr. Morse.

16   What question were you answering?

17               MR. PYSER:  I think the --

18   BY MR. FULLER:

19       Q.      What was the question I asked

20   you that spurred that colloquy?

21       A.      Whether these two -- well, you

22   asked what these two comments said, and --

23       Q.      And we read those, right?

24       A.      And I answered that, read those

25   to you, and indicated that there were others

Highly Confidential - Subject to Further Confidentiality Review

```
 1    here.

 2         Q.     Well, hold on.  No, that's not

 3    actually true.  The last question I asked is:

 4    "And the issue we're having at this point in

 5    time, or the concern we're having, is the DEA

 6    wants to know about hydrocodone sales" --

 7         A.     Yes.

 8         Q.     -- "and we see that over

 9    three-quarters of what's being shipped in

10    hydrocodone is the same 10/325s mentioned in

11    the doctor information?"  That was my

12    question, right?

13         A.     That was your question, and I

14    answered --

15         Q.     And then you went on this

16    colloquy about additional information and

17    glowing reviews.  I didn't ask about that,

18    did I?

19                MR. PYSER:  Object to form.

20    BY MR. FULLER:

21         Q.     Did I ask about that?

22                MR. PYSER:  Object to form.

23         A.     No.

24    BY MR. FULLER:

25         Q.     Okay.  So the way this works is
```

```
 1    I get to ask certain questions and I want you

 2    to answer my questions.  Mr. Pyser, sitting

 3    next to you, after I'm done, is going to get

 4    a chance to come sit in this seat and he can

 5    ask you all those follow-up questions he

 6    wants.  Okay?

 7                So I'd ask that you just listen

 8    to my question and answer my question.  I

 9    understand you want to try to go other

10    places --

11        A.    I want to try what?

12              MR. PYSER:  Object --

13    BY MR. FULLER:

14        Q.    Go other places with your

15    answer.

16              MR. PYSER:  Object to form.

17        Move to strike.

18    BY MR. FULLER:

19        Q.    Because as you pointed out, my

20    question had nothing to do with glowing

21    reviews or anything else.

22        A.    Correct.

23        Q.    Okay.

24              MR. PYSER:  Object to form,

25        move to strike.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FULLER:
 2         Q.    So you mentioned Tableau -- or
 3    you mentioned that Kinray owned this,
 4    potentially, during the time of this initial
 5    process, right?
 6         A.    Yes, I did.
 7         Q.    And then Cardinal purchased
 8    Kinray, right?
 9         A.    Yes.
10         Q.    And Cardinal had an obligation
11    to do its due diligence on all these
12    customers, because now Cardinal is operating
13    them, right?
14         A.    Yes.
15         Q.    And Cardinal had access to this
16    information in the file, and Cardinal
17    actually is the one that maintained the
18    Tableau document, correct?
19         A.    Correct.
20         Q.    And do you know of anything in
21    the file for this pharmacy prior to the DEA
22    calling Cardinal and asking for the
23    hydrocodone?  Do you know of any other
24    investigations?
25              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I know of no other

 2    investigations by Cardinal.

 3    BY MR. FULLER:

 4          Q.     And what we've seen and what

 5    you forward --

 6                 MR. PYSER:  Sir, were you

 7          finished with your answer?  I think

 8          counsel may have cut you off.  If you

 9          have more to say, you can finish your

10          answer.  If not, we can move on to the

11          next question.

12    BY MR. FULLER:

13          Q.     Well, let me ask you, if there

14    had been other investigations related to this

15    pharmacy, wouldn't you want to have those to

16    forward to your investigator?

17                 MR. PYSER:  Object to form.

18          A.     Yes.

19    BY MR. FULLER:

20          Q.     Absolutely.  You want to give

21    them as much information as is available,

22    correct?

23          A.     Have access to them, yes.

24          Q.     You'd want to give them to

25    them.
```

```
 1          A.     I don't send them to them
 2   myself.  They have access to it in our
 3   system.
 4          Q.     But, sir, as you've already
 5   testified, this was in Kinray's system --
 6          A.     In Kinray's system.
 7          Q.     -- not necessarily yours.
 8          A.     Right.  That's why this was
 9   sent.
10          Q.     And there's no other
11   investigation there, right?
12          A.     It appears to be just one here.
13          Q.     From 2010, correct?
14          A.     No, that was -- let's see, let
15   me go back and look through it again.
16          Q.     Take your time.
17          A.     Terms.  2010, you're
18   characterizing this as an investigation in
19   2010?
20          Q.     We can call it whatever you
21   want to call it, Mr. Morse.
22          A.     It appears to me from the title
23   on the document that this is Kinray Account
24   Profile Questionnaire.  This is the
25   questionnaire that the customer completed for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Kinray.

 2         Q.    So there was no investigation

 3    in there that was provided?

 4         A.    This document appears to be a

 5    questionnaire.

 6         Q.    Fair enough.

 7         A.    That's what it says.  Let me

 8    look through the rest of this and see if

 9    there's anything else that shows.  There is a

10    second Kinray questionnaire dated 4/26/11.

11              (Document review by witness.)

12         A.    It appears also to be a

13    questionnaire in the title.  Kinray Account

14    Profile Questionnaire, KAPQ.

15    BY MR. FULLER:

16         Q.    You let me know when you're

17    done, Mr. Morse.

18         A.    Not being familiar with

19    Kinray's process, these documents, based on

20    what they say, are questionnaires.  And from

21    what I can tell, there's no indication

22    that -- that their person -- their, meaning

23    Kinray's person -- ah.

24              This information was collected

25    by Whitmore.  Whitmore was their
```

1    investigator, so your characterization of

2    these as a investigation now has a question

3    in my mind because the top, what it says,

4    "questionnaire" versus one where he signed.

5    The --

6        Q.    Hold on.  Hold on.  Let's stop.

7        A.    Okay.  I'm not sure whether

8    that was a visit or whether it was a

9    questionnaire.

10       Q.    You're not answering any

11   question I asked.  You answered my last

12   question and we were moving on and then you

13   continued to talk.

14       A.    Okay.  I'm --

15             MR. PYSER:  Object to form.

16   BY MR. FULLER:

17       Q.    So I'm going to move to strike

18   the nonresponsive narrative and you let me

19   know when you're done, because we'll back out

20   the time and I'll continue using my seven

21   hours.

22       A.    I'm done.

23       Q.    Okay.  Now, let me ask.  The

24   system you had, this Tableau documents, these

25   investigators, this whole supply chain

Highly Confidential - Subject to Further Confidentiality Review

```
 1    integrity system that you guys operated from

 2    corporate, that application was nationwide,

 3    correct?  It applied to all of your customers

 4    no matter where they were in the country.

 5         A.    My understanding is yes.

 6         Q.    Some of the policies and

 7    procedures that we looked at appear to apply

 8    to the entire corporation.  Is that your

 9    understanding?

10         A.    Yes.

11         Q.    So when we talk about the

12    supply chain integrity or the anti-diversion

13    department, it's a systemic department,

14    meaning it's a system applicable everywhere

15    that Cardinal did business?

16         A.    Centralized --

17         Q.    In Dublin, Ohio?

18         A.    -- in Dublin, Ohio.

19         Q.    Okay.  And I think you

20    mentioned even earlier that at some point the

21    DEA came to Dublin; although they may have

22    questions about different distribution

23    centers or different customers, no matter

24    where they are, everything was centralized

25    there in Dublin so, for the most part,
```

1    I guess, their questions could be answered

2    there.  That was sort of the central hub.

3         A.    That's why they came there,

4    yes.

5         Q.    Okay.  So whether it's for good

6    or for bad, the system was the same no matter

7    if we're looking at the operations in

8    Florida, Ohio, West Virginia or Washington

9    state.  Across the whole country, the system

10   was implemented the same way, right?

11        A.    Yes.

12        Q.    Okay.  For example, we just

13   looked at one part of the system operating in

14   Woodstock, New York, correct?

15        A.    Yes.

16        Q.    Now, next we're going to go to

17   PharmHouse Pharmacy, which is in Pasadena,

18   Texas.  Do you know where Pasadena, Texas is,

19   Mr. Morse?

20        A.    Roughly.

21        Q.    Do you mean it's a rough town?

22   No, I'm kidding.  When you say "roughly,"

23   where is it located from here?

24        A.    Somewhere around Houston, I

25   believe.

```
 1          Q.     So a bit east from here, right?

 2          A.     Yes.

 3                 (Cardinal-Morse Exhibit 14

 4          marked.)

 5                 MR. FULLER:  This is 3769, I

 6          believe it's Exhibit 12.  No.  14.

 7   BY MR. FULLER:

 8          Q.     Have you seen this document

 9   before, Mr. Morse?

10          A.     Obviously.  I wrote it.

11          Q.     You conducted this

12   investigation, didn't you?

13          A.     Yes.

14          Q.     Do you remember PharmHouse

15   Pharmacy, Pasadena, Texas?

16          A.     At this time, I do not recall

17   going to this pharmacy other than this

18   document.

19          Q.     And that would have been your

20   first year there, because this is

21   December 2nd of 2008, right?

22          A.     That's correct.

23          Q.     This would be during the time

24   frame or just after the time frame of the

25   suspension of the licenses for the
```

Highly Confidential - Subject to Further Confidentiality Review

1    distribution centers, correct?

2         A.    Yes.

3         Q.    And here it says, "This

4    pharmacy was visited on November 11, 2008, by

5    Steve Morse, CAH."  When you say "Steve

6    Morris/CAH," what does that mean?  Cardinal

7    Health?

8         A.    It just identifies me as

9    Cardinal Health.

10        Q.    Got it.

11              "Met with Craig Longhurst,

12   non-pharmacist owner, and Stephanie

13   Santaromana, the pharmacist on duty at

14   PharmHouse Pharmacy."

15              And again, you don't recollect

16   this visit or this investigation?

17        A.    Not other than from seeing

18   this.

19        Q.    Okay.  If we go down, you see

20   the section "Dispensing practices"?

21        A.    Yes.

22        Q.    "The pharmacy dispensed an

23   average of 150 prescriptions per day

24   primarily from the following sources:

25   Physicians throughout Houston prescribing for

Highly Confidential - Subject to Further Confidentiality Review

1    patients residing in long-term care and

2    assisted living facility" and two pain

3    clinics.  I guess they're also referred to as

4    PSW, which is Pain, Stress and Weight Clinic?

5    Is that right?

6         A.    Yes.

7         Q.    "The physician for PSW clinic

8    had his medical license suspended in 1996 for

9    selling methadone to an undercover agent.

