Page 1

1          IN THE DISTRICT COURT OF CLEVELAND COUNTY

2                    STATE OF OKLAHOMA

3   STATE OF OKLAHOMA, ex rel.,
    MIKE HUNTER, ATTORNEY GENERAL
4   OF OKLAHOMA,

5        Plaintiff,
    vs.                              No. CJ-2017-816
6
    (1)  PURDUE PHARMA, L.P.,
7   (2)  PURDUE PHARMA, INC.,
    (3)  THE PURDUE FREDERICK COMPANY;
8   (4)  TEVA PHARMACEUTICALS USA, INC.;
    (5)  CEPHALON, INC.;
9   (6)  JOHNSON & JOHNSON;
    (7)  JANSSEN PHARMACEUTICALS, INC.;
10  (8)  ORTHO-McNEIL-JANSSEN
    PHARMACEUTICALS, INC., n/k/a
11  JANSSEN PHARMACEUTICALS, INC.;
    (9)  JANSSEN PHARMACEUTICA, INC.;
12  n/k/a JANSSEN PHARMACEUTICALS, INC.;
    (10) ALLERGAN, PLC, f/k/a ACTAVIS PLC,
13  f/k/a ACTAVIS, INC., f/k/a WATSON
    PHARMACEUTICALS, INC.;
14  (11) WATSON LABORATORIES, INC.;
    (12) ACTAVIS LLC; and
15  (13) ACTAVIS PHARMA, INC.;
    f/k/a WATSON PHARMA, INC.;
16
         Defendants.
17

18    VIDEOTAPED DEPOSITION OF J&J 3230(C)(5) WITNESS

19                 BRUCE MOSKOVITZ, M.D.

20         TAKEN ON BEHALF OF THE PLAINTIFFS

21     ON JANUARY 9, 2019, BEGINNING AT 9:18 A.M.

22              IN OKLAHOMA CITY, OKLAHOMA

23

24  VIDEOTAPED BY:  Gabe Pack

25  REPORTED BY:  Jane McConnell, CSR RPR CMR CRR

## Page 2

```
 1              APPEARANCES
 2   On behalf of the PLAINTIFF:
 3        Andrew Pate
          Bradley Beckworth
 4        NIX, PATTERSON & ROACH, LLP
          512 N. Broadway Avenue
 5        Suite 200
          Oklahoma City, Oklahoma 73102
 6        (405) 516-7800
          apate@nixlaw.com
 7        bbeckworth@nixlaw.com
 8   On behalf of the DEFENDANT PURDUE PHARMA:
 9        Jervonne Newsome
          LYNN, PINKER, COX, HURST
10        2100 Ross Avenue, Suite 2700
          Dallas, Texas 75201
11        (214) 981-3828
          jnewsome.lynnllp.com
12
13   On behalf of the DEFENDANTS JOHNSON & JOHNSON AND
     JANSSEN PHARMACEUTICALS:
14
          Charles Lifland
15        Esteban Rodriguez
          O'MELVENY & MYERS, LLP
16        400 South Hope Street
          Los Angeles, California 90071
17        (213) 430-6000
          clifland@omm.com
18        erodriguez2@omm.com
19   - and -
20        Andrew Bowman
          FOLIART, HUFF, OTTAWAY & BOTTOM
21        201 Robert S. Kerr
          Suite 1200
22        Oklahoma City, Oklahoma 73102
          (405) 232-4633
23        andrewbowman@oklahomacounsel.com
24
25   (Appearances continued on next page.)
```

## Page 3

```
 1        APPEARANCES (Continued)
 2   On behalf of the DEFENDANT TEVA PHARMACEUTICALS:
 3        Jeff Curran

          GABLE GOTWALS

 4        211 North Robinson, 15th Floor

          Oklahoma City, Oklahoma  73102-7255

 5        (405) 235-5500

          jcurran@gablelaw.com

 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                   INDEX
 2                                              Page
 3   Direct Examination by Mr. Pate               8
 4               EXHIBITS
 5   Exhibit         Description
 6   EXHIBIT 1    Notice for 3230(C)(5) Videotaped    9
                  Deposition of Corporate
                  Representative of J&J Defendants
 7
 8   EXHIBIT 2    6-13-06 "The Epidemic of Pain in   16
                  America"
 9
     EXHIBIT 3    Selected Studies, Research and     29
10                Analysis of Safety and Efficacy of
                  Duragesic and Nucynta
11
     EXHIBIT 4    Finding Relief - Pain Management for 40
12                Older Adults
13   EXHIBIT 5    Finding Relief (Tab 1) References   43
14   EXHIBIT 6    Black Binder - Finding Relief       66
                  References
15
     EXHIBIT 7    Finding Relief:  Pain Management for 66
16                Older Adults
17   EXHIBIT 8    Index to Supplemental Binder        70
18   EXHIBIT 9    Prescribe Responsibly Overview      92
19   EXHIBIT 10   Selected Support for Statements    112
                  and Representations Regarding
20                Pseudoaddiction
21   EXHIBIT 11   Clinical Note - Opioid            123
                  Pseudoaddiction - An Iatrogenic
22                Syndrome
23   EXHIBIT 12   Clinical Courier - Optimizing     169
                  Chronic Pain Management
24
25   (Exhibits continued on next page.)
```

## Page 5

```
 1              EXHIBITS (Continued)
 2   Exhibit         Description              Page
 3   EXHIBIT 13   Sources of Knowledge Regarding    189
                  Abuse, Misuse, Dependence or
 4                Addiction
 5   EXHIBIT 14   Prescribe Responsibly Binder      190
 6   EXHIBIT 15   Selected Support for Statements   192
                  and Representations Regarding
 7                Pseudoaddiction
 8   EXHIBIT 16   8-01-08 Email from Laurie Kathiari 201
                  to Kimberly Deem-Eshleman
 9
     EXHIBIT 17   CDC Guideline for Prescribing     213
10                Opioids for Chronic Pain - United
                  States 2016
11
     EXHIBIT 18   Duragesic/Nucynta/Nucynta ER      227
12                Timeline
13   EXHIBIT 19   Selected Studies, Research and    227
                  Analysis Supporting Certain
14                Categories of Statements
15   EXHIBIT 20   Sources of Knowledge Regarding    228
                  Abuse, Misuse, Dependence or
16                Addiction
17   EXHIBIT 21   Let's Talk Pain (Tab 1) References 228
18   EXHIBIT 22   Index to Duragesic Risk Management 229
                  Plans
19
     EXHIBIT 23   Nucynta IR and ER Safety          229
20                Surveillance Plans
21   EXHIBIT 24   Opioids Manufactured, Owned and/or 230
                  Developed by Janssen Since 1996
22
     EXHIBIT 25   Prescriberesponsibly.com (Tab 1)  230
23                References
24
25
```

Page 6

```
 1                    STIPULATIONS
 2          It is hereby stipulated and agreed by and
 3  between the parties hereto, through their respective
 4  attorneys, that the deposition of BRUCE MOSKOVITZ,
 5  M.D., may be taken pursuant to subpoena and in
 6  accordance with the Oklahoma Discovery Code on
 7  January 9, 2018, at the offices of 201 Robert S.
 8  Kerr, Oklahoma City, Oklahoma, before Jane
 9  McConnell, CSR RPR CMR CRR.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1          VIDEOGRAPHER:  This is the videotaped
 2  deposition of Dr. Bruce Moskovitz in the matter of
 3  State of Oklahoma, et al., versus Purdue Pharma, et
 4  al.
 5          This deposition is being held at 201
 6  Robert S. Kerr in Oklahoma City, Oklahoma on January
 7  9, 2019.  We are on the record at 9:18 a.m.
 8          Will counsel please state your appearances
 9  for the record.
10          MR. PATE:  Drew Pate, Nix Patterson, for
11  the State.
12          MR. LIFLAND:  Charles Lifland, O'Melveny &
13  Myers, for Janssen and J&J.
14          MR. RODRIGUEZ:  Esteban Rodriguez,
15  O'Melveny & Myers, for Janssen and J&J.
16          MR. BOWMAN:  Andrew Bowman, Foliart, Huff,
17  Ottaway & Bottom, for Janssen and J&J.
18          MS. NEWSOME:  Jervonne Newsome with Lynn,
19  Pinker, Cox, Hurst for the Purdue defendants.
20          MR. CURRAN:  Jeff Curran, Gable Gotwals,
21  for the Teva defendants.
22          VIDEOGRAPHER:  The court reporter will now
23  swear in the witness.
24          (Witness sworn.)
25                    * * * * *
```

Page 8

```
 1  WHEREUPON,
 2              BRUCE MOSKOVITZ, M.D.,
 3  after having been first duly sworn, deposes and
 4  says in reply to the questions propounded as
 5  follows, to-wit:
 6                DIRECT EXAMINATION
 7  BY MR. PATE:
 8      Q    Good morning, Dr. Moskovitz.
 9      A    Good morning.
10      Q    Can you please introduce yourself to the
11  jury.
12      A    Yes.  I'm Dr. Bruce Moskovitz.  Do you
13  want the full name?
14      Q    That's fine.
15      A    Okay.
16      Q    You're a former employee of Johnson &
17  Johnson, correct?
18      A    That's correct.
19      Q    You are being paid to testify today on
20  J&J's behalf, correct?
21      A    That's correct.
22      Q    You have been paid to testify on J&J's
23  behalf a couple of times prior to this in this case,
24  haven't you?
25      A    Yes.
```

Page 9

```
 1      Q    Do you anticipate that you're going to
 2  testify again in the future on J&J's behalf in this
 3  case?
 4      A    Perhaps.
 5      Q    How much are you being paid to testify
 6  today?
 7      A    At a rate of $375 an hour.
 8      Q    Today you are testifying on J&J's behalf
 9  about certain deposition topics; is that correct?
10      A    Yes.
11      Q    And you understand that the testimony you
12  are going to give today is binding on the J&J
13  defendants in this case, correct?
14      A    I do.
15           (Exhibit 1 marked for identification.)
16      Q    (BY MR. PATE)  I'm going to hand you what
17  I've marked as Exhibit 1 for your deposition.  If
18  you will flip to the last two pages, it's my
19  understanding that you are -- have been designated
20  to testify on the topics listed on these two pages
21  with the exception of Topic 18; is that correct?
22      A    Yes.  That's my understanding.
23      Q    Are you prepared to do that today?
24      A    I am.
25      Q    Are you prepared to testify on the J&J
```

Page 10

1    defendants' behalf about information known or
2    reasonably available to those companies about these
3    topics?
4         A    Yes.
5         Q    Now, I've mentioned J&J a couple of times
6    today or the J&J defendants, and I think during your
7    prior depositions we had an understanding that if we
8    refer to Janssen or Johnson & Johnson today, we're
9    referring to all of the J&J defendants in this case
10   unless you tell me otherwise.  Can we have that same
11   understanding today?
12        A    Yes.
13        Q    Did you -- what did you do to prepare for
14   this deposition?
15        A    I reviewed a number of documents, some
16   publications, some package inserts, reports to --
17   periodic reports to the Food and Drug Administration
18   regarding our drugs.  I spoke to some folks,
19   reviewed the prior deposition, reviewed some memos
20   and reviewed some of the literature.
21        Q    How much time would you say you spent
22   preparing for this deposition on these topics?
23        A    Well, the topics cross with some of the
24   topics in another deposition.  So overall we've had
25   14, 15 days of preparation, and I've spent some time

Page 11

1    on my own reviewing some of the information,
2    although, I can't really quantify exactly how much
3    that was.  It was hours worth of just reading some
4    of the literature.  But then in addition to that, as
5    I said, the 14 or 15 days of preparation for the
6    depositions.
7         Q    You referred to a prior deposition that
8    you referred -- that you mentioned to help prepare
9    for today.  Was that your prior deposition that you
10   gave in this case in New Jersey?
11        A    Yes.
12        Q    The one where I was asking you the
13   questions?
14        A    Yes.
15        Q    Did you bring -- I think I know the answer
16   to this because there's a stack of boxes over there.
17   I think there's eight bankers boxes.  Did you bring
18   some documents with you today to assist you in your
19   testimony?
20        A    Yes.
21        Q    What's in those boxes?
22        A    Backup material relevant to the topics
23   upon which I was designated to testify.
24        Q    Did you select those materials?
25        A    I had a hand in selecting the materials.

Page 12

1    Some of the materials were gathered by the legal
2    group.
3         Q    Do they relate to all of the topics that
4    you're here to testify about?
5         A    There are -- well, there are some topics
6    about which there's really not a whole lot to say.
7    So I would say that they're relevant to the topics
8    upon which I'm prepared to speak.
9         Q    Which topics are there not a whole lot to
10   say?
11        A    Topic 36:  "All drugs for opioid use
12   disorder manufactured, owned, contemplated,
13   developed and/or in development by you."
14             And Topic 37:  "All drugs for the
15   treatment of opioid overdose manufactured, owned,
16   contemplated, developed or in development."
17        Q    So you said there's not much to say --
18        A    Right.
19        Q    -- on those topics?
20        A    I can answer your questions, but there's
21   not much to say about those.
22        Q    So you don't have documents with you
23   related to those?
24        A    Because there aren't any drugs that we
25   developed in those two cases.

Page 13

1         Q    There are no drugs for either of those two
2    cases?
3         A    No.
4         Q    We'll come back to that.
5              So the eight boxes you have over there,
6    those relate to the remaining topics that you are
7    designated to testify about today and tomorrow and
8    the next day; is that right?
9         A    Yes.  That's correct.
10        Q    Do those boxes contain all of J&J's
11   research related to the risks and benefits of
12   opioids?
13        A    They do to the best of my knowledge.  It's
14   clearly the data that we were aware of.  There may
15   be additional data out there that we weren't aware
16   of, but to the best of my knowledge they do.
17        Q    Do they contain all of the scientific
18   support that J&J is aware of for any of its
19   marketing statements about opioids?
20        A    Yes, to the best of my knowledge they do.
21        Q    Do those boxes contain all of the
22   scientific support that J&J is aware of for any
23   statements that it's made about pseudoaddiction?
24        A    Yes.  Again, to the best of my knowledge,
25   they do.  I mean, again, I want to be clear, there

Page 14

1  may be other articles out there that we're not aware
2  of, but certainly these are the articles that J&J is
3  aware of.
4      Q    If it's not in one of those boxes, you're
5  not aware of it?
6      A    That's correct.
7      Q    If it's not in one of those boxes, you're
8  not aware of it and haven't identified it as a piece
9  of support for the concept of, let's say,
10 pseudoaddiction; is that right?
11     A    That's correct.
12     Q    And if it's not in one of those boxes,
13 you're not aware of it and J&J hasn't identified it
14 as support for any of its marketing statements about
15 the risks or benefits of opioids; is that right?
16          MR. LIFLAND:  I'm going to object to the
17 form of the question.
18     A    That's my understanding, yes.
19     Q    (BY MR. PATE)  Is the Porter and Jick
20 letter in there?
21     A    I believe it is.
22     Q    Are those boxes organized in any -- in any
23 fashion?
24     A    Yes.  There are major topics that I've
25 been asked to testify on, and I think based upon the

Page 15

1  topic, I have some materials with me at a very high
2  level that I can address.
3          And then if we need to take a look at some
4  of the information in more detail, I have access to
5  it in those boxes.
6      Q    The high level materials you referred to,
7  are those the documents you have in front of you?
8      A    Yes, they are.
9      Q    Can you describe those documents for me.
10     A    I have a high level timeline over some of
11 the key events relative to Duragesic and Nucynta.
12          I have documents that speak to the
13 information relative to the topic -- to the topics
14 relative to pseudoaddiction, relative to our
15 websites, relative to abuse, misuse, dependence,
16 addiction, the opioids that we manufactured, owned
17 and/or developed, our risk management plans to look
18 at issues of abuse, misuse, diversion, use of our
19 drugs, safety surveillance, studies related to
20 safety, efficacy of Duragesic and tapentadol,
21 Nucynta, and additional information supporting
22 certain categories of statements.
23     Q    Do you have copies of those documents that
24 you're looking at right now?
25          MR. RODRIGUEZ:  We do, yeah.  Here's a

Page 16

1  copy.
2          MR. PATE:  Thank you.
3          (Exhibit 2 marked for identification.)
4      Q    (BY MR. PATE)  You've been handed a
5  document marked as Exhibit 2.  Have you ever seen
6  that?
7      A    I have not.
8          MR. LIFLAND:  Hold on a second.
9      Q    (BY MR. PATE)  Have you ever seen that,
10 sir?
11     A    Let me look through it, but I don't recall
12 that I have.  No, I have not.
13     Q    Exhibit 2 are excerpts of a document that
14 was produced to us and only printed out --
15          MR. LIFLAND:  Can you clarify who produced
16 it.
17          MR. PATE:  I think it's been produced by
18 more than one, more than one party in the case.  I'm
19 not sure who produced this particular version of it
20 with this Bates number.
21          MR. LIFLAND:  I guess my question is was
22 it produced by Janssen and Janssen or John -- or
23 Janssen or Johnson & Johnson?
24          MR. PATE:  No.  As far as we know, Janssen
25 hasn't produced this yet.

Page 17

1          MR. LIFLAND:  That's my only question.
2      Q    (BY MR. PATE)  Do you know what the Pain
3  Care Forum is, Dr. Moskovitz?
4      A    No.
5      Q    You never heard of the Pain Care Forum?
6      A    I -- no.
7      Q    Were you aware that Johnson & Johnson was
8  a member of the Pain Care Forum?
9      A    No.
10     Q    This document is a copy of a presentation
11 that was given in June 2013, excuse me, June 13,
12 2006, supported by the American Pain Foundation and
13 the Pain Care Forum.
14          If you will turn to the page that ends in
15 2059.  There's a heading here for "Prevalence Fast
16 Facts."  Do you see that?
17     A    I do.
18     Q    The third bullet down reads, "Although
19 pain has been studied extensively by medical
20 researchers and treatments exist to relieve or ease
21 pain, the reality is that most pain goes untreated,
22 undertreated or improperly treated."
23          Did you see that?
24     A    I do.
25     Q    Are you aware of any scientific support

Page 18

1  that most pain goes untreated?
2      A    Throughout the course of my tenure with
3  Johnson & Johnson, there were a lot of articles that
4  address this.  I actually think that we spoke of one
5  article at the last deposition where we looked at
6  treatment of pain relative to how severe it was and
7  what was used.
8          So there are publications that address
9  this, yes.
10     Q    The article you just specifically
11 mentioned, let's talk about that real quick.  That
12 is your article that you helped author, correct?
13     A    Yes.
14     Q    The one where hydrocodone was placed in
15 the weak opioid category?
16     A    That's correct.
17     Q    Other than that article, what other
18 scientific support is there for this statement that
19 most pain goes untreated?
20     A    I would have to refer back to many of the
21 articles about pain, many of which reference that.
22 I can't point to a specific one at the moment, but
23 it's a concept that even was discussed at FDA
24 advisory meetings that there is the concept that
25 pain is undertreated and a lot of patients aren't

Page 19

1  treated adequately.
2      Q    Other than the article that you helped
3  author, that we already mentioned, is there a
4  specific article that you can point me to today that
5  is Janssen's scientific support for the idea that
6  pain -- most pain goes untreated?
7      A    Again, I'd have to go back to the
8  literature.  I know that in many of the articles
9  that talk about pain treatment, they reference the
10 incidence and prevalence of pain and state facts
11 relative to what you just stated, that many patients
12 are undertreated or don't get treatment, but I can't
13 point to a specific one at the moment.  In a review
14 I'm sure I can bring that to you.
15     Q    Let me ask you this.  As far as you know,
16 J&J itself has never conducted a study to determine
17 whether or not most pain goes untreated; is that
18 correct?
19     A    No.  That's correct, that we have not
20 conducted a study whether most pain goes untreated.
21     Q    You have not conducted a study to
22 determine the percentage of pain that goes
23 untreated; is that right?
24     A    No.
25     Q    No, you haven't done the study?

Page 20

1      A    No, we haven't done a study.
2      Q    In this same sentence it says, "Most pain
3  also goes undertreated."
4          Are your answers the same for that?
5      A    Yes.
6      Q    You don't have -- J&J hasn't conducted a
7  study to determine how much pain goes undertreated,
8  correct?
9      A    Well, again, relative to even the
10 publication that we spoke of at the last deposition
11 that made a point that there is pain that goes
12 undertreated, I don't know that I would quantify it
13 as most, some, some degree, but there is pain that
14 goes undertreated.
15     Q    But you haven't done a study to confirm
16 or determine whether most pain goes undertreated,
17 correct?
18     A    That's correct.
19     Q    And you're not aware of any studies
20 sitting here today that show that most pain goes
21 undertreated, correct?
22     A    Again, I'd have to refer back to the
23 literature, but I'm not aware of a specific study
24 that puts it in those terms, most pain goes
25 undertreated.

Page 21

1      Q    The next statement says, "Most pain also
2  goes or improperly treated."  Do you see that?
3      A    Yes.
4      Q    J&J has never conducted a study to
5  demonstrate that most pain is improperly treated,
6  correct?
7      A    I'm not aware of any.
8      Q    You are not aware of any study at all
9  showing that most pain is improperly treated,
10 correct?
11     A    Publications but not a study and certainly
12 not a study that was done by J&J that I'm aware of.
13     Q    Even if there's one not done by J&J, I'm
14 asking, are you aware of any study/publication that
15 shows that most pain is improperly treated?
16     A    I'm not.
17         MR. LIFLAND:  Object to the form of the
18 question.
19     Q    (BY MR. PATE)  The next statement or the
20 next bullet on the same page, it says, "Chronic pain
21 is a major cause of absenteeism and unemployment.
22 In fact, pain results in more than -- or more that
23 50 million lost work days each year and costs the
24 United States economy an estimated $100 billion in
25 lost productivity and health care expenses."

Page 22

1    Do you see that?
2    A    I do.
3    Q    What is the scientific support for that
4    statement?
5         MR. LIFLAND:  Object to the form of the
6    question.
7    A    I know that there were studies done that
8    looked at the impact of pain on absenteeism.  Again,
9    I'd have to refer back to the literature.
10        That was a theme that was generally
11   understood in the pain community that the impact of
12   pain was not just a matter of a patient experiencing
13   pain, but that it kept him or her from functioning
14   effectively which, in fact, was why there's a focus
15   on functionality as well as pain relief.  But I'd
16   have to go back to the literature to speak about the
17   studies that support that.
18   Q    (BY MR. PATE)  You say you'd have to go
19   back to the literature, what literature are you
20   referring to?
21   A    Some of the articles that are referenced
22   in finding relief, the references that we used for
23   the website.
24        Just by virtue of the title, I see one
25   over here that speaks to underutilization of opioid

Page 23

1    analgesics in elderly patients with chronic pain.
2    Q    What are you referring to?
3    A    I'm referring to a reference that was used
4    in the prescriberesponsibly.com website, No. 17.
5    Q    That article you are saying is scientific
6    support for this statement that chronic pain is a
7    major cause of absenteeism and unemployment --
8    A    No.  Finish your sentence.  I'm sorry.
9    Q    The article you just referenced,
10   "Underutilization of opioid analgesics in elderly
11   patients," you have it on Page 1 of your references
12   for prescriberesponsibly.com is Tab No. 17; is that
13   correct?
14   A    That's correct, yes.
15   Q    You cited that as support for the
16   statement that "chronic pain is a major cause of
17   absenteeism and unemployment.  Pain results in more
18   than 50 million lost work days each year.  It costs
19   the economy an estimated $100 billion."
20        Is that correct?
21   A    I misspoke in that it relates more to the
22   point we just spoke about previously about pain
23   being undertreated.  So it doesn't address the
24   specific question you just asked about the impact.
25   Q    We'll come back to that study then, but

Page 24

1    what -- let's go back it my original question.
2         What scientific support, if any, can you
3    point to for the statement that "pain results in
4    more than 50 million lost work days each year and
5    costs the United States economy an estimated $100
6    billion in lost productivity and health care
7    expenses"?
8         MR. LIFLAND:  Object to the form of the
9    question.
10   A    Yes.  Offhand, I can't speak to any.
11   I'm accustomed when I see these things to having
12   referenced material and I would go to the
13   references.  There are no references provided with
14   this.
15        So offhand I can't answer that.  I'm not
16   aware of any just by virtue of the statement.
17   Q    (BY MR. PATE)  Is it generally appropriate
18   if you're going to make claims about opioid products
19   and things like that that you would provide
20   references for the claims you're making?
21        MR. LIFLAND:  Object to the form of the
22   question.
23   A    Yes.  Generally we would.
24   Q    (BY MR. PATE)  You would not support, you
25   personally, because you dealt with stuff like this

Page 25

1    as part of your job at J&J, right?
2    A    That's correct.
3    Q    You personally wouldn't have supported the
4    idea of just throwing out statements and numbers
5    without having and citing references for them,
6    correct?
7         MR. LIFLAND:  Object to the form of the
8    question.
9    A    Correct.  If we are making a statement
10   under our heading that would be a reference that
11   would support that statement, in most instances you
12   would see the reference there, and then you would be
13   able to go to it, but in this instance I don't see a
14   reference.
15        Again, it's not to say that there isn't.
16   I'm not aware of any, and there's no reference
17   provided over here.
18   Q    (BY MR. PATE)  If you'll turn next to the
19   page that ends in 2103.  There's a bullet in the
20   middle of the page that reads, "Health professionals
21   and the public are unaware that, one, physical
22   dependence on a medication is not the same as
23   addiction; two, appropriate use of opioid
24   medications like oxycodone is safe and effective and
25   unlikely to cause addiction in people who are under

Page 26

1   the care of a doctor and who have no history of
2   substance abuse; and, three, opioid medications are
3   sometimes the only effective treatment for some
4   types of pain."
5          Did I read that correctly?
6   A    Yes.
7   Q    What's the scientific support for the
8   statement that "appropriate use of opioid
9   medications like oxycodone is safe and effective
10  and unlikely to cause addiction"?
11         MR. LIFLAND: Object to the form of the
12  question.
13  A    Let me start off by saying there are no
14  references provided in the materials that you gave
15  me, but I'm certainly aware that there are studies
16  that looked at the incidence of addiction in
17  individuals who are treated with opioids, and there
18  are a number of articles that address that.
19  Q    (BY MR. PATE) There are a number of
20  articles that show that opioid medications like
21  oxycodone are unlikely to cause addiction?
22         MR. LIFLAND: Object to the form of the
23  question.
24  A    That the rate of addiction in patients
25  treated with those medications is relatively low.

Page 27

1   Q    (BY MR. PATE) What's "relatively low"
2   mean?
3   A    Well, in the papers that I reviewed in the
4   range of say 2 to 5 percent. Now, again, that
5   depends upon the past history. So patients with a
6   prior history of addictive behaviors or use of other
7   substances may have a higher incidence. But, in
8   general, for patients who don't come with that
9   history or are managed properly, the incidence is
10  low.
11  Q    When you said low, what do you mean by
12  low?
13  A    In the range of what I quoted to you, 2 to
14  5 percent.
15  Q    2 to 5 percent is low to you?
16         MR. LIFLAND: Object to the form of the
17  question.
18  A    One could argue about relative terms like
19  low, medium, high, yes. When we speak about adverse
20  events, those are considered to be low.
21  Q    (BY MR. PATE) You said there are a number
22  of articles that address that, that support what you
23  just said, that there's a low risk of addiction for
24  opioid medication; is that right?
25  A    That's correct.

