1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT OF OHIO
              EASTERN DIVISION
3                - - -

   IN RE:  NATIONAL        :   HON. DAN A.
4  PRESCRIPTION OPIATE     :   POLSTER
   LITIGATION              :
5                          :
   APPLIES TO ALL CASES    :   NO.
6                          :   1:17-MD-2804
                           :
7

8          - HIGHLY CONFIDENTIAL -

   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
9

10                VOLUME II

11

                    - - -
12

              November 14, 2018
13

                    - - -
14

15          Videotaped deposition of
   BRUCE L. MOSKOVITZ, M.D., taken pursuant
16 to notice, was held at the law offices of
   Drinker Biddle & Reath, 105 College Road
17 East, Princeton, New Jersey, beginning at
   9:17 a.m., on the above date, before
18 Michelle L. Gray, a Registered
   Professional Reporter, Certified
19 Shorthand Reporter, Certified Realtime
   Reporter, and Notary Public.
20
                    - - -
21

22      GOLKOW LITIGATION SERVICES
     877.370.3377 ph | 917.591.5672 fax
23           deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

 3        SIMMONS HANLY CONROY, LLC
          BY:  JAYNE CONROY, ESQ.
          112 Madison Avenue
 4        7th Floor
          New York, New York 10016
 5        (212) 784-6400
          jconroy@simmonsfirm.com
 6
              - and -
 7

 8        SIMMONS HANLY CONROY, LLC
          BY:  SARAH BURNS, ESQ.
          One Court Street
 9        Alton, Illinois 62002
          (618) 259-2222
10        Sburns@simmonsfirm.com
11            - and -
12        THE LANIER FIRM
          BY:  EVAN M. JANUSH, ESQ.
13        126 East 56th Street
          6th Floor
14        New York, New York 10022
          (212) 421-2800
15        evan.janush@lanierlawfirm.com
          Representing the Plaintiffs
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES:  (Cont'd.)
 2

          O'MELVENY & MYERS, LLP
 3        BY:  CHARLES C. LIFLAND, ESQ.
          BY:  ESTEBAN RODRIGUEZ, ESQ.
 4        400 South Hope Street, 18th Floor
          Los Angeles, California 90071
 5        (213) 430-6665
          clifland@omm.com
 6        esrodriguez@omm.com
          Representing the Defendants, Janssen
 7        and Johnson & Johnson
 8

          PIETRAGALLO GORDON ALFANO BOSICK &
 9        RASPANTI, LLP
          BY:  DOUGLAS K. ROSENBLUM, ESQ.
10        1818 Market Street, Suite 3402
          Philadelphia, Pennsylvania 19103
11        (215) 320-6200
          Dkr@pietragallo.com
12        Representing the Defendant, Cardinal
          Health
13

14        CLARK MICHIE, LLP
          BY:  BRUCE W. CLARK, ESQ.
15        103 Carnegie Center, Suite 300
          Princeton, New Jersey 08540
16        (609) 423-2144
          bruce.clark@clarkmichie.com
17        Representing the Defendant, Pernix
18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          TELEPHONIC APPEARANCES:
 2
            ROPES & GRAY, LLP
 3          BY:   COLLEEN B. CREEDEN, ESQ.
            800 Boylston Street
 4          Boston, Massachusetts 02199
            (617) 951-7234
 5          Colleen.creeden@ropesgray.com
            Representing the Defendant,
 6          Mallinckrodt
 7
            FOX ROTHSCHILD, LLP
 8          BY: EILEEN OAKES MUSKETT, ESQ.
            1301 Atlantic Avenue
 9          Midtown Building, Suite 400
            Atlantic City, New Jersey 08401
10          (609) 348-4515
            Emuskett@foxrothschild.com
11          Representing the Defendant, Validus
            Pharmaceuticals
12
13          ULMER BERNE, LLP
            BY:   PAUL J. COSGROVE, ESQ.
14          600 Vine Street, Suite 2800
            Cincinnati, Ohio 45202
15          (513) 698-5104
            pcosgrove@ulmer.com
16          Representing the Defendant, Teva
            Pharmaceuticals, Inc. Cephalon Inc,
17          Watson Laboratories, Actavis LLC,
            Actavis Pharma, Inc.
18
19          ARNOLD & PORTER KAYE SCHOLER, LLP
            BY:   NICOLE R. LEIBOW, ESQ.
20          250 West 55th Street
            New York, New York 10019
21          (212) 836-8214
            nicole.leibow@arnoldporter.com
22          Representing the Defendants, Endo
            Health Solutions; Endo
23          Pharmaceuticals, Inc.; Par
            Pharmaceutical Companies, Inc. f/k/a
24          Par Pharmaceutical Holdings, Inc.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        TELEPHONIC APPEARANCES:   (Cont'd.)
 2

          JACKSON KELLY, PLLC
 3        BY:  SANDRA K. ZERRUSEN, ESQ.
          50 South Main Street, Suite 201
 4        Akron, Ohio 44308
          (330) 252-9060
 5        Skzerrusen@jacksonkelly.com
          Representing the Defendant,
 6        Miami-Luken
 7

          COVINGTON & BURLING, LLP
 8        BY:  SARA SUNDERLAND, ESQ.
          One Front Street
 9        San Francisco, California 94111
          (415) 591-7063
10        Ssunderland@cov.com
          Representing the Defendant, McKesson
11        Corporation
12

          HUGHES HUBBARD & REED, LLP
13        BY:  TINA M. SCHAEFER, ESQ.
          2345 Grand Boulevard
14        Kansas City, Missouri 64108
          (816) 709-4159
15        tina.schaefer@hugheshubbard.com
          Representing the Defendant, UCB,
16        Inc.
17

          JONES DAY
18        MEREDITH KINCAID, ESQ.
          1420 Peachtree Street, NE
19        Suite 800
          Atlanta, Georgia 30309
20        (404) 581-8043
          Mkinkaid@jonesday.com
21        Representing the Defendant, Walmart
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1         APPEARANCES:   (Cont'd.)

2

          ALSO PRESENT:

3

4         VIDEOTAPE TECHNICIAN:

5             Henry Marte

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1                        -   -   -
2                   I N D E X
3                        -   -   -
4

    Testimony of:
5              BRUCE L. MOSKOVITZ, M.D.
6

    By Ms. Conroy        339, 691, 753, 760
7

    By Mr. Lifland          534, 746, 758
8

9

10

11                       -   -   -
12                  E X H I B I T S
13                       -   -   -
14

15   NO.            DESCRIPTION            PAGE
16   Janssen
     Moskovitz-20 E-mail Thread           340
17                12/4/03
                  Subject, 12/5
18                Medical Meeting
                  JAN-MS-01196284
19
     Janssen
20   Moskovitz-21 E-mail Thread           355
                  2/3/04
21                Subject, Nondisclosure
                  JAN-MS-01196462-79
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                     -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Janssen
      Moskovitz-22  Technology                 404
 7                  Reservoir v Matrix
                    Patch Systems
 8                  Sales Training,
                    2/25/04
 9                  JAN-MS-00725016
      Janssen
10    Moskovitz-23  Primary Care               428
                    Franchise Update
11                  Slide Deck
                    6/23/04
12                  JAN-MS-00492868
13    Janssen
      Moskovitz-24  Citizen Petition           435
14                  11/12/04
                    JAN-MS-02508937-48
15
      Janssen
16    Moskovitz-25  Transdermal Fentanyl       435
                    Systems:
17                  Reduced Safety and
                    Increased Societal
18                  Risk of Matrix Patch
                    Formulations
19                  White Paper
20    Janssen
      Moskovitz-26  E-mail Thread              475
21                  9/14/04
                    Subject, Slides for
22                  Tomorrow's Meeting
                    JAN-MS-02109711
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Janssen
     Moskovitz-27 E-mail Thread           481
 7                3/24/08
                  Subject, Duragesic:
 8                Development Plan for
                  a Matrix Patch
 9                JAN-MS-02005184-85
10   Janssen
     Moskovitz-28 Duragesic Risk          500
11                Management Overview
                  4/20/07
12
13   Janssen
     Moskovitz-29 E-mail Thread           500
14                8/7/08
                  Subject, Risk Management
15                Plan, Duragesic, Revised
                  Clean 2007/6/14
16                JAN-MS-01204898-99
                  and Attached
17                Revised Risk
                  Management Plan
18                6/14/07
19   Janssen
     Moskovitz-30 Extended-Release        536
20                And Long-Acting
                  Opioid Analgesics
21                REMS Supporting
                  Document
22                JAN-MS-00935481-34
23
24
```

```
 1                      -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5      NO.              DESCRIPTION              PAGE
 6      Janssen
        Moskovitz-31 Letter, 6/19/12          538
 7                   To Rappaport to
                     Mulligan
 8                   Subject, NDA
                     JAN-MS-00700680
 9
        Janssen
10      Moskovitz-32 Full Prescribing         566
                     Information
11                   Duragesic
                     2/4/05
12                   JAN-MS-00780844-88
13      Janssen
        Moskovitz-33 Review and               590
14                   Conclusion of the
                     RADARS Report
15                   Summarizing Abuse
                     and Diversion
16                   Data for Transdermal
                     Fentanyl Products
17                   JAN-MS-02578637-38
18      Janssen
        Moskovitz-34 Brief Report             605
19                   A New Tool to Assess
                     And Document Pain
20                   Outcomes
                     (Passik)
21
        Janssen
22      Moskovitz-35 Pain Assessment          607
                     and Documentation
23                   Tool
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Janssen
       Moskovitz-36 Duragesic                   624
 7                  First Annual
                    Progress Report
 8                  6/5/07
                    JAN-MS-00213785
 9
       Janssen
10     Moskovitz-37 Cumulative                  636
                    Review of Iatrogenic
11                  Addiction Associated
                    With the Use of
12                  Transdermal Duragesic
                    Patch
13                  JAN-MS-02754767-83
14     Janssen
       Moskovitz-38 Nucynta                     681
15                  Surveillance
                    Plan Progress Report
16                  12/2/13
                    JAN-MS-00228548
17
       Janssen
18     Moskovitz-39 NDA 200533                  686
                    Nucynta ER
19                  Opioid Tablets
                    8/25/11
20                  JAN-MS-01489228-75
21     Janssen
       Moskovitz-40 E-mail Thread               694
22                  6/20/06
                    Subject, Iatrogenic
23                  Addiction
                    JAN-MS-00957863-64
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Janssen
      Moskovitz-41 E-mail, 4/28/08            718
 7                 Subject, Ortho McNeil
                   Janssen SA Review of
 8                 RADARS Report
                   JAN-MS-02484172
 9
      Janssen
10    Moskovitz-42 Color Photo of            763
                   Bruce Moskovitz
11                 Demonstrative
                   With Handwriting
12
      Janssen
13    Moskovitz-43 Color Photo of            763
                   Bruce Moskovitz
14                 Demonstrative
                   With Handwriting
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2           DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.

 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

14   Questions Marked

15   PAGE    LINE
     None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                    -   -   -

2              THE VIDEOGRAPHER:  We are

3         back on the record.  Today's date

4         is November 14th, 2018.  And the

5         time is 9:17 a.m.

6              Counsel, you may proceed.

7                    -   -   -

8         ... BRUCE L. MOSKOVITZ, M.D.,

9    having been previously sworn, was

10   examined and testified as follows:

11                   -   -   -

12             CONTINUED EXAMINATION

13                   -   -   -

14   BY MS. CONROY:

15        Q.    Good morning, Doctor.

16        A.    Good morning.

17        Q.    Thank you for bringing the

18   sun back.

19        A.    We don't often get it in New

20   Jersey at this time of year.

21        Q.    Right.  I guess we're

22   avoiding a snowstorm for a few more hours

23   I guess.  What I'd like to talk about

24   first this morning is the reservoir patch

1    versus the matrix patch.  And let's see.

2    I think maybe one way to address it at

3    first is what I've marked as Exhibit 20.

4            (Document marked for

5         identification as Exhibit

6         Janssen-Moskovitz-20.)

7    BY MS. CONROY:

8        Q.    This is an e-mail from

9    you -- this is an e-mail from you to Drew

10    Jones at ALZA.  Is that --

11        A.    ALZA.

12        Q.    ALZA?  And who is Drew

13    Jones.

14        A.    I believe he was the

15    physician in the R&D area at ALZA.  They

16    were the original manufacturing of

17    Duragesic.

18        Q.    And is GV Gary Vorsanger?

19        A.    I'm sorry.  Are you

20    seeing --

21        Q.    On the cc.

22        A.    I would assume so.

23        MR. LIFLAND:  Are we reading

24        the Bates numbers into the record

Highly Confidential - Subject to Further Confidentiality Review

1        for the exhibits?

2              MS. CONROY:  I'm happy to if

3        you want the Bates number.

4              It's JAN-MS-01196284, and

5        it's Exhibit 20.

6              MR. LIFLAND:  Thank you.

7   BY MS. CONROY:

8        Q.    And I see that your

9   signature line, it says, "Executive

10  director, primary care."

11       A.    Yes.

12       Q.    Is that, we saw yesterday

13  pain/mycology.  Did the department name

14  change or --

15       A.    I can only answer that by

16  saying over the course of time in medical

17  affairs, there were a variety of marketed

18  products that fell under my

19  responsibility.  And so certainly by

20  2003, there was no longer a focus on the

21  anti-fungals.

22             So while the core

23  responsibilities for marketed products

24  remained the same, the title may have

Highly Confidential - Subject to Further Confidentiality Review

1  changed periodically.

2      Q.    Was it considered primary

3  care instead of pain, do you know?

4      A.    There was a period of time

5  when Janssen itself changed its name to

6  Pri-Cara, which reflected our focus on

7  primary care.  So the change in title may

8  have been related to the change in the

9  focus even at the company level.  And

10  then subsequently it became Janssen

11  Ortho-McNeil, and after that Janssen.

12      Q.    Okay.  Take a look at

13  Dr. Jones' e-mail to you, which is at the

14  bottom which was earlier in the day to

15  you.  Think the folks in Europe will have

16  some issues with studies which might

17  generate data suggesting matrix is a more

18  abusable product than form-filled

19  Duragesic."

20          Do you see that?

21      A.    Yes, I do.

22      Q.    Can you describe for me in

23  this e-mail if you know what is meant by

24  matrix?

1    A.    Yes.  We were aware at this

2  period of time, 2003, that there was

3  another company that was developing a

4  formulation of the Duragesic patch in

5  which fentanyl would be delivered, not

6  through a reservoir but through what we

7  term a "matrix," which is a solid fill.

8  It's fentanyl in a solid fill

9  formulation.  And -- so we knew that they

10  would be coming out with that in the

11  United States.

12          There was a matrix

13  formulation already available marketed by

14  Janssen in Europe.

15    Q.    Was that a similar

16  formulation, the one that Janssen

17  marketed in Europe?

18    A.    Well, if by similar you mean

19  pharmacokinetically did it deliver the --

20  the same controlled rate of fentanyl,

21  yes.

22    Q.    I thank -- thank you for

23  that.  What I'm talking about more is,

24  was it considered a matrix patch?

1        A.     Yes, it was.

2        Q.     Okay.  So -- so Janssen had

3    a matrix patch in Europe --

4        A.     Yes.

5        Q.     -- that it was selling?

6        A.     Yes.

7        Q.     And in the U.S., what kind

8    of a patch was Janssen selling at that

9    time?

10       A.     It was still the form-filled

11   patch.  It was still a reservoir in which

12   the fentanyl is between two layers as a

13   semi liquid in an alcohol base in hydroxy

14   cellulose I believe.

15       Q.     Okay.  Was Janssen selling a

16   matrix patch of any sort in the U.S. at

17   this time in 2003?

18       A.     No.

19       Q.     At some point they did

20   switch to the -- to the matrix patch?

21       A.     Yes.

22       Q.     Okay.  Approximately what

23   year did they switch?

24       A.     I believe that was in 2007,

Highly Confidential - Subject to Further Confidentiality Review

1    approval 2008.

2            MR. LIFLAND:  If you -- you

3        should -- you do have the -- the

4        timeline if you want to --

5            THE WITNESS:  Yeah, so let

6        me go back to that.  I'm sorry.

7            Yeah, it was in --

8    BY MS. CONROY:

9        Q.    We're going to -- we're

10   going to look at some documents, but

11   you're -- I'm happy to have you look at

12   this time --

13       A.    Yeah, so it was in 2009 that

14   we marketed.  The -- the data to develop

15   the pharmacokinetic information was

16   developed earlier.

17       Q.    Okay.  Now, if you take a

18   look at your response to Dr. Jones, you

19   say, "Bingo.  It's why it's so important

20   to touch base with all stakeholders."

21            What do you mean by

22   stakeholders?

23       A.    So anything that happens in

24   any one country is shared with all the

1    regulatory authorities in all the other

2    countries.  And so we never want to do

3    something in a void where we're not

4    informing our subsidiaries and -- and

5    other countries where products would be

6    marketed of what's going on in our

7    country, because there would be concerns

8    in -- in another country over what might

9    be happening in the first -- in the first

10   country.

11        Q.   And that's because you,

12   Janssen in the United States, was looking

13   at conducting some tests that would not

14   have been advantageous to the matrix

15   patch that Duragesic Janssen was selling

16   in -- in Europe?

17        A.   I -- I wouldn't characterize

18   it that way.  We were looking at whether

19   there would be differences in issue -- we

20   didn't know ahead of time, otherwise we

21   wouldn't be conducting the studies, but

22   we had concerns based upon an earlier

23   report that there may be different issues

24   around abuse, misuse, diversion, in the

Highly Confidential - Subject to Further Confidentiality Review

1   United States between a reservoir patch

2   and a matrix patch.

3       Q.   Different issues between the

4   United States and Europe?

5       A.   Well, that's one of the

6   things that we explored.

7       Q.   And what was -- what was

8   your conclusion?

9       A.   Well, so there are a couple

10  of components to that.  I mean we

11  ultimately did do studies that suggested

12  to us that in the United States there may

13  be differences in attractiveness of -- of

14  a matrix patch compared with a reservoir

15  patch in potential for abuse, misuse and

16  diversion.

17          At the same time,

18  recognizing that there was a matrix patch

19  in Europe, we commissioned an expert

20  report on the part of a German expert in

21  pain management to assess whether the

22  same concerns that we explored in the

23  United States were valid for Europe.  And

24  it was his conclusion that the

1    environment around abuse, misuse and

2    diversion in the United States,

3    particularly access to other drugs,

4    differed between the United States and

5    Europe such that the -- the concerns we

6    had about bringing a matrix patch to the

7    market in the United States were

8    different for Europe.  And the same

9    issues would not lead to the levels of

10   concern for abuse, misuse and diversion

11   in Europe.

12        Q.    When -- when approximately

13   did you -- I take it Janssen consulted

14   and hired the German expert?

15        A.    Yes.

16        Q.    Approximately when was that?

17        A.    2003, 2004.  I believe the

18   report came out in 2004.

19        Q.    And was that a report to

20   you?

21        A.    It was a report to -- well,

22   I -- I certainly received the report.

23   I -- I don't recall exactly who the

24   report was directed to.

1    Q.    Did you -- were you the
2  person who requested the report of the
3  German expert?
4    A.    No.  That was -- I believe
5  the report -- I can't say for certain, I
6  believe the report was requested by the
7  head of the pain group, the worldwide
8  pain group on the R&D side.
9    Q.    Do you remember the expert's
10  name?
11    A.    It was a German name,
12  Juergen Haeussler, I believe, was the one
13  who requested it.  He may have requested
14  it from his PGSM counterparts.  But I
15  believe Juergen Haeussler was the one who
16  requested that -- that report.
17    Q.    He was -- as best you can
18  recall, he was head of worldwide pain at
19  R and -- R&D?
20    A.    At the R -- on the R&D side.
21    Q.    Do you remember the name of
22  the actual expert?
23    A.    No, I don't.
24    Q.    Or do you know where the

1    expert practiced, I mean what hospital --

2         A.    I believe it was in Germany.

3         Q.    Was it a man or a woman, do

4    you know?

5         A.    It was a gentleman.

6         Q.    And do you recall today what

7    environmental -- what environmental

8    differences there were between the United

9    States and Germany with respect to abuse

10   and diversion of matrix patches?

11        A.    I'd have to go back and

12   refer to the actual report.  But my best

13   recollection was that there were -- there

14   was access to other compounds, including

15   heroin in -- in Europe such that the fact

16   that a matrix formulation of fentanyl was

17   available was not going to be a driver

18   of -- of a switch to fentanyl from other

19   compounds that were widely available, and

20   access to other compounds in Europe

21   compared with the United States.

22        Q.    Licit or illicit compounds?

23        A.    Both licit and illicit.

24        Q.    Was it the finding of the

1    German expert that there was more access

2    to heroin in Germany than in the United

3    States?

4         A.    I believe that was part of

5    the report.

6         Q.    Have you seen that report

7    recently?

8         A.    No, I have not.

9         Q.    It wasn't something that you

10   reviewed in advance of your -- either

11   your 30(b)(6) deposition or this

12   deposition?

13        A.    If I did review it, it was

14   quite some time ago.  So I don't have a

15   recent recollection of it.

16        Q.    Do you recall what -- did

17   you review it in advance of your Oklahoma

18   deposition?

19        A.    Same answer.  In a -- in a

20   general sense I reviewed documents around

21   what became the Citizen's Petition and

22   that was part of the research that was

23   done into differences between the United

24   States and Europe.  But I don't recall

1    whether I reviewed that specific document

2    or simply had a recollection of it from

3    the time that I was at Janssen.

4         Q.    Okay.  "PGSM," the

5    pharmaceutical group strategic --

6         A.    Management --

7         Q.    -- management "should be

8    able to weigh in with the EU concerns."

9              So this was before they

10   actually had the German report, correct?

11        A.    I believe so.

12        Q.    "It may very well be that

13   abuse issues are different in Europe, but

14   at the end of the day, the U.S. has a

15   $1.2 billion at stake."

16             What were you -- what's the

17   $1.2 billion at stake, what were you

18   referring to?

19        A.    I believe I was referring to

20   sales of Duragesic in the United States.

21        Q.    And how did you know the

22   numbers of -- for the sales of Duragesic

23   in the U.S.?

24        A.    It was probably available to

Highly Confidential - Subject to Further Confidentiality Review

1    me through the sales and marketing group.

2         Q.    "If the Duragesic

3    reservoir" -- that's the reservoir

4    matrix -- I mean the reservoir patch?

5         A.    Yes.

6         Q.    "If the reservoir is less

7    abusable than an unprotected matrix

8    patch, we need to get that message out

9    with credible data to back it up."

10              What do you mean by

11   "unprotected matrix patch"?

12        A.    I believe this referred to

13   the fact that Duragesic reservoir had a

14   rate limiting membrane as part of the

15   system; whereas, it was our understanding

16   that the matrix patch, particularly the

17   matrix patch that we anticipated coming

18   to market in the United States, did not

19   have a rate limiting membrane.

20        Q.    And you say, "We need to get

21   that message out with credible data to

22   back it up."  We talked yesterday about

23   basically one of your responsibilities

24   at -- in medical affairs to develop

Highly Confidential - Subject to Further Confidentiality Review

1    clinical studies or clinical trials or

2    whatever, to develop data that would show

3    advantages or disadvantages with

4    competing products.  Is that what you're

5    talking about here?

6            A.    Yes.  We would want to

7    conduct studies that explored

8    differences -- potential differences in

9    abuse, misuse, and diversion between the

10   marketed reservoir patch and a matrix

11   patch.

12           Q.    And at that time your

13   working hypothesis, I take it, was that

14   the reservoir was less abusable?

15           A.    Well, at that time we

16   already had a report in 2001.  There was

17   the Pinney report that we commissioned in

18   2001 that had concluded that Janssen

19   should not, in the United States, proceed

20   with a switch to a matrix patch because

21   there were concerns that a matrix patch

22   could have a higher risk for abuse,

23   misuse and diversion.  And, therefore, we

24   didn't switch in the United States.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.    Would it have been the same

2   patch that was -- if you had switched, if

3   you know, would it have been the same

4   patch that was being sold in Europe?

5   A.    I assume so.  I can't speak

6   to the manufacturing side.

7   Q.    Okay.  Do you know if the --

8   well, the Janssen matrix patch had been

9   approved by the FDA, even though I

10  understand that you were not selling it

11  in the U.S. at that time?

12  A.    In 2003?

13  Q.    Right.

14  A.    No.

15  Q.    It had not been?

16  A.    We had not submitted the

17  data for approval.

18  Q.    Let me show you Exhibit 21.

19        (Document marked for

20        identification as Exhibit

21        Janssen-Moskovitz-21.)

22  BY MS. CONROY:

23  Q.    And this is

24  JAN-MS-011196462.

Highly Confidential - Subject to Further Confidentiality Review

1              Exhibit 21 is a

2    February 3rd, 2004, e-mail, at least the

3    top, from you to Richard Allcorn.  And

4    you'll see at the bottom there is an

5    e-mail from Dr. Allcorn to you.  And

6    attached to that is -- are some slides.

7    Does that look like -- does that look

8    like a printout of slides to you?

9         A.    Yes.

10        Q.    Okay.  Who is Dr. Allcorn?

11        A.    I don't know that he was a

12   doctor.  He was the head of the

13   Mudskipper group that we spoke about

14   yesterday, the group that we contracted

15   with to put together the comprehensive

16   summary of all the information that we

17   developed from developing the reservoir

18   patch to the matrix patch.  And they

19   ultimately put together a White Paper

20   that summarized all that information.

21        Q.    He signs his name "Dr."  But

22   you're not -- are you not sure?

23        A.    It would not be an M.D.  If

24   he -- if he was -- if he signs his name

1  doctor, it's because he has a Ph.D., and

2  I don't know in what.

3        Q.    Okay.  Where is he located?

4        A.    In the UK.

5        Q.    And have you ever met him

6  face to face?

7        A.    Yes, I have.

8        Q.    And how did you know him?

9        A.    I believe -- my best

10 recollection is that Gary Vorsanger had

11 worked with him with other projects and

12 was impressed with his ability to

13 synthesize the data into a readily

14 accessible and readable format.  And so

15 after speaking with him and feeling

16 comfortable that in fact they could do

17 that, we brought them on.

18       Q.    Now, so that I understand,

19 Janssen would prepare, or generate the

20 data and then Dr. Allcorn, Mudskipper,

21 would write it up?

22       A.    It's not that Janssen would

23 generate the data.  We would -- we

24 ultimately funded a number of studies.

Highly Confidential - Subject to Further Confidentiality Review

1    Some of them were internal.  Some of them

2    were external to Janssen, such as the

3    attractiveness scale that Inflexxion did.

4    So the data came from various sources.

5    Ultimately all the data were fed into a

6    summary document that reflected all the

7    information we generated ourselves or

8    through outside groups.

9          Q.    And even -- so Dr. Allcorn's

10   White Paper would have included only

11   studies or data points that had either

12   been generated by Janssen itself or by

13   Janssen-sponsored investigators such as

14   Inflexxion?

15         A.    Yes.  So if I may take a

16   step back.  This process started with an

17   advisory group to look at a number of

18   potential areas of research that would

19   help to differentiate the reservoir patch

20   from the matrix patch.  Ultimately we

21   embarked on funding a select group of

22   those studies that could be done within a

23   reasonable period of time.

24               And it was those studies

1  that were summarized in the White Paper

2  report that Mudskipper put together for

3  us, and that became the basis of the

4  Citizen's Petition.

5      Q.    And I take it -- I take from

6  what you just told me then that

7  Dr. Allcorn did not -- was not going

8  outside of Janssen or Janssen-sponsored

9  studies to write his White Paper; he was

10 using Janssen information?

11     A.    In terms of the data, yes.

12 In terms of a backgrounder, he -- he

13 would have included broadly available

14 information about risks of abuse, misuse

15 and diversion.  But in terms of reporting

16 the data, it was strictly what was

17 provided to him.

18     Q.    And was he -- was he paid

19 for that work, to write the paper?

20     A.    Yes.  Well, Mudskipper was.

21     Q.    Mudskipper.

22         And do you -- do you know

23 whether there was a particular agreement

24 that was signed with him?  I think that

1  there's some -- I saw something, a

2  reference to an agreement.  But would

3  that have been you, or would that have

4  been a different department at Janssen

5  that would have negotiated that agreement

6  with him?

7         A.    It would have been a

8  different department within Janssen.  But

9  yes, there was an agreement.  I can't

10  recall exactly who signed the formal

11  agreement, but he would have been paid

12  for the work that he did.

13         Q.    Did you meet face-to-face

14  with anyone from Mudskipper to prepare

15  this -- while they were preparing this

16  White Paper?

17         A.    We had some face-to-face

18  meetings and some teleconferences to

19  discuss the formatting and where the data

20  would be coming from.  So yes.

21         Q.    If you take a look at your

22  e-mail back to Dr. Allcorn.  You tell him

23  that apparently you're preparing -- there

24  is going to be a teleconference on

1    Friday.  And then you say, "I've attached

2    slides that we've used to outline the

3    abuse program we are embarking on."

4              We'll take a look at those

5    slides in a minute.

6              But then if you go to the

7    next paragraph, it says, "The focus of

8    activities now is to differentiate

9    Duragesic (reservoir) from the

10   unprotected matrix patch."

11             So I think you've been

12   telling me that was what you'd been

13   planning to do.  And now you're stating

14   it; is that correct?

15        A.    That's correct.

16        Q.    You go on -- you say, "There

17   are a series of studies we or ALZA will

18   conduct, including attractiveness,

19   concept mapping, Inflexxion."  Those are

20   the two companies that will perform those

21   studies, correct, the attractiveness

22   studies?

23        A.    Yes.

24        Q.    "Ease of extraction" --

1      A.    Well, it's not two

2  companies.  Concept mapping is the type

3  of study, and it would be conducted by

4  Inflexxion.

5      Q.    Thank you.  And then ease of

6  extraction also to be conducted by

7  Inflexxion?

8      A.    Yes.

9      Q.    And PK, is that

10  pharmacokinetics?

11      A.    Yes, it is.

12      Q.    -- "studies that are

13  expected to show clinically relevant

14  differences in serum concentrations under

15  conditions likely to be encountered in

16  clinical practice (we know the matrix

17  patch is bioequivalent in 'normal healthy

18  volunteers')."

19          Can you explain to me what

20  that means, what you were attempting to

21  do with the serum concentration study?

22      A.    Yes.  So before a generic

23  compound could be approved or even a

24  switch from reservoir to another

Highly Confidential - Subject to Further Confidentiality Review

1    formulation, one of the regulatory

2    requirements is to show that it's

3    bioequivalent.  That is to say that,

4    depending upon the route of

5    administration, in this case obviously it

6    was transdermal, that the -- the amount

7    of the active product, in this case,

8    fentanyl, that enters the bloodstream

9    over a period of time is similar within

10   specified regulatory guidelines to the

11   original compound.

12           So in this case, the matrix

13   compound in a healthy normal patient --

14   volunteer population, subject population,

15   would have to show that the fentanyl

16   transfer into the bloodstream was the

17   same between the matrix patch and the

18   reservoir patch within accepted

19   regulatory guidelines for -- for

20   determining bioequivalence.

21      Q.    And did you -- was it your

22   expectation in the studies that there

23   would be differences between the

24   reservoir and the matrix patch with

1    respect to the serum blood levels that

2    would -- that would reach a patient?

3            A.    In other conditions outside

4    of routine applying a patch to a normal

5    healthy volunteer.

6            Q.    So give me an example of

7    what that might be.

8            A.    So that might be -- if you

9    look at the package insert, there are

10   warnings against heat sources.  So for

11   patients who might have fever, for

12   patients who might be exposed to heat

13   sources such as heating pads or sauna,

14   that in those situations there might be a

15   difference in delivery of the fentanyl

16   between a -- a reservoir patch that was

17   sold in the United States and a

18   hypothetical matrix patch.

19           Q.    Who would get more of the --

20   of the drug?

21           A.    Well --

22           Q.    Under those -- under the

23   conditions you're talking about, like

24   heat?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    So ultimately we did show

2    that under certain conditions -- and

3    another condition also was denuded skin.

4        Q.    Would mean abraded --

5        A.    Abrade -- abraded --

6        Q.    -- or if someone had an

7    open, some sort of open --

8        A.    A wound or even if they put

9    a patch on the same area.  The package

10    insert warns against putting a patch

11    on -- in the same area, but in situations

12    like that, ultimately we did show that

13    there were differences in delivery of

14    fentanyl between the matrix and the

15    reservoir patch.

16        Q.    And the difference that you

17    showed was that the matrix patch could,

18    under certain conditions, such as heat or

19    abraded skin, deliver more fentanyl to a

20    patient?

21        A.    Potentially, yes.

22        Q.    Then you go on and say, "A

23    white paper will collect available data

24    and new data as they are generated to

1    'paint' a full picture of risks

2    associated with the matrix patch."

3              So this was an attempt to

4    differentiate between the reservoir patch

5    as a safer patch than the matrix patch?

6         A.    Well, let's be careful on

7    the term "safe."  We were looking

8    specifically at issues of abuse, misuse,

9    diversion.  Safety encompasses a lot more

10   than that, including adverse event

11   profile.

12             So we were looking at

13   primarily issues of abuse, misuse and

14   diversion.  And our hypothesis in doing

15   the studies was that there may be

16   differences in those areas between the

17   reservoir patch and the matrix patch.

18        Q.    Would you agree with me,

19   however, that heat conditions in abraded

20   skin, that would be -- that's not abuse,

21   diversion or misuse?

22        A.    Well, in a sense it's -- if

23   you -- if you apply heat, you are

24   misusing the patch.

1    Q.    What about someone who is in

2  a sauna, is that a misuse of the patch?

3    A.    In the sense that the

4  package insert warns against exposing the

5  patch to a heat source including sauna,

6  it would be misusing the patch.

7    Q.    Does it say sauna in the

8  label?

9    A.    It does.

10    Q.    And what about in a warm

11  car, something like that, did you test it

12  in conditions where it wasn't something

13  like a sauna, but where you were in an

14  environment that was very warm?

15    A.    I think in a broad sense we

16  warn against heat sources, and examples

17  of the heat sources might be a heating

18  pad or a sauna or a fever.

19    Q.    If you turn the page -- it

20  might be two pages, let's take a look at

21  the slides.

22        Do you know if -- did you

23  prepare these slides?  Do you know who

24  did it?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    If I didn't prepare all of

2  them, I had input to it.

3      Q.    You had, I'm sorry?  You --

4      A.    I would have had input to

5  it.

6      Q.    Okay.

7      A.    I -- I don't see a signature

8  who -- who actually prepared the slides.

9      Q.    Okay.  Let's take a look at

10 the first slide after the title page that

11 says Background.

12          Do you see that?

13     A.    Yes.

14     Q.    Page 2.  It says, "There was

15 an abuse liability expert meeting that

16 was convened in November of 2003."

17          Were you present at that

18 meeting?

19     A.    I was.

20     Q.    Do you recall who the

21 experts were that attended that meeting?

22     A.    Oh, it was a fair size

23 group.  I'd have to go back to the

24 listing.  It would include Nat Katz.

1   Dr. Coleman.  I believe Dr. Steve Passik

2   was there.  Again, I couldn't give you a

3   full listing.

4           Q.    Are they -- Dr. Passik is a

5   key opinion leader?

6           A.    Dr. Passik is a psychologist

7   who is considered an expert in -- in pain

8   issues.

9           Q.    Were the experts that were

10  invited to the abuse liability panel

11  meeting all key opinion leaders for

12  Janssen?

13          A.    They were all experts in

14  their area of -- of concern.  So we had

15  DEA representatives, representatives who

16  understood regulatory issues, so I -- I

17  would refer to them as -- as subject

18  experts.

19          Q.    Well, let me ask it a little

20  differently.  Were these experts who had

21  all been paid by Janssen either in the

22  past or at the time of this meeting as

23  either key opinion leaders or subject

24  experts?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.  They -- we would have

2    had contracts with them to pay for their

3    consulting services.

4        Q.     And they would have had

5    those types -- everyone that you named

6    that was in this, had all had consulting

7    agreements in the past prior to November

8    of 2003?

9        A.     I can't say for certain

10   whether one or more of the individuals,

11   this might have been the very first time

12   we contracted with him or her.  I just

13   don't recall.

14       Q.     Okay.

15       A.     For certain, some of them

16   had been experts to Janssen previously.

17       Q.     Right.  Some of the names we

18   recognize from -- correct.

19       A.     Right.

20       Q.     And then if you take a look,

21   you had -- you had a goal.  And we'll

22   take a look at some of those studies that

23   are in the slides that are after this

24   first slide.

Highly Confidential - Subject to Further Confidentiality Review

1              And then outcome, you say,

2      or someone in the slide says,

3      "Unanimously agreed that the proposed set

4      of abuse liability studies under one

5      year" -- does that mean they would be

6      completed in under a year?

7              A.    Yes.

8              Q.    -- "would by themselves be

9      convincing evidence of differences in

10     abuse liability."

11             Does that mean that the

12     panel unanimously agreed that the studies

13     would be convincing?

14             A.    I believe so.

15             Q.    But the studies had not yet

16     been conducted, correct?

17             A.    That's correct.

18             Q.    Then the next slide it says,

19     "At an internal J&J meeting on

20     January 11th, it was agreed that

21     differentiating Duragesic from other

22     transdermal fentanyl systems would

23     require demonstrations of reduced abuse

24     liability and improved safety profile

1    to" -- "profile compared to the matrix."

2               Who was present, if you

3    recall, at the internal J&J meeting?

4          A.    I don't recall who was

5    present.  My best assumption would be

6    that we had representatives of legal,

7    regulatory, perhaps senior management,

8    because these had to be funded.  The R&D

9    group, the research and development

10   group, as well as elements of medical

11   affairs that might include outcomes

12   research in the biostatistics group.

13              But I don't know -- I don't

14   have a recollection exactly who was at

15   the meeting.

16         Q.    Okay.  Do you know if anyone

17   from Europe was present at the meeting?

18         A.    More likely than not,

19   representatives of the R&D group were

20   present and they represented the global

21   development of -- of the pain products.

22   So they would have represented the

23   fentanyl outside the United States, and

24   perhaps, again I don't have the listing,

Highly Confidential - Subject to Further Confidentiality Review

1   represented the -- the group PGSM that we

2   spoke about, may have been there.

3           Q.    What's the difference

4   between reducing abuse liability and

5   improving the safety profile?

6           A.    So primarily reducing abuse

7   liability refers to the attractiveness of

8   one formulation, the reservoir, versus

9   the matrix.  And this would be primarily

10  to a nonpatient population, if a group

11  was looking to divert the drug, whereas

12  the safety profile would refer to both

13  patients and nonpatients.  So for

14  example, from a safety profile

15  standpoint, when we spoke about

16  differences -- potential differences in

17  delivery of fentanyl if there was a heat

18  source applied, that might refer to a

19  patient who accidentally or intentionally

20  is exposed to a heat source.  And -- so

21  that's what we refer to in the safety

22  profile.

23          Q.    Do you know if any of the

24  safety profile studies had been conducted

Highly Confidential - Subject to Further Confidentiality Review

1    in Europe to determine if there were

2    issues with heat and abrasion with the

3    matrix patch that was sold by Janssen in

4    Europe?

5            A.    I don't.

6            Q.    And would that have been a

7    place that you would have -- if those

8    studies did exist, is that a place you

9    would have looked to make a determination

10   about the differences between the

11   reservoir patch and the matrix patch in

12   the U.S.?

13           A.    Potential differences.

14   There may have been data that were

15   developed that looked at some of these

16   issues.  But in a laboratory setting, I

17   don't recall exactly.

18           Q.    If you take a look at the

19   next page, these are the studies that are

20   being proposed by medical affairs; is

21   that fair to say?

22           A.    Yes.

23           Q.    And it would differentiate

24   Duragesic, which, by saying Duragesic

1    that means the reservoir patch, correct?

2            A.    Correct.

3            Q.    From the matrix and other --

4    what does MRO stand for?

5            A.    I don't recall.

6            Q.    Do you think it means

7    something like similar to a matrix patch?

8            A.    In the context of the title,

9    it would be other formulations of a patch

10   that delivered fentanyl over an

11   extended-release period.

12           Q.    That was not a reservoir

13   patch?

14           A.    It's probably modified

15   release opioids.

16           Q.    Okay.  But in a matrix --

17   with the matrix technology?

18           A.    No.  Because if it's

19   modified release opioids, then we're also

20   comparing fentanyl here to other -- not

21   necessarily fentanyl, other opioids that

22   are delivered in an extended-release

23   mechanism.

24           Q.    Like an OxyContin?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Like OxyContin --

2      Q.      Like a continued --

3      A.      -- where there's extended

4  release of oxycodone.

5      Q.      And so here, you've spoken

6  to me about this before.  You have the

7  abuse liability studies that would be

8  done.  And they would determine

9  attractiveness to an abuser.  Is that

10 what that means?

11     A.      Potential attractiveness to

12 someone who might look to divert the

13 product or to someone who is seeking to

14 abuse the product.

15     Q.      Extractability, does that

16 mean how easy or difficult it is to get

17 the fentanyl out of the -- either the

18 reservoir or the matrix?

19     A.      Yes.

20     Q.      And human abuse liability,

21 what does that mean?

22     A.      Similar to attractiveness,

23 it would be whether the product is more

24 easily abused than the reservoir patch.

1    Some of the same components about abuse

2    liability would also -- may also make it

3    more attractive.

4           Q.    Okay.

5           A.    I think the concept of

6    attractiveness doesn't necessarily

7    include just use of the product.  It

8    would also be how attractive it is to

9    divert the product, but not necessarily

10   use it yourself.

11          Q.    Would that have anything to

12   do with the supply of the product, how

13   available it is?

14          A.    Well, it would be how easy

15   it is to gain access to the fentanyl in a

16   product, regardless of how you access the

17   original fentanyl.

18          Q.    Okay.  So you're talking

19   about how to get the fentanyl out as

20   opposed to how accessible a patch might

21   be?

22          A.    Or how easily it is to

23   transport it too.

24          Q.    What does that mean?

1  A.    So let's -- one of the

2  hypotheses going in, because we knew this

3  from the report we had from Pinney in

4  2001, was that in contradistinction to

5  the reservoir patch where if it was cut,

6  you'd have leakage of the entire contents

7  of the patch.  A matrix patch could be

8  cut and give more consistent sizes of the

9  matrix patch, and, therefore, might be

10  more easily diverted or sold.

11  Q.    And that's -- you call those

12  party dots when they put up the matrix

13  patch?

14  A.    That was one concern that we

15  had in the context of other drugs of

16  abuse.  We knew at the time that

17  fentanyl, reservoir patch, was not

18  attractive in that respect.  But we had

19  concerns that if you could get to a form

20  that delivered a clear dose, that that

21  might become more attractive than the

22  reservoir patch.

23  Q.    And I think I've read in

24  some of the materials that the Duragesic

1    reservoir patch for an abuser would

2    really only be able to be sold once

3    because it would just be the total

4    release of the fentanyl?

5            A.    It was not an attractive

6    formulation of fentanyl for a variety of

7    reasons, which included that it was

8    difficult to get to a controlled dose of

9    fentanyl.

10           Q.    Versus the matrix patch

11   which could be cut into smaller pieces

12   and each one of those pieces could be

13   sold and each one of those pieces could

14   deliver fentanyl?

15           A.    That was the concern.

16           Q.    And then if we look in each

17   one of the studies on this slide -- is

18   the first one, abuse liability.  And this

19   is ease of extractability of fentanyl

20   from transdermal fentanyl systems.  So

21   that's both the reservoir and the matrix,

22   correct?

23           A.    It was a comparison between

24   the two.

1    Q.    And objectives are listed.

2  And then there's the optimal outcome, is

3  that, "Less fentanyl recovered from the

4  Duragesic" -- which is the reservoir

5  patch -- "and it's easier to extract from

6  the unprotected matrix."

7            That's what you -- that

8  would be the best finding for the study,

9  correct?

10    A.    And we already had some data

11 to suggest that that would differentiate

12 the two.

13    Q.    Okay.  So it would be --

14 that would be the optimal, as you say

15 here, outcome of this study, if you were

16 attempting to differentiate the reservoir

17 as a safer -- and I understand safer

18 means both for the patient and for the

19 nonpatient -- than the matrix?

20    A.    In a broad sense, yes.  When

21 I'm speaking about safety, I'm talking

22 not just about the adverse event profile

23 but the potential for abuse, misuse and

24 diversion.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Correct.  And then you list

2    your strategic partners.  Tell me who

3    ALZA is.

4      A.     ALZA is --

5      Q.     ALZA.

6      A.     -- the manufacturer of

7    Duragesic.  They were the originators of

8    the Duragesic patch.

9      Q.     And are they a part of

10   Janssen or how are they related?

11     A.     Janssen bought ALZA.  So it

12   became a part of Janssen, Johnson &

13   Johnson.  And subsequently it was

14   subsumed entirely under Janssen.

15     Q.     Where were they physically

16   located?

17     A.     In California.  I believe

18   it's Mountain View, California.

19     Q.     And who is Bob Bianchi?

20     A.     Bob Bianchi worked with

21   Inflexxion.  He was one of the principals

22   at Inflexxion and an expert in issues of

23   abuse liability.

24     Q.     And status, the contract was

Highly Confidential - Subject to Further Confidentiality Review

1    under negotiation.  Who would there need

2    to be a contract with?  Would Inflexxion

3    be one?

4            A.    Yes.  Inflexxion was one of

5    the groups that would develop a study of

6    attractiveness.

7            Q.    And would there need to be a

8    contract with ALZA?

9            A.    Well, with Janssen.  Because

10   we were marketing the product.

11               ALZA produced the product.

12   Janssen marketed the product.

13           Q.    If you -- the budget on this

14   one is to be determined.  If you turn the

15   page, there's an ease of extractability

16   study.  And the budget was determined to

17   be $220,000, correct?

18               Do you see --

19           A.    I'm sorry.  I see a budget

20   that says TBD.

21           Q.    Go to the next page.

22           A.    I'm sorry.

23           Q.    Yeah, go to the next page.

24   And then here we have another study on

Highly Confidential - Subject to Further Confidentiality Review

1   abuse liability.

2           A.    Ease of extractability.

3           Q.    And -- yeah.  And the

4   strategic partner is Inflexxion.

5                 Do you see that?

6           A.    Yes.

7           Q.    And you have a timeline.  It

8   would take about seven months to do this

9   study.  And the budget that was

10  determined -- was determined at this time

11  to be $220,000, correct?

12          A.    Yes.

13          Q.    And when you say budget

14  $220,000, was that to be paid to

15  Inflexxion?

16          A.    That's my assumption.

17          Q.    Were you -- were you also

18  evaluating what it would cost internally

19  in medical affairs to -- how does the

20  budget work?

21          A.    Oh no, the -- we wouldn't

22  budget internal time.  This would be what

23  we would be paying the contract

24  organization that would be conducting

1    these studies.

2         Q.    Okay.  So that would be

3    money sent out of Janssen to someone

4    else?

5         A.    Yes.

6         Q.    Go to Page 9, please, which

7    is abuse liability, again a proposed

8    study.  This is the impact on euphoria

9    produced by matrix fentanyl via

10   buccal/sublingual ingestion.

11             Have you found that one?  Do

12   you see that?

13        A.    Yes.

14        Q.    So that is impact of

15   euphoria if you put it between your gum

16   and your cheek?

17        A.    Yes.

18        Q.    And who is -- I see the

19   strategic partner is Dr. Jasinski.  Who

20   is he?

21        A.    A subject expert, not a

22   Janssen employee.

23        Q.    Okay.  Do you know him?

24        A.    I came to know him during

1    the course of the discussions over these

2    studies.

3             Q.    Was this study ever

4    conducted?

5             A.    I don't believe so.

6             Q.    Do you know why?

7             A.    I can't say for certain.

8    But I believe it wasn't conducted because

9    it didn't add to the other data that we

10   were going to be developing to

11   differentiate the reservoir from the

12   matrix.

13            Q.    Was the -- was the concept

14   behind this study that somehow the

15   reservoir patch, if it was abused and put

16   between the gum and the cheek, would not

17   produce as much of a high as if you did

18   the same thing with the matrix patch?

19            A.    That's my assumption because

20   you would have evaporation of the

21   alcohol, and the absorption may be

22   different than the matrix.  That's my

23   best recollection, that in fact we would

24   show a difference between the two

Highly Confidential - Subject to Further Confidentiality Review

1    formulations.

2         Q.    And you have an optimal

3    outcome that Duragesic, which is the

4    reservoir, has a less euphoric effect.

5    Had you -- did you, like the others, have

6    some data on that?

7         A.    If the concentration of

8    fentanyl was lower, it should have a less

9    euphoric effect.

10        Q.    And would the concentration

11   of fentanyl be lower in the reservoir

12   than in the matrix patch?

13        A.    Well, I would say that the

14   concentration that crosses -- crossed the

15   buccal mucosa might be lower.  The amount

16   of fentanyl might be the same, but

17   because of the -- you wouldn't have the

18   same sticking ability and you don't have

19   the same formulation that is driving the

20   fentanyl.  So there might be a difference

21   in -- in the amount of fentanyl that's

22   transferred.

23        Q.    Does the matrix patch

24   deliver more fentanyl than a reservoir

Highly Confidential - Subject to Further Confidentiality Review

1    patch?

2         A.    If you go back to the

3    pharmacokinetic studies that showed

4    bioequivalence, in a healthy volunteer

5    population, the rate of delivery of

6    fentanyl is similar between the two

7    formulations.

8         Q.    But if you are putting it

9    between your gum and your teeth -- or gum

10   and your cheek, something changes about

11   the release of the -- something changes

12   about the amount of fentanyl that's

13   released?

14        A.    That may be the case.  This

15   is what we were considering exploring.

16        Q.    What did you already know

17   about that though?

18        A.    Well, we knew there were

19   oral formulations of fentanyl; Actiq was

20   one, and so that -- that fentanyl could

21   be delivered via sublingual or buccal

22   mechanism fairly quickly.  So we

23   certainly had data for other

24   formulations.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What -- what I'm talking

2    about is what did you have that you knew

3    about the difference in the

4    concentrations that would be released

5    between the reservoir and the matrix --

6        A.    I don't know --

7        Q.    -- regardless of where it

8    was located?

9        A.    No.  I don't recall the data

10   that we had that might have indicated

11   that there would be a difference between

12   the two.

13       Q.    Okay.  But you did have --

14   you must have had some data because that

15   would be the only way that you would be

16   able to address --

17       A.    Or at least some

18   hypothetical data that -- towards which

19   we considered doing this study.

20       Q.    And that hypothetical

21   data -- what is hypothetical data?

22       A.    It may be data that -- so --

23   so if we are looking for actual subject

24   data, the hypothetical data may be data

Highly Confidential - Subject to Further Confidentiality Review

1    that comes from a laboratory setting, not

2    in a -- in a human.  But data under a

3    controlled condition -- I'm thinking this

4    through -- where it may be exposed to

5    saliva and not in a patient and through a

6    membrane where you are measuring what

7    crosses the membrane.  That's what I mean

8    by hypothetical data.

9            Q.    Did -- did Janssen have data

10   that showed that there were different

11   amounts of fentanyl that would be

12   released from a reservoir patch to

13   between -- reservoir patch and a matrix

14   patch?

15           A.    Again, if we are talking

16   about a -- a normal volunteer population.

17           Q.    I understand that.  The

18   normal volunteer population, it's your

19   understanding it's bioequivalent?

20           A.    Correct.

21           Q.    My question is different.

22   I'm not talking about a normal.  I'm

23   talking about a patient population or

24   maybe a lab test.  Is there -- does

Highly Confidential - Subject to Further Confidentiality Review

1    Janssen have any data that would suggest

2    that there is a greater release of

3    fentanyl from a reservoir versus a matrix

4    patch or a matrix versus a reservoir?

5         A.    Without having tested it in

6    a normal volunteer population, we

7    probably did have laboratory studies

8    that, for example, might have shown --

9    again I don't recall -- might have shown

10   that there was a differential rate of

11   delivery in a system where heat was

12   applied.

13        Q.    And that would mean that

14   more fentanyl would be released from a

15   matrix patch than a reservoir patch?

16        A.    Where you are adding heat to

17   the delivery system.

18        Q.    Did Janssen have any data,

19   not with respect to applying heat or

20   other types of misuse, that measured the

21   rate of release of fentanyl from a

22   reservoir patch versus a matrix patch,

23   not in a normal volunteer population?

24        A.    We -- we had data certainly

Highly Confidential - Subject to Further Confidentiality Review

1   for the reservoir patch, which is why we

2   have the warnings, that with heat, you

3   would have greater delivery of fentanyl.

4   That's part of the reason we have

5   warnings for heat delivery.

6           I don't know whether or what

7   data were developed before the matrix

8   came to market along the same lines.  But

9   we knew that even with the reservoir,

10  applying heat would lead to a greater

11  release of fentanyl across the skin than

12  without heat.

13      Q.   Do you know if there was any

14  data in Europe with respect to the amount

15  of fentanyl released from the Janssen

16  matrix patch?

17      A.   Under conditions of --

18      Q.   Any -- do you know of any

19  data at all about the amount of fentanyl

20  that would be released from the matrix

21  patch that was -- studies conducted --

22  conducted in Europe?

23      A.   Yes.  The pharmaco

24  equivalent studies, the bioequivalent

1    studies showed that the same amount of

2    fentanyl would be released with the

3    matrix patch and -- and a reservoir

4    patch.

5              If your question is did we

6    do studies under other conditions, I

7    don't recall what was done for the matrix

8    patch relative to the reservoir patch.

9         Q.    Do you consider buccal

10   ingestion to be applying heat?

11        A.    It's certainly warmer in the

12   mouth, but you have other conditions

13   present as well.  I mean it's certainly

14   misuse of the product.

15        Q.    So is your answer no or

16   you're not certain?

17        A.    Well, it's not only that you

18   have a warmer environment, there are

19   other factors that are playing into the

20   potential transfer of fentanyl.

21        Q.    Do you have an understanding

22   based on any data that you have seen why

23   the Duragesic reservoir would have less

24   of a euphoric effect?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The euphoric effect would be

2  related to the concentration of fentanyl

3  in the blood.  So any difference in the

4  euphoric effect would be related to how

5  much drug is transferred over what period

6  of time.  So even if you have the same

7  amount, if it's released more rapidly,

8  that may lead to a greater euphoric

9  effect.

10    Q.    And the -- the hypothesis

11  here in this study was that the matrix

12  would release it faster than the

13  reservoir patch?

14    A.    That potentially it would.

15  Again, a lot of the studies overlapped.

16  So, in fact, that's what we found with

17  other solvents, that -- in other

18  solvents, fentanyl in a matrix patch was

19  released more rapidly and to a greater

20  degree than it was with the reservoir

21  patch.

22    Q.    And that would -- that would

23  create more euphoria?

24    A.    Because it's being released

Highly Confidential - Subject to Further Confidentiality Review

1    at a more rapid rate, yes.

2           Q.    If you turn the page.

3    The -- this is again an abuse liability

4    study.  And the optimal outcome is that

5    Duragesic has a more aversive effect.

6    This is also to be conducted by

7    Dr. Jasinski.

8           Aversive effect is -- is an

9    avoidance effect, is that what it is?

10          A.    Yes.

11          Q.    And what was -- do you know

12   if the study was ever conducted?

13          A.    It was not.

14          Q.    And it was aversive

15   properties of transdermal fentanyl

16   systems, so that would be both the

17   reservoir and the matrix, up at the top,

18   right -- right underneath the title?

19          A.    Okay, yeah.

20          Q.    It would be both the

21   reservoir and the matrix?

22          A.    And I'm seeing, again at the

23   top, so this would be in a subject

24   population of dependent opiate abusers.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Correct.  That would be

2  what -- what Dr. Jasinski -- the proposed

3  study that Dr. Jasinski would perform was

4  whether there were aversive properties

5  for both the reservoir as well as the

6  matrix patch in dependent opiate abusers,

7  correct?

8    A.    Whether there were

9  differences in -- in the aversive effect.

10    Q.    Okay.  And the -- and the

11  optimal outcome would be that the

12  Duragesic had more aversive effect.  They

13  were more likely to avoid --

14    A.    Avoid the Duragesic

15  reservoir formulation than a matrix

16  formulation.  I guess to flip the same,

17  that they would prefer the matrix

18  formulation.

19    Q.    And do you have -- do you

20  recall why a dependent opiate abuser

21  would prefer the matrix?

22    A.    It was hypothetical, because

23  the matrix is not on the market.  But

24  again it would relate -- so these are

Highly Confidential - Subject to Further Confidentiality Review

1   dependent opiate users.  They need the

2   active -- the -- so let's go back to

3   the -- to the mechanism of action.

4              It is the opiates bind to

5   the mu opioid receptor.  That's what

6   causes pain relief but potentially leads

7   to dependence.  So these are individuals

8   who are dependent.  That is to say, when

9   they lack the opiates that occupy the new

10  receptor, they begin to exhibit symptoms

11  of withdrawal.

12             So in that population, if

13  they are using the product that is

14  releasing fentanyl at a lower rate over

15  time than another product, in this case

16  the reservoir versus the matrix, because

17  they are dependent upon an activation of

18  the mu opioid agonist, it would be more

19  aversive to them than a product that

20  delivered an opioid more rapidly.

21       Q.    And so your -- your working

22  hypothesis was that the reservoir patch

23  had a lower rate of release of fentanyl

24  than the matrix?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    And that would in turn

2    inform the abuse -- the aversive effect

3    of the product.

4    Q.    And what -- what data did

5    you have that showed that there would be

6    a lower rate of release of fentanyl in

7    the reservoir patch versus the matrix

8    patch?

9    A.    Laboratory data that showed

10    differences in solvents.

11    Q.    And that was laboratory data

12    at Janssen?

13    A.    It may have been Janssen.

14    It may have been outside groups that

15    developed the data and provided those to

16    Janssen.

17    Q.    And there was something

18    about the solvents in the reservoir patch

19    versus the matrix patch that resulted in

20    less fentanyl being released or being

21    more slowly released from the reservoir

22    patch than the matrix?

23    A.    Well, not solvents -- no,

24    not solvents in the product itself.

Highly Confidential - Subject to Further Confidentiality Review

1    Solvents that might be used to get access

2    to the fentanyl.  But even within the

3    product itself, we spoke previously about

4    the fact that Duragesic had a

5    rate-limiting membrane, and the

6    hypothetical matrix patch didn't.

7              So that also might

8    contribute to a more rapid release of

9    fentanyl across the buccal mucosa, or

10   across any membrane, than the Duragesic

11   reservoir patch.

12        Q.    Because the Duragesic

13   reservoir patch has that thin protective

14   membrane, correct?

15        A.    Rate-limiting membrane.

16        Q.    And rate-limiting means that

17   it was limiting the rate of the release

18   of the fentanyl?

19        A.    Yes.

20        Q.    And I just wanted to ask,

21   one thing that you had said, matrix was

22   not -- a matrix was not on the market --

23        A.    In the United States.

24        Q.    -- in the U.S.  I just

1  wanted to clarify.  It was in the market

2  in Europe --

3          A.    In Europe.

4          Q.    -- and it would be in the

5  market in the U.S. in just a few more

6  years --

7          A.    Yes.

8          Q.    -- after this, correct?

9          A.    Yes.  Well, it would be on

10  the market in a few more months if you're

11  talking about the generic.

12          Q.    Right.  By the other

13  company.

14          A.    Yes.

15          Q.    Not by -- not by Janssen?

16          A.    Not by Janssen.

17          Q.    Correct.

18          A.    But it came to the market in

19  January of 2005.

20          Q.    Did Janssen have data

21  concerning the protective

22  rate-controlling membrane of the

23  reservoir patch compared to a patch that

24  did not have that rate-controlling

1  membrane?

2       A.    Only for the reservoir

3  patch.  So we -- I believe that there

4  were data that compared a reservoir patch

5  with a rate-limiting membrane, versus a

6  reservoir patch without a rate-limiting

7  membrane, but not to a matrix patch

8  without a rate-limiting membrane.

9       Q.    Okay.  That latter study was

10  never done, as far as you know?

11       A.    I don't know.

12       Q.    Okay.  The -- this study

13  talks about aversive properties of

14  transdermal fentanyl systems in dependent

15  opiate abusers.  Would you agree with me

16  that there are also dependent patients

17  that take -- that use a -- either a

18  matrix or a reservoir patch?

19       A.    Yes.  By definition,

20  dependent means that if you -- if you

21  withdraw the opiate, stop the delivery of

22  the opiate, they would exhibit signs of

23  withdrawal.

24       Q.    And that's your definition

1    of dependent, that withdrawal would occur

2    when the opioid is removed?

3           A.    If they no longer receive

4    the opiate.

5           Q.    Turn the page.  The next one

6    are the schema for the safety studies.

7    And then turn the page again.  First

8    safety study is, "Safety After Chewing an

9    Unprotected Fentanyl Matrix Versus the

10   Duragesic Reservoir Matrix," correct?

11          A.    Yes.

12          Q.    Was this study -- now, this

13   is another Don Jasinski.  Who is Tom

14   Kosten?

15          A.    I'm sure he was a subject

16   expert.  I don't recall exactly what his

17   affiliation or title was.

18          Q.    The optimal outcome here

19   would be that the Duragesic reservoir

20   patch, if it was chewed, would have less

21   of a detrimental effect than if someone

22   chewed the matrix patch, correct?

23          A.    Yes.

24          Q.    Was this study ever done?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No.

2          Q.     Do you know why?

3          A.     Well, again, in the total

4     potential studies that were proposed and

5     evaluated within the context of the

6     budgets and the timelines, we selected a

7     subset of studies that were most

8     relevant.  In this instance, just looking

9     at it today, it probably overlapped in

10    some instances in data that we would be

11    generating from some of the other

12    studies.

13         Q.     Do you know if any -- if

14    there had been any data development prior

15    to this with respect to chewing either a

16    reservoir matrix or a -- or the

17    unprotected matrix -- I'm sorry, a

18    reservoir patch versus the matrix patch?

19         A.     I don't know.

20         Q.     Do you know if any studies

21    had been done in Europe?

22         A.     I don't know.

23         Q.     The next safety study was

24    "The Effect of Heat on Fentanyl Release

Highly Confidential - Subject to Further Confidentiality Review

1    in Duragesic and Fentanyl Matrix."  Do

2    you know if this study was done?

3         A.    Yes.

4         Q.    It was done?

5         A.    It was done.

6         Q.    And the optimal outcome was

7    that Duragesic has less variability.  Is

8    that what was found in the study when it

9    was ultimately conducted?

10        A.    I believe in fact we did

11   show that there was less fentanyl

12   transfer using a reservoir patch than a

13   matrix patch.

14        Q.    Do you know what kind of

15   heat was used?

16        A.    I don't recall.  It was

17   probably a heating pad which could be set

18   specifically to certain temperatures.

19   But again, I don't want to -- I don't

20   recall exactly.

21        Q.    Okay.  Then I see another

22   safety study.  This is the one with

23   respect to abraded skin.  Was that done?

24        A.    Not in a human volunteer.

Highly Confidential - Subject to Further Confidentiality Review

1  This was done, I believe this was done in

2  rats or mice.

3          Q.    Okay.  That was also ALZA?

4          A.    It was ALZA.

5          Q.    And the next slide, this

6  just tells you when the studies would be

7  -- sort of a timeline for the proposed

8  studies?

9          A.    Yes.

10         Q.    Okay.  You can put that one

11 away.

12              (Document marked for

13              identification as Exhibit

14              Janssen-Moskovitz-22.)

15 BY MS. CONROY:

16         Q.    I'll hand you Exhibit 22.

17              MS. CONROY:  Sorry, folks,

18              you'll have to use the...

19 BY MS. CONROY:

20         Q.    Doctor, this is -- it's hard

21 to tell.  This looks it might have -- I

22 don't know whether this was slides or a

23 booklet.  It is JAN-MS-00725016.  And

24 it's a technology comparison, reservoir

1  versus the matrix patch system.  And it's

2  sales training, dated February 25th,

3  2004.

4           Does this look familiar to

5  you?

6       A.    I'm certainly aware of the

7  information that's here.  I can't say

8  that I've seen this slide deck or this

9  exact presentation of the data.  I'm

10  certainly aware of the information here.

11      Q.    And are you aware that the

12  sales force was trained with respect to

13  the technological differences between the

14  reservoir and the matrix patch?

15      A.    Yes.

16      Q.    And would they have been

17  trained sometime around the winter in

18  2004?

19      A.    Going by the date on the

20  first page, that would seem to be the

21  case.

22      Q.    Did you yourself ever

23  conduct or speak at any sales training

24  conferences or seminars about the

1  differences between the reservoir and the

2  matrix?

3          A.    I don't recall that I did.

4  I spoke to sales representatives on a

5  number of topics.  I can't say

6  specifically that I would have spoken to

7  them on the reservoir versus matrix or

8  that someone else in my group may have

9  done that, or that someone in the medical

10  information group might have done that.

11          Q.    Is it fair to say that if a

12  comparison was done and written up like

13  this, your eyes would have been on this

14  at some point?

15          A.    We would have reviewed the

16  information.

17          Q.    Did you ever do any webinars

18  or any sort of video presentations for

19  the sales force on any particular

20  matters?

21          A.    I don't recall that I did

22  webinars.  Certainly I did some training

23  at sales meetings, particularly around

24  clinical trial data.  Again, I can't tell

1   you the specifics of each and every

2   presentation that I might have been

3   involved with.

4             I don't recall that I had

5   any webinars as part of the sales

6   training.  That doesn't mean that I

7   didn't.

8        Q.   What about any videotaping

9   of some -- a time when you were speaking

10  about things so that it could be viewed

11  by others at a later date?

12       A.   I know that there were

13  instances where I was videotaped, and I

14  believe some of those videotapes may have

15  been for sales training purposes.

16       Q.   Have you ever had any media

17  training?

18       A.   Yes, I have.

19       Q.   And when did you have that?

20       A.   Oh, at various times over

21  the course of my being with Janssen, both

22  on the R&D side and on the medical

23  affairs side.

24       Q.   And it was -- it was a

Highly Confidential - Subject to Further Confidentiality Review

1    Janssen though, you weren't -- you

2    didn't -- this wasn't media training, you

3    know, for like a rep theater or

4    something, this was Janssen?

5         A.    Yes.

6         Q.    Was to do with your job?

7         A.    Yes.

8         Q.    And if this -- this is just

9    a -- the key points between the reservoir

10   and the matrix.  And if we can just take

11   a look, the reservoir has a rate

12   controlling membrane that you have spoken

13   to me about.  And that regulates the flow

14   of fentanyl into the skin; do you agree

15   with that?

16        A.    Yes.

17        Q.    It just explains there the

18   fentanyl and alcohol is in a gel.  That's

19   what the reservoir is, correct, a gel?

20        A.    It's the composition, yes.

21        Q.    It says, "Difficult to

22   extract pure fentanyl from the patch."

23             Do you agree with that?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And did you -- and you had

2    conducted studies to show that?

3    A.    Well, so if you cut the

4    patch, you are going to be getting the

5    fentanyl in the cellulose gel and

6    alcohol.  Then you would first have to

7    purify the fentanyl.  So, yes, we knew

8    that -- that that would require more --

9    additional steps.

10    Q.    Right.  Because to get the

11    fentanyl, you have to get rid of the gel?

12    A.    And the alcohol -- the

13    alcohol and the cellulose gel, yes.

14    Q.    "Cutting the patch renders

15    the system inactive."  By that you mean,

16    if you cut the patch, it renders the

17    system of extended-release pain relief

18    inactive?

19    A.    The ability to deliver a

20    controlled release of fentanyl over the

21    72 hours inactive.

22    Q.    And, "13 years of proven

23    safety."  The reservoir patch had been on

24    the market for 13 years at that point?

1        A.      Since 1990.

2        Q.      "The matrix itself has no

3   rate-controlling membrane."  The drug is

4   delivered directly into the skin,

5   correct?

6        A.      Yes.

7        Q.      And is that true today with

8   a matrix patch?

9        A.      I believe that there are

10  several formulations of matrix patches.

11  I can't speak to each and every one of

12  them.  I -- there are matrix patches that

13  don't have a rate-controlling membrane,

14  but I can't speak to all of them.

15       Q.      Okay.  At the time when this

16  was written, the matrix patch sold by

17  Janssen in Europe delivered the drug

18  directly onto the skin -- or into the

19  skin, correct?

20       A.      I believe so.

21       Q.      There was no

22  rate-controlling membrane in the matrix

23  patch, the Janssen matrix patch in

24  Europe?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I believe so.

2    Q.    Okay.  And the -- and a few

3  years later, the Janssen matrix patch

4  that was sold in the United States did

5  not have a rate-controlling membrane?

6    A.    I believe that's correct,

7  that it was very similar to the matrix

8  patch that had been sold in Europe.

9    Q.    Are you familiar, at least

10 until the time you left Janssen in 2011,

11 of any Janssen matrix patch that had a

12 rate-control membrane?

13   A.    No.

14   Q.    The next point is "Drug in

15 adhesive formulation."  And then the next

16 point is "Unforeseeable extraction

17 methods and implications."

18        I'm -- I'm questioning this

19 because I thought we -- we -- there are

20 foreseeable extraction methods, correct?

21   A.    Yes.  Put it in vodka.

22   Q.    Right.  So this, this just

23 means that, to the sales force, that

24 there are many ways that fentanyl can be

Highly Confidential - Subject to Further Confidentiality Review

1    extracted from a matrix patch?

2         A.    Ways that we might not even

3    imagine.

4         Q.    Okay.  "Cutting the patch

5    allows the system to remain intact."  And

6    I think you explained to me why that is a

7    safety concern, because each one of the

8    pieces can deliver -- can be sold and

9    deliver fentanyl?

10        A.    Can be sold and deliver a --

11   a known quantity of fentanyl.

12        Q.    "Currently marketed matrix

13   systems are untested with controlled" --

14   "with CII opioids."

15              What does -- what do you

16   mean by that?

17        A.    There were other matrix

18   systems for other drugs on the market but

19   they were not Schedule CII opioids.

20        Q.    I see.  So the -- the matrix

21   patch that was either -- at this point

22   now we are in February of 2004, was

23   either just going on the market in the

24   U.S. or it was about to go on the market?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    No.  The matrix -- the

2  matrix patch didn't go on the market

3  until January of 2005.  There were other

4  drugs, nonopioids, that were available as

5  sustained-release formulations to deliver

6  the drug in a matrix patch, but they were

7  not opioids.

8      Q.    I see.  Okay.

9      A.    So I mean, the technology

10  was well known, but they -- it had not

11  been used at this time to deliver an

12  opioid.

13      Q.    I see.

14          Turn the page.  And I think

15  that explains some questions I had about

16  this.

17          The -- this is talking about

18  the rate-controlled -- the

19  rate-controlling membrane in the

20  reservoir versus the no-rate-controlling

21  membrane in the matrix.

22          And then you -- this

23  explains then why it's important.  And

24  then if you go to the last paragraph, it

Highly Confidential - Subject to Further Confidentiality Review

1  says, "The currently marketed matrix

2  delivery systems are untested in real

3  world prescribing situations with

4  Schedule II opioids."

5       That's what you were just

6  telling me, correct?  Because it's been

7  tested with respect to other drugs,

8  there's no testing as far as you know

9  with respect to the delivery of a

10  controlled substance?

11       A.    Of controlled substances,

12  yes, that's correct.

13       Q.    "This means that physicians

14  who choose the matrix are knowingly" --

15  "are unknowingly investigators in an

16  overdue safety trial."

17       Do you see that?

18       A.    Yes.

19       Q.    Had there been any safety

20  trials of the matrix system with respect

21  to the delivery of opioids in Europe?

22       A.    I -- I don't know.

23       Q.    Well, it would -- looking at

24  this, it would suggest to me that Janssen

Highly Confidential - Subject to Further Confidentiality Review

1   was selling the matrix patch in Europe

2   without any safety trials.

3            MR. LIFLAND:  Object to the

4        form of the question.

5            THE WITNESS:  We were aware

6        of the fact that there could be a

7        hypothetical greater release of

8        fentanyl under special conditions

9        such as heat, but those conditions

10       were warned against.  It was true

11       for the fentanyl reservoir patch

12       as well.

13           What that meant in terms of

14       a population of nonpatients who

15       might choose to abuse, misuse or

16       divert the drug was unknown.

17  BY MS. CONROY:

18       Q.    But the -- this one isn't

19  talking about abuse or diversion.  This

20  is just talking about patients, the --

21  the matrix system was untested with

22  respect to the release of a controlled

23  substance to patients, to legitimate

24  patients --

1          A.     Other than --

2          Q.     -- at this time in --

3          A.     Well, other than the fact

4    that we knew even with a reservoir that

5    under conditions that we warn against

6    such as heat release, you would have a

7    greater release of fentanyl than without

8    those conditions.

9          Q.     Correct, but this suggests

10   to me that the reservoir patch had been

11   tested with respect to whether or not

12   controlled substances could be safely

13   administered to a patient.

14              MR. LIFLAND:  Object to the

15         form of the question.

16              THE WITNESS:  I'm not

17         following exactly your question

18         because by virtue of the fact that

19         there were pharmaco-equivalence

20         studies, bioequivalence studies

21         that showed under conditions of

22         appropriate use you would deliver

23         the same amount of fentanyl.  By

24         virtue of those studies, you are

1    showing similar efficacy and

2    safety.

3  BY MS. CONROY:

4        Q.    So this -- this statement to

5  the sales force is not correct, it's

6  false?

7        A.    No, because we're not

8  talking about a controlled bioequivalent

9  study.  We're saying in real world --

10  real world prescribing situations where

11  we don't know how well the patient has

12  been instructed on the appropriate use of

13  the product.

14        Q.    It doesn't say that

15  anywhere, does it?

16        A.    Well, that's what we mean

17  by --

18            MR. LIFLAND:  Objection to

19        the form of the question.

20            THE WITNESS:  That's what we

21        mean by real world prescribing.

22        So that's in contradistinction to

23        a controlled pharmacokinetic

24        bioequivalent study.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. CONROY:

2          Q.    This says that it's untested

3    in -- "the matrix is untested in real

4    world prescribing situations."  What is

5    your understanding of a real world

6    prescribing situation?

7          A.    What might happen -- and

8    here we are talking about the United

9    States.  Again, we already had data that

10   the environment was different in Europe.

11   So when we say real world, it's in the

12   context of the environment in which we're

13   going to be using the product.

14              There were no data on how --

15   what would happen in the context of

16   prescribing a matrix formulation versus a

17   reservoir formulation other than in a

18   controlled environment where you're --

19   where you're showing that the two are

20   bioequivalent.

21              If the patient accidentally

22   uses it in a manner other than

23   prescribed, he or she might have

24   different outcomes than in the controlled

Highly Confidential - Subject to Further Confidentiality Review

1    system of a laboratory that's looking at

2    bioequivalence.

3          Q.    In healthy human volunteers.

4          A.    Well, that's why I say, in

5    a -- in a real world patient population,

6    where we don't know whether the physician

7    has adequately counseled the patient on

8    the conditions to avoid, whether that

9    might lead to different outcomes than

10   using the reservoir patch.

11         Q.    Was a -- was a safety trial

12   ever done with respect to the matrix

13   patch in a real world situation with

14   prescribing physicians?

15         A.    In a sense, it was because

16   we used the matrix patch to gain approval

17   for pediatric -- for the pediatric

18   indications.  So we had data, safety data

19   for the pediatric population.

20         Q.    And that was later in the

21   2000s?

22         A.    That was -- led to the

23   approval in 2005.

24         Q.    So the pediatric studies had

1    been done by 2005?

2         A.    Were underway and filed so

3    that the approval came in 2005.

4         Q.    And then why were you

5    telling the sales force that a physician

6    who chooses the matrix are unknowingly

7    investigators in an overdue safety trial,

8    if you had data that showed that the

9    matrix was safe?

10        A.    In a pediatric population.

11   But in the broader -- that's a tiny

12   fraction of the market.

13             The broader population, we

14   can control what we inform the physician

15   in terms of what he or she needs to do to

16   educate the patient.  But we had concerns

17   that in real world use, especially if the

18   drug is diverted outside the patient

19   population, that there may be adverse

20   outcomes that we couldn't predict based

21   upon some of the data that we generated.

22        Q.    I understand that, and I

23   think we see some of that data and the

24   effectiveness -- in the attractability

1    and the extraction studies.

2              But this particular sales

3    force educational piece, doesn't talk

4    about abuse and diversion.  If you look

5    at the paragraph above, it says, "A

6    rate-controlling membrane ensures the

7    system delivers fentanyl at a constant

8    rate throughout through wearing period,

9    up to 72 hours, regardless of skin type.

10   Without the membrane" -- which is the

11   membrane in the reservoir -- "the skin

12   itself must regulate drug delivery, which

13   can lead to variations in delivery from

14   patient to patient."

15             So this is not talking about

16   abuse or diversion, correct?

17        A.    Correct.

18             MR. LIFLAND:  Object to the

19        form of the question.  Let me make

20        my objection before you start your

21        answer.

22             THE WITNESS:  Okay.  I

23        didn't know that you would object.

24        I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. LIFLAND:  Well, give me

2      a moment then.  I don't always,

3      but occasionally.

4          THE WITNESS:  When we put

5      this together, our focus is on

6      patients.  In the back of our

7      mind, we also recognize that there

8      is potential for these drugs to be

9      diverted.

10      So yes, our focus is on

11     patients, and we were concerned

12     that if patients didn't follow

13     appropriate use guidelines, that

14     there was a concern in that -- in

15     the patient population that there

16     would be different outcomes than

17     with a reservoir.

18  BY MS. CONROY:

19     Q.   But the sales force doesn't

20  know what's in your head, right?

21         MR. LIFLAND:  Object to the

22     form of the question.

23         THE WITNESS:  Okay.  I'll

24     grant you that the sales force

1        doesn't know what's in my head.

2        But in putting the slides

3        together --

4   BY MS. CONROY:

5        Q.    So the sales force reading

6   this would not understand that what you

7   may have been thinking about was abuse

8   and diversion?

9            MR. LIFLAND:  Objection.

10  BY MS. CONROY:

11       Q.    This is --

12           MR. LIFLAND:  Sorry.

13  BY MS. CONROY:

14       Q.    This is talking about normal

15  use by a physician prescribing it to

16  wear it -- for a patient to wear it for

17  72 hours?

18           MR. LIFLAND:  Object to the

19       form of the question.

20  BY MS. CONROY:

21       Q.    Correct?

22       A.    I would take a step back

23  anyways.  This is not information that we

24  are instructing a sales representative to

1    have a discussion with a physician.  This

2    is for the sales representative to gain

3    an understanding of the differences

4    between a potential matrix and the

5    reservoir patch.

6              It's purely an educational

7    opportunity so that they recognize

8    differences between the systems.  It's

9    not meant for a sales purpose.

10         Q.    I thought the whole purpose

11   of doing these studies was to identify

12   advantages and disadvantages between

13   products.  Isn't that what the sales

14   force would be communicating to

15   customers?

16         A.    No.

17              MR. LIFLAND:  Object to the

18         form of the question.

19              THE WITNESS:  No, it's not.

20         That formed the basis of the

21         Citizen's Petition where we asked

22         the FDA, that based upon the data

23         that we generated, there be a

24         consideration of the potential

1    differences in abuse, misuse, and

2    diversion between a reservoir

3    patch and a matrix patch.

4         Those considerations should

5    go into their decision whether to

6    approve a matrix patch in the

7    United States.

8    BY MS. CONROY:

9         Q.    And you don't think --

10        A.    If they never approved the

11   matrix patch, the sales force would

12   continue to sell a reservoir patch.

13        Q.    But you don't believe the

14   sales force would be using that

15   information between the Mylan matrix

16   patch and the Duragesic reservoir patch?

17        A.    The sales force was

18   instructed on using the package insert

19   and the approved promotional materials.

20   If there was no approved promotional

21   materials that spoke to differences

22   between a reservoir patch and a matrix

23   patch, then they wouldn't be using that.

24        Q.    Despite training them on the

Highly Confidential - Subject to Further Confidentiality Review

1  technological comparisons, correct?

2          MR. LIFLAND:  Object to the

3      form of the question.

4          THE WITNESS:  We trained

5      them on what would be coming down

6      the pike, if you will.  We trained

7      them on other opioids as well,

8      even though they weren't selling

9      other opioids.  They needed to

10     have a broad base of knowledge

11     about competitive products,

12     including competitive products

13     that might be coming to the

14     market.

15 BY MS. CONROY:

16     Q.    Were they precluded from

17 ever stating any of this information to a

18 physician?

19     A.    If it was not part of

20 approved promotional materials, they

21 were.

22     Q.    Do you know if there are any

23 promotional materials that ever described

24 the differences between the reservoir and

1    the matrix system?

2           A.     I don't recall.

3           Q.     So if those exist, the sales

4    force would have been allowed to promote

5    the product by using a comparison between

6    the reservoir patch and the matrix patch?

7           A.     In theory, yes.  And that --

8    if it existed, it might have been limited

9    to simply a discussion of the basic

10   characteristics, that one is in an

11   alcohol and gel-based system and another

12   product is available in a

13   drug-in-adhesive formulation.

14              MR. LIFLAND:  Just -- you

15         don't need to speculate about what

16         may or may not exist in terms of

17         answering questions.

18              MS. CONROY:  Let's take a

19         five-minute -- I should say ten

20         minutes.  Not sure.

21              THE VIDEOGRAPHER:  Okay.

22         Off the record, right?

23              The time is 10:53 a.m.

24         We're going off the record.

Highly Confidential - Subject to Further Confidentiality Review

1          (Short break.)

2          THE VIDEOGRAPHER:  We are

3     back on the record.  The time is

4     11:34 a.m.

5  BY MS. CONROY:

6          Q.   Doctor, I'm going to mark as

7  the next exhibit, 23, a primary care

8  franchise update.  It looks like a slide

9  deck with your name on it from June 23,

10 2004.

11         (Document marked for

12    identification as Exhibit

13    Janssen-Moskovitz-23.)

14         MS. CONROY:  What did I say

15    it was, 24?  23.

16         MR. LIFLAND:  23.

17         MS. CONROY:  23.

18         MR. LIFLAND:  I guess we got

19    the Bates number in the back.

20         MS. CONROY:  I'm going to

21    read it into the record.  It's at

22    the back of the document.  It's

23    JAN-MS-00492868.

24 BY MS. CONROY:

1    Q.    Doctor, we see here in the

2    first slide -- this is -- we saw this in

3    another slide deck as well.  You are the

4    executive director of the primary care

5    division of medical affairs at this time,

6    correct?

7    A.    For the pain products, yes.

8    Q.    For the pain products.

9    A.    And actually, at this time

10    it included gastrointestinal products.  I

11    can see --

12    Q.    Okay.

13    A.    -- Byron DeLemos was

14    reporting to me.

15    Q.    So you had some -- you had

16    some GI products and -- oh, I see over

17    here.  Byron DeLemos --

18    A.    DeLemos.

19    Q.    -- was reporting to you.

20          And then you have Gary

21    Vorsanger, senior director.  And he

22    was -- he was working on the pain

23    products, correct?

24    A.    Yes.

1          Q.    And you explained to me

2    yesterday what medical science liaison

3    did.

4               Did they -- did medical

5    science liaison work for -- work with

6    both the GI products and the pain

7    products at that time?

8          A.    There were -- no, we didn't

9    have medical science liaisons that worked

10   on the GI product.  The GI products were

11   legacy products and they were not

12   actively marketed at the time.  But if

13   there were regulatory reporting

14   requirements, that fell within my group.

15         Q.    And if you take a look

16   through the slides.  And we've seen some

17   of this information before.  If you --

18   the slides are not numbered.  There is

19   one that says, "Play to Win Strategies."

20              Do you know if that was the,

21   I'll call it the slogan for the year or

22   the marketing plan slogan for the year?

23   Does that have any familiarity with you?

24         A.    Very vaguely.  I don't

1    recall.

2            Q.    Okay.  One of the

3    play-to-win strategies was to

4    differentiate Duragesic from the generic

5    matrix patch.  Do you see that?

6            A.    Yes.

7            Q.    And the Duragesic is the

8    reservoir, correct?

9            A.    Yes.

10           Q.    And the -- the two points

11   here are that the patches can be cut

12   which would be an avenue for diversion

13   and abuse.

14                 Increased opportunities for

15   misuse.  That would be heat issues,

16   things like that?

17           A.    Anything that's not per

18   package insert, directions on use.

19           Q.    And then the second point is

20   that the fentanyl matrix patches do not

21   have a rate-controlling membrane, which

22   we looked at earlier, which means that

23   the -- the drug is directly on the skin,

24   correct, there's no rate-controlling

Highly Confidential - Subject to Further Confidentiality Review

1  membrane like there was in the reservoir

2  patch?

3        A.    That's correct.

4        Q.    There's a little bit more on

5  the next page, there's a little bit more

6  about that rate-controlling membrane.

7              The rate-controlling

8  membrane is a key feature of the

9  Duragesic reservoir patch, correct?

10        A.    Yes.

11        Q.    And it -- and the -- I take

12  it the lack of the rate-controlling

13  membrane could have significant

14  implications for patient safety.  And

15  that's with respect to patients --

16  patients who are properly or

17  appropriately using the product, correct?

18        A.    Potentially for patients who

19  would not be using the product

20  appropriately.

21              Patients who would be using

22  the product per package insert, i.e., not

23  applying heat, not cutting it, the matrix

24  would deliver the same amount of fentanyl

1    over the same period of time.  When we

2    say patient safety, this is potentially

3    if they were misusing the drug.

4         Q.    So is it your testimony you

5    were only worried, or you were only

6    concerned about the existence or

7    nonexistence of a rate-controlling

8    membrane with patients who were misusing

9    the product, not -- by that I mean, and

10   not legitimate patients appropriately

11   using the product?

12        A.    Thank you.  Legitimate

13   patients appropriately using the product,

14   we expected that the rate of delivery of

15   fentanyl would be identical, pharmaco

16   equivalent to the Duragesic patch.  So,

17   yes.

18        Q.    Why didn't you say that?

19        A.    Say what?

20        Q.    Why did --

21        MR. LIFLAND:  Object to the

22        form of the question.

23   BY MS. CONROY:

24        Q.    Why would you say

1   significant implications for patient

2   safety?  Why -- why didn't you

3   describe -- in the above section you talk

4   about misuse and diversion, but that does

5   not appear to be the case in this bullet

6   point.

7              MR. LIFLAND:  Object to the

8         form of the question.

9              THE WITNESS:  This is an

10        internal document that updates

11        people.  I don't know what I might

12        have said around these bullet

13        points.  But certainly there were

14        concerns that if patients weren't

15        following the appropriate use

16        guidelines, that they may be

17        exposed to more fentanyl and that

18        would represent a patient safety

19        issue.

20  BY MS. CONROY:

21        Q.    You can put that document

22  away.

23              It will be a little bit out

24  of order, but let me show you Exhibits 25

1    and 26.

2                    (Document marked for

3            identification as Exhibit

4            Janssen-Moskovitz-25.)

5                    (Document marked for

6            identification as Exhibit

7            Janssen-Moskovitz-26.)

8    BY MS. CONROY:

9            Q.    26 is a cover letter from

10   Gayatri Sathyan to Gary Vorsanger, and

11   you are on the cc list.  And it actually

12   attaches the -- Dr. Allcorn Mudskipper

13   White Paper.

14                   And then Exhibit 27 -- I'm

15   sorry.  25 is the confidential draft

16   document, White Paper.  And it's the

17   August 16, 2004, draft.

18                   The -- Exhibit 26 is

19   JAN-MS-021029711, and the White Paper,

20   Exhibit 25, is JAN-MS-02109712, and it's

21   an attachment to Exhibit 26.

22                   MR. LIFLAND:  No, actually

23           she's going to hand you --

24                   MS. CONROY:  I'm going to

1    hand you this one so that you have

2    the stickers.  So the title --

3         MR. LIFLAND:  Sorry.  The

4    first page is 25, and the next one

5    is --

6         MS. CONROY:  No.  The first

7    page is 26.  The attachment is 25.

8         MR. LIFLAND:  Okay.  Thank

9    you.

10   BY MS. CONROY:

11        Q.    If we take a look at

12   Exhibit 26 first, the cover letter.

13        I'm sure I've butchered the

14   name.  Gayatri Sathyan, who is that?

15        A.    It was an ALZA

16   representative.  I don't recall

17   exactly -- based upon the totality of

18   what I'm looking at, probably somebody

19   who was working in the pharmacokinetic

20   group or assessment of -- of drug

21   delivery systems.

22        Q.    And we know who

23   Dr. Vorsanger is?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And Suneel Gupta in -- is

2    also at ALZA?

3    A.    Yes.

4    Q.    You can tell that from the

5    address?

6    A.    Yes.

7    Q.    And then I think you told me

8    Clare Harte is in medical affairs as

9    well; is that correct?

10   A.    That's correct.  She was in

11   the operations group, and she had some

12   overall responsibility with the

13   contracting with the various

14   organizations that we work with and with

15   the operational side of getting the data

16   and collating the data.

17   Q.    If you look below, Clare had

18   sent some slides around.  And then she

19   asked at least the folks on the e-mail --

20   it doesn't look like you are on the

21   e-mail.  "Check the accuracy of the

22   slides and the pharmacokinetic section of

23   the White Paper of this most recent

24   draft."  And then --

1          A.      Excuse me.

2          Q.      Bless you.

3                  And then it looks like the

4    ALZA individual writes, and includes you

5    on it, to Dr. Vorsanger and also Clare

6    Harte that there were some comments on

7    the White Paper.  Number one, "The heat

8    study that showed no major difference

9    between the two formulations is basically

10   being ignored."

11                 And I'm trying to understand

12   what that means.  Did the heat study data

13   show that there was not a difference with

14   respect to release between the reservoir

15   and the matrix patch?

16         A.      I don't recall.  I'd have to

17   go back to the studies.

18         Q.      And then do you recall any

19   issue concerning where to put the patch

20   with respect to delivery of the drug?

21         A.      There are guidelines in the

22   package insert about where to put the

23   drug and how to rotate the attachment

24   site.

1      Q.    Have you ever heard about a

2  difference between putting it on the arm

3  versus the back versus the chest?

4      A.     There were potentially

5  differences because of blood flow in the

6  area that could lead to slight

7  differences in the absorption of the

8  fentanyl.

9      Q.    Do you know -- it says here,

10  "We can speculate such a difference would

11  not show up for the reservoir, but we

12  don't have data."

13          Do you know if any data was

14  ever collected with respect to whether

15  there would be a difference with respect

16  to drug delivery between the arm, the

17  back, or the chest?

18      A.    I don't recall.

19      Q.    Let's take a look at the

20  White Paper itself.

21          MR. LIFLAND:  For the

22      record, this is 25?

23          MS. CONROY:  This is

24      Exhibit 25.  That's right.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. CONROY:

2         Q.    So the title of this is

3    "Transdermal Fentanyl Systems," which at

4    this time would be the reservoir with the

5    protective rate-controlled membrane and

6    the matrix that did not have a

7    rate-controlling membrane, correct?

8         A.    It would be the reservoir

9    and hypothetical matrix systems.  There

10   was nothing marketed at the time.

11        Q.    Well, there was a matrix

12   system marketed in Europe?

13        A.    Correct.  But the studies

14   that were done in here, we didn't have

15   access to the matrix product that would

16   be marketed in the United States.

17        Q.    So what did you --

18        A.    We used the product that was

19   available in Europe.

20        Q.    So you used the Janssen

21   matrix for these studies?  So you

22   compared the Janssen matrix to the

23   Janssen reservoir?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And it was your

2  understanding, at least, that the Janssen

3  matrix that you used for these studies

4  was equivalent to what you expected to be

5  sold as a matrix product in the United

6  States?

7    A.   Ultimately there were very

8  minor differences, because I believe that

9  the pharmacokinetics studies that showed

10  bioequivalence, there was an

11  intermediate -- I'm not certain.  I think

12  there were minor differences in the patch

13  that we ultimately brought to market, the

14  matrix patch that we ultimately brought

15  to market from the matrix patch that was

16  marketed at this time in Europe.  But I

17  don't know the specifics of it.

18    Q.   What do you know about that?

19  Was -- was there an attempt to make the

20  U.S. Janssen matrix patch somehow

21  different than the European Janssen

22  matrix patch?

23    A.   I don't recall that there

24  was any attempt to.  It may have been

1  related to excipients.  But I don't

2  recall.  I have a vague recollection that

3  we couldn't simply manufacture identical

4  matrix patch in the United States to what

5  was being marketed in Europe, and that

6  there were -- there was a bioequivalency

7  study that looked at an intermediate

8  product, and that to the one in the

9  United States.

10          My recollection of that is

11  really vague because it was all done

12  within the formulations group.

13      Q.    When you say an intermediate

14  product, where was -- is that a U.S.

15  intermediate product?

16      A.    Again, I don't know the

17  steps.

18      Q.    Okay.  Do you know if there

19  was ever a bioequivalency test performed

20  at any time between the Janssen European

21  matrix and the Janssen U.S. matrix when

22  they were both on the market?

23      A.    Yes.  Again I have a vague

24  recollection that there was a

1    bioequivalency study done between the

2    marketed matrix product in Europe to a

3    matrix product to be marketed in the U.S.

4    and then a subsequent study between the

5    matrix product to be marketed in the

6    U.S., which was bioequivalent to the

7    European matrix.  And that product to the

8    U.S. reservoir.  Again, I don't have -- I

9    don't have enough recollection of that

10   because most of the work was done in the

11   formulations group.

12         Q.    Is it your understanding

13   that the European matrix patch was

14   bioequivalent to the Janssen matrix patch

15   in the U.S.?

16         A.    Yes.

17         Q.    The remainder of the title

18   here is, "Reduced safety and increased

19   societal risk of matrix patch

20   formulations."

21              Would that include the

22   matrix patch formulations in Europe?

23         A.    These were hypothetical and

24   in some cases, you know -- based upon

Highly Confidential - Subject to Further Confidentiality Review

1   data that we generated over the course of

2   late 2003, 2004, that led us to believe

3   that there were different risks

4   potentially reducing the safety of a

5   matrix patch relative to the reservoir

6   patch in the context of the U.S.

7   environment.

8         Q.    Right.  The patches were the

9   same, it was the patients that were

10  different; is that correct?

11        A.    Or how it was used or how it

12  might be diverted and misused.

13        Q.    But the patches are the

14  same?

15        A.    The patches --

16        Q.    The matrix patch in Europe

17  is the same --

18        A.    -- as the matrix patch that

19  we used as a testing mechanism, where

20  we -- where we used the matrix patch.  In

21  the studies of attractiveness, it was a

22  description.

23        Q.    This front sheet has

24  Mudskipper Strategies.  That's

1    Dr. Allcorn that we spoke about earlier,

2    correct?

3            A.    Who is the principal of

4    Mudskipper, yes.

5            Q.    And you read through this

6    draft White Paper Exhibit 25, correct?

7            A.    Yes.

8            Q.    Carefully, correct?

9            A.    Yes.

10           Q.    If we turn to Page 11, over

11   into the next page, but it states here,

12   "We believe" -- "we" is Janssen, correct?

13           A.    Janssen, ALZA, yes.  And

14   certainly from -- with respect to

15   reservoir and our assessment.  Let's say

16   Janssen.

17           Q.    Okay.

18                 -- "taken together, this

19   information" -- which the information is

20   the comparison between the reservoir

21   patch and the matrix patch, correct?

22           A.    Yes.  And in another

23   instance also relative to other

24   extended-release, other opioids.

1    Q.    -- "demonstrates not only

2    that Duragesic" -- and that means the

3    reservoir patch, right?

4    A.    Yes.

5    Q.    -- "and fentanyl matrix

6    patches are not interchangeable in the

7    clinical setting but that matrix patches

8    present an unacceptable risk" --

9    "additional risk both to patient safety

10   and public health in the United States."

11            Do you see that?

12   A.    Yes.

13   Q.    And do you still agree with

14   that statement?

15   A.    We subsequently developed

16   data to show that the concerns we had at

17   this time didn't materialize.  So I would

18   say that no, I no longer believe that.

19   Q.    Okay.  What data did you

20   prepare or collect?

21   A.    You are talking about

22   subsequent?

23   Q.    Yes, that made you abandon

24   this.

1    A.    So as part of our commitment

2  to the Food and Drug Administration, we

3  continued to market the reservoir in the

4  United States, even after there was a

5  generic matrix fentanyl patch that came

6  to market.

7         As part of our commitment,

8  we had in place a number of surveillance

9  systems, some of which we spoke about

10  yesterday, DAWN, the key informant

11  network, examination of internet

12  websites, laboratory assessments.  And we

13  monitored that for several years.

14         At one point the FDA

15  requested that we shift from our

16  reservoir patch to a matrix patch.  And

17  we contended at the time that we had the

18  same concerns that we brought to the

19  FDA's attention in the Citizen's Petition

20  that we filed in 2004.

21         We at that time said to the

22  FDA, Well, okay, now we have several

23  years of data available to us from our

24  surveillance program, which to a great

Highly Confidential - Subject to Further Confidentiality Review

1   degree was able to differentiate between

2   the marketed matrix on the -- in the

3   United States and the reservoir patch,

4   and when we evaluated those data, we

5   concluded that the concerns we had about

6   increased risks of --

7           (Brief interruption.)

8           THE WITNESS:  I'm sorry.

9           -- increased risks for

10      abuse, misuse and diversion had

11      not materialized, and, therefore,

12      we felt comfortable in moving

13      ahead with the FDA's request that

14      we shift our own Duragesic

15      reservoir patch to a matrix patch

16      in the United States.

17  BY MS. CONROY:

18      Q.    So you became comfortable

19  that there was no increased risk of

20  diversion with respect to the matrix

21  versus the reservoir, correct?

22      A.    We had surveillance data

23  that did not show an increased risk for

24  abuse, misuse and diversion with the

Highly Confidential - Subject to Further Confidentiality Review

1    matrix patch.

2         Q.    Correct.  And then at one

3    point only the matrix patch is available

4    for sale in the United States with, you

5    know, with controlled substance?

6         A.    I -- it was my understanding

7    that there was another generic patch for

8    a time that was a reservoir patch, but at

9    some point they moved from that as well.

10   We weren't the only reservoir patch on

11   the market, but I don't recall the timing

12   for their switch either.

13        Q.    But at some point Janssen

14   switched and only sold the matrix patch,

15   no longer sold the reservoir patch?

16        A.    That's correct.

17        Q.    What studies indicated to

18   you that the matrix patch, after the

19   reservoir was no longer being sold, was

20   not attractive to abusers?

21        A.    We had surveillance data,

22   the surveillance mechanisms that we had

23   put in place in 2005 as part of our risk

24   management program that looked at DAWN

Highly Confidential - Subject to Further Confidentiality Review

1    data, that looked at internet monitoring

2    data, that looked at the NFLIS data

3    around laboratories, and it did not show

4    a difference in rates of abuse, misuse

5    and diversion between the matrix patch

6    and the reservoir patch.

7         Q.    That -- that wasn't actually

8    my question.

9              My question is what data

10   showed you that there was not abuse and

11   diversion with the matrix patch that was

12   being sold by Janssen in the United

13   States.

14              MR. LIFLAND:  Object to the

15         form of the question.

16              THE WITNESS:  And -- so we

17         had data that showed there was no

18         difference in rates of abuse,

19         misuse and diversion.  All of the

20         surveillance showed a small degree

21         of abuse, misuse, diversion

22         adverse events, but we were

23         concerned about potential

24         differences between the two and

Highly Confidential - Subject to Further Confidentiality Review

1    those didn't materialize based

2    upon our surveillance.

3  BY MS. CONROY:

4    Q.   And -- and I understand

5  that, and if you take a look at Page 11,

6  the statement is, "Matrix patches present

7  an unacceptable additional risk both to

8  patient safety and public health in the

9  United States."

10    What changed about the

11  matrix patch that made it not an

12  unacceptable additional risk to patients

13  in the U.S.?

14    A.   Perhaps nothing.  At the

15  time that we did this report, it was all

16  based upon hypothetical data.  There was

17  no matrix patch that was available in the

18  United States.

19    So all of the studies that

20  we did through 2003 and 2004 looked at

21  hypothetical risks associated with the

22  matrix patch.

23    The FDA nonetheless approved

24  a generic matrix patch.  They responded

Highly Confidential - Subject to Further Confidentiality Review

1    to our Citizen's Petition and justified

2    why they were moving ahead with approving

3    a matrix formulation of -- of transdermal

4    fentanyl.  And we did not at the time

5    switch.

6              But because of the

7    hypothetical concerns that we learned of

8    during the course of our studies, we

9    continued to monitor for those

10   differences.  And our -- at this time, we

11   were concerned that introducing a matrix

12   formulation would lead to increases in

13   additional risks to the patient

14   population or to the public health by

15   virtue of differences in diversion and

16   abuse, but they didn't materialize.

17             Q.    So what you don't agree with

18   any longer on Page 11 is the reservoir

19   and the fentanyl matrix patches may be,

20   in your estimation, they are

21   interchangeable?

22             A.    That the risks that we -- we

23   knew that pharmacokinetically they were

24   equivalent.  But we were concerned about

Highly Confidential - Subject to Further Confidentiality Review

1    other risks associated with misuse, abuse

2    and diversion.  They didn't materialize.

3    And until we convinced ourselves that the

4    risks that we were concerned about when

5    we did the early studies with the

6    hypothetical matrix in the United States,

7    it didn't materialize.  And therefore, we

8    felt comfortable moving, per the FDA's

9    request, in switching from our Duragesic

10   reservoir patch to a matrix patch.

11        Q.    So those risks cease to

12   exist with the matrix --

13        A.    They never -- they never

14   materialized.

15        Q.    So they --

16        A.    And I won't say they ceased

17   to risk.  There were risks associated

18   with the reservoir patch and with the

19   matrix patch.  We were looking at whether

20   there were significant differences in

21   those risks.  Differences in rates of

22   those risks.  We did not see a difference

23   in the rates of those risks.

24        Q.    But you saw no decrease in

Highly Confidential - Subject to Further Confidentiality Review

1  the rates with respect to the matrix

2  patch?

3          A.    I believe our conclusion was

4  that there was -- that once we reviewed

5  the surveillance data, that we concluded

6  that there was no additional risk.

7          Q.    Was there an issue with the

8  data with the ability to differentiate

9  between the reservoir patch and the

10  matrix patch?

11          A.    My understanding is

12  initially there was and we worked with

13  the colleagues who did the surveillance

14  program because we pushed them to the

15  extent possible to differentiate between

16  the -- the generic matrix patch and the

17  branded reservoir patch.

18          Q.    And approximately how many

19  months were both on the market in the

20  U.S.?

21          A.    Before we switched to a

22  matrix patch?

23          Q.    Correct.

24          A.    May I go back to see exactly

Highly Confidential - Subject to Further Confidentiality Review

1    when we brought the matrix patch?

2            Okay.  So in 2009 we -- we

3    brought the matrix patch.  Sometime

4    before that the FDA requested that we

5    switch from the reservoir patch.  But

6    certainly between 2005 and 2009 the

7    matrix patch in a generic formulation was

8    available in the United States.  So we

9    would have had data on several years of

10   surveillance.

11        Q.    And the FDA, as you state,

12   requested a change from the reservoir

13   patch to the matrix patch because of two

14   recalls for leaking fentanyl from the

15   reservoir patch?

16        A.    Because of manufacturing

17   issues associated with the Duragesic

18   reservoir patch, that's correct.

19        Q.    Did your analysis of the

20   data from 2005 to 2009 show any

21   differences in the manner of diversion

22   that you studied in this White Paper, the

23   attractiveness or the extractability?

24        A.    Well, it wouldn't show

1  differences in extractability.  That's a

2  laboratory control.  The differences we

3  saw in extractability led us to believe

4  that there might be differences in the

5  real world availability of the two.  But,

6  in fact, in the surveillance systems we

7  put in place, we didn't see the

8  additional risks associated with

9  differences in -- in availability under

10  those conditions.

11        Q.    Did you still see in that

12  data support for the attractiveness of

13  the matrix patch?

14        A.    Based upon the surveillance

15  systems we had in place, we didn't see

16  that the matrix patch was being abused,

17  misused, or diverted at a rate

18  substantially different from the

19  reservoir patch.

20        Q.    I understand that, but did

21  you see any difference with respect to

22  the attractability of the matrix patch to

23  abusers?  And I'm -- I'm not talking

24  about in comparison with the reservoir

1    patch.  I'm just talking about whether or

2    not your hypothesis about why the matrix

3    patch would be attractive to abusers held

4    up when you looked at the data.

5         A.    Well, we --

6              MR. LIFLAND:  Object to the

7         form of the question.

8              THE WITNESS:  We didn't

9         measure attractiveness.

10         Attractiveness was a measure in

11         the studies of whether a drug was

12         more attractive.  If a drug was

13         more attractive, then

14         theoretically that drug would be

15         sought more so than a comparator

16         drug, whether that be Duragesic

17         reservoir or another

18         extended-release opioid.

19              So although we didn't

20         surveil for attractiveness, we --

21         our surveillance was able to pick

22         up measures of abuse, misuse, and

23         diversion.

24              In those measures, we didn't

1     see a significant difference

2     between the two formulations.  It

3     doesn't say that the matrix patch

4     is or is not more attractive.

5     Within the environment of the

6     United States, it may -- it may be

7     that availability of other drugs

8     that are far more attractive

9     overrides the concerns between

10    differences in the reservoir or

11    matrix patch.

12         We simply didn't see

13    differences in rates of abuse,

14    misuse and diversion.  We didn't

15    measure attractiveness in any

16    surveillance system.

17  BY MS. CONROY:

18         Q.    Do you know if the street

19  value of the matrix patch changed at all

20  from your evaluation?  And it's on Page

21  61 of the White Paper.

22         A.    I don't know.

23         Q.    Then if you -- there's a --

24  you'll see there are calculations on the

Highly Confidential - Subject to Further Confidentiality Review

1    value of a cut matrix patch.  Do you know

2    if there were any --

3         A.    I'm sorry.  I'm afraid --

4    what page are you on?

5         Q.    61 and 62.

6         A.    Okay.

7         Q.    61, you see, at the top --

8    it talks about the -- 60 -- Page 62, the

9    economics of diversion of fentanyl matrix

10   patches?

11        A.    Somehow we're not looking --

12   this is my Page 62.

13        Q.    Yeah.  Go page 61.

14        A.    Okay.  Okay.  That's under

15   section 6.2.2.2?

16        Q.    Yes.  So take --

17        A.    Okay.

18        Q.    Take -- it says, "Economics

19   of" --

20        A.    Yep.

21        Q.    -- "diversion of fentanyl

22   matrix patches."

23        A.    Yes.  Okay.

24        Q.    Okay.  And then it talks

1    about the number of units that could be

2    cut?

3         A.    Yes.

4         Q.    Was there anything -- was

5    there any data that was ever collected

6    that indicated that that did not continue

7    to be true about the matrix patch?

8         A.    No.  We -- all of these data

9    were hypothetical.  We didn't collect

10   data on the street value of a matrix

11   patch of fentanyl.  We collected data on

12   actual abuse, misuse and diversion.

13        Q.    Was there anything that

14   indicated there was not still abuse,

15   misuse and diversion of the matrix patch

16   in the data that you reviewed?

17        A.    No.  We continued to see

18   measures of -- and rates of abuse, misuse

19   and diversion for both the Duragesic

20   reservoir patch and the matrix patch, but

21   we didn't see substantial differences

22   between the two.

23        Q.    If you look on Page 84,

24   Number 6 here, "Availability of a

Highly Confidential - Subject to Further Confidentiality Review

1    fentanyl matrix patch is likely to

2    increase the diversion of patches with

3    major" -- "with major public health

4    consequences for expansion of the current

5    market for illicit fentanyl and the

6    creation of new markets for illicit

7    fentanyl use."

8              Do you see that?

9         A.    Yes.

10        Q.    Any reason to believe that

11   that -- that statement or statements are

12   not -- do not continue to be true?

13        A.    Again, just in terms of the

14   surveillance that we had in place to

15   monitor for abuse, misuse and diversion,

16   we did not see differences between the

17   matrix patch and the reservoir patch.

18             Fentanyl continues to be a

19   potent Schedule II opioid that's sought

20   by drug abusers, and that was true after

21   the matrix was introduced and at the time

22   that Duragesic was on the market.  But we

23   didn't see differences when we did our

24   surveillance program.  We continued to

1    see use of illicitly obtained fentanyl,

2    but couldn't directly attribute that to a

3    matrix patch or a reservoir patch.

4         Q.    Did you -- when you reviewed

5    the data after 2004 when this was

6    prepared, did you see that the

7    availability of a matrix patch increased

8    diversion activity --

9         A.    No, we --

10        Q.    Did you see an increase in

11   diversion?

12        A.    The systems we had in place

13   monitored for abuse, misuse and

14   diversion.  We didn't see differences in

15   rates of diversion between the matrix

16   patch and the reservoir patch.

17        Q.    That's not my question.

18        A.    I understand.  So we weren't

19   monitoring for expansion of the market

20   for illicit products.  We -- the

21   surveillance mechanisms did pick up that

22   there was fentanyl that was abused,

23   misused, and diverted that was illicitly

24   obtained fentanyl.  And we knew that

1    illicitly obtained fentanyl was sought

2    after.

3            But where we had

4    surveillance data specifically for the

5    matrix and the reservoir, we didn't see

6    differences between those two.  Yes, we

7    knew that illicitly obtained fentanyl

8    increased over time.

9            Q.    So this -- this ended up

10   being true, Number 6, that the

11   availability of the matrix patch

12   increased the diversion of patches if you

13   saw in your data that there was increased

14   diversion of illicit fentanyl?

15            MR. LIFLAND:  Object to the

16         form of the question.

17            THE WITNESS:  You can't

18         correlate -- you can't show cause

19         and effect between availability of

20         pharmaceutical grade Duragesic,

21         whether it's in a matrix patch or

22         a reservoir patch, to the use of

23         illicitly obtained fentanyl.  That

24         may relate to lots of other

1     potential contributing factors,

2     such as availability of heroin on

3     the market or availability of

4     other products that are laced with

5     a very potent formulation of

6     fentanyl.  So we could not

7     conclude anything between the

8     availability of pharmaceutical

9     grade fentanyl as a matrix patch

10     or a reservoir patch and the use

11     of illicitly obtained fentanyl.

12  BY MS. CONROY:

13     Q.   If you couldn't determine

14  whether there was diversion of pharma

15  grade fentanyl versus illicit fentanyl,

16  how could you make the determination that

17  there was not a distinction between the

18  reservoir matrix -- the reservoir and the

19  matrix --

20     A.   Because --

21     Q.   -- if you can't

22  differentiate pharma grade?

23     MR. LIFLAND:  Object to the

24     form of the question.

1        THE WITNESS:  Because in

2        some of the surveillance programs,

3        they would report to us if they

4        discovered that it was Duragesic

5        or the Mylan early on, and other

6        generic formulations of

7        pharmaceutical grade patches.

8        They had the ability to

9        report to us if there was

10        diversion of those systems, or if

11        those systems were in use.

12        So based upon those

13        surveillance programs where they

14        were able to differentiate the

15        product that was being abused,

16        misused, and diverted, we didn't

17        see a difference between the two

18        formulations.

19   BY MS. CONROY:

20        Q.    And using those same

21   programs, were you able to determine

22   whether or not pharma grade -- the

23   diversion of pharma grade fentanyl was

24   increasing over time up until 2009?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'd have to go back to the

2  reports.  It's my understanding that

3  there were increases over time of abuse,

4  misuse and diversion for formulations of

5  Duragesic.  And that's what we warned

6  against.  That's why we strengthened our

7  package insert over time, because of the

8  concerns with increasing use of strong

9  opioids and the issues around abuse,

10 misuse and diversion.

11   Q.    Correct.  And so this --

12 what you talked about in 2004 apparently

13 was reflected in the data in 2009, that

14 the availability of a fentanyl matrix

15 patch is likely to increase the diversion

16 of patches?

17        MR. LIFLAND:  Object to the

18   form of the question.

19 BY MS. CONROY:

20   Q.    You saw that?

21        MR. LIFLAND:  Object to the

22   form of the question.

23        THE WITNESS:  I disagree

24   that you're showing that by virtue

Highly Confidential - Subject to Further Confidentiality Review

1    of making a matrix patch

2    available, that that led to the

3    increase in expansion of the

4    market for illicit fentanyl.

5    There's no cause and effect there.

6         That's as if saying that had

7    there never been a matrix

8    formulation brought to market, if

9    the Duragesic reservoir patch

10   remained on the market, we would

11   not see any increase in illicit

12   fentanyl use.  I can't say that

13   that would have been the case.  I

14   can only say that when a matrix

15   formulation of Duragesic, when it

16   was introduced to the market, we

17   didn't see differences between the

18   two.

19   BY MS. CONROY:

20        Q.   I know.  But you did say

21   this, you did say that there would be a

22   likely increase in the diversion of

23   patches once the fentanyl matrix patch

24   was available.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That was our --

2          MR. LIFLAND:  Object to the

3    form of the question.

4          THE WITNESS:  That was our

5    hypothetical concern based upon

6    the attractiveness scale and

7    the -- and the knowledge we had

8    that you could cut a matrix patch

9    more readily than you could a

10   reservoir patch.

11 BY MS. CONROY:

12   Q.    And you did see data in 2009

13 that there was an increased diversion of

14 pharma grade fentanyl?

15   A.    Yes, but I can't attribute

16 that to availability of a matrix patch.

17   Q.    Because it hasn't been

18 tested, correct?

19         MR. LIFLAND:  Object to the

20   form of the question.

21         THE WITNESS:  Illicitly

22   obtained fentanyl would be very

23   difficult to test.  We don't know

24   where the drug is coming from.

1    And in many instances, it's

2    co-mixed with heroin and other

3    drugs of abuse.  I'm not sure how

4    you would test that the

5    availability of pharmaceutical

6    grade fentanyl would lead to an

7    increase in illicitly used

8    fentanyl.

9  BY MS. CONROY:

10    Q.    Apparently Mudskipper

11  thought they could figure that out.

12        MR. LIFLAND:  Object to the

13    form of the question.

14        THE WITNESS:  Well,

15    Mudskipper didn't figure it out.

16    We were talking about their simply

17    summarizing the data.

18        Based upon what we knew of

19    the matrix formulation and other

20    studies we did, such as the

21    attractiveness, there was a

22    hypothetical risk that individuals

23    who were interested in abusing,

24    misusing or diverting opioid

Highly Confidential - Subject to Further Confidentiality Review

1    medications, including the

2    Duragesic patch or matrix, would

3    find the matrix patch to be more

4    attractive for abuse, misuse and

5    diversion.

6         If they had access to -- if

7    they wanted a fentanyl product and

8    had access to other fentanyl, such

9    as illicitly obtained fentanyl,

10   perhaps they would go there.

11        I can't make a direct

12   correlation between pharmaceutical

13   grade fentanyl and illicitly

14   obtained fentanyl.

15        I can only speak to what we

16   studied here which was whether

17   there were potential differences

18   between these two formulations.

19   We, in our studies, found

20   potential differences that

21   informed our conclusion that there

22   may be risks associated with the

23   matrix that were going to be

24   greater than risks associated with

1          the reservoir patch.  And we

2          brought those concerns to the FDA

3          in our Citizen's Petition.

4    BY MS. CONROY:

5          Q.    To date, are you aware of

6    any studies sponsored by Janssen that the

7    matrix patch has not increased the

8    diversion of patches?

9               MR. LIFLAND:  Object to the

10         form of the question.

11              THE WITNESS:  No.

12   BY MS. CONROY:

13         Q.    Turn to Page 90.  Do you see

14   where it says, "The parallels between

15   OxyContin" -- and that's a

16   controlled-release pill, correct?

17         A.    Controlled-release pill that

18   delivers Oxycodone.

19         Q.    -- "and the Mylan patch are

20   clear."

21              Were -- were there studies

22   done that compared the Mylan patch to

23   OxyContin?

24         A.    Not to my knowledge.

1    Q.    And Janssen did not have a

2  Mylan matrix -- matrix patch to test at

3  this time; is that correct?

4    A.    That's correct.

5    Q.    Do you know if that testing

6  was ever done, a comparison between

7  OxyContin and the Mylan matrix patch at

8  Janssen?

9    A.    For what reason?  When we

10  talk about parallels, we are not talking

11  about a clinical trial, we're talking

12  about a hypothetical understanding of

13  Oxycodone and extended-release Oxycodone,

14  what was known about OxyContin and what

15  was known about Duragesic and the data

16  that we generated through our studies on

17  a hypothetical patch, that we expected

18  would be coming to market in the 2005

19  time frame.

20    Q.    Do you know if there were

21  ever any clinical studies or trials that

22  compared OxyContin to the Janssen matrix

23  patch?

24    A.    There were not.

1    Q.    Do you know if there were

2  any done comparing the economics of the

3  patch, not the -- not the safety of the

4  patch, the bioequivalency of the patches,

5  patch to the -- to the OxyContin pill?

6    A.    Could you -- I'm sorry, I'm

7  not understanding.  When you say the

8  economics, you are talking about the

9  street value?

10    Q.    Oh, no, I'm not.  I'm sorry.

11    A.    Okay.

12    Q.    We talked yesterday, there

13  was -- we saw some studies between using

14  OxyContin versus a fentanyl patch, and

15  the -- and the effectiveness over time

16  and how much it would cost, the economics

17  of one pain treatment versus another.

18    A.    Okay.

19    Q.    Do you know -- so, I think

20  you've told me there were no studies

21  between the OxyContin -- between

22  OxyContin pills or whatever, and any

23  Janssen products with respect to safety

24  or diversion; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     With respect to diversion,

2    we had studies that compared OxyContin

3    and fentanyl, FEN-USA-71 and 72.  So we

4    had safety data.  But not data with

5    respect to misuse, abuse and diversion.

6    Those data were available to us through

7    the surveillance mechanisms that we had

8    in place.

9        Q.     Do you know if Janssen ever

10   conducted economic studies, and I'm

11   talking about maybe the value to a

12   formulary, or the value to a particular

13   patient population that compared

14   OxyContin to a matrix patch, you know,

15   made by Janssen?

16       A.     And that would be after

17   2009, so my answer would be no.

18       Q.     You are not -- you -- at

19   least you're not aware from 2009 to 2011?

20       A.     That's correct.

21       Q.     And do you know, are you

22   aware of anything, have you heard

23   anything after 2011?

24       A.     No, I haven't.

1        Q.    You can put that one away.

2             (Document marked for

3        identification as Exhibit

4        Janssen-Moskovitz-24)

5   BY MS. CONROY:

6        Q.    The next exhibit is the

7   Citizen's Petition, Exhibit 24.  That is

8   JAN-MS-02508937 through 48.

9             And you've -- you've talked

10  about the Citizen's Petition a bit today.

11  Is this the actual document?

12       A.    Yes.

13       Q.    And -- and ALZA filed the

14  Citizen's Petition?

15       A.    Yes.

16       Q.    And although -- was -- ALZA

17  was a part of Janssen at this time,

18  November 12, 2004?

19       A.    ALZA continued to

20  manufacture the Duragesic reservoir and

21  Janssen was responsible for sales and

22  marketing.  I don't recall the exact

23  companywide relationship between the two.

24  They continued to manufacture, sales and

1   marketing was the responsibility of

2   Janssen.

3           Q.     Is it fair to say that if

4   Janssen had not wanted the Citizen's

5   Petition to be filed, they could have

6   stopped it?

7           A.     Yes.

8           Q.     And can you describe for me

9   what a Citizen's Petition is?

10          A.     A Citizen's Petition gives

11  the opportunity for any interested party

12  in submitting a request to the FDA based

13  upon data that asks the FDA to take

14  certain actions.  It may be changes in

15  the labeling, it may be additional

16  studies.  It's asking the FDA to take

17  action relative to a certain compound.

18          Q.     And -- and what was being

19  asked in this context was that the FDA

20  would require anyone that was

21  manufacturing a fentanyl matrix system to

22  develop and implement a comprehensive

23  risk minimization program.  Do you see

24  that?

1    A.    Yes.

2    Q.    Is that the same as -- as a

3  risk management plan or -- or is a risk

4  minimization program something different?

5    A.    At -- at this time the FDA

6  was on the road towards developing risk

7  management plans, risk minimization and

8  assessment plans.  But plans that would

9  be able to track known risks and assess

10  the frequency with which they are seen.

11    Q.    And then ALZA, Janssen, also

12  requested that the FDA classify matrix

13  and reservoir fentanyl transdermal system

14  as well as products with and without

15  rate-controlling membranes as different

16  dosage forms that are not pharmaceutical

17  equivalents.  Do you see that?

18    A.    Yes.

19    Q.    And can you explain what was

20  meant by requesting that the products not

21  be pharmaceutical equivalents?

22    A.    So in a comparator way, the

23  FDA does not consider tablets and

24  capsules to be pharmaceutically

Highly Confidential - Subject to Further Confidentiality Review

1  equivalent, even if they deliver the same

2  amount of the active drug over the same

3  period of time.

4            So the FDA already had

5  guidelines under which they might

6  classify the two as being bioequivalent,

7  but not pharmaceutically equivalent.

8  That relates to interchangeability at the

9  level of the pharmacy.  In some states at

10  the time, if you write for the active

11  compound, then the -- the pharmacy can

12  fill that with what the FDA would

13  designate as pharmaceutically equivalent.

14            So going back to my

15  original, if you wrote for a capsule, you

16  could not substitute a tablet.

17       Q.    And so you were asking the

18  FDA that if -- if a physician prescribed

19  a reservoir matrix, that that would not

20  be able to be --

21       A.    That you couldn't -- that

22  you couldn't fill that prescription with

23  a fentanyl matrix patch.

24       Q.    And in support of your

Highly Confidential - Subject to Further Confidentiality Review

1    request, you see you talk about the

2    differences in the abuse liability and

3    drug delivery systems between the

4    reservoir and the matrix, correct?

5         A.    Yes.   There are the outcome

6    of the data that we generated over the

7    previous year and a half.

8         Q.    And what happened with the

9    Citizen's Petition?

10        A.    Well, the FDA took it under

11   advisement.  Ultimately they -- they

12   rejected the Citizen's Petition.

13        Q.    And after that rejection,

14   Janssen then moved for an approval of a

15   matrix formulation, matrix fentanyl

16   delivery system formulation?

17             MR. LIFLAND:  Object to the

18        form of the question.

19             THE WITNESS:  Yes, after.

20        But years later.

21             We continued to market the

22        Duragesic as a reservoir fentanyl

23        patch until 2009.

24             This was -- the rejection

Highly Confidential - Subject to Further Confidentiality Review

1    came in January 2005.  But we

2    continued to market the reservoir

3    patch through 2009 because of

4    concerns over what we had brought

5    forth in the studies that we did.

6  BY MS. CONROY:

7        Q.    And is the Citizen's

8  Petition based on the data that was in

9  the White Paper?

10        A.    Yes.

11        Q.    And in 2009 Janssen decided

12  to go forward with the matrix formulation

13  because of the review of the diversion

14  data in the --

15        A.    All -- I'm sorry.

16        Q.    -- in the surveys?

17        A.    All of the surveillance

18  data, that's correct.

19        Q.    Had you ever filed a

20  Citizen's Petition prior to 2004 for any

21  reason?

22        A.    Janssen had.  I had not.

23        Q.    Had you ever done it

24  subsequent to 2004?

1        A.      No.

2        Q.      You can put that away.

3                (Document marked for

4        identification as Exhibit

5        Janssen-Moskovitz-27.)

6    BY MS. CONROY:

7        Q.      That is Exhibit 27.  An

8    e-mail from -- well the top e-mail is

9    from you and it's dated March 24th of

10   2008.  And the Bates range is

11   JAN-MS-02005184 to 185.

12               The subject is "The

13   Duragesic Development Plan For a Matrix

14   Patch."  If you look at the bottom of

15   the -- of Exhibit 27, the first page,

16   there's an e-mail from Ravi Desiraju --

17       A.      Desiraju.

18       Q.      -- Desiraju.  And who is

19   that?

20       A.      He was on -- I believe he

21   was on the sales and marketing side or

22   PGSM.  He was not on the research side.

23       Q.      Okay.  And I see you are --

24   you are one of the recipients.

1    A.    Of Ravi Desiraju's e-mail.

2    Q.    Correct.  And I'm just

3  looking at who else.  Scott Trembley,

4  he's in medical affairs at that point,

5  correct?

6    A.    No.  He's on the sales and

7  marketing side.

8    Q.    Okay.  Karen Naim, where is

9  she from?

10    A.    BRM is the benefit-risk

11  management, U.S., so that was the safety

12  group.

13    Q.    Randolph, William Randolph,

14  what's that group?

15    A.    I believe that relates to

16  the manufacturing.  I'm not certain.

17  It's not sales and marketing.  It's not

18  medical affairs.

19    Q.    Okay.  And Carolyn Gerhardt.

20  What department is she in?

21    A.    PRD would be the R&D side,

22  the research and development side.

23    Q.    And Donna Abbondanza?

24    A.    I believe she was

1  regulatory.  I'm not certain.  But I

2  believe she was regulatory.

3          Q.    And Harindra Abeysinghe.

4  She is after Carolyn Gerhardt.

5          A.    That's a he.  He was

6  regulatory.

7          Q.    Okay.  Todd Moore.

8          A.    Not certain.

9          Q.    Okay.  Henry Richards?

10         A.    He was a physician, and I

11 believe -- he had a variety of positions

12 through the course of my time at Janssen.

13 At times he reported to me.  I believe at

14 this time he looked at some of the safety

15 issues.  But I can't say that for

16 certain.

17         Q.    Okay.  Did you say Ravi is a

18 man, right?

19         A.    Yes.

20         Q.    So Mr. Desiraju, is he a

21 physician or --

22         A.    No.  He is a pharmacist.  I

23 believe that's his background.

24         Q.    He writes to the team, "As

1    you may know, during a teleconference

2    with the FDA on Friday" -- and he's

3    writing this e-mail on a Sunday -- "they

4    strongly recommended that we proceed ASAP

5    with the development and launch of a

6    matrix formulation for Duragesic and

7    replace the reservoir formulation with

8    the matrix."

9              Do you see that?

10        A.    Yes.

11        Q.    And he asked people to be

12   ready to meet tomorrow to discuss the

13   elements of a development plan, do you

14   see that?

15        A.    Yes.

16        Q.    And then he also says he is

17   going to check to see if some patches can

18   be brought in from the EU and used in the

19   United States.

20              Do you see that?

21        A.    Yes.

22        Q.    Do you know if that ever

23   happened?

24        A.    I think that goes to what

Highly Confidential - Subject to Further Confidentiality Review

1    I -- my recollection earlier, that to do

2    the bioequivalency studies between the

3    matrix that we were marketing in Europe

4    and a matrix formulation that was being

5    developed in the United States, that we

6    wanted to have access to the European

7    matrix so that we could do the

8    bioequivalency studies to the matrix that

9    would be produced in the United States.

10        Q.    And I have -- I have your

11   response to his e-mail, it looks like you

12   kept the same folks on the e-mail chain

13   to me.

14        A.    Probably replied to all.

15        Q.    Yeah.  And it looks like you

16   responded the next -- on Monday

17   afternoon, but before the call that was

18   scheduled.

19        A.    Yes.

20        Q.    And you clarify, "The FDA

21   did not 'strongly recommend that we

22   proceed ASAP with the development and

23   launch of a matrix formulation for

24   Duragesic and replace the reservoir

1  formulation with the matrix.'"

2           And then you said, "If that

3  were the case there would be no need for

4  RADARS to update the report and for us to

5  review the findings."

6           What did you mean by that?

7      A.    So our concerns that we

8  expressed in the Citizen's Petition based

9  upon the studies that were conducted in

10 late 2003, 2004 always remained, which is

11 why we continued to manufacture the

12 Duragesic reservoir.

13          We understood that because

14 of the manufacturing issues with the

15 Duragesic reservoir, the FDA expressed

16 that they would like us to consider

17 moving to a matrix formulation.

18          But my point in this was

19 that while they -- while that was their

20 preference and they wanted us to move to

21 it, we would need to resolve the issue in

22 our own minds whether the concerns we had

23 expressed in the Citizen's Petition

24 remained the case, whether there were

1    instances -- whether there were

2    differences between the matrix

3    formulation and our reservoir formulation

4    with respect to potential for abuse,

5    misuse and diversion.

6         Q.    And now it's March of 2008.

7    So you still expressed the same concerns

8    that you had in the Citizen's Petition

9    four years later?

10        A.    Well we -- we didn't -- we

11   didn't have data that would allay those

12   concerns at this time.

13        Q.    You didn't have the data or

14   you didn't look at the data?

15        A.    We didn't evaluate the data

16   in a consistent manner that compared the

17   two.

18        Q.    So from the time that you

19   filed the Citizen's Petition in November

20   of 2004 until March of 2008, you had not

21   gone back to the data that you had

22   available to look to see whether or not

23   there was diversion of either the

24   reservoir matrix or the -- the reservoir

Highly Confidential - Subject to Further Confidentiality Review

1    or the matrix?

2              MR. LIFLAND:  Object to the

3         form of the question.

4              THE WITNESS:  I wouldn't

5         characterize -- we reported in our

6         surveillance programs any

7         surveillance program that reported

8         on abuse, misuse, diversion of all

9         fentanyl products, and where

10        possible, we had data for a matrix

11        patch versus the reservoir patch.

12             We didn't do a comprehensive

13        analysis of the differences

14        between the two.  We reported on

15        the findings from our surveillance

16        programs.

17   BY MS. CONROY:

18        Q.    But you hadn't evaluated the

19   difference between the reservoir patch

20   diversion versus the matrix patch

21   diversion?

22        A.    We reported rates throughout

23   this period.

24        Q.    But -- but you had -- you

Highly Confidential - Subject to Further Confidentiality Review

1   weren't comparing them, one patch to the

2   other?

3          A.    There -- that would be

4   correct, we weren't consistently making a

5   comparison, we were simply reporting the

6   rates.  Our focus was on our product.

7   Our focus was on the Duragesic reservoir

8   patch.

9          Q.    Which was the subject of the

10  sales training program that we looked at,

11  that was the -- that was the discussion

12  of the differences between the product

13  that Janssen was selling, the reservoir

14  patch, and the matrix patch being sold by

15  Mylan?

16             MR. LIFLAND:  Object to the

17         form of the question.

18             THE WITNESS:  So the sales

19         training was to make the

20         representatives aware that there

21         was another formulation of the

22         fentanyl patch that would be

23         coming to market.  It had nothing

24         to do with any data about

Highly Confidential - Subject to Further Confidentiality Review

1   comparison between the two.

2   BY MS. CONROY:

3        Q.    It -- that --

4        A.    There were no data at the

5   time on rates of abuse, misuse and

6   diversion that we could even refer to.

7   These were all hypothetical issues in

8   2004.

9        Q.    Correct.  But you did

10  compare the reservoir patch to the matrix

11  patch and you cited particular situations

12  that could occur with the matrix patch

13  that couldn't occur with the reservoir

14  patch?

15       A.    We cited --

16            MR. LIFLAND:  Object to the

17       form of the question.

18            THE WITNESS:  We cited

19       concerns based upon the data that

20       we generated between 2003 and 2004

21       that might occur with the

22       introduce -- introduction of a new

23       matrix patch to the market.

24  BY MS. CONROY:

1    Q.    And -- and Janssen had

2    available to it data that it could have

3    evaluated to determine what was happening

4    in the market between the reservoir patch

5    and the matrix patch, the differences,

6    the comparison with respect to diversion,

7    at least up until March of 2008 that it

8    did not evaluate?

9              MR. LIFLAND:  Object to the

10         form of the question.

11              THE WITNESS:  I wouldn't

12         characterize it as did not

13         evaluate.  We -- we were aware of

14         all the data.  We were aware of

15         rates of abuse, misuse, and

16         diversion for all of the scheduled

17         products that were reported in the

18         surveillance systems.  We didn't

19         do a consistent evaluation to --

20         to reach a conclusion, were there

21         differences in the rates of abuse,

22         misuse and diversion.  We reported

23         those rates on a consistent basis

24         as part of our commitment to the

1    risk management program and the

2    surveillance programs.

3  BY MS. CONROY:

4        Q.    I understand that.  But you

5  were not reporting an evaluation of the

6  differences between diversion of the

7  reservoir versus the matrix, you were

8  just reporting the diversion of any type

9  of patch with fentanyl in it?

10       A.    And conclusions in those

11 reports that the rates of abuse, misuse

12 and diversion of all pharmaceutical grade

13 fentanyl products was low compared to

14 other opioids.

15            But your characterization is

16 correct, we didn't do a consistent look

17 at the matrix patch versus the reservoir

18 patch until this time in response to the

19 FDA's request that we consider switching

20 from the reservoir patch to the matrix

21 patch.

22       Q.    But the sales force did have

23 information at this time about the

24 differences between the reservoir patch

1    and the matrix patch with respect to

2    abuse and diversion?

3              MR. LIFLAND:  Object to the

4         form of the question.

5              THE WITNESS:  No, the sales

6         force did not have access to the

7         surveillance data that we

8         generated over the period of time

9         from 2005 to 2009.

10             If you're referring back to

11        the 2004 sales training, we

12        educated them on the physical

13        properties of the -- the two

14        formulations.  And, based upon the

15        physical properties, what might

16        occur in a hypothetical case,

17        based upon the data we generated

18        over a period of time.

19             And that was the basis of

20        the Citizen's Petition too.

21   BY MS. CONROY:

22        Q.   Correct.  But the sale --

23   there -- there was nothing that went out

24   to the sales force for example, in 2007

Highly Confidential - Subject to Further Confidentiality Review

1    or 2008 that said, "Our thinking about

2    this has changed."

3                    There were -- the sales

4    training was still that there were

5    differences with respect to abuse and

6    diversion between the reservoir patch and

7    the matrix patch.

8                    MR. LIFLAND:  Object to the

9              form of the question.

10                   THE WITNESS:  Well, we -- we

11             did not share surveillance data

12             with the sales force.  We -- we

13             educated the sales force in 2004

14             because there was a new

15             formulation coming to market.

16             They couldn't promote regardless.

17                   So they continued to be

18             aware that there were other

19             formulations of pharmaceutical

20             grade fentanyl, fentanyl patches

21             on the market, but we didn't share

22             surveillance data with them.  They

23             did not know rates of abuse,

24             misuse and diversion.  Those were

1    reported directly to the FDA.

2    BY MS. CONROY:

3        Q.    Well, they could promote the

4    reservoir patch during that period,

5    from --

6            MR. LIFLAND:  Objection.

7    BY MS. CONROY:

8        Q.    -- 2004 through 2009 when it

9    was no longer available?

10           MR. LIFLAND:  Object to the

11           form of the question.

12           THE WITNESS:  They would

13           promote Duragesic based upon

14           approved promotional materials.

15               Given the package insert

16           and -- and all of the promotional

17           materials on the appropriate

18           selection, dose selection,

19           monitoring and the patient

20           education.

21    BY MS. CONROY:

22        Q.    And you don't know as you

23    sit here today whether there are

24    promotional -- approved promotional

1    materials that compare the matrix patch,

2    the technology of the matrix patch, to

3    the reservoir patch?

4           A.    I don't know.

5           Q.    It says here, "The FDA made

6    clear they would not allow for another

7    recall of the type we had in 2004 and

8    earlier this year."

9                 I think we spoke about that

10   earlier today.  They were -- there were

11   two recalls for leakage in the Duragesic

12   patch, one in 2004, and one maybe January

13   of 2008?

14          A.    It was in that time frame.

15   I don't recall the exact dates.

16          Q.    And then you tell

17   Mr. Desiraju that the -- that "while FDA

18   indicated they would urge we move to an

19   alternative formulation."  And then you

20   put in parentheses, "Matrix being the

21   only viable option at the moment," but

22   "the FDA was open to learning more about

23   our decisions in 2004" -- and in -- "and

24   in 2000 and 2004 to remain with the

1  reservoir and to review data that we will

2  submit for abuse and diversion of the

3  reservoir and the matrix."

4          Do you see that?

5     A.    Yes.

6     Q.    And that's what you're

7  talking about, then you -- at this point

8  in March of 2008, you are indicating that

9  it's time now to go back and take a

10  closer look at the surveillance data?

11     A.    Well, certainly at this

12  point we had three years of data so that

13  we could also determine trends.  Exactly

14  right.  We -- we had concerns throughout

15  this period of time based upon the data

16  we generated in 2003 and 2004, and we

17  understood that the FDA was concerned

18  about the manufacturing issues with the

19  Duragesic reservoir and were open to

20  moving to a matrix patch, but only after

21  we satisfied ourselves and satisfied the

22  FDA that the concerns we raised in the

23  Citizen's Petition did not come to

24  fruition, that we were not seeing an

1    increased signal for abuse, misuse,

2    diversion in public safety with the

3    matrix patch.

4              The FDA agreed with us on

5    that.  They allowed us to do the analysis

6    of the surveillance data and submit that.

7         Q.    And -- and that's what you

8    were telling Mr. Desiraju, don't be --

9    don't be so hasty, we still have work to

10   do here?

11        A.    I'd agree with that in a

12   nutshell, yes.

13        Q.    And do you know how the

14   reservoir, the Duragesic reservoir was

15   doing on the market as compared to the

16   Mylan patch at that time?

17        A.    Those data were shared in

18   meetings.  I couldn't give you the exact

19   numbers.  As is typical, when a generic

20   is introduced to the market, the total

21   number of prescriptions -- I'm not

22   talking about sales -- the total number

23   of prescriptions would increase for

24   the -- for the matrix relative to the

1   branded product.  And that was my

2   understanding of what was happening

3   with -- with generic formulations,

4   because at this time there was more than

5   one generic formulation on the market

6   relative to the Duragesic reservoir

7   patch.

8        Q.   And -- and at this time,

9   depending on a patient's health

10   insurance, I guess, they could be -- a

11   patient might receive a matrix

12   formulation even if their physician had

13   prescribed a reservoir formulation?

14        A.   I believe that that would

15   depend upon a patient's health insurance

16   and regulations within the state.  There

17   are some states that allow

18   interchangeability even if a physician

19   writes for a branded product.  I believe

20   there are some states that don't allow

21   that.

22          MS. CONROY:  I think it's a

23      good time for a lunch break.

24          MR. LIFLAND:  Okay.

 1          MS. CONROY:  We can go off

 2     the record.

 3          THE VIDEOGRAPHER:  Stand by,

 4     please.  The time is 12:56 p.m.

 5     Going off the record.

 6               -  -  -

 7          (Lunch break.)

 8               -  -  -

 9          THE VIDEOGRAPHER:  The time

10     is 2:18 p.m.  Back on the record.

11               -  -  -

12   A F T E R N O O N   S E S S I O N

13               -  -  -

14          EXAMINATION (Cont'd.)

15               -  -  -

16   BY MS. CONROY:

17          Q.   Mr. Moskovitz, let me pass

18   to you Exhibits 28 and 29.

19          (Document marked for

20     identification as Exhibit

21     Janssen-Moskovitz-28.)

22          (Document marked for

23     identification as Exhibit

24     Janssen-Moskovitz-29.)

1    BY MS. CONROY:

2        Q.    We'll look at 28 first.

3    Exhibit 28 is what appears to be another

4    slide deck dated April 20, 2007.  The

5    Bates number is, on the final page,

6    JAN-MS-02305132.  And this -- it's called

7    the Duragesic Risk Management Overview.

8              Do you see that?

9        A.    I do.

10        Q.    And did you prepare this

11    slide deck?

12        A.    I ultimately presented the

13    slide deck.  I probably had assistance in

14    preparing it.

15        Q.    If you just would turn to --

16    you know something, I don't -- some of

17    them have -- this one does not have page

18    numbers.

19              If you go to the very end

20    and you go in a few slides, and I'm going

21    to show you what I'm looking for.  It's a

22    map.  Go in three -- about four slides.

23    Yeah, that's it.

24        A.    Okay.

1    Q.    I don't need -- if you need

2    to refer to some other section of the

3    slide deck, that's fine.  But do I

4    understand correctly that this was an

5    indication that you could look at abuse

6    and diversion down to a zip code area?

7         A.    Even without looking at

8    this, in a general sense we tried to look

9    at issues of abuse and diversion down to

10   the zip code level.

11        Q.    Okay.  And is that what that

12   is showing, a zip code level?  I think I

13   read that somewhere else in the slide

14   deck.  I'm going to look for it here.

15   But I see the three -- it's really hard

16   to read.

17             But do you see there are

18   three numbers in this area of Eastern

19   Kentucky, right on the border of West

20   Virginia, and it looks like you have a

21   412, 413, 414, that are in the center of

22   those different pink color areas?

23        A.    Yes.  And the -- on the side

24   it says rates per three-digit zip code.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. LIFLAND:  Could you

2     pause for one second, because I'm

3     having trouble finding the page.

4          MS. CONROY:  Okay.  Go to

5     the very end, probably easy --

6          MR. LIFLAND:  And I just --

7     I would tell the witness, if you

8     would like to just flip through,

9     just so you understand the context

10    of all of this, feel free.  But

11    it's up to you.

12         THE WITNESS:  Yeah, just in

13    terms of this map, it looks like

14    we're reporting on a three-digit

15    zip code basis.

16   BY MS. CONROY:

17        Q.    And is that data that's

18   available to Janssen from the RADARS

19   system from the Poison Control Centers,

20   if you know?

21        A.    Based upon some of the

22   slides.  Prior to that, that would be my

23   best assessment, yes.

24        Q.    Have you yourself ever honed

1    in on a particular zip code or area of

2    the country with respect to data

3    concerning the Duragesic patch?

4         A.    Could you clarify what you

5    mean by honed in?  I would get the data.

6    Occasionally the data would indicate that

7    there were particular concerns coming

8    from one aspect of the surveillance data

9    that affected a certain three-digit zip

10   code.  And that they might have made a

11   decision to do more intensive

12   surveillance at of area.  So I am not

13   sure what you mean by honed in.

14              So I was aware that there

15   were three-digit ZIP codes that came up

16   on the surveillance issue as areas of

17   concern.

18        Q.    Did you -- let me ask it

19   this way.  Was that something that you

20   would look at, you might identify a

21   three-digit zip code area and then you

22   would ask for an investigator to go and

23   look or do some other action, or is it

24   something that you were aware of

1    happening but you were not the person who

2    was actually saying, "Hey, you better go

3    look at a particular area"?

4        A.    That second, right.  I would

5    receive the report and they would

6    indicate where there were some findings.

7    And so I was aware of the reports.  I

8    would not then tell them what to do.

9        Q.    Okay.  Do you know if those

10   reports, if it was possible, for example,

11   here, to identify a particular

12   three-digit zip code area where there

13   were issues?  Do you know if it was

14   possible then to compare that to IMS

15   data, prescription data with respect to

16   that zip code area?

17       A.    I don't know if it could be

18   done at a zip code level.  And I -- so

19   what they're seeing here are issues of

20   abuse, misuse, and diversion.  To begin

21   with, it wouldn't necessarily mean that

22   it was Duragesic or pharmaceutical grade

23   fentanyl or any branded product of

24   fentanyl.  But -- so I don't think it

1    could be done.

2         Q.    You don't think that if

3    there was an investigator that was going

4    to go out and look at reports of misuse

5    in a three-digit zip code area that was

6    determined from RADARS, you don't think

7    it would be possible to look at

8    prescription data for that same area

9    through IMS?

10        A.    Well, I suspect that you

11   could look at physicians who were

12   operating in that three-digit zip code

13   and look at the prescriptions for that

14   three-digit zip code.

15        Q.    I'm not suggesting it would

16   be -- it would be linked.  I'm just

17   asking if it could be done.

18        A.    Right.  Yeah, I see where

19   you're going with it.  I believe that the

20   IMS data could go down to the granularity

21   of a three-digit zip code.

22        Q.    Do you know if the IMS data

23   that was available to Janssen could look

24   at where a prescription was filled as

Highly Confidential - Subject to Further Confidentiality Review

1    opposed to the physician who prescribed

2    it?  Do you know one way or the other?

3         A.    I don't.

4         Q.    As far as you understand it,

5    that RADARS data, you can't distinguish

6    between patient misuse and abuse,

7    nonpatient misuse and abuse, physician

8    misuse or abuse, or pharmacy misuse or

9    abuse in the RADARS data?

10        A.    Well, there were different

11   streams within the RADARS data.  In some

12   cases, key informant network may define

13   what the abuse was, that there was a

14   diversion of something or that there was

15   laboratory data of fentanyl found in a

16   laboratory examination of a death case

17   for example.

18             So we would know from some

19   streams that it was fentanyl, from other

20   streams the key informant network and

21   the -- and we had police data.  They

22   might state in the police data that it

23   was a branded product or that it was

24   simply fentanyl.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Could you determine a

2    distinction among those physician --

3    abuse issues, or patients or pharmacy in

4    DAWN data?

5    A.    I -- my understanding is the

6    DAWN data were fentanyl mentions.  So you

7    could not distinguish it in the DAWN

8    data.

9    Q.    What about in the poison

10   center control (sic) data?

11   A.    At times we could

12   distinguish it, but not consistently.

13   Q.    Would it be fair to say that

14   for SCEPTRE data, it would totally depend

15   on what you were told about it?

16   A.    So for SCEPTRE data there

17   was always an attempt to try to -- to try

18   to get as much information about a

19   reported case as possible.  If there were

20   issues that were unresolved in the

21   initial report, there might be an inquiry

22   to the reporter to try to get additional

23   information.  Sometimes we would get

24   that; sometimes we wouldn't.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Take a look at the next

2    exhibit, which is Exhibit 29.  And

3    Exhibit 29 is a cover e-mail from you to

4    Fatih Sarioz.  No idea how to pronounce

5    that.  I'm sure I've pronounced it

6    incorrectly.  I just don't know how --

7    A.    I can't do better.

8    Q.    Man or woman?  Do you know?

9    A.    No, I don't.

10    Q.    Whoever this is, is it

11    Janssen in Turkey?

12    A.    Yeah.  Just going down to

13    the message down at the very bottom of

14    that.  It says, "Let me introduce myself.

15    I am" -- and I'm assuming health

16    economics manager of Janssen Turkey.

17    Q.    And this person sent this

18    e-mail to you on August 7th of 2008.  He

19    or she says, "In Turkey, the opioid

20    market is very small because MOH has the

21    concerns about the abuse potential of

22    these products.  According to our growth

23    plan, we are planning to be a partner of

24    MOH and show them the need of the

Highly Confidential - Subject to Further Confidentiality Review

1  patients to these products and

2  desensitize them by showing evidence that

3  Duragesic has no/limited abuse

4  potential."

5           Do you see that?

6      A.    I do.

7      Q.    And so she was asking you if

8  you could give her some information,

9  that's on the next page, about your

10  project.

11           Do you see that?

12     A.    Yes.

13     Q.    And then you respond and

14  say, "It would be incorrect to say that

15  there's a risk management plan for

16  Duragesic in the U.S. to show that

17  Duragesic has not been abused.  Rather,

18  we recognize that fentanyl is attractive

19  as a drug of abuse; and, therefore, for

20  Duragesic, there are significant risks

21  for diversion and abuse, as well as

22  misuse (including off-label uses) and

23  overdose."  And then --

24           Did I read that correctly?

1    A.    Yes.

2    Q.    And then you attach the risk

3  management plan that outlines various

4  risks and provides risk mitigation

5  strategies, including educational

6  activities and surveillance to monitor

7  for diversion, abuse, and misuse thereby

8  maintaining a favorable benefit-to-risk

9  ratio.

10         The benefit-to-risk ratio,

11  you're -- you are talking about a

12  favorable benefit to risk ratio of the

13  marketing and sale of Duragesic, correct?

14    A.    The continued marketing

15  availability, that the benefits of using

16  Duragesic appropriately, which includes

17  proper patient selection, proper dose

18  selection, proper monitoring, proper

19  patient education, would outweigh the

20  risks associated with the use of the

21  drug.

22    Q.    And then if you turn to the

23  actual revised risk management plan that

24  is dated June 14th of 2007.

1    Do you see that?

2    A.    Yes.

3    Q.    And were you involved in the

4    preparation of the risk -- of the revised

5    risk management plan?

6    A.    Involved, yes.

7    Q.    Okay.  How involved were

8    you?

9    A.    Well, we were certainly

10    aware of the various streams of data that

11    would be coming in around the risk

12    management plan.  We probably held the

13    budget that would fund the various groups

14    that were providing us with those data

15    streams.  We would have them come in, we

16    would evaluate them, along with the

17    safety group and other groups within the

18    company and make sure that it was

19    adequate to meet the needs of the Food

20    and Drug Administration as well.

21    Q.    Would the document itself,

22    as you were working on it, reside in

23    medical affairs?

24    A.    I don't recall whether the

Highly Confidential - Subject to Further Confidentiality Review

1    document ultimately resided in medical

2    affairs.  But I know ultimately there was

3    a separate benefit/risk group that had

4    overall responsibility for the REMS

5    program and later the RADARS program.

6    And they assumed responsibility for it.

7    It certainly started off within our

8    group, but I -- it involved the safety

9    group and other groups.  So I don't know

10   how I would answer the question where it

11   resided.  It -- I mean, it was generally

12   available to all those groups, including

13   the regulatory group obviously.

14          Q.    Would you --

15          A.    I -- I might answer that by

16   saying, since the regulatory group was

17   the direct interface with the Food and

18   Drug Administration, the final document

19   would probably reside with regulatory.

20          Q.    Would -- would there be a

21   final document without your review of the

22   entire document?

23          A.    No.

24          Q.    And it -- but it would also

Highly Confidential - Subject to Further Confidentiality Review

1    be fair to say that there are sections

2    that other people other than you would

3    have contributed to?

4          A.    Absolutely correct.

5          Q.    But you would have read all

6    of it?

7          A.    I would have read all -- all

8    of it and been aware of it.

9          Q.    If you could turn to

10   Page 39.  Oh, this is -- did I explain --

11   this is JAN-MS-01204900.  And it's an --

12   it's the attachment to the e-mail which

13   is the front page, which is

14   JAN-MS-01204898.

15          I see here in the first full

16   paragraph a reference to iatrogenic

17   addiction, and then it says, "It's" --

18   "it's addiction that occurs as a result

19   of treatment by a physician."

20          I don't think I had asked

21   you previously for a definition for

22   iatrogenic addiction.  Do you agree with

23   that definition?

24          A.    I do.  It's generally

Highly Confidential - Subject to Further Confidentiality Review

1    accepted.

2         Q.    And is there -- we don't see

3    that term very often or I have not seen

4    it very often in the documents.  We

5    didn't see it in the White Paper for

6    example.  What -- is there a reason why

7    the term "iatrogenic addiction" is used

8    in the risk management plan?

9         A.    It was one of the identified

10   risks of opioids.

11        Q.    Is it different than

12   addiction, a risk of addiction?

13        A.    It -- it leads to the same

14   outcome.  There is a patient who becomes

15   addicted to the drug.  Iatrogenic would

16   be that it's the result of treatment by a

17   physician.

18             A patient may become

19   addicted to opioids that he or she might

20   have obtained illicitly, not through a

21   physician, and that would not be an

22   instance of iatrogenic addiction.

23        Q.    Is there any -- so would it

24   be fair to say that the iatrogenic is how

Highly Confidential - Subject to Further Confidentiality Review

1    someone becomes addicted?  But the

2    addiction is the same whether they

3    received a prescription from a physician

4    or they got it on the street, if there's

5    a diagnosis of addiction?

6           A.    I would say that the source

7    of the opioids would be through a

8    physician prescription rather than

9    through some other channel.

10          Q.    And -- and where you --

11   where someone got the opioids would not

12   change once they were addicted, the

13   symptoms of the condition of addiction

14   would be the same, correct?

15          A.    Yes.  That -- if it would

16   meet the definition of addiction, which

17   is to say destructive behaviors in -- in

18   seeking drug, yes.

19          Q.    If you could go to Page 52,

20   please.  You see there's a -- the second

21   paragraph on the page says, "In summary,

22   there's more than a decade of commercial

23   experience with transdermal fentanyl as a

24   mainstay of pain management.  The

1    physical characteristics of the system

2    that provide gradual onset of effect and

3    steady pain relief also render a properly

4    used and disposed system relatively

5    unattractive to those seeking to obtain

6    drug 'highs' or euphoria."

7              Do you see that?

8         A.    Yes.

9         Q.    At this time, the date of

10   this document which is June 14th of 2007,

11   had Janssen performed any studies to

12   determine whether or not a transdermal

13   system would be unattractive to persons

14   seeking to obtain drug highs or euphoria?

15             MR. LIFLAND:  Object to the

16        form of the question.

17             THE WITNESS:  I would

18        consider the streams of the RADARS

19        program, the risk management

20        program, the surveillance program,

21        to be studies, but not in the

22        sense of controlled clinical

23        trials.  If -- if that's what

24        you're asking about.

1    BY MS. CONROY:

2         Q.    So, the -- I -- well, let me

3    ask it this way.  Is your answer then

4    that the support for this statement that

5    the physical characteristics of the

6    transdermal statement -- system are

7    unattractive to people seeking drug highs

8    or euphoria, are RADARS and other

9    surveillance mechanisms for systems?

10              MR. LIFLAND:  Object to the

11         form of the question.  I think we

12         need to quote it correctly.  You

13         left out the word "relatively."

14              MS. CONROY:  Oh, I'm sorry.

15         Let me -- let me start again.

16    BY MS. CONROY:

17         Q.    Well, let me just ask you.

18    What is your support of the first two

19    sentences of that paragraph?

20         A.    We had the DAWN data, we had

21    other streams of data coming in through

22    the risk management plan, surveillance.

23    We had data from longer term clinical

24    trials where we looked at adverse events,

Highly Confidential - Subject to Further Confidentiality Review

1  and as part of the adverse events, there

2  would also be reports of abuse, misuse,

3  addiction, euphoria.  We always saw those

4  to be low when -- in -- in those clinical

5  trials.

6          So we felt confident that by

7  virtue of the delivery system and the

8  information that we were collecting,

9  including some published information

10  about retrospective data on patients who

11  had been treated long-term with a whole

12  variety of Schedule II opioids,

13  long-acting opioids, that the abuse

14  potential or the attractiveness of the

15  reservoir system relative to other

16  formulations that were out there, other

17  drugs that were out there were -- it was

18  relatively unattractive.

19      Q.    Had you ever done a study

20  that had a primary endpoint to determine

21  whether the reservoir transdermal system

22  would be unattractive to those seeking --

23  relatively unattractive to those seeking

24  to obtain drug highs or euphoria?

1        A.    Well, the -- one of the

2   studies that was done in conjunction with

3   the data filed with the Citizen's

4   Petition looked at attractiveness of the

5   fentanyl -- the Duragesic transdermal

6   fentanyl system with other Schedule II

7   opioids.  And, in fact, on that scale, we

8   saw that Duragesic was the lowest, or

9   among the lowest with respect to

10  attractiveness, relative to the other

11  opioids.

12        Q.    Was that with respect to

13  obtaining a high or euphoria?

14        A.    No, it was -- attractiveness

15  was the endpoint.

16        Q.    Right.  Other --

17        A.    It didn't actually take the

18  drugs.

19        Q.    Right.  Well, we saw that

20  there was -- at least at one time we saw

21  that there was a proposed study that was

22  not actually done that would determine

23  when someone was chewing a patch whether

24  or not there was a difference between the

Highly Confidential - Subject to Further Confidentiality Review

1   high or the euphoria between the

2   reservoir and the matrix, correct?

3          A.     Correct.

4          Q.     That was not done, correct?

5          A.     Correct.

6          Q.     So are you aware of any

7   other study that was done with a primary

8   endpoint of determining the relative

9   unattractiveness of obtaining a drug high

10  or euphoria from a reservoir patch?

11         A.     Where the endpoint was

12  getting a high, not just hoping to.

13         Q.     Doctor, what it says here,

14  "unattractive" -- "relatively

15  unattractive to those seeking to obtain

16  drug highs or euphoria."  Is there any

17  study that the primary endpoint was that?

18         A.     Well, I would posit that the

19  attractiveness scale did measure

20  attractiveness because -- these drugs

21  were attractive because they were looking

22  to get a high.  If they wouldn't get a

23  high, the -- the drugs would not be

24  attractive to them.

1    So if you would, the -- that

2  would be a surrogate measure of a high.

3  The attractiveness of the drug would be a

4  surrogate measure of obtaining a high.

5    It wouldn't be attractive to

6  an individual if he or she didn't obtain

7  the high that he or she was looking for.

8    Q.   I understand what you're

9  saying, and I believe that's when the

10  drug is misused and abused.

11    This sentence suggests to me

12  that what's being explained is it's the

13  physical characteristics of the system

14  that provide gradual onset of effect and

15  steady pain relief also render a properly

16  used and disposed system relatively

17  unattractive to those seeking to obtain

18  drug highs or euphoria.

19    So that suggests to me that

20  you're not looking at individuals who are

21  abusing, the way that test did?

22    A.   That -- that test looked at

23  individuals who had a history of misuse,

24  abuse, and diversion, and what they found

1    attractive about these systems which

2    included the Duragesic reservoir.

3                    They found it attractive

4    because they were seeking to use the

5    systems to get a high.  Yes, we measured

6    attractiveness, but it -- I believe that

7    the attractiveness is a surrogate measure

8    of their ability to get euphoria.

9            Q.    And -- and that's the -- and

10   that's the study that is support for this

11   statement?

12           A.    That and the other streams

13   of information about the lack of interest

14   in obtaining Duragesic because the system

15   was designed to release a -- a controlled

16   amount of fentanyl over an extended

17   period of time.

18           Q.    And the FDA, however, at

19   least in their rejection of the Citizen's

20   Petition, did not agree that there was a

21   lower abuse potential for the reservoir

22   patch, correct?

23           A.    The FDA didn't agree that --

24                 MR. LIFLAND:  I'm just going

1    to object to the form of the

2    question.

3         Sorry.  Go ahead.

4         THE WITNESS:  The FDA didn't

5    agree that the data that we

6    submitted would require what we

7    requested them to institute a risk

8    management plan and a difference

9    in -- of designating a reservoir

10   patch and a matrix patch, because

11   under conditions of use that were

12   specified in the package insert,

13   appropriate conditions of use, the

14   two drugs delivered a

15   bioequivalent amount of fentanyl

16   through the skin.

17        Clearly, the FDA has and

18   continues to have concerns about

19   abuse, misuse, and diversion.  But

20   their focus with respect to the

21   Citizen's Petition was on the

22   patient who is properly selected

23   for whom the package insert is

24   written, with the appropriate

1    warnings about any of the types of

2    activities that might lead to the

3    increased fentanyl release or

4    potential increased release with

5    heat or whatever.  That's why they

6    ultimately rejected the Citizen's

7    Petition.

8  BY MS. CONROY:

9         Q.    If you could turn to Page

10  109, please.  Actually go back -- to make

11  more sense, take a look at page 108, in

12  the middle of the page where it says,

13  "Additional measures for Duragesic."

14              And it says, "To further

15  mitigate the possibility of diversion of

16  Duragesic, the following steps are

17  taken."  And then there's a number, if

18  you go from page 108, take a look through

19  page 109, 110, and actually through the

20  rest -- there's only one more page left.

21              It identifies ways to

22  mitigate the diversion of Duragesic.

23              Did you have anything to do

24  with the collection of information for

1    this portion of the --

2         A.    No.   This is clearly coming

3    from the supply chain, and it describes

4    the process of distribution for

5    Duragesic.

6         Q.    And do you see, on Page 109

7    it says under Number 4, "As per

8    regulation, orders are monitored for

9    suspicious quantities.  Supply of product

10   is stocked to any customers engaging in

11   unlawful conduct or product diversion.

12         "The mitigation measures

13   serve to safeguard the integrity of the

14   supply chain and to minimize the amount

15   of product in distribution."

16         Do you see that?

17         A.    I do.

18         Q.    Do you have any reason to

19   disagree with that statement?

20         A.    I don't.

21         Q.    Okay.  And then it goes on

22   with subpart A, "The demand for Duragesic

23   as quantified by IMS Health prescription

24   data is matched with actual order

1    quantities to verify that the supply

2    chain does not" -- "does not contain

3    excess product."

4            Do you see that?

5        A.    I do.

6        Q.    Where at Janssen was that

7    done?  Do you know what department or

8    division?

9        A.    Again, I assume that this is

10   all part of the supply chain and

11   manufacturing.

12       Q.    And if you look up above,

13   there's a JOM in all caps, written there.

14   Do you know what JOM is?  Sorry --

15       A.    Yeah, on B.

16       Q.    Yeah, on B.  There might be

17   a reference earlier on the page.  Let's

18   see.

19       A.    I believe -- this is 2007.

20   I believe it's Janssen Ortho-McNeil.

21       Q.    Janssen Ortho-McNeil?

22       A.    Yes.  So in 2004 the medical

23   affairs groups within Janssen at

24   Ortho-McNeil were brought together and

1   all of the pain products were

2   consolidated under the Janssen

3   Ortho-McNeil group.

4        Q.    And Janssen Ortho-McNeil

5   also would have been responsible for the

6   monitoring of suspicious quantities and

7   the integrity of the supply chain?

8        A.    Yes, because at that time

9   all of the activities were now within one

10  company.

11       Q.    I'm being shown a website

12  for JOM Pharmaceutical Services, Inc.

13  And it just -- it's just a JOM.  Do you

14  know if there's a different company now,

15  JOM, that's not known as Janssen

16  Ortho-McNeil?

17       A.    There is no Janssen

18  Ortho-McNeil today.  At some point the --

19  Johnson & Johnson consolidated the

20  activities all under the name of Janssen.

21       Q.    Do you know if -- you've

22  been gone for a while.  You may not know.

23  Do you know if it's called JOM or J-O-M

24  or how they refer to that company?

Highly Confidential - Subject to Further Confidentiality Review

1           A.    I believe it's called

2    Janssen Pharmaceuticals, a division of

3    Johnson & Johnson.

4                 MR. LIFLAND:  May I clarify,

5           just to look at page 108.

6                 MS. CONROY:  Sure.

7                 MR. LIFLAND:  There's a

8           reference to --

9                 MS. CONROY:  Oh, did you

10          find it?

11                MR. LIFLAND:  It may be

12          referring simply to the central

13          distribution center that's

14          referred to on 108.  But I don't

15          know if the witness can speak to

16          that.  I don't know if that's what

17          the website is.

18                MS. CONROY:  I don't -- my

19          understanding -- I'm going to look

20          a little further back.  My

21          understanding is that it's not --

22          well --

23                THE WITNESS:  Well, under --

24          at the -- I'm sorry.  At the

Highly Confidential - Subject to Further Confidentiality Review

1        bottom of 108 it states, "Domestic

2        shipments originate from the

3        central distribution center in

4        Somerset New Jersey (Janssen

5        Ortho-McNeil)."

6    BY MS. CONROY:

7        Q.    You found it.

8        A.    So that's my assumption,

9    that JOM is, in fact, Janssen

10   Ortho-McNeil.

11       Q.    Great.  Thank you.  Like

12   every other company, they seem to go to

13   the acronym after so many years.

14       A.    And they appropriately did

15   that after first writing it out.  We just

16   took a while to find the original full

17   name.

18       Q.    Yes.  That's right.  And if

19   you could take a look on Page 110.  The

20   second bullet point says, "Authorized

21   demand is defined as the calculated total

22   demand for the past 52 weeks divided by

23   the same number of weeks factored for

24   both price change activity and product

Highly Confidential - Subject to Further Confidentiality Review

1   growth rate as JOM and its affiliate

2   companies deem appropriate."

3          Do you see that?

4      A.    I do.

5      Q.    Do -- have you ever seen any

6   of these calculated -- these demand

7   calculations?

8          A.    I haven't seen them.  But I

9   was aware that as part of the

10  responsibilities in manufacturing and

11  marketing a scheduled product, that we

12  would have to assess the need for raw

13  product that would go into the production

14  of finished product on a regular basis.

15         Q.    And what about after the

16  product was -- you had a final product

17  and it was manufactured apparently from

18  this.  There was also supply integrity

19  protocols with respect to how much

20  finished product was going out the door,

21  correct?

22         A.    That's my understanding.

23         Q.    Then the next bullet point

24  says, "In the event that orders for any

1    specific product for any specific 'ship

2    to' location significantly exceed the

3    authorized demand for this product, JOM

4    will contact the customer to review the

5    order."

6              Do you see that?

7         A.    I do.

8         Q.    Were you ever in the chain

9    of communication -- for example, were you

10   ever told that there was a particular

11   customer that had been informed that they

12   had exceeded the order, for example?

13        A.    No.

14        Q.    As far as you know, that was

15   a JOM responsibility?

16        A.    Yes.

17        Q.    And then a little bit

18   further down on the page, it says,

19   "Additionally, per request of the DEA,

20   quarterly Duragesic sales analysis

21   reports are submitted to the agency."

22             Do you see that?

23        A.    I do.

24        Q.    They're submitted to DEA,

Highly Confidential - Subject to Further Confidentiality Review

1     correct?

2         A.     Correct.

3         Q.     "These reports detail

4     manufacturing plant output from ALZA to

5     Janssen Pharmaceutical, Inc." -- that's

6     the manufacturing piece, right?

7         A.     The finished product.

8         Q.     -- "sales from Janssen to

9     wholesalers, and IMS data on

10     prescriptions filled by retail

11     pharmacies, hospitals, and long-term care

12     facilities."

13         Do you see that?

14         A.     I do.

15         Q.     And so would it be fair to

16     say that all of that data was available

17     to Janssen Ortho-McNeil in order to

18     create reports for the DEA?

19         A.     That's my understanding of

20     what it states here.

21         MS. CONROY:   That is all I

22         have for now.   I know that your

23         counsel is going to ask you some

24         questions as well.   I bet you I'll

1   be back.

2           THE VIDEOGRAPHER:  Shall we

3   go off the record?

4           MR. LIFLAND:  Yes, let's go

5   off the record.

6           THE VIDEOGRAPHER:  Okay.

7   The time is 2:55 p.m.  We are

8   going off the record.

9           (Short break.)

10          THE VIDEOGRAPHER:  We are

11  back on the record.  The time is

12  3:18 p.m.

13              -   -   -

14              EXAMINATION

15              -   -   -

16  BY MR. LIFLAND:

17      Q.   Good afternoon,

18  Dr. Moskovitz?

19      A.   Good afternoon.

20          MR. LIFLAND:  I'd like to

21  start, Counsel, just by following

22  up a couple of areas from his

23  30(b)(6) corporate designee

24  testimony.  So these will be given

Highly Confidential - Subject to Further Confidentiality Review

1  initially as -- in his capacity as

2  the corporate designee for Janssen

3  on the topics that -- that were

4  specified.  And then once we're

5  done with that, we can indicate on

6  the record and proceed with a

7  normal direct examination in his

8  personal capacity.

9           MS. CONROY:  That's fine.

10          MR. LIFLAND:  Okay.

11  BY MR. LIFLAND:

12          Q.    Dr. Moskovitz, one of the

13  questions that you were asked yesterday

14  was whether you knew whether the company

15  continued to report progress reports

16  under the risk management plan to the FDA

17  after the last one that was marked as an

18  exhibit which I believe was around 2012,

19  and you responded that you didn't have

20  that information.

21          Have you had the opportunity

22  since your dep -- the first part of your

23  deposition yesterday to go back and see

24  if you could find the information to

Highly Confidential - Subject to Further Confidentiality Review

1   answer that question?

2           A.    I have.

3           Q.    Okay.  Let me place before

4   you a document which we'll mark as the

5   next in order.

6               MR. LIFLAND:  What number

7           would that be?  Ah, 30.

8               (Document marked for

9           identification as Exhibit

10          Janssen-Moskovitz-30.)

11  BY MR. LIFLAND:

12          Q.    Can you tell me what that

13  document is?

14          A.    This is the risk evaluation

15  mitigation strategy, the REMS program,

16  that was prepared by what ultimately

17  became the REMS programs company.

18              These are a group of opioid

19  manufacturers that agreed to develop,

20  with the FDA's guidance, a class-wide

21  REMS that covered all of the long-acting

22  opioid products.

23          Q.    Can you turn to Page 20 of

24  the document please.  And before I --

Highly Confidential - Subject to Further Confidentiality Review

1    before I go further, let me read the

2    Bates number in.  It's JAN-MS-00935481.

3    And it goes through, it looks like,

4    00935534.

5              Turning to Page 20, I'd like

6    to draw your attention to Item 5.  Can

7    you tell me what that describes?

8         A.   Just reading the,

9    "Commitment to surveillance monitoring

10   for misuse, abuse, overdose, addiction,

11   death and any intervention to be taken

12   resulting from signals of these metrics,"

13   and I won't continue reading on.

14             So in essence, this was a

15   commitment to continue the surveillance

16   programs that -- as part of the

17   consortium that we already had in place

18   for Duragesic, but at this point, since

19   it became a class-wide REMS, we would

20   participate in the surveillance

21   activities along with the consortium of

22   the other companies.

23        Q.   So it's your understanding

24   that those surveillance activities

1  continued for Duragesic, but the

2  reporting was then done through the REMS

3  process?

4          A.    That's correct.

5               (Document marked for

6          identification as Exhibit

7          Janssen-Moskovitz-31.)

8  BY MR. LIFLAND:

9          Q.    Let me show you what I'll

10 mark as Exhibit 31.

11              (Whereupon, a discussion was

12         held off the stenographic record.)

13 BY MR. LIFLAND:

14         Q.    Can you tell us what

15 Exhibit 31 is?

16         A.    This is a letter to the Food

17 and Drug Administration that describes

18 our transition from having the individual

19 REMS program for Duragesic to now

20 transitioning to the consortium-wide REMS

21 program for all long-acting opioids.  And

22 the most important information here is,

23 in reading it, "The company now

24 transitions to the new REMS programs

1  activities as approved by the agency.

2  This submission will serve as our final

3  RMP" -- risk management program --

4  "report, providing Duragesic risk

5  management information in the format of

6  our previously filed reports."

7         Q.    All right.  And just for the

8  record, the Bates number on that is

9  JAN-MS-00700680 through 81.

10              The second topic, you were

11 asked yesterday in connection with your

12 corporate witness testimony in your

13 capacity as a corporate designee about

14 whether the company, Janssen, and I think

15 Johnson & Johnson may have been

16 mentioned, has a fixed definition or a

17 standard definition of the terms

18 "dependence," the term "addiction."

19 There may have been one other term.

20              Does -- do Janssen and

21 Johnson & Johnson have fixed corporate

22 definitions of those terms that apply

23 whenever the terms are used in the

24 company?

1    A.    No.

2    Q.    And how would you know, if

3  you saw the term in a company document,

4  what was meant if a term like

5  "dependence" were used or a term like

6  "addiction" was used?

7    A.    I would have to look at the

8  context in which it was used, by whom it

9  was used.  If you go through the

10  literature there are a variety of

11  definitions, specific definitions around

12  each of those terms.

13         If it came from a clinical

14  report, a clinical trial, then they would

15  define the criteria upon which they would

16  use that definition.  If it came from an

17  observational study, they would indicate

18  how they might have arrived at that

19  definition.

20         But there was no -- there

21  certainly was no company definition that

22  assured that there was consistent use of

23  that terminology within the company.

24    Q.    So, for example, it's

Highly Confidential - Subject to Further Confidentiality Review

1   possible that in a company document, the

2   company employee might simply use the

3   term incorrectly?

4       A.    Absolutely.

5       Q.    So one would have to look at

6   the context and then make a -- make a

7   judgment as to how the term was being

8   used?

9       A.    That's correct.

10          MR. LIFLAND:  That's all I

11          had on the corporate witness

12          testimony.

13          MS. CONROY:  Okay.

14   BY MR. LIFLAND:

15       Q.    Okay.  Dr. Moskovitz, we're

16   now going to turn to direct examination

17   in your capacity as a fact witness.

18          I'd like to just briefly

19   once again go over your background and

20   credentials.  We won't spend a lot of

21   time on this.  But just so we have a

22   continuous testimony.

23       A.    Okay.

24       Q.    You're a medical doctor?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      And where did you go to

3   medical school?

4       A.      Boston University.

5       Q.      And what -- when did you

6   graduate?

7       A.      It was a combined six-year

8   program.  So I was at Boston University,

9   undergraduate and medical school through

10  1970, '76, and graduated in '76.

11      Q.      Can you give us a capsule

12  description of your areas of specialty

13  and training?

14      A.      Within medical school or

15  subsequent?

16      Q.      Medical school.

17      A.      Okay.  So it was a standard

18  medical school training.  We were trained

19  in biology, physiology, pharmacology.

20  The last two years were generally spent

21  in doing clinical rotations on the

22  various aspects of medicine with exposure

23  to pediatrics, and OB/GYN, internal

24  medicine, surgery, the emergency room,

1    and subspecialties that might interest

2    us.  And so we had a broad overview of

3    the practice of medicine.

4         Q.    And in connection with some

5    of that work, for example, your emergency

6    room experience, did you have any

7    occasion to prescribe opioid pain

8    products?

9         A.    Yes.  But my -- so beyond

10   medical school, I did an internship and

11   three years of residency, and two years

12   of fellowship.  And that's where the bulk

13   of my direct patient care comes in.  And

14   certainly through the period of time that

15   I was an intern, resident, and fellow, I

16   had opportunities to prescribe opioids.

17        Q.    And after medical school,

18   what did you go on to do?

19        A.    I did training in internal

20   medicine and subsequently in the

21   subspecialty of infectious disease.

22        Q.    And when you went to work,

23   what did you do after that?

24        A.    After I finished my

1    fellowship in infectious diseases, I went

2    to work for Hoffman-La Roche.

3           Q.     And that's a pharmaceutical

4    company?

5           A.     Yes.  In Nutley, New Jersey.

6           Q.     And you worked in the area

7    of the pharmaceutical development?

8           A.     I worked on the research and

9    development side with anti-infectives.

10          Q.     And would that have given

11   you experience with clinical trials,

12   bringing products to market?

13          A.     Yes.  Our responsibility was

14   in doing the clinical trials that led to

15   the approval of a number of drugs, but

16   most importantly at that time an

17   anti-effective called ceftriaxone.

18          Q.     And before you joined

19   Janssen, did you work for another

20   pharmaceutical company?

21          A.     Yes.  I worked for

22   Rhone-Poulenc R-H-O-N-E, P-O-U-L-E-N-C,

23   Rhone-Poulenc Pharmaceuticals in

24   Princeton, New Jersey for approximately

1    five years.

2          Q.     And what did you work on

3    there?

4          A.     The anti-infective area.

5    We -- the primary area of research was

6    early development of HIV compounds.

7          Q.     And when did you move to

8    Janssen?

9          A.     In 1990.

10         Q.     And your initial position

11   there was what?

12         A.     As the director of the

13   anti-infective group within Janssen

14   Research Foundation.

15         Q.     And can you just give a

16   capsule description of what you did at

17   Janssen Research Foundation and for how

18   long?

19         A.     I was at Janssen Research

20   Foundation for ten years.  The Research

21   Foundation was primarily responsible for

22   the Phase II and III, the clinical trials

23   that led to showing the effectiveness and

24   safety and risks and efficacy of drugs

Highly Confidential - Subject to Further Confidentiality Review

1  that we were looking to bring to the

2  market.

3            So it was a clinical

4  development program.  I was well versed

5  in the issues and the regulatory issues

6  around clinical trial methodology that

7  would support the safety and efficacy and

8  benefit-risk ratio of the products that

9  we brought to market.

10       Q.    And when did you first

11  become involved with the pain products

12  that Janssen had?

13       A.    In the year 2000 when I

14  moved over to the medical affairs group.

15       Q.    And what was your position

16  there?

17       A.    Group director of the pain

18  and mycology area, mycology being

19  anti-fungals.  I retained my

20  responsibilities for some of the

21  anti-infective compounds, but I was

22  brought on primarily to develop a group

23  that would be responsible for the pain

24  products.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And some of those pain

2    products were Schedule II opioid

3    medications, correct?

4         A.    Correct.

5         Q.    Can you -- can you tell us

6    which ones those were?

7         A.    That was Duragesic, the

8    transdermal fentanyl patch.

9         Q.    And were there others later?

10        A.    Yes.  And later that

11   include -- well, it included other

12   formulations of fentanyl that we were

13   developing, that we -- that we provided

14   input into development into the R&D

15   program.  But a drug that did come to

16   market was Nucynta, N-U-C-Y-N-T-A, which

17   is -- the generic name is tapentadol.

18        Q.    And you're now retired,

19   right?

20        A.    Yes.

21        Q.    And when did you retire?

22        A.    In May of 2011.

23        Q.    So you've now come back as a

24   consultant to help the company meet its

1  obligations to provide information in

2  this litigation?

3  　　　　A.　　Yes.

4  　　　　Q.　　And is that a paid

5  consulting job?

6  　　　　A.　　Yes, it is.

7  　　　　Q.　　So you're paid for your

8  time.  How are you paid?

9  　　　　A.　　I'm paid for my time.

10  　　　　Q.　　And at what rate?

11  　　　　A.　　At a rate of $375 an hour.

12  　　　　Q.　　All right.  Let's go back to

13  your time in medical affairs at Janssen

14  in the pain group starting in 2000.  Just

15  quickly, can you run through the general

16  roles and -- role and responsibilities of

17  that group in connection with Janssen's

18  pain medicines?

19  　　　　A.　　The medical affairs group in

20  general, in contradistinction to the R&D

21  groups, was responsible for marketed

22  products.  So these are products that the

23  FDA had already approved and which were

24  marketed in the United States.  And we

1    would have a cross-functional team, we

2    were part of a cross-functional team that

3    explored opportunities to provide

4    additional data, postmarketing data, that

5    would expand the body of knowledge around

6    the specific drug.

7              The clinical trials that

8    generally lead to approval of a product

9    are somewhat limited and they meet the

10   criteria that the FDA sets out for

11   providing adequate data to assess

12   efficacy and safety of a drug, but don't

13   necessarily meet the information that

14   the -- the healthcare community and

15   treating physicians might need,

16   information such as comparative data

17   against other drugs.  Information on

18   subsets of patients, information on

19   issues other than straightforward

20   efficacy and safety.  That might include

21   specific adverse events or functionality,

22   in the case of -- of pain medicines.  And

23   the medical affairs group led a

24   cross-functional team that assisted in

1    developing some of those data.

2         Q.    And how would your group go

3    about developing data like that?

4         A.    We would be involved early

5    on in the early development of a compound

6    in determining what data would be

7    developed for the initial approval based

8    upon the data that would be developed for

9    the initial approval.

10             We might even at that point

11   give input to endpoints that might be

12   included in those trials, but generally

13   without overcomplicating those trials.

14             But understanding what the

15   additional needs of the healthcare

16   community might be after the approval, we

17   would, based upon those data, meet with

18   healthcare providers, the treating

19   community, experts in the field of, in

20   this case, pain, to get their input to

21   what additional data needs might be out

22   there, what are the opportunities for us

23   to develop those data streams and how

24   best to do those things.

1    It certainly goes beyond

2  just the realm of clinical trials.  We

3  would look at all of the potential groups

4  that might be using the drug.  That --

5  that would include pharmacy, pharmacy

6  benefit managers, and the type of

7  information that they might need to tier

8  a product, to put the product on

9  formulary.  So a broad range of

10 additional data that might prove useful

11 after the drug receives its initial

12 approval.

13    Q.   And did medical affairs

14 participate in other cross-functional

15 areas of -- of the pain drugs, for

16 example, safety, communications,

17 promotional review, can you describe

18 those?

19    A.   Yes.  As I said, there are a

20 whole broad range of activities that

21 medical affairs was involved with.  We

22 had representatives to a promotional

23 review committee.  There -- this is a

24 committee that reviewed pieces that were

¹ contemplated to be used as part of the

² promotion of the drug.

³            Medical affairs included not

⁴ just the physicians within my group, but

⁵ the medical information group, PharmDs

⁶ who would assess the accuracy of the

⁷ information that would be provided in

⁸ promotional review.  They would review

⁹ the source documents that were being used

¹⁰ to -- to provide the information that was

¹¹ in the -- the promotional materials.

¹²            We would have opportunities

¹³ to do additional studies that even

¹⁴ wouldn't be conducted under the auspices

¹⁵ of the medical affairs group, so we would

¹⁶ explore potential investigator-initiated

¹⁷ studies where there was an interest in

¹⁸ doing work with some of our compounds to

¹⁹ expand the basis of knowledge, but didn't

²⁰ necessarily fall within the budgets or

²¹ timelines that we might be able to fund

²² internally, and we would consider funding

²³ those externally.

²⁴            Q.    What about safety reviews

1    and surveillance?  Just generally, I'm

2    going to come back to this.

3           A.    When we had -- well, safety

4    was an ongoing manner that -- that we

5    followed our drugs.  There was a safety

6    group and all reports of adverse events,

7    this is -- this is in addition to the

8    adverse events that we learned of in the

9    formal clinical trials that led to

10   approval.  There is a requirement

11   subsequent to that that any additional

12   clinical trials report, the safety to the

13   safety group, reports that would come in

14   from outside both patients and healthcare

15   providers, and, in fact, anyone within

16   the company who learned of an adverse

17   event.  I think I mentioned that even as

18   a retiree, I have the responsibility for

19   reporting adverse events that I learned

20   about with -- with our compounds.  And --

21   and so we would meet with the safety

22   group and assess those.

23              Where we had additional

24   mechanisms in place to assess risks

Highly Confidential - Subject to Further Confidentiality Review

1   associated with our compound, in the case

2   of Duragesic, we had risk management

3   plans that -- that followed databases and

4   other means of getting information about

5   risks of abuse, misuse, diversion, safety

6   issues for fentanyl in general, other

7   scheduled opioids, and Duragesic.

8          We would review those data

9   streams and determine whether there were

10  additional activities that -- that we

11  needed to be taking.  Those activities

12  might be changes in package inserts,

13  changes in educational material.

14       Q.    All right.  Well, before we

15  come back to that, let's talk a little

16  bit more about Duragesic.  I think you

17  said, Duragesic was already on the market

18  when you started the pain group, medical

19  affairs group.  How long had it been on

20  the market?

21       A.    It was -- in the United

22  States it was approved in 1990.  So it

23  had been on the market for ten years.

24       Q.    And what is Duragesic?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Duragesic is a reservoir

2    patch, a form-filled and sealed reservoir

3    patch, so the active ingredient is in a

4    patch that is designed to deliver a

5    controlled amount of fentanyl through the

6    membrane and then through the skin; you

7    apply the patch to the skin.  And it

8    releases fentanyl in a controlled manner

9    over a period of approximately three

10   days, 72 hours.

11        Q.    And what is fentanyl?

12        A.    Fentanyl is a potent opioid.

13   The opioid class of drugs are drugs that

14   attach to the -- certain receptors in the

15   body, called mu opioid receptors.  And

16   these receptors are involved in

17   modulation of pain.

18        Q.    And is fentanyl used in pain

19   products besides Duragesic or other -- or

20   other pain pills?

21             Is it used in hospitals for

22   example?

23        A.    Yes.  Fentanyl is --

24   fentanyl was originally synthesized I

1     believe around the 1960s and had been

2     used as an anesthetic agent for decades.

3     It was also commonly in use in -- as an

4     intravenous administration for

5     postoperative care where, in a hospital

6     setting, along with other compounds, it

7     might be used for patient-controlled

8     anesthesia, so postoperatively a patient

9     might have the ability to inject himself

10     or herself with a controlled amount of

11     intravenous fentanyl to control their

12     postoperative pain.

13         Q.    And how is fentanyl

14     regulated?

15         A.     Fentanyl is regulated under

16     regulations of the drug -- Drug

17     Enforcement Agency and the Food and Drug

18     Administration.   It's a scheduled

19     product.   It's -- it is a Schedule II

20     product.   Schedule II products are those

21     products that are considered to have

22     therapeutic values, but have the highest

23     propensity for abuse, misuse and

24     diversion, and so they are highly

Highly Confidential - Subject to Further Confidentiality Review

1    regulated in terms of -- of distribution

2    and the access to the drugs.

3         Q.    And fentanyl is what's

4    called the active ingredient in the

5    Duragesic skin patch?

6         A.    Yes.

7         Q.    So it's -- but it's

8    delivered through a patch, as opposed to

9    through an IV or by an anesthesiologist?

10         A.    That's correct.  It goes

11    through the membrane of the patch that's

12    attached to the patient's skin, and then

13    through the patient's skin into the

14    bloodstream.

15         Q.    Now, have you heard of

16    illegally manufactured fentanyl or street

17    fentanyl?

18         A.    I have.

19         Q.    And have you heard names,

20    for example, that goes by?

21         A.    Yes.  It's widely known that

22    fentanyl is an attractive drug of abuse

23    and misuse and is sought after.  Even in

24    some of our own surveillance, we were

1  well aware that there were -- there were

2  illicit laboratories, laboratories

3  outside the United States that

4  manufactured fentanyl or closely related

5  compounds to fentanyl, and they would

6  have a variety of street names, one of

7  which we came to be -- which was familiar

8  to us was China white.

9       Q.    And is that the same thing

10  as the fentanyl that's used in these

11  hospital settings or in the Duragesic

12  patch?

13       A.    No, it's not.

14       Q.    And how is it different?

15       A.    Well, it's certainly not

16  controlled in any sense of the controls

17  that are in place for a pharmaceutical

18  grade product where stringent guidelines

19  around specifications for manufacture,

20  the supply chain is carefully controlled.

21  We know exactly what goes into the

22  product, the concentration of the

23  product.

24                We have no idea how an

1   illicitly manufactured product might be

2   made or even if it's identical to the

3   product fentanyl.

4          Q.     And does that affect how

5   dangerous the product is?

6          A.     It certainly could, if -- in

7   most instances where the product is

8   obtained illicitly, the recipient might

9   have, first of all, no idea whether the

10  product he or she is using even contains

11  fentanyl.  There have certainly been

12  reports of fentanyl-tainted heroin, where

13  an individual expected that he or she was

14  trying to use heroin but in fact was

15  using fentanyl.

16             Even if they sought

17  fentanyl, it would not be in a controlled

18  dosage, the way a Duragesic patch is

19  provided.

20          Q.     Getting back to the

21  Duragesic patch, which you said had been

22  on the market for ten years when you

23  became the pain director.  What did you

24  do to learn about that product when you

1  came into that position?

2       A.    I familiarized myself with

3  the package insert, with the clinical

4  trials that were conducted to support the

5  pharmacokinetics.  I certainly learned

6  about the pharmacokinetic profile and the

7  ability of the patch to deliver a

8  controlled rate of release over the three

9  days.  The clinical trials that led to

10  approval, that led to -- led the FDA to

11  assess the safety and efficacy of the

12  product --

13       Q.    Let's pause for a second on

14  the package insert.  Just broadly -- and

15  we'll come back to it later.  But what

16  information does that provide, the

17  package insert?

18       A.    So in -- so a package insert

19  is all of the important information that

20  a prescriber would need to prescribe the

21  product.  That would include such things

22  as the indications, what the product is

23  indicated for; the selection of the dose

24  for the patient; choosing the patient

Highly Confidential - Subject to Further Confidentiality Review

1    properly; assessing the patient for the

2    potential for adverse events; in the case

3    of Duragesic, certainly, the information

4    on how to monitor that patient over a

5    period of time to assess that the patient

6    continues to get the benefits of the

7    product with reasonable tolerability;

8    education that the healthcare provider is

9    to share with the patient so that he or

10   she uses the product appropriately and

11   does not misuse it in ways that they

12   might accidentally do so.

13          Q.    And the --

14          A.    Those are the key elements

15   that we are providing to the physician.

16          Q.    The package insert would

17   describe, for example, how the product

18   works chemically, how it's absorbed in

19   the body, those kinds of things as well?

20          A.    Yes.  That would be part of

21   the package insert.

22          Q.    And what else did you do to

23   familiarize yourself to learn about the

24   product?

1        A.     In a general sense, I

2   familiarized myself with some of the key

3   concepts around pain management,

4   particularly pain management with

5   opioids; the issues of abuse, misuse and

6   diversion; the other opioids that were

7   available; differences between immediate

8   release and controlled-release opioids;

9   other compounds that are used to treat

10   pain; the process of scheduling.

11        Familiarized myself with

12   some of the experts in the field and some

13   of the work that was continuing around

14   issues of effectiveness, abuse, misuse,

15   diversion.  In a broad sense becoming

16   familiar with the -- with the entire

17   range of pain management.

18        Q.     And did you have others

19   working with you in this role?

20        A.     I did.

21        Q.     And who were they?

22        A.     Well, specifically one of

23   the earliest activities that I embarked

24   on was to bring the ENA physician who had

Highly Confidential - Subject to Further Confidentiality Review

1    specific training.  This was an

2    individual trained as an

3    anesthesiologist, and anesthesiologists

4    are experts at using controlled

5    substances.

6              We spoke already about the

7    use of fentanyl as an anesthetic agent.

8    And so I brought somebody in who had

9    expertise in pain management issues and

10   clinical trial methodology.

11        Q.    And did you have access to

12   others at Janssen who had medical

13   expertise in these areas?

14        A.    Yes.  I think I indicated

15   that medical affairs was a

16   cross-functional group.  We interacted

17   certainly with the research and

18   development side, where there were a

19   number of physicians who had expertise in

20   pain management and clinical trial

21   development.

22              We interacted with the

23   outcomes research group, and they had

24   individuals who had expertise as well.  I

1   had access to the manufacturer of the

2   product, individuals at ALZA who also had

3   some of the history of the development of

4   the product.

5          Q.    So let's talk a little bit

6   about the benefits and risks of

7   Duragesic.  But before we start that, can

8   you explain which patients the medication

9   is intended for?

10          A.    Yes.  If you go to the

11   indications, even early on, this was

12   indicated for patients with moderate to

13   severe chronic pain, individuals who

14   would benefit from treatment with a

15   long-acting opioid after proper patient

16   selection, individuals who generally had

17   been -- were tolerant of other opioids,

18   had received other opioids, for whom

19   other treatment options either didn't

20   work or could not be used perhaps because

21   they had contraindications to other

22   medications or they had had adverse

23   events for the other medications.

24          Q.    So can you give some

Highly Confidential - Subject to Further Confidentiality Review

1    examples of other treatment options?

2        A.    Sure.  Patients with pain

3    might be treated with -- well non --

4    non-pharmaceutical interventions.  They

5    might be treated with cognitive

6    behavioral therapy; physical therapy

7    initially; with milder analgesics that

8    would include acetaminophen, nonsteroidal

9    anti-inflammatories, such as ibuprofen,

10   or naproxen.

11            There were also milder

12   opioid options out there, and opioids

13   with short duration of action.

14       Q.    And to find the indication

15   for the product, where would we find

16   that, what you just described?

17       A.    It's under the indications

18   section of the package insert.

19       Q.    Let's just get one out.

20            MR. LIFLAND:  Do we have the

21       2005 label?

22            MR. RODRIGUEZ:  Do you have

23       that in your package?

24            MS. CONROY:  That, we do.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. LIFLAND:  Let's hand it

2         out, and -- otherwise we're --

3              MS. CONROY:  I have no

4         question we have it.  It's in the

5         packet -- it's in about eight

6         boxes that you gave to us

7         yesterday.  So thank you.  We only

8         need one.

9              (Document marked for

10         identification as Exhibit

11         Janssen-Moskovitz-32.)

12    BY MR. LIFLAND:

13         Q.    I'm marking this document as

14    Exhibit 32.  It begins with

15    JAN-MS-00780844.  It ends with

16    JAN-MS-00780887.

17         A.    Thank you.

18         Q.    Dr. Moskovitz, can you tell

19    me what this document is?

20         A.    This is what is commonly

21    referred to as the package insert.

22    Technically it's the full prescribing

23    information for Duragesic.

24         Q.    And these package inserts

Highly Confidential - Subject to Further Confidentiality Review

1   are regulated by the FDA, correct?

2         A.    Yes, they are.

3         Q.    And do they change over

4   time?

5         A.    They do.

6         Q.    So you would need to look to

7   see when this package insert was in

8   effect, if we wanted to know what period

9   of time it applied to?

10        A.    Yes.

11        Q.    Take a look at -- you may be

12  able to tell just by glancing at it which

13  period of time, but if you go to --

14        A.    The date would usually be on

15  the last page.

16        Q.    Well, let me -- let me just

17  represent to you that this is the 2005

18  package insert, you might be able to look

19  at it, look at the contraindications and

20  just -- oh, I'm sorry, yes.  The last

21  page here, the very last page of the

22  document.

23        A.    Okay.  The very last page of

24  the document I have is -- oh, of the

 1    document.

 2          Q.     No, no, the last page with

 3    the signature at the last page.  Is there

 4    a date there?

 5          A.     There is.  2/4/05.

 6          Q.     So that's 2005?

 7          A.     Yes.

 8          Q.     Okay.  Now, can you turn to

 9    where a doctor would find the indications

10    for the product?

11          A.     So in the black box you'll

12    see, "Duragesic is indicated for

13    management of persistent moderate to

14    severe chronic pain that requires

15    continuous around-the-clock opioid

16    administration for an extended period of

17    time and cannot be managed by other means

18    such as nonsteroidal analgesics, opioid

19    combination products, or immediate

20    release opioids."

21          Q.     So that's what you were

22    talking about in terms of what products

23    the -- the product -- or what patients

24    the product is intended for?

1    A.    That's correct.  The -- the

2    patients who have this indication would

3    be considered for -- might be considered

4    candidates for Duragesic.

5            Then on -- the specific

6    indications of usage is really a repeat

7    of what I just gave you that was in the

8    black box.  And that's on JAN-MS-0780852.

9            I don't have to repeat it.

10   It's the same indication.

11   Q.    And are you aware of whether

12   this indication from 2005 has changed

13   since then?

14   A.    Yes, it has.  I believe the

15   current indications are similar, but the

16   wording indicates that it's for

17   management of pain that's severe enough

18   to require around-the-clock treatment.

19           I'd have to go back to the

20   exact wording.  But it does change over

21   time as more information becomes a

22   available and the benefits/risks are

23   assessed.

24   Q.    But it's still for patients

1  who require continuous around-the-clock

2  opioid administration for an extended

3  period of time?

4      A.    Yes.  And patients with

5  chronic pain -- again, this is moderate

6  to severe.  Ultimately recurrent is for

7  severe enough.

8      Q.    Can it be used for acute

9  pain?

10      A.    It should not be used for

11  acute pain.

12      Q.    And it is -- is that

13  indicated somewhere in the package

14  insert?

15      A.    If you -- even within the

16  black box, the second bullet, it

17  should -- it's contraindicated, which is

18  to say it should not be used, "In the

19  management of acute pain or patients who

20  require opioid analgesic for a short

21  period of time."

22      Q.    And has the -- does the

23  indication limit the kinds of chronic

24  pain for which the product may be used?

1       A.    No, it's indicated for

2   chronic pain.

3       Q.    Has that always been the

4   case?

5       A.    Yes, it has.

6       Q.    So it wouldn't be limited

7   for example, to chronic pain from cancer?

8       A.    That's correct.

9       Q.    It could be any kind of

10  chronic pain?

11      A.    Chronic pain that meets the

12  criteria of persistent around-the-clock

13  need for an analgesic, yes.

14      Q.    Back to the question about

15  the benefits and risks.  What are the

16  benefits of the Duragesic patch for the

17  patient?

18      A.    So to begin with, fentanyl

19  itself is a potent opioid that attaches

20  to the mu opioid receptor.  It's a

21  well-known receptor that modulates pain.

22          We developed Duragesic such

23  that it delivers fentanyl in a controlled

24  manner so that the drug is delivered

1   transdermally over a period of 72 hours,

2   approximately three days.

3          Q.     What's the importance of

4   having a controlled dose?

5          A.     Well, so to begin with it

6   allows you to have less frequent dosing.

7   But also a controlled dose minimizes, in

8   pharmacokinetic terms, peaks and trough.

9   So you have lower high concentrations as

10  the drug is coming into the bloodstream,

11  and you don't go as low as -- as an

12  orally administered drug as the drug

13  wears off.  And that is thought to

14  minimize the potential for abuse and

15  addiction.  It allows the patient to

16  potentially not focus on their pain for

17  the extended period of time.  We are

18  aware of concerns from physicians that

19  patients were focused on when they could

20  take their next pill, and -- and this

21  allows for a period of -- of three days

22  with continuous pain relief that

23  potentially would allow the patient to

24  get back to their activities of daily

1  living.

2       Q.   Is there still a potential

3  for abuse with the patch?

4       A.    Absolutely.  Fentanyl is

5  recognized as a Schedule II drug with

6  a -- a high risk of abuse and misuse --

7  abuse, misuse and diversion.

8       Q.   Is that a topic that's

9  similarly addressed in the package insert

10  as well?

11       A.   It is.  Actually right from

12  the -- in the very first paragraph,

13  "Schedule II opioid substances which

14  include fentanyl have the highest

15  potential for abuse and associated risk

16  of fatal overdose due to respiratory

17  depression.  Fentanyl can be abused and

18  is subject to criminal diversion."

19       Q.   Can you just explain quickly

20  what that -- what is meant by "overdose

21  due to respiratory depression"?

22       A.   So the most serious adverse

23  events of too high a concentration of

24  opioids, they suppress respiration.  So

1   you will -- with a high enough

2   concentration, the patient will stop

3   breathing.  And if that isn't reversed

4   rather quickly the patient could sustain

5   brain injury or death.

6          Q.    And I take it that's the

7   principle reason why it's so important to

8   have a controlled and predictable dose in

9   the delivery system?

10         A.    Yes.

11         Q.    Now, is there more

12  discussion in the package insert around

13  these issues of potential abuse and

14  potential overdose?

15         A.    Yes.  Throughout the package

16  insert these issues are reiterated.  What

17  I've read to you for the most part is in

18  the black box.  So this is highlighted

19  for the treating physician, but similar

20  concepts are presented throughout the

21  package insert.

22         Q.    For example in the -- take a

23  look at Page 10.  There's a section

24  titled Contraindications.

1      A.     Yes.

2      Q.     Can you explain what that

3   is?

4      A.     So contraindications is an

5   absolute, do not give the drug to

6   patients who meet any of these criteria.

7      Q.     And the first one is in

8   patients who are not opioid tolerant.

9   Can you explain that?

10      A.     Yes.  So the concept of

11   tolerance is that patients who have

12   already been exposed to doses of opioids

13   that would equate with a dose of

14   fentanyl.  If you -- that you shouldn't

15   be using fentanyl as the first opioid in

16   an individual.  The individual should

17   have been exposed to other opioids before

18   beginning treatment with fentanyl.

19      Q.     And what's the reason for

20   that?

21      A.     Because there is a risk of

22   the patient developing respiratory

23   depression even with the first dose of

24   fentanyl if they are not opioid tolerant.

1    Q.    Okay.  The second one you

2    spoke about earlier is acute pain.  And

3    then there's a reference for management

4    of postoperative -- postoperative pain.

5    Do you know the reason for that

6    contraindication?

7    A.    We were aware that there

8    were instances of misuse of the product

9    in treating patients with postoperative

10   pain which would fall under the -- the

11   general category of acute pain.  And

12   there were adverse events and deaths

13   associated with the use of the Duragesic

14   patch in treating some of these

15   individuals with postoperative pain.

16   Q.    And then the next two, we

17   have mild pain and intermittent pain.

18   Can you explain those?

19   A.    Yes.  So even if you go back

20   to the original studies, the original

21   studies enrolled patients with moderate

22   to severe pain.  Mild pain can be managed

23   with modalities other than a Schedule II

24   long-acting opioid.  So, therefore, you

1    should be using other compounds to treat

2    mild pain.

3              Intermittent pain is not

4    pain that's around-the-clock that can be

5    generally managed with intermittent

6    dosing of other compounds or short-acting

7    opioids.

8         Q.    Now, if you'll turn to the

9    next page you'll see there's a section

10   entitled "Misuse, Abuse and Diversion of

11   Opioids."  And this is addressed to the

12   risks that you pointed out previously in

13   the black box warning; is that correct?

14        A.    Yes.

15        Q.    But gives a more thorough

16   discussion?

17        A.    Yes.

18        Q.    And then the next section on

19   the next page, hypoventilation, that's

20   another word for respiratory depression?

21        A.    Yes.

22        Q.    So that's the risks of

23   overdosing and essentially having your

24   breathing stopped if you don't --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    If you don't reverse it

2    quickly.

3    Q.    Now, I'm not going to go

4    through the whole thing, but I would like

5    you to turn to Page 17.  And this is a

6    reference to drug interactions.  Can you

7    explain what that is?

8    A.    So a physician should take a

9    careful history of other medications that

10   a patient is on because, as with a lot of

11   medications, concomitant medications may

12   interact with the compound that you're

13   prescribing, in this case with fentanyl.

14          An example of that, there

15   are other drugs that might be metabolized

16   through the same system that metabolizes

17   fentanyl to inactive compounds.  If

18   you're taking such drugs, that may slow

19   the metabolism of Duragesic and lead to

20   concentrations that are higher than would

21   be predicted if you didn't take those

22   concomitant medications.

23          There are other medications

24   that contribute physiologically to the

Highly Confidential - Subject to Further Confidentiality Review

1    effects of opioids that might lead to

2    increased sedation or decreased

3    respiratory drive.

4         Q.    If you turn to Page 23, do

5    you see there's a section entitled "Drug

6    Abuse and Addiction"?

7         A.    Yes.

8         Q.    And if you turn to Page 24,

9    another section entitled "Overdosage."

10        A.    Yes.

11        Q.    So this is giving the

12   physician even more information on those

13   risks, correct?

14        A.    Correct.

15        Q.    And then under that it's

16   "Dosage and Administration."  Can you

17   explain what that section is intended to

18   convey?

19        A.    Yes.  So this is intended to

20   instruct the healthcare provider, the

21   prescriber, in general principles of

22   prescribing opioid narcotics, especially

23   Schedule II narcotics, but also in giving

24   direction to how to select the dose of

1    Duragesic and how to monitor and change

2    that dose as needed.

3         Q.    All right.  Now, let's go

4    back to Page 15.  You'll see there's a

5    section entitled "Information For

6    Patients."  What's the purpose of this

7    section?

8         A.    The physician -- the

9    healthcare provider, the prescriber, is

10   instructed on information that he or she

11   should be providing to the patient to

12   ensure that the drug is used safely and

13   that it's -- to minimize any risk of

14   diversion or access by someone other than

15   the patient, how the patient is to store

16   the drug and concerns about manners in

17   which there might be an uncontrolled

18   delivery or greater than expected

19   delivery of fentanyl.

20        Q.    And can you give some

21   examples of that?

22        A.    Yes.  So there's

23   instruction.  If you look on Page 16

24   under 4.  The patient should be

1    instructed not to use the patch if the

2    seal is broken, altered, cut in any way

3    because that defeats the

4    controlled-release of the product.

5              In Number 5, we ask that the

6    patient be instructed not to -- to avoid

7    exposure to heat sources because

8    potentially heat sources could increase

9    the flux of fentanyl.  And again, the

10   patient would receive a greater than

11   expected dose of fentanyl.

12             They are instructed on how

13   to dispose of the drug when they finish

14   using it so as to minimize access by

15   anyone other than the patient, and

16   ultimately to fold the product and flush

17   it down the toilet so that it isn't even

18   available in a waste basket.

19        Q.    And is this information

20   given directly to the patient as well in

21   written form?

22        A.    Yes.  We also developed a

23   patient medication guide so that much of

24   this information is provided directly to

Highly Confidential - Subject to Further Confidentiality Review

1    the patient through the medication guide

2    that the patient is to receive with each

3    and every refill of the prescription.

4        Q.    Take a look at -- I think

5    the numbering re-starts.  It's after the

6    end of the document, which is Page 33.

7    If you look at the page after that.

8        A.    Yes, I have it.

9        Q.    Can you tell us what that

10   is?

11       A.    This is a patient

12   information.  So this is to be provided

13   to the patient.  It's written in an

14   easier to understand -- in fact, it has

15   to reach -- it has to be written to

16   certain guidelines of understanding so

17   that it's easy for the patient to

18   understand.  And it provides much of the

19   same information about the appropriate

20   use of the product and the appropriate

21   storage and the appropriate disposition

22   of the product.

23       Q.    And it also -- let's turn a

24   few pages in, it gives the basic

Highly Confidential - Subject to Further Confidentiality Review

1    instructions as to how to actually put

2    the patch on the skin, for example.

3         A.    That's correct.

4         Q.    And this one is called

5    patient information sheet.  You referred

6    to it as a patient information guide or

7    medication guide?

8         A.    Medication guide.  That was

9    the term that came to be used under the

10   formal REMS program.

11        Q.    Now, did you have

12   information at the company about how easy

13   or difficult the patch was to abuse for

14   somebody who would try to use it for

15   nonmedical purposes?

16        A.    There are various sources

17   where we learned of the methods that

18   would be tried to abuse and misuse and

19   divert the product.

20        Q.    And what did you -- what did

21   you generally learn?  And we'll talk

22   about first the reservoir patch, the one

23   that was there when you came into the

24   position.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    So among the -- or what we

2    learned that it was not an attractive

3    formulation for abuse, misuse and

4    diversion.  It was rather difficult to

5    use through a variety of sources, not the

6    least of which was internet monitoring.

7             We understood that it was

8    not a preferred route of delivery.  Most

9    addicts or individuals who sought the

10   high from an opioid compound would seek a

11   pill.  It was difficult to get a known

12   quantity of the drug.  And in fact, we

13   learned that -- word on the street that

14   we saw in some of the monitoring was that

15   it was too great a risk for serious

16   adverse events and even death.

17      Q.    So even -- even addicts

18   would be worried about the risks they

19   were taking with trying to use this as a

20   drug of abuse?

21             MS. CONROY:  Objection.

22             THE WITNESS:  That was one

23        of the things that we came to

24        understand in the monitoring

1          programs.

2     BY MR. LIFLAND:

3          Q.     And can it be snorted like a

4     pill?

5          A.     You can attempt to.

6          Q.     Is it easier or more

7     difficult?

8          A.     It's more difficult to --

9     than you -- because you have fentanyl in

10    an alcohol base and a gel base.  It's

11    difficult to snort or to smoke or to

12    inject the compound.

13         Q.     At some point in time, the

14    company changed the way the patch was

15    formulated and went from the gel-based

16    patch that we've been talking about where

17    the fentanyl is dissolved in an alcohol

18    gel, to what's called a matrix design.

19    Can you explain what that is?

20         A.     Yes.  A matrix design would

21    almost be described as fentanyl in a

22    solid formulation where the fentanyl is

23    evenly distributed throughout the solid

24    patch, not a liquid patch.  You wouldn't

Highly Confidential - Subject to Further Confidentiality Review

1   see liquid as you would if you opened

2   a -- the original fentanyl reservoir

3   patch.  This would be a solid piece of

4   patch.

5        Q.    When did the company first

6   start looking at the matrix design for

7   the patch?

8        A.    We looked at the matrix

9   design, I believe, around 2000.

10        Q.    And I take it there would be

11   some advantages to the matrix design

12   would be a reason to look at it, can you

13   describe what those would be?

14        A.    Yes.  For one thing it

15   couldn't -- it couldn't leak.  So one of

16   the concerns around Duragesic was if you

17   cut the patch or if there were a problem

18   with manufacturing, there could be

19   leakage of the fentanyl.  That would not

20   happen with a matrix.

21        Q.    And you said you first --

22   the company first looked at it in 2001.

23   Did the company decide to go forward with

24   the matrix patch in 2001?

1        A.    Not in the United States.

2        Q.    And why not?

3        A.    We commissioned a -- a

4  review of the potential for abuse,

5  misuse, diversion with a matrix patch and

6  the experts that did that review

7  concluded that there were risks

8  associated with the matrix patch that

9  were not present with a reservoir patch

10  and that those risks might lead to

11  increased abuse, misuse and diversion.

12        Q.    And were those risks that

13  the company had actually seen in people

14  using the matrix patch?

15        A.    Yes, but to a fairly low

16  degree.

17        Q.    And this is in 2001?

18        A.    This is in 2000, 2001 --

19  well, it's -- it's throughout the history

20  of -- from 2000 on -- from 1999 on just

21  based on adverse event reporting and

22  clinical trials.

23        Q.    And over the years did the

24  company look further at the question of

1    the matrix patch as a possible

2    alternative formulation?

3          A.    Yes.  In the United States

4    we again commissioned, if you will, an

5    update to the 2001 report because we were

6    aware that there was potential for a

7    matrix patch to be marketed in the United

8    States and we asked whether the

9    conditions or the -- the knowledge base

10   we had in 2001 was still relevant.

11         Q.    Now, when you commissioned

12   these reports, did the reports give you

13   information about what was happening in

14   the real world with abuse of the patch

15   that you had, the reservoir patch?

16               MS. CONROY:  Objection.

17               THE WITNESS:  Yes, that

18        was -- yes, that was part of the

19        report.  So the reports went back

20        and looked at databases that would

21        inform about the relative risks of

22        abuse, misuse and diversion.

23   BY MR. LIFLAND:

24         Q.    And what information did

Highly Confidential - Subject to Further Confidentiality Review

1  they give you on that subject?

2      A.    That through both periods of

3  time, 2001 up to 2004, the Duragesic was

4  not attractive as a drug of abuse, misuse

5  and diversion.  And that the rates, at

6  least using the databases available at

7  that time, remained consistently lower

8  than other extended-release opioids.

9      Q.    Now, at a certain point in

10  time the company did change the design

11  and introduce the matrix patch in place

12  of the reservoir patch; is that correct?

13      A.    That's correct.

14      Q.    Do you recall when that

15  happened?

16      A.    Well, the -- the drug was

17  approved for marketing in 2009.

18      Q.    And did the company, before

19  doing that, did the company look again at

20  the issues around the potential

21  abusability of the matrix formulation as

22  compared to the reservoir formulation?

23      A.    Yes, we did.  So at that

24  point, as I indicated, there was a matrix

1  patch that had been marketed in the

2  United States since 2005.  Certainly at

3  that time there were other matrix patches

4  that were on the market, but the first

5  matrix patch was marketed in 2005.  And

6  so we had several years of data at that

7  point in the 2008-2009 period to assess

8  relative rates of abuse, misuse and

9  diversion.

10              (Document marked for

11        identification as Exhibit

12        Janssen-Moskovitz-33.)

13  BY MR. LIFLAND:

14        Q.    So I'm going to mark as

15  Exhibit 33, it's JAN-MS-02578637 through

16  38.

17              MS. CONROY:  Thank you.

18  BY MR. LIFLAND:

19        Q.    A memorandum.  It's entitled

20  Review and Conclusion of the RADARS

21  Report Summarizing Abuse and Diversion

22  Data For Transdermal Fentanyl Products in

23  the United States.  And it's signed on

24  the second page by you, Bruce Moskovitz,

1    M.D.

2          A.     Thank you.

3          Q.     Can you explain what this

4    document is?

5          A.     Give me a moment to look at

6    it.

7               Yeah, so this -- this

8    summarizes the conclusion of the

9    surveillance programs that we had in

10   place, certainly before 2005, but we were

11   looking at a comparison of the rates of

12   abuse, misuse and diversion that might

13   have occurred from the time that a matrix

14   patch was available from 2005 on.  And we

15   looked at those rates through the various

16   tracking systems that were subsumed under

17   the, what was called RADARS, a number of

18   different streams of data.  And we

19   concluded that through this period of

20   time, approximately two to three years,

21   the abuse and diversion of fentanyl

22   patches remained low relative to other

23   opioids.  And that there was no

24   compelling evidence to suggest that the

1   matrix formulation was abused or diverted

2   more than the reservoir formulations.

3           At that time we concluded

4   that we could safely move from a

5   reservoir patch to a matrix patch in

6   conformance with what the FDA preferred

7   as the formulation.

8           Q.    Let me shift the focus a

9   little here.  And again, let's talk about

10  the issue of actions the company may have

11  taken to encourage safe and effective use

12  of the product and deter abuse and misuse

13  of the patch.  And now I'm talking about

14  things beyond simply discussing the

15  design of the patch and how that might be

16  harder or easier to abuse.

17          Can you -- can you describe

18  for me those, please?

19          A.    Well, we --

20          Q.    And you might want to start

21  with the package insert.

22          A.    Okay.  So the package insert

23  summarizes all of the pertinent

24  information that a prescriber needs to

1  appropriately select the patient.  Get

2  the medical history that would inform the

3  treating physician.  Whether there were

4  any contraindications or concomitant

5  medications that -- that he or she should

6  be aware of.  Select the appropriate dose

7  based upon the opioids that the patient

8  had previously been exposed to.  How to

9  monitor that patient -- well, how to

10  inform the patient, first of all, at the

11  time that you're prescribing the drug,

12  about the appropriate use of the product,

13  the appropriate precautions that the

14  patient should be taking.  Things that

15  we've already spoken about, such as not

16  exposing the patch to heat sources.  How

17  to properly dispose of the patch.  And

18  the type of monitoring that the physician

19  might be doing with the patient.

20              So we also instructed the

21  physician about how to monitor the

22  patient over the course of his or her

23  therapy to continue to assess that the

24  benefits that the patient would be

1    getting from Duragesic would continue to

2    outweigh the risks of the -- the product.

3         Q.    Okay.  Well, let's -- let's

4    break that down a little bit.

5         A.    Okay.

6         Q.    We looked at the -- at the

7    package insert initially.  And the

8    initial thing we looked at was the

9    descriptions of the risks.

10             So those are described here?

11        A.    Yes.

12        Q.    And then you mentioned

13   patient selection, proper patient

14   selection?

15        A.    Correct.

16        Q.    You mentioned proper dosing?

17        A.    Correct.

18        Q.    And you mentioned patient

19   counseling?

20        A.    Correct.

21        Q.    And you mentioned proper

22   monitoring?

23        A.    Correct.

24        Q.    So let's talk a little bit

1    about each of those.

2            Patient selection, I gather

3    initially that's looking at the --

4    whether the patient fits the indication,

5    at least that's one aspect of it?

6       A.    Whether the patient fits the

7    indication and the patient doesn't have

8    any of the contraindications or any other

9    concerns, even though they may not be

10   contraindications, other drugs that the

11   patient may be taking that might alter

12   their -- their mental state or that might

13   increase certain risks for some of the

14   adverse events.  So it's not just those

15   that are contraindications.

16      Q.    And proper dosing?

17      A.    Yes.

18      Q.    And that, I take it, is to

19   ensure that the dose is -- to ensure that

20   the dose is high enough for pain relief,

21   but not so high that it places the

22   patient in danger of hypoventilation?

23      A.    I would start off by saying

24   that the dose is low enough --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Low enough.

2    A.    -- to begin with, so that

3  you begin from a place where you are not

4  putting the patient at risk.  And if

5  higher doses are needed to achieve

6  analgesia, you have an opportunity to

7  increase those doses.

8          To -- there are tables in

9  here and aids to assist the patient in

10  choosing the proper dose of Duragesic

11  based upon the opioid that the patient

12  might be taking at the time he or she is

13  transferred to Duragesic.

14    Q.    And you mean to assist -- I

15  assume you meant to say assist the doctor

16  in choosing?

17    A.    Yes.  Assist the doctor in

18  choosing the right dose based upon what

19  the patient is taking at the time.

20    Q.    And that process of starting

21  at a lower dose and moving to the minimum

22  that's needed, what is that called?

23    A.    Well, titration of the

24  patient.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then patient counseling.

2    This is what you spoke about before in

3    terms of giving the patient the

4    information that they would need to

5    minimize the risk of -- of adverse

6    events?

7    A.    Yes, and counseling the

8    patient so that the patient is aware that

9    he or she shouldn't be treated with the

10   drug if the treatment is for acute pain

11   or for pain that's not continuous,

12   around-the-clock, persistent pain.

13   Q.    And proper monitoring,

14   what's the importance of proper

15   monitoring?

16   A.    Well, in a -- in a broad

17   sense, the concept of patient management,

18   especially with potent opioids, we would

19   look at four aspects of treatment.

20   Analgesia, how well are you achieving the

21   goal of pain reduction.  I mean you're

22   treating the patient with an analgesic.

23   You want to reduce their pain.

24        Adverse events, how well is

1   the patient tolerating the drug.  Are

2   they experiencing -- and we expect that

3   many of the patients, particularly early

4   in the course of therapy, may have some

5   adverse events that may be tolerated or

6   may diminish over time.  Commonly for

7   opioids, those might be constipation,

8   gastrointestinal adverse events, itching,

9   pruritis.

10            Okay.  So we spoke about

11  analgesia and adverse events.

12            Activities of daily living,

13  one of the things that we like to achieve

14  with pain medication is not just a

15  reduction in pain but getting the patient

16  back to those activities that might be

17  important to him or her.  And that has to

18  be individualized to the patient, but

19  it's a discussion that physicians should

20  have.  What does the patient want to do

21  if we can relieve their pain?

22            And then elements that would

23  help you determine whether there are

24  behaviors associated with abuse and

1   misuse and assess those as well.

2       Q.    Now, did you have data at

3   Janssen that looked at the efficacy of

4   the products, if it -- if it was used

5   chronically, that is, over a longer term

6   course of therapy?

7       A.    Yes.

8       Q.    And can you describe what

9   those were?

10      A.    So even going back to the

11  original studies, and I'd have to

12  refer -- the efficacy assessment was made

13  over a period of 30 days.  But some of

14  those patients were treated for extended

15  periods of time where they continued to

16  gain the benefits of pain management.

17  There are other studies that were

18  subsequently conducted.

19          And in a number of those

20  studies, the treatment period extended to

21  a year or more.  So we had a body of data

22  that there were patients who would

23  continue to benefit from continued use of

24  Duragesic, where they would have pain

1  relief and have tolerable side effects

2  over a long period of time.

3      Q.    And because you have that

4  data, does that mean that a doctor can

5  simply place a patient on the medication

6  for a long period of time and, you know,

7  and set and forget?

8      A.    No, of course not.  The

9  risks associated with opioids are

10  substantial.  And, therefore, a physician

11  has to monitor the patient on a regular

12  basis, monitor the patient for analgesia,

13  adverse events, activities of daily

14  living, and aberrant drug behaviors.

15          By virtue of it being a

16  Schedule II, you can't even call in the

17  prescription.  You have to see the

18  patient on a regular basis.  So we are

19  talking about a continual assessment

20  of -- that the benefits of the medication

21  continue to outweigh the risks associated

22  with opioid therapy.

23      Q.    For the particular patient?

24      A.    For that particular patient,

Highly Confidential - Subject to Further Confidentiality Review

1   yes.

2          Q.     And you mentioned quality of

3   life.  Did the company have data on

4   quality of life from improvements from

5   opioid therapy with Duragesic?

6          A.     Yes, there were a number of

7   studies that included measures of quality

8   of life.  There are a number of surveys,

9   there are a number of questionnaires and

10  assessments that the clinician or the

11  investigator can administer that assess

12  functionality and quality of life.  And

13  we included those in a number of our

14  investigations.

15         Q.     And what is the importance

16  of monitoring -- I think the last thing

17  you said was signs of aberrant behavior.

18         A.     As with other potent

19  opioids, these are drugs that are used --

20  abused, misused, diverted.  So if a

21  patient was exhibiting aberrant

22  behaviors, early refills, I lost the

23  drug, there are a variety of known

24  behaviors that are classified as aberrant

1  drug behaviors that might suggest to the

2  treating physician that he or she

3  carefully determined whether continued

4  use of the product is warranted.  In some

5  cases it may very well be.  But you may

6  need to put in place a more stringent

7  monitoring avenues.

8          In some cases based upon

9  those aberrant behaviors, you may choose

10 to decrease the dose or even stop the

11 dose or to refer the patient to a pain

12 specialist who has more experience in

13 managing a patient who might exhibit

14 these aberrant behaviors.

15     Q.    Are different patients at

16 different risk for these kinds of adverse

17 events?

18     A.    Yes.  We saw that in

19 multiple publications over the course of

20 time.  You can almost construct a

21 hierarchy where an older patient who does

22 not smoke, does not have history of

23 alcohol abuse or abuse of other drugs,

24 would have among the lowest likelihood of

Highly Confidential - Subject to Further Confidentiality Review

1    abuse, misuse and diversion, all the way

2    to an individual who has pain that needs

3    to be treated, but that individual has a

4    history of substance abuse, alcoholism,

5    other drugs of -- with euphoric

6    capabilities, smoking, depression.  There

7    are a number of high risk conditions that

8    would inform the treating physician that

9    this is a patient who is at greater risk

10   for issues of abuse, misuse and

11   diversion.

12         Q.    And what would that counsel

13   in terms of patient monitoring?

14         A.    That, again, would be

15   individualized.  So you would have to

16   make a very careful assessment of the

17   patient, of the starting dose.  You might

18   have a written agreement with the patient

19   such that the patient would agree to have

20   pill counts.  The patient might agree to

21   have urine testing on a regular basis.

22              Again, going back to the

23   very outset, you might choose to refer

24   that patient to a pain specialist to have

1    that individual who has much more

2    expertise in treating high risk

3    individuals, treat that patient, rather

4    than primary care, if that's the -- what

5    we're talking about.  But -- or you might

6    see the patient more frequently to assess

7    whether that patient continues to gain

8    the benefits of the drug and the

9    benefit-risk ratio remains.

10        Q.    We've already looked, I

11   think, at the information on these topics

12   that's provided in the package insert.

13             Were there other vehicles

14   that the company used to provide this

15   kind of information to physicians?

16        A.    Yes.  We supported

17   educational programs that taught about

18   appropriate prescribing, appropriate

19   monitoring.  We supported websites that

20   spoke about how to manage patients with

21   pain.  We developed tools that a

22   physician could use to assess these

23   aspects of pain management and document

24   the interaction with the patient.

1    Q.    Let me show you a document.

2  It may take just a minute to find it

3  here.

4          (Document marked for

5          identification as Exhibit

6          Janssen-Moskovitz-34.)

7  BY MR. LIFLAND:

8    Q.    We marked this as

9  Exhibit 34.

10         MS. CONROY:  You are going

11         to need it, right?

12         MR. LIFLAND:  I think we

13         have a third one.

14         MS. CONROY:  You have --

15         okay, great.  Thank you.

16         MR. LIFLAND:  And I'll put

17         it up on the screen.

18  BY MR. LIFLAND:

19    Q.    Can you tell me what this

20  document is, Dr. Moskovitz?

21    A.    Yes.  This is a report on a

22  tool that was developed in part with

23  the -- the work that was done internally

24  at Janssen to assess in relatively brief

Highly Confidential - Subject to Further Confidentiality Review

1  and straightforward way those elements

2  that we just spoke of.  Steve Passik, who

3  is the lead author, had developed the

4  concept of -- of monitoring for the four

5  A's:  Analgesia, pain relief, adverse

6  events, how well the patient tolerated

7  the drug, activities of daily living, and

8  aberrant drug use.

9          And this was a tool that was

10  developed to help a physician assess

11  those four areas of treatment and

12  document them in a -- in a note with each

13  patient visit.

14      Q.    And is Janssen or a Janssen

15  employee one of the authors on this?

16      A.    Actually two, there are two

17  Janssen employees, Sheri Dodd and Jeffrey

18  Schein.

19      Q.    And was this a tool that was

20  provided to physicians so that they could

21  use it for the patient monitoring that's

22  recommended?

23      A.    Yes, we -- we did provide

24  it.  Ultimately we had tear-off sheets so

1    that it could be provided to prescribers

2    as a -- as a tool to use in documenting

3    the four A's of patient management with

4    an opioid.

5              (Document marked for

6         identification as Exhibit

7         Janssen-Moskovitz-35.)

8    BY MR. LIFLAND:

9         Q.    And let me hand you another

10   document.  This will be Exhibit 35.  And

11   this is from the website of NIDA.  And

12   you -- do you know what NIDA is?

13        A.    National Institute on Drug

14   Addiction.

15        Q.    And do you know what NIDA's

16   mission is?

17        A.    Yes.  They're -- they're --

18   I couldn't give you it to you in exact

19   unless I went to the website.  But they

20   want to develop scientific data that

21   informs the scientific community, the

22   treating community on issues related to

23   public health abuse, misuse and issues of

24   addiction.  Scientifically based data

Highly Confidential - Subject to Further Confidentiality Review

1    that do that.

2         Q.    And -- and they have posted

3    the PADT developed by Janssen as a tool

4    on their website?

5         A.    Yes.  I don't know if we

6    officially used the term "PADT."  So the

7    tool that we were speaking about that

8    assessed these four A's of treatment was

9    called the Pain Assessment and

10   Documentation Tool and was shortened to

11   the PADT.

12        Q.    And take -- take a look at

13   the second page.  That's what it's

14   referred to at the top there?

15        A.    That's correct.

16        Q.    And let me just ask you, is

17   this a validated tool?  Can you explain

18   what that is, or is it just -- something

19   short of that?

20        A.    It -- it was -- it was not

21   validated in the sense that it could

22   actually predict whether by using the

23   tool you could predict for issues of

24   abuse, misuse and -- and diversion.  But

Highly Confidential - Subject to Further Confidentiality Review

1   it was understood that one of the -- one

2   of the requirements for appropriate

3   patient care, particularly if you're

4   prescribing a scheduled product, is to

5   continue to document in your notes the

6   reasoning behind your decision to start a

7   patient on drug or your decision to make

8   any changes during the course of therapy

9   or to continue therapy.  And this was a

10  tool that was developed to assist with

11  that.

12          Q.    Let me turn now to the

13  subject of safety surveillance.  Were you

14  involved with safety surveillance of the

15  Duragesic and other pain products at

16  Janssen?

17          A.    Yes.

18          Q.    And how did the company go

19  about doing that?

20          A.    Well, safety surveillance

21  goes all the way back to designing a

22  clinical trial that would assess benefits

23  and risks in the clinical trials, adverse

24  events.  The -- after the drug is

¹ marketed there is a regulatory

² responsibility to report to the Food and

³ Drug Administration on a periodic basis,

⁴ more frequently initially, less

⁵ frequently later on, adverse events and

⁶ events of particular interest.

⁷ In the case of opioids, the

⁸ events of particular interest might be

⁹ such things as a respiratory depression,

¹⁰ exposure, pediatric exposures, opioid

¹¹ naive exposures.

¹² But we also put in place

¹³ other mechanisms for monitoring, for

¹⁴ abuse, misuse and diversion, monitoring

¹⁵ databases such as DAWN, TESS databases,

¹⁶ of forensic laboratory databases,

¹⁷ internet databases.

¹⁸ Q. Let me -- let me --

¹⁹ A. Sure.

²⁰ Q. Let me see if I can give you

²¹ a document that will allow us to go

²² through that a little bit more

²³ systematically.

²⁴ I'm going to -- I'm

Highly Confidential - Subject to Further Confidentiality Review

1    referring to Exhibit 28.  It should be in

2    your stack.  It was marked earlier today.

3          A.    I wish I was as good as you

4    were about putting things in the --

5                MS. CONROY:  I have one, I

6          think, that does not have any

7          writing on it, except for my

8          Ex-28.

9                THE WITNESS:  I think I have

10         it here.  Thank you.

11               MS. CONROY:  Okay.

12   BY MR. LIFLAND:

13         Q.    Dr. Moskovitz, do you

14   recognize this document?

15         A.    I do.

16         Q.    And you -- you referred to a

17   number of surveillance measures.  Did

18   there come a time when Janssen pulled

19   those together in something that was

20   called a risk management plan?

21         A.    Yes.

22         Q.    And that occurred when?

23         A.    Well, we had a formal risk

24   management plan agreement with the FDA to

1  monitor these risks in approximately

2  2005, but we had a number of these

3  screens in place even before 2005.

4       Q.    So this plan built on

5  monitoring the company had been doing

6  before that time?

7       A.    Yes.

8       Q.    And some of the things you

9  described, the periodic adverse event

10  report review, for example, that's

11  something that is required under FDA

12  regulations, it would have been done

13  since 1990?

14       A.    That's correct.  That's

15  correct.  There are regulatory

16  requirements over periodic reporting of

17  adverse events.

18       Q.    And you referred to the

19  reports that you had received from, for

20  example Pinney Associates, which looked

21  at, among other things, the -- the degree

22  to which the company had seen abuse of

23  the patch that the company had at that

24  time in 2001?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.  As part of his

2  assessment of relative risks of abuse, he

3  reviewed available data around

4  information on abuse of the Duragesic

5  patch up to that point.

6    Q.    And this document that we

7  have in front of us is a presentation

8  from 2007?

9    A.    I -- yes, that's the date on

10  the front page.

11    Q.    And you are listed as the

12  presenter; is that correct?

13    A.    Correct.

14    Q.    And this gives an overview

15  of -- well, you tell me generally what's

16  the overview here?

17    A.    An overview of the

18  activities within the medical affairs

19  group to monitor for the safety of our

20  pain products.  But the risk management

21  plan in general, how we go about

22  collecting the various streams that would

23  inform us on the safety of our product

24  and -- and the process by which we review

1   those data internally and externally.

2       Q.    And further down the

3   document, is there a description of the

4   Duragesic risk management plan in

5   particular?

6       A.    Yes.  There is no page

7   number, but there is a slide that's

8   labeled Duragesic (opioid risk management

9   plan).

10      Q.    And that would be the plan

11  that was in effect in or around 2007 --

12      A.    Yes.

13      Q.    -- at the time you gave that

14  presentation?

15      A.    Yes.  It's a -- it's an

16  overview of that plan.

17      Q.    And I take it those plans

18  evolved over time.  You mentioned that in

19  2005 you -- you had an agreement with the

20  FDA to formalize this; is that right?

21      A.    Yes.

22      Q.    And then did it change over

23  time as the years went on?

24      A.    It did.  We've spoken

1    already about how the risk management

2    plan ultimately evolved into a REMS

3    program, and into -- into a

4    consortiumwide surveillance program.

5        Q.    All right.  Well, let's take

6    a quick look at some of the slides,

7    starting with the ones that deal with

8    risk management generally.

9        A.    So that's towards the

10   beginning of the document.

11       Q.    That's the beginning of the

12   plan.

13       A.    Okay.

14       Q.    Now, you have a -- initial

15   subscribe -- describes the FDA regulatory

16   system, and then you have the question,

17   "But how safe is safe?"

18            What is -- what is the point

19   that you're making there?

20       A.    All drugs have risks

21   associated with them.  Every drug has

22   adverse events, and you have to assess

23   those risks against the potential

24   benefits to determine whether to

Highly Confidential - Subject to Further Confidentiality Review

1    prescribe or to continue a drug for a

2    specific patient.

3         Q.    All right.  If you turn to

4    the next page, there's a section on

5    limitations of clinical trials.  And I

6    take it your point here is that there are

7    limitations of clinical trials on the

8    subject of assessing risk.  Can you

9    describe what those are and what you're

10   conveying in this slide?

11        A.    Yes.  Absolutely.  So

12   clinical trials are conducted in a highly

13   controlled environment.  There are clear

14   selection criteria, inclusion/exclusion

15   criteria in a clinical criteria.

16             So by virtue of that highly

17   controlled environment there are

18   limitations on the full picture of safety

19   and efficacy that you might ultimately

20   develop with a drug.

21             It's been well noted that

22   even large clinical trials would have

23   difficulty in determining adverse events

24   that -- that might be serious but that

Highly Confidential - Subject to Further Confidentiality Review

1    are seen at a very low incidence in the

2    general population.  That's one of the

3    limitations on a clinical trial.

4              You're also limited in the

5    patient population you're seeing.  So you

6    might want -- you might need to develop

7    more data around an elderly population.

8    We certainly know of doing separate

9    studies in a pediatric population.  Those

10   would not necessarily be answered with

11   the initial clinical trials.

12        Q.    If you'll turn to the next

13   one.  This refers to guidance for

14   industry.  What guidance is that

15   referring to?

16        A.    The FDA published in the

17   federal register a guidance around risk

18   management.

19        Q.    And that came out in 2005?

20        A.    Yes.

21        Q.    And that was one of the

22   reasons for systematizing this risk

23   management plan, I take it?

24        A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Let's move on to -- you can

2    skip the next slide and go to the slide

3    entitled "Goals of a Risk Management

4    Program."

5         What's the point that you're

6    making in this slide?

7    A.    So to the extent possible,

8    we want to -- when I say optimize the

9    benefit-risk ratio, so by optimizing a

10   ratio, you can either increase the

11   positive aspect, the efficacy of the

12   drug, or you can minimize the risks.  So

13   if you can identify the risks and take

14   steps to minimize those risks, that works

15   towards optimizing that benefit-risk

16   ratio.

17   Q.    And the next slide is

18   entitled "the process of risk

19   management."  Can you explain that one?

20   A.    Going back to what I just

21   spoke about.  So understand what the

22   risks are associated with your product

23   and develop tools so that you can

24   minimize those risks.  And those tools

1    might be education, education for the

2    healthcare provider, education for the

3    patient.

4              And as you -- and over time

5    you may need to change those.

6         Q.    Is that what Janssen is

7    trying to do with the risk management

8    plan for Duragesic?

9         A.    Yes.

10        Q.    Next slide is "Tools."  Can

11   you comment on that one, please.

12        A.    Yes.  These are -- these are

13   methodologies that might be employed.

14   I'm not saying necessarily for Duragesic.

15   But these are some of the tools that

16   could be used to minimize risks

17   associated with a product, not just an

18   opioid.

19              We've spoken about education

20   and training for the healthcare providers

21   and educating patients.

22              Just looking at a number of

23   these, you might restrict the setting in

24   which the drug might be used so that it

Highly Confidential - Subject to Further Confidentiality Review

1    would be only within a hospital setting.

2                You might require that

3    patients register before they could use

4    the drug or that -- or limit it to

5    certain types of physicians.

6                Again, this goes across all

7    drugs where you are considering a risk

8    management plan.

9         Q.    And in the next slide you

10   have "Evaluating the Plan."  And it

11   speaks of criteria for success, signals,

12   strategies for intervention.  Can you

13   explain what signals and strategies for

14   interventions are?

15        A.    We would put in surveillance

16   mechanisms that would help us assess the

17   identified risks, primarily risks of

18   abuse, misuse and diversion, but

19   certainly the adverse events that we've

20   spoken of, that were common for opioids.

21                And how we would go about

22   collecting data on the incidence of those

23   risks and what would constitute a signal

24   where we might need additional

1    intervention or more information.

2         Q.    And what kind of

3    intervention might that be?

4         A.    Interventions might be

5    changes in our educational material,

6    changes in the package insert.  It might

7    be, in the case of a surveillance

8    program, sending someone out or getting

9    more information about what's going on in

10   a particular geographic area to

11   understand the background behind what we

12   may be seeing in the surveillance

13   program.

14        Q.    All right.  Your

15   presentation goes on to give another --

16   some examples involving another drug.

17   Let's go, move forward to the discussion

18   now of Duragesic risk management plan.

19             And if you turn to the first

20   slide there, that's a -- I guess a

21   graphic representation of the way the

22   plan was organized.  Can you just give a

23   quick summary of what that's supposed to

24   depict?

1    A.    Yes.  We've spoken about

2  risks and we -- starting with the

3  understood risks or perceived risks of a

4  medication, we assess the risks and what

5  tools we have to manage the risk.

6         The assessment would be a

7  variety of data.  That might include, in

8  the case of opioids, abuse liability

9  studies, epidemiology, in vitro studies,

10  and then ways in which we could manage

11  those risks.

12         Managing those risks could

13  entail things that we've already spoken

14  of, appropriate labeling so that the

15  risks are properly conveyed to the

16  healthcare provider who's prescribing the

17  drug; education, both to the healthcare

18  provider and the treating community,

19  activities around launch and promotion of

20  these risks are continued to be brought

21  to the physicians' attention about the

22  proper patient selection and monitoring;

23  surveillance, we've spoken about the

24  streams of data that come into us that

1    look at issues around abuse, misuse and

2    diversion; supply chain management, which

3    we've spoken about; manufacturing which

4    we've spoken about.

5         Q.    So under surveillance,

6    there's two categories, one is routine or

7    passive and the other is active.  Can you

8    explain the difference between those two?

9         A.    Routine, passive, for the

10   most part these are the adverse event

11   reports that come into the company.

12   We're not going out and soliciting them.

13   Maybe in the case of a clinical trial we

14   might be.  But these are adverse events

15   that are reported to us, passive in that

16   respect -- in that respect.

17              Active being that we are

18   actively supporting surveillance to

19   understand what -- how the drugs are

20   being used in the community and whether

21   there are issues around abuse, misuse and

22   diversion.

23        Q.    All right.  So what were

24   the -- what were the passive surveillance

Highly Confidential - Subject to Further Confidentiality Review

1    tools that Janssen had available for

2    Duragesic?

3            A.    Adverse event reporting

4    would be the primary one, yeah.

5                MR. LIFLAND:  Let's take a

6            look at one of the progress

7            reports.

8                Does anyone need a break or

9            are we good?

10               MS. CONROY:  Fine.

11               MR. LIFLAND:  I'd like to

12           mark as the next, Exhibit Number

13           36.

14               (Document marked for

15           identification as Exhibit

16           Janssen-Moskovitz-36.)

17               MR. LIFLAND:  The document

18           begins with Bates number

19           JAN-MS-00213785, and ends with --

20           oh, I'm sorry, that's -- that's

21           the number.  It's a native file

22           provided.

23    BY MR. LIFLAND:

24           Q.    Doctor, can you look at the

1    title page of this document and tell us

2    what it is?

3            A.    The Duragesic first annual

4    progress report.  This is part of the

5    periodic safety update that was required

6    to be filed with the Food and Drug

7    Administration.

8            Q.    So this is a report that's

9    prepared under the risk management plan,

10   the first one, in fact?

11           A.    It's part of our

12   responsibility to report adverse events

13   and -- and the -- and the risk management

14   activities that we agreed to provide.

15           Q.    And the issue date is listed

16   there as the 5th of June, 2007?

17           A.    Yes.

18                 MR. RODRIGUEZ:  What exhibit

19        number are we on?

20                 MR. LIFLAND:  Oh, I'm sorry.

21                 MS. CONROY:  I'm sure he

22        said it, I just missed it.  I'll

23        go back --

24                 MR. LIFLAND:  36.

Highly Confidential - Subject to Further Confidentiality Review

1                    MS. CONROY:  Thank you.

2    BY MR. LIFLAND:

3          Q.    So if you turn to the table

4    of contents you'll see how the report is

5    structured, correct?

6          A.    Correct.

7          Q.    It gives you a description

8    of what the risk management plan is?

9          A.    Yes.

10         Q.    And what it's looking at?

11         A.    Yes.

12         Q.    In Section 2, or 1 is the

13   introduction and the background explains

14   it?

15         A.    That's correct.

16         Q.    And then Section 3 goes

17   through all the elements of the plan and

18   what the -- what the findings are for

19   this reporting period; is that correct?

20         A.    Yes.

21         Q.    All right.  And if you turn

22   to Page 12, there's a summary.

23         A.    Executive summary, yes.

24         Q.    And the first thing after

1    the introduction is what's referred to as

2    pharmacovigilance plan?

3          A.    Yes.

4          Q.    And that I take it is what's

5    referred to as the passive monitoring or

6    the passive surveillance?

7          A.    Yes.

8                Excuse me.

9          Q.    And the next page describes

10   the elements of that.  The first one is

11   review of the SCEPTRE database.

12         A.    Yes.

13         Q.    You described the SCEPTRE

14   database?

15         A.    That was the adverse event

16   reporting database that -- to which we

17   entered all reports of adverse events on

18   a worldwide basis.

19         Q.    So when you say on a

20   worldwide basis, there were other

21   countries in the world in which Janssen

22   sold fentanyl patches?

23         A.    Yes.

24         Q.    And so this would compile

1  adverse events not just from the United

2  States?

3          A.    That's correct.

4          Q.    And those would be analyzed

5  as the first part of the surveillance?

6          A.    Yes.

7          Q.    And then the second is,

8  underneath that the FDA SRS/AERS

9  database.  What is that?

10          A.    The FDA also had a database

11  of adverse events if a healthcare --

12  healthcare provider or a patient might

13  report to the FDA and not report to the

14  company.  So there was an attempt to

15  share the databases so that we had

16  similar information that we were working

17  with.

18          Q.    Okay.  So the first step in

19  this place is to do a review of all of

20  the FDA's adverse events and --

21          A.    And -- FDA and our adverse

22  events.

23          Q.    And then all of the

24  company's adverse events that it's

Highly Confidential - Subject to Further Confidentiality Review

1    learned about worldwide?

2        A.    Correct.

3        Q.    Okay.  And the next listed

4    under here is review of the drug abuse

5    warning network, DAWN.

6                  Can you explain what that

7    is?

8        A.    It collects data on

9    emergency department visits for a variety

10   of drugs, I mean, but emergency

11   department visits which are related to

12   drug intake.

13       Q.    And what information does

14   that provide relating to abuse, misuse?

15       A.    That in the most serious

16   cases, if the intake of a drug led to the

17   need to present the patient to an

18   emergency room, we would have information

19   on the drugs that were used that led to

20   that emergency room admission.

21       Q.    And is that -- who -- who

22   puts together that data?

23       A.    There's a separate database

24   that's maintained by the DAWN group.  I

1    don't recall exactly how it is

2    constructed.

3           Q.    Is it a government database?

4           A.    It is.

5           Q.    Federal domain?

6           A.    Yes.

7           Q.    And then the next on the

8    list is review of IMS Health LRx

9    database.  Can you explain how that's

10   used in the risk management plan?

11          A.    Well, this helps us

12   determine patient exposure to Duragesic

13   and other compounds.

14          Q.    So it would give you a

15   baseline of exposure that you could

16   then --

17          A.    How many prescriptions were

18   written and how many patients received

19   the drug.

20          Q.    All right.  Then we have a

21   reference to Poison Control Center data.

22   And is this -- are we now moving into the

23   area of active surveillance?

24          A.    Yes.  These were streams

Highly Confidential - Subject to Further Confidentiality Review

1  that we contracted to receive from the

2  Poison Control Centers.

3          Q.     And have you heard of

4  RADARS?

5          A.     Yes.

6          Q.     And can you tell us what

7  that stands for?

8          A.     Research, abuse -- I'd have

9  to go back on the exact acronym.

10         Q.     It's referred to on the

11  next -- the next page here.  Explain what

12  it is.

13         A.     Well, there are a number

14  of -- of surveillance programs that fall

15  under RADARS.  But they -- they monitor

16  for streams of -- that would help to

17  detect abuse, misuse and diversion.

18         Q.     And then there's a reference

19  to National Forensic Laboratory

20  Information System.

21              What's that?

22         A.     In instances where samples

23  might be submitted to a laboratory to

24  determine what the cause of death was or

1    if there was an adverse event, they would

2    have a database that they would be able

3    to determine what the drug was that was

4    used when it came to the attention of the

5    laboratory.

6          Q.    Further down the page is a

7    reference to supplemental RADARS program

8    from the RADARS system.

9                Can you explain what that

10   is?

11         A.    We have the opportunity

12   to -- to be a little bit more granular

13   with the data that RADARS provides and to

14   get down to a three-digit zip code level.

15   That's the supplementary data.

16               It -- so it -- the elements

17   of that would include drug diversion

18   network, key informant network, opioid

19   dependence treatment network.

20         Q.    What's a key informant

21   network?

22         A.    There were individuals in

23   various geographic locations throughout

24   the country who had their ear to the

1    ground around issues of abuse, misuse,

2    diversion, particularly for an illicit

3    drug that might be coming into the area,

4    and they would help inform what was going

5    on.

6         Q.    And then finally, there's a

7    reference, at the top of the next page to

8    supplementary internet media monitoring

9    programs?

10        A.    Yes.

11        Q.    Explain what that is.

12        A.    So we would monitor, or we

13   would contract with a group that would

14   monitor -- there were sites that were

15   well known to drug users, abusers on the

16   internet where they would talk about

17   their experiences using drugs, what gave

18   them the high, how easy it was to obtain

19   the drug -- excuse me.

20             And we were monitoring

21   those -- these internet sites to gain an

22   understanding of, especially over time,

23   what the interest in particular drugs,

24   particular formulations might be.

```
 1            MR. LIFLAND:  Maybe we
 2       should take a quick break.  I
 3       think it sounds like you need some
 4       water.
 5            THE WITNESS:  If you don't
 6       mind.  Thank you.
 7            THE VIDEOGRAPHER:  All
 8       right.  Remove your microphones.
 9       The time is 5:20 p.m.  Going off
10       the record.
11            (Short break.)
12            THE VIDEOGRAPHER:  We are
13       back on the record.  The time is
14       5:29 p.m.
15  BY MR. LIFLAND:
16       Q.   Dr. Moskovitz, can you turn
17  to Page 29 of the progress report, risk
18  management plan progress report that
19  we've been discussing.
20            THE VIDEOGRAPHER:  Your
21       microphone.
22            THE WITNESS:  Mine too.
23       Sorry.
24            MR. LIFLAND:  All three of
```

Highly Confidential - Subject to Further Confidentiality Review

1    us.

2         MS. CONROY:  Yeah.

3    BY MR. LIFLAND:

4         Q.    Dr. Moskovitz, could you

5    please turn to Page 29 of the risk

6    management plan progress report that

7    we've been discussing.

8         A.    Yes.

9         Q.    And the two headings on this

10   page refer to cumulative reviews of

11   information from the company's adverse

12   event database that the company

13   performed.  Do you see those?

14        A.    Yes, I do.

15        Q.    And is that something that

16   the company would do periodically from

17   time to time if a question came up?

18        A.    Yes.

19        Q.    And can you tell us what the

20   first one of those is?

21        A.    2.6.4?

22        Q.    2.6.4.

23        A.    Iatrogenic addiction,

24   addiction that -- that from -- was an

Highly Confidential - Subject to Further Confidentiality Review

1  outcome of prescribing of Duragesic.  So

2  it was a review of cases of addiction

3  associated with prescriptions of

4  addiction -- of Duragesic.

5         Q.    So these would be patients

6  who had received a prescription and

7  become addicted?

8         A.    That is my understanding.

9               MR. LIFLAND:  Have we got

10        the -- I'm going to hand you

11        another document on this topic.

12        We'll mark it as -- are we on 37?

13             (Document marked for

14        identification as Exhibit

15        Janssen-Moskovitz-37.)

16             THE WITNESS:  Do you want me

17        to keep this here?

18  BY MR. LIFLAND:

19        Q.    Yeah, you can keep it there.

20  We're going to come back to both of

21  those.  I just want to review this.

22        A.    Okay.

23        Q.    Can you read the title of

24  this document.

1     A.     "Cumulative Review of

2   Iatrogenic Addiction Associated With the

3   Use of Transdermal Duragesic Fentanyl

4   Patch."

5     Q.     And is this a report of that

6   review that's referred to here in the

7   risk management plan that we just

8   discussed?

9     A.     By the dates, it would

10   appear to be, yes.

11     Q.     And can you just take a

12   moment to look at it and then describe

13   what the review was?

14     A.     So going through the

15   database, based upon the -- our database,

16   we reviewed all cases that would be

17   suggestive of iatrogenic addiction

18   reported to the company with the use of

19   the transdermal fentanyl patch.

20     Q.     And for what period of time

21   would this cover?

22     A.     Without seeing specifically

23   the timeline, I would assume this would

24   be over the entire course of the

Highly Confidential - Subject to Further Confidentiality Review

1    marketing for Duragesic.  That is to say,

2    from 1990 on.

3         Q.    Does it cover just the

4    United States or is it worldwide?

5         A.    This is a worldwide

6    database.

7         Q.    All right.  So it's your

8    understanding that -- then that this is a

9    review of cases reported worldwide, of

10   all the cases that have been reported to

11   the company on cases of what might be

12   suggestive of iatrogenic addiction with

13   Duragesic patients on Duragesic?

14        A.    Correct.

15        Q.    Or the international

16   versions of it?

17        A.    Correct.

18        Q.    And can you take a look at

19   the conclusion of the -- well, let me

20   start.  Is there -- is there a discussion

21   of the exposure to Duragesic that the

22   period of time that these cases are drawn

23   from --

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- corresponds to?

2    A.    Yes.

3    Q.    Page 9?

4    A.    Yes.  I'm looking at Page 9.
5  And thank you, that helps me determine,
6  so that it is, in fact, from launch
7  through June 2005.

8    Q.    And what's the -- what's the
9  amount of exposure that's shown there?

10    A.    Well, overall in terms of
11  patient days, it would be 1,611,000 --
12  more than a billion patient days.

13    Q.    So it's approximately 1.1
14  billion 600 thousand --

15    A.    1,611,158,440.

16    Q.    Okay.  But that's
17  1.6 billion roughly?

18    A.    1.6 billion roughly, yes.

19    Q.    And what is a patient day?

20    A.    A patient day would be one
21  day of exposure of a patient to the
22  Duragesic patch.

23    Q.    And if you look at the
24  conclusion of -- well, just take a look

Highly Confidential - Subject to Further Confidentiality Review

1    at the results of the conclusion and

2    maybe you can summarize what the finding

3    was based on this review.

4          A.    That iatrogenic addiction

5    was very rare.

6          Q.    How many cases did they

7    find?

8          A.    They found 103 cases during

9    this -- over that period of time.

10          Q.    All right.  If you go back

11    to the previous document, which is

12    Exhibit 36 I think.

13          A.    Yes.

14          Q.    And you'll see underneath

15    the reference to that study we just saw,

16    or that review that we just discussed is

17    another cumulative review of death cases

18    with the fentanyl transdermal system.

19                Do you see that?

20          A.    Yes.

21          Q.    And -- and do you recall

22    that review?

23          A.    Yes.

24          Q.    Can you explain how that

1    came about and what the result was?

2         A.    So there was an FDA Public

3    Health Advisory around issues of misuse

4    of the Duragesic patch and deaths.  And

5    we had a -- the global regulatory had a

6    request from the German health

7    authorities to analyze all cases of

8    Duragesic use where the outcome was death

9    that was reported to the company.

10        Q.    And probably there's enough

11   here, if you look at the next page, you

12   can see the rest of the description of

13   that.  Can you -- does this tell you what

14   the results of that review was?

15        A.    That most of the cases of

16   death were expected deaths because the

17   drug was used in end-of-life conditions,

18   and that there was no increase, in a

19   trend in increase in reporting rates of

20   death between the year 2000 and 2005.

21        Q.    And when you say expected

22   deaths, you're referring to a situation

23   where for example, a person might be

24   taking Duragesic to relieve pain from

Highly Confidential - Subject to Further Confidentiality Review

1    terminal cancer and they die while they

2    are on the -- on the medicine, but the

3    cause of death is not the medicine, it's

4    the cancer.  Is that what you're

5    referring to as an expected death?

6         A.    That's correct, where the

7    reporter did not attribute the death to

8    the Duragesic patch.

9         Q.    And again the conclusion

10   with respect to deaths that did not fall

11   into category -- into that category, was

12   what?

13        A.    That we didn't -- that there

14   was no trend to suggest an increase in

15   the death rate, and, therefore, the --

16   the core data sheet adequately describes

17   those risks, the risk of death with the

18   drug.

19        Q.    And what's the core data

20   sheet?

21        A.    The company core data sheet

22   is a worldwide document that contains all

23   the information about the drug.  And

24   based upon the company core data sheet,

Highly Confidential - Subject to Further Confidentiality Review

¹ the individual package inserts would be

² harmonized to the company core data

³ sheets.  There might be differences from

⁴ one region to another.  But it contains

⁵ the -- the fundamental information that

⁶ has to be included in all package

⁷ inserts.

⁸         Q.    Let's go back to the slide

⁹ presentation on the risk management plan.

¹⁰ I think it will be easier to use this

¹¹ document just to walk through the last

¹² few pieces of it.

¹³         A.    Okay.

¹⁴         Q.    And what I'd like to do is,

¹⁵ let's move forward to the sections of the

¹⁶ document that report on the findings of

¹⁷ the data, the data from the latest plan.

¹⁸ It gives some examples.

¹⁹              So if you can turn to the

²⁰ page that says, "Passive Surveillance:

²¹ Data" -- "Databases routinely surveyed."

²²         A.    Yes.

²³         Q.    And those are some of the

²⁴ ones -- well, let's go back to the prior

Highly Confidential - Subject to Further Confidentiality Review

1    page.  There's a reference to routine

2    surveillance.  That's the SCEPTRE and

3    the -- and the FDA AERS that we talked

4    about --

5         A.    Yes.

6         Q.    -- right?

7         A.    Yes.

8         Q.    And then the next page

9    refers to some of the other passive

10   surveillance databases.  The DAWN

11   database that you mentioned.

12        A.    There's additional streams

13   of data that we were collecting about

14   specific issues of abuse, misuse,

15   diversion, of fentanyl and other

16   products.

17        Q.    Right.  So DAWN was the

18   emergency room mentions?

19        A.    Yes.

20        Q.    And there's a reference to

21   toxic exposure surveillance system,

22   abbreviated TESS.  What's that?

23        A.    I'd have to go to another

24   document to refresh my memory about what

Highly Confidential - Subject to Further Confidentiality Review

1   TESS was.

2           Q.     Poison control?

3           A.     Well, since poison control

4   isn't listed over here and I know that we

5   did it, my assumption is that that's what

6   it's referring to.

7           Q.     And then the National

8   Forensic Laboratory Information Service

9   we talked about, right?

10          A.     Yes.

11          Q.     And the IMS database?

12          A.     Database that helped us

13  assess exposure.

14          Q.     And the next page actually

15  has a table that lists what aspects of

16  what you're surveying, what you're

17  looking for, each of these databases

18  would give you information about,

19  that's -- is that correct?

20          A.     That's correct.

21          Q.     So for diversion, you have

22  information from the J&J SCEPTRE, from

23  the FDA, and from the National Forensic

24  Labs?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    For misuse -- well, the J&J

3    SCEPTRE and the FDA covers information on

4    all of these adverse --

5        A.    All of those --

6        Q.    -- abuse, overdose, misuse,

7    diversion, other adverse events, correct?

8        A.    Adverse events of interest.

9        Q.    Right.

10        A.    That's correct.

11        Q.    And then TESS speaks to

12    abuse, overdose and misuse?

13        A.    Yes.

14        Q.    NFLIS, diversion?

15        A.    Diversion.

16        Q.    IMS?

17        A.    Misuse.

18        Q.    Misuse.

19            And then DAWN would be?

20        A.    Overdose and abuse.

21        Q.    And then if you go to the

22    next page we get into the active

23    surveillance tools, correct?

24        A.    Correct.

1    Q.    It starts off with RADARS?

2    A.    Yes.

3    Q.    It still doesn't say what

4  RADARS stands for, but I assume we'll --

5  at some point, we'll come across that.

6              And --

7    A.    It's research, abuse.

8  That's definitely the R and A --

9  diversion activities.  I --

10    Q.    Let me -- let me ask you the

11  question.  Who ran RADARS?

12    A.    Well, initially it was the

13  Rocky Mountain Control Group that -- Rick

14  Dart's group in Colorado ran RADARS.

15    Q.    So that was an independent

16  group of experts who set up this

17  surveillance network?

18    A.    That's correct.

19    Q.    And it lists here four

20  different networks?

21    A.    Yes.

22    Q.    So within RADARS you had the

23  four different sources that you could

24  look to for different kinds of data that

Highly Confidential - Subject to Further Confidentiality Review

1   speak to the questions you're looking

2   for?

3          A.     Yes.  Four different streams

4   of information that came in.

5          Q.     Okay.  And let's look at the

6   first one.  This is key informant data.

7   This is one of the RADARS data streams I

8   take it?

9          A.     Yes.

10         Q.     And can you describe again

11  what that is?

12         A.     There -- there were

13  individuals in geographic areas

14  throughout the country who would alert

15  the company to -- well, alert RADARS

16  about issues of abuse, misuse of -- and

17  diversion of a variety of compounds

18  within their geographic area.

19         Q.     And this particular table is

20  showing their data from 2002 through the

21  first part of 2005; is that correct?

22         A.     That's correct.

23         Q.     It lists the number of cases

24  that are reported out of this key

1    enforcement network --

2            A.    Informant.

3            Q.    -- informant network --

4            A.    Yes.

5            Q.    -- for a bunch of different

6    opioids, correct?

7            A.    Yes.

8            Q.    And fentanyl is one of them,

9    correct?

10           A.    Yes.

11           Q.    Is that Duragesic only?

12           A.    No.  This would be any

13   mention of fentanyl.

14           Q.    So it could be Duragesic in

15   part?

16           A.    It could be Duragesic.  It

17   could be --

18           Q.    What else could it be?

19           A.    It could be another

20   formulation of Duragesic, including at

21   this time the buccal formulations of

22   fentanyl.

23           Q.    Right.  You said another

24   formulation of Duragesic.

1    A.    I'm sorry.  Another

2  formulation of fentanyl, which could

3  include the buccal formulations.  Actiq

4  was one that was -- by brand name.

5    Q.    And just for my benefit,

6  what does buccal mean?

7    A.    Oh, it's placed in the mouth

8  sublingually so that you have a rapid

9  absorption of the fentanyl.

10    Q.    So it's a lozenge that you

11  place under your tongue, and it's

12  absorbed that way?

13    A.    Absorbed quickly.

14    Q.    So that was a product by

15  another company -- marketed by another

16  company.  It was another fentanyl

17  product.

18    A.    Yes.

19    Q.    And could these mentions be

20  anything else?

21    A.    It could be illicit fentanyl

22  mentions as well.

23    Q.    So all of those would be

24  combined in the fentanyl line in this

Highly Confidential - Subject to Further Confidentiality Review

1   data?

2           A.    Yes.

3           Q.    Okay.  Can you see which

4   line here is the fentanyl line?

5           A.    Yes.  Thankfully it's in

6   color.  The green line represents the

7   fentanyl cases.

8           Q.    So, and I know it's a little

9   hard to see.  But if I point to it with

10  my pen, it's this green line right here

11  that -- it looks like for most of this

12  period, it's close to the bottom.

13  There's one that, it looks like

14  buprenorphine is a little bit lower?

15          A.    Yeah, it's the lowest or

16  second lowest except for one data point

17  before all the other data points.

18          Q.    And it's considerably lower

19  than the data points for the other

20  product, at least some of the other

21  products mentioned, really all of them

22  except for that one that's lower,

23  correct?

24          A.    That's correct.

1         Q.    All right.  Let's go to the

2    next slide.  This is the law enforcement

3    network data, drug diversion total

4    mentions 2000, 2004.  And this is another

5    RADARS resource, correct?

6         A.    Correct.  Seizures of

7    medications that may have been illicitly

8    diverted outside the normal prescription

9    stream.

10        Q.    And again, fentanyl is the

11   green line?

12        A.    Yes.

13        Q.    And fentanyl here could

14   include --

15        A.    Hold on.  Hold on.  Fentanyl

16   is the dark green line here.  Diazepam is

17   also green, but fentanyl is a darker

18   green.

19        Q.    Okay.  Dark green with the

20   triangles.  And -- well, I'll take a

21   minute.

22        A.    And again, fentanyl is among

23   the lowest mentioned.

24        Q.    And just to confirm, would

1    the same be true that fentanyl on this

2    chart would include not only any mentions

3    that they found for the Duragesic patch,

4    but also illegal fentanyl, which could

5    have been seized by law enforcement?

6          A.    And other formulations of

7    fentanyl.  That's my understanding.

8          Q.    Let's look at the next

9    chart.  This is AATOD report.  Maybe we

10   can go back and refresh on what that

11   stands for.  American Association For the

12   Treatment of Opioid Dependence?

13         A.    It's my understanding that

14   this is a database for patients who were

15   admitted to methadone treatment programs,

16   and they would report on the drug that

17   they had taken -- abused most recently

18   during the prior month, prior to their

19   admission to the methadone treatment

20   program.

21         Q.    All right.  If we look at

22   this chart, the top one is heroin?

23         A.    Yes.

24         Q.    And then next we have some

1    of the more commonly prescribed opioid

2    pills?

3            A.    Yes.

4            Q.    And where is fentanyl on the

5    chart?

6            A.    It's the third from the

7    bottom.

8            Q.    So it's this one that I'm

9    pointing to right now?

10           A.    Yes.

11           Q.    Okay.  And again, those

12   would include Duragesic, any other forms

13   of fentanyl altogether, correct?

14           A.    Again, that's my

15   understanding, yes.

16           Q.    Now, taking a look at this

17   chart, this is a chart which isn't

18   breaking out different opioid drugs.  Can

19   you tell us what this is showing?

20           A.    Yeah.  So this is -- so in

21   the previous slide we've spoken about the

22   drugs they would have -- they reported

23   taking in the month prior to the

24   admission to the methadone treatment

Highly Confidential - Subject to Further Confidentiality Review

1   clinic.  Here we're looking at where

2   their source of those drugs was, from

3   where they received the drugs that they

4   were abusing.

5        Q.    And some of those -- I'm

6   pointing right here -- are from

7   prescriptions that they got, according to

8   what they reported, correct?

9        A.    Yes.

10       Q.    But there are two categories

11  that are even higher than that.  What are

12  those two categories?

13       A.    From a drug dealer,

14  80 percent of the individuals admitted to

15  the methadone treatment program; or from

16  a friend or relative, more than

17  50 percent of the patients received drug

18  from a friend or relative.

19            These are -- these don't add

20  up to 100, because there may have been

21  more than one source for the drug.

22       Q.    So if you're receiving from

23  a friend or relative, that's not -- that

24  would be -- fall into the category of

Highly Confidential - Subject to Further Confidentiality Review

1  potentially both -- well, certainly

2  misuse and abuse, both, right?

3        A.    Well, certainly misuse.

4  You're not prescribed the product.  So

5  you're not taking it for the prescribed

6  analgesic effect.

7        Q.    The next slide is just

8  showing the poison -- the parts of the

9  country that the Poison Control Center

10  data is covering, right?

11        A.    That's correct.

12        Q.    So let's get to the next

13  chart.  And we have "Poison Control

14  Center data:  Intentional exposure rates

15  by quarter."

16              And, again, this goes

17  through -- I guess it starts in '03 and

18  goes to the second quarter of '05.  Can

19  you explain what that is?

20        A.    So they were monitoring --

21  I'd have to go back to what they mean by

22  "intentional exposure."  I think these

23  are cases where it became known to RADARS

24  through their stream where the patient --

Highly Confidential - Subject to Further Confidentiality Review

1  where the individual took a drug of abuse

2  over this period of time.  And came to

3  the -- well, the Poison Control Center

4  was the head center for RADARS.

5          So I don't know which stream

6  they're reporting on for this specific

7  dataset.

8      Q.    And where is fentanyl on

9  this chart?  Can you see?

10     A.    Yes.  Fentanyl is, across

11 this period of time, the third from the

12 bottom.

13     Q.    So it's, again, the green

14 line that I am pointing to that's near

15 the bottom?

16     A.    Yes.

17     Q.    And again, this is

18 potentially any form of fentanyl,

19 including illegal?

20     A.    Yes.

21     Q.    Now, the next chart is some

22 zip code-specific data.  Did -- do you

23 know whether this chart refers to actual

24 data from a Duragesic report or whether

1  it's simply an example of what this data

2  collects?

3          A.    My best recollection,

4  particularly looking at these data today,

5  is that we're talking about rates of

6  exposure for hydrocodone, and that's what

7  the "HC" is.

8          Q.    And -- but you did have this

9  information for Duragesic as part of the

10 service that the company contracted with

11 RADARS to provide?

12         A.    Yes.

13         Q.    And when you saw zip

14 code-level data, what typically, if you

15 remember, what numbers of cases would you

16 typically see in those reports?

17         A.    Very low.  You either saw no

18 cases in a three-digit zip code or one to

19 three cases in a three-digit zip code.

20         Q.    And if you saw, let's say,

21 three cases, what would -- would action

22 be taken?

23         A.    There were boundaries.

24 There were certain set points at which

1    there would be an intervention to further

2    explore what the -- what was going on in

3    that three-digit zip code.  It would

4    depend not just upon the three-digit zip

5    code, but whether activity was seen in

6    adjacent three-digit ZIP codes or whether

7    we saw this activity for more than one

8    quarter.

9              So if it met certain

10   criteria for -- certain surveillance

11   criteria, we would explore further.  And

12   that might include calls to the area, to

13   legal -- to the police in the area or

14   representatives who are following up on

15   issues, legal issues of policing, or

16   actually send somebody down to try to

17   understand the environment in that area.

18        Q.    And who actually would do

19   that work?

20        A.    Someone from RADARS.

21        Q.    Can we take a look at the

22   next slide.  Does this ring a bell with

23   you?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   Can you describe what

2  happened here?

3  A.   So this is an example where

4  reports of fentanyl increased to the

5  point where we did further investigation

6  of what was going on to understand the

7  mentions of fentanyl in a three-digit zip

8  code.

9  And so in 2006, we learned

10  of addicts who were dying of heroin

11  overdoses, but the heroin was tainted

12  with fentanyl.  And we were exploring

13  whether the fentanyl that was found in

14  blood -- in the laboratory testing of the

15  blood might have come from pharmaceutical

16  grade Duragesic.  So we did a deeper

17  dive, if you will, to try to understand

18  that.

19  Ultimately RADARS dispatched

20  a -- a Drug Enforcement Agency agent to

21  investigate on our behalf, and we learned

22  that the fentanyl that was -- that was

23  mixed in with the heroin that was leading

24  to these deaths, in fact, came from an

1    illicit source.  It was from a -- a

2    laboratory in Mexico and was not --

3    Duragesic was not the source of the

4    fentanyl.

5          Q.    Let's go back to the slide

6    that's entitled Proposed Review For

7    Interventions.

8          A.    I have that.

9          Q.    And I take it this is

10   discussing how the company would address

11   issues that potentially could be picked

12   up in the surveillance plan like the one

13   that we just saw, correct?

14         A.    Yes, proposed interventions

15   and -- and how we would evaluate the data

16   streams that were coming into us from

17   these surveillance systems.

18         Q.    And there is a reference

19   here to project RMT, or product RMT.  I'm

20   sorry.  Can you tell us what that is?

21         A.    Product risk management

22   team.  So it was representatives of -- I

23   think we have -- we may have a slide, but

24   it would include representatives from the

Highly Confidential - Subject to Further Confidentiality Review

1    regulatory group, from the safety group

2    that -- that made the report, from legal,

3    from sales management, from medical

4    affairs, a cross-functional team that --

5    that evaluated these data streams.

6            Q.    And as a result of

7    evaluation the team might recommend the

8    changes that are referenced here.  Could

9    you explain those?

10           A.    So as a result of the

11   findings of these surveillance streams,

12   we might recommend that we change

13   labeling or that we increase or change

14   our educational efforts.  Change our

15   sales training materials and promotional

16   materials, or notify the supply chain

17   group about activity that we uncovered.

18           Q.    All right.  And how often

19   did these -- this team meet to review the

20   surveillance data?

21                 And let me ask you first,

22   were you a part of that team?

23           A.    I or a member of my team.

24   It might have been Gary Vorsanger as my

Highly Confidential - Subject to Further Confidentiality Review

1    representative to that team.

2          Q.    And how often were these

3    meetings held?

4          A.    I believe these meetings

5    were on a quarterly basis initially.  I

6    don't know if that frequency changed.

7          Q.    And if you turn the page to

8    the next slide.  This identifies the

9    areas within the company that had

10   representatives who would be reviewing

11   this risk management surveillance data;

12   is that right?

13         A.    No.  So -- so --

14         Q.    This is a team?

15         A.    Right.  The risk management

16   team is separate.  The risk management

17   team we've spoken about.  We made a

18   presentation based upon the data, to

19   senior management, to the -- the senior

20   management of these groups that were

21   involved in the day-to-day -- in the

22   quarterly review or the assessment of the

23   data streams.  So this was a senior

24   management level that would include the

1    chairperson of the risk management team,

2    the safety group, benefit/risk

3    management, regulatory affairs, medical

4    affairs, brand, the R&D side,

5    pharmaceutical group, strategic

6    management and legal.

7          Q.     So the -- the results of

8    this surveillance were reported up to

9    senior management?

10         A.     To senior management.

11         Q.     And of course --

12         A.     With our recommendations.

13         Q.     And were also reported to

14   the FDA as we saw in the progress report?

15         A.     That's correct.

16         Q.     You mentioned earlier that

17   the Duragesic patch -- that that generic

18   versions of patch came into market in

19   early 2005; is that right?

20         A.     Yes.

21         Q.     And that's because Janssen's

22   patent for the product expired, so

23   generics were allowed to come in?

24         A.     Quite simply because the FDA

Highly Confidential - Subject to Further Confidentiality Review

1     approved a generic version of the

2     Duragesic patch.

3          Q.    And did Duragesic become a

4     smaller and smaller market share in terms

5     of the number of prescriptions written

6     compared to the generics after that?

7          A.    From 2005 on, yes.

8          Q.    And did there come a time

9     when the company, in fact, stopped

10    actively promoting it?  And I mean in the

11    sense of no longer sending sales reps out

12    at all to call on physicians.

13         A.    Yes.

14              MS. CONROY:  Objection.

15    BY MR. LIFLAND:

16         Q.    Do you know approximately

17    when that was?

18         A.    Approximately 2008.

19         Q.    All right.  Did the company

20    continue the risk management plan after

21    it was no longer actively promoting the

22    product?

23         A.    Yes.

24         Q.    And why was that?

1    A.    Well, for one thing we had

2    an obligation under our regulatory

3    requirements to the FDA, as the NDA

4    holder, those were commitments that we --

5    that we made to continue surveillance of

6    our product.

7    Q.    And I think we saw earlier,

8    the last one of the progress reports is

9    from 2012; is that correct?

10    A.    Correct.

11    Q.    And then what happened to

12    the surveillance after that?

13    A.    Well, in a broad sense

14    the -- the FDA had already moved to a

15    determination that the long-acting

16    opioids should have a risk evaluation

17    mitigation strategy, REMS program, that

18    was standard for all of the long-acting

19    opioids.  So we were part of a consortium

20    that put together the REMS program for

21    long-acting opioids.

22        And ultimately the -- the

23    REMS program and the surveillance program

24    that was associated with that REMS

Highly Confidential - Subject to Further Confidentiality Review

1    program was approved by the FDA and that

2    became the -- the data stream that was

3    fed to the FDA in lieu of the risk

4    management plan.

5         Q.    All right.  I'd like to

6    change subjects here.  We've been talking

7    really about Duragesic so far.  But I

8    wanted to ask you about the other

9    Schedule II opioid that we mentioned at

10   the beginning, which were the tapentadol

11   products.

12              So when were those products

13   developed?

14        A.    The tapentadol immediate

15   release began development in the early

16   2000s, eventually leading to approval in

17   the United States in 2009.  The

18   extended-release product was developed

19   later on, eventually leading to approval

20   in 2011 I believe.

21        Q.    And what are the -- what are

22   the brand names of those tapentadol

23   products?

24        A.    Nucynta and Nucynta ER,

1    extended release.

2          Q.    And tapentadol, I take it,

3    is the chemical name of the molecule

4    that -- the pain molecule?

5          A.    That's correct.

6          Q.    And what is tapentadol?

7          A.    Tapentadol is a innovative

8    opioid product that had more than one

9    mechanism of action that led to its

10   analgesic effect.  So on the one hand, it

11   was a mu opioid agonist, which is to say

12   that it -- it bound to the -- the mu

13   opioid receptor and by virtue of that,

14   had analgesic properties.

15               But there was a second

16   mechanism of action which was

17   norepinephrine reuptake inhibition which

18   was another mechanism of action

19   associated with analgesic properties.

20         Q.    So part of the analgesic

21   from the molecule was essentially the

22   same -- the same route as your typical

23   long -- well, your typical opioid drug,

24   the mu agonistic receptor --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    -- so in that respect it was

3  an opioid?

4    A.    In that respect, it was --

5  it acted as an opioid.

6    Q.    And what you -- you

7  described as the other pathway, the

8  norepinephrine reuptake inhibitor, are

9  there other drugs that people know about

10  that that would --

11    A.    Yes.  Antidepressants have

12  norepinephrine reuptake inhibition.

13  There are other drugs that use

14  epinephrine or norepinephrine reuptake

15  inhibition to -- that can be used for

16  analgesic properties.

17    Q.    And when you say that, they

18  can be used for pain relief?

19    A.    That's correct.

20    Q.    And so those -- that was the

21  molecule that went into -- was the active

22  ingredient of Nucynta and Nucynta ER

23  which were the brand names, correct?

24    A.    That's correct.

1    Q.    Now, what was the benefit,

2  maybe it was a hypothetical benefit, but

3  what was the benefit, hoped-for benefit

4  of the dual mechanism of action, what was

5  important about that for the company?

6    A.    We learned early on from

7  animal models and from preclinical models

8  that by virtue of having more than one

9  mechanism of action, a second mechanism

10  of action that was not mediated through

11  mu opioid agonism, that there was the

12  potential to achieve pain relief,

13  analgesia effect, without some of the

14  associated side effects of a pure mu

15  opioid agonist such as Oxycodone or

16  hydromorphone -- or hydromorphone.

17    Q.    And what were the potential

18  benefits of that in terms of a pain

19  relief product?

20    A.    If you could achieve similar

21  pain relief, the most worrisome side

22  effects of treating with a potent opioid,

23  the side effects that would lead most

24  often to discontinuing an opioid

Highly Confidential - Subject to Further Confidentiality Review

1    medication, would include

2    gastrointestinal side effects, nausea,

3    vomiting, constipation, and some other

4    side effects, worrisome side effects such

5    as itching, pruritis.

6                    And so by using a drug with

7    a dual mechanism of action, we would

8    expect to have a better adverse event

9    profile.

10                   Other potential benefits

11   were to look at pain models where the

12   norepinephrine reuptake inhibition was

13   understood to play a more prominent role

14   in achieving the level of pain relief.

15   And that would be in models of

16   neuropathic pain, probably the best known

17   model would be diabetic neuropathy.

18        Q.    And did the company study

19   the drug to see if it would be effective

20   in that specific indication?

21        A.    Yes, it did.

22        Q.    And what happened with that?

23        A.    Ultimately, we had two

24   adequate, well-controlled trials in a

1  neuropathic pain model, and we -- that

2  led to the FDA to give an indication of

3  neuropathic pain for Nucynta

4  extended-release, Nucynta ER, as well as

5  the indication of chronic pain.  I

6  believe it was the first opioid to get

7  that indication.

8        Q.    Now, you said that Nucynta

9  ER, the one that came in 2011, you said

10 as well is an indication for chronic

11 pain.  So is that the initial indication,

12 chronic pain?

13       A.    The initial indication was

14 for moderate to severe chronic pain.

15       Q.    And was it the same

16 indication as Duragesic with the other --

17 the other aspects of it that we

18 discussed, need around -- you need

19 around-the-clock pain relief and other

20 methods of treating it were not

21 effective?

22       A.    Yes.  So as a matter of fact

23 it was the same indication that I believe

24 all of the extended-release opioids had,

1   which was for persistent,

2   around-the-clock, moderate to severe

3   chronic pain that could not be managed

4   with a short-acting opioid or other

5   modalities.

6          Q.    Okay.  So Nucynta

7   extended-release had that indication, and

8   then as an additional indication specific

9   for diabetic -- pain from diabetic

10  peripheral neuropathy, the neuropathic --

11         A.    Neuropathic pain.

12         Q.    And what about Nucynta IR?

13  Or I guess it was called Nucynta without

14  an ER.

15         A.    That's correct.

16         Q.    That was the immediate

17  release version?

18         A.    That was the immediate

19  release version.

20         Q.    What was the indication for

21  that?

22         A.    For acute pain that needed

23  to be managed with a potent opioid.

24         Q.    And let me ask you again

1  some of the same questions that I asked

2  on Duragesic.

3           Were there steps the company

4  took in terms of the product design to

5  try to make it safer to use with regard

6  to the risks, the opioid-type risks of

7  abuse and misuse and diversion?

8       A.    Yes.

9       Q.    Can you describe that?  And

10  let's start with the product design.

11      A.    Well, let me start even

12  earlier than product design --

13      Q.    Okay.

14      A.    -- with the basic molecule.

15  Because it has a dual mechanism of action

16  and doesn't rely solely upon mu opioid

17  agonism, there was the hypothesis that,

18  therefore, it would be less attractive to

19  someone who is looking to abuse or misuse

20  the drug.

21           In terms of the design of

22  the formulation, we're talking here with

23  the extended-release where higher dose is

24  delivered.  From the outset, the marketed

Highly Confidential - Subject to Further Confidentiality Review

1  product was developed to be an abuse

2  deterrent formulation, a formulation that

3  if you tried to defeat the properties

4  that led to extended-release, it would be

5  difficult to defeat those -- those

6  properties.

7      Q.    Now, did you -- what kind of

8  testing did the company do with regard to

9  the abuse deterrent formulation?

10      A.    Well, we looked at the

11  physical chemical properties of the

12  abused deterrent formulation.  There were

13  a whole variety of tests.  We used

14  solvents to try to extract it.  Chewing.

15  We put it in a blender to try to make

16  smaller pieces.  We tried crushing it.

17      Q.    What happened in the

18  blender?

19      A.    We broke the blades of the

20  blender.  I remember distinctly seeing

21  the video of that test.

22      Q.    All right.  So you had these

23  tests.  Was the company able to label the

24  product as abuse-deterrent in the way

1    that some of the other opioid products

2    have been labeled in recent years?

3          A.    No.

4          Q.    And can you explain why not?

5          A.    At the time the drug was

6    approved, there were other opioid

7    compounds that were marketed in a

8    formulation that we would consider to be

9    abuse-deterrent.  It was more difficult

10   to -- in it was more difficult to defeat

11   the extended-release properties of the

12   compound.

13          The FDA made it clear in an

14   advisory meeting, I think perhaps more

15   than one, that they were not -- they

16   would not allow for a labeling of product

17   as abuse-deterrent or abuse-resistant

18   purely on the basis of the physical

19   chemistry of the formulation, but that

20   actual data would have to be developed to

21   show that the formulation would in fact

22   reduce the rates of abuse, misuse,

23   diversion because of the abuse-deterrent

24   properties of the formulation.

1    So we did not have wording

2    around that when we brought Nucynta ER to

3    market.

4         Q.    And was that data that could

5    have been developed in the Nucynta ER

6    clinical trials?

7         A.    The pivotal clinical trials,

8    no.  Those data would have to be

9    developed over an extended period of

10   time, not over the period of a short

11   trial.

12        Q.    Okay.  But when you brought

13   the product to market, it still was in

14   the abuse-deterrent formulation,

15   regardless of whether you were allowed to

16   label it as such?

17        A.    That's correct.  In fact,

18   the clinical trials that we performed

19   with Nucynta were performed with an

20   earlier version of the formulation that

21   was not in an abuse-deterrent

22   formulation.  But we made it clear to our

23   partner in the development, Grünenthal

24   Pharmaceuticals, that we would not bring

1    a non-abuse-deterrent formulation to the

2    U.S. market.

3              So we would wait until the

4    final formulation with the

5    abuse-deterrent properties.  The

6    development on that was finished in that

7    we could do the bioequivalence studies to

8    show it was bioequivalent to the

9    formulation that was used in the pivotal

10   trials.

11        Q.    Now, were there other steps

12   that the company took to assess abuse,

13   misuse, deterrence in terms of

14   surveillance for the Nucynta product?

15        A.    Yes.  We had a risk

16   management plan that we put in place that

17   essentially monitored similar data

18   streams that were already in place for

19   our Duragesic product.

20            Q.    So those would be the ones

21   we just discussed, the SCEPTRE review,

22   the FDA AERS review, the various --

23        A.    The RADARS program.

24        Q.    The RADARS programs, the

Highly Confidential - Subject to Further Confidentiality Review

1  DAWN.  And all of the things essentially

2  that we just talked about that were

3  elements of the RADARS risk management

4  plan were put into the Nucynta risk

5  management plans?

6          A.    That's correct.  We -- the

7  surveillance programs, in a broad sense,

8  looked at Schedule II opioids.  And

9  Nucynta was a Schedule II opioid.  So it

10  was proven to include it once we began

11  marketing in established programs that

12  were monitoring for abuse, misuse,

13  diversion of these Schedule II products.

14          Q.    Have you heard of a

15  surveillance tool called NAVIPPRO?

16          A.    Yes.

17          Q.    What is NAVIPPRO?

18          A.    NAVIPPRO is a more

19  sophisticated tool to monitor internet

20  mentions and publications mentions of

21  drugs that are abused, misused and

22  diverted.

23          They -- in addition to the

24  internet monitoring, they have

1    methodology that can give a more

2    qualitative in addition to quantitative

3    assessment.

4         Q.    And we haven't mentioned yet

5    the -- the Nucynta package insert.  But I

6    take it there was a package insert which

7    gave similar instructions that we talked

8    about, from Duragesic, about patient

9    selection, dosing, patient monitoring,

10   patient counseling, and warnings about

11   the risks; is that correct?

12        A.    That's correct.  At this

13   time, to the degree possible the FDA had

14   moved to have similar indications,

15   warnings, instructions to physicians

16   across all of the long-acting opioid

17   products.  And to the degree that they

18   could have a similar package insert to

19   the other long-acting opioids, that was

20   the package insert that was reflected for

21   Nucynta ER.

22        Q.    Was there -- well, before we

23   go further on the package insert, let's

24   just finish up on the surveillance

Highly Confidential - Subject to Further Confidentiality Review

1    program.  And I had asked you about

2    NAVIPPRO.  I want to hand you another

3    document which is one of the progress

4    reports for -- progress reports for the

5    Nucynta ER surveillance plan.

6              (Document marked for

7         identification as Exhibit

8         Janssen-Moskovitz-38.)

9              MS. CONROY:  What's that

10        number?

11             MR. LIFLAND:  I'm sorry,

12        what's the number?

13             THE WITNESS:  38.

14             MR. LIFLAND:  38.

15             MS. CONROY:  Thank you.

16   BY MR. LIFLAND:

17        Q.    If you turn to the first

18   page I think you'll see that the

19   nomenclature was changed from the

20   Duragesic plan which was called the risk

21   management plan.  The title of this one

22   is surveillance plan --

23        A.    Safety surveillance plan.

24        Q.    But is it -- it's

Highly Confidential - Subject to Further Confidentiality Review

1   functionally the same type of safety

2   surveillance program as what we looked at

3   before?

4        A.    And this is in -- in

5   December of 2013, I had retired at that

6   time.  But if I look at the table of

7   contents, the data streams that inform

8   this safety surveillance were similar to

9   what had been reported for Duragesic.

10   There were some specific adverse events

11   of interest that were specific to Nucynta

12   such as the serotonin syndrome.  But

13   otherwise similar in breadth to what

14   we've seen for Duragesic.

15        Q.    And if you turn to Page 80.

16   You can see at the bottom of Page 80 and

17   then going onto Page 81, a reference to

18   the NAVIPPRO system programs.  And that's

19   something you were familiar with when you

20   were still at the company, correct?

21        A.    Yes, we began using NAVIPPRO

22   for Duragesic.

23        Q.    And can you -- can you

24   describe what the NAVIPPRO program was,

1    surveillance program?

2         A.    Just reading through the

3    materials here, surveillance and

4    interventional programs that analyze data

5    from three sources, the addiction survey

6    index multi media version, comprehensive

7    health assessment for teams, and a web

8    informed services, internet monitoring,

9    archive indicators of prescription opioid

10   medication abuse.

11        Q.    And what was the type of

12   information you were looking for here in

13   practical terms?

14        A.    We wanted early information

15   on whether tapentadol, the active

16   ingredient in Nucynta, was going to be

17   found attractive by drug abusers,

18   attractive for abuse, misuse and

19   diversion.  This was an opportunity to

20   explore these issues with a brand-new

21   opioid product brought to market and to

22   understand that at a very early stage

23   through these mechanisms of -- of

24   internet monitoring and use among

1    teenagers, whether there were concerns

2    about Nucynta that it might be different

3    from other opioids.

4         Q.    And do you remember what

5    kinds of data the company received from

6    the surveillance plans that were put in

7    place for the Nucynta product?

8         A.    That in general, Nucynta was

9    not a product that was sought by

10   individuals who would abuse, misuse and

11   divert -- and divert opioid products.

12        Q.    And where did it rank in

13   terms of the various RADARS indexes that

14   we looked at on the slide?

15        A.    Consistently at the bottom,

16   or very near the bottom of measures of

17   abuse, misuse and diversion.

18        Q.    Now, when Nucynta, the

19   extended release was brought out, was

20   there -- was the extended release, the

21   class REMS in place yet?

22        A.    No.  It was still -- it

23   still hadn't been finalized between the

24   consortium of companies marketing

1    extended-release products and the FDA.

2         Q.    And so did the -- what did

3    the company do about that?

4         A.    We developed a REMS program

5    similar to the Duragesic REMS program

6    that we could institute before there was

7    a final long-acting opioid REMS program

8    approved for all of the long-acting

9    opioids.

10        Q.    So you put up, when you

11   introduced the extended-release version,

12   you had its own REMS to go along with the

13   launch of the product?

14        A.    That's correct.  With the

15   understanding that when there was a REMS

16   that was approved for all of the

17   long-acting opioids, Nucynta would be

18   included as part of that REMS.  But we

19   didn't wait for that.  We -- we had a

20   REMS program earlier.

21        Q.    And let me mark the next in

22   order as Exhibit 39.

23             (Document marked for

24        identification as Exhibit

1      Janssen-Moskovitz-39.)

2           MS. CONROY:  Thank you.

3  BY MR. LIFLAND:

4      Q.    Take a moment to flip

5  through that.  Can you tell me what this

6  document is?

7      A.    This is the REMS program,

8  the risk evaluation mitigation strategy

9  program per FDA guidelines around the

10  REMS program that was instituted for

11  Nucynta ER at the time of launch.

12      Q.    And this was in addition to

13  the safety surveillance plan that we just

14  looked at?

15      A.    That's correct.

16      Q.    And what were the elements

17  of this?

18      A.    The elements would include a

19  medication guide that went to the patient

20  each and every time he or she picked up

21  their prescription from the pharmacy.

22  Education of healthcare providers on all

23  of the elements that we've previously

24  spoken about.  And a educational program

1    with an attempt to enroll as many

2    physicians as possible to take the

3    educational program.

4         Q.    And if you turn to Page 24.

5    This is a set of educational materials

6    that were prepared as part of the REMS?

7         A.    Yes.  Yes.

8         Q.    And if you go back to, two

9    pages, you see a letter there.  Well, let

10   me -- I'm sorry, not two pages.

11        A.    I believe you're looking at

12   Page 16.

13        Q.    Yeah, 16.  What's Page 16?

14        A.    This is the letter to

15   healthcare providers that would have been

16   sent out as part of the REMS program.

17        Q.    So they would have been sent

18   out, at product launch, this entire

19   package of educational materials?

20        A.    Yes.

21        Q.    Was Nucynta a successful

22   product?

23        A.    Success is relative.  It was

24   not as successful as we had hoped it

Highly Confidential - Subject to Further Confidentiality Review

1  would be.

2       Q.    And did you have a view on

3  why that was?

4       A.    We knew that we were

5  introducing a new opioid into a

6  marketplace with a lot of other options,

7  including options that were available

8  generically.

9       Q.    And ultimately what happened

10  to the Nucynta products at Janssen?

11       A.    We divested the product and

12  sold it to another company.

13       Q.    And that occurred when?

14       A.    In 2015.

15       Q.    Just one last -- one last

16  question.

17          In your testimony earlier,

18  you were asked questions about the

19  difficulty of doing a clinical trial with

20  -- prospective clinical trial with an

21  endpoint of addiction.

22          Can you elaborate on the

23  reasons why such a trial would be so

24  difficult to do?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      There are a variety of

2  reasons why that would be the case, if

3  you're talking about a controlled

4  clinical trial where the endpoint was

5  addiction.

6              To begin with, as the -- you

7  would have to define addiction such that

8  it could be assessed in a proper clinical

9  trial.  You would estimate the point of

10  addiction such that you would get a

11  sample size.  Because the adverse event

12  of addiction is considered to be rare in

13  properly monitored patients, a

14  statistical assessment of the number of

15  patients that you would need to do such a

16  clinical trial would be rather large,

17  perhaps in the range of 100,000 patients

18  or more.

19              Moreover from an ethical

20  standpoint, you would be enrolling these

21  patients with instructions to the

22  treating physician to see these patients

23  on a regular basis so that he or she

24  would be properly monitoring the patient.

1    In all of the clinical trials, you would

2    have regular assessments, and the regular

3    assessments would include elements that

4    we've spoken of earlier as indicators of

5    behaviors that would indicate abuse,

6    misuse and diversion.

7              And there, from an ethical

8    standpoint would need to be an

9    intervention at that time.  And that

10   intervention may even include

11   discontinuing the drug.

12             So the likelihood that you

13   would reach the endpoint of interest with

14   a reasonable number of patients in a

15   reasonable period of time would be

16   exceedingly small.

17             MR. LIFLAND:  No further

18       questions.

19             We'll take a five-minute

20       break.

21             THE VIDEOGRAPHER:  Okay.

22   The time is 6:35 p.m.  Going off

23       the record.

24             (Short break.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We are
 2         back on the record.  The time is
 3         6:45 p.m.
 4                   -  -  -
 5              EXAMINATION
 6                   -  -  -
 7    BY MS. CONROY:
 8         Q.    Dr. Moskovitz, for probably
 9    about the last two hours or so you've
10    testified about the Duragesic and the
11    Nucynta label, the treatment of chronic
12    pain with opioids, different
13    formulations, the reservoir, the matrix,
14    abuse, diversion, misuse, addiction,
15    iatrogenic addiction, monitoring --
16    monitoring programs, all of those things,
17    right?
18         A.    Yes.
19         Q.    And you've been designated
20    by Janssen as the person most
21    knowledgeable about studies, trials,
22    reports about opioids, including
23    Duragesic, as well as the label and
24    warnings and adverse events and the
```

Highly Confidential - Subject to Further Confidentiality Review

1    benefits and the risks of Duragesic,

2    Nucynta, and -- and opioids generally,

3    would you agree?

4            A.    Yes.

5                  MR. LIFLAND:  I object to

6            the form of the question.  He's

7            not designated as the person most

8            knowledgeable.  It's a 30(b)(6)

9            corporate rep deposition.

10   BY MS. CONROY:

11           Q.    You can answer.

12           A.    That's my understanding.

13           Q.    And you were appointed the

14   head of the pain division in medical

15   affairs and you held that position -- and

16   I know it had some name changes -- for

17   approximately 11 years, correct?

18           A.    Yes.

19           Q.    You are a medical doctor?

20           A.    Yes.

21           Q.    You have prescribed opioids?

22           A.    I have.

23           Q.    Janssen believed you were

24   qualified to head the division, correct?

1     A.    Yes.

2     Q.    Would you say that you are

3   an expert with respect to pain,

4   addiction, abuse, diversion, the label,

5   Duragesic, all of those items?

6          MR. LIFLAND:  Object to the

7          form of the question.

8          THE WITNESS:  That's a broad

9          set.  I would say I have expertise

10         in clinical trial methodology.

11         I'm well versed in the label of

12         our products.

13         I certainly gained extensive

14         amount of knowledge over general

15         principles of pain management.  I

16         have an extensive information

17         about the benefits and risks of

18         our products, the

19         pharmacokinetics, the -- the

20         formulations.

21         But in -- in terms of the

22         level of expertise, I mean clearly

23         there are other experts in pain

24         management, but overall I'm well

Highly Confidential - Subject to Further Confidentiality Review

1    versed in our products.

2    BY MS. CONROY:

3         Q.    And that would include pain

4    and addiction?

5         A.    That would include pain and,

6    with -- with respect to our compounds,

7    the concerns of adverse events that --

8    that include the potential for abuse,

9    misuse, diversion.

10            I'm not an expert on

11   treating addiction, but in the sense

12   of -- of the potential for our drugs to

13   have as adverse events abuse, misuse and

14   diversion, yes.

15        Q.    What about the adverse event

16   of addiction?

17        A.    The -- the knowledge that a

18   potent opioid such as our compounds,

19   Duragesic and Nucynta, have the capacity

20   for addiction, abuse, misuse and

21   diversion, yes.

22            (Document marked for

23        identification as Exhibit

24        Janssen-Moskovitz-40.)

```
 1    BY MS. CONROY:
 2         Q.    I'll show you Exhibit 40.
 3               Exhibit 40 is a -- an e-mail
 4    thread in June of 2006.  It is
 5    JAN-MS-00957863 through 864.  And if you
 6    would turn the page to the second page
 7    which is the first e-mail.  And it is an
 8    e-mail to you from Dawn
 9    Sanderson-Bongiovanni, do you see that?
10         A.    Yes.
11         Q.    On June 19, 2006.  And
12    she -- I -- I saw her name.  She was one
13    of the individuals that's in the
14    benefit/risk management group and she
15    signs or she is one of the signators to
16    the progress report that's filed with the
17    FDA, the risk management progress report?
18         A.    I'd have to go back to the
19    document but I'll certainly take your --
20    your word for that.
21         Q.    I won't make you take -- I
22    can show it to you, but --
23         A.    That's fine.
24         Q.    Okay.
```

1    "Dear Bruce, it was so nice

2    to meet you at the data flow meeting last

3    week" -- "last Monday.  Thank you for

4    hosting a lovely dinner.  I'm writing in

5    regard to the comments received from the

6    FDA in response to the Duragesic risk map

7    proposal.  The agency expressed concern

8    about the risk of iatrogenic addiction

9    with chronic use of Duragesic.

10   Therefore, I'm in the process of

11   reviewing potential cases of iatrogenic

12   addiction that have been reported to the

13   company."

14            Those would be cases

15   reported through the adverse event

16   reporting mechanism, correct?

17        A.    Yes.

18        Q.    "As part of my background

19   research I've read multiple articles in

20   the past week with conflicting estimates

21   for the incidence of addiction in

22   patients with chronic pain.  The

23   variation is probably due to inherent

24   differences between the study

1    populations," in parentheses, (AIDS

2    patients versus burn patients) and

3    differences in monitoring parameters.  I

4    was wondering if you could possibly cite

5    a 'landmark' article that reflects

6    current medical thinking about the

7    occurrence and etiology of addiction

8    (induced by opioid therapy).  Thank you

9    for sharing your expertise on this

10   subject."

11           Do you know Dawn

12   Sanderson-Bongiovanni, do you know her

13   face-to-face?

14           A.    No, I don't.

15           Q.    Okay.  Do you know where she

16   works?  I mean do you know what office

17   location she works in?

18           A.    It -- it would have been in

19   the Titusville office.  That's how she

20   signs her name.

21           Q.    And that's not where you

22   were located?

23           A.    No, I was up in the --

24           Q.    And then you respond to her

Highly Confidential - Subject to Further Confidentiality Review

1    that same day, actually five minutes

2    later, and you say, "Dawn, I cannot.

3    Pain and addiction are not my specialty.

4    However, I'm copying your request to Gary

5    Vorsanger and David Hewitt in my group.

6    Gary is an anesthesiologist by training.

7    David is a neurologist specializing in

8    pain medicine.  Gary, David, kindly

9    address Dawn's questions.  Thanks."

10                Do you see that?

11          A.    Yes.

12          Q.    And then both men do respond

13   that same day.  And you can -- and you

14   can read it, but Dr. Hewitt says,

15   "Unfortunately the evidence supporting

16   the low abuse potential among patients

17   receiving opioids for chronic pain is not

18   based upon strong data.  I've seen

19   numbers that suggest the rate of

20   addiction is similar to the population at

21   large and no higher."

22                And Dr. Vorsanger says,

23   among other things, that he's skeptical

24   of the low rates, that Margo, Margo

 1    McCaffery who is referenced in an e-mail,

 2    cite, and others cite.

 3              Had you had -- you had

 4    conversations, do you know, with

 5    Dr. Vorsanger or Dr. Hewitt about their

 6    belief about the incidence of iatrogenic

 7    addiction with chronic pain patients

 8    taking opioids for chronic pain?

 9         A.    In a general sense we were

10    aware that the data would not be

11    considered high quality data when there

12    is a methodology that -- that reports on

13    what would be considered high quality

14    data, which would be a controlled

15    clinical trial.  So the -- the reports

16    oftentimes didn't cite the criteria by

17    which they would make that diagnosis, the

18    patient population that they explored,

19    whether this was prospective or

20    retrospective.  So there was

21    the understanding that there are data out

22    there, and those are the best data

23    available to us, but it doesn't

24    necessarily reflect a true incidence of

1    abuse, misuse and diversion with opioids.

2        Q.    Do you believe it doesn't

3    represent the true incidence because the

4    true incidence is higher?

5        A.    Because the true incidence

6    can't be arrived at with the methodology

7    used in the papers that explored that.

8        Q.    But it appears to me, and

9    we'll ask Dr. Vorsanger about this,

10   and -- and potentially Dr. Hewitt, but it

11   seems to me that they believed that those

12   studies also under -- under represent?

13            MR. LIFLAND:  Object to the

14        form of the question.

15            THE WITNESS:  That may be

16        the case.  That that -- being a

17        potentially inaccurate estimate,

18        it may underestimate the rate of

19        abuse, misuse, and diversion.  And

20        particularly addiction and those

21        reports of addiction.

22   BY MS. CONROY:

23        Q.    Is there a reason why you

24   cited -- well, let me ask you this.  Are

1    you familiar with the Porter & Jick

2    study?

3            A.    Yes.

4            Q.    And you've cited that in the

5    past?

6            A.    As part of what was

7    available at the time that -- some --

8    some of the earlier reports around

9    incidence of abuse, misuse and diversion.

10   Abuse.

11           Q.    When you cited that --

12   actually a letter to the editor, when you

13   cited that --

14           A.    Right.

15           Q.    -- it was -- you cited it a

16   few times that I saw the most, the latest

17   cite was in 2007 in the risk management

18   plan, you didn't qualify that study or --

19   I guess it's not a study -- letter to the

20   editor.

21               You didn't qualify it in any

22   way and say I'm not sure that this study

23   was done correctly or that it accurately

24   reflects the -- the situation today.

1    Isn't that true?

2            A.    I didn't --

3                MR. LIFLAND:  Object to the

4        form of the question.

5                THE WITNESS:  I didn't

6        qualify it in that respect.

7    BY MS. CONROY:

8            Q.    Why did you cite it?

9            A.    Because it was part of the

10   body of information.  There were

11   relatively few reports of rates of abuse

12   with the use of opioids.  And this was

13   certainly one of the earliest, one of the

14   largest, went through a large number of

15   patients, and it was recognized in the

16   pain literature as one point of

17   reference.

18           Q.    But you understand that was

19   not about abuse, that was about addiction

20   that letter?

21           A.    Yes.

22           Q.    And are you familiar with

23   the details of that letter?

24           A.    I'd have to go back to the

Highly Confidential - Subject to Further Confidentiality Review

1  letter.

2      Q.   Do you understand that it

3  was with -- only concerning patients in a

4  hospital?

5      A.   Yes, that's my -- yes,

6  that's my understanding.

7      Q.   And for a very short period

8  of time?

9      A.   Yes.

10     Q.   And a very short follow-up

11  as well?

12     A.   I'd have to go back to the

13  letter to see what the follow-up period

14  was.

15     Q.   Is there a reason why you

16  didn't tell Ms. Sanderson-Bongiovanni

17  about the Porter and Jick?

18     A.   I -- I referred it to the

19  two individuals in my group, the two

20  physicians who reported to me who may

21  have been able to provide better data

22  sources to her.

23     Q.   But you knew there weren't

24  any other data sources.

1        A.    I knew what I knew, and they

2   may have -- and they may have had a

3   broader knowledge base than I did.

4        Q.    You just told me there were

5   very few large scale studies.  Did you

6   think that one got by you?

7             MR. LIFLAND:  Object to the

8        form of the question.

9             THE WITNESS:  I don't know.

10       I don't recall all of the sources

11       of information around addiction.

12  BY MS. CONROY:

13       Q.    But you do recall that there

14  aren't many?

15       A.    I recall that there weren't

16  many.  And I recall that in instances

17  where they were reported, they may not

18  have reported what criteria they used to

19  make the diagnosis of addiction or the

20  patient population or the duration of

21  therapy.  So there were limitations in

22  the reports.

23       Q.    The only one that you cited,

24  however, in the risk management plan was

1    Porter and Jick, correct?

2          A.    I'd have to go back to the

3    risk management plan.  But I'll --

4                MR. LIFLAND:  Object to the

5          form of the question.

6    BY MS. CONROY:

7          Q.    Let me ask it this way.  You

8    can't recall any other study concerning

9    addiction to chronic pain medication

10   other than Porter and Jick as you sit

11   here today?

12         A.    There were other studies

13   that looked at issues -- at addiction in

14   a population that received opioids.

15         Q.    Do you recall what the

16   results were?

17         A.    That the overall incidence

18   of addiction was relatively low.

19         Q.    If you take a look at

20   Ms. Sanderson-Bongiovanni response.  She

21   says, "Well, one thing is obvious from

22   these responses.  Medical affairs is not

23   in the process of addressing the FDA

24   comments on the issues of iatrogenic

Highly Confidential - Subject to Further Confidentiality Review

1    addiction, so we're not duplicating

2    efforts and resources."

3                Did you have any

4    conversation with her about whether or

5    not you were in fact going to assist in

6    addressing the FDA's comments on the

7    issues of iatrogenic addiction?

8          A.    Well, we looked at our

9    database of adverse event reports and did

10   an analysis of our database relative to

11   iatrogenic addiction.  But I was not on

12   that final -- no, I don't know.

13         Q.    Were you -- were you

14   involved in her progress report to the

15   FDA with respect to the issue of

16   iatrogenic addiction?

17         A.    I would have reviewed that.

18         Q.    You provided the database

19   results for that progress report,

20   correct, the issue with the 103 patients

21   believed to be addicted, an adverse event

22   of addiction?

23         A.    That would have come from

24   the benefit-risk management group, from

Highly Confidential - Subject to Further Confidentiality Review

1   the group that received the adverse

2   events, not from medical affairs.

3          Q.    Okay.  So the -- so what if

4   anything would you have been providing to

5   Sanderson-Bongiovanni to assist in the

6   process of addressing the FDA comments?

7          A.    The report on iatrogenic

8   addiction was relative to Duragesic.  If

9   I go back to her original question, it

10  appears that she's asking a broader

11  question about iatrogenic addiction, not

12  specific to Duragesic.

13         Q.    Well, she says, "I'm writing

14  in regard to the comments received from

15  FDA in response to the Duragesic risk map

16  proposal.  The agency expressed concern

17  about the risk of iatrogenic addiction

18  with chronic use of Duragesic."

19             That sounds pretty specific

20  to me.

21         A.    Right, but she continues,

22  "As part of my background and research,

23  I've read multiple articles with

24  conflicting estimates for the incidence

1   of addiction in patients with chronic

2   pain, and she cites specific groups.

3            So she's asking for a

4   landmark article about the occurrence and

5   etiology of addiction, not -- I read that

6   as not specific to Duragesic.  She wants

7   a backgrounder on addiction.

8        Q.    Right.  And instead of

9   telling her anything, you respond that

10  pain and addiction aren't your specialty.

11       A.    I respond that there are

12  better sources for the articles that she

13  was looking for.

14       Q.    And the two individuals who

15  provided that source tell her that

16  they're skeptical about the low rates of

17  iatrogenic addiction, correct?

18       A.    Correct.

19       Q.    And yet she continues in

20  that progress report that was marked as

21  an exhibit at this deposition in --

22  continuing to imply that the rates of

23  iatrogenic addiction are low.

24       A.    Because the available data

Highly Confidential - Subject to Further Confidentiality Review

1   which could be questioned as to the

2   patient population that they looked at,

3   the criteria that they use to make that

4   diagnosis, could be questioned.  It was

5   clear that the available data did not

6   come from a controlled clinical trial.

7   And so it had the limitations that we

8   understood for retrospective databases or

9   anything other than a controlled clinical

10  trial.

11          But it was -- we were trying

12  to find the best available data at the

13  time.

14          Q.    But you understand -- and

15  I'm sure you have seen studies, that

16  adverse event reporting picks up about 10

17  percent, it's believed, of adverse events

18  that are experienced by patients, because

19  it's dependent upon doctors, and

20  potentially others, reporting those

21  adverse events, correct?

22          A.    I won't cite a rate.  But

23  yes, it's generally understood that the

24  rate of reporting of adverse event is far

1    less than the actual incidence of adverse

2    events.  Yes, that was -- that was widely

3    understood for almost all adverse events.

4         Q.    However, that's not cited in

5    the report to the FDA, correct?

6         A.    No.  But in the report to

7    the FDA about iatrogenic addiction, we

8    specifically state these are the cases we

9    received.

10        Q.    But you don't state that

11   it's well known that adverse event

12   reporting is a very inaccurate way of

13   determining the true extent of adverse

14   events?

15        A.    We are reporting this to the

16   Food and Drug Administration.  And I

17   think they, above all, would understand

18   that there are limitations, significant

19   limitations in rates of adverse event

20   reporting that come into the company or

21   to the FDA.

22        Q.    Do you think when you cite

23   Porter and Jick to them, they likewise

24   understand the limitations of that letter

Highly Confidential - Subject to Further Confidentiality Review

1    to the editor?

2         A.    I do think that the FDA

3    understands the limitations of any source

4    of data, and they can compare those

5    sources of data with respect to the

6    accuracy.  So clearly a randomized

7    controlled clinical trial is going to

8    give you more accurate data than an

9    observational study or than a study in

10   which there were reports of that come

11   into a company.  I'm clear that the FDA

12   understands the limitations of those

13   data.

14        Q.    You also spoke during your

15   direct examination about animal models

16   and that there were some -- you talked

17   about some dual mechanisms of action with

18   the mu receptors in animal models and

19   animal trials.  Do you recall that

20   testimony?

21        A.    Yes.

22        Q.    Are you familiar with the

23   reference in your risk management plan to

24   an animal study that talked about low

1  doses after one or more months of

2  treatment that animals can develop opioid

3  addiction?

4         A.    I'd have to look at the

5  document.  I don't recall it offhand.

6         Q.    Let's take a look at it.  I

7  don't --

8              MS. CONROY:  Mr. Lifland,

9         maybe you can help him find the --

10        I don't have the exhibit number.

11        It's about that thick.  It's an

12        exhibit right there.  And it is

13        the risk management plan from

14        June 14, 2007.  I have a -- I can

15        pass you a copy if you want to see

16        it.

17             MR. LIFLAND:  This?

18             MS. CONROY:  Except -- I

19        can't see it.

20             MR. LIFLAND:  The plan or

21        the report?

22             MS. CONROY:  The plan.

23        That's it right there.  Do you

24        have the exhibit number?

1    MR. LIFLAND:  29.

2    MS. CONROY:  29.  Great.

3  Thank you.

4  BY MS. CONROY:

5    Q.    If you go to Page 29.

6    A.    I'm not there yet.

7    Q.    Oh, here.  Let me give you

8  this one.  It will be faster.  If you go

9  to Page 29.  I gave my clean copy away,

10  but I'll put it on the screen.  Hide my

11  notes.

12    "At low doses after one or

13  more months of treatment, animals can

14  develop opioid addiction."

15    Do you see that?

16    A.    I do.

17    Q.    Do you know what -- that

18  study is not cited here.  Do you know

19  what it is?

20    A.    My assumption is that, as

21  part of development of any program, we

22  would be looking at preclinical data and

23  animal data, and that this was one of the

24  studies that helped to assess the

Highly Confidential - Subject to Further Confidentiality Review

1  potential for addiction in -- it was a

2  study that was done in an animal model.

3  But we knew that fentanyl, by virtue of

4  being a Schedule II compound, had a high

5  potential for abuse, misuse and

6  addiction.

7          Q.    Well, animals aren't

8  misusing or abusing it, correct?

9          A.    No.  Correct.

10         Q.    So this would be a study

11  about addiction?

12         A.    In -- yes.

13         Q.    Will I find this study in

14  the -- I have lots of references that I

15  got at your 30(b)(6) deposition.  Will

16  this study be part of the NDA, do you

17  think, or?

18         A.    I would imagine it would be

19  part of the NDA.

20         Q.    Okay.  You don't have any

21  specific memory of what this is?

22         A.    I don't.  But again we

23  understood all potent opioids have

24  addictive properties and, if administered

Highly Confidential - Subject to Further Confidentiality Review

1    to laboratory animals, you can --

2    chronically administering it can lead to

3    addiction.

4         Q.    And oftentimes animal --

5    animal models are used to give some

6    insight into what might happen with

7    humans, correct?  That's the reason that

8    you do animal model studies, right?

9         A.    Certainly insight into

10   scheduling a product, and insight into

11   potential risks for the product.

12        Q.    One month of treatment with

13   a controlled substance, an opioid or

14   something like a fentanyl patch, that

15   would be fairly typical for chronic pain

16   patients, correct?

17        A.    One month would be typical

18   for chronic -- for treating chronic pain

19   moderate -- severe enough, if they met

20   the criteria with a Duragesic -- with a

21   Duragesic patch, yes.

22             But I don't want to indicate

23   that you can directly translate animal

24   models into a human model.  We know that

1  opioids are addictive, therefore, they

2  need to be properly prescribed with the

3  appropriate monitoring around them and

4  the appropriate instruction to patients

5  and assessing patients.

6          Q.    Correct.

7                I know you testified earlier

8  that RADARS is independent of Janssen,

9  correct?

10         A.    Yes.

11         Q.    Do you know if RADARS is

12  independent of any other pharmaceutical

13  company?

14         A.    It is.

15         Q.    It's a standalone?

16         A.    It's a standalone.

17         Q.    Do you know if Janssen has

18  or had a licensing agreement with Sandoz

19  to either manufacture or market generic

20  Duragesic?

21         A.    It's my understanding that

22  we had an agreement with Sandoz to market

23  an authorized generic of Duragesic.

24         Q.    And was it -- that was in

1   writing, I assume?

2       A.    I'm sure it was.  I never

3   saw the contract.

4       Q.    Okay.  And while you were

5   employed at Janssen, do you know if

6   Janssen or Johnson & Johnson, or Janssen

7   Ortho-McNeil ever owned a company called

8   Noramco that -- that manufactured opiates

9   or the raw material that potentially was

10  used for any Janssen opioid products?

11      A.    I was aware of a company

12  Noramco.  I don't recall the exact

13  relationship, whether it was part of the

14  Johnson & Johnson organization, but I

15  knew that, that they manufactured raw

16  materials.

17      Q.    Do you know if they

18  manufactured raw materials for other

19  pharmaceutical companies' products?

20      A.    I don't know.

21      Q.    Who would know that?

22            MR. LIFLAND:  Object to the

23      form of the question.

24            THE WITNESS:  Probably

1    somebody in the supply chain.

2    BY MS. CONROY:

3        Q.    Do you know if -- or had you

4    ever heard that they manufactured the

5    opiate for OxyContin?

6        A.    I don't know.

7        Q.    You were -- Exhibit 33 was

8    marked during your direct testimony.

9            What I'm going to mark is a

10   cover letter for that paper, I mean

11   for -- for your report.

12       A.    So I don't need to find

13   it --

14       Q.    No, I'm going to give you

15   the whole thing even though it will kind

16   of be an extra.

17           The -- I will tell you that

18   the attached is already marked as

19   Exhibit 33.

20           (Document marked for

21           identification as Exhibit

22           Janssen-Moskovitz-41.)

23   BY MS. CONROY:

24       Q.    So this is 41, and this is

1    33.

2                   Exhibit 41 is an e-mail from

3    you to Ravi Desiraju and Michael Kaufman

4    with cc's to Lisbeth Warren, Gary

5    Vorsanger and Jean Farrell.  And it's

6    dated April 28 of 2008.

7                   And in this e-mail you

8    attach your summary of the RADARS report

9    on rates of abuse and diversion for

10   transdermal fentanyl products.  And you

11   say, "I understand.  We will not provide

12   this assessment with the RADARS report we

13   submit to the FDA."

14                  Do you see that?

15        A.    Yes.

16        Q.    So Exhibit 33, which we've

17   already looked at, would not be submitted

18   to the FDA, correct?

19        A.    Correct.

20        Q.    "In that case, it becomes an

21   internal document justifying our move to

22   a clinical development plan for a switch

23   from the reservoir to the matrix

24   transdermal patch, would anyone need to

1    review it."

2              Do you see that?

3         A.    Yes.

4         Q.    And is it still your

5    understanding that this remained an

6    internal Janssen document to justify the

7    clinical development plan to move from

8    reservoir to matrix?

9         A.    I believe so.  I mean, our

10   commitment to the FDA was that before any

11   decision to move from a reservoir patch

12   to the matrix patch, we would want to

13   review the available RADARS data to

14   satisfy ourselves that the concerns we

15   expressed in 2001 and 2004 over potential

16   differences between the two formulations

17   were not coming to fruition and that once

18   we had the data for our own use, we were

19   comfortable that it, in fact, did not

20   show an increased rate of abuse, misuse

21   and diversion.  And so we felt

22   comfortable with the decision to move to

23   the matrix patch which was what the FDA

24   had preferred we do.

1    I don't know whether the

2 final decision was to submit those data

3 or simply acknowledge to the FDA that

4 yes, we've had an opportunity to review

5 the data, we're comfortable that the

6 concerns we expressed in 2001 and 2004

7 were allayed and that we will move

8 towards the development of a matrix.

9    Q.    And -- and you wrote that

10 out in Exhibit 33.  But if you take a

11 look at the second page of Exhibit 33,

12 you go -- you continue to say, "While

13 concerns remain that in the future rates

14 of abuse and diversion may increase,

15 because the matrix formulation can be cut

16 and diverted in ways the reservoir

17 cannot.  A matrix formulation has

18 advantages over a reservoir formulation

19 in that it cannot 'leak' if a

20 manufacturing defect leads to an unsealed

21 reservoir."

22    Do you see that?

23    A.    Yes.

24    Q.    So you still had concerns

1    about the abuse and diversion of the

2    matrix patch or the matrix technology?

3           A.    We're always concerned about

4    ways in which any of our products might

5    be abused, misused and diverted.  At this

6    point in time we had -- we had no

7    evidence that over the previous few

8    years, that the rates differed between

9    the two formulations.

10          We were certainly going to

11   continue our surveillance program so if

12   we started to see increases in rates

13   of -- of cutting the patch and diversion

14   of the patch, based upon what we've

15   already discussed as outcomes of our

16   surveillance program, we might have taken

17   additional steps to minimize those risks.

18          Q.    But as of -- as of the date

19   that you were internally justifying this

20   switch, and the date on this is April

21   of -- end of April of 2008, you -- you

22   still had concerns that there would be an

23   increase in abuse and diversion with the

24   matrix?

1    A.    We knew that there were ways

2    in which the matrix patch could be

3    abused, misused and diverted that

4    differed from the Duragesic reservoir

5    patch.  I don't think those concerns

6    would ever completely dissipate.  But

7    that's why we monitor.

8    Q.    Okay.  And so if we go back

9    to what was said in the Mudskipper report

10   from 2004, which was Exhibit 25, that

11   "the availability of a fentanyl matrix

12   patch is likely to increase the diversion

13   of patches with major public health

14   consequences," and then it goes onto the

15   two bullet points of -- of further

16   explaining that, that's really the same

17   thing that you're saying in the internal

18   justification memo, correct?

19            MR. LIFLAND:  Object to the

20       form of the question.

21   BY MS. CONROY:

22   Q.    -- that you were

23   concerned that -- you were concerned that

24   diversion and abuse might increase with

1    the matrix patch?

2                MR. LIFLAND:  Object to the

3         form of the question.

4                THE WITNESS:  At the time of

5         the 2004 report, this was a

6         hypothetical, because there was no

7         matrix patch on the market in the

8         U.S.

9                And so we did the studies

10        that informed our concerns about

11        risks of -- differential risks of

12        abuse, misuse and diversion.

13                In 2007, 2008 we had

14        available data from the RADARS

15        reports that informed us that the

16        differences were not the degree

17        that we had perhaps anticipated in

18        2004, and so we felt comfortable

19        with the decision to switch from a

20        reservoir to a matrix.

21                The concerns about the ways

22        in which a drug might be abused,

23        misused and diverted would remain.

24        And that's why we continue our

1    surveillance programs.

2  BY MS. CONROY:

3         Q.    Right.  Because the

4  availability of a fentanyl matrix patch

5  is likely to increase the diversion of

6  patches with major public health

7  consequences, has never changed, correct?

8              MR. LIFLAND:  Object to the

9         form of the question.

10              THE WITNESS:  That -- that

11         was our -- lacking any actual use

12         data, this was our assessment in

13         2004 based upon the data that we

14         generated in the course of 2003,

15         2004.

16              By 2007, 2008, we had actual

17         use data.  That allayed the

18         concern at the time and helped us

19         make the decision that we would

20         follow the FDA's preference for

21         moving from a Duragesic reservoir

22         patch to a matrix patch, which we

23         identified as having certain

24         advantages over a reservoir patch.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MS. CONROY:

2      Q.    I accept all of that.  But

3  you still remained concerned about an

4  increase in diversion with a matrix

5  patch.  You had that concern in 2004.

6  You had that concern in 2008.  And it

7  sounds like you have that concern today.

8           MR. LIFLAND:  Object to the

9        form of the question.

10          THE WITNESS:  We're always

11       aware of ways in which our drugs

12       might be abused, misused and

13       diverted.  We're always -- we're

14       always aware that there are

15       differences in the ways a

16       reservoir patch and a matrix patch

17       might be abused, misused, and

18       diverted.  We had greater concerns

19       before we had real world data.

20          By 2007, 2008, there were

21       enough data that allayed those

22       concerns.

23          Why that was the case,

24       that's hypothetical.  It may be

1    because there is more attraction

2    to other compounds that are on the

3    market.

4         It doesn't change the fact

5    that there are ways in which a

6    matrix Duragesic patch can be

7    abused that differ from the

8    reservoir patch.  We continued our

9    surveillance programs to see if at

10   any point that would be the case.

11        In theory, if you took all

12   other Schedule II products off the

13   market and the only drugs that

14   were available were a reservoir

15   patch and a matrix patch, there

16   would be more abuse, misuse and

17   diversion of a matrix patch

18   because, in some ways, it was

19   easier.

20   BY MS. CONROY:

21        Q.   I understand what you're

22   saying.  My question is not about the

23   relationship between a reservoir patch

24   and matrix patch.  It's strictly that

1    once you made the decision with respect

2    to the matrix patch to go with the matrix

3    patch, you still had concerns about abuse

4    and diversion?

5              MR. LIFLAND:  Object to the

6         form of the question.

7              THE WITNESS:  We always had

8         concerns about abuse, misuse and

9         diversion of our Duragesic

10        product, whether it was reservoir

11        or matrix.  That's why we

12        monitored for signals of abuse,

13        misuse, and diversion.  We're

14        simply aware that there were

15        different ways that you could

16        abuse, misuse and divert a matrix

17        patch.  We always had concerns for

18        both of the formulations that they

19        could be abused, misused and

20        diverted.

21   BY MS. CONROY:

22        Q.    And those concerns existed

23   in 2004 and they remained a concern for

24   the matrix patch in 2008.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    And that's why --

2            MR. LIFLAND:  Object to the

3      form of the question.

4            THE WITNESS:  And that's why

5      we continued our surveillance

6      programs.  Yes, we continued to

7      have concerns about ways in which

8      our products could be abused,

9      misused and diverted.

10  BY MS. CONROY:

11      Q.    You testified right at the

12  beginning of your direct testimony about

13  addiction -- definitions of addiction and

14  dependence.  Do you remember saying that?

15      A.    I do.

16      Q.    You were not suggesting that

17  Janssen scientists and researchers and

18  doctors and sales reps are free to use

19  any definition they want when they are

20  referring to either addiction or

21  dependence or abuse or misuse or

22  anything?

23      A.    I believe my testimony was

24  that there was no company-wide definition

Highly Confidential - Subject to Further Confidentiality Review

1    of these terms that was understood by

2    everyone who used these terms.

3         Q.    Was there a medical

4    affairs-wide definition of those terms --

5         A.    No.

6         Q.    -- or some of those terms?

7         A.    No.

8         Q.    Are there -- I do see that

9    in certain pieces, for example the

10   Exhibit 30 -- you don't need to really

11   pull it out, I don't think.  But this is

12   one of the -- this is -- this is one of

13   the REMS from -- it must be later if it's

14   a REMS, right?

15        A.    Yes.

16        Q.    Yeah.  The -- there are

17   definitions listed at the beginning of

18   the document, correct?  But that's good

19   scientific practice, right, if you're

20   writing, and you're going to be using

21   particular terms, to define those terms

22   somewhere in the document?

23        A.    Yes.

24        Q.    Was it the practice in

1    medical affairs to define terms that at

2    least medical affairs was using in their

3    documentation?

4         A.    That would depend upon the

5    context.  If we were doing a clinical

6    trial where we had to define a term or

7    how we would arrive at that diagnosis,

8    then it would be defined in the clinical

9    trial.

10              In general use, we would use

11   the terms that were widely identified and

12   defined by well-recognized societies that

13   managed -- that did pain management.  The

14   American Academy of Pain Management has

15   definition of these terms.  The American

16   Pain Society has a definition of these

17   terms.  There are DSM-IV definitions of

18   these terms.

19        Q.    You would agree with me that

20   that would be good scientific practice

21   for a pharmaceutical company to use a

22   common definition when -- I'm not talking

23   about clinical trials where you are

24   laying it out.  I'm not talking about

1    analyses of prior literature by other

2    authors.  I'm talking about studies,

3    reports, writings by the medical affairs

4    department at Janssen, it would be good

5    scientific medical practice to have a

6    common definition, correct?

7                MR. LIFLAND:  Object to the

8         form of the question.

9                THE WITNESS:  It would

10        depend on the context.  So if we

11        were talking about adverse event

12        reports, it may simply be the way

13        it was defined by the reporter.

14        If we are talking about internal

15        documents, it would probably be

16        the understanding of these terms

17        as used by the medical societies,

18        the broadly accepted use of these

19        terms.

20             That doesn't necessarily

21        mean that an individual who used

22        the terms outside of a document

23        like a risk management document

24        would be using the terms in the

1        same manner that a group where the

2        terminology is reviewed by a large

3        number of individuals would use

4        it.

5    BY MS. CONROY:

6        Q.    So if I'm reading Janssen

7    documents over a period of time, I need

8    to be aware that the definition of

9    addiction, dependence, abuse, misuse, may

10   change with respect to the context it's

11   used?

12       A.    And who is writing the

13   report and the level of expertise that he

14   or she has.

15       Q.    You were shown Exhibit 34,

16   which was one of your key opinion leaders

17   and Dr. Passik and several Janssen

18   employees that have a brief report on

19   tools to assess and document pain

20   outcomes in chronic pain patients

21   receiving opioid therapy.  Do you recall

22   that?

23       A.    You're referring to the

24   PADT, yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     I'm going to put that on

2     there.  PADT.  This study has the PADT

3     inside the study, and I know we saw a

4     color version of the PADT as well,

5     correct?

6          A.     Yes.

7          Q.     But this -- this is offered

8     as a tool by Dr. Passik and others.  But

9     it was -- it hadn't been tested, right?

10    It could prove helpful in clinical

11    management?

12         A.     It hadn't been validated.

13    But we -- in the development of the tool

14    we used -- I think it describes how the

15    tool was developed in the paper.

16         Q.     Right.  We had predictive

17    validity through longitudinal use of the

18    tool.  But you said that must be

19    confirmed.

20         A.     Confirmed.

21         Q.     So it had not yet been

22    confirmed at the time this article was

23    written, correct?

24         A.     That's correct.

1    Q.    And studies are needed to

2  clarify the interval of assessment that

3  optimally balances the need to minimize

4  clinician burden with the need to validly

5  assess and document outcomes that may

6  change continually over time, correct?

7    A.    Yes.

8    Q.    And so while this was a tool

9  that was offered to physicians, we have

10  no evidence as of today that this tool --

11  that anyone is using it or that it works?

12    A.    I don't know the level to

13  which they are using it.  Certainly it

14  was part of the recommendations of NIDA,

15  as we spoke about.  But I don't know the

16  numbers.

17        As a tool for documentation,

18  which is to say if someone went to a

19  physician and asked him or her, "On what

20  basis did you choose," they could at --

21  at least pull this tool up, if they were

22  using it to say, "Okay, here was my

23  assessment of the patient at the time

24  that I saw the patient."

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sure.  And it might be great

2    for that.  But we have no idea who is

3    using it and for how long they use it and

4    whether it actually works, even if people

5    are using it.

6    A.    It works as a tool to

7    document the decision, yes, it -- it

8    would be a valuable tool to document

9    their decision.

10    Whether, by doing so and the

11    frequency with which you're doing it

12    leads to a lower risk for behaviors that

13    predict abuse, misuse and diversion,

14    that's part of the validation.  We don't

15    know that.

16    Q.    Right.  And that's also true

17    of addiction, correct, it's not just

18    abuse, misuse and diversion, it's

19    addiction as well?

20    A.    That's correct.

21    Q.    And earlier you were

22    discussing the -- why doing a study with

23    addiction as a primary endpoint would be

24    impractical.  Do you recall that

Highly Confidential - Subject to Further Confidentiality Review

1   testimony?

2          A.    Yes.

3          Q.    And when you were discussing

4   the reasons why it would be impractical,

5   that's really the reason why it's

6   difficult for even a treating physician

7   to understand what's happening with a

8   patient who has chronic pain, is being

9   prescribed opioid therapy and may or may

10  not be exhibiting aberrant behavior,

11  correct?

12              MR. LIFLAND:  Object to the

13         form of the question.

14              THE WITNESS:  I'm not sure

15         of the -- that the conclusion we

16         have about use of a clinical trial

17         pertains to assessment of an

18         individual patient sitting in

19         front of a treating physician.

20              The individual patient

21         sitting in front of a treating

22         physician, that treating physician

23         should assess that individual for

24         behaviors that might be suggestive

Highly Confidential - Subject to Further Confidentiality Review

1          of the potential for addiction or

2          actual addiction and make a

3          decision for that patient what the

4          further method of care should be.

5               That's different than a

6          clinical trial.  I wouldn't equate

7          the two.

8     BY MS. CONROY:

9          Q.    What I understood you to say

10    was when a physician in a clinical trial

11    was presented with that problem, very

12    often they wouldn't see the patient

13    anymore, the patient would be gone.  I

14    think you don't actually -- there would

15    be a discontinuance of the drug or there

16    wouldn't be an ability to follow up with

17    that patient.

18         A.    I said that that was one of

19    the concerns we would have in such a

20    clinical trial, that you -- that there

21    would be a high dropout rate among

22    patients such that you might not even be

23    able to get to an endpoint of -- an

24    accurate endpoint of addiction.

1    What I didn't mention

2 earlier too is the best you can do in

3 such a clinical trial would be to get,

4 perhaps, a rate of iatrogenic addiction.

5 You certainly wouldn't be looking at

6 addiction in a subject population that

7 was outside of the specific patient who

8 gave informed consent to be in that

9 trial.

10    Q.    Of course, right.  My point

11 was that that real world situation,

12 either in the clinical trial or in the

13 real world, is what makes it difficult,

14 because when patients are suspected of

15 having aberrant behavior, very often the

16 physician stops prescribing the opioid,

17 correct?

18    A.    Well, that's one

19 possibility.  But another possibility

20 would be, as I spoke about earlier,

21 closer monitoring of the patient,

22 instituting other elements of monitoring,

23 opioid agreements, urine monitoring, or

24 referring that patient to a pain

Highly Confidential - Subject to Further Confidentiality Review

1  specialist who has greater expertise in

2  monitoring patients with higher risk of

3  abuse, misuse and addiction.

4      Q.    And I know you talked about

5  the label and the monitoring of

6  addiction.

7          Do you have any evidence

8  that signing contracts or urine testing

9  or any of those things actually work to

10  reduce the incidence of addiction or

11  abuse or misuse?

12      A.    I don't.  And in fact, it's

13  my understanding that it's unclear at

14  this point whether those elements of

15  intervention do so.

16      Q.    So while the label says

17  monitor your patient, isn't it fair to

18  say it's not entirely clear what the

19  components of monitoring a patient that

20  is exhibiting some signs of aberrant

21  behavior really means?

22      A.    The level of evidence over

23  what those interventions would lead to is

24  not at a high level of accuracy.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    You also testified that a

2  controlled dose is a benefit of

3  Duragesic.  Do you recall that?  You were

4  looking at the label at the time when you

5  were talking about.

6     A.    I do.

7     Q.    And you said it was because

8  there are lower high concentrations as

9  the drug is entering the bloodstream and

10  you don't go as low as an orally

11  administered drug as it wears off.  Do

12  you recall that?

13     A.    I do.  That there was a more

14  consistent delivery of a concentration of

15  fentanyl over the 72-hour period.

16     Q.    So in effect, lower highs

17  and higher lows for a Duragesic patch?

18     A.    That would be one way of

19  putting it.

20     Q.    Is that -- is that actually

21  in the label, that benefit?

22     A.    Not as a benefit.  We

23  present the pharmacokinetic data.

24     Q.    And the pharmacokinetic data

1  shows the lower highs and the higher

2  lows?

3        A.    That you would maintain a

4  consistent level of fentanyl over that

5  72-hour period.

6        Q.    And is that in normal human

7  volunteers?

8        A.    Yes.

9        Q.    And do you know for how long

10  those tests were conducted?

11        A.    I believe in the package

12  insert it's over two -- two, 72-hour

13  periods.

14        Q.    So about -- about -- a

15  little under three weeks?

16        A.    Once they achieved steady

17  state, then there was -- there were two,

18  72-hour periods after that.

19        Q.    Do you know if that's ever

20  been tested in chronic pain patients for

21  longer than three or four weeks?

22        A.    I'm sorry, I don't want

23  to -- if what has been tested?

24        Q.    The -- the serum blood

1    levels, whether or not the concentration

2    was -- the highs were lower, and the lows

3    were higher?

4          A.    So the principles of

5    pharmacokinetics inform the -- the

6    clinical -- the trial that was done that

7    looked at the pharmacokinetics, it was

8    understood based upon principles of

9    pharmacokinetics, that once you reach a

10   steady state, that you could predict the

11   longer term concentrations based upon

12   those steady-state concentrations of

13   fentanyl beyond the period of time in

14   which you are measuring it.

15         Q.    Do you know if that

16   specifically has been tested with respect

17   to fentanyl or some other opioid, or is

18   that just a principle of pharmacokinetics

19   that, regardless of the drug, once you

20   reach steady state, it would remain that

21   way?

22         A.    That's a general principle

23   of pharmacokinetics, that once you reach

24   a steady state, a constant dosing, at

1  whatever interval, because you're --

2  you're dosing at that interval to reach

3  the steady state.  But by definition, the

4  steady state would indicate that the

5  doses after that point would give you

6  peak concentrations within a certain

7  range and trough low concentrations

8  within a certain range.  That's a

9  generally known principle of

10  pharmacokinetics.

11       Q.    Do you know whether or not

12  there were any specific tests of

13  Duragesic over -- that -- that lasted for

14  longer than the tests that are here in

15  the label that went for, I'm not entirely

16  sure, maybe 19 days after steady state

17  was achieved?

18       A.    There were additional

19  pharmacokinetic studies, certainly the

20  pharmacokinetic studies that looked at

21  heat.  We did pharmacokinetic studies

22  with the bio occlusive overlay.  We did

23  pharmacokinetic studies that looked at

24  bioequivalence when we changed

1    formulations.  I don't recall that any

2    extended beyond the period of time that

3    you're seeing in the label or that gave

4    different information which then the FDA

5    might have included in the label.

6         Q.    We already covered this one.

7         MS. CONROY:  So I'm done.

8         MR. LIFLAND:  I have just a

9    couple of follow-ups.

10        MS. CONROY:  Do you want to

11    do it from there or do you want to

12    come across?

13        MR. LIFLAND:  I think I will

14    do it from there.

15        THE VIDEOGRAPHER:  All

16    right.  Remove your microphones.

17    The time is 7:42 p.m.  Off the

18    record.

19        (Short break.)

20        THE VIDEOGRAPHER:  The time

21    is 7:44 p.m.  Back on the record.

22            -  -  -

23        EXAMINATION

24            -  -  -

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. LIFLAND:

2         Q.    Dr. Moskovitz, just a couple

3    of follow-up questions.

4              First, relating to

5    Exhibit 41.  Do you have that?

6         A.    I do.  It's the top

7    document.

8         Q.    This is the document that

9    indicates that the company was treating

10   its assessment for going forward with the

11   development program for the matrix

12   patches that the FDA wanted as an

13   internal company document.  There's no

14   suggestion in here though that the

15   company did not send the RADARS data

16   itself to the FDA?

17              MS. CONROY:  Objection.

18              THE WITNESS:  That's

19         correct.  That's correct.  We sent

20         the RADARS data as part of our

21         obligation for the risk management

22         program.

23   BY MR. LIFLAND:

24         Q.    And in fact, it says here,

Highly Confidential - Subject to Further Confidentiality Review

1    "The RADARS report we submit to the FDA,"

2    indicating the data is sent, correct?

3         A.    Yes.

4         Q.    Let's go to Exhibit 29.

5         A.    29.  I've got it.

6         Q.    Can you turn to Page 39.

7         A.    I have it.

8         Q.    You'll see there's a

9    statement on Page 39, mostly down the

10   third paragraph that says, "For example,

11   in a retrospective review of over 12,000

12   hospital patients, only four potential

13   addicts were identified."

14              And there are some

15   footnotes.

16              You understand that that --

17   at least one of those citations is a

18   reference to the Porter and Jick survey?

19        A.    It's my understanding that

20   we cited it.  I can't say it's 14 or 15.

21        Q.    We can confirm that --

22        A.    Actually, I have it here.

23   15 is the Porter and Jick, yes.

24        Q.    And in fact, the

Highly Confidential - Subject to Further Confidentiality Review

1    representation of that is accurate,

2    correct, it tells -- it cites it as a

3    survey of hospital patients, correct?

4         A.    Yes.

5         Q.    So it tells the reader that

6    it's a hospital setting, correct?

7         A.    Yes.

8              MS. CONROY:  Objection.

9    BY MR. LIFLAND:

10        Q.    It tells the reader that

11   it's survey data, correct?

12        A.    A retrospective review would

13   be survey data, yes.

14        Q.    And it indicates there have

15   been no large prospective studies of

16   iatrogenic drug addiction, correct?

17        A.    Yes.

18        Q.    So nothing is being

19   inaccurately represented here, correct?

20        A.    Yes.

21        Q.    Now, in fact what's being

22   represented is that we don't have much

23   data, correct?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And is that the reason why

2  the company continues to track these

3  adverse events as best it can?

4    A.    Yes.  We knew that there

5  were inadequate data on the true

6  incidence of any of these terms.  And

7  so -- especially specifically with

8  Duragesic, because all of these data were

9  developed on all opioid compounds.  And

10  so that's why we continued to maintain a

11  surveillance program for our compounds.

12    Q.    And in all the years, in all

13  these surveys with the risk management

14  plan, did you see evidence of high

15  addiction problems with Duragesic as

16  compared to other opioid analgesics?

17    A.    I'm certainly glad you

18  qualified that with "as compared to other

19  opioid analgesic products."

20        In all streams of

21  surveillance that we received, rates of

22  abuse and diversion were consistently low

23  risk or very low for Duragesic relative

24  to other extended-release opioid

1    compounds.

2              And non extended-release.

3    Certainly hydrocodone was included in

4    those surveillance studies.

5         Q.    And let me show you

6    exhibit --

7              MR. LIFLAND:  Did we mark --

8         did we mark the iatrogenic

9         addiction report that I showed

10        him?

11             MS. CONROY:  I thought you

12        had.

13             MR. RODRIGUEZ:  I thought

14        you did.

15             THE WITNESS:  I thought you

16        did too.

17             Here we go.  It's

18        Exhibit 37.

19             MS. CONROY:  This is part of

20        your pile.  It's in there.

21   BY MR. LIFLAND:

22        Q.    Take a look at Exhibit 37.

23   This is the review of the adverse event

24   reports of addiction for Duragesic,

1    correct?

2        A.    The adverse events reported

3    to our safety group with the term

4    "addiction," yes.

5        Q.    And it goes into some

6    detail.  It has exactly how they analyzed

7    and searched and figured out which ones

8    they could characterize as reports of

9    addiction based on what they were

10   attempting to look at, correct?

11       A.    Yes.

12       Q.    And the report is very clear

13   that what they are looking at is not

14   anything other than reports that are

15   received in an adverse event database,

16   correct?

17       A.    Correct.

18       Q.    And in fact, in the

19   conclusion, when you read the

20   conclusion --

21           MS. CONROY:  What page is

22       that on?

23           MR. LIFLAND:  On 16.  Well,

24       it's shortly before the

Highly Confidential - Subject to Further Confidentiality Review

1    conclusion.

2            THE WITNESS:  It's part of

3        the discussion.

4    BY MR. LIFLAND:

5        Q.    Right.  It's the discussion.

6    It indicates that, "The reporting rate

7    must be considered very rare given that

8    there are 103 cases over 1.6 billion

9    patient days."

10            You'd agree with that,

11   right?

12       A.    Yes.

13       Q.    And you'd agree that it

14   would be also very rare even if you

15   assumed that 90 percent of the cases

16   weren't reported, correct?  If it was a

17   thousand over 1.6 billion patient days,

18   that would be a low reporting rate?

19       A.    It would still be --

20            MS. CONROY:  Objection.

21            THE WITNESS:  It would still

22        be considered a low rate.

23            MR. LIFLAND:  Thank you.

24            MS. CONROY:  Are you all

Highly Confidential - Subject to Further Confidentiality Review

 1          set?  I just have a quick

 2          question.

 3                  THE VIDEOGRAPHER:  Off the

 4          record, right?

 5                  MS. CONROY:  Keep it on the

 6          record.

 7                  THE VIDEOGRAPHER:  No

 8          problem.

 9                      -   -   -

10                  EXAMINATION

11                      -   -   -

12     BY MS. CONROY:

13          Q.    Doctor, Exhibit 29 I'm going

14     to ask you about.  29 is --

15                  MR. LIFLAND:  I've got it.

16          It's the --

17                  MS. CONROY:  It is the risk

18          management report plan, June 14,

19          2007.

20     BY MS. CONROY:

21          Q.    You just had it a minute

22     ago.  It's thick.

23          A.    There are lots of documents.

24     If it's this --

1          MR. LIFLAND:  This one.

2          THE WITNESS:  Okay.  Okay.

3     Thank you.

4  BY MS. CONROY:

5          Q.    And could you go to Page 39,

6  please.

7          A.    Yes.

8          Q.    And I think earlier we were

9  talking about the context in which

10  certain words are used or you have to be

11  careful of the context of a document.  Is

12  that true?

13          A.    Yes.

14          Q.    And if you take a look, I

15  know that Mr. Lifland read to you that --

16  he read the sentence, "For example, in a

17  retrospective review of over 12,000

18  hospital patients, only four potential

19  addicts were identified."  And that cites

20  the Porter and Jick letter to the editor

21  from 17 -- 27 years earlier.

22          But if you look at -- above

23  that, it says, "One of the main

24  misconception leading to the

1    undertreatment of pain by clinicians in

2    the United States is exaggerated fear

3    that efforts to adequately relieve pain

4    will result in the development of

5    addiction to the pain-relieving medicine.

6    Clinicians commonly overestimate the

7    frequency of addiction in hospitalized

8    patients."

9              And then it goes onto cite

10   Porter and Jick.  And says the survey

11   data suggest low rates of iatrogenic

12   addiction.

13             Do you see that?

14        A.    I do.

15        Q.    So the context of this is

16   that there are misconceptions with

17   respect to concerns about iatrogenic

18   addiction, and that it is in fact a low

19   rate, correct?

20             MR. LIFLAND:  Object to the

21        form of the question.

22             THE WITNESS:  In the context

23        of stating that there are no large

24        prospective studies that would get

1          to the exact rate, these are the

2          best data that we have available.

3   BY MS. CONROY:

4          Q.    And from that, you can -- if

5   you're reading this, it's telling you

6   there's a -- there's a misconception

7   leading to the undertreatment of pain

8   because people are more worried than they

9   should be about iatrogenic addiction?

10          MR. LIFLAND:  Object to the

11          form of the question.

12          THE WITNESS:  This is in the

13          context of a report we're making

14          to the Food and Drug

15          Administration describing the --

16          our risk management plan, but we

17          make those statements.

18   BY MS. CONROY:

19          Q.    Right.  You make statements

20   of misconception of undertreatment of

21   pain to the FDA, and not statements about

22   the lack of studies with respect to

23   iatrogenic addiction?

24          MR. LIFLAND:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1     form of the question.

2          THE WITNESS:  I'm not sure

3     of the question.  We did cite the

4     Porter and Jick letter.

5     BY MS. CONROY:

6          Q.    With a statement about the

7     fact that there were misconceptions about

8     concerns about addiction.

9          A.    Yes.

10         Q.    It would seem to -- it would

11    seem to be contradictory.

12         MR. LIFLAND:  Object to the

13    form of the question.

14         THE WITNESS:  It was -- I

15    don't know that I'd call it

16    contradictory.  But that there are

17    inadequate data.  But that there

18    was the general conception at the

19    time, certainly information that

20    we gathered even at advisory

21    committees with the FDA, that

22    the -- the concern about the

23    potential for addiction led to

24    undertreatment of pain.

1      That was a widely cited

2      concern, even by the FDA at their

3      advisory committee meetings, there

4      were some data that assessed rates

5      of addiction, one of which was the

6      Porter & Jick letter.

7  BY MS. CONROY:

8      Q.    And so those concerns were

9  stated by Janssen here without the

10  benefit of any large scale addiction

11  study?

12      A.    As we stated.

13      MS. CONROY:  That's all I

14      have.

15      MR. LIFLAND:  Just one quick

16      question.  I'll do it from here.

17      THE VIDEOGRAPHER:  Your

18      microphone.

19            -  -  -

20          EXAMINATION

21            -  -  -

22  BY MR. LIFLAND:

23      Q.    Can you read the sentence

24  that begins "Clinicians commonly

Highly Confidential - Subject to Further Confidentiality Review

1   overestimate"?

2       A.    "Clinicians commonly

3   overestimate the frequency of addiction

4   in hospitalized patients."

5       Q.    What patients is that

6   sentence talking about?

7       A.    I'd have to go to the

8   reference.  Well, that -- it's talking

9   about hospitalized patients by virtue of

10  the sentence.

11      Q.    And what -- that's what it

12  says.  And what patients did the Porter &

13  Jick survey look at?

14      A.    Hospitalized patients.

15      Q.    So in fact, the sentence is

16  responding to a sentence about

17  overestimation of addiction in

18  hospitalized patients, correct?

19      A.    Correct.  In that respect

20  we're looking at a similar patient

21  population.

22      Q.    And then can you read the

23  final sentence of that paragraph?

24      A.    "It should be noted that

Highly Confidential - Subject to Further Confidentiality Review

1    there have been no large prospective

2    studies of iatrogenic drug addiction, but

3    these survey data suggest low rates of

4    iatrogenic addiction."

5         Q.    So the absence of large

6    scale prospective studies is expressly

7    noted, right?

8         A.    Yes.

9              MR. LIFLAND:  Thank you.

10                  -   -   -

11              EXAMINATION

12                  -   -   -

13   BY MS. CONROY:

14         Q.    Just take a look.  Prior to

15   the sentence about the "clinicians

16   commonly overestimate the frequency of

17   addiction in hospitalized patients,"

18   there's no definer of the types of

19   clinicians in the sentence above.  One of

20   the main misconceptions leading to

21   undertreatment of pain by clinicians in

22   the United States is exaggerated fears

23   that efforts to adequately relieve pain

24   will result in the development of

1    addiction to pain relieving medicine.

2           That has no qualifier with

3    respect to hospitals or hospital

4    patients, correct?

5           A.    Correct.

6           MS. CONROY:  No further

7           questions.

8           THE VIDEOGRAPHER:  This

9           marks the end of today's

10          deposition.  The time is 8:01 p.m.

11          We are off the record.

12             (Brief pause.)

13                -  -  -

14          MS. CONROY:  As a

15          housekeeping detail to the

16          30(b)(6) deposition, I know that I

17          marked as exhibits all of the

18          index sheets to the documents that

19          were provided to us by defense

20          counsel, and we did not mark

21          separately all of the documents,

22          we just marked the index sheets.

23          And so at this time, we will

24          mark -- we won't do it here at the

Highly Confidential - Subject to Further Confidentiality Review

1    deposition, but we will consider

2    that all of the documents

3    referenced on the index sheets are

4    part of the exhibit, and we can

5    label them, the exhibit number A,

6    if you want or we can --

7         MR. LIFLAND:  Should we do

8    it that way?  I'm fine with that.

9         And for the record, I just

10   have an objection here.  There

11   were three exhibits, I guess one

12   was simply his --

13        MS. CONROY:  That one is

14   marked as an exhibit.

15        MR. LIFLAND:  I'd like to

16   have them all here.  There was

17   another one yesterday, right?

18        MS. CONROY:  I think he has

19   that one.  Here is the other one.

20        MR. LIFLAND:  There was

21   another one yesterday.

22        MS. CONROY:  There was.  Let

23   me -- I'll tell you what, I will

24   find that and I will mark it as

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Exhibit 43 and we'll put it in the
 2          record.  Okay?
 3                (Document marked for
 4          identification as Exhibit
 5          Janssen-Moskovitz-42.)
 6                (Document marked for
 7          identification as Exhibit
 8          Janssen-Moskovitz-43.)
 9                MR. LIFLAND:  Just for the
10          record, these are pictures of the
11          witness in which counsel has
12          written excerpts from documents.
13          I believe these are not proper
14          argument.  They shouldn't have
15          been displayed while the testimony
16          was being taken, and I would
17          object to them being displayed
18          with the testimony, if the
19          testimony is played.  So I just
20          want to make that objection for
21          the record.
22                I appreciate having a copy
23          of these, you know, for our
24          purposes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    MS. CONROY:  Sure.  And we

2    consider these demonstratives that

3    would takes place at this

4    deposition.  If used as trial they

5    would be perfectly possible to

6    create during trial and so we may

7    have -- we may have additional

8    justification if it comes -- if it

9    ever comes to that.  But that's

10    our position right now.

11    MR. LIFLAND:  Okay.

12    (Excused.)

13    (Deposition concluded at

14    approximately 8:05 p.m.)

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.

7

8              It was requested before
     completion of the deposition that the
     witness, BRUCE L. MOSKOVITZ, M.D., have
9    the opportunity to read and sign the
     deposition transcript.

10

11

12    _____

      MICHELLE L. GRAY,
13    A Registered Professional
      Reporter, Certified Shorthand
14    Reporter, Certified Realtime
      Reporter and Notary Public
15    Dated:  November 15, 2018

16

17

18              (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1    INSTRUCTIONS TO WITNESS

2

3         Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8         After doing so, please sign

9    the errata sheet and date it.

10         You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14         It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                    –   –    –    –    –    –

                     E R R A T A

2                    –   –    –    –    –    –

3

4       PAGE   LINE   CHANGE

5       _____  _____  _____

6           REASON: _____

7       _____  _____  _____

8           REASON: _____

9       _____  _____  _____

10          REASON: _____

11      _____  _____  _____

12          REASON: _____

13      _____  _____  _____

14          REASON: _____

15      _____  _____  _____

16          REASON: _____

17      _____  _____  _____

18          REASON: _____

19      _____  _____  _____

20          REASON: _____

21      _____  _____  _____

22          REASON: _____

23      _____  _____  _____

24          REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4              I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 326 - 769, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16     BRUCE L. MOSKOVITZ, M.D.          DATE
17
18
19    Subscribed and sworn
      to before me this
20    _____ day of _____, 20_____.
21    My commission expires:_____
22

      _____
23    Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____    _____

 4      _____  _____    _____

 5      _____  _____    _____

 6      _____  _____    _____

 7      _____  _____    _____

 8      _____  _____    _____

 9      _____  _____    _____

10      _____  _____    _____

11      _____  _____    _____

12      _____  _____    _____

13      _____  _____    _____

14      _____  _____    _____

15      _____  _____    _____

16      _____  _____    _____

17      _____  _____    _____

18      _____  _____    _____

19      _____  _____    _____

20      _____  _____    _____

21      _____  _____    _____

22      _____  _____    _____

23      _____  _____    _____

24      _____  _____    _____
```