## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

---------------------------x

IN RE: NATIONAL PRESCRIPTION ) MDL No. 2804

LITIGATION            ) Case No. 17-md-2804

This document relates to:   ) Hon. Dan A. Polster

All Cases            )

---------------------------x

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF BRIAN MUNROE

WASHINGTON, D.C.

TUESDAY, MARCH 19, 2019

9:14 A.M.

Reported by: Leslie A. Todd

## Page 2

```
 1      Deposition of BRIAN MUNROE, held at the offices
 2   of:
 3
 4
 5             ARNOLD & PORTER KAYE SCHOLER, LLP
 6             601 Massachusetts Avenue, N.W.
 7             Washington, D.C. 20001
 8             (202) 942-5000
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1          A P P E A R A N C E S
 2
 3   ON BEHALF OF THE MDL PLAINTIFFS:
 4      PARVIN AMINOLROAYA, ESQUIRE
 5      SEEGER WEISS, LLP
 6      77 Water Street, 8th Floor
 7      New York, New York 10005
 8      (212) 584-0700
 9
10   ON BEHALF OF THE TENNESSEE PLAINTIFFS:
11      TRICIA HERZFELD, ESQUIRE
12      BRANSTETTER, STRANCH & JENNINGS, PLLC
13      223 Rosa L. Parks Avenue, Suite 200
14      Nashville, Tennessee 37203
15      (615) 254-8801
16
17   ON BEHALF OF ENDO PHARMACEUTICALS and PAR:
18      JOSHUA M. DAVIS, ESQUIRE
19      WREDE SMITH, ESQUIRE
20      ARNOLD & PORTER KAYE SCHOLER, LLP
21      601 Massachusetts Avenue, N.W.
22      Washington, D.C. 20001
23      (202) 942-5000
24
```

## Page 4

```
 1   APPEARANCES (Continued):
 2      JOBINA JONES-McDONNELL, ESQUIRE
 3      ENDO PHARMACEUTICALS
 4
 5   ON BEHALF OF THE WITNESS:
 6      WALTER W. COHEN, ESQUIRE
 7      OBERMAYER REBMANN MAXWELL & HIPPEL LLP
 8      200 Locust Street, Suite 400
 9      Harrisburg, Pennsylvania 17101-1508
10      (717) 234-9730
11
12   ON BEHALF OF WALMART:
13      SHIRLETHIA V. FRANKLIN, ESQUIRE
14      JONES DAY
15      51 Louisiana Avenue, N.W.
16      Washington, D.C. 20001-2113
17      (202) 879-3939
18
19   ON BEHALF OF PURDUE PHARMA:
20      NICHOLAS A. NOVY, ESQUIRE
21      DECHERT, LLP
22      Cira Centre, 2929 Arch Street
23      Philadelphia, Pennsylvania 19104-2808
24      (215) 994-4000
```

Page 5

1  APPEARANCES (Continued):
2
3  ON BEHALF OF ADAM KASAAB:
4      J  MICHAEL CONNOLLY, ESQUIRE
5      CONSOVOY McCARTHY, PLLC
6      3033 Wilson Boulevard
7      Suite 700
8      Arlington, Virginia 22201
9      (703) 243-9423
10
11  ON BEHALF OF McKESSON CORPORATION:
12     GABRIEL FULMER, ESQUIRE
13     COVINGTON & BURLING LLP
14     One CityCenter
15     850 Tenth Street, NW
16     Washington, DC 20001-4956
17     (202) 662-5769
18
19  ON BEHALF OF WEST VIRGINIA BOARD OF PHARMACY:
20     HARRISON CYRUS, ESQUIRE (Remote Streaming)
21     BAILEY & WYANT, PLLC
22     500 Virginia Street East, Suite 600
23     Charleston, West Virginia 25301
24     (304) 345-4222

Page 6

1  APPEARANCES (Continued):
2
3      SARAH MILLER BENOIT, ESQUIRE
4      (Remote Streaming)
5      ULMER & BERNE, LLP
6      65 East State Street
7      Suite 1100
8      Columbus, Ohio 43215-4213
9      (614) 229-0000
10
11  ON BEHALF OF AMERISOURCEBERGEN:
12     M. PATRICK YINGLING, ESQUIRE
13     (Remote streaming)
14     REED SMITH LLP
15     10 South Wacker Drive, 40th Floor
16     Chicago, Illinois 60606-7507
17     (312) 207-2834
18
19  ALSO PRESENT:
20     ERICA KUBLY, Seeger Weiss, Law Clerk
21     SCOTT SIEGEL, Seeger Weiss, Paralegal Manager
22     JEFF SAYRES, Trial Consultant
23     DANIEL HOLMSTOCK, Videographer
24

Page 7

1        C O N T E N T S
2  EXAMINATION OF BRIAN MUNROE          PAGE
3  By Ms. Aminolroaya          15, 425
4  By Ms. Herzfeld             303
5  By Mr. Davis                419
6
7
8
9        E X H I B I T S
10     (Attached to transcript)
11  ENDO-MUNROE DEPOSITION EXHIBITS     PAGE
12  No. 1   (Exhibit number not used.)
13  No. 2   Subpoena to Testify at a Deposition
14         in a Civil Action          22
15  No. 3   LinkedIn profile of Brian Munroe,
16         E1900.1 to E1900.3         52
17  No. 4   E-mail re No Subject EML, Bates
18         ENDO-OPIOID_MDL-02210739 to
19         02210763                   84
20  No. 5   (Exhibit number not used.)
21  No. 6   Document entitled "3 Waves of the
22         Rise in Opioid Overdose Deaths,"
23         E1901.1                    108
24

Page 8

1        E X H I B I T S (Continued)
2      (Attached to transcript)
3  ENDO-MUNROE DEPOSITION EXHIBITS     PAGE
4  No. 7   E-mail string re Urge Your Member of
5         Congress to Join the Bipartisan
6         Congressional Caucus on Drug Policy,
7         Bates PPLPC018000141199 to
8         18000141201                118
9  No. 8   E-mail re Note the Bold at end,
10         Bates PPLPC019000154246 to
11         19000154249                121
12  No. 9   E-mail re Invoice from Consultant
13         Munroe, Bates PPLPC023000118882   123
14  No. 10  (Exhibit number not used.)
15  No. 11  E-mail string re Slides, Bates
16         ENDO-OPIOID_MDL-02212973 to
17         02213004                   131
18  No. 12  E-mail string re Percocet, Bates
19         ENDO-OPIOID_MDL-06146694 to
20         06146695, with attachment   152
21  No. 13  E-mail re Dec. 20th Meeting
22         Follow-Up, Bates ENDO-OR-CID-
23         00707260 to 00707267        160
24

Page 9

1        E X H I B I T S (Continued)
2         (Attached to transcript)
3    ENDO-MUNROE DEPOSITION EXHIBITS        PAGE
4    No. 14   Demonstrative created at
5         deposition        165
6    No. 15   E-mail string re Percocet, Bates
7         ENDO-OPIOID_MDL-06146694 to 06146696,
8         with attachment        167
9    No. 16   AMDG Interagency Guideline on
10        Opioid Dosing for Chronic Non-
11        Cancer Pain; an educational pilot
12        to improve care and safety with
13        opioid treatment, E1957.1 to
14        E1957.14        173
15   No. 17   E-mail string re Washington state
16        Opioid prescribing guidelines,
17        Bates EPI001775348 to 001775349    176
18   No. 18   E-mail string re POPAN activities
19        in the past months, Bates
20        ENDO-OPIOID_MDL-02210853 to
21        2210855        178
22   No. 19   E-mail re Washington Draft Opioid
23        Guidelines, Bates PPLP004301238 to
24        004301239        178

Page 10

1        E X H I B I T S (Continued)
2         (Attached to transcript)
3    ENDO-MUNROE DEPOSITION EXHIBITS        PAGE
4    No. 20   E-mail string re Washington State
5         Opioid Dosing Guidelines, Bates
6         PPLP004024280 to 004024281        185
7    No. 21   Compilation of documents, E0287.1
8         to E0287.35        191
9    No. 22   (Exhibit number not used.)
10   No. 23   Document entitled: "Responsible
11        Opioid Prescribing, a Physician's
12        Guide," Bates END000051370 to
13        00051443        188
14   No. 24   (Exhibit number not used.)
15   No. 25   E-mail re Opana ER - doses >30mg?
16        Bates ENDO-OPIOID_MDL01902659 to
17        01902662        206
18   No. 26   E-mail string re FDA Response to
19        PROP Petition, Bates ENDO-OPIOID_
20        MDL-01448657 to 01448675        213
21   No. 27   E-mail re FDA petition regarding
22        opioid labeling, Bates
23        END000403619 to 00403646        216
24

Page 11

1        E X H I B I T S (Continued)
2         (Attached to transcript)
3    ENDO-MUNROE DEPOSITION EXHIBITS        PAGE
4    No. 28   E-mail string re PCF REMS Task
5         Force - I need your input ASAP,
6         Bates ENDO-OPIOID_MDL-03902804
7         to 03902806        222
8    No. 29   E-mail string re REMS Letter,
9         Bates ENDO-OPIOID_MDL-02485618
10        to 02485622        229
11   No. 30   E-mail string re Meeting today at
12        NOON - Draft PCF response regarding
13        REMS, Bates EPI001789493 to
14        001789494        232
15   No. 31   E-mail re [blank], Bates
16        ENDO-OPIOID_MDL-01134277 to
17        01134291        236
18   No. 32   E-mail re FDA Docket, Bates
19        ENDO-OPIOID_MDL-02293305 to
20        02293319        239
21   No. 33   E-mail re Friday's schedule,
22        Bates ENDO-OPIOID_MDL-02297404
23        to 02297405, with attachment    249
24

Page 12

1        E X H I B I T S (Continued)
2         (Attached to transcript)
3    ENDO-MUNROE DEPOSITION EXHIBITS        PAGE
4    No. 34   E-mail re PCF REMS Task Force
5         Recommendation and process,
6         Bates END00077888 to 0077921    249
7    No. 35   E-mail string re Opana Rebate,
8         Bates EPI001080837 to 001080838    252
9    No. 36   E-mail string re EPPC Update -
10        Senator Casey -- Prescription
11        Drug Abuse Meeting, Bates
12        EPI002377845 to 002377847        259
13   No. 37   E-mail re Military/Veterans and
14        Pain Media Briefing this Tuesday
15        10-30, Bates ENDO-OPIOID_MDL-
16        02807915 to 02807922        269
17   No. 38   American Pain Foundation Invoice,
18        dated November 2, 2007, to
19        Endo Pharmaceuticals, Bates
20        CHI_000430399 to 0004303404    271
21   No. 39   E-mail re APF Briefing, Bates
22        ENDO-OPIOID_MDL-02807881 to
23        02807908        277
24

| | Page 13 |
|---|---|

1         E X H I B I T S (Continued)

2          (Attached to transcript)

3    ENDO-MUNROE DEPOSITION EXHIBITS         PAGE

4    No. 40   E-mail re Endo meeting with the

5            DEA, Bates EPI001179443 to

6            001179451, with attachment        286

7    No. 41   Letter to Robert Barto from

8            Parinda Jani (FDA), Bates

9            EPI001313856 to 001313859        290

10   No. 42   E-mail string re DEA Letter,

11           Bates ENDO-CHI_LIT-00096310 to

12           00096312            296

13   No. 43   (Exhibit number not used)

14   No. 44   E-mail string re Response from DEA

15           Bates EPI001504213 to 001504221   299

16   No. 45   E-mail string re TN Opana ER,

17           Bates ENDO-OPIOID_MDL-02667004

18           to 02667005          337

19   No. 46   E-mail string re Submitted for

20           your review - Final Draft Rx Drug

21           Abuse Plan - please provide comments

22           Bates ENDO-OPIOID_MDL-02801542 to

23           02801547, with attachment     348

24   No. 47   (Exhibit was clawed back)      365

| | Page 14 |
|---|---|

1         E X H I B I T S (Continued)

2          (Attached to transcript)

3    ENDO-MUNROE DEPOSITION EXHIBITS          PAGE

4    No. 48   (Exhibit was clawed back)      371

5    No. 49   (Exhibit was clawed back)      373

6    No. 50   (Exhibit was clawed back)      381

7    No. 51   E-mail re Draft Rx Drug Abuse

8            Deck for 6/5/12       385

9    No. 52   E-mail re Draft 2012 GA Strategic

10           Plan, Bates ENDO-OPIOID_MDL-

11           06213500 to 06213540       395

12   No. 53   E-mail string re External: HR

13           659 Opioid Addiction Advisory

14           Committee Meeting 06-26-14,

15           Bates ENDO-OPIOID_MDL-02795421

16           to 02795422, with attachment      408

17   No. 54   E-mail string re Top 10 States --

18           Opana Sales, Bates ENDO-OPIOID_MDL-

19           02791740 to 02791742, with

20           attachment        411

21   No. 55   E-mail string re Oxymorphone HCL

22           ER Geographical Insights, Bates

23           EPI001106854 to 001106856, with

24           attachment        415

| | Page 15 |
|---|---|

1           P R O C E E D I N G S

2          -------------------

3        THE VIDEOGRAPHER:  We are now on the

4    record   My name is Daniel Holmstock   I am the

5    videographer for Golkow Litigation Services

6    Today's date is March 19th, 2019, and the time on

7    the video screen is 9:14 a m

8        This video deposition is being held at

9    the law offices of Arnold & Porter Kaye Scholer

10   LLP, at 601 Massachusetts Avenue, Northwest, in

11   Washington, D C , in the matter of In Re: National

12   Prescription Opiate Litigation pending before the

13   United States District Court for the Northern

14   District of Ohio, Eastern Division, MDL No  2804

15   Our deponent today is Mr  Brian Munroe

16        Counsel for appearances will be noted on

17   the stenographic record

18        The court reporter is Leslie A  Todd,

19   who will now administer the oath

20           BRIAN MUNROE,

21      and having been first duly sworn,

22   was examined and testified as follows:

23   EXAMINATION BY COUNSEL FOR THE MDL PLAINTIFFS

24   BY MS  AMINOLROAYA:

| | Page 16 |
|---|---|

1        Q   Good morning, Mr. Munroe.

2        A   Good morning.

3        Q   Have you ever been deposed before?

4        MR. DAVIS:  I just want to put a

5    statement on the record before we get going.

6    It's -- we went on the record at 9:15.  Mr. Munroe

7    was in the chair at 9:00.  MDL plaintiffs' counsel

8    wasn't even in the building until 9:07.  I think

9    it's extremely inconsiderate to all of us here in

10   the room, and especially Mr. Munroe, given how

11   long these depositions have been going.  I just

12   want that on the record.

13        MS. AMINOLROAYA:  Sure.  And I

14   apologize.  As I mentioned before we went on the

15   record, I have a foot injury that has impeded my

16   ability to walk, and so I was slow getting

17   together this morning.  I think we've been on time

18   before -- we've been at the deposition before the

19   start time.  I apologize for that.  It's

20   unexpected.

21   BY MS. AMINOLROAYA:

22        Q   Mr. Munroe, have you ever been deposed

23   before?

24        A   No.

1    Q   So I'll just go over a few ground rules
2  with you.  Your counsel may have gone over them
3  with you before, but just so that we're on the
4  same page, there's a couple of things that will be
5  helpful if we both keep in mind throughout the
6  day.
7         So if you don't understand a question,
8  please tell me.  Otherwise -- or you can ask me to
9  rephrase it.  Otherwise, the record will reflect
10  that you understood the record.
11         Does that sound fair?
12         You need to --
13         MR. DAVIS:  You've got to say yes or no.
14         MS. AMINOLROAYA:  Yes.
15         MR. DAVIS:  You've got to be verbal.
16         THE WITNESS:  Yes.
17  BY MS. AMINOLROAYA:
18     Q   Another -- another ground rule that
19  I'll -- I'll let you know is that we need to
20  answer with verbal -- verbal responses.  The court
21  reporter can only take down a "yes" or a verbal
22  response, so nods of the head or shakes can't be
23  recorded.
24         Another thing that may happen throughout

1  the day is in the course of normal conversation,
2  it's normal for you to anticipate my question, but
3  again for purposes of having a clear record, let
4  me finish the question, and then you can provide
5  your answer so that we have a clean record.
6         We can take a break whenever you need.
7  If you need a break at any time, that's completely
8  fine.  I would just ask that if I've asked a
9  question, you answer that question before we take
10  a break.
11         Does that sound fair?
12     A   Yes.
13     Q   All right.  Do you understand these
14  instructions?
15     A   Yes.
16     Q   Okay.  And -- and as a reminder, you are
17  under oath as if you were in a court of law before
18  a judge, Judge Polster in Ohio.  So you must
19  answer fully and include all relevant information
20  in your answer.
21         And if you don't know or can't recall,
22  just say so.  We're not looking for any guesses,
23  but we are entitled to your best recollection.
24         Do you understand that?

1     A   Yes.
2     Q   Thank you.
3         And is there anything we should know
4  that would prevent you from testifying truthfully
5  and to the best of your ability today?
6     A   No.
7     Q   Okay.  Thank you.
8         What did you do to prepare for your
9  deposition today?
10     A   I met with my legal team.
11     Q   Okay.  And whose your legal team?
12     A   They're seated to the left of me,
13  representatives from Arnold & Porter, Endo, and
14  Walter Cohen from Obermayer.
15     Q   And what's the second firm's name?
16     A   Obermayer.
17     Q   Obermayer.  And does Obermayer represent
18  you personally?
19     A   Yes.
20     Q   And when did you retain Obermayer?
21     A   In preparation for the deposition.
22     Q   Okay.  And do you remember -- do you
23  recall what date that was?
24     A   I don't recall.

1     Q   Was it in 2019?
2     A   It was in 2019.
3     Q   Tell me the name of your lawyer at
4  Obermayer.
5     A   Walter Cohen.
6         (Counsel conferring.)
7  BY MS. AMINOLROAYA:
8     Q   And how long did you spend preparing for
9  your deposition?
10     A   Approximately a dozen hours.
11     Q   And was that in one day or multiple
12  days?
13     A   Multiple days.
14     Q   How many days did you spend preparing?
15     A   I prepared on four separate days for
16  several hours each day.
17     Q   All right.  And did you speak with
18  anyone to -- besides your lawyers, to prepare for
19  this deposition?
20     A   No.
21     Q   Did you reach out to any employees at --
22  at Endo?
23     A   No.  The only people that I spoke to
24  about the deposition were family and close friends

Page 21

1   telling them that I was going to go through this
2   process, but I discussed none of the content or
3   substance.
4       Q   Okay.  For example, you told your wife
5   maybe that you were going to a deposition today.
6       A   Yes.
7       Q   Okay.  And did you review any documents
8   in the course of your preparation for the
9   deposition?
10      A   I did.
11      Q   All right.  Did you bring them with you
12  today?
13      A   I did not.
14      Q   Okay.  And do you know what documents
15  you reviewed in preparation for your deposition?
16          MR. DAVIS:  Objection.  Form.
17          I'm going to instruct you, Brian, not to
18  divulge the content of any of the documents that
19  you reviewed during the course of your preparation
20  with us.
21  BY MS. AMINOLROAYA:
22      Q   Did you ask to review any documents in
23  particular in the course -- I'm not asking for the
24  content of them yet.  I'm asking if you asked to

Page 22

1   review any particular documents in preparation for
2   your deposition.
3       A   I don't recall.
4           (Munroe Exhibit No. 2 was marked
5           for identification.)
6   BY MS. AMINOLROAYA:
7       Q   So I'm going to hand you what's been
8   marked -- we used Exhibit 1 for another document,
9   so we'll start with Exhibit 2, a subpoena to
10  testify at a deposition.
11          MS. AMINOLROAYA:  And do we have copies
12  for counsel?
13  BY MS. AMINOLROAYA:
14      Q   Have you seen this document?
15      A   Yes, I believe -- I didn't study it, but
16  I believe that I did see the subpoena for me to
17  appear to testify.
18      Q   Okay.  And when did you see a copy of
19  this?
20      A   During my preparation.
21      Q   All right.  And did you take a look at
22  page 9 of the subpoena, "Requests for Production
23  by Brian Munroe"?
24      A   Let me look at that.

Page 23

1       Q   Sure.
2       A   (Peruses document.)  Yes, I did look at
3   this.
4       Q   All right.  And so there are ten
5   requests per the production of documents.  Did you
6   search for documents to respond to these requests?
7       A   I did.
8       Q   Where did you search?
9       A   I searched my wife's e-mail account, and
10  I searched my personal laptop, which were the only
11  areas that I thought there might be documents
12  relevant to these requests, knowing that the
13  company would have documents from my time when I
14  was an employee at Endo.
15      Q   Okay.  But you understood that you also
16  needed to search -- separately search --
17      A   I did.
18      Q   -- these other sources.
19          And did you find any documents that were
20  responsive to these requests?
21      A   I found one document on my personal
22  laptop that was a public document.
23      Q   And what was -- what was the document
24  about?

Page 24

1       A   The document was the notice of a hearing
2   of the Energy and Commerce Committee on the
3   subject of opioids.
4       Q   And do you recall the date of that
5   document?
6       A   I don't.
7       Q   And where did you find the document?
8       A   On my laptop.
9       Q   Did you use your laptop for work as
10  well?
11      A   No.  I used it briefly as a consultant
12  in between jobs.  My -- end of my time as an
13  employee at Endo and before I started my current
14  position, I was a consultant and I used my laptop
15  for my consulting business.  So that's why I
16  searched my laptop to see if there were any
17  relevant documents.
18      Q   And when did you -- since when have you
19  had this laptop?
20      A   I believe that I purchased the laptop at
21  the end of my time at Endo, knowing that I was
22  going to transition out of the company, but I
23  don't recall the exact date.
24      Q   Okay.  And did you have a laptop prior

Page 25

1    to this -- this laptop?
2        A   No.
3        Q   Did you have a desktop that you used
4    before you purchased this laptop at home?
5        A   We had a family desktop.
6        Q   And did you ever use that family desktop
7    for work?
8        A   I might have occasionally used it for
9    work when I didn't have my laptop from work.  If I
10   was doing something on the weekends, I might have
11   used the family desktop.  But I don't -- it would
12   have been very infrequent.
13       Q   And did you search the family desktop
14   for documents that would be responsive to these
15   requests?
16       A   I did.
17       Q   And did you find any documents?
18       A   I did not.
19       Q   And what's the name of your consulting
20   firm?
21       A   I was just an individual consultant.  It
22   didn't have a name.
23       Q   Okay.  And during -- when did you become
24   an individual consultant?

Page 26

1        A   At the conclusion of my employment with
2    Endo in March of 2019.
3        Q   And did you ever work as an individual
4    consultant prior to that?
5        A   I was a consultant at a consulting firm
6    prior to my employment at Endo.
7        Q   And what year was that -- or what years
8    did that cover?
9        A   I don't recall.
10       Q   Would that be Capitol Hill Consulting?
11       A   That would be Capitol Hill Consulting
12   Group.
13       Q   Do you recall that you worked at Capitol
14   Hill Consulting Group in 2007?
15       A   I don't recall the dates.
16       Q   Was it prior to your time at Endo?
17       A   It -- it was.
18       Q   And after leaving WellPoint?
19       A   Yes.
20       Q   Did you ever use your phone for work
21   purposes, your personal phone?
22       A   While I was an employee at Endo?
23       Q   Yes, mm-hmm.
24       A   I did not have a personal phone.  It was

Page 27

1    my work phone.  And I would use my e-mail account
2    on my phone for work purposes, absolutely.
3        Q   And would you ever send text messages
4    related to work on that phone?
5        A   I don't recall sending text messages
6    related to work.
7        Q   And you mentioned that you searched your
8    wife's e-mail.  What is that e-mail address?
9        A   VMunroe@msn.com.
10       Q   And would you use this e-mail address
11   for work?
12       A   No.
13       Q   Did you ever use it for your -- related
14   to your work at Endo?
15       A   I don't recall ever using it for
16   work-related purposes at Endo.
17       Q   Are you aware that we located some
18   e-mails that were sent -- that were sent from this
19   e-mail account to -- to parties who are employed
20   by other defendants in the litigation?
21       A   I am aware of -- of those e-mails, and
22   those e-mails were employment opportunities for
23   me, so I considered that non-work related and
24   personal in nature.

