```
 1         IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -  -  -
 5    IN RE:  NATIONAL    :  MDL NO. 2804
      PRESCRIPTION OPIATE :
 6    LITIGATION          :
      ----------------------------------------
 7                        :  CASE NO.
      THIS DOCUMENT       :  1:17-MD-2804
 8    RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                        :  Polster
10                    -  -  -
            Thursday March 14, 2019
11                    -  -  -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                      -  -  -
14
                  Videotaped deposition of
15    ALAN MUST, taken pursuant to notice, was
      held at Dechert LLP, 1095 Avenue of the
16    Americas, 27th Floor, New York, New York,
      10036, beginning at 8:36 a.m., on the
17    above date, before Amanda Dee
      Maslynsky-Miller, a Certified Realtime
18    Reporter.
19                    -  -  -
20
21
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2

 3

            CRUEGER DICKINSON LLC
 4          BY:  CHARLES CRUEGER, ESQUIRE
            4532 N Oakland Avenue
 5          Whitefish Bay, Wisconsin 53211
            (414) 210-3868
 6          Cjc@cruegerdickinson.com
            Representing the Plaintiffs
 7

 8

 9

            MOTLEY RICE LLC
10          BY:  DAVID I. ACKERMAN, ESQUIRE
            401 9th St. NW
11          Suite 1001
            Washington, DC 20004
12          (202) 232-5504
            Dackerman@motleyrice.com
13          Representing the Plaintiffs

14

15

16          SIMMONS HANLY CONROY LLC
            BY:  JO ANNA POLLOCK, ESQUIRE
17          One Court Street
            Alton, Illinois 62002
18          (618) 259-2222
            Jpollock@simmonsfirm.com
19          Representing the Plaintiffs

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Continued)

 2

 3

           DECHERT LLP
 4         BY:  ERIK SNAPP, ESQUIRE
           35 West Wacker Drive
 5         Suite 3400
           Chicago, Illinois 60601
 6         (312) 646-5800
           Erik.snapp@dechert.com
 7
           - and -
 8
           BY:  ALYSSA CLARK, ESQUIRE
 9         Three Bryant Park
           1095 Avenue of the Americas
10         New York, New York 10036
           (212) 698-3500
11         Alyssa.clark@dechert.com
           Representing the Defendant,
12         Purdue Pharma L.P.

13

14

15         JONES DAY
           BY:  ADAM HOLLINGSWORTH, ESQUIRE
16         North Point
           901 Lakeside Avenue
17         Cleveland, Ohio 44114
           (216) 586-3939
18         Ahollingsworth@jonesday.com
           Representing the Defendant,
19         Walmart and

20

21

22

23

24
```

```
 1    APPEARANCES:   (Continued)
 2
      VIA TELEPHONE/LIVESTREAM:
 3
 4          SIMMONS HANLY CONROY LLC
            BY:  SANFORD SMOKLER, ESQUIRE
 5          112 Madison Avenue
            New York, New York 10016
 6          (212) 784-6400
            Ssmokler@simmonsfirm.com
 7          Representing the Plaintiffs
 8
 9
10          O'MELVENY & MYERS LLP
            BY:  BROOKE D. JENKINS, ESQUIRE
11          1999 Avenue of the Stars
            8th Floor
12          Los Angeles, California 90067
            (310) 553-6700
13          Brookejenkins@omm.com
            Representing the Defendant,
14          Janssen Pharmaceutica and
            Johnson & Johnson, Inc.
15
16
17
            COVINGTON & BURLING LLP
18          BY: PAUL F. DOWNS, ESQUIRE
            The New York Times Building
19          620 Eighth Avenue
            New York, New York 10018
20          (212) 841-1000
            pdowns@cov.com
21          Representing the Defendant,
            McKesson Corporation
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Continued)
 2    VIA TELEPHONE/LIVESTREAM:
 3
 4            JACKSON KELLY PLLC
              BY:  SANDRA K. ZERRUSEN, ESQUIRE
 5            50 South Main Street
              Suite 201
 6            Akron, Ohio 44308
              (330) 252-9060
 7            Skzerrusen@jacksonkelly.com
              Representing the Defendant,
 8            AmerisourceBergen Corporation
 9
10
              ARNOLD & PORTER KAYE SCHOLER LLP
11            BY:  WREDE SMITH, ESQUIRE
              601 Massachusetts Ave, NW
12            Washington, DC 20001
              (202) 942-5000
13            Wrede.smith@arnoldporter.com
              Representing the Defendant,
14            Endo Pharmaceuticals
15
16            BAILEY & WYANT PLLC
              BY: HARRISON M. CYRUS, ESQUIRE
17            500 Virginia Street East
              Suite 600
18            Charleston, West Virginia 25301
              (304) 345-4222
19            Hcyrus@baileywyant.com
              Representing the Defendant,
20            West Virginia Board of Pharmacy
21
22
       ALSO PRESENT:
23     Henry Marte, Videographer
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2                  I N D E X

 3                    -   -   -

 4

 5   Testimony of: ALAN MUST
 6         By Mr. Crueger            12, 212
           By Mr. Snapp              197
 7

 8

                      -   -   -
 9
                  E X H I B I T S
10
                      -   -   -
11
     NO.            DESCRIPTION                PAGE
12
     Purdue-Must
13   Exhibit-1      Amended Notice of Deposition
                    Pursuant to Rule 30(b)(6)
14                  And Document Requests
                    Pursuant to Rule 30(b)(2)
15                  And Rule 34 to Defendants
                    Purdue Pharma LP, Purdue
16                  Pharma, Inc., and The
                    Purdue Frederick Company   17
17
     Purdue-Must
18   Exhibit-2      SFC00000001                24
19   Purdue-Must
     Exhibit-3      No Bates
20                  Reading This Could
                    Help Ease Your Pain,
21                  Pain Action Guide          35
22   Purdue-Must
     Exhibit-4      No Bates
23                  Pain Foundation Website
                    Screen Shot                35
24
```

```
 1                          -  -  -
 2                     E X H I B I T S
 3                          -  -  -
 4     NO.              DESCRIPTION              PAGE
 5     Purdue-Must
       Exhibit-5    CHI_001978630                 37
 6
       Purdue-Must
 7     Exhibit-6    No Bates
                    American Pain Foundation
 8                  Payments Received
                    1998-2012                     41
 9
       Purdue-Must
10     Exhibit-7    PPLP004052543-548             44
11     Purdue-Must
       Exhibit-8    No Bates
12                  American Pain Foundation
                    A Reporter's Guide -
13                  Covering Pain and Its
                    Management                    56
14
       Purdue-Must
15     Exhibit-9    CHI_001032002-003             69
16     Purdue-Must
       Exhibit-10   PPLPC13000057412-421          74
17
       Purdue-Must
18     Exhibit-11   CHI_001260914-919             88
19     Purdue-Must
       Exhibit-12   No Bates
20                  Payment Spreadsheet           25
21     Purdue-Must
       Exhibit-13   No Bates
22                  The Use of Opioids for
                    The Treatment of Chronic
23                  Pain                          99
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2                     E X H I B I T S
 3                          -   -   -
 4     NO.            DESCRIPTION                   PAGE
 5     Purdue-Must
       Exhibit-14    Joint Commission on
 6                   Accreditation of
                     Healthcare Organization's
 7                   Pain Standards for
                     2001                           110
 8
       Purdue-Must
 9     Exhibit-15    PDD8801183361-364              114
10     Purdue-Must
       Exhibit-16    No Bates
11                   Model Policy for the
                     Use of Controlled Substances
12                   For the Treatment of Pain,
                     Federation of State
13                   Medical Boards of the
                     United States, Inc.           125
14
       Purdue-Must
15     Exhibit-17    PPLP003477086-125             133
16     Purdue-Must
       Exhibit-18    PPLPC009000040055             92
17
       Purdue-Must
18     Exhibit-19    PPLP004406095-192             146
19     Purdue-Must
       Exhibit-20    SFC00013064-066               152
20
       Purdue-Must
21     Exhibit-21    PPLPC019001224346-347         178
22     Purdue-Must
       Exhibit-22    No Bates
23                   Alan Must 30(b)(6)
                     Topics 11, 20, 22,
24                   23, 24 and 37                  192
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2              E X H I B I T S

 3                    -   -   -

 4   NO.            DESCRIPTION              PAGE

 5   Purdue-Must

     Exhibit-23   Curriculum Vitae of

 6                 Alan Must                 195

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line     Page Line      Page Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page Line     Page Line      Page Line

12   None

13

14

15   Stipulations

16   Page Line     Page Line      Page Line

17   11      1

18

19

20   Question Marked

21   Page Line     Page Line      Page Line

22   None

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                      -   -   -

2              (It is hereby stipulated and

3         agreed by and among counsel that

4         sealing, filing and certification

5         are waived; and that all

6         objections, except as to the form

7         of the question, will be reserved

8         until the time of trial.)

9                      -   -   -

10             VIDEO TECHNICIAN:  We are

11        now on the record.  My name is

12        Henry Marte, I'm a videographer

13        with Golkow Litigation Services.

14        Today's date is March 14th, 2019,

15        and the time is 8:36 a.m.

16             This videotape deposition is

17        being held at 1095 Avenue of the

18        Americas, New York, New York, in

19        the matter of National

20        Prescription Opiate Litigation.

21        The deponent today is Mr. Alan

22        Must.  All appearances are noted

23        on stenographic record.

24             Will the court reporter

```
 1              please administer the oath to the

 2              witness?

 3                        -   -   -

 4              ALAN MUST, after having been

 5              duly sworn, was examined and

 6              testified as follows:

 7                        -   -   -

 8              MR. SNAPP:  Before we get

 9              started, I just want to confirm

10              that everyone present in the room

11              and on the phone agrees to be

12              bound by the MDL confidentiality

13              protective order.

14              If that's not the case,

15              please speak up now.

16              Hearing nothing, please go

17              ahead, Chuck.  Thanks.

18                        -   -   -

19                    EXAMINATION

20                        -   -   -

21    BY MR. CRUEGER:

22         Q.    Good morning.

23         A.    Good morning.

24         Q.    So my name is Chuck Crueger.
```

1      Have you been deposed

2  before?

3      A.    I have been.

4      Q.    How many times?

5      A.    I guess three times.

6      Q.    And were those personal or

7  work related?

8      A.    They were all work related.

9      Q.    While you were at Purdue?

10     A.    Yes, sir.

11     Q.    While the rules for the

12  deposition are -- probably haven't

13  changed much since you were deposed

14  last -- when were you deposed last, by

15  the way?

16     A.    Most recently?

17     Q.    Yes.

18     A.    Last week.

19     Q.    As part of this case?

20     A.    As part of a case that deals

21  with the State of Oklahoma.

22     Q.    Where did that deposition

23  take place?

24     A.    Oklahoma City.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Well, again, the rules

2    haven't changed.  I'm just going to ask

3    you questions.  If you don't understand,

4    please tell me, and I'll clarify.

5          Is that fair enough?

6    A.    Yes, sir.

7    Q.    So you work at Purdue?

8    A.    I do.

9    Q.    When did you start?

10   A.    I was hired into Purdue in

11   February of 2001.

12   Q.    And when you were hired,

13   what was your job?

14   A.    Originally, I was hired as

15   the director of State Government Affairs.

16   Q.    And what do you do now?

17   A.    Currently, I am the vice

18   president of Government Affairs.

19   Q.    And what does that mean in

20   English?

21   A.    So for the majority of my

22   career at Purdue, I've been involved in

23   State Government Affairs activities.  So

24   dealing with state legislative and

Highly Confidential - Subject to Further Confidentiality Review

1    regulatory issues, dealing with state

2    agencies.

3                 In July of last year, I then

4    expanded my responsibilities to include

5    federal government, as well with state

6    government.

7                 Actually, let me correct

8    that, it was July of 2017.

9         Q.    Time does fly.

10                Does any of your dealings in

11   state legislatures include Ohio?

12        A.    It does.

13        Q.    What kind of work did you do

14   in Ohio?

15        A.    Again, I'm responsible for

16   all 50 states.  So at different times

17   during the course of time between 2001

18   and present, I may have been in Ohio

19   myself, or I had retained counsel or

20   somebody working for me that was working

21   in Ohio.

22        Q.    And did you work on any

23   legislation, while you were at Purdue,

24   that pertained to pain in Ohio?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I worked on legislation that

2   pertained to the prescribing of opioids,

3   yes.

4      Q.      Which -- what legislation

5   was that?  Just one law or multiple?

6      A.      The main one that we worked

7   on in the State of Ohio was a piece of

8   legislation that ultimately passed and

9   was put into effect.

10              And that was to put in place

11   the -- what's called the OARS program

12   currently, O-A-R-S.  In common speak,

13   it's the state prescription drug

14   monitoring program.  And the purpose of

15   that, at that time, was to have a system

16   put into place in the state that would

17   collect all of the data of the dispensing

18   of controlled substances and provide a

19   database that prescribers could then

20   go -- and appropriately-identified

21   regulators could go into and look at the

22   prescribing histories, at that time, to

23   try to address the issues around doctor

24   shopping and appropriately prescribing

1  opioids.

2      Q.    Any other legislation you

3  worked on for Ohio?

4      A.    I don't think we actively

5  worked on any other pieces of legislation

6  in Ohio that I can recall.

7      Q.    So in order to both speed

8  things up and make things a little

9  easier, given the width of the table, I

10  have a stack of exhibits that are

11  somewhere in front of you that are

12  already marked.

13      A.    Okay.

14      Q.    If you can just take

15  Exhibit-1, it's the notice of deposition.

16                  -  -  -

17          (Whereupon, Purdue-Must

18      Exhibit-1, Amended Notice of

19      Deposition Pursuant to Rule

20      30(b)(6)  and Document Requests

21      Pursuant to Rule 30(b)(2) and Rule

22      34 to Defendants Purdue Pharma LP,

23      Purdue Pharma, Inc., and The

24      Purdue Frederick Company, was

Highly Confidential - Subject to Further Confidentiality Review

1          marked for identification.)

2                    -  -  -

3               THE WITNESS:  Yes, sir.

4     BY MR. CRUEGER:

5          Q.    You have seen this before?

6          A.    I have.

7          Q.    You understand that you have

8     been designated as a representative of

9     Purdue in this deposition?

10         A.    I am.

11         Q.    And you have been

12    designated, I believe, on Topics 11, 20,

13    22, 23, 24, and 37, correct?

14         A.    Correct.

15         Q.    You're referring to a paper.

16               What are you referring to?

17         A.    I've got a document to help

18    me to remember a variety of different

19    issues.

20               MR. SNAPP:  Just to clarify

21          the record, he was -- on Topic 22,

22          he's only been designated for part

23          of that topic.

24               MR. CRUEGER:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. SNAPP:  That was as

2       stated in our responses.

3   BY MR. CRUEGER:

4       Q.    So you were going to

5   explain, what is the paper that you're

6   referring to?

7       A.    This is just a -- it informs

8   me of the topics that I was to be deposed

9   on.  It's listed on the top of the sheet.

10      Q.    And you've brought other

11  documents with you?

12      A.    I did, yes.

13      Q.    What are those documents?

14      A.    The first document is my

15  resume with my work history.

16          The second document is a

17  reminder of the various sources of

18  information that I looked at in

19  preparation for this, as well as the list

20  of questions that I was going to be -- or

21  the topics that I was going to be deposed

22  on.

23          And the third document is a

24  document that was put together, that we

1    put together, on the financials of

2    various organizations and the funds that

3    we provided for them.

4         Q.   So you understand, as a

5    representative of Purdue, you're not here

6    just to testify about your own personal

7    knowledge, correct?

8         A.   I am.

9         Q.   And you kind of referenced

10   that you have a sheet that has some

11   information on it.

12              You know, what did you do to

13   prepare?

14        A.   Correct.  So we had quite a

15   few hours of preparation where we looked

16   at documents that were pertinent to these

17   specific topics and reviewed those

18   documents in anticipation of the

19   deposition today.

20        Q.   Apart from your attorneys,

21   did you talk with anyone else at Purdue

22   about these topics to prepare?

23        A.   I did not talk to anybody,

24   without my attorneys present, on these

Highly Confidential - Subject to Further Confidentiality Review

1    matters.

2         Q.    But who did you talk to, to

3    prepare for this deposition?

4         A.    So the one document that I

5    have has a list of those individuals that

6    we had spoken with in preparation for the

7    deposition today.

8         Q.    And who are those

9    individuals?

10        A.    So the individuals listed

11   here under the sources of information are

12   Brian Rosen -- do you want to know who

13   they are or just the names?

14             MR. SNAPP:  Burt Rosen.

15             THE WITNESS:  I'm sorry,

16        Burt Rosen.

17             We have too many Rosens in

18        our company.

19             MR. CRUEGER:  We can just --

20        can we make a copy of that?

21             MR. SNAPP:  Absolutely.  We

22        have copies for you.

23                  -   -   -

24             (Whereupon, a discussion off

Highly Confidential - Subject to Further Confidentiality Review

1      the record occurred.)

2                    -   -   -

3              MR. SNAPP:  Would you like a

4        copy of Mr. Must's resume as well,

5        Chuck?

6              MR. CRUEGER:  Not right now.

7        Thank you.

8    BY MR. CRUEGER:

9        Q.    So the sources of

10   information, that's who you --

11       A.    Yes.  So I misidentified

12   Burt Rosen as Brian Rosen.

13             Burt Rosen is our vice

14   president of federal government affairs

15   in Washington, D.C.

16       Q.    And you also spoke with

17   Pamela Bennett?

18       A.    Pamela Bennett was the head

19   of our advocacy department for a number

20   of years.

21       Q.    And you spoke with Bob --

22       A.    Josephson.

23             Bob Josephson works in the

24   corporate communication department.

1    And Josie Martin is the

2  executive vice president of corporate

3  communication that Bob reports to.

4    Q.   And what are the government

5  affair files and public affair files?

6    A.   So over the course of time,

7  this expansive time, the organization has

8  changed, in terms of structure.  So at

9  some points, there was a government

10  affairs department that was a standalone

11  department; at other times, they may have

12  been part of a group called external

13  affairs that was part of the public

14  affairs department or the corporate

15  communications, as it's now called.

16    Q.   And I assume all the

17  documents that you reviewed were produced

18  in this litigation?

19    MR. SNAPP:  That's correct.

20    I can speak to that.  I don't

21    think Mr. Must would know that.

22    But I can tell you that they have

23    been produced, yes.

24  BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And are you able to identify

2    which of those documents in the

3    government affair files and public affair

4    files that you -- that you reviewed?

5    A.    I would not be able to

6    identify them at this time, no.

7    Q.    So let's look at Exhibit-2.

8              -   -   -

9              (Whereupon, Purdue-Must

10             Exhibit-2, SFC00000001, was marked

11             for identification.)

12             -   -   -

13   BY MR. CRUEGER:

14   Q.    And you also said that --

15   you're going to need your reading glasses

16   for this.

17             You also said that you had a

18   spreadsheet that you had put together.

19   A.    I do.

20             MR. SNAPP:  Would you like

21             copies, Chuck?

22             MR. CRUEGER:  Yes, that

23             would be great.

24   BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   So let's look at Exhibit-2.

2       Have you seen this document

3  before?

4  A.   So reading from the

5  document, it appears to be the

6  information that was provided for the

7  Senate Finance Committee -- pardon me --

8  in 2012.

9  Q.   And your spreadsheet, I'm

10  going to label that Exhibit-12, because

11  that's about where we're at.

12                 -  -  -

13       (Whereupon, Purdue-Must

14       Exhibit-12, No Bates, Payment

15       Spreadsheet, was marked for

16       identification.)

17                 -  -  -

18       MR. CRUEGER:  Can you give

19       this to him as Exhibit-12?

20  BY MR. CRUEGER:

21  Q.   So the exhibit that I've put

22  together as Exhibit-12, that's the

23  spreadsheet that you brought with you

24  today?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, sir.

2    Q.    And did you put together

3  this information or did someone put it

4  together for you?

5    A.    Together with myself and our

6  attorneys, utilizing internal financial

7  systems, which are listed on the third

8  page of this, the Oracle payment data,

9  which dates back to 1995 and goes through

10  the time period of 2001.

11           Subsequent to that, we

12  changed our system into the SAP payment

13  system.  So from 2002 to late 2018, we

14  utilized that system.

15           And then we also looked at

16  our internal credit card reporting to see

17  if there were any items in there, based

18  on this list.

19           And then we also used the

20  information that was provided to the

21  Senate Finance Committee in 2012 as part

22  of this list.

23    Q.    And so just looking at --

24  I'm going to stick with Exhibit-2.

Highly Confidential - Subject to Further Confidentiality Review

1           So if you see, the first one

2    is American Pain Foundation, correct?

3           A.    Yes, sir.

4           Q.    And it says that you gave

5    about -- that Purdue provided about $3.6

6    million to the American Pain Foundation?

7           A.    Yes, sir.

8           Q.    And these different groups,

9    like the AAPM, the American Academy of

10   Pain Medicine --

11          A.    Yes, sir.

12          Q.    -- that's about $2.2

13   million, through 2012, correct?

14          A.    Right.  From 1997 to 2012.

15          Q.    And if I wanted to see what

16   else was -- Purdue gave to the American

17   Academy of Pain Medicine, I would look at

18   your spreadsheet that you brought,

19   Exhibit-12, right?

20          A.    Our document goes beyond

21   2012.

22          Q.    It goes up to 2018, correct?

23          A.    Correct.  Yes, sir.

24          Q.    Were there any entries --

Highly Confidential - Subject to Further Confidentiality Review

1    any money given to any of these entities

2    that are on your Exhibit-12, or even

3    Exhibit-2, in 2019?

4          A.    To the best of my knowledge,

5    no, sir.

6          Q.    So the next one on Exhibit-2

7    is the American Pain Society.

8                And that's about $3 million,

9    correct, through 2012, right?

10               Sorry, $500,000.  Sorry.

11               No, about $3 million through

12   2012.  Sorry, the print is small.

13         A.    Based on Exhibit-2?

14         Q.    Yes, still on Exhibit-2.

15         A.    Yes.

16               MR. SNAPP:  Just so the

17         record is clear, I think you -- I

18         was looking at the transcript.

19               For American Academy of Pain

20         Medicine, the transcript says that

21         you said $2.2 million.  I think

22         you meant $2 million.

23               MR. CRUEGER:  $2 million,

24         sorry.

1           MR. SNAPP:   Thank you.

2    BY MR. CRUEGER:

3           Q.    So there's other entities

4    listed on this Exhibit-2.

5                There's the Pain and Policy

6    Studies Group, correct?

7           A.    Yes, sir.

8           Q.    And it doesn't look like,

9    according to your records, that Purdue

10   has given any money to the Pain and

11   Policy Studies Group since 2011, correct?

12          A.    That is correct.

13          Q.    And there's the -- what's

14   referred to as JCAHO, correct, the Joint

15   Commission on Accreditation of Healthcare

16   Organizations?

17          A.    Yes, sir.

18          Q.    And it doesn't show that

19   Purdue has provided any money to them

20   since 2002, correct?

21          A.    That is correct.

22          Q.    And the Federation of State

23   Medical Boards, which is on Page 2 of

24   your Exhibit-12.

Highly Confidential - Subject to Further Confidentiality Review

1          So it doesn't look like

2    Purdue has provided any money to the FSMB

3    since 2012, correct?  Or, actually, since

4    2007, correct?

5          A.    That is correct.

6          Q.    And then you also list some

7    individuals?

8          A.    Yes, sir.

9          Q.    Such as Russel Portnoy?

10         A.    Yes, sir.

11         Q.    And so apart from the one

12   payment of $4,500 in 2010, there's been

13   no other money paid to Mr. Portnoy?

14         A.    Yes, sir.  That's correct.

15         Q.    Why did Purdue pay that

16   money to Mr. Portnoy?

17              MR. SNAPP:  I'm sorry, just,

18         I want the record to be clear,

19         Chuck.

20              There are -- Portnoy is up

21         here.  Andy is down here.

22              MR. CRUEGER:  Oh, I see how

23         you did it.

24              MR. SNAPP:  We were trying

Highly Confidential - Subject to Further Confidentiality Review

1        to save some trees.  I apologize.

2        I just want to make sure that the

3        record is clear.

4              MR. CRUEGER:  I've been used

5        to going where you're spreading it

6        over multiple pages.

7   BY MR. CRUEGER:

8        Q.    So the last payment was in

9   2010, correct, to Mr. Portnoy?

10       A.    Yes, sir.  That's correct.

11       Q.    And the first payment on

12  this starts in 1995, correct?

13       A.    That's correct.

14       Q.    Do you know why Purdue paid

15  this amount of money to Mr. Portnoy?

16       A.    It's my understanding that

17  Mr. Portnoy did some consulting, as well

18  as some speaking engagements.

19       Q.    When you mean --

20  "consulting," what does that mean?

21       A.    I'm not entirely sure of the

22  content of the consulting that he did.

23  But I understand that he did consulting

24  with the company.

1    Q.    Same with Mr. Scott Fishman,

2  it shows payments, if I'm reading this

3  right, from '97 through 2000.

4          And I don't believe anything

5  afterwards, correct?

6    A.    That's correct.

7    Q.    And then Dr. Lynn Webster

8  shows payments starting in 2004, correct?

9    A.    Yes, sir.

10    Q.    And it shows that Purdue

11  paid Dr. Webster approximately $245,000

12  in 2004, about $1 million in 2005.

13          Do you know what those two

14  payments are for?

15    A.    My understanding is, again,

16  Dr. Webster did some consulting, as well

17  as some clinical research in his

18  facilities in Utah.

19    Q.    Clinical research for

20  Purdue?

21    A.    Correct.

22    Q.    Do you know what that

23  research was about?

24    A.    It's my understanding that

1    it had to do with clinical research on

2    the reformulation of our product

3    OxyContin to have abuse-deterrent

4    properties.

5          Q.    Did Mr. Webster produce any

6    reports related to that?

7          A.    I'm unaware of that right

8    now.

9          Q.    Would you be aware if he

10   published any reports about his research

11   that Purdue paid for?

12              MR. SNAPP:  Objection.

13         Scope.  And form.

14              THE WITNESS:  I wouldn't be

15         aware of any clinical research

16         publications that he did, no.

17   BY MR. CRUEGER:

18         Q.    You're familiar with Dr.

19   Haddox, correct?

20         A.    Yes, sir.

21         Q.    He's currently an employee

22   of Purdue, correct?  Or at least he was?

23         A.    He was an employee of

24   Purdue's, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Did -- prior to Dr. Haddox

2   becoming an employee of Purdue, did

3   Purdue pay him any money?

4      A.    I don't have the answer to

5   that.

6      Q.    In preparing for the

7   deposition, did you look?

8      A.    I don't recall looking at

9   anything about Dr. Haddox in advance of

10  his employment, no.

11     Q.    So we're going to talk a

12  little bit about the payments to some of

13  these entities.  I'm going to start

14  with -- well, let's just start with the

15  American Pain Foundation.

16             If you take what I labeled

17  as Exhibit-2.

18             MR. SNAPP:  This one?

19             MR. CRUEGER:  It's that,

20       yes.

21             MR. SNAPP:  It's 3.

22             MR. CRUEGER:  Sorry.

23       Exhibit-3.

24                  -   -   -

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Whereupon, Purdue-Must

 2          Exhibit-3, No Bates, Reading This

 3          Could Help Ease Your Pain, Pain

 4          Action Guide, was marked for

 5          identification.)

 6                    -  -  -

 7          MR. SNAPP:  Are we done with

 8      1 and 2 and 12 for now?

 9          MR. CRUEGER:  Yes, for now.

10      If you can just start -- you can

11      put them to the side.

12          MR. SNAPP:  I can take

13      those.

14          MR. CRUEGER:  And, also, if

15      we can just put Exhibit-4 in the

16      record, you don't have to look at

17      it.  It's just a record of where I

18      got Exhibit-3 from.

19                    -  -  -

20              (Whereupon, Purdue-Must

21          Exhibit-4, No Bates, Pain

22          Foundation Website Screen Shot,

23          was marked for identification.)

24                    -  -  -
```

