IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

----------------------------X

IN RE: NATIONAL PRESCRIPTION    MDL No 2804

OPIATE LITIGATION,

        Case No 17-MD-2804

This document relates to:

All Cases            Hon Dan A Polster

----------------------------X

\* \* HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER \* \*

\* \* CONFIDENTIALITY REVIEW \* \*

VIDEOTAPED DEPOSITION

OF

THOMAS P NAPOLI

New York, New York

Thursday, January 17, 2019

Reported by:

ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

---

1       January 17, 2019

2       9:06 a.m.

3

4    Videotaped deposition of PURDUE PHARMA,

5  through its representative, THOMAS P.

6  NAPOLI, held at the offices of LIEFF

7  CABRASER HEIMANN & BERNSTEIN LLP, 250

8  Hudson Street, New York, New York, pursuant

9  to Notice, before Annette Arlequin, a

10  Certified Court Reporter, a Registered

11  Professional Reporter, a Realtime Systems

12  Administrator, a Certified Realtime

13  Reporter, and a Notary Public of the State

14  of New York and New Jersey.

15

16

17

18

19

20

21

22

23

24

---

1  A P P E A R A N C E S:

2

3    ROBBINS GELLER RUDMAN & DOWD LLP

4    Attorneys for Plaintiffs

5      655 West Broadway - Suite 1900

6      San Diego, California 92101

7    BY: THOMAS E. EGLER, ESQ.

8      Tegler@rgrdlaw.com

9    BY: KELLI BLACK, ESQ.

10     Kblack@rgrdlaw.com

11

12    MORGAN, LEWIS & BOCKIUS LLP

13    Attorneys for Teva Pharmaceuticals

14      1111 Pennsylvania Avenue NW

15      Washington, D.C. 20004-2541

16    BY: STEVEN A. LUXTON, ESQ.

17      steven.luxton@morganlewis.com

18    BY: MARYANN B. ZAKI, ESQ.

19      Maryann.zaki@morganlewis.com

20      (Teleconferenced)

21    BY: ARCANGELO CELLA, ESQ.

22      Arcangelo.cella@morganlewis.com

23      (Teleconferenced)

24

---

1  A P P E A R A N C E S(CONT'D.):

2

3    JONES DAY

4    Attorneys for Walmart

5      North Point

6      901 Lakeside Avenue

7      Cleveland, Ohio 44114-1190

8    BY: ADAM HOLLINGSWORTH, ESQ.

9      Ahollingsworth@jonesday.com

10

11    KIRKLAND & ELLIS LLP

12    Attorneys for Allergan Finance LLC

13      300 North LaSalle

14      Chicago, Illinois 60654

15    BY: TIMOTHY KNAPP, ESQ.

16      Timothy knapp@kirkland.com

17

18    FARRELL FRITZ P.C.

19    Attorneys for Cardinal Health

20      400 RXR Plaza

21      Uniondale, New York 11556

22    BY: KEVIN P. MULRY, ESQ.

23      Kmulry@farrellfritz.com

24

```
 1    A P P E A R A N C E S(CONT'D.):
 2
 3         ARNOLD & PORTER KAYE SCHOLER, LLP
 4         Attorneys for Endo Pharmaceuticals, Inc.
 5          and Endo Health Solutions, Inc.
 6          601 Massachusetts Ave., NW
 7          Washington, D.C., 20001-3743
 8         BY: SEAN HENNESSY, ESQ.
 9          Sean.Hennessy@arnoldporter.com
10          (Teleconferenced/Internet realtime))
11
12         GIBBONS, P.C.
13         Attorneys for AmerisourceBergen Drug Corporation
14          One Pennsylvania Plaza - 37th Floor
15          New York, NY 10119-3701
16         BY: PAUL E. ASFENDIS, ESQ.
17          Pasfendis@gibbonslaw.com
18          (Teleconferenced/Internet realtime)
19
20
21
22
23
24
```

```
 1    A P P E A R A N C E S(CONT'D.):
 2
 3         O'MELVENY & MYERS LLP
 4         Attorneys for Janssen Pharmaceuticals
 5          Two Embarcadero Center, 28th Floor
 6          San Francisco, CA 94111
 7         BY: TRISHA PARIKH, ESQ.
 8          Tparikh@omm.com
 9          (Teleconferenced/internet realtime)
10
11         ROPES & GRAY LLP
12         Attorneys for Mallinckrodt
13          1211 Avenue of the Americas
14          New York, New York 10036-8704
15         BY: JUSTIN MANN, Law Clerk
16          Justin.Mann@ropesgray.com
17          (Via internet realtime)
18
19    ALSO PRESENT:
20
21         ERIK DAVIDSON, Videographer
22
23
24
```

```
 1         IT IS HEREBY STIPULATED AND AGREED by
 2    and between the attorneys for the
 3    respective parties herein, that filing and
 4    sealing be and the same are hereby waived;
 5         IT IS FURTHER STIPULATED AND AGREED
 6    that all objections, except as to the form
 7    of the question, shall be reserved to the
 8    time of the trial;
 9         IT IS FURTHER STIPULATED AND AGREED
10    that the within deposition may be sworn to
11    and signed before any officer authorized to
12    administer an oath, with the same force and
13    effect as if signed and sworn to before the
14    Court.
15
16          - o0o -
17
18
19
20
21
22
23
24
```

```
 1         THE VIDEOGRAPHER:  We are now on the
 2    record.  My name is Eric Davidson.  I am
 3    videographer for Golkow Litigation
 4    Services.
 5         Today's date is January 17, 2019, and
 6    the time is approximately 9:06 a.m.
 7         This video deposition is being held
 8    in 250 Hudson Street, 8th Floor, New York,
 9    New York, in the matters of National
10    Prescription Opiate Litigation for the
11    United States District Court Northern
12    District of Ohio.
13         The deponent is Tom Napoli.
14         Please note counsel will be noted on
15    the stenographic record.
16         The court reporter may now swear in
17    the witness.
18
19         *     *     *
20    T H O M A S  P.  N A P O L I, called as a
21     witness, having been duly sworn by a
22     Notary Public, was examined and testified
23     as follows:
24         THE WITNESS:  I do.
```

1    Thomas Patrick Napoli.
2    EXAMINATION BY
3    MR. EGLER:
4    Q.   Mr. Napoli, thanks for coming in
5    today.
6         Do you understand that you're under
7    oath?
8    A.   Yes, sir.
9    Q.   And when you say you're under oath,
10   what does that mean to you?
11   A.   It means I have an obligation to tell
12   the truth and the whole truth.
13   Q.   And do you have an understanding that
14   the testimony you give today can be used in a
15   court of law and even at trial under some
16   circumstances?
17   A.   Yes, sir.
18   Q.   Okay.  And as you sit here today, do
19   you have any conditions or have you taken any
20   medications that could affect your memory or
21   ability to testify?
22   A.   No, sir.
23   Q.   So can you tell me what your home
24   address is?

1    A.   Sure.
2
3
4    Q.   Tell me what your work address is
5    currently.
6    A.   It's 900 Danbury Road, Richfield,
7    Connecticut.
8    Q.   So today we're going to be talking
9    mostly about your time at a company called
10   Watson and then its successors.
11        I guess, starting out, you graduated
12   from Rutgers; is that right?
13   A.   Yes, sir.
14   Q.   What year was that?
15   A.   '92.
16   Q.   After graduating from Rutgers, what
17   did you do?
18   A.   When I graduated -- during my time at
19   Rutgers, I graduated with a degree in
20   administration of justice.  I come from a large
21   police family, and I was probably going to go
22   into the family business.  But while -- during
23   my time at Rutgers, being in New Brunswick, New
24   Jersey, I had an opportunity to have an

1    internship with Johnson & Johnson within their
2    corporate security department.  And I had some
3    outstanding mentorship there.  And when I
4    graduated, had the opportunity to be a security
5    manager for one of their operating facilities in
6    Titusville, West Trenton, New Jersey, Janssen
7    Pharmaceuticals.  It was a headquarters
8    location.  And --
9    Q.   For how long did you work at Johnson
10   & Johnson?
11   A.   Seven years.
12   Q.   So when you left Janssen, what -- as
13   you think of it, what was your job title?
14   A.   When I was at Janssen, I was a
15   security manager.
16   Q.   When you were security manager there,
17   did you work with controlled substances?
18   A.   No, sir.  It was a corporate
19   environment.
20   Q.   So moving on from Janssen, where did
21   you go next?
22   A.   I went on to -- I went on to take an
23   opportunity with Lockheed Martin, a large
24   defense contractor that -- in South Jersey.  I

1    took a position as a security program manager
2    for a classified naval weapon systems programs.
3    Q.   And then at some point, did you leave
4    Lockheed Martin?
5    A.   I did.
6    Q.   Where did you go?
7    A.   I went to Watson Pharmaceuticals in
8    2002.
9    Q.   So at Watson, where -- when you
10   started at Watson, where did you work?
11   A.   I worked -- I was hired as the
12   manager of security for -- we had a
13   manufacturing facility in Carmel, New York,
14   which is in Putnam County.  And we had a
15   distribution center in Brewster, New York, as
16   well as a small research and manufacturing
17   facility in Danbury, Connecticut.  They were all
18   in close proximity to each other.
19   Q.   Did you split your time among those
20   three locations?
21   A.   Yes.
22   Q.   And, subsequently, did you take a
23   different position at Watson?
24   A.   I did.  I did.  Well, as I -- as --

1    during my time with those facilities, I
2    eventually took on the responsibility for
3    controlled substance compliance within an
4    operational setting.  So, so we did manufacture
5    controlled substances at the manufacturing site.
6        And then eventually -- after seven
7    years in that position, there was a
8    consolidation within the organization, so we
9    were transitioning, closing the facilities that
10    I was supporting, moving some of our easier to
11    replicate products and Schedule III through V
12    substances to a facility in India and also some
13    Schedule II products to our Corona facility in
14    California.  And our distribution center was
15    folded into our distribution center in the
16    Chicago area based -- after the consolidation, I
17    took a position in Morristown, New Jersey, at
18    our corporate headquarters, where I was a -- the
19    -- had made an organizational decision to fold
20    the DEA compliance function from -- transition
21    that from quality into the operations group
22    because of the synergies of -- with security --
23    with security and the DEA regulations, because
24    of my background with DEA compliance and really

1    doing a good job, a very good job with the
2    program and having a good relationship with DEA
3    and having a high-functioning program, they
4    asked me to take on responsibility for a larger
5    role of DEA compliance at their headquarters
6    location.
7        Q.   All right.  So as we're going through
8    today, the court reporter is going to type down
9    everything that you say.
10        A.   Sure.
11        Q.   And so if we have a complicated word
12    or if we have a long statement, I want you to
13    speak freely, but if you can pace yourself just
14    so we make sure we get a good record.
15        A.   Sure, sure.
16        Q.   So as you think about the time where
17    you moved to New Jersey, about what time frame
18    was that?
19        A.   2009.
20        Q.   And when you moved to New Jersey, as
21    you think of it, what was -- do you remember
22    what your job title was?
23        A.   Manager of security and controlled
24    substance compliance, I believe, or something to

1    that --
2        Q.   Okay.  And you had mentioned that the
3    Schedule III through V drugs that Watson made
4    had been -- let me start over.
5        You had mentioned that the
6    manufacturing center for the Schedule III
7    through V controlled substance drugs that Watson
8    made had been moved to India.
9        A.   Some of the easier to replicate, like
10    single-entity products, immediate-release
11    products.  Some of the more technological, you
12    know, controlled, sustained-release products,
13    those probably wouldn't go over, but...
14        Q.   Do you remember whether -- well, let
15    me start over.
16        Do you remember where Watson's
17    Schedule II controlled substances were
18    manufactured, if anywhere?
19        A.   Corona, California, would have been
20    one of the prime locations.
21        Q.   As part of your job, did you -- let
22    me start over.
23        In 2009, as part of your job, were
24    you the head of security group for or did you

1    oversee the security group in Corona,
2    California?
3        A.   No.  I was part of a structure where
4    there was a global executive director of
5    security and DEA affairs.  I was a manager -- I
6    had regional responsibility in that I ensured
7    that there was security controls in place that
8    were in compliance with the DEA requirements.
9    But each site had a responsible security manager
10    responsible for their operations.
11        Q.   As you think of it, when you started
12    working for Watson in New Jersey, do you
13    remember who was head of security in Corona,
14    California?
15        A.   At that time, it was Eric Nibergall.
16        Q.   Can you spell his last name?
17        A.   N-i-b-e-r-g-a-l-l.
18        Q.   At any point while you were working
19    at Watson or Actavis, did that position change
20    hands did somebody replace Mr. Nibergall?
21        A.   Yes, yes.
22        Q.   Who replaced him?
23        A.   Scott Soltis, S-o-l-t-i-s.
24        Q.   And then did anybody replace

1  Mr. Soltis?
2      A.  Not during my tenure.
3      Q.  All right.  So today we're going to
4  talk about -- well, let's keep going.
5          You worked at Watson in New Jersey
6  starting, I think you said, in 2009?
7      A.  Um-hmm.
8      Q.  And then at any point, did you, did
9  your position change at Watson?
10      A.  I eventually went, moved from a
11  manager position to associate director, but a
12  lot of the same responsibilities.
13      Q.  And about when was that?
14      A.  2013.  Just speculating there.
15      Q.  And then did your job change at
16  Watson after then?
17      A.  No.
18      Q.  And then at some point, Watson
19  changed its name; is that right?
20      A.  Right.
21      Q.  What did it change its name to?
22      A.  On October 31st of 2012, Watson
23  acquired Actavis Pharmaceuticals and took the
24  unprecedented step of acquiring the company but

1  taking their name.  And that was because of -- I
2  think one of the reasons for the acquisition was
3  to have a more global presence.  And Actavis had
4  an established international presence under that
5  name.
6      Q.  So when Watson bought Actavis, as you
7  think of it --
8      A.  Um-hmm.
9      Q.  -- did your duties expand at all?
10      A.  In the respect that we were bringing
11  on additional manufacturing facilities and some,
12  some new controlled products, so, yes.
13      Q.  And then at some point after that
14  acquisition closed, did you -- well, did your
15  job title change?
16      A.  No.
17      Q.  Did you leave what was then called
18  Actavis at some point?
19      A.  I did.
20      Q.  When did you leave?
21      A.  I left 2015 -- 2016.  I was part
22  of -- when Teva acquired Actavis, they had
23  already had a robust DEA compliance program and
24  staff, so we were a synergy target.  So

1  essentially I helped them through the transition
2  and then I was part of the reduction of force.
3      Q.  And then between -- well, where do
4  you work now?
5      A.  I work for Boehringer-Ingelheim.
6      Q.  All right.  So you have to spell
7  those two words --
8      A.  Oh, boy.
9      Q.  -- because I think they're German.
10      A.  We just call them BI, but
11  B-o-e-h-r-i-n-g-e-r, hyphen, I-n-g-e-l-h-e-i-m.
12      Q.  And what is Boehringer-Ingelheim?
13      A.  Boehringer-Ingelheim is a large,
14  private, still family-owned by the Boehringer
15  family pharmaceutical company specializing in
16  human pharma, as well as animal health.
17      Q.  You said human pharma.  What does
18  that mean?
19      A.  Human pharma, so products that are
20  taken by humans.
21      Q.  Oh, as opposed to animal health?
22      A.  Correct.
23      Q.  All right.  What is your job there?
24      A.  I am the head of security and crisis

1  management for the United States region.
2      Q.  Is Boehringer-Ingelheim based in the
3  United States?
4      A.  We have a U.S. headquarters in
5  Ridgefield, Connecticut, but our corporate
6  headquarters is Ingelheim, Germany.
7      Q.  With regard to Boehringer-Ingelheim,
8  do they manufacture or market any Schedule II
9  controlled substance?
10      A.  No, sir, no controlled drugs in the
11  portfolio.
12      Q.  So as we move on today, we're going
13  to be talking about some terms and names.  I
14  just want to go through them with you initially
15  so we can get a common understanding.
16      A.  Sure.
17      Q.  One of the terms that's going to come
18  up today is "Suspicious Order Monitoring" or
19  "SOM" or "SOMS."
20          What does that mean to you?
21      A.  Suspicious Order Monitoring is a, to
22  me, it's a holistic program that is mandated
23  through DEA requirements to ensure that you're
24  ensuring that your products are not winding up

1   in illicit channels; that you have safeguards in
2   place to ensure that you know your customer and
3   that you are monitoring ordering behavior of
4   your customers to prevent illegal diversion.
5           Q.   And then another term that we're
6   going to talk about a little bit is N-J-P-I-G,
7   the New Jersey Pharmaceutical Industry Group.
8           Have you ever heard of that?
9       A.   I have.
10      Q.   What is --
11      A.   I'm part of it.
12      Q.   What is that?
13      A.   That was a group of New Jersey-based,
14  for the most part, controlled substance
15  manufacturers that we met on a regular basis to,
16  you know -- because something, you know, like
17  DEA compliance or controlled substance
18  compliance is not something that is a
19  proprietary thing; it's something that we, you
20  know, collaborate on as an industry as much as
21  we can. So it was a forum in which we could
22  exchange ideas and share best practices, as well
23  as identify opportunities to partner with our
24  local DEA and find opportunities where we could

1   work together to, to prevent diversion.
2       Q.   So could you pronounce the acronym
3   NJPIG, how you would say it?
4       A.   NJPIG. It's kind of an awkward
5   acronym so, yeah.
6       Q.   Right.
7           So -- and then the next one that we
8   are going to talking about is a thing called
9   chargebacks, chargebacks data.
10          Do you know what that is?
11      A.   I do have an understanding of what
12  chargeback is, yeah.
13      Q.   Okay. What is a chargeback?
14      A.   Chargeback is a -- and I'm -- and
15  this is more layman's terms because I'm not a
16  commercial side of the house kind of person, but
17  to my understanding, chargeback is when a
18  customer or -- has a negotiated price with you,
19  and if they were to purchase your product from
20  someone at a higher price, they would submit a
21  chargeback for a rebate for the difference in
22  that cost.
23      Q.   All right. And then the next one is
24  a -- it's actually two, because I think it

1   changes through time. It's IMS and IQVIA data.
2           Are you familiar with that?
3       A.   I'm familiar with IMS.
4       Q.   What is IMS, as you think of it?
5       A.   IMS is an organization that deals in
6   data and gathering industry data and providing
7   that data to industry. Largely used by our
8   sales and marketing groups.
9       Q.   All right. So today --
10          MR. EGLER: Can we go off the record
11  for one second?
12          THE VIDEOGRAPHER: The time is
13  approximately 9:21 a.m. We are going off
14  the record.
15          (Off the record.)
16          THE VIDEOGRAPHER: We are back on the
17  record. The time is approximately
18  9:22 a.m.
19  BY MR. EGLER:
20      Q.   Mr. Napoli, as we move through today,
21  I'm going to be handing you documents. To the
22  extent -- well, every document that I'm going to
23  hand to you has been produced in this
24  litigation.

1       A.   Um-hmm.
2       Q.   And they'll have various Bates
3   numbers on them on the bottom right-hand corner,
4   and I'll read them into the record. And I'll
5   try to, to the extent I think any context is
6   needed, I'll tell you what I think the context
7   is from my data.
8           To the extent you need any context or
9   you have any questions about the documents, just
10  ask and I'll see if I can get the answer for
11  you.
12      A.   Sure.
13      Q.   So with that said, I'm going to hand
14  you what we'll mark as Exhibit 1.
15          (Napoli Exhibit 1, Memo dated
16  11/13/08, Bates-stamped
17  ALLERGAN_MDL_03535130 through 5133, marked
18  for identification, as of this date.)
19  BY MR. EGLER:
20      Q.   Mr. Napoli, can you look at
21  Exhibit 1?
22      A.   Yes.
23          MR. EGLER: And for the record, I'll
24  note that the first page doesn't have a

1    Bates-stamp, but the second page is
2    Bates-stamped Allergan_MDL_03535130 and it
3    goes to 35133.
4    BY MR. EGLER:
5        Q.   And can you look generally at this,
6    and when you're ready, just tell me and I'll ask
7    you some questions about it and tell you what I
8    know about it.
9        A.   Okay.  You want me to look at the
10    second page?
11        Q.   Well, just look through it generally.
12    You don't have to read it or anything.  I'm
13    going to ask you to read parts of it.
14           (Witness complies.)
15        A.   Okay.  All right.
16        Q.   All right.  So the first page of this
17    document is -- again, it does not have a Bates
18    number on it.  I'll tell you it's a printout of
19    what's referred to as the metadata for this.
20        A.   Okay.  Got it.
21        Q.   And it has various data on there.
22    One of them is, under Document Identification,
23    it says "custodian" and then a colon and
24    "Napoli, Tom."

1        Do you see that there?
2        A.   Um-hmm.
3        Q.   And in the context of this case, my
4    understanding is it is a document that comes
5    from your files.
6        A.   Yes.
7        Q.   So with that in mind, as you think
8    about the remaining pages of this document, do
9    you recognize this document?
10        A.   It appears to be a document that I
11    authored.
12        Q.   Do you, as you sit here today, do you
13    remember typing up this particular document?
14        A.   This particular document, no.  But it
15    wouldn't be uncommon for me to attend a
16    controlled substance seminar and report back a
17    summary to management and...
18        Q.   And just so we're clear, so I can put
19    it in perspective for the record, the date on
20    the document is November 13th, 2008, which is
21    just a little over ten years ago, right?
22        A.   Um-hmm.
23        Q.   So do you remember in 2008 in May and
24    June attending a controlled substance conference

1    and meeting of the New Jersey Pharmaceutical
2    Industry Group?
3        A.   I don't remember the specific
4    meeting, but I attended this particular
5    conference consistently almost on an annual
6    basis.
7        Q.   All right.  So the conference that
8    you referred to in this document is the
9    controlled substance conference sponsored by
10    Cegedim-Dendrite, and it's C-e-g-e-d-i-m, dash,
11    D-e-n-d-r-i-t-e.
12           Do you see that there?
13        A.   Yes.
14        Q.   What is Cegedim-Dendrite, as you
15    think of it.
16        A.   Cegedim-Dendrite is an industry
17    consulting organization.  We actually -- the
18    consulting firm that would host these events
19    was -- Cegedim-Dendrite is almost synonymous
20    with a consulting firm called Buzzeo Associates.
21    So they're essentially interchangeable, but
22    Buzzeo Associate is a industry controlled
23    substance FDA type of expert consultant group.
24        Q.   As you think of it, I think you said

1    you attended this --
2        A.   Um-hmm.
3        Q.   -- often.
4           When would have been the first time
5    you would have attended the controlled substance
6    conference sponsored by Cegedim-Dendrite?
7        A.   Probably in the mid-2000s, but I
8    couldn't attest to a date, specific date, sir.
9        Q.   All right.  And you had mentioned the
10    name Buzzeo?
11        A.   Yes.
12        Q.   Is there a Mr. Buzzeo?
13        A.   Yeah.  Ron Buzzeo.
14        Q.   Did you know Mr. Buzzeo?
15        A.   I do.
16        Q.   How do you know Mr. Buzzeo?
17        A.   Through seminars and also we had
18    utilized their -- their services from time to
19    time for compliance support.
20        Q.   So going down through that first
21    paragraph, it talks about the conference, and
22    then it talks about the New Jersey
23    Pharmaceutical Industry Group.  And you write,
24    "The New Jersey Industry Group meeting was

1  facilitated and attended by a cross-section of
2  pharma partners engaged in controlled substance
3  activities throughout the northeast region."
4      Do you see that there?
5      A.  Yes, sir.
6      Q.  Do you remember, as you sit here
7  today, attending that particular meeting?
8      A.  I don't.
9      Q.  Do you have a memory that that was
10 the first meeting of the New Jersey PIG?
11     A.  I don't -- I don't believe it was the
12 first meeting.
13     Q.  So this memo, as you think of it, the
14 "to" and "from" lines at the top are blank.
15     Do you know whether you ever sent
16 this to anybody or whether you kept it for
17 yourself?
18     A.  Looking at the date, it would have
19 been prior to taking the position at corporate
20 headquarters.  I would have likely have sent
21 this to my boss, Eric Nibergall.  And perhaps if
22 I -- I was working at a manufacturing site,
23 probably our site general manager.
24     Q.  All right.  As you think about this

1  time, November 2008, who was your site general
2  manager?
3      A.  An individual by the name of Tom
4  Strohl, S-t-r-o-h-l.
5      Q.  So going down further into this memo,
6  there is a discussion of "areas of
7  interest/concern"?
8      A.  Um-hmm.
9      Q.  And then it says "Quota"?
10     A.  Yes, sir.
11     Q.  And there is a discussion of quota?
12     A.  Um-hmm.
13     Q.  What does that term "quota" mean to
14 you in the context of your work?
15     A.  The way that the DEA ensures
16 compliance and mitigates the opportunity for
17 diversion is to maintain a closed system, what
18 they call a closed system of distribution.  And
19 that closed system distribution starts with a
20 process, a quota process for Schedule II
21 controlled substances and III narcotics, such as
22 hydrocodone, where there is a -- based on a lot
23 of research that DEA does and also input from
24 FDA, as well as looking at abuse data, emergency

1  room record -- data, all types of big data to
2  determine what is called an aggregate quota for
3  the United States issuance of a quota for a
4  particular molecule for a controlled substance.
5      So they'll look at sales data from
6  each one of the companies, what was consumed
7  over the year, the prior year, and they would
8  make a decision where they would come up with an
9  aggregate of a particular molecule.  It could be
10 oxycodone, hydrocodone, et cetera, which would
11 be divided up among industry.
12     We would have -- API manufacturers
13 would have a quota called a "manufacturing
14 quota" where they could synthesize and develop
15 an active pharmaceutical material like the raw
16 material for OxyContin.
17     At the manufacturer level, where we
18 were at, we would have what's called
19 "procurement quota" where we would of, based on
20 our -- we would do an end of year report and
21 make an application to the DEA based on our
22 prior sales, provide them with all of our sales
23 history.  They would do a review, and they would
24 grant you a quota to, to manufacture for a given

1  year.  And that quota could be a adjusted
2  midyear or throughout the year based on your
3  sales.  If you acquired new business, you could
4  apply for more quota.  If business dropped off,
5  you may, there are opportunities where you could
6  have perhaps surrendered quota if you didn't
7  need it.  But it was -- that's essentially in a
8  nutshell what the quota system is.
9      Q.  So as you think about it, around this
10 time, end of 2008, when you were at Watson, did
11 you have any responsibility for applying for or
12 managing the quota that Watson got for any
13 controlled substances?
14     A.  Not at the time of this memo.  But in
15 2019, when I assumed my role at corporate
16 headquarters, I did have responsibility for, for
17 that aspect of the business.  I had an
18 individual who worked for me who was just
19 dedicated to quota administration.
20     Q.  And I think you said 2019.
21     A.  2009.  I apologize.
22     Q.  Okay.  That's fine.
23     And just so you know, at the end of
24 the deposition, if anything like that happens,

1    neither of us catch it, you'll have the
2    opportunity to correct anything --
3        A.   Okay.
4        Q.   -- with no problem?
5        A.   Okay.
6        Q.   So with regard to the quota process,
7    you said you managed someone who was responsible
8    for the quota?
9        A.   Right.
10       Q.   Who was that?
11       A.   Bill Hepworth.
12       Q.   And that's?
13       A.   H-e-p-w-o-r-t-h.
14       Q.   And beyond managing Mr. Hepworth, did
15   you have any involvement in the negotiation or
16   application of a quota for Watson?
17       A.   I definitely reviewed the
18   applications and provided input for those
19   applications.
20       Q.   All right.  Anything else?
21       A.   No, not necessarily.
22       Q.   All right.  So moving on into this
23   document, on the following page, on 131, about a
24   little bit more than halfway down, there is a

1    paragraph that you wrote that says, "During the
2    NJ Pharmaceutical Industry Group meeting, a
3    proposal was made to draft a letter from
4    industry to the DEA outlining the current
5    situation and its affect on the industry.  The
6    letter will be a documented record of the
7    industry's desire for change and efficiency
8    within the current process to adequately meet
9    market needs.  The letter will only be sent upon
10   the affirmation by the represented
11   organizations's legal and government affairs
12   functions."
13           Do you remember having a discussion
14   at the 2008 New Jersey Pharmaceutical Industry
15   Group meeting about potentially writing a letter
16   to the DEA?
17       A.   I do not have a recollection of that.
18       Q.   All right.  And then -- I apologize
19   for going backwards.
20       A.   No worries.
21       Q.   Further up in this document, there is
22   a number of references to a person by the name
23   of Joseph Rannazzisi?
24       A.   Yes.

1        Q.   R-a-n-n-a-z-z-i-s-i.
2            Do you know who Mr. Rannazzisi is?
3        A.   Yeah, Mr. Rannazzisi was the deputy
4    administrator, DEA diversion.
5        Q.   Did you ever meet Mr. Rannazzisi?
6        A.   I did.
7        Q.   When did you meet him?
8        A.   I met him at a conference that he
9    spoke at in Edison, New Jersey.  I don't recall
10   the date.
11       Q.   Was it while you were working at
12   Watson?
13       A.   Yes.
14       Q.   Do you think it was around this time
15   2008 or later?
16       A.   I can't speculate to that.
17       Q.   So with regard to Mr. Rannazzisi, do
18   you remember discussions of a one or two or more
19   letters that Mr. Rannazzisi wrote about the
20   opioid situation in the United States?
21       A.   I don't recall specific letters,
22   but...
23       Q.   Okay.  So we'll probably talk about
24   them further.  And I'll -- to the extent we talk

1    about them, I'll show them to you.
2        A.   Yeah.
3        Q.   All right.  So if you can turn to the
4    next page, which is 5132.  And at the bottom of
5    the previous page and at the top of this page,
6    it's talking about SOM.
7            Do you see that there?
8        A.   Yes, sir.
9        Q.   And is SOM, as you think of it, the
10   Suspicious Order Monitoring systems?
11       A.   Yes.
12       Q.   And you write that "It is highly
13   recommended that industry utilize a 'total SOM
14   model.'  This model favors a more
15   statistically-based model that dynamically
16   evaluates a variety of order characteristics to
17   determine whether an order should be pending.
18   Characteristics include order size, ordering
19   frequency, ordering patterns and percentage of
20   CS ordered."
21           "CS" there is controlled substance;
22   is that right?
23       A.   Correct.
24       Q.   And then it says, "This approach is

1  viewed to be more effective and defensible than
2  the traditional approach of just setting a
3  threshold."
4         Now you write there that it is
5  "highly recommended."
6         From the context of this memo, take
7  your time, can you see where -- where you came
8  to that conclusion that it was highly
9  recommended?
10     A.   It was highly recommended by the
11 Cegedim-Dendrite group.
12     Q.   Okay.
13     A.   To put it in context as well, too,
14 you have to understand they're, as a consultant
15 group, they're selling a product as well, too,
16 for compliance.
17     Q.   All right.
18         And so then going down here, it says,
19 "The following concepts are to be considered
20 when developing an effective SOM: How are new
21 accounts opened, background check, Know Your
22 Customers." And then a bullet point, "How are
23 orders evaluated," and then a bullet point, "How
24 are orders cleared from suspicion, appropriate

1  investigation, resources/SOPs."
2         And in the context of this document,
3  what does the term "SOP" mean?
4      A.   Standard operating procedure.
5      Q.   And then a bullet point, "Who reports
6  suspicion order to DEA, management oversight,"
7  and then a bullet point, "Do third-party
8  distributors utilize an adequate SOM."
9         Do you see that there?
10     A.   Yes, sir.
11     Q.   So that last one, "Do third party
12 distributors utilize an adequate SOM," what does
13 that mean in the context of this document?
14     A.   That, to me, implies that, you know,
15 and it comes back to me to know your customer,
16 that ensuring that your supply chain partner
17 that you distribute your products to that they
18 have an effective system in place that's
19 compliant with DEA regulations.
20     Q.   And with regard to this discussion
21 here with these bullet points that I've been
22 reading, it says "Know Your Customers"?
23     A.   Yes, sir.
24     Q.   And in the context of your work at

1  Watson, the customers that are referred to
2  there, who are they?
3      A.   Distributors or large chains such as
4  Walgreens, CVS.
5      Q.   Walgreens and CVS would essentially
6  distribute to themselves, is that fair to say?
7      A.   Right, to their own pharmacy
8  locations.
9      Q.   So with regard to the third bullet
10 point there, it says, "How are orders cleared
11 from suspicion."
12     A.   Um-hmm.
13     Q.   Can you tell me what that means in
14 the context of this document?
15     A.   Sure.
16         And within the context of, of this
17 document, if you have an order that pens with or
18 flags within a given system, you know, what
19 steps do you take as a registrant to understand
20 that ordering behavior and subsequently justify
21 why that order is out of -- is not consistent
22 with an ordering pattern. It could be because a
23 company took on more business, another
24 manufacturer had an issue for the same product

1  and they're coming to you for an increase.
2  There could be a variety of reasons why an order
3  increased.
4         So really taking a deeper dive to
5  understand why the change in behavior.
6      Q.   All right. Then moving further down
7  in the document, it states, "DEA shifted
8  operating philosophy."
9         Do you see that there?
10     A.   Yes.
11     Q.   It says, "Field offices becoming less
12 'friendly,' shifting from partners to
13 enforcers."
14     A.   Yes.
15     Q.   Do you have a memory or an
16 understanding of where you got that information?
17     A.   That would have come from a -- the
18 Cegedim or the Buzzeo group was comprised
19 largely of former DEA high-ranking officials,
20 policy and liaison folks within management that
21 still had contacts, and as well as I can see in
22 here that Mark Caverly and James Crawford, both
23 from DEA, spoke at this conference. And that
24 there was a shift in -- there was more trends of

1   more aggressive enforcement because of some of
2   the abuse patterns that were existing in the
3   country.
4       Q.   By this time in 2008, for about how
5   long had you been working or encountering issues
6   with the DEA in your work?
7       A.   Up to that point, I didn't have any
8   issues with the DEA.
9       Q.   Just when you say you didn't have any
10  issues, it means your work didn't have any --
11      A.   Are you talking about -- can you
12  provide context to "issue"?
13      Q.   Right.
14      A.   Is it negative issue or just dealings
15  with DEA?
16      Q.   That's what I want to get a better
17  word for.
18          So as you think about your work up to
19  this point, the end of 2012, did you have any
20  responsibilities for enforcing DEA regulations
21  in your job?
22      A.   Well, you used the term "2012."
23      Q.   I'm sorry.  2008.
24      A.   Okay.  2008.

1       In 2008, I was responsible for
2   compliance within our manufacture and
3   distribution sites in -- locally in New York,
4   yes.
5       Q.   And as part of that compliance
6   process, would you be responsible for preparing
7   the sites for audits by the DEA?
8       A.   Yes.
9       Q.   As you think of it, in your time up
10  to this point, end of 2008, before you moved to
11  New Jersey, about how many DEA audits did you
12  participate in for Watson?
13      A.   Several.  We -- the way that the DEA
14  audits is based on your registration, so -- and
15  the cyclical audits could be -- they can range
16  from three years to sometimes five years.
17          If you have a violative past or a
18  history, you can get an inspection every year.
19          We were on a three to five-year
20  inspection schedule, but because we had multiple
21  registrations, so we had manufacturer
22  registration, I believe we had import
23  registrations, research, each one of those
24  registrations are subject to an inspection on a

1   periodic basis.  So probably every couple of
2   years or so, we would see the DEA in for a
3   cyclical inspection, it would be called.
4       Q.   All right.  So moving further down
5   onto this page, which is page 3 of the document,
6   page 132 of Exhibit 1, it states, "Contributing
7   Factors," colon, and then in quotations, "the
8   perfect storm."
9           Do you see that there?
10      A.   Right.
11      Q.   And you write a series of five bullet
12  points:  "Non-medical use of pharmaceutical
13  products now greater than the abuse of cocaine,
14  hallucinogens and inhalants" --
15      A.   Right.
16      Q.   -- "among adults 26 or older.  Seven
17  million Americans reporting non-medical use of
18  prescription medicines in 2006."
19          Next bullet point is:  "Presidential
20  mandate to cut drug use, enforcement efforts
21  have been highly successful in areas of illicit
22  drug use, yet one category is rising,
23  prescription medicines.  Clandestine
24  methamphetamine production, 'shut down in U.S.,'

1   mainly in Mexico now."
2           And the next one is:  "Proliferation
3   of Internet."
4           Next one is:  "Congressional
5   interest, children dying, tremendous cost to
6   society."
7           And the last bullet point is:
8   "Dwindling DEA resources."
9           So as you think about the information
10  that you convey there in this memo, where would
11  you have gotten that information?
12      A.   That would have been from a
13  presentation directly from the Cegedim-Dendrite
14  conference.  It may have come from, from their,
15  one of their presentations or one of the
16  speakers from DEA.
17      Q.   And then you state that the -- well,
18  the next thing you state is, "Result," and a
19  colon, and it says, first bullet point,
20  "Application of traditional principals of
21  enforcement industry."
22          And then the next bullet point is:
23  "Enforcement focus - commingling of enforcement
24  agents and diversion investigators and single

1    enforcement group at all field offices. 400
2    diversion investigators in the world, more than
3    one million registrants, 5,000 special agents
4    currently hiring."
5        A.   Yes.
6        Q.   And then the next one is: "All
7    policy decisions made by HQ."
8        So, again, where would you have
9    gotten that information?
10       A.   Again, it probably would have come
11   from either Mr. Crawford or Caverly from DEA.
12       Q.   The statement there, it says, "All
13   policy decisions made by HQ."
14       What does that mean?
15       A.   That the policy decisions for, as I
16   would interpret this, enforcement actions would
17   be made in the Washington, D.C., level, not at a
18   local field office.
19       Q.   All right.  And then on the next
20   page, at the bottom of that page, the next page
21   talks about two people from the DEA, James
22   Crawford, who is special assistant, Office of
23   Diversion Control, and Mark Caverly?
24       A.   Caverly.

