Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                  EASTERN DIVISION

 4                     - - -

 5    IN RE:  NATIONAL            :

      PRESCRIPTION                :  MDL No. 2804

 6    OPIATE LITIGATION           :

      _____ :  Case No.

 7                                :  1:17-MD-2804

      THIS DOCUMENT RELATES       :

 8    TO ALL CASES                :  Hon. Dan A. Polster

 9                     - - -

10          Monday, January 7, 2019

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

12

                       - - -

13

14        Videotaped deposition of TOM NAMETH, held at

15    the offices of Cavitch, Familo & Durkin,

16    1300 East Ninth Street, Cleveland, Ohio, commencing at

17    9:03 a.m., on the above date, before Carol A. Kirk,

18    Registered Merit Reporter and Notary Public.

19

20                     - - -

21

22

23          GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  A P P E A R A N C E S:
 2    On behalf of the Plaintiffs:
 3           COHEN & MALAD, LLP
             BY:  EDWARD "NED" B. MULLIGAN, ESQUIRE
 4                nmulligan@cohenandmalad.com
                  JONATHAN A. KNOLL, ESQUIRE
 5                jknoll@cohenandmalad.com
             One Indiana Square, Suite 1400
 6           Indianapolis, Indiana  46204
             317-636-6481
 7
 8    On behalf of Discount Drug Mart:
 9           CAVITCH FAMILO & DURKIN
             BY:  TIMOTHY JOHNSON, ESQUIRE
10                tjohnson@cavitch.com
             1300 East Ninth Street, 20th Floor
11           Cleveland, Ohio  44114
             216-621-7860
12
13    On behalf of Cardinal Health, Inc.:
14           PORTER WRIGHT MORRIS & ARTHUR LLP
             BY:  JILL G. OKUN, ESQUIRE
15                jokun@porterwright.com
             950 Main Avenue, Suite 500
16           Cleveland, Ohio  44113
             202-443-2508
17
18    On behalf of AmerisourceBergen:
19           JACKSON KELLY PLLC
             BY:  SANDRA K. ZERRUSEN, ESQUIRE
20                skzerrusen@jacksonkelly.com
             50 South Main Street, Suite 201
21           Akron, Ohio  44308
             330-252-9060
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   On behalf of Walmart:
 2         JONES DAY
           BY:  ADAM HOLLINGSWORTH, ESQUIRE
 3              ahollingsworth@jonesday.com
           901 Lakeside Avenue East
 4         Cleveland, Ohio  44114
           216-586-3939
 5
 6   On behalf of Endo Pharmaceuticals, Inc. and
     Endo Health Solutions Inc. (via teleconference):
 7
           BAKER & HOSTETLER LLP
 8         BY:  TERA N. COLEMAN, ESQUIRE
                tcoleman@bakerlaw.com
 9         127 Public Square, Suite 2000
           Cleveland, Ohio  44114
10         216-861-7582
11
12   On behalf of McKesson:
13         ULMER & BERNE, LLP
           BY:  GREGORY C. DJORDJEVIC, ESQUIRE
14              gdjordjevic@ulmer.com
           1660 West 2nd Street, Suite 1100
15         Cleveland, Ohio  44113
           216-583-7000
16
17
18   ALSO PRESENT:
19         Tom McConnell, Discount Drug Mart
           Mike Newell, Videographer
20         Zach Hone, Trial Technician
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1        VIDEOTAPED DEPOSITION OF TOM NAMETH

2                INDEX TO EXAMINATION

3    DDM-NAMETH                                    PAGE

4    TOM NAMETH

5        CROSS-EXAMINATION BY MR. MULLIGAN          11

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1          VIDEOTAPED DEPOSITION OF TOM NAMETH
 2                    INDEX TO EXHIBITS
 3    DDM-NAMETH      DESCRIPTION                      PAGE
 4    DDM-Nameth 1    Plaintiffs' Notice of Oral        69
                      Videotaped Fact Deposition of
 5                    Tom Nameth
 6    DDM-Nameth 2    Discount Drug Mart, Inc.          77
                      Responses to Plaintiffs' First
 7                    Set of Interrogatories
 8    DDM-Nameth 3    Letter to Sir or Madam from      135
                      Mr. Rannazzisi, dated
 9                    February 7, 2007, Bates-
                      stamped DDM00068281 through
10                    68284
11    DDM-Nameth 4    Letter to Registrant from        184
                      Mr. Rannazzisi, dated
12                    December 27, 2007,
                      Bates-stamped DDM00068279
13                    through 68284
14    DDM-Nameth 5    E-mail to Mr. Redmond from       210
                      Ms. Strang, dated 5/18/2017,
15                    with attachment titled
                      "Shipments Greater Than 99% of
16                    AVG. Movement," Bates-stamped
                      DDM00053874
17
      DDM-Nameth 6    Letter from Mr. Ratycz, dated    212
18                    November 13, 2001,
                      Bates-stamped DDM00011545
19
      DDM-Nameth 7    E-mail to Ms. Twardzik from      220
20                    Mr. Nameth, dated 5/14/2005,
                      Bates-stamped DDM00358736
21
      DDM-Nameth 8    E-mail string ending with an     229
22                    e-mail to Ms. Biancardi and
                      others from Mr. Ratycz, dated
23                    4/4/2007, Bates-stamped
                      DDM00355119
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    DDM-NAMETH      DESCRIPTION                    PAGE
 3    DDM-Nameth 9    E-mail string ending with an    233
                      e-mail to Mr. Bontempo from
 4                    Mr. Ratycz, dated 10/1/2008,
                      Bates-stamped DDM00011543 and
 5                    11544
 6    DDM-Nameth 10   E-mail to Messrs. Nameth and    238
                      Hawk from Mr. Steinkerchner,
 7                    dated 11/11/2010, Bates-
                      stamped DDM00003408
 8
      DDM-Nameth 11   E-mail string ending with an    253
 9                    e-mail to Mr. Doug Boodjeh
                      from Mr. McConnell, dated
10                    9/11/2013, Bates-stamped
                      DDM00013519 through 13524
11
      DDM-Nameth 12   E-mail string ending with an    276
12                    e-mail to Mr. Rehner from
                      Mr. Nameth, dated 12/4/2013,
13                    Bates-stamped DDM00075841 and
                      75842
14
      DDM-Nameth 13   E-mail to Ms. Ferut from        290
15                    Mr. Nameth, dated 9/9/2013,
                      Bates-stamped DDM00046047
16
      DDM-Nameth 14   E-mail to All Pharmacists from  293
17                    Mr. Ratycz, dated 9/14/2013,
                      Bates-stamped DDM00261505
18
      DDM-Nameth 15   E-mail to Mr. Glinski from      299
19                    Mr. Kistler, dated 11/17/2013,
                      Bates-stamped DDM00071409
20
      DDM-Nameth 16   E-mail to Mr. Ratycz and        306
21                    others from Mr. Glinski, dated
                      10/2/2014, Bates-stamped
22                    DDM00421435
23
24
```

```
 1                    INDEX TO EXHIBITS (CONT'D)
 2    DDM-NAMETH        DESCRIPTION                      PAGE
 3    DDM-Nameth 17   E-mail string ending with an       311
                      e-mail to Ms. Bartish from
 4                    Mr. Nameth, dated 4/18/2014,
                      Bates-stamped DDM00171919
 5                    through DDM00171922
 6    DDM-Nameth 18   E-mail string ending with an       330
                      e-mail to Messrs. Ratycz and
 7                    Nameth from Ms. Golob, dated
                      8/21/2013, Bates-stamped
 8                    DDM00174146 through 174148
 9    DDM-Nameth 19   E-mail string ending with an       342
                      e-mail to Messrs. Ratycz,
10                    Glinski, Nameth, and Graf from
                      Ms. Golob, dated 8/21/2013,
11                    Bates-stamped DDM00048217
                      and 48218
12
      DDM-Nameth 20   E-mail string ending with an       343
13                    e-mail to Ms. Golob and
                      Mr. Nameth from Mr. Ratycz,
14                    dated 9/18/2013, Bates-stamped
                      DDM00427343
15
      DDM-Nameth 21   Graphs titled "Hydrocodone         348
16                    Shipments to BD2308155 from
                      Discount Drug Mart" and
17                    Hydrocodone Shipments to
                      BD0995095 from Discount Drug
18                    Mart," Bates-stamped
                      P-DDM-0501
19
      DDM-Nameth 22   E-mail to Mr. Brinks from          356
20                    Mr. Ratycz, dated 10/23/2013,
                      Bates-stamped DDM00169025
21
      DDM-Nameth 23   E-mail from Mr. McGinley,          359
22                    dated 12/2/2013, with attached
                      Controlled Substances Model
23                    Policy, Bates-stamped
                      DDM00031931 through 31965
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)

 2   DDM-NAMETH      DESCRIPTION                      PAGE

 3   DDM-Nameth 24   E-mail string ending with an     363
                     e-mail to Mr. Devens from
 4                   Ms. Strang, dated 4/2/2014,
                     with attached Controlled
 5                   Substances Model Policy,
                     Bates-stamped DDM00092440
 6                   through DDM00091629

 7   DDM-Nameth 25   Document titled "DLSS            365
                     Controlled Substance client
 8                   Customers:  Due Diligence
                     Questionnaire," Bates-stamped
 9                   DDM00382315 through 382320

10   DDM-Nameth 26   E-mail string ending with an     369
                     e-mail to Ms. Strang from
11                   Ms. Kreiner, dated 1/20/2017,
                     Bates-stamped DDM00074952 and
12                   74953

13   DDM-Nameth 27   E-mail string ending with an     373
                     e-mail to Mr. Nameth from
14                   Mr. Wilkins, dated 9/18/2013,
                     Bates-stamped DDM00055694
15
     DDM-Nameth 28   E-mail to All Pharmacists from   378
16                   Mr. Nameth, dated 9/24/13,
                     with attachment, Bates-stamped
17                   DDM00110147

18   DDM-Nameth 29   E-mail string to                 382
                     Messrs. Ratycz and Nameth from
19                   Mr. Wilkins, dated 10/16/13,
                     Bates-stamped DDM00168903 and
20                   168904

21   DDM-Nameth 30   E-mail string ending with an     386
                     e-mail to Mr. Nameth and
22                   others from Mr. Simmons, dated
                     10/21/2013, Bates-stamped
23                   DDM00169973 and 169974

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INDEX TO EXHIBITS (CONT'D)

 2    DDM-NAMETH      DESCRIPTION                    PAGE

 3    DDM-Nameth 31   E-mail string ending with an    390
                      e-mail to Mr. Carter and
 4                    Ms. Bartish from Mr. Nameth,
                      dated 6/13/2014, Bates-stamped
 5                    DDM00087058 and 87059

 6    DDM-Nameth 32   Compilation of documents with   393
                      various Bates numbers
 7

      DDM-Nameth 33   Discount Drug Mart, Inc.        414
 8                    Organizational Chart

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2              P R O C E E D I N G S

 3                      - - -

 4              THE VIDEOGRAPHER:  We are now on

 5         the record.  My name is Michael Newell.

 6         I am a videographer for Golkow

 7         Litigation Services.  Today's date is

 8         January 7, 2019.  The time is 9:03 a.m.

 9              This deposition is being held in

10         Cleveland, Ohio in the matter of

11         National Prescription Opiate Litigation.

12              The deponent today is Tom Nameth.

13              Will counsel please identify

14         themselves.

15              MR. MULLIGAN:  Edward Mulligan and

16         Jonathan Knoll for the Plaintiffs.

17              MR. JOHNSON:  Tim Johnson for the

18         Defendant, Discount Drug Mart.

19              MR. HOLLINGSWORTH:  Adam

20         Hollingsworth for Walmart.

21              MR. DJORDJEVIC:  Greg Djordjevic

22         for McKesson.

23              MS. ZERRUSEN:  Sandy Zerrusen from

24         Jackson Kelly for AmerisourceBergen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. OKUN:  Jill Okun for Cardinal
 2         Health.
 3                    MR. MULLIGAN:  Anybody on the
 4         phone?
 5                    MS. COLEMAN:  Hi.  This is Tera
 6         Coleman at BakerHostetler on behalf of
 7         the Endo Defendants.
 8                    THE VIDEOGRAPHER:  The court
 9         reporter today is Carol Kirk and will
10         now swear in the witness.
11                       - - -
12                    TOM NAMETH
13   being by me first duly sworn, as hereinafter
14   certified, deposes and says as follows:
15              CROSS-EXAMINATION
16   BY MR. MULLIGAN:
17         Q.    Good morning, Mr. Nameth.
18         A.    Good morning.  How are you?
19         Q.    My name is Ned Mulligan, and I'm
20   an attorney at Cohen & Malad in Indianapolis.
21   And we're here to take your deposition today.
22                    Do you understand that?
23         A.    Yes.
24         Q.    Okay.  And I appreciate your time
```

Highly Confidential - Subject to Further Confidentiality Review

 1    here today.  I'm sure there's things you'd

 2    rather be doing.  We'll try to get you out of

 3    here as soon as we can, okay?

 4          A.    That's fine.

 5          Q.    Before the deposition started, I

 6    went over a couple just basic ground rules.

 7                Did you understand those

 8    generally?

 9          A.    Yes.

10          Q.    Okay.  And the only thing I didn't

11    mention -- well, there was two things.  One, if

12    you want to take a break, I'm more than happy to

13    let you take a break.  It's not a marathon.  All

14    I ask is that we finish the document we're on or

15    that you answer the question that's pending.

16                Is that fair?

17          A.    That's fair.

18          Q.    Okay.  And if I ask a question

19    today that you don't understand, which is likely

20    to happen, I'd just ask that you let me know

21    that you didn't understand, and I can try and

22    rephrase it.

23                Is that fair?

24          A.    That's fair.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    Okay.  And in the same vein, to

 2    the extent that you do answer my question, is it

 3    fair for me to assume that you understood it?

 4           A.    Yes.

 5           Q.    Okay.  For the purposes of the

 6    deposition, I may use some abbreviations today

 7    that I want to just clear with you, if that's

 8    all right.  The first one would be suspicious

 9    order monitoring I may refer to as SOM.  Is that

10    an abbreviation you're familiar with?

11           A.    Yes, it is.

12           Q.    Okay.  And same with suspicious

13    order reporting would be SOR?

14           A.    Okay.

15           Q.    Okay?

16                 And then I may refer to Discount

17    Drug Mart as DDM.

18           A.    That's fine, yes.

19           Q.    Okay.  And then the Controlled

20    Substances Act as the CSA.

21           A.    Okay.

22           Q.    Okay.  And just a second ago, you

23    were -- you swore that you would tell the truth

24    today.
```

```
 1                    Did you understand that?

 2          A.    Sure did.

 3          Q.    Okay.  And you know that that

 4    means that you're here to tell the truth and the

 5    whole truth, correct?

 6          A.    Yes, sir.

 7          Q.    Okay.  And are you prepared and

 8    ready to do that?

 9          A.    I hope so.

10          Q.    Okay.  Is there anything that

11    would keep you from telling the whole truth

12    today?

13          A.    No.

14          Q.    Okay.  So my understanding is that

15    you're actually retired now; is that correct?

16          A.    That's right.

17          Q.    Okay.  When did you retire?

18          A.    2014.  And then I went -- after

19    that, I did stay on with the company as a

20    part -- on a part-time basis for approximately a

21    year, but reduced workloads.

22          Q.    Okay.  And having talked to some

23    of your former colleagues, my understanding is

24    that that's sort of a common thing at DDM, that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the outgoing manager sort of stays on part-time,

 2    at least in some instances, to transition in the

 3    new person.

 4              Is that fair?

 5         A.    Yes.

 6         Q.    Okay.  And who took over for you

 7    in 2014 and then thereafter?

 8         A.    Jason Briscoe.

 9         Q.    Okay.  And what was your title

10    in -- when you retired?

11         A.    Director of pharmacy operations.

12         Q.    So I assume sometime prior to

13    2014, you indicated you wanted to retire; is

14    that correct?

15         A.    Yes.

16         Q.    And then they would -- they

17    brought in Jason -- or they tabbed Jason to take

18    over for you?

19         A.    Right.  He was brought in prior to

20    that date.  Maybe a year prior to that date or

21    so.

22         Q.    Okay.  And do you know what his

23    title was prior to that?

24         A.    He was supervisor of the southern
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   region, I think.

 2           Q.    So he was like a regional

 3   supervisor --

 4           A.    Right --

 5           Q.    -- of a sect of the DDM

 6   pharmacies?

 7           A.    Yes.

 8           Q.    Okay.  And I understand there was

 9   a couple of those, right?

10           A.    There were.

11           Q.    Okay.  And so DDM chose him to

12   replace you --

13           A.    Correct.

14           Q.    -- or did you choose him?

15           A.    No.  It was a corporate decision

16   to do that.

17           Q.    Okay.  And so would it be fair to

18   say that in 2014, he became the director of

19   pharmacy operations but then you stayed on in

20   a -- sort of a part-time capacity to help ensure

21   that he got up to speed?

22           A.    I think that was done prior.  I

23   mean, he was there a year prior to that, so he

24   was pretty much up to speed by the time I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   retired, and when I did retire, I went to just a
 2   couple of days a week in a reduced capacity.
 3   But, you know, that's ...
 4        Q.   Okay.  Did you work closely with
 5   him prior to your retirement?
 6        A.   Yes.
 7        Q.   And was -- were you his -- strike
 8   that.
 9             Did he directly report to you?
10        A.   Not necessarily.  I mean, he
11   probably worked with me alongside of me in a lot
12   of things, but he reported to -- to Pete Ratycz.
13        Q.   Okay.  And you also reported to
14   Pete Ratycz?
15        A.   Yes.
16        Q.   How long did you work at DDM?
17        A.   Approximately 30 years.
18        Q.   So if my math is correct, does
19   that mean that you started in -- would it have
20   been like --
21        A.   About '85 or somewhere in there.
22        Q.   What was your position when you
23   started there?
24        A.   Staff pharmacist, retail.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    So that would have been a

 2   pharmacist at one of the stores?

 3              A.    Yes.

 4              Q.    And my understanding -- well,

 5   strike that.

 6                    At that time were there chief

 7   pharmacists at the stores as well?

 8              A.    There were chief and staff.

 9              Q.    And so correct me if I'm wrong,

10   you are a pharmacist then?

11              A.    Yes.

12              Q.    Okay.  Do you have a PharmD?

13              A.    I do not.

14              Q.    Okay.  And what's the degree that

15   you have?

16              A.    BS.

17              Q.    I'm sorry?

18              A.    BS, Bachelor of Science, pharmacy.

19              Q.    Okay.

20                    MR. JOHNSON:  You're jumping on

21              the end of his questions a little bit

22              so --

23                    THE WITNESS:  Okay.

24                    MR. JOHNSON:  -- just slow it down
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              a notch or so.

 2                   MR. MULLIGAN:  He was pretty good

 3         until that last one.

 4                   MR. JOHNSON:  Yeah.

 5   BY MR. MULLIGAN:

 6         Q.    You're doing good.

 7         A.    Okay.

 8         Q.    And where did you get your

 9   bachelor in pharmacy?

10         A.    Duquesne University, Pittsburgh.

11         Q.    And what year was that?

12         A.    1972.

13         Q.    And did you start working as a

14   pharmacist in 1972?

15         A.    I was in the service from '72 to

16   '74.  And after that -- which I worked as a

17   pharmacist in the service --

18         Q.    Okay.

19         A.    -- at Madigan Hospital in Fort

20   Lewis, Washington.  Came out and then went into

21   retail here.

22         Q.    So did you work as a retail

23   pharmacist somewhere else before joining DDM?

24         A.    Yes.  Revco for -- which is now
```

Highly Confidential - Subject to Further Confidentiality Review

 1    CVS, for a number of years.

 2          Q.    Was there any other pharmacies

 3    that you worked at from -- between your time in

 4    the service and when you started at DDM in --

 5          A.    Yes.  After Revco, I worked for

 6    Kroger's.  Kroger's was leaving the Cleveland

 7    area, so I had to switch at that point, and

 8    which -- I don't know.  It was late '70s, I

 9    guess -- to Rite Aid.

10          Q.    Okay.

11          A.    And then from Rite Aid to Drug

12    Mart --

13          Q.    Okay.

14          A.    -- or DDM.

15          Q.    And you were in a retail

16    pharmacist role in each of those locations,

17    correct?

18          A.    For all of those, yes.

19          Q.    And when did you -- when were you

20    promoted from staff pharmacist at DDM to a

21    higher position?

22          A.    Maybe in the late '90s I went

23    to -- I was the director of IPS, which was a

24    mail order nursing home and physicians'

Highly Confidential - Subject to Further Confidentiality Review

```
 1    dispensing operation.

 2          Q.    So from, let's say, '84, '85

 3    time --

 4          A.    Maybe to '90 -- it was probably

 5    '90 -- maybe it was even early '90s.

 6          Q.    Okay.  So from the '84 to '85 time

 7    frame until when you went to that role, you were

 8    a staff pharmacist at the DDM stores?

 9          A.    Yes.

10          Q.    Okay.  And then how did you go

11    from the director of IPS to being the director

12    of pharmacy operations?  Were there any other

13    intermediate steps?

14          A.    I -- from the -- from the IPS, I

15    went to the Medina store as chief pharmacist,

16    and then from the Medina retail store, I went to

17    the corporate office as director.  And that was

18    probably, I'm going to say, '96, '97.

19          Q.    And then you were in that role

20    until 2014, correct?

21          A.    There was one year interim where I

22    was -- took over our VP -- our current VP at

23    that time, rather, had left and for about a

24    year, I was acting VP until Pete took over in, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   believe, '02.

 2          Q.   Okay.  So it would be fair to say

 3   you've got a pretty in-depth understanding as to

 4   how DDM's business works?

 5          A.   I would think so.

 6          Q.   And specifically as it relates to

 7   its pharmacy?

 8          A.   Yes.

 9          Q.   And you're also very well versed

10   in sort of the pharmaceutical business, retail

11   business, if you will?

12          A.   Yes.

13          Q.   Okay.  So as the director of

14   pharmacy operations, what were your primary

15   responsibilities?

16          A.   Well, anything that went on, you

17   know, in the pharmacies themselves, hiring,

18   firing, you know, staffing, making sure the

19   stores are run properly, looking at stores', you

20   know, profitabilities and inventories.

21          Q.   Is there anything else that you

22   were responsible for as director of pharmacy

23   operations that you can think of?

24          A.   I mean, you know, not offhand.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.    Okay.  You know why we're here

 2   today, right?

 3          A.    Yes.

 4          Q.    And why is that?

 5          A.    Looking at the opioid problems,

 6   situations, in the country.

 7          Q.    Okay.  And could you be a little

 8   more specific?

 9          A.    Looking at possible drug

10   diversion, what that is, and how do you go about

11   fighting that problem, I guess.

12          Q.    Were you responsible for

13   overseeing DDM's system to detect and deter

14   diversion?

15          A.    I wouldn't say responsible.  As

16   far as what -- as far as writing it or as far as

17   operations or what?

18          Q.    Go ahead and tell me what you were

19   responsible for.

20          A.    More of the operational aspect of

21   it.

22          Q.    Okay.  How do you define

23   "operational"?  I want to just make sure I

24   understand sort of the scope of what your

1    responsibilities were related to diversion.

2         A.    Okay.  Once a policy was

3    determined on how we're going to go about

4    organizing and making sure that there was no

5    diversion, whether that be theft or whether it

6    be -- whether it be just routine distribution,

7    my job was to make sure that the process was

8    done on a regular basis and making -- and react

9    to situations when they did come up.

10        Q.    Okay.  When was a -- well, you

11   said when a policy was determined, what do you

12   mean by that?

13        A.    Well, we're a small company, so we

14   determined what we wanted to do on a regular

15   basis, on an ongoing basis, whether or not --

16   there was -- at that time there was a report

17   that was run on a monthly basis, and someone had

18   to review the report on a regular basis, and

19   take appropriate steps when necessary.  So, you

20   know, we knew our duties at that time and

21   fulfilled those duties.

22        Q.    All right.  So I'll just -- we're

23   talking -- you're talking in very general terms,

24   and so what that means is I'm going to have to

1    ask you a lot of follow-up questions, so -- and

2    that's fine.  But I'm going to try to dig into

3    that a little bit more --

4           A.    Okay.

5           Q.    -- so we don't -- we can get

6    through it quicker.

7                 Okay.  So you said you're a small

8    company.  Can you tell me what the relevance of

9    that is to what your ultimate policy became?

10          A.    Well, you know, our company is

11   small to the point where we have very little

12   turnover.  So somebody that is in my position,

13   there's only two people really in the corporate

14   office that was looking at the reporting

15   systems.

16                So, you know, we didn't

17   necessarily have a written policy, per se, but

18   we knew what the policies were, what our jobs

19   were, what our functions were.  So it was really

20   up to us to maintain that functionality on a

21   monthly basis to make sure that, you know, the

22   reports were looked at and followed up on,

23   so ...

24          Q.    Who was the other person?

```
 1              A.    The VP of pharmacy and myself, the

 2    director.

 3              Q.    Okay.  So at some point -- and

 4    tell me -- correct me if I'm wrong.  Were you --

 5    did you participate in designing DDM's

 6    suspicious order monitoring policies and

 7    procedures?

 8              A.    No.

 9              Q.    You did not?  Do you know who did?

10              A.    Well, there's a couple of

11    different layers that were involved in that.

12    Back in, oh, mid '90s there was a policy that

13    was -- not a policy, but a program that was

14    written to monitor controlled drug orders and

15    that was probably done in the mid '90s.

16              Q.    And is that the policies and

17    procedures that are in place today that you know

18    of, or at least as of when you retired?

19              A.    A portion of it, yes.

20              Q.    Okay.  And did you play any role

21    in drafting that?

22              A.    I did not.

23              Q.    Okay.  What did that policy

24    consist of at that time?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It was a monthly report that was

 2    run out on controlled drugs.  It was a

 3    controlled drug report looking at the average

 4    number of bottles of controlled drugs that were

 5    distributed or actually ordered by a particular

 6    store based on a monthly average, but I think it

 7    was -- might have been designed as a rolling

 8    12-month --

 9          Q.    Okay.

10          A.    -- average looking backwards.

11          Q.    And I'll just represent to you,

12    based on the depositions I've been at, that

13    that's the report that they still use today as

14    part of their suspicious order monitoring

15    policies.

16                Are you aware of that?

17          A.    Okay.  I believe that they still

18    use it, but I've been gone for -- since '14.

19          Q.    Sure.

20          A.    I was really out of that loop, I

21    mean, from '14, but ...

22          Q.    Was it used in 2014?

23          A.    Yes.

24          Q.    And it was used from when it was
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    put in place through 2014?

2           A.    Yes.

3           Q.    Without any exception?

4           A.    That portion was used straight

5    through.  There were some additions that were

6    added to that.

7           Q.    Okay.  Was that report designed to

8    identify suspicious orders?

9           A.    Part of it.  That was part of the

10   functionality.  I mean, you know, suspicious

11   orders were -- you know, it was kind of a

12   different layer -- multilayered type of program

13   where we -- that was one part of the program,

14   yes.

15          Q.    Okay.  So it sounds to me like it

16   was maybe designed for multiple reasons and one

17   of them might have been suspicious orders; is

18   that fair?

19          A.    That particular rolling average

20   monthly report was designed specifically to look

21   at controlled drugs anomalies that would -- you

22   know, quantities higher than the normal, and

23   that was really the specific use of it.

24          Q.    Okay.  In your eyes, would an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    anomaly associated with a controlled substance,

 2    in terms of size, would that be something that

 3    would constitute a suspicious order?

 4         A.    Not necessarily.  It would be

 5    something that would jump out of the page at you

 6    and then you'd have to look into that specific

 7    reason why that -- there was an increase from

 8    month to month or that particular month.

 9              So it, not necessarily, would make

10    it a suspicious order.  It would jump out of the

11    page.  Then there would be follow up to

12    determine whether it was suspicious or not.

13         Q.    Okay.  So if you were looking at

14    this one month -- the monthly -- what do you

15    want to call this report for the sake of the

16    transcript?  Do you have a preference as to what

17    you call it?

18         A.    Twelve-month order.  I mean,

19    12-month --

20         Q.    The 12-month report?

21         A.    Yeah, I guess.

22         Q.    Okay.  And when we say that, we'll

23    agree that we're referring to the one that's

24    printed monthly and reflects a rolling 12-month
```

```
 1   average.

 2              Is that fair?

 3        A.    Right.  Yes.

 4        Q.    Okay.  So if you were looking --

 5   and I assume part of your responsibilities were

 6   to review this 12-month report, correct?

 7        A.    Yes.

 8        Q.    Was anybody else responsible for

 9   reviewing this 12-month report on a monthly

10   basis?

11        A.    If I was on vacation, the VP of

12   pharmacy would do that --

13        Q.    Okay.

14        A.    -- but it would only be between

15   the two of us.

16        Q.    Okay.  And you said that you would

17   use that report to see if anything jumped out at

18   you, right?

19        A.    I would use the report to make the

20   next determination of whether we had to do

21   something else besides necessarily what had to

22   be -- there was another form that we used that

23   we sent out to a store to ask them the reasons

24   why of the increase.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.     Okay.  So let's say Store Number 1

2      has a 12-month rolling average of five bottles

3      of hydrocodone per month, fair?

4              A.     Yes.

5              Q.     Okay.  And then you get a report

6      on January 1st showing that in December they

7      ordered 15 bottles of hydrocodone.

8              A.     Yes.  Okay.

9              Q.     And so would that appear on the

10     report?

11             A.     Yes.

12             Q.     Okay.  And would that jump out at

13     you?

14             A.     Yes.

15             Q.     Was there any policy and procedure

16     at DDM that told you what should jump out at

17     you?

18             A.     It was discussed that if we

19     determined that it was a policy -- not a policy.

20     We determined that the volume was higher than

21     normal, then we would follow up with a report to

22     the store.

23             Q.     Okay.  And so it sounds like there

24     wasn't --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    In other words, if they're going

 2      up from two bottles to four bottles, that, not

 3      necessarily, would -- it's a higher volume than

 4      normal.  And that's why we had to look at that

 5      as an individual, because we had to determine

 6      what store we're looking at.

 7              If you're looking at just a

 8      number, a black and white number, it really

 9      doesn't tell you much.  It tells you a volume,

10      but it doesn't tell you anything besides that.

11      So that's why we had to look at it and then

12      determine a reason why, and that reason then

13      would go out to the stores.  We'd ask the

14      question and then they would have to respond.

15              Q.    Okay.  And I appreciate all that.

16      What I'm really focused on right now is, did you

17      ever receive any training or was there any

18      policies and procedures that said, "All right,

19      Tom, if you see this report and this store that

20      was ordering five has ordered, you know -- if it

21      increases by X percentage, then you have to do

22      something."

23              Was there anything like that?

24              A.    Well, as being a retail pharmacist
```

```
 1   for 15 years probably before, you know, I was

 2   very well aware of what stores -- the

 3   functionalities of stores do, how their orders

 4   were done, and they gave you a background.

 5              Now, we also -- when I came on

 6   board, it was verbally dictated to me that this

 7   is what we should do if you have -- if you feel

 8   that this is higher than normal, then we should

 9   follow up.  So that's what we did.

10        Q.    Okay.  So what I'm hearing is --

11   tell me if I'm wrong -- there was no set policy

12   and procedure that required you to follow up

13   based on a particularly -- like a percentage

14   increase?  There was no percentage that says,

15   all right, in this instance, you have to follow

16   up with the pharmacist, correct?  It was a

17   judgment call that you got to make?

18        A.    Yes.

19        Q.    Okay.

20        A.    Yes.

21        Q.    And so on any given month, let's

22   take that store we just talked about that had an

23   average of five bottles, correct?  Okay?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Is there a specific number where

2    for Tom, an increase that would jump out at you

3    where you'd say, "I need to follow up"?

4          A.    Well, the report itself, I think,

5    would populate once that -- that number would,

6    say, hit a threshold.  I think the threshold of

7    that report, if I don't -- if I remember

8    correctly, was about 90 -- 90 percent,

9    99 percent or so.  So when it would populate in

10   the report, in your case, that would have to be,

11   what, ten bottles?

12         Q.    Mm-hmm.

13         A.    And so in my opinion, that would

14   be a substantial increase.  So we would have to

15   understand why it went from five to ten.  So

16   that would -- that would then generate a report

17   on my side out to the stores to ask them that

18   question.

19               Now, there's some other things

20   involved.  If a store was -- you know, had a

21   clinic that opened up next store, Cleveland

22   Clinic was populating, you know, individual

23   satellites around the suburbs of Cleveland quite

24   rapidly, and so there are things that we knew --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that's why it's important for us to have

 2    somebody look at it rather than just take it by

 3    its value on a piece of paper.

 4           Q.    Okay.  So my question was

 5    specific.  Was there a certain number that would

 6    cause you to do follow up?  And I appreciate all

 7    the other things you told me.  We'll be here

 8    until Friday if --

 9           A.    Okay.

10           Q.    I appreciate the information.

11           A.    I'm just trying to explain what we

12    do, but you know.

13           Q.    Yeah.  And I don't want anybody --

14           A.    I understand.

15           Q.    -- to be mad at me later --

16           A.    No.  I understand.

17           Q.    -- when it's 7:00 and we're still

18    here.  But -- you know, so I -- if you can

19    listen to my question.  I'm going to try and ask

20    very specific pointed questions for what I need,

21    and if you can try and answer the question.

22    Certainly you're welcome to provide any

23    additional information you want, but I don't

24    want to keep you here all day.
```

1                   So let me ask this.  Okay.  So

2    this report's printed monthly, right?

3          A.    Correct.

4          Q.    Okay.  Does it have all DDM's

5    stores on it?

6          A.    Yes, it does.

7          Q.    And it's broken up by store?

8          A.    Yes.

9          Q.    Okay.  Does it include just

10   controlled substances or other items?

11         A.    Yes.

12         Q.    Just controlled substances.  Okay.

13               Do all controlled substance orders

14   appear on this report or just the ones that

15   exceed the 99 percent?

16         A.    They can all appear on there.

17   Now, they -- I think that once they're printed,

18   only the 99 percent were.  I don't -- I think

19   it's only the 99 percent.

20         Q.    Okay.  So let's say -- let's use

21   our example again, and I don't remember what

22   store it was.  We'll say Store 1 so we can

23   remember.  So Store 1 has an average of five

24   bottles a month, right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes.

2          Q.    This feels like math class,

3    doesn't it?

4          A.    Yeah.

5          Q.    Okay.  So they're averaging five a

6    month and then all of a sudden in December they

7    order nine, right?

8          A.    Yes.

9          Q.    Okay.  That wouldn't show up on

10   the report, would it?

11         A.    Probably not.

12         Q.    Okay.  So then we're at nine, and

13   then let's say the next month they order 16.

14   That wouldn't show up on the report either,

15   would it?

16         A.    Well, I'd have to look and see.

17   It's a rolling average, so ...

18         Q.    Okay.  So the December amount --

19               MR. JOHNSON:  Let him finish.

20         Q.    Yeah.  Go ahead.

21         A.    I don't know.  I'd have to look

22   at -- and we'll do the math, I guess, and see if

23   a rolling average from month to month when

24   you're going back 12 months, I would have to

Highly Confidential - Subject to Further Confidentiality Review

1    understand the math.

2           Q.    I gotcha.  But you'd agree that

3    each month they could increase 98 percent over

4    what their last 12-month average was and it

5    wouldn't show up on the report; is that correct?

6           A.    Well, it's an increment -- when

7    you're looking at it on a month to month on a

8    rolling 12, I don't -- when you average in the

9    whole year, I don't think it -- I'm not quite

10   sure.  I'd have to look at the math, you know,

11   and if it pops on that report.

12          Q.    Okay.  So my question was, I'm

13   trying to frame my question in a way that --

14          A.    Well, I -- yeah.  You're trying --

15          Q.    Let me ask --

16                MR. JOHNSON:  Let him ask you --

17          let him --

18          Q.    So my question is:  If you

19   could -- that a store could increase its orders

20   every month, right?

21          A.    Mm-hmm.

22          Q.    Under that formula just generally

23   over time and without having any of those

24   ordering patterns show up on that report,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2          A.    If you're only looking at a month

 3    to month, you're correct in your statement that

 4    you wouldn't see that.  But when you throw in

 5    the rolling average of 12, I don't know if that

 6    skews that number.

 7          Q.    Well, let's say in month 12 you

 8    increase your orders by 98 percent, all of a

 9    sudden your 12-month average went up, didn't it?

10          A.    Yes.

11          Q.    And so then you could then

12    increase again by 98 percent, which would then

13    again bring your --

14          A.    I don't think on a monthly -- each

15    month that would -- you could do a 90 -- or

16    100 percent, whatever it is, 99 percent every

17    single month and increase that because it's a

18    rolling 12.  It looks back -- you know, it's

19    slow -- it's a slow progression.

20          Q.    Right.  So the January before

21    rolls off when the --

22          A.    Okay.  Yes.  Yes.

23          Q.    -- most recent January goes on.

24          A.    Mm-hmm.
```

```
 1                  (Reporter clarification.)

 2          A.     I'm sorry.

 3          Q.     The -- yeah.  We talked over

 4   there, each other.

 5                 So your January from last year

 6   rolls off the report when your January from this

 7   year gets added?

 8          A.     Yes.

 9          Q.     Okay.  And so if your January from

10   last year was five bottles and your January this

11   year was ten, your average goes up, right?

12          A.     Yes.

13          Q.     Which then raises the amount that

14   you could order in February without that amount

15   showing up on your report, correct?

16          A.     I'm taking your word for it.

17          Q.     Okay.  I mean --

18          A.     Without doing the math, but yes.

19          Q.     Right.  Well, and I haven't given

20   you any specific math.  And it's your report.

21   So I'm just trying to understand how this would

22   work and how things would show up.

23          A.     Yeah.

24          Q.     Okay.  How often would stores show
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   up on this report?

 2           A.    They would show up on the report

 3   with some frequency.  It depends on if it's

 4   cough and cold and flu season, then you're going

 5   to see more cough syrups report -- on the

 6   report.  But how often a particular store?

 7           Q.    I guess what I want to know is,

 8   Tom goes into work on January 1 -- I'm sorry for

 9   calling you Tom.  Mr. Nameth.

10           A.    That's fine.

11           Q.    Mr. Nameth goes into work on

12   January 1.  The report prints out.  It lands on

13   your desk.  Are all 74 stores on that report --

14           A.    Yeah.

15           Q.    -- showing stuff that's exceeded

16   the 99 percent rolling average?

17           A.    All stores are on the report but

18   there could be blank pages that they don't show

19   anything.

20           Q.    Okay.  So if no stores' order

21   history trigger this reporting system that had

22   been set up, they would just have the store but

23   nothing underneath?

24           A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And how common was it for the

 2    store to be listed with nothing underneath it?

 3              A.    I would say it was not that common

 4    for having a store having nothing.  So we had to

 5    review each -- you know, it was fairly time

 6    consuming to do, but ...

 7              Q.    Let's talk about opioids.

 8              A.    Yeah.

 9              Q.    When would this report print?

10    Would it be the first of the month?

11              A.    Yes.

12              Q.    Okay.  And would that be the thing

13    you'd expect to spend that day doing, looking at

14    that report?

15              A.    Generally, yeah.  I mean, it was

16    something that took some time.

17              Q.    Okay.  How many days would you

18    spend on it?

19              A.    It depends on how much time I had.

20    It could be several hours to, you know, a day

21    maybe, looking at it.

22              Q.    Okay.  Would it ever take you more

23    than a day to go through that report and do

24    whatever due diligence you needed to do?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Not that I recall.

 2              Q.     Okay.  And how many stores would

 3     you say on average would show up on that report

 4     regarding opioid purchases?

 5              A.     Strictly opioids?

 6              Q.     Correct.

 7              A.     There might be a dozen stores.

 8              Q.     Okay.  So 12 of the 74 stores

 9     would appear on average, just generally on a

10     given month showing that their orders for the

11     last month for opioids were greater than

12     99 percent of their 12-month rolling average; is

13     that fair?

14              A.     Yeah.  Now, that number -- when we

15     got towards 2012, '13, '14, those numbers seems

16     to -- seemed to decrease.

17              Q.     Do you know why that was?

18              A.     I do not know.

19              Q.     Did you ever look into why the

20     amount of times a store appeared on that report

21     went down around that time frame?

22              A.     No.

23              Q.     Okay.  So you noticed a marked

24     decline in stores showing up on your suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

1    order monitoring report and you didn't do

2    anything to figure out why?

3            A.    If they decreased?

4            Q.    Correct.

5            A.    No, I did not.

6            Q.    Okay.  Do you have any idea today

7    why fewer stores were showing up on your

8    suspicious order monitoring report starting in

9    2012?

10           A.    No.

11           Q.    Are you aware that that time frame

12   more or less coincides with when this opioid

13   crisis really kind of got blown out of

14   proportion?  Excuse me.  Blew up is the word I

15   was looking for.

16           A.    I think that it was more in the

17   news and there were some policies that the State

18   Board of Pharmacy made -- and, you know, I'm --

19   again, I'm not quite sure of the year, but there

20   was some changes to the board of how many

21   opioids you could dispense at a particular time,

22   so ...

23           Q.    Do you know what those rules are?

24           A.    Quantities, you know -- actually,

Highly Confidential - Subject to Further Confidentiality Review

1   the big thing was when hydrocodone went to

2   Schedule II, but now you're talking, what, I

3   think in '14.  So prior to that, not really.  I

4   don't know why that would have been.

5           Q.    So you told me that you thought

6   about a dozen stores would show up regarding

7   opioids on a monthly basis on that report.  Was

8   that prior to 2012 or was that --

9           A.    Yeah.  I think that -- that was

10  probably around '12, '13.  Prior to that, it

11  might have been slightly more on -- strictly on

12  the opioids.

13          Q.    Okay.  And you would spend upwards

14  of a day looking into that and doing due

15  diligence to determine whether that ordering

16  pattern was suspicious?

17          A.    I don't know if I would say

18  upwards of a day.

19          Q.    Okay.  So --

20          A.    A portion of the day.

21          Q.    Okay.  And what would that -- what

22  would the time that you spent -- what would you

23  spend that time doing?

24          A.    Reviewing each particular order

Highly Confidential - Subject to Further Confidentiality Review

1   that would show on the report, looking at what

2   store it was, determining to the best of my

3   knowledge why that would be, and then sending

4   out reports to the store.  You know, generating

5   another report to the store to ask them, you

6   know, why they had an increase.

7          Q.    Okay.  Did you always send the

8   form to the store?

9          A.    I'm sending the forms and it would

10  always go to the store, yes.

11         Q.    Okay.  So any time that a store

12  showed up on that report, you would send a form

13  asking them to explain why their ordering had

14  increased?

15         A.    No.

16         Q.    Okay.

17         A.    I mean, that's when I used a

18  judgment.

19         Q.    So this report would populate

20  automatically, correct?

21         A.    Yes.

22         Q.    And you would get the report,

23  correct?

24         A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And you were primarily responsible

 2    for reviewing it, correct?

 3              A.    Yes.

 4              Q.    And you'd spend a couple hours on

 5    the day that it populated reviewing it, right?

 6              A.    Right.

 7              Q.    And depending upon what popped out

 8    at you, you would then decide whether to send a

 9    form to the store asking for more information

10    about why --

11              A.    Well, you know, if the volume --

12              Q.    Hold on.  You would then send a

13    form that would ask them to explain why their

14    orders increased, correct?

15              A.    Yes, but I would send a form -- if

16    the quantities went from one to two or three, I

17    generally would not send a report.  If the

18    quantities went from five to ten, that would

19    generate a report, so ...

20              Q.    Why would five to ten generate a

21    report to the store and not one to three?

22              A.    Well, when you're looking at ups

23    and downs in the marketplace and all the

24    variables, you know, when you're talking about
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    increase by one bottle, so to speak, that

 2    necessarily would not, in my mind, generate a

 3    report that would lead to a possible suspicious

 4    order.

 5           Q.   Okay.  That was a judgment call

 6    you made, right?

 7           A.   Yes.

 8           Q.   And what was the purpose of the

 9    report that you would send to the stores?

10           A.   Well, it was twofold, in my

11    opinion anyway.  One was to see why the

12    increase.  The second was to see, after they do

13    the math of -- say, like they had an increase in

14    the number of volume of scripts, I also wanted

15    to know whether or not the remaining bottles

16    were on the shelf, or if there was some

17    diversion where someone was -- you know, are we

18    missing bottles?  Because if they had ordered

19    ten bottles and five were used for filling

20    scripts, they better have five on the shelf, so

21    to speak.

22           Q.   Did you ever send out one of those

23    forms and get a response back that, you know,

24    we're missing two bottles and so we had to
```

1    replace them?

2          A.    Not that I recall.

3          Q.    Okay.  Do you ever recall any

4    issues regarding missing controlled substances?

5          A.    At store level?

6          Q.    Correct.

7          A.    There have been situations at

8    store level where there have been missing

9    controlled substances.

10         Q.    Is that a common occurrence?

11         A.    Not really.

12         Q.    Okay.  So it was uncommon?

13         A.    I would say.

14         Q.    Do you think DDM did a good job of

15   preventing diversion at its store level?

16         A.    I think we did.

17         Q.    Okay.  All right.  So let's just

18   recap this because I want to make sure I fully

19   understand.  So at some point in the '90s, DDM

20   designed this report that would generate

21   monthly, right?

22         A.    Yes.

23         Q.    Okay.  And the monthly report had

24   every store on it, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    And it would show the rolling

 3    12-month average for -- well, it would reflect

 4    the rolling -- strike that.

 5                  The formula used to decide whether

 6    an ordering history would show up for a given

 7    store was whether it exceeded the prior 12-month

 8    rolling average by 99 percent, right?

 9            A.    Yes.

10            Q.    Otherwise nothing would show up,

11    right?

12            A.    Right.

13            Q.    Okay.  And so this report, did it

14    get e-mailed to you?  Was it printed?

15            A.    Printed.

16            Q.    Okay.  So this report comes out

17    and you go and you grab it and then you look at

18    it, right?

19            A.    Correct.

20            Q.    And you spend a couple hours and

21    you look at all the orders or the ordering

22    history that shows up.  And you'd agree that

23    we're talking about ordering history, right, not

24    necessarily a specific order?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.     Say again.

2            Q.     So, like, for example, the store

3     orders -- the stores made orders more than once

4     a month, right?

5            A.     Yes.

6            Q.     Okay.  And so the report would

7     reflect what was ordered the prior month, but it

8     wasn't a -- it wasn't showing specific orders,

9     it was showing the total orders?

10           A.     Yes.

11           Q.     Okay.  And so you would then look

12    at that and you would make a judgment call as to

13    whether you needed to follow up with the store

14    to get more information, correct?

15           A.     Yes.

16           Q.     Okay.  And if you decided that a

17    particular change was large enough, based on

18    your own judgment, then you would send a form to

19    the store asking for more information, correct?

20           A.     Correct.

21           Q.     Okay.  And what -- let's say we

22    had that store where they averaged five and now

23    they've ordered ten the last month, what would

24    be a satisfactory explanation for why they
```

```
 1    increased their order?

 2           A.    If the number of scripts went up,

 3    if the number of -- the volume of controlled

 4    substances that were dispensed went up, then

 5    that would equate to a reason why their volume

 6    went up.  But then, again, on the same token,

 7    there was lots of times when I would follow up

 8    if I wasn't -- if that wasn't a complete answer,

 9    I would make sure that the bottles were still on

10    the shelf.

11              Now, so there were several times

12    where the pharmacist would increase their order

13    because they were running a little bit low

14    previously.  These are controlled drugs for

15    pain.  We don't want to run out of a pain

16    medication that someone needs immediately.  You

17    can't tell them, they're going to come in two

18    days later for their pain medicine.

19              So we would -- there were a lot of

20    times when the pharmacist would -- might order

21    heavier, you know, than normal, just so they

22    wouldn't run out, if they were getting low.

23           Q.    And was that okay by you?

24           A.    Yes, as long as I knew where they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   were.

 2           Q.    Okay.  So if a pharmacy averaged

 3   five and then they ordered ten, they'd show up

 4   on the report, right?

 5           A.    Yes.

 6           Q.    And then you would decide whether

 7   or not that warranted any follow up, right?

 8           A.    Yes.

 9           Q.    Okay.  And if the pharmacist

10   filled out this form and said, "Look,

11   Mr. Nameth, you know, we had more prescriptions

12   this month we had to fill and that's why we had

13   to order twice as much," that would be a

14   sufficient explanation?

15           A.    As long as the volume would equate

16   to that, yes.

17           Q.    Okay.  And what would they need to

18   do to show you that the volume equated to the

19   increase in ordering?

20           A.    They would either -- they would

21   either send a report of the actual scripts.  If

22   they didn't send a report of the actual scripts,

23   if they determined that they had an increase in

24   volume or whatever of particular scripts, they
```

 1    would have an explanation of why, and that could

 2    have been followed up -- well, you know, a lot

 3    of times it was, was how many bottles are left

 4    on your shelf.  Because the last thing we wanted

 5    is to have somebody, you know, have some

 6    diversion going on at store level.

 7         Q.    Okay.  And so would it be fair to

 8    say that the purpose of that report and your due

 9    diligence was to make sure they weren't

10    replacing opioids, for example, with some that

11    had been diverted at the store level like

12    through theft; would that be fair?

13         A.    What do you mean by "replacing"?

14    I didn't understand that.

15         Q.    So it sounds -- you indicated to

16    me that an appropriate explanation for an

17    increase in orders that would show up on that

18    report would be that there were more

19    prescriptions, right?

20         A.    Yes.

21         Q.    And then you said to me that you

22    were concerned with making sure that they

23    weren't replacing bottles that may be -- were

24    diverted through theft or some other means at

1    the store level, correct?

2          A.    I'm getting hung up on

3    "replacing."  You know, what --

4          Q.    Well, tell me what you mean.  I'm

5    just trying to understand what you're telling

6    me.  That's all.

7          A.    Okay.  I wanted to make sure that

8    the bottles were not diverted out of the store

9    through theft, that they have them on the shelf.

10         Q.    Okay.

11         A.    So --

12         Q.    And so you wanted to make sure

13   that the increased order wasn't sort of --

14   wasn't a way of compensating for a bottle that

15   disappeared; is that fair?

16         A.    Yes.

17         Q.    Okay.  What other ways that you

18   understand that a -- let's say a bottle of

19   opioids could be diverted out of a DDM store?

20         A.    What other ways?

21         Q.    Correct.

22         A.    Well, possible theft, but other

23   possible ways?  Maybe through a delivery.  Maybe

24   there was a driver that decided to, you know,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    take some controlled drugs.  But other than

 2    that, because it's a -- we're kind of a --

 3    sending to our own people from our warehouse, it

 4    would go from warehouse to store.

 5              There's other -- those would be

 6    probably the only two aspects that I could think

 7    of, is either theft or diversion before it got

 8    to the store.

 9         Q.    Okay.  That would all be theft,

10    right?

11         A.    Oh, yeah.  One way --

12         Q.    So theft by the driver delivering

13    the drugs?

14         A.    Yes.

15         Q.    And theft by a store employee?

16         A.    Yes.

17         Q.    Theft by anybody else?  Is that

18    uncommon?

19         A.    You're talking about at store

20    level?

21         Q.    Correct.

22         A.    Robbery.

23         Q.    Okay.  Did that ever happen?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  How many times?

 2            A.    In what period?

 3            Q.    You tell me.  I mean, any --

 4     whatever -- while you were there, how many times

 5     were -- was a DDM store robbed and prescription

 6     drugs were taken?

 7            A.    It could have been a dozen times.

 8            Q.    Okay.

 9            A.    I don't know if it was an

10     extremely common occurrence.

11            Q.    Can you identify for me -- we've

12     been obviously talking about this process where

13     you were looking at this report and you were

14     doing due diligence on the stores you determined

15     you needed to do it on, right?

16            A.    Yes.

17            Q.    Can you identify for me what you

18     did as part of that process to determine whether

19     those, let's say, opioids were -- or those

20     opioid orders were suspicious?

21            A.    I don't think we ever had a

22     suspicious order.

23            Q.    Okay.  And that's an answer to a

24     different question which --
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Okay.

2        Q.     -- I appreciate and I already know

3    the answer to.

4               My question is:  What did you do

5    when you got that report to identify whether

6    those drugs were all being used for a legitimate

7    purpose?

8        A.     That's when I would fill out the

9    other -- the second half of that report.  Once I

10   got the green bar, the printed report, reviewed

11   the report, sent my -- a follow-up report to the

12   stores asking why the increase was, they would

13   send back the response on why they had to order

14   so much.  If the quantities on the shelf were --

15   and we did also monthly counts at that time.

16   And if those were all fine, that would be, you

17   know, the result of what we would do.

18       Q.     Okay.  And so your role in

19   reviewing that report and communicating with the

20   stores did not include ensuring whether the

21   prescriptions were appropriate or whether the

22   drugs that were being -- the increase on the

23   drugs going out were all being used for

24   legitimate purposes; is that fair?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Well, that's what happens at store

 2    level.  That's what the pharmacists are doing.

 3    That's -- their job is to make sure that they're

 4    filling legitimate prescriptions.

 5              Q.    Okay.  So would it be fair to say

 6    that DDM deferred to the pharmacist at the store

 7    level to identify potential diversion through

 8    prescriptions?

 9              A.    Yes.  I mean, we -- we would give

10    them some guidelines to -- whether it was e-mail

11    or not -- about watching out for out of state

12    type of prescriptions.  But the State Board of

13    Pharmacy were setting guidelines for the

14    pharmacists to follow at that particular point,

15    you know, especially with corresponding

16    responsibility.  Once that became effective,

17    pharmacists were very well aware of whether --

18    to the best of their knowledge, whether they

19    were legitimate prescriptions or not.

20              Q.    And you used the phrase there

21    "corresponding responsibility," right?

22              A.    Correct.

23              Q.    What does that mean?

24              A.    Well, in other words, you can't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    turn a blind eye just because you have a

 2    prescription for a medication.  You cannot just

 3    fill it carte blanche.

 4          Q.    Okay.

 5          A.    The first thing you want to do is

 6    make sure that the prescription itself is not

 7    from out of state.  You know, that raises a

 8    question right there.  So you don't want to fill

 9    a prescription that's from out of state.  We

10    wouldn't honor really out of state

11    prescriptions.

12                So we knew what was happening in

13    the State of Florida, and people from Ohio were

14    traveling to Florida to get prescriptions.  When

15    they came back to our stores, we would turn them

16    down.

17          Q.    So you knew this was a big

18    problem, right?

19          A.    Yes.

20          Q.    Okay.  And would you agree the

21    phrase "corresponding responsibility" actually

22    means that DDM had a responsibility, as well as

23    its pharmacists, to ensure that the drugs that

24    it -- within its system were not being diverted?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    I think that the State Board wrote

2    that regulation for retail pharmacies at the

3    store levels.

4            Q.    And what do you mean by that?

5            A.    I mean by -- a corresponding

6    responsibility was something that the

7    pharmacies -- pharmacists did at store level.

8            Q.    Okay.  And so would it be fair to

9    say that as director of pharmacy operations who

10   was primarily responsible for reviewing this

11   report and identifying unusual ordering

12   patterns, that you deferred entirely to the

13   pharmacists to determine whether those pills

14   were being diverted as part of prescriptions or

15   that kind of a venue -- or avenue rather?

16           A.    We relied on our people -- so

17   we're a small enough company that we knew -- we

18   had meetings a lot, as far as what they should

19   be looking for, you know, what the pharmacists

20   at their -- if the pharmacists are doing their

21   job at store level, that should equate to what

22   we're doing at the retail -- at the wholesale

23   level to ship them their medication.

24                 So, you know, if you're doing it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   down at the end point, the distribution point

 2   then relies on the end point, yes.

 3          Q.    Okay.  And so if an order

 4   appeared -- or a monthly ordering history was

 5   larger and you called the pharmacist and they

 6   gave you -- they said, "This is A-okay and above

 7   board," you would trust them, right?

 8          A.    Yes, I would.

 9          Q.    Okay.  And you would trust them

10   completely, right?

11          A.    Yes, I would.

12          Q.    Because you knew your people,

13   right?

14          A.    Yes.

15          Q.    And that was an important piece of

16   your suspicious order monitoring policy and

17   procedure, is trusting your pharmacists, right?

18          A.    I would say I trusted them

19   implicitly, yes.

20          Q.    Okay.  As the director of pharmacy

21   operations, my understanding is that you

22   supervised all pharmacy employees for the DDM

23   stores?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And that would include -- was that

2     74 stores most of the time?

3          A.    Yes.

4          Q.    Okay.  And how many pharmacists

5     did each store have on average?

6          A.    Minimum of two at each store.

7     Then some stores had three, and we also had

8     floating pharmacists.  So we might have had 150

9     pharmacists or so.  Maybe a little more.

10         Q.    Okay.  So in terms of the

11    hierarchy, it's Tom Nameth, director of pharmacy

12    operations, here, right?  And then you have

13    your -- the regional managers over here under

14    Pete or were they under you?

15         A.    They were actually -- well, they

16    were, I would say, under me and then Pete -- and

17    then the hierarchy would be Pete and myself, the

18    supervisors, then the chief pharmacists, and

19    then the staff pharmacists.

20         Q.    Okay.  How many supervisors were

21    there?

22         A.    I believe around four, maybe five.

23         Q.    Is that pretty consistent --

24               MR. JOHNSON:  Objection.  Which

Highly Confidential - Subject to Further Confidentiality Review

```
 1          period of time?

 2          A.    Yeah, that's --

 3                MR. JOHNSON:  It's kind of a

 4          long --

 5                MR. MULLIGAN:  Well, I just asked

 6          him whether that was --

 7                MR. JOHNSON:  Okay.

 8                MR. MULLIGAN:  Yeah.

 9     BY MR. MULLIGAN:

10          Q.    Was that a consistent number or

11     did it change over time?

12          A.    It changed over time.

13          Q.    Okay.

14          A.    I mean, when I first came on, we

15     didn't have any, and then we added as we grew.

16          Q.    Okay.  More work, you need more

17     people?

18          A.    Correct.

19          Q.    Okay.  So then you got the

20     supervisors and then you have the chief

21     pharmacists who run the store pharmacies?

22          A.    Yes.

23          Q.    Okay.  And then underneath that

24     you've got like a secondary pharmacist?
```

1          A.     The staff pharmacist, yes.

2          Q.     Okay.  And then you've got

3     floating pharmacists?

4          A.     Yes.

5          Q.     And then were pharmacy technicians

6     the next level?

7          A.     I would say yes.

8          Q.     Okay.  Was there anybody else that

9     worked in the pharmacy that reported to you?

10         A.     No.

11         Q.     Okay.  Other than that report that

12    we just talked about, was there anything that

13    you did to monitor for suspicious orders that

14    were placed by DDM stores?

15         A.     Not specifically.  Not to me, no.

16         Q.     Okay.  And when you say "not to

17    me," what do you mean by that?

18         A.     Well, there were other -- there

19    were other aspects of our SOMS report, but it

20    was basically maybe what Jill Strang, who ran

21    the warehouse, would be looking at.

22         Q.     Okay.  Other than what Jill Strang

23    did and what you did, which we just talked

24    about, was there anything else that was done at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DDM to monitor for suspicious orders, that you

 2    know of?

 3           A.    Yes.  The store levels did their

 4    monthly counts.

 5           Q.    Okay.

 6           A.    And they would actually do

 7    running -- running tallies as well.  You know,

 8    probably after we had our new pharmacy system in

 9    place, they were doing that.  It was a -- you

10    know, in the later years, maybe '12 and on.

11           Q.    Okay.  But on a corporate level it

12    was you and Jill?

13           A.    A corporate level, right.

14           Q.    Okay.  And then on a store level,

15    you guys relied on the pharmacists entirely,

16    right?

17           A.    We also had our store supervisors

18    that would go in, visit the stores, and they

19    would do sporadic drug counts just to make sure

20    that there was -- you know, so nobody would know

21    what we're going to be counting, they would go

22    into the stores, visit the stores, and do some

23    counts on their own.

24           Q.    Okay.  And that's an inventory
```

Highly Confidential - Subject to Further Confidentiality Review

1    thing, right?

2            A.    Yes, just to match what's on the

3    shelf versus what's -- yes.

4            Q.    And the goal of that really was to

5    identify whether someone had stolen the drugs

6    either in transit or at the store level,

7    correct?

8            A.    Anywhere, yeah.

9            Q.    Okay.  But that wasn't done to

10   identify suspicious orders --

11           A.    Oh, no.

12           Q.    -- being placed with the

13   warehouse?

14           A.    Correct.  No.

15           Q.    We're stepping on each other a

16   little bit.  Just a reminder.

17                 Okay.  So you are a pharmacist,

18   right?

19           A.    Yes.

20           Q.    And so -- and obviously you had a

21   very long and successful career as a pharmacist,

22   agree?

23           A.    Yes.

24           Q.    And so would it be fair to say

Highly Confidential - Subject to Further Confidentiality Review

1    that you have an intimate understanding of how

2    the Controlled Substances Act works?

3            A.    Yes --

4            Q.    Okay.

5            A.    -- to my knowledge.

6            Q.    Okay.  Are you concerned that you

7    don't have a full understanding of how the

8    Controlled Substances Act works?

9            A.    No.  But I mean the hierarchy was

10   involved maybe where our VP would be more

11   involved than I would as far as -- you know, I

12   don't know what specific aspect of it you're

13   referring to.

14           Q.    Okay.  And the -- okay.

15                 You agree that controlled

16   substances are heavily regulated by the federal

17   government because they're dangerous, right?

18           A.    Yes.

19           Q.    Okay.  And they're especially

20   dangerous if they're abused or diverted,

21   correct?

22           A.    Yes.

23           Q.    Okay.  And you'd also agree that

24   they're highly addictive, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      They are.

 2              Q.      And if they are used improperly,

 3      they can even be deadly, right?

 4              A.      Yes.

 5              Q.      Okay.

 6              A.      As well as any drug can.

 7                      MR. MULLIGAN:  Move to strike as

 8              nonresponsive.

 9              Q.      All right.  I'm going to hand you

10      what Mr. -- well, Mr. Knoll is going to hand you

11      what's being marked as Exhibit 1, which is

12      Plaintiffs' Notice of Oral Videotaped Fact

13      Deposition of Tom Nameth.

14                              - - -

15              (DDM-Nameth Exhibit 1 marked.)

16                              - - -

17      BY MR. MULLIGAN:

18              Q.      And again, you can look at the

19      screen if you want.  It's a little small right

20      now, but ...

21                      MR. JOHNSON:  It's going to be on

22              the screen eventually.

23              Q.      I just want to know if you've seen

24      that document before.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    And when was the first time you

 3    saw it?

 4            A.    When our lawyer sent it to me.

 5            Q.    Okay.  When was that?

 6            A.    Several weeks ago.

 7            Q.    Okay.  And I imagine being retired

 8    at that point, you were probably not all that

 9    happy about having to come and be deposed,

10    right?

11            A.    True.

12            Q.    Okay.  What did you do to prepare

13    for today's deposition?

14            A.    I -- a lawyer sent the deposition

15    of several people to me, which I reviewed, and

16    then we also met with Tim Johnson at the

17    corporate office.

18            Q.    Okay.  And whose depositions did

19    you review?

20            A.    Jason Briscoe, Pete Ratycz, and I

21    briefly went over Keith Miller's.

22            Q.    Okay.  Anybody else?

23            A.    No.

24            Q.    Did you see anything in those
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    depositions that jumped out at you?

 2            A.    No.

 3            Q.    Okay.  Nothing that you thought

 4    was incorrect or needed to be corrected?

 5            A.    Nothing that would have any

 6    pertinence to the findings.  I mean, there were

 7    some dates that might have been erroneous

 8    but ...

 9            Q.    But generally the processes that

10    were discussed regarding suspicious order

11    monitoring policies at DDM were accurate?

12            A.    Right.  Yes.

13            Q.    Okay.  When did you -- you said

14    that you got an e-mail from a lawyer with those

15    transcripts; is that correct?

16            A.    Tim Johnson, yes.

17            Q.    Okay.  And was that before you'd

18    ever met with him?

19            A.    Yes.

20            Q.    Okay.  And did you meet with him

21    in advance of today's deposition?

22            A.    Yes.

23            Q.    And when was that?

24            A.    That was on Saturday, this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Saturday.

 2            Q.    Okay.  And you said that was at

 3    DDM headquarters?

 4            A.    Correct.

 5            Q.    How long did you meet for?

 6            A.    About four hours.

 7            Q.    Okay.  Was anybody else present?

 8            A.    Jason Briscoe, Tom McConnell.  And

 9    John Gans was there for a portion.

10            Q.    Did you review -- other than those

11    three depositions, did you review any other

12    paper or electronic files in preparation for

13    your deposition today?

14            A.    We looked at some e-mails.

15            Q.    Do you know which e-mails?

16            A.    I don't have any specifics.

17    E-mails that were sent by maybe myself.  There

18    weren't too many of them, so ...

19            Q.    Did somebody else choose those

20    e-mails?

21            A.    Tim Johnson handed to me from the

22    file.

23            Q.    Okay.  And you don't have any

24    recollection, as you sit here two days later, as
```

1  to what any of those e-mails discussed?

2          A.    Some of them were discussing

3  counts, and I believe some -- one of -- the one

4  on the count was asking about -- asking the

5  pharmacist whether or not they included the

6  return solution -- the drugs that went to return

7  solutions.  They were trying to balance the

8  count at the store.

9          Q.    Okay.  So e-mails regarding

10  inventory issues?

11          A.    You mean at this particular --

12  yes.

13          Q.    Correct.  Were there any other

14  e-mails that you reviewed that were not related

15  to inventory counts?

16          A.    There was an e-mail that was sent

17  from -- by Jill to a drug manufacturer asking

18  about our policy and procedures.

19          Q.    Okay.  Any other e-mails?

20          A.    We looked at a lot of information

21  that day, so those are the only ones that stand

22  out in my mind.

23          Q.    Okay.  How many e-mails or

24  electronic files would you say you looked at, if

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you had to estimate?

 2            A.    Total number of files?

 3            Q.    Mm-hmm.

 4            A.    Five or six.

 5            Q.    Okay.  So when you say you looked

 6    at a lot of information, was that just within

 7    those five or six documents?

 8            A.    Yes.  There was a lot of

 9    discussions going on as far as the other

10    depositions.

11            Q.    Okay.  Did the depositions refresh

12    your recollection about any facts that you

13    didn't -- that you didn't remember as of

14    Saturday?

15            A.    Yeah.  There was a lot I didn't

16    remember about prior to that, but, you know,

17    being retired, you kind of, you know, step away

18    from that aspect and --

19            Q.    Right.

20            A.    -- you have to refresh your

21    memory, so to speak.

22            Q.    Okay.  So we're obviously here

23    today to test your knowledge, okay, your

24    personal knowledge, and technically your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    personal knowledge doesn't include other

 2    people's deposition testimony.

 3              So what I would ask is, if there's

 4    anything that I ask you today that you only know

 5    because you read those depositions, will you

 6    please let me know that?

 7         A.   Sure.

 8         Q.   Okay.  Because I really -- I want

 9    to know what you know --

10         A.   Yes.

11         Q.   -- and obviously since you've been

12    retired, there's maybe some things you don't

13    know anymore, but I want to try and isolate what

14    you know from what they've testified to already.

15         A.   Okay.

16         Q.   Fair?

17         A.   I agree.

18         Q.   Okay.  Did you -- other than the

19    individuals you mentioned, did you talk to

20    anybody else in preparation for today's

21    deposition?

22         A.   When I went to the corporate

23    office, I did -- and talked to Pete and Jason,

24    but that was not with any specifics.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.

2        A.    It was a general -- my -- I was

3    more interested in the procedures, you know,

4    what does this entail, type of things.  And at

5    that time I don't think either one of them had

6    been deposed anyway, so ...

7        Q.    And what did you guys discuss

8    specifically?

9        A.    In generalities of the lawsuit in

10   general.

11       Q.    Okay.  Did you discuss what DDM's

12   position was going to be as to what its

13   suspicious order monitoring policies were?

14       A.    No.

15       Q.    There was no discussion about

16   that?

17       A.    No.

18       Q.    Okay.  So the discussion, would it

19   be fair to say, was limited to sort of the

20   procedural posture of this case; would that be

21   fair?

22       A.    Yeah.  My concern was, you know,

23   do I have any responsibility, legality -- legal

24   responsibilities, or are they just looking at

Highly Confidential - Subject to Further Confidentiality Review

1  the corporation as a whole, do I need my own

2  lawyer, do I have a corporate lawyer, those

3  types of things.

4          Q.    All very good questions, right?

5  That's probably what I would be asking, too.

6              Okay.  All right.  And as you

7  know, we haven't sued you individually, right?

8          A.    Right.

9          Q.    Okay.  So you know you don't have

10  any personal responsibility as it relates to --

11          A.    I know now.

12          Q.    -- liability?

13          A.    Yes.

14          Q.    Okay.  It's good to clarify that.

15          A.    Yeah.

16          Q.    Okay.  Let's look at Exhibit 2.

17                   - - -

18      (DDM-Nameth Exhibit 2 marked.)

19                   - - -

20          Q.    This is Discount Drug Mart's

21  Responses to Plaintiffs' First Set of

22  Interrogatories.  I'm only going to ask you

23  about certain portions of this document.  I'll

24  just tell you it's a document that DDM's lawyers

Highly Confidential - Subject to Further Confidentiality Review

```
 1    completed, with the help of some individuals.

 2              And I want to just know, are

 3    you -- did you assist in preparing these answers

 4    in any way?

 5         A.   No.

 6         Q.   Okay.  And so you weren't

 7    contacted and asked to help provide answers to

 8    this document; is that fair?

 9         A.   That's correct.

10         Q.   Okay.  And I'll just represent to

11    you, this was served on October 29th of 2018.

12    Had you been contacted about this litigation or

13    did you know about this litigation as of that

14    date?

15         A.   No.

16         Q.   Okay.  If you can turn to page 3.

17    This is Interrogatory Number 4.  And it says --

18    I'm going to skip -- I'm not going to read it

19    verbatim but, "Please identify any orders

20    you" -- and that's DDM -- "received that were at

21    any point identified as a possible suspicious

22    order."

23              Do you see that?

24         A.   Yes.
```

1        Q.    And if you go down to the response

2    at the bottom, it says "None."

3              Do you see?

4        A.    Mm-hmm.

5        Q.    Would that be accurate based on

6    your understanding of -- from your role at DDM?

7        A.    When you say -- when you throw in

8    the word a "possible" suspicious order, there

9    could have been -- there could have been

10   possible suspicious orders, because then we

11   would have to follow up and determine whether it

12   was suspicious or not.

13       Q.    Okay.  So depending upon how one

14   would define "possible suspicious order," you'd

15   agree that that could -- may or may not include

16   orders or histories that show up on your

17   12-month rolling report, correct?

18       A.    Yes.

19       Q.    Okay.  And to the extent that you

20   then decided to do due diligence and got an

21   explanation, then potentially those would be not

22   considered suspicious orders at that point,

23   correct?

24       A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  And so you were the one who

 2    was determining whether those possible -- well,

 3    strike that.

 4                    They weren't really orders, right?

 5    They were ordering histories, weren't they, for

 6    the prior month?

 7              A.    Yes.

 8              Q.    Okay.  So you would decide whether

 9    the ordering history from the prior month was

10    suspicious, but it being on that report to you

11    would be an indication that it was possibly

12    suspicious, right?

13              A.    Correct.

14              Q.    Okay.  And to the extent that you

15    got a sufficient explanation, then they would --

16    you'd just say, "Well, check that box.  It's not

17    suspicious."  Right?

18              A.    Right.

19              Q.    Okay.  When you got that report,

20    did you ever just report that to the DEA, the

21    fact that a store appeared on there and had a

22    larger had than normal ordering history?

23              A.    Other than ARCOS?

24              Q.    I'm asking if you --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    We reported to ARCOS but not to

 2   that report.

 3              Q.    Okay.

 4              A.    Not that report.

 5              Q.    You didn't fill out -- you didn't

 6   specifically report that -- those as possible

 7   suspicious orders to the DEA, correct?

 8              A.    Correct, because they weren't

 9   suspicious at that time.

10              Q.    Okay.  But you would agree that

11   they were possibly suspicious, right?

12              A.    They could have been.

13              Q.    Okay.  Do you know whether the

14   reporting obligation under the Controlled

15   Substances Act requires you to report possible

16   suspicious orders?

17              A.    I'm not aware of that.

18              Q.    Okay.  Do you know what the

19   criteria is that the CSA provides for when you

20   have to report a suspicious order?

21              A.    Say again.

22              Q.    Do you -- what is the -- do you --

23   well, strike that.

24                    Do you generally know, as you sit
```

Highly Confidential - Subject to Further Confidentiality Review

1   here today, what types of orders should be

2   reported to the DEA under the Controlled

3   Substances Act?

4           A.    Suspicious orders.

5           Q.    Okay.  And how would you define a

6   suspicious order?

7           A.    One that we could not identify a

8   reason of why it was ordered.

9           Q.    Okay.  And so my understanding is

10  that you don't believe that the Controlled

11  Substances Act required you to report possible

12  suspicious orders, only suspicious ones,

13  correct?

14          A.    Yes.

15          Q.    And it was okay that you didn't

16  report an order until after due diligence was

17  done to determine whether it was, in fact,

18  suspicious, correct?

19          A.    Yes.

20          Q.    Okay.  And if that due diligence

21  took a week, it was okay for you to take that

22  time to determine whether the order was

23  suspicious or not before you could report it to

24  the DEA, correct?

Highly Confidential - Subject to Further Confidentiality Review

1            A.    Yes.

2            Q.    And that's how you operated at

3    DDM?

4            A.    Yes.

5            Q.    Okay.  Was there ever an instance

6    at DDM where you found a possible suspicious

7    order and you reported it immediately to the

8    DEA?

9            A.    No.

10           Q.    Was there ever a time when you

11   reported any order as suspicious to the DEA at

12   any time?

13           A.    We did not.

14           Q.    Okay.  That would include you and

15   anyone else; is that fair?

16           A.    To my knowledge, yes.

17           Q.    Okay.  Is that knowledge partially

18   reflective of what you read in those

19   depositions?

20           A.    No.  I'm just speaking -- I don't

21   recall -- I mean, you know, not that I'm aware

22   of that we ever reported a suspicious order to

23   the DEA.

24           Q.    Okay.  Okay.  So let's go back to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Interrogatory Number 4, and I think as you aptly

 2    pointed out, it includes the words "possible

 3    suspicious order," correct?

 4          A.    Yes.

 5          Q.    And so with the addition of that

 6    word, would you agree that any order that

 7    appeared on your 12-month report should probably

 8    be listed here in the response?

 9                MR. JOHNSON:  Objection.

10          A.    When you list this as possible

11    suspicious orders, then I guess anything on the

12    report could be provided.

13          Q.    Except for the fact maybe that

14    that report didn't actually show specific

15    orders, right, it just showed how much you had

16    ordered in the month?

17          A.    Correct.

18          Q.    Okay.  And so let's look at the

19    information that was requested for each of

20    those.  It says, "The date of the suspicious

21    order and the customer's identity and address."

22                Do you see that under a?

23          A.    Yes.

24          Q.    That -- your report wouldn't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actually show the date of the suspicious order,

 2    would it?

 3          A.    No.

 4          Q.    Okay.  It would just show how much

 5    was ordered the month -- in that month, right?

 6          A.    Yes.

 7          Q.    Okay.  And then b, "A description

 8    of said order."  Would that information be

 9    contained in that report?

10          A.    Yes.

11          Q.    So like how much was ordered --

12    the --

13          A.    The description being the type of

14    drug that it was.

15          Q.    Would that include NDC number?

16          A.    Yes.

17          Q.    The name of the drug?

18          A.    Yes.

19          Q.    Where the drug came from, like the

20    manufacturer?

21          A.    That would -- that's by the NDC

22    number you would know what manufacturer.

23          Q.    Okay.  And it would have like

24    quantity and strength?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And under c, obviously none of

 3    them were ever reported to the DEA, correct?

 4              A.    Correct.

 5              Q.    Okay.  And the due diligence that

 6    would have been performed on anything that

 7    showed up on that 12-month report would have

 8    been the form you sent to the stores; is that

 9    correct?

10              A.    Yes.

11              Q.    And would there be any other

12    documentation to reflect any due diligence that

13    was done?

14              A.    Not to my knowledge, no.

15              Q.    Okay.  Did you keep files in your

16    office or that were accessible to you that

17    contained those documents or some sort of a

18    running file that would show your due diligence

19    over time as it related to a particular store?

20              A.    Yes.

21              Q.    And would that just be by store?

22              A.    It would be by month.

23              Q.    So it would be by month, not by

24    store?
```

1        A.     Correct.

2        Q.     Okay.  And would that basically

3    consist of you taking the report that was

4    printed out and just putting it in a file?

5        A.     Well, the reports -- those whole

6    reports were kept.  Usually I indicated on the

7    report which ones that I notified the stores

8    about, on that report.  But then also when the

9    report was generated and went out to the stores,

10   there was also a follow up that had to make sure

11   that those answers were received.

12       Q.     Okay.  And so you would write on

13   the physical report that was printed each month?

14       A.     Yes.

15       Q.     And was that report only in hard

16   copy?

17       A.     Yes.

18       Q.     And -- but you retained that

19   report?

20       A.     Yes.

21       Q.     Do you know whether DDM still has

22   those reports?

23       A.     I can't answer that.

24       Q.     Okay.  Would you have written the

Highly Confidential - Subject to Further Confidentiality Review

1    reasons why you determined a possible suspicious

2    order was not suspicious on that report?

3         A.    No.

4         Q.    Would that be reflected in the

5    form that you sent to the store?

6         A.    Correct.

7         Q.    Okay.  Did you ever halt or

8    suspend any order as suspicious?

9         A.    Did not.

10        Q.    Okay.  And, in fact, I believe the

11   report you've been talking about, the 12-month

12   report, was a retrospective report, correct?

13        A.    Yes.

14        Q.    So that report was not -- didn't

15   work in a way that would allow you to stop an

16   order before it was filled, right?

17        A.    No.  But there was another report

18   that was generated that Jill looked at that

19   could have fulfilled that.

20        Q.    Okay.  And so the only prospective

21   system that was in place at DDM to identify

22   suspicious orders, that you know of, was the

23   report that Jill looked at, correct?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  And so it wasn't your job

 2    or responsibility to identify orders that were

 3    suspicious and should be halted before they went

 4    out, correct?

 5            A.    Say again.

 6            Q.    It wasn't your job or

 7    responsibility at DDM to identify suspicious

 8    orders and then halt them before they went out,

 9    correct?

10            A.    Well, you're using the term

11    "suspicious order."  We didn't -- but if there

12    was a suspicious order, then they would have

13    gone out.  We would have followed up at the back

14    side, on the back end.

15            Q.    They would have gone out but you

16    would have followed up later?

17            A.    Yes.

18            Q.    Okay.  Do you know whether that

19    complies with the Controlled Substances Act

20    requirement that you have effective controls in

21    place to prevent against diversion?

22            A.    Well, when you look at our -- you

23    know, because we're still a closed system, there

24    was some conversations whether or not, because
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    we didn't -- it didn't leave our -- in other

2    words, it didn't leave our small group of

3    individual stores, because they're still within

4    our family of stores, that we let the orders go,

5    but we could follow up and then -- we didn't cut

6    orders, so to speak, before they went out the

7    door.

8           Q.    Okay.  So it would be fair to say

9    that DDM -- the extent of DDM's system to put in

10   place effective controls to prevent diversion

11   would have been reliance on the pharmacist; is

12   that fair?

13          A.    Yes.

14          Q.    Okay.  All right.  If you look at

15   5.  It says, "Please identify any persons" --

16   I'm going to paraphrase -- "who reviewed or

17   analyzed data regarding the distribution or

18   dispensing of opioids or your opioid products."

19                Do you see that?

20          A.    Mm-hmm.

21          Q.    Okay.  And if you flip the next

22   page, it's got yourself, Jill Strang, Jason

23   Briscoe, and Pete Ratycz.

24                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    Yes, I do.

 2           Q.    Did you ever review any reports

 3     that reflected ordering history of opioids over

 4     time?

 5           A.    Other than the report that I

 6     reviewed?

 7           Q.    Correct.

 8           A.    No.

 9           Q.    Okay.  And that report only showed

10     what the average was for the prior 12 months,

11     correct?

12           A.    Yes.

13           Q.    Okay.  So you didn't look at any

14     reports that showed, over the last three years

15     Store 33's orders have gone from X to Y,

16     correct?

17           A.    That's correct.

18           Q.    Okay.  Do you know if anybody else

19     did?

20           A.    Not that I'm aware of.

21           Q.    Okay.  And so would the only

22     information that you analyzed regarding the

23     distribution or dispensing of opioids be that

24     12-month rolling report?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    Yes.

 2           Q.    Okay.  Do you know whether anybody

 3    else at DDM reviewed any report other than that

 4    one which would have allowed them to analyze the

 5    movement of opioids?

 6           A.    Unless it was Pete in his

 7    responsibilities.  I wasn't quite sure from a

 8    30-foot -- 30,000-foot level what he was doing.

 9    He could have been.  I wasn't aware of it.

10           Q.    Okay.  But he was running the

11    show, right?

12           A.    Yes.

13           Q.    And your piece of this was to

14    review and monitor that 12-month rolling report?

15           A.    Right.  Right.

16           Q.    Okay.  And that -- it was limited

17    to that, correct?

18           A.    Correct.

19           Q.    Okay.  Let's go to Interrogatory

20    Number 12, which is on page 6.  So this one

21    asks, "Please identify" -- or "For each

22    customer" -- and that would be a DDM store in

23    this context.  "Please identify their thresholds

24    and/or controlled substance limits at the time
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the order -- of the order and identify personnel

 2    who were responsible for establishing and/or

 3    approving any thresholds or controlled substance

 4    limit, as well as any overrides."

 5              Do you see that?

 6         A.   Mm-hmm.

 7         Q.   And the answer there is "None,"

 8    right?

 9         A.   That's the answer, yes.

10         Q.   Would that be consistent with your

11    understanding of how DDM operated?

12         A.   I'm reading through it again.

13         Q.   Sure.

14              MR. JOHNSON:  It's also up on the

15         screen if that's easier for you.

16              THE WITNESS:  Yeah, that's

17         probably easier.

18    BY MR. MULLIGAN

19         Q.   Maybe I can para -- I --

20              MR. JOHNSON:  It takes getting

21         used to.

22              MR. MULLIGAN:  Sure.  Yeah.

23    BY MR. MULLIGAN:

24         Q.   And I can paraphrase even more.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Really what I'm asking is, did -- were there --

 2    were -- did individual DDM stores ever have any

 3    thresholds for how much they could order?

 4           A.    No.

 5           Q.    Okay.  And so there would never

 6    have been a time where Store 33 ordered X amount

 7    and automatically that order would be halted if

 8    it exceeded a certain limit, correct?

 9           A.    Correct.

10           Q.    Okay.  Did DDM ever discuss the

11    merits of imposing thresholds upon its stores?

12           A.    No, but it could have been at a

13    different level.

14           Q.    Okay.  So nobody ever approached

15    you and said, "Hey, maybe we should put some

16    thresholds on our stores in light of the opioid

17    crisis that seems to be developing"?

18           A.    Well, all our C-IIs did not come

19    from our warehouse.  The only thing that was

20    coming from our warehouse was the hydrocodones.

21           Q.    Okay.

22           A.    So there were -- I assume there

23    were limits from the wholesalers.

24           Q.    Okay.  At some point, DDM stores
```

```
 1    did obtain hydrocodone from your distribution

 2    center, correct?

 3            A.    Yes.

 4            Q.    Okay.  But there were never any

 5    thresholds put in place where orders were

 6    automatically cut if they exceeded --

 7            A.    No.

 8            Q.    -- a certain threshold, right?

 9            A.    Correct.

10            MR. JOHNSON:  You're answering his

11            question before he gets it out, but ...

12            MR. MULLIGAN:  It's not uncommon,

13            but, you know, thanks for the reminder.

14            MR. JOHNSON:  Is this a good time

15            for a break or --

16            MR. MULLIGAN:  Yeah.  We can --

17            MR. JOHNSON:  -- did you want to

18            finish this?

19            MR. MULLIGAN:  Well, let me finish

20            this document, if that's all right.

21            MR. JOHNSON:  Okay.

22    BY MR. MULLIGAN:

23            Q.    And so you don't ever recall ever

24    having a discussion at DDM about whether a
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    threshold should be put in place for, let's say,

2    hydrocodone?

3           A.    I don't recall that, no.

4           Q.    Okay.  Did you ever have any

5    concern about whether a threshold should be put

6    in place?

7           A.    No.  My concern was as the -- as

8    long as the pharmacists were doing their job at

9    the store level, that would -- because you're

10   working backwards from that point, I would

11   assume that at that point that we were filling

12   needed prescriptions, so we didn't put anything

13   else in place.

14          Q.    And so you felt comfortable not

15   putting that safety measure in place because you

16   knew and trusted your pharmacy staff, correct?

17          A.    Correct.

18          Q.    All right.  Let's go to

19   Interrogatory Number 14, which is on page 7.

20   And this asks to "identify all persons

21   responsible for administering, overseeing,

22   developing, and/or implementing all policies,

23   procedures, systems, or programs designed to

24   detect and report suspicious orders or to
```

1    maintain effective controls against diversion."

2              Do you see that?

3         A.    Yes.

4         Q.    Is there anybody that should be on

5    this list that's not on here?

6         A.    No.

7         Q.    Okay.  Would it be fair to say

8    that your role in response to this question was

9    simply administering, overseeing, and

10   implementing that 12-month average rolling

11   report?

12        A.    Correct.

13        Q.    Did you ever help to administer,

14   oversee or implement any other portion of the

15   suspicious order monitoring policies?

16        A.    In the design or the policy

17   itself?

18        Q.    Well, let's start with design.

19   Did you help design any other component of the

20   monitoring policies?

21        A.    No.

22        Q.    Okay.  Did you help to administer

23   any other portion of the monitoring policies?

24        A.    No.  But in regard to if Jill had

Highly Confidential - Subject to Further Confidentiality Review

1    a question with regards to the six-week order,

2    that six-week average, she had the ability to

3    come to us and ask questions about it prior.  So

4    there was another aspect other than the 12-month

5    average that I could have had an input in.  But

6    I don't know if that's what you're after.

7           Q.    Sure.  Did you ever go and meet

8    with Jill on a periodic basis to discuss any

9    possible suspicious orders?

10          A.    No.

11          Q.    Have you ever met with Jill at any

12   time to discuss possible suspicious orders from

13   stores?

14          A.    As far as her report was

15   concerned?

16          Q.    Just in general about --

17          A.    In general?  Not to my knowledge.

18          Q.    Okay.  Let's go to page 12, which

19   is Interrogatory Number 26.  And this says,

20   "Please identify for all your subsidiaries,

21   affiliates, et cetera" -- which is probably

22   poorly worded -- "who were involved in

23   distributing opioids or opioid products in the

24   State of Ohio the following:  A, board of

Highly Confidential - Subject to Further Confidentiality Review

1    directors; b, senior management; c, person in

2    charge of detecting and preventing diversion;

3    all persons employed by that exact entity

4    involved in detecting and preventing diversion;

5    and e, total number of employees."  And then

6    there's "f, address of each facility."

7              So c is "person in charge of

8    detecting and preventing diversion."  And if you

9    look on the answer, c lists Pete Ratycz.

10             Do you see that?

11        A.    Mm-hmm.

12        Q.    Would you agree that he was the

13   person in charge of detecting and preventing

14   diversion at DDM?

15        A.    Yes.

16        Q.    And I would imagine, based on the

17   testimony that you've given today and what we

18   know, that the two prongs of that were the

19   12-month rolling average report that you were

20   responsible for and the greater than six-week

21   average report that Jill was responsible for; is

22   that fair?

23        A.    That was a portion of it, yeah --

24        Q.    Okay.

```
 1              A.    -- and then we would determine

 2     whether or not from that point.

 3              Q.    And then the due diligence would

 4     be the last piece?

 5              A.    Correct.

 6              Q.    But that was the whole system,

 7     correct?

 8              A.    Yes.

 9              Q.    Okay.  Who is John Gans?

10              A.    He's the president of the company.

11              Q.    And do you know what role he

12     played in suspicious order monitoring?

13              A.    Very little.  I mean, John was

14     more or less in charge of the company, not

15     the -- he had really no functionality in

16     pharmacy.

17              Q.    Okay.  Did he play any role in

18     helping to design DDM's suspicious order

19     monitoring policies and procedures?

20              A.    No.

21              Q.    Okay.  Do you know whether he ever

22     asked to be informed or updated as to what they

23     were?

24              A.    I don't believe so.
```

```
1              Q.     Okay.  Do you ever remember

2    meeting with him or anyone else in senior

3    management regarding the adequacy of DDM's

4    suspicious order monitoring policies once the

5    opioid epidemic became more apparent?

6              A.     Other than Pete?

7              Q.     Correct.

8              A.     No.

9              Q.     Did you and Pete and Jill ever sit

10   down to discuss the adequacy of DDM's suspicious

11   order monitoring policies?

12             A.     Not that I recall.

13             Q.     Did you ever have any concerns

14   that DDM's suspicious order monitoring policies

15   and procedures were inadequate to identify

16   suspicious orders in advance of them going out?

17             A.     No.  I don't think that -- you're

18   talking about in advance now?

19             Q.     Correct.

20             A.     We thought that -- we never had an

21   instance where we had a suspicious order after

22   our due diligence, and so it wouldn't lend us to

23   be suspicious or to have concerns about it.

24             Q.     And when you say you never had a
```

```
 1   suspicious order, what you really mean is you

 2   never identified an order as suspicious,

 3   correct?

 4           A.    Well, we looked at --

 5                 MR. JOHNSON:  Objection.

 6           A.    -- we looked at them all.  I don't

 7   think we ever had a suspicious order.

 8           Q.    Okay.  But do you get my -- in

 9   order for it to be suspicious, someone has to

10   look at it and say, "That doesn't look right,"

11   correct?

12           A.    Correct.

13           Q.    Okay.  And so your ability to

14   identify it is only as good as the person who's

15   looking at the information and the criteria that

16   they're applying, correct?

17           A.    Correct.

18           Q.    Okay.  And I recognize this

19   document's a little bit long.  I'm trying to get

20   through it so we can all take a break.  I

21   apologize.

22                 All right.  D asks for, "All

23   persons employed by the exact entity involved in

24   detecting and preventing diversion."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2          A.      Mm-hmm.

 3          Q.      And the answer is, "All pharmacy

 4   employees."

 5                    Do you see that?

 6          A.      Yes.

 7          Q.      And that's what we were talking

 8   about earlier about how you guys relied on the

 9   pharmacy employees, correct?

10          A.      Correct.

11          Q.      Okay.  How many pharmacy employees

12   did you have at a given time?  And we talked

13   about all the levels.

14          A.      Around 180 maybe, in that range.

15          Q.      Okay.  So out of the

16   4,000-some-odd DDM employees, there's only 180

17   pharmacy employees?

18          A.      Yes.

19          Q.      Does that include the techs and

20   the floaters?

21          A.      It does not.

22          Q.      Okay.  So if you include the --

23          A.      Pharmacists.

24          Q.      -- the regional people, the chief,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the staff, the floater and the techs, how many

 2    would you have?

 3              A.    Including regional?

 4              Q.    Mm-hmm.

 5              A.    Maybe 190.

 6              Q.    So only 190 employees?

 7              A.    In the pharmacy?

 8              Q.    Correct.

 9              A.    As far as that handled the

10    controlled drugs?

11              Q.    I'm just asking how many pharmacy

12    employees you had that included the regional

13    supervisors, the chief pharmacists, the staff

14    pharmacists, the floating pharmacists, and the

15    pharmacy techs.

16              A.    I would say that number is in that

17    range, about 190 or so.

18              Q.    Did you know them all on a name

19    basis?

20              A.    Yes.

21              Q.    Could you have walked into any

22    store on any given day and known the names of

23    every single person working in the pharmacy?

24              A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  Did anybody ever indicate

 2    to you that they were concerned that there were

 3    suspicious orders being placed in the DDM

 4    system?

 5            A.    No.

 6                  MR. MULLIGAN:  All right.  Now, we

 7         can take a break.

 8                  MR. JOHNSON:  Okay.

 9                  MR. MULLIGAN:  Sorry about that.

10                  THE VIDEOGRAPHER:  We're going off

11         the record at 10:36.

12                  (Recess taken.)

13                  THE VIDEOGRAPHER:  We're back on

14         the record at 10:49.

15    BY MR. MULLIGAN:

16            Q.    Earlier we were talking about the

17    trust that you place in the pharmacists and the

18    pharmacy employees at DDM, correct?

19            A.    Correct.

20            Q.    And did you do anything to verify

21    that the pharmacy level employees were doing

22    everything they could to prevent diversion,

23    other than trusting them?

24            A.    Making sure that when the
```

Highly Confidential - Subject to Further Confidentiality Review

1    supervisors were going to the stores, that they

2    were not filling scripts that were maybe out of

3    state or those type of things.  But you're

4    talking about diversion, a theft diversion or

5    any diversion, what?

6            Q.    I'm just talking about any

7    diversion.  It sounds like a large piece of your

8    suspicious order monitoring was trust, and I

9    want to know what you did -- was it just trust

10   or was it trust and verify or was it -- how

11   would you describe it?

12           A.    Well, we would be able to make

13   sure that the scripts that were being filled

14   were not from out of state through -- we would

15   actually go through the -- the supervisors would

16   go through on an ad hoc basis and review certain

17   scripts to make sure that they were complying

18   and nothing would show up as far as filling

19   out-of-state scripts and those types of issues.

20                Plus the State Board of Pharmacy

21   was very strict as far as regulating what we

22   did.  They gave a lot of direction as far as

23   what the pharmacists should be looking for and

24   so ...

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     What I'm asking is --

 2            A.     But as far as -- we were going in

 3    the store levels --

 4            Q.     So on an ad hoc basis, you would

 5    go and look and see whether any scripts were

 6    being filled for people who were geographically

 7    not supposed to be at that store; is that fair?

 8            A.     Yeah, because of -- the

 9    supervisors would actually review.  They would

10    go through, you know, unmarked particular

11    scripts and look and see if the quantities were

12    verified by what they filled and those types of

13    things, making sure that the addresses were on

14    the script, that the pharmacists were doing

15    their job by that, making sure that they were

16    local people not filling scripts from, you know,

17    out of the --

18            Q.     Sure.

19            A.     -- out of state.

20            Q.     Was there anything else that

21    anybody underneath you did, other than the

22    pharmacists, to verify that what the pharmacists

23    were doing was on the up and up?

24            A.     Not to my knowledge, no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And you'd agree that the

2    way that you used the -- well, strike that.

3                    You'd agree that the lack of

4    criteria that was put in place at DDM regarding

5    the evaluation of your 12-month report meant

6    that the decisions that were made about whether

7    to follow up or not were subjective, not

8    objective, correct?

9              A.    Correct.

10             Q.    And they were your subjective

11   decisions, right?

12             A.    Correct.

13             Q.    Okay.  Was there any reason why

14   DDM -- well, strike that.

15                   Could DDM have designed a system

16   that would stop an order when placed if it

17   caused the store to exceed the 99 percent in

18   excess of the prior 12-month average?

19             A.    Well, we felt that what we had in

20   place -- because we would review that, that we

21   didn't need to add an extra layer, because now

22   you're talking about basically black and white,

23   okay.  You're looking at a number and that

24   number is going to stop you at that particular
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   threshold.

 2            Q.    Right.

 3            A.    We felt that it was not necessary

 4   to do that because we were eyeballing it and

 5   reviewing it and making sure that there was

 6   reasons why.  In other words -- yeah.

 7            Q.    So my question was, could you have

 8   done that?

 9            A.    Could we?  I can't answer that.

10   I'm not on the IT team.  So I don't know what it

11   would take to do that.

12            Q.    And I can imagine if it was

13   important enough, DDM could have done something

14   like that, right?

15                  MR. JOHNSON:  Objection.

16            A.    We didn't see the need to do it.

17   I don't know if you're speculating could we,

18   should we, you know.

19            Q.    And, again, I appreciate that.  So

20   you didn't see the need to do it.  But my

21   question is, do you know whether you could have

22   done it, and it sounds like you're not sure

23   whether you could have done it or not?

24            A.    I'm not sure because I'm not on
```

1    the IT side.

2         Q.    Okay.  Was there ever any

3    discussion about whether a report like that

4    would be useful in detecting and halting

5    diversion in its tracks?

6         A.    No.

7         Q.    Okay.  All right.  We're going to

8    turn to what Mr. Knoll is going to mark as

9    Exhibit 3.

10            MR. MULLIGAN:  Actually, you know

11         what, before we get there, Jon, I've got

12         a couple questions.  So mark it and

13         we'll just --

14   BY MR. MULLIGAN:

15         Q.    You'd agree, Mr. Nameth, that

16   patient and customer safety are DDM's first

17   priority?

18         A.    I would agree.

19         Q.    Okay.  Along with maybe staying in

20   business?

21         A.    Well ...

22         Q.    Is that fair?

23         A.    I would say that we have a

24   responsibility to our customers' patients, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  Do you agree that DDM as a

2    handler of controlled substance also has an

3    obligation to the general public to prevent

4    diversion of opioids?

5              A.    Yes.

6              Q.    Okay.  And would you agree that

7    DDM was legally required to implement a system

8    of effective controls to prevent diversion?

9              A.    We were required to have a system.

10             Q.    Okay.  To prevent diversion,

11   correct?

12             A.    Yes.

13             Q.    Okay.  And not to respond to it,

14   right?

15             A.    Well, now, you're getting into --

16   we felt our system was adequate for what we

17   needed to be done.

18             Q.    Okay.  And what you needed to be

19   done is defined by the Controlled Substances

20   Act, right?

21             A.    Yes.

22             Q.    And you're a pharmacist, and you

23   know that, right?

24             A.    Yes.
```

```
 1              Q.    Okay.  And so let's talk about
 2    this a little more.
 3                    Did that system have to prevent
 4    diversion or simply identify it and respond to
 5    it after the fact; do you know?
 6              A.    Well, it would prevent diversion
 7    as far as looking at the system and knowing
 8    whether it was diversion or not.  If it wasn't,
 9    then it wouldn't be diversion.
10              Q.    Your report would only allow you
11    to identify it had already happened --
12              A.    Yes.
13              Q.    -- which would then potentially
14    enable you to try and stop it in the future,
15    right?
16              A.    Well, but by following up,
17    wouldn't we be actually looking at that
18    particular issue?
19              Q.    Well, you tell me.
20              A.    Yes.  I mean, we would look at a
21    particular issue and follow up with a written
22    report and find out whether it was diversion or
23    not.  So ...
24              Q.    But you'd agree that that's
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    identifying that diversion has already happened,

2    so it's not actually preventing diversion,

3    agree?

4            A.    What it is, it's -- in my opinion,

5    it's preventing diversion by looking at the

6    system and determining whether there's diversion

7    or not.  What you're asking is, are you going to

8    stop an order before it went out the door?

9            Q.    Correct.

10           A.    No, it did not.

11           Q.    Okay.  So it potentially was a

12   tool that could put you on notice that diversion

13   had already occurred and then give you the

14   option to try and stem it or prevent it in the

15   future, correct?

16           A.    Yes.

17           Q.    Okay.  And you guys never

18   identified a suspicious order, right?

19           A.    Right.

20           Q.    And so you never determined that

21   any diversion was taking place regarding

22   suspicious orders, right?

23           A.    Right.

24           Q.    And so, therefore, you guys didn't
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   do anything to change what you were doing to

2   prevent future diversion, correct?

3           A.    Correct.

4           Q.    Okay.  And you'd agree that DDM's

5   legal requirements to implement a system of

6   effective controls to prevent diversion would

7   include things like employee theft, right?

8           A.    Yes.

9           Q.    Okay.  But you don't think that it

10  required you to identify and stop suspicious

11  orders before they went out; is that fair?

12          A.    Yes.

13          Q.    Okay.  Would you agree that DDM

14  could not discharge its obligations under the

15  Controlled Substances Act by merely relying upon

16  pharmacists, or do you think that relying on the

17  pharmacists was sufficient?

18          A.    We didn't rely on just the

19  pharmacists.

20          Q.    So that's what you did.  I'm

21  asking what would have been sufficient to

22  discharge DDM's obligations under the Controlled

23  Substances Act.  Was relying on the pharmacists

24  enough, or did you have to do more?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Well, we did more as far as what

2    you're asking.  We didn't rely just on the

3    pharmacists.  We looked at our systems and then

4    did our due diligence and then moved forward

5    from that.  So we weren't just relying on our

6    pharmacists, per se.  We were look -- there's an

7    overseer to that aspect.

8            Q.    But if a pharmacist told you that

9    they just needed the drugs, then that would be a

10   sufficient explanation, correct?

11           A.    Correct.

12           Q.    And you told me that you relied on

13   the pharmacists to identify whether diversion

14   was taking place through the prescription

15   process, right?

16           A.    Correct.

17           Q.    Okay.  And so do you think relying

18   on the pharmacists for those two aspects of

19   suspicious order monitoring discharged DDM's

20   obligations under the Controlled Substances Act?

21           A.    I don't -- I just don't think your

22   statement that relying only on the pharmacists

23   absolves Drug Mart from its obligations to

24   report.  Is that what you're asking?
```

1    Q.    I'm asking you whether DDM can

2    just rely on the pharmacists to identify

3    diversion at the store level, or whether DDM has

4    a corresponding obligation to double check and

5    try to identify diversion?

6    A.    Well, there's certain layers.  I

7    mean, you know, when you're asking about the

8    pharmacists at store level, you're asking about

9    just whether they're filling legitimate

10   prescriptions.

11   Q.    Correct.

12   A.    In that aspect of it, we're

13   relying on the pharmacists.

14   Q.    You'd agree that that's a main

15   source of diversion, right, through illegitimate

16   prescriptions?

17   A.    Well, that's not the only.  I

18   mean, several years ago the DEA actually came

19   out and was on the news about how to take your

20   controlled substances and don't leave them in a

21   medicine cabinet if you have children.  You

22   know, take that and place -- lock them up, do

23   something with it, because there was a huge

24   diversion at home level about legitimately

```
 1   prescribed prescriptions getting into the hands

 2   of people that it wasn't intended to do.

 3           Q.    Sure.  And you can't do anything

 4   about that, right?

 5           A.    I can't do anything about that.

 6           Q.    Okay.  So what types of diversion

 7   can DDM do something about?

 8           A.    We can -- theft.

 9           Q.    Okay.  Like employee theft, right?

10           A.    Employee theft, corporate theft,

11   warehouse theft.

12           Q.    Anything else?

13           A.    Making sure the pharmacists are

14   doing their due diligence at store level to fill

15   legitimate prescriptions.

16           Q.    And you rely on them to do that,

17   right?

18           A.    Yes.

19           Q.    Are there any other avenues of

20   diversion, other than those four we just talked

21   about, that you can think of right now?

22           A.    No.

23           Q.    Okay.  You'd agree that DDM is in

24   the best position to prevent diversion occurring
```

```
 1    within its business, correct?

 2           A.    Yes.

 3           Q.    And you'd agree that DDM is in the

 4    best position to ensure that its employees are

 5    not diverting controlled substances, correct?

 6           A.    Yes.

 7           Q.    And you'd agree that DDM is in the

 8    best position to identify suspicious orders

 9    placed in its distribution center, correct?

10           A.    Yes.

11           Q.    And you'd agree that the same

12    would be true for a possible suspicious order,

13    correct?

14           A.    Yes.

15           Q.    And you'd agree that DDM had more

16    than enough information available to it to

17    identify possible suspicious orders before they

18    went out, correct?

19           A.    I can't answer that.

20           Q.    Why is that?

21           A.    I don't know, because -- I don't

22    know whether we could respond to that through an

23    IT aspect, whether or not we could arrange a

24    prospective ordering process or stopping
```

```
 1    process.

 2           Q.    As a pharmacist, and based on your

 3    understanding of the Controlled Substances Act,

 4    to the extent that DDM could have done that, do

 5    you think it should have?

 6           A.    In my opinion, I think we -- the

 7    system that we had was working well enough that

 8    we didn't need to do that.

 9           Q.    Okay.

10           A.    And there's other problems with

11    that.  When you get into a system that only has

12    black and white, that doesn't look at anything

13    else besides the number.

14           Q.    Okay.

15           A.    We think by looking -- having an

16    eyeball on a human being, looking at -- knowing

17    our stores and knowing our pharmacists, knowing

18    the store locations, the growth of the store and

19    all that, we have actually maybe a better aspect

20    of what's going on at store level than someone

21    that's just doing a black and white aspect of

22    cutting an order.

23           Q.    Why couldn't you do both?

24           A.    We felt that we didn't need to.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Would imposing a system that would

 2    identify possible suspicious orders in advance

 3    and halt shipments, that would create more work,

 4    wouldn't it?

 5              A.    Well, if you're going to stop --

 6              Q.    It's a very simple question.  I'm

 7    just -- would it create more work or not?

 8              A.    You've got to create another

 9    system.

10              Q.    Okay.  So it would be more work

11    for somebody at DDM, right?

12              A.    But that's not why we did it --

13    didn't do it.

14              Q.    But I didn't ask that question.  I

15    just asked if it would create more work.

16              A.    Possibly.

17              Q.    Okay.  Can you think of an

18    instance where it would create less work?

19              A.    Depends how smart your system was.

20    I don't know.

21              Q.    So but presumably if you put that

22    system in place, it would stop an order, right?

23    All of a sudden now someone's got to deal with a

24    stopped order, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.  Now -- so if you're saying

 2     then you're going to stop an order and then have

 3     somebody look at it and then override that

 4     stopped order, then is there a reason why you're

 5     stopping the order?

 6              Q.    Well, I mean, just let's say

 7     there's an order that shows up on your 12-month

 8     report.  Let's say prospectively you get the

 9     report, the second the order is placed, and it

10     says, "Hey, this person is ordering more than

11     what their average has been now with this last

12     order," you could do that, right?

13              A.    So you're going to do exactly what

14     we're doing now in a quicker time -- in an

15     earlier time frame.

16              Q.    It would be designed to catch

17     those orders before they went out, right?

18              A.    Yes.

19              Q.    Is there any reason why you

20     couldn't have done that, other than IT problems?

21              A.    Not that I would recall.

22              Q.    Okay.  Do you think that a system

23     like that would have been useful to help stop --

24     to identify suspicious orders and stop
```

Highly Confidential - Subject to Further Confidentiality Review

1    diversion?

2         A.   Well, based on my knowledge and

3    looking at what I dealt with and the reason --

4    and not having a suspicious order, you know,

5    retrospectively in my mind, I wouldn't have a

6    need to do it.

7         Q.   Okay.  But, again, that's based on

8    the fact that you never personally identified an

9    order that you decided was suspicious, correct?

10        A.   Correct.

11        Q.   Okay.  But if that system or that

12   report you reviewed was designed to generate

13   every time a store exceeded their threshold with

14   an order, that wouldn't require that much more

15   work for you, right?  You might have had to look

16   at the report more often, but it would have been

17   the same process, right?

18        A.   Yes.

19        Q.   Okay.  You would agree that DDM

20   had the tools necessary, therefore, to identify

21   suspicious orders, stop them before they went

22   out, and report them to the DEA immediately if

23   it chose to, correct?

24        A.   I can't answer that, because

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you're -- like I stated before, that I'm not

 2    quite sure if our IT department would have the

 3    ability to do that.

 4            Q.    Okay.

 5            A.    And you're saying they did.

 6            Q.    So you don't know, as you sit here

 7    today, whether DDM had the tools necessary to

 8    identify suspicious orders in advance and stop

 9    them before they went out?

10            A.    That's basically what I'm saying,

11    yeah, without looking into it further.

12            Q.    Okay.

13            A.    I mean, I can't answer that.

14            Q.    So would that also mean that DDM

15    didn't actually do that?

16            A.    No.  I mean, you know, that they

17    looked at it and said that they weren't going to

18    do it?

19            Q.    Well, you just told me you didn't

20    know whether DDM had the tools necessary to

21    identify a suspicious order and stop it before

22    it went out, right?

23            A.    Right.

24            Q.    So that would suggest to me that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DDM didn't identify suspicious orders or stop

 2    them before they went out, right?

 3              MR. JOHNSON:  Objection.

 4         Q.   So that it could stop them before

 5    they went out?

 6         A.   So that they could stop them

 7    before they went out?

 8         Q.   Correct.

 9         A.   Yeah.

10         Q.   Okay.  They didn't?

11         A.   They didn't what?

12         Q.   This is like a Monty Python movie,

13    right?  Sometimes.  Let me ask the question

14    again.

15              So your testimony is that you

16    don't know whether DDM had the tools necessary

17    to identify suspicious orders and stop them

18    before they went out, right?

19         A.   Correct.

20         Q.   Okay.  So you would also agree

21    that DDM did not identify suspicious orders in a

22    way that would allow them to stop them before

23    they went out, right?

24              MR. JOHNSON:  Objection.
```

1          Q.     And I think you said yes?

2          A.     Yes.

3          Q.     Okay.  You would agree that DDM's

4     in the best position to ensure that any

5     suspicious orders placed within its business are

6     reported to the Ohio State Board and the DEA,

7     right?

8          A.     Yes.

9          Q.     Okay.  Do you know what the most

10    dispensed drug was at DDM pharmacies, let's say

11    in 2014?

12         A.     Offhand, no.

13         Q.     Okay.  Do you know what the most

14    dispensed controlled substance was?

15         A.     I would -- I would be guessing if

16    I gave you an answer.

17         Q.     Okay.  Do you have a couple that

18    might be in the running?

19         A.     Controlled drugs?

20         Q.     Yeah.

21         A.     It could have been a

22    codeine-containing cough syrup.  Could have been

23    Ambien.

24         Q.     Anything else?

```
 1              A.    It could have been a family of

 2    hydrocodones, you know, as a group.

 3              Q.    Okay.  That would include brand,

 4    generic, et cetera?  Different --

 5              A.    Different strengths.

 6              Q.    -- strengths?

 7              A.    Different -- yeah.

 8              Q.    Okay.  What percentage of DDM's

 9    pharmacy business was controlled versus not

10    controlled in 2014, do you know?

11              A.    I don't know.

12              Q.    Do you know, was it reflective of

13    the national average; was it higher or lower?

14              A.    I can't really answer that.

15              Q.    Did you ever do anything to

16    monitor or identify what the most -- or the

17    largest -- strike that.

18                    Did you ever do anything to

19    identify or monitor which controlled substance

20    was being prescribed the most frequently and

21    filled in your stores?

22              A.    Did we monitor that?

23              Q.    Yeah, did you ever do anything to

24    monitor that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    No.

 2            Q.    Do you know if anybody else did?

 3            A.    I don't know that.

 4            Q.    Do you know whether there were

 5    ever any large unexplained increases of, let's

 6    say, hydrocodone prescriptions at any time when

 7    you were at DDM?

 8            A.    They showed up on our reports, if

 9    there were large increases in orders.

10            Q.    Do you know just from a chain wide

11    standpoint, were there ever any large

12    unexplained trends of use of hydrocodone within

13    the DDM system?

14            A.    Well, I'm sure we followed the

15    national trend, and the national trend was an

16    increase in hydrocodone use.  So we wouldn't be

17    any different than anybody else.

18            Q.    But you're just speculating,

19    right?  You don't actually know?

20            A.    Yes.

21            Q.    Okay.  Do you know what the most

22    commonly diverted drugs are?

23            A.    I would say that Schedule II

24    narcotics.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.    Would that include hydrocodone?

2           A.    It does now.  It didn't then.

3           Q.    Well, you're saying the

4    Schedule II didn't include hydrocodone then?

5           A.    Well, no.  I mean, I'm not sure of

6    your question.  The most highly diverted drugs?

7           Q.    Mm-hmm.

8           A.    I would have to assume it would be

9    any Schedule II or hydrocodones or IIIs at that

10   particular point.

11          Q.    Were you aware of the most highly

12   diverted or most likely to be diverted drugs

13   were when you were working at DDM?

14          A.    I knew that hydrocodones were a

15   particular potential problem.

16          Q.    And that, in addition to those

17   other two drugs that make up the trilogy; is

18   that right?

19          A.    Yes.

20          Q.    And that's -- what, benzo is the

21   other one.  What's the third one?

22          A.    Basically codeine-containing cough

23   syrups, because of cough, cold and flu seasons.

24   I mean, that's a very highly used particular
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    product.

 2           Q.    So as a pharmacist and the

 3    director of pharmacy operations at DDM, you were

 4    aware of the types of drugs that were most

 5    commonly diverted, correct?

 6           A.    I would say yes.

 7           Q.    And did you do anything special to

 8    monitor the movement of those drugs within DDM's

 9    system, other than what we've talked about today

10    with that 12-month report?

11           A.    No.

12           Q.    Okay.  Did you ever run any

13    reports or look at any trends over time to see

14    how commonly those types of drugs were being

15    filled at DDM stores?

16           A.    Did not.

17           Q.    Are you aware of anybody that did?

18           A.    I'm not aware of that.

19           Q.    Is that something you could have

20    done?

21           A.    A trend for us?  It's possible,

22    yes.

23           Q.    Okay.  Do you think looking at

24    trends of how hydrocodone was being filled in
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    your stores over time would have been helpful to

2    determine whether your suspicious order

3    monitoring policies and procedures were

4    adequate?

5          A.    Well, the problem with that is

6    that if you're getting actual legitimate

7    prescriptions for particular products, you

8    would -- if the trend was upward, then we would

9    actually not look at that because we have

10   legitimate prescriptions that we're filling.  So

11   it would determine whether or not you're filling

12   legitimate prescriptions at that point.

13               So if the prescription use was up,

14   then we would assume that the orders were going

15   to be up, and the distribution was up.

16         Q.    But we know -- it's common

17   knowledge that there were tons of illegitimate

18   prescriptions that led to this opioid crisis,

19   correct?

20               MR. JOHNSON:  Objection.

21         A.    Define "illegitimate

22   prescriptions."

23         Q.    Prescriptions that were written by

24   pill mills.  Prescriptions that were written for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    larger amounts than necessary.  I mean, you're a

 2    pharmacist.  I mean, you know this information,

 3    right?

 4         A.    Right.

 5         Q.    Okay.  And you'd agree that there

 6    are -- that part of the opioid epidemic problem

 7    is illegitimate prescriptions, correct?

 8         A.    It's part of it.

 9         Q.    Okay.  And you, at the corporate

10    level, and as a pharmacist yourself, didn't do

11    anything to identify whether the prescriptions

12    being filled at the store level were legitimate,

13    correct?

14              MR. JOHNSON:  Objection.

15         A.    You know, that's -- you've got a

16    broad brush there, and you're -- and what we did

17    was make sure that we're not filling scripts

18    that were out of state, that -- and there were

19    actually times when the State Board of Pharmacy

20    would notify us if a particular physician was

21    under investigation.  We would send that out to

22    the stores so that they would not fill

23    particular prescriptions for that particular

24    physician.  So ...
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    And I'm not trying to put blame on

2     you.  What I'm trying to understand is --

3     because I asked you about whether it would be

4     useful to look at the trends of the way -- how

5     hydrocodone increased in usage over time, and

6     you said, well, you know, if they were

7     legitimate, then it wouldn't be useful, right?

8              A.    Right.

9              Q.    And so my next question was, you

10    knew there were lots of illegitimate ones,

11    right?  So presume --

12             A.    Healthcare in the world, yes --

13             Q.    Right.

14             A.    -- in the marketplace.  Not

15    necessarily in our stores.

16             Q.    Okay.  Are you aware of any time

17    ever that there was a prescription that was

18    identified as illegitimate in one of DDM's

19    stores?

20             A.    Yes.

21             Q.    Okay.  So that trend chart that I

22    was asking if you ever looked at, you said no,

23    that would reflect -- generally would include

24    some illegitimate use, correct?
```

```
 1          A.    You're talking about a percentage

 2    or some?

 3          Q.    Just some.

 4          A.    Any?

 5          Q.    Yeah.

 6          A.    Is one some?

 7          Q.    Well, my point is that you told me

 8    that generally that wouldn't be useful if it

 9    only contained legitimate prescriptions, right?

10    And my question back to you is, it had to have

11    included some illegitimate prescriptions just by

12    definition, right, based on this crisis?

13          A.    What you're doing --

14                MR. JOHNSON:  Objection.

15                Go ahead.

16          Q.    I don't want to know what I'm

17    doing.  I want to know what the answer to my

18    question is, okay?  I want an answer to the

19    question.

20          A.    You're placing the pharmacist, you

21    know, in the light of determining whether or not

22    a particular physician has the right to write

23    this prescription.  I can't determine at that

24    particular point whether a patient standing in
```

1   front of me and whether they have cancer pain or

2   whether they have back pain or whether they came

3   from, you know -- we know they came from a pill

4   mill because they would be out of state.

5              We didn't know -- recognize any

6   pill mills, or if the State Board did recognize

7   pill mills, they would identify it to us and we

8   would not fill them.

9              So now you're relying -- we relied

10  on our pharmacists to determine what was

11  legitimate and what was not.  If the trend -- if

12  the written trend was upwards, okay, we're going

13  to be filling more of those prescriptions.  So

14  the trend is going to be up.  I don't know why

15  looking at the trend would have an actual effect

16  on what we did as far as distributing that drug.

17       Q.    Okay.  And so your testimony today

18  is that looking at a trend of the sales of

19  hydrocodone over time would not be useful in any

20  way in identifying suspicious orders or

21  diversion; is that fair?

22       A.    I would say yes.

23       Q.    Okay.  Did you ever look at the

24  greater than six-week average report that was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    used in the warehouse or at the store level?

 2            A.    I've seen them.

 3            Q.    Okay.  But it wasn't your practice

 4    to look at them or review them?

 5            A.    No.

 6            Q.    Okay.  Do you know what percentage

 7    increase would trigger those?

 8            A.    I don't know that.

 9            Q.    Okay.  Do you know who designed

10    that report?

11            A.    If I had to guess, it might have

12    been P.J., by I'm not quite sure.  P.J. Ferut.

13            Q.    Okay.  Let's look at Exhibit 3.

14                        - - -

15        (DDM-Nameth Exhibit 3 marked.)

16                        - - -

17    BY MR. MULLIGAN:

18            Q.    This is DDM68281, and this is a

19    February 7, 2007, letter from the U.S.

20    Department of Justice Drug Enforcement

21    Administration.

22                  Do you see that?

23            A.    Yes.

24            Q.    Have you ever seen this document
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    before?

 2            A.    I believe possibly in preparation

 3    for this.

 4            Q.    Okay.  Do you know whether you'd

 5    ever seen it prior to that?

 6            A.    Not that I can recall.

 7            Q.    Okay.  Have you ever seen a

 8    letter -- would you have seen a letter like this

 9    as the director of pharmacy operations at DDM?

10            A.    It would have gone to the VP

11    probably.

12            Q.    To Pete?

13            A.    Most likely.

14            Q.    Did he ever share this type of

15    document with you when it came in?

16            A.    He could have.

17            Q.    Okay.  I'll just represent to you

18    that this document discusses just generally the

19    obligations under the Controlled Substances Act.

20    Is that your understanding, having reviewed it

21    in preparation for today?

22            A.    Yes.

23            Q.    Okay.  So if you look at the first

24    sentence, it says, "This letter is being sent to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    every commercial entity in the United States

 2    registered with the DEA."

 3              Do you see that?

 4         A.    Mm-hmm.

 5         Q.    Okay.  And that's registered to

 6    distribute controlled substances, correct?

 7         A.    Yes.

 8         Q.    Okay.  And so this would have gone

 9    to DDM, right?

10         A.    Yes, it would.

11         Q.    Okay.  "The purpose of this letter

12    is to reiterate the responsibilities of

13    controlled substance distributors in view of the

14    prescription drug abuse problem our nation

15    currently faces."

16              Do you see that?

17         A.    Yes.

18         Q.    Were you aware of what DDM's

19    responsibilities were as a distributor at this

20    time in 2007?

21         A.    I know that we had to report, I

22    believe at that time, to ARCOS.

23         Q.    Okay.  So other than reporting

24    transactions to ARCOS, do you know any other
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    obligations that DDM had at that time?

 2           A.    I'm sure if I read through it, it

 3    would, you know, remind me.  I didn't read

 4    through it, per se.

 5           Q.    We'll go through it, but you

 6    don't -- at this time, you don't recall any

 7    other --

 8           A.    No.

 9           Q.    Okay.  And so it's referencing a

10    prescription drug abuse problem the nation

11    currently faces.

12                 Do you see that?

13           A.    Yes.

14           Q.    Were you aware that the nation

15    faced a prescription drug abuse problem in 2007?

16           A.    We were leading -- we were getting

17    concerned at that point, yes.

18           Q.    Okay.  So the next sentence says,

19    "As each of you is undoubtedly aware, the abuse

20    (nonmedical use) of controlled prescription

21    drugs is a serious and growing health problem in

22    this country."

23                 Do you see that?

24           A.    Mm-hmm.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Were you undoubtedly aware of that

2    in 2007?

3          A.    Yes.

4          Q.    Okay.  And you'd agree that the

5    nonmedical use is another -- it's a synonym for

6    diversion, right, illegitimate use?

7          A.    Correct.

8          Q.    Okay.  All right.  If you go down

9    to the next paragraph.  "The CSA was designed by

10   Congress to combat diversion by providing for a

11   closed system of drug distribution, in which all

12   legitimate handlers of controlled substances

13   must obtain a DEA registration and, as a

14   condition of maintaining such registration, must

15   take reasonable steps to ensure that their

16   registration is not being utilized as a source

17   of diversion."

18               Do you see that?

19         A.    Mm-hmm.

20         Q.    Did D- --

21               MR. JOHNSON:  Is that a "yes"?

22         A.    Yes.

23         Q.    Did D -- thank you.

24               Did DDM obtain a DEA registration?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And did you understand that as a

 3    condition of that, DDM had to take reasonable

 4    steps to ensure that it was not being used as a

 5    source of diversion?

 6              A.    Yes.

 7              Q.    Okay.  If you go further down, it

 8    says, "If the closed system is to function

 9    properly as Congress envisioned,

10    distributors" -- that's DDM, right?

11              A.    Yes.

12              Q.    -- "must be vigilant in deciding

13    whether a prospective customer can be trusted to

14    deliver controlled substances only for lawful

15    purposes."

16                    Do you see that?

17              A.    Yes.

18              Q.    And in this instance, the customer

19    would be a DDM store, correct?

20              A.    Correct.

21              Q.    Okay.  "This responsibility is

22    critical, as Congress has expressly declared

23    that the illegal distribution of controlled

24    substances has a substantial and detrimental
```

```
 1    effect on the health and general welfare of the

 2    American people."

 3                 Do you see that?

 4         A.    Yes.

 5         Q.    And would you agree with that

 6    statement?

 7         A.    Yes.

 8         Q.    Okay.  And the statement before

 9    basically says you've got to know who your

10    customers are, right?

11         A.    Reasonable steps.

12         Q.    Okay.  Well, it says that you must

13    be vigilant in deciding whether a prospective

14    customer or store can be trusted to deliver the

15    controlled substances --

16         A.    Right.

17         Q.    -- only for lawful purposes,

18    right?

19         A.    Correct.

20         Q.    Okay.  Did you do that?

21         A.    I believe to the best of our

22    ability, we did that.

23         Q.    Okay.  Do you think that DDM could

24    have done a better job at that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    Well, being a small system and a

2     closed system, we knew that all our stores

3     were -- licenses were in place.  We knew the

4     pharmacists were -- had their licenses.  So, you

5     know, we knew our customers.

6              Q.    Did you know them well enough to

7     know that they weren't diverting drugs?

8              A.    We did by looking at the reports

9     that were done on their end and our end as well.

10             Q.    But you told me earlier you knew

11    them personally, right?

12             A.    We -- the stores did their counts

13    on a monthly -- on a monthly basis.  So if there

14    was diversion, that would show up in the monthly

15    drug count.  Are you talking about --

16             Q.    Hold on.  I want you to listen to

17    my question, okay, because my question was very

18    specific.

19                   My question was, you knew all the

20    pharmacists by name, right?

21             A.    Yes.

22             Q.    Personally?

23             A.    Yes.

24             Q.    Okay.  Was that the extent to
```

1    which you were vigilant in determining whether

2    your stores could be trusted to deliver

3    controlled substances only for a lawful purpose,

4    the fact that you knew them personally?

5         A.    No.  Knowing them personally and

6    knowing that they have -- they have -- their

7    licenses are active and there are not -- there

8    are no -- just knowing a person is one thing,

9    but knowing that their licenses are in place to

10   send them the controlled substances, that's

11   part -- you know, you have -- you know your

12   customers.

13             If I didn't know my customer, if I

14   was a mail order distributor or something to

15   that nature, I'm sending them to somebody else

16   in another part of the country, they could take

17   a photocopy of their DEA license and send it to

18   me.  I wouldn't exactly know whether it was

19   legitimate or not.

20             But when we're dealing with a

21   closed system, we're kind of responsible for

22   having their licenses in place and the

23   pharmacists have an active license.

24        Q.    So is knowing your customer, does

```
 1    that just mean knowing that they have a license

 2    in place?

 3            A.    Not -- that's part and parcel.

 4            Q.    Is there anything else?

 5            A.    Knowing that they don't have a

 6    background against -- marks with -- against the

 7    State Board.

 8            Q.    Knowing there's no diversion

 9    taking place at their store, there's never been

10    one, would that be included?

11            A.    Possibly.

12            Q.    So knowing whether diversion had

13    occurred at a store under a pharmacist's watch

14    would not necessarily be part of knowing your

15    customer?  I just want to make sure -- I'm

16    trying to understand.

17            A.    I don't think the pharmacist, as

18    far as in that aspect, has that much to do with

19    it.  As far as knowing that there's no diversion

20    under that particular pharmacist, that really

21    doesn't have much to do with sending them the

22    drug or not.

23            Q.    So I'm just trying to understand

24    what you did -- I'm looking at this letter,
```

 1    right -- to be vigilant in deciding whether a

 2    prospective customer can be trusted to deliver

 3    controlled substances.

 4                    And what you've told me is, one,

 5    we know you know them personally, right?  That's

 6    one.  And two, you knew that their licenses were

 7    in place, right?

 8                    So I want to know, was there

 9    anything else that you did to be vigilant to

10    determine whether your stores were participating

11    in diversion or not.

12            A.    I'm reading it here to -- we're

13    relying on our pharmacists at that particular

14    point.

15            Q.    Okay.  But if you read this, it

16    says that "Distributors must be vigilant,"

17    right?

18                    And so in deciding whether a

19    prospective customer -- which would be your

20    store, right?  And that's also your pharmacist,

21    right?

22            A.    Correct.

23            Q.    So it sounds like you guys didn't

24    do this; is that fair?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    No.

 2                  MR. JOHNSON:  Objection.

 3            Q.    Well, you just told me that your

 4    vigilance was relying on your pharmacist, right?

 5    But your pharmacist is your customer, right?

 6            A.    Stores, yeah.

 7            Q.    Yeah.

 8            A.    Not necessarily just the

 9    pharmacist.

10            Q.    So your --

11            A.    It's the store.

12            Q.    So your vigilance in deciding

13    whether a prospective customer can be trusted

14    was just to trust them; is that fair?

15            A.    I don't know if I would go that

16    far.

17            Q.    Okay.  Well, clarify it for me.

18            A.    I think the pharmacists can be

19    trusted because they -- they, at that particular

20    point, are deemed to be following the State

21    Board of Pharmacy rules.

22            Q.    All right.  I'm going to keep

23    asking you this question until we get to the

24    right answer, honestly.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 This says, right, "DDM

 2    distributors must be vigilant in deciding

 3    whether a prospective customer" -- which is the

 4    store or a pharmacist -- "can be trusted."

 5                 And I'm asking you what you did,

 6    other than just blindly trusting them, to

 7    determine whether they could be trusted.

 8         A.    Well, we didn't blindly trust

 9    them.  I mean, if I know a pharmacist for -- we

10    had a long-standing history of having

11    pharmacists under our control for numbers of

12    years.  We did not have a high turnover.  We

13    knew our people in the stores.

14                 So a trust is determined over a

15    segment of time with that person.  So obviously

16    if you're looking at -- things were in place as

17    far as licensures was correct.  That was one

18    aspect of it.  But the other aspect of it is

19    to -- we're not sending it to someone we don't

20    know.

21         Q.    Okay.  So the two prongs of your

22    discharging your duty to be vigilant is:  One,

23    the pharmacist has a license of his own or her

24    own; and two, you know them personally, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Correct.

 2            Q.    Okay.  Okay.  If you go to the

 3    next page, page 2, second paragraph, second

 4    sentence, it says, "Moreover, all registrants -

 5    manufacturers, distributors, pharmacies, and

 6    practitioners - share responsibility for

 7    maintaining appropriate safeguards against

 8    diversion."

 9                  Do you see that?

10            A.    Mm-hmm.

11            Q.    And so you'd agree that that means

12    that DDM and its pharmacies have a corresponding

13    responsibility to protect against diversion,

14    right?

15            A.    Yes.

16            Q.    Okay.  And it says, "Nonetheless,

17    given the extent of prescription drug abuse in

18    the United States, along with the dangerous and

19    potentially lethal consequences of such abuse,

20    even just one distributor that uses its DEA

21    registration to facilitate diversion can cause

22    enormous harm."

23                  Do you see that?

24            A.    Mm-hmm.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Would you agree with that?

2              A.    Yes.

3              Q.    Okay.  If you go to the next

4      paragraph.  This is referencing a federal

5      statute.  Are you familiar with that statute,

6      21 U.S.C. 823(e)?

7              A.    I'd have to review it.

8              Q.    Okay.  It says -- and it talks

9      about it here a little bit.  It says listed

10     among the factors on that statute is "the duty

11     of a distributor to maintain effective controls

12     against diversion of controlled substances into

13     other than legitimate medical, scientific, and

14     industrial channels."

15              Do you see that?

16             A.    Mm-hmm, yes.

17             Q.    And that's what we've been talking

18     about today, right?

19             A.    Yes.

20             Q.    Okay.  And down below it says,

21     "The DEA regulations require all

22     distributors" -- and that's DDM, right?

23             A.    Yes.

24             Q.    -- "to report suspicious orders of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    controlled substances."

 2              Do you see that?

 3         A.    Yes.

 4         Q.    And the regulations state in

 5    21 C.F.R. 1301.74(b) the following --

 6         A.    Where are you?

 7              MR. JOHNSON:  Where are you right

 8         now?

 9         A.    I think I lost you.

10              MR. JOHNSON:  It's not up on the

11         screen.

12              MR. MULLIGAN:  Yeah.  We're good

13         now.  Do you guys see that now?

14    BY MR. MULLIGAN:

15         Q.    So I'm looking at the indented

16    paragraph, okay?

17         A.    Go ahead and start.

18         Q.    It says, "The registrant shall

19    design and operate a system to disclose to the

20    registrant suspicious orders of controlled

21    substances."

22              Do you see that?

23         A.    Yes.

24         Q.    And so -- and that's -- the system
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that DDM designed is the one that we've talked

2    about today, right?

3            A.    Yes.

4            Q.    It says, "The registrant" -- which

5    is DDM -- "shall inform the Field Division

6    Office of the Administration in his area of

7    suspicious orders when discovered by the

8    registrant."

9               Do you see that?

10           A.    Yes.

11           Q.    And you'd agree that that means

12   that as soon as a suspicious order is

13   identified, it must be reported immediately,

14   right?

15              MR. JOHNSON:  Objection.

16           A.    Yes.

17           Q.    Okay.  It doesn't say within a

18   week, right?

19           A.    Right.

20           Q.    And it doesn't say within a month,

21   right?

22           A.    Right.

23           Q.    And it doesn't say after you've

24   done your due diligence, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    Correct.

2              Q.    It just says when it's identified,

3    right?

4              A.    Yes.

5              Q.    Okay.  "Suspicious orders include

6    orders of unusual size, orders deviating

7    substantially from a normal pattern, and orders

8    of unusual frequency."

9                    Do you see that?

10             A.    Yes.

11             Q.    So here the C.F.R. is actually

12   defining the word "suspicious order," isn't it?

13             A.    It says what it includes.  It's

14   not inclusive, but --

15             Q.    Right.  It's not -- it's not an

16   exhaustive list --

17             A.    Right.

18             Q.    -- but it tells you what is a

19   suspicious order under the regulations, right?

20   And that would include an order of unusual size,

21   right?

22             A.    It includes orders of unusual

23   size.

24             Q.    Okay.  And would you agree that
```

1    any order that shows up on your 12-month report

2    or your monthly -- 12-month average report would

3    reflect orders of unusual size by definition?

4            A.    By definition, yes.

5            Q.    Okay.  And a suspicious order also

6    includes orders deviating substantially from a

7    normal pattern, correct?

8            A.    Yes.

9            Q.    And by definition, your report

10   would also include orders deviating

11   substantially from a normal pattern, right?

12           A.    Yes.

13           Q.    Okay.  And the last thing is

14   "orders of unusual frequency."

15                 Do you see that?

16           A.    Yes.

17           Q.    Okay.  So this definition of

18   suspicious order would seem to include anything

19   that would show up on your 12-month average

20   report, correct?

21           A.    Depends on what they're stating is

22   unusual size.

23           Q.    Well, I mean --

24           A.    I mean, if on our report we look

Highly Confidential - Subject to Further Confidentiality Review

```
 1   at it, and if we could answer the reason why,

 2   then, you know, we could justify the order.

 3           Q.    Okay.  But this -- the sentence

 4   above it says that you "shall inform the DEA of

 5   suspicious orders when discovered," right?  And

 6   it doesn't say after doing due diligence, does

 7   it?

 8                 MR. JOHNSON:  Objection.

 9           Q.    So you're getting -- is that

10   right?

11           A.    It doesn't say when.

12           Q.    It says you have to -- well, it

13   says, "The registrant shall inform the Field

14   Division Office of the Administration in his

15   area of suspicious orders when discovered."

16           A.    Right.

17           Q.    Okay.  So you're saying that you

18   didn't discover a suspicious order when you

19   looked at the report; it was only after you did

20   due diligence?

21           A.    Correct.

22           Q.    Okay.  But you don't see that

23   leeway in this text here, do you?

24           A.    I'm looking at it.  And when it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   says -- are you pointing specifically to orders

 2   of unusual size, that particular aspect of it?

 3   We never identified suspicious orders, so ...

 4          Q.    Did you ever have an order of

 5   unusual size?

 6          A.    Yes.

 7          Q.    Okay.  Did you ever report those

 8   orders?

 9          A.    Not after we reviewed them, no.

10          Q.    The answer to that question is you

11   never reported them, right?

12          A.    We never reported a suspicious

13   order.

14          Q.    Okay.  So DDM had unusual --

15   orders of unusual size, right?

16          A.    In this definition, it doesn't say

17   what unusual size is.  Is unusual size 100

18   bottles in their definition or not?  I mean,

19   that's very -- you know, you can determine

20   however you want the number on that.  So ...

21          Q.    But DDM defined unusual size to

22   orders on its own with its report that you

23   reviewed, didn't it?

24          A.    We looked at higher than normal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders.

 2            Q.    Okay.  That's -- is that

 3    substantially different than an unusually sized

 4    order?

 5            A.    That's an interpretation.

 6            Q.    I mean, if a pharmacy is ordering

 7    ten bottles a month over 12 months and then they

 8    order twenty, that's unusual isn't it?

 9            A.    Can be.

10            Q.    That's the whole point of the

11    rolling average, right?

12            A.    Can be.

13            Q.    Okay.  So DDM defined what an

14    order of unusual size was through its report,

15    right?  And that was a report that you guys

16    designed to identify suspicious orders, right?

17            A.    Could be.

18            Q.    Okay.  Well, did it or not?

19            A.    Again, I -- you know, according to

20    this, that was our -- our report listed anything

21    over 99 percent.  I don't know what this unusual

22    size means.  Does it determine -- why didn't

23    they tell me in the -- in this, why didn't they

24    say -- give me a percentage and something
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   concrete to work with.
 2           Q.    All right.  Sir, I'm asking you
 3   very specific questions and I'm happy to talk
 4   about this paragraph for the rest of the day if
 5   you want.  But if you can listen to my questions
 6   and answer them, we'll be able to get through my
 7   remaining stack of documents a lot faster.
 8                 Okay.  So I --
 9                 MR. JOHNSON:  Objection.
10           Q.    Would you agree with me that the
11   DEA is saying that a suspicious order is one
12   that includes orders of unusual size.  Would you
13   agree with that?
14           A.    That's what it says.
15           Q.    Okay.  And would you agree that
16   your rolling 12-month report showed orders of
17   unusual size by definition?
18           A.    I can't agree to that.
19           Q.    You don't agree?  So they were
20   normal?  There was nothing abnormal about those
21   orders?
22           A.    No.  They were -- they could have
23   been larger than normal, but what's unusual --
24   it's not unusual to me once I find out the
```

1    reasoning.

2           Q.    Okay.  So therein lies what we

3    talked about earlier, which is DDM's suspicious

4    order monitoring policies turned on your

5    subjective belief about what was unusual and

6    what wasn't; is that fair?

7           A.    Possibly.

8           Q.    DDM didn't define unusual --

9    orders of unusual size?

10          A.    Well, they did when they said

11   99 percent.

12          Q.    Exactly.  So anything that showed

13   up on that report was an order of unusual size,

14   right?

15          A.    In DDM's mind but not necessarily

16   in the DEA's mind.

17          Q.    Okay.  But in DDM's mind, DDM had

18   orders of unusual size, correct?

19          A.    Yes.

20          Q.    Okay.  And this says a suspicious

21   order is one that is an order of unusual size,

22   correct?

23          A.    In -- in --

24          Q.    Right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    That's what it says.

 2              Q.    Okay.  And DDM had orders of

 3    unusual size and you knew about them when you

 4    saw them, right?

 5                    We're almost there.

 6              A.    It was only unusual if we didn't

 7    have an answer for it.

 8              Q.    Okay.  I'll go around this

 9    merry-go-round with you all day.

10                    All right.  You've agreed with me

11    that DDM had orders of unusual size and they

12    showed up on your 12-month rolling report,

13    right?

14              A.    Yes.

15              Q.    Okay.  And you saw those, right?

16              A.    Mm-hmm.

17              Q.    And you didn't report them, right?

18              A.    Right.

19              Q.    Okay.  What would have been the

20    harm in reporting those orders?

21              A.    Well, in our opinion, that --

22    there's no sense of calling the DEA in when

23    there was no necessary need to.

24              Q.    But that would have been the safe
```

1    route to go, wouldn't it?

2          A.    I don't think -- would DEA have

3    all the manpower to do all that?

4          Q.    That's not your problem, though --

5          A.    I mean I don't know.

6          Q.    -- is it?

7          A.    No, but there's no sense of

8    instigating a situation when you didn't have to.

9          Q.    But if you were going to be extra

10   safe, if you were going to dot all your Is and

11   cross all your Ts, wouldn't it have been easy to

12   just submit the orders that showed up on that

13   report to the DEA and just --

14         A.    Easy for me, but why should I make

15   it easy for me.  You know, I -- my job is to

16   determine whether or not that order is

17   legitimate or not, okay?  And so I'm taking the

18   stance that I'm going to do the legwork and not

19   throw it at the DEA without even looking at it.

20   That, to me, doesn't do service to the DEA.

21         Q.    Sir, as a pharmacist, you were not

22   given the subjective ability to decide what was

23   suspicious or not under the regulations,

24   wouldn't you agree?

```
 1                   MR. JOHNSON:  Objection.

 2           A.    Yes.

 3           Q.    Okay.  So this is a pretty hard

 4   and fast requirement to identify and report

 5   suspicious orders, isn't it?

 6                   MR. JOHNSON:  Objection.

 7           A.    It doesn't specify specifics.

 8           Q.    Okay.  We've been down that road,

 9   so I'm not going to go down that road again.

10                   But it would have been easy for

11   you to just take your report that you got every

12   month and just send it on to the DEA, right?

13           A.    I could have, but I don't think

14   that would be -- it would be unverifiable

15   numbers.

16           Q.    Okay.  But you didn't do that,

17   right?

18           A.    No.

19           Q.    Okay.  The next paragraph says,

20   "It bears emphasis that the foregoing reporting

21   requirement is in addition to, and not in lieu

22   of, the general requirement under 21 U.S.C.

23   823(e) that a distributor maintain effective

24   controls against diversion."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Right?

 2          A.    Mm-hmm.

 3          Q.    As we talked about before, there

 4   was nothing that DDM did to prevent diversion in

 5   advance; it only identified it after the fact,

 6   correct?

 7                    MR. JOHNSON:  Objection.

 8          A.    We did things prior to with the

 9   rolling six-week average.

10          Q.    Okay.  But that would have been

11   Jill's province, right?

12          A.    Well, not necessarily just Jill.

13   If she would have -- if she reviewed it, but she

14   could have brought it further up to someone else

15   if she had any questions.

16          Q.    Okay.  You didn't oversee your

17   own -- any controls that prevented against

18   diversion in advance, right?

19          A.    No.

20          Q.    Okay.  And so if we were going

21   to -- the only controls that could have

22   prevented against diversion would be under Jill,

23   and we would need to talk to Jill about that,

24   right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Okay.  All right.  The next

 3   sentence or the next paragraph says, "In

 4   addition to reporting all suspicious orders, a

 5   distributor has a statutory responsibility to

 6   exercise due diligence to avoid filling

 7   suspicious orders that might be diverted into

 8   other than legitimate medical, scientific, and

 9   industrial channels."

10                Do you see that?

11          A.    Yes.

12          Q.    And that was discharged through

13   whatever Jill did with that six-week report,

14   right?  Is that your understanding?

15          A.    Part of it.

16          Q.    Is that your understanding?

17          A.    That's part of what --

18          Q.    What else did it do?

19          A.    As far as -- are you talking about

20   Jill's order?

21          Q.    I just want to know what DDM did

22   to discharge its statutory responsibility to

23   avoid filling suspicious orders that might be

24   diverted.  That's in advance.
```

```
 1              A.    In this particular case, they're

 2    referring to illegitimate prescriptions.  It

 3    states "illegitimate medical, scientific, and

 4    industrial channels."  We knew our customers at

 5    that point.  So we knew that the channels were

 6    regulated.  And we're relying on our pharmacists

 7    to fill legitimate prescriptions.

 8              Q.    Okay.  Well, in fairness, I

 9    appreciate that.  That's not what it says.  It

10    actually says, "A distributor has a statutory

11    responsibility to exercise due diligence to

12    avoid filling suspicious orders that might be

13    diverted."

14              Do you see that?

15              A.    Yes.

16              Q.    So that's not talking about the

17    stores.  That's talking about the DDM warehouse

18    distribution facility, right?

19              A.    Correct.

20              Q.    Okay.  What did DDM do to

21    discharge that responsibility at the

22    distribution level?

23              A.    We -- we reviewed our 12-week

24    orders and followed up on suspicious -- possible
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious orders sent out to the stores.  And

2    they reviewed them and answered back our

3    questionnaires.

4             Q.    So who's "we"?

5             A.    Pharmacy operations.

6             Q.    And who's that?

7             A.    Myself or Pete.

8             Q.    Okay.  So you reviewed a 12-week

9    report?  What's that?

10            A.    The 12 -- I'm sorry.  The 12-month

11   report.

12            Q.    Okay.  So you reviewed the

13   12-month rolling report.  And -- so that's what

14   we already talked about, right?

15            A.    Yes.

16            Q.    Okay.  But that didn't help DDM

17   avoid filling suspicious orders, did it?

18            A.    That is what our pharmacists are

19   licensed to do, the filling suspicious orders,

20   and then we would also have our supervisors go

21   in and review prescriptions that they might --

22   to make sure that they -- you know, we're not

23   going into diversion.

24                  I also sent e-mails and
```

Highly Confidential - Subject to Further Confidentiality Review

1    notifications to our stores about not filling

2    legitimate prescriptions.

3            Q.    Okay.  And so you're saying

4    prescriptions, you're talking about pharmacists

5    again.  But we're talking about the distributor

6    and orders.

7            A.    Okay.

8            Q.    Orders are things that are placed

9    by the store to the distribution center,

10   correct?

11           A.    Yes.

12           Q.    Okay.  So other than looking at

13   your 12-month rolling report, DDM didn't do

14   anything else --

15           A.    No.

16           Q.    -- to avoid filling suspicious

17   orders, right?

18           A.    Correct.

19           Q.    Okay.  And had you had your report

20   populate when the order was placed, as we talked

21   about hypothetically before, you actually would

22   have complied with that obligation, wouldn't

23   you?

24           A.    Possibly.

1          Q.     What do you mean by "possibly"?

2          A.     Your point is that prospectively

3    we should have been stopping orders, and we were

4    doing it after the fact, right?

5          Q.     Mm-hmm.

6          A.     So in this instance, you're saying

7    they have -- we have -- the distributor has a

8    statutory responsibility to avoid filling

9    suspicious orders.  We felt that we were

10   accomplishing our goal by doing that by looking

11   at our 12-month order and sending it to -- the

12   response to the stores.

13         Q.     But that wasn't narrowly tailored

14   to stop suspicious orders from being filled when

15   they happened, right?  It was after the fact?

16         A.     Right.

17         Q.     My question to you was, if that

18   report had been changed so that you would get it

19   when the order was placed, you actually could

20   have possibly put measures in place to avoid

21   filling suspicious orders, correct?

22         A.     I think that the system we did

23   have worked for us and --

24         Q.     That's not what I asked.  That's

Highly Confidential - Subject to Further Confidentiality Review

```
1    not an answer to the question I asked.

2                    And, again, we can be here all

3    day, but if you listen to the question I'm

4    asking you, I'm trying to ask you narrowly

5    tailored questions so that the answer is

6    relatively easy.  All right.  Let me start

7    again.

8                    My question is, if the 12-month

9    average report had been changed so you would get

10   it when the order pushing the store over the

11   limit was placed, you could have actually put

12   measures in place to avoid filling suspicious

13   orders in advance, right?

14        A.    What that would do would -- we

15   would do our due diligence after looking at that

16   report.  We would still do the same due

17   diligence.  So you're saying -- if you look at

18   what Cardinal or any other wholesaler was doing,

19   they did it prospectively, correct?

20        Q.    I don't know.

21        A.    But they also said, "Notify us if

22   there's any change in the way your orders were

23   needed.  In other words, if you had a clinic

24   move in or if there was a reason -- give us a
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    reason why we should change that number."

2              What we were doing was looking at

3    the number and then verifying the reason why the

4    order was placed.  So ...

5         Q.   My question's really specific,

6    okay?  And I -- that -- again, I don't think

7    you're answering my question.  I understand what

8    you're doing, but I -- if you read the sentence,

9    okay, let's just break it down.

10             "A distributor has a statutory

11   responsibility."  That means federal law

12   requires DDM to exercise due diligence, right?

13        A.   Mm-hmm.

14        Q.   To avoid filling, right?  That's

15   prospective, isn't it?

16        A.   Yes.

17        Q.   That means to identify a

18   suspicious order and to not fill it before it

19   leaves the distribution facility, correct?

20        A.   Yes.

21        Q.   Okay.  And I just want to be

22   clear.  The question I'm asking you is, if your

23   12-month rolling report, which was

24   retrospective, had been generated when that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   offending order was placed, you could have

 2   complied with that, right?

 3                   MR. JOHNSON:  Objection.

 4        A.    Yes.

 5        Q.    Okay.  But you didn't do that,

 6   right?

 7                   MR. JOHNSON:  Objection.

 8        Q.    Right?

 9                   MR. JOHNSON:  Objection.

10        A.    We didn't do that because there

11   was no need.

12        Q.    Well, I didn't ask you why you

13   didn't do it.  I just asked you whether you

14   did -- I asked you if you didn't do it.

15              You did not do that, right?

16        A.    Correct.

17        Q.    Okay.  Okay.  If you look at the

18   next paragraph.  It says, "In a similar vein,

19   given the requirement under section 823(e)" --

20   which we've been talking about -- "that a

21   distributor" -- which is DDM -- "maintain

22   effective controls against diversion, a

23   distributor may not simply rely on the fact that

24   the person placing the suspicious order is a DEA
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    registrant."

2              Do you see that?

3         A.    Yes.

4         Q.    So that's saying that in addition

5    to preventing suspicious orders from leaving the

6    facility, DDM can't just rely on the fact that

7    its pharmacists are ordering the drugs, right?

8         A.    That's what it states, yes.

9         Q.    Okay.  Are you familiar with that

10   under -- are you familiar with that requirement?

11        A.    I'm reading it.

12        Q.    So is this the first time you've

13   learned that DDM can't just rely on its

14   pharmacists?

15             MR. JOHNSON:  Objection.

16        A.    What it's stating is that they --

17   we have -- the distributor may not simply rely

18   on the fact that the person placing a suspicious

19   order is a DEA registrant.  What they're -- what

20   they're implying is that you should know your

21   customer, which, you know --

22        Q.    That --

23        A.    -- we're still within our closed

24   system.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    I'm not asking you what this is

 2     implying.  I'm asking you what it says.  And

 3     what it says is that DDM cannot rely on the fact

 4     that the person placing the suspicious order is

 5     one of its pharmacists.

 6                    MR. JOHNSON:  Objection.

 7              Q.    Right?

 8                    MR. JOHNSON:  That's not what it

 9              says.

10              Q.    Right.  Well, are your pharmacists

11     DEA registrants?  I'm filling in the blank.

12              A.    The pharmacies are.  Not the

13     pharmacists.

14              Q.    So the pharmacist isn't a DEA

15     registrant?

16              A.    Correct.

17              Q.    But the pharmacy is operated by

18     the pharmacists, right?

19              A.    Well, the pharmacy is really

20     operated by Discount Drug Mart.

21              Q.    Okay.  Which is run by its

22     employees, right?

23                    MR. JOHNSON:  Objection.

24              A.    No.  The pharmacies -- pharmacists
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    work for Discount Drug Mart.  Discount Drug Mart

 2    has to make sure that the DEA registrant is who

 3    they say they are.

 4          Q.    So who runs Store 33's pharmacy?

 5          A.    The pharmacist runs the pharmacy

 6    but the pharmacy --

 7          Q.    Okay.  That's all I've asked.  The

 8    pharmacist runs --

 9                MR. JOHNSON:  He gets to finish

10          his answer, doesn't he?

11                MR. MULLIGAN:  He does, but we're

12          going to -- we are -- I mean, we're

13          going to be out of here tomorrow, Tim,

14          at this rate.  So like --

15                MR. JOHNSON:  We'll see about

16          that, but ...

17                MR. MULLIGAN:  Okay.

18    BY MR. MULLIGAN:

19          Q.    The pharmacist runs the pharmacy,

20    right?

21          A.    And the pharmacy is run by the

22    corporation.

23          Q.    Okay.  Is the pharmacist

24    registered with the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    The pharmacist is not registered

 2   with the DEA.

 3              Q.    Okay.  So as a pharmacist, you

 4   have no DEA registration process you have to go

 5   through?

 6              A.    I don't have -- I've never had a

 7   DEA registration myself personally.

 8              Q.    Okay.  So --

 9              A.    The store does.

10              Q.    So the store is the DEA

11   registrant?

12              A.    Right.

13              Q.    Okay.  So DDM, distributor, can't

14   rely on the fact that the order is being placed

15   by a DDM store as a way of discharging its

16   obligations under the Controlled Substances Act,

17   correct?  That's what that says?

18              A.     It says it can -- it can't simply

19   rely on the fact that the person placing the

20   suspicious order is a DEA registrant.

21              Q.    Right.  So you can't rely on the

22   fact that you know your stores as the basis or

23   as a way of discharging your obligations under

24   the act, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. JOHNSON:  Objection.
 2         A.    It's different when the store --
 3   when the warehouse is submitting it to their own
 4   store.
 5         Q.    What does that mean?
 6         A.    That means that we're not simply
 7   relying on the person placing the order.  We
 8   know that the store has its license in place.
 9         Q.    So you're relying on the fact that
10   the order is being placed by your store, right?
11         A.    The person -- the store is
12   requesting those drugs sent under the auspices
13   of that DEA registration, and that DEA
14   registration is under the Discount Drug Mart
15   corporate entity.
16         Q.    And you're relying on the fact
17   that they're a DEA registrant when you're
18   shipping them orders, right?
19         A.    Yes.
20         Q.    All right.  If you go to the last
21   sentence of that paragraph, I'm just going to
22   read the second clause, it says, "The
23   distributor" -- which is DDM -- "should exercise
24   due care in confirming the legitimacy of all
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders prior to filling."

 2              Right?  And you guys didn't do

 3    that, did you?

 4              MR. JOHNSON:  Objection.

 5         A.   We knew the legitimacy of the

 6    orders.

 7         Q.   But you didn't do any due

 8    diligence.  You just assumed they were

 9    legitimate, didn't you?

10              MR. JOHNSON:  Objection.

11         A.   We did our due diligence, and we

12    knew that they were legitimate orders.

13         Q.   What due diligence did you do to

14    confirm that all orders were legitimate prior to

15    being filled?

16              MR. JOHNSON:  "You" being him or

17         DDM?

18              MR. MULLIGAN:  DDM.

19    BY MR. MULLIGAN:

20         Q.   That you know of.

21         A.   We knew that their DEA licenses

22    were in place.

23         Q.   Okay.  And to go back to the

24    sentence before, it says, "A distributor may not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    simply rely on the fact that the person placing

 2    the suspicious order is a DEA registrant."

 3              Right?

 4         A.    Right.

 5         Q.    So you can't rely on that.  That's

 6    all you did, right?

 7              MR. JOHNSON:  Objection.

 8         A.    Well, I wouldn't say that's all we

 9    did.

10         Q.    Tell me what you did.  What due

11    diligence did DDM do to confirm the legitimacy

12    of all orders prior to filling them, other than

13    relying on the fact that they were ordered by a

14    store that had a DEA registration?

15         A.    We knew our stores.  Because it

16    was in a closed system, they were our stores.

17    They were not shipping it to someone we had no

18    idea who they were.  So ...

19         Q.    So just knowing where your stores

20    are located and who works there is your due

21    diligence; is that right?

22         A.    We confirmed the legitimacy of the

23    orders to our best of our ability.

24         Q.    Okay.  And how did you do that?
```

```
 1              A.    Well, we knew --

 2              Q.    Prior to -- hold on.  Prior to

 3    them being filled?

 4              A.    Yes.  We knew who was ordering

 5    them.

 6              Q.    Okay.  So, again, it's just based

 7    on the fact that you know the people at the

 8    store and that they have a registration, right?

 9    That's all --

10              A.    They were our stores.

11              Q.    That's all that was done, right?

12              A.    Yes.

13              Q.    Okay.  All right.  Let's go to the

14    next page.  It says, "Circumstances that might

15    be indicative of diversion."

16                    Do you see that?

17              A.    Mm-hmm.

18              Q.    And then it says, "DEA

19    investigations revealed that certain pharmacies

20    engaged in dispensing controlled substances for

21    other than a legitimate medical purpose often

22    display one or more of the following

23    characteristics in their pattern of ordering."

24                    Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And there's four items listed

 3   there, right?

 4          A.    Mm-hmm.

 5          Q.    Are you familiar with these

 6   factors or characteristics of a pharmacy

 7   engaging in diversion?

 8          A.    Not specifically.

 9          Q.    Okay.  Have you ever seen these

10   before?

11          A.    Not that I recall.

12          Q.    Okay.  Do you think it would have

13   been important for you as the director of

14   pharmacy operations to be familiar with these

15   characteristics while you were operating DDM's

16   suspicious order monitoring policies?

17          A.    Yes, but I think it was reviewed

18   by our VP.

19          Q.    Okay.  So -- but you didn't know

20   about it, right?

21          A.    We knew -- we talked about

22   excessive quantities.  I mean, I'd have to

23   review all these in order to give you a specific

24   answer.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  Why don't you give

 2          him a chance to read them.

 3                    MR. MULLIGAN:  I'm just asking --

 4          A.    Are you going to highlight all of

 5    the --

 6    BY MR. MULLIGAN:

 7          Q.    Let me ask -- I'll just ask some

 8    targeted questions, and if you need to read more

 9    at that point then y'all -- you go ahead and do

10    that, okay?

11                    So the first one is "ordering

12    excessive quantities of a limited variety of

13    controlled substances," right?

14          A.    Yes.

15          Q.    So that would be a factor that the

16    DEA has identified as a red flag for a pharmacy

17    engaging in diversion, right?

18          A.    Yes.

19          Q.    Okay.  And there's obviously

20    others here.  If you look at the next paragraph,

21    it says, "A distributor seeking to determine

22    whether a suspicious order is indicative of

23    diversion of controlled substances to other than

24    legitimate medical channels may wish to inquire
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with the ordering pharmacy about the following."

 2              Do you see that?

 3        A.    Yes.

 4        Q.    Are you familiar with these ten

 5   issues?

 6        A.    I'd have to read them.

 7        Q.    Okay.  Why don't you go ahead and

 8   do that.

 9              MR. MULLIGAN:  Why don't we go off

10         the record while he reads that.

11              MR. JOHNSON:  You know, it's noon.

12              MR. MULLIGAN:  Okay.  I want --

13         I'm finishing -- I have, frankly, this

14         one and one more that I want to finish

15         before we take a lunch break.

16              THE VIDEOGRAPHER:  We're going off

17         the record at 12:03.

18              (Pause in proceedings.)

19              THE VIDEOGRAPHER:  We're back on

20         the record at 12:05.

21   BY MR. MULLIGAN:

22        Q.    All right.  So we just went off

23   the record quickly so you could read these

24   factors that we were looking at on Exhibit 3,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2          A.    Yes.

 3          Q.    Did you have a chance to review

 4    those?

 5          A.    Yes.

 6          Q.    Did you defer to the pharmacist to

 7    identify these types of issues within the actual

 8    pharmacy level?

 9          A.    Some of them, yes.

10          Q.    Were there any that you

11    specifically inquired with the ordering pharmacy

12    about regarding a suspicious order?

13          A.    We would send notices out to the

14    stores to notify practitioners that were out of

15    state or out of the area, so -- to make sure

16    that our pharmacies were complying.  We had no

17    Internet affiliation at that particular time,

18    nor we do today.

19          Q.    Did you ever inquire about what

20    percentage of the pharmacy's business does

21    dispensing controlled substances constitute?

22          A.    Not to my knowledge.

23          Q.    Okay.  What about 5, does the

24    pharmacy -- did you ever inquire whether the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacy filled prescriptions issued by

 2    practitioners based solely on an online

 3    questionnaire without a medical examination or

 4    bona fide doctor/patient relationship?

 5         A.    I didn't ask -- we didn't

 6    specifically ask that question.

 7         Q.    Okay.  What about 7, "Are one or

 8    more practitioners writing a disproportionate

 9    share of the prescriptions for controlled

10    substances being filled by the pharmacy?"

11         A.    That was identified by the State

12    Board of Pharmacy and we would rely on them to

13    notify us which practitioners in an area, that

14    they were under investigation.

15         Q.    All right.  We're done with 3.

16    I'm going to hand you Exhibit 4.

17              MR. MULLIGAN:  And then maybe what

18         we do is we take a lunch break after

19         this next exhibit --

20              MR. JOHNSON:  Sure.

21              MR. MULLIGAN:  -- if it's okay?

22              MR. JOHNSON:  Yeah.

23              MR. MULLIGAN:  I'm just trying to

24         keep things moving.  That's all.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. JOHNSON:  Sure.

 2                   - - -

 3          (DDM-Nameth Exhibit 4 marked.)

 4                   - - -

 5   BY MR. MULLIGAN:

 6          Q.    This next document is DDM68279.

 7   It's another letter.  This one is dated

 8   December 27, 2007.

 9              MR. JOHNSON:  I'm thrilled to see

10         it.

11              MR. MULLIGAN:  I figured you would

12         be.

13   BY MR. MULLIGAN:

14          Q.    And again, this one is -- if you

15   look at the first paragraph, it's sent to every

16   entity in the United States registered with the

17   DEA to manufacture and distribute controlled

18   substances, right?

19          A.    Yes.

20          Q.    So DDM would have been included in

21   this, correct?

22          A.    Yes.

23          Q.    All right.  And then the second

24   paragraph says, "In addition to, and not in lieu
```

```
 1    of, the general requirement under 21 U.S.C. 823,

 2    that manufacturers and distributors maintain

 3    effective controls against diversion, DEA

 4    regulations require all manufacturers and

 5    distributors to report suspicious orders of

 6    controlled substances."

 7              Do you see that?

 8         A.   Yes.

 9         Q.   And that's your understanding,

10    right?

11         A.   Yes.

12         Q.   Okay.  So you find a suspicious

13    order.  You've got to report it, right?

14         A.   Yes.

15         Q.   Okay.  If you go down to the third

16    paragraph, it says, "The regulation also

17    requires that the registrant inform the local

18    DEA Division Office of suspicious orders when

19    discovered by the registrant."

20              Right?

21         A.   Yes.

22         Q.   And we saw that on the last

23    letter, didn't we?

24         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  So they're reiterating all

2    these requirements in another letter to DDM,

3    correct?

4          A.    Yes.

5          Q.    All right.  And the next sentence

6    says, "Filing a monthly report of completed

7    transactions (e.g., excessive purchase report or

8    high unit purchases) does not meet the

9    regulatory requirement to report suspicious

10   orders."

11              Do you see that?

12         A.    Yes.

13         Q.    And so basically what that's

14   saying is, even if you had submitted your

15   12-month rolling average report, even that

16   wouldn't have met the statutory requirements to

17   report suspicious orders, correct?

18         A.    Well, we were not just doing a

19   monthly report.  We were doing a monthly report

20   based on something else.  If they were -- if we

21   were just only doing a monthly report, I -- is

22   that what they're referring to?  It looks like

23   it, but ...

24         Q.    My question -- I get what you're

Highly Confidential - Subject to Further Confidentiality Review

1    doing.  My question is very -- let me ask it

2    again because maybe I didn't ask it well.

3            So this says filing a monthly

4    report with the DEA, which includes high unit

5    purchases, which would be kind of like your

6    12-month rolling average report, right?

7            A.    Part of it.

8            Q.    Okay.  But this is saying that

9    even if you had submitted that report to the

10   DEA, that wouldn't be enough to meet the

11   regulatory requirement for reporting suspicious

12   orders, correct?

13           A.    But we were doing more than just

14   doing a monthly report.

15           Q.    The word "but" is not an answer to

16   a question.  All right.

17           A.    Well, I can't -- I can't say --

18   you can't agree to what they're saying, a

19   monthly report.  We were not -- we were doing

20   more than just a monthly report.  It was a

21   monthly report based on a yearly average.

22           Q.    And I didn't ask you any of that.

23   Okay?  I asked you -- having read this sentence,

24   which we've done now three times.  I asked you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    if this says that if you had taken your rolling

 2    12-month average report and sent that to the

 3    DEA, that even that wouldn't have been enough to

 4    discharge your reporting obligations, correct?

 5         A.    That's not correct, because that's

 6    specifically stating just a monthly report.

 7    That's what it says.

 8         Q.    Your answer doesn't make any

 9    sense, okay?

10               MR. JOHNSON:  Objection.

11         Q.    I'm asking you --

12               MR. JOHNSON:  It makes sense to

13         me.

14               MR. MULLIGAN:  Okay.  Well, I'm

15         sure it does, because it makes no sense

16         to anybody else.

17               MR. HOLLINGSWORTH:  Well, let's

18         watch the professional tone with these

19         questions.  All right?

20               MR. MULLIGAN:  Who are you?

21               MR. HOLLINGSWORTH:  Adam

22         Hollingsworth.

23               MR. MULLIGAN:  Okay.  Are you

24         defending the witness?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. HOLLINGSWORTH:  No.  But in

 2           this district, we all have an obligation

 3           to be professional at depositions.

 4                  MR. MULLIGAN:  Okay.  I'm being

 5           professional and I'm on a videotape.

 6           I'm just trying to get an answer to my

 7           questions.  That's all.  All right.

 8  BY MR. MULLIGAN:

 9           Q.   And -- okay.  Let's try this

10  again, all right?

11                  MR. MULLIGAN:  I don't appreciate

12           that, by the way.

13  BY MR. MULLIGAN:

14           Q.   Okay.  So this says -- I'm just

15  trying to extrapolate this to what you could

16  have done, okay?  You guys had a 12-month

17  rolling average report, right?

18           A.   Yes.

19           Q.   And you didn't submit that to the

20  DEA ever, right?

21           A.   Correct.

22           Q.   And this says that even if you had

23  that, it wouldn't have been enough to satisfy

24  your reporting obligations under the CSA,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2             A.    Yes.

 3             Q.    Okay.  And the next sentence says,

 4    "Registrants are reminded that their

 5    responsibility does not end merely with the

 6    filing of a suspicious order report."

 7                   Correct?

 8             A.    Mm-hmm.

 9             Q.    Do you agree with that?

10             A.    Yes.

11             Q.    Do you agree with that?

12             A.    Yes.

13             Q.    Okay.  And it says, "Registrants

14    must conduct an independent analysis of

15    suspicious orders prior to completing a sale to

16    determine whether the controlled substances are

17    likely to be diverted from legitimate channels."

18                   Do you see that?

19             A.    Yes.

20             Q.    And that's what we looked at

21    earlier, which is similar to the language

22    regarding avoiding filling in advance, right?

23             A.    Yes.

24             Q.    Okay.  And do you think that DDA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   did that -- DDM did that?

 2        A.    We did not do a -- stopping an

 3   order prior to sending it out, so prospectively,

 4   no.

 5        Q.    Okay.  And, again, down below, it

 6   says, "The regulation specifically states that

 7   suspicious orders include orders of an unusual

 8   size, orders deviating substantially from a

 9   normal pattern and orders of an unusual

10   frequency."

11             Right?

12        A.    That's right -- that's correct.

13        Q.    And we saw that before, didn't we?

14        A.    Yes.

15        Q.    Okay.  If you go down about

16   halfway through that paragraph, in the middle it

17   says, "The size of an order alone, whether or

18   not it deviates from a normal pattern, is enough

19   to trigger the registrant's responsibility to

20   report the order as suspicious."

21             Do you see that?

22        A.    Yes.

23        Q.    Okay.  So that's saying that if

24   you have an order that's large, that's enough to
```

```
 1    trigger your duty to report as suspicious,

 2    correct?

 3           A.    That's what it states.

 4           Q.    Okay.  Did DDM do that?

 5           A.    No.

 6           Q.    All right.  Second page.  At the

 7    top it says, "Registrants that rely on rigid

 8    formulas to define whether an order is

 9    suspicious may be failing to detect suspicious

10    orders."

11                 Do you see that?

12           A.    Yes.

13           Q.    Would you agree that your rolling

14    12-month average report was generated by a rigid

15    formula?

16           A.    It was a set formula, yes.

17           Q.    Okay.  And then it says, "For

18    example, a system that identifies orders as

19    suspicious only if the total amount of a

20    controlled substance ordered during one month

21    exceeds the amount ordered the previous month by

22    certain percentages or more is insufficient."

23                 Do you see that?

24           A.    I do, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.     Okay.  So this is saying that

2    DDM's system, which did exactly that, was

3    insufficient, correct?

4           A.     No.  Our system was not just

5    that -- based on that particular situation.

6           Q.     Let's say -- okay.  That's fair.

7    Let's say -- let's just take your report, your

8    rolling 12-month average report.  You'd agree

9    that this is saying that if that report was all

10   you did, that it would be insufficient, correct?

11          A.     It says that during one month.  I

12   mean, when you throw in the average of the

13   previous year, that's a little bit different

14   than what that states.

15          Q.     Correct.  This system, one that

16   identified an order that was just bigger than

17   the last month, would actually be more sensitive

18   than yours, wouldn't it?

19          A.     I don't see how.

20          Q.     Well, okay.  Let's just say --

21   let's just say we've got store 1 orders five

22   pills -- five bottles in December, right?  And

23   then you order six bottles in January.  That

24   would trigger a report like this, wouldn't it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    Does that mean -- is that

2    considered an excessive quantity?

3           Q.    I'm just --

4           A.    I don't think so.

5           Q.    Well, let's look at this sentence

6    a little more closely, okay.  It says, "A system

7    that identifies orders as suspicious only if the

8    total amount of a controlled substance ordered

9    during one month exceeds the amount ordered in

10   the previous month by a certain percentage."

11               Right?  It's saying that's

12   insufficient, correct?

13          A.    Yes.

14          Q.    Okay.  And are you telling me that

15   your report was different than this and was,

16   therefore, sufficient?

17          A.    Yes.

18          Q.    And tell me how.

19          A.    Because this, in my opinion,

20   states that you're only looking at month to

21   month to month.  That's it.  But when you throw

22   in looking at over the last year, okay, as an

23   average, then you can determine -- it's not --

24   doesn't meet this criteria.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Okay.

2          A.    You're adding another layer on to

3    that reporting -- to the monthly reporting

4    system that isn't mentioned in this -- in this

5    designated -- this definition.

6          Q.    So simply by including -- instead

7    of looking at the prior month, you're looking at

8    the average from the prior 12, you think that

9    that makes your report sufficient?

10         A.    I think so.

11         Q.    Okay.  And what about that

12   difference makes it sufficient?

13         A.    Because we're looking at a bigger

14   view than just one month, the previous month.

15   If you just look at the previous month -- we're

16   looking at the previous average year, not just

17   the previous month.

18         Q.    And what about that helps you

19   identify suspicious orders better than a system

20   like this?

21         A.    Because it's encompassing the

22   whole previous year rather than just the

23   previous month.

24         Q.    Okay.  Let's look at the next
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sentence.  It says, "This system fails to

 2    identify orders placed by a pharmacy if the

 3    pharmacy placed unusually large orders from the

 4    beginning of its relationship with the

 5    distributor."

 6                  Do you see that?

 7          A.    Yes.

 8          Q.    Your 12-month average report would

 9    also fail to identify pharmacies ordering

10    unusually large amounts if they had ordered them

11    from the beginning, correct?

12          A.    Well, they're referring to --

13    they're referring to just the monthly system.

14    It's referencing back to the previous sentence.

15          Q.    It's explaining why the system

16    described here is inadequate, right?

17          A.    Yes.

18          Q.    And it's saying it's inadequate

19    because if a pharmacy is already ordering too

20    much, it doesn't catch that, if they keep

21    ordering too much, right?

22          A.    Yes.

23          Q.    The same thing applies to your

24    report, right?  If a pharmacy is ordering 20
```

1    bottles every month, they should only be

2    ordering 10, it's not going to show up on your

3    report, is it?

4           A.    Say again.  If they're ordering 20

5    bottles every month --

6           Q.    So if you have a store in your

7    system that has an average of 20 bottles a month

8    for a year and that's more than they should be

9    getting and they continue to order 20, that's

10   not going to show up on your report, is it?

11          A.    You stated in your question if

12   it's more than what they should be getting.

13   What do you mean by that?

14          Q.    I'm not testifying today.  I'm the

15   only one who gets to ask questions.

16                MR. JOHNSON:  I think that was a

17          clarification of the question.

18          A.    Right.

19          Q.    Okay.  I've given you a specific

20   example, all right.  So there's a store in your

21   system that has an average of 20 bottles a month

22   for a year, okay?

23          A.    Okay.

24          Q.    And under whatever definition you

1    want, they're getting more than they should be

2    getting, okay?  Your report -- if they keep

3    ordering more than they're supposed to, your

4    report is not going to catch that, right?

5           A.    They'll catch it if they get it

6    over that percentage.

7           Q.    Right.  But if they stay -- if

8    they continue ordering on a level playing field

9    but there's some issue baked in there and

10   they're getting too much --

11          A.    The first time they order too

12   much, it would show up, right?

13          Q.    Well, yes, there's got to be a

14   year zero somewhere, right?  But if they're

15   starting at the beginning and they're ordering

16   too much, you're not going to catch it on your

17   report, correct?

18          A.    Correct.

19          Q.    Okay.  So your report has the same

20   flaw that this report has, right?

21                MR. JOHNSON:  Objection.

22          A.    But in this situation, they're

23   talking about a monthly report.  Our report was

24   different than just a monthly report.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    I know.  And that wasn't an answer

 2    to my question.  No question -- no answer starts

 3    with "but," okay?  If you want to add a but

 4    after and clarify it, then I'm okay with that,

 5    but my question to you is very specific.

 6                    Your report has the same flaw that

 7    the report in this example does, right?

 8              A.    No, it does not.

 9              Q.    Explain to me why not.

10              A.    Because in this example, they're

11    going off of a strictly -- only a one-month

12    report.  They're just looking at the previous

13    one month, okay?  In our system, we're looking

14    at a rolling 12-month average.  There's a

15    difference.

16              Q.    And what's the difference?

17              A.    The difference is you're looking

18    at more than just the previous month.

19              Q.    Why is that -- why does that

20    matter?

21              A.    It gives you a longer history.

22              Q.    Why does that matter?

23              A.    Because it -- it matters when

24    you're trying to determine what's a legitimate
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    order and what's not.  You're looking at a

2    longer history.

3            Q.    Okay.  This letter is describing

4    the type of monitoring that's insufficient under

5    the CSA, right?

6            A.    Yes.

7            Q.    Okay.  And it's saying that a

8    report that's generated when an order history

9    one month exceeds a prior month by a certain

10   percentage, it's saying that's not good enough,

11   right?

12           A.    That's what it says.

13           Q.    Okay.  And the reason that's not

14   good enough is because if the pharmacy is

15   already ordering too much, it doesn't catch

16   that, right?

17           A.    In this case, they're saying that

18   you're only looking at month to month.

19           Q.    That's not an answer to my

20   question.  I'm asking you a very specific

21   question.

22                 The problem with a report like

23   that is if the pharmacy is already ordering too

24   much and they continue to order too much, it
```

```
 1    doesn't catch that, right?

 2           A.    Right.

 3           Q.    Okay.  The same is true for yours,

 4    if over the course of a year they're ordering

 5    too much, and they keep ordering too much, your

 6    report doesn't catch that either, does it?

 7           A.    It would catch it if it hit that

 8    99 percent.

 9           Q.    Okay.  But otherwise it would not,

10    right?

11           A.    Right.

12           Q.    Okay.

13           MR. MULLIGAN:  Everybody hungry?

14           MR. JOHNSON:  I think this is a

15    good time if you're done with that

16    document.

17           MR. MULLIGAN:  Yeah.  That's good.

18           THE VIDEOGRAPHER:  We're going off

19    the record at 12:23.

20                 - - -

21           Thereupon, at 12:23 p.m. a lunch

22           recess was taken until 1:09 p.m.

23                 - - -

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          Monday Afternoon Session

                            January 7, 2019

 2                          1:09 p.m.

 3                          - - -

 4              THE VIDEOGRAPHER:  We're back on

 5         the record at 1:09.

 6    BY MR. MULLIGAN:

 7         Q.    All right.  Mr. Nameth, we're back

 8    after a brief lunch break.

 9              Did you get to eat?

10         A.    Yes, I did.  Thanks.

11         Q.    Okay.  Great.

12              We were talking about your

13    12-month report.  And I'm curious -- I know the

14    percentage that would trigger something to show

15    up and that was 99 percent, right?

16         A.    Right.

17         Q.    In excess of whatever the average

18    was?

19         A.    Right.

20         Q.    What was the -- what was the unit

21    that was being subjected to that threshold, if

22    you will?

23         A.    Bottles you mean versus tablets?

24         Q.    Yeah.  Which --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Bottles.

 2            Q.     It was bottles.  Okay.  So would

 3     it be a bottle of a specific size or just

 4     bottles in general?

 5            A.     I think it was a specific size.

 6            Q.     Okay.  And so what were there --

 7     let's say for hydrocodone, were there varying

 8     sizes of bottles you could get?

 9            A.     Depending on the strength, yes.

10            Q.     And so what would be a -- do you

11     know what the different options were for bottles

12     of hydrocodone?

13            A.     100s or 500s.

14            Q.     So that would be a 100-tablet

15     bottle or a 500-tablet bottle?

16            A.     Yes.  But, you know, it depends on

17     when you're -- what period of time you're

18     looking at, too, because after a while, it

19     didn't seem rational to carry 100-size.  If

20     you're ordering four bottles, you know, you

21     might as well just order one 5-.

22            Q.     Okay.  Were the 100-bottle

23     strengths different than the 500-bottle

24     strengths?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     In what way?  What do you mean?

 2          Q.     Well, you said it depends on the

 3   strength, I think, earlier.

 4          A.     There could be -- there was an

 5   instance where we had the same drug, the same

 6   strength in 100s and 500s.

 7          Q.     You could get whatever strength

 8   you wanted in either the 100- or 500-tab bottle?

 9          A.     You can get a particular strength

10   in either size.  And in this one instance -- you

11   know, I think there was one, possibly two drugs

12   that we had different sizes of.

13          Q.     Okay.  So let's say -- well,

14   strike that.

15                 If a store shifted from 100-tablet

16   count bottle to a 500-tablet count bottle, how,

17   if at all, would that be reflected in your

18   12-month report?

19          A.     I think they went to a family of

20   drugs.

21          Q.     Okay.

22          A.     So they went -- you know, it was a

23   different -- it might be on a different page by

24   NDC number.  So you could tell whether it was --
```

```
 1   what size it was.  In other words, it wasn't --

 2   it didn't come out in 5,000 tablets.  It came

 3   out as 500s or 100s.

 4         Q.    Okay.  And so let's just say, for

 5   example, a store is ordering one bottle of 500

 6   tablets, that's their monthly average, and then

 7   they switch and they order five bottles of 100

 8   tablets, would that show up on your greater than

 9   99 percent average 12-month report?

10         A.    It would if they were only

11   ordering one bottle of the 100s previously.

12         Q.    Well, I know.  My hypothetical was

13   they were ordering one bottle of 500s.

14         A.    But then you said you were going

15   to switch to 100s.

16         Q.    To five bottles of 100s.  So the

17   tablets are the same, but now instead of one

18   bottle, we've got five.  Would that show up on

19   your report?

20         A.    Yes.

21         Q.    Okay.  And why is that?

22         A.    Because I think previously they

23   were getting one bottle of 100.  Now they're

24   getting five bottles of 100.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So the report would say

 2    their average is one bottle for the last year

 3    and this month they ordered five bottles, you've

 4    got to look into it?

 5              A.    We have to -- yes, that would be a

 6    case where I knew that we had different sizes

 7    and before they would -- they switched sizes.

 8    They switched size bottles.

 9              Q.    Okay.  Conversely, if a pharmacy

10    was ordering, let's say, two bottles of 100

11    tablets and that was their average for the last

12    12 months, okay?  Is that fair example to start?

13              A.    Yes.

14              Q.    All right.  And then they switched

15    the next month and they -- instead of getting

16    two bottles of 100 tablets, they get two bottles

17    of 500 tablets, would that show up on your

18    12-month average rolling report?

19              A.    Yes, because previously they

20    didn't order any of the 500s.  Now they're

21    ordering two.  So their history was different.

22              Q.    Okay.  So it would say -- it would

23    say your previous 12-month on a 500-tablet

24    bottle is zero and now you've ordered two?
```

```
 1              A.     Correct.

 2              Q.     And that's greater than

 3  99 percent?

 4              A.     Correct.

 5              Q.     So it wouldn't be based on the

 6  tablet numbers, it would be based on the

 7  bottle's size?

 8              A.     Yes.

 9              Q.     Okay.  Was there any other unit

10  that was tracked by that report that would cause

11  it to generate other than bottle size?

12              A.     Not to my knowledge.  It's been a

13  while since I looked at that report.

14              Q.     Okay.  After those two letters

15  that we looked at from the DEA, do you believe

16  that DDM complied with every obligation

17  underneath the Controlled Substances Act?

18              A.     I do.  I still think that our

19  system, our SOMS system, looked at -- it wasn't

20  just the 12-month rolling average.  It was --

21  you know, that was part and parcel of the plan,

22  the program.

23              Q.     Okay.

24              A.     We did have a prospective in
```

```
 1    regards to the six-week average if Jill was

 2    looking at that, but that was still part of the

 3    program.  It wasn't something that I look at,

 4    but it was still something that was looked at by

 5    humans, by people, a set of eyeballs on it.

 6    So -- and if she had any questions about it, she

 7    would either contact the stores or contact me

 8    or -- you know.

 9            Q.    Just to be clear, I don't want to

10    know what Jill did because obviously Jill did

11    that, so --

12            A.    All right.

13            Q.    Yeah.  But just after looking at

14    those two letters and all the things we

15    discussed, it's still your position that DDM

16    complied with the obligations that it had under

17    the Controlled Substances Act?

18            A.    I believe so.

19            Q.    Okay.  All right.  And just so

20    that we're clear, I want to just confirm, DDM's

21    suspicious order monitoring policies and

22    procedures were never put in writing, correct?

23            A.    Correct.

24            Q.    Okay.  And those policies and
```

Highly Confidential - Subject to Further Confidentiality Review

 1   procedures were not effective at deterring or

 2   preventing completely theft of hydrocodone from

 3   stores, correct?

 4            MR. JOHNSON:  Objection.

 5       A.    I think that -- you're talking

 6   about distribution level versus store level

 7   here, right?

 8       Q.    I'm just asking you whether DDM's

 9   suspicious order monitoring policies were

10   effective at preventing --

11       A.    Yes.

12       Q.    -- theft.

13       A.    Yes.

14       Q.    Okay.  But you agreed with me

15   earlier today that there were several instances

16   where controlled substances were stolen from a

17   DDM pharmacy, right?

18       A.    But -- yes, but the system

19   caught -- the systems in place caught whatever

20   was missing based on our monthly reports, based

21   on the rolling reports, based on everything that

22   we reported.

23       Q.    Right.  They caught it after the

24   fact, but they didn't prevent it, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    On -- in a theft situation, we

 2    caught it after the fact.

 3            Q.    And DDM has never reported a

 4    single suspicious order to the DEA or the Ohio

 5    State Board, right?

 6            A.    Correct.

 7            Q.    And DDM has never identified or

 8    reported a single possible suspicious order

 9    either, correct?

10            A.    Correct.

11            Q.    Okay.  All right.  Let's look at

12    Exhibit -- I think we're on 5.

13                 MR. JOHNSON:  4 maybe.

14                 MR. MULLIGAN:  The last letter was

15            4.

16                 MR. JOHNSON:  You're right.  I'm

17            sorry.

18                         - - -

19            (DDM-Nameth Exhibit 5 marked.)

20                         - - -

21    BY MR. MULLIGAN:

22            Q.    Okay.  So this is an e-mail with

23    an attachment.  The e-mail is DDM53874, and the

24    attached document is DDM53912.  And I'll just
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    tell you, this is an e-mail from after you

2    retired.  But I mostly just want to know if you

3    know what this attachment is.  It's the -- the

4    attachment is -- the title says "Shipments

5    Greater Than 99 percent of Average Movement."

6    And then it says "Controlled Drugs."

7                    And the e-mail says, "Attached is

8    our suspicious monitoring report for the last 12

9    months."

10                   Does that look like -- is this the

11   report that you would have reviewed -- I mean,

12   obviously the date is different but ...

13           A.    I didn't see it in this form.

14           Q.    Okay.

15           A.    But, you know.

16           Q.    This contains the information that

17   you would have reviewed on your -- on the report

18   that you got?

19           A.    Yes.

20           Q.    Okay.  That's all I've got for

21   that one.

22                   Let's do Exhibit 6.

23                   Actually, no.  Let's skip that

24         one.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2          (DDM-Nameth Exhibit 6 marked.)

 3                    - - -

 4   BY MR. MULLIGAN:

 5          Q.    This is DDM11545.  And this is a

 6   letter from Pete Ratycz to the U.S. Department

 7   of Justice dated November 13, 2001.

 8                Do you see that?

 9          A.    Yes.

10          Q.    Okay.

11                MR. JOHNSON:  Can you give him a

12          second to look at it?

13          Q.    I mean, if you need time to read

14   it, feel free, but I'm just going to ask you

15   some questions about it.  We're going to walk

16   through it.

17                It says, "Dear Sirs:  Please be

18   advised on November 6, 2001 a pharmacy

19   technician, Darlene Cottle, was apprehended

20   selling controlled substances to an undercover

21   officer outside our pharmacy located at -- in

22   Bellbrook, Ohio."

23                Do you see that?

24          A.    Mm-hmm, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Do you recall that instance?

 2              A.    Vaguely.

 3              Q.    Okay.  Do you know who Darlene

 4    Cottle is?

 5              A.    I believe she is a pharmacy tech.

 6              Q.    Okay.  Could you pick her out of a

 7    lineup?

 8              A.    No.

 9              Q.    Okay.  And so if you go down

10    further, it's talking about the drugs she had on

11    her.  And it says, "However, a complete audit of

12    the suspected drugs indicate significant

13    shortage."

14                    Do you see that?

15              A.    Yes.

16              Q.    Okay.  And so this would indicate

17    that this store -- and I'm not sure what the

18    store number was, but they had a significant

19    shortage of their drugs, which was identified

20    after this pharmacy tech was caught selling

21    controlled substances to an undercover officer

22    just outside the pharmacy, right?

23              A.    Yes.

24              Q.    Okay.  Is that concerning to you?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes.

2          Q.    And why is that?

3          A.    Well, several reasons.  One is

4    that you're getting controlled substances out

5    into the public and the use of unprescribed

6    medication.  Two is the employee.  You never

7    want to see one of your own employees stealing.

8    So, you know, for those two reasons

9    specifically.

10         Q.    Do you know -- well, if you look

11   down at the bottom, it says that the audit --

12   the drug audit was started on August 31, 2001.

13             Do you see that at the bottom?

14         A.    Yes.

15         Q.    But then the letter to the DEA is

16   dated November 13, 2001.

17             Do you see that?

18         A.    Yes.

19         Q.    Do you know why this issue

20   wouldn't have been reported to the DEA earlier

21   than -- it looks like it's about a month and a

22   half later -- actually, two and a half months

23   later?

24         A.    Because they probably did a drug

Highly Confidential - Subject to Further Confidentiality Review

```
 1    audit.  The store did their drug audit on

 2    August 31st.  And so they use that as a starting

 3    point.  And then count the number of medications

 4    that were delivered under that particular --

 5    those particular drugs they're looking for or

 6    that were confiscated.  So they have to go back

 7    to a starting point.

 8            Q.    If you were going to do an audit

 9    to see if there was a shortage of drugs, how

10    long would that take?

11            A.    From beginning to end?

12            Q.    Yeah.

13            A.    It depends on the quantity, but

14    you'd have to probably -- it may take several

15    days.  It may take -- it may take a week.

16                  MR. JOHNSON:  I'm going to have to

17            object.  I don't know if you just read

18            it wrong or maybe I'm reading it wrong.

19            It says that the theft took place on

20            November 6th, and the letter is dated

21            November 13th.  So it would have only

22            been a week?

23                  MR. MULLIGAN:  Is that an

24            objection?
```

```
 1              MR. JOHNSON:  Yes.

 2              MR. MULLIGAN:  Okay.  Is it a form

 3       objection?

 4              MR. JOHNSON:  Yes.

 5              MR. MULLIGAN:  Is it a form

 6       objection?

 7              MR. JOHNSON:  Yes.

 8              MR. MULLIGAN:  Okay.  Well, I was

 9       asking about August 31st, which is at

10       the bottom of the letter.

11              MR. JOHNSON:  I know you were

12       but -- okay.  Well, they wouldn't have

13       known about the theft until --

14              MR. MULLIGAN:  But that's

15       testimony, Tim.

16              MR. JOHNSON:  Okay.  So it's not a

17       mistake.  I just thought you were making

18       a mistake.

19              MR. MULLIGAN:  No.  No.  Thank

20       you, though.  All right.

21  BY MR. MULLIGAN:

22       Q.    Okay.  So if an audit took a

23  couple days, and you started on August 31st, do

24  you have any understanding why this report
```

 1   wouldn't have been made to the FDA -- I'm sorry,

 2   the DEA on November 13th, 2011?

 3            And your counsel may have

 4   suggested the answer to you.

 5        A.   Well, what this states is that the

 6   theft was confirmed on the basis of the findings

 7   of the drug -- the drug audit -- we do a drug

 8   audit every -- at the end of every month.  And

 9   that was on August 31st.

10        Q.   Okay.

11        A.   So when there was a theft

12   encountered, we had to go back to the 31st to

13   start our drug count to see what we got in stock

14   after that date -- what we had on stock as of

15   the 31st, what we sent them after the 31st to

16   the date of the theft.  Then go run a report on

17   all the scripts that were filled during that

18   period of time, and come up with a number to the

19   State Board of what we're dealing with.

20        Q.   Okay.  And in fairness to Tim, I

21   think I understand what his point is, is that

22   this letter is not exactly clear as to the

23   time -- the stages in which it's unfolded,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Right.

 2            Q.     Okay.  Would it be likely that

 3     there would be something suspicious that's

 4     happening there or is there -- there's just a

 5     monthly audit?

 6            A.     Yes.

 7            Q.     Okay.  Regardless of whether

 8     there's suspicions?

 9            A.     Correct.

10            Q.     Okay.  And so would it likely be

11     that there was an audit done, and August 31 is

12     when it started, and through that audit they

13     identified a shortage?

14            A.     They wouldn't have identified the

15     shortage on August 31st.

16            Q.     Okay.  But within a couple days?

17            A.     They would have identified the

18     shortage on the next month.  They would have

19     known that there was a shortage.

20            Q.     Okay.  So it would have taken a

21     whole month to figure out whether there was a

22     shortage?

23            A.     In this case, could have, yes.

24            Q.     Okay.  And then I'm guessing what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    happened is -- and tell me if I'm wrong, and

 2    this could be completely wrong.  I just -- and I

 3    only want to know what you remember.  So if you

 4    don't remember, then that's fine, too.

 5              You identify a shortage.  Then I'm

 6    assuming you've got to figure out why that's

 7    happening, right?

 8         A.   Correct.

 9         Q.   And that may be where this

10    undercover officer comes in?  Was there ever a

11    time where you guys worked with the police to

12    try and identify who was diverting your pills in

13    your store?

14         A.   We do.  But in this particular

15    case, I can't answer whether or not somebody was

16    aware of it at that time --

17         Q.   Okay.

18         A.   -- or not.  I just couldn't tell

19    you.

20         Q.   Okay.  So you're not sure whether

21    the undercover officer was someone who was

22    working with DDM or whether they just happened

23    to go to the store?

24         A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1             Q.    Okay.  But you would agree this is

 2    an example of diversion occurring within DDM's

 3    system, correct?

 4             A.    Yes.

 5             Q.    Okay.  And, in fact, it's by a

 6    pharmacy technician who was within the pharmacy

 7    operation department, right?

 8             A.    It takes place at store level,

 9    right.

10             Q.    Right, but it's a pharmacy

11    employee, right?

12             A.    It's -- yes.

13                         - - -

14        (DDM-Nameth Exhibit 7 marked.)

15                         - - -

16             Q.    Okay.  Let's go to the next

17    exhibit, which is Exhibit 7.  This is DDM358736.

18    This is an e-mail from you to Michelle Twardzik.

19             A.    Twardzik.

20             Q.    Yeah, Twardzik, dated May 14,

21    2005.

22                   Do you see that?

23             A.    Yes.

24             Q.    Okay.  And this says, "Here are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the total" -- well, it says, "Theft at store

 2    number 41" and the subject.

 3                    Do you see that?

 4          A.    Yes, I do.

 5          Q.    And it says, "Here are the total

 6    missing tablets I came up with."

 7                    Do you see?

 8          A.    Mm-hmm, yes.

 9          Q.    And it says Vicodin ES is short

10    657 tablets; Vicodin HP, short 100; Vicodin,

11    short 488."

12                    Is that next one hydrocodone?

13          A.    Yes, it is.

14          Q.    Okay.  And that's short 1,468

15    tablets?

16          A.    Yes.

17          Q.    And the next one is hydrocodone,

18    which I think is a lower strength, right?

19          A.    Correct.

20          Q.    And that's short 389 tablets,

21    right?

22          A.    Right.

23          Q.    And then hydrocodone 7.5, which is

24    like a middle strength?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And that's short 1,051 tablets?

 3              A.    Yes.

 4              Q.    Okay.  Those seem like very large

 5    shortages.  Is that accurate?

 6              A.    I would say yes.

 7              Q.    Okay.  So this is a pretty

 8    substantial instance of diversion, would you

 9    agree?

10              A.    Yes.

11              Q.    Do you recall this instance?

12              A.    I recall it to the point that it

13    either could have been a robbery, that somebody

14    came in through the ceiling.  You know, they --

15    that's happened several times where they're

16    going to drill down through, and now we're going

17    to have to come up with a specific what was

18    missing.  So we have to, you know, run these

19    numbers and see what they got away with.

20              Q.    So as you sit here today, you

21    can't recall whether this was an employee theft

22    or an outside burglary?

23              A.    I don't recall.

24              Q.    Okay.  Do you recall any specific
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    instances where a store was burglared and a

 2    controlled substance was stolen?

 3         A.    Yes.  I mean, not too clearly, but

 4    I do remember we had burglaries.

 5         Q.    Okay.  Do you know how many there

 6    would have been in the time that you were the

 7    director of pharmacy operations?

 8              MR. JOHNSON:  Objection.

 9         A.    Six, seven.  I don't know.

10         Q.    Okay.  Would there be

11    documentation of those?

12         A.    Probably with the State Board and

13    the police department, I would guess.

14         Q.    Did DDM keep records of things

15    like that?

16         A.    Loss prevention may, but I don't

17    know how far back they go.

18         Q.    Okay.  Do you know how these

19    missing tablets would have been identified?

20         A.    Yes.  The same way as the other

21    report, you'd go back to a specific count.  Then

22    you would have to establish a beginning point.

23    Then you would have to establish how many pills

24    were sent to the pharmacy, how many scripts were
```

1   dispensed, and come up with a specific number.

2          Q.    And how long would that take?

3          A.    It might take half your day

4   sometimes.

5          Q.    Okay.  So I'll just represent I

6   just did the math.  If you add up all these

7   missing tablets, the total is 4,153 pills.

8                Does that look about right?

9          A.    Yes.

10          Q.    Okay.  And would these types of

11   drugs typically come in 100-bottle -- or

12   100-tablet bottles or 500-tablet bottles; do you

13   know?

14          A.    It's a mixture of both.

15          Q.    Okay.  So assuming they're all

16   500-tablet bottles, then that means there's over

17   eight bottles missing; would that be fair?

18          A.    Well, I know that there are some

19   on here.  The HP only came in 100s.

20          Q.    Okay.  But you agree, I mean, all

21   these missing tablet counts are larger than a

22   100-tab bottle, right?  Or the same sizes.

23          A.    Some are.  Not all of them.

24          Q.    Well, one is you're missing 100.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   So I would imagine that unless someone -- was it

 2   likely that someone would just take a whole

 3   bottle off the shelf or was it more that they

 4   were, take a few here, take a few there so it

 5   wouldn't get noticed, in your experience?

 6           A.    In a case where you have a

 7   break-in, they would normally rake the shelf.

 8   In a pilferage they would probably, or most

 9   likely, take a few here, a few there.  It would

10   be more obvious if they made off with whole

11   bottles.

12           Q.    Okay.  So the pilferage would take

13   more time to accomplish?

14           A.    Yes.

15           Q.    But it would be more discrete as

16   well?

17           A.    Yes.

18           Q.    Okay.  And you'd agree this is

19   another example of diversion occurring at a DDM

20   store, correct?

21           A.    At store level?

22           Q.    Yeah.

23           A.    Yes.

24           Q.    But within the DDM system, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    And so at least as it relates to

 3    2001, the last item we looked at, and this one

 4    in 2005, you were aware that there was diversion

 5    taking place within the DDM system, correct?

 6            A.    Yes.

 7            Q.    Okay.  Let's look at Exhibit 8.

 8            Before we go to that one, did

 9    you -- do you know, did you ever catch anybody

10    on this one, if you recall?

11            A.    If it was a break-in, I can't

12    answer that question.  It would have been loss

13    prevention.

14            Q.    Okay.  So you just don't recall

15    whether it was an employee or a break-in?

16            A.    Well, we -- there isn't a case

17    that we never caught any of the employees,

18    because there would be -- there would be video

19    footage.  All pharmacies had video recordings.

20            Q.    Okay.

21            A.    So you could tell if there was

22    somebody obviously taking large quantities like

23    that.

24            Q.    Right.
```

```
 1          A.    That they would be caught on film.

 2          Q.    Okay.

 3          A.    So --

 4          Q.    Same basic question.  Why would

 5    they do it, right?

 6          A.    Can't answer that question.

 7                MR. JOHNSON:  That's a pretty big

 8          question to answer.

 9          Q.    Yeah.  I guess addiction is one

10    answer, right?

11          A.    That's -- yes.

12          Q.    Okay.  All right.  So if you -- if

13    we need to go back and figure out where these

14    went, we would just need to either, one, look at

15    a tape, if it still exists, or, two, look at any

16    records that may be associated with this theft?

17          A.    Through loss prevention possibly.

18          Q.    Okay.  Do you have any idea

19    whether DDM would still have possession of

20    either the tapes associated with this theft

21    specifically or any documentation of it?

22          A.    I have no idea.

23          Q.    Okay.  When you were there and a

24    theft was identified and you found the relevant
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   footage, would that be something that you would

 2   extract and keep somewhere?

 3         A.    Loss prevention would keep the

 4   footage.

 5         Q.    Okay.

 6         A.    If it was someone that they were

 7   prosecuting, they would keep the footage until

 8   afterwards, I would assume, and then after that,

 9   I'm not quite sure where it would go.

10         Q.    That's your smoking gun evidence,

11   right?

12         A.    Yes.

13         Q.    Who was in charge of loss

14   prevention at DDM when you were there?

15         A.    Bob Graf.

16         Q.    Okay.  Is that Buddy Graf?

17         A.    That's his father.

18         Q.    Okay.  I've seen Buddy on a lot of

19   e-mails.  What was his role?

20         A.    Buddy took over -- took over for

21   Bob, and they were within the same role.

22         Q.    Okay.

23         A.    Buddy had a little bit more

24   expanded responsibilities than Bob.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Do you know when Buddy took over

2    for Bob?

3          A.    I don't recall.

4          Q.    Okay.  Do you recall doing

5    anything or putting any policies and procedures

6    in place to avoid this kind of issue as it was

7    cropping up?

8                MR. JOHNSON:  Objection.

9          A.    Other than putting cameras --

10   making sure cameras were in our stores, no.

11         Q.    Okay.  But like that 12-month

12   report, the camera is only going to help you

13   identify the person after the fact, right?

14         A.    Correct.

15                     - - -

16        (DDM-Nameth Exhibit 8 marked.)

17                     - - -

18         Q.    Okay.  All right.  Let's go to 8.

19   DDM355119.  So if you look at the bottom, this

20   is an e-mail dated April 3, 2007 from Holly

21   Turner.

22                Do you know who she is?

23         A.    She is one of the pharmacists.

24         Q.    Okay.  Would she have been a chief
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   pharmacist?

 2          A.    It depends on the time frame.  At

 3   this particular time, I'm not sure.

 4          Q.    Okay.  It says, "Pete, here are

 5   the pill counts you wanted."

 6                And then it lists some pill counts

 7   for Vicodin, correct?

 8          A.    Correct.

 9          Q.    All right.  And if you go above --

10   well, strike that.

11                Do you know why Pete would have

12   been asking for pill counts from Holly?

13          A.    Yes.  They could have had another

14   loss.  Whether it was pilferage by a pharmacy

15   tech or a break-in, at this particular point, I

16   couldn't tell you.

17          Q.    Okay.  If you go to the top, Pete,

18   it looks like, forwards the counts to Lisa

19   Biancardi, Laura Taylor, and Jill Strang and

20   copies you.

21                Do you see that?

22          A.    Mm-hmm, yes.

23          Q.    And he says, "When it rains it

24   pours.  Now DDM 32."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Do you know what he's talking

 2    about there?

 3                  MR. JOHNSON:  Objection.

 4          A.    It would only be an assumption on

 5    my part, so I -- you know, I can't answer that

 6    specifically.

 7          Q.    Okay.  What do you think he's

 8    referring to?

 9          A.    There could have been two

10    incidences, you know, within a certain time

11    period.

12          Q.    Or more than two?

13          A.    Not necessarily.

14          Q.    But you don't know, right?

15          A.    I have no idea.

16          Q.    Okay.  I mean, "pouring" sounds

17    like a problem that would include more than two

18    instances.

19          A.    Nobody likes to see any.

20          Q.    Exactly.  Okay.  And then it says,

21    "At least it's not a two-year span," exclamation

22    point, exclamation point, exclamation point.

23                  Do you know what -- what's he

24    referring to there?  Do you recall any issue
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    over a two-year span?

 2            A.   No.  Again, I would have to guess,

 3    and I don't want to do that.  It's not really

 4    from me.  It's from Pete.  Is he talking about a

 5    two-year span that he has to look back and count

 6    for two years?  I'm not sure.

 7            Q.   Okay.  But you'd agree this is

 8    referring to another instance of diversion

 9    occurring within the DDM system, right?

10            A.   Well, it could be.  And, again,

11    I'm speculating, but it could be a situation

12    where if the counts were off -- there's a

13    reference in the very first sentence.  It says,

14    "#32 did not return any Vicodin or Vicodin ES to

15    Return Solutions."

16                 So they're trying to determine

17    whether or not the count is off because they

18    want to make sure there was nothing -- no Return

19    Solutions involved, but it doesn't look like

20    there was any.  So in that regard, I don't know

21    if it's -- it's probably in regards to a loss,

22    some type of loss.

23            Q.   Okay.  And that's the same as

24    diversion, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes, yes.

 2              Q.    Let's go to Exhibit 9.

 3                    - - -

 4          (DDM-Nameth Exhibit 9 marked.)

 5                    - - -

 6              Q.    This is DDM11543.  We're going to

 7      start about halfway down the first page.  This

 8      is an e-mail from Chuck Bontempo.

 9                    Do you know who he is?

10              A.    Yes, I do.

11              Q.    Who is he?

12              A.    He is the pharmacist in the

13      Lakewood store.

14              Q.    Do you know what number that is?

15              A.    Store number 5.

16              Q.    Okay.  Was he the chief

17      pharmacist?

18              A.    At that time probably.

19              Q.    Okay.  And this is dated

20      October 1, 2008, and the subject is "Missing

21      OxyContin 80-milligram," right?

22              A.    Correct.

23              Q.    And OxyContin is an opioid, right?

24              A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  It says, "Dear Pete, Lisa

 2    Biancardi told me to contact you if I had no

 3    luck.  Well, I had no luck.  I did a report on

 4    brand and generic.  We dispensed two

 5    prescriptions."  And it lists two prescriptions.

 6                  It says, "We started off the month

 7    with 210 tablets.  We dispensed 60 leaving 150

 8    on 9/10 of 2008.  We dispensed 90 leaving 60 on

 9    September 19th, 2008.  We received 100 on

10    September 22, 2008 leaving 160.  And today we

11    only have 60."

12                  Do you see that?

13            A.    Yes, I do.

14            Q.    And, again, it feels like we're in

15    a math class today, but if you do that math, it

16    looks like there's 100 missing OxyContin pills,

17    correct?

18            A.    Yes.  And initially looking at it,

19    there's another layer of probability here that I

20    don't see in this e-mail.  Go ahead.

21            Q.    I was just -- I haven't asked you

22    the next question yet.

23            A.    Okay.

24            Q.    But you would agree that this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    shows that there's 100 pills missing based on

 2    the facts we just read, correct?

 3         A.    Yes.

 4         Q.    Okay.  And then it says, "I ran a

 5    Drug Usage Report."

 6               What is that?  Is that just an

 7    inventory report?

 8         A.    It's a script -- script report

 9    based on that NDC, how many scripts went out.

10         Q.    Okay.  And that would show how

11    many pills went out as part of a prescription?

12         A.    Right.

13         Q.    Okay.  And it says, "As of now, I

14    am filling out the DEA 106 form."

15               Do you know what that is?

16         A.    Yes, standard form for theft or

17    loss reported to the DEA.

18         Q.    Okay.  And I imagine that DDM

19    filled those out for all these other

20    diversionary --

21         A.    Yes.

22         Q.    -- instances we looked at?

23         A.    Right.

24         Q.    And then the next page says, "I am
```

```
 1    not sure if I should report it as a loss or a

 2    theft."

 3               Do you see that?

 4         A.    Yes.

 5         Q.    Was that always kind of an issue?

 6         A.    Pardon me?

 7         Q.    Was it always hard to determine

 8    whether it was a loss or a theft or a one-two?

 9         A.    Normally not, but there are cases

10    where you have to really peel down the layers

11    and determine whether it was or was not.

12         Q.    Okay.  If you looked at the video

13    and it was someone who shouldn't be there, you

14    could figure it out pretty easily, right?

15         A.    Yes.

16         Q.    But the more difficult case might

17    be, there's a pharmacist back there and they

18    pushed two pills into their pocket as they're

19    separating them, right?

20         A.    Yeah.

21         Q.    Okay.  So the fact that this one

22    isn't obvious would suggest that it was probably

23    an inside job, right?

24         A.    Not necessarily.  And what I don't
```

```
 1    see in this e-mail -- and there's actually a

 2    reference in the previous Exhibit 8 where

 3    they're stating -- and this is one thing I would

 4    have asked for, which maybe it was later, but it

 5    says, did you -- about Return Solutions.  Did

 6    they have anything -- it's a full bottle.  If

 7    something went outdated, it would go out of your

 8    inventory to Return Solutions.

 9              If he didn't look at that, then

10    that's part and parcel of where the things are.

11    So that's part of what he should be looking at

12    other than looking at script counts.

13         Q.    So what you're saying is we don't

14    have enough information in this e-mail to

15    determine whether this was just a counting error

16    or whether someone inside took these pills?

17         A.    Yes.

18         Q.    Okay.  Would there be a file

19    somewhere which would document the outcome of

20    the investigation associated with this?

21         A.    Not to my knowledge, unless there

22    was -- there was possibly -- no, I don't think

23    so.

24         Q.    Did you keep files associated with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    missing drugs at DDM?

 2           A.    I did not.

 3           Q.    Who did?

 4           A.    I'm not sure.

 5           Q.    Okay.  So you can't identify

 6    anybody, as you sit here today, who would

 7    monitor or investigate these situations and keep

 8    files?

 9           A.    Loss prevention.

10           Q.    So that would be Buddy Graf?

11           A.    Yes.

12           Q.    Okay.  Or Bob?

13           A.    Depends on the time of year.

14           Q.    Gotcha.  He's a Florida guy, too?

15           MR. JOHNSON:  He's dead.

16           A.    Yeah.  He was a Florida guy.

17                        - - -

18           (DDM-Nameth Exhibit 10 marked.)

19                        - - -

20           Q.    All right.  We're going to look at

21    Exhibit 10 now.  This is DDM3408.  This is an

22    e-mail from Greg Steinkerchner to Pete Ratycz

23    and Buddy Graf, and you're copied on that.  And

24    it's dated November 11, 2010.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2          A.    Yes.

 3          Q.    And the subject says "Update on

 4    33."

 5                    Right?

 6          A.    Yes.

 7          Q.    Who's Gregory Steinkerchner?

 8          A.    He is -- he was a store

 9    supervisor -- or a regional supervisor.  He was

10    also a chief pharmacist, but I think in this

11    context -- I'd have to probably read the e-mail

12    a little bit deeper, but --

13          Q.    Okay.

14          A.     -- he most likely, at this point,

15    was a supervisor.

16          Q.    Okay.  We'll get there.  All

17    right.  So this says, "Pete, Buddy.  Andy and I

18    worked last night at 33" -- which is Store 33

19    probably, right?

20          A.    Yes.

21          Q.     -- "to get a handle on any

22    problems at 33.  We did a complete C-II count

23    and found no missing meds but three possible

24    filing errors from Eric's shift on the 9th."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     Do you see that?

 2          A.    Yes.

 3          Q.    Do you know who Eric is?

 4          A.    I do not.  Probably a tech.

 5          Q.    Okay.  "Andy is contacting the

 6   patients involved and being PC about the

 7   problems."

 8                     Do you see that?

 9          A.    Yes.

10          Q.    Then it says, "We also did a count

11   on all the likely Benzos (Xanax, Valium, Ativan,

12   et cetera) because one of Eric's text message to

13   one of the techs Tuesday night, he said he was

14   back taking meds and talked about benzos."

15                     Do you see that?

16          A.    Yes.

17          Q.    And benzos are part of that

18   trilogy that's plagued -- or led to the opioid

19   epidemic, correct?  It's part of the trilogy?

20          A.    Part of the problem.

21          Q.    Okay.  Does this refresh your

22   recollection as to who Eric is yet?

23          A.    I believe Eric was a tech.

24          Q.    Okay.  "He" -- which is still
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    talking about Eric -- "does not have an Rx for

 2    any drugs in that class on his file."

 3              Do you see?

 4         A.   Yes.

 5         Q.   "The bad news of the situation is

 6    that the numbers of most -- for most of the

 7    drugs in the benzo class are short."

 8              Right?

 9         A.   Correct.

10         Q.   "The ones on the fast movers shelf

11    all were short."

12              Right?

13         A.   Correct.

14         Q.   What is the "fast movers shelf"?

15         A.   Most of the drugs are in

16    alphabetical order with the exception of drugs

17    that are dispensed frequently, and that's

18    usually in front of the pharmacist.

19         Q.   More highly prescribed drugs are

20    put in a place that's more convenient to access?

21         A.   Correct.

22         Q.   And would that include

23    hydrocodone?

24         A.   That depended on the pharmacy.
```

```
 1    Some pharmacists liked to intermingle it with

 2    the rest of their drugs.  Some pharmacists had

 3    it in front of them.  So it could be depending

 4    upon the store.

 5            Q.    Was hydrocodone a fast mover?

 6            A.    Specific strength.

 7            Q.    Which one would be?

 8            A.    Possibly 5/500.

 9            Q.    All right.  If you skip the next

10    sentence, it says, "In the next few days, we are

11    going to have to put the State Board on notice

12    and sort this out."

13            Do you see that?

14            A.    Yes.

15            Q.    Do you know why they wouldn't have

16    put the State Board on notice immediately?

17            A.    I assume they wanted to come up

18    with -- to be sure that this was a theft before

19    they called the board.

20            Q.    Okay.  So they wanted to

21    investigate it first?

22            A.    Yeah, before they involved someone

23    else.

24            Q.    Okay.
```

```
 1              A.    They wanted to look at -- I mean,
 2    obviously they don't want to wait too long
 3    but ...
 4              Q.    Do you know, do the reporting
 5    obligations permit you to wait until after an
 6    internal investigation is done for reporting?
 7              A.    An internal memo?  No.
 8              Q.    Correct.
 9              A.    No.  We have no --
10              Q.    Well, my question is, do you know
11    whether the reporting obligations, either under
12    Ohio State law or federal law, permit DDM to do
13    an internal investigation into a potential theft
14    before it reports that?
15              A.    I'm not aware of that.
16              Q.    Okay.  So you don't know whether
17    they needed to report it immediately upon being
18    suspicious or whether they could report it after
19    doing a full investigation?
20              MR. JOHNSON:  Objection.
21              A.    Once there is a loss determined,
22    you would have to determine whether or not it
23    was a theft or not, and then you could report
24    it.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  But to ask my question

2    again, you don't know whether DDM was required

3    to report a possible loss upon learning of it or

4    whether it could wait until after it did a full

5    investigation?

6          A.    I don't think that the word

7    "possible" was -- is the focal point here.  So

8    if you have a possible loss -- if you have a

9    known loss, then you have to report it.

10         Q.    Immediately or after an

11   investigation?

12         A.    You should report it as soon as

13   you know it's a loss.

14         Q.    Okay.  And this e-mail would

15   suggest that there's -- that you know there's a

16   loss, right, because it says, "The numbers for

17   most of the drugs in the benzo class are short,"

18   right, third paragraph?

19         A.    Yes.  Were they also looking

20   towards other avenues of why they were short or

21   were there other instances of why?  I didn't

22   read the whole thing, though.

23         Q.    Well, that would be an

24   investigation, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Okay.  And so my question to you

3  is, now -- as of the date of this e-mail, we

4  know there's a loss.  We know there's stuff

5  missing.  Does the reporting need to happen

6  right then or can DDM take some time to look

7  into it and then report?  Do you know?

8      A.    It should be reported as soon as

9  you determine there's a loss.

10      Q.    Okay.  So when it says, "In the

11  next few days, we are going to have to put the

12  State Board on notice," that's probably not fast

13  enough, right?

14           MR. JOHNSON:  Objection.

15      A.    It says "we should," right?  Where

16  is that sentence?

17      Q.    It's the third paragraph, fourth

18  sentence on the right.  If you look at the

19  screen, that might help you.

20      A.    Oh, okay.

21           MR. JOHNSON:  Yeah.  It's easier

22      on the screen.  It's the last --

23      A.    In the next few days -- okay.

24      Q.    So this is saying, we know there's

Highly Confidential - Subject to Further Confidentiality Review

1    a loss and we're going to have report it in the

2    next couple of days, right?

3            A.    Correct.

4            Q.    Okay.  Is that sufficient, based

5    on your understanding of DDM's reporting

6    obligations, to wait a couple days?

7            A.    Generally once we investigate and

8    know there's a loss, we should notify the board

9    as soon as possible.

10           Q.    Okay.  All right.  The next

11   sentence says, "I've been talking with Eric's

12   sponsor in the PRO program and they have been

13   screen" -- I'm assuming that's a type --

14   "screening Eric for a larger drug panel."

15           Do you see that?

16           A.    Yes.

17           Q.    What's the PRO program?

18           A.    I believe it was a program that

19   someone that had a drug problem is enrolled in.

20           Q.    Would it be the Pharmacists

21   Rehabilitation Organization?  Is that familiar?

22           A.    Yes.

23           Q.    Okay.  And are you surprised to

24   learn that a DDM employee was in a program that

Highly Confidential - Subject to Further Confidentiality Review

1   was trying to rehabilitate him for a drug

2   addiction?

3           A.    It's not the norm.  I'm a little

4   bit surprised.  The specifics -- and now that I

5   read this a little bit deeper -- because Eric --

6   because of the mention of the PRO program, Eric

7   is the other pharmacist, I believe.

8           Q.    Okay.  So Eric was a pharmacist at

9   Store 33?

10          A.    I believe so.

11          Q.    Is Eric still at Store 33?

12          A.    No.

13          Q.    Do you know, was Eric terminated

14  from Store 33 around this time?

15          A.    I can't answer that, but I

16  assume -- I have to assume he was.  We -- just

17  because someone is in a PRO program doesn't

18  necessarily mean we're going to fire them.

19  We're going to give them a chance to get clean.

20                So -- and that's the reason why

21  you said, "Am I surprised?"  I'm surprised, but

22  it's not unheard of.  It's not the norm.  It's

23  rare to speak of, but yes.

24          Q.    If I told you that the PRO program

Highly Confidential - Subject to Further Confidentiality Review

```
1    website says that at some point in their career,

2    10 to 15 percent of pharmacists struggle with

3    drug or alcohol addiction, would that be

4    surprising to you?

5              MR. JOHNSON:  Objection.

6         A.    It would be a little bit

7    surprising that number is that high.

8         Q.    Okay.  Do you know whether DDM

9    ever had any other pharmacists that were dealing

10   with drug addictions when you were there?

11        A.    I know of one.

12        Q.    Okay.  Who was that?

13        A.    I don't recall his name, to tell

14   you the truth.

15        Q.    Do you know which store he was at?

16        A.    I don't even remember that, to

17   tell you the truth.  I -- you know, if you give

18   me three names in front of me, I would pick them

19   out --

20        Q.    Okay.

21        A.    -- but coming off the top of my

22   head, no.

23        Q.    If you had a -- if a pharmacist

24   was part of the PRO program, was that something
```

1    that they would have to inform DDM about?

2          A.    Yes.

3          Q.    Okay.  And would DDM communicate

4    with the PRO program to ensure that its

5    pharmacists were meeting all the requirements of

6    that program?

7          A.    And it was -- yes, because it was

8    my understanding that you have to go through a

9    routine urinalysis when you're on PRO.

10          Q.    Is that --

11          A.    I think so, yes.  So ...

12          Q.    Who was the person at DDM who

13    interacted with PRO to ensure that the

14    pharmacists at DDM who were in that program were

15    complying with their obligations?

16          A.    I did not do that, so I'm not

17    aware of that.  If that was Pete's

18    responsibility or not or Buddy Graf's, I'm not

19    sure.

20          Q.    As somebody who was charged with

21    reviewing store ordering habits for suspicious

22    orders, do you think it would have been helpful

23    to know whether the pharmacists placing those

24    orders had a drug addiction problem?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I think it would come out in

 2   the -- you know, our SOMS program, but it could

 3   have been helpful.

 4          Q.    It would have been helpful to have

 5   that information when you were looking at a

 6   particular store?

 7          A.    It's always -- the more

 8   information you have, the better off you are.

 9          Q.    Okay.  All right.  If you look at

10   the next sentence, it says, "If he, Eric, has

11   fallen off the wagon, it has to be just in the

12   last week or so."

13                Do you see that?

14          A.    Yes.

15          Q.    And then the next sentence says,

16   "Andy did talk to his mother last evening while

17   I was there, and she said he was admitted to the

18   hospital."

19                Do you see that?

20          A.    Yes.

21          Q.    Okay.  So it sounds like he's

22   having a pretty rough time, right?

23          A.    Yes.

24          Q.    "Andy told her that his shifts are
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    covered until Monday and not to worry.  Just get

2    in touch when he can and we will go from there."

3                Do you see that?

4         A.    Yes.

5         Q.    Do you have any idea what the

6    outcome of that situation was?

7         A.    I believe he never returned to our

8    store, so -- he was under medical care at that

9    point.

10        Q.    Okay.  Do you know whether this

11   instance was reported to the DEA?

12        A.    I don't know.

13        Q.    You would have expected --

14        A.    On 106, probably.

15        Q.    You would expect it to be

16   reported, right?

17        A.    Yes.

18                MR. MULLIGAN:  Before you go to

19            that one, we'll just wait a second.

20   BY MR. MULLIGAN:

21        Q.    So obviously we looked at a number

22   of documents here that reflect DDM pharmacy

23   employees were stealing drugs, fair?

24        A.    We've seen a couple of them.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  And I'll represent to you

2    that I didn't bring them all, but I brought

3    some.  And we've also seen a document now that

4    shows that at least one individual was -- had a

5    drug addiction, correct?

6        A.    Yes.

7        Q.    Okay.  Did -- was there ever any

8    discussions within DDM to try and stem these

9    sort of diversionary issues, that you recall?

10       A.    Other than what was in place

11   currently, no.

12       Q.    Okay.  Did you ever consider drug

13   testing employees in the pharmacies?

14       A.    It had been talked about and not

15   implemented.  But at a later date, it has been

16   implemented.

17       Q.    Do you know when that was

18   implemented?

19       A.    I'm going to guess around 2013,

20   2014, something like that.

21       Q.    Was it right around the time you

22   left or before?

23       A.    It was before I left.

24       Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    So ...

 2            Q.    All right.  Let's look at

 3    Exhibit 11, which is DDM 13519.

 4                     - - -

 5            (DDM-Nameth Exhibit 11 marked.)

 6                     - - -

 7    BY MR. MULLIGAN:

 8            Q.    This is an e-mail chain from

 9    September of 2013.  I'm just going to direct you

10    to the back page.  We're going to kind of work

11    our way backwards.  If you want, you can look at

12    the screen.

13                Okay.  So if you look at that

14    bottom e-mail, it says from Doug Boodjeh to Pete

15    Ratycz, Don Boodjeh, John Gans, and Buddy Graf.

16                Do you see that?

17            A.    Yes.

18            Q.    And the subject is "Stolen Drugs,"

19    right?

20            A.    Yes.

21            Q.    It says, "Two techs in one week,

22    both new hires, and two different stores, 19 and

23    35."

24                Do you see?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    It says, "Were caught stealing

 3      drugs.  It scares me to think how many others

 4      are doing it and were not catching."

 5                    Do you see that?

 6              A.    Yes.

 7              Q.    Okay.  Do you know -- are you

 8      confident at this time that you guys were

 9      catching anyone who was stealing drugs?

10              A.    Was I confident that we were

11      catching everyone?

12              Q.    Yeah.

13              A.    No, I don't think we were catching

14      every possible one, but we would, after the

15      fact, due to our counts.

16              Q.    Okay.  Would it be common for

17      Mr. Boodjeh and his brother and Mr. Gans to be

18      involved in a discussion about diversion at the

19      store level?

20              A.    Only in the fact that they

21      probably sat on the board together.

22              Q.    Okay.  Did you ever attend a board

23      meeting?

24              A.    I did not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    So then Mr. Boodjeh says, "Should

 2   we consider drug screening all techs and

 3   pharmacists."

 4                 Do you see that?

 5           A.    Yes.

 6           Q.    Okay.  And was that the first time

 7   something like that had been discussed that you

 8   know of, around that time frame?

 9           A.    I don't know because I was not on

10   the board.  And in this case, he was talking to

11   the board.

12           Q.    Okay.  Do you ever recall just a

13   conversation at DDM generally about the need to

14   have drug testing for pharmacy employees prior

15   to September of 2013?

16           A.    Not that I recall.

17           Q.    Okay.  And you'd agree that based

18   on that first document we looked at, which

19   identified a tech selling drugs outside the

20   store, that this e-mail was actually about

21   12 years later, right?

22           A.    It was.

23           Q.    Is there any reason why DDM

24   couldn't have instituted a drug testing program
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for its pharmacy employees prior to September of

 2    2013?

 3         A.   No.

 4         Q.   If you go up to the very top of

 5    that last page, it's a response from Mr. Ratycz.

 6    And he said, "One can make that point based on

 7    recent events.  I agree.  There's probably more

 8    we are not catching."

 9              Do you see that?

10         A.   Yes.

11         Q.   Do you recall having other issues

12    regarding diversion in 2013?

13         A.   Not offhand.

14         Q.   Okay.  If you go back a page,

15    Mr. Boodjeh responds and says, "So can we do all

16    pharmacy personnel?"

17              Do you see that?

18         A.   Yes.

19         Q.   Okay.  And then Pete responds and

20    says, "I am fine with it."

21              Then he's talking about how to do

22    it.  And then it says, "Tom Nameth said two

23    potential new hires walked away once they

24    learned of the urine screening."
```

```
 1                    Do you see that?
 2          A.    Yes.
 3          Q.    Do you recall that happening?
 4          A.    Not specifically.
 5          Q.    Okay.  But it sounds like if these
 6     two people walked away upon learning that they
 7     were going to have urine screening, you might
 8     have just avoided hiring two addicts, right?
 9                    MR. JOHNSON:  Objection.
10          A.    Correct.
11          Q.    Do you recall any other instance
12     where individuals who were informed of drug
13     screening decided not to go through with
14     applying for the job?
15          A.    No, I do not.
16          Q.    Okay.  If you go down, second to
17     last line, it says, "Ironically the guy at DDM
18     35 was a relatively new hire."
19                    Do you see that?
20          A.    Yes.
21          Q.    Do you know why that would to be
22     ironic?
23          A.    They're talking in relationship to
24     the drug screening.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Why would it be ironic that he was

2    new?

3          A.    From that statement, I would have

4    to assume that he was caught either stealing

5    drugs or was using drugs.

6          Q.    Okay.  But you're not sure, right?

7          A.    No.  At that point, I'm not sure

8    whether they were referring to what drugs,

9    whether it was -- it didn't matter which drugs.

10   It was marijuana or controlled drugs, what have

11   you.

12         Q.    Did it concern you that two

13   potential hires walked away when they learned

14   about urine screening?

15         A.    It was a concern at that time, I'm

16   sure, as it would be to me today, so ...

17         Q.    Okay.  So if you go up another

18   e-mail.  This is from Buddy Graf to Pete.  The

19   second paragraph, it says, "As it turns out,

20   both of the two techs involved in the most

21   recent incidents would have been identified and

22   avoided by the drug screening.  The one at 35

23   has a nasty heroin addiction.  He was trading

24   what he stole from us for heroin as well as for
```

1    the money to buy the heroin.  And the one at 19

2    told John Glinski that she ingests every bit of

3    Vicodin that she can get her hands on.  Both of

4    these people's habits would show up in their

5    drug screening."

6                    Do you see that?

7           A.    Yes.

8           Q.    Is it really concerning to find

9    out that -- about these drug habits from DDM

10   pharmacy employees?

11          A.    It's concerning.

12          Q.    Did it cause you to question the

13   amount of trust that you put in your DDM people

14   to prevent and avoid diversion?

15          A.    Well, the trust that I have was

16   with pharmacists.

17          Q.    Okay.  So not with the techs?

18          A.    And the techs, I really did not

19   get down to that granular level to know them.

20          Q.    Okay.

21          A.    So to answer your question, I

22   guess, it's concerning.

23          Q.    Okay.  You relied on the

24   pharmacists to know the techs; is that fair?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Correct.

 2              Q.    Okay.  But we also did look at a

 3      document earlier where you actually had a

 4      pharmacist who was an addict, right?

 5              A.    Yes.

 6              Q.    Okay.  And that wasn't something

 7      that you knew about?

 8              A.    I did not.

 9              Q.    Okay.  Did that cause -- would

10      that cause you to be concerned about the

11      effectiveness of your suspicious order

12      monitoring policy, and particularly the part

13      where you put your trust in your pharmacists to

14      ensure that diversion is not occurring?

15              A.    I think that we would have caught

16      anybody that was diverting drugs in that habit,

17      so the system in place could have -- obviously

18      these people are all getting caught one way or

19      another.  So the system is -- something in the

20      system is working, but it's still concerning

21      that you can be proactive.

22              Q.    Well, we only know about the ones

23      that got caught, right?

24              A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1             Q.    So we don't know if you caught

 2   everybody --

 3             A.    Correct.

 4             Q.    -- or if you only caught

 5   10 percent, right?

 6             A.    Correct.

 7             Q.    Okay.  And, of course, the system

 8   even with the people who it did catch, it caught

 9   them after the diversion, right?

10             A.    Yes.  They were still employed, so

11   we were able to ...

12             Q.    My point is, it didn't prevent the

13   diversion?

14             A.    Yes.

15             Q.    Okay.  All right.  If you go up

16   another page, the sentence -- 522 at the bottom.

17   This is Pete responding.  He says, "I would

18   propose doing a full sweep and then just testing

19   a percentage thereafter.  Who knows what we have

20   in our pharmacies."

21                   Do you see that?

22             A.    Yes.

23             Q.    Okay.  We spent a lot of time

24   today talking about Know Your Customer, didn't
```

Highly Confidential - Subject to Further Confidentiality Review

1  we?

2          A.     In reference to pharmacists, yes.

3          Q.     Right.  But this is the vice

4  president of pharmacy saying, "Who knows what we

5  have in our pharmacies" in response to the

6  identification of two pharmacy techs who had

7  significant addiction problems, right?

8          A.     Yes.

9          Q.     Okay.  So it doesn't sound like

10  you guys know what's in your pharmacies, do you?

11          A.     Below the level of pharmacists.

12          Q.     Are you qualifying that?

13          A.     Yeah, I -- yes.

14          Q.     Okay.  But, again, we just looked

15  at a document that showed that there was a

16  pharmacist who had an addiction problem and you

17  didn't know about that, right?

18          A.     Correct.

19          Q.     Okay.  So if you trusted him to

20  prevent diversion, and he was engaged in

21  diversion, then your system failed, right?

22          MR. JOHNSON:  Objection.

23          A.     The system caught it after the

24  fact.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  But it failed to prevent

 2    diversion, right?

 3          A.    In the cases where you mentioned

 4    small theft, no.  In the cases where -- it

 5    didn't prevent it when you're talking about

 6    theft in small quantities.

 7          Q.    Okay.

 8          A.    It would prevent it if you're

 9    talking about diverting large quantities of

10    drugs.  When you're talking about ordering a

11    larger quantity than normal, that would come out

12    in various -- for various reasons, whether it

13    was proactive on Jill's report or post active on

14    our report.  And then doing the monthly studies,

15    you would come up with a number of missing

16    tablets.

17                And so what you're talking about

18    is two things going on here.  One is at store

19    level and one is on the warehouse level, right?

20          Q.    I don't have a question.  I think

21    you've answered my question.

22          A.    Okay.

23          Q.    Okay.  You'd agree, though, that,

24    as this e-mail confirms, and as the other
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   documents show, that you guys didn't really

 2   fully know what was in your pharmacies, right,

 3   from an employee standpoint?

 4           A.    From a technician standpoint.

 5           Q.    And from a pharmacist standpoint?

 6           A.    Well, we knew 99.9 percent of

 7   them.

 8           Q.    Well, you had 74 stores, right?

 9           A.    Yeah.

10           Q.    And we just identified one

11   pharmacist that had a drug addiction, right?

12           A.    Correct.

13           Q.    Okay.  And I have more documents.

14   I haven't gotten to all of them yet, but I --

15   it's clear that you guys do not know what's in

16   your pharmacies, right?

17                 MR. JOHNSON:  Objection.

18           A.    I wouldn't say "clear."

19           Q.    You can't know everybody, right?

20           A.    Correct.

21           Q.    And presumably somebody who has a

22   drug addiction who's a pharmacist is going to do

23   their best to cover that up, right?

24           A.    Obviously he didn't do a very good
```

1  job.

2          Q.    Okay.  Had you tested the

3  individual, done a drug screen on that Eric

4  pharmacist we talked about, you probably would

5  have caught that, right?

6          A.    Well, you're assuming that he's --

7  he was addicted before we hired him.  He could

8  have been -- after he was hired, he could have

9  started using then.

10          Q.    That's fair.  But --

11          A.    So you wouldn't have caught him at

12  the hiring process.

13          Q.    -- assuming that you did drug

14  tests while he was using drugs, you would have

15  caught that, right?

16          A.    But the drug tests were after --

17  after the initial sweep, the drug tests were

18  random.  So ...

19          Q.    I didn't ask if they were random.

20  I asked if while he was using drugs, you tested

21  pharmacy employees you would have caught him,

22  right?

23          A.    If he was using at the time we

24  tested.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Okay.  Okay.  So that sentence

 2     ends, it says, "Well, who knows what we have in

 3     our pharmacies.  Once we get the bad ones out,

 4     then we would only need to know about the ones

 5     that became addicted after successfully passing

 6     a urine test."

 7                   Right?

 8            A.     Okay.  There we go.

 9            Q.     So the idea behind a screening

10     process would be to find out about your

11     employees and figure out who the bad ones were,

12     right?

13            A.     Correct.

14            Q.     Because you didn't have enough

15     information about whether they were good or bad

16     without a screening?

17            A.     Yes.

18            Q.     Okay.  And then Buddy responds and

19     he says, "We will likely be surprised by how

20     many users are either identified or quit before

21     taking their test.  Sad but very likely true."

22                   Do you agree with that?

23            A.     Yeah.

24            Q.     Okay.  Do you recall how many
```

```
1    people were identified or quit before taking

2    their test?

3            A.    No.

4            Q.    Was there -- I assume that when

5    the screening went into place, some people did

6    quit?

7            A.    Possibly some techs.

8            Q.    Okay.  Did anybody test positive?

9            A.    There might have been a couple of

10   incidences, but they -- it's a little bit fuzzy.

11   And I don't know whether they -- after they

12   tested positive, never came back or quit after

13   that point.

14           Q.    Okay.

15           A.    So the specifics are a little bit

16   hazy.

17           Q.    Do you know how many people left

18   DDM's employment once this drug screening

19   process or testing was put in place?

20           A.    I don't think we had any

21   pharmacists, and I don't know how many

22   technicians left.

23           Q.    Do you know whether any pharmacist

24   ever tested positive, while you were there, to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the drug screening?

 2           A.    None that I'm aware of.

 3           Q.    Okay.  Do you know where I would

 4   go to look and confirm that?

 5           A.    Probably loss prevention.

 6           Q.    Okay.  Buddy?

 7           A.    Yes.

 8           Q.    Did DDM have an HR department?

 9           A.    Yes.

10           Q.    And who ran that?

11           A.    Janet Zaccaro.  She is there now

12   currently.

13           Q.    Does she maintain employment files

14   for all DDM employees?

15           A.    Yes.

16           Q.    Including pharmacy employees?

17           A.    Yeah -- I'm not sure if she

18   maintained -- yes, I would guess so.

19           Q.    Did you, in pharmacy operations,

20   maintain files for pharmacy employees?

21           A.    No.

22           Q.    So if I wanted to go and see what

23   issues any particular pharmacy employee had,

24   would Janet be the person to ask?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Okay.  Would Janet be able to tell

 3   you if any employees or pharmacists tested

 4   positive under the drug screening program?

 5          A.    I believe she would be able to.

 6          Q.    Who's John Glinski?

 7          A.    He is loss prevention.

 8          Q.    So he works under Buddy?

 9          A.    Yes.

10          Q.    Okay.  If you go to the next page

11   up, it says -- this is from Buddy to Pete.

12   Copies the same three gentlemen.  "At this point

13   the following is off the record and not to be

14   shared with others please."

15                And it says, "In talking with the

16   State Rx Board inspector, it turns out that this

17   kid at 35 has a real bad heroin problem.  He was

18   actually already in a treatment program for it.

19   The people who he buys his heroin from

20   encouraged/pushed him to get the job at DDM so

21   he could have access to the Oxy, et cetera."

22                Do you see that?

23          A.    Yes.

24          Q.    Is that concerning to you as the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    director of pharmacy operations?

 2           A.    Yes, it is.

 3           Q.    And this would even suggest that

 4    criminals were encouraging people to get jobs at

 5    DDM so that they could gain access to the

 6    opioids that DDM was selling, correct?

 7           A.    It points that direction, yes.

 8           Q.    Okay.  Is this the first time

 9    you're learning about this, these facts?

10           A.    Yes.

11           Q.    So nobody at DDM ever told you

12    about this?

13           A.    It's the first I remember seeing

14    this.

15           Q.    Did you know that DDM was a target

16    for criminals who were trying to gain access to

17    controlled substances?

18           A.    No, I did not.

19           Q.    Does that concern you?

20           A.    Yes, it does.

21           Q.    Okay.  Especially because it would

22    suggest that you guys were a target because your

23    systems weren't adequate, correct?

24           A.    Not necessarily.  I think they
```

```
1    could have been in any pharmacy.

2          Q.    Well, it looks like they pushed

3    him to get the job specifically at DDM.  You

4    wouldn't know why, though, huh?

5          A.    No.

6          Q.    Okay.  And it says, "They loaded

7    him up with plenty of heroin so he would be

8    enslaved to them and the heroin, so he in turn

9    would supply them with all they needed out of

10   the Rx," which is the pharmacy, right?

11         A.    Correct.

12         Q.    Okay.  "Once he would have

13   undoubtedly been caught and become a liability,

14   they would have simply given him an overdose of

15   heroin and he would have been gone."

16               Do you see that?

17         A.    Yes.

18         Q.    That's pretty terrible to have

19   someone like that working in your pharmacy,

20   isn't it?

21         A.    Not encouraging.

22         Q.    No.  It suggests that you guys

23   probably didn't know your people very well,

24   doesn't it?
```

```
 1                    MR. JOHNSON:  Objection.

 2          A.    We knew our pharmacists well.

 3          Q.    Well, I don't -- it looks like

 4   this guy was a tech, right?

 5          A.    Yes.

 6          Q.    I mean, the tech has access to

 7   this stuff in the stores as well, doesn't he?

 8          A.    That was under lock and key.  The

 9   only person that had it would be a pharmacist.

10          Q.    So how would you explain this tech

11   getting access to all these drugs?

12          A.    It says so he could have access to

13   Oxy, et cetera.

14          Q.    Okay.  Let's go to the next

15   paragraph.  It says, "The street value of the

16   Oxy is at about $10 per milligram."

17                Right?

18          A.    Yes.

19          Q.    So that means a 5-milligram tablet

20   would be worth $50?

21          A.    Yes.

22          Q.    Okay.  It says, "He had on his

23   person about 8,000 worth of street value."

24                Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    Okay.  That's a lot -- that's a

3    lot of Oxy, isn't it?

4          A.    Yes.

5          Q.    Okay.  "He dumped a bunch of other

6    stuff when the registered pharmacist confronted

7    him and she was not looking for a brief second

8    (seen on video).  So he had even more.  His

9    hoodie in the back room was loaded with pills as

10   well.  His house was loaded with pills, too."

11               Right?

12         A.    Yes.

13         Q.    Is it concerning to you that this

14   individual was able to get so much Oxy out of

15   your store without you guys knowing about it?

16               MR. JOHNSON:  Objection.

17         A.    Yes, it's concerning.

18         Q.    Okay.  All right.  If you go to --

19   if you go up, it says, "Even more reason to do

20   all pharmacy staff soon and then periodically."

21               Do you see that?

22               So they're not proposing to leave

23   out pharmacists, are they?

24         A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  And at the top -- I don't
 2      know.  It looks like that's from Pete.
 3      Mr. Ratycz says, "I agree.  Waiting only hurts
 4      us at this point."
 5              Do you know why it would hurt DDM?
 6              A.    Well, for obvious reasons.  We
 7      didn't want people diverting drugs in our
 8      stores.
 9              Q.    If you go to the front page, Pete
10      responds again.  The last sentence says, "At
11      least we are not being passive with time as we
12      would otherwise."
13              Do you know what he means by that?
14              A.    Just a general statement.  I have
15      no idea.
16              Q.    As a smaller family-run business,
17      would you agree that DDM was maybe more
18      reactionary to these kinds of things than sort
19      of proactive?
20              A.    I don't know if I would go that
21      far, but with regard to drug testing, I would
22      like to have seen us do something a little more
23      substantial early on, but the counts there bore
24      out -- the people were eventually -- were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    caught.  But to your statement, if we had a drug

 2    screening in place, that possibly could have led

 3    to them not being hired.

 4           Q.    Well, it sounds like when you guys

 5    told people they were going to be tested, some

 6    people just left, right?  So in that instance,

 7    that actually did prevent people who may have

 8    been addicts from coming in and working at your

 9    store, right?

10           A.    Yeah.  And the date of that -- I

11    think it was around the same time period this

12    all is going on, if I'm not mistaken, so they

13    might have asked at that particular point, "Do

14    you do drug testing?"  And if it was going to be

15    instituted in a short period of time, we -- I

16    probably would have -- or they would have been

17    told that.  So ...

18           Q.    But it sounds like that drug

19    testing program actually had somewhat of a

20    preventative effect --

21           A.    Some merit to it?

22           Q.    -- correct?

23           A.    Yes.

24           Q.    Okay.  Do you guys wish you'd put
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that in place earlier?

 2              MR. JOHNSON:  Objection.

 3         Q.   Do you wish that DDM had put that

 4    in place earlier?

 5         A.   Yes.

 6         Q.   Okay.  Let's do Exhibit 12,

 7    DDM75841.

 8                        - - -

 9         (DDM-Nameth Exhibit 12 marked.)

10                        - - -

11         Q.   Okay.  We're going to -- this is

12    an e-mail chain that starts on December 3 of

13    2013, which I assume it was somewhat -- right

14    before you were probably retiring?

15         A.   Yes.

16         Q.   Okay.  If you go to the back page,

17    there's an e-mail from you to Steve Rehner.  Who

18    is that?

19         A.   He was the chief pharmacist at

20    store number 3.

21         Q.   Okay.  And the subject is "Tech

22    hours."  And it says, "I am sure you are aware

23    that your store has had a 10 percent decline in

24    the number of Rxs filled year to date."
```

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that?

2         A.    Yes.

3         Q.    And then the crux of the e-mail

4    looks like you guys were cutting the amount of

5    hours that they could have access to a tech in

6    the pharmacy; is that fair?

7         A.    Yes.

8         Q.    Okay.  And so would the amount of

9    people that you would staff in a pharmacy depend

10   on how many prescriptions were being filled

11   there?

12        A.    That was part and parcel of what

13   we looked at.

14        Q.    Basically just has to do with

15   profit margins and making sure that you're not

16   spending too much to make what you'd otherwise

17   make; is that fair?

18        A.    Well, that's a small percentage of

19   it.

20        Q.    Okay.  When you cut a tech's

21   hours, did that put more strain on your

22   pharmacists naturally?

23        A.    We only cut the tech hours when

24   they have a decline in the number of scripts.

Highly Confidential - Subject to Further Confidentiality Review

1  So they go hand-in-hand.  So if there's less

2  work to be done, the manhours don't require it.

3  Now, if left upon the pharmacist at the store,

4  wouldn't you like to have, you know, less hours

5  or less work or easier work?  It's not up them

6  to determine that.  It's up to us to look at

7  those numbers.

8          Q.    When you cut tech hours, did you

9  do anything to see whether that impacted a

10  pharmacist's ability to look for and monitor for

11  diversion or illegitimate prescriptions?

12          A.    No.

13          Q.    You don't know whether it impacted

14  their ability to do that or not?

15          A.    I don't think it impacted their

16  ability, because they had to do the same

17  reporting whether they had 200 tech hours or

18  190.

19          Q.    Well, let's just say someone comes

20  in with a prescription -- let's say five people

21  come in all at the same time with a prescription

22  from one doctor, would you expect your

23  pharmacy -- pharmacist to do any sort of

24  investigation into as to why those individuals

Highly Confidential - Subject to Further Confidentiality Review

1   are all there at the same time?

2           A.    Five individual people from the

3   same doctor?

4           Q.    At the same time.

5           A.    I'm sure the pharmacist would be

6   aware of it.

7           Q.    What do you mean by "be aware of

8   it"?

9           A.    He would be aware that they're all

10  coming from the same doctor.  So most likely, it

11  would raise his suspicions and determine him --

12  whether he's going to fill or not fill those

13  scripts.

14          Q.    Okay.  Did DDM have any policies

15  and procedures about what a pharmacist was

16  supposed to do in a situation like that?

17          A.    Other than we talking to them in

18  our yearly meeting and sending e-mails, and they

19  knew that the State Board was looking for doctor

20  shopping and out-of-state scripts.  That was --

21  they were very well aware of that during this --

22  especially during this time period.

23          Q.    Right.  I'm asking you very

24  specifically if DDM had any policies and

1    procedures about what a pharmacist was supposed

2    to do to run their due diligence, other than

3    filling those scripts.

4            A.    Other than relying on the State

5    Board of Pharmacy, no.

6            Q.    Okay.  All right.  If you go up an

7    e-mail, this is the response from Steve to you

8    telling him you're cutting his tech hours.  If

9    you go about halfway down, he says, "It has been

10   quite chaotic in here lately with all the work

11   on the table now.  On another note, possibly

12   related to the chaos, Jennifer did the month end

13   C-II count, and she finds that we are off by

14   number 21 on 5/325-milligram Percocet."

15           Do you see that?

16           A.    Yes.

17           Q.    This pharmacist is telling you

18   that he's overloaded, right?

19           A.    Yes.

20           Q.    Okay.  And then he's telling

21   you -- this is right after you told him you're

22   cutting his support staff, right?

23           A.    Correct.

24           Q.    Okay.  And then he's telling you

Highly Confidential - Subject to Further Confidentiality Review

1    that he's overloaded and that the C-II count

2    shows there's a shortage, right?

3            A.    Correct.

4            Q.    Okay.  And he says, "We are

5    looking to see if we can figure it out, and let

6    me know what you want me to do in the meantime.

7    I have to say, Tom, I am getting tired of being

8    a policeman looking for problems."

9                 Do you see that?

10           A.    Yes.

11           Q.    Do you know what he's talking

12   about?

13           A.    Well, most of the complaints

14   coming from our pharmacists were trying to

15   determine which prescriptions they were going to

16   fill and which they were not, and that put them

17   in the policeman type of atmosphere.  They felt

18   that the AMA and the DEA should have had more

19   input into which physicians are actually under

20   scrutiny, and they did disseminate some of that

21   down to us through the State Board.  But in my

22   opinion, it needed to be looked at much broader.

23           Q.    Would you agree that cutting his

24   support staff hours in this type of a context

 1   would be a questionable decision?

 2         A.    Well, if you look at store 85,

 3   he's referring to that, they have had a

 4   decline -- store 85 was literally, I'm going to

 5   say, three miles, four miles away, and it ate

 6   into their -- their total script count.

 7               However, this is December.  It's a

 8   busy time of year because people are wanting the

 9   year-end statement reports and so on and so

10   forth.

11               So does it state when the cuts

12   would take place?  I did not look at that.  What

13   date they were going to take place.

14         Q.    I'm just asking you very

15   specifically, this pharmacist is telling you

16   that he's -- it's chaotic and he's overwhelmed,

17   right?

18         A.    Yes.

19         Q.    Okay.  And he's telling you the

20   reason it's chaotic and he's overwhelmed is

21   because he's having to police probably not only

22   his staff but also the prescriptions that are

23   coming in, right, and that there's a shortage?

24         A.    I don't see anything about staff.

```
 1              Q.    Okay.  Well, I -- that's fair.

 2              A.    Policing his staff.

 3              Q.    Well, he said he's tired of being

 4    a policeman.

 5              A.    Okay.

 6              Q.    I don't know if that applies to

 7    staff or customers.  Do you know?

 8              A.    I think it applies -- replies to

 9    determining who to fill the scripts for and who

10    not.  They're playing policeman at the point of

11    sale.  You know, how do you determine whether

12    it's a legitimate pain -- patient in front of

13    you and who is not.

14              Q.    Okay.  So he's got a problem and

15    instead of helping him, you guys are just

16    cutting his support staff hours, right?

17                    MR. JOHNSON:  Objection.

18              A.    There is no indication on when

19    that would take place.

20              Q.    Well, if you go to the back

21    page --

22              A.    That I'm aware of.

23              Q.    -- he says, "I am only going to

24    cut you back to 200 for now.  This is due to the
```

 1   holiday crunch and also the Pioneer learning

 2   curve.  After January/February, you most likely

 3   be cut again to about 190."

 4              Right?

 5        A.    Right.

 6        Q.    Okay.  If you go up further, you

 7   respond -- and he actually says one of the

 8   reasons why he doesn't want you to cut it down

 9   here is because he's already made the schedule.

10              And then your response on the 4th,

11   you said, the schedule was only posted from --

12   up to 12/10/13 in the call to the store, right?

13   So you're kind of calling him out on that,

14   aren't you?

15        A.    Yes.

16        Q.    Okay.  And you say, "With the

17   numbers dropping, I know you understand that the

18   tech hours have to change.  Can you still adjust

19   the schedule to reflect the changes?"

20              Right?

21        A.    Yes.

22        Q.    So despite all the problems he's

23   raised here about having to be a policeman and

24   prevent diversion, you're still telling him he's

Highly Confidential - Subject to Further Confidentiality Review

```
 1   got to reduce his support staff hours, right?

 2          A.    In this case, yes.

 3          Q.    Okay.  And then you do address to

 4   the C-II shortage and you say, "As for the C-II

 5   shortage, if you have exhausted all possible

 6   scenarios and still can't find them, you will

 7   have to turn in a DEA 106 to the DEA and OSBP."

 8                Right?

 9          A.    Correct.

10          Q.    So basically you're telling him,

11   keep looking, see if you can figure it out.  If

12   you can't figure it out, but only then, then

13   report it.  Is that fair?

14          A.    Yes.  And by -- what I meant by

15   that was that, did he look at the Return

16   Solutions and whatever it had to take place.

17          Q.    Right.  So you -- this is you

18   instructing him that he doesn't need to report

19   this to the DEA or the OSBP until after he's

20   exhausted all possible scenarios to figure out

21   where these missing pills went, right?

22          A.    Generally, yes.

23          Q.    Okay.  What you didn't respond to

24   in your e-mail was him telling you that it was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   chaotic and that he was having difficulty being

 2   a policeman, right?

 3        A.   Yes.

 4        Q.   Okay.  Were you concerned about

 5   that?  Did that make you worried about what was

 6   happening at that store?

 7        A.   No.

 8        Q.   Why is that?

 9        A.   Because every pharmacist in the

10   country at that time was being asked to do the

11   same thing and it was becoming a burden of the

12   job to police controlled drug prescriptions.

13        Q.   So basically he was just

14   complaining about something that everybody was

15   having to deal with?

16        A.   Yes.

17        Q.   Okay.  All right.  If you go up

18   above, Steve writes back and he said, "I'll look

19   at the new schedule and change it around.  As

20   far as the 5/325" -- that's Percocet, right?

21        A.   Yes.

22        Q.   -- "I wanted to see your take if

23   you think we need to be concerned further or

24   these things happen and just be more cautious in
```

1    counting despite the chaos."

2                    Right?

3         A.    Yes.

4         Q.    All right.  And your response to

5    that is, "I assume you are double counting the

6    C-IIs."

7                    Did you actually verify that?

8         A.    Yes.

9         Q.    How do you know that?  The word

10   "assume" makes me think that you didn't.

11        A.    It's the way I stated it.

12        Q.    Okay.  It's a "make sure you're

13   counting the C-IIs," fair?

14        A.    Yes.

15        Q.    Is that what you meant?  Okay.

16                   And then you said, "Therefore, it

17   is unusual that they would be off even during

18   the chaos?"

19                   Right?

20        A.    Correct.

21        Q.    So if he's counting them, they

22   shouldn't be off, right?

23        A.    Correct.

24        Q.    Okay.  So if they're off, that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   means he's probably not counting them, right?

 2          A.    At this point we don't know if

 3   they're off.

 4          Q.    Okay.  Well, I think he said that,

 5   "We're off by 21," down below?

 6          A.    At this point we don't know what

 7   the resolution was.

 8          Q.    Whether there were other

 9   explanations for why that was missing?

10          A.    Correct.

11          Q.    All right.  Then you said, "I

12   think I would just keep this in mind if there

13   are more shortages."  Right?  And that's in

14   response to his question down below about being

15   concerned further or just being cautious?

16          A.    Yes.

17          Q.    Do you know whether this was ever

18   reported to the DEA?

19          A.    I don't know if it was resolved or

20   not.  If it was unresolved, it would have been

21   reported.

22          Q.    If it was unresolved?

23          A.    If there was a shortage.

24          Q.    Okay.  Do you know for sure?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    I don't know for sure.

2              Q.    Would you have reported it or

3    would the pharmacist have reported it?

4              A.    The pharmacist would have at store

5    level.

6              Q.    Would they provide a copy of that

7    to corporate level?

8              A.    Yes.

9              Q.    Okay.  Would that be provided to

10   you?

11             A.    Yes.  But sitting here today, I

12   can't tell you honestly one way or another

13   whether it was or not.

14             Q.    Yeah.  I don't blame you.

15             Did you have like an open file for

16   any type of investigation like this so that it

17   would prompt you to kind of follow up with them,

18   or did you just rely on them following up with

19   you when they determined where the shortage --

20             A.    Usually I would have a file left

21   out on my desk until it was resolved.

22             Q.    And once it resolved -- would

23   resolve, where would you put that file?

24             A.    I'm trying to recall where it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would have gone.  I'm trying to decide whether

 2    or not there was a store file particular to

 3    that -- to each particular store --

 4            Q.    Okay.

 5            A.    -- or whether there was a State

 6    Board file that when in.

 7            Q.    I gotcha.  So you just don't know?

 8            A.    So I'm not quite sure which file

 9    it was going to go into.

10            Q.    If I retire, I'm not ever going to

11    have a file again.  So I can understand.

12                  All right.  Let's go to

13    Exhibit 13.  This is DDM46047.

14                      - - -

15            (DDM-Nameth Exhibit 13 marked.)

16                      - - -

17            Q.    This is an e-mail from you to

18    P.J. Ferut, right?

19            A.    Yes.

20            Q.    And the date is September 9, 2013.

21                  Do you see that?

22            A.    Yes.

23            Q.    All right.  It says, "Hi, P.J.  We

24    have a" -- well, sorry.  The subject line is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "Theft Store 35," right?

 2         A.    Correct.

 3         Q.    So you've got another theft,

 4    right?

 5               Do you see it?

 6         A.    Correct.

 7         Q.    Okay.  And it says, "We have a

 8    theft of controlled substances at store number

 9    35."

10               Do you see that?

11         A.    Yes.

12         Q.    And it looks like you're asking

13    for sort of the movement of drugs to and from

14    that store to try and figure out what's missing,

15    right?

16         A.    Correct.

17         Q.    It also says, "I will contact

18    Cardinal to get their purchases.  They have

19    nothing from Prescription Supply or Anda."

20               What are Prescription Supply and

21    Anda?

22         A.    Well, they're wholesalers.

23         Q.    Were stores able to order opioids

24    or hydrocodone from multiple suppliers at that
```

Highly Confidential - Subject to Further Confidentiality Review

1    time?

2           A.    They could get it from -- yes,

3    yes, they could.

4           Q.    Was there ever a time where they

5    were only permitted to get them from one

6    location?

7           A.    Oh, yeah, there could have been.

8    I mean, prior to Prescription Supply and Anda

9    using them, they could have -- prior to them

10   coming on board, there would have been one.

11          Q.    Do you ever recall a time when you

12   were the director of pharmacy operations where

13   there was only one supplier of hydrocodone?

14          A.    No.  There's always two or more.

15          Q.    When there was a shift at

16   Cardinal, were there -- was there more than one,

17   Cardinal and somebody else?

18          A.    Cardinal and our warehouse.

19          Q.    But at that point, I believe the

20   shift to Cardinal was because hydrocodone became

21   a Schedule II; isn't that correct?

22          A.    Oh, back in '14?

23          Q.    Yeah.

24          A.    Okay.  So ask the question again.

```
 1            Q.    Yeah, sure.

 2            A.    Now I've got to get my dates back

 3    in line here.

 4            Q.    When hydrocodone became a

 5    Schedule II --

 6            A.    Yes.

 7            Q.    -- and DDM was required to get

 8    hydrocodone from another -- from a distributor

 9    other than DDM, they used Cardinal, right?

10            A.    Correct.

11            Q.    Was there another sort of backup?

12            A.    Not that I'm aware of.

13            Q.    Okay.  So it would have just been

14    Cardinal?

15            A.    In '14, it would have been just

16    Cardinal.

17                        - - -

18            (DDM-Nameth Exhibit 14 marked.)

19                        - - -

20            Q.    Okay.  Exhibit 14, DDM 261505.

21    This is an e-mail from Pete Ratycz to all

22    pharmacists.

23                  MR. JOHNSON:  Can we go off just

24            for a second.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  MR. MULLIGAN:  Oh.  What's the --

2                  MR. JOHNSON:  No.  I just

3         wanted --

4                  THE VIDEOGRAPHER:  We're going off

5         the record at 2:38.

6                  (Recess taken.)

7                  THE VIDEOGRAPHER:  We're back on

8         the record at 2:48.

9   BY MR. MULLIGAN:

10        Q.    Okay.  Before we went off the

11   record, Mr. Nameth, we were looking at

12   Exhibit 14.

13                Do you have that in front of you?

14        A.    Not yet.

15        Q.    All right.  This is an e-mail from

16   Pete Ratycz to all pharmacists.  You're copied

17   on this e-mail, right?

18        A.    Mm-hmm.

19        Q.    The date is -- actually, it's five

20   days after the last one we looked at,

21   September 14, 2013?

22        A.    Yeah.

23        Q.    And the subject is "Recent

24   Technician Theft," right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And it says, "In the past month

 3   we've unfortunately encountered multiple

 4   episodes of technicians stealing controlled

 5   substances from the pharmacy."

 6                Right?

 7          A.    Yes.

 8          Q.    "In one circumstance, the

 9   technician was addicted, and then the other tech

10   was not a user but a seller."

11                Right?

12          A.    Mm-hmm.

13          Q.    "The theft is extreme and

14   excessive in both instances, so please be

15   cognizant of what your technicians are doing and

16   don't hesitate to report suspicious behavior to

17   your pharmacy supervisor."

18                Right?

19          A.    Yes.

20          Q.    Okay.  Do you know what this means

21   by "extreme and excessive"?

22          A.    Any theft, I mean, would be

23   extreme and excessive, but there must have been

24   multiple, so that's what he's referring to,
```

```
 1    extreme and excessive.

 2          Q.    Well, it says that both -- there's

 3    multiple episodes, and it says the theft was

 4    extreme and excessive in both instances, right?

 5          A.    Oh, okay.  So they're looking at

 6    higher counts, higher missing tablets.

 7          Q.    Okay.  So potentially the

 8    diversion from within is becoming a bigger

 9    problem than maybe it was before; fair to say?

10          A.    It's subjective, but ...

11          Q.    This is the most strongly worded

12    documentation of an inside job that we've seen,

13    right?

14          A.    Yes.  Yes.

15          Q.    And this is an e-mail from Pete

16    Ratycz to all pharmacists, right?

17          A.    Correct.

18          Q.    So it sounds like this is sort of

19    an "all hands on deck.  We've got a big

20    problem."  Right?

21          A.    It's be vigilant.

22          Q.    Okay.  But he's telling all

23    pharmacists in this instance as opposed to just

24    the corporate group, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    Okay.  So the next sentence says,

 3    "More importantly, don't enable technicians by

 4    allowing them to store purses, book bags, or

 5    coats in the pharmacy."

 6                    Right?

 7              A.    Yes.

 8              Q.    "Also, it's imperative that you

 9    keep your C-II cabinet locked when not in use."

10                    Right?

11              A.    Correct.

12              Q.    Was that ever an issue, that you

13    know of?

14              A.    Locking the C-II cabinet?

15              Q.    Correct.

16              A.    There might have been instances

17    where a pharmacist had it open and went to the

18    bathroom and came back.  But we're telling

19    them --

20              Q.    Don't do that?

21              A.    -- don't do that.

22              Q.    Okay.  "Please use sound wisdom.

23    The OSBP has recently begun levying fines and

24    issuing citations in cases where the amount is
```

Highly Confidential - Subject to Further Confidentiality Review

1    beyond reasonable and they feel the pharmacists

2    were negligent with the safeguarding of

3    controlled substances."

4                Do you see that?

5         A.    Yes.

6         Q.    So this at least indicates that

7    there are maybe not DDM but some stores that

8    have pharmacists who are negligent with the

9    safeguarding of controlled substances, correct?

10        A.    Correct.

11        Q.    And would that explain to you at

12   least or provide some explanation for why the

13   DEA imposes a corresponding responsibility on

14   distributors as well as pharmacists to prevent

15   against diversion?

16        A.    That's a part of it, yes.

17        Q.    Okay.  Do you know whether this

18   e-mail to all pharmacists was in response to or

19   in fear of being fined by the State Board?

20                MR. JOHNSON:  Objection.

21        A.    I don't think so.  I think the

22   concern was that we just don't want to have

23   theft in our stores, and it's becoming evident

24   that the occurrence is more than what we would

Highly Confidential - Subject to Further Confidentiality Review

```
 1    like to see.

 2            Q.    Okay.  And, in fact, it's been

 3    on -- going on for 12 years, right?

 4            A.    I think there's always -- there's

 5    always going to be some theft in anything at any

 6    time.

 7            Q.    Right.  Well, we've looked at

 8    documents that show it went on for over a

 9    12-year period of time, right?

10            MR. JOHNSON:  Objection.

11            Q.    At least the first document we

12    looked at was 2001, right?

13            A.    Correct.

14                        - - -

15            (DDM-Nameth Exhibit 15 marked.)

16                        - - -

17            Q.    Okay.  All right.  We're going to

18    go to Exhibit 15, which is DDM71409.  This is an

19    e-mail from Jeff Kistler to John Glinski, and

20    you are copied on it with Jason and Buddy and

21    Greg.  This is dated November 17, 2013.

22                  Do you see that?

23            A.    Yes.

24            Q.    Okay.  And it says, "Hi, John.  I
```

1    closed Friday 11/15/2013 and got hard counts at

2    store close.  Heather Gaal worked Saturday as

3    only pharmacist.  I opened Sunday morning,

4    11/17/13, and took hard counts and found the

5    following shortages since I closed Friday

6    evening."

7              And then he lists that there's 20

8    Oxy, 5-milligram, and 15 Oxy, 10 milligrams

9    missing, correct?

10         A.    Yes.

11         Q.    Okay.  And Jeff Kistler, is he the

12   chief pharmacist at store 30?

13         A.    He is.  He was.

14         Q.    Do you know who Heather Gaal was?

15         A.    She was a staff pharmacist.

16         Q.    Okay.  And this would suggest that

17   there was a loss of pills on Heather's watch,

18   right?

19         A.    Correct.

20         Q.    Okay.  And that would suggest that

21   either Heather diverted those pills or somebody

22   did it on her watch, right?

23         A.    That's what it's suggesting.

24         Q.    Okay.  Do you know what the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    outcome was to this?
 2           A.    You know, it's a little gray.  I
 3    don't want to speak specifically about it.  I
 4    can't recall whether she was terminated at that
 5    point or whether or not -- yeah, I would have to
 6    go back, and I really don't recall.
 7           Q.    You'd need more documentation?
 8           A.    I guess.
 9           Q.    Okay.  Would this have been
10    reported to the DEA and the Ohio State Board
11    immediately, or would an investigation have been
12    done?
13           A.    Yes.  This was -- because they had
14    the counts prior and they had the numbers post,
15    that -- this should have been turned into the
16    State Board, and if they did a 106, to the DEA.
17           Q.    If they did one?  They should have
18    done one, right?
19           A.    I assume they did one.
20           Q.    Okay.  Who was responsible for
21    assuring that the pharmacist submitted those
22    forms and reported the diversion?
23           A.    The supervisor of that particular
24    store, because the chain of command at this
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    particular time, in 2013, was the chief

2    pharmacist, then going backwards or upwards to

3    the supervisor, then director and vice

4    president.

5         Q.   Okay.  So the supervisor was the

6    one responsible -- responsible for making sure

7    that the pharmacist reported any loss?

8         A.   Making sure that they reported the

9    loss to -- you know, to the State Board and to

10   the DEA, yeah.

11        Q.   Okay.  Did you or anyone at DDM

12   train those supervisors or chief pharmacists

13   regarding their reporting obligations under the

14   CSA?

15        A.   They were trained -- I'm sure that

16   that was part of their training.

17        Q.   You're just talking about generic

18   pharmacist training?

19        A.   Yeah.

20        Q.   Okay.  So nothing specific at DDM?

21        A.   Well, they knew that -- sorry.

22   They knew that they had to report a 106, and

23   then due to the State Board of Pharmacy coming

24   to our annual meetings and e-mails that we sent
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    out to the stores, that they should be reporting

2    any thefts to the State Board and 106s whenever

3    it occurred.

4            Q.    So obviously I think you'd agree

5    with me that you don't know what pharmacists

6    knew, right, necessarily?  Because they would be

7    the only ones who could tell us about that,

8    right?

9            Do you --

10           A.    We got a copy of the 106, so ...

11           Q.    Right.

12           A.    You know.

13           Q.    You can't emphatically state here

14   right now that every pharmacist in your stores

15   ever has always known exactly what the reporting

16   requirements were, right?

17           A.    That was part of their -- part of

18   the State Board regulations, right?

19           Q.    Okay.  So --

20           A.    So ...

21           Q.    -- what I'm specifically asking

22   you is, did DDM's pharmacy department provide

23   training to pharmacy employees to school them or

24   educate them on their reporting obligations
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    under the CSA.  And if you didn't, it's -- I

2    mean --

3           A.    I would have to go back and

4    review.  I mean --

5           Q.    Okay.  So you don't recall ever

6    putting on a training like that?

7           A.    I don't recall, no.

8           Q.    What can you tell me about Heather

9    Gall that you haven't already told me?

10          A.    I believe that Heather Gall was

11   caught in taking the pills and terminated at

12   that point or shortly thereafter, sometime in

13   the near future.

14          Q.    When you say "taking," you mean --

15          A.    She was never really an abusive

16   pharmacist prior to this point.  I think that

17   after this all occurred, and in her statement,

18   there was something about she had back pain and

19   was put on prescribed medication, and so her

20   reasoning then -- I don't recall whether or not

21   this was the specific case, but one of these

22   cases they said, "I didn't have my pills with

23   me, so I, you know, kind of swapped for this or

24   that."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    That's illegal, right?

 2            A.    Yeah.  Yes.

 3            Q.    Okay.  That's diversion?

 4            A.    Yes.

 5            Q.    Okay.  And that was diversion

 6    committed by one of DDM's pharmacists, right?

 7            A.    Yes.

 8            Q.    Okay.  So we've got Eric,

 9    pharmacist, he was an addict.  And we've got

10    Heather, we don't know what was happening there,

11    but she was actually taking drugs out of a DDM

12    store and taking them herself, correct?  Which

13    would suggest that she was also an addict,

14    correct?

15            A.    The reason I'm hesitating, you

16    know, defining an addict at this particular

17    case -- she was on the medication.

18            Q.    Okay.  Fair enough.  I gotcha.

19                  You don't know that she had an

20    addiction?

21            A.    Right.

22            Q.    But you know that she stole pills

23    and took them?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Remember we were talking

2     about that drug screening thing earlier?

3          A.    Yes.

4          Q.    Do you know whether it was in

5     place as of November of 2013?

6          A.    I don't recall exactly when it was

7     implemented, but it was around that time period.

8                        - - -

9          (DDM-Nameth Exhibit 16 marked.)

10                       - - -

11         Q.    Okay.  Well, let's look at

12    Exhibit 16, which is DDM421435.  This is an

13    e-mail from John Glinski to Pete, yourself,

14    Jason Briscoe, and the Gregory Steinkerchner

15    again.  Who is John again?

16         A.    John Glinski is a loss prevention

17    representative.

18         Q.    Okay.  So this is dated October 2,

19    2014.  It's a little less than a year later.

20    Subject is "Suspended employee pharmacist

21    Datkuliak DDM 48."

22               Do you know who that is?

23         A.    Yes.

24         Q.    Who's that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Susan Datkuliak was a pharmacist

 2    at our store 44 in south Ohio somewhere.

 3            Q.    Okay.  So this says, "I had to

 4    split this report in two e-mails as I did not

 5    realize it did not send earlier today."

 6                  Do you recall getting two e-mails

 7    about this?

 8            A.    No.

 9            Q.    Okay.  I only ask because I only

10    got one.

11                  All right.  It says, "Janet, I

12    suspended this employee on 8/31/14.  She is the

13    pharmacy chief at 44."

14                  Right?

15            A.    Yes.

16            Q.    Okay.  And it says, "Pharmacy

17    operations, I wanted everybody to be on the same

18    page as we discuss this so I am sending

19    everybody the same report that I made and sent

20    to Janet."

21                  Right?

22            A.    Yes.

23            Q.    And then it says, "Let's please

24    talk about what the next move is going to be."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                      Do you see that?

2           A.    Yes.

3           Q.    Were there policies and procedures

4    in place at that time that would dictate what

5    the next move would be in a circumstance like

6    this?

7           A.    I believe this particular case was

8    not a drug diversion.  I thought it was a theft

9    of something else in the store.

10          Q.    Okay.  What do you believe that

11   this chief pharmacist stole?

12          A.    I don't recall what it was.

13          Q.    It could have been a controlled

14   substance, though, you're just not sure?

15          A.    It's possible, but something tells

16   me that that's not what the issue here was.

17          Q.    Where are you getting that from?

18          A.    From my poor memory.

19          Q.    Okay.  So you're not sure whether

20   it's -- whether it's diversion or just a theft

21   of a candy bar?

22          A.    Correct.

23          Q.    Okay.  And we would need to go and

24   look at your files regarding store diversions to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   see whether this is one of them?

 2         A.    Yes.

 3         Q.    Okay.  All right.  And then it

 4   says, "I need to go back to 44 to talk to a

 5   pharmacy tech who wanted to talk to me about

 6   issues and suspicions of Datkuliak from the

 7   past.  She approached me on 8/31/14, but I did

 8   not have time to talk to her."

 9               Do you see that?

10         A.    Yes.

11         Q.    Okay.  So it looks like there's a

12   pharmacy tech at 44 that has suspicions about

13   what Datkuliak is up to, right?

14         A.    Yes.

15         Q.    And this pharmacy tech tried to

16   talk to John Glinski on August 31 of '14, but he

17   didn't have time for her, right?

18         A.    At that point, yes.

19         Q.    Okay.  And this e-mail is dated

20   October 2, 2014, so over a month later, and he's

21   saying that he still hasn't gone back to talk to

22   this pharmacy tech, right?

23         A.    Yeah.  And that's --

24         Q.    Is that concerning to you, that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   this pharmacy tech has suspicions about a chief

 2   pharmacist and nobody at corporate has spent any

 3   time trying to figure out what that might be?

 4        A.    Well, the reason that it sticks

 5   out in my mind is, you know, I knew of her

 6   because I think I interviewed -- I was in the

 7   process of interviewing her.  And when this came

 8   up, it was -- I don't believe it was drug

 9   related.  I think it was something else in the

10   store.  That's what's reminding me of that fact.

11             Now, I could be wrong, but I'm

12   fairly certain that this is with reference to a

13   non-controlled drug issue.

14        Q.    Okay.

15        A.    I'm not saying there's not an

16   issue, but ...

17        Q.    Right.  But you don't know for

18   sure, right?  We'll need to do --

19        A.    I'm not going to bet my retirement

20   savings on it, no.

21        Q.    Smart man.

22             Let's go to Exhibit 17.

23                      - - -

24             (DDM-Nameth Exhibit 17 marked.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2   BY MR. MULLIGAN:

 3        Q.    This is DDM171919.  We're going to

 4   start on the second page.  This is an e-mail

 5   from Leslie Arend to Jason, yourself, and Pete.

 6              Do you know what this is

 7   generally?

 8        A.    Yes.  Leslie was a representative

 9   from Cardinal, our representative from Cardinal,

10   and this approaches -- it's notifying that

11   they're approaching that threshold limit on

12   oxycodone.

13        Q.    Okay.

14        A.    Those particular stores.

15        Q.    And so -- and I know this from

16   other testimony, but just correct me if I'm

17   wrong.  When the switch to Cardinal was made,

18   Cardinal imposed thresholds on DDM's stores,

19   correct?

20        A.    Correct.

21        Q.    And then when a store would be

22   nearing its threshold, they would send an e-mail

23   to you guys saying, "Hey, this store is getting

24   close to their threshold or they went over it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and we cut the order and reported it."

 2                  Right?

 3         A.    Correct.

 4         Q.    All right.  So would it be common

 5    when you get an e-mail like that that you would

 6    forward that e-mail to the store pharmacist to

 7    let them know they were getting close to their

 8    threshold?

 9         A.    It was a common occurrence, yes.

10         Q.    Okay.  And so if you look above

11    here, this is actually you forwarding this

12    e-mail to Tom Pfefferle, Deb Fritz -- it looks

13    like those are probably pharmacists at a

14    particular store?

15         A.    Yeah.  Those two were at store 14.

16         Q.    Okay.

17         A.    The other two were at store 76.

18         Q.    Okay.  And you said that, "The

19    store is approaching the limit.  Please read

20    below."

21                  Right?

22         A.    Yes.

23         Q.    All right.  And were you supposed

24    to share the threshold limits with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    individual stores?

 2          A.    I don't think it was anything that

 3    Cardinal made us do at the time that I'm aware

 4    of.

 5          Q.    Okay.  You can't think of any

 6    reason why it might be a bad idea to share those

 7    thresholds with the stores?

 8          A.    I think it's informing them of

 9    where they stand.  You know, being an informed

10    person is better than not being -- is better

11    than being uninformed.

12          Q.    Wouldn't you agree that if you

13    told them what the threshold was, it would allow

14    them to order the maximum amount without

15    generating a suspicious order that would get cut

16    and be reported to the DEA?

17          A.    That doesn't specifically tell

18    them what their threshold was.  It just says

19    that they met -- they were within 85 to

20    95 percent of the threshold.  But I don't

21    think -- or I don't know.  Does it say in there

22    that they're a specific number?

23          Q.    Well, I'll admit that this e-mail

24    is formatted sort of in an odd way.  I think
```

Highly Confidential - Subject to Further Confidentiality Review

 1   that if you look at the last page, if you go

 2   about halfway down, it looks like oxycodone

 3   has -- they were at 20,100 and their limit was

 4   probably 26,000, if the percentage works?

 5            MR. JOHNSON:  Second to last page

 6       you mean?

 7            MR. MULLIGAN:  The last page at

 8       the bottom.  Oh, yeah.  I'm sorry.

 9       Second to last page.

10       A.    Okay.  All right.

11       Q.    Do you see that?

12       A.    Yes.

13       Q.    So that would suggest that you've

14   actually forwarded and shared with them what

15   their threshold is, right?

16       A.    Okay.

17       Q.    But you don't see anything wrong

18   with that?  Or let me ask the question

19   differently.

20            That was not an issue, right?

21   That was something that was common?

22       A.    Yes.

23       Q.    Okay.  All right.  Let's go back

24   to the second page.  So Karla Bartish -- who's

```
 1    that?

 2          A.    She's a pharmacist at one of the

 3    Columbus stores.

 4          Q.    Would it have been 14 or 76?

 5    Because it was -- she wasn't on this original --

 6          A.    76 probably.

 7          Q.    Okay.  So maybe one of these

 8    people forwarded it to her, you think?

 9          A.    Okay.

10          Q.    So she says to you -- she changed

11    the subject, and it says -- instead of saying

12    "Store 14, 76," it now says, "Living on the edge

13    baby."

14                Do you see that?

15          A.    Yes.

16          Q.    Was she kind of a jokester?

17          A.    Yes.

18          Q.    Okay.  I know that type.  Because

19    I am one.

20                Okay.  So she says, "Hi Tom.  Is

21    there a way to increase the threshold?  We seem

22    to just barely stay under the limit lately.

23    Thoughts?  Thank you."

24                Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And would you agree, based on her

 3   subject that -- the subject she chose, that she

 4   doesn't necessarily grasp the gravity of either

 5   the opioid crisis or diversion?

 6          A.    I think she's really looking at

 7   maintaining good patient rapport and having

 8   medication on hand for patients that need pain

 9   management.  I think that there are reasons --

10   see, these particular stores took a while to

11   grow, but they were growing in the Columbus

12   market because we were new to that market.

13          Q.    Okay.

14          A.    So as their overall volume of

15   scripts increased, you know, they had to have --

16   she's asking, "Isn't there any way to increase

17   the threshold, because I'm consistently running

18   out of product?"

19          Q.    Right.

20          A.    So I'm sure if someone was going

21   to come up to them that's in pain, they don't

22   have the product, it's an issue.

23          Q.    Similarly, she's representing that

24   their in pain, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MR. JOHNSON:  Objection.

 2            Q.   Would you agree?

 3            A.   Well, they've got a prescription,

 4    so they've also -- the doctor agrees that

 5    they're in pain.

 6            Q.   Well, at least the doctor is

 7    willing to write them a prescription?  That's

 8    all we really know, right?

 9                   MR. JOHNSON:  Objection.

10            Q.   You've heard of pill mills,

11    haven't you?

12            A.   Yes.

13            Q.   Okay.  So we don't -- we don't --

14    I'm just saying, you're assuming those facts and

15    I'm just pointing out that we don't know whether

16    these people are in pain or not.  Some of them

17    were illegitimate prescriptions, weren't they?

18            A.   I have to assume that there could

19    be.  There could have been.

20            Q.   In fact, it's highly likely that

21    there were illegitimate --

22            A.   Therefore the reference to the

23    policeman earlier, there having to be a

24    policeman for all these prescriptions.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  So my original question

2  was, do you think that she was sort of not

3  appreciating the gravity of diversion with her

4  subject "Living on the edge baby"?

5      A.     No, I don't think that that's the

6  case.  I don't think that points to the gravity

7  of situation.  I think that she's more looking

8  at how she's going to be able to handle her

9  customers.

10      Q.     Okay.  And I read "living on the

11  edge" means she's right up against the threshold

12  every month living on the edge of that

13  threshold.

14      A.     That's just -- she --

15      Q.     You don't know?

16      A.     It has nothing to do with the

17  context of the e-mail.  That was her.

18      Q.     Okay.

19      A.     You know.

20      Q.     Well, let's go to the next e-mail

21  where you respond, you say, "On a serious note,

22  what is the reason why you guys are hitting the

23  ceiling?  In order to increase your limit, we

24  have to send Cardinal several reasons for the

```
 1   sales volume."

 2              Right?

 3        A.    Yes.

 4        Q.    And if you go to the next e-mail,

 5   she writes back and she says, "Well, um, Rx

 6   volume has increased and half of that increase

 7   are narcs.  Lol."

 8              What are narcs?  Are those

 9   controlled substances?

10        A.    She's referring to narcotics.

11        Q.    So controlled substances --

12        A.    Yes.

13        Q.    -- like opioids?

14        A.    Could be, yes.

15        Q.    Do you know what "lol" means?

16        A.    Yes.

17        Q.    What does it mean?

18        A.    Laugh out loud.

19        Q.    Laughing out loud?

20              Okay.  So she says, and -- "Rx

21   volume has increased and half of that increase

22   is narcotics.  Ha ha," right?  That's basically

23   what that is?

24        A.    Yeah.  And I don't know -- when
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you're looking at it printed like this, is she

 2    laughing because she's laughingly saying it's

 3    half increased or is she -- or they really are

 4    half increased.

 5            Q.    Or is it like, "Oh, my God,

 6    they've increased"?

 7            A.    Well, who knows?  I can't answer

 8    that.

 9            Q.    Well, I'm just asking you how you

10    interpret it because you're the one who got it,

11    right?

12            A.    Knowing Karla, it was just -- you

13    know, that was -- she's trying to be funny.

14            Q.    Okay.  Do you think Rx volume

15    increasing and half of that being an increase in

16    narcotics is funny?

17            A.    No.

18            Q.    Okay.  And then she says,

19    "Seriously, patients have been switching from

20    Norco now to plain oxycodone.  So those Rxs for

21    240 Norco are now 240 oxycodone.  It's nuts,

22    Tom.  These people aren't getting 120 or 90.

23    They're getting 360, 420, 500, and we need to

24    keep enough in stock so we don't get to the 0
```

```
 1   stage."

 2             Do you see that?

 3        A.   Yes.

 4        Q.   That's pretty concerning, isn't

 5   it?

 6        A.   Yes.

 7        Q.   This shows that the incidence in

 8   which people are getting opioids is going

 9   through the roof, right?

10        A.   Correct.

11        Q.   And Karla thinks it's funny,

12   right?

13        A.   Well, you have to understand

14   Karla.  So --

15        Q.   Well --

16        A.   -- there are some people that

17   are -- you know.

18        Q.   I mean, you can be a comedian, but

19   I don't think there's anything about the opioid

20   crisis that's funny, do you?

21        A.   No, I don't, but -- you know, she

22   obviously -- in the last sentence that you

23   didn't highlight, she's referring to the ones

24   that they said hit the road, that they're not
```

Highly Confidential - Subject to Further Confidentiality Review

1    filling.

2            Q.    I didn't ask you about that

3    sentence yet.  I'm going to.  I'd rather that

4    you answer the question I asked.

5                  It's not funny, is it?

6            A.    It's not funny.

7            Q.    Okay.  And in fact, she said "it's

8    nuts," right?

9            A.    Yes.

10           Q.    And she's a pharmacist.  Despite

11   the fact that she thinks it's funny, she does

12   also think it's nuts, right?

13           A.    Correct.

14           Q.    Do you think it's nuts?

15           A.    I think it's very concerning.

16           Q.    Okay.  So these people are

17   switching over to opioids.  And when it says,

18   "They're not getting 120 or 90, they're getting

19   360, 420, 500," are those quantities?

20           A.    I would assume so.

21           Q.    I mean, what else could it be?

22           A.    Right.  Yeah.

23           Q.    Do you think it's appropriate for

24   a pharmacist to fill a prescription for 500

Highly Confidential - Subject to Further Confidentiality Review

```
 1    oxycodone pills?

 2           A.    No.  What I'd like to see is, is

 3    that true fact or is she being, you know, overly

 4    zealous in her writing.  I don't know.

 5           Q.    I mean, wouldn't you expect a

 6    communication like this about the way that

 7    opioids are flying out the door to be serious

 8    and factually based from one of our pharmacists?

 9           A.    Yes.  Again --

10           Q.    I get being funny, but this is not

11    a situation where you're going to, you know,

12    throw a bunch of -- she's not going to blow

13    smoke at you, is she?  This is --

14           A.    No.

15           Q.    This is happening, right?

16           A.    I would assume, though, I can't

17    talk to the quantities of 500.  To me, that

18    seems -- I can never think of a situation where

19    somebody is going to get 500, but ...

20           Q.    All right.  That's a good point.

21    Let me ask about that.

22                 So what is the largest quantity

23    that would be appropriate to fill for an

24    oxycodone prescription at one given time?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Let's assume that they're taking

2    eight a day, so 360, around the 400 mark would

3    be, you know --

4          Q.    So 360 is the absolute max and

5    that's if you're taking eight a day?

6          A.    Now, are they getting -- are these

7    three-month supplies?

8          Q.    Answer the questions that I -- I

9    think there's a question pending.

10         A.    Okay.

11         Q.    Do you want me to repeat it?

12         A.    Yeah, please.

13         Q.    So -- okay.  So I want to just

14   make sure I'm clear.  You're telling me as a

15   pharmacist that the largest permissible

16   prescription that anyone could have for

17   oxycodone or that you would want your pharmacist

18   filling would be 360 tablets?

19         A.    For a month's supply.

20         Q.    Okay.  So anything above 360 would

21   be too much, right?

22         A.    If the PBM allows a 90-day supply,

23   then --

24         Q.    Did it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Did it?  I don't know.

 2            Q.    Do you know whether your

 3   pharmacists were permitted to give more than a

 4   30-day supply?

 5            A.    Probably not, no.

 6            Q.    Okay.  Did DDM have any policies

 7   and procedures in-house that told pharmacists

 8   what the maximum amount of opioids was that they

 9   could fill in a particular prescription?

10            A.    We did not have anything in the

11   policy, no.

12            Q.    Okay.  But 360 would be the

13   absolute end all, right?

14            A.    I would say that's getting to the

15   point where anything more than that, you would

16   have to really justify it.  If they were taking

17   multiple doses at bedtime as opposed to so many

18   during the day and then another two doses at

19   bedtime, it could kick it up a little bit higher

20   but, you know, that's a large quantity.

21            Q.    So is it fair to say that you

22   don't know the exact maximum amount of

23   hydrocodone that a person can take safely?

24            A.    It depends on the prescription.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     That a person can take safely?

 2              A.     It depends on the prescription and

 3       the person.  Typically, the problem that we're

 4       seeing in this country is in order to gain the

 5       same pain management that you got when you're

 6       starting off, the physicians were usually on an

 7       upward curve to if they didn't control their

 8       pain with one pill a day, they would up it to

 9       two pills a day.

10              Q.     Because people were --

11              A.     Two pills four times a day.

12              Q.     -- they were developing a

13       tolerance?

14              A.     A tolerance would develop.  And

15       somebody that took four a day versus ten a day

16       would strictly depend upon the tolerance of that

17       drug.  So it's a fluid situation.

18              Q.     Okay.  Let's go to your response.

19       You said, "Who are the prescribers?  Are they

20       reliable?  If questionable, have we notified the

21       Board?"

22                     Do you see that?

23              A.     Yes.

24              Q.     And then she responds.  She said,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "Here are the main ones."  There's four of them,

 2    right?  Right?

 3            A.    Okay.

 4            Q.    And one of them is Gordon Korby.

 5                  Do you see that?

 6            A.    Yes.

 7            Q.    And it says, "Has been

 8    investigated but no action by Board."

 9                  Right?

10            A.    Yes.

11            Q.    Do you know whether any of these

12    other pharmacists or doctors lost their DEA

13    licenses?

14            A.    I don't know that.

15            Q.    Okay.  Did you ever do anything to

16    investigate these doctors?

17            A.    No.

18            Q.    Do you know whether Karla did?

19            A.    Other than contacting the State

20    Board?

21            Q.    Well, you asked her who the

22    prescribers were that were giving the

23    prescriptions in these large quantities down

24    here.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    Yes.

2           Q.    And these are the names she gave

3   you, right?

4           A.    Okay.

5           Q.    But you didn't research those

6   doctors, and I'm asking if you know whether she

7   did?

8           A.    Typically something like this

9   would -- I assume she contacted the State Board

10  on them because she's got an answer on the one

11  that they're being investigated, but the board

12  has not actually come in and taken their license

13  away.  So for her to answer that question --

14          Q.    But I mean, you don't know,

15  though, right?  You're speculating?

16          A.    Yeah.

17          Q.    Okay.  I just want to know what

18  you know, that's all.

19                All right.  So in the response

20  that you give, you say, "As we discussed at the

21  meeting, I would start to pare down those coming

22  to your store from outside your immediate area."

23                And we talked about that earlier,

24  right?
```

```
 1              A.    Yes.

 2              Q.    That's something that you

 3      encouraged pharmacists to do?

 4              A.    Correct.

 5              Q.    And it says, "I would run a report

 6      to see who those people are and notify them of

 7      the new store policy in advance so there will be

 8      surprise" -- I assume you meant "no surprises at

 9      the Rx counter."

10                    Right?

11              A.    Correct.

12              Q.    Okay.  But you didn't instruct her

13      here that she shouldn't be filling prescriptions

14      of that size, right?

15              A.    Correct.

16              Q.    And you didn't tell her that she

17      should investigate these doctors, right?

18              A.    No.

19              Q.    And you didn't tell her that she

20      should report these -- either these

21      prescriptions or these doctors to the board or

22      the DEA, right?

23              A.    I did not instruct her to do that.

24              Q.    Okay.  Exhibit 18.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2           (DDM-Nameth Exhibit 18 marked.)

 3                      - - -

 4   BY MR. MULLIGAN:

 5        Q.    And this is DDM174146.  We're

 6   going to start on the second page, which is the

 7   beginning of the e-mail string, at the bottom.

 8   This is from Michele Golob to Pete and yourself.

 9               Do you see that?  It's down at the

10   bottom.

11               MR. JOHNSON:  Right down here at

12         the bottom.

13        A.    Oh, okay.

14        Q.    It's the second page.

15        A.    Okay.

16        Q.    Got it?

17        A.    Yes.

18        Q.    And it says, "Subject:  34."  I

19   assume that's store 34, right?

20        A.    Yes.

21        Q.    "34 called me yesterday late

22   afternoon stating they were short 60 generic

23   Percocet.  This now brings a total to 100

24   missing in the past month."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    Do you see that?

2          A.    Yes.

3          Q.    Okay.  And if you go to the last

4    page, it says, "Both have offered to do a drug

5    test if we want them to, specifically Vern.  He

6    wants to make sure his name is cleared, and he

7    says he did not take any of them."

8                    Do you see that?

9          A.    Yes.

10         Q.    And this would have been prior to

11   the drug screening going into place, right?

12         A.    Correct.

13         Q.    If you go up to the second e-mail,

14   Pete wrote, "At which point do we want to notify

15   OSBP and DEA."

16                   Right?

17         A.    Yes.

18         Q.    And so it sounds like what he's

19   sort of showing us is that DDM didn't have a set

20   firm policy about what time frame OSBP or DEA

21   needed to be notified regarding certain issues,

22   right?

23         A.    Yes.

24         Q.    Okay.  And then it says, "Scott
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    has told repeatedly to notify them when we

2    uncover a loss or suspect one.  I don't want to

3    jeopardize our relationship with the DEA since

4    they have been imposing heavy fines for a

5    variety of infractions."

6              Do you see that?

7         A.   Mm-hmm.

8         Q.   So Scott, is that Scott Brinks

9    from the DEA?

10        A.   I assume.

11        Q.   Okay.  So it sounds like Scott's

12   repeatedly telling you guys that you have to

13   notify them when you uncover a loss or even a

14   suspected loss, right?

15        A.   That's what it states.

16        Q.   Okay.  But Pete's saying he

17   doesn't want to bug him because you guys have a

18   good relationship; is that fair?  And because

19   they're imposing heavy fines?

20        A.   Yeah.

21        Q.   Okay.  If you go further up, we're

22   going to skip the Glinski e-mail.  There's one

23   from Pete to John, Michele, you, and Buddy.  And

24   who's Michele Golob?
```

```
 1              A.     Supervisor.

 2              Q.     Okay.  So Pete says, "I'm more

 3      worried about the DEA.  They have issued over

 4      8 million in fines against primarily the big

 5      chains."

 6                     Do you see that?

 7              A.     Yes.

 8              Q.     So it sounds like you guys weren't

 9      really underneath the microscope at that point,

10      right?

11              A.     I assume so, yeah.

12              Q.     Okay.  They have been targeting

13      either poor policies and procedures

14      surrounding" -- I assume that's controlled

15      substances, CS?

16              A.     Mm-hmm.

17              Q.     "Tom is participating in a CDC

18      task force regarding this and failing to comply

19      with reporting requirements."

20                     Do you see that?

21              A.     Yes.

22              Q.     So it looks like you guys are

23      aware the DEA is targeting poor policies and

24      procedures and failure to comply with the
```

Highly Confidential - Subject to Further Confidentiality Review

1    reporting requirements, right?

2           A.    Correct.

3           Q.    And it also sounds like Pete

4    Ratycz is concerned about the DEA in light of

5    that, right?

6           A.    Yes.

7           Q.    Okay.  Were you concerned at that

8    time?

9           A.    We were concerned and -- as

10   anybody would be that -- you know, that we work

11   with the DEA very well.  We wanted to make sure

12   we were in compliance with what they wanted us

13   to do.

14          Q.    Okay.  So then it says, "Six CVSs

15   in Oklahoma lost their DEA license in January

16   for not reporting in a timely manner for a

17   period of six months."

18                Do you see that?

19          A.    Yes.

20          Q.    Okay.  So essentially this e-mail

21   is saying, you know, we've got to figure out

22   when we've got to notify them, because if we

23   don't, something bad might happen and that might

24   be the DEA leveraging a fine, right?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    But I don't know -- I don't know

 2    if that's right.  Are they referring to maybe an

 3    ARCOS not reporting?  It doesn't say --

 4          Q.    Well, the e-mail chain is talking

 5    about --

 6          A.    Correct.

 7          Q.    -- loss.

 8          A.    Yes.  I know that's what it is,

 9    but was the incidents in Oklahoma, loss of DEA

10    license in January for not reporting in a timely

11    manner -- could he be referring to ARCOS?  I

12    just don't know that.

13          Q.    You would agree with me that DDM

14    didn't have a policy regarding how quickly you

15    needed to report loss or suspected loss,

16    correct?

17          A.    Correct.

18          Q.    Okay.  Even though Scott Brinks

19    has repeatedly told you that you had to report

20    it when you uncovered either a loss or a

21    suspected loss, correct?

22          A.    Once that became clear to us, I

23    think that's when -- at that particular time, we

24    wanted to make sure -- prior to this -- we

Highly Confidential - Subject to Further Confidentiality Review

```
 1   wanted to make sure that there was indeed a

 2   loss.  Once we found out from Scott that he

 3   wanted to know right away, then we were --

 4   started that procedure.

 5         Q.    Do you remember those DEA letters

 6   that we looked at from 207 --

 7         A.    Yes.

 8         Q.    -- 2007?

 9         A.    Yes.

10         Q.    They made it clear that you had to

11   report them as soon as you discovered them,

12   right?

13         A.    They -- we were trying to

14   determine whether they were a loss before we

15   reported them.

16         Q.    Okay.  You guys read language into

17   that requirement that gave you leeway to

18   investigate before you reported, right?

19               MR. JOHNSON:  Objection.

20         Q.    That's fair, right?

21         A.    I don't want to answer that

22   because I don't know if it's a fair question.

23         Q.    You have to answer it.

24         A.    Well, then I'm going to answer
```

1    that I don't -- I don't think it's fair.

2            Q.    Well, I didn't ask you whether you

3    thought the question was fair.  You still have

4    to answer the question.

5            A.    Didn't you just ask me if it was

6    fair or not?

7                  MR. JOHNSON:  You did ask --

8                  MR. MULLIGAN:  That's a good

9            point.  I did say that, didn't I?

10                 MR. JOHNSON:  Yeah.

11                 MR. MULLIGAN:  Well, foot in

12           mouth.

13    BY MR. MULLIGAN:

14           Q.    Okay.  So you don't think it's

15    fair?

16           A.    No.

17           Q.    Okay.  And what don't you think is

18    fair?

19           A.    Because at that point we were

20    notifying the DEA after we knew that there was a

21    loss.

22           Q.    Okay.

23           A.    It wasn't a suspected loss.

24           Q.    So it's still your position right

Highly Confidential - Subject to Further Confidentiality Review

```
 1   now that --

 2          A.    No.

 3          Q.    Okay.  Go ahead.

 4                MR. JOHNSON:  Wait.  Let him

 5          finish the question.

 6          Q.    It's still your position --

 7                MR. MULLIGAN:  It's getting late,

 8          right?

 9                MR. JOHNSON:  Yes.

10   BY MR. MULLIGAN:

11          Q.    It's still your position that you

12   did not have to report a loss until it was a

13   confirmed loss?

14          A.    As I read this now and then, at

15   the time, yes, we did change our reporting to as

16   soon as we found out.

17          Q.    So even --

18          A.    So that's what they wanted.

19          Q.    Even a suspected loss should be

20   reported when discovered?

21          A.    That's what we were doing.

22          Q.    Okay.  And you guys changed that

23   at some point?

24          A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And would that have been in the

2    2013 time frame?

3          A.     Late.

4          Q.     Okay.  All right.  So the next

5    page on the front, the bottom, Michele writes

6    back to you and Pete and says, "What is the time

7    frame to report the 106?  Oftentimes we are

8    looking into things, doing counts.  A few days

9    after first discovery?  Weeks?"

10               Do you see that?

11         A.     Yes.

12         Q.     So she's a regional pharmacy

13   supervisor, and I believe you told me that they

14   were trained and responsible for overseeing

15   reporting, but it looks like she doesn't even

16   know when she was supposed to report; is that

17   fair?

18         A.     Once the 106 was done, they would

19   send it in, but what your question is, is when

20   do you do it?  Is that what the question is?

21         Q.     Yeah.  Well, and part of reporting

22   is when, right, when and what?

23         A.     Yes.

24         Q.     So Michele doesn't have any idea

```
1    whether she needs to report within a few days

2    after the discovery or a few weeks --

3              A.    Correct.

4              Q.    -- right?

5              A.    Correct.

6              Q.    Okay.  And in realty, it's within

7    a day of discovery, right?

8              A.    Yes.

9              Q.    Okay.  So both of her suggested

10   answers are incorrect, right?

11             A.    Yes.

12             Q.    Okay.  So Pete writes back and

13   goes, "Technically, it's the time you identify

14   an error."

15             So Pete knows the right answer,

16   doesn't he?

17             A.    Yes.  As Scott Brinks had referred

18   to him to do, yes.

19             Q.    Okay.  Do you know why he used the

20   word "technically"?

21             A.    I don't know why he would use

22   that.

23             Q.    Usually in common parlance that's

24   followed with a, but in practice we do the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   following, right?

 2           A.    It's conveyed that.

 3           Q.    So he then says, "The DEA would

 4   argue that it should not take the store weeks to

 5   determine if a Rx was not logged on a perpetual

 6   inventory sheet."

 7                 Right?

 8           A.    Yes.

 9           Q.    And in fact, we know the DEA wants

10   to know about it immediately, right?

11           A.    Well, it's a little confusing

12   because perpetual inventory sheet and something

13   logged in is not commensurate to what we have to

14   turn in to DEA.  So let me read this a little

15   bit closer.

16           Q.    I'm just referring back to

17   Scott's -- the statement about what Scott said.

18           A.    Yes.  Okay.  Yes.

19           Q.    All right.  And then if you go

20   above, it looks like Michele -- neither Michele

21   nor Jen had actually done it.  And she said that

22   she was going to go back and do it.

23                 Do you see that at the top?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  So that one fell through

 2      the cracks, right?

 3            A.    Yes.

 4            Q.    We're on Exhibit 19, which is DDM

 5      48217.

 6                        - - -

 7            (DDM-Nameth Exhibit 19 marked.)

 8                        - - -

 9      BY MR. MULLIGAN:

10            Q.    And I'll just represent this is a

11      piece of that last e-mail chain, but it's just

12      got one extra response at the top.  So we're

13      just going to look at the top part.

14                  So Michele writes back and she

15      says, "Jen did not do a 106 for the initial 40

16      due to taking counts and still investigating.

17      She will submit that one today.  I will give --

18      have her submit the 60 by the end of the week

19      since it looks like nothing is turning up

20      again."

21                  Do you see that?

22            A.    Yes.

23            Q.    So despite this chain about

24      reporting things when found, they're still
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    taking their time to report stuff, aren't they?

 2                MR. JOHNSON:  Objection.

 3          A.    Yes.

 4          Q.    Okay.  All right.  We're going to

 5    look at 21 -- I'm sorry.  20.  Which is

 6    DDM427343.

 7                (DDM-Nameth Exhibit 20 marked.)

 8                           - - -

 9    BY MR. MULLIGAN:

10          Q.    This is an e-mail about a month

11    later from Michele to Pete and yourself.

12                Do you see that at the bottom?

13          A.    Yes.

14          Q.    And she says, "Do we want to

15    implement chain wide asking for a valid ID at

16    the time of drop off/pickup for all controlled

17    substances."

18                Do you see that?

19          A.    Yes.

20          Q.    What would be the benefit of

21    asking for a valid ID when picking up drugs?

22          A.    Well, so that the patient -- it's

23    the right patient that you're handing the

24    medication to.
```

1    Q.    So you can identify it's the right

2  person, right?

3    A.    Right.

4    Q.    You can identify whether they are

5  shopping outside their geographical area, right?

6    A.    Well, the prescription itself

7  would have the address of the patient, right?

8    Q.    You tell me.

9    A.    Yes.

10    Q.    Okay.

11    A.    So that --

12    Q.    But the ID would help you verify

13  that information, too, right?

14    A.    It would be an actual bonus, yes.

15    Q.    Okay.  Is there any other reason

16  why asking for an ID would be important, or is

17  it really just to confirm who they say they are?

18    A.    Well, it may be a deterrent to

19  someone picking it up that they have to show

20  their driver's license or some other ID with a

21  picture on it that they may not want to do that.

22    Q.    So it would be something that

23  could potentially be put in place, could help

24  deter diversion?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    Possibly.

2              Q.    Okay.  And this -- she says that

3    number 21 already has this in place, it looks

4    like.  And I want to know, at that time was

5    asking for a valid ID part of DDM's suspicious

6    order monitoring policies?

7              A.    No.

8              Q.    Okay.  Could it have been easily?

9              A.    Yes.

10             Q.    Okay.  So Pete responds at the

11   top, and he says, "I don't want it to

12   inconvenience customers.  We don't have that

13   luxury."

14                   Right?

15             A.    Correct.

16             Q.    So Michele is saying, we should

17   have a valid -- we should have a chain wide

18   policy where you have to get a valid ID, and

19   you've told me that that would help prevent

20   diversion, correct?

21             A.    It would be a helpful tool.

22             Q.    Okay.  And Pete's saying no,

23   because he doesn't want to inconvenience

24   customers, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Well, the problem is, if you

 2      institute a policy like that and the patient --

 3      whoever is picking it up does not have to be the

 4      patient in the State of Ohio.

 5            Q.    Okay.

 6            A.    If they're sick and in bed,

 7      someone is going to come in and pick it up for

 8      them.  And if -- they're not going to have an ID

 9      that matches the prescription.  So it creates a

10      problem.  And, you know, it's all well and good

11      in theory and, you know, but it's really

12      problematic in carrying that out.

13            Q.    Okay.

14            A.    Because I know plenty of

15      circumstances where people that are not the

16      patient is picking it up.

17            Q.    So at least in this instance, you

18      guys opted for customer convenience over a

19      stronger diversion plan, right?

20            A.    No.  We had -- we asked them to

21      give another form of identification, so to

22      speak, and that was a birth date.

23            Q.    So you had to give a birth date

24      for the person who the prescription was for?
```

1        A.    Yes.

2        Q.    Okay.  How would that prevent the

3   person who was there from improperly taking that

4   prescription and diverting it?

5        A.    It wouldn't.  And it wouldn't --

6   even if it was the person that was prescribed,

7   you're not going to prevent them from diverting

8   it.

9        Q.    Did you ever have an instance

10  where a customer showed up at a store to pick up

11  a prescription that had already been filled and

12  given to somebody else?

13       A.    Yes.

14       Q.    Okay.  And because presumably that

15  person just knew that their family member's

16  birth date was a certain day and they showed up

17  and gave that?

18       A.    Well, we had that instance prior

19  to actually instituting the birth date.  So

20  that's why we instituted the birth date, because

21  people were doing exactly that.  So -- you know,

22  this was years ago.  And so we implemented the

23  birth date.  Now, is it possible that someone

24  could know that?  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  Did DDM ever require that a

 2   valid ID be presented?

 3              A.    Not corporately, no.

 4              Q.    Okay.  Exhibit 23.

 5                           - - -

 6              (DDM-Nameth Exhibit 21 marked.)

 7                           - - -

 8              MR. KNOLL:  Exhibit 21.

 9              MR. MULLIGAN:  Oh, I'm sorry.

10         Yeah, 21.

11   BY MR. MULLIGAN:

12              Q.    This is P-DDM-0501.  And there's

13   actually two pages here.  And this says

14   hydrocodone shipments to BD2308155 from Discount

15   Drug Mart.

16              Do you know what that's referring

17   to?

18              A.    It's their DEA license probably.

19              Q.    So is that a store?

20              A.    Yes.

21              Q.    Okay.  And I think we talked about

22   it earlier, you never looked at this type of

23   information to monitor usage over time, right?

24              A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Do you know which store

2    that is, Parma Heights?

3          A.    Yeah, store 35.

4          Q.    35.  Okay.  We've actually seen

5    references to 35 in these documents, haven't we?

6          A.    Yes.

7          Q.    Okay.  Was store 35 a problem

8    store?

9          A.    I wouldn't specify it as a problem

10   store.

11         Q.    Did you have problems with 35 and

12   opioids?

13         A.    Well, through the documents that

14   we looked at, yes.

15         Q.    Okay.  And at no time did you look

16   at this report showing the amount of hydrocodone

17   that they were putting out into the public,

18   right?

19         A.    No.

20         Q.    Okay.  You'd agree with me that

21   from -- prior to January 2002, there was almost

22   nothing that came out of that store, no

23   hydrocodone, correct?

24         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And then starting in 2002, there

 2    was a pretty significant spike in that first

 3    year, right?

 4              A.    Well, what I don't see on this is

 5    when the store was opened.  And those types of

 6    situations that would skew these numbers.  When

 7    did the store open up?  I would have to look at

 8    that information.

 9              Q.    Okay.

10              A.    So how old the store is.  I'm

11    thinking that the store -- relatively new store

12    would have opened around that time frame, so ...

13              Q.    Okay.  But you'd agree that

14    between, say, 2003 and 2015, the amount of

15    hydrocodone alone that they were putting into

16    the public quintupled, right?  It was five times

17    larger, 5,000 to 25,000?

18              MR. JOHNSON:  Objection.

19              A.    Well, the problem you're -- in

20    seeing this, is that one of the spikes went up,

21    but in -- you know, if you look at all -- if you

22    fill in all the blanks here across the board

23    where it's going up and going down, if it goes

24    up and then comes down to the next level,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   wouldn't you say an average is like halfway

 2   between?  So it's not really reaching that high,

 3   but it's reaching high -- it's trending upward.

 4          Q.    I'm just looking at the order -- I

 5   mean the orders themselves.  I assume these

 6   lines represent orders, correct?  I mean -- or

 7   do you not know?  Or perhaps its --

 8          A.    Did this come from --

 9          Q.    It may have been monthly --

10          A.    I don't know where this generated.

11          Q.    It may have been monthly

12   quantities.

13          A.    Okay.

14          Q.    Obviously hard to count those

15   lines, but -- I mean --

16          A.    Yeah.  There -- it would have to

17   be monthly or every two months, because

18   there's -- are there 12 lines between -- I don't

19   think there's 12 lines between '02 and '03.

20          Q.    Without counting those --

21          A.    There might be six.

22          Q.    Without counting those lines,

23   though, you'd agree that this could be

24   indicative of a problem, right?
```

```
 1                    MR. JOHNSON:  Objection.

 2          A.    It's indicative of an increased

 3   quantities.

 4          Q.    From a store that had documented

 5   problems with diversion?

 6                    MR. JOHNSON:  Objection.

 7          A.    It had documented problems.

 8          Q.    Okay.  Let's turn to the second

 9   page.  This is the Euclid store.  Do you know

10   what number that is?

11          A.    I believe 35 -- no.  31.

12          Q.    Was 31 a problem store?

13          A.    I wouldn't classify it as a

14   problem store.

15          Q.    Okay.  What would you classify it

16   as?  Was it an upper tier?

17          A.    It was a busy store.  It was --

18   upper tier of what?  Oxycodone dispensing?

19          Q.    Yeah.

20          A.    It was a busy store, so any busy

21   store would have high dispensings of oxycodone.

22          Q.    Okay.  At some point, although

23   it's trending up for quite some time, it looks

24   like in about 2012, 2013, the trend started to
```

Highly Confidential - Subject to Further Confidentiality Review

1    go down.  Do you have any idea why that might

2    have happened?

3              A.    I would think that it's due to the

4    reduced amount of oxycodone -- or

5    hydrocodones -- well, first of all, hydrocodone

6    went to Schedule II in 2014, so that's going to

7    reduce it automatically right there.

8              Q.    Okay.

9              A.    And then the volume that you -- I

10   mean the State Board had changes in the -- how

11   much you could dispense, was it a week supply or

12   so, those types of regulations have changed.  So

13   there -- you're going to get a reduction

14   hopefully after 2014.

15             Q.    Okay.  So it took Ohio State Board

16   regulations to help stem this growth of

17   hydrocodone?

18             A.    No, it took DEA regulations to

19   change it to a Schedule II.

20             Q.    Okay.  Did the thresholds that

21   Cardinal imposed on the DDM stores have anything

22   to do with the amount of hydrocodone that they

23   were putting out; do you know?

24             A.    I can't answer that because I

Highly Confidential - Subject to Further Confidentiality Review

```
1    wasn't around during that -- I was not --

2            Q.    So you were -- once that Cardinal

3    came in and thresholds were published, you were

4    gone?

5            A.    Oh, Cardinal.  I'm thinking when

6    we went to someone else.

7                  MR. JOHNSON:  You're talking over

8            each other again, so ...

9            Q.    Go ahead.

10                 MR. JOHNSON:  Got to help Carol

11           out.

12                 MR. MULLIGAN:  Sure.

13   BY MR. MULLIGAN:

14           Q.    So were you at DDM when Cardinal

15   started providing hydrocodone to DDM stores?

16           A.    Yes.

17           Q.    Okay.  And do you recall that once

18   those thresholds were put in place, it was very

19   common for DDM store orders to get cut and

20   reported to the DEA as suspicious because they

21   exceeded the thresholds set by Cardinal?

22           A.    No.

23           Q.    It was not common?

24           A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  Did it happen every month?

 2              A.    No.

 3              Q.    How often would it happen?  Every

 4   month how many stores would have their orders

 5   cut and reported, on average?

 6              A.    One or two, possibly.

 7              Q.    Okay.  All right.  Was there ever

 8   a time where you guys designed or developed or

 9   implemented a more aggressive controlled

10   substance monitoring policy?

11              A.    When we instituted the six-week

12   average.

13              Q.    Okay.

14              A.    That was an add-on to the 12-month

15   policy that was originally in place.

16              Q.    And you're talking about the

17   report that Jill Strang was responsible for?

18              A.    Yes.

19              Q.    Do you know when that was?

20              A.    I don't.

21              Q.    Was there anything else that was

22   done to strengthen DDM's suspicious order

23   monitoring policies and procedures?

24              A.    Not that I recall.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    Okay.  We'll look at Exhibit 22,

 2    which is DDM169025.

 3                       - - -

 4           (DDM-Nameth Exhibit 22 marked.)

 5                       - - -

 6    BY MR. MULLIGAN:

 7           Q.    This is an e-mail from Pete to

 8    Scott Brinks.  He was at the DEA, right?

 9           A.    Yes.

10           Q.    Okay.  And you were copied on

11    this, weren't you?

12           A.    Mm-hmm.

13           Q.    And this is October --

14           A.    Yes.

15           Q.    -- 23, 2013?

16           A.    Correct.

17           Q.    And the subject is "Controlled

18    substance monitoring."

19                 Do you see that?

20           A.    Yes.

21           Q.    All right.  It says, "Scott, Tom

22    Nameth, director of pharmacy, attended the DEA

23    distributor conference in Maryland yesterday.

24    We are in the final process of implementing a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    more aggressive controlled substance monitoring

 2    system handling, dispensing and reporting at

 3    store level and corporate."

 4                  Do you see that?

 5         A.    Yes.

 6         Q.    Do you know what he's talking

 7    about?

 8         A.    Yes.

 9         Q.    What is it?

10         A.    Well, what he's referring to is

11    when I went to the DEA distribution in Maryland,

12    but as far as his more aggressive controlled

13    substance, he was trying -- the reason we went

14    to the DEA conference was we were trying to ask

15    the DEA, "What exactly do you want us to do that

16    we're not doing?"

17                  And so Pete was aware of that, and

18    he is waiting for a return visit.  I attended

19    with P.J. Ferut, and the two of us went there

20    because obviously she would have to institute

21    the new -- a new program if we were going to do

22    so.

23         Q.    Was a new program ever instituted?

24         A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  So a more aggressive

 2  controlled substance monitoring system was never

 3  implemented?

 4            A.    Correct.

 5            Q.    Okay.  Even though this e-mail

 6  indicates that it was in the final process,

 7  right?

 8            A.    I'm trying to find where that

 9  states.

10            Q.    Second sentence.

11            A.    Oh, we're in the final process?

12  Unless he is in reference to the Chain Drug

13  Consortium that was mentioned earlier in here

14  that we were looking to aggressively change our

15  controlled drug policy.

16            Q.    But this more aggressive

17  monitoring system was never put in place, as far

18  as you know, right?

19            A.    Correct.

20            Q.    Okay.  Is there a reason why you

21  guys were asking the DEA for guidance on your

22  monitoring system in 2013 and didn't do it

23  before that?

24            A.    No.  But even after attending this
```

Highly Confidential - Subject to Further Confidentiality Review

1    conference, they never really spelled out what

2    methodology they really wanted us to do.  It was

3    mentioned during this conference, "What are you

4    doing about all the prescriptions that we're

5    seeing?  You know, it's somebody's job to

6    monitor the doctors and all the scripts that

7    we're seeing."

8           That's -- that's the source of

9    what -- we're filling their orders.  Is anybody

10   monitoring the doctors?  Is the AMA?  Is the

11   DEA?  And their answer was no.

12         Q.    All right.  We're on 23 now, which

13   is DDM31931.

14                  - - -

15         (DDM-Nameth Exhibit 23 marked.)

16                  - - -

17   BY MR. MULLIGAN:

18         Q.    And just to confirm, you guys

19   never put your substance -- Controlled Substance

20   Monitoring Policy in writing, correct?

21         A.    Correct.

22         Q.    All right.  So this is an e-mail

23   from Ed McGinley and you're on the to line on

24   December 2, 2013.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2          A.     Yes.

3          Q.     And there's a CDC Controlled

4    Substances Model Policy attached, and this is

5    from Ed McGinley, right?

6          A.     Right.

7          Q.     And he says, "Attached is a

8    substance model policy."

9          And then down below, he says, "It

10   is a comprehensive document intended to be used

11   as a template to construct controlled substance

12   policies or to evaluate and enhance existing

13   policies."

14          Right?

15         A.     Correct.

16         Q.     And if you turn to the next page,

17   there's the document he's referring to.

18          Do you see that?

19         A.     Yes.

20         Q.     What, if anything, did you do with

21   this document?

22         A.     We reviewed it to see if it would

23   fit our model.

24         Q.     Did it fit?

Highly Confidential - Subject to Further Confidentiality Review

    1          A.    For the most part, yes, with small

    2    tweaks in there.

    3          Q.    Okay.  Did you change your

    4    unwritten controlled substance monitoring policy

    5    at all after seeing this document?

    6          A.    Not on a corporate level.

    7          Q.    Okay.  Did you do it on a store

    8    level?

    9          A.    No.

   10          Q.    Okay.  So this didn't cause you to

   11    change anything that you were doing, correct?

   12          A.    Correct.

   13          Q.    Okay.  Did you ever provide a

   14    document like this to a distributor if they

   15    required evidence that you had a suspicious

   16    order monitoring policy?

   17          A.    Yes.  If they -- what we did, if I

   18    remember correctly, in reviewing this -- this

   19    was in late '13 -- we looked at this and

   20    basically what a lot of this is, or most of it,

   21    is what we currently were doing so that if

   22    someone did ask us for a written policy -- if we

   23    had a policy, this was already written in and it

   24    matched what we were currently doing, so we

Highly Confidential - Subject to Further Confidentiality Review

1  might have sent it out to them that would

2  specify what we did.

3         Q.    So let me make sure I understand.

4  There's almost 30 pages of policy in this

5  document, right?

6         A.    Right.

7         Q.    And you're telling me that DDM did

8  everything that's listed in this?

9         A.    In this particular one?  No.

10  We -- according to Ed Ginley [sic], we could

11  modify it to fit our needs.

12         Q.    Okay.  I'm just -- I'm only asking

13  because you said you sent it out because it was

14  what you were doing.  I just want to make sure

15  that --

16         A.    Not they're -- not the CDC

17  document, because at this time that's what this

18  was, the Chain Drug Consortium's controlled

19  substances model.

20         Q.    Okay.  I'm going to hand you 24

21  now, which is DDM92440, and the attachment to

22  that is DDM91606.

23                      - - -

24         (DDM-Nameth Exhibit 24 marked.)

```
 1                    - - -

 2    BY MR. MULLIGAN:

 3         Q.    This is an e-mail dated a couple

 4    months later, April 2, 2014, from Jill Strang to

 5    Tony Devens, and the original e-mail is from

 6    you.  And I'll just represent to you that this

 7    document on the back is the one that was

 8    attached.

 9         A.    Right.

10         Q.    And it looks strikingly similar to

11    the one we just looked at.

12         A.    Yes, with some changes.

13         Q.    And you would have provided this

14    to a distributor as evidence that you had a

15    suspicious order monitoring policy; is that

16    fair?

17         A.    This would document what we did

18    for our policy.

19         Q.    If there are differences between

20    this attachment and the one we just looked at,

21    who would have made these changes?

22         A.    I probably would have.

23         Q.    You would have?  Okay.  Would it

24    surprise you to learn that Jill Strang testified
```

Highly Confidential - Subject to Further Confidentiality Review

1    that this was not Discount Drug Mart's

2    suspicious order monitoring policy?

3         A.    It was never -- it was never

4    actually taken as a corporate policy.  What it

5    did was show what we did during our policy.  In

6    other words, rather than rewrite a telephone

7    book, everything in here after review was

8    something that we did.  So we -- rather than

9    retype this, we used it as our template, changed

10   what we may not have done in the original to

11   what we did do in this --

12        Q.    Okay.

13        A.    -- and sent it to someone that

14   wanted that information.

15        Q.    So if Ms. Strang testified that

16   there were certain things in there that never

17   happened, would she be wrong, or would that ...

18        A.    I would be surprised.  You know,

19   I -- you know, I -- there shouldn't be anything

20   in here that we didn't do.

21             MR. MULLIGAN:  Okay.  Let's do

22        20 -- I'm going to do this document.

23                   - - -

24        (DDM-Nameth Exhibit 25 marked.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2   BY MR. MULLIGAN:

 3          Q.    This is 25.  This is DDM382315.

 4   And this says, "DLSS Controlled Substance Client

 5   Customers:  Due Diligence Questionnaire."

 6                Do you know what that is?

 7          A.    It's my writing, so I better know.

 8          Q.    I mean, if you don't remember,

 9   it's okay.  I was just trying to know what you

10   recall.

11          A.    I don't recall it, but it's my

12   writing, so ...

13          Q.    Okay.  If you go to page 2 -- and

14   I suspect this is probably a distributor of some

15   sort asking you what your policies were as part

16   of the suspicious order monitoring obligation.

17          A.    Okay.

18          Q.    Would that be fair?

19          A.    Yes.

20          Q.    Okay.  If you go down to number 9,

21   it says, "Is your company aware of DEA's Know

22   Your Customer policy?"

23                You said "Yes."

24                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And underneath that it says, "Does

 3    your company have procedures in place for

 4    adhering to the DEA's Know Your Customer

 5    policy?"

 6                And it says "Yes."

 7                Do you see that?

 8          A.    Yes.

 9          Q.    And then it says, "We only sell to

10    our own retail locations.  All pharmacies are

11    monitoring their patients for abuse potential."

12                Right?

13          A.    Yes.

14          Q.    And there's nothing in here that

15    says what DDM corporate is doing to monitor its

16    own people and to know its own pharmacists in

17    stores, correct?

18          A.    Correct.

19          Q.    And as we talked about earlier,

20    all you guys were doing in that respect was,

21    one, you knew who they were, or at least you

22    thought you did, and you knew that they had a

23    license, correct?

24          A.    Mm-hmm, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  And you also remember we

2   looked at that DEA letter which says that you

3   actually can't rely upon your pharmacists,

4   right?  You have a corresponding obligation as a

5   distributor, correct?

6               MR. JOHNSON:  Objection.

7          A.    I think that, in my opinion,

8   referred to the stores themselves, of the

9   customers at the end --

10         Q.    And we're splitting hairs on that,

11  but you'd agree that you can't rely on the store

12  to determine or prevent diversion, you have to

13  do it too, right?

14         A.    Well, we're going to continue to

15  split hairs on that, because we knew our

16  customers.

17         Q.    But you didn't, and you've

18  testified you didn't, because we went through a

19  whole pile of documents that show that DDM

20  employees, which included pharmacists, were not

21  only stealing drugs but they were addicted to

22  them, right?

23              MR. JOHNSON:  Objection.

24         A.    We were sending them to legitimate

```
 1    locations, okay?  So we can never be 100 percent

 2    on any employee in any business.  It doesn't

 3    matter what you're doing; you have the potential

 4    for theft.

 5            Q.    Okay.  And we've identified one

 6    way that you can weed out those bad people,

 7    though, and that's through drug screening,

 8    right?

 9            A.    That necessarily won't be

10    100 percent effective.

11            Q.    But it's better than nothing,

12    isn't it?

13            A.    Yes.

14            Q.    Okay.  All right.  On page 4, you

15    actually attested that DDM is aware of and

16    complies with all laws and regulations enforced

17    by the DEA and applicable state authorities.

18                  Do you see that?

19            A.    Yes.

20            Q.    And then you signed your name?

21            A.    Yes.

22            Q.    Do you know after you left whether

23    DDM's suspicious order monitoring policies were

24    ever put into writing?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    I don't know that.

 2           Q.    Okay.  Did DDM ever have reporting

 3    to help it effectively identify outlier stores

 4    or suspicious store ordering?

 5           A.    It never identified outlier

 6    stores.

 7           Q.    Did it have effective reporting to

 8    help you identify suspicious store ordering?

 9           A.    Part of our process was looking at

10    possible suspicious store ordering.

11                 MR. MULLIGAN:  Okay.  This is

12           going to be 27, right?  It's this one.

13                 MR. JOHNSON:  26, I think.

14                 MR. KNOLL:  26.

15                 MR. MULLIGAN:  26?

16                 MR. JOHNSON:  Yeah, 26.

17                       - - -

18           (DDM-Nameth Exhibit 26 marked.)

19                       - - -

20    BY MR. MULLIGAN:

21           Q.    This is DDM74952.  This is an

22    e-mail from Pete Ratycz.  This is actually dated

23    after you were probably well into retirement.

24    It's dated January 20, 2017.  And I just wanted
```

Highly Confidential - Subject to Further Confidentiality Review

1    to show you the second e-mail down here at the

2    bottom.  It says, "Chris" -- do you know who

3    Chris Peshek is?

4            A.    Yes, I do.

5            Q.    Who's that?

6            A.    Supervisor, store supervisor.

7            Q.    Okay.  "Chris, I think we need to

8    reemphasize our controlled substance program at

9    the upcoming pharmacist meeting.  Also, we need

10   to look at developing reporting to help us

11   effectively identify outliers and/or suspicious

12   store ordering."

13           Do you see that?

14           A.    Yes.

15           Q.    So it looks as of January of 2017,

16   at least it's Pete Ratycz' opinion that DDM does

17   not have reporting to help it effectively

18   identify outlier stores and/or suspicious order

19   monitoring, correct?  Suspicious ordering,

20   rather.  Right?

21           A.    At that time, we did not identify

22   outliers.  It's questionable whether it was

23   suspicious store ordering.  That's questionable.

24           Q.    Well, Pete here is saying --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes, that's what he's saying, yes.

 2              Q.    -- in 2017 DDM still has to

 3    develop reporting to help it effectively

 4    identify outliers and suspicious store ordering,

 5    right?

 6              A.    Correct.

 7              Q.    Which would mean that prior to

 8    this it didn't have effective reporting to help

 9    identify outliers and/or suspicious store

10    ordering, correct?

11                    Would you disagree with Pete?  Do

12    you think that DDM did have effective

13    reporting --

14              A.    I think what he's referring to in

15    my opinion is increasing and improving the

16    system.  The suspicious store ordering was

17    there, looking for an improvement on that

18    particular point, but also adding the outliers,

19    because we did not look at outliers.

20              Q.    And we saw an e-mail earlier which

21    actually talked about making the suspicious

22    order monitoring policies more aggressive,

23    didn't we?

24              A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And nothing was done at that time,

2   right?

3      A.    Correct.

4      Q.    Okay.  And so now, again, this is

5   about three to four years later, he's saying,

6   you know, we actually got to make this stronger

7   now, isn't he?

8      A.    Yes.

9      Q.    Okay.  Is there any reason why it

10   couldn't have been made more effective in that

11   interim, that you know of?

12      A.    Not that I know of.

13      Q.    Did Cardinal ever require DDM to

14   change or do anything to its suspicious order

15   monitoring policies and procedures, that you

16   know of?

17      A.    Require Drug Mart to change?

18      Q.    Yeah.

19      A.    They gave us the ability to change

20   levels.

21      Q.    You mean to order Schedule II?

22      A.    Yes.

23      Q.    Okay.  Would it be fair to say

24   that Cardinal handled Discount Drug Mart's

```
 1    suspicious order monitoring regarding

 2    hydrocodone at that time, from a distribution

 3    level?

 4            A.    After 2014?

 5            Q.    Yes.

 6            A.    Yes.

 7                  MR. MULLIGAN:  Now might be a

 8            decent time to take a break, if you want

 9            to take a quick break, and then I'll try

10            to finish up after that.

11                  MR. JOHNSON:  Okay.  So like

12            another 15 minutes?

13                  THE VIDEOGRAPHER:  We're going off

14            the record at 4:01.

15                  (Recess taken.)

16                  THE VIDEOGRAPHER:  We're back on

17            the record at 4:10.

18                        - - -

19            (DDM-Nameth Exhibit 27 marked.)

20                        - - -

21    BY MR. MULLIGAN:

22            Q.    This is happening because I've

23    eliminated documents, which is a good thing.

24            A.    That's fine.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MULLIGAN:

 2         Q.   All right.  This is Exhibit 27.

 3              MR. JOHNSON:  You're on camera,

 4         you know.

 5              THE WITNESS:  Sorry.  I'll control

 6         myself.

 7   BY MR. MULLIGAN:

 8         Q.   Exhibit 27, DDM55694.  And while

 9   he's handing it out, we were just discussing at

10   some point Cardinal sort of providing

11   hydrocodone, correct?

12         A.   Yes.

13         Q.   And when they did that, the

14   condition of providing hydrocodone was that they

15   required that -- or they insisted that DDM

16   stores have certain thresholds?

17         A.   Correct.

18         Q.   And that would be a maximum amount

19   that a store could order in a given month for a

20   variety of drugs or by drug family, right?

21         A.   Unless they wanted -- a store

22   wanted to increase the threshold, they'd given

23   them some reason to do so.

24         Q.   Okay.  And they had to provide
```

```
 1   some justification --

 2          A.    Yes.

 3          Q.    -- that would be indicative of

 4   demand that was not necessarily tied to

 5   diversion, right?

 6          A.    Correct.

 7          Q.    So a legitimate demand?

 8          A.    Yes.

 9          Q.    Okay.

10                MR. MULLIGAN:  Do you have my

11          copy?

12                MR. KNOLL:  I just gave it to you.

13                MR. MULLIGAN:  Okay.  You guys

14          didn't get a highlighted copy, did you?

15          Okay.  Cool.

16   BY MR. MULLIGAN:

17          Q.    All right.  So if you look at the

18   bottom, this is an e-mail from you to Brandon

19   Wilkins.

20                Do you see that?

21          A.    Yes.

22          Q.    Who is Brandon Wilkins?

23          A.    He's a -- our company

24   representative from Cardinal.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And so he would be the

2     individual that you would interact with

3     regarding the products that Cardinal supplied to

4     DDM stores?

5              A.    Yes, typically.

6              Q.    Okay.  And it says, "Hi Brandon,

7     since several stores have been notified about

8     their C-II orders being over the limit, is there

9     any way of knowing in advance what those monthly

10    limits are for select items such as morphine and

11    oxycodone."

12              Do you see that?

13             A.    Yes.

14             Q.    And it says, "The store

15    pharmacists are asking for it an effort to be

16    proactive."

17              Right?

18             A.    Correct.

19             Q.    And then in response, he says,

20    "Tom, we typically don't give out the thresholds

21    to stores because in DEA's eyes, it could look

22    like encouraging the stores to order the max."

23              Do you see that?

24             A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Do you remember we talked about

2  that earlier?

3     A.    Yes.

4     Q.    And we identified an e-mail where

5  you had just -- and you were in the practice of

6  just forwarding those e-mails to the stores that

7  contained the information that had those

8  thresholds, right?

9     A.    Correct.

10     Q.    Okay.  And I assume you wouldn't

11  have done that if you didn't know that they

12  didn't want it to be shared, correct?

13     A.    Well, it says typically they

14  don't, so, you know, it's -- it doesn't say they

15  don't and they can't.

16     Q.    Okay.  So -- but you made a

17  decision that it would be okay to share those

18  thresholds with the stores?

19     A.    No one said we couldn't.

20     Q.    Okay.  And then you decided that

21  you would, right?

22     A.    Yes.

23     Q.    Okay.  Did you continue sharing

24  that information with stores after that e-mail?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't recall.

 2          Q.    Did DDM ever consider whether it

 3   should impose thresholds on its own stores prior

 4   to Cardinal doing so?

 5          A.    I don't think we did.

 6                      - - -

 7          (DDM-Nameth Exhibit 28 marked.)

 8                      - - -

 9          Q.    Okay.  I'm going to hand you

10   Exhibit 28, which is DDM110147.  This is an

11   e-mail from you to All Pharmacists, dated

12   September 24, 2013.  The subject is "DEA

13   quantity purchase limits."

14                Do you see that?

15          A.    Yes.

16          Q.    And there's an attachment which

17   says "DDM DEA Limits."

18                Do you see that?

19          A.    Yes.

20          Q.    And that's actually attached here,

21   and it's a native document so there's no Bates

22   number.  So it says -- you write, "All

23   Pharmacists, attached is specific store

24   information from Cardinal regarding purchase
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    limits on certain C-II drugs."

 2                 Do you see that?

 3         A.    Yes.

 4         Q.    Did you review this in preparation

 5    for your deposition today?

 6         A.    I've seen it.  I've seen this

 7    before, yes.

 8         Q.    But did you see it in the last

 9    week?

10         A.    Yes.

11         Q.    Okay.  So this is referring to the

12    thresholds that Cardinal put on Schedule II

13    drugs for DDM stores, right?

14         A.    Yes.

15         Q.    Okay.  "The column that states

16    oxycodone SBC is the threshold specifically for

17    oxycodone 15-milligram, 30-milligram.  This is a

18    threshold within the total oxycodone family.

19    Both oxycodone and morphine limits are listed in

20    yellow."

21                 Do you see that?

22         A.    Yes.

23         Q.    And so if we go to this attached

24    document, this would indicate what all the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    thresholds were on each particular store,

 2    correct?

 3              A.    Yes.

 4              Q.    Did you play any role in deciding

 5    what these limits should be?

 6              A.    I did not.

 7              Q.    It says, "These figures are

 8    determined from guidelines offered by the DEA."

 9                    Do you see that?

10              A.    Yes.

11              Q.    Are you familiar with those DEA

12    guidelines?

13              A.    Specifically to these particular

14    drugs, no.

15              Q.    Were you aware that the DEA had

16    guidelines regarding thresholds that should be

17    put on opioids prior to this time frame?

18              A.    No.

19              Q.    Okay.  Then it says, "Many store

20    orders from Cardinal have recently been cut back

21    due to the purchase limits being placed on

22    them."

23                    Do you see that?

24              A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    So that would suggest that prior

 2    to the imposition of Cardinal's thresholds, DDM

 3    stores were ordering in excess of those

 4    thresholds thereby causing them to be cut, fair?

 5              A.    Yes.

 6              Q.    Okay.  "If you hit your Cardinal

 7    limit, do not order from another supplier (Anda)

 8    since the DEA may monitor your purchases and

 9    investigate your purchase history."

10              Do you see that?

11              A.    Mm-hmm.  Yes.

12              Q.    Did you ever have an instance

13    where a DDM store would hit their threshold with

14    Cardinal and then order from another supplier?

15              A.    Not that I'm aware of.

16              Q.    Would that be concerning to you if

17    they tried to circumvent those thresholds?

18              A.    Yes.

19              Q.    Okay.  And, in fact, as you sit

20    here, that's not permitted, right?

21              A.    Correct.

22              Q.    Okay.  It says, "These limits set

23    at Cardinal will roll over on the 22nd."

24              So that basically means they just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   restarted on the 22nd of every month, right?

 2          A.    Yes.

 3                        - - -

 4          (DDM-Nameth Exhibit 29 marked.)

 5                        - - -

 6          Q.    Okay.  This is 29, which is

 7   DDM0 -- I'm sorry.  DDM168903.  We're going to

 8   start at the bottom.  This is from Shirlene

 9   Justus to Brandon Wilkins who was your Cardinal

10   rep, right?

11          A.    Correct.

12          Q.    Okay.  And this says, "Discount

13   Drug Mart 18.  This customer's order for 3,200

14   dosage units of oxycodone caused the customer to

15   exceed its max annual accrual limit for

16   oxycodone this accrual period."

17                So is this the kind of e-mail that

18   a store would get when they order -- they place

19   an order that would cause them to go over their

20   threshold?

21          A.    This came from Cardinal to us.

22          Q.    Right.  But Cardinal would -- if

23   the store submitted an order that if filled

24   would put it over Cardinal's threshold --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    -- the order would get cut?

 3          A.    Correct.

 4          Q.    Reported to the DEA suspicious?

 5          A.    Okay.

 6          Q.    And then you guys would get sent

 7   this e-mail, right?

 8          A.    Yes.

 9          Q.    Okay.  And, in fact, it says here,

10   "The order for 3,200 dosage units has been cut,

11   reported as suspicious to the DEA and will not

12   be shipped."

13                Do you see that?

14          A.    Correct.

15          Q.    So would Cardinal have been the

16   one who first reported an order placed by a DDM

17   store as suspicious to the DEA?

18          A.    In this circumstance, yes.

19          Q.    So that would have been the first

20   time that -- assuming this is the first one --

21   and I don't know that it is, but this context

22   where Cardinal's cutting orders that exceeded

23   thresholds, they would have been the first ones

24   to ever report an order placed by a DDM store as
```

1    suspicious to the DEA, correct?

2          A.    Correct.

3          Q.    Then it says, "Prior to that

4    order, the customer received 4,600 dosage units

5    of oxycodone for this accrual period.  After

6    review of available information, I've determined

7    that a threshold adjustment is not warranted and

8    the customer's threshold will remain at 7,500."

9                Right?

10               And then the next section asks for

11   information that would warrant an increase,

12   right?

13         A.    Yes.

14         Q.    Okay.  So if you go to the top,

15   Pete -- Brandon writes to you and to Pete -- I

16   assume this is him communicating this to you

17   guys.  "Gentlemen, it's about that time of

18   month.  Please see the below regarding 18's cut

19   oxycodone order."

20               Do you see that?

21         A.    Yes.

22         Q.    Was it pretty common around that

23   time of month to have store orders getting cut?

24         A.    Well, I wouldn't say typically,

Highly Confidential - Subject to Further Confidentiality Review

```
1    but -- and, again, we're looking at one or two

2    stores, because this e-mail only equates to one

3    store.  It doesn't -- he would typically list

4    several stores if there was several stores

5    involved.

6                 To my knowledge, there wasn't a

7    lengthy list of stores each month that orders

8    were being cut.

9         Q.    Where would I go to look to see

10   how many stores had orders cut in any particular

11   month?

12        A.    Cardinal.

13        Q.    Cardinal would have that?  Would

14   DDM have a record of these e-mails anywhere?

15        A.    I doubt it.

16        Q.    Did you ever print and file away

17   these e-mails when you got them?

18        A.    No.

19        Q.    Do you know if anybody else did?

20        A.    I can't answer that.

21        Q.    Did DDM have a policy or procedure

22   regarding retaining records regarding cut and

23   reported orders?

24        A.    Not that I'm aware of.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  I mean, this e-mail

2    indicates that this order, which was placed by

3    store 18, is reported as suspicious to the DEA,

4    right?

5        A.    Correct.

6        Q.    And -- but you guys didn't keep

7    any documents at DDM reflecting the fact that

8    this order was deemed suspicious by somebody

9    else?

10       A.    That's correct.

11                   - - -

12       (DDM-Nameth Exhibit 30 marked.)

13                   - - -

14       Q.    Okay.  Let's look at Exhibit 30,

15   which is DDM169973.  We're going to start at the

16   bottom of this one.  It's an e-mail from

17   Shirlene Justus again to Brandon Wilkins who

18   we've just been talking about, and it just so

19   happens that this is the same month as the last

20   e-mail, but it relates to Discount Drug Mart

21   number 2.

22             Do you see that at the bottom?

23       A.    Yes.

24       Q.    Okay.  And if you go to the next

Highly Confidential - Subject to Further Confidentiality Review

```
 1   page, it says, "The customer's order for 1,200

 2   units has caused the customer to exceed its

 3   maximum limit.  The order for 1,200 units was

 4   cut, reported as suspicious to the DEA, and will

 5   not be shipped."

 6              Do you see that?

 7        A.   Yes.

 8        Q.   And then there's a determination

 9   made that the threshold should remain as is,

10   right?

11        A.   Correct.

12        Q.   Okay.  And if you go to the next

13   e-mail up, Brandon forwards this to you and to

14   Pete again, right?

15        A.   Yes.

16        Q.   And it says, "Pete and Tom, please

17   see below regarding number 2's cut oxycodone

18   order.  The store may order up to 500 dosage

19   units prior to Wednesday."

20              Do you see that?

21        A.   Yes.

22        Q.   In fact, the store is being

23   informed how much more they can order without

24   having another order reported to the DEA as
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious, correct?

2            A.    Correct.

3            Q.    Okay.  And then you respond or

4    actually you forwarded it, it looks like, to the

5    store, right?

6            A.    Yes.

7            Q.    And you said, "Hi Gang, Do not

8    order any extra Oxy/APAP.  It is placing you

9    over the limit."

10               Right?

11           A.    Yes.

12           Q.    Okay.  And you forwarded them all

13   the information they needed to see what their

14   maximum is, right, or what their threshold is?

15           A.    I'm looking to see if that's on

16   here, what the threshold was.

17           Q.    Yeah, it's on the back page.

18           A.    Okay.

19           Q.    27,000?

20           A.    Yes.

21           Q.    All right.  So they were real

22   close to their limit, they were only 500 off,

23   right?

24           A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    And at the top, Chris writes back

2    and he says, "Hi Tom" -- who's Chris, by the

3    way?

4              A.    Chief pharmacist at that store.

5              Q.    Okay.  So chief pharmacist at

6    number 2 writes back and says, "I am not

7    familiar with this process.  Does this apply to

8    all oxycodone/APAP products/strengths?  Reported

9    as suspicious to DEA?"

10             So it looks like your chief

11   pharmacist at number 2 doesn't have any idea

12   that there are limits on what he can order from

13   Cardinal; is that fair?

14             A.    That's fair.

15             Q.    Okay.  And it also looks like he's

16   surprised that this order was reported as

17   suspicious to the DEA, correct?

18             A.    Yes.

19             Q.    Did you guys inform your stores

20   that there were thresholds on them?

21             A.    I don't think that we actually

22   did.

23             Q.    Okay.

24                        - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (DDM-Nameth Exhibit 31 marked.)

 2                      - - -

 3    BY MR. MULLIGAN:

 4         Q.    This is Exhibit 31, and it's

 5    DDM87058.  This is June 13 of 2014, Leslie Arend

 6    e-mails Jason, you, and Pete.  So I imagine

 7    Jason is being phased in at this point; is that

 8    fair?

 9         A.    Correct.

10         Q.    Or he's already phased in?

11         A.    He's already been there for quite

12    a while.

13         Q.    And you're maybe being phased out?

14         A.    Yes.

15         Q.    Okay.  It says, "Store 76 is

16    approaching their limit on oxycodone

17    hydrochloride.  The thresholds were set on the

18    22nd."

19              Do you see that?

20         A.    Yes.

21         Q.    And actually they're reaching

22    their threshold almost ten days beforehand,

23    aren't they?  Do you see the e-mail date of

24    June 13?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    Okay.  And if you look above, it

3    looks like, again, you forwarded this e-mail on,

4    right?

5          A.    Mm-hmm.

6          Q.    And, actually, the "to" line, it

7    says Karla Bartish.  She's the one we were

8    talking about earlier, isn't she?

9          A.    Yes.

10         Q.    The one who said that what was

11   happening in her store was nuts?

12         A.    Yes.

13         Q.    Okay.  And so you told her that

14   they're near the end of their limit of oxycodone

15   even though they're only a third of the way

16   through the month, right, or two-thirds of the

17   way through the month?

18         A.    Two-thirds.

19         Q.    And then you said, "Do you have a

20   plan to review or lower your oxy purchases?  I

21   have to assume you are limiting sales to local

22   customers."

23               Right?

24         A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    And that's just the way you speak,

2    right?  You actually are saying, make sure

3    you --

4              A.    Yes.

5              Q.    Okay.  Do you know whether they

6    were doing that?

7              A.    It could be followed up by the

8    supervisor in that region.  That was what he

9    should be doing.

10             Q.    Did you do anything to personally

11   verify that all of your pharmacies were limiting

12   sales to local customers?

13             A.    Other than notifying that's what

14   they should be doing.

15             Q.    And after you told them that that

16   was DDM's policy, did you or anybody else ever

17   run any reports to determine whether individuals

18   were still filling prescriptions outside of

19   their geographic areas?

20             A.    I don't recall.

21             Q.    Okay.  Maybe you did, maybe you

22   didn't?

23             A.    Yeah.

24             Q.    Okay.  The last one, it says, "Are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you also filling Rxs at your pharmacy when other

 2    pharmacies in the area are not?"

 3              Do you see that?

 4         A.    Yes.

 5         Q.    Was that ever something that

 6    occurred within the DDM system that you were

 7    aware of?

 8         A.    No.  We were just making sure that

 9    people weren't coming to our stores because they

10    were being turned down at other stores.

11                    - - -

12         (DDM-Nameth Exhibit 32 marked.)

13                    - - -

14              MR. MULLIGAN:  All right.  This is

15              Exhibit 32.  I apologize.  This is

16              actually a collection of documents that

17              are all similar.  So I'll read the Bates

18              on the top one, but that may not be all

19              that helpful to people.  It's DDM

20              440516.  But we'll have it on the screen

21              then.

22    BY MR. MULLIGAN:

23         Q.    All right.  So I'll represent to

24    you that I -- we looked and we found all these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that we could find, and I put them in
 2   chronological order, which may prove to be more
 3   onerous than putting them in order by store.
 4          A.   Okay.
 5          Q.   But have you seen this document
 6   before?
 7          A.   Yes.
 8               MR. JOHNSON:  Just the one on the
 9          front or --
10          Q.   This type of document.
11          A.   Yes.
12          Q.   Okay.  Did you create this
13   document?
14          A.   No.
15          Q.   Do you know who created this
16   document?
17          A.   It was probably created at the
18   time that the rolling 12-month report was
19   created.
20          Q.   Do you know who created that
21   report?
22          A.   I can't say.
23          Q.   Okay.  So when you -- fair to say
24   when you became director of pharmacy operations,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you had to fill out -- you had to review and

2    fill out these reports?

3            A.    Correct.

4            Q.    When you were a chief pharmacist,

5    did you have to review and fill out these

6    reports?

7            A.    I had to answer the reports.

8            Q.    Okay.  But when you were the chief

9    pharmacist on the other side of it, you got

10   these and you had to answer them?

11           A.    Yes.

12           Q.    Okay.  So would it be fair to say

13   you're familiar with these?

14           A.    Yes.

15           Q.    Okay.  All right.  Let's look at

16   this first one.  So this is Store 33, right?

17           A.    Correct.

18           Q.    And the date is 1/2/08.  And

19   then -- and I won't read this for all of them

20   but it says, "The Drug Enforcement Agency" --

21   which is the U.S. Department of Justice -- "has

22   requested that Discount Drug Mart pharmacy

23   operations maintain records of controlled

24   substances purchased that exceed an average of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    purchases calculated from the previous 12 months

 2    or that deviate substantially from normal

 3    average per month."

 4              Right?

 5    A.    Yes.

 6    Q.    Okay.  And so then it says, "The

 7    December 2007 report indicates an increase in

 8    purchases of" -- it looks like that's

 9    hydrocodone?

10    A.    Yes.

11    Q.    Okay.  "Your average monthly

12    purchase of this item are two bottles.  This

13    month ten bottles were ordered."

14              Do you see that?

15    A.    Yes.

16    Q.    That's a pretty substantial

17    increase, right?

18    A.    Yes.

19    Q.    Okay.  Would this say that -- when

20    it says the "average monthly purchases," is that

21    over the last 12 months?

22    A.    Say again.

23    Q.    So see where it says "your average

24    monthly purchases of this item are two bottles"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    Yes.

2           Q.    Is that information that you would

3   have taken off of the 12-month rolling average

4   and put on here?

5           A.    Yes.

6           Q.    Okay.  So this store was averaging

7   two bottles a month and then this month -- well,

8   the month before this, so maybe December, they

9   ordered ten?

10          A.    Correct.

11          Q.    Okay.  So then it says, "Please

12  verify this quantity and provide appropriate

13  explanation as to the necessity of the increase.

14  Thank you for your immediate response to this

15  request."

16                Do you see that?

17          A.    Yes.

18          Q.    So you would have sent -- when we

19  were talking earlier about your -- the monthly

20  report that you would review?

21          A.    Yes.

22          Q.    You would decide whether an order

23  that showed up there warranted more

24  investigation, right?
```

```
 1            A.    Correct.

 2            Q.    And if it did, you would send this

 3    form out, right?

 4            A.    Correct.

 5            Q.    Okay.  And you would require the

 6    chief pharmacist to provide a -- to verify the

 7    quantity and provide an appropriate explanation

 8    for the increase, right?

 9            A.    That's right.

10            Q.    Okay.  So down below, Store 33.

11    It looks like the chief pharmacist is Andrew --

12    do you know his last name?

13            A.    Hawk.

14            Q.    Okay.

15            A.    Sr.

16            Q.    Okay.  And he completed this, it

17    looks like, about ten days later.  And so his

18    explanation of the increased order was "spike in

19    Rx filled."

20                  Do you see that?

21            A.    Yes, I do.

22            Q.    Okay.  Would that be a sufficient

23    and appropriate explanation as to the increase?

24            A.    Part and parcel of.  What I would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have to do then -- if it didn't meet my --

 2    didn't answer my question as to why, I would

 3    also follow up and see how many bottles were on

 4    the shelf as opposed to the dispensing

 5    information.

 6            Q.    Okay.  Just looking at this form

 7    now, as you sit here today, was the explanation

 8    that he provided to you appropriate and

 9    sufficient to warrant this order not being

10    reported?

11            A.    He actually tells me that shelf

12    inventory on here and also the script --

13    increasing script count, so what I'm looking for

14    is, do you still -- where did those ten bottles

15    go, and he's telling me that seven and three

16    quarters of the bottles are still on his shelf.

17            Q.    Okay.  But the spike in Rxs, you

18    wouldn't do anything to verify with him or make

19    sure that that spike wasn't associated with

20    illegitimate prescriptions or diversion, right?

21                  You would just trust --

22            A.    Nothing, per se.

23            Q.    You would trust his judgment,

24    right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    Let's go to the next page.  This

 3    one is DDM440506.  This is store 5.  Date is

 4    May 5, 2008.  The same form, right?

 5            A.    Yes.

 6            Q.    Okay.  And so in this instance,

 7    it's -- your report showed that they ordered

 8    hydrocodone.  They usually ordered three bottles

 9    and this month they ordered eleven, right?

10            A.    Correct.

11            Q.    And so that -- that triggered

12    your -- that triggered you to send them a

13    report, right?

14            A.    Correct.

15            Q.    Okay.  And the explanation that --

16    is it John?

17            A.    Vedrody.

18            Q.    Vedrody.  His -- well, did you

19    ever have any issues with John Vedrody?

20            A.    No.

21            Q.    Okay.  His explanation was, "Had

22    two or three prescriptions for larger amounts

23    than usual.  Quantities were verified with

24    physicians."
```

Highly Confidential - Subject to Further Confidentiality Review

1                    Right?

2          A.    Correct.

3          Q.    Is that a sufficient explanation

4    for you to confirm that there was no diversion

5    taking place associated with this increase?

6          A.    Based on the bottle size at that

7    particular point, this particular drug and this

8    NDC were bottles of 100.  So they had several

9    prescriptions that were increased.  I might have

10   called him back and asked him how many were on

11   the shelf because if I didn't get that

12   information, I might have placed a phone call.

13                But at that particular time, I

14   can't say what exactly my follow up would have

15   been.

16         Q.    Okay.  Do you remember the DEA

17   document said that a suspicious order is one of

18   unusual size?

19         A.    Yes.

20         Q.    Okay.  You would agree that an

21   eleven-bottle order, when the average over the

22   last 12 months was three, would be one of

23   unusual size, correct?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And, in fact, it was so unusual

 2    that it caused you to send him a form that he

 3    needed to fill out, right?

 4              A.    Right.

 5              Q.    Did you report this to the DEA as

 6    suspicious or possibly suspicious?

 7              A.    Did not.

 8              Q.    Okay.  Any reason why?

 9              A.    Because I didn't think it was a

10    suspicious order.

11              Q.    Because you trusted your

12    pharmacist?

13              A.    Yeah.

14              Q.    Okay.

15              A.    Also, it would have shown up on

16    the monthly report, on the store's monthly

17    report if there were missing prescriptions --

18    missing bottles.

19              Q.    That's an inventory thing, right?

20              A.    More or less, yes.

21              Q.    Okay.  So here's the part that I

22    don't understand.  So if the average is three

23    bottles a month, you said this is -- NDC is

24    associated with 100 tab counts.  So they're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    averaging 300 tabs a month, right?

 2            A.    Correct.

 3            Q.    And then -- that's for a whole

 4    year, right?

 5            A.    Yes.

 6            Q.    And then this month they ordered

 7    eleven bottles, that's 1100 tablets, right?

 8            A.    Correct.

 9            Q.    And his justification for an

10    increase in 800 tablets is that he had two or

11    three prescriptions for larger than usual.  Is

12    that concerning to you?

13            A.    Well, it is enough to --

14    concerning to me to send the report out, but

15    what it does tell me is that he had several

16    prescriptions where he might have had several

17    hundred prescriptions more than he did prior.

18    So what it doesn't say is how many are still on

19    his shelf.

20                  I want to know where they -- if he

21    ordered them, and knowing John, if he didn't

22    have enough to fulfill his orders, that

23    particular month, if he was running real low

24    because he got two or three hundred scripts --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    two or three hundred pills and he was running

 2    out, he would have a tendency to order heavy --

 3    heavier.

 4                    And then what I would like to see

 5    in follow up would be what happened the

 6    following month.  He didn't have -- if he

 7    didn't -- I don't suppose he had a suspicious

 8    order, because the quantity on hand would last

 9    him maybe two months instead of the one, so ...

10          Q.    Did DDM have any policies and

11    procedures about maximum quantities on hand that

12    a store could have?

13          A.    No.

14          Q.    Despite the fact that you guys had

15    evidence that pharmacy employees were diverting

16    drugs out of the stores, right?

17          A.    We had no policy.

18          Q.    Okay.  Do you think that would

19    have maybe helped cut down on diversion if you

20    had limited the amount of quantities that were

21    in the stores?

22          A.    I don't think so, because you're

23    still going to get the same diversion that we

24    were seeing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    So you don't think it mattered?

2              A.    I think the theft is going to

3    occur whether I have five bottles on the shelf

4    or three bottles on the shelf.

5              Q.    Well, if there's a theft and you

6    have one bottle, then you have one bottle out in

7    the public, right?  But if you have a theft and

8    there's ten bottles, then you have ten bottles

9    out in the public, don't you?

10             A.    But one bottle would not be enough

11   to sustain our patients for a month.

12             Q.    Okay.

13             A.    So one prescription could be over

14   100.  It could be 120, which is a typical

15   month's supply.

16             Q.    Did any of your stores get in the

17   habit of carrying larger stocks of opioids in

18   their pharmacies?

19             A.    I can't say that they got into the

20   habit.

21             Q.    Okay.  Let's go to the next one,

22   which is DDM440517.  This is store 35 again.

23   Remember we talked about them?

24             A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    Somewhat of a problem store,

2    right?

3                  MR. JOHNSON:  Objection.

4                  MR. MULLIGAN:  I think he

5         testified to that.

6                  MR. JOHNSON:  I don't know.

7            Q.    Would you agree?

8            A.    I wouldn't consider it a problem

9    store.

10           Q.    Okay.  So if earlier you testified

11   that 35 was a problem store, are you changing

12   that testimony now?

13                 MR. JOHNSON:  I don't know that he

14        did.

15           A.    I don't know if I did.

16           Q.    Okay.  We'll let the record speak

17   for itself.  It's been a long day.

18                 All right.  So store 35 in

19   October -- I'm sorry.  November 1 of '11, they

20   ordered another hydrocodone report, right?

21           A.    Correct.

22           Q.    And this is 6.8 bottles and then

23   this month they ordered 14, right?

24           A.    Correct.
```

```
 1              Q.    Okay.  Is their explanation down

 2      here sufficient or appropriate for you?

 3              A.    So I'm trying to read his

 4      handwriting.

 5              Q.    Let me do this maybe in a

 6      different -- in a more fast way, actually.  You

 7      guys never reported any order as suspicious,

 8      right?

 9              A.    Correct.

10              Q.    So I assume that any explanation

11      that was down on these documents would have been

12      adequate?

13              A.    Correct.

14              Q.    Okay.

15              A.    He is -- he is telling me in this

16      how much he has left on his shelf, which is

17      important to me, because essentially what he's

18      doing, he's ordering a high quantity but that

19      doesn't mean that they're diverted, so to speak.

20              Q.    Okay.  But just to be fair and so

21      that I don't have to walk you through all these,

22      to the extent that you guys never reported

23      anything as suspicious, these explanations were

24      sufficient for you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    Yes.

2              Q.    Okay.  And you were the primary

3     person who sent these out and reviewed them?

4              A.    Yes.

5              Q.    And determined that they weren't

6     suspicious?

7              A.    Correct.

8              Q.    Okay.  And a number of these, the

9     pharmacist would say something like, "see

10    attached," and then they'd have a printout of

11    their prescriptions?

12             A.    Correct.

13             Q.    And so basically that would -- was

14    something along the lines of, "I have a lot of

15    prescriptions, I need to fill them" --

16             A.    Yes.

17             Q.    -- you know, here's my

18    justification?

19             A.    Yes.

20             Q.    And it was up to the pharmacist to

21    determine whether those prescriptions were

22    legitimate or illegitimate, fair?

23             A.    Yes.

24             Q.    Okay.  And you didn't do anything
```

Highly Confidential - Subject to Further Confidentiality Review

1    to confirm or look specifically at those

2    prescriptions to make sure they were

3    appropriate, right?

4         A.    Other than the supervisors going

5    to the stores and randomly checking them, no.

6         Q.    Store supervisors randomly check

7    prescriptions?

8         A.    Yes.

9         Q.    Were they pharmacists?

10        A.    Yes.

11        Q.    So the chief pharmacist you mean?

12        A.    No, the supervisors.  Supervisors

13   were all pharmacists, and their duties was to go

14   to their specified stores, and part of their

15   responsibilities was to --

16        Q.    Regional supervisors?

17        A.    Yes.

18        Q.    Okay.  But that would be like a

19   spot-check situation, right?

20        A.    Yes, yes.

21        Q.    Obviously there's some subjective

22   judgment that you exercised in this suspicious

23   order monitoring policies and procedures, right?

24        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    And -- so regarding the things

2     we've talked about today, did the buck stop with

3     you on that?

4              A.    Primarily, unless I had questions,

5     then I'd run it by Pete or whatever, but yes.

6     Primarily yes.

7              Q.    Unless you pulled Pete in --

8              A.    Yes.

9              Q.    -- it was something that was --

10    DDM referred to your judgment on things you were

11    in charge of, right?

12             A.    Right.

13             Q.    And then you deferred to the

14    judgment of the pharmacist to detect and prevent

15    diversion at the store level, correct?

16             A.    Yes.

17             Q.    Okay.  So we can look at the

18    specific pages in here if you'd like to.  One of

19    the things I just wanted to ask you was, in this

20    collection of documents, store 35 actually has

21    four of them, and there's one on November 1,

22    '11, December 3 of '12, and November 11 of '13.

23                   And if you look at the '11 one,

24    their average was 6.8 bottles and then they
```

Highly Confidential - Subject to Further Confidentiality Review

1    ordered 14.  In '12, they averaged 5.6 and they

2    ordered 12.  But then in '13, they averaged 11.9

3    and they ordered 26.  And, again, I can point

4    you to those pages.

5              But I'm just curious, would you

6    ever look back in your file when you got -- when

7    a store showed up on a report to see what --

8    which -- if you sent any of these in the past

9    and what they looked like?

10         A.    I don't believe I ever did.

11         Q.    Okay.  Do you think that would

12   have been helpful for you to see kind of where

13   they came from and how much their prescriptions

14   had grown over time?

15         A.    We knew that this particular

16   store, and a lot of our stores, were growing

17   over time.  This particular store was remodeled

18   and they had a large influx of patients.  So

19   they were growing exponentially.  So their

20   orders were growing.  So it seemed logical that

21   their controlled drugs would grow with them.

22   So ...

23         Q.    When were they remodeled?

24         A.    Maybe '12, but I'd have to -- I'd

Highly Confidential - Subject to Further Confidentiality Review

```
1    have to review that.

2           Q.    Okay.

3           A.    Well, it's probably before that,

4    slightly before that.

5           Q.    Okay.  So I'll just represent that

6    this packet here has ten of these forms, and we

7    scoured DDM's production to find all the ones we

8    could.

9                 Would you expect there to be more

10   than ten forms based on the fact that this

11   covers a time frame of 2008 to 2014?

12          A.    Possibly, yes.

13          Q.    How many reports would you -- how

14   many of these documents would you send out,

15   let's say, on an annual basis?

16          A.    There could have been -- depending

17   on the year.  I mean, they varied, but there

18   could have been ten or more.

19          Q.    Did you send at least one a month?

20          A.    There were some months that we

21   didn't send any, so I can't say we send at least

22   one a month.  But there were some months when I

23   sent two or three.  So, you know, for me to go

24   back to ten or twelve years ago, you know, it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a little bit fuzzy on what happened back --
 2    specifically back then, how many I sent out.
 3    But I can recall that there were numerous times
 4    when we'd send more than one.
 5         Q.    Okay.  So let's just take your
 6    average of ten over a six-year -- six-,
 7    seven-year period, you'd expect there to be 60
 8    to 70 of these, right, not ten?
 9         A.    Yes.
10         Q.    Okay.  Was there any type of
11    retention -- document retention policy in place
12    for these documents?
13         A.    What they would -- they'd be
14    filed.
15         Q.    Where would they be?
16         A.    We'd give them to pharmacy
17    operations gals to file, and they went into --
18    after two years or so, they got sent somewhere.
19    I don't know where.
20              MR. MULLIGAN:  Okay.  Why don't we
21         take a quick five-minute break.  Let me
22         make sure I've got nothing else.  But I
23         think we're pretty much done.  Sound
24         good?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  We're going off

 2           the record at 4:48.

 3                    (Recess taken.)

 4                    THE VIDEOGRAPHER:  We're back on

 5           the record at 4:52.

 6                         - - -

 7           (DDM-Nameth Exhibit 33 marked.)

 8                         - - -

 9    BY MR. MULLIGAN:

10           Q.    All right.  I'm handing you the

11    last exhibit, which is Exhibit 33, and it's a --

12    you can actually just look at the sheet if you

13    want, but it's a DDM organizational chart.

14                    Do you see that?

15           A.    Yes, I do.

16           Q.    Where would you put yourself if

17    you were still -- I mean, in your position as of

18    2014?

19           A.    Under Pete Ratycz as vice

20    president.

21           Q.    Okay.  So just a line down from

22    Pete?

23           A.    Correct.

24           Q.    Okay.  And what would you put in
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    your box if you had to put a little bullet with

2    the stuff you did?

3           A.    Third-party contracting.

4           Q.    Okay.

5           A.    Controlled drug monitoring,

6    pharmacy operations in general, and then there's

7    a whole lot of things that fall under pharmacy

8    operations.

9           Q.    Okay.

10          A.    Anything and everything.

11          Q.    Is there anybody else on here that

12   was involved in controlled drug monitoring,

13   other than Pete, when you would escalate things

14   to him?

15          A.    Well, Jason was -- who was --

16          Q.    Who took over?

17          A.    Yeah.  Other than Jason, no.

18          Q.    Okay.

19          A.    Jill.

20          Q.    Right.  Who's Mike Eby?

21          A.    Mike now is in -- he used to be in

22   human resources.  Now, he's VP of finance.

23          Q.    Do you know whether Mike has any

24   involvement in suspicious order monitoring or
```

```
 1   preventing diversion?

 2          A.    Not to my knowledge.

 3          Q.    Okay.  Who's Laura Taylor?

 4          A.    She is the pharmacy operations --

 5   she worked under actually myself and Jason.  She

 6   was -- I don't know what the title exactly is

 7   now, but ...

 8          Q.    Is she still there?

 9          A.    Yeah, she is.

10          Q.    And did she assist you in any way

11   in reviewing that 12-month rolling report or

12   sending out these forms to the chief pharmacist?

13          A.    She did not review, but she did

14   send them to the stores, and then it was her

15   duty to make sure then on a follow-up that we

16   got them all back.

17          Q.    Okay.  So she was sort of --

18          A.    And file themselves afterwards,

19   so ...

20          Q.    She was more the messenger and the

21   filer?

22          A.    Yes.

23          Q.    She didn't exercise any judgment

24   or ...
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No, no.

 2          Q.     Okay.  Was John Gans ever involved

 3    in any evaluation of diversion at the store

 4    level?

 5          A.     Not unless it was mentioned during

 6    the board meeting.

 7          Q.     Okay.

 8          A.     So I doubt if he was involved in

 9    any policy making, but ...

10          Q.     What about any of the Boodjehs?

11          A.     The same.  No.  He was -- board

12    meetings, if it was mentioned there, yes.  As

13    far as policy making, no.

14          Q.     So if you look at Doug Boodjeh on

15    here under chief operating officer, he has

16    pharmacy listed there, correct?

17          A.     Yes.

18          Q.     Did he play any role in crafting,

19    evaluating, or analyzing DDM's suspicious order

20    monitoring policies and procedures at any time?

21          A.     Not that I'm aware of.

22          Q.     Did you ever participating in a

23    discussion regarding DDM's suspicious order

24    monitoring policies and procedures with either
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    John Gans or Doug Boodjeh?

 2         A.    Did I?

 3         Q.    Yeah.

 4         A.    No.

 5         Q.    Do you know if anybody else did?

 6         A.    I can't answer that.

 7         Q.    Why is that?  You don't know?

 8         A.    I don't know.

 9               MR. MULLIGAN:  Okay.  That's it.

10               MR. JOHNSON:  Great.

11               MR. MULLIGAN:  Thank you for your

12         time.

13               THE WITNESS:  Thank you.

14               MR. MULLIGAN:  We can go off the

15         record.

16               THE VIDEOGRAPHER:  Going off the

17         record at 4:56.

18               (Signature not waived.)

19                     - - -

20          Thereupon, at 4:56 p.m., on Monday,

21    January 7, 2019, the deposition was concluded.

22                     - - -

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE

 2   STATE OF OHIO          :

                                    SS:

 3   COUNTY OF _____:

 4

 5            I, TOM NAMETH, do hereby certify that I have

 6   read the foregoing transcript of my cross-examination

 7   given on January 7, 2019; that together with the

 8   correction page attached hereto noting changes in form

 9   or substance, if any, it is true and correct.

10                          _____

                            TOM NAMETH

11

12            I do hereby certify that the foregoing

13   transcript of the cross-examination of TOM NAMETH was

14   submitted to the witness for reading and signing; that

15   after he had stated to the undersigned Notary Public

16   that he had read and examined his cross-examination,

17   he signed the same in my presence on the _____ day

18   of _____, 2019.

19

                            _____

20                          NOTARY PUBLIC - STATE OF OHIO

21

22   My Commission Expires:

23   _____, _____.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2  STATE OF OHIO        :

                                SS:
 3  COUNTY OF FRANKLIN   :
 4          I, Carol A. Kirk, a Registered Merit
    Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named TOM NAMETH was by me
 6  first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the cause
 7  aforesaid; that the deposition then given by him was
    by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
    transcript of the deposition so given by him; that the
 9  deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).
13
            IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office at Columbus, Ohio
    on this 10th day of January 2019.
15
16
17
18                     _____
                       CAROL A. KIRK, RMR
19                     NOTARY PUBLIC - STATE OF OHIO
20
21  My Commission Expires:  April 9, 2022.
22                       - - -
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2    I, TOM NAMETH, have read the transcript

      of my deposition taken on the 7th day of January 2019,

 3    or the same has been read to me.  I request that the

      following changes be entered upon the record for the

 4    reasons so indicated.  I have signed the signature

      page and authorize you to attach the same to the

 5    original transcript.

 6    Page  Line  Correction or Change and Reason There:

 7    ____  ____  _____

 8    ____  ____  _____

 9    ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    Date _____  Signature _____
```