Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

------------------------------X

IN RE: NATIONAL PRESCRIPTION    MDL No  2804

OPIATE LITIGATION,

Case No  17-MD-2804

This document relates to:

All Cases            Hon  Dan A  Polster

------------------------------X

* * HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER * *

* * CONFIDENTIALITY REVIEW * *

VIDEOTAPED DEPOSITION

OF

THOMAS P  NAPOLI

New York, New York

Thursday, January 17, 2019

Reported by:

ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

---

Page 2

1          January 17, 2019
2          9:06 a.m.
3
4          Videotaped deposition of PURDUE PHARMA,
5     through its representative, THOMAS P.
6     NAPOLI, held at the offices of LIEFF
7     CABRASER HEIMANN & BERNSTEIN LLP, 250
8     Hudson Street, New York, New York, pursuant
9     to Notice, before Annette Arlequin, a
10    Certified Court Reporter, a Registered
11    Professional Reporter, a Realtime Systems
12    Administrator, a Certified Realtime
13    Reporter, and a Notary Public of the State
14    of New York and New Jersey.
15
16
17
18
19
20
21
22
23
24

---

Page 3

1     A P P E A R A N C E S:
2
3          ROBBINS GELLER RUDMAN & DOWD LLP
4          Attorneys for Plaintiffs
5            655 West Broadway - Suite 1900
6            San Diego, California  92101
7          BY: THOMAS E. EGLER, ESQ.
8            Tegler@rgrdlaw.com
9          BY: KELLI BLACK, ESQ.
10           Kblack@rgrdlaw.com
11
12         MORGAN, LEWIS & BOCKIUS LLP
13         Attorneys for Teva Pharmaceuticals
14           1111 Pennsylvania Avenue NW
15           Washington, D.C.  20004-2541
16         BY: STEVEN A. LUXTON, ESQ.
17           steven.luxton@morganlewis.com
18         BY: MARYANN B. ZAKI, ESQ.
19           Maryann.zaki@morganlewis.com
20           (Teleconferenced)
21         BY: ARCANGELO CELLA, ESQ.
22           Arcangelo.cella@morganlewis.com
23           (Teleconferenced)
24

---

Page 4

1     A P P E A R A N C E S(CONT'D.):
2
3          JONES DAY
4          Attorneys for Walmart
5            North Point
6            901 Lakeside Avenue
7            Cleveland, Ohio 44114-1190
8          BY: ADAM HOLLINGSWORTH, ESQ.
9            Ahollingsworth@jonesday.com
10
11         KIRKLAND & ELLIS LLP
12         Attorneys for Allergan Finance LLC
13           300 North LaSalle
14           Chicago, Illinois 60654
15         BY: TIMOTHY KNAPP, ESQ.
16           Timothy knapp@kirkland.com
17
18         FARRELL FRITZ P.C.
19         Attorneys for Cardinal Health
20           400 RXR Plaza
21           Uniondale, New York  11556
22         BY: KEVIN P. MULRY, ESQ.
23           Kmulry@farrellfritz.com
24

Page 5

```
 1       A P P E A R A N C E S(CONT'D.):
 2
 3          ARNOLD & PORTER KAYE SCHOLER, LLP
 4          Attorneys for Endo Pharmaceuticals, Inc.
 5           and Endo Health Solutions, Inc.
 6           601 Massachusetts Ave., NW
 7           Washington, D.C., 20001-3743
 8          BY: SEAN HENNESSY, ESQ.
 9           Sean.Hennessy@arnoldporter.com
10           (Teleconferenced/Internet realtime))
11
12          GIBBONS, P.C.
13          Attorneys for AmerisourceBergen Drug Corporation
14           One Pennsylvania Plaza - 37th Floor
15           New York, NY 10119-3701
16          BY: PAUL E. ASFENDIS, ESQ.
17           Pasfendis@gibbonslaw.com
18           (Teleconferenced/Internet realtime)
19
20
21
22
23
24
```

Page 6

```
 1       A P P E A R A N C E S(CONT'D.):
 2
 3          O'MELVENY & MYERS LLP
 4          Attorneys for Janssen Pharmaceuticals
 5           Two Embarcadero Center, 28th Floor
 6           San Francisco, CA 94111
 7          BY: TRISHA PARIKH, ESQ.
 8           Tparikh@omm.com
 9           (Teleconferenced/internet realtime)
10
11          ROPES & GRAY LLP
12          Attorneys for Mallinckrodt
13           1211 Avenue of the Americas
14           New York, New York  10036-8704
15          BY: JUSTIN MANN, Law Clerk
16           Justin.Mann@ropesgray.com
17           (Via internet realtime)
18
19       ALSO PRESENT:
20
21          ERIK DAVIDSON, Videographer
22
23
24
```

Page 7

```
 1          IT IS HEREBY STIPULATED AND AGREED by
 2       and between the attorneys for the
 3       respective parties herein, that filing and
 4       sealing be and the same are hereby waived;
 5          IT IS FURTHER STIPULATED AND AGREED
 6       that all objections, except as to the form
 7       of the question, shall be reserved to the
 8       time of the trial;
 9          IT IS FURTHER STIPULATED AND AGREED
10       that the within deposition may be sworn to
11       and signed before any officer authorized to
12       administer an oath, with the same force and
13       effect as if signed and sworn to before the
14       Court.
15
16             - o0o -
17
18
19
20
21
22
23
24
```

Page 8

```
 1          THE VIDEOGRAPHER:  We are now on the
 2       record.  My name is Eric Davidson.  I am
 3       videographer for Golkow Litigation
 4       Services.
 5          Today's date is January 17, 2019, and
 6       the time is approximately 9:06 a.m.
 7          This video deposition is being held
 8       in 250 Hudson Street, 8th Floor, New York,
 9       New York, in the matters of National
10       Prescription Opiate Litigation for the
11       United States District Court Northern
12       District of Ohio.
13          The deponent is Tom Napoli.
14          Please note counsel will be noted on
15       the stenographic record.
16          The court reporter may now swear in
17       the witness.
18
19           *      *      *
20       T H O M A S  P.  N A P O L I,  called as a
21           witness, having been duly sworn by a
22           Notary Public, was examined and testified
23           as follows:
24          THE WITNESS:  I do.
```

## Page 9

1    Thomas Patrick Napoli.
2  EXAMINATION BY
3  MR. EGLER:
4    Q.  Mr. Napoli, thanks for coming in
5  today.
6       Do you understand that you're under
7  oath?
8    A.  Yes, sir.
9    Q.  And when you say you're under oath,
10  what does that mean to you?
11    A.  It means I have an obligation to tell
12  the truth and the whole truth.
13    Q.  And do you have an understanding that
14  the testimony you give today can be used in a
15  court of law and even at trial under some
16  circumstances?
17    A.  Yes, sir.
18    Q.  Okay.  And as you sit here today, do
19  you have any conditions or have you taken any
20  medications that could affect your memory or
21  ability to testify?
22    A.  No, sir.
23    Q.  So can you tell me what your home
24  address is?

## Page 10

1    A.  Sure.
2    ████████████████████
3    ████████
4    Q.  Tell me what your work address is
5  currently.
6    A.  It's 900 Danbury Road, Richfield,
7  Connecticut.
8    Q.  So today we're going to be talking
9  mostly about your time at a company called
10  Watson and then its successors.
11       I guess, starting out, you graduated
12  from Rutgers; is that right?
13    A.  Yes, sir.
14    Q.  What year was that?
15    A.  '92.
16    Q.  After graduating from Rutgers, what
17  did you do?
18    A.  When I graduated -- during my time at
19  Rutgers, I graduated with a degree in
20  administration of justice.  I come from a large
21  police family, and I was probably going to go
22  into the family business.  But while -- during
23  my time at Rutgers, being in New Brunswick, New
24  Jersey, I had an opportunity to have an

## Page 11

1  internship with Johnson & Johnson within their
2  corporate security department.  And I had some
3  outstanding mentorship there.  And when I
4  graduated, had the opportunity to be a security
5  manager for one of their operating facilities in
6  Titusville, West Trenton, New Jersey, Janssen
7  Pharmaceuticals.  It was a headquarters
8  location.  And --
9    Q.  For how long did you work at Johnson
10  & Johnson?
11    A.  Seven years.
12    Q.  So when you left Janssen, what -- as
13  you think of it, what was your job title?
14    A.  When I was at Janssen, I was a
15  security manager.
16    Q.  When you were security manager there,
17  did you work with controlled substances?
18    A.  No, sir.  It was a corporate
19  environment.
20    Q.  So moving on from Janssen, where did
21  you go next?
22    A.  I went on to -- I went on to take an
23  opportunity with Lockheed Martin, a large
24  defense contractor that -- in South Jersey.  I

## Page 12

1  took a position as a security program manager
2  for a classified naval weapon systems programs.
3    Q.  And then at some point, did you leave
4  Lockheed Martin?
5    A.  I did.
6    Q.  Where did you go?
7    A.  I went to Watson Pharmaceuticals in
8  2002.
9    Q.  So at Watson, where -- when you
10  started at Watson, where did you work?
11    A.  I worked -- I was hired as the
12  manager of security for -- we had a
13  manufacturing facility in Carmel, New York,
14  which is in Putnam County.  And we had a
15  distribution center in Brewster, New York, as
16  well as a small research and manufacturing
17  facility in Danbury, Connecticut.  They were all
18  in close proximity to each other.
19    Q.  Did you split your time among those
20  three locations?
21    A.  Yes.
22    Q.  And, subsequently, did you take a
23  different position at Watson?
24    A.  I did.  I did.  Well, as I -- as --

Page 13

1    during my time with those facilities, I
2    eventually took on the responsibility for
3    controlled substance compliance within an
4    operational setting.  So, so we did manufacture
5    controlled substances at the manufacturing site.
6          And then eventually -- after seven
7    years in that position, there was a
8    consolidation within the organization, so we
9    were transitioning, closing the facilities that
10   I was supporting, moving some of our easier to
11   replicate products and Schedule III through V
12   substances to a facility in India and also some
13   Schedule II products to our Corona facility in
14   California.  And our distribution center was
15   folded into our distribution center in the
16   Chicago area based -- after the consolidation, I
17   took a position in Morristown, New Jersey, at
18   our corporate headquarters, where I was a -- the
19   -- had made an organizational decision to fold
20   the DEA compliance function from -- transition
21   that from quality into the operations group
22   because of the synergies of -- with security --
23   with security and the DEA regulations, because
24   of my background with DEA compliance and really

Page 14

1    doing a good job, a very good job with the
2    program and having a good relationship with DEA
3    and having a high-functioning program, they
4    asked me to take on responsibility for a larger
5    role of DEA compliance at their headquarters
6    location.
7          Q.   All right.  So as we're going through
8    today, the court reporter is going to type down
9    everything that you say.
10         A.   Sure.
11         Q.   And so if we have a complicated word
12   or if we have a long statement, I want you to
13   speak freely, but if you can pace yourself just
14   so we make sure we get a good record.
15         A.   Sure, sure.
16         Q.   So as you think about the time where
17   you moved to New Jersey, about what time frame
18   was that?
19         A.   2009.
20         Q.   And when you moved to New Jersey, as
21   you think of it, what was -- do you remember
22   what your job title was?
23         A.   Manager of security and controlled
24   substance compliance, I believe, or something to

Page 15

1    that --
2          Q.   Okay.  And you had mentioned that the
3    Schedule III through V drugs that Watson made
4    had been -- let me start over.
5          You had mentioned that the
6    manufacturing center for the Schedule III
7    through V controlled substance drugs that Watson
8    made had been moved to India.
9          A.   Some of the easier to replicate, like
10   single-entity products, immediate-release
11   products.  Some of the more technological, you
12   know, controlled, sustained-release products,
13   those probably wouldn't go over, but...
14         Q.   Do you remember whether -- well, let
15   me start over.
16         Do you remember where Watson's
17   Schedule II controlled substances were
18   manufactured, if anywhere?
19         A.   Corona, California, would have been
20   one of the prime locations.
21         Q.   As part of your job, did you -- let
22   me start over.
23         In 2009, as part of your job, were
24   you the head of security group for or did you

Page 16

1    oversee the security group in Corona,
2    California?
3          A.   No.  I was part of a structure where
4    there was a global executive director of
5    security and DEA affairs.  I was a manager -- I
6    had regional responsibility in that I ensured
7    that there was security controls in place that
8    were in compliance with the DEA requirements.
9    But each site had a responsible security manager
10   responsible for their operations.
11         Q.   As you think of it, when you started
12   working for Watson in New Jersey, do you
13   remember who was head of security in Corona,
14   California?
15         A.   At that time, it was Eric Nibergall.
16         Q.   Can you spell his last name?
17         A.   N-i-b-e-r-g-a-l-l.
18         Q.   At any point while you were working
19   at Watson or Actavis, did that position change
20   hands did somebody replace Mr. Nibergall?
21         A.   Yes, yes.
22         Q.   Who replaced him?
23         A.   Scott Soltis, S-o-l-t-i-s.
24         Q.   And then did anybody replace

## Page 17

1  Mr. Soltis?
2      A.   Not during my tenure.
3      Q.   All right.  So today we're going to
4  talk about -- well, let's keep going.
5          You worked at Watson in New Jersey
6  starting, I think you said, in 2009?
7      A.   Um-hmm.
8      Q.   And then at any point, did you, did
9  your position change at Watson?
10     A.   I eventually went, moved from a
11 manager position to associate director, but a
12 lot of the same responsibilities.
13     Q.   And about when was that?
14     A.   2013.  Just speculating there.
15     Q.   And then did your job change at
16 Watson after then?
17     A.   No.
18     Q.   And then at some point, Watson
19 changed its name; is that right?
20     A.   Right.
21     Q.   What did it change its name to?
22     A.   On October 31st of 2012, Watson
23 acquired Actavis Pharmaceuticals and took the
24 unprecedented step of acquiring the company but

## Page 18

1  taking their name.  And that was because of -- I
2  think one of the reasons for the acquisition was
3  to have a more global presence.  And Actavis had
4  an established international presence under that
5  name.
6      Q.   So when Watson bought Actavis, as you
7  think of it --
8      A.   Um-hmm.
9      Q.   -- did your duties expand at all?
10     A.   In the respect that we were bringing
11 on additional manufacturing facilities and some,
12 some new controlled products, so, yes.
13     Q.   And then at some point after that
14 acquisition closed, did you -- well, did your
15 job title change?
16     A.   No.
17     Q.   Did you leave what was then called
18 Actavis at some point?
19     A.   I did.
20     Q.   When did you leave?
21     A.   I left 2015 -- 2016.  I was part
22 of -- when Teva acquired Actavis, they had
23 already had a robust DEA compliance program and
24 staff, so we were a synergy target.  So

## Page 19

1  essentially I helped them through the transition
2  and then I was part of the reduction of force.
3      Q.   And then between -- well, where do
4  you work now?
5      A.   I work for Boehringer-Ingelheim.
6      Q.   All right.  So you have to spell
7  those two words --
8      A.   Oh, boy.
9      Q.   -- because I think they're German.
10     A.   We just call them BI, but
11 B-o-e-h-r-i-n-g-e-r, hyphen, I-n-g-e-l-h-e-i-m.
12     Q.   And what is Boehringer-Ingelheim?
13     A.   Boehringer-Ingelheim is a large,
14 private, still family-owned by the Boehringer
15 family pharmaceutical company specializing in
16 human pharma, as well as animal health.
17     Q.   You said human pharma.  What does
18 that mean?
19     A.   Human pharma, so products that are
20 taken by humans.
21     Q.   Oh, as opposed to animal health?
22     A.   Correct.
23     Q.   All right.  What is your job there?
24     A.   I am the head of security and crisis

## Page 20

1  management for the United States region.
2      Q.   Is Boehringer-Ingelheim based in the
3  United States?
4      A.   We have a U.S. headquarters in
5  Ridgefield, Connecticut, but our corporate
6  headquarters is Ingelheim, Germany.
7      Q.   With regard to Boehringer-Ingelheim,
8  do they manufacture or market any Schedule II
9  controlled substance?
10     A.   No, sir, no controlled drugs in the
11 portfolio.
12     Q.   So as we move on today, we're going
13 to be talking about some terms and names.  I
14 just want to go through them with you initially
15 so we can get a common understanding.
16     A.   Sure.
17     Q.   One of the terms that's going to come
18 up today is "Suspicious Order Monitoring" or
19 "SOM" or "SOMS."
20          What does that mean to you?
21     A.   Suspicious Order Monitoring is a, to
22 me, it's a holistic program that is mandated
23 through DEA requirements to ensure that you're
24 ensuring that your products are not winding up

Page 21

1    in illicit channels; that you have safeguards in
2    place to ensure that you know your customer and
3    that you are monitoring ordering behavior of
4    your customers to prevent illegal diversion.
5         Q.   And then another term that we're
6    going to talk about a little bit is N-J-P-I-G,
7    the New Jersey Pharmaceutical Industry Group.
8             Have you ever heard of that?
9         A.   I have.
10        Q.   What is --
11        A.   I'm part of it.
12        Q.   What is that?
13        A.   That was a group of New Jersey-based,
14   for the most part, controlled substance
15   manufacturers that we met on a regular basis to,
16   you know -- because something, you know, like
17   DEA compliance or controlled substance
18   compliance is not something that is a
19   proprietary thing; it's something that we, you
20   know, collaborate on as an industry as much as
21   we can.  So it was a forum in which we could
22   exchange ideas and share best practices, as well
23   as identify opportunities to partner with our
24   local DEA and find opportunities where we could

Page 22

1    work together to, to prevent diversion.
2         Q.   So could you pronounce the acronym
3    NJPIG, how you would say it?
4         A.   NJPIG.  It's kind of an awkward
5    acronym so, yeah.
6         Q.   Right.
7             So -- and then the next one that we
8    are going to talking about is a thing called
9    chargebacks, chargebacks data.
10            Do you know what that is?
11        A.   I do have an understanding of what
12   chargeback is, yeah.
13        Q.   Okay.  What is a chargeback?
14        A.   Chargeback is a -- and I'm -- and
15   this is more layman's terms because I'm not a
16   commercial side of the house kind of person, but
17   to my understanding, chargeback is when a
18   customer or -- has a negotiated price with you,
19   and if they were to purchase your product from
20   someone at a higher price, they would submit a
21   chargeback for a rebate for the difference in
22   that cost.
23        Q.   All right.  And then the next one is
24   a -- it's actually two, because I think it

Page 23

1    changes through time.  It's IMS and IQVIA data.
2             Are you familiar with that?
3         A.   I'm familiar with IMS.
4         Q.   What is IMS, as you think of it?
5         A.   IMS is an organization that deals in
6    data and gathering industry data and providing
7    that data to industry.  Largely used by our
8    sales and marketing groups.
9         Q.   All right.  So today --
10            MR. EGLER:  Can we go off the record
11   for one second?
12            THE VIDEOGRAPHER:  The time is
13   approximately 9:21 a.m.  We are going off
14   the record.
15            (Off the record.)
16            THE VIDEOGRAPHER:  We are back on the
17   record.  The time is approximately
18   9:22 a.m.
19   BY MR. EGLER:
20        Q.   Mr. Napoli, as we move through today,
21   I'm going to be handing you documents.  To the
22   extent -- well, every document that I'm going to
23   hand to you has been produced in this
24   litigation.

Page 24

1         A.   Um-hmm.
2         Q.   And they'll have various Bates
3    numbers on them on the bottom right-hand corner,
4    and I'll read them into the record.  And I'll
5    try to, to the extent I think any context is
6    needed, I'll tell you what I think the context
7    is from my data.
8             To the extent you need any context or
9    you have any questions about the documents, just
10   ask and I'll see if I can get the answer for
11   you.
12        A.   Sure.
13        Q.   So with that said, I'm going to hand
14   you what we'll mark as Exhibit 1.
15            (Napoli Exhibit 1, Memo dated
16            11/13/08, Bates-stamped
17            ALLERGAN_MDL_03535130 through 5133, marked
18            for identification, as of this date.)
19   BY MR. EGLER:
20        Q.   Mr. Napoli, can you look at
21   Exhibit 1?
22        A.   Yes.
23            MR. EGLER:  And for the record, I'll
24   note that the first page doesn't have a

Page 25

1    Bates-stamp, but the second page is
2    Bates-stamped Allergan_MDL_03535130 and it
3    goes to 35133.
4    BY MR. EGLER:
5        Q.   And can you look generally at this,
6    and when you're ready, just tell me and I'll ask
7    you some questions about it and tell you what I
8    know about it.
9        A.   Okay.  You want me to look at the
10   second page?
11       Q.   Well, just look through it generally.
12   You don't have to read it or anything.  I'm
13   going to ask you to read parts of it.
14           (Witness complies.)
15       A.   Okay.  All right.
16       Q.   All right.  So the first page of this
17   document is -- again, it does not have a Bates
18   number on it.  I'll tell you it's a printout of
19   what's referred to as the metadata for this.
20       A.   Okay.  Got it.
21       Q.   And it has various data on there.
22   One of them is, under Document Identification,
23   it says "custodian" and then a colon and
24   "Napoli, Tom."

Page 26

1        Q.   Do you see that there?
2        A.   Um-hmm.
3        Q.   And in the context of this case, my
4    understanding is it is a document that comes
5    from your files.
6        A.   Yes.
7        Q.   So with that in mind, as you think
8    about the remaining pages of this document, do
9    you recognize this document?
10       A.   It appears to be a document that I
11   authored.
12       Q.   Do you, as you sit here today, do you
13   remember typing up this particular document?
14       A.   This particular document, no.  But it
15   wouldn't be uncommon for me to attend a
16   controlled substance seminar and report back a
17   summary to management and...
18       Q.   And just so we're clear, so I can put
19   it in perspective for the record, the date on
20   the document is November 13th, 2008, which is
21   just a little over ten years ago, right?
22       A.   Um-hmm.
23       Q.   So do you remember in 2008 in May and
24   June attending a controlled substance conference

Page 27

1    and meeting of the New Jersey Pharmaceutical
2    Industry Group?
3        A.   I don't remember the specific
4    meeting, but I attended this particular
5    conference consistently almost on an annual
6    basis.
7        Q.   All right.  So the conference that
8    you referred to in this document is the
9    controlled substance conference sponsored by
10   Cegedim-Dendrite, and it's C-e-g-e-d-i-m, dash,
11   D-e-n-d-r-i-t-e.
12           Do you see that there?
13       A.   Yes.
14       Q.   What is Cegedim-Dendrite, as you
15   think of it.
16       A.   Cegedim-Dendrite is an industry
17   consulting organization.  We actually -- the
18   consulting firm that would host these events
19   was -- Cegedim-Dendrite is almost synonymous
20   with a consulting firm called Buzzeo Associates.
21   So they're essentially interchangeable, but
22   Buzzeo Associate is a industry controlled
23   substance FDA type of expert consultant group.
24       Q.   As you think of it, I think you said

Page 28

1    you attended this --
2        A.   Um-hmm.
3        Q.   -- often.
4           When would have been the first time
5    you would have attended the controlled substance
6    conference sponsored by Cegedim-Dendrite?
7        A.   Probably in the mid-2000s, but I
8    couldn't attest to a date, specific date, sir.
9        Q.   All right.  And you had mentioned the
10   name Buzzeo?
11       A.   Yes.
12       Q.   Is there a Mr. Buzzeo?
13       A.   Yeah.  Ron Buzzeo.
14       Q.   Did you know Mr. Buzzeo?
15       A.   I do.
16       Q.   How do you know Mr. Buzzeo?
17       A.   Through seminars and also we had
18   utilized their -- their services from time to
19   time for compliance support.
20       Q.   So going down through that first
21   paragraph, it talks about the conference, and
22   then it talks about the New Jersey
23   Pharmaceutical Industry Group.  And you write,
24   "The New Jersey Industry Group meeting was

Page 29

1    facilitated and attended by a cross-section of
2    pharma partners engaged in controlled substance
3    activities throughout the northeast region."
4         Do you see that there?
5         A.   Yes, sir.
6         Q.   Do you remember, as you sit here
7    today, attending that particular meeting?
8         A.   I don't.
9         Q.   Do you have a memory that that was
10   the first meeting of the New Jersey PIG?
11        A.   I don't -- I don't believe it was the
12   first meeting.
13        Q.   So this memo, as you think of it, the
14   "to" and "from" lines at the top are blank.
15        Do you know whether you ever sent
16   this to anybody or whether you kept it for
17   yourself?
18        A.   Looking at the date, it would have
19   been prior to taking the position at corporate
20   headquarters. I would have likely have sent
21   this to my boss, Eric Nibergall. And perhaps if
22   I -- I was working at a manufacturing site,
23   probably our site general manager.
24        Q.   All right. As you think about this

Page 30

1    time, November 2008, who was your site general
2    manager?
3         A.   An individual by the name of Tom
4    Strohl, S-t-r-o-h-l.
5         Q.   So going down further into this memo,
6    there is a discussion of "areas of
7    interest/concern"?
8         A.   Um-hmm.
9         Q.   And then it says "Quota"?
10        A.   Yes, sir.
11        Q.   And there is a discussion of quota?
12        A.   Um-hmm.
13        Q.   What does that term "quota" mean to
14   you in the context of your work?
15        A.   The way that the DEA ensures
16   compliance and mitigates the opportunity for
17   diversion is to maintain a closed system, what
18   they call a closed system of distribution. And
19   that closed system distribution starts with a
20   process, a quota process for Schedule II
21   controlled substances and III narcotics, such as
22   hydrocodone, where there is a -- based on a lot
23   of research that DEA does and also input from
24   FDA, as well as looking at abuse data, emergency

Page 31

1    room record -- data, all types of big data to
2    determine what is called an aggregate quota for
3    the United States issuance of a quota for a
4    particular molecule for a controlled substance.
5         So they'll look at sales data from
6    each one of the companies, what was consumed
7    over the year, the prior year, and they would
8    make a decision where they would come up with an
9    aggregate of a particular molecule. It could be
10   oxycodone, hydrocodone, et cetera, which would
11   be divided up among industry.
12        We would have -- API manufacturers
13   would have a quota called a "manufacturing
14   quota" where they could synthesize and develop
15   an active pharmaceutical material like the raw
16   material for OxyContin.
17        At the manufacturer level, where we
18   were at, we would have what's called
19   "procurement quota" where we would of, based on
20   our -- we would do an end of year report and
21   make an application to the DEA based on our
22   prior sales, provide them with all of our sales
23   history. They would do a review, and they would
24   grant you a quota to, to manufacture for a given

Page 32

1    year. And that quota could be a adjusted
2    midyear or throughout the year based on your
3    sales. If you acquired new business, you could
4    apply for more quota. If business dropped off,
5    you may, there are opportunities where you could
6    have perhaps surrendered quota if you didn't
7    need it. But it was -- that's essentially in a
8    nutshell what the quota system is.
9         Q.   So as you think about it, around this
10   time, end of 2008, when you were at Watson, did
11   you have any responsibility for applying for or
12   managing the quota that Watson got for any
13   controlled substances?
14        A.   Not at the time of this memo. But in
15   2019, when I assumed my role at corporate
16   headquarters, I did have responsibility for, for
17   that aspect of the business. I had an
18   individual who worked for me who was just
19   dedicated to quota administration.
20        Q.   And I think you said 2019.
21        A.   2009. I apologize.
22        Q.   Okay. That's fine.
23        And just so you know, at the end of
24   the deposition, if anything like that happens,

Page 33

1   neither of us catch it, you'll have the
2   opportunity to correct anything --
3        A.   Okay.
4        Q.   -- with no problem?
5        A.   Okay.
6        Q.   So with regard to the quota process,
7   you said you managed someone who was responsible
8   for the quota?
9        A.   Right.
10       Q.   Who was that?
11       A.   Bill Hepworth.
12       Q.   And that's?
13       A.   H-e-p-w-o-r-t-h.
14       Q.   And beyond managing Mr. Hepworth, did
15  you have any involvement in the negotiation or
16  application of a quota for Watson?
17       A.   I definitely reviewed the
18  applications and provided input for those
19  applications.
20       Q.   All right.  Anything else?
21       A.   No, not necessarily.
22       Q.   All right.  So moving on into this
23  document, on the following page, on 131, about a
24  little bit more than halfway down, there is a

Page 34

1   paragraph that you wrote that says, "During the
2   NJ Pharmaceutical Industry Group meeting, a
3   proposal was made to draft a letter from
4   industry to the DEA outlining the current
5   situation and its affect on the industry.  The
6   letter will be a documented record of the
7   industry's desire for change and efficiency
8   within the current process to adequately meet
9   market needs.  The letter will only be sent upon
10  the affirmation by the represented
11  organizations's legal and government affairs
12  functions."
13       Do you remember having a discussion
14  at the 2008 New Jersey Pharmaceutical Industry
15  Group meeting about potentially writing a letter
16  to the DEA?
17       A.   I do not have a recollection of that.
18       Q.   All right.  And then -- I apologize
19  for going backwards.
20       A.   No worries.
21       Q.   Further up in this document, there is
22  a number of references to a person by the name
23  of Joseph Rannazzizi?
24       A.   Yes.

Page 35

1        Q.   R-a-n-n-a-z-z-i-s-i.
2        Do you know who Mr. Rannazzisi is?
3        A.   Yeah, Mr. Rannazzisi was the deputy
4   administrator, DEA diversion.
5        Q.   Did you ever meet Mr. Rannazzisi?
6        A.   I did.
7        Q.   When did you meet him?
8        A.   I met him at a conference that he
9   spoke at in Edison, New Jersey.  I don't recall
10  the date.
11       Q.   Was it while you were working at
12  Watson?
13       A.   Yes.
14       Q.   Do you think it was around this time
15  2008 or later?
16       A.   I can't speculate to that.
17       Q.   So with regard to Mr. Rannazzisi, do
18  you remember discussions of a one or two or more
19  letters that Mr. Rannazzisi wrote about the
20  opioid situation in the United States?
21       A.   I don't recall specific letters,
22  but...
23       Q.   Okay.  So we'll probably talk about
24  them further.  And I'll -- to the extent we talk

Page 36

1   about them, I'll show them to you.
2        A.   Yeah.
3        Q.   All right.  So if you can turn to the
4   next page, which is 5132.  And at the bottom of
5   the previous page and at the top of this page,
6   it's talking about SOM.
7        Do you see that there?
8        A.   Yes, sir.
9        Q.   And is SOM, as you think of it, the
10  Suspicious Order Monitoring systems?
11       A.   Yes.
12       Q.   And you write that "It is highly
13  recommended that industry utilize a 'total SOM
14  model.'  This model favors a more
15  statistically-based model that dynamically
16  evaluates a variety of order characteristics to
17  determine whether an order should be pending.
18  Characteristics include order size, ordering
19  frequency, ordering patterns and percentage of
20  CS ordered."
21       "CS" there is controlled substance;
22  is that right?
23       A.   Correct.
24       Q.   And then it says, "This approach is

Page 37

1   viewed to be more effective and defensible than
2   the traditional approach of just setting a
3   threshold."
4         Now you write there that it is
5   "highly recommended."
6         From the context of this memo, take
7   your time, can you see where -- where you came
8   to that conclusion that it was highly
9   recommended?
10        A.  It was highly recommended by the
11  Cegedim-Dendrite group.
12        Q.  Okay.
13        A.  To put it in context as well, too,
14  you have to understand they're, as a consultant
15  group, they're selling a product as well, too,
16  for compliance.
17        Q.  All right.
18        And so then going down here, it says,
19  "The following concepts are to be considered
20  when developing an effective SOM:  How are new
21  accounts opened, background check, Know Your
22  Customers."  And then a bullet point, "How are
23  orders evaluated," and then a bullet point, "How
24  are orders cleared from suspicion, appropriate

Page 38

1   investigation, resources/SOPs."
2         And in the context of this document,
3   what does the term "SOP" mean?
4         A.  Standard operating procedure.
5         Q.  And then a bullet point, "Who reports
6   suspicion order to DEA, management oversight,"
7   and then a bullet point, "Do third-party
8   distributors utilize an adequate SOM."
9         Do you see that there?
10        A.  Yes, sir.
11        Q.  So that last one, "Do third party
12  distributors utilize an adequate SOM," what does
13  that mean in the context of this document?
14        A.  That, to me, implies that, you know,
15  and it comes back to me to know your customer,
16  that ensuring that your supply chain partner
17  that you distribute your products to that they
18  have an effective system in place that's
19  compliant with DEA regulations.
20        Q.  And with regard to this discussion
21  here with these bullet points that I've been
22  reading, it says "Know Your Customers"?
23        A.  Yes, sir.
24        Q.  And in the context of your work at

Page 39

1   Watson, the customers that are referred to
2   there, who are they?
3         A.  Distributors or large chains such as
4   Walgreens, CVS.
5         Q.  Walgreens and CVS would essentially
6   distribute to themselves, is that fair to say?
7         A.  Right, to their own pharmacy
8   locations.
9         Q.  So with regard to the third bullet
10  point there, it says, "How are orders cleared
11  from suspicion."
12        A.  Um-hmm.
13        Q.  Can you tell me what that means in
14  the context of this document?
15        A.  Sure.
16        And within the context of, of this
17  document, if you have an order that pens with or
18  flags within a given system, you know, what
19  steps do you take as a registrant to understand
20  that ordering behavior and subsequently justify
21  why that order is out of -- is not consistent
22  with an ordering pattern.  It could be because a
23  company took on more business, another
24  manufacturer had an issue for the same product

Page 40

1   and they're coming to you for an increase.
2   There could be a variety of reasons why an order
3   increased.
4         So really taking a deeper dive to
5   understand why the change in behavior.
6         Q.  All right.  Then moving further down
7   in the document, it states, "DEA shifted
8   operating philosophy."
9         Do you see that there?
10        A.  Yes.
11        Q.  It says, "Field offices becoming less
12  'friendly,' shifting from partners to
13  enforcers."
14        A.  Yes.
15        Q.  Do you have a memory or an
16  understanding of where you got that information?
17        A.  That would have come from a -- the
18  Cegedim or the Buzzeo group was comprised
19  largely of former DEA high-ranking officials,
20  policy and liaison folks within management that
21  still had contacts, and as well as I can see in
22  here that Mark Caverly and James Crawford, both
23  from DEA, spoke at this conference.  And that
24  there was a shift in -- there was more trends of

## Page 41

1 more aggressive enforcement because of some of
2 the abuse patterns that were existing in the
3 country.
4     Q.  By this time in 2008, for about how
5 long had you been working or encountering issues
6 with the DEA in your work?
7     A.  Up to that point, I didn't have any
8 issues with the DEA.
9     Q.  Just when you say you didn't have any
10 issues, it means your work didn't have any --
11     A.  Are you talking about -- can you
12 provide context to "issue"?
13     Q.  Right.
14     A.  Is it negative issue or just dealings
15 with DEA?
16     Q.  That's what I want to get a better
17 word for.
18     So as you think about your work up to
19 this point, the end of 2012, did you have any
20 responsibilities for enforcing DEA regulations
21 in your job?
22     A.  Well, you used the term "2012."
23     Q.  I'm sorry.  2008.
24     A.  Okay.  2008.

## Page 42

1     In 2008, I was responsible for
2 compliance within our manufacture and
3 distribution sites in -- locally in New York,
4 yes.
5     Q.  And as part of that compliance
6 process, would you be responsible for preparing
7 the sites for audits by the DEA?
8     A.  Yes.
9     Q.  As you think of it, in your time up
10 to this point, end of 2008, before you moved to
11 New Jersey, about how many DEA audits did you
12 participate in for Watson?
13     A.  Several.  We -- the way that the DEA
14 audits is based on your registration, so -- and
15 the cyclical audits could be -- they can range
16 from three years to sometimes five years.
17     If you have a violative past or a
18 history, you can get an inspection every year.
19     We were on a three to five-year
20 inspection schedule, but because we had multiple
21 registrations, so we had manufacturer
22 registration, I believe we had import
23 registrations, research, each one of those
24 registrations are subject to an inspection on a

## Page 43

1 periodic basis.  So probably every couple of
2 years or so, we would see the DEA in for a
3 cyclical inspection, it would be called.
4     Q.  All right.  So moving further down
5 onto this page, which is page 3 of the document,
6 page 132 of Exhibit 1, it states, "Contributing
7 Factors," colon, and then in quotations, "the
8 perfect storm."
9     Do you see that there?
10     A.  Right.
11     Q.  And you write a series of five bullet
12 points: "Non-medical use of pharmaceutical
13 products now greater than the abuse of cocaine,
14 hallucinogens and inhalants" --
15     A.  Right.
16     Q.  -- "among adults 26 or older.  Seven
17 million Americans reporting non-medical use of
18 prescription medicines in 2006."
19     Next bullet point is:  "Presidential
20 mandate to cut drug use, enforcement efforts
21 have been highly successful in areas of illicit
22 drug use, yet one category is rising,
23 prescription medicines.  Clandestine
24 methamphetamine production, 'shut down in U.S.,'

## Page 44

1 mainly in Mexico now."
2     And the next one is:  "Proliferation
3 of Internet."
4     Next one is:  "Congressional
5 interest, children dying, tremendous cost to
6 society."
7     And the last bullet point is:
8 "Dwindling DEA resources."
9     So as you think about the information
10 that you convey there in this memo, where would
11 you have gotten that information?
12     A.  That would have been from a
13 presentation directly from the Cegedim-Dendrite
14 conference.  It may have come from, from their,
15 one of their presentations or one of the
16 speakers from DEA.
17     Q.  And then you state that the -- well,
18 the next thing you state is, "Result," and a
19 colon, and it says, first bullet point,
20 "Application of traditional principals of
21 enforcement industry."
22     And then the next bullet point is:
23 "Enforcement focus - commingling of enforcement
24 agents and diversion investigators and single

Page 45

1    enforcement group at all field offices.  400
2    diversion investigators in the world, more than
3    one million registrants, 5,000 special agents
4    currently hiring."
5        A.   Yes.
6        Q.   And then the next one is:  "All
7    policy decisions made by HQ."
8            So, again, where would you have
9    gotten that information?
10       A.   Again, it probably would have come
11   from either Mr. Crawford or Caverly from DEA.
12       Q.   The statement there, it says, "All
13   policy decisions made by HQ."
14           What does that mean?
15       A.   That the policy decisions for, as I
16   would interpret this, enforcement actions would
17   be made in the Washington, D.C., level, not at a
18   local field office.
19       Q.   All right.  And then on the next
20   page, at the bottom of that page, the next page
21   talks about two people from the DEA, James
22   Crawford, who is special assistant, Office of
23   Diversion Control, and Mark Caverly?
24       A.   Caverly.

