Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4
                   ~~~~~~~~~~~~~~~~~~~~
 5
 6     IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
       OPIATE LITIGATION
 7                                     Case No. 17-md-2804
 8                                     Judge Dan Aaron
       This document relates to:      Polster
 9
       The County of Summit, Ohio, et al.
10     v. Purdue Pharma L.P., et al.
       Case No. 17-OP-45004
11
       The County of Cuyahoga v. Purdue
12     Pharma L.P., et al.
       Case No. 18-OP-45090
13
       City of Cleveland, Ohio v. Purdue
14     Pharma L.P., et al
       Case No. 18-OP-45132
15
                   ~~~~~~~~~~~~~~~~~~~~
16
                   Videotaped deposition of
17                      BRIAN NELSEN
                         30(b)(6)
18
                     January 24, 2019
19                      9:08 a.m.
20
21                      Taken at:
                       Jackson Kelly
22          50 South Main Street, Suite 201
                      Akron, Ohio
23
24
25          Renee L. Pellegrino, RPR, CLR
```

Page 2

```
 1  APPEARANCES:
 2  On behalf of Summit County and City of Akron:
      Motley Rice
 3    MICHAEL J. PENDELL, ESQ.
      ANDREW P. ARNOLD, ESQ.
 4    ANNE KEARSE, ESQ.
      28 Bridgeside Boulevard
 5    Mt. Pleasant, South Carolina  29464
      (843) 216-9229
 6    mpendell@motleyrice.com
      aarnold@motleyrice.com
 7    akearse@motleyrice.com
 8  On behalf of Endo Pharmaceuticals, Inc., Endo
      Health Solutions, Inc., Par Pharmaceuticals,
 9  Inc. and Par Pharmaceutical Companies, Inc.:
      (Via Telephone and Veritext Virtual)
10    Arnold & Porter
      ANDREW D. BERGMAN, ESQ.
11    7000 Louisiana Street
      Suite 4000
12    Houston, Texas  77002-2755
      (713) 576-2400
13    andrew.bergman@bakerlaw.com
14  On behalf of Cardinal Health:
      Williams & Connolly
15    J. ANDREW KEYES, ESQ.
      725 12th Street, N.W.
16    Washington, D.C.  20005
      (202) 434-5186
17    akeyes@wc.com
18  On behalf of AmerisourceBergen Drug Corporation:
      (Via Telephone and Veritext Virtual)
19    Jackson Kelly
      M. JANE BRANNON, ESQ.
20    175 East Main Street
      Lexington, Kentucky  40507
21    (859) 288-2805
      mjbrannon@jacksonkelly.com
22
23          ~ ~ ~ ~ ~
24
25
```

Page 3

```
 1  APPEARANCES, CONT'D:
 2  On behalf of Johnson & Johnson and Janssen
      Pharmaceuticals, Inc.:
 3    Tucker Ellis LLP
      TARIQ NAEEM, ESQ.
 4    950 Main Avenue, Suite 1100
      Cleveland, Ohio  44113-7213
 5    (216) 592-5000
      tariq.naeem@tuckerellis.com
 6
    On behalf of McKesson Corporation:
 7    Covington & Burling LLP
      DAVID W. HALLER, ESQ.
 8    The New York Times Building
      620 Eighth Avenue
 9    New York, New York  10018-1405
      (212) 841-1104
10    dhaller@cov.com
11  On behalf of Walmart, Inc.:
      Jones Day
12    BRANDY RANJAN, ESQ.
      325 John R. McConnell Boulevard
13    Columbus, Ohio  43215-2673
      (614) 469-3939
14    branjan@jonesday.com
15
    ALSO PRESENT:  Kurt Henschel, Videographer
16
            ~ ~ ~ ~ ~
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          TRANSCRIPT INDEX
 2
 3  APPEARANCES ......................................2
 4  INDEX OF EXHIBITS ..............................5
 5  INDEX OF OBJECTIONS ...........................6
 6
 7  EXAMINATION OF BRIAN NELSEN:
 8  BY MR. KEYES .................................10
 9  BY MS. RANJAN ...............................211
10  BY MR. NAEEM ................................230
11
12  REPORTER'S CERTIFICATE ......................235
13
14  EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          INDEX OF EXHIBITS
 2
 3  Number      Description        Marked
 4
 5  Exhibit 1  Amended Notice of Videotaped    11
             Deposition of Brian Nelsen
 6
    Exhibit 2  E-Mail from Jennifer Peveich to  68
 7           Bryan Herschel and Brian Nelsen,
             dated August 18, 2017, with
 8           Attachment, Beginning Bates
             Number SUMMIT_001084232
 9
    Exhibit 3  Summit County, Ohio Plaintiff's  177
10           Second Supplemental Response and
             Objections to Distributor
11           Defendants' Interrogatory No. 18
             Pursuant to the Court's November
12           21, 2018 Order
13  Exhibit 4  Spreadsheet Entitled "Summit     177
             County ($ Millions)," Marked
14           Confidential
15  Exhibit 5  Summit County and City of Akron, 215
             Ohio Plaintiffs' First Amended
16           Responses and Objections to the
             National Retail Pharmacy
17           Defendants' First Set of
             Interrogatories
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

INDEX OF OBJECTIONS

1
2
3  Objection .......................37
   Objection .......................37
4  Objection .......................54
   Objection .......................58
5  Objection .......................59
   Objection .......................65
6  Objection .......................67
   Objection .......................69
7  Objection .......................72
   Objection .......................77
8  Objection .......................77
   Objection .......................77
9  Objection .......................78
   Objection .......................79
10 Objection .......................80
   Objection .......................80
11 Objection .......................80
   Objection .......................83
12 Objection .......................83
   Objection .......................84
13 Objection .......................85
   Objection .......................87
14 Objection .......................90
   Objection .......................92
15 Objection .......................94
   Objection .......................102
16 Objection .......................102
   Objection .......................103
17 Objection .......................107
   Objection .......................107
18 Objection .......................107
   Objection .......................113
19 Objection .......................113
   Objection .......................114
20 Objection .......................115
   Objection .......................115
21 Objection .......................115
   Objection .......................116
22 Objection .......................117
   Objection .......................123
23 Objection .......................125
   Objection .......................126
24 Objection .......................126
   Objection .......................127
25 Objection .......................134

Page 8

INDEX OF OBJECTIONS, CONT'D

1
2
3  Objection .......................189
   Objection .......................189
4  Objection .......................190
   Objection .......................190
5  Objection .......................191
   Objection .......................193
6  Objection .......................194
   Objection .......................195
7  Objection .......................196
   Objection .......................197
8  Objection .......................197
   Objection .......................198
9  Objection .......................199
   Objection .......................199
10 Objection .......................200
   Objection .......................201
11 Objection .......................202
   Objection .......................202
12 Objection .......................203
   Objection .......................204
13 Objection .......................209
   Objection .......................209
14 Objection .......................209
   Objection .......................210
15 Objection .......................211
   Objection .......................211
16 Objection .......................212
   Objection .......................214
17 Objection .......................217
   Objection .......................220
18 Objection .......................220
   Objection .......................224
19 Objection .......................228
   Objection .......................231
20
21
22
23
24
25

Page 7

INDEX OF OBJECTIONS, CONT'D

1
2
3  Objection .......................135
   Objection .......................141
4  Objection .......................148
   Objection .......................148
5  Objection .......................148
   Objection .......................148
6  Objection .......................149
   Objection .......................149
7  Objection .......................149
   Objection .......................150
8  Objection .......................150
   Objection .......................150
9  Objection .......................151
   Objection .......................151
10 Objection .......................152
   Objection .......................152
11 Objection .......................153
   Objection .......................153
12 Objection .......................154
   Objection .......................154
13 Objection .......................154
   Objection .......................155
14 Objection .......................156
   Objection .......................156
15 Objection .......................156
   Objection .......................164
16 Objection .......................168
   Objection .......................171
17 Objection .......................171
   Objection .......................172
18 Objection .......................178
   Objection .......................178
19 Objection .......................179
   Objection .......................181
20 Objection .......................182
   Objection .......................183
21 Objection .......................183
   Objection .......................184
22 Objection .......................187
   Objection .......................187
23 Objection .......................187
   Objection .......................188
24 Objection .......................188
   Objection .......................188
25 Objection .......................189

Page 9

1          THE VIDEOGRAPHER:  We're on the
2   record at 9:08.  Today's date is January 24th,
3   2019.  We are here in the matter of the National
4   Prescription Opiate Litigation.  This deposition
5   is taking place in Akron, Ohio.
6          Would counsel please identify
7   themselves for the record?
8          MR. PENDELL:  Mike Pendell, Motley
9   Rice, for Plaintiffs.
10         MR. ARNOLD:  Andrew Arnold, Motley
11  Rice, for Plaintiffs.
12         MS. KEARSE:  Anne Kearse, Motley
13  Rice, on behalf of the County of Summit and the
14  City of Akron.
15         MR. KEYES:  Andrew Keyes, Williams &
16  Connolly, on behalf of Cardinal Health.
17         MS. RANJAN:  Brandy Ranjan from
18  Jones Day on behalf of Walmart.
19         MR. HALLER:  David Haller, Covington
20  & Burling, for McKesson.
21         MR. NAEEM:  Tariq Naeem, Tucker
22  Ellis, on behalf of Janssen and Johnson &
23  Johnson.
24         THE VIDEOGRAPHER:  By telephone?
25         MS. BRANNON:  Jane Brannon, Jackson

Page 10

1 Kelly, on behalf of AmerisourceBergen Drug
2 company.
3        MR. KEYES:  Is there anyone else on
4 the phone?
5        THE VIDEOGRAPHER:  The court
6 reporter may swear in the witness.
7        BRIAN NELSEN, of lawful age, called for
8 examination, as provided by the Federal
9 Rules of Civil Procedure, being by me
10 first duly sworn, as hereinafter certified,
11 deposed and said as follows:
12        EXAMINATION OF BRIAN NELSON
13 BY MR. KEYES:
14    Q.   Good morning, Mr. Nelsen.
15    A.   Good morning.
16    Q.   Are you still employed by Summit
17 County?
18    A.   Yes.
19    Q.   What is your current position?
20    A.   I am the director of finance and
21 budget for the Summit County executive.
22    Q.   Is that the same position you held
23 in December, when you were deposed for the first
24 time?
25    A.   Yes.

Page 11

1    Q.   When you were deposed in December
2 for the first time, you were deposed as a fact
3 witness.  Is it your understanding that you are
4 being deposed today as a corporate
5 representative of Summit County?
6    A.   Yes.
7    Q.   And is it your understanding that
8 you are not testifying as an individual, you are
9 testifying as Summit County?
10    A.   Yes.
11    Q.   And is it your understanding that
12 you are testifying on certain topics?
13    A.   Yes.
14        - - - - -
15        (Thereupon, Nelsen 30(b)(6)
16        Deposition Exhibit 1, Amended Notice
17        of Videotaped Deposition of Brian
18        Nelsen, was marked for purposes of
19        identification.)
20        - - - - -
21    Q.   Let me show you what has been marked
22 as Nelsen 30(b)(6) Exhibit Number 1.  This is
23 the amended notice of videotaped 30(b)(6)
24 deposition of Brian Nelsen.
25        Do you see that?

Page 12

1    A.   Yes.
2    Q.   And if you turn to the top of the
3 second page, do you see that this lists you as
4 being the corporate representative of Summit
5 County who will testify on topics 11, 21, 22, 37
6 and 38 of Defendants' original deposition
7 notice?
8    A.   Yes.
9    Q.   Is it your understanding that you
10 will be testifying as Summit County on those
11 topics?
12    A.   Yes.
13    Q.   And is it your understanding that as
14 you answer questions on those topics, you are
15 answering based on information known or
16 reasonably available to Summit County?
17    A.   Yes.
18    Q.   Did you do anything to prepare for
19 today's deposition?
20    A.   Yes.
21    Q.   What did you do?
22    A.   I -- I had a meeting with Mr. Arnold
23 and Mr. Pendell last week for about an hour and
24 a half.  I reviewed the depositions of Greta
25 Johnson and the 30(b)(6) deposition of Diane

Page 13

1 Miller-Dawson, and yesterday went back through
2 some of my notes for the first deposition, and
3 also did a little bit of research on information
4 available from the Ohio Department of Health and
5 the Ohio Hospital Administrators Association.
6    Q.   Anything else?
7    A.   That's it.
8    Q.   You said you met with Mr. Pendell
9 and Mr. Arnold.  They are attorneys for Summit
10 County?
11    A.   Yes.
12    Q.   Did anyone else participate in that
13 meeting?
14    A.   No.
15    Q.   Did you review documents during that
16 meeting?
17    A.   No.  I don't believe so.
18    Q.   You said you reviewed deposition
19 transcripts?
20    A.   Yes.
21    Q.   Did you review the transcript of the
22 deposition testimony you gave in December?
23    A.   I did not.
24    Q.   Have you reviewed it at any point in
25 time?

4 (Pages 10 - 13)

Page 14

1    A.   I have not.
2    Q.   You said you reviewed the deposition
3 testimony of Greta Johnson?
4    A.   Yes.  Some of it.
5    Q.   Some of it?
6    A.   Yes.
7    Q.   How did you get the transcript?
8    A.   From our attorneys.
9    Q.   Why did you review at least some of
10 her testimony?
11    A.   Because she -- she provided
12 testimony that I was told by our attorneys was
13 good testimony and had some -- and many times
14 throughout that testimony she deferred questions
15 to me, so I wanted to review what those
16 questions may have been.
17    Q.   Which questions did she defer to
18 you?
19    A.   They were questions on financial
20 issues, costs.
21    Q.   And based on the questions that were
22 asked during Ms. Johnson's deposition, where she
23 referred the questions to you, did you do any
24 homework so that you could answer those
25 questions today?

Page 15

1    A.   I did not.
2    Q.   Why not?
3    A.   Because I believed, in reading
4 those, that I already knew the answers to those
5 questions.
6    Q.   And what are those questions?
7    A.   I don't recall what they were
8 specifically.
9    Q.   You said you also read at least
10 portions of Ms. Miller-Dawson's 30(b)(6)?
11    A.   That's correct.
12    Q.   How did you get the transcript?
13    A.   From our attorneys.
14    Q.   Why did you read that transcript?
15    A.   Because she holds a similar position
16 at the City of Akron as my position at Summit
17 County.
18    Q.   Which portions of that testimony did
19 you read?
20    A.   I read probably 90 percent of that
21 testimony.
22    Q.   And how much of Ms. Johnson's
23 deposition testimony did you read?
24    A.   Probably 25 to 30 percent of her
25 testimony.

Page 16

1    Q.   And how did you figure out which
2 parts of Ms. Johnson's testimony to read if you
3 only read 25 to 30 percent?
4    A.   I skimmed through looking for my
5 name.
6    Q.   When you reviewed Ms. Johnson's
7 deposition testimony, did you see anything that
8 she said that you believed to be inaccurate?
9    A.   The one thing that she cited, and I
10 believe I originally cited it in my first
11 testimony in December, that I've come to realize
12 was not accurate, was that the ADM Board went
13 out for a levy increase in their last levy
14 cycle.  It was actually two cycles ago that they
15 sought that increase and received it.
16    Q.   And when you say "two cycles ago,"
17 when was that?
18    A.   So that would have been 2007.
19    Q.   So how did you discover that what
20 you had said in your earlier deposition was
21 inaccurate; based on reading what Ms. Johnson
22 said?
23    A.   Yeah.  When I saw it in
24 Ms. Johnson's testimony, I immediately wondered
25 if that was right or not, and then I went back

Page 17

1 and looked to see when that levy increase had
2 occurred.
3    Q.   Okay.  So the last time there was a
4 levy increase for the ADM Board was in 2007?
5    A.   Yes.
6        My -- and one of the reasons I
7 believed it was the last levy cycle is ADM
8 operationally has changed somewhat, and that is
9 due to two things; Medicaid expansion having
10 taken over a lot of the cases that they
11 previously used to pay for, and then, also, the
12 fact that the state began direct paying Medicaid
13 claims and not running them through ADM.  And
14 all of that occurred in that '12, '13 time
15 frame, which is why when I was thinking back, I
16 was thinking that was their last levy cycle that
17 they had got the increase, but it was actually
18 the increased Medicaid expansion that had freed
19 up dollars for more services from them.
20    Q.   And when you say that in 2007 the
21 ADM Board went out for a levy increase --
22    A.   Yes.
23    Q.   -- what do you mean?
24    A.   Increase the tax millage that they
25 collect to produce more tax revenue.

5 (Pages 14 - 17)

Page 18

1     Q.   So the last time that the ADM Board
2 requested that the voters of Summit County
3 increase the tax millage was in 2007?
4     A.   Yes.
5     Q.   Did you see anything else in your
6 review of Ms. Johnson's testimony that you
7 believed to be inaccurate?
8     A.   That was the only thing.
9     Q.   Did your review of Ms. Johnson's
10 testimony flag for you that there was anything
11 else you had said in your deposition that is
12 inaccurate?
13     A.   It did not.
14     Q.   When you reviewed
15 Ms. Miller-Dawson's testimony, did you see
16 anything in her testimony that you believed to
17 be inaccurate?
18     A.   No. I don't know that I could tell
19 because most of her testimony was based on the15
20 city's financial considerations, city
21 operations, so I would not have knowledge of
22 whether what she said was inaccurate or not.
23     Q.   So when you reviewed what you said
24 was 90 percent of her testimony, did you see
25 anything that she said that you believed to be

Page 19

1 inaccurate?
2     A.   No.
3     Q.   And when you reviewed her testimony,
4 did that prompt you to realize that anything you
5 had said in your deposition was inaccurate?
6     A.   No.
7     Q.   Did you review any other deposition
8 transcripts besides that of Ms. Johnson and
9 Ms. Miller-Dawson?
10     A.   No.
11     Q.   You said you also reviewed your
12 notes --
13     A.   Yes.
14     Q.   -- to prepare for today's
15 deposition?
16     A.   Yes.
17     Q.   What notes are you talking about?
18     A.   Notes on costs to different county
19 departments on trends that affected different
20 county departments, and just some general notes
21 on the economic impact of the opioid crisis,
22 both in Ohio and in Summit County and
23 nationally, and, also, just overdose death
24 rates, things of that nature.
25     Q.   And did you take these notes during

Page 20

1 your deposition in this case?
2     A.   What do you mean by during my
3 deposition?
4     Q.   Well, I'm trying to pin down the
5 notes. So did you take notes during your
6 deposition in this case?
7     A.   As I sat here during the deposition?
8     Q.   Yes.
9     A.   No.
10     Q.   Okay. Are these notes that you took
11 before or after your deposition?
12     A.   My previous deposition?
13     Q.   Um-hum.
14     A.   They were notes that I compiled
15 prior to my previous deposition.
16     Q.   And where are those notes?
17     A.   On my computer at work.
18     Q.   Where on your computer?
19     A.   On my desktop.
20     Q.   So if you wanted to, you know
21 exactly where to go to get the notes?
22     A.   Yes. So when you request them, I
23 can provide them.
24     Q.   Indeed. Thank you.
25         MR. PENDELL: We'll take it under

Page 21

1 advisement.
2     Q.   What was your purpose in reviewing
3 those notes to prepare for today's deposition?
4     A.   Just to refresh my memory.
5     Q.   Did they refresh your memory?
6     A.   Yeah.
7     Q.   On what?
8     A.   On the subjects that were contained
9 in the notes.
10     Q.   And the subjects that you mentioned
11 are trends of spending in the different
12 departments?
13     A.   Yes.
14     Q.   The economic impact of the opioid
15 crisis nationally and in Summit County?
16     A.   Yes.
17     Q.   And overdose rates?
18     A.   Yes.
19     Q.   And what did you --
20     A.   Essentially everything in those
21 notes are things that we discussed in my
22 previous deposition.
23     Q.   And did reviewing those notes
24 identify for you anything you said in your past
25 deposition that you now believe to be

Page 22

1 inaccurate?
2    A.   No.
3    Q.   You also said you did research?
4    A.   Yes.
5    Q.   Is this research you did since your
6 last deposition?
7    A.   Yes.
8    Q.   Okay.  So what research did you do
9 since your last deposition?
10    A.   I looked at some reports, as I
11 mentioned earlier, from the Ohio Hospital
12 Association and from the Ohio Department of
13 Health on overdose rates and death rates.
14    Q.   Okay.  So what -- did you go to a
15 website?
16    A.   Yes.
17    Q.   So you went to a website for the
18 Ohio Hospital Association?
19    A.   Yes.
20    Q.   And what did you learn based on your
21 review of that website about overdose rates or
22 death rates?
23    A.   I learned that from the Ohio
24 Hospital Association -- I'm trying to remember
25 which was on which site.  From the Ohio Hospital

Page 23

1 Association, that essentially there were 66 --
2 roughly 66,000 overdose deaths in either 2016 or
3 2017; two-thirds of those were opiate-related
4 overdose deaths.  And that the Ohio Hospital
5 Association estimates by 2025 that they will be
6 treating 90,000 overdose incidences in their
7 hospitals per year, and that, on average, 30
8 people will die each day from opiate-related
9 overdose deaths.
10        I also looked at a trend sheet they
11 had, which indicated the number of overdoses
12 in -- well, it broke down several categories,
13 but by county, by age group, by -- by sex, by
14 ethnicity.  But looking at Summit County's
15 trend, our trend of overdose -- overdoses
16 treated in hospitals going back to 2008, which
17 were at 200; by 2014, 2015 had exploded to the
18 point where they were up over 2,000 overdoses in
19 Summit County, I believe in either 2016 or 2017.
20 So those were my key take-aways from that.
21        And the other one was just the fact
22 that they impact all age groups, including --
23 the biggest age groups are the 18 to 39 and the
24 39 to 54 age group.
25    Q.   Okay.  So you've described what your

Page 24

1 take-aways were.
2    A.   Yes.
3    Q.   Just from reviewing the Ohio
4 Hospital Association website or both websites?
5    A.   That was just the Ohio Hospital
6 Association website.
7    Q.   Okay.  And so what you are conveying
8 today is your understanding of what you read on
9 the Ohio Hospital Association's website
10 describing research that had been done by
11 someone else?
12    A.   By the hospitals that participate in
13 the Ohio Hospital Association, data they
14 provided.
15    Q.   And did you compile the underlying
16 data?
17    A.   I did not.
18    Q.   Did you participate in any study or
19 analysis of that data?
20    A.   What do you mean by study,
21 participate in study or analysis?
22    Q.   Well, have you done any analysis of
23 the data as opposed to reading what someone has
24 described about the data on this website?
25    A.   I simply reviewed the data on the

Page 25

1 website.  I did nothing in terms of putting it
2 on a spreadsheet and doing any other analysis
3 with it.  I don't know if, in my mind, going
4 through those trends constitutes analysis,
5 but --
6    Q.   Did you talk to anyone from the Ohio
7 Hospital Association about the data or your
8 take-aways from the data?
9    A.   I did not.
10    Q.   And did you talk to anyone who
11 participated in either gathering the underlying
12 data or calculating the statistics from the data
13 that you believe you saw on this website?
14    A.   I don't believe I saw it.  I did see
15 it.  I did not.  I believe the Ohio Hospital
16 Association to be a reputable association and
17 their participating members to be reputable
18 organizations.
19    Q.   What prompted you to go to the Ohio
20 Hospital Association website in the first place?
21    A.   I was just googling opiate --
22 googling about opiates, just wanting to do a
23 little more research prior to today's
24 deposition.
25    Q.   You said that, as you recall it, the

7 (Pages 22 - 25)

Page 26

1 Ohio Hospital Association website reported that
2 there were 66,000 overdose deaths in 2016 or
3 2017?
4     A.   Roughly, yes.
5     Q.   And you said that the website
6 reported that two-thirds of those are opiate
7 related?
8     A.   Yes.
9     Q.   And what drugs are included in
10 opiate when it says that two-thirds of the
11 overdose deaths were opiate related?
12     A.   Those statistics -- well, there is
13 another -- another take-away I took from their
14 analysis.  It might have been the Ohio
15 Department of Health.  You'll have to forgive me
16 because I believe these were in the Ohio
17 Hospital Association, but there was also Ohio
18 Department of Health analysis I looked at.
19         The Ohio Hospital Association
20 included both prescription-based opiates and
21 synthetic, illegal opiates, non-prescription.
22     Q.   So did it break out the number of
23 overdose deaths that were based on overdosing on
24 an illegal opioid versus a prescription opioid?
25     A.   No.  The Ohio Hospital Association

Page 27

1 study did not.
2     Q.   And did it report on the number of
3 overdose deaths that resulted from the use of a
4 prescription opioid?
5     A.   Say that again.
6     Q.   Did it report on the number of
7 overdose deaths that resulted from the use of a
8 prescription opioid?
9     A.   That study did not.
10     Q.   And did it report on the number of
11 overdose deaths that were attributable to use of
12 an illegal opioid where someone had used a
13 prescription opioid in the past?
14     A.   That one did not.
15     Q.   And when it projected, as you recall
16 it, that by 2025 there will be 90,000 overdoses
17 per year, did it break out the number of
18 overdoses it projected per year that are
19 attributable to use of a prescription opioid
20 versus use of an illegal opioid?
21     A.   That study did not.
22     Q.   And when it projected that by 2025,
23 30 people will die per day from an overdose, was
24 that an overdose on opioids?
25     A.   That study did not indicate that.

Page 28

1     Q.   Okay.  It just said 30 people will
2 die per day from a drug overdose?
3     A.   In Ohio -- in Ohio, yes.
4     Q.   Okay.  So it didn't break it out by
5 the number of people who were projected to die
6 from an opioid overdose?
7     A.   That study did not, no.
8     Q.   And it also did not break out the
9 number of people who would die per day from an
10 overdose of an illegal opioid versus a
11 prescription opioid?
12     A.   That study did not.
13     Q.   And then you said, if I understood
14 you correctly, that this same website reported
15 the number of overdoses by county, age group,
16 sex and ethnicity?
17     A.   Yes.
18     Q.   And when it listed overdoses, are
19 those drug overdoses?
20     A.   My belief is yes.  Those were opiate
21 overdoses.
22     Q.   So these numbers that you remember
23 were focused or limited to overdoses on opiates?
24     A.   Yes.
25     Q.   Did it break out the number of

Page 29

1 overdoses based on use of an illegal opiate
2 versus a prescription opioid?
3     A.   That study did not.
4     Q.   And when it reported the number of
5 overdoses, is it reporting the number of
6 overdose deaths or just the number of overdoses?
7     A.   Those were the number of incidences
8 treated in hospitals for overdose, so it was not
9 specifically just deaths.
10     Q.   And did it provide any data about
11 which overdoses or which percentage of overdoses
12 involved someone using a prescription opioid in
13 the past?
14     A.   That study did not.
15     Q.   Then you mentioned that it -- it
16 reported a trend between 2008 and 2015?
17     A.   I believe it went all the way to
18 2017, though I don't know it was inclusive of
19 the entire year of 2017.
20     Q.   And what trend do you remember it
21 reporting?
22     A.   That in Summit County, who I
23 specifically looked at, we were at 200 plus
24 overdose incidences in 2008.  That number was
25 slowly growing in '09, '10, '11.  It was like at

8 (Pages 26 - 29)

Page 30

1 300-some, then 400-some. And then in 2014 I
2 believe it hit somewhere around 770, and then by
3 2015 it went to 1100, and by 2016 it doubled to
4 2200 incidences, roughly.
5     Q.   And so this is data reporting on
6 overdose incidents?
7     A.   Yes.
8     Q.   And did it break out the overdoses
9 by drug?
10     A.   It did not. This study did not.
11     Q.   Were these overdose incidents all
12 drug overdoses or was it limited to
13 opiate-related overdoses?
14     A.   I believe -- I'd have to check, but
15 I believe it was opiate incidences.
16     Q.   And then did it break out the number
17 or percentage of opiate incidents that resulted
18 from use of an illicit opioid versus a
19 prescription opioid?
20     A.   That study did not.
21     Q.   Did you see anything on the website
22 of the Ohio Hospital Association that provided
23 data on overdose -- overdose deaths resulting
24 from the use of a prescription opioid?
25     A.   Not on that -- not on that website.

Page 31

1     Q.   Did you see anything on the website
2 of the Ohio Hospital Association that provided
3 data on overdoses resulting from the use of a
4 prescription opioid?
5     A.   Not on that website.
6     Q.   And did you see anything on the
7 website of the Ohio Hospital Association that
8 provided data on what percentage of overdoses
9 based on the use of an illicit opioid involved
10 prior use of a prescription opioid?
11     A.   Not on that website.
12     Q.   Can you provide any more detail
13 about what you remember seeing on the website of
14 the Ohio Hospital Association?
15     A.   The only other thing that really
16 stuck out at me, as I mentioned, were the age
17 groups, and then kind of the male/female
18 breakdown and the racial component of it. Very
19 much that whole age group from 18 to -- it was
20 either 54 or 59, made up the vast majority, but
21 I was a little surprised at just how much that,
22 roughly, 39 to, I think it was, 54 age group,
23 how large that population was.
24     Q.   You said earlier that you also
25 looked at the website of the Ohio Department of

Page 32

1 Health?
2     A.   Yes.
3     Q.   Okay. When did you look at that?
4     A.   Last night.
5     Q.   Why?
6     A.   Because as most of your questions
7 just kind of alluded to, I was -- I was curious
8 about whether there was data available that
9 broke down usage by prescription versus illegal
10 opiates.
11     Q.   Okay. So you were curious about
12 that. How did that lead you to the Ohio
13 Department of Health website?
14     A.   I just went there looking to see if
15 they had that kind of data available that would
16 tell me what that breakdown was.
17     Q.   Based on your curiosity, did you go
18 anywhere else besides the Ohio Department of
19 Health website?
20     A.   I don't believe so, no.
21     Q.   So what did you -- how much time did
22 you spend on the Ohio Department of Health
23 website?
24     A.   Maybe about an hour.
25     Q.   And what did you learn based on

Page 33

1 reviewing that website?
2     A.   So there were a few things.
3         I found a report that had been done
4 back in 2007, 2008 that detailed, for a
5 three-year period from 2003 to 2007, overdoses
6 in Ohio. It detailed counts by both the type of
7 medication the overdose was attributed to, the
8 breakdown between male and female. And then I
9 found a more current study that went into detail
10 with breakdowns of both prescription and
11 illegal-based opiates and other substances, and
12 that one focused on the death rates from those
13 particular substances.
14     Q.   Anything else?
15     A.   That's probably the main gist of
16 what I got out of those reports.
17     Q.   Okay. So turning to the first
18 report --
19     A.   Yes.
20     Q.   -- that you remember reading about
21 last night on this website, who issued this
22 report back in 2007 or 2008?
23     A.   The Ohio Department of Health.
24     Q.   Which part?
25     A.   What do you mean by "which part"?

9 (Pages 30 - 33)

Page 34

1     Q.    Which division within Ohio
2  Department of Health issued the report?
3     A.    I don't know offhand.
4     Q.    And where did it get the data that
5  it was reporting on?
6     A.    It was data that both it had
7  compiled, the CDC had compiled, and data the
8  Ohio -- you know, it was data also that the Ohio
9  Hospital Association had compiled.
10    Q.    And as you remember it, the report
11 was issued in 2007 or 2008?
12    A.    Yes.
13    Q.    And it was based on data collected
14 from the period of 2003 to 2007?
15    A.    Yes.
16    Q.    And you said it reported on
17 overdoses in Ohio?
18    A.    Yes.
19    Q.    Did it break out the overdoses by
20 jurisdiction within Ohio?
21    A.    That one did not.
22    Q.    So this was statewide?
23    A.    Yes.
24    Q.    Okay.  And did it list the number of
25 overdoses in Ohio each year from 2003 to 2007?

Page 35

1     A.    It had a composite for that
2  four-year period.
3     Q.    So it gave the total number of
4  overdoses for that period of 2003 to 2007?
5     A.    Yes.
6     Q.    And were these overdoses on all
7  drugs or particular types of drugs?
8     A.    Particular -- well, all drugs,
9  groupings of drugs.
10    Q.    Okay.  And what were the groupings
11 of drugs?
12    A.    They had prescription opiates.  They
13 did specifically list cocaine, heroin,
14 benzodiazepine.  I'm trying to remember what
15 else.  There may have been a few other things on
16 the list.
17    Q.    Okay.  So it would, as you recall
18 it, give the total number of overdoses in Ohio
19 between 2003 and 2007 as grouped by drug or
20 grouping of drug?
21    A.    Yes.
22    Q.    Okay.  And the groupings you
23 remember were prescription opioids?
24    A.    Yes.
25    Q.    Cocaine?

Page 36

1     A.    Yes.
2     Q.    Heroin?
3     A.    Yes.
4     Q.    Benzodiazepine?
5     A.    Yes.
6     Q.    Any other groupings you remember?
7     A.    There were others on there.  I don't
8  recall.
9     Q.    And so within each grouping, it
10 would list the total number of overdoses in Ohio
11 from 2003 to 2007?
12    A.    Yes.
13    Q.    And then for the prescription opioid
14 grouping, did it list what drugs were included?
15    A.    It did not.
16          Now, I do believe -- so I may have
17 been at the public health site first, as I think
18 through this, because I believe that table
19 listed the Ohio Hospital Association as the
20 source, which is what led me to the Ohio
21 Hospital Association website, looking for more
22 detail.
23    Q.    And when it listed overdoses in a
24 particular group, how did an overdose end up in
25 that group?  What was the standard for putting

Page 37

1  it in a particular group?
2     A.    I do not know.
3     Q.    So was it where the overdose was
4  attributable to use of a particular drug or
5  where a particular drug was detected in the
6  autopsy or where someone had reported prior use?
7          MR. PENDELL:  Objection.
8     A.    Any answer --
9          MR. PENDELL:  Just give me a chance
10 to object.  Objection to form.
11          Go ahead.
12    A.    I could only assume.
13    Q.    And for this report did it break out
14 the number of overdoses per year within that
15 2003 to 2007 time period?
16    A.    No.
17    Q.    So it was just for that period?
18    A.    Yes.
19    Q.    Do you remember anything else about
20 this 2007 or 2008 report beyond what you've
21 said?
22    A.    No.  That was the main thing.
23    Q.    Then you said, in looking at the
24 website of the Ohio Department of Health last
25 night, you also looked at a second report which

10 (Pages 34 - 37)

Page 38

1 you described as current?
2    A.   Yes.
3    Q.   When was that report issued?
4    A.   I believe it was -- it was either --
5 I think it was issued in 2018.
6    Q.   And who issued it?
7    A.   The Ohio Department of Health.  I
8 don't know what division in particular.
9    Q.   Where did it get the data that was
10 included in this report?
11    A.   It was data that I believe it has
12 compiled.  I don't -- I'm sure there were
13 sources listed in the report, but I didn't go to
14 those source listings.
15    Q.   And what period of time does this
16 report cover?
17    A.   It covered 2010 -- at least the
18 information specifically that I was looking at,
19 2010 through either '16 or '17.
20    Q.   And what did it report for that time
21 period?
22    A.   So the thing that caught my
23 attention in this report were some tables they
24 had, some charts, that showed the number of
25 overdose deaths in Ohio and the cause broken

Page 39

1 down into categories from 2010 through, I
2 believe, 2016.  I don't think it included '17.
3 And those categories broke them down between
4 prescription opioids, heroin, cocaine, fentanyl.
5 And I don't remember what the other groupings --
6 there may have been just an "other" category as
7 well.  I don't recall specifically.
8    Q.   Okay.  You remember categories of
9 prescription, heroin, cocaine, fentanyl and
10 perhaps others?
11    A.   Yes.
12    Q.   And what did it report about the
13 number of overdose deaths in Ohio during this
14 time period in each category?
15    A.   It was interesting to me because
16 there was also some narrative that accompanied
17 this chart.  In 2010, 40 percent of the
18 overdoses in that year, on that chart, were
19 attributed to prescription opioids.  Now, that
20 number declined from 2010 through 2016 as, in
21 particular, fentanyl essentially, I guess the
22 term would be skyrocketed, and cocaine and
23 heroin also increased during that period as
24 well.
25    Q.   So if I understand you correctly,

Page 40

1 you understood this report to say that in 2010,
2 40 percent of the overdose deaths in Ohio were
3 attributable to prescription opioids?
4    A.   Yes.
5    Q.   And that that number went down each
6 year from 2010 to 2016?
7    A.   Yes.
8    Q.   And so what was the number in 2016?
9    A.   So in 2016 that number was 20
10 percent, and from there I went on to read the
11 narrative, which more fully described what
12 happened in 2016.
13    Q.   Did it provide a percentage for
14 2017?
15    A.   I don't believe it did.
16    Q.   And during the same time period,
17 2010 to 2016, you say that the percentage of
18 overdose deaths in Ohio attributable to heroin
19 increased?
20    A.   It did.
21    Q.   The percentage of overdose deaths in
22 Ohio during this time period attributable to
23 cocaine increased?
24    A.   It did.
25    Q.   And the percentage of overdose

Page 41

1 deaths in Ohio attributable to fentanyl
2 skyrocketed?
3    A.   Yes.
4    Q.   So from 2010 to 2016 how did the
5 percentages change for heroin?  I know you said
6 it increased, but from what to what?
7    A.   I don't recall.  I didn't key in on
8 that statistic, nor did I with the other -- the
9 other non-prescription statistics, but they did
10 increase.
11    Q.   So you don't remember what the
12 percentages were in 2010 or 2016 for heroin,
13 cocaine, fentanyl or the other category?
14    A.   No.  The thing I noticed with
15 fentanyl is that it really wasn't even on the --
16 on the radar, on the chart, until maybe 2014 or
17 '15.
18    Q.   Okay.  And then focusing on the
19 prescription opioids category, as you remember
20 it, based on looking at this website --
21    A.   Yes.
22    Q.   -- did it break out the percentage
23 of overdoses on a prescription opioid that had
24 been prescribed to the decedent versus the
25 percentage of overdoses on a prescription opioid

11 (Pages 38 - 41)

Page 42

1 that the decedent had gotten somewhere else?
2     A.    It did go on to say that in 2016, I
3 believe the number was 836 of the 4,000 and some
4 overdose deaths in Ohio, 20 point something
5 percent had -- were attributed to a situation
6 where the person who overdosed had received a
7 prescription opioid within the previous, I think
8 it was, 90 days prior to their death.
9     Q.    That's what you remember the report
10 saying?
11     A.    Yes.
12     Q.    Okay.  And did it give a similar
13 percentage for 2010?
14     A.    Did not.
15     Q.    Or other years between 2010 and
16 2016?
17     A.    It did not.
18     Q.    So you recall that it said 20 point
19 something percent of the overdose deaths in Ohio
20 in 2016 were attributable to a situation where a
21 person had a prescription for an opioid within
22 the prior 90 days?
23     A.    I believe it was 90 days.
24     Q.    Did it say that those people who had
25 died from an overdose had overdosed on a

Page 43

1 prescription opioid?
2     A.    I don't believe it specifically said
3 that.
4     Q.    Okay.  So where it gave a percentage
5 at least for 2016, that percentage was the
6 percentage of people who had overdosed and died
7 from an overdose in Ohio where the person had a
8 prescription for a prescription opioid within
9 the prior 90 days?
10     A.    Correct.
11     Q.    It did not say that those people
12 overdosed on a prescription opioid?
13     A.    I do not believe it said that.
14     Q.    And did it say that for any prior
15 year going back to 2010?
16     A.    I do not believe so.
17     Q.    Anything else you remember about
18 your research on the Ohio Department of Health
19 website to prepare for today's deposition?
20     A.    Well, yeah.
21         So in that analysis of the 2016
22 data, the Ohio Department of Health further went
23 on to discuss efforts that had been made in the
24 state of Ohio, which they felt have helped
25 reduce those -- as you recall, I said in 2010

Page 44

1 the number of deaths that they had prescription
2 opioids as a cause was 40 percent.  It had
3 dropped to 20.  They went on to describe the
4 fact that the OARRS data system in Ohio, along
5 with other efforts on education, law
6 enforcement, had helped create a decline in the
7 number of deaths related to opiates, opiate --
8 prescription-based opiates, but certainly led
9 you to believe that when you see the
10 skyrocketing of fentanyl, heroin and these other
11 drugs, that -- they also went on to talk about
12 a, roughly, 20 percent reduction in the number
13 of prescriptions prescribed between 2010 and
14 2016, but it certainly tied the correlation that
15 the illegal drug overdose deaths -- there is a
16 correlation there -- at least that was my
17 walk-away from it -- between that time period in
18 2015, when OARRS became mandatory.
19         And they did cite statistics that in
20 2011 there were only 1.8 million reviews of the
21 OARRS database.  That number had grown to over
22 24 million by 2015 or '16.  And during that same
23 time, the number of prescriptions issued had
24 decreased by 20 percent, and beginning in 2015
25 and 2016 you see the skyrocketing of the

Page 45

1 fentanyl and the other illegal drugs, which ties
2 into the data we see at the county with the
3 number of overdoses taking off at that point as
4 well.
5     Q.    So if I understand you correctly,
6 based on your review of this report on the Ohio
7 Department of Health website, the existence of
8 OARRS and the use of OARRS helped reduce the
9 number of prescriptions for prescription
10 opioids?
11     A.    That was my take-away from that
12 report.
13     Q.    And which then contributed to
14 reducing the number of overdoses on prescription
15 opioids?
16     A.    That was my take-away.
17     Q.    And reduced the percentage or the
18 number of overdoses where the person had a
19 prescription opioid in the past?
20     A.    Say that last one again.
21     Q.    And that the existence of OARRS and
22 the use of OARRS further reduced the number of
23 overdoses where the decedent had a prescription
24 opioid in the past?
25     A.    That was my take-away, yes.

12 (Pages 42 - 45)

Page 46

1    Q.   Did you compile any of the data that
2  was reported in either of these reports on the
3  website?
4    A.   I did not.
5    Q.   Did you analyze the data to compile
6  any of the statistics that were posted on this
7  website?
8    A.   I did not.
9    Q.   And did you participate in the
10  drafting of the narrative or the analysis of the
11  statistics?
12    A.   I did not.
13    Q.   Did you talk to anyone at the Ohio
14  Department of Health or anyone else who compiled
15  the data that is included in these reports?
16    A.   I did not.
17    Q.   Did you talk to anyone at the Ohio
18  Department of Health or anyone else who analyzed
19  the data to compile the statistics?
20    A.   I did not.
21    Q.   And did you talk to anyone at the
22  Ohio Department of Health or anywhere else about
23  the narrative or analysis that discussed these
24  statistics?
25    A.   I did not.  I just read these

Page 47

1  reports last night, so no, I have not had an
2  opportunity to do anything like that.
3    Q.   So what you've described today is
4  your take-away based on your reading of the
5  websites last night?
6    A.   That's correct.
7        There is one other thing on -- I
8  believe it was on the Ohio Hospital Association.
9  They had a white paper that accompanied these
10  statistics, which was the one report I referred
11  to with the estimates of -- by 2025 of -- based
12  on trend, of 90,000 overdose cases per year.
13        But they had a chart in there of the
14  State of Ohio by county, and they had them
15  categorized based on the number of overdoses per
16  10,000 residents and the number of overdoses --
17  overdose deaths per 100,000 residents.  And
18  Summit County and Fayette County were the two
19  highest counties on the number of overdoses per
20  10,000 residents in the State of Ohio.  They
21  were specifically coded in black.
22    Q.   At what point in time?
23    A.   I don't recall.  I would -- I don't
24  recall.  It was probably either '16 or '17, but
25  I don't recall specifically.

Page 48

1        Summit County was not -- was what I
2  would call second tier in the groupings on the
3  number of overdose deaths of the counties, which
4  I think probably goes a long way to the efforts
5  of the public safety officials to treat people
6  and administer drugs to save lives.
7        In one of those two reports, and I
8  think it was the Ohio Hospital Association
9  report, there was also a statistic that Ohio was
10  second -- or it might have been the Department
11  of Health because it was on deaths -- second in
12  the per capita in the country behind West
13  Virginia with the number of overdose deaths per
14  capita.
15    Q.   You mentioned in your deposition in
16  December that you had participated in a meeting
17  with a number of people other than lawyers for
18  Summit County.
19        Do you recall that --
20    A.   Yes.
21    Q.   -- testimony?
22    A.   Yes.
23    Q.   Okay.  Can you describe for me the
24  meeting you had with representatives from
25  different departments in the Summit County

Page 49

1  government?
2    A.   Yes.
3    Q.   Who did you meet with?
4    A.   To be clear, the attorneys were
5  present in that meeting.
6    Q.   Understood.  But you said there were
7  non-attorneys who participated as well?
8    A.   That's correct.
9    Q.   Who attended that meeting?
10    A.   Jerry Craig from the ADM Board, Jen
11  Peveich from the ADM Board, Julie Barnes from
12  Children Services, Darin Kearns from Children
13  Services, Donna Skoda from the Public Health
14  Department, Angela Burgess from the Public
15  Health Department.  I don't recall if there was
16  anybody else there or not.
17    Q.   And how long was this meeting?
18    A.   Probably about an hour and a half.
19    Q.   When was the meeting?
20    A.   Late November maybe.
21    Q.   And did you participate in this
22  meeting to prepare for your deposition as a
23  corporate representative for Summit County?
24    A.   Yes.
25    Q.   So what did you learn from

13 (Pages 46 - 49)

1 Ms. Barnes in that meeting?
2     A.   In the meeting itself, essentially
3 we sat and talked about the statistics for CSB
4 on the number of cases that -- the number of
5 placement, child placement cases, that were
6 attributable to opiate -- opiates, and also
7 talked about the rise in placement costs, the --
8 and the dollars spent on those placement costs,
9 along with staff costs.
10    Q.   Did you review any documents with
11 Ms. Barnes about these topics you just listed?
12    A.   I don't recall if we had documents
13 specifically with us.
14    Q.   And did you get any documents from
15 Ms. Barnes or anyone at Children Services after
16 the meeting?
17    A.   I have, yes.
18    Q.   What documents did you get?
19    A.   Analysis on cases and a breakdown of
20 spending tied to those cases.
21    Q.   Is that the document we reviewed in
22 your deposition in December?
23    A.   It's probably -- that was probably
24 the original basis for further investigation
25 into what was -- what those trends at CSB truly

1 look like.  So I would call that document we
2 reviewed at my last deposition one of the
3 preliminary, as we first started the fact
4 gathering, documents.
5     Q.   But then after your meeting with
6 Ms. Barnes, you got subsequent reports that were
7 more current?
8     A.   Yes.
9     Q.   So during the meeting that you had
10 with Ms. Barnes, what did she say about the
11 number of placement cases attributable to
12 opiates?
13    A.   Can I request a break for a second?
14    Q.   Yes.  Can you answer my question
15 first, though?
16        MR. PENDELL:  Are you concerned that
17 this implicates work product or privilege?
18        THE WITNESS:  Yes.
19        MR. PENDELL:  Okay.  So then I'm
20 going to request that you not answer that
21 question so we can talk about it at the break
22 and possibly answer your question.
23        MR. KEYES:  Okay.  Let's take a
24 break.
25        THE VIDEOGRAPHER:  Off the record,

1 9:58.
2        (Recess had.)
3        THE VIDEOGRAPHER:  We're on the
4 record, 10:27.
5 BY MR. KEYES:
6     Q.   So during the meeting that you had
7 with Ms. Barnes, what did she say about the
8 number of placement cases attributable to
9 opiates?
10    A.   So at that meeting we discussed the
11 fact that they had done an analysis in their
12 SACWIS system of the number of placements in the
13 years -- I think it was like 2014, '15, '16,
14 '17.
15    Q.   Who did the analysis?
16    A.   Employees at Children Services.
17    Q.   Which ones?
18    A.   I don't know.
19    Q.   And what statistics did they compile
20 based on this analysis of placements?
21    A.   So some of the years were a little
22 inconclusive.  They had not, "they" being the
23 Summit County Children Services agency and the
24 State of Ohio, had not required data related to
25 opioids to be entered into SACWIS, so --

1 sometime until, I think it was, late 2015 or so.
2 So 2016 was probably the first reliable year
3 that we could look at the SACWIS data and have
4 truly available information in the database to
5 tell us how many of those cases were opiate
6 related.  And the number for 2016 was roughly 27
7 percent, I believe.
8     Q.   You recall that Ms. Barnes shared
9 with you at this meeting that for the year 2016,
10 27 percent of the placements were opiate
11 related?
12    A.   Yes.
13    Q.   According to this review by Children
14 Services employees of the SACWIS database?
15    A.   Yes.
16    Q.   And did she share with you a
17 statistic for 2017?
18    A.   Yes.  I think that one was -- it was
19 in the 20 percent range, too.  I don't recall
20 exactly.
21    Q.   Did she share with you a statistic
22 for 2015?
23    A.   She did.
24    Q.   What was it?
25    A.   I don't recall that.  It was lower

Page 54

1 than 20 percent.
2    Q.   Did she share with you a statistic
3 for 2014?
4    A.   She did.  And, again, it was lower
5 than 20 percent.  I don't recall the exact
6 number.
7    Q.   Did she share a statistic for any
8 year prior to 2014?
9    A.   I don't believe so.
10    Q.   So if I understand you correctly, in
11 your meeting with Ms. Barnes, she shared with
12 you that, according to this review by Children
13 Services employees of SACWIS data, they
14 concluded that in 2014 and 2015 less than 20
15 percent of the placements were opioid related,
16 correct?
17       MR. PENDELL:  Objection to form.
18    A.   They did, but they also indicated
19 that that data was incomplete and probably
20 likely understated.
21    Q.   That the percentage of placements
22 that were opiate related in 2016 was 27 percent?
23    A.   Yes.
24    Q.   And that the percentage of
25 placements that were opiate related in 2017 was

Page 55

1 in the 20 percent range?
2    A.   Yes.
3    Q.   And did she provide a statistic for
4 2018?
5    A.   No.
6    Q.   Did Ms. Barnes share with you in
7 this meeting any further data or statistics
8 about the number of placement cases or the
9 percentage of placement cases that were
10 attributable to opioids?
11    A.   They had data on both total
12 placements and then the number of placements
13 attributable to opioids.  That was the extent of
14 the statistics they provided.
15    Q.   Did Ms. Barnes give you any
16 documents during this meeting to substantiate or
17 provide context for any of these statistics?
18    A.   I don't recall if they gave us a
19 document at the meeting.  We may -- I may have
20 received that document prior to the meeting,
21 which was -- one of the things, I think, that
22 prompted the meeting was getting at what this
23 data means and what's been included and not
24 included in the original analysis that we did.
25    Q.   And did that document square with

Page 56

1 the percentages that Ms. Barnes disclosed to you
2 at that meeting?
3    A.   Yes.
4    Q.   Then earlier you said that after the
5 meeting you got subsequent reports that were
6 more current, correct?
7    A.   Not as it relates to the SACWIS
8 data, no.
9    Q.   After the meeting with Ms. Barnes
10 did you get any further reports that were based
11 on SACWIS data?
12    A.   We, at the meeting, discussed the
13 SACWIS data.  We also discussed in our original
14 analysis costs that -- that both were included
15 and costs that I began to ask them about that
16 were not included in that original data; and at
17 the direction of counsel, we asked them to
18 revise cost estimates based on all of that new
19 information.
20    Q.   Okay.  So what costs were included
21 in the figures that Ms. Barnes shared with you
22 at the meeting?
23    A.   Placement costs primarily, and there
24 was a category of smaller child care-related
25 costs that they had originally included.

Page 57

1    Q.   And what costs weren't included?
2    A.   Primarily personnel costs for CSB
3 staff, travel costs for CSB staff, training
4 costs for CSB staff.  None of those costs -- and
5 those were the major ones.  There might be some
6 minor ones, but those were the major ones that
7 had never been included in the analysis.
8    Q.   Did Children Services go back and
9 perform any kind of review of data or files to
10 identify or calculate personnel costs?
11    A.   At the direction of counsel, they
12 did.
13    Q.   Did they do it for travel costs?
14    A.   They did.
15    Q.   Did they do it for training costs?
16    A.   They did.
17    Q.   And did you subsequently get any
18 report or information showing what those
19 personnel costs, travel costs or training costs
20 were?
21    A.   They did provide to counsel reports.
22    Q.   Did they provide it to you?
23    A.   I was cc'd on that e-mail.
24    Q.   Okay.  So what were the personnel
25 costs that were calculated after this meeting?

15 (Pages 54 - 57)

Page 58

1      MR. PENDELL:  Objection.
2      I'm going to instruct you not to
3  answer that on the grounds of privileged work
4  product.
5      A.   I've been instructed not to answer.
6      Q.   What were the travel costs that were
7  calculated after this meeting?
8      MR. PENDELL:  Same instruction.
9      A.   I've been instructed not to answer.
10     Q.   What were the training costs that
11  were calculated after this meeting?
12     MR. PENDELL:  Same instruction.
13     A.   I've been instructed not to answer.
14     Q.   Did you get any reports after this
15  meeting relating to any review of the SACWIS
16  data regarding the number of placement cases or
17  the percentage of placement cases that were
18  attributable to opioids?
19     A.   After the meeting?
20     Q.   Yes.
21     A.   Only -- it was the same statistics
22  that were provided before the meeting and were
23  now included in the reports provided to counsel.
24     Q.   How many reports were provided to
25  counsel after the meeting?

Page 59

1      A.   The report, I should say, is
2  probably more accurate.
3      Q.   Okay.  Were the statistics in this
4  report that was provided after the meeting
5  different than the statistics you described
6  Ms. Barnes sharing during the meeting?
7      MR. PENDELL:  Objection.
8      Hold on one second.
9      You can answer that question.
10     A.   They were not different.
11     Q.   Did you discuss with Ms. Barnes at
12  the meeting any review of case files to
13  determine the number of placement cases or the
14  percentage of placement cases that are
15  attributable to opioids?
16     A.   I'm not sure I know -- I'm not
17  following that question.
18     Q.   Sure.
19     You've described that the statistics
20  that she shared with you were based on the
21  review of the SACWIS data, correct?
22     A.   Yes.
23     Q.   I'm asking whether she shared with
24  you any information about a review of case
25  files.

Page 60

1      A.   Like the physical files themselves
2  you're --
3      Q.   Whatever case files are specific to
4  individual placements as opposed to whatever is
5  in the SACWIS database.
6      A.   The only discussion we had was
7  centered on the SACWIS database.
8      Q.   So during your meeting with
9  Ms. Barnes and others, did you learn anything
10  about whether anyone had reviewed individual
11  case files?
12     A.   I did not learn whether anybody had
13  reviewed individual case files beyond the data
14  provided from SACWIS.
15     Q.   Now, you said Darin Kearns was also
16  at this meeting?
17     A.   He was.
18     Q.   Did Darin Kearns provide any other
19  information about the attempt to determine the
20  number of placement cases or the percentage of
21  placement cases that are attributable to opioids
22  or were opioid related?
23     A.   Nothing beyond what we've already
24  discussed.
25     Q.   You said earlier that Ms. Barnes

Page 61

1  also discussed with you at this meeting the rise
2  in placement costs and the dollars spent on
3  staff.
4      Do you recall that?
5      A.   Correct.
6      Q.   What did Ms. Barnes tell you about
7  the rise in placement costs?
8      A.   Nothing, I believe, that wasn't
9  already outlined in my first deposition about
10  the increasing dollars being spent on placement
11  costs.
12     Q.   What did Ms. Barnes tell you about
13  the dollars spent on staff costs?
14     A.   That was provided to counsel as part
15  of the report at their direction.
16     Q.   This is the report that was provided
17  after this meeting?
18     A.   Yes.
19     Q.   So focusing on the meeting --
20     A.   In the meeting itself we didn't
21  discuss specific dollar amounts.  We asked them
22  to go back and review that information.
23     Q.   Even if you didn't discuss specific
24  dollar amounts, was there a discussion about
25  staff costs?

16 (Pages 58 - 61)

Page 62

1    A.   Only that they weren't included.
2    Q.   Did you discuss with Mr. Kearns at
3 this meeting anything about the rise in
4 placement costs?
5    A.   I don't believe so, no.
6    Q.   Did you discuss with Mr. Kearns at
7 this meeting anything about staff costs for
8 Children Services?
9    A.   So this meeting itself was a
10 general, kind of like this open meeting, where
11 everybody was discussing statistics, those
12 SACWIS statistics, things that were included,
13 not included.  We did not get into -- we did not
14 get into any individual cost pools, other than
15 identifying what cost pools had and had not been
16 included in previous analyses.
17    Q.   And did you identify for me all of
18 the cost pools that were not included in the
19 prior analyses, namely, personnel costs, travel
20 costs and training costs?
21    A.   I believe so.  There may have been
22 some minor ones, but those were certainly the
23 largest of those.
24    Q.   So how many reports were given by
25 Children Services to Summit County's counsel and

Page 63

1 copied to you after this meeting regarding
2 Children services?
3    A.   Given to Summit County counsel?
4    Q.   The lawyers.
5    A.   Oh, I'm thinking of the elected
6 county council members.
7    Q.   I'm sorry.  Legal counsel.
8    A.   I believe just one report.
9    Q.   And was that report given to Summit
10 County's experts?
11    A.   I'm not -- I don't know the answer
12 to that question.  Not that I'm aware of.
13    Q.   You said that Mr. Craig participated
14 in this meeting?
15    A.   Yes.
16    Q.   What is his position with the ADM
17 Board?
18    A.   He's the director of the ADM Board.
19    Q.   And what did you learn from him at
20 this meeting?
21    A.   We were provided, similar to CSB,
22 actual caseload information as ADM had gone back
23 and reviewed their case -- I don't know if they
24 reviewed case files or their system.  They have
25 a different system than SACWIS, but it's a

Page 64

1 similar case management system.  And I believe
2 it was the IT system that they went back and
3 reviewed for -- for opiate treatment costs, both
4 dollars spent -- local dollars spent and federal
5 and state dollars spent on opiate treatment.
6    Q.   What dollar figures did Mr. Craig
7 share at this meeting about money spent on
8 opiate treatment?
9    A.   They had compiled numbers that were
10 in a report that, again, was provided to
11 counsel, at counsel's direction.  Again with ADM
12 we began discussing cost centers that were not
13 included in their original estimates.
14    Q.   Okay.  So what cost centers were not
15 included in their original estimates?
16    A.   Education costs, prevention costs,
17 wrap-around service costs.  There may have been
18 one or two other more minor costs that had not
19 originally been included.
20    Q.   So what costs were included in their
21 estimates?
22    A.   Oh, staffing cost was another one
23 that was not included.  Just the cost of opiate
24 treatment is what was included in their original
25 estimates.

Page 65

1    Q.   And were you reviewing something in
2 writing at this meeting that showed the original
3 cost estimates?
4    A.   I believe we were, yes.
5    Q.   And what dollars were reflected in
6 these cost estimates?
7       MR. PENDELL:  Objection.  Form.
8       One second.
9       Andy, I hate to do this to you.  Can
10 we have two minutes?
11       MR. KEYES:  Sure.
12       THE VIDEOGRAPHER:  Off the record,
13 10:44.
14          (Recess had.)
15       THE VIDEOGRAPHER:  On the record,
16 10:47.
17 BY MR. KEYES:
18    Q.   What dollars were reflected in these
19 cost estimates?
20    A.   I don't recall, but I do recall that
21 those -- the documents related to ADM reviewed
22 at that meeting were requested by counsel.
23    Q.   And what were the figures that were
24 reflected?  Even if you don't remember the
25 dollar figures, what was it?  It was the spend

17 (Pages 62 - 65)

Page 66

1 by ADM that they said was opiate related?
2    A.    It was the spend.  It was further
3 analysis on the spend by ADM, and counsel had
4 asked us to essentially take a deeper dive into
5 ADM spending.
6    Q.    Counsel asked at that meeting to
7 take a deeper dive?
8    A.    Counsel had asked prior to that
9 meeting for us to take a deeper dive.
10    Q.    Okay.  And then Mr. Craig brought to
11 the meeting this report or he circulated it in
12 advance?
13    A.    I believe it was circulated in
14 advance.
15    Q.    How far in advance?
16    A.    That, I don't recall.  A couple
17 weeks maybe.
18    Q.    You said Jen Peveich was present at
19 this meeting?
20    A.    Yes.
21    Q.    Did you discuss with her costs borne
22 by the ADM Board that related to opiates?
23    A.    At the meeting?
24    Q.    Yes.
25    A.    Yes.

Page 67

1    Q.    What did you learn from Ms. Peveich?
2    A.    Again, we discussed what costs had
3 been included, what the new case review had
4 turned up, and then, also, what costs were
5 likely not included in the analysis that they
6 had done.
7    Q.    Anything else you learned from
8 Ms. Peveich regarding the ADM Board?
9    A.    No.
10    Q.    What is her position with the ADM
11 Board?
12    A.    She's their either budget or finance
13 director.
14    Q.    And after this meeting did the ADM
15 Board prepare a report?
16    A.    They subsequently prepared, at the
17 request of counsel, and submitted to counsel
18 the -- a follow-up report.
19    Q.    And were you copied on that report?
20    A.    I was copied on that report.
21    Q.    And what did that report say?
22        MR. PENDELL:  Objection.  Same
23 instruction as earlier.  Work product.
24    A.    I've been instructed not to answer.
25    Q.    Did the ADM Board circulate more

Page 68

1 than one report regarding costs related to
2 opioids after that meeting?
3    A.    I believe it was just one report.
4    Q.    I am showing you what was previously
5 marked as Nelsen Exhibit 8, and we'll mark this
6 as Nelsen 30(b)(6) Number 2.
7        -  -  -  -  -
8        (Thereupon, Nelsen 30(b)(6)
9        Deposition Exhibit 2, E-Mail from
10        Jennifer Peveich to Bryan Herschel
11        and Brian Nelsen, dated August 18,
12        2017, with Attachment, Beginning
13        Bates Number SUMMIT_001084232, was
14        marked for purposes of
15        identification.)
16        -  -  -  -  -
17    Q.    We reviewed this in your deposition
18 in December.  Is that the report that you had
19 received before the meeting and that was
20 reviewed at the meeting, or are you describing
21 something different?
22    A.    I believe this may have been --
23 this -- I think this was the report they had
24 prepared in our original analysis and not the
25 version of data we looked at at the meeting.

Page 69

1    Q.    Okay.  So if I understand you
2 correctly, what we've now marked as Nelsen
3 30(b)(6) Exhibit Number 2 was prepared by the
4 ADM Board?
5    A.    Yes.
6    Q.    To estimate the cost that it had
7 incurred relating to opiates?
8    A.    Yes.  This was our initial, first
9 stab at coming up with costs related to ADM.
10    Q.    Subsequent to this exhibit, the ADM
11 Board prepared an updated estimate of its costs
12 that were related to opiates?
13    A.    Yes.
14    Q.    And that second report was reviewed
15 at that meeting that you've described?
16    A.    I believe so.
17        MR. PENDELL:  Objection to form.
18    A.    I believe so.
19    Q.    And that second report was
20 circulated in advance of that meeting?
21    A.    I believe it was.
22    Q.    So you had seen that second report
23 before the meeting?
24    A.    I believe so.
25    Q.    And who else received a copy of that

18 (Pages 66 - 69)

Page 70

1 second report before the meeting?
2    A.   Our counsel and myself.
3    Q.   And then that second report was
4 reviewed by the group at the meeting?
5    A.   Yes.
6    Q.   And at that meeting the group
7 identified costs that were not included in the
8 second report?
9    A.   That's correct.
10    Q.   And you said there was a direction
11 given to the ADM Board to estimate the
12 costs for these other cost centers that were not
13 included in either the first or the second
14 report?
15    A.   That's my recollection, yes.
16    Q.   And such a report was prepared after
17 the meeting?
18    A.   Yes.
19    Q.   And you were copied on it?
20    A.   Yes.
21    Q.   Was there any fourth report?
22    A.   I don't believe so.
23    Q.   You testified earlier that Donna
24 Skoda was at this meeting?
25    A.   Yes.

Page 71

1    Q.   She is with the Public Health
2 Department?
3    A.   She is.
4    Q.   What is her position?
5    A.   She's the director of public health.
6    Q.   And that's the director of public
7 health for Summit County?
8    A.   For the Summit County Public -- what
9 is their official name?  Summit County Public
10 Health.
11    Q.   And you testified in your deposition
12 in December that Summit County Public Health is
13 not a part of Summit County government, correct?
14    A.   That is correct.
15    Q.   Is that your testimony today?
16    A.   Yes.
17    Q.   And you testified in your deposition
18 in December that Summit County does not
19 contribute any funds to Summit County Public
20 Health?
21    A.   Not general funds.
22    Q.   Okay.  Is that still your testimony
23 today?
24    A.   Yes.
25    Q.   Does Summit County pay any funds to

Page 72

1 Summit County Public Health?
2    A.   Yes.
3    Q.   For what?
4    A.   The Summit County ADM Board in
5 particular supplies funding for them for some of
6 their efforts, including efforts related to
7 opiate abatement.
8    Q.   Okay.  If I understood you
9 correctly, you said the Summit County ADM Board
10 provides funding to Summit County Public Health?
11    A.   Yes.
12    Q.   And the funding that it provides
13 goes, in part, to providing opiate-related
14 services?
15    A.   Yes.
16    Q.   Does Summit County itself give any
17 funds to Summit County Public Health?
18        MR. ARNOLD:  Objection to form.
19    A.   Well, I guess that depends on what
20 you classify as Summit County itself.  There are
21 agencies -- Job and Family Services provides
22 Title 20 funding for senior services to public
23 health.  There are a host of programming things
24 that Summit County provides funding to the
25 Summit County Public Health Department for.

Page 73

1    Q.   Okay.  Separate from whatever
2 funding the ADM Board gives to Summit County
3 Public Health, does Summit County give any money
4 to Summit County Public Health to provide
5 services related to opioids or opioid addiction?
6    A.   I have to think if there were any
7 small grants.  Summit County ADM would be the
8 primary funder of opiate-related services to
9 Summit County Public Health.
10    Q.   Can you think of any funds that
11 Summit County gives to Summit County Public
12 Health to provide services relating to opioids
13 or opioid addiction beyond funds that may be
14 contributed by the ADM Board?
15    A.   Off the top of my head, I cannot,
16 though that doesn't mean there may not be,
17 through the courts or some other entities, some
18 smaller pots of funding.
19    Q.   What did you learn from Ms. Skoda at
20 this meeting?
21    A.   With Ms. Skoda we discussed
22 essentially what you're asking about, the
23 various funding sources that flow through Summit
24 County Public Health for opiate prevention, and
25 then with her we also discussed the fact that

19 (Pages 70 - 73)

Page 74

1  they also had not reported staff time as part of
2  their costs.
3      Q.   You said "they."  You mean Summit
4  County Public Health?
5      A.   "They" being Summit County Public
6  Health, that's correct.
7      Q.   How much money per year does the ADM
8  Board give to Summit County Public Health
9  regarding opiates?
10     A.   It has varied, I think, from year to
11  year.  Generally, it's several hundred thousand
12  dollars.
13     Q.   Was there ever a year where ADM gave
14  more than several hundred thousand dollars to
15  Summit County Public Health for opiates or
16  opiate-related services?
17     A.   I don't recall specifically.  2015
18  or 2016 may have been on the north side of the
19  hundred thousands of dollar figure, I mean
20  approaching somewhere between half a million and
21  a million.
22          One of the reasons I've never really
23  focused a whole lot on that is those costs are
24  also included in ADM's cost analysis as well.
25     Q.   Okay.  So when you met with

Page 75

1  Ms. Skoda, she described the various funding
2  sources, you said through Summit County Public
3  Health, to provide opiate-related services?
4      A.   Yes.
5      Q.   Okay.  So what did she tell you
6  about the dollars that Summit County Public
7  Health receives from the ADM Board for
8  opiate-related services?
9      A.   I don't know that she told me
10  necessarily anything about them.  Again, at the
11  request of counsel, we had them provide us a
12  list of the funding sources and dollars spent on
13  opiate abatement through Summit County Public
14  Health, and, again, at that meeting identified
15  the costs that were not included for them.  It
16  was primarily personnel costs.  And at the
17  instruction of counsel, they prepared a
18  follow-up analysis.
19     Q.   And what did you learn from
20  Ms. Skoda about dollars that Summit County
21  Public Health received from Summit County
22  itself, not from the ADM Board, for
23  opiate-related services?
24     A.   I don't recall.  They would have
25  been contained on that report that was provided.

Page 76

1      Q.   And was this a report that was
2  provided in advance of the meeting?
3      A.   I believe it was provided -- I think
4  theirs was provided at the meeting, if I recall
5  correctly.
6      Q.   And what did the report cover?
7      A.   Just funding sources related to
8  opiate expenses.
9      Q.   And when you say "funding sources,"
10  you mean who is contributing money and how much
11  money is being contributed?
12     A.   That's correct.
13     Q.   To Summit County Public Health for
14  opiate-related services?
15     A.   That's correct.
16     Q.   And you believe that that report was
17  not circulated in advance of the meeting but was
18  handed out at the meeting and discussed at the
19  meeting?
20     A.   That's my recollection, yes.
21     Q.   And did Summit County Public Health
22  then circulate a revised report after the
23  meeting?
24     A.   Yes.
25     Q.   How many?

Page 77

1      A.   Just one.
2      Q.   And were you copied on it?
3      A.   Yes, I was.
4      Q.   And what did that revised report say
5  about funding that Summit County Public Health
6  had received related to opiate services?
7          MR. PENDELL:  Objection.  Same
8  instruction as earlier.
9      A.   That report was provided to counsel,
10  and I've been instructed by counsel not to
11  answer.
12     Q.   So what is your best recollection of
13  what the report that was discussed at this
14  meeting said about the specific dollars that
15  Summit County Public Health had received from
16  Summit County, not ADM Board?
17         MR. PENDELL:  Objection.  Same
18  instruction.
19     Q.   I'm talking about the report that
20  was discussed at the meeting.  What did that say
21  about the dollars that Summit County Public
22  Health had received from Summit County, not the
23  ADM Board?
24         MR. PENDELL:  Objection to form.
25     A.   I don't recall -- I don't recall if

20 (Pages 74 - 77)

Page 78

1 there were -- so, for instance, the Job and
2 Family Services dollars we talked about earlier
3 would have not been included in that report and
4 discussed at that meeting. I don't recall if
5 there were funding sources for opiates from
6 non-Summit County agencies on that report.
7      Q.   And what did the report that was
8 discussed at that meeting say about the dollars
9 that had been received by Summit County Public
10 Health from the ADM Board for opiate-related
11 services?
12           MR. PENDELL: Objection to form.
13      A.   It provided a listing of grants; and
14 in terms of the dollar amounts, I think I've
15 previously answered that question.
16      Q.   Did you learn anything else from
17 Ms. Skoda at this meeting regarding the funding
18 that Summit County Public Health received for
19 opiate-related services?
20      A.   Not above and beyond what was
21 contained in that report, or, as I mentioned
22 earlier, identified primarily personnel costs
23 that were not included in that report.
24      Q.   Did this report from Summit County
25 Public Health identify the dollars that it spent

Page 79

1 on opiate-related services?
2           MR. PENDELL: Objection to form.
3      A.   Yeah. I don't recall if it was just
4 a listing of the grants they got or it included
5 both the grant awards and the actual dollars
6 spent. That, I don't recall.
7      Q.   You said that Angela Burgess was
8 also at this meeting?
9      A.   Yes.
10      Q.   What is her position?
11      A.   I believe she's -- I don't know her
12 exact title, but she's essentially the finance
13 director for Summit County Public Health.
14      Q.   So does she work for the same entity
15 as Ms. Skoda or a different entity?
16      A.   Same entity.
17      Q.   So at this meeting there were two
18 people from Children Services Board, two people
19 from the ADM Board and two people from Summit
20 County Public Health?
21      A.   That's correct.
22      Q.   And did you learn anything from
23 Ms. Burgess, beyond what we've already
24 discussed, about either the funding that Summit
25 County Public Health receives or the money it

Page 80

1 spends on opiate-related services?
2           MR. PENDELL: Objection to form.
3      A.   Nothing more than we have already
4 discussed.
5      Q.   When you got the report from
6 Children Services after this meeting, did you
7 discuss it with anyone?
8      A.   I likely discussed -- I don't recall
9 specifically, but I believe I discussed with
10 counsel. I may have also discussed with Darin
11 Kearns, but I don't recall specifically.
12      Q.   Do you remember anything about any
13 conversation with Ms. Barnes or Ms. Kearns --
14 Mr. Kearns about the report that was circulated
15 by Children Services after this meeting?
16           MR. PENDELL: Objection to form.
17      A.   I don't remember the exact
18 conversations.
19      Q.   When you received the report from
20 the ADM Board after this meeting, did you
21 discuss it with Mr. Craig or Ms. Peveich?
22           MR. PENDELL: Objection to form.
23      A.   Again, I believe I discussed it with
24 counsel and I believe I discussed it with
25 Ms. Peveich as well.

Page 81

1      Q.   Okay. So what do you remember
2 discussing with Ms. Peveich about the report
3 that was circulated after this meeting?
4      A.   I do not recall.
5      Q.   Did you discuss the report with
6 anyone else at the ADM Board?
7      A.   I did not.
8      Q.   And when you got the report from
9 Summit County Public Health after this meeting,
10 did you discuss it with Ms. Skoda or
11 Ms. Burgess?
12      A.   I did not.
13      Q.   Did you discuss it with anyone else
14 from --
15      A.   I believe I discussed it with
16 counsel.
17      Q.   Did you discuss it with anyone else
18 from Summit County Public Health?
19      A.   No.
20      Q.   Did you have further conversations
21 with Ms. Barnes or Mr. Kearns to prepare for
22 your testimony as a corporate rep today?
23      A.   I did not.
24      Q.   How about with Mr. Craig or
25 Ms. Peveich?

21 (Pages 78 - 81)

Page 82

1   A.   I did not.
2   Q.   How about Ms. Skoda or Ms. Burgess?
3   A.   Wait a minute.  I did have a
4 conversation with Ms. Peveich yesterday, I
5 believe.
6   Q.   About what?
7   A.   I had called to ask her if she had a
8 recollection of the first time that the opiate
9 crisis might have shown up as a subject matter
10 in one of their budget documents.
11   Q.   What did she say?
12   A.   Her response was essentially no, but
13 she has only worked for the agency since 2015,
14 so she had no knowledge about what was -- may or
15 may not had been in there prior to that period.
16   Q.   Did you review the ADM Board budget
17 documents?
18   A.   Prior -- are you asking about prior
19 to --
20   Q.   Prior to today's deposition.
21   A.   I did not.
22   Q.   Have you on other occasions in
23 connection with your work as director of
24 finance --
25   A.   Well, yeah.  Every year when they

Page 83

1 submit a budget document, I review it.
2   Q.   And so what is your understanding of
3 the first time that the opiate crisis shows up
4 as a subject matter in the ADM Board budget
5 documents?
6       MR. PENDELL:  Objection to form.
7   A.   I don't recall.
8   Q.   What is the first time you can
9 recall the opiate crisis showing up as a subject
10 matter in the ADM Board budget documents?
11       MR. PENDELL:  Objection to form.
12   A.   I don't recall.
13   Q.   Did you have any further discussion
14 with Ms. Peveich yesterday?
15   A.   No.
16   Q.   Did you have any further
17 conversations with Ms. Skoda or Ms. Burgess to
18 prepare for today's deposition?
19   A.   I did not.
20   Q.   Did you have any conversations with
21 anyone else to prepare for today's deposition?
22   A.   Only our attorneys, as we previously
23 mentioned.
24   Q.   When did Summit County first learn
25 that prescription opioid abuse was resulting in

Page 84

1 harm to the county?
2       MR. PENDELL:  Objection to form.
3   A.   So when you say "Summit County,"
4 obviously it's a big county with a lot of
5 employees and a lot of varied lines of business,
6 so to speak.  I guess I would ask you to further
7 define what you mean by when did Summit County
8 learn.
9   Q.   When did anyone in the Summit County
10 government learn that prescription opioid abuse
11 was resulting in harm to Summit County?
12   A.   My -- I can only speak to the first
13 time I became aware, which was probably around
14 2014 or so, late 2013, early 2014.
15   Q.   And how did you come to learn that?
16   A.   I had a conversation with the county
17 medical examiner, Dr. Kohler, following one of
18 our staff meetings, in which she was talking
19 about the number of overdose deaths that were
20 showing up at the county coroner's office, and I
21 remember asking her point blank, "Well, how many
22 overdoses are you seeing on a daily, weekly,
23 monthly basis?"  And her response was, "I see
24 one every day."
25   Q.   And did you understand from this

Page 85

1 conversation with Dr. Kohler that these were
2 overdoses on opioids?
3   A.   My recollection is that I -- based
4 on that conversation, I did.
5   Q.   And so it's that conversation that
6 you place as the first time you were aware that
7 prescription opioid abuse was resulting in harm
8 to Summit County?
9   A.   Yes.
10   Q.   And moving beyond your knowledge,
11 what about other leaders in Summit County, the
12 county executive, people in the county
13 executive's office or the county council?
14       MR. PENDELL:  Objection to form.
15   A.   I don't know that I can speak
16 specifically for when they knew, but I know
17 it -- I know it was around 2014, for sure into
18 2015, that this began to become a discussion at
19 budget hearings, at council meetings,
20 discussions about the Summit County Opiate Task
21 Force that had been formed.  That's when I first
22 really kind of got brought into the fold with
23 these issues.
24   Q.   What damages is Summit County
25 claiming in this case?

22 (Pages 82 - 85)

Page 86

1    A.   And by that are you asking for a
2  dollar amount, are you asking for types of
3  damages?
4    Q.   Yes.
5    A.   Yes to all of the above?
6    Q.   Yes.
7    A.   I believe we have a damages report
8  that was prepared for us based on accounting
9  data and information we provided to some damage
10  experts, and the makeup of that would be,
11  essentially, personnel costs for -- personnel
12  costs, treatment costs, costs related to our
13  criminal justice system, all of the things that
14  we have had to address as a result of the opiate
15  crisis.
16    Q.   Anything else you can point to as
17  the damages that Summit County is claiming in
18  this case, either by type or category or by
19  dollar figure?
20    A.   I mean, we have education prevention
21  costs.  We have treatment costs.  We have
22  incarceration costs.  We have public defense
23  costs.  We have costs for the medical examiner's
24  office.  Some of those costs are also lost
25  revenue opportunities to the county because of

Page 87

1  workload.  Staffing costs.  Those would be the
2  primary buckets.  I'm sure there are others.
3  Child placement costs, obviously a large pool
4  based on our previous discussions.
5    Q.   Are you able to put a dollar figure
6  on any of these categories of costs you've
7  listed?
8        MR. PENDELL:  Objection to form.
9    A.   Yeah.  I mean, we have a damages
10  calculation that was done on our behalf, and
11  internally we have also done estimates on costs,
12  and those costs currently, maybe focusing on
13  2016, run in the 20 -- roughly -- 2 million
14  dollar range.
15    Q.   The what range, 20 to 22?
16    A.   Roughly, 22 million dollars for that
17  one year just in current costs.  That doesn't --
18  and those costs are just costs known to us.  It
19  does not include the overall economic impact to
20  society as a whole, the drag on work
21  productivity, GDP, how that affects sales tax
22  revenues, housing prices, just essentially
23  overall lost worker productivity, and the pain
24  and suffering of the folks that are dealing with
25  opiate-dependent relatives, friends, employees,

Page 88

1  everything else in the community.
2    Q.   You said, "We internally have done
3  estimates on costs for 2016."  Did I hear you
4  right?
5    A.   We did a cost analysis that, I
6  believe, was for the period 2013 through
7  either -- I think it was through 2016, of actual
8  county costs.
9    Q.   Who is the "we" in that sentence?
10    A.   We is myself, the -- the finance
11  people at CSB, ADM, public health, other -- I'm
12  trying to think if there were other folks in the
13  direct calculation of those costs within the
14  county, but those would be the primary.
15    Q.   And did you prepare a summary of
16  this cost analysis?
17    A.   Yes.
18    Q.   And why did you undertake the cost
19  analysis in the first place?
20    A.   We were -- as we were contemplating
21  this suit, we were going back to try to
22  essentially calculate what it is that this
23  opiate epidemic was costing Summit County, and
24  ours was limited to, initially, Summit County
25  government itself, both in terms of shifting

Page 89

1  manpower cost to address the impact of this, and
2  then, also, additional costs that were being
3  borne by the county as a result of the epidemic.
4    Q.   What do you mean, costs to the
5  Summit County government itself?
6    A.   To -- to the Summit County
7  government political subdivision.  In other
8  words, I did not do an analysis on Akron city
9  government or any of the political subdivisions
10  in the county, or at that point we also had not
11  done an analysis on the state of the economy as
12  a whole in Summit County and the impact it was
13  having on that.  It was just really to our
14  operations.
15    Q.   And when did you undertake this cost
16  analysis that you've described?
17    A.   I think late in the summer of 2017.
18    Q.   And once you did this analysis, who
19  did you share it with?
20    A.   I shared it with the county
21  executive.  We shared it with our legal counsel.
22  I don't recall beyond that who we shared it
23  with.
24    Q.   And when you say "the county
25  executive," who are you referring to in

23 (Pages 86 - 89)

Page 90

1 particular?
2     A.   Ilene Shapiro.
3     Q.   Did you then discuss it with
4 Ms. Shapiro?
5     A.   Yes.  I discussed it -- I discussed
6 it at length with Jason Dodson, our chief of
7 staff.
8     Q.   Did you discuss it with Ms. Shapiro?
9     A.   Yes.
10     Q.   Who made the decision then to file
11 the lawsuit?
12     A.   Ilene Shapiro, the county executive.
13     Q.   How do you know it was her decision?
14     A.   Because she's the county executive.
15     Q.   When did she make the decision to
16 file the lawsuit?
17          MR. PENDELL:  Object to the form,
18 and -- objection to form.  This is outside the
19 scope.
20          MR. KEYES:  I disagree.
21     Q.   When did she make the decision?
22          MS. KEARSE:  What topic is it
23 pertaining to?
24          MR. KEYES:  Damages.
25          MR. NAEEM:  Anne, you understand

Page 91

1 that Special Master Cohen has already ruled on
2 whether people can ask questions outside the
3 scope, and he expressly rejected it, so that's
4 not a proper objection and he can ask anything
5 in his personal knowledge.  It's understandably
6 not binding on the corporation, but his personal
7 knowledge is at issue in this deposition.
8          MS. KEARSE:  I'm not saying he can't
9 ask the question.
10          MR. PENDELL:  Whether it's outside
11 the scope, we're allowed to make that objection.
12          MR. NAEEM:  Go ahead.
13          MS. KEARSE:  I'm not saying not to
14 answer the question.  I just want to make.
15 sure --
16          MR. PENDELL:  So your soliloquy was
17 out of line, Tariq.
18          MR. NAEEM:  And so is your comment,
19 so let's just keep going.
20 BY MR. KEYES:
21     Q.   When did Ms. Shapiro make the
22 decision to file a lawsuit?
23     A.   I don't know the actual date.
24     Q.   You said you discussed your cost
25 analysis with Ms. Shapiro.  What did she say

Page 92

1 about it?
2     A.   I think her general reaction was a
3 little shocked at the total amount of resources
4 that it's taken to address the issue.
5     Q.   When did you share it with her?
6     A.   I don't recall the exact date.  It
7 would have been late summer, early fall,
8 somewhere in that period in 2017.
9     Q.   You said you also discussed your
10 cost analysis with Jason Dodson at length?
11     A.   Yes.
12     Q.   Was that with Ms. Shapiro or without
13 Ms. Shapiro?
14     A.   Most of those conversations were
15 probably without Ms. Shapiro.
16     Q.   So you had multiple conversations
17 with Mr. Dodson?
18     A.   Yes.
19     Q.   But some included Ms. Shapiro?
20     A.   Yes.
21     Q.   And what did Mr. Dodson say about
22 the cost analysis?
23          MR. PENDELL:  Objection to form.
24          MR. ARNOLD:  This is the report that
25 we discussed in the last deposition.  It was all

Page 93

1 done at the request of counsel.  It's all work
2 product.  He's not going to talk about the
3 analysis that he and Dodson did together.
4          MR. KEYES:  This is a first for me
5 where three people representing the same people
6 get to speak, object, opine.
7          MS. KEARSE:  I'll pass notes from
8 now on.  I'll keep my mouth shut.
9          MR. KEYES:  I don't think two is
10 allowed under the protocol, but I'm pretty sure
11 that even your side hasn't articulated that
12 you're allowed to have three people speak on
13 behalf of a single party.
14          MS. KEARSE:  I will do my best to
15 keep quiet.
16     Q.   So you can't answer my question?
17     A.   What was your question again?
18          MR. PENDELL:  I'm instructing the
19 witness not to answer if it implicates attorney
20 work product.
21     Q.   What did Mr. Dodson say about the
22 cost analysis?
23     A.   I don't recall what he said.  Most
24 of our conversations were about how to go about
25 preparing the analysis itself.

24 (Pages 90 - 93)

Page 94

1    Q.   So was Mr. Dodson then involved in
2  structuring the cost analysis that you and the
3  finance department did?
4    A.   I don't know that I would say he
5  was -- I guess that depends on how you define
6  structuring it.  I came up with methodologies to
7  put the analysis together.  He was more of a
8  sounding board to say whether we were on target,
9  not on target, or whether there were other
10  things he could think of that we were missing.
11    Q.   You mentioned earlier incarceration
12  costs as a category of damage?
13    A.   Um-hum.
14    Q.   That's the cost of incarcerating
15  people who have either been convicted of a crime
16  or have been accused of a crime and are awaiting
17  trial?
18        MR. PENDELL:  Objection to form.
19    A.   That's correct.
20    Q.   You mentioned public defender costs.
21  Those are the costs incurred by the public
22  defender's office in representing individuals
23  who have been accused of crimes and are being
24  prosecuted for crimes?
25    A.   It may either be the public

Page 95

1  defender's office or private appointed counsel
2  appointed by the courts to defend indigent
3  defendants that the county bears the cost of.
4    Q.   You're saying this category doesn't
5  include just lawyers in the office of the public
6  defender, it also includes private lawyers who
7  may be appointed to represent indigent
8  defendants?
9    A.   That's correct.
10    Q.   But whether it's public defender or
11  private attorneys, these are the costs spent on
12  lawyers to represent individuals who have been
13  accused of and are being prosecuted for crimes?
14    A.   That's correct.
15    Q.   And you mentioned earlier costs
16  regarding the criminal justice system.  Beyond
17  incarceration costs and public defender costs,
18  are you referring to prosecutor costs?
19    A.   Prosecutor costs, probation costs,
20  costs over at the juvenile court related to
21  probation and detention, costs related to the
22  county's contract with Oriana House for -- for
23  both incarceration and treatment costs through
24  that facility.
25    Q.   So when you refer to prosecutor

Page 96

1  costs, these are the costs of paying prosecutors
2  to pursue criminal cases against defendants who
3  are accused of and are being prosecuted for
4  crimes?
5    A.   Primarily, yes.
6    Q.   Well, is there anything else?
7    A.   There could be victim assistance
8  costs.  There could be costs related to
9  witness -- witnesses.  There are other smaller
10  ancillary costs, but the prosecutors themselves
11  would be the primary cost.
12    Q.   Okay.  And are you able to quantify
13  the victim's assistance costs?
14    A.   We have a -- we have specific
15  employees in victim assistance services.  I
16  don't have that dollar figure off the top of my
17  head, no, but it's part of our operating budget.
18    Q.   And so those are the costs of
19  providing assistance to victims of crimes?
20    A.   Yes.
21    Q.   In particular, drug crimes?
22    A.   Any crimes.
23    Q.   Any crimes.  Not even limited to
24  drug crimes?
25    A.   No.

Page 97

1    Q.   And the witness costs are what
2  costs?
3    A.   Expert witness fees and other
4  witness fees you may have to pay to prosecute
5  somebody.
6    Q.   What kind of witness fees would you
7  have to pay besides expert fees?
8    A.   I don't know offhand.
9    Q.   And so these would be the costs paid
10  by Summit County for experts either to offer
11  opinions in aid of prosecuting someone accused
12  of a crime and being prosecuted from a crime?
13    A.   Correct.
14    Q.   Or the costs of paying experts to
15  offer opinions in defense of people?
16    A.   Well, we pay for both.  If we
17  have -- so along with -- this ties into your
18  question earlier about indigent defense costs as
19  it relates to the public defender and private
20  appointed counsel.  If we have an indigent
21  defendant and their attorney requires that we
22  have -- we need an expert witness related to
23  their case, we pay those expert witness fees as
24  well as part of that indigency.
25    Q.   When you refer to a case, that's a

25 (Pages 94 - 97)

Page 98

1 criminal case?
2     A.   A criminal case, yes.
3     Q.   And then when you mentioned --
4     A.   A felony criminal case in -- well, I
5 guess we're -- we also pay for indigent defense
6 at the municipal court level, so it could be a
7 misdemeanor as well.
8     Q.   And you referenced probation costs
9 as being one category of costs in the criminal
10 justice system?
11     A.   Yes.
12     Q.   These are the costs associated with
13 probation services for people who have been
14 convicted of crimes?
15     A.   Correct.
16     Q.   And then the juvenile court costs?
17     A.   Yes.
18     Q.   Those are the costs borne by Summit
19 County in operating a juvenile court in which
20 juveniles are being prosecuted for crimes?
21     A.   That's correct.
22     Q.   You mentioned the Oriana House
23 contract.  Summit County pays money pursuant to
24 a contract with Oriana House, correct?
25     A.   That's correct.

Page 99

1     Q.   And Oriana House, in exchange for
2 those dollars, provides two types of services,
3 correct?
4     A.   Correct.
5     Q.   Treatment services and incarceration
6 services, correct?
7     A.   Correct.
8     Q.   And the incarceration services are
9 provided by Oriana House to incarcerate people
10 who have been convicted of crimes?
11     A.   Correct.
12     Q.   Felony crimes?
13     A.   Felony and misdemeanor both.
14     Q.   And Oriana House provides treatment
15 services?
16     A.   Yes.
17     Q.   To people who have been convicted of
18 crimes?
19     A.   Yes.
20     Q.   So with respect to these categories
21 of costs that Summit County incurs in operating
22 its criminal justice system, prosecutor costs,
23 probation costs, juvenile court costs, and
24 amounts paid to Oriana House, all of those costs
25 are incurred by Summit County in either

Page 100

1 prosecuting, supporting the prosecution or
2 incarcerating people who have been charged with
3 or convicted of crimes, correct?
4     A.   Correct.  And/or treating people who
5 have been incarcerated as well, or as an
6 alternative to incarceration.
7     Q.   Because they were convicted of a
8 crime?
9     A.   Because they were convicted of a
10 crime, that's correct.
11     Q.   You mentioned treatment costs as one
12 category of damages.
13     A.   Yes.
14     Q.   Who is providing the treatment that
15 falls within this category of treatment costs?
16     A.   As it relates to the criminal
17 justice system?
18     Q.   No.  Let's -- I understand that
19 Oriana House provides treatment services as part
20 of the criminal justice system.
21     A.   Yes.
22     Q.   I want to focus on any other
23 treatment costs that Summit County bears.
24     A.   Well, there's a host of treatment
25 providers throughout Summit County.  As it

Page 101

1 relates to the opiates, those are primarily
2 funded through ADM, and there are a whole host
3 of agencies from -- from Oriana to Interval
4 Brotherhood Home to Summit Psychological to --
5 there are -- I'd have to go down through the
6 list, but there are dozens of them.
7     Q.   And you said all or almost all of
8 those third parties receive funding from the ADM
9 Board?
10     A.   Yes.
11     Q.   What funding do any of those service
12 providers receive from Summit County that
13 doesn't come to them through the ADM Board?
14     A.   Many of them receive money that
15 comes through the juvenile court, through common
16 pleas court, through the Department of Job and
17 Family Services.  There may be some others, but
18 those would be the major funding sources from
19 the county to those types of agencies.
20     Q.   Does Summit County receive any
21 reports or data either from the ADM Board or
22 from any of these service providers that
23 identifies the money spent to provide services
24 to people because of an opioid use disorder --
25         MR. PENDELL:  Objection to form.

26 (Pages 98 - 101)

Page 102

1    Q.   -- in particular, as distinct from
2 other things?
3    A.   My belief is yes, they do.
4    Q.   What is the data or the report or
5 the information that Summit County gets from any
6 of these service providers that shows the
7 dollars that were spent providing services to
8 people because of an opioid use disorder?
9    A.   So, as we mentioned earlier, for
10 example, the ADM Board receives case information
11 and is now coding that in their -- their case
12 management system, which helps them identify
13 treatment related to opiate use disorder.
14    Q.   For how long has ADM been coding
15 things so they can keep track of dollars spent
16 on service providers providing services to
17 people with an opioid use disorder?
18        MR. ARNOLD:  Objection to form.
19    A.   I don't know the exact number of
20 years, but my understanding is they have been
21 coding that longer than Children Services has.
22 I do know, in conversations with Oriana House
23 and based on previous reports I've looked at
24 from Oriana, they code treatment based on --
25 they code primary, secondary and tertiary causes

Page 103

1 for cases that they provide treatment services
2 for, and so they would -- they capture as well
3 opiate use disorder as one of those causes.  So
4 most -- all of these agencies -- and
5 particularly when they -- you got to remember,
6 too, they're not just billing us.  A lot of
7 these people -- and this is expanded with
8 Medicaid -- they're also billing Medicaid, and
9 with Medicaid they're required to report, so
10 throughout the system they're required to report
11 these causes in order to be reimbursed for those
12 treatment costs.
13    Q.   Does Oriana House or any of the
14 service providers provide information or reports
15 to Summit County that shows the dollars spent in
16 providing services to people only because they
17 had an opioid use disorder, where they had no
18 other addiction or mental health need for
19 treatment?
20        MR. PENDELL:  Objection to form.
21    A.   I believe they could.  I don't --
22 I've not had that discussion that we have -- in
23 terms of delving down, when they provide us
24 information, on treatment costs for opiate use
25 disorder -- I have not delved into whether there

Page 104

1 are other causes associated with that.
2        Conversely, when we have a crime,
3 say -- and let's just say -- use domestic
4 violence as an example.  If somebody is arrested
5 on domestic violence charges, we're not
6 necessarily capturing whether they have an
7 underlying opiate use disorder which is
8 contributing to those domestic violence charges.
9 So when we look at all of these statistics, I
10 would say that the number of dollars being spent
11 on certain types of activities is probably
12 understated because we don't have the level of
13 information to tell us whether, for instance, a
14 domestic violence charge was caused because of
15 somebody's opiate use disorder.
16    Q.   Have you done any study of the data
17 to see if that's true or not?
18    A.   Have I personally done a study of
19 the data?
20    Q.   Yes.
21    A.   I have not.  I have talked with
22 people in the various offices about that
23 particular fact.
24    Q.   Has anyone at your direction done
25 such a study?

Page 105

1    A.   They have not.
2    Q.   Has anyone not at your direction
3 done an actual study of the data to see if
4 that's the case?
5    A.   No, but I also don't know that it's
6 possible to do that study in a scenario like the
7 one I just mentioned.  If we haven't captured
8 that information, then they -- that likely is
9 not part of the systems that would allow us to
10 do that analysis.
11    Q.   Do each of the service providers
12 that receive funding from the ADM Board have a
13 contract with the ADM Board?
14    A.   They do.
15    Q.   And does that contract govern the
16 funding that the service provider will receive?
17    A.   It does.
18    Q.   Does it also govern the services
19 that the service provider will provide?
20    A.   It does.
21    Q.   Does it also govern the information
22 that the service provider will report to the ADM
23 Board?
24    A.   I believe it does.  And so in the
25 case of ADM, when they're providing treatment

27 (Pages 102 - 105)

Page 106

services, obviously the underlying cause for treatment services is captured. When you get over to the criminal justice side -- and Job and Family Services is another one. When you have people seeking food stamps or food assistance, we're not going -- we do not go, and we're not required legally to go, to the level of trying to find out whether there's an opiate use disorder contributing to their need for food stamps, Medicaid or any of the other services of the county.

So some areas, obviously because we're treating them specifically for that disorder, we capture it. Others we may or may not depending on why it is they're having an interaction with county government.

Q. Okay. Do the contracts between ADM and the service providers require the service providers to track what services are being provided to individuals because they have an opioid use disorder and for no other reason?

A. I do not know the answer to that question.

Q. And do the contracts between ADM and the service providers require the service

Page 107

providers to do anything to confirm a self-reported opioid use disorder?

MR. ARNOLD: Objection to form.

A. I don't know that I know the answer to that question. My understanding is that when somebody seeks services, that any and all underlying disorders for which they're seeking services are captured and reported.

Q. So if ADM gets data from Oriana House that purports to show the dollars spent in providing services to people with an opioid use disorder, Oriana House is tracking opioid use disorder based on what the recipient of the services says without doing any independent check, such as with a physician, correct?

MR. PENDELL: Objection to form.

MR. ARNOLD: Objection to form.

A. Yeah. I don't know that that's the case. I think --

Q. Do you know either way?

A. I don't know either way. They may very well be following up with physicians and getting medical records on those folks.

Q. How much has Summit County spent on what you describe as education?

Page 108

A. Through the ADM Board, they have spent -- I don't remember the exact figure. It's over 3 million dollars.

Q. Over what period of time?

A. Roughly, 2015 to 2017.

Q. Separate from what the ADM Board has spent, what has Summit County spent on education, if any?

A. Yeah. There has been -- I don't have an exact figure on that from other county departments.

Q. Okay. What other county departments are spending money on education regarding opioids or prescription opioids?

A. The sheriff's office is. The sheriff's office runs a DARE program that provides education services through that program. Children Services has spent money on education. I'm fairly certain other county agencies have as well.

Q. Sitting here today, you can identify the ADM Board, the sheriff's office DARE program and the Children Services Board as spending money on education regarding opioids or prescription opioids?

Page 109

A. Yes.

Q. Any others?

A. That I can specifically identify today, no, but I -- I would guarantee there are others.

Q. What has the Children Services Board spent on education regarding opioids or prescription opioids?

A. I don't have that figure.

Q. Who does?

A. It would be contained in their financials. Darin Kearns could provide that information.

Q. What has the sheriff's office spent on the DARE program?

A. The DARE budget is about $200,000 a year.

Q. And the DARE program is about drug abuse, correct?

A. Correct.

Q. Is it specific to opioids or prescription opioids?

A. It's not specific to that, but there is a component of that.

Q. Separate from what the sheriff's

Page 110

1 office spends on the DARE program, what does the
2 sheriff's office spend on education regarding
3 opioids or prescription opioids, if any?
4     A.   I do not know.
5     Q.   Who would know?
6     A.   Probably Pam Murray, who's the
7 budget director over there.  DARE would be the
8 primary one.  They have some other programs.  I
9 don't know -- grant-specific programs, but I
10 don't know if they're spending money on
11 education out of those.  Summit County Public
12 Health would also be spending money on education
13 as it relates to the opiate issue.
14     Q.   Did you reach out to Mr. Kearns on
15 the topic of what the Children Services Board
16 spends on education regarding opioids or
17 prescription opioids?
18     A.   Not specifically education, though
19 it is likely included in some of those other
20 smaller miscellaneous line items that they had
21 not previously identified.
22     Q.   In the report that was prepared
23 after the meeting and that has not been shared,
24 correct?
25     A.   That's correct.

Page 111

1     Q.   Did you speak with Ms. Murray about
2 moneys spent by the sheriff's office either on
3 the DARE program or otherwise on education
4 regarding opioids or prescription opioids?
5     A.   Not on education in particular, no.
6     Q.   And you said that you believe the
7 ADM Board spends over -- has spent over 3
8 million dollars between 2015 and 2017?
9     A.   Yes.
10     Q.   On education?
11     A.   Yes.
12     Q.   And that's drug education generally?
13     A.   Yes.  I would term that education
14 and prevention services.
15     Q.   Specific to drugs?
16     A.   Yes.  Specific to opiates.
17     Q.   So what is -- what has the ADM Board
18 spent on drug education and prevention regarding
19 opioids before 2015?
20     A.   Probably a much smaller amount.
21 They earmarked 3.2 million dollars -- it was
22 either in the 2015 or 2016 budget, I think it
23 was 2015 being the first year, specifically
24 towards addressing, in addition to what they
25 were already doing, an additional 3.2 million

Page 112

1 dollars out of reserve balances to address the
2 opiate epidemic.  There was an education
3 component to that.  There was an increase in
4 beds and treatment services as a component to
5 that.  There was also a prevention and
6 wrap-around services component to that 3.2
7 million.  And that's annually, going forward
8 through the end of the levy cycle, presently
9 committed to that.
10     Q.   Okay.  Mr. Nelsen, my question
11 wasn't about the period of 2015 or later.  My
12 question was specifically directed to before
13 2015.  So focusing your attention on before
14 2015, what did the ADM Board spend on drug
15 education or prevention regarding opioids or
16 prescription opioids before 2015?
17     A.   I don't have that specific dollar
18 amount.  It would have been smaller than the
19 figures we just discussed.
20     Q.   Well, you said before much smaller.
21     A.   I believe much smaller, yes.
22     Q.   Because before 2015 there was no
23 special funding effort for drug education or
24 prevention regarding opioids or prescription
25 opioids?

Page 113

1         MR. PENDELL:  Objection to form.
2         MR. ARNOLD:  Objection to form.
3     A.   I'm not going to say there was no
4 funding effort, but it certainly picked up steam
5 in that 2015 time period, as the number of
6 overdoses began dramatically --
7         MR. PENDELL:  I'm sorry.  Excuse me,
8 Mr. Keyes.
9         Could you guys on the phone please
10 mute the phone because we can hear you laughing
11 in the middle of the testimony.  Thank you.
12         Sorry.  I was distracted by it, so I
13 apologize.
14         MR. KEYES:  You don't need to
15 apologize to me.  Thank you.
16     Q.   Who at the ADM Board knows how much
17 the board spent before 2015 on drug education
18 and prevention regarding opioids or prescription
19 opioids?
20     A.   Either Jen Peveich or Jerry Craig
21 should be able to provide that.
22     Q.   Did you ask either one of them?
23     A.   Not specifically that question, no.
24     Q.   Now, turning then to what you said
25 about 2015 through 2017, you said that the ADM

29 (Pages 110 - 113)

Page 114

1 Board requested a special appropriation of 3.2
2 million dollars per year through the end of the
3 levy cycle, correct?
4    A.   Correct.
5    Q.   We discussed this briefly in your
6 last deposition, and in that deposition you said
7 the funding request was made in 2016 for 2017.
8         Does that refresh your recollection?
9    A.   If I said that, yeah, it does.
10    Q.   So would you go with what you said
11 in December or what you said today about the
12 timing of this special appropriation?
13         MR. PENDELL:  Objection to form.
14    A.   Yeah, because I think we actually
15 looked at a document that showed it was in 2016
16 for 2017, so that's probably correct.
17    Q.   And so the ADM Board made that
18 request in 2016, correct?
19    A.   Correct.
20    Q.   It made that request to whom?
21    A.   To the -- well, the ADM director
22 made it to the ADM Board, who then made -- who
23 approved it, sent it on to the social services
24 advisory board, and then on to county council.
25    Q.   And that was not for extra funding

Page 115

1 that the ADM Board didn't have, that was for
2 permission to spend money that was in the ADM
3 Board's reserve, correct?
4         MR. PENDELL:  Objection to form.
5    A.   That's correct.
6    Q.   And so that amount has been
7 earmarked for 2017, 2018 and 2019?
8    A.   Yes.  Correct.
9    Q.   And how much of that 3.2 million
10 dollars is directed towards drug education or
11 prevention regarding opioids and prescription
12 opioids?
13         MR. PENDELL:  Objection to form.
14    A.   Say that question again.  Was it --
15 was your question on education or just --
16    Q.   How much of that 3.2 million dollars
17 is directed towards drug education or prevention
18 regarding opioids and prescription opioids?
19         MR. PENDELL:  Objection.
20    A.   There is a treatment component to
21 that 3.2 million dollars as well.  I don't
22 recall the exact split on that.
23    Q.   Do you know how much of the 3.2
24 million dollars per year is to be spent on drug
25 education or prevention regarding opioids or

Page 116

1 prescription opioids?
2         MR. PENDELL:  Objection.
3    A.   I believe the -- I believe the
4 education and prevention component of that is in
5 excess of a million dollars a year.
6    Q.   Can you be more specific?
7    A.   No, not without looking at some
8 documents.
9    Q.   Did you speak with Mr. Craig or
10 Mr. -- Ms. Peveich in advance of today's
11 deposition about that special earmarking of 3.2
12 million dollars per year?
13    A.   Not as it relates to this
14 deposition, no.
15    Q.   Earlier when I had asked you to
16 identify the categories of costs that Summit
17 County is seeking, you listed education, which
18 we've talked about now?
19    A.   Um-hum.
20    Q.   And then you listed prevention?
21    A.   Yes.
22    Q.   Is prevention a separate category or
23 are you now saying education and prevention are
24 lumped together for purposes of ADM Board,
25 sheriff's office and Children Services Board?

Page 117

1    A.   I have -- I have always treated the
2 education and prevention as kind of one and the
3 same in my mind.  I think ADM may classify them
4 a little bit differently, but I don't have what
5 that difference is.
6    Q.   Okay.  So beyond what you've already
7 described, can you identify any specific
8 expenses by Summit County on prevention
9 regarding opioids or prescription opioids?
10         MR. PENDELL:  Objection to form.
11    A.   Not off the top of my head.
12    Q.   You also mentioned medical examiner
13 costs.  What are the medical examiner costs that
14 Summit County is claiming in this lawsuit?
15    A.   So, essentially, the biggest cost --
16 it's almost an opportunity cost -- as it relates
17 to the medical examiner's office has been the --
18 the inability to continue to perform
19 out-of-county autopsies for a fee because of the
20 lack of time based on their in-county caseload
21 increase.
22    Q.   So the Summit County Medical
23 Examiner earns money by performing out-of-county
24 autopsies?
25    A.   Yes.

30 (Pages 114 - 117)

1    Q.    An out-of-county autopsy is where
2  the decedent is located outside the boundaries
3  of Summit County?
4    A.    Yes.
5        So we have a situation where, in
6  most counties in Ohio, they have an elected
7  county coroner, and there are very, very minor
8  job requirements to be a county coroner.  In our
9  case, in Summit County, because we're a charter
10  government, we created a medical examiner
11  position, that the medical examiner has to be --
12  I think it's like a licensed forensic
13  pathologist, which gives her unique credentials
14  that some of the surrounding, more rural county
15  medical -- not medical examiners, but coroners,
16  don't have.  So some of the more complicated
17  death cases they send to Summit County.  They,
18  also, if they have overload in cases, send cases
19  to Summit County.
20    Q.    Does Summit County have agreements
21  with other jurisdictions governing when it will
22  provide an autopsy and how much it will receive?
23    A.    Yes.
24    Q.    And is there a written agreement
25  with each of these jurisdictions?

1    A.    I don't know if -- I'd have to look.
2  I don't know if we have a written agreement or
3  not.  We do have a fee schedule that county
4  council approves for the service of us providing
5  an out-of-county autopsy.  I believe there are
6  signed agreements, but I'm not a hundred percent
7  positive on that.
8    Q.    And so you're saying that because
9  the medical examiner's office is spending so
10  much time performing autopsies for
11  in-Summit-County decedents --
12    A.    Yes.
13    Q.    -- that it doesn't have the
14  resources to perform out-of-county autopsies?
15    A.    That's correct.
16    Q.    So why didn't Summit County hire
17  another medical examiner?
18    A.    Because it costs a lot of money to
19  hire another medical examiner and there's not
20  enough money in the budget to be able to do
21  that.
22    Q.    How much does it cost to hire a
23  medical examiner?
24    A.    A medical examiner, with salary,
25  health care and benefits, is about a quarter of

1  a million dollars.
2        The other issue that we faced is
3  there is nationally a shortage of people with
4  those credentials who qualify for those jobs.
5    Q.    Did Summit County attempt to hire
6  another medical examiner?
7    A.    We did.
8    Q.    When did Summit County initiate that
9  effort?
10    A.    We -- so this was probably in the
11  2014, 2015 range.  We spent about a year, or
12  close to it, looking to hire another medical
13  examiner.  We ended up hiring a medical
14  examiner.  We have three medical examiners,
15  essentially, on staff.  That medical examiner
16  then ended up leaving and going to Cuyahoga
17  County about a year ago, so we are back down to
18  two medical examiners.
19        And then we had also -- the medical
20  examiner has also come to us identifying the
21  need to hire another toxicologist to perform all
22  of the tox screens that are necessary to keep up
23  with her caseloads as a result of this, and we
24  have not had the money in the budget to hire a
25  second toxicologist either.  So that request

1  has -- has essentially sat dormant.
2    Q.    Okay.  So let's stay focused first
3  on the medical examiner.
4    A.    Okay.
5    Q.    How many medical examiners did
6  Summit County have in 2013?
7    A.    In 2013?
8    Q.    Yes.
9    A.    It should have been three.
10    Q.    Throughout 2013?
11    A.    I believe so.
12    Q.    How much in 2014?
13    A.    I'm not sure at what point Dorothy
14  Dean, who was the medical examiner who -- the
15  deputy medical examiner who left -- it was
16  probably somewhere around '14.  It had to be
17  somewhere around '14, I think.
18    Q.    So you went from three to two?
19    A.    Yes.
20    Q.    How many in 2015?
21    A.    We may -- probably most of the year
22  we were just sitting at two.  I don't remember
23  when we hired Todd Barr.  So late '15, maybe
24  '16, we hired him and went back up to three.
25    Q.    Okay.  And how many in 2017?

31 (Pages 118 - 121)

Page 122

1    A.   2017, we were at three until either
2  late '17 or early '18, and I think it was
3  probably late '17.
4    Q.   And what happened then?
5    A.   That's when Todd left and went up to
6  Cuyahoga County.
7    Q.   And how many in 2018?
8    A.   2018, we are sitting at two.  And my
9  understanding was Todd was not happy with the
10  high volume of workload that he had here in
11  Summit County.
12    Q.   So was there ever an attempt by
13  Summit County to hire a fourth when you had
14  three?
15    A.   There was discussion of hiring a
16  fourth.  Dr. Kohler came to us with a plan that
17  she wanted to make a job offer to a woman who
18  was very interested -- who was going through
19  medical school, was very interested in coming to
20  work for her, and essentially agreed to hold a
21  job for her when she completed her residency
22  requirements to create a fourth medical examiner
23  position.
24    Q.   When was that?
25    A.   That was probably 2016, 2017-ish.

Page 123

1    Q.   When she finished her residency,
2  did --
3    A.   No.  No.  This is when Dr. Kohler
4  came to us with this plan.  The conversation, as
5  I recall, that she would complete her residency
6  requirements and be able to come to work for us
7  in 2019.  So this was somewhat of a transition
8  period, because in the budget then -- this was
9  one of those we can't afford this right now,
10  let's try to align the resources so that in a
11  couple years we'll be able to afford to bring
12  her on.  And then, in the interim, we lost our
13  third medical examiner.  And so she is still
14  like in the pipeline to come to work for us, I
15  believe, in 2019, to restore us to three, but in
16  the interim we've been hiring what they call,
17  under these locum agreements, medical examiners
18  from other parts of the state who come in and do
19  autopsy work for us.
20    Q.   So was the judgment made that the
21  cost of hiring a medical examiner was greater
22  than the lost fees from performing out-of-county
23  autopsies?
24        MR. PENDELL:  Objection to form.
25    A.   Not necessarily that simple.  We're

Page 124

1  losing about 250 to $300,000 a year from
2  performing these out-of-county autopsy fees.  So
3  when you look at that on the surface, it's about
4  a tradeoff, getting in that other medical
5  examiner.
6        Maybe the biggest problem that we've
7  got over the next few years is we also have a
8  high backlog of caseloads that need work done
9  with them, and so in our conversations with
10  Dr. Kohler, hiring that third medical examiner
11  was not going to restore our ability to start
12  performing out-of-county autopsies.  It might
13  get us to the point where we could start
14  catching up on work.
15        Hiring a fourth, hopefully we would
16  be caught up and be able to cover that cost
17  without those out-of-county autopsy fees, but
18  even at that point it's still a loss for us when
19  historically we've operated with three medical
20  examiners and the out-of-county autopsy fees.
21  Now we would have to get to four medical
22  examiners just to restore the county autopsy
23  fees.
24        MR. PENDELL:  Can we take a break?
25        MR. KEYES:  Sure, in just a minute.

Page 125

1    Q.   Since 2013 Summit County has hired
2  one medical examiner, Todd Barr, correct?
3    A.   Correct.
4    Q.   And it has discussed hiring someone
5  as a medical examiner in 2019, when she finishes
6  her residency?
7    A.   Correct.
8    Q.   And Summit County has made the
9  decision not to incur the cost of hiring someone
10  else as a medical examiner even at the risk of
11  losing the fees that it would get from
12  performing out-of-county autopsies, correct?
13        MR. PENDELL:  Objection to form.
14    A.   Well, so what we -- so because it is
15  very difficult to find a full-time medical
16  examiner, and the reality is to get one, you
17  have to get somebody to relocate from somewhere
18  else in the country to come here.  And because
19  bringing them one -- bringing one in is not
20  going to restore those out-of-county autopsy
21  fees, we have made the decision in the interim
22  that it is more cost effective and easier to
23  operationally manage to go ahead and hire,
24  essentially, contract out, that third position
25  during this interim period.

32 (Pages 122 - 125)

Page 126

1    Q.   So Summit County has made the
2 decision not to hire a medical examiner or two
3 medical examiners in order to get the fees from
4 performing out-of-county autopsies?
5         MR. PENDELL:  Objection to form.
6         MR. ARNOLD:  Objection to form.
7    A.   I think the decision is just trying
8 to get the operation back to three medical
9 examiners, and we know we have likely lost long
10 term that revenue from out-of-county autopsies.
11 And even bringing in a fourth might restore that
12 revenue, but now we've got the cost of that
13 fourth medical examiner, and so bringing one in
14 to restore those fees doesn't really address the
15 issue that we have with the fact that we've lost
16 those fees.
17    Q.   Because even -- your position is
18 even if you hire another medical examiner, you
19 will not be able to perform out-of-county
20 autopsies?
21    A.   Getting that third medical examiner
22 will not get us back to the point of being able
23 to perform those out-of-county autopsies.
24         MR. KEYES:  Okay.  We can take a
25 break.

Page 127

1         THE VIDEOGRAPHER:  Off the record,
2 12 p.m.
3         (Recess had.)
4         THE VIDEOGRAPHER:  On the record,
5 12:21.
6 BY MR. KEYES:
7    Q.   Mr. Nelsen, I believe you said
8 before the break that Summit County loses
9 hundreds of thousands of dollars from its
10 inability to perform out-of-county autopsies?
11    A.   Correct.
12    Q.   Is that per year?
13    A.   Yes.
14    Q.   And when you say loses hundreds of
15 thousands of dollars, you're talking about
16 revenue?
17    A.   That's correct.
18    Q.   That doesn't take into consideration
19 the costs that would be incurred by Summit
20 County in order to perform those out-of-county
21 autopsies or have staffing to perform those
22 out-of-county autopsies, correct?
23         MR. PENDELL:  Objection to form.
24    A.   Semi-correct I guess.  I mean, so
25 those costs -- the majority of those costs are,

Page 128

1 essentially, costs that are already there
2 regardless of whether we perform them or not.
3 Those out-of-county autopsy fees, under Ohio
4 statute, go into what they call the medical
5 examiner's lab fund, and are used to pay for
6 maintenance and purchase of equipment for the
7 medical examiner's office.  So where we really
8 lose out budgetarily is the general fund has had
9 to supplement the cost of maintaining that
10 portion of the medical examiner's budget for the
11 last two years and likely will continue to have
12 to do that going forward.
13    Q.   You're saying the general fund has
14 to supplement money that otherwise would have
15 been contributed from the fees for performing
16 out-of-county autopsies?
17    A.   That's correct.
18    Q.   But in order to perform
19 out-of-county autopsies, you would need another
20 medical examiner?
21    A.   That's correct.
22    Q.   And Summit County would incur the
23 costs of having that medical examiner?
24    A.   That's correct.
25    Q.   Plus Summit County would incur the

Page 129

1 costs of performing the out-of-county autopsies
2 themselves?
3    A.   Yeah.  There's not a whole lot of
4 additional costs when it comes to performing
5 out-of-county autopsies.  I mean, we were
6 staffed -- as an analogy, we were staffed with
7 three medical examiners at a level that afforded
8 them enough time to handle in-county caseloads
9 plus the out-of-county work that came their way.
10 Now, those three medical examiners -- so we're
11 still paying those costs, those salaries, which
12 is the biggest driver of that, but we just no
13 longer have the capacity to do the out-of-county
14 work, so that most of the costs associated with
15 out-of-county autopsies are costs that we still
16 have.
17    Q.   Over the past five years what has
18 been the increase in the number of autopsies
19 performed by the medical examiner's office?
20    A.   I don't have those numbers.  Those
21 were, I believe, included in our original
22 analysis we put together back in 2017.
23    Q.   Do you believe it's increased
24 between 2013 and now?
25    A.   Oh, definitely, yes.

33 (Pages 126 - 129)

Page 130

1    Q.   Focusing, then, on the increased
2  number of autopsies performed by the medical
3  examiner's office, what percentage of those
4  additional autopsies are attributable to deaths
5  resulting from the use of a prescription opioid?
6    A.   Just the prescription component of
7  the opioid?
8    Q.   Yes.
9    A.   I don't have that information.
10    Q.   And what percentage of the
11  additional autopsies that the Summit County
12  Medical Examiner's Office is performing over the
13  past five years involve a decedent who died from
14  an overdose and had used a prescription opioid
15  at some point in the past?
16    A.   Again, Dr. Kohler would be the one
17  that may have that information.  I do not.
18    Q.   Earlier when I asked you what are
19  the medical examiner costs that Summit County
20  has incurred and that it's seeking in this case,
21  you said the biggest one is the lost revenue
22  from performing out-of-county autopsies,
23  correct?
24    A.   Correct.
25    Q.   What other, if any, medical examiner

Page 131

1  costs is Summit County seeking?
2    A.   There were additional costs
3  associated with lab testing, with body
4  transport.  We had a $25,000 contract with an
5  agency to do body transports.  We had to double
6  that contract to $50,000.  We have overtime
7  costs.  We added an additional investigator, and
8  that investigator was originally added and then
9  put on the county's lab fund.  So when the
10  county ends up subsidizing, through the general
11  fund, the lab fund, based on our financial
12  situation in Summit County, we don't have
13  additional revenues to cover that.
14        What that means is something else
15  doesn't get paid for.  And the big loser to the
16  county, the county's budget, in all of this has
17  truly been the county's capital investments in
18  buildings, equipment, car replacements,
19  maintaining facilities, HVAC systems, roof
20  replacements.  All of that stuff has suffered as
21  a result of money that we have had to divert
22  into helping out with this opiate issue.
23    Q.   Okay.  I was asking about medical
24  examiner costs besides the lost revenue from
25  performing out-of-county autopsies, and you

Page 132

1  mentioned lab testing.  What are the specific
2  lab testing costs?
3    A.   Additional supplies.  I think we
4  bought an additional piece of equipment.  I
5  don't know if it was last year or the year
6  before as well.
7    Q.   So the lab testing costs include
8  supplies and one additional piece of equipment?
9    A.   I believe so, yes.
10    Q.   And these are supplies that are
11  necessary to perform any autopsy?
12    A.   I don't know that I can speak to
13  that having never performed an autopsy.
14    Q.   Do you know what the supplies are
15  that you're referring to?
16    A.   Supplies related to the toxicology
17  work they do, the slides, whatever they use for
18  tissue sample.  I'm not an expert.  I don't
19  know.
20    Q.   And so these are supplies that are
21  used to perform any and every autopsy?
22    A.   I don't know if -- I can't quantify
23  that answer.  That's a Dr. Kohler answer.
24    Q.   What is the additional piece of
25  equipment that you believe the medical

Page 133

1  examiner's office purchased?
2    A.   We purchased a -- I'm trying -- a --
3  what was it?  A gas -- gastro -- gastrometer
4  something.  I don't remember the name of it.
5    Q.   What does it do?
6    A.   I don't remember.  I was told at the
7  time we made the purchase what it did.
8    Q.   When was it purchased?
9    A.   It was -- I believe it was either
10  last year or the year before.
11    Q.   So 2017 or 2018?
12    A.   Yes.  Possibly even 2016, but
13  somewhere right in that time frame.
14    Q.   Did the piece of equipment that was
15  purchased in 2017 or 2018 replace equipment that
16  the medical examiner's office already had?
17    A.   I believe it did, yes, but that's
18  one of those purchases that would have been paid
19  for out of lab fund dollars that were not
20  available to pay for it.
21    Q.   Well, this piece of equipment, was
22  this increasing the technical capacity of the
23  medical examiner's office or just replacing old
24  equipment?
25    A.   I think it's both, but I would defer

34 (Pages 130 - 133)

Page 134

1 to Dr. Kohler on that answer, though.
2    Q.   What additional technical capacity
3 did the medical examiner's office need such that
4 it purchased this equipment that it didn't need
5 it before?
6    A.   That's not a question I'm qualified
7 to answer.
8    Q.   Was it prompted by the fact that the
9 medical examiner's office was now seeing
10 fentanyl and carfentanil and analogs to fentanyl
11 and carfentanil in the autopsies and it needed
12 to test for those things?
13       MR. PENDELL:  Object to form.
14    A.   I can't say specifically.  I do know
15 back when fentanyl and carfentanil kind of hit
16 the scene, that we -- that Dr. Kohler was
17 having, with carfentanil I think in particular,
18 a very difficult time being able to get that to
19 show up in the kind of standard sets of tests
20 that they run.  I don't remember what the
21 solution that ultimately -- if this was part of
22 that or this was just something different.
23    Q.   So was it the increasing incidence
24 of fentanyl and carfentanil in the overdoses
25 that were being autopsied that led to the need

Page 135

1 to purchase this additional piece of equipment?
2       MR. PENDELL:  Objection to form.
3    A.   I don't know that it was -- I don't
4 remember it being conveyed to me that way.  I
5 don't know for sure.
6    Q.   Who would know about these claimed
7 costs incurred by the medical examiner's office?
8    A.   Dr. Kohler would be the -- would
9 have more detail on the types of questions
10 you're asking.
11    Q.   Did you reach out to Dr. Kohler to
12 understand what the medical examiner costs were
13 that are being sought in this case prior to
14 today's deposition?
15    A.   Well, back in 2017, when we did our
16 original analysis of cost, we talked with
17 Dr. Kohler about the costs she was incurring.
18    Q.   Since then have you talked to her?
19    A.   Not specific to this, no.
20    Q.   And did you talk to her to prepare
21 for today's deposition?
22    A.   I did not.
23    Q.   You said overtime is a cost?
24    A.   Overtime is a cost.
25    Q.   Overtime by which personnel?

Page 136

1    A.   Primarily the investigators.
2    Q.   How many investigators are there in
3 the medical examiner's office?
4    A.   I think we're at -- I believe it's
5 six investigators and two supervising
6 investigators.
7    Q.   How many were there in 2018?
8    A.   We had that many in 2018.
9    Q.   Six investigators plus two
10 supervisors?
11    A.   I believe so.
12    Q.   How many in 2017?
13    A.   I believe we had that number in '17
14 as well.
15    Q.   Six investigators plus two
16 supervisors?
17    A.   Yes.
18    Q.   How many in 2016?
19    A.   I would -- and forgive me because
20 all this stuff kind of runs together.  It was
21 either -- it was probably 2016 that we added an
22 additional investigator.  It could have been
23 2015, though.
24    Q.   And how many supervisors in 2016?
25    A.   Two.

Page 137

1    Q.   How many supervisors in 2015?
2    A.   Two.
3    Q.   How many investigators in 2014?
4    A.   I would assume two.
5    Q.   Investigators.
6    A.   Oh, investigators.  We would have
7 had five investigators and two supervisors.
8    Q.   How many in 2013?
9    A.   I believe it was five and two.  I
10 don't recall any changes.  Again, I'd have to go
11 back and look, but I don't recall changes other
12 than adding that additional investigator
13 somewhere in that '15, '16 time range.
14    Q.   Since 2013 the medical examiner's
15 office has had two supervisors?
16    A.   I believe so, yes.
17    Q.   And since 2013 the medical
18 examiner's office has had either five or six
19 investigators?
20    A.   I believe so, yes.
21    Q.   And you believe that that sixth
22 investigator was hired either in 2016 or 2017?
23    A.   I believe so.
24    Q.   And who made the decision to hire
25 that additional investigator?

35 (Pages 134 - 137)

Page 138

1    A.    Dr. Kohler came to us and requested
2 it.
3    Q.    When?
4    A.    So that request really -- I know it
5 came prior to the issues with the lab fund,
6 because the -- we did two things.  We agreed to
7 hire the additional investigator, pay them out
8 of the lab fund, and then we also went back and
9 revisited the fee schedule for out-of-county
10 autopsies, which had not been updated in several
11 years, and updated that to help produce some
12 more revenue to help pay for the investigator.
13    Q.    And what was Dr. Kohler's rationale
14 for needing to hire one more investigator either
15 in 2016 or 2017?
16    A.    Higher caseloads.  I'm going to
17 guess it was probably '15 or '16, because the
18 lab fund really began struggling in 2017 because
19 I know I've provided general fund dollars to
20 keep it afloat in both 2017 and 2018.
21    Q.    So is it your testimony that since
22 2013 the medical examiner's office has always
23 had two supervisors and it's had either five or
24 six investigators and that it hired the sixth
25 investigator in 2015 or 2016?

Page 139

1    A.    Off the top of my head, that is my
2 best recollection of those employee counts.  I
3 can say for certain we hired an additional
4 investigator and put them on the lab fund in
5 '15, '16-ish time frame.
6    Q.    How many toxicologists does the
7 medical examiner's office have currently?
8    A.    One toxicologist.
9    Q.    How many in 2018?
10    A.    One.
11    Q.    How many in 2017?
12    A.    One.
13    Q.    How many in 2016?
14    A.    One.
15    Q.    How many in 2015?
16    A.    One.
17    Q.    How many in 2014?
18    A.    One.
19    Q.    How many in 2013?
20    A.    One.
21    Q.    Okay.
22    A.    She has requested that she would
23 like a second toxicologist.
24    Q.    Dr. Kohler has requested?
25    A.    Yep.

Page 140

1    Q.    When did Dr. Kohler first request a
2 second toxicologist?
3    A.    It was at least two years ago.
4    Q.    And to whom did Dr. Kohler make that
5 request?
6    A.    To myself and Mr. Dodson.
7    Q.    And I take it that request has not
8 been granted so far?
9    A.    That is correct.
10    Q.    What is your reasoning for not
11 granting a second toxicologist per Dr. Kohler's
12 request?
13    A.    Lack of funding.
14         We also have -- we have a position
15 that, I think our thought was, down the road
16 when that person retires, rather than replace
17 that position, we would likely hire a second
18 toxicologist into that position instead, so she
19 is kind of playing the waiting game so that we
20 can do it within budget.
21    Q.    Focusing on the medical examiner's
22 office, since 2013 is it accurate to say that
23 only one position has been created and that is
24 the position of an investigator?
25         MR. PENDELL:  Objection to form.

Page 141

1    A.    It is semi-accurate to say that, I
2 guess.  It is true, we have added one
3 investigator.  That position was added and is
4 currently on the county's payroll.  A plan was
5 put together to add a fourth medical examiner
6 position, but that then kind of -- and it was
7 agreed upon and then just kind of fell apart
8 when we lost the third medical investigator.
9    Q.    Okay.  But since 2013 the medical
10 examiner's office has always had one
11 toxicologist?
12    A.    Um-hum.
13    Q.    Correct?
14    A.    Yes.
15    Q.    It's always had two supervisors,
16 correct?
17    A.    Yes.
18    Q.    It's either had five or six
19 investigators, correct?
20    A.    Yes.
21    Q.    And it's always had two or three
22 medical examiners?
23    A.    Correct.
24    Q.    And other than hiring Todd Barr to
25 fill the position that was left vacant when

Page 142

1 Dorothy Dean left, the only plans that have been
2 discussed to hire someone else are to hire this
3 resident who can join the office in 2019,
4 correct?
5     A.   That is correct, but don't forget,
6 in addition, we started contracting out autopsy
7 work to non-county employee medical examiners,
8 so that third position is being filled by
9 contract workers.  And when we get into 2019,
10 we'll have to make a decision about whether we
11 continue that practice in addition to this third
12 medical examiner, and whether we can afford to
13 continue that practice becomes the other
14 practicality in all of this for us.
15     Q.   How many contractors is Summit
16 County paying in 2019 to do autopsies?
17     A.   We have -- I believe it's two or
18 three different what they call locum contract
19 persons that come in and do this work for us.
20     Q.   How many did Summit County have in
21 2018?
22     A.   We have -- we will have the same in
23 '18, or had the same -- excuse me -- in '18.
24     Q.   How many in 2017?
25     A.   I think at the point Dr. Barr left,

Page 143

1 which I think was in '17, most of '17 we had
2 none, and then we reached out to these handful
3 when he left.
4     Q.   Did Summit County pay contractors to
5 do autopsies before 2017?
6     A.   Yes.  In that interim period, when
7 Dorothy Dean retired and before Todd Barr
8 started working for us, we were paying them
9 as -- then as well.  I don't remember if it was
10 three of them or not, but --
11     Q.   Okay.  Did Summit County pay
12 contractors to perform autopsies before Dorothy
13 Dean left?
14     A.   No.
15     Q.   So since 2013, Summit County first
16 started using contractors to perform autopsies
17 when Dorothy Dean left?
18     A.   Yes.
19     Q.   And that was either in 2016 or 2017?
20     A.   No.  That was when Todd Barr left.
21 Dorothy Dean left earlier, '13 or '14, somewhere
22 in there.  So the reality is when Dorothy Dean
23 was there, we were not paying contractors and we
24 were performing out-of-county autopsy work.
25 After Dorothy Dean left and caseloads began to

Page 144

1 spike, we had to stop doing out-of-county
2 autopsies -- that occurred somewhere in that '15
3 to '16 time frame -- and we had to start hiring
4 somebody -- we had to hire locums and then a
5 third medical examiner just to keep up with the
6 in-county work, and we really were not -- I
7 don't know that we've kept up with it.  I think
8 there's still a backlog of cases that need
9 finalized.
10     Q.   Before Dorothy Dean left did Summit
11 County pay contractors to perform autopsies?
12     A.   No.
13     Q.   During the time between Dorothy Dean
14 leaving and Todd Barr joining Summit County did
15 pay contractors?
16     A.   Yes.
17     Q.   When Todd Barr filled the spot that
18 Dorothy Dean had vacated, did Summit County
19 continue to pay contractors to perform
20 autopsies?
21     A.   No.
22     Q.   Okay.  And then at some point
23 thereafter Summit County started to use
24 contractors again to perform autopsies?
25     A.   Yes.

Page 145

1     Q.   When was that?
2     A.   That would have been after Todd
3 left.
4     Q.   And you believe he left in 2017?
5     A.   I believe so, yes.
6     Q.   And so when he left -- if he left in
7 2017, Summit County used two or three
8 contractors?
9     A.   Yes.
10     Q.   And then used two or three
11 contractors in 2018?
12     A.   Yes.
13     Q.   And is still using two or three
14 contractors?
15     A.   Yes.
16     Q.   And how much did Summit County pay
17 the contractors to perform these autopsies in
18 2017?
19     A.   I think the rate is a thousand
20 dollars per autopsy.
21     Q.   And how many autopsies did they
22 perform?
23     A.   I don't know offhand.  If I recall,
24 we -- we entered into about $75,000 worth of
25 contracts.

37 (Pages 142 - 145)

Page 146

1    Q.   In 2017?
2    A.   In -- no.  In 2018, for a full year.
3    Q.   Okay.  So you paid these contractors
4  $75,000 in 2018 to perform autopsies?
5    A.   Well, I'm not going to say we paid
6  them that.  I know we -- I believe that we
7  approved $75,000 worth of contracts.
8    Q.   How much was approved for 2017?
9    A.   I don't recall.  It only would have
10  been for a partial year, so it would have been a
11  smaller amount.
12    Q.   Okay.  So to make sure I understand,
13  the first time that the medical examiner's
14  office paid contractors to perform autopsies was
15  the period when -- after Dorothy Dean had left
16  and before Todd Barr had joined?
17    A.   Yes.
18    Q.   And then it wasn't until Todd Barr
19  left that Summit County again started paying
20  contractors to perform autopsies?
21    A.   That is correct.
22    Q.   And Summit County paid or approved
23  approximately $75,000 to be paid to contractors
24  for autopsies in 2018, correct?
25    A.   That's my recollection, yes.

Page 147

1    Q.   And something less than $75,000 was
2  approved to pay contractors to perform autopsies
3  in 2017?
4    A.   That's my recollection.
5    Q.   So the cost to Summit County of
6  paying these two or three contractors to perform
7  autopsies is lower than the cost of hiring a
8  medical examiner?
9    A.   Yes.  It's kind of a multi-part
10  question.  I mean, if we had them come in and
11  perform the same amount of work as a full-time
12  medical examiner, I don't know if that would be
13  the case, but it provided flexibility for us to
14  be able to call them when we needed them and not
15  pay somebody if nobody is showing up at the
16  door, which hasn't really been the case for the
17  last several years, but it -- it also allowed us
18  to -- as I mentioned earlier, the difficulty in
19  trying to find a full-time employee.  We had to
20  implore kind of what I'd call stop gap measures
21  to keep everything afloat until we could get a
22  new full-time person in.
23    Q.   Has the crime rate in Summit County
24  increased or decreased over the past five years?
25        MR. PENDELL:  Objection to form.

Page 148

1    A.   So I don't know that I can answer if
2  the crime rate itself has increased, but what I
3  can tell you is that from 2013 to 2016 the
4  number of cases prosecuted by the Summit County
5  Prosecutor's Office has increased.
6    Q.   Has the crime rate in Summit County
7  increased or decreased over the past ten years?
8        MR. PENDELL:  Objection to form.
9    A.   I have not reviewed -- and I would
10  assume you're referring to like FBI crime rate
11  statistics.  I have not reviewed any of those
12  statistics but have reviewed caseload stats, as
13  I mentioned.
14    Q.   My question was specific, and if you
15  don't know, you don't know.
16        Do you know whether the crime rate
17  in Summit County has increased or decreased over
18  the past five years?
19        MR. PENDELL:  Objection to form.
20    A.   I do not know the answer to that.
21    Q.   Do you know whether the crime rate
22  in Summit County has increased or decreased over
23  the past ten years?
24        MR. PENDELL:  Objection.  Form.
25    A.   I know caseloads at the prosecutor's

Page 149

1  office have increased.  I cannot tell you about
2  the overall crime rate in the county.
3    Q.   And you said that before and you
4  said you know that happened between 2013 and
5  2016.
6    A.   And I know that only because those
7  are the only years I actually looked at it.
8  They could have increased over the last ten
9  years as well.
10    Q.   Has the rate of drug crime increased
11  or decreased over the past five years?
12        MR. PENDELL:  Objection to form.
13    A.   The rate of drug prosecutions by the
14  prosecutor's office from 2013 to 2016 increased
15  42 percent.
16    Q.   Over the past five years has the
17  drug crime rate gone up or down?
18        MR. PENDELL:  Objection.
19    A.   The number of prosecuted cases has
20  gone up.
21    Q.   Has the drug crime rate over the
22  past ten years gone up or down?
23        MR. PENDELL:  Objection.
24    A.   I can't -- I can't tell you.  I
25  don't know.

38 (Pages 146 - 149)

Page 150

1  Q.  Has the rate of opioid-related
2  crimes gone up or down over the past five years?
3      MR. PENDELL:  Objection.
4  A.  My answer would be intuitive.  I
5  haven't seen an exact stat on opiate, but I
6  would assume, given the increase in all of the
7  statistics we've talked about, that the number
8  of the increase in felony drug possession cases
9  by the prosecutor's office would indicate that
10  the number of opiate crimes has increased.
11  Q.  And you said that's your assumption?
12  A.  Yes.
13  Q.  You don't know?
14  A.  I don't have a statistic on that.
15  Q.  Has the rate of opioid-related
16  crimes increased or decreased over the last ten
17  years?
18      MR. PENDELL:  Objection to form.
19  A.  Same answer as the last one.
20  Q.  Has the number of drug crimes
21  involving opioids increased or decreased over
22  the past five years?
23      MR. PENDELL:  Objection.
24  A.  How is that question different than
25  the previous ones?

Page 151

1  Q.  I asked you before about the rates.
2  Now I'm just asking you about pure number.
3  Has the number of opioid-related
4  crimes increased or decreased over the past five
5  years?
6      MR. PENDELL:  Objection.
7  A.  I'm still not following how that's
8  different than the rates.  Were you talking
9  percentages before?
10  Q.  Well, my question right now is, the
11  number of opioid-related crimes, has that gone
12  up or down over the last five years?
13  A.  I think my answer to that would be
14  the same as the previous answer.
15  Q.  That it's your assumption that it
16  went up?
17  A.  It's my assumption that it went up.
18  Q.  Has the number of opioid-related
19  crimes increased or decreased over the last ten
20  years?
21      MR. PENDELL:  Objection.
22  A.  Same answer.
23  Q.  Earlier you said that in your
24  meeting with Ms. Barnes and Mr. Kearns, they
25  described a review of SACWIS data to determine

Page 152

1  the percentage of child placement cases that
2  were opioid related?
3  A.  Correct.
4  Q.  Did they use a specific list of
5  placement cases to conduct that review?
6  A.  I was not a part of that review.  I
7  don't know -- I can't answer any questions on
8  what the criteria was.
9  Q.  Have you seen any records that show
10  which cases they looked at?
11      MR. ARNOLD:  Objection to form.
12  A.  I have not seen a listing.
13  Q.  Are you aware of the number of
14  people in Summit County who used prescription
15  opioids, became addicted to opioids, and then
16  used illegal opioids and entered the criminal
17  justice system?
18      MR. PENDELL:  Objection.  Form.
19  A.  No.  I have not seen a statistic on
20  that.  I, again, can only infer from, as I
21  mentioned earlier, the data regarding OARRS and
22  the increase in caseloads both in the criminal
23  justice system, the overdoses, that there are
24  probably a large number of people who started
25  off with prescription-based opioids, who, when

Page 153

1  the OARRS requirement went into place, ended up
2  moving on to illegal opioids.
3  Q.  My question was, are you aware of
4  the number of people in Summit County who used
5  prescription opioids, became addicted to
6  opioids, then used illegal opioids and entered
7  the criminal justice system?
8      MR. PENDELL:  Objection.
9  A.  I haven't conducted a survey on
10  that, no.
11  Q.  Have you directed anyone else to do
12  that?
13  A.  I have not.
14  Q.  Do you know of anyone else in Summit
15  County who has done that?
16  A.  I am not aware.  That does not mean
17  it may not exist.
18  Q.  Can you point me to any individual
19  who fits that description, used prescription
20  opioids, became addicted to opioids, then used
21  illicit or unlawful opioids and entered the
22  criminal justice system?
23      MR. PENDELL:  Objection.
24  A.  Can I personally point you?
25  Q.  Yes.

39 (Pages 150 - 153)

Page 154

1    A.    Let me think about that for a
2 minute.
3         MR. PENDELL:  And I'm just objecting
4 to the form and scope, but you can go ahead.
5    A.    You know, I am aware of some people
6 -- I don't know that I'm going to say they ended
7 up in the criminal justice system, but who
8 either ended up in the hospital, or another
9 gentleman I'm thinking actually lost a licensure
10 because of a situation like that.  And I'm
11 certainly not going to go into any detail on
12 those cases or who those people are.
13    Q.    But my question was specific.  Can
14 you point to anybody who used prescription
15 opioids, became addicted to opioids, then used
16 illicit or unlawful opioids and then entered the
17 criminal justice system, that is they were
18 charged with and prosecuted for a drug crime
19 involving opioids?
20         MR. PENDELL:  Objection.
21    Q.    Can you point to anyone?
22         MR. PENDELL:  Objection.  Form and
23 scope.
24    A.    Not off the top of my head do I
25 personally know somebody or can think that I

Page 155

1 personally know somebody in that situation.
2    Q.    Have you undertaken to determine the
3 percentage of people who were convicted of a
4 drug crime who used prescription opioids,
5 developed an addiction, then used illicit
6 opioids and then were charged with and convicted
7 of a drug crime because of their use of illicit
8 opioids?
9         MR. PENDELL:  Objection.
10    A.    So, to me, these are interesting
11 questions as a -- personal questions as a
12 representative of Summit County.  I personally
13 cannot think of anybody in that situation, but
14 as I have talked with people that -- in the
15 county that deal with people in that situation,
16 the first person I'm thinking about is one of
17 the judges who runs the Turning Point program,
18 who told me that 71 out of the 85 people who
19 participated in that last year were there
20 because of an opioid addiction, and that, yes,
21 it is quite common for people to -- to use a
22 prescription opiate and eventually end up on an
23 illegal opiate substance and in the criminal
24 justice system.  So I have been told that
25 happens quite routinely.

Page 156

1    Q.    Who is that judge?
2    A.    That was Judge Joy Oldfield.
3    Q.    That didn't answer my question at
4 all.
5    A.    To answer your question, I do not --
6 I cannot, off the top of my head, personally
7 think of somebody in that situation.
8    Q.    That wasn't my question either.  I
9 already asked that question and you said you
10 couldn't name anyone.
11         The question I just asked was, have
12 you undertaken to determine the percentage of
13 people who are in the criminal justice system
14 because they were convicted of a drug crime who
15 used prescription opioids, developed an
16 addiction to opioids, then used illicit opioids
17 and were then arrested and prosecuted because of
18 a drug crime involving opioids?
19         MR. PENDELL:  Objection to form.
20         MR. ARNOLD:  Objection to form.
21    Q.    Have you undertaken to do that?
22         MR. PENDELL:  Same objection.
23    A.    So your question is have I gone out
24 and surveyed all the prisoners in the jail to
25 ask them if they started out on prescription

Page 157

1 opioids?
2    Q.    Have you done anything to undertake
3 that?
4    A.    I don't know that that's my role
5 with the county, to undertake something like
6 that.
7    Q.    Whether it's your role or not, have
8 you undertaken to do that?
9    A.    I have not.
10    Q.    Have you asked anyone else to do it?
11    A.    I have not.
12    Q.    To your knowledge, has anyone else
13 at Summit County studied that?
14    A.    I do not know.
15    Q.    Did the -- in 2018 did the ADM Board
16 create any new positions because of the opioid
17 problem?
18    A.    In the 2019 -- 2019 budget, the ADM
19 Board has requested an additional position.  I
20 do not know offhand if that is specifically
21 related to the opiate issue or not.
22    Q.    What is the new position it's
23 requested?
24    A.    I don't recall.  I just recall that
25 they were going from 20 employees to 21

40 (Pages 154 - 157)

Page 158

1 full-time employees.
2    Q.   Has that request been granted?
3    A.   Yes.
4    Q.   How about in 2018; did the ADM Board
5 create any new position because of the opioid
6 problem in Summit County?
7    A.   They did not, but let's not forget
8 the ADM Board is essentially a contracting
9 entity that essentially -- when it comes to
10 service providers, when it comes to addiction
11 treatment and all of those services, it's the
12 non-profits who contract with ADM who have added
13 positions and requested additional dollars to
14 deal with the opioid epidemic, not the ADM Board
15 itself.
16    Q.   In 2018 did the ADM Board create any
17 new position because of the opioid problem in
18 Summit County?
19    A.   They did not.
20    Q.   How about in 2017?
21    A.   They did not.
22    Q.   2016?
23    A.   I do not believe.
24    Q.   2015?
25    A.   I do not believe.

Page 159

1    Q.   2014?
2    A.   I do not believe.
3    Q.   2013?
4    A.   I don't recall that far back.
5    Q.   In 2018 did the Children Services
6 Board create any new position because of the
7 opioid problem?
8    A.   The Children Services Board, in
9 their 2019 budget request, has requested five
10 additional staffing positions for case managers.
11    Q.   What is the status of that request?
12    A.   It was approved as part of their
13 budget, and it was also part of their levy
14 increase request back in November to fund those.
15    Q.   In 2018 did the Children Services
16 Board create any new positions because of the
17 opioid problem?
18    A.   They did not.  I think the
19 additional placement costs were consuming the
20 vast majority of any excess dollars they had.
21    Q.   In 2017 did the Children Services
22 Board create any new positions because of the
23 opioid problem?
24    A.   Same answer.
25    Q.   The answer is no, they did not?

Page 160

1    A.   That's correct.
2    Q.   How about 2016?
3    A.   No, they did not.
4    Q.   2015?
5    A.   They did not.
6    Q.   2014?
7    A.   They did not.  And before that I
8 would have to say I don't recall.
9    Q.   2013?
10    A.   Don't recall.
11    Q.   How many new positions did the
12 prosecutor's office create in 2018 because of
13 the opioid problem?
14    A.   So with the prosecutor's office, you
15 are talking about a -- an office that is
16 restricted in funding because of the general
17 fund restrictions on it and lack of funding for
18 it.  I don't believe they added any positions in
19 2018.
20    Q.   So did the prosecutor's office
21 create any new positions in 2018 because of the
22 opioid problem?
23    A.   I do not believe so.
24    Q.   How about in 2017?
25    A.   I don't believe so.

Page 161

1    Q.   How about 2016?
2    A.   If we start getting back there, I
3 don't recall, because they also have a number of
4 grants that they receive.
5    Q.   How about in 2015?
6    A.   I don't recall.
7    Q.   How about 2014?
8    A.   I don't recall either.
9    Q.   How about 2013?
10    A.   I don't recall.
11    Q.   Public defender's office; in 2018
12 did the public defender's office create any new
13 positions because of the opioid problem?
14    A.   The public defender's office is not
15 a county agency.  They're a private non-profit,
16 so I have no way -- I do not know.
17    Q.   Did the court of common pleas create
18 any new positions in 2018 because of the opioid
19 problem?
20    A.   The court of common pleas has in
21 2018 added additional probation officers.
22    Q.   How many?
23    A.   I'm going to say about eight.
24    Q.   And to be clear, are you saying they
25 created eight new positions for probation

41 (Pages 158 - 161)

Page 162

1 officers or they filled slots?
2     A.   They created eight new positions for
3 probation officers.
4     Q.   In 2018?
5     A.   In late 2017, into early 2018, so
6 part of this, and the funding for this was part
7 of the initiative by the State of Ohio, because
8 of overcrowding in the state's prison system, to
9 essentially say we don't want non-violent, low
10 level, felony 5 offenders, and that's where the
11 big increase -- because those are primarily the
12 drug possession cases.  That's where the big
13 increase occurred in both the local and state
14 prisons.  It's where the increase occurred in
15 our public defense costs.  The State of Ohio
16 essentially said we won't accept prisoners
17 sentenced to state prison anymore for those
18 offenses and began a program called TCAP, which
19 is Targeted Community Alternatives to Prison, to
20 push low-level offenders back to the county
21 level for alternative sentencing solutions.
22         And so we -- and they provided grant
23 money to do that.  We at local level then ended
24 up hiring -- one of the main offshoots of that
25 were the additional eight positions hired at the

Page 163

1 adult probation department.
2         The State of Ohio is also looking at
3 sentencing -- and this is what led to State
4 Issue 1 last year, to reform sentencing for
5 these drug possession offenders because there
6 are so many of them in the system who, once they
7 get a felony conviction, can't get work anymore;
8 that they are looking at alternative treatment
9 programs and trying to essentially decriminalize
10 a lot of the drug possession -- and all of this
11 is a result of what's happened over the last
12 several years with this opiate.
13     Q.   In 2017 did the court of common
14 pleas create any new positions because of the
15 opioid problem?
16     A.   They did not.
17     Q.   How about in 2016?
18     A.   They did not.
19     Q.   How about 2015?
20     A.   I don't believe.
21     Q.   How about 2014?
22     A.   I don't believe.  Now --
23     Q.   How about 2013?
24     A.   -- somewhere -- and I don't recall
25 what year this was -- we did add two additional

Page 164

1 judges to the common pleas benches in Summit
2 County, going from eight to ten, and staffing
3 for those, to deal with increases in crime.
4 That may have been even prior to 2013.
5     Q.   Can you place that in time?
6     A.   Offhand, I don't recall.  Probably
7 mid to late 2000s.
8     Q.   So you believe that the two
9 additional judges, plus the staffing to assist
10 those judges, was sometime before 2010?
11         MR. PENDELL:  Objection to form.
12     A.   I believe.
13     Q.   And sitting here today, your
14 understanding is that the court of common pleas
15 did not create any new positions because of the
16 opioid problem between 2013 and 2017, correct?
17     A.   I have to think about -- they have
18 added one or two positions in the court
19 operations itself.  One of -- I believe one of
20 those positions may have been in the
21 psycho-diagnostic -- a psycho-diagnostic
22 evaluator, which isn't -- I'm going to say is
23 not completely opioid related but certainly has
24 strong ties into the opiate situation.
25     Q.   When was the psycho-diagnostic

Page 165

1 evaluator position created?
2     A.   I think that was somewhere around
3 2015, '14.  I'm not completely sure on that,
4 though, without going back to look.
5     Q.   Turning your attention to the eight
6 new probation officer positions created by the
7 court of common pleas in 2018, you said that was
8 the result of overcrowding as a result of the
9 state system not accepting prisoners?
10     A.   Correct.
11     Q.   And how did Summit County pay for
12 these new -- eight new probation officer
13 positions, using what funds?
14     A.   Grant funds provided by the state.
15     Q.   Entirely?
16     A.   Yes.
17     Q.   Turning your attention to the
18 juvenile court, how many positions, if any, did
19 the juvenile court create in 2018 because of the
20 opioid problem?
21     A.   Juvenile court is a little different
22 in the way that they operate.  The judge at our
23 juvenile court has a strong belief in
24 alternative programming, so they tend not to
25 hold very many kids in detention.

42 (Pages 162 - 165)

Page 166

1    The biggest cost driver at the
2 juvenile court is the significant increase in
3 indigent defense costs related to those cases at
4 the court.  I do not believe -- well, they have
5 added -- they have added some staff over the
6 years through some alternative programming in
7 their CASA GAL program.  I don't know.  I don't
8 have specific numbers for specific years on
9 them.  I don't recall anything in the last two
10 or three years that they've added.
11    Q.   Okay.  Did the juvenile court create
12 any new positions in 2018 because of the opioid
13 problem?
14    A.   I don't believe so.
15    Q.   How about 2017?
16    A.   I don't believe so.
17    Q.   How about 2016?
18    A.   I don't believe so.
19    Q.   How about 2015?
20    A.   I don't recall.
21    Q.   How about 2014?
22    A.   Don't recall.
23    Q.   How about 2013?
24    A.   Don't recall.
25    Q.   Sheriff's office --

Page 167

1    A.   Yes.
2    Q.   -- in 2018 how many, if any, new
3 positions did the sheriff's office create
4 because of the opioid problem?
5    A.   Well, so the sheriff's office came
6 to us in 2018 with a request to add 60
7 additional deputies to his staff.  That request
8 was turned down.  We do not have the funding for
9 that.  That request ultimately led to -- was one
10 of the drivers that led to the formation of
11 redesignating the Glenwood Jail operated by
12 Oriana House as a community alternative
13 sentencing center and not a county jail, which
14 would allow for more folks who are being pushed
15 through the prison system, particularly on these
16 low-level, non-violent offenses, to go to
17 this -- to the CASC and receive treatment
18 services.
19    The -- result of that was also
20 that we were able to pull 16 sheriff deputies
21 back from what used to be the Glenwood Jail, add
22 them to the staffing at the county jail, and
23 then also approved hiring five -- five
24 additional inmate service workers to help
25 restore programming at the jail that was

Page 168

1 eliminated several years ago.  The -- we have
2 also, over the last several years, double-bunked
3 most of the jail to hold inmates as a result of
4 the increase in the number of felony 5 offenders
5 sitting at the jail.
6    Q.   Okay, sir.  My question was very
7 specific.  How many positions, if any, did the
8 sheriff's office create in 2018 because of the
9 opioid problem?
10    MR. PENDELL:  Objection to form.
11    A.   I never did finish answering.  So
12 the reality is they're adding five, they've
13 realigned 16 to come back to the jail, and
14 they've requested 60.
15    Q.   So how many new positions are there?
16    A.   Five.
17    Q.   Okay.  And what will these
18 additional inmate service workers do?
19    A.   Provide recreation -- primarily
20 recreation programming, AA and NA, which are the
21 alcohol and drug programming services, and
22 religious services at the jail to deal with the
23 larger inmate population at the jail.
24    Q.   And so did the sheriff's office get
25 these five additional inmate service workers

Page 169

1 because of the increased population at the
2 county jail?
3    A.   Yes.
4    Q.   How many, if any, new positions did
5 the sheriff's office create in 2017?
6    A.   As a result of the opioid epidemic?
7    Q.   Because of the opioid problem.
8    A.   The answer to that would be none.
9    Q.   How about 2016?
10    A.   None.
11    Q.   2015?
12    A.   And I should clarify.  All of these
13 years they've requested additional staffing and
14 gotten none because of a lack of funding.
15    Q.   Okay.  So how many -- to be clear,
16 in 2017 and 2016 the sheriff's office did not
17 create any new positions because of the opioid
18 problem, correct?
19    A.   They requested two and were denied.
20    Q.   Okay.  Requested two in 2017?
21    A.   Yep.
22    Q.   And requested two in 2016?
23    A.   Yep.
24    Q.   And both were denied?
25    A.   Yes.

43 (Pages 166 - 169)

Page 170

1    Q.    How many, if any, new positions were
2  created by the sheriff's office in 2015?
3    A.    They requested in '15 and were
4  denied.
5    Q.    How many did they request in 2015?
6    A.    I think the number then was right
7  around 24 to 26.
8    Q.    How many, if any, new positions were
9  created by the sheriff's office in 2014 because
10  of the opioid problem?
11    A.    24 to 26.
12    Q.    Were requested?
13    A.    Yes.
14    Q.    How many were granted?
15    A.    None.
16    Q.    How many, if any, new positions were
17  created by the sheriff's office in 2013 because
18  of the opioid problem?
19    A.    Again, requested 24 to 26, and none
20  were granted.
21    Q.    So is it accurate to say that from
22  2013 to 2017, the sheriff's office did not
23  create any new positions because of the opioid
24  problem?
25    A.    It is accurate --

Page 171

1        MR. PENDELL:  Objection.
2    A.    -- to say they did not create any
3  new positions because of a lack of funding, but
4  the need was there because of the opiate
5  problem.
6    Q.    But if we're trying to figure out
7  dollars that were spent, no new positions were
8  created between 2013 and 2017 because of the
9  opioid problem, correct?
10    A.    If we're going to start talking
11  about dollars that were spent, we also had an
12  increase in overtime costs at the jail during
13  that period.
14    Q.    Sir, this is -- you can give your
15  testimony down the road.  Today -- and I think
16  I've been quite tolerant -- I'm asking you to
17  answer the question I pose.  So is it accurate
18  to say that between 2013 and 2017, the sheriff's
19  office did not create any new positions because
20  of the opioid problem?  Is that accurate?
21        MR. PENDELL:  Objection.  Form.
22  Asked and answered.
23    A.    It is accurate to say the sheriff's
24  office did not receive funding for any new
25  positions during that period.

Page 172

1    Q.    And in 2018 the sheriff's office
2  added five inmate service workers because of the
3  opioid problem?
4    A.    Yes.
5    Q.    And that's because of the additional
6  inmate population at the county jail, correct?
7    A.    Yes.
8    Q.    Which is due to the state refusing
9  to accept inmates at state-run facilities?
10        MR. PENDELL:  Objection to form.
11    A.    Not completely.  The jail inmate
12  population has risen steadily over the last two
13  or three years, even prior to the state action.
14  The creation of the CASC and more people being
15  sent out of the jail to the former Glenwood
16  Jail, the now CASC run by Oriana, that increase
17  is truly a direct result, along with the
18  additional probation officers, of the state
19  refusing to accept felony 5 non-violent
20  offenders.
21    Q.    What funds is Summit County using to
22  pay for these five additional inmate service
23  workers?
24    A.    County general fund dollars.
25    Q.    I had asked you before about the

Page 173

1  sheriff's office.  If we talk about the sheriff
2  jail category, would you have anything different
3  to say about whether any new positions were
4  created?
5    A.    No.  It's all the same answers.
6  Yeah.
7    Q.    So you don't break it out by
8  sheriff's office and sheriff jail?
9    A.    I mean, we have a budget for sheriff
10  admin, sheriff jail.  When you and I are talking
11  about sheriff operations, I'm thinking of the
12  whole big --
13    Q.    So taking sheriff office admin and
14  sheriff jail, the only new positions that were
15  created since 2013 because of the opioid problem
16  are these five additional inmate service
17  workers?
18    A.    Yeah.  They were the only positions
19  funded.
20    Q.    Now, turning to alternative
21  corrections --
22    A.    Okay.
23    Q.    -- what is that?
24    A.    Alternative corrections is the
25  Oriana House.

44 (Pages 170 - 173)

Page 174

1    Q.   What new positions did Oriana House
2  create in 2018 because of the opioid problem?
3    A.   So Oriana is a private,
4  not-for-profit entity.  I don't have an answer
5  for that.  I will tell you that as a result of
6  the formation of the CASC, we have increased
7  their budget by a total of -- I think starting
8  this year, with the new operation of the CASC,
9  by a total of about $760,000, to provide for
10  additional employees and additional programming
11  at that facility.
12    Q.   Okay.  Are you able to tell me for
13  any year between 2013 and 2018 whether or how
14  many new positions were created by Oriana House
15  because of the opioid problem?
16    A.   I cannot.  I don't have any of that
17  information available.
18    Q.   And does Oriana House get funding
19  from Summit County to provide incarceration
20  services?
21    A.   They get -- they get funding to
22  provide incarceration services, drug and alcohol
23  treatment programs, home monitoring services, a
24  whole host of what we would call alternative
25  sentencing options.

Page 175

1    Q.   Then turning your attention to adult
2  probation --
3    A.   Yes.  We did talk about that.
4  That's part of common pleas court.
5    Q.   So you grouped that together?
6    A.   Yes, I did.
7    Q.   So talking about the court of common
8  pleas and adult probation, the only new
9  positions that were created since 2013 are the
10  eight new probation officer positions?
11    A.   Yes.
12    Q.   Those were created in 2018, and
13  those are funded by the state entirely?
14    A.   Those new positions, yes.
15         And then there was also that
16  evaluator position, I believe, at the court.
17    Q.   Right, which -- the
18  psycho-diagnostic evaluator position?
19    A.   Yes.
20    Q.   And you placed that sometime in 2014
21  or 2015?
22    A.   Somewhere in that range, yeah.
23    Q.   How about public health?  Has public
24  health created any new positions because of the
25  opioid problem since 2013?

Page 176

1    A.   Again, with public health, they're a
2  separate entity.  I don't have their employment
3  information.
4         The other thing I will say about
5  adult probation, over the last several years, in
6  addition to those eight that the state has paid
7  for, they have, like the sheriff's office and
8  the prosecutor's office and other entities,
9  asked for funding for additional positions and
10  been denied because of the lack of available
11  funding.  They also asked us for money to
12  increase the salary of probation officers this
13  year because of the caseloads and because they
14  felt they weren't competitive with what other
15  counties are paying, and they were denied that
16  request from local dollars as well.
17         -  -  -  -  -
18    (Thereupon, Nelsen 30(b)(6)
19    Deposition Exhibit 3, Summit County,
20    Ohio Plaintiff's Second Supplemental
21    Response and Objections to
22    Distributor Defendants'
23    Interrogatory No. 18 Pursuant to the
24    Court's November 21, 2018 Order, was
25    marked for purposes of

Page 177

1    identification.)
2         -  -  -  -  -
3    (Thereupon, Nelsen 30(b)(6)
4    Deposition Exhibit 4, Spreadsheet
5    Entitled "Summit County ($
6    Millions)," Marked Confidential, was
7    marked for purposes of
8    identification.)
9         -  -  -  -  -
10    Q.   I'm showing you what has been marked
11  as Nelsen 30(b)(6) Exhibit 3 and what I've
12  marked as Nelsen 30(b)(6) number 4.  These two
13  documents were previously marked as Nelsen
14  Exhibit 2 and 3 in your December deposition.
15         Do you have those two documents in
16  front of you?
17    A.   Yes.
18    Q.   I asked you questions about the
19  chart that is Nelsen 30(b)(6) Exhibit 4 in your
20  deposition in December.
21         Do you recall that?
22    A.   Yes.
23    Q.   And you testified that you did not
24  prepare this chart, correct?
25    A.   That's correct.

45 (Pages 174 - 177)

Page 178

1    Q.   You understand it was prepared by
2  experts for Summit County, correct?
3    A.   That's correct.
4    Q.   That you understand that the experts
5  used data that you or your office had provided,
6  correct?
7    A.   That's correct.
8    Q.   And that the only data that you are
9  aware of that had been provided to those experts
10  were reports of expenditures by Summit County?
11    A.   Correct.
12       MR. PENDELL:  Objection to form.
13    Q.   And when I asked you whether you
14  could explain how any of these numbers were
15  calculated, you said you could not, correct?
16       MR. PENDELL:  Objection to form.
17    A.   How they compiled those numbers, I
18  would say that's correct.
19    Q.   So have you done anything since your
20  last deposition to understand how this chart was
21  put together?
22    A.   So I have not done anything to talk
23  to these experts about how this chart was put
24  together, but -- here's the big but, and this is
25  probably a little different from the last

Page 179

1  deposition I gave -- we have spent quite a bit
2  of time today talking about the fact that in
3  2017 we internally put together an analysis of
4  costs by departments, and, as we indicated, we
5  have had some ongoing discussion about what was
6  in, not in, those costs, and honing in on better
7  data to verify those costs.
8       When I go back and look at the
9  analysis we put together in 2017 -- and the one
10  thing I have done since the last deposition is
11  sit down and compare our original analysis
12  with -- in particular, for year 2016 with these
13  cost centers, to see if essentially I've arrived
14  at the same place through an independent means
15  that these experts have arrived at, I would say
16  our numbers are extremely similar in most of
17  these categories.
18    Q.   So do the numbers on this chart
19  include the costs from the various cost centers
20  that you said were excluded from the analysis
21  that was reviewed at the meeting in November?
22       MR. PENDELL:  Objection.
23    Q.   I'll break that down.
24       You talked about a meeting in
25  November?

Page 180

1    A.   Correct.
2    Q.   You said you reviewed some summaries
3  of costs incurred by different departments or
4  agencies?
5    A.   Correct.
6    Q.   You said that during the meeting,
7  the group identified costs or categories of
8  costs that were not included in those figures,
9  correct?
10    A.   That's correct.
11    Q.   You said that counsel directed the
12  various departments or agencies to then go out
13  and calculate the costs from those missing
14  categories?
15    A.   Correct.
16    Q.   And you have seen those subsequent
17  analyses?
18    A.   I have.
19    Q.   And the subsequent analyses do
20  include those other categories of costs that
21  were missing from the earlier reports?
22    A.   From our earlier reports, yes.
23    Q.   Okay.  So does this chart that --
24  Nelsen 30(b)(6) Exhibit 4, does this chart
25  include in these figures those costs that were

Page 181

1  to be added based on the November meeting?
2       MR. PENDELL:  Objection.
3       Hold on one second.
4    A.   So the -- the meeting that we had in
5  November, the further analyses that we did was
6  independent of the damage experts, the
7  economists who put together this chart, so I
8  cannot tell you -- I don't know whether that
9  information was relayed to them or not.  I don't
10  even know -- this chart may have come out before
11  we had that meeting.  I'm not positive on that.
12  What I can tell you is that I can look at this
13  chart and say that in some cost pools those
14  numbers look pretty similar, in other cost pools
15  this chart may be a little lower than the
16  estimates that I compiled.
17    Q.   So you said that the work you did
18  coming out of that November meeting was
19  independent of this?
20    A.   Completely independent of this.
21    Q.   How do you know it's completely
22  independent?
23    A.   I have not -- I have not supplied
24  any of that information.  I have seen -- I
25  believe -- and I'd have to go back and look, but

Page 182

1 I have seen versions of this prior to that
2 analysis. I have seen versions of this and
3 compared this to our original analysis. I can't
4 sit here and say with any certainty, but my
5 understanding is this was done under a
6 completely -- other than us supplying, here's
7 our financial information, their methodology for
8 going through and putting together these costs
9 was completely independent of the analysis we
10 did.
11     Q.   And when you keep saying "this,"
12 you're referring to the chart that is Nelsen
13 30(b)(6) Exhibit 4?
14     A.   I am, yes.
15     Q.   But the analysis that you say you
16 did that was "completely independent" is an
17 analysis that you gave to Summit County's
18 outside lawyers?
19     A.   That's correct.
20     Q.   But the analysis that you did, you
21 did compare that with Nelsen 30(b)(6) Exhibit 4?
22         MR. PENDELL:  Objection to form.
23     A.   I did.
24     Q.   And you said they're roughly the
25 same?

Page 183

1         MR. PENDELL:  Objection to form.
2     A.   Yeah. Some of the -- most of the
3 categories I would -- I would say this. Most of
4 the categories are within about a -- and I only
5 really compared 2016, honing in on the fact
6 that, as I mentioned earlier with like SACWIS
7 data, it wasn't until 2016 that we truly had
8 good data. I didn't go back to 2006 either in
9 the analysis I did. It focused on the periods
10 of 2013 through 2016. Most of these categories
11 are within a hundred thousand dollars.
12         There are -- one category that I had
13 costs higher than what is on this are the
14 sheriff jail and sheriff's office in particular.
15 So there are some differences. But overall,
16 they're generally fairly close.
17     Q.   And what is your understanding of
18 why you have different and higher numbers for
19 sheriff and sheriff jail than is reflected in
20 Nelsen 30(b)(6) Exhibit 4?
21         MR. PENDELL:  Objection to form.
22     A.   I don't know because I have had no
23 conversation with the folks who compiled Nelsen
24 30(b)(6) Exhibit 4.
25     Q.   And the comparison that you said

Page 184

1 where you're comparing Summit County's outside
2 lawyers' experts' numbers with your analysis,
3 your analysis includes the additional categories
4 of costs that were identified at that November
5 meeting, correct?
6         MR. PENDELL:  Objection to form.
7     A.   I compared it to both my original
8 version and I have a comparison to the latest
9 version that was compiled after the November
10 meeting, yes.
11     Q.   Okay. So you've compared this
12 Nelsen 30(b)(6) Exhibit 4 to the cost estimates
13 that were prepared before the November meeting
14 and discussed at the November meeting; yes?
15     A.   Yes.
16     Q.   And you've done a comparison, a
17 side-by-side comparison?
18     A.   Yes.
19     Q.   And is that reflected in writing,
20 that side-by-side comparison?
21     A.   No.
22     Q.   It's just you've eyeballed it?
23     A.   I sat down with both of them and
24 looked one to one, yes.
25     Q.   And then you did a separate

Page 185

1 comparison of Nelsen Exhibit 4 with the separate
2 report that was created after the November
3 meeting that included these additional
4 categories of costs that were identified at that
5 meeting?
6     A.   Correct.
7     Q.   And you say that in that second
8 comparison, your numbers were roughly the same,
9 although your numbers were a little bit higher
10 for sheriff and sheriff jail?
11     A.   Yes.
12     Q.   Other than that comparison, have you
13 learned anything at all about how this Nelsen
14 30(b)(6) Exhibit 4 was created?
15     A.   No.
16     Q.   Or how the numbers were arrived at?
17     A.   All I know is I supplied numbers and
18 identified cost pools to study and then did my
19 own analysis on those same cost pools; and they,
20 through their methodology, came up with this,
21 and under a separate methodology I came up with
22 an analysis, and those numbers are pretty
23 similar.
24     Q.   Then turning your attention to
25 Nelsen 30(b)(6) Exhibit 3, would you turn to

47 (Pages 182 - 185)

Page 186

1 page 6?  At the bottom of page 6 it says,
2 "Plaintiff also seeks the following past and
3 ongoing lost tax revenue in the amount of
4 approximately 734 million dollars."
5      Do you see that?
6   A.   I do.
7   Q.   And I asked you about how that
8 number was arrived at in your deposition in
9 December and you said you didn't know?
10   A.   That's correct.
11   Q.   Do you know anything more about how
12 this figure was arrived at today than you knew
13 back in December?
14   A.   I do not.  Again, that was compiled
15 by these economists and experts.  As I indicated
16 back in December, I have looked at other
17 economic indicators from outside economists and
18 experts that -- I think as I mentioned in
19 December there's a study I looked at that
20 indicated there was a .8 percent drag on GDP in
21 Ohio, and that if I wanted to sit down, I could
22 probably come up with a methodology, but that
23 was not an exercise I had undertaken on the
24 overall economic impact to Summit County.
25   Q.   So for this 734 million dollar

Page 187

1 figure, do you know how much is past tax
2 revenue?
3   A.   Other than the 734 million dollar
4 figure, I've been provided no information beyond
5 that total dollar amount.
6   Q.   So how much of that is past lost tax
7 revenue?
8      MR. PENDELL:  Objection to form.
9   A.   Hasn't been provided to me.
10   Q.   How much of that is ongoing lost tax
11 revenue?
12      MR. PENDELL:  Objection to form.
13   A.   Hasn't been provided to me.
14   Q.   What types of lost tax revenue are
15 included in this figure?
16   A.   Hasn't been provided to me.
17   Q.   And how was this 734 million dollar
18 figure calculated?
19      MR. PENDELL:  Objection to form.
20   A.   Hasn't been provided to me.
21   Q.   Are you saying it hasn't been
22 provided to the county, to anyone in the county?
23   A.   I would assume if I haven't gotten
24 it, nobody else has either.
25   Q.   Okay.  Then going -- so you can't

Page 188

1 tell me anything about the 734 million dollar
2 figure --
3      MR. PENDELL:  Objection to form.
4   Q.   -- correct?
5   A.   That is correct.
6   Q.   And then going back to the chart
7 that is Nelsen 30(b)(6) Exhibit 4 --
8   A.   Yes.
9   Q.   -- are you able to connect any of
10 these damages figures to the conduct of any
11 particular defendant?
12      MR. PENDELL:  Objection to form.
13   A.   Individually?
14   Q.   Yes.  Can you connect any of the
15 damages figures to any particular defendant or
16 the conduct of any particular defendant?
17      MR. PENDELL:  Objection to form and
18 scope.
19   A.   No.  We have not gone to that level
20 of analysis.
21   Q.   When you say "we," you mean you and
22 the experts?
23   A.   Well, I can't speak for the experts.
24 I have not.
25   Q.   Okay.  Well, we are looking at the

Page 189

1 chart that you say was prepared by the experts.
2   A.   That's correct.
3   Q.   Are you able to connect any of the
4 figures in that chart to any particular
5 defendant?
6      MR. PENDELL:  Objection to form.
7   A.   I cannot from looking at the chart.
8   Q.   Can you connect any of those figures
9 in the chart to the particular conduct of any
10 particular defendant?
11      MR. PENDELL:  Objection to form.
12   A.   I cannot, looking at the chart.
13   Q.   Then going back to the reports that
14 you have prepared and that you compared with
15 this chart, for either of those can you connect
16 any of the damages figures to any particular
17 defendant?
18      MR. PENDELL:  Objection to form.
19   A.   Repeat that question.
20   Q.   It's the same question I asked you
21 about this chart.  Now I'm asking about the two
22 cost analyses that you said you prepared.
23   A.   Oh, that I did.  Yeah.  No.  No, we
24 did not.
25   Q.   Can you connect any of the damages

48 (Pages 186 - 189)

Page 190

1 figures in either of those analyses to any
2 particular defendant?
3          MR. PENDELL: Objection.
4     A.   We cannot, nor was it an objective
5 of that analysis.
6     Q.   And can you connect any particular
7 damages figures in either of your analyses to
8 particular conduct of a particular defendant?
9          MR. PENDELL: Objection to form.
10    A.   We cannot, nor was it an objective.
11          I would like to -- I would like to
12 add one thing, and I know this -- I know this
13 does not bear on an explanation of how the 734
14 million dollars was calculated, but I do want to
15 say that Summit County, based on our current tax
16 structure, collects about 200 million dollars a
17 year in county property tax and sales tax, so
18 arriving at a figure that big over a multi-year
19 look-back, look-forward period, I don't find
20 that number to be terribly shocking to me as I
21 look at it, but again, I don't have any detail
22 as to how it was actually calculated.
23    Q.   So you testified earlier that the
24 first time you became aware that Summit County
25 was spending money because of the opioid problem

Page 191

1 was the end of 2013 or early 2014. Did I get
2 that right?
3     A.   Yes.
4     Q.   Okay. So looking at the chart,
5 Nelsen Exhibit 30(b)(6), Exhibit 4, do you see
6 the line "Department-Related Costs Past"?
7     A.   Yes.
8     Q.   So is it your testimony that Summit
9 County incurred 6.8 million dollars in costs in
10 2006 because of the opioid problem?
11          MR. PENDELL: Objection to form.
12    A.   So my -- my analysis did not go back
13 to 2006, but there is -- I -- my analysis
14 strictly focused on that period where everything
15 skyrocketed. When I go back and look at data,
16 like the Ohio Hospital Association provides, the
17 Department of Health provides, and then, again,
18 based on news reports and everything else I've
19 read, there's always been an underlying level of
20 opiate costs built into our issue. And so what
21 -- I guess when we later go on to find out that
22 the marketing practices that date all the way
23 back to the '90s of the firms -- the Defendants
24 in this case have contributed to this, I don't
25 look at this chart and find it unreasonable to

Page 192

1 think, yeah, we had costs back in 2006 related
2 to this.
3     Q.   So you found out that the marketing
4 practices go all the way back to the '90s and
5 that that caused these opioid expenses?
6     A.   That's my understanding.
7     Q.   Okay. And how did you find out that
8 these marketing practices caused these opioid
9 expenses?
10    A.   Through conversations -- through
11 news media reports, conversations with
12 attorneys, conversations with people over at the
13 ADM Board. In this 2017, 2016 time frame was
14 when -- and everything blew up, I became, at
15 least on my end, aware of this issue.
16    Q.   So this is -- this chart, although
17 it was prepared by Summit County's lawyers'
18 experts, this chart is Summit County's position.
19 You understand that?
20    A.   I understand that.
21    Q.   And so Summit County's position is
22 that it spent 6.8 million dollars in 2006
23 because of the opioid problem?
24    A.   Yes.
25    Q.   And another 7.2 million dollars in

Page 193

1 2007 because of the opioid problem?
2     A.   Yep.
3     Q.   And another 8.3 million dollars in
4 2008 because of the opioid problem?
5     A.   Yes.
6     Q.   And another 11.8 million dollars in
7 2009 because of the opioid problem?
8     A.   Yes.
9     Q.   And another 12.3 million dollars in
10 2010 because of the opioid problem?
11    A.   Yes.
12    Q.   Another 12.3 million dollars in 2011
13 because of the opioid problem?
14    A.   Yes.
15    Q.   Another 13.7 million dollars in 2012
16 because of the opioid problem?
17    A.   Yes.
18    Q.   And another 17 million dollars in
19 2013 because of the opioid problem?
20    A.   Yes.
21    Q.   All unbeknownst to Summit County?
22          MR. PENDELL: Objection to form.
23    A.   So when I go back, such as last
24 night, and look at the statistics from the Ohio
25 Hospital Administration -- or Ohio Hospital

49 (Pages 190 - 193)

Page 194

1  Association on overdose deaths in Summit County
2  and see that our -- or overdoses in Summit
3  County and see that number, there's a baseline
4  number back in 2008 on that report, and I see it
5  slowly growing across the board and then
6  skyrocketing as we get into that 2014, '15
7  period, and I sit here and look at these numbers
8  and then see them take off when we get into that
9  same period, those numbers to me correlate with
10 each other that there has always been an issue
11 with overdoses and an issue with opiates, and
12 that those numbers just took off when we got
13 into the 2014, roughly, time frame.
14     Q.  Well, Summit County has taken the
15 position that it spent 6.8 million dollars in
16 2006 because of the opioid problem.
17     A.  Yes.
18     Q.  Did Summit County know that it was
19 spending 6.8 million dollars because of the
20 opioid problem that year?
21         MR. PENDELL:  Objection to form.
22     A.  In 2006?
23     Q.  Yes.
24     A.  I don't think so.  I'm sure I did
25 not know that.

Page 195

1      Q.  And how about the 7.2 million
2  dollars in 2007?
3          MR. PENDELL:  Objection to form.
4      A.  No.
5      Q.  Didn't know about it?
6      A.  Here's the thing.  We spent money on
7  cocaine in 2006.  It was built into the numbers.
8  It wasn't -- until it started skyrocketing and
9  kind of smacked us in the face in the last few
10 years, no, we weren't aware of it.  Part of
11 that, half -- 6.8 million in a half billion
12 dollar budget spread out amongst multiple
13 departments doesn't strike me as anything
14 extreme.
15     Q.  And another 8.3 million in 2008
16 unbeknownst to --
17     A.  Yes.  Continues to slowly grow.
18     Q.  And another 11.8 million in 2009
19 unbeknownst to you and your office?
20     A.  Yes.
21     Q.  And another 12.3 million in 2010
22 unbeknownst to you and your office?
23     A.  Yes.
24     Q.  Another 12.3 in 2011 unbeknownst to
25 you and your office?

Page 196

1      A.  Yes.
2      Q.  Another 13.7 in 2012 unbeknownst to
3  you and your office?
4      A.  Yes.
5      Q.  17 million in 2013 unbeknownst to
6  you and your office?
7      A.  So now we get to the period where we
8  start looking around and saying, what is going
9  on here, why are overdoses increasing, why are
10 these departments -- why is the jail filling up
11 and departments are struggling.  So it then
12 begins to start like jumping off the page at us.
13     Q.  In 2013?
14     A.  Begins to, but we still didn't have
15 an answer.  I didn't have an answer for it.
16     Q.  So what steps do you take in 2013
17 when these figures are skyrocketing and it's
18 jumping off the page?
19         MR. PENDELL:  Objection to form.
20     A.  2013 was also the year our indigent
21 defense costs started going up, so we started
22 analyzing indigent defense costs.  The ADM Board
23 forms the -- at some point in this period forms
24 the opiate task force.  There were things that
25 were independently going on that -- that -- and

Page 197

1  it's kind of siloed at this point where we're
2  all looking at different things, saying, what's
3  going on here.
4      Q.  So what steps did you take in 2013
5  to understand why Summit County was spending
6  millions and millions and millions of dollars
7  because of the opioid problem going back to
8  2006?
9          MR. PENDELL:  Objection to form.
10     A.  Going back to 2006, I don't know
11 that I realized in 2013 that this problem went
12 back to 2006.
13     Q.  What investigation did the county do
14 in 2013 when it sees these numbers?
15         MR. PENDELL:  Objection to form.
16     A.  We started looking at the increased
17 costs that were occurring in 2013 to try to
18 figure out what was going on with them.
19     Q.  So what did you and your office do
20 to try to figure out the increased costs and why
21 they were being incurred?
22     A.  We started analyzing them, we
23 started having meetings with departments, and we
24 started talking about what the issue is.
25     Q.  And what steps did you take besides

Page 198

talking about it to figure out that the county was incurring millions of dollars each year because of this opioid problem?

MR. PENDELL: Objection to form.

A. Well, I think when you look at particular, like ADM and public health, they were already taking steps on -- and public safety throughout Summit County were already taking steps with this opiate task force and some of these things. At my level, we were just more in the analyzing data. And for me it was really the indigent defense costs that first cropped up. We were already dealing with the jail issue at that time and we were coming off the recession and state budget cuts, so our ability to react to this was somewhat limited.

The other fortunate thing we had going on was Medicaid expansion at the time, which was allowing ADM to live within their budgetary means and -- within their revenue streams to begin dealing with this. It really was not -- and I think the other thing at the time was, well, is this going to go away, is this just a blip in the radar. I mean, there was just a lot of trying to understand what was

Page 199

going on and whether there were truly long-term impacts with this at the time.

Q. At what point did Summit County conclude that it was the fault of the Defendants in this case that Summit County was spending all this money because of the opioid problem?

MR. PENDELL: Objection to form and scope.

A. I don't know that I can answer that because I think the reality is there were probably -- depending on who you ask and what part of the county, there would probably be different answers.

Q. But the conclusion was made in 2016 or 2017 to go after the Defendants in this case for all these expenses?

MR. PENDELL: Objection to form and scope.

A. I was not brought into the fold of that conversation until 2017. I can't speak for what anybody else thought or any other conversations they had.

Q. So what did the county learn in 2017 to -- as the basis to file this lawsuit against the Defendants to recover all these costs?

Page 200

MR. PENDELL: Objection to form and scope.

A. You know, I don't know that I'm the -- the complete expert on this, but I go back to the story I talked about on 60 Minutes relating to Kermit, West Virginia, and the 11 million pills being dispensed for a town of 400 people. I think we all became more aware of the types of marketing and lack of -- marketing processes and lack of monitoring how and where these pills were being dispensed along the course of that time. And I'm not going to say that other people didn't -- weren't aware of that before I was. I'm the finance guy. I mean, they come to me when it comes to dollars and cents. I'm not necessarily on the forefront of all of those issues.

Q. You are the finance guy, and so when Summit County -- as you say, it realizes in 2013 that these costs are skyrocketing because of the opioid problem and has been spending 75 million dollars over the last seven years because of the opioid problem, what did you do to figure out why and to identify the causes and figure out who's responsible?

Page 201

MR. PENDELL: Objection to form and scope.

A. So in 2013 I can tell you that I did not know we spent 75 million dollars dating back to 2006 on this issue. This analysis that goes back to 2006 that analyzes how much of our costs in 2006 were on this issue I just saw this past year. What I can tell you is when I start seeing costs take off, which they were, we began asking questions.

Q. In 2013?

A. In 2013. I didn't have answers in 2013. This continued into 2014 and 2015. It was really 2015 where everything kind of blew up with the overdoses, having to call the state to send up a mobile hospital because we couldn't handle the number of people showing up at the morgue. You start seeing the news reports of parents. I remember seeing the picture on the Beacon Journal of parents both passed out in a vehicle with a needle in their arms while their kids were found at -- their little children were found at home unattended. That's when we became aware of all this.

Q. Starting in 2013, when you say this

1 came to your attention and you didn't have
2 answers, what did you or Summit County do
3 between 2013 and 2017 to get answers?
4     MR. PENDELL:  Objection to form and
5 scope.
6     A.  I think I just outlined that.  We
7 just started talking to -- just because we
8 waited until 2017 to file the suit doesn't mean
9 we were not actively trying to -- the opiate
10 task force, the DAWN clinics, all of the things
11 that were going on to try to mitigate this.  We
12 were kind of busy on the front lines of trying
13 to deal with this.
14     Q.  And so what is it in 2017 that
15 caused Summit County to say now we will
16 attribute fault to the Defendants in this case?
17     MR. PENDELL:  Objection to form and
18 scope.
19     A.  I can't answer on why we finally
20 reached the point of enough is enough, we need
21 to do something to mitigate this problem.
22     MR. KEYES:  Okay.  Why don't we take
23 a ten-minute break.
24     THE VIDEOGRAPHER:  Off the record,
25 1:48.

1     (Recess had.)
2     THE VIDEOGRAPHER:  On the record,
3 2:16.
4 BY MR. KEYES:
5     Q.  Mr. Nelsen, earlier you testified
6 that the number of cases prosecuted increased
7 between 2013 and 2016?
8     A.  Correct.
9     Q.  What is that based on?
10     A.  Statistics filed -- or provided to
11 me by the prosecutor's office on the number of,
12 I believe, cases filed.
13     Q.  And who in the prosecutor's office
14 gave that to you?
15     A.  I believe it was either Brad Gessner
16 or John Galonski.
17     Q.  And where did either of them pull
18 the data from?
19     MR. PENDELL:  Objection to form.
20     A.  I did not ask.
21     Q.  And what did you do with the
22 statistics that they provided?
23     A.  We used that as a basis -- one of
24 the bases to look at public safety-related
25 departments, like the prosecutor's office, to

1 look at the growth in drug possession cases
2 versus the growth in total caseloads, and then
3 apply that as a statistical measurement in the
4 years 2013 to 2016 to carve out costs
5 attributable to drug possession cases, and then
6 used the growth factor in that cost as the cost
7 to apply it to the analysis we did on cost being
8 spent on the opioid issue.
9     Q.  Would you turn your attention to
10 Nelsen 30(b)(6) Exhibit 4, the chart?
11     A.  Yeah.
12     Q.  There's a line on the chart for
13 "Department-Related Costs Ongoing."
14     Do you see that?
15     A.  Yes.
16     Q.  And that projects out costs from
17 2018 to 2027?
18     A.  Yes.
19     Q.  How were the numbers arrived at for
20 each of those years on this chart?
21     MR. PENDELL:  Objection to form.
22     A.  Yeah.  So those costs on that line
23 were put together by the economists and the
24 experts who calculated damages.  I do not have
25 the basis for that, though I -- though I believe

1 it is -- and the other thing I would say, when I
2 look at those costs and I compare that to the
3 projections provided by the Ohio Hospital
4 Association report, their projections on
5 increases in overdose caseloads; that, based on
6 that comparison, those numbers to me don't look
7 unrealistic, but I don't have the statistical
8 method with which they calculated that.  That
9 was not supplied to me.
10     Q.  So do you know how any of those
11 numbers were arrived at?
12     A.  I do not.
13     Q.  And do you know what specific costs
14 were included in each of those numbers?
15     A.  My belief from looking at this is
16 it's a forward-looking projection at all of the
17 costs identified above as they would continue as
18 the number of overdoses continue to grow in the
19 county, and convictions and everything else that
20 has spiked.
21     Q.  In the analyses that you say you've
22 prepared --
23     A.  Yes.
24     Q.  -- separate from what the experts
25 have prepared --

Page 206

1     A.   Yes.
2     Q.   -- have you undertaken any
3 projections of costs to be incurred by Summit
4 County in the future because of the opioid
5 problem?
6     A.   My analysis was strictly the 2013 to
7 2016 time frame.
8     Q.   How does the total head count for
9 the Summit County government in 2018 compare to
10 2015; higher or lower?
11     A.   Total, it would be lower.
12     Q.   Lower in 2018?
13     A.   Yes.
14     Q.   And how does the total head count
15 for the Summit County government in 2015 compare
16 with 2012?
17     A.   2012 would have been higher
18 countywide.
19     Q.   And how does the head count between
20 2012 and 2009 compare?
21     A.   2009 would have been higher.  If you
22 recall, in my first deposition I explained that
23 in 2009, when the Great Recession hit Summit
24 County, along with all of the local governments,
25 the revenues available to Summit County, which

Page 207

1 were primarily sales tax, property conveyance
2 taxes, property taxes, even the levy revenues
3 for like CSB, ADM, DD, all of these agencies --
4 everything began to drop considerably and the
5 county began reducing workforce to live within
6 those constrained means.  Then you fast forward
7 to 2012.  We have a governor in office in Ohio
8 who starts balancing the state budget by cutting
9 funding to local governments, and that has
10 continued all the way through 2017, 2018, and so
11 we have -- while we've increased like the levy
12 for CSB, had increased the levy for ADM in 2007,
13 part of the overall global picture in Summit
14 County is that we're having to address this by
15 reallocating resources and deferring capital and
16 other needs of the county to address this issue.
17     Q.   So if I understand you correctly,
18 the total head count for the Summit County
19 government is lower in 2018 than it was in 2015?
20     A.   That's correct.
21     Q.   And it was lower in 2015 than it was
22 in 2012?
23     A.   Yes.
24     Q.   And it was lower in 2012 than it was
25 in 2009?

Page 208

1     A.   Yes.
2     Q.   So by how much has the total head
3 count for the Summit County government decreased
4 from 2009 through 2018?
5     A.   I can tell you from 2008 to 2018 it
6 has decreased, roughly, 900 employees
7 countywide.
8     Q.   In the two cost analyses that you
9 said you did, did you break out any of the cost
10 categories according to the source of revenue
11 that covered the cost?
12     A.   I did -- well, all of the -- kind of
13 yes.  I mean, I know what the source revenue is
14 for all of these.  I strictly looked at the cost
15 side, but I know what the revenue source is for
16 all of these.
17     Q.   Well, you know it, but does the
18 analysis that you put together --
19     A.   Indicate which one?
20     Q.   -- indicate what the source of
21 revenue is for each cost category?
22     A.   The analysis itself does not, no.
23     Q.   So it's purely focused on the cost
24 side?
25     A.   Yes.

Page 209

1     Q.   It does not look at or take into
2 consideration the source of revenue for the
3 costs?
4     A.   That's correct.
5     Q.   In the cost analyses that you put
6 together, those are your effort to quantify the
7 costs incurred by different parts of the Summit
8 County government because of the opioid problem,
9 correct?
10          MR. PENDELL:  Objection to form.
11     A.   Correct.
12     Q.   Does your analysis separate out
13 costs incurred because of people's use, abuse or
14 addiction to prescription opioids versus illicit
15 opioids?
16          MR. PENDELL:  Objection to form.
17     A.   My analysis does not make that
18 distinction.
19     Q.   Does your analysis separate out
20 costs incurred because of people's overdoses to
21 prescription opioids versus illicit opioids?
22          MR. PENDELL:  Objection to form.
23     A.   My analysis does not make that
24 distinction.
25     Q.   Does your analysis separate out

53 (Pages 206 - 209)

Page 210

1 costs incurred because of overdoses resulting
2 from the use of prescription opioids rather than
3 illicit opioids?
4     A.   My analysis does not make that
5 distinction.
6     Q.   Does your analysis separate out
7 treatment costs for people who have an opioid
8 use disorder arising from their use of
9 prescription opioids versus their use of illicit
10 opioids?
11         MR. PENDELL:  Objection to form.
12     A.   My analysis does not make that
13 distinction.
14     Q.   Does your analysis separate out the
15 costs incurred by Summit County because people
16 are in the criminal justice system because of
17 their use of prescription opioids versus their
18 use of illicit opioids?
19     A.   My analysis does not make that
20 distinction.
21     Q.   And does your analysis separate out
22 personnel costs incurred by Summit County
23 because they are dealing with people who use
24 prescription opioids versus use illicit opioids?
25     A.   My analysis does --

Page 211

1         MR. PENDELL:  Object to form.
2     A.   -- not make that distinction.
3     Q.   And, to your knowledge, does the
4 chart that is Nelsen 30(b)(6) Exhibit Number 4
5 draw any of those distinctions?
6         MR. PENDELL:  Objection to form.
7     A.   I don't have enough information
8 about how this was compiled to tell you.
9     Q.   You can't say one way or the other?
10     A.   That's correct.
11         MR. KEYES:  I will pass the witness.
12         EXAMINATION OF BRIAN NELSEN
13 BY MS. RANJAN:
14     Q.   Mr. Nelsen, my name is Brandy
15 Ranjan.  I represent Walmart here today.  I have
16 a few additional questions for you.  It should
17 be brief.  I'm going to jump around a little bit
18 just because a lot of the things have been hit
19 already so I apologize if it seems a little
20 disjointed.  Just let me know if you're not --
21 you know, if you're not understanding my
22 question.
23     A.   Sure.
24     Q.   So you spoke briefly about the
25 sources of funding for Summit County.  It's true

Page 212

1 that Summit County has received grants
2 throughout the years that are specifically for
3 the opiate crisis; is that right?
4     A.   Some dollars, yes.
5     Q.   The analysis that you did leading up
6 to that November meeting and then coming out of
7 that November meeting, did it make any effort to
8 tease out which costs were paid from those grant
9 funds?
10     A.   Yes.
11         MR. ARNOLD:  Objection to form.
12     A.   Yes.  We -- we focused on county
13 general fund dollars, and with the levy
14 agencies, and I'll use ADM as the example,
15 because we focused on just ADM levy dollars, not
16 any matching federal or state dollars and not
17 any of the cases that they managed that were
18 billed back to Medicaid and not billed to the
19 county.  So the analysis we did was just local
20 county dollars.
21     Q.   Okay.
22     A.   And we didn't use like drug -- I
23 know we have a drug court grant that we get.  We
24 didn't use those dollars in that analysis, nor
25 for -- we talked earlier about the eight

Page 213

1 additional adult probation officers.  We did not
2 include the funding -- that TCAP funding from
3 the state that paid for those eight probation
4 officers as part of this analysis either.
5     Q.   So when we look at your final
6 analysis coming out of that November meeting, it
7 would not include any of those grant dollars
8 that you received from federal or state funds?
9     A.   That's correct.  Our initial
10 analysis last -- in '17 and then this latest
11 analysis that we've done does not include those
12 dollars.  It's also one of the reasons, like,
13 you don't see Job and Family Services and all of
14 the client services they provide to people who
15 might be affected.  None of that has been
16 included in this as well.
17     Q.   And when you say "this," I see you
18 motioning to the document in front of you.
19     A.   This document -- well, I don't
20 know -- JFS is not listed on this document.
21 They're certainly not included in the analysis I
22 did, and the analysis I did that I've compared
23 to this document leads me to believe that they
24 have not as well, but again, I haven't been
25 given the level of detail that makes this up to

54 (Pages 210 - 213)

Page 214

1  say for certain.
2      Q.   Changing gears, we talked earlier
3  about the lab fund for the medical examiner's
4  office.  Are you aware of what proportion of the
5  dollars in spend from that lab fund are used to
6  pay for sending toxicology samples to reference
7  laboratories?
8      A.   Not -- that lab fund has about three
9  to four -- probably about $400,000 a year in
10 spending.  I don't have the breakdown on how
11 much of that would be specifically for those
12 toxicology tests.
13     Q.   So help me understand.  This
14 analysis that you put together, that you then
15 discussed at the November meeting, was the goal
16 of that analysis to estimate all of the costs of
17 the opioid crisis to Summit County?
18         MR. PENDELL:  Objection to form.
19     A.   It was to, as -- it was essentially
20 -- and I can't say all.  What I can say is we
21 knew there were certain things that we could dig
22 a little deeper to try to identify costs, and it
23 was to make sure that we had truly looked into
24 identifying cases and digging to the point where
25 we felt comfortable that the costs we identified

Page 215

1  were truly costs associated with this and that
2  we could back up.  So it was to, as reasonably
3  as you could, pinpoint costs associated to the
4  opioid epidemic.
5          I can tell you for certain I don't
6  know that we could ever identify every cost
7  associated with it.  Like at the county jail,
8  you dig -- you'd have to dig down into every
9  court record, and even then, you still may not
10 have enough information, like my example earlier
11 about domestic violence.
12         -  -  -  -  -
13         (Thereupon, Nelsen 30(b)(6)
14         Deposition Exhibit 5, Summit County
15         and City of Akron, Ohio Plaintiffs'
16         First Amended Responses and
17         Objections to the National Retail
18         Pharmacy Defendants' First Set of
19         Interrogatories, was marked for
20         purposes of identification.)
21         -  -  -  -  -
22     Q.   I'm handing you what's been marked
23 as Nelsen 30(b)(6) Exhibit 5.  Do you recognize
24 this document?
25     A.   It looks like -- is this the

Page 216

1  complaint document?
2      Q.   No.  So this is Summit County's
3  interrogatory responses to some interrogatories
4  that were posed by the retail pharmacy
5  Defendants.
6      A.   Okay.
7      Q.   With that explanation, do you know
8  if you've seen this document prior to today?
9      A.   I do not believe I've seen this
10 entire document, no.  Yeah.  No, I haven't.
11     Q.   Okay.  Do you know if you provided
12 any information that was used to compile this
13 document?
14     A.   Well --
15     Q.   And I'll tell you I'm specifically
16 going to be asking you today about interrogatory
17 number 20, which starts on page 87.
18     A.   87?
19     Q.   Yes.
20     A.   Okay.
21     Q.   So you'll see interrogatory number
22 20 asks, "Provide a computation of each category
23 of damages, monetary sums, and injunctive relief
24 that you seek from each National Retail Pharmacy
25 Defendant."

Page 217

1          Do you see that?
2      A.   I see that, yes.
3      Q.   If you look on the next page,
4  there's a bullet point list of categories of
5  damages.
6      A.   Um-hum.
7          MR. PENDELL:  Yes?
8          THE WITNESS:  Yes.
9      Q.   Do you know if you provided any
10 information that was used to draft this
11 interrogatory?
12         MR. PENDELL:  Objection to form.
13     A.   So I would assume by that you mean
14 this response (indicating)?
15     Q.   No.  I mean what's listed on page 88
16 through 89, that bullet point list.  Did you
17 have any role in helping to draft that bullet
18 point list?
19     A.   I guess the answer to that is not
20 directly, but maybe indirectly.
21     Q.   You're not sure if the information
22 you provided was used here or not?
23     A.   Well, I think -- I think the reality
24 is the cost analysis that we did, identifying
25 departments and areas of service that were

55 (Pages 214 - 217)

Page 218

1 affected, was probably used to compile this
2 list, but I did not type out this list or have
3 any comment on this list.
4     Q.   Okay.  Let's just use a couple of
5 examples from this list and maybe we can
6 streamline the questioning a little bit.
7         If you look at the second bullet
8 there, "Costs for providing healthcare and
9 medical care for patients suffering from
10 opioid-related addiction or disease, including
11 overdoses and deaths," is that something that
12 you analyzed in connection with your analysis of
13 Summit County's costs in connection with the
14 opioid crisis?
15     A.   When we went -- so off the top of my
16 head, there would be -- and I guess the
17 definition of medical care -- so we looked at
18 our own internal employee healthcare pool and
19 went back and reviewed the number of opiate
20 prescriptions in the history of that.  My belief
21 is we chose not to claim that as part of these
22 damages.  We do have healthcare and medical
23 costs that we pay for at the county jail, which
24 would be inclusive of the numbers on Exhibit 4,
25 as part of the jail expense, though the analysis

Page 219

1 we used to drill down into this, we did not go
2 pull medical records for those inmates to drill
3 down into that.
4         Now, I guess the other thing, I
5 don't know that -- if the -- the alternative,
6 like programming that ADM and Oriana and those
7 agencies provided, would fall under this bullet
8 point, but obviously we've spent more time on
9 that than on the healthcare piece of it.
10     Q.   Sure.
11         Sitting here today, can you tell me
12 if the costs that you would include in this
13 second bullet point, the healthcare and medical
14 care for patients suffering from opioid-related
15 addiction or disease, including overdoses and
16 deaths -- are the costs that Summit County is
17 claiming for that, are they included in the
18 numbers that are Nelsen 30(b)(6) Exhibit 4?
19     A.   So, again, to make the distinction,
20 I don't know what -- what they included in
21 Exhibit 4.
22     Q.   And I think that answers my
23 question.
24     A.   Okay.
25     Q.   I mean, you either know if those

Page 220

1 costs are included in Nelsen Deposition Exhibit
2 4, 30(b)(6) Exhibit 4, or you don't, so is the
3 answer you don't know?
4         MR. PENDELL:  Objection to form.
5     A.   Yeah.  I would have to say I don't
6 know.
7     Q.   Okay.  And you just described some
8 costs that you think may or may not fall into
9 this category.  Based on your understanding of
10 the second bullet point, would those costs have
11 been included in the estimation of costs that
12 you put together leading up to that November
13 meeting and then further analysis coming out of
14 that November meeting?
15         MR. ARNOLD:  Objection to form.
16     A.   The jail medical cost certainly
17 would have been.  The employee healthcare costs
18 would not have been.  And as we talked, I think
19 ad nauseam, certainly all of ADM's costs would
20 have been included in that as well.
21     Q.   And do you know, sitting here today,
22 what the dollar figure is that you would assign
23 to those categories?  The jail healthcare costs
24 I think was one of them.
25     A.   Let me think here.  Off the top of

Page 221

1 my head, probably for the jail -- I'm just going
2 to give you a top of my head ballpark, roughly
3 $180,000 annually.
4     Q.   And similar to the other costs that
5 we talked about today, that figure does not
6 tease out which costs are related to illicit
7 drugs versus which costs are related to
8 prescription opioids?
9     A.   That is correct.
10     Q.   Okay.
11     A.   Now -- and I would also make the
12 point that remember earlier when we discussed,
13 on the jail in particular, my cost analysis was
14 higher on the jail than this one, so -- not only
15 in terms of not being able to say what they
16 included and didn't include, that $180,000
17 figure, based on my numbers, could be higher
18 than what is in here, if it is in here, just
19 based on the pro rata comparison.
20     Q.   Moving on to the next bullet point,
21 "Costs of training emergency and/or first
22 responders in the proper treatment of drug
23 overdoses," is that something you looked at in
24 connection with your November analysis and then
25 going forward?

56 (Pages 218 - 221)

Page 222

1    A.    Not in -- not specifically.  So at
2 the county -- this is one of those cost items
3 that's probably more relevant to the -- like the
4 City of Akron.  We don't have fire and EMS
5 services at the county.  EMS would be one of the
6 big ones on that.  Even our sheriff's office is
7 limited in terms of the number of communities
8 they provide road patrol in where they might be
9 a first responder responding to that.  I think
10 in total we have about 70 sheriff deputies out
11 of the pool of 300 and some, roughly, sheriff
12 deputies, so -- and in those rotary communities
13 that pay us for those services, I did not, in my
14 analysis, include any of the -- any of those
15 deputies' costs, training costs, or the revenues
16 that support that back to those communities in
17 this analysis.
18    Q.    Okay.
19    A.    So I would say that that -- to the
20 extent any of that's included, it's got to be
21 fairly nominal.
22    Q.    So the cost to Summit County in this
23 category would be nominal?
24    A.    Yes.
25        MS. RANJAN:  Can we go off the

Page 223

1 record for just a second?
2        THE VIDEOGRAPHER:  Off the record at
3 2:41.
4        (Recess had.)
5        THE VIDEOGRAPHER:  On the record,
6 2:42.
7 BY MS. RANJAN:
8    Q.    Mr. Nelsen, moving on to the next
9 category, "Costs associated with providing
10 police officers, firefighters and emergency
11 and/or first responders with naloxone," do you
12 have an estimate for how much Summit County
13 estimates its costs have been related to that
14 category?
15    A.    Yes.  The only naloxone costs that I
16 found in the research we did on this was through
17 the ADM Board, and those costs were fairly
18 nominal, too.  I think that number was under --
19 I'm going to say it was under $40,000.
20    Q.    And those would be included in the
21 ADM figures that you've already given us today?
22    A.    Yes.
23    Q.    Moving on to the next category,
24 "Costs associated with emergency responses by
25 police officers, firefighters and emergency

Page 224

1 and/or first responders to opioid overdoses,"
2 do you have an estimate for the cost to Summit
3 County in that category?
4    A.    Our costs, or at least in my
5 analysis that I provided, did not include any
6 costs for emergency responses to opioid
7 overdoses.
8    Q.    And sitting here today, do you have
9 a figure for how much those services, as it
10 relates to the opioid crisis, have cost Summit
11 County?
12        MR. PENDELL:  Objection to form.
13    A.    Again, as I mentioned, we only -- we
14 don't have fire and EMS services at the county.
15 We --
16    Q.    So this would be more of a city
17 cost?
18    A.    It really is a city cost, yeah.
19    Q.    Okay.
20    A.    We do have those community patrols,
21 but those communities pay us for those, and I
22 did not include those in this -- in my analysis
23 anyway.
24    Q.    Taking a look at the list overall,
25 are there any other categories in here that you

Page 225

1 would say are more city costs and not county
2 costs?
3    A.    I'm not aware of any costs that we
4 would incur on cleanup of public park spaces
5 and -- well, I guess I should take that back.  I
6 don't know if the -- we did not include costs
7 like for the sanitary sewer department of the
8 county.  They could have cleanup costs, but
9 those were not identified.
10    Q.    Okay.
11    A.    We don't -- we the -- there is a
12 Summit County MetroParks that's a separate
13 political subdivision that's not part of this,
14 so we don't have costs with that.
15    Q.    Turning your attention to the third
16 from the bottom bullet point, "Losses caused by
17 decreased business investment and tax revenue,"
18 do I understand your testimony from earlier
19 today to be that you, sitting here today, cannot
20 assign a dollar figure to that?
21    A.    We have not assigned a dollar figure
22 to that.  I think the report provided by the
23 damages experts and economists assign a figure
24 to that, but I have not done an internal study
25 on my own of that.

57 (Pages 222 - 225)

Page 226

1    Q.    And speaking on behalf of Summit
2  County sitting here today, you do not know how
3  that figure was arrived at; is that correct?
4    A.    Their figure?
5    Q.    Yes.
6    A.    No.  I have not been provided that
7  level of detail.
8    Q.    Let's go to the next bullet point,
9  "Plaintiff's contributions to the Alcohol, Drug
10 Addiction and Mental Health Services Board."
11        We talked about those costs to
12 Summit County already, right?
13   A.    Yes.
14   Q.    And the next one, "Increased public
15 safety services, including but not limited to,
16 training, investigation, staffing," et cetera,
17 we talked about those costs already today as
18 well?
19   A.    Yes.
20   Q.    Going to the fourth from the bottom
21 bullet, "Loss of tax revenue due to decreased
22 efficiency and size of the working population,"
23 et cetera, again, do I understand your testimony
24 to be that you do not have a dollar figure to
25 assign to that category today?

Page 227

1    A.    My belief would be that would be
2  part of that 743 million dollars the experts --
3  and, again, I didn't -- I haven't seen how they
4  calculated that and I have not done my own
5  separate calculation of that.
6    Q.    Costs associated with the increased
7  burden on Plaintiff's drug courts, have we
8  talked about that already today?
9    A.    We do have drug -- a drug court, and
10 we have grant funding for that, so that drug
11 court costs were not included in this -- in my
12 analysis.
13   Q.    Because the increased burden on the
14 drug courts, that is -- those are -- let me
15 rephrase that question.  The costs that are
16 associated with the drug courts, that's funded
17 by grant money?
18   A.    Yes.  Now, let me think through
19 this.  So the drug court itself, the services
20 that are provided by the drug court are provided
21 by Oriana House, so all of the treatment
22 services and any -- typically those don't
23 involve incarceration, but monitoring,
24 treatment, probation, Oriana provides that.  The
25 grant pays for that.  The court's time and

Page 228

1  staffing of that would be included in the common
2  pleas court costs that were included in my
3  analysis that -- that, again, I didn't -- you
4  know, I didn't participate in these
5  calculations, but mine were very similar, at
6  least in 2016, to the court of common pleas
7  costs on this Exhibit 4.
8    Q.    Okay.  Taking a look at -- and I
9  want to make sure you're looking at the bullets
10 that are on page 89 as well as the ones that are
11 on page 88.
12   A.    Um-hum.
13   Q.    Is there any category of costs
14 that's listed here that you would say is a
15 significant driver of costs related to opioids
16 that we have not already discussed today?
17        MR. PENDELL:  Objection to form.
18   A.    I got to tell you, I think in some
19 way, shape or form we have touched just about --
20 we didn't talk about fleet vehicles, but I did
21 not -- we had some debate about this, but I did
22 not feel that we should assign a cost, on the
23 county's side anyway, to vehicle fleet
24 replacement.
25        As I've mentioned earlier, one of

Page 229

1  the things that, in order to address this, we've
2  had to do is put off replacing fleet vehicles,
3  and I suppose there is some future costs that we
4  could estimate in terms of catching up with
5  that.
6        But no.  I got to tell you.  I think
7  throughout the two depositions I've done, we've
8  pretty much gone through really every major cost
9  center of the county at least.
10   Q.    Turning your attention to the list
11 on pages 94 through 95 -- and I believe this is
12 a list of treatment and recovery services that
13 Summit County offers.
14   A.    Okay.
15   Q.    Are these the ones that are funded
16 through the ADM Board?
17   A.    These certainly look like the list
18 of service providers ADM funds.  Now, like --
19 now -- but let me make the distinction.  Like
20 Summa Akron City Hospital, I don't know that --
21 I'm not sure if ADM provides funding to them or
22 this is -- you know, Summa itself provides that
23 funding.  But, yeah, this is -- this is
24 representative of the service providers that ADM
25 uses.

Page 230

1    Q.   And so the funds that were provided
2  to fund these treatment and recovery services
3  would be included in the costs that you've
4  already estimated related to the ADM Board?
5    A.   That's correct.
6       MS. RANJAN:  Let's go off the
7  record.
8       THE VIDEOGRAPHER:  Off the record,
9  2:51.
10      (Recess had.)
11      THE VIDEOGRAPHER:  On the record,
12  2:59.
13      MR. BERGMAN:  Before we get started,
14  can I just announce my appearance really quick
15  for the record?  I forgot to mention it earlier.
16  Andrew Bergman on behalf of Endo and Par.
17      MR. KEYES:  You're now official.
18      MR. BERGMAN:  Great.
19      EXAMINATION OF BRIAN NELSEN
20  BY MR. NAEEM:
21    Q.   Mr. Nelson, I really just wanted to
22  follow up on one of your answers to make sure I
23  understood it.  What I wrote down was -- and
24  this is towards the end of your testimony, so
25  just a few minutes before we broke.  I thought

Page 231

1  that what I heard you say was that when you were
2  doing your analysis, you did not include grants
3  in making that calculation, and my question is,
4  simply, why didn't you include grants?
5       MR. PENDELL:  Objection to form.
6    A.   We only -- we made the decision not
7  to include federal and state-funded dollars in
8  our assessment, really just the money that local
9  Summit County taxpayers were paying to Summit
10  County government for those services.
11    Q.   And when you say "we," who is the
12  "we"?
13    A.   "We" being the administration within
14  the executive's office.
15    Q.   Okay.  Earlier when you were talking
16  about Summit Public Health, you mentioned that
17  it's not technically a part of the Summit County
18  government?
19    A.   That's correct.
20    Q.   Is that also accurate for the ADM
21  Board?
22    A.   No, that is not.  ADM Board is
23  actually -- it is actually an agency within
24  Summit County government.
25    Q.   Okay.  And when you did the

Page 232

1  calculations we've been discussing throughout
2  the course of the day for that specific entity,
3  is it also accurate that you did not include
4  grants in coming up with the ADM dollars
5  allegedly attributable to the opioid crisis?
6    A.   That's correct.  We just used their
7  local levy dollars and identified just that
8  portion.  So if we paid a bill and two thirds of
9  it was levy and one third was federal or state
10  money, it was just that two-thirds portion that
11  we included.
12    Q.   Okay.  Now, when you were looking at
13  that ADM opioid-related service and dividing up
14  between, you know, what portion was grant versus
15  general revenue fund, did you also make that
16  division for any employee cost and benefit cost
17  associated with providing that service?
18    A.   Yes, because there -- we did a
19  time -- ADM in particular provided a time
20  breakdown and funding breakdown for their
21  employees.
22    Q.   Now -- and I just have to tie this
23  off then with respect to what I believe was the
24  30(b)(6) Depo Exhibit 4, which is the expert one
25  page that we've discussed.  Do you have any

Page 233

1  knowledge one way or the other as to whether on,
2  for example, that ADM line item that Summit's
3  experts used the same method that you did to
4  exclude grants and to assign for employee costs
5  the difference between grant dollars and general
6  revenue dollars?
7    A.   I do not.
8       MR. NAEEM:  I don't have anything
9  further.
10      MR. PENDELL:  Anyone on the phone
11  have a question in the five minutes we have
12  left?  I'll take that as a no.
13      We don't have any questions.  We
14  thank you for your time and we will reserve the
15  right to read and sign.
16      THE VIDEOGRAPHER:  Off the record,
17  3:02.
18
19      (Deposition concluded at 3:02 p.m.)
20      - - - - -
21
22
23
24
25

59 (Pages 230 - 233)

Page 234

1  Whereupon, counsel was requested to give
2  instruction regarding the witness' review of
3  the transcript pursuant to the Civil Rules.
4
5         SIGNATURE:
6  Transcript review was requested pursuant to
7  the applicable Rules of Civil Procedure.
8
9         TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1         I do further certify that I am not a
2  relative, counsel or attorney for either party,
3  or otherwise interested in the event of this
4  action.
5         IN WITNESS WHEREOF, I have hereunto set
6  my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 29th day of January, 2019.
8
9
10
11
12  _Renee L. Pellegrino_
13 Renee L. Pellegrino, Notary Public
14 within and for the State of Ohio
15
16 My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25

Page 235

1         REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3                       ) SS:
4  County of Cuyahoga.  )
5
6         I, Renee L. Pellegrino, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, BRIAN NELSEN, was by
10 me first duly sworn to testify the truth, the whole
11 truth and nothing but the truth in the cause
12 aforesaid; that the testimony then given by the
13 above referenced witness was by me reduced to
14 stenotypy in the presence of said witness;
15 afterwards transcribed, and that the foregoing is a
16 true and correct transcription of the testimony so
17 given by the above referenced witness.
18         I do further certify that this
19 deposition was taken at the time and place in the
20 foregoing caption specified and was completed
21 without adjournment.
22
23
24
25

Page 237

1              Veritext Legal Solutions
2                 1100 Superior Ave
                     Suite 1820
3               Cleveland, Ohio 44114
                Phone: 216-523-1313
4
   January 29, 2019
5
   To: Michael J. Pendell
6
   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 3196704
8
   Witness:  Brian Nelsen      Deposition Date:  1/24/2019
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 238

```
1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3196704
3    CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 1/24/2019
4    WITNESS' NAME: Brian Nelsen
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have made no changes to the testimony
     as transcribed by the court reporter.
8

9    Date _____     Brian Nelsen
10       Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17

18       _____
         Notary Public
19
         _____
         Commission Expiration Date
20
21
22
23
24
25
```

Page 240

```
1         ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2         ASSIGNMENT NO: 1/24/2019
3    PAGE/LINE(S) /      CHANGE      /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____

     _____      _____
20   Date            Brian Nelsen
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23
         _____
         Notary Public
24
         _____
25       Commission Expiration Date
```

Page 239

```
1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3196704
3    CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 1/24/2019
4    WITNESS' NAME: Brian Nelsen
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9        I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
     Date           Brian Nelsen
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed.
21       I have affixed my name and official seal
22   this _____ day of_____, 20____.
23
         _____
         Notary Public
24
         _____
25       Commission Expiration Date
```

61 (Pages 238 - 240)

[& - 2013]

| & | | | |
|---|---|---|---|
| **&**   2:10,14 3:2,7 9:15,20,22 | **126**   6:23,24 | **177**   5:9,13 | **20005**   2:16 |
| | **127**   6:24 | **178**   7:18,18 | **2000s**   164:7 |
| **0** | **12:21**   127:5 | **179**   7:19 | **2003**   33:5 34:14,25 35:4,19 36:11 37:15 |
| **001084232**   5:8 68:13 | **12th**   2:15 | **18**   1:12,14 5:7,11 23:23 31:19 68:11 122:2 142:23,23 176:23 | |
| | **13**   17:14 143:21 | | **2006**   183:8 191:10 191:13 192:1,22 194:16,22 195:7 197:8,10,12 201:5 201:6,7 |
| **09**   29:25 | **13.7**   193:15 196:2 | | |
| **1** | **134**   6:25 | | |
| **1**   5:5 11:16,22 163:4 | **135**   7:3 | **180,000**   221:3,16 | |
| | **14**   121:16,17 143:21 165:3 | **181**   7:19 | |
| **1.8**   44:20 | | **182**   7:20 | **2007**   16:18 17:4,20 18:3 33:4,5,22 34:11,14,25 35:4 35:19 36:11 37:15 37:20 193:1 195:2 207:12 |
| **1/24/2019**   237:8 238:3 239:3 240:2 | **141**   7:3 | **1820**   237:2 | |
| | **148**   7:4,4,5,5 | **183**   7:20,21 | |
| **10**   4:8 29:25 | **149**   7:6,6,7 | **184**   7:21 | |
| **10,000**   47:16,20 | **15**   41:17 52:13 121:23 137:13 138:17 139:5 144:2 170:3 194:6 | **187**   7:22,22,23 | |
| **100,000**   47:17 | | **188**   7:23,24,24 | |
| **10018-1405**   3:9 | | **189**   7:25 8:3,3 | **2008**   23:16 29:16 29:24 33:4,22 34:11 37:20 193:4 194:4 195:15 208:5 |
| **102**   6:15,16 | | **190**   8:4,4 | |
| **103**   6:16 | **150**   7:7,8,8 | **191**   8:5 | |
| **107**   6:17,17,18 | **151**   7:9,9 | **193**   8:5 | |
| **10:27**   52:4 | **152**   7:10,10 | **194**   8:6 | |
| **10:44**   65:13 | **153**   7:11,11 | **195**   8:6 | **2009**   193:7 195:18 206:20,21,23 207:25 208:4 |
| **10:47**   65:16 | **154**   7:12,12,13 | **196**   8:7 | |
| **11**   5:5 12:5 29:25 200:6 | **155**   7:13 | **197**   8:7,8 | |
| | **156**   7:14,14,15 | **198**   8:8 | **201**   1:22 8:10 |
| **11.8**   193:6 195:18 | **16**   38:19 44:22 47:24 52:13 121:24 137:13 138:17 139:5 144:3 167:20 168:13 | **199**   8:9,9 | **2010**   38:17,19 39:1 39:17,20 40:1,6,17 41:4,12 42:13,15 43:15,25 44:13 164:10 193:10 195:21 |
| **1100**   3:4 30:3 237:1 | | **1:48**   202:25 | |
| | | **2** | |
| **113**   6:18,19 | | **2**   4:3 5:6 68:6,9 69:3 87:13 177:14 | |
| **114**   6:19 | | | |
| **115**   6:20,20,21 | **164**   7:15 | **2,000**   23:18 | |
| **116**   6:21 | **168**   7:16 | **20**   40:9 42:4,18 44:3,12,24 53:19 54:1,5,14 55:1 72:22 87:13,15 157:25 216:17,22 238:16 239:22 240:22 | **2011**   44:20 193:12 195:24 |
| **117**   6:22 | **17**   1:7,10 38:19 39:2 47:24 52:14 122:2,3 136:13 143:1,1 193:18 196:5 213:10 | | |
| **12**   17:14 127:2 236:16 | | | **2012**   193:15 196:2 206:16,17,20 207:7,22,24 |
| | | | |
| **12.3**   193:9,12 195:21,24 | | | **2013**   84:14 88:6 121:6,7,10 125:1 129:24 137:8,14 137:17 138:22 139:19 140:22 |
| **123**   6:22 | **171**   7:16,17 | **200**   8:10 23:17 29:23 190:16 | |
| **125**   6:23 | **172**   7:17 | | |
| | **175**   2:20 | **200,000**   109:16 | |

[2013 - 3.2]                                                                    Page 2

141:9 143:15
148:3 149:4,14
159:3 160:9 161:9
163:23 164:4,16
166:23 170:17,22
171:8,18 173:15
174:13 175:9,25
183:10 191:1
193:19 196:5,13
196:16,20 197:4
197:11,14,17
200:19 201:3,11
201:12,13,25
202:3 203:7 204:4
206:6
**2014** 23:17 30:1
41:16 52:13 54:3
54:8,14 84:14,14
85:17 120:11
121:12 137:3
139:17 159:1
160:6 161:7
163:21 166:21
170:9 175:20
191:1 194:6,13
201:13
**2015** 23:17 29:16
30:3 44:18,22,24
53:1,22 54:14
74:17 82:13 85:18
108:5 111:8,19,22
111:23 112:11,13
112:14,16,22
113:5,17,25
120:11 121:20
136:23 137:1
138:25 139:15
158:24 160:4
161:5 163:19
165:3 166:19
169:11 170:2,5

175:21 201:13,14
206:10,15 207:19
207:21
**2016** 23:2,19 26:2
30:3 39:2,20 40:6
40:8,9,12,17 41:4
41:12 42:2,16,20
43:5,21 44:14,25
53:2,6,9 54:22
74:18 87:13 88:3
88:7 111:22 114:7
114:15,18 122:25
133:12 136:18,21
136:24 137:22
138:15,25 139:13
143:19 148:3
149:5,14 158:22
160:2 161:1
163:17 166:17
169:9,16,22
179:12 183:5,7,10
192:13 199:14
203:7 204:4 206:7
228:6
**2017** 5:7 23:3,19
26:3 29:18,19
40:14 53:17 54:25
68:12 89:17 92:8
108:5 111:8
113:25 114:7,16
115:7 121:25
122:1,25 129:22
133:11,15 135:15
136:12 137:22
138:15,18,20
139:11 142:24
143:5,19 145:4,7
145:18 146:1,8
147:3 158:20
159:21 160:24
162:5 163:13

164:16 166:15
169:5,16,20
170:22 171:8,18
179:3,9 192:13
199:15,20,23
202:3,8,14 207:10
**2018** 5:12 38:5
55:4 115:7 122:7
122:8 133:11,15
136:7,8 138:20
139:9 142:21
145:11 146:2,4,24
157:15 158:4,16
159:5,15 160:12
160:19,21 161:11
161:18,21 162:4,5
165:7,19 166:12
167:2,6 168:8
172:1 174:2,13
175:12 176:24
204:17 206:9,12
207:10,19 208:4,5
**2019** 1:18 9:3
115:7 123:7,15
125:5 142:3,9,16
157:18,18 159:9
236:7 237:4
**202** 2:16 8:11,11
**2020** 236:16
**2025** 23:5 27:16,22
47:11
**2027** 204:17
**203** 8:12
**204** 8:12
**209** 8:13,13,14
**21** 5:12 12:5
157:25 176:24
**210** 8:14
**211** 4:9 8:15,15
**212** 3:9 8:16

**214** 8:16
**215** 5:15
**216** 3:5
**216-523-1313**
237:3
**216-9229** 2:5
**217** 8:17
**22** 12:5 87:15,16
**220** 8:17,18
**2200** 30:4
**2227** 236:12
**224** 8:18
**228** 8:19
**230** 4:10
**231** 8:19
**235** 4:12
**24** 1:18 44:22
170:7,11,19
**24th** 9:2
**25** 15:24 16:3
**25,000** 131:4
**250** 124:1
**26** 170:7,11,19
**27** 53:6,10 54:22
**28** 2:4
**2804** 1:6,7
**288-2805** 2:21
**29** 237:4
**29464** 2:5
**29th** 236:7
**2:16** 203:3
**2:41** 223:3
**2:42** 223:6
**2:51** 230:9
**2:59** 230:12

**3**

**3** 5:9 108:3 111:7
176:19 177:11,14
185:25
**3.2** 111:21,25
112:6 114:1 115:9

**[3.2 - accepting]**                                                                                   Page 3

115:16,21,23
116:11
**30**   1:17 11:15,22
11:23 12:25 15:10
15:24 16:3 23:7
27:23 28:1 68:6,8
69:3 176:18 177:3
177:11,12,19
180:24 182:13,21
183:20,24 184:12
185:14,25 188:7
191:5 204:10
211:4 215:13,23
219:18 220:2
232:24
**300**   30:1 222:11
**300,000**   124:1
**3196704**   237:7
238:2 239:2
**325**   3:12
**37**   6:3,3 12:5
**38**   12:6
**39**   23:23,24 31:22
**3:02**   233:17,19

**4**

**4**   5:13 177:4,12,19
180:24 182:13,21
183:20,24 184:12
185:1,14 188:7
191:5 204:10
211:4 218:24
219:18,21 220:2,2
228:7 232:24
**4,000**   42:3
**40**   39:17 40:2 44:2
**40,000**   223:19
**400**   30:1 200:7
**400,000**   214:9
**4000**   2:11
**40507**   2:20

**42**   149:15
**43215-2673**   3:13
**434-5186**   2:16
**44113-7213**   3:4
**44114**   237:2
**45004**   1:10
**45090**   1:12
**45132**   1:14
**469-3939**   3:13

**5**

**5**   4:4 5:15 162:10
168:4 172:19
215:14,23
**50**   1:22
**50,000**   131:6
**54**   6:4 23:24 31:20
31:22
**576-2400**   2:12
**58**   6:4
**59**   6:5 31:20
**592-5000**   3:5

**6**

**6**   1:17 4:5 11:15
11:22,23 12:25
15:10 68:6,8 69:3
176:18 177:3,11
177:12,19 180:24
182:13,21 183:20
183:24 184:12
185:14,25 186:1,1
188:7 191:5
204:10 211:4
215:13,23 219:18
220:2 232:24
**6.8**   191:9 192:22
194:15,19 195:11
**60**   167:6 168:14
200:5
**614**   3:13

**620**   3:8
**65**   6:5
**66**   23:1
**66,000**   23:2 26:2
**67**   6:6
**68**   5:6
**69**   6:6

**7**

**7.2**   192:25 195:1
**70**   222:10
**7000**   2:11
**71**   155:18
**713**   2:12
**72**   6:7
**725**   2:15
**734**   186:4,25 187:3
187:17 188:1
190:13
**743**   227:2
**75**   200:21 201:4
**75,000**   145:24
146:4,7,23 147:1
**760,000**   174:9
**77**   6:7,8,8
**770**   30:2
**77002-2755**   2:12
**78**   6:9
**79**   6:9

**8**

**8**   68:5 186:20
**8.3**   193:3 195:15
**80**   6:10,10,11
**83**   6:11,12
**836**   42:3
**84**   6:12
**841-1104**   3:9
**843**   2:5
**85**   6:13 155:18
**859**   2:21

**87**   6:13 216:17,18
**88**   217:15 228:11
**89**   217:16 228:10

**9**

**90**   6:14 15:20
18:24 42:8,22,23
43:9
**90,000**   23:6 27:16
47:12
**900**   208:6
**90s**   191:23 192:4
**92**   6:14
**94**   6:15 229:11
**95**   229:11
**950**   3:4
**9:08**   1:19 9:2
**9:58**   52:1

**a**

**a.m.**   1:19
**aa**   168:20
**aarnold**   2:6
**aaron**   1:8
**abatement**   72:7
75:13
**ability**   124:11
198:16
**able**   87:5 96:12
113:21 119:20
123:6,11 124:16
126:19,22 134:18
147:14 167:20
174:12 188:9
189:3 221:15
**abuse**   83:25 84:10
85:7 109:19
209:13
**accept**   162:16
172:9,19
**accepting**   165:9

**accompanied**
39:16 47:9
**accounting** 86:8
**accurate** 16:12
59:2 140:22 141:1
170:21,25 171:17
171:20,23 231:20
232:3
**accused** 94:16,23
95:13 96:3 97:11
**acknowledge**
238:11 239:16
**act** 238:14 239:20
**action** 172:13
236:4
**actively** 202:9
**activities** 104:11
**actual** 63:22 79:5
88:7 91:23 105:3
**ad** 220:19
**add** 141:5 163:25
167:6,21 190:12
**added** 131:7,8
136:21 141:2,3
158:12 160:18
161:21 164:18
166:5,5,10 172:2
181:1
**addicted** 152:15
153:5,20 154:15
**addiction** 73:5,13
103:18 155:5,20
156:16 158:10
209:14 218:10
219:15 226:10
**adding** 137:12
168:12
**addition** 111:24
142:6,11 176:6
**additional** 89:2
111:25 129:4

130:4,11 131:2,7
131:13 132:3,4,8
132:24 134:2
135:1 136:22
137:12,25 138:7
139:3 157:19
158:13 159:10,19
161:21 162:25
163:25 164:9
167:7,24 168:18
168:25 169:13
172:5,18,22
173:16 174:10,10
176:9 184:3 185:3
211:16 213:1
**address** 86:14
89:1 92:4 112:1
126:14 207:14,16
229:1 237:15
**addressing** 111:24
**adjournment**
235:21
**adm** 16:12 17:4,7
17:13,21 18:1
49:10,11 63:16,18
63:22 64:11 65:21
66:1,3,5,22 67:8
67:10,14,25 69:4,9
69:10 70:11 72:4
72:9 73:2,7,14
74:7,13 75:7,22
77:16,23 78:10
79:19 80:20 81:6
82:16 83:4,10
88:11 101:2,8,13
101:21 102:10,14
105:12,13,22,25
106:17,24 107:9
108:1,6,22 111:7
111:17 112:14
113:16,25 114:17

114:21,22 115:1,2
116:24 117:3
157:15,18 158:4,8
158:12,14,16
192:13 196:22
198:6,19 207:3,12
212:14,15 219:6
223:17,21 229:16
229:18,21,24
230:4 231:20,22
232:4,13,19 233:2
**adm's** 74:24
220:19
**admin** 173:10,13
**administer** 48:6
**administration**
193:25 231:13
**administrators**
13:5
**adult** 163:1 175:1
175:8 176:5 213:1
**advance** 66:12,14
66:15 69:20 76:2
76:17 116:10
**advisement** 21:1
**advisory** 114:24
**affixed** 236:6
238:15 239:21
**afford** 123:9,11
142:12
**afforded** 129:7
**afloat** 138:20
147:21
**aforesaid** 235:12
**age** 10:7 23:13,22
23:23,24 28:15
31:16,19,22
**agencies** 72:21
78:6 101:3,19
103:4 108:20
180:4,12 207:3

212:14 219:7
**agency** 52:23
82:13 131:5
161:15 231:23
**ago** 16:14,16
120:17 140:3
168:1
**agreed** 122:20
138:6 141:7
**agreement** 118:24
119:2
**agreements**
118:20 119:6
123:17
**ahead** 37:11 91:12
125:23 154:4
**aid** 97:11
**akearse** 2:7
**akeyes** 2:17
**akron** 1:22 2:2
5:15 9:5,14 15:16
89:8 215:15 222:4
229:20
**al** 1:9,10,12,14
**alcohol** 168:21
174:22 226:9
**align** 123:10
**allegedly** 232:5
**allow** 105:9
167:14
**allowed** 91:11
93:10,12 147:17
**allowing** 198:19
**alluded** 32:7
**alternative** 100:6
162:21 163:8
165:24 166:6
167:12 173:20,24
174:24 219:5
**alternatives**
162:19

[amended - assignment] Page 5

**amended** 5:5,15
11:16,23 215:16
**amerisourceberg...**
2:18 10:1
**amount** 86:2 92:3
111:20 112:18
115:6 146:11
147:11 186:3
187:5
**amounts** 61:21,24
78:14 99:24
**analogs** 134:10
**analogy** 129:6
**analyses** 62:16,19
180:17,19 181:5
189:22 190:1,7
205:21 208:8
209:5
**analysis** 24:19,21
24:22 25:2,4
26:14,18 43:21
46:10,23 50:19
52:11,15,20 55:24
56:14 57:7 66:3
67:5 68:24 74:24
75:18 88:5,16,19
89:8,11,16,18
91:25 92:10,22
93:3,22,25 94:2,7
105:10 129:22
135:16 179:3,9,11
179:20 182:2,3,9
182:15,17,20
183:9 184:2,3
185:19,22 188:20
190:5 191:12,13
201:5 204:7 206:6
208:18,22 209:12
209:17,19,23,25
210:4,6,12,14,19
210:21,25 212:5

212:19,24 213:4,6
213:10,11,21,22
214:14,16 217:24
218:12,25 220:13
221:13,24 222:14
222:17 224:5,22
227:12 228:3
231:2
**analyze** 46:5
**analyzed** 46:18
218:12
**analyzes** 201:6
**analyzing** 196:22
197:22 198:11
**ancillary** 96:10
**andrew** 2:3,10,15
9:10,15 230:16
**andrew.bergman**
2:13
**andy** 65:9
**angela** 49:14 79:7
**anne** 2:4 9:12
90:25
**announce** 230:14
**annually** 112:7
221:3
**answer** 12:14
14:24 37:8 51:14
51:20,22 58:3,5,9
58:13 59:9 63:11
67:24 77:11 91:14
93:16,19 106:22
107:4 132:23,23
134:1,7 148:1,20
150:4,19 151:13
151:14,22 152:7
156:3,5 159:24,25
169:8 171:17
174:4 196:15,15
199:9 202:19
217:19 220:3

**answered** 78:15
171:22
**answering** 12:15
168:11
**answers** 15:4
173:5 199:13
201:12 202:2,3
219:22 230:22
**anybody** 49:16
60:12 154:14
155:13 199:21
**anymore** 162:17
163:7
**anyway** 224:23
228:23
**apart** 141:7
**apologize** 113:13
113:15 211:19
**appear** 238:11
239:15
**appearance**
230:14
**appearances** 2:1
3:1 4:3
**appended** 239:11
239:18
**applicable** 234:7
**apply** 204:3,7
**appointed** 95:1,2,7
97:20
**approaching**
74:20
**appropriation**
114:1,12
**approved** 114:23
146:7,8,22 147:2
159:12 167:23
**approves** 119:4
**approximately**
146:23 186:4

**areas** 106:12
217:25
**arising** 210:8
**arms** 201:21
**arnold** 2:3,10 9:10
9:10 12:22 13:9
72:18 92:24
102:18 107:3,17
113:2 126:6
152:11 156:20
212:11 220:15
**arrested** 104:4
156:17
**arrived** 179:13,15
185:16 186:8,12
204:19 205:11
226:3
**arriving** 190:18
**articulated** 93:11
**asked** 14:22 56:17
61:21 66:4,6,8
116:15 130:18
151:1 156:9,11
157:10 171:22
172:25 176:9,11
177:18 178:13
186:7 189:20
**asking** 59:23
73:22 82:18 84:21
86:1,2 131:23
135:10 151:2
171:16 189:21
201:10 216:16
**asks** 216:22
**assessment** 231:8
**assign** 220:22
225:20,23 226:25
228:22 233:4
**assigned** 225:21
**assignment** 238:2
239:2 240:2

assist 164:9
assistance 96:7,13
96:15,19 106:5
associated 98:12
104:1 129:14
131:3 215:1,3,7
223:9,24 227:6,16
232:17
association 13:5
22:12,18,24 23:1,5
24:4,6,13 25:7,16
25:16,20 26:1,17
26:19,25 30:22
31:2,7,14 34:9
36:19,21 47:8
48:8 191:16 194:1
205:4
association's 24:9
assume 37:12
137:4 148:10
150:6 187:23
217:13
assumption
150:11 151:15,17
attached 239:7
attachment 5:8
68:12
attempt 60:19
120:5 122:12
attended 49:9
attention 38:23
112:13 165:5,17
175:1 185:24
202:1 204:9
225:15 229:10
attorney 93:19
97:21 236:2
attorneys 13:9
14:8,12 15:13
49:4,7 83:22
95:11 192:12

attributable 27:11
27:19 37:4 40:3
40:18,22 41:1
42:20 50:6 51:11
52:8 55:10,13
58:18 59:15 60:21
130:4 204:5 232:5
attribute 202:16
attributed 33:7
39:19 42:5
august 5:7 68:11
authorize 239:11
autopsied 134:25
autopsies 117:9
117:24 119:10,14
123:23 124:12
125:12 126:4,10
126:20,23 127:10
127:21,22 128:16
128:19 129:1,5,15
129:18 130:2,4,11
130:22 131:25
134:11 138:10
142:16 143:5,12
143:16 144:2,11
144:20,24 145:17
145:21 146:4,14
146:20,24 147:2,7
autopsy 37:6
118:1,22 119:5
123:19 124:2,17
124:20,22 125:20
128:3 132:11,13
132:21 142:6
143:24 145:20
available 12:16
13:4 32:8,15 53:4
133:20 174:17
176:10 206:25
ave 237:1

avenue 3:4,8
average 23:7
awaiting 94:16
awards 79:5
aware 63:12 84:13
85:6 152:13 153:3
153:16 154:5
178:9 190:24
192:15 195:10
200:8,13 201:24
214:4 225:3
aways 23:20 24:1
25:8

**b**

b 1:17 11:15,22,23
12:25 15:10 68:6
68:8 69:3 176:18
177:3,11,12,19
180:24 182:13,21
183:20,24 184:12
185:14,25 188:7
191:5 204:10
211:4 215:13,23
219:18 220:2
232:24
back 13:1 16:25
17:15 23:16 33:4
33:22 43:15 57:8
61:22 63:22 64:2
88:21 120:17
121:24 126:8,22
129:22 134:15
135:15 137:11
138:8 159:4,14
161:2 162:20
165:4 167:21
168:13 179:8
181:25 183:8
186:13,16 188:6
189:13 190:19
191:12,15,23

192:1,4 193:23
194:4 197:7,10,12
200:5 201:4,6
212:18 215:2
218:19 222:16
225:5 237:15
backlog 124:8
144:8
bakerlaw.com
2:13
balances 112:1
balancing 207:8
ballpark 221:2
barnes 49:11 50:1
50:11,15 51:6,10
52:7 53:8 54:11
55:6,15 56:1,9,21
59:6,11 60:9,25
61:6,12 80:13
81:21 151:24
barr 121:23 125:2
141:24 142:25
143:7,20 144:14
144:17 146:16,18
based 12:15 14:21
16:21 18:19 22:20
26:20,23 29:1
31:9 32:17,25
33:11 34:13 41:20
44:8 45:6 47:4,11
47:15 52:20 56:10
56:18 59:20 85:3
86:8 87:4 102:23
102:24 107:13
117:20 131:11
152:25 181:1
190:15 191:18
203:9 205:5 220:9
221:17,19
baseline 194:3

**bases** 203:24
**basis** 50:24 84:23
  199:24 203:23
  204:25
**bates** 5:8 68:13
**beacon** 201:20
**bear** 190:13
**bears** 95:3 100:23
**beds** 112:4
**began** 17:12 56:15
  64:12 85:18 113:6
  138:18 143:25
  162:18 201:9
  207:4,5
**beginning** 5:8
  44:24 68:12
**begins** 196:12,14
**behalf** 2:2,8,14,18
  3:2,6,11 9:13,16
  9:18,22 10:1
  87:10 93:13 226:1
  230:16
**belief** 28:20 102:3
  165:23 205:15
  218:20 227:1
**believe** 13:17
  16:10 21:25 23:19
  25:13,14,15 26:16
  29:17 30:2,14,15
  32:20 36:16,18
  38:4,11 39:2
  40:15 42:3,23
  43:2,13,16 44:9
  47:8 53:7 54:9
  61:8 62:5,21 63:8
  64:1 65:4 66:13
  68:3,22 69:16,18
  69:21,24 70:22
  76:3,16 79:11
  80:9,23,24 81:15
  82:5 86:7 88:6

103:21 105:24
111:6 112:21
116:3,3 119:5
121:11 123:15
127:7 129:21,23
132:9,25 133:9,17
136:4,11,13 137:9
137:16,20,21,23
142:17 145:4,5
146:6 158:23,25
159:2 160:18,23
160:25 163:20,22
164:8,12,19 166:4
166:14,16,18
175:16 181:25
203:12,15 204:25
213:23 216:9
229:11 232:23
**believed** 15:3 16:8
  17:7 18:7,16,25
**benches** 164:1
**benefit** 232:16
**benefits** 119:25
**benzodiazepine**
  35:14 36:4
**bergman** 2:10
  230:13,16,18
**best** 77:12 93:14
  139:2
**better** 179:6
**beyond** 37:20
  60:13,23 73:13
  78:20 79:23 85:10
  89:22 95:16 117:6
  187:4
**big** 84:4 131:15
  162:11,12 173:12
  178:24 190:18
  222:6
**biggest** 23:23
  117:15 124:6

129:12 130:21
  166:1
**bill** 232:8
**billed** 212:18,18
**billing** 103:6,8
**billion** 195:11
**binding** 91:6
**bit** 13:3 117:4
  179:1 185:9
  211:17 218:6
**black** 47:21
**blank** 84:21
**blew** 192:14
  201:14
**blip** 198:24
**board** 16:12 17:4
  17:21 18:1 49:10
  49:11 63:17,18
  66:22 67:8,11,15
  67:25 69:4,11
  70:11 72:4,9 73:2
  73:14 74:8 75:7
  75:22 77:16,23
  78:10 79:18,19
  80:20 81:6 82:16
  83:4,10 94:8
  101:9,13,21
  102:10 105:12,13
  105:23 108:1,6,22
  108:23 109:6
  110:15 111:7,17
  112:14 113:16,17
  114:1,17,22,24
  115:1 116:24,25
  157:15,19 158:4,8
  158:14,16 159:6,8
  159:16,22 192:13
  194:5 196:22
  223:17 226:10
  229:16 230:4
  231:21,22

**board's** 115:3
**body** 131:3,5
**borne** 66:21 89:3
  98:18
**bottom** 186:1
  225:16 226:20
**bought** 132:4
**boulevard** 2:4
  3:12
**boundaries** 118:2
**brad** 203:15
**brandy** 3:12 9:17
  211:14
**branjan** 3:14
**brannon** 2:19 9:25
  9:25
**break** 26:22 27:17
  28:4,8,25 30:8,16
  34:19 37:13 41:22
  51:13,21,24
  124:24 126:25
  127:8 173:7
  179:23 202:23
  208:9
**breakdown** 31:18
  32:16 33:8 50:19
  214:10 232:20,20
**breakdowns** 33:10
**brian** 1:17 4:7 5:5
  5:7 10:7,12 11:17
  11:24 68:11
  211:12 230:19
  235:9 237:8 238:4
  238:9 239:4,13
  240:20
**bridgeside** 2:4
**brief** 211:17
**briefly** 114:5
  211:24
**bring** 123:11

[bringing - certainly]

**bringing** 125:19
125:19 126:11,13
**broke** 23:12 32:9
39:3 230:25
**broken** 38:25
**brotherhood**
101:4
**brought** 66:10
85:22 199:19
**bryan** 5:7 68:10
**buckets** 87:2
**budget** 10:21
67:12 82:10,16
83:1,4,10 85:19
96:17 109:16
110:7 111:22
119:20 120:24
123:8 128:10
131:16 140:20
157:18 159:9,13
173:9 174:7
195:12 198:15
207:8
**budgetarily** 128:8
**budgetary** 198:20
**building** 3:8
**buildings** 131:18
**built** 191:20 195:7
**bullet** 217:4,16,17
218:7 219:7,13
220:10 221:20
225:16 226:8,21
**bullets** 228:9
**bunked** 168:2
**burden** 227:7,13
**burgess** 49:14
79:7,23 81:11
82:2 83:17
**burling** 3:7 9:20
**business** 84:5
225:17

**busy** 202:12

**c**

**ca** 237:25
**calculate** 57:10
88:22 180:13
**calculated** 57:25
58:7,11 178:15
187:18 190:14,22
204:24 205:8
227:4
**calculating** 25:12
**calculation** 87:10
88:13 227:5 231:3
**calculations** 228:5
232:1
**call** 48:2 51:1
123:16 128:4
142:18 147:14,20
174:24 201:15
**called** 10:7 82:7
162:18
**capacity** 129:13
133:22 134:2
**capita** 48:12,14
**capital** 131:17
207:15
**caption** 235:20
**capture** 103:2
106:14
**captured** 105:7
106:2 107:8
**capturing** 104:6
**car** 131:18
**cardinal** 2:14 9:16
**care** 56:24 119:25
218:9,17 219:14
**carfentanil** 134:10
134:11,15,17,24
**carolina** 2:5
**carve** 204:4

**casa** 166:7
**casc** 167:17
172:14,16 174:6,8
**case** 1:7,10,12,14
20:1,6 59:12,24
60:3,11,13 63:23
63:24 64:1 67:3
85:25 86:18 97:23
97:25 98:1,2,4
102:10,11 105:4
105:25 107:19
118:9 130:20
135:13 147:13,16
159:10 191:24
199:5,15 202:16
237:6 238:3 239:3
**caseload** 63:22
117:20 148:12
**caseloads** 120:23
124:8 129:8
138:16 143:25
148:25 152:22
176:13 204:2
205:5
**cases** 17:10 47:12
50:4,5,19,20 51:11
52:8 53:5 55:8,9
58:16,17 59:13,14
60:20,21 96:2
103:1 118:17,18
118:18 144:8
148:4 149:19
150:8 152:1,5,10
154:12 162:12
166:3 203:6,12
204:1,5 212:17
214:24
**catching** 124:14
229:4
**categories** 23:12
39:1,3,8 87:6

99:20 116:16
179:17 180:7,14
180:20 183:3,4,10
184:3 185:4
208:10 217:4
220:23 224:25
**categorized** 47:15
**category** 39:6,14
41:13,19 56:24
86:18 94:12 95:4
98:9 100:12,15
116:22 173:2
183:12 208:21
216:22 220:9
222:23 223:9,14
223:23 224:3
226:25 228:13
**caught** 38:22
124:16
**cause** 38:25 44:2
106:1 235:11
**caused** 104:14
192:5,8 202:15
225:16
**causes** 102:25
103:3,11 104:1
200:24
**cc'd** 57:23
**cdc** 34:7
**center** 167:13
229:9
**centered** 60:7
**centers** 64:12,14
70:12 179:13,19
**cents** 200:16
**certain** 11:12
104:11 108:19
139:3 214:1,21
215:5
**certainly** 44:8,14
62:22 113:4

[certainly - complaint]                                                    Page 9

154:11 164:23
213:21 220:16,19
229:17
**certainty** 182:4
**certificate** 4:12
235:1 239:11
**certification** 238:1
239:1
**certified** 10:10
**certify** 235:8,18
236:1
**cetera** 226:16,23
**chance** 37:9
**change** 41:5
237:13,14 239:8
240:3
**changed** 17:8
**changes** 137:10,11
237:12 238:7
239:7,9
**changing** 214:2
**charge** 104:14
**charged** 100:2
154:18 155:6
**charges** 104:5,8
**chart** 39:17,18
41:16 47:13
177:19,24 178:20
178:23 179:18
180:23,24 181:7
181:10,13,15
182:12 188:6
189:1,4,7,9,12,15
189:21 191:4,25
192:16,18 204:10
204:12,20 211:4
**charter** 118:9
**charts** 38:24
**check** 30:14
107:15

**chief** 90:6
**child** 50:5 56:24
87:3 152:1
**children** 49:12,12
50:15 52:16,23
53:13 54:12 57:8
62:8,25 63:2
79:18 80:6,15
102:21 108:18,23
109:6 110:15
116:25 159:5,8,15
159:21 201:22
**chose** 218:21
**circulate** 67:25
76:22
**circulated** 66:11
66:13 69:20 76:17
80:14 81:3
**cite** 44:19
**cited** 16:9,10
**city** 1:13 2:2 5:15
9:14 15:16 18:20
89:8 215:15 222:4
224:16,18 225:1
229:20
**city's** 18:20
**civil** 10:9 234:3,7
238:5 239:5
**claim** 218:21
**claimed** 135:6
**claiming** 85:25
86:17 117:14
219:17
**claims** 17:13
**clarify** 169:12
**classify** 72:20
117:3
**cleanup** 225:4,8
**clear** 49:4 161:24
169:15

**cleveland** 1:13 3:4
236:7 237:2
**client** 213:14
**clinics** 202:10
**close** 120:12
183:16
**clr** 1:25
**cocaine** 35:13,25
39:4,9,22 40:23
41:13 195:7
**code** 102:24,25
**coded** 47:21
**coding** 102:11,14
102:21
**cohen** 91:1
**collect** 17:25
**collected** 34:13
**collects** 190:16
**columbus** 3:13
**come** 16:11 84:15
101:13 120:20
123:6,14,18
125:18 142:19
147:10 168:13
181:10 186:22
200:15
**comes** 101:15
129:4 158:9,10
200:15
**comfortable**
214:25
**coming** 69:9
122:19 181:18
198:14 212:6
213:6 220:13
232:4
**comment** 91:18
218:3
**commission**
236:16 238:19
239:25 240:25

**commissioned**
235:8
**committed** 112:9
**common** 101:15
155:21 161:17,20
163:13 164:1,14
165:7 175:4,7
228:1,6
**communities**
222:7,12,16
224:21
**community** 88:1
162:19 167:12
224:20
**companies** 2:9
**company** 10:2
**compare** 179:11
182:21 205:2
206:9,15,20
**compared** 182:3
183:5 184:7,11
189:14 213:22
**comparing** 184:1
**comparison**
183:25 184:8,16
184:17,20 185:1,8
185:12 205:6
221:19
**competitive**
176:14
**compile** 24:15
46:1,5,19 52:19
216:12 218:1
**compiled** 20:14
34:7,7,9 38:12
46:14 64:9 178:17
181:16 183:23
184:9 186:14
211:8
**complaint** 216:1

complete   123:5
200:4
completed   122:21
235:20 237:15
completely   164:23
165:3 172:11
181:20,21 182:6,9
182:16
complicated
118:16
component   31:18
109:24 112:3,4,6
115:20 116:4
130:6
composite   35:1
computation
216:22
computer   20:17
20:18
concerned   51:16
conclude   199:4
concluded   54:14
233:19
conclusion   199:14
conduct   152:5
188:10,16 189:9
190:8
conducted   153:9
confidential   5:14
177:6
confirm   107:1
connect   188:9,14
189:3,8,15,25
190:6
connection   82:23
218:12,13 221:24
connolly   2:14 9:16
considerably
207:4
consideration
127:18 209:2

considerations
18:20
constitutes   25:4
constrained   207:6
consuming   159:19
cont'd   3:1 7:1 8:1
contained   21:8
75:25 78:21
109:11
contemplating
88:20
context   55:17
continue   117:18
128:11 142:11,13
144:19 205:17,18
continued   201:13
207:10
continues   195:17
contract   95:22
98:23,24 105:13
105:15 125:24
131:4,6 142:9,18
158:12
contracting   142:6
158:8
contractors
142:15 143:4,12
143:16,23 144:11
144:15,19,24
145:8,11,14,17
146:3,14,20,23
147:2,6
contracts   106:17
106:24 145:25
146:7
contribute   71:19
73:14 76:11
128:15 191:24
contributing
76:10 104:8 106:9

contributions
226:9
conversation
80:13 82:4 84:16
85:1,4,5 123:4
183:23 199:20
conversations
80:18 81:20 83:17
83:20 92:14,16
93:24 102:22
124:9 192:10,11
192:12 199:22
conversely   104:2
conveyance   207:1
conveyed   135:4
conveying   24:7
convicted   94:15
98:14 99:10,17
100:3,7,9 155:3,6
156:14
conviction   163:7
convictions   205:19
copied   63:1 67:19
67:20 70:19 77:2
copy   69:25
coroner   118:7,8
coroner's   84:20
coroners   118:15
corporate   11:4
12:4 49:23 81:22
corporation   2:18
3:6 91:6
correct   15:11
43:10 47:6 49:8
54:16 56:6 59:21
61:5 70:9 71:13
71:14 74:6 76:12
76:15 79:21 94:19
95:9,14 97:13
98:15,21,24,25
99:3,4,6,7,11

100:3,4,10 107:15
109:19,20 110:24
110:25 114:3,4,16
114:18,19 115:3,5
115:8 119:15
125:2,3,7,12
127:11,17,22,24
128:17,21,24
130:23,24 140:9
141:13,16,19,23
142:4,5 146:21,24
152:3 160:1
164:16 165:10
169:18 171:9
172:6 177:24,25
178:2,3,6,7,11,15
178:18 180:1,5,9
180:10,15 182:19
184:5 185:6
186:10 188:4,5
189:2 203:8
207:20 209:4,9,11
211:10 213:9
221:9 226:3 230:5
231:19 232:6
235:16
corrections   173:21
173:24 237:12
239:17
correctly   28:14
39:25 45:5 54:10
69:2 72:9 76:5
207:17
correlate   194:9
correlation   44:14
44:16
cost   56:18 62:14
62:15,18 64:12,14
64:22,23 65:3,6,19
69:6 70:12 74:24
88:5,16,18 89:1,15

91:24 92:10,22
93:22 94:2,14
95:3 96:11 117:15
117:16 119:22
123:21 124:16
125:9,22 126:12
128:9 135:16,23
135:24 147:5,7
166:1 179:13,19
181:13,14 184:12
185:18,19 189:22
204:6,6,7 208:8,9
208:11,14,21,23
209:5 215:6
217:24 220:16
221:13 222:2,22
224:2,10,17,18
228:22 229:8
232:16,16
**costing** 88:23
**costs** 14:20 19:18
50:7,8,9 56:14,15
56:20,23,25 57:1,2
57:3,4,4,10,13,15
57:19,19,19,25
58:6,10 61:2,7,11
61:13,25 62:4,7,19
62:20,20 64:3,16
64:16,17,18,20
66:21 67:2,4 68:1
69:9,11 70:7,12
74:2,23 75:15,16
78:22 86:11,12,12
86:12,21,21,22,23
86:23,24 87:1,3,6
87:11,12,17,18,18
88:3,8,13 89:2,4
94:12,20,21 95:11
95:15,17,17,18,19
95:19,20,21,23
96:1,1,8,8,10,13

96:18 97:1,2,9,14
97:18 98:8,9,12,16
98:18 99:21,22,23
99:23,24 100:11
100:15,23 103:12
103:24 116:16
117:13,13 119:18
127:19,25,25
128:1,23 129:1,4
129:11,14,15
130:19 131:1,2,7
131:24 132:2,7
135:7,12,17
159:19 162:15
166:3 171:12
179:4,6,7,19 180:3
180:7,8,13,20,25
182:8 183:13
184:4 185:4 191:6
191:9,20 192:1
196:21,22 197:17
197:20 198:12
199:25 200:20
201:6,9 204:4,13
204:16,22 205:2
205:13,17 206:3
209:3,7,13,20
210:1,7,15,22
212:8 214:16,22
214:25 215:1,3
218:8,13,23
219:12,16 220:1,8
220:10,11,17,19
220:23 221:4,6,7
221:21 222:15,15
223:9,13,15,17,24
224:4,6 225:1,2,3
225:6,8,14 226:11
226:17 227:6,11
227:15 228:2,7,13
228:15 229:3

230:3 233:4
**council** 63:6 85:13
85:19 114:24
119:4
**counsel** 9:6 56:17
57:11,21 58:23,25
61:14 62:25 63:3
63:7 64:11 65:22
66:3,6,8 67:17,17
70:2 75:11,17
77:9,10 80:10,24
81:16 89:21 93:1
95:1 97:20 180:11
234:1,10 236:2
**counsel's** 64:11
**count** 206:8,14,19
207:18 208:3
**counties** 47:19
48:3 118:6 176:15
**country** 48:12
125:18
**counts** 33:6 139:2
**county** 1:9,11 2:2
5:9,13,15 9:13
10:17,21 11:5,9
12:5,10,16 13:10
15:17 18:2 19:18
19:20,22 21:15
23:13,19 28:15
29:22 45:2 47:14
47:18,18 48:1,18
48:25 49:23 52:23
63:3,6 71:7,8,9,12
71:13,18,19,25
72:1,4,9,10,16,17
72:20,24,25 73:2,3
73:4,7,9,11,11,24
74:4,5,8,15 75:2,6
75:13,20,21 76:13
76:21 77:5,15,16
77:21,22 78:6,9,18

78:24 79:13,20,25
81:9,18 83:24
84:1,3,4,7,9,11,16
84:20 85:8,11,12
85:12,13,20,24
86:17,25 88:8,14
88:23,24 89:3,5,6
89:10,12,20,24
90:12,14 95:3
97:10 98:19,23
99:21,25 100:23
100:25 101:12,19
101:20 102:5
103:15 106:11,16
107:24 108:7,10
108:12,19 110:11
114:24 116:17
117:8,14,19,20,22
117:23 118:1,3,7,8
118:9,14,17,19,20
119:3,5,11,14,16
120:5,8,17 121:6
122:6,11,13
123:22 124:2,12
124:17,20,22
125:1,8,12,20
126:1,4,10,19,23
127:8,10,20,20,22
128:3,16,19,22,25
129:1,5,8,9,13,15
130:11,19,22
131:1,10,12,16,25
138:9 142:7,16,20
143:4,11,15,24
144:1,6,11,14,18
144:23 145:7,16
146:19,22 147:5
147:23 148:4,6,17
148:22 149:2
152:14 153:4,15
155:12,15 157:5

157:13 158:6,18
161:15 162:20
164:2 165:11
167:13,22 169:2
172:6,21,24
174:19 176:19
177:5 178:2,10
186:24 187:22,22
190:15,17,24
191:9 193:21
194:1,3,14,18
197:5,13 198:1,8
199:3,5,12,23
200:19 202:2,15
205:19 206:4,9,15
206:24,25 207:5
207:14,16,18
208:3 209:8
210:15,22 211:25
212:1,12,19,20
214:17 215:7,14
218:23 219:16
222:2,5,22 223:12
224:3,11,14 225:1
225:8,12 226:2,12
229:9,13 231:9,10
231:17,24 235:4
238:10 239:15

**county's**  23:14
62:25 63:10 95:22
131:9,16,17 141:4
182:17 184:1
192:17,18,21
216:2 218:13
228:23

**countywide**
206:18 208:7

**couple**  66:16
123:11 218:4

**course**  200:12
232:2

**court**  1:1 4:14
10:5 95:20 98:6
98:16,19 99:23
101:15,16 161:17
161:20 163:13
164:14,18 165:7
165:18,19,21,23
166:2,4,11 175:4,7
175:16 212:23
215:9 227:9,11,19
227:20 228:2,6
238:7

**court's**  5:11
176:24 227:25

**courts**  73:17 95:2
227:7,14,16

**cov.com**  3:10

**cover**  38:16 76:6
124:16 131:13

**covered**  38:17
208:11

**covington**  3:7 9:19

**craig**  49:10 63:13
64:6 66:10 80:21
81:24 113:20
116:9

**create**  44:6 122:22
157:16 158:5,16
159:6,16,22
160:12,21 161:12
161:17 163:14
164:15 165:19
166:11 167:3
168:8 169:5,17
170:23 171:2,19
174:2

**created**  118:10
140:23 161:25
162:2 165:1,6
170:2,9,17 171:8
173:4,15 174:14

175:9,12,24 185:2
185:14

**creation**  172:14

**credentials**  118:13
120:4

**crime**  94:15,16
97:12,12 100:8,10
104:2 147:23
148:2,6,10,16,21
149:2,10,17,21
154:18 155:4,7
156:14,18 164:3

**crimes**  94:23,24
95:13 96:4,19,21
96:22,23,24 98:14
98:20 99:10,12,18
100:3 150:2,10,16
150:20 151:4,11
151:19

**criminal**  86:13
95:16 96:2 98:1,2
98:4,9 99:22
100:16,20 106:3
152:16,22 153:7
153:22 154:7,17
155:23 156:13
210:16

**crisis**  19:21 21:15
82:9 83:3,9 86:15
212:3 214:17
218:14 224:10
232:5

**criteria**  152:8

**cropped**  198:13

**csb**  50:3,25 57:2,3
57:4 63:21 88:11
207:3,12

**curiosity**  32:17

**curious**  32:7,11

**current**  10:19 33:9
38:1 51:7 56:6

87:17 190:15

**currently**  87:12
139:7 141:4

**custody**  4:14

**cuts**  198:15

**cutting**  207:8

**cuyahoga**  1:11
120:16 122:6
235:4

**cycle**  16:14 17:7
17:16 112:8 114:3

**cycles**  16:14,16

---

**d**

**d**  2:10

**d.c.**  2:16

**daily**  84:22

**damage**  86:9
94:12 181:6

**damages**  85:24
86:3,7,17 87:9
90:24 100:12
188:10,15 189:16
189:25 190:7
204:24 216:23
217:5 218:22
225:23

**dan**  1:8

**dare**  108:16,22
109:15,16,18
110:1,7 111:3

**darin**  49:12 60:15
60:18 80:10
109:12

**data**  24:13,16,19
24:23,24,25 25:7,8
25:12,12 29:10
30:5,23 31:3,8
32:8,15 34:4,6,7,8
34:13 38:9,11
43:22 44:4 45:2
46:1,5,15,19 52:24

53:3 54:13,19
55:7,11,23 56:8,11
56:13,16 57:9
58:16 59:21 60:13
68:25 86:9 101:21
102:4 104:16,19
105:3 107:9
151:25 152:21
178:5,8 179:7
183:7,8 191:15
198:11 203:18
**database** 44:21
53:4,14 60:5,7
**date** 9:2 91:23
92:6 191:22
234:11 237:8
238:3,9,19 239:3
239:13,25 240:20
240:25
**dated** 5:7 68:11
**dating** 201:4
**david** 3:7 9:19
**dawn** 202:10
**dawson** 13:1 19:9
**dawson's** 15:10
18:15
**day** 3:11 9:18 23:8
27:23 28:2,9
84:24 232:2 236:7
238:16 239:22
240:22
**days** 42:8,22,23
43:9 237:18
**dd** 207:3
**deal** 155:15
158:14 164:3
168:22 202:13
**dealing** 87:24
198:13,21 210:23
**dean** 121:14 142:1
143:7,13,17,21,22

143:25 144:10,13
144:18 146:15
**dear** 237:10
**death** 19:23 22:13
22:22 33:12 42:8
118:17
**deaths** 23:2,4,9
26:2,11,23 27:3,7
27:11 29:6,9
30:23 38:25 39:13
40:2,18,21 41:1
42:4,19 44:1,7,15
47:17 48:3,11,13
84:19 130:4 194:1
218:11 219:16
**debate** 228:21
**decedent** 41:24
42:1 45:23 118:2
130:13
**decedents** 119:11
**december** 10:23
11:1 13:22 16:11
48:16 50:22 68:18
71:12,18 114:11
177:14,20 186:9
186:13,16,19
**decision** 90:10,13
90:15,21 91:22
125:9,21 126:2,7
137:24 142:10
231:6
**decline** 44:6
**declined** 39:20
**decreased** 44:24
147:24 148:7,17
148:22 149:11
150:16,21 151:4
151:19 208:3,6
225:17 226:21
**decriminalize**
163:9

**deed** 238:14
239:20
**deemed** 237:19
**deeper** 66:4,7,9
214:22
**defend** 95:2
**defendant** 97:21
188:11,15,16
189:5,10,17 190:2
190:8 216:25
**defendants** 5:11
5:17 12:6 95:3,8
96:2 176:22
191:23 199:4,15
199:25 202:16
215:18 216:5
**defender** 94:20
95:6,10,17 97:19
**defender's** 94:22
95:1 161:11,12,14
**defense** 86:22
97:15,18 98:5
162:15 166:3
196:21,22 198:12
**defer** 14:17 133:25
**deferred** 14:14
**deferring** 207:15
**define** 84:7 94:5
**definitely** 129:25
**definition** 218:17
**delivery** 234:9,11
**delved** 103:25
**delving** 103:23
**denied** 169:19,24
170:4 176:10,15
**department** 13:4
22:12 26:15,18
31:25 32:13,18,22
33:23 34:2 37:24
38:7 43:18,22
45:7 46:14,18,22

48:10 49:14,15
71:2 72:25 94:3
101:16 163:1
191:6,17 204:13
225:7 237:22
**departments**
19:19,20 21:12
48:25 108:11,12
179:4 180:3,12
195:13 196:10,11
197:23 203:25
217:25
**dependent** 87:25
**depending** 106:15
199:11
**depends** 72:19
94:5
**depo** 232:24
**deposed** 10:11,23
11:1,2,4
**deposition** 1:16
5:5 9:4 11:16,17
11:24 12:6,19,25
13:2,18,22 14:2,22
15:23 16:7,20
18:11 19:5,7,15
20:1,3,6,7,11,12
20:15 21:3,22,25
22:6,9 25:24
43:19 48:15 49:22
50:22 51:2 61:9
68:9,17 71:11,17
82:20 83:18,21
91:7 92:25 114:6
114:6 116:11,14
135:14,21 176:19
177:4,14,20
178:20 179:1,10
186:8 206:22
215:14 220:1
233:19 235:19

237:8,11 238:1,3
239:1,3
depositions 12:24
229:7
deputies 167:7,20
222:10,12,15
deputy 121:15
describe 44:3
48:23 107:25
described 23:25
24:24 38:1 40:11
47:3 59:5,19
69:15 75:1 89:16
117:7 151:25
220:7
describing 24:10
68:20
description 5:3
153:19
desktop 20:19
detail 31:12 33:9
36:22 135:9
154:11 190:21
213:25 226:7
detailed 33:4,6
detected 37:5
detention 95:21
165:25
determine 59:13
60:19 151:25
155:2 156:12
developed 155:5
156:15
dhaller 3:10
diagnostic 164:21
164:21,25 175:18
diane 12:25
die 23:8 27:23
28:2,5,9
died 42:25 43:6
130:13

difference 117:5
233:5
differences 183:15
different 19:18,19
21:11 48:25 59:5
59:10 63:25 68:21
79:15 134:22
142:18 150:24
151:8 165:21
173:2 178:25
180:3 183:18
197:2 199:13
209:7
differently 117:4
difficult 125:15
134:18
difficulty 147:18
dig 214:21 215:8,8
digging 214:24
direct 17:12 88:13
172:17
directed 112:12
115:10,17 153:11
180:11
direction 56:17
57:11 61:15 64:11
70:10 104:24
105:2
directly 217:20
director 10:20
63:18 67:13 71:5
71:6 79:13 82:23
110:7 114:21
disagree 90:20
disclosed 56:1
discover 16:19
discuss 43:23
59:11 61:21,23
62:2,6 66:21 80:7
80:21 81:5,10,13
81:17 90:3,8

discussed 21:21
46:23 52:10 56:12
56:13 60:24 61:1
67:2 73:21,25
76:18 77:13,20
78:4,8 79:24 80:4
80:8,9,10,23,24
81:15 90:5,5
91:24 92:9,25
112:19 114:5
125:4 142:2
184:14 214:15
221:12 228:16
232:25
discussing 62:11
64:12 81:2 232:1
discussion 60:6
61:24 83:13 85:18
103:22 122:15
179:5
discussions 85:20
87:4
disease 218:10
219:15
disjointed 211:20
disorder 101:24
102:8,13,17 103:3
103:17,25 104:7
104:15 106:9,14
106:21 107:2,12
107:13 210:8
disorders 107:7
dispensed 200:7
200:11
distinct 102:1
distinction 209:18
209:24 210:5,13
210:20 211:2
219:19 229:19
distinctions 211:5

distracted 113:12
distributor 5:10
176:22
district 1:1,2
dive 66:4,7,9
divert 131:21
dividing 232:13
division 1:3 34:1
38:8 232:16
document 1:8
50:21 51:1 55:19
55:20,25 83:1
114:15 213:18,19
213:20,23 215:24
216:1,8,10,13
documents 13:15
50:10,12,14,18
51:4 55:16 65:21
82:10,17 83:5,10
116:8 177:13,15
dodson 90:6 92:10
92:17,21 93:3,21
94:1 140:6
doing 25:2 107:14
111:25 144:1
231:2
dollar 61:21,24
64:6 65:25 74:19
78:14 86:2,19
87:5,14 96:16
112:17 186:25
187:3,5,17 188:1
195:12 220:22
225:20,21 226:24
dollars 17:19 50:8
61:2,10,13 64:4,4
64:5 65:5,18
74:12,14 75:6,12
75:20 77:14,21
78:2,8,25 79:5
87:16 99:2 102:7

102:15 103:15
104:10 107:10
108:3 111:8,21
112:1 114:2
115:10,16,21,24
116:5,12 120:1
127:9,15 133:19
138:19 145:20
158:13 159:20
171:7,11 172:24
176:16 183:11
186:4 190:14,16
191:9 192:22,25
193:3,6,9,12,15,18
194:15,19 195:2
197:6 198:2
200:15,22 201:4
212:4,13,15,16,20
212:24 213:7,12
214:5 227:2 231:7
232:4,7 233:5,6
**domestic** 104:3,5,8
104:14 215:11
**donna** 49:13 70:23
**door** 147:16
**dormant** 121:1
**dorothy** 121:13
142:1 143:7,12,17
143:21,22,25
144:10,13,18
146:15
**double** 131:5
168:2
**doubled** 30:3
**dozens** 101:6
**dr** 84:17 85:1
122:16 123:3
124:10 130:16
132:23 134:1,16
135:8,11,17 138:1
138:13 139:24

140:1,4,11 142:25
**draft** 217:10,17
**drafting** 46:10
**drag** 87:20 186:20
**dramatically**
113:6
**draw** 211:5
**drill** 219:1,2
**driver** 129:12
166:1 228:15
**drivers** 167:10
**drop** 207:4
**dropped** 44:3
**drug** 2:18 10:1
28:2,19 30:9,12
35:19,20 37:4,5
44:15 96:21,24
109:18 111:12,18
112:14,23 113:17
115:10,17,24
149:10,13,17,21
150:8,20 154:18
155:4,7 156:14,18
162:12 163:5,10
168:21 174:22
204:1,5 212:22,23
221:22 226:9
227:7,9,9,10,14,16
227:19,20
**drugs** 26:9 35:7,7
35:8,9,11 36:14
44:11 45:1 48:6
111:15 221:7
**due** 17:9 172:8
226:21
**duly** 10:10 235:7
235:10

**e**

**e** 5:6 57:23 68:9
**earlier** 16:20
22:11 31:24 56:4

60:25 67:23 70:23
77:8 78:2,22
94:11 95:15 97:18
102:9 116:15
130:18 143:21
147:18 151:23
152:21 180:21,22
183:6 190:23
203:5 212:25
214:2 215:10
221:12 225:18
228:25 230:15
231:15
**early** 84:14 92:7
122:2 162:5 191:1
**earmarked** 111:21
115:7
**earmarking**
116:11
**earns** 117:23
**easier** 125:22
**east** 2:20
**eastern** 1:3
**economic** 19:21
21:14 87:19
186:17,24
**economists** 181:7
186:15,17 204:23
225:23
**economy** 89:11
**education** 44:5
64:16 86:20
107:25 108:8,13
108:17,19,24
109:7 110:2,11,12
110:16,18 111:3,5
111:10,12,13,18
112:2,15,23
113:17 115:10,15
115:17,25 116:4
116:17,23 117:2

**effective** 125:22
**efficiency** 226:22
**effort** 112:23
113:4 120:9 209:6
212:7
**efforts** 43:23 44:5
48:4 72:6,6
**eight** 161:23,25
162:2,25 164:2
165:5,12 175:10
176:6 212:25
213:3
**eighth** 3:8
**either** 23:2,19
25:11 31:20 38:4
38:19 46:2 47:24
67:12 70:13 79:24
86:18 88:7 94:15
94:25 97:10 99:25
101:21 107:20,21
111:2,22 113:20
113:22 120:25
122:1 133:9
136:21 137:18,22
138:14,23 141:18
143:19 154:8
156:8 161:8 183:8
187:24 189:15
190:1,7 203:15,17
213:4 219:25
236:2
**elected** 63:5 118:6
**eliminated** 168:1
**ellis** 3:3 9:22
**email** 237:17
**emergency** 221:21
223:10,24,25
224:6
**employed** 10:16
**employee** 139:2
142:7 147:19

218:18 220:17
232:16 233:4
**employees** 52:16
53:14 54:13 84:5
87:25 96:15
157:25 158:1
174:10 208:6
232:21
**employment** 176:2
**ems** 222:4,5
224:14
**enclosed** 237:11
**ended** 120:13,16
153:1 154:6,8
162:23
**endo** 2:8,8 230:16
**ends** 131:10
**enforcement** 44:6
**entered** 52:25
145:24 152:16
153:6,21 154:16
239:9
**entire** 29:19
216:10 238:5
239:5
**entirely** 165:15
175:13
**entities** 73:17
176:8
**entitled** 5:13 177:5
**entity** 79:14,15,16
158:9 174:4 176:2
232:2
**epidemic** 88:23
89:3 112:2 158:14
169:6 215:4
**equipment** 128:6
131:18 132:4,8,25
133:14,15,21,24
134:4 135:1

**errata** 237:13,18
239:7,10,18 240:1
**esq** 2:3,3,4,10,15
2:19 3:3,7,12
**essentially** 21:20
23:1 39:21 50:2
66:4 73:22 79:12
82:12 86:11 87:22
88:22 117:15
120:15 121:1
122:20 125:24
128:1 158:8,9
162:9,16 163:9
179:13 214:19
**estimate** 69:6,11
70:11 214:16
223:12 224:2
229:4
**estimated** 230:4
**estimates** 23:5
47:11 56:18 64:13
64:15,21,25 65:3,6
65:19 87:11 88:3
181:16 184:12
223:13
**estimation** 220:11
**et** 1:9,10,12,14
226:16,23
**ethnicity** 23:14
28:16
**evaluator** 164:22
165:1 175:16,18
**event** 236:3
**eventually** 155:22
**everybody** 62:11
**exact** 54:5 79:12
80:17 92:6 102:19
108:2,10 115:22
150:5
**exactly** 20:21
53:20

**examination** 4:7
10:8,12 211:12
230:19
**examiner** 84:17
117:12,13,23
118:10,11 119:17
119:19,23,24
120:6,13,14,15,20
121:3,14,15
122:22 123:13,21
124:5,10 125:2,5
125:10,16 126:2
126:13,18,21
128:20,23 130:19
130:25 131:24
135:12 141:5
142:12 144:5
147:8,12
**examiner's** 86:23
117:17 119:9
128:5,7,10 129:19
130:3,12 133:1,16
133:23 134:3,9
135:7 136:3
137:14,18 138:22
139:7 140:21
141:10 146:13
214:3
**examiners** 118:15
120:14,18 121:5
123:17 124:20,22
126:3,9 129:7,10
141:22 142:7
**example** 102:10
104:4 212:14
215:10 233:2
**examples** 218:5
**excess** 116:5
159:20
**exchange** 99:1

**exclude** 233:4
**excluded** 179:20
**excuse** 113:7
142:23
**executed** 239:10
**execution** 238:14
239:19
**executive** 10:21
85:12 89:21,25
90:12,14
**executive's** 85:13
231:14
**exercise** 186:23
**exhibit** 4:14 5:5,6
5:9,13,15 11:16,22
68:5,9 69:3,10
176:19 177:4,11
177:14,19 180:24
182:13,21 183:20
183:24 184:12
185:1,14,25 188:7
191:5,5 204:10
211:4 215:14,23
218:24 219:18,21
220:1,2 228:7
232:24
**exhibits** 4:4 5:1
**exist** 153:17
**existence** 45:7,21
**expanded** 103:7
**expansion** 17:9,18
198:18
**expenditures**
178:10
**expense** 218:25
**expenses** 76:8
117:8 192:5,9
199:16
**expert** 97:3,7,22
97:23 132:18
200:4 232:24

**experts** 63:10
86:10 97:10,14
178:2,4,9,23
179:15 181:6
184:2 186:15,18
188:22,23 189:1
192:18 204:24
205:24 225:23
227:2 233:3
**expiration** 238:19
239:25 240:25
**expires** 236:16
**explain** 178:14
**explained** 206:22
**explanation**
190:13 216:7
**exploded** 23:17
**expressly** 91:3
**extent** 55:13
222:20
**extra** 114:25
**extreme** 195:14
**extremely** 179:16
**eyeballed** 184:22

**f**

**face** 195:9
**faced** 120:2
**facilities** 131:19
172:9
**facility** 95:24
174:11
**fact** 11:2 17:12
23:21 44:4 51:3
52:11 73:25
104:23 126:15
134:8 179:2 183:5
**factor** 204:6
**fairly** 108:19
183:16 222:21
223:17

**fall** 92:7 219:7
220:8
**falls** 100:15
**family** 72:21 78:2
101:17 106:4
213:13
**far** 66:15 140:8
159:4
**fast** 207:6
**fault** 199:4 202:16
**fayette** 47:18
**fbi** 148:10
**federal** 10:8 64:4
212:16 213:8
231:7 232:9
**fee** 117:19 119:3
138:9
**feel** 228:22
**fees** 97:3,4,6,7,23
123:22 124:2,17
124:20,23 125:11
125:21 126:3,14
126:16 128:3,15
**fell** 141:7
**felony** 98:4 99:12
99:13 150:8
162:10 163:7
168:4 172:19
**felt** 43:24 176:14
214:25
**female** 31:17 33:8
**fentanyl** 39:4,9,21
41:1,13,15 44:10
45:1 134:10,10,15
134:24
**figure** 16:1 74:19
86:19 87:5 96:16
108:2,10 109:9
171:6 186:12
187:1,4,15,18
188:2 190:18

197:18,20 198:1
200:23,24 220:22
221:5,17 224:9
225:20,21,23
226:3,4,24
**figures** 56:21 64:6
65:23,25 112:19
180:8,25 188:10
188:15 189:4,8,16
190:1,7 196:17
223:21
**file** 90:10,16 91:22
199:24 202:8
**filed** 203:10,12
**files** 57:9 59:12,25
60:1,3,11,13 63:24
**fill** 141:25
**filled** 142:8 144:17
162:1
**filling** 196:10
**final** 213:5
**finalized** 144:9
**finally** 202:19
**finance** 10:20
67:12 79:12 82:24
88:10 94:3 200:14
200:18
**financial** 14:19
18:20 131:11
182:7
**financials** 109:12
**find** 106:8 125:15
147:19 190:19
191:21,25 192:7
237:11
**finish** 168:11
**finished** 123:1
**finishes** 125:5
**fire** 222:4 224:14
**firefighters** 223:10
223:25

**firms** 191:23
**first** 5:15,17 10:10
10:23 11:2 13:2
16:10 25:20 33:17
36:17 51:3,15
53:2 61:9 69:8
70:13 82:8 83:3,8
83:24 84:12 85:6
85:21 88:19 93:4
111:23 121:2
140:1 143:15
146:13 155:16
190:24 198:12
206:22 215:16,18
221:21 222:9
223:11 224:1
235:10
**fits** 153:19
**five** 129:17 130:13
137:7,9,18 138:23
141:18 147:24
148:18 149:11,16
150:2,22 151:4,12
159:9 167:23,23
168:12,16,25
172:2,22 173:16
233:11
**flag** 18:10
**fleet** 228:20,23
229:2
**flexibility** 147:13
**flow** 73:23
**focus** 100:22
**focused** 28:23
33:12 74:23 121:2
183:9 191:14
208:23 212:12,15
**focusing** 41:18
61:19 87:12
112:13 130:1
140:21

**[fold - give]**

fold 85:22 199:19
folks 87:24 88:12
 107:23 167:14
 183:23
follow 67:18 75:18
 230:22
following 59:17
 84:17 107:22
 151:7 186:2
follows 10:11
food 106:5,5,9
force 85:21 196:24
 198:9 202:10
forefront 200:16
foregoing 235:15
 235:20 238:13
 239:18
forensic 118:12
forget 142:5 158:7
forgive 26:15
 136:19
forgot 230:15
form 37:10 54:17
 65:7 69:17 72:18
 77:24 78:12 79:2
 80:2,16,22 83:6,11
 84:2 85:14 87:8
 90:17,18 92:23
 94:18 101:25
 102:18 103:20
 107:3,16,17 113:1
 113:2 114:13
 115:4,13 117:10
 123:24 125:13
 126:5,6 127:23
 134:13 135:2
 140:25 147:25
 148:8,19,24
 149:12 150:18
 152:11,18 154:4
 154:22 156:19,20

164:11 168:10
 171:21 172:10
 178:12,16 182:22
 183:1,21 184:6
 187:8,12,19 188:3
 188:12,17 189:6
 189:11,18 190:9
 191:11 193:22
 194:21 195:3
 196:19 197:9,15
 198:4 199:7,17
 200:1 201:1 202:4
 202:17 203:19
 204:21 209:10,16
 209:22 210:11
 211:1,6 212:11
 214:18 217:12
 220:4,15 224:12
 228:17,19 231:5
formation 167:10
 174:6
formed 85:21
former 172:15
forms 196:23,23
fortunate 198:17
forward 112:7
 128:12 190:19
 205:16 207:6
 221:25 237:15
found 33:3,9 192:3
 201:22,23 223:16
four 35:2 124:21
 214:9
fourth 70:21
 122:13,16,22
 124:15 126:11,13
 141:5 226:20
frame 17:15
 133:13 139:5
 144:3 192:13
 194:13 206:7

free 238:14 239:20
freed 17:18
friends 87:25
front 177:16
 202:12 213:18
full 125:15 146:2
 147:11,19,22
 158:1
fully 40:11
fund 128:5,8,13
 131:9,11,11
 133:19 138:5,8,18
 138:19 139:4
 159:14 160:17
 172:24 212:13
 214:3,5,8 230:2
 232:15
funded 101:2
 173:19 175:13
 227:16 229:15
 231:7
funder 73:8
funding 72:5,10
 72:12,22,24 73:2
 73:18,23 75:1,12
 76:7,9 77:5 78:5
 78:17 79:24 101:8
 101:11,18 105:12
 105:16 112:23
 113:4 114:7,25
 140:13 160:16,17
 162:6 167:8
 169:14 171:3,24
 174:18,21 176:9
 176:11 207:9
 211:25 213:2,2
 227:10 229:21,23
 232:20
funds 71:19,21,25
 72:17 73:10,13
 165:13,14 172:21

212:9 213:8
 229:18 230:1
further 43:22
 45:22 50:24 55:7
 56:10 66:2 81:20
 83:13,16 84:6
 181:5 220:13
 233:9 235:18
 236:1
future 206:4 229:3

**g**

gal 166:7
galonski 203:16
game 140:19
gap 147:20
gas 133:3
gastro 133:3
gastrometer 133:3
gathering 25:11
 51:4
gdp 87:21 186:20
gears 214:2
general 19:20
 62:10 71:21 92:2
 128:8,13 131:10
 138:19 160:16
 172:24 212:13
 232:15 233:5
generally 74:11
 111:12 183:16
gentleman 154:9
gessner 203:15
getting 55:22
 107:23 124:4
 126:21 161:2
gist 33:15
give 35:18 37:9
 42:12 55:15 72:16
 73:3 74:8 171:14
 221:2 234:1,10

given 62:24 63:3,9
  70:11 150:6
  213:25 223:21
  235:12,17
gives 73:2,11
  118:13
glenwood 167:11
  167:21 172:15
global 207:13
go 20:21 22:14
  25:19 32:17 37:11
  38:13 42:2 57:8
  61:22 70:11 91:12
  93:24 101:5 106:6
  106:7 114:10
  125:23 128:4
  137:10 154:4,11
  167:16 179:8
  180:12 181:25
  183:8 191:12,15
  191:21 192:4
  193:23 198:23
  199:15 200:4
  219:1 222:25
  226:8 230:6
goal 214:15
goes 48:4 72:13
  201:5
going 23:16 25:3
  43:15 51:20 58:2
  88:21 91:19 93:2
  106:6 112:7 113:3
  120:16 122:18
  124:11 125:20
  128:12 138:16
  146:5 154:6,11
  157:25 161:23
  164:2,22 165:4
  171:10 182:8
  187:25 188:6
  189:13 196:8,21

196:25 197:3,7,10
  197:18 198:18,23
  199:1 200:12
  202:11 211:17
  216:16 221:1,25
  223:19 226:20
good 10:14,15
  14:13 183:8
googling 25:21,22
gotten 42:1 169:14
  187:23
govern 105:15,18
  105:21
governing 118:21
government 49:1
  71:13 84:10 88:25
  89:5,7,9 106:16
  118:10 206:9,15
  207:19 208:3
  209:8 231:10,18
  231:24
governments
  206:24 207:9
governor 207:7
grant 79:5 110:9
  162:22 165:14
  212:8,23 213:7
  227:10,17,25
  232:14 233:5
granted 140:8
  158:2 170:14,20
granting 140:11
grants 73:7 78:13
  79:4 161:4 212:1
  231:2,4 232:4
  233:4
great 206:23
  230:18
greater 123:21
greta 12:24 14:3

grounds 58:3
group 23:13,24
  28:15 31:19,22
  36:24,25 37:1
  70:4,6 180:7
grouped 35:19
  175:5
grouping 35:20
  36:9,14
groupings 35:9,10
  35:22 36:6 39:5
  48:2
groups 23:22,23
  31:17
grow 195:17
  205:18
growing 29:25
  194:5
grown 44:21
growth 204:1,2,6
guarantee 109:4
guess 39:21 72:19
  84:6 94:5 98:5
  127:24 138:17
  141:2 191:21
  217:19 218:16
  219:4 225:5
guy 200:14,18
guys 113:9

**h**

h 3:12
half 12:24 49:18
  74:20 195:11,11
haller 3:7 9:19,19
hand 236:6
handed 76:18
handful 143:2
handing 215:22
handle 129:8
  201:17

grounds 58:3
happened 40:12
  122:4 149:4
  163:11
happens 155:25
happy 122:9
harm 84:1,11 85:7
hate 65:9
head 73:15 96:17
  117:11 139:1
  154:24 156:6
  206:8,14,19
  207:18 208:2
  218:16 221:1,2
health 2:8,14 9:16
  13:4 22:13 26:15
  26:18 32:1,13,19
  32:22 33:23 34:2
  36:17 37:24 38:7
  43:18,22 45:7
  46:14,18,22 48:11
  49:13,15 71:1,5,7
  71:10,12,20 72:1
  72:10,17,23,25
  73:3,4,9,12,24
  74:4,6,8,15 75:3,7
  75:14,21 76:13,21
  77:5,15,22 78:10
  78:18,25 79:13,20
  79:25 81:9,18
  88:11 103:18
  110:12 119:25
  175:23,24 176:1
  191:17 198:6
  226:10 231:16
healthcare 218:8
  218:18,22 219:9
  219:13 220:17,23
hear 88:3 113:10
heard 231:1
hearings 85:19

held 10:22
help 138:11,12
  167:24 214:13
helped 43:24 44:6
  45:8
helping 131:22
  217:17
helps 102:12
henschel 3:15
hereinafter 10:10
hereunto 236:5
heroin 35:13 36:2
  39:4,9,23 40:18
  41:5,12 44:10
herschel 5:7 68:10
high 122:10 124:8
higher 138:16
  183:13,18 185:9
  206:10,17,21
  221:14,17
highest 47:19
hire 119:16,19,22
  120:5,12,21,24
  122:13 125:23
  126:2,18 137:24
  138:7,14 140:17
  142:2,2 144:4
hired 121:23,24
  125:1 137:22
  138:24 139:3
  162:25
hiring 120:13
  122:15 123:16,21
  124:10,15 125:4,9
  141:24 144:3
  147:7 162:24
  167:23
historically
  124:19
history 218:20

hit 30:2 134:15
  206:23 211:18
hold 59:8 122:20
  165:25 168:3
  181:3
holds 15:15
home 101:4
  174:23 201:23
homework 14:24
honing 179:6
  183:5
hopefully 124:15
hospital 13:5
  22:11,18,24,25
  23:4 24:4,5,9,13
  25:7,15,20 26:1,17
  26:19,25 30:22
  31:2,7,14 34:9
  36:19,21 47:8
  48:8 154:8 191:16
  193:25,25 201:16
  205:3 229:20
hospitals 23:7,16
  24:12 29:8
host 72:23 100:24
  101:2 174:24
hour 12:23 32:24
  49:18
house 95:22 98:22
  98:24 99:1,9,14,24
  100:19 102:22
  103:13 107:10,12
  167:12 173:25
  174:1,14,18
  227:21
housing 87:22
houston 2:12
hum 20:13 94:13
  116:19 141:12
  217:6 228:12

hundred 74:11,14
  74:19 119:6
  183:11
hundreds 127:9
  127:14
hvac 131:19

i

identification
  11:19 68:15 177:1
  177:8 215:20
identified 70:7
  75:14 78:22
  110:21 180:7
  184:4 185:4,18
  205:17 214:25
  225:9 232:7
identifies 101:23
identify 9:6 21:24
  57:10 62:17 78:25
  102:12 108:21
  109:3 116:16
  117:7 200:24
  214:22 215:6
identifying 62:15
  120:20 214:24
  217:24
ilene 90:2,12
illegal 26:21,24
  27:12,20 28:10
  29:1 32:9 33:11
  44:15 45:1 152:16
  153:2,6 155:23
illicit 30:18 31:9
  153:21 154:16
  155:5,7 156:16
  209:14,21 210:3,9
  210:18,24 221:6
immediately 16:24
impact 19:21
  21:14 23:22 87:19
  89:1,12 186:24

impacts 199:2
implicates 51:17
  93:19
implore 147:20
inability 117:18
  127:10
inaccurate 16:8,21
  18:7,12,17,22 19:1
  19:5 22:1
incarcerate 99:9
incarcerated
  100:5
incarcerating
  94:14 100:2
incarceration
  86:22 94:11 95:17
  95:23 99:5,8
  100:6 174:19,22
  227:23
incidence 134:23
incidences 23:6
  29:7,24 30:4,15
incidents 30:6,11
  30:17
include 87:19 95:5
  132:7 179:19
  180:20,25 213:2,7
  213:11 219:12
  221:16 222:14
  224:5,22 225:6
  231:2,4,7 232:3
included 26:9,20
  36:14 38:10 39:2
  46:15 55:23,24
  56:14,16,20,25
  57:1,7 58:23 62:1
  62:12,13,16,18
  64:13,15,19,20,23
  64:24 67:3,5 70:7
  70:13 74:24 75:15
  78:3,23 79:4

92:19 110:19
129:21 180:8
185:3 187:15
205:14 213:16,21
219:17,20 220:1
220:11,20 221:16
222:20 223:20
227:11 228:1,2
230:3 232:11
237:13
**includes** 95:6
184:3
**including** 23:22
72:6 218:10
219:15 226:15
**inclusive** 29:18
218:24
**incomplete** 54:19
**inconclusive** 52:22
**incorporated**
239:12
**increase** 16:13,15
17:1,4,17,21,24
18:3 41:10 112:3
117:21 129:18
150:6,8 152:22
159:14 162:11,13
162:14 166:2
168:4 171:12
172:16 176:12
**increased** 17:18
39:23 40:19,23
41:6 129:23 130:1
147:24 148:2,5,7
148:17,22 149:1,8
149:10,14 150:10
150:16,21 151:4
151:19 169:1
174:6 197:16,20
203:6 207:11,12
226:14 227:6,13

**increases** 164:3
205:5
**increasing** 61:10
133:22 134:23
196:9
**incur** 125:9
128:22,25 225:4
**incurred** 69:7
94:21 99:25
127:19 130:20
135:7 180:3 191:9
197:21 206:3
209:7,13,20 210:1
210:15,22
**incurring** 135:17
198:2
**incurs** 99:21
**independent**
107:14 179:14
181:6,19,20,22
182:9,16
**independently**
196:25
**index** 4:1,4,5 5:1
6:1 7:1 8:1
**indicate** 27:25
150:9 208:19,20
**indicated** 23:11
54:18 179:4
186:15,20
**indicating** 217:14
237:13
**indicators** 186:17
**indigency** 97:24
**indigent** 95:2,7
97:18,20 98:5
166:3 196:20,22
198:12
**indirectly** 217:20
**individual** 11:8
60:4,10,13 62:14

153:18
**individually**
188:13
**individuals** 94:22
95:12 106:20
**infer** 152:20
**information** 12:15
13:3 38:18 53:4
56:19 57:18 59:24
60:19 61:22 63:22
86:9 102:5,10
103:14,24 104:13
105:8,21 109:13
130:9,17 174:17
176:3 181:9,24
182:7 187:4 211:7
215:10 216:12
217:10,21
**initial** 69:8 213:9
**initially** 88:24
**initiate** 120:8
**initiative** 162:7
**injunctive** 216:23
**inmate** 167:24
168:18,23,25
172:2,6,11,22
173:16
**inmates** 168:3
172:9 219:2
**instance** 78:1
104:13
**instruct** 58:2
**instructed** 58:5,9
58:13 67:24 77:10
**instructing** 93:18
**instruction** 58:8
58:12 67:23 75:17
77:8,18 234:2,10
**interaction** 106:16
**interested** 122:18
122:19 236:3

**interesting** 39:15
155:10
**interim** 123:12,16
125:21,25 143:6
**internal** 218:18
225:24
**internally** 87:11
88:2 179:3
**interrogatories**
5:17 215:19 216:3
**interrogatory**
5:11 176:23 216:3
216:16,21 217:11
**interval** 101:3
**intuitive** 150:4
**investigation**
50:24 197:13
226:16
**investigator** 131:7
131:8 136:22
137:12,22,25
138:7,12,14,25
139:4 140:24
141:3,8
**investigators**
136:1,2,5,6,9,15
137:3,5,6,7,19
138:24 141:19
**investment** 225:17
**investments**
131:17
**involve** 130:13
227:23
**involved** 29:12
31:9 94:1
**involving** 150:21
154:19 156:18
**ish** 122:25 139:5
**issue** 91:7 92:4
110:13 120:2
126:15 131:22

157:21 163:4
191:20 192:15
194:10,11 197:24
198:14 201:5,7
204:8 207:16
**issued** 33:21 34:2
34:11 38:3,5,6
44:23
**issues** 14:20 85:23
138:5 200:17
**item** 233:2
**items** 110:20
222:2

**j**

**j** 2:3,15 237:5
**jackson** 1:21 2:19
9:25
**jacksonkelly.com**
2:21
**jail** 156:24 167:11
167:13,21,22,25
168:3,5,13,22,23
169:2 171:12
172:6,11,15,16
173:2,8,10,14
183:14,19 185:10
196:10 198:14
215:7 218:23,25
220:16,23 221:1
221:13,14
**jane** 2:19 9:25
**janssen** 3:2 9:22
**january** 1:18 9:2
236:7 237:4
**jason** 90:6 92:10
**jen** 49:10 66:18
113:20
**jennifer** 5:6 68:10
**jerry** 49:10 113:20
**jfs** 213:20

**job** 72:21 78:1
101:16 106:3
118:8 122:17,21
213:13
**jobs** 120:4
**john** 3:12 203:16
**johnson** 3:2,2 9:22
9:23 12:25 14:3
16:21 19:8
**johnson's** 14:22
15:22 16:2,6,24
18:6,9
**join** 142:3
**joined** 146:16
**joining** 144:14
**jones** 3:11 9:18
**jonesday.com**
3:14
**journal** 201:20
**joy** 156:2
**judge** 1:8 156:1,2
165:22
**judges** 155:17
164:1,9,10
**judgment** 123:20
**julie** 49:11
**jump** 211:17
**jumping** 196:12
196:18
**jurisdiction** 34:20
**jurisdictions**
118:21,25
**justice** 86:13
95:16 98:10 99:22
100:17,20 106:3
152:17,23 153:7
153:22 154:7,17
155:24 156:13
210:16
**juvenile** 95:20
98:16,19 99:23

101:15 165:18,19
165:21,23 166:2
166:11
**juveniles** 98:20

**k**

**kearns** 49:12
60:15,18 62:2,6
80:11,13,14 81:21
109:12 110:14
151:24
**kearse** 2:4 9:12,12
90:22 91:8,13
93:7,14
**keep** 91:19 93:8,15
102:15 120:22
138:20 144:5
147:21 182:11
**kelly** 1:21 2:19
10:1
**kentucky** 2:20
**kept** 144:7
**kermit** 200:6
**key** 23:20 41:7
**keyes** 2:15 4:8
9:15,15 10:3,13
51:23 52:5 65:11
65:17 90:20,24
91:20 93:4,9
113:8,14 124:25
126:24 127:6
202:22 203:4
211:11 230:17
**kids** 165:25
201:22
**kind** 31:17 32:7,15
57:9 62:10 85:22
97:6 117:2 134:15
134:19 136:20
140:19 141:6,7
147:9,20 195:9
197:1 201:14

202:12 208:12
**knew** 15:4 85:16
186:12 214:21
**know** 18:18 20:20
25:3 29:18 34:3,8
37:2 38:8 41:5
52:18 59:16 63:11
63:23 75:9 79:11
85:15,16,17 90:13
91:23 94:4 97:8
102:19,22 105:5
106:22 107:4,4,18
107:20,21 110:4,5
110:9,10 115:23
119:1,2 126:9
132:5,12,14,19,22
134:14 135:3,5,6
138:4,19 144:7
145:23 146:6
147:12 148:1,15
148:15,16,20,21
148:25 149:4,6,25
150:13 152:7
153:14 154:5,6,25
155:1 157:4,14,20
161:16 166:7
181:8,10,21
183:22 185:17
186:9,11 187:1
190:12,12 194:18
194:25 195:5
197:10 199:9
200:3,3 201:4
205:10,13 208:13
208:15,17 211:20
211:21 212:23
213:20 215:6
216:7,11 217:9
219:5,20,25 220:3
220:6,21 225:6
226:2 228:4

229:20,22 232:14
**knowledge** 18:21
82:14 85:10 91:5
91:7 157:12 211:3
233:1
**known** 12:15
87:18
**knows** 113:16
**kohler** 84:17 85:1
122:16 123:3
124:10 130:16
132:23 134:1,16
135:8,11,17 138:1
139:24 140:1,4
**kohler's** 138:13
140:11
**kurt** 3:15

**l**

**l** 1:25 235:6
236:13
**l.p.** 1:10,12,14
**lab** 128:5 131:3,9
131:11 132:1,2,7
133:19 138:5,8,18
139:4 214:3,5,8
**laboratories** 214:7
**lack** 117:20
140:13 160:17
169:14 171:3
176:10 200:9,10
**large** 31:23 87:3
152:24
**larger** 168:23
**largest** 62:23
**late** 49:20 53:1
84:14 89:17 92:7
121:23 122:2,3
162:5 164:7
**latest** 184:8
213:10

**laughing** 113:10
**law** 44:5
**lawful** 10:7
**lawsuit** 90:11,16
91:22 117:14
199:24
**lawyers** 48:17
63:4 95:5,6,12
182:18 184:2
192:17
**lead** 32:12
**leaders** 85:11
**leading** 212:5
220:12
**leads** 213:23
**learn** 22:20 32:25
49:25 60:9,12
63:19 67:1 73:19
75:19 78:16 79:22
83:24 84:8,10,15
199:23
**learned** 22:23 67:7
185:13
**leaving** 120:16
144:14
**led** 36:20 44:8
134:25 163:3
167:9,10
**left** 121:15 122:5
141:25 142:1,25
143:3,13,17,20,21
143:25 144:10
145:3,4,6,6 146:15
146:19 233:12
**legal** 63:7 89:21
237:1 240:1
**legally** 106:7
**length** 90:6 92:10
**letter** 237:19
**level** 98:6 104:12
106:7 129:7

162:10,20,21,23
167:16 188:19
191:19 198:10
213:25 226:7
**levy** 16:13,13 17:1
17:4,7,16,21 112:8
114:3 159:13
207:2,11,12
212:13,15 232:7,9
**lexington** 2:20
**licensed** 118:12
**licensure** 154:9
**limited** 28:23
30:12 88:24 96:23
198:16 222:7
226:15
**line** 91:17 110:20
191:6 204:12,22
233:2 237:13
239:7 240:3
**lines** 84:5 202:12
**list** 34:24 35:13,16
36:10,14 75:12
101:6 152:4 217:4
217:16,18 218:2,2
218:3,5 224:24
229:10,12,17
**listed** 28:18 36:19
36:23 38:13 50:11
87:7 116:17,20
213:20 217:15
228:14 239:7,17
**listing** 78:13 79:4
152:12 239:7
**listings** 38:14
**lists** 12:3
**litigation** 1:6 9:4
237:6 238:3 239:3
**little** 13:3 25:23
31:21 52:21 92:3
117:4 165:21

178:25 181:15
185:9 201:22
211:17,19 214:22
218:6
**live** 198:19 207:5
**lives** 48:6
**llp** 3:3,7
**local** 64:4 162:13
162:23 176:16
206:24 207:9
212:19 231:8
232:7
**located** 118:2
**locum** 123:17
142:18
**locums** 144:4
**long** 48:4 49:17
102:14 126:9
199:1
**longer** 102:21
129:13
**look** 32:3 51:1
53:3 104:9 119:1
124:3 137:11
165:4 179:8
181:12,14,25
190:19,19,21
191:15,25 193:24
194:7 198:5
203:24 204:1
205:2,6 209:1
213:5 217:3 218:7
224:24 228:8
229:17
**looked** 17:1 22:10
23:10 26:18 29:23
31:25 37:25 68:25
102:23 114:15
149:7 152:10
184:24 186:16,19
208:14 214:23

[looked - mental]

218:17 221:23

**looking**  16:4 23:14
32:14 36:21 37:23
38:18 41:20 116:7
120:12 163:2,8
188:25 189:7,12
191:4 196:8 197:2
197:16 205:15,16
228:9 232:12

**looks**  215:25

**lose**  128:8

**loser**  131:15

**loses**  127:8,14

**losing**  124:1
125:11

**loss**  124:18 226:21

**losses**  225:16

**lost**  86:24 87:23
123:12,22 126:9
126:15 130:21
131:24 141:8
154:9 186:3 187:6
187:10,14

**lot**  17:10 74:23
84:4,5 103:6
119:18 129:3
163:10 198:25
211:18

**louisiana**  2:11

**low**  162:9,20
167:16

**lower**  53:25 54:4
147:7 181:15
206:10,11,12
207:19,21,24

**lumped**  116:24

**m**

**m**  2:19

**madam**  237:10

**mail**  5:6 57:23
68:9

**main**  1:22 2:20 3:4
33:15 37:22
162:24

**maintaining**  128:9
131:19

**maintenance**
128:6

**major**  57:5,6
101:18 229:8

**majority**  31:20
127:25 159:20

**makeup**  86:10

**making**  231:3

**male**  31:17 33:8

**manage**  125:23

**managed**  212:17

**management**  64:1
102:12

**managers**  159:10

**mandatory**  44:18

**manpower**  89:1

**mark**  68:5

**marked**  5:3,13
11:18,21 68:5,14
69:2 176:25 177:6
177:7,10,12,13
215:19,22

**marketing**  191:22
192:3,8 200:9,9

**master**  91:1

**matching**  212:16

**matter**  9:3 82:9
83:4,10

**mcconnell**  3:12

**mckesson**  3:6 9:20

**md**  1:7

**mdl**  1:6

**mean**  17:23 20:2
24:20 33:25 73:16
74:3,19 76:10
84:7 86:20 87:9

89:4 127:24 129:5
147:10 153:16
173:9 188:21
198:24 200:15
202:8 208:13
217:13,15 219:25

**means**  55:23
131:14 179:14
198:20 207:6

**measurement**
204:3

**measures**  147:20

**media**  192:11

**medicaid**  17:9,12
17:18 103:8,8,9
106:10 198:18
212:18

**medical**  84:17
86:23 107:23
117:12,13,17,22
118:10,11,15,15
119:9,17,19,23,24
120:6,12,13,14,15
120:18,19 121:3,5
121:14,15 122:19
122:22 123:13,17
123:21 124:4,10
124:19,21 125:2,5
125:10,15 126:2,3
126:8,13,18,21
128:4,7,10,20,23
129:7,10,19 130:2
130:12,19,25
131:23 132:25
133:16,23 134:3,9
135:7,12 136:3
137:14,17 138:22
139:7 140:21
141:5,8,9,22 142:7
142:12 144:5
146:13 147:8,12

214:3 218:9,17,22
219:2,13 220:16

**medication**  33:7

**meet**  49:3

**meeting**  12:22
13:13,16 48:16,24
49:5,9,17,19,22
50:1,2,16 51:5,9
52:6,10 53:9
54:11 55:7,16,19
55:20,22 56:2,5,9
56:12,22 57:25
58:7,11,15,19,22
58:25 59:4,6,12
60:8,16 61:1,17,19
61:20 62:3,7,9,10
63:1,14,20 64:7
65:2,22 66:6,9,11
66:19,23 67:14
68:2,19,20,25
69:15,20,23 70:1,4
70:6,17,24 73:20
75:14 76:2,4,17,18
76:19,23 77:14,20
78:4,8,17 79:8,17
80:6,15,20 81:3,9
110:23 151:24
179:21,24 180:6
181:1,4,11,18
184:5,10,13,14
185:3,5 212:6,7
213:6 214:15
220:13,14

**meetings**  84:18
85:19 197:23

**members**  25:17
63:6

**memory**  21:4,5

**mental**  103:18
226:10

mention  230:15
mentioned  21:10
  22:11 29:15 31:16
  48:15 78:21 83:23
  94:11,20 95:15
  98:3,22 100:11
  102:9 105:7
  117:12 132:1
  147:18 148:13
  152:21 183:6
  186:18 224:13
  228:25 231:16
met  13:8 74:25
method  205:8
  233:3
methodologies
  94:6
methodology
  182:7 185:20,21
  186:22
metroparks
  225:12
michael  2:3 237:5
mid  164:7
middle  113:11
midwest  237:17
  240:1
mike  9:8
millage  17:24 18:3
miller  13:1 15:10
  18:15 19:9
million  44:20,22
  74:20,21 87:13,16
  108:3 111:8,21,25
  112:7 114:2 115:9
  115:16,21,24
  116:5,12 120:1
  186:4,25 187:3,17
  188:1 190:14,16
  191:9 192:22,25
  193:3,6,9,12,15,18

194:15,19 195:1
195:11,15,18,21
196:5 200:7,21
201:4 227:2
millions  5:13
  177:6 197:6,6,6
  198:2
mind  25:3 117:3
mine  228:5
minor  57:6 62:22
  64:18 118:7
minute  82:3
  124:25 154:2
  202:23
minutes  65:10
  200:5 230:25
  233:11
miscellaneous
  110:20
misdemeanor  98:7
  99:13
missing  94:10
  180:13,21
mitigate  202:11,21
mjbrannon  2:21
mobile  201:16
monetary  216:23
money  64:7 73:3
  74:7 76:10,11
  79:25 98:23
  101:14,23 108:13
  108:18,24 110:10
  110:12 115:2
  117:23 119:18,20
  120:24 128:14
  131:21 162:23
  176:11 190:25
  195:6 199:6
  227:17 231:8
  232:10

moneys  111:2
monitoring  174:23
  200:10 227:23
monthly  84:23
morgue  201:18
morning  10:14,15
motioning  213:18
motley  2:2 9:8,10
  9:12
motleyrice.com
  2:6,6,7
mouth  93:8
moving  85:10
  153:2 221:20
  223:8,23
mpendell  2:6
mt  2:5
multi  147:9
  190:18
multiple  92:16
  195:12
municipal  98:6
murray  110:6
  111:1
mute  113:10

**n**

n.w.  2:15
naeem  3:3 4:10
  9:21,21 90:25
  91:12,18 230:20
  233:8
naloxone  223:11
  223:15
name  16:5 71:9
  133:4 156:10
  211:14 237:6
  238:3,4,15 239:3,4
  239:21
named  235:9
narrative  39:16
  40:11 46:10,23

national  1:6 5:16
  9:3 215:17 216:24
  237:6 238:3 239:3
nationally  19:23
  21:15 120:3
nature  19:24
nauseam  220:19
necessarily  75:10
  104:6 123:25
  200:16
necessary  120:22
  132:11
need  97:22 103:18
  106:9 113:14
  120:21 124:8
  128:19 134:3,4,25
  144:8 171:4
  202:20
needed  134:11
  147:14
needing  138:14
needle  201:21
needs  207:16
nelsen  1:17 4:7 5:5
  5:7 10:7,14 11:15
  11:18,22,24 68:5,6
  68:8,11 69:2
  112:10 127:7
  176:18 177:3,11
  177:12,13,19
  180:24 182:12,21
  183:20,23 184:12
  185:1,13,25 188:7
  191:5 203:5
  204:10 211:4,12
  211:14 215:13,23
  219:18 220:1
  223:8 230:19
  235:9 237:8 238:4
  238:9 239:4,13
  240:20

[nelson - objection]

**nelson** 10:12
230:21
**never** 57:7 74:22
132:13 168:11
**new** 3:8,9,9 56:18
67:3 147:22
157:16,22 158:5
158:17 159:6,16
159:22 160:11,21
161:12,18,25
162:2 163:14
164:15 165:6,12
165:12 166:12
167:2 168:15
169:4,17 170:1,8
170:16,23 171:3,7
171:19,24 173:3
173:14 174:1,8,14
175:8,10,14,24
**news** 191:18
192:11 201:18
**night** 32:4 33:21
37:25 47:1,5
193:24
**nominal** 222:21,23
223:18
**non** 26:21 41:9
49:7 78:6 142:7
158:12 161:15
162:9 167:16
172:19
**north** 74:18
**northern** 1:2
**notarized** 237:14
**notary** 235:6
236:13 237:25
238:10,18 239:15
239:23 240:23
**note** 237:12
**notes** 13:2 19:12
19:17,18,20,25

20:5,5,10,14,16,21
21:3,9,21,23 93:7
**notice** 5:5 11:16
11:23 12:7
**noticed** 41:14
**november** 5:11
49:20 159:14
176:24 179:21,25
181:1,5,18 184:4,9
184:13,14 185:2
212:6,7 213:6
214:15 220:12,14
221:24
**number** 5:3,8
11:22 23:11 26:22
27:2,6,10,17 28:5
28:9,15,25 29:4,5
29:6,7,24 30:16
34:24 35:3,18
36:10 37:14 38:24
39:13,20 40:5,8,9
42:3 44:1,7,12,21
44:23 45:3,9,14,18
45:22 47:15,16,19
48:3,13,17 50:4,4
51:11 52:8,12
53:6 54:6 55:8,12
58:16 59:13 60:20
68:6,13 69:3
84:19 102:19
104:10 113:5
129:18 130:2
136:13 148:4
149:19 150:7,10
150:20 151:2,3,11
151:18 152:13,24
153:4 161:3 168:4
170:6 177:12
186:8 190:20
194:3,4 201:17
203:6,11 205:18

211:4 216:17,21
218:19 222:7
223:18 237:7,13
**numbers** 28:22
64:9 129:20 166:8
178:14,17 179:16
179:18 181:14
183:18 184:2
185:8,9,16,17,22
194:7,9,12 195:7
197:14 204:19
205:6,11,14
218:24 219:18
221:17 239:7

**o**

**oarrs** 44:4,18,21
45:8,8,21,22
152:21 153:1
**object** 37:10 90:17
93:6 134:13 211:1
**objecting** 154:3
**objection** 6:3,3,4,4
6:5,5,6,6,7,7,8,8,9
6:9,10,10,11,11,12
6:12,13,13,14,14
6:15,15,16,16,17
6:17,18,18,19,19
6:20,20,21,21,22
6:22,23,23,24,24
6:25 7:3,3,4,4,5,5
7:6,6,7,7,8,8,9,9
7:10,10,11,11,12
7:12,13,13,14,14
7:15,15,16,16,17
7:17,18,18,19,19
7:20,20,21,21,22
7:22,23,23,24,24
7:25 8:3,3,4,4,5,5
8:6,6,7,7,8,8,9,9
8:10,10,11,11,12
8:12,13,13,14,14

8:15,15,16,16,17
8:17,18,18,19,19
37:7,10 54:17
58:1 59:7 65:7
67:22 69:17 72:18
77:7,17,24 78:12
79:2 80:2,16,22
83:6,11 84:2
85:14 87:8 90:18
91:4,11 92:23
94:18 101:25
102:18 103:20
107:3,16,17 113:1
113:2 114:13
115:4,13,19 116:2
117:10 123:24
125:13 126:5,6
127:23 135:2
140:25 147:25
148:8,19,24
149:12,18,23
150:3,18,23 151:6
151:21 152:11,18
153:8,23 154:20
154:22 155:9
156:19,20,22
164:11 168:10
171:1,21 172:10
178:12,16 179:22
181:2 182:22
183:1,21 184:6
187:8,12,19 188:3
188:12,17 189:6
189:11,18 190:3,9
191:11 193:22
194:21 195:3
196:19 197:9,15
198:4 199:7,17
200:1 201:1 202:4
202:17 203:19
204:21 209:10,16

209:22 210:11
211:6 212:11
214:18 217:12
220:4,15 224:12
228:17 231:5
**objections** 4:5
5:10,16 6:1 7:1
8:1 176:21 215:17
**objective** 190:4,10
**obviously** 84:4
87:3 106:1,12
219:8
**occasions** 82:22
**occurred** 17:2,14
144:2 162:13,14
**occurring** 197:17
**october** 236:16
**offenders** 162:10
162:20 163:5
168:4 172:20
**offenses** 162:18
167:16
**offer** 97:10,15
122:17
**offers** 229:13
**offhand** 34:3 97:8
145:23 157:20
164:6
**office** 84:20 85:13
86:24 94:22 95:1
95:5 108:15,16,22
109:14 110:1,2
111:2 116:25
117:17 119:9
128:7 129:19
130:3,12 133:1,16
133:23 134:3,9
135:7 136:3
137:15,18 138:22
139:7 140:22
141:10 142:3

146:14 148:5
149:1,14 150:9
160:12,14,15,20
161:11,12,14
166:25 167:3,5
168:8,24 169:5,16
170:2,9,17,22
171:19,24 172:1
173:1,8,13 176:7,8
178:5 183:14
195:19,22,25
196:3,6 197:19
203:11,13,25
207:7 214:4 222:6
231:14 236:6
**officer** 165:6,12
175:10
**officers** 161:21
162:1,3 172:18
176:12 213:1,4
223:10,25
**offices** 104:22
**official** 71:9
230:17 238:15
239:21
**officials** 48:5
**offshoots** 162:24
**oh** 63:5 64:22
129:25 137:6
189:23
**ohio** 1:2,9,13,22
3:4,13 5:9,15 9:5
13:4,5 19:22
22:11,12,18,23,25
23:4 24:3,5,9,13
25:6,15,19 26:1,14
26:16,17,19,25
28:3,3 30:22 31:2
31:7,14,25 32:12
32:18,22 33:6,23
34:1,8,8,17,20,25

35:18 36:10,19,20
37:24 38:7,25
39:13 40:2,18,22
41:1 42:4,19 43:7
43:18,22,24 44:4
45:6 46:13,17,22
47:8,14,20 48:8,9
52:24 118:6 128:3
162:7,15 163:2
176:20 186:21
191:16 193:24,25
205:3 207:7
215:15 235:2,7
236:7,14 237:2
**okay** 17:3 20:10
22:8,14 23:25
24:7 28:1,4 32:3
32:11 33:17 34:24
35:10,17,22 39:8
41:18 42:12 43:4
48:23 51:19,23
56:20 57:24 59:3
64:14 66:10 69:1
71:22 72:8 73:1
74:25 75:5 81:1
96:12 106:17
108:12 112:10
117:6 121:2,4,25
126:24 131:23
139:21 141:9
143:11 144:22
146:3,12 166:11
168:6,17 169:15
169:20 173:22
174:12 180:23
184:11 187:25
188:25 191:4
192:7 202:22
212:21 216:6,11
216:20 218:4
219:24 220:7

221:10 222:18
224:19 225:10
228:8 229:14
231:15,25 232:12
**old** 133:23
**oldfield** 156:2
**once** 89:18 163:6
**ones** 52:17 57:5,6
57:6 62:22 150:25
222:6 228:10
229:15
**ongoing** 179:5
186:3 187:10
204:13
**op** 1:10,12,14
**open** 62:10
**operate** 165:22
**operated** 124:19
167:11
**operating** 96:17
98:19 99:21
**operation** 126:8
174:8
**operationally** 17:8
125:23
**operations** 18:21
89:14 164:19
173:11
**opiate** 1:6 9:4 23:3
23:8 25:21 26:6
26:10,11 28:20
29:1 30:13,15,17
44:7 50:6 53:5,10
54:22,25 64:3,5,8
64:23 66:1 72:7
72:13 73:8,24
74:16 75:3,8,13,23
76:8,14 77:6
78:10,19 79:1
80:1 82:8 83:3,9
85:20 86:14 87:25

88:23 102:13
103:3,24 104:7,15
106:8 110:13
112:2 131:22
150:5,10 155:22
155:23 157:21
163:12 164:24
171:4 191:20
196:24 198:9
202:9 212:3
218:19 237:6
238:3 239:3
**opiates** 25:22
26:20,21 28:23
32:10 33:11 35:12
44:7,8 50:6 51:12
52:9 66:22 69:7
69:12 74:9,15
78:5 101:1 111:16
194:11
**opine** 93:6
**opinions** 97:11,15
**opioid** 19:21 21:14
26:24,24 27:4,8,12
27:13,19,20 28:6
28:10,11 29:2,12
30:18,19,24 31:4,9
31:10 36:13 41:23
41:25 42:7,21
43:1,8,12 45:19,24
54:15 60:22 73:5
73:13 83:25 84:10
85:7 101:24 102:8
102:17 103:17
106:21 107:2,11
107:12 130:5,7,14
150:1,15 151:3,11
151:18 152:2
155:20 157:16
158:5,14,17 159:7
159:17,23 160:13

160:22 161:13,18
163:15 164:16,23
165:20 166:12
167:4 168:9 169:6
169:7,17 170:10
170:18,23 171:9
171:20 172:3
173:15 174:2,15
175:25 190:25
191:10 192:5,8,23
193:1,4,7,10,13,16
193:19 194:16,20
197:7 198:3 199:6
200:21,23 204:8
206:4 209:8 210:7
214:17 215:4
218:10,14 219:14
224:1,6,10 232:5
232:13
**opioids** 27:24
35:23 39:4,19
40:3 41:19 44:2
45:10,15 52:25
55:10,13 58:18
59:15 60:21 68:2
73:5,12 85:2
108:14,14,24,25
109:7,8,21,22
110:3,3,16,17
111:4,4,19 112:15
112:16,24,25
113:18,19 115:11
115:12,18,18,25
116:1 117:9,9
150:21 152:15,15
152:16,25 153:2,5
153:6,6,20,20,21
154:15,15,16,19
155:4,6,8 156:15
156:16,16,18
157:1 209:14,15

209:21,21 210:2,3
210:9,10,17,18,24
210:24 221:8
228:15
**opportunities**
86:25
**opportunity** 47:2
117:16
**opposed** 24:23
60:4
**options** 174:25
**order** 5:12 103:11
126:3 127:20
128:18 176:24
229:1
**organizations**
25:18
**oriana** 95:22
98:22,24 99:1,9,14
99:24 100:19
101:3 102:22,24
103:13 107:9,12
167:12 172:16
173:25 174:1,3,14
174:18 219:6
227:21,24
**original** 12:6
50:24 55:24 56:13
56:16 64:13,15,24
65:2 68:24 129:21
135:16 179:11
182:3 184:7
**originally** 16:10
56:25 64:19 131:8
**outlined** 61:9
202:6
**outside** 90:18 91:2
91:10 118:2
182:18 184:1
186:17

**overall** 87:19,23
149:2 183:15
186:24 207:13
224:24
**overcrowding**
162:8 165:8
**overdose** 19:23
21:17 22:13,21
23:2,4,6,9,15 26:2
26:11,23 27:3,7,11
27:23,24 28:2,6,10
29:6,8,24 30:6,11
30:23,23 33:7
36:24 37:3 38:25
39:13 40:2,18,21
40:25 42:4,19,25
43:7 44:15 47:12
47:17 48:3,13
84:19 130:14
194:1 205:5
**overdosed** 42:6,25
43:6,12
**overdoses** 23:11
23:15,18 27:16,18
28:15,18,19,21,23
29:1,5,6,11,11
30:8,12,13 31:3,8
33:5 34:17,19,25
35:4,6,18 36:10,23
37:14 39:18 41:23
41:25 45:3,14,18
45:23 47:15,16,19
84:22 85:2 113:6
134:24 152:23
194:2,11 196:9
201:15 205:18
209:20 210:1
218:11 219:15
221:23 224:1,7
**overdosing** 26:23

**overload** 118:18
**overtime** 131:6
135:23,24,25
171:12

**p**

**p** 2:3
**p.m.** 127:2 233:19
**page** 12:3 186:1,1
196:12,18 216:17
217:3,15 228:10
228:11 232:25
237:13,15 239:7
240:3
**pages** 229:11
**paid** 97:9 99:24
131:15 133:18
146:3,5,14,22,23
176:6 212:8 213:3
232:8
**pain** 87:23
**pam** 110:6
**paper** 47:9
**par** 2:8,9 230:16
**parents** 201:19,20
**park** 225:4
**part** 33:24,25
61:14 71:13 72:13
74:1 96:17 97:24
100:19 105:9
134:21 147:9
152:6 159:12,13
162:6,6 175:4
195:10 199:12
207:13 213:4
218:21,25 225:13
227:2 231:17
239:9
**partial** 146:10
**participate** 13:12
24:12,18,21 46:9
49:21 228:4

**participated** 25:11
48:16 49:7 63:13
155:19
**participating**
25:17
**particular** 33:13
35:7,8 36:24 37:1
37:4,5 38:8 39:21
72:5 90:1 96:21
102:1 104:23
111:5 134:17
179:12 183:14
188:11,15,16
189:4,9,10,16
190:2,6,8,8 198:6
221:13 232:19
**particularly** 103:5
167:15
**parties** 101:8
**parts** 16:2 123:18
209:7
**party** 93:13 236:2
**pass** 93:7 211:11
**passed** 201:20
**pathologist** 118:13
**patients** 218:9
219:14
**patrol** 222:8
**patrols** 224:20
**pay** 17:11 71:25
97:4,7,16,23 98:5
128:5 133:20
138:7,12 143:4,11
144:11,15,19
145:16 147:2,15
165:11 172:22
214:6 218:23
222:13 224:21
**paying** 17:12 96:1
97:14 129:11
142:16 143:8,23

146:19 147:6
176:15 231:9
**payroll** 141:4
**pays** 98:23 227:25
**pellegrino** 1:25
235:6 236:13
**pendell** 2:3 9:8,8
12:23 13:8 20:25
37:7,9 51:16,19
54:17 58:1,8,12
59:7 65:7 67:22
69:17 77:7,17,24
78:12 79:2 80:2
80:16,22 83:6,11
84:2 85:14 87:8
90:17 91:10,16
92:23 93:18 94:18
101:25 103:20
107:16 113:1,7
114:13 115:4,13
115:19 116:2
117:10 123:24
124:24 125:13
126:5 127:23
134:13 135:2
140:25 147:25
148:8,19,24
149:12,18,23
150:3,18,23 151:6
151:21 152:18
153:8,23 154:3,20
154:22 155:9
156:19,22 164:11
168:10 171:1,21
172:10 178:12,16
179:22 181:2
182:22 183:1,21
184:6 187:8,12,19
188:3,12,17 189:6
189:11,18 190:3,9
191:11 193:22

194:21 195:3
196:19 197:9,15
198:4 199:7,17
200:1 201:1 202:4
202:17 203:19
204:22 209:10,16
209:22 210:11
211:1,6 214:18
217:7,12 220:4
224:12 228:17
231:5 233:10
237:5
**people** 23:8 27:23
28:1,5,9 42:24
43:6,11 48:5,17
79:18,18,19 85:12
88:11 91:2 93:5,5
93:12 94:15 97:15
98:13 99:9,17
100:2,4 101:24
102:8,17 103:7,16
104:22 106:5
107:11 120:3
152:14,24 153:4
154:5,12 155:3,14
155:15,18,21
156:13 172:14
192:12 200:8,13
201:17 210:7,15
210:23 213:14
**people's** 209:13,20
**percent** 15:20,24
16:3 18:24 39:17
40:2,10 42:5,19
44:2,12,24 53:7,10
53:19 54:1,5,15,22
55:1 119:6 149:15
186:20
**percentage** 29:11
30:17 31:8 40:13
40:17,21,25 41:22

41:25 42:13 43:4
43:5,6 45:17
54:21,24 55:9
58:17 59:14 60:20
130:3,10 152:1
155:3 156:12
**percentages** 41:5
41:12 56:1 151:9
**perform** 57:9
117:18 119:14
120:21 126:19,23
127:10,20,21
128:2,18 132:11
132:21 143:12,16
144:11,19,24
145:17,22 146:4
146:14,20 147:2,6
147:11
**performed** 129:19
130:2 132:13
**performing**
117:23 119:10
123:22 124:2,12
125:12 126:4
128:15 129:1,4
130:12,22 131:25
143:24
**period** 33:5 34:14
35:2,4 37:15,17
38:15,21 39:14,23
40:16,22 44:17
82:15 88:6 92:8
108:4 112:11
113:5 123:8
125:25 143:6
146:15 171:13,25
190:19 191:14
194:7,9 196:7,23
**periods** 183:9
**permission** 115:2

**person** 42:6,21
43:7 45:18 140:16
147:22 155:16
**personal** 91:5,6
155:11
**personally** 104:18
153:24 154:25
155:1,12 156:6
238:11 239:15
**personnel** 57:2,10
57:19,24 62:19
75:16 78:22 86:11
86:11 135:25
210:22
**persons** 142:19
**pertaining** 90:23
**peveich** 5:6 49:11
66:18 67:1,8
68:10 80:21,25
81:2,25 82:4
83:14 113:20
116:10
**pharma** 1:10,12
1:14
**pharmaceutical**
2:9
**pharmaceuticals**
2:8,8 3:2
**pharmacy** 5:16
215:18 216:4,24
**phone** 10:4 113:9
113:10 233:10
237:3
**physical** 60:1
**physician** 107:15
**physicians** 107:22
**picked** 113:4
**picture** 201:19
207:13
**piece** 132:4,8,24
133:14,21 135:1

219:9
**pills** 200:7,11
**pin** 20:4
**pinpoint** 215:3
**pipeline** 123:14
**place** 9:5 25:20
85:6 88:19 153:1
164:5 179:14
235:19
**placed** 175:20
**placement** 50:5,5
50:7,8 51:11 52:8
55:8,9 56:23
58:16,17 59:13,14
60:20,21 61:2,7,10
62:4 87:3 152:1,5
159:19
**placements** 52:12
52:20 53:10 54:15
54:21,25 55:12,12
60:4
**plaintiff** 186:2
**plaintiff's** 5:9
176:20 226:9
227:7
**plaintiffs** 5:15 9:9
9:11 215:15
**plan** 122:16 123:4
141:4
**plans** 142:1
**playing** 140:19
**pleas** 101:16
161:17,20 163:14
164:1,14 165:7
175:4,8 228:2,6
**pleasant** 2:5
**please** 9:6 113:9
237:11,11
**plus** 29:23 128:25
129:9 136:9,15
164:9

**point** 13:24 23:18
42:4,18 45:3
47:22 84:21 86:16
89:10 121:13
124:13,18 126:22
130:15 142:25
144:22 153:18,24
154:14,21 155:17
196:23 197:1
199:3 202:20
214:24 217:4,16
217:18 219:8,13
220:10 221:12,20
225:16 226:8
**police** 223:10,25
**political** 89:7,9
225:13
**polster** 1:8
**pool** 87:3 218:18
222:11
**pools** 62:14,15,18
181:13,14 185:18
185:19
**population** 31:23
168:23 169:1
172:6,12 226:22
**porter** 2:10
**portion** 128:10
232:8,10,14
**portions** 15:10,18
**pose** 171:17
**posed** 216:4
**position** 10:19,22
15:15,16 63:16
67:10 71:4 79:10
118:11 122:23
125:24 126:17
140:14,17,18,23
140:24 141:3,6,25
142:8 157:19,22
158:5,17 159:6

165:1 175:16,18
192:18,21 194:15
**positions** 157:16
158:13 159:10,16
159:22 160:11,18
160:21 161:13,18
161:25 162:2,25
163:14 164:15,18
164:20 165:6,13
165:18 166:12
167:3 168:7,15
169:4,17 170:1,8
170:16,23 171:3,7
171:19,25 173:3
173:14,18 174:1
174:14 175:9,10
175:14,24 176:9
**positive** 119:7
181:11
**possession** 150:8
162:12 163:5,10
204:1,5
**possible** 105:6
**possibly** 51:22
133:12
**posted** 46:6
**pots** 73:18
**practicality**
142:14
**practice** 142:11,13
**practices** 191:22
192:4,8
**preliminary** 51:3
**prepare** 12:18
19:14 21:3 43:19
49:22 67:15 81:21
83:18,21 88:15
135:20 177:24
**prepared** 67:16
68:24 69:3,11
70:16 75:17 86:8

110:22 178:1
184:13 189:1,14
189:22 192:17
205:22,25
**preparing** 93:25
**prescribed** 41:24
44:13
**prescription** 1:6
9:4 26:20,21,24
27:4,8,13,19 28:11
29:2,12 30:19,24
31:4,10 32:9
33:10 35:12,23
36:13 39:4,9,19
40:3 41:9,19,23,25
42:7,21 43:1,8,8
43:12 44:1,8 45:9
45:14,19,23 83:25
84:10 85:7 108:14
108:25 109:8,22
110:3,17 111:4
112:16,24 113:18
115:11,18 116:1
117:9 130:5,6,14
152:14,25 153:5
153:19 154:14
155:4,22 156:15
156:25 209:14,21
210:2,9,17,24
221:8 237:6 238:3
239:3
**prescriptions**
44:13,23 45:9
218:20
**presence** 235:14
**present** 3:15 49:5
66:18
**presently** 112:8
**pretty** 93:10
181:14 185:22
229:8

**prevention** 64:16
73:24 86:20
111:14,18 112:5
112:15,24 113:18
115:11,17,25
116:4,20,22,23
117:2,8
**previous** 20:12,15
21:22 42:7 62:16
87:4 102:23
150:25 151:14
**previously** 17:11
68:4 78:15 83:22
110:21 177:13
**prices** 87:22
**primarily** 56:23
57:2 75:16 78:22
96:5 101:1 136:1
162:11 168:19
207:1
**primary** 73:8 87:2
88:14 96:11
102:25 110:8
**prior** 20:15 25:23
31:10 37:6 42:8
42:22 43:9,14
54:8 55:20 62:19
66:8 82:15,18,18
82:20 135:13
138:5 164:4
172:13 182:1
216:8
**prison** 162:8,17,19
167:15
**prisoners** 156:24
162:16 165:9
**prisons** 162:14
**private** 95:1,6,11
97:19 161:15
174:3

**privilege** 51:17
**privileged** 58:3
**pro** 221:19
**probably** 15:20,24
33:15 47:24 48:4
49:18 50:23,23
53:2 54:19 59:2
84:13 92:15
104:11 110:6
111:20 114:16
120:10 121:16,21
122:3,25 136:21
138:17 152:24
164:6 178:25
186:22 199:11,12
214:9 218:1 221:1
222:3
**probation** 95:19
95:21 98:8,13
99:23 161:21,25
162:3 163:1 165:6
165:12 172:18
175:2,8,10 176:5
176:12 213:1,3
227:24
**problem** 124:6
157:17 158:6,17
159:7,17,23
160:13,22 161:13
161:19 163:15
164:16 165:20
166:13 167:4
168:9 169:7,18
170:10,18,24
171:5,9,20 172:3
173:15 174:2,15
175:25 190:25
191:10 192:23
193:1,4,7,10,13,16
193:19 194:16,20
197:7,11 198:3

199:6 200:21,23
202:21 206:5
209:8
**procedure**  10:9
234:7 238:5 239:5
**processes**  200:10
**produce**  17:25
138:11
**product**  51:17
58:4 67:23 93:2
93:20
**production**  237:15
237:17,22
**productivity**
87:21,23
**profit**  161:15
174:4
**profits**  158:12
**program**  108:16
108:18,22 109:15
109:18 110:1
111:3 155:17
162:18 166:7
**programming**
72:23 165:24
166:6 167:25
168:20,21 174:10
219:6
**programs**  110:8,9
163:9 174:23
**projected**  27:15
27:18,22 28:5
**projection**  205:16
**projections**  205:3
205:4 206:3
**projects**  204:16
**prompt**  19:4
**prompted**  25:19
55:22 134:8
**proper**  91:4
221:22

**property**  190:17
207:1,2
**proportion**  214:4
**prosecute**  97:4
**prosecuted**  94:24
95:13 96:3 97:12
98:20 148:4
149:19 154:18
156:17 203:6
**prosecuting**  97:11
100:1
**prosecution**  100:1
**prosecutions**
149:13
**prosecutor**  95:18
95:19,25 99:22
**prosecutor's**  148:5
148:25 149:14
150:9 160:12,14
160:20 176:8
203:11,13,25
**prosecutors**  96:1
96:10
**protocol**  93:10
**provide**  20:23
29:10 31:12 40:13
55:3,17 57:21,22
60:18 73:4,12
75:3,11 101:23
103:1,14,23
105:19 109:12
113:21 118:22
168:19 174:9,19
174:22 213:14
216:22 222:8
**provided**  10:8
14:11 24:14 30:22
31:2,8 55:14
58:22,23,24 59:4
60:14 61:14,16
63:21 64:10 75:25

76:2,3,4 77:9
78:13 86:9 99:9
106:20 138:19
147:13 162:22
165:14 178:5,9
187:4,9,13,16,20
187:22 203:10,22
205:3 216:11
217:9,22 219:7
224:5 225:22
226:6 227:20,20
230:1 232:19
**provider**  105:16
105:19,22
**providers**  100:25
101:12,22 102:6
102:16 103:14
105:11 106:18,19
106:25 107:1
158:10 229:18,24
**provides**  72:10,12
72:21,24 99:2,14
100:19 108:17
191:16,17 227:24
229:21,22
**providing**  72:13
96:19 100:14
102:7,16 103:16
105:25 107:11
119:4 218:8 223:9
232:17
**psycho**  164:21,21
164:25 175:18
**psychological**
101:4
**public**  36:17 48:5
49:13,14 71:1,5,6
71:8,9,12,19 72:1
72:10,17,22,25
73:3,4,9,11,24
74:4,5,8,15 75:2,6

75:13,21 76:13,21
77:5,15,21 78:9,18
78:25 79:13,20,25
81:9,18 86:22
88:11 94:20,21,25
95:5,10,17 97:19
110:11 161:11,12
161:14 162:15
175:23,23 176:1
198:6,7 203:24
225:4 226:14
231:16 235:6
236:13 238:10,18
239:15,23 240:23
**pull**  167:20 203:17
219:2
**purchase**  128:6
133:7 135:1
**purchased**  133:1,2
133:8,15 134:4
**purchases**  133:18
**purdue**  1:10,11,13
**pure**  151:2
**purely**  208:23
**purports**  107:10
**purpose**  21:2
**purposes**  11:18
68:14 116:24
176:25 177:7
215:20
**pursuant**  5:11
98:23 176:23
234:3,6
**pursue**  96:2
**push**  162:20
**pushed**  167:14
**put**  87:5 94:7
129:22 131:9
139:4 141:5
178:21,23 179:3,9
181:7 204:23

208:18 209:5
214:14 220:12
229:2
**putting**  25:1 36:25
182:8

**q**

**qualified**  134:6
235:8
**qualify**  120:4
**quantify**  96:12
132:22 209:6
**quarter**  119:25
**question**  51:14,21
51:22 59:9,17
63:12 78:15 91:9
91:14 93:16,17
97:18 106:23
107:5 112:10,12
113:23 115:14,15
134:6 147:10
148:14 150:24
151:10 153:3
154:13 156:3,5,8,9
156:11,23 168:6
171:17 189:19,20
211:22 219:23
227:15 231:3
233:11
**questioning**  218:6
**questions**  12:14
14:14,16,17,19,21
14:23,25 15:5,6
32:6 91:2 135:9
152:7 155:11,11
177:18 201:10
211:16 233:13
**quick**  230:14
**quiet**  93:15
**quite**  155:21,25
171:16 179:1

**r**

**racial**  31:18
**radar**  41:16
198:24
**range**  53:19 55:1
87:14,15 120:11
137:13 175:22
**ranjan**  3:12 4:9
9:17,17 211:13,15
222:25 223:7
230:6
**rata**  221:19
**rate**  145:19 147:23
148:2,6,10,16,21
149:2,10,13,17,21
150:1,15
**rates**  19:24 21:17
22:13,13,21,22
33:12 151:1,8
**rationale**  138:13
**reach**  110:14
135:11
**reached**  143:2
202:20
**react**  198:16
**reaction**  92:2
**read**  15:9,14,19,20
15:23 16:2,3 24:8
40:10 46:25
191:19 233:15
238:5,6,12 239:5,6
239:17
**reading**  15:3
16:21 24:23 33:20
47:4 237:19
**realigned**  168:13
**reality**  125:16
143:22 168:12
199:10 217:23
**realize**  16:11 19:4

**realized**  197:11
**realizes**  200:19
**reallocating**
207:15
**really**  31:15 41:15
74:22 85:22 89:13
126:14 128:7
138:4,18 144:6
147:16 183:5
198:12,21 201:14
224:18 229:8
230:14,21 231:8
**reason**  106:21
237:14 239:8
240:3
**reasonably**  12:16
215:2
**reasoning**  140:10
**reasons**  17:6 74:22
213:12
**recall**  15:7 25:25
27:15 35:17 36:8
39:7 41:7 42:18
43:25 47:23,24,25
48:19 49:15 50:12
53:8,19,25 54:5
55:18 61:4 65:20
65:20 66:16 74:17
75:24 76:4 77:25
77:25 78:4 79:3,6
80:8,11 81:4 83:7
83:9,12 89:22
92:6 93:23 115:22
123:5 137:10,11
145:23 146:9
157:24,24 159:4
160:8,10 161:3,6,8
161:10 163:24
164:6 166:9,20,22
166:24 177:21
206:22

**receipt**  237:18
**receive**  101:8,12
101:14,20 105:12
105:16 118:22
161:4 167:17
171:24
**received**  16:15
42:6 55:20 68:19
69:25 75:21 77:6
77:15,22 78:9,18
80:19 212:1 213:8
**receives**  75:7
79:25 102:10
**recess**  52:2 65:14
127:3 203:1 223:4
230:10
**recession**  198:15
206:23
**recipient**  107:13
**recognize**  215:23
**recollection**  70:15
76:20 77:12 82:8
85:3 114:8 139:2
146:25 147:4
**record**  9:2,7 51:25
52:4 65:12,15
127:1,4 202:24
203:2 215:9 223:1
223:2,5 230:7,8,11
230:15 233:16
239:9
**records**  107:23
152:9 219:2
**recover**  199:25
**recovery**  229:12
230:2
**recreation**  168:19
168:20
**redesignating**
167:11

reduce 43:25 45:8
reduced 45:17,22
 235:13
reducing 45:14
 207:5
reduction 44:12
refer 95:25 97:25
reference 214:6
 237:7 238:2 239:2
referenced 98:8
 235:13,17 238:11
 239:15
referred 14:23
 47:10
referring 89:25
 95:18 132:15
 148:10 182:12
reflected 65:5,18
 65:24 183:19
 184:19
reform 163:4
refresh 21:4,5
 114:8
refusing 172:8,19
regarding 58:16
 63:1 67:8 68:1
 74:9 78:17 95:16
 108:13,24 109:7
 110:2,16 111:4,18
 112:15,24 113:18
 115:11,18,25
 117:9 152:21
 234:2,11
regardless 128:2
reimbursed
 103:11
rejected 91:3
related 23:3,8 26:7
 26:11 30:13 44:7
 52:24 53:6,11
 54:15,22,25 56:24

60:22 65:21 66:1
66:22 68:1 69:9
69:12 72:6,13
73:5,8 74:16 75:3
75:8,23 76:7,14
77:6 78:10,19
79:1 80:1 86:12
95:20,21 96:8
97:22 102:13
132:16 150:1,15
151:3,11,18 152:2
157:21 164:23
166:3 191:6 192:1
203:24 204:13
218:10 219:14
221:6,7 223:13
228:15 230:4
232:13
relates 1:8 56:7
 97:19 100:16
 101:1 110:13
 116:13 117:16
 224:10
relating 58:15
 69:7 73:12 200:6
relative 236:2
relatives 87:25
relayed 181:9
relevant 222:3
reliable 53:2
relief 216:23
religious 168:22
relocate 125:17
remember 22:24
 28:22 29:20 31:13
 33:20 34:10 35:14
 35:23 36:6 37:19
 39:5,8 41:11,19
 42:9 43:17 65:24
 80:12,17 81:1
 84:21 103:5 108:2

121:22 133:4,6
134:20 135:4
143:9 201:19
221:12
renee 1:25 235:6
 236:13
rep 81:22
repeat 189:19
rephrase 227:15
replace 133:15
 140:16
replacement
 228:24
replacements
 131:18,20
replacing 133:23
 229:2
report 27:2,6,10
 33:3,18,22 34:2,10
 37:13,20,25 38:3
 38:10,13,16,20,23
 39:12 40:1 42:9
 45:6,12 47:10
 48:9 57:18 59:1,4
 61:15,16 63:8,9
 64:10 66:11 67:15
 67:18,19,20,21
 68:1,3,18,23 69:14
 69:19,22 70:1,3,8
 70:14,16,21 75:25
 76:1,6,16,22 77:4
 77:9,13,19 78:3,6
 78:7,21,23,24 80:5
 80:14,19 81:2,5,8
 86:7 92:24 102:4
 103:9,10 105:22
 110:22 185:2
 194:4 205:4
 225:22
reported 26:1,6
 28:14 29:4,16

34:16 37:6 46:2
74:1 107:2,8
reporter 4:14 10:6
 238:7
reporter's 4:12
 235:1
reporting 29:5,21
 30:5 34:5
reports 22:10
 33:16 46:2,15
 47:1 48:7 51:6
 56:5,10 57:21
 58:14,23,24 62:24
 101:21 102:23
 103:14 178:10
 180:21,22 189:13
 191:18 192:11
 201:18
represent 95:7,12
 211:15
representative
 11:5 12:4 49:23
 155:12 229:24
representatives
 48:24
representing 93:5
 94:22
reputable 25:16
 25:17
request 20:22
 51:13,20 67:17
 75:11 93:1 114:7
 114:18,20 120:25
 138:4 140:1,5,7,12
 158:2 159:9,11,14
 167:6,7,9 170:5
 176:16 239:9,11
requested 18:2
 65:22 114:1 138:1
 139:22,24 157:19
 157:23 158:13

159:9 168:14
169:13,19,20,22
170:3,12,19 234:1
234:6,10
**require**  106:18,25
**required**  52:24
103:9,10 106:7
237:25
**requirement**
153:1
**requirements**
118:8 122:22
123:6
**requires**  97:21
**research**  13:3 22:3
22:5,8 24:10
25:23 43:18
223:16
**reserve**  112:1
115:3 233:14
**residency**  122:21
123:1,5 125:6
**resident**  142:3
**residents**  47:16,17
47:20
**resources**  92:3
119:14 123:10
207:15
**respect**  99:20
232:23
**responder**  222:9
**responders**  221:22
223:11 224:1
**responding**  222:9
**response**  5:10
82:12 84:23
176:21 217:14
**responses**  5:16
215:16 216:3
223:24 224:6

**responsible**
200:25
**restore**  123:15
124:11,22 125:20
126:11,14 167:25
**restricted**  160:16
**restrictions**
160:17
**result**  86:14 89:3
120:23 131:21
163:11 165:8,8
167:19 168:3
169:6 172:17
174:5
**resulted**  27:3,7
30:17
**resulting**  30:23
31:3 83:25 84:11
85:7 130:5 210:1
**retail**  5:16 215:17
216:4,24
**retained**  4:14
**retired**  143:7
**retires**  140:16
**returned**  237:18
**revenue**  17:25
86:25 126:10,12
127:16 130:21
131:24 138:12
186:3 187:2,7,11
187:14 198:20
208:10,13,15,21
209:2 225:17
226:21 232:15
233:6
**revenues**  87:22
131:13 206:25
207:2 222:15
**review**  13:15,21
14:9,15 18:6,9
19:7 22:21 45:6

50:10 53:13 54:12
57:9 58:15 59:12
59:21,24 61:22
67:3 82:16 83:1
151:25 152:5,6
234:2,6 237:12
238:1 239:1
**reviewed**  12:24
13:18,24 14:2
16:6 18:14,23
19:3,11 24:25
50:21 51:2 60:10
60:13 63:23,24
64:3 65:21 68:17
68:20 69:14 70:4
148:9,11,12
179:21 180:2
218:19
**reviewing**  21:2,23
24:3 33:1 65:1
**reviews**  44:20
**revise**  56:18
**revised**  76:22 77:4
**revisited**  138:9
**rice**  2:2 9:9,11,13
**right**  16:25 88:4
123:9 133:13
151:10 170:6
175:17 191:2
212:3 226:12
233:15
**rise**  50:7 61:1,7
62:3
**risen**  172:12
**risk**  125:10
**road**  140:15
171:15 222:8
**role**  157:4,7
217:17
**roof**  131:19

**rotary**  222:12
**roughly**  23:2 26:4
30:4 31:22 44:12
53:6 87:13,16
108:5 182:24
185:8 194:13
208:6 221:2
222:11
**routinely**  155:25
**rpr**  1:25
**ruled**  91:1
**rules**  10:9 234:3,7
238:5 239:5
**run**  87:13 134:20
172:9,16
**running**  17:13
**runs**  108:16
136:20 155:17
**rural**  118:14

**s**

**s**  237:15 239:8,8
240:3
**sacwis**  52:12,25
53:3,14 54:13
56:7,11,13 58:15
59:21 60:5,7,14
62:12 63:25
151:25 183:6
**safety**  48:5 198:8
203:24 226:15
**salaries**  129:11
**salary**  119:24
176:12
**sales**  87:21 190:17
207:1
**sample**  132:18
**samples**  214:6
**sanitary**  225:7
**sat**  20:7 50:3 121:1
184:23

save   48:6
saw   16:23 25:13
  25:14 201:7
saying   42:10 91:8
  91:13 95:4 116:23
  119:8 128:13
  161:24 182:11
  187:21 196:8
  197:2
says   26:10 107:14
  186:1
scenario   105:6
scene   134:16
schedule   119:3
  138:9
school   122:19
scope   90:19 91:3
  91:11 154:4,23
  188:18 199:8,18
  200:2 201:2 202:5
  202:18
screens   120:22
seal   236:6 238:15
  239:21
second   5:10 12:3
  37:25 48:2,10,11
  51:13 59:8 65:8
  69:14,19,22 70:1,3
  70:8,13 120:25
  139:23 140:2,11
  140:17 176:20
  181:3 185:7 218:7
  219:13 220:10
  223:1
secondary   102:25
see   11:25 12:3
  16:7 17:1 18:5,15
  18:24 25:14 30:21
  31:1,6 32:14 44:9
  44:25 45:2 84:23
  104:17 105:3

179:13 186:5
  191:5 194:2,3,4,8
  204:14 213:13,17
  216:21 217:1,2
seeing   31:13 84:22
  134:9 201:9,18,19
seek   216:24
seeking   106:5
  107:7 116:17
  130:20 131:1
seeks   107:6 186:2
seen   69:22 150:5
  152:9,12,19
  180:16 181:24
  182:1,2 216:8,9
  227:3
sees   197:14
self   107:2
semi   127:24 141:1
send   118:17,18
  201:16
sending   214:6
senior   72:22
sent   114:23 172:15
sentence   88:9
sentenced   162:17
sentencing   162:21
  163:3,4 167:13
  174:25
separate   73:1
  108:6 109:25
  116:22 176:2
  184:25 185:1,21
  205:24 209:12,19
  209:25 210:6,14
  210:21 225:12
  227:5
service   64:17
  101:11,22 102:6
  102:16 103:14
  105:11,16,19,22

106:18,18,25,25
  119:4 158:10
  167:24 168:18,25
  172:2,22 173:16
  217:25 229:18,24
  232:13,17
services   17:19
  49:12,13 50:15
  52:16,23 53:14
  54:13 57:8 62:8
  62:25 63:2 72:14
  72:21,22 73:5,8,12
  74:14 75:3,8,23
  76:14 77:6 78:2
  78:11,19 79:1,18
  80:1,6,15 96:15
  98:13 99:2,5,6,8
  99:15 100:19
  101:17,23 102:7
  102:16,21 103:1
  103:16 105:18
  106:1,2,4,10,19
  107:6,8,11,14
  108:17,18,23
  109:6 110:15
  111:14 112:4,6
  114:23 116:25
  158:11 159:5,8,15
  159:21 167:18
  168:21,22 174:20
  174:22,23 213:13
  213:14 222:5,13
  224:9,14 226:10
  226:15 227:19,22
  229:12 230:2
  231:10
set   5:17 215:18
  236:5
sets   134:19
seven   200:22

sewer   225:7
sex   23:13 28:16
shape   228:19
shapiro   90:2,4,8
  90:12 91:21,25
  92:12,13,15,19
share   53:16,21
  54:2,7 55:6 64:7
  89:19 92:5
shared   53:8 54:11
  56:21 59:20,23
  89:20,21,22
  110:23
sharing   59:6
sheet   23:10 237:13
  239:7,10,18 240:1
sheriff   167:20
  173:1,8,9,10,11,13
  173:14 183:14,19
  183:19 185:10,10
  222:10,11
sheriff's   108:15,16
  108:22 109:14,25
  110:2 111:2
  116:25 166:25
  167:3,5 168:8,24
  169:5,16 170:2,9
  170:17,22 171:18
  171:23 172:1
  173:1,8 176:7
  183:14 222:6
shifting   88:25
shocked   92:3
shocking   190:20
shortage   120:3
show   11:21 107:10
  134:19 152:9
showed   38:24 65:2
  114:15
showing   57:18
  68:4 83:9 84:20

[showing - split]                                                                Page 37

147:15 177:10
201:17
**shown**  82:9 237:16
**shows**  83:3 102:6
103:15
**shut**  93:8
**side**  74:18 93:11
106:3 184:17,17
184:20,20 208:15
208:24 228:23
**sign**  233:15
**signature**  234:5
236:12 237:14
**signed**  197:6
238:13 239:18
**significant**  166:2
228:15
**signing**  237:19
**siloed**  197:1
**similar**  15:15
42:12 63:21 64:1
179:16 181:14
185:23 221:4
228:5
**simple**  123:25
**simply**  24:25
231:4
**sincerely**  237:21
**single**  93:13
**sir**  168:6 171:14
237:10
**sit**  179:11 182:4
186:21 194:7
**site**  22:25 36:17
**sitting**  108:21
121:22 122:8
164:13 168:5
219:11 220:21
224:8 225:19
226:2

**situation**  42:5,20
118:5 131:12
154:10 155:1,13
155:15 156:7
164:24
**six**  136:5,9,15
137:18 138:24
141:18
**sixth**  137:21
138:24
**size**  226:22
**skimmed**  16:4
**skoda**  49:13 70:24
73:19,21 75:1,20
78:17 79:15 81:10
82:2 83:17
**skyrocketed**  39:22
41:2 191:15
**skyrocketing**
44:10,25 194:6
195:8 196:17
200:20
**slides**  132:17
**slots**  162:1
**slowly**  29:25 194:5
195:17
**smacked**  195:9
**small**  73:7
**smaller**  56:24
73:18 96:9 110:20
111:20 112:18,20
112:21 146:11
**social**  114:23
**society**  87:20
**soliloquy**  91:16
**solution**  134:21
**solutions**  2:8
162:21 237:1
240:1
**somebody**  97:5
104:4 107:6

125:17 144:4
147:15 154:25
155:1 156:7
**somebody's**
104:15
**somewhat**  17:8
123:7 198:16
**sorry**  63:7 113:7
113:12
**sought**  16:15
135:13
**sounding**  94:8
**source**  36:20
38:14 208:10,13
208:15,20 209:2
**sources**  38:13
73:23 75:2,12
76:7,9 78:5
101:18 211:25
**south**  1:22 2:5
**spaces**  225:4
**speak**  84:6,12
85:15 93:6,12
111:1 116:9
132:12 188:23
199:20
**speaking**  226:1
**special**  91:1
112:23 114:1,12
116:11
**specific**  60:3 61:21
61:23 77:14 96:14
109:21,23 110:9
111:15,16 112:17
116:6 117:7 132:1
135:19 148:14
152:4 154:13
166:8,8 168:7
205:13 232:2
**specifically**  15:8
29:9,23 35:13

38:18 39:7 43:2
47:21,25 50:13
74:17 80:9,11
85:16 106:13
109:3 110:18
111:23 112:12
113:23 134:14
157:20 212:2
214:11 216:15
222:1
**specified**  235:20
**spend**  32:22 65:25
66:2,3 110:2
112:14 115:2
214:5
**spending**  21:11
50:20 66:5 108:13
108:23 110:10,12
119:9 190:25
194:19 197:5
199:5 200:21
214:10
**spends**  80:1 110:1
110:16 111:7
**spent**  50:8 61:2,10
61:13 64:4,4,5,7
75:12 78:25 79:6
95:11 101:23
102:7,15 103:15
104:10 107:10,24
108:2,7,7,18 109:7
109:14 111:2,7,18
113:17 115:24
120:11 171:7,11
179:1 192:22
194:15 195:6
201:4 204:8 219:8
**spike**  144:1
**spiked**  205:20
**split**  115:22

**[spoke - summit]**

spoke  211:24
spot  144:17
spread  195:12
spreadsheet  5:13
   25:2 177:4
square  55:25
ss  235:3
stab  69:9
staff  50:9 57:3,3,4
   61:3,13,25 62:7
   74:1 84:18 90:7
   120:15 166:5
   167:7
staffed  129:6,6
staffing  64:22 87:1
   127:21 159:10
   164:2,9 167:22
   169:13 226:16
   228:1
stamps  106:5,10
standard  36:25
   134:19
start  124:11,13
   144:3 161:2
   171:10 196:8,12
   201:8,18
started  51:3 142:6
   143:8,16 144:23
   146:19 152:24
   156:25 195:8
   196:21,21 197:16
   197:22,23,24
   202:7 230:13
starting  174:7
   201:25
starts  207:8
   216:17
stat  150:5
state  17:12 43:24
   47:14,20 52:24
   64:5 89:11 123:18

162:7,13,15,17
163:2,3 165:9,14
172:8,9,13,18
175:13 176:6
198:15 201:15
207:8 212:16
213:3,8 231:7
232:9 235:2,7
236:14 238:10
239:15
state's  162:8
statement  238:13
   238:14 239:19,19
states  1:1
statewide  34:22
statistic  41:8 48:9
   53:17,21 54:2,7
   55:3 150:14
   152:19
statistical  204:3
   205:7
statistics  25:12
   26:12 41:9 44:19
   46:6,11,19,24
   47:10 50:3 52:19
   55:7,14,17 58:21
   59:3,5,19 62:11,12
   104:9 148:11,12
   150:7 193:24
   203:10,22
stats  148:12
status  159:11
statute  128:4
stay  121:2
steadily  172:12
steam  113:4
stenotypy  235:14
steps  196:16 197:4
   197:25 198:7,9
stop  144:1 147:20

story  200:5
streamline  218:6
streams  198:21
street  1:22 2:11,15
   2:20
strictly  191:14
   206:6 208:14
strike  195:13
strong  164:24
   165:23
structure  190:16
structuring  94:2,6
struggling  138:18
   196:11
stuck  31:16
studied  157:13
study  24:18,20,21
   27:1,9,21,25 28:7
   28:12 29:3,14
   30:10,20 33:9
   104:16,18,25
   105:3,6 185:18
   186:19 225:24
stuff  131:20
   136:20
subdivision  89:7
   225:13
subdivisions  89:9
subject  82:9 83:4
   83:9
subjects  21:8,10
submit  83:1
submitted  67:17
subscribed  238:10
   239:14 240:21
subsequent  51:6
   56:5 69:10 180:16
   180:19
subsequently
   57:17 67:16

subsidizing  131:10
substance  155:23
substances  33:11
   33:13
substantiate  55:16
suffered  131:20
suffering  87:24
   218:9 219:14
suit  88:21 202:8
suite  1:22 2:11 3:4
   237:2
summa  229:20,22
summaries  180:2
summary  88:15
summer  89:17
   92:7
summit  1:9 2:2 5:8
   5:9,13,15 9:13
   10:16,21 11:5,9
   12:4,10,16 13:9
   15:16 18:2 19:22
   21:15 23:14,19
   29:22 47:18 48:1
   48:18,25 49:23
   52:23 62:25 63:3
   63:9 68:13 71:7,8
   71:9,12,13,18,19
   71:25 72:1,4,9,10
   72:16,17,20,24,25
   73:2,3,4,7,9,11,11
   73:23 74:3,5,8,15
   75:2,6,13,20,21
   76:13,21 77:5,15
   77:16,21,22 78:6,9
   78:18,24 79:13,19
   79:24 81:9,18
   83:24 84:3,7,9,11
   85:8,11,20,24
   86:17 88:23,24
   89:5,6,12 97:10
   98:18,23 99:21,25

100:23,25 101:4
101:12,20 102:5
103:15 107:24
108:7 110:11
116:16 117:8,14
117:22 118:3,9,17
118:19,20 119:11
119:16 120:5,8
121:6 122:11,13
125:1,8 126:1
127:8,19 128:22
128:25 130:11,19
131:1,12 142:15
142:20 143:4,11
143:15 144:10,14
144:18,23 145:7
145:16 146:19,22
147:5,23 148:4,6
148:17,22 152:14
153:4,14 155:12
157:13 158:6,18
164:1 165:11
172:21 174:19
176:19 177:5
178:2,10 182:17
184:1 186:24
190:15,24 191:8
192:17,18,21
193:21 194:1,2,14
194:18 197:5
198:8 199:3,5
200:19 202:2,15
206:3,9,15,23,25
207:13,18 208:3
209:7 210:15,22
211:25 212:1
214:17 215:14
216:2 218:13
219:16 222:22
223:12 224:2,10
225:12 226:1,12

229:13 231:9,9,16
231:17,24
**summit's** 233:2
**sums** 216:23
**superior** 237:1
**supervising** 136:5
**supervisors**
136:10,16,24
137:1,7,15 138:23
141:15
**supplement** 128:9
128:14
**supplemental** 5:10
176:20
**supplied** 181:23
185:17 205:9
**supplies** 72:5
132:3,8,10,14,16
132:20
**supplying** 182:6
**support** 222:16
**supporting** 100:1
**suppose** 229:3
**sure** 38:12 59:16
59:18 65:11 85:17
87:2 91:15 93:10
121:13 124:25
135:5 146:12
165:3 194:24
211:23 214:23
217:21 219:10
228:9 229:21
230:22
**surface** 124:3
**surprised** 31:21
**surrounding**
118:14
**survey** 153:9
**surveyed** 156:24
**swear** 10:6

**sworn** 10:10
235:10 238:10,13
239:14,18 240:21
**synthetic** 26:21
**system** 44:4 52:12
63:24,25 64:1,2
86:13 95:16 98:10
99:22 100:17,20
102:12 103:10
152:17,23 153:7
153:22 154:7,17
155:24 156:13
162:8 163:6 165:9
167:15 210:16
**systems** 105:9
131:19

**t**

**table** 36:18
**tables** 38:23
**take** 19:25 20:5,25
23:20 24:1 25:8
26:13 45:11,16,25
47:4 51:23 66:4,7
66:9 124:24
126:24 127:18
140:7 194:8
196:16 197:4,25
201:9 202:22
209:1 225:5
233:12
**taken** 1:21 17:10
92:4 194:14
235:19
**talk** 25:6,10 44:11
46:13,17,21 51:21
93:2 135:20 173:1
175:3 178:22
228:20
**talked** 50:3,7 78:2
104:21 116:18
135:16,18 150:7

155:14 179:24
200:5 212:25
214:2 220:18
221:5 226:11,17
227:8
**talking** 19:17
77:19 84:18
127:15 151:8
160:15 171:10
173:10 175:7
179:2 197:24
198:1 202:7
231:15
**target** 94:8,9
**targeted** 162:19
**tariq** 3:3 9:21
91:17
**tariq.naeem** 3:5
**task** 85:20 196:24
198:9 202:10
**tax** 17:24,25 18:3
87:21 186:3 187:1
187:6,10,14
190:15,17,17
207:1 225:17
226:21
**taxes** 207:2,2
**taxpayers** 231:9
**tcap** 162:18 213:2
**tease** 212:8 221:6
**technical** 133:22
134:2
**technically** 231:17
**telephone** 2:9,18
9:24
**tell** 18:18 32:16
53:5 61:6,12 75:5
104:13 148:3
149:1,24 174:5,12
181:8,12 188:1
201:3,8 208:5

211:8 215:5
216:15 219:11
228:18 229:6
**ten**  148:7,23 149:8
149:22 150:16
151:19 164:2
202:23
**tend**  165:24
**term**  39:22 111:13
126:10 199:1
**terms**  25:1 78:14
88:25 103:23
221:15 222:7
229:4
**terribly**  190:20
**tertiary**  102:25
**test**  134:12
**testified**  70:23
71:11,17 177:23
190:23 203:5
**testify**  12:5 235:10
**testifying**  11:8,9
11:12 12:10
**testimony**  13:22
14:3,10,12,13,14
15:18,21,23,25
16:2,7,11,24 18:6
18:10,15,16,19,24
19:3 48:21 71:15
71:22 81:22
113:11 138:21
171:15 191:8
225:18 226:23
230:24 235:12,16
238:6,7 239:6,9,12
**testing**  131:3
132:1,2,7
**tests**  134:19
214:12
**texas**  2:12

**thank**  20:24
113:11,15 233:14
**the15**  18:19
**theirs**  76:4
**thing**  16:9 18:8
31:15 37:22 38:22
41:14 47:7 176:4
179:10 190:12
195:6 198:17,22
205:1 219:4
**things**  17:9 19:24
21:21 33:2 35:15
55:21 62:12 72:23
86:13 94:10 102:2
102:15 134:12
138:6 196:24
197:2 198:10
202:10 211:18
214:21 229:1
**think**  31:22 36:17
38:5 39:2 42:7
48:4,8 52:13 53:1
53:18 55:21 68:23
73:6,10 74:10
76:3 78:14 88:7
88:12 89:17 92:2
93:9 94:10 107:19
111:22 114:14
117:3 118:12
121:17 122:2
126:7 132:3
133:25 134:17
136:4 140:15
142:25 143:1
144:7 145:19
151:13 154:1,25
155:13 156:7
159:18 164:17
165:2 170:6
171:15 174:7
186:18 192:1

194:24 198:5,22
199:10 200:8
202:6 217:23,23
219:22 220:8,18
220:24,25 222:9
223:18 225:22
227:18 228:18
229:6
**thinking**  17:15,16
63:5 154:9 155:16
173:11
**third**  101:8 123:13
124:10 125:24
126:21 141:8
142:8,11 144:5
225:15 232:9
**thirds**  23:3 26:6
26:10 232:8,10
**thirty**  237:18
**thought**  140:15
199:21 230:25
**thousand**  74:11,14
145:19 183:11
**thousands**  74:19
127:9,15
**three**  33:5 93:5,12
120:14 121:9,18
121:24 122:1,14
123:15 124:19
126:8 129:7,10
141:21 142:18
143:10 145:7,10
145:13 147:6
166:10 172:13
214:8
**tie**  232:22
**tied**  44:14 50:20
**tier**  48:2
**ties**  45:1 97:17
164:24

**time**  10:24 11:2
13:25 17:3,14
18:1 32:21 37:15
38:15,20 39:14
40:16,22 44:17,23
47:22 74:1 82:8
83:3,8 84:13 85:6
108:4 113:5
117:20 119:10
125:15 129:8
133:7,13 134:18
137:13 139:5
144:3,13 146:13
147:11,19,22
158:1 164:5 179:2
190:24 192:13
194:13 198:14,18
198:23 199:2
200:12 206:7
219:8 227:25
232:19,19 233:14
235:19
**times**  3:8 14:13
**timing**  114:12
**tissue**  132:18
**title**  72:22 79:12
**today**  11:4 14:25
24:8 47:3 71:15
71:23 81:22
108:21 109:4
114:11 164:13
171:15 179:2
186:12 211:15
216:8,16 219:11
220:21 221:5
223:21 224:8
225:19,19 226:2
226:17,25 227:8
228:16
**today's**  9:2 12:19
19:14 21:3 25:23

43:19 82:20 83:18
83:21 116:10
135:14,21
**todd**  121:23 122:5
122:9 125:2
141:24 143:7,20
144:14,17 145:2
146:16,18
**told**  14:12 75:9
133:6 155:18,24
**tolerant**  171:16
**top**  12:2 73:15
96:16 117:11
139:1 154:24
156:6 218:15
220:25 221:2
**topic**  90:22 110:15
**topics**  11:12 12:5
12:11,14 50:11
**total**  35:3,18 36:10
55:11 92:3 174:7
174:9 187:5 204:2
206:8,11,14
207:18 208:2
222:10
**touched**  228:19
**town**  200:7
**tox**  120:22
**toxicologist**
120:21,25 139:8
139:23 140:2,11
140:18 141:11
**toxicologists**  139:6
**toxicology**  132:16
214:6,12
**track**  102:15
106:19
**tracking**  107:12
**tradeoff**  124:4
**training**  57:3,15
57:19 58:10 62:20

221:21 222:15
226:16
**transcribed**
235:15 238:7
**transcript**  4:1
13:21 14:7 15:12
15:14 234:3,6,9,11
237:11,12 238:5
238:12 239:5,11
239:17
**transcription**
235:16
**transcripts**  13:19
19:8
**transition**  123:7
**transport**  131:4
**transports**  131:5
**travel**  57:3,13,19
58:6 62:19
**treat**  48:5
**treated**  23:16 29:8
117:1
**treating**  23:6
100:4 106:13
**treatment**  64:3,5,8
64:24 86:12,21
95:23 99:5,14
100:11,14,15,19
100:23,24 102:13
102:24 103:1,12
103:19,24 105:25
106:2 112:4
115:20 158:11
163:8 167:17
174:23 210:7
221:22 227:21,24
229:12 230:2
**trend**  23:10,15,15
29:16,20 47:12
**trends**  19:19 21:11
25:4 50:25

**trial**  94:17
**true**  104:17 141:2
211:25 235:16
**truly**  50:25 53:4
131:17 172:17
183:7 199:1
214:23 215:1
**truth**  235:10,11,11
**try**  88:21 123:10
197:17,20 202:11
214:22
**trying**  20:4 22:24
35:14 88:12 106:7
126:7 133:2
147:19 163:9
171:6 198:25
202:9,12
**tucker**  3:3 9:21
**tuckerellis.com**
3:5
**turn**  12:2 185:25
204:9
**turned**  67:4 167:8
**turning**  33:17
113:24 155:17
165:5,17 173:20
175:1 185:24
225:15 229:10
**two**  16:14,16 17:9
23:3 26:6,10
47:18 48:7 64:18
65:10 79:17,18,19
93:9 99:2 120:18
121:18,22 122:8
126:2 128:11
136:5,9,15,25
137:2,4,7,9,15
138:6,23 140:3
141:15,21 142:17
145:7,10,13 147:6
163:25 164:8,18

166:9 169:19,20
169:22 172:12
177:12,15 189:21
208:8 229:7 232:8
232:10
**type**  33:6 86:18
218:2
**types**  35:7 86:2
99:2 101:19
104:11 135:9
187:14 200:9
**typically**  227:22

**u**

**ultimately**  134:21
167:9
**um**  20:13 94:13
116:19 141:12
217:6 228:12
**unattended**
201:23
**unbeknownst**
193:21 195:16,19
195:22,24 196:2,5
**underlying**  24:15
25:11 104:7 106:1
107:7 191:19
**understand**  39:25
45:5 54:10 69:1
84:25 90:25
100:18 135:12
146:12 178:1,4,20
192:19,20 197:5
198:25 207:17
214:13 225:18
226:23
**understandably**
91:5
**understanding**
11:3,7,11 12:9,13
24:8 83:2 102:20
107:5 122:9

164:14 182:5
183:17 192:6
211:21 220:9
**understated** 54:20
104:12
**understood** 28:13
40:1 49:6 72:8
230:23
**undertake** 88:18
89:15 157:2,5
**undertaken** 155:2
156:12,21 157:8
186:23 206:2
**unique** 118:13
**united** 1:1
**unlawful** 153:21
154:16
**unrealistic** 205:7
**unreasonable**
191:25
**updated** 69:11
138:10,11
**usage** 32:9
**use** 27:3,7,11,19
27:20 29:1 30:18
30:24 31:3,9,10
37:4,6 45:8,22
101:24 102:8,13
102:17 103:3,17
103:24 104:3,7,15
106:8,21 107:2,11
107:12 130:5
132:17 144:23
152:4 155:7,21
209:13 210:2,8,8,9
210:17,18,23,24
212:14,22,24
218:4
**uses** 229:25

**v**

**v** 1:10,11,13 237:6
238:3 239:3
**vacant** 141:25
**vacated** 144:18
**varied** 74:10 84:5
**various** 73:23 75:1
104:22 179:19
180:12
**vast** 31:20 159:20
**vehicle** 201:21
228:23
**vehicles** 228:20
229:2
**verify** 179:7
**veritext** 2:9,18
237:1,7 240:1
**veritext.com.**
237:17
**version** 68:25
184:8,9
**versions** 182:1,2
**versus** 26:24 27:20
28:10 29:2 30:18
32:9 41:24 204:2
209:14,21 210:9
210:17,24 221:7
232:14
**victim** 96:7,15
**victim's** 96:13
**victims** 96:19
**videographer** 3:15
9:1,24 10:5 51:25
52:3 65:12,15
127:1,4 202:24
203:2 223:2,5
230:8,11 233:16
**videotaped** 1:16
5:5 11:17,23
**violence** 104:4,5,8
104:14 215:11

**violent** 162:9
167:16 172:19
**virginia** 48:13
200:6
**virtual** 2:9,18
**volume** 122:10
**voters** 18:2

**w**

**w** 3:7
**wait** 82:3
**waited** 202:8
**waiting** 140:19
**waived** 237:19
**walk** 44:17
**walmart** 3:11 9:18
211:15
**want** 91:14 100:22
162:9 190:14
228:9
**wanted** 14:15
20:20 122:17
186:21 230:21
**wanting** 25:22
**washington** 2:16
**way** 29:17 48:4
107:20,21 129:9
135:4 161:16
165:22 191:22
192:4 207:10
211:9 228:19
233:1
**wc.com** 2:17
**we've** 60:23 69:2
79:23 116:18
123:16 124:6,19
126:12,15 144:7
150:7 207:11
213:11 219:8
229:1,7 232:1,25
**website** 22:15,17
22:21 24:4,6,9,24

25:1,13,20 26:1,5
28:14 30:21,25
31:1,5,7,11,13,25
32:13,19,23 33:1
33:21 36:21 37:24
41:20 43:19 45:7
46:3,7
**websites** 24:4 47:5
**week** 12:23
**weekly** 84:22
**weeks** 66:17
**went** 13:1 16:12
16:25 17:21 22:17
29:17 30:3 32:14
33:9 40:5,10
43:22 44:3,11
64:2 121:18,24
122:5 138:8
151:16,17 153:1
197:11 218:15,19
**west** 48:12 200:6
**whereof** 236:5
**white** 47:9
**williams** 2:14 9:15
**witness** 10:6 11:3
51:18 93:19 96:9
97:1,3,4,6,22,23
211:11 217:8
234:2 235:9,13,14
235:17 236:5
237:8,11 238:1,4
238:11 239:1,4,15
**witnesses** 96:9
**witness'** 237:14
**woman** 122:17
**wondered** 16:24
**words** 89:8
**work** 20:17 51:17
58:3 67:23 79:14
82:23 87:20 93:1
93:20 122:20

[work - york]                                                             Page 43

123:6,14,19 124:8
124:14 129:9,14
132:17 142:7,19
143:24 144:6
147:11 163:7
181:17
**worked** 82:13
**worker** 87:23
**workers** 142:9
167:24 168:18,25
172:2,23 173:17
**workforce** 207:5
**working** 143:8
226:22
**workload** 87:1
122:10
**worth** 145:24
146:7
**wrap** 64:17 112:6
**writing** 65:2
184:19
**written** 118:24
119:2
**wrote** 230:23

**y**

**yeah** 16:23 21:6
43:20 79:3 82:25
87:9 107:18 108:9
114:9,14 129:3
173:6,18 175:22
183:2 189:23
192:1 204:11,22
216:10 220:5
224:18 229:23
**year** 23:7 27:17,18
29:19 33:5 34:25
35:2 37:14 39:18
40:6 43:15 47:12
53:2,9 54:8 74:7
74:10,11,13 82:25
87:17 109:17

111:23 114:2
115:24 116:5,12
120:11,17 121:21
124:1 127:12
132:5,5 133:10,10
146:2,10 155:19
163:4,25 174:8,13
176:13 179:12
190:17,18 194:20
196:20 198:2
201:8 214:9
**years** 42:15 52:13
52:21 102:20
123:11 124:7
128:11 129:17
130:13 138:11
140:3 147:17,24
148:7,18,23 149:7
149:9,11,16,22
150:2,17,22 151:5
151:12,20 163:12
166:6,8,10 168:1,2
169:13 172:13
176:5 195:10
200:22 204:4,20
212:2
**yep** 139:25 169:21
169:23 193:2
**yesterday** 13:1
82:4 83:14
**york** 3:8,9,9

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.