IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

\- - -

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : HON. DAN A. POLSTER |
| APPLIES TO ALL CASES | : NO. 1:17-MD-2804 |

\- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

\- - -

JANUARY 16, 2019

\- - -

Videotaped sworn deposition of TRACEY L. NORTON, taken pursuant to notice, was held at BEST WESTERN LEHIGH VALLEY HOTEL & CONFERENCE CENTER, 300 Gateway Drive, Bethlehem, Pennsylvania, beginning at 8:51 a.m., on the abovedate, before Margaret M. Reihl, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

A P P E A R A N C E S:

SEEGER WEISS LLP
BY: DAVID BUCHANAN, ESQUIRE
ELINA RAKHLIN, ESQUIRE
SCOTT SIEGEL, PARALEGAL
55 Challenger Road
Ridgefiled Park, New Jersey 07660
(212) 584-7732
erakhlin@seegerweiss.com
Representing the Plaintiffs

MORGAN & MORGAN
BY: JAMES YOUNG, ESQUIRE
RAYMOND TAMAYO, ESQUIRE (telephonic)
TERESA DuBUISSON-MAI, ESQUIRE (telephonic)
RENEE COOK, ESQUIRE (telephonic)
SHAWKURA SHAW, ESQUIRE (telephonic)
JENNIFER WILLIAMS, ESQUIRE (telephonic)
76 Laura Street, Suite 1100
Jacksonville, Florida 32202
(904) 398-2722
jyoung@forthepeople.com
Representing the Plaintiffs

MCCARTER & ENGLISH
BY: AMY M. VANNI, ESQUIRE
1600 Market Street
Suite 3900
Philadelphia, Pennsylvania 19103
(215) 979-3848
avanni@mccarter.com
- AND -
BY: HAYLEY J. REESE, ESQUIRE
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6308
hreese@mccarter.com
Representing the Defendant Endo and the witness

A P P E A R A N C E S: (cont'd)

KIRKLAND & ELLIS LLP
BY: JENNIFER G LEVY, ESQUIRE
655 Fifteenth Street, N W
Washington, D C 20005
(202) 879-5211
jennifer levy@kirkland com
Representing the Defendant Allergan

REED SMITH LLP
BY: LOUIS W SCHACK, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8280
lschack@reedsmith com
Representing the Defendant AmerisourceBergen

FOLEY & LARDNER LLP
BY: KATY E KOSKI, ESQUIRE
111 Huntington Avenue
Boston, Massachusetts 02199-7610
(617) 342-4000
kkoski@foley com
Representing the Defendant Anda

MORGAN LEWIS & BOCKIUS LLP
BY: MARTHA A LEIBELL, ESQUIRE
200 South Biscayne Boulevard
Suite 5300
Miami, Florida 33131-2339
(305) 415-3387
martha leibell@morganlewis com
Representing the Defendant Teva

A P P E A R A N C E S: (cont'd)

JONES DAY
BY: TAYLOR A. GOODSPEED, ESQUIRE
555 California Street, 26th Floor
San Francisco, California 94104-1500
(415) 626-3939
tgoodspeed@jonesday.com
Representing the Defendant Walmart

BARNES & THORNBURG
BY: WILLIAM J. LEEDER, III, ESQUIRE
171 Monroe Avenue N.W.
Suite 1000
Grand Rapids, Michigan 49503-2694
bleeder@btlaw com
Representing the Defendant H.D. Smith

ALSO PRESENT:

Sandra Di Iorio, Litigation Counsel
Endo

Kevin Frank, Videographer

Bradley Smith, Trial Technician

---

TELEPHONIC APPEARANCES:

TUCKER ELLIS LLP
BY: SAVANNAH M FOX, ESQUIRE
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
(216) 696-3950
savannah fox@tuckerellis com
Representing the Defendants
Janssen and J&J

WILLIAMS & CONNOLLY LLP
BY: JOSEPH S BUSHUR, ESQUIRE
725 Twelfth Street, N W
Washington, D C 20005
(202) 434-5013
jbusher@wc com
Representing the Defendant,
Cardinal Health

ALLEGAERT BERGER & VOGEL LLP
BY: LUCY N ONYEFORO, ESQUIRE
111 Broadway, 20th Floor
New York, New York 10006
(212) 616-7050
callegaert@abv com
Representing the Defendant,
Rochester Drug Co-operative, Inc

ALSTON & BIRD LLP
BY: JENNY A HERGENROTHER, ESQUIRE
1201 West Peachtree Street NW
Atlanta, Georgia 30309
(404) 881-4977
jenny hergenrother@alston com
Representing the Defendant Noramco

INDEX

| WITNESS | PAGE |
|---|---|
| TRACEY L NORTON | |
| By Mr Buchanan | 13 |
| By Mr Young | 496 |

EXHIBITS

| NO | DESCRIPTION | PAGE |
|---|---|---|
| Par-Norton-1 | Resume | 13 |
| Par-Norton-2 | Charts, Par Total Pills Shipped 2008-2015 [E1157 1 and 1157 2] | 31 |
| Par-Norton-3 | E-mail dated 10/15/14, with attachments [HDS_MDL_00404792 through 4798] | 83 |
| Par-Norton-4 | E-mail dated 9/30/14 with attachment [PAR_OPIOID_MDL-0001059825 through 9827] | 122 |
| Par-Norton-5 | E-mail string, top one dated 2/27/14, Subject FW: Bellco-Qualitest SOMS [ABDCMDL00337067 to 7073] | 138 |
| Par-Norton-6 | E-mail string, top one dated 7/16/13, Subject, FW: SOMS Customer Letter & Sales Rep Talking Points [PAR_ OPIOID MDL_ 0000372485 to 2492] | 172 |

EXHIBITS (cont'd)

| NO | DESCRIPTION | PAGE |
|---|---|---|
| Par-Norton-7 | Effective Controls Against Diversion of Controlled Substances, Meeting with Vintage Pharmaceuticals March 6, 2013 [PAR_OPIOID_MDL_0002016179 to 6588] | 177 |
| Par-Norton-8 | E-mail string, top one dated 3/7/13, Subject, FW: Charts from DEA Meeting, with attachments [ENDO-OPIOID_MDL-02975958 to 6118] | 208 |
| Par-Norton-9 | E-mail string, top one dated 11/12/15, Subject FW: Information captured from DEA Meeting [PAR_OPI01D_MDL_0000006058 to 6059] | 215 |
| Par-Norton-10 | E-mail string, top one dated 6/23/17, Subject letter you ask for, with attached memorandum [PAR_OPI01D_MDL_000021619 and PAR_OPI01D_MDL_0000216199 to 6201] | 245 |
| Par-Norton-11 | E-mail string, top one dated 11/12/15, Subject FW: DEA meeting notes 3-6-13 [PAR_ OPIOID MDL_ 0000006053 to 6057] | 262 |

EXHIBITS (cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Par-Norton-12 | E-mail dated 10/7/13 with attachment produced natively, Subject, SOMS Info [PAR_OPIOID_MDL_0000018920] | 269 |
| Par-Norton-13 | E-mails dated 3/13/13, Subject, FW: Slide Deck for This Morning's Meeting, produced natively [PAR_OPIOID_MDL_0000365381 | 312 |
| Par-Norton-14 | E-mail dated 11/7/13, Subject SOMS Update with attached presentation produced natively [PAR_ OPIOID MDL_ 0000376972] | 333 |
| Par-Norton-15 | E-mail string, top one dated 2/9/13, Subject, DEA Compliance Initiatives Presentation, attachments [PAR_ OPIOID_MDL_0000034190 and 0001424664 to 4667] | 347 |
| Par-Norton-16 | E-mail dated 2/9/13, Subject DEA Compliance Initiatives Presentation, with attachment [PAR_OPIOID_MDL_0000034190 to 4215] | 374 |
| Par-Norton-17 | E-mail dated 1/4/13, Subject Today's Meeting, with attachments, natively produced [PAR_OPIOID_MDL_0000363469] | 385 |

EXHIBITS (cont'd)

| NO | DESCRIPTION | PAGE |
|---|---|---|
| Par-Norton-18 | E-mails dated 11/16/11, Subject, RE: DEA Inspection Wrap-Up in Charlotte (11/15/2011) [PAR_ OPIOID MDL_ 0000390035 to 0037] | 395 |
| Par-Norton-19 | E-mail string, top one dated 9/13/12, Subject Re: DEA Revokes Two CVS Retailers' Ability To Sell Controlled Substances [PAR_OPI01D_MDL_0000397090 to 7092] | 405 |
| Par-Norton-20 | E-mail dated 9/4/08, Subject, Qualitest 08-2008 doc with attachment [PAR_OPIOID_MDL_0000076009 to 6011] | 411 |
| Par-Norton-21 | E-mail string, top one dated 10/21/14, Subject, RE: EXTERNAL: FW: Due Diligence and Revised SOM [PAR_OPIOID_MDL_0000001708 to 1712] | 420 |
| Par-Norton-22 | Qualitest letter dated 11/25/13 [PAR_ OPIOID MDL_ 0000024197] | 431 |
| Par-Norton-23 | Qualitest letter dated 11/25/13 [PAR_ OPIOID MDL_ 0000024197] | 444 |

E X H I B I T S (cont'd)

| NO | DESCRIPTION | PAGE |
|---|---|---|
| Par-Norton-24 | E-mail dated 11/21/14, Subject, Secondary customers with attached letter [ENDO_HSGAC_0015838 to 5840] | 445 |
| Par-Norton-25 | E-mail dated 5/26/16, Subject, FW: Minutes from the Anti-Diversion Working Group Meeting - 10/8/2013 with attachment [PAR_ OPIOID MDL_ 0000009576 to 9579] | 456 |
| Par-Norton-26 | DEA Compliance Trip Report 11/14/13 [PAR_OPIOID_MDL_0001252760 to 2765] | 470 |
| Par-Norton-27 | E-mail dated 10/28/14, Subject, BuzzeoPDMA 9th Regional DEA Seminar - Agenda and Presentations with attachments [PAR_OPI01D_MDL_0000016438 to 6639] | 480 |
| Par-Norton-28 | Project Initiation Form (PIF) [HDS_Hernandez_00037 and HDS_MDL_00302301] | 508 |
| Par-Norton-29 | H D Smith Meeting Minutes 9/7/16 [H0S_MDL_00294884 to 4886] | 528 |
| Par-Norton-30 | E-mail dated 2/3/15, Subject CSOMP Analysis, with attachment [HDS_MDL_00407087 to 7088] | 539 |

THE VIDEOGRAPHER: Good morning, we are now on the record. Today's date is January 16, 2019. The time is approximately 8:51 a m. This is the videotaped deposition of Tracey Hernandez in the National Prescription Opiate Litigation. All counsel and parties present will be noted on the stenographic record.

Will the court reporter please swear in the witness.

... TRACEY L. NORTON, having been duly sworn as a witness, was examined and testified as follows:

BY MR. BUCHANAN

Q. Good morning, ma'am. I think we just said this is the deposition of Tracey Hernandez, but I see from your updated resume that you're now Tracey Norton.

A. Correct.

Q. Please forgive me if at times I refer to you as Ms. Hernandez, because I think that's ingrained now in my mind, having looked at some of your documents over the years.

Congratulations, by the way?

A. Thank you.

Q. Have you ever been deposed before?

A. I have not.

Q. Okay. It's a Q and A. I'm sure you had a chance to meet with counsel before you came in today. It's, you know, a little more formal. Obviously, you see a videographer. You see a court reporter taking down everything that we say together. So it's going to be important that I do my best to wait until you're done answering to ask my questions and that you wait until my question is done to start answering. Fair?

A. Absolutely.

Q. Okay. The way this goes is there's going to be a written transcript, so if you don't understand the question, but you answer it anyway, the record is going to reflect that you understood the question. So if there's confusion in my questions, and there might be, I'm prone to confusing questions at times, just ask me to clarify, and I'll do my best to make

it better for you, okay?

A. Okay, thank you.

Q. Ms. Norton, I see that you are a person who over the course of your 25-plus years in the pharmaceutical industry have had a focus on compliance and DEA compliance in particular, is that fair?

A. Yes, that's correct.

MR. BUCHANAN: I've been handed an updated copy of your resume we've marked as Exhibit 1 to your deposition.

(Document marked for identification as Par-Norton Deposition Exhibit No. 1)

MR. BUCHANAN: Pass a copy back. Do you have one already, Counsel?

MS. VANNI: I do, thank you.

MR. BUCHANAN: There's one for you all to share and one for my colleague at the small table.

BY MR. BUCHANAN

Q. Is this the current version of your resume?

A. Yes, it is.

Q. You prepared it on your own?
A. Yes.
Q. Okay. And you didn't have any input from counsel into what to say and what not to say?
MR. VANNI: Object to form.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. When I say you prepared it on your own, maybe somebody looked it over for you to help you --
A. Years ago someone at like a resume service helped with some of it, but it's been modified several times by me since then.
Q. Okay. Okay. They helped you get the framework together, but you own it?
A. Correct.
Q. You are comfortable with it, fair enough?
A. Correct.
Q. I want to focus with you principally on your time while you were with the Endo entities, I guess Qualitest and Endo, depending on the timeline and maybe Par.

You left in 2014, though, correct?
A. Correct. I've never worked for Par.
Q. So we'll focus on Endo/Qualitest, okay?
I understand, though, before you joined Endo, you worked in the pharmaceutical industries?
A. Yes, that's correct.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. If we dial back in time, you've got -- you've helpfully put some page numbers page on there for us. I see page 3, started off with Novartis in '87. Was that out of school or out of high school?
A. I worked out of high school and then at a bank and then to Novartis. Actually, it was Ciba-Geigy at the time.
Q. Gotcha. Okay. And you worked there over in New Jersey over the river about 45 minutes to an hour from here?
A. About an hour and 15.

Q. And home -- just so we're clear, home is Bethlehem, Pennsylvania?
A. Bethlehem.
Q. Looks like where you finished up in Novartis, and let's just get the dates on that, you were there from '87 to 2002? I say Novartis, Ciba-Geigy.
A. Correct.
Q. '87 to 2002, you finished up in DEA, PDMA or in that department as a manager, fair?
A. Yes.
Q. And what is DEA?
A. DEA is Drug Enforcement Administration.
Q. And PDMA?
A. Prescription Drug Marketing Act.
Q. And you had some role for regulatory compliance in that group?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. I see that you acted as a consultant -- I'm looking at the second bullet

point -- "acted as a consultant to the division for issues associated with these regulations."
Would these be DEA regulations?
A. Correct.
Q. Okay. "Quota, ARCOS, import/export, 222 forms, in-transit losses/thefts, returns/disposals, et cetera," correct?
A. Yes.
Q. Okay. And you've got other details on here as we go down, I think, to the fourth, fifth, six, bullet, something like that. "Supervised development of controlled drug reporting systems."
Do you see that bullet?
A. Correct, yes.
Q. And these are systems that were within the company that would then report events or data to the various regulatory bodies, correct?
MS. VANNI: Objection.
THE WITNESS: To DEA.
BY MR. BUCHANAN:
Q. DEA, okay. The first you list is

ARCOS; is that right?
A. Yes.
Q. That's a system that manufacturers and the DEA communicate back and forth about sales?
MS. VANNI: Objection.
THE WITNESS: And other things.
BY MR. BUCHANAN:
Q. I'm sorry. Yeah. Could be the acquisition of controlled substances?
A. Yes.
Q. The disposition of controlled substances?
A. It's all transactions -- or most transactions with certain controlled substances.
Q. Okay. And -- or SOMs, what is SOMs?
A. Suspicious order monitoring.
Q. And that term may come up today more than ten times, so how do you use that acronym?
A. SOM.
Q. You do? Okay. So you supervised the development of controlled drug reporting

systems such as we talked about ARCOS briefly and then SOM.
So while you were at Ciba-Geigy, you had responsibility for that system?
MS. VANNI: Objection. You can answer.
THE WITNESS: I'm not sure if -- when the transition occurred from Ciba-Geigy to Novartis, so at Ciba-Geigy, probably not. I think that was prior. There was someone else in the role as -- that would head up that group, so I was provided input into it, but I wasn't the main person championing it.
BY MR. BUCHANAN:
Q. Okay. So you had visibility to it, but not responsibility or exclusive responsibility for it?
MS. VANNI: Objection.
THE WITNESS: Yes. As you see it, like when I started as a regulatory analyst, that was basically at the time Ciba-Geigy. I don't know -- I don't

recall exactly when it transitioned from Ciba-Geigy to Novartis. So when I was the DEA PDMA manager, I had that responsibility.
BY MR. BUCHANAN:
Q. Okay. So SOM was something that you were engaged with maybe more tangentially while you were at Ciba-Geigy/Novartis, fair?
MS. VANNI: Objection.
THE WITNESS: I'm sorry.
BY MR. BUCHANAN:
Q. I'll let you describe it. I'm not trying to mischaracterize it in any way. It didn't sound like you had primary responsibility for Novartis' SOM system, fair?
MS. VANNI: Objection.
THE WITNESS: It was -- Novartis' SOM system was in place prior to my coming, and I maintained it and may have modified along the way, so yes.
BY MR. BUCHANAN:
Q. Okay. And when we talk about SOMs, we're talking about a system for reporting orders, orders of concern, suspicious orders to

the DEA related to controlled substances, fair?
MS. VANNI: Objection.
THE WITNESS: Reporting suspicious orders.
BY MR. BUCHANAN:
Q. To the DEA, correct?
A. Mm-hmm.
Q. And there's been regulatory frameworks around that for some time, true?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. As a person in the industry for at least 25 years or now 30 years now, you've been aware of, if you will, statutory frameworks and regulatory frameworks around manufacturer and distributor obligations for suspicious order monitoring, correct?
MS. VANNI: Objection.
THE WITNESS: It's changed drastically over time, but, yes. The regulation itself has been the same, but the interpretation and application has changed drastically over the years.

BY MR. BUCHANAN:
Q. And we'll circle back on that more specifically as we go through today, but to start with, I mean, the statute has been the same, correct?
A. Yes.
Q. And a manufacturer and distributor has to maintain -- a manufacturer and distributor of controlled substances has to maintain effective controls against diversion, correct?
MS. VANNI: Objection.
THE WITNESS: Registrants have to maintain.
BY MR. BUCHANAN:
Q. Fair enough. And a registrant who is a manufacturer, a registrant that is a distributor has to maintain effective controls against diversion, correct?
A. Yes.
Q. And I take it, then, during your time with Novartis -- Novartis was a registrant?
A. Correct.
Q. Okay. There are also obligations

under the regulations that have been passed by the DEA with regard to the monitoring and reporting of suspicious orders, correct?
MS. VANNI: Objection.
THE WITNESS: Yes, there's a regulation.
BY MR. BUCHANAN:
Q. Okay. And in your field, I've seen at various times that you've been characterized as a, quote, DEA compliance manager; would that be fair?
A. Yes.
Q. And when you -- is compliance a field?
A. Yes.
Q. Could you describe generally what compliance is, as a field?
A. Well, there's a lot of different types of compliance. Are you referring specifically to DEA compliance?
Q. I am.
A. Okay. The goal of individuals in those positions is to become familiar with the DEA regulations and to apply those regulations

to the company and to work to -- work to improve or to end ultimately to comply with those regulations.
Q. And some of the things that you consider obviously as a compliance manager are the regulations themselves, right?
A. Yes.
Q. You consider how the DEA is applying or interpreting or enforcing those regulations?
MS. VANNI: Objection.
THE WITNESS: Yes. And the reason I say yes is because different local offices sometimes apply them differently, but, yes, overall.
BY MR. BUCHANAN:
Q. You go to industry conferences and you hear what others have to say about what they're doing to -- and how they're interpreting the regulations to ensure compliance?
MS. VANNI: Objection.
THE WITNESS: Yes, to a certain extent within confidentiality.
BY MR. BUCHANAN:

Q. And we'll probably have a chance to talk about some of that today. You've been on various committees, antidiversion working groups, various distributor associations, various manufacturer associations where you've gone and attended and received input as to I'll say antidiversion and SOM practices, fair?
MS. VANNI: Objection.
THE WITNESS: Well, antidiversion, yes, yes.
BY MR. BUCHANAN:
Q. In fact, you've presented at them, correct?
A. Yes.
Q. So that's one of the ways in which those in the industry get information about, if you will, state-of-the-art compliance, state-of-the-art SOM practices, state-of-the-art antidiversion practices, true?
MS. VANNI: Objection.
THE WITNESS: Yes and no. A lot of things aren't shared because of the confidentiality, so I always say I want to hear it from the horse's mouth, I

want to hear it from DEA. I do take into consideration, but ultimately any changes I implement would be based on things that I would hear from the DEA.
BY MR. BUCHANAN:
Q. And as a manufacturer, as a distributor of controlled substances, there's also just the general responsibility to ensure that your product isn't getting to places where it's not supposed to get, right?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And you recognize that?
MS. VANNI: Objection.
THE WITNESS: It's part of the regulation.
BY MR. BUCHANAN:
Q. And part of your obligation as the manufacturer distributor?
MS. VANNI: Objection.
THE WITNESS: To follow the regulations.
BY MR. BUCHANAN:

Q. Okay. Let's look, then, at where you went after -- after Novartis. You went to Watson; is that right?
A. Yes, that's correct.
Q. And if I understand correctly during your time at Watson, there was an acquisition of another company Anda?
A. Anda, yes.
Q. Is that how it's pronounced Anda, it's not ANDA?
A. Yeah. ANDA would refer more to an FDA acronym.
Q. I thought that was why they did that. But okay. It's Anda. Thank you.
So Watson acquired Anda and during your tenure at Watson?
A. Yes.
Q. Okay. I just need to draw a distinction between the companies.
With regard to Watson, did you have a role in responsibility for DEA compliance?
A. Yes.
Q. Okay. Did you ever have any

issues while you were at Watson with regard to Watson's DEA compliance?
MS. VANNI: Objection.
THE WITNESS: Not that I can recall.
BY MR. BUCHANAN:
Q. Did you ever have any issues while you were at Watson with regard to Anda's compliance?
MS. VANNI: Objection.
THE WITNESS: I was not -- I didn't have responsibility for Anda. I was consulted on occasion and did help out at certain points, but it was not my ultimate responsibility.
BY MS. DICKINSON:
Q. I mean, they got called in to the DEA for some issues, right?
A. Yes.
Q. Were you the one responsible for the oversight of that problem before it was brought to the DEA?
MS. KOSKI: Object to form.
THE WITNESS: No, I had no

responsibility for Anda up until that point.
BY MR. BUCHANAN:
Q. Okay. So as I understand the timeline, you're at Watson from 2002 to 2009. You finish as the director of controlled substances compliance. Within that function, you had responsibility for suspicious order monitoring for Watson, correct?
A. Yes.
Q. And then Watson at a point in time acquired Anda, correct?
A. Yes.
Q. Anda got called in by the DEA for some violations, fair?
MS. KOSKI: Object to form.
THE WITNESS: Not for violations, no.
BY MR. BUCHANAN:
Q. Okay. They had a sit-down with the DEA?
MS. KOSKI: Object to form.
THE WITNESS: It was part of the distributor initiative.

BY MR. BUCHANAN:
Q. And let's make sure we understand your role in that.
Shortly after Watson purchased Anda, Anda was summoned to the DEA as a result of their lack of a robust SOM program, correct?
MS. KOSKI: Object to form.
THE WITNESS: No, that's not correct. DEA -- DEA was -- had initiated what they termed a distributor initiative, and they called all distributors at different times to the headquarters office to talk about sales of their product.
BY MR. BUCHANAN:
Q. Okay. So I'm not sure that we can pin down the date, or at least in my examination we won't be pinning down the date, but at a point in time when you were at Watson, do you remember roughly when this was that you got called in with Anda to meet with the DEA?
MS. KOSKI: Object to form.
THE WITNESS: I don't. I would assume closer to the time I left, but I

don't know for sure.
(Document marked for identification as Par-Norton Deposition Exhibit No. 2.)
BY MR. BUCHANAN:
Q. Ma'am, I'm passing over what we're marking as Exhibit 2 to your deposition. I have a few more questions before we get into that, but you will have a chance to review that at the appropriate time.
So you were at Watson, just to confirm, until 2009?
A. Yes.
Q. And do you remember roughly how soon before you left Watson that this -- or when relative to your departure from Watson this meeting with Anda and the DEA occurred?
A. I do not recall.
Q. Okay. Let's look now at Exhibit 2 to your deposition. This is a document during your time at Endo. It was produced to us by, I think, H.D. Smith.
MS. VANNI: Counsel, I just want to clarify she was not an Endo employee.

She was a Qualitest employee.
BY MR. BUCHANAN:
Q. Yeah, I'm thinking of you in the Endo family of companies, Endo being -- Endo was the owner of Qualitest?
A. Endo was the owner, but there was a separate business from Qualitest, and I was not -- not responsible for that business. I handled just Qualitest really for the most part.
Q. Okay. All right, fair. So this is during your time at Qualitest, then, shortly before you left. And looks like about two months before -- you left Qualitest in November of 2014; is that right?
A. Yes.
Q. Okay. It's an e-mail between somebody in HR at H.D. Smith and yourself. "Please call Tracey at the phone number at" blank. "She is expecting your call right now. Thanks for the last minute."
There's two attachments. One is your resume.
Do you see that?
A. Yes.

Q. Another is a document entitled "SOMs Experience"?
A. Mm-hmm.
Q. Do you recognize this document "Tracey Hernandez SOM Experience"?
A. I do. It was specifically requested as part of the interview process.
Q. Okay. So you had to assemble something to share with H.D. Smith as part of this interview process?
A. Yes, to prove my experience with SOM.
Q. Okay. And so what you did in doing so is you listed your relevant SOM experience at various entities that you'd worked with over the years, fair?
A. Yes.
Q. For example, with Ciba-Geigy, you list that you reviewed and submitted monthly suspicious order monitoring reports to the DEA for review. You note back then suspicious orders were based solely on the customer's order frequency pattern and volume, and then you notified customer service based on the DEA

register notice or conversations if there were customers that were high-risk customers, right?
A. Yes.
Q. And that was something that was reasonable to do at that time, to comply with your obligation as a manufacturer?
MS. VANNI: Object to form.
THE WITNESS: Yes, it was.
BY MR. BUCHANAN:
Q. And so one of the things you were doing while at Ciba-Geigy or Novartis was, you know, monitoring customers to see if customers were, in fact, high-risk customers, right?
MS. VANNI: Objection.
THE WITNESS: Monitoring customers for suspicious orders.
BY MR. BUCHANAN:
Q. Right. Which you note here in your writing. And these are your words, correct?
A. Yes.
Q. "If a customer was deemed a high risk and should be discontinued."
Do you see that at the bottom?

A. On Ciba-Geigy?
Q. Yes.
A. Yes.
Q. And so you understood, at least during your time at Novartis and during your time at Ciba-Geigy, that was one of the obligations of a manufacturer distributor?
MS. VANNI: Objection.
THE WITNESS: To notify for suspicious orders, yes.
BY MR. BUCHANAN:
Q. And to monitor for customers that were a high risk and who should be discontinued, correct?
MS. VANNI: Object to form.
THE WITNESS: My definition of a high risk would mean that they have suspicious orders.
BY MR. BUCHANAN:
Q. Okay. Well, in order to -- what you say you are going to do here is notify customer service based on -- I think you say DEA Federal Register notices or conversations with DEA if a customer was deemed high risk.

Do you see that?
A. So the Federal Registers would be --
Q. I'm sorry, I just need to make sure that you --
A. Yes, I see that.
Q. Okay. And if you're -- what you're doing there is you're looking to external sources, in this case, the Federal Register notices or conversations with the DEA to determine and to ensure that your customers are not high risk, right?
MS. VANNI: Objection.
THE WITNESS: Yes. If a customer appeared in a Federal Register notice and had a license suspended or had action taken against them, I would contact them to -- customer service to make sure that they weren't, in fact, a customer that we were shipping to.
BY MR. BUCHANAN:
Q. Right. So when you became aware that there were customers that were engaged in problematic activities, you notified customer

service so customer service ceases activity or you got comfort that we weren't doing business with them or Ciba-Geigy wasn't doing business with them?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And for clarity, ma'am, what was the period of time when you were working at Ciba-Geigy and Novartis?
A. From 1987 to 2002.
Q. Okay. And you understood that part of the role and obligation of Ciba-Geigy or Novartis as a registrant was to maintain effective controls against diversion, fair?
A. Yes, that's --
MS. VANNI: Objection.
THE WITNESS: -- part of the DEA regulation.
BY MR. BUCHANAN:
Q. That's the statute, actually?
A. Mm-hmm.
Q. Yes?
A. Yes.

Q. Okay. And one of the ways that you did that at that point in time was by notifying customer service of high-risk customers, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes. It was not a requirement that I notify them, but, obviously, I don't want to ship to someone who has a suspended license or has issues.
BY MR. BUCHANAN:
Q. Whether it was a requirement or not, that's what you did at that point in time as part of you executing your role and function in DEA compliance for Ciba-Geigy and Novartis, fair?
MS. VANNI: Objection.
THE WITNESS: Yes, always tried to go above and beyond, yes.
BY MR. BUCHANAN:
Q. Okay. And it was reasonable to do that, right?
MS. VANNI: Objection.
THE WITNESS: Mm-hmm.

BY MR. BUCHANAN:
Q. Is that a yes?
A. Yes.
Q. Okay. It looks like while you were at Watson, you didn't have any interactions concerning the SOM program in terms of deficiencies in your SOM program relevant to the Watson part of the business, fair?
A. Yes.
Q. Then you note "However, Watson purchased Anda."
Do you see that in the middle of the page, the middle of the Watson page?
A. Yes.
Q. It says "However, Watson purchased Anda and shortly afterward, Anda was summoned to DEA a result of their lack of a robust SOM program."
Do you see that?
A. Yes.
Q. Okay. And that was the reference I mentioned five, ten minutes ago with regard to why you went to see the DEA.
Do you see that, ma'am?

A. Yes.
Q. Okay. And those are your words certainly in characterizing your experience at Watson with regard to Anda and that particular DEA interaction, correct?
A. Yes.
Q. And what you note after that, and I think to -- well, I'll ask you this. What you note after that was "I did not support Anda from a DEA perspective, as they had come to Watson with their own DEA person. However, I was asked to be their DEA representative for the meeting in HQ. I went with legal and the individual who at the time was the president of Anda. DEA presented and provided a binder, as they have done for most companies at this point. However, in Anda's case, the DEA meeting was for cause, and immediate action was required."
Did I read that correctly?
A. Yes.
Q. Okay. So this particular meeting with regard to Anda was different than the other meetings that you were aware that were happening in the industry at that point in time, correct?

MS. KOSKI: Object to form.
THE WITNESS: It was -- I'm sorry, can you repeat that?
BY MR. BUCHANAN:
Q. This particular meeting with regard to Anda was different than the other meetings that you were aware of that were happening between DEA and the industry at that point in time, correct?
MS. KOSKI: Objection.
THE WITNESS: It was the same type of meeting. It was a distributor initiative. They reviewed the same type of data. The individuals that we met with presented it a little differently than other meetings I had been at.
BY MR. BUCHANAN:
Q. Okay. This particular meeting as you characterized it in summarizing your SOM experience at and Watson -- and, again, we're referring at the meeting with DEA and Anda -- you characterize it as a meeting for cause, correct?
A. I did characterize it that way.

However, there was no DEA violation. There was no action taken by DEA against Anda. It was a meeting to share information, and that was also my first experience with a distributor. Everything up to that point had been more on the manufacturing side, so to me at the time, it was spun a little bit differently.

Q. Okay. I understand that this meeting was different than prior meetings you had had kind of with your manufacturer hat on.

A. Right.

Q. But with regard to this meeting, and you wrote this, to be clear, some five years, six years after the meeting, right?

A. Yes.

Q. Okay. And the way you characterized it with the benefit of hindsight and looking backward was a meeting for cause with immediate action required, correct?

A. Yes. I think you need to take into context the purpose of the document, though. You know, I'm trying to get a job, so obviously I'm trying to make myself look very good to this company and to kind of put forth

that, you know, this company needed me at this time, and I stepped in and helped out and was able to resolve an issue, so...

Q. Well, yeah, and I suppose, you know, thank you for, I would say, being candid and reflecting the context in which this was prepared, but you were also saying, weren't you, that the problems that Anda had were not mine?

MS. KOSKI: Object to form.

THE WITNESS: They became mine.

BY MR. BUCHANAN:

Q. Right. We could read this, and it says "Watson had no issues with DEA regarding their SOMs program during my seven-year tenure."

A. Mm-hmm.

Q. "However, Watson purchased Anda and shortly afterward, Anda was summoned to DEA as a result of their lack of a robust SOM program."

Did I read that correctly?

A. Yes.

Q. Was that true that they did not have a robust SOM program?

MS. KOSKI: Object to form.

THE WITNESS: I actually don't know what they had. What was -- and I also didn't know their customer base. Since I hadn't worked with them up to that point, I was told that I, you know, was not to handle Anda from a DEA perspective, that was someone else's responsibility. So I was pulled into the meeting really without having any background on the company.

BY MR. BUCHANAN:

Q. Right. You are a DEA compliance person. Watson has just acquired Anda. There's a situation that has occurred that apparently is being seen as a serious situation because the president as a company knew, correct?

A. He was very concerned, yes.

Q. And Anda grabs you from the Watson side, please come and sit next to us in this meeting while we take the bullets we're going to take on this?

MS. KOSKI: Object to form.

THE WITNESS: They actually asked me to come because of my -- because I

knew the people that had called them to the meeting. I had interacted with them previously on multiple occasions and they had -- had reached out to me. So I think they felt more comfortable that I would, you know, have a good working relationship with them and would -- would help the meeting to go smoothly.

BY MR. BUCHANAN:

Q. Okay. And so in that context, how you characterized it at least for purposes of reflectively, looking back at that time, was that they were summoned to the DEA as a result of their lack of a robust SOM program and that the DEA meeting was for cause and immediate action was required, those were some reflections that you noted on this particular meeting, fair, ma'am?

A. That's what I noted in the document, yes.

Q. And then you said after that, you worked with the president and "we reviewed numerous customers and cut many"; is that right?

A. Yes, probably too many.

Page 46

Q. So during the time that you were at Watson -- and you left there when, ma'am?
A. 2009.
Q. So prior to 2009, during your time with Watson in connection with your role and oversight of Anda, when you started to work with the president to actually look at the customers in a manner like you had looked at customers at Novartis and Ciba-Geigy, you cut many customers, correct?
MS. KOSKI: Object to form.
THE WITNESS: It wasn't in the same manner and, again, because I didn't know their business, the president really took it upon himself. At that meeting, DEA had -- one of the individuals at DEA had thrown out a number as far as dosage forms, and they said that they felt that a pharmacy should not receive more than this amount, and that's what the president worked with. He really took it to the extreme and was very concerned about it and cut off a lot of customers as a

Page 47

result.
I think, unfortunately for Anda, in doing that, the number was a -- kind of an ad hoc number thrown out by DEA, again, when the SOM program was developing. So they just cut based on that number only, and they didn't look at the customer's business and whether that business actually required more volume.
So, you know, they took a very, very aggressive approach and were very concerned about the information the DEA had shared.
BY MR. BUCHANAN:
Q. Right.
We can agree, certainly, that prior to the point of time of that sit-down with the DEA, Anda had not been looking at customers in a manner that was looking for suspicious orders, correct?
MS. KOSKI: Object to form.
THE WITNESS: I can't really say that, again, because I didn't have

Page 48

responsibility for them, I don't really know what they were doing.
BY MR. BUCHANAN:
Q. Well, we know they didn't have a robust SOM program, right?
MS. KOSKI: Object to form.
THE WITNESS: Well, that's opinion-based, to be honest.
BY MR. BUCHANAN:
Q. And certainly opinion-based four years ago, right?
MS. KOSKI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Nearer in time than today, right?
A. I'm sorry?
Q. Nearer in time to the events than today, correct?
A. Yes.
Q. And a program that certainly necessitated immediate action, fair?
MS. KOSKI: Object to form.
BY MR. BUCHANAN:
Q. That's what you wrote at a point

Page 49

in time nearer to today?
A. Yes, that's what I wrote.
Q. And you said some other things that you implemented with them -- and this is back in at least before 2009, "Prior to my leaving," you said you were "instrumental in convincing Watson to start looking at drug combinations, i.e., Holy Trinity and to begin customer visits for the purpose of SOM which I believe they now contract out to a third party.
Did I read that correctly?
A. Yes.
Q. So during the time that you were at Watson and I guess you were helping them to further reshape their SOM program, is this Watson/Anda or is this Watson?
A. This is Watson.
Q. So on the manufacturer side -- when we said Watson we're thinking manufacturer and when we're thinking Anda you're thinking more distributor; is that fair?
A. Yes.
Q. With regard to Watson as a manufacturer back in 2009 they were starting to

implement customer visits but they were doing with a third party?
A. They were -- I have that, I believe, they now contract out to a third party. I don't know if they implemented that after I left.
Q. Okay.
A. Watson was very -- very proactive and it wasn't just based on my input, it was really a team effort and customer service was also very proactive in -- we worked together to kind of go above and beyond. There was no requirement for Holy Trinity -- you know, to look at Holy Trinity. There was no requirement for -- there were certain products that weren't controlled yet, but that we had heard there was an abuse potential that we added to the system, so a lot of good things that were added above and beyond.
Q. Well, there is a requirement to maintain effective controls against diversion, true?
A. Yes, within -- within the regulations which apply. When they're talking

more about effective controls against diversion, you know, reporting suspicious orders, it's not -- it's not all-encompassing. It includes a security provision, accountability, recordkeeping.
Q. Let's just separate the two so we're not kind of fusing them together.
The statutory obligation for manufacturers and distributors who are registrants, thank you for that clarification, is to maintain effective controls against diversion, fair?
A. Is to make sure that you are doing everything that you can to prevent your product from being diverted into a list of channels.
Q. And one of the things that you implemented or helped Watson implement during your time there was expanding their antidiversion controls to include looking at drug combinations like Holy Trinity. That was one thing, correct?
A. Yes.
Q. To begin customer visits,

correct?
A. Again, not sure if that actually came to fruition or not.
Q. What you noted here --
A. It was something we talked about.
Q. -- "prior to my leaving, I was instrumental" -- your words, correct, "instrumental"?
A. Mm-hmm.
Q. -- "in convincing Watson to start looking at drug combinations, i.e., Holy Trinity, and to begin customer visits for the purpose of SOM, which I believe they now contract out to a third party."
Did I read that correctly?
A. To start looking at beginning customer visits, to start looking at. There's a difference between implementing versus start looking at. So doing research as to whether or not they wanted to implement customer visits. There's a lot involved in implementing that.
Q. The jury has your words, but the words you wrote was, "I was instrumental in convincing Watson" -- and you list two things,

right?
MS. VANNI: Object to form.
THE WITNESS: Mm-hmm.
BY MR. BUCHANAN:
Q. "I was instrumental in convincing Watson," and then you say the first one, "to start looking at drug combinations," that is, Holy Trinity. That was the first item, correct?
A. Yes.
Q. Holy Trinity is what?
A. It's a combination of hydrocodone, carisoprodol and alprazolam.
Q. In your field, and certainly in DEA compliance, you understood that the Holy Trinity, those three drugs, were often abused in combination, fair?
A. That's what I was told at conferences, yes.
Q. And so as far back as at this point in time, sometime prior to 2009, when you were at Watson, you were instrumental in convincing Watson to start looking at that drug combination as a combination of abuse, fair?
A. Yes.

