Highly Confidential – Subject to Further Confidentiality Review

Page 548

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL          : HON. DAN A. POLSTER
POLSTER
PRESCRIPTION OPIATE       :
LITIGATION                :
                          :
APPLIES TO ALL CASES      : NO.
                          : 1:17-MD-2804

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

JANUARY 17, 2019

- - -

VOLUME II

Videotaped sworn continued

deposition of TRACEY L. NORTON, taken

pursuant to notice, was held at BEST

WESTERN LEHIGH VALLEY HOTEL & CONFERENCE

CENTER, 300 Gateway Drive, Bethlehem,

Pennsylvania, beginning at 8:38 a.m., on

the above date, before Margaret M.

Reihl, a Registered Professional

Reporter, Certified Shorthand Reporter,

Certified Realtime Reporter, and Notary

Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax

Highly Confidential - Subject to Further Confidentiality Review

Page 549

```
 1    A P P E A R A N C E S :
 2
      SEEGER WEISS LLP
 3    BY:  DAVID BUCHANAN, ESQUIRE
           ELINA RAKHLIN, ESQUIRE
 4         SCOTT SIEGEL, PARALEGAL
      55 Challenger Road
 5    Ridgefield Park, New Jersey  07660
      (212) 584-7732
 6    erakhlin@seegerweiss.com
      Representing the Plaintiffs
 7
 8    MORGAN & MORGAN
      BY:  JAMES YOUNG, ESQUIRE
 9         RAYMOND TAMAYO, ESQUIRE (telephonic)
           TERESA DuBUISSON-MAI, ESQUIRE (telephonic)
10         RENEE COOK, ESQUIRE (telephonic)
           SHAWKURA SHAW, ESQUIRE (telephonic)
11         JENNIFER WILLIAMS, ESQUIRE (telephonic)
      76 Laura Street, Suite 1100
12    Jacksonville, Florida  32202
      (904) 398-2722
13    jyoung@forthepeople.com
      Representing the Plaintiffs
14
15    MCCARTER & ENGLISH
      BY:  AMY M. VANNI, ESQUIRE
16    1600 Market Street
      Suite 3900
17    Philadelphia, Pennsylvania  19103
      (215) 979-3848
18    avanni@mccarter.com
          - AND -
19    BY:  HAYLEY J. REESE, ESQUIRE
      405 N. King Street, 8th Floor
20    Wilmington, Delaware  19801
      (302) 984-6308
21    hreese@mccarter.com
      Representing the Defendant Endo and
22    the witness
23
24
```

Page 551

```
 1    A P P E A R A N C E S :  (cont'd)
 2
 3    BARNES & THORNBURG
      BY:  WILLIAM J. LEEDER, III, ESQUIRE
 4    171 Monroe Avenue N.W.
      Suite 1000
 5    Grand Rapids, Michigan  49503-2694
      bleeder@btlaw.com
 6    Representing the Defendant H.D. Smith
 7    ALSO PRESENT:
 8
 9    Sandra Di Iorio, Litigation Counsel
      Endo
10
      Phillip Todd, Videographer
11
      Bradley Smith, Trial Technician
12
13               ---
14
15
16
17
18
19
20
21
22
23
24
```

Page 550

```
 1    A P P E A R A N C E S :  (cont'd)
 2
      KIRKLAND & ELLIS LLP
 3    BY:  JENNIFER G. LEVY, ESQUIRE
      655 Fifteenth Street, N W
 4    Washington, D C  20005
      (202) 879-5211
 5    jennifer.levy@kirkland.com
      Representing the Defendant Allergan
 6
 7    REED SMITH LLP
 8    BY:  LOUIS W. SCHACK, ESQUIRE
      Three Logan Square
 9    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania  19103
10    (215) 851-8280
      lschack@reedsmith.com
11    Representing the Defendant AmerisourceBergen
12
      FOLEY & LARDNER LLP
13    BY:  KATY E. KOSKI, ESQUIRE
      111 Huntington Avenue
14    Boston, Massachusetts  02199-7610
      (617) 342-4000
15    kkoski@foley.com
      Representing the Defendant Anda
16
17    MORGAN LEWIS & BOCKIUS LLP
      BY:  MARTHA A. LEIBELL, ESQUIRE
18    200 South Biscayne Boulevard
      Suite 5300
19    Miami, Florida  33131-2339
      (305) 415-3387
20    martha.leibell@morganlewis.com
      Representing the Defendant Teva
21
22
23
24
```

Page 552

```
 1    TELEPHONIC APPEARANCES:
 2    JONES DAY
      BY:  KASEY M. HEMPHILL, ESQUIRE
 3    555 South Flower Street
      Fiftieth Floor
 4    Los Angeles, California  90071-2300
      (213) 243-2356
 5    Representing the Defendant Walmart
 6
 7    TUCKER ELLIS LLP
      BY:  RACHEL N. BYRNES, ESQUIRE
 8    950 Main Avenue, Suite 1100
      Cleveland, Ohio 44113
 9    (216) 696-3950
      rachel.byrnes@tuckerellis.com
10    Representing the Defendants
      Janssen and J&J
11
      ARNOLD & PORTER KAYE SCHOLER LLP
12    BY:  DAVID D. FAUVRE, ESQUIRE
      601 Massachusetts Ave, NW
13    Washington, DC 20001-3743
      (202) 942-5000
14    david.fauvre@arnoldporter.com
      Representing the Defendants, Endo
15    Health Solutions; Endo
      Pharmaceuticals, Inc.; Par
16    Pharmaceutical Companies, Inc. f/k/a
      Par Pharmaceutical Holdings, Inc.
17
18
19
20
21
22
23
24
```

2 (Pages 549 to 552)

Highly Confidential – Subject to Further Confidentiality Review

Page 553

```
 1              I N D E X
 2   WITNESS                    PAGE
     TRACEY L. NORTON
 3      By Ms. Vanni            555
        By Ms. Koski            592
 4      By Mr. Buchanan         643
 5              - - -
 6
 7          E X H I B I T S (cont'd)
 8   NO.     DESCRIPTION        PAGE
 9   Par-
     Norton-31 Title 21-Food and Drugs
10        excerpted pages
          no Bates              594
11
     Par-
12   Norton-32 E-mail dated 7/17/07
          Subject, Re: DEA Contact
13        History
          [ALLERGAN_MDL_03952959
14        to 2960]              622
15   Par-
     Norton-33 E-mail dated 8/22/07,
16        Subject, DEA Meeting Logistics
          - 8/23
17        [Anda_Opioids_MDL_0000152278]  624
18   Par-
     Norton-34 E-mail dated 7/31/07,
19        Subject, DEA Teleconference
          re: CS Distribution/Anda
20        [Anda_Opioids_MDL_0000275627]  632
21   Par-
     Norton-35 Charts, produced natively
22        [PAR_OPIOID_MDL_0001596805]    655
23
24
```

Page 554

```
 1          E X H I B I T S (cont'd)
 2   NO.     DESCRIPTION        PAGE
 3   Par-
     Norton-36 E-mail string, top one
 4        dated 5/7/13, Subject,
          Re: API quota of
 5        OXYCODONE HYDROCHLORIDE
          ER Tablets for 2013
 6        [PAR_OPIOID_MDL_0000368385
          to 8392]              668
 7
 8   Par-
     Norton-37 E-mail dated 2/25/14,
 9        Subject, charter
          with attachment
10        [PAR_OPIOID_MDL_0001642692
          to 2695]              672
11   Par-
     Norton-38 E-mail string, top one
12        dated 1/11/08, Subject
          FW: DEA Notice
13        with attachments
          [ENDO-OPIOID MDL-04881787
14        to 1788]              682
15   Par-
     Norton-39 E-mail dated 5/21/14
16        Subject, New Educational
          Video for Pharmacists
17        Addresses Prescription
          Drug Abuse - MarketWatch
18        with attachment
          [ENDO-OPIOID MDL-02794965
19        to 4967]              710
20   Par-
     Norton-40 Thumb Drive      712
21
     Par-
22   Norton-41 2009 QT Mapics Direct
          Sales Data
23        [Par_Opioid_MDL_
          0001596813_HC]        745
24
```

Page 555

```
 1          THE VIDEOGRAPHER:  We're now on
 2   the record.  My name is Phillip Todd,
 3   I'm a videographer for Golkow Litigation
 4   Services.  Today's date is January 17,
 5   2019.  The time is 8:38 a.m.
 6          This video deposition is being
 7   held in Bethlehem, PA in the matter of
 8   National Prescription Opiate Litigation
 9   for the United States District Court,
10   Northern District of Ohio, Eastern
11   Division.  The deponent is Tracey
12   Norton.  Counsel will be noted on the
13   stenographic record.
14          The court reporter is Peg Reihl
15   and will now swear in the witness.
16          ... TRACEY L. NORTON, having been
17   duly sworn as a witness, was examined
18   and testified further as follows:
19   BY MS. VANNI:
20      Q.    Good morning, Tracey.
21      A.    Good morning.
22      Q.    Can you please introduce yourself
23   to the jury.
24      A.    Yes, my name is Tracey Norton.
```

Page 556

```
 1      Q.    We've seen some documents over
 2   the course of the last couple of days where you
 3   were referred to as Tracey Hernandez.
 4          Is that a previous name you used
 5   to use?
 6      A.    Yes, it is.
 7      Q.    What is your educational
 8   background?
 9      A.    I have a Bachelor's in business
10   from Muhlenberg University and a Master's in
11   pharmaceutical policy from the University of
12   Florida.
13      Q.    And when did you earn your
14   Master's?
15      A.    In -- my Master's was 2010.
16      Q.    How long did it take you to earn
17   your Master's?
18      A.    Two years.
19      Q.    And can you give us a sense of
20   what your Master's involves.
21      A.    Yes.  It covered all different
22   types of regulations that apply to the
23   pharmaceutical industry, so FDA regulations,
24   drug approval, DEA regulations, state
```

Highly Confidential - Subject to Further Confidentiality Review

Page 557

1    regulations, basically the gamut of regulations
2    that apply to the industry.
3              Q.    And why did you get your
4    Master's?
5         A.    It was an area that I wanted to
6    pursue and make sure that I had a thorough
7    understanding, even beyond DEA compliance.
8         Q.    When did you first begin working
9    at Qualitest?
10        A.    In August of 2011.
11        Q.    And when did you leave Qualitest?
12        A.    In December of 2014.
13        Q.    So you were there about three
14   years and a couple of months?
15        A.    Yes, three years and four months.
16        Q.    What was Qualitest's customer
17   base?
18        A.    Primarily wholesalers and chains.
19        Q.    And when you say "chains," what
20   are you referring to?
21        A.    Chain drug stores.
22        Q.    When you joined Qualitest, what
23   was your position?
24        A.    The director of DEA compliance.

Page 558

1         Q.    And during your time at
2    Qualitest, did your position change?
3         A.    No.
4         Q.    As director of DEA compliance,
5    can you explain to us a little bit of what you
6    were responsible for on a day-to-day basis?
7         A.    Absolutely.  I was responsible
8    for -- excuse me -- quota, recordkeeping, such
9    as dealing with DEA 222 forms, import and export
10   documentation, also end of year reporting, ARCOS
11   reporting, SOMS and training for employees.
12        Q.    Did anyone report to you?
13        A.    Yes.  Ultimately, I had eight
14   people that reported to me.  When I first
15   started there was one.
16        Q.    And just, generally speaking,
17   what were the functions of those people who
18   reported to you?
19        A.    So I had a person for each --
20   each manufacturing and distribution facility,
21   and they were responsible for the overall
22   compliance of that facility, all of the
23   activities that I mentioned, the day-to-day
24   records and things like that.

Page 559

1              And then I also had a SOMS team
2    of SOMS manager and two associates.
3         Q.    So SOMS was handled separately?
4         A.    Yes, separate from the
5    manufacturing and distribution.
6         Q.    I want to talk to you about some
7    of the components of DEA compliance program at
8    Qualitest based on what you just told us that
9    you handled on a day-to-day basis.
10        A.    Sure.
11        Q.    I believe one thing you just
12   mentioned was quota, so I want to talk to you
13   first a little about quota, okay?
14        A.    Mm-hmm, yes.
15        Q.    Before I do that, I want to ask
16   you whether you recall being shown a
17   demonstrative that plaintiff's counsel put
18   together yesterday, it's Exhibit 4.  I think you
19   have it in front of you.
20        A.    Yes, I do.
21        Q.    It's called "Par Total Pills
22   Shipped 2008 - 2015."
23        A.    Yes.
24        Q.    Do you remember that?

Page 560

1         A.    Yes, I do.
2         Q.    Counsel represented to you
3    yesterday that the information in this
4    demonstrative was based on information that Endo
5    had pointed him to.
6              Do you recall that?
7         A.    I do.
8         Q.    Have you ever seen any of the
9    underlying data referenced in this
10   demonstrative?
11        A.    No, I have not.
12        Q.    Do you know what the data
13   represents?
14        A.    No.
15        Q.    Do you know if the data reflects
16   sales?
17        A.    I'm not sure.
18        Q.    You mentioned yesterday that it
19   could reflect more than sales.
20              Do you have a recollection of
21   that?
22        A.    Yes, yes, it could actually also
23   reflect transfers, when DEA refers to a sale
24   that can also be a transfer or a movement of

Highly Confidential – Subject to Further Confidentiality Review

Page 561

1    product from your facility to somewhere else.
2         MR. BUCHANAN:  Move to strike,
3         called for speculation.  The witness'
4         answer was speculation.
5    BY MS. VANNI:
6         Q.    Are you familiar with quota --
7         A.    Yes.
8         Q.    -- and how quota is handled?
9         A.    Yes, I am.
10        Q.    Do you know if this demonstrative
11   is accurate?
12        A.    No, I do not.
13        Q.    Counsel also referred to
14   Qualitest as pumping pills out.
15             Do you recall that?
16        A.    I do.
17        Q.    Can you describe for the jury
18   what quota is?
19        A.    Yes.  So quota is a requirement
20   by DEA, it's basically a permission to purchase
21   a certain -- in Qualitest's case, it was a
22   permission to purchase a certain quantity of raw
23   material for each controlled substance family.
24        DEA regulates that amount every year, there's a

Page 562

1    new quota assigned, and it's based on several --
2    several different things that DEA considers,
3    information that the company provides as well as
4    information that DEA obtains elsewhere.
5         Q.    Like what?
6         A.    It's based on sales data that the
7    company provides.  It's also based on
8    destruction data of material that's on hand.
9    It's based on prescriptions written, DEA does
10   review the IMS data that talks about
11   prescriptions and, you know -- so they're
12   looking for the medical need for the product.
13             It's also -- they also confer
14   with FDA on it as well, and it could also be for
15   commercial distribution, but the quota is also
16   used for research activities as well, validation
17   activities of validating new processes and
18   things like that.
19        Q.    As part of your responsibilities
20   as DEA compliance manager, did you manage quota?
21        A.    Yes.
22        Q.    And what would that require you
23   to do?
24        A.    We would interact with a lot of

Page 563

1    different departments at Qualitest to find out
2    what the needs of the department were.  So if
3    there were any research projects that were going
4    on, if there were any transfers or validations
5    that were going on.
6         So, for example, if product was
7    being made in one piece of equipment and needed
8    to be transferred to a different piece of
9    equipment, you would have to make three
10   validation batches, that was an FDA requirement,
11   so we would need to get quota for that as well.
12        We would also have information on
13   destructions and information on sales, and we
14   would be submitting all of that information to
15   DEA and also answering any follow-up questions
16   that they had on those quotas.
17        Q.    How often would you have to apply
18   for quota?
19        A.    You would apply in April of the
20   prior year for the current year.  That was your
21   initial submission, and then throughout the
22   year, as things changed, you would submit
23   additional quota requests if sales increased.
24   You could also surrender quota if you weren't

Page 564

1    using it.
2         Q.    Could it be carried over?
3         A.    No, it could not.  It was
4    basically for that one year, and anything that
5    was not used in the permission by December 31st
6    was forfeited.
7         Q.    Approximately how much of your
8    time was spent managing quota?
9         A.    Probably about 40%.
10        Q.    And as part of your
11   responsibilities in managing quota, would you
12   communicate with the DEA?
13        A.    Yes, on a regular basis, mostly
14   with DEA headquarters.
15        Q.    Based on your experience and
16   knowledge of how quota works, could Qualitest
17   just be pumping pills out, as counsel suggested?
18        A.    No.
19             MR. BUCHANAN:  Objection to form.
20   BY MS. VANNI:
21        Q.    Why is that?
22        A.    DEA basically regulates how much
23   we can make, and, again, it's based on a number
24   of factors, one of which is medical need.

5 (Pages 561 to 564)

Page 565

1    Q.    You also mentioned, I believe you
2  said recordkeeping or end of year recordkeeping
3  reporting.
4            Can you tell the jury what that
5  is?
6    A.    Yes.  So every transfer that we
7  have of a Schedule I or II drug, which is what
8  oxycodone or hydrocodone was, every movement
9  that we make of those drugs is visible to DEA.
10  There's a form called a DEA 222 form, which is a
11  three-part form issued by DEA.  The purchaser
12  receives a copy, the supplier receives a copy,
13  and DEA gets a copy.  So they're aware of every
14  movement and every customer purchase of Schedule
15  I or Schedule II drugs.  So that's the 222s.
16            Then we also did ARCOS reporting,
17  which is a quarterly report, could also be
18  monthly, depending on how the company wants to
19  submit it, but it's a quarterly report that sums
20  up all sales, all purchases.  And by "sales," I
21  mean movement as well as actual sales.  All
22  purchases, all transfers that we would make
23  within the company or externally, all of that is
24  recorded and submitted to DEA on a regular

Page 566

1  basis.  So, again, they have additional
2  information about your movements.
3            And then at the end of the year,
4  we also did an end of year report, and that was
5  a full accountability of everything on site
6  of -- a large part of that is your end of year
7  inventory, and you count everything on site, and
8  then you reconcile to the prior year's
9  inventory, and that gets submitted to DEA as
10  well.
11            MR. BUCHANAN:  Move to strike the
12      narratives, and, frankly, they should
13      proceed in a question, answer not with
14      narratives.
15  BY MS. VANNI:
16    Q.    And why is end of year reporting
17  important?
18    A.    It's important because it's a
19  total reconciliation and it shows that you are
20  able to account for all of your product.  There
21  is some loss that's allowed by DEA, because they
22  expect that you're going to have some
23  manufacturing loss due to the processes, but
24  there's an unspoken percentage that DEA will

Page 567

1  investigate and you'll have to explain if you
2  can't account for everything.
3    Q.    If you're not able to reconcile
4  your numbers, what do you have to do?
5            MR. BUCHANAN:  Objection to form,
6      calls for narrative.
7            THE WITNESS:  You would have to
8      report it to DEA if you can't reconcile,
9      and there could be a violation.
10  BY MS. VANNI:
11    Q.    You were asked some questions
12  yesterday about the SOMS program at Qualitest.
13            Do you recall that?
14    A.    Yes.
15    Q.    First of all, can you define what
16  SOMS is?
17    A.    Suspicious order monitoring
18  system.
19    Q.    And why is -- is a SOMS program
20  important, in your view?
21    A.    It is, yes.
22    Q.    And why?
23    A.    Because we need to make sure that
24  we're shipping product to customers that are

Page 568

1  legitimate and that have legitimate use of the
2  product.
3    Q.    You were asked some questions
4  yesterday about a DEA meeting that Qualitest had
5  in March of 2013.
6            Do you recall those?
7    A.    I do.
8    Q.    And I believe that counsel made
9  some reference to Qualitest being called to or
10  summoned to the DEA in DC, and I think you
11  referred to it as a different kind of meeting.
12            Can you describe the meeting that
13  Qualitest had with DEA in March of 2013?
14    A.    Yes.
15            MR. BUCHANAN:  Objection,
16      misstates the record.
17            THE WITNESS:  DEA had a
18      distributor initiative that was ongoing
19      for several years, and it was their
20      intent to meet with all distributors,
21      all distributor registrants and to share
22      information, and it was really a meeting
23      where they were talking to industry
24      about some possible things that they

6 (Pages 565 to 568)

Highly Confidential - Subject to Further Confidentiality Review

Page 569

1          could look at to improve their SOMS
2      program, as well as getting information
3      from industry as to what tools might be
4      out there, what they were doing that
5      could also be of value.  Really looking
6      to partner to -- to help make the SOMS
7      programs the best it could be.
8              MR. BUCHANAN:  Objection, move to
9      strike, lack of foundation.
10     BY MS. VANNI:
11         Q.    Did you personally attend the
12     meeting?
13         A.    I did.
14         Q.    Did you interact with DEA at the
15     meeting?
16         A.    I did, yes.
17         Q.    Counsel showed you a variety of
18     documents yesterday to establish that you knew
19     about certain factors that went into having an
20     effective SOMS program.
21              Before you met with the DEA in
22     March of 2013, do you remember that line of
23     questioning?
24         A.    Yes, I do.

