Page 1

1            UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF OHIO
3                 EASTERN DIVISION
4            ~~~~~~~~~~~~~~~~~~~~~
5   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
    OPIATE LITIGATION
6                                   Case No.
                                    17-md-2804
7
                                    Judge Dan Aaron
8                                   Polster
9   This document relates to:
10  The County of Cuyahoga v. Purdue Pharma, L.P.
    et al., Case No. 18-OP-45090
11
    City of Cleveland, Ohio v. Purdue Pharma L.P.,
12  et al., Case No. 18-OP-45132
13  The County of Summit, Ohio, et al. v. Purdue
    Pharma L.P., et al., Case No. 17-OP-45004
14
             ~~~~~~~~~~~~~~~~~~~~~
15
16
             Videotaped Deposition of
17               JOAN PAPP, M.D.
18             February 5, 2019
                   9:20 a.m.
19
20                 Taken at:
21       Porter Wright Morris & Arthur LLP
             950 Main Avenue, Suite 500
22             Cleveland, Ohio 44113
23
24
             Stephen J. DeBacco, RPR

Page 2

```
1  APPEARANCES:
2
3        On behalf of MetroHealth Hospital:

4        Scott & Scott Attorneys at Law LLP,
         by
         JUDY SCOLNICK, ESQ.
5        The Helmsley Building
         230 Park Avenue, 17th Floor
6        New York, New York 10169
         (212) 223-6444
7        jscolnick@scott-scott.com
8
         On behalf of the Plaintiffs:
9
         Motley Rice LLC, by
10       ANNIE E. KOUBA, ESQ.
         28 Bridgeside Boulevard
11       Mt. Pleasant, South Carolina 29464
         (843) 216-9225
12       akouba@motleyrice.com
13
         On behalf of Cuyahoga County:
14
         Plevin & Gallucci, by
15       ROBIN M. WILSON, ESQ.
         55 Public Square, Suite 2222
16       Cleveland, Ohio 44113-1901
         (216) 861-0804
17       rwilson@pglawyer.com
18
         On behalf of Cuyahoga County, via
19       teleconference:
20       Napoli Shkolnik PLLC, by
         SALVATORE C. BADALA, ESQ.
21       SHAYNA E. SACKS, ESQ.
         JOSEPH L. CIACCIO, ESQ.
22       360 Lexington Avenue, 11th Floor
         New York, New York 10017
23       (212) 397-1000
         sbadala@napolilaw.com
24       ssacks@napolilaw.com
         jciaccio@napolilaw.com
25       ~ ~ ~ ~ ~
```

Page 4

```
1  APPEARANCES, Continued:
2
3        On behalf of Cardinal Health:

4        Williams & Connolly LLP, by:
         COLLEEN MCNAMARA, ESQ.
5        725 Twelfth Street Northwest
         Washington, D.C. 20005
6        (202) 434-5186
         cmcnamara@wc.com
7
8        On behalf of HBC Service Company, via
         teleconference:
9        Marcus & Shapira LLP, by
         RICHARD I. HALPERN, ESQ.
10       One Oxford Centre, 35th Floor
         Pittsburgh, Pennsylvania 15219
11       (412) 338-3990
         halpern@marcus-shapira.com
12
13       On behalf of Walmart, Inc., via
         teleconference:
14
         Jones Day, by
15       LISA B. GATES, ESQ.
         901 Lakeside Avenue
16       Cleveland, Ohio 44114-1190
         (216) 586-7154
17       lgates@jonesday.com
18
19       On behalf of Cephalon, Inc.; Teva
         Pharmaceuticals USA, Inc.; Actavis, LLC;
         Actavis Pharma, Inc. f/k/a Watson Pharma,
20       Inc.; and Watson Laboratories, Inc., via
         teleconference:
21
         Morgan, Lewis & Bockius LLP, by
22       ZACHARY R. LAZAR, ESQ.
         77 West Wacker Drive
23       Chicago, Illinois 60601-5094
         (312) 324-1492
24
25       ~ ~ ~ ~ ~
```

Page 3

```
1  APPEARANCES, Continued:
2
         On behalf of Janssen Pharmaceuticals; and
3        Johnson & Johnson:
4        Tucker Ellis, LLP, by
         CLIFFORD S. MENDELSOHN, ESQ.
5        950 North Main Avenue, Suite 1100
         Cleveland, Ohio 44113-7213
6        (216) 696-3921
         clifford.mendelsohn@tuckerellis.com
7
8        On behalf of CVS Indiana, LLC; and CVS Rx
         Services, Incorporated:
9
         Zuckerman Spaeder LLP, by
10       STEVEN N. HERMAN, ESQ.
         1800 M Street Northwest, Suite 1000
11       Washington, D.C. 20036-5807
         (202) 778-1883
12       sherman@zuckerman.com
13
         On behalf of Mallinckrodt, LLC; and
14       Specgx, LLC:
15       Ropes & Gray, by
         WILLIAM DAVISON, ESQ.
16       Prudential Tower
         800 Boylston Street
17       Boston, Massachusetts 02199-3600
         (617) 951-7000
18       william.davison@ropesgray.com
19       -and-
20       Ropes & Gray LLP, by
         HAYDEN MILLER, ESQ.
21       1211 Avenue of the Americas
         New York, New York 10036
22       (212) 596-9000
         hayden.miller@ropesgray.com
23
         ~ ~ ~ ~ ~
24
25
```

Page 5

```
1  APPEARANCES, Continued:
2
         On behalf Endo Health Solutions, Inc.,
3        and Endo Pharmaceuticals, Inc., and Par
         Pharmaceuticals, via teleconference:
4
         Arnold & Porter Kaye Scholer LLP, by
5        HEATHER A. HOSMER, ESQ.
         601 Massachusetts Avenue Northwest
6        Washington, D.C. 20001-3743
         (202) 942-6208
7        heather.hosmer@arnoldporter.com
8
         On behalf of McKesson Corporation, via
9        teleconference:
10       Covington & Burling LLP, by
         PATRICK R. CAREY, ESQ.
11       One Front Street
         San Francisco, California 94111-5356
12       (415) 591-7093
         pcarey@cov.com
13
         ~ ~ ~ ~ ~
14
15  ALSO PRESENT:
16       Shaun Crum, Legal Videographer
17       ~ ~ ~ ~ ~
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1    TRANSCRIPT INDEX
2
3  APPEARANCES.............................    2
4
5  INDEX OF EXHIBITS ......................    7
6
7  EXAMINATION OF JOAN PAPP, M.D.
8   By Ms. McNamara..........................   12
9   By Mr. Davison...........................  164
10  By Mr. Herman............................  171
11
12  REPORTER'S CERTIFICATE...................  182
13
14  EXHIBIT CUSTODY
15  EXHIBITS RETAINED BY THE COURT REPORTER
16
17
18
19
20
21
22
23
24
25

Page 7

1    INDEX OF EXHIBITS
2  NUMBER     DESCRIPTION      MARKED
3  Exhibit 1  Dr. Papp Bio, ................  16
      CUYAH_001688134
4
   Exhibit 2  Document Titled "MHMC ........  67
5      Guidelines for Chronic
       Opioid Management,"
6      MH000000027 to 000000036
7  Exhibit 3  2/1/2013 E-Mail from Vince ...  73
       Caraffi Re:
8      Updates/Information From,
       with Attachment,
9      CLEVE_000220806 to 000220816
10  Exhibit 4  Document Titled "The .........  84
       MetroHealth System Policies
11      Controlled Substance
       Prescribing Policy,"
12      MH000000272 to 000000279
13  Exhibit 5  4/18/2017 The MetroHealth ....  105
       System Opioid Committee
14      Meeting Minutes, MH000000566
       to 000000567
15
   Exhibit 6  Slide Deck Titled, "Metro ....  123
16      Health Office of Opioid
       Safety," CUYAH_002048327
17
   Exhibit 7  Document Titled, "Safer ......  148
18      Opioid Prescribing for
       Healthcare Providers,"
19      MH000000131 to 000000157
20
21
22
23
24
25

Page 8

1    INDEX OF VIDEO OBJECTION
2  OBJECT              PAGE
3  object................   18
    objection.................   19
4  objection................   19
    objection.................   19
5  object................   29
    object.................   30
6  object................   31
    object.................   37
7  object................   57
    object.................   61
8  objection................   62
    object.................   63
9  object................   63
    object.................   64
10  object................   64
    object.................   65
11  objection................   65
    object.................   69
12  objection................   71
    object.................   76
13  object................   77
    object.................   80
14  object................   84
    object.................   86
15  object................   86
    object.................   87
16  object................   89
    objection.................   93
17  object................   96
    objection.................   99
18  object................  100
    object.................  101
19  object................  104
    object.................  105
20  objection................  117
    objection.................  118
21  object................  133
    object.................  134
22  object................  135
    object.................  135
23  objection................  136
    objection.................  137
24  object................  142
    object.................  142
25  object................  151

Page 9

1  object................  153
    object.................  154
2  object................  154
    object.................  154
3  object................  155
    object.................  156
4  object................  157
    object.................  158
5  object................  160
    objection.................  161
6  object................  166
    object.................  166
7  object................  168
    object.................  168
8  object................  170
    object.................  171
9  object................  171
    object.................  174
10  object................  174
    object.................  176
11  object................  177
    object.................  178
12  object................  178
    object.................  179
13  object................  180
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 10

1    THE VIDEOGRAPHER:  The date is
2 February 5, 2019.  We're on the record at
3 a.m.
4    This is the deposition of Dr. Joan
5 Papp in the matter of In Re:  National
6 Prescription Opiate Litigation in the United
7 States District Court, Northern District of
8 Ohio, Eastern Division.
9    Will counsel in the room please
10 state appearances for the record.
11    MS. SCOLNICK:  My name is Judy
12 Scolnick, and I am a partner at Scott & Scott.
13 We represent the Plaintiff, MetroHealth
14 Hospital, which is not a bellwether plaintiff
15 in the MDL.
16    MS. KOUBA:  Annie Kouba with Motley
17 Rice representing Plaintiffs.
18    MS. WILSON:  Robin Wilson
19 representing Plaintiff Cuyahoga County.
20    MR. MENDELSOHN:  Clifford
21 Mendelsohn from Tucker Ellis on behalf of
22 Janssen Pharmaceuticals and Johnson & Johnson.
23    MR. HERMAN:  Steven Herman from
24 Zuckerman Spaeder on behalf of CVS Indiana,
25 LLC, and CVS Rx Services Incorporated.

Page 11

1    MR. MILLER:  Hayden Miller from
2 Ropes & Gray on behalf of Mallinckrodt, LLC,
3 and SpecGx, LLC.
4    MR. DAVISON:  William Davison of
5 Ropes & Gray on behalf of Mallinckrodt, LLC,
6 and SpecGx, LLC.
7    MS. McNAMARA:  Colleen McNamara
8 from Williams & Connolly on behalf of Cardinal
9 Health.
10    THE VIDEOGRAPHER:  Will counsel on
11 the phone please state appearances for the
12 record.
13    MR. HALPERN:  Richard Halpern,
14 Marcus & Shapira, on behalf of HBC.
15    MS. GATES:  Lisa Gates from Jones
16 Day on behalf of Walmart.
17    MR. LAZAR:  Zachary Lazar of Morgan
18 Lewis for the Teva Defendants.
19    MR. BADALA:  Salvatore Badala,
20 Cuyahoga County.
21    MS. HOSMER:  Heather Hosmer of
22 Arnold & Porter on behalf of Endo and Par
23 Defendants.
24    MR. CIACCIO:  Joseph Ciaccio,
25 Napoli Shkolnik --

Page 12

1    (Crosstalk.)
2    MS. SACKS:  Hi.  So that's
3 Joe and -- Joseph Ciaccio and Shayna Sacks for
4 Napoli Shkolnik, Cuyahoga County.
5    JOAN PAPP, M.D., of lawful age, called
6 for examination as provided by the Federal
7 Rules of Civil Procedure, being by me first
8 duly sworn, as hereinafter certified, deposed
9 and said as follows:
10    EXAMINATION OF JOAN PAPP, M.D.
11 BY MS. McNAMARA:
12    Q.    Good morning, Dr. Papp.
13    A.    Good morning.
14    Q.    Could you please state your full
15 name for the record?
16    A.    Joan Papp.
17    Q.    And what's your current address?
18    A.    My home address is 27228
19 Worthington Lane, Olmsted Falls, Ohio 44138.
20    Q.    Great.  Have you ever been deposed
21 before?
22    A.    I have not.
23    Q.    Great.  So I'll just start out with
24 a few simple ground rules to help it go
25 smoothly today.

Page 13

1    We have a court reporter who's
2 going to be taking down everything we say, so
3 it's important that we try our best not to talk
4 over each other.  So I will do my best to wait
5 until you finish your answer before I start my
6 next question, and I'd appreciate if you do the
7 same for me.  Fair?
8    A.    Fair.
9    Q.    And along the same lines, it can be
10 difficult to transcribe an "uh-huh" or "uh-uh,"
11 so it's also important that you answer every
12 question with a full word like a "yes," "no,"
13 or "okay."  Fair enough?
14    A.    Yes.
15    Q.    And we will take periodic breaks
16 throughout the day, but if at any time you need
17 to take a break, just let me know and we'll do
18 that.  My only request is that if there's a
19 question pending, you answer the question
20 before we go off the record.  Okay?
21    A.    Okay.
22    Q.    And is there any reason that you
23 would not be able to provide truthful and
24 accurate testimony today?  Any medications,
25 illness, anything?

4 (Pages 10 - 13)

Page 14

1    A.   No.
2    Q.   Great.  So you understand that you
3  are testifying today in connection with some
4  ongoing litigation, correct?
5    A.   Correct.
6    Q.   And do you know who the plaintiffs
7  are in the case in which you are testifying
8  today?
9    A.   I have reviewed the plaintiffs,
10  yes.
11    Q.   So you understand that Cuyahoga
12  County and Summit County and City of Cleveland
13  are the Plaintiffs?
14    A.   Yes.
15    Q.   Great.  Do you know who the
16  Defendants are?
17    A.   The pharmaceutical companies, as
18  well as distributors.
19    Q.   And do you have an understanding of
20  the allegations in the case?
21    A.   Yes.
22    Q.   And what's your understanding?
23    A.   That misinformation was provided
24  about the addictiveness of opioids, which led
25  to overprescribing.

Page 15

1    Q.   And you have an understanding of
2  the relief that's being sought in this case?
3    A.   Yes.
4    Q.   And what's your understanding?
5    A.   Damages and -- and financial
6  damages.
7    Q.   Do you know how much money is being
8  claimed in damages?
9    A.   I do not.
10    Q.   And do you know whether MetroHealth
11  has filed its own lawsuit against some of the
12  Defendants?
13    A.   Yes.
14    Q.   And do you know the status of that
15  lawsuit?
16    A.   It is ongoing.
17    Q.   And so you understand that you're
18  here today to testify in your personal capacity
19  about your own knowledge based on your
20  experience as a doctor in Cuyahoga County,
21  correct?
22    A.   Yes.
23    Q.   And you are not here to testify on
24  behalf of MetroHealth --
25    A.   Yes.

Page 16

1    Q.   -- or to MetroHealth's view on
2  anything?
3    A.   Yes, I understand.
4    Q.   So I will do my best to ask clear
5  questions that make that clear.  If at any
6  point you're confused, just ask me to rephrase.
7  Okay?
8    A.   Okay.
9    Q.   Great.  So I want to start by
10  talking a little bit about your professional
11  background.  So I'll hand you what I've marked
12  as Exhibit 1.
13      MS. McNAMARA:  There are a bunch of
14  copies in the folder.
15      - - - - -
16      (Thereupon, Deposition Exhibit 1,
17      Dr. Papp Bio, CUYAH_001688134, was
18      marked for purposes of
19      identification.)
20      - - - - -
21      MS. SCOLNICK:  Does anyone else
22  need them?
23    Q.   Do you recognize Exhibit 1?
24    A.   Yes.
25    Q.   And what is it?

Page 17

1    A.   This is a bio.
2    Q.   Of you?
3    A.   Of me, correct.  Yes.
4    Q.   And did you prepare this document?
5    A.   Yes, I did.
6    Q.   Okay.  So it looks like, from your
7  bio, that you graduated from the Medical
8  College of Ohio in 2000; is that correct?
9    A.   Yes, that's correct.
10    Q.   And then you went to MetroHealth
11  Medical Center in Cleveland for obstetrics and
12  gynecology?
13    A.   Yes, that's correct.
14    Q.   And what was that?  Was that a --
15    A.   I did one year of residency in
16  OB/GYN.
17    Q.   And then you did a residency in
18  emergency medicine, correct?
19    A.   That's correct.
20    Q.   What drew you to emergency
21  medicine?
22    A.   I enjoyed the rapid pace and caring
23  for patients, and -- that had acute medical
24  problems.
25    Q.   And you completed your residency in

5 (Pages 14 - 17)

Page 18

1 2004; is that correct?
2     A.   That's correct.
3     Q.   And what did you do after you
4 completed your residency?
5     A.   I worked for Emergency Professional
6 Services and was employed both at the Cleveland
7 Clinic at Lakewood, and also at Lutheran.  We
8 worked through a contractor, EPS.  I worked
9 there until 2007.
10     Q.   And in 2007 you joined MetroHealth?
11     A.   I joined MetroHealth as a staff
12 physician, that's correct.
13     Q.   And just to back up for a second
14 because we'll be mentioning MetroHealth today,
15 MetroHealth is a hospital system, correct?
16     A.   Yes.
17     Q.   And so what's the structure of
18 MetroHealth?  Is there a central hospital and
19 then satellite facilities?
20        MS. SCOLNICK: I'm going to object.
21 Beyond the scope of the deposition.
22        But you can answer.
23     A.   It's -- there's a main campus
24 hospital, and there are satellite hospitals.
25     Q.   And you work at the main campus?

Page 19

1     A.   I primarily work at the main
2 campus.  I do occasionally do emergency
3 department shifts at satellite emergency
4 departments.
5     Q.   Do you know approximately how many
6 licensed prescribers are staff members at
7 MetroHealth?
8        MS. SCOLNICK: The same objection
9 and same instruction.
10        You can answer.
11        THE WITNESS: Okay.
12     A.   There are about 950 staff medical
13 providers.
14     Q.   And what's the geographic scope of
15 the patients you serve at MetroHealth?
16        MS. SCOLNICK: Objection. The same
17 objection. It's beyond the scope.
18     Q.   You can answer.
19        MS. SCOLNICK: And you can answer.
20     A.   Cuyahoga County.
21     Q.   Do you serve any residents of
22 Summit County as well?
23        MS. SCOLNICK: Objection. The same
24 objection.
25        You can answer.

Page 20

1     A.   We -- we care for any patients who
2 come through our doors.
3     Q.   But mostly Cuyahoga County
4 residents?
5     A.   Primarily, just based on our
6 location.
7     Q.   And have you focused on emergency
8 medicine the whole time since you joined
9 MetroHealth in 2007?
10     A.   Since 2007 I have been an emergency
11 physician at MetroHealth.
12     Q.   And have your duties and
13 responsibilities changed over the years since
14 you joined?
15     A.   Yes, they have.
16     Q.   Great.  So let's start at the
17 beginning and just kind of walk through
18 chronologically.
19     A.   Sure.
20     Q.   So you joined as an emergen- -- as
21 a staff physician in the emergency department?
22     A.   That's correct.
23     Q.   And what were your responsibilities
24 in that capacity?
25     A.   Clinical care of emergency

Page 21

1 department patients.  There's also teaching
2 responsibilities with medical students and
3 residents, and a small percentage of my time
4 was dedicated to administrative duties.
5     Q.   And for how long did you hold that
6 role as a staff physician in the emergency
7 department?
8     A.   Well, I -- it's an ongoing
9 position, so I continue in that capacity.  But
10 my role changed, and I took on additional
11 duties in 2012.
12     Q.   And what were those additional
13 duties?
14     A.   I sought to develop a program to
15 dispense naloxone to lay providers, Project
16 DAWN.
17     Q.   And -- and you started that in 2012
18 you said?
19     A.   I began research in program
20 development during that time.  The program
21 didn't begin until Sep- -- excuse me -- March
22 of 2013.
23     Q.   And when you took on responsibilities
24 for Project DAWN, approximately how much of
25 your time was devoted to that as opposed to

6 (Pages 18 - 21)

Page 22

1 practicing in the emergency room?
2     A.   That's a difficult question to
3 answer.  My clinical time didn't formally
4 change.  I spent a number of hours outside of
5 my regular clinical duties.  At that time my
6 clinical percentage was 90 percent.  But I --
7 but I spent many hours outside of those formal
8 hours doing work around the program
9 development.
10     Q.   Got it.  So this was kind of an
11 additional project on top of everything you
12 were already -- you were already doing?
13     A.   It was on top of my
14 already-assigned duties.
15     Q.   And have you taken on any other
16 responsibilities since 2012?
17     A.   Yes.
18     Q.   And what are those?
19     A.   In 2017 we opened an Office of
20 Opioid Safety, with the mission to improve
21 opioid safety throughout the community and
22 MetroHealth through education, advocacy, and
23 treatment.
24     Q.   And that's an initiative within
25 MetroHealth, correct?

Page 23

1     A.   That is correct.
2     Q.   And when you took that on, did that
3 reduce your clinical time?
4     A.   Yes, it did.
5     Q.   By about how much percentage-wise?
6     A.   It ranges between 40 and 50
7 percent, depending on how many programs I have
8 going on.
9     Q.   And when in 2017 did that launch?
10     A.   July.
11     Q.   July.  And have you taken on any
12 other responsibilities since then?
13     A.   As -- as our program has developed,
14 we have started many initiatives within the
15 office.
16     Q.   And what are those initiatives?
17     A.   Boy, there's a lot.  So I can
18 start -- let's see.  Where to start.
19          So we have a grant that allows us
20 to form Quick Response Teams.  It's a SAMHSA
21 Grant.  And that initiative involves a social
22 worker and a police officer who form a team and
23 respond to opioid overdoses in the community,
24 typically within one week, meeting with the
25 overdose victim and family, and an attempt is

Page 24

1 made to connect that victim and family to
2 treatment.  With the support of the family, of
3 course.
4     Q.   And I have some documents I'll show
5 you later, so -- that might refresh your
6 recollection on some other --
7     A.   Okay.
8     Q.   -- parts of it, so you don't have
9 to remember.
10     A.   Okay.
11     Q.   Are there any others you can think
12 of off the top of your head?
13     A.   Yeah.  So that's one program.
14          We have -- we've certainly expanded
15 Project DAWN over the course of the six years
16 that I've been functioning in this role.  We
17 have five walk-in sites.  We have expanded
18 Project DAWN to include opioid -- excuse me --
19 naloxone distribution in the emergency
20 department, inpatient units, and in Cleveland
21 EMS.
22          We also have developed a peer
23 supporter program.  We have collaborated with
24 an outside agency called THRIVE that staffs our
25 emergency department in other areas of our

Page 25

1 hospital with peer supporters.  And those are
2 individuals who are licensed by the State so
3 that they can provide support and resources to
4 patients who have either had an overdose in the
5 emergency department or who are otherwise
6 suffering from opioid use disorder.  The goal
7 is to connect them to treatment.
8          Another initiative that we've
9 started is our education program throughout the
10 hospital.  We have hired two full-time opioid
11 educators in our office to help develop
12 curriculum to educate both providers and
13 community on just general awareness of the
14 opioid epidemic, as well as a curriculum
15 dedicated toward safer prescribing for staff
16 providers in our hospital.
17          We have a community educator that
18 focuses more on education in the community,
19 raising awareness of the opioid epidemic.
20          We also received a grant from Ohio
21 Mental Health and Addiction Services that funds
22 a full-time case manager in our emergency
23 department who helps us to connect patients to
24 treatment.  And she is a nurse practitioner who
25 also is licensed to prescribe buprenorphine for

7 (Pages 22 - 25)

Page 26

1 treatment of opioid use disorder.
2        We also supported an initiative to
3 increase access to medication-assisted
4 treatment by -- we hosted several waiver
5 trainings at MetroHealth and level-of-care
6 trainings for our providers at MetroHealth.
7        Let me think.  What else?
8        We -- I know I'm probably
9 forgetting some really obvious ones.
10        We have a program in the jail.  We
11 received a grant to connect inmates with
12 treatment in the jail.  This is still very
13 early in the development phase and
14 implementation phase, so it's not a fully
15 developed program, but we're working to grow
16 that program currently.
17        I'm sure there are others.  I --
18 not jumping to the forefront of my mind right
19 now, unfortunately.
20    Q.    No problem.  Understood.  So not an
21 exclusive list.
22    A.    Not an exclusive list.
23    Q.    Fair enough.  And all of those
24 things that you've described are things that
25 you've done since July 2017?

Page 27

1    A.    Except for the expansion of Project
2 DAWN.  That has been ongoing since 2013.
3 That's been a steady growth over time.
4    Q.    Got it.  So aside from Project
5 DAWN, these are all new initiatives?
6    A.    That's correct.
7    Q.    And so when you started Project
8 DAWN, you started your initial research back in
9 2012.  It seems like there was a bit of a gap
10 between when you started researching and when
11 the program actually got off the ground.
12    A.    Sure.
13    Q.    Did you encounter any resistance
14 from anyone within MetroHealth or the community
15 to the idea of -- actually, strike that.  Let
16 me back up and just say --
17    A.    Sure.
18    Q.    -- so can you explain a little bit
19 about what Project DAWN is?
20    A.    Sure.  Project DAWN stands for
21 "deaths avoided with naloxone."  It's an opioid
22 education and naloxone distribution program.
23 This is a program that was initially started by
24 the Ohio Department of Health as a pilot
25 project in Southern Ohio.  When I learned about

Page 28

1 the program, I wanted to adapt the program for
2 Cuyahoga County and expand it, and we did just
3 that.
4        And again, we have some walk-in
5 sites, and we have expanded naloxone access to
6 our inpatient units, our emergency department,
7 and various other sites.
8    Q.    So do you recall when that pilot
9 project in Southern Ohio was first launched?
10    A.    I believe it was 2012.
11    Q.    And when did you learn about it?
12    A.    In 2012.
13    Q.    Okay.  Got it.
14        And what made you want to adopt and
15 expand it for Cuyahoga County?
16    A.    I had read about those programs,
17 and they were found to be effective in other
18 areas.
19    Q.    And naloxone is an antidote for an
20 opiate overdose specifically, correct?
21    A.    An opioid overdose, correct.
22    Q.    And were you, at the time of 2012,
23 as someone working in the emergency room,
24 seeing an increase in the number of opioid
25 overdoses that were --

Page 29

1    A.    Yes.
2    Q.    -- happening in the community?
3    A.    Yes.
4    Q.    And so that was what made you want
5 to bring Project DAWN to Cuyahoga County,
6 correct?
7    A.    In part, yes.
8    Q.    And so Project DAWN trains people
9 to administer naloxone, one of the things it
10 does; is that accurate?
11        MS. SCOLNICK:  Object to the form.
12        You can answer.
13        THE WITNESS:  Okay.
14    A.    Project DAWN, in the community,
15 provides opioid education to both people who
16 are actively using opioids and people who may
17 be in a position to rescue them.  And we
18 educate on risk factors for overdose.  We
19 recognize -- on how to recognize an opioid
20 overdose and how to respond to an opioid
21 overdose with rescue breathing, and calling
22 911, and administering naloxone.  And naloxone
23 kits are dispensed.
24    Q.    And so now to circle back to my
25 original question that I kind of jumped ahead

8 (Pages 26 - 29)

Page 30

1  to. When you were in the process of
2  researching the possibility of bringing Project
3  DAWN, did you encounter any resistance in the
4  community to the type of education and response
5  training that Project DAWN offers?
6      A.  Very little.
7      Q.  But some?
8      A.  It was a new concept, and so we did
9  get some public concern that perhaps this was
10  not -- not the best idea. But otherwise, we
11  got very little resistance from the medical
12  community and very little resistance from the
13  County.
14      Q.  And the public concern that you did
15  get, what did you do to respond to that?
16      MS. SCOLNICK:  Object to the form.
17      A.  We did a lot of public awareness
18  events. We spoke at libraries and we spoke
19  at -- in the community churches. All -- all
20  of -- just a variety of forums to really get
21  the message out that this was a safe and
22  effective way to manage overdoses.
23      Q.  And so to circle back for a minute
24  to your role at -- or the creation of the
25  Office of Opioid Safety at MetroHealth, what's

Page 31

1  your role with respect to the Office of Opioid
2  Safety?
3      A.  I'm the founder and medical
4  director.
5      Q.  And do you know whose decision it
6  was to create the Office of Opioid Safety?
7      A.  My -- my responsibilities increased
8  between 2012 and 2017, and because of that I
9  approached our chief clinical officer,
10  Dr. Boulanger and requested additional time to
11  work on this effort, and he suggested that we
12  create an expanded office, including staff, to
13  support the work that I was doing.
14      Q.  And how many staff are currently in
15  the Office of Opioid Safety?
16      A.  I believe we have 15 as of now.
17      Q.  So as somebody who has practiced
18  medicine for -- for many years, you do
19  prescribe medication, correct?
20      MS. SCOLNICK:  I'm going to object
21  to that question.
22      Do you want to go off the record?
23      MS. McNAMARA:  Do we need to?
24      MS. SCOLNICK:  I just don't want to
25  clutter up the record if we don't need to.

Page 32

1      Mr. Masters wrote me an e-mail that
2  I could find that said not only is she a fact
3  witness and not representative of MetroHealth,
4  but she is also not an expert. So that's part
5  of the -- she's -- your question to me sounds
6  like it was presuming an expertise. I think
7  that was in -- the word in the question. So
8  that's the reason for my objection. It's to
9  the scope. She's not an expert. She's a fact
10  witness.
11      MS. McNAMARA:  Understood. I just
12  asked if she prescribes medication, which I
13  think is a fact question.
14      MS. SCOLNICK:  I don't think that's
15  what you asked, but she can certainly answer
16  the question that you just asked now.
17      MS. McNAMARA:  Fair enough. That
18  was my intent, so I will clarify.
19      MS. SCOLNICK:  Sure.
20      Q.  Do you prescribe medication?
21      A.  Yes, I do.
22      Q.  And what are the factors that you
23  personally consider when you are deciding
24  whether to write a prescription?
25      A.  I determine -- I take a history and

Page 33

1  a physical examination, and I determine the
2  benefits of the medication versus the risk and
3  make a decision, based on my medical knowledge,
4  if a medication is indicated.
5      Q.  And what information do you rely on
6  to figure out the benefits of a medication?
7      A.  That's a -- kind of a very broad
8  question. Studies of effectiveness.
9      Q.  Do you rely on the FDA-approved
10  labeling?
11      A.  Yes.
12      Q.  And do you also rely on the
13  FDA-approved labeling to determine the risks?
14      A.  Yes.
15      Q.  And do you rely on any other
16  sources of information to determine the risks?
17      A.  We look to the medical literature.
18      Q.  Have you personally ever prescribed
19  an opioid?
20      A.  Yes.
21      Q.  And has the frequency with which
22  you prescribed opioids changed over time?
23      A.  Yes.
24      Q.  How so?
25      A.  I have decreased the prescribing of

9 (Pages 30 - 33)

Page 34

1  opioids over time.
2      Q.   Do you have a sense of how much
3  you've decreased?  The percentage?
4      A.   I don't know that number.
5      Q.   When you started at MetroHealth
6  back in 2007, what was your understanding
7  regarding the appropriate circumstances to
8  prescribe an opioid?
9      A.   During my training I was taught
10  that patients should not have to experience
11  pain, and that we should be very aggressive
12  about treating their pain, and that opioids
13  were a safe and effective treatment.
14      Q.   And what training are you referring
15  to specifically?
16      A.   My emergency medicine residency
17  training.
18      Q.   And that was at MetroHealth?
19      A.   That's correct.
20      Q.   And when you prescribed opioids
21  back in -- in 2007, you prescribed them based
22  on your clinical judgment of the patient's
23  legitimate medical need, correct?
24      A.   I did an assessment of the risks
25  and the benefits, and if the benefits

Page 35

1  outweighed the risks, I chose to prescribe, in
2  my assessment at the time, based on the
3  information that I had.
4      Q.   Has your understanding of the
5  appropriate circumstances in which to prescribe
6  an opioid changed over time?
7      A.   Yes.
8      Q.   How so?
9      A.   I was not aware of the extent of
10  the risks associated with opioids, and so that
11  balance of risk versus benefit has changed for
12  me.
13      Q.   And what information -- strike
14  that.
15          What sources of information have
16  come out since 2007 that helped change your
17  understanding?
18      A.   One of the most influential
19  publications that I look back to is the CDC
20  MMWR report in 2012 that first described the
21  prescription drug opioid epidemic.  I, prior to
22  that time, was not fully aware of the risks and
23  the number of opioid overdose deaths and
24  addiction that was occurring.
25      Q.   So you were aware, prior to 2012,

Page 36

1  that opioids were addictive, correct?
2      A.   I was.
3      Q.   But you're -- you weren't aware of
4  the extent to which they were addictive?  Am I
5  understanding correctly?
6      A.   I think so.  And I -- I think
7  I'm -- I was also not aware of the extent to
8  which they were causing fatal overdoses.
9      Q.   And when you say "the extent to
10  which they were causing fatal overdoses," are
11  you referring to overdoses where the
12  prescription opioid was the sole cause of the
13  overdose?
14      A.   I'm referring to opioid overdoses
15  in totality.
16      Q.   So that would include overdoses in
17  which there were multiple drugs present,
18  including an opioid?
19      A.   Correct.
20      Q.   And to back up again, so we are on
21  the same page in -- terminology-wise.  Opioids
22  and opiates, is there a distinction between the
23  two in your mind?
24      A.   Yes.
25      Q.   What's that distinction?

Page 37

1      A.   "Opioid" is a term that encompasses
2  all medications that are either synthetic or
3  semisynthetic, or also encompasses opiates,
4  which are the naturally occurring substances of
5  the poppy plant.
6      Q.   So "opioids" is the broader term?
7      A.   "Opioids" is the broader term.
8      Q.   Got it.
9          When you started at MetroHealth
10  back in 2007, did you follow any written
11  guidelines for the prescribing of opioids?
12      A.   I wasn't aware of any either state
13  or national guidelines on safe opioid
14  prescribing at that time.
15      Q.   And have you become aware of any
16  such written guidelines since then?
17      A.   Yes.
18      Q.   And I know there are a bunch, so
19  I'll table that and show them to you later.
20      A.   Sure.
21      Q.   Have you ever written a
22  prescription for opioids for a patient that you
23  did not think was medically appropriate based
24  on what you knew at the time?
25          MS. SCOLNICK:  I'm going to object

10 (Pages 34 - 37)

Page 38

1 to the question, to the form.
2    A.   Can you restate the question?
3    Q.   Sure.  Has there ever been an
4 instance in which you wrote an opioid
5 prescription that you did not think was based
6 on legitimate medical need?
7    A.   No.
8    Q.   And you've treated patients in the
9 emergency room for the effects of an opioid
10 overdose, correct?
11    A.   Yes.
12    Q.   Is there any difference in how you
13 treat a patient who overdosed on one type of
14 opioid versus another?  Say, heroin versus
15 oxycodone?
16    A.   It depends.
17    Q.   What does it depend on?
18    A.   The half-life of the medication.
19    Q.   So are there some opioids that have
20 a longer half-life than others?
21    A.   Yes.
22    Q.   And what are the ones that are on
23 the longer half-life side of the scale?
24    A.   Methadone, OxyContin.
25    Q.   And what are some of the ones with

Page 39

1 the shorter half-life?
2    A.   Oxycodone.  Immediate release; I
3 should clarify.
4    Q.   And what's the relevance of the
5 half-life when it comes to treating an
6 overdose?  Strike that.
7       What's the relevance of the
8 half-life when it comes to how you treat an
9 overdose?
