Page 1

1          UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4          ~~~~~~~~~~~~~~~~~~~~~
5   IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
    OPIATE LITIGATION
6                                Case No.
                                 17-md-2804
7
                                 Judge Dan Aaron
8                                Polster
9   This document relates to:
10  The County of Cuyahoga v. Purdue Pharma, et
    al., Case No. 17-OP-45004
11
    City of Cleveland, Ohio v. Purdue Pharma L.P.,
12  et al., Case No. 18-OP-45132
13  The County of Summit, Ohio, et al. v. Purdue
    Pharma L.P., et al., Case No. 18-OP-45090
14
             ~~~~~~~~~~~~~~~~~~~~~
15
16
            Videotaped Deposition of
17             KIMBERLY PATTON
18            January 22, 2019
                 9:13 a.m.
19
20               Taken at:
21          Brennan Manna & Diamond
             75 East Market Street
22              Akron, Ohio
23
24
            Stephen J. DeBacco, RPR

Page 2

1  APPEARANCES:
2
3    On behalf of the City of Akron, Summit
     County, and the Witness:
4
       Motley Rice LLC, by
5      ANNE MCGINNESS KEARSE, ESQ.
       DANIELLE R. SALERNO, ESQ.
6      28 Bridgeside Boulevard
       Mt. Pleasant, South Carolina 29464
7      (843) 216-9140
       akearse@motleyrice.com
8      (843) 216-9461
       dsalerno@motleyrice.com
9
10 On behalf of Walmart, Inc.:
11     Jones Day, by
       KRISTIN S.M. MORRISON, ESQ.
12     North Point
       901 Lakeside Avenue
13     Cleveland, Ohio 44114-1190
       (216) 586-7375
14     kmorrison@jonesday.com
15
     On behalf of AmerisourceBergen Drug
16 Corporation, via teleconference:
17     Jackson Kelly, PLLC, by
       JILL McINTYRE, ESQ.
18     500 Lee Street East, Suite 1600
       Charleston, West Virginia 25301-3202
19     (304) 340-1018
       jmcintyre@jacksonkelly.com
20
         ~ ~ ~ ~ ~
21
22
23
24
25

Page 3

1  APPEARANCES, Continued:
2
     On behalf of Cephalon, Inc.; Teva
3  Pharmaceuticals USA, Inc.; Actavis, LLC;
   Actavis Pharma, Inc. f/k/a Watson Pharma,
4  Inc.; and Watson Laboratories, Inc.:
5      Morgan, Lewis & Bockius LLP, by
       WENDY WEST FEINSTEIN, ESQ.
6      One Oxford Centre, 32nd Floor
       Pittsburgh, Pennsylvania 15219-6401
7      (412) 560-7455
       wendy.feinstein@morganlewis.com
8
9  On behalf of Cardinal Health:
10     Williams & Connolly, by
       PAUL E. BOEHM, ESQ.
11     Williams & Connolly LLP
       725 Twelfth Street Northwest
12     Washington, D.C. 20005
       (202) 434-5366
13     pboehm@wc.com
14
15 On behalf of Cephalon, Inc.; Teva
   Pharmaceuticals USA, Inc.; Actavis, LLC;
   Actavis Pharma, Inc. f/k/a Watson Pharma,
16 Inc.; and Watson Laboratories, Inc., via
   teleconference:
17
       Morgan, Lewis & Bockius LLP, by
18     ZACHARY R. LAZAR, ESQ.
       77 West Wacker Drive
19     Chicago, Illinois 60601-5094
       (312) 324-1492
20
         ~ ~ ~ ~ ~
21
22
23
24
25

Page 4

1  APPEARANCES, Continued:
2
     On behalf of Endo Pharmaceuticals, Inc.,
3  Endo Health Solutions, Inc., Par
   Pharmaceuticals, Inc. and Par
4  Pharmaceutical Companies, Inc.:
5      Arnold & Porter Kaye Scholer, by
       NICOLE E. LEIBOW, ESQ.
6      250 West 55th Street
       New York, New York 10019-9710
7      (212) 836-7838
       nicole.leibow@arnoldporter.com
8
9  On behalf of McKesson Corporation:
10     Covington & Burling LLP, by
       BRYANT E. PULSIPHER, ESQ.
11     One Front Street
       San Francisco, California 94111-5356
12     (415) 591-7055
       bpulsipher@cov.com
13
14 On behalf of Johnson & Johnson and
   Janssen Pharmaceuticals, Inc.:
15
       Tucker Ellis, LLP, by
16     BRENDA A. SWEET, ESQ.
       950 North Main Avenue, Suite 1100
17     Cleveland, Ohio 44113
       (216) 696-2493
18     brenda.sweet@tuckerellis.com
19         ~ ~ ~ ~ ~
20 ALSO PRESENT:
21     Joe VanDetta, Legal Videographer
22         ~ ~ ~ ~ ~
23
24
25

Page 5

1          TRANSCRIPT INDEX
2
3  APPEARANCES.............................   2
4
5  INDEX OF EXHIBITS ......................   6
6
7  EXAMINATION OF KIMBERLY PATTON
8  By Ms. Feinstein..........................   11
9  By Mr. Boehm.............................  248
10 By Ms. Morrison..........................  260
11 By Ms. Kearse............................  267
12 By Ms. Feinstein..........................  273
13 By Mr. Boehm.............................  276
14
15 REPORTER'S CERTIFICATE...................  282
16
17 EXHIBIT CUSTODY
18 EXHIBITS RETAINED BY THE COURT REPORTER
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

```
 1        INDEX OF EXHIBITS
 2 NUMBER      DESCRIPTION      MARKED
 3 Exhibit 1  Kimberly Patton Resume, ...... 19
            SUMMIT_001128843 to
 4          001128846
 5 Exhibit 2  Bullet Point List of Job ..... 67
            Responsibilities,
 6          SUMMIT_000959818 to
            000959819
 7
   Exhibit 3  Document Titled "Objectives .. 157
 8          and Brief Bio for Quick
            Response Teams in Summit
 9          County," SUMMIT_000945488
10 Exhibit 4  Document Titled "Summit ...... 162
            County Quick Response Team
11          Quarterly (Q2) Meeting,
            September 21, 2017,"
12          SUMMIT_000960323
13 Exhibit 5  ADM Board Document Titled .... 183
            "Summit County Quick
14          Response Team,"
            SUMMIT_001793050 to
15          001793051
16 Exhibit 6  May 2018 E-Mail Chain Re: .... 187
            QRT, SUMMIT_000970749 to
17          000970754
18 Exhibit 7  Document Titled "Training & .. 204
            Development Request,"
19          SUMMIT_000945633
20 Exhibit 8  Document Titled .............. 208
            "Prescription for
21          Prevention: Cuyahoga County
            Coalition Minutes from April
22          20, 2011 Meeting,"
            CLEVE_000216547 to 000216548
23
24
25
```

Page 7

```
 1 Exhibit 9   Slide Deck Titled "The ....... 228
            Opiate Epidemic Hits Home:
 2          What We All Need to Know,"
            SUMMIT_000289523 to
 3          000289533
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1        INDEX OF VIDEO OBJECTION
 2 OBJECT                        PAGE
 3 objection.................... 52
            objection........... 53
 4 objection................... 53
            object.............. 63
 5 object...................... 78
            object.............. 124
 6 object...................... 125
            object.............. 125
 7 object...................... 130
            object.............. 136
 8 object...................... 143
            object.............. 146
 9 object...................... 148
            objection........... 170
10 object..................... 180
            object.............. 193
11 object..................... 199
            object.............. 200
12 object..................... 202
            object.............. 206
13 object..................... 206
            object.............. 211
14 object..................... 212
            object.............. 212
15 object..................... 214
            object.............. 215
16 object..................... 215
            object.............. 215
17 object..................... 216
            object.............. 218
18 object..................... 218
            object.............. 218
19 object..................... 219
            object.............. 219
20 object..................... 222
            object.............. 222
21 object..................... 223
            object.............. 239
22 object..................... 254
            object.............. 255
23 object..................... 256
            object.............. 258
24 object..................... 259
            object.............. 259
25 object..................... 266
```

Page 9

```
 1 objection.................... 268
   objection.................... 269
 2 move to strike.............. 270
   objection.................... 271
 3 object...................... 276
   object...................... 276
 4 object...................... 277
   object...................... 277
 5 object...................... 278
   object...................... 278
 6 object...................... 278
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions

www.veritext.com                                                    888-391-3376

1       THE VIDEOGRAPHER:  We are now on
2  the record.
3       The date is January 22, 2019.  The
4  time is 9:13 a.m.
5       The caption of this case is In Re:
6  National Prescription Opiate Litigation.
7       The name of the witness is Kimberly
8  Patton.
9       At this time, the attorneys present
10  and those attending remotely will identify
11  themselves and the parties they represent.
12       MS. KEARSE:  Anne Kearse with
13  Motley Rice on behalf of the County of Summit,
14  City of Akron, and the Witness.
15       MS. SALERNO:  Danielle Salerno with
16  Motley Rice on behalf of Summit County, City of
17  Akron, and the Witness.
18       MS. FEINSTEIN:  Wendy West
19  Feinstein with Morgan Lewis on behalf of the
20  Teva Defendants.
21       MR. BOEHM:  Paul Boehm with
22  Williams & Connolly for Cardinal Health.
23       MS. MORRISON:  Kristin Morrison,
24  Jones Day, for Walmart.
25       THE VIDEOGRAPHER:  Those on the

1  phone?
2       MS. LEIBOW:  Nicole Leibow with
3  Arnold & Porter on behalf of Endo and Par.
4       MR. LAZAR:  Zachary Lazar of Morgan
5  Lewis on behalf of the Teva Defendants.
6       MR. PULSIPHER:  Bryant Pulsipher of
7  Covington & Burling for McKesson.
8       MS. SWEET:  Brenda Sweet of Tucker
9  Ellis on behalf of Janssen and Johnson &
10  Johnson.
11       THE VIDEOGRAPHER:  Will the court
12  reporter please swear in the witness.
13       KIMBERLY PATTON, of lawful age, called
14  for examination as provided by the Federal
15  Rules of Civil Procedure, being by me first
16  duly sworn, as hereinafter certified, deposed
17  and said as follows:
18       EXAMINATION OF KIMBERLY PATTON
19  BY MS. FEINSTEIN:
20       Q.   Good morning, Ms. Patton.
21       A.   Good morning.
22       Q.   I'll reintroduce myself.  We met
23  briefly before we went on the record this
24  morning.  My name is Wendy West Feinstein.  I
25  am with Morgan Lewis, and I represent the Teva

1  Defendants in this litigation.
2       Could you please state your full
3  name for the record?
4       A.   Kimberly Patton.
5       Q.   Where do you live?
6       A.   For the purpose of this, I want
7  to -- is it okay if I wanted to give the County
8  of Summit ADM address?
9       Q.   Well, that's fine to have you work
10  address, but I'd also like to know where you
11  live as well.
12       A.   Okay.  Work address is 1867 West
13  Market Street, Suite B, Akron, Ohio 44313.
14       Q.   Thank you.
15       A.   The home address, I live in
16  Cuyahoga County.
17       Q.   Okay.  And the city of Parma?
18       A.   Correct.
19       Q.   For how long have you lived in
20  Cuyahoga County?
21       A.   With the exception of six months,
22  all of my life.
23       Q.   For how long have you worked in
24  Summit County?
25       A.   May 2nd of 2016.

1       Q.   When you started with the ADM
2  Board?
3       A.   Correct.
4       Q.   Have you ever had your deposition
5  taken before?
6       A.   No.
7       Q.   As your attorneys may have
8  explained to you, I'm going to be asking you a
9  series of questions today.  The court reporter
10  is taking down everything that's being said in
11  the room while we're on the record.
12       And you understand that?
13       A.   Yes.
14       Q.   And the videographer is also
15  recording everything that occurs in the room
16  while we're on the record.
17       You understand that?
18       A.   Yes.
19       Q.   Even though we have the
20  videographer, it's really important, and you're
21  doing a great job so far, that you answer
22  verbally rather than with gestures, so that the
23  written transcript is accurate, okay?
24       A.   Yes.
25       Q.   If at any time I ask you a question

Page 14

1 that you don't understand, please let me know
2 and I'll do my lest to rephrase it, okay?
3    A.  Yes.
4    Q.  If you answer a question that I've
5 asked, I'll assume that you understood as I've
6 asked it.  Is that fair?
7    A.  Yes.
8    Q.  Have you ever testified in any
9 proceeding?
10    A.  No.
11    Q.  Have you ever given a sworn written
12 statement?
13    A.  No.
14    Q.  What did you do to get ready for
15 your deposition today?
16    A.  I have met with the attorneys on, I
17 would -- on four occasions.
18    Q.  And for how long did you meet with
19 the attorneys?
20    A.  The time varied, but it ranged from
21 two to four hours, during each session.
22    Q.  When were those sessions?
23    A.  I don't have the exact dates.  The
24 first time I met with them was back in August
25 of 2018.  I met with them on two occasions.  I

Page 15

1 met again with them in November of 2018, and I
2 met with them lastly last week, which was
3 January 17th.
4    Q.  How long did you meet with them
5 last week?
6    A.  For two hours.
7    Q.  Did you review any documents to
8 prepare for your deposition?
9    A.  In looking at documents, it wasn't
10 too -- I was just looking at some of the
11 e-mails; they had some questions for clarifying
12 information.
13    Q.  Did any of the e-mails refresh your
14 recollection of events?
15    A.  No.
16    Q.  Do you recall the subject matter of
17 any of those e-mails?
18    A.  Recovery housing was one of the
19 topics.
20    Q.  Anything else that you recall?
21    A.  One of the other topics was an
22 e-mail in regards to residential treatment.
23    Q.  Did you talk with any of the other
24 members of the ADM Board who have also been
25 deposed?

Page 16

1    A.  The extent of our conversation was
2 just simply how long did it take.  I have two
3 young children, so it was me trying to be
4 proactive in making childcare arrangements.
5    Q.  Who did you talk to?
6    A.  I did ask Eric Hutzell how long he
7 was deposed for, and then I also asked Doug
8 Smith.
9    Q.  What did they tell you?
10    A.  They said it will be a long day.
11    Q.  Did you talk with either
12 Mr. Hutzell or Dr. Smith about the substance of
13 their testimony?
14    A.  No.
15    Q.  Did you read either of their
16 transcripts?
17    A.  No.
18    Q.  Did you ask either of them about
19 any exhibits that were shown during their
20 depositions?
21    A.  No.
22    Q.  Did either of them offer that
23 information to you?
24    A.  No.
25    Q.  Did you talk with anyone else about

Page 17

1 depositions in this litigation, whether with
2 the ADM Board or otherwise?
3    A.  No.
4    Q.  When did you talk with Dr. Smith?
5    A.  I would say approximately two --
6 two and a half weeks ago.
7    Q.  When did you talk with Mr. Hutzell?
8    A.  I texted him the evening of his
9 deposition and asked how long it took.
10    Q.  Other than telling you it would be
11 a long day, did they tell you -- give you any
12 other tips for the deposition?
13    A.  No.  Eric Hutzell said to bring
14 snacks.
15    Q.  That's a good suggestion.
16        Did you talk with Mr. Craig at all?
17    A.  No.
18    Q.  You mentioned that you joined the
19 ADM Board on May 2, 2016, right?
20    A.  Correct.
21    Q.  You have a college degree?
22    A.  Correct.
23    Q.  From where did you get your college
24 degree?
25    A.  I received my bachelor's in

5 (Pages 14 - 17)

Page 18

1 psychology from Kent State University in 2002.
2 And then I received my master's of social
3 science administration from Case Western
4 Reserve University in May of 2009.
5     Q.   Did you go straight from college to
6 the master's program at Case?
7     A.   No, I did not.
8     Q.   What did you do in between?
9     A.   In between I worked for Franklin
10 County Child Support in Columbus, Ohio.  I did
11 also receive a certificate from Columbus State
12 Community College during that time period, to
13 use that education towards my licensure for
14 chemical dependency counseling.  And that was
15 an 18-month program.
16    Q.   Where is Columbus State?
17    A.   Columbus State Community College is
18 in downtown Columbus, Ohio.
19    Q.   How long was that program?
20    A.   18 months.
21    Q.   And you said that you attained a
22 certificate?
23    A.   Correct.
24    Q.   Did you have to take any exam to
25 attain that certificate?

Page 19

1     A.   At Columbus State, no, I did not.
2          - - - - -
3          (Thereupon, Deposition Exhibit 1,
4          Kimberly Patton Resume,
5          SUMMIT_001128843 to 001128846, was
6          marked for purposes of
7          identification.)
8          - - - - -
9     Q.   I'm going to hand you what we have
10 marked as Exhibit 1 for identification
11 purposes.
12         Can you please identify Exhibit 1
13 for the record?
14    A.   It is my resume.
15    Q.   Is this a current version of your
16 resume?
17    A.   Yes.
18    Q.   Can you tell me, from looking at
19 Exhibit 1, in what year it was prepared?
20    A.   I would say it was most likely
21 updated in 2018.
22    Q.   And for what purpose was this
23 prepared in 2018?
24    A.   Simply just to reflect the current
25 employment.  I had not updated it since I had

Page 20

1 my new employment.
2     Q.   Were you applying for any jobs
3 internally at the ADM Board at that time?
4     A.   No, I was not.  I did presentations
5 at some state conferences, and part of that
6 requirement is to submit an updated resume.
7     Q.   Did any of the presentations --
8 strike that.
9         When were the presentations at
10 state conferences?  In 2018?
11    A.   I'd presented at the OACBHA opiate
12 conference in 2017, as well as 2018.
13    Q.   Where is that conference?
14    A.   Columbus, Ohio.
15    Q.   What did you present?
16    A.   I presented on Quick Response
17 Teams.  In 2017, we presented about our first
18 implementation of Quick Response Teams in
19 Summit County.  In 2018, I presented as a
20 followup of one year into utilization of those
21 teams.
22    Q.   So another report on the QRT?
23    A.   Correct.
24    Q.   Did anyone present with you?
25    A.   In 2017, I had three co-presenters:

Page 21

1 two staff from Oriana House and a Cuyahoga
2 Falls police officer.
3     Q.   How about in 2018?  Did anyone --
4     A.   I presented alone.
5     Q.   Okay.  Did you prepare a PowerPoint
6 for either of those years?
7     A.   Yes.
8     Q.   Both years?
9     A.   Yes.
10    Q.   Did you prepare the PowerPoint
11 yourself?
12    A.   I worked in collaboration with the
13 two counselors from Orianna House for the
14 PowerPoint in 2017, and I created it myself in
15 2018.
16    Q.   Did you use any prepared slides
17 that the ADM Board had to develop your
18 PowerPoint for the OACBHA conference in 2018?
19    A.   Not that I recall.
20    Q.   So you created the slides on your
21 own?
22    A.   Correct.
23    Q.   How about for the presentation that
24 was done in 2017?  Did you use any prepared
25 slides that already existed at the ADM Board at

Page 22

1 that time?
2    A.   Not that I recall.
3    Q.   In 2017, what was the arrangement,
4 if any, between -- or the relationship between
5 Oriana House and the ADM Board?
6    A.   Are you referencing specifically to
7 the presentation or in general?
8    Q.   Let's start first in general, and
9 then -- and then talk about the presentation
10 specifically.
11       So in general, in 2017, what is
12 your understanding of the relationship between
13 Oriana House and the ADM Board?
14    A.   Oriana House, it was a con- -- is
15 and was at that time a contracted provider of
16 the ADM Board.
17    Q.   What services did Oriana House
18 provide in 2017?
19    A.   Are you referencing specifically
20 services funded through the ADM Board or --
21    Q.   Yes, let's start there first.
22    A.   So the services funded by the ADM
23 Board in 2017 through -- for Oriana House, we
24 fund a counselor position for the Quick
25 Response Teams.  Then we also do provide

Page 23

1 funding to them for detox services.
2    Q.   Anything else?
3    A.   Off the top of my head, I can't
4 recall all the specifics that is funded.
5    Q.   Who handles the funding
6 relationship between Oriana House and the ADM
7 Board, if you know?
8    A.   Are you referencing, in general,
9 what's agreed upon in the contract, the dollar
10 amounts?
11    Q.   So who at the ADM Board handles
12 determining what services the ADM Board will
13 contract with Oriana House for?
14    A.   It's my understanding that
15 ultimately our management, along with Jerry
16 Craig, meets with their management and agrees
17 upon the services.
18    Q.   You mentioned the counselor
19 position for the Quick Response Team, and then
20 detox services that -- that you're aware of
21 that ADM Board contracts with Oriana House for,
22 right?
23    A.   Correct.
24    Q.   Do the detox services, are they
25 focused on all substances or just opioids?

Page 24

1    A.   The detox program that is funded
2 through ADM is for substances that are deemed a
3 medical necessity for detox services.
4    Q.   So medically-assisted treatment?
5    A.   No.  What I was referencing was if
6 a person presents using a specific substance,
7 such as opioids, they meet the criteria for
8 withdrawal management.  So for medical
9 necessity, if -- there are other substances
10 that a person may be using that will not meet
11 medical necessity for the need of withdrawal
12 management.
13    Q.   What other types of substances,
14 besides opioids, may qualify for a medical
15 necessity withdrawal treatment?
16    A.   The other two substances are
17 benzodiazepines and alcohol.
18    Q.   Do you have any idea -- or strike
19 that.
20       Do you know about how much of the
21 detox services provided by Oriana House, as
22 funded by the ADM Board, relate to opioids
23 versus benzo and alcohol?
24    A.   I do not know that.
25    Q.   The counselor position at Oriana

Page 25

1 House for the Quick Response Team, does that
2 counselor position work with Quick Response
3 Team on overdoses for substances other than
4 opioids?
5    A.   They go out on -- the calls that
6 they go out are -- so the police departments
7 get calls for overdoses that they respond to
8 for the opioids.  There are sometimes other
9 substances also present in the system, but the
10 primary substance that they respond to these
11 visits for is opioids.
12    Q.   Do you know whether there is any
13 percentage of the Quick Response Team responses
14 that are for substances other than opioids, not
15 in combination with opioids?
16    A.   Off the top of my head, I don't
17 have that information.
18    Q.   And the context of my question was
19 what was the ADM Board's relationship with
20 Oriana House, generally, aside from your
21 speaking in 2017.  Do you understand that
22 relationship to have been the same in 2018 as
23 well?
24    A.   Yes.
25    Q.   How about 2016 when you first

7 (Pages 22 - 25)

Page 26

1 joined the ADM Board?  Do you have any
2 understanding of what the ADM Board's
3 relationship with Oriana House was at that
4 time?
5     A.   At the -- I don't know what all
6 specific services were covered under the
7 contract.  I do know that the Quick Response
8 Team piece was added in 2017.  So in 2016, that
9 was not a funded part.
10     Q.   With respect to the presentation
11 that you did in conjunction with some folks
12 from Oriana House, what was the relationship
13 between the ADM and the people at the Oriana
14 House for purposes of that OACBHA presentation?
15     A.   The two counselors presented with
16 me participated in the Quick Response Teams.
17 Oriana House counselors specifically
18 participated in -- they are the counselors in
19 six out of nine teams in the community.
20     Q.   There are a total of nine Quick
21 Response Teams now?
22     A.   Correct.  With 10 communities being
23 represented.
24     Q.   Does the ADM Board manage the
25 funding for those Quick Response Teams?

Page 27

1     A.   The ADM funds counselor positions.
2 So Oriana House works with six of the Quick
3 Response Team.  We have Summit County public
4 health that works with the City of Akron's
5 Quick Response Team, and we have CHC Addiction
6 Services that works with two of the teams.  And
7 our role is funding -- providing funding for
8 that counselor position to be part of the team
9 to go out.
10     Q.   Where does the funding come from
11 for the counselor position?
12     A.   I don't know specifically.
13     Q.   Do you know whether it's a grant
14 from the state?
15     A.   I -- it is not a grant that we
16 applied for.  I know it is ADM funding, and as
17 far as what specific line item or where that
18 funding stream is from directly, I don't know.
19 Our finance office would know that.
20     Q.   So you don't know the ultimate --
21 you don't know the source of the funds that ADM
22 utilizes to fund these counselor positions for
23 the Quick Response Team?
24     A.   I do know there was no grants
25 applied for to utilize it, but that it was ADM

Page 28

1 funding.
2     Q.   Have you presented any -- at --
3 strike that.
4         Have you given any other
5 presentations related to opioids since joining
6 the ADM Board?
7     A.   Opioids have been part of the
8 presentation.  I do speak at some master's of
9 social work classes, as an informal
10 presentation at some of their class sessions.
11 I've done it once a year for -- in 2016, 2017,
12 as well as 2018, as an overview of substance
13 use and how to assess individuals with
14 substance use.  And then part of that
15 presentation also included what are some
16 resources available to individuals in Summit
17 County.
18     Q.   Where have you given that
19 presentation, the master's of social work
20 classes?
21     A.   In the Polsky Building at the
22 University of Akron, in a classroom setting.
23     Q.   So through the University of Akron?
24     A.   Correct.  Approximately 20 to 25
25 students.

Page 29

1     Q.   How many times have you given that
2 presentation?
3     A.   Once a year for the last three
4 years.
5     Q.   Do you use a PowerPoint for that
6 presentation?
7     A.   I do not.
8     Q.   Do you have any printed materials
9 that you provide to the students?
10     A.   Other than resource guides or
11 materials of resources within the community,
12 no, I do not.
13     Q.   What are resource guides?
14     A.   We have an addiction resource guide
15 that we have created.  We created it in January
16 of 2017 to provide information of where
17 individuals can go for treatment, MAT
18 treatment, peer support, recovery housing,
19 self-help groups.
20     Q.   And I think you mentioned that you
21 provide other -- information regarding other
22 resources.  Are those printed materials as
23 well, in addition to the resource guide?
24     A.   We also had some rack cards printed
25 up for our Addiction Helpline that we

8 (Pages 26 - 29)

1 presented.
2    Q.   What are rack cards?  Sorry.
3    A.   I'm sorry.  It's a card about this
4 large.
5    Q.   Okay.
6    A.   It's just a one-page with
7 information.
8    Q.   That -- the rack card specifically
9 provides information regarding the ADM
10 Helpline?
11    A.   The ADM Addiction Helpline.  It's
12 the phone number of where an individual can
13 call if they'd like to seek services.
14    Q.   I'd like to come back to your
15 responsibilities at the ADM Board in a little
16 bit, but before we do that, I'd like to walk
17 through a little bit of your employment history
18 if we could.  And feel free to refer to
19 Exhibit 1 if you'd like, or from memory.
20 Whatever -- whatever is convenient for you.
21 And, again, Exhibit 1 is a copy of your resume
22 that I believe you said you prepared in or
23 around 2018.
24       So you attained your bachelor's in
25 psychology in 2002.  And after that, if you

1 could take a look at the last page of your
2 resume and the second to last page of your
3 resume.  It looks like you were employed as a
4 behavioral health technician at two different
5 locations; is that right?
6    A.   Yes.
7    Q.   What did you do as a behavioral
8 health technician at Deaconess Hospital and at
9 Lutheran Hospital?
10    A.   I worked on the psychiatric units,
11 adult psychiatric units, and provided some
12 basic daily living skill groups, assisted with
13 getting their rooms cleaned, assisting with
14 meals, assisted with taking vitals on the unit.
15    Q.   The second bullet under each of
16 those job descriptions that talk about the
17 things that you did indicates, and I'll just
18 read from page Bates ending 845 of Exhibit 1,
19 the behavioral health technician at Lutheran
20 Hospital.  The second bullet reads, "Maintain
21 required documentation according to Joint
22 Commission and CMS standards."
23    A.   Yes.
24    Q.   Do you see that?
25       Can you explain to us what that

1 means?
2    A.   So part of the requirement is if
3 you facilitate a group or anything at that
4 time, this was before electronic health
5 records, so it was a paper chart, so I had to
6 complete paper documentation of any of the
7 groups I performed, in compliance with our
8 surveys when we were reviewed to show, in
9 accordance to the client's treatment plan, that
10 we were offering those services.
11    Q.   Is it your understanding that
12 both -- and strike that.  Let me back up a
13 little bit.
14       That same entry appears in the
15 description of the work that you did at
16 Deaconess Hospital; is that right?
17    A.   Yes.
18    Q.   Is it your understanding that both
19 Deaconess Hospital and Lutheran Hospital were
20 accredited by the Joint Commission?
21    A.   Yes.
22    Q.   Did both of those facilities also
23 have some sort of CMS accreditation?
24    A.   Yes.
25    Q.   What is your understanding of what

1 that accreditation means to the facility?
2    A.   With the CMS accreditation, that is
3 the Medicaid system, so in billing the Medicaid
4 system for services, there is a set of
5 requirements.  They also work in conjunction
6 with the Joint Commission, and there's a set of
7 standards that are put in place for health care
8 facilities to follow.
9       And if those health care facilities
10 do not follow those standards or procedures,
11 they are at the risk of having the
12 accreditation taken away.  It's my
13 understanding, with CMS, there's a risk of
14 having to pay back funds if you're not meeting
15 those standards.
16    Q.   Do you know whether the -- strike
17 that.
18       Did either the Joint Commission or
19 CMS standards provide to you guidelines to use
20 when conducting the -- the groups that you
21 facilitated?
22    A.   No, not that I can recall.
23    Q.   You mentioned that some of the
24 paperwork included something about surveys?
25 Can you explain what you meant by that?

9 (Pages 30 - 33)

1    A.    Not about surveys, but I completed
2  documentation in relation to the groups that I
3  facilitated or co-facilitated.  We would
4  document the group topic, as well as the
5  patient's response to that topic.
6    Q.    I'm sorry.  I must have misheard.
7       Did the group's participants
8  complete any paperwork regarding their
9  participation in the group?  Was that part of
10 the -- the standards at the time?
11   A.    It's my understanding that when
12 clients would be discharged from a facility,
13 there was an -- an exit client survey that they
14 would complete, but I did not participate in
15 those.
16   Q.    Do you know whether, at -- in the
17 2002, 2003 time frame when you were with
18 Lutheran Hospital and Deaconess Hospital,
19 whether either of those facilities provided
20 pain management treatment to patients?
21   A.    I can't recall specifically, as far
22 as what the pain management would be.
23   Q.    Were you involved at all in any
24 type of work with pain management at either of
25 those facilities?

1    A.    No.
2    Q.    The groups that you participated in
3  and facilitated, what was the focus or the
4  subject matter of those groups?
5    A.    At Deaconess Hospital I worked with
6  adults, so it may be looking at coping skills.
7  It may look at anger management.  Some of the
8  individuals had a wide array of mental health
9  diagnoses, as is what they were, primarily
10 mental health facilities.  So it was a wide
11 range of topics.
12      At Deac- -- at Lutheran Hospital, I
13 worked with geriatric psychiatry, so older
14 adults.  So some of their groups were also on
15 coping skills or recognizing depression, but it
16 was more age appropriate.  We also had other
17 mental health issues or just daily living
18 skills that I would assist them with more so on
19 that unit versus the adult units.
20   Q.    Did either -- at either facility
21 did you facilitate any groups regarding
22 substance use or substance use disorders?
23   A.    I did not.  I did not have the
24 education at that time.
25   Q.    As a part of your training at

1  either facility, did you receive information
2  regarding Joint Commission standards or
3  expectations?
4    A.    Yes.
5    Q.    And as a part of that training --
6  strike that.
7       What was that training that you
8  received for the Joint Commission standards?
9    A.    We were provided a basic overview
10 of what the standards were, what the
11 requirements were through the Joint Commission,
12 as well as CMS.  And when the surveyors would
13 come to the hospitals, we would have an
14 understanding as to what they would be asking
15 us about so we would be prepared and
16 knowledgeable of what those surveys would look
17 like.
18   Q.    Did each of those facilities expect
19 you to comply with the Joint Commission and CMS
20 standards?
21   A.    Yes.
22   Q.    Did -- at the time, in conducting
23 your groups, did you have discretion to vary
24 from the Joint Commission or CMS standards in
25 conducting your groups?

1    A.    No.  And the Joint Commission and
2  CMS standards didn't really dictate topics
3  discussed in the group programming.  It was
4  more along the guidelines of documentation of
5  services, making sure they're in accordance
6  with treatment plan goals and objectives.
7    Q.    Moving up in your CV to the 2003
8  time frame, the next position that we see on
9  your CV, which is Exhibit 1, or your resume, is
10 program specialist --
11   A.    Uh-huh.
12   Q.    -- at Broadlawns Medical Center --
13   A.    Yes.
14   Q.    -- dash, adult mental health.
15 That has a similar sort of description of what
16 you did.
17      Can you tell us what your
18 responsibilities were at Broadlawns Medical
19 Center?
20   A.    So that was when I lived in Iowa
21 for approximately four months.  It was a county
22 hospital, and I worked on the adult mental
23 health unit at the time.  And the program
24 specialist was responsible for some of the
25 similar duties at the other jobs of, as a

Page 38

1 technician on the floor to assist the RN and
2 LPNs on the units, facilitate some basic
3 education groups around the coping skills and
4 anger management and other topics related to
5 that, basic education on mental illness.
6     Q.   You were also, at Broadlawns,
7 responsible for maintaining the required
8 documentation for the Joint Commission and CMS
9 standards; is that right?
10    A.   Correct.
11    Q.   Was there anything different at
12 that facility that you had to do to maintain
13 the documentation for the Joint Commission and
14 CMS standards that you did not have to do at
15 either Lutheran or Deaconess Hospital?
16    A.   Not that I recall.
17    Q.   Did you receive any specific
18 training at Broadlawns Medical Center on the
19 Joint Commission and CMS standards?
20    A.   Nothing different than I would have
21 at the other hospitals.
22    Q.   Then you briefly mentioned earlier
23 that you had worked as a support officer at the
24 Franklin County Child Support Enforcement
25 Agency, right?

Page 39

1     A.   Correct.
2     Q.   Then, after that, it looks like you
3 held that position from 2003 to 2005 and
4 then -- then became a lead substance abuse
5 mental illness counselor at Northcoast
6 Behavioral Health, right?
7     A.   Correct.
8     Q.   At what point in time did you
9 obtain your certification in chemical
10 dependency?
11    A.   While I was in Columbus working at
12 Franklin County Child Support, I attended
13 school in the evening.
14    Q.   Why did you seek out that
15 certification?
16    A.   When I was in undergraduate school
17 at Kent State University in psychology, the
18 substance use back-- background was always
19 interesting to me.  And ultimately, my goal was
20 to return back to school to further my
21 education, and the next stepping stone for me
22 was to get that certification so that I could
23 obtain my licensure to do chemical dependency
24 counseling.
25    Q.   Did you ultimately obtain that

Page 40

1 licensure?
2     A.   I did.
3     Q.   After you got your master's degree
4 or before?
5     A.   Prior.  While I was in Columbus, I
6 completed the program, and after that I sat for
7 the examination.
8     Q.   Is that a state exam?
9     A.   Yes.
10    Q.   Do you still hold that license?
11    A.   I do.
12    Q.   What do you have to do to maintain
13 that license?
14    A.   Every two years, you have to
15 complete 40 hours of continuing education and
16 pay a renewal fee.
17    Q.   Have you ever let your license
18 lapse?
19    A.   No.
20    Q.   So you've held it continuously
21 since 2005?
22    A.   I want to say I -- the license was
23 first obtained early 2006.
24    Q.   Do you hold any other licenses or
25 certificates?

Page 41

1     A.   I also hold my -- am a licensed
2 independent social worker with supervision
3 designation.
4     Q.   Does that have a substance --
5 substance use specialty with it?
6     A.   If you have the education, it can
7 be within your scope of practice, and I am able
8 to practice with substance use with that
9 license.
10    Q.   Anything else?
11    A.   No.
12    Q.   While you were in your master's
13 program, it looks like you worked as a
14 counselor at Northcoast Behavioral Health; is
15 that right?
16    A.   Correct.
17    Q.   Did you go to -- strike that.
18        Were you a full-time employee or a
19 part-time employee while you were in school?
20    A.   Full-time.
21    Q.   Describe for us, if you will --
22 you've got a lot of detailed bullets here on
23 your -- on your resume of what you did in -- in
24 your job as a lead substance abuse mental
25 illness counselor, but if you could just kind

11 (Pages 38 - 41)

Page 42

1  of briefly summarize for us, what were your --
2  was your role and your responsibilities in that
3  job?
4      A.    When individuals were admitted into
5  the state psychiatric hospital, my role, if
6  they came in positive for a substance or
7  reported a recent history of substance, the
8  admitting physician would then submit a
9  referral for me to complete an assessment of
10  that individual to further explore their
11  substance use history and needs for ongoing
12  treatment.
13          I also facilitated groups while at
14  the -- while the individuals were at the
15  hospital.  We worked with the treatment teams
16  as far as discharge planning and aftercare
17  recommendations in the county that they were
18  returning to.
19          And then, also, as it states, I
20  collaborated with county -- other various
21  county board members with the counties that
22  admitted into the hospital to give follow-up
23  updates and status updates on the clients that
24  were at the hospital at the time.
25      Q.    What counties fed into Northcoast

Page 43

1  Behavioral Healthcare at that time?
2      A.    At that time, it was Cuyahoga
3  County, Summit County, Lorain County, Lake
4  County, Geauga County, Ashtabula County, and --
5  I think that's it at the time -- at that time.
6  We did sometimes get overflow from other
7  neighboring counties, such as Portage,
8  Trumbull, and Mahoning.
9      Q.    When you were the lead substance
10  abuse mental illness counselor, where were you
11  physically located?  Where was the facility?
12      A.    Northfield, Ohio.  And now that I
13  think about it, you had asked in the beginning,
14  they are actually located in Summit County,
15  that hospital.  If you cross the street,
16  they're Cuyahoga County, so.
17      Q.    Right on the border, right?
18      A.    Correct.
19      Q.    Is there just one facility?
20      A.    At this time, yes.  When I did
21  start in 2005, there were two -- three
22  facilities:  one in Toledo, Ohio; Cleveland,
23  Ohio; and Northfield, Ohio location.
24      Q.    Did you always work at the
25  Northfield location?

Page 44

1      A.    Yes.
2      Q.    One of the things that you
3  mentioned that you did was complete an
4  assessment of the individuals who came in?
5          Did you actually diagnose anyone
6  with a substance use disorder?
7      A.    No, I did not.  At the time, my
8  license did not permit me to do that.  That was
9  with -- outside the scope of practice.  What I
10  would do would give a diagnostic impression,
11  and then, ultimately, the treating psychiatrist
12  would give the diagnosis.
13      Q.    Would the same be true, then, for
14  an individual -- my first question was with
15  respect to substance use disorder.  Did you do
16  the same, make an assessment, with respect to
17  opioid use disorder?
18      A.    I would give a diagnostic
19  impression if they met the criteria of, at that
20  time it was the DSM-IV.
21      Q.    Then the treating psychiatrist
22  would make the ultimate determination --
23      A.    Correct.
24      Q.    -- of what the diagnosis was; is
25  that right?

Page 45

1      A.    Correct.
2      Q.    At any point in time have you been
3  licensed to prescribe any sort of medications?
4      A.    No.
5      Q.    As a part of your analysis or
6  assessment, rather, of individuals at
7  Northcoast Behavioral Healthcare when you were
8  a SAMI counselor, did you make recommendations
9  for medical treatment?
10      A.    No.  Actually, when you say
11  "medical treatment," are you talking
12  specifically about medications?
13      Q.    So that's a great -- great
14  question.
15          So, first, did you make
16  recommendations regarding the use of
17  medications to treat patients?
18      A.    No, I did not.
19      Q.    Did you make recommendations
20  regarding other types of treatment for the
21  patients?
22      A.    Yes.  I would make recommendations
23  if I felt they could benefit from outpatient,
24  intensive outpatient, or residential services
25  upon discharge from our hospital.

12 (Pages 42 - 45)

1    Q.   To whom would you make those
2  recommendations?
3    A.   Initially, during the assessment
4  process, we -- I would consult with the client
5  themselves to see what their needs were and
6  what they were willing to engage in at the
7  time.  And then I would also collaborate with a
8  the treatment team as to what my
9  recommendations would be for that individual.
10    Q.   What types of -- of professionals
11  were included in the treatment team?
12    A.   There was a unit psychiatrist, a
13  unit social worker, registered nurse, unit
14  psychologist, and then the client themselves.
15    Q.   During this time period, 2005 to
16  2013, do you know whether Northcoast Behavioral
17  Healthcare was Joint Commission-accredited?
18    A.   Yes, they were.
19    Q.   Did any part of your job
20  responsibilities involve maintaining
21  documentation pursuant to the Joint Commission
22  standards?
23    A.   Yes.
24    Q.   Was it similar to what you had done
25  at your prior positions?

1    A.   Yes, with the addition of the
2  assessments.  We had to adhere to our hospital
3  policy, which was to complete the assessment
4  within a designated period of time.
5    Q.   Do you know whether at Northcoast
6  Behavioral Healthcare during the time period
7  that you were a SAMI counselor, did the
8  facility do any patient satisfaction surveys
9  regarding the care that you and the treatment
10  team provided them?
11    A.   They did do surveys at time of
12  discharge, and those were completed
13  independently, and the clients' rights
14  coordinator collected those.
15    Q.   Did you receive feedback, based on
16  those surveys?
17    A.   We would get updates quarterly on
18  overall results.  At times, if there was a
19  positive remark about a staff member, the
20  administration would let that staff member know
21  of those positive remarks.
22    Q.   How about negative remarks; did you
23  hear about those as well?
24    A.   I myself did not have any negative
25  remarks, so I can't speak specifically for

1  myself; however, I can say if there was
2  something negative mentioned about a specific
3  staff member or situation, our -- the
4  administration there did work with the mana- --
5  the supervisor of that staff and try to rectify
6  the situation moving forward.
7    Q.   During that time period, 2005 to
8  2013, as a SAMI counselor, did you have any
9  role in working with patients regarding pain
10  management?
11    A.   So my role as a SAMI counselor,
12  there were individuals that came in with pain
13  management issues.  I did not work specifically
14  with them in regards to the control or overall
15  management of the pain management.  The groups
16  that I focused on were in coherence with the
17  IDDT model, which is integrated dual disorder
18  treatment model.  And with that, we had a
19  curriculum based on where the individual was at
20  in their process of recovery and insight into
21  recovery.
22       And my groups were more over
23  healthy lifestyles, positive alt- -- positive
24  alternatives for coping, recognition of the
25  substance use disorders, the mental health

1  disorders, basic education in that respect.
2       The hospital was not accredited
3  to perform -- to offer addiction treatment.  It
4  was solely certified for mental health
5  treatment.  So we did not go beyond basic
6  education with the clients we served.
7    Q.   While you were a SAMI counselor
8  at North -- Northcoast Behavioral Healthcare,
9  it looks like for some portion of that time
10  frame, you were also a behavioral health intake
11  assessment counselor at the Cleveland Clinic;
12  is that right?
13    A.   Correct.
14    Q.   For how long did you perform that
15  work?
16    A.   So I was employed with the
17  Cleveland Clinic as -- in a PRN position, which
18  is a minimum of four days a month.  So
19  initially, prior to having a family, I worked
20  probably 10 to 15 hours a week.  And that role
21  was doing, ultimately, behavioral health intake
22  for the entire Cleveland Clinic system.  We
23  would get all the referrals through our center
24  and determine where the beds were available and
25  present to the doctors to accept for admission.

13 (Pages 46 - 49)

Page 50

1     Q.   Did you interface with the actual
2  patients in that position?
3     A.   At times.  We were located at
4  Lutheran Hospital specifically, so -- and there
5  were times that I also worked at Fairview
6  Hospital in the pediatric unit.  If individuals
7  came in, we were at times placed in the
8  emergency departments, and we would do
9  face-to-face assessments.
10    Q.   Did that role involve any sort of
11 assessment for substance use disorders?
12    A.   So as part of that role, one of the
13 units was for substance -- for detox
14 specifically.  We would get the records from
15 the emergency room clinicians, whether it be
16 the nursing staff or the psychiatrist -- or
17 medical doctors; I'm sorry -- and they would
18 give us the overall information, and we would
19 take that information and present it to the
20 doctor that had admitting privileges for that
21 shift, for that specific unit, and then that
22 physician would make the determination if they
23 met criteria for admission or not.
24    Q.   Did you -- as the intake assessment
25 counselor, did you make recommendations in your

Page 51

1  submissions to the -- the on-call physicians?
2     A.   Can you clarify what you mean by
3  recommendations?
4     Q.   Sure.  And as a part of the -- the
5  paperwork that -- that you provided to the --
6  the physician who was on at the -- on call at
7  the time or on duty at the time, did the
8  paperwork include any recommendations from you
9  for the next step in treatment?
10    A.   Our recommendations were solely
11 that we were recommending they be admitted to
12 the unit we were contacting.  We did not go
13 above and beyond as far as recommendations
14 after that time.  The unit social worker would
15 then work with that client to determine further
16 recommendations.
17    Q.   Did any of your work for the
18 Cleveland Clinic as the intake assessment
19 counselor involve opioid use or opioid use
20 disorder?
21    A.   We did have clients sometimes
22 contacting us that did present with opioid use
23 disorder, yes.
24    Q.   Was that self-reported opioid use
25 disorder, or did you glean that information

Page 52

1  from medical records?
2     A.   It was with a combination of
3  self-report, as well as if there was a positive
4  tox screen, or if they had been admitted into
5  the hospital system previously, we could look
6  at previous medical records.
7     Q.   Your work at Northcoast Behavioral
8  Healthcare as the SAMI counselor from 2005 to
9  2013, you mentioned that the facility was not
10 accreditate -- accredited for addiction
11 treatment, but did any of your work involve
12 working with patients who had opioid use
13 disorder?
14    A.   Yes.
15    Q.   About what percentage of your work
16 as the SAMI counselor involved individuals with
17 opioid use disorder?
18    A.   I don't know.
19    Q.   Can you give me a ballpark?
20         MS. KEARSE:  Objection.
21    A.   I can't recall the specific number,
22 as far as substance-specific of what percentage
23 of clients had opioid use disorder.
24    Q.   Can you give me a ballpark of about
25 how many of the individuals that you saw had a

Page 53

1  substance use disorder of any type?
2         MS. KEARSE:  Object to form.
3     A.   While I was there, we saw about --
4  the average was about around overall 66 percent
5  of the clients admitted into the hospital had a
6  dual diagnosis.
7     Q.   One of those diagnoses would be a
8  substance use disorder?
9     A.   Correct.
10    Q.   And the other would be a mental
11 health illness?
12    A.   Correct.
13    Q.   And realizing it's been some time,
14 you don't have a ballpark of what percentage of
15 that 66 percent of substance use disorder dual
16 diagnosis folks may have had an opioid use
17 disorder; is that right?
18         MS. KEARSE:  Objection.  Asked and
19 answered.
20    A.   I do not.
21    Q.   And you stayed with Northcoast
22 Behavioral Health but changed positions in
23 2013; is that right?
24    A.   Yes.
25    Q.   What -- what -- strike that.

14 (Pages 50 - 53)

Page 54

1    And you became the director of
2  social services; is that correct?
3    A.   Correct.
4    Q.   In your director role, did you
5  continue to provide clinical work?
6    A.   There were times where if staff
7  were not available or if it was after the staff
8  had already leaved, yes, I would go on the unit
9  and assist.
10    Q.   Were -- tell us what your primary
11  responsibilities were as the director of social
12  services at Northcoast Behavioral Healthcare?
13    A.   I supervised a staff of
14  approximately 18 social workers, and, at the
15  time, two SAMI counselors at the hospital.  I
16  worked with upper administration to manage
17  admissions, discharges, the flow of beds,
18  collaborated with the county board staff to
19  provide status updates for the clients that
20  were there, and would collaborate if -- with
21  the unit treatment teams and assist with
22  discharge planning if requested.
23    Q.   You mentioned that you collaborated
24  with county board staffs.  What county boards
25  did you collaborate with?

Page 55

1    A.   Lake County, Geauga County,
2  Ashtabula County, Summit County, Cuyahoga
3  County, and at that time also Lorain County,
4  Trumbull County, Mahoning County, and Portage
5  County at times.
6    Q.   What boards within each of those
7  counties did you collaborate with?
8    A.   The alcohol and mental health
9  addiction boards with -- with the exception of
10  Lorain County.  Their boards remain separate,
11  so they have a separate addiction board, as
12  well as a separate mental health board.  But we
13  did work with both of them.
14    Q.   The other counties, it's your
15  understanding, at that time had combined
16  addiction and mental health boards; is that
17  right?
18    A.   Yes.
19    Q.   Did you work with the Summit County
20  ADM Board in your position as director of
21  social services for Northcoast Behavioral
22  Healthcare?
23    A.   Yes.
24    Q.   With whom did you interface at the
25  Summit County ADM Board while you were with

Page 56

1  Northcoast Behavioral Healthcare?
2    A.   Joann Arndt, who was the mental
3  health coordinator, as well as Chris
4  Freeman-Clark, who was the forensic
5  coordinator.
6    Q.   Was there someone in the position
7  at the ADM Board from 2013 to 2016 in the
8  position of addiction prevention and training
9  coordinator, as far as you know?
10    A.   It's my understanding that Paula
11  Rabinowitz was -- provided oversight over the
12  addiction programming for Summit County, and
13  Aimee Wade was over the prevention services.
14    Q.   Did you interface with either of
15  them?
16    A.   No, I did not.
17    Q.   Who was the forensic coordinator?
18    A.   Chris Freeman-Clark.
19    Q.   Thanks.
20    Did you interface with anyone at
21  the Cuyahoga County ADM Board?
22    A.   Yes.
23    Q.   Who did you interface with there?
24    A.   Maggie Tolbert and Carole Ballard.
25    Q.   Do you know what their roles were?

Page 57

1    A.   Maggie Tolbert at the time was
2  the -- our liaison for the hospital, so we
3  worked with her for anyone that was admitted to
4  the hospital.
5    Carole Ballard, at the time, was
6  over forensic services.
7    Q.   What does forensic services mean?
8    A.   So if an individual is deemed not
9  guilty by reason of insanity or incompetent to
10  stand trial, unrestorable, they can be admitted
11  to the mental health -- state mental health
12  hospital, in lieu of incarceration and jail.
13    We did also get individuals
14  pre-adjudication, meaning for competency
15  evaluation, to determine if they were able to
16  represent themselves and assist themselves in
17  their defense of the charges that they had
18  pending.
19    Q.   Did any of your work as director of
20  social services with Northcoast Behavioral
21  Healthcare between 2013 and 2016 involve
22  substance use disorders?
23    A.   Are you asking did clients that we
24  interfaced with have diagnosis of substance use
25  disorders, or my role specifically as the

15 (Pages 54 - 57)

1 director working with the substance use
2 disorders?
3    Q.   Your role specifically.  In your
4 role specifically, did you have any -- did you
5 have any responsibilities related to substance
6 use disorders?
7    A.   So I did supervise the SAMI
8 counselors at the time.  There were times that
9 I would work with them to help problem-solve of
10 what resources were available in the counties
11 that the client was from.  At the state
12 hospital, we primarily served the indigent and
13 uninsured population, so we had a -- we had
14 some res- -- community resources that would
15 treat those clients, the indigent clients or
16 uninsured clients in the respective communities
17 and where they could access those services.  So
18 sometimes I would offer assistance in figuring
19 out what those resources were.
20    Q.   At any point when you were with
21 Northeast Behavioral Healthcare, so at any
22 time between 2005 and 2016, do you know whether
23 the facility was accredited in addiction
24 treatment?
25    A.   No, they were not.

1    Q.   Was Northcoast Behavioral
2 Healthcare, during that entire time period, '05
3 to 2016, accredited by the Joint Commission?
4    A.   Yes.
5    Q.   During the time that you were with
6 Northcoast Behavioral Healthcare, did you --
7 did you receive any training related to
8 opioids, whether it be an opioid use disorder
9 or opioid misuse at all?
10    A.   I did attend some conferences
11 within the state as it relates to opiate abuse.
12    Q.   What conferences did you attend?
13    A.   I know -- I don't know how many I
14 attended.  I did attend the OACBHA opiate
15 conference at one to two times, I think.  And I
16 did also attend a local one-day conference that
17 the Cleveland Clinic held as it related to the
18 opioid use.
19    Q.   Do you remember when the Cleveland
20 Clinic conference was?
21    A.   I do not offhand.
22    Q.   Do you remember what years the
23 OACBHA opiate conferences were?
24    A.   Offhand, I don't know.  I know I
25 attended the first year that they launched it.

1 I would -- I don't know the specific years,
2 though.
3    Q.   Was it when you were a director of
4 social services or when you were a SAMI
5 counselor?
6    A.   When I was a SAMI counselor.
7    Q.   Is that true for all of those
8 conferences, both the Cleveland Clinic and the
9 first OACBHA conference?
10    A.   Yes.  And I did also attend the
11 Addiction Studies Institute down in Columbus,
12 Ohio as a SAMI counselor.
13    Q.   So as a SAMI counselor, you
14 attended a couple of OACBHA opiate conferences,
15 the Addiction Studies --
16    A.   Institute.
17    Q.   -- Institute, thanks.  And the --
18 an opioid conference at the Cleveland Clinic;
19 is that right?
20    A.   Correct.
21    Q.   Do you know whether those
22 conferences kind of fell later in the time that
23 you were a SAMI counselor?
24    A.   I would say the first conference
25 was 2011, so towards the second half of the

1 career.
2    Q.   Okay.  Did you -- did you
3 participate as a presenter at any of those
4 conferences?
5    A.   No, I did not.
6    Q.   So then, at some point in 2016, you
7 decided to change positions from Northcoast
8 Behavioral Healthcare and join the ADM Board,
9 right?
10    A.   Yes.
11    Q.   What prompted you to look for that
12 position?
13    A.   I was not actually looking for the
14 position.  A staff member at the board actually
15 e-mailed me the job des- -- posting when it was
16 posted, so I was not actively looking for a new
17 role at that time.
18        When I did see the position
19 posting, I felt it would be a good fit, allow
20 me more opportunity to focus more on the
21 addiction field, which is where I had my
22 initial training at Columbus State, and had a
23 passion for dual diagnosis.  It was also --
24 presented more flexibility, as I had two young
25 children at home.

16 (Pages 58 - 61)

Page 62

1       MS. KEARSE:  Counsel, we've been
2  going about an hour.  Since you're
3  transitioning, is this a good time?
4       MS. FEINSTEIN:  Sure, yeah.
5       And I should have said, at any
6  point if you need a break, you just let us
7  know.  We're happy to take a break, okay?
8       THE WITNESS:  Uh-huh.
9       MS. FEINSTEIN:  Yeah, thanks.
10      THE VIDEOGRAPHER:  Off the record,
11  10:13.
12       (A recess was taken.)
13      THE VIDEOGRAPHER:  On the record
14  10:33.
15      MS. FEINSTEIN:  Thank you.
16  BY MS. FEINSTEIN:
17      Q.   Ms. Patton, before the break you
18  mentioned that one of the reasons that you were
19  interested in the position at the ADM Board was
20  one of your passions of dual diagnosis; is that
21  right?
22      A.   Correct.
23      Q.   Can you please explain to me
24  what -- what dual diagnosis is?
25      A.   When I reference dual diagnosis, I

Page 63

1  mean individuals with a mental health diagnosis
2  as well as a substance use disorder diagnosis.
3      Q.   In your experience -- strike that.
4       What role, if any, does a mental
5  health diagnosis play in the development of a
6  substance use disorder?
7       MS. KEARSE:  Object to form.
8      A.   Individuals with mental health
9  diagnoses do have an increased risk of a
10  substance use disorder, along with other
11  disorders, physical health as well.
12       But there are individuals that
13  solely have a mental health disorder or solely
14  have a substance use disorder.
15      Q.   So not all individuals with a
16  mental health disorder will develop a substance
17  use disorder, right?
18      A.   Correct.
19      Q.   And not all individuals with a
20  substance use disorder have a mental health
21  disorder; is that correct?
22      A.   Correct.
23      Q.   Do you consider substance use
24  disorder to be a mental health disorder?
25      A.   As far as treating and individuals,

Page 64

1  I deem both mental health diagnoses and
2  substance abuse diagnoses as an overall
3  behavioral health issue.
4      Q.   Are the criteria for diagnosing
5  substances use disorder included in the DSM?
6      A.   Yes.
7      Q.   Are the criteria for diagnosing
8  opioid use disorder including in the DSM?
9      A.   Yes.
10      Q.   Do you know, when opioid use
11  disorder was first included, what version of
12  the DSM it was first included in?
13      A.   DSM-III.
14      Q.   Which one are we on now?
15      A.   Five.
16      Q.   Thank you.
17       Have you ever contributed in any
18  update to the DSM?
19      A.   No.
20      Q.   When you were at Northcoast
21  Behavioral Healthcare, did you work with
22  Dr. Smith?
23      A.   Briefly.  At the time when I was at
24  Northcoast at the same time he was at
25  Northcoast, he was our medical director, and we

Page 65

1  also had three locations at that time.  So
2  although his office was based out of our
3  Northfield location, there were many times
4  where he would travel to the other location.
5      Q.   When you -- when you were contacted
6  about the position at the ADM Board, was
7  Dr. Smith already at the ADM Board?
8      A.   Yes.
9      Q.   Did you know that he was there?
10      A.   Yes.
11      Q.   Did you talk with him about the
12  work of the ADM Board before you formally
13  applied for the position?
14      A.   No.
15      Q.   When you were at Northcoast
16  Behavioral Health, you mentioned that Dr. Smith
17  was the medical director.  Did you report to
18  him in any capacity there?
19      A.   Not directly, no.
20      Q.   When you joined the Summit County
21  ADM Board, did you at any time report to
22  Dr. Smith?
23      A.   Not directly, no.
24      Q.   What is his role at the ADM Board?
25      A.   I don't know his official tit- -- I

17 (Pages 62 - 65)

Page 66

1 would say chief clinical officer. He is part
2 of the clinical team. He is not my direct
3 supervisor. Aimee Wade, who is the associate
4 director of clinical services, she is my direct
5 supervisor. I know he does work with a lot of
6 our providers as well.
7 Q. Do you and he ever work together on
8 any projects at the ADM Board?
9 A. No projects specifically, no.
10 Q. Have you ever done any
11 presentations with Dr. Smith while you were at
12 the ADM Board?
13 A. No.
14 Q. You started at the ADM Board on May
15 2, 2016?
16 A. Correct.
17 Q. Can you briefly describe for us
18 what you do at the ADM Board?
19 A. I provide oversight to the
20 addiction programming with the agencies we
21 fund, as well as oversight with the prevention
22 programs that we fund. Those are primarily
23 school-based prevention programming.
24 I do also work with the recovery
25 housing providers.

Page 67

1 I work with the certified peer
2 recovery supporters in the county.
3 I oversee trainings that are
4 offered through the ADM Board and assist with
5 planning, assessing what trainings are needed
6 for our stakeholders and will apply for
7 continuing education credits for those
8 trainings.
9 I also was an integral part of
10 implementing the Quick Response Teams in Summit
11 County.
12 And I work with the specialty drug
13 courts as well.
14 Q. Did you, at one point, prepare a
15 bullet point of -- bullet point list of the job
16 responsibilities or tasks that you perform in
17 your role at the ADM Board?
18 A. Yes.
19 - - - - -
20 (Thereupon, Deposition Exhibit 2,
21 Bullet Point List of Job
22 Responsibilities, SUMMIT_000959818
23 to 000959819, was marked for
24 purposes of identification.)
25 - - - - -

Page 68

1 Q. I'm going to hand you what we have
2 marked as Exhibit 2 for identification
3 purposes.
4 MS. FEINSTEIN: For those on the
5 phone, this is a document Bates-numbered
6 SUMMIT_000959818.
7 MS. KEARSE: And, Counsel, reminder
8 that if anyone on the phone did not make an
9 appearance, just wanted to make sure we -- we
10 got that down.
11 MS. McINTYRE: I did not make an
12 appearance yet on the record.
13 MS. FEINSTEIN: And who is that?
14 MS. McINTYRE: Jill McIntyre,
15 Jackson Kelly, AmerisourceBergen Drug
16 Corporation.
17 MS. FEINSTEIN: Thank you.
18 MS. KEARSE: I didn't mean to
19 interrupt. It just --
20 MS. FEINSTEIN: Oh, no problem.
21 MS. KEARSE: -- dawned on me.
22 MS. FEINSTEIN: No, thanks.
23 Appreciate it.
24 Q. Looking at Exhibit 2, Ms. Patton,
25 did you prepare that?

Page 69

1 A. I did.
2 Q. For -- why did you prepare this?
3 A. At the time, our supervisors, both
4 Aimee Wade and Doug Smith, did ask for us each
5 individually, as part of the clinical team, to
6 prepare an overall list of our job duties. At
7 the time we were in the process of filling some
8 vacancies.
9 Q. When was this prepared?
10 A. In 2018.
11 Q. Have the vacancies been filled?
12 A. We now have two vacancies that have
13 recently occurred, so, no.
14 Q. What positions are vacant that you
15 are aware of?
16 A. Currently, right now, the research
17 and quality improvement coordinator position is
18 vacant, and the care access and clients' rights
19 coordinator position is vacant.
20 Q. Who held those positions before the
21 vacancies?
22 A. Joann Arndt for the care access and
23 client rights coordinator, and Eric Hutzell for
24 the research and quality improvement
25 coordinator.

18 (Pages 66 - 69)

Page 70

1    Q.    When did Ms. Arndt leave?
2    A.    She retired December 31, 2018.
3    Q.    And when did Mr. Hutzell leave?
4    A.    His resignation date was December
5  13th -- December 31, 2018.  Sorry about that.
6    Q.    So they both left at the end of --
7  of last year?
8    A.    Correct.
9    Q.    Do you have any role in evaluating
10  applicants for either of those positions?
11    A.    We do have a clinical interview
12  where the applicants will sit down with the
13  members of the clinical team that are available
14  at that time.
15    Q.    Who are the current members of the
16  clinical team?
17    A.    Dr. Aaron Ellington.  He's the
18  evidence-based practice coordinator.
19        Chris Freeman-Clark is our forensic
20  coordinator.
21        Beth Kuckuck is our children's
22  program coordinator.
23        Myself, as the addiction prevention
24  and training coordinator.
25        And Darletta Logan is the care

Page 71

1  management and clinical compliance coordinator.
2    Q.    Anyone else in the clinical time?
3    A.    Dr. Doug Smith and Aimee Wade
4  provide our management for the clinical team.
5    Q.    Is Aimee Wade a physician?
6    A.    No.
7    Q.    Do you know what her -- what her
8  clinical credentials are?
9    A.    LISW with supervision designation,
10  and OCPC, which is an Ohio Certified Prevention
11  Consultant.
12    Q.    Do you know whether she has any
13  certifications in addiction?
14    A.    I do not.
15    Q.    Dr. Smith is a psychiatrist?
16    A.    Yes.
17    Q.    Do you know for how long he was the
18  medical director at Northcoast Behavioral
19  Healthcare?
20    A.    I do not.
21    Q.    Do you know what year he joined the
22  ADM Board?
23    A.    Offhand, I do not.
24    Q.    Turning back to Exhibit 2, does
25  Exhibit 2 -- is Exhibit 2 a comprehensive list

Page 72

1  of the responsibilities that you have at the
2  ADM Board?
3    A.    Yes.
4    Q.    I'd like to just kind of quickly
5  walk through the bullets to get an
6  understanding for what each of these items
7  involves.  So the first bullet is, "Monitor QRT
8  within Summit County."
9        QRT is the Quick Response Team?
10    A.    Correct.
11    Q.    We discussed this briefly a little
12  bit earlier, but the QRT program started in
13  2017, right?
14    A.    Our first team launched January 17,
15  2017.
16    Q.    Your role -- you've got four
17  bullets that -- that describes your role, which
18  is, "Meet with new communities," "Monitor
19  counselors," "Monitor outcomes," and "Schedule
20  and facilitate quarterly meetings"; is that
21  right?
22    A.    Yes.
23    Q.    When did the quarterly meetings
24  begin?
25    A.    I want to say we had our first

Page 73

1  quarterly meeting mid-2017.
2    Q.    Who attends the quarterly meetings?
3    A.    We invite the counselors that
4  participate, as well as the police and fire
5  chiefs.
6    Q.    Where are the meetings held?
7    A.    We rotate it throughout the county
8  with participating communities.  I ask for
9  volunteers to host.
10    Q.    What is discussed, typically, at
11  the quarterly meetings?  Is there a set agenda?
12    A.    We -- Eric Hutzell, while he was on
13  staff at the time, would provide an update on
14  outcomes as they relate to the Quick Response
15  Team, as that was his responsibility.
16        We would also provide information
17  and new resources, and we would have an open
18  floor discussion on any barriers that the teams
19  may be facing or also share some success
20  stories at that time.
21    Q.    How did Mr. Hutzell monitor the
22  outcomes?
23    A.    I don't know the specifics as far
24  as how he determined the outcomes.  I know he
25  did present a report each quarter, and would

19 (Pages 70 - 73)

Page 74

1 look at how many individuals were seen through
2 the Quick Response Teams and how many in -- we
3 would look at how many individuals engaged in
4 treatment after being seen from...
5     Q.   How is that information tracked?
6     A.   The counselors submit a monthly
7 report of all the clients that are seen, and
8 then he would take that report and analyze it
9 and produce the quarterly report.
10     Q.   To whom is the monthly report
11 submitted by the counselors?
12     A.   To me.
13     Q.   What information is included in
14 that monthly report from the counselors?
15     A.   The name, date of birth, social
16 security number, address of where they were
17 seen, if they were a client that had been seen
18 previously, if they scheduled an assessment,
19 and when that assessment date was.
20     Q.   Does it include the substance?
21     A.   No.
22     Q.   It does not?
23     A.   No, uh-uh.
24     Q.   These are all overdose visits,
25 right?

Page 75

1     A.   Correct.
2     Q.   So each of the individuals that is
3 visited by the -- the Quick Response Team, they
4 had been diagnosed or previously treated with a
5 drug overdose in a fairly recent time period;
6 is that right?
7     A.   Each client that is identified is
8 identified by the police department as calls
9 they have responded to in the week previously.
10     Q.   The reporting that comes to you
11 does not include a description of the substance
12 involved in the overdose?
13     A.   No.
14     Q.   Do you know -- strike that.
15          Does any of the reporting done by
16 the Quick Response Team to the ADM Board
17 include tracking the substance involved in the
18 overdose?
19     A.   Not to my knowledge.
20     Q.   Do you have any -- any information
21 available to you as monitor of the Quick
22 Response Team to determine how much of that
23 work involves opioid-related overdoses?
24     A.   Well, anyone that they're going to,
25 the police department codes -- has a specific

Page 76

1 code in their system to identify an overdose,
2 and they're going to individuals that either
3 they had to dispense naloxone to, which would
4 only be in an opiate overdose situation, or if
5 the client self-reported it was opiates that
6 they used.
7     Q.   So are all of the -- the Quick
8 Response Team visits, is it your understanding
9 that all of the Quick Response Team visits
10 relate to opioid overdoses?
11     A.   So all of the visits that they do
12 go on do have an opioid use component.  As I
13 mentioned previously, there are some
14 individuals that are using multiple substances,
15 and that would also be indicated in -- during
16 their assessment, if they engaged in treatment.
17     Q.   As a part of your monitoring, do
18 you have access to the -- the police records
19 that identify the substance involved in the
20 overdose, in the underlying overdose?
21     A.   I individually do not have access,
22 no.
23     Q.   Does that -- strike that.
24          When evaluating outcomes, does the
25 ADM Board consider the -- the substance

Page 77

1 involved in the -- the overdose?
2     A.   With the Quick Response Team
3 specifically, outcomes, we are not looking at
4 the substance specifically.
5     Q.   So you don't know and don't track,
6 from the ADM perspective, how many of the
7 overdoses involve prescription opioids versus
8 some other opioids?
9     A.   As it relates specifically to the
10 Quick Response data, no.
11     Q.   Do you have -- does the ADM Board
12 have any data with respect to overdoses that
13 might prompt a Quick Response Team visit or any
14 other treatment by the ADM Board of what
15 percentage of those opioids are prescription
16 versus non-prescription?
17     A.   So are you asking at -- based on
18 data collected from the ADM Board, would we
19 contact a Quick Response Team to go out based
20 on information we received?
21     Q.   No.  Let me --
22     A.   Okay.
23     Q.   -- let me try to re-ask it.
24          Does -- so the ADM Board does not
25 track the Quick Response Team data -- or strike

20 (Pages 74 - 77)

Page 78

1 that.
2       The ADM Board does not track
3 whether a Quick Response Team visit relates to
4 a prescription opioid versus an illicit opioid,
5 correct?
6    A.   Correct.
7       MS. KEARSE:  Object to form.
8    Q.   Does the ADM Board track any
9 services based on prescription opioid versus
10 illicit opioid?
11    A.   Our ADM Addiction Helpline tracks
12 what substance they're calling in.
13    Q.   The ADM Helpline, when folks call
14 in, they would self-report whether they were
15 using a prescription opioid or some other
16 opioid?
17    A.   Yes.
18    Q.   What is your role with respect to
19 the ADM Helpline?
20    A.   So the care management clinical
21 compliance coordinator position oversees the
22 ADM Addiction Helpline.  That position was
23 vacant from July -- mid-July to end of
24 November, so I did provide some oversight
25 during that brief time period, as far as

Page 79

1 on-boarding new providers to be part of the ADM
2 Addiction Helpline, and their reports were
3 submitted to me.
4    Q.   That was just from July 2018 to
5 November 2018?
6    A.   Yes.
7    Q.   Other than that brief time period,
8 do you have any responsibility for the ADM
9 Helpline?
10    A.   No.
11    Q.   So since November 2018, who at the
12 ADM has been responsible for the ADM Helpline?
13    A.   Darletta Logan was hired December
14 3rd of 2018, so although she's still orienting,
15 we are in the process of transitioning her to
16 providing oversight for that.
17    Q.   Who handled that previously?
18    A.   Christine Smalley.
19    Q.   Ms. Smalley left in July 2018?
20    A.   Yes.
21    Q.   Do you know where she went?
22    A.   No, I don't.
23    Q.   Where did Mr. Hutzell go; do you
24 know?
25    A.   Cleveland Clinic.

Page 80

1    Q.   Getting back to Exhibit 2, your
2 responsibilities with respect to the Quick
3 Response Team within Summit County --
4    A.   Uh-huh.
5    Q.   -- is there anything else that --
6 that you do to monitor outcomes of the Quick
7 Response Team?
8    A.   My role specifically, no.  Eric
9 Hutzell did also complete an annual report in
10 2017.
11    Q.   If Mr. Hutzell's position is not
12 filled, will you prepare the outcome report for
13 the next quarterly meeting?
14    A.   I don't know.  That hasn't been
15 discussed yet.
16    Q.   Who would make that decision?
17    A.   Jerry Craig.
18    Q.   Who is Mr. Craig?
19    A.   He's our executive director of the
20 ADM Board.
21    Q.   Do you report to Mr. Craig?
22    A.   No, not directly.
23    Q.   So you directly report to Ms. Wade?
24    A.   Correct.
25    Q.   Has that been the case since you

Page 81

1 started with the ADM Board?
2    A.   Yes.
3    Q.   What do you do to monitor the
4 counselors within the Quick Response Team?
5    A.   We do offer technical assistance
6 with the counselors, as far as if they are
7 having difficulty with actually speaking to an
8 individual in the community, if they're not
9 answering their door or not available.
10       We do -- we have had meetings to
11 bring all the counselors together to kind of
12 strategize amongst each other of what's worked,
13 what hasn't worked, amongst them.
14       They are also, like I said,
15 responsible to submit that report to me on a
16 monthly basis.
17       And then as a billing perspective,
18 because we do fund the counseling roles, I
19 review and approve their time logs that are
20 submitted monthly to our finance department.
21    Q.   In what format are the reports
22 provided to you?
23    A.   In Excel format.
24    Q.   What do you do with the reports
25 when you get them?

21 (Pages 78 - 81)

Page 82

1    A.    We have a shared P drive amongst
2  our clinical team that I have a folder for
3  Quick Response Teams that I save it in.
4    Q.    For how long do you save the
5  reports?
6    A.    I don't -- we have a record
7  retention policy, so for those reports
8  specifically, I don't know the exact time
9  frame.  But it's a minimum of five years.
10    Q.    Who set up the -- the format for
11  the reports?  Did you do that?
12    A.    Eric Hutzell.
13    Q.    Do you know what information
14  Mr. Hutzell used to set up the form?  Was there
15  a guideline given from the State, or did he
16  just come up with the form himself?
17    A.    As far as I know, he came -- he
18  developed the form himself in order -- knowing
19  what we -- information we needed to look into
20  our billing system to look at follow-up
21  information.  We asked for that specific
22  information so that we -- and also so we could
23  track it by ZIP codes within our community.
24    Q.    So when the form was created for
25  the counselors to report, Mr. Hutzell

Page 83

1  included -- it's your understanding he included
2  information that was important for your billing
3  information and also so you could track by ZIP
4  code; is that right?
5    A.    Yes.
6    Q.    At the time the form was created,
7  did you work with Mr. Hutzell to come up with
8  the -- the categories to be included on the
9  form?
10    A.    We did talk about it.  We did also
11  meet with the Quick Response Team in Colerain
12  Township in southern Ohio to see, similarly,
13  what they were doing.
14    Q.    At any point did you and
15  Mr. Hutzell or the team in -- what county was
16  it?
17    A.    Colerain Township.
18    Q.    Colerain?
19    A.    I think it's Hamilton County.
20    Q.    At any point did you, Mr. Hutzell,
21  or any of the representatives from Colerain
22  Township discuss including the type of opioid
23  involved in the incident?
24    A.    Not that I can recall.
25    Q.    Do you use those reports to review

Page 84

1  and approve the time charges for the
2  counselors?
3    A.    I will look at that report to make
4  sure the times and dates do match.
5    Q.    How frequently are time charges
6  submitted to you?
7    A.    Monthly.
8    Q.    So the counselors submit to you,
9  monthly, the Excel spreadsheet that has
10  information about the visits, right?
11    A.    Yes.
12    Q.    And they submit to you a time chart
13  or a request for reimbursement?
14    A.    Their billing department submits it
15  to our finance department, so our finance office
16  will bring it over.
17    Q.    So they don't -- the counselors
18  don't submit their time charges directly to
19  you?
20    A.    No.
21    Q.    What information do you look at to
22  review and approve the time charges for the
23  counselors?
24    A.    The dates and the times, because
25  they -- on the Excel form, they do also track

Page 85

1  the time spent with each client.
2    Q.    Is there anything else that you do
3  to monitor the counselors?
4    A.    No.
5    Q.    Do you train the counselors?
6    A.    When we first partnered with the
7  provider agencies to offer counselors with the
8  Quick Response Teams, we did have some
9  preliminary meetings.  The counselors that all
10  go out do have experience already with the
11  addiction field and had a good understanding of
12  what this role would look like, so we did not
13  have any specific training.
14        We did have an overview training of
15  Quick Response Teams from Colerain Township
16  that came up to Summit County December 9th of
17  2016 to give a presentation of what their
18  program looked like.
19    Q.    For how long had Colerain Township
20  been doing the Quick Response Teams?
21    A.    When they came up, they had been
22  implementing at that time for 18 months.
23    Q.    Did they report to you anything
24  about how -- how it was working for them?
25    A.    When they presented to us, they

22 (Pages 82 - 85)

1 reported that 75 percent of the individuals
2 they engaged with entered into treatment.
3     Q.   So they had been doing their Quick
4 Response program since some point in 2015; is
5 that right?
6     A.   That's my understanding.
7     Q.   Does Summit County, does the ADM
8 Board track what percentage of -- of
9 individuals go into treatment after being
10 visited by the Quick Response Team?
11    A.   Yes.
12        THE REPORTER:  I didn't hear,
13 sorry.
14        THE WITNESS:  Yes.  I'm sorry.
15        THE REPORTER:  Thank you.
16    Q.   How is that tracked?  Is that
17 information included on the Excel spreadsheet?
18    A.   That information is provided by
19 Eric Hutzell, so the information that we did --
20 we are able to track is the number of clients
21 that engage into treatment into ADM-funded
22 services.  So we do not have access to look at
23 Medicaid data, so if a client has Medicaid that
24 they're utilizing for that, treatment services,
25 we don't have access to that information.

1     Q.   So the only treatment that that ADM
2 Board is able to track, following a Quick
3 Response Team visit, is if the individual
4 participates in ADM-funded treatment; is that
5 right?
6     A.   Correct.
7     Q.   It's possible, however, that an
8 individual could go into treatment that would
9 not be reflected in the ADM statistics,
10 correct?
11    A.   Correct.
12    Q.   So is there a -- a separate report
13 that includes the information about the
14 individuals who are visited by the Quick
15 Response Team who go into treatment?
16    A.   Are you asking if there's a
17 separate report of treatment not funded by ADM
18 or --
19    Q.   No.  So I'm trying to understand
20 what Mr. Hutzell, how he tracks -- how he
21 tracked that when he was --
22    A.   Okay.
23    Q.   -- with the ADM Board.  So it's not
24 in -- I understand it's not in the monthly
25 report from the counselors, correct?

1     A.   Uh-huh.
2     Q.   So from where does Mr. Hutzell get
3 that information?
4     A.   We have a GOSH billing system that
5 our providers utilize, so -- because that's why
6 we specifically ask for name, date of birth,
7 and Social Security Number, because those are
8 the key components we can look in that GOSH
9 billing system and see if they've accessed
10 services within our system.
11    Q.   Is it a specific -- is there a
12 specific question on intake forms for ADM
13 treatment providers to gather data on whether
14 the person reports that they've been visited by
15 a Quick Response Team?
16    A.   For the referral source on the ADM
17 Addiction Helpline, we do have the Quick
18 Response Teams identified, so the client can
19 identify that they are being referred with
20 Quick Response Team, and we have that broken
21 down by each team so that we can track
22 specifically what team they worked with.
23    Q.   When did -- when did you first
24 learn of the availability of -- of Quick
25 Response Teams in the state of Ohio?

1     A.   In November of 2016, Greg McNeil
2 from Cover2 Resources reached out to Jerry
3 Craig.  He does a podcast series throughout the
4 state, as well as other states.  And he
5 contacted Jerry Craig about a program that
6 could be useful in Summit County.  So at that
7 time, we moved forward with scheduling them to
8 come up and meet with us the following month.
9     Q.   What is Cover2 Resources?
10    A.   That is Greg McNeil's podcast
11 series.
12    Q.   And who is Mr. McNeil?
13    A.   He is a Hudson resident who lost a
14 son to an opioid overdose.
15    Q.   Do you know how he found out about
16 Quick Response Teams?
17    A.   I do not.  I know he does a lot of
18 research as far as seeing what is working, not
19 only in the state of Ohio, but across the
20 nation.
21    Q.   Before Mr. McNeil reached out to
22 Mr. Craig, had you heard about Quick Response
23 Teams or anything similar to that at any of the
24 opioid conferences that you attended?
25    A.   No, I did not.

23 (Pages 86 - 89)

1     Q.   Are you aware of how many other
2  counties in Ohio have Quick Response Teams?
3     A.   I do not know the definitive
4  number, but I know they are -- other counties
5  within the state of Ohio implementing, all in
6  different fashions.
7     Q.   Do you know whether it's kind of
8  uniformly called the Quick Response Team?
9     A.   I've heard other titles, such as
10 Community Outreach.
11    Q.   Did -- from where did Summit
12 County, the Summit County ADM Board, receive
13 information about how to implement the Quick
14 Response Teams?
15    A.   As I mentioned before, we had
16 Colerain Township come up in December of 2016
17 and give a presentation on what their model
18 looked like, and then we went and met with each
19 community individually to see what would work
20 best in their community.
21    Q.   One of the bullets under -- on
22 Exhibit 2 is "Meet with new communities."
23         What -- is that what you just
24 described, meeting with communities?
25    A.   Yes.  So in the beginning of the

1  planning phase of Quick Response Teams, we
2  reached out to the Mayor's Association, the
3  Police Chief's Association, as well as the Fire
4  Chief's in Summit County, and presented
5  information on what the Quick Response Teams
6  were and what their overall objective was, and
7  had them contact me or Jerry Craig if they had
8  an interest in setting up a Quick Response
9  Team.
10    Q.   You mentioned that the ADM Board
11 pays a certain amount for the counseling
12 services; is that right?
13    A.   Correct.
14    Q.   Does the ADM Board reimburse the
15 police or the fire participants in the Quick
16 Response Team?
17    A.   No.
18    Q.   Do you know whether those entities
19 obtain funding from any outside -- any source
20 outside of the county of Summit for their work
21 on the Quick Response Teams?
22    A.   There are, I think, four
23 communities that receive funding from the
24 attorney general in a grant form, and those are
25 Cuyahoga Falls, Barberton, Akron, and Green.

1     Q.   Do you know approximately how much
2  the Quick Response Team program costs on an
3  annual basis?
4     A.   I do not know that.
5     Q.   Do you know how much the ADM Board
6  has spent on its portion of the Quick Response
7  Team for calendar year 2017 and calendar year
8  2018?
9     A.   I do not have that specific figure.
10 I know our finance officer would have that
11 information.
12    Q.   Do you have a particular budget for
13 the Quick Response Team?
14    A.   I have not been given a specific
15 budget, no.
16    Q.   Have you ever declined a request
17 for reimbursement from any counselors?
18    A.   No.
19    Q.   On any given month can you estimate
20 about how much the ADM Board reimburses
21 counselors for the Quick Response Team?
22    A.   I cannot, because on the forms that
23 are given to me are just solely the time.
24 There's no dollar figures on those forms.
25    Q.   Is it a set rate that is

1  reimbursed?
2     A.   Yes.
3     Q.   Do you know what the set rate is?
4     A.   I don't have the specific number.
5  I know it's $25 and some-odd change.  And it's
6  my -- that's per unit.
7     Q.   What is a unit?
8     A.   And for Quick Response Team, I
9  can't answer.  It could vary.  It could be
10 15-minute increments.  It could be one-hour
11 increments, and I'm -- I'm not certain what our
12 finance office contracted with those agencies
13 and what that unit would be specifically.
14    Q.   Is it your understanding that the
15 ADM Board has some sort of -- some sort of
16 document that would define, with each counselor
17 group, what the rate of reimbursement is and
18 what the definition of the unit is?
19    A.   Yes.
20    Q.   And do you know from where the
21 funding comes for the ADM Board to pay those
22 counselors?
23    A.   The only thing I do know, it is
24 ADM-funded.  I don't know specifically if where
25 it's -- what source it's from.

Page 94

1    Q.  Do you know how the ADM is funded?
2    A.  We have -- a large portion of our
3  funding is levy funded.  Approximately 80
4  percent is levy funded from the Summit County
5  taxpayers.
6    Q.  What is the other 20 percent?
7    A.  I'm not certain specifically as to
8  the other revenue source -- sources.
9    Q.  Do you know whether any of the levy
10  is designated or earmarked for any particular
11  use?
12    A.  Not to my knowledge.
13    Q.  Do you know whether any of the --
14  the additional 20 percent of funding to make up
15  the 100 percent funding of the ADM Board,
16  whether any of the 20 percent is earmarked or
17  specified for a particular use?
18    A.  Some of the funding that comes
19  through us is grant monies through the State of
20  Ohio, the Ohio Department of Mental Health and
21  Addiction Services.  So if it is a funding
22  source from there, there would be specific
23  requirements for that.
24    Q.  Do any of the programs that you're
25  involved with receive funding from the State?

Page 95

1    A.  Yes.
2    Q.  Which programs?
3    A.  I provide oversight for some of the
4  peer support, and some of our peer support
5  services is funded through the 21st Century
6  Cures Act.  And we also have some recovery
7  housing funded through that as well.
8    Q.  So let's skip down first to the
9  peer support.  That's the third bullet on
10  Exhibit 2.
11      What is your role with respect to
12  the peer support program?
13    A.  I coordinate trainings.  We have
14  budgeted to offer three trainings annually for
15  certified peer recovery supporters.  It is a
16  training offered through the Ohio Department of
17  Mental Health and Addiction Services, so I
18  coordinate them as far as the training dates.
19      OhioMHAS does provide the funding
20  for the trainers, which is $1,500 each, and
21  then we offer, provide the location for the
22  training, as well as we provide the food for
23  the training for the week.  It's a 40-hour
24  training for those counselors.
25      I do participate in bimonthly

Page 96

1  meetings that the peer support in Summit County
2  do have that is run by two peer supporters
3  within our community, so I am just a
4  participant in the meeting, and I reserve the
5  office -- the meeting space for them.
6      And then I am -- provide some
7  technical assistance if they're having any
8  difficulties getting their certifications or
9  trainings for recertification.  We will offer
10  trainings that go towards that recertification.
11    Q.  What type of work does the peer
12  support group do?  Is it substance use or
13  addiction work, or is it mental health work?
14    A.  So an individual, in order to be a
15  certified peer recovery supporter, they have to
16  have lived experience of either mental health
17  or addiction.  So there are some individuals
18  that provide peer support in our mental health
19  agencies.  We have some individuals that
20  provide peer support in our agencies that are
21  more addiction focused.  So both.
22    Q.  Are there any peer support groups
23  that are focused on opioid use disorder?
24    A.  So the peer supporters that are
25  employed by agencies that provide addiction

Page 97

1  services, their focus is primarily with
2  addiction.
3      We have peer supporters that work
4  in our specialty docket courtrooms, so those
5  individuals are working specifically with
6  individuals that primarily have addiction
7  issues, if they're in that docket.
8      And then, with our ADM Addiction
9  Helpline, we have some provider agencies that
10  receive ad- -- referrals through the Addiction
11  Helpline, so those agencies are addiction
12  focused.
13      And our recovery housing providers,
14  they are primarily substance use related, so
15  they're primary experience is with addiction as
16  well.
17    Q.  And for all of the -- those who
18  work within addiction, does the ADM Board
19  track, in the peer support program, what
20  substance the addiction is related to or
21  attributed to?
22    A.  So the individuals that provide
23  peer recovery support services through the ADM
24  Addiction Helpline, they are receiving funding
25  through the Cures Act, and so a primary

25 (Pages 94 - 97)

Page 98

1  requirement is that those individuals have
2  opioid use disorder as a diagnosis, as well as
3  two of the recovery housing providers that
4  receive Cures funding for clients that are on
5  that.  So those individuals also have
6  specifically opioid use disorder diagnoses.
7      Q.   For purposes of the peer support
8  group, is that -- are the peer support groups
9  separate from the ADM Helpline?
10     A.   Yes.
11     Q.   Are the peer support groups
12  separate from recovery housing?
13     A.   Yes.  They're just a component of
14  recovery housing.
15     Q.   Understood, okay.  So if the peer
16  support is provided in recovery housing that's
17  related to opioid use disorder, then the ADM
18  Board would have information about the opioid
19  use disorder; is that right?
20     A.   Correct.
21         Also, for our -- in general, some
22  of the quarterly reports that are submitted for
23  recovery housing providers, we did modify the
24  outcomes form at the end of last year that we
25  were tracking.  So for -- we have the data for

Page 99

1  all of 2018, and moving forward, we do look at
2  what substance, of the five recovery housing
3  providers that we fund, of what substance the
4  individuals were using.
5      Q.   Is that information on a -- that
6  you started tracking for purposes of the
7  recovery housing, is that patient-reported or
8  self-reported information?
9      A.   Yes.
10     Q.   Okay.  Does the ADM Board, as a
11  part of its tracking of the substances, confirm
12  or verify that information using medical
13  records or diagnoses?
14     A.   Specifically to the recovery
15  housing providers, no.  Part of the requirement
16  of being in our recovery housing is that
17  they're engaged a treatment provider for
18  aftercare followup, so that information would
19  probably be those agency-specific information.
20     Q.   Does the ADM Board do anything for
21  its own purposes to confirm this self-reported
22  substance?
23     A.   No.
24     Q.   So for purposes of funding, like,
25  for the Cures Act, for example, it was my

Page 100

1  understanding that that had to be used for
2  opioid use disorder; is that right?
3      A.   Uh-huh, yes.
4      Q.   Thanks.
5          Do -- does the ADM Board do
6  anything to confirm a self-reported --
7  self-reported diagnosis of opioid use disorder
8  before being -- before submitting for payment
9  under the Cures Act?
10     A.   So there is information that is
11  submitted on a monthly basis through the Cures
12  funding.  The recovery housing providers, they
13  receive specifically funding to house
14  individuals that are engaged in MAT treatment,
15  so it is indicated in their monthly reporting,
16  the start date of the MAT treatment or if
17  they've declined it or stopped the MAT
18  treatment.
19         So that is submitted to us, as well
20  as the peer support information.  We do have
21  information that is submitted to us,
22  demographics information, and information of
23  how many individuals have requested service,
24  ongoing service, have completed service.  For
25  the peer support specifically, we do not get

Page 101

1  any personal health information submitted to
2  us, but for the recovery housing component, we
3  do get the PHI.
4      Q.   What other responsibilities do you
5  have with respect to recovery housing?
6      A.   We do complete annual audits of the
7  programs, and of that audit checklist, it will
8  ensure they are in compliance with Ohio
9  recovery housing, which we require all of our
10 providers to be certified through.  This is a
11 statewide entity that look at housing standards
12 and requirements.  We also review their
13 documentation and their billing as part of that
14 review process, and tour the facilities.
15     Q.   Do you do that personally, or does
16 someone else at the ADM Board?
17     A.   I personally did it.  2018 was the
18 first year we completed those.
19     Q.   In 2017, did the ADM have any
20 involvement with recovery housing?
21     A.   Yes.  At that time, Oriana House
22 provide -- did complete those audits, as they
23 were the coordinator in 2017.
24     Q.   Did ADM become the coordinator in
25 2018?

26 (Pages 98 - 101)

Page 102

1     A.    ADM assumed -- we contracted
2  directly with the recovery housing providers,
3  effective October 29th of 2017, with those
4  providers.  And the coordinator for the
5  recovery housing beds and managing the
6  availability is staffed through ASCA, and they
7  are also the program that coordinates our ADM
8  Addiction Helpline.
9     Q.    What is ASCA?
10    A.    Akron Summit Community Action.
11    Q.    The recovery housing, do the
12 residents in recovery housing all -- strike
13 that.
14         What percentage of the -- the users
15 of recovery housing have an opioid-related
16 addiction?
17    A.    I don't have that number
18 specifically.
19    Q.    Does anyone track the substances
20 that are related to the -- the users of
21 recovery housing?
22    A.    So as I mentioned previously,
23 beginning in 2018, we did start tracking what
24 substances they were using.
25    Q.    Where is that tracked?

Page 103

1     A.    It's a quarterly outcomes form
2  that's submitted to me.
3     Q.    Who tracks it?
4     A.    So the recovery housing providers
5  are responsible to submit that to me on a
6  quarterly process.  We have not compiled an
7  annual report yet.
8     Q.    Do you plan to?
9     A.    Our hopes are, yes, to do an
10 overall summary.
11    Q.    So you've received one full
12 calendar year of quarterly reports from the
13 recovery housing?
14    A.    Yes.
15    Q.    Do you know whether Oriana House
16 gathered that information for the calendar year
17 2017?
18    A.    No, they did not.
19    Q.    Do you know whether recovery
20 housing was in effect before 2017?
21    A.    It was -- it was operated when I
22 began in the position of 2016, so as far as
23 when it began, I do not know, but I know it was
24 up and running and being funded through ADM
25 when I began my position.

Page 104

1     Q.    Do you know the source of the funds
2  from ADM for recovery housing in 2016?
3     A.    I do not.
4     Q.    How about 2017?
5     A.    I do not.
6     Q.    And 2018?
7     A.    I do not, other than the Cures
8  funding for the two providers.
9     Q.    That just covers the two providers
10 of recovery housing?
11    A.    And only a limited number of beds.
12 It's not their whole program.
13    Q.    How many recovery housing beds are
14 there total, if you know?
15    A.    That ADM Board funds?
16    Q.    Yes.
17    A.    We currently fund 54 beds.
18    Q.    How many are covered by the Cures?
19    A.    That is 54 beds solely with
20 ADM funding.
21    Q.    Separate and apart from --
22    A.    So when we look at the Cures
23 funding, it -- 13.5, I think, is how the dollar
24 amount came out to.
25    Q.    So the ADM Board funds 54 beds.

Page 105

1  Cures funds about 13.5 beds.  Are there any
2  other recovery housing beds from any other
3  sources of funding?
4     A.    Not through ADM entities.
5     Q.    The Cures beds have to be
6  opioid-related, right?
7     A.    Yes.
8     Q.    Do the ADM-funded beds have to be
9  opioid-related?
10    A.    No.
11    Q.    Have you reviewed any of the data
12 that was gathered for 2018 to take a look at
13 how many of the ADM-funded beds involved
14 opioid-related issues?
15    A.    No.
16    Q.    Do you know whether the information
17 that was -- is tracked by the ADM now, and that
18 it tracked in 2018, identifies opioids by
19 categories, so whether prescription or illicit?
20    A.    I can't recall specifically without
21 looking at the form.
22    Q.    Who set up the form?
23    A.    Eric Hutzell helped compile the
24 form, and as well as I had two social work
25 interns at the time.  They looked at what the

Page 106

1 Ohio recovery housing standards were versus
2 what we were collecting previously through
3 Oriana House, and created a molded form.
4    Q.    Do you have any other
5 responsibilities with respect to recovery
6 housing?
7    A.    Other -- other than what's listed,
8 no.
9    Q.    What does monitoring the wait list
10 involve?
11    A.    So we do have, as I mentioned, the
12 54 beds for recovery housing.  One of the
13 recovery housing providers is more of an
14 apartment style, so it is a more highly desired
15 set of housing for individuals.  So we do give
16 clients the choice of where they would like to
17 go.  Highest priority for recovery housing are
18 individuals coming out of residential treatment
19 or detox services for those beds.
20       The staff member at ASCA does
21 coordinate that list.  She provides me a weekly
22 update of the bed availability.  And if there
23 are beds open, we will have discussions as to
24 why are there beds open, what are we doing to
25 fill those, and things like that.

Page 107

1    Q.    Do you then make determination of
2 who's next in line to fill the bed?
3    A.    No.  We have an overall protocol of
4 individuals coming from residential or detox
5 are top priority.  And then, if individuals who
6 are also sometimes referred, if they are in
7 corrections setting or if they are in an IOP
8 program in the community, they are the next
9 priority.
10    Q.    What is ATP and ATR?  I'm looking
11 at the fourth bullet on Exhibit 2.
12    A.    So those are two OMHAS-funded
13 programs.  ATP is Addiction Treatment Program,
14 and ATR, that program did end in April of last
15 year, and it was Access to Recovery.
16       So both of those programs are
17 similar in the fact that with ATR, that was
18 designed for individuals that had a criminal
19 history or involvement in the criminal justice
20 system within the last 10 years.  And it's --
21 provided funding for recovery supports.
22       And then the ATP program, Addiction
23 Treatment Program, worked specifically with
24 individuals that are involved in the specialty
25 drug court dockets, and provides funding that

Page 108

1 Medicaid would not fund.
2    Q.    And that funding comes from the
3 State?
4    A.    Correct.
5    Q.    Does any of the ATP work relate to
6 opioids?
7    A.    There are individuals that are
8 involved in the docket that do have opioid use
9 disorder, but it's not specific -- let me take
10 that back.
11       Yes.  Sorry about that.
12    Q.    That's okay.
13    A.    So they have to be MAT-eligible.
14 So when we say MAT-eligible, the client doesn't
15 have to be on MAT treatment, but they have to
16 be eligible to receive that treatment.
17    Q.    And just so the record is clear,
18 can you tell us what MAT-eligible means?
19    A.    Medication-assisted treatment.  So
20 an individual that meets the criteria that
21 would qualify for, whether it's methadone,
22 Suboxone, or Vivitrol program, and they either
23 are inducted onto that medication-assisted
24 treatment or they have declined that treatment.
25 But they are -- if they choose to be on it,

Page 109

1 would qualify for that medication.
2    Q.    So all participants in the ATP
3 program have to be eligible for medical --
4 medical-assisted treatment; is that right?
5    A.    Correct.
6    Q.    So is it your understanding that
7 all of those ATP participants are -- have some
8 opioid-related issue?
9    A.    So there are -- alcohol is also a
10 qualifying factor for the Vivitrol.
11    Q.    Do you know, does ADM track what --
12 how many of the ATP participants are opioid
13 versus alcohol?
14    A.    We do not directly.  So since this
15 is an OMHAS-funded program, we are simply the
16 passthrough for the funds.  The providers that
17 have contracted -- well, have done a memorandum
18 of understanding with OMHAS to be part of ATP,
19 they enter into a data system called Tricep,
20 which is not monitored by us.
21    Q.    What is your role with respect to
22 funding, if any, for the ATP program?
23    A.    My primary responsible has been
24 working with the courts directly to identify
25 those recovery supports that can be funded

28 (Pages 106 - 109)

1 through the ATP program, such as recovery
2 housing or peer support services or other
3 treatment services, such as if they're not on
4 Medicaid yet, this will cover all their
5 treatment services until they do become on
6 Medicaid.
7    Q.   Do you know how much funding from
8 the State the ATP program in Summit County
9 receives?
10    A.   In -- what I can tell you, in July
11 1st of 2018, which is the fiscal calendar that
12 the State is on, they did not give us any
13 additional funds, but they did roll over funds
14 from the previous year, which I don't have the
15 exact number, but I know it was 900,000
16 something.
17    Q.   Around 900,000?
18    A.   Correct.
19    Q.   And that's an annual amount?
20    A.   That was rolled over to us from the
21 year previously, because we did not spend it.
22    Q.   So the 900,000 was rolled over as
23 unused --
24    A.   Correct.
25    Q.   -- from the prior year?

1       Do you know the total amount that
2 the ATP program in -- for that fiscal year of
3 2017 to 2018, received?
4    A.   I don't know the specific number.
5    Q.   But it was around 900,000 that was
6 left unused to roll over to this -- to
7 2018-2019?
8    A.   Right.
9    Q.   Did -- do you know whether ADM,
10 whether the ADM Board specifically requested
11 that that rolled-over funds remain within
12 Summit County?
13    A.   I don't know specifically if that
14 request was made.
15    Q.   Moving down Exhibit 2, this is --
16 gosh, it's kind of the bottom third of the
17 page. Do you see the bullet that begins
18 "Provide technical assistance"?
19    A.   Uh-huh.
20    Q.   And then underneath that is a
21 bullet that says, "Participate with the Summit
22 County OTF and sit on the criminal justice
23 subcommittee."
24    A.   Yes.
25    Q.   Do you see that?

1    A.   Yes.
2    Q.   Tell us, what is that?
3    A.   So the Summit County OTF is the
4 Summit County Opiate Task Force, and I sit on
5 the criminal justice subcommittee, which some
6 of our law enforcement providers, our specialty
7 courts, sit on that committee.  Probation as
8 well.  Summit County sheriff's office also
9 participates on that.
10    Q.   What is your role with that
11 subcommittee?
12    A.   I'm a member of it.  So I do not
13 have a leadership role in that subcommittee,
14 but we do -- I do provide report-outs for the
15 Quick Response Teams, since that is law
16 enforcement-related, as to how we are doing in
17 the community.
18    Q.   Do you report at all at the Opioid
19 Task Force criminal justice committee about any
20 of the work under the ATP program?
21    A.   Yes, sometimes ATP does come up in
22 our discussion.
23    Q.   Because part -- a component of that
24 is the drug court?
25    A.   Correct.

1    Q.   What is your role with respect to
2 drug court?
3    A.   I do sit on the advisory council
4 for our Turning Point program, which is common
5 pleas-level drug court docket, and I also sit
6 on the advisory board for Barberton drug court.
7    Q.   Do you have any specific focus, as
8 a part of the advisory committee, with respect
9 to specific substance or anything such as that?
10    A.   Sometimes in the attendance of the
11 meetings, I'll update them on expanded
12 resources in the community or how to access
13 specific services.
14    Q.   Other than being a member of the
15 criminal justice subcommittee, do you have any
16 role with the Opioid Task Force?
17    A.   I did recently just transition off
18 of the Young People in Recovery Committee.  I
19 do sit on there as a member, but I'm not the
20 primary ADM representative.  That was due to a
21 staff member retiring in December of 2017.  So
22 I did participate in that and chaired that
23 meeting for the last year, but in November of
24 2018, we did have two new co-chairs.
25    Q.   How frequently were their meetings?

29 (Pages 110 - 113)

Page 114

1    A.    They are meeting quarterly.  I --
2 usually about the week before the quarterly
3 Summit County Opiate Task Force meetings so
4 that they can provide an update on items that
5 they're working on.
6    Q.    Did you attend the quarterly
7 meetings of the Summit County Opiate Task
8 Force?
9    A.    When available, yes.  I did not
10 attend the one -- the last one.
11    Q.    Have you ever given any
12 presentations at the Summit County Opiate Task
13 Force?
14    A.    Other than giving a report-out for
15 the Young People in Recovery Committee, no.
16    Q.    Do you know what the kind of goal
17 is of the Young People in Recovery Committee?
18    A.    So they have recently formed two
19 new subgroups of their committee.  They are
20 focusing more on basically recovery resources
21 available for the youth within Summit County,
22 and then they are also going to look at
23 prevention efforts as well.
24       In 2018, we were -- we also did
25 have a subgroup looking at recovery high

Page 115

1 schools.
2    Q.    What did you do to look at recovery
3 high schools?
4    A.    We researched -- so there's only 41
5 in the U.S., but we did research.  A lot of
6 them are based in California, Texas area.  We
7 looked at some of the research.  There's not a
8 lot of research out there.
9       And then we were looking at the
10 feasibility of bringing a recovery high school
11 to Summit County, and we got to the point of if
12 we had the funding, we had the building
13 location; this was what the program would look
14 like.
15    Q.    Did you make any recommendations to
16 the Opiate Task Force?
17    A.    We did present out on what we had
18 developed.  At this time, we don't have an
19 education provider or county to kind of take it
20 over and put it into fruition.
21    Q.    Did part of that evaluation include
22 evaluating the cost to the county to implement
23 a recovery high school?
24    A.    Yes.  We did meet with Sarah Nerad
25 from Franklin County, Ohio.  They're getting

Page 116

1 ready to open up their recovery high school,
2 Heartland High School, and we did talk to her
3 about what the costs were that they were
4 looking at and what it would potentially cost
5 to start up a program.
6    Q.    Do you recall what that figure was?
7    A.    I know in Franklin County, they
8 were doing a private school model, and they
9 were looking to charge approximately $30,000
10 annually per student.
11    Q.    Was that number presented to the
12 Opiate Task Force of Summit County?
13    A.    I can't recall directly if we gave
14 that in our report or not.  But in reporting,
15 looking at the feasibility, it was also
16 discussed, would we do the private school
17 model, would we do a public school model, would
18 we do a charter school model.  So some of the
19 education providers at the table weighed in on
20 that.  Because I don't come from an education
21 background, I wasn't able to provide a lot of
22 feedback into that.
23    Q.    Did your -- did the committee -- or
24 the subcommittee make any recommendations to
25 the Opiate Task Force about whether the

Page 117

1 recovery high school would be a good idea?
2    A.    What we did do was create the
3 report of, if we had the funding, if we had the
4 building location, this is what we would
5 recommend it look like.  We did hand out the
6 one-page handout, indicating what that proposal
7 was at one of our quarterly Opiate Task Force
8 meetings.
9    Q.    So you told the task force what it
10 would look like.  Did you make a recommendation
11 of whether you thought it was something that
12 Summit County could benefit from?
13    A.    I can't recall directly if we made
14 that specific recommendation of opening one.
15       THE REPORTER:  Recommendation of?
16       THE WITNESS:  Of opening one.
17       THE REPORTER:  Thank you.
18       THE WITNESS:  Uh-huh.
19    Q.    Did the one-pager include a
20 recommendation; do you remember?
21    A.    I can't recall directly.
22    Q.    What else do you do with respect to
23 the Opiate Task Force?
24    A.    Other than attend.  I mean,
25 sometimes at the meetings people will come up

30 (Pages 114 - 117)

Page 118

1 with questions or things like that, but.
2    Q.   Any questions about ADM services?
3    A.   ADM services, or if we do use that
4 opportunity if there's some grass root programs
5 or nonprofits, they will advertise events.  I
6 know the University of Akron this last fall had
7 some sober tailgates and things like that they
8 were advertising, so.
9    Q.   Do you know for how long the Summit
10 County Opiate Task Force has been in existence?
11    A.   I don't know when they first
12 initiated.  I do know that when I came on board
13 in May of '16, they were up and going.
14    Q.   Have you ever, in any of the
15 presentations that you've presented or that
16 you've given, have you used any standard slides
17 from the Opiate Task Force?
18    A.   As part of the speaker's bureau of
19 the Opiate Task Force, there have been some
20 events that I've asked to go talk to, and, yes,
21 we have used those slides.
22    Q.   How many times have you spoken as a
23 part of the speaker's bureau for the Opiate
24 Task Force?
25    A.   I don't have the specific number.

Page 119

1    Q.   Can you give me a ballpark?
2    A.   At least four engagements.
3    Q.   Can you gi- -- do you recall
4 roughly when those engagements were?
5    A.   I -- I don't know the -- I would
6 say -- I spoke at a town hall meeting in the
7 fall of 2016.  And then, last year, I did speak
8 at OhioMeansJobs.  They had an event.  And in
9 the summer, I would say, August of last year, I
10 also presented to superintendents at an event
11 that was put on by the Education Service
12 Center, and they had asked if we would come
13 present.
14    Q.   What did you present on at -- at
15 each of those?
16    A.   At the town hall meeting, I
17 presented the PowerPoint format that was
18 formed -- formu- -- created by our public
19 relations department.  It's a template
20 PowerPoint presentation that is utilized by the
21 speaker's bureau to talk about not only the
22 opioid epidemic, but also looking at how to
23 access services specifically within Summit
24 County.
25       In the OhioMeansJobs conference, we

Page 120

1 did talk about similar -- the similar
2 PowerPoint.  We also talked about our Addiction
3 Helpline and the Quick Response Teams that we
4 have implemented within the county.
5       And at the superintendents meeting,
6 we did -- I co-presented that with Yvonne
7 Culver of Akron Public Schools, and we talked
8 about some trends that were being seen within
9 the schools, and we also talked about some
10 prevention programming that's implemented and
11 has done very well within our schools.
12    Q.   What trends do you recall reporting
13 on that you're seeing in schools with respect
14 to opioids?
15    A.   I can't recall specifically the
16 content of the PowerPoint.  I know we did talk
17 about our youth risk behavior survey and some
18 of the results; however, those results are from
19 2013.  We're in the process right now of doing
20 an updated 2018 survey, so -- however, we don't
21 have those results yet.
22    Q.   Who's conducting that survey?
23    A.   Case Western Reserve University and
24 the Summit County ADM Board.  And Summit County
25 Public Health is paying for that to be done.

Page 121

1    Q.   From where did the ADM Board get
2 funds to contribute to that survey?
3    A.   I don't know the specific source.
4 I know the amount we contributed was 80,000.
5    Q.   Do you know when that survey will
6 be completed and the results will be available?
7    A.   It's my understanding that we won't
8 have the final report until fall of 2019.
9    Q.   Recognizing that you don't have a
10 memory of exactly what was in the slides, can
11 you give us a description of what you recall
12 some of the trends in the schools were that you
13 presented?
14    A.   So I myself did not present.  On
15 some of the information, Yvonne Culver, as I
16 mentioned, she's part of Akron Public Schools,
17 did do some of the presentations.  Some of the
18 presentations, she talked about was some of the
19 experiences she has seen in the schools.
20       One case she discussed was a second
21 grader that was in the school, and her mother
22 overdosed in the hallway of the school
23 building.  So they talked about how they really
24 have to look at the larger picture in working
25 with these children, and maybe seeing what the

31 (Pages 118 - 121)

Page 122

1 issues are outside of the school building, and
2 being cognizant of that.
3    Q.   What was your portion of that
4 presentation to the superintendents?
5    A.   So I presented on the youth risk
6 behavior survey and the results from 2013, and
7 then also promoting and encouraging schools to
8 be involved in the 2018 conference.  I
9 presented on resources that are available in
10 Summit County.  And then I also talked about
11 some of the prevention programming that we are
12 doing within the Summit County.
13    Q.   The OhioMeansJobs presentation, you
14 said it was a similar PowerPoint to the town
15 hall PowerPoint, and you described that as
16 including a description of the opioid epidemic
17 and then how to access services, right?
18    A.   Yes.
19    Q.   Do you -- what do you present
20 regarding the opioid epidemic?
21    A.   Some of the slides do include
22 statistically that the United States accounts
23 for 99 percent of the opioid prescription, of
24 the opioid medication, and we talked about
25 specifically how -- we showed statistics that

Page 123

1 were compiled from Summit County Public Health
2 that show the increase in the number of
3 overdose deaths specifically within Summit
4 County.
5    Q.   Do you know where the statistics
6 regarding the U.S. use of opioids versus other
7 countries' use of opioids, where that comes
8 from?
9    A.   I know it's cited in the
10 PowerPoint, but I don't know the exact one,
11 because I did not create the PowerPoint.
12    Q.   Got it.
13        Anything else you present regarding
14 the opioid epidemic that you can recall?
15    A.   Not offhand, no.
16    Q.   Do you talk about the causes of the
17 epidemic?
18    A.   So part of the presentation, yes,
19 we'll -- some of the presentation will include
20 how we got here, so to speak.
21    Q.   And as you sit here today,
22 recognizing you don't have the presentation in
23 front of you, but do you have any memory of
24 what some of those -- some of those
25 contributing factors are?

Page 124

1        MS. KEARSE:  Object to form.
2    A.   Some of the items that we did talk
3 about in the presentation, we talked about how,
4 historically, the amount of pills that were
5 coming into the community was extremely high,
6 and we talked about how the contributing
7 factors were with the combination of people
8 prescribing the medications, were informed that
9 these are safe medications; we can prescribe
10 these medications.
11        Part of the presentation was also
12 inclusive of information of how consumers had
13 that sense of safety because a doctor is
14 prescribing this to me, so they wouldn't do
15 anything that would harm me.
16        So those are some of the -- without
17 looking at it specifically, some of the items
18 we talked about.
19        We also talked about with -- with
20 the facade of, with Joint Commission, the
21 pressure of the pain as the fifth vital sign
22 and really putting the pressure on not only
23 facilities to offer these pain medications.  I
24 know they're -- and how their client surveys
25 may reflect them negatively if they didn't give

Page 125

1 the pain medication.
2    Q.   Do you talk about how the opioid
3 epidemic is a -- a complex epidemic and has
4 many factors?
5        MS. KEARSE:  Object to form.
6    A.   I don't recall specifically as far
7 as all the content.  I didn't -- because, like
8 I mentioned before, our public relations
9 department formulated the PowerPoint.
10    Q.   Do you know whether Dr. Smith was
11 involved at all in preparing the PowerPoint?
12    A.   I do not.
13    Q.   Did you ever talk him about the --
14 the slides, specifically on the opioid
15 epidemic, before you presented it?
16        MS. KEARSE:  Object to form.
17    A.   No.
18    Q.   Did you ever see him present or
19 make any presentations regarding the opioid
20 epidemic?
21    A.   Yes.
22    Q.   When did you see him give a
23 presentation?
24    A.   He presented over this past summer.
25 There was a -- a -- or actually it was probably

32 (Pages 122 - 125)

1 the fall -- a career fair at University of
2 Akron. A behavioral health career fair.
3      Q.   And what do you -- what do you
4 remember about his presentation?
5      A.   He -- part of it was the PowerPoint
6 provided by the speaker's bureau, but he also
7 went into the science of addiction as well.
8      Q.   Do you recall what portion of
9 the -- the speaker's bureau, as you described
10 it, PowerPoint he used?
11      A.   I can't recall the specifics.
12      Q.   Do you remember whether he talked
13 about kind of how we got here, like what -- the
14 genesis of the opioid epidemic?
15      A.   I'm -- he did lead into the --
16 initial part of the presentation did talk about
17 that, yes.
18      Q.   And do you remember what he said
19 about that?
20      A.   I don't know specifically. He did
21 use the PowerPoint slides that we've kind of --
22 that we've created and utilized at various
23 presentations, so.
24      Q.   Do you remember him mentioning that
25 the Joint Commission prescribing guidelines and

1 pain as the fifth vital sign?
2      A.   I don't remember specifically if he
3 brought that specific part of the presentation
4 up.
5      Q.   Do you recall him talking about
6 client surveys at all?
7      A.   I don't.
8      Q.   Do you recall him talking about the
9 perception that medications are safe if they
10 come from your doctor?
11      A.   I don't remember.
12          MS. KEARSE: We've been going for
13 over an hour. Is this --
14          MS. FEINSTEIN: Uh-huh. Yeah, we
15 can take a break here.
16          Or I just have a couple more
17 questions on Exhibit 2. And if you're okay to
18 go for a few more minutes, I can just wrap this
19 up and then we can break. Is that good?
20          THE WITNESS: Uh-huh. Uh-huh.
21      Q.   Referring you back to Exhibit 2,
22 the third bullet from the bottom --
23      A.   Okay.
24      Q.   -- of the first page says,
25 "Participate with the OACBHA opiate committee."

1      A.   Yes.
2      Q.   What is, first, OACBHA? And then,
3 second, I'm curious what your participation is
4 with their opiate committee.
5      A.   Ohio Association of County
6 Behavioral Health -- I don't know the last
7 name.
8      Q.   But that's what OACBHA is, right?
9      A.   Yes.
10      Q.   Okay. And what is your involvement
11 with OACBHA's opiate committee?
12      A.   So I sit on this committee. The
13 OACBHA offices are in Columbus, so we meet
14 every other month, whether it's in-person or
15 via telephone. And we -- one of the
16 initiatives that we did last year was create an
17 appreciation week for first responders, as kind
18 of a thank you. So that committee really
19 worked with that.
20          We also worked together as a
21 committee around programming. A lot of times
22 the ATP funding is discussed in these meetings,
23 other grants that are maybe going -- that are
24 coming up or have been released will be
25 discussed in this committee. And we -- they do

1 also plan the Ohio opiate conference that's --
2 occurs annually in June.
3      Q.   Do you know for how long the opiate
4 committee has existed at OACBHA?
5      A.   I -- we had our first meeting in
6 2017. The date I don't know.
7      Q.   And it's your understanding that
8 the committee did not exist prior to 2017?
9      A.   Correct.
10          MS. FEINSTEIN: All right. Why
11 don't we take a break here.
12          THE VIDEOGRAPHER: Off the record,
13 11:54.
14          (A recess was taken.)
15          THE VIDEOGRAPHER: On the record,
16 12:53.
17          MS. FEINSTEIN: Thank you.
18 BY MS. FEINSTEIN:
19      Q.   Welcome back, Ms. Patton.
20          Before the break, we were talking
21 about the opiate committee with OACBHA.
22      A.   Uh-huh.
23      Q.   And it was, I believe, your
24 understanding that the first meetings of that
25 committee were in 2017; is that right?

Page 130

1    A.   Yes.
2    Q.   And before that, I had asked you
3  about the Summit County Opiate Task Force,
4  right?  Do you recall that?
5    A.   Yes.
6    Q.   And you testified that that entity
7  was in existence when you joined the ADM Board,
8  right?
9    A.   Yes.
10    Q.   Earlier, when you were at
11  Northcoast Behavioral Healthcare, you had
12  attended conferences regarding opioids,
13  correct?
14    A.   Yes.
15    Q.   And those conferences you thought
16  were in the kind of 2011-2012 time frame, sort
17  of the -- near the end of when you were a SAMI
18  counselor?
19        MS. KEARSE:  Object to form.
20  Misstates her char- -- her testimony.
21    A.   Yes, was around 2011.
22    Q.   Around 2011-ish?
23    A.   I think was the first training.  I
24  don't have the specific dates, though.
25    Q.   Sure.  Do you recall what the

Page 131

1  subject matter of those trainings were, those
2  2011 trainings at the State?
3    A.   So the OACBHA opiate conference was
4  opiate-specific.  I did attend those.  2011,
5  I -- and I did actually attend 2014.  And I
6  don't know if I attended any others of the
7  opiate conference.
8        I attended the Addiction Studies
9  Institute as well, which was in downtown
10  Columbus.  I don't have the specific years.  I
11  know I have attended it a few times, so.
12    Q.   Before you joined the Summit ADM
13  Board, what did you know about the Summit ADM
14  Board?
15    A.   Minimal.  So I -- my involvement
16  primarily with the Summit ADM Board was with
17  Chris Freeman-Clark and Joanne Arndt, so --
18  with my role at the hospital.  So -- and Summit
19  County was just one of the counties that we
20  served at the hospital, so very little about
21  the board itself.
22    Q.   Did you have any interaction with
23  the ADM Board and its addiction services before
24  you joined the board in 2016?
25    A.   Not with the board specifically.

Page 132

1  When I worked at Northcoast Behavioral
2  Healthcare, there were times where we would
3  refer clients to services, but more often than
4  not, we would contact the provider directly.
5  We wouldn't go through the board.
6    Q.   Before you accepted the position
7  with the ADM Board, did you do any research
8  online to learn more about the entity?
9    A.   At the time, when I scheduled an
10  interview with them, I did look at the
11  Internet, their website, in preparation for the
12  interview.
13    Q.   Who do you interview with?
14    A.   My initial interview was with Aimee
15  Wade, and at the time, Jackie Steward, who was
16  our human resource.  I then was called back for
17  a clinical team interview, and that comprised
18  of Christine Smalley, Beth Kuckuck, Joann Arndt
19  and Chris Freeman-Clark.  And Dr. Aaron
20  Ellington was also present.  And then I was
21  called back for a third interview directly with
22  Jerry Craig.
23    Q.   At any time did you interview with
24  Dr. Smith?
25    A.   No.

Page 133

1    Q.   What is Dr. Ellington's background?
2    A.   He's our evidence-based practice
3  coordinator.  I know professionally he's a
4  psychologist.  Also has his LICDC.
5    Q.   What is LICDC?
6    A.   Licensed independent chemical
7  dependency counselor.
8    Q.   How long has he been with the
9  board?
10    A.   I don't know.  He was there when I
11  started.
12    Q.   And what is your understanding of
13  evidence-based practice coordinator?  What is
14  that?
15    A.   So he works with our agency
16  providers on such initiatives such as cognitive
17  behavior therapy, motivational interviewing,
18  other treatment modalities that are
19  evidence-based, have been deemed evidence-based
20  by SAMHSA at the national level.  And he works
21  at working with those providers, not only
22  training them, training their staff, but also
23  ongoing monitoring of those practum- practices.
24    Q.   Do you work with him on any of
25  those programs, evidence-based programs?

34 (Pages 130 - 133)

Page 134

1    A.    Not directly, no.
2    Q.    Other than -- strike that.
3          Do you consider Dr. Ellington a --
4 a provider of addiction services?
5    A.    No.
6    Q.    No?
7    A.    No.
8    Q.    Are you the only one in the -- the
9 clinical group at the ADM Board with -- with
10 addiction training certifications?
11   A.    As I mentioned, Dr. Aaron Ellington
12 does have his LICDC, licensed independent
13 chemical dependency counselor, but as far as
14 his role with ADM, doesn't necessarily utilize
15 it in his role.  Other than that, yes, I am the
16 only one that has the certification, licensure.
17   Q.    Prior to you joining the ADM, do
18 you know whether anyone had licensure in
19 addiction besides Dr. Ellington?
20   A.    I'm not certain what Paula's
21 credentials were.  I know she was a registered
22 nurse, but I don't know if she also had
23 chemical dependency training.
24   Q.    When did she leave?
25   A.    It's my understanding she retired a

Page 135

1 few months before I started.  I think there was
2 a couple months' gap before I began.
3    Q.    Do you have any understanding of
4 the ADM Board's relationship with Summit
5 County?
6    A.    Other than the understanding I had
7 from when I came on board of we are an entity
8 within Summit County that helps fund programs
9 within the county.
10   Q.    Does the ADM Board receive funding
11 directly from Summit County?
12   A.    Are you asking, like, specifically
13 from, like, the county executives or --
14   Q.    Yeah.  So you mentioned earlier
15 that there is a dedicated levy --
16   A.    Correct.
17   Q.    -- for the ADM Board, right?
18   A.    Correct.
19   Q.    And that those funds come from,
20 essentially, the taxpayers of the county,
21 right?
22   A.    Correct.
23   Q.    Are you aware of any funds that the
24 ADM Board receives from the county government
25 to the ADM Board, not counting the levy?

Page 136

1         MS. KEARSE:  Object to form.
2    A.    Not that I know of.
3    Q.    Do you know of any grants that the
4 ADM Board receives from Summit County for any
5 services?
6    A.    No.
7    Q.    Does the ADM Board receive any --
8 any funds from the County that are earmarked
9 specifically for opioid-related activities?
10   A.    Can you repeat that again?
11   Q.    Sure.  Does the ADM Board receive,
12 from Summit County, any funds that are
13 earmarked for opioid-related activities?
14   A.    Not that I know of that are
15 specific from the county government.
16   Q.    Does the ADM Board receive any
17 services from the County to assist the ADM
18 Board in performing opioid-related services?
19   A.    Our Summit County Public Health
20 does have a program where they dis-- -- educate
21 and dispense Project DAWN kits.  They also have
22 Summit Safe, which is our needle exchange
23 program.  And I -- Summit County Public Health
24 had -- gives access to the naloxone medication.
25   Q.    Do you know from where Summit

Page 137

1 County Public Health gets the funds to pay for
2 Project DAWN?
3    A.    Ohio Department of Health.
4    Q.    Do you know where the Summit County
5 Public Health gets the fund to pay for the
6 needle exchange program?
7    A.    I do not.  I do not.
8    Q.    The naloxone that you referred to,
9 that's part of Project DAWN, right?
10   A.    Yes.  So they receive funding from
11 Ohio Department of Health, and then ADM Board
12 does also provide funding to public health
13 for -- to go in excess of what Ohio Department
14 of Health funds.
15   Q.    So the Summit County Public Health
16 Department doesn't provide ADM funds; in fact,
17 ADM provides Summit County Public Health some
18 funds for Project DAWN, right?
19   A.    Yes, yeah.
20   Q.    Does the ADM Board provide the
21 Summit County Public Health Department funds
22 for the needle exchange?
23   A.    I don't know if that's in their
24 contract or not.
25   Q.    Do you know how many contracting

35 (Pages 134 - 137)

Page 138

1 agencies the ADM Board works with that address
2 substance use issues?
3      A.   Without having the list in front of
4 me and being able to count it, I don't know the
5 number offhand.
6      Q.   Can you give me a ballpark?
7 Recognizing you don't have the list in front of
8 you.
9      A.   The number of providers that treat
10 opioid use disorder?  Is that the question?
11     Q.   It's a little broader than that.
12     A.   Okay.
13     Q.   So I'm curious how many service
14 providers ADM contracts with that provide
15 substance --
16     A.   Okay.
17     Q.   -- use services.
18     A.   Just one more question.
19     Q.   Sure.
20     A.   Are you referring to just treatment
21 services, or treatment and prevention?
22     Q.   Any kind of services related to
23 substance use.
24     A.   Okay.  I would say, ballpark, 10.
25     Q.   Of those 10, can you give me an

Page 139

1 estimate of how many provide opioid services?
2      A.   When you reference just
3 opioid-specific services, so, generally, all of
4 our addiction providers treat all addictions.
5      Q.   Sure.
6      A.   Not just one addiction.  So are
7 you meaning they have programs that are in
8 addition to their overall programs that can be
9 specific for opioid use disorder?
10     Q.   That's a great question.  Let me
11 ask it -- I'll ask a little bit of a better
12 question.
13          Do any of the 10 --
14     A.   Okay.
15     Q.   -- only service opioid-related
16 issues?
17     A.   No.
18     Q.   Recognizing that 10 was an
19 estimate, does the ADM Board track, for each of
20 those contracting service providers, what
21 portion of their substance use treatment or
22 prevention goes to opioids versus other
23 substances?
24     A.   What I am aware of is I do know
25 that the providers are required to submit

Page 140

1 specific outcome measurements on a regular
2 basis to the ADM Board; however, I'm not
3 knowledgeable of what specifically they're all
4 tracking, so I'm -- I don't know.
5      Q.   Do you know how frequently the
6 service providers report to the ADM Board?
7      A.   Depending on the program, when they
8 complete their contracts with their budget
9 applications to ADM Board, they determine if
10 it's going to be quarterly, biannually,
11 semiannually.  But, for the most part, they --
12 the majority report quarterly.
13     Q.   Do they report to you or somebody
14 else at the ADM Board?
15     A.   So there is an outcomes e-mail that
16 everything is submitted to, and it gets saved.
17 And prior to Eric Hutzell departing, that was
18 one of his primary responsibilities is -- was
19 working with the outcomes that were collected.
20     Q.   Do you have access to the outcomes
21 e-mail?
22     A.   I do not have access to it, no.
23     Q.   Do you see the reports, whether
24 they be quarterly or -- or at some other
25 interval, directly or do you just see an

Page 141

1 analysis done by Eric Hutzell?
2      A.   If I want to go into our shared
3 drive and look at them specifically, I can.  I
4 have not gone into any of those quarterly
5 reports and looked at them individually, and
6 have just -- if there's typically information I
7 need for a report or pres- -- Eric Hutzell
8 would be the one that would compile that
9 information and give that to me.
10     Q.   Have -- do you know whether the ADM
11 Board has interviewed anybody to take Eric's
12 positions?
13     A.   They did begin the interview
14 process last week, I think.
15     Q.   And will you participate in that
16 interview process?
17     A.   When it gets to the clinical team
18 part, yes.  As many members that are available
19 will participate in that interview.
20     Q.   Do you know what kind of background
21 the ADM Board is looking for to fill that
22 position?
23     A.   I do not.  I did not see the -- I
24 did not look at the job posting before they --
25 when they posted it.

36 (Pages 138 - 141)

Page 142

1    Q.    What was the other vacancy that you
2  mentioned?
3    A.    The care access and clients' rights
4  coordinator.
5    Q.    That's not a clinical position,
6  right?  Or is it?
7    A.    It is.
8    Q.    It is?
9    A.    Uh-huh.
10    Q.    Okay.  So there are two openings
11  within the clinical group?
12    A.    Yes.  That position will primarily
13  provide oversight with the adult mental health
14  system, as well as clients' rights officer to
15  the board.
16    Q.    Does that position have any
17  responsibility for addiction services?
18    A.    Historically, no.  Because we are a
19  small department, our desire is to bring on
20  staff that have a wide history and an
21  experience across, so they can cross-cover.
22    Q.    How much of your work -- I know
23  your title includes the word "addiction," but
24  how much of your work is focused on addiction
25  as opposed to mental health services?

Page 143

1    A.    I would say 95 percent or higher is
2  solely addiction.
3    Q.    And of that 95 percent or higher,
4  can you give me an estimate about how much is
5  related to opioid issues?
6    A.    I think that number has ebbed and
7  flowed since I've become a staff member.  When
8  I was first hired on, I would say over 90 --
9  100 percent of the time was dedicated to the
10  opioid use disorder.  But as far as giving a
11  range now, in looking at the various programs
12  that I provide oversight with and participate
13  in, I would say over 50 percent.
14    Q.    When -- when did that change, that
15  percentage?  When did it reduce from opioid to
16  about half-and-half opioid versus non-opioid?
17        MS. KEARSE:  Object to form.
18    A.    I think more recently.  I would say
19  over the last six -- the -- months or so, we've
20  kind of tried to expand out and look at other
21  services we're offering.  Like I mentioned
22  before, recovery housing isn't only for opioid
23  use, so a lot of times we'll be dealing with
24  other substances and things like that.
25    Q.    So at some point in 2018?

Page 144

1    A.    Yeah.  And also with other
2  vacancies that were in the department, it
3  create- -- caused me to have to cover other
4  areas that weren't necessarily dedicated
5  solely, such as the Addiction Helpline covers
6  all substances, and things like that.
7    Q.    Did you know, when you first joined
8  the ADM Board, that the vast majority, if not
9  all of your time, would be spent on opioid
10  issues when you joined in 2016?
11    A.    No.
12    Q.    Did you do anything before you
13  joined the board to learn about the status of
14  the opioid issue in Summit County?
15    A.    No.
16    Q.    Did you have any awareness, when
17  you joined the board, of the -- the status of
18  opioid issues in Summit County?
19    A.    Not until I was hired on and was
20  orienting for the position.
21    Q.    Who trained you when you joined?
22    A.    A variety of the clinical team.  So
23  I -- I did receive some orientation from my
24  supervisor, Aimee Wade.  I also received
25  orientation from other members of the clinical

Page 145

1  team.  I spent some time with each of them.
2        And then a lot of it was really
3  figuring out the position for myself, because
4  it was a newly formed position that they
5  combined other roles into one.  So this
6  position did not exist completely as it is now
7  prior to me coming on board.
8    Q.    The person who retired who preceded
9  you, Paula -- what was her last name?
10    A.    Rabinowitz.
11    Q.    Ms. Rabinowitz was with the board
12  for how long?
13    A.    I don't know.
14    Q.    What -- do you have any
15  understanding of what her responsibilities were
16  when she was with the board before she retired?
17    A.    It was my understanding that she
18  provided oversight over the addiction
19  programming, adult addiction programming, as
20  well as I know she was involved with recovery
21  housing and peer support.
22    Q.    At some point did you -- strike
23  that.
24        Do you agree that there is an
25  opioid epidemic in Summit County?

37 (Pages 142 - 145)

Page 146

1     A.   Yes.
2     Q.   When did you first learn that there
3 was an opioid epidemic in Summit County?
4     A.   As I mentioned, I didn't really
5 follow Summit County too closely prior to being
6 employed in Summit County, and then quickly
7 realized the state hospital was just a very
8 small part of Summit County.  So in that sense,
9 I really didn't involve myself or educate
10 myself on the situation until becoming employed
11 in May of 2016.
12     Q.   So you didn't learn that there was
13 an opioid epidemic in Summit County until you
14 joined the ADM Board in May of 2016?
15         MS. KEARSE:  Object to form.
16     A.   I would say it's not that I didn't
17 know there was an issue.  I didn't follow it
18 closely.  I'm not a resident of Summit County,
19 nor did -- was that my primary work
20 responsibility.
21     Q.   When did you first become aware of
22 an opioid issue in Summit County?
23     A.   I don't have a specific date.  I
24 want to -- in my work at the hospital, prior to
25 becoming -- coming on board at Summit County,

Page 147

1 we did work with clients that came from the
2 county at times.  But, as I said, I really
3 didn't familiarize myself with the situation
4 prior to becoming employed.
5     Q.   The conferences that you attended
6 when you were a SAMI counselor, did any of them
7 talk about the opioid issue in terms of it
8 building an opioid epidemic in any region in
9 Ohio?
10     A.   I don't know if the word "epidemic"
11 was used.  I know that in the first -- in the
12 Ohio opiate conferences through OACBHA, it was
13 definitely a growing discussion in looking at
14 the -- the increasing issue.
15         If I could recall correctly, the
16 initial conference, the first conference,
17 really focused on just -- southern Ohio was a
18 big hot topic.  But they really focused on --
19 just on, per capita, how many pills per person
20 in regions were available, whether that's
21 adult, child, infant, older adult.  And that
22 was a lot of the focus, so that's where the
23 discussion -- where I've first heard the
24 discussion in Ohio.
25     Q.   So at that first conference, a big

Page 148

1 focus was the -- the number of pills; is that
2 right?
3     A.   And how there were -- they were so
4 readily accessible and such a large number of
5 individuals were abusing medication.
6     Q.   Did you -- did you understand that,
7 the number of pills, to be referring to
8 prescription opioids versus illicit opioids?
9     A.   It's my understanding that it was
10 prescription.
11     Q.   So go back at that first conference,
12 around 2011 or so, you had an understanding
13 that at least there -- there were reports of --
14 of high numbers of prescription opioids being
15 available --
16         MS. KEARSE:  Object to --
17     Q.   -- that were problematic in Ohio?
18         MS. KEARSE:  Object to form.
19     A.   Yes.
20         THE REPORTER:  I didn't hear the
21 answer.
22         THE WITNESS:  Yes.  I'm sorry.
23     Q.   When you joined the ADM Board, did
24 any member of the ADM Board provide information
25 to you specific to the opioid issue as it

Page 149

1 relates to Summit County?
2     A.   I can't recall the specific
3 conversations we had.  I know that it was part
4 of some of the orientation and on-boarding, and
5 just basically introducing me to programs,
6 meetings, committees, so on and so forth.  But
7 I don't remember the specifics of the
8 conversations.
9     Q.   Do you remember whether you
10 reviewed any documents that were prepared by
11 the ADM Board that summarize the opioid issue
12 in Summit County or anything like that?
13     A.   When I was first employed, I know,
14 like, at the quarterly Opiate Task Force
15 meetings, I would look at the presentation that
16 was being presented and would see that
17 information.
18     Q.   Did you review any of the reports
19 from the Opiate Task Force, either annual
20 reports or any other reports generated by the
21 Opiate Task Force?
22     A.   When I first was employed or --
23     Q.   Yes, when you were first employed.
24     A.   Nothing initially, no.
25     Q.   Since joining the ADM Board, have

38 (Pages 146 - 149)

1  you reviewed the annual reports of the Opiate
2  Task Force?
3      A.   I will look at them, probably a
4  couple hours before, because typically that's
5  when we get them e-mailed to us.  And I will
6  look at them and then listen to the
7  presentation at the board -- at the meetings
8  when I'm there.
9      Q.   Do you play any role in preparing
10 any portion of the annual report for the Opiate
11 Task Force?
12     A.   No.
13     Q.   Do any of the programs that -- that
14 you're involved with provide annual reports to
15 the board or to any stakeholders?
16     A.   We did provide an annual report
17 that Eric Hutzell compiled in 2017 that we had
18 discussed earlier.  We have not compiled a 2018
19 report.
20         There is an overall annual report
21 that was completed by the board every year, and
22 I will assist in the areas that fall under me
23 to provide those updates, such as how many peer
24 recovery supporters have been trained in the
25 community, recovery housing beds available, and

1  information of that nature.
2      Q.   And you'll provide -- for that
3  board annual report, do you provide a narrative
4  section, or do you provide just data?
5      A.   I provide the data, and then my
6  supervisor compiles the report.
7      Q.   Do you ever review or edit any
8  narrative portion of the ADM Board annual
9  report?
10     A.   No.
11     Q.   The annual report that you
12 referenced earlier today and that you just
13 mentioned that Mr. Hutzell worked on, that was
14 for the Quick Response Team; is that right?
15     A.   Correct.
16     Q.   You also mentioned that there were
17 quarterly meetings of the Quick Response Team.
18 Did you prepare any sort of reports for those
19 quarterly meetings?
20     A.   Eric Hutzell prepared the
21 quarterly.  Sorry.
22     Q.   Did he prepare PowerPoints for
23 those meetings?
24     A.   It was -- it was probably about
25 four slides, but, yeah, he would do a

1  PowerPoint for those meetings.
2      Q.   Did you prepare any written
3  information for any of those meetings?
4      A.   No.
5      Q.   Do you present -- do you present
6  the information at the quarterly QRT meetings?
7      A.   At the time Eric was employed with
8  us, so Eric attended those meetings with me.  I
9  would assist if he wasn't able to be present,
10 but for the most part, Eric reported that out,
11 because he could field any question they may
12 have.
13     Q.   Part of the reports, the quarterly
14 reports for the QRT, talk about the impact of
15 the program, right?
16     A.   Uh-huh.
17     Q.   Yes?
18     A.   Yes.
19     Q.   Do you track the impact -- or
20 strike that.
21         Do you monitor the impact of any
22 other programs, such as the recovery housing
23 program or the peer support program?
24     A.   So with the peer support program,
25 there's no Summit County peer support program.

1  It's just there -- we have certified peer
2  recovery supports that are employed by various
3  entities, whether it's recovery housing
4  providers, treatment providers, so on and so
5  forth, the courts.  But there's no, like, one
6  central group.  So we do not collect any data
7  specifically just as Summit County peer
8  support.
9          As far as looking at the recovery
10 housing, some of the outcomes we do measure is
11 looking at sobriety time and things of that
12 nature.
13     Q.   Do you look at, with respect to
14 recovery housing, whether -- whether there is
15 any repeated need by any one individual?
16     A.   So we have had some individuals
17 that will maybe relapse while they are in the
18 program and will maybe go to detox services and
19 then get back on track and go into the housing
20 program, so we will work with the providers to
21 allow them to take that client back in.
22     Q.   Oriana House was involved in the
23 recovery housing program until the end of 2017?
24 Is that what you said?
25     A.   October 28th was their last day of

39 (Pages 150 - 153)

Page 154

1 involvement.
2    Q.   Okay.  What is Oriana House?
3    A.   They're an addiction treatment
4 provider within our county, who work largely
5 with the criminal justice system.
6    Q.   What is ADM's role with respect to
7 Oriana House?
8    A.   We are a funder of some of their
9 services.
10    Q.   It's a separate entity, though,
11 right?  Oriana House is a separate entity from
12 the ADM Board?
13    A.   Correct.
14    Q.   ADM Board funds some services for
15 Oriana House?
16    A.   Correct.
17    Q.   And we discussed those services
18 earlier?
19    A.   Yeah.  As I mentioned off the top
20 of my head, I can only come up with those
21 couple, but I know they have more services in
22 their contract.  I just don't know it offhand.
23    Q.   Does the ADM Board have one
24 contract with the -- with Oriana House?
25    A.   Yes.

Page 155

1    Q.   Is -- do you know whether that's an
2 annual contract with Oriana House?
3    A.   Yes.  It's my understanding all of
4 our contracts are annual.  I know some were
5 18-month contracts when we transitioned from a
6 calendar year to a fiscal year calendar.
7    Q.   Did that occur while you were with
8 the board?
9    A.   Yes.
10    Q.   When did that occur?
11    A.   I think it's just finishing up,
12 like, the process of them all getting onto the
13 fiscal year calendar, so.
14    Q.   What is the fiscal year?
15    A.   July 1 to June 30th.
16    Q.   So before recently, was the ADM
17 Board on a calendar year for financial
18 reporting services or purposes?
19    A.   Correct.
20    Q.   Okay.  And until this transition,
21 2018 to 2019, is when the transition to fiscal
22 year occurred?
23    A.   Some agencies went sooner,
24 depending on what the agencies were.  So -- but
25 for the most part, I think they are all on the

Page 156

1 fiscal calendar at this point.
2    Q.   Do you know why that change was
3 made?
4    A.   OhioMHAS is on that fiscal
5 schedule, July 1 to June 30th, so it makes
6 things simpler as far as their reporting
7 guidelines and our reporting guidelines.  That
8 way they line up.
9    Q.   So for programs where ADM is
10 providing some funding and -- and OHMAS is
11 providing some funding, that allows that, the
12 funding calendar to be the same, essentially,
13 if you're both on the same fiscal year?
14    A.   Uh-huh.
15    Q.   Is that your understanding?
16    A.   Uh-huh.
17    Q.   You need to say yes or no.
18    A.   Yes.
19    Q.   Thanks.
20        When the ADM Board first considered
21 implementing Quick Response Teams, did you
22 prepare an ex- -- like a summary of the Quick
23 Response Team and -- and what the -- the goals
24 and the plans were for that?
25    A.   Possibly.  I don't remember.  You

Page 157

1 know, we did send a lot of e-mails out to,
2 like, as I mentioned, we were reaching out to
3 mayors and police chiefs and fire chiefs, so I
4 may.
5        - - - - -
6        (Thereupon, Deposition Exhibit 3,
7        Document Titled "Objectives and
8        Brief Bio for Quick Response Teams
9        in Summit County," SUMMIT_000945488,
10        was marked for purposes of
11        identification.)
12        - - - - -
13    Q.   I'm going to hand you what we've
14 marked as Exhibit 3 --
15    A.   Okay.
16    Q.   -- for identification purposes.  If
17 you could please take a look at that and let me
18 know whether you recognize that document.
19        MS. FEINSTEIN:  While you're
20 reviewing it, I'll just note for the record it
21 is SUMMIT_000945488.
22    A.   Okay.
23    Q.   Do you recognize that document?
24    A.   Yes.
25    Q.   Do you --

40 (Pages 154 - 157)

Page 158

1    A.   So this was from when we did a call
2 for presentation in 2017 for the OACBHA opiate
3 conference.  When I co-presented with the two
4 Oriana counselors and Cuyahoga Falls police
5 officer, this was what we had to submit to be
6 considered as a presenter.
7    Q.   So this was not a submission to a
8 county; this was your submission to OACBHA to
9 talk about the Quick Response Teams?
10    A.   Yes.  So it was basically our
11 proposal of what we would present about.
12    Q.   Did you prepare Exhibit 3?
13    A.   I did not.  I did provide some
14 edits to it.  Primarily the two counselors from
15 Oriana House compiled it.
16    Q.   And I forget what year that
17 presentation was.  Was it 2017?
18    A.   Correct.  June of 2017.
19    Q.   So this was not prepared by you,
20 Exhibit 3?
21    A.   Not completely.  Like I said, I did
22 make some edits to it before it was submitted.
23    Q.   There are a couple of stats,
24 statistics reported for the Colerain
25 Township --

Page 159

1    A.   Yes.
2    Q.   -- program, the QRT program that
3 you mentioned the Summit County program was
4 based on.  And looking at the, kind of the
5 first full paragraph under the numbered
6 paragraphs near the top of the document, the
7 second sentence reads, "The QRT is modeled
8 after Colerain Township, where it saw a 35
9 percent decline in the number of emergency
10 response calls for first responders since
11 implementing the program approximately 18
12 months ago."
13         Did I read that correctly?
14    A.   Yes.
15    Q.   Did -- did Summit County do
16 anything to confirm the -- the numbers provided
17 by Colerain Township for purposes of the Quick
18 Response Team?
19    A.   To my knowledge, we took the
20 numbers that were presented by their police and
21 fire and -- and took those numbers that they
22 presented to us in December.
23    Q.   And assumed that they were true
24 based on the source of the information --
25    A.   Yes.

Page 160

1    Q.   -- is that right?
2    A.   Yes.
3    Q.   So because those numbers were
4 provided to you from the first responders, you
5 took them to be valid numbers from those first
6 responders; is that right?
7    A.   Yes.
8    Q.   The next sentence reads,
9 "Additionally, approximately 80 percent of the
10 individuals the team spoke with entered into
11 some form of treatment program."
12         Did I read that correctly?
13    A.   Yes.
14    Q.   And was that -- that was your
15 understanding, based on presentations from
16 Colerain Township to Summit County, correct?
17    A.   Correct.
18    Q.   Since implementing the program, has
19 Summit County seen -- seen similar successes?
20    A.   So in our 2017 report, we did
21 report 330 individuals entered into some form
22 of treatment after being seen by the Quick
23 Response Teams.  I think that percentage, it
24 was roughly between -- around 38 percent.  I
25 don't have the exact number off the top of my

Page 161

1 head.
2         One thing we do also take into
3 account is these are individuals that we are
4 tracking solely through our ADM billing system.
5         Another factor is, in Colerain
6 Township, their program was structured a little
7 differently.  They took individuals and would
8 physically take them and transport them to a
9 residential provider, so to speak.  They did
10 assessments on site, is also my understanding,
11 with their program there.
12         So our program is slightly
13 different, but in the numbers that we saw, in
14 our eyes, of implementing this program, to if
15 we could engage just a small number of
16 individuals into treatment that may not have
17 engaged into treatment and prevent just one
18 death, we thought that was a success as well.
19         So we -- we're happy with the
20 results we saw in the first year, and we, at
21 our quarterly meetings, are continuing to
22 discuss how we can improve the program as a
23 whole.
24    Q.   I'm going to show you just a couple
25 of documents --

41 (Pages 158 - 161)

Page 162

1     A.   Okay.
2     Q.   -- to see if these are some of the
3  things that you have utilized as a part of kind
4  of evaluating the performance of the Quick
5  Response program.
6          - - - - -
7          (Thereupon, Deposition Exhibit 4,
8          Document Titled "Summit County Quick
9          Response Team Quarterly (Q2)
10         Meeting, September 21, 2017,"
11         SUMMIT_000960323, was marked for
12         purposes of identification.)
13         - - - - -
14    Q.   First I'll hand you what we've
15  marked as Exhibit 4 for identification
16  purposes.  It has a cover sheet because the
17  document was produced to us in native format,
18  meaning it was a -- this particular document is
19  a PowerPoint that was produced in native.  And
20  the Bates number on the native is
21  SUMMIT_000960323.
22         Have you seen this document before?
23    A.   Yes.
24    Q.   And what is Exhibit 4?
25    A.   This is a PowerPoint presentation

Page 163

1  Eric Hutzell created to present at one of our
2  quarterly QRT meetings, so it looks like it was
3  our second meeting since implementing the
4  program.
5     Q.   And you get that from the first
6  page -- so unfortunately the pages of the
7  PowerPoint aren't numbered, but I -- this copy
8  is double sided, so it's the second sheet of
9  paper, and the title page of the PowerPoint, it
10  reads, "Summit County Quick Response Team
11  Quarterly (Q2) meeting."
12         Is that correct?
13    A.   Uh-huh.
14    Q.   Yes?
15    A.   Yes.
16    Q.   And the date of that meeting is
17  September 21, 2017, correct?
18    A.   Correct.
19    Q.   This is the PowerPoint that
20  Mr. Hutzell put together?
21    A.   Correct.
22    Q.   Did you have any input into the
23  creation of this PowerPoint?
24    A.   I would say other than the page of
25  the start times of the teams, no.

Page 164

1     Q.   So the -- the second page of the
2  PowerPoint that has the months in 2017 that
3  various communities joined the Quick Response
4  Team --
5     A.   Correct.
6     Q.   -- that's the slide that you had
7  input in?
8     A.   Correct.
9     Q.   Did you observe as Mr. Hutzell
10  presented this information at the quarterly
11  meeting?
12    A.   Yes.
13    Q.   There is a page -- gosh -- it's two
14  sheets in, so I believe the fifth page of the
15  presentation.  It says, "Treatment Results" at
16  the top.
17    A.   Yes.
18    Q.   Do these treatment results
19  represent both quarters, the first and second
20  quarter of the QRT, or is this just Q2
21  reporting?
22    A.   Just quarterly two.
23    Q.   Okay.  So this is just second
24  quarter treatment results?
25    A.   Correct.

Page 165

1     Q.   This slide indicates that 30
2  percent of the clients entered treatment,
3  correct?
4     A.   Yes.
5     Q.   And by your earlier testimony, it's
6  my understanding that the 30 percent number
7  represents clients who enter ADM-funded
8  treatment; is that correct?
9     A.   Correct.  And it's also based on
10  when the provider bills us, so if they're
11  delayed in billing us, we don't have access to
12  that information, which -- so we do not only
13  look at the immediate.  We also, we're looking
14  farther down, if they would have started to
15  bill us later.
16    Q.   The second sub-bullet under the --
17  the bullet regarding 30 percent of clients
18  entering treatment references, "43 percent of
19  the clients who received treatment called the
20  ADM Helpline."
21         Do you see that?
22    A.   Yes.
23    Q.   Does the ADM Board track and
24  consider a contact to the ADM Helpline as
25  seeking treatment?

42 (Pages 162 - 165)

Page 166

1     A.   If an individual calls the ADM
2  Addiction Helpline and schedules an assessment.
3  So that 43 percent of the clients who receive
4  treatment called the Addiction Helpline, so
5  they went through the ADM Addiction Helpline to
6  schedule an appointment for an assessment and
7  showed up.
8     Q.   So they didn't just call the
9  helpline.  They actually called the helpline to
10 schedule an appointment?
11    A.   Correct.
12    Q.   Okay.  Did -- is the ADM Helpline
13 sometimes utilized by people just to call to
14 kind of talk through support, sort of like a
15 support line as well?
16    A.   No.
17    Q.   It's a referral line?
18    A.   Yes.  They do track if a person's
19 not eligible for services.  So if an individual
20 is calling for support or for, like, 12-step
21 information, if they do have the capability,
22 they will provide that information, but that's
23 not a purpose of the ADM Addiction Helpline.
24        The primary purpose is for
25 individuals to call that one number and be able

Page 167

1  to get scheduled for the services they're
2  requesting.  And depending on what provider,
3  since there's multiple providers.
4     Q.   Turning now to the -- the next
5  page.  At the very top, it reads, "ADM Helpline
6  results."  Do you see that?
7     A.   Yes.
8     Q.   This chart, did you have any role
9  in preparing this chart?
10    A.   No.
11    Q.   Underneath the chart are some
12 statistics.  So the -- in boxes.  There are two
13 boxes.  The top box reads, "50 percent (22) of
14 the QRT clients referred to the ADM Helpline
15 had a mental health illness."
16        Did I read that correctly?
17    A.   Yes.
18    Q.   What do you understand that to
19 mean?
20    A.   So when an individual calls in to
21 schedule an appointment, the staff at the
22 helpline will ask a series of questions.  Takes
23 about five minutes.  And they will ask them if
24 they have any mental health diagnoses or other
25 co-occurring diagnoses, so that was based on

Page 168

1  self-report of the client when they schedule
2  their assessment.
3     Q.   The next box reads, "The total
4  jumps to 55 clients from 22 clients when
5  comparing the helpline data to the QRT data."
6     A.   Uh-huh.
7     Q.   What do you understand that to
8  mean?
9     A.   That if you're looking at the
10 individuals in general calling the helpline,
11 but through QRT, saying -- so I mentioned
12 earlier when an individual calls, they ask
13 referral source, so it's either a
14 self-referral, treatment provider, their
15 probation officer.
16        If they're with a Quick Response
17 Team, we've really tried to encourage the QRT
18 staff to say -- have them say QRT so that we
19 can track that effectively.  But ultimately
20 it's up to the clients, if they say they were
21 calling through QRT.
22        So it is, from what I'm looking at
23 it, it's showing that individuals working with
24 the QRT, the number jumps to 55 clients.
25    Q.   Is that 55 clients who also had a

Page 169

1  mental health illness or 55 clients who called
2  the helpline through QRT?
3     A.   Of -- with mental illness.
4     Q.   Okay.
5     A.   Mental health illness.
6     Q.   Okay.  Thank you.
7     A.   Uh-huh.
8     Q.   The next page has a graphic
9  regarding ADM Helpline results.  Do you see
10 that?
11    A.   Yes.
12    Q.   Did you have any role in preparing
13 this page?
14    A.   No.  All this was compiled with
15 Eric -- with our ADM Addiction Helpline and
16 their system.  We're able to pull all of this
17 information out from their system.
18    Q.   And do you have any understanding
19 of what this page depicts?
20    A.   It depicts for when the individual
21 calls in to schedule their assessment, what
22 substances they're reporting as using.  And
23 this is the period January 2017 to July 2017.
24    Q.   And, again, this is self-reported
25 information, correct?

43 (Pages 166 - 169)

Page 170

1    A.    Correct.
2    Q.    This chart includes reporting -- of
3 the callers, 26 reported use of heroin, right?
4    A.    Correct.
5    Q.    Seven reported use of fentanyl?
6    A.    Correct.
7    Q.    Do you know whether that is
8 prescription fentanyl or illicit fentanyl?
9    A.    I do not know.
10    Q.    Would it -- would you expect it to
11 indicate if it was a prescription opioid?
12        MS. KEARSE:  Objection.
13    A.    If you look down, it says
14 "prescription opiates."  So if a person was
15 prescribed the -- it would be their self-report
16 of how they perceive it, and if they knowingly
17 were taking fentanyl or not.
18    Q.    Okay.  So if they -- if a -- strike
19 that.
20        So the ADM Helpline is only going
21 on the self-report; it doesn't do anything to
22 verify the report; is that right?
23    A.    That's my understanding.
24    Q.    And this -- this report from the
25 ADM Helpline results that was presented at the

Page 171

1 September 21, 2017, QRT quarterly meeting
2 indicates that 26 per-- 26 callers reported a
3 use of heroin, seven reported a use of
4 fentanyl, six reported a use of alcohol, right?
5    A.    Uh-huh, yes.
6    Q.    Five reported a use of
7 methamphetamines; is that right?
8    A.    Yes.
9    Q.    Five reported prescription opiates?
10    A.    Yes.
11    Q.    Four reported other drugs, unknown.
12 What -- what does that mean?
13    A.    So if the individual was using
14 other prescriptions.  So if it
15 was benzodiazepines or other sedatives.  Or
16 there have been instances where, "I took a
17 pill.  I don't know what it was."
18    Q.    Understood.  Okay.  The next one is
19 cannabis.  Two callers reported that, right?
20    A.    Yes.
21    Q.    Two callers reported use of
22 cocaine, right?
23    A.    Yes.
24    Q.    And then two callers reported other
25 opioids/opiates.  Do you have any understanding

Page 172

1 of what that category includes?
2    A.    I do not know.  I think that's
3 where they would fall if it was not prescribed
4 to them, but they were using it.
5    Q.    So you take that to mean
6 potentially a prescription opioid, but that it
7 was not prescribed to them?
8    A.    Correct.
9    Q.    But you don't know for -- for sure
10 if that's prescription?
11    A.    I do not.
12    Q.    Do the ADM Helpline, how are the
13 records kept by the ADM Helpline workers?  Are
14 they kept electronically, or is it in paper?
15    A.    Electronically.
16    Q.    Electronic?
17    A.    Electronic --
18    Q.    What system --
19    A.    -- health record.
20    Q.    What system do they put it into?
21    A.    I don't know.
22    Q.    Do you have access to it?
23    A.    We do have a password.  I do not
24 specifically have the password access to it.
25 Jerry Craig does have access to the data

Page 173

1 system.
2    Q.    This report -- strike that.
3        Do you know why Mr. Hutzell's
4 report to the quarterly QRT meeting includes
5 ADM Helpline information?
6    A.    So the ADM Helpline was launched
7 January 17th of 2017.  The first Quick Response
8 Team was launched January 17th, 2017.  So when
9 we launched the Quick Response Teams, the idea
10 was we're not going to assess them on site, but
11 we're going to connect them with the Addiction
12 Helpline and sit with them while they schedule
13 an assessment appointment, as a warm handoff.
14 And that assessment date was -- is also what --
15 reported -- one of the items reported in the
16 monthly data that's submitted to me.
17    Q.    How is the ADM Helpline funded?
18    A.    Through the ADM Board.
19 Specifically, I don't know.
20    Q.    Does the ADM Helpline provide
21 referrals for mental health services?
22    A.    No.
23    Q.    Just addiction services?
24    A.    Yes.
25    Q.    Does the ADM Helpline provide

1 referrals for addiction to all substances?
2    A.   Yes.
3    Q.   Directing your attention now to --
4 I wish they were numbered -- a few more pages
5 in, to Exhibit 4.  It is a slide that has,
6 "Drug overdose death results," at the top,
7 "Taking a deeper look."
8    A.   Okay.
9    Q.   So there are actually two them.
10 I'm on the slide that has one main bullet and
11 two sub-bullets.  It says, "Suspected drug
12 overdose death data."
13    A.   Okay.
14    Q.   Are you there?
15    A.   Yep.
16    Q.   Did you have any role in preparing
17 this slide?
18    A.   No.
19    Q.   Do you have any understanding of
20 what this slide presents?
21    A.   Looking at how many fatal overdoses
22 were reported from the medical examiner's
23 office.
24    Q.   Does the ADM Board regularly review
25 medical examiner data?

1    A.   While Eric was employed with the
2 ADM Board, he did have access with them, and he
3 worked with the medical examiner's office.  We
4 do get e-mails -- well, Doug -- Dr. Smith does
5 get an e-mail daily, as well, from the medical
6 examiner.
7    Q.   Do you utilize medical examiner
8 data in your day-to-day work?
9    A.   No.
10    Q.   Is it important -- is the medical
11 examiner data an important piece of evaluating
12 the effectiveness of the QRT program?
13    A.   I think, when looking at the number
14 of individuals that were fatal overdoses and
15 looking at the number of how many individuals
16 were seen by QRT, the stakeholders with the QRT
17 teams are interested in that information.
18    Q.   Those stakeholders are the
19 counselors, the -- and the first responders; is
20 that right?
21    A.   The police and fire chiefs of the
22 county, the cities.
23    Q.   This slide shows a total of 140
24 deaths.  Six were QRT clients, and 134 were
25 non-QRT clients; is that right?

1    A.   Six deaths were QRT.  134, yes,
2 were non-QRT.
3    Q.   For a -- for a total of 140 deaths
4 that were reported, right?
5    A.   Correct.
6    Q.   Were you present when Mr. Hutzell
7 presented this information?
8    A.   Yes.
9    Q.   And is that -- was that
10 representing something that was -- strike that.
11        Did -- was this presented as being
12 indicative of the QRT program making a
13 difference in overdoses?
14    A.   I would say yes, because we were
15 providing that outreach and attempting to
16 engage clients into services and helping them
17 navigate the system.
18    Q.   And if you look to the next slide
19 with -- with text, there's a bell curve graph,
20 and then a slide with additional bullets.
21    A.   Uh-huh.
22    Q.   That says, "multiple linear
23 regression."
24    A.   Okay.
25    Q.   Do you have any idea what multiple

1 linear regression is?
2    A.   No.
3    Q.   That's an Eric Hutzell slide, isn't
4 it?
5    A.   Yeah.  And -- and many people in
6 the room had blank looks when he was presenting
7 this presentation, so future presentations got
8 much more brief.
9    Q.   The last bullet on that page
10 concludes, "This means that QRT visits have a
11 significant impact on preventing drug overdose
12 deaths amongst visited clients who have entered
13 treatment."
14        Did I read that correctly?
15    A.   Yes.
16    Q.   Is that your understanding of what
17 the data showed for the first two quarters of
18 the QRT program?
19    A.   Yes.
20    Q.   Then if I could direct your
21 attention now to two slides later, titled, "The
22 most important statistic."  Are you there?
23    A.   Uh-huh.
24    Q.   Did you have any role in preparing
25 this slide?

45 (Pages 174 - 177)

Page 178

1     A.    No.
2     Q.    This slide reads, "The most
3  important statistic," and the bullet is, "Zero
4  QRT clients that entered treatment died from a
5  drug overdose during this time period."
6         Is that correct?
7     A.    Correct.
8     Q.    Do you have any understanding of --
9  of what percentage of QRT clients during the
10  second quarter of 2017 were opioid-related
11  versus other substances?
12     A.    I don't know offhand.
13     Q.    Back on -- and I'm sorry to flip
14  back, but the ADM Helpline, results reads that,
15  "80 percent of the QRT referrals were clients
16  who had used some form of opiate."
17         Does that help refresh your
18  recollection of how many QRT clients had
19  opiate-related issues as opposed to other
20  substances, overdose?
21     A.    I don't know the specific number,
22  no.
23     Q.    But it's your -- it's certainly
24  your understanding that the QRT program is
25  making a positive difference with respect to

Page 179

1  overdose deaths; is that right?
2     A.    Yes.
3     Q.    And Colerain Township had
4  experienced a similar -- similar success with
5  its program in preventing overdose deaths,
6  right?
7     A.    Yes.
8     Q.    Do you track the QRT program to
9  determine whether there is actually a reduction
10  in substance abuse due to the QRT program?
11     A.    So right now they're -- we're not
12  tracking that specifically.  And some items
13  aren't always necessarily trackable.  Some of
14  the discussions we've had in our quarterly
15  meetings is just the perception maybe first
16  responders have of individuals that are also
17  using substances and engaging them in providing
18  them resources.  So to see a positive impact on
19  that as well has also been beneficial with us.
20     Q.    Do you know whether the overdose
21  death data that ADM evaluated from the medical
22  examiner differentiated among the opioids to
23  identify prescription opioids versus illicit
24  opioids?
25     A.    I don't -- I don't know if it does

Page 180

1  separate or not.  I never looked at the data
2  specifically myself to know whether or not.
3     Q.    Does ADM have an interest in
4  identifying whether the opioid involved in an
5  opioid-related overdose is a prescription
6  opioid versus an illicit opioid?
7         MS. KEARSE:  Object to form.
8     A.    Can you clarify that?
9     Q.    Sure.  Does the -- does the ADM
10  Board, for purposes of tracking and evaluating
11  the QRT program, have any interest in
12  differentiating among the opioids involved to
13  identify that number of prescription opioids
14  versus illicit opioids?
15     A.    So at this time, we're not
16  differentiating in our tracking.  In looking at
17  our outcomes, we're not differentiating versus
18  prescribed versus illicit.
19     Q.    At any time has the board
20  differentiated?
21     A.    I don't know.
22     Q.    For purposes of the QRT program?
23     A.    Not that I'm aware of.
24     Q.    For purposes of the ADM Helpline,
25  that information appears to be elicited from

Page 181

1  the callers?
2     A.    Correct.
3     Q.    Why is that information elicited
4  from the callers at the ADM Helpline level?
5     A.    So when the person calls in, they
6  ask the substances, because specifically if a
7  client's calling in wanting methadone, for
8  example, only one provider in Summit County
9  offers methadone through the helpline.  So
10  that's going to immediately direct the person
11  working with them to do the warm handoff.
12  They're going to offer CHC as the option, as
13  that's the only provider that offers that
14  service.
15         When they're talking about the
16  substances used, that is some of the basic
17  information that the ASCA staff will take.  And
18  they also then do a three-way call with the
19  provider that the client chooses to schedule an
20  assessment with.
21         So they will connect -- so for
22  example, say a person will choose to schedule
23  with CHC.  The ASCA staff member will call CHC,
24  get them on the phone while the person is on
25  hold, give a basic overview of this persons's

46 (Pages 178 - 181)

1 use, and then they will connect them in a
2 three-way call.  And then the ASCA staff member
3 stays on the phone until an appointment is
4 given, and that's when the ASCA staff member
5 will separate from the call, and they can
6 continue any ongoing information that they may
7 need to get before coming in for that
8 appointment.
9     Q.   Are all of the ADM calls handled by
10 ASCA staff members?
11     A.   For the helpline, yes.
12     Q.   So all the ADM -- the ADM Helpline
13 is staffed by ASCA staff members?
14     A.   Correct.
15     Q.   Who pays for the ASCA staff
16 members?
17     A.   Well, ASCA -- their paychecks
18 directly come from ASCA, but ASCA does have a
19 contract with the ADM Board.
20     Q.   Do you know whether the referral
21 process is different, and just referring -- I'm
22 just asking about the process itself -- is
23 different if the caller identifies that they
24 are using a prescription opioid versus an
25 illicit opioid?

1     A.   Not to my knowledge.
2     Q.   Do you have any information about
3 why it would be important for the staff member
4 taking the call to have an understanding of
5 whether the user was using a prescription
6 opioid versus an illicit opioid?
7     A.   I don't know.
8          - - - - -
9          (Thereupon, Deposition Exhibit 5,
10          ADM Board Document Titled "Summit
11          County Quick Response Team,"
12          SUMMIT_001793050 to 001793051, was
13          marked for purposes of
14          identification.)
15          - - - - -
16     Q.   Next I'm going to hand you what we
17 have marked as Exhibit 5 for identification
18 purposes, and I apologize that it is not
19 stapled.  It is a two-page document bearing
20 Bates numbers SUMMIT_001793050 through 051.
21     Do you recognize this document?
22     A.   Yes.  This was the 2017 annual
23 report that Eric Hutzell compiled.
24     Q.   For the Quick Response Team?
25     A.   Yes, we also handed it out at our

1 Summit County Opiate Task Force meeting.
2     Q.   Did you have any involvement in
3 preparing Exhibit 5?
4     A.   Other than proofreading it after he
5 compiled it, no.
6     Q.   I'd like to direct your attention
7 to the second page of Exhibit 5, which ends in
8 Bates number 051.  There are some -- in the
9 bottom left-hand corner of the second page is a
10 quick fact sheet for QRT (2017).
11     Do you see that?
12     A.   Yes.
13     Q.   Did you have any role in gathering
14 that data?
15     A.   No.  Eric Hutzell compiled it.
16     Q.   Do you know whether -- strike that.
17     Did you do anything to verify this
18 data?
19     A.   No.  With Eric, I trusted that he
20 did the background information and ensured it
21 was accurate.
22     Q.   Are you familiar with these quick
23 facts, these three bullets that are set forth
24 on the second page of Exhibit 5?
25     A.   Yes.

1     Q.   The first one reads that, "Of the
2 330 clients who received treatment, 72 percent
3 (236) of them were seen for opiate use
4 disorders."
5     Is that right?
6     A.   Yes.
7     Q.   So do you have any understanding of
8 what the other 28 percentage of clients with
9 QRT were seen for?
10     A.   No, I don't.
11     Q.   The third bullet reads, "90 percent
12 of the clients that entered treatment received
13 assessments through the ADM Helpline."
14     Is that right?
15     A.   Yes.
16     Q.   What do you understand that to
17 mean?
18     A.   So 90 percent of the clients that
19 entered into treatment that were seen through
20 QRT scheduled assessments through the ADM
21 Helpline.
22     Q.   Was that a good number?  Was that
23 something that -- that you were hoping to see
24 after the first year of the program?
25     A.   Yes, because our overall goal was

47 (Pages 182 - 185)

Page 186

1 for the teams to work with the ADM Helpline,
2 because we were able to get clients in to be
3 seen sooner.
4     Q.    Does the ADM Helpline only refer
5 clients to ADM services?
6     A.    We do have two providers that are
7 part of the helpline now that are not
8 ADM-funded.
9     Q.    In 2017, were there any
10 non-ADM-funded entities that could be referred
11 to through the ADM Helpline?
12     A.    I don't know, because I -- it was
13 not my primary responsibility for the helpline,
14 so I'm not sure when some of the providers came
15 on board.
16     Q.    Directing your attention to the --
17 the first page of Exhibit 5, there is a chart
18 at the bottom right-hand corner.
19     A.    Uh-huh.
20     Q.    It reads, "The top five substances
21 reported from the ADM Helpline in 2017."
22         Do you see that?
23     A.    Yes.
24     Q.    And none of those top five are
25 prescription opioids, correct?

Page 187

1     A.    Correct.
2     Q.    In the -- the QRT program continued
3 in 2018, correct?
4     A.    Correct.
5     Q.    Do you know someone named Martha
6 Polinsky?
7     A.    Off the top of my head, no.
8 Possibly.
9     Q.    Let me mark this e-mail for you and
10 see if it --
11     A.    Okay.
12     Q.    -- refreshes your recollection.
13         - - - - -
14     (Thereupon, Deposition Exhibit 6,
15     May 2018 E-Mail Chain Re: QRT,
16     SUMMIT_000970749 to 000970754, was
17     marked for purposes of
18     identification.)
19         - - - - -
20     Q.    I'm going to hand you what we've
21 marked as Exhibit 6 --
22     A.    Okay.
23     Q.    -- for identification purposes.
24 Exhibit 6 is an e-mail string that the
25 beginning Bates number is SUMMIT_00970749, and

Page 188

1 it continues to 754.
2         If you could take a moment to flip
3 through this e-mail string and let me know
4 whether you've seen this before.
5     A.    Martha is from Wheeling, West
6 Virginia.  They received a grant, and they were
7 looking to implement Quick Response Teams, and
8 so they reached out to us.
9     Q.    And you -- you provided her some
10 information?
11     A.    Yes.
12     Q.    Did you meet with her to give her
13 information or just talk with her on the phone?
14     A.    It was a phone conference.
15     Q.    Directing your attention, please,
16 to the third page of the document with Bates
17 pages 751 in the bottom right-hand corner.
18 It's double sides, so it's the -- the e-mail
19 from you at the -- is at the bottom of the
20 page, dated Friday May 18, 2018.
21     A.    Uh-huh.
22     Q.    Do you see that?
23     A.    Yes.
24     Q.    And in your e-mail, you write,
25 "Attached or some documents we have created for

Page 189

1 QRT.  The Excel document is what we collect
2 monthly from the counselors/peer supporters,
3 and our research and QI coordinator analyzes it
4 for us."
5         Did I read that correctly?
6     A.    Yes.
7     Q.    And that is the monthly reporting
8 that you get that you described to us earlier,
9 correct?
10     A.    Yes.  That was a blank template we
11 sent her.
12     Q.    Okay.  Then you offered to speak
13 with her about how to gather and then analyze
14 the information, correct?
15     A.    Correct.
16     Q.    Do you know whether Mr. Hutzell
17 spoke with her at all about how to analyze the
18 information?
19     A.    I don't know if they had specific
20 conversations or not.
21     Q.    Continuing now to -- moving forward
22 kind of in the e-mail string, so the next page
23 moving forward, there's an e-mail from
24 Ms. Polinsky to you dated May 24, 2018, near
25 the top of the page.  Do you see that?

48 (Pages 186 - 189)

Page 190

1    A.   Yes.
2    Q.   And she writes, "Thanks again.  You
3  spoke of a 40 percent success rate in getting
4  overdose survives treatment.  Is that correct?
5  Have you seen a decline in overdoses yet?"
6        Do you recall giving her that
7  information?
8    A.   So I do recall.  So -- and then
9  that was -- at the time we were looking at, it
10  ebbed and flowed between 36 and 42 percent
11  of -- with the Quick Response Teams, of
12  individuals engaging in treatment.
13    Q.   And you recall giving Ms. Polinsky
14  that information?
15    A.   Yes.
16    Q.   Did you give her any documents with
17  that information on it or verbally report it?
18    A.   It was verbally over the phone.
19    Q.   And the next page, which is the
20  first page of Exhibit 6, is an e-mail from you,
21  in the middle of the page, dated May 25, 2018.
22        Do you see that?
23    A.   Yes.
24    Q.   You write, "Both deaths and actual
25  overdoses have declined this year when compared

Page 191

1  to the previous year."
2        Did I read that correctly?
3    A.   Yes.
4    Q.   And was that based on the data from
5  both the medical examiner and from the QRT?
6    A.   I would say it was mostly from the
7  medical examiner information that we were
8  getting.
9    Q.   The next sentence reads, "It seems
10  cocaine, meth, and other stimulant drugs are
11  being used more commonly.  These typically have
12  a lower mortality and a higher morbidity."
13        Did I read that correctly?
14    A.   Yes.
15    Q.   Why were you reporting that
16  information to her?
17    A.   Because -- and this does relate
18  directly with the Quick Response Teams -- when
19  our Quick Response Teams were going out, for
20  example, we had one indication where, in our
21  Cuyahoga Falls team, they went out to meet with
22  a female that had an opioid overdose, and she
23  had told the officers, "No, I'm okay.  I'm
24  going to use meth now."  Because, in her eyes,
25  she still had that addiction, but she was

Page 192

1  fearful of dying from the opiate use.  And in
2  her eyes, she was switching one addiction for
3  another.  So we did see individuals with that
4  mentality of switching their addiction and what
5  they were using, because they felt it was less
6  lethal.
7        We also saw that although the
8  number of deaths were decreasing, we also saw
9  the number of DAWN kits and naloxone was
10  increased in -- and we saw those numbers going
11  up.  So I do also believe that also contributed
12  to the lower death rate.
13    Q.   So the QRT program contributed to
14  lower death rates, you think; is that right?
15    A.   A portion of it.
16    Q.   And the use of DAWN kits helped
17  contribute to lower death rates; is that right?
18    A.   I do believe that it helped.
19    Q.   Do you have any understanding of
20  what portion of opioid deaths in 2016, 2017, or
21  2018 were attributable to prescription opioids
22  versus non-prescription opioids?
23    A.   I don't know that information
24  specifically.
25    Q.   And it was your impression, in --

Page 193

1  at least in May of 2018, that, at least
2  anecdotally, some users of substances were
3  shifting their use from opioids to some other
4  substance; is that right?
5    A.   Or they were using them
6  concurrently.
7    Q.   And we saw in the annual report
8  that at least calls to the ADM Helpline did not
9  include prescription opioids in the top five
10  substances reported, right?
11    A.   Correct.
12        MS. KEARSE:  Object to form.
13    Q.   Do you have any understanding of
14  whether there was a decline in the misuse of
15  prescription opioids in the 2017-2018 time
16  frame?
17    A.   I don't know.
18    Q.   Do you know whether the Summit ADM
19  Board tracks that information?
20    A.   I can't -- I don't know if they do
21  specifically or not.
22    Q.   Aside from the ADM Helpline, that
23  is; is that right?
24    A.   Correct, yeah.
25    Q.   Has the ADM Helpline always

49 (Pages 190 - 193)

Page 194

1 requested information regarding whether a
2 caller was using a prescription opioid versus a
3 non-prescription opioid?
4     A.   To my knowledge, yes.
5     Q.   Is there a script or something that
6 the ADM Helpline staffer is trained to use, if
7 somebody identifies an opioid, do they follow
8 up with questions, then, to determine whether
9 or not it's a prescription versus a
10 non-prescription?
11    A.   I was not part of the initial
12 on-boarding and training.  I know there were
13 some scripts that were created for the staff as
14 a step-by-step process for a caller, based on
15 what they answer, but I don't know specifically
16 what that protocol was.
17    Q.   Do you know if the ADM has those
18 scripts still?
19    A.   I know we did create a manual when
20 we on-boarded everyone.
21    Q.   Have you ever seen the manual?
22    A.   The training manual for providers
23 as they became part of the helpline?  I do have
24 a copy of it, yes; however, it's not updated
25 because it was created when we first created

Page 195

1 the helpline.
2     Q.   Do you know if -- if it had -- if
3 that document -- not your copy, obviously --
4 but whether the -- the helpline manual was
5 updated at any point?
6     A.   That I don't know.  I -- I can say,
7 from the time I covered it, from July to
8 November, I did not provide updates to it yet.
9 We do need to update, because we had two new
10 providers come on board.
11    Q.   Do you know whether the requests --
12 strike that.
13         Do you know whether during the ADM
14 Helpline call when the staff member is
15 discussing with the caller whether the caller
16 is using prescription opioids, whether they
17 request information about whether that
18 prescription opioid was prescribed to the
19 caller?
20    A.   I don't know how much specifics
21 they get into from the helpline staff
22 themselves.
23    Q.   Does the ADM Board track outcomes
24 for all of its programs that you're involved
25 with?

Page 196

1     A.   Yes.
2     Q.   Does the ADM Board do any sort of
3 cost outcome analysis to determine whether it
4 will continue to fund any particular program?
5     A.   I don't know.  What I do know is
6 that when we are evaluating programs, we are
7 now directly pulling in their outcomes as part
8 of their funding.  So -- in part of the audit
9 process as well, of looking at the outcomes.
10    Q.   Do you have any role in the audit
11 process?
12    A.   Yes.
13    Q.   What is your role?
14    A.   So with the treatment providers, I
15 assist.  I am not the primary staff responsible
16 for the treatment provider audits.  The care --
17 the clinical compliance and care management
18 coordinator is that -- that's the role that is
19 primarily responsible for those and will be
20 scheduling those.  And the whole clinical team
21 kind of signs up to help with various agencies.
22 And then I am the primary contact for the
23 prevention audits, as well as the recovery
24 housing audits.
25    Q.   How many prevention programs are

Page 197

1 there related to opioids?
2     A.   We have no programs that are
3 specific opioid-only.
4     Q.   Does the ADM Board have to engage
5 in peer reviews of other agencies?
6     A.   Of other boards or other treatment
7 providers outside of Summit County?
8     Q.   Either.  Yeah, either.
9     A.   I know my supervisor does
10 participate in doing those peer reviews with
11 other boards.
12    Q.   Do you have any understanding of
13 what that program involves?
14    A.   No, not specifically.  I know when
15 we may get some e-mails or follow-up questions
16 when we're -- because we also are reviewed by
17 other teams, but as far as specifically what's
18 entailed with that, I mean, we may provide some
19 feedback or some information if they're
20 requesting it specifically, but not involved
21 directly with preparing.
22    Q.   Have you ever been involved in a
23 peer review process for any other agency
24 outside of Summit County?
25    A.   When I worked at Northcoast

50 (Pages 194 - 197)

Page 198

1 Behavioral Healthcare, I did fidelity reviews
2 at other state hospitals.
3      Q.   Since you've been with the ADM
4 Board, have you engaged in any such peer
5 reviews?
6      A.   No.
7      Q.   Do you know whether any outside
8 agency has evaluated the ADM Board's services
9 related to opioids?
10     A.   I don't know.
11          MS. FEINSTEIN:  Why don't we take a
12 short break here.
13          THE VIDEOGRAPHER:  Off the record,
14 2:12.
15          (A recess was taken.)
16          THE VIDEOGRAPHER:  On the record,
17 2:33.
18          MS. FEINSTEIN:  Thank you.
19 BY MS. FEINSTEIN:
20     Q.   Ms. Patton, before the break, at
21 least a little bit before the break, we were
22 looking at Exhibit 6, and the last e-mail that
23 we discussed in Exhibit 6 you had written to
24 Ms. Polinsky that it seemed that cocaine, meth,
25 and other stimulants were being used a little

Page 199

1 more commonly.  Do you recall that?
2      A.   Uh-huh, yes.
3      Q.   And you testified that it was your
4 understanding that there was a switch from
5 opioid users to those substances?  Is that your
6 understanding?
7          MS. KEARSE:  Object to form.
8      A.   No.  I think what we've -- we have
9 seen an increase of those substances in our
10 communities.  What I do think is that some
11 individuals perceive it as less lethal, so they
12 were -- some -- some of them were using other
13 substances if they felt it was a safer
14 substance for them to use.  But I do believe we
15 still do have a significant number of
16 individuals with opioid use disorder.
17     Q.   Do you have any understanding of
18 what types of opioids are associated with the
19 overdoses seen in Summit County?
20     A.   I myself do not specifically see
21 those reports that will differentiate the
22 substances specifically.
23     Q.   Do you have any understanding,
24 aside from whether or not you've seen them in
25 reports or not, do you have any understanding

Page 200

1 of what substances are usually associated with
2 overdoses in Summit County?
3      A.   I do not because -- the only
4 information I'm given is, "Was it an overdose?"
5 And then they give us information if it was a
6 suspected overdose.
7      Q.   Have you ever seen any reports
8 in -- in the newspaper or anywhere that
9 attribute opioid-related overdoses to any
10 particular opioid?
11     A.   I don't recall seeing anything
12 specifically naming specific --
13     Q.   How about any --
14     A.   -- medications.
15     Q.   I'm sorry.
16          How about at any of the Opioid --
17 Opiate Task Force meetings that you've
18 attended, has there been any discussion at any
19 of those meetings about what substances are
20 more commonly seen in overdose deaths?
21          MS. KEARSE:  Object to form.
22     A.   I can't recall specifically the --
23 in the presentations of the meetings, if --
24 what specific medications were discussed with
25 the over -- as related to overdoses.

Page 201

1      Q.   Do you have a sense of whether they
2 were prescription opioids versus illicit
3 opioids?
4      A.   I don't recall seeing any of the
5 data --
6      Q.   Do you have --
7      A.   -- that will specific say was it a
8 prescription or was it illicit use.  I believe
9 there's both.
10     Q.   In the overdose deaths, you believe
11 there's both?
12     A.   Correct.
13     Q.   Where would you go if you wanted to
14 get that information?
15     A.   My first step would probably be to
16 go to Dr. Smith to see who I could contact to
17 get that information, or if at the time that
18 Eric was still employed with us, I'd ask him.
19     Q.   So either Eric or -- Mr. Hutzell or
20 Dr. Smith?
21     A.   Correct.  I'd ask them.
22     Q.   You wouldn't ask Mr. Hutzell now,
23 though, because he's at the Cleveland Clinic,
24 right?
25     A.   Yeah.

51 (Pages 198 - 201)

Page 202

1     Q.    Although you could, I suppose,
2 still call him.
3           MS. KEARSE:  Object to form.
4     Q.    So did you work directly with
5 Dr. Smith when you were at -- at Northcoast
6 Behavioral Healthcare?
7     A.    Not directly, no.
8     Q.    He was the medical director; is
9 that right?
10    A.    Correct.
11    Q.    And now he is -- what is his title
12 at the ADM Board?
13    A.    I'm not sure, but -- his official
14 title, if it's medical director, chief clinical
15 officer, but --
16    Q.    He was --
17    A.    -- something of that sorts.
18    Q.    And he was at the ADM Board when
19 you joined the ADM Board in 2016, right?
20    A.    Yes.
21    Q.    You did not interview with
22 Dr. Smith, though, when you joined the ADM
23 Board, right?
24    A.    No, he was not part of the
25 interview.

Page 203

1     Q.    Did you talk with him at all about
2 the job before you took it?
3     A.    No.
4     Q.    Was Dr. Smith well-respected at
5 Northcoast Behavioral Healthcare?
6     A.    Yes.
7     Q.    Is he well-respected at the ADM
8 Board?
9     A.    Yes.
10    Q.    Do you have any sense of -- of
11 whether Dr. Smith has a role -- strike that.
12          Do you know whether Dr. Smith has a
13 role with the Summit County Opiate Task Force?
14    A.    Yes.  He participates on the health
15 care subcommittee.
16    Q.    Does he have any other role; do you
17 know?
18    A.    I know he has done presentations
19 every now and again.
20    Q.    Have you seen some of his
21 presentations?
22    A.    I have not, other than the one that
23 I had mentioned, in the fall at the behavioral
24 health fair.
25    Q.    But you've not seen his

Page 204

1 presentations at the Opiate Task Force?
2     A.    No.
3           - - - - -
4           (Thereupon, Deposition Exhibit 7,
5           Document Titled "Training &
6           Development Request,"
7           SUMMIT_000945633, was marked for
8           purposes of identification.)
9           - - - - -
10    Q.    I'm going to show you a document
11 that we have marked as Exhibit 7 for
12 identification purposes.
13          Do you recognize Exhibit 7?
14    A.    Yes.
15          MS. FEINSTEIN:  It is, just for the
16 record, for those on the phone, it's a document
17 with Bates SUMMIT_000945633.
18    Q.    What is Exhibit 7?
19    A.    It was a training and development
20 request to attend the National Cocaine, Meth,
21 and Stimulant Summit.
22    Q.    Did you prepare this document?
23    A.    Yes.
24    Q.    In the middle of the page, there's
25 a paragraph that poses the question, "How will

Page 205

1 this course/workshop/seminar and/or program
2 benefit you, your job, and/or the agency."
3           Do you see that?
4     A.    Yes.
5     Q.    And underneath that, it reads, "In
6 Summit County, we are seeing emerging --
7 emerging trends with substance use other than
8 opioids.  Our community has especially seen a
9 rise in the use of methamphetamines."
10          Did I read that correctly?
11    A.    Yes.
12    Q.    Did you write those two sentences?
13    A.    Yes.
14    Q.    When did you start seeing emerging
15 trends with substance use other than opioids in
16 Summit County?
17    A.    I would say approximately -- and it
18 was more in the discussion of our meetings,
19 whether it be Quick Response Team meeting or
20 other treatment provider meetings -- in the
21 summer of 2018.
22    Q.    This document is dated -- the date
23 of the request is dated May 8, 2018, right?
24    A.    Uh-huh, yes.
25    Q.    Does that help sort of place in

52 (Pages 202 - 205)

Page 206

1 time for you when you started seeing that --
2 that change?
3        MS. KEARSE: Object to form.
4     A.   If so, I initially said summer. It
5 may have been a couple months earlier, but it
6 was early -- it was in 2018 that we started
7 that discussion, and some of our law
8 enforcement and other neighboring areas were
9 saying they were also seeing a trend.
10     Q.   In your work in addiction at
11 Northcoast Behavioral Healthcare or with the
12 ADM Board, have you seen -- have you seen
13 trends with substance use over that time
14 period?
15        MS. KEARSE: Object to form.
16     A.   I would -- yes.
17     Q.   With -- what different trends have
18 you seen over the course of your career in
19 addiction?
20     A.   I would say while at Northcoast
21 specifically, we did see a large population
22 coming in, abuse -- abusing opioids, prescribed
23 opioids, and coming in -- they were coming into
24 our system because perhaps maybe the community
25 they were coming from didn't have resources,

Page 207

1 and so they were coming in for services at our
2 hospital.
3        We have also seen, as I mentioned
4 previously, recently, an increase in stimulant
5 use as well.
6     Q.   When did you first start seeing it
7 at Northcoast Behavioral Health, the patients
8 coming in seeking treatment for prescription
9 opioid use?
10     A.   I don't have an exact date, but I
11 would say probably around 2011.
12     Q.   Do you recall a program called
13 Prescription For Prevention?
14     A.   No.
15     Q.   I'm sorry. The answer --
16     A.   No.
17     Q.   Do you recall attending meetings --
18 strike that.
19        Do you recall receiving information
20 regarding meetings in 2011 from a Cuyahoga
21 County coalition related to prescription
22 opioids?
23     A.   Offhand, no. I -- off the top of
24 my head, no, I don't remember.
25     Q.   Do you know an individual named

Page 208

1 Vince Caraffi?
2     A.   Yes.
3     Q.   Who is Mr. Caraffi?
4     A.   He provided -- was the point person
5 for the Cuyahoga County Opiate Task Force. He
6 worked for Cuyahoga County Department of
7 Health.
8     Q.   Did you interface with him when you
9 were at Northcoast Behavioral Health?
10     A.   Minimally, yes.
11     Q.   Do you know Nancy Pommerening?
12     A.   No.
13     Q.   And the program Prescription For
14 Prevention doesn't ring a bell to you?
15     A.   Off the top of my head, no.
16        - - - - -
17        (Thereupon, Deposition Exhibit 8,
18        Document Titled "Prescription for
19        Prevention: Cuyahoga County
20        Coalition Minutes from April 20,
21        2011 Meeting," CLEVE_000216547 to
22        000216548, was marked for purposes
23        of identification.)
24        - - - - -
25     Q.   I'm going to show you a document

Page 209

1 that was produced by Cleveland, but you were
2 copied on the cover e-mail. We'll mark it
3 as --
4     A.   Okay.
5     Q.   -- Exhibit 8.
6        Just let me know whether you've
7 seen that before.
8        It is Bates labeled
9 CLEVE_000216547.
10        Do you recognize this document at
11 all?
12     A.   (Witness shaking head.)
13     Q.   Does it refresh your recollection
14 at all, seeing it?
15     A.   No.
16     Q.   Okay. Do you know who --
17        THE REPORTER: If you could speak
18 up a little bit more --
19        THE WITNESS: Yes. Sorry about
20 that. Yes, I'm sorry about that.
21        THE REPORTER: Thanks.
22     Q.   Do you remember -- strike that.
23 Have you ever heard from a Sheriff Rogers from
24 Adams County?
25     A.   I did attend a few meetings of the

53 (Pages 206 - 209)

Page 210

1 Cuyahoga County Opiate Task Force, so if I can
2 recall correctly, he attended one of the
3 meetings that I attended.
4     Q.   Do you remember about when you
5 attended those meetings?
6     A.   I would say I -- around 2011 is
7 when I attended one of the first meetings.  I
8 did not attend regularly, but probably up until
9 about 2015 or so, I did go, here and there, to
10 some of their Opiate Task Force meetings.
11        MS. KEARSE:  I may be blind, so
12 just -- I'm trying to find her name on the
13 document.
14        MS. FEINSTEIN:  Yeah, her name is
15 not -- just, I'll just note for the record,
16 Ms. Patton's name is not on this document.  It
17 was attached to a mass e-mail that had a bunch
18 of e-mail addresses, and her e-mail at the
19 hospital at Northcoast Behavioral Health.
20        MS. KEARSE:  Okay.  Do you have
21 that e-mail?
22        MS. FEINSTEIN:  I don't have it
23 marked as an exhibit, but I can provide it to
24 you later.
25        MS. KEARSE:  Okay, yeah.  That's

Page 211

1 good.  I just don't want the -- I do not see
2 Ms. Patton's name anywhere on the document, nor
3 do I have a copy of the e-mail to confirm or
4 deny that she got the e-mail or that she ever
5 even read the document.
6        MS. FEINSTEIN:  Yeah.  And it
7 doesn't refresh her recollection.  That was the
8 only reason for me putting it if front of her.
9     Q.   Do you recall learning anything
10 about the opioid epidemic at any of the
11 Cuyahoga County Opiate Task Force meetings that
12 you attended in that time period, 2011 to 2015?
13        MS. KEARSE:  Object to form.
14     A.   In some of the meetings that I did
15 attend, yes, we did -- we -- it was a very
16 small group.  I would say probably about 30
17 people at some of the -- or less at the
18 meetings that I did attend.
19        They were -- a lot of the topics
20 talking -- I know they had someone from the
21 Board of Pharmacy that participated, and we
22 talked about the opiate medications and the
23 implementation of the OARRS program that they
24 were creating to help address, hopefully,
25 individuals and looking at individuals' opioid

Page 212

1 use and the prescriptions and so that the
2 prescribing physicians would have access to
3 that information.
4     Q.   Was that the first time that you
5 had learned of OARRS; was that at a Cuyahoga
6 County Opiate Task Force meeting?
7        MS. KEARSE:  Object to form.
8     A.   I -- I know that the staff at
9 Northcoast also did utilize the OARRS form, so
10 I can't recall specifically if it was at
11 Northcoast or the meetings.
12     Q.   Sure.  What is your understanding
13 of the opioid epidemic?  What -- what
14 understanding do you have of when it started in
15 Ohio?
16        MS. KEARSE:  Object to form.  I
17 think she asked and answered that question
18 already.
19     A.   So as I had stated previously, I
20 did beco- -- start becoming involved in around
21 2011 with some of the initiatives going on
22 throughout the state and some of the trainings
23 at that time.
24     Q.   And we've been using the terms
25 "opioids" and "opiates" quite a bit, so just to

Page 213

1 make sure that we're on the same page when
2 we're using those terms, what -- what is your
3 understanding of the term "opioid"?
4     A.   So what the opioid is, looking at
5 the prescription opioids, so looking at some of
6 the specific medications fall under opioid, and
7 how they interact --
8     Q.   Do you have any --
9     A.   -- with the individual.
10     Q.   And I'm sorry.  I didn't mean --
11     A.   That's okay.
12     Q.   -- to cut you off.
13        Do you have any understanding of
14 what the term "opiate" means?
15     A.   So -- and I know a lot of times
16 they're used interchangeably.  So with the
17 opiates, I think that referred to another
18 subgroup of looking at not only the medication,
19 but also looking at other opiates, such as --
20 because heroin is an opiate, so to speak.
21     Q.   Do you know for how long
22 prescription opioids have been available for
23 prescription in the United States?
24     A.   I do not.
25     Q.   Do you have an understanding of --

54 (Pages 210 - 213)

1 of the -- strike that.

2     Do you know that prescription

3 opioids are approved by the Food and Drug

4 Administration?

5     A.   Do I -- yes, that some of them are,

6 yes.

7     Q.   Are you aware of any prescription

8 opioid that's available by prescription that is

9 not approved by the FDA?

10    A.   No.

11    Q.   Do you have any understanding of

12 the FDA approval process?

13    A.   I don't have a good understanding

14 of what all entails in that process, no.

15    Q.   Do you -- do you know anything

16 about -- strike that.

17        Have you ever taken a prescription

18 opioid?

19        MS. KEARSE:  I'm going to -- I'm

20 going to object and just advise the witness she

21 can answer that question if she wants, but she

22 has her own rights and protection if she

23 doesn't want to answer questions about her --

24 anything medically-related, HIPAA rights.

25    A.   I would prefer not to answer.

1     Q.   Have you ever taken a prescription

2 medication that had information provided about

3 that information in -- in writing in a package

4 insert or label?

5        MS. KEARSE:  Object to form.

6     A.   So as it relates to my personal

7 history?  I would prefer not to answer.

8     Q.   So -- and my question is very

9 general.  You're aware that prescription

10 medications come with information regarding

11 instructions for use and risks and warnings

12 right?

13        MS. KEARSE:  Object to form.

14    A.   So from the pharmacies, yes, they

15 give papers at times with medication.

16    Q.   Have you ever -- have you ever read

17 any of the accompanying information that comes

18 with a prescription opioid that includes

19 information about the use, risks, and warnings?

20        MS. KEARSE:  Object to form.

21    A.   As far as my own personal use,

22 again, I care not to answer, as it relates to

23 any personal medical history and prescriptions

24 given.

25    Q.   As a part of your work at

1 Northcoast Behavioral Healthcare or through the

2 ADM Board, have you ever seen the patient

3 information that accompanies a prescription

4 opioid that includes information on the use of

5 the opioid and risks associated with that

6 prescription opioid?

7     A.   So the -- when a person is -- was

8 discharged from hospital, part of their

9 discharge paperwork included medications and

10 any information related to those medications.

11    Q.   And have you read any information

12 related to prescription opioids that included

13 information about risks associated with

14 prescription opioids?

15    A.   I have, but I don't, off the top of

16 my head, recall specifically what any of it

17 stated, because it's been quite some time.

18    Q.   Do you have an understanding that

19 prescription opioids have a risk of addiction

20 associated with them?

21        MS. KEARSE:  Object to form.

22    A.   Yes.

23    Q.   How did you develop that

24 understanding that opioids have a risk of

25 addiction?

1     A.   So my understanding is with some of

2 that paperwork, like you said, have I ever,

3 with the clients working at Northcoast, get

4 what's provided by the pharma- -- pharmacy

5 department and seeing some of the paperwork.

6     Q.   Prior to seeing any paperwork, as a

7 part of your training at any point, either

8 through your master's program or your

9 bachelor's program, have you received any

10 information regarding the risk of addiction as

11 associated with prescription opioids?

12    A.   In some of the coursework with --

13 not in my undergraduate program, but in some of

14 the other coursework programs, when covering

15 opioids, yes.

16    Q.   So back in your master's program

17 you learned that opioids carry with them a risk

18 of addiction?

19    A.   As well -- in the Columbus State

20 program.

21    Q.   And about what -- what year was

22 that that you first learned that?

23    A.   I attended Columbus State, I don't

24 remember the specific start date, but

25 approximately 2004 is when I began my program.

Page 218

1  And I completed the program in 2005, so --
2      Q.    Somewhere in that time frame?
3  Okay.
4          At any point did you become aware
5  that prescription opioids also have associated
6  with them a risk of death?
7          MS. KEARSE:  Object to form.
8      A.    During my coursework, I don't
9  recall being taught that.
10      Q.    But you do recall learning about
11  the risk of addiction?
12      A.    Yes.
13      Q.    Have you ever seen FDA-approved
14  labeling information for any prescription
15  medication that include -- included a warning
16  for the -- the risk of addiction or death?
17          MS. KEARSE:  Object to form.
18      A.    I don't recall seeing any.
19      Q.    Would you agree with me that all
20  prescription medications carry some level of
21  risk with them?
22          MS. KEARSE:  Object to form.
23      A.    I think, depending on the
24  medication and depending on who the person is
25  taking it, because everyone's body reacts

Page 219

1  differently, so it -- depending on what it
2  could be, there could be risk with a
3  medication, yes.
4      Q.    Are you aware of any prescription
5  medication that has no risks?
6          MS. KEARSE:  Object to form.
7      A.    Not off the top of my head.
8      Q.    Do you believe that prescription
9  opioids can be appropriate for some patients
10  for the treatment of pain?
11          MS. KEARSE:  Object to form.
12      A.    I think that some individuals can
13  be prescribed prescription opioids and have
14  taken them and have -- have not formed an
15  addiction with them.
16      Q.    Do you agree that it is within the
17  medical judgment of a physician to determine
18  whether or not a prescription opioid is
19  medically appropriate for any given patient?
20      A.    I believe that a medical
21  professional can only make a decision based on
22  what they know.  I -- I -- I believe that
23  sometimes they may prescribe an opioid thinking
24  it's medically necessary, that there's low
25  risk; however, then the individual that is

Page 220

1  taking the prescription, their brain is
2  triggered with that substance, and then it
3  could form into an addicted habit for that --
4  or an addiction for that individual.
5          So I think there are times where a
6  medical professional can prescribe; however,
7  there are so many other factors that tie into
8  it that could potentially lead to an addiction.
9      Q.    Do you know whether -- strike that.
10          Do you agree that only certain
11  medical professionals can provide patients with
12  prescriptions for opioids in the state of Ohio?
13      A.    Can you clarify as far as if I
14  believe only certain -- or I just -- I -- can
15  you just repeat the question?  Sorry about
16  that.
17      Q.    Yeah.  Oh, no, no.  No problem.  I
18  appreciate you asking for clarification if you
19  don't understand, and it's kind of late in the
20  day too.  I'll restate it --
21      A.    Okay.
22      Q.    -- and see if this helps.
23          In Ohio, medical doctors can
24  prescribe prescription opioids, right?
25      A.    Yes.

Page 221

1      Q.    Do you know whether nurse
2  practitioners in Ohio are permitted to
3  prescribe prescription opioids?
4      A.    I don't know.
5      Q.    Do you know whether dentists can
6  prescribe prescription opioids in Ohio?
7      A.    Yes.
8      Q.    Do you know whether a pharmacy can
9  lawfully dispense a prescription opioid without
10  a valid prescription?
11      A.    I don't know.  Legally, I would --
12  legally, I think no, but I don't know for a
13  fact or not.
14      Q.    Do you know whether a
15  pharmaceutical manufacturer can directly
16  provide a prescription opioid to a patient?
17      A.    I don't know.
18      Q.    Do you know whether a
19  pharmaceutical distributor can directly provide
20  a prescription opioid to a patient?
21      A.    I don't think they can, but I don't
22  know.
23      Q.    Are there other legal substances,
24  other than prescription opioids, that an
25  individual can become addicted to?

56 (Pages 218 - 221)

Page 222

1    A.   I'm sorry.  My mind drifted for a
2  second.
3    Q.   Sure.
4    A.   Can you just repeat the question?
5    Q.   I sure can.
6         Are there other legal substances,
7  other than prescription opioids, that an
8  individual can become addicted to?
9    A.   Yes.
10        MS. KEARSE:  Object to form.
11   Q.   What are those substances?
12   A.   Alcohol is legal for ages 21 and
13  older, at least, in the state of Ohio.
14   Q.   Any other legal substances that a
15  person can become addicted to?
16   A.   Tobacco, as well as other
17  prescription medications such as
18  benzodiazepines.
19   Q.   I asked you earlier about the
20  opioid epidemic, and I just realized we didn't
21  talk about, really, what that term means.
22        What does "opioid epidemic" mean to
23  you?
24        MS. KEARSE:  Object to form.
25   A.   When I hear "opioid epidemic" and

Page 223

1  what it means to me, meaning that over a period
2  of time the problem has exacerbated itself and
3  become such a large issue impacting such a
4  great number of individuals.
5    Q.   We -- we touched earlier on some of
6  the things that were contributing factors to
7  the opioid epidemic, and among them, you
8  included the availability of prescription
9  medications, pain as the fifth vital sign, and
10  a -- and a few other things.
11        Do you have -- just sitting here
12  today, do you have any additional things that
13  you believe are contributing factors to the
14  opioid epidemic?
15        MS. KEARSE:  Object to form.  I
16  think that was your term, "contributing
17  factors," not the witness's.  I think it's also
18  asked and answered.
19   A.   When looking at what has
20  contributed to this issue, I think one of the
21  issues is the facade that many physicians
22  were -- they were given the idea that the
23  medications were modified or changed, that
24  they're no longer dangerous, because I recall
25  those reports coming out when I was working at

Page 224

1  Northcoast.
2         And then, also, the doctors
3  giving -- getting reassurance of, "These are
4  okay to prescribe.  We're going to prescribe --
5  you can prescribe them."
6         And then also looking -- and they
7  were, I think, when -- being marketed, being --
8  the -- the pain as fifth vit- -- and consumer
9  surveys and things like that were also part of
10  that.  So I think that was a contributing
11  factor, as far as just -- and how easily
12  accessible they were accessed by individuals.
13   Q.   In some of the presentations that
14  you've given, you've touched on the causes of
15  the opioid epidemic, right?
16   A.   As part of the speaker's bureau,
17  some of the presentations have included slides
18  on that, yes.
19   Q.   The speaker's bureau, is that
20  through the Summit County Opiate Task Force?
21   A.   Correct.
22   Q.   Do you know who prepared those
23  slides?
24   A.   The original slides I do not know.
25  I know our public relations staff, in

Page 225

1  conjunction with Dr. Smith and Jerry Craig,
2  have compiled that PowerPoint presentation.
3    Q.   Who is that on the PR staff?
4    A.   Currently it's Lucky Tisch.  Her
5  supervisor retired in December of '17, and that
6  was Mary Alice Sonnhalter.
7    Q.   What role does the ADM Board play
8  with the Opiate -- the Summit County Opiate
9  Task Force?
10   A.   I think as long -- as -- along with
11  many other members of the community, we are
12  stakeholders with the Opiate Task Force.  We --
13  many of us do participate on various
14  subcommittees as part of the Summit -- of the
15  Opiate Task Force and initiatives that are set
16  forth with them.
17   Q.   So what is the relationship between
18  the ADM Board and the speaker's bureau of the
19  Opiate Task Force?
20   A.   So the speaker's bureau was one of
21  the components created by the Summit County
22  Opiate Task Force to increase awareness, as
23  part of the prevention and education piece,
24  with the Opiate Task Force to educate community
25  members, schools, other venues that may request

57 (Pages 222 - 225)

Page 226

1 a speaker to come and educate their staff or
2 other employees or community members on the
3 Opiate Task Force.
4        And that was created by
5 participants of the Opiate Task Force. So some
6 are just community members. Some or employed
7 by treatment providers. It's a vast array of
8 individuals that participate with the speaker's
9 bureau.
10     Q.   The slides that you mentioned, are
11 they Opiate Task Force slides or are they ADM
12 Board slides?
13     A.   Summit County Opiate Task Force.
14     Q.   But the ADM Board has access to
15 them?
16     A.   Yes.
17     Q.   When you -- when you've given
18 presentations using the speaker's bureau
19 slides, are you able to modify the slides to
20 adjust it to a particular audience, for
21 example?
22     A.   So when a request comes in, so all
23 the speaker requests come in to Lucky Tisch in
24 our public relations, and if there's a specific
25 need, we will see what the population is,

Page 227

1 depending if it's a school, if it's a parent
2 group, who it may be.
3        I don't necessarily tailor the
4 presentation, but maybe some of the talking and
5 the actual speaking that we do may be tailored
6 to add, to enhance to that population and
7 target specifically that population.
8     Q.   So you'll make notes or use the
9 speaker notes feature in PowerPoint to
10 customize your portion of the presentation; is
11 that right?
12     A.   Yes. And -- and I'll be honest;
13 our ADM logo may be on the presentation. I
14 can't recall.
15     Q.   Lucky Tisch is at the ADM Board,
16 right?
17     A.   Correct.
18     Q.   Have you ever done a -- a
19 presentation using a slide deck that was
20 prepared by Paula Rabinowitz?
21     A.   No.
22     Q.   I'm just going to mark this
23 document to see if you recognize the
24 handwriting.
25              - - - - -

Page 228

1        (Thereupon, Deposition Exhibit 9,
2        Slide Deck Titled "The Opiate
3        Epidemic Hits Home: What We All Need
4        to Know," SUMMIT_000289523 to
5        000289533, was marked for purposes
6        of identification.)
7              - - - - -
8     Q.   Handing you what we've marked as
9 Exhibit 9 for identification purposes.
10     A.   Uh-huh.
11     Q.   Do you recognize the handwriting on
12 Exhibit 9?
13     A.   These were pulled from Paula
14 Rabinowitz' records, so I would say they're
15 hers, but I don't know because she was not
16 there when I was there.
17     Q.   How do you know that was pulled
18 from Paula's records?
19     A.   So when we were asked to pull
20 records -- we have a record and retention
21 policy at ADM Board that we have to keep
22 specific documents. So this was kept because
23 it hasn't hit that time frame yet of being able
24 to shred. So when I was asked to pull
25 documents, this was in the file drawer.

Page 229

1     Q.   And so you physically pulled this?
2     A.   One of the files, yes.
3     Q.   Okay. And you recognize it just
4 for purposes of gathering it for a response to
5 this litigation --
6     A.   Yes.
7     Q.   -- is that right?
8     A.   Correct.
9     Q.   Okay, thanks. That's why it was in
10 your file then.
11     A.   Correct.
12     Q.   You don't recognize this
13 handwriting?
14     A.   No, I don't.
15     Q.   Did you ever see any presentations
16 presented by Ms. Rabinowitz?
17     A.   I did not, no.
18     Q.   Did you review this document that
19 we've marked as Exhibit 9 before providing it
20 to the lawyers for this litigation?
21     A.   Prior to providing it, no.
22     Q.   After providing it, did you look at
23 it?
24     A.   I kind of glanced at it, but not in
25 depth, so.

58 (Pages 226 - 229)

1 Q. And so Exhibit 9 is not a
2 presentation that you've ever given?
3 A. No.
4 Q. And you mentioned that
5 Ms. Rabinowitz retired; is that right?
6 A. Yes, that's my understanding.
7 Q. When's the last time you spoke with
8 her?
9 A. I met her once at a meeting when I
10 first started. She was at a meeting at Summit
11 County Children's Services as a volunteer, and
12 that's the only time I've spoken with her.
13 Q. She wasn't involved in your
14 training at all?
15 A. No.
16 Q. You've done some presentations to
17 schools about opioids, right?
18 A. I've -- was on a panel discussion
19 at the Summit County ESC, which is Education
20 Service Center, but I haven't gone to any
21 schools specifically.
22 Q. Have you done any presentations to
23 parent groups about opioids?
24 A. I have not specifically.
25 Q. Have you done any presentations

1 that involved discussion about how young people
2 get access to prescription opioids?
3 A. I have not done any specific
4 presentations related with youth and...
5 Q. Do you have any information about
6 what portion of opioid users in Summit County
7 have never had a valid prescription?
8 A. I don't know.
9 Q. Do you have any information about
10 whether Ohio has experienced a more severe
11 opioid epidemic than any other state?
12 A. I have only gone off of reports
13 I've seen, maybe like various news reports or
14 things like that when -- or articles where they
15 have named Ohio as, I think for a while it was
16 between Ohio and West Virginia was being named
17 as highest prevalence.
18 Q. Do you -- from those news reports,
19 do you have any recollection of what types of
20 opiate -- opioids or opiates were discussed in
21 the context of the severity of the problem in
22 Ohio?
23 A. I can't recall any specific
24 substances, but the articles that I think I --
25 that I did come across was looking at overall

1 overdose rates and things like that. But I
2 don't recall a specific substance or whatever
3 the -- prescribed or illicit.
4 Q. Do you recall whether those stories
5 or articles that you've seen discussed heroin
6 or fentanyl as being associated with overdose
7 deaths?
8 A. I do know in some of the reports
9 those substances were discussed in some of the
10 reports as it relates to the overdoses.
11 Q. Do you recall seeing reports of
12 prescription opioids being associated with
13 overdose deaths?
14 A. In looking at those articles, I
15 can't recall anything specifically off the top
16 of my head.
17 Q. Do you recall the titles of any of
18 the articles?
19 A. I don't recall. I'm sorry. No, I
20 don't know.
21 Q. Do you recall -- do you recall
22 where you read those articles?
23 A. I would say I've read most of them
24 online, whether it was, like, Ohio.com. Or
25 I've seen some reports on 60 Minutes, things

1 like that, but...
2 Q. What do you recall about what you
3 saw on 60 Minutes?
4 A. It's been a long time, so I can't
5 recall specifics. I know in general it talked
6 about, overall, the opioid crisis that is --
7 we're facing, not only in Ohio, but overall.
8 Q. And what about the -- what about
9 the opioid crisis was discussed in that story?
10 A. From what I can recall, it was just
11 a kind of a basic overview of, from their
12 standpoint and a reporting standpoint, where a
13 lot of it was discussed of with having the
14 manufacturers and all of the -- like, and
15 promotion of the prescription opioids, such as,
16 like, even -- even commercials that were kind
17 of geared on TV, and the idea that these
18 medications are safe. And then how it's kind
19 of evolved from that point moving forward.
20 Q. Have you ever seen any
21 advertisements for prescription opioids?
22 A. Recently? No.
23 Q. Ever?
24 A. Vaguely, I can recall. If you ask
25 content, I don't recall any specific content,

59 (Pages 230 - 233)

Page 234

1  but I do recall seeing commercials in the past,
2  but I don't remember any of the content.
3      Q.   Do you recall -- you said recently
4  you had not.  When's the last time that you saw
5  an advertisement for a prescription opioid?
6      A.   I don't have a specific date.  I
7  would say at least a couple years, but I can't
8  pinpoint a date.
9      Q.   Was it a television commercial or a
10  magazine ad?
11      A.   A television commercial.  But, like
12  I said, I don't recall the last time I've seen
13  one.
14      Q.   Do you recall for what opioid?
15      A.   No, I don't.
16      Q.   Was it a pill or some other form of
17  delivery?
18      A.   I -- for definitively I don't know.
19  I think it was for a pill, but I don't know.
20      Q.   Do you have any understanding of
21  whether the FDA regulates pharmaceutical
22  advertising in the United States?
23      A.   I don't know.
24      Q.   When did you first learn of this
25  lawsuit?

Page 235

1      A.   I would -- sometime in 2017?  I
2  mean, I don't have a specific time frame as to
3  when.  I think I heard some talk of a potential
4  lawsuit in 2017.
5      Q.   Where did you hear that talk?
6      A.   I don't know what specific meeting
7  it was, but I know it was discussed of the
8  potential of having a lawsuit in one of the
9  meetings I attended.  I don't know if -- I
10  can't recall if it was part of Opiate Task
11  Force or another meeting.
12      Q.   Do you remember anything about
13  those discussions about the lawsuit?
14      A.   No.
15      Q.   Did you provide any input about
16  your views on any lawsuit?
17      A.   No.
18      Q.   Do you have any understanding of
19  who the Defendants are in this lawsuit, who is
20  being sued?
21      A.   Some understanding.  I don't know
22  all of the individuals represented, but I know
23  some of it.
24      Q.   What is your understanding of who
25  the Defendants are in this lawsuit?

Page 236

1      A.   My understanding is that it's some
2  of the manufacturers of the medica- -- of the
3  prescription opioids, as well as some of the
4  pharmacies that will dispense the medications.
5  But I, again, roughly don't know specifically
6  who all is named in the lawsuit.
7      Q.   Do you have any understanding of
8  the nature of the claims against the
9  manufacturers?
10      A.   Some.  I know some of it.  I
11  haven't read the full complaint or anything
12  like that.
13      Q.   Have you seen the complaint?
14      A.   Yes.  But I have not read -- I've
15  read maybe a couple pages as it relates to ADM
16  Board.
17      Q.   When did you read those pages
18  related to the ADM Board?
19      A.   November.
20      Q.   Of 2018?
21      A.   Yes.
22      Q.   Did you read any of the allegations
23  related to any of the Manufacturer Defendants?
24      A.   No.
25      Q.   Did you read any of the allegations

Page 237

1  related to any of the Pharmacy Defendants?
2      A.   No.
3      Q.   Do you recall seeing any
4  allegations against any category of Defendants
5  called "distributors"?
6      A.   I didn't read anything specific to
7  it, no.
8      Q.   What is your understanding of the
9  claims against the manufacturers?
10      A.   So my basic understanding of --
11  with the manufacturers, that they knowingly
12  were marketing to the distributors, and -- to
13  sell these medications and distribute these
14  medications, and -- whether it was with
15  physicians or other entities.  And then with
16  the distributors, and then, that knowingly were
17  distributing the medications, although, they
18  knew there was already a large amount of
19  readily accessible I -- in -- for individuals
20  in designated counties.  And then with the
21  pharmacies, that they had an abundant supply of
22  the medications, but they were still taking in
23  those medications and dispensing those
24  medications of the prescriptions that were
25  coming in.

60 (Pages 234 - 237)

1    Q.   Do you have any understanding of
2 who the Plaintiff is in this litigation, or who
3 the Plaintiffs are in this litigation?
4    A.   So it's my understanding that it's
5 Summit County, Akron, Cleveland, Cuyahoga
6 County.
7    Q.   Have you spoken with anyone other
8 than attorneys about the factual allegations in
9 the complaint?
10   A.   No.
11   Q.   Did you provide any factual
12 information in support of the complainants,
13 that you know of?
14   A.   No.
15   Q.   Were you asked to preserve
16 documents at any point related to this
17 litigation?
18   A.   Yes.  We got a notice not to
19 destroy anything.
20   Q.   When did you get that notice?
21   A.   I don't -- I don't know
22 specifically.  After August.  Because that's
23 when I was initially first contacted about the
24 litigation.  But soon after that, we got an
25 e-mail indicating not to destroy anything.

1    Q.   Two boxes of hardcopy documents?
2    A.   Correct.
3    Q.   Do you know whether your e-mails
4 were gathered?
5    A.   Yes.
6    Q.   What types of documents were
7 provided in the hardcopy documents?
8    A.   Meeting minutes that may not have
9 been our meeting minutes, so they weren't saved
10 electronically.  Some of these presentations or
11 other information prior to my coming to ADM
12 Board.  Basically anything that couldn't be
13 saved electr- -- that wasn't saved
14 electronically.
15   Q.   Exhibit 9 has some handwritten
16 notes on it that you said you've found and
17 provided, but you don't know whose handwritten
18 notes they were.
19        Did you provide any handwritten
20 notes yourself that were your notes in
21 hardcopy?
22   A.   Some of the meeting minutes may
23 have had notes that I wrote on them that were
24 provided, yes.  I tend to write my notes all on
25 the agendas.

1    Q.   So August of 2018?
2    A.   Yes.
3    Q.   You mentioned that the ADM Board
4 has a document retention and destruction
5 policy?
6    A.   Yes.
7    Q.   And prior to receiving the
8 information regarding the document preservation
9 in -- in or around August 2018, did you abide
10 by the Summit County ADM Board document
11 retention and destruction policy?
12   A.   Yes.
13        MS. KEARSE:  Object to form.
14   Q.   You mentioned that Exhibit 9 was
15 one of the documents that -- that you gathered.
16        Do you recall gathering other
17 documents to provide to the lawyers for this
18 litigation?
19   A.   So the documents I basic -- if I --
20 if I looked at it and thought it had anything
21 to do with opiates, I pulled it.
22   Q.   Did you have a -- strike that.
23        About how many hardcopy documents
24 did you find?
25   A.   I provided them with two boxes.

1    Q.   Do you know the names of any
2 pharmaceutical manufacturers who manufacture
3 prescription opioids?
4    A.   I know Cardinal.  Purdue is one of
5 the ones I've heard before.  I don't know many
6 of the pharmaceutical companies.
7    Q.   Have you ever heard of a company
8 called Allergan?
9    A.   I've heard of it, but not much of
10 as far as what all they manufacture.
11   Q.   Do you know whether Allergan
12 manufactures prescription opioids?
13   A.   I don't.
14   Q.   Have you heard of a company called
15 Cephalon?
16   A.   No.
17   Q.   Do you know whether Cephalon
18 manufactures prescription opioids?
19   A.   No.
20   Q.   Have you heard of a company called
21 Endo?
22   A.   No.
23   Q.   Do you know whether Endo
24 manufactures prescription opioids?
25   A.   I don't.

61 (Pages 238 - 241)

1    Q.   Have you heard of a company called
2 Insys?
3    A.   No.
4    Q.   Do you know whether Insys
5 manufactures prescription opioids?
6    A.   I don't.
7    Q.   Have you heard of a company called
8 Janssen?
9    A.   Yes.
10    Q.   Do you know whether Janssen
11 manufactures prescription opioids?
12    A.   I don't.
13    Q.   Have you heard of a company called
14 Johnson & Johnson?
15    A.   Yes.
16    Q.   Do you know whether Johnson &
17 Johnson is a manufacturer of prescription
18 opioids?
19    A.   I don't.
20    Q.   Have you heard of a company called
21 Mallinckrodt?
22    A.   Yes.
23    Q.   Do you know whether Mallinckrodt is
24 a manufacturer of prescription opioids?
25    A.   Yes.

1    Q.   What opioid does Mallinckrodt
2 manufacture?
3    A.   If -- if I'm not mistaken, I think
4 they manufacture OxyContin.
5    Q.   You mentioned that you had heard of
6 Purdue before.
7    A.   Yes.
8    Q.   Do you know whether Purdue is a
9 manufacturer of prescription opioids?
10    A.   I have heard them in the
11 discussion, but I don't know specifically what.
12    Q.   Have you heard of a company called
13 Teva?
14    A.   No.
15    Q.   Do you know whether Teva is a
16 manufacturer of prescription opioids?
17    A.   I do not.
18    Q.   Of the companies that I just
19 listed, do you know whether any of them were
20 the company that had the advertising that you
21 recall seeing some years ago?
22    A.   I do not recall at all.
23    Q.   Do you recall anything about the
24 advertising for a prescription opioid that you
25 saw?

1    A.   I don't.
2    Q.   And you're sure that it was a
3 prescription opioid?
4    A.   I -- with -- I do recall seeing the
5 commercial.  As far as the specific content of
6 the commercial and the message they were saying
7 in the commercial and any specific content, I
8 don't recall that, but I do recall it was for a
9 prescription opioid.
10    Q.   And you don't recall what year?
11    A.   No, I don't.
12    Q.   In your role at the ADM Board, have
13 you had any interaction with any of the
14 pharmaceutical manufacturers that I've just
15 listed?
16    A.   No.
17    Q.   Are you familiar with any of the
18 claims that the Plaintiffs have brought against
19 the Teva Defendants in this litigation?
20    A.   No.
21    Q.   Have you ever been -- strike that.
22        Have you ever had any interaction
23 with any representatives, other than me,
24 counsel for Teva, with Teva?
25    A.   No.

1    Q.   Have you had any interaction with
2 any of the pharmaceutical companies that we
3 just listed?
4    A.   No.
5    Q.   Do you have any personal knowledge
6 of anything that any of those manufacturers did
7 wrong in Summit County?
8    A.   I don't have any personal
9 information, no.
10    Q.   Do you have any personal knowledge
11 of any misrepresentations or omissions made by
12 any manufacturer of prescription opioids in
13 Summit County?
14    A.   No.
15    Q.   Do you have any personal knowledge
16 of any agreement between or among any of the
17 companies that I just listed?
18    A.   No.
19    Q.   Are you familiar with any of the
20 distributors of pharmaceuticals?
21    A.   No.
22    Q.   And are you aware of what
23 pharmacies are listed as Defendants in this
24 litigation?
25    A.   I know some of them, but I --

Page 246

1 because I saw on the filings.  I know Walmart
2 is one of them.  Discount Drug Mart.  I think
3 Walgreens was part of it.  Possibly CVS.  Those
4 are just some of the big companies that I
5 remember seeing.
6     Q.   Do you have any personal knowledge
7 about anything that any of those companies did
8 wrong in Summit County?
9     A.   No.
10     Q.   Do you have any personal knowledge
11 of anything that any distributor of
12 pharmaceutical products did wrong in Summit
13 County?
14     A.   No.
15         MS. FEINSTEIN:  Why don't we take a
16 short break here.  I'm just going to flip
17 through my notes, but I think I'm almost done.
18         THE VIDEOGRAPHER:  Off the record,
19 3:29.
20         (A recess was taken.)
21         THE VIDEOGRAPHER:  On the record at
22 3:46.
23         MS. FEINSTEIN:  Thank you.
24 BY MS. FEINSTEIN:
25     Q.   Ms. Patton, one thing I -- I

Page 247

1 haven't asked you yet regarding the treatment
2 providers that -- with whom the ADM Board
3 contracts.  Do you have any role in selecting
4 those treatment providers?
5     A.   No.
6     Q.   Do you have any role in deciding
7 what services are provided by any of the
8 treatment providers?
9     A.   No.
10     Q.   Do you have any personal knowledge
11 about any of the damages that Summit County
12 alleges to have sustained in this litigation?
13     A.   I don't have any specific
14 knowledge, no.
15     Q.   Do you have any personal knowledge
16 about how much the ADM Board has spent on
17 opioid-related expenses?
18     A.   No, I don't have that.
19     Q.   Do you know whether the ADM Board
20 has performed any academic research on opioids?
21     A.   I don't.
22     Q.   Have you been involved in any
23 academic research regarding opioids?
24     A.   No.
25     Q.   Are you aware of any physician in

Page 248

1 Summit County who was misled by any of the
2 opioid manufacturers?
3     A.   I don't.
4     Q.   Are you aware of any physician --
5 or strike that.
6         Are you -- can you identify any
7 prescription for opioids written in Summit
8 County on the basis of any misrepresentation
9 made by a manufacturer?
10     A.   No.
11         MS. FEINSTEIN:  Thank you.  I have
12 nothing further for you today, but my
13 colleagues have a few questions, so I'm going
14 to pass the mic.
15         MS. KEARSE:  Just a few.
16         EXAMINATION OF KIMBERLY PATTON
17 BY MR. BOEHM:
18     Q.   Good afternoon, Ms. Patton.
19     A.   Hi.
20     Q.   My name is Paul Boehm.  I
21 introduced myself to you before we started this
22 morning.
23     A.   Yes.
24     Q.   And I've been sitting here
25 listening to your testimony, and I think we all

Page 249

1 thank you very much for being here.
2     A.   Thank you.
3     Q.   You indicated that you read just a
4 small section of the complaint that was filed
5 by the County.  Is that what I understood?
6     A.   Yes.  What I did is I kind of just
7 skimmed over the information of the brief part
8 that related to ADM Board.
9     Q.   Did you skim over any other parts
10 of the written complaint filed by Summit County
11 in this lawsuit, other than the section that
12 you perceived to be relevant to the ADAMHS
13 Board?
14     A.   No, I did not.
15     Q.   Did you read the section of the
16 complaint or any sections of the complaint that
17 made allegations as to wholesale drug
18 distributors?
19     A.   No.
20     Q.   Do you have any understanding,
21 separate and apart from conversations you've
22 had with lawyers for the County, about the
23 nature of the allegations that are being made
24 against the wholesale drug distributors in this
25 case?

63 (Pages 246 - 249)

1    A.   I'm sorry.  Can you repeat that?
2    Q.   Sure.
3        Do you have any understanding,
4  separate and apart from your conversations that
5  you may have had with the lawyers for Summit
6  County, about the substance or the nature of
7  the allegations that are being made in this
8  lawsuit against wholesale drug distributors?
9    A.   No.
10    Q.   Do you have any independent
11  understanding as to why wholesale drug
12  distributors are being named as Defendants in
13  this lawsuit?
14    A.   No.  As far as --
15    Q.   I'm sorry.
16    A.   -- as far as in referencing why
17  they -- can I ask for clarification, as to, are
18  you asking why -- do I have any understanding
19  as to why they're named?
20    Q.   Yes.  Do you have an understanding
21  as to why wholesale drug distributors have been
22  named as Defendants in this case, separate and
23  apart from any conversations that you may have
24  had with the lawyers for Summit County?
25    A.   No.

1    Q.   Prior to the filing of the lawsuit
2  by lawyers in this case, had you ever heard
3  anybody state or indicate that wholesale drug
4  distributors were somehow responsible for the
5  trends of opioid abuse and overdose in Summit
6  County?
7    A.   No.
8    Q.   Do you know what the role of
9  wholesale drug distributors is in the delivery
10  of health care in the United States?
11    A.   My understanding of what their role
12  is, my personal understanding is that they
13  distribute the medication to the pharmacies to
14  dispense the medication.
15    Q.   And do you know what rules and
16  regulations govern the filling of pharmacy
17  orders for medications by wholesale drug
18  distributors?
19    A.   I do not.
20    Q.   Are you familiar with the United
21  States Drug Enforcement Agency?
22    A.   I know of its existence, yes.
23    Q.   Do you know what the
24  responsibilities of the -- of the DEA are in
25  the context of the distribution of controlled

1  substances?
2    A.   No.
3    Q.   I saw you shake your head no, but I
4  don't know if the court reporter --
5    A.   Oh, I said no.  I'm sorry.
6    Q.   Oh, I'm sorry.  I may not --
7    A.   Apologies.
8        MS. KEARSE:  Yeah, she said it --
9  she said it too.
10        MR. BOEHM:  I'm sorry.  In my
11  dotage, I'm getting a little hard of hearing.
12    Q.   Have you ever heard of something
13  called the aggregate production quota?
14    A.   No.
15    Q.   In your testimony before the break,
16  you indicated that you had heard of the company
17  Cardinal Health; is that right?
18    A.   Yes.
19    Q.   And I think you stated that your
20  understanding is that Cardinal Health is a
21  manufacturer of an opioid, a prescription
22  opioid medication; is that your understanding?
23    A.   No.  She, in general was naming
24  companies and just if I've heard of those
25  companies.  I have heard of Cardinal Health.

1  As specifically what their -- a manufacturer
2  versus distributor, but I just heard of
3  Cardinal Health in general.
4    Q.   Do you know an- -- I'm sorry.
5    A.   As far as the specifics, no, I
6  don't know the specifics of Cardinal Health and
7  what they do.
8    Q.   Okay.  Do you know why Cardinal
9  Health has been named as a Defendant in this
10  case?
11    A.   It's my understanding that they
12  were named in this case as a distributor.
13    Q.   Now, your testimony earlier, I
14  heard it somewhat differently.
15        At what point did you come to an
16  understanding that Cardinal Health has been
17  named as a distributor?
18    A.   In looking at the filings
19  that the -- I don't know what the official word
20  is the, actual filing that -- the complaint, so
21  to speak.  I saw that name listed in -- in
22  some of the readings.  As far as specifically
23  where I was it, I don't under- -- know exactly.
24    Q.   You said that you had skimmed the
25  complaint, to the extent that that complaint

Page 254

1 had to do with the ADAMHS Board and that you
2 hadn't skimmed any other parts of the
3 complaint; isn't that what your testimony was
4 earlier today?
5        MS. KEARSE:  Object to form.
6 Misstates her testimony.
7    A.    What I had said was, yes, that I
8 skimmed parts that I thought were relevant, as
9 far as it relates to my employer.
10   Q.    Okay.  But your testimony is now
11 that you have skimmed parts of the complaint
12 that referenced Cardinal?
13   A.    From what I can recall, I remember
14 seeing Cardinal named in the complaint.  As far
15 as the specifics, I don't know.
16   Q.    But you don't know what Cardinal
17 does, what its business is; is that right?
18   A.    No.
19   Q.    Meaning, yes, that is correct; you
20 do not know what Cardinal does?
21   A.    Correct.  I apologize.  Yes, I
22 don't know their role as a business in general.
23   Q.    Have you ever heard of McKesson?
24   A.    No.
25   Q.    Have you ever heard of

Page 255

1 AmerisourceBergen?
2    A.    No.
3    Q.    Are you aware of any specific
4 misconduct on the part of Cardinal, McKesson,
5 or AmerisourceBergen, or any other wholesale
6 drug distributor in Summit County in connection
7 with trends of opioid abuse of overdoses?
8    A.    I do not know any specific
9 information, no.
10   Q.    To the best of your knowledge, was
11 anybody, other than yourself, who works at or
12 on behalf of the Summit County ADAMHS Board,
13 consulted about the accuracy of the allegations
14 that are being made by the County in this
15 lawsuit before the lawsuit was filed?
16        MS. KEARSE:  Object to form.
17   A.    I don't know who all specifically
18 was engaged in conversations from our board.
19   Q.    So my question is, to your
20 knowledge, are you aware of anybody who works
21 at or on behalf of the ADAMHS Board for Summit
22 County who was consulted about the accuracy of
23 the allegations that are being made in this
24 lawsuit?
25   A.    I do not.  I know other staff such

Page 256

1 as Jerry Craig, Doug Smith, they have been
2 talked to, but the nature of what they were
3 talked to about, I do not know, so I do not
4 know if it was regarding the accuracy or other
5 components.  I don't know what was part of
6 those conversations because I wasn't part of
7 them.
8    Q.    Do you know, whether it be Jerry
9 Craig or Doug Smith or anybody else at the
10 ADAMHS Board, whether or not any of them were
11 consulted in any way about the nature or
12 accuracy of the allegations that are made in
13 this lawsuit before the lawsuit was filed?
14        MS. KEARSE:  Object to form.  Asked
15 and answered.
16   A.    As I said before, I don't know what
17 was discussed.
18   Q.    Do you know if there were any
19 discussions?
20   A.    (Witness shaking head.)
21   Q.    You said you don't know what was
22 discussed, and that's why I'm asking again,
23 because I want --
24   A.    Right.
25   Q.    Do you know if there were any

Page 257

1 discussions?
2    A.    I don't know specifically.
3    Q.    I just wanted to follow up, I
4 think, on one last piece.
5        During questioning earlier today,
6 you spoke about the connection between mental
7 illness and substance abuse.  Do you recall
8 questions on that subject?
9    A.    Yes.
10   Q.    I think you said that's an area of
11 particular interest for you; is that right?
12   A.    Yes.
13   Q.    Is that something that you've
14 studied, whether it be from an academic
15 perspective or in your professional role?
16   A.    Yes.  So while I was employed at
17 Northcoast Behavioral Healthcare, I started out
18 as the SAMI counselor, so starting at the very
19 beginning of my employment in 2005, I was very
20 much involved with dual diagnosis.
21   Q.    What is it, based on your
22 understanding, from all you've learned and
23 researched on that subject, what is it about
24 mental illness that makes it a causal risk
25 factor for substance abuse?

65 (Pages 254 - 257)

Page 258

1          MS. KEARSE:  Object to form.
2      A.    I know individuals with mental
3  illness will at times self-medicate with
4  substances if they're not medicated properly or
5  don't have insight into their mental illness.
6  So I -- I do know that individuals with mental
7  illness do have risk of developing substance
8  use disorders, due to those factors or lack of
9  coping.
10         However, there is some question
11 whether -- there are also some individuals that
12 are dually diagnosed that may have began their
13 substance use initially and then were later
14 diagnosed with mental illness, so it's hard to
15 determine which came first, if one actually
16 causes the other.
17         So because I think some individuals
18 will have an onset of substance use and then
19 later be diagnosed, or vice versa, have their
20 mental illness and be self-medicating or using
21 for other reasons, and also develop a substance
22 use disorder.
23     Q.    Fair to say that the relationship
24 between substance abuse and mental illness is a
25 complex and multifaceted relationship?

Page 259

1          MS. KEARSE:  Object to form.
2      A.    I definitely think it is complex,
3  because there are many factors, and there are
4  also individuals that have solely mental health
5  diagnoses and individuals that just because
6  they have a mental illness doesn't mean they're
7  going to develop a substance abuse disorder,
8  and vice versa, just because someone is using
9  substances doesn't mean they're going to
10 develop a mental health diagnosis.  Similar to
11 that, where they can be more likely to develop
12 medical problems, other medical issues as well.
13         So I think, yes, it is a complex
14 illness.  But I also believe that it's only one
15 component, and that, like I said before, there
16 are individuals that have mental illness and
17 never develop a substance use disorder or use
18 substance uses [sic] and never develop a mental
19 illness.
20     Q.    Do you agree that the disease of
21 addiction itself is an extremely complex and
22 multifaceted disease?
23         MS. KEARSE:  Object to form.
24     A.    I believe that the disease of
25 addiction is, we're learning, every day, more

Page 260

1  and more about the disease of addiction and how
2  it impacts the brain, and that there are many
3  components with addiction, yes.
4          MR. BOEHM:  I'm going to pass the
5  witness.  I don't know if anyone else has any
6  questions, but thank you very much for your
7  time, Ms. Patton.
8          THE WITNESS:  Thank you.
9          Getting too far down the line.
10         EXAMINATION OF KIMBERLY PATTON
11 BY MS. MORRISON:
12     Q.    Good afternoon, Ms. Patton.  I'm
13 Kristin Morrison.  I'm an attorney on behalf of
14 Walmart here.  Long day.
15         I want to talk to you a little bit
16 about additional information about opioid
17 addiction and some overdose issues you
18 discussed earlier with respect to the tracking
19 that the ADAMHS Board does.
20         Does the ADAMHS Board's tracking
21 allow you to identify any overdoses that were
22 caused by an individual taking a prescription
23 opioid medication consistent with their
24 doctor's instructions?
25     A.    Not to my knowledge.

Page 261

1      Q.    Does the ADAMHS Board's tracking
2  allow you to identify how many overdoses were
3  caused by altering the medication in some way,
4  such as crushing or tampering with prescription
5  opioid pills?
6      A.    Not to my knowledge.
7      Q.    Fair to say that the ADAMHS Board's
8  tracking does not allow you to identify how
9  many overdoses were caused by an individual
10 simply taking too many of their prescribed
11 opioid pills?
12     A.    As far as the specific tracking by
13 the ADM Board specifically, we -- we do not, to
14 my knowledge, track the overdose rates and
15 break it down by that information of -- it was
16 just an overdose, is my understanding is the
17 information that we receive.
18     Q.    So just so I'm clear, the ADAMHS
19 Board does not track whether an overdose was
20 caused by someone taking too many of their
21 prescribed medications?
22     A.    To my knowledge, no.
23     Q.    And also fair to say the ADAMHS
24 Board's tracking does not allow it to identify
25 how many overdoses were caused by an individual

Page 262

1 taking a medication that had been prescribed to
2 someone else?
3      A.   Not at ADM, no.
4          THE REPORTER:  Not what?
5          THE WITNESS:  Not at ADM, no.
6 Sorry about that.
7      Q.   Do you have any personal knowledge
8 of an example of an improper prescription for
9 opioids that was written in Summit County?
10     A.   I do not.
11     Q.   Do you have any personal knowledge
12 of a prescription opioid being improperly
13 dispensed by a pharmacy in Summit County?
14     A.   I do not.
15     Q.   Do you have any understanding,
16 separate and apart from conversations with the
17 lawyers for Summit County, about why the Retail
18 Pharmacy Defendants that you've named earlier
19 today were named in this lawsuit?
20     A.   I do not.
21     Q.   Are you aware of any client of the
22 ADAMHS Board who overdosed with opioid drugs
23 from one of the Pharmacy Defendants in this
24 lawsuit?
25     A.   I do not.

Page 263

1      Q.   Did you ever try to contact any of
2 the Pharmacy Defendants to seek their
3 assistance with dealing with the opioid problem
4 in Summit County?
5      A.   I have not.
6      Q.   Do you know if anyone else at the
7 ADAMHS Board has done so?
8      A.   I do not know.
9      Q.   Have you interacted with the Ohio
10 Board of Pharmacy in your role at the ADAMHS
11 Board?
12     A.   No.
13     Q.   Are you familiar with ARCOS data?
14     A.   No.
15     Q.   Automatic -- Automated Reports and
16 Consolidated Ordering System?
17     A.   No.
18     Q.   What about OARRS reporting, Ohio
19 Automated Prescription Reporting System?
20     A.   I am familiar with OARRS.
21     Q.   In what way are you familiar with
22 OARRS at your role at the ADAMHS Board?
23     A.   In my role at the ADAMHS Board, no.
24     Q.   So your familiarity with OARRS
25 comes from a prior position you had?

Page 264

1      A.   Correct.
2      Q.   And what position is that?
3      A.   When I worked at Northcoast
4 Behavioral Healthcare, our physician, our
5 psychiatrist utilized the OARRS system.
6      Q.   Did you utilize the OARRS system in
7 your role at Northcoast Behavioral Healthcare?
8      A.   I did not.
9      Q.   Do you have an understanding of how
10 your psych- -- your -- was it a physician or a
11 psychologist?  Who was it that used the OARRS
12 data?
13     A.   The psychiatrist at Northcoast.
14     Q.   Do you have any familiarity with
15 what the psychiatrist at Northcoast used the
16 OARRS data for?
17     A.   On any new admissions that came
18 into the hospital, they would, if a client
19 reported being prescribed the medications, they
20 would crosscheck the -- they would look at the
21 OARRS system, and then they used -- when --
22 then they further transitioned it to any client
23 that was admitted to the hospital, they would
24 automatically run an OARRS report on that
25 client.

Page 265

1      Q.   Do you know the purpose for which
2 they used the OARRS report after they ran it?
3      A.   So if an individual was coming in
4 with a substance use disorder and they were
5 maybe not completely honest with the
6 psychiatrist while their care at the hospital,
7 the psychiatrist would sometimes use that
8 record reporting in working with the client to
9 address the contradictions.
10     Q.   Do you know what time frame, the
11 earliest time frame you know that a -- that a
12 psychiatrist used an OARRS report at Northcoast
13 Behavioral Healthcare?
14     A.   Can you just --
15     Q.   The earliest -- the earliest time
16 period you recall being aware that the
17 psychiatrist was using an OARRS report?
18     A.   I don't know the specific time
19 frame.  I know -- I'm sorry.  Are you talking
20 about, like, what year --
21     Q.   Yes.
22     A.   -- they started?  Okay.  I don't
23 know the specific year.  I can say that when it
24 was created, they began implementing it, but I
25 don't know the specific year as to when that

67 (Pages 262 - 265)

Page 266

1 was created. And then they would run it if an
2 individual came in with substance use as part
3 of the admission data, they would run that
4 report at admission.
5     Q.   So as far as you know, as soon as
6 an OARRS report data was available for use, the
7 psychiatrist at Northcoast Behavioral
8 Healthcare started using it?
9     A.   That's my understanding.
10         MS. KEARSE: Object to form.
11    Q.   Okay. You mentioned earlier in
12 your testimony a little bit about dispensing
13 and pharmacies dispensing prescription opioids.
14         Would you agree that it can be
15 appropriate for pharmacists to stock and to
16 fill prescriptions for opioids?
17    A.   Yes.
18         MS. MORRISON: I may be done. Let
19 me go off the record for a few minutes to
20 confer with my colleagues.
21         THE WITNESS: Okay.
22         MS. MORRISON: Thank you.
23         THE VIDEOGRAPHER: Off the record,
24 4:10.
25         (A recess was taken.)

Page 267

1         THE VIDEOGRAPHER: On the record,
2 4:13.
3         MS. MORRISON: Thank you
4 Mrs. Patton. I am done with questions. My
5 colleagues in the room are done.
6         Does anyone on the phone have any
7 questions.
8         MS. McINTYRE: Jill McIntyre. I do
9 not.
10         MS. MORRISON: Anyone else?
11        Hearing none, do you have any
12 redirect?
13        MS. KEARSE: Yeah, I'm going to
14 actually take a break and look to see that. I
15 wasn't sure, so let us take our break and we
16 will let you know.
17        THE VIDEOGRAPHER: Off the record,
18 4:14.
19        (A recess was taken.)
20        THE VIDEOGRAPHER: On the record
21 4:46.
22     EXAMINATION OF KIMBERLY PATTON
23 BY MS. KEARSE:
24    Q.   Ms. Patton, Anne Kearse. Thank you
25 for being here today and answering questions

Page 268

1 for Counsel.
2     A.   A couple, just, things I want to
3 clarify.
4         Counsel for Teva asked you
5 questions about prevention programs provided by
6 the ADM specific to opioids. Do you recall
7 that line of questioning?
8     A.   Yes.
9     Q.   Do ADM programs, do the prevention
10 programs that ADM does provide, do they include
11 components that deal specifically with opioids?
12    A.   Yes. They do -- the prevention
13 programs that are funded through ADM Board do
14 address opioids, as well as other substances.
15    Q.   And are there ADM-targeted
16 prevention grants, meaning that ADM actually
17 provides grants and pays for prevention
18 programs that are specific to opioids?
19         MS. FEINSTEIN: Objection. Form.
20    A.   So we do have targeted prevention
21 grants. There have been in place since I've
22 been employed at ADM Board. And to my
23 knowledge, 2015-'16, school year, there --
24 Pastoral Counseling Services did receive a
25 grant as part of that grant funding to

Page 269

1 administer Generation Rx curriculum within the
2 Akron Public Schools that they were in.
3         And in 2017, the '17-'18 school
4 year, Kenmore Garfield High School in Akron
5 implemented an athletic prevention program
6 where they also implemented the Generation Rx
7 curriculum amongst athletes in the high school.
8     Q.   Okay. And that's -- that's just --
9 fair to say, ADM does provide grant dollars
10 specific to opioid prevention and use within
11 Summit County; is that correct?
12         MS. FEINSTEIN: Objection. Form.
13    A.   Yes.
14    Q.   Ms. Patton, do you recall a line of
15 questioning from counsel for Teva about when
16 you first learned about a public health crisis
17 in Summit County? Do you recall that?
18    A.   Yes.
19    Q.   Okay. And as to Summit County
20 specifically, when's the first time that you
21 became aware that Summit County was facing a
22 public health crisis as it relates to opioid
23 use?
24    A.   As it relates specific to Summit
25 County, when I became employed with the ADM

68 (Pages 266 - 269)

Page 270

1 Board in May of 2016, I, soon after that, saw
2 the impact it was having in our community, in
3 those months soon to follow, whereas many of
4 our systems were becoming overloaded, whereas
5 Summit County Children Services was taking in
6 kids beyond capacity, whether it's because
7 children lost their caregivers to overdose, or
8 if they were in the criminal justice system.
9        We also had mobile morgues
10 delivered and set up within our county at that
11 time, and we were getting calls at the ADM
12 Board at that time, in that -- those summer
13 months of 2016, where people were fearful,
14 calling.
15        I had one individual, a family
16 member call, indicating their family member
17 overdosed four times, and how can they just get
18 them into treatment because they don't want
19 them to die.
20        So as far as Summit County
21 specifically, it really wasn't -- it was when I
22 first became employed with the ADM Board and
23 was working with the ADM Board.
24        MS. FEINSTEIN: I'm going to move
25 to strike the non-responsive portion of that

Page 271

1 answer.
2    Q.    And regarding the -- well, let me
3 ask you this. To when -- when you came to
4 Summit County, after you came to Summit County,
5 did you see a rise in the number of deaths and
6 people dying of opioid-related use?
7        MS. FEINSTEIN: Objection. Form.
8    A.    So when I became employed by Summit
9 County ADM Board, that is when I became aware
10 of the numbers of overdoses within the county.
11 As I mentioned before, it really wasn't on my
12 radar prior to that employment.
13    Q.    And as for Summit County, is Summit
14 County still facing an opioid crisis today?
15    A.    I believe so.
16    Q.    Okay. And do you have a reason
17 to -- what are some examples that you still see
18 today?
19    A.    You know, I believe we have done a
20 good job at expanding capacity at our
21 providers, as well as trying to streamline the
22 process to get individuals into services
23 quicker; however, as late as last week, we had
24 an individual, a female, that we were trying to
25 get into residential treatment. She was

Page 272

1 assessed on December 27th, cleared for
2 admission into a residential treatment program
3 on the 9th. We called -- at least scheduled
4 her on the 14th. When we made that phone call,
5 her grandmother, at the time, told us that she
6 had passed away on that Sunday, on the 13th,
7 prior, of an overdose.
8    Q.    Has the opioid crisis in Summit
9 County impacted people of all ages?
10    A.    I believe so, yes. You know, we
11 have children that have been impacted by this.
12 We have adults, young adults, adults, as well
13 as older adults that are -- have all been
14 impacted by this within the community.
15    Q.    Has it impacted people of all
16 races?
17    A.    Yes.
18    Q.    Socioeconomic statuses?
19    A.    Yes.
20    Q.    Gender?
21    A.    Yes.
22    Q.    And is it still the goal of the ADM
23 and as your role as -- in a -- with the ADM to
24 attempt to try and get people into service
25 quicker so that they can perhaps be saved?

Page 273

1    A.    Yes. Our overall goal is to
2 streamline the services as much as possible so
3 that we can get the individuals the services
4 they need as quickly as possible.
5        MS. KEARSE: Okay. Thank you,
6 Ms. Patton. No further questions.
7        MS. FEINSTEIN: I just have a
8 couple of follow-up for you.
9        THE WITNESS: Uh-huh.
10        EXAMINATION OF KIMBERLY PATTON
11 BY MS. FEINSTEIN:
12    Q.    The grants that you just testified
13 about in response to the questions from your
14 counsel, do you know the source of the funds
15 for those grants?
16    A.    I know it's ADM funding. I don't
17 know specifically what part of the ADM funding
18 it is.
19    Q.    Do you know whether Summit County
20 has provided to the ADM any additional funds to
21 fund those grants?
22    A.    Can you clarify -- when you say
23 Summit County, because I know we've talked
24 taxpayer money versus government.
25    Q.    Sure. So based on your earlier

69 (Pages 270 - 273)

Page 274

1  testimony --
2     A.  Yes.
3     Q.  -- it's my understanding that you
4  know that the ADM Board is funded by a levy?
5     A.  Correct.
6     Q.  The grants that you just testified
7  about moments ago, do you know whether those
8  grants come from the levy funds?
9     A.  I don't know for sure.
10     Q.  Do you know whether Summit County
11  provides any funds, other than the levy funds
12  that are from the designated grant --
13  designated levy, does Summit County provide any
14  funds specific to the ADM Board for the funding
15  of those grants?
16     A.  Not that I'm aware of.
17     Q.  How much are the grants that you
18  just testified about?
19     A.  The 2015-'16 grant, I don't know
20  that specific dollar amount, because they were
21  already awarded prior to me coming on board,
22  and I was just responsible for the outcomes.
23        The 2017 grant that was issued to
24  Kenmore Garfield High School was in the amount
25  of $2,500.

Page 275

1     Q.  Are you aware of any other grants
2  that fall in the category of those prevention
3  grants?
4     A.  For the targeted prevention grants,
5  there were no other grants, of those grants
6  that were opioid-specific.
7     Q.  The woman that you just told the
8  story about who was placed in the residential
9  facility but unfortunately did not make it into
10  the facility before suffering an overdose, do
11  you know whether she overdosed on prescription
12  opioids?
13     A.  I do not know that specifically;
14  however, I do know that we are following up to
15  get an incident report on the situation.
16     Q.  What information would you need to
17  confirm what she overdosed on?
18     A.  Ultimately, the tox -- a tox screen
19  from the medical examiner would confirm it.
20  Part of the unusual incident reporting process,
21  though, is the treatment -- treatment provider
22  that she was linked with will do a report to
23  us, and if there was anything reported to them,
24  they can indicate it at that time.
25        EXAMINATION OF KIMBERLY PATTON

Page 276

1  BY MR. BOEHM:
2     Q.  Thank you.  Just had to fix the
3  microphone so that I could ask you a few
4  questions, Ms. Patton.  Thank you.
5        You indicated that with respect
6  specifically to Summit County, it was when you
7  became employed in 2016 that you determined
8  that there was an opioid abuse epidemic taking
9  place in Summit County; is that right?
10     MS. KEARSE:  Object to form.
11  Misstates her testimony.
12     A.  So when I was -- began my
13  employment in May of 2016, that is really when
14  I became aware of the opiate crisis within
15  Summit County.
16     Q.  Is it your testimony that the
17  opiate crisis within Summit County was already
18  underway when you joined the ADAMHS Board in
19  2016?
20     MS. KEARSE:  Object to form.
21  Misstates her testimony.
22     A.  I can't speak as far as because
23  I -- as mentioned before, I really did not
24  follow Summit County and their ADM Board prior
25  to my employment, so I don't know what the

Page 277

1  situation was prior to my employment.
2     Q.  But did you determine, when you
3  joined the ADAMHS Board, that the opioid
4  epidemic was already underway when you joined?
5     MS. KEARSE:  Object to form.
6     Q.  Or do you have no idea one way or
7  another?
8     A.  So I believe when I became employed
9  in -- as I had mentioned soon after I became
10  employed, I don't know the specific date, but
11  that was really when we saw a spike in the
12  deaths and the mobile morgue coming, so as far
13  as was it a crisis beforehand, I don't know
14  what state the county was in prior to me
15  becoming employed.
16     Q.  Have you ever undertaken any effort
17  to try and understand when Summit County, the
18  trends of prescription opioid abuse and
19  overdoses, started to go upward?
20     MS. KEARSE:  Object to form.
21     A.  Can you clarify?  When you say have
22  I ever made --
23     Q.  Have you ever undertaken any effort
24  to try and determine when prescription opioid
25  abuse and overdoses started to trend upward in

70 (Pages 274 - 277)

Page 278

1 Summit County?
2        MS. KEARSE:  Object to form.
3    A.   So I myself have not -- have not
4 personally researched or attempted to analyze
5 that.
6    Q.   Have you ever asked anybody at
7 ADAMHS or anybody else in the county government
8 whether they have ever undertaken to try and
9 understand when the trend started to go upward
10 in terms of prescription drug abuse or
11 overdoses?
12        MS. KEARSE:  Object to form.
13    A.   I have not.
14    Q.   So as you sit here -- as you sit
15 here today, you don't know whether or not
16 anybody has ever investigated the causes or the
17 beginning of the opioid use epidemic in Summit
18 County; is that fair?
19        MS. KEARSE:  Object to form.
20    A.   No, I don't personally have that
21 knowledge.
22    Q.   Did you read newspapers in the late
23 1990s and early 2000s?
24    A.   Not really.
25    Q.   Do you ever read newspapers?

Page 279

1    A.   Occasionally.
2    Q.   What newspapers do you read?
3    A.   Well, now, more recently, because
4 everything is virtually online, it will be
5 articles online that --
6    Q.   When did you start reading
7 newspapers?
8    A.   I don't know.
9    Q.   Don't know?
10        What news- -- newspapers have you
11 read?
12    A.   Plain Dealer.
13    Q.   When did you start reading the
14 Plain Dealer?
15    A.   I have no idea.
16        MS. KEARSE:  Counsel, the time is
17 up.
18    Q.   Do you read -- do you read national
19 newspapers?
20    A.   No.
21    Q.   No?
22        MS. KEARSE:  Okay.  That's the last
23 question, Counsel.
24        MR. BOEHM:  No, I'm not -- I'm not
25 quite done.

Page 280

1        MS. KEARSE:  Well, no, we --
2        MR. BOEHM:  We took at least 30
3 seconds for me to fix my microphone.
4        MS. SALERNO:  I stopped it.
5        MS. KEARSE:  We stopped it.  We
6 did.  We timed it on that.
7        MR. BOEHM:  Okay.  I'm -- under
8 protest, I will stop.
9        MS. KEARSE:  Okay.  Thank you
10 Ms. Patton.
11        THE WITNESS:  Thank you.
12        THE VIDEOGRAPHER:  Off the record,
13 5:00 p.m.
14     (Deposition concluded at 5:00 p.m.)
15        ~ ~ ~ ~ ~
16
17
18
19
20
21
22
23
24
25

Page 281

1 Whereupon, counsel was requested to give
2 instructions regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5        SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9        TRANSCRIPT DELIVERY:
10 Counsel was requested to give instructions
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

71 (Pages 278 - 281)

Page 282

```
 1        REPORTER'S CERTIFICATE
 2   The State of Ohio,   )
 3                        SS:
 4   County of Cuyahoga.  )
 5
 6        I, Stephen J. DeBacco, a Notary
 7   Public within and for the State of Ohio, duly
 8   commissioned and qualified, do hereby certify
 9   that the within named witness, KIMBERLY PATTON,
10   was by me first duly sworn to testify the
11   truth, the whole truth and nothing but the
12   truth in the cause aforesaid; that the
13   testimony then given by the above-referenced
14   witness was by me reduced to stenotypy in the
15   presence of said witness; afterwards
16   transcribed, and that the foregoing is a true
17   and correct transcription of the testimony so
18   given by the above-referenced witness.
19        I do further certify that this
20   deposition was taken at the time and place in
21   the foregoing caption specified and was
22   completed without adjournment.
23
24
25
```

Page 283

```
 1        I do further certify that I am not
 2   a relative, counsel or attorney for either
 3   party, or otherwise interested in the event of
 4   this action.
 5        IN WITNESS WHEREOF, I have hereunto
 6   set my hand and affixed my seal of office at
 7   Cleveland, Ohio, on this 25th day of
 8   January, 2019.
 9
10
11
12
13
14        Stephen J. DeBacco, Notary Public
15        within and for the State of Ohio
16
17   My commission expires September 30, 2022.
18
19
20
21
22
23
24
25
```

Page 284

```
 1              Veritext Legal Solutions
                    1100 Superior Ave
 2                     Suite 1820
                  Cleveland, Ohio 44114
 3              Phone: 216-523-1313
 4
     January 25, 2019
 5
     To: Anne McGuiness Kearse
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3188714
 8
     Witness:  Kimberly Patton     Deposition Date:  1/22/2019
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 285

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3188714
 3   CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 1/22/2019
 4   WITNESS' NAME: Kimberly Patton
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have made no changes to the testimony
     as transcribed by the court reporter.
 8
     _____
 9   Date              Kimberly Patton
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
          _____
18        Notary Public
19        _____
          Commission Expiration Date
20
21
22
23
24
25
```

72 (Pages 282 - 285)

Page 286

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 3188714
 3  CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 1/22/2019
 4  WITNESS' NAME: Kimberly Patton
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9      I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date            Kimberly Patton
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of _____, 20____.
23  _____
        Notary Public
24  _____
25      Commission Expiration Date
```

Page 287

```
 1        ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 1/22/2019
 3  PAGE/LINE(S) /     CHANGE     /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____  _____
20  Date            Kimberly Patton
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24  _____
25      Commission Expiration Date
```

73 (Pages 286 - 287)

| & | | |
|---|---|---|

**&** 1:21 3:5,10,11
3:17 4:5,10,14
6:18 10:22 11:3,7
11:9 204:5 242:14
242:16

**0**

**000216547** 6:22
208:21 209:9
**000216548** 6:22
208:22
**000289523** 7:2
228:4
**000289533** 7:3
228:5
**000945488** 6:9
157:9,21
**000945633** 6:19
204:7,17
**000959818** 6:6
67:22 68:6
**000959819** 6:6
67:23
**000960323** 6:12
162:11,21
**000970749** 6:16
187:16
**000970754** 6:17
187:16
**001128843** 6:3
19:5
**001128846** 6:4
19:5
**001793050** 6:14
183:12,20
**001793051** 6:15
183:12
**00970749** 187:25
**05** 59:2

**051** 183:20 184:8

**1**

**1** 6:3 19:3,10,12,19
30:19,21 31:18
37:9 155:15 156:5
**1,500** 95:20
**1/22/2019** 284:8
285:3 286:3 287:2
**10** 26:22 49:20
107:20 138:24,25
139:13,18
**100** 94:15 143:9
**10019-9710** 4:6
**10:13** 62:11
**10:33** 62:14
**11** 5:8
**1100** 4:16 284:1
**11472** 283:13
**11:54** 129:13
**12** 166:20
**124** 8:5
**125** 8:6,6
**12:53** 129:16
**13.5** 104:23 105:1
**130** 8:7
**134** 175:24 176:1
**136** 8:7
**13th** 70:5 272:6
**140** 175:23 176:3
**143** 8:8
**146** 8:8
**148** 8:9
**14th** 272:4
**15** 49:20 93:10
**15219-6401** 3:6
**157** 6:7
**16** 118:13 268:23
274:19
**1600** 2:18
**162** 6:10

**17** 1:6,10 72:14
225:5 269:3
**170** 8:9
**17th** 15:3 173:7,8
**18** 1:12,13 18:15
18:20 54:14 85:22
155:5 159:11
188:20 269:3
**180** 8:10
**1820** 284:2
**183** 6:13
**1867** 12:12
**187** 6:16
**19** 6:3
**193** 8:10
**199** 8:11
**1990s** 278:23
**1st** 110:11

**2**

**2** 5:3 6:5 17:19
66:15 67:20 68:2
68:24 71:24,25,25
80:1 90:22 95:10
107:11 111:15
127:17,21
**2,500** 274:25
**20** 6:22 28:24 94:6
94:14,16 208:20
285:16 286:22
287:22
**200** 8:11
**20005** 3:12
**2000s** 278:23
**2002** 18:1 30:25
34:17
**2003** 34:17 37:7
39:3
**2004** 217:25
**2005** 39:3 40:21
43:21 46:15 48:7
52:8 58:22 218:1

257:19
**2006** 40:23
**2009** 18:4
**2011** 6:22 60:25
130:21,22 131:2,4
148:12 207:11,20
208:21 210:6
211:12 212:21
**2011-2012** 130:16
**2013** 46:16 48:8
52:9 53:23 56:7
57:21 120:19
122:6
**2014** 131:5
**2015** 86:4 210:9
211:12 268:23
274:19
**2016** 12:25 17:19
25:25 26:8 28:11
56:7 57:21 58:22
59:3 61:6 66:15
85:17 89:1 90:16
103:22 104:2
119:7 131:24
144:10 146:11,14
192:20 202:19
270:1,13 276:7,13
276:19
**2017** 6:11 20:12,17
20:25 21:14,24
22:3,11,18,23
25:21 26:8 28:11
29:16 72:13,15
73:1 80:10 92:7
101:19,23 102:3
103:17,20 104:4
111:3 113:21
129:6,8,25 150:17
153:23 158:2,17
158:18 160:20
162:10 163:17

164:2 169:23,23
171:1 173:7,8
178:10 183:22
184:10 186:9,21
192:20 235:1,4
269:3 274:23
**2017-2018** 193:15
**2018** 6:16 14:25
15:1 19:21,23
20:10,12,19 21:3
21:15,18 25:22
28:12 30:23 69:10
70:2,5 79:4,5,11
79:14,19 92:8
99:1 101:17,25
102:23 104:6
105:12,18 110:11
111:3 113:24
114:24 120:20
122:8 143:25
150:18 155:21
187:3,15 188:20
189:24 190:21
192:21 193:1
205:21,23 206:6
236:20 239:1,9
**2018-2019** 111:7
**2019** 1:18 10:3
121:8 155:21
283:8 284:4
**202** 3:12 8:12
**2022** 283:17
**204** 6:18
**206** 8:12,13
**208** 6:20
**21** 6:11 162:10
163:17 171:1
222:12
**211** 8:13
**212** 4:7 8:14,14

**214** 8:15
**215** 8:15,16,16
**216** 2:13 4:17 8:17
**216-523-1313**
284:3
**216-9140** 2:7
**216-9461** 2:8
**218** 8:17,18,18
**219** 8:19,19
**21st** 95:5
**22** 1:18 10:3
167:13 168:4
**222** 8:20,20
**223** 8:21
**228** 7:1
**236** 185:3
**239** 8:21
**24** 189:24
**248** 5:9
**25** 28:24 93:5
190:21 284:4
**250** 4:6
**25301-3202** 2:18
**254** 8:22
**255** 8:22
**256** 8:23
**258** 8:23
**259** 8:24,24
**25th** 283:7
**26** 170:3 171:2,2
**260** 5:10
**266** 8:25
**267** 5:11
**268** 9:1
**269** 9:1
**270** 9:2
**271** 9:2
**273** 5:12
**276** 5:13 9:3,3
**277** 9:4,4

**278** 9:5,5,6
**27th** 272:1
**28** 2:6 185:8
**2804** 1:5,6
**282** 5:15
**28th** 153:25
**29464** 2:6
**29th** 102:3
**2:12** 198:14
**2:33** 198:17
**2nd** 12:25

### 3

**3** 6:7 157:6,14
158:12,20
**30** 165:1,6,17
211:16 280:2
283:17
**30,000** 116:9
**304** 2:19
**30th** 155:15 156:5
**31** 70:2,5
**312** 3:19
**3188714** 284:7
285:2 286:2
**324-1492** 3:19
**32nd** 3:6
**330** 160:21 185:2
**340-1018** 2:19
**35** 159:8
**36** 190:10
**38** 160:24
**3:29** 246:19
**3:46** 246:22
**3rd** 79:14

### 4

**4** 6:10 162:7,15,24
174:5
**40** 40:15 95:23
190:3

**41** 115:4
**412** 3:7
**415** 4:12
**42** 190:10
**43** 165:18 166:3
**434-5366** 3:12
**44113** 4:17
**44114** 284:2
**44114-1190** 2:13
**44313** 12:13
**45004** 1:10
**45090** 1:13
**45132** 1:12
**4:10** 266:24
**4:13** 267:2
**4:14** 267:18
**4:46** 267:21

### 5

**5** 6:13 183:9,17
184:3,7,24 186:17
**50** 143:13 167:13
**500** 2:18
**52** 8:3
**53** 8:3,4
**54** 104:17,19,25
106:12
**55** 168:4,24,25
169:1
**55th** 4:6
**560-7455** 3:7
**586-7375** 2:13
**591-7055** 4:12
**5:00** 280:13,14

### 6

**6** 5:5 6:16 187:14
187:21,24 190:20
198:22,23
**60** 232:25 233:3
**60601-5094** 3:19

**63**  8:4
**66**  53:4,15
**67**  6:5
**696-2493**  4:17

**7**

**7**  6:18 204:4,11,13
  204:18
**72**  185:2
**725**  3:11
**75**  1:21 86:1
**751**  188:17
**754**  188:1
**77**  3:18
**78**  8:5

**8**

**8**  6:20 205:23
  208:17 209:5
**80**  94:3 160:9
  178:15
**80,000**  121:4
**836-7838**  4:7
**843**  2:7,8
**845**  31:18

**9**

**9**  7:1 228:1,9,12
  229:19 230:1
  239:14 240:15
**90**  143:8 185:11,18
**900,000**  110:15,17
  110:22 111:5
**901**  2:12
**94111-5356**  4:11
**95**  143:1,3
**950**  4:16
**99**  122:23
**9:13**  1:18 10:4
**9th**  85:16 272:3

**a**

**a.m.**  1:18 10:4
**aaron**  1:7 70:17
  132:19 134:11
**abide**  239:9
**able**  41:7 57:15
  86:20 87:2 116:21
  138:4 152:9
  166:25 169:16
  186:2 226:19
  228:23
**abundant**  237:21
**abuse**  39:4 41:24
  43:10 59:11 64:2
  179:10 206:22
  251:5 255:7 257:7
  257:25 258:24
  259:7 276:8
  277:18,25 278:10
**abusing**  148:5
  206:22
**academic**  247:20
  247:23 257:14
**accept**  49:25
**accepted**  132:6
**access**  58:17 69:18
  69:22 76:18,21
  86:22,25 107:15
  113:12 119:23
  122:17 136:24
  140:20,22 142:3
  165:11 172:22,24
  172:25 175:2
  212:2 226:14
  231:2
**accessed**  88:9
  224:12
**accessible**  148:4
  224:12 237:19
**accompanies**
  216:3
**accompanying**
  215:17
**account**  161:3
**accounts**  122:22
**accredidate**  52:10
**accreditated**  49:2
**accreditation**
  32:23 33:1,2,12
**accredited**  32:20
  46:17 52:10 58:23
  59:3
**accuracy**  255:13
  255:22 256:4,12
**accurate**  13:23
  184:21
**acknowledge**
  285:11 286:16
**act**  95:6 97:25
  99:25 100:9
  285:14 286:20
**actavis**  3:3,3,15,15
**action**  102:10
  283:4
**actively**  61:16
**activities**  136:9,13
**actual**  50:1 190:24
  227:5 253:20
**ad**  97:10 234:10
**adamhs**  249:12
  254:1 255:12,21
  256:10 260:19,20
  261:1,7,18,23
  262:22 263:7,10
  263:22,23 276:18
  277:3 278:7
**adams**  209:24
**add**  227:6
**added**  26:8
**addicted**  220:3
  221:25 222:8,15
**addiction**  27:5
  29:14,25 30:11
  49:3 52:10 55:9
  55:11,16 56:8,12
  58:23 60:11,15
  61:21 66:20 70:23
  71:13 78:11,22
  79:2 85:11 88:17
  94:21 95:17 96:13
  96:17,21,25 97:2,6
  97:8,10,11,15,18
  97:20,24 102:8,16
  107:13,22 120:2
  126:7 131:8,23
  134:4,10,19 139:4
  139:6 142:17,23
  142:24 143:2
  144:5 145:18,19
  154:3 166:2,4,5,23
  169:15 173:11,23
  174:1 191:25
  192:2,4 206:10,19
  216:19,25 217:10
  217:18 218:11,16
  219:15 220:4,8
  259:21,25 260:1,3
  260:17
**addictions**  139:4
**addition**  29:23
  47:1 139:8
**additional**  94:14
  110:13 176:20
  223:12 260:16
  273:20
**additionally**  160:9
**address**  12:8,10,12
  12:15 74:16 138:1
  211:24 265:9
  268:14 284:15
**addresses**  210:18

**adhere** 47:2
**adjournment**
282:22
**adjudication**
57:14
**adjust** 226:20
**adm** 6:13 12:8
13:1 15:24 17:2
17:19 20:3 21:17
21:25 22:5,13,16
22:20,22 23:6,11
23:12,21 24:2,22
25:19 26:1,2,13,24
27:1,16,21,25 28:6
30:9,11,15 55:20
55:25 56:7,21
61:8 62:19 65:6,7
65:12,21,24 66:8
66:12,14,18 67:4
67:17 71:22 72:2
75:16 76:25 77:6
77:11,14,18,24
78:2,8,11,13,19,22
79:1,8,12,12 80:20
81:1 86:7,21 87:1
87:4,9,17,23 88:12
88:16 90:12 91:10
91:14 92:5,20
93:15,21,24 94:1
94:15 97:8,18,23
98:9,17 99:10,20
100:5 101:16,19
101:24 102:1,7
103:24 104:2,15
104:20,25 105:4,8
105:13,17 109:11
111:9,10 113:20
118:2,3 120:24
121:1 130:7
131:12,13,16,23
132:7 134:9,14,17

135:4,10,17,24,25
136:4,7,11,16,17
137:11,16,17,20
138:1,14 139:19
140:2,6,9,14
141:10,21 144:8
146:14 148:23,24
149:11,25 151:8
154:12,14,23
155:16 156:9,20
161:4 165:7,20,23
165:24 166:1,5,12
166:23 167:5,14
169:9,15 170:20
170:25 172:12,13
173:5,6,17,18,20
173:25 174:24
175:2 178:14
179:21 180:3,9,24
181:4 182:9,12,12
182:19 183:10
185:13,20 186:1,4
186:5,8,10,11,21
193:8,18,22,25
194:6,17 195:13
195:23 196:2
197:4 198:3,8
202:12,18,19,22
203:7 206:12
216:2 225:7,18
226:11,14 227:13
227:15 228:21
236:15,18 239:3
239:10 240:11
244:12 247:2,16
247:19 249:8
261:13 262:3,5
268:6,9,10,13,15
268:16,22 269:9
269:25 270:11,22
270:23 271:9

272:22,23 273:16
273:17,20 274:4
274:14 276:24
**adm's** 154:6
**administer** 269:1
**administration**
18:3 47:20 48:4
54:16 214:4
**admission** 49:25
50:23 266:3,4
272:2
**admissions** 54:17
264:17
**admitted** 42:4,22
51:11 52:4 53:5
57:3,10 264:23
**admitting** 42:8
50:20
**adult** 31:11 35:19
37:14,22 142:13
145:19 147:21,21
**adults** 35:6,14
272:12,12,12,13
**advertise** 118:5
**advertisement**
234:5
**advertisements**
233:21
**advertising** 118:8
234:22 243:20,24
**advise** 214:20
**advisory** 113:3,6,8
**affixed** 283:6
285:15 286:21
**aforesaid** 282:12
**aftercare** 42:16
99:18
**afternoon** 248:18
260:12
**age** 11:13 35:16

**agencies** 66:20
85:7 93:12 96:19
96:20,25 97:9,11
138:1 155:23,24
196:21 197:5
**agency** 38:25
99:19 133:15
197:23 198:8
205:2 251:21
**agenda** 73:11
**agendas** 240:25
**ages** 222:12 272:9
**aggregate** 252:13
**ago** 17:6 159:12
243:21 274:7
**agree** 145:24
218:19 219:16
220:10 259:20
266:14
**agreed** 23:9
**agreement** 245:16
**agrees** 23:16
**aimee** 56:13 66:3
69:4 71:3,5
132:14 144:24
**akearse** 2:7
**akron** 1:22 2:3
10:14,17 12:13
28:22,23 91:25
102:10 118:6
120:7 121:16
126:2 238:5 269:2
269:4
**akron's** 27:4
**al** 1:10,12,13,13
**alcohol** 24:17,23
55:8 109:9,13
171:4 222:12
**alice** 225:6
**allegations** 236:22
236:25 237:4

238:8 249:17,23 250:7 255:13,23 256:12

**alleges** 247:12

**allergan** 241:8,11

**allow** 61:19 153:21 260:21 261:2,8,24

**allows** 156:11

**alt** 48:23

**altering** 261:3

**alternatives** 48:24

**amerisourceberg...** 2:15 68:15 255:1 255:5

**amount** 91:11 104:24 110:19 111:1 121:4 124:4 237:18 274:20,24

**amounts** 23:10

**analysis** 45:5 141:1 196:3

**analyze** 74:8 189:13,17 278:4

**analyzes** 189:3

**anecdotally** 193:2

**anger** 35:7 38:4

**anne** 2:5 10:12 267:24 284:5

**annual** 80:9 92:3 101:6 103:7 110:19 149:19 150:1,10,14,16,20 151:3,8,11 155:2,4 183:22 193:7

**annually** 95:14 116:10 129:2

**answer** 13:21 14:4 93:9 148:21 194:15 207:15 214:21,23,25

**answered** 53:19 212:17 223:18 256:15

**answering** 81:9 267:25

**anybody** 141:11 251:3 255:11,20 256:9 278:6,7,16

**apart** 104:21 249:21 250:4,23 262:16

**apartment** 106:14

**apologies** 252:7

**apologize** 183:18 254:21

**appear** 285:11 286:15

**appearance** 68:9 68:12

**appearances** 2:1 3:1 4:1 5:3

**appears** 32:14 180:25

**appended** 286:11 286:18

**applicable** 281:7

**applicants** 70:10 70:12

**applications** 140:9

**applied** 27:16,25 65:13

**apply** 67:6

**applying** 20:2

**appointment** 166:6,10 167:21 173:13 182:3,8

**appreciate** 68:23 220:18

**appreciation** 128:17

**appropriate** 35:16 219:9,19 266:15

**approval** 214:12

**approve** 81:19 84:1,22

**approved** 214:3,9 218:13

**approximately** 17:5 28:24 37:21 54:14 92:1 94:3 116:9 159:11 160:9 205:17 217:25

**april** 6:21 107:14 208:20

**arcos** 263:13

**area** 115:6 257:10

**areas** 144:4 150:22 206:8

**arndt** 56:2 69:22 70:1 131:17 132:18

**arnold** 4:5 11:3

**arnoldporter.com** 4:7

**arrangement** 22:3

**arrangements** 16:4

**array** 35:8 226:7

**articles** 231:14,24 232:5,14,18,22 279:5

**asca** 102:6,9 106:20 181:17,23 182:2,4,10,13,15 182:17,18,18

**ashtabula** 43:4 55:2

**aside** 25:20 193:22 199:24

**asked** 14:5,6 16:7 17:9 43:13 53:18 82:21 118:20 119:12 130:2 212:17 222:19 223:18 228:19,24 238:15 247:1 256:14 268:4 278:6

**asking** 13:8 36:14 57:23 77:17 87:16 135:12 182:22 220:18 250:18 256:22

**assess** 28:13 173:10

**assessed** 272:1

**assessing** 67:5

**assessment** 42:9 44:4,16 45:6 46:3 47:3 49:11 50:11 50:24 51:18 74:18 74:19 76:16 166:2 166:6 168:2 169:21 173:13,14 181:20

**assessments** 47:2 50:9 161:10 185:13,20

**assignment** 285:2 286:2 287:2

**assist** 35:18 38:1 54:9,21 57:16 67:4 136:17 150:22 152:9 196:15

**assistance** 58:18 81:5 96:7 111:18 263:3

**assisted** 24:4 31:12,14 108:19

108:23 109:4
**assisting** 31:13
**associate** 66:3
**associated** 199:18
200:1 216:5,13,20
217:11 218:5
232:6,12
**association** 91:2,3
128:5
**assume** 14:5
**assumed** 102:1
159:23
**athletes** 269:7
**athletic** 269:5
**atp** 107:10,13,22
108:5 109:2,7,12
109:18,22 110:1,8
111:2 112:20,21
128:22
**atr** 107:10,14,17
**attached** 188:25
210:17 286:7
**attain** 18:25
**attained** 18:21
30:24
**attempt** 272:24
**attempted** 278:4
**attempting** 176:15
**attend** 59:10,12,14
59:16 60:10 114:6
114:10 117:24
131:4,5 204:20
209:25 210:8
211:15,18
**attendance** 113:10
**attended** 39:12
59:14,25 60:14
89:24 130:12
131:6,8,11 147:5
152:8 200:18
210:2,3,5,7 211:12

217:23 235:9
**attending** 10:10
207:17
**attends** 73:2
**attention** 174:3
177:21 184:6
186:16 188:15
**attorney** 91:24
260:13 283:2
**attorneys** 10:9
13:7 14:16,19
238:8
**attributable**
192:21
**attribute** 200:9
**attributed** 97:21
**audience** 226:20
**audit** 101:7 196:8
196:10
**audits** 101:6,22
196:16,23,24
**august** 14:24
119:9 238:22
239:1,9
**authorize** 286:11
**automated** 263:15
263:19
**automatic** 263:15
**automatically**
264:24
**availability** 88:24
102:6 106:22
223:8
**available** 28:16
49:24 54:7 58:10
70:13 75:21 81:9
114:9,21 121:6
122:9 141:18
147:20 148:15
150:25 213:22
214:8 266:6

**ave** 284:1
**avenue** 2:12 4:16
**average** 53:4
**awarded** 274:21
**aware** 23:20 69:15
90:1 135:23
139:24 146:21
180:23 214:7
215:9 218:4 219:4
245:22 247:25
248:4 255:3,20
262:21 265:16
269:21 271:9
274:16 275:1
276:14
**awareness** 144:16
225:22

**b**

**b** 12:13
**bachelor's** 17:25
30:24 217:9
**back** 14:24 30:14
32:12 33:14 39:18
39:20 71:24 80:1
108:10 127:21
129:19 132:16,21
148:11 153:19,21
178:13,14 217:16
284:15
**background** 39:18
116:21 133:1
141:20 184:20
**ballard** 56:24 57:5
**ballpark** 52:19,24
53:14 119:1 138:6
138:24
**barberton** 91:25
113:6
**barriers** 73:18
**based** 47:15 48:19
65:2 66:23 70:18

77:17,19 78:9
115:6 133:2,13,19
133:19,25 159:4
159:24 160:15
165:9 167:25
191:4 194:14
219:21 257:21
273:25
**basic** 31:12 36:9
38:2,5 49:1,5
181:16,25 233:11
237:10 239:19
**basically** 114:20
149:5 158:10
240:12
**basis** 81:16 92:3
100:11 140:2
248:8
**bates** 31:18 68:5
162:20 183:20
184:8 187:25
188:16 204:17
209:8
**bearing** 183:19
**beco** 212:20
**becoming** 146:10
146:25 147:4
212:20 270:4
277:15
**bed** 106:22 107:2
**beds** 49:24 54:17
102:5 104:11,13
104:17,19,25
105:1,2,5,8,13
106:12,19,23,24
150:25
**began** 103:22,23
103:25 135:2
217:25 258:12
265:24 276:12

**beginning** 43:13
90:25 102:23
187:25 257:19
278:17
**begins** 111:17
**behalf** 2:3,10,15
3:2,9,14 4:2,9,14
10:13,16,19 11:3,5
11:9 255:12,21
260:13
**behavior** 120:17
122:6 133:17
**behavioral** 31:4,7
31:19 39:6 41:14
43:1 45:7 46:16
47:6 49:8,10,21
52:7 53:22 54:12
55:21 56:1 57:20
58:21 59:1,6 61:8
64:3,21 65:16
71:18 126:2 128:6
130:11 132:1
198:1 202:6 203:5
203:23 206:11
207:7 208:9
210:19 216:1
257:17 264:4,7
265:13 266:7
**believe** 30:22
129:23 164:14
192:11,18 199:14
201:8,10 219:8,20
219:22 220:14
223:13 259:14,24
271:15,19 272:10
277:8
**bell** 176:19 208:14
**beneficial** 179:19
**benefit** 45:23
117:12 205:2

**benzo** 24:23
**benzodiazepines**
24:17 171:15
222:18
**best** 90:20 255:10
**beth** 70:21 132:18
**better** 139:11
**beyond** 49:5 51:13
270:6
**biannually** 140:10
**big** 147:18,25
246:4
**bill** 165:15
**billing** 33:3 81:17
82:20 83:2 84:14
88:4,9 101:13
161:4 165:11
**bills** 165:10
**bimonthly** 95:25
**bio** 6:8 157:8
**birth** 74:15 88:6
**bit** 30:16,17 32:13
72:12 139:11
198:21 209:18
212:25 260:15
266:12
**blank** 177:6
189:10
**blind** 210:11
**board** 6:13 13:2
15:24 17:2,19
20:3 21:17,25
22:5,13,16,20,23
23:7,11,12,21
24:22 26:1,24
28:6 30:15 42:21
54:18,24 55:11,12
55:20,25 56:7,21
61:8,14 62:19
65:6,7,12,21,24
66:8,12,14,18 67:4

67:17 71:22 72:2
75:16 76:25 77:11
77:14,18,24 78:2,8
80:20 81:1 86:8
87:2,23 90:12
91:10,14 92:5,20
93:15,21 94:15
97:18 98:18 99:10
99:20 100:5
101:16 104:15,25
111:10 113:6
118:12 120:24
121:1 130:7
131:13,14,16,21
131:23,24,25
132:5,7 133:9
134:9 135:7,10,17
135:24,25 136:4,7
136:11,16,18
137:11,20 138:1
139:19 140:2,6,9
140:14 141:11,21
142:15 144:8,13
144:17 145:7,11
145:16 146:14,25
148:23,24 149:11
149:25 150:7,15
150:21 151:3,8
154:12,14,23
155:8,17 156:20
165:23 173:18
174:24 175:2
180:10,19 182:19
183:10 186:15
193:19 195:10,23
196:2 197:4 198:4
202:12,18,19,23
203:8 206:12
211:21 216:2
225:7,18 226:12
226:14 227:15

228:21 236:16,18
239:3,10 240:12
244:12 247:2,16
247:19 249:8,13
254:1 255:12,18
255:21 256:10
260:19 261:13,19
262:22 263:7,10
263:11,22,23
268:13,22 270:1
270:12,22,23
271:9 274:4,14,21
276:18,24 277:3
**board's** 25:19 26:2
135:4 198:8
260:20 261:1,7,24
**boarded** 194:20
**boarding** 79:1
149:4 194:12
**boards** 54:24 55:6
55:9,10,16 197:6
197:11
**bockius** 3:5,17
**body** 218:25
**boehm** 3:10 5:9,13
10:21,21 248:17
248:20 252:10
260:4 276:1
279:24 280:2,7
**border** 43:17
**bottom** 111:16
127:22 184:9
186:18 188:17,19
**boulevard** 2:6
**box** 167:13 168:3
**boxes** 167:12,13
239:25 240:1
**bpulsipher** 4:12
**brain** 220:1 260:2
**break** 62:6,7,17
127:15,19 129:11

129:20 198:12,20
198:21 246:16
252:15 261:15
267:14,15
**brenda** 4:16 11:8
**brenda.sweet** 4:18
**brennan** 1:21
**bridgeside** 2:6
**brief** 6:8 78:25
79:7 157:8 177:8
249:7
**briefly** 11:23
38:22 42:1 64:23
66:17 72:11
**bring** 17:13 81:11
84:16 142:19
**bringing** 115:10
**broader** 138:11
**broadlawns** 37:12
37:18 38:6,18
**broken** 88:20
**brought** 127:3
244:18
**bryant** 4:10 11:6
**budget** 92:12,15
140:8
**budgeted** 95:14
**building** 28:21
115:12 117:4
121:23 122:1
147:8
**bullet** 6:5 31:15,20
67:15,15,21 72:7
95:9 107:11
111:17,21 127:22
165:16,17 174:10
177:9 178:3
185:11
**bullets** 41:22 72:5
72:17 90:21
174:11 176:20

184:23
**bunch** 210:17
**bureau** 118:18,23
119:21 126:6,9
224:16,19 225:18
225:20 226:9,18
**burling** 4:10 11:7
**business** 254:17
254:22

**c**

**ca** 284:25
**calendar** 92:7,7
103:12,16 110:11
155:6,6,13,17
156:1,12
**california** 4:11
115:6
**call** 30:13 51:1,6
78:13 158:1 166:8
166:13,25 181:18
181:23 182:2,5
183:4 195:14
202:2 270:16
272:4
**called** 11:13 90:8
109:19 132:16,21
165:19 166:4,9
169:1 207:12
237:5 241:8,14,20
242:1,7,13,20
243:12 252:13
272:3
**caller** 182:23
194:2,14 195:15
195:15,19
**callers** 170:3
171:2,19,21,24
181:1,4
**calling** 78:12
166:20 168:10,21
181:7 270:14

**calls** 25:5,7 75:8
159:10 166:1
167:20 168:12
169:21 181:5
182:9 193:8
270:11
**cannabis** 171:19
**capability** 166:21
**capacity** 65:18
270:6 271:20
**capita** 147:19
**caption** 10:5
282:21
**caraffi** 208:1,3
**card** 30:3,8
**cardinal** 3:9 10:22
241:4 252:17,20
252:25 253:3,6,8
253:16 254:12,14
254:16,20 255:4
**cards** 29:24 30:2
**care** 33:7,9 47:9
69:18,22 70:25
78:20 142:3
196:16,17 203:15
215:22 251:10
265:6
**career** 61:1 126:1
126:2 206:18
**caregivers** 270:7
**carole** 56:24 57:5
**carolina** 2:6
**carry** 217:17
218:20
**case** 1:6,10,12,13
10:5 18:3,6 80:25
120:23 121:20
249:25 250:22
251:2 253:10,12
284:6 285:3 286:3

**categories** 83:8
105:19
**category** 172:1
237:4 275:2
**causal** 257:24
**cause** 282:12
**caused** 144:3
260:22 261:3,9,20
261:25
**causes** 123:16
224:14 258:16
278:16
**center** 37:12,19
38:18 49:23
119:12 230:20
**central** 153:6
**centre** 3:6
**century** 95:5
**cephalon** 3:2,14
241:15,17
**certain** 91:11
93:11 94:7 134:20
220:10,14
**certainly** 178:23
**certificate** 5:15
18:11,22,25 282:1
286:11
**certificates** 40:25
**certification** 39:9
39:15,22 134:16
285:1 286:1
**certifications**
71:13 96:8 134:10
**certified** 11:16
49:4 67:1 71:10
95:15 96:15
101:10 153:1
**certify** 282:8,19
283:1
**chain** 6:16 187:15

chaired 113:22
chairs 113:24
change 61:7 93:5
143:14 156:2
206:2 284:13,14
286:8 287:3
changed 53:22
223:23
changes 284:12
285:7 286:7,9
char 130:20
charge 116:9
charges 57:17
84:1,5,18,22
charleston 2:18
chart 32:5 84:12
167:8,9,11 170:2
186:17
charter 116:18
chc 27:5 181:12,23
181:23
checklist 101:7
chemical 18:14
39:9,23 133:6
134:13,23
chicago 3:19
chief 66:1 202:14
chief's 91:3,4
chiefs 73:5 157:3,3
175:21
child 18:10 38:24
39:12 147:21
childcare 16:4
children 16:3
61:25 121:25
270:5,7 272:11
children's 70:21
230:11
choice 106:16
choose 108:25
181:22

chooses 181:19
chris 56:3,18
70:19 131:17
132:19
christine 79:18
132:18
cited 123:9
cities 175:22
city 1:11 2:3 10:14
10:16 12:17 27:4
civil 11:15 281:3,7
285:5 286:5
claims 236:8 237:9
244:18
clarification
220:18 250:17
clarify 51:2 180:8
220:13 268:3
273:22 277:21
clarifying 15:11
clark 56:4,18
70:19 131:17
132:19
class 28:10
classes 28:9,20
classroom 28:22
cleaned 31:13
clear 108:17
261:18
cleared 272:1
cleve 6:22 208:21
209:9
cleveland 1:11
2:13 4:17 43:22
49:11,17,22 51:18
59:17,19 60:8,18
79:25 201:23
209:1 238:5 283:7
284:2
client 34:13 46:4
46:14 51:15 58:11

69:23 74:17 75:7
76:5 85:1 86:23
88:18 108:14
124:24 127:6
153:21 168:1
181:19 262:21
264:18,22,25
265:8
client's 32:9 181:7
clients 34:12 42:23
47:13 49:6 51:21
52:23 53:5 54:19
57:23 58:15,15,16
69:18 74:7 86:20
98:4 106:16 132:3
142:3,14 147:1
165:2,7,17,19
166:3 167:14
168:4,4,20,24,25
169:1 175:24,25
176:16 177:12
178:4,9,15,18
185:2,8,12,18
186:2,5 217:3
clinic 49:11,17,22
51:18 59:17,20
60:8,18 79:25
201:23
clinical 54:5 66:1
66:2,4 69:5 70:11
70:13,16 71:1,2,4
71:8 78:20 82:2
132:17 134:9
141:17 142:5,11
144:22,25 196:17
196:20 202:14
clinicians 50:15
closely 146:5,18
cms 31:22 32:23
33:2,13,19 36:12
36:19,24 37:2

38:8,14,19
coalition 6:21
207:21 208:20
cocaine 171:22
191:10 198:24
204:20
code 76:1 83:4
codes 75:25 82:23
cognitive 133:16
cognizant 122:2
coherence 48:16
colerain 83:11,17
83:18,21 85:15,19
90:16 158:24
159:8,17 160:16
161:5 179:3
collaborate 46:7
54:20,25 55:7
collaborated
42:20 54:18,23
collaboration
21:12
colleagues 248:13
266:20 267:5
collect 153:6 189:1
collected 47:14
77:18 140:19
collecting 106:2
college 17:21,23
18:5,12,17
columbus 18:10
18:11,16,17,18
19:1 20:14 39:11
40:5 60:11 61:22
128:13 131:10
217:19,23
combination
25:15 52:2 124:7
combined 55:15
145:5

**come** 27:10 30:14
36:13 82:16 83:7
89:8 90:16 112:21
116:20 117:25
119:12 127:10
135:19 154:20
182:18 195:10
215:10 226:1,23
231:25 253:15
274:8
**comes** 75:10 93:21
94:18 108:2 123:7
215:17 226:22
263:25
**coming** 106:18
107:4 124:5
128:24 145:7
146:25 182:7
206:22,23,23,25
207:1,8 223:25
237:25 240:11
265:3 274:21
277:12
**commercial** 234:9
234:11 244:5,6,7
**commercials**
233:16 234:1
**commission** 31:22
32:20 33:6,18
36:2,8,11,19,24
37:1 38:8,13,19
46:17,21 59:3
124:20 126:25
283:17 285:19
286:25 287:25
**commissioned**
282:8
**committee** 112:7
112:19 113:8,18
114:15,17,19
116:23 127:25

128:4,11,12,18,21
128:25 129:4,8,21
129:25
**committees** 149:6
**common** 113:4
**commonly** 191:11
199:1 200:20
**communities**
26:22 58:16 72:18
73:8 90:22,24
91:23 164:3
199:10
**community** 18:12
18:17 26:19 29:11
58:14 81:8 82:23
90:10,19,20 96:3
102:10 107:8
112:17 113:12
124:5 150:25
205:8 206:24
225:11,24 226:2,6
270:2 272:14
**companies** 4:4
241:6 243:18
245:2,17 246:4,7
252:24,25
**company** 241:7,14
241:20 242:1,7,13
242:20 243:12,20
252:16
**compared** 190:25
**comparing** 168:5
**competency** 57:14
**compile** 105:23
141:8
**compiled** 103:6
123:1 150:17,18
158:15 169:14
183:23 184:5,15
225:2

**compiles** 151:6
**complainants**
238:12
**complaint** 236:11
236:13 238:9
249:4,10,16,16
253:20,25,25
254:3,11,14
**complete** 32:6
34:8,14 40:15
42:9 44:3 47:3
80:9 101:6,22
140:8
**completed** 34:1
40:6 47:12 100:24
101:18 121:6
150:21 218:1
282:22 284:15
**completely** 145:6
158:21 265:5
**complex** 125:3
258:25 259:2,13
259:21
**compliance** 32:7
71:1 78:21 101:8
196:17
**comply** 36:19
**component** 76:12
98:13 101:2
112:23 259:15
**components** 88:8
225:21 256:5
260:3 268:11
**comprehensive**
71:25
**comprised** 132:17
**con** 22:14
**concluded** 280:14
**concludes** 177:10
**concurrently**
193:6

**conducting** 33:20
36:22,25 120:22
**confer** 266:20
**conference** 20:12
20:13 21:18 59:15
59:16,20 60:9,18
60:24 119:25
122:8 129:1 131:3
131:7 147:16,16
147:25 148:11
158:3 188:14
**conferences** 20:5
20:10 59:10,12,23
60:8,14,22 61:4
89:24 130:12,15
147:5,12
**confirm** 99:11,21
100:6 159:16
211:3 275:17,19
**conjunction** 26:11
33:5 225:1
**connect** 173:11
181:21 182:1
**connection** 255:6
257:6
**connolly** 3:10,11
10:22
**consider** 63:23
76:25 134:3
165:24
**considered** 156:20
158:6
**consistent** 260:23
**consolidated**
263:16
**consult** 46:4
**consultant** 71:11
**consulted** 255:13
255:22 256:11
**consumer** 224:8

consumers 124:12
contact 77:19 91:7
 132:4 165:24
 196:22 201:16
 263:1
contacted 65:5
 89:5 238:23
contacting 51:12
 51:22
content 120:16
 125:7 233:25,25
 234:2 244:5,7
context 25:18
 231:21 251:25
continue 54:5
 182:6 196:4
continued 3:1 4:1
 187:2
continues 188:1
continuing 40:15
 67:7 161:21
 189:21
continuously
 40:20
contract 23:9,13
 26:7 137:24
 154:22,24 155:2
 182:19
contracted 22:15
 93:12 102:1
 109:17
contracting
 137:25 139:20
contracts 23:21
 138:14 140:8
 155:4,5 247:3
contradictions
 265:9
contribute 121:2
 192:17

contributed 64:17
 121:4 192:11,13
 223:20
contributing
 123:25 124:6
 223:6,13,16
 224:10
control 48:14
controlled 251:25
convenient 30:20
conversation 16:1
conversations
 149:3,8 189:20
 249:21 250:4,23
 255:18 256:6
 262:16
coordinate 95:13
 95:18 106:21
coordinates 102:7
coordinator 47:14
 56:3,5,9,17 69:17
 69:19,23,25 70:18
 70:20,22,24 71:1
 78:21 101:23,24
 102:4 133:3,13
 142:4 189:3
 196:18
copied 209:2
coping 35:6,15
 38:3 48:24 258:9
copy 30:21 163:7
 194:24 195:3
 211:3
corner 184:9
 186:18 188:17
corporation 2:16
 4:9 68:16
correct 12:18 13:3
 17:20,22 18:23
 20:23 21:22 23:23
 26:22 28:24 38:10

39:1,7 41:16
 43:18 44:23 45:1
 49:13 53:9,12
 54:2,3 60:20
 62:22 63:18,21,22
 66:16 70:8 72:10
 75:1 78:5,6 80:24
 87:6,10,11,25
 91:13 98:20 108:4
 109:5 110:18,24
 112:25 129:9
 130:13 135:16,18
 135:22 151:15
 154:13,16 155:19
 158:18 160:16,17
 163:12,17,18,21
 164:5,8,25 165:3,8
 165:9 166:11
 169:25 170:1,4,6
 172:8,15 176:5
 178:6,7 181:2
 182:14 186:25
 187:1,3,4 189:9,14
 189:15 190:4
 193:11,24 201:12
 201:21 202:10
 224:21 227:17
 229:8,11 240:2
 254:19,21 264:1
 269:11 274:5
 282:17
corrections 107:7
 284:12 286:17
correctly 147:15
 159:13 160:12
 167:16 177:14
 189:5 191:2,13
 205:10 210:2
cost 115:22 116:4
 196:3

costs 92:2 116:3
council 113:3
counsel 62:1 68:7
 244:24 268:1,4
 269:15 273:14
 279:16,23 281:1
 281:10 283:2
counseling 18:14
 39:24 81:18 91:11
 268:24
counselor 22:24
 23:18 24:25 25:2
 27:1,8,11,22 39:5
 41:14,25 43:10
 45:8 47:7 48:8,11
 49:7,11 50:25
 51:19 52:8,16
 60:5,6,12,13,23
 93:16 130:18
 133:7 134:13
 147:6 257:18
counselors 21:13
 26:15,17,18 54:15
 58:8 72:19 73:3
 74:6,11,14 81:4,6
 81:11 82:25 84:2
 84:8,17,23 85:3,5
 85:7,9 87:25
 92:17,21 93:22
 95:24 158:4,14
 175:19 189:2
count 138:4
counties 42:21,25
 43:7 55:7,14
 58:10 90:2,4
 131:19 237:20
counting 135:25
countries 123:7
county 1:10,13 2:3
 6:9,10,13,21 10:13
 10:16 12:7,16,20

12:24 18:10 20:19
27:3 28:17 37:21
38:24 39:12 42:17
42:20,21 43:3,3,3
43:4,4,4,14,16
54:18,24,24 55:1,1
55:2,2,3,3,4,4,5,10
55:19,25 56:12,21
65:20 67:2,11
72:8 73:7 80:3
83:15,19 85:16
86:7 89:6 90:12
90:12 91:4,20
94:4 96:1 110:8
111:12,22 112:3,4
112:8 114:3,7,12
114:21 115:11,19
115:22,25 116:7
116:12 117:12
118:10 119:24
120:4,24,24
122:10,12 123:1,4
128:5 130:3
131:19 135:5,8,9
135:11,13,20,24
136:4,8,12,15,17
136:19,23 137:1,4
137:15,17,21
144:14,18 145:25
146:3,5,6,8,13,18
146:22,25 147:2
149:1,12 152:25
153:7 154:4 157:9
158:8 159:3,15
160:16,19 162:8
163:10 175:22
181:8 183:11
184:1 197:7,24
199:19 200:2
203:13 205:6,16
207:21 208:5,6,19

209:24 210:1
211:11 212:6
224:20 225:8,21
226:13 230:11,19
231:6 238:5,6
239:10 245:7,13
246:8,13 247:11
248:1,8 249:5,10
249:22 250:6,24
251:6 255:6,12,14
255:22 262:9,13
262:17 263:4
269:11,17,19,21
269:25 270:5,10
270:20 271:4,4,9
271:10,13,14
272:9 273:19,23
274:10,13 276:6,9
276:15,17,24
277:14,17 278:1,7
278:18 282:4
285:10 286:15
**couple** 60:14
127:16 135:2
150:4 154:21
158:23 161:24
206:5 234:7
236:15 268:2
273:8
**course** 205:1
206:18
**coursework**
217:12,14 218:8
**court** 1:1 5:18
11:11 13:9 107:25
112:24 113:2,5,6
252:4 285:7
**courtrooms** 97:4
**courts** 67:13
109:24 112:7
153:5

**cov.com** 4:12
**cover** 110:4
142:21 144:3
162:16 209:2
**cover2** 89:2,9
**covered** 26:6
104:18 195:7
**covering** 217:14
**covers** 104:9 144:5
**covington** 4:10
11:7
**craig** 17:16 23:16
80:17,18,21 89:3,5
89:22 91:7 132:22
172:25 225:1
256:1,9
**create** 117:2
123:11 128:16
144:3 194:19
**created** 21:14,20
29:15,15 82:24
83:6 106:3 119:18
126:22 163:1
188:25 194:13,25
194:25 225:21
226:4 265:24
266:1
**creating** 211:24
**creation** 163:23
**credentials** 71:8
134:21
**credits** 67:7
**criminal** 107:18
107:19 111:22
112:5,19 113:15
154:5 270:8
**crisis** 233:6,9
269:16,22 271:14
272:8 276:14,17
277:13

**criteria** 24:7 44:19
50:23 64:4,7
108:20
**cross** 43:15 142:21
**crosscheck** 264:20
**crushing** 261:4
**culver** 120:7
121:15
**cures** 95:6 97:25
98:4 99:25 100:9
100:11 104:7,18
104:22 105:1,5
**curious** 128:3
138:13
**current** 19:15,24
70:15
**currently** 69:16
104:17 225:4
**curriculum** 48:19
269:1,7
**curve** 176:19
**custody** 5:17
**customize** 227:10
**cut** 213:12
**cuyahoga** 1:10
6:21 12:16,20
21:1 43:2,16 55:2
56:21 91:25 158:4
191:21 207:20
208:5,6,19 210:1
211:11 212:5
238:5 282:4
**cv** 37:7,9
**cvs** 246:3

**d**

**d.c.** 3:12
**daily** 31:12 35:17
175:5
**damages** 247:11
**dan** 1:7

**dangerous**  223:24
**danielle**  2:5 10:15
**darletta**  70:25
  79:13
**dash**  37:14
**data**  77:10,12,18
  77:25 86:23 88:13
  98:25 105:11
  109:19 151:4,5
  153:6 168:5,5
  172:25 173:16
  174:12,25 175:8
  175:11 177:17
  179:21 180:1
  184:14,18 191:4
  201:5 263:13
  264:12,16 266:3,6
**date**  10:3 70:4
  74:15,19 88:6
  100:16 129:6
  146:23 163:16
  173:14 205:22
  207:10 217:24
  234:6,8 277:10
  281:11 284:8
  285:3,9,19 286:3
  286:13,25 287:20
  287:25
**dated**  188:20
  189:24 190:21
  205:22,23
**dates**  14:23 84:4
  84:24 95:18
  130:24
**dawn**  136:21
  137:2,9,18 192:9
  192:16
**dawned**  68:21
**day**  2:11 10:24
  16:10 17:11 59:16
  153:25 175:8,8

220:20 259:25
  260:14 283:7
  285:16 286:22
  287:22
**days**  49:18 284:18
**dea**  251:24
**deac**  35:12
**deaconess**  31:8
  32:16,19 34:18
  35:5 38:15
**deal**  268:11
**dealer**  279:12,14
**dealing**  143:23
  263:3
**dear**  284:10
**death**  161:18
  174:6,12 179:21
  192:12,14,17
  218:6,16
**deaths**  123:3
  175:24 176:1,3
  177:12 179:1,5
  190:24 192:8,20
  200:20 201:10
  232:7,13 271:5
  277:12
**debacco**  1:25
  282:6 283:14
**december**  70:2,4,5
  79:13 85:16 90:16
  113:21 159:22
  225:5 272:1
**decided**  61:7
**deciding**  247:6
**decision**  80:16
  219:21
**deck**  7:1 227:19
  228:2
**decline**  159:9
  190:5 193:14

**declined**  92:16
  100:17 108:24
  190:25
**decreasing**  192:8
**dedicated**  135:15
  143:9 144:4
**deed**  285:14
  286:20
**deem**  64:1
**deemed**  24:2 57:8
  133:19 284:19
**deeper**  174:7
**defendant**  253:9
**defendants**  10:20
  11:5 12:1 235:19
  235:25 236:23
  237:1,4 244:19
  245:23 250:12,22
  262:18,23 263:2
**defense**  57:17
**define**  93:16
**definitely**  147:13
  259:2
**definition**  93:18
**definitive**  90:3
**definitively**
  234:18
**degree**  17:21,24
  40:3
**delayed**  165:11
**delivered**  270:10
**delivery**  234:17
  251:9 281:9,11
**demographics**
  100:22
**dentists**  221:5
**deny**  211:4
**departing**  140:17
**department**  75:8
  75:25 81:20 84:14
  94:20 95:16

119:19 125:9
  137:3,11,13,16,21
  142:19 144:2
  208:6 217:5
  284:22
**departments**  25:6
  50:8
**dependency**  18:14
  39:10,23 133:7
  134:13,23
**depending**  140:7
  155:24 167:2
  218:23,24 219:1
  227:1
**depicts**  169:19,20
**deposed**  11:16
  15:25 16:7
**deposition**  1:16
  13:4 14:15 15:8
  17:9,12 19:3
  67:20 157:6 162:7
  183:9 187:14
  204:4 208:17
  228:1 280:14
  282:20 284:8,11
  285:1,3 286:1,3
**depositions**  16:20
  17:1
**depression**  35:15
**depth**  229:25
**des**  61:15
**describe**  41:21
  66:17
**described**  90:24
  122:15 126:9
  189:8
**describes**  72:17
**description**  6:2
  32:15 37:15 75:11
  121:11 122:16

descriptions 31:16
designated 47:4
 94:10 237:20
 274:12,13
designation 41:3
 71:9
designed 107:18
desire 142:19
desired 106:14
destroy 238:19,25
destruction 239:4
 239:11
detailed 41:22
determination
 44:22 50:22 107:1
determine 49:24
 51:15 57:15 75:22
 140:9 179:9 194:8
 196:3 219:17
 258:15 277:2,24
determined 73:24
 276:7
determining 23:12
detox 23:1,20,24
 24:1,3,21 50:13
 106:19 107:4
 153:18
develop 21:17
 63:16 216:23
 258:21 259:7,10
 259:11,17,18
developed 82:18
 115:18
developing 258:7
development 6:18
 63:5 204:6,19
diagnose 44:5
diagnosed 75:4
 258:12,14,19
diagnoses 35:9
 53:7 63:9 64:1,2

98:6 99:13 167:24
 167:25 259:5
diagnosing 64:4,7
diagnosis 44:12,24
 53:6,16 57:24
 61:23 62:20,24,25
 63:1,2,5 98:2
 100:7 257:20
 259:10
diagnostic 44:10
 44:18
diamond 1:21
dictate 37:2
die 270:19
died 178:4
difference 176:13
 178:25
different 31:4
 38:11,20 90:6
 161:13 182:21,23
 206:17
differentiate
 199:21
differentiated
 179:22 180:20
differentiating
 180:12,16,17
differently 161:7
 219:1 253:14
difficulties 96:8
difficulty 81:7
direct 66:2,4
 177:20 181:10
 184:6
directing 174:3
 186:16 188:15
directly 27:18
 65:19,23 80:22,23
 84:18 102:2
 109:14,24 116:13
 117:13,21 132:4

132:21 134:1
 135:11 140:25
 182:18 191:18
 196:7 197:21
 202:4,7 221:15,19
director 54:1,4,11
 55:20 57:19 58:1
 60:3 64:25 65:17
 66:4 71:18 80:19
 202:8,14
dis 136:20
discharge 42:16
 45:25 47:12 54:22
 216:9
discharged 34:12
 216:8
discharges 54:17
discount 246:2
discretion 36:23
discuss 83:22
 161:22
discussed 37:3
 72:11 73:10 80:15
 116:16 121:20
 128:22,25 150:18
 154:17 198:23
 200:24 231:20
 232:5,9 233:9,13
 235:7 256:17,22
 260:18
discussing 195:15
discussion 73:18
 112:22 147:13,23
 147:24 200:18
 205:18 206:7
 230:18 231:1
 243:11
discussions 106:23
 179:14 235:13
 256:19 257:1

disease 259:20,22
 259:24 260:1
disorder 44:6,15
 44:17 48:17 51:20
 51:23,25 52:13,17
 52:23 53:1,8,15,17
 59:8 63:2,6,10,13
 63:14,16,17,20,21
 63:24,24 64:5,8,11
 96:23 98:2,6,17,19
 100:2,7 108:9
 138:10 139:9
 143:10 199:16
 258:22 259:7,17
 265:4
disorders 35:22
 48:25 49:1 50:11
 57:22,25 58:2,6
 63:11 185:4 258:8
dispense 76:3
 136:21 221:9
 236:4 251:14
dispensed 262:13
dispensing 237:23
 266:12,13
distribute 237:13
 251:13
distributing
 237:17
distribution
 251:25
distributor 221:19
 246:11 253:2,12
 253:17 255:6
distributors 237:5
 237:12,16 245:20
 249:18,24 250:8
 250:12,21 251:4,9
 251:18
district 1:1,2

**division** 1:3
**docket** 97:4,7
　108:8 113:5
**dockets** 107:25
**doctor** 50:20
　124:13 127:10
**doctor's** 260:24
**doctors** 49:25
　50:17 220:23
　224:2
**document** 1:9 6:7
　6:10,13,18,20 34:4
　68:5 93:16 157:7
　157:18,23 159:6
　162:8,17,18,22
　183:10,19,21
　188:16 189:1
　195:3 204:5,10,16
　204:22 205:22
　208:18,25 209:10
　210:13,16 211:2,5
　227:23 229:18
　239:4,8,10
**documentation**
　31:21 32:6 34:2
　37:4 38:8,13
　46:21 101:13
**documents** 15:7,9
　149:10 161:25
　188:25 190:16
　228:22,25 238:16
　239:15,17,19,23
　240:1,6,7
**doing** 13:21 49:21
　83:13 85:20 86:3
　106:24 112:16
　116:8 120:19
　122:12 197:10
**dollar** 23:9 92:24
　104:23 274:20

**dollars** 269:9
**door** 81:9
**dotage** 252:11
**double** 163:8
　188:18
**doug** 16:7 69:4
　71:3 175:4 256:1
　256:9
**downtown** 18:18
　131:9
**dr** 16:12 17:4
　64:22 65:7,16,22
　66:11 70:17 71:3
　71:15 125:10
　132:19,24 133:1
　134:3,11,19 175:4
　201:16,20 202:5
　202:22 203:4,11
　203:12 225:1
**drawer** 228:25
**drifted** 222:1
**drive** 3:18 82:1
　141:3
**drug** 2:15 67:12
　68:15 75:5 107:25
　112:24 113:2,5,6
　174:6,11 177:11
　178:5 214:3 246:2
　249:17,24 250:8
　250:11,21 251:3,9
　251:17,21 255:6
　278:10
**drugs** 171:11
　191:10 262:22
**dsalerno** 2:8
**dsm** 44:20 64:5,8
　64:12,13,18
**dual** 48:17 53:6,15
　61:23 62:20,24,25
　257:20

**dually** 258:12
**due** 113:20 179:10
　258:8
**duly** 11:16 282:7
　282:10
**duties** 37:25 69:6
**duty** 51:7
**dying** 192:1 271:6

**e**

**e** 3:10 4:10 6:16
　15:11,13,17,22
　61:15 140:15,21
　150:5 157:1 175:4
　175:5 187:9,15,24
　188:3,18,24
　189:22,23 190:20
　197:15 198:22
　209:2 210:17,18
　210:18,21 211:3,4
　238:25 240:3
**earlier** 38:22
　72:12 130:10
　135:14 150:18
　151:12 154:18
　165:5 168:12
　189:8 206:5
　222:19 223:5
　253:13 254:4
　257:5 260:18
　262:18 266:11
　273:25
**earliest** 265:11,15
　265:15
**early** 40:23 206:6
　278:23
**earmarked** 94:10
　94:16 136:8,13
**easily** 224:11
**east** 1:21 2:18
**eastern** 1:3

**ebbed** 143:6
　190:10
**edit** 151:7
**edits** 158:14,22
**educate** 136:20
　146:9 225:24
　226:1
**education** 18:13
　35:24 38:3,5
　39:21 40:15 41:6
　49:1,6 67:7
　115:19 116:19,20
　119:11 225:23
　230:19
**effect** 103:20
**effective** 102:3
**effectively** 168:19
**effectiveness**
　175:12
**effort** 277:16,23
**efforts** 114:23
**either** 16:11,15,18
　16:22 21:6 33:18
　34:19,24 35:20,20
　36:1 38:15 56:14
　70:10 76:2 96:16
　108:22 149:19
　168:13 197:8,8
　201:19 217:7
　283:2
**electr** 240:13
**electronic** 32:4
　172:16,17
**electronically**
　172:14 240:10,14
**elicited** 180:25
　181:3
**eligible** 108:13,14
　108:16,18 109:3
　166:19

**ellington** 70:17
132:20 134:3,11
134:19
**ellington's** 133:1
**ellis** 4:15 11:9
**email** 284:17
**emergency** 50:8
50:15 159:9
**emerging** 205:6,7
205:14
**employed** 31:3
49:16 96:25 146:6
146:10 147:4
149:13,22,23
152:7 153:2 175:1
201:18 226:6
257:16 268:22
269:25 270:22
271:8 276:7 277:8
277:10,15
**employee** 41:18,19
**employees** 226:2
**employer** 254:9
**employment** 19:25
20:1 30:17 257:19
271:12 276:13,25
277:1
**enclosed** 284:11
**encourage** 168:17
**encouraging** 122:7
**endo** 4:2,3 11:3
241:21,23
**ends** 184:7
**enforcement**
38:24 112:6,16
206:8 251:21
**engage** 46:6 86:21
161:15 176:16
197:4
**engaged** 74:3
76:16 86:2 99:17

100:14 161:17
198:4 255:18
**engagements**
119:2,4
**engaging** 179:17
190:12
**enhance** 227:6
**ensure** 101:8
**ensured** 184:20
**entailed** 197:18
**entails** 214:14
**enter** 109:19 165:7
**entered** 86:2
160:10,21 165:2
177:12 178:4
185:12,19 286:9
**entering** 165:18
**entire** 49:22 59:2
285:5 286:5
**entities** 91:18
105:4 153:3
186:10 237:15
**entity** 101:11
130:6 132:8 135:7
154:10,11
**entry** 32:14
**epidemic** 7:1
119:22 122:16,20
123:14,17 125:3,3
125:15,20 126:14
145:25 146:3,13
147:8,10 211:10
212:13 222:20,22
222:25 223:7,14
224:15 228:3
231:11 276:8
277:4 278:17
**eric** 16:6 17:13
69:23 73:12 80:8
82:12 86:19
105:23 140:17

141:1,7 150:17
151:20 152:7,8,10
163:1 169:15
175:1 177:3
183:23 184:15,19
201:18,19
**eric's** 141:11
**errata** 284:13,18
286:7,10,18 287:1
**esc** 230:19
**especially** 205:8
**esq** 2:5,5,11,17 3:5
3:10,18 4:5,10,16
**essentially** 135:20
156:12
**estimate** 92:19
139:1,19 143:4
**et** 1:10,12,13,13
**evaluated** 179:21
198:8
**evaluating** 70:9
76:24 115:22
162:4 175:11
180:10 196:6
**evaluation** 57:15
115:21
**evening** 17:8
39:13
**event** 119:8,10
283:3
**events** 15:14 118:5
118:20
**everyone's** 218:25
**evidence** 70:18
133:2,13,19,19,25
**evolved** 233:19
**ex** 156:22
**exacerbated** 223:2
**exact** 14:23 82:8
110:15 123:10
160:25 207:10

**exactly** 121:10
253:23
**exam** 18:24 40:8
**examination** 5:7
11:14,18 40:7
248:16 260:10
267:22 273:10
275:25
**examiner** 174:25
175:6,7,11 179:22
191:5,7 275:19
**examiner's** 174:22
175:3
**example** 99:25
181:8,22 191:20
226:21 262:8
**examples** 271:17
**excel** 81:23 84:9
84:25 86:17 189:1
**exception** 12:21
55:9
**excess** 137:13
**exchange** 136:22
137:6,22
**executed** 286:10
**execution** 285:14
286:19
**executive** 80:19
**executives** 135:13
**exhibit** 5:17 6:3,5
6:7,10,13,16,18,20
7:1 19:3,10,12,19
30:19,21 31:18
37:9 67:20 68:2
68:24 71:24,25,25
80:1 90:22 95:10
107:11 111:15
127:17,21 157:6
157:14 158:12,20
162:7,15,24 174:5
183:9,17 184:3,7

184:24 186:17
187:14,21,24
190:20 198:22,23
204:4,11,13,18
208:17 209:5
210:23 228:1,9,12
229:19 230:1
239:14 240:15
**exhibits**  5:5,18 6:1
16:19
**exist**  129:8 145:6
**existed**  21:25
129:4
**existence**  118:10
130:7 251:22
**exit**  34:13
**expand**  143:20
**expanded**  113:11
**expanding**  271:20
**expect**  36:18
170:10
**expectations**  36:3
**expenses**  247:17
**experience**  63:3
85:10 96:16 97:15
142:21
**experienced**  179:4
231:10
**experiences**
121:19
**expiration**  285:19
286:25 287:25
**expires**  283:17
**explain**  31:25
33:25 62:23
**explained**  13:8
**explore**  42:10
**extent**  16:1 253:25
**extremely**  124:5
259:21

**eyes**  161:14
191:24 192:2

**f**

**f**  3:3,15
**facade**  124:20
223:21
**face**  50:9,9
**facilitate**  32:3
35:21 38:2 72:20
**facilitated**  33:21
34:3,3 35:3 42:13
**facilities**  32:22
33:8,9 34:19,25
35:10 36:18 43:22
101:14 124:23
**facility**  33:1 34:12
35:20 36:1 38:12
43:11,19 47:8
52:9 58:23 275:9
275:10
**facing**  73:19 233:7
269:21 271:14
**fact**  107:17 137:16
184:10 221:13
**factor**  109:10
161:5 224:11
257:25
**factors**  123:25
124:7 125:4 220:7
223:6,13,17 258:8
259:3
**facts**  184:23
**factual**  238:8,11
**fair**  14:6 126:1,2
203:24 258:23
261:7,23 269:9
278:18
**fairly**  75:5
**fairview**  50:5
**fall**  118:6 119:7
121:8 126:1

150:22 172:3
203:23 213:6
275:2
**falls**  21:2 91:25
158:4 191:21
**familiar**  184:22
244:17 245:19
251:20 263:13,20
263:21
**familiarity**  263:24
264:14
**familiarize**  147:3
**family**  49:19
270:15,16
**far**  13:21 27:17
34:21 42:16 51:13
52:22 56:9 63:25
73:23 78:25 81:6
82:17 89:18 95:18
103:22 125:6
134:13 143:10
153:9 156:6
197:17 215:21
220:13 224:11
241:10 244:5
250:14,16 253:5
253:22 254:9,14
260:9 261:12
266:5 270:20
276:22 277:12
**farther**  165:14
**fashions**  90:6
**fatal**  174:21
175:14
**fda**  214:9,12
218:13 234:21
**fearful**  192:1
270:13
**feasibility**  115:10
116:15

**feature**  227:9
**fed**  42:25
**federal**  11:14
**fee**  40:16
**feedback**  47:15
116:22 197:19
**feel**  30:18
**feinstein**  3:5 5:8
5:12 10:18,19
11:19,24 62:4,9,15
62:16 68:4,13,17
68:20,22 127:14
129:10,17,18
157:19 198:11,18
198:19 204:15
210:14,22 211:6
246:15,23,24
248:11 268:19
269:12 270:24
271:7 273:7,11
**fell**  60:22
**felt**  45:23 61:19
192:5 199:13
**female**  191:22
271:24
**fentanyl**  170:5,8,8
170:17 171:4
232:6
**fidelity**  198:1
**field**  61:21 85:11
152:11
**fifth**  124:21 127:1
164:14 223:9
224:8
**figure**  92:9 116:6
**figures**  92:24
**figuring**  58:18
145:3
**file**  228:25 229:10
**filed**  249:4,10
255:15 256:13

files 229:2
filing 251:1 253:20
filings 246:1
  253:18
fill 106:25 107:2
  141:21 266:16
filled 69:11 80:12
filling 69:7 251:16
final 121:8
finance 27:19
  81:20 84:15,15
  92:10 93:12
financial 155:17
find 210:12 239:24
  284:11
fine 12:9
finishing 155:11
fire 73:4 91:3,15
  157:3 159:21
  175:21
first 11:15 14:24
  20:17 22:8,21
  25:25 40:23 44:14
  45:15 59:25 60:9
  60:24 64:11,12
  72:7,14,25 85:6
  88:23 95:8 101:18
  118:11 127:24
  128:2,17 129:5,24
  130:23 143:8
  144:7 146:2,21
  147:11,16,23,25
  148:11 149:13,22
  149:23 156:20
  159:5,10 160:4,5
  161:20 162:14
  163:5 164:19
  173:7 175:19
  177:17 179:15
  185:1,24 186:17
  190:20 194:25

201:15 207:6
210:7 212:4
217:22 230:10
234:24 238:23
258:15 269:16,20
270:22 282:10
fiscal 110:11 111:2
  155:6,13,14,21
  156:1,4,13
fit 61:19
five 64:15 82:9
  99:2 167:23 171:6
  171:9 186:20,24
  193:9
fix 276:2 280:3
flexibility 61:24
flip 178:13 188:2
  246:16
floor 3:6 38:1
  73:18
flow 54:17
flowed 143:7
  190:10
focus 35:3 61:20
  97:1 113:7 147:22
  148:1
focused 23:25
  48:16 96:21,23
  97:12 142:24
  147:17,18
focusing 114:20
folder 82:2
folks 26:11 53:16
  78:13
follow 33:8,10
  42:22 82:20 146:5
  146:17 194:7
  197:15 257:3
  270:3 273:8
  276:24

following 87:2
  89:8 275:14
follows 11:17
followup 20:20
  99:18
food 95:22 214:3
force 112:4,19
  113:16 114:3,8,13
  115:16 116:12,25
  117:7,9,23 118:10
  118:17,19,24
  130:3 149:14,19
  149:21 150:2,11
  184:1 200:17
  203:13 204:1
  208:5 210:1,10
  211:11 212:6
  224:20 225:9,12
  225:15,19,22,24
  226:3,5,11,13
  235:11
foregoing 282:16
  282:21 285:13
  286:18
forensic 56:4,17
  57:6,7 70:19
forget 158:16
form 53:2 63:7
  78:7 82:14,16,18
  82:24 83:6,9
  84:25 91:24 98:24
  103:1 105:21,22
  105:24 106:3
  124:1 125:5,16
  130:19 136:1
  143:17 146:15
  148:18 160:11,21
  178:16 180:7
  193:12 199:7
  200:21 202:3
  206:3,15 211:13

212:7,9,16 215:5
215:13,20 216:21
218:7,17,22 219:6
219:11 220:3
222:10,24 223:15
234:16 239:13
254:5 255:16
256:14 258:1
259:1,23 266:10
268:19 269:12
271:7 276:10,20
277:5,20 278:2,12
278:19
formally 65:12
format 81:21,23
  82:10 119:17
  162:17
formed 114:18
  119:18 145:4
  219:14
forms 88:12 92:22
  92:24
formu 119:18
formulated 125:9
forth 149:6 153:5
  184:23 225:16
forward 48:6 89:7
  99:1 189:21,23
  233:19 284:15
found 89:15
  240:16
four 14:17,21
  37:21 49:18 72:16
  91:22 119:2
  151:25 171:11
  270:17
fourth 107:11
frame 34:17 37:8
  49:10 82:9 130:16
  193:16 218:2
  228:23 235:2

265:10,11,19
**francisco**  4:11
**franklin**  18:9
   38:24 39:12
   115:25 116:7
**free**  30:18 285:14
   286:20
**freeman**  56:4,18
   70:19 131:17
   132:19
**frequently**  84:5
   113:25 140:5
**friday**  188:20
**front**  4:11 123:23
   138:3,7 211:8
**fruition**  115:20
**full**  12:2 41:18,20
   103:11 159:5
   236:11
**fund**  22:24 27:22
   66:21,22 81:18
   99:3 104:17 108:1
   135:8 137:5 196:4
   273:21
**funded**  22:20,22
   23:4 24:1,22 26:9
   86:21 87:4,17
   93:24 94:1,3,4
   95:5,7 103:24
   105:8,13 107:12
   109:15,25 165:7
   173:17 186:8,10
   268:13 274:4
**funder**  154:8
**funding**  23:1,5
   26:25 27:7,7,10,16
   27:18 28:1 91:19
   91:23 93:21 94:3
   94:14,15,18,21,25
   95:19 97:24 98:4
   99:24 100:12,13

104:8,20,23 105:3
107:21,25 108:2
109:22 110:7
115:12 117:3
128:22 135:10
137:10,12 156:10
156:11,12 196:8
268:25 273:16,17
274:14
**funds**  27:1,21
   33:14 104:1,15,25
   105:1 109:16
   110:13,13 111:11
   121:2 135:19,23
   136:8,12 137:1,14
   137:16,18,21
   154:14 273:14,20
   274:8,11,11,14
**further**  39:20
   42:10 51:15
   248:12 264:22
   273:6 282:19
   283:1
**future**  177:7

**g**

**gap**  135:2
**garfield**  269:4
   274:24
**gather**  88:13
   189:13
**gathered**  103:16
   105:12 239:15
   240:4
**gathering**  184:13
   229:4 239:16
**geared**  233:17
**geauga**  43:4 55:1
**gender**  272:20
**general**  22:7,8,11
   23:8 91:24 98:21
   168:10 215:9

233:5 252:23
253:3 254:22
**generally**  25:20
   139:3
**generated**  149:20
**generation**  269:1
   269:6
**genesis**  126:14
**geriatric**  35:13
**gestures**  13:22
**getting**  31:13 80:1
   96:8 115:25
   155:12 190:3
   191:8 224:3
   252:11 260:9
   270:11
**gi**  119:3
**give**  12:7 17:11
   42:22 44:10,12,18
   50:18 52:19,24
   85:17 90:17
   106:15 110:12
   119:1 121:11
   124:25 125:22
   138:6,25 141:9
   143:4 181:25
   188:12 190:16
   200:5 215:15
   281:1,10
**given**  14:11 28:4
   28:18 29:1 82:15
   92:14,19,23
   114:11 118:16
   182:4 200:4
   215:24 219:19
   223:22 224:14
   226:17 230:2
   282:13,18
**gives**  136:24
**giving**  114:14
   143:10 190:6,13

224:3
**glanced**  229:24
**glean**  51:25
**go**  18:5 25:5,6
   27:9 29:17 41:17
   49:5 51:12 54:8
   76:12 77:19 79:23
   85:10 86:9 87:8
   87:15 96:10
   106:17 118:20
   127:18 132:5
   137:13 141:2
   153:18,19 201:13
   201:16 210:9
   266:19 277:19
   278:9
**goal**  39:19 114:16
   185:25 272:22
   273:1
**goals**  37:6 156:23
**goes**  139:22
**going**  13:8 19:9
   62:2 68:1 75:24
   76:2 114:22
   118:13 127:12
   128:23 140:10
   157:13 161:24
   170:20 173:10,11
   181:10,12 183:16
   187:20 191:19,24
   192:10 204:10
   208:25 212:21
   214:19,20 224:4
   227:22 246:16
   248:13 259:7,9
   260:4 267:13
   270:24
**good**  11:20,21
   17:15 61:19 62:3
   85:11 117:1
   127:19 185:22

211:1 214:13
248:18 260:12
271:20
**gosh** 88:4,8 111:16
164:13
**govern** 251:16
**government**
135:24 136:15
273:24 278:7
**grader** 121:21
**grandmother**
272:5
**grant** 27:13,15
91:24 94:19 188:6
268:25,25 269:9
274:12,19,23
**grants** 27:24
128:23 136:3
268:16,17,21
273:12,15,21
274:6,8,15,17
275:1,3,4,5,5
**graph** 176:19
**graphic** 169:8
**grass** 118:4
**great** 13:21 45:13
45:13 139:10
223:4
**green** 91:25
**greg** 89:1,10
**group** 32:3 34:4,9
37:3 93:17 96:12
98:8 134:9 142:11
153:6 211:16
227:2
**group's** 34:7
**groups** 29:19
31:12 32:7 33:20
34:2 35:2,4,14,21
36:23,25 38:3
42:13 48:15,22

96:22 98:8,11
230:23
**growing** 147:13
**guide** 29:14,23
**guideline** 82:15
**guidelines** 33:19
37:4 126:25 156:7
156:7
**guides** 29:10,13
**guilty** 57:9

**h**

**habit** 220:3
**half** 17:6 60:25
143:16,16
**hall** 119:6,16
122:15
**hallway** 121:22
**hamilton** 83:19
**hand** 19:9 68:1
117:5 157:13
162:14 183:16
184:9 186:18
187:20 188:17
283:6
**handed** 183:25
**handing** 228:8
**handled** 79:17
182:9
**handles** 23:5,11
**handoff** 173:13
181:11
**handout** 117:6
**handwriting**
227:24 228:11
229:13
**handwritten**
240:15,17,19
**happy** 62:7 161:19
**hard** 252:11
258:14

**hardcopy** 239:23
240:1,7,21
**harm** 124:15
**head** 23:3 25:16
154:20 161:1
187:7 207:24
208:15 209:12
216:16 219:7
232:16 252:3
256:20
**health** 3:9 4:3
10:22 27:4 31:4,8
31:19 32:4 33:7,9
35:8,10,17 37:14
37:23 39:6 41:14
48:25 49:4,10,21
53:11,22 55:8,12
55:16 56:3 57:11
57:11 63:1,5,8,11
63:13,16,20,24
64:1,3 65:16
94:20 95:17 96:13
96:16,18 101:1
120:25 123:1
126:2 128:6
136:19,23 137:1,3
137:5,11,12,14,15
137:17,21 142:13
142:25 167:15,24
169:1,5 172:19
173:21 203:14,24
207:7 208:7,9
210:19 251:10
252:17,20,25
253:3,6,9,16 259:4
259:10 269:16,22
**healthcare** 43:1
45:7 46:17 47:6
49:8 52:8 54:12
55:22 56:1 57:21
58:21 59:2,6 61:8

64:21 71:19
130:11 132:2
198:1 202:6 203:5
206:11 216:1
257:17 264:4,7
265:13 266:8
**healthy** 48:23
**hear** 47:23 86:12
148:20 222:25
235:5
**heard** 89:22 90:9
147:23 209:23
235:3 241:5,7,9,14
241:20 242:1,7,13
242:20 243:5,10
243:12 251:2
252:12,16,24,25
253:2,14 254:23
254:25
**hearing** 252:11
267:11
**heartland** 116:2
**held** 39:3 40:20
59:17 69:20 73:6
**help** 29:19 58:9
178:17 196:21
205:25 211:24
**helped** 105:23
192:16,18
**helping** 176:16
**helpline** 29:25
30:10,11 78:11,13
78:19,22 79:2,9,12
88:17 97:9,11,24
98:9 102:8 120:3
144:5 165:20,24
166:2,4,5,9,9,12
166:23 167:5,14
167:22 168:5,10
169:2,9,15 170:20
170:25 172:12,13

173:5,6,12,17,20
173:25 178:14
180:24 181:4,9
182:11,12 185:13
185:21 186:1,4,7
186:11,13,21
193:8,22,25 194:6
194:23 195:1,4,14
195:21
**helps** 135:8 220:22
**hereinafter** 11:16
**hereunto** 283:5
**heroin** 170:3
171:3 213:20
232:5
**hi** 248:19
**high** 114:25 115:3
115:10,23 116:1,2
117:1 124:5
148:14 269:4,7
274:24
**higher** 143:1,3
191:12
**highest** 106:17
231:17
**highly** 106:14
**hipaa** 214:24
**hired** 79:13 143:8
144:19
**historically** 124:4
142:18
**history** 30:17 42:7
42:11 107:19
142:20 215:7,23
**hit** 228:23
**hits** 7:1 228:3
**hold** 40:10,24 41:1
181:25
**home** 7:1 12:15
61:25 228:3

**honest** 227:12
265:5
**hopefully** 211:24
**hopes** 103:9
**hoping** 185:23
**hospital** 31:8,9,20
32:16,19,19 34:18
34:18 35:5,12
37:22 38:15 42:5
42:15,22,24 43:15
45:25 47:2 49:2
50:4,6 52:5 53:5
54:15 57:2,4,12
58:12 131:18,20
146:7,24 207:2
210:19 216:8
264:18,23 265:6
**hospitals** 36:13
38:21 198:2
**host** 73:9
**hot** 147:18
**hour** 62:2 93:10
95:23 127:13
**hours** 14:21 15:6
40:15 49:20 150:4
**house** 21:1,13 22:5
22:13,14,17,23
23:6,13,21 24:21
25:1,20 26:3,12,14
26:17 27:2 100:13
101:21 103:15
106:3 153:22
154:2,7,11,15,24
155:2 158:15
**housing** 15:18
29:18 66:25 95:7
97:13 98:3,12,14
98:16,23 99:2,7,15
99:16 100:12
101:2,5,9,11,20
102:2,5,11,12,15

102:21 103:4,13
103:20 104:2,10
104:13 105:2
106:1,6,12,13,15
106:17 110:2
143:22 145:21
150:25 152:22
153:3,10,14,19,23
196:24
**hudson** 89:13
**huh** 37:11 62:8
80:4 88:1 100:3
111:19 117:18
127:14,20,20
129:22 142:9
152:16 156:14,16
163:13 168:6
169:7 171:5
176:21 177:23
186:19 188:21
199:2 205:24
228:10 273:9
**human** 132:16
**hutzell** 16:6,12
17:7,13 69:23
70:3 73:12,21
79:23 80:9 82:12
82:14,25 83:7,15
83:20 86:19 87:20
88:2 105:23
140:17 141:1,7
150:17 151:13,20
163:1,20 164:9
176:6 177:3
183:23 184:15
189:16 201:19,22
**hutzell's** 80:11
173:3

**i**

**iddt** 48:17
**idea** 24:18 117:1
173:9 176:25
223:22 233:17
277:6 279:15
**identification** 19:7
19:10 67:24 68:2
157:11,16 162:12
162:15 183:14,17
187:18,23 204:8
204:12 208:23
228:6,9
**identified** 75:7,8
88:18
**identifies** 105:18
182:23 194:7
**identify** 10:10
19:12 76:1,19
88:19 109:24
179:23 180:13
248:6 260:21
261:2,8,24
**identifying** 180:4
**iii** 64:13
**illicit** 78:4,10
105:19 148:8
170:8 179:23
180:6,14,18
182:25 183:6
201:2,8 232:3
**illinois** 3:19
**illness** 38:5 39:5
41:25 43:10 53:11
167:15 169:1,3,5
257:7,24 258:3,5,7
258:14,20,24
259:6,14,16,19
**immediate** 165:13
**immediately**
181:10

**impact** 152:14,19
152:21 177:11
179:18 270:2
**impacted** 272:9,11
272:14,15
**impacting** 223:3
**impacts** 260:2
**implement** 90:13
115:22 188:7
**implementation**
20:18 211:23
**implemented**
120:4,10 269:5,6
**implementing**
67:10 85:22 90:5
156:21 159:11
160:18 161:14
163:3 265:24
**important** 13:20
83:2 175:10,11
177:22 178:3
183:3
**impression** 44:10
44:19 192:25
**improper** 262:8
**improperly**
262:12
**improve** 161:22
**improvement**
69:17,24
**incarceration**
57:12
**incident** 83:23
275:15,20
**include** 51:8 74:20
75:11,17 115:21
117:19 122:21
123:19 193:9
218:15 268:10
**included** 28:15
33:24 46:11 64:5

64:11,12 74:13
83:1,1,8 86:17
216:9,12 218:15
223:8 224:17
284:13
**includes** 87:13
142:23 170:2
172:1 173:4
215:18 216:4
**including** 64:8
83:22 122:16
**inclusive** 124:12
**incompetent** 57:9
**incorporated**
286:12
**increase** 123:2
199:9 207:4
225:22
**increased** 63:9
192:10
**increasing** 147:14
**increments** 93:10
93:11
**independent** 41:2
133:6 134:12
250:10
**independently**
47:13
**index** 5:1,5 6:1 8:1
**indicate** 170:11
251:3 275:24
**indicated** 76:15
100:15 249:3
252:16 276:5
**indicates** 31:17
165:1 171:2
**indicating** 117:6
238:25 270:16
284:13
**indication** 191:20

**indicative** 176:12
**indigent** 58:12,15
**individual** 30:12
42:10 44:14 46:9
48:19 57:8 81:8
87:3,8 96:14
108:20 153:15
166:1,19 167:20
168:12 169:20
171:13 207:25
213:9 219:25
220:4 221:25
222:8 260:22
261:9,25 265:3
266:2 270:15
271:24
**individually** 69:5
76:21 90:19 141:5
**individuals** 28:13
28:16 29:17 35:8
42:4,14 44:4 45:6
48:12 50:6 52:16
52:25 57:13 63:1
63:8,12,15,19,25
74:1,3 75:2 76:2
76:14 86:1,9
87:14 96:17,19
97:5,6,22 98:1,5
99:4 100:14,23
106:15,18 107:4,5
107:18,24 108:7
148:5 153:16
160:10,21 161:3,7
161:16 166:25
168:10,23 175:14
175:15 179:16
190:12 192:3
199:11,16 211:25
211:25 219:12
223:4 224:12
226:8 235:22

237:19 258:2,6,11
258:17 259:4,5,16
271:22 273:3
**inducted** 108:23
**infant** 147:21
**informal** 28:9
**information** 15:12
16:23 25:17 29:16
29:21 30:7,9 36:1
50:18,19 51:25
73:16 74:5,13
75:20 77:20 82:13
82:19,21,22 83:2,3
84:10,21 86:17,18
86:19,25 87:13
88:3 90:13 91:5
92:11 98:18 99:5
99:8,12,18,19
100:10,20,21,22
100:22 101:1
103:16 105:16
121:15 124:12
141:6,9 148:24
149:17 151:1
152:3,6 159:24
164:10 165:12
166:21,22 169:17
169:25 173:5
175:17 176:7
180:25 181:3,17
182:6 183:2
184:20 188:10,13
189:14,18 190:7
190:14,17 191:7
191:16 192:23
193:19 194:1
195:17 197:19
200:4,5 201:14,17
207:19 212:3
215:2,3,10,17,19
216:3,4,10,11,13

217:10 218:14
231:5,9 238:12
239:8 240:11
245:9 249:7 255:9
260:16 261:15,17
275:16
**informed** 124:8
**initial** 61:22
126:16 132:14
147:16 194:11
**initially** 46:3
49:19 149:24
206:4 238:23
258:13
**initiated** 118:12
**initiatives** 128:16
133:16 212:21
225:15
**input** 163:22
164:7 235:15
**insanity** 57:9
**insert** 215:4
**insight** 48:20
258:5
**instances** 171:16
**institute** 60:11,16
60:17 131:9
**instructions**
215:11 260:24
281:2,10
**insys** 242:2,4
**intake** 49:10,21
50:24 51:18 88:12
**integral** 67:9
**integrated** 48:17
**intensive** 45:24
**interact** 213:7
**interacted** 263:9
**interaction** 131:22
244:13,22 245:1

**interchangeably**
213:16
**interest** 91:8 180:3
180:11 257:11
**interested** 62:19
175:17 283:3
**interesting** 39:19
**interface** 50:1
55:24 56:14,20,23
208:8
**interfaced** 57:24
**internally** 20:3
**internet** 132:11
**interns** 105:25
**interrupt** 68:19
**interval** 140:25
**interview** 70:11
132:10,12,13,14
132:17,21,23
141:13,16,19
202:21,25
**interviewed**
141:11
**interviewing**
133:17
**introduced** 248:21
**introducing** 149:5
**investigated**
278:16
**invite** 73:3
**involve** 46:20
50:10 51:19 52:11
57:21 77:7 106:10
146:9
**involved** 34:23
52:16 75:12,17
76:19 77:1 83:23
94:25 105:13
107:24 108:8
122:8 125:11
145:20 150:14

153:22 180:4,12
195:24 197:20,22
212:20 230:13
231:1 247:22
257:20
**involvement**
101:20 107:19
128:10 131:15
154:1 184:2
**involves** 72:7
75:23 197:13
**iop** 107:7
**iowa** 37:20
**ish** 130:22
**issue** 64:3 109:8
144:14 146:17,22
147:7,14 148:25
149:11 223:3,20
**issued** 274:23
**issues** 35:17 48:13
97:7 105:14 122:1
138:2 139:16
143:5 144:10,18
178:19 223:21
259:12 260:17
**item** 27:17
**items** 72:6 114:4
124:2,17 173:15
179:12
**iv** 44:20

**j**

**j** 1:25 282:6
283:14
**jackie** 132:15
**jackson** 2:17
68:15
**jacksonkelly.com**
2:19
**jail** 57:12
**janssen** 4:14 11:9
242:8,10

**january** 1:18 10:3
15:3 29:15 72:14
169:23 173:7,8
283:8 284:4
**jerry** 23:15 80:17
89:2,5 91:7
132:22 172:25
225:1 256:1,8
**jill** 2:17 68:14
267:8
**jmcintyre** 2:19
**joann** 56:2 69:22
132:18
**joanne** 131:17
**job** 6:5 13:21
31:16 41:24 42:3
46:19 61:15 67:15
67:21 69:6 141:24
203:2 205:2
271:20
**jobs** 20:2 37:25
**joe** 4:21
**johnson** 4:14,14
11:9,10 242:14,14
242:16,17
**join** 61:8
**joined** 17:18 26:1
65:20 71:21 130:7
131:12,24 144:7
144:10,13,17,21
146:14 148:23
164:3 202:19,22
276:18 277:3,4
**joining** 28:5
134:17 149:25
**joint** 31:21 32:20
33:6,18 36:2,8,11
36:19,24 37:1
38:8,13,19 46:17
46:21 59:3 124:20
126:25

**jones** 2:11 10:24
**jonesday.com**
 2:14
**judge** 1:7
**judgment** 219:17
**july** 78:23,23 79:4
 79:19 110:10
 155:15 156:5
 169:23 195:7
**jumps** 168:4,24
**june** 129:2 155:15
 156:5 158:18
**justice** 107:19
 111:22 112:5,19
 113:15 154:5
 270:8

**k**

**k** 3:3,15
**kaye** 4:5
**kearse** 2:5 5:11
 10:12,12 52:20
 53:2,18 62:1 63:7
 68:7,18,21 78:7
 124:1 125:5,16
 127:12 130:19
 136:1 143:17
 146:15 148:16,18
 170:12 180:7
 193:12 199:7
 200:21 202:3
 206:3,15 210:11
 210:20,25 211:13
 212:7,16 214:19
 215:5,13,20
 216:21 218:7,17
 218:22 219:6,11
 222:10,24 223:15
 239:13 248:15
 252:8 254:5
 255:16 256:14
 258:1 259:1,23

266:10 267:13,23
267:24 273:5
276:10,20 277:5
277:20 278:2,12
278:19 279:16,22
280:1,5,9 284:5
**keep** 228:21
**kelly** 2:17 68:15
**kenmore** 269:4
 274:24
**kent** 18:1 39:17
**kept** 172:13,14
 228:22
**key** 88:8
**kids** 270:6
**kimberly** 1:17 5:7
 6:3 10:7 11:13,18
 12:4 19:4 248:16
 260:10 267:22
 273:10 275:25
 282:9 284:8 285:4
 285:9 286:4,13
 287:20
**kind** 41:25 60:22
 72:4 81:11 90:7
 111:16 114:16
 115:19 126:13,21
 128:17 130:16
 138:22 141:20
 143:20 159:4
 162:3 166:14
 189:22 196:21
 220:19 229:24
 233:11,16,18
 249:6
**kits** 136:21 192:9
 192:16
**kmorrison** 2:14
**knew** 237:18
**know** 7:2 12:10
 14:1 23:7 24:20

24:24 25:12 26:5
26:7 27:12,13,16
27:18,19,20,21,24
33:16 34:16 46:16
47:5,20 52:18
56:9,25 58:22
59:13,13,24,24
60:1,21 62:7
64:10 65:9,25
66:5 71:7,12,17,21
73:23,24 75:14
77:5 79:21,24
80:14 82:8,13,17
85:15,17 90:3,4,7
91:18 92:1,4,5,10
93:3,5,20,23,24
94:1,9,13 103:15
103:19,23,23
104:1,14 105:16
109:11 110:7,15
111:1,4,9,13
114:16 116:7
118:6,9,11,12
119:5 120:16
121:3,4,5 123:5,9
123:10 124:24
125:10 126:20
128:6 129:3,6
131:6,11,13 133:3
133:10 134:18,21
134:22 136:2,3,14
136:25 137:4,23
137:25 138:4
139:24 140:4,5
141:10,20 142:22
144:7 145:13,20
146:17 147:10,11
149:3,13 154:21
154:22 155:1,4
156:2 157:1,18
170:7,9 171:17

172:2,9,21 173:3
173:19 178:12,21
179:20,25 180:2
180:21 182:20
183:7 184:16
186:12 187:5
188:3 189:16,19
192:23 193:17,18
193:20 194:12,15
194:17,19 195:2,6
195:11,13,20
196:5,5 197:9,14
198:7,10 203:12
203:17,18 207:25
208:11 209:6,16
211:20 212:8
213:15,21 214:2
214:15 219:22
220:9 221:1,4,5,8
221:11,12,14,17
221:18,22 224:22
224:24,25 228:4
228:15,17 231:8
232:8,20 233:5
234:18,19,23
235:6,7,9,21,22
236:5,10 238:13
238:21 240:3,17
241:1,4,5,11,17,23
242:4,10,16,23
243:8,11,15,19
245:25 246:1
247:19 251:8,15
251:22,23 252:4
253:4,6,8,19,23
254:15,16,20,22
255:8,17,25 256:3
256:4,5,8,16,18,21
256:25 257:2
258:2,6 260:5
263:6,8 265:1,10

265:11,18,19,23
265:25 266:5
267:16 271:19
272:10 273:14,16
273:17,19,23
274:4,7,9,10,19
275:11,13,14
276:25 277:10,13
278:15 279:8,9
**knowing** 82:18
**knowingly** 170:16
237:11,16
**knowledge** 75:19
94:12 159:19
183:1 194:4 245:5
245:10,15 246:6
246:10 247:10,14
247:15 255:10,20
260:25 261:6,14
261:22 262:7,11
268:23 278:21
**knowledgeable**
36:16 140:3
**kristin** 2:11 10:23
260:13
**kuckuck** 70:21
132:18

**l**

**l.p.** 1:11,13
**label** 215:4
**labeled** 209:8
**labeling** 218:14
**laboratories** 3:4
3:16
**lack** 258:8
**lake** 43:3 55:1
**lakeside** 2:12
**lapse** 40:18
**large** 30:4 94:2
148:4 206:21
223:3 237:18

**largely** 154:4
**larger** 121:24
**lastly** 15:2
**late** 220:19 271:23
278:22
**launched** 59:25
72:14 173:6,8,9
**law** 112:6,15
206:7
**lawful** 11:13
**lawfully** 221:9
**lawsuit** 234:25
235:4,8,13,16,19
235:25 236:6
249:11 250:8,13
251:1 255:15,15
255:24 256:13,13
262:19,24
**lawyers** 229:20
239:17 249:22
250:5,24 251:2
262:17
**lazar** 3:18 11:4,4
**lead** 39:4 41:24
43:9 126:15 220:8
**leadership** 112:13
**learn** 88:24 132:8
144:13 146:2,12
234:24
**learned** 212:5
217:17,22 257:22
269:16
**learning** 211:9
218:10 259:25
**leave** 70:1,3
134:24
**leaved** 54:8
**lee** 2:18
**left** 70:6 79:19
111:6 184:9

**legal** 4:21 221:23
222:6,12,14 284:1
287:1
**legally** 221:11,12
**leibow** 4:5 11:2,2
**lest** 14:2
**lethal** 192:6
199:11
**letter** 284:19
**level** 113:5 133:20
181:4 218:20
**levy** 94:3,4,9
135:15,25 274:4,8
274:11,13
**lewis** 3:5,17 10:19
11:5,25
**liaison** 57:2
**licdc** 133:4,5
134:12
**license** 40:10,13
40:17,22 41:9
44:8
**licensed** 41:1 45:3
133:6 134:12
**licenses** 40:24
**licensure** 18:13
39:23 40:1 134:16
134:18
**lieu** 57:12
**life** 12:22
**lifestyles** 48:23
**limited** 104:11
**line** 27:17 107:2
156:8 166:15,17
260:9 268:7
269:14 284:13
286:7 287:3
**linear** 176:22
177:1
**linked** 275:22

**list** 6:5 67:15,21
69:6 71:25 106:9
106:21 138:3,7
**listed** 106:7
243:19 244:15
245:3,17,23
253:21 286:7,17
**listen** 150:6
**listening** 248:25
**listing** 286:7
**lisw** 71:9
**litigation** 1:5 10:6
12:1 17:1 229:5
229:20 238:2,3,17
238:24 239:18
244:19 245:24
247:12 284:6
285:3 286:3
**little** 30:15,17
32:13 72:11
131:20 138:11
139:11 161:6
198:21,25 209:18
252:11 260:15
266:12
**live** 12:5,11,15
**lived** 12:19 37:20
96:16
**living** 31:12 35:17
**llc** 2:4 3:3,15
**llp** 3:5,11,17 4:10
4:15
**local** 59:16
**located** 43:11,14
50:3
**location** 43:23,25
65:3,4 95:21
115:13 117:4
**locations** 31:5
65:1

**logan** 70:25 79:13
**logo** 227:13
**logs** 81:19
**long** 12:19,23
  14:18 15:4 16:2,6
  16:10 17:9,11
  18:19 49:14 71:17
  82:4 85:19 118:9
  129:3 133:8
  145:12 213:21
  225:10 233:4
  260:14
**longer** 223:24
**look** 31:1 35:7
  36:16 52:5 61:11
  74:1,3 82:19,20
  84:3,21 85:12
  86:22 88:8 99:1
  101:11 104:22
  105:12 114:22
  115:2,13 117:5,10
  121:24 132:10
  141:3,24 143:20
  149:15 150:3,6
  153:13 157:17
  165:13 170:13
  174:7 176:18
  229:22 264:20
  267:14
**looked** 85:18
  90:18 105:25
  115:7 141:5 180:1
  239:20
**looking** 15:9,10
  19:18 35:6 61:13
  61:16 68:24 77:3
  105:21 107:10
  114:25 115:9
  116:4,9,15 119:22
  124:17 141:21
  143:11 147:13

153:9,11 159:4
165:13 168:9,22
174:21 175:13,15
180:16 188:7
190:9 196:9
198:22 211:25
213:4,5,18,19
223:19 224:6
231:25 232:14
253:18
**looks** 31:3 39:2
  41:13 49:9 163:2
  177:6
**lorain** 43:3 55:3
  55:10
**lost** 89:13 270:7
**lot** 41:22 66:5
  89:17 115:5,8
  116:21 128:21
  143:23 145:2
  147:22 157:1
  211:19 213:15
  233:13
**low** 219:24
**lower** 191:12
  192:12,14,17
**lpns** 38:2
**lucky** 225:4
  226:23 227:15
**lutheran** 31:9,19
  32:19 34:18 35:12
  38:15 50:4

| **m** |
|---|

**m** 2:5
**madam** 284:10
**magazine** 234:10
**maggie** 56:24 57:1
**mahoning** 43:8
  55:4
**mail** 6:16 15:22
  140:15,21 175:5

187:9,15,24 188:3
188:18,24 189:22
189:23 190:20
198:22 209:2
210:17,18,18,21
211:3,4 238:25
**mailed** 61:15
  150:5
**mails** 15:11,13,17
  157:1 175:4
  197:15 240:3
**main** 4:16 174:10
**maintain** 31:20
  38:12 40:12
**maintaining** 38:7
  46:20
**majority** 140:12
  144:8
**making** 16:4 37:5
  176:12 178:25
**mallinckrodt**
  242:21,23 243:1
**mana** 48:4
**manage** 26:24
  54:16
**management**
  23:15,16 24:8,12
  34:20,22,24 35:7
  38:4 48:10,13,15
  48:15 71:1,4
  78:20 196:17
**managing** 102:5
**manna** 1:21
**manual** 194:19,21
  194:22 195:4
**manufacture**
  241:2,10 243:2,4
**manufacturer**
  221:15 236:23
  242:17,24 243:9
  243:16 245:12

248:9 252:21
253:1
**manufacturers**
  233:14 236:2,9
  237:9,11 241:2
  244:14 245:6
  248:2
**manufactures**
  241:12,18,24
  242:5,11
**mark** 187:9 209:2
  227:22
**marked** 6:2 19:6
  19:10 67:23 68:2
  157:10,14 162:11
  162:15 183:13,17
  187:17,21 204:7
  204:11 208:22
  210:23 228:5,8
  229:19
**market** 1:21 12:13
**marketed** 224:7
**marketing** 237:12
**mart** 246:2
**martha** 187:5
  188:5
**mary** 225:6
**mass** 210:17
**master's** 18:2,6
  28:8,19 40:3
  41:12 217:8,16
**mat** 29:17 100:14
  100:16,17 108:13
  108:14,15,18
**match** 84:4
**materials** 29:8,11
  29:22
**matter** 15:16 35:4
  131:1
**mayor's** 91:2

| | | | |
|---|---|---|---|
| **mayors** 157:3 | 99:12 109:3,4 | 119:6,16 120:5 | **memory** 30:19 |
| **mcginness** 2:5 | 174:22,25 175:3,5 | 129:5 162:10 | 121:10 123:23 |
| **mcguiness** 284:5 | 175:7,10 179:21 | 163:3,11,16 | **mental** 35:8,10,17 |
| **mcintyre** 2:17 | 191:5,7 202:8,14 | 164:11 171:1 | 37:14,22 38:5 |
| 68:11,14,14 267:8 | 215:23 219:17,20 | 173:4 184:1 | 39:5 41:24 43:10 |
| 267:8 | 220:6,11,23 | 205:19 208:21 | 48:25 49:4 53:10 |
| **mckesson** 4:9 11:7 | 259:12,12 275:19 | 212:6 230:9,10 | 55:8,12,16 56:2 |
| 254:23 255:4 | **medically** 24:4 | 235:6,11 240:8,9 | 57:11,11 63:1,4,8 |
| **mcneil** 89:1,12,21 | 214:24 219:19,24 | 240:22 | 63:13,16,20,24 |
| **mcneil's** 89:10 | **medicate** 258:3 | **meetings** 72:20,23 | 64:1 94:20 95:17 |
| **md** 1:6 | **medicated** 258:4 | 73:2,6,11 81:10 | 96:13,16,18 |
| **mdl** 1:5 | **medicating** 258:20 | 85:9 96:1 113:11 | 142:13,25 167:15 |
| **meals** 31:14 | **medication** 108:19 | 113:25 114:3,7 | 167:24 169:1,3,5 |
| **mean** 51:2 57:7 | 108:23 109:1 | 117:8,25 128:22 | 173:21 257:6,24 |
| 63:1 68:18 117:24 | 122:24 125:1 | 129:24 149:6,15 | 258:2,5,6,14,20,24 |
| 167:19 168:8 | 136:24 148:5 | 150:7 151:17,19 | 259:4,6,10,16,18 |
| 171:12 172:5 | 213:18 215:2,15 | 151:23 152:1,3,6,8 | **mentality** 192:4 |
| 185:17 197:18 | 218:15,24 219:3,5 | 161:21 163:2 | **mentioned** 17:18 |
| 213:10 222:22 | 251:13,14 252:22 | 179:15 200:17,19 | 23:18 29:20 33:23 |
| 235:2 259:6,9 | 260:23 261:3 | 200:23 205:18,20 | 38:22 44:3 48:2 |
| **meaning** 57:14 | 262:1 | 207:17,20 209:25 | 52:9 54:23 62:18 |
| 139:7 162:18 | **medications** 45:3 | 210:3,5,7,10 | 65:16 76:13 90:15 |
| 223:1 254:19 | 45:12,17 124:8,9 | 211:11,14,18 | 91:10 102:22 |
| 268:16 | 124:10,23 127:9 | 212:11 235:9 | 106:11 121:16 |
| **means** 32:1 33:1 | 200:14,24 211:22 | **meets** 23:16 | 125:8 134:11 |
| 108:18 177:10 | 213:6 215:10 | 108:20 | 135:14 142:2 |
| 213:14 222:21 | 216:9,10 218:20 | **member** 47:19,20 | 143:21 146:4 |
| 223:1 | 222:17 223:9,23 | 48:3 61:14 106:20 | 151:13,16 154:19 |
| **meant** 33:25 | 233:18 236:4 | 112:12 113:14,19 | 157:2 159:3 |
| **measure** 153:10 | 237:13,14,17,22 | 113:21 143:7 | 168:11 203:23 |
| **measurements** | 237:23,24 251:17 | 148:24 181:23 | 207:3 226:10 |
| 140:1 | 261:21 264:19 | 182:2,4 183:3 | 230:4 239:3,14 |
| **medica** 236:2 | **meet** 14:18 15:4 | 195:14 270:16,16 | 243:5 266:11 |
| **medicaid** 33:3,3 | 24:7,10 72:18 | **members** 15:24 | 271:11 276:23 |
| 86:23,23 108:1 | 83:11 89:8 90:22 | 42:21 70:13,15 | 277:9 |
| 110:4,6 | 115:24 128:13 | 141:18 144:25 | **mentioning** |
| **medical** 24:3,8,11 | 188:12 191:21 | 182:10,13,16 | 126:24 |
| 24:14 37:12,18 | **meeting** 6:11,22 | 225:11,25 226:2,6 | **message** 244:6 |
| 38:18 45:9,11 | 33:14 73:1 80:13 | **memorandum** | **met** 11:22 14:16 |
| 50:17 52:1,6 | 90:24 96:4,5 | 109:17 | 14:24,25 15:1,2 |
| 64:25 65:17 71:18 | 113:23 114:1 | | 44:19 50:23 90:18 |

230:9
meth 191:10,24
  198:24 204:20
methadone 108:21
  181:7,9
methamphetami...
  171:7 205:9
mic 248:14
microphone 276:3
  280:3
mid 73:1 78:23
middle 190:21
  204:24
midwest 284:17
  287:1
mind 222:1
minimal 131:15
minimally 208:10
minimum 49:18
  82:9
minute 93:10
minutes 6:21
  127:18 167:23
  208:20 232:25
  233:3 240:8,9,22
  266:19
misconduct 255:4
misheard 34:6
misled 248:1
misrepresentation
  248:8
misrepresentatio...
  245:11
misstates 130:20
  254:6 276:11,21
mistaken 243:3
misuse 59:9
  193:14
mobile 270:9
  277:12

modalities 133:18
model 48:17,18
  90:17 116:8,17,17
  116:18
modeled 159:7
modified 223:23
modify 98:23
  226:19
molded 106:3
moment 188:2
moments 274:7
money 273:24
monies 94:19
monitor 72:7,18
  72:19 73:21 75:21
  80:6 81:3 85:3
  152:21
monitored 109:20
monitoring 76:17
  106:9 133:23
month 18:15
  49:18 89:8 92:19
  128:14 155:5
monthly 74:6,10
  74:14 81:16,20
  84:7,9 87:24
  100:11,15 173:16
  189:2,7
months 12:21
  18:20 37:21 85:22
  135:1,2 143:19
  159:12 164:2
  206:5 270:3,13
morbidity 191:12
morgan 3:5,17
  10:19 11:4,25
morganlewis.com
  3:7
morgue 277:12
morgues 270:9

morning 11:20,21
  11:24 248:22
morrison 2:11
  5:10 10:23,23
  260:11,13 266:18
  266:22 267:3,10
mortality 191:12
mother 121:21
motivational
  133:17
motley 2:4 10:13
  10:16
motleyrice.com
  2:7,8
move 9:2 270:24
moved 89:7
moving 37:7 48:6
  99:1 111:15
  189:21,23 233:19
mt 2:6
multifaceted
  258:25 259:22
multiple 76:14
  167:3 176:22,25

n

naloxone 76:3
  136:24 137:8
  192:9
name 10:7 11:24
  12:3 74:15 88:6
  128:7 145:9
  210:12,14,16
  211:2 248:20
  253:21 284:6
  285:3,4,15 286:3,4
  286:21
named 187:5
  207:25 231:15,16
  236:6 250:12,19
  250:22 253:9,12
  253:17 254:14

262:18,19 282:9
names 241:1
naming 200:12
  252:23
nancy 208:11
narrative 151:3,8
nation 89:20
national 1:5 10:6
  133:20 204:20
  279:18 284:6
  285:3 286:3
native 162:17,19
  162:20
nature 151:1
  153:12 236:8
  249:23 250:6
  256:2,11
navigate 176:17
near 130:17 159:6
  189:24
necessarily 134:14
  144:4 179:13
  227:3
necessary 219:24
necessity 24:3,9
  24:11,15
need 7:2 24:11
  62:6 141:7 153:15
  156:17 182:7
  195:9 226:25
  228:3 273:4
  275:16
needed 67:5 82:19
needle 136:22
  137:6,22
needs 42:11 46:5
negative 47:22,24
  48:2
negatively 124:25
neighboring 43:7
  206:8

**nerad** 115:24
**never** 180:1 231:7
   259:17,18
**new** 4:6,6 20:1
   61:16 72:18 73:17
   79:1 90:22 113:24
   114:19 195:9
   264:17
**newly** 145:4
**news** 231:13,18
   279:10
**newspaper** 200:8
**newspapers**
   278:22,25 279:2,7
   279:10,19
**nicole** 4:5 11:2
**nicole.leibow** 4:7
**nine** 26:19,20
**non** 77:16 143:16
   175:25 176:2
   186:10 192:22
   194:3,10 270:25
**nonprofits** 118:5
**north** 2:12 4:16
   49:8
**northcoast** 39:5
   41:14 42:25 45:7
   46:16 47:5 49:8
   52:7 53:21 54:12
   55:21 56:1 57:20
   58:21 59:1,6 61:7
   64:20,24,25 65:15
   71:18 130:11
   132:1 197:25
   202:5 203:5
   206:11,20 207:7
   208:9 210:19
   212:9,11 216:1
   217:3 224:1
   257:17 264:3,7,13
   264:15 265:12

266:7
**northern** 1:2
**northfield** 43:12
   43:23,25 65:3
**northwest** 3:11
**notarized** 284:14
**notary** 282:6
   283:14 284:25
   285:10,18 286:15
   286:23 287:23
**note** 157:20
   210:15 284:12
**notes** 227:8,9
   240:16,18,20,20
   240:23,24 246:17
**notice** 238:18,20
**november** 15:1
   78:24 79:5,11
   89:1 113:23 195:8
   236:19
**number** 6:2 30:12
   52:21 74:16 86:20
   88:7 90:4 93:4
   102:17 104:11
   110:15 111:4
   116:11 118:25
   123:2 138:5,9
   143:6 148:1,4,7
   159:9 160:25
   161:15 162:20
   165:6 166:25
   168:24 175:13,15
   178:21 180:13
   184:8 185:22
   187:25 192:8,9
   199:15 223:4
   271:5 284:7,13
**numbered** 68:5
   159:5 163:7 174:4
**numbers** 148:14
   159:16,20,21

160:3,5 161:13
   183:20 192:10
   271:10 286:7
**nurse** 46:13
   134:22 221:1
**nursing** 50:16

## o

**oacbha** 20:11
   21:18 26:14 59:14
   59:23 60:9,14
   127:25 128:2,8,13
   129:4,21 131:3
   147:12 158:2,8
**oacbha's** 128:11
**oarrs** 211:23
   212:5,9 263:18,20
   263:22,24 264:5,6
   264:11,16,21,24
   265:2,12,17 266:6
**object** 8:2,3,4,5,5
   8:6,6,7,7,8,8,9,10
   8:10,11,11,12,12
   8:13,13,14,14,15
   8:15,16,16,17,17
   8:18,18,19,19,20
   8:20,21,21,22,22
   8:23,23,24,24,25
   9:3,3,4,4,5,5,6
   53:2 63:7 78:7
   124:1 125:5,16
   130:19 136:1
   143:17 146:15
   148:16,18 180:7
   193:12 199:7
   200:21 202:3
   206:3,15 211:13
   212:7,16 214:20
   215:5,13,20
   216:21 218:7,17
   218:22 219:6,11
   222:10,24 223:15

239:13 254:5
   255:16 256:14
   258:1 259:1,23
   266:10 276:10,20
   277:5,20 278:2,12
   278:19
**objection** 8:1,3,4,9
   9:1,1,2 52:20
   53:18 170:12
   268:19 269:12
   271:7
**objective** 91:6
**objectives** 6:7 37:6
   157:7
**observe** 164:9
**obtain** 39:9,23,25
   91:19
**obtained** 40:23
**obviously** 195:3
**occasionally** 279:1
**occasions** 14:17,25
**occur** 155:7,10
**occurred** 69:13
   155:22
**occurring** 167:25
**occurs** 13:15
   129:2
**ocpc** 71:10
**october** 102:3
   153:25
**odd** 93:5
**offer** 16:22 49:3
   58:18 81:5 85:7
   95:14,21 96:9
   124:23 181:12
**offered** 67:4 95:16
   189:12
**offering** 32:10
   143:21
**offers** 181:9,13

| | | | |
|---|---|---|---|
| **offhand** 59:21,24 | **ohmas** 156:10 | **open** 73:17 106:23 | 98:2,6,17,18 100:2 |
| 71:23 123:15 | **okay** 12:7,12,17 | 106:24 116:1 | 100:7 102:15 |
| 138:5 154:22 | 13:23 14:2 21:5 | **opening** 117:14,16 | 105:6,9,14 108:8 |
| 178:12 207:23 | 30:5 61:2 62:7 | **openings** 142:10 | 109:8,12 112:18 |
| **office** 27:19 65:2 | 77:22 87:22 98:15 | **operated** 103:21 | 113:16 119:22 |
| 84:15,15 93:12 | 99:10 108:12 | **opiate** 1:5 7:1 10:6 | 122:16,20,23,24 |
| 96:5 112:8 174:23 | 127:17,23 128:10 | 20:11 59:11,14,23 | 123:14 125:2,14 |
| 175:3 283:6 | 138:12,16,24 | 60:14 76:4 112:4 | 125:19 126:14 |
| **officer** 21:2 38:23 | 139:14 142:10 | 114:3,7,12 115:16 | 136:9,13,18 |
| 66:1 92:10 142:14 | 154:2 155:20 | 116:12,25 117:7 | 138:10 139:1,3,9 |
| 158:5 168:15 | 157:15,22 162:1 | 117:23 118:10,17 | 139:15 143:5,10 |
| 202:15 | 164:23 166:12 | 118:19,23 127:25 | 143:15,16,16,22 |
| **officers** 191:23 | 169:4,6 170:18 | 128:4,11 129:1,3 | 144:9,14,18 |
| **offices** 128:13 | 171:18 174:8,13 | 129:21 130:3 | 145:25 146:3,13 |
| **official** 65:25 | 176:24 187:11,22 | 131:3,4,7 147:12 | 146:22 147:7,8 |
| 202:13 253:19 | 189:12 191:23 | 149:14,19,21 | 148:25 149:11 |
| 285:15 286:21 | 209:4,16 210:20 | 150:1,10 158:2 | 170:11 172:6 |
| **oh** 68:20 220:17 | 210:25 213:11 | 178:16,19 184:1 | 178:10 180:4,5,6,6 |
| 252:5,6 | 218:3 220:21 | 185:3 192:1 | 182:24,25 183:6,6 |
| **ohio** 1:2,11,13,22 | 224:4 229:3,9 | 200:17 203:13 | 191:22 192:20 |
| 2:13 4:17 12:13 | 253:8 254:10 | 204:1 208:5 210:1 | 194:2,3,7 195:18 |
| 18:10,18 20:14 | 265:22 266:11,21 | 210:10 211:11,22 | 197:3 199:5,16 |
| 43:12,22,23,23 | 269:8,19 271:16 | 212:6 213:14,20 | 200:9,10,16 207:9 |
| 60:12 71:10 83:12 | 273:5 279:22 | 224:20 225:8,8,12 | 211:10,25 212:13 |
| 88:25 89:19 90:2 | 280:7,9 | 225:15,19,22,24 | 213:3,4,6 214:8,18 |
| 90:5 94:20,20 | **older** 35:13 147:21 | 226:3,5,11,13 | 215:18 216:4,5,6 |
| 95:16 101:8 106:1 | 222:13 272:13 | 228:2 231:20 | 219:18,23 221:9 |
| 115:25 128:5 | **omhas** 107:12 | 235:10 276:14,17 | 221:16,20 222:20 |
| 129:1 137:3,11,13 | 109:15,18 | 284:6 285:3 286:3 | 222:22,25 223:7 |
| 147:9,12,17,24 | **omissions** 245:11 | **opiates** 76:5 | 223:14 224:15 |
| 148:17 212:15 | **once** 28:11 29:3 | 170:14 171:9,25 | 231:6,11 233:6,9 |
| 220:12,23 221:2,6 | 230:9 | 212:25 213:17,19 | 234:5,14 243:1,24 |
| 222:13 231:10,15 | **ones** 241:5 | 231:20 239:21 | 244:3,9 247:17 |
| 231:16,22 233:7 | **ongoing** 42:11 | **opioid** 44:17 51:19 | 248:2 251:5 |
| 263:9,18 282:2,7 | 100:24 133:23 | 51:19,22,24 52:12 | 252:21,22 255:7 |
| 283:7,15 284:2 | 182:6 | 52:17,23 53:16 | 260:16,23 261:5 |
| **ohio.com.** 232:24 | **online** 132:8 | 59:8,9,18 60:18 | 261:11 262:12,22 |
| **ohiomeansjobs** | 232:24 279:4,5 | 64:8,10 75:23 | 263:3 269:10,22 |
| 119:8,25 122:13 | **onset** 258:18 | 76:10,12 78:4,4,9 | 271:6,14 272:8 |
| **ohiomhas** 95:19 | **op** 1:10,12,13 | 78:10,15,16 83:22 | 275:6 276:8 277:3 |
| 156:4 | | 89:14,24 96:23 | 277:18,24 278:17 |

**opioids** 23:25 24:7
24:14,22 25:4,8,11
25:14,15 28:5,7
59:8 77:7,8,15
105:18 108:6
120:14 123:6,7
130:12 139:22
148:8,8,14 171:25
179:22,23,24
180:12,13,14
186:25 192:21,22
193:3,9,15 195:16
197:1 198:9
199:18 201:2,3
205:8,15 206:22
206:23 207:22
212:25 213:5,22
214:3 216:12,14
216:19,24 217:11
217:15,17 218:5
219:9,13 220:12
220:24 221:3,6,24
222:7 230:17,23
231:2,20 232:12
233:15,21 236:3
241:3,12,18,24
242:5,11,18,24
243:9,16 245:12
247:20,23 248:7
262:9 266:13,16
268:6,11,14,18
275:12
**opportunity** 61:20
118:4
**opposed** 142:25
178:19
**option** 181:12
**order** 82:18 96:14
**ordering** 263:16
**orders** 251:17

**oriana** 21:1 22:5
22:13,14,17,23
23:6,13,21 24:21
24:25 25:20 26:3
26:12,13,17 27:2
101:21 103:15
106:3 153:22
154:2,7,11,15,24
155:2 158:4,15
**orianna** 21:13
**orientation** 144:23
144:25 149:4
**orienting** 79:14
144:20
**original** 224:24
**otf** 111:22 112:3
**outcome** 80:12
140:1 196:3
**outcomes** 72:19
73:14,22,24 76:24
77:3 80:6 98:24
103:1 140:15,19
140:20 153:10
180:17 195:23
196:7,9 274:22
**outpatient** 45:23
45:24
**outreach** 90:10
176:15
**outs** 112:14
**outside** 44:9 91:19
91:20 122:1 197:7
197:24 198:7
**overall** 47:18
48:14 50:18 53:4
64:2 69:6 91:6
103:10 107:3
139:8 150:20
185:25 231:25
233:6,7 273:1

**overdose** 74:24
75:5,12,18 76:1,4
76:20,20 77:1
89:14 123:3 174:6
174:12 177:11
178:5,20 179:1,5
179:20 180:5
190:4 191:22
200:4,6,20 201:10
232:1,6,13 251:5
260:17 261:14,16
261:19 270:7
272:7 275:10
**overdosed** 121:22
262:22 270:17
275:11,17
**overdoses** 25:3,7
75:23 76:10 77:7
77:12 174:21
175:14 176:13
190:5,25 199:19
200:2,9,25 232:10
255:7 260:21
261:2,9,25 271:10
277:19,25 278:11
**overflow** 43:6
**overloaded** 270:4
**oversee** 67:3
**oversees** 78:21
**oversight** 56:11
66:19,21 78:24
79:16 95:3 142:13
143:12 145:18
**overview** 28:12
36:9 85:14 181:25
233:11
**oxford** 3:6
**oxycontin** 243:4

**p**

**p** 82:1
**p.m.** 280:13,14
**package** 215:3
**page** 8:2 30:6 31:1
31:2,18 111:17
117:6 127:24
163:6,9,24 164:1
164:13,14 167:5
169:8,13,19 177:9
183:19 184:7,9,24
186:17 188:16,20
189:22,25 190:19
190:20,21 204:24
213:1 284:13,15
286:7 287:3
**pager** 117:19
**pages** 163:6 174:4
188:17 236:15,17
**pain** 34:20,22,24
48:9,12,15 124:21
124:23 125:1
127:1 219:10
223:9 224:8
**panel** 230:18
**paper** 32:5,6 163:9
172:14
**papers** 215:15
**paperwork** 33:24
34:8 51:5,8 216:9
217:2,5,6
**par** 4:3,3 11:3
**paragraph** 159:5
204:25
**paragraphs** 159:6
**parent** 227:1
230:23
**parma** 12:17
**part** 20:5 26:9
27:8 28:7,14 32:2
34:9 35:25 36:5

**[part - personal]**

41:19 45:5 46:19
50:12 51:4 66:1
67:9 69:5 76:17
79:1 99:11,15
101:13 109:18
112:23 113:8
115:21 118:18,23
121:16 123:18
124:11 126:5,16
127:3 137:9
140:11 141:18
146:8 149:3
152:10,13 155:25
162:3 186:7
194:11,23 196:7,8
202:24 215:25
216:8 217:7 224:9
224:16 225:14,23
235:10 246:3
249:7 255:4 256:5
256:6 266:2
268:25 273:17
275:20 286:9
**participant** 96:4
**participants** 34:7
91:15 109:2,7,12
226:5
**participate** 34:14
61:3 73:4 95:25
111:21 113:22
127:25 141:15,19
143:12 197:10
225:13 226:8
**participated** 26:16
26:18 35:2 211:21
**participates** 87:4
112:9 203:14
**participating** 73:8
**participation** 34:9
128:3

**particular** 92:12
94:10,17 162:18
196:4 200:10
226:20 257:11
**parties** 10:11
**partnered** 85:6
**parts** 249:9 254:2
254:8,11
**party** 283:3
**pass** 248:14 260:4
**passed** 272:6
**passion** 61:23
**passions** 62:20
**passthrough**
109:16
**password** 172:23
172:24
**pastoral** 268:24
**patient** 47:8 99:7
216:2 219:19
221:16,20
**patient's** 34:5
**patients** 34:20
45:17,21 48:9
50:2 52:12 207:7
219:9 220:11
**patton** 1:17 5:7
6:3 10:8 11:13,18
11:20 12:4 19:4
62:17 68:24
129:19 198:20
246:25 248:16,18
260:7,10,12 267:4
267:22,24 269:14
273:6,10 275:25
276:4 280:10
282:9 284:8 285:4
285:9 286:4,13
287:20
**patton's** 210:16
211:2

**paul** 3:10 10:21
248:20
**paula** 56:10 145:9
227:20 228:13
**paula's** 134:20
228:18
**pay** 33:14 40:16
93:21 137:1,5
**paychecks** 182:17
**paying** 120:25
**payment** 100:8
**pays** 91:11 182:15
268:17
**pboehm** 3:13
**pediatric** 50:6
**peer** 29:18 67:1
95:4,4,9,12,15
96:1,2,11,15,18,20
96:22,24 97:3,19
97:23 98:7,8,11,15
100:20,25 110:2
145:21 150:23
152:23,24,25
153:1,7 189:2
197:5,10,23 198:4
**pending** 57:18
**pennsylvania** 3:6
**people** 26:13
113:18 114:15,17
117:25 124:7
166:13 177:5
211:17 231:1
270:13 271:6
272:9,15,24
**perceive** 170:16
199:11
**perceived** 249:12
**percent** 53:4,15
86:1 94:4,6,14,15
94:16 122:23
143:1,3,9,13 159:9

160:9,24 165:2,6
165:17,18 166:3
167:13 178:15
185:2,11,18 190:3
190:10
**percentage** 25:13
52:15,22 53:14
77:15 86:8 102:14
143:15 160:23
178:9 185:8
**perception** 127:9
179:15
**perform** 49:3,14
67:16
**performance**
162:4
**performed** 32:7
247:20
**performing**
136:18
**period** 18:12
46:15 47:4,6 48:7
59:2 75:5 78:25
79:7 169:23 178:5
206:14 211:12
223:1 265:16
**permit** 44:8
**permitted** 221:2
**person** 24:6,10
88:14 128:14
145:8 147:19
170:14 181:5,10
181:22,24 208:4
216:7 218:24
222:15
**person's** 166:18
**personal** 101:1
215:6,21,23 245:5
245:8,10,15 246:6
246:10 247:10,15
251:12 262:7,11

**personally** 101:15
101:17 278:4,20
285:11 286:15
**persons's** 181:25
**perspective** 77:6
81:17 257:15
**pharma** 1:10,11
1:13 3:3,3,15,15
217:4
**pharmaceutical**
4:4 221:15,19
234:21 241:2,6
244:14 245:2
246:12
**pharmaceuticals**
3:3,15 4:2,3,14
245:20
**pharmacies**
215:14 236:4
237:21 245:23
251:13 266:13
**pharmacists**
266:15
**pharmacy** 211:21
217:4 221:8 237:1
251:16 262:13,18
262:23 263:2,10
**phase** 91:1
**phi** 101:3
**phone** 11:1 30:12
68:5,8 181:24
182:3 188:13,14
190:18 204:16
267:6 272:4 284:3
**physical** 63:11
**physically** 43:11
161:8 229:1
**physician** 42:8
50:22 51:6 71:5
219:17 247:25
248:4 264:4,10

**physicians** 51:1
212:2 223:21
237:15
**picture** 121:24
**piece** 26:8 175:11
225:23 257:4
**pill** 171:17 234:16
234:19
**pills** 124:4 147:19
148:1,7 261:5,11
**pinpoint** 234:8
**pittsburgh** 3:6
**place** 33:7 205:25
268:21 276:9
282:20
**placed** 50:7 275:8
**plain** 279:12,14
**plaintiff** 238:2
**plaintiffs** 238:3
244:18
**plan** 32:9 37:6
103:8 129:1
**planning** 42:16
54:22 67:5 91:1
**plans** 156:24
**play** 63:5 150:9
225:7
**pleas** 113:5
**pleasant** 2:6
**please** 11:12 12:2
14:1 19:12 62:23
157:17 188:15
284:11,11
**pllc** 2:17
**podcast** 89:3,10
**point** 2:12 6:5 39:8
45:2 58:20 61:6
62:6 67:14,15,15
67:21 83:14,20
86:4 113:4 115:11
143:25 145:22

156:1 195:5 208:4
217:7 218:4
233:19 238:16
253:15
**police** 21:2 25:6
73:4 75:8,25
76:18 91:3,15
157:3 158:4
159:20 175:21
**policy** 47:3 82:7
228:21 239:5,11
**polinsky** 187:6
189:24 190:13
198:24
**polsky** 28:21
**polster** 1:8
**pommerening**
208:11
**population** 58:13
206:21 226:25
227:6,7
**portage** 43:7 55:4
**porter** 4:5 11:3
**portion** 49:9 92:6
94:2 122:3 126:8
139:21 150:10
151:8 192:15,20
227:10 231:6
270:25
**poses** 204:25
**position** 22:24
23:19 24:25 25:2
27:8,11 37:8 39:3
49:17 50:2 55:20
56:6,8 61:12,14,18
62:19 65:6,13
69:17,19 78:21,22
80:11 103:22,25
132:6 141:22
142:5,12,16
144:20 145:3,4,6

263:25 264:2
**positions** 27:1,22
46:25 53:22 61:7
69:14,20 70:10
141:12
**positive** 42:6
47:19,21 48:23,23
52:3 178:25
179:18
**possible** 87:7
273:2,4
**possibly** 156:25
187:8 246:3
**posted** 61:16
141:25
**posting** 61:15,19
141:24
**potential** 235:3,8
**potentially** 116:4
172:6 220:8
**powerpoint** 21:5
21:10,14,18 29:5
119:17,20 120:2
120:16 122:14,15
123:10,11 125:9
125:11 126:5,10
126:21 152:1
162:19,25 163:7,9
163:19,23 164:2
225:2 227:9
**powerpoints**
151:22
**pr** 225:3
**practice** 41:7,8
44:9 70:18 133:2
133:13
**practices** 133:23
**practitioners**
221:2
**practum** 133:23

**pre** 57:14

**preceded** 145:8

**prefer** 214:25
  215:7

**preliminary** 85:9

**preparation**
  132:11

**prepare** 15:8 21:5
  21:10 67:14 68:25
  69:2,6 80:12
  151:18,22 152:2
  156:22 158:12
  204:22

**prepared** 19:19,23
  21:16,24 30:22
  36:15 69:9 149:10
  151:20 158:19
  224:22 227:20

**preparing** 125:11
  150:9 167:9
  169:12 174:16
  177:24 184:3
  197:21

**pres** 141:7

**prescribe** 45:3
  124:9 219:23
  220:6,24 221:3,6
  224:4,4,5

**prescribed** 170:15
  172:3,7 180:18
  195:18 206:22
  219:13 232:3
  261:10,21 262:1
  264:19

**prescribing** 124:8
  124:14 126:25
  212:2

**prescription** 1:5
  6:20 10:6 77:7,15
  77:16 78:4,9,15
  105:19 122:23

148:8,10,14 170:8
170:11,14 171:9
172:6,10 179:23
180:5,13 182:24
183:5 186:25
192:21,22 193:9
193:15 194:2,3,9
194:10 195:16,18
201:2,8 207:8,13
207:21 208:13,18
213:5,22,23 214:2
214:7,8,17 215:1,9
215:18 216:3,6,12
216:14,19 217:11
218:5,14,20 219:4
219:8,13,18 220:1
220:24 221:3,6,9
221:10,16,20,24
222:7,17 223:8
231:2,7 232:12
233:15,21 234:5
236:3 241:3,12,18
241:24 242:5,11
242:17,24 243:9
243:16,24 244:3,9
245:12 248:7
252:21 260:22
261:4 262:8,12
263:19 266:13
275:11 277:18,24
278:10 284:6
285:3 286:3

**prescriptions**
  171:14 212:1
  215:23 220:12
  237:24 266:16

**presence** 282:15

**present** 4:20 10:9
  20:15,24 25:9
  49:25 50:19 51:22
  73:25 115:17

119:13,14 121:14
122:19 123:13
125:18 132:20
152:5,5,9 158:11
163:1 176:6

**presentation**
  21:23 22:7,9
  26:10,14 28:8,10
  28:15,19 29:2,6
  85:17 90:17
  119:20 122:4,13
  123:18,19,22
  124:3,11 125:23
  126:4,16 127:3
  149:15 150:7
  158:2,17 162:25
  164:15 177:7
  225:2 227:4,10,13
  227:19 230:2

**presentations** 20:4
  20:7,9 28:5 66:11
  114:12 118:15
  121:17,18 125:19
  126:23 160:15
  177:7 200:23
  203:18,21 204:1
  224:13,17 226:18
  229:15 230:16,22
  230:25 231:4
  240:10

**presented** 20:11
  20:16,17,19 21:4
  26:15 28:2 30:1
  61:24 85:25 91:4
  116:11 118:15
  119:10,17 120:6
  121:13 122:5,9
  125:15,24 149:16
  158:3 159:20,22
  164:10 170:25
  176:7,11 229:16

**presenter** 61:3
  158:6

**presenters** 20:25

**presenting** 177:6

**presents** 24:6
  174:20

**preservation**
  239:8

**preserve** 238:15

**pressure** 124:21
  124:22

**prevalence** 231:17

**prevent** 161:17

**preventing** 177:11
  179:5

**prevention** 6:21
  56:8,13 66:21,23
  70:23 71:10
  114:23 120:10
  122:11 138:21
  139:22 196:23,25
  207:13 208:14,19
  225:23 268:5,9,12
  268:16,17,20
  269:5,10 275:2,4

**previous** 52:6
  110:14 191:1

**previously** 52:5
  74:18 75:4,9
  76:13 79:17
  102:22 106:2
  110:21 207:4
  212:19

**primarily** 35:9
  58:12 66:22 97:1
  97:6,14 131:16
  142:12 158:14
  196:19

**primary** 25:10
  54:10 97:15,25
  109:23 113:20

140:18 146:19
166:24 186:13
196:15,22
**printed** 29:8,22,24
**prior** 40:5 46:25
49:19 110:25
129:8 134:17
140:17 145:7
146:5,24 147:4
217:6 229:21
239:7 240:11
251:1 263:25
271:12 272:7
274:21 276:24
277:1,14
**priority** 106:17
107:5,9
**private** 116:8,16
**privileges** 50:20
**prn** 49:17
**proactive** 16:4
**probably** 49:20
99:19 125:25
150:3 151:24
201:15 207:11
210:8 211:16
**probation** 112:7
168:15
**problem** 58:9
68:20 220:17
223:2 231:21
263:3
**problematic**
148:17
**problems** 259:12
**procedure** 11:15
281:7 285:5 286:5
**procedures** 33:10
**proceeding** 14:9
**process** 46:4 48:20
69:7 79:15 101:14

103:6 120:19
141:14,16 155:12
182:21,22 194:14
196:9,11 197:23
214:12,14 271:22
275:20
**produce** 74:9
**produced** 162:17
162:19 209:1
**production** 252:13
284:15,17,22
**products** 246:12
**professional**
219:21 220:6
257:15
**professionally**
133:3
**professionals**
46:10 220:11
**program** 18:6,15
18:19 24:1 37:10
37:23 40:6 41:13
70:22 72:12 85:18
86:4 89:5 92:2
95:12 97:19 102:7
104:12 107:8,13
107:14,22,23
108:22 109:3,15
109:22 110:1,8
111:2 112:20
113:4 115:13
116:5 136:20,23
137:6 140:7
152:15,23,23,24
152:25 153:18,20
153:23 159:2,2,3
159:11 160:11,18
161:6,11,12,14,22
162:5 163:4
175:12 176:12
177:18 178:24

179:5,8,10 180:11
180:22 185:24
187:2 192:13
196:4 197:13
205:1 207:12
208:13 211:23
217:8,9,13,16,20
217:25 218:1
269:5 272:2
**programming**
37:3 56:12 66:20
66:23 120:10
122:11 128:21
145:19,19
**programs** 66:22
94:24 95:2 101:7
107:13,16 118:4
133:25,25 135:8
139:7,8 143:11
149:5 150:13
152:22 156:9
195:24 196:6,25
197:2 217:14
268:5,9,10,13,18
**project** 136:21
137:2,9,18
**projects** 66:8,9
**promoting** 122:7
**promotion** 233:15
**prompt** 77:13
**prompted** 61:11
**proofreading**
184:4
**properly** 258:4
**proposal** 117:6
158:11
**protection** 214:22
**protest** 280:8
**protocol** 107:3
194:16

**provide** 22:18,25
29:9,16,21 33:19
54:5,19 66:19
71:4 73:13,16
78:24 95:3,19,21
95:22 96:6,18,20
96:25 97:22
101:22 111:18
112:14 114:4
116:21 137:12,16
137:20 138:14
139:1 142:13
143:12 148:24
150:14,16,23
151:2,3,4,5 158:13
166:22 173:20,25
195:8 197:18
210:23 220:11
221:16,19 235:15
238:11 239:17
240:19 268:10
269:9 274:13
**provided** 11:14
24:21 31:11 34:19
36:9 47:10 51:5
56:11 81:22 86:18
98:16 107:21
126:6 145:18
159:16 160:4
188:9 208:4 215:2
217:4 239:25
240:7,17,24 247:7
268:5 273:20
**provider** 22:15
85:7 97:9 99:17
115:19 132:4
134:4 154:4 161:9
165:10 167:2
168:14 181:8,13
181:19 196:16
205:20 275:21

**[providers - quick]**                                          Page 36

**providers** 66:6,25
79:1 88:5,13
97:13 98:3,23
99:3,15 100:12
101:10 102:2,4
103:4 104:8,9
106:13 109:16
112:6 116:19
133:16,21 138:9
138:14 139:4,20
139:25 140:6
153:4,4,20 167:3
186:6,14 194:22
195:10 196:14
197:7 226:7 247:2
247:4,8 271:21
**provides** 30:9
106:21 107:25
137:17 268:17
274:11
**providing** 27:7
79:16 156:10,11
176:15 179:17
229:19,21,22
**psych** 264:10
**psychiatric** 31:10
31:11 42:5
**psychiatrist** 44:11
44:21 46:12 50:16
71:15 264:5,13,15
265:6,7,12,17
266:7
**psychiatry** 35:13
**psychologist** 46:14
133:4 264:11
**psychology** 18:1
30:25 39:17
**public** 27:3 116:17
119:18 120:7,25
121:16 123:1
125:8 136:19,23

137:1,5,12,15,17
137:21 224:25
226:24 269:2,16
269:22 282:7
283:14 285:10,18
286:15,23 287:23
**pull** 169:16 228:19
228:24
**pulled** 228:13,17
229:1 239:21
**pulling** 196:7
**pulsipher** 4:10
11:6,6
**purdue** 1:10,11,13
241:4 243:6,8
**purpose** 12:6
19:22 166:23,24
265:1
**purposes** 19:6,11
26:14 67:24 68:3
98:7 99:6,21,24
155:18 157:10,16
159:17 162:12,16
180:10,22,24
183:13,18 187:17
187:23 204:8,12
208:22 228:5,9
229:4
**pursuant** 46:21
281:3,6
**put** 33:7 115:20
119:11 163:20
172:20
**putting** 124:22
211:8

**q**

**q2** 6:11 162:9
163:11 164:20
**qi** 189:3
**qrt** 6:16 20:22
72:7,9,12 152:6,14

159:2,7 163:2
164:20 167:14
168:5,11,17,18,21
168:24 169:2
171:1 173:4
175:12,16,16,24
175:25 176:1,2,12
177:10,18 178:4,9
178:15,18,24
179:8,10 180:11
180:22 184:10
185:9,20 187:2,15
189:1 191:5
192:13
**qualified** 282:8
**qualify** 24:14
108:21 109:1
**qualifying** 109:10
**quality** 69:17,24
**quarter** 73:25
164:20,24 178:10
**quarterly** 6:11
47:17 72:20,23
73:1,2,11 74:9
80:13 98:22 103:1
103:6,12 114:1,2,6
117:7 140:10,12
140:24 141:4
149:14 151:17,19
151:21 152:6,13
161:21 162:9
163:2,11 164:10
164:22 171:1
173:4 179:14
**quarters** 164:19
177:17
**question** 13:25
14:4 25:18 44:14
45:14 88:12
138:10,18 139:10
139:12 152:11

204:25 212:17
214:21 215:8
220:15 222:4
255:19 258:10
279:23
**questioning** 257:5
268:7 269:15
**questions** 13:9
15:11 118:1,2
127:17 167:22
194:8 197:15
214:23 248:13
257:8 260:6 267:4
267:7,25 268:5
273:6,13 276:4
**quick** 6:8,10,13
20:16,18 22:24
23:19 25:1,2,13
26:7,16,20,25 27:2
27:5,23 67:10
72:9 73:14 74:2
75:3,16,21 76:7,9
77:2,10,13,19,25
78:3 80:2,6 81:4
82:3 83:11 85:8
85:15,20 86:3,10
87:2,14 88:15,17
88:20,24 89:16,22
90:2,8,13 91:1,5,8
91:15,21 92:2,6,13
92:21 93:8 112:15
120:3 151:14,17
156:21,22 157:8
158:9 159:17
160:22 162:4,8
163:10 164:3
168:16 173:7,9
183:11,24 184:10
184:22 188:7
190:11 191:18,19
205:19

**quicker** 271:23
272:25
**quickly** 72:4 146:6
273:4
**quite** 212:25
216:17 279:25
**quota** 252:13

**r**

**r** 3:18 4:5
**rabinowitz** 56:11
145:10,11 227:20
228:14 229:16
230:5
**races** 272:16
**rack** 29:24 30:2,8
**radar** 271:12
**ran** 265:2
**range** 35:11
143:11
**ranged** 14:20
**rate** 92:25 93:3,17
190:3 192:12
**rates** 192:14,17
232:1 261:14
**reached** 89:2,21
91:2 188:8
**reaching** 157:2
**reacts** 218:25
**read** 16:15 31:18
159:13 160:12
167:16 177:14
189:5 191:2,13
205:10 211:5
215:16 216:11
232:22,23 236:11
236:14,15,17,22
236:25 237:6
249:3,15 278:22
278:25 279:2,11
279:18,18 285:5,6
285:12 286:5,6,17

**readily** 148:4
237:19
**reading** 279:6,13
284:19
**readings** 253:22
**reads** 31:20 159:7
160:8 163:10
167:5,13 168:3
178:2,14 185:1,11
186:20 191:9
205:5
**ready** 14:14 116:1
**realized** 146:7
222:20
**realizing** 53:13
**really** 13:20 37:2
121:23 124:22
128:18 145:2
146:4,9 147:2,17
147:18 168:17
222:21 270:21
271:11 276:13,23
277:11 278:24
**reason** 57:9 211:8
271:16 284:14
286:8 287:3
**reasons** 62:18
258:21
**reassurance** 224:3
**recall** 15:16,20
21:19 22:2 23:4
33:22 34:21 38:16
52:21 83:24
105:20 116:6,13
117:13,21 119:3
120:12,15 121:11
123:14 125:6
126:8,11 127:5,8
130:4,25 147:15
149:2 190:6,8,13
199:1 200:11,22

201:4 207:12,17
207:19 210:2
211:9 212:10
216:16 218:9,10
218:18 223:24
227:14 231:23
232:2,4,11,15,17
232:19,21,21
233:2,5,10,24,25
234:1,3,12,14
235:10 237:3
239:16 243:21,22
243:23 244:4,8,8
244:10 254:13
257:7 265:16
268:6 269:14,17
**receipt** 284:18
**receive** 18:11 36:1
38:17 47:15 59:7
90:12 91:23 94:25
97:10 98:4 100:13
108:16 135:10
136:7,11,16
137:10 144:23
166:3 261:17
268:24
**received** 17:25
18:2 36:8 77:20
103:11 111:3
144:24 165:19
185:2,12 188:6
217:9
**receives** 110:9
135:24 136:4
**receiving** 97:24
207:19 239:7
**recertification**
96:9,10
**recess** 62:12
129:14 198:15
246:20 266:25

267:19
**recognition** 48:24
**recognize** 157:18
157:23 183:21
204:13 209:10
227:23 228:11
229:3,12
**recognizing** 35:15
121:9 123:22
138:7 139:18
**recollection** 15:14
178:18 187:12
209:13 211:7
231:19
**recommend** 117:5
**recommendation**
117:10,14,15,20
**recommendations**
42:17 45:8,16,19
45:22 46:2,9
50:25 51:3,8,10,13
51:16 115:15
116:24
**recommending**
51:11
**record** 10:2 11:23
12:3 13:11,16
19:13 62:10,13
68:12 82:6 108:17
129:12,15 157:20
172:19 198:13,16
204:16 210:15
228:20 246:18,21
265:8 266:19,23
267:1,17,20
280:12 286:9
**recording** 13:15
**records** 32:5 50:14
52:1,6 76:18
99:13 172:13
228:14,18,20

recovery   15:18
  29:18 48:20,21
  66:24 67:2 95:6
  95:15 96:15 97:13
  97:23 98:3,12,14
  98:16,23 99:2,7,14
  99:16 100:12
  101:2,5,9,20 102:2
  102:5,11,12,15,21
  103:4,13,19 104:2
  104:10,13 105:2
  106:1,5,12,13,17
  107:15,21 109:25
  110:1 113:18
  114:15,17,20,25
  115:2,10,23 116:1
  117:1 143:22
  145:20 150:24,25
  152:22 153:2,3,9
  153:14,23 196:23
rectify   48:5
redirect   267:12
reduce   143:15
reduced   282:14
reduction   179:9
refer   30:18 132:3
  186:4
reference   62:25
  139:2 284:7 285:2
  286:2
referenced   151:12
  254:12 282:13,18
  285:11 286:15
references   165:18
referencing   22:6
  22:19 23:8 24:5
  250:16
referral   42:9
  88:16 166:17
  168:13,14 182:20

referrals   49:23
  97:10 173:21
  174:1 178:15
referred   88:19
  107:6 137:8
  167:14 186:10
  213:17
referring   127:21
  138:20 148:7
  182:21
reflect   19:24
  124:25
reflected   87:9
refresh   15:13
  178:17 209:13
  211:7
refreshes   187:12
regarding   29:21
  30:9 34:8 35:21
  36:2 45:16,20
  47:9 48:9 122:20
  123:6,13 125:19
  130:12 165:17
  169:9 194:1
  207:20 215:10
  217:10 239:8
  247:1,23 256:4
  271:2 281:2,11
regards   15:22
  48:14
region   147:8
regions   147:20
registered   46:13
  134:21
regression   176:23
  177:1
regular   140:1
regularly   174:24
  210:8
regulates   234:21

regulations   251:16
reimburse   91:14
reimbursed   93:1
reimbursement
  84:13 92:17 93:17
reimburses   92:20
reintroduce   11:22
relapse   153:17
relate   24:22 73:14
  76:10 108:5
  191:17
related   28:5 38:4
  58:5 59:7,17
  75:23 97:14,20
  98:17 102:15,20
  105:6,9,14 109:8
  112:16 136:9,13
  136:18 138:22
  139:15 143:5
  178:10,19 180:5
  197:1 198:9 200:9
  200:25 207:21
  214:24 216:10,12
  231:4 236:18,23
  237:1 238:16
  247:17 249:8
  271:6
relates   1:9 59:11
  77:9 78:3 149:1
  215:6,22 232:10
  236:15 254:9
  269:22,24
relation   34:2
relations   119:19
  125:8 224:25
  226:24
relationship   22:4
  22:12 23:6 25:19
  25:22 26:3,12
  135:4 225:17
  258:23,25

relative   283:2
released   128:24
relevant   249:12
  254:8
remain   55:10
  111:11
remark   47:19
remarks   47:21,22
  47:25
remember   59:19
  59:22 117:20
  126:4,12,18,24
  127:2,11 149:7,9
  156:25 207:24
  209:22 210:4
  217:24 234:2
  235:12 246:5
  254:13
reminder   68:7
remotely   10:10
renewal   40:16
repeat   136:10
  220:15 222:4
  250:1
repeated   153:15
rephrase   14:2
report   20:22 52:3
  65:17,21 73:25
  74:7,8,9,10,14
  78:14 80:9,12,21
  80:23 81:15 82:25
  84:3 85:23 87:12
  87:17,25 103:7
  112:14,18 114:14
  116:14 117:3
  121:8 140:6,12,13
  141:7 150:10,16
  150:19,20 151:3,6
  151:9,11 160:20
  160:21 168:1
  170:15,21,22,24

173:2,4 183:23
190:17 193:7
264:24 265:2,12
265:17 266:4,6
275:15,22
**reported** 42:7
51:24 76:5 86:1
99:7,8,21 100:6,7
152:10 158:24
169:24 170:3,5
171:2,3,4,6,9,11
171:19,21,24
173:15,15 174:22
176:4 186:21
193:10 264:19
275:23
**reporter** 5:18
11:12 13:9 86:12
86:15 117:15,17
148:20 209:17,21
252:4 262:4 285:7
**reporter's** 5:15
282:1
**reporting** 75:10
75:15 100:15
116:14 120:12
155:18 156:6,7
164:21 169:22
170:2 189:7
191:15 233:12
263:18,19 265:8
275:20
**reports** 79:2 81:21
81:24 82:5,7,11
83:25 88:14 98:22
103:12 140:23
141:5 148:13
149:18,20,20
150:1,14 151:18
152:13,14 199:21
199:25 200:7

223:25 231:12,13
231:18 232:8,10
232:11,25 263:15
**represent** 10:11
11:25 57:16
164:19
**representative**
113:20
**representatives**
83:21 244:23
**represented** 26:23
235:22
**representing**
176:10
**represents** 165:7
**request** 6:18 84:13
92:16 111:14
195:17 204:6,20
205:23 225:25
226:22 286:9,11
**requested** 54:22
100:23 111:10
194:1 281:1,6,10
**requesting** 167:2
197:20
**requests** 195:11
226:23
**require** 101:9
**required** 31:21
38:7 139:25
284:25
**requirement** 20:6
32:2 98:1 99:15
**requirements** 33:5
36:11 94:23
101:12
**res** 58:14
**research** 69:16,24
89:18 115:5,7,8
132:7 189:3
247:20,23

**researched** 115:4
257:23 278:4
**reserve** 18:4 96:4
120:23
**resident** 89:13
146:18
**residential** 15:22
45:24 106:18
107:4 161:9
271:25 272:2
275:8
**residents** 102:12
**resignation** 70:4
**resource** 29:10,13
29:14,23 132:16
**resources** 28:16
29:11,22 58:10,14
58:19 73:17 89:2
89:9 113:12
114:20 122:9
179:18 206:25
**respect** 26:10
44:15,16 49:1
77:12 78:18 80:2
95:11 101:5 106:5
109:21 113:1,8
117:22 120:13
153:13 154:6
178:25 260:18
276:5
**respected** 203:4,7
**respective** 58:16
**respond** 25:7,10
**responded** 75:9
**responders** 128:17
159:10 160:4,6
175:19 179:16
**response** 6:8,10,14
20:16,18 22:25
23:19 25:1,2,13
26:7,16,21,25 27:3

27:5,23 34:5
67:10 72:9 73:14
74:2 75:3,16,22
76:8,9 77:2,10,13
77:19,25 78:3
80:3,7 81:4 82:3
83:11 85:8,15,20
86:4,10 87:3,15
88:15,18,20,25
89:16,22 90:2,8,14
91:1,5,8,16,21
92:2,6,13,21 93:8
112:15 120:3
151:14,17 156:21
156:23 157:8
158:9 159:10,18
160:23 162:5,9
163:10 164:3
168:16 173:7,9
183:11,24 188:7
190:11 191:18,19
205:19 229:4
273:13
**responses** 25:13
**responsibilities**
6:5 30:15 37:18
42:2 46:20 54:11
58:5 67:16,22
72:1 80:2 101:4
106:5 140:18
145:15 251:24
**responsibility**
73:15 79:8 142:17
146:20 186:13
**responsible** 37:24
38:7 79:12 81:15
103:5 109:23
196:15,19 251:4
274:22
**responsive** 270:25

restate  220:20
results  47:18
    120:18,18,21
    121:6 122:6
    161:20 164:15,18
    164:24 167:6
    169:9 170:25
    174:6 178:14
resume  6:3 19:4
    19:14,16 20:6
    30:21 31:2,3 37:9
    41:23
retail  262:17
retained  5:18
retention  82:7
    228:20 239:4,11
retired  70:2
    134:25 145:8,16
    225:5 230:5
retiring  113:21
return  39:20
returned  284:18
returning  42:18
revenue  94:8
review  15:7 81:19
    83:25 84:22
    101:12,14 149:18
    151:7 174:24
    197:23 229:18
    281:2,6 284:12
    285:1 286:1
reviewed  32:8
    105:11 149:10
    150:1 197:16
reviewing  157:20
reviews  197:5,10
    198:1,5
rice  2:4 10:13,16
right  17:19 23:22
    31:5 32:16 38:9
    38:25 39:6 41:15

43:17,17 44:25
49:12 53:17,23
55:17 60:19 61:9
62:21 63:17 69:16
72:13,21 74:25
75:6 83:4 84:10
86:5 87:5 91:12
98:19 100:2 105:6
109:4 111:8
120:19 122:17
128:8 129:10,25
130:4,8 135:17,21
137:9,18 142:6
148:2 151:14
152:15 154:11
160:1,6 170:3,22
171:4,7,19,22
175:20,25 176:4
179:1,6,11 185:5
185:14 186:18
188:17 192:14,17
193:4,10,23
201:24 202:9,19
202:23 205:23
215:12 220:24
224:15 227:11,16
229:7 230:5,17
252:17 254:17
256:24 257:11
276:9
rights  47:13 69:18
    69:23 142:3,14
    214:22,24
ring  208:14
rise  205:9 271:5
risk  33:11,13 63:9
    120:17 122:5
    216:19,24 217:10
    217:17 218:6,11
    218:16,21 219:2
    219:25 257:24

258:7
risks  215:11,19
    216:5,13 219:5
rn  38:1
rogers  209:23
role  27:7 42:2,5
    48:9,11 49:20
    50:10,12 54:4
    57:25 58:3,4
    61:17 63:4 65:24
    67:17 70:9 72:16
    72:17 78:18 80:8
    85:12 95:11
    109:21 112:10,13
    113:1,16 131:18
    134:14,15 150:9
    154:6 167:8
    169:12 174:16
    177:24 184:13
    196:10,13,18
    203:11,13,16
    225:7 244:12
    247:3,6 251:8,11
    254:22 257:15
    263:10,22,23
    264:7 272:23
roles  56:25 81:18
    145:5
roll  110:13 111:6
rolled  110:20,22
    111:11
room  13:11,15
    50:15 177:6 267:5
rooms  31:13
root  118:4
rotate  73:7
roughly  119:4
    160:24 236:5
rpr  1:25
rules  11:15 251:15
    281:3,7 285:5

286:5
run  96:2 264:24
    266:1,3
running  103:24
rx  269:1,6

s

s  284:15 286:8,8
    287:3
s.m.  2:11
safe  124:9 127:9
    136:22 233:18
safer  199:13
safety  124:13
salerno  2:5 10:15
    10:15 280:4
samhsa  133:20
sami  45:8 47:7
    48:8,11 49:7 52:8
    52:16 54:15 58:7
    60:4,6,12,13,23
    130:17 147:6
    257:18
san  4:11
sarah  115:24
sat  40:6
satisfaction  47:8
save  82:3,4
saved  140:16
    240:9,13,13
    272:25
saw  52:25 53:3
    159:8 161:13,20
    192:7,8,10 193:7
    233:3 234:4
    243:25 246:1
    252:3 253:21
    270:1 277:11
saying  168:11
    206:9 244:6
says  111:21
    127:24 164:15

170:13 174:11
176:22
**schedule** 72:19
156:5 166:6,10
167:21 168:1
169:21 173:12
181:19,22
**scheduled** 74:18
132:9 167:1
185:20 272:3
**schedules** 166:2
**scheduling** 89:7
196:20
**scholer** 4:5
**school** 39:13,16,20
41:19 66:23
115:10,23 116:1,2
116:8,16,17,18
117:1 121:21,22
122:1 227:1
268:23 269:3,4,7
274:24
**schools** 115:1,3
120:7,9,11,13
121:12,16,19
122:7 225:25
230:17,21 269:2
**science** 18:3 126:7
**scope** 41:7 44:9
**screen** 52:4 275:18
**script** 194:5
**scripts** 194:13,18
**seal** 283:6 285:15
286:21
**second** 31:2,15,20
60:25 121:20
128:3 159:7 163:3
163:8 164:1,19,23
165:16 178:10
184:7,9,24 222:2

**seconds** 280:3
**section** 151:4
249:4,11,15
**sections** 249:16
**security** 74:16
88:7
**sedatives** 171:15
**see** 31:24 37:8
46:5 61:18 83:12
88:9 90:19 111:17
111:25 125:18,22
140:23,25 141:23
149:16 162:2
165:21 167:6
169:9 179:18
184:11 185:23
186:22 187:10
188:22 189:25
190:22 192:3
199:20 201:16
205:3 206:21
211:1 220:22
226:25 227:23
229:15 267:14
271:5,17
**seeing** 89:18
120:13 121:25
200:11 201:4
205:6,14 206:1,9
207:6 209:14
217:5,6 218:18
232:11 234:1
237:3 243:21
244:4 246:5
254:14
**seek** 30:13 39:14
263:2
**seeking** 165:25
207:8
**seen** 74:1,4,7,17
74:17 120:8

121:19 160:19,19
160:22 162:22
175:16 185:3,9,19
186:3 188:4 190:5
194:21 199:9,19
199:24 200:7,20
203:20,25 205:8
206:12,12,18
207:3 209:7 216:2
218:13 231:13
232:5,25 233:20
234:12 236:13
**selecting** 247:3
**self** 29:19 51:24
52:3 76:5 78:14
99:8,21 100:6,7
168:1,14 169:24
170:15,21 258:3
258:20
**sell** 237:13
**semiannually**
140:11
**seminar** 205:1
**send** 157:1
**sense** 124:13 146:8
201:1 203:10
**sent** 189:11
**sentence** 159:7
160:8 191:9
**sentences** 205:12
**separate** 55:10,11
55:12 87:12,17
98:9,12 104:21
154:10,11 180:1
182:5 249:21
250:4,22 262:16
**september** 6:11
162:10 163:17
171:1 283:17
**series** 13:9 89:3,11
167:22

**served** 49:6 58:12
131:20
**service** 100:23,24
100:24 119:11
138:13 139:15,20
140:6 181:14
230:20 272:24
**services** 22:17,20
22:22 23:1,12,17
23:20,24 24:3,21
26:6 27:6 30:13
32:10 33:4 37:5
45:24 54:2,12
55:21 56:13 57:6
57:7,20 58:17
60:4 66:4 78:9
86:22,24 88:10
91:12 94:21 95:5
95:17 97:1,23
106:19 110:2,3,5
113:13 118:2,3
119:23 122:17
131:23 132:3
134:4 136:5,17,18
138:17,21,22
139:1,3 142:17,25
143:21 153:18
154:9,14,17,21
155:18 166:19
167:1 173:21,23
176:16 186:5
198:8 207:1
230:11 247:7
268:24 270:5
271:22 273:2,3
**session** 14:21
**sessions** 14:22
28:10
**set** 33:4,6 73:11
82:10,14 92:25
93:3 105:22

**[set - speak]**                                                                    Page 42

106:15 184:23
225:15 270:10
283:6
**setting**  28:22 91:8
107:7
**seven**  170:5 171:3
**severe**  231:10
**severity**  231:21
**shake**  252:3
**shaking**  209:12
256:20
**share**  73:19
**shared**  82:1 141:2
**sheet**  162:16 163:8
184:10 284:13
286:7,10,18 287:1
**sheets**  164:14
**sheriff**  209:23
**sheriff's**  112:8
**shift**  50:21
**shifting**  193:3
**short**  198:12
246:16
**show**  32:8 123:2
161:24 204:10
208:25
**showed**  122:25
166:7 177:17
**showing**  168:23
**shown**  16:19
284:16
**shows**  175:23
**shred**  228:24
**sic**  259:18
**sided**  163:8
**sides**  188:18
**sign**  124:21 127:1
223:9
**signature**  281:5
283:13 284:14

**signed**  285:13
286:18
**significant**  177:11
199:15
**signing**  284:19
**signs**  196:21
**similar**  37:15,25
46:24 89:23
107:17 120:1,1
122:14 160:19
179:4,4 259:10
**similarly**  83:12
**simpler**  156:6
**simply**  16:2 19:24
109:15 261:10
**sincerely**  284:21
**sir**  284:10
**sit**  70:12 111:22
112:4,7 113:3,5,19
123:21 128:12
173:12 278:14,14
**site**  161:10 173:10
**sitting**  223:11
248:24
**situation**  48:3,6
76:4 146:10 147:3
275:15 277:1
**six**  12:21 26:19
27:2 143:19 171:4
175:24 176:1
**skill**  31:12
**skills**  35:6,15,18
38:3
**skim**  249:9
**skimmed**  249:7
253:24 254:2,8,11
**skip**  95:8
**slide**  7:1 164:6
165:1 174:5,10,17
174:20 175:23
176:18,20 177:3

177:25 178:2
227:19 228:2
**slides**  21:16,20,25
118:16,21 121:10
122:21 125:14
126:21 151:25
177:21 224:17,23
224:24 226:10,11
226:12,19,19
**slightly**  161:12
**small**  142:19
146:8 161:15
211:16 249:4
**smalley**  79:18,19
132:18
**smith**  16:8,12 17:4
64:22 65:7,16,22
66:11 69:4 71:3
71:15 125:10
132:24 175:4
201:16,20 202:5
202:22 203:4,11
203:12 225:1
256:1,9
**snacks**  17:14
**sober**  118:7
**sobriety**  153:11
**social**  18:2 28:9,19
41:2 46:13 51:14
54:2,11,14 55:21
57:20 60:4 74:15
88:7 105:24
**socioeconomic**
272:18
**solely**  49:4 51:10
63:13,13 92:23
104:19 143:2
144:5 161:4 259:4
**solutions**  4:3
284:1 287:1

**solve**  58:9
**somebody**  140:13
194:7
**somewhat**  253:14
**son**  89:14
**sonnhalter**  225:6
**soon**  238:24 266:5
270:1,3 277:9
**sooner**  155:23
186:3
**sorry**  30:2,3 34:6
50:17 70:5 86:13
86:14 108:11
148:22 151:21
178:13 200:15
207:15 209:19,20
213:10 220:15
222:1 232:19
250:1,15 252:5,6
252:10 253:4
262:6 265:19
**sort**  32:23 37:15
45:3 50:10 93:15
93:15 130:16
151:18 166:14
196:2 205:25
**sorts**  202:17
**source**  27:21
88:16 91:19 93:25
94:8,22 104:1
121:3 159:24
168:13 273:14
**sources**  94:8 105:3
**south**  2:6
**southern**  83:12
147:17
**space**  96:5
**speak**  28:8 47:25
119:7 123:20
161:9 189:12
209:17 213:20

[speak - statement]

253:21 276:22
**speaker** 226:1,23
227:9
**speaker's** 118:18
118:23 119:21
126:6,9 224:16,19
225:18,20 226:8
226:18
**speaking** 25:21
81:7 227:5
**specialist** 37:10,24
**specialty** 41:5
67:12 97:4 107:24
112:6
**specific** 24:6 26:6
27:17 38:17 48:2
50:21 52:21,22
60:1 75:25 82:21
85:13 88:11,12
92:9,14 93:4
94:22 99:19 108:9
111:4 113:7,9,13
117:14 118:25
121:3 127:3
130:24 131:4,10
136:15 139:3,9
140:1 146:23
148:25 149:2
178:21 189:19
197:3 200:12,24
201:7 213:6
217:24 226:24
228:22 231:3,23
232:2 233:25
234:6 235:2,6
237:6 244:5,7
247:13 255:3,8
261:12 265:18,23
265:25 268:6,18
269:10,24 274:14
274:20 275:6

277:10
**specifically** 22:6
22:10,19 26:17
27:12 30:8 34:21
45:12 47:25 48:13
50:4,14 57:25
58:3,4 66:9 77:3,4
77:9 80:8 82:8
88:6,22 93:13,24
94:7 97:5 98:6
99:14 100:13,25
102:18 105:20
107:23 111:10,13
119:23 120:15
122:25 123:3
124:17 125:6,14
126:20 127:2
131:25 135:12
136:9 140:3 141:3
153:7 172:24
173:19 179:12
180:2 181:6
192:24 193:21
194:15 197:14,17
197:20 199:20,22
200:12,22 206:21
212:10 216:16
227:7 230:21,24
232:15 236:5
238:22 243:11
253:1,22 255:17
257:2 261:13
268:11 269:20
270:21 273:17
275:13 276:6
**specifics** 23:4
73:23 126:11
149:7 195:20
233:5 253:5,6
254:15

**specified** 94:17
282:21
**spend** 110:21
**spent** 85:1 92:6
144:9 145:1
247:16
**spike** 277:11
**spoke** 119:6
160:10 189:17
190:3 230:7 257:6
**spoken** 118:22
230:12 238:7
**spreadsheet** 84:9
86:17
**ss** 282:3
**staff** 21:1 47:19,20
48:3,5 50:16 54:6
54:7,13,18 61:14
73:13 106:20
113:21 133:22
142:20 143:7
167:21 168:18
181:17,23 182:2,4
182:10,13,15
183:3 194:13
195:14,21 196:15
212:8 224:25
225:3 226:1
255:25
**staffed** 102:6
182:13
**staffer** 194:6
**staffs** 54:24
**stakeholders** 67:6
150:15 175:16,18
225:12
**stand** 57:10
**standard** 118:16
**standards** 31:22
33:7,10,15,19
34:10 36:2,8,10,20

36:24 37:2 38:9
38:14,19 46:22
101:11 106:1
**standpoint** 233:12
233:12
**stapled** 183:19
**start** 22:8,21 43:21
100:16 102:23
116:5 163:25
205:14 207:6
212:20 217:24
279:6,13
**started** 13:1 66:14
72:12 81:1 99:6
133:11 135:1
165:14 206:1,6
212:14 230:10
248:21 257:17
265:22 266:8
277:19,25 278:9
**starting** 257:18
**state** 12:2 18:1,11
18:16,17 19:1
20:5,10 27:14
39:17 40:8 42:5
57:11 58:11 59:11
61:22 82:15 88:25
89:4,19 90:5
94:19,25 108:3
110:8,12 131:2
146:7 198:2
212:22 217:19,23
220:12 222:13
231:11 251:3
277:14 282:2,7
283:15 285:10
286:15
**stated** 212:19
216:17 252:19
**statement** 14:12
285:13,14 286:19

286:19
states 1:1 42:19
    89:4 122:22
    213:23 234:22
    251:10,21
statewide 101:11
statistic 177:22
    178:3
statistically
    122:22
statistics 87:9
    122:25 123:5
    158:24 167:12
stats 158:23
status 42:23 54:19
    144:13,17
statuses 272:18
stayed 53:21
stays 182:3
stenotypy 282:14
step 51:9 166:20
    194:14,14 201:15
stephen 1:25
    282:6 283:14
stepping 39:21
steward 132:15
stimulant 191:10
    204:21 207:4
stimulants 198:25
stock 266:15
stone 39:21
stop 280:8
stopped 100:17
    280:4,5
stories 73:20
    232:4
story 233:9 275:8
straight 18:5
strategize 81:12
stream 27:18

streamline 271:21
    273:2
street 1:21 2:18
    3:11 4:6,11 12:13
    43:15
strike 9:2 20:8
    24:18 28:3 32:12
    33:16 36:6 41:17
    53:25 63:3 75:14
    76:23 77:25
    102:12 134:2
    145:22 152:20
    170:18 173:2
    176:10 184:16
    195:12 203:11
    207:18 209:22
    214:1,16 220:9
    239:22 244:21
    248:5 270:25
string 187:24
    188:3 189:22
structured 161:6
student 116:10
students 28:25
    29:9
studied 257:14
studies 60:11,15
    131:8
style 106:14
sub 165:16 174:11
subcommittee
    111:23 112:5,11
    112:13 113:15
    116:24 203:15
subcommittees
    225:14
subgroup 114:25
    213:18
subgroups 114:19
subject 15:16 35:4
    131:1 257:8,23

submission 158:7
    158:8
submissions 51:1
submit 20:6 42:8
    74:6 81:15 84:8
    84:12,18 103:5
    139:25 158:5
submits 84:14
submitted 74:11
    79:3 81:20 84:6
    98:22 100:11,19
    100:21 101:1
    103:2 140:16
    158:22 173:16
submitting 100:8
suboxone 108:22
subscribed 285:10
    286:14 287:21
substance 16:12
    24:6 25:10 28:12
    28:14 35:22,22
    39:4,18 41:4,5,8
    41:24 42:6,7,11
    43:9 44:6,15
    48:25 50:11,13
    52:22 53:1,8,15
    57:22,24 58:1,5
    63:2,6,10,14,16,20
    63:23 64:2 74:20
    75:11,17 76:19,25
    77:4 78:12 96:12
    97:14,20 99:2,3,22
    113:9 138:2,15,23
    139:21 179:10
    193:4 199:14
    205:7,15 206:13
    220:2 232:2 250:6
    257:7,25 258:7,13
    258:18,21,24
    259:7,17,18 265:4
    266:2

substances 23:25
    24:2,9,13,16 25:3
    25:9,14 64:5
    76:14 99:11
    102:19,24 139:23
    143:24 144:6
    169:22 174:1
    178:11,20 179:17
    181:6,16 186:20
    193:2,10 199:5,9
    199:13,22 200:1
    200:19 221:23
    222:6,11,14
    231:24 232:9
    252:1 258:4 259:9
    268:14
success 73:19
    161:18 179:4
    190:3
successes 160:19
sued 235:20
suffering 275:10
suggestion 17:15
suite 2:18 4:16
    12:13 284:2
summarize 42:1
    149:11
summary 103:10
    156:22
summer 119:9
    125:24 205:21
    206:4 270:12
summit 1:13 2:3
    6:3,6,8,9,10,12,13
    6:14,16,19 7:2
    10:13,16 12:8,24
    19:5 20:19 27:3
    28:16 43:3,14
    55:2,19,25 56:12
    65:20 67:10,22
    68:6 72:8 80:3

| | | | |
|---|---|---|---|
| 85:16 86:7 89:6 | 271:4,4,8,13,13 | 186:14 202:13 | **take** 16:2 18:24 |
| 90:11,12 91:4,20 | 272:8 273:19,23 | 212:12 213:1 | 31:1 50:19 62:7 |
| 94:4 96:1 102:10 | 274:10,13 276:6,9 | 222:3,5 244:2 | 74:8 105:12 108:9 |
| 110:8 111:12,21 | 276:15,17,24 | 250:2 267:15 | 115:19 127:15 |
| 112:3,4,8 114:3,7 | 277:17 278:1,17 | 273:25 274:9 | 129:11 141:11 |
| 114:12,21 115:11 | **sunday** 272:6 | **survey** 34:13 | 153:21 157:17 |
| 116:12 117:12 | **superintendents** | 120:17,20,22 | 161:2,8 172:5 |
| 118:9 119:23 | 119:10 120:5 | 121:2,5 122:6 | 181:17 188:2 |
| 120:24,24 122:10 | 122:4 | **surveyors** 36:12 | 198:11 246:15 |
| 122:12 123:1,3 | **superior** 284:1 | **surveys** 32:8 33:24 | 267:14,15 |
| 130:3 131:12,13 | **supervise** 58:7 | 34:1 36:16 47:8 | **taken** 1:20 13:5 |
| 131:16,18 135:4,8 | **supervised** 54:13 | 47:11,16 124:24 | 33:12 62:12 |
| 135:11 136:4,12 | **supervision** 41:2 | 127:6 224:9 | 129:14 198:15 |
| 136:19,22,23,25 | 71:9 | **survives** 190:4 | 214:17 215:1 |
| 137:4,15,17,21 | **supervisor** 48:5 | **suspected** 174:11 | 219:14 246:20 |
| 144:14,18 145:25 | 66:3,5 144:24 | 200:6 | 266:25 267:19 |
| 146:3,5,6,8,13,18 | 151:6 197:9 225:5 | **sustained** 247:12 | 282:20 |
| 146:22,25 149:1 | **supervisors** 69:3 | **swear** 11:12 | **takes** 167:22 |
| 149:12 152:25 | **supply** 237:21 | **sweet** 4:16 11:8,8 | **talk** 15:23 16:5,11 |
| 153:7 157:9,9,21 | **support** 18:10 | **switch** 199:4 | 16:25 17:4,7,16 |
| 159:3,15 160:16 | 29:18 38:23,24 | **switching** 192:2,4 | 22:9 31:16 65:11 |
| 160:19 162:8,11 | 39:12 95:4,4,9,12 | **sworn** 11:16 14:11 | 83:10 116:2 |
| 162:21 163:10 | 96:1,12,18,20,22 | 282:10 285:10,13 | 118:20 119:21 |
| 181:8 183:10,12 | 97:19,23 98:7,8,11 | 286:14,18 287:21 | 120:1,16 123:16 |
| 183:20 184:1 | 98:16 100:20,25 | **system** 25:9 33:3,4 | 124:2 125:2,13 |
| 187:16,25 193:18 | 110:2 145:21 | 49:22 52:5 76:1 | 126:16 147:7 |
| 197:7,24 199:19 | 152:23,24,25 | 82:20 88:4,9,10 | 152:14 158:9 |
| 200:2 203:13 | 153:8 166:14,15 | 107:20 109:19 | 166:14 188:13 |
| 204:7,17,21 205:6 | 166:20 238:12 | 142:14 154:5 | 203:1 222:21 |
| 205:16 224:20 | **supporter** 96:15 | 161:4 169:16,17 | 235:3,5 260:15 |
| 225:8,14,21 | **supporters** 67:2 | 172:18,20 173:1 | **talked** 120:2,7,9 |
| 226:13 228:4 | 95:15 96:2,24 | 176:17 206:24 | 121:18,23 122:10 |
| 230:10,19 231:6 | 97:3 150:24 189:2 | 263:16,19 264:5,6 | 122:24 124:3,6,18 |
| 238:5 239:10 | **supports** 107:21 | 264:21 270:8 | 124:19 126:12 |
| 245:7,13 246:8,12 | 109:25 153:2 | **systems** 270:4 | 211:22 233:5 |
| 247:11 248:1,7 | **suppose** 202:1 | | 256:2,3 273:23 |
| 249:10 250:5,24 | **sure** 37:5 51:4 | **t** | **talking** 45:11 |
| 251:5 255:6,12,21 | 62:4 68:9 84:4 | **table** 116:19 | 127:5,8 129:20 |
| 262:9,13,17 263:4 | 130:25 136:11 | **tailgates** 118:7 | 181:15 211:20 |
| 269:11,17,19,21 | 138:19 139:5 | **tailor** 227:3 | 227:4 265:19 |
| 269:24 270:5,20 | 172:9 180:9 | **tailored** 227:5 | |

**tampering** 261:4
**target** 227:7
**targeted** 268:15
  268:20 275:4
**task** 112:4,19
  113:16 114:3,7,12
  115:16 116:12,25
  117:7,9,23 118:10
  118:17,19,24
  130:3 149:14,19
  149:21 150:2,11
  184:1 200:17
  203:13 204:1
  208:5 210:1,10
  211:11 212:6
  224:20 225:9,12
  225:15,19,22,24
  226:3,5,11,13
  235:10
**tasks** 67:16
**taught** 218:9
**taxpayer** 273:24
**taxpayers** 94:5
  135:20
**team** 6:10,14
  23:19 25:1,3,13
  26:8 27:3,5,8,23
  46:8,11 47:10
  66:2 69:5 70:13
  70:16 71:4 72:9
  72:14 73:15 75:3
  75:16,22 76:8,9
  77:2,13,19,25 78:3
  80:3,7 81:4 82:2
  83:11,15 86:10
  87:3,15 88:15,20
  88:21,22 90:8
  91:9,16 92:2,7,13
  92:21 93:8 132:17
  141:17 144:22
  145:1 151:14,17

156:23 159:18
160:10 162:9
163:10 164:4
168:17 173:8
183:11,24 191:21
196:20 205:19
**teams** 6:8 20:17,18
  20:21 22:25 26:16
  26:19,21,25 27:6
  42:15 54:21 67:10
  73:18 74:2 82:3
  85:8,15,20 88:18
  88:25 89:16,23
  90:2,14 91:1,5,21
  112:15 120:3
  156:21 157:8
  158:9 160:23
  163:25 173:9
  175:17 186:1
  188:7 190:11
  191:18,19 197:17
**technical** 81:5
  96:7 111:18
**technician** 31:4,8
  31:19 38:1
**teleconference**
  2:16 3:16
**telephone** 128:15
**television** 234:9,11
**tell** 16:9 17:11
  19:18 37:17 54:10
  108:18 110:10
  112:2
**telling** 17:10
**template** 119:19
  189:10
**tend** 240:24
**term** 213:3,14
  222:21 223:16
**terms** 147:7
  212:24 213:2

278:10
**testified** 14:8
  130:6 199:3
  273:12 274:6,18
**testify** 282:10
**testimony** 16:13
  130:20 165:5
  248:25 252:15
  253:13 254:3,6,10
  266:12 274:1
  276:11,16,21
  282:13,17 285:6,7
  286:6,9,12
**teva** 3:2,14 10:20
  11:5,25 243:13,15
  244:19,24,24
  268:4 269:15
**texas** 115:6
**text** 176:19
**texted** 17:8
**thank** 12:14 62:15
  64:16 68:17 86:15
  117:17 128:18
  129:17 169:6
  198:18 246:23
  248:11 249:1,2
  260:6,8 266:22
  267:3,24 273:5
  276:2,4 280:9,11
**thanks** 56:19
  60:17 62:9 68:22
  100:4 156:19
  190:2 209:21
  229:9
**therapy** 133:17
**thing** 93:23 161:2
  246:25
**things** 31:17 44:2
  106:25 118:1,7
  143:24 144:6
  153:11 156:6

162:3 223:6,10,12
224:9 231:14
232:1,25 268:2
**think** 29:20 43:5
  43:13 59:15 83:19
  91:22 104:23
  130:23 135:1
  141:14 143:6,18
  155:11,25 160:23
  172:2 175:13
  192:14 199:8,10
  212:17 213:17
  218:23 219:12
  220:5 221:12,21
  223:16,17,20
  224:7,10 225:10
  231:15,24 234:19
  235:3 243:3 246:2
  246:17 248:25
  252:19 257:4,10
  258:17 259:2,13
**thinking** 219:23
**third** 95:9 111:16
  127:22 132:21
  185:11 188:16
**thirty** 284:18
**thought** 117:11
  130:15 161:18
  239:20 254:8
**three** 20:25 29:3
  43:21 65:1 95:14
  181:18 182:2
  184:23
**tie** 220:7
**time** 10:4,9 13:25
  14:20,24 18:12
  20:3 22:1,15 26:4
  32:4 34:10,17
  35:24 36:22 37:8
  37:23 39:8 41:18
  41:19,20 42:24

**[time - treatment]**                                                     Page 47

43:1,2,5,5,20 44:7
44:20 45:2 46:7
46:15 47:4,6,11
48:7 49:9 51:7,7
51:14 53:13 54:15
55:3,15 57:1,5
58:8,22 59:2,5
60:22 61:17 62:3
64:23,24 65:1,21
69:3,7 70:14 71:2
73:13,20 75:5
78:25 79:7 81:19
82:8 83:6 84:1,5
84:12,18,22 85:1
85:22 89:7 92:23
101:21 105:25
115:18 130:16
132:9,15,23 143:9
144:9 145:1 152:7
153:11 178:5
180:15,19 190:9
193:15 195:7
201:17 206:1,13
211:12 212:4,23
216:17 218:2
223:2 228:23
230:7,12 233:4
234:4,12 235:2
260:7 265:10,11
265:15,18 269:20
270:11,12 272:5
275:24 279:16
282:20
**timed**  280:6
**times**  29:1 47:18
50:3,5,7 54:6 55:5
58:8 59:15 65:3
84:4,24 118:22
128:21 131:11
132:2 143:23
147:2 163:25

213:15 215:15
220:5 258:3
270:17
**tips**  17:12
**tisch**  225:4 226:23
227:15
**tit**  65:25
**title**  142:23 163:9
202:11,14
**titled**  6:7,10,13,18
6:20 7:1 157:7
162:8 177:21
183:10 204:5
208:18 228:2
**titles**  90:9 232:17
**tobacco**  222:16
**today**  13:9 14:15
123:21 151:12
223:12 248:12
254:4 257:5
262:19 267:25
271:14,18 278:15
**tolbert**  56:24 57:1
**told**  117:9 191:23
272:5 275:7
**toledo**  43:22
**top**  23:3 25:16
107:5 154:19
159:6 160:25
164:16 167:5,13
174:6 186:20,24
187:7 189:25
193:9 207:23
208:15 216:15
219:7 232:15
**topic**  34:4,5
147:18
**topics**  15:19,21
35:11 37:2 38:4
211:19

**total**  26:20 104:14
111:1 168:3
175:23 176:3
**touched**  223:5
224:14
**tour**  101:14
**town**  119:6,16
122:14
**township**  83:12,17
83:22 85:15,19
90:16 158:25
159:8,17 160:16
161:6 179:3
**tox**  52:4 275:18,18
**track**  77:5,25 78:2
78:8 82:23 83:3
84:25 86:8,20
87:2 88:21 97:19
102:19 109:11
139:19 152:19
153:19 165:23
166:18 168:19
179:8 195:23
261:14,19
**trackable**  179:13
**tracked**  74:5
86:16 87:21
102:25 105:17,18
**tracking**  75:17
98:25 99:6,11
102:23 140:4
161:4 179:12
180:10,16 260:18
260:20 261:1,8,12
261:24
**tracks**  78:11 87:20
103:3 193:19
**train**  85:5
**trained**  144:21
150:24 194:6

**trainers**  95:20
**training**  6:18
35:25 36:5,7
38:18 56:8 59:7
61:22 70:24 85:13
85:14 95:16,18,22
95:23,24 130:23
133:22,22 134:10
134:23 194:12,22
204:5,19 217:7
230:14
**trainings**  67:3,5,8
95:13,14 96:9,10
131:1,2 212:22
**transcribed**
282:16 285:7
**transcript**  5:1
13:23 281:3,6,9,11
284:11,12 285:5
285:12 286:5,11
286:17
**transcription**
282:17
**transcripts**  16:16
**transition**  113:17
155:20,21
**transitioned**  155:5
264:22
**transitioning**  62:3
79:15
**transport**  161:8
**travel**  65:4
**treat**  45:17 58:15
138:9 139:4
**treated**  75:4
**treating**  44:11,21
63:25
**treatment**  15:22
24:4,15 29:17,18
32:9 34:20 37:6
42:12,15 45:9,11

[treatment - unit]

Page 48

45:20 46:8,11
47:9 48:18 49:3,5
51:9 52:11 54:21
58:24 74:4 76:16
77:14 86:2,9,21,24
87:1,4,8,15,17
88:13 99:17
100:14,16,18
106:18 107:13,23
108:15,16,19,24
108:24 109:4
110:3,5 133:18
138:20,21 139:21
153:4 154:3
160:11,22 161:16
161:17 164:15,18
164:24 165:2,8,18
165:19,25 166:4
168:14 177:13
178:4 185:2,12,19
190:4,12 196:14
196:16 197:6
205:20 207:8
219:10 226:7
247:1,4,8 270:18
271:25 272:2
275:21,21
**trend**  206:9
277:25 278:9
**trends**  120:8,12
121:12 205:7,15
206:13,17 251:5
255:7 277:18
**trial**  57:10
**tricep**  109:19
**tried**  143:20
168:17
**triggered**  220:2
**true**  44:13 60:7
159:23 282:16

**trumbull**  43:8
55:4
**trusted**  184:19
**truth**  282:11,11,12
**try**  48:5 77:23
263:1 272:24
277:17,24 278:8
**trying**  16:3 87:19
210:12 271:21,24
**tucker**  4:15 11:8
**tuckerellis.com**
4:18
**turning**  71:24
113:4 167:4
**tv**  233:17
**twelfth**  3:11
**two**  14:21,25 15:6
16:2 17:5,6 21:1
21:13 24:16 26:15
27:6 31:4 40:14
43:21 54:15 59:15
61:24 69:12 96:2
98:3 104:8,9
105:24 107:12
113:24 114:18
142:10 158:3,14
164:13,22 167:12
171:19,21,24
174:9,11 177:17
177:21 183:19
186:6 195:9
205:12 239:25
240:1
**type**  34:24 53:1
83:22 96:11
**types**  24:13 45:20
46:10 199:18
231:19 240:6
**typically**  73:10
141:6 150:4
191:11

**u**

**u.s.**  115:5 123:6
**uh**  37:11 62:8
74:23,23 80:4
88:1 100:3 111:19
117:18 127:14,20
127:20 129:22
142:9 152:16
156:14,16 163:13
168:6 169:7 171:5
176:21 177:23
186:19 188:21
199:2 205:24
228:10 273:9
**ultimate**  27:20
44:22
**ultimately**  23:15
39:19,25 44:11
49:21 168:19
275:18
**undergraduate**
39:16 217:13
**underlying**  76:20
**underneath**
111:20 167:11
205:5
**understand**  13:12
13:17 14:1 25:21
87:19,24 148:6
167:18 168:7
185:16 220:19
277:17 278:9
**understanding**
22:12 23:14 26:2
32:11,18,25 33:13
34:11 36:14 55:15
56:10 72:6 76:8
83:1 85:11 86:6
93:14 100:1 109:6
109:18 121:7
129:7,24 133:12

134:25 135:3,6
145:15,17 148:9
148:12 155:3
156:15 160:15
161:10 165:6
169:18 170:23
171:25 174:19
177:16 178:8,24
183:4 185:7
192:19 193:13
197:12 199:4,6,17
199:23,25 212:12
212:14 213:3,13
213:25 214:11,13
216:18,24 217:1
230:6 234:20
235:18,21,24
236:1,7 237:8,10
238:1,4 249:20
250:3,11,18,20
251:11,12 252:20
252:22 253:11,16
257:22 261:16
262:15 264:9
266:9 274:3
**understood**  14:5
98:15 171:18
249:5
**undertaken**
277:16,23 278:8
**underway**  276:18
277:4
**unfortunately**
163:6 275:9
**uniformly**  90:8
**uninsured**  58:13
58:16
**unit**  31:14 35:19
37:23 46:12,13,13
50:6,21 51:12,14
54:8,21 93:6,7,13

93:18
**united** 1:1 122:22
  213:23 234:22
  251:10,20
**units** 31:10,11
  35:19 38:2 50:13
**university** 18:1,4
  28:22,23 39:17
  118:6 120:23
  126:1
**unknown** 171:11
**unrestorable**
  57:10
**unused** 110:23
  111:6
**unusual** 275:20
**update** 64:18
  73:13 106:22
  113:11 114:4
  195:9
**updated** 19:21,25
  20:6 120:20
  194:24 195:5
**updates** 42:23,23
  47:17 54:19
  150:23 195:8
**upper** 54:16
**upward** 277:19,25
  278:9
**usa** 3:3,15
**use** 18:13 21:16,24
  28:13,14 29:5
  33:19 35:22,22
  39:18 41:5,8
  42:11 44:6,15,17
  45:16 48:25 50:11
  51:19,19,22,24
  52:12,17,23 53:1,8
  53:15,16 57:22,24
  58:1,6 59:8,18
  63:2,6,10,14,17,20

63:23 64:5,8,10
  76:12 83:25 94:11
  94:17 96:12,23
  97:14 98:2,6,17,19
  100:2,7 108:8
  118:3 123:6,7
  126:21 138:2,10
  138:17,23 139:9
  139:21 143:10,23
  170:3,5 171:3,3,4
  171:6,21 182:1
  185:3 191:24
  192:1,16 193:3
  194:6 199:14,16
  201:8 205:7,9,15
  206:13 207:5,9
  212:1 215:11,19
  215:21 216:4
  227:8 258:8,13,18
  258:22 259:17,17
  265:4,7 266:2,6
  269:10,23 271:6
  278:17
**useful** 89:6
**user** 183:5
**users** 102:14,20
  193:2 199:5 231:6
**uses** 259:18
**usually** 114:2
  200:1
**utilization** 20:20
**utilize** 27:25 88:5
  134:14 175:7
  212:9 264:6
**utilized** 119:20
  126:22 162:3
  166:13 264:5
**utilizes** 27:22
**utilizing** 86:24

**v**

**v** 1:10,11,13 284:6
  285:3 286:3
**vacancies** 69:8,11
  69:12,21 144:2
**vacancy** 142:1
**vacant** 69:14,18
  69:19 78:23
**vaguely** 233:24
**valid** 160:5 221:10
  231:7
**vandetta** 4:21
**varied** 14:20
**variety** 144:22
**various** 42:20
  126:22 143:11
  153:2 164:3
  196:21 225:13
  231:13
**vary** 36:23 93:9
**vast** 144:8 226:7
**venues** 225:25
**verbally** 13:22
  190:17,18
**verify** 99:12
  170:22 184:17
**veritext** 284:1,7
  287:1
**veritext.com.**
  284:17
**versa** 258:19
  259:8
**version** 19:15
  64:11
**versus** 24:23 35:19
  77:7,16 78:4,9
  106:1 109:13
  123:6 139:22
  143:16 148:8
  178:11 179:23
  180:6,14,17,18

182:24 183:6
  192:22 194:2,9
  201:2 253:2
  273:24
**vice** 258:19 259:8
**video** 8:1
**videographer** 4:21
  10:1,25 11:11
  13:14,20 62:10,13
  129:12,15 198:13
  198:16 246:18,21
  266:23 267:1,17
  267:20 280:12
**videotaped** 1:16
**views** 235:16
**vince** 208:1
**virginia** 2:18
  188:6 231:16
**virtually** 279:4
**visit** 77:13 78:3
  87:3
**visited** 75:3 86:10
  87:14 88:14
  177:12
**visits** 25:11 74:24
  76:8,9,11 84:10
  177:10
**vit** 224:8
**vital** 124:21 127:1
  223:9
**vitals** 31:14
**vivitrol** 108:22
  109:10
**volunteer** 230:11
**volunteers** 73:9

**w**

**wacker** 3:18
**wade** 56:13 66:3
  69:4 71:3,5 80:23
  132:15 144:24

**wait** 106:9
**waived** 284:19
**walgreens** 246:3
**walk** 30:16 72:5
**walmart** 2:10
  10:24 246:1
  260:14
**want** 12:6 40:22
  72:25 141:2
  146:24 211:1
  214:23 256:23
  260:15 268:2
  270:18
**wanted** 12:7 68:9
  201:13 257:3
**wanting** 181:7
**wants** 214:21
**warm** 173:13
  181:11
**warning** 218:15
**warnings** 215:11
  215:19
**washington** 3:12
**watson** 3:3,4,15,16
**way** 156:8 181:18
  182:2 256:11
  261:3 263:21
  277:6
**wc.com** 3:13
**we've** 62:1 126:21
  126:22 127:12
  143:19 157:13
  162:14 168:17
  179:14 187:20
  199:8 212:24
  228:8 229:19
  273:23
**website** 132:11
**week** 15:2,5 49:20
  75:9 95:23 114:2
  128:17 141:14

**271**:23
**weekly** 106:21
**weeks** 17:6
**weighed** 116:19
**welcome** 129:19
**wendy** 3:5 10:18
  11:24
**wendy.feinstein**
  3:7
**went** 11:23 79:21
  90:18 126:7
  155:23 166:5
  191:21
**west** 2:18 3:5,18
  4:6 10:18 11:24
  12:12 188:5
  231:16
**western** 18:3
  120:23
**wheeling** 188:5
**when's** 230:7
  234:4 269:20
**whereof** 283:5
**wholesale** 249:17
  249:24 250:8,11
  250:21 251:3,9,17
  255:5
**wide** 35:8,10
  142:20
**williams** 3:10,11
  10:22
**willing** 46:6
**wish** 174:4
**withdrawal** 24:8
  24:11,15
**witness** 2:3 10:7
  10:14,17 11:12
  62:8 86:14 117:16
  117:18 127:20
  148:22 209:12,19
  214:20 256:20

**260**:5,8 262:5
  266:21 273:9
  280:11 282:9,14
  282:15,18 283:5
  284:8,11 285:1,4
  285:11 286:1,4,15
**witness's** 223:17
  281:2
**witness'** 284:14
**woman** 275:7
**word** 142:23
  147:10 253:19
**work** 12:9,12 25:2
  28:9,19 32:15
  33:5 34:24 43:24
  48:4,13 49:15
  51:15,17 52:7,11
  52:15 54:5 55:13
  55:19 57:19 58:9
  64:21 65:12 66:5
  66:7,24 67:1,12
  75:23 83:7 90:19
  91:20 96:11,13,13
  97:3,18 105:24
  108:5 112:20
  133:24 142:22,24
  146:19,24 147:1
  153:20 154:4
  175:8 186:1 202:4
  206:10 215:25
**worked** 12:23 18:9
  21:12 31:10 35:5
  35:13 37:22 38:23
  41:13 42:15 49:19
  50:5 54:16 57:3
  81:12,13 88:22
  107:23 128:19,20
  132:1 151:13
  175:3 197:25
  208:6 264:3

**worker** 41:2 46:13
  51:14
**workers** 54:14
  172:13
**working** 39:11
  48:9 52:12 58:1
  85:24 89:18 97:5
  109:24 114:5
  121:24 133:21
  140:19 168:23
  181:11 217:3
  223:25 265:8
  270:23
**works** 27:2,4,6
  133:15,20 138:1
  255:11,20
**workshop** 205:1
**wrap** 127:18
**write** 188:24
  190:24 205:12
  240:24
**writes** 190:2
**writing** 215:3
**written** 13:23
  14:11 152:2
  198:23 248:7
  249:10 262:9
**wrong** 245:7 246:8
  246:12
**wrote** 240:23

|   y   |
|-------|

**yeah** 62:4,9
  127:14 135:14
  137:19 144:1
  151:25 154:19
  177:5 193:24
  197:8 201:25
  210:14,25 211:6
  220:17 252:8
  267:13

**[year - zip]**

**year**   19:19 20:20
28:11 29:3 59:25
70:7 71:21 92:7,7
98:24 101:18
103:12,16 107:15
110:14,21,25
111:2 113:23
119:7,9 128:16
150:21 155:6,6,13
155:14,17,22
156:13 158:16
161:20 185:24
190:25 191:1
217:21 244:10
265:20,23,25
268:23 269:4
**years**   21:6,8 29:4
40:14 59:22 60:1
82:9 107:20
131:10 234:7
243:21
**yep**   174:15
**york**   4:6,6
**young**   16:3 61:24
113:18 114:15,17
231:1 272:12
**youth**   114:21
120:17 122:5
231:4
**yvonne**   120:6
121:15

**z**

**zachary**   3:18 11:4
**zero**   178:3
**zip**   82:23 83:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.