10   The license was reinstated in April --

11   April 2nd, 2007.  One of the PAs working for

12   the PSW clinic had his license to practice

13   disciplined for falsifying an application."

14             Those would be two red flags,

15   wouldn't they?

16        A.    Certainly to be considered.

17        Q.    If you go on down, "Pharmacist

18   on duty," and halfway through the first

19   bullet it says, "The pharmacist on duty

20   provided no indication that the legitimate

21   issuance of prescriptions was considered.

22   The first 20 patients had their prescriptions

23   filled," and then basically they cut off

24   everybody else the rest of the day, right?

25        A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Is that another red flag?

2          A.     Very well could be.

3          Q.     It says, the next bullet point,

4     "Stated that the -- that prior to the

5     limitation to 20 patients, it was difficult

6     for her," being the pharmacist, "to take a

7     lunch as patients from the pain clinics would

8     fill the waiting room and line up in the

9     public areas on the clinic -- of the clinic

10    for access to the pharmacy."

11               That's a huge red flag to see

12    people lined up out of the pharmacy, isn't

13    it?

14         A.     Yes.

15         Q.     You've seen that before at

16    facilities that Cardinal was distributing to,

17    correct?

18               MR. PYSER:  Object to form.

19         A.     I personally have not seen it.

20    BY MR. FULLER:

21         Q.     You have not.  Have you seen

22    reports from your investigators who have seen

23    it?

24         A.     Yes.

25         Q.     It goes on to say, "Stated that

Highly Confidential - Subject to Further Confidentiality Review

1    the pharmacy receives virtually no

2    prescriptions from practitioners in the

3    surrounding area other than from the pain

4    clinics," which is in contradiction to the

5    above dispensing practices information,

6    correct?

7         A.    I'm not sure what two things

8    you are comparing here.

9         Q.    So up above, under "Dispensing

10   practices," it says it gets the prescriptions

11   from two sources, physicians throughout

12   Houston and the pain clinics.

13              And down below, when you're

14   talking to the pharmacist on duty, she states

15   that the pharmacy sees virtually no

16   prescriptions from practitioners in the

17   surrounding area other than the pain clinics.

18        A.    I think she is zeroing in on

19   the immediate area, and in the immediate area

20   is strictly from the pain clinics.

21        Q.    And then you interview the

22   non-pharmacist owner.  It says -- and this is

23   going down a little bit on the next page --

24   "The representation was made that

25   approximately 30% of the pharmacy's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prescriptions were for controlled

 2    substances."

 3               That's also high on the

 4    comparison chart, correct?

 5        A.    It's of -- you would need to

 6    look into that, yes.

 7        Q.    Another red flag.

 8        A.    Uh-huh.

 9        Q.    It says, "Only a few patients

10    were observed in the pharmacy, but virtually

11    all of them were young males less than 30

12    years of age."

13               That's another red flag, isn't

14    it?

15        A.    Yes.

16        Q.    That's why you're putting it in

17    your report.

18        A.    Yes.

19        Q.    "The pharmacy did not have an

20    over" -- or OTC, which is over-the-counter,

21    correct?

22        A.    That's correct.

23        Q.    -- "front end of any

24    consequence."  Again, another red flag when

25    we're trying to look at potential for
```

```
 1    diversion, right?

 2          A.      Yes.

 3          Q.      "Related Findings," if you go

 4    down to the second bullet point, you actually

 5    knew a former BOP state investigator, didn't

 6    you?

 7          A.      May I have time to read through

 8    these?

 9          Q.      Sure.  Well, listen, I can read

10    it and maybe you can still digest it while I

11    read it.

12                  "A former investigator for the

13    State of Texas Board of Pharmacy having

14    responsibility for Houston area was

15    contacted.  My concerns regarding the

16    prescription practices of the PSW clinic and

17    the dispensing practices of PharmHouse

18    Pharmacy were presented.  Since the contact

19    is now employed as an investigator by the

20    Texas AG's office," which is Attorney

21    General, correct?

22          A.      Correct.

23          Q.      "He was unable to provide any

24    pertinent information other than to say I

25    should probably trust my instincts."  Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      "Recommendation:  The visit to

 3      the pharmacy resulting in the findings above

 4      support the determination at this time that

 5      the pharmacy represents a significant risk

 6      for diversion."

 7                      You found, based on those red

 8      flags, that you thought this pharmacy was a

 9      significant risk to Cardinal for diversion.

10      Right?

11              A.      I did.  I did.

12              Q.      And do you know how long

13      Cardinal continued to service that pharmacy?

14              A.      I do not.

15              Q.      I'm going to hand you -- I'm

16      sorry -- 3729, which is going to be

17      Plaintiffs' Exhibit 13.

18                      (Cardinal-Morse Exhibit 13

19              marked.)

20      BY MR. FULLER:

21              Q.      And if you'll turn to the

22      second page of this document...

23              A.      The second page?

24              Q.      Yes, sir.

25              A.      Number 2?  I'm sorry, I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    sorry, these are covered up up here.  The

2    second page down?

3         Q.    Yes, sir, right there.  At the

4    top it says "Cardinal Health Supply Chain

5    Integrity, Anti-Diversion Program."

6         A.    Yes.

7         Q.    That's the department you

8    worked with, right?

9         A.    Yes.

10        Q.    It says, "Customers restricted

11   from purchasing controlled substances since

12   October 1st, 2008," and you look down

13   there -- I think it's the one, two, three,

14   four -- fifth one down, PharmHouse Pharmacy,

15   Pasadena?

16        A.    Yes.

17        Q.    Suspended on 5/29/09?

18        A.    Yes.

19        Q.    About five, six months after

20   you visited the place, right?

21        A.    Yes.

22        Q.    So even with all the findings

23   you made, Cardinal apparently continued to

24   sell narcotics to that pharmacy that,

25   according to you, posed a high risk of
```

1    diversion.

2              MR. PYSER:  Object to form.

3    BY MR. FULLER:

4         Q.     Correct?

5         A.     It appears so.

6         Q.     Okay.  Okay.  We talked earlier

7    about Mallinckrodt letters, and I think you

8    mentioned you didn't know whether you got

9    that particular one we looked at earlier but

10   you remember seeing Mallinckrodt letters.  Is

11   that right?

12             (Cardinal-Morse Exhibit 15

13        marked.)

14   BY MR. FULLER:

15        Q.     P.3736.  Do you see that there?

16        A.     Yes.

17        Q.     It starts with an e-mail from

18   Carolyn McPherson to Michael Moné, Mr. Rausch

19   and yourself, correct?

20        A.     It starts prior to that but it

21   goes to Ms. McPherson, and she -- yes, she

22   goes from there.

23        Q.     Sorry, I apologize.  It starts

24   from Dale Hill.  Then Ms. McPherson forwards

25   it to persons including yourself, right?

1         A.      Yes.

2         Q.      And then Mr. Rausch forwards it

3    again, or responds, and says, "Please see the

4    attached letter from Mallinckrodt referencing

5    Florida customers.  Could you please review

6    the attached customers and determine what

7    level of due diligence we have for them, if

8    any of the due diligence speaks to their

9    oxycodone utilization, and if we a site visit

10   report on file?"  I think it should be "and

11   if we have."  But listen, I will be the last

12   one to criticize someone's typos.

13               He then says, "I'll pull the

14   historic data for these accounts and we can

15   collectively review both the data and the

16   documentation."

17               And then you respond, right?

18        A.      Looks like I did.

19        Q.      What did you say?

20        A.      "I am inclined to visit GoodRx,

21   The Medicine Shoppe 1939" --

22        Q.      I'm sorry, read that again.

23        A.      "I am inclined to visit GoodRx,

24   Medicine Shoppe 1939" -- it must have been a

25   corporation name versus a street pharmacy

1    name -- "as their purchases of 15- and

2    30-milligram oxy over the last six months

3    accounts for 91% of their oxy purchases from

4    us.  Has your analysis found anything else we

5    need to be aware of?"

6         Q.    Now, why is that concerning to

7    you?  That's -- we looked at that chart

8    earlier.  I want to see if I can get it back

9    out.

10              MR. PYSER:  Object to form.

11              MR. FULLER:  It's the one that

12         doesn't have the P1.  Yeah, this one.

13    BY MR. FULLER:

14         Q.    All right.  This is that

15    objective review document again, Mr. Morse.

16    I'm going to ask for your help, what the --

17    yep, right below it.  What exhibit number is

18    that at the bottom on that sticker?

19         A.    The sticker?

20         Q.    Yes, sir.

21         A.    Exhibit 12.

22         Q.    Exhibit 12.  What does it say

23    about percentage of oxycodone?

24              MR. PYSER:  Same objection as

25         before on time frame.

```
 1    BY MR. FULLER:

 2         Q.     Sure.  Go ahead.

 3         A.     On -- you say on -- your

 4    question again, please?

 5         Q.     Oxycodone, it says "The

 6    percentage of oxycodone that is 15- and

 7    30 milligrams products" is the criteria.  The

 8    national average is 22, correct?

 9         A.     That's what the chart says.

10         Q.     95th percentage is 68%.  Where

11    does this pharmacy fall?

12         A.     91%.

13         Q.     91.  That's awful high, isn't

14    it?

15              MR. PYSER:  Object to form.

16         A.     Compared to that chart, yes.

17    BY MR. FULLER:

18         Q.     Well, it's -- you would agree

19    91% is high anyway?

20         A.     That's high.

21         Q.     Okay.  Now, again, Cardinal

22    didn't pick up on this on their own, did

23    they?  At least there's no indication here

24    that they did, is there?

25              MR. PYSER:  Object --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Not within this document.

 2                  THE WITNESS:  Sorry.

 3                  MR. PYSER:  Object to form.

 4      BY MR. FULLER:

 5          Q.      And if we look at the letter

 6      that the nice people at Mallinckrodt sent

 7      over, it's directly to Cardinal Health,

 8      overnight delivery, November 12th, 2010,

 9      right?