Page 28

1          MR. LIFLAND: Object to the form of the
2   question.
3   Q    (BY MR. PATE) What are those articles?
4   A    There's an article by Fleming, there's an
5   article by Banta-Green, there's an article by
6   Boscarino, there's an article by Fishbain.
7   Q    Are you reading that off of the document
8   you have in front of you or are you recalling that?
9   A    Well, we've previously spoken about these
10  articles at other depositions. So I'm aware of the
11  articles. So at the moment I'm reading it off of
12  here.
13  Q    Those are the same articles that we talked
14  about at your last deposition, you and I?
15  A    Yes.
16  Q    Right now you're reading from what?
17  A    A summary of some of the articles that
18  support various statements.
19  Q    Is it in this one? Can you identify what
20  you're looking at for me.
21  A    It starts with, "Selected studies,
22  research and analysis of safety and efficacy of
23  Duragesic and Nucynta."
24  Q    What page are you on?
25  A    Page 16.

Page 29

1   Q    Can I see the one that you've got in front
2   of you real quick. I'd like to mark that. Thank
3   you.
4          (Exhibit 3 marked for identification.)
5   Q    (BY MR. PATE) I've marked the document
6   that -- one of the documents that you brought with
7   you as Exhibit 3 so that we can talk about it.
8   A    Okay.
9   Q    Can you just describe what Exhibit 3 is
10  for me real quick.
11  A    These are references, information that we
12  have that addresses some of the topics that I've
13  been asked to speak about today. In this instance
14  it would be "Selected studies, research and analysis
15  of safety and efficacy of Duragesic and Nucynta."
16         If I may, in addition, I think we've also
17  spoken about that we have internal reports that
18  address iatrogenic addiction, a report that we did
19  on Duragesic internally.
20         Well, this wasn't related to addiction.
21  So I'm not going to bring it up.
22  Q    What were you just thinking of?
23  A    We -- well, so let me take a step back.
24         In all of our studies as part of adverse
25  event reporting, addiction may be an adverse event

Page 30

1  that's reported.  So we collect the incidences of
2  adverse event.
3       But I was specifically referring to
4  withdrawal symptoms that we measured specifically in
5  one of our studies.
6    Q   Earlier when I asked you what are the
7  articles that support the concept that opioid
8  medications like oxycodone are safe and effective
9  and unlikely to cause addiction in people not -- who
10 are under the care of a doctor, and you listed the
11 four articles, correct?
12   A   That's correct.
13   Q   You said you were -- at the time you were
14 reading them off of somewhere in Exhibit 3.  Can you
15 point me to that page.
16   A   That's Page 16.
17   Q   Let's just go down the list.  So these
18 are the articles.  Before we do that, these are the
19 articles that you're aware of and that you would
20 rely on for this statement that we see in Exhibit 2
21 that opioid medications like oxycodone are safe and
22 effective and unlikely to cause addiction in people
23 under the care of a doctor, correct?
24   A   Yes.
25   Q   The first study, the Fleming study, was

Page 31

1  published in 2007, correct?
2    A   That's correct.
3    Q   Where was that published?
4    A   In Journal of Pain.
5    Q   Was it peer reviewed?
6    A   Yes.  That's my understanding that the
7  Journal of Pain peer reviews the articles.  That's
8  my understanding.  So I don't want to speak out of
9  turn for them, but it's my understanding that the
10 Journal of Pain is a highly regarded journal and
11 that they peer review all the articles.
12   Q   The authors are listed right here on
13 Page 16, correct?
14   A   That's correct.
15   Q   Who paid for this study?
16   A   I have no idea.
17   Q   Did J&J contribute to it?
18   A   I don't believe so.  I have no information
19 that we did.
20   Q   Do you know whether or not a different
21 pharmaceutical contributed to the study?
22   A   I have no idea.
23   Q   Do you know what the criteria were for
24 this study?
25   A   I'd have to review the study.

Page 32

1    Q   Do you have it with you?
2    A   We have access to it, yes.  I'm sorry.
I don't understand what you mean by "criteria."
4    Q   How was it done?  How was the study done?
5    A   That would be described in the methodology
6  section.
7    Q   Did you contribute to the study in any
8  way?
9    A   No.
10   Q   Did J&J contribute to the study in any
11 way?
12   A   I don't believe so.
13   Q   Did it review it before it was published?
14   A   I don't believe so.
15   Q   Did you make any edits to it?
16   A   No.
17   Q   Any other pharmaceutical companies, as far
18 as you're aware, have any role in the publication of
19 that study?
20   A   Not as far as I'm aware.
21   Q   Do you know how the patients or doctors
22 were selected in that study?
23   A   I'd have to review the methodology.
24   Q   The second article that you pointed to is
25 the Banta-Green article listed next on this page,

Page 33

1  correct?
2    A   Yes.
3    Q   That's a 2009 publication, correct?
4    A   That's correct.
5    Q   Where was it published?
6    A   Drug and Alcohol Dependence.
7    Q   Was it peer reviewed?
8    A   I can't -- I don't know the publication
9  strategy for this journal article.
10   Q   But you rely on it as support, correct?
11   A   As part of a number of articles, yes,
12 especially when they describe the methodology so we
13 understand how they got to their results.
14   Q   Did J&J fund this study?
15   A   Not to my knowledge.
16   Q   Did J&J contribute to it?
17   A   Not to my knowledge.
18   Q   Did it review it before it was published?
19   A   No.
20   Q   Make any edits to it?
21   A   No.
22   Q   Make any suggestions on it?
23   A   No.
24   Q   Any other pharmaceutical company do those
25 things?

Page 34

1     A    Not to my knowledge.
2     Q    Do you know whether or not J&J has ever
3  provided funding or honoraria or anything of value
4  to any of the authors to the Banta-Green study?
5     A    I don't know.
6     Q    Do you recognize any of those people as
7  key opinion leaders?
8     A    No.
9     Q    Or as paid speakers for Janssen?
10    A    No.
11    Q    What about back on the Fleming study, have
12  any of those people ever been key opinion leaders of
13  J&J?
14    A    Not to my knowledge.
15    Q    Or paid speakers?
16    A    Not to my knowledge.
17    Q    The next article that you cited as support
18  for the statement in Exhibit 2 about addiction is
19  the Boscarino study, correct?
20    A    Yes.
21    Q    That's a 2010 publication, correct?
22    A    Yes.
23    Q    And it was published where?
24    A    Addiction.
25    Q    Was it peer reviewed?

Page 35

1     A    Again, I don't know their requirements.
2     Q    Did J&J contribute to it?
3     A    Not to my knowledge.
4     Q    Did it provide any support for it?
5     A    Not to my knowledge.
6     Q    Did it review it before it was published?
7     A    No.
8     Q    Did it make any edits to it?
9     A    No.
10    Q    Any other pharmaceutical company, as far
11  as you know, aware of the publication of this study?
12    A    Not to my knowledge.
13    Q    Has J&J provided any funding or grants,
14  anything of value to the authors of this study?
15    A    Not to my knowledge.  I'm not familiar
16  with them.
17    Q    You don't recognize any of them as key
18  opinion leaders or paid speakers for J&J?
19    A    I don't.
20    Q    The last article that you cited as support
21  for the statement in Exhibit 2 about addiction is
22  the Fishbain article, correct?
23    A    Yes.
24    Q    Listed here on Page 16, correct?
25    A    Yes.

Page 36

1     Q    That was published in 2008, correct?
2     A    Yes.
3     Q    And the authors are listed, all the
4  authors listed here on the page?
5     A    I'd have to go back to the article.  There
6  may be additional authors.  I don't know.  Sometimes
7  they'll cut off the number of authors.  So I can't
8  say that this is a complete list.
9     Q    Where was it published?
10    A    Pain Medicine.
11    Q    Was it peer reviewed?
12    A    I believe Pain Medicine is a peer-reviewed
13  journal.
14    Q    Do you know who funded this study?
15    A    I don't.
16    Q    Did J&J provide any funding for it?
17    A    Not to my knowledge.
18    Q    Provide any support to it?
19    A    Not to my knowledge.
20    Q    Did it review it before it was published?
21    A    No.
22    Q    Are you aware of any other pharmaceutical
23  company that did?
24    A    No.
25    Q    You're citing studies from 2007, 2008,

Page 37

1  2009 and 2010 as support for the statement that I
2  read to you from Exhibit 2, correct?
3     A    Yes.
4     Q    The one about opioid medications like
5  oxycodone are safe and effective and unlikely to
6  cause addiction in people who are under the care of
7  a doctor, right?
8     A    And have no history of substance abuse.
9     Q    And who have no history of substance
10  abuse.
11    A    That's correct.
12    Q    You're aware that the document in Exhibit
13  2 is a 2006 publication, correct?
14    A    I'm sorry.
15    Q    This is from 2006.
16    A    Okay.
17    Q    Are you aware of that?
18    A    Yes.
19    Q    So the articles that you pointed to, none
20  of those would have existed or have been published
21  in 2006, correct?
22    A    That's correct.
23    Q    Anyone who wrote Exhibit 2 wouldn't have
24  known or been able to rely on anything in the
25  articles you just pointed to in order to support the

Page 38

1  statement they made in Exhibit 2, correct?
2      A    Not for 2006, that's correct.
3      Q    You agree that people, pharmaceutical
4  companies, shouldn't make statements about the
5  addiction risk of a drug like oxycodone without
6  having scientific support for it, correct?
7      A    I believe that there should be scientific
8  support that underpins a scientific statement.
9      Q    J&J doesn't make any oxycodone products,
10 does it?
11     A    No.
12     Q    J&J has never made any oxycodone products,
13 has it?
14     A    Well, we explored tamper-resistant
15 formulations of oxycodone.  We never developed them.
16 We never marketed them.
17     Q    You never put an oxycodone product on the
18 market?
19     A    That's correct.
20     Q    So as far as -- I assume then J&J has
21 never done its own study specific to oxycodone to
22 determine what the rate of addiction is for
23 oxycodone in people who are under the care of
24 their -- or taking it under the care of a doctor; is
25 that right?

Page 39

1      A    Only with respect to adverse event
2  reporting where oxycodone was a comparative drug.
3      Q    You've never taken oxycodone and said
4  let's figure out how addictive oxycodone is for
5  people who are taking it under the care of a doctor,
6  correct?
7      A    That's correct.
8      Q    Are you aware of any study that does that?
9      A    Specific to oxycodone you're asking?
10     Q    Yes.
11     A    I'm not aware.
12     Q    Will you turn to the page ending in 2119.
13 The bullet that is second from the bottom reads,
14 "In most communities it is difficult for pain
15 patients to find physicians willing to prescribe
16 opioid medicines for pain."
17          Did I read that correctly?
18     A    Yes.
19     Q    Do you recall this document was published
20 in 2006, right?
21     A    Yes.
22     Q    What is the support for the statement
23 that in most communities it is difficult for pain
24 patients to find a physician willing to prescribe an
25 opioid for their pain in 2006?

Page 40

1      A    I don't know.
2      Q    You're not aware of any?
3      A    I'm not aware of any and there's no
4  reference given.
5      Q    And J&J, as far as you know, has never
6  conducted a study to demonstrate whether or not
7  pain patients have trouble finding physicians to
8  prescribe them opioids?
9      A    No.  We did not.
10          (Exhibit 4 marked for identification.)
11     Q    (BY MR. PATE)  I've handed you a document
12 marked as Exhibit 4.  Do you recognize that
13 document?
14     A    Yes.
15     Q    What's Exhibit 4?
16     A    It's a website.  No, this was a monograph,
17 I believe, that was developed with a DVD for
18 information about pain and pain management for
19 physicians and patients.
20     Q    What we see in Exhibit 4 was provided to
21 both doctors and their patients, correct?
22     A    Through their physicians, yes.
23     Q    This was part of a national marketing
24 campaign, correct?
25     A    I don't recall the scope of it, but I

Page 41

1  believe so.
2      Q    It wasn't exclusive to any particular area
3  of the country?
4      A    Of the country, I'm not aware of that, no.
5      Q    In the bottom right we see a reference
6  that this publication was sponsored by PriCara?
7      A    PriCara.
8      Q    PriCara?
9      A    Yes.
10     Q    A division of Ortho-McNeil-Janssen
11 Pharmaceuticals, correct?
12     A    Correct.
13     Q    That's a Johnson & Johnson entity,
14 correct?
15     A    That was the name of the pharmaceutical
16 company at the time, yes.
17     Q    J&J sponsored what we see in Exhibit 4,
18 correct?
19          MR. LIFLAND:  Object to the form of the
20 question.
21     A    Yes.
22     Q    (BY MR. PATE)  This was published in 2009,
23 correct?
24     A    Yes.
25     Q    If you'll turn to Page 17.  Are you on

Page 42

1  Page 17, sir?

2      A    I am.

3      Q    There's a box labeled "opioid myths."  Do

4  you see that?

5      A    I do.

6      Q    The first myth listed is that "opioid

7  medications are always addictive."

8           Then underneath that it says, "Fact:

9  Many studies show that opioids are rarely addictive

10 when used properly for the management of chronic

11 pain."  Correct?

12     A    I do.  Yes.

13     Q    And the word "rarely" is emphasized and

14 italicized in that sentence, correct?

15     A    Yes.

16     Q    What is the scientific support for the

17 statement that "many studies show opioids are rarely

18 addictive when used properly for the management of

19 chronic pain"?

20     A    In addition to the studies that we just

21 discussed, there are a number of references that

22 support the statements in the Finding Relief.  I'd

23 have to review them to see which ones specifically

24 address the fact that's mentioned over here.

25     Q    You're holding something in front of you.

Page 43

1  What is that you're holding there?

2      A    References relative to the Finding Relief.

3      Q    Let's mark that.

4           (Exhibit 5 marked for identification.)

5      Q    (BY MR. PATE)  I've marked the document,

6  one of the documents you brought with you as Exhibit

7  5.  Can you just identify what Exhibit 5 is.

8      A    These are references that were used in

9  support of statements made in the Finding Relief

10 monograph.

11     Q    Exhibit 4 is the Finding Relief monograph,

12 correct?

13     A    Yes.

14     Q    And you came today with the table that we

15 see in Exhibit 5 which is all of the scientific

16 support for the statements made in Finding Relief?

17     A    Yes.

18     Q    There are it looks like 25 or so articles

19 listed.  Which ones -- I'm sorry.

20     A    Yes.  I wasn't counting them down.  Yeah.

21     Q    Which ones -- however many you have listed

22 here, which ones relate or show that opioids are

23 rarely addictive when used properly for the

24 management of chronic pain?

25     A    I would have to go back and review the

Page 44

1  individual articles, but just by title they do cite

2  the Porter and Jick letter.

3      Q    Where did you get the list that's in

4  Exhibit 5?

5      A    This was provided to me by counsel.

6      Q    All right.  The article that you pointed

7  to is as support for the statement, "Many studies

8  show that opioids are rarely addictive when used

9  properly for the management of chronic pain."

10          The article you point to is the Porter

11 and Jick letter on Page 2; is that right?

12     A    By title.  As I said, I'd have to review

13 other articles to see where in the article they

14 address the incidence of addiction.

15     Q    Let me ask my question again.  I just need

16 the record to be clear.

17          I asked you which articles support this

18 statement, "Many studies show..."  So far the one

19 you've pointed to on your list is the Porter and

20 Jick letter, right?

21     A    Yes, and the articles that we spoke about,

22 the Fishbain, Boscarino and other articles, but

23 they're not listed over here.

24     Q    Those are not listed in Exhibit 5?

25     A    That's correct.

Page 45

1      Q    Are there any other articles in this list

2  on Exhibit 5 that support this statement about "many

3  studies show opioids are rarely addictive"?

4      A    There may be.  I'd have to go back to the

5  individual articles and see whether they support

6  that.

7      Q    Well, I'm guessing that's why you brought

8  eight boxes with you.  So I need an answer to the

9  question.  So if you need to look at the boxes or

10 whatever you need to do, feel free, but I need to

11 know which studies J&J says support this statement.

12     A    Okay.

13          If I may for a moment, just because we

14 spoke about it, there are some statements also that

15 address some of the concerns you raised earlier

16 about the incidence and the inadequate treatment.

17     Q    The incidence and inadequate treatment,

18 you're talking about the statements from Exhibit 2

19 about how many or whether or not most pain goes

20 untreated, undertreated or improperly treated?

21     A    Yes.

22     Q    Do you think you've identified something

23 that supports that?

24     A    I do just in looking for the other.

25     Q    What is it?

Page 46

1    A    This is a -- it's a journal article in the
2  Clinical Journal of Pain titled, "The Use of Opioids
3  for the Treatment of Chronic Pain, a Consensus
4  Statement from the American Academy of Pain Medicine
5  and the American Pain Society."
6    Q    When was it published?
7    A    1997.
8    Q    Who was the author?
9    A    This is a consensus statement.  They give
10 a listing of the committee members.
11   Q    What tab are you looking at in your
12 binder?
13   A    I'm looking at Tab 5.
14   Q    From the Clinical Journal of Pain?
15   A    Yes.
16   Q    Do you know how much money J&J has
17 provided to the American Academy of Pain Medicine?
18   A    I do not.
19   Q    You know that they have provided money to
20 that organization, correct?
21   A    I believe we have supported a number of
22 their programs.
23   Q    And J&J also supports the American Pain
24 Society and has provided money to them as well,
25 correct?

Page 47

1    A    Yes.
2    Q    Do you know what the parameters were of
3  this study?
4    A    I don't.  Again, could you define what you
5  mean by "parameters."
6    Q    How did this study determine that most
7  pain goes untreated?
8    A    I don't know.
9    Q    How did this study determine that most
10 pain goes undertreated?
11   A    I don't know.
12   Q    How did this study determine that most
13 pain is improperly treated?
14   A    I don't know.
15   Q    But you're stating that this study does
16 support those ideas?
17   A    They don't provide references.  I know
18 the American Academy of Pain Medicine is a highly
19 regarded society, and I would venture that they have
20 appropriate backup for these statements.
21   Q    But you don't know?
22   A    I don't know.  That's correct.
23   Q    And the study itself doesn't provide any?
24   A    That's correct.
25   Q    If you'll continue trying to identify for

Page 48

1  me any other articles that support the --
2    A    Uh-huh.
3    Q    -- the statement from Finding Relief that
4  many studies show that opioids are rarely addictive
5  when used properly for the management of chronic
6  pain other than the Porter and Jick letter.
7    A    Again, if I find material that references
8  what we had spoken about previously, do you want me
9  to bring it up?
10   Q    I would like to know that.  I would
11 suggest for purposes of our record that you stick
12 with trying to answer this question.  I'm happy to
13 give you a pen if you want to make some notes about
14 things you want to come back to.  If you think --
15   A    Perhaps a sticky.  Thank you.
16   Q    You're welcome.
17   A    Can I?
18   Q    (Nods affirmatively.)
19   A    Do you want me to bring it up as I come to
20 them?
21   Q    Sure.
22   A    Okay.  There's a citation in Tab 6.
23   Q    "Principles and Practice of Medicine,
24 Warfield."
25   A    "Pain: Current Understanding of

Page 49

1  Assessment, Management and Treatment."
2         I'm on Page 17.  "Most experts agree that
3  patients who undergo prolonged opioid therapy
4  usually develop physical tolerance..." I'm sorry.
5  I'll try to slow down for you.  "...but do not
6  develop addictive disorders.  In general, patients
7  in pain do not become addicted to opioids.
8  Although, the actual risk of addiction is unknown,
9  it is thought to be quite low.  A recent study of
10 opioid analgesic use revealed low and stable abuse
11 of opioids between 1990 and 1996."
12        Do you want me to go to the references
13 that are cited here?
14   Q    You're reading from Page 17?
15   A    I'm reading from Page 17, Section B,
16 "Etiology, Issues and Concerns."
17   Q    The article doesn't cite any support for
18 the statement that "In general, patients in pain do
19 not become addicted to opioids."  Correct?
20   A    I'm sorry, I'd have to -- so to my
21 knowledge, it's saying that if the rate of addiction
22 is low, in general you're not going to become
23 addicted.
24   Q    You're saying because --
25   A    So I'm saying the statement "most experts

Page 50

1    agree that patients who undergo prolonged opioid
2    therapy usually develop physical dependence but do
3    not develop addictive disorders" would support that
4    statement.
5         Q    I see.  Okay.  What's the basis for that
6    statement?
7         A    Let me go to 152.  Citation 152 is the
8    American Society of Addictive Medicine definitions
9    related to the use of opioids for the treatment of
10   pain consensus document from the American Academy of
11   Pain Medicine, American Pain Society and American
12   Society of Addictive (sic) Medicine, February 2001,
13   and it's a website that can be accessed, and they
14   give the link.
15        Q    The actual document that's being cited is
16   something published by the American Academy of Pain
17   Medicine, the American Pain Society and the American
18   Society of Addiction Medicine, correct?
19        A    Correct.
20        Q    You're aware that the American Academy of
21   Pain Medicine and the American Pain Society are two
22   organizations that J&J has contributed significant
23   money to, correct?
24             MR. LIFLAND:  Object to the form of the
25   question.

Page 51

1         A    I can't answer significant.  I don't know
2    what significant is.  We support their programs.
3         Q    (BY MR. PATE)  So that's one article that
4    they cite for "Most experts agree patients who
5    undergo prolonged opioid therapy usually develop
6    physical dependence but do not develop addictive
7    disorders."  Correct?
8         A    Correct.
9         Q    And the article goes on to state, "In
10   general, patients in pain do not become addicted to
11   opioids.  Although, the actual risk of addiction is
12   unknown.  It is thought to be quite low."  Correct?
13        A    Correct.
14        Q    This articles states, "The actual risk of
15   addiction is unknown." Correct?
16        A    Correct.
17        Q    Do you agree with that?
18        A    Based upon all the information I've seen
19   for patients without -- who are properly selected,
20   properly monitored, properly followed up and
21   properly educated, I believe that to be so, yes.
22        Q    So far you've cited the Porter and Jick
23   letter and this article, "Pain: Current
24   Understanding of Assessment, Management and
25   Treatments" for support for the statement in the

Page 52

1    Finding Relief about rare addiction.
2         Q    Are there any other articles?
3         A    Again, we've spoken about the Fleming
4    article, the Boscarino article, the other articles
5    previously.  I don't see them listed in here, but
6    they support the statement as well.
7         Q    So those four plus you've pointed to two
8    more.
9         A    (Witness nods affirmatively.)
10        Q    Are there any others?
11        A    There is a statement in that same section,
12   Page 53, at the very -- the very bottom of the first
13   column.  "Although, not usually encountered in
14   patients without a history of preceding drug abuse,
15   the administration of some drugs may cause
16   addiction."
17             So not usually seen in patients without a
18   prior history of addiction, there is no reference.
19        Q    You as a doctor would probably like to see
20   a reference for that, right?
21        A    It's preferable, absolutely.
22        Q    Outside of this study, so you've
23   identified this study or this article, you
24   identified the Porter letter, the Fleming,
25   Boscarino, and the two others that we previously

Page 53

1    discussed.
2         A    Correct.
3         Q    What other articles, if any, in this
4    binder are you aware of that support the rarely
5    addictive statement in Finding Relief?
6         A    There is a citation in here for the Porter
7    and Jick just as an aside.
8             There is another paper I think we've
9    mentioned in the past also among burn patients that
10   has been cited as well.  If you want, I'll read you
11   the citation.
12        Q    Sure.
13        A    That's Perry and Heidrich, "Management of
14   Pain During Debridement:  A Survey of US Pain
15   Units."
16             They indicate, "A national survey of over
17   10,000 burn patients without prior histories of drug
18   abuse who received opioids for extended periods
19   revealed no cases of addiction.  Only three of 2,369
20   chronic headache patients, most of whom had access
21   to opioids, abused the analgesics."
22             That's a different reference, and that
23   was Medina and Diamond, Drug Dependency in Patients
24   with Chronic Headache, and that's in the journal,
25   Headache.

Page 54

1      Q    That's different than the burn study?
2      A    That's different than the burn study, yes.
3  Do you want the -- I think I gave you the references
4  for both.
5      Q    The burn study is Perry, the Perry study?
6      A    64, the burn study is Perry, that's
7  correct.
8      Q    Please continue.
9      A    Okay.  There's a citation here with Porter
10 and Jick.
11          There is -- I'll read you the sentence
12 here.  "Senay," who's the physician being quoted.
13 "Senay examined 1,900 patients enrolled in an
14 Illinois drug treatment program and convinced
15 himself that three began their careers with a
16 legitimate medical exposure."
17     Q    What are you reading from?
18     A    I'm reading -- this is Tab A.
19     Q    16A?
20     A    Yes.  Tab A, Page 170, at the bottom
21 there's the Porter and Jick reference and then that
22 goes on, the very last sentence at the bottom there.
23          On Tab B, the Use of Opioids for the
24 Treatment of Chronic Pain, this is the consensus
25 statement from the American Academy of Pain

Page 55

1  Medicine, the American Pain Society on Page 6 at the
2  bottom, no reference, but in the section, Section 4,
3  "Current information and experience suggests that
4  many commonly-held assumptions need modification."
5          It goes on to speak about addiction, and
6  there's a statement on Page 7, five lines down,
7  "Studies indicate that the de novo development of
8  addiction when opioids are used for the relief of
9  pain is low."  There's no reference there.
10         Tab E is the Porter and Jick letter.
11         Tab F is the Perry letter.  I'm sorry, the
12 Perry article on debridement in a burn unit.
13     Q    I just want to clarify.  Your document,
14 Exhibit 5, that is the reference sheet for all of
15 these, it lists -- I think it's one off on its
16 references.  It lists the Porter and Jick letter as
17 16D.  I just want to clarify that what you're
18 pointing to are the actual articles in the binder.
19 16E is Porter and 16E --
20     A    16E is the Porter and Jick letter.
21     Q    Right.
22     A    Yes.  And 16F is the Perry article.  16G
23 is the article on chronic headache, the Medina and
24 Diamond article.
25         MR. LIFLAND:  While he's looking, maybe we

Page 56

1  can clarify this because I think you did -- it looks
2  like what's in the notebook as 16B, which he
3  referred to previously as the consensus statement,
4  is not included in the, I'm sure inadvertently, in
5  the index.  So that's where the lettering goes off.
6          MR. PATE:  Okay.
7          MR. LIFLAND:  So B should be the consensus
8  statement, and then what's labeled as B should be C,
9  what's labeled as C should be D and so on.
10         MR. PATE:  Thank you.
11     A    As an aside, there's a reference to
12 hydrocodone being a weak opioid, too.
13     Q    (BY MR. PATE)  What are you looking at?
14     A    I'm looking at, "Uses and misuse" -- this
15 is under Tab K, "Uses and misuses of medication in
16 the management of chronic non-cancer pain."
17     Q    Where are you reading?
18     A    An article by Hare and Lipman.  I'm
19 looking at Page 584, the second column, second
20 paragraph.  "The weak opioids include propoxyphene,
21 codeine, oxycodone and hydrocodone.
22     Q    Let's talk about that for a minute.  You
23 would never consider oxycodone to be a weak opioid,
24 would you?
25     A    I would not.

Page 57

1      Q    And I think that we talked a lot about
2  whether or not hydrocodone was a weak opioid at your
3  last deposition, and we agree that hydrocodone by
4  itself is not a weak opioid, correct?
5      A    Hydrocodone as a single agent is not a
6  weak opioid; although, we found varying potency
7  equivalents with morphine most of which considered
8  to be at a one-to-one potency.
9          But we also spoke about the limitations in
10 using hydrocodone because at the time it could only
11 be given with acetaminophen.
12     Q    That's hydrocodone.  Oxycodone is actually
13 more powerful and more potent than morphine,
14 correct?
15     A    I agree.  I'm sorry.  These things come
16 up in the review.  Okay.  That's what I see in the
17 binder over here.
18     Q    I'd like to go back to Tab B, the
19 consensus statement that you referred to.
20     A    Okay.
21     Q    It lists several committee members who
22 helped prepare this statement, on the bottom left of
23 the first page.  Do you see that?
24     A    I do.
25     Q    David Haddox is the first person listed,

Page 58

1  isn't he?