Page 28

1        Q   All right.  Switching gears a little
2    bit, tell us about your education.
3        A   I have a B.A. degree from the University
4    of California.
5        Q   Which school?
6        A   The University of California at Santa
7    Barbara.
8        Q   And what is your degree in?
9        A   History.
10       Q   Do you have a graduate degree?
11       A   I don't.
12       Q   Okay.  And what year did you obtain
13   your -- your Bachelor's?
14       A   1983.
15       Q   And after you graduated, what did you
16   do?
17       A   After I graduated, in the summer of 1983
18   I worked at the University.
19       Q   And what kind of work did you do at the
20   University?
21       A   I worked at a place called the Alumni
22   Vacation Center.
23       Q   All right.  And how long did you do
24   that?

Page 29

1    A   For three months.
2    Q   Do you have a CV, Mr. Munroe?
3    A   I do.
4    Q   Did you bring one with you?
5    A   I did not.
6    Q   Okay.  And you were there for three
7  months, and what did you do after that?
8    A   I recall that I went to work at the
9  Democratic National Committee.
10   Q   And is this still 1983?
11   A   This would still be 1983.
12   Q   And what did you do at the Democratic
13  National Committee?
14   A   I worked in the mailroom.
15   Q   How long were you there?
16   A   I don't recall.
17   Q   All right.  And do you recall what your
18  next position was after working in the mailroom at
19  the Democratic National Committee?
20   A   Yes.  I worked on the finance staff.
21   Q   And until when was that?
22   A   I don't recall.
23   Q   Did you remain at the Democratic
24  National Committee for any -- in any other

Page 30

1  positions?
2    A   I don't recall.
3    Q   And do you recall where you went after
4  the Democratic National Committee?
5    A   Yes.  Occidental.
6    Q   And what did you do on the financial
7  staff at the Democratic National Committee?
8    A   We organized fundraisers and organized
9  the collection of funds to support the activities
10  at the DNC.
11   Q   And who did you work with in this -- in
12  this role?
13   A   Don Sweitzer.
14   Q   And who -- who is he?
15   A   At that time he was the head of the
16  finance group at the DNC.
17   Q   Did you work with anyone else?
18   A   Yes.
19   Q   Who else?
20   A   I don't recall.
21   Q   Okay.  And then you went to Occidental.
22  What is Occidental?
23   A   It's a large oil and chemical company.
24   Q   And what did you do there?

Page 31

1    A   I was responsible for state government
2  relations at Occidental Chemical Company.
3    Q   Is that the same thing as lobbying?
4       MR. DAVIS:  Objection to form.
5       You can answer.
6       THE WITNESS:  No.
7  BY MS. AMINOLROAYA:
8    Q   Okay.  What did you do in your role in
9  the state government relations at Occidental?
10   A   It was a job where I monitored
11  legislative and regulatory activity, participated
12  in trade association meetings and wrote reports.
13   Q   And until when were you there?
14   A   I don't recall.
15   Q   All right.  What did you do after
16  leaving Occidental?
17   A   I went to work for Hoffmann-La Roche.
18   Q   What was your role at Hoffmann-La Roche?
19   A   I was a lobbyist at Hoffmann-La Roche.
20   Q   And what did you do in your role as a
21  lobbyist for Hoffmann-La Roche?
22   A   I worked on projects in the southeastern
23  United States and in Congress, and I worked on
24  projects at the intersection where an issue was a

Page 32

1  benefit to society or a benefit to public health
2  and a benefit to Hoffmann-La Roche.
3    Q   Can you give me an example of an issue
4  that fit the description you just provided?
5    A   No, I don't recall my work in any detail
6  that long ago.
7    Q   Do you recall what year you were at
8  Hoffmann-La Roche?
9    A   No, I don't recall.
10   Q   And did you work on issues that involved
11  pharmaceutical drugs at Hoffmann-La Roche?
12   A   Yes.
13   Q   Do you recall which drugs?
14   A   No, I don't recall.
15   Q   Do you recall working on Accutane while
16  you were at Hoffmann-La Roche?
17      MR. DAVIS:  Objection to form.
18      THE WITNESS:  I don't recall.
19  BY MS. AMINOLROAYA:
20   Q   Or the drug -- the generic was called
21  isotretinoin.  Do you recall that?
22   A   No, I don't recall.
23   Q   Did you work on any medical devices at
24  Hoffmann-La Roche?

Page 33

1    A  I don't recall the specific issues I
2  worked on that many years ago.
3    Q  Okay.  And after leaving
4  Hoffmann-La Roche where did you go?
5    A  I went to SmithKline Beecham.
6    Q  And what did you do at SmithKline
7  Beecham?
8    A  I was the head of state government
9  affairs.
10    Q  And what did -- what did that involve?
11    A  It involved creating a department,
12  lobbying and public policy development
13  specifically to address issues at the state level
14  for SmithKline Beecham.  And it was a startup
15  role, so I was tasked with creating a department
16  that would develop and implement public policy
17  work for the company.
18    Q  And what is public policy work?
19    A  It involves developing public policy
20  positions for the company that would benefit the
21  public health or benefits to society -- determine
22  which issues benefit society and make an important
23  contribution to society, and also benefit
24  SmithKline Beecham.

Page 34

1    Q  And who determines whether the public
2  policy that you're describing here benefits
3  society?
4    A  Lawmakers.
5    Q  And would you suggest public policies
6  that you believed would fit this description to
7  lawmakers?
8    A  Yes.
9    Q  And earlier it seemed like you made a
10  distinction between government affairs and
11  lobbying.  What is the distinction you were
12  making?
13       MR. DAVIS:  Objection to form.
14       THE WITNESS:  I was making the
15  distinction about the specific job I had at
16  Occidental where I -- I did not meet with
17  lawmakers directly.  I did the research, I
18  monitored, I wrote reports, I met with company
19  officials, but was not meeting directly with
20  elected officials.
21  BY MS. AMINOLROAYA:
22    Q  Thank you.
23       And at SmithKline Beecham, you were
24  lobbying politicians?

Page 35

1       MR. DAVIS:  Objection to form.
2       THE WITNESS:  At the beginning of my job
3  at SmithKline Beecham and through the early parts
4  of my job at SmithKline Beecham, I was lobbying
5  elected officials, but as the department grew, I
6  built a team that would do much of that work.
7  BY MS. AMINOLROAYA:
8    Q  And by lobbying, what do you mean by
9  lobbying?
10    A  Lobbying for me was determining and
11  finding issues that would benefit the public and
12  provide a societal benefit, particularly in the
13  area of public health, and then determining which
14  of those issues would benefit SmithKline Beecham,
15  and when those issues intersected, those were
16  issues that -- that we would actually approach
17  elected officials and have conversations with them
18  about.
19    Q  And who determined whether an issue
20  benefitted the public health?
21    A  Lawmakers.
22    Q  And would -- again, would you suggest a
23  public health issue to a lawmaker that you
24  believed would benefit the public health?

Page 36

1       MR. DAVIS:  Objection to form.
2       THE WITNESS:  Yes.
3  BY MS. AMINOLROAYA:
4    Q  And you would try in your lobbying
5  efforts -- or what were your lobbying efforts when
6  you were suggesting a public health issue or a
7  public policy, excuse me, that would benefit the
8  public health, what were you doing to lobby the
9  politician?
10       MR. DAVIS:  Objection to form.
11       THE WITNESS:  We would provide them with
12  facts and data.
13  BY MS. AMINOLROAYA:
14    Q  Would you do anything else?
15    A  I don't know.
16    Q  Why don't you know?
17       MR. DAVIS:  Objection to form.
18       THE WITNESS:  That's just an open-ended
19  question.  I can't think of all of the things that
20  we might have done to lobby any particular issue.
21       Our principal activity was to provide
22  elected officials and appointed officials with
23  facts and data to support our position that what
24  we were advocating was a benefit to society,

Page 37

1    particularly in the area of public health, and to
2    put forward positions that would protect the
3    interests of patients.  So -- so the principal
4    thing we did was provide them with facts and data
5    to support a position that would protect the
6    interests of patients, public health, and -- and
7    identify the benefits to society.
8        I might also bring in experts from the
9    company, subject matter experts on particular
10   topics.  That would be another activity that --
11   that I would do.  But I can't think now of all of
12   the things I've done throughout my career, and
13   it's -- it's a pretty open-ended question.
14   BY MS. AMINOLROAYA:
15     Q   Thank you.
16         Would you hire -- would your efforts --
17   your lobbying efforts that you just described,
18   would it -- do those involve hiring outside
19   lobbying firms?
20     A   Yes.
21     Q   And did you ever hire outside lobbying
22   firms at Smithfield as part of your lobbying
23   work?
24         MR. DAVIS:  Objection to form.

Page 38

1        THE WITNESS:  Do you mean SmithKline
2    Beecham?
3    BY MS. AMINOLROAYA:
4      Q   I'm sorry.  Yes, SmithKline Beecham.
5      A   Yes, we did hire outside consultant
6    lobbyists.
7      Q   And SmithKline Beecham, is that where
8    you met Burt Rosen?
9          MR. DAVIS:  Objection to form.
10   Foundation.
11         THE WITNESS:  It is.
12   BY MS. AMINOLROAYA:
13     Q   When did you meet Mr. Rosen?
14     A   I don't recall.
15     Q   Do you recall, was Mr. Rosen an -- an
16   employee at SmithKline Beecham?
17     A   He was.
18     Q   And was he in your department?
19     A   Yes, he was.
20     Q   And what was his role there?
21     A   He was the head of government affairs.
22     Q   Did you bring him on?
23         MR. DAVIS:  Objection to form.
24         MR. NOVY:  Objection to form.

Page 39

1        THE WITNESS:  No.
2    BY MS. AMINOLROAYA:
3      Q   I believe you stated that you created
4    the government affairs department at SmithKline
5    Beecham; is that correct?
6      A   No, that's incorrect.
7      Q   I believe you testified that you were
8    the head of state government affairs?
9      A   That's correct.
10     Q   And so was Mr. Rosen the head of -- how
11   did state -- strike that.
12         How did state government affairs fit
13   with the government affairs department?
14         MR. DAVIS:  Objection to form.
15         THE WITNESS:  The state government
16   affairs department was a part of the government
17   affairs department.
18   BY MS. AMINOLROAYA:
19     Q   So did you work for Mr. Rosen then?
20     A   I did.
21     Q   Did you -- when you started at
22   Smithfield -- excuse me -- SmithKline Beecham, was
23   Mr. Rosen your boss?
24     A   Yes.

Page 40

1      Q   And did you know Mr. Rosen prior to
2    starting at SmithKline Beecham?
3      A   No.
4      Q   Was Mr. Rosen a friend?
5          MR. NOVY:  Objection to form.
6          MR. DAVIS:  Objection to form.
7          THE WITNESS:  Mr. Rosen is a friend.
8    BY MS. AMINOLROAYA:
9      Q   Did that friendship develop when you
10   were at SmithKline Beecham?
11         MR. NOVY:  Objection to form.
12         THE WITNESS:  No.
13         MR. DAVIS:  Objection to form.
14   BY MS. AMINOLROAYA:
15     Q   When did that friendship develop?
16     A   After my employment with SmithKline
17   Beecham.
18     Q   And do you get together socially with
19   Mr. Rosen?
20         MR. NOVY:  Objection to form.
21         MR. DAVIS:  Objection to form.
22         THE WITNESS:  I do.
23   BY MS. AMINOLROAYA:
24     Q   And that continues through today?

Page 41

1     MR. DAVIS:  Objection to form.
2     MR. NOVY:  Objection to form.
3     THE WITNESS:  Yes.
4   BY MS. AMINOLROAYA:
5     Q   Earlier you mentioned that you would
6   hire outside lobbyists in addition -- in addition
7   to the work that was being done in the government
8   affairs department at SmithKline Beecham.
9     Why would you hire outside lobbyists in
10  addition to the work that was being done?
11     MR. DAVIS:  Objection to form.
12  BY MS. AMINOLROAYA:
13     Q   By government affairs.
14     A   We would hire consultant lobbyists for
15  their expertise in either policy areas or
16  consultants for their expertise in a state
17  capital's government processes.
18     Q   And did lobbyists ever draft bills for
19  SmithKline Beecham?
20     MR. DAVIS:  Objection to form.
21     THE WITNESS:  I don't recall.
22  BY MS. AMINOLROAYA:
23     Q   And -- and what do you mean by your
24  explanation that -- that you hired lobbyists for

Page 42

1   their expertise in government state capital
2   processes?
3     A   Well, each state capital, as you might
4   know, is different from every other state capital
5   and state government.  So each one is unique in
6   their processes.  In the way legislation travels
7   through the government process, the way laws are
8   created, the way state agencies will implement
9   programs, each state government and each state
10  capital has unique government processes.
11     And I believe at our zenith, we had five
12  to seven employee lobbyists throughout the United
13  States, but we did not have an expert on the
14  government process in each and every state.  So it
15  was necessary oftentimes to have a consultant who
16  understood the government processes in each of the
17  state capitals and state governments.
18     Q   And could they assist with communicating
19  with politicians in state government?
20     MR. DAVIS:  Objection to form.
21     THE WITNESS:  Yes.
22  BY MS. AMINOLROAYA:
23     Q   And is that one way that you used
24  lobbyists during your time at SmithKline Beecham

Page 43

1   to help you communicate with a politician?
2     MR. DAVIS:  Objection to form.
3     THE WITNESS:  Yes.
4   BY MS. AMINOLROAYA:
5     Q   And would you use lobbyists to help you
6   set up a meeting with a politician?
7     MR. DAVIS:  Objection to form.
8     THE WITNESS:  Yes.
9   BY MS. AMINOLROAYA:
10     Q   And if you wanted, for example, to
11  discuss a -- a potential bill with a politician,
12  would you ask the lobbyists to help you set up a
13  meeting?
14     MR. DAVIS:  Objection to form.
15     THE WITNESS:  Yes.
16  BY MS. AMINOLROAYA:
17     Q   Would lobbyists ever help you with
18  the -- the scope of the work that the lobbyists
19  did for you at SmithKline Beecham, did it ever
20  involve bundling contributions for politicians?
21     MR. DAVIS:  Objection to form and
22  foundation.
23     THE WITNESS:  I don't recall.
24  BY MS. AMINOLROAYA:

Page 44

1     Q   Did lobbyists ever help -- help
2   politicians that you were seeking to obtain a
3   meeting with hold fundraising events?
4     A   I don't recall.
5     MR. DAVIS:  Objection to form.
6   BY MS. AMINOLROAYA:
7     Q   Did the lobbyists that you hired while
8   you were at SmithKline Beecham ever help with any
9   kind of fundraising for a politician that you were
10  seeking to have a meeting with?
11     MR. DAVIS:  Objection to form.
12     THE WITNESS:  I don't recall.
13  BY MS. AMINOLROAYA:
14     Q   And when you were using lobbyists to
15  communicate with politicians, were the politicians
16  aware that the lobbyists were there on your
17  behalf?
18     MR. DAVIS:  Objection to form.
19     Are you talking about during his time at
20  SmithKline Beecham or --
21     MS. AMINOLROAYA:  Yes.
22     THE WITNESS:  I would think so in almost
23  every event, although I cannot speak for the
24  lawmakers themselves.  You'd have to ask them.

Page 45

```
 1    BY MS. AMINOLROAYA:
 2        Q   And just switching gears for a moment,
 3    did you speak with Mr. Rosen about your deposition
 4    today?
 5        A   I did not.
 6        Q   Are you aware that Mr. Rosen was deposed
 7    in this litigation?
 8        A   Yes, I was aware.
 9        Q   Did you read his deposition transcript?
10        A   I did not.
11        Q   And how did you become aware that
12    Mr. Rosen was deposed?
13            MR. DAVIS:  Objection to form.
14            To the extent you know from some source
15    other than conversations you've had with counsel,
16    you can answer.  If not, I'm going to instruct you
17    not to.
18            THE WITNESS:  I've been instructed by
19    counsel not to answer that question.
20    BY MS. AMINOLROAYA:
21        Q   Okay.  And when did you become aware
22    that Mr. Rosen was deposed in this litigation?
23        A   I've been instructed by counsel not to
24    answer that question.
```

Page 46

```
 1            MR. DAVIS:  You can answer the -- the
 2    time.
 3            THE WITNESS:  In the last three weeks.
 4    BY MS. AMINOLROAYA:
 5        Q   Did you work with Mr. Rosen at any
 6    organizations?
 7            MR. NOVY:  Objection to form.
 8            MR. DAVIS:  Objection to form.
 9            THE WITNESS:  I worked with Mr. Rosen on
10    issues where there was an intersection between --
11    where we both supported the same public policy,
12    and that that public policy intersected with a
13    benefit to society, and in particular, a benefit
14    to public health and protecting patient health.
15    BY MS. AMINOLROAYA:
16        Q   And on what issues did you work with
17    Mr. Rosen?
18            MR. NOVY:  Objection to form.
19            MR. DAVIS:  Objection to form.  I think
20    it mischaracterizes his testimony.
21    BY MS. AMINOLROAYA:
22        Q   You testified that you worked with
23    Mr. Rosen on issues where there was an
24    intersection of -- where you both supported the
```

Page 47

```
 1    same public policy and that public policy
 2    inter- -- intersected with a benefit to society.
 3            On what issues did you work with
 4    Mr. Rosen?
 5        A   I don't recall --
 6            MR. DAVIS:  Same objection.
 7            THE WITNESS:  -- the specific issues.
 8    BY MS. AMINOLROAYA:
 9        Q   And did you work together in any
10    organizations?
11            MR. DAVIS:  Objection to form.
12            MR. NOVY:  Objection to form.
13            THE WITNESS:  We were both members of
14    the Pain Care Forum, but I don't recall the
15    specific issues that I worked on with Mr. Rosen.
16    BY MS. AMINOLROAYA:
17        Q   And are you both -- are you members of
18    any other organizations that Mr. Rosen is also a
19    member of?
20            MR. NOVY:  Objection to form.
21            MR. DAVIS:  Objection to form.
22            THE WITNESS:  I know of one other
23    organization, although I am not currently active
24    in that organization, and that's the organization
```

Page 48

```
 1    BCRG, which is the organization of the heads of
 2    Washington offices.  Business-Government Relations
 3    Council is -- is what I believe it's called.
 4    BY MS. AMINOLROAYA:
 5        Q   And when did you become a member of
 6    BCRG?
 7        A   I don't recall.
 8        Q   Is it -- was this -- did you become a
 9    member prior to beginning your work at Endo?
10        A   I don't recall.
11        Q   And what is the Business-Government
12    Relations Council?
13        A   It's a networking organization for the
14    heads of Washington offices of businesses.
15        Q   What kind of events does the
16    organization hold?
17            MR. DAVIS:  Objection to form,
18    foundation.
19            THE WITNESS:  They hold an annual
20    meeting and luncheons with speakers from
21    Washington, D.C.
22    BY MS. AMINOLROAYA:
23        Q   Are these events open to the public?
24        A   I don't believe they are.
```

Page 49

1  Q   When was the last time you attended an
2  event put on by this organization?
3  A   I don't recall the specifics, but it's
4  been over a year.
5  Q   Did this networking organization focus
6  on any particular issues?
7  A   No.
8  Q   Are there any other organizations that
9  both you and Mr. Rosen belong to?
10 A   Not that I recall.
11 Q   And what did you do after leaving
12 SmithKline Beecham?
13 A   After leaving SmithKline Beecham, I went
14 to work at Millennium Pharmaceuticals.
15 Q   And what did you do at Millennium?
16 A   I was the head of government affairs.
17 Q   What did you do in that role?
18 A   Government affairs.
19 Q   Can you describe what that -- what that
20 means?
21 A   I developed public policy positions for
22 the company, and then lobbied elected and
23 appointed officials on issues that would benefit
24 society, benefit the public health, and also

Page 50

1  benefit Millennium Pharmaceuticals.
2  Q   And who determined if these public
3  policy decisions -- excuse me -- if these public
4  policy positions benefitted society or the public
5  health?
6  MR. DAVIS:  Objection to form.
7  THE WITNESS:  Government officials.
8  BY MS. AMINOLROAYA:
9  Q   And would government officials approach
10 you with public policies?
11 MR. DAVIS:  Objection to form.
12 Again, is this during his time at
13 Millennium?
14 BY MS. AMINOLROAYA:
15 Q   During your time at Millennium, yes.
16 A   I don't recall.
17 Q   Would -- would you approach government
18 officials with public policy-- public policies
19 that you wanted them to support?
20 MR. DAVIS:  Objection to form.  Same
21 timing question.
22 BY MS. AMINOLROAYA:
23 Q   We're still talking about Millennium.
24 A   Yes.

Page 51

1  Q   So when you were approaching them with
2  public policies, it was because you or your
3  employer had determined that this is something
4  that they wanted the politician to support,
5  correct?
6  MR. DAVIS:  Objection to form.
7  THE WITNESS:  We approached government
8  officials during my time at Millennium when we
9  identified an issue that would benefit the public,
10 particularly in the area of public health, and
11 would be a direct benefit to patients and patient
12 health, and a benefit to Millennium.
13 BY MS. AMINOLROAYA:
14 Q   Did your work at Millennium involve
15 opioids?
16 A   No.
17 Q   Did it involve other drugs?
18 A   It did.
19 Q   Any pain medication?
20 A   No.
21 Q   And what did you do after leaving
22 Millennium?
23 A   I went to work for WellPoint.
24 Q   And what did you do at WellPoint?

Page 52

1  A   I was the head of the Washington office.
2  Q   And by Washington office, do you mean a
3  government relations office?
4  A   Yes.
5  Q   And what did you do as the head of
6  government relations for WellPoint?
7  A   I was the lead federal lobbyist.
8  Q   And was this in 2006?
9  A   I don't recall.
10 (Munroe Exhibit No. 3 was marked
11 for identification.)
12 BY MS. AMINOLROAYA:
13 Q   I'm handing you what's been marked as
14 Exhibit 3.
15 Do you recognize this as your LinkedIn
16 profile?
17 A   Yes, I do.
18 Q   And do you see on page 2 of the document
19 you've listed your Millennium Pharmaceuticals
20 position, vice president of government affairs.
21 You were there through 2006, according to this?
22 A   Yes, that's what this says.
23 Q   Okay.  Is that correct?
24 A   I don't recall the exact dates.