1    BY MR. CRUEGER:

2         Q.    So, Mr. Must, you've heard

3    of the American Pain Foundation?

4         A.    Yes, sir.

5         Q.    Have you seen this pain

6    action guide previously?

7         A.    I don't know that I have

8    personally, no.

9         Q.    And it says here that the

10   American Pain Foundation, on the cover,

11   it says it's an independent, nonprofit

12   organization, correct?

13        A.    Yes, sir.

14        Q.    It says it's serving people

15   with pain, correct?

16        A.    Yes, sir.

17        Q.    And Purdue provided the

18   American Pain Foundation approximately

19   $3.6 million through 2012, correct?

20              If you want to look at

21   Exhibit-2, that's -- you probably want to

22   keep that a little handy, sorry.

23        A.    I'm sorry.  Can you repeat

24   your question?

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Purdue provided the American

2  Pain Foundation approximately $3.6

3  million, correct?

4      A.    From the year 1997 to 2012,

5  yes.

6      Q.    And if you look through this

7  guide, Purdue's funding is never

8  mentioned in this guide, is it?

9      A.    I don't see it anywhere, no.

10      Q.    And if you look at

11  Exhibit-5 -- it's right there.

12              -  -  -

13          (Whereupon, Purdue-Must

14          Exhibit-5, CHI_001978630, was

15          marked for identification.)

16              -  -  -

17  BY MR. CRUEGER:

18      Q.    So Purdue was not the only

19  opioid manufacturer to provide money to

20  the American Pain Foundation, was it?

21          MR. SNAPP:  Object to the

22          form.

23          THE WITNESS:  I would assume

24          not.

BY MR. CRUEGER:

Q.    Well, Purdue knew that other companies were providing money to the American Pain Foundation, correct?

A.    I would assume that's accurate, yes, sir.

Q.    And if you look through Exhibit-5, this is a list from the American Pain Foundation of money received from different organizations, including Purdue.

And if you go through it, you'll see different names; like Cephalon is on Page 1, correct?

A.    Yes, sir.

Q.    And then Endo is listed on Page 2 going through 3, correct?

A.    Yes, sir.

Q.    And if you look at Page 4, there's Janssen Pharma, correct?

A.    Yes, sir.

Q.    And Johnson & Johnson, correct?

A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And Ortho-McNeil is also on

2    there, correct?

3    A.    On Page 6, yes, sir.

4    Q.    And these are all

5    competitors of Purdue, correct?

6    A.    They are all companies that

7    manufacture some form of a pain

8    medication, yes.

9    Q.    Yes.

10    So they are competitors,

11    correct?

12    MR. SNAPP:  Object to the

13    form.

14    THE WITNESS:  Potentially,

15    yes.

16    BY MR. CRUEGER:

17    Q.    Well, they sell -- they sell

18    a product that competes with a product

19    that Purdue sells, correct?

20    A.    I'm not aware of what

21    Ortho-McNeil manufactures, so I don't

22    know if they have a competing product or

23    not.

24    Q.    And if you all banded, these

Highly Confidential - Subject to Further Confidentiality Review

1    companies, you and these other companies

2    that are listed in the American Pain

3    Foundation document, Exhibit-5, all got

4    together to fund the American Pain

5    Foundation, correct?

6            MR. SNAPP:  Object to the

7        form.

8            THE WITNESS:  Based on this

9        document, it looks like all of

10        these companies, including Purdue,

11        did provide funding to the

12        American Pain Foundation, yes,

13        sir.

14   BY MR. CRUEGER:

15        Q.    And it's a substantial

16   amount of money, correct?

17            I won't make you add it all

18   up, it comes up to about $17 million.  So

19   it's a substantial amount of money,

20   correct?

21        A.    $17 million is a substantial

22   amount of money, yes, sir.

23        Q.    And if you look at

24   Exhibit-6.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2              (Whereupon, Purdue-Must

 3          Exhibit-6, No Bates, American Pain

 4          Foundation Payments Received

 5          1998-2012, was marked for

 6          identification.)

 7                    -   -   -

 8    BY MR. CRUEGER:

 9          Q.    This is just a graph of the

10    payments by year that are in that

11    document, Exhibit-5.

12              So you can see how the

13    payments --

14          A.    I'm sorry, may I ask a

15    question?

16          Q.    Yes.

17          A.    Is this payments of all

18    companies, or is this Purdue only?

19          Q.    All payments of all

20    companies from Exhibit-5.

21          A.    Thank you.

22          Q.    So it includes Purdue and

23    everybody else.

24              And you can tell how it's
```

1    increasing over time, correct, except for

2    2006, where there's a slight dip?

3              MR. SNAPP:  Object to the

4         form.

5              THE WITNESS:  I'm slightly

6         confused.  So I thought we said

7         that all these payments in

8         Exhibit-5 added up to $17 million?

9    BY MR. CRUEGER:

10        Q.    Yes.

11        A.    So this Exhibit-6 ultimately

12   adds up to that same amount?

13        Q.    It should be around there,

14   yes.

15        A.    Okay.  I understand it now.

16   Thank you.

17        Q.    So it's by year.

18        A.    Thank you.

19        Q.    And you would agree it shows

20   that, basically, every year the

21   contributions to the American Pain

22   Foundation were increasing, correct?

23        A.    It appears until 2011, and

24   then it appears there's a drop-off after

1    that.

2         Q.    And 2012 is when the

3    American Pain Foundation shut down,

4    correct?

5         A.    I don't know the exact date.

6    But I do know that it did shut down in

7    that timeline.

8         Q.    And so what I'm trying to

9    get at, so Purdue and the other opioid

10   manufacturers that are listed in

11   Exhibit-5, so wouldn't you agree that

12   they were giving money to the American

13   Pain Foundation because the American Pain

14   Foundation was advocating for the use of

15   opioids to treat chronic pain, correct?

16            MR. SNAPP:  Object to the

17         form.

18            THE WITNESS:  I think the

19         American Pain Foundation was

20         advocating for good pain

21         management and treatment options

22         for pain patients.  That included

23         opioids as well.

24   BY MR. CRUEGER:

1    Q.    Well, they provided -- the

2  American -- if you look at Exhibit-7.

3                  -  -  -

4            (Whereupon, Purdue-Must

5            Exhibit-7, PPLP004052543-548, was

6            marked for identification.)

7                  -  -  -

8            THE WITNESS:  Yes, sir.

9  BY MR. CRUEGER:

10   Q.    So the American Pain

11 Foundation would provide a report on what

12 they did, correct?

13   A.    Yes, they would.

14   Q.    And this report was provided

15 to -- in this case, it came out of

16 Purdue's files, if you look at the

17 bottom, correct?

18            The PPLP Bates number.

19   A.    I see that, yes, sir.

20   Q.    And as far as you know, this

21 report was not public, was it?

22   A.    I don't know the answer to

23 that.  I'm sorry.

24   Q.    And the money that Purdue

1    gave to the American Pain Foundation,

2    that was not publicly known, was it?

3                    MR. SNAPP:  Object to the

4           form.

5                    THE WITNESS:  I'm not

6           familiar with the American Pain

7           Foundation and their policies on

8           providing the levels of support

9           and who those supporters were, as

10          a nonprofit organization.

11   BY MR. CRUEGER:

12          Q.    But Purdue did not provide

13   any public announcement on the levels of

14   support it was providing to the American

15   Pain Foundation, correct?

16          A.    Not to my knowledge.

17          Q.    And the other companies that

18   were listed in Exhibit-5 that provided

19   support to the American Pain Foundation,

20   are you aware of any public announcements

21   about the levels of support they were

22   providing?

23          A.    I don't believe I can speak

24   to their policies or procedures

Highly Confidential - Subject to Further Confidentiality Review

1    concerning their contributions.

2           Q.    I was wondering more about

3    if you're aware of any.

4           A.    Again, I'm not personally

5    knowledgeable about what they produce or

6    don't produce.

7           Q.    And so going back to

8    Exhibit-7.

9                 This is a report by the

10   American Pain Foundation.  And it kind of

11   lists -- or does list what the American

12   Pain Foundation did, in this case it

13   would be in 2008, correct?

14          A.    Yes, sir.

15          Q.    And this is telling Purdue

16   and other contributors to the American

17   Pain Foundation, basically, what they

18   were getting for their money, correct?

19          A.    Yes.  It's providing

20   information on what they accomplished in

21   2008.

22          Q.    And the first one is --

23   section is called Advocacy, correct?

24          A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And it shows that the

2    American Pain Foundation, they report on

3    advocating on different pieces of

4    legislation in here, correct?

5    A.    It does.

6    Q.    And they say -- for example,

7    at the end of the second paragraph under

8    advocacy, there's -- the final sentence

9    starts, APF played a central role.

10           Do you see where I am?

11    A.    I do.

12    Q.    So it's talking about how --

13    APF is telling Purdue and other donors

14    how it played a central role in

15    organizing and presenting the

16    congressional briefing on pain, correct?

17    A.    Yes, sir.

18    Q.    So the APF provides

19    testimony to the Senate Veterans Affairs

20    Committee hearing on the Veterans Pain

21    Care Bill, correct?

22    A.    Yes, sir.

23    Q.    And are you aware of the

24    American Pain Foundation disclosing the

Highly Confidential - Subject to Further Confidentiality Review

1    sources of its funding when it was

2    providing this testimony and advocating

3    to Congress?

4                    MR. SNAPP:  Object to the

5           form.

6                    THE WITNESS:  I do not know.

7    BY MR. CRUEGER:

8           Q.    The American Pain Foundation

9    was also a member of the Pain Care Forum,

10   correct?

11          A.    Yes, it was.

12          Q.    And that's an organization

13   that Purdue was involved in, correct?

14          A.    Purdue was also a member of

15   the Pain Care Forum, yes, sir.

16          Q.    And, actually, Purdue had a

17   fairly important role in establishing the

18   Pain Care Forum, correct?

19                    MR. SNAPP:  Object to the

20          form.

21                    THE WITNESS:  Purdue was one

22          of the original organizations that

23          was involved in the Pain Care

24          Forum, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CRUEGER:

2         Q.    And so the American Pain

3    Foundation -- well, let's just say the

4    Pain Care Forum, other opioid

5    manufacturers were members of the Pain

6    Care Forum, too, correct?

7         A.    Yes, some were.

8         Q.    And so was the HDMA, an

9    organization of pharmaceutical

10   distributors, correct?

11        A.    The membership of the Pain

12   Care Forum changed over the years.  But I

13   believe at least at some point they were,

14   yes.

15        Q.    And, again, all these

16   companies that are in the Pain Care Forum

17   are -- at a certain level they are all

18   competitors, correct?

19             MR. SNAPP:  Object to the

20        form.

21             THE WITNESS:  They could all

22        be competitors, yes.

23   BY MR. CRUEGER:

24        Q.    And in here it says, At the

Highly Confidential - Subject to Further Confidentiality Review

1   end of 2008, if you see where -- that

2   paragraph, where it says, APF's

3   leadership in the Pain Care Forum.

4            Do you see where I am?

5       A.    I do.

6       Q.    The final sentence says, At

7   the end of 2008, APF developed and

8   continues to lead the REMS, Risk

9   Evaluation Mitigation Strategies, task

10  force of the Pain Care Forum.

11           Do you see where I am?

12      A.    I do see that, yes.

13      Q.    And REMS deals with the FDA,

14  correct?

15      A.    Yes.  The REMS was -- has to

16  do with opioid products that are FDA

17  approved, yes.

18      Q.    And so there the APF is

19  playing some sort of advocacy role for

20  the FDA, correct?

21           MR. SNAPP:  Object to the

22       form.

23           THE WITNESS:  I'm not

24       entirely clear what the Pain Care

1          Forum was doing during that time

2          concerning the REMS.  But,

3          obviously, it was involved in some

4          way.

5     BY MR. CRUEGER:

6          Q.    And are you aware of the

7     American Pain Foundation disclosing its

8     financial support from Purdue and other

9     opioid manufacturers to the FDA?

10              MR. SNAPP:  Object to the

11         form.

12              THE WITNESS:  I don't -- I

13         don't know that, no.

14    BY MR. CRUEGER:

15         Q.    If you go to the page -- the

16    last three of the Bates number at the

17    bottom is 546.

18              Do you see where I am?

19         A.    Yes, sir.

20         Q.    You're on the right page.

21              It says, Media, correct?

22         A.    Yes, sir.

23         Q.    And so media is another item

24    that the Pain Care Forum is -- not the

1   Pain Care Forum, sorry.  Let me strike

2   that.

3                  So in this section, the

4   American Pain Foundation is reporting to

5   Purdue and other financial backers what

6   it did in the media to advocate for

7   opioid prescribing, correct?

8                  MR. SNAPP:  Object to the

9         form.

10                 THE WITNESS:  I believe it

11        is identifying what it did in the

12        media as it advocated for pain

13        patients, yes, sir.

14  BY MR. CRUEGER:

15        Q.    And you can see here in this

16  first paragraph, it refers to providing

17  reporters that the American -- sorry,

18  strike that.

19                 In this paragraph, it talks

20  about how the American Pain Foundation

21  provided reporters with a reporter's

22  guide covering pain and its management,

23  correct?

24        A.    Yes, sir.

1    Q.    And it also talks about how

2  the American Pain Foundation targeted

3  strategically identified media markets,

4  including markets where key members of

5  Congress reside, correct?

6    A.    That's what this document

7  says, yes, sir.

8    Q.    So the American Pain

9  Foundation is telling Purdue and its

10  other financial backers how it's trying

11  to influence, through the media, public

12  opinion about opioids and opioid

13  prescribing, correct?

14    MR. SNAPP:  Object to the

15    form.

16    THE WITNESS:  Again, I think

17    it's talking about pain and pain

18    management more broadly.  But yes.

19  BY MR. CRUEGER:

20    Q.    And, again, this is what

21  Purdue and the other opioid manufacturers

22  are paying the American Pain Foundation

23  to do, correct?

24    MR. SNAPP:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1              form.

2                     THE WITNESS:  The American

3              Pain Foundation, as indicated in

4              their own description, was an

5              organization that advocated for

6              pain patients.

7                     And this is a report of the

8              things that they did to advocate

9              for pain patients and appropriate

10             pain treatment.

11     BY MR. CRUEGER:

12             Q.    Well, this is what -- let me

13     rephrase it.

14                    This is what Purdue and the

15     other opioid manufacturers expected the

16     American Pain Foundation to do with the

17     money it was providing them, correct?

18                    MR. SNAPP:  Object to form.

19                    MR. SMITH:  Object to form.

20                    THE WITNESS:  I think that

21             the American Pain Foundation

22             reported what they did.

23                    But we were not -- we were

24             made aware of what they were

1        doing.  But I don't know that we

2        were paying them to do that.  We

3        were supporting a nonprofit

4        organization that was advocating

5        for pain patients.

6              Our products were used in

7        that therapeutic area for pain.

8   BY MR. CRUEGER:

9        Q.    Well, but let's just look at

10  it from Purdue's perspective.

11              You were funding the

12  American -- Purdue was funding the

13  American Pain Foundation because it

14  wanted to appear as an independent

15  entity, but it was advancing Purdue's

16  interests, correct?

17              MR. SNAPP:  Object to the

18        form.

19              THE WITNESS:  I think APF

20        was an independent entity.  And we

21        had mission matching, that we

22        agreed with the same things that

23        they were advocating for.

24  BY MR. CRUEGER:

1      Q.    If you look at Exhibit-8,

2   this is that reporter's guide that's

3   referred to in Exhibit-7.

4                   -  -  -

5            (Whereupon, Purdue-Must

6         Exhibit-8, No Bates, American Pain

7         Foundation A Reporter's Guide -

8         Covering Pain and Its Management,

9         was marked for identification.)

10                  -  -  -

11           THE WITNESS:  Yes, sir.

12   BY MR. CRUEGER:

13     Q.    And this is a document,

14   again, that's put out by the American

15   Pain Foundation, correct?

16     A.    It appears that way, yes,

17   sir.

18     Q.    And if you'd look at Page 1.

19     A.    Yes, sir.

20     Q.    It says -- this is, the box

21   in Page 1 is called, Common

22   misconceptions about pain.

23           Do you see where I am?

24     A.    I do, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so you said that the

2  American Pain Foundation and the opioid

3  manufacturers and Purdue, that their

4  interests aligned.

5         I think that was the -- what

6  was the term that you used?  How did you

7  explain it?

8         A.    We have --

9         MR. SNAPP:  Object to the

10        form.

11        THE WITNESS:  We agreed

12        with -- we had mission match with

13        them, yes.

14  BY MR. CRUEGER:

15        Q.    Mission match is the -- so

16  if you look at the -- in the second

17  column, the bullet point that starts

18  with, Use of strong pain medication leads

19  to addiction.

20        A.    Yes, sir.

21        Q.    And this is one of the

22  misconceptions about pain that's listed

23  by the American Pain Foundation, correct?

24        A.    That is what's in this

Highly Confidential - Subject to Further Confidentiality Review

1    document, yes, sir.

2            Q.    And it says in here, the

3    American Pain Foundation says, Studies

4    have shown that the risk of addiction is

5    small.

6                  Do you see where I am?

7            A.    I do.

8            Q.    So, Studies have shown that

9    the risk of addiction is small when these

10    medications are properly prescribed and

11    taken as directed.

12                  So that's -- that's a

13    message that the American Pain Foundation

14    is spreading to the media in this guide,

15    correct?

16                  MR. SNAPP:  Object to the

17            form.

18                  THE WITNESS:  That is one of

19            the points on this -- in this

20            black box, yes; or in this boxed

21            section, yes.

22    BY MR. CRUEGER:

23            Q.    And that is one of the

24    messages that Purdue and the other opioid

1    manufacturers are funding the American

2    Pain Foundation to spread, correct?

3                    MR. SNAPP:  Object to the

4           form.

5                    THE WITNESS:  I think that

6           there are studies looking at the

7           issue around the evidence of the

8           risk of addiction.

9    BY MR. CRUEGER:

10          Q.    Yes --

11          A.    As indicated in here.

12          Q.    -- but my question is,

13   though, that is one of the messages that

14   Purdue and the other opioid companies are

15   funding the American Pain Foundation to

16   spread, correct?

17                   MR. SNAPP:  Object to the

18          form.

19                   THE WITNESS:  I don't think

20          we're funding them to spread any

21          specific message.  But it is

22          something that they are stating in

23          their document.

24   BY MR. CRUEGER:

1    Q.    So do you know if -- well,

2    the American Pain Foundation is telling

3    Purdue, in this instance, in Exhibit-7,

4    that it was -- it was providing reporters

5    with a copy of this document, correct?

6    A.    That is correct.

7         MR. SNAPP:  Object to the

8    form.

9    BY MR. CRUEGER:

10   Q.    And that it was using this

11   document to influence -- or strike that

12   question.

13        It was using -- that the

14   American Pain Foundation was using

15   Exhibit-8, the reporter's guide, to

16   influence reporters, correct?

17        MR. SNAPP:  Object to the

18   form.

19        THE WITNESS:  It does

20        indicate that they were

21        distributing this media guide,

22        yes.

23   BY MR. CRUEGER:

24   Q.    And Purdue, then, knew that

1    the American Pain Foundation was

2    distributing this media guide, correct?

3                    MR. SNAPP:  Object to the

4            form.

5                    THE WITNESS:  Yes.

6    BY MR. CRUEGER:

7        Q.    And this is an example of

8    the mission match, as you referred to it,

9    correct?

10                   MR. SNAPP:  Object to the

11           form.

12                   THE WITNESS:  Again, we

13           are -- we provided funding to an

14           organization that advocates for

15           pain and pain management.

16   BY MR. CRUEGER:

17       Q.    But you're providing the

18   funding because Purdue agrees with that

19   message, correct?

20                   MR. SNAPP:  Object to the

21           form.

22                   THE WITNESS:  I think that

23           we're providing the funding more

24           broadly in support of the

Highly Confidential - Subject to Further Confidentiality Review

1          organization and the things

2          they're doing to advance proper

3          pain management and awareness of

4          un- or undertreated pain.

5     BY MR. CRUEGER:

6          Q.    And just looking at that

7     bullet point again in Exhibit-8, the

8     reporter's guide --

9          A.    Yes.

10         Q.    -- does it -- you would

11    agree with me, it does not mention in

12    here any issues about dependence arising

13    from opioid use, correct?

14         A.    Under that bullet point?

15              MR. SNAPP:  Object to the

16         form.

17    BY MR. CRUEGER:

18         Q.    Yes, under that.

19         A.    That we were just talking

20    about?

21         Q.    Yes.

22         A.    Well, it does say, As with

23    many medications, there are risks.  These

24    risks can be managed.

Highly Confidential - Subject to Further Confidentiality Review