1        Q.   Section chief, Office of Diversion
2    Control.
3        Do you remember meeting Mr. Crawford
4    or Mr. Caverly?
5        A.   I do remember meeting Mr. Crawford.
6    And Mr. Caverly, I know very well.
7        Q.   So how do you know Mr. Caverly?
8        A.   Mr. Caverly, I knew him when he was
9    head of policy and liaison with DEA.  And he was
10   someone that you would reach out to if you had
11   any questions about interpretation of federal
12   regulations, which sometimes, as you know, can
13   not be clear at all times.  So he was a resource
14   to reach out to to get clarification.
15       As well as when he retired from DEA,
16   he actually became one of the head consultants
17   for Cegedim/Buzzeo.  So I've known him for many
18   years.
19       Q.   Do you remember when about he
20   retired?
21       A.   I don't.  It might have been right
22   around this time period within -- give or take a
23   year.
24       Q.   How about Mr. Crawford, do you

1    remember him?
2        A.   I do.
3        Q.   How did you know Mr. Crawford?
4        A.   Just from the one meeting at this
5    conference, I believe.
6        Q.   All right.  Mr. Caverly, as you think
7    of it, when was the last time you talked with
8    him?
9        A.   I haven't worked for Actavis --
10   probably three years ago.
11       Q.   All right.  You can set this
12   document, Exhibit 1, aside.
13       (Witness complies.)
14       (Discussion off the record.)
15   BY MR. EGLER:
16       Q.   And at the end of the day, the court
17   reporter will take all the documents that are
18   marked with the actual stickers and keep them.
19       A.   Okay.
20       Q.   No souvenirs.
21       A.   Parting gifts.
22       (Laughter.)
23       Q.   Mr. Napoli, I'm going to hand you
24   what we'll mark as Napoli Exhibit 2.

1        A.   Okay.
2        (Napoli Exhibit 2, NJPIG Charter
3        Statement, Bates-stamped HDS_MDL_00095906
4        through 5907, marked for identification, as
5        of this date.)
6    BY MR. EGLER:
7        Q.   What we marked as Exhibit 2, I'm just
8    going to tell you, at the bottom right-hand
9    corner, there is a Bates number.  It says
10   HDS_MDL_00095906.  And I want to be clear, this
11   document did not come from the files of your
12   former employer or your own files.
13       But that said, do you remember ever
14   seeing this document before?
15       A.   Yes.
16       Q.   Okay.  What is it?
17       A.   It's a charter statement for the New
18   Jersey Pharmaceutical Industry working group
19   essentially stating what the goals of the
20   working group is, as well as -- I'm trying to
21   think of this.  There was a document about, you
22   know, not sharing proprietary, confidential
23   information.  I don't know if that's within this
24   document.  But this is just essentially the

1    charter and the mission of what our, our group
2    was put together for.
3        Q.    And as you think about your
4    involvement in the New Jersey Pharmaceutical
5    Industry Group, how many people from Watson in
6    2008 were involved in the NJPIG?
7        A.    In 2008, certainly I was a new member
8    to the team.  I think probably Tracey Hernandez,
9    who was our head of DEA compliance at the time,
10   would have been a member.
11       Q.    Anybody else?
12       A.    I'm not 100 percent sure, but some
13   people within her group may have been members.
14       Q.    So as you think of the entity, the
15   New Jersey Pharmaceutical Industry Group, did
16   you know anybody from other companies that were
17   in the group?
18       A.    Yes.
19       Q.    Who did you know, as you think about
20   it just off the top of your head?
21       A.    Mike Mejjiolaro, and I don't even
22   know if I can spell that name.
23       Q.    Anybody else?
24       A.    I'm trying to think.  It's -- we're

1    going back now, and I know that there were
2    individuals from Novartis, but I'm struggling
3    with some of the names.
4        Q.    With regard to the companies like
5    Novartis, can you think of any other companies
6    that were participating in the New Jersey
7    Pharmaceutical Industry Group around this time?
8        A.    Novartis, Halo Pharmaceuticals.
9    Yeah, I'm actually struggling with that, with
10   some of the names.
11       Q.    Have you ever heard of a company
12   called Endo?
13       A.    Yes.
14       Q.    Do you remember anyone from Endo
15   being part of the NJPIG?
16       A.    Not at that time.  They may have been
17   a member.  I don't know who would represent them
18   at that time.
19       Q.    As you think about it, about this
20   time, June 2008, again, just as you think about
21   it, about how many members of the NJPIG were
22   there?
23       A.    I couldn't speculate!  I mean, if I
24   said a dozen, I --

1        Q.    But you don't have any particular
2    feeling either way?
3        A.    No.
4        Q.    All right.  So this charter statement
5    has various text on it.  And part of it is
6    bullet points.  And it says: "The goal of the
7    New Jersey Pharmaceutical Industry Group is to
8    increase compliance with DEA requirements
9    through the shared knowledge and experience of
10   group members."
11       A.    Yes.
12       Q.    And then it states: "All information
13   shared in the meeting is confidential.  If you
14   use an idea that was presented at a meeting, it
15   should not be attributed to any specific
16   company.  We do not publish meeting notes."
17            And then it says: "Each
18   company/member is expected to volunteer to host
19   a meeting when it is their turn.  We have about
20   two meetings a year.  The location is chosen by
21   the host company.  Each meeting we ask for a
22   volunteer for the next meeting.  Attendance by
23   multiple persons from the same company may need
24   to be limited based upon the room size."

1            And then it states: "Invitation for
2    speakers from state or federal agency and/or
3    suppliers is after discussion with the group."
4            All right?  Do you see that there?
5        A.    Yes, sir.
6        Q.    Now you are -- or I just read the
7    second bullet point, "All information shared in
8    the meeting is confidential.  And if you use the
9    idea that was presented at a meeting, it should
10   not be attributed to any specific company.  We
11   do not publish meeting notes."
12            Do you remember whether you took
13   notes at meetings of the New Jersey
14   Pharmaceutical Industry Group?
15       A.    I don't recall if I took notes at
16   those meetings.
17       Q.    And you regularly attended the
18   meetings of this NJPIG, right?
19       A.    I wouldn't say regularly.  It was
20   probably intimately, when my schedule allowed
21   it.
22       Q.    Okay.  When you did not attend a
23   scheduled meeting of the NJPIG, would someone
24   attend for you?

1    A.   In this time frame, no.

2    Q.   How about later on?

3    A.   Later on, probably, yeah.

4    Q.   As you think of it, who would have

5    been the person who would have attended for you?

6    A.   It could have been any of the -- it

7    could have been Bill Hepworth.  It could have

8    been one of our auditors.

9    Q.   All right.  And then you mentioned

10   one of the other people from Watson who may have

11   been involved in this was woman by the name of

12   Tracey Hernandez, right?

13   A.   Yes, sir.

14   Q.   Was Tracey Hernandez, did she work in

15   New Jersey at this time?

16   A.   Yes.

17   Q.   And when you moved into the

18   reorganized DEA affairs and security part of

19   Watson, what did Ms. Hernandez do?

20   A.   She was actually, because of the

21   organizational change to fold the organization

22   from quality into the security and operations

23   organization, she was transitioning out of the

24   organization.  So I think when I came in, she

1    was transitioning out over a six-month period.

2    Q.   Do you remember whether she stayed

3    employed at Watson at the end of the six-month

4    period?

5    A.   I can't recall if she stayed the

6    whole six months.

7    Q.   She doesn't work at Watson -- well,

8    do you know whether she ever left Watson's

9    employment at some point?

10   A.   Yes.

11   Q.   Do you know when?

12   A.   It would have been 2009.

13   Q.   All right.  So with regard to the New

14   Jersey Pharmaceutical Industry Group, do you

15   remember whether you ever hosted one of their

16   meetings?

17   A.   I believe we did host a meeting.

18   Q.   Where did you host it?

19   A.   It would have either been in our

20   Morristown location, but we subsequently moved

21   to Parsippany, so either one of those.  I don't

22   have a specific recollection of where we hosted

23   it.  I believe we did host one.

24   Q.   So you mentioned Morristown, and it's

1    M-o-r-r-i-s-town, right?

2    A.   Yes.

3    Q.   And then Parsippany, New Jersey.

4        Was it Parsippany, New Jersey, your

5    offices at Actavis?

6    A.   Yes.

7    Q.   And Morristown was where Watson was;

8    is that right?

9    A.   Well, it was Watson and then Actavis.

10   So it was -- Watson moved from their location in

11   Morristown to Parsippany.  And then after the

12   acquisition of Actavis, it became the Actavis

13   headquarters.

14   Q.   Okay.  So Watson moved to Parsippany?

15   A.   Um-hmm.

16   Q.   And then they bought Actavis?

17   A.   Correct.

18   Q.   All right.  Okay.  You can set this

19   document aside for now.

20       (Witness complies.)

21   BY MR. EGLER:

22   Q.   All right.  And I'll hand you what

23   we'll mark as Exhibit 3.

24       (Napoli Exhibit 3, Cegedim-Dendrite

1    document dated 10/21/08, Bates-stamped

2    ALLERGAN_MDL_03535009 through 010, marked

3    for identification, as of this date.)

4    BY MR. EGLER:

5    Q.   So Exhibit 3, again, the first page

6    doesn't have a Bates number on it, but starting

7    on the second page, it's ALLERGAN_MDL_03535009

8    through 010.

9        Mr. Napoli, when you're ready, can

10   you tell me what this appears to you to be?

11   A.   This looks like a promotional or a

12   summary of a service or a product that

13   Cegedim-Dendrite was marketing towards industry

14   to develop a statistically based model of

15   Suspicious Order Monitoring.

16   Q.   And, again, based on the information

17   that we received in the litigation, this

18   document came from your files.

19   A.   Um-hmm.

20   Q.   Do you remember this document?

21   A.   Yes.

22   Q.   What do you remember about it?

23   A.   It probably, you know, came from

24   either from the conference or post conference,

1 something that was, was sent to us or that I
2 printed off for informational purposes.
3     Q.   Do you remember around this time --
4 well, this document refers -- is dated
5 October 21st, 2008.
6     A.   Um-hmm.
7     Q.   Do you remember around this time
8 having discussions with anyone from
9 Cegedim-Dendrite about their Suspicious Order
10 Monitoring offerings?
11     A.   Not in 2008 because I wasn't in the
12 corporate role yet.
13     Q.   Okay.  So why would you have saved
14 this document?
15     A.   For educational informational
16 purposes.
17     Q.   All right.  You can set this document
18 aside.
19         (Witness complies.)
20 BY MR. EGLER:
21     Q.   Now we're going to move on.  I'm hand
22 you what we will mark as Exhibit 4.
23         (Napoli Exhibit 4, Email chain
24         beginning with email dated 6/8/09 from

1 Woods to Napoli, Bates-stamped
2 ALLERGAN_MDL_02467143 through 154, marked
3 for identification, as of this date.)
4         (Handing.)
5     A.   Thank you.
6     Q.   Mr. Napoli, can you look at
7 Exhibit 4.  And while you're looking at it
8 generally, I'll read into the record the Bates
9 numbers.
10         It's ALLERGAN_MDL_02467143 through
11 154.  And I'm going to ask you some questions
12 about this document.
13     A.   Sure.
14     Q.   Just let me know when you're ready.
15 You don't have to have an understanding of all
16 the information.
17     A.   Okay.
18     Q.   I just want to ask you some questions
19 about it.
20         (Document review.)
21     A.   Okay.
22     Q.   So did you use email when you worked
23 at Watson?
24     A.   Yes.

1     Q.   What was your email address?
2     A.   I think it was TNapoli@Watson.com.
3     Q.   Did you ever print out an email that
4 you wrote or received while you worked at
5 Watson?
6     A.   I'm sure I have.
7     Q.   As you think of it, would it have
8 looked like the -- format-wise, looked like the
9 document that we've marked as Exhibit 4?
10     A.   I would think so.
11     Q.   I'll represent to you that this
12 document was produced to us by Allergan --
13     A.   Okay.
14     Q.   -- in this case.
15         And it's my understanding that it is
16 an email.  And at the top of the page, it says
17 "from," and it has the name Mary Woods.
18         Do you know Ms. Woods?
19     A.   I do.
20     Q.   Who is Mary Woods?
21     A.   Mary Woods was our head of order
22 management.
23     Q.   When did you first meet Mary Woods?
24     A.   Most likely when I entered into my

1 new role in 2009.
2     Q.   And there is a person there named
3 Molly Martin.
4     A.   Um-hmm.
5     Q.   Who is Molly Martin?
6     A.   Molly Martin, I believe, was someone
7 who was a member of management within our
8 quality team.
9     Q.   I think you had mentioned that term
10 "quality" before.
11     A.   Um-hmm.
12     Q.   In the context of your work at
13 Watson, what does that mean to you, quality
14 team?
15     A.   The quality assurance organization is
16 an organization that is very closely tied with
17 ensuring compliance with FDA regulations and
18 ensuring that we have a total quality system and
19 that we are functioning according to FDA
20 regulations.
21     Q.   So is it fair to say there is a
22 different group to ensure compliance with FDA
23 regulations than there -- than there is a group
24 to ensure compliance with DEA regulations?

1     MR. KNAPP:  Objection to form.
2     MR. LUXTON:  Objection.
3  BY MR. EGLER:
4     Q.   Do you have an answer to the
5  question?  Sorry.
6     A.   Yeah, there is -- there is both
7  quality group and a DEA compliance group.
8     MR. LUXTON:  Sorry to interrupt, but
9     can we just have an agreement, because I
10    objected at the same time, an objection for
11    one defendant is an objection for all so I
12    don't have to put the same objections on
13    the record?
14    MR. EGLER:  Yeah.
15    MR. LUXTON:  It might be in the CMO.
16    MR. EGLER:  It is.  That's all
17    covered.
18    MR. LUXTON:  Great.  Thanks.
19    MR. EGLER:  We just need one.  And
20    you guys can have a button if you want.
21    (Laughter.)
22 BY MR. EGLER:
23    Q.   For the quality assurance group and
24 their role with regard to FDA regulations, we

1  talked about Ms. Martin.
2     Do you remember anybody else from
3  that group?
4     A.   From the quality group?
5     Q.   Yes.
6     A.   It's a very large group.  Yeah, I do.
7     Q.   About how many people were in the
8  group, as you think of it?
9     A.   I couldn't even speculate.
10    Q.   Like dozens or less than ten?
11    A.   More than -- more than a dozen.  I
12 mean, we had a corporate group, and then there
13 were quality groups at the sites.
14    Q.   And thinking of the DEA group -- let
15 me start over because that was a little
16 cumbersome.
17    As you think about the people at
18 Watson that were responsible for making sure the
19 company complied with the DEA regulations and
20 laws, about how many people at the Watson
21 headquarters when you started there had the
22 primary responsibility for that?
23    A.   About a half dozen.
24    MR. KNAPP:  Objection to form.

1  BY MR. EGLER:
2     Q.   And as you think about the half
3  dozen, can you name some of them?
4     A.   Bill Hepworth, Lynn DaCunha,
5  D-a-c-u-n-h-a.  Ione Graziosi, Jim Dougherty
6  D-o-u-g-h-e-r-t-y, Sarah Blackenship.  And we
7  also had individuals at the sites that had
8  compliance responsibilities as well.
9     Q.   All right.  With regard to each of
10 those people, as you think about them, did any
11 of them have primary responsibility for the
12 Suspicious Order Monitoring System?
13    A.   I believe Ione Graziosi.
14    Q.   All right.  That is a woman, right?
15    A.   Correct.
16    Q.   Do you know what her job title was
17 when you started at Watson's headquarters in New
18 Jersey?
19    A.   Manager of controlled substance
20 compliance, I believe.
21    Q.   How would she -- what was her -- let
22 me start over.
23    What were her job responsibilities at
24 that time?

1     A.   She would have been probably second,
2  you know, kind of someone who supported Tracey
3  Hernandez in her direct role.  So oversight of,
4  of the group.  Probably had her oversight in
5  various functions.  So as far as licensing,
6  registration, quota, Suspicious Order
7  Monitoring, ensuring probably day-to-day
8  management, where Tracey might have been a
9  little bit more strategic in her role.
10    Q.   And then as Ms. Hernandez
11 transitioned out of her role, what did -- what,
12 if anything, changed about Ms. Graziosi's role?
13    A.   Essentially it stayed the same.
14    Q.   Did she report to you at some point?
15    A.   Yes.
16    Q.   For about how long did she report to
17 you at Watson and Actavis?
18    A.   I'd say maybe a year.
19    Q.   And then after the year that you're
20 thinking of, what, if anything, happened?
21    A.   She left the organization.
22    Q.   Were her job responsibilities
23 undertaken by somebody else?
24    A.   We actually -- with me leading the

1  group, we actually brought in another individual
2  who became an auditor investigator for us who
3  took the primary responsibility for the SOMS,
4  the Suspicious Order Monitoring role. And the
5  other individuals really kind of just picked up
6  the other responsibilities.
7       I managed the overall operation, as
8  well as the strategic operations.
9       Q. So who was the person that you're
10  thinking of that came in after Ms. Graziosi
11  left?
12       A. It would have been Lisa Scott. She
13  kind of came in during the time when Ione was
14  there.
15       Q. And then for how long was Ms. Scott
16  in that role?
17       A. Four or five years maybe.
18       Q. Do you remember --
19       A. If that.
20       Q. Do you remember when she left?
21       A. When she left?
22       Q. About the time?
23       A. I'd say 2012, 2013.
24       Q. Do you remember if anyone replaced

1  her in that role?
2       A. Yes.
3       Q. Who?
4       A. William Simmons.
5       Q. All right. And what was
6  Mr. Simmons's role?
7       A. Will Simmons was, again, brought in
8  as an auditor/investigator, so he had a primary
9  role for the day-to-day, for the DEA compliance
10  side of Suspicious Order Monitoring, Know Your
11  Customer activities, any type of investigations,
12  as well as audit.
13       Q. Was Mr. Simmons physically located in
14  New Jersey for work?
15       A. Yes, sir. Yes.
16       Q. And as you think of it, by that time
17  when you were working with Mr. Simmons, you were
18  in Parsippany; is that right?
19       A. Yes, sir.
20       Q. As you think about the physical
21  layout of the Parsippany business for Watson and
22  Actavis, about how many stories was it?
23       A. Four.
24       Q. And what floor were you on?

1       A. Third.
2       Q. Do you remember, as you think of it,
3  who else was on the third floor?
4       A. In Parsippany?
5       Q. And let me ask this a little bit
6  better.
7       As you think about the Parsippany
8  office building in the time that you moved in,
9  how would you categorize the group that you
10  managed or worked for? Would it be DEA affairs
11  or something else?
12       A. DEA affairs.
13       Q. So about, as you think of it, about
14  this time, about how many people in the DEA
15  affairs group were located for work in the
16  Parsippany building?
17       A. Everyone.
18       Q. And about how many people was that?
19       A. I guess about half a dozen folks
20  there related to it.
21       Q. So beyond the DEA affairs group, can
22  you remember any other groups that were on the
23  third floor of the Parsippany building when you
24  moved in?

1       A. There was labeling. There was a
2  component of quality there, supply chain.
3       Q. Anything else you can think of?
4       A. Not in particular.
5       Q. All right. And I know this is a
6  complete estimate, but as you think of it, about
7  how many people worked on the third floor in the
8  Parsippany building for Watson when you moved
9  in?
10       A. A couple hundred.
11       Q. All right. Do you know whether
12  Watson maintained a call center at the
13  Parsippany building around the time that they
14  moved in?
15       A. I don't believe there was a call -- I
16  don't know if there was a call center in
17  Parsippany. I know there may have been one in
18  California. Not -- I can't speculate on that.
19       Q. All right. So let's go back to this
20  Exhibit 4. And I'll -- I'll tell you that we
21  met with Mary Woods and took her deposition last
22  week --
23       A. Okay.
24       Q. -- and I'm going to try not to

1 characterize what she said, but I think my
2 questions were being formed by my perception of
3 what she said --
4 A. Okay.
5 Q. -- which might be different from your
6 counsel's perception of what she said.
7 A. Okay.
8 Q. So rather than get into an argument
9 about what she said, I'm going to ask you
10 questions for you to answer.
11 A. Sure.
12 Q. So this first email, which is the
13 last email in time, on Exhibit 4, Ms. Woods
14 writes, "Hi, Tom. Need your feedback for Molly.
15 The SOP below belongs to the call center but has
16 many owners that supply feedback as designated
17 in the left column. Several departments review
18 to make sure we are in compliance.
19 "The current control substance
20 compliance team requested an immediate change
21 last month. We added their request to Section
22 1.11. Molly has a few questions in reference to
23 these changes. Her questions are below.
24 "We feel it is critical to get your

1 input as this is transitioning over to you."
2 So she uses a couple terms there, the
3 SOP, and I think we talked about what that
4 meant.
5 A. Yes.
6 Q. And then she uses the term "the call
7 center."
8 As you think back to around this
9 time, 2009 at Watson, what was the call center?
10 A. She may be referring to the call
11 center for sales.
12 Q. Okay. And then with regard to the
13 controlled substance compliance team, do you
14 recognize that as the group that you worked
15 with?
16 A. Yes.
17 Q. All right. So when she talks about
18 the "SOP below," as you look through this email,
19 can you identify an SOP that's attached to it or
20 a part of it?
21 A. Yes.
22 Q. All right. Where would that be?
23 (Document review.)
24 A. MDL_7151.

1 Q. All right. That's the last few
2 pages. The page that you pointed to starts with
3 the word "purpose."
4 Is that right?
5 A. Correct.
6 Q. And under "purpose" it states, "To
7 assure distribution of controlled drugs is
8 monitored for excessive use by an individual
9 location using the DEA number as the
10 identifier."
11 Do you remember whether this SOP was
12 enforced when you started in -- when you started
13 in your job at Watson around June 2009?
14 A. I believe it was.
15 Q. All right. So around this time, did
16 you do a study or a review of the standard
17 operating procedures of the Suspicious Order
18 Monitoring System?
19 A. I'm sure that I did.
20 Q. How would you have done that, as you
21 think of it?
22 A. I would have likely worked with, with
23 Mary to get an understanding of the process, as
24 well as folks on my team, to understand how it

1 worked from a systemic standpoint, as well as
2 from a procedural standpoint in ensuring that we
3 didn't have any gaps.
4 Q. Before this time, mid 2009, did you
5 have any experience with Suspicious Order
6 Monitoring systems?
7 A. Not in an operational sense, but I
8 certainly had education and was familiar with
9 Suspicious Order Monitoring.
10 Q. When did that education start?
11 A. Probably shortly after I joined the
12 organization and took controlled substance
13 responsibilities.
14 Q. So as you think about the suspicious
15 order of management system at Watson at this
16 time, what -- and "this time" being mid-2009
17 when this email was written, what part of it, if
18 any, was your responsibility?
19 A. When I came on into this role?
20 Q. Yes.
21 A. I would have oversight to ensure that
22 it was compliant with DEA regulations.
23 Q. And I want to talk for a little bit
24 about the physical or mechanical processes

1    involved in the Suspicious Order Monitoring
2    System, as you understand them.
3        A.    Sure.
4        Q.    So my understanding is that the
5    Suspicious Order Monitoring System creates a, a
6    limit on the size of an order based on various
7    variables that will alert people at a company
8    that an order is of interest or pending; is that
9    right?
10       MR. KNAPP:  Objection to form.
11       MR. LUXTON:  Objection to form.
12   BY MR. EGLER:
13       Q.    Is your understanding similar to
14   that?
15       A.    My understanding, that there is a
16   system that was developed within our, our ERP,
17   our enterprise resource and system SAP that
18   would, based on a model that was designed, that
19   would look at a six-month role in history, would
20   develop an average -- it would rationalize
21   ordering behavior.  It would also look at
22   different characteristics as markers, whether it
23   was a particular class of trade of an
24   organization or -- and a monthly average as

1    well, too, for those types of class trades.  So
2    various different parameters that would provide
3    an average of ordering history, so not a static
4    number.  So it would be changing based on, on
5    the ordering patterns, as well as their was a
6    multiplier as well, too, that would provide a
7    plus or minus tolerance, so to speak.
8        Q.    So, again, thinking of the mechanical
9    part or the process part of the Suspicious Order
10   Monitoring System, you used the terms ERP and
11   SAP system.
12       A.    Um-hmm.
13       Q.    How would the parameters for the
14   Watson Suspicious Order Monitoring System be
15   included in the ERP system?
16       Do you have an understanding?
17       And what I'm trying to ask is, as you
18   think of the SAP systems that manages
19   inventories and orders and everything --
20       A.    Um-hmm.
21       Q.    -- do you know who was responsible
22   for putting the Suspicious Order Monitoring
23   System in the process of the ERP?
24       A.    The -- who built the process?

1        Q.    Yes.
2        A.    Who built the process, I think it was
3    before my time, but it was a collaboration
4    between order management, our SAP, IT folks, as
5    well as controlled substance compliance would
6    have been a project team member.
7        Q.    So with regard to the IT people for
8    the SAP system, can you think of any particular
9    individuals that you would think would be
10   primarily responsible for that?
11       A.    I can't recall back that far.
12       Q.    All right.  And then when the system
13   was in place in the -- let me start over.
14       When the Suspicious Order Monitoring
15   System was in place in Watson's SAP system and
16   an order pended, what would happen next?
17       A.    If an order pended, it would be
18   reviewed by a member of the order management
19   team specifically dedicated to controlled
20   substance ordering.
21       Q.    Now that order management team that
22   you mentioned, did they report to you?
23       A.    No, they reported to Mary.
24       Q.    And do you know about how many people

1    were on the order management team when you
2    started in 2008?
3        A.    No.
4        Q.    As you think of it, was it more than
5    a dozen?
6        A.    No.
7        Q.    Was it more than six?
8        A.    Probably less than six.
9        Q.    And then do you have an understanding
10   of whether the, the number of people on the
11   order management team at Watson increased while
12   you were there and the company changed its name
13   to Actavis?
14       A.    I can't be certain, but I believe
15   that there were additional folks that came on
16   board.
17       Q.    Do you remember the names of any
18   people who were on the order management team?
19       A.    Sandy Simmons was the manager.
20   Victoria Lepore was in order management.
21   Bettina Dwor, I think was and individual --
22   Bettina, I think it's D-w--o-r.  I think she
23   came on later.  I know there was another
24   individual or two, but I just can't recall the

1    names.
2        Q.   So the people that you're thinking
3    of, were they all located in New Jersey?
4        A.   Yes, sir.
5        Q.   All right.  And do you have an
6    understanding of, before you started, whether
7    the entire order management team was it located
8    in New Jersey or were they in New Jersey and
9    other places?
10       A.   You know, now when I think back on
11   it, I believe Mary, as well as there was an
12   individual, Judy Callahan, who worked for Mary
13   as well too, they both came over from the
14   Corona, California, facility.  So that call
15   center may have been in Corona, and it
16   eventually transitioned to New Jersey.
17       Q.   With regard to the -- let me start
18   over.
19            With regard to Mary Woods, what was
20   her role with regard to the order of the
21   management team?
22       A.   Mary had responsibility for customer
23   -- customer service capacity, but also on the
24   order management side, she would have been

1    responsible for ensuring the onboarding, the
2    compliant onboarding of, of customers, you know,
3    ensuring, you know, and, you know, the order
4    management process for -- on the commercial
5    side.
6        Q.   You used the term "onboarding."
7            What does that mean in the context of
8    your work?
9        A.   Doing due diligence, vetting.
10       Q.   So is that when Watson first took on
11   a new customer or something else?
12       A.   Yes.
13       Q.   All right.  And then -- can you think
14   of any other responsibilities that Ms. Woods
15   had?
16       A.   No, I -- I can't speak to what her
17   specific job functions are.
18       Q.   All right.  So you can set this aside
19   for now.
20            MR. EGLER:  You guys want to take a
21   break?
22            MR. LUXTON:  Yeah, it's probably a
23   good time.
24            THE VIDEOGRAPHER:  The time is

1        approximately 10:23 a.m.  We are going off
2    the record.
3        (Recess is taken.)
4            THE VIDEOGRAPHER:  The time is
5    approximately 10:47 a.m., and we are back
6    on the record.
7    BY MR. EGLER:
8        Q.   Mr. Napoli, thanks for coming back.
9        A.   Sure.
10       Q.   Can you pick up this, what we've
11   marked as Exhibit 4, and turn to essentially the
12   third to last page.  It's ALLERGAN_MDL_02467152.
13   In the top left-hand corner, it states
14   "Responsibility"?
15       A.   Yes.
16       Q.   So as you look at this page, are
17   these the processes contained in the standard
18   operating procedure that we've been talking
19   about before the break?
20       A.   Yes.
21       Q.   So in the upper left-hand corner
22   under "Responsibility," it states, "Master data
23   administrator."
24            Do you see that there?

1        A.   Um-hmm.
2        Q.   Is the master data administrator, as
3    you think about it, about the same thing as the
4    order management team we are talking about?
5        A.   Yes.
6        Q.   So as you go through the columns
7    there, it says, "Action," and it has 1.3, 1.4
8    and so on.  And it talks about various actions
9    that are taken.
10           And, again, with the understanding
11   that this email, it's Exhibit 4, is a decade
12   old, I'd like to ask you about a couple of the
13   actions that are listed there.
14       A.   Sure.
15       Q.   If you look at -- let's just go
16   through the first one.
17           1.3 states:  "If a processed order
18   generates a SOMS excessive order flag in SAP,"
19   and then there's words in parentheses, "due to
20   more frequent or larger than normal order
21   pattern, master data administrator will generate
22   a suspicious order controlled drug SOMS."
23           Do you see that there?
24       A.   Um-hmm.

1    Q.   And then it states, "The master data
2  administrator will review the SOMS report and
3  then, if warranted, contact the customer to
4  confirm the quantity ordered, verify the reason
5  for a larger or more frequent order."
6        The next one is: "Once this SOMS
7  report is confirmed" --
8        MR. LUXTON:  Can someone put the
9  phone on mute?  We're getting background
10   noise.
11 BY MR. EGLER:
12    Q.   "Once the SOMS report is confirmed
13 and verified by the customer, the SOMS report is
14 signed and marked with a reason code by the
15 master data administrator and submitted to the
16 manager for review and signature."
17        In the context of this document, do
18 you have an understanding of who the manager
19 would be?
20    A.   It could have been, depending on the
21 time, it could have been Julie Callahan.  It
22 could have been Sandy Simmons.
23    Q.   Okay.  So with regard to Ms. Callahan
24 and Ms. Simmons, were they all, as you think of

1  it, in the customer service organization that
2  we've been talking about?
3    A.   Yeah, but on the order management
4  side, yes.
5    Q.   Okay.  And as I'm thinking about it,
6  as, as opposed to, or just to be sure, they
7  weren't in the DEA affairs group at that time?
8    A.   Right.  They were a customer-facing
9  group.
10    Q.   Okay.  So the next one there, the
11 data -- "The master data administrator will be
12 responsible to ensure that pending sales orders
13 on hold due to suspicious order SOMS violation
14 are investigated."
15        And then 1.7 is: "The matter data
16 administrator will release pending orders due to
17 SOMS violations by canceling the order or
18 reducing the quantity per SOMS procedure."
19        And then the next one is: "If the
20 SOMS violation cannot be resolved by cancelling
21 the order or reducing the quantity, the master
22 data administrator will escalate the suspicious
23 order to the next level."
24        And then it goes to the term, "call

1  center management."
2        Do you see that there?
3    A.   Yes.
4    Q.   And it says, 1.9, under Call Center
5  Management, "Determine if the order does or does
6  not classify as suspicious."
7        And so, again, as you think about
8  this time, June 2009, was the call center
9  management group at Watson under the DEA affairs
10 department or some other department?
11    A.   No, they were within the customer
12 service group.
13    Q.   All right.  And then on 1.10, it
14 states: "If a valid reason, based on objective
15 criteria does not exist, order will be deemed as
16 a suspicious order and will not be filled.
17 Report suspicious issue to controlled substance
18 compliance department."
19        Now that controlled substance
20 compliance department, is that your group?
21    A.   Yeah.  That was the group I was
22 transitioning to at the time.
23    Q.   Okay.  And then the next one there,
24 it states, on the left-hand side, "Controlled

1  substance compliance department."  And 1.11 has
2  words that are struck out and then words that
3  are underlined that are supposed to be replacing
4  the words that are struck out.
5        The words that are struck out are:
6  "The controlled substance compliance department
7  will be responsible for reporting the order to
8  the Drug Enforcement Administration."
9    A.   Um-hmm.
10    Q.   And then the new words are: "Upon
11 confirmation that the order is suspicious, the
12 controlled substance compliance department will
13 be report" -- "will be responsible for reporting
14 the order to the Drug Enforcement Administration
15 and the applicable state Board of Pharmacy.  The
16 Department of Regulatory Affairs will also
17 report the incident to FDA within three business
18 days."
19        Do you see that there?
20    A.   Yes, sir.
21    Q.   Do you remember this proposed
22 change -- going back again, understanding it's
23 ten years ago, do you remember that proposed
24 change being proposed?

1     A.  No.

2     Q.  All right.  And then do you remember

3 whether that process that's underlined there was

4 ever -- ever adopted?

5     A.  It was.

6     Q.  All right.  Then the last one goes

7 back to the master data administrator.  It's

8 1.12.  "File a copy of the SOMS report along

9 with the customer purchase order and the

10 suspicious order record file."

11      So with regard to these procedures

12 that are listed there, as you think about them

13 and as I read them, did some or many of the them

14 change while you were at Watson and then

15 Actavis?

16     A.  Yes.

17     Q.  So especially with regard to looking

18 at the classification of determining if the

19 order does or does not classify as suspicious,

20 in this procedure, it's listed as being under

21 the call center management's organization.

22      Did that change at some point?

23     A.  Yes, because the decision to

24 determine if an order was suspicious was

1 eventually handled by my DEA affairs group.

2     Q.  And as you think about that change,

3 and the decision being moved to the DEA affairs

4 group, do you remember why that change was made?

5     A.  I think we were the appropriate

6 organization, being a compliance organization,

7 to make that determination.

8     Q.  Right.

9      Do you know when that change was

10 made?

11     A.  I do not.

12     Q.  Do you remember ever having a

13 discussion about making that change?

14     A.  I do not.

15     Q.  And as you think about the

16 organization that this responsibility was

17 shifted to, the 1.9 listed there, who in your

18 organization would have been primarily

19 responsible for determining if an order does or

20 does not classify as suspicious once that

21 responsibility was transferred to them?

22     A.  There would be an investigation

23 process that would be conducted by an auditor or

24 investigator on my staff, and we would meet and

1 review the facts of the issue, and I would

2 ultimately make the determination.

3     Q.  So the auditor/investigator that you

4 mentioned, how many -- during your time at

5 Watson, how many auditor/investigators did you

6 have?

7     A.  Two primary.  And we also had an

8 individual who was part of our global security

9 team who was a trained investigator who served

10 as a backup.

11     Q.  Who were the two primary auditor

12 investigators?

13     A.  We first had Lisa Scott and then Will

14 Simmons.  Our security auditor was Jeff Collins.

15     Q.  So with regard to Ms. Scott and

16 Simmons, were they ever in their respective

17 positions as auditor investigators at the same

18 time?

19     A.  No.

20     Q.  So with regard to the

21 auditor/investigator role, as you think of it

22 while you were at Watson and then at Actavis,

23 there was one primary auditor/investigator at

24 any given time?

1     A.  Yes, sir.

2     Q.  All right.  And with regard -- as you

3 think about it with regard to the processes that

4 the auditor/investigator would undertake, once

5 they were given an order to make the

6 determination of, what would they do?

7     A.  If there was an order that pended in

8 the system of an order of interest that couldn't

9 be resolved at the level by order management,

10 our auditor/investigator would reach out to the

11 customer, to the compliance person.

12      In some cases on the order management

13 side, they're -- they might be talking to

14 someone on the other side who is placing the

15 order who is not necessarily a compliance

16 person.  So our person, our auditor, would pick

17 up the phone.  And we had strong relationships

18 with all our customers.  We knew who the

19 compliance people were.  We would reach out to

20 the compliance person for that customer and have

21 a conversation with them, explain that their

22 order had pended, and try to ascertain or obtain

23 justification.

24      Was there a new customer that came on

1  board, has there been an issue within the
2  market, an inventory build for a launch or
3  something, and try to ascertain what the
4  business rationale was for the increase in the
5  order.
6      Q.   So with regard to the justifications
7  that you're thinking of, when an issue was
8  raised to the auditor/investigator level, if
9  they reached out to the customer at any level,
10  would they be required to have some type of
11  documentary evidence or other evidence to
12  demonstrate the facts that the customer was
13  giving them?
14      MR. KNAPP:  Objection to form.
15      A.   I don't know if in all cases, but
16  there -- you know, where we could obtain
17  documented information, we -- we could.
18      Q.   All right.  You can set this document
19  aside.
20      (Witness complies.)
21  BY MR. EGLER:
22      Q.   And before we get to the next
23  document, I wanted to ask you, before today, did
24  you do any preparation for the deposition?

1      A.   I met with the gentleman seated next
2  to me, just to really go through what is
3  entailed in a deposition, kind of the process.
4      Q.   Have you ever given a deposition
5  before?
6      A.   Civilly.  It would be many years ago.
7      Q.   About when was it?
8      A.   1990s.  It was a personal injury
9  thing.
10      Q.   Have you ever given testimony under
11  oath in a court of law?
12      A.   No, sir.
13      Q.   All right.  Did you talk with anyone
14  other than your counsel about the deposition
15  today?
16      A.   My wife.
17      Q.   All right.  Anyone else?
18      A.   No.
19      Q.   Okay.  So I'm going to hand you what
20  we'll mark as Exhibit 5.
21      A.   Can I correct -- I did have a
22  conversation with Mary Woods.
23      MR. LUXTON:  You should correct that,
24      yeah.