Page 46

1        Q.   Section chief, Office of Diversion
2    Control.
3            Do you remember meeting Mr. Crawford
4    or Mr. Caverly?
5        A.   I do remember meeting Mr. Crawford.
6    And Mr. Caverly, I know very well.
7        Q.   So how do you know Mr. Caverly?
8        A.   Mr. Caverly, I knew him when he was
9    head of policy and liaison with DEA.  And he was
10   someone that you would reach out to if you had
11   any questions about interpretation of federal
12   regulations, which sometimes, as you know, can
13   not be clear at all times.  So he was a resource
14   to reach out to to get clarification.
15           As well as when he retired from DEA,
16   he actually became one of the head consultants
17   for Cegedim/Buzzeo.  So I've known him for many
18   years.
19       Q.   Do you remember when about he
20   retired?
21       A.   I don't.  It might have been right
22   around this time period within -- give or take a
23   year.
24       Q.   How about Mr. Crawford, do you

Page 47

1    remember him?
2        A.   I do.
3        Q.   How did you know Mr. Crawford?
4        A.   Just from the one meeting at this
5    conference, I believe.
6        Q.   All right.  Mr. Caverly, as you think
7    of it, when was the last time you talked with
8    him?
9        A.   I haven't worked for Actavis --
10   probably three years ago.
11       Q.   All right.  You can set this
12   document, Exhibit 1, aside.
13           (Witness complies.)
14           (Discussion off the record.)
15   BY MR. EGLER:
16       Q.   And at the end of the day, the court
17   reporter will take all the documents that are
18   marked with the actual stickers and keep them.
19       A.   Okay.
20       Q.   No souvenirs.
21       A.   Parting gifts.
22           (Laughter.)
23       Q.   Mr. Napoli, I'm going to hand you
24   what we'll mark as Napoli Exhibit 2.

Page 48

1        A.   Okay.
2            (Napoli Exhibit 2, NJPIG Charter
3    Statement, Bates-stamped HDS_MDL_00095906
4    through 5907, marked for identification, as
5    of this date.)
6    BY MR. EGLER:
7        Q.   What we marked as Exhibit 2, I'm just
8    going to tell you, at the bottom right-hand
9    corner, there is a Bates number.  It says
10   HDS_MDL_00095906.  And I want to be clear, this
11   document did not come from the files of your
12   former employer or your own files.
13           But that said, do you remember ever
14   seeing this document before?
15       A.   Yes.
16       Q.   Okay.  What is it?
17       A.   It's a charter statement for the New
18   Jersey Pharmaceutical Industry working group
19   essentially stating what the goals of the
20   working group is, as well as -- I'm trying to
21   think of this.  There was a document about, you
22   know, not sharing proprietary, confidential
23   information.  I don't know if that's within this
24   document.  But this is just essentially the

Page 49

1    charter and the mission of what our, our group
2    was put together for.
3        Q.   And as you think about your
4    involvement in the New Jersey Pharmaceutical
5    Industry Group, how many people from Watson in
6    2008 were involved in the NJPIG?
7        A.   In 2008, certainly I was a new member
8    to the team.  I think probably Tracey Hernandez,
9    who was our head of DEA compliance at the time,
10   would have been a member.
11       Q.   Anybody else?
12       A.   I'm not 100 percent sure, but some
13   people within her group may have been members.
14       Q.   So as you think of the entity, the
15   New Jersey Pharmaceutical Industry Group, did
16   you know anybody from other companies that were
17   in the group?
18   A.   Yes.
19       Q.   Who did you know, as you think about
20   it just off the top of your head?
21       A.   Mike Mejjiolaro, and I don't even
22   know if I can spell that name.
23       Q.   Anybody else?
24       A.   I'm trying to think.  It's -- we're

Page 50

1    going back now, and I know that there were
2    individuals from Novartis, but I'm struggling
3    with some of the names.
4        Q.   With regard to the companies like
5    Novartis, can you think of any other companies
6    that were participating in the New Jersey
7    Pharmaceutical Industry Group around this time?
8        A.   Novartis, Halo Pharmaceuticals.
9    Yeah, I'm actually struggling with that, with
10   some of the names.
11       Q.   Have you ever heard of a company
12   called Endo?
13       A.   Yes.
14       Q.   Do you remember anyone from Endo
15   being part of the NJPIG?
16       A.   Not at that time.  They may have been
17   a member.  I don't know who would represent them
18   at that time.
19       Q.   As you think about it, about this
20   time, June 2008, again, just as you think about
21   it, about how many members of the NJPIG were
22   there?
23       A.   I couldn't speculate.  I mean, if I
24   said a dozen, I --

Page 51

1        Q.   But you don't have any particular
2    feeling either way?
3        A.   No.
4        Q.   All right.  So this charter statement
5    has various text on it.  And part of it is
6    bullet points.  And it says: "The goal of the
7    New Jersey Pharmaceutical Industry Group is to
8    increase compliance with DEA requirements
9    through the shared knowledge and experience of
10   group members."
11       A.   Yes.
12       Q.   And then it states: "All information
13   shared in the meeting is confidential.  If you
14   use an idea that was presented at a meeting, it
15   should not be attributed to any specific
16   company.  We do not publish meeting notes."
17           And then it says: "Each
18   company/member is expected to volunteer to host
19   a meeting when it is their turn.  We have about
20   two meetings a year.  The location is chosen by
21   the host company.  Each meeting we ask for a
22   volunteer for the next meeting.  Attendance by
23   multiple persons from the same company may need
24   to be limited based upon the room size."

Page 52

1            And then it states: "Invitation for
2    speakers from state or federal agency and/or
3    suppliers is after discussion with the group."
4            All right?  Do you see that there?
5        A.   Yes, sir.
6        Q.   Now you are -- or I just read the
7    second bullet point, "All information shared in
8    the meeting is confidential.  And if you use the
9    idea that was presented at a meeting, it should
10   not be attributed to any specific company.  We
11   do not publish meeting notes."
12           Do you remember whether you took
13   notes at meetings of the New Jersey
14   Pharmaceutical Industry Group?
15       A.   I don't recall if I took notes at
16   those meetings.
17       Q.   And you regularly attended the
18   meetings of this NJPIG, right?
19       A.   I wouldn't say regularly.  It was
20   probably intimately, when my schedule allowed
21   it.
22       Q.   Okay.  When you did not attend a
23   scheduled meeting of the NJPIG, would someone
24   attend for you?

Page 53

1   A.   In this time frame, no.
2   Q.   How about later on?
3   A.   Later on, probably, yeah.
4   Q.   As you think of it, who would have
5   been the person who would have attended for you?
6   A.   It could have been any of the -- it
7   could have been Bill Hepworth.  It could have
8   been one of our auditors.
9   Q.   All right.  And then you mentioned
10  one of the other people from Watson who may have
11  been involved in this was woman by the name of
12  Tracey Hernandez, right?
13  A.   Yes, sir.
14  Q.   Was Tracey Hernandez, did she work in
15  New Jersey at this time?
16  A.   Yes.
17  Q.   And when you moved into the
18  reorganized DEA affairs and security part of
19  Watson, what did Ms. Hernandez do?
20  A.   She was actually, because of the
21  organizational change to fold the organization
22  from quality into the security and operations
23  organization, she was transitioning out of the
24  organization.  So I think when I came in, she

Page 54

1   was transitioning out over a six-month period.
2   Q.   Do you remember whether she stayed
3   employed at Watson at the end of the six-month
4   period?
5   A.   I can't recall if she stayed the
6   whole six months.
7   Q.   She doesn't work at Watson -- well,
8   do you know whether she ever left Watson's
9   employment at some point?
10  A.   Yes.
11  Q.   Do you know when?
12  A.   It would have been 2009.
13  Q.   All right.  So with regard to the New
14  Jersey Pharmaceutical Industry Group, do you
15  remember whether you ever hosted one of their
16  meetings?
17  A.   I believe we did host a meeting.
18  Q.   Where did you host it?
19  A.   It would have either been in our
20  Morristown location, but we subsequently moved
21  to Parsippany, so either one of those.  I don't
22  have a specific recollection of where we hosted
23  it.  I believe we did host one.
24  Q.   So you mentioned Morristown, and it's

Page 55

1   M-o-r-r-i-s-town, right?
2   A.   Yes.
3   Q.   And then Parsippany, New Jersey.
4   Was it Parsippany, New Jersey, your
5   offices at Actavis?
6   A.   Yes.
7   Q.   And Morristown was where Watson was;
8   is that right?
9   A.   Well, it was Watson and then Actavis.
10  So it was -- Watson moved from their location in
11  Morristown to Parsippany.  And then after the
12  acquisition of Actavis, it became the Actavis
13  headquarters.
14  Q.   Okay.  So Watson moved to Parsippany?
15  A.   Um-hmm.
16  Q.   And then they bought Actavis?
17  A.   Correct.
18  Q.   All right.  Okay.  You can set this
19  document aside for now.
20       (Witness complies.)
21  BY MR. EGLER:
22  Q.   All right.  And I'll hand you what
23  we'll mark as Exhibit 3.
24       (Napoli Exhibit 3, Cegedim-Dendrite

Page 56

1   document dated 10/21/08, Bates-stamped
2   ALLERGAN_MDL_03535009 through 010, marked
3   for identification, as of this date.)
4   BY MR. EGLER:
5   Q.   So Exhibit 3, again, the first page
6   doesn't have a Bates number on it, but starting
7   on the second page, it's ALLERGAN_MDL_03535009
8   through 010.
9       Mr. Napoli, when you're ready, can
10  you tell me what this appears to you to be?
11  A.   This looks like a promotional or a
12  summary of a service or a product that
13  Cegedim-Dendrite was marketing towards industry
14  to develop a statistically based model of
15  Suspicious Order Monitoring.
16  Q.   And, again, based on the information
17  that we received in the litigation, this
18  document came from your files.
19  A.   Um-hmm.
20  Q.   Do you remember this document?
21  A.   Yes.
22  Q.   What do you remember about it?
23  A.   It probably, you know, came from
24  either from the conference or post conference,

Page 57

1    something that was, was sent to us or that I
2    printed off for informational purposes.
3        Q.   Do you remember around this time --
4    well, this document refers -- is dated
5    October 21st, 2008.
6        A.   Um-hmm.
7        Q.   Do you remember around this time
8    having discussions with anyone from
9    Cegedim-Dendrite about their Suspicious Order
10   Monitoring offerings?
11       A.   Not in 2008 because I wasn't in the
12   corporate role yet.
13       Q.   Okay.  So why would you have saved
14   this document?
15       A.   For educational informational
16   purposes.
17       Q.   All right.  You can set this document
18   aside.
19           (Witness complies.)
20   BY MR. EGLER:
21       Q.   Now we're going to move on.  I'm hand
22   you what we will mark as Exhibit 4.
23           (Napoli Exhibit 4, Email chain
24           beginning with email dated 6/8/09 from

Page 58

1    Woods to Napoli, Bates-stamped
2    ALLERGAN_MDL_ 02467143 through 154, marked
3    for identification, as of this date.)
4           (Handing.)
5        A.   Thank you.
6        Q.   Mr. Napoli, can you look at
7    Exhibit 4.  And while you're looking at it
8    generally, I'll read into the record the Bates
9    numbers.
10           It's ALLERGAN_MDL_ 02467143 through
11   154.  And I'm going to ask you some questions
12   about this document.
13       A.   Sure.
14       Q.   Just let me know when you're ready.
15   You don't have to have an understanding of all
16   the information.
17       A.   Okay.
18       Q.   I just want to ask you some questions
19   about it.
20           (Document review.)
21       A.   Okay.
22       Q.   So did you use email when you worked
23   at Watson?
24       A.   Yes.

Page 59

1        Q.   What was your email address?
2        A.   I think it was TNapoli@Watson.com.
3        Q.   Did you ever print out an email that
4    you wrote or received while you worked at
5    Watson?
6        A.   I'm sure I have.
7        Q.   As you think of it, would it have
8    looked like the -- format-wise, looked like the
9    document that we've marked as Exhibit 4?
10       A.   I would think so.
11       Q.   I'll represent to you that this
12   document was produced to us by Allergan --
13       A.   Okay.
14       Q.   -- in this case.
15           And it's my understanding that it is
16   an email.  And at the top of the page, it says
17   "from," and it has the name Mary Woods.
18           Do you know Ms. Woods?
19       A.   I do.
20       Q.   Who is Mary Woods?
21       A.   Mary Woods was our head of order
22   management.
23       Q.   When did you first meet Mary Woods?
24       A.   Most likely when I entered into my

Page 60

1    new role in 2009.
2        Q.   And there is a person there named
3    Molly Martin.
4        A.   Um-hmm.
5        Q.   Who is Molly Martin?
6        A.   Molly Martin, I believe, was someone
7    who was a member of management within our
8    quality team.
9        Q.   I think you had mentioned that term
10   "quality" before.
11       A.   Um-hmm.
12       Q.   In the context of your work at
13   Watson, what does that mean to you, quality
14   team?
15       A.   The quality assurance organization is
16   an organization that is very closely tied with
17   ensuring compliance with FDA regulations and
18   ensuring that we have a total quality system and
19   that we are functioning according to FDA
20   regulations.
21       Q.   So is it fair to say there is a
22   different group to ensure compliance with FDA
23   regulations than there -- than there is a group
24   to ensure compliance with DEA regulations?

1    MR. KNAPP:  Objection to form.
2    MR. LUXTON:  Objection.
3  BY MR. EGLER:
4    Q.  Do you have an answer to the
5  question?  Sorry.
6    A.  Yeah, there is -- there is both
7  quality group and a DEA compliance group.
8    MR. LUXTON:  Sorry to interrupt, but
9  can we just have an agreement, because I
10  objected at the same time, an objection for
11  one defendant is an objection for all so I
12  don't have to put the same objections on
13  the record?
14    MR. EGLER:  Yeah.
15    MR. LUXTON:  It might be in the CMO.
16    MR. EGLER:  It is.  That's all
17  covered.
18    MR. LUXTON:  Great.  Thanks.
19    MR. EGLER:  We just need one.  And
20  you guys can have a button if you want.
21    (Laughter.)
22  BY MR. EGLER:
23    Q.  For the quality assurance group and
24  their role with regard to FDA regulations, we

1  talked about Ms. Martin.
2    Do you remember anybody else from
3  that group?
4    A.  From the quality group?
5    Q.  Yes.
6    A.  It's a very large group.  Yeah, I do.
7    Q.  About how many people were in the
8  group, as you think of it?
9    A.  I couldn't even speculate.
10    Q.  Like dozens or less than ten?
11    A.  More than -- more than a dozen.  I
12  mean, we had a corporate group, and then there
13  were quality groups at the sites.
14    Q.  And thinking of the DEA group -- let
15  me start over because that was a little
16  cumbersome.
17    As you think about the people at
18  Watson that were responsible for making sure the
19  company complied with the DEA regulations and
20  laws, about how many people at the Watson
21  headquarters when you started there had the
22  primary responsibility for that?
23    A.  About a half dozen.
24    MR. KNAPP:  Objection to form.

1  BY MR. EGLER:
2    Q.  And as you think about the half
3  dozen, can you name some of them?
4    A.  Bill Hepworth, Lynn DaCunha,
5  D-a-c-u-n-h-a.  Ione Graziosi, Jim Dougherty
6  D-o-u-g-h-e-r-t-y, Sarah Blackenship.  And we
7  also had individuals at the sites that had
8  compliance responsibilities as well.
9    Q.  All right.  With regard to each of
10  those people, as you think about them, did any
11  of them have primary responsibility for the
12  Suspicious Order Monitoring System?
13    A.  I believe Ione Graziosi.
14    Q.  All right.  That is a woman, right?
15    A.  Correct.
16    Q.  Do you know what her job title was
17  when you started at Watson's headquarters in New
18  Jersey?
19    A.  Manager of controlled substance
20  compliance, I believe.
21    Q.  How would she -- what was her -- let
22  me start over.
23    What were her job responsibilities at
24  that time?

1    A.  She would have been probably second,
2  you know, kind of someone who supported Tracey
3  Hernandez in her direct role.  So oversight of,
4  of the group.  Probably had her oversight in
5  various functions.  So as far as licensing,
6  registration, quota, Suspicious Order
7  Monitoring, ensuring probably day-to-day
8  management, where Tracey might have been a
9  little bit more strategic in her role.
10    Q.  And then as Ms. Hernandez
11  transitioned out of her role, what did -- what,
12  if anything, changed about Ms. Graziosi's role?
13    A.  Essentially it stayed the same.
14    Q.  Did she report to you at some point?
15    A.  Yes.
16    Q.  For about how long did she report to
17  you at Watson and Actavis?
18    A.  I'd say maybe a year.
19    Q.  And then after the year that you're
20  thinking of, what, if anything, happened?
21    A.  She left the organization.
22    Q.  Were her job responsibilities
23  undertaken by somebody else?
24    A.  We actually -- with me leading the

Page 65

1    group, we actually brought in another individual
2    who became an auditor investigator for us who
3    took the primary responsibility for the SOMS,
4    the Suspicious Order Monitoring role.  And the
5    other individuals really kind of just picked up
6    the other responsibilities.
7            I managed the overall operation, as
8    well as the strategic operations.
9        Q.   So who was the person that you're
10   thinking of that came in after Ms. Graziosi
11   left?
12       A.   It would have been Lisa Scott.  She
13   kind of came in during the time when Ione was
14   there.
15       Q.   And then for how long was Ms. Scott
16   in that role?
17       A.   Four or five years maybe.
18       Q.   Do you remember --
19       A.   If that.
20       Q.   Do you remember when she left?
21       A.   When she left?
22       Q.   About the time?
23       A.   I'd say 2012, 2013.
24       Q.   Do you remember if anyone replaced

Page 66

1    her in that role?
2        A.   Yes.
3        Q.   Who?
4        A.   William Simmons.
5        Q.   All right.  And what was
6    Mr. Simmons's role?
7        A.   Will Simmons was, again, brought in
8    as an auditor/investigator, so he had a primary
9    role for the day-to-day, for the DEA compliance
10   side of Suspicious Order Monitoring, Know Your
11   Customer activities, any type of investigations,
12   as well as audit.
13       Q.   Was Mr. Simmons physically located in
14   New Jersey for work?
15       A.   Yes, sir.  Yes.
16       Q.   And as you think of it, by that time
17   when you were working with Mr. Simmons, you were
18   in Parsippany; is that right?
19       A.   Yes, sir.
20       Q.   As you think about the physical
21   layout of the Parsippany business for Watson and
22   Actavis, about how many stories was it?
23       A.   Four.
24       Q.   And what floor were you on?

Page 67

1        A.   Third.
2        Q.   Do you remember, as you think of it,
3    who else was on the third floor?
4        A.   In Parsippany?
5        Q.   And let me ask this a little bit
6    better.
7            As you think about the Parsippany
8    office building in the time that you moved in,
9    how would you categorize the group that you
10   managed or worked for?  Would it be DEA affairs
11   or something else?
12       A.   DEA affairs.
13       Q.   So about, as you think of it, about
14   this time, about how many people in the DEA
15   affairs group were located for work in the
16   Parsippany building?
17       A.   Everyone.
18       Q.   And about how many people was that?
19       A.   I guess about half a dozen folks
20   there related to it.
21       Q.   So beyond the DEA affairs group, can
22   you remember any other groups that were on the
23   third floor of the Parsippany building when you
24   moved in?

Page 68

1        A.   There was labeling.  There was a
2    component of quality there, supply chain.
3        Q.   Anything else you can think of?
4        A.   Not in particular.
5        Q.   All right.  And I know this is a
6    complete estimate, but as you think of it, about
7    how many people worked on the third floor in the
8    Parsippany building for Watson when you moved
9    in?
10       A.   A couple hundred.
11       Q.   All right.  Do you know whether
12   Watson maintained a call center at the
13   Parsippany building around the time that you
14   moved in?
15       A.   I don't believe there was a call -- I
16   don't know if there was a call center in
17   Parsippany.  I know there may have been one in
18   California.  Not -- I can't speculate on that.
19       Q.   All right.  So let's go back to this
20   Exhibit 4.  And I'll -- I'll tell you that we
21   met with Mary Woods and took her deposition last
22   week --
23       A.   Okay.
24       Q.   -- and I'm going to try not to

Page 69

1    characterize what she said, but I think my
2    questions were being formed by my perception of
3    what she said --
4        A.  Okay.
5        Q.  -- which might be different from your
6    counsel's perception of what she said.
7        A.  Okay.
8        Q.  So rather than get into an argument
9    about what she said, I'm going to ask you
10   questions for you to answer.
11       A.  Sure.
12       Q.  So this first email, which is the
13   last email in time, on Exhibit 4, Ms. Woods
14   writes, "Hi, Tom.  Need your feedback for Molly.
15   The SOP below belongs to the call center but has
16   many owners that supply feedback as designated
17   in the left column.  Several departments review
18   to make sure we are in compliance.
19           "The current control substance
20   compliance team requested an immediate change
21   last month.  We added their request to Section
22   1.11.  Molly has a few questions in reference to
23   these changes.  Her questions are below.
24           "We feel it is critical to get your

Page 70

1    input as this is transitioning over to you."
2            So she uses a couple terms there, the
3    SOP, and I think we talked about what that
4    meant.
5        A.  Yes.
6        Q.  And then she uses the term "the call
7    center."
8            As you think back to around this
9    time, 2009 at Watson, what was the call center?
10       A.  She may be referring to the call
11   center for sales.
12       Q.  Okay.  And then with regard to the
13   controlled substance compliance team, do you
14   recognize that as the group that you worked
15   with?
16       A.  Yes.
17       Q.  All right.  So when she talks about
18   the "SOP below," as you look through this email,
19   can you identify an SOP that's attached to it or
20   a part of it?
21       A.  Yes.
22       Q.  All right.  Where would that be?
23           (Document review.)
24       A.  MDL_7151.

Page 71

1        Q.  All right.  That's the last few
2    pages.  The page that you pointed to starts with
3    the word "purpose."
4            Is that right?
5        A.  Correct.
6        Q.  And under "purpose" it states, "To
7    assure distribution of controlled drugs is
8    monitored for excessive use by an individual
9    location using the DEA number as the
10   identifier."
11           Do you remember whether this SOP was
12   enforced when you started in -- when you started
13   in your job at Watson around June 2009?
14       A.  I believe it was.
15       Q.  All right.  So around this time, did
16   you do a study or a review of the standard
17   operating procedures of the Suspicious Order
18   Monitoring System?
19       A.  I'm sure that I did.
20       Q.  How would you have done that, as you
21   think of it?
22       A.  I would have likely worked with, with
23   Mary to get an understanding of the process, as
24   well as folks on my team, to understand how it

Page 72

1    worked from a systemic standpoint, as well as
2    from a procedural standpoint in ensuring that we
3    didn't have any gaps.
4        Q.  Before this time, mid 2009, did you
5    have any experience with Suspicious Order
6    Monitoring systems?
7        A.  Not in an operational sense, but I
8    certainly had education and was familiar with
9    Suspicious Order Monitoring.
10       Q.  When did that education start?
11       A.  Probably shortly after I joined the
12   organization and took controlled substance
13   responsibilities.
14       Q.  So as you think about the suspicious
15   order of management system at Watson at this
16   time, what -- and "this time" being mid-2009
17   when this email was written, what part of it, if
18   any, was your responsibility?
19       A.  When I came on into this role?
20       Q.  Yes.
21       A.  I would have oversight to ensure that
22   it was compliant with DEA regulations.
23       Q.  And I want to talk for a little bit
24   about the physical or mechanical processes

Page 73

1  involved in the Suspicious Order Monitoring
2  System, as you understand them.
3      A.  Sure.
4      Q.  So my understanding is that the
5  Suspicious Order Monitoring System creates a, a
6  limit on the size of an order based on various
7  variables that will alert people at a company
8  that an order is of interest or pending; is that
9  right?
10         MR. KNAPP:  Objection to form.
11         MR. LUXTON:  Objection to form.
12  BY MR. EGLER:
13      Q.  Is your understanding similar to
14  that?
15      A.  My understanding, that there is a
16  system that was developed within our, our ERP,
17  our enterprise resource and system SAP that
18  would, based on a model that was designed, that
19  would look at a six-month role in history, would
20  develop an average -- it would rationalize
21  ordering behavior.  It would also look at
22  different characteristics as markers, whether it
23  was a particular class of trade of an
24  organization or -- and a monthly average as

Page 74

1  well, too, for those types of class trades.  So
2  various different parameters that would provide
3  an average of ordering history, so not a static
4  number.  So it would be changing based on, on
5  the ordering patterns, as well as their was a
6  multiplier as well, too, that would provide a
7  plus or minus tolerance, so to speak.
8      Q.  So, again, thinking of the mechanical
9  part or the process part of the Suspicious Order
10  Monitoring System, you used the terms ERP and
11  SAP system.
12      A.  Um-hmm.
13      Q.  How would the parameters for the
14  Watson Suspicious Order Monitoring System be
15  included in the ERP system?
16         Do you have an understanding?
17         And what I'm trying to ask is, as you
18  think of the SAP systems that manages
19  inventories and orders and everything --
20      A.  Um-hmm.
21      Q.  -- do you know who was responsible
22  for putting the Suspicious Order Monitoring
23  System in the process of the ERP?
24      A.  The -- who built the process?

Page 75

1      Q.  Yes.
2      A.  Who built the process, I think it was
3  before my time, but it was a collaboration
4  between order management, our SAP, IT folks, as
5  well as controlled substance compliance would
6  have been a project team member.
7      Q.  So with regard to the IT people for
8  the SAP system, can you think of any particular
9  individuals that you would think would be
10  primarily responsible for that?
11      A.  I can't recall back that far.
12      Q.  All right.  And then when the system
13  was in place in the -- let me start over.
14         When the Suspicious Order Monitoring
15  System was in place in Watson's SAP system and
16  an order pended, what would happen next?
17      A.  If an order pended, it would be
18  reviewed by a member of the order management
19  team specifically dedicated to controlled
20  substance ordering.
21      Q.  Now that order management team that
22  you mentioned, did they report to you?
23      A.  No, they reported to Mary.
24      Q.  And do you know about how many people

Page 76

1  were on the order management team when you
2  started in 2008?
3      A.  No.
4      Q.  As you think of it, was it more than
5  a dozen?
6      A.  No.
7      Q.  Was it more than six?
8      A.  Probably less than six.
9      Q.  And then do you have an understanding
10  of whether the, the number of people on the
11  order management team at Watson increased while
12  you were there and the company changed its name
13  to Actavis?
14      A.  I can't be certain, but I believe
15  that there were additional folks that came on
16  board.
17      Q.  Do you remember the names of any
18  people who were on the order management team?
19      A.  Sandy Simmons was the manager.
20  Victoria Lepore was in order management.
21  Bettina Dwor, I think was and individual --
22  Bettina, I think it's D-w--o-r.  I think she
23  came on later.  I know there was another
24  individual or two, but I just can't recall the

Page 77

```
 1    names.
 2        Q.  So the people that you're thinking
 3    of, were they all located in New Jersey?
 4        A.  Yes, sir.
 5        Q.  All right.  And do you have an
 6    understanding of, before you started, whether
 7    the entire order management team was it located
 8    in New Jersey or were they in New Jersey and
 9    other places?
10        A.  You know, now when I think back on
11    it, I believe Mary, as well as there was an
12    individual, Judy Callahan, who worked for Mary
13    as well too, they both came over from the
14    Corona, California, facility.  So that call
15    center may have been in Corona, and it
16    eventually transitioned to New Jersey.
17        Q.  With regard to the -- let me start
18    over.
19            With regard to Mary Woods, what was
20    her role with regard to the order of the
21    management team?
22        A.  Mary had responsibility for customer
23    -- customer service capacity, but also on the
24    order management side, she would have been
```

Page 78

```
 1    responsible for ensuring the onboarding, the
 2    compliant onboarding of of, customers, you know,
 3    ensuring, you know, and, you know, the order
 4    management process for -- on the commercial
 5    side.
 6        Q.  You used the term "onboarding."
 7            What does that mean in the context of
 8    your work?
 9        A.  Doing due diligence, vetting.
10        Q.  So is that when Watson first took on
11    a new customer or something else?
12        A.  Yes.
13        Q.  All right.  And then -- can you think
14    of any other responsibilities that Ms. Woods
15    had?
16        A.  No, I -- I can't speak to what her
17    specific job functions are.
18        Q.  All right.  So you can set this aside
19    for now.
20            MR. EGLER:  You guys want to take a
21    break?
22            MR. LUXTON:  Yeah, it's probably a
23    good time.
24            THE VIDEOGRAPHER:  The time is
```

Page 79

```
 1    approximately 10:23 a.m.  We are going off
 2    the record.
 3        (Recess is taken.)
 4            THE VIDEOGRAPHER:  The time is
 5    approximately 10:47 a.m., and we are back
 6    on the record.
 7    BY MR. EGLER:
 8        Q.  Mr. Napoli, thanks for coming back.
 9        A.  Sure.
10        Q.  Can you pick up this, what we've
11    marked as Exhibit 4, and turn to essentially the
12    third to last page.  It's ALLERGAN_MDL_02467152.
13    In the top left-hand corner, it states
14    "Responsibility"?
15        A.  Yes.
16        Q.  So as you look at this page, are
17    these the processes contained in the standard
18    operating procedure that we've been talking
19    about before the break?
20        A.  Yes.
21        Q.  So in the upper left-hand corner
22    under "Responsibility," it states, "Master data
23    administrator."
24            Do you see that there?
```

Page 80

```
 1        A.  Um-hmm.
 2        Q.  Is the master data administrator, as
 3    you think about it, about the same thing as the
 4    order management team we are talking about?
 5        A.  Yes.
 6        Q.  So as you go through the columns
 7    there, it says, "Action," and it has 1.3, 1.4
 8    and so on.  And it talks about various actions
 9    that are taken.
10            And, again, with the understanding
11    that this email, it's Exhibit 4, is a decade
12    old, I'd like to ask you about a couple of the
13    actions that are listed there.
14        A.  Sure.
15        Q.  If you look at -- let's just go
16    through the first one.
17            1.3 states:  "If a processed order
18    generates a SOMS excessive order flag in SAP,"
19    and then there's words in parentheses, "due to
20    more frequent or larger than normal order
21    pattern, master data administrator will generate
22    a suspicious order controlled drug SOMS."
23            Do you see that there?
24        A.  Um-hmm.
```

Page 81

1     Q.   And then it states, "The master data
2  administrator will review the SOMS report and
3  then, if warranted, contact the customer to
4  confirm the quantity ordered, verify the reason
5  for a larger or more frequent order."
6         The next one is: "Once this SOMS
7  report is confirmed" --
8         MR. LUXTON:  Can someone put the
9  phone on mute?  We're getting background
10  noise.
11  BY MR. EGLER:
12     Q.   "Once the SOMS report is confirmed
13  and verified by the customer, the SOMS report is
14  signed and marked with a reason code by the
15  master data administrator and submitted to the
16  manager for review and signature."
17         In the context of this document, do
18  you have an understanding of who the manager
19  would be?
20     A.   It could have been, depending on the
21  time, it could have been Julie Callahan.  It
22  could have been Sandy Simmons.
23     Q.   Okay.  So with regard to Ms. Callahan
24  and Ms. Simmons, were they all, as you think of

Page 82

1  it, in the customer service organization that
2  we've been talking about?
3     A.   Yeah, but on the order management
4  side, yes.
5     Q.   Okay.  And as I'm thinking about it,
6  as, as opposed to, or just to be sure, they
7  weren't in the DEA affairs group at that time?
8     A.   Right.  They were a customer-facing
9  group.
10     Q.   Okay.  So the next one there, the
11  data -- "The master data administrator will be
12  responsible to ensure that pending sales orders
13  on hold due to suspicious order SOMS violation
14  are investigated."
15         And then 1.7 is: "The matter data
16  administrator will release pending orders due to
17  SOMS violations by canceling the order or
18  reducing the quantity per SOMS procedure."
19         And then the next one is: "If the
20  SOMS violation cannot be resolved by cancelling
21  the order or reducing the quantity, the master
22  data administrator will escalate the suspicious
23  order to the next level."
24         And then it goes to the term, "call

Page 83

1  center management."
2         Do you see that there?
3     A.   Yes.
4     Q.   And it says, 1.9, under Call Center
5  Management, "Determine if the order does or does
6  not classify as suspicious."
7         And so, again, as you think about
8  this time, June 2009, was the call center
9  management group at Watson under the DEA affairs
10  department or some other department?
11     A.   No, they were within the customer
12  service group.
13     Q.   All right.  And then on 1.10, it
14  states: "If a valid reason, based on objective
15  criteria does not exist, order will be deemed as
16  a suspicious order and will not be filled.
17  Report suspicious issue to controlled substance
18  compliance department."
19         Now that controlled substance
20  compliance department, is that your group?
21     A.   Yeah.  That was the group I was
22  transitioning to at the time.
23     Q.   Okay.  And then the next one there,
24  it states, on the left-hand side, "Controlled

Page 84

1  substance compliance department."  And 1.11 has
2  words that are struck out and then words that
3  are underlined that are supposed to be replacing
4  the words that are struck out.
5         The words that are struck out are:
6  "The controlled substance compliance department
7  will be responsible for reporting the order to
8  the Drug Enforcement Administration."
9     A.   Um-hmm.
10     Q.   And then the new words are: "Upon
11  confirmation that the order is suspicious, the
12  controlled substance compliance department will
13  be report" -- "will be responsible for reporting
14  the order to the Drug Enforcement Administration
15  and the applicable state Board of Pharmacy.  The
16  Department of Regulatory Affairs will also
17  report the incident to FDA within three business
18  days."
19         Do you see that there?
20     A.   Yes, sir.
21     Q.   Do you remember this proposed
22  change -- going back again, understanding it's
23  ten years ago, do you remember that proposed
24  change being proposed?

Page 85

1     A.  No.
2     Q.  All right.  And then do you remember
3  whether that process that's underlined there was
4  ever -- ever adopted?
5     A.  It was.
6     Q.  All right.  Then the last one goes
7  back to the master data administrator.  It's
8  1.12.  "File a copy of the SOMS report along
9  with the customer purchase order and the
10  suspicious order record file."
11        So with regard to these procedures
12  that are listed there, as you think about them
13  and as I read them, did some or many of the them
14  change while you were at Watson and then
15  Actavis?
16     A.  Yes.
17     Q.  So especially with regard to looking
18  at the classification of determining if the
19  order does or does not classify as suspicious,
20  in this procedure, it's listed as being under
21  the call center management's organization.
22        Did that change at some point?
23     A.  Yes, because the decision to
24  determine if an order was suspicious was

Page 86

1  eventually handled by my DEA affairs group.
2     Q.  And as you think about that change,
3  and the decision being moved to the DEA affairs
4  group, do you remember why that change was made?
5     A.  I think we were the appropriate
6  organization, being a compliance organization,
7  to make that determination.
8     Q.  Right.
9        Do you know when that change was
10  made?
11     A.  I do not.
12     Q.  Do you remember ever having a
13  discussion about making that change?
14     A.  I do not.
15     Q.  And as you think about the
16  organization that this responsibility was
17  shifted to, the 1.9 listed there, who in your
18  organization would have been primarily
19  responsible for determining if an order does or
20  does not classify as suspicious once that
21  responsibility was transferred to them?
22     A.  There would be an investigation
23  process that would be conducted by an auditor or
24  investigator on my staff, and we would meet and

Page 87

1  review the facts of the issue, and I would
2  ultimately make the determination.
3     Q.  So the auditor/investigator that you
4  mentioned, how many -- during your time at
5  Watson, how many auditor/investigators did you
6  have?
7     A.  Two primary.  And we also had an
8  individual who was part of our global security
9  team who was a trained investigator who served
10  as a backup.
11     Q.  Who were the two primary auditor
12  investigators?
13     A.  We first had Lisa Scott and then Will
14  Simmons.  Our security auditor was Jeff Collins.
15     Q.  So with regard to Ms. Scott and
16  Simmons, were they ever in their respective
17  positions as auditor investigators at the same
18  time?
19     A.  No.
20     Q.  So with regard to the
21  auditor/investigator role, as you think of it
22  while you were at Watson and then at Actavis,
23  there was one primary auditor/investigator at
24  any given time?

Page 88

1     A.  Yes, sir.
2     Q.  All right.  And with regard -- as you
3  think about it with regard to the processes that
4  the auditor/investigator would undertake, once
5  they were given an order to make the
6  determination of, what would they do?
7     A.  If there was an order that pended in
8  the system of an order of interest that couldn't
9  be resolved at the level by order management,
10  our auditor/investigator would reach out to the
11  customer, to the compliance person.
12        In some cases on the order management
13  side, they're -- they might be talking to
14  someone on the other side who is placing the
15  order who is not necessarily a compliance
16  person.  So our person, our auditor, would pick
17  up the phone.  And we had strong relationships
18  with all our customers.  We knew who the
19  compliance people were.  We would reach out to
20  the compliance person for that customer and have
21  a conversation with them, explain that their
22  order had pended, and try to ascertain or obtain
23  justification.
24        Was there a new customer that came on

Page 89

1     board, has there been an issue within the
2     market, an inventory build for a launch or
3     something, and try to ascertain what the
4     business rationale was for the increase in the
5     order.
6         Q.   So with regard to the justifications
7     that you're thinking of, when an issue was
8     raised to the auditor/investigator level, if
9     they reached out to the customer at any level,
10    would they be required to have some type of
11    documentary evidence or other evidence to
12    demonstrate the facts that the customer was
13    giving them?
14        MR. KNAPP:  Objection to form.
15        A.   I don't know if in all cases, but
16    there -- you know, where we could obtain
17    documented information, we -- we could.
18        Q.   All right.  You can set this document
19    aside.
20        (Witness complies.)
21    BY MR. EGLER:
22        Q.   And before we get to the next
23    document, I wanted to ask you, before today, did
24    you do any preparation for the deposition?

Page 90

1         A.   I met with the gentleman seated next
2     to me, just to really go through what is
3     entailed in a deposition, kind of the process.
4         Q.   Have you ever given a deposition
5     before?
6         A.   Civilly.  It would be many years ago.
7         Q.   About when was it?
8         A.   1990s.  It was a personal injury
9     thing.
10        Q.   Have you ever given testimony under
11    oath in a court of law?
12        A.   No, sir.
13        Q.   All right.  Did you talk with anyone
14    other than your counsel about the deposition
15    today?
16        A.   My wife.
17        Q.   All right.  Anyone else?
18        A.   No.
19        Q.   Okay.  So I'm going to hand you what
20    we'll mark as Exhibit 5.
21        A.   Can I correct -- I did have a
22    conversation with Mary Woods.
23        MR. LUXTON:  You should correct that,
24    yeah.