Q. Okay. And then you said there was a second thing you were instrumental in, correct?
A. Mm-hmm.
Q. You were instrumental in "convincing Watson to begin customer visits for the purpose of SOM, which I believe they now contract out to a third party."
Did I read that correctly?
A. Yes.
Q. All right. So that takes us through your time at Watson. Actually, let's go up the page a little bit.
Characterizing some other things that Watson was doing on the manufacturing side, you list the way in which they handled SOM during the seven years you were there.
Do you see that?
A. Mm-hmm.
Q. We can start at the beginning. "Conducted audits as noted above, Watson already utilized NTIS, but based on the requirements of several states, added the process for collecting customer state license information."

NTIS, is that a way of determining whether somebody is, in fact, a registrant who is a customer of yours?
A. It's National Technical Information systems or Service, and it's a government -- government-run tool that can be purchased, and it helps you -- your licenses typically expire yearly, but in this particular case, if you have this tool, you can look at licenses in between that yearly expiration to determine -- catch licenses that might have been suspended.
Q. You would agree that it's an important thing to make sure -- in a closed system of controlled substance drug distribution to make sure if you are a manufacturer distributor that you are only selling drug to people who are --
MS. LEIBELL: Object to form.
BY MR. BUCHANAN:
Q. -- permitted or licensed to receive drug?
A. Yes.
Q. So one of the things Watson was

doing and had implemented was they were doing license checks in connection with each order, correct?
A. Mm-hmm, yes.
Q. It was something that they were already doing before you got there, right?
A. Yes.
Q. So if you were there from 2002 to 2009, they had already implemented as part of their order flow a license check every time somebody placed an order to ensure that the customer was permitted to receive the product, correct?
A. Yes.
Q. All right. That was actually something you implemented for Ciba-Geigy and Novartis, right?
A. Yes.
Q. If we go up on the page --
A. Mm-hmm.
Q. -- it says "responsible for conducting internal audits of customer service."
You talk about "to assure customer licensing was obtained and verified."

You see the first sentence of the paragraph?
A. Yes.
Q. The section sentence says "modified process to include the use of the NTIS tape to assure license checks occurred at each order rather than depending on customers to provide new license at expiry."
And then you talk about increased awareness and how you did the monthly monitoring reports and various submissions around that, correct?
A. Yes.
Q. But all the way back prior to your time at Watson, even implementing transaction-level order checks was something that you thought was important and you implemented, correct?
MS. VANNI: Object to the form.
THE WITNESS: Yes, certain -- certain types of checks, yes.
BY MR. BUCHANAN:
Q. Am I correct, ma'am, that under the Controlled Substance Act, it's supposed to

be a closed system of manufacturer, distribution, prescription, et cetera?
A. Yes, that's correct.
Q. And so if there's any leak in that system, in that -- in all the players in that system, then there's diversion risk, fair?
MS. VANNI: Object to form.
THE WITNESS: Then there is a DEA violation.
BY MR. BUCHANAN:
Q. And diversion risk?
MS. VANNI: Object to form.
THE WITNESS: Potentially.
BY MR. BUCHANAN:
Q. I mean, you understand that as somebody in the -- in the industry; if drug is being sold to somebody not permitted to get it, by law, it's not a closed system, right?
A. Yes.
Q. And when you apply for a registration, when a manufacturer distributor applies for a registration, they apply for that registration making the representation they're going to do everything they can to maintain a

closed system, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And I mean, that's been true -- and that's not a change in the regulations, that's been true for as long as you've been involved with controlled substances, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. So let's go back, if we could, to Watson. I realize I'm hopping around. Sorry about that.
We'll go back to Watson.
And then you note that during your time at Watson, Watson was running shipping history for certain customers of concern, right?
A. Just trying to see where your --
Q. Oh, I'm sorry, I realize I've been hopping around.
"As part of the internal audits, began to run shipping history for certain customers of concern."

Do you see that?
A. Yes.
Q. That was something you were doing -- that was you who was doing that?
A. Working with customer service.
Q. And to run shipping history for customers of concern?
A. Mm-hmm.
Q. Okay. And then you also had -- you. Bad word. Withdrawn.
Watson also had a suspicious order monitoring system that included a multiplier, and then you would adjust the multiplier on a customer-to-customer basis, correct?
A. I don't believe we could adjust it at a customer level. I think it was adjusted overall for the class of trade.
Q. So you had class-of-trade adjustments at Watson?
A. I believe it was by class of trade. I'm not positive.
Q. And class of trade, meaning Watson could have clients who were distributors,

correct?
A. Wholesalers would be one class of trade. It's basically, for the most part, DEA license type.
Q. Okay. And can you identify the various classes of trade?
A. Not all, but a wholesaler would be one. A chain drug store might be another. A physician, not necessarily for Watson, but if we -- if you were to distribute to physicians, that would be a class of trade, clinic or hospital, long-term care.
Q. And how about -- I'm sorry.
A. Long-term care. There's quite a few.
Q. Okay. And how about just independent pharmacy, is that a separate class of trade?
A. Yes.
Q. And so during your time at Watson, you were responsible for the multipliers for the various class of trades, right?
A. Yes.
Q. And when you say multiplier, what

does that mean?

A. It's really a part of the SOM system, the percentage of orders that you would look at. So, for example, when you create the system, you want to make sure that you're catching orders that are legitimately of concern from a quantity perspective, but you also want to make sure it's not catching every single order.

You know, you have to know -- it's almost like setting a threshold really. You have to know what -- where you want to cut that off. So when you first set up your system, it could stop everything if you don't have a multiplier that would dial down to where you think is reasonable orders that you would want to investigate further.

Q. So a system, essentially, that would identify orders that are red flags to be further investigated; would that be fair?

A. Well, that's the SOM system, yes.

Q. Okay. And the way --

A. This is one piece of -- I'm sorry -- this is one piece of the SOM system.

Q. Got you. So the multiplier was a component of an order monitoring system, fair?

A. Yes.

Q. Okay. And the multiplier was used to set effectively where an order would get flagged as an order to be investigated further, fair?

A. For Watson, yes.

Q. Yes.

And this was happening on the Watson, if you will, manufacturing side during your entire tenure there?

A. Yes.

Q. Okay.

A. It was part of Watson's system. It may not be part of other systems, depending on how it's developed.

Q. Okay, yeah, and I was referring to, you know, Watson had the system that you've described in your testimony and in this writing during the entire time you were there?

A. Right.

Q. Okay. Then you talk about your time at Qualitest, right?

A. Mm-hmm.

Q. And what were the circumstances of your -- you weren't brought in to take responsibility for the SOM system for Qualitest, right?

MS. VANNI: Object to form.

THE WITNESS: It was part of the regulations, so ultimately I would have responsibility for it. There's nothing that requires the things that I have responsibility for to report in to me, just more that I'm overseeing them.

BY MR. BUCHANAN:

Q. When you arrived at Qualitest, SOM was being handled by a different group, right?

A. Correct.

Q. And that was true for several years, right?

MS. VANNI: Object to form.

THE WITNESS: It became more of a partnership.

BY MR. BUCHANAN:

Q. In 2013, I think, after the

meeting with the DEA, you were able to bring that under your umbrella more directly, fair?

MS. VANNI: Object to form.

THE WITNESS: Not sure exactly when it occurred, but I think it was before then, I believe.

BY MR. BUCHANAN:

Q. When you actually had responsibility for it?

A. Yes, I believe so.

Q. Let's just get some -- some dates kind of on a visual timeline, if you will.

You joined Qualitest in the summer of 2011?

A. Yes.

Page 66

Page 67

Page 68

BY MR. BUCHANAN:
Q. I mean, the manufacturer, of course, has business relationships with its various distributors and wholesalers, and under those agreements, there are often chargeback agreements, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And those chargeback agreements yield an exchange of information that provides visibility to the manufacturer of the secondary customers of the distributor, correct?
MS. VANNI: Object to form.
THE WITNESS: Sometimes.
Chargebacks are not a very -- not a very dependable tool for multiple reasons.
BY MR. BUCHANAN:

Page 69

Q. Well, they're certainly good enough for people to exchange a lot of money back and forth with, right?
MS. VANNI: Objection.
THE WITNESS: I don't know. I don't really know a lot about chargeback data.
BY MR. BUCHANAN:
Q. Well, you do know that chargebacks are a means for which manufacturers and distributors exchange big checks, right?
MS. VANNI: Objection.
THE WITNESS: I don't know. I know that it's a rebate type of program, but other than that, I don't know whether it's big or whether it's small. I don't know a lot about the financial aspects of it.
BY MR. BUCHANAN:
Q. Right. It's a system that's used between manufacturers and distributors whereby if a distributor ends up having to sell its product to its end user pharmacies and customers for less or at some type of discount relative to

what it paid for it, it can get money back from the manufacturer, fair?
MS. VANNI: Objection.
THE WITNESS: From what I know, yes.
BY MR. BUCHANAN:
Q. That's a decent thumbnail sketch of what we're talking about with the business purpose -- primary business purpose of chargeback data, correct?
A. Yes.
Q. And as part of that, the distributor has got to come forward with its sales information to its end user customers, correct?
A. Yes.
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And so the manufacturers then, as part of that reconciliation process, given end user customer information as part of the chargeback agreements, correct?
MS. VANNI: Objection.

THE WITNESS: Yes, on some customers.
BY MR. BUCHANAN:
Q. Right, and some customers --
A. Some don't participate.
Q. Right. Your larger wholesalers and distributors have chargeback agreements with the manufacturers, correct?
MS. VANNI: Objection.
THE WITNESS: I don't know.
BY MR. BUCHANAN:
Q. Okay. Well, during your time at Qualitest, you did have access to chargeback data, correct?
A. I looked at the data. I met with financial individuals, and the data was not helpful at that time.
Q. Okay. We'll highlight that answer and we'll circle back at some point during the day on that.
A. Yes.
Q. You would agree that during the time that you were at Qualitest, the company implemented a system to incorporate chargeback

data as part of its suspicious order monitoring tools, correct?
MS. VANNI: Objection.
THE WITNESS: The company reviewed the potential of including chargeback data. At the time that I had left, we had not implemented it. I don't know if it was implemented after.
BY MR. BUCHANAN:
Q. Okay. We'll talk about that in a little more detail.
A. Let me be clear, though. There is no -- there's no DEA regulation that requires a company to include chargeback data in their SOM program.
Q. Qualitest at the point in time when they implemented this -- and I guess there's some debate between you and I at the moment, and we'll just have to work through this during the day, as to whether Qualitest ever actually looked at chargeback data and used it as part of its suspicious order monitoring program.
Is it your contention, as least

as you are sitting here now, you don't recall Qualitest doing that for its customers?
MS. VANNI: Object to form.
THE WITNESS: When I was there, we did not.
BY MR. BUCHANAN:
Q. Okay. Looking now to your description -- it's 1146.3, those are numbers in the top right corner, I'll reference them from time to time, but it's Exhibit 2 for the record -- this says "Upon arrival at Qualitest, I did not have responsibility for SOMs."
Was there a particular DEA issue that you were brought in to deal with in Alabama?
MS. VANNI: Object to form.
THE WITNESS: I was brought in to basically implement a DEA program overall. Wasn't SOM specific.
BY MR. BUCHANAN:
Q. Who was the DEA compliance person that you replaced?
A. John Schultz.
Q. Okay. If I understand correctly,

historic files show that Qualitest had separate incidents with DEA which caused a bit of a stir, fair?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. What were those?
A. Well, we had multiple interactions with DEA. Are you referring to prior to my coming?
Q. Prior to your coming, yes, the issues that you were aware of that created a bit of a stir.
MS. VANNI: Object to form.
THE WITNESS: I was told that there was a theft, and that that's why Mr. Schultz was being let go.
BY MR. BUCHANAN:
Q. Okay. And was that in the Charlottesville facility or in the Huntsville facility?
A. Huntsville.
Q. Okay. And what was the other incident?

A. That's the -- that's the only one I'm aware of prior to my coming.
Q. Okay. Are you aware of incidents where the company was shipping products to people who didn't have DEA licenses?
MS. VANNI: Object to form.
THE WITNESS: No, I'm not.
BY MR. BUCHANAN:
Q. Not during your time nor before your time, you're not aware of that?
A. No, I'm not.
Q. Okay. And then you describe in the middle, that you were "very concerned with the status of the SOM program."
Do you recall that?
A. Yes.
Q. Not just writing it, but you recall that?
A. Yes.
Q. You recall being very concerned about where Qualitest was with regard to license checks, for example?
MS. VANNI: Object to form.
Counsel, can you point me to

where you're referring to?
MR. BUCHANAN: It's in this and outside of this.
THE WITNESS: License checks, I was not concerned. I know they were checking the licenses.
BY MR. BUCHANAN:
Q. On an order-by-order basis?
A. I don't believe it was on an order-by-order basis. DEA required at the time and still requires really that you check the license when you get a copy of the customer's license, and that license is good for a year. There's no DEA requirement, in other words, to purchase NTIS data.
Q. Okay. Fair enough. But all the way back in the '90s, I mean, when you were at Ciba-Geigy, I mean, Ciba-Geigy had an NTIS data stream that was checking orders as they were placed, correct?
A. It was available, yes, yes.
Q. And that's how they were doing it back in the '90s?
MS. VANNI: Object to form.

THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. And that's how Watson was doing it before you -- before you got to Watson?
A. Correct. Yes.
Q. And before you got to Qualitest, it would be fair that you had to add the NTIS and state license checks to the system, right?
A. I didn't have to. It was an upgrade that I wanted to make.
Q. Okay. What you stated here was you were very concerned with the status of the program and began to work with sales, customer service and IT to make improvements and with your management to raise your concerns.
Would it be fair that you raised concerns?
MS. VANNI: Object to form.
THE WITNESS: About the SOM program?
BY MR. BUCHANAN:
Q. Yes.
A. The concerns I had with the SOM program was that it was being handled by sales

and they were reviewing what they needed to. My concern was the perception that sales was the one handling it, and how that would be perceived by others.

Q. Right, because, I mean, you know there's -- the salespeople are about selling, right?

MS. VANNI: Object to form.

THE WITNESS: That's what people would perceive, yes.

BY MR. BUCHANAN:

Q. I mean, that's not an unreasonable perception, right?

MS. VANNI: Object to form.

THE WITNESS: It is a perception that's out there --

BY MR. BUCHANAN

Q. Right.

A. And regardless of how -- you know, salespeople have integrity, too, believe it or not.

Q. Do you recall getting some pushback from the sales side of Qualitest as you started to implement and explore various SOMs

initiatives --

MS. VANNI: Objection.

BY MR. BUCHANAN:

Q. -- after your meeting with the DEA?

A. Questions from them? I think that the education, we needed to educate a little bit more. As far as how DEA looked at the program -- not looked at the program, but how they -- how the regulation had changed over the years and how the perception of the regulation and the things that DEA would like to see changed over the years.

Q. My question was simply whether you got some -- some pushback from sales as you were starting to implement, restrict and propose terminating certain customers.

Do you recall that?

MS. VANNI: Objection.

THE WITNESS: I think you will always get pushback from sales at any company when you're cutting off a customer, but when we gave information as to why that customer needed to be cut

off, they were on board anytime that I interacted with them.

BY MR. BUCHANAN:

Q. Right.

So once you showed them diligence that you had done -- or investigation that had been done, a review of data that had been conducted, people were willing to accept the conclusion, fair?

A. Yes.

Q. Okay. But you've got to do the diligence, you've got to do the digging, you had to make the case?

MS. VANNI: Object to form.

THE WITNESS: Yes. We're not going to, you know, stop shipping to a customer without justification, sure.

BY MR. BUCHANAN:

Q. So it's really hard to develop that justification if you're not doing due diligence on customers, correct?

MS. VANNI: Object to form.

THE WITNESS: No, because sales was contacting me. If they had a

concern about a particular customer, they were really, really good with bringing things forward and asking questions, and so we were working together on it.

BY MR. BUCHANAN:

Q. Okay. It says here in early 2013 you received a program -- you received approval to move the SOM program into DEA compliance.

Do you see that?

A. Yes.

Q. Okay. Does that help refresh your recollection as to when that came under your umbrella?

A. Yes, thank you.

Q. Okay. So prior to that point in time, it was a sales function, right?

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. Sales, customer service? Excuse me.

A. It was under the sales department, managed by the sales department with input.

Q. Right, so --
A. With compliance input.
Q. And so in 2013, you brought it into the DEA compliance group.
Were you the head of DEA compliance at that point in time?
A. Yes.
Q. And that was the title you held until you left?
A. Yes.
Q. Why did you leave?
A. A better position, promotion. I went to H.D. Smith as the VP.
Q. Okay. There was a -- you left -- let's just look at Exhibit 2. Exhibit 2 is dated October 15th, 2014.
Two weeks before this, you got that letter from the U.S. Attorney in Alabama about egregious violations?
A. Prior to me leaving?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Yeah. Do you recall that?
A. We had -- we had inspections by

DEA throughout my time at Qualitest. I don't know which -- what instance you are referring to, but we did have occasions where we had violation letters.
Q. Okay. And do you recall -- do you recall getting a letter not from the DEA, but from the U.S. Attorney directed to you, telling you that there were egregious violations and you had a week to sit down with them to talk about your fine?
MS. VANNI: Object to form.
THE WITNESS: I don't recall that.
THE VIDEOGRAPHER: Counsel, could we go off the record just momentarily?
MR. BUCHANAN: Yeah.
THE VIDEOGRAPHER: Going off the record. The time is now 9:53 a m.
(Brief recess.)
THE VIDEOGRAPHER: Back on the record. The time is 9:55 a m.
(Document marked for identification as Par- Norton Deposition Exhibit No. 3)

BY MR. BUCHANAN:
Q. I'm passing you, Ms. Norton, a copy of Exhibit 3 to your deposition. This is a letter from the U.S. Attorney, U.S. Department of Justice, Joyce Vance, United States Attorney, I guess for the Northern District of Alabama, it's dated September 30, 2014, 1060.2. If you could pull it up, please.
And do you see before -- I guess you read the content of it, ma'am, do you see you're on this exchange?
A. Yes, I do.
Q. Okay. You are the point of contact from the Department of Justice on this particular correspondence from the U.S. Attorney's Office?
A. Yes.
Q. It says "Ms. Hernandez, please find attached the Notice of Intent to Seek Civil Penalties."
Do you see that on the cover, the cover e-mail?
A. Yes.
Q. And this is September 30, 2014,

it's a couple weeks, it looks like, before you are engaging with H.D. Smith in your job search.
Do you see that?
A. The date, yes, September 30.
Q. Is that correct?
A. Mm-hmm.
Q. Okay. So you get this letter. Please feel free to look at it. It's a follow-up letter to a teleconference you had had a week earlier on September 22, 2014.
Do you see that?
A. Yes.
Q. Okay. It says, "The audit revealed alarming deviations of Schedule II and Schedule III controlled substances in violation of 21 CFR 1304.21, other statutes, you failed to account for and properly maintain records of the following."
And then it's got a list of seven items there. And, I'm sorry, are you still reading?
A. Yes.
Q. Okay.
A. (Witness reviews document.)

Q. And can you highlight the items, please.
So we see item one, Hydrocodone 10, 325 milligrams, that's Hydrocodone 10 milligrams, 325 milligrams of acetaminophen, is that what that would be?
A. Yes.
Q. And so, you know, about roughly 1200 bottles unaccounted for, right?
A. Mm-hmm.
MS. VANNI: Objection to the form.
THE WITNESS: Doesn't necessarily mean they were unaccounted for as much as the recordkeeping of them.
BY MR. BUCHANAN:
Q. Well, it says "GB," and GB is --
A. Generics Bidco.
Q. And Generics Bidco was one of the operating entities of Qualitest, correct?
A. Yes.
Q. One of the registrants with the DEA, correct?
A. Yes.

Q. And there was another registrant with the DEA that also operated under Qualitest, correct?
A. Yes.
Q. And what was the entity's name?
A. Vintage -- Vintage Pharmaceuticals.
Q. Right.
So what we see here are some 1200 bottles of Hydrocodone with 10 milligrams, 1300 bottles of hydrocodone seven and a half milligrams, more in different -- in different allocations. 816 bottles of Oxycodone.
What's Oxycodone 30 milligrams, ma'am?
A. What is it?
Q. Yeah.
A. I don't --
Q. Is it a generic of Oxycontin?
A. Yes.
Q. Okay. And then on the next page, it says "The DEA's inspection revealed an overall careless and haphazard recordkeeping practice at GB" -- that's the Qualitest entity,

correct?
A. Mm-hmm.
Q. -- "as demonstrated by, among other things, deviations exceeding 9 million tablets."
Did I read that correctly?
A. Yes.
Q. It continues, the follow on paragraph, "GB's recordkeeping violations, in particular, as evidenced by the several-million tablet deviations are" -- and what did they say?
A. I'm sorry, where are you looking? Failure to maintain --
Q. "GB's recordkeeping violations, in particular" --
A. Yes.
Q. -- "as evidenced by the several-million tablet deviation are," and what do they say?
A. -- "egregious and evidence a complete disregard of GB's statutory and regulatory obligations."
Q. That's not good.
MS. VANNI: Object to form.

THE WITNESS: The way the DEA and/or the Attorney General words a violation letter is meant to -- meant to be exaggerated for impact.
BY MR. BUCHANAN:
Q. "Egregious and evidence of a complete disregard of your statutory and regulatory obligation," that's not good, right?
MS. VANNI: Object to form.
THE WITNESS: It's not -- it's not really descriptive of the situation.
BY MR. BUCHANAN:
Q. It's certainly not the way a company who is a registrant in a closed system of controlled substance distribution should be contacting itself, right?
MS. VANNI: Object to form.
THE WITNESS: These letters are also meant to point out violations --
BY MR. BUCHANAN:
Q. Can you answer my question?
A. I'm sorry, what was the question?
Q. Yes. It's not the way in which a manufacturer and registrant of a controlled

substance is supposed to be behaving, correct?
MS. VANNI: Object to form.
THE WITNESS: You don't want any violations.
BY MR. BUCHANAN:
Q. Okay. You certainly don't want to engage in egregious and complete disregard of your statutory and regulatory obligations, fair?
MS. VANNI: Object to form.
THE WITNESS: And we were not.
BY MR. BUCHANAN:
Q. Okay. And they said you had a week to sit down with them to negotiate your fine, right?
A. Yes.
Q. And were you part of those discussions?
A. I don't recall.
Q. Because this is not -- this wasn't just the first notice you had from the U.S. Attorney, right?
MS. VANNI: Object to form.
THE WITNESS: I don't know whether we had notices from the Attorney

General or violation letters. We did have other violation letters, but I don't know if the Attorney General was involved. Offhand, I don't recall.
BY MR. BUCHANAN:
Q. Right.
You had a call with certainly the U.S. Attorney a week before this, right?
A. I don't know for sure.
Q. First paragraph, last sentence.
A. Yes.
Q. Okay. You had a call with the U.S. Attorney before this?
A. So the call would have been -- by the looks of it here, the call would have been to say do we want this sent by e-mail, do we want it sent by mail, et cetera.
At that point, we probably would not know the details of what was included in it until it came.
Q. And you would have had interactions with the DEA on this before the U.S. Attorney got it, right?
A. This was a result --

MS. VANNI: Objection.
THE WITNESS: -- of a DEA inspection.
BY MR. BUCHANAN:
Q. Right. So you would have had interactions with the DEA on this issue before you got --
A. The local office, yes.
Q. And what fine did Qualitest pay in connection with this?
MS. VANNI: Object to form.
THE WITNESS: I'm not sure.
BY MR. BUCHANAN:
Q. Were you a part of those discussions?
A. No, I think I had left already. I don't recall.
Q. Okay. What happened after this letter?
MS. VANNI: Object to form.
THE WITNESS: After any letter -- and, again, I didn't recall this instance offhand -- and I know that the quantities that are listed here, the

issues were surrounding complaint samples which get returned to the company from customers in various conditions and, for example, you might receive a liquid in -- that came in in a bottle that the bottle is broken and there's glass.
So, I mean, these are not liquid, but the complaints that come back from customers are not usually in very good form, and that's what many of these were related to, I believe.
BY MR. BUCHANAN:
Q. 9 million pills?
A. Mm-hmm, yes.
Q. 9 million pills, you're claiming, were cracked bottles?
MS. VANNI: Object to form.
THE WITNESS: No, no, these were not bottle -- these, in particular, that are listed here are not liquid, but I'm giving an example of the condition that complaints come back to us.
BY MR. BUCHANAN:

Q. Okay.
A. So partial tablets in prescription bottles dumped into containers, loose, you know, that's what we're dealing with from a complaint perspective when those are returned to us.
Q. Okay. Well, specifically on this one, were you a part of the investigation around this?
A. I don't recall.
Q. Who handled the investigation?
A. I don't know. It was for the distribution, Generics Bidco, it would be for the distribution center, so I would assume someone in distribution, someone who had been left on my team. I don't know who else.
Q. Okay. And so after this interaction at least -- and I haven't been able to see -- withdrawn.
After you received this letter, we certainly know you're in at least more -- you send your resume out, you commence a screening process with H.D. Smith to pursue employment there, fair?

A. No, not fair. This letter would have nothing to do with me leaving the company. After the amount of time that I have in a DEA compliance role, a violation letter would not cause me to leave a company.
Q. And so -- that's what I'm trying to understand.
We have this letter, you're not involved in the investigation around the letter, and you're the head of DEA compliance?
MS. VANNI: Object to form.
THE WITNESS: I don't know if I was or not. I just don't recall it. It's been a while. I would assume --
BY MR. BUCHANAN:
Q. You had some recollection, ma'am, about, you know, getting the ANDA meeting with the DEA back in 2008, 2009 -- or the Anda meeting, excuse me, in 2008, 2009. You don't remember a letter from the U.S. Attorney saying we've got to sit down and talk about potentially millions of dollars in fines relating to egregious, alarming, complete deviations and failure to account for more than 9 million

pills? You don't remember that?
MS. VANNI: Object to form.
THE WITNESS: I may have been involved in it during my time there, but I don't recall any of it. I don't want to miscomment on what I did or didn't do.
BY MR. BUCHANAN:
Q. As part of your separation with the company in 2014, did you have interactions with management in any way relating to this particular event?
MS. VANNI: Object to form.
THE WITNESS: I would have interactions with management about any violation that the company received, so I would assume that I did. Again, I don't know who or -- I don't recall the details of it.
MR. BUCHANAN: You asked for a five-minute break, and I'm good now, thanks.
MS. VANNI: Okay.
THE VIDEOGRAPHER: Going off the

record. The time now is 10:06 a m.
(Brief recess.)
THE VIDEOGRAPHER: Now going back on the record. The time is 10:20 a m.
BY MR. BUCHANAN:
Q. As I said, you can set aside that last exhibit. You've worked for several manufacturers, distributors who are the subject of the litigation that brings us here today.
I'm focusing most of my questions during your time on Qualitest, so I've got a period of time to do that. Other people may have some questions about other points in time.
A. Yes.
Q. But you spent some time, I assume, meeting with counsel before today to kind of run through this?
A. Yes, I did.
Q. Okay. Who -- who did you speak with by the entity, counsel for?
A. Counsel for Endo, counsel for H.D. Smith and counsel for Watson.
Q. Okay. Separate counsel for Anda or same counsel for both?

A. Briefly for Anda. Briefly for Anda.
Q. Okay. And so that was separate counsel for Anda?
A. Yes.
Q. Okay. And all in one session or in multiple sessions?
MS. VANNI: Object to form.
THE WITNESS: Multiple.
BY MR. BUCHANAN:
Q. Okay. When did you first start meeting?
A. About a month ago.
Q. Okay. And let's talk about kind of in-person meetings first.
How many of those did you have?
A. I think three with Endo, two with H.D. Smith and one with Watson.
Q. Each one of these several hours?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. You don't currently work for any of the firms whose counsel you met with,

correct?
A. No, I do not.
Q. When I said firms, I mean either Endo or H.D. Smith or Watson, correct?
A. No, do not.
Q. Was your current employer present at any of those meetings?
A. Yes.
Q. Okay. All of them?
A. No.
Q. Okay. So that would be an additional meeting or that person attended certain of the meetings?
A. Attended certain.
Q. Okay.
A. And there was an additional meeting with them separately.
Q. Okay. And your current employer I see from Exhibit 1 is Noramco?
A. Yes, that's correct.
Q. Out of Wilmington, Delaware?
A. Yes.
Q. Do you work in Wilmington, Delaware?

A. I do.
Q. What is the business of Noramco?
A. They are a chemical active ingredient manufacturer.
Q. So they make the API?
A. Yes.
Q. They make APIs that are controlled substances?
A. Yes.
Q. And which ones do they make?
A. They make several. Hydrocodone, oxycodone, Tapentadol.
Q. And oxycodone would be the active pharmaceutical ingredient in -- is API an active pharmaceutical ingredient?
A. Yes, it is.
Q. Okay. So oxycodone is the active pharmaceutical ingredient in Oxycontin?
A. Yes.
Q. And hydrocodone would be an active pharmaceutical ingredient in products like Vicodin?
A. Yes.
Q. Okay. And so we'll look at some

documents today where they're referenced by hydrocodone APAP or oxycodone.
When we see hydrocodone APAP, we can think of that as Vicodin?
MS. VANNI: Objection.
THE WITNESS: Hydrocodone acetaminophen, yes.
BY MR. BUCHANAN:
Q. Okay. APAP is an abbreviation in the pharmaceutical industry for acetaminophen, which would retail as Tylenol in its -- if it was just acetaminophen, right?
A. Yes.
Q. Okay. When you combine essentially Tylenol with the controlled substance hydrocodone, that goes by a brand name of Vicodin, correct?
A. Sometimes, yes.
Q. Well, Vicodin is hydrocodone and acetaminophen combined, correct?
A. Yes.
Q. In one tablet?
A. Yes.
Q. Thank you.

And so the business of Noramco is the manufacturer of the -- if you will, the active controlled substance that gets ultimately put into the tablets that are stamped by manufacturers like Qualitest, correct?
A. Yes, that's correct.
MS. HERGENROTHER: Objection.
MR. BUCHANAN: Who is on the line and raising that objection for which defendant?
MS. HERGENROTHER: It's Jenny Hergenrother for Noramco, Inc.
BY MR. BUCHANAN:
Q. All right. So we were running through these meetings you had, several hours, several meetings, several hours at each meeting for several meetings, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes, correct.
BY MR. BUCHANAN:
Q. All right. Good. I've got seven meetings over the last month?
A. Approximately.
Q. Okay. And these are

face-to-face, right?
MS. KOSKI: Object to form.
THE WITNESS: Most, yes.
BY MR. BUCHANAN:
Q. Okay. And then you probably had some video conference-type stuff where you shared screens. Did that happen, too?
MS. VANNI: Object to form.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. No?
Did you have some teleconferences or phone calls?
A. Yes.
Q. Okay. Did that start before the last month?
A. I'm not positive.
Q. Okay.
A. I don't think so.
Q. Did you review some documents to get ready for today?
A. I was shown some documents, yes.
Q. Help refresh your memory?
A. Yes, in some cases, yes.

Q. And did it?
A. Yes.
Q. What were you shown?
MS. VANNI: Object to the form. I'm going to instruct her not to answer as to what she was shown. That's clearly work product.
MR. BUCHANAN: It's actually not. I mean, frankly, if you showed her anything that refreshed her recollection, I'm entitled under Rule 608 or 611, whatever it is, to copies of whatever she was shown, so...
MS. VANNI: I'm going to instruct her not to answer as exactly to what she was shown.
You can ask her how her recollection was refreshed or if her recollection was refreshed, but -- or if she remembers specific documents, but she is not going to tell you specific documents that she was shown.
MR. BUCHANAN: If the witness' recollection was refreshed by documents

that you showed her, I'm entitled to have them so that I can appropriately examine her on her refreshed recollection. That's the law.
MS. VANNI: Counsel, this -- you know that the documents that she is shown by counsel in preparation for deposition are protected by attorney-client and work product.
MR. BUCHANAN: We disagree. Certainly where it refreshes your recollection.
BY MR. BUCHANAN:
Q. So please describe the subject matter --
MR. BUCHANAN: You're instructing her not to answer, correct?
MS. VANNI: I am as to what specific documents she was shown.
BY MR. BUCHANAN:
Q. Okay. Let's talk about, then, the areas in which you were shown documents.
You were shown documents apparently by counsel for Endo, fair?

A. Yes.
Q. Okay. And what areas of subject matter were those documents?
A. Oh, gosh. E-mails, inspection information.
Q. Documents you wrote?
A. Yes.
Q. Documents you received?
A. In some cases, yes.
Q. Documents that you don't appear to have been copied on but were, nonetheless, in your area of responsibility?
MS. VANNI: Objection.
THE WITNESS: Yeah, yes.
BY MR. BUCHANAN:
Q. Okay. Were you shown documents by counsel for any of the other defendants?
A. Other than Endo?
Q. Yes.
A. Yes.
Q. Okay. Which defendant?
A. H.D. Smith.
Q. And did those refresh your recollection as well?

A. Yes.
Q. Okay. And what subject areas were those?
A. SOM. I think that's -- mostly SOM.
Q. Okay. And what documents were you shown?
MR. LEEDER: Objection?
MR. BUCHANAN: We've already had the instruction on the record. You're going to have to instruct the witness not to answer.
MR. LEEDER: I've already raised this objection with Mr. Young, and I will ask the witness not to answer the question.
MR. BUCHANAN: Unless he instructs you not to answer the -- I just -- I need to be clear, are you instructing witness not to --
MR. LEEDER: I'm instructing the witness not to answer the question.
BY MR. BUCHANAN:
Q. All right. So after you left

Endo, you went off to H.D. Smith?
A. Yes.
Q. Had a little consulting gig after that, right?
MS. VANNI: Object to form.
THE WITNESS: I was consulting.
BY MR. BUCHANAN:
Q. For nine months?
A. Yes.
Q. I didn't say that disparagingly. I'm just trying to fill out your full history so we can drill down a little bit.
You were at H.D. Smith from 2014 to 2016. From 2016 to 2017, you remained Pennsylvania based or came back here to Pennsylvania --
A. Yes.
Q. -- and were a regulatory consultant or compliance consultant from here, correct?
A. Correct.
Q. Did you consult for any of your former clients during that period of time? I shouldn't -- withdrawn.

Did you consult for any of the former employers we've already talked about during that period of time?
A. I did not.
Q. Okay. Since leaving Endo, have you done consulting for Endo?
MS. VANNI: Object to the form.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. Since leaving H.D. Smith, have you done consulting for H.D. Smith?
A. No.
Q. Since leaving -- I said Endo. I should have said Qualitest.
Since leaving Qualitest, have you done work for Qualitest?
A. No.
Q. Okay. So, too, for any of the other manufacturers, distributors you've worked for, correct?
A. Correct.
Q. Who did you work for, then, in that period of time -- withdrawn. Let me be more precise.

Did you work for any manufacturers of controlled substances or distributors of controlled substances that you believe are defendants in this case?
A. No.
Q. Okay. Did you work for any manufacturers or distributors of controlled substances?
A. Yes.
Q. Who?
A. For Neos Therapeutics.
Q. Okay. And they brought you on board?
A. Yes, they did.
Q. Okay. Texas was too far, so you lasted for a year and then you came back here?
A. No.
Q. Okay.
A. I did not relocate to Texas. I worked from -- from my home in Bethlehem and went to Texas one week a month.
Q. Okay. All right. So I think we understand at this point, ma'am, to recap, you've got about 30 years' experience dealing

with controlled substances in some capacity or another, fair?
A. Yes.
Q. At various points at time and at times I'm going to drill down on in particular during your time at Qualitest, you were the DEA compliance manager, correct?
A. The director of DEA compliance, yes.
Q. Okay. You were the most senior person on DEA compliance?
A. Yes.
Q. Okay. I mean, there are org charts, and we could look at them if we wanted to just make a big pile of exhibits over there, but there's org charts from your time at Qualitest that reflect you reported directly to the chief operating officer; is that correct?
MS. VANNI: Object to form.
THE WITNESS: For a short period of time, yes.
BY MR. BUCHANAN:
Q. Okay. And what was that period of time?

A. Closer to -- closer to my leaving, closer to the end of my work. Mostly I did not report to him for a long period of time.
Q. Okay. So you had different people you reported to over time, but at the end of your tenure at Qualitest, the person you reported to is the chief operating officer, correct?
A. Yes.
Q. Okay. That person was for the pharmaceutical division?
A. Yes.
Q. Okay. And who was that person?
A. Don Degoyler.
Q. Okay. And you had interactions with him from time to time?
MS. VANNI: Object to form.
THE WITNESS: Occasionally.
BY MR. BUCHANAN:
Q. Let's talk about Qualitest.
Qualitest is a manufacturer and distributor of controlled substances, true?
A. They were.
Q. Among other things?

A. They were, yes.
Q. Okay. Roughly 70% of their business was controlled substances, do you remember that?
MS. VANNI: Objection.
THE WITNESS: If I had to guess, yes, about that.
BY MR. BUCHANAN:
Q. I mean, they made a lot of controlled substances, true?
A. Yes, they did.
Q. Okay. And they had these facilities, what is it, in Huntsville, Alabama and Charlottesville where they did all that manufacturing?
A. Charlotte, North Carolina.
Q. I think I said Charlottesville. That would be Virginia, right?
A. Yes.
Q. Charlotte, North Carolina.
A. Correct.
Q. Charlottesville, Virginia. And they don't have a place in Charlottesville, Virginia, right?