Page 570

1          Q.    In fact, I believe counsel's
2      question was something to the effect of you knew
3      what was important before the DEA meeting in
4      2013, right?
5              MR. BUCHANAN:  Objection to form.
6              THE WITNESS:  Yes.
7      BY MS. VANNI:
8          Q.    Do you recall that?
9          A.    I do.
10         Q.    In fact, that's true, right?
11         A.    It is very true.
12         Q.    Is there any dispute about that?
13         A.    No, not at all.
14         Q.    Do you have an understanding, as
15     you sit here today, why Qualitest hired you in
16     2011?
17         A.    I do.
18         Q.    What is that?
19         A.    Qualitest hired me to come in and
20     make improvements to the DEA program that they
21     wanted to have, and that includes all of the
22     recordkeeping quotas, SOMS, make improvements
23     across the board.
24              MR. BUCHANAN:  Objection.  Move

Page 571

1          to strike, absence of foundation.
2      BY MS. VANNI:
3          Q.    And when you started at
4      Qualitest, were there some areas of improvement
5      that you wanted to address with respect to the
6      SOMS program?
7          A.    Yes, there were.
8          Q.    Okay.  And what were some of
9      those areas?
10         A.    I had heard at DEA conferences
11     that there were things that DEA thought that
12     industry could do to improve SOMS programs, such
13     as a customer questionnaire, a customer on-site
14     visits, putting boots on the ground, to visit
15     your customers, SOPs, chargeback data.  Those
16     were all things that had come up at DEA
17     conferences in the past and that DEA was
18     suggesting could be helpful.
19         Q.    Were they required by regulation?
20         A.    They were not.
21              MR. BUCHANAN:  Objection to form,
22     foundation.
23     BY MS. VANNI:
24         Q.    Are you familiar with the

Page 572

1      regulation?
2          A.    I am, yes.
3          Q.    I want to show you what plaintiff
4      used yesterday, I believe it was Exhibit 17.  I
5      think you have it in front of you.
6              If you could go to I believe it's
7      page 574.24.
8          A.    Yes.
9          Q.    Under "Potential Failure
10     Mode/Effect."
11              Do you see where I am?
12         A.    I do.
13         Q.    It says, "Our current Suspicious
14     Order Monitoring Program (SOMS) was built in
15     pieces and only applies to the retail side of
16     the business."
17         A.    Yes.
18         Q.    "DEA requires it to apply to all
19     customers.  In addition, the current system has
20     had two issues in the past year that resulted in
21     controlled product being released that should
22     not have been.  The system needs to be revamped,
23     all customers added, IMS data and chargeback
24     data incorporated and eventually a contracted

Highly Confidential – Subject to Further Confidentiality Review

Page 573

1    customer assessment firm hired or an on-site
2    SOMS specific individual to perform these
3    assessments."
4            Do you know who wrote this?
5    A.    I did.
6    Q.    Yesterday counsel had suggested
7    to you that this document was written in
8    January 2013 because it was attached to an
9    e-mail from that date.
10           Do you recall that?
11   A.    Yes, I do.
12   Q.    When was this document written?
13   A.    This document was a living
14   document that was written from -- started at the
15   time when -- at the time that I was hired and as
16   I reviewed different areas, I added to the
17   document, on an ongoing basis.
18   Q.    And what was the purpose of you
19   doing that?
20   A.    To document things that I wanted
21   to improve at the company and to basically make
22   sure that we addressed all of them.
23   Q.    Your comments with respect to the
24   current suspicious order monitoring program that

Page 574

1    I just read, were they -- was that based on
2    observations that you made?
3    A.    It was.
4    Q.    Can you estimate for us when you
5    started looking at the SOMS program at
6    Qualitest?
7    A.    Basically --
8            MR. BUCHANAN:  Calls for
9    speculation.
10           THE WITNESS:  -- when I started.
11   BY MS. VANNI:
12   Q.    And I think we've established
13   that you started in 2011.  Do you remember the
14   month?
15   A.    August of 2011, yes.
16   Q.    Tracey, did you wait until the
17   DEA meeting in March 2013 to start looking at
18   the SOMS program?
19   A.    Absolutely not.
20   Q.    If you started looking at the
21   SOMS program around the time you were first
22   hired at Qualitest, can you explain to the jury
23   why all of the changes that you wanted to make
24   were not implemented before March 2013?

Page 575

1    A.    Yes.
2            MR. BUCHANAN:  Objection,
3    foundation.
4            THE WITNESS:  Creating a SOMS
5    program is an extremely involved
6    process, especially if you want to do it
7    right, and our -- we had to evaluate the
8    electronic systems that were available
9    to us, our own internal system to see if
10   it was capable of handling and our IT
11   structure to see if they could build --
12   we could build our own system in-house
13   versus outsource it.  We had to hire
14   people to manage the program on a
15   regular basis.  We had to write SOPs.
16   We had to educate internal people on
17   what the program was about and how to
18   use it.  And we had to make sure that we
19   had the capability to visit customers.
20   We had to review chargeback data.  There
21   were a lot of different things that went
22   into developing an enhancement of that
23   program.
24

Page 576

1    BY MS. VANNI:
2    Q.    You mentioned needing to hire
3    people?
4    A.    Yes.
5    Q.    Were you involved in the hiring
6    process?
7    A.    I was.
8    Q.    Can you describe a little bit for
9    us why that would take time?
10   A.    It took a long time because of
11   the facility being in Huntsville, for one.  It
12   was not -- not really in the pharmaceutical
13   belt, so it was a little bit difficult to find
14   someone who had applicable experience and then,
15   also, we wanted to -- I wanted to make sure that
16   we found the right person.  I think it's a very
17   important role.  So it definitely took a long
18   time to get the right person in and to write the
19   job descriptions as well.
20   Q.    With respect to the DEA meeting
21   that you were questioned about yesterday, you
22   made a comment or provided testimony that
23   counsel moved to strike that the SOMS -- that
24   the DEA did not find Qualitest SOMS program

8  (Pages 573 to 576)

Highly Confidential - Subject to Further Confidentiality Review



Page 577

1    inadequate.
2        Do you recall that?
3        A.   I do, yes.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 579

Page 578

Page 580

1        Q.    Yesterday you were shown
2    Plaintiffs' Exhibit Number 5.  You should have
3    it in front of you.  I can direct your attention
4    to the second page of that document on Qualitest
5    letterhead dated October 18, 2013?
6        A.    Yes.
7        Q.    Turn the back page of it, 594.4,
8    is that your signature?
9        A.    Yes, it is.
10        Q.    Did you send this letter?
11        A.    I did.
12        Q.    What is -- what was the purpose
13    in you sending this letter?
14        A.    The purpose of the letter was to
15    notify our customers that we were going to be
16    asking for additional information from them in
17    the form of a questionnaire, that we were
18    concerned we would be looking at orders in
19    different ways than we had in the past and --
20        Q.    Different how?
21        A.    Different through the new
22    electronic system, so those -- the information
23    that the new electronic system would give us
24    would be additional information.  We may be

Highly Confidential - Subject to Further Confidentiality Review

Page 581

1   coming back to the customers to ask questions,
2   and so it was really just notifying them that,
3   you know, they might get calls from us that they
4   did have to fill out this questionnaire,
5   basically putting them on alert to this change.
6        Q.   If the customers did not fill out
7   questionnaires, would you take any steps or
8   actions or would anybody in your department?
9        A.   Yes, we would follow up with them
10  at first to give them an opportunity.  If it
11  didn't -- hadn't been sent to the correct
12  person, we wanted to make sure that it
13  absolutely did get to the right person.  If they
14  didn't fill it out after that, then we would
15  take action against them as far as not servicing
16  them.
17       Q.   If I could direct your attention
18  to the third paragraph, it's the second sentence
19  begins, "Qualitest is enhancing its due
20  diligence efforts when fulfilling orders to
21  provide greater assurance that our products are
22  purchased by appropriate patients for prescribed
23  uses."
24            Did I read that correctly?

Page 582

1        A.   Yes, you did.
2        Q.   What did you mean by that
3   statement?
4        A.   We wanted to make sure that we
5   were doing everything we could, meeting the
6   regulation, which is what we were doing
7   previously, but we also wanted to make sure that
8   we were building in some of the things that I
9   knew had been suggestions and feedback from DEA
10  in the past to make sure that we were doing
11  whatever we could to prevent our product from
12  getting into illegitimate hands.
13       Q.   And I think we established you're
14  familiar with the DEA regulations?
15       A.   Yes.
16       Q.   The things that you were able to
17  implement during your time at Qualitest with
18  respect to the SOMS program, were they required
19  under the regulation?
20            MR. BUCHANAN:  Objection to the
21  form, foundation.
22            THE WITNESS:  No, they were not
23  required.
24  BY MS. VANNI:

Page 583

1        Q.   I believe you mentioned customer
2   visits as well?
3        A.   Yes.
4        Q.   Were you able to implement
5   customer visits after the DEA meeting?
6        A.   We were, yes.
7        Q.   And why did you want to do that?
8        A.   It was one of the suggestions
9   that DEA had had, and I had seen it being
10  suggested by DEA previously as well.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 584

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential – Subject to Further Confidentiality Review

Page 585

1 BY MS. VANNI:
2      Q.     And what time frame are we
3 talking about here with respect to your
4 description of the SOMS program, as you just
5 provided it?
6      A.     As far as when did the customer
7 visits start?
8      Q.     No, in terms of the questions
9 that I was just asking you generally in terms of
10 the SOMS program, how it operated, what time
11 frame are you referring to?
12      So the time frame of an order
13 pending versus the investigation and all the
14 happenings, so it --
15      Q.     My question was a little bit
16 different.
17      What years are we talking about
18 that the SOMS program operated like this?
19      A.     Basically 2013, 2014.
20      Q.     You also when you were describing
21 your overall DEA compliance responsibilities at
22 Qualitest, you had mentioned training?
23      A.     Yes.
24      Q.     What do you mean by "training"?

Page 586

1      A.     We did a lot of training for
2 employees, a lot of different types of training.
3      So the main one was the general
4 overview, which covered I called it soup to nuts
5 on the DEA regulations, all of the
6 recordkeeping, the requirements, storage
7 requirements, the general overview of quota, the
8 need for the suspicious order monitoring.  It
9 covered everything.
10      MR. BUCHANAN:  Objection to form
11      as to time again.  I'm sorry it's
12      belated, but if you want to correct it
13      to clarify, I just wanted to give you
14      notice.
15 BY MS. VANNI:
16      Q.     When would you have implemented
17 training?
18      A.     Basically when I started.
19      Q.     So we're talking like the 2011
20 time frame?
21      A.     Correct.
22      Q.     And would the training be
23 provided at different points in time?
24      A.     It would, yes.  It was provided

Page 587

1 on an ongoing basis across the employee.
2      Q.     Would you personally provide the
3 training, or would people on your team do it?
4      A.     At first I was the main one
5 providing the training.  Certain specific
6 training others gave, so, for example, our SOM
7 manager gave specific SOMS training.
8      Q.     What kind of -- what's your
9 understanding of what training Mr. Brantley
10 would provide?
11      A.     Basically, why we needed the SOMS
12 program.
13      MR. BUCHANAN:  Objection to form,
14      foundation.
15      THE WITNESS:  What types of
16      things we would look for and why it was
17      important, things that we would
18      document.
19 BY MS. VANNI:
20      Q.     Prior to someone on your team
21 giving training to someone in the company, would
22 you have a discussion with them?
23      A.     We were discussing things with
24 employees all the time, so it was really an

Page 588

1 ongoing education process, so we would train and
2 talk to all employees, all levels.
3      Q.     Finally, you were asked some
4 questions yesterday about some industry groups
5 that you belong to, specifically the
6 anti-diversion working group and the New Jersey
7 Pharmaceutical Industry Group.
8      Do you remember that?
9      A.     I do, yes.
10      Q.     Can you describe for the jury
11 what the anti-diversion working group is?
12      A.     Yes, the anti-diversion working
13 group was put together -- it consisted of
14 manufacturers and distributors, it was a group
15 that met maybe four times total.  It --
16      Q.     What was the purpose of the
17 group?
18      A.     The purpose of the group was to
19 collaborate, to see if there was a way that we
20 could impact abuse and diversion in a positive
21 way, to help to prevent it, and we came up with
22 the red flags video.
23      Q.     What is the red flags video?
24      A.     It's a video that's directed to

11 (Pages 585 to 588)

Highly Confidential - Subject to Further Confidentiality Review

Page 589

1    pharmacies and pharmacists, and it basically
2    talks about things that they should look for in
3    patients or individuals that are seeking to
4    divert the product.
5        Q.    What is the -- what was the
6    purpose of that?
7        A.    The purpose was to make sure that
8    pharmacists were aware of things to look for to
9    help to prevent diversion.  We were concerned
10   about it and wanted to try to do whatever we
11   could.
12       Q.    Do you know if the DEA was aware
13   of this group?
14       A.    The DEA was aware of the group.
15   DEA was actually -- I believe they were sent --
16   also sent a copy of the video.
17       MR. BUCHANAN:  Objection move to
18   strike, foundation.
19   BY MS. VANNI:
20       Q.    You also were asked about your
21   time at -- involved in the New Jersey
22   Pharmaceutical Industry Group?
23       A.    Yes.
24       Q.    Do you recall that?

Page 590

1        A.    Mm-hmm.
2        Q.    What is that?
3        A.    It's a working group of peers,
4    others in the companies that handled DEA
5    compliance, and the group gets together maybe
6    once or twice a year, and the purpose is to
7    share learnings of DEA regulations and to get
8    industry to do benchmarking.
9        Q.    What is benchmarking?
10       A.    Basically to see what other
11   companies are doing in some areas so --
12       Q.    Why is that important?
13       A.    It's important because it helps
14   to -- helps to keep you abreast of what's new
15   and what's developing.  It also helps to know
16   what's going on in other companies, because
17   sometimes you might want to implement something
18   internally and you're asked, you know, by others
19   in your company, well, what are other companies
20   doing?  So to have that background and that
21   knowledge, to a certain extent, obviously, there
22   are, you know, pretty big confidentiality issues
23   when you're dealing with people who are our
24   competitors, so there's not a lot of detail

Page 591

1    shared, but there is some detail shared.
2        Q.    And why did you decide to join
3    these groups?
4        A.    The group actually started, the
5    New Jersey working group actually started
6    through a request from the local DEA, and DEA
7    was looking to have a good working relationship
8    with industry and to make sure that we,
9    together, could do, you know, everything that we
10   could from a prevention of abuse and diversion.
11       MS. VANNI:  At this point I don't
12   have any further questions for you.  I
13   might have some follow-up after.
14       THE WITNESS:  Okay.
15       MS. VANNI:  Thank you.  Pass the
16   witness.
17       MR. BUCHANAN:  You can go off the
18   record.  Thank you.
19       THE VIDEOGRAPHER:  The time is
20   now 9:13.  We are off the record.
21       (Brief recess.)
22       THE VIDEOGRAPHER:  9:15, back on
23   the record.
24   BY MS. KOSKI:

Page 592

1        Q.    Good morning, I introduced myself
2    earlier on the record, but my name is Katie
3    Koski, and I represent Anda, Inc.
4        Over the course of your
5    deposition you've been asked a lot of questions
6    or we've heard a lot of answers about a couple
7    of different concepts that I want to discuss
8    with you this morning, concepts such as ordering
9    limits or thresholds.
10       Are you familiar with that
11   concept?
12       A.    Yes.
13       Q.    And customer dispensing data or
14   dispensed data.
15       Do you recall talking about that?
16       A.    I do.
17       Q.    And we've heard reference to
18   customer questionnaires, do you recall that?
19       A.    Yes.
20       Q.    And there have been references to
21   electronic order monitoring or electronic order
22   systems?
23       A.    Yes.
24       Q.    And I'd like to ask some

Highly Confidential – Subject to Further Confidentiality Review

Page 593

1    questions about those concepts.
2        So you've worked in DEA
3    compliance for about 25 years; is that right?
4        A.    Yes.
5        Q.    And you understand when I refer
6    to DEA compliance that I mean working with a
7    company's obligations under the Federal
8    Controlled Substances Act, right?
9        A.    I do.
10       Q.    And you're familiar with that
11   statute?
12       A.    Yes, I am.
13       Q.    So if I referred to 21 USC
14   Section 801, you understand what that is; is
15   that right?
16       A.    I understand the 21 USC, yes.
17       Q.    Okay.  And is it fair to say
18   throughout the course of your career, you had
19   occasion to review the statute?
20       A.    I have.
21       Q.    Okay.  And you're familiar with
22   Section 823 of the Act, right?
23       A.    I'm not sure exactly what 823 is
24   but...

Page 594

1        (Document marked for
2        identification as Par-Norton Deposition
3        Exhibit No. 31.)
4    BY MS. KOSKI:
5        Q.    Okay.  I'm going to hand you what
6    we've then marked as Exhibit 31.
7        MR. BUCHANAN:  You said 31?
8        MS. KOSKI:  Yes.
9    BY MS. KOSKI:
10       Q.    And you recognize the document
11   that I handed you as Section 823 of the
12   Controlled Substances Act?
13       A.    Yes, I do.
14       MR. BUCHANAN:  Counsel, I just
15       wanted to note a preliminary objection.
16       I trust this is going to be fact
17       testimony.  It doesn't sound like it to
18       me at this point, but I just wanted to
19       give you notice that this does not seem
20       to be related to the witness' experience
21       or at least my examination of the
22       witness, so I don't feel constrained by
23       whatever time you use if I need more
24       time.

Page 595

1        MS. KOSKI:  We'll agree to
2    disagree on that.
3        MR. BUCHANAN:  That's fine.
4    BY MS. KOSKI:
5        Q.    Ms. Norton, you're familiar with
6    the statute?
7        A.    Yes.
8        Q.    Having taken a look at it just
9    now, Exhibit 31, does that refresh your
10   recollection as to the statute?
11       A.    Yes, I just wasn't sure offhand
12   what 823 was.
13       Q.    And yesterday during the course
14   of your examination, you referred on several
15   occasions to statutes of regulations that govern
16   DEA compliance, the role that you served?
17       A.    Yes.
18       Q.    Okay.  And if you refer to
19   Section 823, you see that that governs the
20   registration of pharmaceutical manufacturers and
21   distributors, right?
22       A.    Yes, it does.
23       Q.    And we talked at length yesterday
24   that you worked primarily for pharmaceutical

Page 596

1    manufacturers and then later in your career for
2    a distributor; is that right?
3        A.    Yes, that's correct.
4        Q.    Okay.  And for both manufacturers
5    and distributors, Section 823 provides that the
6    Attorney General shall register an applicant to
7    manufacture or distribute controlled substances
8    if he determines such registration is consistent
9    with the public interest.
10       Do you see that?
11       A.    Yes, I do.
12       Q.    And Section 823 in front of you
13   also provides that "In determining the public
14   interest, the following factors shall be
15   considered," and then it lists several, which
16   includes maintenance of effective controls
17   against diversion of particular controlled
18   substances into other than legitimate medical,
19   scientific and industrial channels.
20       You see that, right?
21       A.    Yes, I do.
22       Q.    In fact, that's the only section
23   of the Controlled Substances Act that addresses
24   maintenance of effective controls against

13  (Pages 593 to 596)

Highly Confidential – Subject to Further Confidentiality Review

Page 597

1  diversion, right?
2      MR. BUCHANAN:  Objection to the
3  form, leading, and, frankly, you should
4  do this with experts.  This is also
5  beyond yesterday.  This is not fact
6  testimony, counsel.  Put it in a legal
7  brief, get an expert, do something, but
8  this is not appropriate redirect
9  examination.
10      MS. KOSKI:  You may object as to
11  form, if you want a standing objection
12  other than your speech that you just
13  gave, you can have it.
14      MR. BUCHANAN:  No, I think you
15  should know the basis of the objection.
16  This is beyond -- this is expert.
17      MS. KOSKI:  I don't need -- I
18  don't need to know the basis of the
19  objection.  You can object as to form.
20  BY MS. KOSKI:
21      Q.    And I'll repeat my question.
22      This is the only section of the
23  Controlled Substances Act that addresses
24  maintenance of effective controls against

Page 598

1  diversion, right?
2      MR. BUCHANAN:  It's leading.
3      THE WITNESS:  I think overall the
4  regulations as a whole address in
5  different ways those controls.  It does
6  reference that specific wording here.
7  BY MS. KOSKI:
8      Q.    Okay.  And in the Controlled --
9  the Federal Controlled Substances Act, the
10  statute, there's no mention of suspicious order;
11  is that fair?
12      MR. BUCHANAN:  Objection to form
13  and the leading, counsel.  It's a new
14  area.  It should be direct examination.
15      MS. KOSKI:  I'm sorry.  You can
16  object as to form, and you can preserve
17  your record as to form.
18      MR. BUCHANAN:  You're leading a
19  witness on expert territory, counsel.
20  It's highly improper.
21      MS. KOSKI:  It's a form
22  objection.  You can object as to form.
23      MR. BUCHANAN:  I'll just tell
24  you, counsel, it's not appropriate