10    A.   I would observe the patient for
11 longer if the medication has a longer
12 half-life.  Oftentimes we would admit a patient
13 if they have overdosed on a medication with a
14 longer half-life.
15    Q.   When you treat a patient for an
16 overdose, do you or anyone on your team attempt
17 to figure out whether the person has overdosed
18 on a prescription opioid versus an illicit
19 opioid?
20    A.   We ask the patient what medication
21 or drug they ingested.
22    Q.   And do you record the answer
23 anywhere?
24    A.   In the docu- -- medical
25 documentation in the electronic health record.

Page 40

1    Q.   And have you ever run any reports
2 on that medical documentation that quantify the
3 number of overdoses from prescription opioids
4 versus illicit opioids?
5    A.   No.
6    Q.   To your knowledge, is that
7 possible?
8    A.   No.
9    Q.   Have you treated patients for any
10 other side effects of opioids?
11    A.   Yes.
12    Q.   What are those?
13    A.   Constipation.  We often see
14 patients with illicit drug use who have skin
15 and soft tissue infections, other infectious
16 diseases related to injection of opioids.  We
17 see oversedation.  We see patients presenting
18 with withdrawal as well.  And oftentimes
19 patients present with opioid use disorder
20 seeking treatment.
21    Q.   And that's all in the context of
22 the emergency room?
23    A.   That's correct.
24    Q.   Are you required to take any CMEs,
25 continuing medical education courses, in order

Page 41

1 to retain your medical license?
2    A.   No.
3    Q.   Have you opted to take any CMEs
4 since you got your medical license?
5    A.   Yes.
6    Q.   Have you taken any related to pain
7 management over the years?
8    A.   Yes.
9    Q.   And when was that?
10    A.   I don't recall the exact date.
11    Q.   Was it within the last five years?
12    A.   Yes.
13    Q.   Within the last two years?
14    A.   Yes.
15    Q.   Any pain management CMEs before
16 that?
17    A.   I don't recall.
18    Q.   Do you recall who, if anyone,
19 sponsored the pain management CME that you
20 took?
21    A.   I don't recall.
22    Q.   Have you taken any CMEs on opioid
23 prescribing?
24    A.   Yes.
25    Q.   And when was that?

11 (Pages 38 - 41)

Page 42

1    A.   Within the same time frame.  I
2  don't recall exact dates.
3    Q.   And just to circle back for a
4  second to the pain management, was that an
5  in-person class?
6    A.   I have attended both inpatient
7  [sic] and online courses.
8    Q.   And was the in-person class at
9  MetroHealth?
10    A.   No.
11    Q.   Where was it?
12    A.   I took a class at -- it was in
13  Columbus as part of the American College of
14  Emergency Physicians.
15    Q.   And the opioid prescribing CMEs --
16  CME, was that in person?
17    A.   I had both in-person and online
18  training.
19    Q.   And where was the in-person
20  training held?
21    A.   We held a SCOPE of Pain course
22  at -- at MetroHealth, although it was actually
23  off campus, but we -- we hosted a SCOPE of Pain
24  training.  That was a live training.  And I
25  also did the same SCOPE of Pain training online

Page 43

1  as well.
2    Q.   And do you recall who presented or
3  who taught the SCOPE of Pain course?
4    A.   I don't remember his name off the
5  top of my head.  If you know it --
6    Q.   I don't.  I don't.  But if it pops
7  into your head.
8         Have you ever taken a CME on
9  preventing diversion of controlled substances?
10    A.   I'm sorry.  Could you repeat one
11  more time?
12    Q.   Sure.  Have you ever taken a CME on
13  preventing diversion of controlled substances?
14    A.   Not that I recall.
15    Q.   Have you taught any CMEs?
16    A.   Yes.
17    Q.   And what were the subject of those?
18    A.   Let me think.  Naloxone,
19  distribution and benefits of lay-access
20  naloxone.  I've given lectures and grand rounds
21  to the residents and medical students on the
22  opioid epidemic.  I've also given grand rounds
23  and other lectures to medical students on other
24  topics outside of the opioid crisis.
25    Q.   And what are grand rounds?

Page 44

1    A.   It's a CME lecture for medical
2  staff, residents, and medical students.
3    Q.   And you mentioned early on, when we
4  started talking about your background, that you
5  had some teaching responsibilities for medical
6  students?
7    A.   Correct.
8    Q.   And you've done that since you
9  started at MetroHealth in 2007?
10    A.   Yes.
11    Q.   And in addition to grand rounds
12  courses, what else do you teach?
13    A.   We do bedside teaching with medical
14  students and residents.  We do brief lectures
15  during shifts.  We have more formal education
16  on Wednesday mornings, one-hour lectures.  I've
17  often been requested to speak to other
18  departments in my hospital on a variety of
19  topics, including opioid-related issues.
20    Q.   Are you aware that Cuyahoga County
21  has an opiate task force?
22    A.   Yes.
23    Q.   For how long have you known about
24  the opiate task force in Cuyahoga County?
25    A.   Since 2012.

Page 45

1    Q.   How did you learn about it?
2    A.   I met the supervisor and director
3  of that task force, Vince Caraffi.
4    Q.   Are you a member -- are you
5  currently a member of the opiate task force?
6    A.   Yes.
7    Q.   Are you on any committees within
8  the opiate task force?
9    A.   No.
10    Q.   And have you been a member since
11  2012?
12    A.   Yes.
13    Q.   And is Project DAWN affiliated with
14  the opiate task force in any way?
15    A.   We -- let me think if we've had
16  any.
17         Well, we do have Project DAWN --
18  one of our -- one of our sites is at the county
19  board of health at the Parma location, and I've
20  collaborated with Vince Caraffi at various
21  times throughout the years to support our
22  program.
23    Q.   On Project DAWN, what makes up --
24  strike that.
25         How is Project DAWN funded?

12 (Pages 42 - 45)

1    A.   We have a variety of funding
2  streams, and it's changed over the course of
3  the past six years.
4        We have funding through
5  MetroHealth.  We originally received some money
6  from Ohio Department of Health.  We've received
7  money from Cuyahoga County.  Currently, we
8  have, additionally, a variety of funding
9  sources:  Money from the ADAMHS Board, money
10  through the SAMHSA Grant, and I believe we
11  still have some funding from Ohio Department of
12  Health as well.
13    Q.   Do you know an approximate
14  percentage of -- or what percentage of funding
15  for Project DAWN comes from Cuyahoga County?
16    A.   I don't recall.
17    Q.   Is it less than 25 percent?
18    A.   I couldn't state that with
19  confidence.
20    Q.   And what does the funding for
21  Project DAWN cover?
22    A.   It covers naloxone.  To some degree
23  it covers staffing.  It covers kits, which
24  include a bag, some printed materials, airway
25  barrier masks for rescue breathing, and other

1  promotional materials.
2    Q.   So does Project DAWN purchase the
3  naloxone?
4    A.   We purchase most of the naloxone,
5  yes.  Some is supplied to us from other
6  sources, like the Ohio Department of Health.
7    Q.   So some is -- is given; the rest
8  you purchase?
9    A.   Correct.
10    Q.   And from where do you purchase it?
11    A.   Through our pharmacy department at
12  MetroHealth.
13    Q.   Aside from -- well, aside from
14  Project DAWN, are you involved with any other
15  specific opiate task force initiatives?
16    A.   Yes.
17    Q.   What are those?
18    A.   U.S. attorney's heroin task force.
19  I am a member, and I chair the policy
20  subcommittee.
21        I am also a member of the hospital
22  consortium.  I'm not sure.  The exact title
23  is --
24    Q.   Northeast Ohio --
25    A.   Northeast Ohio --

1    Q.   Yep.  Got it.
2    A.   -- Opioid Hospital Consortium, I
3  think.  Yeah, that's right.  And I serve on the
4  executive leadership committee.
5        I am also the chair of the Ohio
6  Hospital Association Opioid Response
7  Initiative.
8        Within MetroHealth, I serve on two
9  committees.  I chair two committees.  One is
10  our opioid safety task force, and the second is
11  our controlled substance peer-review committee.
12  I think that's it.
13    Q.   Okay.  I wanted to make sure you
14  were done.
15        So to circle back to the U.S.
16  attorney's opiate task force, when did that
17  start?
18    A.   2015.
19    Q.   And when did you join?
20    A.   At its inception.
21    Q.   And how did that come about?
22    A.   The U.S. Attorney, at the time,
23  convened a group of local stakeholders with the
24  purpose of delivering a conference on heroin
25  awareness.

1    Q.   And that conference happened in
2  2013?
3    A.   That's correct.
4    Q.   And did the task force continue on
5  after the conference?
6    A.   Yes, it did.
7    Q.   And have there been any other areas
8  of focus for the task force since 2013?
9    A.   Sure.  After the conference we
10  developed a community action plan developed
11  around some prior- ---- priority areas:
12  education, treatment, law enforcement, and
13  policy.
14    Q.   And you were specifically involved
15  in the policy section?
16    A.   Yes, that's correct.
17    Q.   And were there -- what were the --
18  strike that.
19        Were there any specific policies
20  that -- that your subcommittee focused on over
21  the years?
22    A.   Yes.  Initially, we focused on
23  expansion of naloxone.  We lobbied to support
24  state law that would expand access to naloxone.
25    Q.   Any others?

13 (Pages 46 - 49)

1     A.   We supported the Good Samaritan
2 legislation.  We also worked with the medical
3 board to provide feedback on medical board
4 rules around office-based opioid treatments.
5 And we also collaborated with other lawmakers
6 on a variety of local and federal policy.
7     Q.   Were there any -- have there been
8 any policies that your subcommittee has opposed
9 over the years?
10     A.   I don't recall.
11     Q.   And was it the U.S. attorney in
12 Cleveland who convened the task force?
13     A.   Yes, that's correct.
14     Q.   And do you have a sense of the
15 geographic area that's encompassed by the
16 activities of the task force?
17     A.   It includes the Northern District
18 of Ohio, which is the jurisdiction of the U.S.
19 attorney.  That's much broader than the
20 practical group that met.  We tended to be
21 folks from Northeast Ohio.
22     Q.   But it was intended to cover an
23 area broader than just, say, Cuyahoga County
24 and Cleveland; is that fair?
25     A.   I -- I think others from Western

1 Ohio were also invited to attend and
2 participated as needed.
3     Q.   You also mentioned the Northeast
4 Ohio Opioid Hospital Consortium?
5     A.   Yes, that's correct.
6     Q.   What is that?
7     A.   It is a consortium of local
8 hospital leaders who have convened to address
9 the opioid crisis, as best served by hospital
10 systems.
11     Q.   When was that formed?
12     A.   I believe that was 2016 or 2017?  I
13 don't recall the exact date.
14     Q.   Within the last couple years?
15     A.   Yes.
16     Q.   And have you been involved since
17 the start of that?
18     A.   Yes.
19     Q.   And are there any specific
20 initiatives or aspects of the opioid crisis
21 that the consortium has focused on?
22     A.   Yes.
23     Q.   What are those?
24     A.   Education for nurses and naloxone
25 access in hospitals.

1     Q.   And why education for nurses?
2     A.   That's an area that largely has not
3 been focused on in the past, and we felt that
4 that was a gap that needed to be filled.
5     Q.   Are nurses able to prescribe
6 opioids?
7     A.   No.
8     Q.   So the -- was the education related
9 to treatment of --
10     A.   It was related to recognizing signs
11 of opioid misuse, abuse, and other side
12 effects.
13     Q.   You also mentioned --
14     MS. McNAMARA:  Oh, do you want to
15 take --
16     MS. SCOLNICK:  Just say on the
17 record we've been at it for about an hour, and
18 I was asking the witness if she wants a break.
19     MS. McNAMARA:  Okay.
20     MS. SCOLNICK:  Do you?
21     Because -- do you want to finish an
22 area?  I don't want to interrupt if no one's
23 tired, but --
24     MS. McNAMARA:  I was just going to
25 ask about the Ohio Hospital Association, and

1 then I'm -- then would actually be a really
2 good time.
3     THE WITNESS:  Okay.
4     MS. SCOLNICK:  Okay.
5     Q.   So you also mentioned that you were
6 the chair of the Ohio Hospital Association
7 Opioid Response Initiative?
8     A.   Yes, that's correct.
9     Q.   And what is that?
10     A.   It is an organization -- well, the
11 Ohio Hospital Association is a statewide
12 organization that serves member hospitals.  The
13 opioid response initiative was formed by Paul
14 Hicks, a physician, a leader at the Ohio
15 Hospital Association.
16     And the goal of our opioid response
17 initiative is to identify promising or known-
18 to-be-effective interventions in hospital
19 systems, and to evaluate outcomes, and
20 disseminate best practice among hospital
21 systems.
22     Q.   And when was that initiative
23 launched?
24     A.   I believe it was 2017.
25     MS. McNAMARA:  Good.  Let's take a

14 (Pages 50 - 53)

Page 54

1 break.
2        THE WITNESS:  Okay.
3        MS. McNAMARA:  Thank you.
4        THE VIDEOGRAPHER:  Off the record
5 at 10:16 a.m.
6        (A recess was taken.)
7        THE VIDEOGRAPHER:  Back on the
8 record at 10:35 a.m.
9     Q.   Welcome back.
10    A.   Thank you.
11    Q.   Just to circle back for a moment to
12 the Northeast Ohio Opioid Hospital Consortium.
13       Was prescriber training part of the
14 mission of that group?
15    A.   It has been part of the mission,
16 yes.
17    Q.   And has the group undertaken any
18 initiatives related to prescriber training?
19    A.   Not that I'm aware of currently.
20    Q.   Are there any plans to do so?  Any
21 current plans to do so in the future?
22    A.   Always.
23    Q.   And what are the plans for that?
24    A.   I am not -- not aware of the
25 immediate plans.

Page 55

1     Q.   During the course of your practice
2 and your work at MetroHealth, have you become
3 familiar at all with the closed system of
4 distribution for controlled substances?
5     A.   No.
6     Q.   Are you familiar with the term
7 "diversion" in the context of controlled
8 substances?
9     A.   Yes.
10    Q.   And what does that mean to you in
11 the context of your practice and work?
12    A.   Medications being diverted from
13 normal, prescribed legal avenues to illegal or
14 misuse of the medications.
15    Q.   And as a doctor, do you understand
16 prescribers to have any role in preventing the
17 diversion of controlled substances?
18    A.   Insofar as we educate patients on
19 keeping medications safely stored to prevent
20 diversion, yes.
21    Q.   And what's the importance of safe
22 storage of controlled substances?
23    A.   Well, we know that these
24 medications are frequently misused and diverted
25 by family members, and I have taught our

Page 56

1 providers that it's important to educate
2 patients to keep medications locked up and
3 safely stored so that they are not diverted.
4     Q.   And as the -- as the doctor who's
5 prescribing the medication, is there any way
6 for you to know in advance of writing the
7 prescription that it might be diverted by a
8 family member?
9     A.   It's unlikely for me to have that
10 information.  Sometimes patients do volunteer
11 that they have family members that have misused
12 opioids in the past, but that's not the rule.
13    Q.   Have you, during the course of your
14 practice and work, developed an understanding
15 of a pharmacist's role in preventing the
16 diversion of controlled substances?
17    A.   Yes.
18    Q.   What's your understanding of that?
19    A.   They report prescriptions to the
20 PMP, the state PMP.  They often will notify a
21 physician directly if a prescription seems
22 suspicious or altered.
23    Q.   Have you ever been contacted by a
24 pharmacist about a prescription for controlled
25 substances that you wrote?

Page 57

1     A.   I don't recall.
2     Q.   But you don't understand
3 pharmacists to be responsible for assessing the
4 legitimate medical need of one of your
5 patients, correct?
6        MS. SCOLNICK:  Object -- object to
7 the form.
8     A.   I -- I understand the benefit of
9 the clinical pharmacist and the practicing
10 pharmacist's role in providing the medication
11 to the patient.  They often have information
12 that is not available to me.
13    Q.   And what information might a
14 pharmacist have that you don't see as a
15 physician?
16    A.   They may see a patient's behavior
17 at the pharmacy that seems suspicious.  They
18 may see a patient who has altered a
19 prescription.
20    Q.   Are you -- have you become familiar
21 with the role of wholesale pharmaceutical
22 distributors in the controlled substance supply
23 chain?
24    A.   No.
25    Q.   Have you become familiar with the

15 (Pages 54 - 57)

Page 58

1 role of manufacturers in the controlled
2 substance supply chain?
3    A.   Yes.  I...
4    Q.   And what's your understanding of
5 the manufacturers' role?
6    A.   That they perform the research and
7 development of medications, they promote the
8 medications, and they manufacture the
9 medications.
10    Q.   Are you aware that the DEA sets
11 production quotas for certain controlled
12 substances?
13    A.   Yes.
14    Q.   Including opioids?
15    A.   Yes.
16    Q.   Do you know what factors the DEA
17 considers in setting the quotas?
18    A.   I do not.
19    Q.   But you are aware that production
20 of opioids is limited to the quotas set by DEA,
21 correct?
22    A.   Only very -- in very broad terms.
23    Q.   And it's your understanding that a
24 person can't lawfully obtain a prescription
25 opioid without a legitimate prescription

Page 59

1 written by a licensed prescriber, correct?
2    A.   Yes.
3    Q.   And in addition to FDA-approved
4 prescription opioids, there -- you're also
5 aware of a number of illicit opioids, correct?
6    A.   Yes.
7    Q.   Including heroin?
8    A.   Yes.
9    Q.   Analogues of fentanyl?
10    A.   Yes.
11    Q.   Carfentanil?
12    A.   Yes.
13    Q.   And you're aware that
14 manufacturers -- drug manufacturers don't
15 manufacture those illicit opioids, right?
16    A.   Yes.
17    Q.   And wholesale distributors don't
18 distribute those, correct?
19    A.   Yes.
20    Q.   And they're not prescribed by
21 doctors like you, right?
22    A.   That's correct.
23    Q.   Before the break we talked a little
24 bit about opioids being addictive.  Do you
25 recall that?

Page 60

1    A.   Yes.
2    Q.   And when -- when we say that a drug
3 is addictive, what does that mean?
4    A.   Well, addiction starts as a
5 physical dependence.  The body becomes
6 dependent on the medication.  But the addiction
7 progresses when there are maladaptive behaviors
8 that accompany that physical and psychological
9 dependence on the opioid medication.
10    Q.   And what do you mean by
11 "maladaptive behaviors"?
12    A.   An excessive desire and craving to
13 obtain the drug, engaging in sometimes criminal
14 or other, I guess, unethical behavior to obtain
15 the drug.  They're typically disregarding
16 family and friends and engaging in behavior
17 that is -- is not their norm.
18    Q.   And in your experience, does
19 everyone who takes a prescription opioid
20 eventually become addicted to the drug?
21    A.   No.
22    Q.   And do you understand some
23 prescription opioids to be more addictive than
24 others?
25    A.   Yes.

Page 61

1    Q.   Which are the more addictive, to
2 your knowledge?
3    A.   The higher DEA classes, so C2 and
4 C1.
5    Q.   Do you have a sense of how many
6 patients who are prescribed opioids by a doctor
7 eventually end up addicted to them?
8    A.   I don't think that that's a known
9 factor.
10    Q.   In your experience, have some
11 people -- strike that.
12        So in your experience, have you
13 come to see that some people are more likely to
14 become addicted to opioids than other people?
15        MS. SCOLNICK:  Object to the form.
16        But you can answer.
17    A.   Yes.
18    Q.   And what are the factors that make
19 somebody more likely to become addicted?
20    A.   Factors may include age, gender,
21 past history of substance use, family history
22 of substance abuse, and psychological disease.
23    Q.   And as part of your decision about
24 whether to prescribe an opioid, do you consider
25 those factors in deciding whether the drug is

16 (Pages 58 - 61)

1 appropriate?
2     A.   I use those fact- -- factors to
3 determine risk versus benefit.
4     Q.   So -- so it's always a balance,
5 risk versus benefit, anytime you're deciding
6 whether to write a prescription for opioids,
7 correct?
8     A.   Correct.
9     Q.   So there might be a situation
10 where -- so in your experience, has there been
11 a situation where the factors indicate that the
12 person might be likely to become addicted, but
13 the benefit ultimately outweighs that risk?
14     A.   Yes.
15     Q.   And each decision you make about
16 whether to write an opioid prescription, then,
17 is based on your determination of the
18 risk/benefits to the individual, specific
19 patient in front of you, right?
20     A.   Yes.
21         MS. SCOLNICK:  Objection.  That's
22 been asked and answered.
23     Q.   And that patient-specific
24 information that you consider, are you aware of
25 that information being available to wholesale

1 pharmaceutical distributors?
2     A.   No.
3     Q.   What about drug manufacturers?
4     A.   No.
5     Q.   And because you have access to all
6 of that patient-specific information, do you
7 believe that you, as a treating physician, are
8 best able to make that risk-benefit decision
9 about whether to prescribe an opioid?
10         MS. SCOLNICK:  Object to the form.
11         But you can answer.
12     A.   We make decisions based on the
13 information that is available to us.  And each
14 individual decision is based on the current
15 available literature, as well as evaluating
16 those factors that we know to be risks for
17 opioid misuse and harm.
18     Q.   But you believe that you, as a
19 physician, are better positioned to make that
20 risk-benefit analysis than, say, a third-party
21 payer like an insurance company?
22         MS. SCOLNICK:  Object to the form.
23     A.   I -- I'm in a more proximate
24 position, yes.  I understand what's going on
25 directly with the patient.

1     Q.   And you're better positioned than a
2 wholesale pharmaceutical distributor?
3         MS. SCOLNICK:  Object as to form.
4     A.   Yes.
5     Q.   And a drug manufacturer?
6         MS. SCOLNICK:  Object as to form.
7     A.   Yes.
8     Q.   So as a practicing physician, do
9 you keep up to date on relevant prescribing
10 guidelines for prescription opioids?
11     A.   Yes, I do.
12     Q.   And sitting here today, which --
13 what guidelines are you aware of relating to
14 opioid prescribing that you have considered in
15 your practice?
16     A.   I am aware of the 2016 CDC
17 guidelines for safer opioid prescribing.  I am
18 aware of our state's guidelines for opioid
19 prescribing.  We also have state law, as well,
20 that has recently been enacted, both for the
21 setting of acute and chronic pain.
22     Q.   Since you joined MetroHealth in
23 2007, has MetroHealth done anything to ensure
24 that you, as a physician, keep up to date on
25 the relevant prescribing guidelines for

1 opioids?
2         MS. SCOLNICK:  Object.  Beyond the
3 scope.
4         THE WITNESS:  Do I answer?
5         MS. SCOLNICK:  Yes.
6     A.   Yes.  Our Office of Opioid Safety
7 has held town hall meetings for all of our
8 providers.  They're mandatory.  We've also made
9 available other online tools.
10     Q.   And the -- the mandatory town
11 halls, did they start after the Office of
12 Opioid Safety was launched?
13     A.   Yes, that's correct.
14     Q.   So that would be after July 2017?
15     A.   Yes, that's correct.
16     Q.   And before that, do you recall
17 MetroHealth doing anything to make sure that
18 you were aware of the relevant prescribing
19 guidelines for opioids?
20         MS. SCOLNICK:  Beyond the scope.
21 Objection.
22         You can answer.
23         THE WITNESS:  Okay.
24     A.   We notified prescribers by e-mail
25 of updates from the medical board.  We held a

Page 66

1 full-day conference on prescribing guidelines.
2 We held a full-day conference on the stigma of
3 opioid abuse, in which there was a panel on
4 policy.
5        I updated the medical staff when
6 policy changes were made. We made an online
7 module mandatory for providing an update on all
8 state and -- I think it was only state law.
9    Q.   And do any of those efforts go --
10 date all the way back to 2007 when you started?
11   A.   No.
12   Q.   When did they start?
13   A.   Of those --
14   Q.   Let me strike that --
15   A.   Yeah.
16   Q.   -- because that's a really broad
17 question.
18        What's the earliest one you can
19 remember?
20   A.   I believe it was 2014 when we
21 updated our policy for the first time.
22   Q.   And is it fair to say that the
23 state guidelines for opioid prescribing have
24 changed considerably over the past 10 years?
25   A.   Prior to 2014, I'm -- I wasn't

Page 67

1 aware. There may have been guidelines, but I
2 was not aware of them. But guidelines were
3 released around that time from the state
4 medical board, both for acute and chronic pain
5 management.
6    Q.   And -- and MetroHealth also issued
7 guidelines for chronic opioid management,
8 correct?
9    A.   We have a policy.
10        - - - - -
11        (Thereupon, Deposition Exhibit 2,
12        Document Titled "MHMC Guidelines for
13        Chronic Opioid Management,"
14        MH000000027 to 000000036, was marked
15        for purposes of identification.)
16        - - - - -
17   Q.   I'm going to hand you what I've
18 marked as Exhibit 2.
19        Exhibit 2 is a document
20 Bates-labeled MH000000027. The title on the
21 top is "MHMC Guidelines for Chronic Opioid
22 Management."
23   A.   Yes.
24   Q.   Have you seen this document before?
25   A.   It looks familiar. I have not

Page 68

1 reviewed it in detail.
2    Q.   Haven't reviewed it in detail ever,
3 or just not recently?
4    A.   Not recently.
5    Q.   The bottom left-hand corner,
6 there's a date, June 22, 2011. Do you see
7 that?
8    A.   Yes, I do.
9    Q.   And do you recall reviewing these
10 documents around that time?
11   A.   No. I -- I was not -- I did not
12 participate in creating this document or
13 reviewing it.
14   Q.   Approximately when was the first
15 time you recall reviewing it?
16   A.   I do not recall.
17   Q.   Do you know who was responsible for
18 drafting these?
19   A.   The chairman of emergency medicine.
20   Q.   And is that Charles L. Emerman,
21 M.D., whose --
22   A.   Yes.
23   Q.   -- name is in the lower right
24 corner?
25   A.   Yes, that's correct.

Page 69

1    Q.   And he was the chief of emergency
2 medicine, you said?
3    A.   The chairman --
4    Q.   Chairman.
5    A.   -- of the department.
6    Q.   In the lower left-hand corner,
7 underneath the date, it says "Opioid Management
8 Task Force." Do you see that?
9    A.   Yes, I do.
10   Q.   What is the Opioid Management Task
11 Force?
12   A.   I'm not familiar with that task
13 force.
14   Q.   And you said that MetroHealth had a
15 policy for prescribing controlled substances?
16   A.   Correct.
17   Q.   Is this one of the policies you
18 were referring to?
19   A.   No.
20   Q.   Is this something different, in
21 your mind, from a policy?
22        MS. SCOLNICK: Object to the form.
23        But you can answer.
24   A.   Yes. A guideline sets best -- best
25 practice, typically based in evidence-based --

18 (Pages 66 - 69)

Page 70

1  evidence, and a policy is a rule.
2     Q.   So realizing this is a gross
3  simplification, but do you understand a
4  guideline to be helpful but not mandatory, and
5  a policy mandatory?
6     A.   Yes.
7     Q.   Okay.  Do you know whether the
8  Opioid Management Task Force still exists?
9     A.   It does not.
10     Q.   Do you know when it --
11     A.   Right.  Let me -- let me clarify.
12  I'm not familiar with this -- this task force.
13  I believe that -- I -- I can't speak to that --
14  that task force.
15     Q.   Got it.
16        So about halfway down the first
17  page of the document, the third full paragraph,
18  it says, "The decision to initiate or continue
19  chronic opioid management, like all decisions
20  in medicine, must balance risk versus benefit."
21        Do you see that?
22     A.   Yes.
23     Q.   And is that the type of
24  risk-benefit analysis that we've been
25  discussing today?

Page 71

1     A.   Yes.
2     Q.   Now, this particular document,
3  Exhibit 2, has this document influenced your
4  decisions about whether to prescribe opioids in
5  terms of how to perform that risk-benefit
6  analysis?
7        MS. SCOLNICK:  Objection.
8        You can answer that.
9        MS. McNAMARA:  Yeah.  Let me strike
10  that.  That's a terrible question.  Don't start
11  if you don't know where you're going to stop.
12     Q.   Has this -- in your practice did
13  this particular document, Exhibit 2, influence
14  at all your opioid prescribing?
15     A.   No.
16     Q.   Okay.  On the fourth page of the
17  document, the -- it has a number in the lower
18  right-hand corner that ends with 30.  It's a
19  narcotic management agreement.  Do you see
20  that?
21     A.   Yes.
22     Q.   And are you familiar with narcotic
23  management agreements?
24     A.   Yes.
25     Q.   What are they?

Page 72

1     A.   They are agreements between the
2  patient and the provider that a provider will
3  perform a duty to prescribe the medication, and
4  the pa- -- it outlines, essentially, both the
5  physician's responsibilities and the patient's
6  responsibilities.
7     Q.   And have you ever entered a
8  narcotic management agreement with one of your
9  patients?
10     A.   No.
11     Q.   Do you, as a result of your work at
12  MetroHealth, have an understanding of when a
13  narcotic management agreement is appropriate?
14     A.   Yes.
15     Q.   What's that understanding?
16     A.   Ongoing chronic opioid therapy.
17     Q.   And I take it because you work in
18  the emergency room, you do not handle ongoing
19  chronic opioid therapy?
20     A.   That's correct.
21     Q.   And so you said that the -- that
22  Exhibit 2 did not influence your prescribing
23  decisions.  Why not?
24     A.   I don't prescribe medications for
25  chronic opioid therap- -- I don't,

Page 73

1  essentially, prescribe in this setting.  I
2  don't prescribe opioids for chronic pain
3  management.
4     Q.   And this document relates to
5  prescribing for chronic pain management?
6     A.   That's -- I think that's the title
7  of it, "Guidelines for Chronic Opioid
8  Management."
9        - - - - -
10        (Thereupon, Deposition Exhibit 3,
11        2/1/2013 E-Mail from Vince Caraffi
12        Re: Updates/Information From, with
13        Attachment, CLEVE_000220806 to
14        000220816, was marked for purposes
15        of identification.)
16        - - - - -
17     Q.   I'm going to hand you Exhibit 3.
18        Exhibit 3 is a document that starts
19  with Bates label CLEVE_000220806.  And the
20  cover document is an e-mail from Vince Caraffi
21  to a number of different recipients, dated
22  February 1, 2013.
23     A.   Uh-huh.
24     Q.   So you are one of the recipients --
25     A.   Yeah, I'm a recipient.  I see that.

19 (Pages 70 - 73)

Page 74

1    Q.   -- of the -- of the cover e-mail.
2    But I am interested in the --
3    A.   The other --
4    Q.   -- the attachments, the first of
5    which is the "Ohio Emergency and Acute Care
6    Facility Opioids and Other Controlled
7    Substances (OOCS) Prescribing Guidelines."
8        Do you see that?
9    A.   Yes.
10   Q.   It rolls off the tongue.
11   A.   It does.
12   Q.   So in the lower left-hand corner,
13   it says, "Approved by GCOAT on April 18, 2012."
14       Do you see that?
15   A.   Yes.
16   Q.   And do you know what GCOAT is?
17   A.   Yes.
18   Q.   What is that?
19   A.   The Governor's Cabinet Opioid
20   Action Team.
21   Q.   And so these are guidelines that
22   relate to your specific area of practice,
23   correct?
24   A.   Yes, that's correct.
25   Q.   So when did you -- and -- and have

Page 75

1    you seen this document before?
2    A.   Yes.
3    Q.   When was the first time you recall
4    seeing these guidelines?
5    A.   Probably about the time that it was
6    released.
7    Q.   And how did you become aware of
8    these guidelines at the time?
9    A.   I don't recall, but probably
10   through the opiate task force.
11   Q.   And Mr. Caraffi, who sent the
12   e-mail, is the chairman of the opiate task
13   force?
14   A.   Yes.
15   Q.   Were you aware of any guidelines
16   issued by the State before 2012 that related
17   specifically to emergency and acute care
18   facility opioid prescribing?
19   A.   Not to my knowledge.
20   Q.   Do you have an understanding as to
21   why these guidelines were issued in 2012?
22   A.   I think there was a growing concern
23   of misuse and abuse of opioids prescribed in
24   the emergency department.
25   Q.   And did you personally, at the

Page 76

1    time, observe misuse and abuse of opioids that
2    were prescribed in the emergency department at
3    MetroHealth?
4        MS. SCOLNICK:  Object to the form.
5    A.   I see patients one time, typically.
6    And I could not speculate on the use of the
7    medications that I prescribed after the patient
8    left the emergency department.
9    Q.   So do you have an understanding as
10   to why there was a growing concern about misuse
11   and abuse of opioids prescribed by emergency
12   departments?
13   A.   Yes.
14   Q.   What's that?
15   A.   We saw an increased number of
16   fatalities from opioid overdose nationwide.
17   And I -- I think there was a concern that we
18   needed to look at all sources of opioid
19   medications.  Opioid medications are commonly
20   prescribed from the emergency department
21   because the majority of patients who are seen
22   in the emergency department and treated have a
23   painful condition.
24   Q.   And when you say they have a
25   painful condition, you're referring to a -- an

Page 77

1    acute painful condition generally?  Or could it
2    be chronic as well?
3        MS. SCOLNICK:  Object to the form.
4    A.   Patients can present with both
5    acute and chronic pain in the emergency
6    department.
7    Q.   When you first read these
8    guidelines, did they influence in any way the
9    risk-benefit analysis that you undertake when
10   you're deciding whether or not to prescribe an
11   opioid?
12   A.   Yes.  I think this emphasized that
13   growing concern of the harms of opioid
14   medications.
15   Q.   You testified earlier that
16   initially you weren't aware of the extent to
17   which opioids were addictive.
18   A.   Right.
19   Q.   Is that fair?
20   A.   That's fair.
21   Q.   And is -- is this particular
22   document, these guidelines, something that
23   helped change your understanding?
24   A.   I think it did.  I think there was
25   a -- a growing interest in learning more about

20 (Pages 74 - 77)

Page 78

1  the addictiveness of opioid medications about
2  the time that these guidelines were released.
3        We also saw that MMWR report from
4  the CDC that declared an opioid prescription --
5  prescription painkiller epidemic.  And so I
6  think many physicians decided to start doing a
7  little bit more independent research and
8  evaluating the harms and -- and sort of doing a
9  reassessment of the harms versus the benefits.
10     Q.    So this is something that prompted
11  further inquiry?
12     A.    Correct.
13     Q.    Did these guidelines actually
14  change your prescribing practices with respect
15  to opioids at all?
16     A.    Yes.
17     Q.    How so?
18     A.    Can I spend a moment to review?
19     Q.    Take your time.
20     A.    Okay.
21        (Telephonic interruption.)
22        MS. McNAMARA:  Can the people on
23  the line mute their phones, please?
24     A.    I would -- I would say that No. 7
25  was a change in my practice.  We often

Page 79

1  prescribed for longer than a three-day supply.
2  After this recommendation was created, I made a
3  concerted effort to reduce that to a three-day
4  supply.
5     Q.    And No. 7 says, just for the
6  record, "Except in rare circumstances,
7  prescriptions for OOCS should be limited to a
8  three-day supply.  Most conditions seen in the
9  emergency/acute care facility should resolve or
10  improve within a few days.  Continued pain
11  needs referral to the primary care physician or
12  appropriate specialist for reevaluation."
13        Did I read that correctly?
14     A.    Yes.
15     Q.    And that's what you were referring
16  to?
17     A.    Yes.
18        We also reevaluated our discharge
19  instructions and information that we provided
20  to patients after these guidelines were
21  prepared.
22        At one point we had a guideline
23  similar to this posted on the wall in our
24  emergency department to inform patients of our
25  guidelines, which pertains to No. 8 and No. 9.

Page 80

1     Q.    With respect to No. 7, the
2  guideline for limiting prescriptions to a
3  three-day supply, you said that before this
4  guideline you would typically prescribe for
5  longer?
6     A.    I wouldn't say that I typically
7  prescribe.  I would say that there were cases
8  in which I did prescribe longer than three
9  days.