10          A.      Yes.

11          Q.      And it's very similar to the

12      letter or the document from Mallinckrodt that

13      we looked at earlier, isn't it?  It says, "As

14      you are aware, U.S. Drug Enforcement

15      Administration (DEA) registrants are required

16      by law to have a robust suspicious order

17      monitoring program.  As a DEA registrant,

18      Mallinckrodt Inc. or Covidien --

19          A.      Corvidien -- Covidien.

20          Q.      However you want to pronounce

21      it, "Company, otherwise known as

22      Mallinckrodt, has developed and maintains a

23      comprehensive program that includes review of

24      customer orders, IMS data and chargeback

25      information and, where appropriate,
```

1    subsequent audits of distributors' suspicious

2    order monitoring programs."

3              So they've used these systems

4    that they have in place to flag this account,

5    right?

6              MR. PYSER:  Objection.

7         A.    It's what it appears.

8              MR. PYSER:  Object to form.

9    BY MR. FULLER:

10        Q.    And not only are they looking

11   into it themselves, but they're going as far

12   as recognizing that you, Cardinal, through

13   the chargeback data, is the one providing

14   controlled substances to this facility, this

15   pharmacy, and asking you to take a look as

16   well, right?

17        A.    I'll agree to the they're

18   asking us to take a look as well.  I'm not

19   sure how they got the information.

20        Q.    And they say -- do you know

21   what the -- it says IMS data.  Do you know

22   what IMS data is?  And if you don't, that's

23   fine.

24        A.    I do not.

25        Q.    Okay.  I'll represent to you

1    it's a -- well, I'll just tell you.  It's a

2    third-party vendor that collects data in the

3    pharmaceutical industry and then sells it to

4    whoever is willing to pay for it.  Sales

5    data, distribution data, a whole litany of

6    different information.

7              MR. PYSER:  Object to form.

8    BY MR. FULLER:

9         Q.    And the chargeback system, do

10   you know what the chargeback system is?

11        A.    Only vaguely.  I never fully

12   understood what a --

13        Q.    Sort of like a rebate system.

14        A.    -- chargeback system was and

15   how it worked.

16        Q.    Okay.  Then they go on to say,

17   "Our suspicious order monitoring program has

18   identified certain pharmacies found in

19   Florida listed on the Attachment 1."  If you

20   turn over to the Attachment 1, we see

21   GoodRx V LLC, which is the same one that you

22   guys recognized that you need to look into,

23   correct?

24        A.    Yes, it does appear to be so.

25        Q.    And do you know whether an

Highly Confidential - Subject to Further Confidentiality Review

1    investigation was done at this point into

2    GoodRx?

3         A.    Not with this information in

4    front of me.  Other than this.

5         Q.    Right, sure.

6              And you would suspect that

7    Cardinal would be able to pick up on this

8    high percentage of oxy 15 and 30s being

9    purchased and recognize that themselves to do

10   their own due diligence before Mallinckrodt

11   brought it to their attention, even, right?

12             MR. PYSER:  Object to form.

13        A.    This system is outside of my

14   realm.  I don't know what the system was

15   capable of at this time.  I would like to

16   have seen that -- yeah, should have caught

17   it.  But I don't know what the system as

18   developed in time was at this time.

19   BY MR. FULLER:

20        Q.    Sure.  Sure.

21             And you're aware that in 2007

22   and 2008, when you joined, Cardinal was in

23   the process of automating their system?

24        A.    Yes.

25        Q.    That prior to, they did not

1    have an automated system.

2              MR. PYSER:  Object to form.

3         A.    I wouldn't -- I would not be

4    able to answer that.  I don't know.

5    BY MR. FULLER:

6         Q.    Well, you do know that they

7    were in the process of automating their

8    system, right?

9         A.    When I was there, yes.

10        Q.    Yes, okay.

11              If there are customers who are

12   known to be high risk for diversion, would

13   you agree that it's risky for Cardinal to

14   continue to service those accounts?

15              MR. PYSER:  Object to form.

16        A.    I would agree.  That decision

17   was not mine.

18   BY MR. FULLER:

19        Q.    Would you also agree that

20   Cardinal, while it does have statutory and

21   regulatory obligations, should operate in a

22   way that it doesn't needlessly endanger the

23   communities that it services?

24              MR. PYSER:  Object to form.

25        A.    I don't believe Cardinal

```
 1    operated any system that needlessly did that,

 2    so I would say yes.

 3    BY MR. FULLER:

 4         Q.    Let me ask the question again.

 5    I'm not saying Cardinal did.  I'm asking you

 6    a question and listen to my question very

 7    carefully.

 8              Would you agree that Cardinal

 9    should operate -- I'm not saying -- I'm not

10    judging whether they did or didn't -- but

11    that they should operate in a way that

12    doesn't needlessly endanger the communities

13    they service?

14              MR. PYSER:  Object to form.

15         A.    From my point of view, looking

16    at the regulation, 1301.74(b), we have two

17    obligations; to have a program, operate it,

18    and to report suspicious orders.

19              Cardinal goes beyond that and

20    they do things that would educate --

21    BY MR. FULLER:

22         Q.    No, let's stop there.

23              MR. PYSER:  Let him finish his

24         answer.

25              MR. FULLER:  No, I'm not.  He's
```

Highly Confidential - Subject to Further Confidentiality Review

1       not answering my question.  No, not

2       when he's not answering.

3              MR. PYSER:  You can ask

4       another.  He gets to finish his

5       answer.

6              MR. FULLER:  No, we don't.

7              MR. PYSER:  You know he gets to

8       answer his question, Mr. Fuller.

9              MR. FULLER:  He is not

10      answering the question.  I am not

11      wasting my time.

12             MR. PYSER:  Then you can move

13      to strike it.  You can move to strike

14      the answer.

15             MR. FULLER:  Okay, move to

16      strike.

17             MR. PYSER:  Finish the answer.

18  BY MR. FULLER:

19      Q.    The next question --

20             MR. PYSER:  Sir, you may finish

21      your answer.  Counsel cannot cut you

22      off.  Go ahead and answer.

23  BY MR. FULLER:

24      Q.    The next question is, again --

25      listen to the question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Before the next

 2         question, please finish your answer.

 3         You may finish your answer.

 4              MR. FULLER:  I specifically --

 5              MR. PYSER:  Counsel does not

 6         have the right to stop you from

 7         speaking when he asks you a question.

 8    BY MR. FULLER:

 9         Q.    I specifically started off this

10    question asking you, regulations aside,

11    right?  Regulations, statutory obligations

12    aside, didn't I?

13              MR. PYSER:  Object to form.  If

14         you would like to finish your answer,

15         you may go ahead and finish your

16         answer and then you can answer

17         whatever question Mr. Fuller decides

18         to place to you next.

19    BY MR. FULLER:

20         Q.    Didn't I start off my whole

21    preface that way?

22              MR. PYSER:  Same objections.

23         You may finish your answer if you'd

24         like.

25         A.    I would like to have the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    question repeated now.

 2    BY MR. FULLER:

 3          Q.     Nope.

 4                 MR. FULLER:  I'll strike the

 5          question.

 6                 MR. PYSER:  You can't do that.

 7                 MR. FULLER:  I can absolutely

 8          strike my question.

 9                 MR. PYSER:  You may finish your

10          answer, Mr. Morse.

11    BY MR. FULLER:

12          Q.     Mr. Morse --

13          A.     Cardinal Health --

14          Q.     Mr. Morse --

15          A.     -- does have --

16                 THE WITNESS:  We're talking

17          over -- he's talking over me.

18    BY MR. FULLER:

19          Q.     -- aside from the statutory and

20    regulatory obligations, should Cardinal act

21    in a way that does not needlessly endanger

22    the communities it services?  Yes or no?

23                 MR. PYSER:  Object to form, but

24          go ahead and answer.

25          A.     Cardinal Health does that, yes,
```

```
 1    and I agree, they should.  And they do.

 2    BY MR. FULLER:

 3         Q.     Irrespective of whatever the

 4    regulations are, right?

 5                MR. PYSER:  Object to form.

 6    BY MR. FULLER:

 7         Q.     Sure, they have to comply with

 8    the reg- --

 9         A.     I'm not sure what you mean by

10    that question.

11         Q.     No matter what the

12    regulations -- well, I shouldn't say no

13    matter what the regulations say.

14                Even in spite of the

15    regulations, they need to make sure that they

16    conduct themselves in a way that doesn't

17    needlessly endanger our communities, correct?

18                MR. PYSER:  Object to form and

19         asked and answered.  The --

20    BY MR. FULLER:

21         Q.     Right?

22         A.     The requirement --

23         Q.     I'm not asking about the

24    requirement.

25         A.     Beyond the -- they go beyond
```

1    the requirement and when they go beyond the

2    requirement, they do some of those things

3    that I think you're looking for.  The

4    requirement is to protect the public by

5    following that regulation.  They do that.

6    They did the best they could to do that.

7         Q.    And when they chose -- strike

8    that.

9              When you and your investigators

10   go in and do an investigation and you

11   determine somebody is at high risk for

12   diversion, that means that there is a real

13   possibility the diversion may be going on

14   through that pharmacy, correct?

15             MR. PYSER:  Object to form.

16        A.    That decision is made by those

17   who review the documents.

18   BY MR. FULLER:

19        Q.    No, sir.  You make the

20   recommendation as to a high risk of

21   diversion, correct?

22             MR. PYSER:  Object to form.

23   BY MR. FULLER:

24        Q.    We just saw it.

25        A.    I make the recommendation.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    That -- no, no.  You don't make

2  the recommendation.  You're -- let's pull it

3  out.  No, that's the Mallinckrodt letter.

4  3769.  This is the PharmHouse in Pasadena.

5  Page 3, "Recommendation."

6            You're saying here that you are

7  making the determination that the pharmacy

8  represents a significant risk for diversion.

9  Right?

10      A.    That's my recommendation.

11      Q.    That's your opinion.

12      A.    It goes to review.  That's my

13  recommendation --

14      Q.    That's your opinion?

15      A.    -- that goes to review.

16            That's my recommendation.  It's

17  titled a recommendation.  It's intended to be

18  a recommendation to those who make the

19  decision as to what to do with this pharmacy.

20  We gathered the information for them.

21      Q.    And you have -- you found this

22  pharmacy to be a high risk for diversion,

23  correct?

24            MR. PYSER:  Object to form.

25                 --oOo--

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. FULLER:

2        Q.    Based on your investigation

3    actually out there at the pharmacy, right?

4              MR. PYSER:  Object to form.

5        A.    That they -- that they -- that

6    the pharmacy represents a significant risk of

7    diversion, exactly what it says.

8    BY MR. FULLER:

9        Q.    Okay.

10       A.    It's a recommendation for

11   consideration for someone to make the

12   determination about what we're going to do

13   with it.

14   BY MR. FULLER:

15       Q.    And if we're delivering pills

16   to pharmacies that are at high risk for

17   diversion, that's not the safest decision for

18   our communities, is it?