2      A    Yes.

3      Q    David Haddox works for Purdue

4  Pharmaceuticals, doesn't he?

5      A    I don't know his current employment, but

6  he did, and I don't know the dates.

7      Q    The next person listed is David Joranson,

8  right?

9      A    Yes.

10     Q    He's associated with a group known as

11 PPSG, the Pain & Policy Studies Group from

12 Wisconsin, isn't he?

13     A    I don't know.

14     Q    Then another consultant that is listed

15 here is a Dr. Russell Portenoy, correct?

16     A    Yes.

17     Q    Dr. Portenoy is someone we spoke about at

18 your last deposition, right?

19     A    Correct.

20     Q    He was believed and treated by J&J as a

21 key opinion leader for a number of years in the

22 opioid treatment area, right?

23     A    He was considered to be a key opinion

24 leader, yes.

25     Q    He was someone you provided money to?

Page 59

1           MR. LIFLAND:  Object to the form of the

2  question.

3      A    I don't -- I don't believe from medical

4  affairs because I don't believe he did a study.

5  From medical affairs we would have provided money if

6  they were doing a clinical -- a study for us.  I'd

7  have to go back to the funding.  So I don't know

8  from medical affairs that we ever provided funds to

9  him.

10     Q    (BY MR. PATE)  You're aware that

11 Dr. Portenoy has done a lot of work for a lot of

12 opioid manufacturers, correct?

13     A    I would clarify "work" for him.  He's

14 certainly regarded as a key opinion leader, and his

15 knowledge is sought when we are looking for advice

16 on various aspects of pain management and treatment,

17 and I would assume without knowledge that that's

18 true for other companies as well.

19     Q    The consensus statement is provided here

20 by a group called the American Academy of Pain

21 Medicine, right?

22     A    Yes.

23     Q    And the American Pain Society, right?

24     A    Yes.

25     Q    You're aware the American Pain Society is

Page 60

1  a group that trademarked the phrase "pain is the

2  fifth vital sign."  Is that right?

3      A    I'm aware of the phrase.  I didn't know

4  that they trademarked it.

5      Q    You're aware that both of these groups

6  accept large amounts of money from pharmaceutical

7  companies like J&J, correct?

8           MR. LIFLAND:  Object to the form of the

9  question.

10     A    I'm aware that we fund their programs.

11 Again, the use of terms like "large" you'd have to

12 specify.

13     Q    (BY MR. PATE)  Are you aware that members

14 of a Senate inquiry have investigated the ties

15 between these groups and companies like J&J, the

16 financial ties?

17          MR. LIFLAND:  Object to the form of the

18 question.

19     A    I wasn't aware of that.

20     Q    (BY MR. PATE)  The specific statement that

21 you pointed to to support the claim that studies

22 show opioids are rarely addictive, I believe you

23 pointed to Page 7, top left, where it says, "Studies

24 indicate that the de novo development of addiction

25 when opioids are used for the relief of pain is

Page 61

1  low."  Correct?

2      A    (Witness nods affirmatively.)

3      Q    They don't provide any support for that

4  statement in this article, do they?

5      A    Correct.  There's no reference in this

6  article.

7      Q    This was published in 1997; is that right?

8      A    Correct.

9      Q    Are you aware of any studies that existed

10 in 1997 that would have supported that statement?

11     A    What was the year of the Porter and Jick

12 letter?

13     Q    1980.

14     A    Okay.  So that would have been in the

15 Headache.  I'd have to go back to the -- some of

16 those studies were before 1997.  I don't recall

17 which ones were.

18     Q    The Porter and Jick study is the first one

19 that comes to mind for you?

20     A    Only because I know that was one of the

21 very earliest citations.

22     Q    As scientific support for this statement?

23     A    As a report of observations on a large

24 group of individuals that Porter and Jick followed.

25 It's a letter to the editor.  It's a report of an

Page 62

1  observation.
2      Q    Well, now I'm not sure I understand your
3  answer.  So let me ask again.
4           Is the Porter and Jick study something you
5  would call scientific support?  Is it science?
6      A    I can't readily answer that.  It's an
7  observation on what they saw.  Science is the gamut
8  of formal controlled clinical trials where the
9  methodology is provided to observations.
10  Observation provides information as well.  To the
11  extent it provides information, I would classify it
12  as science, but you have to understand the
13  limitations.  That's all.
14      Q    Based on the limitations from Porter and
15  Jick, does it support the statement that the de novo
16  development of addiction when opioids are used for
17  the relief of pain is low?
18      A    I don't know on what basis they -- there's
19  no reference here.  So I don't know on what basis
20  they're making this statement.
21      Q    You're a doctor here to testify about the
22  support for J&J's statements.  So I'm asking you
23  whether or not J&J believes that Porter and Jick
24  supports this statement that de novo development of
25  addiction when opioids are used for the relief of

Page 63

1  pain is low?
2           MR. LIFLAND:  Object to the form of the
3  question.
4      A    I believe we wouldn't depend upon Porter
5  and Jick.  There are other articles where the
6  methodology and the information is laid out in a
7  better manner that we would use to support those
8  statements.
9      Q    (BY MR. PATE)  Porter and Jick is a one
10  paragraph letter, right?
11      A    Yes.
12      Q    About a very narrow set of circumstances
13  and observational set of circumstances, right?
14      A    That's correct.
15      Q    It does not deal with chronic non-cancer
16  pain outside of a hospital setting, does it?
17      A    That's correct.
18      Q    So you wouldn't rely just on Porter and
19  Jick to support this statement, would you?
20      A    You're asking my personal opinion?
21      Q    J&J.
22      A    I don't know what J&J relied upon for this
23  statement.  There are other articles that support
24  this.
25      Q    I'm asking would J&J rely -- if all J&J

Page 64

1  had was Porter and Jick, could you reach the
2  conclusion that de novo development of addiction
3  when opioids are used for the relief of pain is
4  low?
5           MR. LIFLAND:  Object to the form of the
6  question.
7      A    We would rely on a body of data, and I
8  can't answer upon what we relied upon other than the
9  fact that there are other reports of incidence of
10  addiction.  I can't answer your question if that
11  were the only thing, would we rely on that.
12      Q    (BY MR. PATE)  Why not?
13      A    Because I don't know the answer to it.
14      Q    Okay.
15      A    It wasn't.  It isn't.  We have other
16  supportive data where the methodology is better
17  described.
18      Q    You've written articles, right?
19      A    Yes.
20      Q    You write them based on evidence, right?
21      A    Or findings in the clinical trials, that's
22  correct.
23      Q    Experiments you conduct, correct?
24      A    Clinical trials.
25      Q    Okay.  Trials?

Page 65

1      A    Yes.
2      Q    And things you observe?
3      A    Yes.
4      Q    And whatever criteria you've set forth
5  for what you're trying to find out, right?
6      A    Yes.
7      Q    You understand in order to reach a
8  conclusion, you need to have support for that
9  conclusion, right?
10      A    Yes.
11      Q    The conclusion I'm asking about is de novo
12  development of addiction when opioids are used for
13  the relief of pain is low.  Okay?
14      A    Okay.
15      Q    Can you reach that conclusion if the only
16  evidence you have is Porter and Jick?
17      A    Again, I'm asking.  You're talking about
18  my personal opinion?
19      Q    Yes.
20      A    No.  I would use other evidence.
21           MR. PATE:  Do you want to take a break?
22           MR. LIFLAND:  Sure.
23           VIDEOGRAPHER:  Off the record at 11:01
24  a.m.
25           (Break taken from 11:01 a.m. to 11:31

Page 66

```
1   a.m.)
2          VIDEOGRAPHER:  Back on the record at 11:31
3   a.m.
4      Q   (BY MR. PATE)  Dr. Moskovitz, are you
5   ready to proceed?
6      A   Yes.
7      Q   You understand you're still under oath?
8      A   I do.
9      Q   I wanted to mark the binder that we were
10  looking at while you were answering your questions
11  about Exhibit 4, the binder that you've got in front
12  of you is labeled "Finding Relief References."
13  Correct?
14     A   Yes.
15     Q   Can you slide that to me.
16     A   I'm sorry.
17         (Exhibit 6 marked for identification.)
18     Q   (BY MR. PATE)  Can you just identify what
19  I've marked as Exhibit 6, please.
20     A   These are references in support of some of
21  the statements in the Finding Relief monograph.
22         (Exhibit 7 marked for identification.)
23     Q   (BY MR. PATE)  Dr. Moskovitz, I've handed
24  you a document that I've marked as Exhibit 7.  Do
25  you recognize --
```

Page 67

```
1      A   I can put this aside?
2      Q   Yes, sir.
3          Do you recognize that document?
4      A   No, I don't.  I mean, it's labeled Finding
5   Relief, but I don't recall that I've ever seen this
6   document per se.
7      Q   What's Finding Relief?
8      A   It was information for physicians and
9   patients on how best to manage issues around pain
10  and pain concerns.
11     Q   And it included the monograph that you
12  referred to earlier that we've marked as Exhibit 4
13  as part of it, right?
14     A   Yes.
15     Q   That also came with a video; is that
16  right?
17     A   A DVD, that's my understanding, yes.
18     Q   Exhibit 7 is labeled "Finding Relief:
19  Pain Management for Older Adults."  Then it says,
20  "Video script."  Do you see that?
21     A   I do.
22     Q   Is it your understanding that this is the
23  script for the video that went along with that
24  brochure?
25     A   I'll accept that it is.  I didn't review
```

Page 68

```
1   it.  I didn't look at the DVD.
2      Q   Have you seen the DVD before?
3      A   I may have.  I don't recall.
4      Q   If you'll turn to Page 13, please.  If
5   you'll look near the bottom there is -- in the
6   section that is the audio content of the script, the
7   middle column there, there's some text that reads,
8   "Addiction is an abnormal, very unusual state in
9   people with chronic pain, that is a compulsive
10  seeking out or taking opioid medications without
11  regard to the physical, psychological or social
12  consequences of taking those opioid medications."
13         Do you see that?
14     A   I do.
15     Q   What is J&J's scientific support for the
16  statement that "Addiction is an abnormal, very
17  unusual state in people with chronic pain"?
18     A   Well, to begin with, the first part,
19  "Addiction is an abnormal," by definition addiction
20  is a craving for.  So it's not the normal state of
21  pain management.  "Very unusual state," I take this
22  to be related to the incidence of it, it doesn't occur
23  at -- it occurs rarely.
24     Q   You're saying that by "very unusual," you
25  interpret that to mean it occurs rarely?
```

Page 69

```
1      A   That's my -- that's my understanding.
2      Q   Okay.  So what is the support for the
3   statement that "Addiction rarely occurs in people
4   with chronic pain"?
5      A   We cited a number of references
6   previously, just a few -- the last hour or so and
7   another reference is -- there's a general review of
8   incidence of addiction, and that was the Cochrane
9   report as well.
10     Q   The Cochrane report?
11     A   Yes.
12     Q   Do you have that with you?
13     A   I do.  Can we get that?
14         MR. LIFLAND:  Yes.  I think it's on the
15  list that you were speaking from earlier.  It was
16  just on the flip side of the page.  The one that had
17  the four articles that he referenced, it was in
18  No. 5 on the flip side.  It's referenced there.
19         THE WITNESS:  Do you know which tab the
20  Cochrane review is under?
21         MR. LIFLAND:  It's No. 14.
22         THE WITNESS:  Yes.  I've got it.  Okay.
23     Q   (BY MR. PATE)  So the support you're
24  claiming for this statement "Addiction rarely occurs
25  in people with chronic pain" are the articles you
```

Page 70

1  mentioned previously when we were talking about
2  Exhibit 4, correct?
3       A    Correct.
4       Q    Now you've also added the Cochrane review;
5  is that right?
6       A    Yes.
7       Q    That's Tab 14 of what you have in front of
8  you?
9       A    Yes.
10      Q    Let's go ahead and mark what you have in
11 front of you.
12      A    The full binder?
13      Q    Yes, sir.
14           (Exhibit 8 marked for identification.)
15      Q    (BY MR. PATE)  That will be Exhibit 8.
16 Can you identify Exhibit 8 for me.
17      A    It's an index to the supplemental binder
18 with some additional articles.  It includes the
19 Fleming article, the Banta-Green article, the
20 Boscarino article, the Fishbain article that we
21 spoke of and the Cochrane review.
22      Q    And where was the Cochrane review
23 published?
24      A    In the Cochrane Database of Systematic
25 Reviews, 2010.  It's part of the Cochrane library.

Page 71

1       Q    So that was published in 2010.  It would
2  not have existed in 2008 and 2009 when the Finding
3  Relief campaign was used, correct?
4       A    Not the review but perhaps the articles
5  that are cited.
6       Q    What article are you pointing to that --
7  is there any article cited in here that would
8  support this statement?
9       A    So they review a lot of articles, and the
10 articles that meet certain criteria then are
11 summarized in a major summary.  That's what Cochrane
12 is known for.  It's a summary of summaries.  You'd
13 have to go through the -- they speak about reviewing
14 26 studies with 27 treatment groups.  This is under
15 the abstract section, and they would cite the 26
16 studies.
17      Q    But the Cochrane review itself didn't
18 exist at the time of the Finding Relief campaign,
19 right?
20      A    Correct.
21      Q    That's not something that J&J would have
22 relied on to support any statements it was making at
23 that time, right?
24      A    No, but it supports the statement that the
25 incidence of opioid addiction, especially in a

Page 72

1  preselected population, is low.
2       Q    If you read Page 2, the plain language
3  summary of the Cochrane review, it says, "However,
4  the evidence supporting these conclusions is weak
5  and longer term studies are needed to identify the
6  patients who are most likely to benefit from
7  treatment."  Correct?
8       A    Correct.
9       Q    "The evidence supporting these conclusions
10 is weak."  That's what the summary of summaries
11 found, right?
12      A    "And longer term studies are needed,"
13 correct.
14      Q    Has J&J conducted any longer term studies
15 as suggested by this Cochrane review?
16      A    Not after this.  We've had long-term
17 follow-up on a number of our own clinical trials,
18 but, no, not relative to the incidence of addiction.
19      Q    You disagree that longer term studies are
20 needed to determine what the addiction risk of
21 opioids is?
22      A    I believe better data are needed, yes.
23      Q    Better data are needed to determine what
24 the actual rate of addiction is for someone who's on
25 opioids for let's say longer than three months,

Page 73

1  right?
2       A    And relative to what risk factors they had
3  before starting therapy, yes.
4       Q    There are no good studies for longer than
5  three months to determine what the addiction rate of
6  chronic opioid use is there?
7       A    I have to go back to the studies that they
8  review here, whether any of them went beyond three
9  months.
10      Q    Let's talk --
11      A    We have studies that go up to two years
12 and, again, just in terms of the adverse event
13 reporting, we know that the rate of addiction was
14 very low, at least reported rates.
15      Q    You have studies that go up to two years?
16      A    (Witness nods affirmatively.)
17      Q    For what?
18      A    For Duragesic.
19      Q    For Duragesic.  Okay.  Those are studies
20 where you gave patients Duragesic continuously for a
21 period of up to two years?
22      A    We followed patients who were given
23 Duragesic for a period of up to two years.
24      Q    They were given it continuously that
25 entire time?

Page 74

1     A    Yes.  It was not an intermittent
2  treatment, yes.
3     Q    Did the patients take it daily?
4     A    I can only speak to the general
5  methodology of the study.  Since they were in a
6  controlled clinical trial, they would be seen
7  periodically by the treating physician who would
8  collect the data.  So if they discontinued it, they
9  would be dropped from the study and reported as a
10  discontinuation.
11         So the answer to your question is to the
12  best of my knowledge, there was a cohort who
13  continued for up to two years.
14     Q    Do you know how many?
15     A    I don't.
16     Q    Do you know how they were selected?
17     A    I'd have to go back to the selection
18  criteria for that study.
19     Q    Do you have it?
20     A    We have the long-term treatment with
21  Duragesic.  There is also a long-term at least one
22  year follow-up with Nucynta as well.  There is
23  "Efficacy of transdermal fentanyl in the management
24  of pain in patients with malignancy."  In the notes
25  I see there are patients treated for up to 550 days.

Page 75

1     Q    What are you reading from?
2     A    I'm reading from a "Summary of Selected
3  Studies, Research and Analysis of Safety and
4  Efficacy of Duragesic and Nucynta."
5         Exhibit 3, it's marked, and Tab 1 is
6  "Long-term Safety and Efficacy."
7     Q    And what were you reading?
8     A    Beginning with Page 1 there are studies
9  where patients were followed in the first case three
10  to 156 days, in the second two to 550 days, 36
11  patients were on fentanyl for more than 90 days and
12  Duragesic 11.  The citation on Page 2, an open label
13  long-term follow-up, nine patients who were observed
14  for two years after treatment.
15     Q    These are the Duragesic clinical trials
16  that you were just referring to?
17     A    Yes.
18     Q    Except for the last one was not a clinical
19  trial, was it, the open label long-term follow-up?
20     A    Long term may very well be just long term
21  to a clinical trial.  I'd have to go back to the
22  specific trial.
23     Q    Let's make sure we're clear on this.  The
24  first tab under 1987 Duragesic NDA, "The study of
25  the efficacy and kinetics of fentanyl delivered via

Page 76

1  continuous intravenous infusion."  Do you see where
2  I'm at?
3     A    Yes.
4     Q    That's a clinical trial that J&J
5  performed?
6     A    Yes.
7     Q    Internally?
8     A    Yes.
9     Q    Did you report the results?
10     A    Yes.
11     Q    Did you publish them?
12     A    I don't know.  I would imagine we did.
13     Q    The next one is another clinical trial
14  that you -- that J&J performed; is that right?
15     A    Yes.
16     Q    Two to 550 days?
17     A    Yes.
18     Q    The next one is also a clinical trial that
19  J&J performed; is that right?
20     A    Yes.
21     Q    The fourth one you referred to, though, is
22  that a clinical trial that J&J performed?
23         THE WITNESS:  Can we get that study?
24         MR. LIFLAND:  Do you want to look at the
25  notebook?

Page 77

1         THE WITNESS:  Yes.
2     A    If this is under Tab 11, that's not what
3  I'm seeing under Tab 11.  There's several studies
4  listed under Tab 11.  Let me just take a look.
5         Okay.  This is on -- it's under Tab 11, a
6  regional article, "Prolonged treatment with
7  transdermal fentanyl and neuropathic pain."
8     Q    (BY MR. PATE)  Tab 11?
9     A    Yes, but it's several pages in.
10         MR. LIFLAND:  If it helps, the summary
11  sheet actually has the page number within the tab
12  where you'll find the reference.
13         MR. PATE:  Okay.
14     A    So this was a clinical trial.  I'm just
15  reading from the abstract, "48 patients with
16  non-cancer neuropathic pain who had participated in
17  a randomized controlled trial with intravenous
18  fentanyl infusions received prolonged transdermal
19  fentanyl in an open prospective study."
20     Q    (BY MR. PATE)  They looked at a 12 week
21  period?
22     A    I'm sorry?
23     Q    They looked at a 12 week period?
24     A    The original study -- well, the original
25  study was a 12 week dose titration study.  So they

Page 78

1  were titrated to a dose that gave them pain relief
2  in a reasonable adverse event profile, and then they
3  were allowed to continue on.  It looks like some of
4  the patients continued on for up to two years.
5      Q    Where does it show that?
6      A    That's what I'm looking for.  It's the
7  first page of that article.  I'd have to go to the
8  full article.  I don't have that here.
9      Q    This is just the first page of the
10 article?
11     A    Yes.
12     Q    You did not bring the -- it's not in one
13 of your boxes, the full article?
14          MR. LIFLAND:  I think we just have the
15 abstracts.  I think unfortunately we would have had
16 to bring 50 boxes if we brought every article in
17 full.
18     Q    (BY MR. PATE)  Let's go back to the
19 clinical trials that J&J performed.
20     A    Let me just go back.  So my reading just
21 as the abstract, the original study was the 12 week
22 study, but they're reporting on the patients who
23 continued beyond that period of time.  Although I
24 don't have it in this first page, the duration of
25 therapy for the patients who continued in the open

Page 79

1  label portion of the study.
2      Q    So in the first clinical trial that's
3  listed here, and I'm looking at Exhibit 3, there's
4  a three to 156 day clinical trial listed.
5      A    Yes.
6      Q    That was a study of patients who were on
7  Duragesic continuously for up to 156 days; is that
8  correct?
9      A    That's my understanding, yes.  Again, I'd
10 have to go back to the study, but generally that's
11 the way we do the trials.  There's a period of time
12 where patients are evaluated for critical endpoints,
13 and then in many of the trials we allow them to
14 continue in the trial in an open label fashion and
15 continue to collect data with respect to efficacy
16 and safety.
17     Q    That was not a clinical trial directed at
18 figuring out specifically what the rate of addiction
19 would be with prolonged Duragesic use, was it?
20     A    If you're speaking about that as the
21 primary endpoint, no.
22     Q    It was just a trial that you kept track of
23 how the patients were doing for a period of 156
24 days, right?
25     A    Up to 156 days, correct.

Page 80

1      Q    If a patient happened to report to their
2  doctor that they were an addict as what you call an
3  adverse event, that would be the only way you would
4  know if someone was addicted, someone in that study
5  was addicted, correct?
6      A    Yes.
7      Q    And the same is true for the next clinical
8  trial that you have listed here for Duragesic that
9  went up to 550 days, correct?
10     A    Yes.
11     Q    You were monitoring the patients or their
12 doctors were and reporting any adverse events among
13 other things back to J&J, correct?
14     A    Correct.
15     Q    And if the patients happen to report that
16 they were addicted, that's how you would know and
17 flag an incidence of addiction, correct?
18     A    Correct.
19          MR. LIFLAND:  Object to the form of the
20 question.
21     Q    (BY MR. PATE)  You didn't provide the
22 doctors with any specific criteria for them to use
23 or evaluate to identify whether or not a patient was
24 addicted, correct?
25     A    I don't believe so.  I'd have to go back

Page 81

1  to the original clinical trial.
2      Q    That trial was limited to Duragesic,
3  right?
4      A    Yes.
5      Q    It is not any evidence of what the
6  addiction rate would be about opioids generally as
7  a class of drug for long-term treatment, correct?
8      A    Correct.
9      Q    Are the doctors who participate in these
10 paid?
11     A    Yes.  They would be paid on a per patient
12 basis and for the procedures that they conducted.
13     Q    The same is true of the next clinical
14 trial that's listed here where it says the 36
15 patients were on TTS for more than 90 days, correct?
16     A    Yes.
17     Q    TTS, is that Duragesic?
18     A    Yes, transdermal therapeutic system.
19     Q    That was focused on Duragesic, right?
20     A    Yes.
21     Q    It has nothing to do with opioids
22 generally as a class of drug, right?
23     A    It was focused on Duragesic, that's
24 correct.
25     Q    And if a patient happened to report that

Page 82

1  they were addicted to their doctor, that would be
2  reported back to J&J, right?
3        MR. LIFLAND:  Object to the form of the
4  question.
5     A    Any adverse event including an adverse
6  event of addiction.
7     Q    (BY MR. PATE)  And that's how you have --
8  whenever you've answered questions, we saw low
9  incidences of addiction, that's what you're basing
10 that on, right?
11       MR. LIFLAND:  Object to the form of the
12 question.
13    Q    (BY MR. PATE)  The reports that you got
14 from these clinical trials?
15    A    No.  I said that the clinical trials is
16 one aspect of understanding rates of addiction
17 certainly for Duragesic, but that we had other
18 publications that cited low rates of addiction
19 particularly in patients with low or no risk
20 factors.
21    Q    My question wasn't clear.
22         When you were discussing these clinical
23 trials specifically and you said that we had
24 clinical trials that showed low numbers of
25 addiction, are you with me?

Page 83

1     A    Yes.
2     Q    You said that?
3     A    Yes.
4     Q    You're basing that on these reports that
5  you get from these doctors that we've been talking
6  about about these patients, right?
7     A    Yes.
8     Q    Not any independent review that you're
9  doing of those patients or their symptoms, right?
10    A    Yes, that's correct.  I think we also
11 spoke about there was a report on iatrogenic
12 addiction that Janssen was asked to do for a
13 regulatory authority and which also showed a low
14 rate of iatrogenic addiction.
15    Q    For the clinical trials, these three
16 clinical trials for Duragesic, were there a specific
17 list or types of adverse events that were provided
18 to the doctors for them to report?
19    A    No.  These are spontaneous reports.  So
20 unless there is an adverse event of interest, in
21 almost all the clinical trials you would -- these
22 would be spontaneously reported adverse events.
23    Q    You agree that a person can become
24 addicted to Duragesic even when they take it as
25 prescribed by a doctor, correct?

Page 84

1     A    That's in the package insert.  We do
2  describe that that's possible.
3     Q    And a person can continue to stay on it
4  without that doctor realizing that they've become an
5  addict, correct?
6     A    Potentially.  One of the things we do is
7  try to educate physicians to understand addictive
8  behaviors and try to monitor for those.
9     Q    You didn't provide anything to these
10 doctors for these clinical studies for them to
11 specifically monitor for addiction, did you?
12    A    I was not involved with the clinical
13 trials.  So I can't answer that.  But based upon
14 what I know of clinical trials, we would have
15 instructed them to report spontaneous adverse
16 events.
17    Q    Which includes a whole lot more than just
18 addiction, right?
19    A    Absolutely, any adverse event.
20    Q    What's the report on iatrogenic addiction
21 that you mentioned?
22    A    I think we brought that up at the last
23 deposition as well.  We were asked to summarize
24 iatrogenic addiction and we have the report.
25       MR. LIFLAND:  Tab 6 in the binder.

Page 85

1        MR. PATE:  Thank you.
2     Q    (BY MR. PATE)  This was a study that J&J
3  did for Duragesic specifically?
4     A    I wouldn't call it a study.  It's a review
5  of data that were available to the company through
6  adverse event reporting or anything that was
7  reported to the company even outside of clinical
8  trials.
9     Q    So outside of something that would have
10 been reported to J&J?
11    A    Well, it would have been reported to J&J
12 or we would have found it in the literature.  So
13 there's a comprehensive review of literature,
14 there's adverse event reporting in the clinical
15 trials, there are spontaneous calls to the safety
16 group, and there's a review of anything that might
17 be reported to the FDA as well.
18    Q    It's not a clinical study?
19    A    It's not a clinical study.
20    Q    You didn't gather a group of patients and
21 put them on Duragesic for three years, right?
22    A    That's correct.
23    Q    And see what happens, right?
24    A    That's correct.
25    Q    See how many become addicted, right?

Page 86

1    A    That's correct.

2    Q    You've never done that, right?

3    A    Again, so you're speaking about a clinical

4 trial with addiction as the endpoint?

5    Q    Yes.

6    A    No.

7    Q    You agree that addiction to opioids can

8 ruin someone's life, right?

9    A    By definition it's a craving that impairs

10 their ability to function normally.

11    Q    It can lead to aberrant behaviors?

12    A    Yes.

13    Q    It can lead to some very disturbing

14 behaviors, correct?

15    A    It can lead -- yes, absolutely.  It can

16 lead to death.

17    Q    It can lead to their death, right?

18    A    Yes.

19    Q    It can ruin the lives of their family

20 members, right?

21    A    It can, yes.

22    Q    I've got a book here called Responsible

23 Opioid Prescribing.  Have you ever seen this?

24         MR. LIFLAND:  Do you have any other

25 copies?

Page 87

1         MR. PATE:  I don't actually.

2         THE WITNESS:  I may have.  I don't recall.

3         MR. LIFLAND:  Can I take a quick look at

4 it?

5         THE WITNESS:  Yes.

6    Q    (BY MR. PATE)  If you'll turn to Page 63

7 for me.  Are you there?

8    A    Yes.

9    Q    There's a table here.  This is a page

10 about pseudoaddiction.  Are you familiar with this?