Page 53

1      Q    Any reason to believe this is not
2    correct?
3      A    There would be no reason to believe it's
4    not correct.
5      Q    Thank you.
6          All right.  And after leaving
7    Millennium, you went to WellPoint, as you just
8    mentioned, and were you there until November 2006?
9      A    That's what this says.
10     Q    Okay.  And what did you do after you
11   left WellPoint?
12     A    After I left WellPoint, I came to work
13   for Endo.
14     Q    Did you do anything between Endo and
15   WellPoint?
16     A    At the conclusion of WellPoint, for a
17   short period I worked at the Capitol Hill
18   Consulting Group.
19     Q    Is there any reason that's not on your
20   LinkedIn profile?
21     A    Yes.
22     Q    What is that?
23     A    There are lots of smaller, lesser jobs
24   that are not on my LinkedIn profile.  I put my

Page 54

1    primary jobs on my LinkedIn profile.
2      Q    And what did you do at Capitol Hill
3    Consulting?
4      A    I was responsible for lobbying for their
5    healthcare clients.
6      Q    Did that include opioid manufacturers?
7      A    Yes.
8      Q    And which opioid manufacturers did that
9    include?
10     A    Purdue.
11     Q    Do you recall how long you worked for
12   Purdue?
13         MR. NOVY:  Objection.
14         MR. DAVIS:  Objection to form.
15         THE WITNESS:  I have never worked for
16   Purdue.
17   BY MS. AMINOLROAYA:
18     Q    Do you recall how long you were
19   responsible for lobbying for Purdue?
20         MR. NOVY:  Objection to form.
21         MR. DAVIS:  Objection to form.
22         THE WITNESS:  I never actually lobbied
23   for Purdue.  Purdue was one of the healthcare
24   clients that Capitol Hill Consulting Group had,

Page 55

1    but they did not require my services during the
2    time that I was a consultant lobbyist.  So I never
3    actually lobbied on behalf of Purdue Pharma.
4    BY MS. AMINOLROAYA:
5      Q    Did you do any other work for -- besides
6    lobbying while you were at Capitol Hill
7    Consulting?
8      A    No.
9      Q    Did you do any work at all while you
10   were at Capitol Hill Consulting for their Purdue
11   client?
12         MR. NOVY:  Objection.
13         MR. DAVIS:  Objection to form.
14         THE WITNESS:  I don't recall doing any
15   work for Purdue during my time as a consultant
16   there.
17   BY MS. AMINOLROAYA:
18     Q    And after Capitol Hill Consulting, did
19   you go to Endo?
20     A    Yes.
21     Q    What did you do at Endo?
22     A    At Endo, I started up the government
23   relations department.
24     Q    What did Endo's government relations

Page 56

1    department do?
2          MR. DAVIS:  Objection to form.
3          THE WITNESS:  Our department at Endo
4    Pharmaceuticals, government affairs would develop
5    public policy positions based on what was -- based
6    on those public policy issues that were good for
7    society, beneficial to public health, and
8    beneficial to the patient that intersected with
9    public policy issues that were beneficial to the
10   company, and at that intersection, we would
11   develop projects on the legis-- on legislative
12   and regulatory issues to work on that would
13   benefit the patient and society.
14   BY MS. AMINOLROAYA:
15     Q    And who determined whether a public
16   policy position was good for society?
17     A    Well, ultimately, the elected and
18   appointed officials that we were speaking to, they
19   would have to make that determination based on the
20   facts and data.
21     Q    And initially, Endo's government affairs
22   department made that determination, correct?
23         MR. DAVIS:  Objection to form.
24         THE WITNESS:  No.  We identified issues

Page 57

1    which we believed were beneficial to society, the
2    public health, and beneficial to patient care that
3    intersected with issues that were also beneficial
4    to Endo, and it was those issues that we would
5    bring before lawmakers, and it was the lawmakers,
6    the elected officials, the appointed officials,
7    that would make the determination.
8    BY MS. AMINOLROAYA:
9        Q   And issues that were beneficial to Endo
10   were issues that would -- issues that were good
11   for Endo's business, correct?
12       MR. DAVIS:  Objection to form.
13       THE WITNESS:  The issues that I worked
14   on at Endo, and I can only speak in my capacity as
15   the head of government affairs, were issues that
16   were beneficial to society, beneficial to the
17   public health, those issues that benefitted the
18   patients directly, and where those issues
19   intersected with issues that were beneficial to
20   Endo, those were issues that we worked on.
21   BY MS. AMINOLROAYA:
22       Q   And the issues that you were
23   identifying, public health issues -- strike that.
24       The public policies that you just

Page 58

1    described, these were public policies that would
2    have a return on investment for Endo?
3        MR. DAVIS:  Objection to form.
4        THE WITNESS:  The issues that I worked
5    on in my capacity as the head of government
6    affairs were those issues that we identified would
7    have a benefit to society, the public health, and
8    benefits often directly to patients, and a benefit
9    to Endo.
10   BY MS. AMINOLROAYA:
11       Q   And the benefit to Endo, would that be
12   a -- in the way of product successes?
13       A   I can only speak to the issues that --
14   that I was involved with at my -- while I was
15   employed by Endo.
16       Q   Sure.
17       A   And those issues were issues that had a
18   benefit to society, the public health, often
19   directly to patient health, and a benefit to Endo.
20       Q   And my question was, the benefit to
21   Endo, does that include product success?
22       A   You'll have to ask Endo.  I'm no longer
23   an employee of Endo.
24       Q   All right.  If you can take a look at

Page 59

1    Exhibit 3.
2        Page 1 of your LinkedIn profile, it
3    states under "Endo Pharmaceuticals," created from
4    scratch and currently lead an offensive mind, a
5    proactive and high return on investment government
6    relations function focused on commercial/product
7    successes."
8        Did I read that correctly?
9        A   Let me look at this, please.
10       Q   Sure.
11       A   (Peruses document.)  Yes.
12       Q   And what did you mean by -- by this
13   statement?
14       A   Which statement?
15       Q   The statement that's highlighted for us
16   that -- that I just read.
17       A   What I have attempted to communicate
18   here and what I know to be true is that I worked
19   on issues that had a benefit to society, a benefit
20   to the public health, and a benefit to patients,
21   and I worked on those issues that intersected with
22   the interests of Endo.  And when that intersection
23   came together, those were projects we worked on.
24       Q   You would agree, sir, that there's no

Page 60

1    mention of any benefit to society in this -- in
2    the description of your role at Endo on your
3    LinkedIn profile?
4        MR. DAVIS:  Objection to form.
5        THE WITNESS:  Perspective employers who
6    might be looking at my LinkedIn profile would
7    know, and I know that they would know, that's --
8    that it is impossible to be successful at what I
9    have made my life's work without demonstrating a
10   benefit to society, a benefit to public health,
11   and a benefit to patients.  And so one is unable
12   to be successful in lobbying unless you can
13   demonstrate facts and data to support a benefit to
14   society, a benefit to public health, or a benefit
15   to the patient.
16   BY MS. AMINOLROAYA:
17       Q   But the only thing you felt was
18   important to include or to mention in this first
19   sentence in your role -- describing your role at
20   Endo was that you "created from scratch and
21   currently lead an offensive minded, proactive and
22   high return on investment government relations
23   function focused on commercial/product successes."
24   Correct?

Page 61

1      MR. DAVIS:  Objection to form,
2  foundation.
3      THE WITNESS:  I do know that the
4  projects that I worked on at Endo had a benefit to
5  society -- we believed that they had a benefit to
6  society, a benefit to the public health, a benefit
7  to patients, and where those ideals intersected
8  with the interests of Endo, that those were
9  projects that I worked on.
10 BY MS. AMINOLROAYA:
11     Q   And I -- but those -- those things are
12 mentioned nowhere on your LinkedIn profile
13 describing your role at Endo, correct?
14     MR. DAVIS:  Objection to form.
15     THE WITNESS:  My work at Endo, which I
16 can describe was work where we identified a
17 benefit to society, a benefit to the public
18 health, and a benefit often directly to the
19 patient, and it's where those issues intersected
20 with the interests of Endo that I spent my time
21 working.
22 BY MS. AMINOLROAYA:
23     Q   Thank you.  My question is more narrow
24 than that.

Page 62

1      My question is, your role at Endo, as
2  it's described on your LinkedIn profile, does not
3  mention a benefit to the public health or a
4  benefit to society, correct?
5      MR. DAVIS:  Objection to form.
6      THE WITNESS:  People of importance that
7  I cared about looking at my LinkedIn profile, I
8  felt, would know that you cannot be successful at
9  the work you do here in Washington unless you can
10 clearly demonstrate with facts and data that there
11 is a benefit to society, a benefit to public
12 health, and a benefit to the patient, and it's
13 where those principles intersected with my work at
14 Endo that I spent my time.
15 BY MS. AMINOLROAYA:
16     Q   Sir, can you stay with my question?  Are
17 those things found anywhere on your LinkedIn
18 profile, just yes or no?
19     MR. DAVIS:  Objection to form.  Asked
20 and answered several times now.
21     THE WITNESS:  I will say that the work I
22 did at Endo was focused on those public policy
23 issues where we believed there was a benefit to
24 society, a benefit to the public health, and often

Page 63

1  a direct benefit to the patient, and it's where
2  those principles intersected with the interests of
3  Endo that I spent my time.
4      MS. AMINOLROAYA:  Move to strike your
5  answer.
6  BY MS. AMINOLROAYA:
7      Q   Sir, do you understand you're under oath
8  as if you were in a court of law before Judge
9  Polster?
10     A   Yes.
11     Q   You need to answer my questions.
12     MR. DAVIS:  Parvin, he's answered this
13 question I think probably five times now.  Just
14 because you don't like his answer doesn't mean
15 he's not answering.
16     MS. AMINOLROAYA:  No, he has not
17 answered the question.  My question is, is a
18 benefit to public health or a benefit to public
19 society -- society found on the description of his
20 role at Endo in his LinkedIn profile.  He's
21 answering another question.  This is not a Sunday
22 morning talk show where he can pivot and provide
23 the answer that he wants to provide.
24     MR. DAVIS:  Just because you don't like

Page 64

1  his answer doesn't mean he needs to change it.
2  You've asked him the question several times, he's
3  given you the same answer several times.  You can
4  keep asking him the question, but the answer I
5  would imagine is not going to change.
6      MS. AMINOLROAYA:  We'll get the special
7  master on the phone if this continues.  We can
8  take a short break.
9      THE VIDEOGRAPHER:  The time is 10:18
10 a.m.  We're going off the record.
11     (Recess.)
12     THE VIDEOGRAPHER:  The time is 10:32
13 a.m., and we're back on the record.
14 BY MS. AMINOLROAYA:
15     Q   Welcome back, Mr. Munroe.  We took a
16 short break.  We're back on the record.
17     Your LinkedIn profile on page 2, if you
18 turn there, at the top of the page 2, it's the
19 last clause after the semicolon.  It states:
20 "Lead Endo teams through five Congressional
21 investigations and numerous crises."
22     What were the five Congressional
23 investigations that you led Endo through?
24 ███████████████████████████



Page 69



7     Q    And your profile continues:  "Achieved
8    two of only four technical corrections to
9    Obamacare to exempt two Endo products from
10   Medicaid rebates."
11         Which products are you referring to
12   here?
13    A    I'm trying to remember the names of the
14   products.  I remember the name of one of the
15   products.  They're both non-opioid products.  And
16   the exceptions we gained were for infused -- I'm
17   sorry, instilled and implanted products, and I
18   believe the name of one of the products is
19   Valstar, and I don't recall the name of the other
20   product.
21    Q    Thank you.
22         Then you describe yourself as "battle
23   tested."  Do you see that?
24    A    That's what this says.

Page 70

1     Q    Yes.  What does that mean?
2     A    I think it refers to my lobbying on
3    issues of controversy.
4     Q    And that's followed in the same bullet
5    by:  "Lead Endo teams through five Congressional
6    investigations and numerous crises."
7         So were these issues of controversy,
8    these five Congressional investigations for Endo?
9         MR. DAVIS:  Objection to form.

22   BY MS. AMINOLROAYA:
23    Q    But you do include the term "battle
24   tested" in the same bullet as your description of

Page 71

1    the five Congressional investigations that you led
2    Endo through, correct?
3     A    That's what this says.
4     Q    And you also mention numerous crises
5    that you led Endo through.  Which are those?
6     A    I don't recall.
7     Q    And were you responsible for particular
8    drugs in your role as senior vice president of
9    government affairs at Endo?
10    A    No.
11    Q    Did your work span all of Endo's drugs?
12         MR. DAVIS:  Objection to form.
13         THE WITNESS:  My work spanned not only
14   all of the drugs, but all of the issues that the
15   company felt had a benefit to society, a benefit
16   to public health, a benefit to patients, and a
17   benefit to Endo.  So those might be pharmaceutical
18   product issues, but many other issues as well
19   where we identified a societal benefit.
20   BY MS. AMINOLROAYA:
21    Q    And again, this benefit to society and
22   benefit to public health is mentioned nowhere in
23   the description of your job at Endo on your
24   LinkedIn profile, correct?

Page 72

1         MR. DAVIS:  Objection to form.
2         THE WITNESS:  I -- I would agree that --
3    that while it's not on my LinkedIn profile, it's
4    implicit in the work that I was doing, especially
5    the successful work, that you simply can't be
6    successful at my job without producing the facts
7    and data and convincing lawmakers and appointed
8    officials that there was a clear benefit to
9    society.
10   BY MS. AMINOLROAYA:
11    Q    What did you do when you left Endo?
12    A    I became a consultant for a short
13   period.
14    Q    Did you consult for any opioid
15   companies?
16    A    Yes.
17    Q    Which companies did you consult for?
18    A    Endo.
19    Q    When did you consult for Endo?
20    A    After leaving Endo, I consulted for
21   several months before I began my next full-time
22   employment.
23    Q    And on what issues did you consult for
24   Endo?

Page 73

1    A   My time as a consultant for Endo, I
2  spent most of that time coaching the new head of
3  government affairs, one of my former employees
4  that was left behind in the group, and most of
5  what I did was coach him on his job and monitored
6  legislative and regulatory activities and kind of
7  kept him informed of what I thought he needed to
8  be kept informed about in terms of legislative and
9  regulatory activities.
10   Q   And what is his name?
11   A   James Manser.
12   Q   Did you do any other work in your role
13  as a consultant for Endo?
14   A   No.
15   Q   Did you do any other consulting work for
16  any other companies?
17   A   Yes.
18   Q   For any companies that sell opioids?
19   A   No.
20   Q   For any companies that distribute
21  opioids?
22   A   No.
23   Q   For any other organizations that
24  interact with opioids?

Page 74

1       MR. DAVIS:  Objection to form.
2       THE WITNESS:  I did do executive
3  coaching for an employee of a company that has a
4  pipeline product in the addiction recovery space.
5  And that company's pipeline product, which is not
6  yet approved by the FDA, does contain an opioid
7  substance, buprenorphine.
8  BY MS. AMINOLROAYA:
9    Q   Thank you.
10       And now at Bausch Health, do you -- does
11  your work there involve opioids?
12   A   No.
13   Q   And why did you leave Endo?
14   A   I left Endo because Endo was going
15  through a restructuring and made a decision to
16  close the Washington office to reduce operating
17  expense.
18   Q   Did you enter into a separation
19  agreement with Endo?
20   A   I did.
21   Q   Are you testifying today pursuant to
22  your separation agreement?
23       MR. DAVIS:  Objection to form.
24       THE WITNESS:  I'm here to be responsive

Page 75

1  to the subpoena.
2  BY MS. AMINOLROAYA:
3    Q   Does your separation agreement require
4  you to testify?
5    A   Not explicitly.  The separation
6  agreement, as I understand it, requires me to
7  cooperate with the company on reasonable levels of
8  issue -- at a reasonable level of issues,
9  including litigation.
10   Q   Are you being paid for your time today
11  by Endo?
12   A   I am not.
13   Q   Did Endo's government affairs department
14  do lobbying?
15       MR. DAVIS:  Objection to form.
16       THE WITNESS:  Yes.
17  BY MS. AMINOLROAYA:
18   Q   And what -- what did the lobbying work
19  that Endo's government affairs department did when
20  you were in the department involve?
21   A   So we would identify issues that were
22  beneficial to society, particularly those issues
23  that were of benefit to public health and a
24  benefit to patients, or issues that would protect

Page 76

1  the physicians' prescribing authority to prescribe
2  the right medication to the right patient at the
3  right time to the appropriate patient, we would
4  identify those issues that had this societal
5  benefit, and where they intersected with Endo's
6  interests, we would work on those issues.
7  BY MS. AMINOLROAYA:
8    Q   You would agree that if a physician
9  can't prescribe one of Endo's products, that's --
10  that's not good for Endo's business?
11       MR. DAVIS:  Objection to form.
12       THE WITNESS:  We believed, and I can
13  only speak in my role in government affairs and
14  the role that I played, that we sought to protect
15  a physician's right to prescribe the right drug,
16  any drug, any company's drug, so long as it was
17  the right drug for that patient's best healthcare
18  needs.  And so that was very much a priority to
19  have this patient-centered approach, and to
20  protect a physician's right to -- to make that
21  decision with the patient.
22  BY MS. AMINOLROAYA:
23   Q   And a physician's right to prescribe a
24  drug, it's beneficial for Endo, correct?

Page 77

1    MR. DAVIS:  Objection to form.
2    THE WITNESS:  We thought the primary
3  benefit -- you're asking about benefit, which I --
4  which I think is important.  Our focus was on
5  protecting the physician's right to prescribe the
6  right medication.  That was really our focus,
7  and -- and we thought it was important then, and I
8  imagine that it's -- it remains important to the
9  company.
10  BY MS. AMINOLROAYA:
11    Q    So your focus in government affairs was
12  protecting a physician's right to prescribe the
13  right medication; is that correct?
14    A    Well, we identified issues that were --
15  that had a societal benefit, particularly in the
16  area of public health, and would have a,
17  oftentimes, direct benefit on the patient, and
18  where those issues intersected with the interests
19  of Endo, those were the issues that I worked on.
20    Q    And again, if a physician could not
21  prescribe one of Endo's products, you would agree
22  that that would be negative for Endo's business
23  goals?
24    MR. DAVIS:  Objection to form,

Page 78

1  foundation.
2    THE WITNESS:  We believed that it was
3  very important for the best interests of the
4  patient to have the physician have the ability to
5  prescribe the right medication for that patient's
6  best healthcare needs.  And that was our focus and
7  that was our priority.
8  BY MS. AMINOLROAYA:
9    Q    Is being profitable a goal that Endo
10  has?
11    A    Yes.  We were a commercial enterprise
12  while I worked there, and I think they're still a
13  commercial enterprise.  So I think while it was
14  important, we did not work on issues that were
15  solely issues driven by Endo's profit.  We worked
16  on issues where Endo's interests were intersecting
17  with those issues that had a benefit to society,
18  public health, and the patient's best healthcare
19  needs and interests.
20    Q    And did Endo's lobbying activities in
21  this department, did it include writing
22  legislation?
23    MR. DAVIS:  Objection to form,
24  foundation.

Page 79

1    THE WITNESS:  Sometimes it did.
2  BY MS. AMINOLROAYA:
3    Q    And did it include providing drafts of
4  legislation to legislative staff?
5    MR. DAVIS:  Objection to form.
6    THE WITNESS:  Yes.
7  BY MS. AMINOLROAYA:
8    Q    Did Endo's lobbying efforts include
9  hosting legislators in meetings?
10    A    I don't know what you mean by the term
11  "hosted."
12    Q    Did Endo either directly -- or strike
13  that.
14    Did Endo ever invite legislators to
15  meetings at places other than legislators'
16  offices?
17    A    I don't recall.
18    Q    Was that something that you've ever done
19  throughout your career?
20    A    I have invited legislators, constituent
21  members of Congress, and state legislators that
22  are constituent members of the -- the state
23  legislatures to our Endo facilities so that they
24  could better understand the technologies and the

Page 80

1  products that -- that serve the important patients
2  needs that my companies have -- have made over the
3  years.
4    Q    And when did you invite legislators to
5  Endo's facilities?
6    A    I don't recall.
7    Q    And did you invite legislators to Endo's
8  facilities to learn about any particular opioid
9  products?
10    A    I don't recall.
11    Q    Any other products?
12    A    We invited legislators, particularly
13  constituent members of Congress and constituent
14  members of the state legislature, to tour
15  facilities at companies that I've worked at over
16  the years to discuss Endo's, or any company that I
17  worked at, products and services so that they
18  could better understand, you know, the
19  technologies and products that were coming forward
20  from the company I was working at, and for which
21  they represented in Congress or the state
22  legislature.
23    Q    Did your work as a lobbyist for Endo
24  include bundling contributions for politicians?

Page 81

```
 1          MR. DAVIS:  Objection to form.
 2   Foundation.
 3          THE WITNESS:  I don't recall.
 4   BY MS. AMINOLROAYA:
 5      Q   What does -- what does "bundling
 6   contributions" mean?
 7          MR. DAVIS:  Objection to form.
 8          THE WITNESS:  My understanding is that
 9   that's a legal term, and -- and I'm not an FEC
10   lawyer and I don't want to speculate about what
11   the legal definition of that term is.
12   BY MS. AMINOLROAYA:
13      Q   Did your -- did your responsibility as a
14   lobbyist for Endo include finding donors to make
15   contributions to politicians?
16          MR. DAVIS:  Objection to form.
17          THE WITNESS:  I don't recall.
18   BY MS. AMINOLROAYA:
19      Q   Have you ever done this at any of your
20   jobs over the years?
21      A   I don't recall.
22      Q   Did your responsibilities as a lobbyist
23   for Endo include hosting receptions for
24   politicians?
```

Page 82

```
 1      A   What do you mean by "hosting"?
 2      Q   Hosting.  Where Endo is the one putting
 3   on the event.
 4          MR. DAVIS:  Objection to form.
 5          THE WITNESS:  I don't recall.
 6   BY MS. AMINOLROAYA:
 7      Q   And did your responsibilities as a
 8   lobbyist for Endo include lobbying the executive
 9   branch?
10      A   They did.
11      Q   And during your time at Endo, which
12   parts of the executive branch did you lobby?
13      A   I don't recall.
14      Q   Did your responsibility as a lobbyist
15   for Endo include lobbying to advocacy groups?
16          MR. DAVIS:  Objection to form.
17          THE WITNESS:  I would not characterize
18   my work with advocacy groups as lobbying.  Where
19   there was an intersection between public policy
20   issues that were a benefit to society,
21   particularly in the areas of public health or a
22   benefit to the patient, and those interests
23   intersected with Endo's, and independent third-
24   party organizations had the same -- had come to
```

Page 83

```
 1   the same conclusion on those same issues, those
 2   were issues that -- that would have brought us
 3   into contact.
 4   BY MS. AMINOLROAYA:
 5      Q   And which independent third-party
 6   organizations did you come into contact with
 7   during your time at Endo?
 8      A   I don't recall each and every one.
 9      Q   Do you recall any of them?
10      A   I do recall the American Cancer Society.
11      Q   Do you recall any other third-party
12   organizations that you interacted with during your
13   time at Endo?
14      A   Yes.
15      Q   And which are those?
16      A   The Pain Care Coalition.  The American
17   Pain Foundation.  The Alliance for Aging Research.
18   Those are the ones that are top of mind.
19      Q   And do you recall that Endo provided
20   financial support to the American Pain Foundation?
21      A   I do recall that.
22
23
24
```

Page 84

```
 1          MR. DAVIS:  Objection to form.
 2   BY MS. AMINOLROAYA:
 3      Q   Did your job at Endo include putting
 4   together communication strategies for the media?
 5          MR. DAVIS:  Objection to form.
 6          THE WITNESS:  That was certainly not a
 7   principal part of my job.  That was another
 8   department.  I might have had views about what the
 9   company should do infrequently, but that was not
10   my department.
11          MS. AMINOLROAYA:  May I have 1785,
12   please.
13          MR. DAVIS:  Do you mind not putting the
14   exhibits on the screen until the witness has the
15   document in front of him, please.  Thank you.
16          (Munroe Exhibit No. 4 was marked
17          for identification.)
18   BY MS. AMINOLROAYA:
19      Q   I'm handing you Exhibit 4.  This is an
20   e-mail from you.  And for the record, this is
21   ENDO-OPIOID_MDL-02210739.  It's E number 1785.
22   This is an e-mail from you to colleagues at Endo,
23   including Lankau and others, dated January 11,
24   2008.
```

Page 85

```
 1        And you state:  "Attached for your
 2   review are materials that I will use at our
 3   discussion next week."
 4        January 11th, 2008, how long had you
 5   been at Endo at this point?
 6      A   I don't recall, but it couldn't have
 7   been very long.
 8      Q   So this -- just to orient us, this is at
 9   the beginning of your career at Endo.
10      A   That sounds right.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Page 86

Page 87

Page 88











Page 105

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 106

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 107

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 108