```
1              It doesn't specifically talk
2       about what those risks are.
3              Q.    Right.  So it doesn't
4       mention dependence, does it?
5              A.    It does not in that bullet
6       point.  No, sir.
7              Q.    No.
8              And it doesn't mention
9       withdrawal, does it?
10             MR. SNAPP:  Object to the
11        form.
12             THE WITNESS:  Not in that
13        bullet point.  No, sir.
14      BY MR. CRUEGER:
15             Q.    And if you'd look at Page
16      14.
17             And if you see, this is
18      another thing on Page 14, there's a
19      column down the middle that says, Myth
20      and truth.
21             Do you see where I am?
22             A.    Yes, sir.
23             Q.    And the third one down,
24      myth, says -- starts with, Children.  And
```

1    it says, Children can easily become

2    addicted to pain medications.

3              Do you see where I am?

4         A.    Yes, sir.

5         Q.    And then the truth is,

6    according to the American Pain Foundation

7    is, Less than 1 percent of children

8    treated with opioids become addicted.

9              Do you see where I am?

10        A.    Yes, sir, I do.

11        Q.    Is that another example --

12   that is yet another example of mission

13   match between the message Purdue wants to

14   send and the message being sent by the

15   American Pain Foundation, correct?

16             MR. SNAPP:  Object to the

17        form.

18             THE WITNESS:  No, I don't

19        believe so.

20             But I do notice that there's

21        a footnote of some sort of a study

22        that they're pointing to.

23   BY MR. CRUEGER:

24        Q.    So you don't -- you don't

1    believe that Purdue was aware of this

2    message when it was providing funding to

3    the American Pain Foundation?

4                  MR. SNAPP:  Object to the

5          form.

6                  THE WITNESS:  Again, we

7          don't dictate what they do.  We're

8          funding the organization.

9                  We may or may not agree with

10         everything that they say.

11   BY MR. CRUEGER:

12         Q.    So do you believe that

13   Purdue would review materials before the

14   American Pain Foundation sent them out?

15                 MR. SNAPP:  Object to the

16         form.

17                 THE WITNESS:  I don't know

18         whether the American Pain

19         Foundation would provide the

20         opportunity for Purdue to look at

21         any of their documents in advance

22         or not.

23                 But by policy, we would not

24         do anything with content of any of

1          these documents.

2     BY MR. CRUEGER:

3          Q.    Is that a written policy?

4          A.    I would have to check to see

5     that.  I'm not certain whether it is.

6                But based on the fact that

7     if we would provide any unrestricted

8     educational grants, those don't come with

9     any -- in fact, we explicitly don't get

10    involved with content on anything that

11    they do.

12         Q.    If you'd look at Page 28.

13         A.    Yes, sir.

14         Q.    And the section that's

15    called, Adverse effects.

16                And this is supposedly

17    educating the public about the adverse

18    effects of opioids, correct?

19                MR. SNAPP:  Object to the

20         form.

21                THE WITNESS:  I believe

22         that's accurate, yes.

23    BY MR. CRUEGER:

24         Q.    And nowhere in here does the

1    American Pain Foundation mention

2    addiction, does it?

3                    MR. SNAPP:  Object to the

4            form.

5                    THE WITNESS:  It does not.

6    BY MR. CRUEGER:

7        Q.    And nowhere in here does the

8    American Pain Foundation discuss

9    dependence as an adverse effect, does it?

10                   MR. SNAPP:  Object to the

11           form.

12                   THE WITNESS:  I don't see it

13           in this section, no, sir.

14   BY MR. CRUEGER:

15       Q.    And nowhere in here does the

16   American Pain Foundation discuss

17   withdrawal as an adverse effect from

18   opioids, correct?

19                   MR. SNAPP:  Object to the

20           form.

21                   THE WITNESS:  I do not see

22           it in this adverse events section,

23           no, sir.

24   BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In fact, the adverse

2    events -- sorry.  Strike that.

3          The adverse effects section

4    does not even use the word "overdose,"

5    does it?

6    A.    I do not see it in there,

7    no, sir.

8    Q.    Now, Richard Sackler, can

9    you just tell the jury who Richard

10   Sackler is?

11   A.    Richard Sackler is one of

12   the board members -- prior board members

13   of Purdue Pharma.

14   Q.    Does he have any ownership

15   interest in Purdue?

16         MR. SNAPP:  Objection.

17         Scope.

18         THE WITNESS:  As a board

19         member and -- yes.  As an owner of

20         the company, yes.

21   BY MR. CRUEGER:

22   Q.    So if you'd look at

23   Exhibit-9.

24                    -  -  -

Highly Confidential - Subject to Further Confidentiality Review

 1              (Whereupon, Purdue-Must

 2          Exhibit-9, CHI_001032002-003, was

 3          marked for identification.)

 4                  -   -   -

 5   BY MR. CRUEGER:

 6          Q.    Richard Sackler was

 7   personally involved with the American

 8   Pain Foundation, correct?

 9              MR. SNAPP:  Objection.

10          Form.

11              THE WITNESS:  It does

12          appear, based on this document,

13          that he was involved in a meeting

14          with the American Pain Foundation.

15   BY MR. CRUEGER:

16          Q.    Right.  This is a visit

17   report to the -- about a visit between

18   certain people from Purdue with the

19   American Pain Foundation, correct?

20          A.    Correct.  On, according to

21   the document, Monday, August the 7th,

22   2000, in Stamford, Connecticut.

23          Q.    And that's Purdue's

24   headquarters, correct?

1           MR. SNAPP:  Object to the

2      form.

3           THE WITNESS:  Yes, sir, it

4      is.

5           Well, our headquarters is

6      located in Stamford, Connecticut.

7      I'm assuming that's where this

8      meeting took place.

9  BY MR. CRUEGER:

10      Q.   And if you see the very last

11  paragraph -- the first page, sorry.

12           Sackler, that's referring to

13  Richard Sackler, correct?

14           MR. SNAPP:  Object to the

15      form.

16           THE WITNESS:  It appears

17      that way on this document, yes,

18      sir.

19  BY MR. CRUEGER:

20      Q.   So in this document, Sackler

21  said it was important, both for APF and

22  for Purdue, that APF be seen as

23  independent, and as such he did not want

24  Purdue to be the lead funder on the Stop

Highly Confidential - Subject to Further Confidentiality Review

1   Pain Now campaign.

2              I read that correctly,

3   correct?

4        A.    Yes, sir.

5        Q.    So that's the point, isn't

6   it, that it's important for Purdue and

7   the other opioid companies that the

8   American Pain Foundation be perceived as

9   independent, correct?

10             MR. SNAPP:  Object to the

11        form.

12             MR. SMITH:  Object to form.

13             THE WITNESS:  I can't speak

14        to Richard Sackler's intent, no,

15        sir.

16   BY MR. CRUEGER:

17        Q.    But Purdue, it's important

18   for Purdue that the American Pain

19   Foundation be perceived as independent,

20   correct?

21             MR. SNAPP:  Object to the

22        form.

23             THE WITNESS:  Well, the APF

24        is an independent, nonprofit

Highly Confidential - Subject to Further Confidentiality Review

1    organization, according to their

2    own document.

3  BY MR. CRUEGER:

4        Q.    But Purdue and other opioid

5  manufacturers provided millions upon

6  millions of dollars, correct?

7            MR. SNAPP:  Object to the

8        form.

9            THE WITNESS:  We did provide

10       funding for the organization, yes,

11       sir.

12           MR. SMITH:  Object to the

13       form.

14  BY MR. CRUEGER:

15       Q.    And that funding was used to

16  distribute information about opioids and

17  the risks of opioids, correct?

18       A.    Again, I think that their

19  mission was to talk about appropriate

20  pain management and discuss untreated or

21  undertreated pain, at that time.

22       Q.    But their mission is to

23  promote the use of opioids to treat

24  chronic pain, correct?

 1                    MR. SNAPP:  Object to the

 2          form.

 3                    THE WITNESS:  I believe

 4          their mission is to -- to promote

 5          appropriate prescribing in

 6          treatment of pain broadly, opioids

 7          being one of those items.

 8   BY MR. CRUEGER:

 9          Q.    And your company, Purdue,

10   they sell opioids, correct?

11          A.    Yes, sir.

12          Q.    So this is another example

13   of mission match, correct?  Where they

14   are advocating for the use of a product

15   that your company sells, correct?

16                    MR. SNAPP:  Objection to

17          form.

18                    THE WITNESS:  Again, they're

19          advocating for appropriate pain

20          treatment.  Opioids may be one of

21          the things that are used by

22          prescribers for the treatment of

23          pain.

24                         -   -   -

```
 1              (Whereupon, Purdue-Must

 2         Exhibit-10, PPLPC13000057412-421,

 3         was marked for identification.)

 4              -  -  -

 5   BY MR. CRUEGER:

 6         Q.    Now, if you look at

 7   Exhbiti-10.

 8              This a copy of an e-mail.

 9   And it's from Dr. Haddox, correct?

10         A.    It is.  Yes, sir.

11         Q.    And he's a Purdue employee?

12              MR. SNAPP:  Object to form.

13              THE WITNESS:  I'm just

14         trying --

15              MR. SNAPP:  Do you have a

16         time of this -- of this e-mail?

17              MR. CRUEGER:  What's that?

18              THE WITNESS:  I was just --

19         I was looking at the date of this

20         and trying to determine if Dr.

21         Haddox was, in fact, an employee

22         in 2000.