1      A.   I think that needs to be corrected.
2      Q.   Sure.
3      A.   Last week I had a half-hour call with
4  counsel and Mary Woods regarding deposition.
5      Q.   What did she tell you?
6      A.   She was just looking for some
7  clarification, procedural clarifications from
8  when we administered the SOMS program.  Nothing
9  about the deposition.
10      Q.   Is it fair to say she asked you
11  questions in preparation for her deposition?
12      A.   Correct.
13      Q.   All right.  Great.  Thank you.
14      A.   You're welcome.
15      Q.   And I'll hand you what we'll mark as
16  Exhibit 5.
17      A.   Sure.
18      Q.   Mr. Napoli, can you look generally at
19  Exhibit 5.  As you're looking at it, I'll read
20  into the record.  It's Bates-stamped
21  ALLERGAN_MDL_03738524 through 8528.
22      (Napoli Exhibit 5, Document entitled
23  "Customer Communication for SOMS,"
24  ALLERGAN_MDL_03738524 through 8528, marked

1  for identification, as of this date.)
2      A.   Yes.
3      Q.   When you're ready, I ask you, while
4  you were at Actavis and Watson, did you ever use
5  the, use Microsoft note taking program?
6      A.   Not that I recall.
7      Q.   We had a conversation last week with
8  Ms. Woods about Microsoft OneNote, and this
9  appears to be a document that's formatted as a
10  OneNote document.
11      But that said, as you look at this
12  document, it's dated -- the first entry at the
13  top of the document is dated Wednesday,
14  June 23rd, 2010.
15      A.   Um-hmm.
16      Q.   And it states, "Customer
17  communications for SOMS."
18      As you read through this, it has the
19  word or the name "Laura Pinti"?
20      A.   Um-hmm.
21      Q.   Who is Laura Pinti?
22      A.   Laura Pinti also worked in Mary
23  Woods's group.
24      Q.   Do you remember what her position was

1  around this time, mid-2010?
2     A.  I don't.
3     Q.  And Ms. Pinti writes, "Effective
4  today, please implement the following format for
5  all SOMS orders that require additional
6  information from the customer."
7        Then it has, "Dear Customer," and
8  then it says, "Merge Tom's email into this
9  paragraph. Thank you for your recent controlled
10  substance order. The order is currently under
11  review. In effort to complete the review
12  process, please take a moment to complete the
13  following questions below that will assist us in
14  completing the necessary review process. Your
15  immediate response is required to expedited the
16  order review procedure."
17        And then it states, "In accordance
18  with CFR and then an ellipsis, and then it says,
19  in parentheses, "Tom's paragraph."
20        Do you think the "Tom" they're
21  referring to there is you?
22     A.  Yes.
23     Q.  All right. So do you remember having
24  a discussion around this time of what type of

1  language be sent to customers when a SOMS order
2  pended?
3     A.  Sure.
4        In addition to the header that is
5  indicated in the "Dear Customer" highlighted
6  paragraph, the Tom's paragraph is essentially a
7  verbatim quote from CFR 1301.74 which details a
8  registrant's obligation to report orders of
9  suspicious, order of pattern of frequency and
10  size, and just detailing the regulations for the
11  customers to why we're doing it. And it's a
12  regulatory requirement. It needs to be complied
13  with.
14     Q.  All right. So then there are various
15  entries underneath that paragraph and it says,
16  "Reason for Increase." And then there are
17  numbered explanations there. Two under "New
18  Contract" and two under "Promotion" and two
19  under "New Customer" and two for "Adding Product
20  to Product Line."
21        Do you know who would have come up
22  with that data there?
23     A.  Likely Mary and her team.
24     Q.  All right. And then going down

1  further in this page, it's highlighted there, it
2  states, "Tie the 852 data to Suspicious Order
3  Monitoring."
4        In the context of your work at Watson
5  and Actavis, do you have an understanding of
6  what that would mean?
7     A.  852 data in the parlance of SAP or
8  it's called EDI, electronic data interchange, so
9  it's a standard language or a protocol for a
10  supply chain. I don't know if it's exclusive
11  to, to the pharma industry. But essentially I
12  believe 852 data tells you what a specific
13  customer has on hand in their warehouse.
14     Q.  As you think of the 852 data, would
15  that be information about the -- Watson's direct
16  customers or would it be information about the
17  distributor's customers or something else?
18     A.  Direct customers. We would only have
19  access to that.
20     Q.  And then go on to the next page of
21  this document. It has the word "Tom's verbiage"
22  there.
23        Do you see that?
24     A.  Um-hmm.

1     Q.  Do you remember writing that
2  paragraph that appears there starting with, "In
3  accordance with 21 CFR 1301.74"?
4     A.  Yes.
5     Q.  So this is June 2010, right?
6     A.  Um-hmm.
7     Q.  And at this time, you had been in
8  your position with the DEA affairs group for
9  about a year, is that fair to say?
10     A.  Just about, yes.
11     Q.  Before you started your position with
12  the DEA affairs, what training, if any, did you
13  have with regard to the Suspicious Order
14  Monitoring processes?
15     A.  Consistent attendance with the
16  Cegedim/Buzzeo group, their education. And they
17  spent a lot of time on Suspicious Order
18  Monitoring. It was very important to them.
19  Obviously as a consultant. But they provided
20  excellent training.
21        Also the DEA on almost an -- at one
22  time, was almost on an annual or biannual basis,
23  the DEA would host conferences for the various
24  registrant populations, whether it be

1    manufacturers, distributors, importers,
2    exporters. And I attended consistently those
3    conferences as well too dealing directly with
4    the DEA in understanding the regulations and the
5    expectations of the Drug Enforcement
6    Administration.
7        Q.    Can you think of any other training
8    you had?
9        A.    There may have been some other
10   private industry training, but also, you know,
11   certainly a large component of any job is
12   on-the-job training as well too. So when my
13   predecessor was transitioning out, as well as
14   folks I had on staff, I would learn from them as
15   well, too.
16       Q.    Then after you took the job as the
17   head of DEA affairs, did you have any further
18   training on Suspicious Order Monitoring systems?
19       A.    Just the continued education through
20   Buzzeo, DEA, and practical experience as I got
21   into the role.
22       Q.    With regard to the NJPIG group that
23   we had been discussing, at their meetings, did
24   they discuss Suspicious Order Monitoring

1    systems?
2        A.    I don't recall any conversations
3    in-depth regarding systems or practices in place
4    at -- for individual pharmaceutical
5    manufacturers.
6        Q.    All right. Do you remember whether
7    that, the Suspicious Order Monitoring System was
8    ever discussed as a topic at any NJPIG meeting?
9        A.    It could have been a topic of --
10   Suspicious Order Monitoring, as a topic, could
11   have been discussed at the meeting.
12       Q.    Okay. All right. Turning further
13   into this document, on the next page, it's
14   38526?
15       A.    Yes.
16       Q.    And it states, "SOMS Agreement," and
17   it appears to be an email that you were cc'd on.
18       Do you see that there?
19       A.    Yes.
20       Q.    So I think we had talked about it
21   before, but who is Lisa Scott?
22       A.    She was a compliance
23   auditor/investigator for our security and DEA
24   affairs team.

1        Q.    And then she writes an email to
2    Victoria Lepore, L-e-p-o-r-e, and Larry E.
3    Schaffer?
4        A.    Schaffer.
5        Q.    And she cc's Mary Woods, Laura Pinti,
6    you, Lynn DaCunha, and Ione Graziosi -- can
7    you --
8        A.    Graziosi.
9        Q.    That's G-r-a-z-i-o-s-i.
10       A.    Correct.
11       Q.    And she states, Ms. Scotts states,
12   "FYI, as discussed during our 10:00 [sic] a m.
13   EST meeting today, we have come to the following
14   agreement. Any order placed on June 21st, 22nd,
15   or 23rd by ABC, Cardinal, McKesson or HD Smith
16   that is held by the system pending on SOMS
17   review will not require customer contact for
18   order justification and DEA affairs reviews.
19   These orders may be released. This agreement
20   applies specifically to these customers and
21   order dates only."
22       Do you remember this email from
23   Ms. Scott?
24       A.    I don't.

1        Q.    Do you remember --
2        A.    It was a long time ago.
3        Q.    All right. And do you remember this
4    event that of June of 2010, for three days in
5    June 2010, orders from four distributors would
6    be not asked for justifications if they pended
7    in the SOMS system?
8        A.    I don't recall the specific event.
9    But looking at the dates, it's just prior to 4th
10   of July holiday. These are large customers.
11   Likely not doing business over that period, so
12   they may have been -- had a meeting with us as
13   our customers to talk about we're going to be
14   ordering quantities that are not consistent with
15   our ordering patterns because we're building an
16   inventory because we're going to be shut down,
17   so they would be missing a normal ordering
18   pattern. So I would -- it would be speculation,
19   but that there was a conversation that took
20   place where they discussed what those quantities
21   would be and rationalizing them and
22   understanding that next order cycle, there
23   wouldn't be an order because it would -- it
24   would flatten out.

1    So just discussing -- discussing the
2    rationale prior to a holiday, it's not uncommon
3    at the end of year or midyear.
4        Q.   Do you remember whether this type
5    of -- this type of process was used every year
6    around the 4th of July holiday as you mentioned?
7        A.   There, there typically were
8    conversations with customers regarding when
9    there was going to be a period of shutdown or an
10   interruption to the normal order -- ordering
11   pattern.
12       Q.   So I think you mentioned the 4th of
13   July and then the winter holidays.
14       Is there any other time of year that
15   you can think of that this would occur?
16       A.   Not necessarily, unless a product was
17   seasonal.  You know, you had some products that
18   were, you know, during a particular cold and flu
19   season or if -- children are going back to
20   school, for certain products, there would be a
21   seasonality, so increases might be out of the
22   ordinary.
23       Q.   And that leads me to the next
24   question.

1    With regard to the SOMS system at
2    Watson and then at Actavis, the SOMS system
3    applied to every controlled substance drug; is
4    that right?
5        A.   Yes, sir.
6        Q.   And that would be Schedule II through
7    V; is that right?
8        A.   Correct.
9        Q.   And as you think of it, were -- was
10   there any time at Watson or Actavis where one
11   schedule of drug was treated differently from
12   the other schedules of drugs by the Suspicious
13   Order Monitoring System?
14       A.   Within the Suspicious Order
15   Monitoring System, it was all -- you know, a
16   controlled drug was a controlled drug.
17       Q.   So, for example, Schedule II drugs
18   wouldn't be treated any differently from
19   Schedule III, IV or V drugs?
20       A.   Right.
21       Q.   Do you remember whether particular
22   opioids were ever treated differently from all
23   the other scheduled drugs?
24       MR. KNAPP:  Objection to form.

1        A.   No.
2        Q.   So just so we're clear, you don't
3    think they ever were, or you don't remember
4    either way?
5        MR. KNAPP:  Same objection.
6        A.   I don't recall.
7        Q.   All right.  You can set this document
8    aside.
9        (Witness complies.)
10       (Napoli Exhibit 6, Email dated 2/2/10
11   from L. Scott to T. Napoli with attachment,
12   ALLERGAN_MDL_01236063 through 6094, marked
13   for identification, as of this date.)
14   BY MR. EGLER:
15       Q.   I'm going to hand you what we will
16   mark as Exhibit 6.
17       Mr. Napoli, can you look at what
18   we'll mark Exhibit 6?  While you're looking at
19   it, I'll read into the record.  It's
20   ALLERGAN_MDL_01236063 through 6094.
21       When you're ready, can you tell me
22   whether you remember ever seeing the document
23   that appears on the second page of this exhibit
24   through the end?

1        (Document review.)
2        A.   I definitely recognize the document.
3        Q.   So starting with the first page of
4    this exhibit, page 063, is that an email from
5    Lisa Scott to you?
6        A.   Yes.
7        Q.   And she sends it on Tuesday, February
8    2nd, 2010, at 11:47 a.m., which says -- the
9    subject is "Presentation," and it says, "Tom,
10   see attached, Scotty."
11       A.   Yes.
12       Q.   Do you remember whether Ms. Scott
13   sent you this particular presentation around
14   that time, early February, 2010?
15       A.   I don't have a specific recollection
16   of it.
17       Q.   So on the next page, page 064 begins
18   the attachment to the email, which appears to be
19   a PowerPoint presentation, and states, "DEA
20   affairs organizational overview," and it says
21   "Thomas Napoli, CCP, U.S. generics, February
22   2nd, 2010."
23       Do you see that there?
24       A.   Yes.

1    Q.   So did you make this presentation to
2  somebody or a group of people in Florida in
3  early February of 2010?
4    A.   It's possible.
5    Q.   Do you remember making this
6  presentation to a group of people in early 2010?
7    A.   I don't.
8    Q.   Okay.  So next to your name there, it
9  says "CPP."
10       What does that stand for?
11    A.   That is a board certification in
12  security management from the American Society of
13  Industrial Security, so the highest designation
14  you can get in security management.
15    Q.   So that designation from the American
16  Society of Industrial Security, what was the
17  subject matter of the certification that you
18  received from them?
19    A.   The subject matter were all aspects
20  of physical security.
21    Q.   Was the certification specifically
22  related to pharmaceutical drugs?
23    A.   No.
24    Q.   As part of the certification, was

1  there any training on Suspicious Order
2  Monitoring systems?
3    A.   No.
4    Q.   When did you receive the
5  certification from the American Society of
6  Industrial Security?
7    A.   Mid-2000s.
8    Q.   So then below there it states, "U.S.
9  generics."
10       As you think about that term, what
11  does that mean in the context of this
12  presentation?
13    A.   That indicates the division that I
14  worked for.
15    Q.   All right.  As you think of Watson
16  around this time, early 2010, you identified the
17  U.S. generics division.
18       What were the other divisions that
19  you can think of?
20    A.   There would be generics and, I guess
21  brand or commercial.
22    Q.   Okay.  Do you know whether any of the
23  brand or commercial drugs that Watson made at
24  this time were controlled substances?

1    A.   There were but very few.
2    Q.   Do you know whether those controlled
3  substances from the brand division would have
4  been governed by the same Suspicious Order
5  Monitoring System that applied to the generics
6  drugs?
7    A.   Of course.
8    Q.   And as you think of it, was it the
9  same system or two similar systems?
10    A.   Same exact system.
11    Q.   All right.  And would they all -- let
12  me start over.
13       Would all the orders for the
14  controlled substances, as you think of them, be
15  passed through that SAP system that we were
16  talking about earlier today?
17    A.   Correct.
18    Q.   So the next page on this exhibit, 65
19  states, "Objective" and "Provide an overview of
20  the DEA affairs team" --
21    A.   Um-hmm.
22    Q.   -- "who we are, what we do, origins
23  and path forward, achievements to date,
24  compliance landscape opportunities and 2010

1  goals and objectives."
2       Reading that, do you -- does this
3  help you remember who you might have presented
4  this to in early 2010?
5    A.   No.  This was probably presented to a
6  lot of folks.
7    Q.   When you say "a lot of folks," is
8  that a lot of folks at once or you made this
9  presentation to different groups at different
10  times?
11    A.   Different groups, different times.
12    Q.   All right.  As you think of it, in
13  2010, can you remember about how many times you
14  would have made this presentation?
15    A.   No.
16    Q.   So turning two pages in on 067, your
17  name appears there.  And at the upper left-hand
18  corner it states, "DEA Affairs Organization
19  current state"?
20    A.   Um-hmm.
21    Q.   And so you were the manager of
22  security in DEA affairs; is that right?
23    A.   Correct.
24    Q.   And then as you look at the rest of

1  the organizational chart that appears there, the
2  various people and groups, which, if any, would
3  have a responsibility for portions of the
4  Suspicious Order Monitoring System around this
5  time, early 2010?
6     A.  It would have been Ione and Lisa.
7     Q.  And Ione is listed there, Ione
8  Graziosi?
9     A.  Um-hmm.
10    Q.  And she's a manager DEA affairs?
11    A.  Yup.
12    Q.  And then Lisa Scott is CS auditor?
13    A.  Yes.
14    Q.  And under Ms. Scott's name, it says,
15  "Audit program, investigations, agency request,
16  policy development and inspection support."
17    A.  Um-hmm.
18    Q.  As you think of those various terms,
19  which of those relate to the Suspicious Order
20  Monitoring System?
21    A.  The auditing investigations.
22    Q.  And then under Ms. Graziosi, it says
23  "quota, site liaison," and then "reporting."
24  And then underneath there, it says, "SLC and

1  Gurnee," and then "import control, R&D/new
2  product support."
3    A.  Right.
4    Q.  Of those, which relate to the
5  Suspicious Order Monitoring System?
6    A.  Actually none of them, so it looks
7  like there was a typo and it was left off.
8    Q.  Okay.  And the term "SLC" for
9  reporting, is that Salt Lake City?
10    A.  Correct.
11    Q.  What was in Salt Lake City for Watson
12  around this time, early 2010?
13    A.  They had a broad portfolio of
14  products, controlled and not controlled.  From a
15  controlled substance standpoint, it would have
16  been the fentanyl patch.
17    Q.  And how about Gurnee?
18    A.  Gurnee was a distribution center.
19    Q.  And that is in Illinois; is that
20  right?
21    A.  Yes.  Chicago area.
22    Q.  Turning to the next page, which would
23  be 068, it says "DEA affairs organization, 2010"
24  and your name again appears there.

1    A.  Um-hmm.
2    Q.  As you look at this organizational
3  chart, do any of the people have any
4  responsibility for the Suspicious Order
5  Monitoring System?
6    A.  Again, it would have been Lisa and
7  the proposed lead, because Ione, not being part
8  of the team at the time.
9    Q.  All right.  So going further into
10  this document, if you'll turn to page 072.  So
11  072 and 073 face each other and it states at the
12  top of 072 "Origins."
13    Do you see that there?
14    A.  Yes, I do.
15    Q.  It says, "Senior management decision
16  was made to integrate the former C/S compliance
17  department into the security department in April
18  of 2009."
19    That date, April of 2009, is that
20  when you became involved in the DEA affairs
21  group?
22    A.  I don't know if it was the exact
23  time, but it would have been around then or
24  thereafter.

1    Q.  And you write, "Department renamed
2  security and DEA affairs and that created
3  synergy where silos previously existed."
4    That second term --
5    A.  Sure.
6    Q.  -- "created synergies where silos
7  previously existed," what does that mean?
8    A.  When I articulated earlier that there
9  was a decision made to merge the compliance
10  group with global security is because if you
11  look at the DEA regulations and the code of --
12  and the CFR, there is a very strong security
13  component to it.  So it made sense because of
14  those synergies that the large security
15  component to the CFR to merge the two
16  organizations because previously reporting
17  through separate organizations, there -- it
18  could inhibit effective communication.
19    Q.  So if you go further into this
20  document, going to, sorry, page 085, and it
21  states:  "Achievements to date, continued.  "
22    A.  Yup.
23    Q.  If you need to, you can look at
24  whatever part you need to, but I'm just going to

1  ask you about the one that appears under ARCOS.
2      Do you see that there?
3      A.   Um-hmm.
4      Q.   What is ARCOS?
5      A.   ARCOS is the Automated Records and
6  Consolidation Ordering System, I think.
7      Q.   Okay.  Was your group at Watson
8  around this time, 2010, responsible for the
9  reporting of any ARCOS data?
10     A.   We supported -- yes, the, the ARCOS
11 reporting for sites as well as for our
12 distribution center.
13     Q.   All right.  When you say the "sites,"
14 is that the manufacturing sites?
15     A.   Correct.
16     Q.   All right.  So -- and then there's
17 two bullet points there, "data integrity" and
18 "Florida program implemented."
19         Do you have a memory as to what the
20 data integrity achievement was?
21     A.   Sure.
22         Data integrity I think was probably
23 a -- more accuracy in the reporting, because
24 sometimes the -- at that time, it was a manual,

1  very manually intensive process, so I think
2  there were probably some fat finger mistakes.
3  So I think we probably reduced the amount of
4  mistakes because you get errors reports from the
5  DEA.  So it's probably an enhancement in the
6  process.
7      Q.   All right.  And then you state,
8  "Florida program implemented."
9          Do you remember what that meant?
10     A.   Sure.
11         The Florida program was that there
12 were -- Florida and subsequently other states
13 sought to receive ARCOS reporting for products
14 distributed into their states so they'd have a
15 view of products being distributed by a
16 particular manufacturer into their state.
17     Q.   All right.  So is it fair to say,
18 then, that the State of Florida would receive
19 the same data that Watson sent to the DEA?
20     A.   Yes.
21     Q.   All right.  So going to the next
22 page, it states "Compliance Landscape"?
23     A.   Um-hmm.
24     Q.   This is page 086 of Exhibit 6.

1          "In 2008, 6.2 Americans used
2  prescription-type psychotherapeutic drugs for
3  non-medical purposes in a one-month period.
4  2.5 --
5          (Interruption.)
6  BY MR. EGLER:
7      Q.   "In 2008, 6.2 million Americans used
8  prescription-type psychotherapeutic drugs for
9  non-medical purposes in a one-month period, 2.5
10 percent population."
11         And then in bullet points you say,
12 "More than cocaine, heroin, hallucinogens" --
13 "hallucinogens and inhalants combined."
14         And then in the next one, it says
15 "Non-medical use of prescription pain relievers
16 tied with marijuana as having the highest rate
17 of new abusers, 2.2 million."
18         Do you remember why you would have
19 written that here?
20     A.   Yeah, communicating the compliance
21 landscape to our audience to -- and to stress
22 the importance of, you know, our compliance
23 efforts as well, too.
24     Q.   Do you remember ever having a

1  discussion about the non-medical use of
2  prescription pain relievers tied with marijuana
3  as having the highest rate of new abusers around
4  this time?
5      A.   No.  I mean, this would have been
6  information directly taken from DEA.
7      Q.   The next section there states, "Drugs
8  most frequently implicated in non-medical use,"
9  and then in parentheses "2004 through 2006."
10         And can you pronounce the next word
11 that appears next to the bullet?
12     A.   Benzodiazepines.
13     Q.   Okay.
14         MR. KNAPP:  Nice job.
15         THE WITNESS:  Thank you.
16 BY MR. EGLER:
17     Q.   So that's hydrocodone, and can you
18 pronounce that word?
19     A.   Alprazolam.
20     Q.   All right.
21     A.   Actually, hydrocodone doesn't belong
22 in there.  That's, that's not a benzodiazepine.
23     Q.   Hydrocodone is an opioid; is that
24 right?

1    A.    Correct.

2    Q.    And it says "36 percent increase."

3    A.    Um-hmm.

4    Q.    And then it states,

5  "Hydrocodone/combinations, 44 percent increase"?

6    A.    Um-hmm.

7    Q.    And then, "Oxycodone/combinations,

8  primarily OxyContin, 56 percent increase"?

9    A.    Um-hmm.

10    Q.    Do you remember why you would have

11  written that down?

12    A.    I certainly wanted to give

13  perspective to the audience of the issues that

14  were going on today in the, you know, in the

15  landscape.

16    Q.    Do you remember around this time

17  whether Watson made generic OxyContin?

18    A.    We did not.

19    Q.    Do you remember around this time

20  whether Watson made generic hydrocodone?

21    A.    We did.

22    Q.    Do you remember whether there were

23  any particular endeavors around this time,

24  February 2010, to address the non-medical use of

1  hydrocodone by Watson?

2         MR. LUXTON:  Object to the form.

3         MR. EGLER:  Well, let me start over.

4  That was a bad question because Watson

5  probably didn't use it as a non-medical

6  way.

7    A.    No.

8    Q.    So do you remember whether there was

9  any initiatives or endeavors to address the high

10  rate of non-medical use of Americans of

11  hydrocodone at Watson around this time frame?

12    A.    Our efforts certainly at that time

13  and throughout my tenure were focused on

14  ensuring that, as a DEA registrant, that we had

15  effective controls in place throughout our

16  entire controlled substance lifecycle to reduce

17  the opportunity for theft or diversion.

18    Q.    Okay.  So going further into this

19  document, can you look two pages in at 089?

20    A.    Sure.

21    Q.    You state, "Our products are among

22  the most commonly-prescribed for legitimate

23  medical use in the U.S."

24         Do you see that there?

1    A.    Yes.

2         MR. LUXTON:  088?

3         MR. EGLER:  This is on the previous

4  page from that, 088.

5  BY MR. EGLER:

6    Q.    It states, "Our products are among

7  the most commonly-prescribed for legitimate

8  medical use in the U.S."

9         And it states, "Entered into evidence

10  by law enforcement."

11         What did you mean by that?

12    A.    What I meant by that was that, you

13  know, that, you know our -- and the goal of our

14  organization, obviously, is we want to reduce,

15  you know, pain and suffering for those

16  individuals who have legitimate chronic pain

17  issues or acute pain issues and that there is a,

18  a largely legitimate need for this product.  But

19  also we want to point out that this is not only

20  our product but all opioids are also found in

21  illicit channels as well, too.  And there was an

22  increase in law enforcement finding opioids in

23  illicit channels and also -- and that there was

24  a demand -- there was a demand for legitimate

1  use, but also there was a rising illicit need as

2  well, too, or demand.

3    Q.    All right.  And then 089, the next

4  page down, it says, "Challenges continued."

5         Do you see that?

6    A.    Um-hmm.

7    Q.    And then it says, "Products include,"

8  and then under "Corona," does that refer to the

9  manufacturing facility in Corona, California?

10    A.    Yes, sir.

11    Q.    It says, "Hydrocodone."

12    A.    Um-hmm.

13    Q.    It says, "Initial quota grant is 25

14  percent of aggregate."

15         In the context of your work at

16  Watson, what does that mean?

17    A.    It would mean 25 percent of all the

18  hydrocodone produced within the U.S. was

19  manufactured.

20    Q.    Was manufactured at the Corona site?

21    A.    Yes.

22    Q.    And then oxycodone, what does that

23  mean?

24    A.    It just means oxycodone was produced

1  at that facility.
2      Q.  Do you remember whether Watson
3  marketed oxycodone around this time frame, early
4  2010?
5          MR. KNAPP:  Objection to form.
6          MR. LUXTON:  Object to form.
7      A.  Our products were mainly generic.  We
8  didn't market those products.
9      Q.  Do you remember whether Watson sold
10 generic oxycodone around this time frame?
11     A.  Yes.
12     Q.  With regard to fentanyl, what is
13 fentanyl?
14     A.  Fentanyl is a -- is an opioid.  It's
15 a powerful pain management medication.  It's
16 largely used in, you know, serious chronic pain
17 issues, cancer patients to relieve suffering.
18 It was delivered through a Duragesic or a patch
19 so it can last for longer periods so it could
20 deliver a sustained dose to a patient so there
21 would be no lull in the dosage as far as if you
22 took a tablet where we don't want these patients
23 to have any sufferings.  We want them to
24 maintain a steady stream of the product.

1      Q.  Was the fentanyl produced at -- well,
2  let me start over.
3      A.  Right.
4      Q.  Were the fentanyl-based products
5  produced at the Corona, California, site for
6  Watson in 2010 patches or something else?
7      A.  No, I think those -- that would have
8  been very small quantity, if my, if my memory
9  serves.  And I think there may have been a
10 sublingual, but I -- I'm not 100 percent sure.
11     Q.  And a sublingual is something you put
12 under your tongue?
13     A.  Yes, sir.
14     Q.  And the next word there,
15 methylphenidate?
16     A.  Methylphenidate.
17     Q.  Is that an opioid?
18     A.  No.  That's Ritalin.
19     Q.  And then the next one there, diazepam
20 and lorazepam?
21     A.  Yes.
22     Q.  Are those opioids?
23     A.  No.  They're benzodiazepines.
24 They're muscle relaxers.

1      Q.  And then the next one is F-line and
2  Butalbital?
3      A.  Fiorinal, Fioricet, Butalbital.
4      Q.  Are those opioids?
5      A.  No.
6      Q.  Then the last word under "Corona" is
7  Pentazocine?
8      A.  Pentazocine.
9      Q.  All right.  Is that an opioid?
10     A.  No.  It's a benzodiazapine.
11     Q.  So out of the seven entries under
12 Corona, three of them, the top three are
13 opioids; is that right?
14         MR. KNAPP:  Objection to form.
15     A.  Three of the listed are opioids.
16     Q.  And the first three, right?
17     A.  Right.
18     Q.  And then the next one is Salt Lake
19 City.
20         Fentanyl --
21     A.  Yes.
22     Q.  -- do you see that there?
23         And then there are two other listed
24 there.  The same methylphenidate?

1      A.  Yes.
2      Q.  And testosterone?
3      A.  Right.
4      Q.  Neither of those are opioids; is that
5  right?
6      A.  Correct.
7      Q.  But the first one there is an opioid?
8      A.  Yeah.
9      Q.  And then Florida, did Watson have a
10 manufacturing plant in Florida?
11     A.  Yes.  It was part of the Actavis
12 acquisition.
13     Q.  All right.  It states hydrocodone and
14 amphetamine and --
15     A.  Actually, let me back that up.
16     Q.  Okay.
17     A.  It wasn't part Actavis acquisition.
18 It was part of the Andrx acquisition.
19     Q.  Okay.  So let's get to that in a
20 second.
21         Hydrocodone, amphetamine, and
22 pseudoephedrine; is that right?
23     A.  Yes.
24     Q.  And then can you pronounce that last

1    word?
2       A.   It can be carisoprodol or
3    carisoprodol, depending on how you want to
4    pronounce it.
5       Q.   All right.  So are any of those in
6    that list opioids?
7       A.   Hydrocodone.
8       Q.   So the first one there.
9            With regard to the opioids that we've
10   read on these lists, do you know why they were
11   listed as challenges?
12      A.   I think probably because the amount
13   of regulation, the quota implications for some
14   of the products as well.
15      Q.   So with regard to the Florida
16   manufacturing facility that you were talking
17   about, the purchase of Actavis didn't take place
18   until sometime in 2012; is that right?
19      A.   Right.  Yeah, this would have been
20   Andrx, which I think was in 2009.
21      Q.   What was Andrx?
22      A.   Andrx was a generic pharmaceutical
23   manufacturer.
24      Q.   Do you remember at some point whether

1    the, the manufacturer of controlled substances
2    for Watson was moved out of Florida?
3       A.   Can you repeat that question?
4       Q.   Do you remember whether, while you
5    were at Watson or Actavis, the company stopped
6    making controlled substances at a Florida plant?
7       A.   No.
8       Q.   So staying on this page --
9       A.   Sure.
10      Q.   -- the Corona entry states
11   hydrocodone, and then it states initial quota
12   grant is 25 percent of aggregate.
13      A.   Right.
14      Q.   And then it states, hydrocodone under
15   Florida as well.
16           Do you see that there?
17      A.   Yes.
18      Q.   So the 25 percent of aggregate quota
19   that you had explained before, was the Florida
20   plant in addition to the 25 percent or included
21   in that?
22      A.   It would have been exclusive of it.
23   But from my recollection, the hydrocodone
24   production in Florida was minimal.

1       Q.   Moving on to the next page it states,
2    "Product development. "
3            Do you see that there?
4       A.   Yes, I do.
5       Q.   And this is page 090 in Exhibit 6.
6    And there are eight chemicals or drugs listed
7    there.
8            Can you go through that list and tell
9    me which of them are opioids?
10      A.   Sure.
11           Fentanyl citrate, hydromorphone,
12   morphine sulfate, oxymorphone.
13      Q.   Okay.  So four out of the eight
14   product development?
15      A.   Yes.
16      Q.   Do you remember why these eight drugs
17   or chemicals were listed as challenges?
18      A.   Sure.
19      Q.   Why?
20      A.   With product development efforts, you
21   would have to still apply for quota with the
22   DEA.  It was a very challenging process in that
23   you'd have to work closely with your R&D folks
24   and scientists who -- to provide a justification

1    to DEA and also to articulate quantities to --
2    for the, the build of test batches, exhibit
3    batches that would be submitted to FDA.
4            So it was really -- the challenges
5    that I'm speaking about here are, are challenges
6    administratively from a quota standpoint where,
7    you know, that these -- these are not -- and the
8    quota process, especially at that time, took a
9    long period of time.  So, you know, in any type
10   of new product development in any pharmaceutical
11   organization, you want to be first to file for a
12   generic patent challenge.  So any type of delays
13   in the quota process, these things could affect
14   your timeline in getting your, your product
15   approved and being able to have affordable
16   products in the generic market for, for
17   patients.
18      Q.   So as you've just described the
19   challenges, are those more business challenges
20   than, say, security challenges?
21      A.   Yes.
22      Q.   So do you remember there being any
23   security challenges for the fentanyl citrate EQ
24   oral or the hydromorphone or morphine sulfate or

1 oxymorphone?
2    A.   No.
3         MR. LUXTON:  Objection to the form.
4 BY MR. EGLER:
5    Q.   All right.  So as you think about it,
6 the fentanyl citrate EQ oral, do you know what
7 the brand name equivalent of that would be?
8    A.   I don't off the top of my head.
9    Q.   How about hydromorphone?
10    A.   No.
11    Q.   How about morphine sulfate?
12    A.   Hydromorphone I believe is Dilaudid.
13 These, these were all products that were not
14 high-volume products.  If you look at
15 hydromorphone, morphine sulfate, they're --
16 oxymorphone, but I would say are institutional
17 products that we used in hospital settings or
18 long-term care.
19    Q.   Have you ever heard of the drug
20 Kadian?
21    A.   I have.
22    Q.   Is the morphine sulfate that's listed
23 there the same thing as Kadian or something
24 else?

1    A.   I can't be sure.
2    Q.   Do you remember whether Watson ever
3 undertook to make generic Kadian?
4    A.   I believe with the Actavis
5 acquisition, I believe that was a legacy Actavis
6 product, Kadian.
7    Q.   But do you remember whether Watson
8 ever made generic Kadian?
9    A.   I don't have a specific recollection.
10    Q.   All right.  So moving on in this
11 document, get to page 091, and it states
12 "Suspicious Order Monitoring, SOM," it says,
13 "The registered shall design and operate a
14 system to disclose suspicious orders of
15 controlled substances."  And there are two
16 bullet points that states "unusual size,
17 pattern, frequency," and then, "suspicious order
18 should not be identified on
19 benchmarks/thresholds only."
20    A.   Um-hmm.
21    Q.   So that first group of three terms
22 there, "unusual size, pattern or frequency,"
23 what did you mean by that?
24    A.   It was taken directly from 1301.74 in

1 the Code of Federal Regulations, and is just the
2 DEA's verbiage for, you know, what, you know,
3 what could comprise, potentially comprise an
4 order that should be flagged as of potential
5 interest.
6    Q.   Did anyone ever -- well, let me start
7 over.
8         Around this time, February of 2010,
9 do you remember ever having a conversation that
10 the CFR in question listed unusual size, pattern
11 or frequency, but also could include other
12 aspects or other things that a company should
13 look for in a Suspicious Order Monitoring
14 System?
15         MR. KNAPP:  Form.
16         MR. LUXTON:  Same.
17    A.   No.
18    Q.   For example, did anyone ever tell you
19 that the CFR in question, before it states
20 unusual size, pattern of frequency has the word
21 "including" in it?
22    A.   Um-hmm.  I'm aware of the -- of the
23 DEA regulation.
24    Q.   Did anyone ever say that the

1 "including" word would increase the number of
2 considerations beyond unusual size, pattern or
3 frequency?
4    A.   I can't make that assumption.
5    Q.   Was your understanding that the --
6 let me start over.
7         Was your understanding around this
8 time that the Suspicious Order Monitoring System
9 as required by the DEA was to track unusual
10 size, pattern or frequency and not include any
11 other aspects?
12    A.   I think those were key elements to
13 look for as mandated within the regulations.
14    Q.   Do you remember ever including
15 aspects beyond those three?
16    A.   There are certainly other
17 considerations, such as products that may be
18 bought in combination that may be concerning.
19    Q.   Anything else?
20    A.   Not to my knowledge.
21    Q.   All right.  And then I just -- I
22 hadn't said it before, but the top of this page
23 is "Compliance Landscape."
24         The second bullet point there states,

1    "SOM as well as 'Know Your Customer' efforts are
2    key to DEA's effort to curb diversion of C/S in
3    listed chemicals."
4          Do you see that there?
5      A.  Yes, sir.
6      Q.  Do you remember -- well, that term,
7    "Know Your Customer," what does that mean to
8    you?
9      A.  It implies due diligence to me and
10   understanding who your business partner is.
11     Q.  And with regard to the due diligence
12   processes that you're thinking of, who, if
13   anyone, or what group at Watson around this
14   time, early 2010, was responsible for the Know
15   Your Customer function?
16     A.  Primarily from a DEA perspective, it
17   would be my group but also order management or
18   the customer service side also had a role as
19   well, too.  If onboarding a new customer, they
20   would have a process that they would go to, a
21   licensed validation process.  You know, Dun &
22   Bradstreet, they would do a due diligence on a
23   customer prior to onboarding them on a customer.
24   And from a security aspect or from a DEA

1    compliance aspect, we would have a set of
2    questions that would be answered by the
3    customer.
4      Q.  Who in your group, as you think of it
5    around this time, early 2010, would have been
6    responsible for the Know Your Customer part?
7      A.  Me.
8      Q.  Okay.  Anybody else?
9      A.  I would overall be responsible.
10   Probably compliance auditor would be responsible
11   for procedurally.
12     Q.  Beyond what you referred to as the
13   onboarding process that Watson took on a new
14   customer, were there ongoing Know Your Customer
15   efforts?
16     A.  We maintained strong relationships
17   with our, with our customers.  We also -- I know
18   in the process when we acquired Actavis, we did
19   a revisit with our customers.  We asked for, for
20   new compliance information.
21         And when I was leaving the
22   organization, we were again doing another
23   refresh as well to update our records.
24     Q.  So with regard to this term, Know

1    Your Customer, have you ever heard an additional
2    term "Know Your Customer's Customer"?
3      A.  I have.
4      Q.  What does that mean to you?
5      A.  That implies that you should not only
6    understand who your customers are, but who your
7    customer is doing business with.
8      Q.  So with regard to this time frame,
9    early 2010, do you remember any "Know Your
10   Customer's Customers" efforts at Watson?
11     A.  No.
12     Q.  With regard to the SOM system, have
13   you ever heard the term "indirect customer SOM"?
14     A.  I've heard "indirect customer," but
15   not "indirect customer SOM."
16     Q.  So what does that mean to you,
17   indirect customer?
18     A.  Indirect customer, again, would be a
19   customer of our customer.
20     Q.  At any time during your time at
21   Watson and Actavis, was the automatic part, the
22   SOM system, the part that was contained in the
23   SAP system designed to track indirect customer
24   sales?