Page 91

1         A.   I think that needs to be corrected.
2         Q.   Sure.
3         A.   Last week I had a half-hour call with
4     counsel and Mary Woods regarding deposition.
5         Q.   What did she tell you?
6         A.   She was just looking for some
7     clarification, procedural clarifications from
8     when we administered the SOMS program.  Nothing
9     about the deposition.
10        Q.   Is it fair to say she asked you
11    questions in preparation for her deposition?
12        A.   Correct.
13        Q.   All right.  Great.  Thank you.
14        A.   You're welcome.
15        Q.   And I'll hand you what we'll mark as
16    Exhibit 5.
17        A.   Sure.
18        Q.   Mr. Napoli, can you look generally at
19    Exhibit 5.  As you're looking at it, I'll read
20    into the record.  It's Bates-stamped
21    ALLERGAN_MDL_03738524 through 8528.
22        (Napoli Exhibit 5, Document entitled
23    "Customer Communication for SOMS,"
24    ALLERGAN_MDL_03738524 through 8528, marked

Page 92

1     for identification, as of this date.)
2         A.   Yes.
3         Q.   When you're ready, I ask you, while
4     you were at Actavis and Watson, did you ever use
5     the, use Microsoft note taking program?
6         A.   Not that I recall.
7         Q.   We had a conversation last week with
8     Ms. Woods about Microsoft OneNote, and this
9     appears to be a document that's formatted as a
10    OneNote document.
11        But that said, as you look at this
12    document, it's dated -- the first entry at the
13    top of the document is dated Wednesday,
14    June 23rd, 2010.
15        A.   Um-hmm.
16        Q.   And it states, "Customer
17    communications for SOMS."
18        As you read through this, it has the
19    word or the name "Laura Pinti?
20        A.   Um-hmm.
21        Q.   Who is Laura Pinti?
22        A.   Laura Pinti also worked in Mary
23    Woods's group.
24        Q.   Do you remember what her position was

Page 93

1    around this time, mid-2010?
2        A.   I don't.
3        Q.   And Ms. Pinti writes, "Effective
4    today, please implement the following format for
5    all SOMS orders that require additional
6    information from the customer."
7            Then it has, "Dear Customer," and
8    then it says, "Merge Tom's email into this
9    paragraph.  Thank you for your recent controlled
10   substance order.  The order is currently under
11   review.  In effort to complete the review
12   process, please take a moment to complete the
13   following questions below that will assist us in
14   completing the necessary review process.  Your
15   immediate response is required to expedited the
16   order review procedure."
17           And then it states, "In accordance
18   with CFR and then an ellipsis, and then it says,
19   in parentheses, "Tom's paragraph."
20           Do you think the "Tom" they're
21   referring to there is you?
22       A.   Yes.
23       Q.   All right.  So do you remember having
24   a discussion around this time of what type of

Page 94

1    language be sent to customers when a SOMS order
2    pended?
3        A.   Sure.
4            In addition to the header that is
5    indicated in the "Dear Customer" highlighted
6    paragraph, the Tom's paragraph is essentially a
7    verbatim quote from CFR 1301.74 which details a
8    registrant's obligation to report orders of
9    suspicious, order of pattern of frequency and
10   size, and just detailing the regulations for the
11   customers to why we're doing it.  And it's a
12   regulatory requirement.  It needs to be complied
13   with.
14       Q.   All right.  So then there are various
15   entries underneath that paragraph and it says,
16   "Reason for Increase."  And then there are
17   numbered explanations there.  Two under "New
18   Contract" and two under "Promotion" and two
19   under "New Customer" and two for "Adding Product
20   to Product Line."
21           Do you know who would have come up
22   with that data there?
23       A.   Likely Mary and her team.
24       Q.   All right.  And then going down

Page 95

1    further in this page, it's highlighted there, it
2    states, "Tie the 852 data to Suspicious Order
3    Monitoring."
4            In the context of your work at Watson
5    and Actavis, do you have an understanding of
6    what that would mean?
7        A.   852 data in the parlance of SAP or
8    it's called EDI, electronic data interchange, so
9    it's a standard language or a protocol for a
10   supply chain.  I don't know if it's exclusive
11   to, to the pharma industry.  But essentially I
12   believe 852 data tells you what a specific
13   customer has on hand in their warehouse.
14       Q.   As you think of the 852 data, would
15   that be information about the -- Watson's direct
16   customers or would it be information about the
17   distributor's customers or something else?
18       A.   Direct customers.  We would only have
19   access to that.
20       Q.   And then go on to the next page of
21   this document.  It has the word "Tom's verbiage"
22   there.
23           Do you see that?
24       A.   Um-hmm.

Page 96

1        Q.   Do you remember writing that
2    paragraph that appears there starting with, "In
3    accordance with 21 CFR 1301.74"?
4        A.   Yes.
5        Q.   So this is June 2010, right?
6        A.   Um-hmm.
7        Q.   And at this time, you had been in
8    your position with the DEA affairs group for
9    about a year, is that fair to say?
10       A.   Just about, yes.
11       Q.   Before you started your position with
12   the DEA affairs, what training, if any, did you
13   have with regard to the Suspicious Order
14   Monitoring processes?
15       A.   Consistent attendance with the
16   Cegedim/Buzzeo group, their education.  And they
17   spent a lot of time on Suspicious Order
18   Monitoring.  It was very important to them.
19   Obviously as a consultant.  But they provided
20   excellent training.
21           Also the DEA on almost an -- at one
22   time, was almost on an annual or biannual basis,
23   the DEA would host conferences for the various
24   registrant populations, whether it be

Page 97

1    manufacturers, distributors, importers,
2    exporters.  And I attended consistently those
3    conferences as well too dealing directly with
4    the DEA in understanding the regulations and the
5    expectations of the Drug Enforcement
6    Administration.
7        Q.   Can you think of any other training
8    you had?
9        A.   There may have been some other
10   private industry training, but also, you know,
11   certainly a large component of any job is
12   on-the-job training as well too.  So when my
13   predecessor was transitioning out, as well as
14   folks I had on staff, I would learn from them as
15   well, too.
16       Q.   Then after you took the job as the
17   head of DEA affairs, did you have any further
18   training on Suspicious Order Monitoring systems?
19       A.   Just the continued education through
20   Buzzeo, DEA, and practical experience as I got
21   into the role.
22       Q.   With regard to the NJPIG group that
23   we had been discussing, at their meetings, did
24   they discuss Suspicious Order Monitoring

Page 98

1    systems?
2        A.   I don't recall any conversations
3    in-depth regarding systems or practices in place
4    at -- for individual pharmaceutical
5    manufacturers.
6        Q.   All right.  Do you remember whether
7    that, the Suspicious Order Monitoring System was
8    ever discussed as a topic at any NJPIG meeting?
9        A.   It could have been a topic of --
10   Suspicious Order Monitoring, as a topic, could
11   have been discussed at the meeting.
12       Q.   Okay.  All right.  Turning further
13   into this document, on the next page, it's
14   38526?
15       A.   Yes.
16       Q.   And it states, "SOMS Agreement," and
17   it appears to be an email that you were cc'd on.
18            Do you see that there?
19       A.   Yes.
20       Q.   So I think we had talked about it
21   before, but who is Lisa Scott?
22       A.   She was a compliance
23   auditor/investigator for our security and DEA
24   affairs team.

Page 99

1        Q.   And then she writes an email to
2    Victoria Lepore, L-e-p-o-r-e, and Larry E.
3    Schaffer.
4        A.   Schaffer.
5        Q.   And she cc's Mary Woods, Laura Pinti,
6    you, Lynn DaCunha, and Ione Graziosi -- can
7    you --
8        A.   Graziosi.
9        Q.   That's G-r-a-z-i-o-s-i.
10       A.   Correct.
11       Q.   And she states, Ms. Scotts states,
12   "FYI, as discussed during our 10:00 [sic] a.m.
13   EST meeting today, we have come to the following
14   agreement.  Any order placed on June 21st, 22nd,
15   or 23rd by ABC, Cardinal, McKesson or HD Smith
16   that is held by the system pending on SOMS
17   review will not require customer contact for
18   order justification and DEA affairs reviews.
19   These orders may be released.  This agreement
20   applies specifically to these customers and
21   order dates only."
22            Do you remember this email from
23   Ms. Scott?
24       A.   I don't.

Page 100

1        Q.   Do you remember --
2        A.   It was a long time ago.
3        Q.   All right.  And do you remember this
4    event that of June of 2010, for three days in
5    June 2010, orders from four distributors would
6    be not asked for justifications if they pended
7    in the SOMS system?
8        A.   I don't recall the specific event.
9    But looking at the dates, it's just prior to 4th
10   of July holiday.  These are large customers.
11   Likely not doing business over that period, so
12   they may have been -- had a meeting with us as
13   our customers to talk about we're going to be
14   ordering quantities that's not consistent with
15   our ordering patterns because we're building an
16   inventory because we're going to be shut down,
17   so they would be missing a normal ordering
18   pattern.  So I would -- it would be speculation,
19   but that there was a conversation that took
20   place where they discussed what those quantities
21   would be and rationalizing them and
22   understanding that next order cycle, there
23   wouldn't be an order because it would -- it
24   would flatten out.

Page 101

```
 1          So just discussing -- discussing the
 2    rationale prior to a holiday, it's not uncommon
 3    at the end of year or midyear.
 4          Q.   Do you remember whether this type
 5    of -- this type of process was used every year
 6    around the 4th of July holiday as you mentioned?
 7          A.   There, there typically were
 8    conversations with customers regarding when
 9    there was going to be a period of shutdown or an
10    interruption to the normal order -- ordering
11    pattern.
12          Q.   So I think you mentioned the 4th of
13    July and then the winter holidays.
14          Is there any other time of year that
15    you can think of that this would occur?
16          A.   Not necessarily, unless a product was
17    seasonal. You know, we had some products that
18    were, you know, during a particular cold and flu
19    season or if -- children are going back to
20    school, for certain products, there would be a
21    seasonality, so increases might be out of the
22    ordinary.
23          Q.   And that leads me to the next
24    question.
```

Page 102

```
 1          With regard to the SOMS system at
 2    Watson and then at Actavis, the SOMS system
 3    applied to every controlled substance drug; is
 4    that right?
 5          A.   Yes, sir.
 6          Q.   And that would be Schedule II through
 7    V; is that right?
 8          A.   Correct.
 9          Q.   And as you think of it, were -- was
10    there any time at Watson or Actavis where one
11    schedule of drug was treated differently from
12    the other schedules of drugs by the Suspicious
13    Order Monitoring System?
14          A.   Within the Suspicious Order
15    Monitoring System, it was all -- you know, a
16    controlled drug was a controlled drug.
17          Q.   So, for example, Schedule II drugs
18    wouldn't be treated any differently from
19    Schedule III, IV or V drugs?
20          A.   Right.
21          Q.   Do you remember whether particular
22    opioids were ever treated differently from all
23    the other scheduled drugs?
24          MR. KNAPP:  Objection to form.
```

Page 103

```
 1          A.   No.
 2          Q.   So just so we're clear, you don't
 3    think they ever were, or you don't remember
 4    either way?
 5          MR. KNAPP:  Same objection.
 6          A.   I don't recall.
 7          Q.   All right. You can set this document
 8    aside.
 9          (Witness complies.)
10          (Napoli Exhibit 6, Email dated 2/2/10
11          from L. Scott to T. Napoli with attachment,
12          ALLERGAN_MDL_01236063 through 6094, marked
13          for identification, as of this date.)
14    BY MR. EGLER:
15          Q.   I'm going to hand you what we will
16    mark as Exhibit 6.
17          Mr. Napoli, can you look at what
18    we'll mark Exhibit 6? While you're looking at
19    it, I'll read into the record. It's
20    ALLERGAN_MDL_01236063 through 6094.
21          When you're ready, can you tell me
22    whether you remember ever seeing the document
23    that appears on the second page of this exhibit
24    through the end?
```

Page 104

```
 1          (Document review.)
 2          A.   I definitely recognize the document.
 3          Q.   So starting with the first page of
 4    this exhibit, page 063, is that an email from
 5    Lisa Scott to you?
 6          A.   Yes.
 7          Q.   And she sends it on Tuesday, February
 8    2nd, 2010, at 11:47 a m., which says -- the
 9    subject is "Presentation," and it says, "Tom,
10    see attached, Scotty."
11          A.   Yes.
12          Q.   Do you remember whether Ms. Scott
13    sent you this particular presentation around
14    that time, early February, 2010?
15          A.   I don't have a specific recollection
16    of it.
17          Q.   So on the next page, page 064 begins
18    the attachment to the email, which appears to be
19    a PowerPoint presentation, and states, "DEA
20    affairs organizational overview," and it says
21    "Thomas Napoli, CCP, U.S. generics, February
22    2nd, 2010."
23          Do you see that there?
24          A.   Yes.
```

Page 105

1    Q.   So did you make this presentation to
2  somebody or a group of people in Florida in
3  early February of 2010?
4    A.   It's possible.
5    Q.   Do you remember making this
6  presentation to a group of people in early 2010?
7    A.   I don't.
8    Q.   Okay.  So next to your name there, it
9  says "CPP."
10       What does that stand for?
11   A.   That is a board certification in
12 security management from the American Society of
13 Industrial Security, so the highest designation
14 you can get in security management.
15   Q.   So that designation from the American
16 Society of Industrial Security, what was the
17 subject matter of the certification that you
18 received from them?
19   A.   The subject matter were all aspects
20 of physical security.
21   Q.   Was the certification specifically
22 related to pharmaceutical drugs?
23   A.   No.
24   Q.   As part of the certification, was

Page 106

1  there any training on Suspicious Order
2  Monitoring systems?
3    A.   No.
4    Q.   When did you receive the
5  certification from the American Society of
6  Industrial Security?
7    A.   Mid-2000s.
8    Q.   So then below there it states, "U.S.
9  generics."
10       As you think about that term, what
11 does that mean in the context of this
12 presentation?
13   A.   That indicates the division that I
14 worked for.
15   Q.   All right.  As you think of Watson
16 around this time, early 2010, you identified the
17 U.S. generics division.
18       What were the other divisions that
19 you can think of?
20   A.   There would be generics and, I guess
21 brand or commercial.
22   Q.   Okay.  Do you know whether any of the
23 brand or commercial drugs that Watson made at
24 this time were controlled substances?

Page 107

1    A.   There were but very few.
2    Q.   Do you know whether those controlled
3  substances from the brand division would have
4  been governed by the same Suspicious Order
5  Monitoring System that applied to the generics
6  drugs?
7    A.   Of course.
8    Q.   And as you think of it, was it the
9  same system or two similar systems?
10   A.   Same exact system.
11   Q.   All right.  And would they all -- let
12 me start over.
13       Would all the orders for the
14 controlled substances, as you think of them, be
15 passed through that SAP system that we were
16 talking about earlier today?
17   A.   Correct.
18   Q.   So the next page on this exhibit, 65
19 states, "Objective" and "Provide an overview of
20 the DEA affairs team" --
21   A.   Um-hmm.
22   Q.   -- "who we are, what we do, origins
23 and path forward, achievements to date,
24 compliance landscape opportunities and 2010

Page 108

1  goals and objectives."
2        Reading that, do you -- does this
3  help you remember who you might have presented
4  this to in early 2010?
5    A.   No.  This was probably presented to a
6  lot of folks.
7    Q.   When you say "a lot of folks," is
8  that a lot of folks at once or you made this
9  presentation to different groups at different
10 times?
11   A.   Different groups, different times.
12   Q.   All right.  As you think of it, in
13 2010, can you remember about how many times you
14 would have made this presentation?
15   A.   No.
16   Q.   So turning two pages in on 067, your
17 name appears there.  And at the upper left-hand
18 corner it states, "DEA Affairs Organization
19 current state"?
20   A.   Um-hmm.
21   Q.   And so you were the manager of
22 security in DEA affairs; is that right?
23   A.   Correct.
24   Q.   And then as you look at the rest of

Page 109

1    the organizational chart that appears there, the
2    various people and groups, which, if any, would
3    have a responsibility for portions of the
4    Suspicious Order Monitoring System around this
5    time, early 2010?
6        A.   It would have been Ione and Lisa.
7        Q.   And Ione is listed there, Ione
8    Graziosi?
9        A.   Um-hmm.
10       Q.   And she's a manager DEA affairs?
11       A.   Yup.
12       Q.   And then Lisa Scott is CS auditor?
13       A.   Yes.
14       Q.   And under Ms. Scott's name, it says,
15   "Audit program, investigations, agency request,
16   policy development and inspection support."
17       A.   Um-hmm.
18       Q.   As you think of those various terms,
19   which of those relate to the Suspicious Order
20   Monitoring System?
21       A.   The auditing investigations.
22       Q.   And then under Ms. Graziosi, it says
23   "quota, site liaison," and then "reporting."
24   And then underneath it, it says, "SLC and

Page 110

1    Gurnee," and then "import control, R&D/new
2    product support."
3        A.   Right.
4        Q.   Of those, which relate to the
5    Suspicious Order Monitoring System?
6        A.   Actually none of them, so it looks
7    like there was a typo and it was left off.
8        Q.   Okay.  And the term "SLC" for
9    reporting, is that Salt Lake City?
10       A.   Correct.
11       Q.   What was in Salt Lake City for Watson
12   around this time, early 2010?
13       A.   They had a broad portfolio of
14   products, controlled and not controlled.  From a
15   controlled substance standpoint, it would have
16   been the fentanyl patch.
17       Q.   And how about Gurnee?
18       A.   Gurnee was a distribution center.
19       Q.   And that is in Illinois; is that
20   right?
21       A.   Yes.  Chicago area.
22       Q.   Turning to the next page, which would
23   be 068, it says "DEA affairs organization, 2010"
24   and your name again appears there.

Page 111

1        A.   Um-hmm.
2        Q.   As you look at this organizational
3    chart, do any of the people have any
4    responsibility for the Suspicious Order
5    Monitoring System?
6        A.   Again, it would have been Lisa and
7    the proposed lead, because Ione, not being part
8    of the team at the time.
9        Q.   All right.  So going further into
10   this document, if you'll turn to page 072.  So
11   072 and 073 face each other and it states at the
12   top of 072 "Origins."
13       Do you see that there?
14       A.   Yes, I do.
15       Q.   It says, "Senior management decision
16   was made to integrate the former C/S compliance
17   department into the security department in April
18   of 2009."
19       That date, April of 2009, is that
20   when you became involved in the DEA affairs
21   group?
22       A.   I don't know if it was the exact
23   time, but it would have been around then or
24   thereafter.

Page 112

1        Q.   And you write, "Department renamed
2    security and DEA affairs and that created
3    synergy where silos previously existed."
4        That second term --
5        A.   Sure.
6        Q.   -- "created synergies where silos
7    previously existed," what does that mean?
8        A.   When I articulated earlier that there
9    was a decision made to merge the compliance
10   group with global security is because if you
11   look at the DEA regulations and the code of --
12   and the CFR, there is a very strong security
13   component to it.  So it made sense because of
14   those synergies that the large security
15   component to the CFR to merge the two
16   organizations because previously reporting
17   through separate organizations, there -- it
18   could inhibit effective communication.
19       Q.   So if you go further into this
20   document, going to, sorry, page 085, and it
21   states:  "Achievements to date, continued. "
22       A.   Yup.
23       Q.   If you need to, you can look at
24   whatever part you need to, but I'm just going to

## Page 113

1    ask you about the one that appears under ARCOS.
2         Do you see that there?
3    A.  Um-hmm.
4    Q.  What is ARCOS?
5    A.  ARCOS is the Automated Records and
6    Consolidation Ordering System, I think.
7    Q.  Okay.  Was your group at Watson
8    around this time, 2010, responsible for the
9    reporting of any ARCOS data?
10   A.  We supported -- yes, the, the ARCOS
11   reporting for sites as well as for our
12   distribution center.
13   Q.  All right.  When you say the "sites,"
14   is that the manufacturing sites?
15   A.  Correct.
16   Q.  All right.  So -- and then there's
17   two bullet points there, "data integrity" and
18   "Florida program implemented."
19        Do you have a memory as to what the
20   data integrity achievement was?
21   A.  Sure.
22        Data integrity I think was probably
23   a -- more accuracy in the reporting, because
24   sometimes the -- at that time, it was a manual,

## Page 114

1    very manually intensive process, so I think
2    there were probably some fat finger mistakes.
3    So I think we probably reduced the amount of
4    mistakes because you get errors reports from the
5    DEA.  So it's probably an enhancement in the
6    process.
7    Q.  All right.  And then you state,
8    "Florida program implemented."
9         Do you remember what that meant?
10   A.  Sure.
11        The Florida program was that there
12   were -- Florida and subsequently other states
13   sought to receive ARCOS reporting for products
14   distributed into their states so they'd have a
15   view of products being distributed by a
16   particular manufacturer into their state.
17   Q.  All right.  So is it fair to say,
18   then, that the State of Florida would receive
19   the same data that Watson sent to the DEA?
20   A.  Yes.
21   Q.  All right.  So going to the next
22   page, it states "Compliance Landscape"?
23   A.  Um-hmm.
24   Q.  This is page 086 of Exhibit 6.

## Page 115

1    "In 2008, 6.2 Americans used
2    prescription-type psychotherapeutic drugs for
3    non-medical purposes in a one-month period.
4    2.5 --
5         (Interruption.)
6    BY MR. EGLER:
7    Q.  "In 2008, 6.2 million Americans used
8    prescription-type psychotherapeutic drugs for
9    non-medical purposes in a one-month period, 2.5
10   percent population."
11        And in bullet points you say,
12   "More than cocaine, heroin, hallucinogens" --
13   "hallucinogens and inhalants combined."
14        And then in the next one, it says
15   "Non-medical use of prescription pain relievers
16   tied with marijuana as having the highest rate
17   of new abusers, 2.2 million."
18        Do you remember why you would have
19   written that here?
20   A.  Yeah, communicating the compliance
21   landscape to our audience to -- and to stress
22   the importance of, you know, our compliance
23   efforts as well, too.
24   Q.  Do you remember ever having a

## Page 116

1    discussion about the non-medical use of
2    prescription pain relievers tied with marijuana
3    as having the highest rate of new abusers around
4    this time?
5    A.  No.  I mean, this would have been
6    information directly taken from DEA.
7    Q.  The next section there states, "Drugs
8    most frequently implicated in non-medical use,"
9    and then in parentheses "2004 through 2006."
10        And can you pronounce the next word
11   that appears next to the bullet?
12   A.  Benzodiazepines.
13   Q.  Okay.
14   MR. KNAPP:  Nice job.
15   THE WITNESS:  Thank you.
16   BY MR. EGLER:
17   Q.  So that's hydrocodone, and can you
18   pronounce that word?
19   A.  Alprazolam.
20   Q.  All right.
21   A.  Actually, hydrocodone doesn't belong
22   in there.  That's, that's not a benzodiazepine.
23   Q.  Hydrocodone is an opioid; is that
24   right?

## Page 117

1    A.   Correct.
2    Q.   And it says "36 percent increase."
3    A.   Um-hmm.
4    Q.   And then it states,
5    "Hydrocodone/combinations, 44 percent increase"?
6    A.   Um-hmm.
7    Q.   And then, "Oxycodone/combinations,
8    primarily OxyContin, 56 percent increase"?
9    A.   Um-hmm.
10   Q.   Do you remember why you would have
11   written that down?
12   A.   I certainly wanted to give
13   perspective to the audience of the issues that
14   were going on today in the, you know, in the
15   landscape.
16   Q.   Do you remember around this time
17   whether Watson made generic OxyContin?
18   A.   We did not.
19   Q.   Do you remember around this time
20   whether Watson made generic hydrocodone?
21   A.   We did.
22   Q.   Do you remember whether there were
23   any particular endeavors around this time,
24   February 2010, to address the non-medical use of

## Page 118

1    hydrocodone by Watson?
2         MR. LUXTON:  Object to the form.
3         MR. EGLER:  Well, let me start over.
4    That was a bad question because Watson
5    probably didn't use it as a non-medical
6    way.
7    A.   No.
8    Q.   So do you remember whether there was
9    any initiatives or endeavors to address the high
10   rate of non-medical use of Americans of
11   hydrocodone at Watson around this time frame?
12   A.   Our efforts certainly at that time
13   and throughout my tenure were focused on
14   ensuring that, as a DEA registrant, that we had
15   effective controls in place throughout our
16   entire controlled substance lifecycle to reduce
17   the opportunity for theft or diversion.
18   Q.   Okay.  So going further into this
19   document, can you look two pages in at 089?
20   A.   Sure.
21   Q.   You state, "Our products are among
22   the most commonly-prescribed for legitimate
23   medical use in the U.S."
24        Do you see that there?

## Page 119

1    A.   Yes.
2         MR. LUXTON:  088?
3         MR. EGLER:  This is on the previous
4    page from that, 088.
5    BY MR. EGLER:
6    Q.   It states, "Our products are among
7    the most commonly-prescribed for legitimate
8    medical use in the U.S."
9         And it states, "Entered into evidence
10   by law enforcement."
11        What did you mean by that?
12   A.   What I meant by that was that, you
13   know, that, you know our -- and the goal of our
14   organization, obviously, is we want to reduce,
15   you know, pain and suffering for those
16   individuals who have legitimate chronic pain
17   issues or acute pain issues and that there is a,
18   a largely legitimate need for this product.  But
19   also we want to point out that this is not only
20   our product but all opioids are also found in
21   illicit channels as well, too.  And there was an
22   increase in law enforcement finding opioids in
23   illicit channels and also -- and that there was
24   a demand -- there was a demand for legitimate

## Page 120

1    use, but also there was a rising illicit need as
2    well, too, or demand.
3    Q.   All right.  And then 089, the next
4    page down, it says, "Challenges continued."
5         Do you see that?
6    A.   Um-hmm.
7    Q.   And then it says, "Products include,"
8    and then under "Corona," does that refer to the
9    manufacturing facility in Corona, California?
10   A.   Yes, sir.
11   Q.   It says, "Hydrocodone."
12   A.   Um-hmm.
13   Q.   It says, "Initial quota grant is 25
14   percent of aggregate."
15        In the context of your work at
16   Watson, what does that mean?
17   A.   It would mean 25 percent of all the
18   hydrocodone produced within the U.S. was
19   manufactured.
20   Q.   Was manufactured at the Corona site?
21   A.   Yes.
22   Q.   And then oxycodone, what does that
23   mean?
24   A.   It just means oxycodone was produced

Page 121

1    at that facility.
2        Q.   Do you remember whether Watson
3    marketed oxycodone around this time frame, early
4    2010?
5            MR. KNAPP:  Objection to form.
6            MR. LUXTON:  Object to form.
7        A.   Our products were mainly generic.  We
8    didn't market those products.
9        Q.   Do you remember whether Watson sold
10   generic oxycodone around this time frame?
11       A.   Yes.
12       Q.   With regard to fentanyl, what is
13   fentanyl?
14       A.   Fentanyl is a -- is an opioid.  It's
15   a powerful pain management medication.  It's
16   largely used in, you know, serious chronic pain
17   issues, cancer patients to relieve suffering.
18   It was delivered through a Duragesic or a patch
19   so it can last for longer periods so it could
20   deliver a sustained dose to a patient so there
21   would be no lull in the dosage as far as if you
22   took a tablet where we don't want these patients
23   to have any sufferings.  We want them to
24   maintain a steady stream of the product.

Page 122

1        Q.   Was the fentanyl produced at -- well,
2    let me start over.
3        A.   Right.
4        Q.   Were the fentanyl-based products
5    produced at the Corona, California, site for
6    Watson in 2010 patches or something else?
7        A.   No, I think those -- that would have
8    been very small quantity, if my, if my memory
9    serves.  And I think there may have been a
10   sublingual, but I -- I'm not 100 percent sure.
11       Q.   And a sublingual is something you put
12   under your tongue?
13       A.   Yes, sir.
14       Q.   And the next word there,
15   methylphenidate?
16       A.   Methylphenidate.
17       Q.   Is that an opioid?
18       A.   No.  That's Ritalin.
19       Q.   And then the next one there, diazepam
20   and lorazepam?
21       A.   Yes.
22       Q.   Are those opioids?
23       A.   No.  They're benzodiazepines.
24   They're muscle relaxers.

Page 123

1        Q.   And then the next one is F-line and
2    Butalbital?
3        A.   Fiorinal, Fioricet, Butalbital.
4        Q.   Are those opioids?
5        A.   No.
6        Q.   Then the last word under "Corona" is
7    Pentazocine?
8        A.   Pentazocine.
9        Q.   All right.  Is that an opioid?
10       A.   No.  It's a benzodiazapine.
11       Q.   So out of the seven entries under
12   Corona, three of them, the top three are
13   opioids; is that right?
14           MR. KNAPP:  Objection to form.
15       A.   Three of the listed are opioids.
16       Q.   And the first three, right?
17       A.   Right.
18       Q.   And then the next one is Salt Lake
19   City.
20           Fentanyl --
21       A.   Yes.
22       Q.   -- do you see that there?
23           And then there are two other listed
24   there.  The same methylphenidate?

Page 124

1        A.   Yes.
2        Q.   And testosterone?
3        A.   Right.
4        Q.   Neither of those are opioids; is that
5    right?
6        A.   Correct.
7        Q.   But the first one there is an opioid?
8        A.   Yeah.
9        Q.   And then Florida, did Watson have a
10   manufacturing plant in Florida?
11       A.   Yes.  It was part of the Actavis
12   acquisition.
13       Q.   All right.  It states hydrocodone and
14   amphetamine and --
15       A.   Actually, let me back that up.
16       Q.   Okay.
17       A.   It wasn't part Actavis acquisition.
18   It was part of the Andrx acquisition.
19       Q.   Okay.  So let's get to that in a
20   second.
21           Hydrocodone, amphetamine, and
22   pseudoephedrine; is that right?
23       Q.   Yes.
24       Q.   And then can you pronounce that last

Page 125

1  word?
2      A.   It can be carisoprodol or
3  carisoprodol, depending on how you want to
4  pronounce it.
5      Q.   All right.  So are any of those in
6  that list opioids?
7      A.   Hydrocodone.
8      Q.   So the first one there.
9          With regard to the opioids that we've
10  read on these lists, do you know why they were
11  listed as challenges?
12      A.   I think probably because the amount
13  of regulation, the quota implications for some
14  of the products as well.
15      Q.   So with regard to the Florida
16  manufacturing facility that you were talking
17  about, the purchase of Actavis didn't take place
18  until sometime in 2012; is that right?
19      A.   Right.  Yeah, this would have been
20  Andrx, which I think was in 2009.
21      Q.   What was Andrx?
22      A.   Andrx was a generic pharmaceutical
23  manufacturer.
24      Q.   Do you remember at some point whether

Page 126

1  the, the manufacturer of controlled substances
2  for Watson was moved out of Florida?
3      A.   Can you repeat that question?
4      Q.   Do you remember whether, while you
5  were at Watson or Actavis, the company stopped
6  making controlled substances at a Florida plant?
7      A.   No.
8      Q.   So staying on this page --
9      A.   Sure.
10      Q.   -- the Corona entry states
11  hydrocodone, and then it states initial quota
12  grant is 25 percent of aggregate.
13      A.   Right.
14      Q.   And then it states, hydrocodone under
15  Florida as well.
16          Do you see that there?
17      A.   Yes.
18      Q.   So the 25 percent of aggregate quota
19  that you had explained before, was the Florida
20  plant in addition to the 25 percent or included
21  in that?
22      A.   It would have been exclusive of it.
23  But from my recollection, the hydrocodone
24  production in Florida was minimal.

Page 127

1      Q.   Moving on to the next page it states,
2  "Product development. "
3          Do you see that there?
4      A.   Yes, I do.
5      Q.   And this is page 090 in Exhibit 6.
6  And there are eight chemicals or drugs listed
7  there.
8          Can you go through that list and tell
9  me which of them are opioids?
10      A.   Sure.
11          Fentanyl citrate, hydromorphone,
12  morphine sulfate, oxymorphone.
13      Q.   Okay.  So four out of the eight
14  product development?
15      A.   Yes.
16      Q.   Do you remember why these eight drugs
17  or chemicals were listed as challenges?
18      A.   Sure.
19      Q.   Why?
20      A.   With product development efforts, you
21  would have to still apply for quota with the
22  DEA.  It was a very challenging process in that
23  you'd have to work closely with your R&D folks
24  and scientists who -- to provide a justification

Page 128

1  to DEA and also to articulate quantities to --
2  for the, the build of test batches, exhibit
3  batches that would be submitted to FDA.
4          So it was really -- the challenges
5  that I'm speaking about here are, are challenges
6  administratively from a quota standpoint where,
7  you know, that these -- these are not -- and the
8  quota process, especially at that time, took a
9  long period of time.  So, you know, in any type
10  of new product development in any pharmaceutical
11  organization, you want to be first to file for a
12  generic patent challenge.  So any type of delays
13  in the quota process, these things could affect
14  your timeline in getting your, your product
15  approved and being able to have affordable
16  products in the generic market for, for
17  patients.
18      Q.   So as you've just described the
19  challenges, are those more business challenges
20  than, say, security challenges?
21      A.   Yes.
22      Q.   So do you remember there being any
23  security challenges for the fentanyl citrate EQ
24  oral or the hydromorphone or morphine sulfate or

Page 129

1   oxymorphone?
2       A.  No.
3           MR. LUXTON:  Objection to the form.
4   BY MR. EGLER:
5       Q.  All right.  So as you think about it,
6   the fentanyl citrate EQ oral, do you know what
7   the brand name equivalent of that would be?
8       A.  I don't off the top of my head.
9       Q.  How about hydromorphone?
10      A.  No.
11      Q.  How about morphine sulfate?
12      A.  Hydromorphone I believe is Dilaudid.
13  These, these were all products that were not
14  high-volume products.  If you look at
15  hydromorphone, morphine sulfate, they're --
16  oxymorphone, but I would say are institutional
17  products that we used in hospital settings or
18  long-term care.
19      Q.  Have you ever heard of the drug
20  Kadian?
21      A.  I have.
22      Q.  Is the morphine sulfate that's listed
23  there the same thing as Kadian or something
24  else?

Page 130

1       A.  I can't be sure.
2       Q.  Do you remember whether Watson ever
3   undertook to make generic Kadian?
4       A.  I believe with the Actavis
5   acquisition, I believe that was a legacy Actavis
6   product, Kadian.
7       Q.  But do you remember whether Watson
8   ever made generic Kadian?
9       A.  I don't have a specific recollection.
10      Q.  All right.  So moving on in this
11  document, get to page 091, and it states
12  "Suspicious Order Monitoring, SOM," it says,
13  "The registered shall design and operate a
14  system to disclose suspicious orders of
15  controlled substances."  And there are two
16  bullet points that states "unusual size,
17  pattern, frequency," and then, "suspicious order
18  should not be identified on
19  benchmarks/thresholds only."
20      A.  Um-hmm.
21      Q.  So that first group of three terms
22  there, "unusual size, pattern or frequency,"
23  what did you mean by that?
24      A.  It was taken directly from 1301.74 in

Page 131

1   the Code of Federal Regulations, and is just the
2   DEA's verbiage for, you know, what, you know,
3   what could comprise, potentially comprise an
4   order that should be flagged as of potential
5   interest.
6       Q.  Did anyone ever -- well, let me start
7   over.
8           Around this time, February of 2010,
9   do you remember ever having a conversation that
10  the CFR in question listed unusual size, pattern
11  or frequency, but also could include other
12  aspects or other things that a company should
13  look for in a Suspicious Order Monitoring
14  System?
15          MR. KNAPP:  Form.
16          MR. LUXTON:  Same.
17      A.  No.
18      Q.  For example, did anyone ever tell you
19  that the CFR in question, before it states
20  unusual size, pattern of frequency has the word
21  "including" in it?
22      A.  Um-hmm.  I'm aware of the -- of the
23  DEA regulation.
24      Q.  Did anyone ever say that the

Page 132

1   "including" word would increase the number of
2   considerations beyond unusual size, pattern or
3   frequency?
4       A.  I can't make that assumption.
5       Q.  Was your understanding that the --
6   let me start over.
7           Was your understanding around this
8   time that the Suspicious Order Monitoring System
9   as required by the DEA was to track unusual
10  size, pattern or frequency and not include any
11  other aspects?
12      A.  I think those were key elements to
13  look for as mandated within the regulations.
14      Q.  Do you remember ever including
15  aspects beyond those three?
16      A.  There are certainly other
17  considerations, such as products that may be
18  bought in combination that may be concerning.
19      Q.  Anything else?
20      A.  Not to my knowledge.
21      Q.  All right.  And then I just -- I
22  hadn't said it before, but the top of this page
23  is "Compliance Landscape."
24          The second bullet point there states,

Page 133

1    "SOM as well as 'Know Your Customer' efforts are
2    key to DEA's effort to curb diversion of C/S in
3    listed chemicals."
4          Do you see that there?
5      A.   Yes, sir.
6      Q.   Do you remember -- well, that term,
7    "Know Your Customer," what does that mean to
8    you?
9      A.   It implies due diligence to me and
10   understanding who your business partner is.
11     Q.   And with regard to the due diligence
12   processes that you're thinking of, who, if
13   anyone, or what group at Watson around this
14   time, early 2010, was responsible for the Know
15   Your Customer function?
16     A.   Primarily from a DEA perspective, it
17   would be my group but also order management or
18   the customer service side also had a role as
19   well, too.  If onboarding a new customer, they
20   would have a process that they would go to, a
21   licensed validation process.  You know, Dun &
22   Bradstreet, they would do a due diligence on a
23   customer prior to onboarding them on a customer.
24   And from a security aspect or from a DEA

Page 134

1    compliance aspect, we would have a set of
2    questions that would be answered by the
3    customer.
4      Q.   Who in your group, as you think of it
5    around this time, early 2010, would have been
6    responsible for the Know Your Customer part?
7      A.   Me.
8      Q.   Okay.  Anybody else?
9      A.   I would overall be responsible.
10   Probably compliance auditor would be responsible
11   for procedurally.
12     Q.   Beyond what you referred to as the
13   onboarding process when Watson took on a new
14   customer, were there ongoing Know Your Customer
15   efforts?
16     A.   We maintained strong relationships
17   with our, with our customers.  We also -- I know
18   in the process when we acquired Actavis, we did
19   a revisit with our customers.  We asked for, for
20   new compliance information.
21         And when I was leaving the
22   organization, we were again doing another
23   refresh as well to update our records.
24     Q.   So with regard to this term, Know

Page 135

1    Your Customer, have you ever heard an additional
2    term "Know Your Customer's Customer"?
3      A.   I have.
4      Q.   What does that mean to you?
5      A.   That implies that you should not only
6    understand who your customers are, but who your
7    customer is doing business with.
8      Q.   So with regard to this time frame,
9    early 2010, do you remember any "Know Your
10   Customer's Customers" efforts at Watson?
11     A.   No.
12     Q.   With regard to the SOM system, have
13   you ever heard the term "indirect customer SOM"?
14     A.   I've heard "indirect customer," but
15   not "indirect customer SOM."
16     Q.   So what does that mean to you,
17   indirect customer?
18     A.   Indirect customer, again, would be a
19   customer of our customer.
20     Q.   At any time during your time at
21   Watson and Actavis, was the automatic part, the
22   SOM system, the part that was contained in the
23   SAP system designed to track indirect customer
24   sales?