A. They did not.
Q. So Charlotte, North Carolina, Huntsville, Alabama is where they're making all these pills, correct?
MS. VANNI: Object to form.
THE WITNESS: That's where they had facilities, yes.
BY MR. BUCHANAN:
Q. Okay. And to be clear, I mean, billions and billions of pills, right?
MS. VANNI: Object to form.
THE WITNESS: I didn't keep track of total quantities.
BY MR. BUCHANAN:
Q. Do you have -- do you have a sense that they were making a lot of them?
MS. VANNI: Object to form.
THE WITNESS: There was a diverse -- diverse range of products.
BY MR. BUCHANAN:
Q. Okay. I mean, you've been to the manufacturing facilities, right?
A. Mm-hmm.
Q. Yes?

A. Yes.
Q. Sorry. We're kind of getting loose there.
And I mean, these controlled substances -- and let's dial back for a second.
The DEA framework makes it a closed system, right?
A. Correct.
Q. And you've got a -- I mean, there's so much concern about these drugs that you've got to store them in vaults and in cages and have special procedures around the incoming shipments and the outcoming shipments to make sure you're not losing pills anywhere in the process, right?
MS. VANNI: Objection.
THE WITNESS: There is an entire set of regulations governing the control of them, yes.
BY MR. BUCHANAN:
Q. But, I mean, you as somebody in DEA compliance for companies that, you know, deal in controlled substances over the years, I mean, you recognize that these are dangerous

drugs?
MS. VANNI: Objection.
THE WITNESS: I would not classify them as dangerous. When used appropriately, they're products that are approved by FDA for legitimate purposes. I wouldn't necessarily characterize them as dangerous.
BY MR. BUCHANAN:
Q. Okay. Got to keep them in vaults, right?
A. Yes.
Q. Cages, right?
A. Yes.
Q. Two people watching everybody at all times, right?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Right?
A. In some instances, two people.
Q. Don't put on the outside of the box what's on the inside of the box because they're very prone to being stolen, diverted, abused, right?

MS. VANNI: Object to form.
THE WITNESS: There is a diversion potential, abuse potential, yes.
BY MR. BUCHANAN:
Q. And that's not something you've come to learn about in 2019; that's something you've known about for 25 years, right?
MS. VANNI: Object to form.
THE WITNESS: I've learned more over the years, yes.
BY MR. BUCHANAN:
Q. Right, but I mean, these -- these drugs, certainly if we're talking about Oxycontin, these are Morphine derivatives, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Opiates have been around for a long time, right?
A. Yes.
Q. Since before the Controlled Substance Act, right?

A. Yes.
Q. And there's stories -- did you go and get a Master's in pharmacy?
A. It's a Master's in pharmaceutical policy and regulation.
Q. So you learned the regulations, you learned the case law I saw as well in your resume, right?
A. Yes, some.
Q. And so you saw how the Controlled Substances Act came about, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. You are aware that these drugs have been drugs of abuse for a long time, right?
MS. VANNI: Objection.
THE WITNESS: The abuse of controlled substances has changed drastically over the years, different -- different products, different entities at different times.
BY MR. BUCHANAN:
Q. Right.

And, for example, back in the '70s, there was a drug known as oxymorphone. Have you heard of oxymorphone?
A. Yes.
Q. Controlled substances?
A. Yes.
Q. Withdrawn from the market?
MS. VANNI: Object to form.
THE WITNESS: I'm not aware of that.
BY MR. BUCHANAN:
Q. Due to abuse?
Have you heard of numorphan?
A. No.
Q. You only -- when you were at Qualitest, you only had exposure to the generic products, not the branded products?
A. Yes, for the most part.
Q. Okay. If I understand, your silo of responsibilities with regard to DEA compliance was strictly on the Qualitest side?
A. I would be consulted occasionally for the brand side, but my responsibilities were directed at the generic side.

Q. Who was the head of DEA compliance for Endo?
A. There was -- there were several people that handled DEA compliance. They didn't necessarily have that title, from what I can recall.
Q. Did -- Endo makes controlled substances, right?
A. Endo outsourced controlled substances, so they didn't necessarily hold a license. They used contract manufacturers, so the DEA person would really be at that contract manufacturer for the most part.
Q. Am I correct there is no head of DEA compliance for Endo?
MS. VANNI: Objection.
THE WITNESS: Not that I knew of.
BY MR. BUCHANAN:
Q. Okay. If you were looking to have a conversation with a counterparty at Endo on DEA compliance issues, there was not a person like yourself on the other side of the building?
MS. VANNI: Objection.
THE WITNESS: Not with that

title, but the knowledge was there.
BY MR. BUCHANAN:
Q. With who?
A. Some with Jill Connell, who was my boss when I started. With Sanjay Patel, who later came in. With Lisa Walker. Doug Felton was another individual.
There was -- there was just a good level of DEA knowledge, I think, at the Endo headquarters from what I experienced.
Q. So there wasn't a DEA compliance person, per se, correct?
MS. VANNI: Object to form.
THE WITNESS: Correct.
BY MR. BUCHANAN:
Q. In your resume, you talk about having to comply with OIG orders and CIAs for other manufacturers.
During your time at Qualitest, were there any CIAs or other orders, regulatory orders that you were charged with enforcing?
A. I'm sorry, CIAs?
Q. Agreements with the Department of Justice resolving allegations, claims where the

company committed to do things in a certain way.
A. No.
Q. Okay. From a compliance perspective at Qualitest, your compliance was focused on the regulatory framework, the statutory framework and, if you will, the industry framework, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. All right. So let's just kind of put a fine point on Qualitest's business.
(Document marked for identification as Par-Norton Deposition Exhibit No. 4.)
BY MR. BUCHANAN:
Q. Passing you what's been marked as Exhibit 4. It's 1157.
MR. BUCHANAN: Bradley, if you could pull it up.
MS. VANNI: Do you have a copy for me?
MR. BUCHANAN: Oh, I'm sorry.

MS. VANNI: Thank you.
MR. BUCHANAN: I need one back, actually. Keep that in the folder.
BY MR. BUCHANAN:
Q. We're marking as Exhibit 4 a summary of Qualitest shipments.
MS. VANNI: Counsel, I'm assuming this is produced in native, but could you read the Bates number into this.
MR. BUCHANAN: Yeah, the Bates number is -- so this -- we've asked you for your shipping information, and you've pointed us to this particular document. I guess I could ask the witness to sum it, but that would be a poor use of our day together, but the Bates numbers at the top Par Opioid MDL0001596805, Par Opioid MDL00015968013-68019. I believe these are spreadsheets that you have produced to us.
MS. VANNI: And it's one page or two?
MR. BUCHANAN: Mine is two pages.

Yours should be as well.
BY MR. BUCHANAN:
Q. Do you have two pages, ma'am?
A. Yes.
Q. So on the screen, we see a chart, and this chart was prepared by our office from the spreadsheets that are referenced here and using the data that your counsel has pointed us to, to reflect the shipping data for Par products.
Qualitest was ultimately -- I'm sorry, Par was ultimately acquired by Endo, and the Qualitest business went into Par.
Do you have that understanding?
A. Yes.
Q. Okay. All right. So this is looking back in time, and there's a list of products on the left.
Do you see those?
A. Yes, I do.
Q. Okay. Some of these are controlled substances and CS2, some are CS3, some are Schedule I, right?
A. There are no Schedule I.

Q. Oh, I don't see -- that would be what, pseudoephedrine-type products?
A. No, a Schedule I drug has no medical use in the United States. If you are referring to pseudoephedrine, that's a List I chemical.
Q. Thank you. That's what I was trying to convey.
And we don't have List I chemicals on here, correct?
A. Correct.
Q. So these are products. Which of these of Schedule II, ma'am?
A. The Endocet, the Endodan, hydrocodone products, ibudone I believe is Schedule II. Some of the ones in the middle, Peritab I'm not sure of. Morphine is Schedule II. Opana is Schedule II. Oxycone, oxymorphone, Percocet -- most of them are Schedule II.
Meperidine, I believe, is Schedule IV.
Q. And then we can see at the bottom of each of these the products of these various

products by year. I guess if we looked over time -- and we only have data going back to 2008, we don't have it past 2015.

So if we looked at oxycodone, for example, and you told us before that was Oxycontin, right? That's the active pharmaceutical ingredient?

A. In the brand, in the brand.

Q. In branded form, it's Oxycontin, correct?

A. Mm-hmm.

Q. So, you know, roughly 2.8, 2.9, is that million pills or billion pills, ma'am? 2.8 million?

A. Yes.

Q. It's billion, right?

MS. VANNI: Where are you looking?

THE WITNESS: The total.

BY MR. BUCHANAN:

Q. 2.8 billion pills?

A. Mm-hmm.

Q. Wow. That's a lot.

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. Could we agree?

MS. VANNI: Objection.

THE WITNESS: I don't know -- the data that I'm looking at, I'm not sure where it's coming from. And when you're talking shipments -- so a shipment in DEA's mind could be a transfer from one location to another. It's not necessarily a sale to a customer. I don't know which facility this is referring to, which -- and, you know, whether it's big or small is opinion. So...

BY MR. BUCHANAN

Q. Okay. And we could fuss with the data. That would probably require me to fuss with your counsel because this is what they've pointed us to for the sales of the product.

A. Mm-hmm.

Q. Let's just talk about a number, I guess. If we're counting the zeros here right, 2.88 billion pills of oxycodone, one formulation of the oxycodone, correct?

MS. VANNI: Object to form.

THE WITNESS: It appears that way.

BY MR. BUCHANAN:

Q. Can we agree that's a lot?

MS. VANNI: Objection.

THE WITNESS: It depends on the scenario. I don't know what's a lot versus a little. It's not something that I was involved in or --

BY MR. BUCHANAN:

Q. I mean, close to ten pills for every human being in the United States --

MS. VANNI: Objection.

BY MR. BUCHANAN

Q. -- over a seven-year period of time --

MS. VANNI: Objection.

THE WITNESS: Mm-hmm.

BY MR. BUCHANAN:

Q. -- does that qualify as a lot to you --

MS. VANNI: Objection.

BY MR. BUCHANAN:

Q. -- from one manufacturer?

MS. VANNI: Objection.

THE WITNESS: I can't make that determination.

BY MR. BUCHANAN:

Q. Okay. And that's just one, one item on this sheet.

We've got oxycodone APAP combinations. That's 533 million, right?

A. Yes.

Q. They're up to 3.3, 3.4 billion pills of Oxycontin or Oxycontin combinations.

How about -- you talked about Vicodin before, you said that's a schedule drug, right?

A. Yes.

Q. Do you see the generic equivalent of Vicodin on this sheet, ma'am?

A. The Hydrocodone product?

Q. Okay. Let's look up there.

MR. BUCHANAN: Can you highlight the two hydrocodones. There you go.

BY MR. BUCHANAN:

Q. All right. Is that 3 billion?

That's 33 billion. 33 billion pills, right? 33 billion Vicodins Qualitest made and shipped between 2008 and 2015?
MS. VANNI: Objection.
THE WITNESS: Again, I don't -- I can't comment on this data. There's not enough information here. I don't know what the background is. I don't know what's a lot and what's a small amount. I mean, I'm not a physician, I'm not one to make a determination of small versus large.
BY MR. BUCHANAN:
Q. A hundred Vicodin for every human being of every age in the United States?
MS. VANNI: Objection.
BY MR. BUCHANAN:
Q. Is that a lot to you?
A. I don't know.
MS. VANNI: Objection.
BY MR. BUCHANAN:
Q. Well, when you were the head of DEA compliance for Qualitest, did you have the sense, ma'am, that -- this company was pumping

out controlled substances at this rate?
MS. VANNI: Objection.
THE WITNESS: We were a large manufacturer and distributor of controlled products. I'm sure there were larger.
BY MR. BUCHANAN:
Q. There's other people -- somebody made -- this is just you, right? This is just one manufacturer, Qualitest, right?
A. And again --
MS. VANNI: Object to form.
THE WITNESS: -- you don't know whether these are sales, whether these are shipments for transfer. This is not conclusive.
BY MR. BUCHANAN:
Q. Well, so if we go to the next sheet, the company gave us the dollars and the sales for these; do you see that?
A. Mm-hmm.
Q. And they're telling us, if you highlight those two hydrocodone lines, what is that, looks like about $25 billion in sales.

Am I doing my math right, ma'am?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Does that look right to you, 25, $26 billion in just Vicodin?
MS. VANNI: Object to the form.
BY MR. BUCHANAN:
Q. Right?
A. Again, can't comment on the financials. I didn't get involved with the financials.
Q. I mean, does this help clarify for you, ma'am, this is actually sale and shipping data?
MS. VANNI: Object to form.
THE WITNESS: No, because a sale is also a transfer. When you're -- when you're talking about a movement from a distributor, you know, I don't know whether this is a movement from Qualitest distribution to a storage location, if it's a movement from a manufacturer to a distributor. I don't have any -- and even if I did, I can't

comment on whether that amount is large, small. Not something that I dealt with. I don't have anything to compare it to, in other words.
BY MR. BUCHANAN:
Q. Okay. I mean, did you have the sense, though, ma'am, that the company during your tenure was pumping out billions and billions and billions of Vicodin every year?
MS. VANNI: Objection.
THE WITNESS: The company was an ongoing manufacturer of controlled substances.
BY MR. BUCHANAN:
Q. Okay. And so very important, if you're manufacturing enough Vicodin to give every human being, living person in the United States 100 pills from just your manufacturing facility, very important if you're that type of manufacturer to make sure you are maintaining a closed system with effective controls against diversion, true?
MS. VANNI: Objection.
THE WITNESS: Any -- any

controlled substance manufacturer, it's important.
BY MR. BUCHANAN:
Q. That's right. Top to bottom, if you're making a million, a million pills can cause a lot of problems, right?
MS. VANNI: Objection.
THE WITNESS: If they make it out of the legitimate channel.
BY MR. BUCHANAN:
Q. Right.
I mean, if you're just a small manufacturer, you still have to keep this stuff in a vault, right?
A. Schedule I and II, yes.
MS. VANNI: Objection.
BY MR. BUCHANAN:
Q. Schedule II, we're talking about hydrocodone, right?
A. Yes.
Q. Hydrocodone is Schedule II?
A. For part of the -- part of my time at Qualitest, hydrocodone was Schedule III, which would require it to be in a cage, not a

vault, but that changed.
Q. Right.
So that's what, 2013 or so, it changed schedule from --
A. 2013, 2014. I'm not exactly sure.
Q. Okay. You still had to keep it in the cage?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Schedule II has to be in a vault, a safe?
A. Safe for small quantities, yes.
Q. Right. Right.
So even if you are a manufacturer that's not putting out 35 billion pills of Vicodin or selling $25 billion worth of it, you've got to watch this stuff like a hawk, right?
MS. VANNI: Object to form.
THE WITNESS: You have to follow the regulations regardless of the quantities.

BY MR. BUCHANAN:
Q. Make sure it's only getting to customers who are getting it for legitimate purposes, right?
A. Yes.
Q. Make sure that your customers have processes in place so that they're using it only for legitimate purposes, right?
A. To the best of your ability, yes.
Q. So that you maintain this closed system of distribution because we know at some point in time, it's not going to be in a safe, right?
MS. VANNI: Object to form.
THE WITNESS: At the pharmacy level, at the physician -- yes.
BY MR. BUCHANAN:
Q. And, ultimately, these are drugs that cause lots of problems, right?
MS. VANNI: Object to form.
THE WITNESS: These are drugs that have a legitimate medical purpose and serve a legitimate need when used properly.

BY MR. BUCHANAN:
Q. These are drugs that wreak havoc in our communities, would you agree?
MS. VANNI: Objection.
THE WITNESS: No, I would not agree.
BY MR. BUCHANAN:
Q. These are drugs that wreak havoc and devastating consequences in our community, do you agree, ma'am?
MS. VANNI: Object to form.
THE WITNESS: The drugs that were manufactured at companies that I worked for went to legitimate entities.
BY MR. BUCHANAN:
Q. Pardon me for a moment.
Is there some debate in your mind, ma'am, as to whether or not these drugs, Oxycontin, oxycodone, oxymorphone, hydrocodone wreak havoc in our communities?
MS. VANNI: Object to form.
THE WITNESS: The drugs do have abuse potential. What I'm saying is that the products that were made at the

Page 138

companies that I worked for were kept under control and are not the products -- well, not the tablets that are wreaking havoc in the community, as you put it.

(Document marked for identification as Par-Norton Deposition Exhibit No. 5.)

MR. BUCHANAN: Passing what we're marking as Exhibit 5 to your deposition.

Copy for you, Counsel. Actually, keep one, please. Make sure you keep one.

MS. VANNI: Thank you.

BY MR. BUCHANAN:

Q. We're calling this Exhibit 5.

Ma'am, this is a letter that you put together in 2013; is that right?

A. It is a letter I put together, yes, 2013.

Q. And this is after you had the meeting with the DEA and --

MS. VANNI: Counsel, did this come from Qualitest's file or ABC or --

Page 139

I'm just not understanding the designation at the bottom.

MR. BUCHANAN: You know, that's a good question. I believe if it says ABDCMDL, I assume it's AmerisourceBergen. For the record, Exhibit 5 is Bates-stamped ABDCMDL00337067.

BY MR. BUCHANAN:

Q. Let's go to point 3. You see the Qualitest letterhead?

A. Yes.

Q. This is, in fact, a letter from you if you turn to the next page, right?

A. Yes, it is.

Q. You sent a letter out to your customers, right?

A. Yes, we did.

Q. And this was before you were going to have that follow-up meeting with the DEA after your first meeting with the DEA on the SOMs issues, correct?

MS. VANNI: Object to form.

THE WITNESS: The follow-up

Page 140

meeting wasn't a required meeting. It was something that we requested.

BY MR. BUCHANAN:

Q. And this was one of the things you were doing in advance of that meeting, fair?

A. This is something we were working on making improvements to the SOM program before we met with DEA.

Page 141

Page 142

A. From attending DEA conferences, yes.

Q. You didn't have to go to DEA conferences. You could read the New York Times, you could read your local paper here in Bethlehem, Pennsylvania and see that Congress is holding hearings, that Purdue is getting sanctioned to the tune of $650 million for its

Page 143

roles. You had that knowledge, ma'am, as somebody in the industry that these products are dangerous, right?

MS. VANNI: Objection.

THE WITNESS: Again, products that -- the products that we made at our facilities were under our control.

BY MR. BUCHANAN:

Q. Did you know there were congressional hearings --

A. I'm not saying -- I'm not saying that hydrocodone is not a dangerous substance when used improperly.

What I'm saying is that hydrocodone did not come from Qualitest.

Page 144

Q. Is that a true statement?

A. Yes. Yes, it is. And you know what --

Q. We know in the early 2000s -- sorry. If you were going to add something --

A. Okay.

Q. Okay. In the early 2000s, there were congressional hearings about Oxycontin abuse, do you remember that?

MS. VANNI: Object to form.

THE WITNESS: Vaguely, yes.

BY MR. BUCHANAN:

Q. Oxycontin is oxycodone, correct?

A. Yes.

Page 145

Page 146

Page 147

Page 148

Page 149

Q. Okay. And you believed it then, right?
A. Yes.
Q. And you believe it today, right?
A. If we follow the regulations, then we are doing what we can, yes.
Q. Oh, no, ma'am, you can do a lot more than the regulations. Those are minimum standards?
A. And we have.
Q. Right?
A. Mm-hmm.
MS. VANNI: Object to form.
BY MR. BUCHANAN:

Case: 1:17-md-02804-DAP Doc #: 1982-17 Filed: 07/24/19 39 of 138. PageID #: 242596

Highly Confidential - Subject to Further Confidentiality Review

Page 150

[redacted]

Page 151

[redacted]

Page 152

[redacted]

Page 153

[redacted]

39 (Pages 150 to 153)

Golkow Litigation Services - 877.370.3377

Page 154

Page 155

Q. Because, you know, if you go to a pharmacy and there's no front-end merchandise and there's a cage between the pharmacist and the customers and there's a long line out the front door, that starts to look a little different than walking into your local -- your local pharmacy that's got front-end merchandise, a good balance of business and no lines out the door, right?
A. Yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Okay. And those are things you can figure out just by walking in the door, right?
MS. VANNI: Object to form.
THE WITNESS: I think for some,

Page 156

you really can't make a decision based on one thing. It's the overall -- it's the overall assessment that you have to consider.
BY MR. BUCHANAN:
Q. Absolutely. Got to be a comprehensive look, right?
A. Yes.
Q. A thorough knowledge of your customers, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. That's what's expected; know your customer, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Not only your customer, know your customers' customer, right?
MS. VANNI: Object to form.
THE WITNESS: To the extent you can.
BY MR. BUCHANAN:

Page 157

Q. Right.
And so, you know, understand are these distributors who you are selling -- you can't just turn a blind eye because you're selling just to a distributor, right?
MS. VANNI: Object to form.
THE WITNESS: Absolutely not.
BY MR. BUCHANAN:
Q. Right.
I mean, you have to understand whether that distributor is acquiring drug to go to for a legitimate medical purpose at the end of that process, correct?
A. Yes.
Q. They have to have a customer base of sound customers, correct?
A. Yes.
Q. And they have to have suspicious order monitoring practices to determine that, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. We can't just let somebody in the

supply chain put their head in the sand, right?
MS. VANNI: Object to form.
THE WITNESS: Correct.
BY MR. BUCHANAN:
Q. That's very, very dangerous, right?
MS. VANNI: Objection.
THE WITNESS: Potentially, yes.
BY MR. BUCHANAN:
Q. We can't have a closed system of controlled substances if participants in that closed system are going to put their head in the sand, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And so one of your jobs and what you're saying in this letter is we're no longer going to put our head in the sand, right?
MS. VANNI: Objection.
THE WITNESS: No, that's not what we're saying at all.
BY MR. BUCHANAN:
Q. You are saying we're going to

start doing some due diligence on you, right?
MS. VANNI: Objection.
THE WITNESS: We are saying we're making improvements to our existing program.
BY MR. BUCHANAN:
Q. Okay. And we'll talk about what the old program looked like versus what the new program looked like. But you are going to start doing site visits, right?
A. Yes.
Q. You are going to start seeing whether they've got lines out the door at the pharmacies, right?
MS. VANNI: Object to form.
THE WITNESS: Again, these are things that DEA --
BY MR. BUCHANAN:
Q. Could you answer my question first?
A. Yes.
Q. Okay.
A. Again, these are things that DEA was talking about over time. They were not part

of the original regulation or the original SOM requirements, and they're still not requirements today.
Q. As a manufacturer of 35 billion pills who has got a responsibility to do everything they can to ensure that their product stays in the appropriate channels, you would agree with me, ma'am, that it is reasonable to do inspections of your customers, due diligence visits, correct?
MS. VANNI: Object to form.
THE WITNESS: In some -- of your direct customers, yes.
BY MR. BUCHANAN:
Q. It is further reasonable to ensure that your customers are doing the same thing with their customers, right?
MS. VANNI: Object to form.
THE WITNESS: Not necessarily.
BY MR. BUCHANAN:
Q. Okay. When your customers are wholesalers or distributors, you certainly want to make sure that they've got suspicious order monitoring protocols in place because they've

got a wide customer base rate?
MS. VANNI: Object to form.
THE WITNESS: I would want them to have some program. The details of that program can vary, depending on what they choose to implement and how effective it is.
BY MR. BUCHANAN:
Q. So as a manufacturer, you knew certainly during your time at Qualitest you just couldn't ship it to somebody who was going to just put their head in the sand, right?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. You couldn't ship it to somebody who didn't have suspicious order monitoring practices right?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. That would be a problem?
MS. VANNI: Objection.
BY MR. BUCHANAN:

Q. Not a reason --
A. It could be, yes.
Q. Not a reasonable thing to do, that's for sure, right?
MS. VANNI: Object to form.
THE WITNESS: It could be a problem.
BY MR. BUCHANAN:
Q. And certainly not something a responsible company would do or a responsible corporate citizen as you've listed here, correct?
MS. VANNI: Object to form.
THE WITNESS: Again, the company is required to abide by the DEA regulations. That's the only obligations of the company. Because I held the company to a different standard is not -- it's not what's required by the company.
BY MR. BUCHANAN
Q. What you said, ma'am, was as responsible corporate citizens, we have a responsibility to do what you set forth in this

letter, correct?
MS. VANNI: Object to form.
THE WITNESS: That is my individual belief, yes.
BY MR. BUCHANAN:
Q. That was your belief, that was Qualitest's belief, as reflected in the letter it authorized you to send, correct?
MS. VANNI: Object to form.
THE WITNESS: Depending on the approvals, yes.
BY MR. BUCHANAN:
Q. Yeah. I mean, this wasn't some -- this wasn't some off-the-book thing you did, right?
MS. VANNI: Object to form.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. We're not looking at just a side e-mail, you know, my personal view is this, right?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. This is a letter that went to

your full customer base, correct?
A. Yes.
Q. You remember this, right?
A. I do.
Q. It was the responsible and right thing to do, right?
A. It was the requirement to notify -- not the requirement. It was the desire to notify the customer that their orders might be held and they might be questioned more than -- they might be asked to fill out a questionnaire that was different than what they had filled out in the past.
Q. And you were putting them on notice that they have a responsibility; they, too, have a responsibility --
A. Yes.
Q. -- in this system to do all they can. That's what you told them, right?
A. Yes.
Q. Does this refresh your recollection, though, ma'am, that these drugs can lead to heart-wrenching problems in our communities?

MS. VANNI: Object to form.
THE WITNESS: These drugs generally, hydrocodone, oxycodone, yes. Again, these drugs did not come from Qualitest.
BY MR. BUCHANAN:

Case: 1:17-md-02804-DAP Doc #: 1982-17 Filed: 07/24/19 43 of 138. PageID #: 242600

Highly Confidential - Subject to Further Confidentiality Review

Page 166

[redacted]

Page 167

[redacted]

Page 168

[redacted]

Page 169

[redacted]

43 (Pages 166 to 169)

Golkow Litigation Services - 877.370.3377



Page 170

Page 171

BY MR. BUCHANAN:
Q. Thank you.
MR. BUCHANAN: So -- can I have 586, please. I think this is Exhibit 6.
(Document marked for identification as Par-Norton Deposition

Page 172

Exhibit No. 6.)
BY MR. BUCHANAN:
Q. Passing you what we're marking as Exhibit 6 to your deposition, ma'am.
MR. BUCHANAN: Here you go.
MS. VANNI: Thanks.
BY MR. BUCHANAN:
Q. This follows -- withdrawn.
Exhibit 6, ma'am, is an e-mail exchange with an attachment. The attachment appears to be a draft of your "dear valued customer" letter. The "dear valued customer" letter starts on point 3.
MR. BUCHANAN: Could you go there, Bradley. 586.3. Thanks.
BY MR. BUCHANAN:
Q. Does that look familiar to you, ma'am?
A. Yes, it does.
Q. An earlier version of the letter that was ultimately sent?
A. Yes.
Q. Okay. And this is an e-mail from you to -- attaching that letter to a handful of

Page 173

people, Mike Reiney, Trey Propst, Margaret Richardson and Sandra Parker.
Do you see that?
A. Yes, I do.
Q. And you CC a couple of your colleagues, right?
A. Yes.
Q. Okay. And, first of all, who is Mike Reiney?
A. Mike Reiney is sales.
Q. Propst?
A. Also sales.
Q. Ms. Richardson?
A. Legal.
Q. And Sandra Parker?
A. Also legal.
Q. Okay. So you had this letter that was transmitted to sales and legal, was transmitted to them, I think you say, for their review, correct?
A. Yes, it was a -- for the sales team, it was a courtesy review, and for legal, it was a normal legal review of a document.
Q. Okay. So the letter that was

Page 174

ultimately sent by the company, and it looks like you are asking for comments if we turn to the next page, .2, you are looking for comments by, you know, July 23rd.

Didn't quite happen that fast, I guess, that you got it out, right?

MS. VANNI: Object to form.

THE WITNESS: Not sure. No, I'm not sure when the comments were received back, but it didn't go out until October. Agreed.

BY MR. BUCHANAN:

Q. And you put cautions in your transmittal. Well, first of all, you say, "Please review the letter, give me comments." At a high level, that's what you're saying, right?

A. Yes.

Q. Okay. So you wanted comments from your sales colleagues because this would be going to their customers, fair?

A. Yes.

Q. And you wanted comments from legal because this was a company correspondence,

Page 175

an official company correspondence?

A. Correct.

Q. Okay. The letter is subsequently finalized and distributed in the form that we looked at earlier, I think it's the prior exhibit, Exhibit 5, correct?

A. Yes.

Page 176

Q. And the letter that was ultimately revised and sent is the one that we looked at in the prior exhibit, correct, ma'am?

A. Yes.

Q. Okay. From your perspective sitting here today, you endorsed its content, correct?

A. I did.

Q. And you understood from the people who reviewed it they endorsed its content as well?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. You certainly didn't send it out on your own without higher-level approval?

Page 177

A. I did not.

Q. What I would like to do is talk with you about the meeting with the DEA in March of 2013.

A. Okay.

MR. BUCHANAN: Can I have, please, 1117.

(Document marked for identification as Par-Norton Deposition Exhibit No. 7.)

BY MR. BUCHANAN:

Q. Passing you, ma'am, what we're marking as Exhibit 7 to your deposition.

MR. BUCHANAN: Do we have a copy for counsel? I apologize, Counsel, if we get into a subschedule. We may have to share the one over there. That's unintentional. I'm sure we'll find a way to fix that.

BY MR. BUCHANAN:

Q. Before you, ma'am, is Exhibit 7 to your deposition.

Is this a copy of a binder that you received at a meeting with the DEA in March

of 2013?
A. Yes, it is.
Q. Okay. We were talking about your experience at Watson earlier and Anda when you went in for that meeting.
A. Yes.
Q. Do you recall that?
A. I do.
Q. You had a similar binder when you went in with them?
A. I did.
Q. Okay. This was something the DEA was doing from time to time with its registrants, fair?
A. For all distributors, yes.
Q. There are hundreds and hundreds and hundreds of registrants; is that fair?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. There are hundreds and hundreds of registrant that are distributors, there are hundreds that are manufacturers, fair?
A. Yes.

Q. And there's, of course, prescribers --
A. Millions of prescribers, yes.
Q. So but some distributors are bigger than others, right?
A. Yes.
Q. Some manufacturers are larger than others?
A. Yes.
Q. Are you aware of other manufacturers that made more hydrocodone than you?
MS. VANNI: Object to form.
THE WITNESS: That would be confidential information. I wouldn't have access to that.
BY MR. BUCHANAN:
Q. You can't figure that out using IMS data?
MS. VANNI: Object to form.
THE WITNESS: I've never looked at it for that --
BY MR. BUCHANAN:
Q. You don't know whether you could

or couldn't?
MS. VANNI: Object to form.
THE WITNESS: I don't know.
BY MR. BUCHANAN:
Q. Okay. All right. So this is the binder that you all were given. I guess you went in -- you got called in, right?
MS. VANNI: Object to the form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. This isn't like they just popped into Huntsville, Alabama, right?
A. No.
Q. And Huntsville is where you were at the time?
A. Yes, it is.
Q. That was the physical location that you called your office every day when you went to work?
A. Yes.
Q. DEA compliance had an office -- DEA compliance or Qualitest had an office in Huntsville?
A. Yes, it did, and we also had a

person in Charlotte.
Q. Okay. So you get word that you're getting called to D.C., right?
A. Yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. You had a sense of what was coming?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. You had been through this rodeo before?
MS. VANNI: Object to form.
THE WITNESS: I've been to the distributor meetings before, yes.
BY MR. BUCHANAN:
Q. Okay. Apart from the one you went to with Anda, had you been to any other distributor meetings?
A. I think I have. I'm not 100% sure, but I believe so. I believe I went to one for Watson. I'm not sure.
Q. Okay. Qualitest was both a

manufacturer and a distributor, right?
A. Yes.
Q. Had two registrations?
A. Correct. Well, they had more -- more than that. We had lab and import-export, research.
Q. They had a distributor registration and a manufacturer registration?
A. Yes.
Q. Okay. And that's an annual process, you've got to renew that?
A. It is.
Q. Okay. And every time you renew it, you are making a promise you are going to abide by the regulation and the statute with regard to antidiversion, right?
MS. VANNI: Objection.
THE WITNESS: Technically, yes. It's not written on there, but yes.
BY MR. BUCHANAN:
Q. That is the -- that is the implied commitment on the part of the registrants, correct?
MS. VANNI: Objection.

THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. I'm asking for permission to make controlled substances, I will abide by the statute, I will abide by the regulations. That's part of the process, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes, it is.
BY MR. BUCHANAN:
Q. I would like to direct you to hopefully pages your counsel has.
And I guess let's set the table a little bit with what happened that day.
So you go up in person, you went with a few other folks from Qualitest?
A. I was -- I believe there was a snowstorm, and we did go with -- there were other people that were going to be in the room that didn't make it in, but there was at least one other person, I believe, with me.
Q. Okay. So you go in, and the DEA starts to give you the presentation, I guess, that you've heard before, certainly the general portion of it, correct?

A. To a certain extent, yes. Yes.
Q. For example, if you go to 1117.4, they start to tell you about the statute that you operate under, right?
A. Yes.
Q. The Comprehensive Drug Abuse Prevention and Control Act as amended created a system for the legitimate manufacturing, distribution and prescribing dispensing of controlled substances.
The next bullet states, "Each registrant within the closed system of distribution has defined privileges and responsibilities in which they must operate."
Do you see that?
A. Yes.
Q. And you had that understanding, correct?
A. I did.
Q. And you didn't need the DEA to tell you that, correct?
A. Not at that point, no.
Q. In fact, you had been working in this framework for 20 years at that point,

right?
A. Yes.
Q. Okay. When a registrant -- next slide, the bottom, "When a registrant fails to adhere to their responsibilities, those violations represent a danger to the public and jeopardize the closed system of distribution."
Do you see that?
A. I do.
Q. Do you agree with that?
A. Yes.
Q. And, again, this is on the slide that says closed system, something you understood as of that point in time, correct?
A. Yes.
Q. And something that you echoed to your customers when you wrote a letter out to them, correct?
A. Correct.
Q. To the extent others didn't know it, you were telling them the same thing, right?
A. Yes.
Q. We all have a responsibility, correct?

MS. VANNI: Object to form.
THE WITNESS: Yes, that's what I was telling them.
BY MR. BUCHANAN:
Q. And that's the regulatory framework that we were just talking about, and then there's also -- excuse me, that's the statutory framework, right?
A. Mm-hmm.
Q. And then we go forward to suspicious orders, there's a particular regulation specific to suspicious orders, correct?
A. 130174.
Q. Great. We'll go to 1117.9.
And that regulation requires that -- and it says "suspicious orders" on the side. I'm sorry, the one at the bottom.
MR. BUCHANAN: Thank you, Bradley. Since there's a few documents on the table, I'll try to keep you in sync.
BY MR. BUCHANAN:
Q. The heading on the side is

"Suspicious Orders." The regulation you just stated from memory, ma'am, is listed on the slide, right?
A. Yes.
Q. A regulation you've known about for a long time, right?
A. Yes.
Q. I mean, you've known about that regulation because that's been around since before your time at Ciba-Geigy?
A. Correct.
Q. And you've heard about that regulation at distributor conferences and manufacturer conferences, correct?
A. Yes.
Q. Okay. 21 CFR 1301.74 requires that registrants design and operate a system to identify suspicious orders.
Do you see that?
A. Yes.
Q. "Report suspicious orders to DEA," what does it say?
A. "When discovered."
Q. Okay. And then it goes through

and it elucidates us further with your due diligence responsibility on E 1117.11. "Due diligence" know your customers.
Do you see that?
A. Yes.
Q. "Prior to filing an order, the distribute should review the following: Unusual frequency of orders, unusual size of orders, deviating substantially from a normal pattern," and then it lists the regulation there.
You see that?
A. Yes.
Q. And then it continues with due diligence below, "Range of products being purchased, methods of payment (cash, insurance, Medicaid), locations and hours of operation, percent controlled versus percent noncontrolled, customer pickup at distributorship."
Do you see that?
A. Yes, I do.
Q. "Other aspects of due diligence," correct?
MS. VANNI: Object to form.
THE WITNESS: Other guidances

from DEA as to what to look at.
BY MR. BUCHANAN:
Q. Right.
I mean, look, the DEA doesn't -- and the FDA doesn't tell you how to promote your drug to make the most sales, right? Companies figure that out on their own, right?
MS. VANNI: Object to form.
THE WITNESS: They do tell you how to promote your drug and how not to promote.
BY MR. BUCHANAN:
Q. They tell you how you can't do it?
A. Yes.
Q. I mean, companies are pretty crafty when it comes to figuring out marketing that can be effective, to figure out educational seminars that might educate physicians depending on how you determine the word "educate" and other ways to grow a market for their product. There's marketing departments that are built to do those types of things, fair?
MS. VANNI: Object to form.