Page 599

1  redirect.
2  BY MS. KOSKI:
3      Q.    The Act doesn't mention --
4  doesn't include the phrase suspicious order,
5  right?
6      MR. BUCHANAN:  That is leading.
7      THE WITNESS:  The CFR
8  mentions suspicious order.
9  BY MS. KOSKI:
10      Q.    I'm talking about the statute in
11  front of you, the Controlled Substances Act.
12      MR. BUCHANAN:  That's leading.
13      THE WITNESS:  It does not say it
14  here, no.
15  BY MS. KOSKI:
16      Q.    And you know that there is no
17  reference in the Controlled Substances Act to a
18  "suspicious order monitoring system," correct?
19      MR. BUCHANAN:  Objection to the
20  leading, counsel.
21      THE WITNESS:  Not to a system.
22  BY MS. KOSKI:
23      Q.    Okay.  And there's no language in
24  the section of the Controlled Substances Act

Page 600

1  that you have in front of you that says to "know
2  your customer," right?
3      MR. BUCHANAN:  Objection to the
4  leading, counsel.
5      THE WITNESS:  No, there is not.
6  BY MS. KOSKI:
7      Q.    And there's no section in the
8  Controlled Substances Act in front of you that
9  refers to dispense data or dispensing data,
10  right?
11      A.    There is not.
12      MR. BUCHANAN:  Objection to the
13  leading, counsel.
14  BY MS. KOSKI:
15      Q.    And there's no mention of
16  customer questionnaire in the Act either, right?
17      A.    There is not.
18      MR. BUCHANAN:  Objection to the
19  leading.
20      You just have to give me a moment
21  to get my objections in.  Apparently,
22  there are going to be quite a few.
23      THE WITNESS:  I'm sorry.
24      MR. BUCHANAN:  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

Page 601

1   BY MS. KOSKI:
2       Q.   And the Act does not refer to
3   internet pharmacies, right?
4           MR. BUCHANAN:  Objection to the
5   leading.
6           THE WITNESS:  It does not.
7   BY MS. KOSKI:
8       Q.   And there's no provision of the
9   Act that states that distributors may not fill
10  orders that are identified by them as
11  potentially "suspicious orders"?
12          MR. BUCHANAN:  Objection to the
13  leading, counsel.
14  BY MS. KOSKI:
15      Q.   There's nothing in the Act in
16  front of you that says that?
17          MR. BUCHANAN:  Objection to the
18  leading.  Those words, is that what
19  you're saying?
20          MS. KOSKI:  Yes.
21          MR. BUCHANAN:  Leading.
22  BY MS. KOSKI:
23      Q.   You can answer.
24      A.   The CFR --

Page 602

1       Q.   Referring to the Controlled
2   Substances Act in front of you.  We'll talk
3   about the CFR after that.
4       A.   No.
5       Q.   Okay.  And the Act doesn't have
6   any provision that requires distributors to
7   create an ordering system that allows a customer
8   to submit suspicious orders so that the
9   distributor can then report those orders to the
10  DEA, right?  That's not in the language of the
11  statute?
12          MR. BUCHANAN:  I'll object to the
13  leading.
14          THE WITNESS:  No.
15          MR. BUCHANAN:  I'm also going to
16  object to the examination, counsel.
17          Did you serve a separate notice
18  for this examination?  This goes well
19  beyond the direct examination.
20          MS. KOSKI:  It doesn't.
21          MR. BUCHANAN:  It does.  Did you
22  serve a separate notice?
23          MS. KOSKI:  If references all of
24  the concepts that you discussed.

Page 603

1           MR. BUCHANAN:  Did you serve a
2   notice on this?
3           MS. KOSKI:  You can object as to
4   form.
5           MR. BUCHANAN:  No, no, no, no.
6   I'm objecting because you don't have the
7   right to do this.
8           If you want to do this with this
9   witness, you need to serve a notice;
10  otherwise, you're limited to the
11  examination that I conducted.
12          MS. KOSKI:  And this is
13  clearly visible --
14          MR. BUCHANAN:  This is not.
15          MS. KOSKI:  Well, we can --
16          MR. BUCHANAN:  You're using her
17  as an expert.
18          MS. KOSKI:  This is within the
19  scope.
20          MR. BUCHANAN:  Tender her as a
21  26(a)(1) expert if you want to.
22          MS. KOSKI:  I'm sorry, I'm not
23  using her as an expert.
24          MR. BUCHANAN:  Then we'll take

Page 604

1   the full examination.
2           MS. KOSKI:  I'm using -- this is
3   within the scope of your examination
4   yesterday.
5           MR. BUCHANAN:  It's absolutely
6   not.  Does everybody here consent to
7   this?  Because if you do, it's going
8   well beyond the time.  We're going to
9   kick open the door and we're going to go
10  all morning.
11          MS. KOSKI:  I object to that.
12  It's within the scope.
13          MR. BUCHANAN:  That's all right,
14  we'll sit here.
15  BY MS. KOSKI:
16      Q.   And you've heard reference
17  throughout your deposition -- I think you
18  actually referred to the term registrants,
19  right?
20      A.   Yes.
21      Q.   Okay.  And registrants are -- the
22  term registrant is because of Section 823 that
23  talks about the registration, right?
24          MR. BUCHANAN:  Objection to

Highly Confidential – Subject to Further Confidentiality Review

Page 605

1          foundation and the leading.
2               THE WITNESS:  The registration.
3      BY MS. KOSKI:
4          Q.    Okay.  And when you referred to
5      the term yesterday throughout your deposition as
6      registrant, that was someone who was registered
7      to either manufacture or distribute controlled
8      substances pursuant to the Controlled Substances
9      Act; is that correct?
10              MR. BUCHANAN:  Objection to form,
11          leading.
12              THE WITNESS:  There are other
13          types of registration as well.
14     BY MS. KOSKI:
15         Q.    And you referred during your
16     testimony yesterday to the DEA regulations that
17     relate to the distribution and manufacture of
18     controlled substances, right?
19         A.    Yes.
20         Q.    And I believe you referred to
21     that -- the CFR, I think you referenced that, is
22     that the Code of Federal Regulations?
23         A.    Yes, it is.
24         Q.    And is that what you were

Page 606

1      referring to when you said the DEA regulations
2      that you used in your work as a compliance
3      director?
4          A.    Yes.
5          Q.    Okay.  And I believe you said the
6      regulations are -- that's what you worked with
7      more than the statute itself; is that right?
8               MR. BUCHANAN:  Objection to form
9          and the leading.
10              THE WITNESS:  Yes.
11     BY MS. KOSKI:
12         Q.    Is that a fair summary of your
13     testimony yesterday that the regulations are
14     something you used as part of your roles and
15     responsibilities as a director of compliance?
16              MR. BUCHANAN:  Objection,
17          overbroad.
18              THE WITNESS:  Yes.
19     BY MS. KOSKI:
20         Q.    And you know that those
21     regulations don't refer to "know your customer,"
22     right?
23              MR. BUCHANAN:  Objection to form
24          and the leading.

Page 607

1               THE WITNESS:  Yes.
2      BY MS. KOSKI:
3          Q.    And they don't make any mention
4      of dispensing data?
5               MR. BUCHANAN:  Objection to form,
6          leading.
7               THE WITNESS:  They do not.
8      BY MS. KOSKI:
9          Q.    And they don't refer to customer
10     questionnaires in the regulations, right?
11              MR. BUCHANAN:  Objection to form,
12          leading.
13              THE WITNESS:  They do not.
14     BY MS. KOSKI:
15         Q.    And one of the other things that
16     you mentioned yesterday throughout your
17     testimony is guidance from DEA.
18              Do you recall that testimony?
19         A.    I do.
20         Q.    Okay.  And as someone with your
21     background in DEA compliance, you're familiar
22     with the concept of guidance from the agency
23     that regulates your business, right?
24         A.    Yes.

Page 608

1          Q.    Okay.  And guidance sort of
2      generally refers to the way the DEA as an agency
3      itself or as individual employees of the DEA
4      communicate with you as an industry participant;
5      is that a fair summary?
6               MR. BUCHANAN:  Objection to form.
7               THE WITNESS:  Yes.
8      BY MS. KOSKI:
9          Q.    And as you talked about yesterday
10     and I think earlier this morning as well, it may
11     come in the form of a presentation given by
12     representatives of the agency, right?
13              MR. BUCHANAN:  Objection to form.
14              THE WITNESS:  Yes, that's
15          correct.
16     BY MS. KOSKI:
17         Q.    Okay.  And you've attended those
18     types of presentations by DEA representatives?
19         A.    I have.
20         Q.    Okay.  Could DEA guidance also
21     come in the form of conversations between
22     representatives of the industry and members of
23     DEA?
24              MR. BUCHANAN:  Objection,

16  (Pages 605 to 608)

Highly Confidential – Subject to Further Confidentiality Review

Page 609

1       foundation.
2               THE WITNESS: Yes, it could.
3       BY MS. KOSKI:
4       Q.    In your experience, has that
5   actually happened?
6       A.    Yes, it has.
7       Q.    And you talked a lot about that
8   yesterday in the context of your many years in
9   the industry; is that fair?
10              MR. BUCHANAN: Objection,
11          overbroad.
12              THE WITNESS: Yes.
13      BY MS. KOSKI:
14      Q.    Mr. Buchanan asked you about
15  conversations you had with DEA agents?
16      A.    Yes.
17      Q.    And it may come in the form of
18  written statements sent to one or more industry
19  participant as well, guidance from the DEA that
20  is?
21              MR. BUCHANAN: Objection, form.
22              THE WITNESS: Yes.
23      BY MS. KOSKI:
24      Q.    And there's a -- is there a

Page 610

1   difference, in your mind, between the Controlled
2   Substances Act that we marked as Exhibit 31 and
3   the guidance in the form of conversations or
4   presentations from DEA agents?
5               MR. BUCHANAN: Objection to form.
6               THE WITNESS: Yes, there is.
7       BY MS. KOSKI:
8       Q.    Now, yesterday during the course
9   of your testimony, you heard reference to things
10  like notice of violation or I believe there was
11  a reference to being summoned to the DEA and
12  things like that.
13              Do you recall that testimony?
14      A.    I do.
15      Q.    Okay.  So I'd like to talk to you
16  a little bit about your understanding of how DEA
17  interacts with members of the industry.
18              And so, for example, on one side
19  of the house, DEA has some sort of, for lack of
20  a better word, law enforcement responsibilities.
21              Are you familiar with take?
22              MR. BUCHANAN: Objection to form.
23              THE WITNESS: Yes, I am.
24              MR. BUCHANAN: I'll renew my

Page 611

1   continuing objection as to the scope of
2   this examination.
3   BY MS. KOSKI:
4       Q.    And by law enforcement, DEA acts
5   as a sort of a police; is that fair?
6               MR. BUCHANAN: Objection to form
7           and the leading.
8               THE WITNESS: Yes, there are
9           agents.
10      BY MS. KOSKI:
11      Q.    Okay.  And they might investigate
12  criminal activity, for example?
13      A.    Yes.
14      Q.    And they may refer cases to the
15  Department of Justice for prosecution if they
16  have reason to believe there's criminal activity
17  happening within the industry.
18              Are you familiar with that?
19      A.    Yes.
20      Q.    And now based on your testimony
21  yesterday, your experience, is it fair to say,
22  was more on the DEA's administrative or civil
23  side of their responsibilities; is that fair?
24      A.    The meetings with DEA?

Page 612

1       Q.    Right.
2       A.    Yeah.
3       Q.    Those weren't criminal in nature
4   that you're aware of?
5               MR. BUCHANAN: Objection to form.
6               THE WITNESS: No, they were not.
7       BY MS. KOSKI:
8       Q.    Okay.  And over the course of
9   your testimony yesterday, I believe we saw some
10  documents in reference to some meetings that
11  would have been on behalf of DEA as the agency.
12              Do you recall that?
13      A.    I'm sorry?
14      Q.    For example, we saw a letter
15  issued a dear registrant letter I believe that
16  you testified about yesterday.
17              Do you recall that testimony?
18      A.    I do.
19      Q.    Okay.  And is it your
20  understanding that was a communication sent on
21  behalf of the agency itself?
22      A.    Yes.
23      Q.    But you've also -- you also
24  testified yesterday, in your experience, and

Highly Confidential – Subject to Further Confidentiality Review

Page 613

1  correct me if I'm wrong with this, that you've
2  engaged at a more sort of one-on-one level with
3  representatives of the agency in the course of
4  your business, right?
5       MR. BUCHANAN:  Objection to the
6  leading.
7       THE WITNESS:  Yes.
8  BY MS. KOSKI:
9       Q.   And on the administrative power
10  side, which you testified being more familiar
11  with, you're aware that DEA can take different
12  actions against industry participants; is that
13  right?
14       MR. BUCHANAN:  Objection to the
15  form.
16       THE WITNESS:  Yes.
17  BY MS. KOSKI:
18       Q.   And you reference in some of your
19  documents you referred to violations, I think
20  you talked earlier about fines, possible
21  administrative fines, right?
22       A.   Yes.
23       Q.   Okay.  And as part of that,
24  you're familiar that DEA can get a search

Page 614

1  warrant; is that right?
2       A.   Yes.
3       Q.   And they can compel a company to
4  send individuals to appear before DEA and to
5  testify under oath.
6       Are you familiar with that?
7       A.   Yes.
8       Q.   And they can institute a formal
9  proceeding like an enforcement action, right?
10  Are you familiar with that?
11       MR. BUCHANAN:  Objection to form.
12  This is so beyond the scope and so the
13  subject for somebody who you're going to
14  designate as an expert.  You shouldn't
15  be doing this in fact testimony,
16  counsel.
17  BY MS. KOSKI:
18       Q.   You're familiar with the roles
19  and responsibilities of DEA over the course of
20  your 25 years in the industry, right?
21       A.   Yes.
22       Q.   And there's also something called
23  an order to show cause.
24       Are you familiar with that

Page 615

1  language from the DEA?
2       MR. BUCHANAN:  Same objection.
3       THE WITNESS:  Vaguely, yes.
4  BY MS. KOSKI:
5       Q.   All right.  So with all this sort
6  of in mind, I'd like to refer you to Exhibit 2,
7  which I believe you have in front of you and
8  which counsel marked yesterday.  And just for
9  purposes of folks in the room, Exhibit 2 was an
10  e-mail cover with a copy of Ms. Hernandez, then
11  Hernandez, sorry, resume and then also a summary
12  of suspicious order monitoring experience.
13       Do you recall this testimony
14  about this document?
15       A.   I do.
16       Q.   Okay.  And as I understand it,
17  you prepared Exhibit 2, I believe you testified
18  yesterday, in connection with applying for a
19  job; is that right?
20       A.   Yes.
21       Q.   Okay.  And the date at least on
22  the cover e-mail is October 2014.
23       Do you see that?
24       A.   Yes.

Page 616

1       Q.   Is that around or about the time
2  that you prepared the summary of suspicious
3  order monitoring?
4       A.   Yes, it is.
5       Q.   Okay.  And so when you prepared
6  this, this was about -- sorry, strike that.
7       And on the second page of the
8  document, you see there's a reference to Watson.
9       Do you see that?
10       A.   Yes.
11       Q.   And that's Watson Laboratories,
12  Inc.; is that right?
13       A.   Yes.
14       Q.   And you were employed by Watson
15  Laboratories, Inc., right?
16       A.   I was.
17       Q.   Okay.  And that's reflected in
18  Exhibit 1, your resume, if you need to look at
19  it.
20       A.   Yes.
21       Q.   And I believe on your resume it
22  indicates you worked at Watson from 2002 to
23  2009; is that right?
24       A.   Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 617

```
 1        Q.    And so this document, Exhibit 2,
 2  was prepared five years after you left Watson
 3  Laboratories; is that right?
 4        A.    Yes, that's correct.
 5        Q.    And I think you testified
 6  yesterday that you draft -- in the course of
 7  drafting this document, you were trying to make
 8  yourself look good to a potential employer; is
 9  that fair?
10              MR. BUCHANAN:  Objection to form.
11              THE WITNESS:  That was what was
12        requested of me.
13  BY MS. KOSKI:
14        Q.    And that's what you said
15  yesterday, right?
16              MR. BUCHANAN:  Objection to form.
17              THE WITNESS:  Yes.
18  BY MS. KOSKI:
19        Q.    All right.  And I want to just
20  look at some of the -- and I'm focused again on
21  the Watson section and some of the things that
22  you wrote.
23              And you wrote that while you were
24  employed by Watson, you did not support Anda
```

Page 618

```
 1  from a DEA perspective.
 2              Do you see that?
 3        A.    Yes, that's correct.
 4        Q.    And that's an accurate statement,
 5  right?
 6        A.    It is.
 7        Q.    Okay.  You never worked for Anda,
 8  Inc., right?
 9        A.    I did not.
10        Q.    And you didn't work day to day in
11  Anda's compliance department, right?
12        A.    I did not.
13        Q.    And you weren't responsible for
14  oversight or for the actions of Anda's
15  compliance department, right?
16        A.    I was not.
17        Q.    I believe you testified yesterday
18  that -- and as I think you reference here, Anda
19  had its own compliance department when it was
20  acquired by Watson, right?
21        A.    Yes.
22        Q.    And in Exhibit 2 you describe a
23  meeting between Anda and DEA, right?
24        A.    Yes.
```

Page 619

```
 1        Q.    Okay.  And do you recall that the
 2  meeting was in the summer of 2007?  Does that
 3  sound about right?
 4        A.    I don't recall when the meeting
 5  was.
 6        Q.    Fair to say that it was sometime
 7  during your employment at Watson?
 8        A.    Yes.
 9        Q.    And you wrote here that "Anda was
10  summoned to DEA."
11              Do you see that, and you spent
12  some time with counsel yesterday?
13        A.    Yes.
14        Q.    Okay.  And we just went through
15  some of the ways in which the DEA exercises its
16  criminal and administrative powers, right?  Do
17  you recall that; we just went through that?
18        A.    I do.
19        Q.    And you're familiar with that
20  from your experience, right?
21        A.    Yes.
22        Q.    And you'll agree with me that DEA
23  didn't issue any kind of a subpoena or some
24  legal process to bring Anda in to appear, right?
```

Page 620

```
 1              MR. BUCHANAN:  Leading.
 2              THE WITNESS:  They did not.
 3              MR. BUCHANAN:  Objection to form.
 4  BY MS. KOSKI:
 5        Q.    Did DEA issue a warrant to Anda,
 6  search warrant?
 7        A.    They did not.
 8        Q.    Okay.  And you'll agree, won't
 9  you, that DEA didn't issue any kind of formal
10  process like we talked about as it relates to
11  Anda, right?
12              MR. BUCHANAN:  Objection, form,
13        leading.
14              THE WITNESS:  No, they did not.
15  BY MS. KOSKI:
16        Q.    And, of course, I'm focused on
17  the time period that you were at Watson and this
18  time period where you were dealing with this
19  meeting with Anda.
20        A.    Understood.
21        Q.    Okay.  And so to the extent here
22  in your job application papers where you refer
23  to summoned, you didn't mean to say that DEA
24  issued a summons to Anda, right?
```

19 (Pages 617 to 620)

Highly Confidential - Subject to Further Confidentiality Review

Page 621

1      A.   I did not, no.
2      Q.   And as we said, Exhibit 2, that
3  was in 2014, right?
4      A.   Yes.
5      Q.   So I want to refer you now --
6           MR. BUCHANAN:  I'm sorry,
7           counsel, just so the record is clear,
8           your last question was 2014, you're just
9           referring to the date that this was
10          prepared.
11  BY MS. KOSKI:
12     Q.   I'm sorry, yes.  The year of
13  Exhibit 2 was 2014?
14     A.   Yes.
15     Q.   All right.  And I'd like to
16  focus, if we could, on the time period of the
17  actual meeting that you referenced in Exhibit 2
18  and talked a little bit about yesterday.
19          Now, you recall that the -- you
20  said that you weren't summoned in the formal
21  sense, but that you -- do you recall that you
22  received a phone call, you, Ms. Hernandez, at
23  Watson as it related to this Anda issue with
24  DEA?

Page 622

1      A.   Yes, I did.
2      Q.   Sorry about that.  My piles
3  are -- here you go.
4           (Document marked for
5           identification as Par-Norton Deposition
6           Exhibit No. 32.)
7  BY MS. KOSKI:
8      Q.   Handing you what we marked as
9  Exhibit 32.  And for the record, this is a
10  document with a Bates number
11  ALLERGAN_MDL_03952959.
12          And if you look on the second
13  page of this document, this an e-mail -- just
14  for the record, this is an e-mail that you wrote
15  in July of 2007.
16          Do you see that?
17     A.   Yes.
18     Q.   Okay.  And on the second page, in
19  the first full paragraph, do you see there that
20  it says Mr. Mapes.
21          Do you know who Mr. Mapes is?
22     A.   Yes, he was at DEA headquarters.
23     Q.   And you see the reference
24  there -- and he worked at DEA, right?