10     Q.    And what was the benefit, in those
11  cases, of prescribing for longer?
12        MS. SCOLNICK:  Object to the form.
13     A.    My assessment of risk versus
14  benefit was related to a misunderstanding of
15  the potential harms with the medications when
16  taken for a longer duration of time.
17     Q.    And when you say misunderstanding
18  of the harms for a longer duration of time,
19  what are you referring -- what harms are you
20  referring to relating to the longer duration?
21     A.    Increased risk associated -- the
22  increased risk of addiction and dependency
23  associated with a longer duration of being on
24  the medication.
25     Q.    And do you understand that risk of

Page 81

1  addiction and dependency to increase even if
2  the person takes the drug as you've prescribed
3  it?
4     A.    Yes.
5     Q.    Did anything in this document
6  itself change your understanding -- change your
7  underlying understanding of the addictiveness
8  of opioids?
9     A.    No.  But as I stated before, it
10  prompted further inquiry.
11     Q.    And it -- did it prompt further
12  inquiry by you yourself?
13     A.    Yes.
14     Q.    What did you do?
15     A.    I researched addiction and sought
16  to learn more about the addictive nature of
17  medications.
18     Q.    So how did you -- how did you go
19  about doing that?  Did you review the medical
20  literature?
21     A.    Yes.
22     Q.    And is there anything -- I know you
23  mentioned the 2012 CDC -- MWR?
24     A.    Yes.
25     Q.    Okay.

21 (Pages 78 - 81)

Page 82

1   A.   Morbidity and mortality report.
2   Q.   Was there anything -- anything else
3 that you recall as helping to change your
4 understanding of the addictiveness of opioids?
5   A.   I participated in the SCOPE of Pain
6 prescribing course.
7   Q.   And when was that?
8   A.   I don't recall.
9   Q.   Was that around the 2012 time
10 period or more recently?
11   A.   It's -- I don't recall.
12   Q.   And when you -- when you were
13 researching addiction -- so I had asked about
14 reviewing medical literature, and you mentioned
15 the SCOPE of Pain course.
16       Was there anything else that you
17 did to learn more about the addictiveness of
18 opioids?
19   A.   I reviewed medical literature.  As
20 to specifics, I can't -- I can't recall
21 specific pieces of literature that I reviewed.
22   Q.   And then from that review you
23 started to understand that opioids were more
24 addictive than you initially understood?
25   A.   Correct.

Page 83

1   Q.   But prior to -- prior to that
2 research and prior to developing more
3 understanding about addictiveness, you believed
4 that the prescriptions you were writing were
5 based on your risk-benefit analysis of what was
6 appropriate for the patient; is that right?
7   A.   That's correct.
8   Q.   Based on the information you had at
9 the time?
10   A.   Based on the information that I had
11 at the time, the prescriptions that I wrote, I
12 believed that the benefit outweighed the risk.
13   Q.   To your knowledge, did your
14 colleagues -- strike that, to back up for a
15 second.
16       So during the course of your work
17 in the emergency room, have you been able to
18 develop any sort of understanding of your
19 colleagues' prescribing practices with respect
20 to opioids?
21   A.   Yes.
22   Q.   And to your knowledge, have your
23 colleagues also followed point No. 7 in the
24 guidelines about limiting prescriptions to a
25 three-day supply?

Page 84

1   A.   Yes.
2   Q.   And that's been since 2012?
3   A.   Yes.
4   Q.   And do you understand your
5 colleagues, like you, to always have been
6 writing prescriptions based on their individual
7 analysis of the risks and benefits of the
8 medication?
9       MS. SCOLNICK:  Object to the form.
10   But you can answer.
11   A.   I can't speak to my colleagues'
12 decision-making in individual cases, but I -- I
13 know and trust my colleagues, and their
14 practice is typically an analysis of risk
15 versus benefits just as -- as mine is.
16   Q.   And you have no reason to believe
17 that your colleagues are writing illegitimate
18 prescriptions for opioids, correct?
19       MS. SCOLNICK:  Object.  Object as
20 to form, and repetitive.
21   A.   None -- none that I am aware of.
22       - - - - -
23       (Thereupon, Deposition Exhibit 4,
24       Document Titled "The MetroHealth
25       System Policies Controlled Substance

Page 85

1       Prescribing Policy," MH000000272 to
2       000000279, was marked for purposes
3       of identification.)
4       - - - - -
5   Q.   So I'm going to hand you Exhibit 4.
6 Exhibit 4 is Bates-labeled MH000000272.
7       So have you seen this document
8 before?
9   A.   Yes, I have.
10   Q.   What is this document?
11   A.   This is our controlled medication
12 safety committee, and pharmacy and therapeutic
13 safety committee controlled substance
14 prescribing policy.
15   Q.   So when you referred earlier to a
16 MetroHealth policy, is this the document you
17 were --
18   A.   This is the document.
19   Q.   And to kind of circle back to our
20 discussion of guidelines versus policies, this
21 document says it's a policy, correct?
22   A.   Yes.
23   Q.   So you understood this document --
24 compliance with this document to be mandatory?
25   A.   That's correct.

22 (Pages 82 - 85)

1    Q.    As opposed to Exhibit 3, the state
2  guidelines?
3    A.    Correct.
4    Q.    Which were not mandatory --
5    A.    Correct.
6    Q.    -- in your understanding, correct?
7    A.    That's correct.
8    Q.    So the date on this document in the
9  upper right-hand corner, it says, "Original
10 date, 9/20/15." Do you see that?
11   A.    Yes.
12   Q.    And when was the first time you
13 recall seeing this document?
14   A.    I participated in the drafting of
15 the language of this document.
16   Q.    In the upper right-hand corner, it
17 says Policy No. XIV, in Roman numerals, dash,
18 01. Do you see that?
19   A.    I do.
20   Q.    Is there a significance to the
21 "01"?
22        MS. SCOLNICK:  Object to the scope.
23        But you can answer it.
24   A.    I don't know.
25   Q.    Is this, to your knowledge, the

1  first MetroHealth controlled substance
2  prescribing policy?
3        MS. SCOLNICK:  Object to the scope.
4        But you can answer.
5    A.    Not that I'm aware of.
6    Q.    Meaning you're not aware of any
7  prior policies?
8    A.    Correct, I am not aware of prior
9  policies.
10   Q.    So you mentioned that you
11 participated in the drafting of the language in
12 this document, correct?
13   A.    Yes, that's correct.
14   Q.    Can you describe the process for
15 drafting this document?
16   A.    We engaged stakeholders from
17 throughout the hospital who practiced in a
18 variety of health care settings, and we
19 reviewed current policy, both state guidelines
20 as well as state law, and incorporated them
21 into this policy.
22   Q.    And was there a group of people who
23 worked on this?
24   A.    Yes.
25   Q.    Who was in that group?

1    A.    Dr. Sherrie Dixon Williams
2  participated, and I don't recall other members.
3    Q.    Do you recall approximately how
4  many people?
5    A.    No.
6    Q.    Do you know -- do you know why you
7  were enlisted to help work on this?
8    A.    At the time, Dr. Williams was
9  heading the opioid -- what -- what was our
10 opioid task force, our opioid safety task
11 force, at that time, and I had recently
12 participated in that committee.
13   Q.    And are you referring to the -- so
14 in -- strike that.
15        In the upper left-hand corner, it
16 says, "Originated by opioid safety committee."
17 Do you see that?
18   A.    Yes, that's correct.
19   Q.    And is -- is that the opioid safety
20 task force you're referring to?
21   A.    It's the opioid safety committee
22 that was present at that time.
23   Q.    And what was that opioid -- what
24 was the -- what was the -- strike it.
25        What was the purpose of that opioid

1  safety committee at the time?
2        MS. SCOLNICK:  Object to the form.
3    A.    To improve opioid safety throughout
4  the hospital system.
5    Q.    When was it launched?
6    A.    I don't know.
7    Q.    Do you know what prompted it to be
8  created?
9    A.    I don't know.
10   Q.    When did you first become involved?
11   A.    Shortly before this policy was
12 created in 2015.
13   Q.    And you said Dr. Dixon Williams was
14 the head of that committee at the time?
15   A.    Yes, that's correct.
16   Q.    Aside from drafting this policy,
17 were there any specific initiatives that the
18 opioid safety committee was working on at the
19 time?
20   A.    I believe there was some
21 educational initiatives to increase awareness
22 of new state laws and -- and guidelines. I
23 don't recall specifics.
24   Q.    And were those educational
25 initiatives directed towards prescribers?

1    A.    Yes.
2    Q.    Any educational initiatives related
3 to the addictiveness of opioids?
4    A.    I don't recall.
5    Q.    If you take a look at the second
6 page of the document under "General Procedures,
7 A" --
8    A.    Uh-huh.
9    Q.    -- it says, "All licensed
10 prescribers are required by law to register for
11 OARRS in accordance with Ohio state law."
12        Do you see that?
13   A.    Yes.
14   Q.    What is OARRS?
15   A.    The Ohio Automated Rx Reporting
16 System.
17   Q.    And earlier you had mentioned PMP.
18 Do you recall that?
19   A.    Yes.
20   Q.    Were you referring to OARRS --
21   A.    Yes.
22   Q.    -- when --
23       And OARRS is a database that
24 prescribers, among other people, are able to
25 query, correct?

1    A.    That's correct.
2    Q.    And what information in -- in --
3 strike that.
4        And OARRS contains information
5 related to prescriptions -- controlled
6 substance prescriptions filled by an individual
7 patient, correct?
8    A.    Yes.
9    Q.    And it's now legally required to
10 check OARRS in certain circumstances, correct?
11   A.    Yes.
12   Q.    Has that always been the case, that
13 it was a legal requirement?
14   A.    No.
15   Q.    Do you know approximately the time
16 when it did become a legal requirement for
17 prescribers to check OARRS?
18   A.    I believe it was just prior to
19 2015, possibly 2014. I don't remember the
20 exact date.
21   Q.    And so was the -- was the creation
22 of a legal requirement to -- to check OARRS one
23 of the reasons for drafting this policy?
24   A.    We did want to raise awareness and
25 ensure that our -- our providers were

1 compliant.
2    Q.    Were there any other reasons that
3 you drafted and issued this policy around
4 September 2015?
5    A.    There was a growing awareness
6 among -- I think nationwide that opioids were
7 becoming a crisis and leading to overdoses, and
8 this -- this became a growing concern among our
9 hospital leadership, and we wanted to take
10 initiative to do as much as we could to raise
11 awareness among our staff.
12   Q.    So you said it was a growing
13 concern in 2015?
14   A.    Yes.
15   Q.    But Cuyahoga County had had an
16 opiate task force for a number of years by that
17 point, correct?
18   A.    That's correct.
19   Q.    Since 2010, correct?
20   A.    I don't know the date that they
21 started. I was not a member until 2012.
22   Q.    But you know at least since 2012,
23 correct?
24   A.    I was aware in 2012, that's
25 correct.

1    Q.    And you yourself researched and
2 launched Project DAWN to combat the opioid
3 overdoses you were seeing in the emergency
4 room, correct?
5    A.    Yes, that's right. That happened
6 in 2013.
7    Q.    So why in 2015 was it still a
8 growing concern for you and your colleagues?
9        MS. SCOLNICK:  Objection to the
10 form.
11   Q.    Was it a full-blown concern by
12 then?
13   A.    I think the concern began even
14 earlier. It began in the beginning of the
15 2000s and the mid-1990s. It has continued to
16 grow over time. That wasn't a plateau. It
17 wasn't the beginning. It wasn't the end. It
18 was a growing concern.
19   Q.    Got it. So growing in terms of the
20 trajectory of it?
21   A.    Correct.
22   Q.    Okay. So the magnitude, not the
23 existence?
24   A.    Not the existence, but, yes, the
25 magnitude.

24 (Pages 90 - 93)

1    Q.    Got it.
2    A.    I think physicians also were
3  beginning to recognize some of the root causes
4  of -- of the epidemic as well.
5    Q.    And what were those -- and by
6  "physicians," you -- you include yourself in
7  that group?
8    A.    Yes.
9    Q.    So what were the -- were the root
10  causes that you were beginning to identify?
11    A.    An increased -- an increased
12  distribution of opioid prescrip- --
13  prescriptions.  There was a 600 percent
14  increase in the distribution of opioid grams in
15  the state of Ohio over about a decade.
16    Q.    And when you say "increased
17  distribution," do you mean an increased number
18  of prescriptions being filled by pharmacies?
19    A.    Yes, but -- but that would also
20  include medications personally furnished as
21  well.
22    Q.    Personally furnished by
23  prescribers?
24    A.    Prescribers, yes.
25    Q.    So this increased distribution

1  reflected an increased number of prescriptions
2  that were being written, correct?
3    A.    Prescriptions and medications that
4  were personally furnished, yes.
5    Q.    And medica- -- medications that are
6  personally furnished by a prescriber, does that
7  prescriber still have to write a prescription
8  in order to personally furnish them?
9    A.    That's not our practice at
10  MetroHealth.  We don't personally furnish
11  opioid medications.
12        I believe at the time there were
13  some outside facilities that personally
14  furnished opioid medications directly to
15  patients.  Our institution was not one of those
16  institutions.
17    Q.    Do you currently -- strike that.
18        So turning back to -- to OARRS for
19  a second.
20    A.    Uh-huh.
21    Q.    So I take it you currently comply,
22  in your practice, with the legal requirements
23  for checking OARRS, correct?
24    A.    Yes, that's correct.
25    Q.    But back before it was a legal

1  requirement, did you regularly check OARRS as a
2  part of your practice before you wrote an
3  opioid prescription?
4    A.    Yes.
5    Q.    When did you start doing that?
6    A.    As soon as I was aware that the
7  database was available.
8    Q.    Do you know when the database was
9  created?
10    A.    I think that I registered around
11  2008 or 2009, but I don't recall the precise
12  date.
13    Q.    And what were the circumstances
14  under which you would check OARRS back in that
15  2008-2009 time frame?
16        MS. SCOLNICK:  Object to the form.
17        You can answer.
18    A.    I typically checked OARRS prior to
19  writing any prescription for -- for an opioid.
20    Q.    Why did you do that?
21    A.    We in the emergency department care
22  for a number of patients with substance use
23  disorders, and I was concerned that they may be
24  at risk for developing opioid use disorder or
25  may already have developed opioid use disorder.

1    Q.    And did you continue that practice
2  of regularly checking OARRS up to 2015 when it
3  become mandatory?
4    A.    Yes.
5    Q.    And you continue to do that today?
6    A.    Yes.
7    Q.    From working in the emergency room,
8  have you developed an understanding of how
9  often your colleagues checked OARRS back in the
10  2008-2009 time frame when you first registered?
11    A.    I'm sorry.  Can you restate that
12  question?
13    Q.    Yeah.  So while working in the
14  emergency room in the period of time prior to
15  the legal requirements to check OARRS, did you
16  develop an understanding of how often your
17  colleagues were looking at OARRS?
18    A.    I did.
19    Q.    And how often would they do that?
20    A.    I can't speak to the frequency, but
21  the majority of our providers in the emergency
22  department regularly checked OARRS.
23    Q.    And that was the case even before
24  it was legally required?
25    A.    I believe -- I believe that the

25 (Pages 94 - 97)

Page 98

1 majority of providers in our department did,
2 although I can't speak to specific providers
3 and I can't speak outside of generalities.
4    Q.   And to your knowledge, are your
5 colleagues in the emergency room complying with
6 the current requirements to check OARRS?
7    A.   To my knowledge, yes.
8    Q.   No reason to believe they are not
9 complying?
10   A.   No.
11      MS. McNAMARA:  What was that?
12      MS. SCOLNICK:  I said it's been
13 about an hour, and I asked if she was getting
14 tired.
15      MS. McNAMARA:  It's up to you.
16      THE WITNESS:  I actually would like
17 to go to the bathroom if that's okay.
18      THE VIDEOGRAPHER:  Off the record,
19 11:38.
20      (Luncheon recess.)
21      THE VIDEOGRAPHER:  Back on the
22 record at 12:24 p.m.
23 BY MS. McNAMARA:
24   Q.   Welcome back.
25   A.   Thank you.

Page 99

1    Q.   Before lunch we were discussing the
2 2015 controlled substance prescribing policy.
3 Do you recall that?
4    A.   Yes.
5    Q.   And that was drafted by the opioid
6 safety committee?
7    A.   Yes, that's correct.
8    Q.   Did you remain involved with the
9 opioid safety committee after the issuance of
10 the policy in September 2015?
11      MS. SCOLNICK:  Objection to form.
12   A.   Yes.
13   Q.   And what did the opioid safety
14 committee do in terms of initiatives or
15 projects after the policy?
16   A.   I -- I recall that we did a few
17 educational events.  They also sponsored our
18 full-day conference on the stigma of opioid use
19 disorder.
20   Q.   And for how long did that committee
21 exist after -- strike that.
22      Is that committee still in
23 existence today?
24   A.   No.
25   Q.   How long did it -- it exist after

Page 100

1 September 2015?
2    A.   I don't know.  It did end sometime
3 between 2015 and our opioid safety task force.
4 There was a gap.
5    Q.   Earlier today you described the
6 policy as mandatory, correct?
7    A.   Yes.
8    Q.   Were you aware of MetroHealth
9 monitoring prescribers' compliance with the
10 policy in any way?
11      MS. SCOLNICK:  Object.  Beyond the
12 scope.
13      You can answer.
14   A.   Can I take a moment to think about
15 that?  I'm not sure that I -- I don't know.
16 I'm not aware of any monitoring that was
17 occurring in that immediate time frame.
18   Q.   In the 2015 time frame?
19   A.   In 2015.  I was not in a leadership
20 role at that time.  There may have been efforts
21 or whatnot that I was not participating in.
22   Q.   Do you receive any performance
23 reviews as a staff physician at MetroHealth?
24   A.   Yes.
25   Q.   And as -- as part of your

Page 101

1 performance review, the review process, was
2 compliance with the controlled substance
3 prescribing policy considered?
4    A.   No.
5    Q.   Do you know whether there was any
6 penalty for not complying with the controlled
7 substance prescribing policy?
8    A.   Not to my knowledge.
9    Q.   So over the past couple of years,
10 MetroHealth has undertaken a number of
11 initiatives to reduce opioid prescribing,
12 correct?
13   A.   Yes.
14   Q.   And when we're talking about
15 reducing opioid prescribing in terms of
16 MetroHealth's initiatives, is the focus on
17 reducing the number of prescriptions?
18      MS. SCOLNICK:  Objection as to the
19 scope.  She can answer.
20   A.   We monitor a variety of metrics,
21 including the number of prescriptions.
22   Q.   And do you also monitor the number
23 of pills?
24   A.   Yes.
25   Q.   And is this part of the work of the

26 (Pages 98 - 101)

Page 102

1 opioid safety committee?
2     A.    No.
3     Q.    Who does the monitoring of the
4 number of prescriptions and pills?
5     A.    That initiative was led by our
6 opioid executive committee.  Initial work was
7 started in our controlled substance peer review
8 committee, but that work accelerated when we
9 formed the opioid executive committee.
10     Q.    So just so I get the committee
11 names straight, so initial review by the
12 controlled substances peer review committee?
13     A.    Yes.
14     Q.    And then it escalated to the opioid
15 executive committee?
16     A.    They're separate committees.
17     Q.    Yes.
18     A.    The controlled substance peer
19 review committee formed -- I don't want to --
20     Q.    Yeah.
21     A.    -- hold -- hold you to the date --
22     Q.    I will --
23     A.    -- be held to the date, but I think
24 it was in 2016 that committee formed.
25         And we did an analysis of

Page 103

1 prescribing metrics, and we had a greater level
2 of sophistication of our analysis when our
3 opioid executive committee formed.  That
4 committee formed in 2- -- the end of 2017.  We
5 had an analy- -- analyst -- excuse me -- that
6 was dedicated to obtaining that data for us.
7     Q.    And are you on the opioid executive
8 committee?
9     A.    Yes.
10     Q.    How many members are on that
11 committee?
12     A.    It varies.  We have ad hoc members
13 and regular members, but between 10 and 15.
14     Q.    And is that 10 to 15 total, ad hoc
15 plus regular?
16     A.    I -- I couldn't --
17     Q.    Do you happen to know how many
18 regular members there are?
19     A.    I don't know.  May- -- maybe ten.
20 Eight or -- maybe eight or ten.
21     Q.    And the -- the analyst that you
22 mentioned with respect to the opioid executive
23 committee, is that someone that was hired?
24     A.    No.
25     Q.    It was someone who was already

Page 104

1 employed by MetroHealth?
2     A.    Yes.
3     Q.    Who is that person?
4     A.    Peter Lawson.
5     Q.    Who was responsible for deciding
6 that MetroHealth should try to reduce the
7 number of opioid prescriptions?
8         MS. SCOLNICK:  Object to the scope.
9     A.    I think that the work that we did
10 with the controlled substance peer review
11 committee sparked an interest in reducing the
12 number of opioid prescriptions and other
13 opioid-prescribing metrics, but it became
14 formalized, and goals were set when leadership
15 became involved.
16     Q.    And when you refer to leadership,
17 who -- who are you referring to?
18     A.    Dr. Boulanger, the chief clinical
19 officer at the hospital.
20     Q.    Now, this -- these strategies to
21 reduce opioid prescribing, this is not a result
22 of MetroHealth determining that its prescribers
23 were writing illegitimate prescriptions --
24         MS. SCOLNICK:  Object as to --
25     Q.    -- right?

Page 105

1         MS. SCOLNICK:  Object as to form.
2     A.    No.
3     Q.    To your understanding, it's about
4 the evolving knowledge of the addictiveness of
5 these drugs, correct?
6     A.    And -- and the evolving knowledge
7 of the adverse outcomes associated with them.
8 So not just addictiveness, but also fatalities
9 associated with them.  And other associated
10 morbidity, I should add.
11         - - - - -
12     (Thereupon, Deposition Exhibit 5,
13     4/18/2017 The MetroHealth System
14     Opioid Committee Meeting Minutes,
15     MH000000566 to 000000567, was marked
16     for purposes of identification.)
17         - - - - -
18     Q.    Going to hand you Exhibit 5.
19     A.    Thank you.
20     Q.    Exhibit 5 is Bates-labeled
21 MH000000566.
22         Do you recognize this document?
23     A.    I do.
24     Q.    What is it?
25     A.    It is the minutes from our

27 (Pages 102 - 105)

1 controlled substance peer review committee.

2    Q.    And this is the same committee that

3 was launched in 2016?

4    A.    Yes.

5    Q.    Okay.  And the minutes indicate

6 that you were -- you were the chairperson?

7    A.    Yes, that's correct.

8         I would add that at the top it says

9 "Opioid committee."  This is -- this is peer

10 review.

11    Q.    Okay.  Does the peer review

12 committee meet regularly?

13    A.    Yes.

14    Q.    How often?

15    A.    We try to meet monthly.  Sometimes

16 meetings get canceled, but typically monthly.

17    Q.    Have you been the chairperson since

18 the committee was started in 2016?

19    A.    Yes.

20    Q.    Do you have an understanding as to

21 why it was started?

22    A.    We had a growing concern that

23 patients may be at risk for adverse outcomes

24 from opioid prescriptions.

25    Q.    And what was the purpose of the

1 committee?  What -- strike that.

2         The -- the committee still exists,

3 correct?

4    A.    Yes.

5    Q.    So what's the purpose of the

6 committee?

7    A.    The committee serves to review

8 opioid-prescribing patterns to determine if

9 there are any outlying prescriber patterns, and

10 to reeducate providers if we identify providers

11 who may be prescribing in a manner that is --

12 that varies from their peers or does not appear

13 to be consistent with guidelines.

14    Q.    So does the committee -- does the

15 committee review the prescribing patterns of

16 all prescribers employed by MetroHealth?

17    A.    We review prescribing data from all

18 prescribers.  We don't do in-depth reviews of

19 all providers.

20    Q.    Got it.

21         And what prescribing data does the

22 committee review?

23    A.    We look at total prescriptions of

24 an opioid, a C2 prescription.  We look at total

25 pills prescribed by that -- by pro- -- by

1 providers.  We look at average MME.  We also

2 look at opioid prescriptions co-prescribed with

3 a benzodiazepine.  And there may be other

4 metrics I am not recalling, but those are the

5 main ones.

6    Q.    And you mentioned "average MME."

7 What is "MME"?

8    A.    Morphine milligram equivalent.

9    Q.    And what's the significance of that

10 metric?

11    A.    With increasing MME, there's an

12 increased risk of adverse events, including

13 overdose.

14    Q.    And is it fair to say that the --

15 the higher the MME, the stronger the dosage?

16    A.    Yes.

17    Q.    Just trying to --

18    A.    Yes.

19    Q.    Fair, in layman's terms?

20    A.    Yes.

21    Q.    Okay.  And you also mentioned

22 co-prescribing of opioids and benzodiazepine,

23 correct?

24    A.    Yes, that's correct.

25    Q.    So what's the significance of that

1 metric?

2    A.    It increases the risk for

3 respiratory depression and other adverse

4 events.

5    Q.    And just what are some common

6 benzodiazepines?  Just to -- for a background

7 in case we play this for the jury.

8    A.    Sure.  Valium, Ativan, Xanax.

9    Q.    And so after you review the

10 prescribing data for everyone, do you select

11 certain providers for a more in-depth review?

12    A.    Yes.

13    Q.    And how -- how do you select those

14 providers?

15    A.    We review providers who appear to

16 be prescribing at a higher rate on those

17 metrics compared to either their peers or

18 overall throughout the hospital.

19    Q.    And when you say "peers," what are

20 you referring to?

21    A.    We compare providers both to other

22 providers that are practicing in the same

23 practice environment, as well as overall,

24 compared to all providers within the hospital

25 system.

28 (Pages 106 - 109)

Page 110

1    Q.    So, for example, if someone
2  practices in the palliative care area, you
3  would compare them both to other palliative
4  care providers and then to other providers?
5    A.    Yes, that's correct.  It wouldn't
6  be fair to compare a palliative care physician
7  to a pediatrician.
8    Q.    Because you'd expect a palliative
9  care provider, just because of the nature of
10  the practice, to prescribe more opioids?
11    A.    Yes, that's correct.  They have a
12  different patient population.
13    Q.    So going to the minutes of this
14  particular meeting -- and actually back up.
15    Do you recall attending this
16  particular meeting?
17    A.    Yes.
18    Q.    In the lower left-hand corner,
19  there's a reference to the "pain board."  Do
20  you see that?
21    A.    Yes.
22    Q.    What's the pain board?
23    A.    This was a planned initiative to
24  create a group of physicians to review
25  complicated medical patients who are being

Page 111

1  treated with opioids.  This board did not form.
2  We never created this forum.
3    Q.    And was it an internal MetroHealth
4  initiative?
5    A.    It was an initiative of this -- it
6  was a -- it was a planned initiative for this
7  group that didn't get off the ground.
8    Q.    Why didn't it get off the ground?
9    A.    Other -- other initiative took
10  precedence.  At that time I didn't have a -- a
11  staff.  It was me running the show.
12    Q.    Because this is in April 2017,
13  correct?
14    A.    This is in April of 2017.
15    Q.    So this is before the launch of the
16  Office of Opioid Safety?
17    A.    It's before the launch of the
18  Office of Opioid Safety, and it was before we
19  were -- we received numerous grant funds that
20  required our immediate attention.
21    Q.    So what initiatives did you
22  prioritize over the pain board at the time?
23    A.    We prioritized initiatives to train
24  our physicians to obtain their DEA waiver.  We
25  prioritized a conference to educate our

Page 112

1  prescribers on safe opioid prescribing.  I
2  think that's mentioned here in this minutes as
3  well.  We also prioritized the simulation
4  program for safe -- safer prescribing.
5    Q.    And what's a DEA waiver?
6    A.    It is a waiver that allows a
7  prescriber to treat opioid use disorder with
8  opioid agonists.
9    For clarification, in this document
10  that training is referred to as MAT training,
11  medication-assisted treatment training.  It can
12  be kind of used interchangeably, but "DEA 2000
13  waiver" is the correct terminology.
14    Q.    Got it.
15    And the conference you're referring
16  to, is that the SCOPE of Pain discussed in this
17  document?
18    A.    Yes, that's correct.
19    Q.    And what was the simulation program
20  that you were describing?
21    A.    It is an ongoing program that is
22  managed by our simulation center that involves
23  actors who act out a particular script
24  regarding opioid prescribing so that a
25  physician can walk into a room, have a

Page 113

1  conversation with a patient about, you know,
2  one of a number of topics that we developed.
3  Prescribing opioids to a patient that they had
4  inherited on high doses of opioids was one of
5  the topics.  Responding to a patient who had an
6  abnormal toxicology screen was another topic.
7    Q.    And were you involved in selecting
8  the scenarios for the simulation?
9    A.    I was not the lead on this project,
10  but I was involved.
11    Q.    Was there a written script for
12  these?
13    A.    Yes.
14    Q.    Were you involved in the drafting
15  of the script?
16    A.    Not involved in the drafting, but
17  involved in the review.
18    Q.    And the simulation program did get
19  off the ground, correct?
20    A.    Yes.
21    Q.    When did that start?
22    A.    I don't recall.  Shortly after
23  this -- this meeting.
24    Q.    And it's still going?
25    A.    Yes.

29 (Pages 110 - 113)

1    Q.   In the context of the pain board,
2 it references -- in the fourth line -- third
3 and fourth line, it says, "Dr. Margolias
4 discussed the draft algorithm from the opioid
5 advisory committee put together to create the
6 algorithm to put together the pieces to support
7 the algorithm."
8         Do you see that?
9    A.   Your guess is as good as mine.
10   Q.   Do you know what algorithm they're
11 referring to?
12   A.   Again, this -- this project never
13 got off the ground.  You know, we discussed
14 initiatives.  We sort of do brainstorming.
15 At -- at this time there was no other opioid
16 group, so we were doing some brainstorming
17 about how we could develop a group or a forum
18 like this, but there -- there must have been
19 some algorithm that we were trying to -- trying
20 to sort out that never happened.
21   Q.   Got it.
22         On the flip side of the document,
23 on page --
24   A.   Uh-huh.
25   Q.   -- 2, it discusses a review of a

1 provider.  Do you see that?
2    A.   I do.
3    Q.   And this particular provider is a
4 palliative care provider, correct?
5    A.   Yes, that's correct.
6    Q.   And it says that the provider was
7 reviewed by E. Horwath, correct?
8    A.   Yes.
9    Q.   Who is that?
10   A.   He's the chairman of psychiatry.
11   Q.   Okay.  And when the committee looks
12 at the prescribing data and identifies specific
13 providers to look at more closely, about how
14 many providers do you identify at a time?
15   A.   We had different practices when we
16 first started our program.  And we looked at
17 providers that had the highest metrics
18 initially.  And we were somewhat limited
19 because intensive reviews are very lengthy and
20 physicians really didn't have the time allotted
21 to spend the several hours that it would take
22 to do a deep-dive review, so we prioritized the
23 providers who had the highest metrics.
24   Q.   And how many providers did you
25 identify in that initial cut?

1    A.   I don't recall.
2    Q.   And so with a -- with a palliative
3 care provider, as I think we said before, you
4 expect a higher level of opioid prescribing
5 relative to other specialties like
6 pediatricians, correct?
7    A.   Correct.
8    Q.   So the fact that a palliative care
9 provider has a higher rate of opioid
10 prescribing than other specialties does not, in
11 and of itself, make that person an outlier,
12 right?
13   A.   Not necessarily.
14   Q.   So in the -- in the description of
15 the recommendation and action here, it says
16 that "There was a discussion of the severity of
17 illness of each patient."  Do you see that?
18   A.   What line are you looking at?
19   Q.   Oh, I'm sorry.  In the first full
20 paragraph, the second to the last line, it
21 says, "Severity of illness for each patient was
22 discussed."
23   A.   Yes.
24   Q.   Do you see that?
25   A.   Yes.

1    Q.   And is that typical of the review
2 process, that you look at each individual
3 patient?
4    A.   We look at the diagnosis associated
5 with the prescription.
6    Q.   Why is that important?
7    A.   To determine -- to -- basically to
8 put it in context, to put the prescription in
9 context.
10   Q.   Because some patients, depending on
11 their condition, might require higher amounts
12 of opioids to relieve their pain?
13   A.   It's specific to the patient, but
14 in general terms, yes.
15   Q.   And, for example, there's a -- the
16 next sentence in the review says, "Spinal cord
17 injury patient had the most prescribing."
18         Do you see that?
19   A.   I do.
20   Q.   So that's an example of a person
21 who might need considerably more opioids than
22 the average patient?
23         MS. SCOLNICK:  Objection to the
24 form.
25   A.   Depends on the context.  I don't

30 (Pages 114 - 117)

1 have the detailed information regarding that
2 patient's case.
3    Q.    But some patients might
4 legitimately require high volumes of opioids,
5 fair?
6         MS. SCOLNICK:  Objection to the
7 form.
8    A.    Again, I would -- I would say that
9 it depends on the individual case of the
10 patient.  And the time frame:  acute versus
11 chronic.
12    Q.    In terms of the review of the
13 individual diagnoses of the patients, is that
14 performed by a single physician?
15    A.    No.
16    Q.    How many people participate in that
17 review?
18    A.    In this process that we had in
19 place at the time of these minutes, a provider
20 was chosen based on the metrics that we
21 reviewed, and then 10 patients were chosen, and
22 those patients were chosen based on the dosage,
23 or the MME, that they were prescribed.  And
24 those individual patients were -- much more
25 intensive evaluation and review of those

1 patients' medical charts was completed.
2         And the items that we reviewed
3 included the -- the diagnosis, the other
4 medical diagnoses that patient had, the other
5 medications that they were taking.  And we
6 evaluated whether they were compliant with a
7 number of basic opioid stewardship measures.
8         We tried to determine based on the
9 chart review, but the next step was to meet
10 with the -- the provider and get additional
11 information, because sometimes we don't get the
12 full picture without having a conversation with
13 the doctor.
14    Q.    Got it.
15         So if I'm understanding correctly,
16 the -- the review of the 10 patients was
17 conducted separately, and then there was a
18 conversation with the doctor --
19    A.    That's correct.
20    Q.    -- to resolve any questions?
21    A.    Right.
22    Q.    And in the last paragraph in the
23 minutes, it says, "After a meaningful
24 discussion, Dr. Horwath and J. Papp will meet
25 with this provider after the next review."

1         Do you see that?
2    A.    Yes.
3    Q.    And is that -- is that the
4 conversation that you've just described?  The
5 type of conversation?
6    A.    Yes.  That -- that resulted from
7 our peer review meeting discussing
8 Dr. Horwath's review of the 10 patients, and
9 the committee decided that based on his review
10 of those patients, that Dr. Horwath and I would
11 meet with the provider in question.
12    Q.    You mentioned that one of -- one
13 part of the review is determining whether the
14 compliant -- whether the prescriber is
15 compliant with opioid stewardship measures?
16    A.    Yes.
17    Q.    What were you referring to by
18 "opioid stewardship measures"?
19    A.    Were they complying with CDC
20 guidelines?  Were they documenting that they
21 had queried OARRS and documenting a summary in
22 the medical record?
23         There were a number of other items
24 that are just not coming to my head right now.
25 Were they co-prescribing naloxone, was another

1 one.  But that's part of the CDC guidelines.
2    Q.    And do you recall actually having a
3 subsequent meeting with this provider?
4    A.    Yes.
5    Q.    And what was the result of that
6 meeting?
7    A.    I believe that's subject to peer
8 review confidentiality.
9         MS. SCOLNICK:  Sorry.
10    Q.    Let me ask that --
11         MS. SCOLNICK:  Yes, it is.
12    Q.    Okay.  So let me ask a more
13 targeted question.
14         Was -- was this provider
15 disciplined as a result of the review?