19             MR. PYSER:  Object to form.

20       A.    Under my opinion of what it

21   said, that would have been reviewed.  And to

22   answer your question, if they made the

23   decision, people who are responsible for

24   making our decision, that that customer was a

25   risk, it was their decision and that would be

Highly Confidential - Subject to Further Confidentiality Review

```
 1      the point to go forward.

 2                  My decision did not cause that

 3      to -- cause any drugs to go out there or to

 4      be stopped from going to that particular

 5      pharmacy.

 6                  MR. PYSER:  Let's take a break.

 7          We've been going about an hour and 20

 8          minutes.

 9                  MR. FULLER:  Sure.

10                  THE VIDEOGRAPHER:  Off the

11          record at 3:34.  This concludes

12          Tape 4.

13                  (Recess taken, 3:34 p.m. to

14          3:46 p.m.)

15                  THE VIDEOGRAPHER:  All right,

16          stand by.  Okay.  We're back on the

17          record at 3:46.  This begins Tape 5.

18      BY MR. FULLER:

19          Q.    All right.  Before we took a

20      break, you're saying that your designation on

21      the investigation is a recommendation.  Is it

22      also your opinion?

23          A.    It's a recommendation based

24      upon what I observed there.

25          Q.    Well, it's not just based on
```

Highly Confidential - Subject to Further Confidentiality Review

1   what you observed, is it?  It's based on all

2   the information.

3          A.     All the information that we had

4   documented there.

5          Q.     I mean -- and let's not just

6   focus on that -- PharmHouse.  I mean, the

7   investigation should encompass a lot of --

8   anything available, correct?

9          A.     Anything available that's

10  pertinent.

11         Q.     Sales history?

12         A.     If they -- yes, if they can get

13  it.  Sales history they can get.

14         Q.     The dosage usage --

15         A.     Yes.

16         Q.     -- based on the pharmacy; if

17  appropriate, primary prescribers, correct?

18  Observations about customers?

19         A.     Information that we get is

20  appropriate to the time.  There's some

21  information that changed over time as to what

22  we got, yes.  You do -- all the information

23  you get, the better recommendation you can

24  make.

25         Q.     Right.  And the recommendation

1    is based on all your years of experience and

2    training, you yourself being a pharmacist

3    yourself, correct?  Right?

4         A.     Licensed as such.  Not

5    practicing for 35 years, yes.

6         Q.     Sure.  Sure.

7                But all still -- I mean, you

8    still understand what they are supposed to

9    and not supposed to be doing and how they're

10   supposed to conduct themselves in compliance

11   with the regulations, right?

12        A.     Yes.

13        Q.     And then you provide this

14   recommendation, I'm assuming it's your

15   opinion that you're giving them based on the

16   designation that whether they're at low risk,

17   moderate risk or high risk, correct?

18        A.     Yes.

19        Q.     And then you mentioned it goes

20   on to someone else.  Who has the final

21   determination as to whether a pharmacy is at

22   high risk, moderate risk or low risk?

23        A.     Michael Moné.

24        Q.     So even Mr. Hartman above him

25   can't weigh in on that?  Is that your

1    understanding?

2        A.    I'm not aware of that being the

3    system.

4        Q.    Okay.  So your understanding,

5    it goes up to Mr. Moné, and Mr. Moné has the

6    final determination.  Right?

7        A.    That's the way I understood the

8    process to work, yes.

9        Q.    Okay.

10       A.    That's the way I understand the

11   process worked.

12       Q.    And then if the final

13   determination is made that a pharmacy is at

14   high risk, whether it's consistent with yours

15   or different than yours, you would agree that

16   we should not be shipping controlled

17   substances to a pharmacy that is at high risk

18   for diversion, correct?

19       A.    Yes.

20            MR. PYSER:  Object to form.

21   BY MR. FULLER:

22       Q.    And when Mr. Moné is making

23   this decision, has he ever consulted

24   additionally with you?  Has he ever came to

25   you and said, "Hey, tell me more about this"?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      On occasion.

2        Q.      Okay.  So he's not just looking

3    at the report; he also has access to you or

4    your investigators, whoever may have went out

5    there, to maybe get more of a sense of what

6    was going on.

7        A.      Yes.

8        Q.      Has he ever asked you to do a

9    revisit or go back out?

10        A.      I can't think of a specific

11    time, but I have gone back after a short --

12    or had an investigator go back after a short

13    period of time, so I guess the term "revisit"

14    there is what I would take issue with,

15    whether it's --

16        Q.      Or follow-up in a short period?

17        A.      Yeah, the follow-up in a short

18    period of time.  Additional information or

19    based upon the original visit, I don't

20    remember.  I don't know.

21        Q.      Now, and we have looked at

22    today a bunch of different pharmacies in a

23    bunch of different areas of the country.  One

24    thing I think we can agree on, can we not,

25    that with the increased dispensing of opium

Highly Confidential - Subject to Further Confidentiality Review

```
1    pills, it also increases the chance of

2    diversion, correct?

3                    MS. RANJAN:  Object to form.

4                    MR. PYSER:  Object to form,

5           "opium pills."

6         A.      Rephrase or restate the

7    question.

8    BY MR. FULLER:

9         Q.      Sure.

10                   The more pills that are being

11   dispersed or dispensed across the country

12   increases the chance of potential diversion,

13   right?

14                   MR. PYSER:  Object to form.

15                   MS. RANJAN:  Object to form.

16        A.      You're saying availability?

17   BY MR. FULLER:

18        Q.      Yes, sir.

19        A.      Yeah.  Availability, possibly.

20        Q.      And you're aware that the

21   country is in the throes of an opioid

22   epidemic, even prior to your start at

23   Cardinal, correct?

24        A.      Yes.

25        Q.      And if we have diversion or the
```

```
 1    increased availability of pills out there,

 2    that's going to increase the chance of abuse

 3    and addiction, correct?

 4              MR. PYSER:  Object to form.

 5         A.    Yes.

 6    BY MR. FULLER:

 7         Q.    All right.  And one of the

 8    goals behind the Controlled Substance Act --

 9    have you ever actually read the Controlled

10    Substance Act?

11         A.    Years and years ago.

12         Q.    Okay.  So do you have an

13    understanding that one of the goals behind

14    the Controlled Substance Act in and of itself

15    is try to form this controlled or this closed

16    system --

17         A.    Yes.

18         Q.    -- because we are fearful of

19    some of these controlled substances and what

20    would happen if they were just dispersed

21    without any type of oversight?

22              MR. PYSER:  Object to form.

23         A.    Yes.  They're still on the

24    market.

25                    --oOo--
```

```
 1    BY MR. FULLER:

 2        Q.    And you're also aware that

 3    Congress has actually found that the

 4    uncontrolled distribution of these type of

 5    narcotics could significantly impact or be

 6    detrimental to the health, welfare and safety

 7    of the American people?

 8              MR. PYSER:  Object to form.

 9        A.    Restate the question.

10    BY MR. FULLER:

11        Q.    I'm going to do better than

12    that for you if I can find my... no, that's

13    not it.

14              Let's do 4916.  Hold on and

15    I'll hand you a copy too, Mr. Morse.  This is

16    Plaintiffs' Exhibit 18.

17              (Cardinal-Morse Exhibit 18

18        marked.)

19    BY MR. FULLER:

20        Q.    4916.  If you look at the first

21    page up on the screen, number 2 on the

22    screen, Mr. Morse, read that aloud to us.

23        A.    "The illegal importation,

24    manufacture, distribution and possession --

25    and possession and improper use of controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    substances have a substantial and detrimental

2    effect on the health and general welfare of

3    the American people."

4         Q.    And you don't disagree with

5    that, do you?  And I'll tell you, this is a

6    finding by the United States Congress.

7         A.    This appears to be as a part of

8    the original Controlled Substance Act --

9         Q.    Controlled Substances --

10        A.    -- in 19- -- well, the one of

11   1970, not the old Food, Drug and Cosmetics

12   Act.

13        Q.    Correct.  Correct.  And you

14   don't disagree with that, right?

15        A.    I do not disagree with that.

16        Q.    And that's why we have so many

17   regulations and controls in dealing with

18   controlled substances.  Because while they

19   may have some legitimate medical purpose, if

20   they're not handled properly, as we see in a

21   lot of our kids today, they can have a huge

22   detrimental impact on our society as well,

23   correct?

24             MR. PYSER:  Object to form.

25        A.    The illegal use of controlled

Highly Confidential - Subject to Further Confidentiality Review

1     substances, yes, can be a problem.

2     BY MR. FULLER:

3          Q.     And illegal distribution, the

4     illegal importation, manufacture and

5     distribution as well, correct?

6               MR. PYSER:  Object to form.

7          A.     Restate the question.

8     BY MR. FULLER:

9          Q.     Sure.  You said the "illegal

10    use."

11         A.     Yes.

12         Q.     It's not just the illegal use.

13    Congress said it's the illegal importation,

14    manufacture, distribution and possession and

15    improper use.  Right?

16              MR. PYSER:  Object to form.

17         A.     That's what it says, yes.

18    BY MR. FULLER:

19         Q.     And do you agree with that?

20         A.     Yes.

21              MR. PYSER:  Object to form.

22    BY MR. FULLER:

23         Q.     Did you ever do anything,

24    Mr. Morse, with the ingredient limit reports,

25    or know what they are?

```
 1           A.      The term was used, but I, at

 2    the moment, can't remember what they were.

 3           Q.      Are you aware of -- what did

 4    you do in relation to distribution centers?

 5    Did you have anything to do with the

 6    distribution centers?

 7           A.      No.  My investigators

 8    investigated the customers that we sold to;

 9    pharmacies, hospitals, et cetera.  We're

10    not -- to answer your question further, we're

11    not an internal investigative unit.

12           Q.      You're only external.

13           A.      Yes.

14           Q.      External to evaluate the risk

15    or potential risk of customers as it relates

16    to diversion of controlled substances,

17    correct?

18           A.      Correct.

19           Q.      That's mainly all you and your

20    team did, right?