11    A    Yes.  I'm familiar with the concept of

12 pseudoaddiction.

13    Q    Are you familiar with this table that you

14 see on Page 63?

15    A    Yes.  I'm aware of behaviors that are

16 flags for addiction and some more so and some less

17 so, yes.

18    Q    This table is claiming that the behaviors

19 on the left are less indicative of addiction, right?

20    A    Yes.

21    Q    Meaning they're more indicative of

22 pseudoaddiction?

23    A    No.  It doesn't say that they're more

24 indicative of pseudoaddiction.  It just says that

25 they're less indicative of addiction.

Page 88

1         There are other reasons that patients

2 might exhibit behaviors.  They may be hoarding

3 because they worry that they're not going to be

4 able to access it.  They may be somewhere where

5 they can't get ahold of their opioid medications.

6    Q    We'll talk more about this table and

7 pseudoaddiction as a concept later.

8         But you agree at least that according to

9 this table on the left, these are -- the behaviors

10 are less indicative of addiction, right?

11    A    That's how the authors posit them, yes.

12    Q    The ones on the right are more indicative

13 of addiction, right?

14    A    Yes.

15    Q    You agree that the behaviors on the right

16 are aberrant behaviors, right?

17    A    Yes.

18    Q    That they're disturbing behaviors?

19    A    I think many people would consider them to

20 be disturbing behaviors, yes.

21    Q    You wouldn't want that to happen to anyone

22 that you know, would you?

23    A    I wouldn't want that to happen to anyone I

24 know.

25    Q    Right.  Let's go through some of them.

Page 89

1         One of the symptoms or behavior that's

2 indicative of addiction that's listed here is if you

3 become an addict you might perform sex for drugs,

4 right?

5    A    One of the way -- one way of getting

6 access to your drugs would be to prostitute

7 yourself.

8    Q    Right.  Or that you might prostitute other

9 people to obtain drugs?

10    A    Yes.

11    Q    And that you might forge prescriptions?

12    A    Yes.

13    Q    Or steal money to obtain drugs?

14    A    Yes.  I grant you, these are all behaviors

15 that are indicative of -- more indicative of

16 addictive behaviors.

17    Q    And those are all behaviors that can

18 happen to someone who becomes addicted to an opioid,

19 right?

20    A    Yes.

21    Q    Would you agree that it would be -- let me

22 back up.

23         I asked you whether or not J&J has ever

24 put a group of people on Duragesic for a number of

25 years to see how many get addicted.  Do you remember

Page 90

1  that?

2      A     Yes.

3      Q     You said no, right?

4      A     Yes.

5      Q     It would be -- the risks and the dangers

6  to someone if they become addicted to opioids are

7  great, aren't they?

8      A     Yes.

9      Q     We've just seen a number of them that are

10  horrible that can happen to you if you become an

11  addict, right?

12     A     Yes.

13     Q     You agreed that if you become an addict,

14  you may even die, right?

15     A     Yes.

16     Q     It would be unethical to even conduct a

17  study and force people to take Duragesic for a

18  number of years to see how many become addicts,

19  wouldn't it?

20     A     I'm sorry.  I'm not following you.  So it

21  would be -- you're saying it would be unethical to

22  force individuals to take an opioid like Duragesic

23  to see how many of them would become addicts?

24     Q     Correct.

25     A     It would be unethical to force anyone to

Page 91

1  take any medication.

2      Q     And specifically with an opioid, the risks

3  of what can happen to you if you become an addict

4  are extreme, aren't they?

5      A     They can be, yes.

6      Q     They're deadly?

7      A     They can be, yes.

8      Q     And they can force you to become a

9  criminal?

10     A     If you are addicted, yes.

11     Q     I want to be clear when I use the term

12  "force," I don't mean physically hold someone down

13  and force them to take the medication.  So I just

14  want to make sure that we're talking about the same

15  thing.

16           It would be unethical to conduct a study

17  where you required the patients to take that drug

18  for that extended period of time to determine if

19  they would become an addict, wouldn't it?

20     A     All of our clinical trials allow patients

21  to discontinue therapy at any time.  No clinical

22  trial forces a patient to take a medication for any

23  proscribed period of time without any possibility of

24  exiting the trial.

25           MR. BOWMAN:  Drew, I just got an email

Page 92

1  that somebody dropped off a folder for you.  Do you

2  need that or do you want to wait for a break?

3           MR. PATE:  We can wait for a break.  Thank

4  you, though.

5      A     May I set this aside?

6      Q     (BY MR. PATE)  Sure.

7           (Exhibit 9 marked for identification.)

8      Q     (BY MR. PATE)  I've handed you what we've

9  marked as Exhibit 9.  Do you recognize that

10  document?

11     A     I do.

12     Q     What is Exhibit 9?

13     A     It's background material to a website that

14  was developed for physicians that they can access

15  information on pain management.

16     Q     That website was called "Prescribe

17  Responsibly," right?

18     A     Yes.

19     Q     It was sponsored by J&J, right?

20     A     Yes.

21     Q     It was funded by J&J?

22     A     Yes.

23     Q     It was created by J&J?

24     A     With input from experts in the field of

25  pain management.

Page 93

1      Q     The content was drafted by J&J, right?

2      A     Yes.

3      Q     And approved by J&J?

4      A     Yes.

5      Q     It provided information about how to

6  prescribe opioids, correct?

7      A     It provided information about pain

8  management including the use of opioids, how to

9  assess pain and other options for treating pain.

10     Q     If you would turn to the page that ends in

11  070.  This is about opioid withdrawal assessment,

12  correct?

13     A     Yes.

14     Q     It states that, "Opioid withdrawal

15  symptoms are usually not medically serious."

16           Do you see that?

17     A     Yes.

18     Q     "But can be uncomfortable and may need

19  clinical management."  Correct?

20     A     Yes.

21     Q     Have you ever known anyone who is going

22  through opioid withdrawal?

23     A     I'm aware of friends' offspring who were

24  addicted, but I can't say that they went through

25  opioid withdrawal.  So, no.  We did measure this in

Page 94

1  some of the clinical trials.  So, in that sense, we
2  did look at it.
3      Q    Have you ever seen an infant that's going
4  through opioid withdrawal?
5      A    On television.  No, I did not personally.
6      Q    What is the scientific support for
7  claiming that opioid withdrawal symptoms are usually
8  not medically serious?
9      A    Well, I can cite for you that in our
10  clinical trials where we followed opioid withdrawal
11  we didn't see by adverse event reporting serious
12  opioid withdrawal symptoms.  I'm not aware of other
13  data.
14      Q    Your clinical trials that we looked at for
15  Duragesic?
16      A    And for Nucynta.
17      Q    Anything else?
18      A    No.
19      Q    Were you specifically looking for or did
20  you look for whether or not any withdrawal symptoms
21  were medically serious?
22      A    We did for -- well, we followed the
23  clinical opioid withdrawal scale for tapentadol,
24  for Nucynta, and they are rated on severity.
25      Q    How so?

Page 95

1      A    I'd have to go back to the COWS, but they
2  are rated based upon how severe the symptoms are.
3  So there is a rating scale that's used for that, and
4  it's reported how many patients had mild, moderate,
5  severe withdrawal.
6      Q    That was for Nucynta?
7      A    Yes.
8      Q    That was not done for Duragesic, correct?
9      A    I don't recall that it was ever done for
10  Duragesic.
11      Q    It was certainly not done for opioids as a
12  class of drug, was it?
13      A    I can't speak for other opioids.
14      Q    This is speaking about other opioids,
15  though.
16      A    I don't know.
17      Q    This says, "Opioid withdrawal symptoms are
18  usually not medically serious."  Correct?
19      A    Correct.
20      Q    It doesn't say Nucynta opioid
21  withdrawals -- or Nucynta withdrawal symptoms are
22  usually not medically serious, does it?
23      A    No.
24      Q    It doesn't say Duragesic withdrawal
25  symptoms are usually not medically serious, does it?

Page 96

1      A    No, it doesn't.
2      Q    It says, "Opioid withdrawal symptoms are
3  usually not medically serious."  Correct?
4      A    Correct.
5      Q    This was a statement that J&J wrote,
6  correct?
7      A    Yes.
8      Q    And you are not aware of J&J ever actually
9  studying whether or not opioid withdrawal symptoms
10  are medically serious, are you?
11      A    Opioids in general, no.  We didn't do a
12  study per se.  Whether there was literature to
13  indicate that, I don't know.
14      Q    Similarly, J&J never did a study to
15  determine whether "withdrawal symptoms can be
16  avoided or eased by slowly tapering the opioid
17  dose."  Correct?
18      A    Not a study per se, but that was widely
19  reported in the literature on how to taper patients
20  who are going off of opioid therapy.
21      Q    Are you familiar with a website called
22  PainKnowledge.com or, excuse me, PainKnowledge.org?
23      A    No.
24      Q    Is that a J&J website?
25      A    I'm not familiar with the website.

Page 97

1      Q    What kind of doctor are you?
2      A    Internal medicine with a specialty in
3  infectious diseases.
4      Q    You said that you have never personally
5  seen an infant who's going through opioid
6  withdrawal, right?
7      A    Not that I recall.  If it had been part of
8  my internship, residency training, I don't recall
9  it.
10      Q    You're aware that that can happen?
11      A    Oh, yes.
12      Q    Infants can be born addicted to opioids?
13      A    Yes.  And package inserts now have that as
14  a warning.
15      Q    Those infants when they are born can have
16  very serious medical conditions, can't they?
17      A    Yes.
18      Q    They can go through very serious
19  withdrawal symptoms, can't they?
20      A    Yes.
21      Q    Withdrawal related to addiction to
22  opioids, right?
23      A    Withdrawal related to -- they're dependent
24  on opioids at the time of birth and then it's the
25  withdrawal from the dependency.

Page 98

1      Q    You would never tell one of those --
2      A    I'm sorry.  I just want to clarify because
3  you used the term addiction for the infants.
4      Q    Dependence.
5      A    Okay.
6      Q    A baby born with opioid dependence can go
7  through very medically serious withdrawal symptoms,
8  can't they?
9      A    Yes.
10     Q    They can die, can't they?
11     A    They can.
12     Q    They can go through extreme pain, can't
13 they?
14     A    I haven't studied it, but I don't know so
15 much about the pain aspect of it.  Certainly the
16 symptoms of withdrawal can be severe.
17     Q    They can have seizures?
18     A    Yes.
19     Q    And they're required to have
20 around-the-clock, if it's available,
21 around-the-clock NICU observation, correct?
22     A    I would anticipate in severe cases they
23 would need continuous support for the period of time
24 where they're weaned.
25     Q    You would never tell a parent of one of

Page 99

1  those children that the opioid withdrawal symptoms
2  that that baby was going through against their will
3  is not medically serious, would you?
4          MR. LIFLAND:  Object to the form of the
5  question.
6      A    No, but the infant was born to a parent
7  who took the opioid.
8      Q    (BY MR. PATE)  That was not my question.
9      A    I understand.
10     Q    My question is about the child who is
11 born opioid dependent and goes through very serious
12 withdrawal, you would never tell the parent or
13 anybody that that wasn't medically serious, would
14 you?
15         MR. LIFLAND:  Object to the form of the
16 question.
17     A    In the cases where there's been long-term
18 exposure, yes, infants who were born to parents who
19 get occasional drugs but aren't born with a neonatal
20 withdrawal syndrome.
21         But I would agree with you that there are
22 infants who have severe withdrawal when they've been
23 exposed to opioids in utero for an extended period
24 of time, yes.
25     Q    (BY MR. PATE)  Have you treated anyone

Page 100

1  addicted to opioids?
2      A    Personally, no.
3      Q    Have you treated anyone dependent on
4  opioids?
5      A    Yes.  As part of my internal medicine
6  internship residency, yes.
7      Q    Did you -- did that patient go through
8  withdrawal?
9      A    It was so long ago, I can't recall the
10 specifics.  I'm sorry.
11     Q    Have you ever heard the term "dope sick"?
12     A    No.
13     Q    Would you tell a patient who is addicted
14 to opioids and going through withdrawal that their
15 symptoms were not medically serious?
16     A    I would assess the symptoms.  I wouldn't
17 just offhand speak about whether it was or wasn't
18 serious.  If the patient was reporting serious
19 withdrawal, I'm going to evaluate the patient based
20 upon what he or she is reporting to me.
21     Q    Would you tell a patient that opioid
22 withdrawal symptoms are usually not medically
23 serious?
24     A    Again, this is hypothetical.  I know that
25 patients who have been on opioids for extended

Page 101

1  periods of time need to be tapered off slowly, and
2  there are some recommendations on how to do that.
3          So if I were in that situation, that's the
4  discussion I would be having with the patient.  When
5  you come to a period where we're going to take you
6  off of the opioids, we're going to do it slowly and
7  monitor you so that you don't have serious
8  symptomatology from the withdrawal.
9      Q    You cannot always prevent the serious
10 symptomatology, using your term, from the
11 withdrawal, can you?
12     A    I've not treated those patients.  So I
13 can't speak from firsthand knowledge.  There are
14 patients who experience significant symptoms of
15 withdrawal, particularly if they're not tapered
16 slowly.
17     Q    Is there any scientific support for the
18 statement that opioids are less than 1 percent
19 addictive?
20         MR. LIFLAND:  Object to the form of the
21 question.
22     A    If you go to the literature and you look
23 at subsets of patients, particularly patients who
24 come in without a history of alcohol use, smoking,
25 other addictive behaviors, I believe that there are

Page 102

1  rates that show the potential for addiction is in
2  the range of 1 percent or less.
3        Q    (BY MR. PATE)  In those narrow specific
4  circumstances?
5        A    Yes.  You look for risk factors with
6  patients.
7        Q    My question is different.  My question is
8  there is no study that has been done that would
9  support the statement opioids are less than 1
10 percent addictive, is there?
11       MR. LIFLAND:  Object to the form of the
12 question.
13       A    My understanding of the summaries that we
14 provided, the various studies that looked at rates
15 of addiction, the rates of addiction were, again,
16 depending upon the background of the individuals,
17 but overall all-comers, anywhere from the 2 to 5
18 percent range.  So that's not less than 1 percent.
19       Q    (BY MR. PATE)  So the answer to my
20 question then is yes, you are not aware of any
21 scientific support for a statement as broad as
22 opioids are less than 1 percent addictive, right?
23       MR. LIFLAND:  Object to the form of the
24 question.
25       A    Most of what I've seen gives you a range

Page 103

1  depending upon the background of the patients, but
2  not in the overall universe of patients that are
3  studied, those ranges tend to be above 1 percent.
4        Q    (BY MR. PATE)  And those ranges are not as
5  broad as just using opioids, are they?
6        A    I'm sorry.
7        Q    Every study you're talking about, every
8  study you've looked at or cited at any point today
9  is looking at a specific group of patients, isn't
10 it?
11       A    Well, in the methodology they speak about
12 the patients that they looked at.
13       Q    Right.  There's a specific -- there's a
14 methodology for all of those studies, right?
15       A    Correct.
16       Q    None of those studies are broad enough to
17 look at opioids generally for any patients and how
18 they're used, are they?
19       MR. LIFLAND:  Object to the form of the
20 question.
21       A    Again, I'm not -- so they report on large
22 cohorts of patients.  So I'm not understanding your
23 question that these are -- including the Cochrane
24 review, which is a review of a lot of other studies,
25 I'm not clear on your question.

Page 104

1        There are a variety of subjects who were
2  exposed to opioids who were studied in all these
3  various studies.  Could you clarify your question?
4        Q    (BY MR. PATE)  Each study is limited to
5  the circumstances of that study?
6        A    And that's described in the methodology.
7        Q    You agree with that?
8        A    Yes.
9        Q    And they should not be exaggerated beyond
10 what those studies were actually about, right?
11       MR. LIFLAND:  Object to the form of the
12 question.
13       A    I think that by reading the methodology,
14 you understand the limitations of those studies.
15       Q    (BY MR. PATE)  So a company shouldn't
16 take a limited study and then make an unlimited
17 statement, should it?
18       MR. LIFLAND:  Object to the form of the
19 question.
20       A    Some of those studies looked at wide
21 cohorts of patients who were exposed to opioids.
22       Again, how those studies were used, the
23 methodology behind those studies in a number of
24 instances indicated that these are unselected
25 patients who are exposed to opioids over some period

Page 105

1  of time.  That might be construed as a broad cohort
2  of exposure to opioids, but you would need to look
3  at the methodology to understand those limitations.
4        Q    (BY MR. PATE)  Would you personally make
5  the statement that opioids are less than 1 percent
6  addictive?
7        MR. LIFLAND:  Object to the form of the
8  question.
9        A    I would quantify -- qualify that with
10 whether you had a patient who had risk factors, what
11 were the risk factors, but overall I would not make
12 that overall statement myself.
13       Q    (BY MR. PATE)  Would you make the
14 statement that opioids -- opioids are virtually
15 non-addictive?
16       A    Are virtually non-addictive, that's the
17 first time I've heard that terminology.  I
18 personally would not make that statement.
19       Q    You would not recommend Janssen make that
20 statement either, would you?
21       A    I didn't make those recommendations.
22       Q    And you wouldn't now as a paid expert for
23 them, would you?
24       A    I wouldn't now.
25       Q    Have you ever heard the expression that

Page 106

1  pain soaks up the euphoria of an opioid?
2      A    No, I have not.
3      Q    Is that a statement that has any
4  scientific support as far as you're aware?
5      A    I'm not -- I've never heard of the
6  statement.  So I'm certainly not aware of what
7  support that statement might have.
8      Q    Are you aware of any scientific support to
9  say that there's no risk of addiction when opioids
10 are taken under the care of a doctor?
11     A    No, absolutely not.  Even the package
12 insert indicates that there is a risk of addiction
13 even in a properly managed patient.
14     Q    And that's true for any opioid, not just
15 opioids generally, right?
16     A    I'm sorry.  So you're saying -- well, I'll
17 speak to our opioids that's in our package insert,
18 and that's my understanding for any opioid.
19     Q    For any opioid there is still a risk of
20 addiction even when it's taken under the care of
21 your doctor, right?
22     A    Well, I mean, we can really go into great
23 detail, but there are opioids that are over the
24 counter right now.  Loperamide is an opioid.
25     Q    Schedule II.

Page 107

1      A    Okay.  Thank you.  That's correct.
2      Q    Is it true to say related to opioids that
3  the potential for addiction is in the patient, not
4  the opioid?
5      A    This is the first time I'm hearing that
6  statement.
7      Q    That's not true, is it?
8      A    There are risk factors that need to be
9  considered because patients have greater or less or
10 lower risk of addiction.  So, I'm sorry, can you
11 restate your question?
12     Q    Let me just -- you said you never heard it
13 before.  So I'll repeat it.  Maybe that will help
14 you get comfortable with it.
15     A    Okay.
16     Q    The potential for addiction is in the
17 patient, not the opioid.  That's not a true
18 statement, is it?  Opioids carry the risk of
19 addiction regardless of the patient, don't they?
20     MR. LIFLAND:  Object to the form of the
21 question.
22     A    And certainly if we speak of Schedule II
23 opioids, that's true.  There is a risk of addiction
24 with any Schedule II opioid.
25     Q    (BY MR. PATE)  Right.  They all come --

Page 108

1  they come from opium, right?
2      A    They are opiates, yes.
3      Q    And the same thing heroin comes from,
4  right?
5      A    They may be synthetically made, yes.
6      Q    And so they can be addictive?
7      A    Yes.
8      MR. PATE:  Do you want to take a lunch
9  break?
10     MR. LIFLAND:  Sure.
11     VIDEOGRAPHER:  Off the videotaped record.
12 The time is 12:38 p.m.
13     (Break taken from 12:38 p.m. to 1:39 p.m.)
14     VIDEOGRAPHER:  Back on the record at 1:39
15 p.m.
16     Q    (BY MR. PATE)  Dr. Moskovitz, are you
17 ready to proceed?
18     A    Yes.
19     Q    You understand you're still under oath?
20     A    I do.
21     Q    What is pseudoaddiction?
22     A    It's a term that has been described as
23 patients who may present with signs that sometimes
24 can be considered to be signs of addiction, they
25 want more opioids but, in fact, are not due to

Page 109

1  addiction.  It may relate to an underlying need for
2  more pain medication for a variety of reasons.
3      So by definition it's not addiction.
4  Once the pain is adequately treated and it's a
5  diagnosis made retrospectively, the patient is
6  adequately treated for his or her pain and proceeds
7  with the standard course of therapy.
8      Q    Is it a real thing?
9      A    It is widely described in the literature.
10 In fact, it's in the package inserts for all of the
11 Schedule II drugs.
12     Q    Pseudoaddiction is in the package inserts
13 for all Schedule II opioids?
14     A    The concept, the concept of
15 pseudoaddiction can be found in the package insert.
16     Q    Let's break that down first.  Is the term
17 "pseudoaddiction" in all of the package inserts for
18 Schedule II opioids?
19     A    Not the term "pseudoaddiction," but the
20 definition, the conceptual idea that there are
21 patients who may be exhibiting behaviors of opioid
22 seeking but, in fact, are doing so because they have
23 inadequately treated pain.
24     Q    Is the term "pseudoaddiction" anywhere in
25 any label for a Schedule II opioid?

Page 110

1    A    Not to my knowledge.  But as I said, the
2  concept is unequivocally there.
3    Q    You're saying the concept of
4  pseudoaddiction is in every single label for every
5  single Schedule II opioid?
6    A    To the extent that I'm aware that the
7  Schedule II opioid, certainly the long-acting
8  opioids, I won't speak for the short-acting, have
9  a uniform package insert, it's in there.
10    Q    Did you bring those with you today?
11    A    Yes.  We have an example of the latest
12  Duragesic.
13    Q    While he's looking for that, you first
14  said that the concept of pseudoaddiction was in
15  every Schedule II opioid product insert, right?
16    A    Let me qualify that to say long-acting
17  opioids where the package insert now has been
18  standardized across all of the long-acting Schedule
19  II opioids.
20    Q    So the first time you misspoke and now
21  it's long-acting opioids are limited to or have some
22  concept of pseudoaddiction in them?  That's what
23  you're saying?
24    A    Yes.  I'm simply not aware of the others.
25  I'm aware of the standardized wording around the

Page 111

1  long-acting opioids.
2    Q    Can you list every long-acting opioid that
3  you're referring to?
4    A    Long-acting oxycodone, long-acting
5  hydromorphone, long-acting fentanyl, long-acting
6  hydrocodone, hydromorphone, Nucynta, tapentadol.
7    Q    Any others?
8    A    Those are the ones that come to mind.
9    Q    You said that this concept is now uniform
10  in the long-acting opioids.  When did that happen?
11    A    Around -- well, there's class-wide
12  labeling for the opioids in 2014.
13    Q    Prior to 2014, was the concept of
14  pseudoaddiction, according to you, in all Schedule
15  II long-acting opioid labels?
16    A    I can't speak to others.  So I don't know.
17    Q    Was it in any prior to 2014?
18    A    I don't know.
19    Q    So when you said it's in every single
20  long-acting opioid package insert, you're talking
21  about from 2014 forward?
22    A    Yes.
23    Q    Your lawyer has handed me a document that
24  I think you're looking at.  What is this document?
25    A    Selected support for statements and

Page 112

1  representations regarded pseudoaddiction.
2         (Exhibit 10 marked for identification.)
3    Q    (BY MR. PATE)  If you'll hand me the one
4  that you have, I'll mark that as Exhibit 10.
5         What are you looking at in Exhibit 10?
6    A    I'm looking at the package insert.  This
7  is under Tab 2, and it's Section 9.2, "Abuse."
8         And in the third paragraph you'll see
9  the end of the third paragraph speaks about,
10  "Preoccupation with achieving pain relief can be
11  appropriate behavior in a patient with poor pain
12  control."
13    Q    "Preoccupation with achieving pain relief
14  can be appropriate behavior in a patient with poor
15  pain control."
16         That's what you're referring to?
17    A    Yes.
18    Q    Your testimony is that that is
19  pseudoaddiction?
20    A    That that represents -- yes.
21  Pseudoaddiction, as I defined it, is behaviors
22  associated with which is preoccupation, the patient
23  is exhibiting behaviors that might look like
24  addictive behaviors.  But when they get appropriate
25  pain relief, then those behaviors stop.

Page 113

1    Q    Do you have that Responsible Opioid
2  Prescribing book in front of you still?
3    A    Yes.
4    Q    If you'll turn to Page 62 and 63.  Do you
5  agree that the behaviors that are described on
6  Page 62 in the bullets are common signs of
7  pseudoaddiction?
8    A    I wouldn't say common.  I would say that
9  there are behaviors that look like behaviors that
10  would be exhibited that may be indicative more or
11  less of addiction, but, in fact, when you take a
12  careful history and you determine that it's because
13  the patient is not receiving adequate pain relief,
14  you may make the decision to change the dose or
15  change the drug that the patient is on, and then the
16  diagnosis can be made retrospectively.  So you may
17  see behaviors that look like addictive behaviors,
18  behaviors that are listed here.
19    Q    One of the first common signs listed is
20  requesting analgesics by name.  Do you see that,
21  Page 62?
22    A    Yes.
23    Q    You agree that's a -- do you think that's
24  a symptom of pseudoaddiction?
25    A    As I said, I'm just speaking in a general

Page 114

1  sense that there are behaviors associated in some
2  cases with addiction that may be because the patient
3  is being inadequately treated.
4      Q   Does J&J agree with the description of
5  pseudoaddiction and the behaviors that are listed in
6  this book?
7          MR. LIFLAND:  Object to the form of the
8  question.
9      A   I won't speak with J&J whether it agrees
10 or disagrees.  We certainly understand the concept
11 of pseudoaddiction and support the statements that
12 are in our package insert that relate to making sure
13 that you treat the patient adequately.  If the
14 patient is exhibiting behaviors that may be
15 indicative, you have to evaluate that patient
16 carefully.
17     Q   (BY MR. PATE)  Let's look at the package
18 insert.  The package insert doesn't list any actual
19 behaviors, does it?
20     A   No.
21     Q   It doesn't list what preoccupation with
22 achieving pain relief looks like, does it?
23     A   No.
24     Q   This description of pseudoaddiction that's
25 provided in this book Responsible Opioid Prescribing

Page 115

1  lists specific behaviors, doesn't it?
2      A   Yes.
3      Q   It says, "Requesting analgesics by name is
4  a sign of pseudoaddiction."  Doesn't it?
5      A   I'm sorry?  Repeat your question.
6      Q   The book says, "Requesting analgesics by
7  name is a sign of pseudoaddiction."  Doesn't it?
8      A   It may be.
9      Q   It says, "Some common signs of
10 pseudoaddiction are"?
11     A   Right, but it's some.  That means you may
12 or may not see those.
13     Q   It doesn't say "may be."  It says, "Some
14 common signs of pseudoaddiction are these things."
15 Doesn't it?
16     A   Correct, but not necessarily in every
17 patient.  That's why I'm saying "some."
18     Q   The package insert does not say that
19 requesting analgesics by name is appropriate
20 behavior and a sign of pseudoaddiction, does it?
21     A   No.  It doesn't go through the specific
22 behaviors.
23     Q   The package insert does not say that
24 demanding or manipulative behavior is preoccupation
25 with achieving pain relief?

Page 116

1      A   No.  The package insert doesn't say that.
2      Q   The package insert doesn't say that clock
3  watching is appropriate behavior, does it?
4      A   No.  It does not.
5      Q   The package insert doesn't say that taking
6  opioid drugs for an extended period is appropriate
7  behavior, does it?
8      A   No.
9      Q   The package insert doesn't say that
10 hoarding opioids is appropriate behavior, does it?
11     A   No.  No, it does not.
12     Q   The package insert doesn't say that
13 obtaining drugs from more than one physician is
14 appropriate behavior, does it?
15     A   Of course, it does not.
16     Q   It doesn't say that taking someone else's
17 pain medications is appropriate behavior, does it?
18     A   Of course.  It's not appropriate behavior.
19 It's behavior that needs to be assessed.
20     Q   It's behavior that is a sign of
21 pseudoaddiction according --
22     A   It's behavior that may be a sign --
23     Q   Let me finish my question, please.
24         It's behavior that's documented in this
25 book as being a sign of pseudoaddiction, isn't it?