```
 1
 2
 3
 4
 5
 6
 7        MS. AMINOLROAYA:  Can I have 1761,
 8   please.
 9             (Munroe Exhibit No. 6 was marked
10             for identification.)
11   BY MS. AMINOLROAYA:
12      Q   I'm handing you what's been marked as
13   Exhibit 6.  It's entitled "3 Waves of the Rise of
14   Opioid Overdose Deaths."  And the source of this
15   is the National Vital Statistics System Mortality
16   File.
17             Are you familiar with the National Vital
18   Statistics System?
19      A   No.
20      Q   Are you familiar with the -- the opioid
21   overdose problem in the country?
22             MR. DAVIS:  Objection to form.
23             THE WITNESS:  Only what I read about in
24   the press.
```

Page 109

BY MS. AMINOLROAYA:

Q   Have you ever visited the CDC's website?

A   I have.

Q   Have you ever seen any material on the CDC's website reflecting the opioid overdoses in the country?

A   I don't recall.

Q   Have you ever attended Congressional hearings discussing the opioid epidemic?

A   I don't recall.

Q   Have you ever attended meetings discussing the opioid epidemic?

A   Yes.

Q   So this document is entitled "3 Waves of the Rise in Opioid Overdoses."

And you started at Endo in 2007; is that correct?

A   I don't recall.

Q   According to your LinkedIn profile, it states you started at Endo in 2007.  Any reason to believe that's incorrect?

A   No.

Q   Okay.  So let's take a look at this chart.

Page 110

Do you see three lines here -- three colored lines on this chart?

A   I do.

Q   All right.  And what is Wave 1, according to this chart?

A   I have never seen this chart before.  I don't know what the information says, and so I don't really want to talk about a document that I'm unfamiliar with.

I'm not an epidemiologist, I'm not a scientist, I'm not a physician, I'm not a statistician, and I don't want to speculate about a document that I'm seeing for the first time that has lines and -- and dates and numbers and what looks like statistical analysis.  So my preference is to just not speculate about the information on this document.

Q   Mr. Munroe, do you see the word "Wave 1" in purple on the left-hand side of this document, the lower left side of the document?

MR. DAVIS:  Objection to form.

THE WITNESS:  That -- that's what it says.

BY MS. AMINOLROAYA:

Page 111

Q   Okay.  And does it state:  "Rise in prescription opioid overdose deaths"?

A   That's what that says.

Q   All right.  And does the chart start in 1999?

A   I don't want to talk about the information on the chart because I'm just unfamiliar with it, and I don't understand it and I don't know what it means, and this is the first time I'm seeing this information.

Q   Are you saying you don't want to answer my question, Mr. Munroe?

A   I do very much want to say that I'm not a statistician, an epidemiologist, a physician, a scientist, or someone who could interpret this information in a meaningful way.  And I don't want to speculate about a document that I've never seen before.  That -- that would be my preference.

Q   Sir, I'm not -- I'm not asking you to speculate.  I'm asking you whether the first year on this chart is 1999.

MR. DAVIS:  Objection to form.

THE WITNESS:  I don't want to talk about the numbers on the chart.  There's numbers on the

Page 112

side, there's numbers on the bottom.  I don't want to speak to a chart that I'm seeing for the first time because I just don't understand it and I haven't had a chance to study it.

MS. AMINOLROAYA:  Would the court reporter mark the record.

BY MS. AMINOLROAYA:

Q   And the first purple -- the first box on the left-hand corner here states:  "Wave 1, rise in opioid -- rise in prescription opioid overdose deaths."  Correct?

A   That's what that says.

Q   And that covers 1999 to 2005, correct?

MR. DAVIS:  Objection to form.

THE WITNESS:  I don't want to talk about what -- what that means, because I'm not an epidemiologist, a statistician, a scientist, a physician.  I've not studied this document.  This is the first time I'm seeing this document.  And I don't want to begin to interpret, you know, the relevance of the dates or -- or other information on the chart since this is my first time seeing it, and I haven't studied the document.

BY MS. AMINOLROAYA:

Page 113

1    Q   And 2007 is when you began at Endo.  And
2   do you see on the left -- the left side of this
3   document, it states:  "Deaths per 100,000
4   population"?
5    A   I disagree with your connecting my
6   employment date at Endo with -- with deaths,
7   and -- and I disagree with that wholeheartedly.
8        I worked on issues at Endo in my role in
9   government affairs where there was an intersection
10  between what we identified as being beneficial to
11  society, the public health or the patient, and the
12  interests of Endo.  So I disagree with your
13  characterization and -- and the connection of my
14  employment date with this chart.
15   Q   Sir, my question was, do you see on the
16  left side of this document, it states:  "One" --
17  it states:  "Deaths per 100,000 population"?
18   A   That's what's written along the side
19  here, yeah.
20   Q   Thank you.
21       And do you see that in 2007, the purple
22  line, which refers to commonly prescribed opioids,
23  natural and semisynthetic opioids, and methadone
24  for 2007 corresponds with four deaths per 100,000

Page 114

1   population?
2        MR. DAVIS:  Objection to form.
3        THE WITNESS:  I absolutely do not want
4   to draw any conclusions about this document that
5   I'm seeing for the first time.  I am neither an
6   epidemiologist, a scientist, a physician, or a
7   statistician.
8        So I don't -- I don't recognize the
9   source of this document.  I've not seen this
10  document before, and I don't want to begin to
11  speculate the meaning of this document and the
12  data.
13  BY MS. AMINOLROAYA:
14   Q   Is Opana ER a commonly prescribed
15  semisynthetic opioid?
16       MR. DAVIS:  Objection to form.
17       THE WITNESS:  I was not in product
18  development, scientific affairs, research and
19  development.
20       In my role in government affairs, I
21  wouldn't have been able to categorize the nature
22  of our -- our products and their chemical makeup.
23  That was just not -- that was beyond the scope of
24  my position at Endo.

Page 115

1   BY MS. AMINOLROAYA:
2    Q   Is Opana ER or was Opana ER a commonly
3   prescribed opioid?
4        MR. DAVIS:  Objection to form.  He just
5   answered that question.
6        THE WITNESS:  I think the word
7   "commonly" is something that -- that I would be
8   unfamiliar with, because you would associate
9   "commonly" with some sort of percentage within the
10  opioid market, and again, that was beyond the
11  scope of my job.  So I would not have the
12  information necessary to answer that question
13  adequately.
14  BY MS. AMINOLROAYA:
15   Q   Would you agree that in 2007, the deaths
16  per 100,000 population for commonly prescribed
17  opioids was four?
18       MR. DAVIS:  Objection to form.
19       I think Mr. Munroe has been clear that
20  he can't interpret this chart.  If you want him to
21  read the words that are on this piece of paper,
22  I -- we can do that, but having him interpret this
23  data is something I think he has told you several
24  times he's unprepared and unable to do.

Page 116

1   BY MS. AMINOLROAYA:
2    Q   Mr. Munroe, are you having difficulty
3   seeing where the purple line is in 2007 on this
4   page?
5    A   I am not having difficulty seeing the
6   purple line.
7    Q   Is the purple line at the number 4?
8        MR. DAVIS:  Objection to form.
9        Answer one more time.
10       THE WITNESS:  I don't want to answer a
11  question about a document and begin interpreting
12  it, because I'm not an epidemiologist, a
13  scientist, a physician, or a statistician.  And I
14  don't want to interpret a document that I'm seeing
15  for the first time in which I don't even recognize
16  the source of the data or the underlying data, and
17  I've not studied this document.  And so my
18  preference is not to speculate about the
19  information in the document.
20  BY MS. AMINOLROAYA:
21   Q   Mr. Munroe, earlier you testified that
22  Endo put the patients' interests first, and its
23  public policy -- strike that.
24       Earlier you testified that in selecting

1 public policy matters to pursue, Endo put the
2 patients' interests first and the benefits to
3 society first.
4     Do you recall the many times you
5 testified to that?
6     MR. DAVIS: Objection to form.
7     THE WITNESS: I -- I testified that we
8 worked on issues that were benefits to society,
9 public health, and the patients that also
10 benefitted Endo, and where those two sets of
11 principles intersected, those were the issues that
12 we worked on.
13 BY MS. AMINOLROAYA:
14    Q   Do you recall in 2007, prior to
15 beginning at Endo, abuse of OxyContin was -- was
16 well known?
17     MR. DAVIS: Objection to form.
18     MR. NOVY: Objection to form.
19     THE WITNESS: I have never been an
20 employee of Purdue Pharma, and so I have no
21 knowledge of those issues relating to OxyContin.
22 So I can't speak for Purdue.
23 BY MS. AMINOLROAYA:
24    Q   Did you ever do any consulting work for

1 Purdue?
2     MR. DAVIS: Objection to form.
3     THE WITNESS: Purdue was a client of the
4 Capitol Hill Consulting Group during the time I
5 was a consultant lobbyist at the Capitol Hill
6 Consulting Group, but I do not recall doing any
7 work for the Purdue account.
8     (Counsel conferring.)
9     (Munroe Exhibit No. 7 was marked
10     for identification.)
11 BY MS. AMINOLROAYA:
12    Q   I'm handing you what's been marked as
13 Exhibit 7 to your deposition.  This is
14 PPLC018000 --
15     MR. DAVIS: Do you have another one?
16 BY MS. AMINOLROAYA:
17    Q   -- 141199.
18     MR. DAVIS: Have another one?
19     MS. AMINOLROAYA: Yes.
20 BY MS. AMINOLROAYA:
21    Q   It's E number 1743.
22     And in May of 2007, is Mr. Rosen of
23 Purdue asking you whether you should visit at the
24 appropriate time with anyone listed?

1    A   I don't recall this document at all.
2 It's a 12-year-old e-mail.  I have no idea what
3 this is about.
4    Q   And does this page -- does -- does this
5 e-mail from Mr. Rosen state:  "Let's discuss
6 whether we should visit at the appropriate time
7 with anyone listed.  Thanks for yesterday"?
8    A   That's what this says.
9    Q   All right.  And is -- is your name in
10 the "to" line here?
11    A   Yes.  Two names.
12    Q   And is the date of this e-mail May 11,
13 2007?
14    A   Yes, that's what this says.
15    Q   And does page 3 of this document list
16 current members of the Congressional Caucus on
17 Drug Policy?
18    A   That's what this says.
19    Q   And is your -- is your response to
20 Mr. Rosen on page 1 of the document:  "Would it be
21 worth trying to get one of our friends to join
22 this caucus to," quote, "ensure the government's
23 appropriate and measured response based on medical
24 facts and data to the nation's drug policies," end

1 quote, question mark, hyphen, "both as a mole and
2 as an insider to make this group doesn't
3 overreach.  Thanks, Brian"?
4    A   That's what that says.
5    Q   Thank you.
6     And does Mr. Rosen respond:  "Like the
7 idea.  Do you suggest anyone"?
8    A   Again, I don't recall this e-mail
9 exchange at all.  The only thing that strikes a
10 chord for me is where it says "facts and data to
11 the nation's drug policies," because that's
12 something that I built a career around, which is
13 providing facts and data to government officials
14 so that we can land on issues that are benefits to
15 society, public health, and a benefit to the
16 patient where they intersect with our -- my own
17 company's goals.
18     So that -- that statement about facts
19 and data and providing facts and data, that
20 strikes a chord with me, but I don't remember this
21 e-mail exchange at all.
22     MS. AMINOLROAYA: Move to strike
23 everything in his last answer.
24     And would the court reporter please mark

Page 121

1  the record.
2       (Munroe Exhibit No. 8 was marked
3       for identification.)
4  BY MS. AMINOLROAYA:
5       Q   It's Exhibit 8.  E1777 and
6  PPLPC019000154246.
7       And is this an e-mail from Burt Rosen to
8  you and two other individuals at Capitol Hill
9  Consulting Group dated July 20th, 2007?
10      A   That's what this says.
11      Q   All right.  And does Mr. Rosen write to
12 you:  "Can you discreetly check to see if Senate
13 Judiciary is planning any kind of drug abuse
14 hearing on July 31st?"
15      A   That's what this says.
16      Q   And is the -- is there an article
17 included in the body of the e-mail?
18      A   It appears that that's the case,
19 although I have no memory of this e-mail.  Bill
20 Brewster was not only the chairman of the firm,
21 but he was the longtime contract lobbyist for
22 Purdue Pharma.
23      So I was a healthcare practitioner at
24 the firm so I was included on this e-mail, but --

Page 122

1  but Bill was the principal recipient of this
2  e-mail.  And I don't recall it in any regard.
3       MS. AMINOLROAYA:  Move to strike as
4  nonresponsive.
5  BY MS. AMINOLROAYA:
6       Q   My question was, is there an article
7  included in the body of the e-mail, and is it --
8  is it entitled "Mother to face those she blames.
9  Woman's death tied to OxyContin.  Drug exec
10 sentenced today"?
11      A   That's what that says.
12      Q   Thank you.
13      And was Mr. Rosen here asking you and
14 your colleagues at Capitol Hill Consulting Group
15 to see if the Senate Judiciary was planning any
16 kind of drug abuse hearing on July 31st?
17      MR. NOVY:  Objection to form.
18      MR. DAVIS:  Objection to form.
19      THE WITNESS:  Well, that's what this
20 says, and it would not have been unusual for a
21 company lobbyist to make inquiries about what
22 Congressional hearings of various healthcare
23 related committees or other committees of Congress
24 might be holding in the future.  That would be a

Page 123

1  very routine kind of request.
2       (Munroe Exhibit No. 9 was marked
3       for identification.)
4  BY MS. AMINOLROAYA:
5       Q   I'm handing you what's been marked as
6  Exhibit 9.  PPLPC023000118882.  It's also
7  E-numbered 1739.
8       And is the subject of this e-mail
9  "Invoice from Consultant Munroe"?
10      A   I don't recognize this in any regard.
11      Q   Is the subject of this e-mail "Invoice
12 from Consultant Munroe"?
13      A   Yes.
14      Q   Okay.  And does Mr. Rosen write to the
15 recipients here:  "Brian Munroe is a government
16 affairs consultant.  I had the opportunity to hire
17 him as a consultant for a three-month period at
18 $5,000 per month.  In this time frame he assisted
19 me in my capacity as the VP Federal Government
20 Affairs."
21      Is that what Mr. Rosen states here?
22      A   Yes.
23      Q   And does he continue:  "Together we
24 reviewed an organization that I helped found.  The

Page 124

1  group is the Pain Care Forum, which is organized
2  around several pharmaceutical companies, pain
3  advocacy groups, pain groups, healthcare
4  professionals and hospice organizations"?
5       A   That's what this says.
6       Q   And does it continue:  "Brian Munroe has
7  had past experience with forming similar
8  coalitions, and he has given me several
9  suggestions for growing the Pain Care Forum and
10 for strengthening its effectiveness"?
11      A   That's what this says.  But this e-mail
12 was not to me and I didn't receive it, and I don't
13 recognize it at all.
14      Q   Did you consult for Mr. Rosen in 2007
15 regarding the Pain Care Forum?
16      A   I don't recall doing that.
17      Q   Do you have any reason to believe that
18 Mr. Rosen's e-mail is not accurate?
19      A   I just don't know what this e-mail is
20 about.  I don't know whether it was about a
21 prospective consultant opportunity.  I don't
22 recall consulting for Burt.  So I -- I simply
23 don't recall, and I've never seen this e-mail
24 before in my life.

## Page 125

1    Q   Well, the e-mail states, fourth
2   sentence: "And together we reviewed an
3   organization that I helped found."
4        Right?  So you would agree that's the
5   past tense?
6    A   I don't want to comment on this e-mail.
7   This e-mail is not any e-mail that I received.
8   I've never seen it before, so I don't want to try
9   and interpret it.
10    Q   You would agree that here Mr. Rosen is
11   stating that you and he reviewed an organization
12   called the Pain Care Forum, and that he provided
13   you with suggestions for growing -- or, rather,
14   that you provided him with grow- -- with
15   suggestions for growing the Pain Care Forum and
16   strengthening its effectiveness?
17    A   You'd have to ask Mr. Rosen.
18    Q   Do you have any reason to believe that
19   Mr. Rosen would write an e-mail that misrepresents
20   work that you've done for him, and submit that
21   e-mail or submit an invoice --
22    A   You would have to ask --
23    Q   -- to the company?
24    A   You would have to ask Mr. Rosen.  I

## Page 126

1   don't know what his intentions are.
2    Q   And you know Mr. Rosen fairly well;
3   isn't that correct?
4        MR. DAVIS:  Objection to form.
5        MR. NOVY:  Objection to form.
6        THE WITNESS:  I do know him well.
7   BY MS. AMINOLROAYA:
8    Q   Do you know him to misstate facts?
9        MR. DAVIS:  Objection to form.
10        MR. NOVY:  Objection.
11        THE WITNESS:  I don't want to comment
12   and interpret an e-mail that Burt sent to some
13   other individual that I don't know.  I don't
14   understand the content of this e-mail.  So I don't
15   want to begin to speculate on an interpretation on
16   a 12-year-old e-mail of which I never received.
17   BY MS. AMINOLROAYA:
18    Q   Do you know who Ms. Shaw is?
19    A   Yes.
20    Q   Who is Ms. Shaw?
21    A   Ms. Shaw is Burt's assistant in the
22   Washington office.
23    Q   Thank you.
24        MR. DAVIS:  We're a little bit over an

## Page 127

1   hour and a half.  It's after noon.  Do you mind if
2   we take a break here?
3        MS. AMINOLROAYA:  I'm just about to go
4   through another document.  I think we can take a
5   break after that.
6        MR. DAVIS:  How long do you think you're
7   going to have with the document?
8        MS. AMINOLROAYA:  I won't be very long.
9   BY MS. AMINOLROAYA:
10    Q   And you and Mr. Rosen were close,
11   correct?
12        MR. DAVIS:  Objection to form.
13        THE WITNESS:  In what regard?
14   BY MS. AMINOLROAYA:
15    Q   Well, you're friends.
16    A   We are friends.
17    Q   And -- and you have no reason to
18   believe -- do you have no reason -- you have no
19   reason to believe that Mr. Rosen would
20   inaccurately state facts?
21        MR. DAVIS:  Objection to form.
22        THE WITNESS:  I don't want to speculate
23   on a document, on a 12-year-old e-mail, that I've
24   never seen and that I did not receive.

## Page 128

1        So, my answer remains the same.  I don't
2   want to speculate on a document that's 12 years
3   old and an e-mail that I've never seen.
4   BY MS. AMINOLROAYA:
5    Q   And my question is not with respect to
6   the document at this time.
7        My question is, do you have any reason
8   to believe that Mr. Rosen would inaccurately state
9   facts?
10        MR. DAVIS:  Objection to form.
11        THE WITNESS:  I have found Mr. Rosen to
12   be a -- man of high integrity.
13        MS. AMINOLROAYA:  We can take a break.
14        THE VIDEOGRAPHER:  The time is 12:08
15   p.m., and we are going off the record.
16        (Lunch recess.)
17        THE VIDEOGRAPHER:  The time is 12:46
18   p.m., and we're back on the record.
19   BY MS. AMINOLROAYA:
20    Q   Welcome back, Mr. Munroe.  We took a
21   lunch break.  We're back on the record.
22        In 2009, did the FDA announce that it
23   would make a REMS requirement for opioids?
24    A   I don't --



Page 129

1       MR. DAVIS: Objection to form.
2       THE WITNESS: -- remember the date.
3   BY MS. AMINOLROAYA:
4       Q   At a certain point during your tenure at
5   Endo, did FDA announce that a REMS would become
6   applicable to opioids?
7       MR. DAVIS: Objection to form.
8   Foundation.
9       THE WITNESS: I don't -- I don't recall
10  what FDA was doing ten years ago.
11  BY MS. AMINOLROAYA:
12      Q   Are you familiar with the term "REMS"?
13      A   I am.
14      Q   And what is a REMS?
15      A   REMS stands for Risk Evaluation
16  Mitigation Strategies.
17
18
19
20
21
22
23
24

Page 131

1
2
3
4
5       MS. AMINOLROAYA: Let me have 1998,
6   please.
7   BY MS. AMINOLROAYA:
8       Q   And would you agree that in 2009
9   prescription opioid and misuse was continuing to
10  grow in the United States?
11      MR. DAVIS: Objection to form.
12  Foundation.
13      THE WITNESS: While I would like to
14  answer the question directly, I'm just not in a
15  position to, given the fact that I'm not an
16  epidemiologist, a statistician, a physician, or a
17  scientist that's really studied these issues in
18  any detail.
19      (Munroe Exhibit No. 11 was marked
20      for identification.)
21  BY MS. AMINOLROAYA:
22      Q   I'm handing you what's been marked as
23  Exhibit 11.
24



Page 137

Page 138

| | |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6  BY MS. AMINOLROAYA: |
| 7 | 7     Q   You testified earlier that Endo worked |
| 8 | 8  on strategies that put patient interests first, |
| 9 | 9  correct? |
| 10 | 10     A   I testified that our priority was to |
| 11 | 11  identify public policy issues where there was a |
| 12 | 12  benefit to society, a benefit to the public |
| 13 | 13  health, and/or a benefit to patients, and to work |
| 14 | 14  on those issues where those principles intersected |
| 15 | 15  with the interests of Endo. |
| 16 | 16     Q   So you would agree that it's a benefit |
| 17 | 17  to society that people don't die from opioid |
| 18 | 18  overdoses? |
| 19 | 19        MR. DAVIS:  Objection to form. |
| 20 | 20        THE WITNESS:  I am -- I would absolutely |
| 21 | 21  agree that that would be a benefit to society. |
| 22 | 22  That seems to be a common sense position that we |
| 23 | 23  don't want people overdosing and dying. |
| 24 | 24  BY MS. AMINOLROAYA: |

Page 139

1     Q   But you don't know if Endo ever
2  considered stopping sales of its opioids.
3        MR. DAVIS:  Objection to form.
4        THE WITNESS:  I don't know.
5  BY MS. AMINOLROAYA:
6     Q   And prior to 2016, did Endo ever stop
7  marketing its prescription opioids?
8        MR. DAVIS:  Objection to form,
9  foundation.
10        THE WITNESS:  I don't know the date that
11  Endo stopped marketing its opioid products.
12  BY MS. AMINOLROAYA:
13     Q   Did Endo market its opioid products --
14        MR. DAVIS:  Objection to form.
15  BY MS. AMINOLROAYA:
16     Q   -- as a general matter?
17        MR. DAVIS:  Objection to form,
18  foundation.
19        THE WITNESS:  I actually -- as much as I
20  would like to answer that question very directly,
21  I'm just not in a position to, because I was not
22  in the commercial organization, and I don't want
23  to speak to, you know, what we marketed and how we
24  marketed it, because that was just outside the

Page 140

1  scope of my position.
2  BY MS. AMINOLROAYA:
3     Q   And I'm just -- I'm not asking you for
4  specifics or what type of marketing was done.  I'm
5  asking you whether you know if Endo marketed its
6  opioids.
7        MR. DAVIS:  Objection to form,
8  foundation.
9        THE WITNESS:  Yes, you're using the term
10  "opioids," plural.  So I don't know if Endo
11  marketed opioids, plural.  I do not know the
12  answer to that question.
13  BY MS. AMINOLROAYA:
14     Q   Do you know if Endo marketed Opana ER?
15        MR. DAVIS:  Objection to form.
16        THE WITNESS:  My understanding was that
17  they did market Opana ER.
18  BY MS. AMINOLROAYA:
19
20
21
22
23
24



Page 141

1    BY MS. AMINOLROAYA:

19    BY MS. AMINOLROAYA:
20        Q    In light of the public health crisis
21    with prescription opioids, did Endo ever advocate
22    that states adopt prescribing guidelines like the
23    CDC's guidelines?
24            MR. DAVIS:  Objection to form.

Page 142

1            THE WITNESS:  I don't recall what our --
2    what our activities were in the states.  I had
3    somebody who reported me -- to me handle state
4    government affairs, and so I don't want to speak
5    to details that I really don't recall.
6    BY MS. AMINOLROAYA:
7        Q    Do you recall whether Endo ever
8    advocated for federal agencies to adopt opioid
9    prescribing guidelines like the CDC's guidelines?
10            MR. DAVIS:  Objection to form.
11            THE WITNESS:  No, I don't recall.
12    BY MS. AMINOLROAYA:

Page 143

13            (Counsel conferring.)
14    BY MS. AMINOLROAYA:
15        Q    Mr. Munroe, earlier we talked about the
16    Pain Care Forum.  What is the Pain Care Forum?
17        A    The Pain Care Forum, I think, is -- is
18    accurately named in that it was a forum, a place
19    where people could gather, organizations could
20    gather, that were interested in -- in balancing
21    the needs of the pain patient and the interests of
22    the pain patient with the interests of mitigating
23    the misuse and abuse of pain medicines.  So it was
24    a -- collection of organizations that -- that

Page 144

1    got together monthly and would have discussions
2    about topics related to pain.
3        Q    And what types of organizations were
4    members of the Pain Care Forum?











Page 165



18   Q   All right. We'll mark this as
19 Exhibit 14.
20   (Munroe Exhibit No. 14 was marked
21   for identification.)
22   MR. DAVIS: I'm going to object to this
23 demonstrative that was made here in the day in a
24 terribly misleading way as being introduced as an

Page 166

1 exhibit.
2   MS. AMINOLROAYA: I'll remind you,
3 Mr. Davis, to keep your objections to form. Thank
4 you.
5   Can I have 1448, please.
6 BY MS. AMINOLROAYA:
7   Q   Did the Pain Care Forum develop plans
8 for how professional, medical and advocacy groups
9 should operate?
10   MR. DAVIS: Objection to form.
11   THE WITNESS: The Pain Care Forum was a
12 place where people could have discussions, raise
13 ideas, talk to each other about pain policy
14 matters, and if they so desired, work together on
15 issues that they believed where there was a shared
16 interest. We called it a coalition of the
17 willing. The Pain Care Forum itself did not take
18 public policy positions --
19 BY MS. AMINOLROAYA:
20   Q   Did it develop --
21   A   -- that I'm aware of.
22   Q   Did it develop strategies for patient
23 advocacy groups?
24   MR. DAVIS: Objection to form.

Page 167

1   THE WITNESS: I don't know.
2   (Munroe Exhibit No. 15 was marked
3   for identification.)
4 BY MS. AMINOLROAYA:

Page 168



Page 169

Page 170

Page 171

(Witness and counsel conferring.)

Page 172