23   BY MR. CRUEGER:

24         Q.    So if you look at the
```

1    bottom, under his signature block on the

2    first page --

3            A.    Thank you, yes.

4            Q.    So --

5            A.    So he was the medical

6    director of internal -- international

7    analgesics is his title at that time.

8            Q.    And so he's an employee of

9    Purdue, correct?

10           A.    Yes.

11           Q.    Okay.  And he's sending the

12   e-mail to Mr. Jim Guest, correct?

13           A.    Yes, sir.

14           Q.    And if you look at the

15   second page, just so that -- in case you

16   don't know, Mr. Guest is the executive

17   director of the American Pain Foundation,

18   correct?

19           A.    According to this document,

20   yes, sir.

21           Q.    And two other people are

22   cc'd on this e-mail, if you look at the

23   first page, again, of Exhibit-10,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, sir.

2    Q.    Robin Hogan, that's also a

3  Purdue employee?

4    A.    Yes, sir.

5    Q.    What's her role?

6    A.    Robin Hogan is a male.

7    Q.    Sorry.

8    A.    That's all right.

9          And he was in corporate

10 communications.  I don't know what his

11 specific title might have been at that

12 time.

13   Q.    And Dr. Robert Kaiko?

14   A.    Kaiko.  Yes, sir.

15   Q.    Also a Purdue employee?

16   A.    Yes, sir.

17         I believe, at that time, Dr.

18 Kaiko -- I believe Dr. Haddox may have

19 been reporting to Dr. Kaiko at that time.

20   Q.    And Dr. Haddox, in this

21 e-mail to the executive director of the

22 American Pain Foundation, is attaching,

23 it says here, a pain action guide or pain

24 action pamphlet, correct?

1     A.    Yes.

2     Q.    And if you look at Bates

3  label -- the attachment starts with, the

4  last three of the Bates numbers are 414?

5     A.    414?

6     Q.    Yes.

7     A.    Yes, sir.

8     Q.    And so this is the -- if you

9  look at that document that's attached,

10  this is an American Pain Foundation

11  document, correct?

12     A.    It appears so, yes, sir.

13     Q.    And if you look at Page 413

14  of Exhibit-10.

15     A.    Got it.  Yes, sir.

16     Q.    And that's an e-mail from

17  Mr. Guest to Dr. Haddox, correct?

18     A.    Yes, sir.

19     Q.    And he's sending a draft of

20  this document and asking for Dr. Haddox

21  to comment on it, correct?

22     A.    Yes, sir.

23     Q.    And then in the first page

24  of Exhibit-10, this is Mr. Haddox -- or

1    Dr. Haddox providing his comments and

2    edits to the pain action pamphlet,

3    correct?

4         A.    It appears so from this

5    e-mail, yes.

6         Q.    And so this is an example of

7    Purdue commenting and editing a draft of

8    an American Pain Foundation document,

9    correct?

10             MR. SNAPP:  Object to the

11             form.

12             THE WITNESS:  Based on this

13             e-mail, it does appear that Dr.

14             Haddox was offering some suggested

15             wording on this, yes.

16    BY MR. CRUEGER:

17        Q.    And some of that suggested

18    wording, if you look at Dr. Haddox's Item

19    7 on the first page of Exhibit-10 -- so

20    Dr. Haddox is providing advice to the

21    American Pain Foundation on how to frame

22    the issue of addiction, is he not?

23             MR. SNAPP:  Object to the

24             form.

1          THE WITNESS:  It does appear

2      from this document that Dr. Haddox

3      is providing some thoughts on that

4      subject, yes, sir.

5  BY MR. CRUEGER:

6      Q.    And so Dr. Haddox, in here,

7  is providing suggestions to downplay the

8  risk of addiction, correct?

9          MR. SNAPP:  Object to the

10     form.

11         THE WITNESS:  I don't know

12     what specifically was in Dr.

13     Haddox's mind at that time.

14         But in reading this

15     document, he is offering up some

16     suggested language, yes, sir.

17  BY MR. CRUEGER:

18     Q.    And this is a document that

19  was -- this American Pain Foundation

20  document that Dr. Haddox is providing

21  comments on, this was going to be

22  distributed to the public, correct?

23         MR. SNAPP:  Object to the

24     form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I'm not clear

2     on how they planned to use this

3     document, so I can't speak to

4     that.

5 BY MR. CRUEGER:

6     Q.    So if you go to, again,

7 Page -- again, it's 414 of Exhibit-10.

8          So it says, Reading this

9 could help ease your pain, a guide to

10 getting the help you need and deserve.

11 The American Pain Foundation.

12     A.    Yes, sir.

13     Q.    So if you look at

14 Exhibit-3 -- I believe it's right next to

15 your right hand.  I think that's it.

16          Is that it?

17     A.    Got it.

18     Q.    That's the title of

19 Exhibit-3, correct?

20     A.    Yes, sir, it is.

21     Q.    So Dr. Haddox is providing

22 comments on the pain action guide,

23 correct?

24     A.    It does appear that they

Highly Confidential - Subject to Further Confidentiality Review

1  have similar language.

2          Q.    But my question is that Dr.

3  Haddox is providing comments and edits on

4  the pain action guide, correct?

5              MR. SNAPP:  Object to the

6          form.

7              THE WITNESS:  Based on this

8          document, it appears that way,

9          yes, sir.

10  BY MR. CRUEGER:

11          Q.    So when -- Dr. Haddox

12  reviewed the pain action guide from the

13  American Pain Foundation, correct?

14              MR. SNAPP:  Object to the

15          form.

16              THE WITNESS:  It appears

17          that way, based on this document.

18  BY MR. CRUEGER:

19          Q.    And if you look at

20  Exhibit-2 -- and you'll want to keep

21  Exhibit-10 in front of you.  Exhibit-2 is

22  the spreadsheet.

23          A.    Got you.  I'll find it.

24          Q.    Actually, you can use

Highly Confidential - Subject to Further Confidentiality Review

1   Exhibit-12, since I see it's in front of

2   you.  It's the same thing.

3          A.    Okay.  Thank you.  Okay.

4          Q.    So Exhibit-10, Dr. Haddox's

5   e-mail to the American Pain Foundation

6   executive director, that's dated October

7   11th of the year 2000, correct?

8          A.    Yes, sir.

9          Q.    And in -- the American Pain

10  Foundation, under Exhibit-12, in 2000,

11  Purdue had not provided any support for

12  the American Pain Foundation, correct?

13         A.    That is correct.

14         Q.    But in 2001, it provided a

15  little over $600,000 in support, correct?

16         A.    Yes, sir.

17         Q.    And, presumably, 2001 is

18  when this pamphlet, the pain action

19  guide, came out, correct?

20             MR. SNAPP:  Object to the

21         form.

22             THE WITNESS:  I don't know

23         specifically when it came out.

24  BY MR. CRUEGER:

1    Q.    And let's look at the pain

action guide.  This is Exhibit-3.

3    A.    Yes.

4    Q.    And if you look at --

unfortunately, there's no page numbers on

this.

7         If you look at what would be

the third page, it starts with, Know the

facts, at the top.

10   A.    I'm on that page.

11   Q.    Okay.  And in that column,

the fourth paragraph down starts with,

Pain medications?

14   A.    Yes, sir.

15   Q.    So, Pain medications rarely

cause addiction.

17         That's what the American

Pain Foundation is saying in this

pamphlet, correct?

20   A.    That is what it says on this

document, yes, sir.

22   Q.    And that's in the -- another

example of mission match with Purdue's

message to the public that opioids rarely

Highly Confidential - Subject to Further Confidentiality Review

1    cause addiction, correct?

2             MR. SNAPP:  Object to the

3        form.

4             THE WITNESS:  Well, there

5        are associated risks involved in

6        opioids.  And in the labeling

7        itself, it clearly identifies that

8        there are problems with addiction.

9    BY MR. CRUEGER:

10       Q.    My question, though, was the

11   American Pain Foundation's message to the

12   public in this pamphlet that pain

13   medications, in this case, opioids,

14   rarely cause addiction matches with

15   Purdue's message to the public that

16   opioids rarely cause addiction, correct?

17            MR. SNAPP:  Object to the

18       form.

19            THE WITNESS:  That is what

20       their document says here.  And

21       Purdue does have a position on

22       addiction related to --

23   BY MR. CRUEGER:

24       Q.    And, in fact, as we see in

1    Exhibit-10, Item 7 on Dr. Haddox's

2    e-mail, Dr. Haddox edited that part of

3    the American Pain Foundation's documents,

4    correct?

5                  MR. SNAPP:  Object to the

6          form.

7                  THE WITNESS:  I do see that

8          in this document.

9                  MR. SNAPP:  Jack, we've been

10         going for 70 minutes.  Is now a

11         good time for a short break?  I

12         can use a break.

13                 MR. CRUEGER:  Yes, we can

14         take a short break.

15                 MR. SNAPP:  Thank you.

16                 VIDEO TECHNICIAN:  The time

17         is 9:48 a.m.  Off the record.

18                     -  -  -

19                 (Whereupon, a brief recess

20         was taken.)

21                     -  -  -

22                 VIDEO TECHNICIAN:  We are

23         back on the record.  The time is

24         10:17 a.m.

1  BY MR. CRUEGER:

2       Q.   So, Mr. Must, when we left,

3  we were talking about Exhibit-3, the pain

4  action guide, right?

5       A.   Yes, sir.

6       Q.   If you'd look at the cover

7  page of Exhibit-3.

8           On the left-hand side it has

9  a copyright of 2003, correct?

10      A.   Yes, sir.

11      Q.   And if you look at

12  Exhibit-10, which is Dr. Haddox's e-mail,

13  that's 2000.

14           Do you recall that?

15      A.   Yes, sir.

16      Q.   And if you look at your

17  Exhibit-12, as we said, in 2000 Purdue

18  had provided no funding to the American

19  Pain Foundation, correct?

20      A.   That is correct.

21      Q.   But in 2001, after Mr.

22  Haddox's e-mail -- the year after Mr.

23  Haddox's e-mail, Purdue had provided

24  $606,000 in funding, correct?

1       A.    Yes, sir.

2       Q.    And in 2002, it provided

3  $15,000 to the American Pain Foundation,

4  correct?

5       A.    Yes, sir.

6       Q.    And then 2003, $461,000,

7  correct?

8       A.    Yes, sir.

9       Q.    And then 2004, $250,000,

10 correct?

11      A.    Yes, sir.

12      Q.    And part of that -- at least

13 part of that money allowed the American

14 Pain Foundation to distribute the pain

15 action guide that Dr. Haddox had edited,

16 correct?

17           MR. SNAPP:  Object to the

18      form.

19           THE WITNESS:  That would be

20      my assumption.

21 BY MR. CRUEGER:

22      Q.    And if you look at

23 Exhibit-11, it's going to be in the stack

24 of exhibits right next to you.

Highly Confidential - Subject to Further Confidentiality Review

1                    -   -   -

2                 (Whereupon, Purdue-Must

3            Exhibit-11, CHI_001260914-919, was

4            marked for identification.)

5                    -   -   -

6                 THE WITNESS:  Yes, sir.

7      BY MR. CRUEGER:

8            Q.    So this is the American Pain

9      Foundation board of directors meeting

10     from 2001, correct?

11           A.    Yes, sir.

12           Q.    Do you see that?

13                 If you look at, starting at

14     the bottom of Page 3, the last paragraph

15     says, APF.

16           A.    The last paragraph?

17           Q.    Yes.

18           A.    Yes, sir.

19           Q.    And it says, APF has started

20     to sell pain action guides.

21                 Do you see that?

22           A.    I do.

23           Q.    So, presumably, the American

24     Pain Foundation is using the mail to

Highly Confidential - Subject to Further Confidentiality Review

1  distribute the pain action guide,

2  correct?

3           MR. SNAPP:  Object to the

4      form.

5           THE WITNESS:  I'm sorry, can

6      you repeat the question?

7  BY MR. CRUEGER:

8      Q.    The American Pain Foundation

9  is distributing the pain action guides

10 through the mail, correct?

11          MR. SNAPP:  Object to the

12     form.

13          THE WITNESS:  I don't get

14     that from that paragraph.

15 BY MR. CRUEGER:

16     Q.    If you look at Page 4 --

17     A.    I'm sorry, are you in the

18 next-to-last paragraph or the last

19 paragraph?

20     Q.    I was just looking at the

21 last paragraph on Page 3.

22     A.    Okay.

23     Q.    And if you look at Page 4,

24 at the top, it says, John reported.

1        A.     Yes.

2        Q.     And it says that, Purdue

3   Pharma has ordered 50,000 brochures,

4   correct?

5        A.     Yes, sir.

6        Q.     And, also, Medtronic has

7   ordered 1,000 pain action guides,

8   correct?

9        A.     Yes, sir.

10        Q.     And then MPE has ordered

11   1,000 BORs, which I believe is Bill of

12   Rights, correct?

13        A.     I don't know.  But that's

14   what the document says, yes, sir.

15        Q.     If you look at Page 3, at

16   the bottom, the last paragraph, they

17   explain more, their acronym, Bill of

18   Rights.

19        A.     Sorry.  I see that now, yes,

20   sir.

21        Q.     And so Purdue ordered 50,000

22   of these pain action guides, correct?

23        A.     That's what this document

24   says.  Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then Purdue would then
2  use the mail to distribute them to
3  doctors' offices, correct?
4              MR. SNAPP:  Object to the
5         form.  Scope.
6              THE WITNESS:  I can't say
7         what Purdue did with them.  I'm
8         not aware.
9              But they did order 50,000 of
10        them, yes.
11 BY MR. CRUEGER:
12   Q.    Well, they would use them
13 for selling, correct?
14             MR. SNAPP:  Object to the
15        form.
16             THE WITNESS:  I'm sorry, for
17        self?
18 BY MR. CRUEGER:
19   Q.    For selling.  For selling
20 your product.
21             MR. SNAPP:  Object to the
22        form.  Scope.
23             THE WITNESS:  Again, I'm not
24        familiar with what the marketing

Highly Confidential - Subject to Further Confidentiality Review

1          and sales group may or may not do

2          with these.

3   BY MR. CRUEGER:

4          Q.    Let's just look quickly,

5   I'll have to try to push this one across.

6   Exhibit-18.

7                    -   -   -

8              (Whereupon, Purdue-Must

9          Exhibit-18, PPLPC009000040055, was

10         marked for identification.)

11                   -   -   -

12             MS. POLLOCK:  You have

13         copies in there.

14             MR. SNAPP:  We have copies

15         in here?

16             MR. CRUEGER:  Yes.

17  BY MR. CRUEGER:

18         Q.    Mr. Must, if you just

19  quickly look at Exhibit-18, this is a

20  Purdue document.

21             And the cover is an e-mail,

22  right, from Gary Lewandowski to Tony

23  Goodman, correct?

24         A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know who those people

2    are?  Who is Gary Lewandowski?

3    A.    Gary Lewandowski was a

4    member of our marketing department, as

5    was Tony Goodman.

6    Q.    And it attaches a

7    PowerPoint, which the cover page is on

8    the next page, and the PowerPoint starts

9    after that?

10    A.    Yes, sir.

11    Q.    And because the PowerPoint

12    is not labeled, and to speed things up, I

13    put a tag on there that says 1, to kind

14    of help you get to where -- I'm sorry, go

15    to 2.

16    Just so we're on the right

17    page, is the one you're looking at, does

18    it have -- it says, New pain action guide

19    by APF at the top?

20    A.    Yes, sir.

21    Q.    And does it say, Selling

22    messages?

23    A.    Yes, sir.

24    Q.    Okay.  And so this is an

Highly Confidential - Subject to Further Confidentiality Review

1    example of Purdue using the pain action

2    guide to sell OxyContin, correct?

3                    MR. SNAPP:  Object to the

4            form.  Scope.

5                    THE WITNESS:  Again, I'm not

6            familiar with the sales and

7            marketing plans.  But that's what

8            it says on this particular

9            document, that this is a selling

10           message.

11   BY MR. CRUEGER:

12           Q.    And that's really the point

13   of all the funding that Purdue is

14   providing to the American Pain

15   Foundation, isn't it?

16                   You want to expand the

17   market for opioids, correct?

18                   MR. SNAPP:  Object to the

19           form.

20                   THE WITNESS:  Again, I think

21           that as an organization that

22           represents pain patients and

23           having a product in the pain

24           therapeutic area, we supported the

Highly Confidential - Subject to Further Confidentiality Review

1  organization, yes.

2  BY MR. CRUEGER:

3  Q.    Well, you supported --

4  Purdue supported the organization because

5  it believed the messaging from the

6  American Pain Foundation would expand the

7  market for opioids, correct?

8  MR. SNAPP:  Object to the

9  form.

10  THE WITNESS:  Again, I think

11  we provided funding and support

12  for the organization because they

13  represented the patients that our

14  products were meant to be used

15  with, when prescribed

16  appropriately.

17  BY MR. CRUEGER:

18  Q.    Well, they didn't really

19  represent the patients, did they, Mr.

20  Must?

21  They represented your

22  interests, and were promoting your and

23  other opioid manufacturers' interests,

24  correct?

1                    MR. SNAPP:  Object to the

2          form.

3                    THE WITNESS:  No.  I believe

4          they represented pain patients.

5    BY MR. CRUEGER:

6          Q.    So, but it was Purdue and

7    other opioid manufacturers that provided

8    the primary funding for the American Pain

9    Foundation, correct?

10         A.    I think that --

11                   MR. SNAPP:  Object to the

12         form.

13                   THE WITNESS:  I think that

14         Purdue, other manufacturers of

15         opioids, and other companies that

16         may or may not have been in the

17         opioid space were funders of the

18         organization.

19   BY MR. CRUEGER:

20         Q.    And all that funding was not

21   in the public knowledge, was it?

22                   MR. SNAPP:  Object to the

23         form.

24                   THE WITNESS:  I can't speak

Highly Confidential - Subject to Further Confidentiality Review

1    to that.  I'm not sure.

2    BY MR. CRUEGER:

3        Q.    But none of the Purdue

4    funding was in the public knowledge, was

5    it?

6            MR. SNAPP:  Object to the

7        form.

8            THE WITNESS:  Again, I'm not

9        sure what APF did or didn't

10       disclose.

11   BY MR. CRUEGER:

12       Q.    Well, if you look at

13   Exhibit-3, Purdue's name is not disclosed

14   in the pain action guide, the guide that

15   the American Pain Foundation distributed,

16   is it?

17           MR. SNAPP:  Object to the

18       form.

19           THE WITNESS:  It is not.

20   BY MR. CRUEGER:

21       Q.    Nor is any of the other

22   funding provided by other opioid

23   manufacturers; that is not disclosed in

24   this American Pain Foundation document,

1    is it?

2              MR. SNAPP:  Object to the

3         form.

4              THE WITNESS:  It is not.

5    BY MR. CRUEGER:

6         Q.    So wouldn't you agree, Mr.

7    Must, that while the document says that

8    the American Pain Foundation is an

9    independent, nonprofit organization, that

10   it really only has the illusion of an

11   independent nonprofit organization?

12             MR. SNAPP:  Object to the

13        form.

14             THE WITNESS:  No.  I don't

15        believe that this one document

16        specifically talks about the

17        American Pain Foundation's

18        funding.

19   BY MR. CRUEGER:

20        Q.    Let's look at Exhibit-13.

21   It would be the next one on the stack.

22                  -  -  -

23             (Whereupon, Purdue-Must

24        Exhibit-13, No Bates, The Use of

1    Opioids for the Treatment of

2    Chronic Pain, was marked for

3    identification.)

4              -  -  -

5        MR. CRUEGER:  I think you

6    can put all those to the side,

7    except for Exhibit-12.

8          THE WITNESS:  Thank you.

9        MR. SNAPP:  Except for

10   exhibit what?  I'm sorry.

11       MR. CRUEGER:  12, just the

12   spreadsheet.

13  BY MR. CRUEGER:

14       Q.   This is a consensus

15  statement put out by the American Academy

16  of Pain Medicine.

17            Do you see that?

18       A.   Yes, sir.  Along with the

19  American Pain Society.

20       Q.   Correct.

21            And the title is, The Use of

22  Opioids for the Treatment of Chronic

23  Pain, correct?

24       A.   Yes, sir.

1      Q.    And Purdue gave a

2  substantial amount of money to both of

3  these organizations, the American Academy

4  of Pain Medicine and the American Pain

5  Society, correct?

6              MR. SNAPP:  Object to the

7         form.

8              THE WITNESS:  Yes, we did.

9  BY MR. CRUEGER:

10     Q.    And you know that other

11  opioid manufacturers also provided funds

12  to the American Academy of Pain Medicine?

13             MR. SNAPP:  Object to the

14        form.

15             THE WITNESS:  I don't know

16        specifically --

17             MR. SMITH:  Object to the

18        form.

19             THE WITNESS:  I don't know

20        specifically who, but I would

21        assume that other organizations

22        that were interested in the

23        treatment of pain did provide

24        contributions to these

Highly Confidential - Subject to Further Confidentiality Review

1     organizations.

2 BY MR. CRUEGER:

3    Q.  And other organizations --

4 other opioid manufacturers also provided

5 financial support for the American Pain

6 Society, correct?

7     MR. SNAPP: Object to the

8    form.

9     MR. SMITH: Object to form.

10     THE WITNESS: Again, I have

11    no personal knowledge.

12 BY MR. CRUEGER:

13    Q.  And, again, these would

14 be -- assuming that they did provide

15 money, these would be competitors,

16 correct, the other opioid manufacturers?

17     MR. SNAPP: Object to the

18    form.

19     MR. SMITH: Object to form.

20     THE WITNESS: They would be

21    organizations that sell opioids

22    into the same therapeutic area.

23 BY MR. CRUEGER:

24    Q.  And if you look at the last

Highly Confidential - Subject to Further Confidentiality Review

1    page, Page 4 of Exhibit-13.

2         A.    Yes, sir.

3         Q.    There's a list of people.

4    It's all in italics, This statement was

5    prepared by the following committee

6    members.

7               Do you see where I am?

8         A.    Yes, sir.

9         Q.    The first person is Dr.

10   David Haddox.

11              Do you see that?

12        A.    I do.

13        Q.    So he eventually went to

14   Purdue, correct?

15        A.    Yes, sir.

16        Q.    The next person is David

17   Jarenson.

18              Do you see his name?

19        A.    Yes, sir.

20        Q.    And he's at the Wisconsin

21   Pain and Policy Studies Group, correct?

22        A.    That's correct.

23        Q.    And Purdue provided

24   financial support to the Wisconsin Pain

1    and Policy Studies Group, correct?

2         A.    We did.

3         Q.    And the next person after

4    that is a Robert Angelrolla, I think is

5    the name.

6         A.    I don't know him, so we'll

7    go with you.

8         Q.    You see that?

9         A.    Yes, I do see it.

10        Q.    And Mr. Angerolla, that is

11   an attorney who worked for Johnson &

12   Johnson, correct?

13             MR. SNAPP:  Object to the

14        form.  Scope.

15             THE WITNESS:  I don't know

16        that.

17             As I indicated, I don't know

18        who that person is.  But it does

19        appear from the title that he was

20        an attorney.

21   BY MR. CRUEGER:

22        Q.    And then the consultant at

23   the bottom is Russel Portnoy, correct?

24        A.    Yes, sir.  Excuse me.

1          Yes, sir.

2          Q.    And that's a doctor that

3     Purdue had provided financial support to,

4     correct?

5          A.    Yes, sir.

6          Q.    Another name on here is

7     Richard Payne.

8               Do you see that?

9          A.    I do.

10         Q.    And did Richard Payne have

11    any ties to Purdue?

12              MR. SNAPP:  Objection.

13         Scope.

14              THE WITNESS:  I don't know

15         the answer to that.

16    BY MR. CRUEGER:

17         Q.    How about Dr. Carr, do you

18    know if he has any ties to Purdue?

19         A.    I don't know whether he has

20    ties to Purdue or not.

21         Q.    And I'm just looking at your

22    Exhibit-12.

23              So the guidelines are

24    approved, if you see at the bottom of

Highly Confidential - Subject to Further Confidentiality Review

1    that, in 1996, correct?

2              A.    Yes, sir.

3              Q.    And the copyright date on

4    this Exhibit-13 is 1997, correct?

5              A.    Yes, sir.

6              Q.    And if you look at your

7    Exhibit-12, by 1996, Purdue had provided

8    $29,600 in funding to the American

9    Academy of Pain Medicine, correct?

10             A.    Yes, sir.

11             Q.    And then it provided funding

12   to the American Academy of Pain Medicine

13   every year until 2018, correct?

14             A.    Yes, sir.

15             Q.    And the same with the

16   American Pain Society, it had provided,

17   in 1997, $48,501 in funding, correct?

18             A.    Yes, sir.

19             Q.    And then it provided funding

20   every year to the American Pain Society

21   through 2018, correct?

22             A.    Yes, sir.

23             Q.    And some of those years,

24   such as 2002, 2003, 2004, were

1    substantial amounts of money, correct?

2              MR. SNAPP:  Object to the

3         form.

4              THE WITNESS:  Those were

5         larger contributions than prior

6         years, yes, sir.

7    BY MR. CRUEGER:

8         Q.   So is it true that -- well,

9    Purdue's payments to the American Academy

10   of Medicine and the American Pain Society

11   were a quid pro quo for the creation of

12   these 1997 consensus statements?

13             MR. SNAPP:  Object to the

14        form.

15             THE WITNESS:  No, I don't

16        believe so.

17   BY MR. CRUEGER:

18        Q.   And isn't it true -- well,

19   strike that.

20             Wouldn't you agree that

21   Purdue then used this 1997 consensus

22   statement to expand the market and sell

23   more opioids?

24             MR. SNAPP:  Object to the

1          form.  Scope.

2               THE WITNESS:  I do think

3          that Purdue agreed with the

4          document.

5               And while I'm not familiar

6          with the marketing or sales plans,

7          I'm sure that we distributed this

8          to clinicians.

9     BY MR. CRUEGER:

10         Q.    And you distributed it to

11    clinicians using the mail and -- correct?

12              MR. SNAPP:  Object to the

13         form.  And scope.

14              THE WITNESS:  Again, I'm

15         not -- I'm not familiar with

16         marketing and sales plans.  So I

17         don't know exactly how they may

18         have done that.

19    BY MR. CRUEGER:

20         Q.    And Purdue wouldn't have

21    funded -- well, let me strike that.

22              Purdue wouldn't have

23    provided funds to the American Academy of

24    Pain Medicine if it didn't agree with the

Highly Confidential - Subject to Further Confidentiality Review

1   message in this 1997 consensus statement,

2   correct?

3                   MR. SNAPP:   Object to the

4           form.

5                   THE WITNESS:   I think with

6           any of these organizations, again,

7           they operate within the

8           therapeutic area where we were

9           providing medications.

10                  We probably didn't always

11          agree with all of their

12          statements.   But, broadly, they

13          were organizations that were

14          important because these were the

15          specialists in this therapeutic

16          category.

17   BY MR. CRUEGER:

18          Q.    And as we saw at the back of

19   Page -- of Exhibit-13, Page 4, you had

20   ties -- Purdue had ties with at least two

21   of these people, Dr. Haddox and David

22   Jarenson, at the Pain and Policy Studies

23   Group, correct?

24                  MR. SNAPP:   Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2              THE WITNESS:  Sure.  We know

3          both of those.

4              And David Haddox, I don't

5          believe, at this time, worked for

6          the company; but, ultimately, did

7          work for the company.

8    BY MR. CRUEGER:

9          Q.    Within two years, basically?

10   Two or three years, correct?

11         A.    Yeah, I think that's right.

12         Q.    And if you look at your

13   Exhibit-12, in 1997, when these came out,

14   Purdue had provided $75,000 of financial

15   support to the Pain and Policy Studies

16   Group, correct?

17             MR. SNAPP:  Object to the

18         form.

19             THE WITNESS:  Yes, sir.

20   BY MR. CRUEGER:

21         Q.    So let's look at Exhibit-14.

22                 -  -  -

23             (Whereupon, Purdue-Must

24         Exhibit-14, Joint Commission on

Highly Confidential - Subject to Further Confidentiality Review

1              Accreditation of Healthcare

2              Organization's Pain Standards for

3              2001, was marked for

4              identification.)

5                        -  -  -

6    BY MR. CRUEGER:

7         Q.    So this is a document

8    published by the Joint Commission on the

9    Accreditation of Healthcare

10   Organizations, correct?

11        A.    Yes, sir.

12        Q.    So instead of that long

13   title, can we agree just to call it

14   either the Joint Commission or JCAHO?

15        A.    Yes, sir.

16        Q.    Okay.  And these

17   standards -- well, let's see, these

18   standards are about the treatment of

19   pain, correct?

20        A.    That's correct.

21        Q.    And they originally were

22   made public in 2000, correct?

23        A.    Well, the document says it's

24   standards for 2001.  So I assume they

Highly Confidential - Subject to Further Confidentiality Review

1   were developed in 2000 and made available

2   in 2001.

3          Q.    And the Joint Commission is

4   an important entity because it provides

5   accreditation to hospitals, correct?

6          A.    Yes, it does.

7          Q.    And so the hospitals, if

8   they want to receive that accreditation,

9   they have to follow these standards for

10  pain, correct?

11         A.    That's my understanding.

12         Q.    And if you look at your

13  Exhibit-12, the Joint Commission is on

14  the first page.  It's close to the

15  bottom, JCAHO.

16              Do you see that?

17         A.    I do.

18         Q.    So in 2000, Purdue had

19  provided $560,000 of financial support to

20  the Joint Commission, correct?

21         A.    Yes, sir.

22         Q.    And then in 2001, which is

23  the date of Exhibit-14, Purdue had

24  provided $981,358 in financial support to

1    the Joint Commission, correct?

2           A.    Yes, sir.

3           Q.    And then in 2002, Purdue had

4    provided $582,649 of financial support to

5    the Joint Commission, correct?

6           A.    Yes, sir.

7           Q.    So Purdue -- and then Purdue

8    thereafter doesn't provide any more

9    financial support to the Joint

10   Commission, does it?

11          A.    That is correct.

12          Q.    So Purdue started giving

13   money to the Joint Commission in 2000,

14   when it was presumably drafting and

15   formulating the guidelines, correct?

16               MR. SNAPP:  Object to the

17          form.

18               THE WITNESS:  Yes, sir.

19   BY MR. CRUEGER:

20          Q.    And it stopped giving money

21   to the Joint Commission in -- after 2002,

22   after the Joint Commission had published

23   these guidelines on the treatment of

24   pain, correct?

1          A.    It appears that way, yes,

2    sir.

3          Q.    And Purdue is providing

4    financial support to the Joint Commission

5    because it wanted to use these guidelines

6    to sell opioids, correct?

7               MR. SNAPP:  Object to the

8          form.

9               THE WITNESS:  My

10         understanding is that Purdue

11         provided funding to the Joint

12         Commission on Accreditation of

13         Healthcare Organizations, or

14         JCAHO, to distribute these

15         guidelines, once they were

16         developed by JCAHO, to healthcare

17         facilities.

18   BY MR. CRUEGER:

19         Q.    And that's so that Purdue

20   could sell more OxyContin, correct?

21               MR. SNAPP:  Object to the

22         form.  Scope.

23               THE WITNESS:  I think it was

24         to make healthcare professionals

```
 1              and facilities aware of the need

 2              to treat pain appropriately.