1      A.  No.
2      Q.  At any time when you were at Watson
3    or Actavis, was the automatic part of the
4    Suspicious Order Monitoring System that was
5    contained in the SAP system designed to get an
6    understanding of the broader secondary market
7    for the controlled substances it was tracking?
8          MR. LUXTON:  Objection to form.
9      A.  No.
10     Q.  All right.  So can you turn two more
11   pages in to 093?
12     A.  Sure.
13     Q.  And it states, "2010 Goals and
14   Objectives."  093.
15         And under 2010 Goals and Objectives,
16   it states, SOM.
17         Do you remember what the 2010 goals
18   and objectives for Suspicious Order Monitoring
19   System were at Watson?
20     A.  Sure.
21         It was likely -- again, it was almost
22   nine years ago.  It was an effort to enhance our
23   already compliant system.  So to -- that's
24   probably right around the time when we started,

1  because of what we were seeing on the landscape
2  and what DEA was indicating as important as well
3  as our consultants as Know Your Customer, that's
4  probably when we really started to, to build up
5  our Know Your Customer aspect of our system.
6      Q.   All right.  And then the last one
7  there that's listed, "Placebo Program" --
8      A.   Yes.
9      Q.   -- tell me what that means.
10     A.   Placebo program is because of our
11 long relationship with law enforcement and the
12 DEA, we had a formal program where if DEA
13 requested, we would be very happy to manufacture
14 placebo of our products that they could use in
15 operations to combat illicit traffic of
16 controlled substances.
17     Q.   With regard to that issue, do you
18 remember ever hearing of an opioid called Norco,
19 N-o-r-c-o?
20     A.   Yes.
21     Q.   Do you remember participating in a
22 DEA program to provide placebos of the drug
23 Norco?
24     A.   It's possible.

1      Q.   Do you have any particular memory
2  about that?
3      A.   No, but we've, we've done many
4  placebo manufacturing runs for DEA or law
5  enforcement.
6      Q.   Do you remember ever having an
7  understanding of, of the demand in the illicit
8  market for Watson's drug Norco?
9      A.   No, I don't think it -- it was not a
10 high-volume product being a branded product.  As
11 far as a demand for it illicitly, I -- there may
12 have been because there was an illicit desire
13 for all opioids.
14     Q.   Okay.  All right.  You can set this
15 document aside.
16     (Witness complies.)
17 BY MR. EGLER:
18     Q.   I'll hand you what I'll mark as
19 Exhibit 7.
20
21     (Napoli Exhibit 7, Email chain
22     beginning with email dated 4/12/10 from S.
23     Soltis to Napoli, Bates-stamped
24     ALLERGAN_MDL_01236097 and 6098, marked for

1      identification, as of this date.)
2  BY MR. EGLER:
3      Q.   Mr. Napoli, I've just handed you what
4  we will mark as Exhibit 7.
5          Can you look through it?  And as
6  you're looking through it, I'll read into the
7  record the Bates numbers.  ALLERGAN_MDL_01236097
8  and 6098.
9          And when you're ready, can you tell
10 me what this appears to you to be?
11     A.   It looks like it's a document in
12 reference to a DEA request for a placebo product
13 and setting them up within our distribution
14 system as a customer to receive a no charge.
15     Q.   Right.
16          As you think about that, an entity
17 that is being set up as a customer, is that the
18 DEA?
19     A.   Yes.
20     Q.   So at the earliest email in time on
21 this exhibit, and it's at the bottom of the
22 first page, you write to Scott Soltis.
23     A.   Um-hmm.
24     Q.   I think we've talked about him

1  before.
2      A.   Um-hmm.
3      Q.   Who is Scott Soltis?
4      A.   Scott was our executive director of
5  securities and DEA affairs.
6      Q.   So was he on an organizational chart
7  above you or below you.
8      A.   Above me.  He was responsible for
9  security and DEA compliance for the
10 organization.
11     Q.   And then you cc Gary Stewart?
12     A.   Yes.
13     Q.   Who is Gary Stewart?
14     A.   Gary Stewart was our supply chain
15 security manager based out of Gurnee, Illinois,
16 distribution center.
17     Q.   And then Ed J. Grover?
18     A.   Yes.
19     Q.   Who is Mr. Grover?
20     A.   Ed Grover was our head of
21 distribution in Gurnee, Illinois.
22     Q.   And you write, "Scott, in regards to
23 the recent DEA request for product, I would
24 suggest the following course of action:  Special

1    Agent Warpness should provide the request for
2    product on official letterhead," and then in
3    parentheses, "include reg number," close
4    parentheses, "and fax to Watson DEA affairs.
5    But if time is of the essence, I would suggest
6    fax going to Gary at the DC since most of us
7    will be at the DEA conference this week."
8         Do you remember going to a DEA
9    conference in April of 2010?
10        A.   Yeah.  I've been to many of them.
11        Q.   And you say, "Faxing to Gary at the
12   DC."
13        What does that mean?
14        A.   If I'm going to be out of the office,
15   it probably would make sense, if this DEA agent
16   wants the placebo as soon as practical, send it
17   directly to our security manager in the
18   distribution center so the process can be, the
19   request can be processed without delay.
20        Q.   All right.  And then Scott Soltis
21   writes back on the same day, April 12, 2010, and
22   that is the email above.
23        A.   Um-hmm.
24        Q.   He says, "FYI, I just talked to

1    Mark."
2         From the context of this email, can
3    you tell who the Mark is that he's referring to?
4         A.   That's Mark Warpness, a DEA
5    investigator.
6         Q.   And --
7         A.   Or special agent.  I'm sorry.
8         Q.   And Mr. Soltis writes, "He wants ten
9    bottles, which I told him no problem and that we
10   will not charge him."
11        And then Mr. Soltis writes, "He did
12   indicate that Norco is the most abused
13   painkiller of preference on the street and it is
14   just known on the street as 'Watson.'"
15        Do you remember ever hearing that
16   before this time, April 2010, that people from
17   the DEA indicated that Norco was the most abused
18   painkiller of preference on the street?
19        A.   We certainly heard from the DEA that
20   hydrocodone was one of the most abused products.
21        Q.   So and that's what Norco is,
22   hydrocodone?
23        A.   Norco is a branded product, so --
24   and, again, I don't know if he was saying Norco

1    or hydrocodone there, so I can't be inside his
2    mind but...
3         Q.   Okay.  Well, do you remember ever
4    hearing that on the, quote/unquote, street, that
5    one of the opioids that Watson manufactured was
6    known simply as "Watson"?
7         A.   I was aware of that.  There were --
8    many opioids and controlled drugs had many
9    illicit street, street names.  It's very common.
10        Q.   Have you ever seen a pill of the drug
11   Norco, the brand name drug Norco?
12        A.   I have.
13        Q.   Do you know whether it has the word
14   "Watson" written on it?
15        A.   It may.  It's been a while since I've
16   seen a tablet.
17        Q.   Do you remember ever participating
18   with the DEA beyond what's listed here in
19   Exhibit 7 to address the the, quote/unquote,
20   street abuse of Norco?
21        A.   As far as efforts that we made to
22   help combat?
23        Q.   Yes.
24        A.   We would always be willing to help

1    out from a placebo standpoint.  Or if there are
2    any type of information requests, we would be
3    happy to fulfill those for DEA.
4         Q.   Do you remember ever -- let me start
5    over.
6         A.   Sure.
7         Q.   Beyond this event that is listed here
8    with the request for 10 bottles of placebo
9    Norco, do you remember particularly any other
10   requests or provision of that type of placebo to
11   the DEA?
12        A.   I don't recall specific requests, but
13   I am positive that there were multiple requests
14   for drugs throughout my tenure for placebo.
15        Q.   And after you heard or read this
16   email and found that one of the DEA agents
17   indicated that Norco was the most abused
18   painkiller of preference on the street, did you
19   take any action internally to address that
20   issue?
21        A.   We were already aware that
22   hydrocodone and opioids were products of abuse
23   in illicit markets, as you can see through some
24   of the documents we've looked at already that I

1    clearly communicated regarding the landscape.
2          You know, we took the responsibility
3    very seriously.  And to the extent that a
4    manufacturer can prevent the illicit diversion
5    of products, we made every effort to ensure that
6    we had a robust security program that was -- not
7    only met the basic requirement of DEA
8    regulations, but exceeded them to make sure that
9    we were doing our part.
10         Q.   Where was, as you think of it, where
11   was Watson's Norco physically made?
12         A.   Corona.
13         Q.   And, you know, we saw before that
14   there was a notation that Watson's Corona
15   facility had 25 percent of the nationwide quota
16   for a particular drug?
17         A.   Yes.
18         Q.   Is that the same drug as Norco?
19         A.   It would be included within that
20   product, but Norco would not comprise 25 percent
21   of the market.
22         Q.   Do you know whether any of the
23   security processes used with regard to Norco by
24   Watson were more than the security processes

1    Watson used with regard to other drugs?
2          MR. LUXTON:  Objection to form.
3          A.   Yes.
4          Q.   Were they higher than security
5    processes used for other Schedule II drugs?
6          MR. LUXTON:  Objection to form.
7          A.   No.
8          Q.   Were they higher than security
9    processes used for Schedule II opioids?
10         MR. LUXTON:  Same objection.
11         A.   They were consistent.
12         Q.   Do you remember ever talking with the
13   FDA about this agent's opinion or indication
14   that Norco was the most abused painkiller of
15   preference on the street?
16         A.   It would not be within my role to
17   have conversations with the FDA about that.
18         Q.   Would it be within the role of anyone
19   at Watson to have that type of a conversation?
20         MR. KNAPP:  Just real quick, was that
21   last question about -- that was about the
22   FDA?
23         THE WITNESS:  Yes.
24         MR. KNAPP:  I believe Mr. Napoli

1    answered based upon the FDA.
2          MR. EGLER:  Let me ask this again.
3    BY MR. EGLER:
4          Q.   Do you remember ever talking with
5    anyone at the DEA about this indication that
6    Norco was the most abused painkiller of
7    preference on the street?
8          A.   Not about Norco in particular.
9          Q.   Okay.  Do you remember whether anyone
10   at Watson had that type of a conversation with
11   anyone from the DEA?
12         MR. KNAPP:  Foundation.
13         A.   I don't recall.
14         Q.   All right.  You can set that document
15   aside.
16         (Witness complies.)
17         (Napoli Exhibit 8, Email chain
18         beginning with email dated 4/29/10 from L.
19         Scott to Napoli, ALLERGAN_MDL_01236095
20         through 6096, marked for identification, as
21         of this date.)
22   BY MR. EGLER:
23         Q.   Mr. Napoli, I'll hand you what we
24   will mark as Exhibit 8.

1          A.   Okay.
2          Q.   Exhibit 8, can you look through it
3    generally.  And as you're looking through it,
4    I'll read on the record it's
5    ALLERGAN_MDL_01236095 through 6096.
6          And when you're ready, can you tell
7    me what this appears to you to be?
8          (Document review.)
9          A.   Looks like a question from one of our
10   security supervisors who attended a National
11   Association of Drug Diversion Investigators
12   conference about placebo programs.
13         Q.   So that National Association of Drug
14   Diversion -- can you say that again?
15         A.   National Association of Drug
16   Diversion Investigators.
17         Q.   Investigators.
18         That's the NADDI --
19         A.   Correct.
20         Q.   -- that's referred to in the earliest
21   email in time on the second page of Exhibit 8?
22         A.   Yeah.
23         Q.   And it's Pete J. Herrera?
24         A.   Correct.

1    Q.   Mr. Herrera worked at Watson; is that
2  right?
3    A.   Yes.
4    Q.   What was his role around this time,
5  April 2010?
6    A.   Security supervisor of the Corona
7  facility.
8    Q.   And he writes to you and Ms. Scott,
9  "Just got back from NADDI last night and wanted
10 some clarification on how Watson, (DEA affairs)
11 administers the placebo program for law
12 enforcement."
13   A.   Um-hmm.
14   Q.   And he goes on from there.
15       And you respond to him on April 29th
16 and say, "Hi, Pete.  It is not uncommon to
17 return from NADDI with a pocket full of placebo
18 requests.  We will be establishing a placebo
19 program this year, though, so you can forward
20 the contact names to Lisa and they will be added
21 to the list."
22       And then continuing, "Interesting
23 that the FBI inquired.  They usually follow the
24 money trail on high-profile RX cases through

1  electronic channels and tend not to get their
2  hands dirty with diverse buys, et cetera."
3        And then on the next page,
4  Mr. Herrera writes to you, "Thank you for your
5  prompt reply.  I hear you about the FBI's MO
6  with reverses.  The agents were" -- "The agents
7  that were interested were from the San Diego
8  field office.  And there was one presentation by
9  an SD County prosecutor that keyed on the
10 diversion wave in SD, especially Watson hydro
11 and Norco really hard.  Maybe I heard it wrong
12 at the DEA seminar, but didn't the DEA people
13 say they had the problem under control down
14 there?"
15   A.   Um-hmm.
16   Q.   So do you remember there being
17 something that can be referred to as a
18 "diversion wave" in San Diego that especially
19 related to Watson's hydrocodone and Norco
20 products?
21   A.   No.
22   Q.   Do you remember ever hearing that a
23 San Diego County prosecutor had contacted -- let
24 me start over.

1        Did you ever hear that a San Diego
2  County prosecutor had made a presentation about
3  diversion of Watson's hydrocodone and Norco
4  products in San Diego County, California?
5    A.   No, I don't recall ever receiving any
6  requests from San Diego or contact by a
7  prosecutor.
8    Q.   So you know that San Diego County is
9  just to the south of the Riverside County where
10 Corona is?
11   A.   Correct.  I mean, it may be possible.
12 I just don't recall if there was a placebo
13 effort.
14   Q.   And then you write back to
15 Mr. Herrera and Ms. Scott, "I don't think it
16 will ever been under control.  The bad boys are
17 always a step ahead.  This is why" -- "This is
18 why DEA likes to beat up on legitimate industry.
19 Is all they can control."
20       Then you have exclamation point
21 there.
22   A.   Um-hmm.
23   Q.   So when you wrote, "I don't think it
24 will ever been under control," what did you

1  mean?
2    A.   I think because of the way that the
3  current tact was.  And in that email, it
4  expresses probably a feeling within industry
5  that the approach by DEA was aggressive
6  enforcement on industry, where this not -- this
7  is a complex societal problem; it's not just the
8  manufacturers.  But the least amount of
9  registrants are manufacturers, so I think it's
10 easier to approach that population rather than
11 going down the supply chain.
12       A lot of these products that are on
13 the market in illicit channels are because
14 of, quote/unquote, legitimate prescriptions that
15 are written at the prescriber level, and there
16 are -- there was at the time seemingly no
17 efforts to focus on that.
18       So it just probably indicating just
19 that the their -- the focus, although well
20 intended, is I think heavily on the wrong part
21 of the system of distribution.
22   Q.   And you write there as well, "The bad
23 boys are always a step ahead."
24   A.   Right.

1  Q.  What did you mean by that?
2  A.  I think in any type of criminal
3  endeavor, it's -- where there's profit to be
4  made, there's always -- criminals always seem to
5  be one step ahead of law enforcement.
6  Q.  So with regard to the "bad boys"
7  there, who are you referring to?
8  A.  Anybody who engages in the illicit
9  trafficking of a controlled drug.
10  Q.  And then you write, "This is why DEA
11  likes to beat up on legitimate industry."
12  Around this time, April 2010, why did
13  you think DEA likes to beat up on legitimate
14  industry?
15  A.  Because there was a change -- as you
16  probably saw in one of the landscape slides that
17  I did earlier, that there was kind of a change
18  from -- previously, the DEA was more of a
19  partner with industry and we worked
20  collaboratively.
21  And then as you saw a shift in where
22  the DEA was making efforts to combat the illicit
23  drugs and making headway there, then you saw
24  abusers migrating over to the legitimate

1  pharmaceuticals.
2  And then you saw it went from the
3  diversion investigator concept to we're going to
4  take diversion investigators and now add special
5  agents from the criminal side in with those
6  groups and be more aggressive with the
7  registrant population.
8  Q.  So with regard to this email that you
9  sent to Mr. Herrera and Ms. Scott, you said, "I
10  don't think it will ever be under control."
11  This is April 29, 2010.
12  A.  Um-hmm.
13  Q.  When you had that belief, did you
14  ever try to change Watson's internal processes
15  to try to control the diversion that was going
16  on of Norco?
17  MR. KNAPP:  Objection to form.
18  A.  We continually ensure that we had
19  appropriate controls in place to mitigate theft
20  and diversion for what was under our control.
21  Q.  So with regard to the Norco drug,
22  after this time, April 29, 2010, did you ever
23  undertake to have higher security processes than
24  other drugs that Watson made in the same

1  controlled substance class?
2  A.  Well, we sought to always have a
3  strong program for all of our controlled
4  substances from the time we received the
5  material on our loading dock until we produced a
6  solid dosage form.  So we had a layered and
7  balanced approach to physical security
8  throughout our entire product lifecycle through
9  distribution.
10  Q.  And with regard to the diversion
11  issues, did you or -- is it your understanding
12  that anyone at Norco -- I'm sorry.
13  With regard to the diversion issues,
14  is it your understanding that you or anyone else
15  at Watson ever made special efforts to
16  understand and reduce or stop the diversion of
17  its Norco drug?
18  MR. KNAPP:  Objection to form.
19  MR. LUXTON:  Form.
20  A.  It's not within the scope of our, of
21  our power to do that.
22  Q.  With regard to what we've been
23  talking about before, that indirect customer
24  concept, did you or anyone you know at Watson

1  undertake to have a greater understanding of the
2  indirect customers for Norco?
3  MR. KNAPP:  Objection to form.
4  MR. LUXTON:  Form.
5  A.  We at, at Watson had -- through our
6  Know Your Customer program, we sought to find
7  out about our customers, about their -- we had a
8  form letter that went out to our customers and
9  indicated that we were interested in finding out
10  information from them of -- specifically of
11  hydrocodone and oxycodone products that they
12  purchased from us, a customer list, and who
13  their most significant customers were.  So it
14  was all part of our Know Your Customer process.
15  Q.  So when those letters went out, was
16  that at the onboarding process that you were
17  talking about or at some other time?
18  A.  It would be at the onboarding time.
19  It would also be when we did a periodic refresh,
20  which would have been, again -- probably that
21  next juncture would have been 2012, when we had
22  the, the Actavis acquisition.
23  But throughout my tenure with, with
24  Watson/Actavis, we didn't onboard too many

1    customers.  We did not have a big customer list,
2    so there wasn't too much addition to that
3    customer base.
4         Q.   So when you wrote that you didn't
5    think it would ever been under control, did you
6    renew the process of trying to understand your
7    customers' customers to understand any part of
8    the diversion process?
9         A.   What we sought to do was to
10   understand -- to work with our customers to
11   ensure that they had programs in place, that
12   they were ensuring that they understood their
13   customers and their ordering behaviors, and they
14   had effective controls in place to detect any
15   type of unusual behavior.
16        Q.   And as are you wrote here, "I don't
17   think it will ever been under control," do you
18   think that the -- your customers' processes were
19   effective?
20        A.   I don't think that was any indictment
21   of a customer's process.  I just think it's a --
22   probably a societal note about the demand for
23   drugs in this country.
24        Q.   But the customers that Watson had at

1    this time were selling the Norco drug to other
2    people; is that right?
3         A.   They would be selling them to a
4    pharmacy.
5         Q.   And do you remember ever undertaking
6    a project or directing someone else to undertake
7    a project to gain a greater understanding of the
8    pharmacies to which the Norco drugs were being
9    sold?
10        MR. KNAPP:  Objection to form.
11        A.   We actually looked at through our
12   Know Your Customer process at all of our
13   customers and -- and gaining an understanding of
14   where all of our controlled substances, but
15   specifically hydrocodone and oxycodone, were
16   going.
17        As far as the daily day-to-day
18   management of those customers, that was not
19   within our role.  And if you look at some of our
20   customers, they had -- just one customer maybe
21   had thousands upon thousands upon pharmacy
22   locations.  It would be untenable to do a
23   realtime monitoring of those activities.
24        Q.   With regard to the time frame that

1    is -- that appears in this email, April 29th, do
2    you remember -- or April 29th, 2012, do you
3    remember whether there was any particular
4    endeavor to look at any of the pharmacies that
5    were selling Norco?
6         MR. LUXTON:  Objection to form.
7         MR. KNAPP:  I believe you said 2012.
8         A.   It's 2010.
9         Q.   2010.
10        A.   Again, through our Know Your Customer
11   efforts, we would gain an understanding of where
12   our customers were distributing.  But if there
13   was a suspicious order that pended, we would
14   take a deeper dive and we would look to see
15   where these products were going.
16        Q.   In response to this process at the
17   end of April of 2010, do you remember any
18   particular effort being made in that regard?
19        A.   No.
20        Q.   So Mr. Herrera writes back to you on
21   that day, April 29th, "I felt like I was a class
22   president or something at the seminar.  Pretty
23   popular guy as soon as someone would read my
24   name badge and see I was from Watson."

1         As you sit here today, what's your
2    understanding of what Mr. Herrera meant?
3         MR. LUXTON:  Objection --
4         MR. KNAPP:  Foundation.
5         MR. LUXTON:  -- calls for
6    speculation.
7         A.   I can't speculate --
8         Q.   As you read it.
9         A.   I can't speculate --
10        MR. KNAPP:  Same objection.
11        A.   I can't speculate what Mr. Herrera
12   was thinking.
13        Q.   Okay.  So when he wrote, "I felt like
14   I was a class president or something at the
15   seminar," do you remember ever having a
16   follow-up conversation with him about that?
17        A.   No.
18        Q.   What do you think he meant by that?
19        MR. KNAPP:  Objection.
20        MR. LUXTON:  Objection calls for
21   speculation.
22        A.   I, again, can't speculate as to
23   someone else's thoughts.
24        Q.   I'm not asking about his thoughts.

1    I'm asking what you thought he meant by that.
2         MR. KNAPP:  Same objection.
3         MR. LUXTON:  Foundation.
4    A.   Again, I can't.
5    Q.   And he writes, "...pretty popular guy
6    as soon as someone would read my name badge and
7    see I was from Watson."
8         Do you remember ever having a
9    follow-up conversation about that issue?
10   A.   No.
11   Q.   And as you sit here today, do you
12   have any memory of what you thought at the time
13   he meant by saying that?
14        MR. LUXTON:  Objection.  Calls for
15        speculation.
16   A.   No, I don't.
17   Q.   And then the first email on the page,
18   the last one in time, Ms. Scott responds to you
19   only and leaves Mr. Herrera off and she says,
20   "Ug, vomit."
21        As you sit here today, what do you
22   think she meant?
23        MR. LUXTON:  Objection.  Calls for
24        speculation.

1         MR. KNAPP:  Objection.
2    A.   I can't speculate.
3    Q.   If someone writes, "Ug, vomit," do
4    you think they agree with what Mr. Herrera has
5    said?
6         MR. LUXTON:  Same objection.
7         MR. KNAPP:  Objection.
8    A.   I don't know.
9    Q.   Do you remember ever having a
10   discussion with Ms. Scott about the diversion
11   wave in San Diego that was referred to in this
12   email?
13   A.   No.
14   Q.   Do you remember ever having a
15   discussion with Ms. Scott about the impression
16   of the DEA that there was a substantial
17   diversion of the Watson hydro and Norco drugs?
18        MR. KNAPP:  Foundation --
19   A.   We --
20        MR. KNAPP:  -- and form.
21   A.   We had an understanding, as I
22   articulated earlier, from DEA that there was
23   a -- an increased illicit demand or use for
24   hydrocodone in general, just not Watson.

1    Q.   And based on that understanding, do
2    you remember ever taking any special steps in
3    regard to the Watson hydro and Norco with regard
4    to security issues or Suspicious Order
5    Monitoring System or anything else?
6         MR. KNAPP:  Form.
7         MR. LUXTON:  Objection to form.
8    A.   From a security perspective, again we
9    continually looked to enhance our security
10   process as any good security practitioner would
11   do.  We assessed the current risk, and we looked
12   to make enhancements where we can to our
13   systems.
14        And we had a very robust security
15   program at Corona and in all our facilities, and
16   we were frequent recipients of DEA inspections
17   from the Riverside office and other offices that
18   were heavily focused on the security aspect and
19   control of -- that you had over your product.
20   And we had outstanding results with DEA in our
21   inspections.
22   Q.   Do you remember whether Watson,
23   around this time or at any point after
24   April 2010, undertook to modify or create a

1    special process inside the Suspicious Order
2    Monitoring System that would address any of the
3    diversion issues that Watson's hydro and Norco
4    were facing?
5         MR. LUXTON:  Objection to form.
6         MR. KNAPP:  Objection to form.  Asked
7         and answered.
8    A.   As I stated, our Suspicious Order
9    Monitoring System program was a holistic and, we
10   feel, an effective program that was complying
11   with DEA regulations.
12   Q.   You can set that document aside.
13        MR. KNAPP:  Can we take a break?
14        MR. EGLER:  You want to break for
15   lunch?
16        MR. LUXTON:  Is it being brought in?
17        MR. EGLER:  Yes.
18        MR. LUXTON:  Hopefully if it's here,
19   we'll break for lunch.
20        MR. EGLER:  I'll check if it's here.
21   If it's not, we'll take a ten-minute break.
22        THE VIDEOGRAPHER:  The time is
23   approximately 12:23 p.m., and we are going
24   off the record.

1    (Recess is taken.)

2

3

4    A F T E R N O O N   S E S S I O N

5    (Time noted:  1:10 p.m.)

6    THE VIDEOGRAPHER:  We are back on the

7    record.  The time is approximately

8    1:10 p.m.

9        *    *    *

10   T H O M A S   P.   N A P O L I , resumed and

11   testified as follows:

12   EXAMINATION BY (Cont'd.)

13   MR. EGLER:

14   Q.   Mr. Napoli, you understand you are

15   still under oath?

16   A.   Yes, sir.

17   Q.   And for -- I'm going to hand you what

18   we will mark as Exhibit 9.

19       (Napoli Exhibit 9, PowerPoint

20       presentation entitled "DEA affairs

21       Organizational Achievements,

22       ALLERGAN_MDL_02467984 through 7998, marked

23       for identification, as of this date.)

24   BY MR. EGLER:

1    Q.   Can you look through Exhibit 9?  And

2    as you're reading through it, I'll note for the

3    record that the first page has no Bates stamps.

4        The second page is

5    ALLERGAN_MDL_02467984 through 7998.

6        And when you're finished looking

7    through this document, can you tell me what it

8    appears to you to be?

9        (Document review.)

10   A.   Okay.

11   Q.   All right.  Do you recognize the

12   document that appears after the first page?

13   A.   I do.

14   Q.   What is it?

15   A.   This appears to be a presentation

16   that I put together that talks about

17   achievements and accomplishments during a

18   calendar year and also what goals for the

19   upcoming year of 2011 were for our DEA affairs

20   organization.

21   Q.   So the achievements were for the

22   calendar year 2010; is that right?

23   A.   Yes, sir.

24   Q.   Do you remember who the audience for

1    this presentation was?

2    A.   No, I don't.

3    Q.   So that author on the first page in

4    the metadata page says Steve G. Sost.

5        Do you see that there?

6    A.   Steve Sost.

7    Q.   Who is he?

8    A.   Steve Sost was one of our

9    communications folks, corporation

10   communications.  He may have put this into a

11   company-approved format for me.

12   Q.   So as you think about this

13   presentation, would you regularly give a

14   presentation like this at the beginning or at

15   the end of each year?

16   A.   It would likely --

17       (Interruption.)

18       THE VIDEOGRAPHER:  The time is

19   approximately 1:14 p.m.  We are going off

20   the record.

21       MR. EGLER:  I can ask a better

22   question.  Yeah, let's go back on.

23       THE VIDEOGRAPHER:  The time is

24   approximately the 1:14 p.m., and we're back

1    on the record.

2    BY MR. EGLER:

3    Q.   So would you make this type of a

4    presentation annually?

5    A.   It's likely that I would.

6    Q.   Do you remember making these types of

7    presentations?

8    A.   I do.

9    Q.   And who would you make them to?

10   A.   Likely to my department management

11   and perhaps organizational management.

12   Q.   So your department management would

13   be who?

14   A.   My executive director Scott Soltis.

15   Then eventually we were part of supply chain as

16   well.  So that -- that wasn't at that time.  So

17   this would have been Scott Soltis and perhaps

18   higher levels of management.

19   Q.   All right.  So if you turn to page

20   990 of this document, it's about halfway

21   through, a little bit less, on the document, at

22   the top of the page there, 990, it states,

23   "Suspicious Order Monitoring."

24       Do you see that?

1     A.    Um-hmm.
2     Q.    As you see that page there that
3  appears under Suspicious Order Monitoring, what
4  does that mean to you in the context of this
5  document?
6        (Document review.)
7     A.    It really just looks like kind of a
8  status update on the Suspicious Order
9  Monitoring.
10    Q.    So this would be looking back at year
11 2010; is that right?
12    A.    Yes.
13    Q.    It states, "Evaluation and
14 enhancement," and then a dash, "effective
15 relationship with internal customers."
16    A.    Yes.
17    Q.    And it states, "Sales and marketing"
18 and "customer relations."
19       What does that group of words mean,
20 "Effective relationship with internal
21 customers," and "sales and marketing" and then
22 "customer relations"?
23    A.    It's indicative of our continuous
24 desire to enhance and improve our compliance

1  efforts.  And by doing so, it's ensuring that we
2  had a strong relationships with internal
3  customers, such as sales or marketing folks that
4  we could garner information from about customer
5  ordering behavior, maybe upcoming awards of
6  contracts or types of changes within the market,
7  if somebody dropped out, if somebody is picked
8  up.  Just another source of gathering
9  information so we can be most effective and also
10 ensuring we maintained our strong partnership
11 with the customer relations folks who we
12 partnered with on the SOMS initiative.
13    Q.    So with regard to the customer
14 relations entity that's referred to there, at
15 Watson at this time, end of year 2010, was the
16 customer relations group part of the sales and
17 marketing group?
18    A.    Yes.
19    Q.    Was there any other entity within
20 Watson that you think of as an internal customer
21 that you or your group worked with in 2010 to
22 evaluate and enhance the Suspicious Order
23 Monitoring program?
24    A.    As far as internal customers?

1     Q.    Yes.
2     A.    I'm sure there was a component with
3  perhaps with legal.
4     Q.    Okay.  Do you remember ever talking
5  with anyone involved with FDA regulation part of
6  Watson with regard to the Suspicious Order
7  Monitoring System in 2010?
8     A.    It's a little vague.  Is that FDA or
9  DEA you're referring to?
10    Q.    FDA.
11    Q.    FDA?
12    Q.    So let's back up a little bit.  So --
13 and we had talked about this before earlier.
14       As you think about it, what group do
15 you identify at Watson around this time frame,
16 2010, to be most responsible for dealing with
17 FDA regulation of drugs?
18    A.    Quality assurance.
19    Q.    So do you remember whether you
20 ever -- well, let me start over.
21       Do you remember whether you or your
22 group ever identified quality assurance as an
23 entity to interface with regard to the
24 Suspicious Order Monitoring System in 2010?

1     A.    No, they, they wouldn't really have a
2  relevant stake, I think, in Suspicious Order
3  Monitoring because they're more focused on safe,
4  pure and effective drugs, ensuring that we have
5  quality systems around safe, pure and effective
6  drugs.
7     Q.    Do you remember ever meeting with
8  anyone from the quality assurance group with
9  regard to the data that they collected on opioid
10 drugs?
11    A.    I don't recall.
12    Q.    Then you state "increase security
13 visibility," and it says "order of interest
14 review," and then "investigation," and then
15 "communication with customers."
16    A.    Um-hmm.
17    Q.    What was the "increase security
18 visibility" in 2010?
19    A.    That was, you know -- again, 2010 is,
20 depending on what time it was, it was a little
21 over a year or a year since I transitioned in.
22 So it was really getting more involved from a
23 security standpoint and, and from a compliance
24 standpoint, meaning our internal auditors and

1 taking an active role in the order of interest
2 review investigation and, you know, and the
3 communication with the customers about orders.
4     Q.   And the "order of interest," that
5 term, is that the same as you understand it as a
6 pending order?
7     A.   Correct.
8     Q.   Then the next dash down there it
9 says, "systemic upgrade and enhanced system
10 logic and increase efficiency."
11         Do you see that there?
12     A.   Yes.
13     Q.   Do you remember during 2010 what
14 steps you and your group at Watson took with
15 regards to the systemic upgrade of the
16 Suspicious Order Monitoring System?
17     A.   I think that this may have been
18 around the time where we engaged with Cegedim to
19 look at our system and, and maybe propose some
20 enhancements to the, to the system itself.  And
21 we were looking to increase the efficiency and
22 again enhance some of the system logic in
23 building in an additional or enhancing an
24 algorithm.

1     Q.   All right.  And then can you turn to
2 page 995.  It looks like this (indicating).
3     A.   Um-hmm.
4     Q.   And it says, "2011 goals and
5 objectives continued."
6         So if you need to look before there,
7 feel free, but I'm just going to ask you about
8 this page.
9     A.   Yup.
10     Q.   It states, "SOMS" and that's
11 Suspicious Order Monitoring System, right?
12     A.   Yes, sir.
13     Q.   And your -- the goal at Watson for
14 2011 was to improve the system and enhanced
15 automation?
16     A.   Yes.
17     Q.   Do you remember what you meant by
18 that?
19     A.   Yeah, just what we just spoke of, is,
20 is looking at our current compliance system but
21 also finding ways to make it -- to look at more
22 parameters regarding an order of interest and to
23 increase the efficiency of the program.
24     Q.   Okay.  Then the next one says,

1 "Enhance investigation process," and it says
2 "Procedure in cross-training."
3         What did you mean by that group of
4 words?
5     A.   Creation of a more formal procedure
6 on the investigation process of an order of
7 interest.  And cross-training meaning, as I
8 referred to earlier, we had an individual in our
9 global security department, Jeff Collins, who
10 was a trained, seasoned investigator to provide
11 cross-training in this area for him so he could
12 serve as a backup or a supplement to performing
13 investigations for the team.
14     Q.   And in this time frame, 2011, the
15 initial investigation of a pending order would
16 take place in the customer service group?
17     A.   The order management side, yeah.
18     Q.   And if it was escalated, it would
19 come to your group; is that right?
20     A.   Yes, sir.
21     Q.   All right.  Do you, as you think
22 about it, as long as there is an internal
23 Suspicious Order Monitoring System at Watson or
24 the part of Actavis that you worked with, did

1 that process ever change?
2     A.   No.
3     Q.   All right.  You can set that aside.
4     (Witness complies.)
5 BY MR. EGLER:
6     Q.   I will hand you what we will mark as
7 Exhibit 10.
8     (Napoli Exhibit 10, Watson 210
9 Performance Review Form - Exempt,
10 Bates-stamped ALLERGAN_MDL_03535275 through
11 283, marked for identification, as of this
12 date.)
13     (Document review.)
14 BY MR. EGLER:
15     Q.   Mr. Napoli, can you look at what's
16 been marked as Exhibit 10?
17     A.   Yes.
18     Q.   And look at it generally.  And while
19 you're checking it out, I'll read into the
20 record, it's Allergan_MDL_03535275 through 283.
21         And you can look through the whole
22 document.  I'm going to ask you about text that
23 appears on the third page, which is 5277.
24     A.   Sure.