Page 136

1      A.   No.
2      Q.   At any time when you were at Watson
3    or Actavis, was the automatic part of the
4    Suspicious Order Monitoring System that was
5    contained in the SAP system designed to get an
6    understanding of the broader secondary market
7    for the controlled substances it was tracking?
8          MR. LUXTON:  Objection to form.
9      A.   No.
10     Q.   All right.  So can you turn two more
11   pages in to 093?
12     A.   Sure.
13     Q.   And it states, "2010 Goals and
14   Objectives."  093.
15         And under 2010 Goals and Objectives,
16   it states, SOM.
17         Do you remember what the 2010 goals
18   and objectives for Suspicious Order Monitoring
19   System were at Watson?
20     A.   Sure.
21         It was likely -- again, it was almost
22   nine years ago.  It was an effort to enhance our
23   already compliant system.  So to -- that's
24   probably right around the time when we started,

Page 137

1    because of what we were seeing on the landscape
2    and what DEA was indicating as important as well
3    as our consultants as Know Your Customer, that's
4    probably when we really started to, to build up
5    our Know Your Customer aspect of our system.
6        Q.   All right.  And then the last one
7    there that's listed, "Placebo Program" --
8        A.   Yes.
9        Q.   -- tell me what that means.
10       A.   Placebo program is because of our
11   long relationship with law enforcement and the
12   DEA, we had a formal program where if DEA
13   requested, we would be very happy to manufacture
14   placebo of our products that they could use in
15   operations to combat illicit traffic of
16   controlled substances.
17       Q.   With regard to that issue, do you
18   remember ever hearing of an opioid called Norco,
19   N-o-r-c-o?
20       A.   Yes.
21       Q.   Do you remember participating in a
22   DEA program to provide placebos of the drug
23   Norco?
24       A.   It's possible.

Page 138

1        Q.   Do you have any particular memory
2    about that?
3        A.   No, but we've, we've done many
4    placebo manufacturing runs for DEA or law
5    enforcement.
6        Q.   Do you remember ever having an
7    understanding of, of the demand in the illicit
8    market for Watson's drug Norco?
9        A.   No, I don't think it -- it was not a
10   high-volume product being a branded product.  As
11   far as a demand for it illicitly, I -- there may
12   have been because there was an illicit desire
13   for all opioids.
14       Q.   Okay.  All right.  You can set this
15   document aside.
16           (Witness complies.)
17   BY MR. EGLER:
18       Q.   I'll hand you what I'll mark as
19   Exhibit 7.
20
21           (Napoli Exhibit 7, Email chain
22       beginning with email dated 4/12/10 from S.
23       Soltis to Napoli, Bates-stamped
24       ALLERGAN_MDL_01236097 and 6098, marked for

Page 139

1           identification, as of this date.)
2    BY MR. EGLER:
3        Q.   Mr. Napoli, I've just handed you what
4    we will mark as Exhibit 7.
5           Can you look through it?  And as
6    you're looking through it, I'll read into the
7    record the Bates numbers.  ALLERGAN_MDL_01236097
8    and 6098.
9           And when you're ready, can you tell
10   me what this appears to you to be?
11       A.   It looks like it's a document in
12   reference to a DEA request for a placebo product
13   and setting them up within our distribution
14   system as a customer to receive a no charge.
15       Q.   Right.
16           As you think about that, an entity
17   that is being set up as a customer, is that the
18   DEA?
19       A.   Yes.
20       Q.   So at the earliest email in time on
21   this exhibit, and it's at the bottom of the
22   first page, you write to Scott Soltis.
23       A.   Um-hmm.
24       Q.   I think we've talked about him

Page 140

1    before.
2        A.   Um-hmm.
3        Q.   Who is Scott Soltis?
4        A.   Scott was our executive director of
5    securities and DEA affairs.
6        Q.   So was he on an organizational chart
7    above you or below you.
8        A.   Above me.  He was responsible for
9    security and DEA compliance for the
10   organization.
11       Q.   And then you cc Gary Stewart?
12       A.   Yes.
13       Q.   Who is Gary Stewart?
14       A.   Gary Stewart was our supply chain
15   security manager based out of Gurnee, Illinois,
16   distribution center.
17       Q.   And then Ed J. Grover?
18       A.   Yes.
19       Q.   Who is Mr. Grover?
20       A.   Ed Grover was our head of
21   distribution in Gurnee, Illinois.
22       Q.   And you write, "Scott, in regards to
23   the recent DEA request for product, I would
24   suggest the following course of action:  Special

Page 141

1   Agent Warpness should provide the request for
2   product on official letterhead," and then in
3   parentheses, "include reg number," close
4   parentheses, "and fax to Watson DEA affairs.
5   But if time is of the essence, I would suggest
6   fax going to Gary at the DC since most of us
7   will be at the DEA conference this week."
8         Do you remember going to a DEA
9   conference in April of 2010?
10        A.   Yeah.  I've been to many of them.
11        Q.   And you say, "Faxing to Gary at the
12  DC."
13        What does that mean?
14        A.   If I'm going to be out of the office,
15  it probably would make sense, if this DEA agent
16  wants the placebo as soon as practical, send it
17  directly to our security manager in the
18  distribution center so the process can be, the
19  request can be processed without delay.
20        Q.   All right.  And then Scott Soltis
21  writes back on the same day, April 12, 2010, and
22  that is the email above.
23        A.   Um-hmm.
24        Q.   He says, "FYI, I just talked to

Page 142

1   Mark."
2         From the context of this email, can
3   you tell who the Mark is that he's referring to?
4         A.   That's Mark Warpness, a DEA
5   investigator.
6         Q.   And --
7         A.   Or special agent.  I'm sorry.
8         Q.   And Mr. Soltis writes, "He wants ten
9   bottles, which I told him no problem and that we
10  will not charge him."
11        And then Mr. Soltis writes, "He did
12  indicate that Norco is the most abused
13  painkiller of preference on the street and it is
14  just known on the street as 'Watson.'"
15        Do you remember ever hearing that
16  before this time, April 2010, that people from
17  the DEA indicated that Norco the most abused
18  painkiller of preference on the street?
19        A.   We certainly heard from the DEA that
20  hydrocodone was one of the most abused products.
21        Q.   So and that's what Norco is,
22  hydrocodone?
23        A.   Norco is a branded product, so --
24  and, again, I don't know if he was saying Norco

Page 143

1   or hydrocodone there, so I can't be inside his
2   mind but...
3         Q.   Okay.  Well, do you remember ever
4   hearing that on the, quote/unquote, street, that
5   one of the opioids that Watson manufactured was
6   known simply as "Watson"?
7         A.   I was aware of that.  There were --
8   many opioids and controlled drugs had many
9   illicit street, street names.  It's very common.
10        Q.   Have you ever seen a pill of the drug
11  Norco, the brand name drug Norco?
12        A.   I have.
13        Q.   Do you know whether it has the word
14  "Watson" written on it?
15        A.   It may.  It's been a while since I've
16  seen a tablet.
17        Q.   Do you remember ever participating
18  with the DEA beyond what's listed here in
19  Exhibit 7 to address the the, quote/unquote,
20  street abuse of Norco?
21        A.   As far as efforts that we made to
22  help combat?
23        Q.   Yes.
24        A.   We would always be willing to help

Page 144

1   out from a placebo standpoint.  Or if there are
2   any type of information requests, we would be
3   happy to fulfill those for DEA.
4         Q.   Do you remember ever -- let me start
5   over.
6         A.   Sure.
7         Q.   Beyond this event that is listed here
8   with the request for 10 bottles of placebo
9   Norco, do you remember particularly any other
10  requests or provision of that type of placebo to
11  the DEA?
12        A.   I don't recall specific requests, but
13  I am positive that there were multiple requests
14  for drugs throughout my tenure for placebo.
15        Q.   And after you heard or read this
16  email and found that one of the DEA agents
17  indicated that Norco was the most abused
18  painkiller of preference on the street, did you
19  take any action internally to address that
20  issue?
21        A.   We were already aware that
22  hydrocodone and opioids were products of abuse
23  in illicit markets, as you can see through some
24  of the documents we've looked at already that I

Page 145

1    clearly communicated regarding the landscape.
2         You know, we took the responsibility
3    very seriously.  And to the extent that a
4    manufacturer can prevent the illicit diversion
5    of products, we made every effort to ensure that
6    we had a robust security program that was -- not
7    only met the basic requirement of DEA
8    regulations, but exceeded them to make sure that
9    we were doing our part.
10        Q.   Where was, as you think of it, where
11   was Watson's Norco physically made?
12        A.   Corona.
13        Q.   And, you know, we saw before that
14   there was a notation that Watson's Corona
15   facility had 25 percent of the nationwide quota
16   for a particular drug?
17        A.   Yes.
18        Q.   Is that the same drug as Norco?
19        A.   It would be included within that
20   product, but Norco would not comprise 25 percent
21   of the market.
22        Q.   Do you know whether any of the
23   security processes used with regard to Norco by
24   Watson were more than the security processes

Page 146

1    Watson used with regard to other drugs?
2         MR. LUXTON:  Objection to form.
3         A.   Yes.
4         Q.   Were they higher than security
5    processes used for other Schedule II drugs?
6         MR. LUXTON:  Objection to form.
7         A.   No.
8         Q.   Were they higher than security
9    processes used for Schedule II opioids?
10        MR. LUXTON:  Same objection.
11        A.   They were consistent.
12        Q.   Do you remember ever talking with the
13   FDA about this agent's opinion or indication
14   that Norco was the most abused painkiller of
15   preference on the street?
16        A.   It would not be within my role to
17   have conversations with the FDA about that.
18        Q.   Would it be within the role of anyone
19   at Watson to have that type of a conversation?
20        MR. KNAPP:  Just real quick, was that
21   last question about -- that was about the
22   FDA?
23        THE WITNESS:  Yes.
24        MR. KNAPP:  I believe Mr. Napoli

Page 147

1    answered based upon the FDA.
2         MR. EGLER:  Let me ask this again.
3    BY MR. EGLER:
4         Q.   Do you remember ever talking with
5    anyone at the DEA about this indication that
6    Norco was the most abused painkiller of
7    preference on the street?
8         A.   Not about Norco in particular.
9         Q.   Okay.  Do you remember whether anyone
10   at Watson had that type of a conversation with
11   anyone from the DEA?
12        MR. KNAPP:  Foundation.
13        A.   I don't recall.
14        Q.   All right.  You can set that document
15   aside.
16        (Witness complies.)
17        (Napoli Exhibit 8, Email chain
18        beginning with email dated 4/29/10 from L.
19        Scott to Napoli, ALLERGAN_MDL_01236095
20        through 6096, marked for identification, as
21        of this date.)
22   BY MR. EGLER:
23        Q.   Mr. Napoli, I'll hand you what we
24   will mark as Exhibit 8.

Page 148

1         A.   Okay.
2         Q.   Exhibit 8, can you look through it
3    generally.  And as you're looking through it,
4    I'll read on the record it's
5    ALLERGAN_MDL_01236095 through 6096.
6         And when you're ready, can you tell
7    me what this appears to you to be?
8         (Document review.)
9         A.   Looks like a question from one of our
10   security supervisors who attended a National
11   Association of Drug Diversion Investigators
12   conference about placebo programs.
13        Q.   So that National Association of Drug
14   Diversion -- can you say that again?
15        A.   National Association of Drug
16   Diversion Investigators.
17        Q.   Investigators.
18        That's the NADDI --
19        A.   Correct.
20        Q.   -- that's referred to in the earliest
21   email in time on the second page of Exhibit 8?
22        A.   Yeah.
23        Q.   And it's Pete J. Herrera?
24        A.   Correct.

1     Q.   Mr. Herrera worked at Watson; is that
2  right?
3     A.   Yes.
4     Q.   What was his role around this time,
5  April 2010?
6     A.   Security supervisor of the Corona
7  facility.
8     Q.   And he writes to you and Ms. Scott,
9  "Just got back from NADDI last night and wanted
10  some clarification on how Watson, (DEA affairs)
11  administers the placebo program for law
12  enforcement."
13     A.   Um-hmm.
14     Q.   And he goes on from there.
15        And you respond to him on April 29th
16  and say, "Hi, Pete.  It is not uncommon to
17  return from NADDI with a pocket full of placebo
18  requests.  We will be establishing a placebo
19  program this year, though, so you can forward
20  the contact names to Lisa and they will be added
21  to the list."
22        And then continuing, "Interesting
23  that the FBI inquired.  They usually follow the
24  money trail on high-profile RX cases through

1  electronic channels and tend not to get their
2  hands dirty with diverse buys, et cetera."
3        And then on the next page,
4  Mr. Herrera writes to you, "Thank you for your
5  prompt reply.  I hear you about the FBI's MO
6  with reverses.  The agents were" -- "The agents
7  that were interested were from the San Diego
8  field office.  And there was one presentation by
9  an SD County prosecutor that keyed on the
10  diversion wave in SD, especially Watson hydro
11  and Norco really hard.  Maybe I heard it wrong
12  at the DEA seminar, but didn't the DEA people
13  say they had the problem under control down
14  there?"
15     A.   Um-hmm.
16     Q.   So do you remember there being
17  something that can be referred to as a
18  "diversion wave" in San Diego that especially
19  related to Watson's hydrocodone and Norco
20  products?
21     A.   No.
22     Q.   Do you remember ever hearing that a
23  San Diego County prosecutor had contacted -- let
24  me start over.

1        Did you ever hear that a San Diego
2  County prosecutor had made a presentation about
3  diversion of Watson's hydrocodone and Norco
4  products in San Diego County, California?
5     A.   No, I don't recall ever receiving any
6  requests from San Diego or contact by a
7  prosecutor.
8     Q.   So you know that San Diego County is
9  just to the south of the Riverside County where
10  Corona is?
11     A.   Correct.  I mean, it may be possible.
12  I just don't recall if there was a placebo
13  effort.
14     Q.   And then you write back to
15  Mr. Herrera and Ms. Scott, "I don't think it
16  will ever been under control.  The bad boys are
17  always a step ahead.  This is why" -- "This is
18  why DEA likes to beat up on legitimate industry.
19  Is all they can control."
20        Then you have exclamation point
21  there.
22     A.   Um-hmm.
23     Q.   So when you wrote, "I don't think it
24  will ever been under control," what did you

1  mean?
2     A.   I think because of the way that the
3  current tact was.  And in that email, it
4  expresses probably a feeling within industry
5  that the approach by DEA was aggressive
6  enforcement on industry, where this not -- this
7  is a complex societal problem; it's not just the
8  manufacturers.  But the least amount of
9  registrants are manufacturers, so I think it's
10  easier to approach that population rather than
11  going down the supply chain.
12        A lot of these products that are on
13  the market are in illicit channels are because
14  of, quote/unquote, legitimate prescriptions that
15  are written at the prescriber level, and there
16  are -- there was at the time seemingly no
17  efforts to focus on that.
18        So it just probably indicating just
19  that the their -- the focus, although well
20  intended, is I think heavily on the wrong part
21  of the system of distribution.
22     Q.   And you write there as well, "The bad
23  boys are always a step ahead."
24     A.   Right.

Page 153

1     Q.  What did you mean by that?

2     A.  I think in any type of criminal

3  endeavor, it's -- where there's profit to be

4  made, there's always -- criminals always seem to

5  be one step ahead of law enforcement.

6     Q.  So with regard to the "bad boys"

7  there, who are you referring to?

8     A.  Anybody who engages in the illicit

9  trafficking of a controlled drug.

10    Q.  And then you write, "This is why DEA

11  likes to beat up on legitimate industry."

12       Around this time, April 2010, why did

13  you think DEA likes to beat up on legitimate

14  industry?

15    A.  Because there was a change -- as you

16  probably saw in one of the landscape slides that

17  I did earlier, that there was kind of a change

18  from -- previously, the DEA was more of a

19  partner with industry and we worked

20  collaboratively.

21       And then as you saw a shift in where

22  the DEA was making efforts to combat the illicit

23  drugs and making headway there, then you saw

24  abusers migrating over to the legitimate

Page 154

1  pharmaceuticals.

2       And then you saw it went from the

3  diversion investigator concept to we're going to

4  take diversion investigators and now add special

5  agents from the criminal side in with those

6  groups and be more aggressive with the

7  registrant population.

8     Q.  So with regard to this email that you

9  sent to Mr. Herrera and Ms. Scott, you said, "I

10  don't think it will ever be under control."

11       This is April 29, 2010.

12    A.  Um-hmm.

13    Q.  When you had that belief, did you

14  ever try to change Watson's internal processes

15  to try to control the diversion that was going

16  on of Norco?

17       MR. KNAPP:  Objection to form.

18    A.  We continually ensure that we had

19  appropriate controls in place to mitigate theft

20  and diversion for what was under our control.

21    Q.  So with regard to the Norco drug,

22  after this time, April 29, 2010, did you ever

23  undertake to have higher security processes than

24  other drugs that Watson made in the same

Page 155

1  controlled substance class?

2    A.  Well, we sought to always have a

3  strong program for all of our controlled

4  substances from the time we received the

5  material on our loading dock until we produced a

6  solid dosage form.  So we had a layered and

7  balanced approach to physical security

8  throughout our entire product lifecycle through

9  distribution.

10    Q.  And with regard to the diversion

11  issues, did you or -- is it your understanding

12  that anyone at Norco -- I'm sorry.

13       With regard to the diversion issues,

14  is it your understanding that you or anyone else

15  at Watson ever made special efforts to

16  understand and reduce or stop the diversion of

17  its Norco drug?

18       MR. KNAPP:  Objection to form.

19       MR. LUXTON:  Form.

20    A.  It's not within the scope of our, of

21  our power to do that.

22    Q.  With regard to what we've been

23  talking about before, that indirect customer

24  concept, did you or anyone you know at Watson

Page 156

1  undertake to have a greater understanding of the

2  indirect customers for Norco?

3       MR. KNAPP:  Objection to form.

4       MR. LUXTON:  Form.

5    A.  We at, at Watson had -- through our

6  Know Your Customer program, we sought to find

7  out about our customers, about their -- we had a

8  form letter that went out to our customers and

9  indicated that we were interested in finding out

10  information from them of -- specifically of

11  hydrocodone and oxycodone products that they

12  purchased from us, a customer list, and who

13  their most significant customers were.  So it

14  was all part of our Know Your Customer process.

15    Q.  So when those letters went out, was

16  that at the onboarding process that you were

17  talking about or at some other time?

18    A.  It would be at the onboarding time.

19  It would also be when we did a periodic refresh,

20  which would have been, again -- probably that

21  next juncture would have been 2012, when we had

22  the, the Actavis acquisition.

23       But throughout my tenure with, with

24  Watson/Actavis, we didn't onboard too many

Page 157

```
1   customers.  We did not have a big customer list,
2   so there wasn't too much addition to that
3   customer base.
4        Q.  So when you wrote that you didn't
5   think it would ever been under control, did you
6   renew the process of trying to understand your
7   customers' customers to understand any part of
8   the diversion process?
9        A.  What we sought to do was to
10  understand -- to work with our customers to
11  ensure that they had programs in place, that
12  they were ensuring that they understood their
13  customers and their ordering behaviors, and they
14  had effective controls in place to detect any
15  type of unusual behavior.
16       Q.  And as are you wrote here, "I don't
17  think it will ever been under control," do you
18  think that the -- your customers' processes were
19  effective?
20       A.  I don't think that was any indictment
21  of a customer's process.  I just think it's a --
22  probably a societal note about the demand for
23  drugs in this country.
24       Q.  But the customers that Watson had at
```

Page 158

```
1   this time were selling the Norco drug to other
2   people; is that right?
3        A.  They would be selling them to a
4   pharmacy.
5        Q.  And do you remember ever undertaking
6   a project or directing someone else to undertake
7   a project to gain a greater understanding of the
8   pharmacies to which the Norco drugs were being
9   sold?
10       MR. KNAPP:  Objection to form.
11       A.  We actually looked at through our
12  Know Your Customer process at all of our
13  customers and -- and gaining an understanding of
14  where all of our controlled substances, but
15  specifically hydrocodone and oxycodone, were
16  going.
17       As far as the daily day-to-day
18  management of those customers, that was not
19  within our role.  And if you look at some of our
20  customers, they had -- just one customer maybe
21  had thousands upon thousands upon pharmacy
22  locations.  It would be untenable to do a
23  realtime monitoring of those activities.
24       Q.  With regard to the time frame that
```

Page 159

```
1   is -- that appears in this email, April 29th, do
2   you remember -- or April 29th, 2012, do you
3   remember whether there was any particular
4   endeavor to look at any of the pharmacies that
5   were selling Norco?
6        MR. LUXTON:  Objection to form.
7        MR. KNAPP:  I believe you said 2012.
8        A.  It's 2010.
9        Q.  2010.
10       A.  Again, through our Know Your Customer
11  efforts, we would gain an understanding of where
12  our customers were distributing.  But if there
13  was a suspicious order that pended, we would
14  take a deeper dive and we would look to see
15  where these products were going.
16       Q.  In response to this process at the
17  end of April of 2010, do you remember any
18  particular effort being made in that regard?
19       A.  No.
20       Q.  So Mr. Herrera writes back to you on
21  that day, April 29th, "I felt like I was a class
22  president or something at the seminar.  Pretty
23  popular guy as soon as someone would read my
24  name badge and see I was from Watson."
```

Page 160

```
1        As you sit here today, what's your
2   understanding of what Mr. Herrera meant?
3        MR. KNAPP:  Objection --
4        MR. LUXTON:  Foundation.
5        MR. KNAPP:  -- calls for
6   speculation.
7        A.  I can't speculate --
8        Q.  As you read it.
9        A.  I can't speculate --
10       MR. KNAPP:  Same objection.
11       A.  I can't speculate what Mr. Herrera
12  was thinking.
13       Q.  Okay.  So when he wrote, "I felt like
14  I was a class president or something at the
15  seminar," do you remember ever having a
16  follow-up conversation with him about that?
17       A.  No.
18       Q.  What do you think he meant by that?
19       MR. KNAPP:  Objection.
20       MR. LUXTON:  Objection calls for
21  speculation.
22       A.  I, again, I can't speculate as to
23  someone else's thoughts.
24       Q.  I'm not asking about his thoughts.
```

Page 161

1    I'm asking what you thought he meant by that.
2            MR. KNAPP:  Same objection.
3            MR. LUXTON:  Foundation.
4        A.  Again, I can't.
5        Q.   And he writes, "...pretty popular guy
6    as soon as someone would read my name badge and
7    see I was from Watson."
8            Do you remember ever having a
9    follow-up conversation about that issue?
10       A.  No.
11       Q.   And as you sit here today, do you
12   have any memory of what you thought at the time
13   he meant by saying that?
14           MR. LUXTON:  Objection.  Calls for
15       speculation.
16       A.  No, I don't.
17       Q.   And then the first email on the page,
18   the last one in time, Ms. Scott responds to you
19   only and leaves Mr. Herrera off and she says,
20   "Ug, vomit."
21           As you sit here today, what do you
22   think she meant?
23           MR. LUXTON:  Objection.  Calls for
24       speculation.

Page 162

1            MR. KNAPP:  Objection.
2        A.  I can't speculate.
3        Q.   If someone writes, "Ug, vomit," do
4    you think they agree with what Mr. Herrera has
5    said?
6            MR. LUXTON:  Same objection.
7            MR. KNAPP:  Objection.
8        A.  I don't know.
9        Q.   Do you remember ever having a
10   discussion with Ms. Scott about the diversion
11   wave in San Diego that was referred to in this
12   email?
13       A.  No.
14       Q.   Do you remember ever having a
15   discussion with Ms. Scott about the impression
16   of the DEA that there was a substantial
17   diversion of the Watson hydro and Norco drugs?
18           MR. KNAPP:  Foundation --
19       A.  We --
20           MR. KNAPP:  -- and form.
21       A.  We had an understanding, as I
22   articulated earlier, from DEA that there was
23   a -- an increased illicit demand or use for
24   hydrocodone in general, just not Watson.

Page 163

1        Q.   And based on that understanding, do
2    you remember ever taking any special steps in
3    regard to the Watson hydro and Norco with regard
4    to security issues or Suspicious Order
5    Monitoring System or anything else?
6            MR. KNAPP:  Form.
7            MR. LUXTON:  Objection to form.
8        A.  From a security perspective, again we
9    continually looked to enhance our security
10   process as any good security practitioner would
11   do.  We assessed the current risk, and we looked
12   to make enhancements where we can to our
13   systems.
14           And we had a very robust security
15   program at Corona and in all our facilities, and
16   we were frequent recipients of DEA inspections
17   from the Riverside office and other offices that
18   were heavily focused on the security aspect and
19   control of -- that you had over your product.
20   And we had outstanding results with DEA in our
21   inspections.
22       Q.   Do you remember whether Watson,
23   around this time or at any point after
24   April 2010, undertook to modify or create a

Page 164

1    special process inside the Suspicious Order
2    Monitoring System that would address any of the
3    diversion issues that Watson's hydro and Norco
4    were facing?
5            MR. LUXTON:  Objection to form.
6            MR. KNAPP:  Objection to form.  Asked
7        and answered.
8        A.  As I stated, our Suspicious Order
9    Monitoring System program was a holistic and, we
10   feel, an effective program that was complying
11   with DEA regulations.
12       Q.   You can set that document aside.
13           MR. KNAPP:  Can we take a break?
14           MR. EGLER:  You want to break for
15   lunch?
16           MR. LUXTON:  Is it being brought in?
17           MR. EGLER:  Yes.
18           MR. LUXTON:  Hopefully if it's here,
19   we'll break for lunch.
20           MR. EGLER:  I'll check if it's here.
21   If it's not, we'll take a ten-minute break.
22           THE VIDEOGRAPHER:  The time is
23   approximately 12:23 p m., and we are going
24   off the record.

Page 165

1          (Recess is taken.)
2
3
4     A F T E R N O O N  S E S S I O N
5          (Time noted:  1:10 p.m.)
6          THE VIDEOGRAPHER:  We are back on the
7     record.  The time is approximately
8     1:10 p.m.
9               *  *  *
10    T H O M A S  P.  N A P O L I, resumed and
11         testified as follows:
12    EXAMINATION BY (Cont'd.)
13    MR. EGLER:
14         Q.   Mr. Napoli, you understand you are
15    still under oath?
16         A.   Yes, sir.
17         Q.   And for -- I'm going to hand you what
18    we will mark as Exhibit 9.
19              (Napoli Exhibit 9, PowerPoint
20         presentation entitled "DEA affairs
21         Organizational Achievements,
22         ALLERGAN_MDL_02467984 through 7998, marked
23         for identification, as of this date.)
24    BY MR. EGLER:

Page 166

1          Q.   Can you look through Exhibit 9?  And
2     as you're reading through it, I'll note for the
3     record that the first page has no Bates stamps.
4          The second page is
5     ALLERGAN_MDL_02467984 through 7998.
6          And when you're finished looking
7     through this document, can you tell me what it
8     appears to you to be?
9          (Document review.)
10         A.   Okay.
11         Q.   All right.  Do you recognize the
12    document that appears after the first page?
13         A.   I do.
14         Q.   What is it?
15         A.   This appears to be a presentation
16    that I put together that talks about
17    achievements and accomplishments during a
18    calendar year and also what goals for the
19    upcoming year of 2011 were for our DEA affairs
20    organization.
21         Q.   So the achievements were for the
22    calendar year 2010; is that right?
23         A.   Yes, sir.
24         Q.   Do you remember who the audience for

Page 167

1     this presentation was?
2          A.   No, I don't.
3          Q.   So that author on the first page in
4     the metadata page says Steve G. Sost.
5          Do you see that there?
6          A.   Steve Sost.
7          Q.   Who is he?
8          A.   Steve Sost was one of our
9     communications folks, corporation
10    communications.  He may have put this into a
11    company-approved format for me.
12         Q.   So as you think about this
13    presentation, would you regularly give a
14    presentation like this at the beginning or at
15    the end of each year?
16         A.   It would likely --
17              (Interruption.)
18         THE VIDEOGRAPHER:  The time is
19    approximately 1:14 p.m.  We are going off
20    the record.
21         MR. EGLER:  I can ask a better
22    question.  Yeah, let's go back on.
23         THE VIDEOGRAPHER:  The time is
24    approximately the 1:14 p.m., and we're back

Page 168

1     on the record.
2     BY MR. EGLER:
3          Q.   So would you make this type of a
4     presentation annually?
5          A.   It's likely that I would.
6          Q.   Do you remember making these types of
7     presentations?
8          A.   I do.
9          Q.   And who would you make them to?
10         A.   Likely to my department management
11    and perhaps organizational management.
12         Q.   So your department management would
13    be who?
14         A.   My executive director Scott Soltis.
15    Then eventually we were part of supply chain as
16    well.  So that -- that wasn't at that time.  So
17    this would have been Scott Soltis and perhaps
18    higher levels of management.
19         Q.   All right.  So if you turn to page
20    990 of this document, it's about halfway
21    through, a little bit less, on the document, at
22    the top of the page there, 990, it states,
23    "Suspicious Order Monitoring."
24         Do you see that?

## Page 169

1    A.   Um-hmm.

2    Q.   As you see that page there that
3  appears under Suspicious Order Monitoring, what
4  does that mean to you in the context of this
5  document?

6       (Document review.)

7    A.   It really just looks like kind of a
8  status update on the Suspicious Order
9  Monitoring.

10   Q.   So this would be looking back at year
11  2010; is that right?

12   A.   Yes.

13   Q.   It states, "Evaluation and
14  enhancement," and then a dash, "effective
15  relationship with internal customers."

16   A.   Yes.

17   Q.   And it states, "Sales and marketing"
18  and "customer relations."

19       What does that group of words mean,
20  "Effective relationship with internal
21  customers," and "sales and marketing" and then
22  "customer relations"?

23   A.   It's indicative of our continuous
24  desire to enhance and improve our compliance

## Page 170

1  efforts.  And by doing so, it's ensuring that we
2  had a strong relationships with internal
3  customers, such as sales or marketing folks that
4  we could garner information from about customer
5  ordering behavior, maybe upcoming awards of
6  contracts or types of changes within the market,
7  if somebody dropped out, if somebody is picked
8  up.  Just another source of gathering
9  information so we can be most effective and also
10  ensuring we maintained our strong partnership
11  with the customer relations folks who we
12  partnered with on the SOMS initiative.

13   Q.   So with regard to the customer
14  relations entity that's referred to there, at
15  Watson at this time, end of year 2010, was the
16  customer relations group part of the sales and
17  marketing group?

18   A.   Yes.

19   Q.   Was there any other entity within
20  Watson that you think of as an internal customer
21  that you or your group worked with in 2010 to
22  evaluate and enhance the Suspicious Order
23  Monitoring program?

24   A.   As far as internal customers?

## Page 171

1    Q.   Yes.

2    A.   I'm sure there was a component with
3  perhaps with legal.

4    Q.   Okay.  Do you remember ever talking
5  with anyone involved with FDA regulation part of
6  Watson with regard to the Suspicious Order
7  Monitoring System in 2010?

8    A.   It's a little vague.  Is that FDA or
9  DEA you're referring to?

10   Q.   FDA.

11   Q.   FDA?

12   Q.   So let's back up a little bit.  So --
13  and we had talked about this before earlier.

14       As you think about it, what group do
15  you identify at Watson around this time frame,
16  2010, to be most responsible for dealing with
17  FDA regulation of drugs?

18   A.   Quality assurance.

19   Q.   So do you remember whether you
20  ever -- well, let me start over.

21       Do you remember whether you or your
22  group ever identified quality assurance as an
23  entity to interface with regard to the
24  Suspicious Order Monitoring System in 2010?

## Page 172

1    A.   No, they, they wouldn't really have a
2  relevant stake, I think, in Suspicious Order
3  Monitoring because they're more focused on safe,
4  pure and effective drugs, ensuring that we have
5  quality systems around safe, pure and effective
6  drugs.

7    Q.   Do you remember ever meeting with
8  anyone from the quality assurance group with
9  regard to the data that they collected on opioid
10  drugs?

11   A.   I don't recall.

12   Q.   Then you state "increase security
13  visibility," and it says "order of interest
14  review," and then "investigation," and then
15  "communication with customers."

16   A.   Um-hmm.

17   Q.   What was the "increase security
18  visibility" in 2010?

19   A.   That was, you know -- again, 2010 is,
20  depending on what time it was, it was a little
21  over a year or a year since I transitioned in.
22  So it was really getting more involved from a
23  security standpoint and, and from a compliance
24  standpoint, meaning our internal auditors and

Page 173

1   taking an active role in the order of interest
2   review investigation and, you know, and the
3   communication with the customers about orders.
4       Q.   And the "order of interest," that
5   term, is that the same as you understand it as a
6   pending order?
7       A.   Correct.
8       Q.   Then the next dash down there it
9   says, "systemic upgrade and enhanced system
10  logic and increase efficiency."
11      Do you see that there?
12      A.   Yes.
13      Q.   Do you remember during 2010 what
14  steps you and your group at Watson took with
15  regards to the systemic upgrade of the
16  Suspicious Order Monitoring System?
17      A.   I think that this may have been
18  around the time where we engaged with Cegedim to
19  look at our system and, and maybe propose some
20  enhancements to the, to the system itself.  And
21  we were looking to increase the efficiency and
22  again enhance some of the system logic in
23  building in an additional or enhancing an
24  algorithm.

Page 174

1       Q.   All right.  And then can you turn to
2   page 995.  It looks like this (indicating).
3       A.   Um-hmm.
4       Q.   And it says, "2011 goals and
5   objectives continued."
6       So if you need to look before there,
7   feel free, but I'm just going to ask you about
8   this page.
9       A.   Yup.
10      Q.   It states, "SOMS" and that's
11  Suspicious Order Monitoring System, right?
12      A.   Yes, sir.
13      Q.   And your -- the goal at Watson for
14  2011 was to improve the system and enhanced
15  automation?
16      A.   Yes.
17      Q.   Do you remember what you meant by
18  that?
19      A.   Yeah, just what we just spoke of, is,
20  is looking at our current compliance system but
21  also finding ways to make it -- to look at more
22  parameters regarding an order of interest and to
23  increase the efficiency of the program.
24      Q.   Okay.  Then the next one says,

Page 175

1   "Enhance investigation process," and it says
2   "Procedure in cross-training."
3       What did you mean by that group of
4   words?
5       A.   Creation of a more formal procedure
6   on the investigation process of an order of
7   interest.  And cross-training meaning, as I
8   referred to earlier, we had an individual in our
9   global security department, Jeff Collins, who
10  was a trained, seasoned investigator to provide
11  cross-training in this area for him so he could
12  serve as a backup or a supplement to performing
13  investigations for the team.
14      Q.   And in this time frame, 2011, the
15  initial investigation of a pending order would
16  take place in the customer service group?
17      A.   The order management side, yeah.
18      Q.   And if it was escalated, it would
19  come to your group; is that right?
20      A.   Yes, sir.
21      Q.   All right.  Do you, as you think
22  about it, as long as there is an internal
23  Suspicious Order Monitoring System at Watson or
24  the part of Actavis that you worked with, did

Page 176

1   that process ever change?
2       A.   No.
3       Q.   All right.  You can set that aside.
4       (Witness complies.)
5   BY MR. EGLER:
6       Q.   I will hand you what we will mark as
7   Exhibit 10.
8       (Napoli Exhibit 10, Watson 210
9   Performance Review Form - Exempt,
10  Bates-stamped ALLERGAN_MDL_03535275 through
11  283, marked for identification, as of this
12  date.)
13      (Document review.)
14  BY MR. EGLER:
15      Q.   Mr. Napoli, can you look at what's
16  been marked as Exhibit 10?
17      A.   Yes.
18      Q.   And look at it generally.  And while
19  you're checking it out, I'll read into the
20  record, it's Allergan_MDL_03535275 through 283.
21      And you can look through the whole
22  document.  I'm going to ask you about text that
23  appears on the third page, which is 5277.
24      A.   Sure.

Page 177

1          (Document review.)
2          Q.   So first, to get the big picture, do
3     you recognize this document?
4          A.   I do.
5          Q.   What is it?
6          A.   It's a performance review form.
7          Q.   So is this your performance review?
8          A.   It appears that it is.
9          Q.   And do you remember filling out a
10    performance review at the end of 2010?
11         A.   I'm sure that I did.
12         Q.   All right.  Could you look at the top
13    of page 5277?  It states, "Key goal No. 1."
14              Do you see that?
15         A.   Yes, sir.
16         Q.   And it says, "Suspicious Order
17    Monitoring program, SOM, upgrade Phase II."
18              And did you write the text that
19    appears in this box?
20         A.   Yes.
21         Q.   All right.  And you state, "Lead a
22    cross functional team with the goal of enhancing
23    the program logic within SAP to accurately and
24    efficiently determine legitimacy of CS orders

Page 178

1     with minimum impact to the business while
2     maintaining DEA compliance."
3              And you write, "Overall objectives:
4     Utilize identified vendor to evaluate the
5     current system.  An evaluation will consider
6     Watson's approach of design, parameters
7     inherently unique to account types, and
8     validation process."
9              Do you see that?
10         A.   Um-hmm.  Yes.
11         Q.   So it says, "Evaluation will consider
12    Watson's approach and design."
13              What did you mean by that?
14         A.   That we would be utilizing a vendor,
15    Cegedim in this case, to come in and do an
16    assessment or an overall valuation of our
17    current system and our approach and design of
18    our system.
19         Q.   All right.  And "parameters
20    inherently unique to account types," do you have
21    an understanding of what that means?
22         A.   Likely the different -- differences
23    between different types of account types.  So
24    different types of customers, whether it's a

Page 179

1     large distributor, midsize distributor or, you
2     know... different class of trade.
3          Q.   When you use the term "class of
4     trade," what does that mean?
5          A.   Class of trade, is, you know, the
6     various different types of, of customers.  So
7     you might have a customer that is a midsize
8     distributor, a large distributor, a chain
9     distributor.  So it's just the differentiator
10    for the different types of business classes.
11         Q.   So would one class of trade be, as
12    you said, a large distributor?
13         A.   Um-hmm.  Yes.
14         Q.   Yes?
15         A.   Yes.
16         Q.   And then the last one there says
17    "validation process."
18              Then there is a bullet point, and it
19    states, "Based on evaluation, a report will be
20    generated that identifies any gaps and
21    recommended actions to ensure that the system is
22    statistically defensible in compliance" -- "and
23    compliant with DEA mandate."
24              Do you see that there?