THE WITNESS: Yes, but I think it's a little bit different.
BY MR. BUCHANAN:
Q. You agree that as it relates to marketing and promotion, companies have departments built to do that, right?
A. Yes.
Q. Okay. There's also a regulation that says that if you're going to seek our permission -- or a statute that says if you are going to seek permission to operate in this closed system that you have to have effective controls against diversion, right?
A. Yes.
Q. And companies certainly can, as you have from time to time done, can employ their own tools and techniques to maintain effective controls against diversion, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. There are minimum ways to do it and there's a suspicious order monitoring regulation that says something about that,

correct?
A. Correct.
Q. But ultimately the manufacturers and distributors have a statutory obligation to maintain effective controls against diversion, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Would it be fair to say, ma'am, in the time that you've spent at Qualitest, the group that handled -- would you say the marketing group was bigger than the DEA compliance group?
A. Actually, no.
Q. The sales group?
A. Oh, I don't know. I don't know about out in the field. Maybe, but I don't know.
Q. Because in your DEA compliance group before you brought in the people you brought in, when you started there, how many people were in DEA compliance?
A. There were two and the one that

was let go.
Q. Okay. Two people who had the title of DEA compliance, or at least under that umbrella, to maintain effective controls against diversion?
MS. VANNI: Object to form.
THE WITNESS: Yes. However, it's not -- it's not just those two people's responsibility.
BY MR. BUCHANAN:
Q. It should go --
A. That's why we train -- yeah.
Q. It should go throughout the organization, that responsibility, right?
A. Correct.
Q. And that was one of the things in 2013 after you had this meeting that you set out to implement, correct?
A. To enhance.
Q. Okay. And we'll talk about what it was before versus what it was later?
A. Yes.
Q. Because ultimately it's a company-wide obligation to maintain effective

controls against diversion, correct?
MS. VANNI: Object to form.
THE WITNESS: Just like it's a company-wide obligation to make your product safe and effective.
BY MR. BUCHANAN:
Q. Right, right.
Because if you're making controlled substances, you've made that commitment, you've made that commitment to get the permission slip to make the drug that you're going to maintain effective controls against diversion, fair?
A. The quota, yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Right?
So as a company, the company must be committed to maintain effective controls against diversion, right?
MS. VANNI: Object to form.
THE WITNESS: The company can't -- the individuals at the company are not -- they're not experienced in

a -- what gets diverted and what doesn't or in additional controls that they can put in place.
We learn that from DEA. We learn that from the guidances and from the presentations that they give. We're not -- most people in the company are not -- they don't have law enforcement backgrounds, they don't have medical backgrounds.
BY MR. BUCHANAN:
Q. Right.
So education is an important component?
A. It is, from DEA, yes.
Q. Within a company certainly, right?
A. Yes.
Q. Within a company, a company has got to educate its employees company-wide on how to maintain effective controls against diversion, right?
MS. VANNI: Object to form.
THE WITNESS: To abide by the DEA

regulations, yes.
BY MR. BUCHANAN:
Q. And if you're going to -- if you're going to sell controlled substances and if you are going to make the promise to the government that you're going to maintain effective controls against the government, you certainly should, right?
MS. VANNI: Object to form.
THE WITNESS: Do training.
BY MR. BUCHANAN:
Q. You certainly -- if you are saying you are going to maintain effective controls against diversion to get that registration, you would agree that you certainly should implement effective controls to prevent diversion, fair?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. That's -- that's the promise, right?
A. Yes, it's a privilege to have a license.

Q. Okay. We see the DEA showing examples on 1117.12 of kind of -- it's not the best picture, but you've probably seen this picture a few times, haven't you?
A. Yes.
Q. It's shown up in DEA presentations and other presentations?
A. Yes, it has.
Q. It's representing really what you can see when you actually go and see your customer, right?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Something that you could see in a customer, right?
A. Potentially.
Q. Right, lines --
A. Hopefully not.
Q. -- people sitting on the floor -- I mean, would it surprise you to know that you had customers like this?
MS. VANNI: Object to form.
THE WITNESS: I would be surprised in -- from a Qualitest

perspective, yes, I would be very surprised.
BY MR. BUCHANAN:
Q. Well, Qualitest had direct pharmacy customers, correct?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Do you recall that?
A. I don't believe so.
Q. Okay. Maybe we'll have a chance to talk about that at risk of going down too many different forks in the road to actually get there, but hopefully we'll have a chance.
So these are the types of things that the DEA is saying to look for. A lot of cash transactions, right? Why could that be a sign? Has that been associated with illicit use of drugs?
A. That's what DEA says, yes --
MS. VANNI: Object to form.
THE WITNESS: There's no traceability.
BY MR. BUCHANAN:
Q. Right.

And, I mean, the use of cash for drugs was not something that was new in 2011, right?

MS. VANNI: Object to form.

THE WITNESS: Yeah, should not happen.

BY MR. BUCHANAN:

Q. No, that shouldn't happen. That's kind of a commonsense thing, right?

A. Yes.

Q. If a pharmacy or a customer is doing, you know, 70, 80% of their business or 50% of their business in controlled substances, and the national average is 13%, that might be something of a red flag, right?

A. It would be something --

MS. VANNI: Object to form.

THE WITNESS: -- to look into further, yes.

BY MR. BUCHANAN:

Q. Right.

If the pharmacy itself has the cage, no front-end merchandise, that would be something to consider, right?

A. It would be.

Q. Something that you can see when you go and do the due diligence on your customers, right?

A. Yes.

Q. I think you talked about Watson actually is a manufacturer starting to implement customer visits as part of their SOM program at your urging, I can't remember whether you were instrumental or what word you used in your summary, but at your urging, essentially, before you left in 2009, true?

MS. LEIBELL: Object to form.

THE WITNESS: We did talk about it obviously, yes.

BY MR. BUCHANAN:

Q. And then we got to the meat of the -- they sent you a bunch of decisions?

A. Yes.

Q. Probably some that you learned about in your pharmacy classes in Florida, right?

A. And I had a practice of reading the Federal Registers or skimming them for

things like this.

MR. BUCHANAN: And I'm sorry, Counsel, this one is not in yours. I can see it. We're not going to substantively discuss it.

BY MR. BUCHANAN:

Q. They sent you a decision from the Supreme Court from 1943, right, Direct Sales versus United States?

A. Mm-hmm.

Q. And they brought a series of cases and regulatory actions to your attention about the types of things that are really problematic and what you got to be doing and what to watch out for, right?

MS. VANNI: Object to form.

THE WITNESS: They very much skimmed over the cases. They didn't go into them in a lot of detail, but they were presented, yes.

BY MR. BUCHANAN:

Q. Right.

And I suppose if you were not a person who was generally reading that kind of

thing, maybe somebody else on your team or maybe from another manufacturer, they may have found that new and enlightened, but you are saying you were aware of this already?

MS. VANNI: Object to form.

THE WITNESS: Not all of them, but some of them, yes.

BY MR. BUCHANAN:

Q. Okay. And then towards the back, in kind of more the meat of this is a series of charts.

Can you pull up so counsel can see it, I don't want to talk about it if she can't see it, 1117.232. And it's on your screen as well, ma'am.

Do you recall the DEA presenting charts like these to you at this meeting in 2011?

A. I do.

Q. Do you recall the DEA presenting charts like these to you when you were with Anda in 2008 or '9?

A. I do.

MS. KOSKI: Object to form.

Page 202

BY MR. BUCHANAN:
Q. That was -- the DEA was presenting to the various distributors and manufacturers when it got to them information concerning what they saw about their customers -- about their sale transactions, correct?
MS. VANNI: Object to form.
THE WITNESS: And their customer's customer.
BY MR. BUCHANAN:
Q. Thank you. I'm going to get there. You don't have to anticipate it for me, though.
A. Okay.
Q. They were presenting, first of all, your volume -- "your" meaning Qualitest's volume of this particular dosage of oxycodone, we're at 1117.232, and those two companies there under Alabama Vintage Pharmaceuticals and Generics Bidco, those are both Qualitest affiliates, correct?
A. Yes.
Q. They were their registrants that

Page 203

manufactured or distributed Qualitest products, right?
A. I believe the first one is the manufacturer and the second is the distributor.
Q. Right.

Page 204

Page 205

MR. BUCHANAN: Can I have Exhibit 575, please. How are we doing as a time check? How long have we been going?
THE VIDEOGRAPHER: Two hours, 40 minutes, approximately.
MR. BUCHANAN: Let me just mark this document and I'll take a short break. I don't know how long we've been going. I lost track.
MS. VANNI: I lost track, too. It's quarter to 12.
MR. BUCHANAN: Can we just mark this one real quick just so your counsel has it.
THE WITNESS: Yeah.
MR. BUCHANAN: It will include the schedules.
BY MR. BUCHANAN:
Q. Ma'am, while we're waiting for that, we'll talk more about your interactions with DEA that day, what they told you about your

systems and your self-assessment of the inadequacies in your SOM system at that point in time.

Do you have a recollection, though, that in your eyes, Qualitest SOM practices at that point in time, as of the time of the DEA meeting, were inadequate?

MS. VANNI: Object to form.

THE WITNESS: I would not say that they were inadequate. I would say that we needed to make improvements, and I would have come back and presented it in a way that -- you know, there's a lot going on at a pharmaceutical company and for -- for this to -- for any improvements that I wanted to make to get the right -- to basically -- what -- to get the attention that it needed, you have to make things a little more urgent than they may actually be, so I'm sure you'll see that in my -- in my e-mails.

BY MR. BUCHANAN:

Q. Getting management buy-in can be a challenge at a pharmaceutical company?

MS. VANNI: Object to form.

THE WITNESS: Not so much -- not so much getting their buy-in, but making them aware of the urgency surrounding it, that it's not just, you know, Tracey wants to make improvements. That there's an impact to making improvements and that there's things that -- you know, things that we can do better.

BY MR. BUCHANAN:

Q. Right.

I mean, when you're talking about controlled substances and the heart-wrenching havoc that they can wreak in the communities, responsible companies act to try and minimize that risk by maintaining effective controls against diversion, you agree?

MS. VANNI: Object to form.

THE WITNESS: I think the company has to follow the DEA regulations, and if you do that, then ultimately you will be preventing that from happening.

BY MR. BUCHANAN:

Q. And what you wrote certainly and

what you told your customers is that as a responsible company, you had the obligation to do what was in your letter, and they had the same obligation, that's what you told your customers, right?

A. The customers, yes. The customers needed a heads-up to -- needed education on what was changing.

(Document marked for identification as Par-Norton Deposition Exhibit No. 8.)

MR. BUCHANAN: I'm passing you, ma'am, what we're marking as Exhibit 8 to your deposition. There we go.

MS. VANNI: Thanks.

BY MR. BUCHANAN:

Q. And this is really more for the benefit of counsel so they have the charts that I was referring to.

After you got back from the meeting -- this is March 6, 5:58 p m., you tore off the schedules and you sent them around within the company, right?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. And what you're doing is -- who is Peter Bigelow, by the way?

A. He was actually -- at one point, he was my supervisor, but he was actually over -- I think he was over Denise and Sanjay at the time.

Q. Senior vice president?

A. Sanjay was my supervisor.

Q. Okay. Senior vice president?

A. Yes.

Q. Yes, okay.

And what was his -- you know, senior vice president for sales, drug safety?

A. No.

MS. VANNI: Objection.

THE WITNESS: He was kind of like over the COO, I guess. He was contract -- I think he was a contractor that was brought in, so he was kind of assisting the plant manager.

BY MR. BUCHANAN:

Q. Okay.

Page 210

A. He had a couple of different roles, I believe, while he was there.
Q. Senior person?
A. Yes. Senior person.
Q. Senior to your immediate boss?
A. Yes.
Q. Okay. Senior to the chief operating officer?
A. Yes.
Q. Okay. All right. So you get back, you tear off the schedules and you send them up the corporate ladder to a senior vice president, fair?
MS. VANNI: Object to form.
THE WITNESS: Mm-hmm.
BY MR. BUCHANAN:
Q. Okay. And you say, "Attached are the charts that the DEA reviewed with us at the meeting today."
And then you say, "As we expected," and then you describe them, right?
A. Yes.
Q. And so this was not news to you?
MS. VANNI: Object to form.

Page 211

THE WITNESS: No, having attended other distributor initiatives, it was not news.
BY MR. BUCHANAN:
Q. Right, that not only are you supposed to look at your customers, but also your customers' customers, right?
MS. VANNI: Object to form.
THE WITNESS: When you can, when you have the information to do so.
BY MR. BUCHANAN:
Q. And when you can generate it, right?
A. To my knowledge at that time, we didn't have that capability, but yes.
Q. But certainly you had the ability for any of your customers to say, hey, I'm going to stop by today?
MS. VANNI: Object to form.
THE WITNESS: To our customers?
BY MR. BUCHANAN:
Q. Sure.
A. Yeah.
Q. Right, I mean, you can --

Page 212

A. If they allowed it.
Q. And if they didn't, you don't have to do business with them?
MS. VANNI: Object to form.
THE WITNESS: Yes, correct.
BY MR. BUCHANAN:
Q. Because ultimately, to secure the supply chain, to ensure that everyone views things the way you did, the way Qualitest did, to maintain effective controls against diversion, we have to do everything we can to ensure that your customers felt the same way, you could just not sell it to them if they wouldn't give you the information, right?
MS. VANNI: Objection.
THE WITNESS: We could.
BY MR. BUCHANAN:
Q. And there's no obligation for you to sell to people, right?
MS. VANNI: Objection.
THE WITNESS: Correct.
BY MR. BUCHANAN:
Q. It's a choice?
MS. VANNI: Objection.

Page 213

THE WITNESS: Yes.
BY MR. BUCHANAN:

Page 214

Page 215

MR. BUCHANAN: It's as good a time as any for a break.
MS. VANNI: It''s 10 of 12. You want to take a lunch break? What do you want to do?
THE VIDEOGRAPHER: Let's go off the record. The time is 11:51 a.m.
(Luncheon recess.)
(Document marked for identification as Par-Norton Deposition Exhibit No. 9.)
THE VIDEOGRAPHER: We're now going back on the record. The time is 12:45 p m.
BY MR. BUCHANAN:
Q. Good afternoon, Ms. Norton. After lunch but you're still under oath, you're good?
A. Yes.
Q. Okay. Passing you what we're marking as Exhibit 9 to your deposition. We were talking, just to reorient you before the break, we were looking at that period of time in

Page 216

March of 2013, you got the call, come to DC?
A. Mm-hmm.
Q. DEA wants to have a chat with you, right?
A. Yes.
Q. Okay. DEA gives you the binder, I think it's still under your hand.
A. It is.
Q. A binder like that which you received from Anda several years before, correct?
A. Yes.
Q. The Anda binder obviously had --
MS. KOSKI: Objection.
MR. BUCHANAN: Every Anda objection is presumably coming from --
BY MR. BUCHANAN:
Q. And they gave you a binder that also contained information about Anda's business and Anda's customers, correct?
A. Correct.
Q. Okay. And we looked at an e-mail that you sent, a separate e-mail, where you forwarded the schedules upstream to a senior

Page 217

vice president at Qualitest at the time for his information, and you noted that, as we expected, we were at the DEA, they gave us this stuff on our customers, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. All right. So here's more of a -- if you will, a bullet point summary you sent around to some other people in the group?
A. Mm-hmm.
Q. Not to the senior vice president. This is -- looks like more your working group on compliance issues and DEA stuff?
A. It's my boss, my boss's boss and then his boss.
Q. Okay. We're looking at Exhibit 657 from March 7, 2013, and I'm a little confused on my dates here. Is this the same day as the meeting or the next day? You have the binder right before you?
A. This is March 7th versus this is the day after the meeting.
Q. Got you. Okay. So March 7th,

Page 218

the next night you're 5:00, I guess late afternoon, you're sending around your notes, and you note that you were not really in a position to be taking the notes yourself. You were kind of doing your best to be engaged with the DEA when they were talking to you, right?

A. Yes, to listen.

Q. Okay. So this is kind of your notes after you reflected on it and you just had a day and you kind of noted down some takeaways, fair?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. Okay. If we scroll down and we looked at a chart of the production of the company's -- I don't know the number of pills, hydrocodone and oxycodone that were made over the years.

Do you recall us looking at that chart earlier today?

A. I recall looking at it, yes.

Q. Yeah, and when I say the chart, I mean the one that we generated from the

Page 219

spreadsheets counsel told us to look at.

A. Yes.

that these products, the one identified in the first bullet, hydrocodone and oxycodone products are being abused and diverted, right?

MS. VANNI: Object to form.

MR. BUCHANAN: Could you highlight, please, the first bullet.

THE WITNESS: It says DEA is looking at top manufacturers of hydrocodone and oxycodone.

BY MR. BUCHANAN:

Q. That's right. And then we go to the third bullet, and they say, "these products are being abused and diverted."

Do you see that?

A. Yes.

Page 220

Q. And then what did they say about prescription abuse?

A. "Prescription abuse of these two items is worse than addiction to heroin and cocaine."

Q. Okay. And that was true, to your knowledge, at that point in time, right?

MS. VANNI: Object to form.

THE WITNESS: That's really something that I wouldn't know. I was, you know, getting that from DEA.

BY MR. BUCHANAN:

Q. I mean, you weren't following the public discussion and the congressional hearings and everything that was going on really outside the walls of Qualitest with regard to the epidemic of opioid abuse?

MS. VANNI: Objection.

THE WITNESS: I couldn't put a number on it or compare it to heroin or cocaine without the details coming from DEA.

BY MR. BUCHANAN:

Q. Okay. Suffice it to say, without

Page 221

the DEA telling you that, you still knew it was a big problem at that point in time? You knew there were congressional hearings going on, right?

MS. VANNI: Objection.

THE WITNESS: I knew that hydrocodone and oxycodone was being abused.

BY MR. BUCHANAN:

Q. Okay. You knew that they were also being diverted, right?

A. Yes.

Q. Okay. They say here 85% of oxycodone 30 milligrams sent to Florida is diverted, right?

A. That's what DEA told us, yes.

Q. So what's happening is customers, distributors, wholesalers buying the drug in Florida or customers of their customers bringing the drug into Florida, that drug is then leaving Florida and going elsewhere in the country, right?

MS. VANNI: Object to form.

THE WITNESS: I don't know if

Page 222

they were saying it was leaving Florida. They were just saying that it was being diverted. It wasn't getting to a legitimate channel somewhere down the line.

BY MR. BUCHANAN:

Q. Fair enough, okay. Got it. So if -- whether it stayed in Florida or whether it left Florida, it wasn't landing in the channel where it was supposed to land, right?

A. Correct.

Q. Fair enough, okay. Then it said, the "US uses 90-95% of the hydrocodone produced" worldwide. It doesn't say worldwide, but you understood that from your meeting, right?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. Okay. So of all of the people in the world with all of their maladies and all of their pain and all of their conditions, this country uses 90 to 95% of all the hydrocodone produced in the world, right?

MS. VANNI: Object to form.

Page 223

THE WITNESS: That was my understanding from what they were saying, yes.

BY MR. BUCHANAN:

Q. Would it be fair to say, ma'am, that we don't have 90 to 95% of the world's population?

MS. VANNI: Object to form.

THE WITNESS: I'm not sure. I guess you could say that. I don't know. I don't know what the population is in every country.

BY MR. BUCHANAN:

Q. Well, worldwide, internationally, there are organizations that monitor the use of opioids country by country, right?

A. Mm-hmm. What it tells me is that we're more humane in the United States and we treat pain as compared to some third world countries, for example.

Q. There's another part of that, right?

A. Mm-hmm.

Q. We abuse opioids more than other

Page 224

people in other countries, right?

MS. VANNI: Object to form.

THE WITNESS: I don't know if you could make that assumption.

BY MR. BUCHANAN:

Q. You're not aware of that?

A. No, I'm not.

Q. You're not aware that --

A. I don't have any knowledge of what goes on in other countries.

Q. But as a person engaged in DEA compliance, I mean, do you look to see, I mean, what the trends are with regard to the use of the products that your manufacturers or distributors are making or distributing?

A. I look at some data, but a lot of data is not -- not represented well, I don't think, and it doesn't have the level of detail that it needs to accurately focus or address the problem.

Q. Well then, certainly, you'd want to be really cautious, right?

MS. VANNI: Object to form.

THE WITNESS: Yes.

Page 225

BY MR. BUCHANAN:

Q. And you'd be -- want to be really cautious because if we're talking about products that have to be kept in cages or have to be kept in vaults or have to be handled by two people at the same time because we can't really trust one person or the other not to take this and divert it, we've got to be really cautious in how we distribute or sell these types of drugs, fair?

MS. VANNI: Objection.

THE WITNESS: Yes, and we were.

BY MR. BUCHANAN:

Q. And I move to strike the end. If you could stay with my question, ma'am.

Page 226

Page 228

Q. So as some -- we could agree that during your entire time at Qualitest, the company was selling drugs into the Ohio community, true?
MS. VANNI: Object to form.
THE WITNESS: The company sold drugs into a lot of states.
BY MR. BUCHANAN:
Q. Every state, as far as you know,

Page 227

Page 229

right?
A. As far as I know, yes.
Q. Okay. So, certainly, selling the drug directly into Ohio or to Ohio distributors or wholesalers, right?
A. Yes.
Q. And certainly wouldn't be surprised if the drug that Qualitest was making was landing in Ohio pharmacies, right?
MS. VANNI: Object to form.
THE WITNESS: Potentially, yes.
BY MR. BUCHANAN:
Q. And could you tell the jury, please, when was the first time that Qualitest conducted a due diligence visit on an Ohio pharmacy?
A. I cannot tell you right now. I'm not sure off the top of my head.
Q. Are you aware of any prior to 2013, ma'am?
A. We would have had due diligence visits conducted. It would have been by the sales team. I'm not sure if they were in Ohio or not.



Q. Are you aware of any visits into Ohio by the sales team or otherwise prior to 2013?
A. I would not know, since I wasn't there.
Q. And, frankly, if it happened prior to 2013, you're saying I'd have to go talk to a sales rep?
A. Not a sales rep.
MS. VANNI: Object to form.
THE WITNESS: One of the more -- the sales team that would be internal, not necessarily a sales rep outside.
BY MR. BUCHANAN:
Q. Well, certainly, the company and its compliance -- this was a compliance function you're saying was happening?
A. The visits?
Q. Mm-hmm.
A. It was a compliance function later, after we -- after we had the personnel and we started doing them.
Q. Okay. Well, I just want to understand the -- kind of the visits you're

saying may have served the same function at earlier points in time that you're not sure actually happened in Ohio.
Was that being done as, you know, as a know your customer anti-diversion effort; is that what you're saying?
MS. VANNI: Object to the form.
THE WITNESS: I really don't know. I can't comment since I wasn't there.
BY MR. BUCHANAN:
Q. Well, surely if this was being done as part of a compliance function, you'd maintain records of due diligence visits like that, right?
MS. VANNI: Object to form.
THE WITNESS: Not necessarily. DEA didn't -- they didn't really talk about documenting your due diligence until more recent -- you know, not more recent like this year but, you know, till later on. As I said, the program, the SOM program changed over time so...
BY MR. BUCHANAN:

Q. Right.
So let's -- I just want to understand whether these visits by salespeople that may or may not have happened, I mean, was that being done as a formal compliance effort, where you were generating due diligence files?
MS. VANNI: Object to form.
THE WITNESS: I can't say if they were or not.
BY MR. BUCHANAN:
Q. Are you aware of any that happened prior to 2013?
A. I don't know either way.
Q. Okay. All right. So what the DEA is telling you or at least your takeaway from this meeting in March is, one, you've got to get to know your customers, right?
A. Yes.
Q. And they also told you you got to get to know your customers' customers, right?
A. To the extent you can, yes.
Q. They told you Ohio is a problem, Florida is a problem, right?
MS. VANNI: Object to form.

THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. You had that knowledge, though, that Florida today was an issue even before the DEA told you, right?
A. Mainly because of seeing it on presentations that they had given, yes.
Q. Right. I mean, you knew that licenses were getting suspended of distributorships and pharmacies were getting shuttered in -- I shouldn't say shuttered -- the DEA was taking their license, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. I guess they could continue to sell noncontrolled substances and chewing gum and milk and stuff, but they couldn't sell controlled substances after that point, right?
A. Yes.
Q. And hefty fines were levied, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.

BY MR. BUCHANAN:
Q. Okay. They then tell you that "keep a filing system on customers reported to DEA and a database on due diligence."
Do you see that?
A. That's --
Q. Database on due diligence?
A. Yes, that's exactly where they started talking about writing, documenting your due diligence.
Q. And we'll look at some of your earlier documents that precede this meeting. I mean, you knew about the DEA's know your customer initiative well before March of 2013, didn't you, ma'am?
MS. VANNI: Object to form.
THE WITNESS: Prior to this meeting, I'm sure it was mentioned at conferences, know your customer.
BY MR. BUCHANAN:
Q. Right. And this, as you said, as expected, and the other e-mail and then you described what happened at the meeting.
Do you recall that?

A. I do.
Q. Yes. So what's happening here, and I guess you got some visibility in the charts as to your customers' customers and what their transactions were?
A. Yes.
Q. But you were aware that the DEA had a know your customer expectation before this meeting, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:

Q. Okay. And so one of the things you could do is you could look through IMS data or you could look through prescription level data if you got it through questionnaires or through dispensing histories from pharmacies or you could get it from your distributor customers if they provided it to you, you could see the relative balance of controlled substances versus noncontrolled substances, right?
MS. VANNI: Object to form.
THE WITNESS: Absolutely not. So as a manufacturer, we were not entitled to dispensing data, for one. We would not be getting dispensing data. It would be a HIPAA violation if it wasn't cleansed from patient information for one.
BY MR. BUCHANAN:
Q. Okay. Maybe my question was confusing then.
And we'll look at this, provided I still have time, the company after it

implemented its revised SOMS actually requested from its customers and from some of its customers' customers dispensing data that showed aggregate purchases of controlled substances versus noncontrolled substances, correct?
MS. VANNI: Object to form.
THE WITNESS: I don't know after -- I'm not sure. I don't believe so.
BY MR. BUCHANAN:
Q. While you were there it happened.
Do you recall that?
A. I recall looking at IMS data for the national averages. I don't recall actually getting dispensing data.
Q. Okay. We'll see if we can fill in that -- your memory on that if we have time.
A. Okay.
Q. But one of the things you can do, obviously, is you can see is this pharmacy behaving like a pharmacy. Is it purchasing roughly 13 to 15% controlled substances, or is it doing something different? Is it buying 30, 40, 50%, right?

MS. VANNI: Object to form.
THE WITNESS: Yes, and it's a guidance.
BY MR. BUCHANAN:
Q. Right, because it could be that there's a unique circumstance for that particular pharmacy. It might be a small one. It might have a particular reason why it's 16% rather than 13%, whatever the numbers are?
A. Correct.
Q. So you've got to think, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. So you get red flags -- well, let's take a step back.
The process, as I understand it is, one, we should get information, right; that's what you're being told?
A. Yes.
Q. As a participant in this closed system, you have an obligation to get information on your customers, correct?
MS. VANNI: Object to form.

THE WITNESS: Correct.
BY MR. BUCHANAN:
Q. And you have an obligation to get information on your customers' customers, right?
MS. VANNI: Object to form.
THE WITNESS: To the extent you can, yes.
BY MR. BUCHANAN:
Q. Right. And so, look, you could have difficult customers who don't cooperate, that's one thing, correct?
A. Mm-hmm, yes.
Q. And you can choose not to do business with them?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Every manufacturer, every distributor has that choice, correct?
MS. VANNI: Object to form.
THE WITNESS: That's rare. That's rare, but...
BY MR. BUCHANAN:
Q. Well, you have a choice. That's

not rare that you have choice?
MS. VANNI: Object to form.
THE WITNESS: No, I'm saying it's rare that a customer would not cooperate but...
BY MR. BUCHANAN:
Q. Right, right. So we will see some examples. You recall some customers who didn't cooperate?
A. Yes.
Q. Some distributors who didn't cooperate, right?
MS. VANNI: Objection.
THE WITNESS: I don't believe so, but...
BY MR. BUCHANAN:
Q. Some distributors who didn't give you their SOM information or had no SOM program.
Do you recall that?
MS. VANNI: Objection.
THE WITNESS: I do not.
BY MR. BUCHANAN:
Q. Because that would be a concern, right, if it --

A. Yes.
Q. Somebody you were selling drug to didn't have a SOM program, right?
MS. VANNI: Objection.
BY MR. BUCHANAN:
Q. When I say "SOM," I mean a distributor.
A. It would depend on controls they have in place, other controls that -- maybe they're not calling it a SOMS program, but they have some things in place. It depends on the situation.
Q. Okay. So let's take the -- let's take the name off of it, whether they call it a SOM program. It would be of concern to you, ma'am, if somebody in this field, if a customer of a manufacturer, a distributor or a wholesaler didn't have a program, whether by name or function, to serve SOM purposes, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. In fact, I mean, you identified that as a concern at various points in time

after you implemented SOPs at Qualitest, correct?
A. Yes.
Q. That if somebody doesn't give you SOM information, we should not be selling to them, right?
MS. VANNI: Object to form.
THE WITNESS: Again, depending on the scenario, the situation.
BY MR. BUCHANAN:
Q. Do you recall giving that guidance?
A. Yes.
Q. Because if your customers don't have SOM programs in place, there can be no assurance that you're living up to your promise to get your registration that you're going to maintain effective controls against diversion, right?
MS. VANNI: Object to form.
THE WITNESS: Again, it depends on the controls that the customer has in place and the situation.
BY MR. BUCHANAN:

Q. Well, the controlled system doesn't work if you sell it to people who are putting their head in the sand; we can agree on that?
A. Yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. And the system doesn't work if you're selling to people who don't have by name or function suspicious order monitoring programs, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. And suspicious order monitoring programs have been either statutorily or regulatory required for as long as you've been in dealing with controlled substances, correct?
A. Yes.
Q. And that takes us back to the late '80s?
A. Yes.
Q. Okay. So next bullet was --

getting back to it, I'm sorry, 657.1, we're going to go to "If we decide to terminate a customer, we should let both the local and HQ offices of DEA know."
Do you see that?
A. Yes.
Q. Do you agree with that, that's something you should do?
A. It depends on, again, on the situation. If we're terminating a customer for a -- for a reason that isn't causing any diversion or abuse or we don't have a suspicion about that customer, then no there's no reason to let DEA know.
Q. Right. I mean, if you're terminating a customer because you believe they're either a suspicious customer or they've -- their orders are suspicious, you got to let the DEA know, right, no question?
MS. VANNI: Object to form.
THE WITNESS: The regulation is you notify them of suspicious orders. It's not -- the regulation doesn't require you to notify them if you just

terminate them as a customer.
BY MR. BUCHANAN:
Q. Okay. So these were your high level takeaways from the meeting the next day?
A. Yes.
Q. And then I know you implemented a process, and we'll talk about that in a moment, about what you started to do to kind of bring Qualitest SOMS procedures in line, fair?
MS. VANNI: Objection to form.
THE WITNESS: No, not fair. It was --
BY MR. BUCHANAN:
Q. Okay. We'll see whether it's fair in a moment, so let's pause.
(Document marked for identification as Par-Norton Deposition Exhibit No. 10.)
MR. BUCHANAN: I'm going to pass you what we're marking -- it's 1044, Scott -- next in order is Exhibit 10, ma'am.
BY MR. BUCHANAN:
Q. Aimee Cooper was someone who

worked in your organization in compliance?
MS. VANNI: Can I have a copy?
THE WITNESS: Yes.
MR. BUCHANAN: Oh, sorry. It should have gone to you first.
MS. VANNI: Thank you.
BY MR. BUCHANAN:
Q. All right. So Aimee Cooper was with you. I guess this is from 2017, but she's forwarding along in the minutes from the March 27 meeting?
A. Mm-hmm.
Q. I'm sorry, not the March 27 meeting. The minutes are stamped March 27, 2013.
You see the memorandum on the next page?
A. Yes.
Q. And so what's happening here is I guess at a later point in time in 2017, there's a need to look back at the -- what happened in March of 2013, and they're being forwarded along.
Do you recognize the format of

the memo that's reflected on page 2?
MS. VANNI: Object to the colloquy.
THE WITNESS: I recognize the format. I'm not sure if I had a copy before I left. This appears to be an internal DEA document.
BY MR. BUCHANAN:
Q. Okay.
A. So it may have been obtained through Freedom of Information, I'm not sure.
Q. So manufacturers can request information from the DEA through informal process and also formal process, right?
A. Through formal process and at this point it takes years to get it, so, yeah.
Q. Okay. So we have here the minutes from the DEA of the meeting, and let's pull those up.
It's from a Barbara Boockholdt, chief regulatory section ODG, Office of Diversion Control to a Joseph Rannazzisi, deputy assistant administrator, Office of Diversion Control.

Ms. Boockholdt was at the meeting?
A. I believe so, yes.
Q. Do you know how to pronounce her name?
A. Boockholdt.
Q. Boockholdt, thank you.
And she's with the Office of Diversion Control, and she's writing to I guess one of her colleagues?
A. Rannazzisi was in charge of DEA.
Q. And who is he -- oh, in charge of DEA?
A. Yes.
Q. Okay. And he had been talking and writing and speaking about diversion, anti-diversion, suspicious order monitoring for some time, fair?
MS. VANNI: Object to form.
THE WITNESS: I would assume, yes.
BY MR. BUCHANAN:
Q. Well, you've been in this space for a while, right?

A. Yes.
Q. Okay. "Space" meaning suspicious order monitoring, DEA compliance, right?
A. Correct.
Q. You remember in the mid-2000s receiving letters from Mr. Rannazzisi, right?
MS. VANNI: Object to form.
THE WITNESS: I remember receiving letters. I don't recall if they came from Mr. Rannazzisi, but, yes, we did receive letters.
BY MR. BUCHANAN:
Q. Okay. Letters concerning either manufacturers' obligations or distributor obligations with regard to maintaining effective controls against diversion?
A. Yes.
Q. Okay. And so that's all information that you as somebody in regulatory compliance take into consideration in designing programs to maintain effective controls against diversion, true?
MS. VANNI: Object to form.
THE WITNESS: Yes.

BY MR. BUCHANAN:
Q. Okay. So let's look at this one. This is a recap of the meeting from the perspective of the DEA. Can we scroll down. Probably the second paragraph is where we get into the meat of it.
Do you see that?
A. Okay.
Q. Okay?
A. "SC Levin opened."
Q. SC Levin, do you know SC Levin?
A. Yes.
Q. What's that C stand for?
A. Special -- staff coordinator.
Q. Got you. Staff coordinator Levin, somebody with the DEA?
A. Yes, headquarters.
Q. And just to orient us, where -- this is a summary of, I guess, Barbara Boockholdt of what happened at the meeting three weeks earlier with you?
A. I believe so, yes.
Q. Okay. SC Levin opened the meeting by stating the purpose was both

educational and informative. SC Levin stated he would discuss Qualitest's responsibilities under the Controlled Substances Act, their suspicious order monitoring system, their procedures concerning due diligence, knowing their customers, who their customers sell to and graphs depicting the pharmacies and practitioners where oxycodone in various formulations and hydrocodone in various formulations were ultimately dispensed from.
Do you see that, ma'am?
A. Yes.
Q. And as an encapsulation, is that a good high level summary of what happened during the meeting?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. It states that in the next paragraph, after summarizing Qualitest, I think it's the third sentence or fourth sentence, it says Ms. Hernandez -- well, let's read it. "SC Levin asked Ms. Hernandez to talk briefly about Qualitest, their product line and their

suspicious order monitoring system."
Do you see that, ma'am?
A. Yes.
Q. Okay. And it talks about Qualitest and its locations and then there's a sentence attributed to you.
Ms. Hernandez was aware of the chargeback system utilized by manufacturers, including Qualitest, but stating that the firm has not reviewed it.
Do you see that?
A. Yes.
Q. Do you recall discussing that with the DEA?
A. Yes, I do.
Q. Okay. And that accurately sets forth at least that portion of the discussion, right?
A. Yes.
Q. Okay. "Ms. Hernandez stated the firm's suspicious order monitoring system is a work in progress."
Do you see that?
A. Yes.

Q. "And it is currently based on historical purchases by an individual customer (thresholds)."
Did I read that correctly?
A. Yes, you did.
Q. Okay. Stated that you do not routinely visit customers to determine who they are selling to and "Qualitest does not visit their pharmacies or practitioners who dispense their product."
Do you see that?
A. Yes.
Q. Do you recall discussing that with the DEA?
A. I do.
Q. So you don't dispute the characterization of the meeting?
A. No.
Q. Okay. "Ms. Hernandez stated the only individuals who visit their customers are from the sales force and not compliance."
Do you see that?
A. Yes.
Q. It notes that you're currently

seeking to update your computer system and to improve the suspicious order monitoring system.
Do you see that?
A. Yes, I do.
Q. Okay. Apparently, you presented some organizational structure of Endo and the subsidiaries, and then you "stated that over 50 percent of the firm's sales are controlled substances."
Do you see that?
A. Yes.
Q. I want to focus on the next paragraph.
"SC Levin stated that 80 percent of all controlled substances manufactured in the world are prescribed and consumed in the United States."
Do you recall this discussion?
A. Yes.
Q. Okay. SC Levin stated that the abuse and diversion of oxycodone 15 and 30-milligram tablets is a major problem.
Do you recall that?
A. Yes.

Q. Do you recall that being a major problem at this point in time?
MS. VANNI: Object to form.
THE WITNESS: I recall him saying it was a major problem, yes.
BY MR. BUCHANAN:
Q. Okay. "SC Levin discussed the pain clinic issues found in Florida, as well as other drug abuse trends across the country. SC Levin outlined the methods of diversion of these products and advised that Qualitest is responsible for monitoring and reviewing their suspicious order monitoring system, assuring Qualitest is reporting to ARCOS correctly, visiting and knowing their customers, maintaining a due diligence file on their customers, and knowing where their products are ending up."
Let's pause for a moment. First, did I read that correctly?
A. Yes.
Q. And you recall that discussion?
A. Yes.
Q. Okay. And then some of that's

reflected in your takeaway bullet points, fair?
A. Yes.
Q. Okay.
A. He's basically going over the regulations in general and the things that they're seeing.
Q. Okay. Also says, you know, you should be reviewing what the DEA has done, our investigations, things that you read more publicly on websites concerning customers and customers of customers, fair?
A. Yes.
Q. And then it talks about the PowerPoint that he presented and some bullets that we don't need to revisit in great depth but, again, echoing this concept that closed system of controlled substance distribution, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And then it notes what the graphs depicted at the end of the first page, yes. The graphs depicted or the graphs revealed several

pharmacies purchasing large quantities of oxycodone and hydrocodone products from Qualitest's customers. The graph showed the pharmacies in Florida purchased very large quantities of Qualitest's oxycodone products. Also, the graphs show that pharmacies in Texas and California purchased large quantities of Qualitest's hydrocodone products. Ms. Hernandez, Ms. Hudson and Ms. Patel were completely unaware of where Qualitest products were ending up.
As of that point in time, ma'am, were you completely unaware of where Qualitest's products were ending up?
A. No. What this refers to is that we were unaware of the secondary customers. So we ship to the customers and we were aware who we were shipping to and, you know, the information for them, but we did not have visibility of the customers that they then shipped to.
Q. Right, as of that point in time, ma'am, you were not looking at really the customers of customers in terms of what they

were receiving, right?
A. Correct. We didn't have data available to us.
Q. Well, there is chargeback data that the company ultimately looked at, fair?
MS. VANNI: Object to form.
THE WITNESS: Yes, that gave us --
BY MR. BUCHANAN:
Q. In fact, the DEA told you you need to be looking at that, right?
MS. VANNI: Object to form.
THE WITNESS: The DEA told us that we should look at it because that's what they were hearing from other manufacturers, that they were looking into that and trying to see if they could get data from it.
BY MR. BUCHANAN:
Q. And, in fact, you contracted to after this meeting and started to implement a process where you reviewed and considered chargeback data, correct?
A. Yes, we did try.