Page 623

1      A.   Yes.
2      Q.   And is it fair to say he's the
3  person with whom you were communicating about
4  this issue?
5      A.   Yes.
6      Q.   Do you see there's a reference it
7  says, "Mr. Mapes also offered to meet with us to
8  discuss the issue and internet pharmacies in
9  general in more detail."
10          Do you see the reference to that?
11     A.   Yes, I do.
12     Q.   And does this refresh your
13  recollection about the circumstances under which
14  Anda was meeting with DEA in 2007?
15     A.   Yes.
16     Q.   So, in other words, in your
17  Exhibit -- in Exhibit 2 where you referenced
18  Anda being summoned in, that was written in
19  2014, right?
20     A.   Yes.
21     Q.   But at the time of your
22  conversations in 2007 with Mr. Mapes, you make a
23  reference here that you were -- that Mr. Mapes
24  offered to meet with Anda, right?

Page 624

1           MR. BUCHANAN:  Objection,
2           misstates the document, form.
3           THE WITNESS:  That is what it
4           states later in the document, yes.
5  BY MS. KOSKI:
6      Q.   And does that refresh your
7  recollection about what was happening in 2007?
8           MR. BUCHANAN:  Objection to form.
9           THE WITNESS:  Yes.
10  BY MS. KOSKI:
11     Q.   And did Anda accept Mr. Mapes'
12  invitation to meet?
13     A.   Yes.
14     Q.   Now, do you recall when after
15  Mr. Mapes contacted you you went in to meet with
16  him?
17     A.   I do not.
18     Q.   Was it immediate?
19     A.   I'm assuming it was close to the
20  date, but I don't know exactly when.
21          (Document marked for
22          identification as Par-Norton Deposition
23          Exhibit No. 33.)
24  BY MS. KOSKI:

Highly Confidential – Subject to Further Confidentiality Review

Page 625

1     Q.    Handing you what we've marked as
2  Exhibit 33. For the record, Exhibit 33 is Bates
3  number Anda_Opioids_MDL_0000152278.
4        MR. BUCHANAN: I only have one
5  page.
6        MS. KOSKI: It's just a one-page
7  document.
8        MR. BUCHANAN: Oh, I'm sorry. I
9  thought you were holding two, and it's
10  Exhibit Number 33.
11        MS. KOSKI: Thirty-three, yes.
12  BY MS. KOSKI:
13     Q.    And you see this is an e-mail
14  dated August 22nd, 2007?
15     A.    Yes.
16     Q.    Okay. And on the first line it
17  says "Hello All, tomorrow's (8/23) meeting with
18  the DEA."
19        Do you see that?
20     A.    Yes, I do.
21     Q.    Okay. So is it fair to say the
22  meeting was on August 23rd?
23     A.    Yes.
24     Q.    About a month after the phone

Page 626

1  call referenced in the prior exhibit?
2     A.    Yes.
3     Q.    And do you recall that the
4  meeting was scheduled for about a two-hour time
5  period with DEA?
6     A.    I'm not sure.
7     Q.    Do you recall it being a full day
8  meeting?
9     A.    No, it was not.
10     Q.    And if you look at what we marked
11  as Exhibit 33, you'll see again the first line,
12  the meeting is scheduled from 12:00 to 2:00 p.m.
13        Do you see that?
14     A.    Yes.
15     Q.    Is that consistent with your
16  memory of the meeting?
17     A.    Yes.
18     Q.    Now, referring back to Exhibit 2,
19  you wrote that DEA asked for the meeting because
20  of Anda's, and I think I'm quoting you here,
21  "lack of a robust SOM program."
22        Do you recall that from the
23  document --
24     A.    Yes.

Page 627

1     Q.    -- and your testimony yesterday?
2     A.    Okay. Now, you had, as indicated
3  in Exhibit 32, several calls with Mr. Mapes
4  before the August 23rd meeting.
5        Do you recall that?
6        MR. BUCHANAN: Objection to form
7  and the leading.
8        THE WITNESS: I do not.
9  BY MS. KOSKI:
10     Q.    Okay. If you look at Exhibit 32,
11  you can see there's references to a number of
12  phone calls if you read through the e-mail?
13     A.    Yes.
14     Q.    Okay. Does that refresh your
15  recollection that you had several phone calls
16  with Mr. Mapes before the August 23rd meeting?
17        MR. BUCHANAN: Objection to the
18  form and the leading.
19        THE WITNESS: Yes.
20  BY MS. KOSKI:
21     Q.    And the exhibit -- sorry -- 32 is
22  a rather lengthy e-mail, Exhibit 32.
23        Is it fair to characterize that
24  as your notes from those phone calls, or how

Page 628

1  would you characterize what's in that e-mail?
2     A.    That is documentation of the
3  phone calls.
4     Q.    Okay. And, again, focusing on --
5  I think now we're on the -- if you look at the
6  bottom of Exhibit 32, you'll see the paragraph
7  starts on July 16, 2007.
8        Do you see that?
9     A.    Yes.
10     Q.    It says "I received a telephone
11  call from Michael Mapes, DEA HQ."
12        Do you see that?
13     A.    Yes.
14        MR. BUCHANAN: I don't, actually.
15  Can you just highlight on Bates 60?
16        MS. KOSKI: On page 59 and it's
17  below the sort of the page break line,
18  the first page of the e-mail.
19        Do you see that, Exhibit 32?
20        MR. BUCHANAN: Can you see it?
21  Thank you. I got it. Thank you.
22  BY MS. KOSKI:
23     Q.    Do you see that reference to
24  Mr. Mapes?

Highly Confidential - Subject to Further Confidentiality Review

Page 629

1      A.   Yes.
2      Q.   And so, according to this note,
3  you, Ms. Hernandez received a call from
4  Mr. Mapes, right?
5      A.   Yes.
6      Q.   Okay.  I believe you testified
7  yesterday that part of the reason you were
8  involved was because you knew the people at DEA
9  that were involved?
10     A.   Yes.
11     Q.   Okay.  And, in fact, this
12 document indicates that the initial contact came
13 directly to you; is that right?
14     A.   Yes, it did.
15     Q.   And if you look at the next
16 paragraph, there's a reference there that
17 Mr. Mapes told you DEA had seen "a steady
18 increase in Anda sales of hydrocodone," right?
19 That's at the bottom of the page going over to
20 the next page.
21     A.   Yes.
22     Q.   And then you note, we don't need
23 to read through it all, but you note a number of
24 other things that you talked about with

Page 631

1  leading.
2           THE WITNESS:  I did not have any
3      knowledge of Anda orders at the time.  I
4      was just documenting what was told to me
5      by Mr. Mapes.
6  BY MS. KOSKI:
7      Q.   Okay.  That's because Anda had a
8  compliance department, right?
9           MR. BUCHANAN:  Objection to form.
10          THE WITNESS:  Yes.
11 BY MS. KOSKI:
12     Q.   And you didn't work in it?
13     A.   Correct.
14     Q.   Okay.  And then if you see in the
15 last paragraph where you say this commitment was
16 conveyed to Mr. Mapes by telephone on 7/16/2007.
17          Do you see that?
18     A.   Yes.
19     Q.   So you called Mr. Mapes back
20 after you spoke with some of the folks at Anda,
21 right?
22     A.   Yes.
23     Q.   And that's referenced in this
24 document, right?

Page 630

1  Mr. Mapes during that initial call, right?
2      A.   Yes.
3      Q.   And then the bottom paragraph --
4  oh, I'm sorry, in that same -- sorry, the top
5  paragraph, you indicate that Mr. Mapes asked
6  about the effectiveness of Anda's suspicious
7  order monitoring program or system, excuse me.
8           Do you see that, the top of the
9  page marked 60?
10     A.   No, I'm sorry, I don't see where.
11     Q.   The paragraph that bleeds over
12 from the first to the second page, and you'll
13 see he says, "He also asked about the
14 effectiveness of Anda's suspicious order
15 monitoring system; quoting orders of 279,000
16 hydrocodone dosage units sold to a single
17 customer in a 30 day period and another for
18 174,000."
19          Do you see that?
20     A.   Yes, I see that.
21     Q.   And so did you understand this is
22 in reference to two specific orders that Anda
23 had filled?
24          MR. BUCHANAN:  Objection to the

Page 632

1      A.   Mm-hmm, yes.
2           (Document marked for
3      identification as Par-Norton Deposition
4      Exhibit No. 34.)
5  BY MS. KOSKI:
6      Q.   Handing you what we marked as
7  Exhibit 34.
8           MS. KOSKI:  Counsel.  And for the
9      record, Exhibit 34 is Bates
10     Anda_Opioids_MDL_0000275627.
11 BY MS. KOSKI:
12     Q.   Do you see that?
13     A.   Yes.
14     Q.   Okay.  And what's this document?
15     A.   It's an internal e-mail from
16 myself to Diane Miranda and Al Paonessa.
17     Q.   With a CC to Michael Cochrane and
18 Patrick Cochrane?
19     A.   Yes.
20     Q.   And what's the date on it?
21     A.   July 31st, 2007.
22     Q.   Okay.  And the subject is "DEA
23 Teleconference re: CS Distribution/Anda."
24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 633

1    A.    Yes.
2    Q.    Okay.  And is it -- and the first
3  reference there is "today we finally got to have
4  our teleconference with DEA."
5         Do you see that?
6    A.    Yes.
7    Q.    So the today referenced there
8  would be the date of the e-mail; is that fair?
9    A.    Yes.
10   Q.    Okay.  So this is, in fact, a
11  third call you had with DEA relating to the Anda
12  issues?
13   A.    It is another call, yes.
14   Q.    Okay.  And you made notes of that
15  call as well, right?
16   A.    Yes.
17   Q.    And that's reflected in what we
18  just marked as Exhibit 34?
19   A.    Yes.
20   Q.    And these notes were made the
21  same day as the phone call, right?
22   A.    Yes.
23   Q.    Fair to say it would have been
24  fresh in your memory at the time that you wrote

Page 634

1  the e-mail?
2    A.    Yes.
3    Q.    And as reflected in this e-mail,
4  you discussed Anda's decision to establish new
5  limits on customers who purchase controlled
6  substances from Anda, right, beginning of the
7  second paragraph.  You need reference?
8    A.    Yes, it talks about limits.
9    Q.    Right, and that's Anda's decision
10  to establish the new limits, right?
11        MR. BUCHANAN:  Objection to form.
12  BY MS. KOSKI:
13   Q.    We're talking about Anda here?
14   A.    Yes.
15   Q.    And the new limit was 5,000
16  dosage units per drug family.
17        Do you see that?
18   A.    For hydrocodone products, yes.
19   Q.    And other controlled substances
20  with a high diversion potential.
21        Do you see that?
22   A.    Yes.
23   Q.    Okay.  And yesterday you referred
24  to and you were talking about your -- this

Page 635

1  interaction you indicated that after or during
2  your discussions with DEA, Anda made some
3  changes to its SOMS program, right?
4    A.    Yes.
5    Q.    Okay.  And I think you referred
6  to a limit, but I don't know that you put a
7  number on it.
8    A.    Yes.
9    Q.    Okay.  Does this refresh your
10  recollection about the number?
11   A.    It does.
12   Q.    Okay.  And you also discuss other
13  things or you reflect your discussion with
14  Mr. Mapes about other things as well here in
15  Exhibit 34, and you discussed two customers in
16  particular who had -- whose legitimate needs
17  dictate quantities greater than 5,000 a month.
18        Do you see that?
19   A.    Yes, I do.
20   Q.    And that's a reflection of the
21  discussion that Anda had with Mr. Mapes on
22  July 31st of 2007?
23   A.    Yes.
24   Q.    And then you say here, "His exact

Page 636

1  words were that '5,000 dosage units is not a
2  hard limit, but a start' and that as long as we
3  are making the effort to know the customer's
4  business he is fine with that."
5         Do you see that reference?
6    A.    I do.
7    Q.    And that's reflecting your
8  conversation at the time with Mr. Mapes, right?
9    A.    Yes.
10   Q.    And if you refer back to I
11  believe it's Exhibit 32 or in your first call,
12  you indicate that Mr. Mapes had expressly
13  referred to some specific large orders as the
14  reason -- one of the reasons, at least, for the
15  phone call that he made to you, right?
16   A.    Yes.
17   Q.    And so here on July 31st, you're
18  discussing -- you reflect -- you're reflecting
19  your discussion with Mr. Mapes where you talked
20  about that, the large order situation, fair?
21        MR. BUCHANAN:  Object to the
22  leading.
23        THE WITNESS:  Without knowing the
24  customers, I'm not sure if that's the

Highly Confidential – Subject to Further Confidentiality Review

Page 637

1        same, but there is -- there are comments
2    here, yes.
3    BY MS. KOSKI:
4        Q.    And the idea being that for some
5    specific customers, dispensing more than the
6    5,000 per month that was recommended by DEA
7    could be appropriate, right?
8        MR. BUCHANAN:  Objection to the
9    form.
10        THE WITNESS:  Yes.
11    BY MS. KOSKI:
12        Q.    And that's reflected in your
13    notes that you wrote at the time, right?
14        MR. BUCHANAN:  Objection to the
15    form.
16        THE WITNESS:  Yes, that's based
17    on the comments from DEA.
18    BY MS. KOSKI:
19        Q.    If you look back to 32, and this
20    was the e-mail we were just looking at that
21    referred to the initial phone call you received
22    from Mr. Mapes, right?
23        A.    Yes.
24        Q.    And if you see on the second page

Page 638

1    of the document, there's a reference in your
2    notes about what -- that Mr. Mapes, I believe is
3    the he, referenced recent regulatory actions DEA
4    has taken against, and he names some entities,
5    not Anda, right?
6        A.    Yes.
7        Q.    Okay.  And you recorded that in
8    these notes from your conversation with him at
9    the time?
10        A.    I did.
11        Q.    Now, when we talked earlier about
12    DEA has different mechanisms of communicating
13    with the industry, DEA has different formal
14    processes they could take, did you understand
15    that was what Mr. Mapes was referencing here in
16    this document?
17        MR. BUCHANAN:  Objection to the
18    form.  Which document are you
19    referencing, counsel?
20        MS. KOSKI:  Exhibit 32 that you
21    have in your hand.
22        MR. BUCHANAN:  Objection to form,
23    vague.
24        THE WITNESS:  Are you referring

Page 639

1        to the actions taken against Southwood,
2        Bellco, Richie, those companies?
3    BY MS. KOSKI:
4        Q.    Right, right.
5        A.    Yes.
6        Q.    So you refer -- you refer here in
7    your notes to recent regulatory actions DEA has
8    taken, right?
9        A.    Yes.
10        Q.    And we talked earlier this
11    morning about some of the types of regulatory
12    actions that DEA is empowered to take, right?
13        A.    Yes.
14        Q.    And did you understand that's
15    what Mr. Mapes was referring to with respect to
16    these other companies?
17        MR. BUCHANAN:  Objection to form.
18        THE WITNESS:  Yes.
19    BY MS. KOSKI:
20        Q.    Now, DEA never instituted any
21    formal action against Anda while you worked at
22    Anda, right?
23        MR. BUCHANAN:  Objection to form.
24        MS. KOSKI:  Excuse me.  Strike

Page 640

1        that.
2    BY MS. KOSKI:
3        Q.    DEA never instituted any formal
4    action against Anda while you worked at Watson,
5    right?
6        A.    Not that I'm aware of.
7        Q.    Instead, you -- this experience
8    that you had with Mr. Mapes was a series of
9    telephone calls and an agreed meeting; is that
10    fair?
11        A.    Yes.
12        Q.    And I believe you discussed
13    yesterday and maybe earlier this morning the
14    distributor initiative that you believe this
15    related to?
16        MR. BUCHANAN:  Objection to form
17    and the leading.
18        THE WITNESS:  Yes.
19    BY MS. KOSKI:
20        Q.    And, in fact, during your
21    conversations, you had an exchange of
22    information with Mr. Mapes; is that fair?
23        A.    Yes.
24        Q.    And when we talked earlier about

Highly Confidential - Subject to Further Confidentiality Review

Page 641

1  guidance received from DEA, would this fall into
2  what you've referred to over the course of the
3  couple days as guidance?
4      A.  Yes.
5      Q.  And, in fact, outside of this
6  narrow context with Anda, you've had other
7  occasions to have conversations with DEA, right?
8      A.  Yes.
9      Q.  And then just looking back at
10  Exhibit 2 quickly, which is your employment
11  application, for lack of a better word, do you
12  have that Exhibit 2, the e-mail with your
13  resume?  Of course, it's at the bottom of the
14  pile.  It's at the bottom of the pile.
15      A.  Yes.
16      Q.  And do you see in there that you
17  wrote that the meeting was for cause?
18      A.  Yes.
19      Q.  And when we talked about DEA has
20  formal actions, we talked at one point about
21  orders to show cause.  That's one of the formal
22  processes, right?
23      A.  It is, yes.
24      Q.  And an order to show cause is

Page 642

1  something that actually compels the registrant
2  to appear before DEA, right?
3      A.  Yes.
4      Q.  Okay.  And you didn't mean to
5  suggest in Exhibit 2, in your employment
6  application documents, that DEA issued an order
7  to show cause to Anda, right?
8      A.  They did not.
9      Q.  In fact, they didn't do that,
10  right?
11      A.  Correct.
12      Q.  And as long as you worked at
13  Watson, you weren't aware of any occasion in
14  which DEA issued Anda an order to show cause,
15  right?
16      A.  I'm not aware of any.
17      MR. BUCHANAN:  Objection to the
18  leading, move to strike.
19  BY MS. KOSKI:
20      Q.  And, again, as we've gone through
21  your contemporaneous notes from August of 2007,
22  when the meeting happened, the meeting was a
23  result of some exchanges between Anda and DEA
24  and an invitation from you, right?

Page 643

1      MR. BUCHANAN:  Objection to form,
2  misstates the evidence.
3      THE WITNESS:  Yes.
4      MS. KOSKI:  That's all I have.
5  Thank you.
6      THE WITNESS:  Thank you.
7      MR. BUCHANAN:  Do any other
8  defense counsel have questions?  We can
9  close the record -- close it on that.  I
10  have follow-up questions.  Go off the
11  record for a few minutes.
12      THE VIDEOGRAPHER:  The time is
13  9:57.  Off the record.
14      (Brief recess.)
15      THE VIDEOGRAPHER:  The time is
16  10:24 a.m.  This begins DVD Number 2.
17  We are back on the record.
18  BY MR. BUCHANAN:
19      Q.  Ms. Norton, I have a few
20  questions in follow-up to the questions asked by
21  Endo's counsel, Qualitest's counsel as well as
22  Anda counsel.
23      A.  Yes.
24      Q.  Before I do that, though, can we

Page 644

1  agree that you and I hadn't met before today?
2      A.  We met yesterday.
3      Q.  That's fair.  Before your
4  deposition began, we can agree on that?
5      A.  Yes.
6      Q.  Thank you.  Obviously, you told
7  us that you had an opportunity to meet with
8  counsel for Endo, I think, before your testimony
9  yesterday, correct?
10      A.  Yes.
11      Q.  Three days?
12      A.  Yes.
13      Q.  Multiple hours each time?
14      A.  Yes.
15      Q.  Did you have an opportunity to
16  meet with Anda's counsel before you answered
17  questions today?
18      A.  Briefly by phone.
19      Q.  And in that regard, did you
20  review or discuss documents to refresh your
21  recollection?
22      A.  Yes.
23      Q.  Okay.  And what were they?
24      MS. KOSKI:  Objection.

25 (Pages 641 to 644)

Highly Confidential – Subject to Further Confidentiality Review

Page 645

1    MS. LEIBELL: Objection.
2  BY MR. BUCHANAN:
3    Q.    Did they refresh your
4  recollection?
5    A.    Yes.
6    Q.    What were they?
7    A.    The Mike Mapes' phone call,
8  documentation of the first phone call.
9    Q.    Okay. So you worked through that
10  document?
11    A.    The first one, yes.
12    Q.    Before you came in today?
13    A.    Yes.
14    Q.    Did you do that again before you
15  testified this morning?
16    A.    No.
17    Q.    Okay. Any other documents that
18  refreshed your recollection?
19    A.    No.
20    Q.    Okay. I'd like now to start, and
21  we'll get to the Anda portion of this. I'd like
22  to start with your testimony relating to your
23  time at Qualitest.
24      You joined in 2011, you left in

Page 646

1  2014, right?
2    A.    Yes.
3    Q.    You were asked some general
4  questions, I think open-ended questions about
5  describe your SOM process.
6      Do you recall those questions on
7  examination by Endo counsel?
8    A.    Yes.
9    Q.    Okay. And you gave a list of
10  things that were done. You would look at order
11  of interests. You would look at the customer's
12  specific history, look at the customer
13  questionnaire. You would get customer feedback.
14  You would go and visit customers. You would do
15  that whole process.
16      Do you recall that?
17    A.    Yes.
18    Q.    That process was implemented, if
19  I understand your testimony correctly, in 2013?
20    A.    Over time.
21    Q.    The process you described with
22  those items that I just listed, that was the
23  process in place as of 2013, correct?
24    A.    It was, yes.