16    A.    No.
17    Q.    So is it --
18    A.    And I -- and I should clarify that
19 this is not a disciplinary committee.
20    Q.    Yeah.
21    A.    This is a peer review committee.
22    Q.    So, yeah, my next -- is it fair to
23 say that the peer review process is intended
24 more to educate providers --
25    A.    Yes, that's correct.

31 (Pages 118 - 121)

Page 122

1    Q.   -- than to discipline them?
2    A.   Yes.
3    Q.   Okay.  That makes sense.
4         A number of the documents mention
5  Epic.  Are you --
6    A.   Yes.
7    Q.   -- familiar with Epic?
8    A.   Unfortunately, yes.
9    Q.   What is Epic?
10   A.   It's our electronic health record.
11   Q.   Is Epic an acronym for something?
12   A.   Not that I know of.
13   Q.   Okay.
14   A.   I don't think so.
15   Q.   How long has MetroHealth used Epic?
16   A.   As long as I've been at
17 MetroHealth.
18   Q.   Since at least 2007?
19   A.   Since 2000.  I trained at Metro as
20 well.  It's been there.
21   Q.   So I take it Epic has evolved over
22 the years?
23   A.   It has.  It's become more
24 sophisticated.
25   Q.   Have there been any features added

Page 123

1  to Epic that relate specifically to opioid
2  prescribing?
3    A.   Yes.  Features that we added.
4    Q.   You, as in the Office of Opioid
5  Safety?
6    A.   As in members of our opioid
7  executive committee.  I guess in our opioid
8  safety committee as well, yeah.
9              - - - - -
10        (Thereupon, Deposition Exhibit 6,
11         Slide Deck Titled, "Metro Health
12         Office of Opioid Safety,"
13         CUYAH_002048327, was marked for
14         purposes of identification.)
15             - - - - -
16   Q.   I'll hand you Exhibit 6.  Exhibit 6
17 is Bates-numbered CUYAH_002048327.
18        Do you recognize this document?
19   A.   I do.
20   Q.   What is it?
21   A.   It is a PowerPoint presentation --
22 I don't know the -- I don't know who the
23 audience was -- that I put together to give an
24 overview of the Office of Opioid Safety, our
25 mission, and some of our goals.

Page 124

1    Q.   So if you turn ahead -- I don't
2  think we have page numbers.  There's a slide
3  with the title "Provider Resources" at the top.
4  I think it's the seventh page in.
5    A.   Oh, yes.
6    Q.   And the first item listed here is
7  "Epic Support," correct?
8    A.   Yes.
9    Q.   And it lists an MME calculator,
10 order sets/smart sets, best practice alerts,
11 and links to resources and handouts, correct?
12   A.   Yes.
13   Q.   And are these some of the upgrades
14 that the opioid executive committee implemented
15 to Epic?
16   A.   These are examples of some of the
17 resources that we created.
18   Q.   So what is an MME calculator?
19   A.   There are two forms of an MME
20 calculator that we have created in Epic.
21        And just for clarity, we have an
22 informatics specialist who creates these for
23 our Office of Opioid Safety.  He actually is
24 employed, not in our Office of Opioid Safety,
25 but he's employed in the office of -- the

Page 125

1  informatics department.  But his role is to
2  create resources in Epic to make safer
3  prescribing easier for providers.
4         The MME calculator, again, it comes
5  in two forms.  We have a total MME calculator
6  that puts the total MME of prescribed opioid
7  medications in what we call the header in Epic,
8  which is the top line of the screen that shows
9  the patient's name, date of birth, medical
10 record number, allergy and vital signs.  And
11 right next to that is total MME, and that's a
12 calculation of all the opioid MMEs there are in
13 Epic.  That's one area where we have a
14 calculator.
15        I think since we built this -- or
16 since I wrote this presentation, we've also
17 created a second in-line calculator, so that
18 when a prescriber is writing a prescription,
19 before that prescriber signs the prescription,
20 they can see what the total MME of that
21 prescription is equal to.
22   Q.   And when did the total MME
23 calculator in the header become available?
24   A.   2017, I believe.
25   Q.   And the in-line calculator was --

32 (Pages 122 - 125)

Page 126

1    A.   It came much later.  Either --
2  either late 2017 or early 2018.  I can't
3  remember.
4    Q.   It also references order sets and
5  smart sets.  What are those?
6    A.   Order sets are standard -- it's
7  a -- sort of like a -- I guess the best way I
8  could describe it would be a list of common
9  orders that a physician may prescribe together.
10       For instance, if I were admitting a
11 patient, I may want to order meals, activity
12 level, prescriptions, and an order set gives
13 you a list of options from which to choose
14 from.  And there are standard defaults for
15 medications, including dosages, as well as
16 total pills dispensed.
17   Q.   So it -- it helps the physicians
18 decide on a dosage?
19   A.   It standardizes and simplifies the
20 ordering process.
21   Q.   And how does that help -- or,
22 scratch that.
23       Does that help reduce opioid
24 prescribing?
25   A.   If done with that intent, it can

Page 127

1  reduce opioid prescribing.
2    Q.   What do you mean by "if done with
3  that intent"?
4    A.   Some of the specific initiatives
5  that we took were to reevaluate some of the
6  order sets and change the order sentence and
7  the default quantity prescribed.
8        For instance, as an example, if we
9  saw a prescription for one tablet every four to
10 six hours with a 30-tablet default, that was
11 changed to one tablet every six hours with a
12 default option of three-, five-, or seven-day
13 supplies.
14   Q.   Got it.
15       How long have there been order sets
16 in Epic?
17   A.   As long as I remember, which would
18 be since it started in, I guess, 2000.
19   Q.   But then there were recent
20 adjustments to the default sets for some
21 opioids?
22   A.   Yes, that's correct.
23   Q.   And when did that occur?
24   A.   Over the course of, boy, mostly in
25 2018.  Probably some of that work happened in

Page 128

1  2017 as well, with that calculator and some of
2  the other things that we did.
3    Q.   Were there any adjustments made
4  after the issuance of -- after Ohio issued the
5  acute prescribing guidelines --
6    A.   Yes.
7    Q.   -- for opioids --
8    A.   Yes.
9    Q.   -- back in 2012?
10   A.   Oh, I --
11   Q.   Yes.
12   A.   I apologize.  I thought -- I
13 thought you were referring to the acute pain
14 rules --
15   Q.   So let me -- let me back up --
16   A.   -- not the guidelines.
17   Q.   -- so we have a clear record.
18       So do you recall, earlier, we
19 reviewed Ohio guidelines for opioid prescribing
20 in the acute care and emergency setting?
21   A.   Yes.
22   Q.   And one part of those guidelines
23 was that opioid prescriptions should not exceed
24 three days, correct?
25   A.   I don't think that's exactly --

Page 129

1    Q.   Okay.
2    A.   -- what those rules say, but --
3    Q.   Generally speaking it should be
4  limited to three days or less?  You're welcome
5  to --
6    A.   We can -- we can --
7    Q.   Yeah, go for it.
8    A.   -- can -- just for the record
9  clarify exactly --
10   Q.   Sure.
11   A.   -- how it's worded.
12   Q.   Because I can't find mine.
13   A.   "Except in rare circumstances,
14 prescriptions should be limited to a three-day
15 supply."
16   Q.   Were any changes made to the order
17 sets after that guideline was issued?
18   A.   No.
19   Q.   Another of the provider resources
20 are best practice alerts.
21   A.   Yes.
22   Q.   What are those?
23   A.   Those are alerts to a provider when
24 an order is being placed to remind them of
25 current guidelines and other best practice.

33 (Pages 126 - 129)

1    Q.    And so best practice alerts were
2  created for opioid prescriptions?
3    A.    Yes.
4    Q.    And what guidelines did they
5  reference or incorporate?
6    A.    We included an alert for -- in an
7  ambulatory environment, we set an alert so that
8  if opioid prescribing exceeded 80 MME, that an
9  alert would fire, reminding the provider that
10 that was a high dose of a medication.
11        That same type of warning was also
12 set to fire in acute settings, but the
13 threshold was lower.  It was set at 30 MME, and
14 that was to comply with state law.
15    Q.    And in the -- in the ambula- --
16 strike that.
17        "Ambulatory environment," what
18 does -- what does that mean?
19    A.    That means the outpatient setting.
20 Generally primary care, specialty clinics.
21        These are well patients who are
22 coming for a doctor visit, as opposed to acute
23 care where they're injured or having an acute
24 crisis.
25    Q.    And the best practice -- the best

1  practice alert in the ambulatory environment
2  for over 80 MME, when was that set?
3    A.    That was set probably in 2017 or
4  2018.
5    Q.    And was the acute warning for the
6  30 MME set around the same time?
7    A.    Yes, I believe so.
8    Q.    How long has Epic had the
9  capability of doing the best practice alerts?
10    A.    I'm not an informatics specialist.
11 I can't answer that.
12    Q.    Has -- so in -- in your practice,
13 have you received best practice alerts through
14 Epic when you've prescribed medications?
15    A.    Yes.
16    Q.    What's the earliest you can recall
17 receiving one?
18    A.    I don't recall.  Probably within
19 the last 10 years.
20    Q.    But they definitely existed prior
21 to 2017-2018, when the specific alerts for
22 opioids --
23    A.    Yes.  When we created those, yes.
24    Q.    And the last provider resource is
25 the links to research and handouts.  Do you see

1  that?
2    A.    Yes.
3    Q.    And what type of resources and
4  handouts is Epic linked to for opioids?
5    A.    We have links that when you -- it
6  would be nice if I could do a demo, but when
7  you click on the MME in the header, you get a
8  list of links.  Those -- because when you click
9  on the MME in the header, first you get a
10 drill-down of how the prescriptions were
11 calculated to create that MME total that's in
12 the header, and then below that are a list of
13 links, sort of a resource guide that we created
14 to provide access to CDC guidelines, and on the
15 CDC website there's a number of handouts, so we
16 link to several of those.
17        Also link to state and other rules
18 and medical board rules there.  We tried to put
19 all the kind of common resources the doctors
20 might want to have access to in one place.
21    Q.    Underneath the Epic support and the
22 provider resources slide, it mentions pain
23 management boards.  Do you see that?
24    A.    I think I've lost my page.  I'm
25 sorry.  I should have numbered these.

1        Yeah, again, this was -- this was
2  one of our planned initiatives that just didn't
3  get off the ground.
4    Q.    Got it.  So the same pain board
5  we --
6    A.    The same thing, yeah.
7    Q.    -- discussed earlier?  Got it.
8        So if you flip ahead about three
9  slides, there's one with a heading "Predictive
10 Analytics."  Do you see that?
11    A.    Yes.
12    Q.    And it says, "Use system data to
13 identify patients or providers who may benefit
14 from a specialized care pathway."
15        Did I read that correctly?
16    A.    Yes.
17    Q.    And what system data is this
18 referring to?
19    A.    This is the prescribing data that
20 we reviewed with our analytic -- with our
21 analysts.
22    Q.    And this prescribing data is
23 stored, I take it, in some sort of database at
24 MetroHealth?
25        MS. SCOLNICK:  Object to the form.

34 (Pages 130 - 133)

Page 134

1   A.   It's stored in a secure file, in a
2 secured database, yes.
3   Q.   And MetroHealth has been compiling
4 and storing prescribing data for as long as you
5 worked there, correct?
6   A.   I --
7         MS. SCOLNICK:  Object to the scope.
8   A.   -- can't speak to any of the work
9 that MetroHealth did prior to my involvement.
10   Q.   So when did you first become aware
11 that MetroHealth had stored prescribing data
12 for the physicians it employs?
13   A.   I guess when we started our
14 controlled substance peer review committee.
15 That's when I requested the data.
16   Q.   And when you requested the data,
17 did you request data from -- did you request
18 prescribing data from previous years?
19   A.   Yes.
20   Q.   How far back did you request?
21   A.   I don't recall.  Probably no more
22 than a year prior to our controlled substance
23 peer review committee formation.
24   Q.   Why not go back farther?
25   A.   Many physicians had changed their

Page 135

1 practice, and it didn't seem pertinent to
2 re-educate providers who had clearly already
3 changed their practice.
4   Q.   And I know we spoke about your --
5 your personal evolving understanding, but how
6 did you come to realize that many other
7 people -- many other physicians had also
8 changed their practice?
9         MS. SCOLNICK:  Object to the form.
10   A.   We reviewed data over time, and we
11 noticed a trend towards decreasing opioid
12 metrics on a number of the metrics that we
13 reviewed.
14   Q.   So the "we" is the controlled
15 substance peer review committee?
16   A.   That committee, as well as our
17 opioid executive committee.  Again, when we
18 started our controlled substance peer review
19 committee, we had limited resources available
20 to us to analyze data.  It became much more
21 sophisticated in later years.
22   Q.   So when you were reviewing data
23 over time, what specific data were you looking
24 at that you were just referring to?
25         MS. SCOLNICK:  Object to the form.

Page 136

1   A.   The same data we -- we discussed
2 before.  Total -- total opioid prescriptions,
3 total opioid prescriptions per encounter, total
4 opioid pills, average MME, opioids plus
5 benzodiazepines, and there may be some other
6 measures that I'm failing to recall.
7   Q.   And how far back did you look in
8 that analysis?
9         MS. SCOLNICK:  Objection.
10   A.   Our initial analysis?
11   Q.   Yes.
12   A.   Again, one year prior to the
13 formation of our committee is as far as back as
14 I recall that we looked.
15   Q.   I think -- my question was bad, and
16 I'm sorry.
17   A.   That's okay.
18   Q.   So you had said that many
19 physicians changed their practice, and you said
20 you understood that through a review of data
21 over time.
22   A.   Well, and we noticed that
23 prescribing patterns were changing, and that
24 was generally something that we expected would
25 have happened across the system, although we

Page 137

1 didn't -- may not have had any hard data to
2 prove that.
3         And it generally doesn't make sense
4 to go too far back because, you know,
5 physicians' behavior and practice patterns
6 evolve over time with new information, and so
7 we thought it was pertinent to look one year
8 prior to the time of our committee formation.
9         And we had limited resources at the
10 time as well.  We didn't have an army of
11 physicians who were able to do these reviews.
12 So it's a very time-intensive process.
13   Q.   So have you ever looked at the
14 prescribing data back, say, to 2007 when you
15 started and analyzed that trend?
16         MS. SCOLNICK:  Objection.  That has
17 been asked and answered.
18         You can answer again.
19   A.   I'm not --
20   Q.   So separate and apart from the
21 analysis you just described, have you ever
22 looked at prescribing data going back farther
23 than a year, to say 2007, to get a -- a
24 longer-term trend?
25   A.   If there were an individual patient

35 (Pages 134 - 137)

1 who we were reviewing, we would do a detailed
2 chart review that may go back several years.
3 But we did not look system-wide or
4 provider-wide at -- at metrics, but we did go
5 back and look on individual patients several
6 years prior.
7    Q.   Got it.  Okay.
8         And if you flip forward another
9 four slides, there's a slide titled "Study and
10 Report Outcomes."  Do you see that?
11    A.   I do.
12    Q.   And to put this in context, this
13 PowerPoint was written at the launch of the --
14    A.   Correct.
15    Q.   -- opioid safety committee,
16 correct?
17    A.   Correct.  Right.  It was -- right.
18    Q.   So these are -- are goals at the --
19    A.   These goals -- proposed.
20    Q.   -- start of the program?
21    A.   These were proposed outcomes that
22 we planned to look at.  Some of them we looked
23 at.  Some of them we did not.  Sometimes we
24 found better measures that we felt were worthy
25 of looking at instead.

1    Q.   Have you looked at -- the first
2 item on the list is, "Reduce total average MME
3 throughout the system."  Do you see that?
4    A.   Yes.
5    Q.   And is that a metric you've looked
6 at?
7    A.   Yes.
8    Q.   And have you reduced the total
9 average MME throughout the system since the
10 Office of Opioid Safety was launched?
11    A.   It depends on how you look at it.
12 So overall, I will say yes.
13    Q.   And why does it depend on how you
14 look at it?
15    A.   Because we have -- we look at data
16 system-wide, and we look at data based on each
17 department.  System-wide, the MME has
18 decreased.  Most departments have also
19 decreased the average MME.  There are, however,
20 individual providers whose average MME have not
21 changed.
22    Q.   The second item on the list is,
23 "Reduce percentage of opioids per encounter."
24 Do you see that?
25    A.   Yes.

1    Q.   What does that mean?
2    A.   We looked at not only total number
3 of pills, but total number of pills per patient
4 encounter.  Because opioid prescribing is
5 not -- you know, different -- different
6 providers have -- see different volumes of
7 patients and have different numbers of
8 encounters that they participate in, and so a
9 rate is a better way to equalize that M- --
10    Q.   So -- so it's basically a rate of
11 prescribing per patient seen?
12    A.   Correct.
13    Q.   Okay.  And is that a metric you've
14 looked at?
15    A.   Yes.
16    Q.   And have you reduced the -- the
17 percentage of opioids per encounter?
18    A.   Again, system-wide we have reduced
19 that rate.  There are individual providers who
20 have not reduced their rate.
21    Q.   And these individual providers who
22 haven't changed MMEs or reduced their rates, do
23 you, as the director of the Office of Opioid
24 Safety, consider that to be problematic?
25    A.   Yes.

1    Q.   Why?
2    A.   That indicates that they have not
3 responded to the education that we have
4 provided.
5    Q.   And are you -- so you've been able
6 to identify these people, I take it?
7    A.   We have a -- a few providers who
8 have not responded.
9    Q.   And are you taking any action or
10 directing any other initiatives toward those
11 specific providers?
12    A.   Yes.
13    Q.   What are you doing?
14    A.   We have provided additional
15 resources for them, including a second meeting,
16 to inform them of their progress or lack of
17 progress.
18         We have required that they
19 participate in educational events.  I --
20 actually, I to want retract that.  We have
21 recommended.  We don't require.  We have
22 recommended that they participate in
23 educational act- -- educational activities, and
24 we have offered to pay for those activities.
25         We have also recently hired a pain

36 (Pages 138 - 141)

Page 142

1 management pharmacist to work directly with
2 those providers to provide them additional
3 resources and support.
4    Q.  Does the Office of Opioid Safety
5 have the power to discipline physicians?
6    A.  No.
7    Q.  Notwithstanding their --
8 notwithstanding the fact that they haven't
9 reduced their opioid prescribing, do you have
10 any reason to believe that these providers are
11 writing illegitimate prescriptions or not
12 performing a risk-benefit analysis --
13        MS. SCOLNICK:  Object to the form.
14    Q.  -- before prescribing an opioid?
15        MS. SCOLNICK:  Object to the form.
16    A.  No.
17    Q.  The next -- the next item on the
18 list is, "Improve OARRS documentation."
19    A.  Yes.
20    Q.  Have you looked at that?
21    A.  We have.
22    Q.  And has OARRS documentation
23 improved?
24    A.  We have a very limited measure of
25 evaluating OARRS documentation.  Many providers

Page 143

1 write in their own documentation that they've
2 checked OARRS.  We created a smart phrase that
3 we can query and run reports on, but compliance
4 is difficult.  And many providers choose to
5 write in their documentation of OARRS, and so
6 we have a very rough estimate of their
7 compliance with OARRS.
8        You may know that the pharmacy
9 board does not allow us to measure compliance
10 of our providers.  We have no -- no way to get
11 a report on who is checking OARRS.  So we rely
12 on the documentation.  But that has improved.
13    Q.  Okay.  So this is providers'
14 self-documentation of checking OARRS?
15    A.  Yes, providing a summary of what
16 was seen in the OARRS database.
17    Q.  And based on the information you
18 have, what's the percentage of times
19 pharmacists check OARRS?
20    A.  Times pharmacists check OARRS?
21    Q.  Actually, strike that.
22        So what is the -- what is the
23 metric that you maintain with respect to OARRS
24 documentation?
25    A.  The only report that we are able to

Page 144

1 run is a report on the use of the "dot OARRS"
2 phrase.
3    Q.  Okay.  So you can see how many
4 times that was run per opioid prescription --
5 over the number of opioid prescriptions?
6    A.  We can associate -- we can
7 associate that with the times that an opioid
8 prescription was written during the same
9 encounter.  And so it's a rough estimate of
10 compliance, simply because checking OARRS is
11 not required with every prescription, and so a
12 provider may be in compliance with the law and
13 have written the prescription, but our report
14 wouldn't give us that detailed information.
15    Q.  And what's -- what's the rough
16 estimate?
17    A.  System-wide?
18    Q.  Yes.
19    A.  I don't recall off the top of my
20 head.
21    Q.  System-wide, have you looked at
22 whether there's been a decrease of prescribing
23 of opioids plus benzodiazepines?
24    A.  There -- it has remained relatively
25 stable.  But it's a very, very small percentage

Page 145

1 of opioid prescriptions that are written with a
2 benzodiazepine to begin with, so it's very hard
3 to make movement in that metric, and we can
4 only query when an opioid is prescribed at the
5 same time as the benzo prescription.
6    Q.  The next item is a "Decrease of
7 opioid refills within visits of less than six
8 months."  Do you see that?
9    A.  I do.
10    Q.  Is that something you've looked at?
11    A.  Oh, I -- it was worded strangely.
12        So I don't think we run any reports
13 on this, but generally when we review a
14 provider, we want to see that that provider is
15 having a face-to-face encounter with the
16 patient at least every -- now we look at it
17 every three months.  We expect providers to see
18 a patient, who is on chronic opioid therapies
19 at least, face-to-face at minimum every three
20 months; ideally, more frequently.
21    Q.  Have you looked at the next item on
22 the list, "Compliance with education/REMS"?
23    A.  Yes, we have looked at that.
24    Q.  What is REMS?
25    A.  Risk evaluation and mitigation

37 (Pages 142 - 145)

Page 146

1 strategy.
2    Q.    And has compliance with education
3 and REMS increased since the Office of Opioid
4 Safety was launched?
5    A.    Yes.
6    Q.    And what information are you
7 looking at to draw that conclusion?
8    A.    So we have performed, you know,
9 over 100 opioid safety town halls for providers
10 throughout the system, and we measure
11 compliance.
12        For REMS we only require this to be
13 completed for providers who -- and again, I
14 should back up and say we never require this
15 for our providers; however, we recommend that
16 providers participate in the REMS activity if
17 they prescribe long-acting, controlled-release
18 substances, but we -- we don't require it.
19        The only means that I have of
20 ensuring compliance is with providers who we
21 have offered to pay for their course, or if
22 they attended our SCOPE of Pain course that was
23 live.
24    Q.    And that's what you're looking at
25 when you say compliance with education --

Page 147

1    A.    Yes.
2    Q.    -- has increased?
3    A.    Yes.
4    Q.    The next item is, "Increase total
5 MAT providers"?
6    A.    Yes.
7    Q.    Have you looked at that?
8    A.    Yes.
9    Q.    And has the number of MAT providers
10 increased?
11    A.    Yes.
12    Q.    And the last metric is, "Reduce
13 opioid-related deaths."  Do you see that?
14    A.    I do.
15    Q.    And I assume that's something you
16 have looked at?
17    A.    We've looked at countywide data.
18 It's difficult to tie those back to MetroHealth
19 patients, but.
20    Q.    So have you looked at MetroHealth
21 specifically?
22    A.    We have attempted to identify
23 overall opioid deaths that had an encounter at
24 MetroHealth, yes.
25    Q.    And what has the result of that

Page 148

1 been?
2    A.    What specifically are you --
3    Q.    Have you had -- has there been a
4 reduction in the number of opioid-related
5 deaths?
6    A.    I can't answer that.
7    Q.    In general or attributable to
8 efforts by your team at MetroHealth?
9    A.    I -- I don't have an answer to that
10 question.
11    Q.    Got it.  Okay.
12        Have there been -- strike that.
13        - - - - -
14        (Thereupon, Deposition Exhibit 7,
15        Document Titled, "Safer Opioid
16        Prescribing for Healthcare
17        Providers," MH000000131 to
18        000000157, was marked for purposes
19        of identification.)
20        - - - - -
21    Q.    I'll hand you Exhibit 7.
22    A.    Thank you.
23    Q.    This has a Bates label MH000000131.
24        MS. HOSMER:  Could you repeat that
25 Bates, please?

Page 149

1        MS. McNAMARA:  Oh, sure.
2 MH000000131.
3        MS. HOSMER:  Thank you.
4    Q.    Have you seen this document before?
5    A.    Yes, I have.
6    Q.    And this is a PowerPoint titled
7 "Safer Opioid Prescribing for Health Care
8 Providers" --
9    A.    Right.
10    Q.    -- correct?
11        Did you draft this PowerPoint?
12    A.    Yes.
13    Q.    And do you recall the date or a
14 general time frame of this?
15    A.    When it was drafted?
16    Q.    Yes.
17    A.    The end of 2017.  It may have been
18 updated.  This looks like an updated version
19 that occurred in 2018.
20    Q.    And what was the purpose of this
21 PowerPoint?
22    A.    This was the opioid safety town
23 hall that was delivered to providers throughout
24 the MetroHealth system that was mandatory.
25    Q.    And I think you mentioned having

38 (Pages 146 - 149)

Page 150

1 held a hundred town halls or so?
2     A.    Somewhere in -- somewhere in that
3 neighborhood.
4     Q.    And at each of them you would have
5 given a presentation like --
6     A.    Yes.
7     Q.    -- Exhibit --
8     A.    Seven.
9     Q.    -- 7?  Yes.
10     A.    Yes.
11     Q.    Okay.  I want to look at the slide
12 with the Bates number in the lower right corner
13 ending in 134.
14     A.    Okay.
15     Q.    It says, "Why is safe opioid
16 prescribing important?"  Do you see that?
17     A.    Yes.
18     Q.    And at the top it says, on the
19 left, "Patient safety," and then on the right,
20 next to a bullet point, "Unsafe prescribing is
21 driving the opioid crisis."
22        Do you see that?
23     A.    Yes.
24     Q.    And is that something you wrote?
25     A.    Yes.

Page 151

1     Q.    What did you mean by that?
2     A.    I meant that prescribing that was
3 not compliant with current CDC guidelines.
4     Q.    So not prescriptions that were not
5 written for a legitimate medical purpose; just
6 prescriptions that did not comply with the
7 current guidelines?
8        MS. SCOLNICK:  Object to the form.
9     A.    In this context, it refers to
10 prescriptions that were not compliant with CDC
11 guidelines.
12     Q.    And underneath that is a second
13 bullet point that says, "37 percent of overdose
14 deaths from prescribed opioids annually."
15        Do you see that?
16     A.    I do.
17     Q.    And when it says "from prescribed
18 opioids" -- "overdose deaths from prescribed
19 opioids," was is that figure referring to?  37
20 percent of what?
21     A.    My references are listed at the
22 bottom.  I don't recall which source -- which
23 of those sources I used to obtain that number.
24     Q.    Do you know whether that 37 percent
25 figure refers to overdose deaths where only a

Page 152

1 prescription opioid was present?
2     A.    I don't believe that that was
3 specified in those articles.
4     Q.    So you're not sure one way or the
5 other?
6     A.    I don't know, no.
7     Q.    And then I'd like to look at the
8 slide with the Bates number ending in 136,
9 which has a "Heroin Risk Continuum."  Do you
10 see that?
11     A.    Yes.
12     Q.    And did you create this "Heroin
13 Risk Continuum"?
14     A.    I did not.
15     Q.    Where did you get it?
16     A.    These two slides were borrowed from
17 the medical examiner's presentation.  I believe
18 Hugh Shannon was the creator of this -- these
19 two slides.
20     Q.    From the Cuyahoga County Medical
21 Examiner's Office?
22     A.    Yeah.  Yeah, it says, "Source:
23 Cuyahoga County Medical Examiner's Office."
24     Q.    Okay.  So the -- the "Heroin Risk
25 Continuum" at the top of the page kind of

Page 153

1 contains a schematic where on the right we have
2 a person not using heroin, then there's an auto
3 accident, and then there's a previous legal
4 prescription for opioids.  Do you see that?
5     A.    I do.
6     Q.    And then the next step on the
7 continuum is using heroin.  Do you see that?
8     A.    Yes.
9     Q.    But in your experience, not
10 everyone who receives a legitimate legal -- or
11 strike it.
12        In your experience, not everyone
13 who receives a legal prescription for opioids
14 after being in an auto accident goes on to use
15 heroin, correct?
16        MS. SCOLNICK:  Object -- object to
17 the form.
18     A.    No, not everybody.
19     Q.    And is it fair to say that in your
20 experience -- strike that.  Strike that.
21        So is it fair to say that in your
22 experience most of the people who go from a
23 previous legal prescription for opioids to
24 using heroin had first abused prescription
25 opioids in some way --

39 (Pages 150 - 153)

Page 154

1    MS. SCOLNICK:  Object to the form.
2    Q.  -- as opposed to using them only as
3 prescribed?
4    A.  Based on medical literature that
5 I've reviewed, the number varies between about
6 75 and 80 percent of individuals reported a
7 previous opioid that was prescribed prior to
8 starting heroin.
9    Q.  But that 75 to 80 percent figure,
10 does that look at a -- the temporal link
11 between the opioid prescription and the heroin?
12    MS. SCOLNICK:  Object as to form.
13    A.  I'm not -- I don't believe that
14 that was studied in the papers that I've
15 reviewed.
16    Q.  So that 75 to 80 percent figure
17 could include somebody who got a legitimate
18 prescription for opioids in 2013, started using
19 heroin in 2018, correct?
20    MS. SCOLNICK:  Object -- object as
21 to form.
22    A.  I would have to do additional
23 review of medical literature to give you an
24 accurate answer.
25    Q.  But in your exper- -- but I think

Page 155

1 my -- my question, I think, was a little bit
2 different, because I asked in your experience
3 and based on your reading of the literature, is
4 it fair to say that most of the people who go
5 from a legal prescription to heroin first abuse
6 the prescription by taking it other than as
7 medically directed, by diverting it, or some
8 other means?
9    MS. SCOLNICK:  Object to the form
10 and also the scope.
11    A.  I don't know that I can answer that
12 question.
13    Q.  If you flip ahead to 140, it says
14 at the top of the slide "Prescription Opioid
15 Abuse and Heroin."  Do you see that?
16    A.  Yes.
17    Q.  And in the left-hand column, it
18 says, "Up to 50 percent of patients using
19 chronic opioid therapy for non-cancer pain
20 abuse or misuse" -- "misuse or abuse their
21 medications."  Do you see that?
22    A.  Yes.
23    Q.  And have you ever looked at,
24 reviewed any literature relating to how many
25 patients -- relating to how many patients first

Page 156

1 misuse or abuse their medications before --
2 misuse or abuse opioid medications before
3 transitioning to heroin?
4    MS. SCOLNICK:  Object as to form.
5    A.  I have -- I've cited to two studies
6 here.  One of them looks at patients who are
7 being treated for chronic pain, and the outcome
8 that they reported is stated here, that
9 approximately 50 percent of those patients were
10 found to misuse or abuse those medications.
11    The second article that I cited
12 here looked at patients who are entering
13 treatment for heroin addiction, and those
14 patients reported -- actually I think the
15 number is 75 percent entering treatment for
16 heroin addiction reported that their first
17 opioid use was an opioid medication -- a
18 prescription opioid medication.
19    I can't extrapolate the findings of
20 those studies.  Those are the findings that
21 they reported.
22    Q.  Got it.  Okay.
23    I -- I was wondering if you had
24 read anything different.  Anything outside of
25 those two studies that you're describing.

Page 157

1    A.  I have looked at other articles,
2 yes.
3    Q.  That look at the link between
4 abusing prescription opioids and transitioning
5 to heroin?
6    A.  Not that I recall.
7    Q.  Okay.  In your experience, do you
8 have a sense of -- have you developed a sense
9 of how likely it is a person will become
10 addicted to a prescription opioid if they take
11 it exactly as the doctor prescribes it for the
12 duration of time in which it was prescribed?
13    MS. SCOLNICK:  Object as to form.
14    A.  I don't think that anybody has an
15 answer to that.  There are clear risk factors
16 that place a person at higher risk that we've
17 discussed previously, but there's -- there's no
18 clear answer to which patients and exactly,
19 precisely what that risk is.  Nobody knows the
20 answer to that.
21    Q.  When you're treating someone in the
22 emergency room for an overdose, do you ever
23 determine whether that person was misusing
24 prescription opioids leading up to the
25 overdose?

40 (Pages 154 - 157)

Page 158

1        MS. SCOLNICK:  Object as to form.
2     A.    Yes.  We've had patients report to
3 us that they misused the medications.
4     Q.    Other than self-reporting, is there
5 any way you could determine whether someone was
6 abusing prescription -- whether an overdose
7 patient had been abusing prescription opioids?
8     A.    We would take into consideration a
9 number of factors:  the route of
10 administration; if -- if we obtained any lab
11 testing, that may give us some additional
12 information; review of the OARRS report may
13 give us information about polypharmacy.  We
14 look at all of those factors.
15        But that only tells us what the
16 patient is taking.  It doesn't necessarily tell
17 us what the patient knows or what their
18 perceived risk was.  Sometimes they just don't
19 know that taking medications together can be
20 dangerous.
21     Q.    And when you say that, you're
22 talking about prescription medications?
23     A.    Well, not necessarily.  Drinking
24 alcohol, using sleeping pills, sedating
25 psychiatric medications can all contribute to

Page 159

1 the CNS and respiratory depression when taken
2 with an opioid, and sometimes the patients just
3 don't know.
4     Q.    Okay.
5        MS. McNAMARA:  I don't know how
6 long we've been going, but I'm about to switch
7 to a new topic.
8        THE WITNESS:  This would be a nice
9 time for a break for me.
10        MS. McNAMARA:  Okay.  Perfect.
11        THE VIDEOGRAPHER:  Off the record
12 at 1:50 p.m.
13        (A recess was taken.)
14        THE VIDEOGRAPHER:  Back on the
15 record at 2:05 p.m.
16 BY MS. McNAMARA:
17     Q.    Welcome back.
18     A.    Thank you.
19     Q.    Dr. Papp, are you aware that
20 MetroHealth has a pharmacy?
21     A.    Yes, I am.
22     Q.    And is that a retail pharmacy?
23     A.    We have both an inpatient and a
24 retail pharmacy.
25     Q.    And is the inpatient pharmacy only

Page 160

1 open to MetroHealth inpatients?
2     A.    I believe that's how it operates.
3     Q.    Do you know whether the retail
4 pharmacy is open to the public?
5     A.    Yes, it is.
6     Q.    Do you know approximately what
7 percentage of prescriptions at the retail
8 pharmacy are filled by MetroHealth patients?
9        MS. SCOLNICK:  I'm going to object
10 to beyond the scope.  She can answer it.
11     A.    I don't know the answer to that
12 question.
13     Q.    Do you know or have a sense of what
14 percentage of the prescriptions you write are
15 filled at the MetroHealth pharmacy?
16     A.    I do not know.
17     Q.    Do you recall a -- strike that.
18        Have you ever written an opioid
19 prescription that was filled at MetroHealth
20 pharmacy?
21     A.    Again, I don't have any information
22 about where prescriptions are filled.  But
23 having worked there for almost 18 years, I
24 assume that some of those prescriptions were
25 filled at our retail pharmacy.

Page 161

1     Q.    Has the MetroHealth pharmacy ever
2 called you with questions about an opioid
3 prescription you wrote?
4     A.    I don't recall.
5     Q.    Have you ever heard of MetroHealth
6 pharmacy calling a colleague with questions
7 about an opioid prescription?
8     A.    We have received calls from the
9 pharmacists in the past regarding prescriptions
10 written in the emergency department.
11     Q.    And are you aware of MetroHealth
12 pharmacy ever refusing to fill an opioid
13 prescription written by someone in the
14 emergency department?
15     A.    Not to my knowledge.
16     Q.    Based on your experience, do you
17 have any reason to believe that anyone working
18 at the MetroHealth pharmacy was diverting
19 controlled substances for uses other than
20 filling prescriptions written by licensed
21 prescribers?