21           A.      Correct.

22           Q.      And it was your job to, where

23    asked to, go out all across the country,

24    based on issues of concern, do the best

25    analysis you could, and report back.
```

1        A.      Yes.

2        Q.      We talked a lot earlier about

3    flags.  Oh, and let me ask you, did Dendrite

4    help with on-site visits?

5        A.      On occasion.

6        Q.      What else did Dendrite do, do

7    you know?

8        A.      No.

9        Q.      No knowledge of the evaluation

10   of Cardinal's internal systems --

11       A.      No.

12       Q.      -- that they provided back in

13   late 2007, beginning of 2008?

14       A.      No.  Before my time, but no.

15       Q.      Did they interact with your

16   investigators at all?

17       A.      There were times when -- oh,

18   interact with my investigators?

19       Q.      Yes, sir.  Yes, sir.  Did --

20       A.      No, they didn't interact, that

21   I'm aware of.

22       Q.      Would they do things separately

23   and distinct from your guys?  I mean, they

24   would never work together to do an

25   investigation?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I don't recall that ever

2    happening.

3                 (Discussion off the

4          stenographic record.)

5                 MR. FULLER:  Hold on.  Yeah, I

6          got it.  I need 4052.

7    BY MR. FULLER:

8          Q.     We were talking about red

9    flags.  Are you aware that Cardinal had a

10   system to indicate red flags related to

11   purchases of controlled substances, an

12   automated system?

13         A.     At this time, I do not recall

14   that.

15         Q.     This is P1.4052.  It's

16   Exhibit 19, for the record.

17                (Cardinal-Morse Exhibit 19

18         marked.)

19   BY MR. FULLER:

20         Q.     And this is similar to some of

21   the policies and procedures we looked at

22   earlier.  Do you see it's "Sales -

23   Anti-Diversion Alert Signals"?

24         A.     Uh-huh.

25         Q.     Have you ever seen this before?

1      A.     No.  It was sales.

2      Q.     Does it appear that it is a

3    policy and procedure maintained by Cardinal?

4    It has Cardinal Health on there?

5      A.     Yes.

6      Q.     And it's entitled "Sales," but

7    read to the jury the scope of this policy and

8    procedure and who it applies to.

9      A.     "This policy applies to Quality

10   & Regulatory Affairs; Supply Chain Integrity;

11   Cardinal Sales."

12     Q.     And this was originated in what

13   year?  What year is this policy issue date?

14     A.     In '08.

15     Q.     December 22, '08, after your

16   start date, right?

17     A.     Yes.

18     Q.     And does it issue -- does it

19   indicate whether there's a previous version

20   or issue?

21     A.     Does it?  No.  It looks like

22   this is new.

23     Q.     It says new, right?  This is

24   the first of its kind.  And it not only

25   applies to sales, like you mentioned, but

1    also QRA and supply chain integrity, which

2    would include your group, correct?

3         A.    Yes.

4         Q.    So turn to page 3 of the

5    document.  And do you know who Tom DeGemmis

6    is?  Do you know who he is?

7         A.    No.

8         Q.    It says he's an SVP, right?

9         A.    Yeah, he's a senior VP.  I do

10   not know him and never heard the name that

11   I'm aware of.

12        Q.    And it seems that -- it appears

13   to be an e-mail that was inputted.  It has a

14   date of December 5, 2008, correct?

15        A.    Yes.

16        Q.    And it talks about suspicious

17   order monitoring update, doesn't it?

18        A.    Yes.

19        Q.    And so at least according to

20   this procedure, what Mr. Senior Vice

21   President is saying is that "We have heard

22   consistent feedback that more tools are

23   needed to perform regular customer data

24   checks.  In response to this feedback, a new

25   report has been created, which we have

Highly Confidential - Subject to Further Confidentiality Review

1    unofficially been calling The Highlight

2    Report.  The Highlight Report has been

3    designed to give Sales a monthly snapshot of

4    each customer's monthly total pharmaceutical

5    sales, six-month purchase history and the

6    purchases of controlled substances to total

7    Rx sales."

8              And if you'd go down to the

9    bullets, it has three different categories.

10   Do you see them down there?

11        A.    I see them.

12             MR. FULLER:  Go ahead and blow

13        them all up, Gina.  Thank you.

14   BY MR. FULLER:

15        Q.    So the first one is "Watch

16   List," right?

17             (Telephonic interruption.)

18             MR. FULLER:  That means the

19        phone is going to self-destruct in

20        five seconds, unless you accept this

21        mission.

22             THE WITNESS:  Somebody went

23        off.

24             MR. PYSER:  You know I'm going

25        to object on that.

1    BY MR. FULLER:

2        Q.    The first bullet point is

3    "Watch List," correct, Mr. Morse?

4        A.    Yes.

5        Q.    And it says, "Watch List is a

6    5% increase, or at least $2500, of controlled

7    substances/List one chemicals.  The customers

8    in this category should be added to the sales

9    consultant's watch list," right?

10       A.    Yes.

11       Q.    All right.  Second one, "Yellow

12   Flag."  Yellow flag is "A 10% increase, or at

13   least $5,000, in controlled substances/List

14   one chemical orders.  Customers in the yellow

15   flag category will require more data.  The

16   PBC should conduct -- excuse me -- contact

17   the account quickly to discuss ordering

18   trends, but an immediate store visit is not

19   required.  QRA Field Compliance Officers

20   should be contacted as needed."  Right?

21       A.    Yes.

22       Q.    So we're stepping up.  We have

23   a 5% increase.  We just need to keep an eye

24   on it.  We have a 10% increase, the PBC --

25   which is the pharmacy business consultant,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.    Yes.  That's his -- most

3    companies will not call it a salesperson.

4         Q.    Right.  It's the salesperson

5    for that particular pharmacy, right?

6         A.    My understanding.

7         Q.    So if we're on the yellow flag,

8    they need to contact the customer and see

9    what's going on, but also contact QRA as

10   needed.  Right?

11        A.    It's QRA field compliance

12   officer.

13        Q.    Right.

14        A.    That's a field person.

15        Q.    Sure.  Should be contacted as

16   needed.  That's what it says, correct?

17        A.    Uh-huh, that's correct.

18        Q.    Okay.  Red flag.  "15%

19   increase, at least $10,000, of controlled

20   substances/List one chemical orders.

21   Customers in the red flag category should be

22   visited ASAP by the PBC and/or QRA," right?

23        A.    Yes.

24        Q.    "The PBC should contact

25   Corporate QRA, as well as the local Field

1    Compliance Officer, to work with this account

2    to understand the reason for the drastic

3    increase in controlled substances."

4            Do you see that there?

5    A.    I do.

6    Q.    Did you realize this was a

7    policy and procedure that Cardinal had in

8    2008 when you were there?

9    A.    As we were reviewing this, yes.

10   I do remember that sales had what they're

11   calling, I think, "the watch list."

12   Q.    The watch list, the yellow flag

13   and the red flag.

14   A.    Yeah, it's --

15   Q.    It's a highlight report.

16   A.    Yeah, okay, highlight report.

17   Q.    That's just above -- they call

18   it "The Highlight Report."

19           So you were aware of this

20   existing?

21   A.    I was aware it existed and was

22   being done.

23   Q.    And this is a good idea, right?

24           MR. PYSER:  Object to form.

25   A.    I think so.

```
 1     BY MR. FULLER:

 2          Q.    Because if we see a 15%, which

 3     according to this is a drastic increase, we

 4     need to know why.  We can at least agree on

 5     that.  Is that fair?

 6          A.    Yes.

 7          Q.    There might be a legitimate

 8     reason, there might be an illegitimate

 9     reason, but either way, we need to get to the

10     bottom of it, right?

11          A.    Yes.

12                MR. PYSER:  Object to form,

13          asked and answered.

14     BY MR. FULLER:

15          Q.    And whatever due diligence

16     we're doing, it may be just sales, it may be

17     sales and the field compliance office or it

18     may involve corporate QRA, again, just

19     depending, but we should see that documented

20     in the reasoning why we're seeing these

21     increases in these customers' purchases to

22     justify the increases, right?

23                MR. PYSER:  Object to form.

24          A.    We should see --

25                     --oOo--
```

```
 1    BY MR. FULLER:
 2         Q.    We should see supporting
 3    documentation as to what's going on --
 4               MR. PYSER:  Object to form.
 5    BY MR. FULLER:
 6         Q.    -- basically.
 7               MR. PYSER:  Object to form.
 8         A.    Who is "we" in this?  The --
 9    BY MR. FULLER:
10         Q.    Inside Cardinal.
11         A.    -- QRA?
12         Q.    Yeah.
13         A.    Yes.  They see supporting
14    documentation.  There could be questions and
15    answers that are just done.  Supporting
16    documentation of any of those types of
17    activities, is that what you're asking?
18         Q.    Yes, sir.  We should see some
19    sort of documentation.  If we have a red flag
20    event, say in Cuyahoga County up in Ohio, we
21    should see some explanation in the customer
22    file to explain that event.  We've just had a
23    15% increase from month to month, and again,
24    we're dealing in controlled substances, a
25    highly regulated industry.  We'd want to put
```

1    in our file, why is this customer having this

2    increase?  Did they just buy out another

3    pharmacy?

4         A.    I don't know what their

5    documentation requirements were under this.

6    This --

7              MR. PYSER:  Object to form.

8         Object to form on the last question.

9              Go ahead and finish your

10        answer, sir.  I didn't mean to cut you

11        off.

12        A.    I am not aware of what

13   documentation requirement is required.

14   BY MR. FULLER:

15        Q.    I'm asking should be.

16        A.    Should be?

17             MR. PYSER:  Object to form.

18   BY MR. FULLER:

19        Q.    Let me ask you this:  If your

20   guys were involved, you'd want to see

21   documentation from them, wouldn't you?

22        A.    My guys were involved when it

23   went a little further than this into the red

24   flag.  This was a way for them to basically

25   direct where we might need to go visit.

Highly Confidential - Subject to Further Confidentiality Review

 1              Obviously, the visit at that

 2    level, we would require documentation.  That,

 3    I can -- I know of because that was my area.

 4         Q.    You did it, right.

 5         A.    What documentation they have

 6    for this, I don't know.  I don't know what

 7    requirements should be there.  I don't know.

 8         Q.    Well, can we agree that a 15%

 9    increase needs some sort of explanation?

10              MR. PYSER:  Object to form.

11              Just wait for me to get my

12         objection in and go ahead and answer.

13         A.    Restate the question, please.

14    BY MR. FULLER:

15         Q.    Sure.

16              One, we need to make sure this

17    policy and procedure is being followed,

18    right?

19              MR. PYSER:  Object to form.

20         A.    "We" being who?

21    BY MR. FULLER:

22         Q.    Cardinal.

23         A.    Cardinal, yes.  Cardinal, yes.

24         Q.    Cardinal needs to make sure

25    that this policy and procedure, this

```
 1    highlight report --

 2         A.    That's what it's for, yes.

 3         Q.    -- is being followed, and that

 4    if we have a red flag, that somebody is

 5    making a visit right away, it says AS- --

 6              MR. FULLER:  Underline that for

 7         me.

 8    BY MR. FULLER:

 9         Q.    ASAP.

10         A.    As soon as possible, I see it.

11    I know it's there.

12         Q.    To visit it ASAP.

13         A.    Uh-huh.

14         Q.    By the PBC and/or QRA, right?

15         A.    Yes.

16         Q.    And in order to ensure or be

17    able to follow up and make sure that this

18    stuff is being done, we have to see

19    documentation somewhere.