Page 117

1      A   In some patients.
2      Q   And Janssen supports this book, don't
3  they?
4      A   In the general sense that it's written by
5  a recognized expert in pain medicine, yes, we
6  support the concepts.
7      Q   You've also supported the promotion of
8  this book and it's guidelines, haven't you?
9      A   I don't know.  I'm sorry.  I simply don't
10 know that.
11     Q   Does the label say that using more opioids
12 than recommended is appropriate behavior?
13     A   The label states exactly what I said it
14 states, that preoccupation can be appropriate
15 behavior.
16     Q   The label does not state that using more
17 opioids than recommended is appropriate behavior,
18 does it?
19     A   No.
20     Q   The label does not state that aggressively
21 complaining to your doctor for more drugs is
22 appropriate behavior, does it?
23     A   I'll grant you it doesn't give the
24 specific behaviors that are listed in here.
25     Q   Your testimony is that this one sentence

Page 118

1  about preoccupation with achieving pain relief is
2  the same thing as the pseudoaddiction concept that
3  we see in this book?
4      A    Conceptually, yes.  You need to assess a
5  patient who has a preoccupation with achieving pain
6  relief that it can be an appropriate behavior in a
7  patient who is looking to get pain relief.  Yes.
8  That conceptually is the same as pseudoaddiction.
9      Q    The label does not list any of the
10  behaviors that are in this book as being appropriate
11  behavior in a patient with poor pain control, does
12  it?
13      A    No.  We've established that.  It doesn't
14  list the specific behaviors that are listed as
15  possible behaviors that a patient seeking pain
16  relief might evidence.
17      Q    The label doesn't describe anything about
18  pseudoaddiction at all, does it?
19      A    It does not use the term
20  "pseudoaddiction."
21      Q    Your --
22      A    My testimony is that it -- I'm sorry.  I
23  was finishing my sentence, that conceptually this is
24  in part what pseudoaddiction is.  There's a patient
25  who's preoccupied with obtaining better pain relief,

Page 119

1  and it could look like addictive behavior.
2      Q    Did you write this label?
3      A    No.
4      Q    Did you participate in it being written?
5      A    Well, not the 2014 label.
6      Q    The 2014 label is the only one that you're
7  pointing to that has this concept, correct?
8      A    It's been proposed in other labels.  As
9  far as I know, the 2014 label is the only one that
10  has this wording in it.
11      Q    You don't work --
12      A    For us.  I don't know for any other
13  company.
14      Q    You don't work for the FDA, do you?
15      A    No.
16      Q    You've never worked for the FDA, have you?
17      A    Correct.
18      Q    You are not responsible for approving this
19  label, were you?
20      A    I was not responsible for approving it.
21      Q    You don't know what the FDA or anyone else
22  meant when it says, "Preoccupation with achieving
23  pain relief can be appropriate behavior in a patient
24  with poor pain control," do you?
25      A    I can't speak for the FDA.

Page 120

1      Q    You don't know that that's referring to
2  pseudoaddiction, do you?
3      A    I'm not sure how I could answer that.
4  I read this as conceptually giving the same
5  information that you have in a patient who's
6  preoccupied with obtaining pain relief may exhibit
7  behaviors.  It doesn't list the behaviors.  I'll
8  grant you that.  But conceptually, this is a basis
9  of the concept of pseudoaddiction.
10      Q    What study has Janssen ever done about
11  pseudoaddiction?
12      A    We haven't.
13      Q    Zero?
14      A    Not to my knowledge.
15      Q    You've never done a study about how often
16  it occurs?
17      A    Not to my knowledge.
18      Q    You've never done a study about whether or
19  not it's real?
20      A    We've never done a study on
21  pseudoaddiction.
22      Q    You've promoted the concept of
23  pseudoaddiction, correct?
24      A    Because it's a generally accepted concept
25  among pain management physicians.

Page 121

1      Q    You've trained your sales force about
2  pseudoaddiction, correct?
3      A    Probably conceptually, yes.
4      Q    And you've supported doctors who promote
5  the concept of pseudoaddiction, correct?
6          MR. LIFLAND:  Object to the form of the
7  question.
8      A    Promote the concept?  As part of pain
9  management, it's like other definitions in pain
10  management, it's a definition that has been accepted
11  as -- because it's been seen.  Physicians who treat
12  pain patients see it and make the diagnosis based on
13  a retrospective analysis of the patient who is
14  responding.
15      Q    (BY MR. PATE)  And you've supported --
16  Janssen has supported groups like the American Pain
17  Foundation and the American Pain Society that
18  promote the concept of pseudoaddiction, correct?
19          MR. LIFLAND:  Object to the form of the
20  question.
21      A    Again, I'm not sure what you mean by
22  "promote the use."  This is a terminology.  It would
23  be the same as saying promote the use of the term
24  tolerance or dependence or addiction.  It's a term
25  that's used in pain management.  So we support the

Page 122

1  terminology that's well-defined.
2      Q    (BY MR. PATE)  Is pseudoaddiction defined
3  in the DSM?
4      A    I don't know.
5      Q    Do you know who came up with the term
6  "pseudoaddiction"?
7      A    The first time I saw it was in a paper.
8      Q    By Dr. David Haddox, correct?
9      A    That's correct.
10     Q    In 1989 he invented the term
11 "pseudoaddiction."  Correct?
12          MR. LIFLAND:  Object to the form of the
13 question.
14     A    I'm not sure what you mean by "invented"
15 as opposed to describing conceptually what was seen
16 as behaviors of accessing pain medication and giving
17 it a term.
18     Q    (BY MR. PATE)  Okay.  He coined the phrase
19 "pseudoaddiction."  Is that fair?
20     A    That's the first time I saw it.
21     Q    From Dr. David Haddox?
22     A    From that article, correct.
23          Let me be clear, though, when you asked at
24 the beginning what other evidence, there are other
25 papers on pseudoaddiction.

Page 123

1      Q    We'll get to those.
2      A    Okay.
3          (Exhibit 11 marked for identification.)
4      Q    (BY MR. PATE)  I've handed you a document
5  marked as Exhibit 11.  Do you recognize that?
6      A    Offhand, no.
7      Q    Exhibit 11 is the article where
8  Dr. Haddox first introduced and coined the term
9  "pseudoaddiction."  Correct?
10     A    Yes.  It just doesn't look exactly like
11 the one I had.
12     Q    He called it an iatrogenic syndrome,
13 right?
14     A    Yes.
15     Q    Iatrogenic means it's caused by the
16 doctor's treatment?
17     A    Yes.
18     Q    And Janssen supports or agrees with
19 Dr. Haddox about pseudoaddiction being an iatrogenic
20 condition, don't they?
21     A    Janssen supports the way the term
22 "pseudoaddiction" is generally accepted in pain
23 literature as patients who may exhibit behaviors
24 that look like drug-seeking behaviors but, in fact,
25 are related to inadequate pain management, and the

Page 124

1  diagnosis can be made retrospectively.  So that's
2  what Janssen supports.
3      Q    What's the DSM?
4      A    It's a criteria for making diagnoses,
5  particularly diagnoses that you're going to be
6  putting in medical claims for with the criteria for
7  them.
8      Q    Do you know what it stands for?
9      A    I don't know offhand.
10     Q    You said that pseudoaddiction was a
11 diagnosis; is that right?
12     A    Yes.
13     Q    You believe someone can be diagnosed with
14 the condition of pseudoaddiction?
15     A    Retrospectively, yes.
16     Q    And that that is caused by the doctor's
17 failure to treat their pain, right?
18     A    That it's not failure to treat their pain.
19 These are patients who may be treated for pain but
20 the patient is exhibiting behaviors that may look
21 like addictive behaviors but, in fact, if the
22 patient is assessed properly and the physician makes
23 a determination that it's because the patient is
24 getting inadequate pain relief and may choose to
25 treat the pain with a different modality and the

Page 125

1  patient -- the patient's pain is relieved and
2  they're no longer exhibiting those signs and
3  symptoms of medication seeking, the behaviors that
4  we just spoke about, then you can make the diagnosis
5  of pseudoaddiction retrospectively.  That's what
6  happened.
7      Q    It's caused by, according to Dr. Haddox
8  and Janssen, pseudoaddiction is a condition caused
9  by a doctor's failure to adequately treat a
10 patient's pain, right?
11          MR. LIFLAND:  Object to the form of the
12 question.
13     A    You're putting the onus on the doctor.
14 So the doctor only becomes aware that the patient
15 is having inadequate pain management because the
16 patient is exhibiting behaviors that may be
17 suggestive.
18          The fact that the patient is exhibiting
19 those behaviors may be because he or she is doing
20 more or there's a change in their underlying
21 condition, but ultimately it's because the pain
22 isn't being adequately treated.
23     Q    (BY MR. PATE)  So then is it not an
24 iatrogenic condition?  Iatrogenic means it's caused
25 by the doctor, right?

Page 126

1    A    Well, the doctor -- if the doctor chooses
2  to treat the patient, the patient's increasing pain,
3  and make the diagnosis retrospectively.  Give me a
4  moment.
5         Yeah.  In the discussion he speaks about
6  patients who exhibit drug-seeking behaviors where
7  the physician may not be increasing, may not be
8  treating the pain adequately.  I think, therefore,
9  he describes it as iatrogenic.
10        I would say at this point with the
11  knowledge that we have, we understand the concept
12  of pseudoaddiction.  I don't know that we would
13  specifically term it as iatrogenic in each case.
14  The physician becomes aware of inadequate pain
15  management.
16    Q    It's not in the DSM, is it?
17    A    I don't know.
18    Q    The solution when a doctor "diagnoses" a
19  patient with pseudoaddiction is to give them more
20  opioids, right?
21    A    That's not what I said.  I said that the
22  diagnosis is made retrospectively.  In the case that
23  we're describing is a patient who's exhibiting
24  behaviors, drug-seeking behaviors, the physician has
25  to adequately assess that patient.

Page 127

1         The physician in his or her assessment may
2  conclude that the underlying pain has changed, and
3  if he or she believes that the patient is exhibiting
4  these behaviors because the patient needs better
5  pain relief, the physician may choose to accommodate
6  that needed pain relief in some other way, by
7  increasing the dose, by changing the medication.
8         If the behaviors subsequently cease, the
9  physician can retrospectively make the diagnosis of
10  a pseudoaddiction in that patient.  The patient was
11  not addicted.  The patient simply needed better pain
12  control.
13    Q    Better pain control by giving them more or
14  higher doses of their opioids, right?
15    A    I didn't say necessarily opioids.  They
16  have to assess what's best for the patient.
17    Q    Pseudoaddiction relates to use of opioids,
18  doesn't it?
19    A    It's a term that's used because the
20  patient is exhibiting behaviors, drug-seeking
21  behaviors, and it was coined because the patient
22  who's exhibiting the behaviors generally was on
23  opioids.
24    Q    Right.  But you said a minute ago that
25  you didn't use the term opioids and you weren't

Page 128

1  necessarily talking about opioids.
2    A    No.  I said that what the physician may
3  choose to treat the patient with to more adequately
4  treat the pain may not necessarily involve
5  increasing the dose of opioids.
6         The physician is faced with a patient
7  who's exhibiting behaviors that may look like
8  addictive behaviors.  If the physician's assessment
9  of the patient is that the patient is having
10  increased pain for a variety of reasons, like I
11  said, the underlying disease may have changed, the
12  physician is going to -- may make the assessment
13  that he or she needs to do something to address the
14  inadequacy of the pain relief.  That may be a change
15  in the dose of opioids.  It may be other modalities.
16        For argument's sake, a patient who has an
17  underlying malignancy and needs radiation therapy,
18  but the addictive behaviors were related to this
19  term of pseudoaddiction.
20    Q    One of the recommended treatments, if you
21  have a condition, there's a treatment for it, right?
22  That's what doctors try to do?
23    A    They assess the condition and determine
24  what's the best course of therapy.
25    Q    You're saying that there is a condition

Page 129

1  that is called pseudoaddiction, right?
2    A    Let me be clear.  I've stated that
3  pseudoaddiction is the diagnosis that can be made
4  retrospectively.  So the doctor, when faced with a
5  patient who's exhibiting these behaviors, is
6  considering whether the behavior is related to
7  addiction, addictive behaviors, or whether it's an
8  outcome of inadequate pain management.
9         In the course of treatment he or she may
10  decide that the most appropriate course of treatment
11  is to address the underlying inadequate pain
12  management.
13        If by doing so those behaviors stop, you
14  can retrospectively say those behaviors were not
15  addiction; they were pseudoaddiction.
16    Q    So the answer to my question was, yes,
17  there's a condition known as pseudoaddiction,
18  whether it's diagnosed retrospectively or
19  prospectively, right?
20        MR. LIFLAND:  Object to the form of the
21  question.
22    A    Right.
23    Q    (BY MR. PATE)  That it has a treatment,
24  right?
25    A    That there is a physician's decision on

Page 130

1  how best to address the patient who's presenting
2  with these behaviors.  I didn't say that the patient
3  who's coming in with these behaviors is getting a
4  diagnosis right then and there of pseudoaddiction.
5          The physician is addressing the behaviors,
6  and in the differential diagnosis he or she is
7  assessing whether that's due to inadequate pain
8  relief, and he's going to address that.
9      Q   He's going to address it by providing more
10 pain relief, right?
11     A   Well, he's going to address it by figuring
12 out how best to address the patient's pain, yes.
13     Q   So if a patient is in pain and the doctor
14 determines that they don't have adequate pain
15 relief, the recommended provision is to give them
16 adequate pain relief, isn't it?
17     A   To the extent possible, yes.
18     Q   Which would -- could include giving them
19 more opioids, right?
20     A   That may be one way, that's correct.
21 There are other -- there are other modalities.
22 He or she is going to assess what's best for the
23 patients.
24     Q   And the factors that those doctors use to
25 determine whether or not a patient is pseudoaddicted

Page 131

1  or is actually addicted are laid out in one place in
2  this book Responsible Opioid Prescribing, aren't
3  they?
4      A   The behaviors that the patient is
5  exhibiting are laid out.
6      Q   And the guidelines given to doctors about
7  how to tell the difference are laid out in this book
8  in one place, aren't they?
9      A   I'm sorry.  Repeat the question.
10     Q   You're saying the doctor has to make their
11 diagnosis, right?  The patient comes in and they're
12 exhibiting symptoms.  Let's just back up.
13     A   Okay.
14     Q   A patient comes in to see his doctor,
15 right?
16     A   Okay.
17     Q   He's exhibiting certain behaviors.
18     A   I'm with you.
19     Q   Some of those behaviors include demanding
20 an opioid by name.  He says he wants Duragesic,
21 right?
22     A   May include that.
23     Q   And he's been on Duragesic for a while.
24     A   Okay.
25     Q   And he may be watching the clock in the

Page 132

1  waiting room, right?
2      A   Perhaps.
3      Q   And maybe he told that doctor that he has
4  been taking more of the opioids that he's been
5  prescribed than the doctor told him to, right?
6      A   Perhaps.
7      Q   And he could tell the doctor that he
8  actually took his brother's pain medication because
9  he was in so much pain, right?
10     A   Perhaps.
11     Q   And he might tell the doctor that he's
12 actually been hoarding other people's pain
13 medications from his family members, right?
14     A   Perhaps.
15     Q   And those are all things that that doctor,
16 according to this book, would be advised are part of
17 or symptoms of pseudoaddiction, right?
18     A   No.  I said that those are elements that
19 the physician would assess to determine why is the
20 patient exhibiting these behaviors.
21         One possibility is that the patient is
22 getting inadequate pain relief.  There are other
23 reasons for it.  Maybe the patient is becoming
24 addicted to the medication, but in the differential
25 the physician should be aware and in the history and

Page 133

1  physical background try to understand why these
2  behaviors are occurring.
3      Q   Does Janssen provide any information to
4  doctors to help them make that diagnosis?
5      A   Only in the general sense of what we've
6  been talking about, the websites, the information
7  about general principles of pain management.
8      Q   Specifically about pseudoaddiction, what
9  material does Janssen provide doctors for them to
10 determine the difference, like in the example I
11 gave, whether or not that patient is pseudoaddicted
12 or actually addicted?
13     A   Well, we spoke about that that's a
14 diagnosis that's made retrospectively.  I believe in
15 some of the materials where we talk about the types
16 of pain medication, we state that it's a diagnosis
17 that's made retrospectively, but you need to
18 evaluate that patient carefully.
19     Q   So there's no way to diagnose
20 pseudoaddiction ahead of time?  You just have to
21 give the patient more opioids and see what happens?
22     A   That's not what I said.  I made it clear
23 that you're assessing.  A patient is coming in with
24 behaviors that may be related to addiction, may be
25 related to underlying inadequate management of pain.

Page 134

1    Q    My question is --
2    A    You as the physician have to make the
3  assessment what the reason for those behaviors are.
4  If you make an assessment that, you know what,
5  this is a patient where I can see that there is
6  progression of the underlying disease, that the
7  patient is now becoming more active, they've gone
8  back to the gym and now they're complaining about
9  more pain.  I might at that point entertain that
10  this patient's pain is inadequately treated, and I
11  may choose at that point to treat the pain
12  differently.
13        That selection of how I choose to treat
14  the pain might include increasing the dose of
15  whatever pain medication the patient is on or
16  other adjuvant medication, and if those behaviors
17  dissipate, then retrospectively I can say, you know
18  what, that wasn't addiction, that was
19  pseudoaddiction.
20    Q    My question was -- I'm just trying to get
21  to understand this.  Okay?  So try to stay with me.
22    A    Okay.
23    Q    What education or information does
24  Janssen provide a doctor so that they can make a
25  determination, to help them make a determination

Page 135

1  whether a patient is exhibiting these symptoms is
2  either a pseudoaddict or is an actual addict?
3    A    I think I answered that with the website,
4  with other information that we provide around
5  general pain management guidelines, some of those
6  guidelines speak to this issue of pseudoaddiction.
7    Q    Okay.  You're pointing your hands at this
8  as one example?
9    A    Well, this is an example of general pain
10  guidelines.
11    Q    That being the Responsible Opioid
12  Prescribing book that you have in front of you?
13    A    Because you pointed it out.
14    Q    What other materials has Janssen provided
15  to doctors about how they should evaluate
16  pseudoaddiction?
17    A    Do we have the website, materials in the
18  website?  So as part of that answer I would say we
19  do provide materials on assessing pain, and the
20  proper assessment of pain would be part of the issue
21  of whether the patient's behaviors are related to a
22  change in underlying pain or whether they're
23  addictive behaviors.
24        We provide definitions of the various
25  aspects including a definition for pseudoaddiction.

Page 136

1    Q    Where do you provide that?
2    A    If you'll look in Tab 1, Page 65.
3    Q    This is from the Janssen Prescribe
4  Responsibly website?
5    A    Correct.
6    Q    It includes information about
7  pseudoaddiction?
8    A    It includes the definition of.
9    Q    On the Janssen website?
10    A    Yes.  On Page 63 it's in the narrative.
11    Q    Anything else?
12    A    No.  Let's stick with that right now.
13    Q    I asked you what information Janssen
14  provides to doctors to help them differentiate
15  between pseudoaddiction and real addiction, and
16  this is what you've pointed to, this part of the
17  Prescribe Responsibly website, right?
18    A    As part, yes.
19    Q    Do you agree that addiction to opioids is
20  a complicated diagnosis?
21    A    Yes.
22    Q    You would agree that it's hard to diagnose
23  addiction to opioids?
24    A    It's a diagnosis made over a period of
25  time.  It's not an easy diagnosis to make.

Page 137

1    Q    Many of the doctors who prescribe opioids
2  are not well trained in addiction, correct?
3    A    I can't speak to their training.  To the
4  extent that the package insert defines some of the
5  terminology and some of the behaviors and what to
6  look for, the package insert addresses some of these
7  issues, but I can't speak to the training of any
8  individual doctor.
9        I know that there are some states that
10  require training on pain management issues.  Again,
11  I can't speak to any individual physician.
12    Q    You know that lots of doctors who are not
13  addiction specialists prescribe opioids, correct?
14    A    Correct.
15    Q    Including family physicians, right?
16    A    Some do, yes.
17    Q    They treat their patients' pain sometimes?
18    A    Yes.
19    Q    They try to or at times they may use
20  opioids to do that, right?
21    A    Yes.
22    Q    And over the years that has increased
23  since the mid '90s, hasn't it?
24    A    The rate of prescription of opioids has
25  increased from mid '90s to the early 2000s, yes.

Page 138

1    Q    Family physicians in your experience
2  having gone through med school aren't provided a
3  whole lot of courses about diagnosing opioid
4  addiction, are they?
5    A    I can't speak to the current state of
6  training.  My training was back in the '70s.
7    Q    Are you aware of any standardized training
8  for family physicians about opioid addiction?
9    A    Standardized training.  Again, there are
10  states that require training in pain management and
11  opioids.  So any physician, any MD would have to as
12  part of CME take that training.  There is training
13  that's provided under the REMS program now to
14  physicians.  It's not mandated, but it is provided.
15    Q    In Oklahoma family physicians aren't
16  required to take addiction treatment classes, are
17  they?
18    A    I don't know.
19    Q    Are you aware of whether or not they are?
20    A    I'm not aware whether they are.
21    Q    What information did Janssen provide to
22  any Oklahoma doctor about how to tell the difference
23  between pseudoaddiction and addiction?
24    A    The information that we generally provided
25  to all physicians that had accesses to the Prescribe

Page 139

1  Responsibly website, supportive pain management
2  symposia, the package insert.
3           Now, when you say specifically make a
4  diagnosis, I said it's part of the differential.  If
5  you're talking about pseudoaddiction and addiction,
6  we educate around addictive behaviors in some of the
7  materials that we've already discussed.  It's up to
8  the physician to decide whether the behaviors the
9  patient is exhibiting might be behaviors of
10  addiction or it may be due to other reasons, such as
11  inadequate pain relief.
12    Q    You've testified that your opioids carry
13  the risk of addiction, right?
14    A    Correct.
15    Q    Even when they're taken under the care of
16  their doctor, correct?
17    A    Yes.
18    Q    Other Janssen witnesses have testified
19  that your job is to educate doctors about your
20  drugs; is that right?
21    A    Correct.
22    Q    You don't provide any education to any or
23  haven't provided any education to any doctor in
24  Oklahoma about how to tell the difference between
25  pseudoaddiction and addiction; isn't that true?

Page 140

1    MR. LIFLAND:  Object to the form of the
2  question.
3    A    No.  There are definitions in the label
4  that speak to addictive behaviors and in the --
5    Q    (BY MR. PATE)  No.  The label didn't list
6  any behaviors.  You told me that over and over again
7  that the label did not list a single --
8    MR. LIFLAND:  Please don't interrupt the
9  witness, Counsel.  You interrupted him mid sentence.
10    MR. PATE:  And you're interrupting me.
11    MR. LIFLAND:  Yes, because you interrupted
12  the witness.  Let him finish his answers, please.
13    A    There's nothing about specific behaviors.
14  That's why we created the monograph.  That's why we
15  created the website.  It was important to us to
16  educate around issues of pain management.  Those
17  issues include what are the behaviors that you need
18  to be aware of.
19           So I would say, yes, part of our mandate
20  was to educate physicians.
21    Q    (BY MR. PATE)  The only education you've
22  pointed to so far today about pseudoaddiction and
23  addiction that your company provided or made
24  available is the definition that you pointed to from
25  the Prescribe Responsibly website, right?

Page 141

1    A    Yes.  That's not to say there's other
2  materials.  I may not be aware of it.
3    Q    That Prescribe Responsibly website, did
4  it list any behaviors as far as whether they're
5  pseudoaddiction or addiction?
6    A    I also spoke about our making available
7  tools, tools that spoke to assessing behavior,
8  patients' behavior and pain.  I'll get to that.
9           Certainly in the definitions we give them
10  references.  So they're free to look at those
11  references, too.
12    Q    What references?
13    A    When we make the statement on Page 64,
14  Tab 1, on prescriberesponsibly.com references, when
15  reasonable limits and boundaries are placed on a
16  patient and yet he or she continues to step out of
17  bounds, addiction or pseudoaddiction should be
18  considered as a Reference 20.  I'm just not seeing
19  it over here.  Do we know what Reference 20 is?
20    MR. LIFLAND:  What page are you on?
21    THE WITNESS:  Page 64, Tab 1, and there's
22  a reference to pseudoaddiction as well.  That's 25.
23    MR. LIFLAND:  If you look on Page 66, I
24  think you'll see it.
25    THE WITNESS:  I was looking at the wrong

Page 142

1  section.  Okay.
2      A    So 20 is.  Gourlay and Heit, "Pain and
3  Addiction:  Managing Risk Through Comprehensive
4  Care."  Heit and Lipman, "Substance Abuse Issues in
5  the Treatment of Pain, Behavioral Approach to Pain."
6  That's a textbook.
7      Q    And you make those resources available to
8  doctors?
9      A    Well, the references are available to them
10  and they're cited.
11     Q    You pointed to the first one, the Gourlay
12  and Heit study, "Pain and Addiction:  Managing Risk
13  Through Comprehensive Care."  Is that right?
14     A    Yes.
15     Q    That was a study published in 2008; is
16  that right?
17     A    Yes.
18     Q    Who paid for that study?
19     A    I don't know.
20     Q    Did J&J help pay for it?
21     A    I don't think so, but I can't say for
22  certain.
23     Q    Did they help write it?
24     A    No.
25     Q    Did you review it before it was published?