```
 1        MR. DAVIS:  Yeah, actually can we take a
 2   quick break?  Mr. Munroe just asked.
 3        THE WITNESS:  I need to take a
 4   five-minute --
 5        MR. DAVIS:  It's been an hour.
 6        THE WITNESS:  -- bio break.
 7        THE VIDEOGRAPHER:  The time is --
 8        MS. AMINOLROAYA:  That's fine.
 9        THE VIDEOGRAPHER:  The time is 1:48 p.m.
10   We're going off the record.
11        (Recess.)
12        THE VIDEOGRAPHER:  The time is 2:01 p.m.
13   and we're back on the record.
14   BY MS. AMINOLROAYA:
15     Q   Good afternoon, Mr. Munroe.  We took a
16   break.  We're back on the record.
17        And we left off with a discussion of the
18   State of Washington's opioid prescribing
19   guidelines, and you said you recall that.
20     A   I -- I do recall the issue.  I don't
21   recall the details.  I had two individuals over my
22   course of time at Endo that ran my state
23   government relations department that would have
24   been more familiar with the details, and it was
```

Page 173

1    really so long ago.  I do recall that it was
2    during the time when I first joined the company or
3    thereabouts that there was an issue in Washington.
4        Q   Yes, that's -- that's a -- in terms of
5    timing, that's an accurate recollection.
6            (Munroe Exhibit No. 16 was marked
7            for identification.)
8    BY MS. AMINOLROAYA:
9        Q   I'm handing you what's been marked as
10   Exhibit 16.  These are the Interagency Guidelines
11   on Opioid Dosing for Chronic Non-Cancer Pain, and
12   these are from the Agency Medical Directors' Group
13   for the State of Washington, and the date on this
14   is March 2007.
15           And if you take a look at page 2 of the
16   document, this will help orient us with some of
17   the details on the reasons for the guidelines.  So
18   if you look at the last paragraph here on the --
19   the left side of the page, on E-numbered
20   page 1957.2, and for the record this is E1957, it
21   states:  "Recent studies indicate an -- an
22   increase in accidental deaths associated with the
23   use of prescription opioids.  At the same time
24   there has been a dramatic increase in the average

Page 174

1    daily morphine equivalent dose, MED, of the most
2    potent Schedule II long-acting opioids."
3            Did I read that correctly?
4        A   Where are we at, which page?
5        Q   We're on page 2, 1957.2.
6        A   Okay.  Could you read that again,
7    please?
8        Q   It says:  "Recent studies indicate an
9    increase in accidental deaths associated with the
10   use of prescription opioids since 1999.  At the
11   same time there has been a dramatic increase in
12   the average daily morphine equivalent dose of the
13   most potent Schedule II long-acting opioids."
14           Do you see that?
15       A   You -- you read that correctly.
16       Q   Thank you.
17           And was Opana ER a Schedule II long-
18   acting opioid?
19       A   It -- it -- it is.
20       Q   Thank you.
21           And the following sentence goes on to
22   describe the problem that the State of Washington
23   was dealing with.  It says:  "The overall number
24   of opioid-related deaths more than doubled between

Page 175

1    1995 and 2004, and prescription opioid-related
2    deaths now exceed non-prescription opioid-related
3    deaths."
4            Did I read that correctly?
5        A   That's what this says.
6        Q   Thank you.
7            And you'll see on the right side of the
8    page, it tells us the purpose of the guidelines.
9    It says:  "The purpose of Part II of the guideline
10   is to assist primary care providers in treating
11   patients whose morphine equivalent dose, MED,
12   already exceeds 120 milligrams per day."
13           Do you see that?
14       A   Well, you skipped over Part I, and then
15   you went to Part II, and you did read the Part II
16   correctly.
17       Q   Thank you.
18           And members of the Pain Care Forum
19   opposed Washington State's opioid prescribing
20   guidelines, these guidelines, correct?
21           MR. DAVIS:  Objection to form.
22           THE WITNESS:  I am not --
23           MS. AMINOLROAYA:  (Inaudible.)
24           THE WITNESS:  I know that there were

Page 176

1    issues raised about these guidelines and the
2    issue, but I don't remember the details and I
3    don't remember which members of the Pain Care
4    Forum objected to them and on what basis.  I just
5    don't recall.
6            This document is from 2007, so that
7    would make it 12 years old.
8    BY MS. AMINOLROAYA:
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Page 177

Page 178

```
11          MR. DAVIS:  Objection to form.
12          (Munroe Exhibit No. 18 was marked
13      for identification.)
14          MS. AMINOLROAYA:  Exhibit 18.
15          MR. DAVIS:  Do you have others?
16          MS. AMINOLROAYA:  I'm sorry.
17          MR. DAVIS:  Do you have others?
18          MS. AMINOLROAYA:  Yes.
19          MR. DAVIS:  May I have them?
20          MS. AMINOLROAYA:  Do I have other copies
21      of that?  I'm not sure.  17 and --
22          And we'll go ahead and mark No. 19 --
23      Exhibit 19 as well.
24          (Munroe Exhibit No. 19 was marked
```

Page 179

```
 1          for identification.)
 2      BY MS. AMINOLROAYA:
 3          Q   For the record, Exhibit 18 is
 4      ENDO-OPIOID_MDL-02210853, and it's E-numbered
 5      E1765.
 6          And Exhibit 19 is E1764, PPLP04301238.
 7          And on Exhibit 18, Mr. Rowe writes to
 8      Micke Brown -- and is that Mr. Rowe -- William
 9      Rowe of the American Pain Foundation?  In the
10      third e-mail from the bottom.  Do you see the
11      e-mail string there from Will Rowe?
12          A   I -- I don't -- I don't recognize this
13      11-year-old e-mail string, but -- but that is who
14      is -- you're referring to is on this -- this
15      e-mail header.
16      BY MS. AMINOLROAYA:
17          Q   And Mr. Rowe was with the American Pain
18      Foundation at this time on February 11th, 2008?
19          A   I don't know the exact dates that he was
20      the head of the American Pain Foundation, but that
21      sounds right.
22          Q   All right.  And he writes here to Micke
23      Brown, Scott Fishman and to you, correct?
24          A   That's what that e-mail header
```

Page 180

```
 1      indicates.
 2          Q   Mm-hmm.  Who is -- do you know who Micke
 3      Brown is?
 4          A   The name is familiar, but -- but I --
 5      I -- I don't recall which organization she's with.
 6          Q   And Scott Fishman, do you know who Scott
 7      Fishman is?
 8          A   I know that he was a leading pain
 9      physician.
```

Page 181



Page 182

BY MS. AMINOLROAYA:

Q   Okay.  My question was whether you saw the language that I read on the document.

A   Could -- could you ask the question again, please?

Q   Yes.  I read language here, and I said, Do you see that?  And you responded with something totally different.

A   Yeah, I -- I don't know if you accurately read that statement or not.  You would have to read it again.

MS. AMINOLROAYA:  Okay.  Let -- let's

Page 183

take a break.

THE VIDEOGRAPHER:  Okay.  The time is 2:16 p.m. and we're going off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 2:28 p.m. and we're back on the record.

BY MS. AMINOLROAYA:

Q   So, Mr. Munroe, you've had a chance to look at Exhibits 18 and 19, correct?

A   Yes.

Page 184



Page 185

5      Q    And do you recall whether the Pain Care
6   Forum or its members came up with a strategy to
7   promote Scott Fishman's responsible opioid
8   prescribing?
9      A   I don't recall.
10         MR. DAVIS:  Objection to form.
11   BY MS. AMINOLROAYA:
12      Q    Do you recall whether you provided
13   talking points to different groups to advance an
14   opposition to the Washington State guidelines?
15         MR. DAVIS:  Objection to form.
16         THE WITNESS:  I don't recall any of the
17   detail of what actually happened in the state of
18   Washington.
19         (Counsel conferring.)
20         MR. DAVIS:  And just for the record, for
21   the next set of stickers, it's Munroe with a U,
22   not an O.
23         (Munroe Exhibit No. 20 was marked
24          for identification.)

Page 186

BY MS. AMINOLROAYA:
2      Q    I'm handing you what's been marked as
3   Exhibit 20.
4         This is an e-mail.  The second e-mail
5   here is from Will Rowe dated January 24th, 2008.
6      A    So this would be an 11-year-old e-mail.

Page 187

Page 188

20         MS. AMINOLROAYA:  423.
21         (Munroe Exhibit No. 23 was marked
22          for identification.)
23   BY MS. AMINOLROAYA:
24      Q    I'm handing you Exhibit 23, Responsible

Page 189

1　Opioid Prescribing, A Physicians Guide.  It's
2　Bates number END00051370, E-numbered E423.
3　　　Do you recognize this --
4　A　I don't --
5　Q　-- document?
6　A　I don't recognize it.
7　Q　Have you heard of Responsible Opioid
8　Prescribing by Scott Fishman before?
9　A　It does ring a bell, but not in any
10　detail.
11　Q　And is this a book that Endo sponsored?
12　　　MR. DAVIS:  Objection to form.
13　　　THE WITNESS:  I don't recall.
14　BY MS. AMINOLROAYA:
15　Q　And the -- Exhibit 20 discusses a
16　consensus strategy to promote excerpts of
17　Dr. Scott Fishman's book, correct?
18　A　You -- you read that correctly on
19　E1852.2.
20　Q　And this is the same book that Endo
21　provided financial support for, correct?
22　　　MR. DAVIS:  Objection to form.
23　　　THE WITNESS:  You know, I -- I don't
24　recall, but I -- I'm seeing on page 3, it says:

Page 190

1　"This book is sponsored by a consortium of
2　organizations," and it has a list of, I don't
3　know, 20 or so organizations, and our -- our
4　company is on that list.  I have no reason to
5　believe that we didn't sponsor it, but I just
6　don't recall.
7　BY MS. AMINOLROAYA:

Page 191

Page 192



Page 193

1  [REDACTED]
2
3        MS. AMINOLROAYA:  Move to strike as
4  nonresponsive.
5  BY MS. AMINOLROAYA:
6     Q   My question was whether Endo was one of
7  the pharmaceutical companies that received a
8  letter from Senator Grassley as part of an
9  investigation into growing evidence that
10 pharmaceutical companies that manufacture opioids
11 may be responsible for the opioid epidemic by
12 promoting misleading information about opioid
13 safety and efficacy.
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  We did receive a letter,
16 as I stated previously, and I -- I see that you --
17 you've correctly identified David Holveck as the
18 recipient of a letter from the Committee on
19 Finance and Senator Grassley.
20 BY MS. AMINOLROAYA:
21    Q   And Endo provided financial support to a
22 number of pain groups and other nonprofit
23 organizations.  Correct?
24    A   We did provide support to independent

Page 194

1  third-party organizations, but it was not
2  connected in any way to our advocacy efforts on
3  Capitol Hill or in state capitals.  We sought to
4  undertake government affairs projects where there
5  was an intersection between the benefits to
6  society, public health, and the benefits to
7  patients, and where those interests intersected
8  with our own, we undertook lobbying activity.
9        MS. AMINOLROAYA:  Move to strike as
10 nonresponsive.
11 BY MS. AMINOLROAYA:
12    Q   Did Endo provide financial support to
13 pain groups and other nonprofit organizations?
14    A   I am aware that we did.
15    Q   And did Endo respond to Senator
16 Grassley's letter with information as to the
17 financial support it provided to third-party
18 organizations?
19    A   I believe that that was part of our
20 response.
21    Q   And if you turn to page 32 of the
22 document, do you see Endo's financial support for
23 the Federation of State Medical Boards?
24    A   I do see that listed here.

Page 195

1     Q   And what is the total amount listed here
2  of funds provided by Endo to the Federation of
3  State Medical Boards?
4     A   For what time period?
5     Q   The total here.
6     A   $369,025.
7     Q   And on page 12 of the document --
8  rather, page 13 --
9     A   Over a ten-year period.
10    Q   And on page 13 of the document, this is
11 one of the organizations that the letter describes
12 as having extensive ties with manufacturers.
13 Correct?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  I'm sorry, where are you
16 referring to?
17 BY MS. AMINOLROAYA:
18    Q   Page 13, middle of the page.
19    A   That's what Senator Grassley's staff are
20 saying in the letter.
21    Q   And the Federation of State Medical
22 Boards model policy is singled out here in the
23 following paragraph.
24       MR. DAVIS:  Objection to form.

Page 196

1        THE WITNESS:  Yeah, I -- I believe that
2  you read that correctly.
3  BY MS. AMINOLROAYA:
4     Q   And it's being singled out because of
5  criticism that it failed to point out the lack of
6  science supporting the use of opioids for chronic
7  non-cancer pain.
8        MR. DAVIS:  Objection to form.
9        THE WITNESS:  That is the -- the charge
10 that Senator Grassley appears to be making in this
11 letter.
12 BY MS. AMINOLROAYA:
13    Q   And how many books, according to this
14 letter, were -- of the model policy were
15 distributed?
16    A   This letter indicates that there were
17 160,000 copies, but I can't, you know, provide any
18 veracity to that because I just don't know.
19    Q   Any reason to dispute this number?
20    A   Well, it's a seven-year-old document
21 created by Congressional staff who probably picked
22 up that number from somewhere, but I don't know
23 where.  And so I -- I can't speak to that issue
24 because I -- I don't work at the Federation of



Page 197

1   State Medical Boards and don't know how many
2   copies of their book they distributed.

Page 198

Page 199

Page 200



Page 201

Page 202

Page 203

Page 204

BY MS. AMINOLROAYA:

Q   And are you aware that high doses of opioids are associated with increased risks?

MR. DAVIS:  Objection to form.

THE WITNESS:  I'm not a medical doctor,

Page 205

1  and that's outside the scope of my position, so I
2  don't know.
3  BY MS. AMINOLROAYA:
4      Q   So you advocate about opioids for -- for
5  ten years at Endo, and you're not familiar with
6  the risks and benefits of the drugs that you
7  advocate for?
8          MR. DAVIS:  Objection to form,
9  mischaracterizes testimony.
10         THE WITNESS:  I am -- I am not medically
11  trained.  I'm not a physician, I'm not a
12  scientist, I'm not a sales representative that was
13  medically trained, formally trained on the
14  product.
15  BY MS. AMINOLROAYA:
16     Q   Sir, your testimony earlier was that
17  your job was to provide facts and data to
18  legislators and politicians, correct?
19     A   Yes.
20     Q   But you're not familiar with the facts
21  and the data that show that higher doses of
22  opioids are associated with increased risks.
23         MR. DAVIS:  Objection to form,
24  mischaracterizes testimony.

Page 206

1          THE WITNESS:  I would answer that on a
2  couple of fronts.  One, I worked on many, many
3  issues.  I worked on tax issues, I worked on
4  compounding issues, I worked on various cancer
5  issues.  So I worked on lots of issues, so I
6  couldn't be an expert on -- on everything.  So we
7  would coordinate the company's public policy
8  positions, including the use of subject matter
9  experts, which I would bring with me to testify on
10  scientific and technical issues, such as Dr. Neil
11  Shusterman, who was our chief medical officer.
12         MS. AMINOLROAYA:  I'm marking -- let's
13  see.
14         (Munroe Exhibit No. 25 was marked
15          for identification.)
16  BY MS. AMINOLROAYA:
17     Q   I'm handing you 1573, which is
18  Exhibit 25.  This is ENDO-OPIOID_MDL-01902659.
19  It's E-numbered E1573.
20
21
22
23
24

Page 207

Page 208



Page 209

Page 210

Page 211

Page 212

```
 1    Q   Thank you.
 2         And Endo also -- strike that.
 3         The Pain Care Forum also opposed dosing
 4    guidelines or dosing limitations when it came to
 5    the label of -- of opioid drugs.
 6         MR. DAVIS:  Objection to form.
 7    Foundation.
 8         THE WITNESS:  Well, the Pain Care Forum
 9    didn't take positions.  The Pain Care Forum was a
10    forum in which organizations could get together on
11    a monthly basis to have discussions about pain
12    public policy issues.
13    BY MS. AMINOLROAYA:
14    Q   But the Pain Care Forum came up with a
15    plan to respond to the PROP petition.
16         MR. DAVIS:  Objection to form,
17    foundation.
18         THE WITNESS:  Is there -- is there a
19    question?
20    BY MS. AMINOLROAYA:
21    Q   Yes.  Did the Pain Care Forum come up
22    with a plan to respond to the PROP petition?
23    A   I don't recall.
24    Q   Are you familiar with the PROP petition?
```



Page 213

1    A   Vaguely.
2        (Munroe Exhibit No. 26 was marked
3        for identification.)
4    BY MS. AMINOLROAYA:
5        Q   Marked Exhibit 26.  It's E1931,
6    ENDO-OPIOID_MDL-01448657.
7        And this PROP, Physicians -- does PROP
8    stand for Physicians for Responsible Opioid
9    Prescribing?
10   A   Yes.
11       Q   And do you recall that they submitted a
12   Citizens Petition to the FDA requesting a change
13   to the labels of opioids?
14       A   As I said before, I vaguely remember
15   this, but -- I don't remember the details in
16   specific.  I remember that it -- it was an issue,
17   but --









Page 225

Page 226

15    MR. DAVIS:  Is now a good time for a
16  break?  It's been over an hour or so.
17    MS. AMINOLROAYA:  I've got a few more in
18  this area, but we can take a break now.
19    THE VIDEOGRAPHER:  The time is 3:35 p.m.
20  We're going off the record.
21    (Recess.)
22    THE VIDEOGRAPHER:  The time is 3:51 p.m.
23  and we're back on the record.
24  BY MS. AMINOLROAYA:

Page 227

1    Q   Welcome back, Mr. Barto.  We took a
2  break, and we're back on the record.
3    A   Mr. Munroe.
4    Q   I'm sorry.
5    A   Yeah, it's okay.
6    Q   Barto -- Munroe.  Thank you.  It's late
7  in the afternoon.  I may confuse things.  I
8  appreciate the reminder.
9       Do you recall if the Pain Care Forum
10  also lobbied the FDA Commissioner concerning the
11  REMS?
12    A   The Pain Care Forum didn't take
13  positions that I'm aware of.  The Pain Care Forum
14  was a -- an opportunity for organizations that --
15  in the pain community and in the healthcare
16  community in Washington to get together on a
17  monthly basis.
18       There were times when members of the
19  Pain Care Forum would take a public policy
20  position and invite others to join them.  But
21  those are the only efforts that I'm aware of are
22  efforts in which the Pain Care Forum members would
23  get together on a particular issue.  I'm unaware
24  of anything that any particular coalition of

Page 228

1  members of the Pain Care Forum did with respect to
2  the FDA Commissioner.
3    MS. AMINOLROAYA:  Our next exhibit,
4  1750, please.
5  BY MS. AMINOLROAYA:





Page 237



Page 238

1
2    Q   Okay.  Well, we'll look at some more
3  documents that provide some support for what we've
4  just seen here.
5        MS. AMINOLROAYA:  E1632.
6  BY MS. AMINOLROAYA:
7    Q   And it was the Pain Care Forum's view
8  that it was really critical to the future of
9  its -- of its members that the -- that the
10  membership make submissions to the FDA or provide
11  feedback to the FDA on the REMS.
12        MR. DAVIS:  Objection to form.
13        THE WITNESS:  What's the question?
14  BY MS. AMINOLROAYA:
15    Q   That it -- was it the Pain Care Forum's
16  view that it was critical to the future of its
17  membership that the membership make submissions to
18  the FDA on the REMS issue?
19        MR. DAVIS:  Objection to form.
20        THE WITNESS:  The Pain Care Forum didn't
21  take public policy positions, as I've described
22  previously.  It was a forum for individual member
23  organizations to get together once a month and
24  meet and have discussions about pain topics.

Page 239

1  BY MS. AMINOLROAYA:
2    Q   Did they prepare recommendations for
3  their membership to submit to the FDA?
4    A   Who is "they"?
5    Q   The Pain Care Forum.
6    A   The Pain Care Forum is made up of
7  members.  They didn't take public policy positions
8  as a whole, that I'm aware of.
9    Q   Did they tell their membership what to
10  say to the FDA?
11        MR. DAVIS:  Objection to form.
12        THE WITNESS:  Did who tell?
13  BY MS. AMINOLROAYA:
14    Q   Did the Pain Care Forum tell their
15  members what to say to the FDA about the REMS?
16    A   Well, the Pain Care Forum didn't take
17  positions on issues, so they couldn't have --
18  very well have told the membership what their
19  positions were because they didn't take positions
20  to my knowledge.
21    Q   We're marking Exhibit 32.  It's
22  ENDO-OPIOID_MDL-02293305.  It's E-numbered E1632.
23        (Munroe Exhibit No. 32 was marked
24          for identification.)

Page 240

BY MS. AMINOLROAYA:



Page 245

Page 246

Page 247

Page 248

12    (Munroe Exhibit No. 33 was marked
13       for identification.)
14  BY MS. AMINOLROAYA:
15    Q   I'm handing you what's been marked as
16  Exhibit 33.  It's ENDO-OPIOID_MDL-02297404.  It's
17  number -- E-numbered 1752.
18        And is this an e-mail from Elizabeth
19  Bush to you on October 31, 2011 -- I'm sorry,
20  yeah, October 31, 2011?
21    A   It looks to be.  I have no recollection
22  of it, but it looks to be.



Page 249



```
15        MS. AMINOLROAYA:  I'm marking as
16   Exhibit 34 END00077888.  It's E-numbered 1450.
17        (Munroe Exhibit No. 34 was marked
18        for identification.)
19   BY MS. AMINOLROAYA:
20        Q    And is this an e-mail from you to Bob
21   Barto on April 28th, 2009?
22        A    It -- it appears to be that.
```

Page 250

Page 251

Page 252



Page 257

Page 258



Page 259

Page 260

```
 1    from you to David Holveck and colleagues, dated
 2    April 17, 2012?
 3         A   Yes, I'm seeing that.
```

BY MS. AMINOLROAYA:

    Q   You actually wrote about this lobbying
on more than one occasion.

        (Munroe Exhibit No. 36 was marked
        for identification.)

BY MS. AMINOLROAYA:

    Q   I'm handing you Exhibit 36.  This is
EPI002377845.  E-numbered 1968.

        And is the middle e-mail here an e-mail





Page 265

Page 266

Page 267

MS. AMINOLROAYA:  I'm not sure how long
we're going -- we've been going.  I'm at a
stopping point, but I can move on.
MR. DAVIS:  No, why don't -- why don't
we take a quick break and then finish up after
that.
THE VIDEOGRAPHER:  The time is 4:51 p.m.
and we're going off the record.
(Recess.)
THE VIDEOGRAPHER:  The time is 5:13 p.m.
and we're back on the record.
BY MS. AMINOLROAYA:
Q   Welcome back, Mr. Barto.  This is the
last stretch.
A   Mr. Munroe.

Page 268

Q   Mr. Munroe.  I'm sorry.  I don't know
why I keep doing that.  Welcome back, Mr. Munroe.
It's a sign that it's 5:12 and we've been going
for six hours.
Did -- do you -- did Endo, as part of
its government affairs and public policy work,
support certain pain measures with respect to
veterans?
MR. DAVIS:  Objection to form.
THE WITNESS:  I recall that we lobbied
one issue on -- on a veterans piece of legislation
while I was at Endo.
BY MS. AMINOLROAYA:
Q   And what was that?
A   I don't remember the details of -- but I
remember the arguments we were making, which is we
wanted to preserve the right of veterans being
treated for pain, for physicians to be able to
prescribe the right medicines for the appropriate
patients at the right time for veterans, and that
there was legislation that was introduced and
moving forward that would have prevented that.  So
we worked with the Veterans' Affairs Committee in
the House to assure that veterans received

Page 269

1   appropriate pain care treatment.
2      Q   And did you support the Veterans Pain
3   Care Act of 2007?
4      A   I don't know if we supported the overall
5   act.  I know that we were involved with the issue
6   as I previously described.
7         MS. AMINOLROAYA:  1747.
8         I'm marking Exhibit 37, which is
9   ENDO-OPIOID_MDL-02807915.  It's E1747.
10        (Munroe Exhibit No. 37 was marked
11        for identification.)
12  BY MS. AMINOLROAYA:
13     Q   And is this an e-mail from Burt Rosen to
14  Brian -- to you on October 28, 2007?
15     A   It does appear to be that.
16     Q   And is he forwarding on an e-mail from
17  Tamara Sloan-Anderson?
18     A   Yes.  Yeah, he is actually forwarding an
19  e-mail from Pamela Bennett.
20     Q   Yes, thank you.
21        And who's Pamela Bennett?
22     A   Pamela Bennett is a Purdue employee.
23
24

Page 270

Page 271

Page 272











Page 285

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20  BY MS. AMINOLROAYA:
21      Q   Thank you.
22          And did you enlist the help of lobbyists
23  and the American Pain Foundation to help lobby the
24  DEA for an increased quote of oxymorphone?

Page 286

1          MR. DAVIS:  Objection to form.
2          THE WITNESS:  I don't recall all of the
3  specific steps that I would have taken.
4          (Munroe Exhibit No. 40 was marked
5          for identification.)
6  BY MS. AMINOLROAYA:
7      Q   We've marked Exhibit 40.  This is
8  EPI001179443, and it's E-numbered 1905.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 287

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 288

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 289

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 290