 3    BY MR. CRUEGER:

 4         Q.    Let's look at Exhibit-15.

 5                    -  -  -

 6              (Whereupon, Purdue-Must

 7              Exhibit-15, PDD8801183361-364, was

 8              marked for identification.)

 9                    -  -  -

10    BY MR. CRUEGER:

11         Q.    Like all these -- it's a

12    series of e-mails that Purdue has

13    produced.

14              Like all these documents for

15    e-mails, you kind of have to start at the

16    back.

17         A.    Okay.

18         Q.    And the original e-mail is

19    from Kathy Walsh, and it's sent on

20    December 27th, 2000 to a number of

21    people, and it includes a number of

22    people with the name Sackler, does it

23    not?

24         A.    It does.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So there's a Beverly

2 Sackler, a Kathy Sackler, Dr.  Mortimer

3 Sackler, Dr. Raymond Sackler, Dr. Richard

4 Sackler, correct?

5    A.    Yes, sir.

6    Q.    Were all these people

7 sitting on the Purdue board of directors

8 at this time?

9        MR. SNAPP:  Object to form.

10       Scope.

11       THE WITNESS:  I can't be

12       certain of that.

13 BY MR. CRUEGER:

14    Q.    Did they all sit on the

15 board of directors at one time?

16       MR. SNAPP:  Objection.

17       Scope.

18       THE WITNESS:  Again, I don't

19       have the knowledge of exactly who

20       is or isn't on the board, or was

21       or wasn't on the board.

22 BY MR. CRUEGER:

23    Q.    Well, we already know that

24 Richard Sackler was on the board, Dr.

Highly Confidential - Subject to Further Confidentiality Review

1    Richard Sackler, correct?

2              MR. SNAPP:  Objection.

3         Scope.

4              THE WITNESS:  He was on the

5         board, yes, sir.

6    BY MR. CRUEGER:

7         Q.    So -- and so this e-mail,

8    the subject is, Press coverage of JCAHO

9    pain guidelines.

10             And we don't have to read --

11   so what this e-mail is just doing is

12   forwarding two articles about -- that

13   happened to mention hospitals

14   implementing the JCAHO guidelines,

15   correct?

16        A.    Yes, it appears that way.

17        Q.    And so the next e-mail,

18   which is on the page with -- I guess the

19   second-to-last page, so with the Bates

20   number ending 63.

21        A.    Yes.

22        Q.    It's from Mortimer Junior

23   Sackler?

24             Do you see that?  It's sent

Highly Confidential - Subject to Further Confidentiality Review

1    to --

2         A.    I do.

3         Q.    -- what appears to be all

4    the people who were on the original

5    e-mail, correct?

6         A.    Yes, sir.

7         Q.    And he's talking about how

8    they need to get more articles that are

9    positive, like the articles that were

10   attached, to counteract negative

11   attention, correct?

12              MR. SNAPP:  Object to the

13         form.

14              THE WITNESS:  That's what he

15         appears to be saying in this

16         document.

17   BY MR. CRUEGER:

18         Q.    And he's talking about --

19   he's asking what can Purdue do to get --

20   what can Purdue do to get more positive

21   media about the JCAHO guidelines,

22   correct?

23         A.    Yes.  He appears to be

24   commenting on this article and looking to

1    identify if there's other things that can

2    be done.

3           Q.    And he's also commenting on

4    whether the information would be better

5    if it came from Purdue or from the

6    American Pain Foundation, correct?

7           A.    Yes, he does make a comment

8    in this e-mail on that.

9           Q.    And that's part of Purdue's

10   strategy, to make it look like favorable

11   information about the guidelines comes

12   from what people believe is an

13   independent source like the American Pain

14   Foundation, correct?

15                MR. SNAPP:  Object to the

16           form.

17                THE WITNESS:  I can't speak

18           to what his strategy or his

19           thinking was.

20                But they are talking about,

21           in this -- at least in this

22           e-mail, where the information

23           should come from.

24   BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And they're doing this, Mr.

2  Sackler and all the other people who are

3  included in this e-mail, because Purdue

4  wants to use the JCAHO guidelines to sell

5  more OxyContin, correct?

6              MR. SNAPP:  Object to the

7          form.  Scope.

8              THE WITNESS:  Well, again, I

9          think Purdue definitely wanted to

10          distribute the JCAHO guidelines to

11          make sure that organizations,

12          institutions and healthcare

13          professionals were aware of the

14          JCAHO standards.

15  BY MR. CRUEGER:

16    Q.    Because that would help

17  Purdue sell more OxyContin, correct?

18              MR. SNAPP:  Object to the

19          form.  Scope.

20              THE WITNESS:  I believe it

21          would be to help raise awareness

22          around untreated or undertreated

23          pain and the fact that JCAHO

24          wanted it now to be considered as

Highly Confidential - Subject to Further Confidentiality Review

1         part of standard treatment in

2         institutions.

3    BY MR. CRUEGER:

4         Q.   Right.  Well, Purdue gave --

5    provided a little over $2 million to

6    JCAHO.

7              So it expected some sort of

8    return on that investment, correct?

9              MR. SNAPP:  Object to the

10        form.

11             THE WITNESS:  I think it

12        agreed with the findings of JCAHO

13        and wanted to make sure that that

14        message was received.

15   BY MR. CRUEGER:

16        Q.   And if you look to the next

17   e-mail up, which is from Robin Hogan.

18        A.   Yes, sir.

19        Q.   And this is to a more

20   discrete group of people.  It's to

21   Mortimer Sackler, Junior, Michael

22   Freedman, Dr. Richard Sackler, and Dr.

23   Mortimer Sackler, correct?

24        A.   Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And if you look at the

2    second paragraph, Mr. Hogan writes, With

3    respect to generating more articles about

4    pain guidelines, we loaned JCAHO our PR

5    firm, FleishmanHillard, last year during

6    the national rollout of the new

7    standards.

8            So Purdue was trying to --

9    again, this is more evidence that Purdue

10   is using the JCAHO standards to sell

11   opioids, correct?

12           MR. SNAPP:  Object to the

13       form.  Scope.

14           THE WITNESS:  It appears

15       that Robin Hogan is indicating

16       that FleishmanHillard helped JCAHO

17       to get their messages out, yes,

18       sir.

19   BY MR. CRUEGER:

20   Q.    So it was -- it sounds like,

21   you can read this e-mail -- strike that.

22           You can read this e-mail --

23   strike that.

24           So Purdue was coordinating

1    its efforts with JCAHO through Purdue's

2    PR firm, FleishmanHillard, correct?

3              MR. SNAPP:  Object to the

4         form.

5              THE WITNESS:  Well, it

6         appears from this e-mail that they

7         certainly were providing

8         FleishmanHillard to assist JCAHO

9         in their PR issues.

10   BY MR. CRUEGER:

11        Q.    Actually, I was wrong on one

12   thing.

13             If you go back to Exhibit-18

14   quickly, it's going to be in that stack I

15   earlier told you that you could set

16   aside.

17        A.    I'll find it.

18        Q.    So in Exhibit-18, if you go

19   to what I tabbed as 1 in the PowerPoint.

20        A.    Yes, sir.

21        Q.    And the title of that

22   PowerPoint is, Steps to Implement JCAHO

23   Standard, Gate Fold?

24        A.    Yes, sir.

1        MR. SNAPP:  Chuck, mine is

2     not tabbed.  Can you wait one

3     second until I get there?  Sorry.

4        MR. CRUEGER:  Sure.

5        MR. SNAPP:  Okay.  Go ahead.

6     Thank you.

7   BY MR. CRUEGER:

8     Q.    And it says there, Selling

9   messages, correct?

10    A.    Correct.

11    Q.    So this is an example of

12  Purdue using the JCAHO standards to sell

13  more OxyContin, correct?

14       MR. SNAPP:  Object to the

15    form.

16       THE WITNESS:  Well, again,

17    while I'm not an expert on the

18    sales and marketing plans, looking

19    at this, I see it has a lit code,

20    which indicates that sales

21    representatives are able to order

22    various pamphlets or materials

23    that they can use when they are

24    out communicating with healthcare

Highly Confidential - Subject to Further Confidentiality Review

1        professionals.

2               And it appears that the

3        JCAHO standards are one of the

4        things that they can use -- or are

5        available for them to use in their

6        conversations with healthcare

7        professionals.

8    BY MR. CRUEGER:

9        Q.    So the answer would be, yes,

10   that Purdue is using the JCAHO standards

11   to sell more opioids, correct?

12              MR. SNAPP:  Object to the

13       form.

14              THE WITNESS:  It appears to

15       me that Purdue is making the JCAHO

16       standards available for the sales

17       force to be able to use in

18       conversations with healthcare

19       professionals.

20   BY MR. CRUEGER:

21       Q.    And you would agree,

22   wouldn't you, Mr. Must, that the reason

23   Purdue is providing over $2 million of

24   financial support to distribute the JCAHO

Highly Confidential - Subject to Further Confidentiality Review

1   standards is because it wants to expand

2   the market for opioids?

3              MR. SNAPP:  Object to the

4        form.  Scope.

5              THE WITNESS:  Again, I'm not

6        familiar with their marketing and

7        sales plans.  But, certainly, they

8        want to make healthcare

9        professionals aware of the JCAHO

10       standards.

11             MR. CRUEGER:  Let's go to

12       Exhibit-16.

13                  -  -  -

14             (Whereupon, Purdue-Must

15       Exhibit-16, No Bates,  Model

16       Policy for the Use of Controlled

17       Substances for the Treatment of

18       Pain, Federation of State

19       Medical Boards of the  United

20       States, Inc., was marked for

21       identification.)

22                  -  -  -

23  BY MR. CRUEGER:

24             Q.   So this is a document put

Highly Confidential - Subject to Further Confidentiality Review

1    out by the Federation of State Medical

2    Boards, correct?

3         A.    Yes, sir.

4              MR. SNAPP:  Object to the

5         form.

6              Chuck, this one and 14,

7         neither of them have Bates numbers

8         on them.  Are they something that

9         was produced in the litigation?

10             MR. CRUEGER:  I think

11        they're just publicly available

12        standards.

13             MR. SNAPP:  This one looks

14        like it was printed from a

15        website.  I'm looking at Number

16        14.  It looks like it was printed

17        from a website on December 18th of

18        2001.  So I'm guessing that's not

19        publicly available.

20             If it was produced, can you

21        let us know what the Bates number

22        was?

23             MR. CRUEGER:  Sure.

24             MR. SNAPP:  People on the

Highly Confidential - Subject to Further Confidentiality Review

1          phone might want to know also so

2          they can follow along.

3                    Thanks.

4    BY MR. CRUEGER:

5          Q.    And this is The Model Policy

6    for the Use of Controlled Substances For

7    the Treatment of Pain, correct?

8          A.    That is the title of this

9    document, yes, sir.

10         Q.    And as reflected in your

11   Exhibit-12, Purdue provides substantial

12   financial support to the Federation of

13   State Medical Boards, correct?

14         A.    I'm sorry, in what year?

15         Q.    Well, between -- according

16   to your Exhibit-12, starting in 1999 and

17   going through 2007, Purdue provided

18   substantial financial support to the

19   Federation of State Medical Boards,

20   correct?

21         A.    Yes, sir.

22         Q.    And other organizations did

23   as well, correct?

24                    MR. SNAPP:  Object to the

1      form.  Scope.

2 BY MR. CRUEGER:

3      Q.    Actually, let's just go to

4 the introduction in the first paragraph,

5 the last sentence lists some entities.

6      A.    Yes, sir.

7      Q.    So it says, The Federation

8 thanks the Robert Wood Johnson Foundation

9 for awarding a grant to support the

10 original project.

11           So the Robert Wood Johnson

12 Foundation supported -- or provided

13 financial support for these standards,

14 correct?

15      A.    According to this document,

16 yes, sir.

17      Q.    And it also lists the

18 American Academy of Pain Medicine,

19 correct?

20      A.    Yes, sir.

21      Q.    And that's an entity that

22 Purdue also provides -- provided

23 substantial financial support to?

24      A.    We did provide financial

1    support to the American Academy of Pain

2    Medicine.

3         Q.     And the next one is the

4    American Pain Society, correct?

5         A.     Yes, sir.

6         Q.     And Purdue also provided

7    substantial financial support to the

8    American Pain Society?

9         A.     Yes, sir.

10         Q.     And the other one is the

11    University of Wisconsin Pain and Policy

12    Studies Group.

13              Do you see that?

14         A.     I do.

15         Q.     And Purdue also provided

16    substantial financial support to the Pain

17    and Policy Studies Group, correct?

18         A.     Yes, we have provided

19    financial support to that organization.

20         Q.     And just -- if you see the

21    last paragraph, it just says, The revised

22    policy notes.

23         A.     Yes.

24         Q.     So, The revised policy notes

1    that the State Medical Board will

2    consider inappropriate treatment,

3    including the undertreatment of pain, a

4    departure from an acceptable standard of

5    practice, correct?

6          A.    That is what it says in that

7    paragraph, yes, sir.

8          Q.    So this model policy is

9    establishing a standard of care for the

10   treatment of pain, correct?

11               MR. SNAPP:  Object to the

12         form.  Scope.

13               THE WITNESS:  It's providing

14         model guidelines, yes.

15   BY MR. CRUEGER:

16         Q.    And Purdue was providing

17   financial support to the Federation of

18   State Medical Boards, and the other

19   entities that were supporting this

20   project, because it wanted to use this

21   policy to expand the market for opioids,

22   correct?

23               MR. SNAPP:  Object to the

24         form.

1          THE WITNESS:  I think that

2     all those organizations are

3     organizations that are active in

4     the therapeutic area of pain

5     management.  And so we have

6     supported those various

7     organizations that you identified

8     at some level.

9          And this Federation of State

10    Medical Boards guideline also is

11    addressing pain management, and we

12    are working with them in support

13    of the work that they are doing.

14 BY MR. CRUEGER:

15    Q.   Because -- you're providing

16 all this financial support because it

17 would help produce business, correct?

18          MR. SNAPP:  Object to the

19    form.

20          THE WITNESS:  We are

21    providing it because it is the

22    therapeutic area in which we are

23    working.  And so all

24    organizations -- or the majority

1          of organizations that are involved

2          in patients or treatment in that

3          space, we would want to be working

4          with.

5     BY MR. CRUEGER:

6          Q.    Because you have a direct

7     financial interest -- let me rephrase

8     that.

9               Because Purdue has a direct

10    financial interest in expanding the

11    market for prescription opioids, correct?

12               MR. SNAPP:  Object to the

13          form.

14               THE WITNESS:  We do want to

15          make sure that patients are

16          treated appropriately.  And if

17          that expands the market and we're

18          selling in that market, then, yes,

19          we potentially would make money in

20          that area.

21    BY MR. CRUEGER:

22          Q.    And if you look at

23    Exhibit-17, it's the next exhibit in the

24    stack.

```
1                    -  -  -
2            (Whereupon, Purdue-Must
3        Exhibit-17, PPLP003477086-125, was
4        marked for identification.)
5                    -  -  -
6   BY MR. CRUEGER:
7        Q.    Do you have it in front of
8   you, Mr. Must?
9        A.    I do.
10       Q.    So this is a Purdue
11  document, correct?
12       A.    I'm not familiar with it,
13  but --
14            MR. SNAPP:  Can he have a
15       minute to look through it, Chuck?
16            MR. CRUEGER:  Sure.
17            MR. SNAPP:  Thanks.
18            THE WITNESS:  Okay.
19            So your question was, is
20       this a Purdue document?
21  BY MR. CRUEGER:
22       Q.    Yes.
23       A.    It is, yes.
24       Q.    And it's about -- the
```

1    document concerns approving a grant

2    request, right?

3          A.    It is the system that we use

4    for approving grant requests, yes, sir.

5          Q.    Right.  And it's a little

6    hard to see in this document, but the top

7    title -- the top of the document, there's

8    a box that says, Grant Title.  It's

9    Federation of State Medical Boards,

10   Responsible Opioid Prescribing, a

11   Physician Guide, correct?

12         A.    Yes, sir.

13         Q.    And the sponsor is Dr.

14   Haddox.

15               Do you see that?  It's kind

16   of on the left.

17         A.    I see it now, yes.  Thank

18   you.

19         Q.    And two boxes above that,

20   the detail notes, it says, 100,000 ED

21   grant.

22               I assume that's educational

23   grant?

24         A.    That would be my assumption

1    as well.

2          Q.    And the grant is to support

3    the purchase and distribution of Scott

4    Fishman book to 700,000 MDs.

5          Correct?

6          A.    That is -- it appears --

7    yes, I think that's true.

8          Q.    And Scott Fishman is a

9    doctor that Purdue has provided financial

10   support to, correct?

11         It's on --

12         A.    Yes.

13         Q.    -- your Exhibit-12.

14         A.    Yes, yes.

15         Q.    If you look at -- the last

16   three of the Bates number at the bottom

17   are 111, let's start -- the e-mail spills

18   into the next page.

19         But it's from Pamela

20   Bennett?

21         A.    Yes, sir.

22         Q.    And if you go on to the next

23   page, the second paragraph says,

24   Originally FSMB was not going to approach

Highly Confidential - Subject to Further Confidentiality Review

1  Purdue because of our recent legal

2  issues.

3        A.    Yes.

4        Q.    Do you know what she's

5  referring to as the "recent legal

6  issues"?

7        A.    I was just going to turn

8  over to see what year it was.

9              So this is, I assume, the

10  Western District of Virginia issue.

11        Q.    So that's when Purdue pled

12  guilty to felony misbranding of

13  OxyContin, correct?

14              MR. SNAPP:  Object to the

15        form.  Scope.

16              THE WITNESS:  That would be

17        that timeline.

18  BY MR. CRUEGER:

19        Q.    So she goes on to say, But

20  they have decided that since Purdue

21  funded the initial work -- and that's

22  referring to Mr. Fishman's book, correct?

23              MR. SNAPP:  Object to the

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  That's -- that

2     would be the way I would

3     understand that.

4  BY MR. CRUEGER:

5          Q.    So that the FSMB would make

6  the request.

7          And it says, FSMB is

8  limiting the number of pharma funders to

9  those they currently have on board.  So

10  Alpharma, Endo and Cephalon and Purdue,

11  if we choose to participate, and each

12  company has provided $100,000

13  unrestricted grant.

14          And that's the grant request

15  they are making to Purdue, correct?

16          A.    It appears that way, yes,

17  sir.

18          Q.    And if you go back to the

19  page that's labeled 111, and it's the

20  e-mail right above Ms. Bennett's from

21  Howard Udell.

22          A.    Yes, sir.

23          Q.    And Mr. Udell writes that,

24  While $100,000 is a lot of money, I feel

Highly Confidential - Subject to Further Confidentiality Review

1  we should do it and be a part of the

2  company's funding this.  I'd hate to see

3  Alpharma, Endo, Cephalon and a fourth

4  company do this and our name be missing.

5          So that's correct?

6      A.    Yes, sir.

7      Q.    And Alpharma, Endo and

8  Cephalon, those are competitors of

9  Purdue, correct?

10     A.    They are other companies in

11 the -- that manufacture opioids, yes,

12 sir.

13     Q.    You would consider them to

14 be competitors, correct?