1        (Document review.)
2        Q.   So first, to get the big picture, do
3   you recognize this document?
4        A.   I do.
5        Q.   What is it?
6        A.   It's a performance review form.
7        Q.   So is this your performance review?
8        A.   It appears that it is.
9        Q.   And do you remember filling out a
10  performance review at the end of 2010?
11       A.   I'm sure that I did.
12       Q.   All right.  Could you look at the top
13  of page 5277?  It states, "Key goal No. 1."
14       Do you see that?
15       A.   Yes, sir.
16       Q.   And it says, "Suspicious Order
17  Monitoring program, SOM, upgrade Phase II."
18       And did you write the text that
19  appears in this box?
20       A.   Yes.
21       Q.   All right.  And you state, "Lead a
22  cross functional team with the goal of enhancing
23  the program logic within SAP to accurately and
24  efficiently determine legitimacy of CS orders

1   with minimum impact to the business while
2   maintaining DEA compliance."
3        And you write, "Overall objectives:
4   Utilize identified vendor to evaluate the
5   current system.  An evaluation will consider
6   Watson's approach of design, parameters
7   inherently unique to account types, and
8   validation process."
9        Do you see that?
10       A.   Um-hmm.  Yes.
11       Q.   So it says, "Evaluation will consider
12  Watson's approach and design."
13       What did you mean by that?
14       A.   That we would be utilizing a vendor,
15  Cegedim in this case, to come in and do an
16  assessment or an overall valuation of our
17  current system and our approach and design of
18  our system.
19       Q.   All right.  And "parameters
20  inherently unique to account types," do you have
21  an understanding of what that means?
22       A.   Likely the different -- differences
23  between different types of account types.  So
24  different types of customers, whether it's a

1   large distributor, midsize distributor or, you
2   know... different class of trade.
3        Q.   When you use the term "class of
4   trade," what does that mean?
5        A.   Class of trade, is, you know, the
6   various different types of, of customers.  So
7   you might have a customer that is a midsize
8   distributor, a large distributor, a chain
9   distributor.  So it's just the differentiator
10  for the different types of business classes.
11       Q.   So would one class of trade be, as
12  you said, a large distributor?
13       A.   Um-hmm.  Yes.
14       Q.   Yes?
15       A.   Yes.
16       Q.   And then the last one there says
17  "validation process."
18       Then there is a bullet point, and it
19  states, "Based on evaluation, a report will be
20  generated that identifies any gaps and
21  recommended actions to ensure that the system is
22  statistically defensible in compliance" -- "and
23  compliant with DEA mandate."
24       Do you see that there?

1        A.   Yes.
2        Q.   And then at the very bottom it
3   states, "Complete evaluation of current system V
4   DEA requirements and prepare executive summary
5   by 4/30, 2011.  Develop action plan and present
6   to management by 6/1, and implement system with
7   automated business system test environment by
8   end of fourth quarter."
9        Do you remember who set that schedule
10  for the Phase II of the upgrade of Watson's
11  Suspicious Order Monitoring program?
12       A.   It's likely myself, my manager.
13       Q.   Again, who was your manager?
14       A.   Scott Soltis.
15       Q.   All right.  So let's set this
16  document aside.
17       (Witness complies.)
18       (Napoli Exhibit 11, Customer Services
19       Agreement - Statement of Work No. 1,
20       Bates-stamped ALLERGAN_MDL_03535028 through
21       5030, marked for identification, as of this
22       date.)
23  BY MR. EGLER:
24       Q.   I'll hand you what we will mark as

1    Exhibit 11.
2         (Handing.)
3         A.  Thank you.
4         Q.  Mr. Napoli, can you look at what I've
5    marked as Exhibit 11?  While you're looking at
6    it, I'll read into the record it's
7    ALLERGAN_MDL_03535028 through 5030.
8         When you're ready, when you're ready,
9    can you tell me what this appears to you to be?
10         (Document review.)
11         A.  Yes.  It's a Statement of Work from
12    Buzzeo PDMA, also known as Cegedim.  And it's to
13    conduct what we discussed in my, my goals and my
14    performance review to do an analysis of our SOM
15    program and discuss our approach, meet with IT
16    and compliance teams, discuss data, and the, the
17    current model and any improvements that can be
18    made.
19         Q.  So with regard to this Statement of
20    Work No. 1, do you know who would have -- who
21    would have, at Watson, negotiated this statement
22    of work with Buzzeo?
23         A.  Likely myself and Scott Soltis.
24         Q.  All right.  And what makes you think

1    that?
2         A.  It was our, our project.
3         Q.  And so speaking generally about the
4    Buzzeo entity, I think you had said today that
5    you had worked with them previously in the
6    course of your work at Watson; is that right?
7         A.  Correct.
8         Q.  And as you think of it, did you work
9    with consultants other than Buzzeo that provided
10    similar services while you were at Watson?
11         A.  I mean primarily from a consulting
12    standpoint, we would utilize Buzzeo.  I'm trying
13    to think if there are any other...
14         There may have been another firm, but
15    I'm just drawing a blank right now.
16         Q.  Do you remember whether with regards
17    to the Phase II that you talked about in your
18    annual review for the Suspicious Order
19    Monitoring program at Watson, whether you
20    entertained bids or proposals from anyone other
21    than Buzzeo PDMA?
22         A.  Perhaps ValueCentric, but I can't be
23    100 percent sure.
24         Q.  So what do you know about

1    ValueCentric?
2         A.  ValueCentric is another organization
3    that is in the business of providing data to the
4    pharmaceutical industry.
5         Q.  Can you think of a particular person
6    that you recognize as a contact at ValueCentric?
7         A.  No.
8         Q.  Do you know whether you were -- when
9    you were at Watson or Actavis, your group ever
10    contracted with the ValueCentric entity?
11         A.  My group did not.
12         Q.  Do you know if anyone at Watson
13    contracted with the ValueCentric entity?
14         MR. KNAPP:  Foundation.
15         A.  I believe sales and marketing may
16    have utilized their services.
17         Q.  Okay.  Anybody else that you know of?
18         A.  No, I don't.
19         Q.  All right.  So with regard to this
20    Statement of Work No. 1, it's marked as
21    Exhibit 11, who in particular, if anyone, at the
22    Buzzeo PDMA group did you negotiate with?
23         A.  Now when you say "negotiate," can you
24    expand on that, on that term?

1         Q.  Okay.  So this document appears to me
2    to be signed by Mr. Soltis, I think, is it
3    July 28th, 2011?
4         A.  Um-hmm.
5         (Document review.)
6         A.  Yes.
7         Q.  So before that time, as the agreement
8    was coming together, is there anyone in
9    particular at Buzzeo PDMA that you worked with
10    to get a mutual understanding of the scope of
11    the project and the cost?
12         A.  Yeah.  Likely it was an individual
13    named Paul Hamby, H-a-m-b-y, and Bob Williamson,
14    common spelling.
15         Q.  And Mr. Hamby I think we mentioned
16    earlier today.
17         When did you first meet Mr. Hamby?
18         A.  Likely in the mid-2000s at a Buzzeo
19    conference.
20         Q.  How about Mr. Williamson?
21         A.  Same.  Mr. Caverly we talked about
22    earlier now.  This is the first introduction to
23    Paul, I believe.
24         Q.  All right.  All right.  You can set

1  this document aside for now.
2  (Witness complies.)
3  BY MR. EGLER:
4  Q.  I'll hand you what we will mark as
5  Exhibit 12.
6  (Napoli Exhibit 12, Meeting Minutes
7  dated 9/8/11 ALLERGAN_MDL_02176488 through
8  6492, marked for identification, as of this
9  date.)
10  BY MR. EGLER:
11  Q.  And Mr. Napoli, can you look at what
12  I've marked as Exhibit 12?
13  And while you're looking at it, I'll
14  note for the record that it's numbered
15  ALLERGAN_MDL_02176488 through 6492.
16  When you're ready, can you tell me if
17  you recognize this document.
18  A.  I do recognize it.
19  Q.  What is it?
20  A.  It looks like a meeting minutes from
21  an initial meeting that we had with Cegedim
22  regarding the SOMS assessment.
23  Q.  So in the subject, on the first page,
24  page 88 states, "SOMS meeting system evaluation,

1  Cegedim Dendrite," and it states "Thursday,
2  September 8th, 2011."
3  Do you remember this particular
4  meeting?
5  A.  I don't.
6  Q.  Can you, can you tell from the
7  context of this where this meeting would have
8  been held?
9  A.  Likely in our Parsippany office.
10  Q.  Do you remember having a meeting like
11  this with people from Cegedim Dendrite in
12  September 2011?
13  A.  Yes.
14  Q.  And there's a person there under
15  attendees, Robert C. Williamson.
16  Is that Bob Williamson -- Bob
17  Williamson that you were talking about before?
18  A.  Bob Williamson, yes.
19  Q.  And there's -- the name underneath
20  there Jonathan Kuhn, Ph.D.
21  Do you know Mr. Kuhn or Dr. Kuhn?
22  A.  Yes.  He's a statistician who worked
23  for Cegedim.
24  Q.  And then there are various people

1  listed beyond there; Scott Soltis, Mary Woods,
2  Larry Schaffer, Justin Park, Laura Pinti, Sandra
3  Simmons, Lisa Scott, Lynn DaCunha, Jaydeep
4  Shukla, Rick Robbins, and Napoleon Clarke.
5  Did all those people that I just read
6  their names, did all those people work at
7  Watson?
8  A.  Yes.
9  Q.  All right.  I don't think we have
10  seen the name Jaydeep Shukla earlier today.  Who
11  is -- is it Mr. or Ms. Shukla?
12  A.  Jaydeep eventually joined our DEA
13  affairs team as an associate or a DEA compliance
14  specialist.
15  Q.  All right.  And then Rick Robbins,
16  who is Rick Robbins?
17  A.  Rick Robbins and Napoleon were both
18  in sales and marketing.
19  Q.  All right.  So -- and the front seems
20  to be a discussion of what is going on at the
21  meeting.
22  And the third entry down there, it
23  say, "Agenda," and then in parentheses, "Tom."
24  A.  Um-hmm.

1  Q.  As you read this, do you know who
2  would have typed the text in there that appears
3  there?
4  A.  No.
5  Q.  Do you think it was you?
6  A.  No.
7  Q.  So it states, "Overview of
8  organization," and it says, "Anda not included
9  in the scope of this project."
10  What is Anda, as you understand it in
11  the context of Watson?
12  A.  Anda is a pharmaceutical distributor
13  that, when we acquired Andrx, they were a part
14  of that organization.  But they were treated as
15  a separate entity.  They weren't part of our --
16  when it came to compliance or anything, they
17  were a separate entity.
18  Q.  And then the next line down there, it
19  states, "Enable and sustain growth of our
20  business" and, dash, "$498 million of C/S
21  products sold in 2010 with top 5 products,
22  hydrocodone, oxycodone, fentanyl and
23  methylphenidate."
24  A.  Yes.

1      Q.   And then in parentheses, "Concerta
2   P&G," close parentheses.
3          So there are, I think, four things
4   listed there.
5          But do you remember having a
6   discussion of Watson having $498 million of CS
7   products sold in 2010 and the top four products
8   being hydrocodone, oxycodone, fentanyl and
9   methylphenidate?
10     A.   It's entirely possible.
11     Q.   All right.  And then the next entry
12  is, "Enable and sustain growth of business," and
13  then dash "security and compliance."
14         Do you have an understanding of
15  whether you said something like this at the
16  meeting and what you meant by it?
17     A.   What I would have meant by that is
18  to, you know, from a business perspective, to
19  support the business and -- but to make sure
20  that we do it in a secure and compliant manner.
21     Q.   All right.  And then the next
22  statement is, "Systemic upgrade" and then it
23  says, "Take labor and subjectivity out of the
24  department."

1          Do you remember whether you said
2   something like that at this meeting and what you
3   meant by it?
4      A.   It's possible.
5      Q.   What would you have meant by it?
6      A.   It meant that although we had a
7   compliant system, it was very labor intensive,
8   and we were looking to make enhancements to the
9   program that would sharpen the tool for us.
10  Maybe have we have a statistician there where --
11  to look at algorithms that were currently
12  developing with the, the advance of technology
13  itself, or to take a look at is there a way that
14  we could do this more efficiently to take some
15  of the labor intensivity out of it and to have
16  it autocalibrate.
17     Q.   So when you say "labor intensivity,"
18  as you think about the labor intensive part of
19  the Suspicious Order Monitoring System and
20  Watson around this time, mid to late 2011, what
21  was labor intensive about it?
22     A.   We pended a lot of orders in the
23  system that need to be reviewed.
24     Q.   And so as you think about it, what

1   was your proposed means of reducing the labor
2   intensiveness of the system?
3      A.   Automation.
4      Q.   Would the automation replace -- let
5   me start over.
6          As I think of the system, there are
7   three basic parts; the SAP system, and then the
8   initial order management team consideration, and
9   the potential DEA team consideration.
10         So as you think about taking the
11  labor intensive part out of it, if those are the
12  correct stages of the system, which part are you
13  thinking of?
14     A.   Well, just to back up and clarify,
15  when I think of our SOM system, I don't think
16  just of SAP.  I think of a holistic approach
17  that begins with the Know Your Customer
18  initiative and vetting.
19         And then we have the systemic
20  approach to it, which we're talking about, then
21  also the evaluation investigative aspect as
22  well, too, and the monitoring.
23         But in this aspect, we were talking
24  strictly about the automated aspect of the

1   system, where although we had a compliant
2   system, it -- we wanted to, again, sharpen the,
3   you know, the sensitivity.  So by -- and I'm
4   just putting this out there.  If we looked at
5   six parameters, we wanted to -- maybe Buzzeo had
6   a statistical algorithm of like 12.  Maybe we
7   could reduce the number, because we had an awful
8   lot of false positives in our system, so we
9   wanted to be more accurate and take -- and by
10  less labor, it means less false positives, less
11  time spent on reviewing orders that we didn't
12  need to have to.  Because that was one of the
13  issues.  We reviewed a lot of orders because we
14  erred on the side of being conservative.  We
15  rather look at too many orders than not look at
16  enough.
17     Q.   So with regard to that issue and
18  trying to make the automated part of the
19  Suspicious Order Monitoring System more
20  accurate, is that a good word or --
21     A.   No, because it was accurate, but we
22  just wanted to make it more efficient.
23     Q.   More efficient.
24         Was there ever any consideration that

1  the system wasn't pulling up enough suspicious
2  orders?
3      MR. LUXTON:  Objection to form.
4      A.   The system wasn't pulling up
5  suspicious orders.  The system was pulling up
6  orders of interest that were pending at it -- I
7  would not say it didn't pull up enough.  I think
8  we pulled up a lot of orders that were, I would
9  say, false positives that we had to -- had to
10  work through.
11      Q.   Was there ever any consideration that
12  the Suspicious Order Monitoring System at Watson
13  around this time in 2011 was not pulling up or
14  not pending orders that were suspicious or would
15  be suspicious if examined?
16      A.   No.
17      MR. KNAPP:  Objection to form.
18  BY MR. EGLER:
19      Q.   Was there ever any discussion of the,
20  for example, the Norco diversion issue and
21  whether the Suspicious Order Monitoring System
22  could be tuned to better examine issues raised
23  to the diversion of Norco?
24      MR. KNAPP:  Form and foundation.

1      A.   Not specifically.  I mean, we already
2  looked at hydrocodone as a molecule, which would
3  include Norco.
4      Q.   Was there any discussion of whether
5  to add more variables or data to examine the
6  known diversion issues with the hydrocodone
7  molecule?
8      A.   Again, known diversion issues -- what
9  known diversion issues are you talking about?
10      Q.   So we are talking about the Exhibit,
11  I think, 8 before, the email...
12      (Document review.)
13  BY MR. EGLER:
14      Q.   What we marked as Exhibit 8, there is
15  a statement from Mr. Herrera that says, "The
16  agents were" -- "that were interested were from
17  the San Diego field office, and there was a
18  presentation by SD County prosecutor that keyed
19  on the diversion wave in SD, especially Watson
20  hydro and Norco really hard."
21      Do you remember, and this is
22  April 2010, do you remember in 2011 when
23  recalibrating the Suspicious Order Monitoring
24  System at Watson, whether there was ever any

1  discussion of finding data or variables that
2  would help to track diversion in, say, San Diego
3  County, California?
4      A.   No.  Our system designed for our SOMS
5  program was in accordance with the DEA
6  regulations for us to identify or that deviated
7  in size, pattern or frequency with, with our
8  trading partners, with our partners.  That's
9  what it was geared towards.
10      Q.   The DEA didn't instruct registrants
11  on the formulas or algorithms they were to use
12  in constructing their Suspicious Order
13  Monitoring systems; is that right?
14      A.   That's correct.
15      Q.   And was there any consideration at
16  Watson at this time after having been told by
17  the San Diego field office of the DEA that there
18  was a diversion wave in San Diego that there
19  should be some analysis of how to account for
20  that wave or analyze it or anything?
21      MR. KNAPP:  Objection to form.  Asked
22  and answered multiple times.
23      A.   And I'll state that, you know, you're
24  basing this premise on someone's version of what

1  they say they heard in a conversation with, with
2  someone from San Diego.
3      There was no official communication
4  from anyone in California or San Diego to us as
5  an organization about a wave.  So this is
6  someone's -- you're taking someone's
7  interpretation of an event that they went to.
8      Q.   Did you --
9      MR. LUXTON:  Sorry to interrupt, but
10  some of the people on the phone notified me
11  that they are having a real tough time
12  hearing, so I wanted to slide this over, if
13  you don't mine, a little.
14      THE WITNESS:  Yeah.  Sure.
15      MR. KNAPP:  If you can just try to
16  keep your voice up.
17      THE WITNESS:  Sure.
18      MR. KNAPP:  Thanks.
19  BY MR. EGLER:
20      Q.   With regard to the, the DEA field
21  office and the DEA in general, Watson provided
22  the -- the -- I can't remember the name.
23      What are the fake pills?
24      A.   Placebo.

1    Q.    Watson provided the placebo pills to
2    the DEA as part of their processes; is that
3    right?
4    A.    Right.
5    Q.    And when you or whoever at Watson
6    talked to the DEA agents, did you get an
7    understanding of why they were asking for
8    placebo Norco pills?
9    A.    If they requested Norco, yes.
10   Q.    What was your understanding of why
11   they were asking for placebo Norco pills?
12   A.    To perform a reverse buy because of
13   an illicit diversion.
14   Q.    Did the Suspicious Order Monitoring
15   System at Watson ever take into account the
16   issues raised by the DEA in seeking the placebo
17   pills?
18   A.    Can you clarify?
19        MR. KNAPP:  Objection to form.
20   BY MR. EGLER:
21   Q.    Do you know why the DEA was asking
22   for the placebo pills?
23   A.    I just explained that.
24   Q.    Can you say it again?  I just --

1    A.    They were looking to do a reverse buy
2    because of illicit activities with product.
3    Q.    So did you ever ask the DEA what the
4    illicit activities that the DEA thought were
5    going on were?
6    A.    The DEA nor any law enforcement
7    agency is going to share any active
8    investigation details with you.
9    Q.    After the DEA requested the Norco
10   placebo pills, did you do any media analysis or
11   court docket analysis to determine whether
12   Watson's drugs were part of an indictment or
13   bust or publicized investigation anywhere in the
14   country?
15   A.    As part of our, our security
16   department's charge, we obviously would monitor
17   the federal register or media for any type of
18   appearance of our product that involved in any
19   type of activities.
20   Q.    But particularly, after the DEA asked
21   you for the fake pills, the placebos, did you
22   ever try to follow up in the media or court
23   records to determine if they busted somebody for
24   trying to buy the pills?

1        MR. KNAPP:  Objection to form.  Asked
2        and answered.
3    A.    I don't recall.
4    Q.    Did you ever instruct anyone to go
5    keep this on a tickler file to see if anything
6    ever came up about it?
7    A.    We had a proactive posture as it was,
8    so we continually monitored for these type of
9    activities.
10   Q.    Do you remember ever finding anything
11   out about it?
12   A.    Not about this particular case.
13   Q.    Well, do you know whether all the
14   pills that the DEA got from Norco or got from
15   Watson, all the placebo pills were used in one
16   case?
17   A.    I don't know.
18   Q.    As you think about it over, say, 2010
19   and 2011, do you have an understanding of how
20   many bottles of placebo Norco Watson supplied to
21   the DEA?
22   A.    I don't, but it wouldn't -- it wasn't
23   a lot.  We didn't get a -- it wasn't a high
24   volume of requests that we got.  And a request

1    would not be solely for Norco either.  So it
2    could be any particular product.
3    Q.    But you are aware that the DEA was
4    asking for placebo pills of Norco, right?
5    A.    Right.  I think it was ten bottles.
6    Q.    And when you met with Buzzeo, the
7    Buzzeo people, did you ask if there was a way
8    that you could tune the Suspicious Order
9    Monitoring System to examine any diversion
10   issues with regard to Norco?
11   A.    When you say "diversion issues,"
12   where, where I'm trying to get an understanding
13   is "diversion" is kind of a blanket term.
14   There's different types of diversion.  You can
15   have a cargo theft.  You can have a loss in
16   transit.  You can have a theft.  You can have a
17   non-righteous prescription.  So you -- it's kind
18   of a broad term that you're using.
19        So what we did was, with our
20   Suspicious Order Monitoring program, is that we,
21   we designed our system, as many other
22   registrants did, to ensure that we are meeting
23   our compliance under the Code of Federal
24   Regulations, under our corresponding

1  responsibility, which was the relationship
2  between us and our direct customer.  And, again,
3  our Know Your Customer aspect of our, of our
4  program dealt with getting more into who their
5  customers were, what the usages were, as well as
6  any type of follow-up investigative work.  But
7  as far the expectation for a SOMS program, to be
8  able to reach that far down into the supply
9  chain is just not realistic.
10     Q.  Well, Watson reached that, reached
11  that far down into the supply chain to examine
12  whether orders should be cleared; is that right?
13     A.  We reached down to the distributor
14  level.  And if the distributor level did not
15  have a satisfactory data for us, we could -- we
16  would ask them for the third-party information
17  as to who they were distributing to.  So that
18  was all done with our direct customer.  We
19  weren't reaching out to individual pharmacies.
20     Q.  There were instances when Watson's
21  customer service group reached out to the sales
22  and marketing people for market data to
23  determine whether pended orders should be
24  cleared; is that right?

1       MR. LUXTON:  Objection to form.
2     A.  It's possible depending on the
3  circumstance.
4     Q.  But it's your understanding that
5  there was never an official policy that would
6  reach out to the sales and marketing people to
7  incorporate market-based data to determine
8  whether an order should penned; is that right?
9     A.  Right.
10     Q.  So, for example, the IMS data that,
11  that Watson bought that gave a view of a -- the
12  entire market of a generic opioid drug, that was
13  never incorporated into Watson's or Actavis's
14  Suspicious Order Monitoring System, the
15  automated part; is that right?
16       MR. KNAPP:  Foundation.
17       MR. LUXTON:  Foundation.
18     A.  I'm not an expert on IMS data.  I do
19  know that there are limitations to that data.
20  It's retrospective as well as I don't know if
21  you can get as granular as to what you may be
22  indicating.  So I can't, I can't really speak to
23  that as an expert.
24     Q.  The Suspicious Order Monitoring

1  System, as you understand it, typically uses
2  retrospective data; is that right?
3     A.  We're actually basing a current order
4  based on a six-month history.
5     Q.  Right.
6       So the six-month history is
7  retrospective; is that right?
8     A.  Yeah, to an extent.  But it's, it's
9  giving you a current snapshot of what the, the
10  average looks like.
11     Q.  An average of the past six months?
12     A.  Right.
13     Q.  And do you know how current the IMS
14  data that was available to Watson in, say, 2010
15  going forward was?
16     A.  I don't.  And, again, I'm -- just to
17  reiterate, I'm not an IMS expert.  I don't have
18  a lot of breadth of knowledge with the topic.
19     Q.  Do you remember ever asking anybody
20  at Watson or anywhere else about what the
21  currentness of any IMS data that would be
22  available would be?
23     A.  No.  I know IMS data was used for
24  product launches.  It was used for, you know,

1  trying to estimate market share.  Or if you're
2  potentially launching a product, what your
3  anticipated launch.  You know, it sometimes was
4  used to support a quota request, but not
5  necessarily -- we didn't use it as part of our
6  SOMS program.
7     Q.  So who at Watson was in charge of the
8  quota request?
9     A.  I was involved with quota request.
10     Q.  So you would have been -- in the
11  course of your work, you would have encountered
12  IMS data; is that right?
13     A.  But when you talk about IMS data,
14  there's all different types of data.  So this,
15  you know, if it was a quota request, if it was
16  for something like a launch, sales and marketing
17  would provide us justification and that, based
18  on data, they anticipate capturing this much of
19  a market, for example, of a product.
20     Q.  So where that DEA quota is
21  established, typically annually?
22     A.  Yes.
23     Q.  And as part of the analysis that you
24  would do at Watson, would you examine IMS data,

1  say, for -- let me start over.
2      As you think about the annual
3  analysis that you did for the generic opioids at
4  Watson, would that involve looking at the IMS
5  data across the various NDAs for a particular
6  molecule to establish Watson's deserved level of
7  quota?
8      A.  Are you talking about ours against
9  others or --
10     Q.  Yes.
11     A.  No.
12     Q.  Would you look at the entire market
13 for a particular molecule?
14     A.  No.  It's part of the quota request
15 process that, you know, that's not something DEA
16 would consider.  The DEA would, would grant your
17 quota request based on your historical sales and
18 nothing to do with anybody else's in the market,
19 so it would not be relevant.
20     Q.  What would you use the IMS data for
21 then?
22     A.  For -- if you wanted to make a DEA
23 request for quota and it's -- maybe it's a new
24 product, so you don't have any sales history,

1  but you're estimating that we're going to launch
2  this generic version of this product that's
3  currently marketed by pharmaceutical company
4  ABC, okay?  So there is market data.  So if this
5  is the brand and these are the total
6  prescriptions, we anticipate that a generic
7  could possibly take 80 percent of that market.
8      So if the total prescriptions for
9  this, for this molecule, or this product in this
10 case, represents this number, that then we would
11 do an exercise based on that to determine how
12 much active material we would need to produce
13 quantities for launch and post-launch quantities
14 to have inventory on hand.
15     Q.  So with regard to the data that you
16 would buy from IMS for this, was there ever, as
17 you know, as far as you know, any restrictions
18 put on the use of the data?
19     A.  Again, I, I didn't extensively use
20 IMS data, and I was not involved of any type of
21 interaction with IMS or the purchase of the
22 data.  Any data that I received was really just
23 as I articulated and provided by sales and
24 marketing.

1      Q.  As you think about the launching of
2  these generics that you're talking about, about
3  how many times did you do it when you were in
4  charge of the DEA affairs group at Watson and
5  then Actavis?
6      MR. KNAPP:  Form.
7      A.  How often did we launch a product?
8      Q.  Well, about how many times, yeah.
9      A.  It's hard to quantify, but it was not
10 a typical activity in my department.
11     Q.  More than once a year?
12     A.  Once a year, if that.
13     Q.  So with regard to the IMS market data
14 that would be collected, if the drug -- let me
15 start over.
16     With regard to the IMS market data
17 that would be collected by Watson, would Watson
18 use that data to inform its Suspicious Order
19 Monitoring System if the drug was approved?
20     So if Watson -- I'll ask this
21 differently.
22     A.  Okay.
23     Q.  If Watson was granted part of the
24 quota by the DEA and was allowed to market a

1  particular drug under that quota, would Watson
2  use the IMS data that it had purchased in
3  furtherance of the quota request to inform its
4  algorithms and formulas in the Suspicious Order
5  Monitoring System?
6      MR. LUXTON:  Objection to form.
7      A.  If you're -- if you're talking about
8  a new product launch, we would receive data
9  from, not necessarily IMS data, but based on
10 from our sales and marketing folks as far as
11 what we can expect as potential quantities based
12 on their interactions with customers.  We would
13 receive estimates on, on that.
14     Q.  So the market would reach -- let me
15 start over.
16     So the data that you would seek out
17 with regard to a new product launch would relate
18 to the demand for the particular Watson generic?
19     Is that right to say?
20     A.  Right.
21     Q.  And not for the demand for the, the
22 comparable NDC-coded generics?
23     A.  You lost me there.
24     Q.  So -- and I appreciate you taking the

1 time with me.
2     A.   Yeah, not a problem.
3     Q.   So what's your understanding of an
4 NDC code?
5     A.   National Drug Code is a number that,
6 a unique number that is established and produced
7 by the FDA for a particular drug.  And it
8 indicates the manufacturer, the labeling code,
9 the quantity and fill size of a product and the
10 strength.
11     Q.   Right.
12         So if it was -- so an NDC code would
13 say, for example, it was a bottle of a 100
14 pills, 20 milligrams each of a particular drug;
15 is that right?
16     A.   Right.
17     Q.   Did you or anyone at Watson ever seek
18 out complimentary NDC codes -- let me start
19 over.
20         Did you or anyone at Watson ever seek
21 out IMS data to complimentary NDC codes when
22 launching a particular generic opioid?
23         MR. KNAPP:  Objection.  Foundation.
24         MR. LUXTON:  Objection.

1 BY MR. EGLER:
2     Q.   To inform the Suspicious Order
3 Monitoring System?
4         MR. KNAPP:  Same objection.
5     A.   I'm still trying to grasp here.
6         Looking at IMS data for the innovator
7 or the brand product are you talking about?  Or
8 for what?
9     Q.   Well, as I'm thinking about it, for
10 any complimentary NDC code.  So if there is a
11 brand version that's 100 pills of 20 milligrams
12 each and then if there is a generic version of
13 100 pills, it's 20 milligrams each, did you ever
14 seek that type of data out to inform the SOM
15 program?
16     A.   Well, the -- like I said, the
17 information we received in regards to if we're
18 talking about a product launch here is, again,
19 we're going to make our case to the DEA for
20 quantities that we need, and we're going to
21 establish what launch quantities would be.
22 These launch quantities are based on what our
23 customers' needs will be.
24         So they are going to articulate to

1 us, that, hey, we buy -- and this -- this is a
2 process that we would, you know, our marketing
3 folks would meet with these folks.  This is what
4 we currently do in the brand, and we're going to
5 be replacing probably 80 percent or whatever, 50
6 percent of that with your product.
7         So that's basically where these
8 numbers are established as to what we can expect
9 as what that customer's order behavior is going
10 to be.
11         And what we would do in our SOM
12 system is we would receive this data, and what
13 we would do for any type of new product or even
14 an NDC code change is we would essentially put
15 the SOMS program on pend everything.  Because we
16 wanted to pend every single one of their orders
17 going forward for at least six months to say,
18 okay, to make sure that they're ordering
19 patterns were righteous with what they're
20 telling us in order to, in order to establish a
21 baseline of normal ordering behavior prior to
22 putting the system into the -- into the current
23 system.
24     Q.   Do you remember whether you or anyone

1 you knew of at Watson ever did an analysis to
2 determine whether the initial demand from any of
3 your customers was due to improper ordering or
4 improper delivering so that the initial demand
5 was improperly high?
6         MR. LUXTON:  Objection.  Form.
7     A.   Like I said, we did analysis of what
8 their current, their current business is.  These
9 are all customers, most -- they're not new
10 customers.  These are customers that are
11 existing that we've done due diligence on, that
12 we have a -- we maintain a relationship with
13 them and that we have conversations with about
14 these types of activities.
15         And so we have a certain comfort
16 level that our -- you know, that having these
17 strong customer relationships that, you know,
18 and that they have a history of doing the right
19 thing.
20         But we'll also look at what customers
21 that they are going to distribute to.  That is
22 all part of the process.
23     Q.   Do you remember whether Agent
24 Rannazzisi ever warned registrants to examine

1    initial levels of orders by pharmacies or
2    distributors to determine whether the initial
3    level of a new customer was improperly high?
4         A.   I don't know if Deputy Administrator
5    Rannazzisi offered that information.  That's
6    something that we would have done anyway as just
7    part of our due diligence.
8         Q.   And how would you have done that?
9         A.   As I just detailed.
10        Q.   Okay.  Anything else that you can
11   think of?
12        A.   No.
13        Q.   All right.  And going back to this
14   Exhibit 12, I think we were on page 2.
15        A.   Okay.
16        Q.   There's -- throughout this document,
17   there is a reference to a person named Bob.
18             Is that Robert Williamson?
19        A.   Yes, sir.
20        Q.   All right.  And here it says -- we
21   were talking about your discussion or your
22   presentation on the first page.
23        A.   Um-hmm.
24        Q.   And on the second page of the

1    document, it says "Bob's overview DEA."  And I
2    had asked you this before.
3             This isn't your writing here,
4    correct?
5         A.   Right.
6         Q.   This description of Bob's overview?
7         A.   Correct.
8         Q.   It says, "DEA plays by their own
9    rules.  Shoot first and ask questions later.
10   They have a tendency to interpret the regs the
11   way they want to and have been successful being
12   aggressive against companies.  Bob requested a
13   list of all our customers from Napoleon,
14   discussed customers, and would like a list of
15   all our List 1 chemical customers."
16             In the context of your work, what
17   does the term "List 1" mean?
18        A.   A List 1 chemical is a chemical that
19   can be a precursor or a chemical entity that's
20   used in the manufacture of a product like a
21   pseudoephedrine, ephedrine.  These List 1
22   chemicals can also be diverted and used in the
23   illicit manufacture of methamphetamine,
24   therefore DEA controlled or regulated those

1    schedule listed chemical products.
2         Q.   And then going down to No. 5, it says
3    "OMS and SOMS."
4         A.   Um-hmm.
5         Q.   Oh, but going back to that No. 2 --
6         A.   Sure.
7         Q.   -- do you remember ever having a
8    discussion with Bob about whether the DEA plays
9    by their own rules and she shoot first and ask
10   questions later?
11        A.   No.
12        Q.   All right.
13        A.   Bob is -- was a former senior member
14   of DEA.  That's purely his opinion.
15        Q.   All right.  So I think going to the
16   next page, No. 7, Bob's discussion again, it
17   says, "DEA wants performance-based approach,
18   statistically defendable model, uses language
19   and regulations, September 2011 letter.  No
20   clients ever called Bob's organization
21   questioning the SOMS program."  K
22             That sentence there, "No clients ever
23   called Bob's organization questioning the SOMS
24   program," do you have an understanding of what

1    that means?
2         A.   I think it's Bob stating that their
3    product is statistically defensible and also
4    that, you know, Bob's selling a product as well.
5         Q.   Okay.  Can you turn to -- it's the
6    last page of the exhibit.  It's 6492.
7         A.   Yes.
8         Q.   And it states, "Orders:  How many
9    ways are orders are placed?  EDI, Electronic
10   Data Intercheck."
11             In the context of your work, do you
12   know what that term means?
13        A.   It can be an order that's placed in
14   an automated fashion with -- within the system.
15   So maybe one SAP system talking to another
16   business's in the electronic data exchange.
17        Q.   All right.  So then down on No. 17,
18   it says "Path forward, evaluation 10 working
19   days.  Bob reviews everything with Ron Buzzeo.
20   All communication will go to Tom and Scott.
21   They recommended that SOMS and compliance
22   regulation is tied into legal.  And future
23   compliance, remove labor intensity and
24   automation."

1    Do you remember having that
2  discussion during this meeting?
3    A.  I don't specifically.  It was a while
4  ago, but I'm sure it took place.
5    Q.  All right.  You can set that document
6  aside.
7    (Napoli Exhibit 13, Document entitled
8    "controlled Substance Awareness:
9    Understanding the Threat," Bates-stamped
10   ALLERGAN_MDL_02054999 through 5022, marked
11   for identification, as of this date.)
12 BY MR. EGLER:
13   Q.  I'll hand you what we will mark as
14 Exhibit 13.  Can you look at Exhibit 13?  And as
15 you're looking at it, I'll read into the record
16 that the first page -- well, the first page has
17 no Bates numbers on it, but starting on the
18 second page, it's ALLERGAN_MDL_02054999 through
19 5022.
20   Mr. Napoli, when you're ready, will
21 you tell me if you recognize the presentation
22 that appears after the first page of this
23 Exhibit 13?
24   A.  I recognize it.

1    Q.  What is it?
2    A.  This is a security awareness
3  presentation that I put together to talk about
4  to our security managers, our operations
5  management, and our employees.  Because part of
6  our security program was security awareness, we
7  wanted to have conversations with our employees
8  about that drug diversion does exist and to talk
9  about some of these instances and also to
10 identify ways in which we can continually, you
11 know, raise the awareness of employees so we can
12 focus on ensuring that we have effective
13 controls in place to, to mitigate the loss of
14 any of these products.
15   Q.  Okay.  With regard to this document,
16 it states "date created," on the first page,
17 "February 2009" and "date last modified,
18 August 2011"?
19   A.  Okay.
20   Q.  And it also states it's from your
21 custodial file.
22   Do you remember using this document
23 around 2011?
24   A.  I don't specifically, but it's

1  possible.
2    Q.  I think you said that this
3  typically -- or this would be a presentation
4  that you would typically give to employees
5  internally; is that right?
6    A.  Management supervisors, as well as
7  security.  And, again, it was to raise the level
8  of understanding of the, you know, of the
9  threats around controlled substance products in
10 general.
11   Q.  So with regard to this document, can
12 you turn into the document to page 004 where it
13 says "Organizational overview"?
14   (Witness complies.)
15   A.  Yes.
16   Q.  And I think we had talked about a
17 number of people that appear on this
18 organizational chart.  And your name appears on
19 the far left-hand side; is that right?
20   A.  Correct.
21   Q.  And where, if anywhere, on this is
22 the -- would the Suspicious Order Monitoring
23 System at Watson around this time, 2011, be
24 placed?

1    A.  Controlled substance compliance U.S.
2    Q.  So that is underneath you; is that
3  right?
4    A.  Yes.
5    Q.  And then with regard to the Mark --
6  is it Buban?
7    A.  Buban.
8    Q.  Buban?
9    A.  Um-hmm.
10   Q.  That's B-u-b-a-n.  Manager, security
11 and product protection Salt Lake City?
12   A.  Um-hmm.
13   Q.  Do you remember what products Watson
14 made in its Salt Lake City facility?
15   A.  Salt Lake City had a broad portfolio.
16 And I, I couldn't speak to the non-controls, to
17 be honest with you.  It was not my -- my focus
18 was on the controlled drug.  But from a
19 controlled drug standpoint, as we talked about
20 before, testosterone, fentanyl transdermal and
21 methylphenidate transdermal.
22   Q.  So the next page, 005, it states, "We
23 manufacture controlled substances that are among
24 the most commonly," and then colon, it states,

1  "prescribed for legitimate medical need in the
2  U.S. and encountered by law enforcement on the
3  street."
4       I think we talked about that earlier;
5  is that right?
6    A.  Yup.
7    Q.  And going to page 007, it says,
8  "hydrocodone" and then in parentheses, "see
9  Roman numeral 3."
10       Is that right?
11    A.  Correct.
12    Q.  It says, "Street names:  Vikes,
13  Hydro and Norco"?
14    A.  Um-hmm.
15    Q.  And then you write, "In 2006, DEA
16  documented the diversion of millions of dosage
17  units."  And then you write, "The United States
18  consumes 99 percent of the global hydrocodone
19  supply."
20       Why did you write that on here?
21    A.  Which statement?
22    Q.  Well, let's go through the three of
23  them.
24       The street name?