Page 180

1          A.   Yes.
2          Q.   And then at the very bottom it
3     states, "Complete evaluation of current system V
4     DEA requirements and prepare executive summary
5     by 4/30, 2011.  Develop action plan and present
6     to management by 6/1, and implement system with
7     automated business system test environment by
8     end of fourth quarter."
9              Do you remember who set that schedule
10    for the Phase II of the upgrade of Watson's
11    Suspicious Order Monitoring program?
12         A.   It's likely myself, my manager.
13         Q.   Again, who was your manager?
14         A.   Scott Soltis.
15         Q.   All right.  So let's set this
16    document aside.
17              (Witness complies.)
18              (Napoli Exhibit 11, Customer Services
19         Agreement - Statement of Work No. 1,
20         Bates-stamped ALLERGAN_MDL_03535028 through
21         5030, marked for identification, as of this
22         date.)
23    BY MR. EGLER:
24         Q.   I'll hand you what we will mark as

Page 181

1    Exhibit 11.
2        (Handing.)
3        A.  Thank you.
4        Q.  Mr. Napoli, can you look at what I've
5    marked as Exhibit 11?  While you're looking at
6    it, I'll read into the record it's
7    ALLERGAN_MDL_03535028 through 5030.
8        When you're ready, when you're ready,
9    can you tell me what this appears to you to be?
10       (Document review.)
11       A.  Yes.  It's a Statement of Work from
12   Buzzeo PDMA, also known as Cegedim.  And it's to
13   conduct what we discussed in my, my goals and my
14   performance review to do an analysis of our SOM
15   program and discuss our approach, meet with IT
16   and compliance teams, discuss data, and the, the
17   current model and any improvements that can be
18   made.
19       Q.  So with regard to this Statement of
20   Work No. 1, do you know who would have -- who
21   would have, at Watson, negotiated this statement
22   of work with Buzzeo?
23       A.  Likely myself and Scott Soltis.
24       Q.  All right.  And what makes you think

Page 182

1    that?
2        A.  It was our, our project.
3        Q.  And so speaking generally about the
4    Buzzeo entity, I think you had said today that
5    you had worked with them previously in the
6    course of your work at Watson; is that right?
7        A.  Correct.
8        Q.  And as you think of it, did you work
9    with consultants other than Buzzeo that provided
10   similar services while you were at Watson?
11       A.  I mean primarily from a consulting
12   standpoint, we would utilize Buzzeo.  I'm trying
13   to think if there are any other...
14       There may have been another firm, but
15   I'm just drawing a blank right now.
16       Q.  Do you remember whether with regards
17   to the Phase II that you talked about in your
18   annual review for the Suspicious Order
19   Monitoring program at Watson, whether you
20   entertained bids or proposals from anyone other
21   than Buzzeo PDMA?
22       A.  Perhaps ValueCentric, but I can't be
23   100 percent sure.
24       Q.  So what do you know about

Page 183

1    ValueCentric?
2        A.  ValueCentric is another organization
3    that is in the business of providing data to the
4    pharmaceutical industry.
5        Q.  Can you think of a particular person
6    that you recognize as a contact at ValueCentric?
7        A.  No.
8        Q.  Do you know whether you were -- when
9    you were at Watson or Actavis, your group ever
10   contracted with the ValueCentric entity?
11       A.  My group did not.
12       Q.  Do you know if anyone at Watson
13   contracted with the ValueCentric entity?
14       MR. KNAPP:  Foundation.
15       A.  I believe sales and marketing may
16   have utilized their services.
17       Q.  Okay.  Anybody else that you know of?
18       A.  No, I don't.
19       Q.  All right.  So with regard to this
20   Statement of Work No. 1, it's marked as
21   Exhibit 11, who in particular, if anyone, at the
22   Buzzeo PDMA group did you negotiate with?
23       A.  Now when you say "negotiate," can you
24   expand on that, on that term?

Page 184

1        Q.  Okay.  So this document appears to me
2    to be signed by Mr. Soltis, I think, is it
3    July 28th, 2011?
4        A.  Um-hmm.
5        (Document review.)
6        A.  Yes.
7        Q.  So before that time, as the agreement
8    was coming together, is there anyone in
9    particular at Buzzeo PDMA that you worked with
10   to get a mutual understanding of the scope of
11   the project and the cost?
12       A.  Yeah.  Likely it was an individual
13   named Paul Hamby, H-a-m-b-y, and Bob Williamson,
14   common spelling.
15       Q.  And Mr. Hamby I think we mentioned
16   earlier today.
17       When did you first meet Mr. Hamby?
18       A.  Likely in the mid-2000s at a Buzzeo
19   conference.
20       Q.  How about Mr. Williamson?
21       A.  Same.  Mr. Caverly we talked about
22   earlier now.  This is the first introduction to
23   Paul, I believe.
24       Q.  All right.  All right.  You can set

Page 185

1    this document aside for now.
2        (Witness complies.)
3    BY MR. EGLER:
4        Q.   I'll hand you what we will mark as
5    Exhibit 12.
6        (Napoli Exhibit 12, Meeting Minutes
7        dated 9/8/11 ALLERGAN_MDL_02176488 through
8        6492, marked for identification, as of this
9        date.)
10   BY MR. EGLER:
11       Q.   And Mr. Napoli, can you look at what
12   I've marked as Exhibit 12?
13       And while you're looking at it, I'll
14   note for the record that it's numbered
15   ALLERGAN_MDL_02176488 through 6492.
16       When you're ready, can you tell me if
17   you recognize this document?
18       A.   I do recognize it.
19       Q.   What is it?
20       A.   It looks like a meeting minutes from
21   an initial meeting that we had with Cegedim
22   regarding the SOMS assessment.
23       Q.   So in the subject, on the first page,
24   page 88 states, "SOMS meeting system evaluation,

Page 186

1    Cegedim Dendrite," and it states "Thursday,
2    September 8th, 2011."
3        Do you remember this particular
4    meeting?
5        A.   I don't.
6        Q.   Can you, can you tell from the
7    context of this where this meeting would have
8    been held?
9        A.   Likely in our Parsippany office.
10       Q.   Do you remember having a meeting like
11   this with people from Cegedim Dendrite in
12   September 2011?
13       A.   Yes.
14       Q.   And there's a person there under
15   attendees, Robert C. Williamson.
16       Is that Bob Williamson -- Bob
17   Williamson that you were talking about before?
18       A.   Bob Williamson, yes.
19       Q.   And there's -- the name underneath
20   there Jonathan Kuhn, Ph.D.
21       Do you know Mr. Kuhn or Dr. Kuhn?
22       A.   Yes.  He's a statistician who worked
23   for Cegedim.
24       Q.   And then there are various people

Page 187

1    listed beyond there; Scott Soltis, Mary Woods,
2    Larry Schaffer, Justin Park, Laura Pinti, Sandra
3    Simmons, Lisa Scott, Lynn DaCunha, Jaydeep
4    Shukla, Rick Robbins, and Napoleon Clarke.
5        Did all those people that I just read
6    their names, did all those people work at
7    Watson?
8        A.   Yes.
9        Q.   All right.  I don't think we have
10   seen the name Jaydeep Shukla earlier today.  Who
11   is -- is it Mr. or Ms. Shukla?
12       A.   Jaydeep eventually joined our DEA
13   affairs team as an associate or a DEA compliance
14   specialist.
15       Q.   All right.  And then Rick Robbins,
16   who is Rick Robbins?
17       A.   Rick Robbins and Napoleon were both
18   in sales and marketing.
19       Q.   All right.  So -- and the front seems
20   to be a discussion of what is going on at the
21   meeting.
22       And the third entry down there, it
23   say, "Agenda," and then in parentheses, "Tom."
24       A.   Um-hmm.

Page 188

1        Q.   As you read this, do you know who
2    would have typed the text in there that appears
3    there?
4        A.   No.
5        Q.   Do you think it was you?
6        A.   No.
7        Q.   So it states, "Overview of
8    organization," and it says, "Anda not included
9    in the scope of this project."
10       What is Anda, as you understand it in
11   the context of Watson?
12       A.   Anda is a pharmaceutical distributor
13   that, when we acquired Andrx, they were a part
14   of that organization.  But they were treated as
15   a separate entity.  They weren't part of our --
16   when it came to compliance or anything, they
17   were a separate entity.
18       Q.   And then the next line down there, it
19   states, "Enable and sustain growth of our
20   business" and, dash, "$498 million of C/S
21   products sold in 2010 with top 5 products,
22   hydrocodone, oxycodone, fentanyl and
23   methylphenidate."
24       A.   Yes.

Page 189

1    Q.   And then in parentheses, "Concerta
2  P&G," close parentheses.
3        So there are, I think, four things
4  listed there.
5        But do you remember having a
6  discussion of Watson having $498 million of CS
7  products sold in 2010 and the top four products
8  being hydrocodone, oxycodone, fentanyl and
9  methylphenidate?
10   A.   It's entirely possible.
11   Q.   All right. And then the next entry
12 is, "Enable and sustain growth of business," and
13 then dash "security and compliance."
14       Do you have an understanding of
15 whether you said something like this at the
16 meeting and what you meant by it?
17   A.   What I would have meant by that is
18 to, you know, from a business perspective, to
19 support the business and -- but to make sure
20 that we do it in a secure and compliant manner.
21   Q.   All right. And then the next
22 statement is, "Systemic upgrade" and then it
23 says, "Take labor and subjectivity out of the
24 department."

Page 190

1        Do you remember whether you said
2  something like that at this meeting and what you
3  meant by it?
4    A.   It's possible.
5    Q.   What would you have meant by it?
6    A.   It meant that although we had a
7  compliant system, it was very labor intensive,
8  and we were looking to make enhancements to the
9  program that would sharpen the tool for us.
10 Maybe have we have a statistician there where --
11 to look at algorithms that were currently
12 developing with the, the advance of technology
13 itself, or to take a look at is there a way that
14 we could do this more efficiently to take some
15 of the labor intensivity out of it and to have
16 it autocalibrate.
17   Q.   So when you say "labor intensivity,"
18 as you think about the labor intensive part of
19 the Suspicious Order Monitoring System and
20 Watson around this time, mid to late 2011, what
21 was labor intensive about it?
22   A.   We pended a lot of orders in the
23 system that need to be reviewed.
24   Q.   And so as you think about it, what

Page 191

1  was your proposed means of reducing the labor
2  intensiveness of the system?
3    A.   Automation.
4    Q.   Would the automation replace -- let
5  me start over.
6        As I think of the system, there are
7  three basic parts; the SAP system, and then the
8  initial order management team consideration, and
9  the potential DEA team consideration.
10       So as you think about taking the
11 labor intensive part out of it, if those are the
12 correct stages of the system, which part are you
13 thinking of?
14   A.   Well, just to back up and clarify,
15 when I think of our SOM system, I don't think
16 just of SAP. I think of a holistic approach
17 that begins with the Know Your Customer
18 initiative and vetting.
19       And then we have the systemic
20 approach to it, which we're talking about, then
21 also the evaluation investigative aspect as
22 well, too, and the monitoring.
23       But in this aspect, we were talking
24 strictly about the automated aspect of the

Page 192

1  system, where although we had a compliant
2  system, it -- we wanted to, again, sharpen the,
3  you know, the sensitivity. So by -- and I'm
4  just putting this out there. If we looked at
5  six parameters, we wanted to -- maybe Buzzeo had
6  a statistical algorithm of like 12. Maybe we
7  could reduce the number, because we had an awful
8  lot of false positives in our system, so we
9  wanted to be more accurate and take -- and by
10 less labor, it means less false positives, less
11 time spent on reviewing orders that we didn't
12 need to have to. Because that was one of the
13 issues. We reviewed a lot of orders because we
14 erred on the side of being conservative. We
15 rather look at too many orders than not look at
16 enough.
17   Q.   So with regard to that issue and
18 trying to make the automated part of the
19 Suspicious Order Monitoring System more
20 accurate, is that a good word or --
21   A.   No, because it was accurate, but we
22 just wanted to make it more efficient.
23   Q.   More efficient.
24       Was there ever any consideration that

Page 193

1   the system wasn't pulling up enough suspicious
2   orders?
3          MR. LUXTON: Objection to form.
4      A.   The system wasn't pulling up
5   suspicious orders. The system was pulling up
6   orders of interest that were pending and it -- I
7   would not say it didn't pull up enough. I think
8   we pulled up a lot of orders that were, I would
9   say, false positives that we had to -- had to
10  work through.
11     Q.   Was there ever any consideration that
12  the Suspicious Order Monitoring System at Watson
13  around this time in 2011 was not pulling up or
14  not pending orders that were suspicious or would
15  be suspicious if examined?
16     A.   No.
17         MR. KNAPP: Objection to form.
18  BY MR. EGLER:
19     Q.   Was there ever any discussion of the,
20  for example, the Norco diversion issue and
21  whether the Suspicious Order Monitoring System
22  could be tuned to better examine issues raised
23  to the diversion of Norco?
24         MR. KNAPP: Form and foundation.

Page 194

1      A.   Not specifically. I mean, we already
2   looked at hydrocodone as a molecule, which would
3   include Norco.
4      Q.   Was there any discussion of whether
5   to add more variables or data to examine the
6   known diversion issues with the hydrocodone
7   molecule?
8      A.   Again, known diversion issues -- what
9   known diversion issues are you talking about?
10     Q.   So we are talking about the Exhibit,
11  I think, 8 before, the email...
12         (Document review.)
13  BY MR. EGLER:
14     Q.   What we marked as Exhibit 8, there is
15  a statement from Mr. Herrera that says, "The
16  agents were" -- "that were interested were from
17  the San Diego field office, and there was a
18  presentation by SD County prosecutor that keyed
19  on the diversion wave in SD, especially Watson
20  hydro and Norco really hard."
21         Do you remember, and this is
22  April 2010, do you remember in 2011 when
23  recalibrating the Suspicious Order Monitoring
24  System at Watson, whether there was ever any

Page 195

1   discussion of finding data or variables that
2   would help to track diversion in, say, San Diego
3   County, California?
4      A.   No. Our system designed for our SOMS
5   program was in accordance with the DEA
6   regulations for us to identify or that deviated
7   in size, pattern or frequency with, with our
8   trading partners, with our partners. That's
9   what it was geared towards.
10     Q.   The DEA didn't instruct registrants
11  on the formulas or algorithms they were to use
12  in constructing their Suspicious Order
13  Monitoring systems; is that right?
14     A.   That's correct.
15     Q.   And was there any consideration at
16  Watson at this time after having been told by
17  the San Diego field office of the DEA that there
18  was a diversion wave in San Diego that there
19  should be some analysis of how to account for
20  that wave or analyze it or anything?
21         MR. KNAPP: Objection to form. Asked
22  and answered multiple times.
23     A.   And I'll state that, you know, you're
24  basing this premise on someone's version of what

Page 196

1   they say they heard in a conversation with, with
2   someone from San Diego.
3          There was no official communication
4   from anyone in California or San Diego to us as
5   an organization about a wave. So this is
6   someone's -- you're taking someone's
7   interpretation of an event that they went to.
8      Q.   Did you --
9          MR. LUXTON: Sorry to interrupt, but
10  some of the people on the phone notified me
11  that they are having a real tough time
12  hearing, so I wanted to slide this over, if
13  you don't mine, a little.
14         THE WITNESS: Yeah. Sure.
15         MR. KNAPP: If you can just try to
16  keep your voice up.
17         THE WITNESS: Sure.
18         MR. KNAPP: Thanks.
19  BY MR. EGLER:
20     Q.   With regard to the, the DEA field
21  office and the DEA in general, Watson provided
22  the -- the -- I can't remember the name.
23         What are the fake pills?
24     A.   Placebo.

## Page 197

1    Q.   Watson provided the placebo pills to
2  the DEA as part of their processes; is that
3  right?
4    A.   Right.
5    Q.   And when you or whoever at Watson
6  talked to the DEA agents, did you get an
7  understanding of why they were asking for
8  placebo Norco pills?
9    A.   If they requested Norco, yes.
10   Q.   What was your understanding of why
11 they were asking for placebo Norco pills?
12   A.   To perform a reverse buy because of
13 an illicit diversion.
14   Q.   Did the Suspicious Order Monitoring
15 System at Watson ever take into account the
16 issues raised by the DEA in seeking the placebo
17 pills?
18   A.   Can you clarify?
19        MR. KNAPP:  Objection to form.
20 BY MR. EGLER:
21   Q.   Do you know why the DEA was asking
22 for the placebo pills?
23   A.   I just explained that.
24   Q.   Can you say it again?  I just --

## Page 198

1    A.   They were looking to do a reverse buy
2  because of illicit activities with product.
3    Q.   So did you ever ask the DEA what the
4  illicit activities that the DEA thought were
5  going on were?
6    A.   The DEA nor any law enforcement
7  agency is going to share any active
8  investigation details with you.
9    Q.   After the DEA requested the Norco
10 placebo pills, did you do any media analysis or
11 court docket analysis to determine whether
12 Watson's drugs were part of an indictment or
13 bust or publicized investigation anywhere in the
14 country?
15   A.   As part of our, our security
16 department's charge, we obviously would monitor
17 the federal register or media for any type of
18 appearance of our product that involved in any
19 type of activities.
20   Q.   But particularly, after the DEA asked
21 you for the fake pills, the placebos, did you
22 ever try to follow up in the media or court
23 records to determine if they busted somebody for
24 trying to buy the pills?

## Page 199

1        MR. KNAPP:  Objection to form.  Asked
2  and answered.
3    A.   I don't recall.
4    Q.   Did you ever instruct anyone to go
5  keep this on a tickler file to see if anything
6  ever came up about it?
7    A.   We had a proactive posture as it was,
8  so we continually monitored for these type of
9  activities.
10   Q.   Do you remember ever finding anything
11 out about it?
12   A.   Not about this particular case.
13   Q.   Well, do you know whether all the
14 pills that the DEA got from Norco or got from
15 Watson, all the placebo pills were used in one
16 case?
17   A.   I don't know.
18   Q.   As you think about it over, say, 2010
19 and 2011, do you have an understanding of how
20 many bottles of placebo Norco Watson supplied to
21 the DEA?
22   A.   I don't, but it wouldn't -- it wasn't
23 a lot.  We didn't get a -- it wasn't a high
24 volume of requests that we got.  And a request

## Page 200

1  would not be solely for Norco either.  So it
2  could be any particular product.
3    Q.   But you are aware that the DEA was
4  asking for placebo pills of Norco, right?
5    A.   Right.  I think it was ten bottles.
6    Q.   And when you met with Buzzeo, the
7  Buzzeo people, did you ask if there was a way
8  that you could tune the Suspicious Order
9  Monitoring System to examine any diversion
10 issues with regard to Norco?
11   A.   When you say "diversion issues,"
12 where, where I'm trying to get an understanding
13 is "diversion" is kind of a blanket term.
14 There's different types of diversion.  You can
15 have a cargo theft.  You can have a loss in
16 transit.  You can have a theft.  You can have a
17 non-righteous prescription.  So you -- it's kind
18 of a broad term that you're using.
19        So what we did was, with our
20 Suspicious Order Monitoring program, is that we,
21 we designed our system, as many other
22 registrants did, to ensure that we are meeting
23 our compliance under the Code of Federal
24 Regulations, under our corresponding

1    responsibility, which was the relationship
2    between us and our direct customer.  And, again,
3    our Know Your Customer aspect of our, of our
4    program dealt with getting more into who their
5    customers were, what the usages were, as well as
6    any type of follow-up investigative work.  But
7    as far as the expectation for a SOMS program, to be
8    able to reach that far down into the supply
9    chain is just not realistic.
10   Q.   Well, Watson reached that, reached
11   that far down into the supply chain to examine
12   whether orders should be cleared; is that right?
13   A.   We reached down to the distributor
14   level.  And if the distributor level did not
15   have a satisfactory data for us, we could -- we
16   would ask them for the third-party information
17   as to who they were distributing to.  So that
18   was all done with our direct customer.  We
19   weren't reaching out to individual pharmacies.
20   Q.   There were instances when Watson's
21   customer service group reached out to the sales
22   and marketing people for market data to
23   determine whether pended orders should be
24   cleared; is that right?

1    MR. LUXTON:  Objection to form.
2    A.   It's possible depending on the
3    circumstance.
4    Q.   But it's your understanding that
5    there was never an official policy that would
6    reach out to the sales and marketing people to
7    incorporate market-based data to determine
8    whether an order should penned; is that right?
9    A.   Right.
10   Q.   So, for example, the IMS data that,
11   that Watson bought that gave a view of a -- the
12   entire market of a generic opioid drug, that was
13   never incorporated into Watson's or Actavis's
14   Suspicious Order Monitoring System, the
15   automated part; is that right?
16   MR. KNAPP:  Foundation.
17   MR. LUXTON:  Foundation.
18   A.   I'm not an expert on IMS data.  I do
19   know that there are limitations to that data.
20   It's retrospective as well as I don't know if
21   you can get as granular as to what you may be
22   indicating.  So I can't, I can't really speak to
23   that as an expert.
24   Q.   The Suspicious Order Monitoring

1    System, as you understand it, typically uses
2    retrospective data; is that right?
3    A.   We're actually basing a current order
4    based on a six-month history.
5    Q.   Right.
6    So the six-month history is
7    retrospective; is that right?
8    A.   Yeah, to an extent.  But it's, it's
9    giving you a current snapshot of what the, the
10   average looks like.
11   Q.   An average of the past six months?
12   A.   Right.
13   Q.   And do you know how current the IMS
14   data that was available to Watson in, say, 2010
15   going forward was?
16   A.   I don't.  And, again, I'm -- just to
17   reiterate, I'm not an IMS expert.  I don't have
18   a lot of breadth of knowledge with the topic.
19   Q.   Do you remember ever asking anybody
20   at Watson or anywhere else about what the
21   currentness of any IMS data that would be
22   available would be?
23   A.   No.  I know IMS data was used for
24   product launches.  It was used for, you know,

1    trying to estimate market share.  Or if you're
2    potentially launching a product, what your
3    anticipated launch.  You know, it sometimes was
4    used to support a quota request, but not
5    necessarily -- we didn't use it as part of our
6    SOMS program.
7    Q.   So who at Watson was in charge of the
8    quota request?
9    A.   I was involved with quota request.
10   Q.   So you would have been -- in the
11   course of your work, you would have encountered
12   IMS data; is that right?
13   A.   But when you talk about IMS data,
14   there's all different types of data.  So this,
15   you know, if it was a quota request, if it was
16   for something like a launch, sales and marketing
17   would provide us justification and that, based
18   on data, they anticipate capturing this much of
19   a market, for example, of a product.
20   Q.   So where that DEA quota is
21   established, typically annually?
22   A.   Yes.
23   Q.   And as part of the analysis that you
24   would do at Watson, would you examine IMS data,

Page 205

1    say, for -- let me start over.
2         As you think about the annual
3    analysis that you did for the generic opioids at
4    Watson, would that involve looking at the IMS
5    data across the various NDAs for a particular
6    molecule to establish Watson's deserved level of
7    quota?
8         A.   Are you talking about ours against
9    others or --
10        Q.   Yes.
11        A.   No.
12        Q.   Would you look at the entire market
13   for a particular molecule?
14        A.   No.  It's part of the quota request
15   process that, you know, that's not something DEA
16   would consider.  The DEA would, would grant your
17   quota request based on your historical sales and
18   nothing to do with anybody else's in the market,
19   so it would not be relevant.
20        Q.   What would you use the IMS data for
21   then?
22        A.   For -- if you wanted to make a DEA
23   request for quota and it's -- maybe it's a new
24   product, so you don't have any sales history,

Page 206

1    but you're estimating that we're going to launch
2    this generic version of this product that's
3    currently marketed by pharmaceutical company
4    ABC, okay?  So there is market data.  So if this
5    is the brand and these are the total
6    prescriptions, we anticipate that a generic
7    could possibly take 80 percent of that market.
8         So if the total prescriptions for
9    this, for this molecule, or this product in this
10   case, represents this number, that then we would
11   do an exercise based on that to determine how
12   much active material we would need to produce
13   quantities for launch and post-launch quantities
14   to have inventory on hand.
15        Q.   So with regard to the data that you
16   would buy from IMS for this, was there ever, as
17   you know, as far as you know, any restrictions
18   put on the use of the data?
19        A.   Again, I, I didn't extensively use
20   IMS data, and I was not involved of any type of
21   interaction with IMS or the purchase of the
22   data.  Any data that I received was really just
23   as I articulated and provided by sales and
24   marketing.

Page 207

1         Q.   As you think about the launching of
2    these generics that you're talking about, about
3    how many times did you do it when you were in
4    charge of the DEA affairs group at Watson and
5    then Actavis?
6         MR. KNAPP:  Form.
7         A.   How often did we launch a product?
8         Q.   Well, about how many times, yeah.
9         A.   It's hard to quantify, but it was not
10   a typical activity in my department.
11        Q.   More than once a year?
12        A.   Once a year, if that.
13        Q.   So with regard to the IMS market data
14   that would be collected, if the drug -- let me
15   start over.
16        With regard to the IMS market data
17   that would be collected by Watson, would Watson
18   use that data to inform its Suspicious Order
19   Monitoring System if the drug was approved?
20        So if Watson -- I'll ask this
21   differently.
22        A.   Okay.
23        Q.   If Watson was granted part of the
24   quota by the DEA and was allowed to market a

Page 208

1    particular drug under that quota, would Watson
2    use the IMS data that it had purchased in
3    furtherance of the quota request to inform its
4    algorithms and formulas in the Suspicious Order
5    Monitoring System?
6         MR. LUXTON:  Objection to form.
7         A.   If you're -- if you're talking about
8    a new product launch, we would receive data
9    from, not necessarily IMS data, but based on
10   from our sales and marketing folks as far as
11   what we can expect as potential quantities based
12   on their interactions with customers.  We would
13   receive estimates on, on that.
14        Q.   So the market would reach -- let me
15   start over.
16        So the data that you would seek out
17   with regard to a new product launch would relate
18   to the demand for the particular Watson generic?
19        Is that right to say?
20        A.   Right.
21        Q.   And not for the demand for the, the
22   comparable NDC-coded generics?
23        A.   You lost me there.
24        Q.   So -- and I appreciate you taking the

Page 209

1   time with me.
2        A.   Yeah, not a problem.
3        Q.   So what's your understanding of an
4   NDC code?
5        A.   National Drug Code is a number that,
6   a unique number that is established and produced
7   by the FDA for a particular drug.  And it
8   indicates the manufacturer, the labeling code,
9   the quantity and fill size of a product and the
10  strength.
11       Q.   Right.
12            So if it was -- so an NDC code would
13  say, for example, it was a bottle of a 100
14  pills, 20 milligrams each of a particular drug;
15  is that right?
16       A.   Right.
17       Q.   Did you or anyone at Watson ever seek
18  out complimentary NDC codes -- let me start
19  over.
20            Did you or anyone at Watson ever seek
21  out IMS data to complimentary NDC codes when
22  launching a particular generic opioid?
23            MR. KNAPP:  Objection.  Foundation.
24            MR. LUXTON:  Objection.

Page 210

1   BY MR. EGLER:
2        Q.   To inform the Suspicious Order
3   Monitoring System?
4            MR. KNAPP:  Same objection.
5        A.   I'm still trying to grasp here.
6            Looking at IMS data for the innovator
7   or the brand product are you talking about?  Or
8   for what?
9        Q.   Well, as I'm thinking about it, for
10  any complimentary NDC code.  So if there is a
11  brand version that's 100 pills of 20 milligrams
12  each and then if there is a generic version of
13  100 pills, it's 20 milligrams each, did you ever
14  seek that type of data out to inform the SOM
15  program?
16       A.   Well, the -- like I said, the
17  information we received in regards to if we're
18  talking about a product launch here is, again,
19  we're going to make our case to the DEA for
20  quantities that we need, and we're going to
21  establish what launch quantities would be.
22  These launch quantities are based on what our
23  customers' needs will be.
24            So they are going to articulate to

Page 211

1   us, that, hey, we buy -- and this -- this is a
2   process that we would, you know, our marketing
3   folks would meet with these folks.  This is what
4   we currently do in the brand, and we're going to
5   be replacing probably 80 percent or whatever, 50
6   percent of that with your product.
7            So that's basically where these
8   numbers are established as to what we can expect
9   as what that customer's order behavior is going
10  to be.
11            And what we would do in our SOM
12  system is we would receive this data, and what
13  we would do for any type of new product or even
14  an NDC code change is we would essentially put
15  the SOMS program on pend everything.  Because we
16  wanted to pend every single one of their orders
17  going forward for at least six months to say,
18  okay, to make sure that they're ordering
19  patterns were righteous with what they're
20  telling us in order to, in order to establish a
21  baseline of normal ordering behavior prior to
22  putting the system into the -- into the current
23  system.
24       Q.   Do you remember whether you or anyone

Page 212

1   you knew of at Watson ever did an analysis to
2   determine whether the initial demand from any of
3   your customers was due to improper ordering or
4   improper delivering so that the initial demand
5   was improperly high?
6            MR. LUXTON:  Objection.  Form.
7        A.   Like I said, we did analysis of what
8   their current, their current business is.  These
9   are all customers, most -- they're not new
10  customers.  These are customers that are
11  existing that we've done due diligence on, that
12  we have a -- we maintain a relationship with
13  them and that we have conversations with about
14  these types of activities.
15            And so we have a certain comfort
16  level that our -- you know, that having these
17  strong customer relationships that, you know,
18  and that they have a history of doing the right
19  thing.
20            But we'll also look at what customers
21  that they are going to distribute to.  That is
22  all part of the process.
23       Q.   Do you remember whether Agent
24  Rannazzisi ever warned registrants to examine

1    initial levels of orders by pharmacies or
2    distributors to determine whether the initial
3    level of a new customer was improperly high?
4        A.   I don't know if Deputy Administrator
5    Rannazzisi offered that information.  That's
6    something that we would have done anyway as just
7    part of our due diligence.
8        Q.   And how would you have done that?
9        A.   As I just detailed.
10       Q.   Okay.  Anything else that you can
11   think of?
12       A.   No.
13       Q.   All right.  And going back to this
14   Exhibit 12, I think we were on page 2.
15       A.   Okay.
16       Q.   There's -- throughout this document,
17   there is a reference to a person named Bob.
18            Is that Robert Williamson?
19       A.   Yes, sir.
20       Q.   All right.  And here it says -- we
21   were talking about your discussion or your
22   presentation on the first page.
23       A.   Um-hmm.
24       Q.   And on the second page of the

1    document, it says "Bob's overview DEA."  And I
2    had asked you this before.
3            This isn't your writing here,
4    correct?
5        A.   Right.
6        Q.   This description of Bob's overview?
7        A.   Correct.
8        Q.   It says, "DEA plays by their own
9    rules.  Shoot first and ask questions later.
10   They have a tendency to interpret the regs the
11   way they want to and have been successful being
12   aggressive against companies.  Bob requested a
13   list of all our customers from Napoleon,
14   discussed customers, and would like a list of
15   all our List 1 chemical customers."
16            In the context of your work, what
17   does the term "List 1" mean?
18       A.   A List 1 chemical is a chemical that
19   can be a precursor or a chemical entity that's
20   used in the manufacture of a product like a
21   pseudoephedrine, ephedrine.  These List 1
22   chemicals can also be diverted and used in the
23   illicit manufacture of methamphetamine,
24   therefore DEA controlled or regulated those

1    schedule listed chemical products.
2        Q.   And then going down to No. 5, it says
3    "OMS and SOMS."
4        A.   Um-hmm.
5        Q.   Oh, but going back to that No. 2 --
6        A.   Sure.
7        Q.   -- do you remember ever having a
8    discussion with Bob about whether the DEA plays
9    by their own rules and she shoot first and ask
10   questions later?
11       A.   No.
12       Q.   All right.
13       A.   Bob is -- was a former senior member
14   of DEA.  That's purely his opinion.
15       Q.   All right.  So I think going to the
16   next page, No. 7, Bob's discussion again, it
17   says, "DEA wants performance-based approach,
18   statistically defendable model, uses language
19   and regulations, September 2011 letter.  No
20   clients ever called Bob's organization
21   questioning the SOMS program."  K
22            That sentence there, "No clients ever
23   called Bob's organization questioning the SOMS
24   program," do you have an understanding of what

1    that means?
2        A.   I think it's Bob stating that their
3    product is statistically defensible and also
4    that, you know, Bob's selling a product as well.
5        Q.   Okay.  Can you turn to -- it's the
6    last page of the exhibit.  It's 6492.
7        A.   Yes.
8        Q.   And it states, "Orders:  How many
9    ways are orders are placed?  EDI, Electronic
10   Data Intercheck."
11            In the context of your work, do you
12   know what that term means?
13       A.   It can be an order that's placed in
14   an automated fashion with -- within the system.
15   So maybe one SAP system talking to another
16   business's in the electronic data exchange.
17       Q.   All right.  So then down on No. 17,
18   it says "Path forward, evaluation 10 working
19   days.  Bob reviews everything with Ron Buzzeo.
20   All communication will go to Tom and Scott.
21   They recommended that SOMS and compliance
22   regulation is tied into legal.  And future
23   compliance, remove labor intensity and
24   automation."

Page 217

1      Do you remember having that
2   discussion during this meeting?
3      A.  I don't specifically.  It was a while
4   ago, but I'm sure it took place.
5      Q.  All right.  You can set that document
6   aside.
7          (Napoli Exhibit 13, Document entitled
8          "Controlled Substance Awareness:
9          Understanding the Threat," Bates-stamped
10         ALLERGAN_MDL_02054999 through 5022, marked
11         for identification, as of this date.)
12  BY MR. EGLER:
13     Q.  I'll hand you what we will mark as
14  Exhibit 13.  Can you look at Exhibit 13?  And as
15  you're looking at it, I'll read into the record
16  that the first page -- well, the first page has
17  no Bates numbers on it, but starting on the
18  second page, it's ALLERGAN_MDL_02054999 through
19  5022.
20         Mr. Napoli, when you're ready, will
21  you tell me if you recognize the presentation
22  that appears after the first page of this
23  Exhibit 13?
24     A.  I recognize it.

Page 218

1      Q.  What is it?
2      A.  This is a security awareness
3   presentation that I put together to talk about
4   to our security managers, our operations
5   management, and our employees.  Because part of
6   our security program was security awareness, we
7   wanted to have conversations with our employees
8   about that drug diversion does exist and to talk
9   about some of these instances and also to
10  identify ways in which we can continually, you
11  know, raise the awareness of employees so we can
12  focus on ensuring that we have effective
13  controls in place to, to mitigate the loss of
14  any of these products.
15     Q.  Okay.  With regard to this document,
16  it states "date created," on the first page,
17  "February 2009" and "date last modified,
18  August 2011"?
19     A.  Okay.
20     Q.  And it also states it's from your
21  custodial file.
22         Do you remember using this document
23  around 2011?
24     A.  I don't specifically, but it's

Page 219

1   possible.
2      Q.  I think you said that this
3   typically -- or this would be a presentation
4   that you would typically give to employees
5   internally; is that right?
6      A.  Management supervisors, as well as
7   security.  And, again, it was to raise the level
8   of understanding of the, you know, of the
9   threats around controlled substance products in
10  general.
11     Q.  So with regard to this document, can
12  you turn into the document to page 004 where it
13  says "Organizational overview"?
14         (Witness complies.)
15     A.  Yes.
16     Q.  And I think we had talked about a
17  number of people that appear on this
18  organizational chart.  And your name appears on
19  the far left-hand side; is that right?
20     A.  Correct.
21     Q.  And where, if anywhere, on this is
22  the -- would the Suspicious Order Monitoring
23  System at Watson around this time, 2011, be
24  placed?

Page 220

1      A.  Controlled substance compliance U.S.
2      Q.  So that is underneath you; is that
3   right?
4      A.  Yes.
5      Q.  And then with regard to the Mark --
6   is it Buban?
7      A.  Buban.
8      Q.  Buban?
9      A.  Um-hmm.
10     Q.  That's B-u-b-a-n.  Manager, security
11  and product protection Salt Lake City?
12     A.  Um-hmm.
13     Q.  Do you remember what products Watson
14  made in its Salt Lake City facility?
15     A.  Salt Lake City had a broad portfolio.
16  And I, I couldn't speak to the non-controls, to
17  be honest with you.  It was not my -- my focus
18  was on the controlled drug.  But from a
19  controlled drug standpoint, as we talked about
20  before, testosterone, fentanyl transdermal and
21  methylphenidate transdermal.
22     Q.  So the next page, 005, it states, "We
23  manufacture controlled substances that are among
24  the most commonly," and then colon, it states,

Page 221

1  "prescribed for legitimate medical need in the
2  U.S. and encountered by law enforcement on the
3  street."
4       I think we talked about that earlier;
5  is that right?
6       A.  Yup.
7       Q.  And going to page 007, it says,
8  "hydrocodone" and then in parentheses, "see
9  Roman numeral 3."
10       Is that right?
11       A.  Correct.
12       Q.  It says, "Street names:  Vikes,
13  Hydro and Norco"?
14       A.  Um-hmm.
15       Q.  And then you write, "In 2006, DEA
16  documented the diversion of millions of dosage
17  units."  And then you write, "The United States
18  consumes 99 percent of the global hydrocodone
19  supply."
20       Why did you write that on here?
21       A.  Which statement?
22       Q.  Well, let's go through the three of
23  them.
24       The street name?