Q. Okay. You, in fact, did implement the consideration of chargeback data as part of your SOMS process, correct?
A. Not while I was at Qualitest. It was something -- I don't know if anything was -- happened afterwards, but while I was there, we were not able to get any good data out of it.
Q. Okay. Let's pause and see if I can refresh your memory on that during our examination today.
A. Sure.
Q. It then continues that "SC Levin stated that Qualitest must review the chargeback information which they have access to, immediately address deficiencies in their suspicious order monitoring system, have compliance people visit their customers to review their suspicious order monitoring system and review the top customers of their customers and pay visits to pharmacies that purchase their products. SC Levin advised Ms. Hernandez that Qualitest must know their customers and maintain a due diligence file on them. SC Levin stated Qualitest's current system as explained to him

and as seen in their ARCOS data," is what, what did he say?
A. He said "inadequate to say the least."
Q. Do you recall this discussion with the DEA in March of 2013?
A. I don't recall it being said to us as being inadequate during the meeting.
I do recall us telling them of some of the things that we were looking at and wanted to implement and them stating that that was good, that they, you know, supported that and that we should move forward with taking those additional steps.
Q. And they gave you a window of time to do this, and they were going to come back and talk to you to make sure you had done it, right?
MS. VANNI: Object to form.
THE WITNESS: I don't believe -- I don't believe there was a you must follow up with us type of mentality. I think that was us saying we wanted to go back and talk to DEA and show them the

things we had implemented.
BY MR. BUCHANAN:
Q. It stated that "SC Levin stated that should Qualitest or any firm who had been briefed was found to have violated the CSA pertaining to what was discussed during the course of the meeting, DEA could seek administrative or civil action to remedy the violation."
Did I read that correctly?
A. Yes.
Q. Okay. You were further guided, I think it's the last sentence here. SC Levin told Ms. Hernandez to educate Qualitest employees who have access to controlled substances on what they discussed today -- or what was discussed today and communicate with her local DEA office, should she have any questions.
Did I read that correctly?
A. Yes.
Q. Okay. Well, let's talk -- let's talk about the implementation steps. Oh, actually, one more document to complete this.

MR. BUCHANAN: 619, please.
(Document marked for identification as Par-Norton Deposition Exhibit No. 11.)
BY MR. BUCHANAN:
Q. I guess before we move off the last exhibit, that generally reflects the meeting and refreshes your recollection what occurred that day?
MS. VANNI: Object to form.
THE WITNESS: Generally, yes. I'm sure that every distributor had almost word for word the same minutes.
BY MR. BUCHANAN:
Q. In other words, this was a meeting that was a meeting that was being had generally; is that what you're saying?
A. Correct. I mean, it was -- DEA was doing the same meeting with all distributors and basically providing the same message.
Q. And so you had that same type of meeting with that same type of message with Anda or Anda back in 2009 or whenever that meeting occurred?

MS. KOSKI: Object to form.
MR. SCHACK: Objection.
THE WITNESS: Yes.
MR. BUCHANAN: Thank you. Passing over what we're marking as Exhibit 11. Can we pull up 619 on the screen.
BY MR. BUCHANAN:
Q. Okay. This is an e-mail from Ms. Hudson to several of the same people we've been talking about, including yourself, Ms. Connell and Sanjay Patel.
Do you see that?
A. Yes.
Q. Denise Hudson worked in your group?
A. Denise was -- there was Denise and then Jill and then Sanjay and then myself.
Q. Okay. And then the written record won't reflect what you just did, so maybe --
A. Sorry.
Q. -- you can verbalize that, if you can.

A. So I reported to Sanjay, who reported to Jill who reported to Denise.
Q. Thank you.
A. Sorry.
Q. So Ms. Hudson was not able to attend the meeting in person, she participated by phone and took notes while you all were in this discussion with the DEA, fair?
A. Yes, with a very bad connection.
Q. Okay. All right. Well, let's go midway on point two. What's reflected here in the middle, "Tracey: we were looking at our SOM program just before Lenny called us."
You see that in the middle of the page, just kind of a back-and-forth, SOM program?
A. Mm-hmm, yes.
Q. There's a question about whether you're looking at chargeback data to help you understand what your customers' customers are doing. You respond, "we were looking at our SOM program just before Lenny called us."
Do you see that?
A. Yes.

Q. Lenny was the local DEA agent?
A. Lenny was at headquarters.
Q. And Lenny is the one who called you to say we need you to come to DC?
A. Yes.
Q. Got you, okay.
Then you were asked -- you asked to see what your customer SOM program is relative to your products, you responded "Right now, our sales team is visiting our customers."
Do you see that?
A. Yes.
Q. Okay. And then it says, you really need to know who your customers are selling to."
Do you see that in the beginning of the next page?
A. I do.
Q. Okay. And DEA told you, as reflected in Ms. Hudson's notes, "We like to differentiate between salespeople and DEA compliance people."
Do you see that?
A. Yes.

Page 266

Q. Do you recall that discussion, at least when you were with the DEA?
A. I do.
Q. Okay. And then she characterized the discussion this way in the middle of that paragraph, "We want you to look at this, decide what to do about it. If we show up at your facility in 6 to 9 months, we want to see some improvement. We need a good SOM program that is adequate for the type of business we are in. We are responsible for these products. DEA is not interested in interfering with legitimate needs of patients."
Do you see that?
A. Yes.
Q. Did I read that correctly?
A. Yes, you did.
Q. Okay. And you recall that as being a component of your discussion with the DEA that day?
A. I think it's interspersed with some of her opinion as well, but generally, yes.
Q. Okay. But you do recall that, in general, that the DEA told you that when we come

Page 267

back to you in six to nine months, we need improvement?
MS. VANNI: Object to form.
THE WITNESS: I don't recall.
BY MR. BUCHANAN:
Q. Okay. It says, "We need a good SOM program that is adequate for the type of business we are in."
Do you see that sentence?
A. I do.
Q. Do you agree, ma'am, as a general matter, that a company needs a SOM program that is adequate for the type of business that it's in?
A. Yes.
Q. And so if a company is in the business of predominantly making and selling controlled substances, it's got to have a robust SOM program?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. If it's selling 33 billion pills of Vicodin over seven years, it's got to have a

Page 268

robust SOM program?
MS. VANNI: Object to form.
THE WITNESS: Actually, I don't feel -- I don't feel the quantity is a factor.
BY MR. BUCHANAN:
Q. Okay. A company should have a robust SOM program and strong measures to prevent diversion regardless of the quantity, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. But, certainly, if a company's entire business, to the tune of billions and billions of pills and many billions of dollars in sales is with controlled substances, they should invest the resources in a robust SOM program; you could agree with me, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
MR. BUCHANAN: So let's -- one other document. Can I have 581.
THE VIDEOGRAPHER: Counsel, can

Page 269

we go off the record momentarily. I do apologize, just going off the record momentarily. The time is 1:25 p m.
(Pause.)
THE VIDEOGRAPHER: Back on the record, the time is 1:28 p.m.
(Document marked for identification as Par-Norton Deposition Exhibit No. 12.)
MR. BUCHANAN: Ma'am, passing you what we marked as Exhibit 12. Do we have a copy for counsel yet? It's -- for the record, it's E606 and it's PAR_OPIOID_MDL 18920.
MS. VANNI: Thank you.
BY MR. BUCHANAN:
Q. This is a document from October of 2013, this is some five, six months after your meeting with the DEA, right?
A. Yes.
Q. Six months to the day almost, right? Mr. Brantley worked in your group?
A. He did.
Q. Mr. Shaffer worked in your group?

A. Yes.
Q. So you were the head of DEA compliance. You hired Mr. Brantley into your group, correct?
A. Yes, I hired Larry first, Mr. Shaffer and then later hired Eric.
Q. When did you bring in Mr. -- is it Shaffer or Shaffer?
A. Shaffer.
Q. It's the two Fs that are throwing me there.
A. I'm not sure exactly when.
Q. I assume his e-mail address is spelled right. All right. So when did you hire him, by the way?
A. I'm not sure on exact -- the exact date, but he was, I believe, my first hire.
Q. After the meeting with the DEA?
A. No. After getting to Qualitest.
Q. Okay. And he was, if I understand right, he was more in this quota management function, right?
A. He was at the company, however,

he actually had a -- he had handled suspicious order monitoring previously.
Q. Got you.
All right. So let's look at this. This is an e-mail from Mr. Shaffer to Mr. Brantley early October 2013, subject SOMS info, right?
A. Yes.
Q. SOMS violations as a spreadsheet, SOMS doc from 2013 and a SOMS presentation, right?
A. Yes.
Q. Okay. Do you remember during your time at the company one of the things you were tracking was who was getting in trouble?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And you had an Excel spreadsheet that you put together and kind of tracked what was happening with different registrants who was getting gigged and written up with big fines and stuff like that, right?
MS. VANNI: Object to form.

THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Gigged is a confusing term.
Getting, what, registrations pulled, fined, civil actions, suspension orders, all that kind of stuff?
A. Yes, we were tracking it.
Q. Okay. And so one of the things a reasonable company does, and I guess this was a responsible thing to do?
MS. VANNI: Object to form.
THE WITNESS: I think so. I think it helped to -- it helped to teach others in the company what ramifications there were if something were to go wrong.
BY MR. BUCHANAN:
Q. And that's something that you have in a compliance department as a bit of an issue from time to time, right?
MS. VANNI: Object to form.
THE WITNESS: No company is perfect.
BY MR. BUCHANAN:

Q. Certainly not, certainly not, and nor are people.
But one of the issues you have in a compliance department is sometimes some tension between compliance with what a responsible company would do or reasonable company would do or the regulations require and what the business people want, right?
MS. VANNI: Objection.
THE WITNESS: I wouldn't necessarily say that there's tension from the aspect of, you know, everybody knows that you have to comply with the DEA regulations. It's a matter of education, it really is.
BY MR. BUCHANAN:
Q. And so one of the things you did was compile a list of all the bad things that could happen to us as a business with 70% controlled substances if we don't comply, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Because this, you know, this is a

-- this could be a devastating consequence if we don't comply, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Fair, yeah.
So one of the things that's helpful in certainly getting management's attention is you should know distribution facilities have been closed, right?
A. Mm-hmm.
Q. That's a yes answer?
A. Yes. Sorry.
Q. You should know that tens of millions of dollars in fines have been imposed against certain distributors, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. You should know that we have a distributor license, right?
A. Yes.
Q. And if we're not doing our job, this could be devastating, right?

MS. VANNI: Object to form.
THE WITNESS: Well, it could impact the business, yes.
BY MR. BUCHANAN:
Q. Certainly.
And so you bring these items to the attention of people above you to say, look, this could affect our pocketbook, right?
MS. VANNI: Objection.
THE WITNESS: Actually, no. The reason that we use these was because I knew that the electronic system that I wanted to implement was very expensive, and I needed to have adequate justification to support that system because -- because we did have something in place, so I knew that the feedback I would get is that we were complying with the regulation. So I wanted to show them some of the things that the other companies were doing that DEA categorized as not enough.
BY MR. BUCHANAN:
Q. Right. I mean, basically, you're

saying I needed to make sure I could get some budget to make this happen, so I had to show the other side of not doing it?
MS. VANNI: Object to form.
THE WITNESS: I was expecting more resistance, yes.
BY MR. BUCHANAN:
Q. Okay. And so you put together this schedule, and let's look at the -- let's be clear, I guess, because I may not have time to come back to this today.
Some of what we see here in the SOMS violations are, for example, we see a reference to Walgreens.
MR. BUCHANAN: Could we go to 606.4. Can you blow up this one right here, if you can see my finger. Thank you, yeah. My eyes are failing me, guys. Sorry about that.
MR. SCHACK: Counsel, do you have any other copies of this exhibit that you can share?
MR. BUCHANAN: There's an extra floater if somebody can pass the floater

down.
MR. SCHACK: Thank you.
BY MR. BUCHANAN:
Q. Okay. All right. So this is suspension order that you tracked, a suspension of a DEA license relating to a Walgreens distribution center in Jupiter, Florida.
Do you remember that?
A. Yes.
Q. Do you remember -- you were aware of that when it happened in 2012, right, as somebody who reads the Federal Register, as somebody who attends DEA conferences?
A. Yes.
Q. Okay. And then off to the right we see really what you guys were doing, right, and this is your drug that was being shipped in to Florida, right?
MS. VANNI: Object to the form.
THE WITNESS: I can't read it.
BY MR. BUCHANAN:
Q. Yeah, it's a challenge with, I don't know, spreadsheets. There's a heading that's --

MR. BUCHANAN: Bradley, I'm sorry, I think it's confusing for people if you do it the way you've done it, because at the top it says "Violation."

BY MR. BUCHANAN:

Q. Let's just read across the top together, ma'am. You see Violation For -- there's Date, Violation For: Company, Violation, Penalty, a web link, What they did, and What we are doing.

Do you see that?

A. Yes.

Q. Okay. So then there's that reference for the Walgreens facility that we were just looking at, and you see there's a narrative description of what happened with that one?

A. Yes.

MR. BUCHANAN: And then I need you to blow up, if you could, Bradley, the units all the way to the right. Keep going. Can you make the box a little bigger so we don't clip off the top. Thanks.

BY MR. BUCHANAN:

Q. Okay. All right. It doesn't get any bigger, but at least it's a little more in focus for you.

So what we see here is Walgreens has a situation with their distribution center severe enough that their license is suspended for that particular distribution facility.

Do you recall that?

A. Yes.

Q. Okay. And then what you did is you looked at, hey, what are we doing with them, right?

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. Do you see that?

A. Mm-hmm.

Q. And it shows here that over the same period of time, or I guess really from 2009, 2010, 2011, your company, Qualitest shipped how many pills, 83 million pills, right?

You see that?

A. Yes.

Q. Shipped 83 million pills to that

particular distribution facility that had its license suspended in 2012, correct?

A. Yes, looks that way.

Q. Of 2009 there were 11 million dosage units, right, Walgreens Jupiter, and you know I think I misspoke. Let me restate this, okay.

What's at the top, I believe, are the dosage units shipped into Florida.

Do you see that?

A. Yes.

Q. 83 million dosage units shipped into Florida, right? Am I reading it correctly?

A. I can't see.

Q. I wish I could do more to help you on that.

A. Yes, it states that 83,000 -- 83 million doses were sent to Florida in the same time frame.

Q. And then in 2009 you shipped 11.6 million dosage units to the Jupiter facility of Walgreens, right?

A. Yes.

Q. In 2010 you shipped 7 million to

that one?

A. Yes.

Q. And then apparently in 2011 they went to another facility, right?

A. Yes.

Q. Okay. So over those two years that we have data for, it doesn't go back prior to 2009, there's some, you know, 18 million, 19 million, 18 and a half million, I guess to be precise, dosage units of controlled substances going to the facility that the DEA suspended its license in 2012, correct?

A. Yes.

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. Okay. And the allegation of the DEA was that that facility and the reason for the suspension of a license was that they failed to maintain effective controls against diversion of controlled substances, right?

A. Yes.

Q. And so prior to -- prior to 2013, ma'am, I take it are you aware of any site visits to Walgreens Jupiter?

A. Again, I don't know what the sales team did, so I don't know if they went to -- went there or not.

Q. We know the DEA's conclusion, at least as reflected here, was that they failed to be -- they were not maintaining effective controls against diversion, right?

A. Yes.

Q. Okay. And had you asked for copies of their suspicious order monitoring protocols prior to 2013?

A. Again, I don't know.

Q. Okay. I mean, there's a list of violations that are noted over several years in this spreadsheet, correct?

A. Yes.

Q. For various entities, some are retail pharmacies, some are distributors, correct?

A. Yes, mm-hmm.

Q. And these are all obviously events that have happened prior to the time of this PowerPoint, right?

A. Yes, they are.

Q. And we could agree, couldn't we, ma'am, that you're not aware of any request to any of the entities on this sheet for request for their suspicious order monitoring program or practices prior to the times of these violations, correct?

MS. VANNI: Objection.

THE WITNESS: I'm not sure. I don't know.

BY MR. BUCHANAN:

Q. You don't have any information, sitting here today, that you did so?

MS. VANNI: Objection.

THE WITNESS: Right, or did not.

BY MR. BUCHANAN:

Q. You have no information either way?

A. Correct.

Q. Fair enough. Okay.

So let's go back to this document. And so tab one was -- I'm sorry, at 606.4 we were just looking at violations, what the allegations were, the consequences were and then really where you were shipping product.

Do you see that there is information for other entities had their registrations pulled or suspended or there were allegations against with regard to effective controls against diversion on this sheet?

MS. VANNI: Object to the colloquy.

THE WITNESS: Yes, that's what -- I mean, there are -- that's what this is a list of violations, yes.

BY MR. BUCHANAN:

Q. There's too many for us to read and it's almost too challenging to put on the screen but --

A. Yes.

Q. -- just for the jury's benefit, there are other manufacturers, other distributors, other pharmacies referenced, correct?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. Okay. And there are other areas where it is listed that you are, in fact,

shipping into that particular customer or community. Do you see the column "What are we doing" on page 606.5 and 606.4?

A. I do, yes.

Q. And there are other customers that you were, in fact, fulfilling orders for that had their licenses suspended or other consequences?

A. Yes.

MS. VANNI: Object to form.

THE WITNESS: Keep in mind as well that when -- when there is a -- a letter of admonition or issued by DEA for not conducting due diligence, for example, that doesn't mean they're not conducting due diligence on every customer that they have. That means the DEA found an example of that. If the license is getting suspended, they've probably found quite a few of them. However, that license was also reinstated, I believe, at a later date by DEA. So at some point DEA felt that they did have controls and gave them

back their license, basically.
BY MR. BUCHANAN:
Q. Right. I mean, but the concern, obviously, and you've talked about it in your own writings, we've seen it from the DEA presentation, we have it in your oral testimony today is a closed system, right?
A. Yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. So if we don't have a closed system at a particular point in time, and I think we looked at that spreadsheet where, I mean, there were billions of pills being made every year of controlled substances by Qualitest, you'd agree?
MS. VANNI: Object to form.
THE WITNESS: Again, I can't speak to those -- those numbers.
BY MR. BUCHANAN:
Q. I'll represent to you that the data that's been produced to us reflects that there were billions of pills of controlled substances for hydrocodone and oxycodone that

were being shipped every year, okay, accepting that representation, if a manufacturer -- if anyone in this chain has their head in the sand or isn't doing their job, then we don't have a closed system?
MS. VANNI: Object to form.
THE WITNESS: Yes, however, a violation from DEA --
BY MR. BUCHANAN:
Q. That's my question.
A. -- a letter of admonition does not mean that somebody had their head in the sand. Again, people make mistakes. Mistakes do occur.
Q. Okay, okay. And so when mistakes occur, okay, when there's negligence and -- withdrawn.
Let's go back to 606.14.
This document, again, just to reorient the jury, because we've been hoping around, at 606.1, this is the e-mail from Mr. Shaffer to Mr. Brantley, people obviously in your DEA compliance group, fair?
A. Yes.

Q. Okay. At 606.14 there's a summary of the current SOMS process.
Do you see that?
A. Yes, I do.
Q. Okay. And this would be the SOMS process for Qualitest as of -- prior to the revamping, right?
A. Prior to the upgrades, yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Okay. So the current SOMS process is that -- was really directed at the retail pharmacies, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. So prior to revamping, SOMS procedures and monitoring of the orders was not tied into the wholesale and distributor customers, correct?
MS. VANNI: Object to form.
THE WITNESS: No, I would disagree with that from the aspect of there was visibility -- in some cases

visibility to the inventories at the wholesale level, so I think that there -- they were being monitored, just not part of this process.
BY MR. BUCHANAN:
Q. Okay. Well, without trying to kind of look backwards and figure out how maybe that could have been done, what was reflected on this particular document, 606.14, as Qualitest's current SOMS practices are these four bullet points, correct?
A. Yes.
Q. Does the -- does this document describe anything being done with wholesalers?
MS. VANNI: Object to form.
THE WITNESS: This document does not.
BY MR. BUCHANAN:
Q. Okay. Retail pharmacies, so one of the items is retail pharmacies under the current SOMS process are based on a product threshold amount, correct?
A. Correct.
Q. "Retail pharmacy threshold

amounts can be changed by the sales department," right?
A. Yes.
Q. And the threshold amounts are set by the sales department, right?
A. Yes.
Q. And then the system holds the order until reviewed, right?
A. Yes.
Q. Okay. And so this is the SOMS process as memorialized by Qualitest as of this point in time, correct?
A. Correct.
Q. Okay. The next page sets forth the issues with that process, right?
A. The improvements that we'd like to make.
Q. Well, what's written here is and before somebody was asked to testify about it --
A. Wording.
Q. Yes, issues with the current process, right?
MS. VANNI: Object to the colloquy.

THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. Issues with the process. The current "system only addresses retail pharmacy by looking at product thresholds."
Do you see that?
A. I do.
Q. "Other COTs are not evaluated for SOMS."
Do you see that?
A. Yes.
Q. Other classes of trade, that's what COTs means right?
A. Yes, it is.
Q. And you broke down for us earlier what classes of trades are, right?
A. Yes.
Q. Classes of trades could be distributors and wholesalers, right?
A. Yes.
Q. Hospitals, right?
A. Yes.
Q. What were the other big ones?
A. Clinics, long-term care.

Q. Okay. And so as of this point in time, as of September 2013, this is some five months after your meeting with the DEA, these other classes of trades were not evaluated for SOMS, correct?
A. Correct, not through the SOMS program. Through the threshold program.
Q. We can agree that the people in the DEA compliance group who are at this point in time trying to respond to criticisms and concerns concerning the SOMS program are identifying issues with the process, right?
MS. VANNI: Object to form.
THE WITNESS: We're saying what's wrong with the current process in order to get improvements made.
BY MR. BUCHANAN:
Q. Okay. Well, I mean, it wasn't false when they wrote it, was it? They wouldn't be lying to their boss about it, right?
MS. VANNI: Object to form.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. Okay. So we can agree that these

were, in fact, issues with the then current process prior to the revamping of the system in 2013, right?
A. They were gaps that we internally wanted to improve upon.
Q. Right, I mean, look, especially if you're selling 33 billion pills of hydrocodone, it's a pretty big gap not to be looking at wholesalers and distributors for SOMS, right?
MS. VANNI: Objection.
THE WITNESS: Really the wholesalers and distributors are not -- they weren't the problem. The retail pharmacies were the problem.
BY MR. BUCHANAN:
Q. Right, but --
A. So we were glad that we were looking at retail pharmacies versus wholesalers.
Q. Well, you knew from the DEA back all the way for years -- when you were at Watson, you were looking at wholesalers?
A. They look at wholesalers on the sale side separate from SOMS. If they weren't

looking at the quantities they were sending to wholesalers, they would be sending all their product to one wholesaler and that could cause problems. It's more from an order management system, that's why it's not detailed in SOMS.

Q. Well, we know from this that an issue before somebody who was asked to testify about it with the current process was that other classes of trades were not being evaluated for SOMS, right?

MS. VANNI: Objection.

THE WITNESS: Other classes of trades were not part of the SOMS program.

BY MR. BUCHANAN:

Q. What this writes --

A. They were part of OMS, which is not what this document is talking about.

Q. The way this is written, ma'am, is other classes of trades are not evaluated for SOMS. That's the way it's written, correct?

MS. VANNI: Object to form.

THE WITNESS: That is the way it's written.

BY MR. BUCHANAN:

Q. What are SOMS, suspicious order monitoring?

A. That's what the system is, yes.

Q. "Retail pharmacy review and approval is handled by the sales department," right?

A. Yes.

Q. And you knew from the DEA that's not good, right?

MS. VANNI: Object to form.

THE WITNESS: Yes, that's not what DEA wanted to see, not required by the regulation, but not what they wanted to see.

BY MR. BUCHANAN:

Q. Well, and the DEA viewed this as a conflict of interest and considered the sales department as the department that is driven by what?

A. Driven by dollars.

Q. Driven by sales?

A. Mm-hmm.

Q. Right?

A. Yes.

Q. Okay. And so compliance can be bad for dollars or compliance can be bad for sales, right?

MS. VANNI: Object to form.

THE WITNESS: I'm sorry? What did you say?

BY MR. BUCHANAN:

Q. Compliance can be bad for dollars and it can be bad for sales, right?

MS. VANNI: Objection.

THE WITNESS: There is a cost to compliance, yes.

BY MR. BUCHANAN:

Q. Further issue with the current process is that once a customer hit their threshold, they could just call up or send an e-mail and request a threshold increase, right?

A. Yes.

Q. Hey, I know we hit our cap last month, we need more, right?

MS. VANNI: Object to form.

THE WITNESS: Not without justifiable reason.

BY MR. BUCHANAN:

Q. Right, the sales department was handling the threshold increases, right?

A. Yes.

Q. That was one of the issues with the current process as framed out in this October 2013 presentation, right?

A. And, again, our sales department, we had people who had good integrity, and it wasn't an issue that it was part of the sales department, with the exception of the perception.

Q. And that's something that you hope but cannot know, ma'am?

MS. VANNI: Object to form.

THE WITNESS: It's something that I did know based on the calls that were made to me and the questions that were asked.

BY MR. BUCHANAN:

Q. Okay. We know that you did not visit or your sales team didn't visit every customer, right?

A. Don't know that. I wasn't there.

Page 298

Q. We know after some visits started to occur that you did find some of those pharmacies like the pictures we looked at, right?
MS. VANNI: Object to form.
THE WITNESS: Don't know about that, but...
BY MR. BUCHANAN:
Q. The pharmacies that were doing well more than 13% of their business in controlled substances, right?
A. 13% is an average, a guideline.
Q. Pharmacies that you had to cut off?
MS. VANNI: Object to form.
THE WITNESS: Pharmacies -- there were customers that we reported to DEA, I'm sure.
BY MR. BUCHANAN:
Q. There were customers after you implemented a revised SOMS program that you had to cut off, right?
A. I believe so.
Q. Are you aware of any customer

Page 299

that you cut off in the two years prior to implementing the new SOMS program?
A. None that I can name, but I know that there were some then as well.
Q. Sitting here today, can you name one?
A. I cannot.
Q. It states that there was "no separate/unbiased check of order quantity outside of the sales and marketing departments."
Do you see that?
A. Yes.
Q. There was no unbiased check of the orders outside of the sales and marketing group, that was an issue with the current process as of October 2014, correct, ma'am -- 2013, correct?
MS. VANNI: Object to form.
THE WITNESS: I'm not quite sure what that bullet means actually at this point, but that's what it says, yes.
BY MR. BUCHANAN:
Q. "No check for order frequency and pattern discrepancies."

Page 300

Do you see that, ma'am?
A. Yes.
Q. And that was an issue with the current process as of October 2013?
A. The system didn't stop an order because of an out of frequency or out of pattern. However, part of looking at a threshold quantity is to look at the history of the account, which would give you the order frequency and pattern. So it wasn't picked up by the system automatically, but it was reviewed.
Q. Well, as of this point in time, we know you weren't reviewing other classes of trade, right?
A. We were not as part of SOMS.
Q. We know, at least what's written here, ma'am, is that there was "no check for order frequency and pattern discrepancies," correct?
A. Not by the initial electronic system.
Q. Not by the system that could be reviewing the thousands and thousands of orders

Page 301

or line items that a company is getting, right?
MS. VANNI: Object to form.
THE WITNESS: No, the system would have been reviewing those line items, but it would have been stopping the orders based on quantity, and then after quantity, after the orders stopped based on quantity, it would have been reviewed for pattern and frequency.
BY MR. BUCHANAN:
Q. Okay. Well, we know as of this point in time, certainly what's stated here is there was no check for order frequency and pattern discrepancy, that's what was written by your colleagues in the DEA compliance group, correct?
A. By the electronic system.
Q. That does not say that; can we agree on that?
MS. VANNI: Object to form.
THE WITNESS: That's how you're interpreting it, so...
BY MR. BUCHANAN:
Q. Well, I'm asking can we agree it

doesn't say what you just said?

A. It does not say.

Q. Thank you. It says the "system does not allow for" what?

A. "Know Your Customer."

Q. Okay. And so the "Requirements for Improvement" are listed on the next page, right?

Do you see that?

A. Yes.

Q. These are things you have to do, right?

MS. VANNI: Object to form.

THE WITNESS: Things we wanted to do.

BY MR. BUCHANAN:

Q. It says requirements, right?

A. Things we want to do. It's a play on words but...

Q. Well, okay. What's written here while you're -- before somebody was sitting in this seat to reinterpret the words was "Requirements for Improvement," agreed?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. Thank you.

The first bullet as a requirement is a system to look at all class of trades and customers.

Do you see that?

A. Yes.

Q. And the classes of trades and customers are wholesalers, distributors, manufacturers, et cetera, right?

A. Yes.

Q. Not just look at pharmacies or retail pharmacies, right?

A. To include these other customers as part of SOMS, yes.

Q. A system to look at all classes of trades and customers.

Do you see that?

A. I do.

Q. Okay. A system to look at all controlled substances.

Do you see that?

A. Yes, and listed chemicals, which

is above the regulation.

Q. Okay. Something a responsible company should do, right?

MS. VANNI: Object to form.

THE WITNESS: Possibly, yes.

BY MR. BUCHANAN:

Q. I mean, you list it as a requirement, right?

A. Right, another example of something that's not a requirement but that's listed, yes.

Q. Okay. I guess if you're going to make a promise to maintain effective controls of diversion, you should do whatever you can do to make sure these things don't leave the channel of trade, right?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. And stay in the closed system, yes?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. Thank you.

It says, and there's a number of items here, but I'm getting notes that I need to move more quickly. Let's head down to the third bullet from the bottom.

You see that, requirement for improvement, "Access to chargeback data and 3rd party data i.e. IMS."

Do you see that?

A. Yes, I do.

Q. Okay. So one of the requirements for improvement was implementing chargeback data as part of your process, right?

A. One of the things we wanted to do, yes.

Q. Okay. And you say "wanted," this says requirements, right?

MS. VANNI: Object to form.

THE WITNESS: The document says requirements. That's not what this is, but yes.

BY MR. BUCHANAN:

Q. Okay. And then -- well, you were also told by the DEA in your meeting, you got to

start looking at chargeback data, right?
MS. VANNI: Object to form.
THE WITNESS: It's not a regulation.
BY MR. BUCHANAN:
Q. Well, didn't they tell you you need to do that?
MS. VANNI: Object to form.
THE WITNESS: They said you should look at it. There's a difference between should and must.
BY MR. BUCHANAN:
Q. Okay. And you'd agree, ma'am, as a company that has been given a permission slip by the U.S. government to stamp apparently billions of pills every year, that you've got to act consistent with the terms of that permission slip, right?
MS. VANNI: Object to form.
THE WITNESS: Yes, with the regulations.
BY MR. BUCHANAN:
Q. And the law, the statute, right?
A. Yes.

Q. Which says you must maintain effective controls against diversion, right?
A. Yes.
Q. Okay. And so one of the tools of information -- one of the classes of information available to manufacturers for many of its customers is chargeback data, right?
A. That's what DEA believes, yes.
Q. Another category of information that's available to manufacturers is IMS data, right?
A. Yes.
Q. And using IMS data, you can see in percentage terms quantities that end user pharmacies might be acquiring, whether they're consistent with national averages, whether they're above national averages or whether they're below, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And that can raise red flags as to whether a pharmacy, for example, is above what you know the national average to be for

particular product lines, right?
MS. VANNI: Object to form.
THE WITNESS: It's one piece of a -- of an investigation, yes.
BY MR. BUCHANAN:
Q. Okay. We see in this next page -- I'm sorry -- 1000 -- 606.18.
We saw a memo from Mr. Rannazzisi or to Mr. Rannazzisi relating to your DEA interaction in March of 2013.
Do you remember that? Ma'am, I'm probably confusing you by showing you the page first.
Do you remember we were just looking at a memo to Mr. Rannazzisi from the DEA officer who was at the meeting you were in in March of 2013?
A. Yes.
Q. Okay. In this presentation, it says "DEA's Attempted Elucidation of SOMS Requirement."
Do you see that?
A. Yes.
Q. And this is a 2007 letter from

the DEA to you, correct?
A. Yes.
Q. And you were aware of this document, correct?
MS. VANNI: Object -- just -- when you say "you," that's vague and ambiguous, and she wasn't at the company at the time in 2007.
BY MR. BUCHANAN:
Q. Well, I mean, this is a PowerPoint from -- this is a PowerPoint from 2013, correct, ma'am?
A. Yeah, but this is just including, I think, the general letter that DEA sent out to registrants. I have to read it to see.
Q. Oh, okay. Let me but -- do you recall that the DEA sent out a letter to registrants in 2007?
A. Yes.
Q. You were working at a registrant at that point in time?
A. Yes.
Q. You got a copy of it while you were at that company, right?

A. Every entity, so, yes, that's what this is.

Q. Okay. So this is a letter from DEA to the company in 2007 saying you've got obligations, you've got to maintain effective controls against diversion, you've got to have suspicious order monitoring systems, a routine threshold is not enough, you've got to do more, right?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. Okay. And I just was -- I just wanted to confirm that, you know, you were certainly aware of that letter as of 2013, but it sounds like you were aware of the equivalent letter from your prior work with other manufacturers, correct?

A. Yes, yes, I was, mm-hmm.

Q. Okay. So you know the DEA had spoken about this certainly prior to 2013?

A. Yes.

Q. And you had obviously had that sit-down you had with Watson and Anda prior to

that, right?

A. Yes.

Q. Okay. So this is a letter that's being called out to the attention of -- in the PowerPoint from 2007 from Mr. Rannazzisi.

Then you also identify examples of repercussions.

Do you see that?

A. Yes.

Q. And this is again -- was this part of trying to get that kind of management buy-in to -- whether it was increase head count or increase budget to improve the SOM system?

MS. VANNI: Object to form.

THE WITNESS: And education, yes.

MS. VANNI: Counsel, when you get a normal stopping break, can we just have a break, use the ladies room.

MR. BUCHANAN: That's fine. I may be just about done with this document.

MS. VANNI: That's fine.

MR. BUCHANAN: It's good. We can go off the record.

THE VIDEOGRAPHER: Going off the record. The time now is 2:02 p.m.

(Brief recess.)

(Document marked for identification as Par-Norton Deposition Exhibit No. 13.)

THE VIDEOGRAPHER: We're now going back on the record. The time is 2:24 p.m.

BY MR. BUCHANAN:

Q. Ma'am, I'm passing you over another exhibit in this 2013 period. This one is from March of 2013. Looks like it's a PowerPoint that you put together for a meeting you were going to have?

A. Mm-hmm.

Q. You see March 13, 2013, it's E581, and we've marked it as Exhibit 13 to your deposition.

A. Okay.

Q. You forward it to a distribution list Ms. Hudson, Ms. Bigelow -- I'm sorry -- Mr. Bigelow, Mr. Propst, Sanjay Patel, Margaret Richardson, Mike Reiney and Jill Connell, cc'd

Sue Dear and Patricia Simmet.

You see that?

A. Yes.

Q. Slide deck for this morning's meeting, right?

A. Mm-hmm.

Q. Is this your group and people that are in management either aligned with your group or they could be affected by what you're being -- what you're proposing?

A. It's not my group, it's the management team.

Q. I see. This was --

A. Some of the management team.

Q. So this is some folks from your group and some folks from the management team?

A. Yes.

Q. Or just the management team?

A. When you say "my group," my boss and boss's boss, yes.

Q. Okay. But not those who worked for you?

A. Correct.

Q. Understood.

So this is kind of a high level deck, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. High level meeting?
A. Mm-hmm.
Q. That's yes?
A. Yes.
MS. VANNI: I'll objection to form.
BY MR. BUCHANAN:
Q. So after you get back from the DEA in March of 2013, we saw your e-mail where you did some quick thoughts, we've seen the DEA's kind of summary of that meeting and Ms. Hudson's summary of that meeting.
You recall us discussing that today?
A. Yes.
Q. Okay. And this is your PowerPoint that you put together for the management team, right?
A. Yes.

Q. Okay. And DEA SOMS action plan, right?
A. Mm-hmm.
Q. March 13, 2013?
A. Yes.
Q. And this was something you put together?
A. Yes, Sanjay had some input into it as well, my boss.
Q. Your boss did, okay.
Was your boss at the meeting?
A. At the DEA meeting, I think he -- he was not, but I think he was supposed to be originally. I think he was missed because of the snow.
Q. Okay. And on this slide it says "Core Elements of DEA Compliance Team," and then there's this kind of chart in the middle, kind of a working framework for your presentation, "Critical Elements of DEA Compliance."
Do you see that?
A. Yes.
Q. And one of the critical elements of DEA compliance is "Data Integrity &

Reporting," right?
A. Correct.
Q. Another is "Manufacturing Site Compliance," right?
A. Yes.
Q. This is vaults and fences and monitors and making sure two people are watching at all times, that type of stuff?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. There's this "Quota Grant Process" on the left, top left, do you see that?
That's a component of DEA compliance, right?
A. Yes, it is.
Q. Okay. Making sure that you're only asking what you need for legitimate medical purposes, right?
MS. VANNI: Object to form.
THE WITNESS: Correct.
BY MR. BUCHANAN:
Q. And because, frankly, your quotas are supposed to be based on what's needed for

legitimate medical use, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. And then there's this component off to the right, as a critical element of DEA compliance "Suspicious Order Monitoring," correct?
A. Correct.
Q. So --
A. Excuse me. May I just go back to the quota process?
Q. If I could move forward, I am time limited. If it's important enough, feel free to discuss with your counsel, and she'll call it out on direct.
A. Okay.
Q. Suspicious order monitoring and we've spent some time talking about that today, right?
A. Yes.
Q. And what it says here is a critical element of DEA compliance is to "Implement a solution that proactively discloses

suspicious orders based on unusual size, order pattern, deviation and unusual frequency," correct?

A. That's what it says, yes.

Q. And then the DEA SOMS feedback you got on the next page, 581.6, was that "You need to differentiate between the sales team role and the DEA compliance role", right?

A. Yes, that's what it says.

Q. "You need to visit your customers," right, and then this is an exclamation point, right?

MS. VANNI: Object to form.

THE WITNESS: That's what it says, yes.