Page 647

1    Q.    Also incorporated at some point
2  in time after 2013, consideration of IMS data,
3  correct?
4    A.    I don't know the exact date as to
5  when it was implemented. That was before -- I
6  don't know exact date, but 2013, yes.
7    Q.    Yeah, we looked at documents in
8  early 2013 where you said we need to start
9  incorporating IMS data.
10      Do you recall that?
11    A.    Yes.
12    Q.    So you hadn't been doing it prior
13  to 2013, correct?
14    MS. VANNI: Object to form.
15    THE WITNESS: We had IMS data.
16  This was different data.
17  BY MR. BUCHANAN:
18    Q.    Yeah, I'm referring to IMS data
19  so that you could evaluate your customer
20  thresholds or customer levels to see whether
21  they were buying above or below national
22  averages for classes of trade?
23    A.    Yes, correct.
24    Q.    You were not doing that prior to

Page 648

1  2013, correct?
2    A.    No.
3    Q.    I'm correct?
4    A.    Yes, you are correct.
5    Q.    Thank you. We talked yesterday
6  about the incorporation of chargeback data into
7  the process and looked at some correspondence
8  where Mr. Brantley was using chargeback data in
9  connection with his correspondence with your
10  direct customers to talk about issues with
11  customers of customers.
12      Do you recall that?
13    A.    Yes, I do.
14    Q.    Use of chargeback data was not
15  being done prior to 2013, correct?
16    A.    Correct.
17    Q.    And we looked at documents
18  yesterday where, in your own words, you said you
19  needed to revamp the SOM process in 2013,
20  correct?
21    A.    Yes.
22    Q.    And we further looked at
23  documents yesterday where you were told in 2013
24  that your current SOM program systems and

26 (Pages 645 to 648)

Highly Confidential - Subject to Further Confidentiality Review

Page 649

```
 1   procedures do not meet the regulatory
 2   requirements.
 3          Do you recall that?
 4          MS. VANNI:  Object to form.
 5          THE WITNESS:  I'm not sure what
 6   document it was.
 7   BY MR. BUCHANAN:
 8      Q.   E-15, I'm sorry, Exhibit 15, it's
 9   E1052.  Can we go to 1052.1.  I don't have the
10   exhibits to give you.  There's a stack right
11   there.
12          All right.  Let's -- we see this
13   correspondence between yourself and Ms. Connell,
14   your boss at the time?
15      A.   Yes, correct.
16      Q.   Okay.  It says, "Jill, I added
17   the action items and the estimated completion.
18   If Judy can put them in the Gantt chart it would
19   be a big help.  Again, the dates are estimates
20   since input is needed from other departments to
21   confirm."
22          This is an e-mail from yourself
23   to your boss in 2013, again before you sat down
24   with DEA, correct?
```

Page 650

```
 1      A.   Correct.
 2      Q.   Some consultants had come in and
 3   looked at your systems, spent a couple days on
 4   site looking at things, correct?
 5      A.   Yes.
 6      Q.   All right.  Could we go to .3.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21   BY MR. BUCHANAN:
22      Q.   Fair enough.  Could you look at
23   Exhibit 16, ma'am.
24          And we don't have to just look at
```

Page 651

```
 1   the consultant opinion, we can look at yours as
 2   of the same time.  Exhibit 16, could we please
 3   go to E.1071.
 4          And here we have, ma'am, a
 5   presentation you put together for Ms. Connell
 6   around the same period of time, February 2013.
 7          Do you see that?
 8      A.   Yes.
 9      Q.   I'm on the cover letter right
10   now.
11      A.   Yes.
12      Q.   Okay.  And you were putting
13   together action items and things that needed to
14   be done and to address various compliance issues
15   you were having at that time, correct?
16          MS. VANNI:  Object to form.
17          THE WITNESS:  Improvements that
18   we wanted to make, not compliance
19   issues.
20   BY MR. BUCHANAN:
21
22
23
24
```

Page 652

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Golkow Litigation Services - 1.877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review



Page 653

18  Can you pull up Exhibit 4, and for the video --
19  excuse me for the display screens, it's E1157.1.
20       As of 2011 -- was your testimony
21  yesterday that 70% of the company's business was
22  controlled substances, ma'am?
23       A.    I said approximately.  I didn't
24  know exact.

Page 654

1       Q.    Okay.  As of 2011 we see -- what
2  is that, over 2 billion controlled substances?
3       A.    Again, I can't speak to the
4  detail of this document.  I don't know what went
5  into it.
6       Q.    Okay.  We could agree the company
7  made a lot of controlled substances, right?
8            MS. VANNI:  Object to form.
9            THE WITNESS:  They were in the
10  controlled substance business.
11  BY MR. BUCHANAN:
12       Q.    Right, and as a company in the
13  controlled substance business, they had one
14  person in DEA compliance; is that right?
15            MS. VANNI:  Object to form.
16            THE WITNESS:  At the time, yes.
17  BY MR. BUCHANAN:
18       Q.    When you were hired as of 2011.
19            MR. BUCHANAN:  Can you take that
20  down.  Can you blow out 2008 through
21  2011 with the legend on the left with
22  drugs and years.
23  BY MR. BUCHANAN:
24       Q.    And so for 2011, when you joined,

Page 655

1  and for the years prior, we could agree the
2  company was making billions and billions and
3  billions of controlled substances that were
4  entering the market, correct?
5            MS. VANNI:  Object to the form.
6            THE WITNESS:  Again, I can't
7  speak to the data or to things that
8  happened before I arrived.
9            MR. BUCHANAN:  Okay.  I mean,
10  this is a bit of a challenge because
11  defense counsel has pointed us to what
12  I'm now going to mark as Exhibit 35.
13       Is that correct, 35 is next in
14  order?
15       (Document marked for
16  identification as Par-Norton Deposition
17  Exhibit No. 35.)
18  BY MR. BUCHANAN:
19       Q.    Passing you, ma'am, Exhibit 35.
20  There you go.  And I'll represent to you, ma'am,
21  that the summary table that was presented to you
22  was derived from these spreadsheets that defense
23  counsel provided to us.
24       I guess what I'd like to -- what

Page 656

1  I'd like to understand, ma'am, is in 2008 how
2  many hydrocodone APAP did Qualitest ship?
3       A.    Again, I don't know where this
4  data came from.  I don't know how it was pulled
5  for research, and I wasn't here in 2008 to speak
6  to it.
7       Q.    I take it you're familiar with
8  this type of form, correct?
9       A.    I am not familiar with this type
10  of form.
11       Q.    Okay.  As the head of DEA
12  compliance, did you review data on the quantity
13  of pills the company was shipping?
14       A.    We had to do reports that gave
15  accountability of what we were shipping, yes.
16       Q.    Did you get them in a more user
17  friendly form than this?
18            MS. VANNI:  Object to form.
19            THE WITNESS:  Yes.
20  BY MR. BUCHANAN:
21       Q.    You did?
22       A.    Well, some of it, sometimes.
23       Q.    You could get your data and
24  systems team to identify for you the quantity of

28 (Pages 653 to 656)

Page 657

1    shipped material?
2        A.   Not all.  Different things were
3    in different systems.
4        Q.   If you wanted to get the quantity
5    of sales to customers could you get that, ma'am?
6        A.   Depends on what is called sales.
7    So are -- if we're referring to direct shipment
8    to customer, we could get some information, yes,
9    more information after SAP was implemented, but
10   not at first.
11       Q.   I assume the company kept track
12   of the drugs that it was selling to its
13   customers?
14       A.   Yes.
15       Q.   Okay.  Company had systems to do
16   that?
17       A.   Systems and electronic -- some
18   electronic, some manual.
19       Q.   And we've had computers for a
20   long time, right?
21       A.   Yes, we have.
22       Q.   Okay.  So as of matter of
23   processing large volumes of orders, the company
24   had a computer system, correct?

Page 658

1        A.   For some things, yes.
2        Q.   For keeping track of shipments to
3    customers, correct?
4        A.   Parts of that data, yes.
5        Q.   And keeping track of orders to
6    customers, correct?
7        A.   Parts of that data, yes.
8        Q.   Right.  Well, just if you could,
9    ma'am, just look through this and please tell us
10   the volume of hydrocodone APAP product that was
11   shipped in your first year, 2011?
12           MR. BUCHANAN:  I'm sorry, please
13       take that document down.
14           MS. VANNI:  Counsel, if you
15       wouldn't mind, could you read the Bates
16       number in.  I saw it and now it sort of
17       disappeared, and I don't know where it
18       went.
19           MR. BUCHANAN:  You know what, I
20       gave you a copy.  I'll give you another
21       one to take home.  My paralegal does
22       have an extra copy.  I wasn't sure
23       whether this was an appropriate one for
24       broader distribution, so I'm giving it

Page 659

1    with the witness.
2            MS. VANNI:  I appreciate that
3        because it is marked highly
4        confidential.
5            MR. BUCHANAN:  It's from the
6        witness' time at the company, so I
7        believe it's an appropriate use, but I'm
8        being sensitive to whatever concerns you
9        may have on its distribution.  You can
10       address that with your co-counsel --
11       co-defense counsel at a later point in
12       time.  I am not burning it into the
13       video feed.
14   BY MR. BUCHANAN:
15       Q.   Looking through it, ma'am, could
16   you please, what I've identified as Exhibit --
17   was that 38 -- 35, could you tell us, please,
18   the shipments for hydrocodone products in 2011?
19       A.   I'm sorry, I can't read it.  It's
20   very small.
21       Q.   I'll give you some time to see if
22   you can sum that up or give us a number.
23       A.   I don't see a total.  I see line
24   items.

Page 660

1        Q.   How about for oxycodone shipments
2    in 2011, ma'am?
3        A.   I don't see totals on here.  I
4    just see line items, individual line items.
5        Q.   Would my question be easier to
6    answer if I said orders?
7        A.   No, it would not.
8        Q.   How about orders of hydrocodone,
9    orders of oxycodone, the quantities that you
10   received in 2011?
11       A.   No.  I mean, this is -- these are
12   individual customer orders, by the looks of it.
13   I don't know when they occurred, since I can't
14   see the dates.
15       Q.   I just need the totals, ma'am.
16       A.   I can't.  There's no -- I don't
17   know where the totals are in here.
18       Q.   There was some question about the
19   providence of the exhibit that we prepared and
20   showed to you and you had questions about where
21   things came from.  I provided that to you.
22           So my question now is can you
23   give us the shipments of hydrocodone and
24   oxycodone for the years that we're talking

Highly Confidential – Subject to Further Confidentiality Review

Page 661

1    about?
2         A.    I cannot.  What you provided me
3    is a report that I can't read that I would need
4    a considerable amount of time to go through in
5    order to pull information out of, and I don't
6    even know if it contains transfers or just
7    financial transactions or what it contains, so I
8    can't on the spot give you that information.
9         Q.    All great questions of the data.
10             MR. BUCHANAN:  Counsel, we'll
11        take your stipulations as to all those
12        numbers if you'll provide them kindly.
13        Do you have them?
14             MS. VANNI:  Do I have what?  Do I
15        have the --
16             MR. BUCHANAN:  The information in
17        the numbers the witness is asking for,
18        because this is where you pointed us --
19        I mean, I'm not comfortable with the
20        witness questioning the providence of
21        the data you've shown -- told us to go
22        to look at, so I'll take your
23        representations and stipulations as to
24        what it is.

Page 662

1             MS. VANNI:  I can't stipulate to
2        anything.  This was a document that I'm
3        seeing for the first time today that
4        you've presented to me in an illegible
5        form.  I don't know if this was prepared
6        for purposes of litigation.  I don't
7        know what this document is.  I
8        apologize, but I can't stipulate to
9        anything because I don't even know what
10        it is.  I can't even read it.
11             MR. BUCHANAN:  All good points
12        you're raising, and I don't think it's
13        any different in reverse on this side of
14        the base, certainly, because we don't
15        have the resources to confirm any of
16        that information, but this is the
17        spreadsheet you called to our attention
18        as 33C in your rog responses.
19        Okay.  I'll move on at this
20        point.
21    BY MR. BUCHANAN:
22        Q.    Ma'am, we were looking at 1071.8.
23    We can agree, even though we can't pin down the
24    actual numbers of pills, that the company was

Page 663

1    making a lot of hydrocodone and a lot of
2    oxycodone in 2011 when you got to the company,
3    right?
4             MS. VANNI:  Object to form.
5             THE WITNESS:  The company was
6        making hydrocodone and oxycodone.  I
7        don't want to define a lot.  I don't
8        know what we're comparing it to.  It's
9        been...
10    BY MR. BUCHANAN:
11        Q.    Okay.  Well, I'll ask you to stay
12    with me on this, and I'll ask you to assume that
13    the company was making billions of pills of
14    oxycodone or hydrocodone per year.  Is that a
15    lot to you?
16             MS. VANNI:  Object to form.
17             THE WITNESS:  That's opinion.
18    BY MR. BUCHANAN:
19        Q.    Okay.  You gave opinions
20    throughout the day.
21        A.    I have nothing to compare it to.
22    I can't comment on what "a lot" is.
23        Q.    You don't have an opinion as to
24    whether billions of hydrocodone pills, hundreds

Page 664

1    of millions of oxycodone pills is a lot?
2        A.    No, I don't.
3             MS. VANNI:  Objection, asked and
4        answered and argumentative.
5    BY MR. BUCHANAN:
6        Q.    As the head of DEA compliance who
7    was the person in charge of ensuring the
8    adequacy of the company's SOMS system --
9        A.    Yes.
10        Q.    -- you don't have an opinion as
11    to whether the company was making a lot --
12             MS. VANNI:  Objection.
13    BY MR. BUCHANAN:
14        Q.    -- of oxycodone or hydrocodone?
15        A.    No, I don't have comparisons to
16    other companies.  I don't have -- no, I don't
17    have an opinion.
18        Q.    Okay.  Let's come back now to
19    weaknesses of the company as of this 2013
20    document.  You had weaknesses related to DEA
21    security and controls, right?
22        A.    Things I wanted to improve upon,
23    yes.
24        Q.    What you wrote was weaknesses?

30  (Pages 661 to 664)

Highly Confidential – Subject to Further Confidentiality Review



Page 665

1    A.    That's what the document says.

Page 666

Page 667

4    about this meeting you had with DEA in March of
5    2013, and you characterized it for us yesterday,
6    perhaps recharacterized it today, but fair to
7    say throughout the rest of 2013, the company got
8    about trying to implement and strengthen its
9    SOMS process, fair?
10          MS. VANNI:  Object to the
11    colloquy.  Object to form.
12          THE WITNESS:  We continued with
13    our planned improvements.
14    BY MR. BUCHANAN:
15          Q.    Okay.  And you also discussed
16    with defense counsel on direct examination the
17    quota process.
18          Do you recall that?
19          A.    I do.
20          Q.    The inner relation with the DEA
21    going back and forth from time to time, and you
22    said that was an important part of your
23    responsibilities?
24          A.    Yes, it is -- was.

Page 668

1          MR. BUCHANAN:  Could I have 1068,
2    please.  I need a copy for the witness.
3    Could you take it down until I have
4    copies for the witness, please.
5    Counsel.
6          (Document marked for
7    identification as Par-Norton Deposition
8    Exhibit No. 36.)
9    BY MR. BUCHANAN:
10          Q.    We're marking this, ma'am, as
11    Exhibit 39 (sic) to your deposition.
12          A.    Okay.
13          Q.    It's an e-mail from -- e-mail
14    exchange between you and a few other folks at
15    Qualitest, Sanjay Patel, yourself as the latest
16    in time e-mail at the top, but there's an
17    exchange going on regarding a quota request.
18    You can go bottom up, but I suggest you can
19    probably get all the information you need on the
20    first page if you start at the bottom of the
21    first.  We're at 1068.1, and you received an
22    e-mail from Fang Zhou?
23          A.    Fang Zhou.
24          Q.    Zhou.  "Hi, Tracey.  Please find

Highly Confidential - Subject to Further Confidentiality Review

Page 669

1   the information below to apply the quote of
2   oxycodone hydrochloride for 2013.  Would you
3   apply quota for 115 kg oxycodone hydrocodone
4   ASAP?"
5        Did I read that correctly?
6   A.   Yes, you did.
7   Q.   And then it's got a list of the
8   various units and strengths.
9        Do you see that?
10  A.   Yes.
11  Q.   Okay.  And is this generally the
12  process, people throughout the organization with
13  various needs, whether it was research, whether
14  it was testing, whether it was sales for
15  production, would come to you and give you
16  numbers to apply to quota or to seek quota from
17  DEA if you needed more?
18       MS. VANNI:  Objection to form.
19       THE WITNESS:  For sales that was
20       not the process.  We would look at our
21       sales using IMS data, and we would -- we
22       would submit quota using that
23       information.  This is for research, and
24       in the research case, they will tell us

Page 670

1        how much we need -- how much they need,
2        and it's our job to push back on that
3        quantity and to determine if that
4        actually is definitively needed.
5   BY MR. BUCHANAN:
6   Q.   Okay.  And so this is all
7   happening in mid-2013 a few months after your --
8   May 2013, a few months after your meeting with
9   DEA, correct?
10  A.   Yes.
11  Q.   Two months exactly.
12       And your response is you forward
13  this to Mr. Patel is FYI, I guess you are
14  forwarding the thread to him for consideration?
15  A.   Yes.
16  Q.   FYI, for your information, is
17  that what that means?
18  A.   Yes, uh-huh.
19  Q.   "Not sure asking for this in" --
20  what did you write?
21  A.   "Not sure asking for this in our
22  current SOMS environment is the best idea.
23  Thoughts?"
24  Q.   Okay.  Let's pause on that.  So

Page 671

1   not sure asking for this in our current SOMS
2   environment, and your current SOMS environment
3   in early 2013, two months after you met with the
4   DEA, was a SOMS environment that you
5   characterized as weak and inadequate, right?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  In that prior
8        document, that's how it was
9        characterized.
10  BY MR. BUCHANAN:
11  Q.   That's right.
12       And what you noted here is you
13  were, I guess, seeking input from your
14  colleague, Mr. Patel, was not sure asking for
15  this, and "this" would be a quota increase,
16  right?
17  A.   Yes.
18  Q.   "Not sure asking for this in the
19  company's current SOMS environment is the best
20  idea."
21       Did I read that correctly?
22  A.   Yes, you did.
23  Q.   Thank you.  You can set that
24  aside.

Page 672

1        You talked about some of the SOMS
2   processes the company engaged in in this 2013
3   and later period, consideration of information
4   and how that worked.
5        You also formed a SOMS advisory
6   board, right?
7   A.   Yes, we did.
8   Q.   Okay.
9        MR. BUCHANAN:  Could I have 1148.
10  This will be Exhibit 43.  Can we go off
11  the record.
12       THE VIDEOGRAPHER:  The time is
13  10:48.  Off the record.
14       (Document marked for
15  identification as Par-Norton Deposition
16  Exhibit No. 37.)
17       THE VIDEOGRAPHER:  The time is
18  10:50 a.m.  We are back on the record.
19  BY MR. BUCHANAN:
20  Q.   Passing you, ma'am, what we just
21  marked as Exhibit 37 to your record.  Our
22  internal number is E1148.  It's an exchange
23  between you and Mr. Brantley in 2014, early
24  2014.

32  (Pages 669 to 672)

Highly Confidential - Subject to Further Confidentiality Review

**Page 673**

1            Do you see that?
2     A.    Yes.
3     Q.    Okay.  And he's passing on the
4 charter for the advisory board of Qualitest
5 Pharmaceuticals suspicious order monitoring
6 program.
7            Do you see that?
8     A.    Yes.
9     Q.    And you told us about some of
10 these DEA interactions, where the DEA didn't
11 want the sales team making calls on whether
12 orders were suspicious and customers were
13 suspicious, right?
14     A.    Correct.
15     Q.    Okay.  You implemented this
16 particular protocol in early 2014?
17     A.    This charter, yes, when it was
18 finalized.
19     Q.    And so what we see here is
20 there's the SOM team, which Mr. Brantley was a
21 part of, correct?
22     A.    Yes.
23     Q.    There was an advisory board,
24 correct?