22        MS. SCOLNICK:  Objection based on
23 scope.
24     A.    And I don't have any direct
25 knowledge of the staffing of the pharmacy.

41 (Pages 158 - 161)

Page 162

1    Q.    So before this morning when I
2  introduced myself, have you ever heard of
3  Cardinal Health?
4    A.    Yes.
5    Q.    In what context?
6    A.    I believe they're one of the
7  distributors for our hospital.
8    Q.    They sell medications to
9  MetroHealth pharmacy?
10    A.    I'm not completely sure of the
11  scope of the service that they provide to
12  MetroHealth, but I know that we have a
13  relationship with Cardinal Health.
14    Q.    Have you personally in the course
15  of your work ever had any with dealings with
16  anybody from Cardinal Health?
17    A.    Yes.
18    Q.    Who was that?
19    A.    I don't remember names, but I did
20  receive a $35,000 education grant from Cardinal
21  Health to educate providers on safer opioid
22  prescribing in the emergency department.
23    Q.    And when did you receive that
24  grant?
25    A.    2017, I believe.

Page 163

1    Q.    Was that around the -- was that in
2  connection with the launch of the office for
3  opioid safety?
4    A.    It was in that time frame, yes.
5    Q.    So in the summer of 2017 time
6  frame?
7    A.    About that time.  That sounds
8  right.
9    Q.    Any other interactions with
10  Cardinal Health?
11    A.    Not that I can recall.
12    Q.    Have you ever heard of McKesson
13  Corporation?
14    A.    I've heard the name, yes.
15    Q.    And in what context have you heard
16  of McKesson?
17    A.    I believe they're a manufacturer.
18    Q.    Have you ever had any professional
19  interactions with anybody from McKesson?
20    A.    Not that I can recall.
21    Q.    Have you ever heard of
22  AmerisourceBergen Drug Corporation?
23    A.    Yes.
24    Q.    In what context?
25    A.    I believe they're also a

Page 164

1  distributor that is affiliated with our
2  hospital.
3    Q.    And have -- have you personally had
4  any dealings with anybody from AmerisourceBergen?
5    A.    Not that I recall.
6    Q.    Have you heard of H.D. Smith?
7    A.    No.
8    Q.    What about ANDA, A-N-D-A?
9    A.    No.
10    Q.    Miami-Luken?
11    A.    No.
12    Q.    Prescription Supply, Inc.?
13    A.    No.
14        MS. McNAMARA:  I think that's all I
15  have.  Thank you very much for your time.  I
16  appreciate it.
17        THE WITNESS:  Thank you.
18        MR. DAVISON:  Could we go off the
19  record for a minute?
20        THE VIDEOGRAPHER:  Off the record
21  at 2:11 p.m.
22        (A recess was taken.)
23        THE VIDEOGRAPHER:  Back on the
24  record at 2:12 p.m.
25        EXAMINATION OF JOAN PAPP, M.D.

Page 165

1  BY MR. DAVISON:
2    Q.    Dr. Papp, thank you for your time
3  so far today.  We will try and keep this brief
4  to get you out of here.
5        As I mentioned, my name is William
6  Davison.  I'm from the law firm of Ropes &
7  Gray, and I represent Mallinckrodt
8  Pharmaceuticals, which is one of the
9  manufacturers that's a defendant in this
10  litigation.
11        So we talked a lot earlier about
12  prescription opioids, pretty much all day.  You
13  still prescribe prescription opioids to
14  appropriate patients today; is that correct?
15    A.    I prescribe opioids based on the
16  risks and the benefits to patients, yes.
17    Q.    Okay.  And what are the benefits of
18  prescription opiates?
19    A.    Reduction in pain.
20    Q.    And are there particular benefits
21  to using an opioid versus, say, some other type
22  of prescription pain medication?
23    A.    It really is very patient and
24  condition specific.  Some patients have
25  allergies to non-opioid medications.  There are

42 (Pages 162 - 165)

Page 166

1  other specific conditions in which an opioid is
2  a better choice than a non-opioid medication.
3      Q.    And so for -- for each prescription
4  that you may write of -- of an opioid, you
5  would weigh the benefits you've discussed with
6  the risks of that particular class of
7  medications.  Is that fair?
8      A.   Yes.
9          MS. SCOLNICK:  Object to the form.
10     A.   Yes.
11     Q.   Okay.  So I want to discuss briefly
12  the information you rely upon in weighing the
13  risks and the benefits in making that
14  determination.
15         Do you rely on the FDA-approved
16  label in evaluating the risks of prescription
17  opioids?
18     A.   Yes, I do.
19     Q.   Okay.  Do you rely on your med
20  school education in weighing the risks and the
21  benefits of prescription opioids?
22         MS. SCOLNICK:  Object to the form.
23     A.   Yes.  However, that education has
24  evolved since medical school.
25     Q.   Fair enough.  Do you also rely on

Page 167

1  your experience over time in weighing the risks
2  and benefits of opioid medications?
3      A.   My continuing education, yes.
4      Q.   Okay.  Do you rely upon scientific
5  literature in weighing the risks and benefits
6  of opioid medications?
7      A.   Yes.
8      Q.   Do you rely upon government
9  guidance?
10     A.   Yes.
11     Q.   Do you rely upon specific
12  conversations with the patient in question
13  relating to particular risk factors?
14     A.   Yes.
15     Q.   Do you rely upon looking at the
16  OARRS database for additional information?
17     A.   Yes.
18     Q.   Are there any other information
19  that you rely upon in determining and weighing
20  the risks and benefits of prescribing
21  prescription opioids?
22     A.    There may be other factors.
23  Occasionally, we get additional information
24  from family members or other sources like EMS
25  that brings a patient in.  They may be able to

Page 168

1  provide us additional information.  So I -- I
2  would say that there may be, based on the
3  individual patient.
4      Q.   Can you think of any other
5  information that you would rely upon that you
6  would listen to instead of, say, the FDA
7  warning label?
8          MS. SCOLNICK:  Object to the -- to
9  the form, and I didn't hear it.
10         MR. DAVISON:  Oh, I apologize.
11     Q.   Can you think of any other sources
12  of information that you would rely on instead
13  of the FDA warning label?
14         MS. SCOLNICK:  Object as to form.
15     A.   I think it's a synthesis of all of
16  these sources together that help to make a --
17  to help us to weigh those benefits.
18     Q.   Okay.  And those were all of the
19  sources we just discussed; is that correct?
20     A.   Correct.
21     Q.   And as of right now, you can't
22  think --
23     A.   And --
24     Q.   -- of any -- I'm sorry.
25     A.   And potentially some other

Page 169

1  sources --
2      Q.   Okay.
3      A.   -- that I can't re- - can't think
4  of right now.
5      Q.   Okay.  Moving to a different area,
6  are you familiar with the distinction between
7  generic and branded prescription medication?
8      A.   Yes.
9      Q.   Okay.  And do you write generic
10  prescriptions?
11     A.   Yes.
12     Q.   And have you written branded
13  prescriptions in the past?
14     A.   Yes.
15     Q.   Okay.  And when you write a generic
16  description [sic] is that for a particular
17  manufacturer's product?
18     A.   No.
19     Q.   Going -- we talked earlier -- and I
20  apologize for jumping around.  I'm just trying
21  to move quickly for you here.
22         We talked about the peer review
23  board a little bit ago, and I just wanted to
24  make clear, simply because a prescriber was
25  evaluated by the peer review board, that does

43 (Pages 166 - 169)

Page 170

1 not mean he had written a prescription that was
2 not medically necessary.  Is that fair?
3     A.    That is correct.
4     Q.    And even if it was suggested that
5 that prescriber be retrained, that does not
6 mean that he had written a prescription that
7 was not medically necessary, correct?
8         MS. SCOLNICK:  Object as to the
9 form.
10     A.    And I would restate that.
11     Q.    Uh-huh.
12     A.    State that we provide additional
13 support and resources to those providers rather
14 than stating that we re- -- we don't retrain --
15     Q.    Fair enough.
16     A.    -- providers.
17     Q.    Let me -- let me restate it,
18 then --
19     A.    Okay.
20     Q.    -- with that.
21         Simply because the peer review
22 board provided additional support and resources
23 to a provider does not mean that that provider
24 had written a prescription that was not
25 medically necessary, correct?

Page 171

1         MS. SCOLNICK:  Object as to form.
2     A.    That does not mean that that
3 prescription was not medically indicated.
4     Q.    And are you personally aware of any
5 opioid prescription written by a MetroHealth
6 prescriber that was not medically necessary?
7         MS. SCOLNICK:  Object as to form.
8     A.    I -- I don't know that I can
9 accurately answer that question.  We evaluate
10 the prescriptions that come to our attention
11 based on evaluation of specific patients and
12 review of their medical records, but I've not
13 been aware of any prescriptions that are
14 illegitimate or inappropriate.
15     Q.    Okay.
16         MR. DAVISON:  That's -- that's all
17 I have.  We can go off the record.
18         THE VIDEOGRAPHER:  Off the record
19 at 2:18 p.m.
20         (A recess was taken.)
21         THE VIDEOGRAPHER:  Back on the
22 record at 2:20 p.m.
23         EXAMINATION OF JOAN PAPP, M.D.
24 BY MR. HERMAN:
25     Q.    Hi, Dr. Papp.  I'm Steve Herman

Page 172

1 from Zukerman Spaeder here on behalf of CVS
2 Indiana, LLC, and CVS Rx Services,
3 Incorporated.  I introduced myself a while ago,
4 but nice to meet you again.  I just have a few
5 questions for you.
6         You un- -- first off, you
7 understand that the rules that Colleen gave you
8 at the beginning of the deposition still apply
9 now?
10     A.    Yes.
11     Q.    And that you're still under oath?
12     A.    Yes.
13     Q.    Okay.  And if you don't understand
14 a question that I ask, just let me know and
15 I'll try to improve upon it.
16     A.    Got it.
17     Q.    Okay.  Before I introduced myself
18 today, were you aware that CVS Indiana, LLC,
19 was a Defendant in this case?
20     A.    No, I was not.
21     Q.    Were you aware that CVS Rx
22 Services, Incorporated, was a Defendant in this
23 case?
24     A.    No.
25     Q.    Were you aware that Rite Aid of

Page 173

1 Maryland is a Defendant in this case?
2     A.    No.
3     Q.    Were you aware that Walgreens is a
4 Defendant in this case?
5     A.    No.
6     Q.    Were you aware that Walmart is a
7 Defendant in this case?
8     A.    No.
9     Q.    Do you have any personal knowledge
10 of why CVS Indiana, LLC, was named as a
11 Defendant in this case?
12     A.    I do not.
13     Q.    Do you have any personal knowledge
14 of why CVS Rx Services, Incorporated, was named
15 as a Defendant in this case?
16     A.    I do not.
17     Q.    Do you have any personal knowledge
18 of why Walmart was named as a Defendant in this
19 case?
20     A.    No.
21     Q.    Do you have any personal knowledge
22 of why Rite Aid was named as a Defendant in
23 this case?
24     A.    No.
25     Q.    Do you have any personal knowledge

44 (Pages 170 - 173)

Page 174

1  of why Walgreens was named as a Defendant in
2  this case?
3      A.   No.
4      Q.   Are you personally aware of any
5  facts that would support any claims against CVS
6  Indiana, LLC?
7          MS. SCOLNICK:  Object as to form.
8      A.   No.
9      Q.   Are you personally aware of any
10  facts that would support claims against CVS Rx
11  Services, Incorporated?
12          MS. SCOLNICK:  The same objection.
13      A.   I have no knowledge to support or
14  refute.
15      Q.   Okay.  Do you have any knowledge to
16  support or refute any of the claims against
17  Walmart?
18      A.   No.
19      Q.   Rite Aid of Maryland?
20      A.   No.
21      Q.   Walgreens?
22      A.   No.
23      Q.   Are you personally aware of any
24  conduct by CVS, Rite Aid, Walgreens, Walmart,
25  or Walgreens [sic] that caused harm to Cuyahoga

Page 175

1  County?
2      A.   Not to my knowledge.
3      Q.   Okay.  Have you had any
4  communications with CVS regarding prescription
5  opioids?
6      A.   It's likely.  I can't remember any
7  specific instances, though.
8      Q.   Okay.  And were those
9  communications just about filling
10  prescriptions?
11      A.   Often we get calls from retail
12  pharmacies regarding prescriptions.
13      Q.   Okay.  So --
14      A.   And I'm -- I'm confident that at
15  some point in my career I've received a call
16  from CVS.
17      Q.   But same question with regard to
18  Wal- -- or Rite Aid?
19      A.   I probably received calls from all
20  local retail pharmacists --
21      Q.   Okay.
22      A.   -- at one point or another.
23      Q.   Okay.  But you don't recall any of
24  those specific conversations?
25      A.   Not any specific conversations.

Page 176

1      Q.   Okay.  And are you aware that CVS,
2  Rite Aid, Walgreens, and Walmart are named in
3  this litigation as distributors and not as
4  retail pharmacies?
5      A.   Only the information that you've
6  provided to me here today.
7      Q.   Okay.  Dr. Papp, are you aware of
8  how many opioid pills MetroHealth prescribed in
9  2018?
10          MS. SCOLNICK:  Object as to scope.
11      A.   I don't have those numbers in front
12  of me.
13      Q.   Are you aware that MetroHealth
14  prescribed millions of pills -- MetroHealth
15  provi- -- prescribers prescribed millions of
16  opioid pills in 2018?
17      A.   Again, I -- I know -- I can't give
18  you a precise number, but I -- I am aware that
19  millions of pills have been prescribed.
20      Q.   And MetroHealth prescribers have
21  pre- -- prescribed millions of pills each year
22  from 2010 all the way through 2018?
23      A.   Yes.
24      Q.   Are you aware of that?
25      A.   Yes.

Page 177

1      Q.   Okay.  And just by looking at those
2  number of pills, you can't tell whether any of
3  those prescriptions for prescription opioids
4  were medically appropriate?
5          MS. SCOLNICK:  Object as to form.
6      A.   Not without a detailed review.
7      Q.   That's right.  You'd need to do a
8  detailed review of each individual
9  prescription?
10      A.   We would be able to determine
11  whether or not a prescription complied with CDC
12  guidelines after we've performed a detailed
13  review.
14      Q.   Okay.  But --
15      A.   But --
16      Q.   I'm sorry.  Were you finished?  I
17  didn't mean to speak over you.  Sorry.
18      A.   I would add that in 2017 and
19  early -- at the end of 2017, we began linking a
20  diagnosis to each opioid prescription, so that
21  would help us to determine if the prescription
22  was linked to an active cancer or a palliative
23  care --
24      Q.   Okay.
25      A.   -- opioid prescription.  So that

45 (Pages 174 - 177)

Page 178

1 would give us a little bit of additional
2 information.  But, again, that doesn't give us
3 the full picture, necessarily, all the time.
4     Q.   Yeah.  I think my question wasn't a
5 particularly good one, maybe.  What I -- what I
6 was trying to ask is, you couldn't tell
7 anything about the medical appropriateness of
8 MetroHealth prescribers' prescriptions just by
9 looking at the absolute number of pills?
10    A.   Not necessarily, no.
11    Q.   You'd have to do the type of
12 drilling down on individual cases that you
13 began to discuss?
14    A.   To evaluate a particular provider,
15 yes.
16    Q.   Okay.  And you'd need to know about
17 each individual patient?
18    A.   We would need to have --
19        MS. SCOLNICK:  Object as to form.
20    A.   We would need to have additional
21 information to determine appropriateness.
22    Q.   Okay.  And you might even -- you'd
23 need to look at the diagnosis, correct?
24    A.   And --
25        MS. SCOLNICK:  Object as to form.

Page 179

1    A.   And other factors.
2    Q.   Some of the factors you've
3 discussed earlier, like the risk benefit
4 calculation?
5    A.   Right.
6    Q.   And you might need to speak with
7 the specific provider to get additional
8 information?
9    A.   Right.  And a review of their
10 pertinent past medical history and other
11 medications that they're taking.
12    Q.   Okay.  And that's the kind of
13 analysis that a provider should do each time
14 that they write a prescription for a
15 prescription opioid, correct?
16    A.   Yes.
17    Q.   Okay.  And MetroHealth hasn't
18 prohibited the -- its providers from
19 prescribing prescription opioids, right?
20        MS. SCOLNICK:  Object as to scope.
21    A.   No.
22    Q.   You could write a pres- -- you
23 could write one of your patients a prescription
24 for prescription opioids today, correct?
25    A.   Yes.

Page 180

1    Q.   Why hasn't MetroHealth prohibited
2 prescribers from writing prescriptions for
3 prescription opioids?
4        MS. SCOLNICK:  Object as to scope.
5    A.   Because there are times when
6 opioids are appropriate to treat pain.
7        MR. HERMAN:  Okay.  Thank you.  I
8 have no further questions.
9        MS. SCOLNICK:  Any other questions?
10       (No response.)
11       MS. SCOLNICK:  Okay.  This
12 deposition is completed.
13       THE VIDEOGRAPHER:  Off the record
14 at 2:27 p.m.
15    (Deposition concluded at 2:27 p.m.)
16       ~ ~ ~ ~ ~
17
18
19
20
21
22
23
24
25

Page 181

1 Whereupon, counsel was requested to give
2 instructions regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5        SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9        TRANSCRIPT DELIVERY:
10 Counsel was requested to give instructions
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

46 (Pages 178 - 181)

Page 182

REPORTER'S CERTIFICATE

1  REPORTER'S CERTIFICATE
2  The State of Ohio,  )
3              SS:
4  County of Cuyahoga.  )
5
6       I, Stephen J. DeBacco, a Notary
7  Public within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, JOAN PAPP, M.D.,
10  was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19       I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

Page 183

1       I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5       IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 8th day of
8  February, 2019.
9
10
11
12
13
14  Stephen J. DeBacco, Notary Public
15  within and for the State of Ohio
16
17  My commission expires September 30, 2022.
18
19
20
21
22
23
24
25

Page 184

1  Veritext Legal Solutions
   1100 Superior Ave
2  Suite 1820
   Cleveland, Ohio 44114
3  Phone: 216-523-1313
4
   February 8, 2019
5
   To: Judith Scolnick
6
   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 3216350
8
   Witness:  Joan Papp, M.D.       Deposition Date:  2/5/2019
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 185

1  DEPOSITION REVIEW
   CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3216350
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 2/5/2019
4  WITNESS' NAME: Joan Papp, M.D.
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9  Date              Joan Papp, M.D.
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13  They signed the foregoing Sworn
   Statement; and
14  Their execution of this Statement is of
   their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18  _____
   Notary Public
19  _____
   Commission Expiration Date
20
21
22
23
24
25

47 (Pages 182 - 185)

Page 186

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3216350
3 CASE NAME: In Re: National Prescription Opiate Litigation v.
  DATE OF DEPOSITION: 2/5/2019
4 WITNESS' NAME: Joan Papp, M.D.
5     In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7     I have listed my changes on the attached
  Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s).
9     I request that these changes be entered
  as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
  that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
  Date              Joan Papp, M.D.
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
  the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18   in the appended Errata Sheet;
      They signed the foregoing Sworn
19   Statement; and
      Their execution of this Statement is of
20   their free act and deed.
21  I have affixed my name and official seal
22 this _____ day of_____, 20____.
23  _____
      Notary Public
24
25    Commission Expiration Date
```

Page 187

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 2/5/2019
3 PAGE/LINE(S) /      CHANGE      /REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____   _____
20 Date              Joan Papp, M.D.
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23  _____
      Notary Public
24
   _____
25    Commission Expiration Date
```

48 (Pages 186 - 187)

| & |
| --- |
| **&** 1:21 2:3,14 3:3 3:15,20 4:3,9,21 5:4,10 10:12,22 11:2,5,8,14,22 165:6 |

| 0 |
| --- |
| **000000036** 7:6 67:14 |
| **000000157** 7:19 148:18 |
| **000000279** 7:12 85:2 |
| **000000567** 7:14 105:15 |
| **000220806** 7:9 73:13,19 |
| **000220816** 7:9 73:14 |
| **001688134** 7:3 16:17 |
| **002048327** 7:16 123:13,17 |
| **01** 86:18,21 |
| **02199-3600** 3:17 |

| 1 |
| --- |
| **1** 7:3 16:12,16,23 73:22 |
| **10** 66:24 103:13,14 118:21 119:16 120:8 131:19 |
| **100** 8:18 146:9 |
| **1000** 3:10 |
| **10017** 2:22 |
| **10036** 3:21 |
| **101** 8:18 |
| **10169** 2:6 |
| **104** 8:19 |
| **105** 7:13 8:19 |

**10:16** 54:5
**10:35** 54:8
**1100** 3:5 184:1
**11472** 183:13
**117** 8:20
**118** 8:20
**11:38** 98:19
**11th** 2:22
**12** 6:8
**1211** 3:21
**123** 7:15
**12:24** 98:22
**133** 8:21
**134** 8:21 150:13
**135** 8:22,22
**136** 8:23 152:8
**137** 8:23
**140** 155:13
**142** 8:24,24
**148** 7:17
**15** 31:16 103:13,14
**151** 8:25
**15219** 4:10
**153** 9:1
**154** 9:1,2,2
**155** 9:3
**156** 9:3
**157** 9:4
**158** 9:4
**16** 7:3
**160** 9:5
**161** 9:5
**164** 6:9
**166** 9:6,6
**168** 9:7,7
**17** 1:6,13
**170** 9:8
**171** 6:10 9:8,9
**174** 9:9,10
**176** 9:10

**177** 9:11
**178** 9:11,12
**179** 9:12
**17th** 2:5
**18** 1:10,12 8:3 74:13 160:23
**180** 9:13
**1800** 3:10
**182** 6:12
**1820** 184:2
**19** 8:3,4,4
**1990s** 93:15
**1:50** 159:12

| 2 |
| --- |
| **2** 6:3 7:4 67:11,18 67:19 71:3,13 72:22 103:4 114:25 |
| **2/1/2013** 7:7 73:11 |
| **2/5/2019** 184:8 185:3 186:3 187:2 |
| **20** 185:16 186:22 187:22 |
| **2000** 17:8 112:12 122:19 127:18 |
| **20001-3743** 5:6 |
| **20005** 4:5 |
| **2000s** 93:15 |
| **20036-5807** 3:11 |
| **2004** 18:1 |
| **2007** 18:9,10 20:9 20:10 34:6,21 35:16 37:10 44:9 64:23 66:10 122:18 137:14,23 |
| **2008** 96:11 |
| **2008-2009** 96:15 97:10 |
| **2009** 96:11 |
| **2010** 92:19 176:22 |

**2011** 68:6
**2012** 21:11,17 22:16 27:9 28:10 28:12,22 31:8 35:20,25 44:25 45:11 74:13 75:16 75:21 81:23 82:9 84:2 92:21,22,24 128:9
**2013** 21:22 27:2 49:2,8 73:22 93:6 154:18
**2014** 66:20,25 91:19
**2015** 48:18 89:12 91:19 92:4,13 93:7 97:2 99:2,10 100:1,3,18,19
**2016** 51:12 64:16 102:24 106:3,18
**2017** 22:19 23:9 26:25 31:8 51:12 53:24 65:14 103:4 111:12,14 125:24 126:2 128:1 131:3 149:17 162:25 163:5 177:18,19
**2017-2018** 131:21
**2018** 126:2 127:25 131:4 149:19 154:19 176:9,16 176:22
**2019** 1:18 10:2 183:8 184:4
**202** 3:11 4:5 5:6
**2022** 183:17
**212** 2:6,23 3:22 4:16
**216** 2:16 3:6
**216-523-1313** 184:3

**[216-9225 - activities]**                                                                                   Page 2

| | |
|---|---|
| **216-9225**  2:11 | **40**  23:6 |
| **22**  68:6 | **412**  4:11 |
| **2222**  2:15 | **415**  5:12 |
| **223-6444**  2:6 | **434-5186**  4:5 |
| **230**  2:5 | **44113**  1:22 |
| **25**  46:17 | **44113-1901**  2:16 |
| **27228**  12:18 | **44113-7213**  3:5 |
| **28**  2:10 | **44114**  184:2 |
| **2804**  1:5,6 | **44114-1190**  4:16 |
| **29**  8:5 | **44138**  12:19 |
| **29464**  2:11 | **45004**  1:13 |
| **2:05**  159:15 | **45090**  1:10 |
| **2:11**  164:21 | **45132**  1:12 |

**216-9225**  2:11
**22**  68:6
**2222**  2:15
**223-6444**  2:6
**230**  2:5
**25**  46:17
**27228**  12:18
**28**  2:10
**2804**  1:5,6
**29**  8:5
**29464**  2:11
**2:05**  159:15
**2:11**  164:21
**2:12**  164:24
**2:18**  171:19
**2:20**  171:22
**2:27**  180:14,15

**3**

**3**  7:7 73:10,17,18
  86:1
**30**  8:5 71:18
  127:10 130:13
  131:6 183:17
**31**  8:6
**312**  4:23
**3216350**  184:7
  185:2 186:2
**324-1492**  4:23
**338-3990**  4:11
**35,000**  162:20
**35th**  4:10
**360**  2:22
**37**  8:6 151:13,19
  151:24
**397-1000**  2:23

**4**

**4**  7:10 84:23 85:5
  85:6
**4/18/2017**  7:13
  105:13

**40**  23:6
**412**  4:11
**415**  5:12
**434-5186**  4:5
**44113**  1:22
**44113-1901**  2:16
**44113-7213**  3:5
**44114**  184:2
**44114-1190**  4:16
**44138**  12:19
**45004**  1:13
**45090**  1:10
**45132**  1:12

**5**

**5**  1:18 7:13 10:2
  105:12,18,20
**50**  23:6 155:18
  156:9
**500**  1:21
**55**  2:15
**57**  8:7
**586-7154**  4:16
**591-7093**  5:12
**596-9000**  3:22

**6**

**6**  7:15 123:10,16
  123:16
**600**  94:13
**601**  5:5
**60601-5094**  4:23
**61**  8:7
**617**  3:17
**62**  8:8
**63**  8:8,9
**64**  8:9,10
**65**  8:10,11
**67**  7:4
**69**  8:11
**696-3921**  3:6

**7**

**7**  6:5 7:17 78:24
  79:5 80:1 83:23
  148:14,21 150:9
**71**  8:12
**725**  4:4
**73**  7:7
**75**  154:6,9,16
  156:15
**76**  8:12
**77**  4:22 8:13
**778-1883**  3:11

**8**

**8**  79:25 184:4
**80**  8:13 130:8
  131:2 154:6,9,16
**800**  3:16
**84**  7:10 8:14,14
**843**  2:11
**86**  8:15
**861-0804**  2:16
**87**  8:15
**89**  8:16
**8th**  183:7

**9**

**9**  79:25
**9/20/15**  86:10
**90**  22:6
**901**  4:15
**911**  29:22
**93**  8:16
**94111-5356**  5:11
**942-6208**  5:6
**950**  1:21 3:5 19:12
**951-7000**  3:17
**96**  8:17
**99**  8:17
**9:20**  1:18

**a**

**a.m.**  1:18 10:3
  54:5,8
**aaron**  1:7
**able**  13:23 52:5
  63:8 83:17 90:24
  137:11 141:5
  143:25 167:25
  177:10
**abnormal**  113:6
**absolute**  178:9
**abuse**  52:11 61:22
  66:3 75:23 76:1
  76:11 155:5,15,20
  155:20 156:1,2,10
**abused**  153:24
**abusing**  157:4
  158:6,7
**accelerated**  102:8
**access**  26:3 28:5
  43:19 49:24 51:25
  63:5 132:14,20
**accident**  153:3,14
**accompany**  60:8
**accurate**  13:24
  29:10 154:24
**accurately**  171:9
**acknowledge**
  185:11 186:16
**acronym**  122:11
**act**  112:23 141:23
  185:14 186:20
**actavis**  4:19,19
**acting**  146:17
**action**  49:10 74:20
  116:15 141:9
  183:4
**active**  177:22
**actively**  29:16
**activities**  50:16
  141:23,24

**activity** 126:11
146:16
**actors** 112:23
**acute** 17:23 64:21
67:4 74:5 75:17
77:1,5 79:9
118:10 128:5,13
128:20 130:12,22
130:23 131:5
**ad** 103:12,14
**adamhs** 46:9
**adapt** 28:1
**add** 105:10 106:8
177:18
**added** 122:25
123:3
**addicted** 60:20
61:7,14,19 62:12
157:10
**addiction** 25:21
35:24 60:4,6
80:22 81:1,15
82:13 156:13,16
**addictive** 36:1,4
59:24 60:3,23
61:1 77:17 81:16
82:24
**addictiveness**
14:24 78:1 81:7
82:4,17 83:3 90:3
105:4,8
**addition** 44:11
59:3
**additional** 21:10
21:12 22:11 31:10
119:10 141:14
142:2 154:22
158:11 167:16,23
168:1 170:12,22
178:1,20 179:7

**additionally** 46:8
**address** 12:17,18
51:8 184:15
**adjournment**
182:22
**adjustments**
127:20 128:3
**administer** 29:9
**administering**
29:22
**administration**
158:10
**administrative**
21:4
**admit** 39:12
**admitting** 126:10
**adopt** 28:14
**advance** 56:6
**adverse** 105:7
106:23 108:12
109:3
**advisory** 114:5
**advocacy** 22:22
**affiliated** 45:13
164:1
**affixed** 183:6
185:15 186:21
**aforesaid** 182:12
**age** 12:5 61:20
**agency** 24:24
**aggressive** 34:11
**ago** 169:23 172:3
**agonists** 112:8
**agreement** 71:19
72:8,13
**agreements** 71:23
72:1
**ahead** 29:25 124:1
133:8 155:13
**aid** 172:25 173:22
174:19,24 175:18

176:2
**airway** 46:24
**akouba** 2:12
**al** 1:10,12,13,13
**alcohol** 158:24
**alert** 130:6,7,9
131:1
**alerts** 124:10
129:20,23 130:1
131:9,13,21
**algorithm** 114:4,6
114:7,10,19
**allegations** 14:20
**allergies** 165:25
**allergy** 125:10
**allotted** 115:20
**allow** 143:9
**allows** 23:19 112:6
**altered** 56:22
57:18
**ambula** 130:15
**ambulatory** 130:7
130:17 131:1
**american** 42:13
**americas** 3:21
**amerisourceberg...**
163:22 164:4
**amounts** 117:11
**analogues** 59:9
**analy** 103:5
**analysis** 63:20
70:24 71:6 77:9
83:5 84:7,14
102:25 103:2
136:8,10 137:21
142:12 179:13
**analyst** 103:5,21
**analysts** 133:21
**analytic** 133:20
**analytics** 133:10

**analyze** 135:20
**analyzed** 137:15
**anda** 164:8
**annie** 2:10 10:16
**annually** 151:14
**answer** 13:5,11,19
18:22 19:10,18,19
19:25 22:3 29:12
32:15 39:22 61:16
63:11 65:4,22
69:23 71:8 84:10
86:23 87:4 96:17
100:13 101:19
131:11 137:18
148:6,9 154:24
155:11 157:15,18
157:20 160:10,11
171:9
**answered** 62:22
137:17
**antidote** 28:19
**anybody** 157:14
162:16 163:19
164:4
**anytime** 62:5
**apart** 137:20
**apologize** 128:12
168:10 169:20
**appear** 107:12
109:15 185:11
186:15
**appearances** 2:1
3:1 4:1 5:1 6:3
10:10 11:11
**appended** 186:11
186:18
**applicable** 181:7
**apply** 172:8
**appreciate** 13:6
164:16

**approached** 31:9
**appropriate** 34:7
35:5 37:23 62:1
72:13 79:12 83:6
165:14 177:4
180:6
**appropriateness**
178:7,21
**approved** 33:9,13
59:3 74:13 166:15
**approximate**
46:13
**approximately**
19:5 21:24 68:14
88:3 91:15 156:9
160:6
**april** 74:13 111:12
111:14
**area** 50:15,23 52:2
52:22 74:22 110:2
125:13 169:5
**areas** 24:25 28:18
49:7,11
**army** 137:10
**arnold** 5:4 11:22
**arnoldporter.com**
5:7
**arthur** 1:21
**article** 156:11
**articles** 152:3
157:1
**aside** 27:4 47:13
47:13 89:16
**asked** 32:12,15,16
62:22 82:13 98:13
137:17 155:2
**asking** 52:18
**aspects** 51:20
**assessing** 57:3
**assessment** 34:24
35:2 80:13

**assigned** 22:14
**assignment** 185:2
186:2 187:2
**assisted** 26:3
112:11
**associate** 144:6,7
**associated** 35:10
80:21,23 105:7,9,9
117:4
**association** 48:6
52:25 53:6,11,15
**assume** 147:15
160:24
**ativan** 109:8
**attached** 186:7
**attachment** 7:8
73:13
**attachments** 74:4
**attempt** 23:25
39:16
**attempted** 147:22
**attend** 51:1
**attended** 42:6
146:22
**attending** 110:15
**attention** 111:20
171:10
**attorney** 48:22
50:11,19 183:2
**attorney's** 47:18
48:16
**attorneys** 2:3
**attributable** 148:7
**audience** 123:23
**authorize** 186:11
**auto** 153:2,14
**automated** 90:15
**available** 57:12
62:25 63:13,15
65:9 96:7 125:23
135:19

**ave** 184:1
**avenue** 1:21 2:5,22
3:5,21 4:15 5:5
**avenues** 55:13
**average** 108:1,6
117:22 136:4
139:2,9,19,20
**avoided** 27:21
**aware** 35:9,22,25
36:3,7 37:12,15
44:20 54:19,24
58:10,19 59:5,13
62:24 64:13,16,18
65:18 67:1,2 75:7
75:15 77:16 84:21
87:5,6,8 92:24
96:6 100:8,16
134:10 159:19
161:11 171:4,13
172:18,21,25
173:3,6 174:4,9,23
176:1,7,13,18,24
**awareness** 25:13
25:19 30:17 48:25
89:21 91:24 92:5
92:11

## b

**b** 4:15
**back** 18:13 27:8
27:16 29:24 30:23
34:6,21 35:19
36:20 37:10 42:3
48:15 54:7,9,11
66:10 83:14 85:19
95:18,25 96:14
97:9 98:21,24
110:14 128:9,15
134:20,24 136:7
136:13 137:4,14
137:22 138:2,5
146:14 147:18

159:14,17 164:23
171:21 184:15
**background** 16:11
44:4 109:6
**bad** 136:15
**badala** 2:20 11:19
11:19
**bag** 46:24
**balance** 35:11
62:4 70:20
**barrier** 46:25
**based** 15:19 20:5
33:3 34:21 35:2
37:23 38:5 50:4
62:17 63:12,14
69:25,25 83:5,8,10
84:6 118:20,22
119:8 120:9
139:16 143:17
154:4 155:3
161:16,22 165:15
168:2 171:11
**basic** 119:7
**basically** 117:7
140:10
**bates** 67:20 73:19
85:6 105:20
123:17 148:23,25
150:12 152:8
**bathroom** 98:17
**becoming** 92:7
**bedside** 44:13
**began** 21:19 93:13
93:14 177:19
178:13
**beginning** 20:17
93:14,17 94:3,10
172:8
**behalf** 2:2,8,13,18
3:2,8,13 4:2,7,13
4:18 5:2,8 10:21

10:24 11:2,5,8,14
11:16,22 15:24
172:1
**behavior** 57:16
60:14,16 137:5
**behaviors** 60:7,11
**believe** 28:10
31:16 46:10 51:12
53:24 63:7,18
66:20 70:13 84:16
89:20 91:18 95:12
97:25,25 98:8
121:7 125:24
131:7 142:10
152:2,17 154:13
160:2 161:17
162:6,25 163:17
163:25
**believed** 83:3,12
**bellwether** 10:14
**benefit** 35:11 57:8
62:3,5,13 63:8,20
70:20,24 71:5
77:9 80:10,14
83:5,12 133:13
142:12 179:3
**benefits** 33:2,6
34:25,25 43:19
62:18 78:9 84:7
84:15 165:16,17
165:20 166:5,13
166:21 167:2,5,20
168:17
**benzo** 145:5
**benzodiazepine**
108:3,22 145:2
**benzodiazepines**
109:6 136:5
144:23
**best** 13:3,4 16:4
30:10 51:9 53:20

63:8 69:24,24
124:10 126:7
129:20,25 130:1
130:25,25 131:9
131:13
**better** 63:19 64:1
138:24 140:9
166:2
**beyond** 18:21
19:17 65:2,20
100:11 160:10
**bio** 7:3 16:17 17:1
17:7
**birth** 125:9
**bit** 16:10 27:9,18
59:24 78:7 155:1
169:23 178:1
**blown** 93:11
**board** 45:19 46:9
50:3,3 65:25 67:4
110:19,22 111:1
111:22 114:1
132:18 133:4
143:9 169:23,25
170:22
**boards** 132:23
**bockius** 4:21
**body** 60:5
**borrowed** 152:16
**boston** 3:17
**bottom** 68:5
151:22
**boulanger** 31:10
104:18
**boulevard** 2:10
**boy** 23:17 127:24
**boylston** 3:16
**brainstorming**
114:14,16
**branded** 169:7,12

**break** 13:17 52:18
54:1 59:23 159:9
**breaks** 13:15
**breathing** 29:21
46:25
**bridgeside** 2:10
**brief** 44:14 165:3
**briefly** 166:11
**bring** 29:5
**bringing** 30:2
**brings** 167:25
**broad** 33:7 58:22
66:16
**broader** 37:6,7
50:19,23
**building** 2:5
**built** 125:15
**bullet** 150:20
151:13
**bunch** 16:13 37:18
**buprenorphine**
25:25
**burling** 5:10

### c

**c** 2:20
**c1** 61:4
**c2** 61:3 107:24
**ca** 184:25
**cabinet** 74:19
**calculated** 132:11
**calculation** 125:12
179:4
**calculator** 124:9
124:18,20 125:4,5
125:14,17,23,25
128:1
**california** 5:11
**call** 125:7 175:15
**called** 12:5 24:24
161:2

**calling** 29:21
161:6
**calls** 161:8 175:11
175:19
**campus** 18:23,25
19:2 42:23
**canceled** 106:16
**cancer** 155:19
177:22
**capability** 131:9
**capacity** 15:18
20:24 21:9
**caption** 182:21
**caraffi** 7:7 45:3,20
73:11,20 75:11
**cardinal** 4:2 11:8
162:3,13,16,20
163:10
**care** 20:1,25 26:5
74:5 75:17 79:9
79:11 87:18 96:21
110:2,4,6,9 115:4
116:3,8 128:20
130:20,23 133:14
149:7 177:23
**career** 175:15
**carey** 5:10
**carfentanil** 59:11
**caring** 17:22
**carolina** 2:11
**case** 1:6,10,12,13
14:7,20 15:2
25:22 91:12 97:23
109:7 118:2,9
172:19,23 173:1,4
173:7,11,15,19,23
174:2 184:6 185:3
186:3
**cases** 80:7,11
84:12 178:12

cause 36:12
182:12
caused 174:25
causes 94:3,10
causing 36:8,10
cdc 35:19 64:16
78:4 81:23 120:19
121:1 132:14,15
151:3,10 177:11
center 17:11
112:22
central 18:18
centre 4:10
cephalon 4:18
certain 58:11
91:10 109:11
certainly 24:14
32:15
certificate 6:12
182:1 186:11
certification 185:1
186:1
certified 12:8
certify 182:8,19
183:1
chain 57:23 58:2
chair 47:19 48:5,9
53:6
chairman 68:19
69:3,4 75:12
115:10
chairperson 106:6
106:17
change 22:4 35:16
77:23 78:14,25
81:6,6 82:3 127:6
184:13,14 186:8
187:3
changed 20:13
21:10 33:22 35:6
35:11 46:2 66:24

127:11 134:25
135:3,8 136:19
139:21 140:22
changes 66:6
129:16 184:12
185:7 186:7,9
changing 136:23
charles 68:20
chart 119:9 138:2
charts 119:1
check 91:10,17,22
96:1,14 97:15
98:6 143:19,20
checked 96:18
97:9,22 143:2
checking 95:23
97:2 143:11,14
144:10
chicago 4:23
chief 31:9 69:1
104:18
choice 166:2
choose 126:13
143:4
chose 35:1
chosen 118:20,21
118:22
chronic 7:5 64:21
67:4,7,13,21 70:19
72:16,19,25 73:2,5
73:7 77:2,5
118:11 145:18
155:19 156:7
chronologically
20:18
churches 30:19
ciaccio 2:21 11:24
11:24 12:3
circle 29:24 30:23
42:3 48:15 54:11
85:19

circumstances
34:7 35:5 79:6
91:10 96:13
129:13
cited 156:5,11
city 1:11 14:12
civil 12:7 181:3,7
185:5 186:5
claimed 15:8
claims 174:5,10,16
clarification 112:9
clarify 32:18 39:3
70:11 121:18
129:9
clarity 124:21
class 42:5,8,12
166:6
classes 61:3
clear 16:4,5
128:17 157:15,18
169:24
clearly 135:2
cleve 7:9 73:13,19
cleveland 1:11,22
2:16 3:5 4:16
14:12 17:11 18:6
24:20 50:12,24
183:7 184:2
click 132:7,8
clifford 3:4 10:20
clifford.mendels...