20         A.    I would think so.

21         Q.    Okay.

22              MR. PYSER:  Object to form on

23         the last question.

24              MR. FULLER:  I don't have any

25         further questions.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. PYSER:  We'll take a short

2     break and switch seats.

3          MR. FULLER:  Sure.

4          THE VIDEOGRAPHER:  Okay.  Off

5     the record at 4:12.

6          (Recess taken, 4:12 p.m. to

7     4:31 p.m.)

8          THE VIDEOGRAPHER:  Okay, stand

9     by.  All right.  We're back on the

10    record at 4:31.

11               EXAMINATION

12    BY MR. PYSER:

13    Q.    Good afternoon, Mr. Morse.  Can

14    you introduce yourself to the jury, please?

15    A.    My name is Donald Steven

16    Morris.  I go by the name of Steve, middle

17    name.

18    Q.    And where did you grow up,

19    Mr. Morse?

20    A.    Primarily in Texas.

21    Q.    And can you tell us your

22    educational background?

23    A.    I am a pharmacist.  I have a

24    B.S. degree in pharmacy from the University

25    of Texas, and shortly thereafter became

Highly Confidential - Subject to Further Confidentiality Review

```
 1    licensed as a pharmacist.

 2         Q.    So after you became licensed as

 3    a pharmacist after graduating from the

 4    University of Texas, where did you go to

 5    work?

 6         A.    I worked in community

 7    pharmacies, a short-term one there in Austin

 8    and then about an hour east in a small

 9    community of about 5,000 called Giddings,

10    Texas.

11         Q.    In all, how long did you work

12    approximately in community pharmacies?

13         A.    About eight years.

14         Q.    And then where did you go to

15    work?

16         A.    At that time I went to work for

17    the Texas State Board of Pharmacy as a

18    compliance officer.

19         Q.    What did you do as a compliance

20    officer for the Texas State Board of

21    Pharmacy?

22         A.    Compliance officers, their role

23    was to visit pharmacies, do routine visits to

24    pharmacies, and assess their operations for

25    compliance with the regulations, federal and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    state; acts, federal and state, that affect

 2    pharmacy operations.

 3          Q.     About how long did you work for

 4    the Texas Board of Pharmacy?

 5          A.     I worked for them for about 19

 6    and a half years.

 7          Q.     And did there come a point in

 8    time when you went to work for Cardinal

 9    Health?

10          A.     Yes.

11          Q.     Okay.  About when was that?

12          A.     That was, I believe, first part

13    of March, in 2008.

14          Q.     And how long did you stay at

15    Cardinal?

16          A.     Till November 1,

17    two-thousand- -- excuse me, not November.

18    Pardon me.  It was -- my last day was the end

19    of January in 2017.

20          Q.     And are you retired now?

21          A.     I am.

22          Q.     What were you initially hired

23    to do at Cardinal Health?

24          A.     I was initially hired to hire,

25    to identify and hire a team of investigators
```

Highly Confidential - Subject to Further Confidentiality Review

1    that would be responsible for visiting

2    pharmacies as they were assigned to our team

3    to visit.

4         Q.    And did you have --

5              MR. FULLER:  Object to the form

6         of the last question.  Sorry.

7    BY MR. PYSER:

8         Q.    Did you have experience in that

9    area?

10             MR. FULLER:  Form.

11        A.    Experience in visiting

12   pharmacies and assessing them, yes.

13   BY MR. PYSER:

14        Q.    And where did you gain that

15   experience before you came to Cardinal

16   Health?

17        A.    Well, from the Texas State

18   Board of Pharmacy, number one, doing the --

19   being a compliance officer and visiting them

20   myself.  Then running the program for the

21   majority of my time or moving up through the

22   program to the point of being a director of

23   compliance.  The last year I moved out of

24   that role of compliance to dealing with

25   drafting rules, et cetera.

```
 1                    But also, between the time that

 2      I worked for the Board of Pharmacy and

 3      Cardinal Health, I visited -- I worked for a

 4      mail service pharmacy, and the mail service

 5      pharmacy had a team of three individuals that

 6      were responsible for running assessment of

 7      our investigations -- not really

 8      investigations, assessments of their

 9      facilities for compliance with the

10      regulations, both federal and state, and the

11      statutes, both federal and state, as they

12      applied in the specific state that the

13      pharmacy was located in, for the mail service

14      pharmacy.

15           Q.    So when you came to Cardinal

16      Health, can you describe what the

17      responsibilities were for yourself and the

18      members of your team?

19                    MR. FULLER:  Form.

20           A.    Repeat the question, please.

21      BY MR. PYSER:

22           Q.    Sure.

23                    You told me -- you told me you

24      started at Cardinal Health in around March

25      of 2008, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes.

2     Q.     When you started at Cardinal

3  Health, can you describe a little bit of what

4  the responsibilities were for the team you

5  built that you described earlier?

6     A.     Okay.  Their responsibility was

7  to visit these pharmacies, according to our

8  policies and procedures, that were assigned

9  to us for visits, and they were to try to

10  determine at those pharmacies whether or not

11  there were any indications that the pharmacy

12  may be, or not be, involved in diversion of

13  controlled substances.

14     Q.     Did some of the people you

15  hired have law enforcement experience before

16  they came to work at Cardinal Health?

17     A.     Yes, they did.

18     Q.     Was your investigative team

19  part of the overall anti-diversion team at

20  Cardinal Health?

21          MR. FULLER:  Form.

22     A.     It was a part of it, yes.

23  BY MR. PYSER:

24     Q.     Was your team that you

25  supervised independent from any sales

Highly Confidential - Subject to Further Confidentiality Review

```
 1    operations at Cardinal Health?

 2         A.    Yes.

 3               MR. FULLER:  Object to form.

 4    BY MR. PYSER:

 5         Q.    When Cardinal Health -- were

 6    there ever times when Cardinal Health decided

 7    to stop doing business with a customer?

 8         A.    Yes.

 9         Q.    When a decision like that was

10    made, who had the final decision?

11               MR. FULLER:  Form.

12         A.    Michael Moné.

13    BY MR. PYSER:

14         Q.    Was there ever a time while you

15    were at Cardinal where the sales staff or

16    anyone else blocked the anti-diversion team

17    from taking action against a customer?

18         A.    Not that I am aware of, ever.

19         Q.    Earlier today you were asked a

20    series of questions by counsel for the

21    plaintiffs about a pharmacy in Florida called

22    Gulf Coast.

23               Do you recall those questions?

24         A.    Yes.

25         Q.    And during your testimony, you
```

Highly Confidential - Subject to Further Confidentiality Review

1    made reference to there being a contact with

2    DEA from one of your investigators related to

3    Gulf Coast.

4              Do you recall that testimony?

5        A.    Yes.

6        Q.    Okay.  I'd like to show you

7    Exhibit 20.

8              (Cardinal-Morse Exhibit 20

9        marked.)

10   BY MR. PYSER:

11       Q.    Do you recognize this document?

12       A.    This is a record of a visit and

13   supporting documentation for a visit to Gulf

14   Coast Medical Pharmacy.  I recognize the

15   document.  This was the manner in which my

16   investigators reported the visits, the

17   investigations.

18             MR. PYSER:  Counsel, can I

19        borrow your highlighter?

20             MR. FULLER:  No.

21             MR. PYSER:  If I ask nicely?

22             MR. FULLER:  You didn't say

23        "please."

24             MR. PYSER:  Please.  Thank you.

25   BY MR. PYSER:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      And the investigator making

2     this report, that was Vincent Moellering?

3          A.      Vincent Moellering is correct.

4          Q.      And the date is in May of 2009,

5     right?

6          A.      Yes.

7          Q.      So the questions you were asked

8     about before concerned 2010, but this

9     actually predates the questions you were

10    asked during the plaintiff's examination.  Is

11    that right?

12         A.      Yes.

13         Q.      And among the findings, I just

14    want to draw your attention to the second

15    bullet point about the location and area.

16              You see there it says, "Middle

17    class, inside medical office building

18    adjoining 480-bed hospital, two other medical

19    buildings within the complex, residential

20    area, located in Lee County"?

21              Do you see that?

22         A.      Yes.

23         Q.      And if you go into the document

24    a little bit further, on the next page, there

25    are additional case notes.

1          Do you see that?

2     A.    Yes.

3     Q.    Okay.  And there's some

4  additional information about the pharmacy,

5  the background, and it lists that the Florida

6  Department of Health has licenses for this

7  pharmacy and the pharmacist who operates it.

8          Do you see that?

9     A.    Background -- in item

10  number II, "Background Information"?

11     Q.    Yes, number 4 under item

12  number II.

13     A.    "Florida Department of Health

14  listing the following:  Gulf Coast Medical

15  Pharmacy, license," yes.

16     Q.    And in addition, I'd like to

17  draw your attention to the data collection

18  section from the QRA visit site.  This is

19  going to be on the third page of the

20  document.  I think it's one more from where

21  you are.

22     A.    There you go.

23     Q.    And you can see it up on the

24  screen as well.  There's a general

25  description of the area.  And this general

1    description harkens back to what we saw on

2    the first page about the number of beds of

3    the hospital.

4              Do you see that?

5         A.    Yes.

6         Q.    And it states "Inside a medical

7    office building, connected to hospital, which

8    expanded from 110 beds to 480 beds on

9    March 4, 2009."

10             Do you see that?

11        A.    Yes.

12        Q.    And it also said, "There are

13   several hundred physicians in the complex,

14   which also includes an Infectious Medical

15   Associate Building."

16             Do you see that?

17        A.    Yes.

18        Q.    And as we continue on in this

19   document, in Section 20, the investigator

20   noted that there were no out-of-state

21   physicians?

22        A.    Yes.

23        Q.    And if you go to the very end,

24   there's a section for follow-up notes and

25   inquiries on that last page.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      On the last page?

 2          Q.      Yes.  And it begins "May 7,

 3    2009."

 4          A.      Yes, I see it.

 5          Q.      Okay.  So it states there,

 6    "It's obvious from my visit in July 2008, and

 7    this visit, that there's been a tremendous

 8    growth within the hospital and the

 9    surrounding medical clinics within the large

10    complex."

11                  Do you see that?

12          A.      Yes.

13          Q.      Okay.  And you were asked on

14    examination from plaintiff's counsel about

15    things that your investigator had heard

16    during the course of his investigation.  And

17    there's a reference to that here too.  The

18    last line, he says, "I do have some concerns

19    pertaining to the hearsay from other

20    customers, but have nothing of concrete

21    evidence."

22                  Do you see that?

23          A.      Yes.

24          Q.      Okay.  But if you look at the

25    last bullet, let's look at another step your
```

1    investigator took.  Do you see what's written

2    there, May 5, 2009?