Page 143

1      A    No.
2      Q    Did any other pharmaceutical company?
3      A    I can't speak for anyone else.
4      Q    What does it say about how to tell the
5  difference between pseudoaddiction and addiction?
6      A    I'd have to go back to the paper.
7      Q    Do you have it?
8          THE WITNESS:  Do we have this reference,
9  the Gourlay 20 reference?  We should.  It's listed
10  in here.
11         MR. LIFLAND:  Tab 20.
12         THE WITNESS:  It's in here.  I'm sorry.
13     A    So on Page 25, Tab 20, "Abhorrent
14  behavior may also be a function of inadequate pain
15  management."
16         Then he goes on to, "Pseudoaddiction is a
17  term used to describe a pattern of maladaptive
18  behavior that is driven by inadequate treatment of
19  pain.  When pain is treated appropriately,
20  inappropriate behavior ceases."
21         And in this article he doesn't list out
22  the specific behaviors.
23     Q    (BY MR. PATE)  So that article doesn't
24  provide any insight for how a doctor can tell the
25  difference between pseudoaddiction and addiction,

Page 144

1  does it?
2      A    Not in this article, no.
3      Q    That article was written by Drs. Gourlay
4  and Heit, correct?
5      A    Yes.
6      Q    Drs. Gourlay and Heit are listed on the
7  Prescribe Responsibly page as expert authors who
8  received compensation from Janssen, aren't they?
9      A    I'm sorry.  Where are you?
10     Q    Page 63 on Prescribe Responsibly.
11     A    As the authors of this section, yes.
12     Q    Those are the same authors of the paper
13  you're pointing to, right?
14     A    Yes.
15     Q    Those are the same authors that J&J paid
16  to write this website, right?
17         MR. LIFLAND:  Object to the form of the
18  question.
19     A    They received compensation for their
20  contributions to Prescribe Responsibly, yes.
21     Q    (BY MR. PATE)  Janssen promotes the use
22  of its drugs to primary care physicians, doesn't it?
23     A    To a subsection of primary care
24  physicians, yes.
25     Q    And historically before Janssen sold all

Page 145

1  its opioids, Janssen promoted opioids to primary
2  care physicians, correct?
3      A    To a group of primary care physician, yes.
4      Q    And Janssen did that in the state of
5  Oklahoma, didn't they?
6      A    I'm assuming we did it nationally,
7  including the state of Oklahoma.
8      Q    You're not aware whether or not Janssen
9  promoted their opioids to doctors in Oklahoma?
10     A    I was not involved with where we were
11  sending our sales representatives, but I am assuming
12  that it was nationally, and that would include every
13  state.
14     Q    You don't know of any reason why Janssen
15  would send drug sales reps everywhere except
16  Oklahoma, do you?
17     A    I'm not aware, that's correct.
18     Q    So Janssen sales reps would have promoted
19  to doctors, targeted and detailed Janssen opioids to
20  doctors in Oklahoma, right?
21     A    Yes.
22     Q    Those same sales reps were paid based on
23  the total number of prescriptions that their doctors
24  wrote, weren't they?
25         MR. LIFLAND:  Object to the form of the

Page 146

1   question. Also, beyond the scope of this witness'
2   topics.
3              You can answer it if you know personally.
4        A    And the answer is I don't know personally
5   how their compensation was.
6        Q    (BY MR. PATE)  You're not aware that your
7   sales force worked on an incentive compensation
8   plan?
9              MR. LIFLAND:  Same objections.
10       A    Same answer.  I don't know what their
11  compensation was based on.
12       Q    (BY MR. PATE)  Regardless of that, when
13  J&J promoted their products to primary care doctors
14  in Oklahoma, the goal is for those doctors to
15  consider prescribing your drugs for patients in
16  chronic pain, right?
17             MR. LIFLAND:  Object to the form of the
18  question.
19       A    The goal is for physicians to treat their
20  patients with pain adequately.  If the physician
21  made determinations that the appropriate way to
22  treat the pain was with an opioid, particularly in a
23  patient with chronic pain that otherwise met the
24  definitions that fall within the indications, then
25  one potential drug that might be considered was a

Page 147

1   Janssen product, and we would provide the
2   information about appropriate selection of patients,
3   appropriate monitoring, appropriate dosing of those
4   patients, appropriate monitoring of those patients
5   and appropriate education for those patients.
6        Q    (BY MR. PATE)  A doctor's determination or
7   that doctor's determination would be influenced by
8   their education, right?
9              MR. LIFLAND:  Object to the form of the
10  question.
11       A    I would hope that they're educated on how
12  to assess a patient.
13       Q    (BY MR. PATE)  And that they rely on that
14  education in order to make those determinations,
15  right?
16       A    They rely on their education, correct.
17       Q    And Janssen believes part of its
18  responsibility is to educate doctors like that about
19  your products, don't you?
20       A    Within the confines of the package insert
21  and what we could use, what we could educate on,
22  yes.
23       Q    And you provided what you call education
24  to primary care doctors for that reason, correct?
25       A    Yes.

Page 148

1        Q    And I think we agreed earlier, but
2   addiction is a difficult thing to diagnose, isn't
3   it?
4        A    Addiction can be a very complex diagnosis.
5        Q    What did you do to determine how well
6   those primary care physicians understood addiction
7   to opioids?
8              MR. LIFLAND:  Object to the form of the
9   question.
10       A    We didn't test them.  So I can't answer
11  your question.  We provided the education.
12             Ultimately when the REMS program was put
13  in place, there were -- it was the ability to go
14  online and take a test with the REMS program.  That
15  wasn't scored by us.  So we didn't do any
16  assessmentment other than providing the education.
17       Q    (BY MR. PATE)  What did you do to
18  determine how well Oklahoma doctors understood the
19  difference between addiction and so-called
20  pseudoaddiction?
21             MR. LIFLAND:  Object to the form of the
22  question.
23       A    We didn't test physicians.
24       Q    (BY MR. PATE)  So is the answer nothing,
25  you didn't do anything to determine that?

Page 149

1              MR. LIFLAND:  Object to the form of the
2   question.
3        A    Not to my knowledge.
4        Q    (BY MR. PATE)  Did you do anything to
5   determine what doctors in Oklahoma were taught in
6   medical school about pseudoaddiction?
7        A    Not to my knowledge.
8        Q    Or in CMEs in the state about
9   pseudoaddiction?
10       A    Again, I don't know what CMEs were offered
11  in the state.
12       Q    Did Janssen provide CMEs with its
13  information about pseudoaddiction?
14       A    I don't know.
15       Q    What did you -- what did Janssen do to
16  determine what classes were offered at any medical
17  school in Oklahoma to teach the diagnosis of
18  addiction for chronic pain patients taking opioids?
19             MR. LIFLAND:  Object to the form of the
20  question.
21       A    To the best of my knowledge, that's not
22  something that a pharmaceutical company would get
23  involved with.  That's the state or the medical
24  school that would determine its curriculum.
25       Q    (BY MR. PATE)  But Janssen states that

Page 150

1   it's its responsibility to educate doctors, correct?
2       A    To educate them about our compounds within
3   the confines of what we can speak about relative to
4   Duragesic and our other opioids and, in a broad
5   sense, to provide education around pain management.
6       Q    What funding has Janssen provided for
7   addiction research in Oklahoma?
8           MR. LIFLAND:  Object to the form of the
9   question.
10      A    I don't know the answer to that.
11      Q    (BY MR. PATE)  What funding has Janssen
12  provided for pseudoaddiction research in Oklahoma?
13          MR. LIFLAND:  Same objection.
14      A    I don't know the answer.
15      Q    (BY MR. PATE)  Has it provided any?
16      A    I don't know.
17      Q    You agree that the risk of -- the risks
18  associated to a patient with addiction, if a patient
19  becomes addicted to opioids, that those risks are
20  high, right, or severe?
21          MR. LIFLAND:  Object to the form of the
22  question.
23      A    Or potentially.  I would hope that if
24  the patient who's under the care of a physician who
25  was providing the opioids -- many patients, many

Page 151

1   individuals who become addicted are not under the
2   care of a physician.  So let's take that out of the
3   equation for a moment.
4           But a patient who is being adequately
5   managed by his or her physician, the physician -- if
6   the physician picks up signs of potential addictive
7   behaviors, the physician can address those behaviors
8   before they progress, but it can be severe.
9       Q    (BY MR. PATE)  It can be severe.  We
10  talked earlier a patient who becomes an addict can
11  die, right?
12      A    Yes.
13      Q    Or they can start prostituting other
14  people to get money to fuel their habit, right?
15      A    Yes.  We spoke about the type of behaviors
16  that an addict can exhibit.
17      Q    Right.  If someone becomes an addict, they
18  may steal drugs from other people, right?
19      A    Yes.
20      Q    They may do all sorts of aberrant
21  behaviors, right?
22      A    Yes.
23      Q    And so if a physician is wrong and
24  diagnoses someone with pseudoaddiction and gives
25  them more opioids, you've increased the risk that

Page 152

1   that person could become an addict, haven't you?
2       A    I wouldn't characterize it that way.  I
3   would say in the course of making the differential
4   diagnosis the physician is assessing what's the
5   proper course of therapy.  There are potential
6   risks to any course of therapy that he or she might
7   undertake.
8       Q    The risks if you're wrong about the
9   difference between pseudoaddiction and addiction are
10  severe, aren't they?
11      A    Potentially.  But, again, if you're
12  monitoring the -- so if your decision is, in your
13  differential, that the behaviors the patient may be
14  exhibiting, I've taken an adequate history, and I
15  believe that there's reason to believe that the
16  level of pain has increased, and it's my decision
17  that the way to appropriately treat this patient is
18  with a change in their dose of opioids, if they're
19  on opioids, it behooves me to follow this patient
20  carefully and determine whether the behaviors that
21  the patient was exhibiting, in fact, are now
22  meliorated with a change in my pain management.
23          And if not, then to reconsider whether the
24  diagnosis was pseudoaddiction or whether I may be
25  dealing with something else.

Page 153

1       Q    Doctors make diagnoses, right?
2       A    Yes.
3       Q    The diagnoses we're talking about are
4   whether a patient is pseudoaddicted or addicted,
5   right?
6       A    We've spoken that pseudoaddiction is a
7   diagnosis that's made retrospectively.
8           Prospectively, a physician is faced with
9   a patient who's exhibiting behaviors that may be
10  indicative of inadequate pain management or
11  addictive behaviors.  Based upon careful assessment
12  of the patient's history, history and physical,
13  other factors, the physician is going to have to
14  make a decision how to manage that patient.
15          In the differential diagnosis, if the
16  physician considers that the behaviors may be
17  related to inadequate pain management, I would argue
18  that the diagnosis at the time is inadequate pain
19  management.
20      Q    One treatment promoted by Janssen for
21  inadequate pain treatment is to give them more
22  opioids, right?
23      A    No.  I disagree that one -- that we
24  promote giving them more opioids.  We promote
25  assessing the patient if the patient is getting

Page 154

1  inadequate pain relief.

2      Q    And if the patient is getting inadequate
3  pain relief, you would give them more pain drugs,
4  wouldn't you?

5      A    That's absolutely not what I said.  You
6  have to assess -- part of pain management is
7  assessing why there is a change in the patient's
8  need for pain management.

9          We spoke previously about it may be due
10 to changes in the underlying disease or changes in
11 their level of activity.  It may be the way to treat
12 the patient's pain is with non-pharmacologic
13 intervention or treating an underlying malignancy
14 differently.  It's not necessarily increasing an
15 opioid.

16     Q    Is it your testimony that Janssen did not
17 promote the treatment of pseudoaddiction by giving a
18 patient more opioids?

19     A    To the best of my knowledge, we educated
20 on the concept of pseudoaddiction as a diagnosis
21 that can only be made retrospectively and needs to
22 be considered when a patient is presenting with
23 behaviors that may be suggestive of addictive
24 behaviors but may also be due to inadequate pain
25 management.

Page 155

1          I'm not aware that in any instance would
2  we say the answer to inadequate pain management is
3  increase the dose of opioids.

4      Q    You would not agree with that suggested
5  line of treatment, would you?

6      A    The patient has to be adequately evaluated
7  by the physician as to why the patient is exhibiting
8  these behaviors, and part of that evaluation may be
9  that the patient is having more pain that is
10 inadequately treated.  It's the differential.

11     Q    Would you or would you not recommend that
12 a patient that presents with pseudoaddictive
13 symptoms receive a higher dose of an opioid?

14     A    Let's unpack that statement.

15     Q    It's a simple question.

16     A    It is not a simple question.  I don't see
17 it as a simple question.  I'm sorry.  Because you
18 said with symptoms of pseudoaddiction -- the
19 symptoms the patient is presenting with are symptoms
20 of behaviors that might be drug-seeking behaviors.
21 You have to make a determination why the patient is
22 exhibiting these behaviors.  One differential for
23 that is the patient is getting inadequate pain
24 relief.

25         The answer to maybe the patient -- okay.

Page 156

1      I've made a diagnosis.  The patient is getting
2  inadequate pain relief.  The answer to that isn't
3  necessarily give them more opioids.  The answer to
4  that is let me understand how I best manage this
5  patient's pain, and there are a variety of ways to
6  do that, not all of which are just increase the dose
7  of whatever they're on.

8      Q    Did Janssen ever promote that that was the
9  right treatment to increase the dose of the opioids
10 that they were on to deal with those symptoms?

11         MR. LIFLAND:  Object to the form of the
12 question.

13     A    I would say not to my knowledge did we
14 ever say that that's the only way to deal with
15 inadequate pain management.

16     Q    (BY MR. PATE)  Did you say it was a way to
17 deal with it?

18     A    It's one of the ways the physician has to
19 assess what's the proper response to the inadequate
20 pain management.

21     Q    I'm not talking about assessment.  I'm
22 talking about treatment.

23     A    I'm talking about treatment as well.  Once
24 you've made the assessment that these behaviors are
25 due to inadequate pain management, you have to make

Page 157

1  the assessment of what's the best way to manage the
2  patient's pain.  Your assessment of what's the best
3  way to manage the pain may be that it's appropriate
4  to increase the dose.

5      Q    Okay.  If that is the case, all right?

6      A    Okay.

7      Q    The physician decides it's appropriate to
8  increase the dose of the opioids.

9      A    Okay.

10     Q    What happens if he's wrong?

11     A    Once --

12     Q    He has just increased the dose of an
13 opioid on a patient who was not pseudoaddicted,
14 who's actually addicted, right?

15     A    No.  We didn't say that.  So now you're
16 giving me a case that you're stating, all right, we
17 have a patient here who -- since the diagnosis can
18 only be made retrospectively, we find that those
19 behaviors continue and, therefore, the diagnosis was
20 not pseudoaddiction.

21         So I'm following that patient.  When I
22 increase the dose, if I choose to increase the dose,
23 as part of my management of that patient, I have an
24 understanding with the patient that I'm going to see
25 you and I'm going to evaluate whether this change in

Page 158

1  medication, just as I would do with any other change
2  in therapy, I need to evaluate whether that change
3  in therapy got me to my goal.
4          It's no different in pain management.  I
5  made a change in your therapy.  Now I need to
6  evaluate whether that change in therapy got me to my
7  goal.  Did we relieve your pain?  And by relieving
8  your pain, did we address the behaviors?  That's how
9  the physician should be treating the patients.
10         Q    And if the physician gets it wrong because
11  they think the patient was a pseudoaddict, not a
12  real addict, and they upped his opioid dosage, are
13  you with me so far?
14         A    I'm with you.  Thank you.
15         Q    Okay.  That could cause things like
16  increased risk of respiratory depression, couldn't
17  it, higher dose of an opioid?
18         A    It could, yes.
19         Q    It could --
20         A    It could cause a number of adverse events,
21  one of which is respiratory depression, yes.
22         Q    And a number of other adverse events,
23  right?
24         A    Yes.
25         Q    Some of the risks that we read about in

Page 159

1  this book, increased risk of taking on some of these
2  behaviors of an addict, right?
3          A    You're conflating adverse events with the
4  drug with the behaviors.  So if the physician is
5  increasing the -- we've agreed that in this instance
6  that we're talking about, the physician has
7  contemplated that this may be due to inadequate pain
8  relief, is increasing the dose of opioid, agrees
9  with the patient that follow-up to determine whether
10  we've addressed the issue is proper, we've set up a
11  time, we're going to see you back here.
12         If I've made a determination, if that
13  physician has made a determination that, nope,
14  those behaviors haven't changed, those behaviors
15  are getting worse, then the physician is going to
16  recognize that this wasn't a case of
17  pseudoaddiction.  This may be a case of the patient
18  becoming addicted to the drug.  I need to follow a
19  different course of therapy.
20         Q    In between those two points in time,
21  though, the doctor was giving him more opioids,
22  right, this patient in this example?
23         A    In this example, yes.
24         Q    And that increases the risks that come
25  with higher opioid dosages to that particular

Page 160

1  patient, right?
2          A    Potentially, yes.
3          Q    And if that person is actually an addict,
4  it could lead to more and more severe addictive
5  behaviors that addicts exhibit, can't it?
6          A    It could lead to -- first of all, I would
7  argue that any time you change any therapy, not
8  just opioids, any therapy, especially if you're
9  increasing the dose of anything you're giving the
10  patient, you increase the risk of adverse events
11  associated with that medication.  It's no different
12  from opioids.
13         In terms of --
14         Q    It is different for opioids?  Because the
15  risk of opioids are deadly and severe and can cause
16  somebody to prostitute other people to obtain drugs.
17  All drugs don't do that, do they?
18         A    No, but there are lots of drugs that have
19  very severe adverse events.  So let's be careful
20  because any time I increase the dose of a drug, I'm
21  increasing the risk that there are adverse events
22  associated with that.
23         I go back to what I said before.  I need
24  to be in a position, I need to be in a position
25  where the patient understands why I'm choosing to

Page 161

1  increase the dose and what my follow-up is going to
2  be.
3          It may be that my instructions to the
4  patient is I'm not comfortable with the behaviors
5  that you're exhibiting.  I want to see you back here
6  in three days.  I want to see you back here in a
7  week.  I want you to call me tomorrow and let me
8  know if you have a change in your pain score.
9          Yes, there are risks associated with it,
10  but to the extent that you follow that patient
11  carefully you can minimize, I didn't say totally do
12  away with, but you can minimize those risks.
13         Q    Can you name me one drug, one other drug,
14  other than an opioid, that carries with it the
15  attendant risks that it could cause someone to
16  engage in human trafficking?
17         A    Barbiturates.
18         Q    Anything else?
19         A    Offhand, no.
20         Q    Janssen has never done a study to
21  determine what -- how often doctors misdiagnose
22  pseudoaddiction, have you?
23         A    No.
24         Q    You're not aware of any studies to try
25  to determine how often doctors misdiagnose

Page 162

1  pseudoaddiction, are you?
2       A    I'm not aware of studies on the success of
3  any physician making any diagnosis to begin with.
4  So the answer to your question is no.
5       Q    About pseudoaddiction?
6       A    About pseudoaddiction, too.
7       Q    For patients who present with
8  pseudoaddiction symptoms or behaviors, what
9  percentage of those patients are actually addicted
10 or are pseudoaddicted?
11      A    Again, I take you back.  They don't
12 present with pseudoaddicted behaviors.  They present
13 with behaviors that are drug seeking.
14           The diagnosis of pseudoaddiction is a
15 retrospective diagnosis.  It has to be taken into
16 account when you are assessing the behaviors the
17 patient is presenting with.
18           Now continue with your question.
19      Q    Let's talk about that for a minute.  You
20 keep saying that pseudoaddiction is a retrospective
21 diagnosis, but a patient comes into a doctor's
22 office, right?
23      A    Yes.
24      Q    They tell the doctor they're experiencing
25 certain symptoms, right?

Page 163

1       A    Well, my assumption is that they're coming
2  in and they're starting out by saying, "I have
3  pain."
4       Q    Right.  They're telling the doctor they're
5  having certain symptoms, right?
6       A    Correct.
7       Q    One of those in our scenario is probably
8  pain, right?
9       A    Correct.
10      Q    Doctor, I'm experiencing a lot of chronic
11 pain, I can't get rid of it, right?
12      A    Okay.
13      Q    That patient also is sitting there in the
14 doctor's office watching the clock a whole lot.  The
15 doctor might notice that, right?
16      A    Okay.  But I would take a step back and so
17 in the discussion the physician is having with the
18 patient, the physician is asking about, "So what are
19 you doing about the pain?"  And the patient may be
20 responding, "Do you know what, I'm taking my pain
21 medication a little bit more frequently.  I'm taking
22 more pain medication during the day.  I upped the
23 dose."
24      Q    Let's use those examples.
25      A    Okay.

Page 164

1       Q    The patient says he's in pain and says,
2  "I'm taking more pain meds than you're giving me."
3       A    Okay.
4       Q    "I'm taking them more frequently than you
5  told me to."
6       A    Okay.
7       Q    "I'm doubling the dosages."  Right?
8       A    Okay.
9       Q    "I'm also stealing, borrowing," whatever
10 word you want to use.
11      A    You can use stealing.  That's fine.
12      Q    "Drugs from my cousin because I'm still in
13 pain."
14      A    Okay.
15      Q    They may present all of those things to
16 the doctor at that time, right?
17      A    Okay.
18      Q    And at that time that doctor has to make
19 a decision and has to decide do I think he's
20 pseudoaddicted and he's just not getting enough pain
21 treatment or may he actually have an addiction
22 problem already?  The doctor needs to make that
23 determination right there.
24      A    Here's where we differ.  I would argue
25 that the doctor isn't saying, "Is this patient

Page 165

1  pseudoaddicted?"  The patient should be asking
2  himself or herself, "Why is this patient exhibiting
3  these behaviors?"
4       Q    You said the patient.  You mean the
5  doctor?
6       A    The doctor is asking, "Why is this patient
7  exhibiting these behaviors?"
8            It may be, "Now, let me take a more
9  comprehensive history of what's happening with your
10 pain.  Did you increase your activity?  Are you
11 going back to the gym?  Let's take a look at the
12 underlying malignancy that you're dealing with.  I
13 may send you for some tests."
14           So I have to address the behaviors that
15 the patient is telling me about.
16      Q    Before that doctor decides to write a
17 script for a higher dose of opioids, he's got to
18 make -- he or she has to make a decision about
19 whether or not they think their patient is an addict
20 or not and simply is not getting the pain relief
21 they need, right?
22      A    They have to make a assessment of why the
23 patient is exhibiting these behaviors.  Are they
24 using the drug to get a high?  So, yes, there's a
25 continuum, and these may be behaviors that are

Page 166

1 indicative of early addiction, correct.
2    Q    They also may be behaviors according to
3 your company and other promotional pieces that
4 you've supported that indicate not real addiction,
5 right?
6         MR. LIFLAND:  Object to the form of the
7 question.
8    Q    (BY MR. PATE)  Fake addiction,
9 pseudoaddiction?
10   A    I'm not clear on your question.  Please
11 repeat it.
12   Q    Sure.  The behaviors we just listed, the
13 pseudoaddiction materials that Janssen provides,
14 provide the doctor with information that those
15 behaviors may not be real addiction, they could be
16 pseudoaddiction, right?
17   A    That the physician should carefully assess
18 the patient to understand why those behaviors are
19 occurring.
20   Q    Because it could be pseudoaddiction.
21   A    Because the patient may be getting
22 inadequate pain relief.
23   Q    Which is the definition of
24 pseudoaddiction, isn't it?
25   A    Which is a diagnosis that's made after you

Page 167

1 adequately treat the patient and those behaviors go
2 away.
3         So the diagnosis that you're trying to
4 think of the day that the patient is presenting is
5 am I -- is this patient exhibiting these behaviors
6 simply because he or she is having more pain.  Let
7 me understand why that might be.  Or is this
8 something other than that, that they may be
9 exhibiting addictive behaviors.
10   Q    What is the scientific support for
11 pseudoaddiction?
12   A    Only that the patient's behaviors resolve
13 with proper treatment.
14   Q    There's no study about it?
15   A    To the best of my knowledge, no.  There's
16 observations about it.
17   Q    You're not aware of any effort to
18 determine how often physicians misdiagnose
19 pseudoaddiction retrospectively or prospectively?
20   A    I'm not aware of any.
21   Q    Janssen hasn't done one?
22   A    No.  I'm not aware of any studies on
23 making the correct diagnosis in almost any -- for
24 clinical trials we have it, but other than that, in
25 general medical practice, I can't say how often the

Page 168

1 correct diagnosis is made or not.  No.  The answer
2 to your question is no.
3         But let me continue, though.  As I said,
4 the physician may be wrong.  We recognize that.
5    Q    Wrong about what?
6    A    About whether the right course of therapy
7 is to increase the dose of opioids should he or she
8 decide that that's the way he or she wants to treat
9 the patient.
10        But the proper way to do that is then to
11 have closer follow-up with the patient to determine
12 whether that took care of the issue.
13        So, yes, there may be misdiagnoses, but
14 the way medicine takes care of misdiagnoses is to
15 change the direction of treatment and then see if
16 that change in the course of direction of treatment
17 achieved the outcome you were looking for.
18   Q    The consequences of misdiagnosing
19 addiction to opioids or failing to diagnose the
20 addiction to opioids can be severe for a patient,
21 can't they?
22   A    They can be which is why if you choose
23 that course, you should be following the patient
24 even more closely.
25        May I put this aside?

Page 169

1    Q    Put what aside?
2    A    Prescribe Responsibly.
3    Q    Sure.
4         (Exhibit 12 marked for identification.)
5    Q    (BY MR. PATE)  I've handed you a document
6 we've marked as Exhibit 12.  Do you recognize that?
7    A    I can't say that I recognize this specific
8 piece that you've given me, but the concepts of
9 pharmacokinetics and pharmacodynamics and education
10 around it I do.  Again, I don't know whether I've
11 seen this specific piece before.
12   Q    It states that it was supported by an
13 educational grant from J&J, correct?
14   A    By PriCara, yes.
15   Q    And administered by J&J, correct?
16        MR. LIFLAND:  Object to the form of the
17 question.
18   A    Yes.
19   Q    (BY MR. PATE)  While we're talking about
20 pseudoaddiction, if you'll turn to the page that
21 ends in 689.
22   A    So I also note that on the top there's a
23 designation of credit which tells me that this was
24 a continuing medical education program.  Okay.  We
25 would have very little input to it.

Page 170

1           I'm sorry.  Go on.
2      Q    The page ending in 689.
3      A    Okay.
4      Q    The left side of the page there's a
5 paragraph that starts, "The topics of opioid
6 analgesic misuse and addiction are discussed
7 frequently."
8           Do you see that?
9      A    Yes, I do.
10     Q    If you move down a few lines you'll see,
11 this is for -- this is a document for pharmacists,
12 right?
13     A    Yeah.  I can just make out that the
14 continuing education is for pharmacy education.
15     Q    So going back to that section.  It says,
16 "It is important that community pharmacists..."
17 Sorry.  The middle of the paragraph.
18     A    I got it.
19     Q    Are you with me?
20     A    Yes, I am.
21     Q    "It is important that community
22 pharmacists, in addition to prescribers, be familiar
23 with the differences between addiction, physical
24 dependence, tolerance, pseudoaddiction and abuse as
25 outlined in Table 8, Page 8.  Pseudoaddiction

Page 171

1 typically results from undertreatment of pain.  The
2 behaviors associated with pseudoaddiction shown in
3 Table 9, Page 8, are unfortunately frequently
4 misidentified as drug-seeking behavior, whereas
5 undertreated pain should be the top-of-the-mind
6 cause."
7           Did I read that correctly?
8      A    Yes.
9      Q    What is the scientific support that
10 undertreated pain should be the top-of-the-mind
11 cause when patients exhibit the drug-seeking
12 behavior that's described here?
13     A    I'm not sure what the question is.  So
14 this is to pharmacists, and there is contention that
15 they should be aware of this terminology.
16           Please rephrase the question.
17     Q    What is the scientific support for the
18 statement that patients exhibiting the drug-seeking
19 behaviors described here, that the top-of-the-mind
20 cause should be considered undertreated pain.
21           Let me start over again.
22           What is the scientific support for the
23 statement that undertreated pain should be the
24 top-of-the-mind cause for patients exhibiting the
25 behaviors, the drug-seeking behaviors described

Page 172

1 here?
2      A    I don't know.  We didn't write this
3 material.  We supported it.  I'm looking at the two
4 references, 56 and 58.  They list two references
5 here.
6      Q    Are you aware of any scientific support
7 for that statement, though?
8      A    Again, I'm not sure what the question is.
9 So a patient who is having inadequate pain relief is
10 going to try to get pain relief.  So what's wrong
11 with trying to get pain relief?
12     Q    I didn't say there was anything wrong with
13 trying to get pain relief, sir.
14     A    I'm sorry.  Then I'm misunderstanding the
15 question.
16     Q    I asked what's the support for the
17 statement that the top-of-the-mind cause where
18 someone exhibiting the behaviors we see on the next
19 page is that their pain is undertreated?
20           Let's look at those behaviors.  It's
21 referring to Table 9 on the next page, right?
22     A    Let me take a step back --
23     Q    Hold on.  Let me ask the question.
24     A    Going back to your previous question.
25 So --

Page 173

1      Q    I ask the --
2      A    I'm not reading it the same way.
3      Q    I ask the questions.  We'll work through
4 it this way.  I'll ask the questions and then you'll
5 answer as best you can.  If you need to explain your
6 answer, you're free to, but I'm going to ask the
7 questions.  Okay?
8      A    Okay.
9      Q    The table on the next page, Table 9 is
10 what it's referring to, right, "Signs of
11 Pseudoaddiction."  Do you see that?
12     A    Yes.
13     Q    The behaviors listed are borrowing drugs
14 from others, correct?
15     A    I can barely make it out.  Keep reading.
16     Q    Obtaining --
17     A    Your vision is better than mine.
18     Q    Obtaining prescription drugs from
19 nonmedical sources, right?
20     A    Okay.
21     Q    Unsanctioned dosage increases, do you see
22 that?
23     A    I do.
24     Q    Running out of medications prematurely,
25 right?