```
 1
 2
 3
 4
 5          MR. DAVIS:  Objection to form.
 6          MS. AMINOLROAYA:  1921.
 7          (Munroe Exhibit No. 41 was marked
 8          for identification.)
 9      BY MS. AMINOLROAYA:
10          Q   I'm handing you Exhibit 41, which is
11      EPI001313856.  It's E-numbered 1921.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 291

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 292

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```





Page 293

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 294

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 295

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 296

```
 1
 2
 3
 4        MS. AMINOLROAYA:  Withdraw the last
 5   question.
 6        (Munroe Exhibit No. 42 was marked
 7        for identification.)
 8   BY MS. AMINOLROAYA:
 9     Q   We're handing you Exhibit 42.  This is
10   ENDO-CHI-LIT00096310.  It's E1771.
11        And is this a letter from Will Rowe to
12   the American Pain Foundation?  If you turn to the
13   second and third page of the document.
14     A   (Peruses document.)  I don't recall this
15   letter from eight years ago, but I have just read
16   it.
17     Q   Thank you.
18
19
20
21
22
23
24
```

Page 297



Page 298

Page 299

Page 300

```
 1     Q    Exhibit 44, EPI001504213, and it's
 2   E-numbered 1782.
 3         And this an e-mail from you to your
 4   colleagues at Endo on December 15th, 2011?
 5     A    It appears to be that.
```

```
17         MS. AMINOLROAYA:  Withdrawn.
18   BY MS. AMINOLROAYA:
19     Q    Mr. Munroe, if you're not going to
20   answer my question, I'm going to withdraw the
21   question and your testimony is meaningless.
22         (Munroe Exhibit No. 44 was marked
23         for identification.)
24   BY MS. AMINOLROAYA:
```

Page 301



Page 302

Page 303

```
1          MS. AMINOLROAYA:  Withdraw the question.
2          I have no further questions at this
3    time.
4          THE VIDEOGRAPHER:  Should we go off the
5    record?
6          MR. DAVIS:  Yeah, we can go off.
7          THE VIDEOGRAPHER:  The time is 6:06 p.m.
8    We're going off the record.
9          (Recess.)
10          THE VIDEOGRAPHER:  The time is 6:20 p.m.
11   and we're back on the record.
12          EXAMINATION BY COUNSEL FOR THE
13          TENNESSEE PLAINTIFFS
14   BY MS. HERZFELD:
15     Q    Okay, Mr. Munroe, my name is Tricia
16   Herzfeld.  I'm an attorney representing the
17   plaintiffs in the Tennessee state litigation.
18          Are you familiar with the Tennessee
19   state litigation?
20     A    I'm not.
21     Q    Okay.
22          MS. HERZFELD:  And I'm going to go ahead
23   and put on the record our usual objections.  We
24   don't believe that the defendants have complied
```

Page 304

```
1    with document production, the MDL deposition
2    protocol or the protocol that's at issue in the
3    Stalbus or Dunaway matters.
4          MR. DAVIS:  Yeah, same response that we
5    have on the record for all of these, that we
6    disagree.  We believe we've complied with document
7    production requirements and the MDL deposition
8    protocol.
9          MS. HERZFELD:  Okay.  Great.
10   BY MS. HERZFELD:
11     Q    Mr. Munroe, you have two sets of
12   attorneys here today; is that correct?
13     A    No.
14     Q    Okay.  So who is your attorney?
15     A    I'm represented by Arnold & Porter.
16   They're joined by the -- the legal team at Endo
17   and Walter Cohen at Obermayer.
18     Q    Okay.  So what about my question if you
19   have two sets of attorneys was incorrect?
20     A    Oh, I was referring to also the -- the
21   Endo legal team.
22     Q    Okay.  So you have Endo in-house
23   counsel.  Is that correct?
24     A    Yeah, I don't -- I don't know if there
```

Page 305

1   is a direct representation there.  So -- so maybe
2   it is two.
3        Q   Okay.  And have you signed a
4   representation agreement with Arnold & Porter?
5        A   I have.
6        Q   Okay.  And are you paying Arnold &
7   Porter?
8        A   No.
9        Q   Okay.  And what was the name of your
10  other attorney?
11       A   Walter Cohen.
12       Q   Walter Cohen.  And do you have a
13  representation agreement with Mr. Cohen?
14       A   I do.
15
16
17
18
19
20
21
22
23
24       Q   Okay.  And did you ask for separate

Page 306

1   counsel or was it offered to you?
2        MR. DAVIS:  Objection to form to the
3   extent that it requires you to divulge
4   conversations you've had with legal counsel.
5        THE WITNESS:  I've been advised by my
6   attorney not to answer that question.
7   BY MS. HERZFELD:
8        Q   And that's how you took his -- his
9   advice there?  He said answer it if you can answer
10  it.
11       So my question is, without divulging
12  attorney-client information, can you answer the
13  question?
14       A   No.
15       Q   Okay.  And so you're relying on the
16  advice of your attorney and refusing to answer the
17  question in this deposition?
18       A   Correct.
19       Q   Okay.  Very good.
20       Okay.  And have you taken any medication
21  today that could impact your memory?
22       A   No.
23       Q   Okay.  Have you had any sort of physical
24  injury or physical impairment that could affect

Page 307

1   your memory?
2        MR. DAVIS:  I'll just object.  These are
3   all preliminary questions that were covered by the
4   MDL plaintiffs counsel.  I think our agreement is
5   to non-duplicative questioning.  So if we could
6   get to the Tennessee-specific non-duplicative
7   questioning sooner rather than later, I think we'd
8   all appreciate it.
9   BY MS. HERZFELD:
10       Q   If you could answer my question, please,
11  sir.
12       A   No.
13       Q   Okay.  So you haven't had a stroke or
14  head injury?
15       A   No.
16       MR. DAVIS:  Objection to form.
17  BY MS. HERZFELD:
18       Q   Okay.  Because I noticed earlier you
19  seemed to be having some problems with your
20  memory, and I'm trying to figure out why that is.
21       MR. DAVIS:  Objection to form.
22       I'm just going to instruct you not to
23  answer that ridiculously abusive question, Brian.
24  That absolutely has no relevance and serves no

Page 308

1   purpose other than to harass the witness.
2        THE WITNESS:  I'm choosing not to answer
3   that question on advice of counsel.
4   BY MS. HERZFELD:
5        Q   Okay.  So you're taking your attorney's
6   advice not to answer a question about why you're
7   having memory problems in this deposition?
8        MR. DAVIS:  Again, objection to form.
9        And, Brian --
10       This is a question that is designed
11  purely to harass the witness.
12       If you want to ask him some substantive
13  questions about events in Tennessee that were not
14  covered by the MDL plaintiffs, you're free to do
15  so.  We welcome your participation in that.  But
16  if you're going to ask questions that are solely
17  designed to harass Mr. Munroe, we're just going to
18  stop.
19       MS. HERZFELD:  Okay.  And if you could
20  just take down the time right now, Ms. Court
21  Reporter, please.
22       I'm not going to have my two hours of
23  time taken up by your speaking objections.
24       MR. DAVIS:  Well, we're not going to

Page 309

1  waste Mr. Munroe's time with questions that are
2  designed to solely harass him.  If you have
3  Tennessee-specific questions, we welcome them.
4  Please go ahead.  Otherwise, we'll take
5  Mr. Munroe, and we can stop this now.
6      MS. HERZFELD:  I will ask my questions.
7  I'll ask my question.  You're not going to tell me
8  what questions I can ask and what questions I
9  cannot.
10      MR. DAVIS:  Well, you may be -- you may
11  be asking questions of an empty chair if they're
12  not Tennessee specific and they're not unique.
13      MS. HERZFELD:  Okay.  Great.
14  BY MS. HERZFELD:
15      Q   In any event, Mr. Munroe, do you have
16  some problems with your memory?
17      MR. DAVIS:  Objection to form.
18      THE WITNESS:  I don't.
19  BY MS. HERZFELD:
20      Q   Okay.  So do you know about the illegal
21  drug market for Opana?
22      MR. DAVIS:  Objection to form.
23      THE WITNESS:  I'm not an expert in the
24  illegal drug market for Opana.

Page 310

1  BY MS. HERZFELD:
2      Q   I didn't ask you if you were an expert
3  in the illegal drug market for Opana.  I asked you
4  if you were aware of the illegal drug market for
5  Opana.
6          Are you aware of the illegal drug market
7  for Opana?
8      A   I am aware that all opioids carry a risk
9  of misuse and abuse.
10      Q   Okay.  But my question was, are you
11  aware of the illegal drug market for Opana?
12      MR. DAVIS:  Objection to form.
13      THE WITNESS:  I am aware of the risks
14  that all opioids carry for misuse and abuse.
15      MS. HERZFELD:  And that was
16  nonresponsive to my question.
17  BY MS. HERZFELD:
18      Q   Do you know that Opana is sold on the
19  street in the black market?
20      MR. DAVIS:  Objection to form.
21      THE WITNESS:  I do understand that all
22  opioids carry a risk of misuse and abuse.
23  BY MS. HERZFELD:
24      Q   Okay.  So you've now given me the same

Page 311

1  answer three different times and none of them have
2  answered my question.
3          Are you aware that Opana is sold on the
4  black market?
5      MR. DAVIS:  Objection to form, and asked
6  and answered.
7      THE WITNESS:  I am aware that all
8  opioids carry a risk of misuse and abuse.
9  BY MS. HERZFELD:
10      Q   Are you aware that any opioids are sold
11  on the black market?
12      MR. DAVIS:  Objection to form.
13  Foundation.
14      THE WITNESS:  I am aware that all
15  opioids carry a risk of misuse and abuse.
16      MS. HERZFELD:  Okay.  We're going to
17  stop right now.  Is he going to answer the
18  questions today or is he going to continue just
19  saying the same thing over and over again?
20      MR. DAVIS:  He's going to answer your
21  questions.  Just because you don't like his answer
22  doesn't mean he's not answering them.  And
23  frankly, you could lay maybe just a touch of
24  foundation for any of these questions.

Page 312

1      MS. HERZFELD:  And your speaking
2  objections are completely inappropriate.
3      MR. DAVIS:  You just asked me a
4  question.
5      MS. HERZFELD:  Under the MDL protocol,
6  you are allowed to object to the form, and that is
7  it.
8      MR. DAVIS:  I'm -- you asked me a direct
9  question, and I'm answering it.
10      MS. HERZFELD:  I'm going to make my
11  record right now.  If we don't get answers from
12  this witness today, we will be going straight to
13  the judge to be asking to re-depose him.
14          Now, I at this point have agreed --
15      MR. DAVIS:  If you want --
16      MS. HERZFELD:  -- to do two hours of
17  questioning in order to see if we can keep the
18  burden of this witness to a minimum.  However, if
19  we're going to sit here for two hours, and he
20  can't answer a basic question, we're just going to
21  go to the judge.
22      MR. DAVIS:  You're not asking him
23  questions for Tennessee.  You're not asking
24  questions for which you've laid a foundation.

## Page 313

1   You've only -- you've asked him again --
2        MS. HERZFELD:  Will you please mark this
3   down for my time.
4        MR. DAVIS:  -- by asking questions to
5   purely harass him.
6        MS. HERZFELD:  I would like to reclaim
7   my time at the end.
8        MR. DAVIS:  And, frankly, if you want to
9   take this record to a state court judge in
10  Northern Virginia, we can do that, but we --
11       MS. HERZFELD:  No, I'll take --
12       MR. DAVIS:  -- we welcome -- we welcome
13  your participation with respect to questions
14  related to Tennessee.
15       MS. HERZFELD:  Okay.  I want to go --
16       MR. DAVIS:  I'm happy to have the
17  witness answer that.
18       MS. HERZFELD:  I want to reclaim my time
19  from this ridiculous speaking objection, please.
20  BY MS. HERZFELD:
21    Q   Now, you're aware that Opana is sold on
22  the black market; is that correct?
23       MR. DAVIS:  Objection to form,
24  foundation.

## Page 314

1        MS. HERZFELD:  No speaking objections.
2   Object to form is what the MDL protocol says.
3   Object to form.
4        MR. DAVIS:  That's an objection to form.
5   Foundation is an objection to the form of the
6   question.
7        MS. HERZFELD:  No, it's not.
8        THE WITNESS:  I don't want to speak to
9   issues that I'm not informed about, and the black
10  market for prescription drugs is not an issue that
11  I'm informed about.
12  BY MS. HERZFELD:
13    Q   Okay.  So you are unaware that opioid
14  medication is sold illegally in the black market.
15       MR. DAVIS:  Objection to form.
16       THE WITNESS:  I don't know what the
17  black market means.
18       I do -- I would tell you that I realize
19  fully that all opioid products carry a risk of
20  misuse and abuse.  So I'm -- I'm clear on that
21  point.
22  BY MS. HERZFELD:
23    Q   Okay.  So you're aware that people
24  inject Opana ER, are you not?

## Page 315

1        MR. DAVIS:  Objection to form.
2        THE WITNESS:  I am aware that Opana ER
3   has been abused.
4   BY MS. HERZFELD:
5     Q   Okay.  And when you say you're aware
6   that Opana ER has been abused, in which ways do
7   you know it has been abused?
8     A   It has been abused by snorting and
9   injecting.
10    Q   Okay.  And what about taking it orally?
11    A   I don't know about that abuse.
12    Q   Okay.  So you've never heard of someone
13  taking orally an Opana -- an Opana pill without a
14  prescription?
15       MR. DAVIS:  Objection to form.
16       THE WITNESS:  I -- I don't recall
17  knowing about that form of abuse.
18  BY MS. HERZFELD:
19    Q   Okay.  But you did know about snorting
20  and intravenous injection; is that correct?
21    A   Yes.
22    Q   Okay.  And so if someone is injecting
23  Opana into their veins, is that typically the way
24  that it has been prescribed for them to take, to

## Page 316

1   your knowledge?
2        MR. DAVIS:  Objection to form.
3        THE WITNESS:  I am not a physician or a
4   medical expert, and I'm uncomfortable speaking
5   about issues and which is the appropriate way to
6   take Opana ER.
7   BY MS. HERZFELD:
8     Q   Okay.  But certain --
9     A   My understanding is the appropriate way
10  to take it would be to swallow it.
11    Q   Okay.  And so to inject it would
12  indicate that someone is abusing Opana ER; is that
13  correct?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  I am not a physician or a
16  scientist or an abuse expert.  So my
17  understanding, which is really almost a layman's
18  understanding, of how the product should be
19  appropriately administered is orally.
20  BY MS. HERZFELD:
21    Q   Okay.  Have you ever heard of anyone
22  being arrested for selling Opana ER without a
23  prescription?
24       MR. DAVIS:  Objection to form.

Page 317

1    THE WITNESS: I don't recall being aware
2  of that.
3  BY MS. HERZFELD:
4    Q  Okay.  And have you heard of any law
5  enforcement actions for anyone selling opioid
6  medication without a prescription?
7    A  I've read about stories in the
8  newspaper.
9    Q  Okay.  So you are aware that opioid
10  medication can be sold illegally on the street; is
11  that right?
12    MR. DAVIS:  Objection to form.
13    THE WITNESS:  I -- I have read press
14  reports about that that would make me aware.
15  BY MS. HERZFELD:
16    Q  Okay.  And you are aware that there was
17  a problem with Opana ER injection in Tennessee; is
18  that correct?
19    A  It is correct.
20    Q  Okay.  And when did you first become
21  aware of that?
22    A  I don't know the dates.
23    Q  Okay.  And what is it that you -- what
24  is it that you recall about the IV injection

Page 318

1  problem with Opana in Tennessee?
2    A  The details are fuzzy because it was
3  sometime ago, but I -- I remember that it being
4  localized in a -- in a particular locality of
5  Tennessee.  I do remember that.
6    Q  Do you know what a pill mill is?
7    A  I've read press reports of -- of what a
8  pill mill is.
9    Q  Okay.  And what is your understanding of
10  what is a pill mill?
11    A  My understanding of a pill mill is a
12  place where there's inappropriate prescribing or
13  dispensing of pain medications.
14    Q  Okay.  And when you say "inappropriate,"
15  what do you mean?
16    A  Not according to good medical practice.
17    Q  Okay.  Is your understanding that it's a
18  place where people can get medication without a
19  legitimate medical need?
20    MR. DAVIS:  Objection to form.
21    THE WITNESS:  I don't really know.
22  BY MS. HERZFELD:
23    Q  Do you know what "diversion" means in
24  regards to opioids?

Page 319

1    A  I think I do.
2    Q  Okay.  And what is your definition of
3  "diversion"?
4    A  My definition of "diversion" would be
5  when an opioid product leaves the legitimate
6  manufacturing distribution, dispensing,
7  prescribing, lawful way in which pain patients,
8  including terminally ill patients, cancer
9  patients, end-of-life patients, or chronically ill
10  pain patients, would lawfully get the -- get a
11  prescription of pain medication.
12    Q  Okay.  Okay.  And then those pills that
13  were diverted that you just described, your
14  understanding is they would enter then the illegal
15  market for pain medication; is that correct?
16    A  I wouldn't characterize it that, because
17  I -- I'm just not close to that situation.  I
18  would say that if it left -- if a product left the
19  legitimate, lawful manufacturing, distribution,
20  dispensing, prescribing, lawful way in which a
21  pain medication was appropriately prescribed for a
22  patient who needed it, that that would constitute
23  diversion.
24    Q  Okay.  And diversion would be unlawful;

Page 320

1  is that correct?
2    MR. DAVIS:  Objection to form.
3    THE WITNESS:  I don't want to speak to
4  all of the laws that control all of the
5  manufacture, distribution, dispensing and
6  prescribing of opioid medications because I'm not
7  an expert in that area.
8  BY MS. HERZFELD:
9    Q  Okay.  But you would agree that at least
10  some of that would be unlawful; is that correct?
11    A  I think that's fair to say.
12    Q  Okay.  Okay.  And so at some point you
13  knew that there was a problem in Tennessee with
14  the abuse and misuse of Opana, you said before; is
15  that correct?
16    A  Yes.
17
18
19
20
21
22
23
24



Page 321

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 322

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 323

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 324

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13  Q   Okay.  So I want to make sure I
14 understood your testimony from earlier.
15      You had said that your role at
16 government affairs was to represent the company's
17 interests before elected and appointed officials.
18 Do you recall that testimony?
19  A   What I recall representing was that --
20 that I represented the company's interests where
21 they intersected with benefits to society, public
22 health, and a benefit to patients.
23  Q   Oh, yes, I remember that.  You said it
24 like 20 times.
```

Page 325

1    But do you recall the testimony about
2  the company's interests before -- you said your
3  role at government affairs was to represent the
4  company's interests before elected and appointed
5  officials.  Is that an accurate statement?
6        MR. DAVIS:  Objection to everything
7  before the question, and objection to the question
8  as purely duplicative of the testimony he gave for
9  seven hours prior to this questioning.
10        THE WITNESS:  I did represent the
11  company's interests where they intersected with
12  benefits to society, public health, and benefits
13  to patients.
14  BY MS. HERZFELD:
15    Q   Okay.  But my question was, is it an
16  accurate statement that your role at government
17  affairs was to represent the company's interests
18  before elected and appointed officials?  It's a
19  very simple question.
20        MR. DAVIS:  Objection to form, and it's
21  one that he answered many times on --
22        THE WITNESS:  I -- I disagree with your
23  characterization because you're leaving out the
24  part about benefits to society, public health, and

Page 326

1  benefits to patients.
2  BY MS. HERZFELD:
3    Q   Okay, sir, it --
4    A   So I disagree with your characterization
5  of my role at Endo.
6    Q   Okay.  I wrote it down as a quote, but
7  that's fine if you don't want to agree with me on
8  that.
9        You had said that you brought in subject
10  matter experts when there were particular
11  questions that you weren't the subject matter
12  expert in when you were dealing with various
13  legislators or the Executive Branch.
14        Did I understand that correctly?
15    A   I -- I --
16        MR. DAVIS:  Objection to form.  This is
17  purely duplicative.  If we could get to the
18  Tennessee-specific questioning, I think we all in
19  the room would appreciate it.
20  BY MS. HERZFELD:
21    Q   Can you answer my question, please.
22    A   I -- I often used subject matter
23  experts.
24    Q   And so when you were using those subject

Page 327

1  matter experts, would they meet with the -- the
2  various legislators on their own or would you be
3  present at that time?
4    A   In almost --
5        MR. DAVIS:  Objection to form.
6        THE WITNESS:  In almost every case, I
7  would be with them.
8  BY MS. HERZFELD:
9    Q   Okay.
10    A   But perhaps not exclusively.

Page 328

17  BY MS. HERZFELD:
18    Q   Have you heard that Appalachia has been
19  hit pretty hard by the opioid abuse epidemic?
20        MR. DAVIS:  Objection to form.
21        THE WITNESS:  I have.  I have read the
22  press reports.
23  BY MS. HERZFELD:
24    Q   Okay.  And when did you first get that



Page 329

```
1     knowledge?
2         A   I don't recall.
3         Q   And do you consider Tennessee to be part
4     of Appalachia?
5         A   It's certainly a part of Tennessee.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 330

Page 331

Page 332

Page 333

Page 334

Page 335

Page 336

8    Q    Okay.  So we've exhausted your personal
9   knowledge on that issue; is that correct?
10    A    I don't know whether we have or not.
11    Q    Well, I guess that's my question.
12          So you're -- you're directing me to Dr.
13   Shusterman to ask for information that you don't
14   have.
15    A    He would best know.
16    Q    I understand that, but I want to make
17   sure I understand everything that you know.
18          And so you've told me about this
19   donation to drugfree.org.
20          What, if anything, else do you know
21   personally?
22    A    I don't recall --
23          MR. DAVIS:  Objection to form.
24          THE WITNESS:  -- anything else.

Page 337

```
 1   BY MS. HERZFELD:
 2      Q   Okay.  Thank you very much for that.
 3          Okay.  I am going to hand you what we
 4   will mark as Munroe Exhibit 45.
 5          (Munroe Exhibit No. 45 was marked
 6           for identification.)
 7          MS. HERZFELD:  There's for you.  And I
 8   think that's for everybody else if anybody wants
 9   them.
10          Okay.  For those on the phone, and for
11   the record, this document is marked ENDO-OPIOID_
12   MDL02667004 and 7005.  It's a two-page document.
13   BY MS. HERZFELD:
14      Q   Mr. Munroe, do you see that this is an
15   e-mail that was sent from Brian Lortie to you on
16   November 13th, 2014?
17      A   I do.
18      Q   Okay.  And Brian Lortie was someone that
19   you worked with at Endo; is that correct?
20      A   Correct.
21      Q   Okay.  Okay.  And Brian Lortie was the
22   president of Endo --
23          MR. DAVIS:  Objection to form.
24   BY MS. HERZFELD:
```

Page 338

```
 1      Q   -- Branded Pharmaceuticals, yes?
 2      A   Branded Pharmaceuticals.
 3      Q   Okay.  And so he sends -- this is an
 4   e-mail forwarding an e-mail from him to Jason
 5   Reckner, and then Jason to Brian Lortie, and then
 6   Brian Lortie to you; is that right?
 7      A   Correct.
```



Page 339

Page 340





Page 345

Page 346

Page 347

Page 348

8      MS. HERZFELD: Okay. We can take a
9  break.
10      THE WITNESS: Thank you.
11      THE VIDEOGRAPHER: The time is 7:01 p.m.
12  We're going off the record.
13      (Recess.)
14      THE VIDEOGRAPHER: The time is 7:08 p.m.
15  We're back on the record.
16  BY MS. HERZFELD:
17      Q  Okay, Mr. Munroe, we're back after a
18  short break.
19      I'm going to hand you the next exhibit,
20  which we will mark as Munroe Exhibit 46. It's
21  ENDO-OPIOID_MDL-02801542 and 43, 44, and a
22  smattering of attachments that end in 62.
23      (Munroe Exhibit No. 46 was marked
24      for identification.)