15          MR. SNAPP:  Object to the

16     form.

17          THE WITNESS:  Again, they

18     are companies that manufacture

19     other opioids in the space.

20 BY MR. CRUEGER:

21     Q.    But they're not out there --

22 Alpharma, Endo, and Cephalon are not out

23 there promoting OxyContin use, are they?

24     A.    They are not promoting

1   OxyContin, no.

2          Q.    They are promoting their own

3   branded opioid drug, correct?

4          A.    That would be accurate, yes.

5              MR. SNAPP:  Object to the

6       form.  Scope.

7              MR. SMITH:  Object to the

8       form.

9   BY MR. CRUEGER:

10         Q.    And so the reason Purdue and

11  these four other -- these three other

12  companies -- strike that.  I'll start

13  over.

14             The reason Purdue and these

15  three other companies are funding the

16  FSMB and Mr. Fishman's book is because

17  they want to use it to expand the market

18  and sell more opioids, correct?

19             MR. SNAPP:  Object to the

20      form.  Scope.

21             MR. SMITH:  Object to form.

22             THE WITNESS:  I think that

23      they want to make sure that

24      there's information out there that

Highly Confidential - Subject to Further Confidentiality Review

1          helps to provide direction on

2          appropriate prescribing of

3          medications for chronic pain.

4     BY MR. CRUEGER:

5          Q.    But the goal is to sell more

6     opioids, correct?

7               MR. SNAPP:  Object to the

8          form.

9               MR. SMITH:  Object to form.

10              MR. SNAPP:  Scope.

11              THE WITNESS:  Again, my

12         understanding is that we would be

13         doing it to support appropriate

14         prescribing of pain products.

15    BY MR. CRUEGER:

16         Q.    But your company, Purdue,

17    does not make money just by the

18    appropriate prescribing of pain products,

19    as you put it, correct?

20              It makes money by selling

21    opioids?

22              MR. SNAPP:  Object to the

23         form.

24              THE WITNESS:  Purdue does

Highly Confidential - Subject to Further Confidentiality Review

1    make money selling opioids, yes.

2    BY MR. CRUEGER:

3        Q.    So Purdue and its

4    competitors, these three other companies,

5    are paying $100,000 each because they

6    expect to sell more opioids by

7    distributing Mr. Fishman's book, right?

8            MR. SNAPP:  Object to the

9        form.  And scope.

10            THE WITNESS:  Well, it's

11        also important to make sure that

12        prescribers are prescribing

13        appropriately so that you don't

14        end up with some of the challenges

15        that the companies could face, or

16        have faced.

17    BY MR. CRUEGER:

18        Q.    So is it your testimony that

19    there's no expectation that they would

20    sell more opioids by funding this book?

21            MR. SNAPP:  Object to the

22        form.

23            MR. SMITH:  Object to form.

24            THE WITNESS:  I don't know

1    whether their intent of sponsoring

2    this is to make more money or not.

3         Mr. Udell was the chief

4    legal officer.  So I don't know

5    whether he would be making sales

6    and marketing decisions.

7  BY MR. CRUEGER:

8         Q.    But he seems to be involved

9  in them right here, does he not?

10        A.    In this particular e-mail,

11  he's giving his opinion that he believes

12  that we should support this initiative,

13  yes.

14        Q.    By the way, Mr. Udell also

15  pled guilty to felony misbranding as part

16  of that legal issue, as Ms. Bennett puts

17  it, right?

18             MR. SNAPP:  Object to the

19        form.  Scope.

20             THE WITNESS:  Yes, he did.

21  BY MR. CRUEGER:

22        Q.    You can put that down.

23             So just so we have a clear

24  record while we're talking to you.

1          Purdue is a private company,

2     right?

3          A.    Yes, sir.

4          Q.    It has a board of directors?

5          A.    It does.

6          Q.    What role does the board of

7     directors play in the operation of the

8     company?

9               MR. SNAPP:  Objection.

10          Beyond the scope.

11               How does this fit within the

12          scope, Chuck?  He's not here to

13          talk about that.

14               MR. CRUEGER:  You can make

15          your objection, and then he can

16          answer.

17               MR. SNAPP:  Well, okay, it's

18          your time.

19               Go ahead.  You can answer if

20          you know the answer.

21               THE WITNESS:  I'm not

22          intimately aware of the actions of

23          the board.

24     BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Were meeting minutes taken

2   of board of director meetings?

3      A.    Yes.

4      Q.    Do you know if they were

5   recorded at all, the meetings?

6            MR. SNAPP:  Objection.

7        Beyond the scope.

8            THE WITNESS:  Recorded

9        beyond written notes?

10  BY MR. CRUEGER:

11     Q.    Yes.  I did phrase that

12  badly.

13           Beyond meeting minutes, as

14  we said, are there audio or visual

15  recordings of board of director meetings?

16           MR. SNAPP:  Objection.

17       Scope.

18           THE WITNESS:  Again, I'm not

19       intimately involved with board

20       meetings.  But I believe the

21       answer is no.

22  BY MR. CRUEGER:

23     Q.    You have attended board

24  meetings, have you not?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I have attended a few board

2  meetings over my 18 years with the

3  company.

4      Q.    Yeah.  You've been there for

5  18 years?

6      A.    Right.

7      Q.    So you have an idea of what

8  role the board of directors plays in

9  running Purdue?

10      A.    I have a --

11          MR. SNAPP:  Object to the

12      form.  And scope.

13          THE WITNESS:  I have a very

14      limited knowledge of what the

15      board of directors does or doesn't

16      do, because I'm not in attendance

17      at the vast majority of board

18      meetings, nor am I provided

19      personally with minutes from board

20      meetings.

21  BY MR. CRUEGER:

22      Q.    So I'll give you what we

23  labeled as Exhibit-19.

24                  -  -  -

1           (Whereupon, Purdue-Must

2           Exhibit-19, PPLP004406095-192, was

3           marked for identification.)

4                    -  -  -

5    BY MR. CRUEGER:

6           Q.    Now, let's just be clear,

7    Mr. Must, that you're here on Topic 22,

8    correct?

9           A.    Yes, sir.

10          MR. SNAPP:  Just to be

11          clear, he's here on one subpart of

12          Topic 22.

13          MR. CRUEGER:  That's your

14          objection.

15   BY MR. CRUEGER:

16          Q.    But that's what you were

17   designated for?

18          MR. SNAPP:  I'm sorry?

19          MR. CRUEGER:  That's your

20          objection.

21          MR. SNAPP:  No, it's not an

22          objection.  It's a clarification

23          for the record.

24          And we informed you back in

Highly Confidential - Subject to Further Confidentiality Review

```
 1          November that he was designated on

 2          only one subpart of Topic 22.

 3               MR. CRUEGER:  That's fine.

 4               MR. SNAPP:  I just want the

 5          record to be clear.  He's only

 6          here on that one subpart, and not

 7          all of it.

 8   BY MR. CRUEGER:

 9          Q.   So if you look at

10   Exhibit-19, this is a presentation to the

11   board of directors, is it not?

12          A.   That's what the title

13   suggests, yes, sir.

14          Q.   And as reflected in your

15   Exhibit-12, the last page, that lists off

16   people that Purdue has provided financial

17   support to?

18          A.   Yes, sir.

19          Q.   So many are not -- all of

20   these people were paid to be speakers,

21   correct?

22               MR. SNAPP:  Object to the

23          form.

24               THE WITNESS:  I think some
```

1          of these people were provided

2          funding for speaking as well as

3          consulting and, as we indicated

4          before, in some cases, clinical

5          research.

6     BY MR. CRUEGER:

7          Q.   And Purdue would provide

8     that financial support for speaking in

9     order to expand the market for opioids,

10    correct?

11              MR. SNAPP:  Object to the

12         form.

13              THE WITNESS:  I don't know

14         the specific speaking items that

15         each of these individuals spoke

16         on.  But I do know that they would

17         frequently speak on matters around

18         education, on prescribing of our

19         products at -- in a variety of

20         different forums.

21    BY MR. CRUEGER:

22         Q.   And the reason Purdue would

23    provide the financial support for those

24    speaking opportunities is to either

Highly Confidential - Subject to Further Confidentiality Review

1    generate or increase demand for its

2    opioid products, correct?

3              MR. SNAPP:  Object to the

4         form.

5              THE WITNESS:  Again, I don't

6         know the specific details of what

7         they spoke on.

8              But, oftentimes, they were

9         educational in nature and may be

10        talking about how to appropriately

11        prescribe our product.

12   BY MR. CRUEGER:

13        Q.    So if you look at what ends

14   at page Bates number 111 in Exhibit-19.

15        A.    Yes, sir.

16        Q.    So the third bullet point

17   is, We believe -- well, just to make sure

18   we're on the same line.

19              It says, Forecast conclusion

20   at the top?

21        A.    Yes, sir.

22        Q.    So the third bullet point

23   is, We believe that our sales

24   representatives, speakers programs, and

1    other activities will maintain demand

2    during the second half of 2011.

3              Correct?

4              MR. SNAPP:  Objection.

5         Scope.

6              THE WITNESS:  That is what

7         the document says, yes, sir.

8    BY MR. CRUEGER:

9         Q.    So going back to the

10   original question, the question I was

11   just asking you before was, Purdue would

12   provide the financial support for these

13   doctors to go out and speak in the

14   expectation that it would at least

15   maintain demand --

16             MR. SNAPP:  Object to the

17        form.

18   BY MR. CRUEGER:

19        Q.    -- for OxyContin, correct?

20             MR. SNAPP:  Object to the

21        form.  And scope.

22             THE WITNESS:  Again, I know

23        that these speakers went out and

24        spoke.  I don't know the specifics

1      of what their presentations were.

2           But in many cases, they were

3      speaking on education on

4      prescribing of our products.

5  BY MR. CRUEGER:

6           Q.    But this Exhibit-19, which

7  is a document presented to the board of

8  directors, that's the expectation that's

9  reflected on the page we were looking at,

10 correct?

11          MR. SNAPP:   Object to the

12     form.   And scope.

13          THE WITNESS:   That's what

14     this specific document says.

15          MR. CRUEGER:   One more

16     across the table.

17               -   -   -

18          (Whereupon, Purdue-Must

19     Exhibit-20, SFC00013064-066, was

20     marked for identification.)

21               -   -   -

22 BY MR. CRUEGER:

23          Q.    Exhibit-20 is an e-mail

24 between various Purdue people, it looks

1    like, from Pamela Bennett, correct?

2            A.    Yes, sir.

3            Q.    You actually are on this

4    e-mail, if you look at -- on the first

5    page of Exhibit-20, in the "to" line,

6    you're kind of the second-to-last line.

7                 There you are, Alan Must,

8    correct?

9            A.    Yes, sir.

10           Q.    And this is -- this e-mail

11   from Pamela Bennett -- and it's talking

12   about next week advisory committee

13   meetings.

14                An advisory committee

15   meeting, that's an FDA meeting, correct?

16           A.    That is correct.

17           Q.    And what she's writing here

18   is -- a person she refers to as she, is

19   confirmed to speak on both days and will

20   provide the same info on both days.

21                I'm on Page 65.  Sorry, it

22   ends.  Just under the box that's

23   redacted.

24           A.    Yes, sir.

1    Q.    So, again, so Ms. Bennett

2  writes, She is confirmed to speak on both

3  days and will provide the same info on

4  both days.  She will have copies of their

5  materials for distribution.

6            And then she goes on -- Ms.

7  Bennett goes on to say there's a small

8  working group, PPSG, which is the Pain

9  and Policy Studies Group, I assume,

10  ACS -- do you know what ACS is?

11    A.    I can guess.  My guess would

12  be the American Cancer Society.

13    Q.    The next one is the American

14  Pain Foundation, correct?

15    A.    That would be my assumption.

16    Q.    And then Scott Fishman,

17  correct?

18    A.    Yes, sir.

19    Q.    So she says, There's a small

20  working group -- and then she names those

21  entities -- who have been working

22  together to ensure consistent and

23  coordinated messaging, correct?

24    A.    Yes, sir.

1    Q.    And all these entities and

2    this person she names are entities that

3    provide -- that Purdue -- sorry, I'm

4    going to strike that.

5         All these three entities and

6    the person, Dr. Fishman, that she names

7    are the three entities and a doctor that

8    Purdue provides financial support to,

9    correct?

10        MR. SNAPP:  Object to the

11        form.

12        THE WITNESS:  Yeah, I think

13        all those organizations work in

14        the therapeutic area of pain

15        management and have received

16        funding from Purdue.

17   BY MR. CRUEGER:

18        Q.    And that's really the whole

19   point of all this money that Purdue is

20   providing to these organizations and

21   these doctors, is to ensure consistent

22   and coordinated messaging about opioid

23   prescribing so that you can expand the

24   market for opioids, correct?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. SNAPP:  Object to the

2        form.

3              THE WITNESS:  Well, at least

4        if we're referring to this

5        document, it looks like these

6        individuals are working together

7        to ensure consistent and

8        coordinated messaging.

9              I don't see that it says

10       that Purdue is doing that.

11  BY MR. CRUEGER:

12       Q.    But they are all entities

13  that you are -- that Purdue is providing

14  financial support to, correct?

15       A.    They are all organizations

16  that we have provided funding to at some

17  point, yes.

18              MR. SNAPP:  Object to the

19        form.

20  BY MR. CRUEGER:

21       Q.    And somehow they are all

22  working together to ensure consistent and

23  coordinated messaging, correct?

24              MR. SNAPP:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1    form.

2              THE WITNESS:  That's what

3         this e-mail suggests.

4              MR. CRUEGER:  Let's just

5         take a break.

6              MR. SNAPP:  Okay.

7              VIDEO TECHNICIAN:  The time

8         is 11:21 a.m.  Going off the

9         record.

10                   -   -   -

11             (Whereupon, a brief recess

12        was taken.)

13                   -   -   -

14             VIDEO TECHNICIAN:  We are

15        back on the record.  The time is

16        11:38 a.m.

17   BY MR. CRUEGER:

18        Q.    I want to go to Exhibit-1,

19   which is the notice.

20             MR. SNAPP:  Can I help?

21             MR. CRUEGER:  It's the

22        notice of deposition.

23             THE WITNESS:  There we go.

24   BY MR. CRUEGER:

1    Q.    You might as well keep that

2    and the Exhibit-12 that you brought with

3    you in front of you.

4            So if you go to Topic 11, I

5    just want to quickly go over a few of the

6    entities that we haven't really yet

7    talked about today.

8            Topic 11, not Exhibit-11.

9    A.    All right.  Yes, sir.

10   Q.    So we'll start with the

11   American Geriatrics Society.

12           What's Purdue's relationship

13   with that entity?

14   A.    So I think that Purdue has

15   funded -- has provided funding for the

16   American Geriatrics Society.

17   Q.    And why has Purdue provided

18   that funding to them?

19   A.    Again, I think the American

20   Geriatrics Society was involved and is

21   involved, or at least has been involved,

22   in appropriate pain treatment for

23   geriatric populations.

24   Q.    The American Chronic Pain

Highly Confidential - Subject to Further Confidentiality Review

1    Association is listed here.

2            What's Purdue's relationship

3    with the American Chronic Pain

4    Association?

5        A.    Again, Purdue has funded --

6    has provided funding to the American

7    Chronic Pain Association over the years

8    because they are involved in this

9    therapeutic area and deal with

10   appropriate pain treatment for patients.

11       Q.    Is there a point of contact

12   at Purdue who deals with, to keep the

13   example of the American Chronic Pain

14   Association?

15       A.    If you're asking about that

16   today, I think the answer is no.

17           But if you're asking during

18   this period of time, I think Pamela

19   Bennett was responsible for maintaining

20   contact with many of the patient advocacy

21   and professional associations.

22       Q.    So the next one is the

23   American Society of Pain Educators.

24           What is Purdue's

1    relationship with the American Society of

2    Pain Educators?

3         A.    So, again, I think the

4    American Society of Pain Educators is an

5    organization that provided education in

6    the form of -- I think they had some

7    meetings where they dealt with

8    appropriate pain treatment and educating

9    healthcare professionals and caregivers

10   on pain management issues.

11        Q.    And, again, Pamela Bennett,

12   would she have been the main contact at

13   Purdue?

14        A.    So the Society of Pain

15   Educators -- for lack of knowing the

16   specifics, I would say yes.

17        Q.    How about, there's the

18   National Pain Foundation, what is

19   Purdue's relationship with the National

20   Pain Foundation?

21        A.    Again, it's another

22   organization that advocated on behalf of

23   pain patients, and we did provide funding

24   for them as well.

1    Q.    And then if you turn the

2    page, on Page 8, there is the American

3    Society of Pain Management Nursing.

4            What is Purdue's

5    relationship with the American Society of

6    Pain Management Nursing?

7    A.    We did provide funding for

8    that organization as well, I believe.

9            Yes, we did provide funding

10   to them over the years, because they

11   represent nurses who are -- who

12   specialize in pain management.

13   Q.    And these entities that we

14   just listed off -- by the way, the

15   American Geriatrics Society, starting at

16   D, and then the American Society of Pain

17   Management Nursing --

18   A.    Yes.

19   Q.    -- do they also participate

20   in the Pain Care Forum?

21   A.    Again, I don't -- I don't

22   know all the current members of the Pain

23   Care Forum.  I can't answer that

24   specifically.

1    Q.    And then there's the

2   American Academy -- sorry, the Academy of

3   Integrative Pain Management.

4            What is Purdue's

5   relationship with that entity?

6        A.    Again, the Academy of

7   Integrative Pain Management, we have

8   provided funding to them.  They have an

9   annual seminar that they put on, the

10  Academy -- which we have provided funding

11  for.

12           They are -- as they say in

13  their name, they are an organization that

14  provides continuing medical education for

15  pain management prescribers, but also

16  look at all integrative pain, so all

17  types of pain therapies.

18       Q.    Who at Purdue was the

19  contact person for that entity?

20       A.    Again, that would have

21  probably been Pamela Bennett during this

22  time period.

23       Q.    The U.S. Pain Foundation,

24  what is Purdue's relationship with that

1    entity?

2         A.    The U.S. Pain Foundation is

3    an organization that represents pain

4    patients.  And we have provided them

5    financial support over this period of

6    time.

7         Q.    And who is the contact at

8    Purdue for the U.S. Pain Foundation?

9         A.    Again, it would have been

10   Pam Bennett during this time period.

11        Q.    And the next one is the

12   Cancer Action Network.

13             What is Purdue's

14   relationship with that entity?

15        A.    The Cancer Action Network is

16   the arm of the American Cancer Society

17   that deals with the public policy.  And

18   we have provided funding for them -- I

19   believe we provided funding for them over

20   the years.

21             Let me just verify.

22             Yes.  We have provided them

23   with some funding over the years.

24        Q.    And who would have been the

1    contact person at Purdue, or who is?

2         A.    Again, I think Pam Bennett

3    would have been the primary contact.

4         Q.    The Washington Legal

5    Foundation, what is Purdue's relationship

6    with the Washington Legal Foundation?

7         A.    Washington Legal Foundation

8    is a think tank that is Washington, D.C.

9    based.  They provide opinions on various

10   public policy matters.  We have provided

11   them funding over the years.

12        Q.    Well, you've provided --

13   Purdue has provided a substantial amount

14   of funding to the Washington Legal

15   Foundation over the years, correct?

16             MR. SNAPP:  Object to the

17        form.

18             THE WITNESS:  We have

19        provided them funding for almost

20        every year since 1997 to 2016.

21   BY MR. CRUEGER:

22        Q.    That's over $1 million in

23   funding, correct?

24             MR. SNAPP:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1           form.

2                    THE WITNESS:  I haven't

3           added it up, but that may be

4           accurate.

5    BY MR. CRUEGER:

6           Q.    And the Washington Legal

7    Foundation, one of the things they do is

8    they bring lawsuits, correct?

9                    MR. SNAPP:  Object to the

10          form.

11                   THE WITNESS:  I'm not

12          certain of everything the

13          Washington Legal Foundation does.

14          That may be one of the things that

15          they do.

16                   But I know that they also

17          write position papers on various

18          legal issues.

19   BY MR. CRUEGER:

20          Q.    So the Washington Legal

21   Foundation are active in challenging

22   prescribing guidelines, is that --

23          A.    So my knowledge of the

24   Washington Legal Foundation, as applies

1    to any federal agency guidelines, was

2    that the Washington Legal Foundation was

3    out in opposition of the process that was

4    used to develop guidelines, not

5    necessarily the content of the

6    guidelines.

7           Q.    And Purdue is -- let's take

8    the example of the CDC's guidelines,

9    okay?

10          A.    Yes, sir.

11          Q.    So the Washington Legal

12   Foundation is -- is or is thinking of

13   challenging the process that the CDC used

14   to promulgate those guidelines?

15               MR. SNAPP:  Object to the

16          form.

17               THE WITNESS:  I think, at

18          the time of the CDC guidelines,

19          the Washington Legal Foundation

20          did come out with some position

21          papers on -- well, a position.

22          I'm not sure if they published a

23          paper on concern about the process

24          that was used for the CDC

1          guidelines.

2   BY MR. CRUEGER:

3          Q.    And that was approximately

4   2016 when the CDC guidelines came out,

5   correct?

6          A.    I think you're right.  I

7   think that's when the initial guidelines

8   came out, yes.

9          Q.    And that's when Purdue

10  provided $200,000 of financial support to

11  the Washington Legal Foundation, correct?

12         A.    Yes, sir.  In 2016, Purdue

13  provided a $200,000 contribution to the

14  Washington Legal Foundation.

15         Q.    And that was to support

16  their challenge to the process by which

17  the CDC guidelines were promulgated,

18  correct?

19              MR. SNAPP:  Object to the

20         form.