1    A.  So we're trying to familiarize our
2  security team members, as well as supervisors
3  and managers, about the illicit use of these
4  products.  You know, our products are developed
5  and marketed for -- to reduce legitimate pain in
6  those in suffering, but also there is a
7  percentage of products that are -- that wind up
8  in illicit markets.  And we're just providing
9  insight to our employee -- to our members of
10  management, supervisors, and security folks
11  about the illicit side.
12    Q.  You write -- and this is 2011, I
13  think, when this is written.
14    A.  Um-hmm.
15    Q.  "In 2006, DEA documented the
16  diversion of millions of dosage units."
17       Why did you write that?
18    A.  Just to convey the magnitude of some
19  of the issues that are going on.
20    Q.  All right.
21       And the next one is, "The United
22  States consumes 99 percent of the global
23  hydrocodone supply."
24    A.  Right.

1    Q.  Why did you write that?
2    A.  To put it in perspective as well.
3    Q.  And of that, United States, I think
4  you had said before, Watson, had -- is it 25
5  percent of the quota in its Corona, California,
6  plant; is that right?
7    A.  Yes.
8    Q.  So and then the next page, 008, it's
9  oxycodone CII.  Street names:  OC, OX, Oxy?
10    A.  Um-hmm.
11    Q.  And it says, "Popular among heroin
12  users for alleviating effects of withdrawal and
13  considered a white-collar addiction because of
14  the perceived product safety."
15       Do you remember why you wrote that
16  text in there?
17    A.  Again, for employee awareness.
18    Q.  And the next page talks about
19  employee theft.
20       But then moving down onto -- I'm
21  sorry.  Page 17 or page 017 in the exhibit.
22       It states, "As management, we must,"
23  and the first one is "foster a work environment
24  that engages employees to prevent loss and

1  removes the opportunity for theft" --
2    A.  Um-hmm.
3    Q.  -- "and then ensure that employees
4  understand what their role is in the prevention
5  of loss, consistently comply with the
6  established policies and procedures and
7  obligation to report diversion and suspicious
8  activity."
9       Do you remember why you wrote that
10  down, "obligation to report diversion and
11  suspicious activity"?
12    A.  Because it is a DEA requirement
13  within the Code of Federal Regulations, and we
14  wanted to ensure compliance.
15    Q.  All right.  You can set this document
16  aside.
17       (Witness complies.)
18  BY MR. EGLER:
19    Q.  I'll hand you what we will mark as
20  Exhibit 14.
21       (Napoli Exhibit 14, NJPIG letter
22  dated 7/20/11 from NJPIG Committee to
23  Rannazzisi, Bates-stamped
24  ENDO-OPIOID_MDL-02219848 through 19851,

1    marked for identification, as of this
2    date.)
3    BY MR. EGLER:
4        Q.   Mr. Napoli, could you look at what we
5    marked as Exhibit 14.  And as with the prior
6    exhibit, I can remember which one, I'll just
7    tell you this didn't come from the Allergan
8    production.
9        A.   Okay.
10       Q.   That's why the bottom right-hand
11   corner numbers are different.
12       A.   Okay.
13       Q.   It states ENDO-OPIOID_MDL-02219848
14   through 19851.  But could you look at this
15   document and tell me if you recognize it?
16           (Document review.)
17       A.   I do recognize the document.
18       Q.   What is this document?
19       A.   This looks like a letter that we sent
20   on behalf of the New Jersey Pharmaceutical
21   Industry Group to Deputy Administrator Joe
22   Rannazzisi.  And it was about significant issues
23   that were going on around this time frame with
24   delays in receiving quota grants that were

1    impacting the manufacturers to be able to, to
2    manufacture and ensure that there were adequate
3    supplies for those patients in need of the
4    products.
5        Q.   So when you that term "delays in
6    receiving quota grants" --
7        A.   Sure.
8        Q.   -- what does that mean?
9        A.   It means that, you know, when -- when
10   -- there's is a couple aspects to it.  So when
11   we talked before about the aggregate quota and
12   also receiving manufacturer procurement quotas
13   and procurement quotas are more relevant to the
14   manufacturers of solid-dose products, there are
15   established timelines within the DEA regulations
16   that they have to meet, that they're obligated
17   to meet to communicate the grants of
18   quota-driven materials to industry.
19           And, for example, these -- there is a
20   midyear adjustment as well as the towards the
21   latter part of the year, you'll receive a grant
22   for the next calendar year.  And the DEA was
23   consistently not coming close to meeting these
24   obligations.

1        And by receiving these grants in a
2    delayed manner, it would impact the company's
3    ability to, if you don't understand what, what
4    quota that you're receiving, you can't plan your
5    manufacturing campaigns effectively and your
6    manufacturing plants to be able to manufacture
7    your product.
8            When they talk about the procurement
9    process, the procurement quota process taking
10   nine weeks or more, again, that was a process
11   that would typically -- throughout the year, a
12   DEA registrant based on sales, you can go back
13   to the DEA and request more quota if it
14   justifies.
15           Those types of requests were taking a
16   protracted amount of time.  Again, that was
17   affecting the supply chain as well and the
18   manufacturing process.
19           So essentially, this, this letter
20   was, you know, an appeal to deputy administrator
21   for us to try to identify a way where we can
22   work on, you know, enhancing or improving these
23   timelines.
24       Q.   Do you remember with regards to this

1    letter seeing it when it was in draft form?
2        A.   Excuse me?
3        Q.   Would you have seen this letter
4    before it was sent, while it was in draft form?
5        A.   I would have seen it and I'm sure our
6    attorneys would have seen it as well.
7        Q.   I was going to ask you that next.
8            Well, let me get a little bit more
9    general.
10       A.   Sure.
11       Q.   This letter is dated July 20th, 2011;
12   is that right?
13       A.   Yes.
14       Q.   And at this time, July 2011, were you
15   still involved in the New Jersey Pharmaceutical
16   Industry Group on behalf of your then employer
17   Watson?
18       A.   Yes.
19       Q.   Was anyone else from Watson involved
20   in the New Jersey Pharmaceutical Industry Group
21   at that time?
22       A.   I was the main person.
23       Q.   And so if this letter was sent in
24   draft to the company representatives, you would

1  have received it; is that right?
2      A.  Correct.
3      Q.  So when -- as you think about your
4  general processes or unless you have a
5  particular memory, when you would have received
6  the draft of this letter, what would you have
7  done with it?
8      A.  I would have reviewed the letter
9  first, and I would have likely reviewed it with
10  my boss and also have either had a meeting or
11  sent it to our legal folks to review.
12      Q.  Do you remember in particular with
13  regard to this letter, having a meeting with the
14  legal staff at Watson about it?
15      A.  I don't remember a specific meeting.
16      Q.  And do you remember -- do you have a
17  particular memory of responding to the NJPIG
18  about Watson's official opinion with regards to
19  this letter?
20      A.  I don't.
21      Q.  Okay.  At the end of this letter,
22  there is the signature block, for lack of better
23  term.  It says "NJPIG committee."
24          Do you see that there?

1      A.  Yes.
2      Q.  And there is a person from Novartis,
3  Noramco, Purdue, Reckitt Benckiser?
4      A.  Benckiser.
5      Q.  Benckiser.
6          And Halo Pharmaceuticals, right?
7      A.  Um-hmm.
8      Q.  Do you know why that subgroup of
9  people from the NJPIG committee were listed
10  here?
11      A.  Those individuals served as kind of
12  the core committee for the organization itself.
13  I don't want to use the term "officers of the
14  committee," but that could can be interpreted in
15  that way.
16      Q.  And one of those people is your
17  former co-employee Tracey Hernandez, right?
18      A.  That's correct.
19      Q.  So do you remember talking with her
20  about this letter?
21      A.  No.
22      Q.  The company that she worked for at
23  this point, Reckitt --
24      A.  Benckiser.

1      Q.  -- Benckiser, do you know whether
2  they made opioids?
3      A.  I don't.  I don't know the first
4  thing about them.
5      Q.  Okay.  So going back to the first
6  page of this letter, do you remember anyone from
7  Watson -- let me start over.
8          Do you remember if anyone from Watson
9  ever told you that this letter was not
10  appropriate to send to Deputy Assistant
11  Administrator Rannazzisi in July of 2011?
12      A.  Not to my knowledge.
13      Q.  And do you remember anybody saying
14  that it was appropriate to send?
15      A.  I don't have a specific memory.
16      Q.  Do you remember anyone from Watson
17  having any edits to the letter --
18      A.  Not that I'm --
19      Q.  -- to the draft?
20      A.  Not that I'm aware.  Sorry.
21      Q.  All right.  Now do you remember
22  anyone from Watson ever commenting that beyond
23  the quota issues that are raised here, there
24  should be other issues raised to Deputy

1  Assistant Administrator Rannazzisi around this
2  time frame, July 2011?
3      A.  I don't recall any specific issues.
4      Q.  So this letter talks about quotas; is
5  that right?
6      A.  Yes, sir.
7      Q.  And let's start off broadly.
8          From the time you started in your DEA
9  affairs position at Watson and through the time
10  you left Actavis, did the quota on any Schedule
11  II controlled substance granted Watson or
12  Actavis go down?
13      A.  I would say by the -- prior to me
14  leaving the organization?
15      Q.  Yes.
16      A.  I definitely think that -- I believe
17  some of the opioids quota went down.
18      Q.  Do you have a particular memory of
19  any particular opioid that went down?
20      A.  I'm -- and, again, I don't have the
21  numbers in front of me.  Those can be easily
22  found in the federal register.  But I think that
23  there were -- in some of the years where DEA
24  focused on aggressive enforcement, I believe

1    that you, you probably saw hydrocodone either
2    stayed the same or maybe go down, but I, but I
3    can't swear to that.
4       Q.   As you think of it, was any reduction
5    in quota for an opioid at Watson or Actavis
6    while you were there the result of
7    company-specific activities or non-activities,
8    or were they related to the entire molecule
9    market?
10       MR. LUXTON:  Objection to form.
11       MR. KNAPP:  Objection to form and
12    foundation.
13       A.   So when I just spoke about
14    reductions, I'm, I'm speaking of the aggregate,
15    so that's everybody's.  So as far as Watson's
16    quota, I don't recall having reduced -- our
17    quotas reduced.  I mean, our quotas were
18    commensurate with what our sales were.  It was a
19    direct relationship there.  And I think, you
20    know, there were times I think where our, our
21    quota needs went down.
22       Q.   When Watson's quotas needs went down,
23    was their quota reduced?
24       A.   It wouldn't be reduced.  It would

1    just be -- well, organically it would be reduced
2    because we would request less.  It wasn't an
3    action taken by DEA to take back your quota, is
4    what I'm saying.
5       Q.   So do you remember making a smaller
6    quota request on any particular opioids in the
7    time that you worked at Watson or Actavis?
8       A.   I do.
9       Q.   Can you tell me about it?
10       A.   Oxycodone.
11       Q.   Do you remember what year that was?
12       A.   It would post 2012.
13       Q.   All right.  Any other ones?
14       A.   Not that I recall.
15       Q.   So oxycodone, is that a generic name
16    for a brand-name opioid?
17       A.   Oxycodone is the molecule, so it's
18    the active ingredient which can be used in
19    combination products, such as in combination
20    with acetaminophen or aspirin.  It could also be
21    a single-entity product, such as like an
22    OxyContin type of product.
23       Q.   Do you remember whether Watson or
24    Actavis made generic OxyContin?

1       A.   OxyContin?
2       Q.   Yes.
3       A.   I'm not sure specifically how far we
4    got into the market with that.  I know it was
5    being developed.  I do know that there was a
6    brief time where we were an authorized generic
7    for Purdue Pharma, but that didn't last very
8    long because of litigation that they had
9    ongoing, so that was not a long lasting
10    relationship.
11       But as far as -- I can't be exact.  I
12    know that it was a product that was in
13    development, but I think that it was -- I don't
14    know if it ever came to fruition or what the
15    distribution of that product was.
16       Q.   So as you think about the reduced
17    quota request for oxycodone, do you remember the
18    reason for it?
19       A.   I do believe that when -- when we
20    transitioned, we when bought legacy Actavis into
21    organization, it became our SOMS program, there
22    was a, a reduction.
23       Q.   Do you remember the reason for the
24    reduction?

1       A.   It could have been our due diligence
2    efforts when we re-onboarded legacy customers.
3       Q.   Do you remember whether a new version
4    of any brand name of oxycodone came out around
5    that time?
6       A.   As far as a brand?
7       Q.   Yes.
8       A.   We wouldn't have manufactured any
9    brand.  If you're talking about anything
10    marketed by us, we would not -- we didn't have
11    any brand oxy.
12       Q.   And beyond any drug marketed by you,
13    do you remember, say, for example, a
14    tamper-resistant version of --
15       A.   I was just going to say, there were
16    various formulations that were being developed
17    by innovators such as Purdue where it was
18    increasing the tamper-resistant for controlled
19    substance single-entity products like OxyContin.
20       Q.   Do you ever remember whether that
21    development, the tamper-resistant technology,
22    had an effect of reducing Watson's or Actavis's
23    quota request?
24       A.   I don't believe there was a direct

1    correlation because we are largely talking about
2    two different types of products where one is --
3    you know, a product like OxyContin is just
4    purely oxycodone in larger controlled release
5    quantities, where a lot of the products we
6    manufactured were a combination products with,
7    you know, smaller amounts, but, but combined
8    with hydrocodone and oxycodone, with
9    acetaminophen or two different types of delivery
10   systems, two different types of products.
11   Probably geared towards different types of
12   patients, I believe, too, as well.  I would
13   imagine OxyContin is delivered more to an
14   individual who has got some chronic pain where
15   again you don't want that, the peaks and valleys
16   of the efficacy of the product so...
17        Q.   So with regard to the reduction in
18   quota request that you're thinking of, would you
19   characterize it as a drop-off in demand or a
20   drop-off in supply or a drop-off in the number
21   of customers or something else?
22        MR. LUXTON:  Objection to form.
23        A.   I couldn't speculate on that.
24        Q.   Do you remember at some point ever

1    inquiring about that?
2        A.   I don't recall.
3        Q.   As you made the reduced quota demand
4    for the --
5        A.   Well, I mean, obviously if we're
6    making a quota request or if we're not due for a
7    quota request is because of diminished sales.
8        Q.   Do you remember what the reason for
9    the diminished sales were?
10       A.   That, I don't know.
11       Q.   All right.
12       MR. LUXTON:  Before we go to the next
13   document, can we take a quick bathroom
14   break?
15       MR. EGLER:  Sure.
16       THE VIDEOGRAPHER:  The time is
17   2:37 p.m.  We are going off the record.
18       (Recess is taken.)
19       THE VIDEOGRAPHER:  We are back on the
20   record at approximately 3:05 p.m.
21       (Napoli Exhibit 15, Watson document
22   entitled SOMS Project Evolution IT
23   Governance Meeting, Bates-stamped
24   ALLERGAN_MDL_02468983 through 68994, marked

1    for identification, as of this date.)
2    BY MR. EGLER:
3        Q.   Mr. Napoli, you understand you are
4    still under oath?
5        A.   Yes.
6        Q.   Could you look at what I've just
7    marked as Exhibit 15?
8             And as with other documents I've
9    handed you today, the first page has no Bates
10   number, but starting on the second page, the
11   Bates numbers are ALLERGAN_MDL_02468983 through
12   68994.
13            Can you take a look at this document,
14   and when you're ready, tell me if you recognize
15   it.
16            (Document review.)
17       A.   I do.
18       Q.   What is this document?
19       A.   It's a document I guess detailing the
20   anatomy of our SOMS project.
21       Q.   So as you think about this document,
22   that is Exhibit 15, were you responsible for it
23   or somebody in your group responsible for
24   creating it?

1        A.   For this document itself?
2        Q.   This particular document.
3        A.   I don't have an exact recollection.
4    I could have contributed to this.
5        Q.   All right.  So as you look at this
6    document, do you have an understanding of who
7    this presentation was made to?
8        A.   Based on the fact that it's an IT
9    governance meeting, I'm thinking perhaps some --
10   our IT folks.
11       Q.   Have you ever heard that term "IT
12   governance" in the course of your work at
13   Watson?
14       A.   I have.
15       Q.   What does that term mean to you?
16       A.   Well, from a governance perspective,
17   I would think, and it's IT, I would think that
18   ensuring that any systems or IT-related programs
19   that we're utilizing within the organization
20   meet the requirements in compliance with our
21   standard operating procedures.
22       Q.   When you think of an IT department at
23   Watson while you were there around this time,
24   April 2012, do you think of one or a couple of

1    particular people that stand out in your mind?
2        A.   Not really.
3        Q.   So going into this document, on the
4    fourth page, it's 8984.  At the top of the page
5    it states, "Regulatory Requirement.
6        A.   Um-hmm.
7        Q.   And it states -- it has the language
8    of that 21 CFR 1301.74 (B), right?
9        A.   Yes.
10       Q.   And you see that?
11           So I'll just read it in the record.
12           "The registrant shall design and
13   operate a system to disclose to the registrant
14   suspicious orders of controlled substances.  The
15   registrant shall inform the field division of
16   the administration in his area of suspicious
17   orders when discovered by the registrant.
18   Suspicious orders include orders of unusual
19   size, orders deviating substantially from a
20   normal pattern, and orders of unusual
21   frequency."
22           Do you see that?
23       A.   Yes, sir.
24       Q.   And then the next one says, "Further

1    guidance, December letter of 2000."  It states,
2    "Registrants that rely on rigid formulas to
3    define whether an order is suspicious may be
4    failing to detect suspicious orders.  For
5    example, a system that identifies orders as
6    suspicious only if the total number exceeds the
7    previous month by a certain percentage or more
8    is insufficient."
9        Do you see that there?
10       A.   Yes.
11       Q.   That second group of, or that second
12   paragraph that I read, do you recognize that as
13   being from the letter authorized by
14   Mr. Rannazzisi?
15       A.   Yes.
16       Q.   And do you remember whether, in that
17   same letter, Mr. Rannazzisi highlighted the term
18   "include" in the 21 CFR 1301.74 (B) language
19   above, that suspicious orders "include" orders
20   of unusual size, orders deviating substantially
21   from a normal pattern, and orders of unusual
22   frequency?
23       A.   I don't recall if that was within the
24   letter.

1        Q.   And that there may be more than those
2    three requirements or conditions for something
3    to be a suspicious order?
4        A.   I don't recall if it was in the
5    letter.
6        Q.   All right.  So moving down into this,
7    on the next page, page 8985, it states, "Current
8    automated model," and it has various texts
9    there.
10           Can you read that text to yourself
11   and tell me what, in your opinion, it describes?
12           As you're reading it to yourself,
13   I'll read it into the record.
14           "Current automated model designed and
15   implemented within SAP, primary user is customer
16   relations," then, dash, "order intake process."
17           And then it states, "Based on a
18   'threshold,'" and then, dash, "customer
19   groupings," and then a bullet point, "class of
20   trade," and then three dashes underneath there,
21   "wholesaler, retail chain, distributor,
22   mail-order, et cetera," then another dash,
23   "monthly average based on 12" -- "based on
24   rolling 12-month period," and then "multiplied

1    by static multiplier equals monthly allowable."
2            So as you think about that whole page
3    together, does that describe the Watson
4    Suspicious Order Monitoring System around this
5    time April of 2012?
6            MR. KNAPP:  Objection to form.
7        A.   It describes a component of the
8    system.
9        Q.   Okay.  Then it has that term that we
10   talked about earlier, "class of trade."
11           Do you see that there?
12       A.   Yes.
13       Q.   Class of trade, it then says,
14   "wholesaler, retail chain, distributor, mail
15   order, et cetera."
16           Is that what you understand a class
17   of trade to be?
18       A.   Yes.
19       Q.   All right.  How about the next
20   language that's down there, "monthly average
21   based on rolling 12-month period," is that class
22   of trade?
23       A.   No.
24       Q.   Okay.  Why would that be listed there

1    under "class of trade"?
2         Could it be just a mistake --
3         A.  Yes.
4         Q.  All right.  And if you were tabbing
5    it today, putting it under a bullet point or a
6    dash, where would you put it?  Would you put it
7    as the same as based on a threshold, customer
8    groupings, or somewhere else?
9         A.  I may put it under a bullet of
10   formula.
11        Q.  Okay.  And then the next one,
12   "multiplied by static multiplier equal monthly
13   allowable," would you put that under the same
14   formula bullet?
15        A.  Yes.
16        Q.  So if you can turn to that next page,
17   8986, it states "Customer groupings."
18        Do you see that there?
19        A.  Yes.
20        Q.  And it states, "Individual customer
21   ship to location monthly average based on 12" --
22   no, "monthly average based on rolling 12-month
23   period," and then "multiplied by static
24   multiplier equal monthly allowable."

1         It seems to be similar language to
2    the prior one?
3         A.  Yes.
4         Q.  What does that "customer groupings"
5    mean?
6         A.  Not having authored this document, I
7    don't know.  I don't want to speculate.
8         Q.  And then it states, "Order pending."
9    And then the next bullet point is, "Multiplier
10   table is populated manually based on
11   estimation."
12        Do you have an understanding of what
13   that sentence means?
14        A.  I believe it indicates that the
15   multiplier is set manually based on a review of
16   the -- what the normal behavior could be
17   estimated to be with a customer.
18        Q.  Now as you think about your time at
19   Watson and Actavis, do you remember about this
20   time, April 2012, who would have set the
21   multiplier that's referred to in this page 8986?
22        A.  Setting the multiplier was the
23   responsibility of my group.
24        Q.  Do you remember if there was one

1    person in particular who would have set the
2    multiplier?
3         A.  I would have authorized it.
4         Q.  So with regard to setting the
5    multiplier, as you think about it, would the
6    multiplier be the same for every order by a
7    particular customer or would they differ with
8    regard to different orders by customers or
9    something else?
10        A.  It would be the same for each
11   customer.
12        Q.  So, say, McKesson was one of the
13   customers, every multiplier -- let me start
14   over.
15        Say McKesson was one of the
16   customers, the multiplier for every order by
17   McKesson would be the same; is that right?
18        A.  Right.
19        Q.  So going down further into the
20   document, "Current Automated System Evaluation"
21   down below, it says "Based on compliance
22   concerns."
23        Do you remember there being concerns
24   about whether Watson's Suspicious Order

1    Monitoring System complied with the DEA
2    regulations and laws in April 2012?
3         A.  I don't recall any specific
4    compliance concerns, but only our desire to
5    enhance the system.
6         Q.  Okay.  Do you remember ever -- anyone
7    ever telling you that they had concerns about
8    Watson's Suspicious Order Monitoring System
9    complying with the DEA regulations and laws
10   around this time?
11        A.  Not that I recall.
12        Q.  All right.  And then it says below,
13   "Increased enforcement action by DEA in the area
14   of SOM audits."
15        And then, "Most recently Cardinal and
16   CVS failing to maintain systems to detect
17   diversion."
18        Do you see that there?
19        A.  Yes.
20        Q.  Do you remember that around this time
21   that Cardinal Lakeland Distribution Center being
22   shut down?
23        A.  I don't have a specific memory, but I
24   do know that they had a distribution center that

1  was, I don't know if it was completely shut down
2  or if there is was a temporary order. I'm not
3  sure.
4      Q. And I guess "shut down" isn't the
5  right way to say it.
6      They were unable to sell controlled
7  substances; is that right?
8      A. Correct.
9      Q. Okay. So the next bullet point down
10 states, "Expectation that we know our customers'
11 customers."
12      Do you see that there?
13     A. Um-hmm.
14     Q. Do you remember where that language
15 came from, "expectation that we know our," that
16 we, quote, "know our customers' customers,"
17 unquote?
18     A. I don't.
19     Q. It states, "Cross-functional team
20 established in 2010."
21     And I think we talked about that
22 before, right?
23     A. Right.
24     Q. And as you understand it, the

1  cross-functional team that's referred to there
2  is the group from customer service and the group
3  from the DEA affairs; is that right?
4      A. That's correct.
5      Q. Oh, and below, it says, "Security and
6  DEA affairs, IT and customer relations."
7      And the IT component is programming
8  the automated system into the SAP process; is
9  that right?
10     A. Right. Or from a project management
11 standpoint of implementing a new -- if we went
12 with a new algorithm into the system.
13     Q. And then "Establish goals, compliance
14 and efficiency."
15     And, again, do you remember there
16 being a discussion about compliance around this
17 time frame?
18     A. No, I do not.
19     Q. All right. And then the next one is,
20 "Budgeted for third-party evaluation in 2011."
21     A. Right.
22     Q. And then turning to the next page,
23 "Automated System Evaluation," it starts talking
24 about Cegedim-Dendrite; is that right?

1      A. Yes.
2      Q. And is that the evaluation that we
3  were talking about in the exhibit before we took
4  the break?
5      A. Correct.
6      Q. So the next page is "Findings."
7      Do you see that there?
8      (Document review.)
9      A. Yes.
10     Q. So it states -- as you see that word
11 "Findings," can you -- do you have an
12 understanding what that means in the context of
13 this document?
14     A. These would be observations that were
15 made by the consultant.
16     Q. And the consultant was Buzzeo?
17     A. Yes.
18     Q. And it says, "Use of multiplier to
19 create monthly threshold."
20     And it says, "Not consistent with
21 specific requirements noted within regulations
22 and guidance, and current system will detect a
23 certain percentage of suspicious orders but not
24 all."

1      Do you see that there?
2      A. I do.
3      Q. Do you remember that being a finding
4  that the Buzzeo group made about the Watson
5  system in early 2012?
6      A. I don't have a specific recollection.
7      Q. Do you remember -- and, you know, I
8  put a date limitation on that.
9      Is your lack of specific recollection
10 based on the date or something else?
11     A. It's just... it's been a while.
12     Q. And then it states, "Current model
13 evaluates at SKU level."
14     Is that pronounced typically "skew"?
15     A. Yes.
16     Q. All right. What is a SKU?
17     A. A SKU is just one, one product. So
18 it can be oxycodone 10325, 100 fill count, SKU.
19     Q. Do you recognize the difference
20 between a SKU and an NDC code?
21     A. The SKU could be -- yeah, there,
22 there is a difference between the two. I don't
23 know the exact -- SKU is more of a -- we're kind
24 of exceeding my, probably my area of expertise,

1  but they're both unique identifiers.
2      I think what this is saying here is
3  that by looking at it at the SKU level, we're
4  not looking at the total molecule.  And that was
5  an enhancement.  So that's something where we
6  could have enhanced.
7      Q.  All right.  So it states, "Current
8  model evaluates at SKU level.  Possibility of
9  distributing orders across multiple SKUs without
10  detection."
11      So that's where you're talking about
12  it can be the same, as you refer to it, molecule
13  but with different SKUs?
14      A.  Right.
15      Q.  And then the next one is, "System
16  does not evaluate listed chemicals"?
17      A.  Right.
18      Q.  I think we talked about that earlier
19  as well?
20      A.  Right.
21      Q.  Those are the precursor chemicals
22  that you talked about?
23      A.  Right.
24      Q.  And then on the next page, 990, it

1  states, "Revisit approach to SOM to fully
2  address specific regulatory requirements."
3      And then it states, "Develop SOM that
4  is a 'non-threshold-based adaptive' -- I'm
5  sorry, let me read it.
6      "Develop SOM that is a,
7  'non-threshold-based adaptive,' system trained
8  to identify suspicious orders by utilizing a set
9  of historic markers to include," and then
10  another bullet point, "statistical scoring of
11  active ingredient order volume versus history,
12  active ingredient order versus short and
13  long-term trend, identification of high/low
14  frequency ordering behavior."
15      And then the next bullet point is
16  "Base system on milligram strength rather than
17  SKU."
18      A.  Um-hmm.
19      Q.  And then, "Include list of chemical
20  within system."
21      And then, "Based on recommendations,
22  GS and DEAA requested a proposal and quote."
23      In the context of this document, do
24  you know what GS and DEAA would be?

1      A.  Global security and DEA affairs.
2      Q.  And your group was DEA affairs; is
3  that right?
4      A.  Yes.
5      Q.  And then the next dash is "Establish
6  meeting with IT and consultant."
7      A.  Um-hmm.
8      Q.  "Understand scope, confirm that
9  solution was appropriate and achievable."  And
10  then the next one is "Budgeted for 2012
11  implementation."
12      Do you see that there?
13      A.  Yes.
14      Q.  Do you remember the -- do you
15  remember whether there was a decision around
16  this time, April 2012, to implement the Buzzeo
17  system at Watson?
18      A.  Yes, I believe there was.
19      Q.  All right.  Do you remember who made
20  that decision?
21      A.  It would have been my management.
22      Q.  Did you support the conclusion to
23  implement the Buzzeo system?
24      A.  I definitely supported enhancing our

1  system.  You know, the automated system that
2  we're talking about is -- we are talking about
3  just one component within the system, that's
4  what I want to make clear.  So we're not relying
5  on one component of a system as our Suspicious
6  Order Monitoring program.
7      Q.  And as you had been talking about
8  earlier, in addition to this process, there is
9  the onboarding process and reviews; is that
10  right?
11      A.  The Know Your Customer due diligence.
12      Q.  And Know Your Customer due diligence.
13      And then beyond the automated system,
14  there is a process of customer service clearing
15  and then, if necessary, DEA affairs clearing of
16  orders; is that right?
17      A.  Yes, sir.
18      Q.  And if none of those processes work,
19  the order will be reported to the DEA as
20  suspicious; is that right?
21      A.  Correct.
22      Q.  All right.
23      All right.  You can set this aside.
24      A.  Okay.

1    (Witness complies.)
2    (Napoli Exhibit 16, Watson document
3    entitled SOMS Project Evolution IT
4    Governance Meeting, Bates-stamped
5    ALLERGAN_MDL_02187196 through 87199, marked
6    for identification, as of this date.)
7    BY MR. EGLER:
8    Q.    Mr. Napoli, I'm handing you what I
9    marked as Exhibit 16.
10   Mr. Napoli, can you look at that
11   exhibit?  And while you're looking through it,
12   I'll read it into the record.  It's
13   ALLERGAN_MDL_02187196 through 87199.
14   And I'll tell you for the record,
15   there -- as I read it, there are two emails in
16   this exhibit, plus an attachment.  And the last
17   email in time, the first one on the page, the
18   first page of Exhibit 16, you're not included in
19   that email.
20   A.    Okay.
21   Q.    So you can read it, but I'm not going
22   to ask you questions about it.
23   A.    Okay.
24   Q.    The one below, Tuesday, October 4th,

1    2011, is from Lisa Scott to Mary Woods, and it
2    cc's you; is that right?
3    A.    Yes.
4    Q.    And it states, "Investigation
5    summary."
6    And Lisa Scott writes, "Mary, please
7    see the attached.  Thank you."
8    Then what follows is a two-page
9    attachment that is called "Investigation
10   Summary, Suspicious Order, TopRx, Inc."
11   And I want to ask generally about
12   this two-page part of the exhibit.
13   A.    Um-hmm.
14   Q.    Do you recognize this format?
15   A.    I do.
16   Q.    What is this format?
17   A.    This would be an investigation
18   summary that we utilized by our department.
19   Q.    So as you think of it, would this be
20   the type of investigation summary that would be
21   done by the DEA affairs group or by the customer
22   service group or something else?
23   A.    This was performed by my group, DEA
24   affairs.

1    Q.    All right.  This investigation
2    summary is then sent to Mary Woods, who was in
3    the customer service group.
4    A.    Yes.
5    Q.    Do you have an understanding of why
6    she would be contacted with regard to an
7    investigation summary?
8    A.    Mary was our partner with Suspicious
9    Order Monitoring, as well as she was on the
10   customer-facing side as well too.  So if we
11   needed to set up a meeting, a partnership
12   meeting to discuss this matter, she would be
13   likely the person to facilitate that for us.
14   Q.    So with regard to -- you used the
15   term "partnership meeting."  Would you have a
16   partnership meeting -- well, let me start over.
17   With regard to that term "partnership
18   meeting," as you think of the context of this
19   document, why would Watson be calling for a
20   partnership meeting with TopRx, Inc.?
21   A.    Because based on an investigation
22   that we performed and our findings, that we
23   found activities that were not consistent with
24   complying with the CFR, and we wanted to let

1    them know of that, that -- what our findings
2    were and discuss a path forward.
3    Q.    So at this point in the process, can
4    you tell from the investigation summary whether
5    Watson had contacted the DEA about the issues
6    raised in the investigation summary?
7    A.    I know for a fact that we provided
8    all this information to the DEA.
9    Q.    Would you have provided the
10   information to the DEA before this investigation
11   summary was written and before TopRx was
12   contacted or after?
13   A.    We would have reported that to DEA
14   upon discovery that the order was suspicious.
15   Q.    Okay.  In the document, the
16   Investigation Summary, does it say that Watson
17   personnel had contacted the DEA?
18   (Document review.)
19   A.    I don't see where it does, but I know
20   that they were contacted.
21   Q.    And as you think of it today, you
22   based that on your -- excuse me -- your
23   experience and typical processes at Watson; is
24   that right?

1      A.   I have a distinct recollection of
2 this case.
3      Q.   What do you remember about this case?
4      A.   I remember most of the details of
5 this case because I remember that it was
6 something that -- I was involved with in the
7 investigation, and that we -- the type of
8 activities that we uncovered, and I do recall
9 that this was reported to the DEA.
10      Q.   Do you remember whether at some point
11 Watson stopped shipping to TopRx?
12      A.   Absolutely.  We cut them off.
13      Q.   And do you remember whether TopRx's
14 license was -- let me start over.
15      Do you remember if TopRx's ability to
16 sell controlled substances was ever withdrawn by
17 the DEA?
18      A.   I don't believe there was any action
19 taken by the DEA against TopRx.
20      Q.   All right.  So let's move on.
21      I'll hand you what we'll mark as
22 Exhibit 17.
23      (Napoli Exhibit 17, Email chain
24      beginning with email dated 4/26/12 from

1      Picone to Woods with attachments,
2      Bates-stamped ACQUIRED_ACTAVIS_01179002
3      through 005, marked for identification, as
4      of this date.)
5      A.   This looks like the last --
6      Q.   Okay.  This is a repeat.  Can you
7 hand me that back and I'll see if I can get the
8 tab off of it.  I'll just make another tab.  So
9 you can set this one aside.
10      MR. KNAPP:  Are we not moving on?
11      MR. EGLER:  No, just set it aside.
12 I'm going to introduce another document
13 that we'll mark as 17 because we are
14 totally modular and we don't use electronic
15 documents.
16 BY MR. EGLER:
17      Q.   With that side trip, Mr. Napoli,
18 could you look at this document that we've
19 marked as Exhibit 17?
20      A.   Yes.
21      Q.   And as you're looking at it, I will
22 read into the record the Bates numbers, which
23 are a new set of Bates numbers, Acquired Actavis
24 -- Acquired_Actavis_01179002 through 005.

1      I'll represent to you that this
2 document was produced as a family of documents,
3 so it's an email, plus other documents put
4 together.
5      A.   Um-hmm.
6      Q.   And could you read through it
7 generally and when you're ready, tell me if you
8 recognize this document?
9      A.   I don't recognize it.
10      Q.   All right.
11      A.   I hope you don't ask me to interpret
12 this second attachment here.
13      (Laughter.)
14      Q.   And I apologize.
15      A.   I don't have my binoculars.
16      Q.   The second attachment that you're
17 referring to has teeny, tiny little numbers.
18 And in the course of us talking about
19 this, if you need to refer to that data, I can
20 go and get it on a computer and you can look at
21 it.  But I just want to let you know, because it
22 is mentioned as a piece of the document, you can
23 see generally what it is.
24      A.   Okay.

1      Q.   So the first two pages of this email,
2 of this Exhibit 17, is an April 17th and
3 April 26th email chain.
4      Do you see that there?
5      A.   Yes.
6      Q.   And the first email in time comes
7 from Mary Woods and it goes to Napoleon Clarke
8 and Toni Picone?
9      A.   Um-hmm.
10      Q.   Who is Ms. Picone?
11      A.   An individual who worked in marketing
12 with Napoleon.  Sales.
13      Q.   And it's T-o-n-i?
14      A.   Yes.
15      Q.   Ms. Woods writes, "Hi, Napoleon and
16 Toni.  I have a few marketing questions
17 regarding the hydrocodone market which I am
18 hoping you can assist with.
19      "As you know, the increased order
20 volume in many of the hydrocodone SKUs has been
21 significant over the past several weeks.  I am
22 intending to use the information provided to
23 discuss the market demand and market share with
24 the DEA compliance team."

1    And she asked a number -- she makes a
2  number of requests for data information.
3    Do you see that there?
4    A.  I do.
5    Q.  All right.  And then that's on
6  April 17th.
7    On April 26th, Ms. Picone writes back
8  to her and Mr. Clarke, Napoleon Clarke, and cc's
9  Lisa Scott, you, Sandy Simmons, Scott Soltis and
10  Andrew Boyer.
11    And we haven't talked previously
12  about Mr. Boyer.
13    Do you remember Mr. Boyer?
14    A.  Yes.
15    Q.  Who he is?
16    A.  Andy Boyer was our head of sales.
17    Q.  Would Mary Woods's department be
18  under Mr. Boyer?
19    A.  Yes.
20    Q.  The sales group, like Napoleon
21  Clarke, he would also be under Mr. Boyer?
22    A.  Correct.
23    Q.  And so would Ms. Picone?
24    A.  Yes.