Page 222

1       A.  So we're trying to familiarize our
2  security team members, as well as supervisors
3  and managers, about the illicit use of these
4  products.  You know, our products are developed
5  and marketed for -- to reduce legitimate pain in
6  those in suffering, but also there is a
7  percentage of products that are -- that wind up
8  in illicit markets.  And we're just providing
9  insight to our employee -- our members of
10  management, supervisors, and security folks
11  about the illicit side.
12       Q.  You write -- and this is 2011, I
13  think, when this is written.
14       A.  Um-hmm.
15       Q.  "In 2006, DEA documented the
16  diversion of millions of dosage units."
17       Why did you write that?
18       A.  Just to convey the magnitude of some
19  of the issues that are going on.
20       Q.  All right.
21       And the next one is, "The United
22  States consumes 99 percent of the global
23  hydrocodone supply."
24       A.  Right.

Page 223

1       Q.  Why did you write that?
2       A.  To put it in perspective as well.
3       Q.  And of that, United States, I think
4  you had said before, Watson, had -- is it 25
5  percent of the quota in its Corona, California,
6  plant; is that right?
7       A.  Yes.
8       Q.  So and then the next page, 008, it's
9  oxycodone CII.  Street names:  OC, OX, Oxy?
10       A.  Um-hmm.
11       Q.  And it says, "Popular among heroin
12  users for alleviating effects of withdrawal and
13  considered a white-collar addiction because of
14  the perceived product safety."
15       Do you remember why you wrote that
16  text in there?
17       A.  Again, for employee awareness.
18       Q.  And the next page talks about
19  employee theft.
20       But then moving down onto -- I'm
21  sorry.  Page 17 or page 017 in the exhibit.
22       It states, "As management, we must,"
23  and the first one is "foster a work environment
24  that engages employees to prevent loss and

Page 224

1  removes the opportunity for theft" --
2       A.  Um-hmm.
3       Q.  -- "and then ensure that employees
4  understand what their role is in the prevention
5  of loss, consistently comply with the
6  established policies and procedures and
7  obligation to report diversion and suspicious
8  activity."
9       Do you remember why you wrote that
10  down, "obligation to report diversion and
11  suspicious activity"?
12       A.  Because it is a DEA requirement
13  within the Code of Federal Regulations, and we
14  wanted to ensure compliance.
15       Q.  All right.  You can set this document
16  aside.
17       (Witness complies.)
18  BY MR. EGLER:
19       Q.  I'll hand you what we will mark as
20  Exhibit 14.
21       (Napoli Exhibit 14, NJPIG letter
22  dated 7/20/11 from NJPIG Committee to
23  Rannazzisi, Bates-stamped
24  ENDO-OPIOID_MDL-02219848 through 19851,

Page 225

1    marked for identification, as of this
2    date.)
3    BY MR. EGLER:
4        Q.   Mr. Napoli, could you look at what we
5    marked as Exhibit 14.  And as with the prior
6    exhibit, I can remember which one, I'll just
7    tell you this didn't come from the Allergan
8    production.
9        A.   Okay.
10       Q.   That's why the bottom right-hand
11   corner numbers are different.
12       A.   Okay.
13       Q.   It states ENDO-OPIOID_MDL-02219848
14   through 19851.  But could you look at this
15   document and tell me if you recognize it?
16           (Document review.)
17       A.   I do recognize the document.
18       Q.   What is this document?
19       A.   This looks like a letter that we sent
20   on behalf of the New Jersey Pharmaceutical
21   Industry Group to Deputy Administrator Joe
22   Rannazzisi.  And it was about significant issues
23   that were going on around this time frame with
24   delays in receiving quota grants that were

Page 226

1    impacting the manufacturers to be able to, to
2    manufacture and ensure that there were adequate
3    supplies for those patients in need of the
4    products.
5        Q.   So when you that term "delays in
6    receiving quota grants" --
7        A.   Sure.
8        Q.   -- what does that mean?
9        A.   It means that, you know, when -- when
10   -- there's is a couple aspects to it.  So when
11   we talked before about the aggregate quota and
12   also receiving manufacturer procurement quotas
13   and procurement quotas are more relevant to the
14   manufacturers of solid-dose products, there are
15   established timelines within the DEA regulations
16   that they have to meet, that they're obligated
17   to meet to communicate the grants of
18   quota-driven materials to industry.
19           And, for example, these -- there is a
20   midyear adjustment as well as the towards the
21   latter part of the year, you'll receive a grant
22   for the next calendar year.  And the DEA was
23   consistently not coming close to meeting these
24   obligations.

Page 227

1        And by receiving these grants in a
2    delayed manner, it would impact the company's
3    ability to, if you don't understand what, what
4    quota that you're receiving, you can't plan your
5    manufacturing campaigns effectively and your
6    manufacturing plants to be able to manufacture
7    your product.
8            When they talk about the procurement
9    process, the procurement quota process taking
10   nine weeks or more, again, that was a process
11   that would typically -- throughout the year, a
12   DEA registrant based on sales, you can go back
13   to the DEA and request more quota if it
14   justifies.
15           Those types of requests were taking a
16   protracted amount of time.  Again, that was
17   affecting the supply chain as well and the
18   manufacturing process.
19           So essentially, this, this letter
20   was, you know, an appeal to deputy administrator
21   for us to try to identify a way where we can
22   work on, you know, enhancing or improving these
23   timelines.
24       Q.   Do you remember with regards to this

Page 228

1    letter seeing it when it was in draft form?
2        A.   Excuse me?
3        Q.   Would you have seen this letter
4    before it was sent, while it was in draft form?
5        A.   I would have seen it and I'm sure our
6    attorneys would have seen it as well.
7        Q.   I was going to ask you that next.
8            Well, let me get a little bit more
9    general.
10       A.   Sure.
11       Q.   This letter is dated July 20th, 2011;
12   is that right?
13       A.   Yes.
14       Q.   And at this time, July 2011, were you
15   still involved in the New Jersey Pharmaceutical
16   Industry Group on behalf of your then employer
17   Watson?
18       A.   Yes.
19       Q.   Was anyone else from Watson involved
20   in the New Jersey Pharmaceutical Industry Group
21   at that time?
22       A.   I was the main person.
23       Q.   And so if this letter was sent in
24   draft to the company representatives, you would

Page 229

1    have received it; is that right?
2        A.   Correct.
3        Q.   So when -- as you think about your
4    general processes or unless you have a
5    particular memory, when you would have received
6    the draft of this letter, what would you have
7    done with it?
8        A.   I would have reviewed the letter
9    first, and I would have likely reviewed it with
10   my boss and also have either had a meeting or
11   sent it to our legal folks to review.
12       Q.   Do you remember in particular with
13   regard to this letter, having a meeting with the
14   legal staff at Watson about it?
15       A.   I don't remember a specific meeting.
16       Q.   And do you remember -- do you have a
17   particular memory of responding to the NJPIG
18   about Watson's official opinion with regards to
19   this letter?
20       A.   I don't.
21       Q.   Okay.  At the end of this letter,
22   there is the signature block, for lack of better
23   term.  It says "NJPIG committee."
24           Do you see that there?

Page 230

1        A.   Yes.
2        Q.   And there is a person from Novartis,
3    Noramco, Purdue, Reckitt Benckiser?
4        A.   Benckiser.
5        Q.   Benckiser.
6            And Halo Pharmaceuticals, right?
7        A.   Um-hmm.
8        Q.   Do you know why that subgroup of
9    people from the NJPIG committee were listed
10   here?
11       A.   Those individuals served as kind of
12   the core committee for the organization itself.
13   I don't want to use the term "officers of the
14   committee," but that could can be interpreted in
15   that way.
16       Q.   And one of those people is your
17   former co-employee Tracey Hernandez, right?
18       A.   That's correct.
19       Q.   So do you remember talking with her
20   about this letter?
21       A.   No.
22       Q.   The company that she worked for at
23   this point, Reckitt --
24       A.   Benckiser.

Page 231

1        Q.   -- Benckiser, do you know whether
2    they made opioids?
3        A.   I don't.  I don't know the first
4    thing about them.
5        Q.   Okay.  So going back to the first
6    page of this letter, do you remember anyone from
7    Watson -- let me start over.
8            Do you remember if anyone from Watson
9    ever told you that this letter was not
10   appropriate to send to Deputy Assistant
11   Administrator Rannazzisi in July of 2011?
12       A.   Not to my knowledge.
13       Q.   And do you remember anybody saying
14   that it was appropriate to send?
15       A.   I don't have a specific memory.
16       Q.   Do you remember anyone from Watson
17   having any edits to the letter --
18       A.   Not that I'm --
19       Q.   -- to the draft?
20       A.   Not that I'm aware.  Sorry.
21       Q.   All right.  Now do you remember
22   anyone from Watson ever commenting that beyond
23   the quota issues that are raised here, there
24   should be other issues raised to Deputy

Page 232

1    Assistant Administrator Rannazzisi around this
2    time frame, July 2011?
3        A.   I don't recall any specific issues.
4        Q.   So this letter talks about quotas; is
5    that right?
6        A.   Yes, sir.
7        Q.   And let's start off broadly.
8            From the time you started in your DEA
9    affairs position at Watson and through the time
10   you left Actavis, did the quota on any Schedule
11   II controlled substance granted Watson or
12   Actavis go down?
13       A.   I would say by the -- prior to me
14   leaving the organization?
15       Q.   Yes.
16       A.   I definitely think that -- I believe
17   some of the opioids quota went down.
18       Q.   Do you have a particular memory of
19   any particular opioid that went down?
20       A.   I'm -- and, again, I don't have the
21   numbers in front of me.  Those can be easily
22   found in the federal register.  But I think that
23   there were -- in some of the years where DEA
24   focused on aggressive enforcement, I believe

Page 233

1    that you, you probably saw hydrocodone either
2    stayed the same or maybe go down, but I, but I
3    can't swear to that.
4        Q.   As you think of it, was any reduction
5    in quota for an opioid at Watson or Actavis
6    while you were there the result of
7    company-specific activities or non-activities,
8    or were they related to the entire molecule
9    market?
10           MR. LUXTON:  Objection to form.
11           MR. KNAPP:  Objection to form and
12       foundation.
13       A.   So when I just spoke about
14   reductions, I'm, I'm speaking of the aggregate,
15   so that's everybody's.  So as far as Watson's
16   quota, I don't recall having reduced -- our
17   quotas reduced.  I mean, our quotas were
18   commensurate with what our sales were.  It was a
19   direct relationship there.  And I think, you
20   know, there were times I think where our, our
21   quota needs went down.
22       Q.   When Watson's quotas needs went down,
23   was their quota reduced?
24       A.   It wouldn't be reduced.  It would

Page 234

1    just be -- well, organically it would be reduced
2    because we would request less.  It wasn't an
3    action taken by DEA to take back your quota, is
4    what I'm saying.
5        Q.   So do you remember making a smaller
6    quota request on any particular opioids in the
7    time that you worked at Watson or Actavis?
8        A.   I do.
9        Q.   Can you tell me about it?
10       A.   Oxycodone.
11       Q.   Do you remember what year that was?
12       A.   It would post 2012.
13       Q.   All right.  Any other ones?
14       A.   Not that I recall.
15       Q.   So oxycodone, is that a generic name
16   for a brand-name opioid?
17       A.   Oxycodone is the molecule, so it's
18   the active ingredient which can be used in
19   combination products, such as in combination
20   with acetaminophen or aspirin.  It could also be
21   a single-entity product, such as like an
22   OxyContin type of product.
23       Q.   Do you remember whether Watson or
24   Actavis made generic OxyContin?

Page 235

1        A.   OxyContin?
2        Q.   Yes.
3        A.   I'm not sure specifically how far we
4    got into the market with that.  I know it was
5    being developed.  I do know that there was a
6    brief time where we were an authorized generic
7    for Purdue Pharma, but that didn't last very
8    long because of litigation that they had
9    ongoing, so that was not a long lasting
10   relationship.
11           But as far as -- I can't be exact.  I
12   know that it was a product that was in
13   development, but I think that it was -- I don't
14   know if it ever came to fruition or what the
15   distribution of that product was.
16       Q.   So as you think about the reduced
17   quota request for oxycodone, do you remember the
18   reason for it?
19       A.   I do believe that when -- when we
20   transitioned, we when bought legacy Actavis into
21   organization, it became our SOMS program, there
22   was a, a reduction.
23       Q.   Do you remember the reason for the
24   reduction?

Page 236

1        A.   It could have been our due diligence
2    efforts when we re-onboarded legacy customers.
3        Q.   Do you remember whether a new version
4    of any brand name of oxycodone came out around
5    that time?
6        A.   As far as a brand?
7        Q.   Yes.
8        A.   We wouldn't have manufactured any
9    brand.  If you're talking about anything
10   marketed by us, we would not -- we didn't have
11   any brand oxy.
12       Q.   And beyond any drug marketed by you,
13   do you remember, say, for example, a
14   tamper-resistant version of --
15       A.   I was just going to say, there were
16   various formulations that were being developed
17   by innovators such as Purdue where it was
18   increasing the tamper-resistant for controlled
19   substance single-entity products like OxyContin.
20       Q.   Do you ever remember whether that
21   development, the tamper-resistant technology,
22   had an effect of reducing Watson's or Actavis's
23   quota request?
24       A.   I don't believe there was a direct

Page 237

```
1    correlation because we are largely talking about
2    two different types of products where one is --
3    you know, a product like OxyContin is just
4    purely oxycodone in larger controlled release
5    quantities, where a lot of the products we
6    manufactured were a combination products with,
7    you know, smaller amounts, but, but combined
8    with hydrocodone and oxycodone, with
9    acetaminophen or two different types of delivery
10   systems, two different types of products.
11   Probably geared towards different types of
12   patients, I believe, too, as well.  I would
13   imagine OxyContin is delivered more to an
14   individual who has got some chronic pain where
15   again you don't want that, the peaks and valleys
16   of the efficacy of the product so...
17        Q.   So with regard to the reduction in
18   quota request that you're thinking of, would you
19   characterize it as a drop-off in demand or a
20   drop-off in supply or a drop-off in the number
21   of customers or something else?
22        MR. LUXTON:  Objection to form.
23        A.   I couldn't speculate on that.
24        Q.   Do you remember at some point ever
```

Page 238

```
1    inquiring about that?
2         A.   I don't recall.
3         Q.   As you made the reduced quota demand
4    for the --
5         A.   Well, I mean, obviously if we're
6    making a quota request or if we're not due for a
7    quota request is because of diminished sales.
8         Q.   Do you remember what the reason for
9    the diminished sales were?
10        A.   That, I don't know.
11        Q.   All right.
12        MR. LUXTON:  Before we go to the next
13   document, can we take a quick bathroom
14   break?
15        MR. EGLER:  Sure.
16        THE VIDEOGRAPHER:  The time is
17   2:37 p.m.  We are going off the record.
18        (Recess is taken.)
19        THE VIDEOGRAPHER:  We are back on the
20   record at approximately 3:05 p.m.
21        (Napoli Exhibit 15, Watson document
22   entitled SOMS Project Evolution IT
23   Governance Meeting, Bates-stamped
24   ALLERGAN_MDL_02468983 through 68994, marked
```

Page 239

```
1    for identification, as of this date.)
2    BY MR. EGLER:
3         Q.   Mr. Napoli, you understand you are
4    still under oath?
5         A.   Yes.
6         Q.   Could you look at what I've just
7    marked as Exhibit 15?
8              And as with other documents I've
9    handed you today, the first page has no Bates
10   number, but starting on the second page, the
11   Bates numbers are ALLERGAN_MDL_02468983 through
12   68994.
13             Can you take a look at this document,
14   and when you're ready, tell me if you recognize
15   it.
16             (Document review.)
17        A.   I do.
18        Q.   What is this document?
19        A.   It's a document I guess detailing the
20   anatomy of our SOMS project.
21        Q.   So as you think about this document,
22   that is Exhibit 15, were you responsible for it
23   or somebody in your group responsible for
24   creating it?
```

Page 240

```
1         A.   For this document itself?
2         Q.   This particular document.
3         A.   I don't have an exact recollection.
4    I could have contributed to this.
5         Q.   All right.  So as you look at this
6    document, do you have an understanding of who
7    this presentation was made to?
8         A.   Based on the fact that it's an IT
9    governance meeting, I'm thinking perhaps some --
10   our IT folks.
11        Q.   Have you ever heard that term "IT
12   governance" in the course of your work at
13   Watson?
14        A.   I have.
15        Q.   What does that term mean to you?
16        A.   Well, from a governance perspective,
17   I would think, and it's IT, I would think that
18   ensuring that any systems or IT-related programs
19   that we're utilizing within the organization
20   meet the requirements in compliance with our
21   standard operating procedures.
22        Q.   When you think of an IT department at
23   Watson while you were there around this time,
24   April 2012, do you think of one or a couple of
```

Page 241

1 particular people that stand out in your mind?
2     A.  Not really.
3     Q.  So going into this document, on the
4 fourth page, it's 8984.  At the top of the page
5 it states, "Regulatory Requirement.
6     A.  Um-hmm.
7     Q.  And it states -- it has the language
8 of that 21 CFR 1301.74 (B), right?
9     A.  Yes.
10    Q.  And you see that?
11        So I'll just read it in the record.
12        "The registrant shall design and
13 operate a system to disclose to the registrant
14 suspicious orders of controlled substances.  The
15 registrant shall inform the field division of
16 the administration in his area of suspicious
17 orders when discovered by the registrant.
18 Suspicious orders include orders of unusual
19 size, orders deviating substantially from a
20 normal pattern, and orders of unusual
21 frequency."
22        Do you see that?
23    A.  Yes, sir.
24    Q.  And then the next one says, "Further

Page 242

1 guidance, December letter of 2000."  It states,
2 "Registrants that rely on rigid formulas to
3 define whether an order is suspicious may be
4 failing to detect suspicious orders.  For
5 example, a system that identifies orders as
6 suspicious only if the total number exceeds the
7 previous month by a certain percentage or more
8 is insufficient."
9        Do you see that there?
10    A.  Yes.
11    Q.  That second group of, or that second
12 paragraph that I read, do you recognize that as
13 being from the letter authorized by
14 Mr. Rannazzisi?
15    A.  Yes.
16    Q.  And do you remember whether, in that
17 same letter, Mr. Rannazzisi highlighted the term
18 "include" in the 21 CFR 1301.74 (B) language
19 above, that suspicious orders "include" orders
20 of unusual size, orders deviating substantially
21 from a normal pattern, and orders of unusual
22 frequency?
23    A.  I don't recall if that was within the
24 letter.

Page 243

1     Q.  And that there may be more than those
2 three requirements or conditions for something
3 to be a suspicious order?
4     A.  I don't recall if it was in the
5 letter.
6     Q.  All right.  So moving down into this,
7 on the next page, page 8985, it states, "Current
8 automated model," and it has various texts
9 there.
10        Can you read that text to yourself
11 and tell me what, in your opinion, it describes?
12        As you're reading it to yourself,
13 I'll read it into the record.
14        "Current automated model designed and
15 implemented within SAP, primary user is customer
16 relations," then, dash, "order intake process."
17        And then it states, "Based on a
18 'threshold,'" and then, dash, "customer
19 groupings," and then a bullet point, "class of
20 trade," and then three dashes underneath there,
21 "wholesaler, retail chain, distributor,
22 mail-order, et cetera," then another dash,
23 "monthly average based on 12" -- "based on
24 rolling 12-month period," and then "multiplied

Page 244

1 by static multiplier equals monthly allowable."
2        So as you think about that whole page
3 together, does that describe the Watson
4 Suspicious Order Monitoring System around this
5 time April of 2012?
6        MR. KNAPP:  Objection to form.
7     A.  It describes a component of the
8 system.
9     Q.  Okay.  Then it has that term that we
10 talked about earlier, "class of trade."
11        Do you see that there?
12    A.  Yes.
13    Q.  Class of trade, it then says,
14 "wholesaler, retail chain, distributor, mail
15 order, et cetera."
16        Is that what you understand a class
17 of trade to be?
18    A.  Yes.
19    Q.  All right.  How about the next
20 language that's down there, "monthly average
21 based on rolling 12-month period," is that class
22 of trade?
23    A.  No.
24    Q.  Okay.  Why would that be listed there

Page 245

1    under "class of trade"?
2         Could it be just a mistake --
3         A.  Yes.
4         Q.  All right.  And if you were tabbing
5    it today, putting it under a bullet point or a
6    dash, where would you put it?  Would you put it
7    as the same as based on a threshold, customer
8    groupings, or somewhere else?
9         A.  I may put it under a bullet of
10   formula.
11        Q.  Okay.  And then the next one,
12   "multiplied by static multiplier equal monthly
13   allowable," would you put that under the same
14   formula bullet?
15        A.  Yes.
16        Q.  So if you can turn to that next page,
17   8986, it states "Customer groupings."
18        Do you see that there?
19        A.  Yes.
20        Q.  And it states, "Individual customer
21   ship to location monthly average based on 12" --
22   no, "monthly average based on rolling 12-month
23   period," and then "multiplied by static
24   multiplier equal monthly allowable."

Page 246

1         It seems to be similar language to
2    the prior one?
3         A.  Yes.
4         Q.  What does that "customer groupings"
5    mean?
6         A.  Not having authored this document, I
7    don't know.  I don't want to speculate.
8         Q.  And then it states, "Order pending."
9    And then the next bullet point is, "Multiplier
10   table is populated manually based on
11   estimation."
12        Do you have an understanding of what
13   that sentence means?
14        A.  I believe it indicates that the
15   multiplier is set manually based on a review of
16   the -- what the normal behavior could be
17   estimated to be with a customer.
18        Q.  Now as you think about your time at
19   Watson and Actavis, do you remember about this
20   time, April 2012, who would have set the
21   multiplier that's referred to in this page 8986?
22        A.  Setting the multiplier was the
23   responsibility of my group.
24        Q.  Do you remember if there was one

Page 247

1    person in particular who would have set the
2    multiplier?
3         A.  I would have authorized it.
4         Q.  So with regard to setting the
5    multiplier, as you think about it, would the
6    multiplier be the same for every order by a
7    particular customer or would they differ with
8    regard to different orders by customers or
9    something else?
10        A.  It would be the same for each
11   customer.
12        Q.  So, say, McKesson was one of the
13   customers, every multiplier -- let me start
14   over.
15        Say McKesson was one of the
16   customers, the multiplier for every order by
17   McKesson would be the same; is that right?
18        A.  Right.
19        Q.  So going down further into the
20   document, "Current Automated System Evaluation"
21   down below, it says "Based on compliance
22   concerns."
23        Do you remember there being concerns
24   about whether Watson's Suspicious Order

Page 248

1    Monitoring System complied with the DEA
2    regulations and laws in April 2012?
3         A.  I don't recall any specific
4    compliance concerns, but only our desire to
5    enhance the system.
6         Q.  Okay.  Do you remember ever -- anyone
7    ever telling you that they had concerns about
8    Watson's Suspicious Order Monitoring System
9    complying with the DEA regulations and laws
10   around this time?
11        A.  Not that I recall.
12        Q.  All right.  And then it says below,
13   "Increased enforcement action by DEA in the area
14   of SOM audits."
15        And then, "Most recently Cardinal and
16   CVS failing to maintain systems to detect
17   diversion."
18        Do you see that there?
19        A.  Yes.
20        Q.  Do you remember that around this time
21   that Cardinal Lakeland Distribution Center being
22   shut down?
23        A.  I don't have a specific memory, but I
24   do know that they had a distribution center that

Page 249

1    was, I don't know if it was completely shut down
2    or if there is was a temporary order.  I'm not
3    sure.
4         Q.    And I guess "shut down" isn't the
5    right way to say it.
6         They were unable to sell controlled
7    substances; is that right?
8         A.    Correct.
9         Q.    Okay.  So the next bullet point down
10   states, "Expectation that we know our customers'
11   customers."
12        Do you see that there?
13        A.    Um-hmm.
14        Q.    Do you remember where that language
15   came from, "expectation that we know our," that
16   we, quote, "know our customers' customers,"
17   unquote?
18        A.    I don't.
19        Q.    It states, "Cross-functional team
20   established in 2010."
21        And I think we talked about that
22   before, right?
23        A.    Right.
24        Q.    And as you understand it, the

Page 250

1    cross-functional team that's referred to there
2    is the group from customer service and the group
3    from the DEA affairs; is that right?
4         A.    That's correct.
5         Q.    Oh, and below, it says, "Security and
6    DEA affairs, IT and customer relations."
7         And the IT component is programming
8    the automated system into the SAP process; is
9    that right?
10        A.    Right.  Or from a project management
11   standpoint of implementing a new -- if we went
12   with a new algorithm into the system.
13        Q.    And then "Establish goals, compliance
14   and efficiency."
15        And, again, do you remember there
16   being a discussion about compliance around this
17   time frame?
18        A.    No, I do not.
19        Q.    All right.  And then the next one is,
20   "Budgeted for third-party evaluation in 2011."
21        A.    Right.
22        Q.    And then turning to the next page,
23   "Automated System Evaluation," it starts talking
24   about Cegedim-Dendrite; is that right?

Page 251

1         A.    Yes.
2         Q.    And is that the evaluation that we
3    were talking about in the exhibit before we took
4    the break?
5         A.    Correct.
6         Q.    So the next page is "Findings."
7         Do you see that there?
8         (Document review.)
9         A.    Yes.
10        Q.    So it states -- as you see that word
11   "Findings," can you -- do you have an
12   understanding what that means in the context of
13   this document?
14        A.    These would be observations that were
15   made by the consultant.
16        Q.    And the consultant was Buzzeo?
17        A.    Yes.
18        Q.    And it says, "Use of multiplier to
19   create monthly threshold."
20        And it says, "Not consistent with
21   specific requirements noted within regulations
22   and guidance, and current system will detect a
23   certain percentage of suspicious orders but not
24   all."

Page 252

1         Do you see that there?
2         A.    I do.
3         Q.    Do you remember that being a finding
4    that the Buzzeo group made about the Watson
5    system in early 2012?
6         A.    I don't have a specific recollection.
7         Q.    Do you remember -- and, you know, I
8    put a date limitation on that.
9         Is your lack of specific recollection
10   based on the date or something else?
11        A.    It's just... it's been a while.
12        Q.    And then it states, "Current model
13   evaluates at SKU level."
14        Is that pronounced typically "skew"?
15        A.    Yes.
16        Q.    All right.  What is a SKU?
17        A.    A SKU is just one, one product.  So
18   it can be oxycodone 10325, 100 fill count, SKU.
19        Q.    Do you recognize the difference
20   between a SKU and an NDC code?
21        A.    The SKU could be -- yeah, there,
22   there is a difference between the two.  I don't
23   know the exact -- SKU is more of a -- we're kind
24   of exceeding my, probably my area of expertise,

## Page 253

1    but they're both unique identifiers.

2         I think what this is saying here is

3    that by looking at it at the SKU level, we're

4    not looking at the total molecule.  And that was

5    an enhancement.  So that's something where we

6    could have enhanced.

7         Q.   All right.  So it states, "Current

8    model evaluates at SKU level.  Possibility of

9    distributing orders across multiple SKUs without

10   detection."

11        So that's where you're talking about

12   it can be the same, as you refer to it, molecule

13   but with different SKUs?

14        A.   Right.

15        Q.   And then the next one is, "System

16   does not evaluate listed chemicals"?

17        A.   Right.

18        Q.   I think we talked about that earlier

19   as well?

20        A.   Right.

21        Q.   Those are the precursor chemicals

22   that you talked about?

23        A.   Right.

24        Q.   And then on the next page, 990, it

## Page 254

1    states, "Revisit approach to SOM to fully

2    address specific regulatory requirements."

3         And then it states, "Develop SOM that

4    is a 'non-threshold-based adaptive' -- I'm

5    sorry, let me read it.

6         "Develop SOM that is a,

7    'non-threshold-based adaptive,' system trained

8    to identify suspicious orders by utilizing a set

9    of historic markers to include," and then

10   another bullet point, "statistical scoring of

11   active ingredient order volume versus history,

12   active ingredient order versus short and

13   long-term trend, identification of high/low

14   frequency ordering behavior."

15        And then the next bullet point is

16   "Base system on milligram strength rather than

17   SKU."

18        A.   Um-hmm.

19        Q.   And then, "Include list of chemical

20   within system."

21        And then, "Based on recommendations,

22   GS and DEAA requested a proposal and quote."

23        In the context of this document, do

24   you know what GS and DEAA would be?

## Page 255

1         A.   Global security and DEA affairs.

2         Q.   And your group was DEA affairs; is

3    that right?

4         A.   Yes.

5         Q.   And then the next dash is "Establish

6    meeting with IT and consultant."

7         A.   Um-hmm.

8         Q.   "Understand scope, confirm that

9    solution was appropriate and achievable."  And

10   then the next one is "Budgeted for 2012

11   implementation."

12        Do you see that there?

13        A.   Yes.

14        Q.   Do you remember the -- do you

15   remember whether there was a decision around

16   this time, April 2012, to implement the Buzzeo

17   system at Watson?

18        A.   Yes, I believe there was.

19        Q.   All right.  Do you remember who made

20   that decision?

21        A.   It would have been my management.

22        Q.   Did you support the conclusion to

23   implement the Buzzeo system?

24        A.   I definitely supported enhancing our

## Page 256

1    system.  You know, the automated system that

2    we're talking about is -- we are talking about

3    just one component within the system, that's

4    what I want to make clear.  So we're not relying

5    on one component of a system as our Suspicious

6    Order Monitoring program.

7         Q.   And as you had been talking about

8    earlier, in addition to this process, there is

9    the onboarding process and reviews; is that

10   right?

11        A.   The Know Your Customer due diligence.

12        Q.   And Know Your Customer due diligence.

13        And then beyond the automated system,

14   there is a process of customer service clearing

15   and then, if necessary, DEA affairs clearing of

16   orders; is that right?

17        A.   Yes, sir.

18        Q.   And if none of those processes work,

19   the order will be reported to the DEA as

20   suspicious; is that right?

21        A.   Correct.

22        Q.   All right.

23        All right.  You can set this aside.

24        A.   Okay.

Page 257

1        (Witness complies.)
2        (Napoli Exhibit 16, Watson document
3     entitled SOMS Project Evolution IT
4     Governance Meeting, Bates-stamped
5        ALLERGAN_MDL_02187196 through 87199, marked
6     for identification, as of this date.)
7  BY MR. EGLER:
8     Q.   Mr. Napoli, I'm handing you what I
9  marked as Exhibit 16.
10        Mr. Napoli, can you look at that
11  exhibit?  And while you're looking through it,
12  I'll read it into the record.  It's
13  ALLERGAN_MDL_02187196 through 87199.
14        And I'll tell you for the record,
15  there -- as I read it, there are two emails in
16  this exhibit, plus an attachment.  And the last
17  email in time, the first one on the page, the
18  first page of Exhibit 16, you're not included in
19  that email.
20     A.   Okay.
21     Q.   So you can read it, but I'm not going
22  to ask you questions about it.
23     A.   Okay.
24     Q.   The one below, Tuesday, October 4th,

Page 258

1  2011, is from Lisa Scott to Mary Woods, and it
2  cc's you; is that right?
3     A.   Yes.
4     Q.   And it states, "Investigation
5  summary."
6        And Lisa Scott writes, "Mary, please
7  see the attached.  Thank you."
8        Then what follows is a two-page
9  attachment that is called "Investigation
10  Summary, Suspicious Order, TopRx, Inc."
11        And I want to ask generally about
12  this two-page part of the exhibit.
13     A.   Um-hmm.
14     Q.   Do you recognize this format?
15     A.   I do.
16     Q.   What is this format?
17     A.   This would be an investigation
18  summary that we utilized by our department.
19     Q.   So as you think of it, would this be
20  the type of investigation summary that would be
21  done by the DEA affairs group or by the customer
22  service group or something else?
23     A.   This was performed by my group, DEA
24  affairs.

Page 259

1     Q.   All right.  This investigation
2  summary is then sent to Mary Woods, who was in
3  the customer service group.
4     A.   Yes.
5     Q.   Do you have an understanding of why
6  she would be contacted with regard to an
7  investigation summary?
8     A.   Mary was our partner with Suspicious
9  Order Monitoring, as well as she was on the
10  customer-facing side as well too.  So if we
11  needed to set up a meeting, a partnership
12  meeting to discuss this matter, she would be
13  likely the person to facilitate that for us.
14     Q.   So with regard to -- you used the
15  term "partnership meeting."  Would you have a
16  partnership meeting -- well, let me start over.
17        With regard to that term "partnership
18  meeting," as you think of the context of this
19  document, why would Watson be calling for a
20  partnership meeting with TopRx, Inc.?
21     A.   Because based on an investigation
22  that we performed and our findings, that we
23  found activities that were not consistent with
24  complying with the CFR, and we wanted to let

Page 260

1  them know of that, that -- what our findings
2  were and discuss a path forward.
3     Q.   So at this point in the process, can
4  you tell from the investigation summary whether
5  Watson had contacted the DEA about the issues
6  raised in the investigation summary?
7     A.   I know for a fact that we provided
8  all this information to the DEA.
9     Q.   Would you have provided the
10  information to the DEA before this investigation
11  summary was written and before TopRx was
12  contacted or after?
13     A.   We would have reported that to DEA
14  upon discovery that the order was suspicious.
15     Q.   Okay.  In the document, the
16  Investigation Summary, does it say that Watson
17  personnel had contacted the DEA?
18        (Document review.)
19     A.   I don't see where it does, but I know
20  that they were contacted.
21     Q.   And as you think of it today, you
22  based that on your -- excuse me -- your
23  experience and typical processes at Watson; is
24  that right?

Page 261

1     A.   I have a distinct recollection of
2  this case.
3     Q.   What do you remember about this case?
4     A.   I remember most of the details of
5  this case because I remember that it was
6  something that -- I was involved with in the
7  investigation, and that we -- the type of
8  activities that we uncovered, and I do recall
9  that this was reported to the DEA.
10     Q.   Do you remember whether at some point
11  Watson stopped shipping to TopRx?
12     A.   Absolutely.  We cut them off.
13     Q.   And do you remember whether TopRx's
14  license was -- let me start over.
15          Do you remember if TopRx's ability to
16  sell controlled substances was ever withdrawn by
17  the DEA?
18     A.   I don't believe there was any action
19  taken by the DEA against TopRx.
20     Q.   All right.  So let's move on.
21          I'll hand you what we'll mark as
22  Exhibit 17.
23          (Napoli Exhibit 17, Email chain
24          beginning with email dated 4/26/12 from

Page 262

1  Picone to Woods with attachments,
2  Bates-stamped ACQUIRED_ACTAVIS_01179002
3  through 005, marked for identification, as
4  of this date.)
5     A.   This looks like the last --
6     Q.   Okay.  This is a repeat.  Can you
7  hand me that back and I'll see if I can get the
8  tab off of it.  I'll just make another tab.  So
9  you can set this one aside.
10          MR. KNAPP:  Are we not moving on?
11          MR. EGLER:  No, just set it aside.
12  I'm going to introduce another document
13  that we'll mark as 17 because we use
14  totally modular and we don't use electronic
15  documents.
16  BY MR. EGLER:
17     Q.   With that side trip, Mr. Napoli,
18  could you look at this document that we've
19  marked as Exhibit 17?
20     A.   Yes.
21     Q.   And as you're looking at it, I will
22  read into the record the Bates numbers, which
23  are a new set of Bates numbers, Acquired Actavis
24  -- Acquired_Actavis_01179002 through 005.

Page 263

1          I'll represent to you that this
2  document was produced as a family of documents,
3  so it's an email, plus other documents put
4  together.
5     A.   Um-hmm.
6     Q.   And could you read through it
7  generally and when you're ready, tell me if you
8  recognize this document?
9     A.   I don't recognize it.
10     Q.   All right.
11     A.   I hope you don't ask me to interpret
12  this second attachment here.
13          (Laughter.)
14     Q.   And I apologize.
15     A.   I don't have my binoculars.
16     Q.   The second attachment that you're
17  referring to has teeny, tiny little numbers.
18          And in the course of us talking about
19  this, if you need to refer to that data, I can
20  go and get it on a computer and you can look at
21  it.  But I just want to let you know, because it
22  is mentioned as a piece of the document, you can
23  see generally what it is.
24     A.   Okay.

Page 264

1     Q.   So the first two pages of this email,
2  of this Exhibit 17, is an April 17th and
3  April 26th email chain.
4          Do you see that there?
5     A.   Yes.
6     Q.   And the first email in time comes
7  from Mary Woods and it goes to Napoleon Clarke
8  and Toni Picone?
9     A.   Um-hmm.
10     Q.   Who is Ms. Picone?
11     A.   An individual who worked in marketing
12  with Napoleon.  Sales.
13     Q.   And it's T-o-n-i?
14     A.   Yes.
15     Q.   Ms. Woods writes, "Hi, Napoleon and
16  Toni.  I have a few marketing questions
17  regarding the hydrocodone market which I am
18  hoping you can assist with.
19          "As you know, the increased order
20  volume in many of the hydrocodone SKUs has been
21  significant over the past several weeks.  I am
22  intending to use the information provided to
23  discuss the market demand and market share with
24  the DEA compliance team."

Page 265

1           And she asked a number -- she makes a
2    number of requests for data information.
3           Do you see that there?
4    A.   I do.
5    Q.   All right.  And then that's on
6    April 17th.
7           On April 26th, Ms. Picone writes back
8    to her and Mr. Clarke, Napoleon Clarke, and cc's
9    Lisa Scott, you, Sandy Simmons, Scott Soltis and
10   Andrew Boyer.
11          And we haven't talked previously
12   about Mr. Boyer.
13          Do you remember Mr. Boyer?
14   A.   Yes.
15   Q.   Who he is?
16   A.   Andy Boyer was our head of sales.
17   Q.   Would Mary Woods's department be
18   under Mr. Boyer?
19   A.   Yes.
20   Q.   The sales group, like Napoleon
21   Clarke, he would also be under Mr. Boyer?
22   A.   Correct.
23   Q.   And so would Ms. Picone?
24   A.   Yes.