BY MR. BUCHANAN:

Q. You got to put boots on the ground from compliance with customers, right?

MS. VANNI: Object to form.

THE WITNESS: Yes, that's what DEA would like to see.

BY MR. BUCHANAN:

Q. I'm assuming you put an exclamation point in there for emphasis, right?

A. Yes.

Q. Okay. We have a problem, I guess "we" there is the DEA -- are you using we to refer to the DEA?

A. We to refer to our company.

Q. Well, it says, we have a problem with companies using their sales team to conduct these site visits.

A. Oh, I'm sorry, it is DEA.

Q. In that instance, you were using the term we to refer to the DEA?

A. Yes.

Q. Right, and you understood the DEA had a problem with companies using sales teams to conduct the site visits, right?

MS. VANNI: Object to form.

THE WITNESS: They had a concern, yes.

BY MR. BUCHANAN:

Q. Then it says you need to use the chargeback data to understand what your customers' customers are doing.

Did I read that correctly?

A. Yes.

Q. And that was one of your takeaways from this meeting with the DEA, right?

MS. VANNI: Object to form.

THE WITNESS: Yes, it was one of their feedback points.

BY MR. BUCHANAN:

Q. And the reference to you there, as you're kind of rephrasing and recasting what happened at the DEA meeting, was Qualitest, Qualitest needs to use the chargeback data to understand what Qualitest customers' customers are doing, right?

MS. VANNI: Object to form.

THE WITNESS: Yes, that was a suggestion by DEA, yes.

BY MR. BUCHANAN:

Q. And the way you framed it is you need to, right?

A. I'm just documenting what DEA told us during the meeting.

Q. Right.

And in terms of further documenting what the DEA told you, the DEA told you you must know the customers you are selling

to, right?

A. Yes.

Q. "You need to track your product from the time it is manufactured to when it is sold to the patient."

Did I read that correctly?

A. To the best of your ability. Yes, you did read it correctly.

Q. The way you wrote it was, and you didn't put to the best of your ability, but the way you wrote it was you need to track your product from the time it is manufactured to when it is sold to the patient, correct?

MS. VANNI: Object to form.

THE WITNESS: Yes, that's how it's written.

BY MR. BUCHANAN:

Q. "Need to have the best possible systems to know what is happening with your product," right?

A. That's what it says, yes.

Q. That's what you wrote.

And this was your DEA feedback that you were recounting to senior management at

Qualitest, correct?
MS. VANNI: Object to form.
THE WITNESS: Correct.
BY MR. BUCHANAN:
Q. You "need to have a good SOM program that is adequate for the business you are in," right?
A. Yes, that's what it says.
Q. Okay. Then says "look at the charts provided," and I guess you're saying that was what the DEA told you, look at the charts provided, right?
A. Yes.
Q. Remember we looked at those graphs that had vintage and Generic Bidco, I think was the other one?
A. Yes, we did.
Q. Okay. Those were the charts you got from the DEA?
A. Yes.
Q. All right. And so you're saying the DEA told you to look at the charts provided and we will visit your site and we will want to see improvements in when?

A. In six months.
Q. Right. In six months.
So we've been looking at some dialogue that was happening in October, September of 2013.
You recall that?
A. Yes.
Q. You brought Mr. Brantley in in September of 2013, roughly about six months after this, right?
A. Yes.
Q. You sent your dear customer letter out in mid-October of 2013, right?
A. Yes.
Q. And you sat down with the DEA again couple weeks after your dear customer letter went out, right?
MS. VANNI: Object to form.
THE WITNESS: Yes, I believe so.
BY MR. BUCHANAN:
Q. Okay. "We will not look the other way if someone screws up. Possible actions include suspension or revocation of license, civil and criminal ramifications,"

right?
A. Yes, that's what it says.
Q. That's what you wrote?
A. Yes. It's all things that DEA commented on or suggested during their meeting.
Q. Right. I mean, all things that you thought were important enough to relay to senior management, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. Further, that "You need to visit your customer's customers and document your findings," right?
A. Yes.
Q. That's what it says?
A. That's what it says.
Q. Not just your customers, right?
A. It says "your customer's customers."
Q. Right. So you need to visit not just your customers but your customers' customers, right?
MS. VANNI: Object to form.

THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And document your findings; is that right?
A. Yes, which would not be permitted.
Q. And you -- I'm sorry?
A. Which would not be permitted. You can't visit your customers' customers. They're not your customer.
Q. You can go to any pharmacy you want and walk into, right?
A. Not to do a SOM visit, not to ask questions about their business and their program. That's your customer's job to ask questions about their customer. So you can't skip a line -- a link in the supply chain and go to that next level --
Q. Well, we can agree you didn't tell the DEA that in March 2013, did you, ma'am?
MS. VANNI: Object to form.
THE WITNESS: We didn't get into that level of detail in the conversation.

BY MR. BUCHANAN:
Q. Right, and what the --
A. We were more listening.
Q. What the DEA told you was you need to visit your customers' customers and document your findings, right?
A. That's what the document says, yes.
Q. And "you must provide documented evidence of these assessments," right?
A. Yes, and, again, none of this is in the regulations.
Q. Ma'am, just stay with my questions, okay.
A. Yes.
Q. We could agree this is what you were told to do, correct?
MS. VANNI: Object to the form.
THE WITNESS: This is -- these are the suggestions we received, the feedback we received at that meeting.
BY MR. BUCHANAN:
Q. Well, you're saying suggestions. It says you need to, right?

A. If we needed to, there would have been a violation coming as a result of not having it.
Q. Well, let's not recast. How did you write it?
MS. VANNI: Object to the colloquy.
THE WITNESS: It's written as the feedback that we received from the DEA.
BY MR. BUCHANAN:
Q. Let's stay on this bullet, ma'am. What did you write, "you need to"?
A. "You need to visit your customer's customers and document your findings."
Q. Next sentence.
A. You must.
Q. You must, must, right?
A. Yes.
Q. Okay. Next "you cannot sell the products until you have satisfactorily closed out the investigation," right?
A. Yes.
Q. That was the information you

received, right, "you cannot sell," correct?
MS. VANNI: Object to the form.
THE WITNESS: That was the feedback we received, yes.
BY MR. BUCHANAN:
Q. You must alert us of suspicious orders, right?
A. Yes.
Q. And if you don't adhere to your responsibilities, and, again, everything that we've just identified was information you received from DEA at that meeting, right?
A. Yes.
Q. And here you say, "If you fail to adhere to your responsibilities," you understood these to be your responsibilities, right?
MS. VANNI: Object to the form.
THE WITNESS: It's your responsibility to comply to the regulation.
BY MR. BUCHANAN:
Q. What you wrote here is, "If you fail to adhere to your responsibilities," and we could agree that above that is one, two, three,

four, five, six, seven, eight, nine items, and the jury will have the document, but there's nine items where you identified you need to, we must, you need to, you must know, you need to have the best possible, you need to have a good SOM program, we will visit your site to confirm improvements, we will not look the other way, you need to visit, need, need, need, requirements, right?
MS. VANNI: Object to form.
THE WITNESS: These are all things that DEA suggested during the meeting.
BY MR. BUCHANAN:
Q. "If you fail to adhere to your responsibilities, you present" what, ma'am?
A. "A danger to the public," that was words from DEA.
Q. Okay. Closed system, right?
A. Yes.
Q. Your obligation to maintain a closed system, right?
MS. VANNI: Object to form.
THE WITNESS: To abide by the

Page 330

regulations and maintain.
BY MR. BUCHANAN:
Q. To maintain a closed system?
A. Yes, and we did.
Q. Move to strike, ma'am. Stay with my question.
Your obligation, I'm not asking what happened. Somebody else will decide whether it complied or didn't comply.
A. Yes.
Q. Your obligation is to maintain that closed system, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Your obligation in maintaining that closed system is to sell to people who, based on your due diligence and investigation, will likewise maintain that closed system, right?
A. Yes.
Q. And to conduct due diligence to assure that their customers have processes in place to maintain the closed system, correct?

Page 331

MS. VANNI: Object to form.
THE WITNESS: The suggestion is to know your customer. The suggestion is not to know your customer's customer.
BY MR. BUCHANAN:
Q. It's not a suggestion, ma'am.
What you took away from that meeting is you must know the customers you're selling to first, right?
A. Mm-hmm, yes.
Q. And we looked at your document earlier today where you recounted it as you must also know your customers' customers, correct?
A. Yes, to the best of your ability when you can.
Q. The best of your ability, right?
A. Yes.
Q. What every reasonable manufacturer should do, right?
MS. VANNI: Objection to form.
THE WITNESS: If the information is available to you.
BY MR. BUCHANAN:
Q. Right. And, certainly, if

Page 332

information can't be discerned, if you can't go and visit a facility, if you can't look at chargeback data, I mean, all you can do is your best, right?
A. Correct.
Q. But you've got to try to do your best, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. "People are dying; kids are born addicted."
You see that?
A. Yes.
Q. That was a true statement certainly as of 2013, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. "These people would not have the drugs if it weren't for the manufacturers and distributors."
Do you see that?
A. That's what DEA said.

Page 333

Q. Okay. And something that you thought worthy of --
A. Disagree.
Q. You disagree?
A. I disagree, yes.
Q. Well, I mean, you'd agree that you made 33 billion pills of Vicodin, right?
A. I would --
MS. VANNI: Object to form.
THE WITNESS: -- agree if I knew where those numbers came from.
BY MR. BUCHANAN:
Q. Well, you know, all I can do is work with what your former employer gives me, and that's what they've told us it is.
MS. VANNI: Object to colloquy.
MR. BUCHANAN: Let's move forward to exhibit internal number 588. You can set that one aside, ma'am.
(Document marked for identification as Par-Norton Deposition Exhibit No. 14.)
BY MR. BUCHANAN:
Q. Passing you next in order is

Exhibit Number 14. There you go. Copy for counsel, please.
Next in order, ma'am, is a SOMS update. Do you see you scheduling a conference call to update folks?
A. Yes.
Q. We don't have the --
A. Not sure who, yeah.
Q. I was just going to say, we don't know who the invitees are. This is just the way we get them. They're already printed out and stamped when we get them, for the most part. Some of these come to us natively, but you will see that on the next page.
This is from November of 2013.
MR. BUCHANAN: What did we call this, 14? Exhibit 14. Can we put it up on the screen? Bradley, let's go to the third -- fourth page.
BY MR. BUCHANAN:
Q. "SOMS Program Update, November 7, 2013." This is a presentation you pulled together for a teleconference or a meeting?
A. Yes, looks that way.

Q. Okay. And you broke down what was happening with regard to the SOMS program into multiple phases, right?
A. Yes.
Q. You had steps that you were going to implement as you tried to revamp things, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. Phase I, your first step was to implement a basic SOMS program, right?
A. No. The first step was to implement the basic SOMS program with statistical algorithm, that's the rest of the sentence there.
Q. Well, actually, it's not. If you want to read the full sentence, I'm happy to.
It's "Implementation of a basic SOMS program for all customers," right?
A. All controlled substances and pseudoephedrine products based on statistical algorithm.
Q. Right.

And so we know, ma'am, that you had received a letter by 2007 -- and I guess you weren't at Qualitest then, but you were at Watson or Anda, where manufacturers and distributors received a letter concerning maintenance of effective controls against diversion.
Do you recall that?
A. Yes.
MS. KOSKI: Object to form.
MS. LEIBELL: Object to form.
BY MR. BUCHANAN:
Q. And the obligation -- the obligation that manufacturers and distributors had to maintain effective controls against diversion, right?
A. Yes.
Q. Okay. And what this is saying as of the fall of 2013 is that Phase I of this revamp is to implement a basic SOMS program for all of your customers, right; that's one part, correct?
MS. VANNI: Object to form.
THE WITNESS: That's what it

says.
BY MR. BUCHANAN:
Q. For all controlled substances, correct?
A. That's what it says, yes.
Q. With a statistical algorithm?
A. Yes, that's correct.
Q. Okay. And so one of the things you were doing then to implement this for all classes of trade and all customers and for all controlled substances in the fall of 2013 is you hired this company, Cegedim -- am I pronouncing that right?
A. Yes.
Q. Is it Cegedim?
A. Cegedim.
Q. Cegedim, okay. You hired Cegedim to help you put together an algorithm that would do what's reflected here, right?
A. Yes.
Q. And to implement it not just for some customers, but to implement it for all classes of trade and all customers, right?
MS. VANNI: Object to form.

THE WITNESS: Basically to automate the program, yes.
BY MR. BUCHANAN:
Q. Phase II is to "Hire individuals to support the program," right?
A. Yes.
Q. Okay. Well, let's go back, I'm sorry, to Phase I. You said to automate the program.
We've looked at documents today, you agree we've looked at documents where the company is saying it was only looking at retail pharmacies as a class of trade.
Do you recall looking at those documents, ma'am, yes or no?
A. Yes, we were only looking at retail customers for the SOMS program, not the OMS program.
Q. Thank you.
"Phase II, Hire individuals to support the program," right? 588.6, that's on the screen to your -- we put one to your left too. That may not be the most optimal location.
A. Yes, I see it. This is good.

Q. Okay. So, certainly, if you're going to have an effective program, you've got to have people as part of this process, right?
MS. VANNI: Object to form.
THE WITNESS: We had people as part of the process. They were just in sales and the perception was not good, so we moved them into compliance.
BY MR. BUCHANAN:
Q. Right.
And you're going to have to put boots on the ground too and do due diligence visits and do all kinds of stuff, right?
MS. VANNI: Object to form.
THE WITNESS: So that sales doesn't have to do it, yes.
BY MR. BUCHANAN:
Q. Well, one of things we know you did is you brought in Mr. Brantley, right?
A. Yes, I did.
Q. I mean, you needed -- I mean, what was his title?
A. He was a manager of the SOM program.

Q. Was there a manager of the SOM program in title, prior to that point in time?
A. Not that title, no.
Q. Right.
There was no manager of the SOM program in Qualitest prior to September of 2014 -- 2013, excuse me?
A. Yes, that's correct. Doesn't mean it wasn't being done.
Q. All right. So -- and someone else is going to decide that, ma'am, so let's -- can we agree there was nobody at Qualitest who had that title prior to September of 2013?
A. Not that title, correct.
Q. Okay. And what you noted here is you're going to hire individuals to support the program, right?
A. Yes.
Q. One of the things you did was you hired somebody as director of SOMS, Mr. Brantley?
A. Manager of SOMS, yes.
Q. There you go.
"All individuals on board and

actively working on other aspects of the program," right?
A. Yes.
Q. One of things you needed was personnel training, right?
A. Yes.
Q. You had to implement SOPs, right?
A. Yes.
Q. You had to develop questionnaires, distribute questionnaires, get responses from questionnaires for their customer SOMS data, right?
A. Yes.
Q. Okay. You had to create customer boundaries, that was one of the things you were going to do, right?
MS. VANNI: Object to form.
THE WITNESS: That was using the IMS data.
BY MR. BUCHANAN:
Q. Okay. So to create as part of this individual customer boundary so that you'd have flags as to unusual order sizes when they went beyond boundaries for various classes of

trade, right?
MS. VANNI: Object to form.
THE WITNESS: Yes, for the automated system, yes.
BY MR. BUCHANAN:
Q. And the next thing here that you were going to implement is due diligence visits, right?
A. Yes, by someone with compliance.
Q. And it sounds, ma'am, like what's happening is -- withdrawn.
Phase III, next page. 588.7.
A. Yes.
Q. "Develop capability to easily access, trend and sort chargeback data," correct?
A. Yes.
Q. You worked with the vendor from IQ2020, or you worked with a vendor called IQ2020.
Do you recall that?
A. We gave a demo. I had seen a demo from them previously, and we shared that demo with the finance folks.

Q. Okay. And so a demo was given to the finance folks. You said an agreement was reached with them, right?
A. Yes.
Q. IT resources were implemented to capture the feed, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And then you're going to plan to further develop this with leadership, I guess that's Mike and Trey?
A. That's the sales team.
Q. Got you.
That was Phase III, right, and that's chargeback data?
A. Yes.
Q. That was another new addition to the program, right?
MS. VANNI: Object to form.
THE WITNESS: That was one new addition to the program, one improvement to the existing program, yes.
BY MR. BUCHANAN:

Q. All right. And we've talked about what the old program was, and this talked about what it covered, and now we're talking about your various phases for revamping it, right?
A. Yes, the enhancements to the existing program.
Q. Okay. Next, Phase IV, boots on the ground, right?
A. Yes.
Q. Okay. "Customer Due Diligence Visits," right, know your customer?
A. Yes, correct.
Q. Okay. Because there were some direct customers that were in the DEA binder, you know, some big distributors, right?
A. Yes.
Q. There were six, I think, charts that reflected McKesson. There were five that reflected CVS. There were two that reflected HD Smith, right?
A. Our intent was to target the customers that were identified in there first, yes.

Q. Right. And these have been called out in the DEA binder as, hey, these are people that you're buying they're well above the norms, right?
MS. VANNI: Object to form.
THE WITNESS: They had large quantities that needed to be researched or DEA thought they were large quantities, yes.
BY MR. BUCHANAN:
Q. Right. So you were going to put boots on the ground first to customers that had been flagged, right?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. In that DEA presentation, right?
A. Yes.
Q. But you also sent out a dear valued customer to every customer, correct?
A. Correct.
Q. That was the October 18 letter that we looked at earlier today, correct?
A. The October, yes, 2013.
Q. I meant October 18, 2013 letter,

thank you.
A. Yes.
Q. And you sent a notice to your direct customers that there were customers of their customers -- customers of that customer that had been flagged as part of that DEA presentation, correct?
A. Yes.
Q. Okay.
A. We couldn't contact them directly, so we went through the direct customer.
Q. Okay. "SOMS Brand Business Analysis," is it correct, ma'am, that you did not have responsibility in your DEA compliance role for what was happening on the branded side, and we'll just call that Endo?
A. Yes, that's correct.
Q. Okay. Now, before the DEA told you that your current SOMS system was inadequate, you had been told that by other people, right?
MS. VANNI: Object to form.
THE WITNESS: DEA actually didn't

tell us it was inadequate.
BY MR. BUCHANAN:
Q. Well, we have the -- we have the discussion --
A. We have the discuss --
Q. -- and the jury can characterize those findings, and we have your words on it as well from that time, but let's -- before that meeting in March, you had had interactions with the company -- with consultants concerning your SOMS system, correct?
A. I don't recall who.
Q. Okay. Let's start with --
MR. BUCHANAN: Can I have 1052.
(Document marked for identification as Par-Norton Deposition Exhibit No. 15.)
BY MR. BUCHANAN:
Q. Passing you, ma'am, what we're a marking as Exhibit 15 to your deposition.
You had some of these folks from Cegedim and Buzzeo come in and to look at your system in 2013, right?
MS. VANNI: Object to form.

THE WITNESS: Yes, I believe so.
MR. BUCHANAN: Okay. Could we pull it up on the screen.
BY MR. BUCHANAN:
Q. This is an e-mail from yourself to Ms. Connell. She was -- was she your boss?
A. She was my boss at the time.
Q. Okay. "Subject: DEA Compliance Initiatives Presentation," and there's a PowerPoint that's attached entitled "DEA Compliance Initiative" from February 9, 2013.
Do you see that, ma'am?
A. Yes.
Q. Okay. At 1052.3 there's a summary of this particular meeting with Buzzeo PDMA.
Do you see that at the top?
A. Yes.
Q. "On January 16th and 17th, 2013, a review of our Suspicious Order Monitoring System was conducted by external consultants working for Buzzeo PDMA."
Do you see that?
A. Yes, I do.

Q. Okay. The paragraph in the middle begins, "The consultants concluded."
Do you see that?
A. I do.
Q. Can you read that into the record, ma'am?
A. "The consultants concluded that our current SOM program, systems and procedures do not meet the regulatory requirements."
Q. Let's pause there.
A. Mm-hmm.
Q. This is -- of course, just to orient ourselves in time, this is two months prior to sitting down with the DEA, correct?
A. Correct.
Q. And what your consultants told you as of this point in time and before the time with the DEA is that your current SOM program, systems and procedures do not even meet the regulatory requirements, right?
MS. VANNI: Object to form.
THE WITNESS: Right, because if they met the regulatory requirements, they wouldn't be able to charge us large

sums to implement a new program.
BY MR. BUCHANAN:
Q. Well, certainly, ma'am, before somebody had to sit in this chair and talk about this document --
A. Whether somebody sat in this chair or not.
Q. Well, you certainly didn't write that, right?
MS. VANNI: Object to form.
THE WITNESS: We wrote what this is. It's minutes.
BY MR. BUCHANAN:
Q. I invite you to review this and say -- and see if at any point in time you wrote here, we have to take this all with a grain of salt because they're just trying to make money?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. In words or substance?
A. I actually didn't write this.
Q. Okay. Can we see in there anywhere where the author of this characterized in words or substance they're just trying to

make money off us?
MS. VANNI: Object to the form.
THE WITNESS: They wouldn't put that in here because they're trying -- we're trying to bring this company on to make improvements to the system.
BY MR. BUCHANAN:
Q. Right.
So what they wrote is the consultants concluded that our current -- and they spent two days with you, right?
A. I'm not sure. It says, "Tracey was not able to participate due to an unannounced DEA inspection."
Q. Right.
So we have Aimee Cooper, Bambi McGaha, Ricky Richardson, Larry Shaffer and Jeremy Tatum, correct?
A. Yes.
Q. And we talked about Mr. -- I pronounced it Shaffer again.
A. Shaffer.
Q. Mr. Shaffer was in your organization?

A. Yes.
Q. Okay. And so the consultants concluded that your current systems, procedures and program for SOM did not meet the regulatory requirements, and then they made specific recommendations, correct?
A. Yes, that's what it says.
Q. Okay. And one of the recommendations they made was increase the amount of initial due diligence to include on site meetings with customers to assure they have controls in place to safeguard against diversion.
Do you see that?
A. Yes.
Q. Okay. That's what the DEA talked to you about two months later, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. Let's go to item 2, "Remove the Sales & Marketing and Customer Service functions from the SOM decision-making process as conducting this review is contrary to

their primary mission of helping accounts with their current business and encouraging new business," right?
A. That's what the minutes say, yes.
Q. Right. And, in fact, I mean, you heard the same thing from the DEA in March, right, that you got to take customer service and sales out of the site inspection and out of that process, correct?
A. Yes.
MS. VANNI: Object to form.
THE WITNESS: The perception is there.
BY MR. BUCHANAN:
Q. Well, in fact, these consultants, not just the DEA, these consultants who you called in to do an inspection of your system, told you that you got to get customer service and sales and marketing out of the SOM process, right?
MS. VANNI: Object to form.
THE WITNESS: Yes, they had that perception too.
BY MR. BUCHANAN:

Q. Okay. They raised a concern about your "Retail thresholds appear to be based upon perceived abuse potential and might be characterized as arbitrary."
Do you see that?
A. Yes.
Q. And one of the things you did after the DEA presentation in March of 2013 was develop a different algorithm to develop your thresholds, correct?
MS. VANNI: Object to form.
THE WITNESS: We developed an algorithm to build pattern and frequency into the initial check.
BY MR. BUCHANAN:
Q. Okay. So that your system, the system for suspicious order monitoring, I'm up to 5 on the next page, just trying to move quickly, ma'am, "System should be tested, validated and statistically defensible."
Do you see that?
A. Yes.
Q. Do you agree with that?
A. Yes, that's their standard

wording for that particular vendor, that's their standard wording, yes.
Q. But do you agree, I mean, if you're going to have a system for detecting suspicious orders, that it should be tested, validated and defensible?
A. Any computer system should be validated. It's an FDA requirement, yes.
Q. Well, I'm not talking about FDA requirements, ma'am.
I just want to know do you agree with regard to suspicious order monitoring, the system should be tested, validated and defensible?
A. Yes.
Q. Okay, good. Statistically defensible, you agree?
A. Yes.
Q. Okay. And they advised further that you should not provide customers for the reason their orders are held or pended as this may result in customers working to avoid the one item that caused the order to be declined.
Do you see that?

A. That's correct.
Q. Do you agree that --
A. That's common sense.
Q. Yeah, I mean, because if you share with customers what the thresholds are that you've set, they can structure their orders in a way so that they stay below the thresholds all the time but get to the same place in a different way?
A. Right, which is why we didn't share those.
Q. Right. So sharing thresholds, bad practice, right?
A. Yes.
Q. Okay. Working with orders to -- working with customers to structure their orders so they stay within thresholds is not a good practice?
A. No, it's not.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. I mean, the manufacturer or the distributor should not be working with its primary customer to structure its order in a way

to stay within whatever the red flag thresholds are, right?
MS. VANNI: Object to form.
THE WITNESS: No, that defeats the purpose of the program.
BY MR. BUCHANAN:
Q. Right.
That's a very bad practice, right?
A. Yes.
Q. And if you're doing that kind of practice and you're certainly not maintaining effective controls against diversion, right?
MS. VANNI: Object to form.
THE WITNESS: That's correct. However, customers can, over time, if they're a regular customer, kind of figure out what your threshold is. You don't communicate it to them, but if they're smart and they keep track of it, they can technically figure it out.
BY MR. BUCHANAN:
Q. But as a manufacturer, you need to be vigilant to make sure your customers are

not structuring transactions to evade --
A. Absolutely, yes.
Q. -- these type of limits, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And then you go through to summarize in your PowerPoint, ma'am, and this is a PowerPoint that you obviously endorsed, right?
MS. VANNI: Object to the form.
THE WITNESS: I don't know if I created it.
BY MR. BUCHANAN:
Q. Well, if we go back to 1052.1. This is a PowerPoint you forwarded to your boss, right?
A. Yes.
Q. Okay. Ms. Connell was your boss at that point in time?
A. Correct.
Q. So, obviously, if you forwarded this, you, obviously, endorsed its content, right?
A. Yes.

MS. VANNI: Object to the form.
BY MR. BUCHANAN:
Q. And you forwarded along the Cegedim report and conclusions and recommendations, right?
A. Yes, looks like I did.
Q. And so the PowerPoint begins on -- I'm sorry, 1052.7.
MR. BUCHANAN: If you can go there, please, Bradley, for everyone's benefit.
BY MR. BUCHANAN:
Q. And you've got your agenda on the next page and an overview of the Cegedim report, right?
A. Yes.
Q. And then you've got the first bullet on page 1052.10.
A. Yes.
Q. Called out for your boss, right?
A. Yes.
Q. Okay. No qualifiers, right?
MS. VANNI: Objection.
THE WITNESS: Just repeating what the consultant said.

BY MR. BUCHANAN:
Q. Right. And so you certainly in passing along the information you received from the consultant, forwarded along their top level conclusion, right?
MS. VANNI: Object to form.
THE WITNESS: I was not at the meeting with the consultant, so I was just going by what the individual told me was said at the meeting and just communicating that information.
BY MR. BUCHANAN:
Q. And for the benefit of your boss --
A. It does not --
Q. -- in passing this along, top level conclusion that you passed along, "The consultants concluded that our current SOM program, systems and procedures do not meet the regulatory requirements," correct?
A. That's what it says, yes.
Q. And that was point one substantively that you conveyed to your boss, right?

MS. VANNI: Object to form.
THE WITNESS: That doesn't mean I agreed with it, but yes.
BY MR. BUCHANAN:
Q. Okay. Well, you certainly didn't put any qualifiers in what you sent to her, right?
MS. VANNI: Object to form.
THE WITNESS: I wouldn't have put it in writing if I'm giving her what they said. We would have had a side conversation.
BY MR. BUCHANAN:
Q. Okay. Specifically, they recommended we make the following changes, increase the amount of initial due diligence with customers, right?
A. Yes.
Q. To assure our customers have controls in place to safeguard against diversion, right?
A. Yes, that's what it says.
Q. To ensure or to assure our

Page 362

customers have their own robust SOMS program, right?
A. Yes.
Q. So it's being recommended and what you're communicating to your boss is having due diligence that's going to confirm that your customers have robust SOMS programs, right?
MS. VANNI: Object to form.
THE WITNESS: There's are all the recommendations of the Cegedim report, yes.
BY MR. BUCHANAN:
Q. Right. And this is months before the DEA meeting, right?
A. Yes.
Q. Okay. Review their SOPs and orders themselves, correct?
A. Yes.
Q. I mean, let me restate that.
"Increase the amount of initial due diligence with customers to assure our customers have their own robust SOMS program," correct?
A. Yes, that's what it says.

Page 363

Q. That's what you wrote.
"(Review of their SOPs and orders they themselves have reported to DEA)," correct?
A. Yes.
Q. "Our process should include on-site meetings (audits) for both Corporate Offices and Distribution Centers," right?
A. That's what they said, yes.
Q. And that's what you communicated to your boss, right?
MS. VANNI: Object to form.
THE WITNESS: Word for word what the consultant reported.
BY MR. BUCHANAN:
Q. That's not quite word for word, but you've recast it and put it in this form --
A. Yes.
Q. -- for your boss, right?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. This is how you understood their recommendation, correct?
A. This is what was told to me of their recommendation. Again, I was not at that

Page 364

meeting.
Q. Okay. "Remove the Sales & Marketing and Customer Service functions from the SOM decision-making process," right?
A. Yes.
Q. Okay. And you note, "The DEA Compliance Department is best suited for this purpose as DEA compliance personnel have a singular mission of protecting the firm from regulatory issues and should be assigned the primary role of conducting due diligence, evaluating pended or possibly suspicious orders, and clearing accounts or reporting the records to DEA."
Did I read that correctly?
MS. VANNI: Object to form.
THE WITNESS: Quoted, yep, word for word --
BY MR. BUCHANAN:
Q. Makes perfect sense.
A. -- by the consultant, yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Makes perfect sense?

Page 365

A. These are their opinions, yes.
Q. Okay. Well, I mean, look you pay -- you brought them in, right?
A. Yes, they have --
Q. You brought them in for the experience they could bring to the evaluation to evaluate your system and give you recommendations, right?
A. I brought them in for their electronic monitoring system, which was the best in the industry at the time.
Q. You brought them in to conduct an audit of your suspicious order monitoring system, correct?
MS. VANNI: Object to form.
THE WITNESS: I didn't need them to conduct an audit. I'm capable of conducting an audit myself.
BY MR. BUCHANAN:
Q. Okay. So you're saying this was all known to you then as of this point in time, correct?
MS. VANNI: Object to form.
THE WITNESS: I did not agree --

BY MR. BUCHANAN:
Q. You were aware of all these points?
A. I did not agree with their recommendations. I knew the condition of our current SOM program, and I knew I wanted to make improvements.
Q. The further recommendation is "Discontinue the use of thresholds and forecasts as part of the SOMS model," correct?
A. That's what the recommendation was, yes.
Q. Telling you that "All customers orders must be evaluated in real time against quantity, frequency and pattern and compared to orders of others in the same class of trade," right?
A. Yes.
Q. And then it goes through other details, some of which we've discussed, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And you're saying this is one of

the things you were looking for from them, right? They had a system that would do this and you wanted to implement that system?
A. The electronic system that would tie into our order system, yes.
Q. Okay. They further recommended to evaluate orders based on active ingredient quantity rather than by dose count, right?
A. Yes.
Q. They recommended to you to utilize chargeback data, right?
MS. VANNI: Object to form.
THE WITNESS: Where are you seeing that?
BY MR. BUCHANAN:
Q. I'm on 1052.12. Evaluate orders based on active ingredient quantity rather than by dose count within a specific product family. The second bullet says, "Utilize chargeback data to evaluate downstream distribution of our products."
Do you see that?
A. Yes.
Q. So that wasn't just DEA telling

you that, that was, in fact, the consultants you hired and paid good money to come in and assess your system?
MS. VANNI: Object to form.
THE WITNESS: The consultants that got it from DEA, yes.
BY MR. BUCHANAN:
Q. Okay. The "System should be tested validated and statistically defensible," right?
A. Yes.
Q. And, again, you echoed upstream that should not be telling your customers the reason their orders are pended, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And so you then come forward with a phased implementation process around these very recommendations, right?
A. Similar, yes.
Q. Well, DCT is you, right?
A. Yes.
Q. That's your group?

A. Drug compliance group, yes.
Q. And this is your PowerPoint, right?
A. It is, mm-hmm.
Q. Sent upstream to your boss, right?
A. Yes.
Q. Okay. First, let's talk about Phase I. Obviously, you're going to bring in somebody that's going to help strengthen your system of evaluating orders, right?
MS. VANNI: Object to form.
THE WITNESS: To implement the electronic system, yes.
BY MR. BUCHANAN:
Q. Cegedim, right?
A. Yes.
Q. You're going to bring them in, right?
A. Correct.
Q. Okay. Two, you're going to update the SOMS SOP to reflect the new process?
A. Right.
Q. You're going to review and lay

out plans to integrate system requirements between the order system and the Cegedim system for order monitoring, right?
A. Yes.
Q. Okay. Further, in this phased approach, Phase II, you're going to look at all products, not just some products, right?
A. We were adding the chemicals which are not required to be regulated to be handled in that way by DEA, but we were adding them.
Q. You're going to start doing search trending, right?
A. Search --
Q. Sales trending?
A. Sales trending.
Q. Yes.
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. You're going to start doing sales trending to assist with discovery of customer ordering patterns, frequencies and sizes, right?
A. Yes.

Q. Including geographical distributions. These are your recommendations before the DEA ever sat down with you, right?
A. Right, the geographical, mm-hmm, yes.
Q. As somebody in the industry with experience in SOMS and also anti-diversion efforts, right?
A. And sitting at DEA conferences, yes.
Q. Okay. And Phase III, you're going to start doing on-site customer evaluations, right?
A. Yes.
Q. That was before you met with the DEA, right?
A. Those were things we were --
Q. On-site customer evaluations?
A. Things we were moving towards, yes.
Q. 1052.15, right?
A. Yes.
Q. And things that were not happening before?

A. Right.
MS. VANNI: Form.
THE WITNESS: Things that were not happening by the compliance team or things that I wanted to improve.
BY MR. BUCHANAN:
Q. Right.
Well, certainly, here it doesn't note that our sales force is doing on-site customer evaluations for compliance, right?
A. Didn't need to be. It was an internal document, and that was well known.
Q. And next you proposed as Phase III accessing chargeback data, correct, ma'am?
A. Yes.
Q. Before the DEA ever even told you, right?
A. Correct. It was brought up at other conferences.
Q. Right. So you didn't need this meeting with the DEA in March to know that, right?
A. Well, I know that other manufacturers --

MS. VANNI: Object to form.
THE WITNESS: -- were using chargeback data, and it was something that I was looking into.
BY MR. BUCHANAN:
Q. Right. So one of the things you were going to do is you're going to start accessing chargeback data and also third party data sources, right?
A. IMS, yes.
Q. IMS, right.
This provides visibility of product flow down the customer stream and allows for enhanced compliance for the "Know Your Customer" requirement of the DEA, correct?
A. I thought it would, yes.
Q. Right.
And so as of 2013, before you ever met with the DEA, you were aware of the know your customer obligation, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. You were aware of the

availability of chargeback data because you were going to start to access it, right?

MS. VANNI: Object to form.

THE WITNESS: We were looking into it to see if it really provided what DEA thought it did.

BY MR. BUCHANAN:

Q. And what you wrote here was Phase III was to access chargeback data and third party data, right?

A. Yes.

Q. And we can agree this is two months before you melt with the FDA -- excuse me -- DEA?

A. Yes.

Q. Thank you. You can set that aside.

(Document marked for identification as Par-Norton Deposition Exhibit No. 16.)

BY MR. BUCHANAN:

Q. Passing you, ma'am, what we're marking as 1071 to your deposition -- I'm sorry. That's false. I'm passing you what we're

marking as Exhibit 16. I've got a separate number on mine.

MR. BUCHANAN: Could we pull up 1071 on the screen.

This is an e-mail exchange -- excuse me. What exhibit did I pass you, on the top right corner, is it 1052?

MS. VANNI: No, 1071.1.

MR. BUCHANAN: Okay. It should be 1071. Are we on the same page? We are, good.

THE WITNESS: 1071.

BY MR. BUCHANAN:

Q. Okay. This is Exhibit 16 to your deposition. It's an e-mail exchange between yourself and Ms. Connell again, DEA Compliance Initiative Presentation. This is from 2/9, and the attachment is "DEA Compliance Improvement Initiative."

Do you see that?

A. Yes.

Q. Contents are on page 1071.3. Executive summary, SWOT analysis, DEA compliance team and then action summaries and other things.

If we can go to 1071.5. We have the same graphic off to the right.

Do you see that?

A. I do.

Q. Where you've got the Quota Grant Process, the Manufacturing Site Compliance, Data Integrity and Suspicious Order Monitoring as critical elements of DEA compliance?

A. Correct.

Q. Correct? Suspicious order monitoring we talked about that and your phrase here mirrors the one in the other document, correct?

A. Yes.

Q. Implement a solution and implement a solution, correct?

A. Implement a solution is what it says, you must implement one.

Q. "Implement a solution that proactively discloses suspicious orders based on unusual size, order pattern, deviation and unusual frequency," correct?

A. Yes.

Q. Okay.

A. This is not talking about the current state of the business. It's talking about the requirements for DEA.

Q. Let's go to 1071.8.

There's an analysis of current weaknesses, right?

A. Yes.

Q. Okay. Weaknesses and there's strengths and opportunities and threats and all kinds of things. I'm not going to have time to go through all of this with you.

One of the weaknesses at this point in time was you had a lack of resources, right?

A. Yes.

Q. Limited talent pool and limited investments in the group, right?

MS. VANNI: Object to form.

THE WITNESS: I'm not sure what the investments means, to be honest, but the talent pool, yes.