**Page 674**

1     A.    Yes.
2     Q.    And you were a component of the
3 advisory board?
4     A.    I believe so.  I don't know where
5 the numbers are listed, but I believe yes.
6     Q.    It's on 1148.2, "Membership."
7     A.    Yes.
8     Q.    Okay.  "The advisory board shall
9 consist of the Director of DEA compliance."
10            That was you, right?
11     A.    Yes.
12     Q.    "Vice President Legal," who was
13 that?
14     A.    Margaret Richardson.
15     Q.    Okay.  And the Deputy Compliance
16 Officer for generics, right?
17     A.    Yes.
18     Q.    And who was that?
19     A.    Sandra Parker.
20     Q.    Okay.  And so the advisory board
21 would consider information given to it by the
22 SOM team, correct?
23     A.    Correct.
24     Q.    And you guys would make calls on

**Page 675**

1 various things or recommendations?
2     A.    Yes, that's correct.



**Page 676**

Highly Confidential – Subject to Further Confidentiality Review



Page 677

Page 679

```
1    on this one.
2         Do you have Exhibit 5 before you?
3         We can work with the screen.
4    Here you go.
5         Exhibit 5 is that letter that you
6    sent out to your customers in 2013.
7         Do you recall that?
8    A.   I do.
9    Q.    And I think you called out the
10   questionnaire in the back and a portion of the
11   description of some of the changes you were
12   making.
13        Do you recall that?
14   A.   I do.
15   Q.    Okay.  But what you noted in the
16   paragraph before that, this is 594.3, it's
17   beginning "when our products."
18        "When our products leave the
19   legitimate channels they have been manufactured
20   to support, heart-wrenching consequences often
21   occur."
22        Do you see that?
23   A.   Yes, we've read it several times.
24   Q.   "As responsible corporate
```

Page 678

Page 680

```
1    citizens -- individuals, parents, friends,
2    caregivers, relatives and acquaintances -- we
3    need to do as much as we can to prevent drug
4    abuse and diversion in our communities."
5         Did I read that correctly?
6    A.   Yes.
7    Q.   "Each company and individual in
8    the supply chain has that responsibility."
9         Did I read that correctly?
10   A.   Yes.
11   Q.   "To put adequate controls in
12   place to discourage and prevent the diversion of
13   prescription products for uses other than those
14   for which they were originally intended."
15        Did I read that correctly?
16   A.   Yes, you did.
17        MS. VANNI:  Just note my
18   objection, just beyond the scope.  I
19   know I used this document on direct, but
20   I didn't refer her to that paragraph or
21   ask her any questions about that part --
22        MR. BUCHANAN:  I understand your
23   objection.  I don't know how video will
24   get cut at some point in time.
```

For Page 678, lines 23–24:
```
23        You spent some time with defense
24   counsel on Exhibit 5, our internal number is 594
```

Highly Confidential – Subject to Further Confidentiality Review

Page 681

1          MS. VANNI:  Just preserving my
2     objection.
3          MR. BUCHANAN:  Fair enough.
4     BY MR. BUCHANAN:
5          Q.   Let's look at -- well, withdrawn.
6          In examination I think both with
7     Endo counsel and Anda counsel, you were asked
8     about compliance with the reg, whether acts were
9     in compliance or not with the reg regarding
10    suspicious orders, and I think you were even
11    shown the statute.
12         Do you recall that?
13         A.   Yes.
14         Q.   Okay.  We looked yesterday, just
15    in passing, at a letter that you received from
16    DEA in 2007, you, obviously at a former company
17    at that point in time, from Mr. Rannazzisi.
18         Do you recall that?
19         A.   I do.
20         Q.   And you remember receiving that
21    letter?
22         A.   I remember seeing the letter,
23    yes.
24         Q.   Okay.

Page 682

1          MR. BUCHANAN:  Let's look at
2     Exhibit -- internal Exhibit Number 640.
3          (Document marked for
4          identification as Par-Norton Deposition
5          Exhibit No. 38.)
6     BY MR. BUCHANAN:
7          Q.   Passing you what we're marking as
8     Exhibit 38.
9          MR. BUCHANAN:  Copy for defense
10    counsel, please.
11    BY MR. BUCHANAN:
12         Q.   And this is some internal
13    correspondence with Endo from before your time
14    there, attaching a letter that had been received
15    from a Mr. Rannazzisi, "Dear Registrant."
16         Do you see that?
17         A.   Yes.
18         MS. VANNI:  I just want to note
19         my objection to use of this document as
20         it predates her employment with the
21         company, and it's an Endo document, so
22         it doesn't even apply to her employment
23         since she wasn't an Endo employee.
24    BY MR. BUCHANAN:

Page 683

1          Q.   Is this the same letter ma'am
2     that we saw in the PowerPoint yesterday that you
3     had referenced from your time at the company?
4          A.   I believe it's the same letter.
5          Q.   And so this is December 27, 2007,
6     several years before you joined the company,
7     correct?
8          A.   Yes.
9          Q.   And you acknowledge being aware
10    or at least having received it during your time
11    at a prior employer, correct?
12         A.   I had seen it, yes.
13         Q.   Okay.  And this went to
14    manufacturers and distributors, right?
15         A.   Yes.
16         Q.   "The purpose of this letter is to
17    reiterate the responsibilities of controlled
18    substance manufacturers and distributors to
19    inform DEA of suspicious orders in accordance
20    with 21 CFR 1301.74(b)."
21         Do you see that?
22         A.   Yes I do.
23         Q.   I'd like to focus on the next
24    paragraph.  It says, "In addition to, and not in

Page 684

1     lieu of, the general requirement under 21 USC
2     823, that manufacturers and distributors
3     maintain effective controls against diversion,"
4     and then the sentence continues.
5          This letter is telling
6     registrants that in addition to obligation, the
7     statutory obligation to maintain effective
8     controls against diversion, there are some other
9     things we want to highlight to you about
10    suspicious order monitoring practices, fair?
11         MS. VANNI:  Object to form.
12         THE WITNESS:  It refers back to
13         the regulation, the CFR, yes.
14    BY MR. BUCHANAN:
15         Q.   Is that a yes to my question?
16         MS. VANNI:  Object to form.
17         THE WITNESS:  No, I'm not sure.
18    BY MR. BUCHANAN:
19         Q.   Okay.  Well, you said, I think,
20    in the examination with defense counsel that you
21    took your communications from DEA as guidance,
22    correct?
23         A.   I did.
24         Q.   Oral communications as guidance,

Highly Confidential — Subject to Further Confidentiality Review

Page 685

1  correct?
2      A.   Yes.
3      Q.   I think you were even told that
4  DEA presentations were guidance as to
5  compliance, correct?
6          MS. VANNI:  Object to form.
7          THE WITNESS:  All instructions
8  from DEA are -- have meaning to me, and
9  I take them seriously, yes.
10 BY MR. BUCHANAN:
11     Q.   Well, in fact, they told you when
12 you sat down with them and we looked at it
13 yesterday in the minutes of the meeting with the
14 DEA in 2013 that all that information I just
15 discussed, presentations, letters, statements
16 and communications with the DEA, that was all
17 guidance for you to incorporate as part of your
18 compliance program, correct?
19         MS. VANNI:  Object to form.
20         THE WITNESS:  They were
21 suggestions for things that industry
22 could use, yes.
23 BY MR. BUCHANAN:
24     Q.   We're circle back on the minutes

Page 686

1  in a moment.
2          What this letter is -- and so
3  this would be guidance to you, this letter,
4  correct?
5      A.   Yes.
6      Q.   As to what the DEA was expecting
7  of you as a registrant, correct?
8      A.   Yes.
9      Q.   Okay.  And so it says "In
10 addition to, and not in lieu of."
11         Do you have an understanding what
12 that means?
13     A.   I do.
14     Q.   And what does it mean?
15     A.   It means instead of versus, yeah,
16 this end instead -- you can't substitute one for
17 the other.
18     Q.   That's right.  I mean, you have
19 an obligation, obviously, to do suspicious order
20 monitoring, and you have an obligation to
21 maintain effective controls against diversion,
22 correct?
23     A.   Absolutely and we were.
24         MS. KOSKI:  Object.

Page 687

1          MS. VANNI:  Object to form.
2          MR. BUCHANAN:  Ma'am, move to
3  strike the nonresponsive portion.  I'm
4  not asking whether and you were.  You
5  keep inserting that at the end.  I'm
6  supposing that maybe that's guidance.
7  Let's stay with my questions, okay.
8          MS. VANNI:  Object to the
9  colloquy, and I just want to note that
10 you are at 35 minutes for Endo.
11         MR. BUCHANAN:  I'm at 35 minutes
12 of an hour and 20 minutes.
13 BY MR. BUCHANAN:
14     Q.   In addition to, you understand to
15 mean in addition to the statutory requirements,
16 correct?
17         MS. VANNI:  Counsel, I'm sorry.
18 Just for -- I'm sorry.  I didn't mean to
19 interrupt you.  Just for clarification,
20 is it your position that you're entitled
21 to use the full direct, not minute for
22 minute as used by the defendants on
23 direct?
24         MR. BUCHANAN:  I am entitled to

Page 688

1  use minute for minute of the redirect
2  examination conducted by you or your
3  direct examination used by you.
4          MS. VANNI:  That would be 35
5  minutes for Endo.
6          MR. BUCHANAN:  No, I mean "you"
7  as defendants.
8          MS. VANNI:  Okay.  We object to
9  that position, but -- so just note our
10 objection.
11         MR. BUCHANAN:  That hasn't been
12 my understanding, but I've been doing
13 issues that concern Anda as part of
14 this.  I'm not sequencing specifically
15 between Anda and Endo.
16 BY MR. BUCHANAN:
17     Q.   This Rannazzisi letter that was
18 received in 2007 by registrants, and we saw it
19 copied in your PowerPoint, reflects that the
20 requirements under the CFR are in addition to
21 and not in lieu of those in the statute,
22 correct?
23     A.   That's what it says.
24     Q.   Thank you.

36  (Pages 685 to 688)

Highly Confidential – Subject to Further Confidentiality Review

Page 689

1          And let's look at that with
2   regard to -- so a manufacturer or a distributor
3   has an obligation to maintain effective controls
4   against diversion, right?
5          A.    Yes, as identified in the
6   regulation.
7          Q.    Statutory -- I'm sorry.  As
8   identified in the statute?
9          A.    Yes.
10         Q.    Okay.  Has an obligation to
11  maintain effective controls against diversion,
12  that's the statutory obligation, correct?
13         A.    Yes.
14         Q.    And Mr. Rannazzisi is saying you
15  have a separate obligation with regard to the
16  CFR, the regulation, with regard to suspicious
17  order monitoring and reporting, correct?
18         MS. KOSKI:  Object to form.
19         MS. VANNI:  Object to form.
20         THE WITNESS:  Yes.
21  BY MR. BUCHANAN:
22         Q.    Okay.  And so in this letter -- I
23  mean, you'd agree this is important guidance
24  from DEA, correct?

Page 690

1          MS. VANNI:  Object to form.
2          THE WITNESS:  It's guidance.
3   It's not anything that wasn't well known
4   at the time.
5   BY MR. BUCHANAN:
6          Q.    Okay.  Well, let's see what was,
7   again, then well known at the time before you
8   got this letter.
9          "The regulation specifically
10  states that suspicious orders include orders of
11  unusual size, orders deviating from a normal
12  pattern and orders of an unusual frequency."
13         Would you agree that's what he
14  wrote?
15         A.    That's what it says, yes.
16         Q.    Can you go to third paragraph,
17  please.  It continue, "The size of order alone,
18  whether or not it deviates from a normal
19  pattern, is enough to trigger the registrant's
20  responsibility to report the order as
21  suspicious."
22         Do you see that?  It's the --
23  sorry, fourth paragraph.
24         Do you see that, ma'am?

Page 691

1          A.    Yes.
2          Q.    Okay.  "The determination of
3   whether an order is suspicious depends not only
4   on the ordering patterns of the particular
5   customer, but also on the patterns of the
6   registrant's customer base and the patterns
7   throughout the relevant segment of the regulated
8   industry."
9          Did I read that correctly?
10         A.    Yes.
11         Q.    Okay.  So what this is saying is,
12  one, your system has got to look at patterns,
13  right?
14         MS. VANNI:  Object to form.
15  BY MR. BUCHANAN:
16         Q.    Isn't that what he wrote?
17         A.    It says if you're looking at
18  patterns, the size of the order is
19  different than -- basically that they're not --
20  you can't base a decision on one versus the
21  other.
22         Q.    Let's look at what's written by
23  the DEA to registrants.
24         "The determination of whether an

Page 692

1   order is suspicious depends not only on the
2   ordering patterns of the particular customer,
3   but also on the patterns of the registrant's
4   customer base and the patterns throughout the
5   relevant segment of the regulated industry."
6          Did I read that correctly?
7          A.    You read it correctly.
8          Q.    Okay.  And as of the time you got
9   to Qualitest, was the Qualitest suspicious order
10  monitoring system looking at class of trade as
11  separate thresholds?
12         A.    Again, I can't comment on what
13  the system was --
14         MS. VANNI:  Objection.
15         THE WITNESS:  -- before I got
16  there.
17         MS. VANNI:  Beyond the scope.
18  BY MR. BUCHANAN:
19         Q.    At the time you got there.  At
20  the time you got there, ma'am, was it looking at
21  relevant classes of trade?
22         MS. VANNI:  Objection, asked and
23  answered.
24         THE WITNESS:  I don't know what

37 (Pages 689 to 692)

Highly Confidential – Subject to Further Confidentiality Review

Page 693

1      OMS was doing.
2   BY MR. BUCHANAN:
3      Q.   Okay.  The next page it says,
4   "Registrants that rely on rigid formulas to
5   define whether an order is suspicious may be
6   failing to detect suspicious orders."
7           Did I read that correctly?
8      A.   You did.
9      Q.   "For example, a system that
10  identifies orders as suspicious only if the
11  total amount of a controlled substance order
12  during one month exceeds the amount ordered the
13  previous month by a certain percentage or more
14  is" -- what did Mr. Rannazzisi say?
15     A.   "Is insufficient."
16     Q.   "Is insufficient."  So you had
17  that knowledge as of 2007, right?
18          MS. VANNI:  Object to form.
19          THE WITNESS:  In other words,
20      don't rely on pattern.
21  BY MR. BUCHANAN:
22     Q.   It says something that is looking
23  at whether or not it just exceeds a
24  predetermined percentage from a prior month is

Page 694

1   insufficient, correct?
2      A.   Which is the frequency of the
3   order.  That's what it says, yes.
4      Q.   "A system that identifies orders
5   as suspicious only if the total amount of a
6   controlled substance ordered during one month
7   exceeds the amount ordered the previous month by
8   a certain percentage or more is insufficient."
9           Those are the words, right?
10          MS. VANNI:  Object to form.
11          THE WITNESS:  That's what it
12      says, yes.
13  BY MR. BUCHANAN:
14     Q.   Okay.  "This system fails to
15  identify orders placed by a pharmacy if the
16  pharmacy placed unusually large orders from the
17  beginning of its relationship with the
18  distributor."
19          Do you agree with that, ma'am?
20     A.   That's what it says.
21     Q.   Okay.  And you agree?
22          MS. LEIBELL:  Object to form.
23          THE WITNESS:  No.
24  BY MR. BUCHANAN:

Page 695

1      Q.   Nonetheless, you had this
2   guidance from the DEA at the end of 2007, and
3   I think you even said this was known before,
4   right?
5          MS. KOSKI:  Object to form.
6          MS. VANNI:  Object to form.
7          THE WITNESS:  The letter was out
8      there.
9   BY MR. BUCHANAN:
10     Q.   And, "Also, this system would not
11  identify orders as suspicious if the order were
12  solely for one highly abused controlled
13  substance if the orders never grew
14  substantially."
15          Did I read that correctly?
16     A.   You did.
17     Q.   "Nevertheless, ordering one
18  highly abused controlled substance and little or
19  nothing else deviates from the normal pattern of
20  what pharmacies generally order."
21          Did I read that correctly?
22     A.   You did.
23     Q.   This is that product mix issue
24  that the DEA discussed with you later in time,

Page 696

1   correct?
2          MS. KOSKI:  Object to form.
3          MS. VANNI:  Object to form.
4          THE WITNESS:  I can't -- can't
5      connect the two.
6   BY MR. BUCHANAN:
7      Q.   Okay.  Well, let's talk about it.
8   "Ordering one highly abused controlled substance
9   and little or nothing else deviates from the
10  normal pattern of what pharmacies generally
11  order."
12          Did I read that correctly?
13     A.   He's making a statement about
14  pharmacies.  I mean, I think you're reading more
15  into what he's saying than is there but...
16     Q.   You told us, ma'am, that these
17  are important guidances, and this is what you
18  governed your actions by, right?
19          MS. KOSKI:  Object to form.
20          MS. VANNI:  Object to form.
21          THE WITNESS:  They are things
22      that I take into consideration, yes.
23  BY MR. BUCHANAN:
24     Q.   Well, if the DEA is telling you

Highly Confidential - Subject to Further Confidentiality Review

Page 697

1    this is what you need to do to comply, then this
2    is what you need to do to comply, right?
3              MS. KOSKI:  Object to form.
4              THE WITNESS:  And we did.
5    BY MR. BUCHANAN:
6        Q.    Okay.  And so Qualitest was
7    considering the relative percentages of
8    controlled substances versus noncontrolled
9    substances of its customers prior to 2013,
10   ma'am?
11       A.    I don't know, again, what OMS was
12   doing.
13       Q.    Okay.  You're not aware that
14   Qualitest was doing that, correct?
15             MS. VANNI:  Object to form.
16             THE WITNESS:  I don't know.  I
17   can't comment.
18   BY MR. BUCHANAN:
19       Q.    Okay.  You have no information to
20   share with us as to whether Qualitest was doing
21   that, correct?
22             MS. VANNI:  Object to form.
23             THE WITNESS:  Do not, no.
24   BY MR. BUCHANAN:

Page 698

1        Q.    Okay.  Paragraph beginning
2    "lastly."
3              Lastly, registrants that
4    routinely report suspicious orders, yet fill
5    these orders without first determining that the
6    order is not being diverted into other than
7    legitimate medical scientific and industrial
8    channels may be failing to maintain effective
9    controls against diversion.
10             Did I read that correctly?
11       A.    Yes, you did.
12       Q.    And you have that knowledge and
13   understanding as of 2007 at the latest, ma'am?
14             MS. VANNI:  Object to form.
15             THE WITNESS:  That's what he's
16   saying in 2007, yes.
17   BY MR. BUCHANAN:
18       Q.    And he is the DEA at this point?
19       A.    Yes.
20       Q.    Okay.  And this is a DEA
21   communication to all registrants, correct?
22             MS. KOSKI:  Object to form.
23             THE WITNESS:  It is a
24   communication to some registrants, yes.

Page 699

1              MR. BUCHANAN:  Okay.
2              THE WITNESS:  Manufacturers and
3    distributors.
4    BY MR. BUCHANAN:
5        Q.    Fair enough, to manufacturers and
6    distributors.  Okay.
7              All right.  So every year that
8    Qualitest or any of the entities you were with
9    filed a application with the DEA to get
10   permission to manufacture, to distribute, to
11   sell controlled substances, you were agreeing to
12   play within that framework, right?
13             MS. KOSKI:  Object to form.
14             MS. VANNI:  Objection.
15             THE WITNESS:  We were agreeing to
16   abide by the DEA regulations.
17   BY MR. BUCHANAN:
18       Q.    You were agreeing to maintain
19   effective controls against diversion, one,
20   correct?
21             MS. VANNI:  Objection.
22             THE WITNESS:  Which we did, yes.
23   All of the recordkeeping and
24   accountability and storage requirements

Page 700

1    were met.
2              MR. BUCHANAN:  Move to strike.
3    You did it again.  Let's stay with my
4    question.
5              MS. KOSKI:  Objection.
6    BY MR. BUCHANAN:
7        Q.    When you apply for a
8    registration, you are agreeing to maintain
9    effective controls against diversion, correct?
10       A.    Yes, and we did.
11             MR. BUCHANAN:  Move to strike.
12   BY MR. BUCHANAN:
13       Q.    Are you having a hard time just
14   staying with my focus?
15             MS. VANNI:  Object to colloquy.
16   BY MR. BUCHANAN:
17       Q.    Are you having a hard time with
18   that?
19       A.    No.
20       Q.    Okay.  When you file an
21   application with the DEA to be a registrant as
22   either a manufacturer or a distributor, you are
23   agreeing that you will maintain effective
24   controls to prevent diversion, yes or no?