3:6
clinic 18:7
clinical 20:25 22:3
22:5,6 23:3 31:9
34:22 57:9 104:18
clinics 130:20
closed 55:3
closely 115:13
clutter 31:25

cmcnamara 4:6
cme 41:19 42:16
43:8,12 44:1
cmes 40:24 41:3
41:15,22 42:15
43:15
cns 159:1
collaborated
24:23 45:20 50:5
colleague 161:6
colleagues 83:14
83:19,23 84:5,11
84:13,17 93:8
97:9,17 98:5
colleen 4:4 11:7
172:7
college 17:8 42:13
columbus 42:13
column 155:17
combat 93:2
come 20:2 35:16
48:21 61:13 135:6
171:10
comes 39:5,8
46:15 125:4
coming 120:24
130:22
commission
183:17 185:1
186:25 187:25
commissioned
182:8
committee 7:13
48:4,11 85:12,13
88:12,16,21 89:1
89:14,18 99:6,9,14
99:20,22 102:1,6,8
102:9,10,12,15,19
102:24 103:3,4,8
103:11,23 104:11
105:14 106:1,2,9

106:12,18 107:1,2
107:6,7,14,15,22
114:5 115:11
120:9 121:19,21
123:7,8 124:14
134:14,23 135:15
135:16,17,19
136:13 137:8
138:15
**committees** 45:7
48:9,9 102:16
**common** 109:5
126:8 132:19
**commonly** 76:19
**communications**
175:4,9
**community** 22:21
23:23 25:13,17,18
27:14 29:2,14
30:4,12,19 49:10
**companies** 14:17
**company** 4:7
63:21
**compare** 109:21
110:3,6
**compared** 109:17
109:24
**compiling** 134:3
**completed** 17:25
18:4 119:1 146:13
180:12 182:22
184:15
**completely** 162:10
**compliance** 85:24
100:9 101:2 143:3
143:7,9 144:10,12
145:22 146:2,11
146:20,25
**compliant** 92:1
119:6 120:14,15
151:3,10

**complicated**
110:25
**complied** 177:11
**comply** 95:21
130:14 151:6
**complying** 98:5,9
101:6 120:19
**concept** 30:8
**concern** 30:9,14
75:22 76:10,17
77:13 92:8,13
93:8,11,13,18
106:22
**concerned** 96:23
**concerted** 79:3
**concluded** 180:15
**conclusion** 146:7
**condition** 76:23,25
77:1 117:11
165:24
**conditions** 79:8
166:1
**conduct** 174:24
**conducted** 119:17
**conference** 48:24
49:1,5,9 66:1,2
99:18 111:25
112:15
**confidence** 46:19
**confident** 175:14
**confidentiality**
121:8
**confused** 16:6
**connect** 24:1 25:7
25:23 26:11
**connection** 14:3
163:2
**connolly** 4:3 11:8
**consider** 32:23
61:24 62:24
140:24

**considerably**
66:24 117:21
**consideration**
158:8
**considered** 64:14
101:3
**considers** 58:17
**consistent** 107:13
**consortium** 47:22
48:2 51:4,7,21
54:12
**constipation** 40:13
**contacted** 56:23
**contains** 91:4
153:1
**context** 40:21 55:7
55:11 114:1 117:8
117:9,25 138:12
151:9 162:5
163:15,24
**continue** 21:9 49:4
70:18 97:1,5
**continued** 3:1 4:1
5:1 79:10 93:15
**continuing** 40:25
167:3
**continuum** 152:9
152:13,25 153:7
**contractor** 18:8
**contribute** 158:25
**controlled** 7:11
43:9,13 48:11
55:4,7,17,22 56:16
56:24 57:22 58:1
58:11 69:15 74:6
84:25 85:11,13
87:1 91:5 99:2
101:2,6 102:7,12
102:18 104:10
106:1 134:14,22
135:14,18 146:17

161:19
**convened** 48:23
50:12 51:8
**conversation**
113:1 119:12,18
120:4,5
**conversations**
167:12 175:24,25
**copies** 16:14
**cord** 117:16
**corner** 68:5,24
69:6 71:18 74:12
86:9,16 88:15
110:18 150:12
**corporation** 5:8
163:13,22
**correct** 14:4,5
15:21 17:3,8,9,13
17:18,19 18:1,2,12
18:15 20:22 22:25
23:1 27:6 28:20
28:21 29:6 31:19
34:19,23 36:1,19
38:10 40:23 44:7
47:9 49:3,16
50:13 51:5 53:8
57:5 58:21 59:1,5
59:18,22 62:7,8
65:13,15 67:8
68:25 69:16 72:20
74:23,24 78:12
82:25 83:7 84:18
85:21,25 86:3,5,6
86:7 87:8,12,13
88:18 89:15 90:25
91:1,7,10 92:17,18
92:19,23,25 93:4
93:21 95:2,23,24
99:7 100:6 101:12
105:5 106:7 107:3
108:23,24 110:5

110:11 111:13
112:13,18 113:19
115:4,5,7 116:6,7
119:19 121:25
124:7,11 127:22
128:24 134:5
138:14,16,17
140:12 149:10
153:15 154:19
165:14 168:19,20
170:3,7,25 178:23
179:15,24 182:17
**corrections** 184:12
186:17
**correctly** 36:5
79:13 119:15
133:15
**counsel** 10:9 11:10
181:1,10 183:2
**county** 1:10,13
2:13,18 10:19
11:20 12:4 14:12
14:12 15:20 19:20
19:22 20:3 28:2
28:15 29:5 30:13
44:20,24 45:18
46:7,15 50:23
92:15 152:20,23
175:1 182:4
185:10 186:15
**countywide**
147:17
**couple** 51:14
101:9
**course** 24:3,15
42:21 43:3 46:2
55:1 56:13 82:6
82:15 83:16
127:24 146:21,22
162:14

**courses** 40:25 42:7
44:12
**court** 1:1 6:15
10:7 13:1 185:7
**cov.com** 5:12
**cover** 46:21 50:22
73:20 74:1
**covers** 46:22,23,23
**covington** 5:10
**craving** 60:12
**create** 31:6,12
110:24 114:5
125:2 132:11
152:12
**created** 79:2 89:8
89:12 96:9 111:2
124:17,20 125:17
130:2 131:23
132:13 143:2
**creates** 124:22
**creating** 68:12
**creation** 30:24
91:21
**creator** 152:18
**criminal** 60:13
**crisis** 43:24 51:9
51:20 92:7 130:24
150:21
**crosstalk** 12:1
**crum** 5:16
**current** 12:17
54:21 63:14 87:19
98:6 129:25 151:3
151:7
**currently** 26:16
31:14 45:5 46:7
54:19 95:17,21
**curriculum** 25:12
25:14
**custody** 6:14

**cut** 115:25
**cuyah** 7:3,16
16:17 123:13,17
**cuyahoga** 1:10
2:13,18 10:19
11:20 12:4 14:11
15:20 19:20 20:3
28:2,15 29:5
44:20,24 46:7,15
50:23 92:15
152:20,23 174:25
182:4
**cvs** 3:8,8 10:24,25
172:1,2,18,21
173:10,14 174:5
174:10,24 175:4
175:16 176:1

**d**

**d** 164:8
**d.c.** 3:11 4:5 5:6
**damages** 15:5,6,8
**dan** 1:7
**dangerous** 158:20
**dash** 86:17
**data** 103:6 107:17
107:21 109:10
115:12 133:12,17
133:19,22 134:4
134:11,15,16,17
134:18 135:10,20
135:22,23 136:1
136:20 137:1,14
137:22 139:15,16
147:17
**database** 90:23
96:7,8 133:23
134:2 143:16
167:16
**date** 10:1 41:10
51:13 64:9,24
66:10 68:6 69:7

86:8,10 91:20
92:20 96:12
102:21,23 125:9
149:13 181:11
184:8 185:3,9,19
186:3,13,25
187:20,25
**dated** 73:21
**dates** 42:2
**davison** 3:15 6:9
11:4,4 164:18
165:1,6 168:10
171:16
**dawn** 21:16,24
24:15,18 27:2,5,8
27:19,20 29:5,8,14
30:3,5 45:13,17,23
45:25 46:15,21
47:2,14 93:2
**day** 4:14 11:16
13:16 66:1,2 79:1
79:3,8 80:3 83:25
99:18 127:12
129:14 165:12
183:7 185:16
186:22 187:22
**days** 79:10 80:9
128:24 129:4
184:18
**dea** 58:10,16,20
61:3 111:24 112:5
112:12
**dealings** 162:15
164:4
**dear** 184:10
**deaths** 27:21
35:23 147:13,23
148:5 151:14,18
151:25
**debacco** 1:25
182:6 183:14

decade 94:15
decide 126:18
decided 78:6
120:9
deciding 32:23
61:25 62:5 77:10
104:5
decision 31:5 33:3
61:23 62:15 63:8
63:14 70:18 84:12
decisions 63:12
70:19 71:4 72:23
deck 7:15 123:11
declared 78:4
decrease 144:22
145:6
decreased 33:25
34:3 139:18,19
decreasing 135:11
dedicated 21:4
25:15 103:6
deed 185:14
186:20
deemed 184:19
deep 115:22
default 127:7,10
127:12,20
defaults 126:14
defendant 165:9
172:19,22 173:1,4
173:7,11,15,18,22
174:1
defendants 11:18
11:23 14:16 15:12
definitely 131:20
degree 46:22
delivered 149:23
delivering 48:24
delivery 181:9,11
demo 132:6

department 19:3
20:21 21:1,7
24:20,25 25:5,23
27:24 28:6 46:6
46:11 47:6,11
69:5 75:24 76:2,8
76:20,22 77:6
79:24 96:21 97:22
98:1 125:1 139:17
161:10,14 162:22
184:22
departments 19:4
44:18 76:12
139:18
depend 38:17
139:13
dependence 60:5,9
dependency 80:22
81:1
dependent 60:6
depending 23:7
117:10
depends 38:16
117:25 118:9
139:11
deposed 12:8,20
deposition 1:16
10:4 16:16 18:21
67:11 73:10 84:23
105:12 123:10
148:14 172:8
180:12,15 182:20
184:8,11 185:1,3
186:1,3
depression 109:3
159:1
depth 107:18
109:11
describe 87:14
126:8

described 26:24
35:20 100:5 120:4
137:21
describing 112:20
156:25
description 7:2
116:14 169:16
desire 60:12
detail 68:1,2
detailed 118:1
138:1 144:14
177:6,8,12
determination
62:17 166:14
determine 32:25
33:1,13,16 62:3
107:8 117:7 119:8
157:23 158:5
177:10,21 178:21
determining
104:22 120:13
167:19
develop 21:14
25:11 83:18 97:16
114:17
developed 23:13
24:22 26:15 49:10
49:10 56:14 96:25
97:8 113:2 157:8
developing 83:2
96:24
development
21:20 22:9 26:13
58:7
devoted 21:25
diagnoses 118:13
119:4
diagnosis 117:4
119:3 177:20
178:23

difference 38:12
different 69:20
73:21 110:12
115:15 140:5,5,6,7
155:2 156:24
169:5
difficult 13:10
22:2 143:4 147:18
direct 161:24
directed 89:25
155:7
directing 141:10
directly 56:21
63:25 95:14 142:1
director 31:4 45:2
140:23
discharge 79:18
disciplinary
121:19
discipline 122:1
142:5
disciplined 121:15
discuss 166:11
178:13
discussed 112:16
114:4,13 116:22
133:7 136:1
157:17 166:5
168:19 179:3
discusses 114:25
discussing 70:25
99:1 120:7
discussion 85:20
116:16 119:24
disease 61:22
diseases 40:16
disorder 25:6 26:1
40:19 96:24,25
99:19 112:7
disorders 96:23

dispense 21:15
dispensed 29:23
  126:16
disregarding
  60:15
disseminate 53:20
distinction 36:22
  36:25 169:6
distribute 59:18
distribution 24:19
  27:22 43:19 55:4
  94:12,14,17,25
distributor 64:2
  164:1
distributors 14:18
  57:22 59:17 63:1
  162:7 176:3
district 1:1,2 10:7
  10:7 50:17
dive 115:22
diversion 43:9,13
  55:7,17,20 56:16
diverted 55:12,24
  56:3,7
diverting 155:7
  161:18
division 1:3 10:8
dixon 88:1 89:13
doctor 15:20
  55:15 56:4 61:6
  119:13,18 130:22
  157:11
doctors 59:21
  132:19
docu 39:24
document 1:9 7:4
  7:10,17 17:4
  67:12,19,24 68:12
  70:17 71:2,3,13,17
  73:4,18,20 75:1
  77:22 81:5 84:24

85:7,10,16,18,21
85:23,24 86:8,13
86:15 87:12,15
90:6 105:22 112:9
112:17 114:22
123:18 148:15
149:4
documentation
  39:25 40:2 142:18
  142:22,25 143:1,5
  143:12,14,24
documenting
  120:20,21
documents 24:4
  68:10 122:4
doing 22:8,12
  31:13 65:17 78:6
  78:8 81:19 96:5
  114:16 131:9
  141:13
doors 20:2
dosage 108:15
  118:22 126:18
dosages 126:15
dose 130:10
doses 113:4
dot 144:1
dr 7:3 10:4 12:12
  16:17 31:10 88:1
  88:8 89:13 104:18
  114:3 119:24
  120:8,10 159:19
  165:2 171:25
  176:7
draft 114:4 149:11
drafted 92:3 99:5
  149:15
drafting 68:18
  86:14 87:11,15
  89:16 91:23
  113:14,16

draw 146:7
drew 17:20
drill 132:10
drilling 178:12
drinking 158:23
drive 4:22
driving 150:21
drug 35:21 39:21
  40:14 59:14 60:2
  60:13,15,20 61:25
  63:3 64:5 81:2
  163:22
drugs 36:17 105:5
duly 12:8 182:7,10
duration 80:16,18
  80:20,23 157:12
duties 20:12 21:4
  21:11,13 22:5,14
duty 72:3

**e**

e 2:10,21 7:7 32:1
  65:24 73:11,20
  74:1 75:12 115:7
earlier 77:15
  85:15 90:17 93:14
  100:5 128:18
  133:7 165:11
  169:19 179:3
earliest 66:18
  131:16
early 26:13 44:3
  126:2 177:19
easier 125:3
eastern 1:3 10:8
educate 25:12
  29:18 55:18 56:1
  111:25 121:24
  135:2 162:21
education 22:22
  25:9,18 27:22
  29:15 30:4 40:25

44:15 49:12 51:24
52:1,8 141:3
145:22 146:2,25
162:20 166:20,23
167:3
educational 89:21
  89:24 90:2 99:17
  141:19,23,23
educator 25:17
educators 25:11
effective 28:17
  30:22 34:13 53:18
effectiveness 33:8
effects 38:9 40:10
  52:12
effort 31:11 79:3
efforts 66:9
  100:20 148:8
eight 103:20,20
either 25:4 37:2,12
  109:17 126:1,2
  183:2
electronic 39:25
  122:10
ellis 3:4 10:21
email 184:17
emergen 20:20
emergency 17:18
  17:20 18:5 19:2,3
  20:7,10,21,25 21:6
  22:1 24:19,25
  25:5,22 28:6,23
  34:16 38:9 40:22
  42:14 68:19 69:1
  72:18 74:5 75:17
  75:24 76:2,8,11,20
  76:22 77:5 79:9
  79:24 83:17 93:3
  96:21 97:7,14,21
  98:5 128:20
  157:22 161:10,14

162:22
emerman 68:20
emphasized 77:12
employed 18:6
104:1 107:16
124:24,25
employs 134:12
ems 24:21 167:24
enacted 64:20
enclosed 184:11
encompassed
50:15
encompasses 37:1
37:3
encounter 27:13
30:3 136:3 139:23
140:4,17 144:9
145:15 147:23
encounters 140:8
endo 5:2,3 11:22
ends 71:18
enforcement
49:12
engaged 87:16
engaging 60:13,16
enjoyed 17:22
enlisted 88:7
ensure 64:23
91:25
ensuring 146:20
entered 72:7 186:9
entering 156:12
156:15
entire 185:5 186:5
environment
109:23 130:7,17
131:1
epic 122:5,7,9,11
122:15,21 123:1
124:7,15,20 125:2
125:7,13 127:16

131:8,14 132:4,21
epidemic 25:14,19
35:21 43:22 78:5
94:4
eps 18:8
equal 125:21
equalize 140:9
equivalent 108:8
errata 184:13,18
186:7,10,18 187:1
escalated 102:14
esq 2:4,10,15,20
2:21,21 3:4,10,15
3:20 4:4,9,15,22
5:5,10
essentially 72:4
73:1
estimate 143:6
144:9,16
et 1:10,12,13,13
evaluate 53:19
171:9 178:14
evaluated 119:6
169:25
evaluating 63:15
78:8 142:25
166:16
evaluation 118:25
145:25 171:11
event 183:3
events 30:18 99:17
108:12 109:4
141:19
eventually 60:20
61:7
everybody 153:18
evidence 69:25
70:1
evolve 137:6
evolved 122:21
166:24

evolving 105:4,6
135:5
exact 41:10 42:2
47:22 51:13 91:20
exactly 128:25
129:9 157:11,18
examination 6:7
12:6,10 33:1
164:25 171:23
examiner's 152:17
152:21,23
example 110:1
117:15,20 127:8
examples 124:16
exceed 128:23
exceeded 130:8
excessive 60:12
exclusive 26:21,22
excuse 21:21
24:18 103:5
executed 186:10
execution 185:14
186:19
executive 48:4
102:6,9,15 103:3,7
103:22 123:7
124:14 135:17
exhibit 6:14 7:3,4
7:7,10,13,15,17
16:12,16,23 67:11
67:18,19 71:3,13
72:22 73:10,17,18
84:23 85:5,6 86:1
105:12,18,20
123:10,16,16
148:14,21 150:7
exhibits 6:5,15 7:1
exist 99:21,25
existed 131:20
existence 93:23,24
99:23

exists 70:8 107:2
expand 28:2,15
49:24
expanded 24:14
24:17 28:5 31:12
expansion 27:1
49:23
expect 110:8 116:4
145:17
expected 136:24
exper 154:25
experience 15:20
34:10 60:18 61:10
61:12 62:10 153:9
153:12,20,22
155:2 157:7
161:16 167:1
expert 32:4,9
expertise 32:6
expiration 185:19
186:25 187:25
expires 183:17
explain 27:18
extent 35:9 36:4,7
36:9 77:16
extrapolate
156:19

<center>f</center>

f 4:19
face 145:15,15,19
145:19
facilities 18:19
95:13
facility 74:6 75:18
79:9
fact 32:2,9,13 62:2
116:8 142:8
factor 61:9
factors 29:18
32:22 58:16 61:18
61:20,25 62:2,11

63:16 157:15
158:9,14 167:13
167:22 179:1,2
**facts** 174:5,10
**failing** 136:6
**fair** 13:7,8,13
26:23 32:17 50:24
66:22 77:19,20
108:14,19 110:6
118:5 121:22
153:19,21 155:4
166:7,25 170:2,15
**falls** 12:19
**familiar** 55:3,6
57:20,25 67:25
69:12 70:12 71:22
122:7 169:6
**family** 23:25 24:1
24:2 55:25 56:8
56:11 60:16 61:21
167:24
**far** 134:20 136:7
136:13 137:4
165:3
**farther** 134:24
137:22
**fatal** 36:8,10
**fatalities** 76:16
105:8
**fda** 33:9,13 59:3
166:15 168:6,13
**features** 122:25
123:3
**february** 1:18
10:2 73:22 183:8
184:4
**federal** 12:6 50:6
**feedback** 50:3
**felt** 52:3 138:24
**fentanyl** 59:9

**figure** 33:6 39:17
151:19,25 154:9
154:16
**file** 134:1
**filed** 15:11
**fill** 161:12
**filled** 52:4 91:6
94:18 160:8,15,19
160:22,25
**filling** 161:20
175:9
**financial** 15:5
**find** 32:2 129:12
184:11
**findings** 156:19,20
**finish** 13:5 52:21
**finished** 177:16
**fire** 130:9,12
**firm** 165:6
**first** 12:7 28:9
35:20 66:21 68:14
70:16 74:4 75:3
77:7 86:12 87:1
89:10 97:10
115:16 116:19
124:6 132:9
134:10 139:1
153:24 155:5,25
156:16 172:6
182:10
**five** 24:17 41:11
127:12
**flip** 114:22 133:8
138:8 155:13
**floor** 2:5,22 4:10
**focus** 49:8 101:16
**focused** 20:7 49:20
49:22 51:21 52:3
**focuses** 25:18
**folder** 16:14

**folks** 50:21
**follow** 37:10
**followed** 83:23
**follows** 12:9
**force** 44:21,24
45:3,5,8,14 47:15
47:18 48:10,16
49:4,8 50:12,16
69:8,11,13 70:8,12
70:14 75:10,13
88:10,11,20 92:16
100:3
**forefront** 26:18
**foregoing** 182:16
182:21 185:13
186:18
**forgetting** 26:9
**form** 23:20,22
29:11 30:16 38:1
57:7 61:15 63:10
63:22 64:3,6
69:22 76:4 77:3
80:12 84:9,20
89:2 93:10 96:16
99:11 105:1 111:1
117:24 118:7
133:25 135:9,25
142:13,15 151:8
153:17 154:1,12
154:21 155:9
156:4 157:13
158:1 166:9,22
168:9,14 170:9
171:1,7 174:7
177:5 178:19,25
**formal** 22:7 44:15
**formalized** 104:14
**formally** 22:3
**formation** 134:23
136:13 137:8

**formed** 51:11
53:13 102:9,19,24
103:3,4
**forms** 124:19
125:5
**forum** 111:2
114:17
**forums** 30:20
**forward** 138:8
184:15
**found** 28:17
138:24 156:10
**founder** 31:3
**four** 127:9 138:9
**fourth** 71:16 114:2
114:3
**frame** 42:1 96:15
97:10 100:17,18
118:10 149:14
163:4,6
**francisco** 5:11
**free** 185:14 186:20
**frequency** 33:21
97:20
**frequently** 55:24
145:20
**friends** 60:16
**front** 5:11 62:19
176:11
**full** 12:14 13:12
25:10,22 66:1,2
70:17 93:11 99:18
116:19 119:12
178:3
**fully** 26:14 35:22
**functioning** 24:16
**funded** 45:25
**funding** 46:1,4,8
46:11,14,20
**funds** 25:21
111:19

**furnish** 95:8,10
**furnished** 94:20
94:22 95:4,6,14
**further** 78:11
81:10,11 180:8
182:19 183:1
**future** 54:21

**g**

**gallucci** 2:14
**gap** 27:9 52:4
100:4
**gates** 4:15 11:15
11:15
**gcoat** 74:13,16
**gender** 61:20
**general** 25:13 90:6
117:14 148:7
149:14
**generalities** 98:3
**generally** 77:1
129:3 130:20
136:24 137:3
145:13
**generic** 169:7,9,15
**geographic** 19:14
50:15
**getting** 98:13
**give** 123:23 144:14
154:23 158:11,13
176:17 178:1,2
181:1,10
**given** 43:20,22
47:7 150:5 182:13
182:18
**gives** 126:12
**go** 12:24 13:20
31:22 66:9 81:18
98:17 129:7
134:24 137:4
138:2,4 153:22
155:4 164:18

171:17
**goal** 25:6 53:16
**goals** 104:14
123:25 138:18,19
**goes** 153:14
**going** 13:2 18:20
23:8 31:20 37:25
52:24 63:24 67:17
71:11 73:17 85:5
105:18 110:13
113:24 137:22
159:6 160:9
169:19
**good** 12:12,13
50:1 53:2,25
114:9 178:5
**government** 167:8
**governor's** 74:19
**graduated** 17:7
**grams** 94:14
**grand** 43:20,22,25
44:11
**grant** 23:19,21
25:20 26:11 46:10
111:19 162:20,24
**gray** 3:15,20 11:2
11:5 165:7
**great** 12:20,23
14:2,15 16:9
20:16
**greater** 103:1
**gross** 70:2
**ground** 12:24
27:11 111:7,8
113:19 114:13
133:3
**group** 48:23 50:20
54:14,17 87:22,25
94:7 110:24 111:7
114:16,17

**grow** 26:15 93:16
**growing** 75:22
76:10 77:13,25
92:5,8,12 93:8,18
93:19 106:22
**growth** 27:3
**guess** 60:14 114:9
123:7 126:7
127:18 134:13
**guidance** 167:9
**guide** 132:13
**guideline** 69:24
70:4 79:22 80:2,4
129:17
**guidelines** 7:5
37:11,13,16 64:10
64:13,17,18,25
65:19 66:1,23
67:1,2,7,12,21
73:7 74:7,21 75:4
75:8,15,21 77:8,22
78:2,13 79:20,25
83:24 85:20 86:2
87:19 89:22
107:13 120:20
121:1 128:5,16,19
128:22 129:25
130:4 132:14
151:3,7,11 177:12
**gyn** 17:16
**gynecology** 17:12

**h**

**h.d.** 164:6
**half** 38:18,20,23
39:1,5,8,12,14
**halfway** 70:16
**hall** 65:7 149:23
**halls** 65:11 146:9
150:1
**halpern** 4:9,11
11:13,13

**hand** 16:11 67:17
68:5 69:6 71:18
73:17 74:12 85:5
86:9,16 88:15
105:18 110:18
123:16 148:21
155:17 183:6
**handle** 72:18
**handouts** 124:11
131:25 132:4,15
**happen** 103:17
**happened** 49:1
93:5 114:20
127:25 136:25
**happening** 29:2
**hard** 137:1 145:2
**harm** 63:17
174:25
**harms** 77:13 78:8
78:9 80:15,18,19
**hayden** 3:20 11:1
**hayden.miller**
3:22
**hbc** 4:7 11:14
**head** 24:12 43:5,7
89:14 120:24
144:20
**header** 125:7,23
132:7,9,12
**heading** 88:9
133:9
**health** 4:2 5:2 7:16
11:9 25:21 27:24
39:25 45:19 46:6
46:12 47:6 87:18
122:10 123:11
149:7 162:3,13,16
162:21 163:10
**healthcare** 7:18
148:16

hear  168:9
heard  161:5 162:2
  163:12,14,15,21
  164:6
heather  5:5 11:21
heather.hosmer
  5:7
held  42:20,21 65:7
  65:25 66:2 102:23
  150:1
helmsley  2:5
help  12:24 25:11
  88:7 126:21,23
  168:16,17 177:21
helped  35:16
  77:23
helpful  70:4
helping  82:3
helps  25:23 126:17
hereinafter  12:8
hereunto  183:5
herman  3:10 6:10
  10:23,23 171:24
  171:25 180:7
heroin  38:14
  47:18 48:24 59:7
  152:9,12,24 153:2
  153:7,15,24 154:8
  154:11,19 155:5
  155:15 156:3,13
  156:16 157:5
hi  12:2 171:25
hicks  53:14
high  113:4 118:4
  130:10
higher  61:3
  108:15 109:16
  116:4,9 117:11
  157:16
highest  115:17,23

hired  25:10
  103:23 141:25
history  32:25
  61:21,21 179:10
hoc  103:12,14
hold  21:5 102:21
  102:21
home  12:18
horwath  115:7
  119:24 120:10
horwath's  120:8
hosmer  5:5 11:21
  11:21 148:24
  149:3
hospital  2:2 10:14
  18:15,18,24 25:1
  25:10,16 44:18
  47:21 48:2,6 51:4
  51:8,9 52:25 53:6
  53:11,15,18,20
  54:12 87:17 89:4
  92:9 104:19
  109:18,24 162:7
  164:2
hospitals  18:24
  51:25 53:12
hosted  26:4 42:23
hour  44:16 52:17
  98:13
hours  22:4,7,8
  115:21 127:10,11
hugh  152:18
huh  13:10 73:23
  90:8 95:20 114:24
  170:11
hundred  150:1

**i**

idea  27:15 30:10
ideally  145:20
identification
  16:19 67:15 73:15

85:3 105:16
  123:14 148:19
identifies  115:12
identify  53:17
  94:10 107:10
  115:14,25 133:13
  141:6 147:22
illegal  55:13
illegitimate  84:17
  104:23 142:11
  171:14
illicit  39:18 40:4
  40:14 59:5,15
illinois  4:23
illness  13:25
  116:17,21
immediate  39:2
  54:25 100:17
  111:20
implementation
  26:14
implemented
  124:14
importance  55:21
important  13:3,11
  56:1 117:6 150:16
improve  22:20
  79:10 89:3 142:18
  172:15
improved  142:23
  143:12
inappropriate
  171:14
inception  48:20
include  24:18
  36:16 46:24 61:20
  94:6,20 154:17
included  119:3
  130:6 184:13
includes  50:17

including  31:12
  36:18 44:19 58:14
  59:7 101:21
  108:12 126:15
  141:15
incorporate  130:5
incorporated  3:8
  10:25 87:20 172:3
  172:22 173:14
  174:11 186:12
increase  26:3
  28:24 81:1 89:21
  94:14 147:4
increased  31:7
  76:15 80:21,22
  94:11,11,16,17,25
  95:1 108:12 146:3
  147:2,10
increases  109:2
increasing  108:11
independent  78:7
index  6:1,5 7:1 8:1
indiana  3:8 10:24
  172:2,18 173:10
  174:6
indicate  62:11
  106:5
indicated  33:4
  171:3
indicates  141:2
indicating  184:13
individual  62:18
  63:14 84:6,12
  91:6 117:2 118:9
  118:13,24 137:25
  138:5 139:20
  140:19,21 168:3
  177:8 178:12,17
individuals  25:2
  154:6

**infections** 40:15
**infectious** 40:15
**influence** 71:13
  72:22 77:8
**influenced** 71:3
**influential** 35:18
**inform** 79:24
  141:16
**informatics**
  124:22 125:1
  131:10
**information** 7:8
  33:5,16 35:3,13,15
  56:10 57:11,13
  62:24,25 63:6,13
  73:12 79:19 83:8
  83:10 91:2,4
  118:1 119:11
  137:6 143:17
  144:14 146:6
  158:12,13 160:21
  166:12 167:16,18
  167:23 168:1,5,12
  176:5 178:2,21
  179:8
**ingested** 39:21
**inherited** 113:4
**initial** 27:8 102:6
  102:11 115:25
  136:10
**initially** 27:23
  49:22 77:16 82:24
  115:18
**initiate** 70:18
**initiative** 22:24
  23:21 25:8 26:2
  48:7 53:7,13,17,22
  92:10 102:5
  110:23 111:4,5,6,9
**initiatives** 23:14
  23:16 27:5 47:15

51:20 54:18 89:17
  89:21,25 90:2
  99:14 101:11,16
  111:21,23 114:14
  127:4 133:2
  141:10
**injection** 40:16
**injured** 130:23
**injury** 117:17
**inmates** 26:11
**inpatient** 24:20
  28:6 42:6 159:23
  159:25
**inpatients** 160:1
**inquiry** 78:11
  81:10,12
**insofar** 55:18
**instance** 38:4
  126:10 127:8
**instances** 175:7
**institution** 95:15
**institutions** 95:16
**instruction** 19:9
**instructions** 79:19
  181:2,10
**insurance** 63:21
**intended** 50:22
  121:23
**intensive** 115:19
  118:25 137:12
**intent** 32:18
  126:25 127:3
**interactions** 163:9
  163:19
**interchangeably**
  112:12
**interest** 77:25
  104:11
**interested** 74:2
  183:3

**internal** 111:3
**interrupt** 52:22
**interruption** 78:21
**interventions**
  53:18
**introduced** 162:2
  172:3,17
**invited** 51:1
**involved** 47:14
  49:14 51:16 89:10
  99:8 104:15 113:7
  113:10,14,16,17
**involvement** 134:9
**involves** 23:21
  112:22
**issuance** 99:9
  128:4
**issued** 67:6 75:16
  75:21 92:3 128:4
  129:17
**issues** 44:19
**item** 124:6 139:2
  139:22 142:17
  145:6,21 147:4
**items** 119:2
  120:23

**j**

**j** 1:25 119:24
  182:6 183:14
**jail** 26:10,12
**janssen** 3:2 10:22
**jciaccio** 2:24
**joan** 1:17 6:7 10:4
  12:5,10,16 164:25
  171:23 182:9
  184:8 185:4,9
  186:4,13 187:20
**joe** 12:3
**johnson** 3:3,3
  10:22,22

**join** 48:19
**joined** 18:10,11
  20:8,14,20 64:22
**jones** 4:14 11:15
**jonesday.com**
  4:17
**joseph** 2:21 11:24
  12:3
**jscolnick** 2:7
**judge** 1:7
**judgment** 34:22
**judith** 184:5
**judy** 2:4 10:11
**july** 23:10,11
  26:25 65:14
**jumped** 29:25
**jumping** 26:18
  169:20
**june** 68:6
**jurisdiction** 50:18
**jury** 109:7

**k**

**k** 4:19
**kaye** 5:4
**keep** 56:2 64:9,24
  165:3
**keeping** 55:19
**kind** 20:17 22:10
  29:25 33:7 85:19
  112:12 132:19
  152:25 179:12
**kits** 29:23 46:23
**knew** 37:24
**know** 13:17 14:6
  14:15 15:7,10,14
  19:5 26:8 31:5
  34:4 37:18 43:5
  46:13 55:23 56:6
  58:16 63:16 68:17
  70:7,10 71:11
  74:16 81:22 84:13

86:24 88:6,6 89:6
89:7,9 91:15
92:20,22 96:8
100:2,15 101:5
103:17,19 113:1
114:10,13 122:12
123:22,22 135:4
137:4 140:5 143:8
146:8 151:24
152:6 155:11
158:19 159:3,5
160:3,6,11,13,16
162:12 171:8
172:14 176:17
178:16
**knowledge** 15:19
33:3 40:6 61:2
75:19 83:13,22
86:25 98:4,7
101:8 105:4,6
161:15,25 173:9
173:13,17,21,25
174:13,15 175:2