3         A.     Yes.

4         Q.     Can you read that last

5    paragraph?

6         A.     "Contacted Kenneth" -- I

7    believe it's Boggess, "Senior Investigator,

8    DEA Drug Diversion Team, Tampa, and informed

9    him of the information I collected.

10   Mr. Boggess thanked me and stated he would

11   schedule a visit to the pharmacy and review

12   their filled prescriptions" -- or "filled

13   scripts."

14        Q.     So this communication with DEA,

15   I want to talk a little bit more about just

16   that last passage, where it says "review

17   their filled scripts."

18               What does that mean?  What does

19   it mean to review filled scripts?

20        A.     To, I guess, look at the

21   prescriptions themselves or to see a printout

22   of the prescriptions that would contain all

23   of the information that was on the

24   prescription.

25        Q.     Okay.  So that would have

1    doctor information and patient information?

2         A.    Yes.

3         Q.    Okay.  So that's something DEA

4    was going to look at, according to this

5    investigator, now?

6         A.    According to this, yes.

7         Q.    And is that something that

8    Cardinal Health is allowed to look at,

9    because of privacy laws?

10        A.    No.

11        Q.    Okay.  So DEA was told about

12   this pharmacy and they were going to look at

13   a series of information beyond what Cardinal

14   Health was able to see.

15        A.    Yes.

16        Q.    And to the best of your

17   knowledge, during all the time that Cardinal

18   Health had a relationship with this customer,

19   did they maintain a DEA license?

20        A.    Yes.

21        Q.    Were there ever times when you

22   personally called a customer to tell them

23   that they were no longer eligible to receive

24   controlled substances from Cardinal Health?

25             MR. FULLER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes, that was one of my duties.

2     BY MR. PYSER:

3          Q.      And when you made those calls

4     and told customers or former customers that

5     they were no longer going to be able to

6     receive controlled substances from Cardinal

7     Health, did those pharmacies typically still

8     have valid DEA licenses?

9          A.      Yes, at the time of my call.

10              MR. FULLER:  Form.

11     BY MR. PYSER:

12          Q.      You were also asked questions

13     earlier today when plaintiff's counsel was

14     examining you about pharmacies who use

15     multiple distributors.

16              Do you remember that?

17          A.      Yes.

18          Q.      Is -- under the laws as you

19     understand them, is it permissible for a

20     pharmacy to use multiple distributors to

21     supply their pharmacy with medication?

22          A.      Yes.

23          Q.      When a pharmacy uses multiple

24     distributors, would Cardinal Health know what

25     that pharmacy receives from other

1    distributors?

2                MR. FULLER:  Object to form.

3        A.     No.

4    BY MR. PYSER:

5        Q.     Are you familiar with something

6    called ARCOS?

7        A.     I became refamiliarized with it

8    earlier today, yes.

9        Q.     And is ARCOS something you knew

10   about?

11       A.     Yes.  Yes.

12       Q.     While you were in your job at

13   Cardinal?

14       A.     Yes.  Yes.  I didn't remember

15   the acronym this morning.

16       Q.     Got it.

17              To your knowledge, would all

18   distributors report their shipments to

19   pharmacies to DEA through the ARCOS system?

20       A.     I believe that is a

21   requirement.

22       Q.     So even if a pharmacy was

23   receiving distributions from multiple

24   distributors, DEA would have the total

25   information for that pharmacy in the ARCOS

1    database.  Is that right?

2                MR. FULLER:  Object to form.

3          A.     Yes, I would think so.

4    BY MR. PYSER:

5          Q.     Do you have an understanding of

6    whether or not DEA would have information

7    from multiple distributors for a single

8    pharmacy in the ARCOS database?

9          A.     Can you restate the question?

10         Q.     Sure.

11                Do you have an understanding as

12   to whether or not DEA would have information

13   from multiple distributors in the ARCOS

14   database?

15         A.     Since all distributors are

16   required to report to DEA on the ARCOS forms,

17   I would assume, yes.  I wouldn't assume; yes,

18   they would.

19                MR. FULLER:  Object to form.

20   BY MR. PYSER:

21         Q.     Does Cardinal Health have

22   access to the ARCOS database, to your

23   knowledge?

24         A.     Not to my knowledge.

25         Q.     While you were working in

Highly Confidential - Subject to Further Confidentiality Review

1  Cardinal Health's anti-diversion group, did

2  you take your best efforts to ensure Cardinal

3  was fulfilling its regulatory

4  responsibilities?

5           MR. FULLER:  Form.

6      A.    Within my scope, yes.

7  BY MR. PYSER:

8      Q.    While you were working at

9  Cardinal Health, did anyone ever ask you to

10  do anything that you believed was immoral or

11  wrong?

12     A.    No.

13     Q.    Were you provided adequate

14  resources for you and your team to do your

15  job at Cardinal Health?

16     A.    I believe so, yes.

17     Q.    In your experience at Cardinal

18  Health over nine years, did you ever see

19  Cardinal Health ship an order that you

20  believed would be diverted?

21     A.    No.

22           MR. PYSER:  No further

23  questions.  Thank you, Mr. Morse.

24           We can go off the record.

25           THE VIDEOGRAPHER:  Okay.  Off

Highly Confidential - Subject to Further Confidentiality Review

```
 1              the record at 4:49.

 2                   (Recess taken, 4:49 p.m. to

 3         4:54 p.m.)

 4                   THE VIDEOGRAPHER:  All right,

 5         stand by.  All right.  We're back on

 6         the record at 4:54.

 7                   FURTHER EXAMINATION

 8    BY MR. FULLER:

 9         Q.    Sir, grab Exhibit 20 that you

10    have right in front of you.  Yes, sir.  Turn

11    to the second page.  This is what you and

12    Mr. Pyser were talking about just a moment

13    ago.  Right?

14         A.    This document is correct,

15    that's correct.

16         Q.    And this is Moellering's

17    investigation of Gulf Coast Pharmacy back in

18    May of 2009.

19         A.    Yes.

20         Q.    So that would have been one of

21    the first times he visited prior to the

22    visits that we looked at.  Correct?

23         A.    Yes.

24         Q.    Does he indicate in here

25    anywhere what the -- well, yeah, he does.
```

```
 1    Okay.  So go to the next page, "Background

 2    Investigative Findings."

 3                Do you see that?

 4         A.     Yes.

 5         Q.     Go to number 8.

 6                MR. FULLER:  Keep this on,

 7         please, somebody.

 8                THE VIDEOGRAPHER:  Uh-huh.

 9         A.     Yes.

10    BY MR. FULLER:

11         Q.     All right.  Read number 8 aloud

12    to us.

13         A.     "Review of the CAH" -- Cardinal

14    Health -- "CS," controlled substance,

15    "purchase history revealed a sharp increase

16    in oxycodone purchases from 21,800 pills in

17    October 2009 to 37,900 pills in

18    November 2009."

19         Q.     So where did they end up in

20    2011?  Do you remember?

21         A.     I don't remember.

22         Q.     Over 300,000 pills was their

23    threshold.

24         A.     Okay.

25         Q.     Per month, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I believe that was the figure.

2          Q.      Over 10 times what's documented

3     here.  And even here, we're seeing

4     significant growth that he's indicating,

5     correct?

6          A.      Yes.

7          Q.      Well, hold on, let's look.

8     Because if you go back to the page just

9     before that, where's 70% of their business

10    coming from?

11         A.      This is self-reported.

12    Controlled substance sales, CS sales, is

13    70% -- controlled substance sales is 70% due

14    to the hospital and three pain clinics in

15    office building.

16         Q.      So how much was due to the

17    three pain clinics?  And you know during this

18    time Florida was cracking down on pain

19    clinics, right?

20              MR. PYSER:  Object to form.

21    BY MR. FULLER:

22         Q.      Pill mills?

23         A.      In 2009, that was, I believe,

24    the beginning of it.

25         Q.      Yes, sir.  Pam Bondi had

1    recently become elected Attorney General down

2    there and one of her main focuses during this

3    time frame was cracking down on pill mills.

4              You know that, right?

5              MR. PYSER:  Object to form.

6         A.    I don't know who that person

7    is.

8    BY MR. FULLER:

9         Q.    So you don't know who the

10   Attorney General was in Florida?

11        A.    I do not know who the Attorney

12   General was in Florida, no.  However, I'm --

13   I'm saying yes to your statement that on or

14   about this time, pill mills were beginning to

15   be focused on.

16        Q.    And three pain clinics in one

17   office building would be a red flag, wouldn't

18   it?

19             MR. PYSER:  Object to form.

20        A.    Could be.

21   BY MR. FULLER:

22        Q.    So do we know how much was

23   coming from the hospital versus how many was

24   coming -- what percentage of controlled

25   substances were being prescribed by these

1   three pain clinics that are in the same

2   building?

3           A.      That was not noted.

4           Q.      That would be good information

5   to have, wouldn't it?

6                   MR. PYSER:  Object to form.

7           A.      Potentially.

8   BY MR. FULLER:

9           Q.      And did we see anything

10  indicating that we'd obtained the dosage

11  usage information from the pharmacy?

12          A.      I would have to read the entire

13  case notes to find that out, sir.

14          Q.      Well, don't worry about it.  If

15  Mr. Pyser didn't point it out, must not be

16  too important.

17                  MR. PYSER:  If you want to look

18          in there and find it, you're welcome

19          to.

20  BY MR. FULLER:

21          Q.      So the second page -- the third

22  page, what percentage is cash?

23          A.      On question 14, "Payment

24  sources," the percentage is 40%.

25          Q.      That's abnormally high too,

Highly Confidential - Subject to Further Confidentiality Review

 1    isn't it?  That's another red flag, right?

 2          A.     Yes.  Could be.  Could be.

 3          Q.     All right.  And we know what

 4    the history was on Gulf Coast, don't we?

 5          A.     Yes.

 6          Q.     What happened to them in the

 7    end of 2011?

 8          A.     End of 2011, we found out they

 9    were -- they were not being truthful with us.

10    We cut them off, and shortly thereafter, DEA

11    got them to surrender their license.

12          Q.     Well, you didn't cut them off

13    until after the DEA served an administrative

14    inspection warrant asking for information

15    related to them, right?

16          A.     I'm not sure of the chronology.

17          Q.     So you don't know whether or

18    not the DEA issued the warrant to Cardinal to

19    provide information related to that pharmacy

20    before you decided to cut them off or whether

21    it was after that?

22                 MR. PYSER:  Object to form.

23    BY MR. FULLER:

24          Q.     You're not sure?

25                 MR. PYSER:  Object to form.

1          A.     I don't know the timeline.  I

2    know the reason that they were cut off was we

3    found out that they were not telling us the

4    truth about some prescriptions that they were

5    supposedly filling to -- to aggregate in one

6    location before the sheriff's department

7    found out that was not true.  We cut them off

8    immediately.  I'm not sure where that was in

9    the timeline of them getting an order or

10   anything.

11   BY MR. FULLER:

12         Q.     Not them getting an order.

13   Cardinal receiving an administrative

14   inspection warrant asking for information

15   from them.

16         A.     I don't know the timeline on

17   that.

18              MR. PYSER:  Object to form.

19   BY MR. FULLER:

20         Q.     Okay.  And additionally, you

21   know what happened when DEA filed its

22   administrative inspection warrant on Gulf

23   Coast, too, don't you?  You saw it earlier

24   today.  It voluntarily --

25         A.     That was the -- okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      -- surrendered --

 2          A.      Yes, they voluntarily

 3     surrendered.

 4          Q.      -- their DEA license because

 5     they knew they were in trouble, right?

 6              MR. PYSER:  Object to form.

 7          A.      I don't know why they

 8     surrendered it.

 9     BY MR. FULLER:

10          Q.      Why else would they give it up?

11          A.      I don't know why they would

12     surrender it.

13          Q.      Can you think of any other

14     reason?

15          A.      I don't know why they

16     surrendered it.

17              MR. PYSER:  Whoa, whoa, whoa.

18          You've got to wait and let me get my

19          objection in before you answer the

20          question.

21     BY MR. FULLER:

22          Q.      Now, you know --

23              MR. PYSER:  Object to form on

24          the last two.

25              THE WITNESS:  Sorry.
```

```
 1      BY MR. FULLER:

 2          Q.      We already talked about the

 3      fact that Cardinal's license was suspended in

 4      2012 as well, correct?

 5          A.      Yes.

 6          Q.      And you know that they finally,

 7      or ultimately, reached an agreement with the

 8      DEA, right?

 9          A.      Yes.

10          Q.      This one will be 3715.  This

11      will be Plaintiffs' Exhibit 21.

12              (Cardinal-Morse Exhibit 21

13          marked.)

14              MR. PYSER:  I'm going to object

15          to this line of questioning as being

16          beyond the scope of the examination.

17      BY MR. FULLER:

18          Q.      If you go to page 3 of the

19      agreement -- or I say page 3 of the

20      agreement.  Page 3 at the top.  I apologize.

21      "Stipulation and Agreement."

22              Do you see that section there?

23          A.      Yes.  This is the memorandum of

24      agreement.  Okay.

25          Q.      That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Stipulation and Agreement on

 2     page 3.

 3          Q.      Have you seen this document

 4     before?  If you go to page 9 is where the

 5     people signed off on it, 9 and -- yeah,

 6     page 9.

 7          A.      The timing on this again was --

 8     when was this issued?  It says on page 9?

 9          Q.      Yes, sir.

10          A.      Okay.

11          Q.      May 14 of 2012.

12          A.      Okay.

13          Q.      You don't remember when this

14     all went on?  Maybe you don't.

15          A.      It's been a long time, sir.

16          Q.      I'm just asking if you remember

17     or not.

18          A.      Okay.  This MOA was completed

19     in May.  Okay.  And -- yes.

20          Q.      You're still in regulatory

21     during that time, right?

22          A.      Yes.

23          Q.      And look up there.

24     "Stipulation and Agreement.  The facts

25     alleged in the Order to Show Cause, as well

1    as the facts alleged in the Government's

2    filings in The Matter of Cardinal Health, DEA

3    Docket No. 12-32, as listed in Appendix D,

4    constitute grounds under which the DEA could

5    revoke the DEA registration of Cardinal

6    Lakeland."

7               That's part of the agreement,

8    right?  At least that's what it says.

9               MR. PYSER:  Object to form.

10       A.      That's what it says.

11   BY MR. FULLER:

12       Q.      It says "Cardinal admits" --

13   this isn't one where they deny any

14   admissions.  "Cardinal admits that its due

15   diligence efforts for some pharmacy customers

16   and its compliance with the 2008 MOA, in

17   certain respects, were inadequate."

18               Did you know before today that

19   Cardinal admitted it failed to comply with

20   the Controlled Substance Act as well as its

21   obligations under the 2008 MOA?  Did you know

22   that before today?

23               MR. PYSER:  Object to form.

24       A.      This is not -- yes.  I knew

25   that this MOA had been written.  Whether