Page 174

1    A    Yes.
2    Q    Requesting higher dosages, right?
3    A    Yes.
4    Q    Requesting specific drugs, right?
5    A    Yes.
6    Q    Hoarding drugs when symptoms are not
7  severe, right?
8    A    Yes.
9    Q    Prescription forgery (may indicate other
10 problems), right?
11   A    Yes.
12   Q    Recurrent prescription loss may indicate
13 other problems, right?
14   A    Yes.
15   Q    Obtaining drugs from multiple medical
16 sources may indicate other problems, right?
17   A    Yes.
18   Q    And stealing drugs may indicate other
19 problems.  Do you see all those?
20   A    Yes.
21   Q    Those are all listed in this table under
22 the heading, "Signs of Pseudoaddiction."  Correct?
23   A    Yes.
24   Q    My question is what scientific support is
25 there that a patient exhibiting these behaviors that

Page 175

1  the top-of-the-mind cause from that should be
2  undertreated pain?
3    A    Here's where I -- I don't know that I'm
4  reading it the same way because the way I'm reading
5  it, especially because this is to a pharmacist who
6  can't prescribe anyway, is that these may be
7  examples of behaviors, but the focus should be on
8  what do I need to do to treat the pain adequately?
9         I don't know what they're citing over
10 here.  We didn't write this piece.
11        I would venture that these are written by
12 experts in pain management.  They see the patients
13 all the time.  They have an opportunity to evaluate
14 hundreds of patients, and this is what they see.
15        Perhaps they have a closer understanding
16 that they have a cohort of patients who at one point
17 or another exhibited these behaviors, and in their
18 assessment of the patient when they made an
19 assessment that the patient's pain was inadequately
20 treated, the behaviors went away.  On the basis of
21 that experience they're writing it.
22        But I can't answer for the writers.
23   Q    Janssen put their name on this document,
24 right?
25   A    We supported it.  It was financial

Page 176

1  support.
2    Q    And you put your name on it?
3    A    It was independent of us in terms of
4  writing it.
5    Q    You put your name on the document, right?
6    A    Yes.  We supported it.
7         MR. LIFLAND:  Object to the form of the
8  question.
9    Q    (BY MR. PATE)  Are you aware of any
10 study that shows that a patient who exhibits these
11 behaviors in Table 9 that the top-of-the-mind cause
12 of those should be undertreated pain or is
13 undertreated pain?
14   A    Let's first take a step back.  It's not
15 "is" undertreated pain, it's "should be."
16        But, again, I don't know of a study.
17 That's the answer to your question.
18   Q    Thank you.
19   A    These are individuals who are writing on
20 the basis of their experience as well.
21        If you go back even to the Haddox report,
22 there was a case record.  There was a case
23 description of these things.  So there are certainly
24 case descriptions that describe the type of
25 drug-seeking behaviors that might be considered to

Page 177

1  be behaviors of addiction.  Whereas, when the
2  patient was treated for their underlying pain, those
3  behaviors went away.
4         Not everything needs a clinical study.
5  Sometimes a clinical observation can make a case for
6  why you might treat a patient one way or another.
7    Q    Are you aware of any clinical observations
8  that show that patients presenting with these
9  behaviors, that the top-of-the-mind cause of that
10 should be undertreated pain?
11   A    Again, the term "top of the mind," no, I'm
12 not, but that consideration should be whether the
13 patient is getting adequate pain relief.
14   Q    Are you aware of any study that shows that
15 those behaviors are frequently misidentified as
16 drug-seeking behavior?
17   A    Again, I'm not understanding the question.
18 So these are drug-seeking behaviors.  When you said
19 that they're misidentified as drug-seeking
20 behaviors, they are drug-seeking behaviors.
21   Q    Well, I'm just --
22   A    The question is what's the differential
23 diagnosis?  Why is this patient exhibiting
24 drug-seeking behaviors?
25   Q    That may be your question, but that's not

Page 178

1  what the document says.  I'm just reading from the
2  document.  It's got your company's name on it, and
3  it says that these behaviors are "unfortunately
4  frequently misidentified as drug-seeking behavior."
5       MR. LIFLAND:  Object to the form.
6    Q   (BY MR. PATE)  Do you see that?
7       MR. LIFLAND:  Object to the form.
8    A    Frequently misidentified as drug-seeking
9  behavior, yes.
10   Q   (BY MR. PATE)  My question is are you
11 aware of any scientific support for that statement?
12   A    No, and we've already indicated that in
13 other cases where they are less likely or more
14 likely.  I'm not aware of scientific support that
15 look at the frequency with which a particular
16 drug-seeking behavior may be more or less predictive
17 of other than perhaps the clinical experience of the
18 physicians who wrote the piece, but I'm not aware of
19 a study.
20   Q    Are you aware of anything that indicates
21 that a patient who comes in and the doctor learns
22 that they've been hoarding drugs, forging
23 prescriptions and obtaining drugs from multiple
24 sources, are you aware of any study that indicates
25 that person is more often than not going to be a

Page 179

1  pseudoaddict than an actual addict?
2    A    It's a consideration of why a patient is
3  exhibiting the behavior.  The answer to your
4  question am I aware of a study that looks at the
5  predictive value of any of these behaviors, no, I'm
6  not.
7    Q    Are you aware of any study that looks at
8  the frequency of pseudoaddiction versus actual
9  addiction to opioids?
10   A    No.  Though, I would again argue that that
11 shouldn't impact on an individual physician in his
12 or her determination for an individual patient
13 what's the right course of therapy for that patient.
14   Q    Why isn't Janssen doing any studies to
15 determine how often people are misdiagnosed with
16 pseudoaddiction versus addiction?
17      MR. LIFLAND:  Object to the form of the
18 question.
19   A    These are clinical determinations, and
20 these are studies or examinations that are best done
21 by the physicians who are treating the patients.
22 This isn't related to any one specific drug either.
23   Q   (BY MR. PATE)  Janssen does studies,
24 right?
25   A    Yes.

Page 180

1    Q   Janssen does studies about its own drugs,
2  right?
3    A   Yes.
4    Q   Or other drugs on the market, right?
5    A   In comparison to our drugs, yes.
6    Q   You have a responsibility to educate
7  doctors you say, right?
8    A   Yes.
9    Q   About your drugs, right?
10   A   Yes.
11   Q   Addiction is a risk of opioids, right?
12   A   Yes.  We state that.
13   Q   You sold opioids for a number of years,
14 right?
15   A   Yes.
16   Q   Why didn't you try to determine what the
17 rate of addiction versus pseudoaddiction was while
18 you were selling opioids?
19   A   I can't answer --
20      MR. LIFLAND:  Object to the form of the
21 question.
22   A   I can't answer why we didn't do a study.
23 We taught that when you're assessing a patient, one
24 of the considerations is what is leading to those
25 behaviors.  An assessment of that patient is not a

Page 181

1  statistic.
2       An assessment of that patient is why is
3  this patient exhibiting these behaviors?  If a take
4  a careful history and I exam the patient carefully
5  and I make a determination that this may be due to
6  inadequate pain relief, then I follow a different
7  course of treatment than if I don't make that
8  determination.  Statistics don't treat patients.
9    Q   (BY MR. PATE)  I've asked you before
10 whether or not Janssen had any studies about the
11 addiction rate of its opioids.  Do you remember
12 that?
13   A   Yes.
14   Q   You said you all did some clinical trials
15 that provided some information to you about that,
16 right?
17   A   And we did a summary report of iatrogenic
18 addiction with Duragesic.
19   Q   Janssen never did a study or looked at for
20 its products what the rate of pseudoaddiction was,
21 did you?
22   A   I'm sorry, I'm seeing this in two
23 different terms.  There isn't a rate of
24 pseudoaddiction to a particular drug.
25   Q   Because it's made up.

Page 182

1    A    I disagree with --
2         MR. LIFLAND:  Object to the form of the
3    question.
4    A    I disagree with that.  So if I'm allowed
5    to, if you have pain and you're on a pain medication
6    and you're worried that you're going to be going
7    someplace and you won't have access to it, so you
8    take extra with you, aren't you concerned about
9    treating your pain?  So you start to hoard the
10   medication, and then it's up to the physician to
11   determine why that's happening.
12        I don't understand why the concept is a
13   concept that's being totally dismissed.
14        Patients who are in pain look for adequate
15   treatment of their pain.  There may be other reasons
16   that they're looking for -- that they're exhibiting
17   certain behaviors, but I think it's absolutely one
18   possibility that a patient who is in pain,
19   especially if they're experiencing more pain than
20   they had before, would be looking for pain relief.
21   Q    (BY MR. PATE)  Let's try to make this --
22   break this down a little bit, make it a little bit
23   more simple.
24        What study did Janssen ever do to
25   determine that someone who borrows drugs from

Page 183

1    another person, how often that person is
2    pseudoaddicted or is actually addicted?
3    A    First of all, that's a reasonable way of
4    addressing the question.
5    Q    Thank you.
6    A    I don't know.  I'm not aware that we did
7    any.
8    Q    Are you aware of any studies that anyone
9    else has done about that?
10   A    No.
11   Q    What studies has Janssen done to determine
12   for a patient who starts obtaining prescription
13   drugs from a nonmedical source, what the rate is of
14   that person being a pseudoaddict versus an actual
15   addict?
16   A    Janssen hasn't done any studies.  It's
17   presumably something that a pain management group
18   would do.  We don't have access to those patients.
19   Q    And you're not aware of any information
20   about that?
21   A    I'm not.
22   Q    What studies has Janssen done about a
23   patient who comes in and presents with unsanctioned
24   dosage increases, meaning they're taking more drugs
25   than the doctor has said they should, right?

Page 184

1    A    Yes.
2    Q    For those patients, what has Janssen done
3    to determine the rate at which those people are
4    either pseudoaddicted or actually addicted?
5    A    I'm not aware of any.
6    Q    Are you aware of any studies that anyone
7    else has done about that?
8    A    No.
9    Q    What studies has Janssen done for a
10   patient who comes in and is running out of their
11   opioid medications prematurely to determine at what
12   rate those people are pseudoaddicts versus actual
13   addicts?
14   A    Not aware of any.
15   Q    By Janssen or anyone else?
16   A    Correct.
17   Q    What study has Janssen done to determine
18   when somebody comes in, a patient, and they're
19   requesting higher -- specifically requesting higher
20   dosages of their medication, that that person is a
21   pseudoaddict versus an actual addict?
22   A    Not aware of any.
23   Q    By Janssen or anyone else?
24   A    Correct.
25   Q    What study has Janssen done to determine

Page 185

1    when a patient comes in requesting a specific drug,
2    an opioid by name, that that person is either
3    pseudoaddicted or actually addicted?
4    A    I'm not aware of any.
5    Q    By Janssen or anyone else?
6    A    Correct.
7    Q    What study has Janssen done to determine
8    when a patient comes in and tells their doctor that
9    they're hoarding their opioid drugs when their
10   symptoms are not as severe, that that person is a
11   pseudoaddict versus an actual addict?
12   A    I'm not aware of any.
13   Q    By Janssen or anyone else?
14   A    Correct.
15   Q    What study has Janssen done to determine
16   when a patient comes in and tells a doctor that
17   they've been forging prescriptions or the doctor
18   finds out they're forging prescriptions; are you
19   with me?
20   A    I am.
21   Q    What studies has Janssen done to
22   determine that that patient is more likely to be a
23   pseudoaddict versus an actual addict?
24   A    None.
25   Q    You're not aware of anybody -- by anyone

                                    Page 186

1  else, right?

2      A    Correct.

3      Q    What studies has Janssen done to determine

4  that a patient who comes in and they come in a lot

5  and they're always saying they're losing their

6  prescriptions, that happens sometimes, right?

7      A    Yes.

8      Q    Doctors will hear sometimes from the same

9  patient over and over about how they lost their

10 prescription, right?

11     A    Yes.

12     Q    So they needed to be refilled early,

13 right?

14     A    Yes.

15     Q    This table refers to recurrent

16 prescription loss.  Is that what that's referring

17 to?

18     A    Yes.

19     Q    What studies has Janssen done to determine

20 that a patient like that with recurrent prescription

21 loss is more likely to be a pseudoaddict versus an

22 actual addict?

23     A    None that I'm aware of.

24     Q    By Janssen or anyone else?

25     A    Correct.


                                    Page 187

1      Q    What study has Janssen done to determine

2  if a patient who comes in and they're obtaining

3  opioid drugs from multiple doctors, what studies

4  has Janssen done to determine that that patient is

5  more likely to be a pseudoaddict versus an actual

6  addict?

7      A    None that I'm aware of.

8      Q    By Janssen or anyone else?

9      A    Correct.

10     Q    What study has Janssen done to determine

11 that a patient who comes in and admits that they've

12 been stealing opioid drugs from someone else, that

13 that person is a pseudoaddict versus an actual

14 addict?

15     A    None I'm aware of.

16     Q    And none by anybody else?

17     A    Not that I'm aware of.  May I make a

18 comment, though?

19     Q    Is it in response to one of my questions?

20     A    Yes.

21     Q    Go ahead.

22     A    When you speak of a study, you're talking

23 about getting at a rate of.  It's true.  A study

24 would help you determine a rate of pseudoaddiction

25 versus addiction if you followed the patient


                                    Page 188

1  prospectively but in no way negates the fact that

2  case record -- reports of patients who have

3  exhibited these behaviors who were subsequently

4  adequately assessed, where the physician made a

5  determination that the behavior I'm seeing is

6  related to inadequate pain management, and then I go

7  ahead and treat the patient's pain adequately and

8  these behaviors dissipate, you only need one case

9  report to make a determination that that's what

10 happened in that case.

11          The studies that you're speaking about

12 are all valuable, but they get at a rate of

13 pseudoaddiction versus addiction, not a

14 determination of what I need to do in a particular

15 patient, which is what a lot of the educational

16 materials address.

17     Q    The studies I'm talking about don't exist?

18     A    Correct.

19     Q    And Janssen is not providing any money so

20 that they be done?

21     A    Not to my knowledge.

22     Q    Now, the report you referred to, are you

23 aware of any article or anything that looks back at

24 case records to determine this based on those types

25 of reports?


                                    Page 189

1      A    I'm not.

2          MR. PATE:  Let's take a break.

3          VIDEOGRAPHER:  Off the videotaped record.

4  The time is 3:35 p.m.

5          (Break taken from 3:35 p.m. to 3:55 p.m.)

6          VIDEOGRAPHER:  Back on the record at 3:55

7  p.m.

8      Q    (BY MR. PATE)  Dr. Moskovitz, are you

9  ready to continue?

10     A    Yes.

11     Q    You understand you're still under oath?

12     A    I do.

13     Q    I want to mark a couple of things just for

14 the record that you've referenced today so far.

15 You've got the binder in front of you that's labeled

16 "Sources of knowledge regarding abuse, misuse,

17 dependence or addiction."

18     A    Yes.

19          (Exhibit 13 marked for identification.)

20     Q    (BY MR. PATE)  I've marked that as Exhibit

21 13.  Can you identify Exhibit 13, please?

22     A    "Sources of knowledge regarding abuse,

23 misuse, dependence or addiction."

24     Q    Those are all the J&J sources of knowledge

25 that you brought with you today, correct?

Page 190

1    A    Yes.  Yes.
2    Q    And they're all that you're aware of
3  having prepared for this deposition, correct?
4    A    Yes.  This is at a high level.  So I
5  didn't bring the full clinical study reports, but at
6  a high level this is the information I'm aware of,
7  yes.
8    Q    And it lists what the reports are that
9  Janssen is aware of?
10   A    Yes.
11   Q    You're just saying it doesn't provide the
12  actual body of the reports themselves?
13   A    Correct.
14   Q    The other large binder that you've
15  referred to once today we referred to as the
16  Prescribe Responsibly binder.  Do you recall that?
17   A    Yes.
18   Q    Let's mark that as well.
19        (Exhibit 14 marked for identification.)
20   Q    (BY MR. PATE)  That will be Exhibit 14.
21  If you can identify that for me, please.
22   A    Exhibit 14 is prescriberesponsibly.com
23  references.
24   Q    What is that?
25   A    The backup material for the website that

Page 191

1  was created, the Prescribe Responsibly website.
2    Q    How long did that website exist?
3    A    You can still access it today.  I'm not
4  sure when we put it online.  I don't recall that.
5    Q    Does the binder contain all the references
6  that have been used on that website over time?
7    A    Yes, I believe so.
8    Q    Does it contain information about or all
9  information about what's been on that website since
10  it was created?
11   A    I don't know.
12   Q    Has the content of that website changed
13  over time?
14   A    I don't know whether the concept --
15  whether the website has changed over time.  I don't
16  know.
17   Q    In the documents that you -- I guess
18  you've called them the high level documents that you
19  brought with you, there is a page in here about
20  "Selected support for statements and representations
21  regarding pseudoaddiction."
22   A    Yes.
23   Q    Do you see that?
24   A    I do.
25   Q    Let's go ahead and mark that.  This was a

Page 192

1  document that you brought with you for your
2  testimony today, correct?
3    A    Yes.
4        (Exhibit 15 marked for identification.)
5    Q    (BY MR. PATE)  Did you put this document
6  together?
7    A    I knew of some of the references, but I
8  didn't put it together, no.
9    Q    Who put it together?
10   A    Counsel put it together.
11   Q    We marked the document as Exhibit 15; is
12  that right?
13   A    Yes.
14   Q    Is that all of the support your -- that
15  J&J is aware of for statements and representations
16  it's made about pseudoaddiction?
17   A    Yes.
18   Q    You testified previously that J&J hasn't
19  done its own studies about pseudoaddiction, right?
20   A    Yes.
21   Q    You agree that that is a -- at least a
22  term that was created by Dr. David Haddox, correct?
23        MR. LIFLAND:  Object to the form of the
24  question.
25   A    He gave a term to a concept that was

Page 193

1  understood to be the underlying concept, inadequate
2  pain relief in a patient who was exhibiting these
3  behaviors and the term -- they used the term
4  "pseudoaddiction," yes.
5    Q    (BY MR. PATE)  And it came from Dr. David
6  Haddox?
7    A    That's the first time I saw it in the
8  literature.
9    Q    And you saw in the article he at least
10  claims that he's introducing that term, right?
11   A    I'd have to go back to the article itself.
12   Q    Exhibit 11.  The first page above "Case
13  report."
14   A    I see it.  So you're talking specifically
15  the term pseudoaddiction is introduced to describe
16  the syndrome.
17   A    Yes.
18   A    Yes.
19   Q    Dr. Haddox now works for Purdue, correct?
20   A    I think I testified I don't know where he
21  is currently.  I know that he worked for Purdue.  I
22  don't know his current employment.
23   Q    For a number of years you're aware that he
24  was a high ranking Purdue executive, correct?
25   A    Yes.  I'm aware of that.

Page 194

1    Q    Do you know Dr. Haddox?
2    A    I've met him.  So the answer, yeah, I know
3  of him.  Yes.
4    Q    You agree with his thoughts on
5  pseudoaddiction?
6    A    I agree that there is a need to assess
7  behaviors that might be considered to be addictive
8  behaviors, but, in fact, upon closer examination and
9  close follow-up are more related to inadequate pain
10 relief.
11        So that's a concept that I certainly agree
12 with, then it got a name.
13   Q    It got a name from Dr. Haddox, right?
14   A    Yes.
15   Q    And then your company has used that name,
16 right?
17   A    My company and the pain treatment
18 community uses that terminology.
19   Q    So, yes, Janssen uses the term
20 pseudoaddiction, right?
21   A    Yes.
22   Q    You include it in materials you provide to
23 patients and doctors, right?
24   A    Yes.
25   Q    You put it on that website, Prescribe

Page 195

1  Responsibly, right?
2    A    Yes.
3    Q    Purdue also uses that term, correct?
4        MS. NEWSOME:  Object to the form.
5    A    Offhand I don't recall that they've used
6  the term, but I wouldn't disagree with that.
7    Q    (BY MR. PATE)  Their doctor, David Haddox,
8  is the one that came up with it.  Safe to assume
9  that they support pseudoaddiction also, right?
10   A    Well, I --
11       MS. NEWSOME:  Object to the form.
12   A    I don't know if he worked for Purdue at
13 the time he wrote this article.  So, again, I simply
14 don't know whether -- how Purdue uses the term.
15 It's a term that's in general use in pain management
16 and widely used.
17   Q    (BY MR. PATE)  Widely used by
18 pharmaceutical companies?
19   A    Widely used by pain specialists in pain
20 management, as a concept in pain management.
21   Q    Did you say pain specialists and pain
22 management?
23   A    In the universe of pain management -- I
24 mean, you just referred to the pharmacy piece.  So
25 it's similar to tolerance, physical tolerance and

Page 196

1  addiction.  Other terms that are used in pain
2  management, pseudoaddiction has entered the lexicon
3  as an understood concept.
4    Q    And it's a concept that originated with
5  David Haddox, right?
6    A    The term originated with David Haddox --
7    Q    Let's use an example.
8    A    -- and David Weissman.
9    Q    You saw the term and the concept discussed
10 in the Responsible Opioid Prescribing book, correct?
11   A    Yes.
12   Q    And we discussed how it was described and
13 the behaviors listed in that book, correct?
14   A    Yes.
15   Q    And if you look at the inside cover of
16 that book, the first page, it lists the supporters
17 of the book.  Do you see that?
18   A    Yes.
19   Q    It lists a number of supporters, correct?
20   A    Yes.
21   Q    It lists Purdue Pharma, LP, correct?
22   A    Yes.
23   Q    It lists, for example, Cephalon, Inc.,
24 correct?
25   A    Yes.

Page 197

1    Q    Endo Pharmaceuticals, right?
2    A    Yes.
3    Q    The American Academy of Pain Medicine?
4    A    Yes.
5    Q    And the American Pain Foundation, correct?
6    A    Yes.
7    Q    And in this book it discussed -- the
8  parts you read, it discussed the concept of
9  pseudoaddiction, right?
10   A    The part you pointed out, yes.
11   Q    And the behaviors associated with it?
12   A    Yes.
13   Q    It is not a true statement to say that
14 most patients who use opioids for more than a year
15 will not become addicted, is it?
16       MR. LIFLAND:  Object to the form of the
17 question.
18   Q    (BY MR. PATE)  That's an overbroad
19 statement, isn't it?
20   A    Is it not -- please rephrase the question.
21 Go on.
22   Q    It's wrong to say that most patients who
23 use opioids for more than a year will not become
24 addicted, isn't it?
25       MR. LIFLAND:  Object to the form of the

Page 198

1 question.
2    A    Patients who use opioids for more than a
3 year who are under the appropriate care of a
4 physician and understand the risks and benefits and
5 they're monitored carefully by the physician, most
6 patients won't become addicted.
7    Q    (BY MR. PATE)  So you think that's a true
8 statement?
9    A    Given the caveats I just spoke about, yes.
10    Q    But the statement I said is broader than
11 that.  That's what I'm asking you.  Just do you
12 agree that most patients who use opioids for more
13 than a year will not become addicted?  Just that
14 alone.
15    A    I don't know the data for that.
16    Q    You don't know the data supporting such a
17 broad statement, correct?
18    A    Correct.
19    Q    Janssen doesn't have data supporting such
20 a broad statement, correct?
21    A    Other than from our own clinical trials
22 where we treated patients for more than a year and
23 had follow-up data with adverse event reporting.
24    Q    But those clinical studies wouldn't
25 support the broad statement that most patients

Page 199

1 taking any opioid for more than a year will not
2 become addicted, correct?
3    A    Those studies couldn't necessarily be
4 broadened to include all opioids.
5    Q    They could not?
6    A    Nor could -- no, especially because they
7 wouldn't know what the follow-up was for those
8 patients.  We know what the follow-up is for our
9 studies.
10    Q    When you are presenting a study, it's
11 important to present and explain the limitations of
12 that study, right?
13    A    Yes.
14    Q    You have to explain the context in which
15 the study was conducted, right?
16    A    The methodology, the patient population,
17 the interventions and, therefore, the limitations in
18 the data.
19    Q    You should not report the good things out
20 of a study without the bad things, right?
21    A    We're reporting the findings of the study
22 regardless of whether they're good or bad.
23    Q    Right.  You need to report the findings of
24 the study in the context in which that study was
25 done, right?

Page 200

1    A    Yes.
2    Q    So that people can understand what's the
3 significance of this study, right?
4    A    Yes.
5    Q    So that they don't exaggerate or take out
6 of context what a study means, right?
7    A    So that we understand the limitations of
8 the study.
9    Q    And that's important to do when you're
10 presenting research, isn't it?
11    A    To give the context of what the clinical
12 trial or what the study looked at and the
13 limitations, yes.
14    Q    When you're providing information about
15 opioids to doctors, it's important to include the
16 limitations of any study you're providing them,
17 right?
18    A    In the context of what were the -- what
19 was the methodology, what was the patient
20 population, how did we assess the patients so they
21 understand where the limitations are, and we bring
22 that to fore also, yes.
23    Q    You shouldn't describe just the conclusion
24 without the context and the limitations of the
25 study, correct?

Page 201

1    A    Unless there are other studies that
2 support a broader context, but within a specific
3 study, yes.
4         (Exhibit 16 marked for identification.)
5    Q    (BY MR. PATE)  I've handed you what we've
6 marked as Exhibit 16.  Do you recognize that?
7    A    I don't.
8    Q    Exhibit 16 is an email among some J&J
9 employees dated August 1, 2008, correct?
10    A    Correct.
11    Q    Regarding a tapentadol newsletter,
12 correct?
13    A    Correct.
14    Q    Tapentadol is Nucynta?
15    A    Yes.
16    Q    An opioid?
17    A    Yes.
18    Q    The newsletter itself is included in
19 Exhibit 16 dated August of 2008.  Do you see that?
20    A    I do.
21    Q    On the second page underneath the heading
22 "Undertreatment of Pain" --
23    A    Yes.
24    Q    -- it says near the bottom of the
25 paragraph, "Despite these developments, recent

Page 202

1   studies and reports suggest that many types of
2   pain in patient populations are undertreated."
3          Do you see that?
4      A   I do.
5      Q   This is in 2008, correct?
6      A   Yes.
7      Q   This is after the prescribing of opioids
8   has increased significantly from the mid '90s,
9   correct?
10     A   Increased significantly, yes.
11     Q   And it says that, "It's still the case
12  that there are many types of pain in patients who
13  are undertreated for pain."  Right?
14     A   Yes.
15     Q   It provides a reference to a 2001 article
16  from the National Pharmaceutical Council for that,
17  doesn't it?
18     A   Yes.
19     Q   Is a 2001 article indicative of how things
20  exist in 2008?
21     A   I can't say that anything changed, but I
22  would have quoted a later source.
23     Q   Well, you have agreed that certain things
24  have changed between the mid '90s and 2008, haven't
25  you?