Page 349

```
 1   BY MS. HERZFELD:
 2       Q   Okay.  If you could take a look at this
 3   for me very quickly, sir.
 4       A   (Peruses document.)
 5       Q   Does this appear to be an e-mail that
 6   was sent from you to Scott Andrew on April the
 7   14th, 2016?
 8       A   Andrew Scott.
 9       Q   Oh, I'm sorry, yes, sir.  Andrew Scott.
10   And who is Andrew Scott?
11       A   He was my employee in the Washington
12   office.
13       Q   Okay.  And it looks like you are
14   forwarding an e-mail that you previously sent to
15   Brian Lortie, Paul Campanelli, Keri Mattox, and
16   then copying a bunch of other folks on April the
17   4th; is that right?
18       A   That would be correct, yes.
19
20
21
22
23
24
```



Page 350

Page 351

Page 352



## Page 353

16    Q   Okay.  You can set that aside for me,
17  please.
18        Are you familiar at all with Purdue's
19  abuse, detection and deterrent plan?
20        MR. NOVY:  Objection to form.
21        MR. DAVIS:  Objection to form.
22        THE WITNESS:  No.
23  BY MS. HERZFELD:
24    Q   Okay.  Have you ever discussed with

## Page 354

1  Mr. Rosen Purdue's efforts to curb the opioid
2  abuse problem?
3        MR. NOVY:  Form and foundation.
4        THE WITNESS:  Not that I recall.
5  BY MS. HERZFELD:

21        MS. HERZFELD:  Okay.  And I'm going to
22  move to strike everything after "I don't recall
23  whether I was involved or not."
24  BY MS. HERZFELD:

## Page 355

1    Q   Sir, do you know what neonatal
2  abstinence syndrome is?
3    A   No.
4    Q   Have you ever heard of the term
5  "neonatal abstinence syndrome"?
6        MR. DAVIS:  Objection to form.
7        THE WITNESS:  I don't recall hearing
8  that term before.
9  BY MS. HERZFELD:
10    Q   Okay.  Have you heard about babies being
11  born dependent on opioids?
12        MR. DAVIS:  Objection to form.
13        THE WITNESS:  I -- I don't recall
14  knowing about that.
15  BY MS. HERZFELD:
16    Q   Sir, do you know that I represent the
17  babies of Tennessee that have been born dependent
18  on opioids?
19        MR. DAVIS:  Objection to form.
20        THE WITNESS:  I did not know that.
21  BY MS. HERZFELD:
22    Q   If we could go back to Exhibit, I
23  think, 45.  Is that the 2014 e-mail?
24        MR. DAVIS:  Which one?

## Page 356

1        MS. HERZFELD:  2014, Exhibit 45.
2        MR. DAVIS:  Is that -- that looks like a
3  43.  I --
4        MS. HERZFELD:  Let me -- oops, that's
5  45.
6        MR. DAVIS:  Is this -- this is the one
7  you want (indicating), right?
8        MS. HERZFELD:  Yes.
9  BY MS. HERZFELD:



**Page 357**

22  BY MS. HERZFELD:
23      Q  Okay.  So in 2015, 2016 and 2017 --
24  actually, strike that.

**Page 358**

1      So Opana was removed from the market in
2  2017; is that correct?
3      MR. DAVIS:  Objection to form.
4      THE WITNESS:  Could you repeat the
5  question, please?
6  BY MS. HERZFELD:
7      Q  Yes.  Opana -- reformulated Opana ER was
8  removed from the market in 2017; is that correct?
9      A  I -- I don't know the exact date.
10      Q  Okay.  But it was removed from the
11  market, yes?
12      MR. DAVIS:  Objection to form.
13      THE WITNESS:  It was removed from the
14  market.
15  BY MS. HERZFELD:
16      Q  Okay.  And it wasn't removed from the
17  market last month, right?
18      MR. DAVIS:  Objection to form.
19      THE WITNESS:  It was not removed from
20  the market last month.  It was removed while I was
21  an employee at Endo.
22  BY MS. HERZFELD:
23      Q  Okay.  And you left your employment with
24  Endo when?

**Page 359**

1      A  In March of 2018.

**Page 360**

12      Q  Okay.  And what is it that you see is
13  the difference between "considered" and
14  "discussed"?
15      MR. DAVIS:  Objection to form.
16      THE WITNESS:  I think it's the -- the
17  Webster's dictionary for those two words, and --
18  BY MS. HERZFELD:
19      Q  Okay.
20      A  -- would use that as a reference
21  document.
22      Q  Great.
23      Okay.  And when dealing with opioid
24  products, you would agree that Endo should balance

Page 361

```
1    the benefits and the risks in the use of opioids;
2    is that correct?
3         MR. DAVIS:  Objection to form.
4    Foundation.
5         THE WITNESS:  When -- when I was an
6    employee at Endo, we sought to protect a
7    physician's ability to write prescriptions for
8    patients who needed them, and also undertake
9    efforts to mitigate the misuse and abuse of our
10   products.
11   BY MS. HERZFELD:
12       Q    Okay.
13       A    So those were dual goals that we had.
14       Q    Okay.  So I'm going to back up.
15           You'd agree with me that while you
16   believe there are benefits of opioids, there are
17   also risks to opioid use; is that correct?
18       A    As I've stated throughout the -- the
19   course of my testimony today, there are -- I
20   understand that there are risks associated with
21   the misuse and abuse of all opioids.
22
23
24
```





Page 365

20 BY MS. HERZFELD:
21    Q   Okay. I'm going to hand you what we're
22 going to mark as Munroe Exhibit 47.
23       (Munroe Exhibit No. 47 was marked
24          for identification.)

Page 366

1       MS. HERZFELD:  Could the witness see
2 that exhibit?
3       MR. DAVIS:  I'm going to claw this
4 document back as protected attorney work product
5 given the involvement of legal counsel in
6 preparation for the Opana ER AdCom.
7       MS. HERZFELD:  Who is the legal counsel
8 on the e-mail?
9       MR. DAVIS:  There's no legal counsel on
10 the -- the e-mail.
11       MS. HERZFELD:  So you're clawing it back
12 and there's no legal counsel?
13       MR. DAVIS:  I'm not going to debate the
14 work-product doctrine with you right now, but
15 we're clawing it back.
16       MS. HERZFELD:  Okay. Well, I'm
17 reserving my right to ask questions about this
18 document because I don't understand how it is that
19 you're declaring it work product if there's no
20 attorney on this e-mail.
21       MR. DAVIS:  Again, I'm not going to
22 explain the work-product doctrine to you right
23 now, but we're clawing it back.
24       MS. HERZFELD:  Pardon me?

Page 367

1       MR. DAVIS:  I said I'm not going to
2 explain the work-product doctrine to you right
3 now, but we're clawing the document back.
4       MS. HERZFELD:  Pardon me.  Okay.
5       Well, we're going to object to that, and
6 specifically reserve the ability to question on
7 that, we -- question on this specific issue.  This
8 e-mail very clearly has to do with Tennessee.
9 There's no attorney on it.  You haven't indicated
10 that it was done at the direction of an attorney.
11       So I don't understand exactly what the
12 work-product privilege claimed here is, but we're
13 specifically reserving our right to -- to question
14 about this.
15       MR. DAVIS:  Again, I'm not going to
16 discuss the work-product doctrine with you on the
17 record right now.  We're clawing it back.
18       MS. HERZFELD:  Okay, we'll talk about it
19 during the break.  Okay?
20 BY MS. HERZFELD:
21    Q   Do you recall ever talking about the
22 opioid problem in Tennessee and discussing it as
23 it's a story about Tennessee, not a story about
24 Opana?

Page 368

1       MR. DAVIS:  Objection to form.
2       THE WITNESS:  I -- I don't recall.
3 BY MS. HERZFELD:
4    Q   Do you -- were you involved at all in
5 trying to figure out why it is that Tennessee had
6 such an abuse problem with Opana?
7       MR. DAVIS:  Objection to form,
8 foundation.
9       THE WITNESS:  I was not involved.  That
10 would have been our pharmacovigilance and our
11 medical affairs department.  The principal
12 individual at Endo would have been Dr. Neil
13 Shusterman, and he would have information about
14 that.
15 BY MS. HERZFELD:



Page 369

Page 370

Page 371

Page 372

```
 1
 2          Do you see that?
 3      A   Yes.  I -- I want to familiarize myself
 4  with this e-mail, so I'm going to take a moment to
 5  read it.
 6      Q   Sure, sir.
 7      A   (Peruses document.)
 8          MR. DAVIS:  I claw this one back too.
 9  Same principle.  This is covered by the
10  work-product doctrine.  It's work performed at the
11  direction of legal counsel.  Specifically Jenn
12  Dubas is referenced in the e-mail chain and copied
13  in the earlier chain.
14          MS. HERZFELD:  Okay.  We're going to
15  object to you clawing this back, and reserve our
16  right to question on this document.
17          MR. DAVIS:  Would -- would you just hang
18  on to them.  I don't want them on the record.
19  BY MS. HERZFELD:
20      Q   Do you know when Endo first observed a
21  problem with injection of Opana in Tennessee?
22          MR. DAVIS:  Objection to form.
23          THE WITNESS:  I don't.
24  BY MS. HERZFELD:
```

Page 373

1    Q   When were you first aware of it?
2    A   I don't know.
3    Q   Okay.  I'm going to hand you what we're
4  going to mark as Munroe Exhibit 49.  We can see if
5  this one does not get clawed back.
6        (Munroe Exhibit No. 49 was marked
7        for identification.)
8  BY MS. HERZFELD:
9    Q   For the record, it's ENDO-OPIOID_MDL-
10  04060965 through 68.
11   A   (Peruses document.)
12   Q   Sir, do you recognize this as an e-mail
13  sent from you to Stephen Mock on February 22nd,
14  2017?
15       MR. DAVIS:  Hang on, Brian.
16       (Counsel conferring.)
17       MR. DAVIS:  Can we go off the record for
18  a second, please?
19       THE VIDEOGRAPHER:  Is that okay,
20  Counsel?
21       The time is 7:37 p.m.  We're going off
22  the record.
23       (Pause in the proceedings.)
24       THE VIDEOGRAPHER:  The time is 7:41 p.m.

Page 374

1  We're back on the record.
2  BY MS. HERZFELD:
3    Q   Okay.  I just handed you a document
4  which your counsel has just removed from you.
5        MR. DAVIS:  Yeah, well, again, similar
6  to the last two documents we've clawed back, these
7  are documents that were prepared at the direction
8  of counsel in preparation for the Opana ER AdComs.
9  So we're calling them back as protected by the
10  work-product doctrine.
11       MS. HERZFELD:  Okay.  And is there an
12  attorney identified anywhere in this e-mail?
13       MR. DAVIS:  Again, I'm not going to
14  debate the work-product doctrine with you.  I
15  think you, like everyone in the room, understands
16  that an attorney not need be present on a
17  communication for the document to be protected by
18  the work-product doctrine.
19       MS. HERZFELD:  I understand that, but my
20  question is, is there anybody on this e-mail
21  that's an attorney?  I don't -- I'm just asking
22  that.  Do you know?
23       MR. DAVIS:  Can I see the e-mail?
24       Do you have Exhibit 49?

Page 375

1        Is it 49 we're talking about now?  Do I
2  have the right one in front of me?
3        MS. HERZFELD:  49.
4        You can follow up in a communication
5  after the deposition to let me know if there's an
6  attorney copied on this e-mail or any of the
7  others you've clawed back.
8  BY MS. HERZFELD:
9    Q   Okay.  I'm going to preserve our right
10  to question you on that e-mail as well, which has
11  been marked as Exhibit 49, subject to where we end
12  up on this work-product argument.
13
14
15
16
17
18
19
20
21
22
23
24

Page 376

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Page 377



Page 378

13    Q   Okay.  But ultimately, none of those
14  undertakings or initiatives that were discussed by
15  Endo ended up curbing the opioid abuse rates in
16  Tennessee; is that right?
17        MR. DAVIS:  Objection to form.
18        THE WITNESS:  I -- I'm not aware of the
19  opioid abuse rates in Tennessee.
20  BY MS. HERZFELD:
21    Q   Okay.  Did you hear of the opioid
22  injection -- Opana injection -- strike that.
23        Did you ever hear that the Opana
24  injection issue in Tennessee ever got solved?

Page 379

1         MR. DAVIS:  Objection to form.
2         THE WITNESS:  I -- I did not hear what
3   the situation was after I left as an employee.
4   BY MS. HERZFELD:
5     Q   What about when you were a consultant?
6     A   No, I -- I never -- I never really -- by
7   that time the company had -- had stopped marketing
8   its opioid products, and they weren't much of a
9   government relations priority.
10    Q   Okay.  And you didn't do any follow-up
11  to see how the folks in Tennessee were doing once
12  Opana was pulled from the market.
13        MR. DAVIS:  Objection to form.
14        THE WITNESS:  It wasn't -- my job at --
15  at Endo as head of government affairs was to
16  communicate the company's positions to elected and
17  appointed officials on those issues that we
18  identified were -- had a benefit to society,
19  public health, or benefit to patients, and also a
20  benefit to Endo.  So that's where I spent my time.
21  BY MS. HERZFELD:
22    Q   And when they didn't have benefits, like
23  people injecting Endo's drug Opana into their
24  veins and then overdosing in Tennessee, did your

Page 380

1   office do anything to follow up on that
2   non-benefit of an Endo opioid product?
3         MR. DAVIS:  Objection to form.
4         THE WITNESS:  I -- I don't want to
5   characterize all of the work that I didn't do.  I
6   feel more comfortable characterizing the work that
7   I did do.  And that work was at the intersection
8   of public policy issues that had a benefit to
9   society, public health, or the patient, which also
10  had a benefit to Endo.
11  BY MS. HERZFELD:
12    Q   And did those intersection of public
13  policy issues when you're talking about the
14  benefit to society, public health or the patient,
15  the people that were abusing Opana by injecting it
16  into their veins and then overdosing, did -- was
17  that something you would consider a benefit of
18  Opana?
19    A   Well, I would say --
20        MR. DAVIS:  Objection to form.
21        THE WITNESS:  -- this:  That there
22  certainly was not a benefit to Endo, and that we
23  were very concerned about mitigating the abuse and
24  misuse of opioids throughout the United States,

Page 381

1    including Tennessee.
2         (Munroe Exhibit No. 50 was marked
3         for identification.)
4    BY MS. HERZFELD:
5         Q    Great.  I'm going to hand you what we've
6    marked as Munroe Exhibit 50.
7         Take a look at that, please.
8         A    (Peruses document.)
9         MR. DAVIS:  Claw this back.  These are
10   draft slides prepared for the Opana ER AdCom that
11   were prepared at the direction and with the --
12   guidance of legal counsel at the company.
13        MS. HERZFELD:  Okay.  We're going to
14   object to your clawback on this document.  So
15   you're aware, it was not clawed back in a previous
16   deposition.  Okay?
17        I'm reserving my right to ask a
18   multitude of questions about this document.
19   BY MS. HERZFELD:
20
21
22
23        MR. DAVIS:  If you're going to ask him
24   questions that are based upon the substance of a

Page 382

1    document that we've just clawed back, I'm going to
2    ask -- instruct Mr. Munroe not to answer.
3         MS. HERZFELD:  I'm just asking if he
4    recalls saying it.
5         THE WITNESS:  On the advice --
6         MR. DAVIS:  Do you recall saying --
7         THE WITNESS:  On the advice of counsel,
8    I'm choosing not to answer that question.
9    BY MS. HERZFELD:
10        Q    Okay.  Do you believe that there is an
11   opioid drug abuse problem in this country?
12        A    I do.
13        Q    Okay.  And do you believe that that's a
14   legitimate problem?
15        A    What do you mean by "legitimate"?
16        Q    Do you believe it's a problem that's
17   created by the media or do you believe that there
18   is actually a drug abuse problem?
19        MR. DAVIS:  Objection to form.
20        THE WITNESS:  I think -- I was aware
21   during my entire employment at Endo, and I am
22   aware today, of the risk from misuse and abuse of
23   all opioids.
24   BY MS. HERZFELD:

Page 383

1         Q    Have you ever known anyone that's been
2    addicted to opioids, sir?
3         MR. DAVIS:  Objection to form.
4         THE WITNESS:  I don't recall that I do.
5    BY MS. HERZFELD:
6         Q    Have you ever met someone who has abused
7    opioids?
8         MR. DAVIS:  Objection to form.
9         THE WITNESS:  I don't recall that I
10   do -- that I have.
11   BY MS. HERZFELD:
12        Q    Okay.  Do you -- have you ever visited
13   with someone who considers themselves to be in
14   recovery from an abuse to opioids?
15        MR. DAVIS:  Objection to form.
16        THE WITNESS:  I don't recall that I
17   have.
18   BY MS. HERZFELD:
19        Q    Have you ever been to Tennessee, sir?
20        A    Yes, I have.
21        Q    Okay.  Where have you been?
22        A    Recently with my family, we went to
23   Pigeon Forge, Tennessee, to the Great Smoky
24   Mountain National Park and Dollywood.

Page 384

1         Q    I hope you enjoyed Dollywood.
2         A    Yes.  Thank you.
3         Q    Are you aware that that region of
4    Tennessee has been particularly hit by the
5    opioid abuse epidemic?
6         MR. DAVIS:  Objection to form.
7         THE WITNESS:  I -- I am aware that --
8    that Appalachia has been hit and that -- I'm not a
9    geography expert, but that that part of Tennessee
10   is -- is known to be part of Appalachia.
11   BY MS. HERZFELD:
12        Q    Okay.  And other than that trip with
13   your family to Pigeon Forge, have you been to
14   Tennessee for any other reason professionally?
15        A    I might have been to Tennessee to the
16   state capital early in my career, because I did a
17   lot of work in state government affairs, but it
18   would have been so long ago that I don't recall
19   the details.
20        Q    Okay.  And have you been to any other
21   city in Tennessee other than Nashville or --
22        A    Not that I recall.
23        Q    Have you ever spoken with any law
24   enforcement in Tennessee?

Page 385

1       A   Not that I recall.

2       Q   Okay.  I'm going to hand you what we're

3   marking as Munroe Exhibit 51.

4           (Munroe Exhibit No. 51 was marked

5           for identification.)

6   BY MS. HERZFELD:

7       Q   Sir, do you recognize this as an e-mail

8   with an attached PowerPoint that was sent from

9   your e-mail account on May 30th, 2012, to the

10  people listed in the "to" line?

11      A   Yes, I do.







Page 397



Page 398

Page 399

BY MS. HERZFELD:

Q   Okay.  But Opana ER reformulated never actually got the abuse-deterrent labeling from the FDA; is that right?

MR. DAVIS:  Objection to form.

THE WITNESS:  I don't want to speak to the label, but if you do have questions about the label, Bob Barto was our head of regulatory affairs, and he would be able to address those issues for you.

BY MS. HERZFELD:

Q   Okay.  And I understand you don't want to speak to it, but my question is, do you know if Opana ER reformulated ever received abuse-deterrent labeling?

MR. DAVIS:  Objection to form.

THE WITNESS:  I really don't want to talk about the label because that's just not something that I have a -- a comfort level with in terms of my area of expertise.

Page 400

BY MS. HERZFELD:

Q   I understand that, sir, but my question is do you have knowledge.  That's -- that's my question.  So you're here today --

A   I don't recall knowledge --

Q   -- because I'm allowed to ask you --

MR. DAVIS:  Let her finish the question.

BY MS. HERZFELD:

Q   I'm sorry.  You don't have any knowledge, is that what you said?  I didn't hear you.

MR. DAVIS:  Ask him the question again, please.

MS. HERZFELD:  Sure.

BY MS. HERZFELD:

Q   I'm asking if you have any knowledge if Opana ER reformulated received abuse-deterrent labeling?

MR. DAVIS:  Objection to form.

You can answer that.

THE WITNESS:  I don't recall any level of knowledge about the answer to that question.

BY MS. HERZFELD:

Q   Okay.  And do you know if you ever had

Page 401

1    knowledge of the answer to that question, or you
2    just don't remember today?
3         MR. DAVIS: Objection to form.
4         THE WITNESS:  I can't say.  I just don't
5    know.
6    BY MS. HERZFELD:
7         Q   Okay.  Okay.  What would be considered a
8    threat -- a state legislative opportunity that
9    would be a threat to Endo in regard to opioids?
10        MR. DAVIS: Objection to form,
11   foundation.
12        THE WITNESS:  A threat might be an
13   impediment to a physician's ability to write an
14   appropriate prescription medicine for an
15   appropriate patient for an appropriate disease
16   state.
17        One of our public policy goals was to
18   facilitate patient access to appropriate pain care
19   medications that were deemed appropriate by
20   physicians.
21   BY MS. HERZFELD:
22        Q   Okay.  And physicians can work at pill
23   mills; is that right?
24        MR. DAVIS: Objection to form.

Page 402

1    Foundation.
2         THE WITNESS:  I don't know about --
3    anything about physicians working at pill mills,
4    actually.
5    BY MS. HERZFELD:
6         Q   Okay.  We talked before about pill
7    mills.  I believe you talked about knowing that
8    it's a place where people would go to get an
9    illegitimate prescription; is that right?
10        A   I don't recall what our conversation
11   was.
12        Q   Oh, okay.  Okay then.
13        Do you recall what, if any, groups
14   specific in Tennessee you worked with --
15        MR. DAVIS: Objection.
16   BY MS. HERZFELD:
17        Q   -- for your lobbying efforts at Endo?
18        MR. DAVIS: Objection to form.
19        THE WITNESS:  No, I don't recall.
20   BY MS. HERZFELD:
21        Q   Okay.  Did you have a contract lobbyist
22   in Tennessee?
23        A   I believe at one point the company did
24   have a contract lobbyist.  That would have been a

Page 403

1    contract lobbyist that worked for Candie Phipps.
2         Q   Okay.  And why did the company have a
3    contract lobbyist in Tennessee?
4         A   It would have been to pursue public
5    policy issues where we believed there was a
6    benefit to society, public health, or a benefit to
7    appropriate patient care and a benefit directly to
8    the patient, and also an intersection with what
9    was beneficial to Endo.
10        Q   Okay.  And who on the lobbying staff's
11   job would it have been to protect the interests of
12   those who were being addicted to Opana in
13   Tennessee?
14        MR. DAVIS: Objection to form.
15        THE WITNESS:  Our job in -- in
16   government affairs was to work on -- on those
17   issues where there was a benefit to society,
18   public health, or a benefit to the patient, and
19   where there was an intersection of those
20   principles with benefits to Endo.
21        What we didn't work on -- I don't want
22   to speak to what we didn't work on, because what
23   we didn't work on was -- was, frankly, infinite
24   where there were a lot of things we didn't do.  I

Page 404

1    feel totally comfortable describing what we did
2    do, and -- and those were efforts that I was proud
3    of.
4    BY MS. HERZFELD:
5         Q   Okay.  And my question is, who, if
6    anyone, in government affairs was responsible for
7    looking out for the people who were getting
8    addicted to Endo's product in Tennessee?
9         MR. DAVIS: Objection to form,
10   foundation.
11        THE WITNESS:  We worked on -- I can tell
12   you what we did work on.  I can't speak to the
13   issues of what we didn't do, but I can speak to
14   the issues of what we did do.  And what we did do
15   was work on public policy issues where there was a
16   benefit to society, public health, benefit to
17   patients, and where those ideals intersected with
18   the interests of Endo.
19        MS. HERZFELD:  I'm going to move to
20   strike the answer there.
21   BY MS. HERZFELD:
22        Q   My question is, was there anyone on the
23   staff of government affairs whose responsibility
24   it was to look out for the people who were getting

Page 405

1    addicted to Opana in Tennessee?
2         MR. DAVIS:  Objection.
3    BY MS. HERZFELD:
4         Q    It's a simple question.  Was there
5    somebody or was there not?
6         MR. DAVIS:  Objection to form,
7    foundation.
8         THE WITNESS:  I believe strongly that
9    the work we did which was directly related to
10   public policy issues where there was a benefit to
11   society, public health or a benefit to patients,
12   and where those ideals intersected with benefits
13   to Endo, that we would engage in public policy
14   activities.  I don't want to describe the infinite
15   number of things we didn't do.  I would rather be
16   forthcoming and tell you what we did do.
17   BY MS. HERZFELD:
18        Q    Okay.  And so you've told me what you
19   did do, and you've said you don't want to talk
20   about what you didn't do.
21        So was there someone in charge of
22   addiction stuff in Tennessee or was there not?
23        MR. DAVIS:  Objection to form.  Asked
24   and answered.