21              THE WITNESS:  No.  We

22         provide general support to the

23         Washington Legal Foundation, not

24         on any specific activity they

Highly Confidential - Subject to Further Confidentiality Review

1    might take on.

2    BY MR. CRUEGER:

3        Q.    But you will agree, won't

4    you, Mr. Must, that there is a -- the

5    same year that the CDC guidelines come

6    out is the same year that Purdue provides

7    the most funding it has ever provided to

8    the Washington Legal Foundation?

9        A.    That is accurate.  I just

10   don't know when in the year the

11   contribution was made and when in the

12   year the CDC guidelines came out.

13            And I don't personally know

14   of any connection to the two.

15       Q.    There's documents, we should

16   be able to figure that out, correct, like

17   when the money was provided to the

18   Washington Legal Foundation in 2016?

19            MR. SNAPP:  Object to form.

20            THE WITNESS:  I'm sure there

21       are.

22            But I also know that any

23       contributions made to the Legal --

24       the Washington Legal Foundation

1     were for their work more broadly,

2     not for any specific initiative.

3   BY MR. CRUEGER:

4     Q.   And then there's the Center

5   for Practical Bioethics.

6     What is Purdue's

7   relationship with the Center for

8   Practical Bioethics?

9     A.   So Purdue did, in fact,

10  provide funding to the Center for

11  Practical Bioethics starting around the

12  year 2000, ending with small

13  contributions in 2016.

14    Q.   And it provided roughly, it

15  looks like, over -- either close to $4

16  million or at least over $3 million to

17  the Center for Practical Bioethics,

18  correct?

19    A.   That's probably about right,

20  yes, sir.

21    Q.   And what did Purdue

22  expect -- well, why did Purdue provide

23  that much funding to the Center for

24  Practical Bioethics?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I can't say in total.  But I

2  do know that there was ultimately a $1

3  million grant that was provided, and it

4  may have been a multi-year contribution,

5  for a pain chair -- a sustainable pain

6  chair for the Center for Practical

7  Bioethics.

8    Q.    And what does that mean?  Is

9  that a -- what is a pain chair at the

10  Center for Practical Bioethics?

11    A.    My understanding was that it

12  put a sustaining position within the

13  Center for Practical Bioethics, that they

14  could fund somebody to continue to look

15  at issues surrounding pain management or

16  pain treatment for the center.

17    Q.    And that would be an

18  advocacy position, to advocate for pain

19  treatment and prescribing?

20    A.    I don't --

21    MR. SNAPP:  Object to the

22    form.

23    THE WITNESS:  I can't say

24    specifically whether it was an

1          advocacy position or an

2          educational position.

3    BY MR. CRUEGER:

4          Q.    If you look further down at

5    Topic 11 on Page 8 of the notice, one of

6    the people that we asked about was Dr.

7    Haddox, correct?

8          A.    Yes, sir.

9          Q.    But you did not look to see

10   if Purdue had paid any money to Dr.

11   Haddox prior to him becoming an employee?

12         A.    I did not look at that, no.

13         Q.    If you look at Topic 20,

14   which is on Page -- the bottom of Page 11

15   of the notice, Exhibit-1.

16         A.    Yes, sir.

17         Q.    It asks for your -- it asks

18   about Purdue's membership and

19   participation in three different

20   entities.

21              One of them is PhRMA, the

22   Pharmaceutical Research and Manufacturers

23   Association.

24              Do you see that?

1      A.    I do.

2      Q.    According to the spreadsheet

3  you produced, Exhibit-12, starting in

4  2002, Purdue has been making financial

5  contributions to PhRMA, correct?

6      A.    Yes, sir.

7      Q.    Would you agree with me as

8  characterizing the contributions as

9  substantial?

10      A.    I would.

11      Q.    What is Purdue's role with

12  PhRMA?

13      A.    So Purdue is a member

14  company of the trade association PhRMA

15  that represents America's biotechnical

16  industry, specifically those companies

17  that make new and innovative products.

18      Q.    Does anyone at Purdue sit on

19  the board of directors of PhRMA?

20      A.    Our CEO, Craig Landau, does

21  sit on the board of PhRMA; as do, I

22  believe, the CEOs of every member

23  company.

24      Q.    And PhRMA, they are a

Highly Confidential - Subject to Further Confidentiality Review

1    lobbyist in Washington, D.C., correct?

2               MR. SNAPP:  Object to the

3         form.

4               THE WITNESS:  One of the

5         things that PhRMA does is lobby on

6         behalf of the pharmaceutical

7         industry, yes.

8    BY MR. CRUEGER:

9         Q.    And they are a -- I guess we

10   could say -- would you agree that we

11   could call it that PhRMA is a powerful

12   lobbyist in Washington, D.C.?

13              MR. SNAPP:  Object to the

14        form.

15              THE WITNESS:  It's hard for

16        me to define "powerful," but PhRMA

17        is a presence in Washington, D.C.,

18        yes.

19   BY MR. CRUEGER:

20        Q.    And do you have -- do you

21   communicate with PhRMA about opioids and

22   opioid products?

23        A.    So PhRMA as a trade

24   association represents industry-wide

1    issues.  PhRMA, by policy, won't take on

2    a company-specific issue.

3              So PhRMA does not -- would

4    not go out and take any action on

5    OxyContin.  But PhRMA has put out a

6    position paper on opioids, broadly on the

7    things that the trade association

8    supports as part of the opioid crisis.

9              So member companies that had

10    an interest in that were able to develop

11    or help to develop the PhRMA position on

12    that.

13         Q.    And by sitting on the board,

14    Purdue would have influence on what

15    issues that PhRMA pursues, correct?

16              MR. SNAPP:  Object to the

17         form.

18              THE WITNESS:  So as it

19         applies to PhRMA, Purdue is a

20         fairly small company.  But every

21         board member, by definition, gets

22         a vote.

23              But the board doesn't take

24         on -- the board, more broadly,

1        does not take on specific issues.

2   BY MR. CRUEGER:

3        Q.    So you know how the board of

4   directors works in PhRMA?

5             MR. SNAPP:  Object to the

6        form.

7             THE WITNESS:  Well, the

8        board of director meetings at

9        PhRMA have an open policy for

10       member companies.  And we do have

11       somebody who attends the PhRMA

12       meetings.

13            If your CEO is not able to

14       attend in person, you can have

15       somebody who is nonvoting go in

16       and listen to the meeting so that

17       they can come back and report

18       what's going on.

19            But PhRMA -- as I said

20       earlier, PhRMA doesn't work on

21       company-specific issues.

22  BY MR. CRUEGER:

23       Q.    And, also -- so the other

24  entity that I'd like to talk to you a

1    little about is the National Association

2    of Chain Drug Stores.

3                    What is Purdue's

4    relationship with the National

5    Association of Chain Drug Stores?

6            A.    So the National Association

7    of Chain Drug Stores, NACDS, represents

8    the large pharmacy retailers across the

9    country.  And we have worked with them

10   over the years on a variety of different

11   initiatives.

12                   When we started to see our

13   product being stolen or seeing pharmacies

14   robbed or burglarized to get our product,

15   we worked closely with NACDS to put

16   together programs and protocols and ideas

17   on how to help their pharmacists to

18   protect themselves from being robbed or

19   burglarized, and also how to better

20   identify, as a witness, if something like

21   that would happen.

22                   We also utilized an

23   organization, or a group, that we

24   established within Purdue called the LELE

Highly Confidential - Subject to Further Confidentiality Review

1    group, law enforcement liaisons.

2              And those LELE groups, who

3    were made up of former DEA or state

4    regulators or inspectors, would go out

5    and do educational programs at NACDS

6    meetings to make them aware of some of

7    the ways to protect themselves, or some

8    of the issues that they may not be aware

9    of as it applied to pharmacy robberies.

10             Those are some of the things

11   that I know that we did with NACDS.

12        Q.    And according to your

13   Exhibit 12 that you brought, Purdue has

14   provided some financial support to the

15   NACDS, correct?

16        A.    Yes, sir.

17        Q.    Would you agree it's

18   substantially less financial support than

19   Purdue has provided to PhRMA, correct?

20        A.    Definitely.

21        Q.    Let's just talk about Topic

22   24.

23             It's asking about,

24   basically, Purdue's lobbying and/or

1    government affairs activities, about the

2    design, approval and implementation of

3    Medicare prescription drug benefit

4    program Part D.

5            So Medicare Part D went into

6    effect in 2006, correct?

7        A.    Yes, sir.

8        Q.    And the law helps Medicare

9    beneficiaries pay for prescription drugs,

10   correct?

11       A.    Yes.

12       Q.    And you would agree it would

13   be beneficial to Purdue if Medicare would

14   pay for OxyContin, for example, correct?

15           MR. SNAPP:  Object to the

16       form.

17           THE WITNESS:  Yes, sir.

18   BY MR. CRUEGER:

19       Q.    Did Purdue -- well, what --

20   what lobbying activities did Purdue

21   engage in to influence Medicare Part D

22   before it was passed?

23       A.    Based on all the documents

24   that we reviewed in preparation for the

1  deposition today, and my communications

2  with our federal government group, I

3  believe we had -- we had no lobbying

4  activity as it related to CMS and the

5  Part D implementation.

6                    -  -  -

7            (Whereupon, Purdue-Must

8        Exhibit-21, PPLPC019001224346-347,

9        was marked for identification.)

10                   -  -  -

11  BY MR. CRUEGER:

12       Q.    I'll hand you what we

13  labeled as Exhibit-21.

14            Before I ask you anything

15  about this e-mail, I'm just wondering,

16  Topic 23 talks about lobbying activities

17  related to the Medicare Modernization Act

18  of 2003.

19            Can you tell me what type of

20  activities -- strike that -- what type of

21  lobbying activities Purdue engaged in as

22  it relates to the Medicare Modernization

23  Act of 2003?

24            A.    Right.  Again, based on my

Highly Confidential - Subject to Further Confidentiality Review

1    review of documents and in conversations

2    with our federal government affairs

3    folks, it's my understanding that we did

4    no lobbying on the Medicare Modernization

5    Act of 2003.

6          Q.    So if you just turn quickly

7    to Exhibit-21.

8          A.    Yes, sir.

9          Q.    This is an e-mail that

10   Purdue produced from Cindy Steinberg.

11         A.    Okay.

12         Q.    And it went to one of the

13   people on there, and the cc is Burt

14   Rosen.

15               Do you see that?

16         A.    I do.

17         Q.    So -- and he's the

18   government affairs -- he works on the

19   federal side for lobbying, correct?

20         A.    He is the vice president of

21   federal government affairs, correct.

22         Q.    And can you just read the

23   text of the letter?

24         A.    Starting with --

1    Q.    You don't have to read it

2   out loud.  To yourself.

3    A.    Oh, okay.

4          Okay.

5    Q.    Now, Cindy Steinberg, she

6   doesn't work for Purdue, does she?

7    A.    She does not.

8    Q.    She works for some third

9   party, correct?

10   A.    She is a pain advocate out

11  of Massachusetts.

12   Q.    So -- and she is, clearly

13  here, she's doing some sort of advocacy

14  as it relates to Medicare and a national

15  pain strategy, correct?

16          MR. SNAPP:  Object to the

17        form.

18          THE WITNESS:  That's what

19        the document appears to be saying,

20        yes, sir.

21  BY MR. CRUEGER:

22   Q.    So did Purdue -- you said

23  Purdue didn't do any lobbying on the

24  Medicare or Medicare Part D.

Highly Confidential - Subject to Further Confidentiality Review

1            Did Purdue coordinate with

2    any third parties to lobby about Medicare

3    or Medicare Part D?

4            MR. SNAPP:  Object to the

5        form.  And also object as beyond

6        scope.

7            THE WITNESS:  Well, it

8        appears to me that Burt is

9        getting -- is part of the

10       distribution to identify what

11       she's doing, but I don't know

12       whether he did anything as it

13       applies to this.

14           In fact, I don't believe

15       that he did do anything on this.

16   BY MR. CRUEGER:

17       Q.    So what I'm asking is, would

18   Purdue -- what I'm asking is, did Purdue

19   go out and work with, say, one of these

20   third parties that it had provided

21   funding to and have those third parties

22   lobby Medicare and Medicare Part D?

23           MR. SNAPP:  Objection.

24       Beyond the scope.  And form.

1          THE WITNESS:  Based on my

2      knowledge, I don't believe that we

3      did.

4  BY MR. CRUEGER:

5      Q.    And if you see Ms.

6  Steinberg's letter, it said -- the second

7  sentence is, If you recall in June --

8          Do you see where I am?

9      A.    Yes, sir.

10     Q.    She writes, -- myself and

11  Kate Strauser did a letter to the

12  committee's working group raising chronic

13  pain as an important comorbid and costly

14  chronic condition disproportionately

15  affecting the Medicare population.

16          And you were a signatory to

17  that letter.

18          Do you see where that is?

19     A.    I do see that.

20     Q.    So am I right that Purdue

21  was a signatory to that, right?

22          MR. SNAPP:  Object to the

23      form.  Scope.

24          THE WITNESS:  I would have

Highly Confidential - Subject to Further Confidentiality Review

1         to see the letter.  So I don't

2         know.

3    BY MR. CRUEGER:

4         Q.    When you talked to -- did

5    you talk to -- I assume, you said you

6    talked to your government affairs, the

7    person, that would be Burt Rosen, about

8    any lobbying efforts for Medicare or

9    Medicare Part D?

10        A.    Correct.

11        Q.    Did you talk to him about

12   any efforts that were coordinated through

13   the Pain Care Forum?

14        A.    We did not talk about the

15   Pain Care Forum.

16        Q.    If you can turn to Topic 37.

17             It talks about your

18   coordination or communications with any

19   defendants in this action, and it lists a

20   bunch of topics.

21        A.    I'm sorry?

22        Q.    I just wanted to make

23   sure --

24        A.    Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you prepared to talk

2    today about Purdue's coordination with

3    other defendants in this action about the

4    sale of opioids?

5    A.    I can potentially answer

6    specific questions if you have them, but

7    I don't know what that means exactly.

8    Q.    Let's put it this way:  Did

9    you work with -- did Purdue work with

10   Endo to coordinate -- let me strike that.

11        Did Purdue work with Endo to

12   expand the market for opioids?

13             MR. SNAPP:  Object to the

14        form.

15             MR. SMITH:  Object to form.

16             THE WITNESS:  If you're

17        asking me from a government

18        affairs perspective, we don't

19        market with Endo.

20             I'm not really sure how to

21        answer that question.  I

22        apologize.

23   BY MR. CRUEGER:

24        Q.    Well, we see different

Highly Confidential - Subject to Further Confidentiality Review

1    efforts, as we've talked about today,

2    about putting up promotional materials,

3    the JCAHO, the American Pain Foundation,

4    pain care brochure, these different

5    things --

6            A.    Right.

7            Q.    -- that Purdue sponsored.

8                  And those -- I've asked you

9    before if those were done to expand the

10   market for opioids prescribing.

11           A.    Right.

12           Q.    So apart from branded, did

13   you do any unbranded -- what you call

14   unbranded types of advertising or

15   unbranded types of marketing with Endo,

16   for example, to expand the market for

17   opioids?

18                 MR. SNAPP:  Object to the

19           form.

20                 MR. SMITH:  Object to form.

21                 THE WITNESS:  Again, I

22           don't -- I'm not aware of working

23           with Endo to expand the opioid

24           market, if that's the question.

Highly Confidential - Subject to Further Confidentiality Review

1    But I'm not sure if I'm

2    answering your question or not.

3 BY MR. CRUEGER:

4    Q.    How about lobbying, did you

5 work with any of the defendants, did you

6 coordinate -- or work with any of them on

7 any of the -- your lobbying activities on

8 the state level?

9    A.    Are you talking about those

10 companies that are listed on 38?

11    Q.    I'm just talking about

12 any -- the defendants in this action,

13 such as Endo; Janssen; J&J; Mallinckrodt;

14 Cardinal; AmerisourceBergen; Teva, which

15 is Cephalon; Allergan, which is Kadian;

16 and McKesson?

17    A.    So we have worked on some

18 pieces of legislation with some of those

19 organizations, yes.

20    If you want an example, we

21 worked with several of those

22 organizations to try to get opioid

23 legislation passed that would allow for

24 opioids that had abuse-deterrent

Highly Confidential - Subject to Further Confidentiality Review

1   properties to be more widely used to try

2   to address the opioid crisis.

3           And we did work with them to

4   have that done at the state level.

5       Q.   Did you work with any of

6   these entities on prescribing guidelines

7   for opioids?

8       A.   At the federal or state

9   level?

10      Q.   At the federal or state

11  level.

12      A.   I believe at the federal

13  level the answer is no.

14          At the state level, for the

15  most part, we didn't get -- we monitored

16  activities around opioid prescribing

17  guidelines.  Only occasionally did we

18  ever weigh in, and sometimes it was at

19  the request of patient groups.

20      Q.   And -- well, let's just use

21  the Washington state opioid prescribing

22  guidelines.

23          You're familiar with those,

24  correct?

1    A.    Okay.  I am.

2    Q.    And you also sat on a

3    committee that I know by the acronym of

4    CEAC.  I forget the name of it.

5          What is the name of it?

6    A.    Right.  The Communications

7    and External Affairs Committee.

8    Q.    And in those committee

9    meeting minutes, you would discuss the

10   Washington state prescribing guidelines,

11   correct?

12   A.    Probably.  I'm not looking

13   at the minutes, but I would think that we

14   probably did.

15   Q.    And also you would talk

16   about activities that were being

17   coordinated through the Pain Care Forum

18   to oppose the Washington state

19   guidelines, correct?

20          MR. SNAPP:  Object to the

21          form.

22          THE WITNESS:  The Pain Care

23          Forum was very involved in the

24          Washington state guidelines, yes.

1    BY MR. CRUEGER:

2        Q.    And it was very involved in

3    opposing the Washington state guidelines,

4    correct?

5                MR. SNAPP:  Form.

6                THE WITNESS:  It had a

7        position of opposition on the

8        guidelines, yes.

9    BY MR. CRUEGER:

10        Q.    And Purdue was a member of

11    the Pain Care Forum, correct?

12                MR. SNAPP:  Object to the

13        form.

14                THE WITNESS:  So the --

15        again, I'm not the expert on the

16        Pain Care Forum.

17                But my understanding is

18        those organizations who wanted to

19        take a position or wanted to be

20        involved in some initiative could

21        do so.  The Pain Care Forum, as

22        the Pain Care Forum, didn't take

23        positions.

24                But I think your question

1    initially was about APF, was that

2    right?  Or did I misunderstand?

3    BY MR. CRUEGER:

4         Q.   No.  We're talking about the

5    Washington state guidelines, just using

6    that as the example.

7              But what you would -- you

8    would use the Pain Care Forum to

9    coordinate positions by the members who

10   wished to participate in that activity,

11   correct?

12             MR. SNAPP:  Object to the

13        form.

14             THE WITNESS:  So I may have

15        not answered the question that you

16        asked me.

17             I thought you asked me about

18        the American Pain Foundation.

19   BY MR. CRUEGER:

20        Q.   No.  I'm talking about the

21   Pain Care Forum, the Pain Care Forum and

22   the Washington state guidelines.

23        A.   So some members of the Pain

24   Care Forum were opposed to the Washington

Highly Confidential - Subject to Further Confidentiality Review

1   state guidelines, yes.

2        Q.    And Purdue was one of the

3   members who was opposed to the Washington

4   state guidelines, correct?

5        A.    We were a member of the Pain

6   Care Forum.  I don't know whether Burt

7   specifically was involved in any type of

8   Washington state specifically identified

9   group.

10       Q.    But in principle, Purdue was

11  opposed to the Washington state

12  guidelines, correct?

13            MR. SNAPP:  Object to the

14       form.

15            THE WITNESS:  Well, the

16       issue with the Washington

17       guidelines came more from advocacy

18       organizations and patient

19       organizations than it did from

20       manufacturers, at their request.

21            Because starting in 2003,

22       when the government got involved

23       in putting together guidelines for

24       the treatment of pain within their

Highly Confidential - Subject to Further Confidentiality Review

1      Medicaid department, they limited

2      access for opioids to only

3      methadone and morphine.

4           And I think 2000 -- I want

5      to say it was 2012, it might have

6      been later, two Seattle Times

7      reporters won a Pulitzer prize

8      because they investigated the fact

9      that they were actually --

10     Medicaid was actually killing

11     patients as opposed to treating

12     them, by forcing physicians to use

13     methadone for pain.

14          And that's what they were

15     afraid of, was that the government

16     was, once again, going to step in

17     and start to mandate or limit

18     clinical appropriateness of

19     prescribing.  And that's why the

20     Pain Foundation was so involved

21     working that initiative, from my

22     understanding and my memory.

23  BY MR. CRUEGER:

24          Q.   But that's a long way of

1    saying that Purdue did not support the

2    Washington state prescribing guidelines?

3           MR. SNAPP:  Object to the

4        form.

5           THE WITNESS:  Well, we did

6        not support the guidelines.

7    BY MR. CRUEGER:

8        Q.    And Purdue didn't advocate

9    for other states to follow the Washington

10   state guidelines, did it?

11       A.    We did not.

12           MR. CRUEGER:  So, one, could

13       we mark the documents that you

14       brought as exhibits?  We already

15       have the spreadsheet as

16       Exhibit-12.

17           I think you said you have a

18       resume.

19           MR. SNAPP:  Here it is.

20           Do you want to state it for

21       the record, and we can mark them

22       when we're done?

23           MR. CRUEGER:  Sure.

24           MR. SNAPP:  I'm sorry, hang

1    on.  We'll get it over there.

2         MR. CRUEGER:  I'm going to

3    mark just for the record as

4    Exhibit-22, the document that

5    says -- that's titled Alan Must

6    30(b)(6) Topics 11, 20, 22, 23, 24

7    and 37.