1    Q.  So Ms. Picone writes back, "Hello
2  all.  Please see answers to the below questions
3  as per our meeting today."
4    And she has six points there.
5  "Amneal, Qualitest, and Mallinckrodt are the
6  suppliers that customers are telling us the
7  reasons for the supply shortages in the market.
8  Amneal has discontinued to select customers only
9  and Mallinckrodt has sent letters that they have
10  backlog and are trying to ramp up as a result of
11  the quota."
12    Do you remember receiving this email?
13    A.  I don't.
14    Q.  As you sit here today, the email is
15  called "Hydrocodone supply issues - market
16  demand."
17    As you read that point one that
18  Ms. Picone writes, what does that mean to you in
19  the context of the document?
20    A.  My interpretation of this document --
21    Q.  Yes.
22    A.  -- is that there is a shortage due to
23  certain manufacturers not receiving quota and
24  having the inability to manufacture.  So other

1  customers of Watson are looking to come over to
2  us to order because we had sufficient quota and
3  they were looking to order the product to meet
4  their customers' needs.
5    Based on this -- what we're seeking
6  here, this justification is because my team
7  likely pended a lot of orders and refused to
8  move on them until we had justification, which
9  probably prompted this meeting so we can get a
10  rationale around why the change in ordering
11  behavior, and you can see in there where we're
12  requesting data and forecasts so we can put some
13  rationale around what these new demands would
14  look like for us, rather than just approve these
15  orders.
16    Q.  Okay.  Ms. Picone, as you were
17  talking about it, she writes, "The customers who
18  are no longer receiving product from Amneal is a
19  permanent change and those who are short for
20  Mallinckrodt we expect to be temporary."
21    Then she says, "We do not know how
22  long the increased demand will be for temporary
23  change.  Mallinckrodt's letter states through
24  May."

1    And then she states, "Customers
2  typically do not proactively provide marketing
3  with increased forecasts.  However, we are
4  closely monitoring the orders and when we see
5  increases in orders, we do reach out to
6  customers to ask for revised forecasts and/or
7  monitor the 852/chargeback data to determine if
8  their sales out is increasing."
9    She uses that term "852/chargeback
10  data."
11    Are those the same 852 and chargeback
12  that we talked about earlier today?
13    A.  852, yes.
14    Q.  And then she states, "If we receive
15  increased forecasts from customers, we will
16  provide them to the master data team.  In
17  addition, if the master data team receives
18  revised forecasts, they will provide to
19  marketing."
20    And she says, "There is potential
21  market share increase of approximately 15
22  percent to 20 percent based on our share versus
23  our competitors' as of Q4 '11, per the IMS EU
24  data."

1    As you read this document, you see
2  that term IMS EU, what does that mean to you?
3    A.   I would interpret it as the -- that
4  IMS is providing the data on market share. EU,
5  I don't know what that means. I know it's not
6  European Union.
7    Q.   That was what I was going to ask.
8    So you don't have any feeling either
9  way?
10   A.   No. I think this email is a great
11 example of communication between the various
12 departments in making educated decisions on
13 rationalizing orders, though.
14   Q.   So let's keep going on it. I agree
15 with you.
16   She says, "I have attached recent TRX
17 data from IMS so you can see the market trends
18 by competitor. I also attached a copy of
19 Mallinckrodt's letter that they sent to
20 customers for your reference."
21   So that reference there, TRX data
22 from IMS, do you have an understanding of what
23 that means?
24   A.   Total prescriptions written.

1    Q.   Okay. So total prescriptions written
2  from IMS, what would that encompass?
3    A.   I believe that would provide the
4  blinded prescription information for a
5  particular manufacturer's product.
6    Q.   All right. So and as we are talking
7  about this hydrocodone, do you understand
8  hydrocodone to be, as we've been talking about
9  it, to be a molecule or a product or something
10 else?
11   A.   It could be -- hydrocodone in its raw
12 form is a molecule. The product itself is when
13 it's in a finished dosage form.
14   Q.   In fact, was Norco a hydrocodone
15 product?
16   A.   Yes.
17   Q.   Ms. Picone is sending the total
18 prescription data from IRS -- from IMS so that
19 Mary Woods can see market trends by competitor,
20 and that would relate to the hydrocodone market;
21 is that right?
22   A.   Yes.
23   Q.   So at any time did you seek data on
24 market trends by competitor to inform the

1  automatic part of the -- or the automated part
2  of the SOM system at Watson or Actavis?
3    A.   No.
4    Q.   Okay. Then you said that this was a
5  good example of communication between the
6  various groups at Watson; is that right?
7    A.   Right.
8    Q.   And do you remember whether this type
9  of communication took place to inform the
10 automated part of the Suspicious Order
11 Monitoring System at Watson?
12   A.   When you refer to the automated part,
13 I mean -- I think you would be referring to the
14 folks that manage the SOMS program, so that
15 would be my group. So certainly we were
16 definitely aware of this. This is information
17 we relied on to make educated decisions.
18   Q.   And the decisions that you're talking
19 about would be decisions made once an order
20 pended in the -- in the case of your group, once
21 an order pended and then was investigated by the
22 customer service group; is that right?
23   A.   Well, initially, this would have been
24 investigated by the customer service group. It

1  would have went to us because we're seeing a
2  trend here of these orders that are way out of
3  line with ordering behavior, and that's what
4  prompted this whole team meeting and discussion
5  and we identified that there was a market issue.
6  So we wanted to explore that because we want to
7  explain why we're seeing these spikes in
8  ordering behavior.
9    Q.   And the market issue that you
10 analyzed with regard to this time frame, did you
11 ever look at those market issues and try to
12 import them into the automated part of the
13 Suspicious Order Monitoring System?
14   A.   I don't think there would be a way to
15 incorporate those into this, but just of having
16 that knowledge of what these quantities look
17 like, we would be -- certainly, our DEA affairs
18 team would be aware of these increases and these
19 volumes so -- because these orders would
20 continue to pend. It wouldn't be part of a
21 12-month rolling history. So these would pend
22 every month and we would review to make sure
23 they were in accordance with the data provided
24 to us, and until such time that the ordering

1    behavior normalized.  And that would be
2    something that would happen outside of the
3    system, outside of the automated system.
4       Q.   So that market demand data that
5    Ms. Picone would is talking about would be used
6    to determine whether the orders that had already
7    pended should be cleared or passed on to the DEA
8    affairs and then the DEA itself; is that fair to
9    say?
10       A.   Right.
11       MR. LUXTON:  Objection to form.
12    BY MR. EGLER:
13       Q.   But they would not be part of the
14    automated system itself?
15       A.   Right.  This is a unique event so
16    that would be hard to implement into an
17    automated system.
18       Q.   Do you know if anyone in your group
19    ever asked whether this type of TRX data from
20    IMS could be brought into the Suspicious Order
21    Monitoring System?
22       A.   I don't.  I don't know what would be
23    gained by having the total prescriptions by the
24    whole market in our SOMS system.

1       Q.   So with regard to the total
2    prescriptions for the market trends by
3    competitor, the hydrocodone market, as you think
4    about it here, would that be in the main generic
5    products?
6       A.   Can you ask the question again,
7    please?
8       Q.   So as you think about the hydrocodone
9    market --
10       A.   Right.
11       Q.   -- generally, around this time frame,
12    2012, would it be dominated by brand names or
13    dominated by generics?
14       MR. KNAPP:  Form.
15       MR. LUXTON:  Objection to form.
16       A.   I couldn't speak to exactly the
17    percentages.
18       Q.   All right.  So with regard to your
19    knowledge of Watson's production, we had seen
20    earlier that they had 25 percent of the quota
21    produced out of their Corona, California plant,
22    plus more from the Florida plant.
23       As you think about that production,
24    was that mostly brand names or mostly generic or

1    something else?
2       A.   Mainly generic.
3       Q.   Okay.  Are you aware whether the
4    Watson balance of brand names versus generics
5    was different from the market as a whole?
6       A.   I can't answer that.  I just don't
7    know.
8       Q.   And as you sit here today, you don't
9    think knowing the entire market trends by
10    competitor for the hydrocodone supply and demand
11    issues would help inform a Suspicious Order
12    Monitoring System?
13       MR. LUXTON:  Objection.  Asked and
14    answered.
15       A.   At this time, I couldn't speculate on
16    how the total lawful prescriptions written would
17    assist us.
18       Q.   And you're not aware of any time when
19    that type of integration of information was
20    discussed at Watson or Actavis; is that right?
21       MR. KNAPP:  Form.
22       A.   Not that I took part in.
23       Q.   All right.  So you can set this
24    document aside.

1       (Witness complies.)
2       (Napoli Exhibit 18, Cegedim document
3    entitled Buzzeo PDMA Suspicious Order
4    Monitoring Seminar, Bates-stamped
5    ALLERGAN_MDL_02467214 through 7216, marked
6    for identification, as of this date.)
7       MR. EGLER:  Here you go.
8       (Handing.)
9    BY MR. EGLER:
10       Q.   Mr. Napoli, can you look at the next
11    exhibit, it's Exhibit 18.
12       A.   Sure.
13       Q.   And again, the first page is a
14    metadata page and then on the second page it's
15    ALLERGAN_MDL_02467214 through 7216.
16       Can you look at this document and
17    tell me if you've ever seen it before.
18       (Document review.)
19       A.   I have seen it.
20       Q.   What is it?
21       A.   This is an agenda from a Suspicious
22    Order Monitoring seminar that was conducted by
23    Cegedim in Chicago in 2012.
24       Q.   So on the last page of this document

1    entry, three o'clock to 3:45 p.m., it says, "SOM
2    experts compliance panel." It says, "A Q and A
3    panel designed to answer your SOMS compliance
4    questions."
5         And Mr. Buzzeo is the moderator.
6         The first person listed on the panel
7    is you; is that right?
8         A.  That's correct.
9         Q.  Do you remember serving on this panel
10   in October of 2012?
11        A.  I do.
12        Q.  What did you talk about when you were
13   serving on this panel?
14        A.  I don't have an exact recollection.
15        Q.  All right.  So as you look at this
16   panel, you were the only person from a, for lack
17   of a better term, DEA registrant; is that right?
18        A.  Yes.
19        Q.  Do you remember having discussions
20   with any other DEA registrants at this
21   conference?
22        A.  I don't have any distinct
23   recollections of conversations with our
24   registrants.

1         I do recollect that one of my key
2    topics was about Know Your Customer, because we
3    were recognized as having a strong program and
4    also asked to be on the panel because of over
5    the years of my acquiring a great deal of
6    knowledge in the area.
7         Q.  So with regard to the Know Your
8    Customer topic that you're thinking of, as you
9    think about this time end of 2012 at Watson,
10   about how many customers for controlled
11   substance product did Watson have?
12        A.  I'd say less than a hundred, but I
13   don't want to -- that would be a guess.
14        Q.  Whatever range you would be comfortable
15   with saying.
16        A.  Sure.
17        Q.  It's fewer than a hundred.
18        A.  Fewer than a hundred.
19        Q.  More than 50?
20        A.  Yes.
21        Q.  And as you think about the typical
22   time frame -- let me start over.
23        As you think about the time frame of
24   your being the head of DEA affairs at Watson and

1    then Actavis, each year about how many new
2    customers, on average, do you think came in to
3    the company?
4         A.  Zero.
5         Q.  All right.  And did they have any new
6    customers at any point?
7         A.  There may have been one or two.  We
8    had a long-standing customer base and we -- it
9    was a very rare occasion if we took on a new
10   customer for controlled substances.
11        Q.  When you talk about the onboarding
12   process for the time that you were the head of
13   DEA affairs at Watson from 2009 through whenever
14   you left, about how many times was there an
15   onboarding process?
16        A.  I don't have a direct recollection.
17        Q.  Fewer than a dozen?
18        A.  Yes.
19        Q.  Fewer than five?
20        A.  I don't know.
21        Q.  All right.  And then with regard to
22   the Know Your Customer processes that you talked
23   about on this panel, do you remember what you
24   presented on?

1         A.  Presented on our process for reaching
2    out, establishing strong relationships with our
3    partners, identifying compliance colleagues at
4    the other organizations, understanding who their
5    customers are and how their business relates to
6    our product, an overview of what their security
7    programs and compliance programs are, ensuring
8    that they were compliant with -- their -- with
9    the CFR, as well as ensuring that we also had a
10   compliance agreement that we would ask our
11   customers to acknowledge as well too.  So.
12        Q.  And around this same time, October of
13   2012, Watson had planned on implementing the
14   Buzzeo automation part of the Suspicious Order
15   Monitoring System; is that right?
16        A.  Correct.
17        Q.  And also around the same time, late
18   2012, is this when Watson and Actavis announced
19   their combination?
20        A.  Yes.
21        Q.  So do you remember whether Watson
22   implemented the Buzzeo process that it had
23   planned on implementing?
24        A.  They did not.

1    Q.   Do you remember what it did instead?
2    A.   We continued with our -- our current
3  system.  The reason why we didn't implement it,
4  with the acquisition of Actavis, there was a
5  freeze-out period within SAP because of this --
6  without getting too into detail, the process of
7  lifting an entire company and moving all their
8  products into the business system, there was a
9  quite extensive freeze-out period where you
10  couldn't make any changes to the business
11  system.  So that would have held us back from
12  implementing our system.
13    Q.   And that freeze out and
14  implementation took place in the years 2012 and
15  2013; is that right?
16    A.   We had at Watson/Actavis there was a
17  period where there was a series of, what I would
18  call, multiple M&A activities in successive
19  years.
20    Q.   Okay.  Let let's leave it at that for
21  now.
22    A.   Okay.
23    Q.   All right.  Let's move on.  You can
24  set that document aside and we'll move on to 19.

1          (Napoli Exhibit 19, Email chain
2     beginning with email dated 9/27/12 from
3     Napoli to Lepore and others, Bates-stamped
4     ALLERGAN_MDL_04173111 through 113, marked
5     for identification, as of this date.)
6  BY MR. EGLER:
7    Q.   Received what's marked as Exhibit 19,
8  can you look through it.  As you're looking
9  through it generally, I'll read on the record,
10  it's ALLERGAN_MDL_04173111 through 113.
11         And as you look at this document, can
12  you tell me what it appears to you to be?
13         (Document review.)
14    A.   This appears to be an email that is
15  in regards to our Suspicious Order Monitoring
16  folks, the customer service side, pending an
17  order for further review for an increase, and us
18  asking for additional information and
19  subsequently releasing the order.
20    Q.   On the second page of Exhibit 19, the
21  first email in time, Victoria Lepore writes to a
22  person named Jared Green and Robert Gettus about
23  an order that's being held; is that right?
24    A.   Um-hmm.

1    Q.   And then she writes back to him again
2  on September 27th in the morning.
3         And then the response from Cardinal
4  Health is at the top of that page.
5         Do you see that there?
6    A.   Yup.
7    Q.   All right.  And the person from
8  Cardinal Health writes, "We are seeing increased
9  volume due to Mallinckrodt being on back order.
10  Please let me know what additional information
11  you need to release this order."
12         Then Ms. Lepore forwards that on to a
13  group of people, not including you, "Attached
14  please find the customer's response along with
15  the SOMS order.  I'm also attaching the
16  controlled substance for your reference."
17    A.   I think that means report.
18    Q.   Okay.  What would a controlled
19  substance report be in this context, as you
20  understand the workings of the Suspicious Order
21  Monitoring System?
22    A.   A controlled substance report in this
23  context would be most likely an imported or
24  Excel file that would provide us with a snapshot

1  of a customer's 852 data, sales month over month
2  by SKU for a particular product, and in this
3  case it would give us a specific on this product
4  itself.  So it would give us more detail and
5  insight into the customer's ordering behavior.
6    Q.   And then she goes on to say, "Based
7  on the controlled substance report, they don't
8  go over their customer's allowance per month
9  until this month, and they didn't order any
10  product in August."
11         This takes place, this email is in
12  September; is that right?
13    A.   Yes.
14    Q.   And then the next email up is later
15  in that day, she writes to the same group,
16  "Please let me know the status of the record.
17  Need a response as soon as possible."
18    A.   Um-hmm.
19    Q.   And you respond; is that right?
20    A.   Yes.
21    Q.   And you respond, "Hi, Vicky, DEA
22  affairs has evaluated and approved -- approves
23  the release of this order.  Although the
24  customer is citing Mallinckrodt back order

1    situation as justification, can you have them
2    articulate which customers specifically has have
3    been affected and are utilizing Watson product
4    as a result? Thanks very much. Tom."
5        So with regard to this email, was it
6    your practice to typically release pended orders
7    that had been raised to the DEA affairs Group as
8    part of your job.
9        MR. KNAPP: Objection to form.
10    A.   I was not typically in the role of
11    releasing orders, but I would do it on occasion.
12    Q.   Do you have a memory as to why you
13    released this particular order?
14    A.   It could have been one of my staff on
15    vacation.
16    Q.   And then with regard to the email
17    that you send, you asked for further information
18    from Cardinal about the -- about their
19    customers.
20        Do you see that there?
21    A.   Right.
22    Q.   Do you remember, that was a typical
23    practice of releasing an order and then asking
24    for more information?

1    A.   I can't speculate. There may be a
2    lot more detail to this behind the email.
3    Q.   Okay.
4    A.   And I'm also confused about the time.
5    The time is showing that it's before the other
6    time email sent.
7    Q.   Right. So what you're pointing out
8    is, Victoria Lepore's email is sent on
9    September 27th, 2012 at 2:04 p.m. and your email
10    appears to be that same day at 11:51 a.m.
11    A.   Right.
12    Q.   So about two hours before that.
13    A.   Yeah.
14    Q.   All right. But as we sit here today,
15    you don't have a particular memory of this
16    process?
17    A.   Correct.
18    Q.   So you can set that one aside.
19        (Witness complies.)
20        (Napoli Exhibit 20, Email chain
21    beginning with email dated 6/26/13 from
22    Collins to Napoli, Bates-stamped
23    ALLERGAN_MDL_02179760 through 772, marked
24    for identification, as of this date.)

1    BY MR. EGLER:
2    Q.   I'll hand you what we'll mark as
3    Exhibit 20.
4        Mr. Napoli, can you look at what we
5    marked as Exhibit 20 and as you're reading it
6    I'll read in the record the Bates number.
7    ALLERGAN_MDL_02179760 through 772.
8        When you're ready, can you tell me
9    what this appears to you to be.
10        I'll just note for the record, this
11    was produced to us and I double-checked it the
12    other day, there are consecutive Bates numbers
13    but a couple of the emails are repeated.
14        So I don't think it's a copying
15    issue. I think it's some type of a production
16    issue, but I don't know what caused it. I think
17    it's understandable in that context, though.
18        (Document review.)
19    A.   Okay.
20    Q.   All right. So with regard to this
21    email, there is a name Jeff Collins.
22        Have we talked about him earlier
23    today?
24    A.   Yes.

1    Q.   Who is Jeff Collins?
2    A.   Jeff Collins is part of our global
3    security team -- was part of our global security
4    team and he was a security investigator.
5    Q.   And then there is another name there,
6    William Simmons.
7        We've talked about him earlier today.
8    A.   William was my auditor investigator.
9    Q.   And Mr. Collins writes to you at the
10    last email in time, "Tom, I believe you are out
11    of the office today. However, I was hoping you
12    would be able to take a look at this. I want to
13    get some feedback. Miami-Luken has placed an
14    order for 72 units of Oxy/APAP,
15    10/650-milligram, 100 count. This is on top of
16    the 84 they have already received this month.
17    They're allowable is 53 which would put them 103
18    over for the month. They sent along their sales
19    for May 1 - June 25, which is helpful and
20    produce nothing extraordinary other than one
21    customer.
22        "McMeans #1 Ashland appears to be a
23    local pharmacy in Ashland, Kentucky. They have
24    ordered 42 units of this product during this

1    time frame which accounts for 4200 pills. This
2    account jumps out as having purchased
3    significantly more than the other, which is why
4    I'm asking. This is a small rural town of
5    21,000 people in the mountains of Kentucky.
6        "Do you have much knowledge of Miami
7    Luke in SOMS program, and are you comfortable
8    with this order?"
9        So do you remember receiving this
10   particular email?
11      A.  I don't. I have no recollection of
12   this email.
13      Q.  Do you remember ever discussing this
14   particular order with anybody?
15      A.  I do not.
16      Q.  All right. And as you look at the
17   last page of this Exhibit 20, the very last
18   page, it says Watson Pharma Inc. SOMS
19   Investigation Form.
20      A.  Yes.
21      Q.  So is the oxycodone that Mr. Collins
22   is discussing listed on this page?
23      A.  I believe it's the last line there.
24      Q.  All right. As you go on this form,

1    the SOMS investigation form that's at page 9772,
2    there are various columns and it states Item No,
3    Material No, Description, Order Quantity.
4        Next to Order Quantity there's
5    handwritten notes.
6        In the context of your work at
7    Watson, do you know what those mean?
8      A.  There is a reason code, which I think
9    corresponds to why something was released. It
10   appears that there was none for the last line
11   item which means it likely was not released.
12      Q.  All right. With regard -- go ahead.
13      A.  Release quantity...
14      (Document review.)
15      A.  The release quantity, it just
16   indicates the number that would be released
17   because of the order.
18      Q.  Okay. What about the order quantity
19   there with the 24, 24 and 72 and 5, 24 and 103
20   written in next to it?
21        Do you know what that means?
22      A.  I'm thinking. I didn't major in math
23   but month-to-date quantity plus 72 equals 103.
24   No, that can't be.

1      Q.  Let me just ask you: From the
2    context of your typical work at Watson and
3    Actavis, you don't know what those handwritten
4    numbers would be?
5      A.  I didn't review these every day.
6      Q.  Okay.
7      A.  And I haven't worked for the company
8    in several years.
9      Q.  But you had mentioned on the far
10   right-hand side, Reason Code --
11      A.  Right.
12      Q.  -- there?
13        Do you remember there being at least
14   12 different reasons as to why not release or
15   hold an order?
16      A.  I don't.
17      Q.  As you read through this document,
18   would it surprise you if this order was
19   released?
20      MR. KNAPP:  Form.
21      MR. LUXTON:  Same.
22      (Document review.)
23      A.  So the 103 was the number they would
24   have been over for the month.

1      Q.  Okay.
2      A.  And I'm not sure about this being
3    released or not.
4      Q.  But as you look at it, would you be
5    surprised if it was released?
6      MR. KNAPP:  Same objection.
7      MR. LUXTON:  Same.
8      A.  I don't know. I don't know if there
9    are other -- if there were subsequent actions or
10   investigation that took place; not contained
11   within here.
12      Q.  Based on the information that's in
13   that email, would you, using your judgment
14   as you sit here today, would you think that the
15   order should be released?
16      MR. KNAPP:  Objection to form.
17      MR. LUXTON:  Objection to form.
18      A.  It would be difficult to judge
19   something that happened that long ago and I
20   don't know if I have all the details there.
21      Q.  As you think about what you read in
22   that email, are there any particular pieces of
23   information that you would want to know beyond
24   what's contained there?

1    A.    Probably want to know more about the
2    pharmacy location.
3    Q.    All right.  So let's move on.  Here's
4    Exhibit 21.
5         (Napoli Exhibit 21,2014 Year-End
6         Review DEA Materials, Bates-stamped
7         ALLERGAN_MDL_03535137 through 143, marked
8         for identification, as of this date.)
9    BY MR. EGLER:
10   Q.    And if you look at Exhibit 21, the
11   first page has no Bates numbers.  The second
12   page is ALLERGAN_MDL_03535137 through 143.
13        And you can look through the whole
14   document, but I'm just going to ask you about
15   what is the third page of the document, the
16   second Bates stamp.
17   A.    Okay.
18   Q.    Before that, this is a 2014 -- it's
19   listed as a 2014 year-end review of William
20   Simmons; is that right?
21   A.    Yes.
22   Q.    All right.  And Mr. Simmons is a DEA
23   compliance auditor and you are his manager; is
24   that right?

1    A.    Correct.
2    Q.    Do you remember writing this 2014
3    year-end review of Mr. Simmons?
4    A.    I don't have a specific recollection,
5    but I definitely would have written his review.
6    Q.    All right.  I want to look at the key
7    goals and responsibilities that are listed on
8    the first Bates-stamped page.  And No. 9 is
9    "Identify resources and key personnel to create
10   a more comprehensive SOMS program to include
11   leverage marketing personnel and chargeback
12   data."
13        Do you see that there?  It's on the
14   prior page and it's right here (indicating).
15   A.    Hold on one second.
16   Q.    Number 9.
17        (Document review.)
18   A.    Yes.
19   Q.    And then on the next page, 138, the
20   second half of Employee Evaluation --
21   A.    Um-hmm.
22   Q.    -- is this Mr. Simmons writing,
23   "Collaborations with internal personnel have
24   opened the door for the use of chargeback data

1    and marketing information as it relates to the
2    sale/usage of controlled substance.  This has
3    provided more insight into the downstream
4    process of controlled substance ordering, but it
5    has also provided a better, quote, whole
6    picture, unquote, of ordering behavior.
7    Relations with customer service personnel have
8    been created to allow for a monthly (or more
9    frequent) report of top customers to include
10   buying groups and contract
11   additions/subtractions.  Groundwork has been
12   laid to start a collaborative relationship with
13   coworkers as it relates to customer order
14   usage."
15        Do you see that there?
16   A.    I do.
17   Q.    Do you remember Mr. Simmons having an
18   initiative to use chargeback data and marketing
19   information in the Suspicious Order Monitoring
20   System at Watson or Actavis?
21   A.    Yes.
22   Q.    All right.  Do you remember whether
23   the data that he was seeking was ever imported
24   into the automated part of the Suspicious Order

1    Monitoring System?
2    A.    Again, data wouldn't be imported into
3    the automated system, but this system would be
4    used for analysis by Will as an auditor.
5         So in addition to the data that's
6    listed here, and I'm trying to look at the time
7    frame of this, but there was a point in which we
8    moved out of the security organizations and were
9    reporting to supply chain.
10        Within the supply chain group we have
11   groups such as market forecasting, demand
12   management.  They have various tools to look at
13   forecasts, volume, et cetera, and we were
14   leveraging those relationships to be able to
15   meet more frequently with those folks so we'd
16   have a better understanding of future ordering
17   behavior, as well as looking retrospectively as
18   well.
19        And we also had an individual that
20   could provide us chargeback data as well
21   internally.
22        But chargeback data, again, is -- has
23   got limited use and because of the vast amount
24   of chargeback data we only used it to look at

1  specific products, specific SKUs that we wanted
2  to focus on, such as hydrocodone and oxycodone.
3      Q.   And as you think about the SKUs and
4  the chargeback data, would that be part of the
5  automated SOMS process or part of a process that
6  was after the automated SOMS once an order had
7  pended?
8      A.   It would all be retrospective because
9  the chargeback data is something that -- a
10  customer would have to submit a rebate for, so
11  that would -- that would all be dependent on
12  when that customer submitted the rebate and when
13  we received and processed pavement. So it's
14  definitely a retrospective tool that Will would
15  review on a monthly basis to supplement the work
16  he was already doing and also looking at
17  historical purchasing data by customers.
18      Q.   The work that Will was doing, was it
19  informing the automated part of the Suspicious
20  Order Monitoring System or would it inform
21  decisions made once an order pended?
22          MR. KNAPP:  Objection to form.
23      A.   I think where I'm getting stuck a
24  little bit is when you refer to notifying the

1  automated system, because it's -- we are talking
2  about -- it's an automated system.
3      Q.   Right.
4      A.   So, you know, Will's role within
5  that -- you know, the automated system was one
6  tool.  Looking at reports or forecasting or
7  demand that we're seeing, those are all tools
8  that Will used as well to make informed
9  decisions and to understand, albeit
10  retrospectively, what a specific customer's
11  ordering habits were.  It essentially gave him
12  more tools in his toolbox to be able to be very
13  effective in his job.
14      Q.   I guess what I'm trying to understand
15  is with regard to the data and information that
16  Mr. Simmons was getting, as you think of it,
17  would it help to inform that algorithm or the
18  formula or whatever was used that was the
19  automated part of the SOM system, or would it
20  inform other parts of the SOM system, or would
21  it inform the people examining orders that had
22  pended, or something else?
23          MR. KNAPP:  Objection to form.
24          MR. LUXTON:  Objection.

1      A.   The data that Will was reviewing
2  is -- again, much of it is retrospective.  He
3  would use that -- he was using that for analysis
4  purposes.
5          So, you know, obviously, you know, we
6  want to be making decisions in the realtime when
7  it came to an order, but to give him perspective
8  and to look at -- to look for trend analysis and
9  things like that and also being proactive as
10  possibly as you can with chargeback data, to
11  look to see if there were any customers that
12  were purchasing from multiple sources.
13          So it was just, again it was one more
14  tool that was really autonomous of the automated
15  system but it was part of our holistic process
16  to have a whole view of as much information we
17  could utilize practically within our program to
18  make educated decisions and to really keep our
19  finger on the pulse of our customers.
20      Q.   So that the profiling of the
21  customers wouldn't be happening on an ongoing
22  basis by Mr. Simmons, but the information that
23  he's looking at, referring to here in this
24  Exhibit 21, would not inform the automated

1  decision about whether to pend an order; is that
2  fair to say?
3      A.   Right.  That is correct.  Because
4  this is all history that we're looking at.
5      Q.   All right.
6          MR. KNAPP:  Is it about time for
7  another break, or am I just ahead of the
8  time here?
9          MR. EGLER:  No, that's a good idea.
10  Let's take a break.
11          THE VIDEOGRAPHER:  The time is
12  approximately 4:21 p m., and we are going
13  off the record.
14          (Recess is taken.)
15          THE VIDEOGRAPHER:  We are back on the
16  record.  The time is approximately
17  4:36 p m.
18  BY MR. EGLER:
19      Q.   Mr. Napoli, you understand you are
20  still under oath?
21      A.   Yes, sir.
22      Q.   Counsel, I've handed you what I have
23  marked as Exhibit 22.
24          (Napoli Exhibit 22, Email chain

1    beginning with email dated 6/27/14 from
2    Napoli to Simmons, Bates-stamped
3    ALLERGAN_MDL_02146710 through 714, marked
4    for identification, as of this date.)
5    BY MR. EGLER:
6        Q.    While you look at it, as you're
7    looking at it I'll read into the record it's
8    ALLERGAN_MDL_02146710 through 714.
9            Can you look at this and tell me,
10   when you're ready, whether you remember this
11   particular set of emails.
12           I'll just note that, from my reading
13   of it, the first email that you're on appears on
14   the second page of the document.
15       A.    Okay.
16           (Document review.)
17       A.    Okay.
18       Q.    All right.  So this email -- well,
19   when you turn to the second page of the document
20   at the bottom, it's page 6711, there is an email
21   from May Chan-Liston.
22       A.    Yes.
23       Q.    Do you know Ms. Chan-Liston?
24       A.    Vague memory.

1        Q.    She's listed as -- I guess it's
2    Dr. Chan-Liston.  She's listed as associate
3    director of global risk management for Actavis,
4    and as you think of it, global risk management,
5    were they in part or in whole tasked with
6    complying with FDA regulations?
7        A.    I don't know.  I mean, global risk
8    management can imply a lot of things.
9        Q.    So she says in her email to you and
10   Ms. Woods, "Dear Mary and Tom.  Hello.  I'm
11   reaching out to you in regards to some needed
12   data regarding our product,
13   Buprenorphine-Naloxone SL tablets.  Since this
14   product has an FDA-mandated risk mitigation and
15   evaluation strategy program, REMs, we as the
16   manufacturer are required to submit certain data
17   in order to assess the program.  You and your
18   teams were identified as the resources to
19   provide the following."
20           And then she says, "First, the number
21   of suspicious orders detected and what the
22   outcome was" -- "and what was the outcome from
23   any investigation that occurred on those
24   suspicious orders, order management, Mary Woods,

1    and then second, any loss or theft of product,
2    controlled substance compliance, Tom Napoli."
3            And the rest of the emails going
4    forward in time are with you and her and the
5    discussion of the data she is seeking from you.
6            Do you see that there?
7        A.    Um-hmm.  Yes.
8        Q.    And you ultimately find out from
9    Mr. Simmons that you had no theft/lost reports
10   for this product for this time period or during
11   any other period.
12           Do you see that?
13       A.    Yes.
14       Q.    So thinking about the two things that
15   Dr. Chan-Liston is asking for, the numbers of
16   suspicious orders detected and what was the
17   outcome from any investigation that occurred on
18   those suspicious orders, as you sit here today
19   with your understanding of the Suspicious Order
20   Monitoring System at Watson and then Actavis, is
21   that a report that your group or Mary Woods'
22   group could generate?
23       A.    We would certainly -- we maintain the
24   file of orders that were deemed suspicious, so

1    we would be able to review that for -- to
2    determine if there was an order that was deemed
3    suspicious for that product.
4        Q.    Would there be any statistics like
5    that kept by your or Mary Woods' office for any
6    reasons?
7        A.    I would likely -- would have likely
8    maintained a file of suspicious order.
9        Q.    But beyond having the file itself,
10   would you have maintained on a regular annual
11   basis a compilation of the number of suspicious
12   orders that pended or were investigated and the
13   results?
14       A.    Orders of interest that pended --
15       Q.    Yes.
16       A.    -- and that were investigated?  I
17   don't have a recollection if that file existed.
18       Q.    So let's -- okay.  We'll mark
19   Exhibit 23.
20           (Napoli Exhibit 23, Document entitled
21   "Customer Analysis and SOMS Overview
22   Import/Export," Bates-stamped
23   ALLERGAN_MDL_021477093 through 7110, marked
24   for identification, as of this date.)

BY MR. EGLER:

Q. Mr. Napoli, can you look at what's been marked as Exhibit 23.

A. Sure.

Q. And for the record, I'll note, again the first page has no Bates numbers on it.

The second page is ALLERGAN_MDL_02147093 through 7110. When you're ready, could you tell me what this appears to you to be.

(Document review.)

A. This appears to be an outstanding overview that the order Will Simmons put together, breaking down our controlled substance ordering, customer activity, 2014 versus 2015, which, again, just gives us more data for analysis and keeps us more in touch with our customers. You'll see, you know, details of who our top customers were and how many active SKUs that we have. Looks like we actually had less customers in 2015 than 2014, and you'll see also distribution of order distribution, so -- by custom -- by customers.

Q. Do you remember ever seeing this

report before?

A. I'm sure that I have. I don't have an distinct recollection at the time, but I'm sure that I've seen this.

Q. I'll just tell you by the conventions of the metadata that appear on the first page, you are listed as the custodian for this document.

It wouldn't surprise you if you had seen this before, right?

A. No, it would not.

Q. So going into this report, on the first page, it says, "Customer analysis and SOMS overview."

Do you see that there?

A. Um-hmm.

Q. And it states "import, export."

Do you know what that means in the context of this document?

A. Sure. Sure. Will also had responsibilities for the import and export of controlled substances -- the import and export activities, so he would have been providing report out on that as well.

Q. Can you turn to page 7095, which is this page (indicating)?

A. Yes.

Q. And can you, as you look at that chart, can you tell me what this appears to be? What is it trying to convey?

A. It's conveying the quantity of solid dosage units by product family that were shipped year over year.

Q. And the first one that's listed there is hydrocodone/APAP?

A. Yes.

Q. Is that right? And that is an opioid; is that right?

A. Correct.

Q. And it lists, "2015 shipments year to date as 1,155,204," and that's solid dose units, as you said?

A. Yes.

Q. And that's down from the prior year, which was 1,522,346; is that right?

A. Actually 2015 is slightly up over 2014. No, you're right. I'm sorry. It's late in the day, but yes, it is down.

Q. I appreciate everybody has to take their time.

And then the next one there, oxycodone/APAP.

In the context of that term, APAP, what does that mean?

VIDEOGRAPHER: Don't touch the microphone, please.

THE WITNESS: I have a habit of grabbing my zipper.

A. APAP is aspirin. I believe there's APAP and there's -- yeah, APAP is aspirin. So it's a combination product.

Q. So this is oxycodone and aspirin, and again in 2015 400,495 solid dose units shipped, which is down from 555,916 in 2014.

The next one is oxycodone/HCL.

A. Um-hmm.

Q. What does HCL mean?

A. Hydrochloride. It's a single entity oxycodone.

Q. Okay. So is that generic OxyContin?

A. No, that may be --

Q. Is it generic Opana ER?

1    A.  I would say that that is likely --
2  let me try to look down the list here, so I can
3  make more educated -- would be the oxycodone 10-
4  and 30-milligram immediate release product.
5    Q.  So as opposed to a slow release or --
6    A.  Yes.
7    Q.  -- longer acting pill?
8    A.  Correct.
9    Q.  So those shipments are up, 2015
10  shipments being 308,097 solid dose units as
11  opposed to just under 200,000 in 2014; is that
12  right?
13    A.  Correct.
14    Q.  So do you know why this information
15  would have been collected?
16    A.  This is just giving us an annual year
17  over year so we have an understanding of
18  customer ordering behavior.  Just, again,
19  another tool that we can use at our disposal,
20  more less of a annual report.
21    Q.  Then there's various other data on
22  the following pages.  And as you go further into
23  the document at 7099 it states at the top,
24  Suspicious Order Monitoring.