Page 266

1    Q.   So Ms. Picone writes back, "Hello
2    all.  Please see answers to the below questions
3    as per our meeting today."
4           And she has six points there.
5    "Amneal, Qualitest, and Mallinckrodt are the
6    suppliers that customers are telling us the
7    reasons for the supply shortages in the market.
8    Amneal has discontinued to select customers only
9    and Mallinckrodt has sent letters that they have
10   backlog and are trying to ramp up as a result of
11   the quota."
12          Do you remember receiving this email?
13   A.   I don't.
14   Q.   As you sit here today, the email is
15   called "Hydrocodone supply issues - market
16   demand."
17          As you read that point one that
18   Ms. Picone writes, what does that mean to you in
19   the context of the document?
20   A.   My interpretation of this document --
21   Q.   Yes.
22   A.   -- is that there is a shortage due to
23   certain manufacturers not receiving quota and
24   having the inability to manufacture.  So other

Page 267

1    customers of Watson are looking to come over to
2    us to order because we had sufficient quota and
3    they were looking to order the product to meet
4    their customers' needs.
5           Based on this -- what we're seeking
6    here, this justification is because my team
7    likely pended a lot of orders and refused to
8    move on them until we had justification, which
9    probably prompted this meeting so we can get a
10   rationale around why the change in ordering
11   behavior, and you can see in there where we're
12   requesting data and forecasts so we can put some
13   rationale around what these new demands would
14   look like for us, rather than just approve these
15   orders.
16   Q.   Okay.  Ms. Picone, as you were
17   talking about it, she writes, "The customers who
18   are no longer receiving product from Amneal is a
19   permanent change and those who are short for
20   Mallinckrodt we expect to be temporary."
21          Then she says, "We do not know how
22   long the increased demand will be for temporary
23   change.  Mallinckrodt's letter states through
24   May."

Page 268

1           And then she states, "Customers
2    typically do not proactively provide marketing
3    with increased forecasts.  However, we are
4    closely monitoring the orders and when we see
5    increases in orders, we do reach out to
6    customers to ask for revised forecasts and/or
7    monitor the 852/chargeback data to determine if
8    their sales out is increasing."
9           She uses that term "852/chargeback
10   data."
11          Are those the same 852 and chargeback
12   that we talked about earlier today?
13   A.   852, yes.
14   Q.   And then she states, "If we receive
15   increased forecasts from customers, we will
16   provide them to the master data team.  In
17   addition, if the master data team receives
18   revised forecasts, they will provide to
19   marketing."
20          And she says, "There is potential
21   market share increase of approximately 15
22   percent to 20 percent based on our share versus
23   our competitors' as of Q4 '11, per the IMS EU
24   data."

Page 269

1    As you read this document, you see
2  that term IMS EU, what does that mean to you?
3    A.   I would interpret it as the -- that
4  IMS is providing the data on market share.  EU,
5  I don't know what that means.  I know it's not
6  European Union.
7    Q.   That was what I was going to ask.
8    So you don't have any feeling either
9  way?
10    A.   No.  I think this email is a great
11  example of communication between the various
12  departments in making educated decisions on
13  rationalizing orders, though.
14    Q.   So let's keep going on it.  I agree
15  with you.
16    She says, "I have attached recent TRX
17  data from IMS so you can see the market trends
18  by competitor.  I also attached a copy of
19  Mallinckrodt's letter that they sent to
20  customers for your reference."
21    So that reference there, TRX data
22  from IMS, do you have an understanding of what
23  that means?
24    A.   Total prescriptions written.

Page 270

1    Q.   Okay.  So total prescriptions written
2  from IMS, what would that encompass?
3    A.   I believe that would provide the
4  blinded prescription information for a
5  particular manufacturer's product.
6    Q.   All right.  So and as we are talking
7  about this hydrocodone, do you understand
8  hydrocodone to be, as we've been talking about
9  it, to be a molecule or a product or something
10  else?
11    A.   It could be -- hydrocodone in its raw
12  form is a molecule.  The product itself is when
13  it's in a finished dosage form.
14    Q.   In fact, was Norco a hydrocodone
15  product?
16    A.   Yes.
17    Q.   Ms. Picone is sending the total
18  prescription data from IRS -- from IMS so that
19  Mary Woods can see market trends by competitor,
20  and that would relate to the hydrocodone market;
21  is that right?
22    A.   Yes.
23    Q.   So at any time did you seek data on
24  market trends by competitor to inform the

Page 271

1  automatic part of the -- or the automated part
2  of the SOM system at Watson or Actavis?
3    A.   No.
4    Q.   Okay.  Then you said that this was a
5  good example of communication between the
6  various groups at Watson; is that right?
7    A.   Right.
8    Q.   And do you remember whether this type
9  of communication took place to inform the
10  automated part of the Suspicious Order
11  Monitoring System at Watson?
12    A.   When you refer to the automated part,
13  I mean -- I think you would be referring to the
14  folks that manage the SOMS program, so that
15  would be my group.  So certainly we were
16  definitely aware of this.  This is information
17  we relied on to make educated decisions.
18    Q.   And the decisions that you're talking
19  about would be decisions made once an order
20  pended in the -- in the case of your group, once
21  an order pended and then was investigated by the
22  customer service group; is that right?
23    A.   Well, initially, this would have been
24  investigated by the customer service group.  It

Page 272

1  would have went to us because we're seeing a
2  trend here of these orders that are way out of
3  line with ordering behavior, and that's what
4  prompted this whole team meeting and discussion
5  and we identified that there was a market issue.
6  So we wanted to explore that because we want to
7  explain why we're seeing these spikes in
8  ordering behavior.
9    Q.   And the market issue that you
10  analyzed with regard to this time frame, did you
11  ever look at those market issues and try to
12  import them into the automated part of the
13  Suspicious Order Monitoring System?
14    A.   I don't think there would be a way to
15  incorporate those into this, but just of having
16  that knowledge of what these quantities look
17  like, we would be -- certainly, our DEA affairs
18  team would be aware of these increases and these
19  volumes so -- because these orders would
20  continue to pend.  It wouldn't be part of a
21  12-month rolling history.  So these would pend
22  every month and we would review to make sure
23  they were in accordance with the data provided
24  to us, and until such time that the ordering

Page 273

1    behavior normalized.  And that would be
2    something that would happen outside of the
3    system, outside of the automated system.
4         Q.   So that market demand data that
5    Ms. Picone would is talking about would be used
6    to determine whether the orders that had already
7    pended should be cleared or passed on to the DEA
8    affairs and then the DEA itself; is that fair to
9    say?
10        A.   Right.
11             MR. LUXTON:  Objection to form.
12   BY MR. EGLER:
13        Q.   But they would not be part of the
14   automated system itself?
15        A.   Right.  This is a unique event so
16   that would be hard to implement into an
17   automated system.
18        Q.   Do you know if anyone in your group
19   ever asked whether this type of TRX data from
20   IMS could be brought into the Suspicious Order
21   Monitoring System?
22        A.   I don't.  I don't know what would be
23   gained by having the total prescriptions by the
24   whole market in our SOMS system.

Page 274

1         Q.   So with regard to the total
2    prescriptions for the market trends by
3    competitor, the hydrocodone market, as you think
4    about it here, would that be in the main generic
5    products?
6         A.   Can you ask the question again,
7    please?
8         Q.   So as you think about the hydrocodone
9    market --
10        A.   Right.
11        Q.   -- generally, around this time frame,
12   2012, would it be dominated by brand names or
13   dominated by generics?
14             MR. KNAPP:  Form.
15             MR. LUXTON:  Objection to form.
16        A.   I couldn't speak to exactly the
17   percentages.
18        Q.   All right.  So with regard to your
19   knowledge of Watson's production, we had seen
20   earlier that they had 25 percent of the quota
21   produced out of their Corona, California plant,
22   plus more from the Florida plant.
23             As you think about that production,
24   was that mostly brand names or mostly generic or

Page 275

1    something else?
2         A.   Mainly generic.
3         Q.   Okay.  Are you aware whether the
4    Watson balance of brand names versus generics
5    was different from the market as a whole?
6         A.   I can't answer that.  I just don't
7    know.
8         Q.   And as you sit here today, you don't
9    think knowing the entire market trends by
10   competitor for the hydrocodone supply and demand
11   issues would help inform a Suspicious Order
12   Monitoring System?
13             MR. LUXTON:  Objection.  Asked and
14   answered.
15        A.   At this time, I couldn't speculate on
16   how the total lawful prescriptions written would
17   assist us.
18        Q.   And you're not aware of any time when
19   that type of integration of information was
20   discussed at Watson or Actavis; is that right?
21             MR. KNAPP:  Form.
22        A.   Not that I took part in.
23        Q.   All right.  So you can set this
24   document aside.

Page 276

1         (Witness complies.)
2         (Napoli Exhibit 18, Cegedim document
3    entitled Buzzeo PDMA Suspicious Order
4    Monitoring Seminar, Bates-stamped
5    ALLERGAN_MDL_02467214 through 7216, marked
6    for identification, as of this date.)
7             MR. EGLER:  Here you go.
8         (Handing.)
9    BY MR. EGLER:
10        Q.   Mr. Napoli, can you look at the next
11   exhibit, it's Exhibit 18.
12        A.   Sure.
13        Q.   And again, the first page is a
14   metadata page and then on the second page it's
15   ALLERGAN_MDL_02467214 through 7216.
16             Can you look at this document and
17   tell me if you've ever seen it before.
18        (Document review.)
19        A.   I have seen it.
20        Q.   What is it?
21        A.   This is an agenda from a Suspicious
22   Order Monitoring seminar that was conducted by
23   Cegedim in Chicago in 2012.
24        Q.   So on the last page of this document

Page 277

1    entry, three o'clock to 3:45 p.m., it says, "SOM
2    experts compliance panel."  It says, "A Q and A
3    panel designed to answer your SOMS compliance
4    questions."
5          And Mr. Buzzeo is the moderator.
6          The first person listed on the panel
7    is you; is that right?
8          A.   That's correct.
9          Q.   Do you remember serving on this panel
10   in October of 2012?
11         A.   I do.
12         Q.   What did you talk about when you were
13   serving on this panel?
14         A.   I don't have an exact recollection.
15         Q.   All right.  So as you look at this
16   panel, you were the only person from a, for lack
17   of a better term, DEA registrant; is that right?
18         A.   Yes.
19         Q.   Do you remember having discussions
20   with any other DEA registrants at this
21   conference?
22         A.   I don't have any distinct
23   recollections of conversations with our
24   registrants.

Page 278

1          I do recollect that one of my key
2    topics was about Know Your Customer, because we
3    were recognized as having a strong program and
4    also asked to be on the panel because of over
5    the years of my acquiring a great deal of
6    knowledge in the area.
7          Q.   So with regard to the Know Your
8    Customer topic that you're thinking of, as you
9    think about this time end of 2012 at Watson,
10   about how many customers for controlled
11   substance product did Watson have?
12         A.   I'd say less than a hundred, but I
13   don't want to -- that would be a guess.
14         Q.   Whatever range you're comfortable
15   with saying.
16         A.   Sure.
17         Q.   It's fewer than a hundred.
18         A.   Fewer than a hundred.
19         Q.   More than 50?
20         A.   Yes.
21         Q.   And as you think about the typical
22   time frame -- let me start over.
23         As you think about the time frame of
24   your being the head of DEA affairs at Watson and

Page 279

1    then Actavis, each year about how many new
2    customers, on average, do you think came in to
3    the company?
4          A.   Zero.
5          Q.   All right.  And did they have any new
6    customers at any point?
7          A.   There may have been one or two.  We
8    had a long-standing customer base and we -- it
9    was a very rare occasion if we took on a new
10   customer for controlled substances.
11         Q.   When you talk about the onboarding
12   process for the time that you were the head of
13   DEA affairs at Watson from 2009 through whenever
14   you left, about how many times was there an
15   onboarding process?
16         A.   I don't have a direct recollection.
17         Q.   Fewer than a dozen?
18         A.   Yes.
19         Q.   Fewer than five?
20         A.   I don't know.
21         Q.   All right.  And then with regard to
22   the Know Your Customer processes that you talked
23   about on this panel, do you remember what you
24   presented on?

Page 280

1          A.   Presented on our process for reaching
2    out, establishing strong relationships with our
3    partners, identifying compliance colleagues at
4    the other organizations, understanding who their
5    customers are and how their business relates to
6    our product, an overview of what their security
7    programs and compliance programs are, ensuring
8    that they were compliant with -- their -- with
9    the CFR, as well as ensuring that we also had a
10   compliance agreement that we would ask our
11   customers to acknowledge as well too.  So.
12         Q.   And around this same time, October of
13   2012, Watson had planned on implementing the
14   Buzzeo automation part of the Suspicious Order
15   Monitoring System; is that right?
16         A.   Correct.
17         Q.   And also around the same time, late
18   2012, is this when Watson and Actavis announced
19   their combination?
20         A.   Yes.
21         Q.   So do you remember whether Watson
22   implemented the Buzzeo process that it had
23   planned on implementing?
24         A.   They did not.

1    Q.   Do you remember what it did instead?
2    A.   We continued with our -- our current
3  system.  The reason why we didn't implement it,
4  with the acquisition of Actavis, there was a
5  freeze-out period within SAP because of this --
6  without getting too into detail, the process of
7  lifting an entire company and moving all their
8  products into the business system, there was a
9  quite extensive freeze-out period where you
10 couldn't make any changes to the business
11 system.  So that would have held us back from
12 implementing our system.
13   Q.   And that freeze out and
14 implementation took place in the years 2012 and
15 2013; is that right?
16   A.   We had at Watson/Actavis there was a
17 period where there was a series of, what I would
18 call, multiple M&A activities in successive
19 years.
20   Q.   Okay.  Let let's leave it at that for
21 now.
22        Okay.
23   Q.   All right.  Let's move on.  You can
24 set that document aside and we'll move on to 19.

1        (Napoli Exhibit 19, Email chain
2  beginning with email dated 9/27/12 from
3  Napoli to Lepore and others, Bates-stamped
4  ALLERGAN_MDL_04173111 through 113, marked
5  for identification, as of this date.)
6  BY MR. EGLER:
7    Q.   Received what's marked as Exhibit 19,
8  can you look through it.  As you're looking
9  through it generally, I'll read on the record,
10 it's ALLERGAN_MDL_04173111 through 113.
11        And as you look at this document, can
12 you tell me what it appears to you to be?
13        (Document review.)
14   A.   This appears to be an email that is
15 in regards to our Suspicious Order Monitoring
16 folks, the customer service side, pending an
17 order for further review for an increase, and us
18 asking for additional information and
19 subsequently releasing the order.
20   Q.   On the second page of Exhibit 19, the
21 first email in time, Victoria Lepore writes to a
22 person named Jared Green and Robert Gettus about
23 an order that's being held; is that right?
24   A.   Um-hmm.

1    Q.   And then she writes back to him again
2  on September 27th in the morning.
3        And then the response from Cardinal
4  Health is at the top of that page.
5        Do you see that there?
6    A.   Yup.
7    Q.   All right.  And the person from
8  Cardinal Health writes, "We are seeing increased
9  volume due to Mallinckrodt being on back order.
10 Please let me know what additional information
11 you need to release this order."
12        Then Ms. Lepore forwards that on to a
13 group of people, not including you, "Attached
14 please find the customer's response along with
15 the SOMS order.  I'm also attaching the
16 controlled substance for your reference."
17   A.   I think that means report.
18   Q.   Okay.  What would a controlled
19 substance report be in this context, as you
20 understand the workings of the Suspicious Order
21 Monitoring System?
22   A.   A controlled substance report in this
23 context would be most likely an imported or
24 Excel file that would provide us with a snapshot

1  of a customer's 852 data, sales month over month
2  by SKU for a particular product, and in this
3  case it would give us a specific on this product
4  itself.  So it would give us more detail and
5  insight into the customer's ordering behavior.
6    Q.   And then she goes on to say, "Based
7  on the controlled substance report, they don't
8  go over their customer's allowance per month
9  until this month, and they didn't order any
10 product in August."
11        This takes place, this email is in
12 September; is that right?
13   A.   Yes.
14   Q.   And then the next email up is later
15 in that day, she writes to the same group,
16 "Please let me know the status of the record.
17 Need a response as soon as possible."
18   A.   Um-hmm.
19   Q.   And you respond; is that right?
20   A.   Yes.
21   Q.   And you respond, "Hi, Vicky, DEA
22 affairs has evaluated and approved -- approves
23 the release of this order.  Although the
24 customer is citing Mallinckrodt back order

Page 285

1    situation as justification, can you have them
2    articulate which customers specifically has have
3    been affected and are utilizing Watson product
4    as a result?  Thanks very much.  Tom."
5        So with regard to this email, was it
6    your practice to typically release pended orders
7    that had been raised to the DEA affairs Group as
8    part of your job.
9        MR. KNAPP:  Objection to form.
10       A.  I was not typically in the role of
11   releasing orders, but I would do it on occasion.
12       Q.  Do you have a memory as to why you
13   released this particular order?
14       A.  It could have been one of my staff on
15   vacation.
16       Q.  And then with regard to the email
17   that you send, you asked for further information
18   from Cardinal about the -- about their
19   customers.
20       Do you see that there?
21       A.  Right.
22       Q.  Do you remember, that was a typical
23   practice of releasing an order and then asking
24   for more information?

Page 286

1        A.  I can't speculate.  There may be a
2    lot more detail to this behind the email.
3        Q.  Okay.
4        A.  And I'm also confused about the time.
5    The time is showing that it's before the other
6    time email sent.
7        Q.  Right.  So what you're pointing out
8    is, Victoria Lepore's email is sent on
9    September 27th, 2012 at 2:04 p.m. and your email
10   appears to be that same day at 11:51 a.m.
11       A.  Right.
12       Q.  So about two hours before that.
13       A.  Yeah.
14       Q.  All right.  But as we sit here today,
15   you don't have a particular memory of this
16   process?
17       A.  Correct.
18       Q.  So you can set that one aside.
19       (Witness complies.)
20       (Napoli Exhibit 20, Email chain
21   beginning with email dated 6/26/13 from
22   Collins to Napoli, Bates-stamped
23   ALLERGAN_MDL_02179760 through 772, marked
24   for identification, as of this date.)

Page 287

1    BY MR. EGLER:
2        Q.  I'll hand you what we'll mark as
3    Exhibit 20.
4        Mr. Napoli, can you look at what we
5    marked as Exhibit 20 and as you're reading it
6    I'll read in the record the Bates number.
7    ALLERGAN_MDL_02179760 through 772.
8        When you're ready, can you tell me
9    what this appears to you to be.
10       I'll just note for the record, this
11   was produced to us and I double-checked it the
12   other day, there are consecutive Bates numbers
13   but a couple of the emails are repeated.
14   So I don't think it's a copying
15   issue.  I think it's some type of a production
16   issue, but I don't know what caused it.  I think
17   it's understandable in that context, though.
18       (Document review.)
19       A.  Okay.
20       Q.  All right.  So with regard to this
21   email, there is a name Jeff Collins.
22       Have we talked about him earlier
23   today?
24       A.  Yes.

Page 288

1        Q.  Who is Jeff Collins?
2        A.  Jeff Collins is part of our global
3    security team -- was part of our global security
4    team and he was a security investigator.
5        Q.  And then there is another name there,
6    William Simmons.
7        We've talked about him earlier today.
8        A.  William was my auditor investigator.
9        Q.  And Mr. Collins writes to you at the
10   last email in time, "Tom, I believe you are out
11   of the office today.  However, I was hoping you
12   would be able to take a look at this.  I want to
13   get some feedback.  Miami-Luken has placed an
14   order for 72 units of Oxy/APAP,
15   10/650-milligram, 100 count.  This is on top of
16   the 84 they have already received this month.
17   They're allowable is 53 which would put them 103
18   over for the month.  They sent along their sales
19   for May 1 - June 25, which is helpful and
20   produce nothing extraordinary other than one
21   customer.
22       "McMeans #1 Ashland appears to be a
23   local pharmacy in Ashland, Kentucky.  They have
24   ordered 42 units of this product during this

Page 289

1    time frame which accounts for 4200 pills.  This
2    account jumps out as having purchased
3    significantly more than the other, which is why
4    I'm asking.  This is a small rural town of
5    21,000 people in the mountains of Kentucky.
6        "Do you have much knowledge of Miami
7    Luke in SOMS program, and are you comfortable
8    with this order?"
9        So do you remember receiving this
10    particular email?
11        A.   I don't.  I have no recollection of
12    this email.
13        Q.   Do you remember ever discussing this
14    particular order with anybody?
15        A.   I do not.
16        Q.   All right.  And as you look at the
17    last page of this Exhibit 20, the very last
18    page, it says Watson Pharma Inc. SOMS
19    Investigation Form.
20        A.   Yes.
21        Q.   So is the oxycodone that Mr. Collins
22    is discussing listed on this page?
23        A.   I believe it's the last line there.
24        Q.   All right.  As you go on this form,

Page 290

1    the SOMS investigation form that's at page 9772,
2    there are various columns and it states Item No,
3    Material No, Description, Order Quantity.
4        Next to Order Quantity there's
5    handwritten notes.
6        In the context of your work at
7    Watson, do you know what those mean?
8        A.   There is a reason code, which I think
9    corresponds to why something was released.  It
10    appears that there was none for the last line
11    item which means it likely was not released.
12        Q.   All right.  With regard -- go ahead.
13        A.   Release quantity...
14        (Document review.)
15        A.   The release quantity, it just
16    indicates the number that would be released
17    because of the order.
18        Q.   Okay.  What about the order quantity
19    there with the 24, 24 and 72 and 5, 24 and 103
20    written in next to it?
21        Do you know what that means?
22        A.   I'm thinking.  I didn't major in math
23    but month-to-date quantity plus 72 equals 103.
24    No, that can't be.

Page 291

1        Q.   Let me just ask you:  From the
2    context of your typical work at Watson and
3    Actavis, you don't know what those handwritten
4    numbers would be?
5        A.   I didn't review these every day.
6        Q.   Okay.
7        A.   And I haven't worked for the company
8    in several years.
9        Q.   But you had mentioned on the far
10    right-hand side, Reason Code --
11        A.   Right.
12        Q.   -- there?
13        Do you remember there being at least
14    12 different reasons as to why not release or
15    hold an order?
16        A.   I don't.
17        Q.   As you read through this document,
18    would it surprise you if this order was
19    released?
20        MR. KNAPP:  Form.
21        MR. LUXTON:  Same.
22        (Document review.)
23        A.   So the 103 was the number they would
24    have been over for the month.

Page 292

1        Q.   Okay.
2        A.   And I'm not sure about this being
3    released or not.
4        Q.   But as you look at it, would you be
5    surprised if it was released?
6        MR. KNAPP:  Same objection.
7        MR. LUXTON:  Same.
8        A.   I don't know.  I don't know if there
9    are other -- if there were subsequent actions or
10    investigation that took place; not contained
11    within here.
12        Q.   Based on the information that's in
13    that email there, would you, using your judgment
14    as you sit here today, would you think that the
15    order should be released?
16        MR. KNAPP:  Objection to form.
17        MR. LUXTON:  Objection to form.
18        A.   It would be difficult to judge
19    something that happened that long ago and I
20    don't know if I have all the details there.
21        Q.   As you think about what you read in
22    that email, are there any particular pieces of
23    information that you would want to know beyond
24    what's contained there?

Page 293

1    A.   Probably want to know more about the
2  pharmacy location.
3    Q.   All right.  So let's move on.  Here's
4  Exhibit 21.
5    (Napoli Exhibit 21,2014 Year-End
6    Review DEA Materials, Bates-stamped
7    ALLERGAN_MDL_03535137 through 143, marked
8    for identification, as of this date.)
9  BY MR. EGLER:
10    Q.   And if you look at Exhibit 21, the
11  first page has no Bates numbers.  The second
12  page is ALLERGAN_MDL_03535137 through 143.
13    And you can look through the whole
14  document, but I'm just going to ask you about
15  what is the third page of the document, the
16  second Bates stamp.
17    A.   Okay.
18    Q.   Before that, this is a 2014 -- it's
19  listed as a 2014 year-end review of William
20  Simmons; is that right?
21    A.   Yes.
22    Q.   All right.  And Mr. Simmons is a DEA
23  compliance auditor and you are his manager; is
24  that right?

Page 294

1    A.   Correct.
2    Q.   Do you remember writing this 2014
3  year-end review of Mr. Simmons?
4    A.   I don't have a specific recollection,
5  but I definitely would have written his review.
6    Q.   All right.  I want to look at the key
7  goals and responsibilities that are listed on
8  the first Bates-stamped page.  And No. 9 is
9  "Identify resources and key personnel to create
10  a more comprehensive SOMS program to include
11  leverage marketing personnel and chargeback
12  data."
13    Do you see that there?  It's on the
14  prior page and it's right here (indicating).
15    A.   Hold on one second.
16    Q.   Number 9.
17    (Document review.)
18    A.   Yes.
19    Q.   And then on the next page, 138, the
20  second half of Employee Evaluation --
21    A.   Um-hmm.
22    Q.   -- is this Mr. Simmons writing,
23  "Collaborations with internal personnel have
24  opened the door for the use of chargeback data

Page 295

1  and marketing information as it relates to the
2  sale/usage of controlled substance.  This has
3  provided more insight into the downstream
4  process of controlled substance ordering, but it
5  has also provided a better, quote, whole
6  picture, unquote, of ordering behavior.
7  Relations with customer service personnel have
8  been created to allow for a monthly (or more
9  frequent) report of top customers to include
10  buying groups and contract
11  additions/subtractions.  Groundwork has been
12  laid to start a collaborative relationship with
13  coworkers as it relates to customer order
14  usage."
15    Do you see that there?
16    A.   I do.
17    Q.   Do you remember Mr. Simmons having an
18  initiative to use chargeback data and marketing
19  information in the Suspicious Order Monitoring
20  System at Watson or Actavis?
21    A.   Yes.
22    Q.   All right.  Do you remember whether
23  the data that he was seeking was ever imported
24  into the automated part of the Suspicious Order

Page 296

1  Monitoring System?
2    A.   Again, data wouldn't be imported into
3  the automated system, but this system would be
4  used for analysis by Will as an auditor.
5    So in addition to the data that's
6  listed here, and I'm trying to look at the time
7  frame of this, but there was a point in which we
8  moved out of the security organizations and were
9  reporting to supply chain.
10    Within the supply chain group we have
11  groups such as market forecasting, demand
12  management.  They have various tools to look at
13  forecasts, volume, et cetera, and we were
14  leveraging those relationships to be able to
15  meet more frequently with those folks so we'd
16  have a better understanding of future ordering
17  behavior, as well as looking retrospectively as
18  well.
19    And we also had an individual that
20  could provide us chargeback data as well
21  internally.
22    But chargeback data, again, is -- has
23  got limited use and because of the vast amount
24  of chargeback data we only used it to look at

Page 297

1   specific products, specific SKUs that we wanted
2   to focus on, such as hydrocodone and oxycodone.
3        Q.   And as you think about the SKUs and
4   the chargeback data, would that be part of the
5   automated SOMS process or part of a process that
6   was after the automated SOMS once an order had
7   pended?
8        A.   It would all be retrospective because
9   the chargeback data is something that -- a
10  customer would have to submit a rebate for, so
11  that would -- that would all be dependent on
12  when that customer submitted the rebate and when
13  we received and processed pavement. So it's
14  definitely a retrospective tool that Will would
15  review on a monthly basis to supplement the work
16  he was already doing and also looking at
17  historical purchasing data by customers.
18       Q.   The work that Will was doing, was it
19  informing the automated part of the Suspicious
20  Order Monitoring System or would it inform
21  decisions made once an order pended?
22       MR. KNAPP:  Objection to form.
23       A.   I think where I'm getting stuck a
24  little bit is when you refer to notifying the

Page 298

1   automated system, because it's -- we are talking
2   about -- it's an automated system.
3        Q.   Right.
4        A.   So, you know, Will's role within
5   that -- you know, the automated system was one
6   tool.  Looking at reports or forecasting or
7   demand that we're seeing, those are all tools
8   that Will used as well to make informed
9   decisions and to understand, albeit
10  retrospectively, what a specific customer's
11  ordering habits were.  It essentially gave him
12  more tools in his toolbox to be able to be very
13  effective in his job.
14       Q.   I guess what I'm trying to understand
15  is with regard to the data and information that
16  Mr. Simmons was getting, as you think of it,
17  would it help to inform that algorithm or the
18  formula or whatever was used that was the
19  automated part of the SOM system, or would it
20  inform other parts of the SOM system, or would
21  it inform the people examining orders that had
22  pended, or something else?
23       MR. KNAPP:  Objection to form.
24       MR. LUXTON:  Objection.

Page 299

1        A.   The data that Will was reviewing
2   is -- again, much of it is retrospective.  He
3   would use that -- he was using that for analysis
4   purposes.
5        So, you know, obviously, you know, we
6   want to be making decisions in the realtime when
7   it came to an order, but to give him perspective
8   and to look at -- to look for trend analysis and
9   things like that and also being proactive as
10  possibly as you can with chargeback data, to
11  look to see if there were any customers that
12  were purchasing from multiple sources.
13       So it was just, again it was one more
14  tool that was really autonomous of the automated
15  system but it was part of our holistic process
16  to have a whole view of as much information we
17  could utilize practically within our program to
18  make educated decisions and to really keep our
19  finger on the pulse of our customers.
20       Q.   So that the profiling of the
21  customers wouldn't be happening on an ongoing
22  basis by Mr. Simmons, but the information that
23  he's looking at, referring to here in this
24  Exhibit 21, would not inform the automated

Page 300

1   decision about whether to pend an order; is that
2   fair to say?
3        A.   Right.  That is correct.  Because
4   this is all history that we're looking at.
5        Q.   All right.
6        MR. KNAPP:  Is it about time for
7   another break, or am I just ahead of the
8   time here?
9        MR. EGLER:  No, that's a good idea.
10  Let's take a break.
11       THE VIDEOGRAPHER:  The time is
12  approximately 4:21 p m., and we are going
13  off the record.
14       (Recess is taken.)
15       THE VIDEOGRAPHER:  We are back on the
16  record.  The time is approximately
17  4:36 p m.
18  BY MR. EGLER:
19       Q.   Mr. Napoli, you understand you are
20  still under oath?
21       A.   Yes, sir.
22       Q.   Counsel, I've handed you what I have
23  marked as Exhibit 22.
24       (Napoli Exhibit 22, Email chain

Page 301

1    beginning with email dated 6/27/14 from
2    Napoli to Simmons, Bates-stamped
3    ALLERGAN_MDL_02146710 through 714, marked
4    for identification, as of this date.)
5    BY MR. EGLER:
6        Q.   While you look at it, as you're
7    looking at it I'll read into the record it's
8    ALLERGAN_MDL_02146710 through 714.
9        Can you look at this and tell me,
10   when you're ready, whether you remember this
11   particular set of emails.
12       I'll just note that, from my reading
13   of it, the first email that you're on appears on
14   the second page of the document.
15       A.   Okay.
16       (Document review.)
17       A.   Okay.
18       Q.   All right.  So this email -- well,
19   when you turn to the second page of the document
20   at the bottom, it's page 6711, there is an email
21   from May Chan-Liston.
22       A.   Yes.
23       Q.   Do you know Ms. Chan-Liston?
24       A.   Vague memory.

Page 302

1        Q.   She's listed as -- I guess it's
2    Dr. Chan-Liston.  She's listed as associate
3    director of global risk management for Actavis,
4    and as you think of it, global risk management,
5    were they in part or in whole tasked with
6    complying with FDA regulations?
7        A.   I don't know.  I mean, global risk
8    management can imply a lot of things.
9        Q.   So she says in her email to you and
10   Ms. Woods, "Dear Mary and Tom.  Hello.  I'm
11   reaching out to you in regards to some needed
12   data regarding our product,
13   Buprenorphine-Naloxone SL tablets.  Since this
14   product has an FDA-mandated risk mitigation and
15   evaluation strategy program, REMs, we as the
16   manufacturer are required to submit certain data
17   in order to assess the program.  You and your
18   teams were identified as the resources to
19   provide the following."
20       And then she says, "First, the number
21   of suspicious orders detected and what the
22   outcome was" -- "and what was the outcome from
23   any investigation that occurred on those
24   suspicious orders, order management, Mary Woods,

Page 303

1    and then second, any loss or theft of product,
2    controlled substance compliance, Tom Napoli."
3        And the rest of the emails going
4    forward in time are with you and her and the
5    discussion of the data she is seeking from you.
6        Do you see that there?
7        A.   Um-hmm.  Yes.
8        Q.   And you ultimately find out from
9    Mr. Simmons that you had no theft/lost reports
10   for this product for this time period or during
11   any other period.
12       Do you see that?
13       A.   Yes.
14       Q.   So thinking about the two things that
15   Dr. Chan-Liston is asking for, the numbers of
16   suspicious orders detected and what was the
17   outcome from any investigation that occurred on
18   those suspicious orders, as you sit here today
19   with your understanding of the Suspicious Order
20   Monitoring System at Watson and then Actavis, is
21   that a report that your group or Mary Woods'
22   group could generate?
23       A.   We would certainly -- we maintain the
24   file of orders that were deemed suspicious, so

Page 304

1    we would be able to review that for -- to
2    determine if there was an order that was deemed
3    suspicious for that product.
4        Q.   Would there be any statistics like
5    that kept by your or Mary Woods' office for any
6    reasons?
7        A.   I would likely -- would have likely
8    maintained a file of suspicious order.
9        Q.   But beyond having the file itself,
10   would you have maintained on a regular annual
11   basis a compilation of the number of suspicious
12   orders that pended or were investigated and the
13   results?
14       A.   Orders of interest that pended --
15       Q.   Yes.
16       A.   -- and that were investigated?  I
17   don't have a recollection if that file existed.
18       Q.   So let's -- okay.  We'll mark
19   Exhibit 23.
20       (Napoli Exhibit 23, Document entitled
21   "Customer Analysis and SOMS Overview
22   Import/Export," Bates-stamped
23   ALLERGAN_MDL_021477093 through 7110, marked
24   for identification, as of this date.)

Page 305

BY MR. EGLER:

1    Q.   Mr. Napoli, can you look at what's
2    been marked as Exhibit 23.
3    A.   Sure.
4    Q.   And for the record, I'll note, again
5    the first page has no Bates numbers on it.
6        The second page is
7    ALLERGAN_MDL_02147093 through 7110.  When you're
8    ready, could you tell me what this appears to
9    you to be.
10       (Document review.)
11   A.   This appears to be an outstanding
12   overview that the order Will Simmons put
13   together, breaking down our controlled substance
14   ordering, customer activity, 2014 versus 2015,
15   which, again, just gives us more data for
16   analysis and keeps us more in touch with our
17   customers.  You'll see, you know, details of who
18   our top customers were and how many active SKUs
19   that we have.  Looks like we actually had less
20   customers in 2015 than 2014, and you'll see also
21   distribution of order distribution, so -- by
22   custom -- by customers.
23   Q.   Do you remember ever seeing this

Page 306

1    report before?
2    A.   I'm sure that I have.  I don't have
3    an distinct recollection at the time, but I'm
4    sure that I've seen this.
5    Q.   I'll just tell you by the conventions
6    of the metadata that appear on the first page,
7    you are listed as the custodian for this
8    document.
9        It wouldn't surprise you if you had
10   seen this before, right?
11   A.   No, it would not.
12   Q.   So going into this report, on the
13   first page, it says, "Customer analysis and SOMS
14   overview."
15       Do you see that there?
16   A.   Um-hmm.
17   Q.   And it states "import, export."
18       Do you know what that means in the
19   context of this document?
20   A.   Sure.  Sure.  Will also had
21   responsibilities for the import and export of
22   controlled substances -- the import and export
23   activities, so he would have been providing
24   report out on that as well.

Page 307

1    Q.   Can you turn to page 7095, which is
2    this page (indicating)?
3    A.   Yes.
4    Q.   And can you, as you look at that
5    chart, can you tell me what this appears to be?
6    What is it trying to convey?
7    A.   It's conveying the quantity of solid
8    dosage units by product family that were shipped
9    year over year.
10   Q.   And the first one that's listed there
11   is hydrocodone/APAP?
12   A.   Yes.
13   Q.   Is that right?  And that is an
14   opioid; is that right?
15   A.   Correct.
16   Q.   And it lists, "2015 shipments year to
17   date as 1,155,204," and that's solid dose units,
18   as you said?
19   A.   Yes.
20   Q.   And that's down from the prior year,
21   which was 1,522,346; is that right?
22   A.   Actually 2015 is slightly up over
23   2014.  No, you're right.  I'm sorry.  It's late
24   in the day, but yes, it is down.

Page 308

1    Q.   I appreciate everybody has to take
2    their time.
3        And then the next one there,
4    oxycodone/APAP.
5        In the context of that term, APAP,
6    what does that mean?
7        VIDEOGRAPHER:  Don't touch the
8    microphone, please.
9        THE WITNESS:  I have a habit of
10   grabbing my zipper.
11   A.   APAP is aspirin.  I believe there's
12   APAP and there's -- yeah, APAP is aspirin.  So
13   it's a combination product.
14   Q.   So this is oxycodone and aspirin, and
15   again in 2015 400,495 solid dose units shipped,
16   which is down from 555,916 in 2014.
17       The next one is oxycodone/HCL.
18   A.   Um-hmm.
19   Q.   What does HCL mean?
20   A.   Hydrochloride.  It's a single entity
21   oxycodone.
22   Q.   Okay.  So is that generic OxyContin?
23   A.   No, that may be --
24   Q.   Is it generic Opana ER?

1    A.  I would say that that is likely --
2  let me try to look down the list here, so I can
3  make more educated -- would be the oxycodone 10-
4  and 30-milligram immediate release product.
5    Q.  So as opposed to a slow release or --
6    A.  Yes.
7    Q.  -- longer acting pill?
8    A.  Correct.
9    Q.  So those shipments are up, 2015
10  shipments being 308,097 solid dose units as
11  opposed to just under 200,000 in 2014; is that
12  right?
13    A.  Correct.
14    Q.  So do you know why this information
15  would have been collected?
16    A.  This is just giving us an annual year
17  over year so we have an understanding of
18  customer ordering behavior.  Just, again,
19  another tool that we can use at our disposal,
20  more less of a annual report.
21    Q.  Then there's various other data on
22  the following pages.  And as you go further into
23  the document at 7099 it states at the top,
24  Suspicious Order Monitoring.