BY MR. BUCHANAN:

Q. Another weakness you had was a "lack of training & compliance first culture,"

right?
A. Yes.
Q. Compliance first culture meaning we got to do this, it's really important that we do it, right?
MS. VANNI: Object to form.
THE WITNESS: I'm again not sure what first culture means. Some of those words, I have a feeling Sanjay participated in this.
BY MR. BUCHANAN:
Q. Okay. And what's the next weakness?
A. "Inadequate SOMS."
We wanted it to be stronger.
Q. Let's be clear, the words you wrote were "inadequate SOMS," correct, ma'am?
A. Correct. Current program is not adequate for my standards.
Q. Okay. And what we're looking at here is could you remind us, ma'am, is this before or after you sat down with the DEA?
A. This is before.
Q. Okay. So even before you sat

down with the DEA and spent the three hours in DC with them, I mean, you knew you had inadequate SOMS, right?
MS. VANNI: Object to form.
THE WITNESS: I knew I had improvements that I wanted to make.
BY MR. BUCHANAN:
Q. I understand that's how it's characterized here in the record, ma'am, but what you wrote to your boss is we have inadequate SOMS correct?
MS. VANNI: Objection.
THE WITNESS: That's what the document says versus what is --
BY MR. BUCHANAN:
Q. And that's what you put into it?
A. Yeah.
Q. Okay. And what you forwarded up the food chain in Qualitest at that point in time, correct?
MS. VANNI: Objection.
THE WITNESS: Correct, because improvements we wanted to make.
BY MR. BUCHANAN:

Q. Well, we can agree it doesn't say that?
A. We can agree you can interpret it however you would like, but that's not what it meant.
Q. What you wrote was "inadequate SOMS," correct?
A. That's what's stated there, correct.
Q. Okay. And SOMS are suspicious order monitoring systems?
A. Yes. Inadequate means you have one, you just want to improve it.
Q. Okay. So --
A. It doesn't say nonexisting.
Q. Inadequate means not adequate, right?
A. Not adequate by whose standards? By mine in this case.
Q. Not adequate, correct?
A. By my standards, yes.
Q. That's what -- you were the head of DEA compliance as of this point in time, correct?

MS. VANNI: Object to form.
THE WITNESS: And I had very high goals and standards.
BY MR. BUCHANAN:
Q. And we can agree not only your standards that was inadequate by but inadequate by the consultants who you met with, correct?
MS. VANNI: Object to form.
THE WITNESS: Because they wanted the business, yes.
BY MR. BUCHANAN:
Q. Okay. We can agree before the DEA told you that your SOMS system was inadequate, you had concluded it was inadequate, correct?
MS. VANNI: Object to form.
THE WITNESS: DEA did not say the SOMS system was inadequate. If they found it to be inadequate, we would have gotten violations. We did not get violations for our SOM system.
MR. BUCHANAN: Move to strike.
BY MR. BUCHANAN:
Q. Okay. We have the DEA statements

with regard to your system.
A. You have them.
Q. And we have your statements with regard to the SOM system before you sat with the DEA, correct?
A. Yes.
Q. And you noted you had an inadequate SOM system, correct?
THE WITNESS: That's what's written.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. We know that you met with -- you had consultants that came and then looked at your system in 2013, right?
A. Yes.
Q. Before you met with the DEA right?
A. Yes.
Q. And they said it was inadequate, correct?
A. Inadequate by -- yes.
Q. Okay. Let's go forward to 1071.20. And, regrettably, I'm not going to

have time to go through all of this with you, but I'd like to focus on action area suspicious order monitoring system.
Again, we see phases of the "Proposed Next Steps," correct?
A. Correct.
Q. The purpose to implement a robust system to guarantee reliability and legit -- in the legitimacy of our customer base, right?
A. Yes.
Q. And I'm just going to call to your attention "Phase III: Utilize chargeback and IMS data to 'know your customer's customer'," correct?
A. That's what it says, yes.
Q. Before you sat with the DEA?
A. Yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. One of the things in your phase planned approach here was to utilize chargeback and IMS data so that you could know your customer's customer, correct?
MS. VANNI: Object to form.

THE WITNESS: That was the goal, yes.
BY MR. BUCHANAN:
Q. Okay. One of your other Phase III items was to implement, those were the words you used, right, implement?
You see that?
A. Yes.
Q. On-site customer audits, correct?
A. Correct.
Q. Utilizing an external audit team, correct?
A. That's what it says, yes, by compliance.
Q. You can set that aside.
MR. BUCHANAN: Do you mind if we take an earlier break? How many minutes are we? Can we just take a break. I just need to shuffle some papers so I provide appropriate time for my co-counsel.
MS. VANNI: That's fine.
THE VIDEOGRAPHER: Off the record now, it's 3:15 p m. Off the record.

(Brief recess.)
THE VIDEOGRAPHER: We're now back on the record. The time is 3:39 p m.
(Document marked for identification as Par-Norton Deposition Exhibit No. 17.)
BY MR. BUCHANAN:
Q. Ma'am, I'm passing you over what we're marking as Exhibit 17 to your deposition.
Are you miked up, ma'am?
A. Yes.
Q. You are. Okay. Better than I.
It's a document from early 2013, right?
A. Yes.
Q. An e-mail from yourself to Sanjay Patel?
A. Yes, correct.
Q. Copied to your boss, Jill Connell?
A. Yes.
Q. Was Sanjay also your boss?
A. He was when Jill left the company, Sanjay was my boss.

Q. Okay. This is today's meeting, and then it's got a list of action items.
Do you see that?
A. Yes, I do.
Q. Okay. Let's roll forward to the body of this, and it's January 4, 2013, just to orient ourselves in time. This would have been prior to the meeting with DEA when you got that thick binder that we spoke about, right?
A. Yes.
Q. This would have been prior to the interactions you had with the Buzzeo group in mid-January 2013, right?
A. Yes.
Q. Okay. Let's go forward to -- if we could, page 574.24, right.
So prior to this meeting and this audit you had with Buzzeo, you were categorizing potential failure modes and effects, visibility rating, severity rating, et cetera, right?
A. Yes.
Q. Okay. And so with regard to your suspicious order monitoring system, you note that it was built in pieces and only applies to

the retail side of the business, correct, ma'am?
A. SOMS does, yes.
Q. Okay. The "suspicious order monitoring program was built in pieces and only applies to the retail side of the business."
Did I read that correctly?
A. You did.
Q. DEA requires it to apply to all customers.
Do you see that?
A. Correct, which is what we had --
Q. Your words, right?
A. Yes.
Q. Okay. "In addition, the current system has had two issues in the past year that resulted in controlled product being released that should not have been."
Do you see that?
A. Yes, I do.
Q. That's not good, right?
MS. VANNI: Object to form.
THE WITNESS: That's what it says, yes.
BY MR. BUCHANAN:

Q. Not good, right?
MS. VANNI: Objection.
THE WITNESS: Not good.
BY MR. BUCHANAN:
Q. Okay. "The system needs to be revamped," right?
A. Yes.
Q. Remember we talked earlier about the system needing to be revamped?
A. Yes, improvements needed to be made.
Q. And what you wrote was revamped, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. First, all customers have to be added, right?
A. Yes.
Q. "IMS data and chargeback data incorporated," correct?
A. That's what it says, yes.
Q. "And eventually a contracted customer assessment firm hired or an on-site

SOMS specific individual to perform these assessments."
Did I read that correctly?
A. Yes, you did.
Q. You knew all of that on your own without having to go up to DC and meet with the DEA, right?
MS. VANNI: Object to form.
THE WITNESS: Yes, we were trying to make a lot of improvements before DEA even got involved.
BY MR. BUCHANAN:
Q. Okay. How to revamp it, right?
A. How to make improvements.
Q. Okay. And previously you characterized the old system as inadequate, correct?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. Then we look at visibility rating and severity rating, right?
A. Yes.
Q. You've been in corporate land for

a while, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. This is one way you do a risk assessment, right?
A. Yes.
Q. Look at the visibility of the problem, look at the severity of the problem and then give it a risk score, right?
A. Correct.
Q. And the risk score you gave this for visibility was a 5, right?
A. Yes.
Q. And severity was a 5, right?
A. Yes.
Q. And the total risk rating was 25, right?
A. Yes.
Q. Highest of anything -- highest of any risk, right?
MS. VANNI: Objection.
THE WITNESS: Twenty-five was the highest in the document, mm-hmm.

BY MR. BUCHANAN:
Q. Thank you.
Let's go to 574.28. Potential failure mode and effect, "No mandatory, routine DEA training exists for employees handling controlled substances."
Did I read that correctly?
A. Yes.
Q. And, again, 70% of the business of Qualitest was controlled substances, right?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. "Knowledge of DEA regulations is not incorporated into employee's job descriptions or performance reviews," correct?
A. Correct.
Q. At this point in time, resources were prohibitive to train all employees, right?
A. Yes.
Q. Okay. And one of the things you were doing was to look for some funding so you could train your people, right?
A. Yes.

Q. And not just your people, I mean all Qualitest employees?
A. To train the company.
Q. Right.
A. It wasn't that they hadn't received any training, there just wasn't any training that was mandated by the company for employees and nothing on a routine basis.
Q. 574.29, additional failure modes and effects, again, with regard to controlled substances, this relates to checking registrations on orders.
Do you see that?
A. Yes.
Q. Okay. Currently, the registrations are checked when somebody becomes a new customer, right?
A. Yes.
Q. And when I say "currently," I mean when you were writing this in early 2013?
A. Yes, that's correct.
Q. Okay. And then they were only done every year after that, correct?
A. Correct.

Q. And what was the industry standard at that point in time, ma'am?
A. I don't know. I don't think everybody was using NTIS, but I don't know for sure.
Q. Well, let's see what you wrote.
What did you write the industry standard was at that point in time?
A. "Industry standard is now to check the DEA license at each purchase since shipping to an entity that has an expired or invalid license is a $10,000 fine."
Q. Okay. And then you note, "The capability exists to automate this check at the weekly level (NTIS Tape or Database)" and "We need to check registrations more frequently," right?
A. Yes, that's what I wanted.
Q. Does this refresh your memory as to what you characterized the industry standard to be?
A. It does, yes.
Q. Okay. And, in fact, when you were back at Ciba-Geigy and Novartis and they

were already using the NTIS data, right --
A. They did.
Q. -- back in the '80s and '90s?
A. They did.
Q. And when you were at Watson, they were using, it right?
A. Yes.
Q. And in this 2012, 2013 period you had the situation where controlled substances were released to customers who should not -- who they should not have been released to, correct?
MS. VANNI: Object to form.
THE WITNESS: That was not -- I don't believe that was in relation to their license.
BY MR. BUCHANAN:
Q. Oh, okay. What was it in relation to?
A. I don't know if it was -- I don't know why. I need to go back to see it.
Q. Sitting here, do you have a recollection?
A. I do not.
Q. If you don't, I'm sorry, I'm just

going to do my best to move along.
A. Okay.
Q. Because I try not to go down too many forks in the road, if you don't mind.
A. Got it.
Q. All right. So let's dial back the clock, if we could.
MR. BUCHANAN: Could I have 567.
(Document marked for identification as Par-Norton Deposition Exhibit No. 18.)
BY MR. BUCHANAN:
Q. Passing you what we're marking as Exhibit 18 to your deposition, ma'am. It's an exchange, it looks like right after you get to the company in 2011. It's 567. It should be on the screen, hopefully.
You see this e-mail exchange between yourself and others relating to a DEA inspection at one of your facilities?
A. Yes, I do.
Q. Okay. Let's -- I'd like to direct your attention -- this is one of the things you would do with DEA compliance. You

might be there when there's a DEA inspection of a manufacturing facility, for example, right?
A. Correct, and I would summarize each day.
Q. Right. And so you'd send around a report to the team or management about the results of the inspection, right?
A. Yes.
Q. Okay. And so this was an inspection of a manufacturing facility as the primary purpose, correct?
A. In Charlotte, yes.
Q. And you'd had an issue with Charlotte previously, right?
MS. VANNI: Object to form.
THE WITNESS: Yes, it was manufacturing.
BY MR. BUCHANAN:
Q. And, basically, you had raw material that was unaccounted for.
Do you remember that?
MS. VANNI: Object to form.
THE WITNESS: I do not, but if you give me a minute, I'll look at this.

BY MR. BUCHANAN:
Q. Okay. Let me just try to keep us focused, I'm sorry, if that's going to require you to go elsewhere.
A. Okay.
Q. 567.2, middle of the second page, and there's this discussion here with the paragraph beginning he noted about, you know, material not being accounted for, you know, if you have .15% that's not accounted for, given the volume of controlled substances y'all were making and that turns into 130 pounds worth of raw material, controlled substances, right?
MS. VANNI: Object to form.
THE WITNESS: Mm-hmm.
BY MR. BUCHANAN:
Q. So you've got 130 pounds of raw materials that aren't accounted for, and you guys need to tighten up your process to make sure 130 pounds of -- this says 64 kilograms, that's, you know -- that's about 130 pounds, right?
A. Calculation.
Q. Okay. 135, something like that?

A. Mm-hmm.
Q. Okay. He went on to say that "manufacturers are making larger batch sizes and greater quantities of controlled product than in years past," right?
A. Yes.
Q. I mean, you guys were making a lot of pills, no debate about that, right?
MS. VANNI: Object to form.
THE WITNESS: That is what it says.
BY MR. BUCHANAN:
Q. It says, "DEA is seeing a much higher rate of prescription drug abuse and diversion as compared to illicit drugs now."
Do you see that?
A. Yes.
Q. Higher rate of prescription drug abuse and diversion as compared to illicit drugs now, and now being 2011, right?
A. Yes.
Q. And this is a couple years before --
A. Yes.

Q. Thank you.
It's a couple years before you had that sit down with the DEA where you got called into DC, right?
A. Yes.
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Okay. So you had that knowledge certainly in 2011, right, ma'am?
MS. VANNI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay. He stated -- he states, "Yet, in his opinion, nothing has changed on the manufacturer's side in regards to the way we do reconciliations."
Do you see that?
A. Yes, I do.
Q. "He stated that we have the public's trust in our hands and we need to be sure we are staying ahead of the curve by monitoring current diversion trends and tightening our processes."
Do you see that?

A. I do.
Q. And do you agree, ma'am, that as a registrant manufacturer and a registrant distributor that you have the public's trust in your hands?
MS. VANNI: Object to form.
THE WITNESS: We have a responsibility to abide by the regulations, the DEA regulations.
BY MR. BUCHANAN:
Q. Right. You have a responsibility under the statute to maintain effective controls against diversion?
A. Right.
Q. And would you fault people of the public, knowing that you have that obligation, for assuming that you were going to do everything in your power to maintain effective controls against diversion?
MS. VANNI: Objection.
THE WITNESS: That is what we did.
BY MR. BUCHANAN:
Q. Would you fault people for

expecting that of you?
MS. VANNI: Objection.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. That's what you should do, right?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. And let's turn now to the next page, point three, it says, "DEA then spoke about SOMS at length and also discussed the need to monitor customers (wholesalers in particular), including our wholesaler's customers, through periodic audits or on-site visits," correct?
A. Yes.
Q. "This is not something we are currently doing and another item we will need to work on improving."
Did I read that correctly?
A. You did.
Q. And so two years or so before back in 2011, before -- long before you sat down with the DEA in DC, you were told you got to

monitor your customers, wholesalers in particular, but including your wholesaler's customers, right?
MS. VANNI: Object to form.
THE WITNESS: Yes, and we were not as part of SOMS, we were as part of OMS, at least the wholesalers.
BY MR. BUCHANAN:
Q. Okay. And it would be fair to say, ma'am, sitting here today, you're not aware of a single site visit report of wholesaler that was done through OMS, right?
MS. VANNI: Objection.
THE WITNESS: I am not, but that doesn't mean they didn't occur.
BY MR. BUCHANAN:
Q. Okay. And we looked at the inadequate -- the inadequacies of the system --
A. We looked at --
Q. -- in your earlier documents. Do you recall looking at that?
MS. VANNI: Object to form.
THE WITNESS: The improvements we'd like to make, yes.



BY MR. BUCHANAN:
Q. I think you called them inadequacies, right?
A. In the document.
Q. Yes.
A. But it means improvements.
Q. Well, let's not talk about what you say it means today. Let's talk about what you wrote.
You wrote inadequate, correct?
MS. VANNI: Objection.
THE WITNESS: I did.
BY MR. BUCHANAN:
Q. Thank you.
And you said this is not something we are currently doing, right?
A. Not in SOMS.
Q. What you wrote here, ma'am, after the DEA spoke about SOMS at length and also discussed the need to monitor customers, wholesalers in particular, including our wholesaler's customers --
A. Yes.
Q. -- through periodic audits and



on-site visits that this is not something you were currently doing, right?
A. Not something we were currently doing under SOMS.
Q. That's not what you wrote. We can agree on that, right?
MS. VANNI: Objection.
THE WITNESS: That's not what's written.
BY MR. BUCHANAN:
Q. And what you follow with that is "another item we will need to work on improving."
Did I read that correctly?
A. You did.
Q. An item you will need to work on improving. Not that we're doing it through customer service, right?
MS. VANNI: Objection.
THE WITNESS: No, that's not what it says. I didn't elaborate.
BY MR. BUCHANAN:
Q. Not that you were doing it through sales?



MS. VANNI: Objection.
THE WITNESS: This group is the manufacturing group. I would not have gone into detail about our SOM program with that group.
BY MR. BUCHANAN:
Q. Right, and, certainly, what you said was it's not something you're currently doing? We could agree that's what you wrote, correct?
A. That is what it says.
MS. VANNI: Objection, asked and answered now about ten times.
MR. BUCHANAN: Okay. Let's go to -- I don't think it was ten, but it may have been more than one.
THE WITNESS: Nine and a half.
MR. BUCHANAN: Let's go to 1046.
(Document marked for identification as Par-Norton Deposition Exhibit No. 19.)
BY MR. BUCHANAN:
Q. Passing you Exhibit 19. I probably should have done this -- kind of I'm

working back in time, if you can follow where we're going, ma'am. We first -- we just looked at an early 2013 exchange where you had a 25 risk assessment for your SOMS program.
Do you recall that?
A. Yes.
Q. Twenty-five being the worst, right?
A. Being -- yes, the highest priority --
MS. VANNI: Object to form.
THE WITNESS: -- that I want to work on.
BY MR. BUCHANAN:
Q. Yeah, and then we also looked at kind of that -- your closeout memo from that DEA inspection in Charlotte. That was 2011, right?
A. Mm-hmm, yes.
Q. Yes?
A. Yes.
Q. I'm a little out of sequence here. This one is September 2012. For the record, I think we're on Exhibit 19.
And this is an e-mail from

yourself to Eric Bonner. Who is Eric Bonner?
A. That's our -- was the plant manager.
Q. Okay. And there's a press release that's out there about CVS retailers and their ability to sell controlled substances, right?
A. Yes.
Q. Okay. And you're directing them to take -- make sure that they get taken out of the order system, okay?
A. Right.
Q. Because they don't have licenses anymore, right?
A. That's what we would do if DEA had an issue with a customer, yes.
Q. Right. So now you couldn't legally sell to somebody who doesn't have a registration, right?
A. That's true.
Q. Okay. And then up top you say, we need our due diligence to find out what happens to our product beyond the first level of the supply chain.

Did I read that correctly?
A. "We just need to do our due diligence to find out what happens," yes.
Q. Right. "We just need to do our due diligence to find out what happens to our product beyond the first level of the supply chain," right?
A. For this particular customer, yes, that's what I'm referring to.
Q. So your supply chain, your supply chain first level would be wholesalers distributors, right?
A. Yes.
Q. Supply chain beyond the first level would be the people they sell to, right?
A. Correct.
Q. People they sell to might be pharmacies, might be hospitals, any number of places, right?
A. Yes.
Q. And so with this saying you got to do your due diligence to find out what happens to your product beyond the first level of the supply chain, right?

A. Yes.
Q. Because the DEA is no longer buying that it's not you?
MS. VANNI: Object to form.
BY MR. BUCHANAN:
Q. Right?
A. I'm not getting what you're referring to.
Q. Withdrawn, okay.
The DEA is no longer buying what you all have been selling for years, right?
MS. VANNI: Objection.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. What you all have been selling for years was it wasn't us, it was our customer?
A. We don't sell --
MS. VANNI: Objection.
THE WITNESS: -- anything to DEA.
BY MR. BUCHANAN:
Q. Well, I'm saying -- okay. Let's look at what you wrote, ma'am.
A. Are you referring to manufacturers in general? I mean, that's an odd

statement.
Q. I'm referring to what you wrote in the middle, September 12, 2012, if we ship to a distribution center -- that's what DC means, right?
A. Yes.
Q. Okay. "That then further distributes to these registrants, we are still shipping to an entity that is contributing to diversion and abuse as evidenced by DEA pulling their license."
Did I read that correctly?
A. Yes.
Q. "DEA is no longer buying the" -- and then you put in quotes -- "it wasn't us, it was our customer philosophy," right?
A. Yes, and that's --
Q. I'm sorry. That's what you wrote, correct?
A. Yes, that's what I wrote.
MR. BUCHANAN: Can I have 1051, please.
(Document marked for identification as Par-Norton Deposition

Exhibit No. 20.)
BY MR. BUCHANAN:
Q. And that was 2011 -- 2012, excuse me?
A. 2012.
Q. So, again, once again, before you met with the DEA and had that sit down, right?
A. Yes, to individuals that wouldn't understand the SOM program. These are basically operations people, so that's why it was worded that way.
Q. Passing you, ma'am, what we've marked as Exhibit 20 to your -- I'm sorry, is this 20? Twenty. Let me read your sticker on the bottom right, ma'am.
A. Exhibit 20.
Q. I did do that right. Exhibit 20.
MS. VANNI: I just want to lodge an objection to the use of this exhibit as it's before Endo's acquisition of Qualitest.
MR. BUCHANAN: Okay.
THE WITNESS: Yeah, and before my time at Qualitest as well.

BY MR. BUCHANAN:
Q. Okay. So, as I understand it, Qualitest was acquired by Endo, correct?
A. Correct.
Q. You joined Qualitest in 2011?
A. Yes.
Q. As part of your evaluation and role -- I'm sorry -- as part of your role in DEA compliance, did you look to see -- did you evaluate the department?
A. Yes.
MS. KOSKI: Object to form.
THE WITNESS: To what extent? What are you referring to specifically did I evaluate?
BY MR. BUCHANAN:
Q. Well, would it surprise you that, in fact, Qualitest had other consultants come in years before you arrived and look at their suspicious order monitoring system?
MS. VANNI: Objection.
THE WITNESS: I don't know.
BY MR. BUCHANAN:
Q. Okay. Here's a -- here is one

such evaluation from 2008. Do you know John Schultz?
A. Yes.
Q. Who is John?
A. He had the position before me.
Q. Okay. So he was predecessor. He didn't have the name of head of DEA compliance, but he had a similar function?
MS. VANNI: Object to form.
THE WITNESS: I'm not sure his title.
BY MR. BUCHANAN:
Q. Okay. "All, attached is Mike's audit report from his visit. We will need to formulate a response and implement the corrective actions. Please provide comment on the observations with suggested corrective actions."
Did I read that correctly?
A. Yes.
Q. Okay. And, time permitting, we would get more deeply into this, but let's focus on the thread we're now talking about, 1051.2.
Under the "Details" at the

Page 414

bottom, the issues that were noted during the review were, and then it's got paragraphs similar to what you've seen in the Buzzeo one from during your time, right?

MS. VANNI: Objection.

THE WITNESS: Okay.

BY MR. BUCHANAN:

Page 415

Page 416

Q. Okay. During this period of time, you were told the Qualitest system for reporting suspicious orders to DEA needs to be improved, right?

MS. LEIBELL: Object to form.

THE WITNESS: This is before I got there. I was not told anything about this.

MS. VANNI: Are you referring to the 2008 period?

Page 417

MR. BUCHANAN: I am. So I'm referring to the 2008, the inspection and report, okay.

MS. VANNI: So it was prior to Endo's acquisition and prior to the witness' employment with Qualitest.

THE WITNESS: Right.

MS. VANNI: Just note my objection.

MR. BUCHANAN: Those are points that you can note, certainly. I don't think they impede or otherwise undermine the relevancy.

BY MR. BUCHANAN:

Q. On the bottom of 1051.3 it says, "It is important to Qualitest to work with all controlled substance customers, including those who will further distribute Qualitest products to other DEA registrants, to assure that the controlled substances are distributed only to customers who have systems in place to assure that the controlled substances will be used for legitimate medical purposes."

Do you see that, ma'am?

A. I see it.
Q. And this is 2008, correct?
A. That's the date on it.
Q. You can set that aside.
A. Again, I had no knowledge of it and wasn't involved.
Q. Okay. And, again, we looked at a letter from Mr. Rannazzisi in a PowerPoint.
Do you recall that?
A. Yes.
Q. That was from 2007?
A. Correct.
Q. Okay. Let's try and move forward.
In late 2013 the company revamped its SOMS process and implemented new SOPs, fair?
MS. VANNI: Object to form.
THE WITNESS: Upgraded the program, yes.
BY MR. BUCHANAN:
Q. And I don't think we'll have time to go through those SOPs with you, but I would like to talk to you about some of the responses you received to the dear customer letter, the

responses you didn't receive, okay?
A. Okay.
MR. BUCHANAN: Can I have 1075, please.
BY MR. BUCHANAN:
Q. Who is Preferred Pharmaceuticals?
A. I don't recall.
Q. Does the name ring a bell to you?
A. No, it does not.
Q. Okay. Let's kind of reorient ourselves.
In 2013 after everything we've discussed, after the risk assessment you set forward, after some meetings with management, after procuring some resources and getting consent from others, you sent a letter out to customers, right?
A. Yes.
Q. Those customers included distributors, those customers included some end user pharmacies that were dealing direct with the company, and you got responses from many of those customers, right?
A. Yes.

(Document marked for identification as Par-Norton Deposition Exhibit No. 21.)
BY MR. BUCHANAN:
Q. Passing you what we're marking as Exhibit 21 to your deposition, ma'am, it's an exchange with you and your SOMS coordinator, Mr. Brantley.
A. Okay.
Q. This is from late 2014 or October of 2014, and I guess if you start back forward, you'll see an exchange between Mr. Brantley and Mr. Kent with his att net e-mail address for Preferred Pharmaceuticals in response to Mr. Brantley's inquiries.
Do you see that?
A. I do.
Q. Okay.
MR. BUCHANAN: Please, Bradley, go to 1075.4, just so we're following each other on the screen.
BY MR. BUCHANAN:
Q. All right. There we go, we see the e-mail from Mr. Kent for Preferred

Pharmaceuticals, and Mr. Brantley is having a back-and-forth with them concerning his -- part of the due diligence process that's described in your revamped SOPs, correct?
A. Yes.
Q. Part of what you implemented in late 2013, correct?
MS. VANNI: Object to form.
THE WITNESS: I'm sorry? I'm sorry, I was reading.
BY MR. BUCHANAN:
Q. You know what, fair.
So in late 2013 you revamped your SOMS process, correct?
MS. VANNI: Form.
THE WITNESS: We made upgrades to it starting --
BY MR. BUCHANAN:
Q. Letters went out, correct?
A. Letters went out then, yes.
Q. Mr. Brantley conducted some due diligence visits, correct?
A. Yes.
Q. Mr. Brantley also engaged with

Page 422

customers to get verification that they actually had a SOM program, right?

A. Yes.

Q. Because this was close --

A. All ongoing.

Q. This closed system doesn't work if the people you're selling to really aren't watching their customers, right?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. Okay. So Mr. Brantley sent some follow-up questions to Mr. Kent, and he sends to you 1075.2. "Tracey, please see the response below from Preferred Pharmaceuticals."

Do you see that, 1075.2? That's also on the screen, if that's easier for you.

A. No, it's okay.

Yes.

Q. Okay. And then you send a response back to Mr. Brantley, and that's at the bottom of 1075.1.

A. Okay.

Page 424

Page 423

Page 425

Page 426

Page 427

Page 428

Q. Okay. And so this is the process the company was undergoing, and you brought in Mr. Brantley in September of 2013, correct?
A. Yes.
Q. Going out to its customers and saying what are the processes you have in place, customer, correct?
A. Correct.
Q. We're going to make sure, as best we're able at this point in time --
A. Yes.
Q. -- to figure out whether you've got your head in the sand or whether you actually have a suspicious order monitoring program, right?
MS. VANNI: Objection.

Page 429

THE WITNESS: Right.
BY MR. BUCHANAN:
Q. Okay. And that's necessary if we're going to maintain this closed system, right?
MS. VANNI: Objection.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Okay.
A. The level that we were asking for was not necessarily necessary, but to have a SOMS system was necessary.
Q. Well, what you said was you wanted proof, right? After that DEA meeting --
A. There's several things.
Q. -- in March of 2013, you wanted proof that he'd had it, right?
MS. VANNI: Object to form.
THE WITNESS: There are several things in here that I was asking for.
BY MR. BUCHANAN:
Q. Yeah, and, in fact, there'd been -- and we don't have time to go through it, there had been a back-and-forth with Preferred

Pharmaceuticals for -- this is about, what, a year after, this is a year after your first letter went out, right?

A. Uh-huh.

Q. So a year after your first letter goes out, you're still going back and forth with Preferred Pharma about whether they've got programs in place, right?

MS. VANNI: Object to form.

THE WITNESS: Well, keep in mind too when you send out a letter --

BY MR. BUCHANAN:

Q. Is that correct?

A. -- you don't know -- I don't know how long this went on.

Q. Well, I'm sorry. This is --

A. I mean, this is 2014, but I don't know what happened from the time of the letter to this.

Q. October 21, 2014 --

A. Correct.

Q. -- correct, that's your last e-mail? You're still not satisfied that they've got programs in place to keep this closed

system, right?

A. I mean, you're making the assumption that they were a customer when the letter originally went out too. I don't even know that.

Q. That's a discernable fact, and we don't have time to root through the documents with you today, but that can be determined.

A. Right.

Q. I'll represent to you I -- I won't make a representation. I'll do that at another time.

But this is a year after your letter went out, right?

A. Yes. And it's an ongoing thing, and the letter might not have gone to the right person in the company to start with either. It might have had to have gone through, you know, several people once it got there, so a lot of logistics in the process.

MR. BUCHANAN: Can I have 1145.

(Document marked for identification as Par-Norton Deposition Exhibit No. 22.)

BY MR. BUCHANAN:

Q. We could agree, ma'am, that from the perspective of maintaining a closed system and having effective controls against diversion, it's not appropriate to sell drug to people that don't have suspicious order monitoring in place, right?

MS. VANNI: Object to form.

THE WITNESS: To have controls in place to make sure it doesn't go out the door --

BY MR. BUCHANAN:

Q. Right.

A. -- to illegitimate channels.

Q. And what you were asking for were their SOM programs, correct?

A. Yes.

Q. That's what you asked for as part of your due diligence information in October of 2013, right?

A. Correct.

Q. And if the company was shipping drug to people who didn't have programs in place, that would be improper, right?

MS. VANNI: Objection.

MR. LEEDER: Objection.

THE WITNESS: Depending on what else they had in place.

BY MR. BUCHANAN:

Q. If they didn't have programs in place to ensure the effective control against diversion, it would be improper for you to be selling to them, right?

MS. VANNI: Objection.

THE WITNESS: If it's -- they don't have to have something they call SOMS, so they have to have appropriate controls, yes.

BY MR. BUCHANAN:

Q. Okay. I mean, they certainly can't -- well, let's take a look at some.

Did you form a SOMS advisory team in late 2013, early 2014?

A. Yes, we did.

Q. Mr. Brantley was a member of that?

A. Yes, he was.

Q. Were you a member of that?

Page 434

A. I think I was a member when Eric wasn't there, I believe. I'm not sure if I was actually on it or I stepped in when he wasn't there.

Q. So one of the things that started to happen after this is you got those resources provisioned internally within Qualitest right?

MS. VANNI: Object to form.

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q. You had a SOMS compliance manager, right, Mr. Brantley?

A. Yes.

Q. Went out and started visiting customers, right?

A. Yes.

Q. And one of the things, lo and behold, you started to figure out when you started to look at the information in due diligence is that some of these customers are really doing some fishy stuff, right?

MS. VANNI: Objection.

THE WITNESS: I'm sure there are customers that we had concerns with,

Page 435

sure.

BY MR. BUCHANAN:

Page 436

Page 437

Case: 1:17-md-02804-DAP Doc #: 1982-17 Filed: 07/24/19 111 of 138. PageID #: 242668

Highly Confidential - Subject to Further Confidentiality Review

Page 438

[redacted]

Page 439

[redacted]

Page 440

[redacted]

Page 441

[redacted]

111 (Pages 438 to 441)

Golkow Litigation Services - 877.370.3377



Case: 1:17-md-02804-DAP Doc #: 1982-17 Filed: 07/24/19 112 of 138. PageID #: 242669

Highly Confidential - Subject to Further Confidentiality Review

Page 442

[redacted]

Page 443

[redacted]

Page 444

[redacted]

Page 445

[redacted]

112 (Pages 442 to 445)

Golkow Litigation Services - 877.370.3377



Case: 1:17-md-02804-DAP Doc #: 1982-17 Filed: 07/24/19 113 of 138. PageID #: 242670

Highly Confidential - Subject to Further Confidentiality Review

Page 446

[redacted]

Page 447

[redacted]

Page 448

[redacted]

Page 449

[redacted]

113 (Pages 446 to 449)

Golkow Litigation Services - 877.370.3377

Case: 1:17-md-02804-DAP Doc #: 1982-17 Filed: 07/24/19 114 of 138. PageID #: 242671

Highly Confidential - Subject to Further Confidentiality Review

Page 450

[redacted]

Page 451

[redacted]

Page 452

[redacted]

Page 453

[redacted]

114 (Pages 450 to 453)

Golkow Litigation Services - 877.370.3377



Q. Okay. I have one last area, please, counsel, if you'll indulge me a few minutes. Do you need a moment? Because we're going to have change the hot seat in a second on my side.
A. We're good.
Q. I see from your CV that you were a member of a number of industry groups; is that fair?
A. Yes.
MR. BUCHANAN: Could we go off the record.
THE VIDEOGRAPHER: Going off the record, the time is 4:33 p.m.
(Pause.)
THE VIDEOGRAPHER: Back on the record, 4:35 p.m.
MR. BUCHANAN: Okay. Let's see if we can bring this in for a landing, with me.
(Document marked for identification as Par-Norton Deposition Exhibit No. 25.)
BY MR. BUCHANAN:

Q. Passing you what we're marking as Exhibit 25, I think we're back on track with the exhibit numbers. Copies for counsel, please.
MR. BUCHANAN: Can we pull up E630, please, Bradley. Thank you.
BY MR. BUCHANAN:
Q. I saw in your resume, ma'am, I don't think we have time to pull it back up, but you list in your resume old one, new one, various forms your involvement and engagement with various industry working groups, right?
A. Correct.
Q. These are the minutes from an industry working group, anti-diversion working group meeting from 2013.
Do you see that?
A. Yes, I do.
Q. Okay. Something you sent around after I guess you went to the meeting to Mr. Brantley?
A. Yes.
Q. This is October 11, 2013. Can you -- there we go.
MR. BUCHANAN: Thank you,

Bradley.

BY MR. BUCHANAN:

Q. And then you've got your DEA compliance trip report, right?

A. Yes.

Q. Did you put this together?

A. Yes, I did.

Q. And it accurately reflected what happened, as best you were able to determine?

A. Yes.

Q. Okay. And so this is a meeting of the Anti-Diversion Industry Working Group held in Chicago, right?

A. Correct.

Q. And you've got -- you've got some folks from manufacturers, Mallinckrodt, right?

A. Yes.

Q. You've got HD Smith and AmerisourceBergen, right?

A. Yes.

Q. McKesson dialing in, right?

A. Yes.

Q. AmerisourceBergen there in person?

MR. SCHACK: Objection. What are you looking at? Sorry, I don't have it.

MR. BUCHANAN: Can we get the 630.2.

MS. KOSKI: It took our screen away too.

MR. SCHACK: Yeah, I can't see the --

MR. BUCHANAN: Just turn the one right there. Okay. I can't solve for that, I'm sorry. 630.2.

BY MR. BUCHANAN:

Q. At the top we have a list of attendees at the meeting, and you were the Qualitest attendee, correct?

A. Yes, I was.

MR. BUCHANAN: Does everybody have a way to get an angle on this right now? If someone needs to stand up over my shoulder, they're welcome to do that.

MR. SCHACK: What exhibit number, Exhibit 25?

MR. BUCHANAN: Yeah.

MR. SCHACK: All right.

BY MR. BUCHANAN:

Q. Okay. And so Anti-Diversion Industry Working Group, that was a group of industry participants that came together from time to time, right?

A. Not -- we really didn't meet a lot. It was more for one purpose.

Q. Okay. And this notes it's the second meeting of the group, correct?

A. Yes.

Q. Okay. And then you had some folks from Quarles & Brady, those are lawyers?

A. Yes.

Q. Okay. So you had lawyers, you had distributors, you had manufacturers all kind of in this group together, right?

MS. VANNI: Object to form.

THE WITNESS: Correct.

BY MR. BUCHANAN:

Q. All right. And then maybe we'll have time to call out some of these. Carmen is a person who spoke that day. You see at the bottom of the first page, Carmen Catizone?

A. Yes.

Q. And she gave some background on NAPB, right?

A. He. He was the executive director of NAPB.

Q. NAPB is what?

A. National Association of Boards of Pharmacy.

Q. Okay. And Carmen is providing information on wholesalers or secondary wholesalers being a diversion risk, correct?

A. Second -- that's what he's saying, yes.

Q. I'm sorry. It's the last paragraph.

A. Yes, that's what he's saying.

Q. First page. Okay.

And then there's some member presentations that occur?

A. Yes.

Q. Right. And the members would be all these folks that are identified other than the outside speakers, right?

A. Yes.

Q. Okay. And one of the team

members, and you don't identify that person, is that just some code of conduct or something when you go to these meetings, you're not allowed to say who said what?
MS. VANNI: Object to form.
THE WITNESS: No.
BY MR. BUCHANAN:
Q. I don't know, you didn't?
A. No, it was just one of the team members. I don't recall which one it was, but one of them presented IMS data.
Q. Okay. Well, for the outside presenter, you identify them by name and then for the other people you attribute them as team members, right?
MR. SCHACK: Object to form.
THE WITNESS: No reason.
BY MR. BUCHANAN:
Q. Okay. "Member Presentation (Based on IMS data). One of the team members has purchased the upgraded IMS subscription and using the data IMS provides, presented a heat map of the US showing the top prescribers for oxycodone and hydrocodone from 2010 - 2013,"

right?
A. Yes.
Q. And it showed the following states in this heat map.
You see this?
A. I do.
Q. Yeah, and you identify several -- for hydrocodone you've got Ohio, California, Texas, you see Florida in there, other states in the mix, right?
A. Yes.
Q. Okay. You've got them also for the seven and a half milligrams hydrocodone, also for 10 milligrams, correct?
A. Yes.
Q. All right. And so these are states that are popping up on this heat map, right?
MS. VANNI: Object to form.
THE WITNESS: That's what it was showing, yes.
BY MR. BUCHANAN:
Q. Okay. Did you go back to the company after you went to this and said, hey,

you know, there's this IMS data with a heat map?
A. I did. It's not standard information to get. It's extremely, extremely costly, in the millions, from what I was told to get that information. So it wasn't something that we wanted to do at that time. It gave us some information, but DEA was presenting similar things at conferences, so it wasn't something that we pursued.
Q. Okay. Well, I mean, you could drill down, right, using these heat maps?
MS. VANNI: Object to form.
THE WITNESS: I don't know if we could in this case or not. The presentation wasn't -- it wasn't -- like, it wasn't -- they didn't spend a long time on it. It was just here's something out there. The whole purpose of the group was to try to do anything that we could to help with the abuse and diversion, and so this was presented as a tool that one company had that -- just to educate people that it was out there on the team.