Highly Confidential - Subject to Further Confidentiality Review

Page 701

1      A.   Yes.
2           MS. VANNI:  Objection, asked and
3      answered.
4      BY MR. BUCHANAN:
5      Q.   When you make an application to
6      be a registrant, you are agreeing that you will
7      comply with the regulations concerning
8      suspicious order monitoring, yes or no?
9           MS. KOSKI:  Objection to form.
10          MS. VANNI:  Objection, asked and
11     answered.
12          THE WITNESS:  Yes.
13     BY MR. BUCHANAN:
14     Q.   You agree not just the first
15     time, you agree every time you do that; yes or
16     no?
17          MS. VANNI:  Objection.
18          THE WITNESS:  Yes.
19     BY MR. BUCHANAN:
20     Q.   And so if you're agreeing to do
21     that, it's not unreasonable for the DEA to
22     believe that you're doing that, correct?
23          MS. VANNI:  Objection.
24          THE WITNESS:  Yes, and to

Page 702

1      inspect, to confirm.
2      BY MR. BUCHANAN:
3      Q.   You saw the interaction with the
4      DEA yesterday, where you were told that you had
5      the public trust in your hands.
6           Do you recall hearing that from
7      the DEA in 2013?
8      A.   Yes.
9           MS. VANNI:  Objection.
10     BY MR. BUCHANAN:
11     Q.   You had that understanding as a
12     DEA compliance officer, correct?
13     A.   Yes.
14     Q.   That not just -- the obligation
15     wasn't just to make the pills and put them out
16     there, but to maintain effective controls
17     against diversion when you were doing that.
18          You understood that, correct?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  Yes.
21     BY MR. BUCHANAN:
22     Q.   And to maintain appropriate --
23     withdrawn.
24          And to maintain a suspicious

Page 703

1      order monitoring program to detect suspicious
2      orders, correct?
3           MS. KOSKI:  Objection.
4           MS. VANNI:  Objection, asked and
5      answered.
6           THE WITNESS:  As done, yes.
7           MR. BUCHANAN:  Move to strike.
8      BY MR. BUCHANAN:
9      Q.   And you also had the obligation,
10     and you agreed every time you renewed, that you
11     were maintaining a suspicious order monitoring
12     program compliant with the DEA guidance,
13     correct?
14          MS. KOSKI:  Object to form.
15          MS. VANNI:  Objection.
16          THE WITNESS:  Yes.
17     BY MR. BUCHANAN:
18     Q.   And if you weren't doing so, and
19     if you weren't doing so, that would be a very
20     serious breach of not only the promise you made
21     as part of your registration but also the public
22     trust, yes or no?
23          MS. KOSKI:  Objection.
24          MS. VANNI:  Objection.

Page 704

1           THE WITNESS:  That would be not
2      complying with the regulation.
3      BY MR. BUCHANAN:
4      Q.   And a breach of the public trust;
5      do you agree with that?
6           MS. VANNI:  Objection.
7           THE WITNESS:  It's not up to me
8      to define what's a breach of the public
9      trust.
10     BY MR. BUCHANAN:
11     Q.   You understand that you can't
12     do -- you being Qualitest, a manufacturer and
13     distributor of controlled substances during the
14     time you were there or with any of the
15     manufacturers and distributors that you worked
16     with, you can't do what you do without the
17     permission slip that's obtained following the
18     promise you make to do those things, right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  Following the grant
21     of the license by DEA.
22     BY MR. BUCHANAN:
23     Q.   And the promise that the
24     registrant will maintain effective controls

Highly Confidential - Subject to Further Confidentiality Review

Page 705

1    against diversion and a suspicious order
2    monitoring program to detect suspicious orders;
3    you would agree, correct?
4            MS. VANNI:  Object to form.
5            THE WITNESS:  We have to comply
6    with the regulations.
7            MS. VANNI:  My real time is down.
8    Could we go off the record.
9            THE VIDEOGRAPHER:  The time is
10   now 11:15 a.m.  We are off the record.
11           (Pause.)
12           THE VIDEOGRAPHER:  The time is
13   11:18.  We are back on the record.
14   BY MR. BUCHANAN:
15       Q.   Ma'am, you have 640.1 before you.
16   Let me just see the exhibit number, though.
17   Internal Number 640.1, 38 for the deposition.
18           MR. BUCHANAN:  Could we pull up
19   that one.
20           MS. VANNI:  Could I have a copy?
21           MR. BUCHANAN:  You have it.  It's
22   already been marked.
23   BY MR. BUCHANAN:
24       Q.   So on Exhibit 38 on the first

Page 706

1    page, ma'am, I understand you were not at
2    Qualitest at this point in time.
3            Did you have familiarity with the
4    HDMA?
5        A.   Not at this time, no.
6        Q.   When did you get involved with
7    HDMA?
8        A.   When I worked for HD Smith.
9        Q.   Okay.  So at a late -- roughly
10   ten years later, I guess?
11       A.   Yes.
12       Q.   Or eight years later, whatever it
13   is.
14           This e-mail notes that the HDMA,
15   that's from Brian Munroe to a distribution list
16   of people that probably included some and didn't
17   include others from your time at Endo and
18   Qualitest, he was the vice president of
19   government affairs.
20           Did you have any opportunity to
21   deal with him during your time at Qualitest?
22       A.   I did.
23       Q.   Okay.  I understood he had
24   relations and interactions with HDMA on various

Page 707

1    issues?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  I don't know.
4    BY MR. BUCHANAN:
5        Q.   What he notes in this e-mail, can
6    we have it on the screen here, "The HDMA is
7    objecting to the attached DEA notice and is
8    presenting to the Pain Care Forum tomorrow."
9            Did I read that correctly?
10       A.   You did.
11       Q.   The attached notice is the notice
12   we were looking at from Mr. Rannazzisi and the
13   DEA in 2007, correct?
14       A.   Yes.
15       Q.   Okay.  Did you know that that was
16   one of the things HDMA was doing with regard to
17   the guidances industry was receiving concerning
18   suspicious order monitoring and anti-diversion
19   efforts?
20       A.   No, I wasn't --
21           MS. VANNI:  Object to form.
22           MR. LEEDER:  Object to form.
23           THE WITNESS:  -- involved and
24   didn't have knowledge of that.

Page 708

1    BY MR. BUCHANAN:
2        Q.   Did you know industry was
3    objecting --
4        A.   No.
5            MS. VANNI:  Object to form.
6    BY MR. BUCHANAN:
7        Q.   -- to the DEA's requirements?
8        A.   No, I did not.
9        Q.   Okay.  "This is worth looking at
10   as it represents the continuing 'creep' of the
11   DEA into activities that contribute to the
12   overall chilling effect of prescribing pain
13   medications."
14           Did I read that correctly?
15       A.   You did.
16       Q.   Okay.  And were you involved at
17   all with HDMA in trying to combat DEA
18   regulations?
19       A.   No.
20           MS. VANNI:  Object to form.
21   BY MR. BUCHANAN:
22       Q.   Okay.  Or guidances?
23       A.   No.
24       Q.   Okay.  Were you a part of Watson

41 (Pages 705 to 708)

Highly Confidential – Subject to Further Confidentiality Review

Page 709

1  or Anda's efforts with the HDMA at this point in
2  time?
3      A.    No.
4          MS. KOSKI:  Object to form.
5          MS. LEIBELL:  Object to form.
6  BY MR. BUCHANAN:
7      Q.    Okay.  Did you tell your peers at
8  Watson or Anda at that point in time we've got
9  to resist this obligation for our companies?
10     A.    No.
11         MS. LEIBELL:  Object to form.
12         MS. KOSKI:  Object to form.
13  BY MR. BUCHANAN:
14     Q.    Did you know that others were
15  doing that?
16     A.    I did not.
17     Q.    Okay.  You talked about other
18  industry organizations in your direct
19  examination with Endo counsel.  I think you
20  mentioned the Anti-Diversion Industry Working
21  Group, a red flags video.
22         Do you recall that?
23     A.    I do.
24     Q.    Pass you what we're marking as

Page 710

1  Exhibit -- it's internal number 1080 for the
2  deposition -- 39.
3         (Document marked for
4         identification as Par-Norton Deposition
5         Exhibit No. 39.)
6  BY MR. BUCHANAN:
7      Q.    Passing you Exhibit 39 to your
8  deposition.  There you go.  This is a press
9  release that issued around the time the red flag
10  video was released; is that right?
11     A.    Yes.
12     Q.    And we looked at a document
13  yesterday concerning the anti-diversion working
14  group, where there was a reference to maybe we
15  should do something like this.
16         Do you recall that?
17     A.    I'm sorry?
18     Q.    I said we looked at a -- I think
19  it was a meeting of -- your minutes having
20  attended an anti-diversion working group meeting
21  where, among other things, one thing that was
22  discussed was the development of this video?
23     A.    Yes.
24     Q.    Okay.  So that occurs and the

Page 711

1  video issues, right?
2      A.    Yes.
3      Q.    Were you a part of the review
4  process for the red flag video, ma'am?
5      A.    I was.
6      Q.    I see Qualitest was also
7  involved?
8      A.    Yes, when I worked for Qualitest.
9      Q.    Okay.  And that was --
10     A.    That's me.
11     Q.    You're actually referenced on the
12  press release announcing the red flag video?
13     A.    Yes.
14     Q.    And so you endorsed its content?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  I did.
17  BY MR. BUCHANAN:
18     Q.    You reviewed its contents?
19     A.    Yes.
20     Q.    Okay.  And then you sent it
21  around to others in the company as a -- to show
22  them, frankly, what the anti-diversion working
23  group had done?
24     A.    Yes.

Page 712

1         MR. BUCHANAN:  Do we have a copy
2  of the video I can give to counsel?  I
3  need a copy of the video, though, just
4  for the record.
5         (Thumb drive marked for
6         identification as Par-Norton Deposition
7         Exhibit No. 40.)
8         MR. BUCHANAN:  All right. I'm
9  just marking as Exhibit 40 a thumb drive
10  which has a copy of the video.  I'd like
11  you to watch with me now as we pull it
12  up on the screen.
13         Can you pull the red flag video
14  up on the screen.  Can you go to the
15  start of it first, and let's just get it
16  rolling for a moment.  Can you
17  transcribe what's played.
18         (Video played as follows:
19         "I'm Carmen Collazo, executive
20  director for the examination" --
21         MR. BUCHANAN:  Let's pause.  We
22  don't have enough volume.
23         THE VIDEOGRAPHER:  The time is
24  11:24.  Off the record.

Highly Confidential – Subject to Further Confidentiality Review

Page 713

1      (Brief recess.)
2          THE VIDEOGRAPHER:  The time is
3      11:30.  We are back on the record.
4   BY MR. BUCHANAN:
5      Q.   Ma'am, you were telling us
6   yesterday about your involvement with the
7   anti-diversion working group.  You also just
8   discussed with us your involvement with the
9   preparation of the red flag video both
10  individually and on behalf of Qualitest.
11         Do you recall that testimony?
12     A.   I do.
13     Q.   Okay.  I'd like to just put it on
14  the screen and just confirm that we're talking
15  about the same thing, okay?
16     A.   Yes.
17         MR. BUCHANAN:  Can you queue it
18  up please and pause for a second.
19  BY MR. BUCHANAN:
20     Q.   This is NABP red flag video.  You
21  saw the title flash on the screen, ma'am?
22     A.   I did.
23     Q.   Okay.  And you recognize this
24  individual?

Page 714

1      A.   Yes.
2      Q.   And who is he?
3      A.   Carmen Collazo, the head of the
4   National Association of Boards of Pharmacy.
5      Q.   Could we go to -- we don't have
6   the time to listen to all 12 minutes.  We're
7   going to hit a few places.  But fair to say that
8   what's happening here is the company is
9   presenting -- I'm sorry -- the anti-diversion
10  working group together with the ABMP is
11  presenting situations and scenarios that may
12  occur in pharmacies to sensitize pharmacists and
13  pharmacies to maybe things they can do to help
14  prevent diversion.
15     A.   Yes.
16     Q.   Would that be fair?
17         MS. VANNI:  Object to form.
18         MR. BUCHANAN:  Let's go to 2:21.
19  Okay.  That's actually helpful.  That
20  will refresh the witness' recollection
21  more broadly.
22  BY MR. BUCHANAN:
23     Q.   And one of the things the video
24  did and we see it on the screen right now is

Page 715

1   show actually faces of individuals struggling
2   with opioids, right?
3          MS. BANNI:  Object to form.
4          THE WITNESS:  Yes.
5   BY MR. BUCHANAN:
6      Q.   One of the points being, these
7   are everyday people who are addicted?
8      A.   That's the point --
9          MS. BANNI:  Object to form.
10         THE WITNESS:  -- yes.
11  BY MR. BUCHANAN:
12     Q.   The point of showing faces of all
13  ilks is to say this is a drug abuse issue that
14  is different than drug abuse that people might
15  ordinarily be thinking of, right?
16         MS. KOSKI:  Object to form.
17         MS. BANNI:  Object to form.
18         THE WITNESS:  I'm not sure, but
19  it's meant to show that there are
20  different types of people who face
21  addiction.
22  BY MR. BUCHANAN:
23     Q.   And the jury will have the full
24  video to review and see what was trying to be

Page 716

1   conveyed --
2      A.   Yes.
3      Q.   -- by the anti-diversion working
4   group, together in collaboration with the ABMP,
5   but I would like to focus on some specific
6   language with you now.  Could we go to 2:21.  Is
7   it ready to play?  All right.  Now we'll play
8   some clips and I'll ask you some questions.
9          (Video played as follows:
10         "Opioid abuse is a nationwide
11     epidemic.  Every 19 minutes someone dies
12     from an unintentional drug overdose and
13     when it comes to overdose deaths caused
14     by prescription drugs, nearly three out
15     of four are caused by painkillers.  The
16     number of deaths involving opioids now
17     outnumbers those from cocaine and heroin
18     combined.  Regulations" --)
19         MR. BUCHANAN:  You can press
20     pause.
21  BY MR. BUCHANAN:
22     Q.   You recall that portion of the
23  video, ma'am?
24     A.   I do.

43 (Pages 713 to 716)

Highly Confidential - Subject to Further Confidentiality Review

Page 717

1    Q.    You were involved in its
2  preparation?
3    A.    I was involved in -- I didn't --
4  I didn't draft the wording for it, but I was --
5  I reviewed it before, yes.
6    Q.    I think you told us a few minutes
7  ago you reviewed and endorsed it, right?
8    A.    Yes.
9    Q.    Okay. Content was accurate when
10 written?
11    MS. BANNI:  Object to form.
12    THE WITNESS:  I don't know if you
13   say accurate. It was -- it sounded --
14   it sounded right when I reviewed it.
15 BY MR. BUCHANAN:
16    Q.    Right, I mean, you were certainly
17 trying to make sure that it was accurate when
18 you were putting it out and distributing it on a
19 website for pharmacies around the country,
20 right?
21    MS. BANNI:  Object to form.
22    THE WITNESS:  We did not put it
23   out and distribute it on a website.
24   That was done by NABP.

Page 718

1  BY MR. BUCHANAN:
2    Q.    Well, the anti-diversion working
3  group issued a press release, right?
4    A.    I believe Mallinckrodt issued a
5  press release and noted everybody on there, yes.
6    Q.    Right. And you endorsed its
7  content when it was released, correct?
8    MS. BANNI:  Object to form.
9    THE WITNESS:  Yes.
10 BY MR. BUCHANAN:
11    Q.    Even sent it around to your peers
12 in the firms to show it to them, right?
13    A.    Right. It was something that I
14 was proud that we had -- we had done.
15    Q.    Okay. Let's go to 4:56, and
16 we're kind of scrubbing through the images.
17 Does that refresh your recollection in terms of
18 its content?
19    A.    Yes.
20    Q.    People walking up to a counter,
21 red flags, cash customers, people walking in in
22 groups?
23    A.    Mm-hmm.
24    Q.    People going from one doctor to

Page 719

1  another doctor, right?
2    MS. BANNI:  Object to form.
3    THE WITNESS:  These were things
4    that we had been told by DEA were
5    issues, yes.
6  BY MR. BUCHANAN:
7    Q.    And we see people on the screen,
8  and these are people that, could we agree, are
9  everyday folks?
10    MS. BANNI:  Object to form.
11    MS. KOSKI:  Object to form.
12    THE WITNESS:  I guess, yeah.
13    MR. BUCHANAN:  Okay. Let's play
14    from 4:56.
15    (Video played as follows:
16    "For every unintentional overdose
17    death from opioids in 2010, there were
18    733 nonmedical users. Emergency room
19    visits resulting from pharmaceutical
20    abuse with no other type of drug or
21    alcohol involved almost doubled between
22    2004 and 2010.")
23    MR. BUCHANAN:  Press pause,
24    please.

Page 720

1  BY MR. BUCHANAN:
2    Q.    Big problem, can we agree?
3    MS. BANNI:  Object to form.
4    THE WITNESS:  Big problem, there
5    is an addiction problem in the United
6    States, yes.
7  BY MR. BUCHANAN:
8    Q.    For every opioid death in 2010,
9  there were 733 nonmedical users of those drugs,
10 right?
11    A.    That's what this -- the data
12 showed. I'm not sure where the data came from,
13 I don't recall, but it was probably from a
14 regulatory agency.
15    Q.    Data you endorsed as accurate at
16 that point in time personally, correct?
17    MS. BANNI:  Object to form.
18    THE WITNESS:  Yes.
19 BY MR. BUCHANAN:
20    Q.    Data you endorsed as accurate on
21 behalf of the anti-diversion working group,
22 correct?
23    MS. BANNI:  Object to form.
24    THE WITNESS:  Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 721

1   BY MR. BUCHANAN:
2       Q.   We've seen stats on opioid
3   deaths.  You're familiar there's stats out
4   there, right?
5       A.   Yes.
6       Q.   As of this point in time, you had
7   the knowledge that for every death there were
8   733 people who were using opioids for nonmedical
9   use, right?
10          MS. BANNI:  Objection, beyond the
11      scope.
12          THE WITNESS:  It's all stats that
13      are out there.  We took the stats as
14      they were.  I don't know what the
15      details were before into them and how
16      they were obtained, but we assumed they
17      were accurate based on the source.
18  BY MR. BUCHANAN:
19      Q.   You certainly were trying to
20  convey accurate information, correct?
21      A.   Yes, we were.
22      Q.   And, to the best of your
23  knowledge, ma'am, you did so, correct?
24      A.   Yes.

Page 722

1       Q.   Okay.  Let's go forward now to
2   8:25.  And we see kind of interspersed with
3   facts these scenarios with individuals
4   approaching a pharmacy counter, fair?
5       A.   Yes.
6       Q.   Okay.
7          MR. BUCHANAN:  Could you play
8      8:25.
9          (Video played as follows:
10      "America's biggest drug problem
11      isn't on the streets, it's in our
12      medicine cabinets.  Seventy percent of
13      Americans are taking at least one
14      prescription drug and more than 50% are
15      on at least two.  Among young people who
16      abuse prescription medications, 70% get
17      them from family or friends.")
18          MR. BUCHANAN:  Let's pause.
19  BY MR. BUCHANAN:
20      Q.   America's drug problem isn't on
21  the streets, it's in our medicine cabinet.
22          Did you hear that?
23      A.   I did.
24      Q.   True statement when made, right?