**known** 44:23
53:17 61:8
**knows** 157:19
158:17
**kouba** 2:10 10:16
10:16

**l**

**l** 2:21 68:20
**l.p.** 1:10,11,13
**lab** 158:10
**label** 73:19 148:23
166:16 168:7,13
**labeled** 67:20 85:6
105:20
**labeling** 33:10,13
**laboratories** 4:20
**lack** 141:16

**lakeside** 4:15
**lakewood** 18:7
**lane** 12:19
**language** 86:15
87:11
**largely** 52:2
**late** 126:2
**launch** 23:9
111:15,17 138:13
163:2
**launched** 28:9
53:23 65:12 89:5
93:2 106:3 139:10
146:4
**law** 2:3 49:12,24
64:19 66:8 87:20
90:10,11 130:14
144:12 165:6
**lawful** 12:5
**lawfully** 58:24
**lawmakers** 50:5
**laws** 89:22
**lawson** 104:4
**lawsuit** 15:11,15
**lay** 21:15 43:19
**layman's** 108:19
**lazar** 4:22 11:17
11:17
**lead** 113:9
**leader** 53:14
**leaders** 51:8
**leadership** 48:4
92:9 100:19
104:14,16
**leading** 92:7
157:24
**learn** 28:11 45:1
81:16 82:17
**learned** 27:25
**learning** 77:25

**lecture** 44:1
**lectures** 43:20,23
44:14,16
**led** 14:24 102:5
**left** 68:5 69:6
74:12 76:8 88:15
110:18 150:19
155:17
**legal** 5:16 55:13
91:13,16,22 95:22
95:25 97:15 153:3
153:10,13,23
155:5 184:1 187:1
**legally** 91:9 97:24
**legislation** 50:2
**legitimate** 34:23
38:6 57:4 58:25
151:5 153:10
154:17
**legitimately** 118:4
**lengthy** 115:19
**letter** 184:19
**level** 26:5 103:1
116:4 126:12
**lewis** 4:21 11:18
**lexington** 2:22
**lgates** 4:17
**libraries** 30:18
**license** 41:1,4
**licensed** 19:6 25:2
25:25 59:1 90:9
161:20
**life** 38:18,20,23
39:1,5,8,12,14
**limited** 58:20 79:7
115:18 129:4,14
135:19 137:9
142:24
**limiting** 80:2
83:24

**line** 78:23 114:2,3
116:18,20 125:8
125:17,25 184:13
186:7 187:3
**lines** 13:9
**link** 132:16,17
154:10 157:3
**linked** 132:4
177:22
**linking** 177:19
**links** 124:11
131:25 132:5,8,13
**lisa** 4:15 11:15
**list** 26:21,22 126:8
126:13 132:8,12
139:2,22 142:18
145:22
**listed** 124:6
151:21 186:7,17
**listen** 168:6
**listing** 186:7
**lists** 124:9
**literature** 33:17
63:15 81:20 82:14
82:19,21 154:4,23
155:3,24 167:5
**litigation** 1:5 10:6
14:4 165:10 176:3
184:6 185:3 186:3
**little** 16:10 27:18
30:6,11,12 59:23
78:7 155:1 169:23
178:1
**live** 42:24 146:23
**llc** 2:9 3:8,13,14
4:19 10:25 11:2,3
11:5,6 172:2,18
173:10 174:6
**llp** 1:21 2:3 3:4,9
3:20 4:3,9,21 5:4
5:10

**lobbied** 49:23
**local** 48:23 50:6
  51:7 175:20
**location** 20:6
  45:19
**locked** 56:2
**long** 21:5 44:23
  99:20,25 122:15
  122:16 127:15,17
  131:8 134:4
  146:17 159:6
**longer** 38:20,23
  39:11,11,14 79:1
  80:5,8,11,16,18,20
  80:23 137:24
**look** 33:17 35:19
  76:18 90:5 107:23
  107:24 108:1,2
  115:13 117:2,4
  136:7 137:7 138:3
  138:5,22 139:11
  139:14,15,16
  145:16 150:11
  152:7 154:10
  157:3 158:14
  178:23
**looked** 115:16
  136:14 137:13,22
  138:22 139:1,5
  140:2,14 142:20
  144:21 145:10,21
  145:23 147:7,16
  147:17,20 155:23
  156:12 157:1
**looking** 97:17
  116:18 135:23
  138:25 146:7,24
  167:15 177:1
  178:9
**looks** 17:6 67:25
  115:11 149:18

156:6
**lost** 132:24
**lot** 23:17 30:17
  165:11
**lower** 68:23 69:6
  71:17 74:12
  110:18 130:13
  150:12
**luken** 164:10
**lunch** 99:1
**luncheon** 98:20
**lutheran** 18:7

**m**

**m** 2:15 3:10 140:9
**m.d.** 1:17 6:7 12:5
  12:10 68:21
  164:25 171:23
  182:9 184:8 185:4
  185:9 186:4,13
  187:20
**madam** 184:10
**magnitude** 93:22
  93:25
**mail** 7:7 32:1
  65:24 73:11,20
  74:1 75:12
**main** 1:21 3:5
  18:23,25 19:1
  108:5
**maintain** 143:23
**majority** 76:21
  97:21 98:1
**making** 84:12
  166:13
**maladaptive** 60:7
  60:11
**mallinckrodt** 3:13
  11:2,5 165:7
**manage** 30:22
**managed** 112:22

**management** 7:5
  41:7,15,19 42:4
  67:5,7,13,22 69:7
  69:10 70:8,19
  71:19,23 72:8,13
  73:3,5,8 132:23
  142:1
**manager** 25:22
**mandatory** 65:8
  65:10 66:7 70:4,5
  85:24 86:4 97:3
  100:6 149:24
**manner** 107:11
**manufacture** 58:8
  59:15
**manufacturer**
  64:5 163:17
**manufacturer's**
  169:17
**manufacturers**
  58:1,5 59:14 63:3
  165:9
**manufactures**
  59:14
**march** 21:21
**marcus** 4:9,11
  11:14
**margolias** 114:3
**marked** 7:2 16:11
  16:18 67:14,18
  73:14 85:2 105:15
  123:13 148:18
**maryland** 173:1
  174:19
**masks** 46:25
**massachusetts**
  3:17 5:5
**masters** 32:1
**mat** 112:10 147:5
  147:9

**materials** 46:24
  47:1
**matter** 10:5
**mckesson** 5:8
  163:12,16,19
**mcnamara** 4:4 6:8
  11:7,7 12:11
  16:13 31:23 32:11
  32:17 52:14,19,24
  53:25 54:3 71:9
  78:22 98:11,15,23
  149:1 159:5,10,16
  164:14
**md** 1:6
**mdl** 1:5 10:15
**meals** 126:11
**mean** 55:10 60:3
  60:10 94:17 127:2
  130:18 140:1
  151:1 170:1,6,23
  171:2 177:17
**meaning** 87:6
**meaningful**
  119:23
**means** 130:19
  146:19 155:8
**meant** 151:2
**measure** 142:24
  143:9 146:10
**measures** 119:7
  120:15,18 136:6
  138:24
**med** 166:19
**medica** 95:5
**medical** 17:7,11
  17:23 19:12 21:2
  30:11 31:3 33:3
  33:17 34:23 38:6
  39:24 40:2,25
  41:1,4 43:21,23
  44:1,2,5,13 50:2,3

57:4 65:25 66:5
67:4 81:19 82:14
82:19 110:25
119:1,4 120:22
125:9 132:18
151:5 152:17,20
152:23 154:4,23
166:24 171:12
178:7 179:10
**medically** 37:23
155:7 170:2,7,25
171:3,6 177:4
**medication** 26:3
31:19 32:12,20
33:2,4,6 38:18
39:11,13,20 56:5
57:10 60:6,9 72:3
80:24 84:8 85:11
112:11 130:10
156:17,18 165:22
166:2 169:7
**medications** 13:24
37:2 55:12,14,19
55:24 56:2 58:7,8
58:9 72:24 76:7
76:19,19 77:14
78:1 80:15 81:17
94:20 95:3,5,11,14
119:5 125:7
126:15 131:14
155:21 156:1,2,10
158:3,19,22,25
162:8 165:25
166:7 167:2,6
179:11
**medicine** 17:18,21
20:8 31:18 34:16
68:19 69:2 70:20
**meet** 106:12,15
119:9,24 120:11
172:4

**meeting** 7:14
23:24 105:14
110:14,16 113:23
120:7 121:3,6
141:15
**meetings** 65:7
106:16
**member** 45:4,5,10
47:19,21 53:12
56:8 92:21
**members** 19:6
55:25 56:11 88:2
103:10,12,13,18
123:6 167:24
**mendelsohn** 3:4
10:20,21
**mental** 25:21
**mention** 122:4
**mentioned** 44:3
51:3 52:13 53:5
81:23 82:14 87:10
90:17 103:22
108:6,21 112:2
120:12 149:25
165:5
**mentioning** 18:14
**mentions** 132:22
**message** 30:21
**met** 45:2 50:20
**methadone** 38:24
**metric** 108:10
109:1 139:5
140:13 143:23
145:3 147:12
**metrics** 101:20
103:1 104:13
108:4 109:17
115:17,23 118:20
135:12,12 138:4
**metro** 7:15 122:19
123:11

**metrohealth** 2:2
7:10,13 10:13
15:10,24 17:10
18:10,11,14,15,18
19:7,15 20:9,11
22:22,25 26:5,6
27:14 30:25 32:3
34:5,18 37:9 42:9
42:22 44:9 46:5
47:12 48:8 55:2
64:22,23 65:17
67:6 69:14 72:12
76:3 84:24 85:16
87:1 95:10 100:8
100:23 101:10
104:1,6,22 105:13
107:16 111:3
122:15,17 133:24
134:3,9,11 147:18
147:20,24 148:8
149:24 159:20
160:1,8,15,19
161:1,5,11,18
162:9,12 171:5
176:8,13,14,20
178:8 179:17
180:1
**metrohealth's**
16:1 101:16
**mh000000027** 7:6
67:14,20
**mh000000131**
7:19 148:17,23
149:2
**mh000000272**
7:12 85:1,6
**mh000000566**
7:14 105:15,21
**mhmc** 7:4 67:12
67:21

**miami** 164:10
**mid** 93:15
**midwest** 184:17
187:1
**miller** 3:20 11:1,1
**milligram** 108:8
**millions** 176:14,15
176:19,21
**mind** 26:18 36:23
69:21
**mine** 84:15 114:9
129:12
**minimum** 145:19
**minute** 30:23
164:19
**minutes** 7:14
105:14,25 106:5
110:13 112:2
118:19 119:23
**misinformation**
14:23
**mission** 22:20
54:14,15 123:25
**misunderstanding**
80:14,17
**misuse** 52:11
55:14 63:17 75:23
76:1,10 155:20,20
156:1,2,10
**misused** 55:24
56:11 158:3
**misusing** 157:23
**mitigation** 145:25
**mme** 108:1,6,7,11
108:15 118:23
124:9,18,19 125:4
125:5,6,11,20,22
130:8,13 131:2,6
132:7,9,11 136:4
139:2,9,17,19,20

**mmes** 125:12
140:22
**mmwr** 35:20 78:3
**module** 66:7
**moment** 54:11
78:18 100:14
**money** 15:7 46:5,7
46:9,9
**monitor** 101:20,22
**monitoring** 100:9
100:16 102:3
**monthly** 106:15
106:16
**months** 145:8,17
145:20
**morbidity** 82:1
105:10
**morgan** 4:21
11:17
**morning** 12:12,13
162:1
**mornings** 44:16
**morphine** 108:8
**morris** 1:21
**mortality** 82:1
**motley** 2:9 10:16
**motleyrice.com**
2:12
**move** 169:21
**movement** 145:3
**moving** 169:5
**mt** 2:11
**multiple** 36:17
**mute** 78:23
**mwr** 81:23

**n**

**n** 3:10 164:8
**naloxone** 21:15
24:19 27:21,22
28:5,19 29:9,22,22
43:18,20 46:22

47:3,4 49:23,24
51:24 120:25
**name** 10:11 12:15
43:4 68:23 125:9
163:14 165:5
184:6 185:3,4,15
186:3,4,21
**named** 173:10,14
173:18,22 174:1
176:2 182:9
**names** 102:11
162:19
**napoli** 2:20 11:25
12:4
**napolilaw.com**
2:23,24,24
**narcotic** 71:19,22
72:8,13
**national** 1:5 10:5
37:13 184:6 185:3
186:3
**nationwide** 76:16
92:6
**naturally** 37:4
**nature** 81:16
110:9
**necessarily** 116:13
158:16,23 178:3
178:10
**necessary** 170:2,7
170:25 171:6
**need** 13:16 16:22
31:23,25 34:23
38:6 57:4 117:21
177:7 178:16,18
178:20,23 179:6
**needed** 51:2 52:4
76:18
**needs** 79:11
**neighborhood**
150:3

**never** 111:2
114:12,20 146:14
**new** 2:6,6,22,22
3:21,21 27:5 30:8
89:22 137:6 159:7
**nice** 132:6 159:8
172:4
**non** 155:19 165:25
166:2
**norm** 60:17
**normal** 55:13
**north** 3:5
**northeast** 47:24
47:25 50:21 51:3
54:12
**northern** 1:2 10:7
50:17
**northwest** 3:10
4:4 5:5
**notarized** 184:14
**notary** 182:6
183:14 184:25
185:10,18 186:15
186:23 187:23
**note** 184:12
**noticed** 135:11
136:22
**notified** 65:24
**notify** 56:20
**notwithstanding**
142:7,8
**number** 7:2 22:4
28:24 34:4 35:23
40:3 59:5 71:17
73:21 76:15 92:16
94:17 95:1 96:22
101:10,17,21,22
102:4 104:7,12
113:2 119:7
120:23 122:4
125:10 132:15

135:12 140:2,3
144:5 147:9 148:4
150:12 151:23
152:8 154:5
156:15 158:9
176:18 177:2
178:9 184:7,13
**numbered** 123:17
132:25
**numbers** 124:2
140:7 176:11
186:7
**numerals** 86:17
**numerous** 111:19
**nurse** 25:24
**nurses** 51:24 52:1
52:5

**o**

**oarrs** 90:11,14,20
90:23 91:4,10,17
91:22 95:18,23
96:1,14,18 97:2,9
97:15,17,22 98:6
120:21 142:18,22
142:25 143:2,5,7
143:11,14,16,19
143:20,23 144:1
144:10 158:12
167:16
**oath** 172:11
**ob** 17:16
**object** 8:2,3,5,5,6
8:6,7,7,8,9,9,10,10
8:11,12,13,13,14
8:14,15,15,16,17
8:18,19,19,21,21
8:22,22,24,24,25
9:1,1,2,2,3,3,4,4,5
9:6,6,7,7,8,8,9,9
9:10,11,11,12,12
9:13 18:20 29:11

30:16 31:20 37:25
57:6,6 61:15
63:10,22 64:3,6
65:2 69:22 76:4
77:3 80:12 84:9
84:19,19 86:22
87:3 89:2 96:16
100:11 104:8,24
105:1 133:25
134:7 135:9,25
142:13,15 151:8
153:16,16 154:1
154:12,20,20
155:9 156:4
157:13 158:1
160:9 166:9,22
168:8,14 170:8
171:1,7 174:7
176:10 177:5
178:19,25 179:20
180:4
**objection** 8:1,3,4,4
8:8,11,12,16,17,18
8:20,20,23,23 9:5
9:10 19:8,16,17,23
19:24 32:8 62:21
65:21 71:7 93:9
99:11 101:18
117:23 118:6
136:9 137:16
161:22 174:12
**observe** 39:10
76:1
**obstetrics** 17:11
**obtain** 58:24 60:13
60:14 111:24
151:23
**obtained** 158:10
**obtaining** 103:6
**obvious** 26:9

**occasionally** 19:2
167:23
**occur** 127:23
**occurred** 149:19
**occurring** 35:24
37:4 100:17
**offered** 141:24
146:21
**offers** 30:5
**office** 7:16 22:19
23:15 25:11 30:25
31:1,6,12,15 50:4
65:6,11 111:16,18
123:4,12,24
124:23,24,25
139:10 140:23
142:4 146:3
152:21,23 163:2
183:6
**officer** 23:22 31:9
104:19
**official** 185:15
186:21
**oftentimes** 39:12
40:18
**oh** 52:14 116:19
124:5 128:10
145:11 149:1
168:10
**ohio** 1:2,11,13,22
2:16 3:5 4:16 10:8
12:19 17:8 25:20
27:24,25 28:9
46:6,11 47:6,24,25
48:5 50:18,21
51:1,4 52:25 53:6
53:11,14 54:12
74:5 90:11,15
94:15 128:4,19
182:2,7 183:7,15
184:2

**okay** 13:13,20,21
16:7,8 17:6 19:11
24:7,10 28:13
29:13 48:13 52:19
53:3,4 54:2 65:23
70:7 71:16 78:20
81:25 93:22 98:17
106:5,11 108:21
115:11 121:12
122:3,13 129:1
136:17 138:7
140:13 143:13
144:3 148:11
150:11,14 152:24
156:22 157:7
159:4,10 165:17
166:11,19 167:4
168:18 169:2,5,9
169:15 170:19
171:15 172:13,17
174:15 175:3,8,13
175:21,23 176:1,7
177:1,14,24
178:16,22 179:12
179:17 180:7,11
**olmsted** 12:19
**one's** 52:22
**ones** 26:9 38:22,25
108:5
**ongoing** 14:4
15:16 21:8 27:2
72:16,18 112:21
**online** 42:7,17,25
65:9 66:6
**oocs** 74:7 79:7
**op** 1:10,12,13
**open** 160:1,4
**opened** 22:19
**operates** 160:2
**opiate** 1:5 10:6
28:20 44:21,24

45:5,8,14 47:15
48:16 75:10,12
92:16 184:6 185:3
186:3
**opiates** 36:22 37:3
165:18
**opioid** 7:5,13,16
7:18 22:20,21
23:23 24:18 25:6
25:10,14,19 26:1
27:21 28:21,24
29:15,19,20 30:25
31:1,6,15 33:19
34:8 35:6,21,23
36:12,14,18 37:1
37:13 38:4,9,14
39:18,19 40:19
41:22 42:15 43:22
43:24 44:19 48:2
48:6,10 50:4 51:4
51:9,20 52:11
53:7,13,16 54:12
58:25 60:9,19
61:24 62:16 63:9
63:17 64:14,17,18
65:6,12 66:3,23
67:7,13,21 69:7,10
70:8,19 71:14
72:16,19,25 73:7
74:19 75:18 76:16
76:18,19 77:11,13
78:1,4 88:9,10,10
88:16,19,21,23,25
89:3,18 93:2
94:12,14 95:11,14
96:3,19,24,25 99:5
99:9,13,18 100:3
101:11,15 102:1,6
102:9,14 103:3,7
103:22 104:7,12
104:13,21 105:14

106:9,24 107:8,24
108:2 111:16,18
112:1,7,8,24 114:4
114:15 116:4,9
119:7 120:15,18
123:1,4,6,7,12,24
124:14,23,24
125:6,12 126:23
127:1 128:19,23
130:2,8 135:11,17
136:2,3,4 138:15
139:10 140:4,23
142:4,9,14 144:4,5
144:7 145:1,4,7,18
146:3,9 147:13,23
148:4,15 149:7,22
150:15,21 152:1
154:7,11 155:14
155:19 156:2,17
156:17,18 157:10
159:2 160:18
161:2,7,12 162:21
163:3 165:21,25
166:1,2,4 167:2,6
171:5 176:8,16
177:20,25 179:15

**opioids** 14:24
29:16 33:22 34:1
34:12,20 35:10
36:1,21 37:6,7,11
37:22 38:19 40:3
40:4,10,16 52:6
56:12 58:14,20
59:4,5,15,24 60:23
61:6,14 62:6
64:10 65:1,19
71:4 73:2 74:6
75:23 76:1,11
77:17 78:15 81:8
82:4,18,23 83:20
84:18 90:3 92:6

108:22 110:10
111:1 113:3,4
117:12,21 118:4
127:21 128:7
131:22 132:4
136:4 139:23
140:17 144:23
151:14,18,19
153:4,13,23,25
154:18 157:4,24
158:7 165:12,13
165:15 166:17,21
167:21 175:5
177:3 179:19,24
180:3,6

**opposed** 21:25
50:8 86:1 130:22
154:2

**opted** 41:3
**option** 127:12
**options** 126:13
**order** 40:25 95:8
124:10 126:4,6,11
126:12 127:6,6,15
129:16,24
**ordering** 126:20
**orders** 126:9
**organization**
53:10,12
**original** 29:25
86:9
**originally** 46:5
**originated** 88:16
**outcome** 156:7
**outcomes** 53:19
105:7 106:23
138:10,21
**outlier** 116:11
**outlines** 72:4
**outlying** 107:9

**outpatient** 130:19
**outside** 22:4,7
24:24 43:24 95:13
98:3 156:24
**outweighed** 35:1
83:12
**outweighs** 62:13
**overall** 109:18,23
139:12 147:23
**overdose** 23:25
25:4 28:20,21
29:18,20,21 35:23
36:13 38:10 39:6
39:9,16 76:16
108:13 151:13,18
151:25 157:22,25
158:6
**overdosed** 38:13
39:13,17
**overdoses** 23:23
28:25 30:22 36:8
36:10,11,14,16
40:3 92:7 93:3
**overprescribing**
14:25
**oversedation**
40:17
**overview** 123:24
**oxford** 4:10
**oxycodone** 38:15
39:2
**oxycontin** 38:24

## p

**p.m.** 98:22 159:12
159:15 164:21,24
171:19,22 180:14
180:15
**pa** 72:4
**pace** 17:22
**page** 8:2 36:21
70:17 71:16 90:6

114:23 124:2,4
132:24 152:25
184:13,15 186:7
187:3
**pain** 34:11,12 41:6
41:15,19 42:4,21
42:23,25 43:3
64:21 67:4 73:2,5
77:5 79:10 82:5
82:15 110:19,22
111:22 112:16
114:1 117:12
128:13 132:22
133:4 141:25
146:22 155:19
156:7 165:19,22
180:6
**painful** 76:23,25
77:1
**painkiller** 78:5
**palliative** 110:2,3
110:6,8 115:4
116:2,8 177:22
**panel** 66:3
**papers** 154:14
**papp** 1:17 6:7 7:3
10:5 12:5,10,12,16
16:17 119:24
159:19 164:25
165:2 171:23,25
176:7 182:9 184:8
185:4,9 186:4,13
187:20
**par** 5:3 11:22
**paragraph** 70:17
116:20 119:22
**park** 2:5
**parma** 45:19
**part** 29:7 32:4
42:13 54:13,15
61:23 96:2 100:25

101:25 120:13
121:1 128:22
186:9
**participate** 68:12
118:16 140:8
141:19,22 146:16
**participated** 51:2
82:5 86:14 87:11
88:2,12
**participating**
100:21
**particular** 71:2,13
77:21 110:14,16
112:23 115:3
165:20 166:6
167:13 169:16
178:14
**particularly** 178:5
**partner** 10:12
**parts** 24:8
**party** 63:20 183:3
**pathway** 133:14
**patient** 37:22
38:13 39:10,12,15
39:20 57:11,18
62:19,23 63:6,25
72:2 76:7 83:6
91:7 110:12 113:1
113:3,5 116:17,21
117:3,13,17,22
118:10 119:4
126:11 137:25
140:3,11 145:16
145:18 150:19
158:7,16,17
165:23 167:12,25
168:3 178:17
**patient's** 34:22
57:16 72:5 118:2
125:9

**patients** 17:23
19:15 20:1 21:1
25:4,23 34:10
38:8 40:9,14,17,19
55:18 56:2,10
57:5 61:6 72:9
76:5,21 77:4
79:20,24 95:15
96:22 106:23
110:25 117:10
118:3,13,21,22,24
119:1,16 120:8,10
130:21 133:13
138:5 140:7
147:19 155:18,25
155:25 156:6,9,12
156:14 157:18
158:2 159:2 160:8
165:14,16,24
171:11 179:23
**patrick** 5:10
**patterns** 107:8,9
107:15 136:23
137:5
**paul** 53:13
**pay** 141:24 146:21
**payer** 63:21
**pcarey** 5:12
**pediatrician** 110:7
**pediatricians**
116:6
**peer** 24:22 25:1
48:11 102:7,12,18
104:10 106:1,9,11
120:7 121:7,21,23
134:14,23 135:15
135:18 169:22,25
170:21
**peers** 107:12
109:17,19

**penalty** 101:6
**pending** 13:19
**pennsylvania** 4:10
**people** 29:8,15,16
61:11,13,14 78:22
87:22 88:4 90:24
118:16 135:7
141:6 153:22
155:4
**perceived** 158:18
**percent** 22:6 23:7
46:17 94:13
151:13,20,24
154:6,9,16 155:18
156:9,15
**percentage** 21:3
22:6 23:5 34:3
46:14,14 139:23
140:17 143:18
144:25 160:7,14
**perfect** 159:10
**perform** 58:6 71:5
72:3
**performance**
100:22 101:1
**performed** 118:14
146:8 177:12
**performing**
142:12
**period** 82:10
97:14
**periodic** 13:15
**person** 39:17 42:5
42:8,16,17,19
58:24 62:12 81:2
104:3 116:11
117:20 153:2
157:9,16,23
**personal** 15:18
135:5 173:9,13,17
173:21,25

**personally** 32:23
33:18 75:25 94:20
94:22 95:4,6,8,10
95:13 162:14
164:3 171:4 174:4
174:9,23 185:11
186:15
**pertains** 79:25
**pertinent** 135:1
137:7 179:10
**peter** 104:4
**pglawyer.com**
2:17
**pharma** 1:10,11
1:13 4:19,19
**pharmaceutical**
14:17 57:21 63:1
64:2
**pharmaceuticals**
3:2 4:19 5:3,3
10:22 165:8
**pharmacies** 94:18
175:12 176:4
**pharmacist** 56:24
57:9,14 142:1
**pharmacist's**
56:15 57:10
**pharmacists** 57:3
143:19,20 161:9
175:20
**pharmacy** 47:11
57:17 85:12 143:8
159:20,22,24,25
160:4,8,15,20,25
161:1,6,12,18,25
162:9
**phase** 26:13,14
**phone** 11:11 184:3
**phones** 78:23
**phrase** 143:2
144:2

**physical**  33:1 60:5
 60:8
**physician**  18:12
 20:11,21 21:6
 53:14 56:21 57:15
 63:7,19 64:8,24
 79:11 100:23
 110:6 112:25
 118:14 126:9
**physician's**  72:5
**physicians**  42:14
 78:6 94:2,6
 110:24 111:24
 115:20 126:17
 134:12,25 135:7
 136:19 137:5,11
 142:5
**picture**  119:12
 178:3
**pieces**  82:21 114:6
**pills**  101:23 102:4
 107:25 126:16
 136:4 140:3,3
 158:24 176:8,14
 176:16,19,21
 177:2 178:9
**pilot**  27:24 28:8
**pittsburgh**  4:10
**place**  118:19
 132:20 157:16
 182:20
**placed**  129:24
**plaintiff**  10:13,14
 10:19
**plaintiffs**  2:8
 10:17 14:6,9,13
**plan**  49:10
**planned**  110:23
 111:6 133:2
 138:22

**plans**  54:20,21,23
 54:25
**plant**  37:5
**plateau**  93:16
**play**  109:7
**pleasant**  2:11
**please**  10:9 11:11
 12:14 78:23
 148:25 184:11,11
**plevin**  2:14
**pllc**  2:20
**plus**  103:15 136:4
 144:23
**pmp**  56:20,20
 90:17
**point**  16:6 79:22
 83:23 92:17
 150:20 151:13
 175:15,22
**police**  23:22
**policies**  7:10 49:19
 50:8 69:17 84:25
 85:20 87:7,9
**policy**  7:11 47:19
 49:13,15 50:6
 66:4,6,21 67:9
 69:15,21 70:1,5
 85:1,14,16,21
 86:17 87:2,19,21
 89:11,16 91:23
 92:3 99:2,10,15
 100:6,10 101:3,7
**polster**  1:8
**polypharmacy**
 158:13
**poppy**  37:5
**pops**  43:6
**population**  110:12
**porter**  1:21 5:4
 11:22

**position**  21:9
 29:17 63:24
**positioned**  63:19
 64:1
**possibility**  30:2
**possible**  40:7
**possibly**  91:19
**posted**  79:23
**potential**  80:15
**potentially**  168:25
**power**  142:5
**powerpoint**
 123:21 138:13
 149:6,11,21
**practical**  50:20
**practice**  53:20
 55:1,11 56:14
 64:15 69:25 71:12
 74:22 78:25 84:14
 95:9,22 96:2 97:1
 109:23 110:10
 124:10 129:20,25
 130:1,25 131:1,9
 131:12,13 135:1,3
 135:8 136:19
 137:5
**practiced**  31:17
 87:17
**practices**  78:14
 83:19 110:2
 115:15
**practicing**  22:1
 57:9 64:8 109:22
**practitioner**  25:24
**pre**  176:21
**precedence**  111:10
**precise**  96:11
 176:18
**precisely**  157:19
**predictive**  133:9

**prepare**  17:4
**prepared**  79:21
**pres**  179:22
**prescribe**  25:25
 31:19 32:20 34:8
 35:1,5 52:5 61:24
 63:9 71:4 72:3,24
 73:1,2 77:10 80:4
 80:7,8 110:10
 126:9 146:17
 165:13,15
**prescribed**  33:18
 33:22 34:20,21
 55:13 59:20 61:6
 75:23 76:2,7,11,20
 79:1 81:2 107:25
 108:2 118:23
 125:6 127:7
 131:14 145:4
 151:14,17,18
 154:3,7 157:12
 176:8,14,15,19,21
**prescriber**  54:13
 54:18 59:1 95:6,7
 107:9 112:7
 120:14 125:18,19
 169:24 170:5
 171:6
**prescribers**  19:6
 55:16 65:24 89:25
 90:10,24 91:17
 94:23,24 100:9
 104:22 107:16,18
 112:1 161:21
 176:15,20 178:8
 180:2
**prescribes**  32:12
 157:11
**prescribing**  7:11
 7:18 25:15 33:25
 37:11,14 41:23

[prescribing - prove]                                                  Page 24

42:15 56:5 64:9
64:14,17,19,25
65:18 66:1,23
69:15 71:14 72:22
73:5 74:7 75:18
78:14 80:11 82:6
83:19 85:1,14
87:2 99:2 101:3,7
101:11,15 103:1
104:13,21 107:8
107:11,15,17,21
108:22 109:10,16
112:1,4,24 113:3
115:12 116:4,10
117:17 120:25
123:2 125:3
126:24 127:1
128:5,19 130:8
133:19,22 134:4
134:11,18 136:23
137:14,22 140:4
140:11 142:9,14
144:22 148:16
149:7 150:16,20
151:2 162:22
167:20 179:19
**prescrip** 94:12
**prescription** 1:5
10:6 32:24 35:21
36:12 37:22 38:5
39:18 40:3 56:7
56:21,24 57:19
58:24,25 59:4
60:19,23 62:6,16
64:10 78:4,5 95:7
96:3,19 107:24
117:5,8 125:18,19
125:21 127:9
144:4,8,11,13
145:5 152:1 153:4
153:13,23,24

154:11,18 155:5,6
155:14 156:18
157:4,10,24 158:6
158:7,22 160:19
161:3,7,13 164:12
165:12,13,18,22
166:3,16,21
167:21 169:7
170:1,6,24 171:3,5
175:4 177:3,9,11
177:20,21,25
179:14,15,19,23
179:24 180:3
184:6 185:3 186:3
**prescriptions**
56:19 79:7 80:2
83:4,11,24 84:6,18
91:5,6 94:13,18
95:1,3 101:17,21
102:4 104:7,12,23
106:24 107:23
108:2 126:12
128:23 129:14
130:2 132:10
136:2,3 142:11
144:5 145:1 151:4
151:6,10 160:7,14
160:22,24 161:9
161:20 169:10,13
171:10,13 175:10
175:12 177:3
178:8 180:2
**presence** 182:15
**present** 5:15 36:17
40:19 77:4 88:22
152:1
**presentation**
123:21 125:16
150:5 152:17
**presented** 43:2

**presenting** 40:17
**presuming** 32:6
**pretty** 165:12
**prevent** 55:19
**preventing** 43:9
43:13 55:16 56:15
**previous** 134:18
153:3,23 154:7
**previously** 157:17
**primarily** 19:1
20:5
**primary** 79:11
130:20
**printed** 46:24
**prior** 35:21,25
49:11 66:25 83:1
83:1,2 87:7,8
91:18 96:18 97:14
131:20 134:9,22
136:12 137:8
138:6 154:7
**prioritize** 111:22
**prioritized** 111:23
111:25 112:3
115:22
**priority** 49:11
**pro** 107:25
**probably** 26:8
75:5,9 127:25
131:3,18 134:21
175:19
**problem** 26:20
**problematic**
140:24
**problems** 17:24
**procedure** 12:7
181:7 185:5 186:5
**procedures** 90:6
**process** 30:1 87:14
101:1 117:2
118:18 121:23

126:20 137:12
**product** 169:17
**production** 58:11
58:19 184:15,17
184:22
**professional** 16:10
18:5 163:18
**program** 21:14,19
21:20 22:8 23:13
24:13,23 25:9
26:10,15,16 27:11
27:22,23 28:1,1
45:22 112:4,19,21
113:18 115:16
138:20
**programs** 23:7
28:16
**progress** 141:16
141:17
**progresses** 60:7
**prohibited** 179:18
180:1
**project** 21:15,24
22:11 24:15,18
27:1,4,7,19,20,25
28:9 29:5,8,14
30:2,5 45:13,17,23
45:25 46:15,21
47:2,14 93:2
113:9 114:12
**projects** 99:15
**promising** 53:17
**promote** 58:7
**promotional** 47:1
**prompt** 81:11
**prompted** 78:10
81:10 89:7
**proposed** 138:19
138:21
**prove** 137:2

provi   176:15
provide   13:23
  25:3 50:3 132:14
  142:2 162:11
  168:1 170:12
provided   12:6
  14:23 79:19 141:4
  141:14 170:22
  176:6
provider   72:2,2
  110:9 115:1,3,4,6
  116:3,9 118:19
  119:10,25 120:11
  121:3,14 124:3
  129:19,23 130:9
  131:24 132:22
  138:4 144:12
  145:14,14 170:23
  170:23 178:14
  179:7,13
providers   7:18
  19:13 21:15 25:12
  25:16 26:6 56:1
  65:8 91:25 97:21
  98:1,2 107:10,10
  107:19 108:1
  109:11,14,15,21
  109:22,24 110:4,4
  115:13,14,17,23
  115:24 121:24
  125:3 133:13
  135:2 139:20
  140:6,19,21 141:7
  141:11 142:2,10
  142:25 143:4,10
  143:13 145:17
  146:9,13,15,16,20
  147:5,9 148:17
  149:8,23 162:21