```
 1    Cardinal admitted to anything --

 2    BY MR. FULLER:

 3         Q.    Did you know that they

 4    admitted?

 5         A.    No, and this admission here

 6    appears to be couched in some very specific

 7    language.

 8         Q.    Very specific.

 9         A.    Yeah.

10         Q.    That "Cardinal admits" --

11         A.    "For some customers."

12         Q.    -- "its due diligence efforts

13    for some customers and its compliance with

14    the 2008 MOA, in certain respects, were

15    inadequate."

16         A.    Certain respects, some

17    customers, yes, I see that.

18              MR. PYSER:  Object to form.

19    BY MR. FULLER:

20         Q.    And we've looked at a lot of

21    different customers so far today, haven't we?

22         A.    Yes, we have.

23         Q.    Gulf Coast being one of them,

24    CVS 219 being another one of them, right?

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    We looked at some customers in

2    other parts of the country as well, correct?

3    A.    Yes.

4    Q.    And Cardinal is admitting in

5    this document that its due diligence efforts

6    for some customers failed.

7         MR. PYSER:  Object to form.

8    BY MR. FULLER:

9    Q.    And that in some respects it

10   did not live up to the obligations it agreed

11   to in 2008 MOU -- or MOA.  MOA.

12        MR. PYSER:  Object to form.

13   BY MR. FULLER:

14   Q.    Right?

15   A.    In some aspects for some

16   customers, yes.

17   Q.    And you didn't know that before

18   today, that they had admitted to that?  No

19   one shared that with you?

20   A.    I -- my understanding of the

21   MOA was that it was an agreement for us to

22   do certain -- for Cardinal to do certain

23   things.  I was not aware of any admissions in

24   it of any kind.

25   Q.    That's all I'm asking you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No, I was not aware.

 2          Q.     I'm asking you, did you know

 3   that Cardinal admitted --

 4          A.     No.

 5          Q.     -- to these deviations --

 6          A.     No.  I've never seen this.

 7                 MR. PYSER:  Object to form.

 8                 Sir, as counsel is asking you

 9          questions, you've got to pause just a

10          beat so I can object.

11                 Object to form for that last

12          line of questioning.

13   BY MR. FULLER:

14          Q.     Did anybody come to you and

15   tell you in which aspects that Cardinal

16   failed in its due diligence?

17                 MR. PYSER:  Object to form.

18          A.     I believe I just said I wasn't

19   aware of it at all.

20   BY MR. FULLER:

21          Q.     But you said you weren't aware

22   they admitted it.  I'm just wondering if they

23   told you where they failed.

24                 MR. PYSER:  Object --

25          A.     No.
```

```
 1              MR. PYSER:  Object to form.

 2         A.    No.

 3    BY MR. FULLER:

 4         Q.    Did they ever tell you where

 5    they failed in compliance with their prior

 6    agreement with the federal government based

 7    on the 2008 MOA?

 8              MR. PYSER:  Object to form,

 9         asked and answered.

10         A.    No.

11              MR. FULLER:  I don't have

12         anything further.

13              MR. PYSER:  No questions from

14         me.

15              THE VIDEOGRAPHER:  Okay.  Are

16         we good?

17              MR. FULLER:  Done.

18              THE VIDEOGRAPHER:  All right.

19         Off the record at 5:07.  This

20         concludes the deposition.

21              (Deposition recessed at

22         5:07 p.m.)

23                   --o0o--

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2           I, SUSAN PERRY MILLER, Registered
     Diplomate Reporter, Certified Realtime
 3   Reporter, Certified Court Reporter and Notary
     Public, do hereby certify that prior to the
 4   commencement of the examination, DONALD
     STEVEN MORSE was duly sworn by me to testify
 5   to the truth, the whole truth and nothing but
     the truth.
 6
             I DO FURTHER CERTIFY that the
 7   foregoing is a verbatim transcript of the
     testimony as taken stenographically by and
 8   before me at the time, place and on the date
     hereinbefore set forth, to the best of my
 9   ability.
10           I DO FURTHER CERTIFY that pursuant
     to FRCP Rule 30, signature of the witness was
11   not requested by the witness or other party
     before the conclusion of the deposition.
12
             I DO FURTHER CERTIFY that I am
13   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
14   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
15   that I am not financially interested in the
     action.
16
17
18           _____
             Susan Perry Miller
19           CSR-TX, CCR-LA, CSR-CA-13648
             Registered Diplomate Reporter
20           Certified Realtime Reporter
             Certified Realtime Captioner
21           NCRA Realtime Systems Administrator
             Notary Public, State of Texas
22           My Commission Expires 03/30/2020
23           Dated:  17th of December, 2018
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8          After doing so, please sign the

 9   errata sheet and date it.

10          You are signing same subject to

11   the changes you have noted on the errata

12   sheet, which will be attached to your

13   deposition.

14          It is imperative that you return

15   the original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                              ERRATA

 2     PAGE   LINE   CHANGE

 3     _____  _____  _____

 4            REASON: _____

 5     _____  _____  _____

 6            REASON: _____

 7     _____  _____  _____

 8            REASON: _____

 9     _____  _____  _____

10            REASON: _____

11     _____  _____  _____

12            REASON: _____

13     _____  _____  _____

14            REASON: _____

15     _____  _____  _____

16            REASON: _____

17     _____  _____  _____

18            REASON: _____

19     _____  _____  _____

20            REASON: _____

21     _____  _____  _____

22            REASON: _____

23     _____  _____  _____

24            REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                ACKNOWLEDGMENT OF DEPONENT

2

3

4           I, DONALD STEVEN MORSE, do hereby
      certify that I have read the foregoing pages
5     and that the same is a correct transcription
      of the answers given by me to the questions
6     therein propounded, except for the
      corrections or changes in form or substance,
7     if any, noted in the attached
      Errata Sheet.

8

9

10

11

12    _____
       DONALD STEVEN MORSE                  DATE
13

14

15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18

19    _____
20    Notary Public
21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                          LAWYER'S NOTES

2

3      PAGE      LINE

4      _____     _____     _____

5      _____     _____     _____

6      _____     _____     _____

7      _____     _____     _____

8      _____     _____     _____

9      _____     _____     _____

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23     _____     _____     _____

24     _____     _____     _____

25
```