Page 203

1      A   That the prescription of opioids
2   increased, yes.
3      Q   Significantly?
4      A   Yes.
5      Q   And yet this is relying on a 2001 source
6   to tell people the state of pain treatment in the
7   country in 2008, correct?
8      A   That's what it appears to be, yes.
9      Q   A 2001 source does not provide any
10  information or data about how things exist as of
11  2008, does it?
12     A   This is not a final document.  So I don't
13  know what was put out into the public.
14     Q   Would you be able to find that out?
15     A   I don't know.
16     Q   This is not one of the documents that you
17  brought with you today?
18     A   It is not.
19     Q   You agree that you should not cite a 2001
20  paper as evidence of how things exist in 2008,
21  correct?
22     A   I would agree that if we can find later
23  citations, they would be appropriate.
24     Q   And you would agree that if that's the
25  only citation that you have, you should disclose the

Page 204

1   limitations of that, correct?
2      A   Unless there was some reason to believe
3   that nothing has changed, I would agree with that.
4      Q   Well, in that case, you would indicate why
5   nothing had changed from 2001 to 2008, correct?
6      A   Correct.  Again, I don't know what was put
7   out into the public.
8      Q   Moving down the next sentence reads,
9   "Additionally, data from a 1999 survey suggests that
10  only one in four individuals with pain receives the
11  appropriate treatment."  Correct?
12     A   Correct.
13     Q   And it's referring to the same survey,
14  right?
15     A   Yes.
16     Q   Again, data from 1999 doesn't indicate
17  the number of individuals receiving appropriate
18  treatment for pain in 2008, does it?
19     A   I would look for a later citation.
20     Q   Because a lot of things can change between
21  1999 and 2008, can't they?
22     A   Hopefully there would be more data, yes.
23     Q   A lot of things we know now did change
24  between 1999 and 2008 with respect to pain
25  treatment, right?

Page 205

1          MR. LIFLAND:  Object to the form of the
2   question.
3      A   If you go back to what you stated, that
4   there was a significant increase in the number of
5   prescriptions for opioids, yes, that's correct.
6      Q   (BY MR. PATE)  2008 was getting closer and
7   closer to the height of opioid prescribing in this
8   country, wasn't it?
9      A   If you're talking about -- I don't recall
10  the year that was the height of opioid prescribing,
11  but it was around that time to my knowledge, yes.
12     Q   You previously testified that there is
13  still a need for more research in the area of
14  addiction risk for chronic opioid treatment,
15  correct?
16         MR. LIFLAND:  Object to the form of the
17  question.
18     A   There's always a need for good and better
19  research.  I would agree with that.
20     Q   (BY MR. PATE)  That's sitting here today,
21  right?  In 2018 that's your view?
22     A   I haven't been significantly involved
23  since 2011, but there are still issues around pain
24  management and treatment that would require more
25  investigation.

Page 206

1      Q    I just want to be clear.  You're
2   testifying based on how you feel today, right?
3      A    Relative to?  I'm sorry.
4      Q    You're saying that there's more research
5   that could or should be done about the addiction
6   rate of opioids.  I'm saying that's your view today.
7   You're not stating that as of 2008 or as of 2007.
8           You're saying, as we sit here today, you
9   believe there's more research that needs to be done
10  about the addiction rate --
11     A    Addiction rate, okay.
12     Q    -- of long-term chronic opioid treatment?
13          MR. LIFLAND:  Object to the form of the
14  question.
15     A    I think it would be useful to do more
16  long-term therapy.  I think that there have been a
17  number of articles and review articles, including
18  the Cochrane review, that summarize a lot of the
19  information, and the fact that they're internally
20  consistent is reassuring.
21          That doesn't mean that having more
22  long-term data wouldn't be useful, particularly
23  around long-term opioid use.
24     Q    (BY MR. PATE)  And the addiction rate of
25  that long-term opioid use, right?

Page 207

1      A    And the addiction rate of that long-term
2   opioid use.
3      Q    And the long-term benefits to patients
4   who are on those drugs for more than three months,
5   right?
6      A    Yes.  As I stated, there are some reports
7   of longer termed therapy that goes out to two years
8   certainly on our part, but we can always use more
9   data in a broader sense on long-term therapy with
10  opioids.
11     Q    And you would like to see more data about
12  that?
13     A    Yes, I would.
14     Q    And the CDC, you're aware that they feel
15  the same way, right?
16     A    Yes.
17     Q    They've stated that there needs to be more
18  research about this, right?
19     A    Yes.
20     Q    Better research about it?
21     A    Yes.
22     Q    More applicable research about it?
23          MR. LIFLAND:  Object to the form of the
24  question.
25     A    Could you define "applicable."

Page 208

1      Q    (BY MR. PATE)  For how those drugs are
2   being used long term?
3      A    Yes.
4      Q    But we do know that from 1996 for a number
5   of years that opioid prescriptions increased,
6   correct?
7      A    Yes.
8      Q    And we know that currently, sitting here
9   today, we are in the middle of an opioid epidemic,
10  correct?
11          MR. LIFLAND:  Object to the form of the
12  question.
13     A    That the incidence of opioid abuse and the
14  attendant outcomes for that have increased, yes.
15     Q    (BY MR. PATE)  It's a crisis, correct?
16     A    It's been termed a crisis.
17     Q    It wasn't a crisis in 1996, was it?
18     A    I don't recall that it was termed a
19  crisis.
20     Q    And opioid prescribing has increased since
21  then, right?
22     A    Yes.
23     Q    And now it's a crisis.  Now there's an
24  opioid crisis, right?
25          MR. LIFLAND:  Object to the form of the

Page 209

1   question.
2      A    You're making a cause and effect there.
3      Q    (BY MR. PATE)  No.  I'm just asking a
4   question.
5      A    All right.  I just want to clarify that.
6   It's been termed a crisis, yes.
7      Q    Sitting here today, Janssen is not doing
8   anything to pay for research to be done related to
9   opioid addiction risks, is it?
10          MR. LIFLAND:  Object to the form of the
11  question.
12     A    I'm not aware of any ongoing studies or
13  supported studies.
14     Q    (BY MR. PATE)  Janssen isn't funding
15  anyone else to do any opioid addiction studies right
16  now?
17          MR. LIFLAND:  Object to the form of the
18  question and also beyond the scope.  You can answer
19  based on your personal knowledge.
20     A    I'm not aware.
21     Q    (BY MR. PATE)  Janssen isn't currently
22  doing any research about the risks or benefits of
23  opioids, is it?
24          MR. LIFLAND:  Same objections.
25     A    About the risks or benefits of opioids.

Page 210

1  Well, as part of the risk -- the REMS program, we
2  are supporting surveillance programs on our opioids.
3  So that would be studies that look at risks and --
4  well, certainly the risks associated with it.  So we
5  do support the ongoing risk evaluations work that
6  the FDA mandates.
7       Q    (BY MR. PATE)  For what opioids?
8       A    Right now we have it for Duragesic.
9       Q    Any others?
10      A    No.
11      Q    What research existed in 1996 about the
12 addiction rate for opioids for chronic pain?
13      A    I'm not aware of the literature for
14 chronic pain in general.  I'm not aware of the
15 literature.  I'm just not familiar with it.
16      Q    Are you aware of any literature that
17 existed in 1996 about what the rate of addiction was
18 for someone who was on long-term opioid treatment
19 for more than three months?
20      A    For more than three months.  I don't
21 recall, no.
22      Q    In 1997?
23      A    I don't recall, no.
24      Q    In 1998?
25      A    For that period of time till we did our

Page 211

1  own studies just looking within our own studies of
2  long-term use of Duragesic.
3            Then the reports that came out including
4  the Cochrane, I'd have to go back to each individual
5  report to see what the length of treatment was.
6       Q    The earliest report out of those four you
7  cited, the Fleming, the Boscarino and all those, the
8  earliest one was in 2007, wasn't it?
9       A    I don't recall the dates, but I'll accept
10 that.
11      Q    Between 1996 and now, there is more data
12 or let's just say information available to us about
13 what happens when more people start taking opioids,
14 isn't there?
15           MR. LIFLAND:  Object to the form of the
16 question.
17      A    What happens when -- I'm not following
18 you.  You mean outcomes?
19      Q    (BY MR. PATE)  Yes.
20      A    There have been more data generated.  We
21 generated some data with our own compounds.  So,
22 yes.
23      Q    As time goes on?
24      A    There's been more data generated.
25      Q    And as time goes on, we learn new things,

Page 212

1  right?
2       A    Yes.
3       Q    More things happen, right?
4       A    Yes.
5       Q    We gather more information?
6       A    Yes.  So, yeah, our knowledge increased
7  from 1996 and on.
8       Q    Right.  And one of the things that has
9  happened from 1996 till now is there's been more
10 opioid prescriptions, right?
11      A    Yes.
12      Q    And there's also, we all know, been more
13 opioid deaths, right?
14      A    Yes.
15           MR. LIFLAND:  Object to the form of the
16 question.
17      Q    (BY MR. PATE)  And there's been more --
18      A    Again, so you're not making cause and
19 effect?
20      Q    Has there been more opioid deaths between
21 1996 and now, has that increased?
22      A    Yes.
23      Q    Have the number of people addicted to
24 opioids increased between now -- from 1996 to now?
25      A    That's my understanding, yes.

Page 213

1            (Exhibit 17 marked for identification.)
2       Q    (BY MR. PATE)  I've handed you a document
3  marked as Exhibit 17.  Do you recognize those?
4       A    Yes.
5       Q    Those are the CDC guidelines for
6  prescribing opioids for chronic pain, correct?
7       A    Yes.
8       Q    Put out in 2016; is that right?
9       A    Yes.
10      Q    Is there anything that Janssen disagrees
11 with in the CDC guidelines?
12           MR. LIFLAND:  Object to the form of the
13 question.
14      A    I'm not aware of what Janssen's focus --
15 how Janssen feels about the CDC guidelines.  I can't
16 speak to that.
17      Q    (BY MR. PATE)  Has Janssen done any
18 research to determine whether or not any of the
19 conclusions reached in the guidelines are correct?
20      A    Not to my knowledge.
21      Q    Has Janssen done -- excuse me.  Has
22 Janssen done any research indicating that what the
23 CDC says in here is wrong?
24      A    Not to my knowledge.
25      Q    Are you aware of any studies that indicate

Page 214

1    that anything that the CDC says in here is wrong?
2         MR. LIFLAND:  Object to the form of the
3    question.
4         A    I'm not.
5         Q    (BY MR. PATE)  Is Janssen currently doing
6    any research related to the findings in the CDC
7    guidelines?
8         MR. LIFLAND:  Object to the form of the
9    question.
10        A    The work that Janssen is doing is
11   currently the surveillance work that we are
12   obligated to do under the REMS program for
13   Duragesic.  Whether that constitutes following the
14   guidelines, I'm not sure.  I'd have to go back to
15   the guidelines that are in here.
16        I believe as part of the REMS there are
17   also long-term studies that we're obligated to do,
18   and I would assume that we would meet our regulatory
19   obligations.  But how that relates to the CDC
20   guidelines, I don't know.
21        Q    (BY MR. PATE)  If you look on Page 2 of
22   Exhibit 17 near the end of the first paragraph, it
23   says, "However, few studies have been conducted to
24   rigorously assess the long-term benefits..."  Sorry,
25   the end of the first paragraph.

Page 215

1         A    Okay.
2         Q    Top of the page.  "However, few studies
3    have been conducted to rigorously assess the
4    long-term benefits of opioids for chronic pain
5    (pain lasting more than three months) with outcomes
6    examined at least one year later."
7         Correct?
8         A    Yes.
9         Q    You agree with that, don't you?
10        A    I don't disagree with that.  We have our
11   own studies that look at outcomes that go beyond a
12   year.
13        Q    Do you disagree with the statement that
14   "Few studies have been conducted to rigorously
15   assess the long-term benefits of opioids for chronic
16   pain for more than three months"?
17        A    I'm not aware of any studies.  Yes, I
18   would agree with that.
19        Q    This was published in 2016, correct?
20        A    Yes.
21        Q    If you'll turn to Page 7 underneath the
22   heading "Summary of findings for clinical
23   questions."  Do you see that?
24        A    I do.
25        Q    There's a sentence that reads, "In

Page 216

1    summary, evidence on long-term opioid therapy for
2    chronic pain outside of end-of-life care remains
3    limited with insufficient evidence to determine
4    long-term benefits versus no opioid therapy, though
5    evidence suggests risk for serious harms that
6    appears to be dose dependent."
7         Did I read that correctly?
8         A    Yes.
9         Q    Do you agree with that statement?
10        A    Overall, yes, we do need more long-term
11   therapy -- we do need more data on long-term therapy
12   of opioids.
13        Q    Is Janssen doing any research or does it
14   have any research that indicates that the CDC is
15   wrong?
16        A    No.  We have data on our compounds that go
17   beyond a year's time where patients continue to
18   benefit, but that doesn't rise to the level of
19   evidence that the CDC is addressing here.
20        Q    Are you currently, Janssen, doing anything
21   to obtain this type of evidence that the CDC says we
22   need?
23        A    Other than ongoing adverse event reporting
24   for Duragesic on patients who are on Duragesic,
25   especially long-term, and I'd have to go back and

Page 217

1    see what our regulatory obligations are under the
2    REMS program.
3         Q    You are required to do those things under
4    the REMS program, correct?
5         A    Correct.
6         Q    You are required to report those adverse
7    events, correct?
8         A    Correct.
9         Q    Is there anything that Janssen is
10   voluntarily doing in order to find the evidence that
11   the CDC says we need here about long-term opioid
12   treatment?
13        MR. LIFLAND:  Object to the form of the
14   question.
15        A    Much of the information that is now a
16   regulatory requirement was done voluntarily by
17   Janssen and then it became a regulatory requirement.
18        So I just want to be clear that much of
19   the surveillance that we had in place was voluntary
20   on the part of Janssen, and because it monitored for
21   issues of abuse, misuse, diversion and was
22   considered to be good data, it became more widely
23   required.
24        Q    (BY MR. PATE)  That wasn't really my
25   question.

Page 218

1          My question was:  Is there anything that
2    Janssen is voluntarily doing right now in order to
3    try to find evidence that the CDC says we need in
4    these guidelines?
5          MR. LIFLAND:  Object to the form of the
6    question; beyond the scope of the designated topics.
7          You can answer if you know in your
8    personal capacity.
9      A    I don't know.
10     Q    (BY MR. PATE)  It's not beyond the scope.
11   The topics are about research that J&J is doing,
12   about opioid risks and benefits.  I'm asking you
13   what research you're doing.
14          CDC says we need research.  I'm asking if
15   right now -- all I'm asking is right now is J&J
16   doing the research that the CDC says we need?
17          MR. LIFLAND:  Same objections.
18     A    And what I'm saying is that we are doing
19   research into long-term use, and there are studies
20   that the FDA has mandated.  You specifically said
21   "voluntary."  I'm not aware of any.
22     Q    (BY MR. PATE)  The ones you're doing are
23   the ones you're required to do under the REMS
24   program, right?
25     A    That's correct.

Page 219

1      Q    What are they?
2      A    They're long-term -- well, long-term, the
3    surveillance programs that are underway that look at
4    issues of abuse, misuse and diversion, and there are
5    long-term treatment protocols that look at issues of
6    hyperalgesia, I believe.
7      Q    What is J&J's role with respect to those
8    surveillance programs?
9      A    We support -- there's now an independent
10   group that conducts that surveillance, and we
11   support the group that does the surveillance.
12     Q    When you say support, you give them money?
13     A    Correct.
14     Q    And you report adverse events that are
15   reported to you?
16     A    Correct.
17     Q    Anything else?
18     A    That's what I'm aware of.
19     Q    Have you put any of your own doctors or
20   scientists on this project?
21     A    Other than to do the mandated long-term
22   studies under the REMS?
23     Q    I thought you said a third party was doing
24   that now.
25     A    That's the surveillance part of it.

Page 220

1      Q    Okay.
2      A    There are required studies that we need to
3    do with our compounds, and that would fall under our
4    mandate because it's Duragesic specific.
5      Q    Okay.  So there are studies separate from
6    the surveillance programs --
7      A    Correct.
8      Q    -- that Janssen is currently required to
9    do about Duragesic?
10     A    Under the REMS program, yes.
11     Q    What are those studies?
12     A    I believe that's the study of
13   hyperalgesia.  I'd have to confirm that.
14     Q    What is hyperalgesia?
15     A    It's one of the long-term potentials for
16   patients who are on opioids to increasingly get less
17   benefit from the opioid because of this issue of
18   hyperalgesia.  The benefit is lost and, in fact,
19   increasing the dose may worsen the problem.
20     Q    For someone who is on opioids for an
21   extended duration?
22     A    Yes.
23     Q    When is that study going to conclude?
24     A    I don't know.
25     Q    What stage is it in currently?

Page 221

1      A    I don't know.
2      Q    How much money has J&J spent on it?
3      A    I don't know.
4      Q    How much money has J&J spent on any
5    research related to the addiction risk associated
6    with long-term opioid therapy?
7      A    Other than the ongoing surveillance right
8    now that we support?
9      Q    No, total.
10          MR. LIFLAND:  Object to the form of the
11   question.
12     A    I don't know.
13          MR. LIFLAND:  I think we withdrew this
14   topic.
15     Q    (BY MR. PATE)  Other than the surveillance
16   program and the required studies under the REMS, is
17   there anything that J&J is currently doing to try to
18   gather the evidence that the CDC says we need about
19   long-term opioid treatment?
20          MR. LIFLAND:  Object to the form of the
21   question.
22     A    Not with our drugs and not with any other
23   drugs.
24     Q    (BY MR. PATE)  Not with any opioids,
25   right?

Page 222

1      A    Not that I'm aware of.

2      Q    J&J has a lot of doctors that work there,

3   right?

4      A    There are quite a number.  A lot.  I think

5   a lot is a reasonable, a reasonable assessment.

6      Q    J&J is a big pharmaceutical company, isn't

7   it?

8      A    Yes.

9      Q    It's one of the largest in the country,

10  correct?

11     A    Correct.

12     Q    You have a lot of very smart people who

13  work for you, don't you?

14     A    I certainly hope so.

15     Q    A lot of very smart scientists, right?

16     A    Yes.

17     Q    A lot of very smart doctors, right?

18     A    Yes.

19     Q    A lot of very smart researchers, right?

20     A    Yes.

21     Q    A lot of people capable of performing

22  studies about the effects of drugs, right?

23     A    And are doing that about the effects of

24  our drugs, yes.

25     Q    You have a lot of resources at your

Page 223

1   disposal, don't you?

2      A    I can't speak to the resources in any

3   particular area.  Resources are allocated.

4      Q    You're a $300 billion company, aren't you?

5           MR. LIFLAND:  Object to the form of the

6   question.

7      A    I don't know.

8      Q    (BY MR. PATE)  Right now, absent what is

9   being required to do, J&J is not using any of those

10  smart people or any of those resources in order to

11  determine and investigate what the long-term

12  benefits and risks of opioids are, is it?

13          MR. LIFLAND:  Object to the form of the

14  question.

15     A    We are not conducting studies or research

16  other than what's mandated under the REMS program

17  and surveillance to look at that question, no.

18     Q    (BY MR. PATE)  Do you think that J&J

19  should do that?

20          MR. LIFLAND:  Object to the form of the

21  question.

22     A    You're asking a personal opinion on that?

23     Q    (BY MR. PATE)  Sure.

24     A    Well, I think over the course of the

25  marketing for Duragesic and tapentadol, our

Page 224

1   surveillance data consistently showed for our

2   compounds, Duragesic and Nucynta tapentadol, rates

3   of use, misuse and diversion were consistently low

4   and lower than most other long-acting opioids that

5   were on the market.  I think we were comfortable

6   knowing that the steps that we took helped to

7   minimize use, misuse and diversion of our compounds.

8           I think in any field you can argue that

9   more research is needed, and that it's up to the

10  company to make a determination of how best to

11  allocate its resources to determine where more

12  research is going to be supported.

13     Q    J&J has so far right now, as far as you

14  know, determined not to allocate any more resources

15  to opioids, right?

16     A    Beyond --

17          MR. LIFLAND:  Object to the form of the

18  question.

19     A    Beyond the studies that are required and

20  the surveillance programs for our products, correct.

21     Q    (BY MR. PATE)  J&J is no longer making any

22  opioids other than Duragesic; is that right?

23     A    I believe we're still making Tylenol with

24  codeine.

25     Q    Schedule II opioids.

Page 225

1      A    Okay.  No.

2      Q    You sold off Nucynta a couple years ago,

3   right?

4      A    Correct.

5      Q    Duragesic has been off patent for a number

6   of years, right?

7      A    Since 2005.

8      Q    So there's no product, opioid product,

9   that J&J, other than Duragesic, that J&J currently

10  has on the market, right?

11     A    Schedule II.

12     Q    And it's not allocating any resources

13  related to the risks and benefits of Schedule II

14  opioids, is it?

15     A    Aside from the mandated REMS studies and

16  surveillance programs.

17     Q    J&J is not doing the research itself.

18  It's also not providing the funding to anyone else

19  to do that research right now, is it?

20          MR. LIFLAND:  Object to the form of the

21  question.

22     A    Other than the mandated surveillance

23  programs, yes.

24     Q    (BY MR. PATE)  Correct?

25     A    Correct.

Page 226

1    Q    Are all the clinical trials that J&J has
2  done with respect to its opioids listed on one of
3  your documents?
4    A    I believe so, yes.
5    Q    Can you point me to that document, please.
6    A    We -- at a very high level we certainly
7  speak of the periodic safety update reports, and all
8  of the studies are in the periodic safety update
9  reports, and we have some examples of those.
10   Q    What are you looking at?
11   A    I'm just aware that we report all of the
12 studies in the periodic safety update reports and we
13 have some.
14        Then beyond that, we break out the
15 specific types of studies and the studies that fit
16 under that specific type.
17        But if you're talking about the studies
18 that go back to the preclinical work, the
19 pharmacokinetic studies, I don't believe we have
20 those specifically listed here.
21   Q    Are the clinical studies that you do have
22 listed, are those listed in Exhibit 3?
23        I tell you what, why don't we do it this
24 way.  Will you hand me the stack of the high level
25 documents that you brought with you today that we

Page 227

1  haven't marked yet.
2        MR. LIFLAND:  I think we gave you the
3  whole stack.  Do you want his copy of it?
4        MR. PATE:  I want to mark it.
5        MR. LIFLAND:  Yeah.
6        THE WITNESS:  These two.
7        (Exhibit 18 marked for identification.)
8    Q    (BY MR. PATE)  I'm going to hand you what
9  I've marked as Exhibit 18 which is the timeline.
10   A    Uh-huh.
11   Q    Can you identify that for me.
12   A    This is the timeline for key events around
13 Duragesic and Nucynta and Nucynta ER.
14   Q    Did you make this timeline?
15   A    I was aware of some of the dates on here.
16 I provided some of the dates, but the timeline was
17 developed by counsel.
18        (Exhibit 19 marked for identification.)
19   Q    (BY MR. PATE)  You've been handed a
20 document marked as Exhibit 19.  What's that one?
21   A    "Selected studies, research and analysis
22 supporting certain categories of statements."
23   Q    Did you put that together?
24   A    Again, I had input to it.  Many of the
25 studies were done while I was at the company, but

Page 228

1  the document itself was developed by counsel.
2    Q    Who determined the categories of
3  statements that you would include support for?
4    A    That was collective.  These were major
5  categories that we felt that the studies fell under.
6  So, for example, we were aware of the need for
7  safety studies longer than 90 days.  So we looked at
8  those specifically.
9        (Exhibit 20 marked for identification.)
10   Q    (BY MR. PATE)  You've been handed a
11 document marked as Exhibit 20.  Do you know what
12 that one is?
13   A    "Sources of knowledge regarding abuse,
14 misuse, dependence or addiction."
15   Q    Is it J&J's sources of knowledge regarding
16 those things?
17   A    Yes.
18        (Exhibit 21 marked for identification.)
19   Q    (BY MR. PATE)  You've been handed a
20 document marked Exhibit 21.  Can you identify that
21 one, please.
22   A    "Let's Talk Pain References."
23   Q    What is that?
24   A    These are references with respect to the
25 monograph we spoke about, "Let's Talk Pain."

Page 229

1        (Exhibit 22 marked for identification.)
2    Q    (BY MR. PATE)  The next document you've
3  been handed is Exhibit 22.  Do you recognize that
4  one?
5    A    The "Index to Duragesic Risk Management
6  Plans."
7    Q    What is that?
8    A    In the course of our marketing with
9  Duragesic, we had an obligation at times to provide
10 activities that fell under the rubric of risk
11 management, and these were the plans that we filed
12 periodically with the FDA with the data for our
13 drug, in this case, Duragesic.
14        It relates to the internal surveillance
15 and to the external surveillance that we had, that
16 we put in place for Duragesic.
17        (Exhibit 23 marked for identification.)
18   Q    (BY MR. PATE)  You've been handed a
19 document marked Exhibit 23.  Can you identify
20 that one?
21   A    Nucynta IR, immediate release, and ER,
22 extended release, safety surveillance plans.
23   Q    What are those?
24   A    Similar to what we just discussed for
25 Duragesic.  These were the surveillance programs

Page 230

1    that we reported to the -- we had in place and
2    reported to the FDA periodically on the findings
3    from these streams of data.
4           (Exhibit 24 marked for identification.)
5      Q    (BY MR. PATE)  The next one has been
6    marked as Exhibit 24.  What's that?
7      A    "Opioids manufactured, owned and/or
8    developed by Janssen since 1996."
9      Q    So this relates to Topic No. 35?
10     A    Correct.
11     Q    I have one that I don't see from you that
12   is prescriberesponsibly.com references.  Has that
13   already been marked?
14     A    No.
15          (Exhibit 25 marked for identification.)
16     Q    (BY MR. PATE)  That one has been marked as
17   Exhibit 25.  Can you tell me what that is?
18     A    References that refer to tab references
19   for articles that were used in the website
20   prescriberesponsibly.com.
21     Q    Those are all the ones you're aware of?
22     A    Yes.
23          MR. PATE:  It's 5:00.  Why don't we take a
24   break for the evening, and we'll pick back up in the
25   morning.

Page 231

1           MR. LIFLAND:  Okay.  Do you want to start
2    at 8:00?  We can go off the record.
3           VIDEOGRAPHER:  Off the record at 4:58 p.m.
4           (DEPOSITION ADJOURNED AT 4:58 P.M.)

Page 232

1                      JURAT
2        State of Oklahoma vs. Purdue Pharma, et al.
3           I, BRUCE MOSKOVITZ, M.D., do hereby state
4    under oath that I have read the above and foregoing
5    deposition in its entirety and that the same is a
6    full, true and correct transcription of my testimony
7    so given at said time and place.
8
9
10          _____
11          Signature of Witness
12
14          Subscribed and sworn to before me, the
15   undersigned Notary Public in and for the State of
16   Oklahoma by said witness, BRUCE MOSKOVITZ, M.D., on
17   this _____ day of_____, 2019.
18
19
20
21          _____
22          NOTARY PUBLIC
23          MY COMMISSION EXPIRES:_____
24          (JMc)  JOB FILE #135845
25

Page 233

1                   ERRATA SHEET
2        State of Oklahoma vs. Purdue Pharma, et al.
3           DEPOSITION OF BRUCE MOSKOVITZ, M.D.
4    REPORTED BY: Jane McConnell, CSR RPR RMR CRR
5        DATE DEPOSITION TAKEN: January 9, 2019
6               JOB FILE NO. 135845
7    PAGE  LINE  IS              SHOULD BE
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____



Page 234

```
1              C E R T I F I C A T E

2

3         I, Jane McConnell, Certified Shorthand

4    Reporter, do hereby certify that the above-named BRUCE

     MOSKOVITZ, M.D., was by me first duly sworn to testify

5    the truth, the whole truth, and nothing but the truth,

6    in the case aforesaid; that the above and foregoing

7    deposition was by me taken in shorthand and

8    thereafter transcribed; and that I am not an

9    attorney for nor relative of any of said parties or

10   otherwise interested in the event of said action.

11        IN WITNESS WHEREOF, I have hereunto set my

12   hand and official seal this 11th day of January,

13   2019.

14

15

16

17

18

19

20

21   _____

22        Jane McConnell, CSR RPR RMR CRR

23

24

25
```