Page 406

1         THE WITNESS:  I think --
2         MS. HERZFELD:  He hasn't answered it.
3         THE WITNESS:  -- I've answered this
4    question, you know, many times.
5    BY MS. HERZFELD:
6         Q    You talked about what you did do, and
7    you talked about what you didn't do.  And my
8    question is simple:  Was there somebody assigned
9    to look out for those interests in Tennessee?
10        MR. DAVIS:  Objection to form, asked and
11   answered.
12        THE WITNESS:  I can tell you that we did
13   work on public policy issues --
14   BY MS. HERZFELD:
15        Q    Okay.  I'm going to back up.
16        A    -- where there was a --
17        MR. DAVIS:  Let him finish his answer.
18        THE WITNESS:  -- benefit to society,
19   public health, and a benefit to patients -- and/or
20   a benefit to patients.
21   BY MS. HERZFELD:
22        Q    Okay.  How about --
23        A    And where those principles intersected
24   with the interests of Endo.

Page 407

1         MS. HERZFELD:  Okay.  I'm going to move
2    to strike that as nonresponsive.
3    BY MS. HERZFELD:
4         Q    What was the name of the person who was
5    in charge in government affairs of looking out for
6    people who were addicted to Endo's products?
7         MR. DAVIS:  Objection to form,
8    foundation.
9         THE WITNESS:  Yeah, I --
10   BY MS. HERZFELD:
11        Q    Do you have a name?
12        A    I don't remember all the names of the
13   employees in my department over the years.
14        Q    Okay.
15        A    I can't recite them, you know, off the
16   cuff.
17        Q    Okay.  And would there have been a title
18   of a person whose job would have included that?
19        MR. DAVIS:  Objection to form.
20   Foundation.
21        THE WITNESS:  I can tell you that the
22   people that did work for me in state government
23   affairs in particular would have worked on public
24   policy issues where there was a benefit to

Page 408

1    society, public health, and a benefit to patients,
2    and where those principles intersected with
3    interests of Endo.  I can tell you that.  That
4    happened in both state government affairs and in
5    federal government affairs.
6         MS. HERZFELD:  I'm going to move to
7    strike that answer as nonresponsive.
8    BY MS. HERZFELD:
9         Q    I'm going to hand you what we're marking
10   as Munroe Exhibit 53.
11        (Munroe Exhibit No. 53 was marked
12        for identification.)
13   BY MS. HERZFELD:
14        Q    Okay.  This is ENDO-OPIOID_MDL-02795421
15   and 22, with -- the attachment is 95460 through
16   66.  We didn't print out all of attachments, just
17   the one that was relevant to Tennessee.
18        Sir, do you recognize this as an e-mail
19   sent from you to James Manser?
20        A    I do.
21        Q    Okay.  And that's dated June 26, 2014;
22   is that correct?
23        A    Yes.
24        Q    Okay.  And it's forwarding an e-mail

Page 409

1    from Alan Must to you, copying Burt Rosen, about
2    materials distributed for the meetings in
3    Pennsylvania that day.  Is that right?
4        A    That's what this says.
5        Q    And do you know --
6        A    You read that correctly.
7        Q    And it says in the subject, "HR659,
8    Opioid Addiction Advisory Committee Meeting,
9    6-26-14."
10            Did I read that correctly?
11       A    That sounds right.
12       Q    Okay.  So if you'll switch with me to
13   the attachment that says "Joint State Government
14   Commission, dated June 4th, 2014."  Do you see
15   where I'm at?
16       A    I do.
17       Q    Okay.  And then it says, title:
18   "Prescription for Success:  Statewide Strategies
19   to Prevent and Treat the Prescription Drug Abuse
20   Epidemic in Tennessee."
21            Did I read that correctly?
22       A    You did.
23       Q    Okay.  And do you know who created this
24   document?

Page 410

1        A    I don't.
2        Q    Do you know where it came from?
3        A    This document does not look familiar to
4    me, and as -- as the -- the cover e-mail
5    indicates, this is something that I sent along FYI
6    to the person who handled state government
7    relations.  And specifically Pennsylvania, that
8    would be James Manser.  So I just forwarded this
9    along.
10       Q    Okay.  And if you just flip through --
11       A    I'm not even sure I read it at the time,
12   but I don't recall ever seeing it.
13       Q    Okay.  If you'll just flip through it --
14   I don't need you to read every page, but if you'll
15   just kind of generally flip through it for me.  It
16   talks very specifically about different things
17   that can be done on -- to combat opioid abuse in
18   Tennessee.
19            Do you know if Endo did any of the
20   things that are recommended in this document?
21            MR. DAVIS:  If you're going to ask him
22   that question, he's going to do a lot more than
23   just flip through the document.
24            THE WITNESS:  Well -- well, first of

Page 411

1    all, I don't recognize the document.
2    BY MS. HERZFELD:
3        Q    Okay.
4        A    So I don't know -- I -- on both fronts,
5    I don't recognize the document, and I don't know
6    all of the things that Endo did or does to
7    mitigate the misuse and abuse of opioids.
8        Q    Okay.
9        A    So I wouldn't be able to crosswalk an
10   answer for you --
11       Q    Okay.
12       A    -- because I don't -- I'm not familiar
13   with this document, and I'm not familiar with
14   everything that Endo has done to mitigate the
15   misuse and abuse of opioids.
16       Q    Okay.  Very good.  Thank you, sir.  You
17   can put that aside.
18            Okay.  And I think I just have a couple
19   more questions for you.
20            I'll mark this as Munroe Exhibit 54.
21            (Munroe Exhibit No. 54 was marked
22            for identification.)
23   BY MS. HERZFELD:
24       Q    This is ENDO-OPIOID_MDL-02791740

Page 412

1    through 42 with an attachment -- two attachments.
2            Sir, do you recognize this as an e-mail
3    sent from Greg Thomas to you and Timothy Byrne?
4        A    I do.
5        Q    Okay.  And looking down at the e-mail
6    that was forwarded to you, does this indicate
7    that, based on prescription volume for those past
8    13 weeks leading up to November 13th, 2012, that
9    Tennessee was number two in the market for
10   Opana ER?
11       A    Yeah, I'm -- I'm really unfamiliar with
12   this data.
13       Q    Sure.  Well, let's just read the e-mail
14   that is being forwarded to you.
15            Okay.
16       Q    So it says:  "Tim and Brian, per our
17   brief discussion on researching the state
18   substitution laws, please see e-mail below
19   regarding the top ten states for Opana.  Look
20   forward to discussing moving ahead on this
21   project.  Greg."
22            Did I read that correctly?
23       A    You did.
24       Q    Do you know what the project is he's

Page 413

1    referring to?
2       A   I don't.
3       Q   Okay.  Do you know if you were working
4    on state substitution laws in some states?
5       A   That -- that sounds familiar, but I -- I
6    don't recall the details of it.
7       Q   And when I say "state substitution
8    laws," what do you -- what do you take that to
9    mean?
10      A   We believed that having generic versions
11   of Opana ER on the market at the same time that
12   the new formulation was on the market would
13   undermine the ability of Opana ER new formulation
14   to reach its full potential in the mitigation of
15   misuse and abuse.
16      Q   Okay.  And that mitigation, the intended
17   mitigation of Opana ER reformulated didn't work so
18   well in Tennessee because they continued injecting
19   Opana ER; is that right?
20      MR. DAVIS:  Objection to form.
21      THE WITNESS:  I --
22      MR. DAVIS:  Foundation.
23      THE WITNESS:  I don't want to speak to
24   the particular drug abuse issues in Tennessee

Page 414

1    because I'm just not knowledgeable about them.  I
2    did become aware of them when there were
3    discussions that happened in the company.
4    BY MS. HERZFELD:
5       Q   Okay.
6       A   And I -- I did read about them in the
7    press.
8       Q   Okay.
9       A   So I have a -- a high level of
10   familiarity with them, but I don't know about
11   the -- the Tennessee prescription drug abuse
12   problems in particular, so I would like to limit
13   my remarks.
14      But I would refer you to Dr. Neil
15   Shusterman, our chief medical officer at the time,
16   who is very expert in these issues and could
17   probably answer your questions.
18      Q   Okay.  And looking down at the e-mail
19   that was forwarded to you, it says:  "Hi, Greg, I
20   have attached a spreadsheet containing IMS Xponent
21   level data for the current 13-week period as of
22   10/26/12."
23      Did I read that correctly?
24      A   I'm just paying attention to this for

Page 415

1    the first time in my recollection, so I -- like I
2    said, I don't recall this at all.  But, yeah, I
3    think you read that correctly.
4       Q   Okay.  And my question is very simple.
5    So Rowan D'Annibale, in Rowan's e-mail to Greg
6    Thomas, identifies Tennessee as one of the top ten
7    states for Opana ER, according to this e-mail; is
8    that right?
9       A   That's what this e-mail indicates, I
10   believe.
11      Q   Okay.  Thank you, sir.
12      Okay, this is my last one.  We will mark
13   this as Munroe Exhibit 55.
14      (Munroe Exhibit No. 55 was marked
15      for identification.)
16   BY MS. HERZFELD:
17      Q   It's EPI001106854 through 856 with an
18   attached PowerPoint.
19      Sir, do you recognize this as an e-mail
20   sent from Greg Thomas to Timothy Byrne and you,
21   copying a bunch of people?
22      A   Yes, I do.
23      Q   And the date on this e-mail is
24   November 13th, 2012; is that correct?

Page 416

1       A   That's what this says.
2       Q   Okay.  And then Greg is passing along
3    information to you and Timothy as an FYI; is that
4    right?
5       A   That's what this says.
6       Q   Okay.  Do you recall reading this
7    e-mail?
8       A   I don't.
9       Q   Okay.  If you'll go down with me to the
10   e-mail from Annnibale -- or Rowan D'Annibale,
11   which is being forwarded then on from Greg to you,
12   it talks about "Key Insights."
13      Do you see where I'm at?
14      A   I do.
15      Q   Okay.  And so see where it says
16   "oxymorphone HCl"?
17      A   I do.
18      Q   Could you read that for me, please.
19      A   "Oxymorphone HCl ER and contributes 40
20   percent of the TRx volume in the current 13 weeks.
21   The Midwest has also seen the most significant
22   decline in Opana ER volume since the
23   reformulation."
24      Q   Okay.  Then the next one, "Oxymorphone

Page 417

1  HCl."
2      A  "ER is geographically concentrated with
3  40 percent of TRx volume coming from four
4  districts - Tennessee, Western PA, Kentucky, Ohio,
5  West Virginia.  More than 22 percent of TRx volume
6  is from four Tennessee footprints - East
7  Knoxville, North Knoxville, East Nashville and
8  West Nashville."
9      Q  Okay, you can stop right there.
10         Do you know of any specific action that
11  Endo took in response to getting these numbers
12  about the concentration of oxymorphone HCl ER in
13  those districts?
14         MR. DAVIS:  Objection to form.
15         THE WITNESS:  I'm just looking at this
16  document for the first time.
17  BY MS. HERZFELD:
18      Q  Sure.
19      A  (Peruses document.)
20      Q  My question is pretty simple.  Do you
21  know of any activities that Endo took specifically
22  in response to this information about the
23  geographic concentration of prescription volumes
24  in these four footprints for oxymorphone HCl ER?

Page 418

1         MR. DAVIS:  Objection to form.
2         THE WITNESS:  I just don't recall seeing
3  this document, so I'm just taking a quick look at
4  it.
5  BY MS. HERZFELD:
6      Q  You can take a look at it, that's fine.
7      A  (Peruses document.)  No.
8         MS. HERZFELD:  Okay.  I don't have any
9  further questions for you, Mr. Munroe.
10         THE WITNESS:  Thank you.
11         MS. HERZFELD:  Thank you very much.
12         THE WITNESS:  Thank you.
13         MS. HERZFELD:  We're standing on our
14  reservation on those various documents that
15  counsel clawed back.  So we'll be suspending the
16  deposition at this time pursuant to further
17  litigation on those issues and others.
18         MR. DAVIS:  Let's go off.
19         THE VIDEOGRAPHER:  The time is 8:33 p.m.
20  We're going off the record.
21         (Recess.)
22         THE VIDEOGRAPHER:  The time is 8:43 p.m.
23  We're back on the record.
24         EXAMINATION BY COUNSEL FOR ENDO

Page 419

1         PHARMACEUTICALS AND PAR
2  BY MR. DAVIS:
3      Q  Mr. Munroe, I just have a couple of
4  questions for you that I want to clarify, if I
5  may.
6         Do you recall questioning from the MDL
7  plaintiffs regarding the Pain Care Forum?
8      A  I do.
9      Q  Do you recall discussion with the MDL
10  plaintiffs regarding the membership of the Pain
11  Care Forum?
12      A  I do.
13      Q  Do you recall being shown lists of the
14  members of the Pain Care Forum?
15      A  I do.
16      Q  And are those lists the lists that are
17  attached to Exhibits 12 and 13?
18      A  Let me take a quick look.
19         That's 13.  Yes.
20      Q  And did counsel for the MDL plaintiffs
21  ask you about all of the members of the Pain Care
22  Forum?
23      A  No.
24      Q  Did -- you can see here, this document

Page 420

1  that -- it's Exhibit 14 that the MDL plaintiffs
2  created during that questioning.  Do you recall
3  this?
4      A  Yes.  And that's a very circumscribed
5  limited view of the Pain Care Forum.
6      Q  Do you recall being asked questions
7  about patient advocacy organizations and
8  professional societies who were members of the
9  Pain Care Forum?
10      A  I -- I remember -- yes, I do remember
11  that question.
12      Q  Were there other patient advocacy
13  organizations or professional societies who were
14  members of the Pain Care Forum?
15      A  There certainly were, a number of them.
16      Q  So let's say there's other -- other
17  organizations.
18         MS. AMINOLROAYA:  Objection.
19  BY MR. DAVIS:
20      Q  Do you recall whether --
21         MS. AMINOLROAYA:  Objection.  Please do
22  not mark my exhibit.
23  BY MR. DAVIS:
24      Q  Do you recall whether --

Page 421

1      MS. AMINOLROAYA: Objection.
2  BY MR. DAVIS:
3      Q    -- whether any of those other
4  organizations related to nursing?
5      A    Yes.  Pain nursing in particular.
6      Q    Okay.  How about cancer treatment?
7      MS. AMINOLROAYA:  Objection.  This is
8  plaintiffs' exhibit and -- excuse me.  We need to
9  go off the record.  This is my exhibit, and if you
10  want to mark up this exhibit, you can, but you
11  need to do it on another copy.
12      MR. DAVIS:  Well, we've already started.
13  This is an exhibit that you created.  I'm just
14  making it actually complete.
15  BY MR. DAVIS:
16      Q    Mr. Munroe, do you recall --
17      MS. AMINOLROAYA:  No.  Objection.
18      MR. DAVIS:  You've got an objection on
19  the record.
20      MS. AMINOLROAYA:  I object.  You are --
21  you are altering my exhibit.
22      MR. DAVIS:  Parvin, you got your -- you
23  got your objection on the record.
24  BY MR. DAVIS:

Page 422

1      Q    Mr. Munroe, do you recall any patient
2  advocacy organizations related to cancer
3  treatment?
4      A    Yes.  In particular, the American Cancer
5  Society, the renowned American Cancer Society.
6      Q    How about patient advocacy organizations
7  or professional societies related to hospice care?
8      A    Yes.  The Hospice and Palliative Care
9  both were members of the Pain Care Forum.
10      Q    How about pain advocacy organizations or
11  professional societies related to drug abuse
12  monitoring?
13      A    Yes.  They --
14      MS. AMINOLROAYA:  Objection to the
15  alteration of the exhibit.
16      THE WITNESS:  They were also members of
17  the Pain Care Forum.  It was a very broad
18  coalition.
19  BY MR. DAVIS:
20      Q    How about third-party organizations
21  related to drug abuse prevention?
22      A    Yes, they were also members of the Pain
23  Care Forum.
24      Q    Do you recall counsel for the MDL

Page 423

1  plaintiffs asking you about companies who were
2  members of the Pain Care Forum?
3      A    I do.
4      Q    Are these all of the companies that were
5  members of the Pain Care Forum?
6      A    No, I don't think so.
7      Q    Can you think of any other companies who
8  were members of the Pain Care Forum?
9      A    Well, one of the big companies that was
10  a very active member was Boston Scientific, makers
11  of medical devices.  They were not an opioid
12  company.  But there were other companies that were
13  non-opioid companies that were members of the Pain
14  Care Forum.
15      Q    Okay.  Do you recall any patient
16  advocacy or professional societies related to
17  pharmacists --
18      A    I do --
19      Q    -- that were members of the Pain Care
20  Forum?
21      A    I do, and they were members.
22      Q    Okay.  Do you recall, Mr. Munroe, you --
23  were you a member of the executive committee of
24  the Pain Care Forum?

Page 424

1      A    Yes.
2      Q    As a member of the executive committee
3  of the Pain Care Forum, do you recall excluding
4  any organization or company from membership?
5      A    I don't recall excluding any
6  organization.
7      Q    So not exclusive.
8      Mr. Munroe, do you recall whether the
9  Pain Care Forum ever took any policy positions?
10      A    I don't recall them ever taking a policy
11  position.
12      Q    Mr. Munroe, can you tell me anything
13  about the agenda of the Pain Care Forum?
14      A    Well, it is --
15      MS. AMINOLROAYA:  Object to form.
16      THE WITNESS:  -- a completely open
17  agenda, and -- and if you just e-mailed the
18  moderator the topic that you wanted to -- to place
19  on the agenda, it went on the agenda.
20      MR. DAVIS:  Great.  Thank you,
21  Mr. Munroe.
22      THE WITNESS:  You're welcome.
23      THE VIDEOGRAPHER:  Off the record.
24      MS. AMINOLROAYA:  Off the record.

## Page 425

1    THE VIDEOGRAPHER:  Okay.  The time is
2  8:49 p.m.  We're going off the record.
3    (Recess.)
4    THE VIDEOGRAPHER:  Okay.  The time is
5  5:30 -- sorry, 8:56 p.m.  We're back on the
6  record.
7    MS. AMINOLROAYA:  I want to reiterate a
8  standing objection to the defacing of Exhibit 14.
9  We are at Arnold & Porter's offices in Washington,
10  D.C.  Mr. Davis could have easily made a copy of
11  the exhibit and marked that one, and instead chose
12  to deface and -- and extricably alter Exhibit 14.
13  And we reserve all rights with respect to that.
14    FURTHER EXAMINATION BY COUNSEL
15    FOR THE MDL PLAINTIFFS
16  BY MS. AMINOLROAYA:
17    Q   Mr. Munroe, do you recall testifying
18  that you could not recall excluding any
19  organization from the Pain Care Forum?
20    A   I--
21    MR. DAVIS:  Objection to form.
22    THE WITNESS:  I -- I do recall
23  testifying to that, that I didn't recall.
24  BY MS. AMINOLROAYA:

## Page 426

1    Q   If someone wanted to join the Pain Care
2  Forum, would there be any way for a person to
3  Google the Pain Care Forum and find them?
4    A   I don't know.  I've never tried to
5  Google the Pain Care Forum.
6    Q   Could they look them up in the
7  phonebook?
8    MR. DAVIS:  Objection to form.
9    THE WITNESS:  They might have been able
10  to Google them.  I don't know.
11  BY MS. AMINOLROAYA:
12    Q   Does the Pain Care --
13    A   I'm not sure I know of anybody who uses
14  a phonebook anymore.
15    Q   Could they be looked up on
16  whitepages.com or the businesswhitepages.com?
17    A   I don't know.  You'd have to try
18  yourself.  I've never done that.
19    Q   All right.  So could someone find out
20  from public sources on the internet about the Pain
21  Care Forum and how to join them?
22    A   I don't know.  I've never done a -- a
23  search on the internet for the Pain Care Forum.
24    Q   And did the Pain Care Forum post their

## Page 427

1  meeting information publicly anywhere?
2    MR. DAVIS:  Objection to form.
3    THE WITNESS:  Not to my knowledge.
4  BY MS. AMINOLROAYA:
5    Q   Did they post their agendas in a public
6  space for the world to see?
7    MR. DAVIS:  Objection to form.
8    THE WITNESS:  No, they did not.
9  BY MS. AMINOLROAYA:
10    Q   Did they publicize their events in any
11  other way?
12    MR. DAVIS:  Objection to form.
13    THE WITNESS:  I'm unaware of any other
14  notices for meetings of the Pain Care Forum other
15  than those that -- that came from the e-mail
16  distribution.
17  BY MS. AMINOLROAYA:
18    Q   Thank you.
19    And did Will Rowe have a leadership
20  position at the Pain Care Forum?
21    MR. DAVIS:  Objection to form.
22    THE WITNESS:  I don't know.
23    MR. DAVIS:  Foundation.
24  BY MS. AMINOLROAYA:

## Page 428

1    Q   Was Will Rowe a member of the Pain Care
2  Forum?
3    A   The American Pain Foundation was a
4  member, and -- and Will was -- was an active
5  member.
6    Q   And was the American Pain Foundation an
7  organization that Endo gave millions of dollars
8  to?
9    MR. DAVIS:  Objection to form.
10    THE WITNESS:  I don't recall the exact
11  amount of money that we gave to the American Pain
12  Foundation.
13  BY MS. AMINOLROAYA:
14    Q   But you would agree that the -- Endo's
15  response to the Senate Finance Committee correctly
16  discloses the amount of money or some of the money
17  that Endo gave to the American Pain Foundation?
18    A   I could say that -- that we made every
19  attempt to -- to make that an accurate document
20  for Senator Grassley.
21    Q   Were many e-mails sent to Pain Care
22  Forum's membership by Mr. Rowe?
23    MR. DAVIS:  Objection to form.
24    THE WITNESS:  You would have to ask him.

Page 429

```
 1    BY MS. AMINOLROAYA:
 2        Q   Did we look at a number of e-mails today
 3    that came from Mr. Rowe to the Pain Care Forum?
 4            MR. DAVIS:  Objection to form.
 5            THE WITNESS:  We did look at some.
 6            MS. AMINOLROAYA:  Those are all the
 7    questions I have.
 8            THE WITNESS:  Thank you.
 9            MR. DAVIS:  We're good to go.
10            THE VIDEOGRAPHER:  Okay.  The time is
11    8:59 p.m., March 19th, 2019.  Going off the
12    record, concluding the videotaped deposition.
13            (Whereupon, the deposition of
14            BRIAN MUNROE was concluded at
15            8:59 p.m.)
16
17
18
19
20
21
22
23
24
```

Page 430

```
 1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2        The undersigned Certified Shorthand Reporter
 3    does hereby certify:
 4        That the foregoing proceeding was taken before
 5    me at the time and place therein set forth, at
 6    which time the witness was duly sworn; That the
 7    testimony of the witness and all objections made
 8    at the time of the examination were recorded
 9    stenographically by me and were thereafter
10    transcribed, said transcript being a true and
11    correct copy of my shorthand notes thereof; That
12    the dismantling of the original transcript will
13    void the reporter's certificate
14        In witness thereof, I have subscribed my name
15    this date:  March 22, 2019
16
17        _____
18        LESLIE A TODD, CSR, RPR
19        Certificate No  5129
20    (The foregoing certification of
21    this transcript does not apply to any
22    reproduction of the same by any means,
23    unless under the direct control and/or
24    supervision of the certifying reporter )
```

Page 431

```
 1          INSTRUCTIONS TO WITNESS
 2        Please read your deposition over carefully and
 3    make any necessary corrections. You should state
 4    the reason in the appropriate space on the errata
 5    sheet for any corrections that are made.
 6    After doing so, please sign the errata sheet
 7    and date it.
 8        You are signing same subject to the changes
 9    you have noted on the errata sheet, which will be
10    attached to your deposition.  It is imperative
11    that you return the original errata sheet to the
12    deposing attorney within thirty (30) days of
13    receipt of the deposition transcript by you. If
14    you fail to do so, the deposition transcript may
15    be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
```

Page 432

```
 1          ------
 2          E R R A T A
 3          ------
 4    PAGE LINE CHANGE
 5    ___ ___ _____
 6    REASON: _____
 7    ___ ___ _____
 8    REASON: _____
 9    ___ ___ _____
10    REASON: _____
11    ___ ___ _____
12    REASON: _____
13    ___ ___ _____
14    REASON: _____
15    ___ ___ _____
16    REASON: _____
17    ___ ___ _____
18    REASON: _____
19    ___ ___ _____
20    REASON: _____
21    ___ ___ _____
22    REASON: _____
23    ___ ___ _____
24    REASON: _____
```

Page 433

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2       I,_____, do hereby
 3   certify that I have read the foregoing pages, and
 4   that the same is a correct transcription of the
 5   answers given by me to the questions therein
 6   propounded, except for the corrections or changes
 7   in form or substance, if any, noted in the
 8   attached Errata Sheet.
 9
10   _____
11   BRIAN MUNROE              DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____day of_____,20___.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24
```