8         -  -  -

9        (Whereupon, Purdue-Must

10    Exhibit-22, No Bates, Alan Must

11    30(b)(6) Topics 11, 20, 22, 23, 24

12    and 37, was marked for

13    identification.)

14         -  -  -

15         MR. CRUEGER:  And then

16    Exhibit-23 will be your resume,

17    the resume of Alan Must.

18         -  -  -

19        (Whereupon, Purdue-Must

20    Exhibit-23, Curriculum Vitae of

21    Alan Must, was marked for

22    identification.)

23         -  -  -

24  BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   So what else can you tell me

2   about Purdue's work with any of these

3   other defendants that we've been talking

4   about, Endo, Janssen, Mallinckrodt,

5   Cardinal, McKesson, AmerisourceBergen?

6              MR. SNAPP:   Objection.

7   BY MR. CRUEGER:

8   Q.   Did Purdue work with them in

9   any -- to fund any of these groups that

10  we've been talking about today, the

11  American Academy of Pain Medicine, and

12  the other groups that were listed in

13  Topic 11?

14             MR. SNAPP:   Object to the

15        form.

16             MR. SMITH:   Object to form.

17             THE WITNESS:   We did not

18        work with them to provide -- any

19        other organizations to provide

20        financial support for any of those

21        organizations, no.

22  BY MR. CRUEGER:

23  Q.   Did you ever talk with any

24  of these other defendants about providing

Highly Confidential - Subject to Further Confidentiality Review

1    financial support to these organizations?

2              MR. SNAPP:  Object to the

3         form.

4              MR. SMITH:  Object to form.

5              THE WITNESS:  No.  We

6         wouldn't -- that's -- no, that's

7         not something that I recall ever

8         doing.

9    BY MR. CRUEGER:

10        Q.    Were you involved in any

11   decisions to provide financial support to

12   any of these organizations listed in

13   Topic 11?

14        A.    So within Purdue, as it

15   applies to grants to organizations, we

16   had two grant committees; one was

17   healthcare-related grants and one was

18   nonhealthcare-related grants.

19              So anything that dealt with

20   healthcare professionals, patients,

21   organizations that represented them,

22   pharmacists, that all went to a separate

23   organization called the

24   healthcare-related grant committee.

1    So I did sit on the

2    nonhealthcare-related grant committee,

3    but none of those kinds of contributions

4    came to that group.  None of the

5    organizations that you have listed here

6    came to the group that I was part of the

7    grant committee.

8    Q.    Okay.  That makes it more

9    clear.

10    Another question I had is,

11    does anyone at Purdue, did they sit on a

12    board of directors for any of these

13    organizations that were listed in Topic

14    11?

15    A.    I can't say for certain.  I

16    believe the answer is no.  But I think

17    that in some cases, some organizations

18    may have, like, a corporate counsel where

19    members of companies are updated on what

20    the organizations are doing and so forth.

21    But they are not actively involved in the

22    direction of the organization.

23    Q.    Would Purdue track that

24    information, if someone was involved in

Highly Confidential - Subject to Further Confidentiality Review

1    the, let's say, the board of directors in

2    one of these organizations?

3         A.    If we tracked it, that would

4    have fallen under the responsibility of

5    Pamela Bennett.

6              MR. CRUEGER:  Okay.  I have

7         no further questions.

8              MR. SNAPP:  Could you tell

9         me how much time has elapsed,

10        please?

11             VIDEO TECHNICIAN:  Three

12        hours.

13             MR. SNAPP:  Three hours

14        exactly.  Thank you.

15             VIDEO TECHNICIAN:  Yes.

16             MR. SNAPP:  I just have a

17        few follow-up questions.  And can

18        you tell me what time it is right

19        now?

20             VIDEO TECHNICIAN:  It's

21        12:23.

22             MR. SNAPP:  12:23?

23             VIDEO TECHNICIAN:  Yes.

24             MR. SNAPP:  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1                    -  -  -

2                  EXAMINATION

3                    -  -  -

4   BY MR. SNAPP:

5        Q.    So, Mr. Must, I'm going to

6   try to be very efficient with my time

7   here.  I'm Eric Snapp, I represent Purdue

8   in this litigation, the Purdue

9   defendants.

10            And, first of all, if we

11   could turn to Deposition Exhibit-14, this

12   is the 2001 Joint Commission on

13   Accreditation of Health Organizations'

14   pain standards that's been marked as

15   Exhibit-14.

16            Is that correct, sir?

17        A.    Yes, sir.

18        Q.    And during the break, did we

19   have a chance to look through this

20   document carefully and look for a

21   particular word to see if it's in there?

22        A.    We did.

23        Q.    What word did we look for?

24        A.    We looked at the document

1    for the word "opioid."

2        Q.    Does the word "opioid" or

3    "opioids" appear anywhere in this

4    document?

5        A.    It does not.

6        Q.    I want to turn to Deposition

7    Exhibit-5, please, sir.

8            This is a document that

9    counsel represented to you is a list of

10   transactions or contributions to the

11   American Pain Foundation for a period

12   covering the time from, it looks like,

13   2004 through 2011 -- 2012, I believe.

14           Is that right, sir?

15       A.    Yes, sir.

16       Q.    Now, if you look on Page 1

17   of 8, which is the page you're looking at

18   right now, partway down that page,

19   there's a company called Boston

20   Scientific.

21           Do you see that, sir?

22       A.    I do.

23       Q.    Did Boston Scientific make

24   contributions, according to this

Highly Confidential - Subject to Further Confidentiality Review

1   document, to the American Pain

2   Foundation?

3          A.     They did.

4          Q.     What is Boston Scientific?

5          A.     I believe they are a device

6   manufacturer.

7          Q.     They -- just to be clear,

8   are they a medical device manufacturer?

9          A.     A medical device

10  manufacturer.

11         Q.     So does that company, Boston

12  Scientific, have any interest or -- I'm

13  sorry.  Strike that.

14                Does Boston Scientific make

15  any opioids, to your knowledge, sir?

16         A.     Not to my knowledge.

17         Q.     If you turn to Page 4 of 8,

18  sir, there's a company listed on 4 and 5

19  named Medtronic.

20         A.     Yes, sir.

21         Q.     Is Medtronic also a medical

22  device maker?

23         A.     It is.

24         Q.     Did Medtronic, to your

1    knowledge, ever make any opioid analgesic

2    medications, sir?

3         A.    Not to my knowledge.

4         Q.    If we can turn to Deposition

5    Exhibit-3, please.

6              You were asked a number of

7    questions about this document.  It's the

8    pan action guide from the American Pain

9    Foundation from 2003.

10             Is that correct, sir?

11        A.    Yes, sir.

12        Q.    And you were asked a number

13   of questions by counsel about the mission

14   for the American Pain Foundation.

15             Is the mission listed in the

16   upper left-hand corner of this front page

17   of Deposition Exhibit-3?

18        A.    Yes, sir.

19        Q.    Could you read that for us,

20   please?

21        A.    Our mission is to improve

22   the quality of life for people with pain

23   by raising public awareness, providing

24   practical information, promoting research

1    on pain and advocating to remove barriers

2    and increase access to effective pain

3    management.

4          Q.    Sir, if you could turn to

5    the third page, under Know the facts.

6          A.    Yes, sir.

7          Q.    You were asked a number of

8    questions about certain statements by the

9    American Pain Foundation related to the

10   risk of addiction.

11            Do you remember those

12   questions, sir?

13         A.    I do.

14         Q.    And if you look in the

15   middle of that page, on the left-hand

16   side, there's a paragraph that you were

17   pointed to, I believe during your

18   questioning earlier, and I'd like you to

19   read the third sentence, starting with,

20   Unless.

21         A.    Unless you have a history of

22   substance abuse, there is little risk of

23   addiction when these medications are

24   properly prescribed by a doctor and taken

Highly Confidential - Subject to Further Confidentiality Review

1    as directed.

2         Q.    So this is saying that

3    there's little risk of addiction when the

4    medications -- they're talking about pain

5    medications -- are taken as directed and

6    properly prescribed by a physician; is

7    that correct, sir?

8         A.    That's what this document

9    says, yes, sir.

10        Q.    If you could turn to the

11   next page.

12             There's a section that says,

13   How can I get the best results?

14             Do you see that?

15        A.    I do.

16        Q.    And just as a reminder, this

17   is a document from the American Pain

18   Foundation.

19             And if you look down near

20   the bottom in the right-hand column,

21   there's a section -- a portion that

22   begins, Ask your healthcare provider

23   about nondrug, nonsurgical treatments.

24             Could you read the next

Highly Confidential - Subject to Further Confidentiality Review

1    sentence of that, please?

2         A.    These could include

3    relaxation therapy, exercise, massage,

4    acupuncture, applications of cold or

5    heat, behavioral therapy and other

6    techniques.

7         Q.    So is it fair to say that

8    the American Pain Foundation was

9    providing information related to other

10   therapies and other ways to ease pain

11   other than just analgesics or pain

12   medications; is that correct, sir?

13        A.    Yes, sir.

14        Q.    If you turn to the next

15   page, there's a section called, How

16   should my pain be treated?

17             Do you see that?

18        A.    I do.

19        Q.    And under that section, the

20   first section calls -- talks about pain

21   medications.

22             Do you see that?

23        A.    Yes, sir.

24        Q.    And it lists acetaminophen.

Highly Confidential - Subject to Further Confidentiality Review

1          Is that the same as Tylenol?

2   In the right-hand column.

3          A.    Yes, sir.

4          Q.    Under that is, Nonsteroidal

5   antiinflammatory drugs, NSAIDs.

6          Is Advil or ibuprofen an

7   example of NSAIDS?

8          A.    It is.

9          Q.    Turn to the next page, sir.

10          You finally get to a section

11   about opioids and strong medications --

12   are strong medications.

13          Do you see that?

14          A.    I do.

15          Q.    And under that, there's a

16   list of additional pain -- other pain

17   medications and then noninvasive drug

18   therapies.

19          Do you see that?

20          A.    I do.

21          Q.    And it talks about thermal

22   treatments, professional therapeutic

23   massage, physical therapy, chiropractic,

24   psychological counseling and cognitive

1  therapy, mind and body techniques and

2  acupuncture, along with additional, more

3  invasive pain therapies as other ways to

4  treat pain; is that correct?

5         A.    Yes, sir.

6         Q.    And if you look under the

7  right-hand side on the next page, there's

8  a box that says, Guidelines for taking

9  medications.

10             Do you see that, sir?

11        A.    I do.

12        Q.    And the third bullet --

13 third bolded point down says, Take all

14 medications as directed.

15             Is that right, sir?

16        A.    Yes, sir.

17        Q.    Finally -- well, let's move

18 on to Deposition Exhibit-8, please.  Just

19 a few points on this one.

20             You were directed, sir,

21 to -- well, first of all, this is

22 something called a Reporter's Guide

23 Covering Pain and Its Management; is that

24 right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes, sir.

2      Q.     Now, you were directed,

3   during your questioning earlier, to a

4   section on Page 28 that talks about

5   adverse effects.

6             Is that right, sir?

7      A.     Yes, sir.

8      Q.     And you were asked whether

9   that section talks about addiction,

10   withdrawal and other issues; is that

11   right?

12      A.     Yes, sir.

13      Q.     Do you remember those

14   questions?

15      A.     I do.

16      Q.     Now, if you turn to the page

17   before that, which, presumably, someone

18   reading this document would see before it

19   actually sees what's on Page 28, there's

20   a section called, Key issues.

21             Do you see that?

22      A.     I do.

23      Q.     And the fourth bullet point

24   down talks about addiction, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    It does.

2        Q.    And it says, Unless a

3   patient has a past or current personal or

4   family history of substance abuse, the

5   likelihood of addiction is low when

6   opioids are taken as prescribed and under

7   the guidance of a physician.  However,

8   they have the potential for misuse, abuse

9   and diversion.

10            Did I read that correctly,

11   sir?

12        A.    Yes, you did.

13        Q.    And that's in the same

14   document that doesn't include that

15   information on the next page under

16   adverse effects; is that right?

17        A.    Correct.

18        Q.    So the next section down, or

19   the next bullet point down, talks about

20   the rising rates of prescription drug

21   abuse and emergency room admissions.

22            Do you see that?

23        A.    I do.

24        Q.    It says, Rising rates of

Highly Confidential - Subject to Further Confidentiality Review

1    prescription drug abuse and emergency

2    room admissions related to prescription

3    drug abuse, as well as an increase in

4    theft and illegal resale of prescription

5    drugs, indicate that drug diversion is a

6    growing problem nationwide.

7            Did I read that correctly?

8        A.    Yes, sir.

9        Q.    I want you to turn, sir, to

10   Page 43 of this document, which is

11   Deposition Exhibit-8.

12           And this is listing pain

13   resources from the American Pain

14   Foundation; is that right, sir?

15       A.    Yes, sir.

16       Q.    And in the left-hand column,

17   there's a section, second bullet point

18   from the bottom, Top 10 tip series.

19           Do you see that?  Bottom

20   left-hand corner.

21       A.    Yes, sir.

22       Q.    And the second bullet point

23   down, what does that say?

24       A.    Exercising for pain relief.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And the right-hand column,

2   on the same page, there's a section

3   called, Special projects and initiatives.

4     A.    Right.

5     Q.    Could you read the

6   second-to-last one there?

7     A.    Yoga for chronic pain.

8     Q.    So is it fair to say that

9   the American Pain Foundation was not

10  focused solely on analgesic pain

11  medications as therapies for pain

12  treatment?

13    A.    Yes, sir.

14    Q.    Let's turn to Deposition

15  Exhibit-17, please.  This is our final

16  exhibit.

17          I believe you described

18  this, and I don't want to put words in

19  your mouth, but I want the record to be

20  clear, did you describe this as a grant

21  package for approval of a grant to the

22  Federation of State Medical Boards?

23    A.    That's correct.

24    Q.    If you turn to the page

1    ending in Bates number 7091, could you

2    tell me what that document is, sir?

3           A.    This document is called a

4    letter of agreement.

5           Q.    And if you turn -- if you

6    look down to numbered Paragraphs 5 and 6

7    for me, please.

8           A.    Yes, sir.

9           Q.    Could you tell us what those

10   paragraphs provide?

11          A.    Directions to the grant

12   recipient.  Number 5 -- you want me to

13   read it?

14          Q.    Sure.

15          A.    Number 5 says, The recipient

16   agrees to name Purdue Pharma LP as a

17   source of funding in any program material

18   and orally during the program.

19          Q.    That was Paragraph 5.

20                What's Paragraph 6 say?

21          A.    In advance of the program,

22   recipient agrees to disclose all relevant

23   financial relationships between any

24   faculty and commercial supporter,

Highly Confidential - Subject to Further Confidentiality Review

1    including the name of the faculty, the

2    name of the commercial supporter and the

3    nature of the financial relationship.

4         Q.   Were those provisions that

5    you just read for the record standard

6    provisions that were included in letters

7    of agreement between Purdue and other

8    companies -- or, I'm sorry, other

9    organizations that it provided funding

10   to?

11        A.   They were, to my knowledge.

12             MR. SNAPP:  That's all the

13        questions I have.  Thank you, sir.

14             Time, please?

15             VIDEO TECHNICIAN:  Three

16        hours and 12 minutes.  So you used

17        up 12 minutes.

18             MR. SNAPP:  Thank you.

19             MS. POLLOCK:  Let's take a

20        break?

21             MR. CRUEGER:  No.

22             MS. POLLOCK:  Okay.

23                  -  -  -

24             EXAMINATION

 1                     -  -  -

 2    BY MR. CRUEGER:

 3         Q.    So, Mr. Rosen --

 4               MR. SNAPP:  Mr. Rosen?

 5               MR. CRUEGER:  Sorry, I've

 6         been deposing him for too long.

 7    BY MR. CRUEGER:

 8         Q.    Mr. Must --

 9         A.    Yes, sir.

10         Q.    -- the American Pain

11    Foundation, Purdue paid $3.6 million to

12    the American Pain Foundation, correct?

13         A.    Yes.

14         Q.    Is it your testimony today,

15    Mr. Must, that Purdue paid $3.6 million

16    to the American Pain Foundation so they

17    could advocate yoga to treat pain?

18               MR. SNAPP:  Object to the

19         form.

20               THE WITNESS:  As I indicated

21         earlier, I believe that we

22         provided funding because they

23         represented pain patients, they

24         were in the therapeutic area and

Highly Confidential - Subject to Further Confidentiality Review

1           advocated for appropriate pain

2           patient -- pain treatment as part

3           of their mission.

4    BY MR. CRUEGER:

5           Q.    And I think the term that

6    you used was "mission match," correct?

7           A.    Correct.

8           Q.    And so the mission match in

9    this case would be the use of opioids to

10   treat pain, correct?

11              MR. SNAPP:  Object to the

12         form.

13              THE WITNESS:  The mission

14         match was to continue to make

15         aware appropriate pain management,

16         the need for appropriate pain

17         management broadly, not just

18         opioid treatment.

19   BY MR. CRUEGER:

20          Q.    So if you can go to

21   Exhibit-3, Page 3.

22              Know the facts --

23          A.    Got it.

24          Q.    -- correct?

1    A.    Yes.

2    Q.    So I'm looking at this page,

3  this is the third page in this document.

4         Can you read for me all the

5  alternative nonopioid treatments for pain

6  that are discussed on this?

7         MR. SNAPP:  Are you talking

8      about the entire document?

9         MR. CRUEGER:  I'm talking

10      about this page, Know the facts,

11      pain care Bill of Rights.

12         THE WITNESS:  I'm sorry, can

13      you repeat your question?

14  BY MR. CRUEGER:

15    Q.    Can you please point out for

16  me on this page, just verify for me --

17  actually, strike the question.

18         On Page 3, there's no

19  discussion of alternative nonopioid-based

20  treatments for pain, correct?

21         MR. SNAPP:  Object to the

22      form.

23         THE WITNESS:  The final

24      paragraph on the left-hand side

1          says, Nondrug therapies such as

2          relaxation training can also help

3          give you relief.

4    BY MR. CRUEGER:

5          Q.    But before that, it goes for

6    pain medications, right?

7                MR. SNAPP:  Object to the

8          form.

9                THE WITNESS:  Correct.

10   BY MR. CRUEGER:

11         Q.    And it states, Pain

12   medications rarely cause addiction,

13   correct?

14         A.    That's what this document

15   says in that paragraph, yes.

16               MR. SNAPP:  Object to the

17         form.

18   BY MR. CRUEGER:

19         Q.    I'm going to make that

20   clear, since we have two people talking.

21               It says, the document,

22   Exhibit-3, the American Pain Foundation

23   says, Pain medications rarely cause

24   addiction, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SNAPP:  Do you want to

2     read the whole paragraph?

3          MR. CRUEGER:  No, I'm

4     reading that sentence.

5          MR. SNAPP:  Okay.

6          THE WITNESS:  Yes.

7  BY MR. CRUEGER:

8     Q.    And this is a document that

9  Dr. Haddox edited, correct?

10          MR. SNAPP:  Object to the

11     form.

12          THE WITNESS:  I saw in an

13     e-mail earlier that Dr. Haddox

14     provided edits for the document.

15     I don't know whether they were

16     accepted or not.

17  BY MR. CRUEGER:

18     Q.    But be that as it may, Dr.

19  Haddox read this document before it was

20  published, correct?

21          MR. SNAPP:  Object to the

22     form.

23          THE WITNESS:  That appears

24     to be accurate, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. CRUEGER:

2         Q.    And that statement, Pain

3    medications rarely cause addiction, that

4    is a false statement, is it not, sir?

5              MR. SNAPP:  Object to the

6         form.

7              THE WITNESS:  I don't know

8         the definition in terms of

9         "rarely."

10             MR. CRUEGER:  I have no

11        further questions.

12             MR. SNAPP:  Nothing further

13        here.  Thank you.

14             VIDEO TECHNICIAN:  This

15        marks the end of today's

16        deposition.  The time is 12:39

17        p.m.

18                  -  -  -

19             (Whereupon, the deposition

20        concluded at 12:39 p.m.)

21                  -  -  -

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                    CERTIFICATE

2

3

4              I HEREBY CERTIFY that the

5     witness was duly sworn by me and that the

6     deposition is a true record of the

7     testimony given by the witness.

8

9

10

      Amanda Maslynsky-Miller

11    Certified Realtime Reporter

      Dated:  March 18, 2019

12

13

14

15

16

17              (The foregoing certification

18    of this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                      - - - - - -

                      E R R A T A

2                      - - - - - -

3      PAGE    LINE    CHANGE/REASON

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

Highly Confidential - Subject to Further Confidentiality Review

```
 1            ACKNOWLEDGMENT OF DEPONENT

 2

              I,_____, do

 3    hereby certify that I have read the

      foregoing pages,  1 - 220, and that the

 4    same is a correct transcription of the

      answers given by me to the questions

 5    therein propounded, except for the

      corrections or changes in form or

 6    substance, if any, noted in the attached

      Errata Sheet.

 7

 8    _____

      ALAN MUST                    DATE

 9

10

      Subscribed and sworn

11    to before me this

      _____ day of _____, 20_____.

12

      My commission expires:_____

13

14    _____

      Notary Public

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                          LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____    _____

4      _____  _____    _____

5      _____  _____    _____

6      _____  _____    _____

7      _____  _____    _____

8      _____  _____    _____

9      _____  _____    _____

10     _____  _____    _____

11     _____  _____    _____

12     _____  _____    _____

13     _____  _____    _____

14     _____  _____    _____

15     _____  _____    _____

16     _____  _____    _____

17     _____  _____    _____

18     _____  _____    _____

19     _____  _____    _____

20     _____  _____    _____

21     _____  _____    _____

22     _____  _____    _____

23     _____  _____    _____

24     _____  _____    _____