1    The first thing there is the CFR that
2  we've read before; is that right?
3    A.  Um-hmm.  Yes.
4    Q.  And the second thing is a quote from
5  Southwood Pharmaceuticals, Inc.
6    A.  Um-hmm.
7    Q.  And that is from the Federal Record,
8  is that right.
9    Do you remember anything about the
10  Southwest Pharmaceuticals case?
11    A.  I do.  I'm not up on all the details.
12  I know it was a -- I don't want to call it a
13  landmark case, but I know it was a significant
14  case.  I think that's probably where it was
15  determined that relying on rigid formulas maybe
16  appears -- may be setting a precedent, but
17  that's...
18    Q.  And then on the next page it states,
19  "SOM system" and states, "SAP system suspends
20  orders based on" -- it has a number of things
21  there -- "class of trade, average" -- is it
22  "quantity/order"?
23    A.  Um-hmm.
24    Q.  And then "class of trade, average

1  quantity ordered per month"?
2    A.  Um-hmm.  Yes.
3    Q.  And "customer allowable quantity per
4  order and customer allowable quantity order per
5  month"; is that right?
6    A.  Correct.
7    Q.  And then it has other information,
8  "System flagged, orders released based on
9  customer allowable quantity per month and
10  current month's order plus pending order" -- and
11  then it says, "If less than allowable quantity
12  per month, release order.  If more than
13  allowable quantity per month, contact customer."
14    Do you see that?
15    A.  Yes.
16    Q.  So the first part up there, "The SAP
17  system suspends orders based on," is that the
18  Buzzeo process?
19    A.  No, that is a -- just reiteration
20  of the system we've been talking about.
21    Q.  Okay.
22    A.  This presentation is an overview --
23  it's an overview of our -- it looks like a
24  walk-through of our system, of our process.

1    Q.  So then by 2015, is it fair to say
2  that Actavis, at this point, had not changed
3  from the prior Watson automated system; is that
4  right?
5    A.  That's correct.  I think what you can
6  see here is the trajectory of enhanced Know Your
7  Customer, as well as the -- seizing more
8  opportunities to use more data that is available
9  to us internally to give us a more holistic view
10  of our customers' ordering patterns.
11    Q.  All right.  Going down to page 107
12  it states, "Additional Analysis."
13    (Document review.)
14    A.  Yes.
15    Q.  And it says, "Chargeback" -- and it
16  has a paragraph about chargebacks.  That says,
17  "Monthly chargeback analysis performed for oxy
18  and hydro products."  It says, "Customers
19  purchasing large amounts from multiple
20  distributors, more than two distributors, and
21  then in (primary, secondary, tertiary) and then
22  analyze month-over-month trends to detect
23  pattern and then assist in violation" -- I'm
24  sorry -- "Assist in validation of SOMS orders."

1    So is this the chargeback analysis
2  that we were talking about with Mr. Simmons in
3  his annual review previously?
4    A.   Yes.
5    Q.   All right.  And, again, as we talked
6  about before, this would inform the decision
7  about whether to clear or escalate an order that
8  had pended typically; is that right?
9    A.   It could be used, yes, as a resource.
10   Q.   What else could it be used for?
11      MR. KNAPP:  Form.
12   A.   It could be used as a resource for
13 conducting an investigation on a pending order,
14 but it can also be used as a statistical
15 analysis tool to -- to look for trends or
16 evaluate if these types of activities, for a
17 forensic review-type of tool.
18   Q.   You can set this document aside.
19 I'll hand you what I'll mark as Exhibit 24.
20      (Napoli Exhibit 24, Email chain
21      beginning with email dated 7/31/14 from
22      Napoli to Simmons, Bates-stamped
23      ACQUIRED_ACTAVIS_02476517 through 6518,
24      marked for identification, as of this

1  date.)
2  BY MR. EGLER:
3    Q.   Mr. Napoli, can you look generally at
4  what's been marked as Exhibit 24.  And as you're
5  doing so, I'll note for the record that it's
6  officially two pages long, acquired Actavis
7  0247, 6517 through 6518.  But the second page,
8  although it's one Bates number, is the
9  PowerPoint presentation that's printed out
10 behind there.
11      Do you see that?
12   A.   Sure.
13   Q.   All right.  And again in the way
14 these things are produced, the PowerPoint
15 presentation was produced as one Bates number.
16      So as you look at this PowerPoint
17 presentation and the emails that are there, the
18 email that's first in time comes from a person
19 named Ann, A-n-n, C., is it, Cipkins?
20   A.   Yes.
21   Q.   C-i-p-k-i-n-s.
22      Do you know Ms. Cipkins?
23   A.   I do.
24   Q.   Who is Ms. Cipkins?

1    A.   I don't know if she still is, but she
2  was the director of demand management for
3  Actavis.
4    Q.   As you think of it, what does demand
5  management mean?
6    A.   Demand management is a group within
7  our supply chain group and they would be a
8  liaison between understanding what the needs are
9  of the customer, as well as interfacing with the
10 sites that manufacture those projects and to
11 help them to -- you know, to coordinate the
12 scheduling.  So, essentially, she would be
13 communicating or putting together data relative
14 demand, communicating that with the site so the
15 site can schedule their manufacturing around
16 that to be able to meet that demand.
17      So in order they may need to
18 prioritize certain products to manufacture
19 during a certain time frame because -- to meet
20 the demand.
21   Q.   All right.  And she writes to a big
22 group of people including yourself, "Attached is
23 the generic S&OP deck.
24      Do you have an understanding of what

1  S, ampersand, OP means?
2    A.   Yes.  It's an S&OP meeting.  An S&OP
3  meeting is a common meeting that occurs in many
4  organizations, whether pharmaceutical or
5  otherwise, and it's basically a sales and
6  operations meeting and it's an opportunity to --
7  for the folks on the sales and the commercial
8  side to interface with the operation side to
9  enhance communication.  Again, to ensure that
10 we -- that the organizations are on the same
11 page, understanding, you know, things, if there
12 have been bids awarded, if there are any issues
13 where somebody is falling out of the market,
14 identifying any opportunities, so that everyone
15 has an understanding and is on the same page and
16 can communicate that back, whether they need to
17 work that into their plans to support the
18 manufacturing sites, et cetera.
19   Q.   All right.  So this presentation
20 doesn't have page numbers.  I'm going to hold up
21 a page to you and it states, "TU Summary (as of
22 7/1)."
23      Would you turn to that page.
24   A.   Yeah.

1    Q.   And do you have an understanding of
2    what this TU summary as of 7/1 is trying to
3    convey?
4        A.   TU, I believe, is Temporarily
5    Unavailable, and it's showing that because of --
6    you see here a reason code, API issue, maybe
7    there isn't enough API, maybe the API failed a
8    test that -- or again insufficient amount of API
9    that we were not able to meet demands.  So there
10   has been a cumulative loss in sales associated
11   with that.
12       So this is really a callout to the
13   business as far as products where we have issues
14   that are temporarily unavailable.  And of course
15   management would want to always be kept abreast
16   of products that are temporarily unavailable and
17   when we're going to get back to market with
18   these products.
19       Q.   All right.  And then there is another
20   slide, and it's -- I think it's six pages from
21   the end, or four pages from the end, it states
22   "Business Opportunities."  It looks like this
23   (indicating).
24           (Document review.)

1        Q.   It states, "Business opportunities,
2    McKesson has confirmed the Rite-Aid award for
3    oxy 15 milligrams and 30 milligrams beginning in
4    September."
5            From the context of this document,
6    can you tell what that statement means?
7        A.   Sure.  That means that our customer
8    McKesson has confirmed with us that they've won
9    an award from Rite-Aid for the business for this
10   particular -- for these particular SKUs and
11   they're reporting what the estimated annual
12   units will be for those products.
13       Q.   So -- go ahead.
14       A.   I was going to say, that's why you'll
15   see that Ann forwarded this onto my team because
16   it's a good source of intelligence for us.  So
17   now we can see we're getting advance
18   information, that, okay, we can anticipate that
19   we're going to see an increase in SOMS and
20   volume on orders on these, and we can dig deeper
21   on this so we can be ready for when this occurs.
22       Q.   And going back to the first page,
23   that's what you write to Mr. Simmons; is that
24   right?

1        A.   Yup.
2        Q.   All right.
3        A.   So it's just another source of
4    intelligence to help us be more effective in
5    compliance.
6        Q.   All right.  You can set this document
7    aside.  I'll hand you what we'll mark as
8    Exhibit 25.
9            (Napoli Exhibit 25, Actavis document
10           entitled "Project Continuation
11           Justification:  SOM Statistical Model
12           Development and Hosting 'in the Cloud'",
13           Bates-stamped ALLERGAN_MDL_ 03535253
14           through 257, marked for identification, as
15           of this date.)
16   BY MR. EGLER:
17       Q.   Mr. Napoli, can you look at
18   Exhibit 25, and like the other ones today the
19   first one has no Bates numbers and then the
20   second page is ALLERGAN_MDL_03535253 through
21   257.
22           And when you're ready, can you tell
23   me if you've ever seen this document before?
24           (Document review.)

1        A.   I have seen this document.
2        Q.   Did you write this document?
3        A.   Yes, sir.
4        Q.   Why did you write this document?
5        A.   I wrote this document as a means to
6    get the Cegedim or Cegedim-Dendrite solution
7    implemented.
8        Q.   At the bottom left-hand corner of the
9    first Bates-stamped page, 253, it has the date
10   February 19th, 2015.
11       A.   Yes.
12       Q.   Do you remember writing this document
13   around that time?
14       A.   It's very likely.
15       Q.   Then on the second Bates-stamped
16   page, 254, the section that starts with:
17   "Background."
18           Do you see that?
19       A.   Yes.
20       Q.   The second full text paragraph, I'm
21   just going to start reading it into the record.
22   It says, "Based on this compliance need, Cegedim
23   did in fact develop and deliver a SOM
24   statistical model to be incorporated into our

1  order management system within SAP.  Due to
2  successive acquisition activities since product
3  initiation the implementation has been placed on
4  hold at several junctures based on business
5  integration needs.  During the past several
6  years, DEA has become more aggressive in its
7  approach related to SOM/Know Your Customer
8  taking against" -- "taking action against a
9  growing number of companies for having
10 non-compliant SOM programs.  In an effort to
11 ensure compliance with the regulations, both the
12 C/S compliance, order management teams, have
13 collaborated making efforts to enhance
14 compliance from customer vetting, order
15 review/evaluation through
16 investigation/disposition.
17        "This manual effort is very labor
18 intensive, as the current system was not
19 configured with any analytical tools to support
20 timely and accurate decision making.  This
21 approach also introduces the element of human
22 interaction into the order evaluation process.
23        "Additionally, the current process
24 can have an impact on the amount of time

1  required to release a pended order that is under
2  review, affecting customer service/fill rate
3  levels."
4        Do you see that there?
5     A.  I do.
6     Q.  Did you write that?
7     A.  Yes, I did.
8     Q.  At the time that you wrote it, did
9  you believe what you wrote there?
10       MR. LUXTON:  Objection to form.
11    A.  Yup, I do believe that those facts
12 are accurate.  We did have -- we did have a
13 compliance system, but we wanted to ensure our
14 compliance to ensure that we were always
15 continually evolving it on the high ground.
16    Q.  So above there you write, under
17 background, "The SOM" -- "The SOM automation
18 project initially commenced in 2011 with the
19 primary goal of replacing our, quote, threshold,
20 unquote, based system with the CFR compliant
21 model developed by Cegedim.  This project was
22 initiated in an effort to ensure compliance with
23 the Code of Federal Regulations, SOM
24 requirements, controlled substances, 21 CFR

1  1301.74 b, as well as December 2007, DEA
2  memory."
3        Do you see that?
4     A.  I did.
5     Q.  When you wrote that in February 2015,
6  did you believe that to be true?
7     A.  I did believe that Buzzeo had a
8  system that they were proposing that was
9  compliant with the CFR
10       We also had one as well, but we
11 wanted to move up to a more enhanced
12 sophisticated system.
13    Q.  So other parts of the -- this memo
14 talk about a suspicious order monitor --
15 suspicious order monitor statistical model that
16 will be hosted, quote, in the cloud and based on
17 Actavis's order data.
18    A.  Yes.
19    Q.  Do you remember whether this
20 cloud-based SOM statistical model was ever
21 adopted at Actavis?
22    A.  This system was created.  We used it
23 in a test environment.  We're happy with it.  We
24 were subsequently acquired by Teva and it was

1  put on hold and I don't believe that Teva chose
2  to utilize it.
3     Q.  All right.  So with regard to the --
4  this is -- so with regard to your
5  understanding -- well, with regard to your
6  understanding, Actavis never implemented the
7  cloud-based system that's discussed in this
8  memo; is that right?
9     A.  That's correct.  When Teva acquired
10 Actavis around this time frame they already had
11 their own program in place for Suspicious Order
12 Monitoring.
13    Q.  So this goes to the number of
14 corporate transactions that took place --
15    A.  Right, right.
16    Q.  You're describing the company as
17 being bought by Teva.  Part of what was Actavis,
18 was purchased and closed on by Allergan.
19       Do you have an understanding of that
20 as well or some type of transaction occurred
21 between Allergan and Actavis; is that right?
22    A.  Right.
23    Q.  Either Actavis bought Allergan or
24 Allergan bought Actavis?

1    A.   Actavis bought Allergan.
2    Q.   All right.  And as far as you're
3  concerned -- well, during that process, when did
4  you leave?
5    A.   I left around maybe October of 2016.
6  Sometime in the early fall of 2016.
7    Q.   So I'm going to hand you what we will
8  mark as Exhibit 26.
9    A.   Okay.
10        (Napoli Exhibit 26, Email chain
11        beginning with email dated 1/11/16 from
12        Baran to Russo with attachment,
13        Bates-stamped ALLERGAN_MDL_03431731
14        through 1739, marked for identification, as
15        of this date.)
16  BY MR. EGLER:
17    Q.   Before we get to Exhibit 26, why did
18  you leave?
19    A.   I was laid off.
20    Q.   All right.
21    A.   Because Teva already had a DEA
22  compliance staff and program.  I helped them
23  orient them with -- with our side of the
24  business and was part of a reduction in force.

1    Q.   All right.  So looking at what I
2  marked as Exhibit 26, can you page through it.
3  I'll read into the record.  It's
4  ALLERGAN_MDL_03431731 through 1739.
5        If you look through this generally,
6  but I'm just going to ask you a few questions
7  about this.
8        (Document review.)
9    Q.   Now I'll note for the record that the
10  last email that you're on the page appears on
11  the third page of this document, as I read it.
12    A.   Um-hmm.
13        (Document review.)
14    A.   Okay.
15    Q.   All right.  Based on the emails that
16  are here, do you remember around August 2015
17  Actavis deciding to sell to Bell Medical again?
18        MR. KNAPP:  Objection to form.
19    A.   I do recall this series of emails and
20  this situation.
21    Q.   All right.  Did you have any input in
22  the decision whether to start selling controlled
23  substances to Bell Medical around this time?
24    A.   My input would have been from a DEA

1  compliance standpoint the -- you can see in this
2  email string that there was -- both of our
3  auditor investigators did a lot of due diligence
4  on this and also met personally, I believe, with
5  the individual from Bell Medical, in Marlboro,
6  New Jersey.
7        And the reason why this stands out to
8  me is that, you know, Actavis, we had a model
9  where we did not distribute direct to dispensing
10  physicians.  And in this case it was a case
11  where we wanted to make sure that we did the
12  right amount of due diligence and understand and
13  monitor what the product -- it would only be one
14  product, what the quantities would be, and they
15  were for these clinics -- Buprenorphine -- they
16  were for clinics to assist, I believe, addicts
17  with -- Buprenorphine was used for more -- for
18  heroin, I think.
19    Q.   Did you ever do a site visit to the
20  Bell Medical facility?
21    A.   I didn't, but I believe Will Simmons
22  may have.
23    Q.   Did you ever talk with him about the
24  site visit that he did?

1    A.   I don't have a distinction
2  recollection of it.
3    Q.   All right.  So now we have a couple
4  of exhibits that are out of order time-wise.
5    A.   Okay.
6    Q.   The first one we'll mark as
7  Exhibit 27.
8        (Napoli Exhibit 27, Email dated
9        11/13/13 from Kemnitzer to distribution
10        list, Bates-stamped PPLPC020000735777
11        through 782, marked for identification, as
12        of this date.)
13        MR. LUXTON:  Thanks.
14  BY MR. EGLER:
15    Q.   Mr. Napoli, can you look at
16  Exhibit 27.  I'll note for the record, again,
17  it's not an Actavis or Allergan document.  It's
18  noted as PPLPC020000735777 through 782.  The
19  last page is marked as nonresponsive.
20        Can you look at this document and
21  tell me if you ever remember receiving an email
22  like this in November 2013.
23        (Document review.)
24    A.   I don't have an exact recollection of

1  this.  This looks like an agenda for a New
2  Jersey Pharmaceutical Industry Group meeting.
3      Q.   All right.  So if you turn to the
4  third page of this document, which is 5779 --
5      A.   Yes.
6      Q.   -- there is an email from Michael
7  Meggiolaro.  It's M-e-g-g-i-o-l-a-r-o.
8      A.   Good job.
9      Q.   It's dated Thursday, November 7,
10 2013, at 5:09 p.m.
11          Do you see that there?
12     A.   I do.
13     Q.   And he writes, apparently to a person
14 named Lisa Butler.  "Lisa, you are so good.  I
15 promised the update for all the topics yesterday
16 but didn't get to them.  Here is what I had
17 received.  You already added Susan Carr's, so I
18 don't have to add hers to the list."
19          And just to note, your name appears
20 on that email; is that right?
21     A.   Yes.
22     Q.   And it says, "Please update the
23 agenda accordingly at 2014 quota letters" -- and
24 then number two is, "SOM programs."

1          And then under SOM programs it says,
2  "Is anyone auditing customers?  If so, how?
3  (Site visits, questionnaires, et cetera)."
4          And then the second one is:
5  "Computerized statistical models."
6          Do you see that there?
7      A.   Yes.
8      Q.   Do you remember attending a New
9  Jersey PIG meeting where SOM programs were
10 discussed around November 2013?
11     A.   I don't.
12     Q.   All right.  You can set that one
13 aside.
14          (Witness complies.)
15     Q.   I'm going to do this one as two
16 separate exhibits.  I'll hand you what we'll
17 mark as Exhibit 28 and 29.
18          (Napoli Exhibit 28, Email chain
19     beginning with email dated 1/14/16 from
20     Lepore to Simmons, Bates-stamped
21     ALLERGAN_MDL_01551062 through 1064, marked
22     for identification, as of this date.)
23          (Napoli Exhibit 29, Natively-produced
24     Spreadsheet, Bates-stamped

1      ALLERGAN_MDL_01551064.xlsx, marked for
2      identification, as of this date.)
3  BY MR. EGLER:
4      Q.   Mr. Napoli, can you look at what I've
5  marked as Exhibits 28 and 29.
6          I'll tell you, for the record,
7  although they are marked as two exhibits, they
8  are one email and one family as produced by the
9  defendants in the case.
10     A.   Okay.
11     Q.   For the record, Exhibit 28 is
12 Bates-stamped ALLERGAN_MDL_01551062 through
13 1064.
14          And then 29 is a larger version of
15 page 1064, which is produced as an Excel file.
16          Can you look through it, and the
17 question I have is:  Do you remember receiving
18 this email?
19     A.   I do not.
20     Q.   So this email that starts on the
21 first page of Exhibit 28 states:  "Re McKesson
22 DEA suspensions."
23          Do you remember around January 14,
24 2016, when this email took place there was a

1  suspension of various DEA licenses at McKesson
2  locations?
3      A.   I do recall that McKesson did have
4  some compliance issues and some subsequent
5  registration suspensions.
6      Q.   And then in an email below, Victoria
7  Lepore writes to you and other people, "Hi, Will
8  and Tom, just want to keep you in the loop that
9  I found out the McKesson's DEA registration
10 (Aurora, Colorado; Livonia, Michigan; Washington
11 Court House, Ohio; and Lakeland, Florida) is
12 suspended for specified products and time
13 periods."  And then she attaches a link and
14 other text.
15          On the top email is what she refers
16 to as the HANA report for McKesson locations
17 that we shipped to from January 2015 to
18 January 2016.
19          Do you see that?
20     A.   Yup.  Yes.
21     Q.   Do you remember from your time
22 working at Actavis and Watson the term HANA
23 report?
24     A.   HANA is a feature, a reporting

1  feature of SAP.
2      Q.   All right.  And so do you remember
3  Ms. Lepore doing reports like this when you or
4  someone else asked for them at Watson and
5  Actavis?
6      A.   I don't specifically have a lot of
7  experience with it, but then HANA was something
8  that you can see by the time frame on there too,
9  it was a recent addition to the SAP.  So it
10  wasn't a report we would have had access to for
11  a long period of time.  I would think that this
12  report is generated so we could rationalize what
13  quantities would be looking for orders that
14  would be, maybe, going to alternate distribution
15  centers for McKesson.
16          This was not something that was a
17  surprise.  McKesson had had some ongoing issues.
18  They had since hired Gary Boggs as their chief
19  of compliance, who was Joe Rannazzisi's deputy,
20  to come into the organization.
21          I flew out to San Francisco and I met
22  with McKesson.  There were many attorneys and
23  compliance people to discuss their compliance
24  program and to get an understanding of some of

1  these things.
2          So we knew, because, you know, these
3  investigations, as you know, can go on for
4  years, and -- but the ultimate result was they
5  had a feeling that these facilities would have
6  licenses that would be suspended.  So this is
7  something that we would have had knowledge of
8  and planned around.
9      Q.   Do you remember around this time,
10  January 2016, whether your group at Actavis
11  performed any analysis to determine whether any
12  sales to these suspended McKesson locations were
13  diverted?
14      A.   It would be a challenge for us to do
15  that from our level, to look at pharmacies to
16  determine what was diverted.  That would be
17  something that would be inherent to a DEA
18  investigation.  We don't even know what the time
19  period is that they were looking at.  So it
20  really would not be something that would be
21  realistic for us to perform.
22      Q.   Did you or anyone else that you know
23  of at Actavis ask for that type of data from
24  McKesson around this time frame?

1      A.   What we did is we asked for a
2  partnership meeting.  That's why I traveled out
3  to San Francisco, because I wanted to -- I was
4  concerned and I wanted to get an overview and an
5  understanding of their program and improvements
6  that they had made, and especially with bringing
7  on their new head of compliance, to understand
8  that we had a level of confidence in their
9  program going forward.
10      Q.   And as part of that partnership
11  meeting or other parts of the relationship, do
12  you remember asking or do you remember anyone
13  from Actavis asking for data about whether
14  materials sold to these McKesson locations was
15  subsequently diverted?
16      A.   I don't recall and I don't know how
17  that would be accessible to us.
18      Q.   All right.  But you don't recall
19  asking for it one way or the other?
20      A.   No, I don't.
21      Q.   All right.
22          MR. EGLER:  Let's take a quick break.
23          THE VIDEOGRAPHER:  The time is
24  approximately 5:25 p.m.  We are going off

1  the record.
2          (Recess is taken.)
3          THE VIDEOGRAPHER:  We are back on the
4  record.  The time is approximately
5  5:34 p.m.
6  BY MR. EGLER:
7      Q.   Mr. Napoli, you understand you are
8  still under oath.
9      A.   Yes, sir.
10      Q.   So do you identify yourself as ever
11  having worked for an entity called Allergan?
12      A.   Yes.
13      Q.   For about how long did you work at
14  Allergan?
15      A.   I'm trying to think.  Actavis
16  acquired Allergan.  I'm trying to think of when
17  at the time Actavis acquired Allergan and then
18  Allergan...
19      Q.   Well, let me put it this way, was it
20  less than a year?
21      A.   Probably more than a year.
22      Q.   So at the time that you worked for
23  Allergan, did -- as you think of it, in your
24  estimation, did Allergan still own the generics

1    that they subsequently sold to Teva?
2         MR. KNAPP:  Objection to form.
3    Foundation.
4         MR. LUXTON:  Same.
5         A.   I don't know how they -- you know,
6    Allergan and Actavis were the -- are the same
7    company, but I don't know how the structure, the
8    parent structure.
9         Q.   I understand this and I'm trying to
10   ask in a very general way.  So maybe you'll let
11   me ask it a different way.
12        So you have an understanding that
13   after either Allergan or Actavis sold the
14   generics to Teva, that there were still some
15   controlled substances manufactured or owned by
16   the Allergan entity?
17        A.   Yes.
18        Q.   And do you remember whether -- when
19   that occurred, you were still working there?
20        A.   When what occurred?
21        Q.   When the -- after the generics all
22   left, but there was still some controlled
23   substances owned by Allergan.
24        MR. KNAPP:  Form.

1         A.   I would have been part of the Teva
2    acquisition, so I would no longer have been with
3    Allergan.
4         Q.   So with regard to any Suspicious
5    Order Monitoring System that Allergan had in
6    place after the sale to Teva, you wouldn't have
7    had anything to do with that; is that correct?
8         A.   Correct.
9         MR. EGLER:  I have no further
10   questions.
11        THE VIDEOGRAPHER:  Anyone else has
12   questions.
13        MR. KNAPP:  I have a few questions.
14   Do I need to get a microphone?
15        THE VIDEOGRAPHER:  Yes, you can have
16   that microphone.
17   EXAMINATION BY
18   MR. KNAPP:
19        Q.   Good afternoon, Mr. Napoli, my name
20   is Tim Knapp.  I'm with the firm of Kirkland &
21   Ellis and I represent Allergan in this matter.
22        In response to some questions that
23   Mr. Egler asked you, you testified about
24   reporting an order from TopRX to the DEA.

1         Do you recall that?
2         A.   Yes, I do.
3         Q.   I know it's been, you know, five
4    years or so since you've left Actavis, Watson,
5    but do you recall sitting here today, recall
6    reporting any other orders or customers to the
7    DEA during the time that you worked on
8    Suspicious Order Monitoring at Actavis or
9    Watson?
10        A.   I do.
11        Q.   And what are those entities that you
12   recall?
13        A.   I know Capital Wholesale was one of
14   them.  And I'm -- there were several others, but
15   I'm hard-pressed to recall them, but there were
16   additional organizations other than TopRX and
17   Capital that we did report.
18        We also did some preemptive reporting
19   to the DEA as well, too.  After the acquisition
20   of Actavis, we had a customer that wanted to
21   come on board with us.  Quality King.  It was a
22   company out of New York, and we did a review of
23   them.  We asked for their customer information,
24   what products they were interested in purchasing

1    from us and we determined that they were high
2    risk due to distributions that they were making
3    in the State of Florida and other states.  Some
4    of their customers were questionable, so we
5    denied them and also reported them to the DEA
6    because we felt it was -- they were that much of
7    a risk.
8         Q.   Now when you say "we reported to the
9    DEA," who specifically are you referring to?
10        A.   I specifically reported that to the
11   DEA to -- the company was based out of Long
12   Island, so I reported to Richard Springer, who
13   is the diversion chief in the Long Island
14   office.
15        Q.   And with respect to TopRX, did you
16   personally report them to the DEA?
17        A.   Yes.
18        Q.   And do you recall who you reported
19   TopRX to?
20        A.   Yes.  That would have been Tim Lenzi
21   in the Chicago DEA field office.
22        Q.   And then what about Capital
23   Wholesale, did you personally report them to the
24   DEA?

1    A.   Yes.  It would have been the same.
2    Q.   And when you say it's the same, who
3  did you report to?
4    A.   To Tim Lenzi, DEA field office,
5  Chicago.
6    Q.   Now Mr. Napoli, you also spoke quite
7  a bit with Mr. Egler about issues associated
8  with diversion of controlled substances.
9        We talked a lot about Suspicious
10  Order Monitoring System today.
11        I just want to ask you, generally,
12  were there any other efforts that you undertook
13  or that the company undertook while you were at
14  Watson, Actavis, Allergan to increase awareness
15  associated with potential diversion of
16  controlled substances?
17    A.   Yes.  First, I'd like to say that I'm
18  actually -- I'm proud of my tenure in the
19  position that I served in.  I felt that I made a
20  difference and it was always our goal to ensure
21  that we were complying and did the right thing.
22        One of the things that I was proud of
23  and that the company did was after the Actavis
24  acquisition, there was a product called

1  promethazine with codeine, which was a cough
2  preparation that contained codeine, that was --
3  actually became popularized within the Houston
4  area Rap culture.  It was a high abuse product;
5  it was referred to as the purple drink, and
6  Actavis was referenced in the social media in
7  different capacities in a very negative light
8  because of this product, and our company decided
9  that that product was not worth the risk
10  associated with it.  So we discontinued the
11  entire product.
12        So I thought that was a proactive
13  step and actually the DEA actually recognized
14  that as well as a positive effort to combat
15  diversion.
16        I also initiated a program called, It
17  Starts With Me, which was a program that engaged
18  our employee population throughout our entire
19  U.S. region regarding the abuse of the opioids
20  that have been going on with the United States,
21  engaging our employees to raise the level of
22  awareness but also to get socially engaged.
23        We partnered with a -- and sponsored
24  a group called Young People in Recovery, and

1  that group, we supported their chapters
2  throughout the U.S. financially and with any
3  type of support.  We had a lot of our employees
4  who did fundraising for these organizations, and
5  it was individuals who -- again, who in their
6  teens and 20s who had issues and struggles with
7  opioids and that were turning things around, and
8  we were very proud to support that program, as
9  well as supporting law enforcement in providing,
10  take-back receptacles to multiple jurisdictions
11  as well, too.
12        So, again, just very proud of a lot
13  of the work that we did, not only to ensure
14  compliance within our work communities but also
15  in the communities in which we live.
16        MR. KNAPP:  I have nothing further.
17  Thank you very much.
18        MR. EGLER:  I have nothing else.
19        (Continued on following page to
20  include jurat.)
21
22
23
24

1
2
3
4        THE WITNESS:  Thank you.
5        THE VIDEOGRAPHER:  The time is
6  approximately 5:42 p.m. and this concludes
7  the deposition.
8
9
10
11        _____.
12        THOMAS P. NAPOLI
13
14
15  Subscribed and sworn to before me
16  this   day of      2019.
17
18        _____
19
20
21
22
23
24

1           C E R T I F I C A T E

2

3   STATE OF NEW YORK   )

4           : ss.

5   COUNTY OF WESTCHESTER )

6

7      I, ANNETTE ARLEQUIN, a Notary Public

8   within and for the State of New York, do

9   hereby certify:

10     That THOMAS P. NAPOLI, whose deposition

11   is hereinbefore set forth, was duly sworn

12   by me, and that the transcript of such

13   depositions is a true record of the

14   testimony given by such witness.

15     I further certify that I am not related

16   to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19     IN WITNESS WHEREOF, I have hereunto set

20   my hand this 17th day of January 2019.

21

22

23   ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

24

---

1           I N D E X

2

3  WITNESS          PAGE

   THOMAS P. NAPOLI

4   MR. EGLER      9

5   MR. KNAPP     339

6    I N D E X O F E X H I B I T S

7  ALLERGAN-NAPOLI EXHIBITS     PAGE

8  Napoli Exhibit 1, Memo dated    24

   11/13/08, Bates-stamped

9   ALLERGAN_MDL_03535130 through 5133

10  Napoli Exhibit 2, NJPIG Charter   48

   Statement, Bates-stamped

11   HDS_MDL_00095906 through 5907

12  Napoli Exhibit 3, Cegedim-Dendrite  55

13  document dated 10/21/08,

14  Bates-stamped ALLERGAN_MDL_03535009

15  through 010

16

17  Napoli Exhibit 4, Email chain    57

18  beginning with email dated 6/8/09

19  from Woods to Napoli, Bates-stamped

20  ALLERGAN_MDL_02467143 through 154

21

22  Napoli Exhibit 5, Document entitled  91

23  "Customer Communication for SOMS,"

24  ALLERGAN_MDL_03738524 through 8528

---

1   I N D E X O F E X H I B I T S(Cont'd.)

   ALLERGAN-NAPOLI EXHIBITS     PAGE

2

   Napoli Exhibit 6, Email dated 2/2/10   103

3  from L. Scott to T. Napoli with

   attachment, ALLERGAN_MDL_01236063

4  through 6094

5  Napoli Exhibit 7, Email chain   138

   beginning with email dated 4/12/10

6  from S. Soltis to Napoli,

   Bates-stamped ALLERGAN_MDL_01236097

7  and 6098

8  Napoli Exhibit 8, Email chain   147

   beginning with email dated 4/29/10

9  from L. Scott to Napoli,

   ALLERGAN_MDL_01236095 through 6096

10

   Napoli Exhibit 9, PowerPoint   166

11  presentation entitled "DEA affairs

   Organizational Achievements,

12  ALLERGAN_MDL_02467984 through 7998

13  Napoli Exhibit 10, Watson 210   177

   Performance Review Form - Exempt,

14  Bates-stamped ALLERGAN_MDL_03535275

15  through 283

16

17  Napoli Exhibit 11, Customer Services  181

18  Agreement - Statement of Work No. 1,

19  Bates-stamped ALLERGAN_MDL_03535028

20  through 5030

21

22  Napoli Exhibit 12, Meeting Minutes  186

23  dated 9/8/11 ALLERGAN_MDL_02176488

24  through 6492

---

1   I N D E X O F E X H I B I T S(Cont'd.)

   ALLERGAN-NAPOLI EXHIBITS     PAGE

2

   Napoli Exhibit 13, Document entitled  218

3  "controlled Substance Awareness:

   Understanding the Threat,"

4  Bates-stamped ALLERGAN_MDL_02054999

   through 5022

5

   Napoli Exhibit 14, NJPIG letter dated  225

6  7/20/11 from NJPIG Committee to

   Rannazzisi, Bates-stamped

7  ENDO-OPIOID_MDL-02219848 through

   19851

8

   Napoli Exhibit 15, Watson document  239

9  entitled SOMS Project Evolution IT

   Governance Meeting, Bates-stamped

10  ALLERGAN_MDL_02468983 through 68994

11  Napoli Exhibit 16, Watson document  257

   entitled SOMS Project Evolution IT

12  Governance Meeting, Bates-stamped

13  ALLERGAN_MDL_02187196 through 87199

14

15  Napoli Exhibit 17, Email chain   262

16  beginning with email dated 4/26/12

17  from Picone to Woods with

18  attachments, Bates-stamped

19  ACQUIRED_ACTAVIS_01179002 through 005

20

21  Napoli Exhibit 18, Cegedim document  276

22  entitled Buzzeo PDMA Suspicious Order

23  Monitoring Seminar, Bates-stamped

24  ALLERGAN_MDL_02467214 through 7216

## Page 349

```
 1       I N D E X   O F   E X H I B I T S(Cont'd )
         ALLERGAN-NAPOLI EXHIBITS              PAGE
 2
         Napoli Exhibit 19, Email chain        282
 3       beginning with email dated 9/27/12
         from Napoli to Lepore and others,
 4       Bates-stamped ALLERGAN_MDL_ 04173111
         through 113
 5
         Napoli Exhibit 20, Email chain        287
 6       beginning with email dated 6/26/13
         from Collins to Napoli, Bates-stamped
 7       ALLERGAN_MDL_02179760 through 772
 8       Napoli Exhibit 21,2014 Year-End       294
         Review DEA Materials, Bates-stamped
 9       ALLERGAN_MDL_03535137 through 143
10       Napoli Exhibit 22, Email chain        301
         beginning with email dated 6/27/14
11       from Napoli to Simmons, Bates-stamped
         ALLERGAN_MDL_02146710 through 714
12
         Napoli Exhibit 23, Document entitled  305
13       "Customer Analysis and SOMS Overview
         Import/Export," Bates-stamped
14       ALLERGAN_MDL_021477093 through 7110
15       Napoli Exhibit 24, Email chain        314
         beginning with email dated 7/31/14
16       from Napoli to Simmons, Bates-stamped
         ACQUIRED_ACTAVIS_02476517 through
17       6518
18
19       Napoli Exhibit 25, Actavis document   320
20       entitled "Project Continuation
21       Justification:  SOM Statistical Model
22       Development and Hosting 'in the
23       Cloud'", Bates-stamped ALLERGAN_MDL_
24       03535253 through 257
```

## Page 350

```
 1       I N D E X   O F   E X H I B I T S(Cont'd.)
 2       ALLERGAN-NAPOLI EXHIBITS              PAGE
 3
 4       Napoli Exhibit 26, Email chain        326
 5       beginning with email dated 1/11/16
 6       from Baran to Russo with attachment,
 7       Bates-stamped ALLERGAN_MDL_ 03431731
 8       through 1739
 9
10       Napoli Exhibit 27, Email dated        329
11       11/13/13 from Kemnitzer to
12       distribution list, Bates-stamped
13       PPLPC020000735777 through 782
14
15       Napoli Exhibit 28, Email chain        331
16       beginning with email dated 1/14/16
17       from Lepore to Simmons, Bates-
18       ALLERGAN_MDL_01551062 through 1064
19
20       Napoli Exhibit 29, Natively-produced  331
21       Spreadsheet, Bates-stamped
22       ALLERGAN_MDL_01551064 xlsx
23
24
```

## Page 351

```
 1           ERRATA SHEET FOR THE TRANSCRIPT OF:

 2       CASE NAME:  NATIONAL PRESCRIPTION OPIATE

 3       DATE:     JANUARY 17, 2019

 4       DEPONENT:  THOMAS P. NAPOLI

 5       Pg.  Ln.   Now Reads   Should Read   Reason

 6       __  __  _____   _____  ____

 7       __  __  _____   _____  ____

 8       __  __  _____   _____  ____

 9       __  __  _____   _____  ____

10       __  __  _____   _____  ____

11       __  __  _____   _____  ____

12       __  __  _____   _____  ____

13       __  __  _____   _____  ____

14       __  __  _____   _____  ____

15       __  __  _____   _____  ____

16

17           _____

18           THOMAS P. NAPOLI

19       SUBSCRIBED AND SWORN BEFORE ME

20       THIS____DAY OF_____ 2019.

21

22       _____

23       (Notary Public)

24       MY COMMISSION EXPIRES:_____
```