1    The first thing there is the CFR that
2  we've read before; is that right?
3    A.  Um-hmm.  Yes.
4    Q.  And the second thing is a quote from
5  Southwood Pharmaceuticals, Inc.
6    A.  Um-hmm.
7    Q.  And that is from the Federal Record,
8  is that right.
9    Do you remember anything about the
10  Southwest Pharmaceuticals case?
11    A.  I do.  I'm not up on all the details.
12  I know it was a -- I don't want to call it a
13  landmark case, but I know it was a significant
14  case.  I think that's probably where it was
15  determined that relying on rigid formulas maybe
16  appears -- may be setting a precedent, but
17  that's...
18    Q.  And then on the next page it states,
19  "SOM system" and states, "SAP system suspends
20  orders based on" -- it has a number of things
21  there -- "class of trade, average" -- is it
22  "quantity/order"?
23    A.  Um-hmm.
24    Q.  And then "class of trade, average

1  quantity ordered per month"?
2    A.  Um-hmm.  Yes.
3    Q.  And "customer allowable quantity per
4  order and customer allowable quantity order per
5  month"; is that right?
6    A.  Correct.
7    Q.  And then it has other information,
8  "System flagged, orders released based on
9  customer allowable quantity per month and
10  current month's order plus pending order" -- and
11  then it says, "If less than allowable quantity
12  per month, release order.  If more than
13  allowable quantity per month, contact customer."
14    Do you see that?
15    A.  Yes.
16    Q.  So the first part up there, "The SAP
17  system suspends orders based on," is that the
18  Buzzeo process?
19    A.  No, that is a -- just reiteration
20  of the system we've been talking about.
21    Q.  Okay.
22    A.  This presentation is an overview --
23  it's an overview of our -- it looks like a
24  walk-through of our system, of our process.

1    Q.  So then by 2015, is it fair to say
2  that Actavis, at this point, had not changed
3  from the prior Watson automated system; is that
4  right?
5    A.  That's correct.  I think what you can
6  see here is the trajectory of enhanced Know Your
7  Customer, as well as the -- seizing more
8  opportunities to use more data that is available
9  to us internally to give us a more holistic view
10  of our customers' ordering patterns.
11    Q.  All right.  Going down into page 107
12  it states, "Additional Analysis."
13    (Document review.)
14    A.  Yes.
15    Q.  And it says, "Chargeback" -- and it
16  has a paragraph about chargebacks.  That says,
17  "Monthly chargeback analysis performed for oxy
18  and hydro products."  It says, "Customers
19  purchasing large amounts from multiple
20  distributors, more than two distributors, and
21  then in (primary, secondary, tertiary) and then
22  analyze month-over-month trends to detect
23  pattern and then assist in violation" -- I'm
24  sorry -- "Assist in validation of SOMS orders."

Page 313

1      So is this the chargeback analysis
2  that we were talking about with Mr. Simmons in
3  his annual review previously?
4      A.  Yes.
5      Q.  All right.  And, again, as we talked
6  about before, this would inform the decision
7  about whether to clear or escalate an order that
8  had pended typically; is that right?
9      A.  It could be used, yes, as a resource.
10      Q.  What else could it be used for?
11      MR. KNAPP:  Form.
12      A.  It could be used as a resource for
13  conducting an investigation on a pending order,
14  but it can also be used as a statistical
15  analysis tool to -- to look for trends or
16  evaluate if these types of activities, for a
17  forensic review-type of tool.
18      Q.  You can set this document aside.
19  I'll hand you what I'll mark as Exhibit 24.
20      (Napoli Exhibit 24, Email chain
21      beginning with email dated 7/31/14 from
22      Napoli to Simmons, Bates-stamped
23      ACQUIRED_ACTAVIS_02476517 through 6518,
24      marked for identification, as of this

Page 314

1  date.)
2  BY MR. EGLER:
3      Q.  Mr. Napoli, can you look generally at
4  what's been marked as Exhibit 24.  And as you're
5  doing so, I'll note for the record that it's
6  officially two pages long, acquired Actavis
7  0247, 6517 through 6518.  But the second page,
8  although it's one Bates number, is the
9  PowerPoint presentation that's printed out
10  behind there.
11      Do you see that?
12      A.  Sure.
13      Q.  All right.  And again in the way
14  these things are produced, the PowerPoint
15  presentation was produced as one Bates number.
16      So as you look at this PowerPoint
17  presentation and the emails that are there, the
18  email that's first in time comes from a person
19  named Ann, A-n-n, C., is it, Cipkins?
20      A.  Yes.
21      Q.  C-i-p-k-i-n-s.
22      Do you know Ms. Cipkins?
23      A.  I do.
24      Q.  Who is Ms. Cipkins?

Page 315

1      A.  I don't know if she still is, but she
2  was the director of demand management for
3  Actavis.
4      Q.  As you think of it, what does demand
5  management mean?
6      A.  Demand management is a group within
7  our supply chain group and they would be a
8  liaison between understanding what the needs are
9  of the customer, as well as interfacing with the
10  sites that manufacture those projects and to
11  help them to -- you know, to coordinate the
12  scheduling.  So, essentially, she would be
13  communicating or putting together data relative
14  demand, communicating that with the site so the
15  site can schedule their manufacturing around
16  that to be able to meet that demand.
17      So in order they may need to
18  prioritize certain products to manufacture
19  during a certain time frame because -- to meet
20  the demand.
21      Q.  All right.  And she writes to a big
22  group of people including yourself, "Attached is
23  the generic S&OP deck.
24      Do you have an understanding of what

Page 316

1  S, ampersand, OP means?
2      A.  Yes.  It's an S&OP meeting.  An S&OP
3  meeting is a common meeting that occurs in many
4  organizations, whether pharmaceutical or
5  otherwise, and it's basically a sales and
6  operations meeting and it's an opportunity to --
7  for the folks on the sales and the commercial
8  side to interface with the operation side to
9  enhance communication.  Again, to ensure that
10  we -- that the organizations are on the same
11  page, understanding, you know, things, if they
12  have been bids awarded, if there are any issues
13  where somebody is falling out of the market,
14  identifying any opportunities, so that everyone
15  has an understanding and is on the same page and
16  can communicate that back, whether they need to
17  work that into their plans to support the
18  manufacturing sites, et cetera.
19      Q.  All right.  So this presentation
20  doesn't have page numbers.  I'm going to hold up
21  a page to you and it states, "TU Summary (as of
22  7/1)."
23      Would you turn to that page.
24      A.  Yeah.

Page 317

1      Q.   And do you have an understanding of
2   what this TU summary as of 7/1 is trying to
3   convey?
4      A.   TU, I believe, is Temporarily
5   Unavailable, and it's showing that because of --
6   you see here a reason code, API issue, maybe
7   there isn't enough API, maybe the API failed a
8   test that -- or again insufficient amount of API
9   that we were not able to meet demands.  So there
10  has been a cumulative loss in sales associated
11  with that.
12        So this is really a callout to the
13  business as far as products where we have issues
14  that are temporarily unavailable.  And of course
15  management would want to always be kept abreast
16  of products that are temporarily unavailable and
17  when we're going to get back to market with
18  these products.
19     Q.   All right.  And then there is another
20  slide, and it's -- I think it's six pages from
21  the end, or four pages from the end, it states
22  "Business Opportunities."  It looks like this
23  (indicating).
24        (Document review.)

Page 318

1      Q.   It states, "Business opportunities,
2   McKesson has confirmed the Rite-Aid award for
3   oxy 15 milligrams and 30 milligrams beginning in
4   September."
5        From the context of this document,
6   can you tell what that statement means?
7      A.   Sure.  That means that our customer
8   McKesson has confirmed with us that they've won
9   an award from Rite-Aid for the business for this
10  particular -- for these particular SKUs and
11  they're reporting what the estimated annual
12  units will be for those products.
13     Q.   So -- go ahead.
14     A.   I was going to say, that's why you'll
15  see that Ann forwarded this onto my team because
16  it's a good source of intelligence for us.  So
17  now we can see we're getting advance
18  information, that, okay, we can anticipate that
19  we're going to see an increase in SOMS and
20  volume on orders on these, and we can dig deeper
21  on this so we can be ready for when this occurs.
22     Q.   And going back to the first page,
23  that's what you write to Mr. Simmons; is that
24  right?

Page 319

1      A.   Yup.
2      Q.   All right.
3      A.   So it's just another source of
4   intelligence to help us be more effective in
5   compliance.
6      Q.   All right.  You can set this document
7   aside.  I'll hand you what we'll mark as
8   Exhibit 25.
9        (Napoli Exhibit 25, Actavis document
10       entitled "Project Continuation
11       Justification:  SOM Statistical Model
12       Development and Hosting 'in the Cloud'",
13       Bates-stamped ALLERGAN_MDL_ 03535253
14       through 257, marked for identification, as
15       of this date.)
16  BY MR. EGLER:
17     Q.   Mr. Napoli, can you look at
18  Exhibit 25, and like the other ones today the
19  first one has no Bates numbers and then the
20  second page is ALLERGAN_MDL_03535253 through
21  257.
22        And when you're ready, can you tell
23  me if you've ever seen this document before.
24        (Document review.)

Page 320

1      A.   I have seen this document.
2      Q.   Did you write this document?
3      A.   Yes, sir.
4      Q.   Why did you write this document?
5      A.   I wrote this document as a means to
6   get the Cegedim or Cegedim-Dendrite solution
7   implemented.
8      Q.   At the bottom left-hand corner of the
9   first Bates-stamped page, 253, it has the date
10  February 19th, 2015.
11     A.   Yes.
12     Q.   Do you remember writing this document
13  around that time?
14     A.   It's very likely.
15     Q.   Then on the second Bates-stamped
16  page, 254, the section that starts with:
17  "Background."
18        Do you see that?
19     A.   Yes.
20     Q.   The second full text paragraph, I'm
21  just going to start reading it into the record.
22  It says, "Based on this compliance need, Cegedim
23  did in fact develop and deliver a SOM
24  statistical model to be incorporated into our

Page 321

1    order management system within SAP.  Due to
2    successive acquisition activities since product
3    initiation the implementation has been placed on
4    hold at several junctures based on business
5    integration needs.  During the past several
6    years, DEA has become more aggressive in its
7    approach related to SOM/Know Your Customer
8    taking against" -- "taking action against a
9    growing number of companies for having
10   non-compliant SOM programs.  In an effort to
11   ensure compliance with the regulations, both the
12   C/S compliance, order management teams, have
13   collaborated making efforts to enhance
14   compliance from customer vetting, order
15   review/evaluation through
16   investigation/disposition.
17        "This manual effort is very labor
18   intensive, as the current system was not
19   configured with any analytical tools to support
20   timely and accurate decision making.  This
21   approach also introduces the element of human
22   interaction into the order evaluation process.
23        "Additionally, the current process
24   can have an impact on the amount of time

Page 322

1    required to release a pended order that is under
2    review, affecting customer service/fill rate
3    levels."
4        Do you see that there?
5    A.   I do.
6    Q.   Did you write that?
7    A.   Yes, I did.
8    Q.   At the time that you wrote it, did
9    you believe what you wrote there?
10       MR. LUXTON:  Objection to form.
11   A.   Yup, I do believe that those facts
12   are accurate.  We did have -- we did have a
13   compliance system, but we wanted to ensure our
14   compliance to ensure that we were always
15   continually evolving it on the high ground.
16   Q.   So above there you write, under
17   background, "The SOM" -- "The SOM automation
18   project initially commenced in 2011 with the
19   primary goal of replacing our, quote, threshold,
20   unquote, based system with the CFR compliant
21   model developed by Cegedim.  This project was
22   initiated in an effort to ensure compliance with
23   the Code of Federal Regulations, SOM
24   requirements, controlled substances, 21 CFR

Page 323

1    1301.74 b, as well as December 2007, DEA
2    memory."
3        Do you see that?
4    A.   I did.
5    Q.   When you wrote that in February 2015,
6    did you believe that to be true?
7    A.   I did believe that Buzzeo had a
8    system that they were proposing that was
9    compliant with the CFR
10        We also had one as well, but we
11   wanted to move up to a more enhanced
12   sophisticated system.
13   Q.   So other parts of the -- this memo
14   talk about a suspicious order monitor --
15   suspicious order monitor statistical model that
16   will be hosted, quote, in the cloud and based on
17   Actavis's order data.
18   A.   Yes.
19   Q.   Do you remember whether this
20   cloud-based SOM statistical model was ever
21   adopted at Actavis?
22   A.   This system was created.  We used it
23   in a test environment.  We're happy with it.  We
24   were subsequently acquired by Teva and it was

Page 324

1    put on hold and I don't believe that Teva chose
2    to utilize it.
3    Q.   All right.  So with regard to the --
4    this is -- so with regard to your
5    understanding -- well, with regard to your
6    understanding, Actavis never implemented the
7    cloud-based system that's discussed in this
8    memo; is that right?
9    A.   That's correct.  When Teva acquired
10   Actavis around this time frame they already had
11   their own program in place for Suspicious Order
12   Monitoring.
13   Q.   So this goes to the number of
14   corporate transactions that took place --
15   A.   Right, right.
16   Q.   You're describing the company as
17   being bought by Teva.  Part of what was Actavis,
18   was purchased and closed on by Allergan.
19        Do you have an understanding of that
20   as well or some type of transaction occurred
21   between Allergan and Actavis; is that right?
22   A.   Right.
23   Q.   Either Actavis bought Allergan or
24   Allergan bought Actavis?

Page 325

1     A.   Actavis bought Allergan.
2     Q.   All right.  And as far as you're
3  concerned -- well, during that process, when did
4  you leave?
5     A.   I left around maybe October of 2016.
6  Sometime in the early fall of 2016.
7     Q.   So I'm going to hand you what we will
8  mark as Exhibit 26.
9     A.   Okay.
10        (Napoli Exhibit 26, Email chain
11     beginning with email dated 1/11/16 from
12     Baran to Russo with attachment,
13     Bates-stamped ALLERGAN_MDL_03431731
14     through 1739, marked for identification, as
15     of this date.)
16  BY MR. EGLER:
17     Q.   Before we get to Exhibit 26, why did
18  you leave?
19     A.   I was laid off.
20     Q.   All right.
21     A.   Because Teva already had a DEA
22  compliance staff and program.  I helped them
23  orient them with -- with our side of the
24  business and was part of a reduction in force.

Page 326

1     Q.   All right.  So looking at what I
2  marked as Exhibit 26, can you page through it.
3  I'll read into the record.  It's
4  ALLERGAN_MDL_03431731 through 1739.
5        If you look through this generally,
6  but I'm just going to ask you a few questions
7  about this.
8        (Document review.)
9     Q.   Now I'll note for the record that the
10  last email that you're on the page appears on
11  the third page of this document, as I read it.
12     A.   Um-hmm.
13        (Document review.)
14     A.   Okay.
15     Q.   All right.  Based on the emails that
16  are here, do you remember around August 2015
17  Actavis deciding to sell to Bell Medical again?
18     MR. KNAPP:  Objection to form.
19     A.   I do recall this series of emails and
20  this situation.
21     Q.   All right.  Did you have any input in
22  the decision whether to start selling controlled
23  substances to Bell Medical around this time?
24     A.   My input would have been from a DEA

Page 327

1  compliance standpoint the -- you can see in this
2  email string that there was -- both of our
3  auditor investigators did a lot of due diligence
4  on this and also met personally, I believe, with
5  the individual from Bell Medical, in Marlboro,
6  New Jersey.
7        And the reason why this stands out to
8  me is that, you know, Actavis, we had a model
9  where we did not distribute direct to dispensing
10  physicians.  And in this case it was a case
11  where we wanted to make sure that we did the
12  right amount of due diligence and understand and
13  monitor what the product -- it would only be one
14  product, what the quantities would be, and they
15  were for these clinics -- Buprenorphine -- they
16  were for clinics to assist, I believe, addicts
17  with -- Buprenorphine was used for more -- for
18  heroin, I think.
19     Q.   Did you ever do a site visit to the
20  Bell Medical facility?
21     A.   I didn't, but I believe Will Simmons
22  may have.
23     Q.   Did you ever talk with him about the
24  site visit that he did?

Page 328

1     A.   I don't have a distinction
2  recollection of it.
3     Q.   All right.  So now we have a couple
4  of exhibits that are out of order time-wise.
5     A.   Okay.
6     Q.   The first one we'll mark as
7  Exhibit 27.
8        (Napoli Exhibit 27, Email dated
9     11/13/13 from Kemnitzer to distribution
10     list, Bates-stamped PPLPC020000735777
11     through 782, marked for identification, as
12     of this date.)
13     MR. LUXTON:  Thanks.
14  BY MR. EGLER:
15     Q.   Mr. Napoli, can you look at
16  Exhibit 27.  I'll note for the record, again,
17  it's not an Actavis or Allergan document.  It's
18  noted as PPLPC020000735777 through 782.  The
19  last page is marked as nonresponsive.
20        Can you look at this document and
21  tell me if you ever remember receiving an email
22  like this in November 2013.
23        (Document review.)
24     A.   I don't have an exact recollection of

Page 329

1    this.  This looks like an agenda for a New
2    Jersey Pharmaceutical Industry Group meeting.
3        Q.   All right.  So if you turn to the
4    third page of this document, which is 5779 --
5        A.   Yes.
6        Q.   -- there is an email from Michael
7    Meggiolaro.  It's M-e-g-g-i-o-l-a-r-o.
8        A.   Good job.
9        Q.   It's dated Thursday, November 7,
10   2013, at 5:09 p.m.
11         Do you see that there?
12       A.   I do.
13       Q.   And he writes, apparently to a person
14   named Lisa Butler.  "Lisa, you are so good.  I
15   promised the update for all the topics yesterday
16   but didn't get to them.  Here is what I had
17   received.  You already added Susan Carr's, so I
18   don't have to add hers to the list."
19         And just to note, your name appears
20   on that email; is that right?
21       A.   Yes.
22       Q.   And it says, "Please update the
23   agenda accordingly at 2014 quota letters" -- and
24   then number two is, "SOM programs."

Page 330

1         And then under SOM programs it says,
2    "Is anyone auditing customers?  If so, how?
3    (Site visits, questionnaires, et cetera)."
4         And then the second one is:
5    "Computerized statistical models."
6         Do you see that there?
7        A.   Yes.
8        Q.   Do you remember attending a New
9    Jersey PIG meeting where SOM programs were
10   discussed around November 2013?
11       A.   I don't.
12       Q.   All right.  You can set that one
13   aside.
14         (Witness complies.)
15       Q.   I'm going to do this one as two
16   separate exhibits.  I'll hand you what we'll
17   mark as Exhibit 28 and 29.
18         (Napoli Exhibit 28, Email chain
19   beginning with email dated 1/14/16 from
20   Lepore to Simmons, Bates-stamped
21   ALLERGAN_MDL_01551062 through 1064, marked
22   for identification, as of this date.)
23         (Napoli Exhibit 29, Natively-produced
24   Spreadsheet, Bates-stamped

Page 331

1    ALLERGAN_MDL_01551064.xlsx, marked for
2    identification, as of this date.)
3    BY MR. EGLER:
4        Q.   Mr. Napoli, can you look at what I've
5    marked as Exhibits 28 and 29.
6         I'll tell you, for the record,
7    although they are marked as two exhibits, they
8    are one email and one family as produced by the
9    defendants in the case.
10       A.   Okay.
11       Q.   For the record, Exhibit 28 is
12   Bates-stamped ALLERGAN_MDL_01551062 through
13   1064.
14         And then 29 is a larger version of
15   page 1064, which is produced as an Excel file.
16         Can you look through it, and the
17   question I have is:  Do you remember receiving
18   this email?
19       A.   I do not.
20       Q.   So this email that starts on the
21   first page of Exhibit 28 states:  "Re McKesson
22   DEA suspensions."
23         Do you remember around January 14,
24   2016, when this email took place there was a

Page 332

1    suspension of various DEA licenses at McKesson
2    locations?
3        A.   I do recall that McKesson did have
4    some compliance issues and some subsequent
5    registration suspensions.
6        Q.   And then in an email below, Victoria
7    Lepore writes to you and other people, "Hi, Will
8    and Tom, just want to keep you in the loop that
9    I found out the McKesson's DEA registration
10   (Aurora, Colorado; Livonia, Michigan; Washington
11   Court House, Ohio; and Lakeland, Florida) is
12   suspended for specified products and time
13   periods."  And then she attaches a link and
14   other text.
15         On the top email is what she refers
16   to as the HANA report for McKesson locations
17   that we shipped to from January 2015 to
18   January 2016.
19         Do you see that?
20       A.   Yup.  Yes.
21       Q.   Do you remember from your time
22   working at Actavis and Watson the term HANA
23   report?
24       A.   HANA is a feature, a reporting

Page 333

1    feature of SAP.
2        Q.   All right.  And so do you remember
3    Ms. Lepore doing reports like this when you or
4    someone else asked for them at Watson and
5    Actavis?
6        A.   I don't specifically have a lot of
7    experience with it, but then HANA was something
8    that you can see by the time frame on there too,
9    it was a recent addition to the SAP.  So it
10   wasn't a report we would have had access to for
11   a long period of time.  I would think that this
12   report is generated so we could rationalize what
13   quantities would be looking like for orders that
14   would be, maybe, going to alternate distribution
15   centers for McKesson.
16           This was not something that was a
17   surprise.  McKesson had had some ongoing issues.
18   They had since hired Gary Boggs as their chief
19   of compliance, who was Joe Rannazzisi's deputy,
20   to come into the organization.
21           I flew out to San Francisco and I met
22   with McKesson.  There were many attorneys and
23   compliance people to discuss their compliance
24   program and to get an understanding of some of

Page 334

1    these things.
2            So we knew, because, you know, these
3    investigations, as you know, can go on for
4    years, and -- but the ultimate result was they
5    had a feeling that these facilities would have
6    licenses that would be suspended.  So this is
7    something that we would have had knowledge of
8    and planned around.
9        Q.   Do you remember around this time,
10   January 2016, whether your group at Actavis
11   performed any analysis to determine whether any
12   sales to these suspended McKesson locations were
13   diverted?
14       A.   It would be a challenge for us to do
15   that from our level, to look at pharmacies to
16   determine what was diverted.  That would be
17   something that would be inherent to a DEA
18   investigation.  We don't even know what the time
19   period is that they were looking at.  So it
20   really would not be something that would be
21   realistic for us to perform.
22       Q.   Did you or anyone else that you know
23   of at Actavis ask for that type of data from
24   McKesson around this time frame?

Page 335

1        A.   What we did is we asked for a
2    partnership meeting.  That's why I traveled out
3    to San Francisco, because I wanted to -- I was
4    concerned and I wanted to get an overview and an
5    understanding of their program and improvements
6    that they had made, and especially with bringing
7    on their new head of compliance, to understand
8    that we had a level of confidence in their
9    program going forward.
10       Q.   And as part of that partnership
11   meeting or other parts of the relationship, do
12   you remember asking or do you remember anyone
13   from Actavis asking for data about whether
14   materials sold to these McKesson locations was
15   subsequently diverted?
16       A.   I don't recall and I don't know how
17   that would be accessible to us.
18       Q.   All right.  But you don't recall
19   asking for it one way or the other?
20       A.   No, I don't.
21       Q.   All right.
22           MR. EGLER:  Let's take a quick break.
23           THE VIDEOGRAPHER:  The time is
24   approximately 5:25 p.m.  We are going off

Page 336

1    the record.
2            (Recess is taken.)
3            THE VIDEOGRAPHER:  We are back on the
4    record.  The time is approximately
5    5:34 p.m.
6    BY MR. EGLER:
7        Q.   Mr. Napoli, you understand you are
8    still under oath.
9        A.   Yes, sir.
10       Q.   So do you identify yourself as ever
11   having worked for an entity called Allergan?
12       A.   Yes.
13       Q.   For about how long did you work at
14   Allergan?
15       A.   I'm trying to think.  Actavis
16   acquired Allergan.  I'm trying to think of when
17   at the time Actavis acquired Allergan and then
18   Allergan...
19       Q.   Well, let me put it this way, was it
20   less than a year?
21       A.   Probably more than a year.
22       Q.   So at the time that you worked for
23   Allergan, did -- as you think of it, in your
24   estimation, did Allergan still own the generics

Page 337

1    that they subsequently sold to Teva?
2         MR. KNAPP:  Objection to form.
3    Foundation.
4         MR. LUXTON:  Same.
5         A.   I don't know how they -- you know,
6    Allergan and Actavis were the -- are the same
7    company, but I don't know how the structure, the
8    parent structure.
9         Q.   I understand this and I'm trying to
10   ask in a very general way.  So maybe you'll let
11   me ask it a different way.
12        So you have an understanding that
13   after either Allergan or Actavis sold the
14   generics to Teva, that there were still some
15   controlled substances manufactured or owned by
16   the Allergan entity?
17        A.   Yes.
18        Q.   And do you remember whether -- when
19   that occurred, you were still working there?
20        A.   When what occurred?
21        Q.   When the -- after the generics all
22   left, but there was still some controlled
23   substances owned by Allergan.
24        MR. KNAPP:  Form.

Page 338

1         A.   I would have been part of the Teva
2    acquisition, so I would no longer have been with
3    Allergan.
4         Q.   So with regard to any Suspicious
5    Order Monitoring System that Allergan had in
6    place after the sale to Teva, you wouldn't have
7    had anything to do with that; is that correct?
8         A.   Correct.
9         MR. EGLER:  I have no further
10   questions.
11        THE VIDEOGRAPHER:  Anyone else has
12   questions.
13        MR. KNAPP:  I have a few questions.
14   Do I need to get a microphone?
15        THE VIDEOGRAPHER:  Yes, you can have
16   that microphone.
17   EXAMINATION BY
18   MR. KNAPP:
19        Q.   Good afternoon, Mr. Napoli, my name
20   is Tim Knapp.  I'm with the firm of Kirkland &
21   Ellis and I represent Allergan in this matter.
22        In response to some questions that
23   Mr. Egler asked you, you testified about
24   reporting an order from TopRX to the DEA.

Page 339

1         Do you recall that?
2         A.   Yes, I do.
3         Q.   I know it's been, you know, five
4    years or so since you've left Actavis, Watson,
5    but do you recall sitting here today, recall
6    reporting any other orders or customers to the
7    DEA during the time that you worked on
8    Suspicious Order Monitoring at Actavis or
9    Watson?
10        A.   I do.
11        Q.   And what are those entities that you
12   recall?
13        A.   I know Capital Wholesale was one of
14   them.  And I'm -- there were several others, but
15   I'm hard-pressed to recall them, but there were
16   additional organizations other than TopRX and
17   Capital that we did report.
18        We also did some preemptive reporting
19   to the DEA as well, too.  After the acquisition
20   of Actavis, we had a customer that wanted to
21   come on board with us.  Quality King.  It was a
22   company out of New York, and we did a review of
23   them.  We asked for their customer information,
24   what products they were interested in purchasing

Page 340

1    from us and we determined that they were high
2    risk due to distributions that they were making
3    in the State of Florida and other states.  Some
4    of their customers were questionable, so we
5    denied them and also reported them to the DEA
6    because we felt it was -- they were that much of
7    a risk.
8         Q.   Now when you say "we reported to the
9    DEA," who specifically are you referring to?
10        A.   I specifically reported that to the
11   DEA to -- the company was based out of Long
12   Island, so I reported to Richard Springer, who
13   is the diversion chief in the Long Island
14   office.
15        Q.   And with respect to TopRX, did you
16   personally report them to the DEA?
17        A.   Yes.
18        Q.   And do you recall who you reported
19   TopRX to?
20        A.   Yes.  That would have been Tim Lenzi
21   in the Chicago DEA field office.
22        Q.   And then what about Capital
23   Wholesale, did you personally report them to the
24   DEA?

Page 341

1      A.   Yes.  It would have been the same.
2      Q.   And when you say it's the same, who
3  did you report to?
4      A.   To Tim Lenzi, DEA field office,
5  Chicago.
6      Q.   Now Mr. Napoli, you also spoke quite
7  a bit with Mr. Egler about issues associated
8  with diversion of controlled substances.
9           We talked a lot about Suspicious
10  Order Monitoring System today.
11          I just want to ask you, generally,
12  were there any other efforts that you undertook
13  or that the company undertook while you were at
14  Watson, Actavis, Allergan to increase awareness
15  associated with potential diversion of
16  controlled substances?
17     A.   Yes.  First, I'd like to say that I'm
18  actually -- I'm proud of my tenure in the
19  position that I served in.  I felt that I made a
20  difference and it was always our goal to ensure
21  that we were complying and did the right thing.
22          One of the things that I was proud of
23  and that the company did was after the Actavis
24  acquisition, there was a product called

Page 342

1  promethazine with codeine, which was a cough
2  preparation that contained codeine, that was --
3  actually became popularized within the Houston
4  area Rap culture.  It was a high abuse product;
5  it was referred to as the purple drink, and
6  Actavis was referenced in the social media in
7  different capacities in a very negative light
8  because of this product, and our company decided
9  that that product was not worth the risk
10  associated with it.  So we discontinued the
11  entire product.
12          So I thought that was a proactive
13  step and actually the DEA actually recognized
14  that as well as a positive effort to combat
15  diversion.
16          I also initiated a program called, It
17  Starts With Me, which was a program that engaged
18  our employee population throughout our entire
19  U.S. region regarding the abuse of the opioids
20  that have been going on with the United States,
21  engaging our employees to raise the level of
22  awareness but also to get socially engaged.
23          We partnered with a -- and sponsored
24  a group called Young People in Recovery, and

Page 343

1  that group, we supported their chapters
2  throughout the U.S. financially and with any
3  type of support.  We had a lot of our employees
4  who did fundraising for these organizations, and
5  it was individuals who -- again, who in their
6  teens and 20s who had issues and struggles with
7  opioids and that were turning things around, and
8  we were very proud to support that program, as
9  well as supporting law enforcement in providing,
10  take-back receptacles to multiple jurisdictions
11  as well, too.
12          So, again, just very proud of a lot
13  of the work that we did, not only to ensure
14  compliance within our work communities but also
15  in the communities in which we live.
16     MR. KNAPP:  I have nothing further.
17  Thank you very much.
18     MR. EGLER:  I have nothing else.
19     (Continued on following page to
20  include jurat.)
21
22
23
24

Page 344

1
2
3
4      THE WITNESS:  Thank you.
5      THE VIDEOGRAPHER:  The time is
6  approximately 5:42 p.m. and this concludes
7  the deposition.
8
9
10
11     _____.
12          THOMAS P. NAPOLI
13
14
15  Subscribed and sworn to before me
16  this    day of      2019.
17
18     _____
19
20
21
22
23
24

Page 345

```
 1            C E R T I F I C A T E
 2
 3    STATE OF NEW YORK      )
 4              : ss.
 5    COUNTY OF WESTCHESTER  )
 6
 7         I, ANNETTE ARLEQUIN, a Notary Public
 8    within and for the State of New York, do
 9    hereby certify:
10         That THOMAS P. NAPOLI, whose deposition
11    is hereinbefore set forth, was duly sworn
12    by me, and that the transcript of such
13    depositions is a true record of the
14    testimony given by such witness.
15         I further certify that I am not related
16    to any of the parties to this action by
17    blood or marriage; and that I am in no way
18    interested in the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto set
20    my hand this 17th day of January 2019.
21
22    _____
23         ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
24
```

Page 346

```
 1              I N D E X
 2
     WITNESS                  PAGE
 3
     THOMAS P. NAPOLI
 4     MR. EGLER              9
 5     MR. KNAPP              339
 6        I N D E X   O F   E X H I B I T S
 7    ALLERGAN-NAPOLI EXHIBITS           PAGE
 8    Napoli Exhibit 1, Memo dated       24
       11/13/08, Bates-stamped
 9     ALLERGAN_MDL_03535130 through 5133
10    Napoli Exhibit 2, NJPIG Charter    48
       Statement, Bates-stamped
11     HDS_MDL_00095906 through 5907
12    Napoli Exhibit 3, Cegedim-Dendrite 55
13     document dated 10/21/08,
14     Bates-stamped ALLERGAN_MDL_03535009
15     through 010
16
17    Napoli Exhibit 4, Email chain      57
18     beginning with email dated 6/8/09
19     from Woods to Napoli, Bates-stamped
20     ALLERGAN_MDL_02467143 through 154
21
22    Napoli Exhibit 5, Document entitled  91
23     "Customer Communication for SOMS,"
24     ALLERGAN_MDL_03738524 through 8528
```

Page 347

```
 1        I N D E X   O F   E X H I B I T S(Cont'd.)
      ALLERGAN-NAPOLI EXHIBITS           PAGE
 2
      Napoli Exhibit 6, Email dated 2/2/10    103
 3     from L. Scott to T. Napoli with
       attachment, ALLERGAN_MDL_01236063
 4     through 6094
 5     Napoli Exhibit 7, Email chain      138
       beginning with email dated 4/12/10
 6     from S. Soltis to Napoli,
       Bates-stamped ALLERGAN_MDL_01236097
 7     and 6098
 8     Napoli Exhibit 8, Email chain      147
       beginning with email dated 4/29/10
 9     from L. Scott to Napoli,
       ALLERGAN_MDL_01236095 through 6096
10
      Napoli Exhibit 9, PowerPoint       166
11     presentation entitled "DEA affairs
       Organizational Achievements,
12     ALLERGAN_MDL_02467984 through 7998
13    Napoli Exhibit 10, Watson 210      177
       Performance Review Form - Exempt,
14     Bates-stamped ALLERGAN_MDL_03535275
15     through 283
16
17    Napoli Exhibit 11, Customer Services  181
18     Agreement - Statement of Work No. 1,
19     Bates-stamped ALLERGAN_MDL_03535028
20     through 5030
21
22    Napoli Exhibit 12, Meeting Minutes 186
23     dated 9/8/11 ALLERGAN_MDL_02176488
24     through 6492
```

Page 348

```
 1        I N D E X   O F   E X H I B I T S(Cont'd.)
      ALLERGAN-NAPOLI EXHIBITS           PAGE
 2
      Napoli Exhibit 13, Document entitled  218
 3     "controlled Substance Awareness:
       Understanding the Threat,"
 4     Bates-stamped ALLERGAN_MDL_02054999
       through 5022
 5
      Napoli Exhibit 14, NJPIG letter dated 225
 6     7/20/11 from NJPIG Committee to
       Rannazzisi, Bates-stamped
 7     ENDO-OPIOID_MDL-02219848 through
       19851
 8
      Napoli Exhibit 15, Watson document 239
 9     entitled SOMS Project Evolution IT
       Governance Meeting, Bates-stamped
10     ALLERGAN_MDL_02468983 through 68994
11    Napoli Exhibit 16, Watson document 257
       entitled SOMS Project Evolution IT
12     Governance Meeting, Bates-stamped
13     ALLERGAN_MDL_02187196 through 87199
14
15    Napoli Exhibit 17, Email chain     262
16     beginning with email dated 4/26/12
17     from Picone to Woods with
18     attachments, Bates-stamped
19     ACQUIRED_ACTAVIS_01179002 through 005
20
21    Napoli Exhibit 18, Cegedim document 276
22     entitled Buzzeo PDMA Suspicious Order
23     Monitoring Seminar, Bates-stamped
24     ALLERGAN_MDL_02467214 through 7216
```

Page 349

1       I N D E X   O F   E X H I B I T S(Cont'd )
ALLERGAN-NAPOLI EXHIBITS          PAGE
2
Napoli Exhibit 19, Email chain          282
3    beginning with email dated 9/27/12
from Napoli to Lepore and others,
4    Bates-stamped ALLERGAN_MDL_ 04173111
through 113
5
Napoli Exhibit 20, Email chain          287
6    beginning with email dated 6/26/13
from Collins to Napoli, Bates-stamped
7    ALLERGAN_MDL_02179760 through 772
8    Napoli Exhibit 21,2014 Year-End          294
Review DEA Materials, Bates-stamped
9    ALLERGAN_MDL_03535137 through 143
10   Napoli Exhibit 22, Email chain          301
beginning with email dated 6/27/14
11   from Napoli to Simmons, Bates-stamped
ALLERGAN_MDL_02146710 through 714
12
Napoli Exhibit 23, Document entitled          305
13   "Customer Analysis and SOMS Overview
Import/Export," Bates-stamped
14   ALLERGAN_MDL_021477093 through 7110
15   Napoli Exhibit 24, Email chain          314
beginning with email dated 7/31/14
16   from Napoli to Simmons, Bates-stamped
ACQUIRED_ACTAVIS_02476517 through
17   6518
18
19   Napoli Exhibit 25, Actavis document          320
20   entitled "Project Continuation
21   Justification: SOM Statistical Model
22   Development and Hosting 'in the
23   Cloud'", Bates-stamped ALLERGAN_MDL_
24   03535253 through 257

Page 350

1       I N D E X   O F   E X H I B I T S(Cont'd.)
2    ALLERGAN-NAPOLI EXHIBITS          PAGE
3
4    Napoli Exhibit 26, Email chain          326
5    beginning with email dated 1/11/16
6    from Baran to Russo with attachment,
7    Bates-stamped ALLERGAN_MDL_ 03431731
8    through 1739
9
10   Napoli Exhibit 27, Email dated          329
11   11/13/13 from Kemnitzer to
12   distribution list, Bates-stamped
13   PPLPC020000735777 through 782
14
15   Napoli Exhibit 28, Email chain          331
16   beginning with email dated 1/14/16
17   from Lepore to Simmons, Bates-stamped
18   ALLERGAN_MDL_01551062 through 1064
19
20   Napoli Exhibit 29, Natively-produced          331
21   Spreadsheet, Bates-stamped
22   ALLERGAN_MDL_01551064 xlsx
23
24

Page 351

```
 1          ERRATA SHEET FOR THE TRANSCRIPT OF:
 2    CASE NAME:  NATIONAL PRESCRIPTION OPIATE
 3    DATE:     JANUARY 17, 2019
 4    DEPONENT:  THOMAS P. NAPOLI
 5    Pg. Ln.  Now Reads  Should Read  Reason
 6    __ __ _____  _____ _____
 7    __ __ _____  _____ _____
 8    __ __ _____  _____ _____
 9    __ __ _____  _____ _____
10    __ __ _____  _____ _____
11    __ __ _____  _____ _____
12    __ __ _____  _____ _____
13    __ __ _____  _____ _____
14    __ __ _____  _____ _____
15    __ __ _____  _____ _____
16
17              _____
18          THOMAS P. NAPOLI
19    SUBSCRIBED AND SWORN BEFORE ME
20    THIS____DAY OF_____ 2019.
21
22    _____
23    (Notary Public)
24    MY COMMISSION EXPIRES:_____
```