BY MR. BUCHANAN:
Q. All right. I mean, what they said you could see was you could see a map of the US showing the top prescribers for oxycodone and hydrocodone, right? That's what it showed, the heat map?
A. I don't know if it drilled down to the actual names of prescribers or anything like that.
Q. Well, you were sufficiently impressed, you say --
A. I was.
MS. VANNI: Object to form.
THE WITNESS: I was. It was interesting information.
BY MR. BUCHANAN:
Q. Not only interesting, you said we need to get it?
A. I wanted to get it if it was reasonable and was something that we could use on a regular basis, yeah.
Q. Well, in the context of billions and billions of pills that you're selling and the tens of thousands of people that are

overdosing each year, I mean, how many millions of dollars is too much to spend to acquire data to help prevent diversion?

A. I don't think --

MS. VANNI: Objection, form.

THE WITNESS: I don't think that this data would have been -- it was informative more than it was helpful in preventing diversion.

BY MR. BUCHANAN:

Q. What you wrote here was that "we need to obtain this data"?

A. That's what I wanted to do, yes.

Q. This was as of --

A. Because I always want to improve upon our compliance and the tools that are available to us and to what we're doing.

Q. Okay. Do you remember how much it was? I would like to know how much --

A. I don't remember.

Q. -- was too much for Qualitest?

A. I don't remember, to be honest.

MS. VANNI: Objection.

THE WITNESS: I don't remember.

BY MR. BUCHANAN:

Q. Okay. And then there's some discussion on other key topics, how to best assure success of the team partnering with the DEA.

Do you see that? It's the first bullet under "Other Key Topics Discussed."

A. Yes, how best to assure the success in partnering to fight drug diversion.

Q. Right. And so the "team felt we should evaluate the HDMA's actions."

Do you see that?

A. Yes, I do.

Q. Okay. And who is the HDMA?

A. Healthcare Distributor Management Association.

Q. And were those meetings that you also attended?

A. They had a conference once a year. I attended one, but at this point I had not -- I have attended one in the past, but at this point I had never attended any.

Q. Okay. And so you'd go to these meetings and as part of these meetings, you'd

get information that could be relevant to you, in your view?

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. As part of your role and function?

A. I don't know if it was really anything new compared to what DEA was putting out there. Again, at that point I hadn't attended it, so it's probably more helpful to a wholesaler, HDMA.

Q. Okay. I was more generalizing. I mean, this particular working group, I mean, getting together with others in the industry, collaborating, understanding what's happening, data sources that might be available, that was information that you brought back to incorporate in your practice?

MS. VANNI: Object to form.

THE WITNESS: It was information that I brought back and made the team knowledgeable of, and, ultimately, the goal and the end result of this team was the red flags video that NABP still

today has on their website.

BY MR. BUCHANAN:

Q. The red flags video being signs for pharmacies, signs for pharmacists, et cetera?

A. Signs for -- yes, it was educational for pharmacists to show them some of the things to look for that we thought would be helpful.

Q. How about a video for any of your customers, your distributors, one that would show them, hey, these are what problematic pharmacies look like and lines out the door and red flags and other things that would help them?

MS. VANNI: Objection.

THE WITNESS: They were, as part of the -- you know, as part of NABP, they would have been seeing that, that video anyway.

BY MR. BUCHANAN:

Q. Like FW Kerr would have been seeing that?

MS. VANNI: Objection.

THE WITNESS: They could have.

It's public knowledge. It's publicly on the website today.

MR. BUCHANAN: Okay. Can I have 1153.

(Document marked for identification as Par-Norton Deposition Exhibit No. 26.)

BY MR. BUCHANAN:

Q. These are minutes of another DEA compliance trip report. This is from the same window of time, fall 2013?

A. Mm-hmm.

Q. I noticed, just from looking through your file, ma'am, that in this 2013 period, you're going to outside industry functions and sending -- and memorializing them in trip reports and sending them out to your team when you get back; is that fair?

A. Something that I've always done, not just in 2013.

Q. So this is of the New Jersey Pharmaceutical Industry Group meeting from November of 2013, correct?

A. Yes.

Q. Hosted at Novartis, correct?

A. Yes, this particular one was.

Q. It's got a bunch of manufacturers. It's got J&J, it's got Novartis, it's got Purdue.

A. Yeah.

Q. You're in there, we've got Watson.

A. Yes, a lot of attendees.

Q. We see distributors there as well, correct?

A. Yes.

Q. AmerisourceBergen, correct?

A. Yes.

Q. And so this is another one of those settings where people would all get together, exchange ideas, exchange insights, collaborate?

MS. VANNI: Objection.

THE WITNESS: This is a different -- different type of meeting than the anti-diversion. This meeting was really bringing people together to share experiences to -- for benchmarking

kind of thing, not really a collaboration, not really a collaboration. There wasn't -- there was no direct outcome of this meeting, like the anti-diversion group meetings, and this was actual -- this group was actually started by Gerry McAleer, the local special agent in charge of the DEA office in Newark, New Jersey.

BY MR. BUCHANAN:

Q. Okay. Is he in attendance at this?

A. I don't think he's in attendance at this one. He was in attendance and spoke at the first one --

Q. Okay. So what --

A. -- and he was invited to other meetings. Other members of DEA were invited to meetings afterwards.

Q. Well, we could agree he's not at this one, correct?

A. I wouldn't know without reading the whole thing, but I don't think so.

Q. Okay. Well, certainly, with

regard to the additional attendees, do you see any notation of a DEA attendee?

A. No.

Q. Okay. And there's a listing of the general meeting charter, correct? The purpose of the New Jersey Pharmaceutical Industry Group meeting was to discuss education and other industry practices regarding DEA compliance. Let's pause on that for a moment.

You were not an attendee at this meeting; is that right?

A. I believe I was; otherwise, I wouldn't be doing a trip report on it. Qualitest attendee was Rohit, Rohit Sutaria was my person in Charlotte. It looks like he was the only attendee.

Q. Okay. And would you have received compliance trip reports from your team?

A. Yes.

Q. Okay.

A. I would ask --

Q. So you don't doubt that you received this, right?

A. No, I don't doubt that.

Q. Sure.
Next paragraph, "The goal of the NJPIG is to increase compliance with DEA requirements through the shared knowledge and experience of the group members."
Do you see that?
A. Yes.
Q. Okay. And was that one of -- was that something that was happening at these meetings; y'all were sharing your experiences back and forth?
A. Yes. I mean, there were some members that were more senior, others were newer to DEA compliance. There was a fine line because there's a lot of things that we couldn't speak about from confidentiality perspective, because we were also competitors, but there was information sharing to the extent that it could be.
Q. Okay. Let's go to 1153.2. It talks about 2014 quota letters. Do you see that?
A. Yes.
Q. And quota letters are the

manufacturers will send in a request for permission to make a certain quantity of controlled substance?
A. Yes, it's based on sales data. It's based on IMS data, prescriptions written. DEA takes a lot of other factors into consideration, meet with FDA, et cetera.
Q. And members here are expressing surprise to receive the quota letter for 2014.
Do you see that?
A. Yes.
Q. And some members said it was because of the reason that GAO is reviewing last two years of quota issued by DEA, right?
A. Yes, that's what it says.
Q. Okay. Was one of the things that industry would discuss at these meetings what participants were doing with regard to their quota letters?
MR. LEEDER: Objection.
THE WITNESS: They would never discuss quota amounts. They would talk about the delays in getting responses from DEA. So a standard -- for example,

a standard turnaround might be eight to ten weeks, and in one instance that I can recall it was taking DEA upwards of 24 weeks to respond to a quota letter, which, as you can see from the comment there, it had an impact on drug supply and created drug shortages.
BY MR. BUCHANAN:
Q. Okay. And strategies for dealing with them, right?
A. Not really strategies. I mean --
MS. VANNI: Objection.
THE WITNESS: -- there's nothing -- not much that companies can do. If DEA wants to take longer, they take longer, you know.
BY MR. BUCHANAN:
Q. Let's then turn to 1153.4, also discussing SOM programs, right?
A. Yes.
Q. And question being put out to everybody at the meeting, "Is anyone auditing customers?"
MS. VANNI: Object to form.

THE WITNESS: Correct, because it was something that --
BY MR. BUCHANAN:
Q. So just let's pause on that.
A. Okay.
Q. I mean, that's what it reflects, right, "Is anyone auditing customers?"
A. Yes.
Q. Okay. "Computerized statistical models?" Right?
A. Yes.
Q. Okay. And so this was a vehicle, this New Jersey Pharmaceutical Industry Group to exchange information about what people were doing on auditing, what people were doing on SOMS, what people were doing with statistical models, right?
A. To a certain extent. So you might get an answer to this question like a yes or no, but you wouldn't necessarily get a lot of detail because that was confidential to the company.
Q. And, right, and we see actually some of the manufacturers sharing information by

name as reflected in Rohit's memo. Teva is replying that they do customer audits, sending regular questionnaires and how they're going about it, right?
A. Yes.
Q. The representative for Watson said how they do the risk assessment based on sales history and quotas, correct?
A. Yes, that's what it says.
Q. Customers have to fill out questionnaires, and they described their process at the meeting, right?
A. Looks that way, yes.
Q. AmerisourceBergen is a distributor and they're sharing what they're doing at that point in time, right?
MR. SCHACK: Objection.
THE WITNESS: It does talk to AmerisourceBergen, yes.
BY MR. BUCHANAN:
Q. Okay. It further notes there was a "general discussion included an important point for companies involved in SOMS program should document their thought process," right?

A. Yes, that's what it says.
Q. And these are just general discussions and suggestions from company to company about how to manage their SOMS program, right?
MS. VANNI: Object to form.
THE WITNESS: I don't know exactly what it means. I would assume docu -- you know, document your due diligence.
BY MR. BUCHANAN:
Q. Right.
Additionally, general discussion included an important point, right?
You see that?
A. Mm-hmm, yes, that's what it says.
Q. For companies involved in SOMS programs to document their thought process.
Did I read that correctly?
A. Yes, that's what it says.
Q. Apart from your attendance at industry meetings, the New Jersey Pharmaceutical Industry Group and the anti-diversion working group, did you attend other groups like this

industry association meetings concerning SOMS and anti-diversion efforts?
A. Those are the only two that I can recall.
Q. Okay.
A. Other than conferences, you know, industry conferences.
Q. My last document for you today.
MR. BUCHANAN: Do I have a few more minutes. How much time have I used?
THE VIDEOGRAPHER: Six hours, six minutes.
MR. BUCHANAN: Okay.
(Document marked for identification as Par-Norton Deposition Exhibit No. 27.)
BY MR. BUCHANAN:
Q. Passing you, ma'am, Exhibit 27. Exhibit 27 is a PowerPoint you put together in 2014. I guess this is shortly before you move on to HD Smith, right?
A. Yes.
Q. Okay. Attached you'll find

presentation from the recent Buzzeo PDMA seminar.
Do you see that?
A. Yes.
Q. Okay. Is this a presentation you prepared?
A. Not this entire thing, no.
Q. Oh, fair enough. I mean, there's -- this is a compilation of presentations from that day, but this looks like it's the seminar book, right?
A. Yes.
Q. Okay. Let me take you to where I think yours is and you can confirm that for us. It's 1059.290.
A. Yes, that's correct.
Q. Okay. And so this is you presenting at the consultant -- the conference for one of the consultants who came and did the inspection at your facility earlier, right?
A. This particular consultant has a regular conference. A lot of times they have DEA actually attend their conference. In this particular instance, they did not, and I was

asked to speak at it.
Q. And what you wrote here is "Developing a robust suspicious order monitoring program," right?
A. Yes.
Q. And did you deliver this presentation?
A. I did.
Q. And this was a presentation to manufacturers, wholesalers, distributors, people in the industry concerning controlled substances?
A. A very small group of them, yes.
Q. Okay. And where was it?
A. I believe it was in Florida.
Q. Okay.
A. I'm not positive. Actually, it might have been in Maryland.
Q. Okay. At page 291, suspicious order monitoring, you again note "DEA's Closed Loop Distribution System," right?
A. Yes.
Q. It's got to be a "Legitimate Medical Need, by an Individual Practitioner

Acting in the Usual Course of His or Her Professional Practice," right?
A. Yes.
Q. You also note "Being a Good Corporate Citizen," right?
A. Yes, because that's how I look at things, yes.
Q. Doing everything in our power to prevent abuse and diversion, right?
MS. VANNI: Objection.
THE WITNESS: Always looking to improve and do more is what my goal is personally.
BY MR. BUCHANAN:
Q. And what the company's statement about its corporate responsibility through your letter in October of 2018 was we have to do everything we can, right?
MS. VANNI: Objection.
THE WITNESS: I believe so.
BY MR. BUCHANAN:
Q. "Reducing Risk," that's good, right?
A. Yes.

Q. Reducing Risk.
Protecting Reputation, that's another reason to do it, I guess, right?
A. Yes.
MS. VANNI: Object to form.
THE WITNESS: Basically, you don't want to have any DEA violations.
BY MR. BUCHANAN:
Q. "Preventing Violations"?
A. Mm-hmm.
Q. "Guarding Your Company & Your License," right?
A. The wording with guarding was talking about building in layers of security into your program.
Q. And I mean how about, you know, making sure that we don't fuel the second epidemic anymore; that would be a good reason to do it, right?
MS. VANNI: Objection.
THE WITNESS: Not the case, but, yes.
BY MR. BUCHANAN:
Q. Not the case, that's not a good

reason?
MS. VANNI: Objection.
THE WITNESS: No, it's not the case as to what the company was doing.
BY MR. BUCHANAN:
Q. Okay. And then 1059.296, you talk about "Robust Data Analysis Tool," right?
A. Yes.
Q. One of the things you do is "Receive Regular Data Feeds," right?
A. Yes.
Q. Those data feeds should be the sales to direct customer, first one, right?
A. Correct.
Q. Next thing is to "Chargeback Data," right?
A. Yes, that's what it says.
Q. This is what you're teaching people, right?
A. Yes.
MS. VANNI: Object to form.
THE WITNESS: To look at this.
BY MR. BUCHANAN:
Q. At this industry meeting, right?

A. To look at this, yes.
Q. To look at chargeback data so you can, what, one, know your customer, right?
A. Yes.
Q. And their customer, right?
A. Correct.
Q. And their customer, right?
MS. VANNI: Object to form.
THE WITNESS: That's what it says.
BY MR. BUCHANAN:
Q. That's what you wrote.
A. Know as much as you can based on the data that's available to you.
Q. It's what you wrote and what you presented, ma'am, correct?
A. Yes.
Q. Chargeback data, to know your customer and their customer and their customer, correct?
A. Yes.
Q. "Dispensing Data," another category, right?
A. That's what I wrote, yes.

Q. These are the information feeds that the company should be taking in for suspicious order monitoring system, correct?
MS. VANNI: Object to form.
THE WITNESS: These are suggestions to companies for things that they can add to their suspicious order monitoring program.
BY MR. BUCHANAN:
Q. And with regard to dispensing data, what you told people, look at national average or actual cleansed dispensing data, right?
A. Yes.
Q. And use that to help set a standard for long-term levels, correct?
A. That's what it says, yes.
Q. Can we go to the next page.
Customer due diligence visits, right?
A. Yes.
Q. Okay. This is the next thing you're telling people that they should do, right?

A. Right.
Q. And you've got the -- I guess the cute cartoon, I don't know if that's Sherlock Holmes or someone there on the right?
A. Look to your customer.
Q. There you go.
A. Look at your customer closely.
Q. Know your customer again, right?
A. Yes.
Q. And so, first, know your customer by virtue of data feeds, that was your prior slide, correct?
A. Correct.
Q. Next, know your customer by on-site visits, right?
A. Right. And all this is repetitive of things that DEA -- suggestions that they were making.
Q. This is a presentation you're making outside the company to those in industry, fair?
A. Yes.
Q. And you thought these were important points to highlight, fair?

A. To reiterate what I had heard DEA say, yes.
Q. And, really, we had seen those in your own writings well before the meeting in March of 2013, correct?
A. Yes, the improvements that I wanted to make.
Q. That's a yes answer, ma'am?
A. Yes.
Q. Those are the -- you knew that these were important components as part of a SOM process even before you sat down with the DEA in March of 2013, correct?
A. Again --
MS. VANNI: Object to form.
THE WITNESS: -- they aren't required, they aren't required by DEA. They are suggested improvements.
MR. BUCHANAN: Move to strike.
BY MR. BUCHANAN:
Q. You knew they were important components of a SOM program before you sat with the DEA in March of 2013, we looked at your documents, right?

MS. VANNI: Object to form.
THE WITNESS: They were my suggestions for improvement.
BY MR. BUCHANAN:
Q. In fact, these were items that were listed under a risk assessment of 25, 25, the most severe --
A. Yes.
Q. -- risk because you didn't have these elements in place prior to November of 2013, right?
A. They're not required by DEA.
Q. Not a matter of whether they're required, ma'am.
A. It is.
Q. The statute, the statute states you must maintain effective controls against diversion, correct?
A. And we did, yes.
Q. Just answer my question.
A. Yes.
Q. That's what the statute says?
A. Yes.
Q. Not and we did?

A. And we did.
MS. VANNI: Objection.
BY MR. BUCHANAN:
Q. That's not the question. The statute says you must maintain effective controls against diversion, correct?
MS. KOSKI: Object to form.
THE WITNESS: Yes.
BY MR. BUCHANAN:
Q. Before the DEA sat with you in March of 2013, you, as the head of DEA compliance with oversight of SOM by early 2013, had outlined a number of things the company needed to do to revamp its SOM, correct?
MS. VANNI: Object to form.
THE WITNESS: I had outlined a number of things I wanted to improve.
BY MR. BUCHANAN:
Q. Fair enough. And what you did here in 2014 is you went out and told industry, peers, distributors, others, these are the elements of an effective program, correct?
MS. VANNI: Object to form.
THE WITNESS: No. These are --

BY MR. BUCHANAN:
Q. Is this being presented in November of 2014?
A. It is what I presented.
Q. Okay.
A. And it was presented as suggestions, and that's how I was asked to present it as well.
Q. And what we have here are, look in the parking lot, right?
A. Again, all things that DEA said during conferences as suggestions for companies.
Q. These are your words, right?
A. Yes.
MS. VANNI: Object to form.
THE WITNESS: Suggestions, yes.
BY MR. BUCHANAN:
Q. These are your words, correct?
MS. VANNI: Object to form.
THE WITNESS: This is my guidance to industry for suggestions of things that they can look at to add to what's required by the regulation.
BY MR. BUCHANAN:

Q. So let's look at this one. "Observe parking lot for suspicious activity, license plates from multiple states, long lines, security guards, etc.," right?
A. Yes.
Q. If pharmacy, are most controlled product prescriptions written by a handful of physicians? Same prescription? Same combination? Do they follow up with physicians? All reasonable things to do, right?
MS. VANNI: Object to form.
THE WITNESS: All good suggestions, yes.
BY MR. BUCHANAN:
Q. All things that you thought worthy to highlight in your presentation about this topic for a robust suspicious order monitoring system in November of 2014, correct?
MS. VANNI: Object to form.
THE WITNESS: Ways to enhance the program, yes.
MR. BUCHANAN: I think I'm off, so with that, let me just check with my colleagues. I've gone over my allotted

time, ma'am. I would have loved to have spent more time with you.

THE WITNESS: I'm sure.

MR. BUCHANAN: Maybe we'll have a chance to talk further. Thank you very much.

THE VIDEOGRAPHER: Going off the record, 5:03 p m.

(Brief recess.)

THE VIDEOGRAPHER: We're now going back on the record. The time is 5:39 p m.

BY MR. YOUNG:

Q. Hi, Ms. Norton. My names is James Young, and I'll try to speak quickly since we only have 45 minutes, though intelligibly.

I'm going to talk to you about your experience at HD Smith. So and you have different counsel with you now, who is actually representing HD Smith, Mr. Leeder.

A. Yes.

Q. So at some point in time, you went to work for HD Smith, I take it?

A. Yes, I did.

Q. Do you recall the date that you began employment there?

A. 2014 through 2016.

Q. How is it that you came to be employed at HD Smith? Did you answer an ad, were you recruited, did you talk to somebody about a job?

A. I believe I got a call from a recruiter and applied, was interested in Illinois. My husband worked for AbbVie, and they had a facility in Illinois, so was looking to kind of have two of us in one place for a change and also for the promotion.

Q. And I wanted to ask you about that. You mentioned on your earlier testimony that it was actually a promotion from your current job at Qualitest.

Do you mean that in title or in salary or both?

Q. Okay. And your title changed from director to vice president?

A. Correct.

Q. Were your job duties essentially the same at both Qualitest and HD Smith, or was there some distinction?

A. There were definite differences since it was a manufacturer versus a wholesaler.

Q. You testified earlier with regard to Exhibit Number 2, which is the summary of the suspicious order monitoring experience that I think you prepared, I think you testified earlier that some of the representations in here were slightly embellished or not exactly accurate because you were trying to get the job at HD Smith.

Do you recall that testimony?

MR. LEEDER: Object to form.

THE WITNESS: Yes, I do recall that testimony.

BY MR. YOUNG:

Q. And do you know of the top of

your head which portions or provisions of this summary in Exhibit 2 were -- are not completely accurate?

MR. LEEDER: Can you provide her a copy.

THE WITNESS: Yeah, not without reviewing.

MR. YOUNG: It's Exhibit 2. It wasn't my exhibit.

MR. LEEDER: Here, I can share it.

MR. YOUNG: I just happen to have this.

BY MR. YOUNG:

Q. So and I guess I'll direct your attention to a couple specific things. On the Qualitest section which begins, in my version at least, on page 2, there is reference in here to using sales and chargeback data, it's in the second full paragraph, in the middle. It says, "Sales and chargeback data are both used," and I think on earlier examination you hedged a bit and suggested that chargeback data may not have been used during your tenure at Qualitest?

Page 498

MR. LEEDER: Object to form.
THE WITNESS: I know that we used -- we did look into sale -- to chargeback data. I don't recall when it was actually implemented, if it was implemented before I left or if it was implemented after I left. I don't recall exactly. I know there were struggles with getting the data and getting it in a format that we could use.
BY MR. YOUNG:
Q. This document was prepared while you were still employed at Qualitest, correct?
A. Yes.
Q. And the specific language is sales and chargeback data are both used, correct?
A. Yes.
Q. And that would suggest to me that, in fact, both sales and chargeback data are used at Qualitest?
A. Agreed.
Q. Okay. But is it your reflection

Page 499

and recollection today that either sales or chargeback data was not used by Qualitest during your tenure there?
MS. VANNI: Objection to form.
THE WITNESS: I wouldn't have lied about that in this document, so it must have been in use before I left, but I didn't recall it being used at the time. I thought -- I thought that it was still under research when I left for some reason, I had that in my head.
BY MR. YOUNG:
Q. Okay. There's also reference in the first full paragraph, the very last sentence under Qualitest, it says that you gained additional diversion information through conferences and through your position as a board member for the Partnership for a Drug Free Community in Huntsville/Madison County. I'm sorry. It's not the last sentence, it's the second to last sentence.
A. Yes, that's correct.
Q. What led you to join the board of the Partnership for Drug Free Community in

Page 500

Huntsville/Madison County?
A. I was actually contacted by them. They were really looking for a donation from Qualitest. That was their initial goal. They were calling all local companies and asking for donations, and the woman asked me if I would like to attend one of their meetings, and I did and found it to be very informative. Local police officers were presenting on things they were seeing in the community, and, basically, that's how I got into the group.
Q. And so you put it to this document that you gained diversion information through your -- both your NADDI/DEA conferences and through this position as a board member. What type of information were you exposed to as a board member of that organization, diversion specific information?
A. I mean, more just things that were being abused or seen in the area, in the very local area, because it was a township organization, so just things that the local police and the narcotics task force were seeing being abused or diverted, so marijuana even they

Page 501

talked about, some of the things that they were seeing that were more gang related, that type of thing.
Q. Do you recall whether any of the items that were being diverted were the items that Qualitest manufactured or distributed at that time, for example, Vicodin?
A. I think that there was mention of those products, not necessarily the Qualitest brand, but those products generally.
Q. Did you ever take any information from that organization and go back to Qualitest and investigate or research whether or not there were issues relating to diversion of Qualitest products?
MS. VANNI: Object to form.
THE WITNESS: I presented that information, some of the information that I received at some of our operations leadership team meetings. I think one meeting, maybe two I presented at, but I wasn't going back and looking for diversion because we didn't have -- I didn't see any gap that this could

have gone out of.
BY MR. YOUNG:
Q. Okay. On earlier testimony you talked about towards the end of your tenure at Qualitest there was an issue -- I shouldn't say an issue -- there was an inquiry or investigation by the DEA and U.S. Attorney's Office.
Do you recall that testimony?
A. Yes.
Q. That happened right as you were ending your employment with Qualitest.
Did you share information about that issue with HD Smith upon joining HD Smith?
MR. LEEDER: Object to form.
THE WITNESS: I don't believe so.
BY MR. YOUNG:
Q. Did it ever come up at HD Smith during your employment with HD Smith about this U.S. Attorney DEA investigation at Qualitest?
A. I don't believe so.
Q. How long did you work for HD Smith?
A. For a little over a year.

as to why you were being let go from HD Smith at that time?
MR. LEEDER: Object to form.
THE WITNESS: The only -- the only opinion that I could give was a license related issue. We were outsourcing licensing at the time, and I had some challenges with the company that was handling the licensing. We had some gaps in licensing that basically when I investigated the company that was handling the licensing, I provided a presentation to my supervisor suggesting that we should not use them any longer. He disagreed. We continued to use them, and we had a state license that expired. That happened right before I was let go, so I made an assumption that that could be what it was, but it was never confirmed.
BY MR. BUCHANAN:
Q. Who was that company that you outsourced to?
A. SLS, State Licensing Services.

Q. Were you critical of HD Smith's compliance program during your tenure at HD Smith?

MR. LEEDER: Object to form.

THE WITNESS: I would not say that I was critical so much as, again, I was looking for improvements to the program, as with anyplace that I go and, you know, handle compliance. So there were improvements that I wanted to make, yes.

BY MR. YOUNG:

Q. How about specifically with regard to the suspicious order monitoring system or program that HD Smith had in place, when you first began your employment with HD Smith, what was your opinion or assessment of their SOMS program?

A. When I first came on, I was very impressed with the level of knowledge that the employees had with their backgrounds, the ones that were, you know, people that were investigating the orders and that were out in the field. I also thought that there were very

good tools that we had available to us. We had dispensing data that was scrubbed from patient information -- of patient information removed, and we had people that were really good from an IT perspective that were able to put that data in a fashion that was really usable.

Q. The system that was in place for suspicious order monitoring on your first day, did you ever make a determination as to whether or not that system was in compliance or out of compliance with the legal and regulatory requirements of the Controlled Substances Act?

MR. LEEDER: Objection to form.

Q. Okay. So your opinion at the time that you began with HD Smith was that the

system in place was compliant with the CSA?

A. Yes, that's correct.

Q. And if that system continued without any changes or modifications that wouldn't be an issue from a legal or regulatory basis, correct?

MR. LEEDER: Object to form.

THE WITNESS: Not from a legal or regulatory basis, I didn't believe that was the case.

BY MR. BUCHANAN:

Q. Okay. Did you engage in a project to evaluate and improve the -- what's called the CSOMP program, the SOMS program?

A. Absolutely, yes, I did.

Q. Okay. I'm going to show you I think we're on Exhibit 28, and it is going to be my internal Exhibit 12. Put a label on it here for you.

(Document marked for identification as Par-Norton Deposition Exhibit No. 28.)

BY MR. YOUNG:

Q. That's called or it's captioned a

"Project Initiation Form."

Does that look familiar to you?

A. Yes, it does.

Q. And it has a date on it revised June 30th, 2015.

Do you see that?

A. Yes.

Q. Okay. What do you recall about this particular document, Project Initiation Form?

A. This was the form that was used to start an IT project at the company, so these were things that I wanted to add to our program to enhance it, and these were -- it's detailed on here.

Q. Okay. In the middle of this first page, there is a section that says "Impact if project not performed," and there's some numbered items underneath there.

Can you read for me what number 1 is under impact?

Page 510

Q. Okay. So let's just go back for a second. I just asked you before whether or not the current program met the minimum DEA requirements from a legal and regulatory perspective, and I believe your answer was, yes, it did?

A. Yes.

Q. Here is a document that I believe you prepared or at least you were the project lead on?

A. Yes.

Page 511

Page 512

Page 513

Q. Is diversion an illegitimate

Page 514

thing to do with a controlled substance?

A. Yes.

Q. And you weren't contemplating diversion of product in to people that shouldn't have the controlled substances here; that's your testimony today?

MR. LEEDER: Object to form.

THE WITNESS: That's not what this meant. I mean, obviously, if you ship it to somebody who is not registered and not doing their due diligence then, yes, you could have diversion or you could have abuse, but that's not what this bullet was referring to.

BY MR. YOUNG:

Page 516

Page 515

Page 517

Page 518

Q. How many compliance people did HD Smith have at the time that you began your employment there?
A. We had five, five or six.

Page 519

Q. So your recollection today is that everything at HD Smith from a compliance perspective was perfectly in compliance with the Controlled Substances Act expectations and regulations and law?
MR. LEEDER: Same objection.
THE WITNESS: It did meet the regulation.
BY MR. YOUNG:
Q. You have no critical recollection of your time at HD Smith today?

Page 520

A. I have recollection of items that I wanted to improve.
Q. And were not able to?
A. No. We were working towards it. This project was working towards it.
Q. Did this project complete prior to your departure from HD Smith?
A. It did not.
Q. Do you know whether or not this project was ever finally implemented?
A. I'm not sure. That occurred -- would have occurred after I left.
Q. Do you know who you replaced at HD Smith in the head of compliance?
A. Yes, George Euson.
Q. Do you have a opinion on the ability and efficacy of George Euson to be the chief compliance officer or senior compliance department person for HD Smith?
MR. LEEDER: Object to form.
THE WITNESS: Absolutely. He's one of the best.
BY MR. YOUNG:
Q. One of the best in the business?

Page 521

A. Yes.
Q. Is George as capable and qualified as you, more so or less so?
MR. LEEDER: Object to form.
THE WITNESS: I can't really say that one way or the other.
BY MR. YOUNG:
Q. Do you know George's background?
A. I believe he was law enforcement, ex-law enforcement. I'm not positive, but I think that was his background.
Q. Do you know if he has any advanced degrees, such as yourself, in the pharmaceutical sector?
A. I don't know.

Page 522

BY MR. YOUNG:

Q. Was there any other means or method that you could determine the extent of controlled substance purchases by a pharmacy's primary supplier when you were the secondary supplier?

A. Through the dis --

MR. LEEDER: Object to form.

THE WITNESS: Yes, through the

Page 523

dispensing data.

BY MR. YOUNG:

Page 524

BY MR. YOUNG:

Q. When you -- when HD Smith takes on an initial customer as a new customer, I think you mentioned that you have them complete a new customer profile form?

A. Yes.

Page 525

BY MR. YOUNG:

Q. When HD Smith terminates a relationship with a customer, a pharmacy customer, obviously, that pharmacy is going to seek its purchases elsewhere.

Does HD Smith inform other distributors that it ceased doing business with a particular pharmacy?

MR. LEEDER: Object to form.

THE WITNESS: I don't recall having done that; however, other wholesale -- well, I don't know. I don't know if we did or not, to be honest.

BY MR. YOUNG:

Q. Do you know whether or not HD Smith has received information from other distributors about pharmacies that they've ceased doing business with?

A. I did receive a couple of inquiries while I was there.

Q. Through any of the trade

associations or working groups or Listservs or any of the other various pharmaceutical distributor or wholesaler organizations, do you know whether or not such information is shared among distributors of bad actor pharmacies or suspicious pharmacies?

A. No, I mean, that would be competitive information, so they wouldn't share that.

Q. Do you know whether or not the DEA or any state board of pharmacy has ever shared with you information about suspicious pharmacies that it was investigating or that it had concerns about?

MR. LEEDER: Object to form.

THE WITNESS: Not on their own. If we conveyed to DEA that we were looking at a particular pharmacy or if we reported that pharmacy to DEA, they have on occasion made comment about looking into that particular customer as well. It was infrequent because it's not like DEA to share that information, but the people that I had working for me

had -- some of them, a couple of them had very good working relationships with DEA.

BY MR. YOUNG:

joined HD Smith, based on your prior experience in the industry or your prior education and training, about the particular way in which HD Smith established its URLs for new customers?

MR. SCHACK: Objection.

THE WITNESS: No I thought the information was -- was pretty well orchestrated as far as that goes.

BY MR. YOUNG:

Q. Did you ever either yourself or have your -- the folks in your compliance

department conduct investigations in order to determine whether or not -- or I should say conduct analysis or investigations in order to determine whether or not the establishment of the initial URLs were sufficient to identify suspicious orders?

MR. LEEDER: Objection.

THE WITNESS: Yes, they were conducting analysis on a daily basis. They were constantly looking at customers and numbers.

MR. YOUNG: I want to show you -- this is going to be number 14 in your book. It's going to Exhibit 29. I do have copies for you guys. I'm sorry. Just trying to get this done as quick as possible.

(Document marked for identification as Par-Norton Deposition Exhibit No. 29.)

BY MR. YOUNG:

Q. This is captioned "Meeting Minutes."

Do you recognize this document?

MR. LEEDER: I just want to note for the record that this is after her departure from the company.

BY MR. YOUNG:

Q. Have you ever seen this document, though?

A. No. I've seen the template used previously, but I haven't seen this.

Q. Okay. I just want to walk through this document with you to see -- get your reflection on some of the information in here. Can we go to page 2, under Number 9 under the Agreement, section E, "customers with less."

MR. SCHACK: Can you identify it for the record with a Bates number on there.

MR. YOUNG: Oh, I just handed you -- oh, I'm sorry. I just handed it to him. Yeah, the Bates range is -- boy, if I could read that.

MR. LEEDER: It's 294884 through 294886.

BY MR. YOUNG:

Q. And it says in Number 9,

Case: 1:17-md-02804-DAP Doc #: 1982-17 Filed: 07/24/19 134 of 138. PageID #: 242691

Highly Confidential - Subject to Further Confidentiality Review

134 (Pages 530 to 533)

Golkow Litigation Services - 877.370.3377

Page 534

BY MR. YOUNG:
Q. Okay. So the CSOMP program was an automated program, right?
A. Yes.

Page 535

BY MR. YOUNG:
Q. Do you know what HD Smith did prior to implementation of its CSOMP in order to identify and report suspicious orders?
A. I do not.
Q. You're wholly unaware of that?
MR. SCHACK: Objection.
THE WITNESS: Yes.
BY MR. YOUNG:
Q. Do you know whether or not --
A. Prior to my coming to the company, I know there was a system, I don't know the details of it, because it was prior to SAP, and when I came, they already had SAP.
Q. Do you know how the company handled the reporting to the DEA of suspicious orders prior to George Euson taking his

Page 536

position?
A. I know that there was -- the reporting to DEA happened by e-mail usually and -- all the time it happened by e-mail.
Q. Do you know how often those would be reported, the frequency?
A. It wasn't a set -- I mean, sometimes it could be one in a month and sometimes it could be four in a month, you know, it varied.
Q. And do you know who identified the suspicious orders, which particular --
A. We had people in the field that basically would go in to audit those customers, and the dispensing data would be run as part of that audit, and that's really where it would be -- they would be identified.

Page 537

Page 538

Page 540

Page 539

Q. All right. I'm going to quickly direct your attention to my Exhibit 18. It will be this deposition's Exhibit 30.

(Document marked for identification as Par-Norton Deposition Exhibit No. 30.)

BY MR. YOUNG:

Q. It's a -- it's a one page e-mail with a colored spreadsheet behind it. I got a copy for you coming.

Do you recall this cover e-mail?

A. I do.

Q. And you were cc'd on this. This is from Kyle Rieger to Durga -- I don't know how you pronounce it, I say Jarugula, kind of like the lettuce?

A. Yes.

Q. And the subject is CSOMP

Page 541

MR. LEEDER: Where are we on time, I'm sorry, but -- it's 7:00?

MR. YOUNG: Are you ceasing the depo now?

MR. LEEDER: That's fine, she can answer the question.

THE WITNESS: I can't answer a lot. That's subjective.

MR. YOUNG: Okay. At this point counsel is directing we've run out of time in the examination, so I don't have any further questions for you.

THE VIDEOGRAPHER: This concludes the deposition, going off the record at 6:25. This concludes this portion of the deposition at 6:25 p m. Going off the record.

(Off the video record.)

MS. VANNI: We are keeping the deposition open until tomorrow in that defendants want to conduct direct examinations of the witness followed by cross. And cross-examination for today is done, and we will start with directs

tomorrow 8:30 a m.

MR. BUCHANAN: We've confirmed that we're commencing at 8:30 and we'll conclude by noon. So defendants will keep their examinations tailored and breaks tailored to accommodate that timing, and plaintiffs will do so as well.

(Witness excused.)

\- - -

C E R T I F I C A T I O N

I, MARGARET M. REIHL, a Registered Professional Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, Certified LiveNote Reporter and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

\-------------------------------

Margaret M. Reihl, RPR, CRR, CLR
CSR #XI01497 Notary Public

\- - - - - -

E R R A T A

\- - - - - -

PAGE LINE CHANGE

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

____ ____ ____________________________

REASON: ____________________________

ACKNOWLEDGMENT OF DEPONENT

I, TRACEY L. NORTON, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

________________________________________

TRACEY L. NORTON DATE

Subscribed and sworn to before me this

_____ day of ______________, 2018.

My commission expires:______________

___________________________________

Notary Public