Page 723

1          MS. VANNI:  Object to form.
2          THE WITNESS:  It's one of the
3      things that's outlined on DEA's website
4      and why they do their national take back
5      days now, yes.
6   BY MR. BUCHANAN:
7       Q.   And the manufacturers who you
8   worked with in the anti-diversion working group
9   endorse that as a true statement of the state of
10  affairs as of 2014 when this video was prepared,
11  correct?
12          MS. VANNI:  Objection.
13          THE WITNESS:  Yes, there's always
14      independent thought and people who will
15      abuse and take things in ways they
16      shouldn't.
17  BY MR. BUCHANAN:
18      Q.   America's drug problem isn't on
19  the streets, it's in our medicine cabinets,
20  right?
21      A.   In that particular case, yes,
22  when we were directing to pharmacies, yes, that
23  is the case.
24          MR. BUCHANAN:  Let's go to nine

Page 724

1   minutes and three seconds and play that
2   portion.
3          (Video played as follows:
4      "More Americans abuse
5      prescription drugs than the number of
6      cocaine, hallucinogen, methamphetamine
7      and heroin abusers combined.  The
8      pharmacy" --)
9          MR. BUCHANAN:  Let's pause there.
10  BY MR. BUCHANAN:
11      Q.   More Americans abuse prescription
12  drugs than cocaine, hallucinogens,
13  methamphetamine and heroin abusers combined.
14          Did you hear that, ma'am?
15      A.   I did.
16      Q.   To your knowledge in 2014, that
17  was a true statement you were making through the
18  anti-diversion working group for this video,
19  correct?
20      A.   Those were statements that have
21  would come from DEA or CDC or a regulator, so I
22  would assume, yes.
23      Q.   You certainly wouldn't endorse
24  them as appropriate or true if they weren't

45 (Pages 721 to 724)

Highly Confidential - Subject to Further Confidentiality Review

Page 725

1  true, right?
2          MS. VANNI:  Object to form.
3          THE WITNESS:  Yes.
4  BY MR. BUCHANAN:
5      Q.    To the best of your knowledge,
6  ma'am, as a person who was on this committee to
7  review and endorse this video, those were true,
8  right?
9      A.    Those --
10         MS. VANNI:  Object to form.
11         THE WITNESS:  Those were publicly
12  available.
13  BY MR. BUCHANAN:
14     Q.    To the best of your knowledge,
15  they were true?
16     A.    I wasn't in a position to make a
17  determination if they were true.  They were
18  publicly available.  I didn't have access to the
19  data that was used to compile that information,
20  so I can't say they were 100% true.  I can only
21  make a assumption based on the viability of the
22  sources that they came from.
23     Q.    America's drug problem isn't on
24  the streets, it's in our medicine cabinets,

Page 726

1  right?
2      A.    It's in a lot of places, but,
3  yes, that's one of them.
4      Q.    What you put in the video is that
5  it wasn't on the streets, it was in people's
6  medicine cabinets, correct, ma'am?
7          MS. VANNI:  Object to form.
8          THE WITNESS:  Because that's what
9  the video was focused on.
10  BY MR. BUCHANAN:
11     Q.    Is that what you put on the
12  video?  Not because, not why --
13         MS. VANNI:  Let her answer her
14  question -- her answer.
15  BY MR. BUCHANAN:
16     Q.    Not because, not why.  Stay with
17  my questions.
18         What you put in the video, ma'am,
19  was that America's drug problem isn't on the
20  street, it's in our medicine cabinets, correct?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  Yes, the video is
23  directed to its audience.
24         MR. BUCHANAN:  Okay.  Let's go to

Page 727

1  10:31 to 10:46.
2          (Video played as followed:
3          "One in four teens reports having
4  misused a prescription drug at least
5  once.  That translates to 5 million
6  teenagers, a 33% increase over the past
7  five years.")
8          MR. BUCHANAN:  Let's pause.
9  BY MR. BUCHANAN:
10     Q.    33% increase in teen abuse of
11  prescription drugs between 2009 and 2014.
12         You saw that reference, ma'am?
13     A.    Yes, I did.
14     Q.    During the same period of time
15  that Mr. -- after Mr. Rannazzisi and the DEA had
16  sent you a notice saying everybody has got to
17  maintain effective controls against diversion,
18  right?
19     A.    Yes.
20     Q.    And where we've gotten to by 2014
21  is that America's drug problem isn't on the
22  street, it's in medicine cabinets, right?
23         MS. VANNI:  Object to form.
24         THE WITNESS:  That was the --

Page 728

1  those were the statistics that were in
2  the video, yes.
3          MR. BUCHANAN:  Okay.  Well, let's
4  go now to towards the end, 11:41.
5  BY MR. BUCHANAN:
6      Q.    Okay.  And this video was going
7  out to pharmacies, right?
8      A.    That was the focus.
9          MR. BUCHANAN:  Okay.  Could you
10  roll it from here, please.
11         (Video played as follows:
12         "Who is responsible?  Yes, it's
13  the culture.  Yes, it's the doctor or
14  prescriber.  Yes, it's law enforcement.
15  Yes, it's the state boards.  But you,
16  the pharmacist, have a corresponding
17  responsibility.  You play a critical
18  role.")
19         MR. BUCHANAN:  Pause, please.
20  BY MR. BUCHANAN:
21     Q.    Did you hear who was listed as
22  who's responsible?
23     A.    Yes.
24     Q.    Who did the anti-diversion

Golkow Litigation Services - 1.877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

Page 729

1   working group highlight as responsible for this
2   situation, ma'am?
3       A.   Many aspects of the supply
4   change.
5       Q.   I'm sorry.  I didn't hear
6   manufacturers or distributors mentioned, did
7   you?
8           MS. VANNI:  Object to form.
9           THE WITNESS:  No, because we had
10          DEA controls in place.
11  BY MR. BUCHANAN:
12      Q.   In this video in terms of who is
13  responsible for this, the anti-diversion working
14  group, Qualitest, other manufacturers, other
15  distributors point the finger at culture, right?
16          MS. VANNI:  Object to form.
17  BY MR. BUCHANAN:
18      Q.   You saw that?
19      A.   That's what it says, yes.
20      Q.   Pointed the finger at the DEA,
21  right?
22          MS. VANNI:  Objection.
23          THE WITNESS:  Yes.
24  BY MR. BUCHANAN:

Page 730

1       Q.   Pointed the finger at doctors,
2   right?
3       A.   Yes, definitely.
4           MS. VANNI:  Objection.
5   BY MR. BUCHANAN:
6       Q.   And pointed the finger at state
7   boards?
8           MS. VANNI:  Objection.
9           THE WITNESS:  Yes, definitely.
10  BY MR. BUCHANAN:
11      Q.   Okay.  And pointed the finger at
12  pharmacists, right?
13          MS. VANNI:  Objection.
14          THE WITNESS:  Yes, definitely.
15      Q.   Missed a few big players in the
16  supply chain; we agree?
17          MS. VANNI:  Objection.
18          THE WITNESS:  I would not agree.
19  BY MR. BUCHANAN:
20      Q.   We could agree that manufacturers
21  aren't referenced in terms of their roles in
22  influencing state boards, right?
23          MS. VANNI:  Objection.
24

Page 731

1           THE WITNESS:  Manufacturers that
2           comply with the regulations are not
3           contributing to the problem.
4   BY MR. BUCHANAN:
5       Q.   Did you see any reference to
6   manufacturers' influence on state boards?
7           MS. VANNI:  Objection.
8           THE WITNESS:  No, I would not
9           think that that would be applicable to
10          this.
11  BY MR. BUCHANAN:
12      Q.   Did you see any reference to
13  distributors' influence on state boards?
14      A.   No.
15      Q.   Did you see any reference to our
16  industry associations that have worked to change
17  the treatment of pain so that these drugs could
18  be prescribed more broadly, did you see any
19  reference to that as a responsibility?
20          MS. VANNI:  Objection.
21          THE WITNESS:  No.
22  BY MR. BUCHANAN:
23      Q.   Did you see any reference to
24  distributors who had no suspicious order

Page 732

1   monitoring programs for years and years and
2   years?
3           MS. VANNI:  Objection.
4           THE WITNESS:  No.
5   BY MR. BUCHANAN:
6       Q.   Did you see any reference to
7   manufacturers who had no such responsibility?
8           MS. VANNI:  Objection.
9           THE WITNESS:  No.
10  BY MR. BUCHANAN:
11      Q.   Did you see any reference to the
12  30 plus million dollars Endo paid to the NIPC to
13  run programs to expand the market for pain?
14          MS. VANNI:  Objection, beyond the
15          scope, argument.
16          THE WITNESS:  No, and I didn't
17          see any reference either to product
18          imported illegally or to any other
19          scenario, independent thought, any other
20          scenario that causes abuse and
21          addiction.  That was not the focus of
22          this video.
23  BY MR. BUCHANAN:
24      Q.   Who is responsible?  You endorsed

47  (Pages 729 to 732)

Highly Confidential - Subject to Further Confidentiality Review

Page 733

1    this?
2          A.    I did.
3          Q.    We have your letter, ma'am, from
4    October 18, 2013.
5          Do you recall that?
6          A.    I recall the date.  I can't
7    recall what the letter said, but yes.
8          Q.    That's where you told all of your
9    customers that we all have this responsibility,
10   right?
11         A.    Yes.
12         MS. VANNI:  Object to form.
13   BY MR. BUCHANAN:
14         Q.    We all have this responsibility,
15   manufacturers, correct?
16         A.    Yes.
17         Q.    Distributors, correct?
18         MS. VANNI:  Objection.
19         THE WITNESS:  Yes.
20         MS. VANNI:  Objection.
21         THE WITNESS:  And I consider
22   putting that out there to be going above
23   and beyond, and that's, again, something
24   that I have always wanted to do.

Page 734

1          MR. BUCHANAN:  Could we go to the
2    next slide, please, let's finish it.
3          (Video played as follows:
4          "When you are in that moment of
5    truth, will you recognize and act upon
6    the red flag?")
7          MR. BUCHANAN:  Let's pause.
8    BY MR. BUCHANAN:
9          Q.    So we could agree that in terms
10   of who has the responsibility, manufacturers and
11   distributors and others that had no suspicious
12   order monitoring programs or efforts to prevent
13   diversion were not listed, correct?
14         MS. VANNI:  Object to form.
15   BY MR. BUCHANAN:
16         Q.    We can agree on that?
17         A.    We can agree that everyone has a
18   responsibility to abide by the regulations.
19         Q.    Okay.  We can agree that when
20   those that had the responsibility for this
21   situation, who is responsible was the question.
22         Do you recall that?
23         MS. VANNI:  Object to form.
24   BY MR. BUCHANAN:

Page 735

1          Q.    Do you recall that question in
2    the video?
3          A.    In this particular video, yes.
4          Q.    Who is responsible?
5          A.    Yes.
6          Q.    Okay.  We could agree that the
7    Cardinal Healths, the Actavis, the McKessons,
8    the Mallinckrodts, the AmerisourceBergens and
9    the Qualitests, who sponsored the video, are not
10   listed in any way as having responsibility for
11   this, correct?
12         MS. VANNI:  Object to form.
13         THE WITNESS:  We have a
14   responsibility to comply with the
15   regulation.
16   BY MR. BUCHANAN:
17         Q.    Do you have my question, ma'am.
18   When the question was asked in the video --
19         A.    They are not listed in the video.
20         Q.    That's right.  But yet you knew,
21   you knew when you sent your letter in February
22   of 2013 that you had a responsibility as
23   Qualitest, correct?
24         MS. VANNI:  Object to form.

Page 736

1          THE WITNESS:  Of course.  That's
2    why we did comply.
3    BY MR. BUCHANAN:
4          Q.    Distributors had that
5    responsibility, correct?
6          A.    Yes.
7          Q.    And if anyone broke that supply
8    -- that closed system, heart-wrenching
9    consequences could occur, right?
10         A.    That's what my letter said, yes.
11         Q.    Okay.  Now, let's focus on a few
12   other points you did in examination with
13   counsel.
14         MR. BUCHANAN:  What do we have
15   time-wise?
16         THE VIDEOGRAPHER:  Seven minutes.
17   We're at 1:13.  Do you want me to go
18   off?
19         MR. BUCHANAN:  No, no, we're
20   fine.
21   BY MR. BUCHANAN:
22         Q.    Just want to circle back on some
23   of the questions about Anda, specifically this
24   interaction you had with DEA in the summer of

48  (Pages 733 to 736)

Highly Confidential – Subject to Further Confidentiality Review

Page 737

```
1    2007.
2              Do you recall that, ma'am?
3         A.   Yes.
4         Q.   Okay.  I think -- I think defense
5    counsel characterized it as an invitation?
6         A.   Yes.
7         Q.   You were invited?
8         A.   Yes.
9         Q.   Didn't they say they wanted to
10   talk to you about serious concerns?
11            MS. KOSKI:  Object to form.
12            THE WITNESS:  DEA did, yes.
13   BY MR. BUCHANAN:
14        Q.   They told you they wanted to talk
15   to you about serious concerns because certainly
16   about certain orders, but also your suspicious
17   order monitoring system, correct?
18            MS. KOSKI:  Object to form.
19            THE WITNESS:  Anda's suspicious
20        order monitoring system.
21   BY MR. BUCHANAN:
22        Q.   Yeah, the year was a little
23   confusing there, but Anda's suspicious order
24   monitoring system, correct?
```

Page 738

```
1         A.   Yes.
2         Q.   And you parsed the language
3    closely in some areas with counsel.  I'd like
4    you now to look at Exhibit 32 that was marked in
5    examination.  I don't have the ability to pull
6    it up on the screen for you, ma'am.  It's the
7    e-mail exchange on July 16th, 2007 between
8    yourself and Diane -- Ms. Miranda?
9         A.   Yes.
10        Q.   Okay.  This is an interaction
11   phone call you had with a Mr. Mapes from the
12   DEA.
13        A.   Hold on.  I just have one page.
14        Q.   This is an interaction you had
15   with a Mr. Mapes from the DEA, correct?
16        A.   It is a documented detail of that
17   descript -- that phone call, yes.
18        Q.   You got a phone call, right?
19        A.   Yes.
20        Q.   First call was, hey, does Watson
21   own Anda now, right?
22        A.   Correct.
23        Q.   Okay.  He then indicated he had
24   concerns.
```

Page 739

```
1              Did I read that correctly?
2         A.   He did indicate that.
3         Q.   About Anda, that he would like to
4    discuss, okay.
5              You understood he had concerns?
6         A.   That's yes.
7         Q.   Okay.  You started to read I
8    think the first sentence in the bottom of page 1
9    of Exhibit 32, Bates stamp 959.  "Mr. Mapes then
10   went on to say that since then, they have seen a
11   steady increase in Anda's sales of hydrocodone,
12   to the point of these sales being extremely
13   questionable."
14             Do you recall that?
15        A.   These were the -- yes, it's a
16   summary of what he was saying during the call.
17        Q.   And he said that many of the
18   retail pharmacies that you were selling to were
19   feeding the drugs to illegal internet
20   pharmacies, right?
21             MS. KOSKI:  Object to form.
22             THE WITNESS:  That's what he
23        said, yes.
24   BY MR. BUCHANAN:
```

Page 740

```
1         Q.   He then said he had questions
2    about the effectiveness of Anda's suspicious
3    order monitoring system, correct?
4         A.   He asked about the effectiveness,
5    which I couldn't really comment on, having not
6    worked there.
7         Q.   Yeah, and that was interesting.
8    I think you were asked a question by defense
9    counsel about did Anda have its own DEA
10   compliance group.
11             Do you recall that?
12        A.   Yes.
13        Q.   When the time came after you
14   were -- I think you said summoned in your
15   characterization of this?
16        A.   I did.
17        Q.   After you were summoned to go and
18   meet with the DEA in Washington, who came with
19   you from DEA compliance at Anda?
20        A.   I believe Michael Cochrane.
21        Q.   CEO?
22        A.   I'm not sure what his title was,
23   but he was the person who at the time I was told
24   handled DEA compliance.
```

49 (Pages 737 to 740)

Highly Confidential – Subject to Further Confidentiality Review

Page 741

1    Q.    Okay.  Well, let's look at your
2  writing in Exhibit 2.  Exhibit 2 is your summary
3  of your experience at Ciba-Geigy, Watson,
4  Qualitest, et cetera; do you recall?
5    A.    Yes.
6    Q.    And you note in the middle of the
7  description --
8        MR. BUCHANAN:  Could we pull up
9      1146.2 and go to the Watson entry in the
10     middle of the paragraph.
11  BY MR. BUCHANAN:
12    Q.    It says, "However, Watson
13  purchased Anda and certainly afterward, Anda was
14  summoned to DEA as a result of their lack of a
15  robust SOM program."
16        Did I read that correctly?
17    A.    You did.
18    Q.    "I did not support Anda from a
19  DEA perspective as they had come to Watson with
20  their own DEA person."
21        And it notes, however, you were
22  asked to be their DEA representative for the
23  meeting in HQ.
24        Did I read that correctly?

Page 742

1    A.    Yes.
2    Q.    And what you listed for the
3  people that you went with to that meeting were a
4  representative of the legal department, correct?
5        You can read it in the next
6  sentence.
7    A.    Yes.
8    Q.    What you listed --
9    A.    I don't know who the legal person
10  was.
11    Q.    You went with legal and the
12  individual who at the time was the president of
13  Anda, correct?
14    A.    Yes.
15    Q.    And we talked about the binder
16  you got, and I won't revisit that.
17        But then you note, however --
18  well, actually, we probably should.  "DEA
19  presented and provided a binder as they have
20  done for most companies at this point" in time.
21        Do you see that?
22    A.    Yes.
23    Q.    Okay.  "However, in Anda's case
24  the DEA meeting was" what?

Page 743

1    A.    For cause.
2    Q.    For cause.  It wasn't just a
3  regular distributor meeting that you talked
4  about having -- being aware of that was
5  happening in the industry, correct?
6    A.    Actually, it was a bad choice of
7  words.
8    Q.    You've told us about several
9  words that I think you'd rather recast in your
10  oral testimony, but what you wrote when you were
11  characterizing your experience, on reflection at
12  Watson, was that the DEA meeting was for cause,
13  correct?
14    A.    That's what I wrote, yes.
15    Q.    And that "immediate action was
16  required," that's what you wrote, right?
17    A.    Yes.
18    Q.    "Immediate action required,"
19  correct?
20    A.    That's what I wrote, yes.
21    Q.    Not suggested, right?
22    A.    That's what I wrote, yes.
23    Q.    Not just to go above and beyond,
24  right?

Page 744

1    A.    Yes.
2    Q.    Required?
3    A.    As written.
4    Q.    That's what you wrote?
5    A.    As written, yes.
6    Q.    Okay.  Anda then revamped their
7  program and we conveyed the results to the DEA.
8        Did I read that correctly?
9    A.    You did.
10    Q.    Okay.  Mr. Mapes, you referenced
11  an interaction with him in this 2007 period of
12  time.
13        Is that the same Mr. Mapes that
14  Qualitest brought in to evaluate their program
15  in 2008 that we looked at yesterday?
16    A.    Yes, I believe so.
17    Q.    That identified inadequacies with
18  the SOM program at Qualitest?
19        MS. VANNI:  Object to form, and I
20      think we're at time.
21        THE WITNESS:  Again, I'm not
22      sure.
23  BY MR. BUCHANAN:
24    Q.    What's that?

Highly Confidential - Subject to Further Confidentiality Review

Page 745

1      A.    Again, I'm not sure.
2          MR. BUCHANAN:  Okay.  If that's
3   the case, is that accurate?  Okay.  Let
4   me -- for to correct one thing on the
5   record, counsel, I'm just going to mark
6   this and you can have it.
7          (Document marked for
8   identification as Par-Norton Deposition
9   Exhibit No. 41.)
10         MR. BUCHANAN:  This is Exhibit
11  41.  It's the -- I'm passing it over to
12  the witness.
13         I'll represent to counsel that
14  Exhibit 41 is the remainder of the
15  spreadsheet data that Endo/Qualitest has
16  pointed plaintiffs' counsel to as
17  representative of -- as containing the
18  sales and shipping data of the company's
19  various controlled substances.  That
20  Bates number should correlate with the
21  summary exhibit, which is Exhibit 4, as
22  a data source.
23         Thank you, ma'am.  I'm told I'm
24  out of time.

Page 746

1          THE WITNESS:  Thank you.
2          MR. BUCHANAN:  I appreciate your
3   indulgence.  Off the record.
4          THE VIDEOGRAPHER:  The time is
5   11:56.  Off the record.
6          (Brief recess.)
7          THE VIDEOGRAPHER:  12:06, back on
8   the record.
9          MR. BUCHANAN:  Ms. Norton, I'm
10  advised that I'm out of time.  I have no
11  further questions at this time.
12  Counsel, your witness.
13         MS. VANNI:  I have no questions
14  at this time.  Thank you.
15         THE VIDEOGRAPHER:  The time is
16  now 12:06 p.m.  This concludes today's
17  portion of the deposition of Tracey
18  Norton.  We are now off the record.
19         (Witness excused.)
20             ---
21
22
23
24

Page 747

1          C E R T I F I C A T I O N
2          I, MARGARET M. REIHL, a
3   Registered Professional Reporter,
4   Certified Realtime Reporter, Certified
5   Shorthand Reporter, Certified LiveNote
6   Reporter and Notary Public, do hereby
7   certify that the foregoing is a true and
8   accurate transcript of the testimony as
9   taken stenographically by and before me
10  at the time, place, and on the date
11  hereinbefore set forth.
12         I DO FURTHER CERTIFY that I
13  am neither a relative nor employee nor
14  attorney nor counsel of any of the
15  parties to this action, and that I am
16  neither a relative nor employee of such
17  attorney or counsel, and that I am not
18  financially interested in the action.
19
20
21  ------------------------------
    Margaret M. Reihl, RPR, CRR, CLR
22  CSR #XI01497  Notary Public
23
24

Page 748

1          - - - - - -
2            E R R A T A
3          - - - - - -
4   PAGE LINE  CHANGE
5   ____ ____ _____
6   REASON: _____
7   ____ ____ _____
8   REASON: _____
9   ____ ____ _____
10  REASON: _____
11  ____ ____ _____
12  REASON: _____
13  ____ ____ _____
14  REASON: _____
15  ____ ____ _____
16  REASON: _____
17  ____ ____ _____
18  REASON: _____
19  ____ ____ _____
20  REASON: _____
21  ____ ____ _____
22  REASON: _____
23  ____ ____ _____
24  REASON: _____

Highly Confidential – Subject to Further Confidentiality Review

Page 749

1       ACKNOWLEDGMENT OF DEPONENT

2

3          I, TRACEY L. NORTON, do hereby

4       certify that I have read the foregoing

5       pages, and that the same is a correct

6       transcription of the answers given by me

7       to the questions therein propounded,

8       except for the corrections or changes in

9       form or substance, if any, noted in the

10      attached Errata Sheet.

11

12

13

14      _____

        TRACEY L. NORTON          DATE

15

        Subscribed and sworn to before me this

16

        _____ day of _____, 2018.

17

        My commission expires:_____

18

19      _____

        Notary Public

20

21

22

23

24

Golkow Litigation Services – 1.877.370.DEPS