  170:13,16 179:18

provides   29:15
providing   57:10
  66:7 143:15
proximate   63:23
prudential   3:16
psychiatric   158:25
psychiatry   115:10
psychological   60:8
  61:22
public   2:15 30:9
  30:14,17 160:4
  182:7 183:14
  185:10,18 186:15
  186:23 187:23
publications   35:19
purchase   47:2,4,8
  47:10
purdue   1:10,11,13
purpose   48:24
  88:25 106:25
  107:5 149:20
  151:5
purposes   16:18
  67:15 73:14 85:2
  105:16 123:14
  148:18
pursuant   181:3,6
put   114:5,6 117:8
  117:8 123:23
  132:18 138:12
puts   125:6

q

qualified   182:8
quantify   40:2
quantity   127:7
queried   120:21
query   90:25 143:3
  145:4
question   13:6,12
  13:19,19 22:2
  29:25 31:21 32:5

32:7,13,16 33:8
38:1,2 66:17
71:10 97:12
120:11 121:13
136:15 148:10
155:1,12 160:12
167:12 171:9
172:14 175:17
178:4
questions   16:5
  119:20 161:2,6
  172:5 180:8,9
quick   23:20
quickly   169:21
quotas   58:11,17
  58:20

r

r   4:22 5:10
raise   91:24 92:10
raising   25:19
ranges   23:6
rapid   17:22
rare   79:6 129:13
rate   109:16 116:9
  140:9,10,19,20
rates   140:22
read   28:16 77:7
  79:13 133:15
  156:24 185:5,6,12
  186:5,6,17
reading   155:3
  184:19
realize   135:6
realizing   70:2
really   26:9 30:20
  53:1 66:16 115:20
  165:23
reason   13:22 32:8
  84:16 98:8 142:10
  161:17 184:14
  186:8 187:3

reasons   91:23 92:2
reassessment   78:9
recall   28:8 41:10
  41:17,18,21 42:2
  43:2,14 46:16
  50:10 51:13 57:1
  59:25 65:16 68:9
  68:15,16 75:3,9
  82:3,8,11,20 86:13
  88:2,3 89:23 90:4
  90:18 96:11 99:3
  99:16 110:15
  113:22 116:1
  121:2 128:18
  131:16,18 134:21
  136:6,14 144:19
  149:13 151:22
  157:6 160:17
  161:4 163:11,20
  164:5 175:23
recalling   108:4
receipt   184:18
receive   100:22
  162:20,23
received   25:20
  26:11 46:5,6
  111:19 131:13
  161:8 175:15,19
receives   153:10,13
receiving   131:17
recess   54:6 98:20
  159:13 164:22
  171:20
recipient   73:25
recipients   73:21
  73:24
recognize   16:23
  29:19,19 94:3
  105:22 123:18
recognizing   52:10

recollection   24:6
recommend
    146:15
recommendation
    79:2 116:15
recommended
    141:21,22
record   10:2,10
    11:12 12:15 13:20
    31:22,25 39:22,25
    52:17 54:4,8 79:6
    98:18,22 120:22
    122:10 125:10
    128:17 129:8
    159:11,15 164:19
    164:20,24 171:17
    171:18,22 180:13
    186:9
records   171:12
reduce   23:3 79:3
    101:11 104:6,21
    126:23 127:1
    139:2,23 147:12
reduced   139:8
    140:16,18,20,22
    142:9 182:14
reducing   101:15
    101:17 104:11
reduction   148:4
    165:19
reeducate   107:10
reevaluate   127:5
reevaluated   79:18
reevaluation
    79:12
refer   104:16
reference   110:19
    130:5 184:7 185:2
    186:2
referenced   182:13
    182:18 185:11

186:15
references   114:2
    126:4 151:21
referral   79:11
referred   85:15
    112:10
referring   34:14
    36:11,14 69:18
    76:25 79:15 80:19
    80:20 88:13,20
    90:20 104:17
    109:20 112:15
    114:11 120:17
    128:13 133:18
    135:24 151:19
refers   151:9,25
refills   145:7
reflected   95:1
refresh   24:5
refusing   161:12
refute   174:14,16
regard   175:17
regarding   34:7
    112:24 118:1
    161:9 175:4,12
    181:2,11
register   90:10
registered   96:10
    97:10
regular   22:5
    103:13,15,18
regularly   96:1
    97:2,22 106:12
relate   74:22 123:1
related   40:16 41:6
    44:19 52:8,10
    54:18 75:16 80:14
    90:2 91:5 147:13
    148:4
relates   1:9 73:4

relating   64:13
    80:20 155:24,25
    167:13
relationship
    162:13
relative   116:5
    183:2
relatively   144:24
release   39:2
    146:17
released   67:3 75:6
    78:2
relevance   39:4,7
relevant   64:9,25
    65:18
relief   15:2
relieve   117:12
rely   33:5,9,12,15
    143:11 166:12,15
    166:19,25 167:4,8
    167:11,15,19
    168:5,12
remain   99:8
remained   144:24
remember   24:9
    43:4 66:19 91:19
    126:3 127:17
    162:19 175:6
remind   129:24
reminding   130:9
rems   145:22,24
    146:3,12,16
repeat   43:10
    148:24
repetitive   84:20
rephrase   16:6
report   35:20 56:19
    78:3 82:1 138:10
    143:11,25 144:1
    144:13 158:2,12

reported   154:6
    156:8,14,16,21
reporter   6:15 13:1
    185:7
reporter's   6:12
    182:1
reporting   90:15
    158:4
reports   40:1 143:3
    145:12
represent   10:13
    165:7
representative
    32:3
representing
    10:17,19
request   13:18
    134:17,17,20
    186:9,11
requested   31:10
    44:17 134:15,16
    181:1,6,10
require   117:11
    118:4 141:21
    146:12,14,18
required   40:24
    90:10 91:9 97:24
    111:20 141:18
    144:11 184:25
requirement
    91:13,16,22 96:1
requirements
    95:22 97:15 98:6
rescue   29:17,21
    46:25
research   21:19
    27:8 58:6 78:7
    83:2 131:25
researched   81:15
    93:1

researching 27:10
30:2 82:13
residency 17:15
17:17,25 18:4
34:16
residents 19:21
20:4 21:3 43:21
44:2,14
resistance 27:13
30:3,11,12
resolve 79:9
119:20
resource 131:24
132:13
resources 25:3
124:3,11,17 125:2
129:19 132:3,19
132:22 135:19
137:9 141:15
142:3 170:13,22
respect 31:1 78:14
80:1 83:19 103:22
143:23
respiratory 109:3
159:1
respond 23:23
29:20 30:15
responded 141:3,8
responding 113:5
response 23:20
30:4 48:6 53:7,13
53:16 180:10
responsibilities
20:13,23 21:2,23
22:16 23:12 31:7
44:5 72:5,6
responsible 57:3
68:17 104:5
rest 47:7
restate 38:2 97:11
170:10,17

result 72:11
104:21 121:5,15
147:25
resulted 120:6
retail 159:22,24
160:3,7,25 175:11
175:20 176:4
retain 41:1
retained 6:15
retract 141:20
retrain 170:14
retrained 170:5
returned 184:18
review 48:11
78:18 81:19 82:22
101:1,1 102:7,11
102:12,19 104:10
106:1,10,11 107:7
107:15,17,22
109:9,11,15
110:24 113:17
114:25 115:22
117:1,16 118:12
118:17,25 119:9
119:16,25 120:7,8
120:9,13 121:8,15
121:21,23 134:14
134:23 135:15,18
136:20 138:2
145:13 154:23
158:12 169:22,25
170:21 171:12
177:6,8,13 179:9
181:2,6 184:12
185:1 186:1
reviewed 14:9
68:1,2 82:19,21
87:19 115:7
118:21 119:2
128:19 133:20
135:10,13 154:5

154:15 155:24
reviewing 68:9,13
68:15 82:14
135:22 138:1
reviews 100:23
107:18 115:19
137:11
rice 2:9 10:17
richard 4:9 11:13
right 26:18 48:3
59:15,21 62:19
68:23 70:11 71:18
77:18 83:6 86:9
86:16 93:5 104:25
116:12 119:21
120:24 125:11
138:17,17 149:9
150:12,19 153:1
163:8 168:21
169:4 177:7 179:5
179:9,19
risk 29:18 33:2
35:11 62:3,5,13,18
63:8,20 70:20,24
71:5 77:9 80:13
80:21,22,25 83:5
83:12 84:14 96:24
106:23 108:12
109:2 142:12
145:25 152:9,13
152:24 157:15,16
157:19 158:18
167:13 179:3
risks 33:13,16
34:24 35:1,10,22
63:16 84:7 165:16
166:6,13,16,20
167:1,5,20
rite 172:25 173:22
174:19,24 175:18
176:2

robin 2:15 10:18
role 21:6,10 24:16
30:24 31:1 55:16
56:15 57:10,21
58:1,5 100:20
125:1
rolls 74:10
roman 86:17
room 10:9 22:1
28:23 38:9 40:22
72:18 83:17 93:4
97:7,14 98:5
112:25 157:22
root 94:3,9
ropes 3:15,20 11:2
11:5 165:6
ropesgray.com
3:18,22
rough 143:6 144:9
144:15
rounds 43:20,22
43:25 44:11
route 158:9
rpr 1:25
rule 56:12 70:1
rules 12:7,24 50:4
128:14 129:2
132:17,18 172:7
181:3,7 185:5
186:5
run 40:1 143:3
144:1,4 145:12
running 111:11
rwilson 2:17
rx 3:8 10:25 90:15
172:2,21 173:14
174:10

| s |
|---|

s 3:4 184:15 186:8
186:8 187:3

**sacks** 2:21 12:2,3
**safe** 30:21 34:13
  37:13 55:21 112:1
  112:4 150:15
**safely** 55:19 56:3
**safer** 7:17 25:15
  64:17 112:4 125:2
  148:15 149:7
  162:21
**safety** 7:16 22:20
  22:21 30:25 31:2
  31:6,15 48:10
  65:6,12 85:12,13
  88:10,16,19,21
  89:1,3,18 99:6,9
  99:13 100:3 102:1
  111:16,18 123:5,8
  123:12,24 124:23
  124:24 138:15
  139:10 140:24
  142:4 146:4,9
  149:22 150:19
  163:3
**salvatore** 2:20
  11:19
**samaritan** 50:1
**samhsa** 23:20
  46:10
**san** 5:11
**satellite** 18:19,24
  19:3
**saw** 76:15 78:3
  127:9
**says** 69:7 70:18
  74:13 79:5 85:21
  86:9,17 88:16
  90:9 106:8 114:3
  115:6 116:15,21
  117:16 119:23
  133:12 150:15,18
  151:13,17 152:22

155:13,18
**sbadala** 2:23
**scale** 38:23
**scenarios** 113:8
**schematic** 153:1
**scholer** 5:4
**school** 166:20,24
**scientific** 167:4
**scolnick** 2:4 10:11
  10:12 16:21 18:20
  19:8,16,19,23
  29:11 30:16 31:20
  31:24 32:14,19
  37:25 52:16,20
  53:4 57:6 61:15
  62:21 63:10,22
  64:3,6 65:2,5,20
  69:22 71:7 76:4
  77:3 80:12 84:9
  84:19 86:22 87:3
  89:2 93:9 96:16
  98:12 99:11
  100:11 101:18
  104:8,24 105:1
  117:23 118:6
  121:9,11 133:25
  134:7 135:9,25
  136:9 137:16
  142:13,15 151:8
  153:16 154:1,12
  154:20 155:9
  156:4 157:13
  158:1 160:9
  161:22 166:9,22
  168:8,14 170:8
  171:1,7 174:7,12
  176:10 177:5
  178:19,25 179:20
  180:4,9,11 184:5
**scope** 18:21 19:14
  19:17 32:9 42:21

42:23,25 43:3
  65:3,20 82:5,15
  86:22 87:3 100:12
  101:19 104:8
  112:16 134:7
  146:22 155:10
  160:10 161:23
  162:11 176:10
  179:20 180:4
**scott** 2:3,3,7 10:12
  10:12
**scott.com** 2:7
**scratch** 126:22
**screen** 113:6 125:8
**script** 112:23
  113:11,15
**seal** 183:6 185:15
  186:21
**second** 18:13 42:4
  48:10 83:15 90:5
  95:19 116:20
  125:17 139:22
  141:15 151:12
  156:11
**section** 49:15
**secure** 134:1
**secured** 134:2
**sedating** 158:24
**see** 23:18 40:13,17
  40:17 57:14,16,18
  61:13 68:6 69:8
  70:21 71:19 73:25
  74:8,14 76:5
  86:10,18 88:17
  90:12 110:20
  114:8 115:1
  116:17,24 117:18
  120:1 125:20
  131:25 132:23
  133:10 138:10
  139:3,24 140:6

144:3 145:8,14,17
  147:13 150:16,22
  151:15 152:10
  153:4,7 155:15,21
**seeing** 28:24 75:4
  86:13 93:3
**seeking** 40:20
**seen** 67:24 75:1
  76:21 79:8 85:7
  140:11 143:16
  149:4
**select** 109:10,13
**selecting** 113:7
**self** 143:14 158:4
**sell** 162:8
**semisynthetic** 37:3
**sense** 34:2 50:14
  61:5 122:3 137:3
  157:8,8 160:13
**sent** 75:11
**sentence** 117:16
  127:6
**sep** 21:21
**separate** 102:16
  137:20
**separately** 119:17
**september** 92:4
  99:10 100:1
  183:17
**serve** 19:15,21
  48:3,8
**served** 51:9
**serves** 53:12 107:7
**service** 4:7 162:11
**services** 3:8 10:25
  18:6 25:21 172:2
  172:22 173:14
  174:11
**set** 58:20 104:14
  126:12 130:7,12
  130:13 131:2,3,6

183:6

sets  58:10 69:24
  124:10,10 126:4,5
  126:6 127:6,15,20
  129:17

setting  58:17
  64:21 73:1 128:20
  130:19

settings  87:18
  130:12

seven  127:12
  150:8

seventh  124:4

severity  116:16,21

shannon  152:18

shapira  4:9 11:14

shapira.com  4:11

shaun  5:16

shayna  2:21 12:3

sheet  184:13 186:7
  186:10,18 187:1

sherman  3:12

sherrie  88:1

shifts  19:3 44:15

shkolnik  2:20
  11:25 12:4

shorter  39:1

shortly  89:11
  113:22

show  24:4 37:19
  111:11

shown  184:16

shows  125:8

sic  42:7 169:16
  174:25

side  38:23 40:10
  52:11 114:22

signature  181:5
  183:13 184:14

signed  185:13
  186:18

significance  86:20
  108:9,25

signing  184:19

signs  52:10 125:10
  125:19

similar  79:23

simple  12:24

simplification
  70:3

simplifies  126:19

simply  144:10
  169:24 170:21

simulation  112:3
  112:19,22 113:8
  113:18

sincerely  184:21

single  118:14

sir  184:10

sites  24:17 28:5,7
  45:18

sitting  64:12

situation  62:9,11

six  24:15 46:3
  127:10,11 145:7

skin  40:14

sleeping  158:24

slide  7:15 123:11
  124:2 132:22
  138:9 150:11
  152:8 155:14

slides  133:9 138:9
  152:16,19

small  21:3 144:25

smart  124:10
  126:5 143:2

smith  164:6

smoothly  12:25

social  23:21

soft  40:15

sole  36:12

solutions  5:2
  184:1 187:1

somebody  31:17
  61:19 154:17

somewhat  115:18

soon  96:6

sophisticated
  122:24 135:21

sophistication
  103:2

sorry  43:10 97:11
  116:19 121:9
  132:25 136:16
  168:24 177:16,17

sort  78:8 83:18
  114:14,20 126:7
  132:13 133:23

sought  15:2 21:14
  81:15

sounds  32:5 163:7

source  151:22
  152:22

sources  33:16
  35:15 46:9 47:6
  76:18 151:23
  167:24 168:11,16
  168:19 169:1

south  2:11

southern  27:25
  28:9

spaeder  3:9 10:24
  172:1

sparked  104:11

speak  44:17 70:13
  84:11 97:20 98:2
  98:3 134:8 177:17
  179:6

speaking  129:3

specgx  3:14 11:3,6

specialist  79:12
  124:22 131:10

specialized  133:14

specialties  116:5
  116:10

specialty  130:20

specific  47:15
  49:19 51:19 62:18
  62:23 63:6 74:22
  82:21 89:17 98:2
  115:12 117:13
  127:4 131:21
  135:23 141:11
  165:24 166:1
  167:11 171:11
  175:7,24,25 179:7

specifically  28:20
  34:15 49:14 75:17
  123:1 147:21
  148:2

specifics  82:20
  89:23

specified  152:3
  182:21

speculate  76:6

spend  78:18
  115:21

spent  22:4,7

spinal  117:16

spoke  30:18,18
  135:4

sponsored  41:19
  99:17

square  2:15

ss  182:3

ssacks  2:24

stable  144:25

staff  18:11 19:6,12
  20:21 21:6 25:15
  31:12,14 44:2
  66:5 92:11 100:23
  111:11

staffing  46:23
  161:25
staffs  24:24
stakeholders
  48:23 87:16
standard  126:6,14
standardizes
  126:19
stands  27:20
start  12:23 13:5
  16:9 20:16 23:18
  23:18 48:17 51:17
  65:11 66:12 71:10
  78:6 96:5 113:21
  138:20
started  21:17
  23:14 25:9 27:7,8
  27:10,23 34:5
  37:9 44:4,9 66:10
  82:23 92:21 102:7
  106:18,21 115:16
  127:18 134:13
  135:18 137:15
  154:18
starting  154:8
starts  60:4 73:18
state  10:10 11:11
  12:14 25:2 37:12
  46:18 49:24 56:20
  64:19 66:8,8,23
  67:3 75:16 86:1
  87:19,20 89:22
  90:11 94:15
  130:14 132:17
  170:12 182:2,7
  183:15 185:10
  186:15
state's  64:18
stated  81:9 156:8
statement  185:13
  185:14 186:19,19

states  1:1 10:7
statewide  53:11
stating  170:14
status  15:14
steady  27:3
stenotypy  182:14
step  119:9 153:6
stephen  1:25
  182:6 183:14
steve  171:25
steven  3:10 10:23
stewardship  119:7
  120:15,18
stigma  66:2 99:18
stop  71:11
storage  55:22
stored  55:19 56:3
  133:23 134:1,11
storing  134:4
straight  102:11
strangely  145:11
strategies  104:20
strategy  146:1
streams  46:2
street  3:10,16 4:4
  5:11
strike  27:15 35:13
  39:6 45:24 49:18
  61:11 66:14 71:9
  83:14 88:14,24
  91:3 95:17 99:21
  107:1 130:16
  143:21 148:12
  153:11,20,20
  160:17
stronger  108:15
structure  18:17
students  21:2
  43:21,23 44:2,6,14
studied  154:14

studies  33:8 156:5
  156:20,25
study  138:9
subcommittee
  47:20 49:20 50:8
subject  43:17
  121:7
subscribed  185:10
  186:14 187:21
subsequent  121:3
substance  7:11
  48:11 57:22 58:2
  61:21,22 84:25
  85:13 87:1 91:6
  96:22 99:2 101:2
  101:7 102:7,18
  104:10 106:1
  134:14,22 135:15
  135:18
substances  37:4
  43:9,13 55:4,8,17
  55:22 56:16,25
  58:12 69:15 74:7
  102:12 146:18
  161:19
suffering  25:6
suggested  31:11
  170:4
suite  1:21 2:15 3:5
  3:10 184:2
summary  120:21
  143:15
summer  163:5
summit  1:13 14:12
  19:22
superior  184:1
supervisor  45:2
supplied  47:5
supplies  127:13
supply  57:22 58:2
  79:1,4,8 80:3

83:25 129:15
  164:12
support  24:2 25:3
  31:13 45:21 49:23
  114:6 124:7
  132:21 142:3
  170:13,22 174:5
  174:10,13,16
supported  26:2
  50:1
supporter  24:23
supporters  25:1
sure  20:19 26:17
  27:12,17,20 32:19
  37:20 38:3 43:12
  47:22 48:13 49:9
  65:17 100:15
  109:8 129:10
  149:1 152:4
  162:10
suspicious  56:22
  57:17
switch  159:6
sworn  12:8 182:10
  185:10,13 186:14
  186:18 187:21
synthesis  168:15
synthetic  37:2
system  7:10,13
  18:15 55:3 84:25
  89:4 90:16 105:13
  109:25 133:12,17
  136:25 138:3
  139:3,9,16,17
  140:18 144:17,21
  146:10 149:24
systems  51:10
  53:19,21

[table - topic]                                                   Page 31

| t | | | |
|---|---|---|---|
| **table** 37:19 | 5:9 | 37:23 38:5 43:18 | 83:9,11 86:12 |
| **tablet** 127:9,10,11 | **telephonic** 78:21 | 45:15 48:3,12 | 88:8,11,22 89:1,14 |
| **take** 13:15,17 | **tell** 158:16 177:2 | 50:25 61:8 66:8 | 89:19 91:15 93:16 |
| 32:25 40:24 41:3 | 178:6 | 73:6 75:22 76:17 | 95:12 96:15 97:10 |
| 52:15 53:25 72:17 | **tells** 158:15 | 77:12,24,24 78:6 | 97:14 100:17,18 |
| 78:19 90:5 92:9 | **temporal** 154:10 | 92:6 93:13 94:2 | 100:20 111:10,22 |
| 95:21 100:14 | **ten** 103:19,20 | 96:10 100:14 | 114:15 115:14,20 |
| 115:21 122:21 | **tended** 50:20 | 102:23 104:9 | 118:10,19 131:6 |
| 133:23 141:6 | **term** 37:1,6,7 55:6 | 112:2 116:3 | 135:10,23 136:21 |
| 157:10 158:8 | 137:24 | 122:14 124:2,4 | 137:6,8,10,12 |
| **taken** 1:20 22:15 | **terminology** 36:21 | 125:15 128:25 | 145:5 149:14 |
| 23:11 41:6,22 | 112:13 | 132:24 136:15 | 157:12 159:9 |
| 43:8,12 54:6 | **terms** 58:22 71:5 | 145:12 149:25 | 163:4,5,7 164:15 |
| 80:16 159:1,13 | 93:19 99:14 | 154:25 155:1 | 165:2 167:1 178:3 |
| 164:22 171:20 | 101:15 108:19 | 156:14 157:14 | 179:13 182:20 |
| 182:20 | 117:14 118:12 | 164:14 168:4,11 | **times** 45:21 |
| **takes** 60:19 81:2 | **terrible** 71:10 | 168:15,22 169:3 | 143:18,20 144:4,7 |
| **talk** 13:3 | **testified** 77:15 | 178:4 | 180:5 |
| **talked** 59:23 | **testify** 15:18,23 | **third** 63:20 70:17 | **tired** 52:23 98:14 |
| 165:11 169:19,22 | 182:10 | 114:2 | **tissue** 40:15 |
| **talking** 16:10 44:4 | **testifying** 14:3,7 | **thirty** 184:18 | **title** 47:22 67:20 |
| 101:14 158:22 | **testimony** 13:24 | **thought** 128:12,13 | 73:6 124:3 |
| **targeted** 121:13 | 182:13,17 185:6,7 | 137:7 | **titled** 7:4,10,15,17 |
| **task** 44:21,24 45:3 | 186:6,9,12 | **three** 79:1,3,8 80:3 | 67:12 84:24 |
| 45:5,8,14 47:15,18 | **testing** 158:11 | 80:8 83:25 127:12 | 123:11 138:9 |
| 48:10,16 49:4,8 | **teva** 4:18 11:18 | 128:24 129:4,14 | 148:15 149:6 |
| 50:12,16 69:8,10 | **thank** 54:3,10 | 133:8 145:17,19 | **today** 12:25 13:24 |
| 69:12 70:8,12,14 | 98:25 105:19 | **threshold** 130:13 | 14:3,8 15:18 |
| 75:10,12 88:10,10 | 148:22 149:3 | **thrive** 24:24 | 18:14 64:12 70:25 |
| 88:20 92:16 100:3 | 159:18 164:15,17 | **tie** 147:18 | 97:5 99:23 100:5 |
| **taught** 34:9 43:3 | 165:2 180:7 | **time** 13:16 20:8 | 165:3,14 172:18 |
| 43:15 55:25 | **therap** 72:25 | 21:3,20,25 22:3,5 | 176:6 179:24 |
| **teach** 44:12 | **therapeutic** 85:12 | 23:3 25:10,22 | **tongue** 74:10 |
| **teaching** 21:1 44:5 | **therapies** 145:18 | 27:3 28:22 31:10 | **tools** 65:9 |
| 44:13 | **therapy** 72:16,19 | 33:22 34:1 35:2,6 | **top** 22:11,13 24:12 |
| **team** 23:22 39:16 | 155:19 | 35:22 37:14,24 | 43:5 67:21 106:8 |
| 74:20 148:8 | **thing** 133:6 | 42:1 43:11 48:22 | 124:3 125:8 |
| **teams** 23:20 | **things** 26:24,24 | 53:2 66:21 67:3 | 144:19 150:18 |
| **teleconference** | 29:9 128:2 | 68:10,15 75:3,5,8 | 152:25 155:14 |
| 2:19 4:8,13,20 5:3 | **think** 24:11 26:7 | 76:1,5 78:2,19 | **topic** 113:6 159:7 |
| | 32:6,13,14 36:6,6 | 80:16,18 82:9 | |

**topics** 43:24 44:19
  113:2,5
**total** 103:14
  107:23,24 125:5,6
  125:11,20,22
  126:16 132:11
  136:2,2,3,3 139:2
  139:8 140:2,3
  147:4
**totality** 36:15
**tower** 3:16
**town** 65:7,10
  146:9 149:22
  150:1
**toxicology** 113:6
**train** 111:23
**trained** 122:19
**training** 30:5 34:9
  34:14,17 42:18,20
  42:24,24,25 54:13
  54:18 112:10,10
  112:11
**trainings** 26:5,6
**trains** 29:8
**trajectory** 93:20
**transcribe** 13:10
**transcribed**
  182:16 185:7
**transcript** 6:1
  181:3,6,9,11
  184:11,12 185:5
  185:12 186:5,11
  186:17
**transcription**
  182:17
**transitioning**
  156:3 157:4
**treat** 38:13 39:8
  39:15 112:7 180:6
**treated** 38:8 40:9
  76:22 111:1 156:7

**treating** 34:12
  39:5 63:7 157:21
**treatment** 22:23
  24:2 25:7,24 26:1
  26:4,12 34:13
  40:20 49:12 52:9
  112:11 156:13,15
**treatments** 50:4
**trend** 135:11
  137:15,24
**tried** 119:8 132:18
**true** 182:16
**trust** 84:13
**truth** 182:11,11,12
**truthful** 13:23
**try** 13:3 104:6
  106:15 165:3
  172:15
**trying** 108:17
  114:19,19 169:20
  178:6
**tucker** 3:4 10:21
**tuckerellis.com**
  3:6
**turn** 124:1
**turning** 95:18
**twelfth** 4:4
**two** 25:10 36:23
  41:13 48:8,9
  124:19 125:5
  152:16,19 156:5
  156:25
**type** 30:4 38:13
  70:23 120:5
  130:11 132:3
  165:21 178:11
**typical** 117:1
**typically** 23:24
  60:15 69:25 76:5
  80:4,6 84:14
  96:18 106:16

|  | **u** |  |
| --- | --- | --- |

**u.s.** 47:18 48:15,22
  50:11,18
**uh** 13:10,10,10
  73:23 90:8 95:20
  114:24 170:11
**ultimately** 62:13
**un** 172:6
**underlying** 81:7
**underneath** 69:7
  132:21 151:12
**understand** 14:2
  14:11 15:17 16:3
  55:15 57:2,8
  60:22 63:24 70:3
  80:25 82:23 84:4
  172:7,13
**understanding**
  14:19,22 15:1,4
  34:6 35:4,17 36:5
  56:14,18 58:4,23
  72:12,15 75:20
  76:9 77:23 81:6,7
  82:4 83:3,18 86:6
  97:8,16 105:3
  106:20 119:15
  135:5
**understood** 26:20
  32:11 82:24 85:23
  136:20
**undertake** 77:9
**undertaken** 54:17
  101:10
**unethical** 60:14
**unfortunately**
  26:19 122:8
**united** 1:1 10:6
**units** 24:20 28:6
**unsafe** 150:20
**update** 66:7

**updated** 66:5,21
  149:18,18
**updates** 7:8 65:25
  73:12
**upgrades** 124:13
**upper** 86:9,16
  88:15
**usa** 4:19
**use** 25:6 26:1
  40:14,19 61:21
  62:2 76:6 96:22
  96:24,25 99:18
  112:7 133:12
  144:1 153:14
  156:17
**uses** 161:19

|  | **v** |  |
| --- | --- | --- |

**v** 1:10,11,13 184:6
  185:3 186:3
**valium** 109:8
**varies** 103:12
  107:12 154:5
**variety** 30:20
  44:18 46:1,8 50:6
  87:18 101:20
**various** 28:7 45:20
**veritext** 184:1,7
  187:1
**veritext.com.**
  184:17
**version** 149:18
**versus** 33:2 35:11
  38:14,14 39:18
  40:4 62:3,5 70:20
  78:9 80:13 84:15
  85:20 118:10
  165:21
**victim** 23:25 24:1
**video** 8:1
**videographer** 5:16
  10:1 11:10 54:4,7

98:18,21 159:11
159:14 164:20,23
171:18,21 180:13
**videotaped** 1:16
**view** 16:1
**vince** 7:7 45:3,20
73:11,20
**visit** 130:22
**visits** 145:7
**vital** 125:10
**volumes** 118:4
140:6
**volunteer** 56:10

**w**

**wacker** 4:22
**wait** 13:4
**waived** 184:19
**waiver** 26:4
111:24 112:5,6,13
**wal** 175:18
**walgreens** 173:3
174:1,21,24,25
176:2
**walk** 20:17 24:17
28:4 112:25
**wall** 79:23
**walmart** 4:13
11:16 173:6,18
174:17,24 176:2
**want** 16:9 28:14
29:4 31:22,24
52:14,21,22 91:24
102:19 126:11
132:20 141:20
145:14 150:11
166:11
**wanted** 28:1 48:13
92:9 169:23
**wants** 52:18
**warning** 130:11
131:5 168:7,13

**washington** 3:11
4:5 5:6
**watson** 4:19,20
**way** 30:22 45:14
56:5 66:10 77:8
100:10 126:7
140:9 143:10
152:4 153:25
158:5 176:22
**wc.com** 4:6
**we've** 24:14 25:8
45:15 46:6 52:17
65:8 70:24 125:16
147:17 157:16
158:2 159:6
177:12
**website** 132:15
**wednesday** 44:16
**week** 23:24
**weigh** 166:5
168:17
**weighing** 166:12
166:20 167:1,5,19
**welcome** 54:9
98:24 129:4
159:17
**went** 17:10
**west** 4:22
**western** 50:25
**whatnot** 100:21
**whereof** 183:5
**wholesale** 57:21
59:17 62:25 64:2
**wide** 138:3,4
139:16,17 140:18
144:17,21
**william** 3:15 11:4
165:5
**william.davison**
3:18

**williams** 4:3 11:8
88:1,8 89:13
**wilson** 2:15 10:18
10:18
**wise** 23:5 36:21
**withdrawal** 40:18
**witness** 19:11
29:13 32:3,10
52:18 53:3 54:2
65:4,23 98:16
159:8 164:17
182:9,14,15,18
183:5 184:8,11
185:1,4,11 186:1,4
186:15
**witness's** 181:2
**witness'** 184:14
**wondering** 156:23
**word** 13:12 32:7
**worded** 129:11
145:11
**work** 18:25 19:1
22:8 31:11,13
55:2,11 56:14
72:11,17 83:16
88:7 101:25 102:6
102:8 104:9
127:25 134:8
142:1 162:15
**worked** 18:5,8,8
50:2 87:23 134:5
160:23
**worker** 23:22
**working** 26:15
28:23 89:18 97:7
97:13 161:17
**worthington**
12:19
**worthy** 138:24
**wright** 1:21

**write** 32:24 62:6
62:16 95:7 143:1
143:5 160:14
166:4 169:9,15
179:14,22,23
**writing** 56:6 83:4
84:6,17 96:19
104:23 125:18
142:11 180:2
**written** 37:10,16
37:21 59:1 95:2
113:11 138:13
144:8,13 145:1
151:5 160:18
161:10,13,20
169:12 170:1,6,24
171:5
**wrote** 32:1 38:4
56:25 83:11 96:2
125:16 150:24
161:3

**x**

**xanax** 109:8
**xiv** 86:17

**y**

**yeah** 24:13 48:3
66:15 71:9 73:25
97:13 102:20
121:20,22 123:8
129:7 133:1,6
152:22,22 178:4
**year** 17:15 134:22
136:12 137:7,23
176:21
**years** 20:13 24:15
31:18 41:7,11,13
45:21 46:3 49:21
50:9 51:14 66:24
92:16 101:9
122:22 131:19

134:18 135:21
138:2,6 160:23
**yep** 48:1
**york** 2:6,6,22,22
3:21,21

**z**

**zachary** 4:22
11:17
**zuckerman** 3:9
10:24
**zuckerman.com**
3:12
**zukerman** 172:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.