Highly Confidential - Subject to Further Confidentiality Review

1           UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OHIO

3                EASTERN DIVISION

4                   -   -   -

5      IN RE: NATIONAL PRESCRIPTION

6      OPIATE LITIGATION           Case No.

7                                  1:17-MD-2804

8      APPLIES TO ALL CASES        Hon. Dan A.

9                                  Polster

10     Case No. 1:17-MD-2804

11                  -   -   -

12              January 30, 2019

13       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14             CONFIDENTIALITY REVIEW

15             Videotaped deposition of JEFFREY

16     S. PEACOCK, held at 200 Vesey Street, New York,

17     New York, commencing at 9:16 a.m., on the

18     above date, before Marie Foley, a Registered

19     Merit Reporter, Certified Realtime

20     Reporter and Notary Public.

21                  -   -   -

22           GOLKOW LITIGATION SERVICES

23        877.370.3377 ph | 917.591.5672 fax

24              Deps@golkow.com

Page 2

1  A P P E A R A N C E S :
2
3  MOTLEY RICE, LLC
4  BY: DONALD A. MIGLIORI, ESQUIRE
5      28 Bridgeside Boulevard
6      Mount Pleasant, South Carolina  29464
7      843.216.9000
8      dmigliori@motleyrice.com
9      Representing the Plaintiff
10
11
12  LOCKE LORD LLP
13  BY: JOHN P. McDONALD, ESQUIRE
14      C. SCOTT JONES, ESQUIRE
15      2200 Ross Avenue
16      Suite 2800
17      Dallas, Texas  75201
18      214.740.8758
19      jpmcdonald@lockelord.com
20      Representing Henry Schein, Inc. and
21      the Witness
22
23
24

Page 3

1  A P P E A R A N C E S :
2
3  FARRELL FRITZ, LLP
4  BY: KEVIN P. MULRY, ESQUIRE
5      400 RXR Plaza
6      Uniondale, New York  11556
7      516.227.0620
8      Kmulry@farrellfritz.com
9      Representing Cardinal Health
10
11
12  GIBBONS P.C.
13  BY: PAUL E. ASFENDIS, ESQUIRE
14      One Pennsylvania Plaza
15      37th Floor
16      New York, New York  10119-3701
17      212.613.2067
18      pasfendis@gibbonslaw.com
19      Representing AmerisourceBergen
20
21
22
23
24

Page 4

1  APPEARANCES VIA TELEPHONE AND STREAMING:
2
3  ARNOLD & PORTER KAYE SCHOLER, LLP
4  BY: TIFFANY M. IKEDA, ESQUIRE
5      777 Figueroa Street
6      44th Floor
7      Los Angeles, California  90017
8      213.243.4000
9      Representing Par and Endo
10
11
12  COVINGTON & BURLING, LLP
13  BY: LAUREN DORRIS, ESQUIRE
14      PAUL DOWNS, ESQUIRE
15      One CityCenter
16      850 Tenth Street NW
17      Washington, DC  20001
18      202.662.6000
19      Representing McKesson
20
21
22
23
24

Page 5

1  APPEARANCES VIA TELEPHONE AND STREAMING:
2
3  JONES DAY
4  BY: CASTEEL BORSAY, ESQUIRE
5      325 John H. McConnell Boulevard, Suite 600
6      Columbus, Ohio  43215
7      614.469.3939
8      Representing Walmart
9
10
11  MARCUS & SHAPIRA LLP
12  BY: PAUL M. MANNIX, ESQUIRE
13      One Oxford Centre
14      35th Floor
15      Pittsburgh, Pennsylvania  15219
16      412.471.3490
17      Representing HBC Service Co.
18
19  ALSO PRESENT:
20      Marjorie Han, Henry Schein
21      Janine Downing, Henry Schein
22      Henry Marte, videographer
23
24

Page 6

```
1           - - -
2      TRANSCRIPT INDEX
3              PAGE
4   APPEARANCES...................... 2 - 5
5   INDEX OF EXHIBITS................ 7 - 11
6   EXAMINATION OF JEFF PEACOCK:
7   BY: MR. MIGLIORI................ 14
8   AFTERNOON SESSION................ 189
9   SIGNATURE PAGE................... 328
10  ERRATA........................... 329
11  REPORTER'S CERTIFICATE........... 330
12
13
14
15          - - -
16
17
18
19
20
21
22
23
24
```

Page 7

```
1           - - -
2       E X H I B I T S
3           - - -
4   Henry Schein, Inc.-Peacock Exhibits    PAGE
5   Peacock    Plaintiffs' Notice of Oral    17
6   Exhibit 1  Videotaped Deposition of
7           Jeff Peacock As Fact
8           Witness For Defendant
9           Henry Schein
10
11  Peacock    LinkedIn profile of Jeff    24
12  Exhibit 2  Peacock
13
14  Peacock    Conflict of Interest    31
15  Exhibit 3  Statement, Offer Letter,
16          Bates No. HSI-MDL-00632419
17          to 00632520
18
19  Peacock    Power Point presentation    37
20  Exhibit 4  Global Quality Assurance,
21          Regulatory Affairs and
22          Trade Compliance December
23          9th, 2016 Jeff Peacock
24
```

Page 8

```
1   Peacock    Title 21 United States    94
2   Exhibit 5  Code Annotated Section 801
3
4   Peacock    Title 21 Code of Federal    100
5   Exhibit 6  Regulations Section 1301.74
6
7   Peacock    Letter dated December 21,    109
8   Exhibit 7  2018 from Locke Lord, with
9           attachment
10
11  Peacock    Healthcare Distribution    114
12  Exhibit 8  Management Association
13          (HDMA) Industry Compliance
14          Guidelines: Reporting
15          Suspicious Orders and
16          Preventing Diversion of
17          Controlled Substances,
18          Bates No. HSI-MDL-00063613
19          to 00063627
20
21  Peacock    Interoffice memorandum    154
22  Exhibit 9  dated December 23, 2013,
23          Bates No. HSI-MDL-00622244
24          to 00422250
```

Page 9

```
1   Peacock    Interoffice memorandum    189
2   Exhibit 10 dated December 19, 2012,
3           Bates No. HSI-MDL-00622252
4           to 00622258
5
6   Peacock    Interoffice memorandum    195
7   Exhibit 11 dated December 30, 2013,
8           Bates No. HSI-MDL-00621989
9           to 00621996
10
11  Peacock    Interoffice memorandum    198
12  Exhibit 12 dated February 14, 2014,
13          Bates No. HSI-MDL-00622219
14          to 00622224
15
16  Peacock    Interoffice memorandum    207
17  Exhibit 13 dated February 17, 2014,
18          Bates No. HSI-MDL-00499366
19          to 00499371
20
21  Peacock    DEA Compliance Update    208
22  Exhibit 14 October 2, 2014, Bates No.
23          HSI-MDL-00575077 to
24          00375079
```

Page 10

1 Peacock      Email chain ending May 7,    220
2 Exhibit 15  2018, with attachment,
3            Bates No. HSI-MDL-00572919
4            to 00572922
5
6 Peacock      Email dated July 19, 2018,    244
7 Exhibit 16  with attachment, Bates No.
8            HSI-MDL-00433692
9
10 Peacock      Email chain ending July    254
11 Exhibit 17  18, 2018, with attachment,
12            Bates No. HSI-MDL-00209427
13            to 00209428
14
15 Peacock      Email chain ending January    259
16 Exhibit 18  26, 2016, Bates No.
17            HSI-MDL-00156897 to 00156899
18
19 Peacock      Letter dated November 9,    277
20 Exhibit 19  2012, Bates No.
21            HSI-MDL-00397293 to 00397294
22
23 Peacock      Letter dated May 8, 2013,    285
24 Exhibit 20  with attachment

Page 11

1 Peacock      Memorandum in Support of    288
2 Exhibit 21  Motion For Summary Judgment
3            in the United States of
4            America versus Brian D. Heim
5
6 Peacock      Customer Service Imaging    295
7 Exhibit 22  printout, Bates No.
8            HSI-MDL-00001198 to 00001210
9
10 Peacock      Cegedim Dendrite Draft    309
11 Exhibit 23  Schein SOM Procedural
12            Review, Bates No.
13            HSI-MDL-00404359 to 00404383
14
15 Peacock      Email chain ending    321
16 Exhibit 24  February 27, 2015, Bates
17            No. HSE-MDL-0039634
18
19
20
21
22
23
24

Page 12

1 DEPOSITION SUPPORT INDEX
2
3 DIRECTION TO WITNESS NOT TO ANSWER
4  Page  Line
5  - -none- -
6
7
8 REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page  Line
10  - -none- -
11
12
13 STIPULATIONS
14  Page  Line
15  - -none- -
16
17
18 QUESTIONS MARKED
19  Page  Line
20  - -none- -
21
22
23
24

Page 13

```
 1             - - -
 2           9:16 a.m.
 3        New York, New York
 4             - - -
 5        THE VIDEOGRAPHER:  We are now on
 6 the record.
 7        My name is Henry Marte.  I'm a
 8 videographer with Golkow Litigation
 9 Services.
10        Today's date is January 30th,
11 2019, and the time is 9:16 a.m.
12        This videotaped deposition is
13 being held at 200 Vesey Street, New
14 York, New York in the matter of
15 National Prescription Opiate
16 Litigation.
17        The deponent today is Jeffrey
18 Peacock.
19        All appearances are noted on the
20 stenographic record.
21        Will the court reporter please
22 administer the oath to the witness.
23             - - -
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  JEFFREY S. PEACOCK, the Witness herein, having
2  been first duly sworn by a Notary
3  Public in and of the State of New
4  York, was examined and testified as
5  follows:
6  EXAMINATION BY
7  MR. MIGLIORI:
8  Q.  Good morning, sir.
9  A.  Hi.
10  Q.  My name is Don Migliori.  I'm
11  from a law firm called Motley Rice, and
12  they represent various plaintiffs in this
13  litigation.
14      It's good to meet you.
15      Have you ever had your
16  deposition taken before?
17  A.  No, never.
18  Q.  Okay.  Let me give you some
19  basics, and then we'll get started.
20      I'm going to ask you questions
21  throughout the day.  The court reporter is
22  going to take down my questions.  If
23  they're clear and understandable, I'd ask
24  that you respond to them.  If you don't

Page 15

1  understand the question, I'd ask you to
2  let me know.
3      I would ask you to give me some
4  time between my question and your answer
5  such that, one, the court reporter can
6  take it down, and, two, your counsel, if
7  he chooses, would have an opportunity to
8  put an objection down on the record.
9      Okay?
10  A.  Mm-hm.
11  Q.  Second rule is you have to
12  actually say "yes" or "no."
13  A.  Yes.
14  Q.  And it's a lot easier for the
15  court reporter to type that --
16  A.  Yes.
17  Q.  -- than nods or gestures or
18  grunts.
19      If you answer a question, I'll
20  assume that you've understood it.
21      Is that a fair ground rule for
22  the day?
23  A.  Sure.
24  Q.  Okay.

Page 16

1  A.  Yes.
2  Q.  And if you need to take a break,
3  I'm happy to do that.  This isn't,
4  hopefully not -- I don't think this will
5  take a full day.  But to the extent we
6  need a break, I just ask that we finish
7  the question that we're on before we go
8  into a break.  And I'm happy to
9  accommodate anything that you need.
10      Before we get started, do you
11  have questions of me or what we're about
12  to do?
13  A.  No.  I'm clear.  Thank you.
14      MR. McDONALD:  Are you ready to
15  start?
16      MR. MIGLIORI:  Yeah.
17      MR. McDONALD:  Let me just --
18  we're not getting realtime.
19      Are you?
20      MR. MIGLIORI:  I am.
21      (Pause.)
22  BY MR. MIGLIORI:
23  Q.  Okay.  Sir, could you give the
24  jury your full name and your address,

Page 17

1  please?
2  A.  My name is Jeffrey Scott
3  Peacock.  I live at 2911 Chester Street,
4  Oceanside, New York  11572.
5  Q.  Okay.  And, what is your job
6  title?
7  A.  I'm the vice-president of Global
8  Quality Assurance and Regulatory Affairs.
9  Q.  And the name of your employer
10  is?
11  A.  Henry Schein.
12  Q.  How long have you worked there?
13  A.  Five years six months,
14  six-and-a-half months.
15  Q.  Okay.  We'll go through some of
16  the specifics of your background and
17  training.
18      I want to start with Exhibit
19  Number 1.
20      (Peacock Exhibit 1, Plaintiffs'
21  Notice of Oral Videotaped Deposition
22  of Jeff Peacock As Fact Witness For
23  Defendant Henry Schein, was marked for
24  identification, as of this date.)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  BY MR. MIGLIORI:
2    Q.   I'm going to pass these across
3  the table.  There are two copies.  The one
4  with the sticker is for you.  The one
5  that's not is for your counsel.
6        In front of you is what's been
7  marked as Exhibit 1.  It's a notice of
8  today's deposition.
9        Were you provided this before
10 today?
11   A.   I left my glasses in my coat.
12       MR. McDONALD:  They're in your
13 jacket?
14       THE WITNESS:  They're in my
15 jacket pocket.  Sorry.
16       MR. MIGLIORI:  Not a problem.
17 We will need those today.
18       THE VIDEOGRAPHER:  Should we go
19 off the record?
20       MR. MIGLIORI:  It doesn't
21 matter.
22       (Pause.)
23       THE VIDEOGRAPHER:  Actually, can
24 we go off the record for just one

Page 19

1  second?  I think that phone might have
2  disconnected on us.
3        MR. MIGLIORI:  Okay.
4        THE VIDEOGRAPHER:  The time is
5  9:21 a.m.
6        Going off the record.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  We are back
9  on the record.
10       The time is 9:23 a.m.
11 BY MR. MIGLIORI:
12   Q.   Okay.  Had you seen, now that
13 we're situated, had you seen this, the
14 notice, before?
15   A.   Yes, sir.
16   Q.   When were you first advised of
17 this deposition?
18   A.   I don't remember the exact date.
19 I was notified by our corporate attorney
20 that I was called.
21   Q.   Was it within the past few
22 months?
23   A.   Yes, weeks.
24   Q.   And, did you meet with anybody

Page 20

1  in preparation for this deposition?
2    A.   Yes.
3    Q.   And, when did you first meet?
4    A.   Yesterday.
5    Q.   That was the first time you met?
6    A.   Yes.
7    Q.   Prior to that meeting, were you
8  provided any materials to review in
9  anticipation of the meeting?
10   A.   No, sir.
11   Q.   Have you reviewed documents in
12 preparation for today?
13   A.   Only yesterday.
14   Q.   How long was your meeting
15 yesterday?
16   A.   Six hours.
17   Q.   And, who was present?
18   A.   Mr. McDonald, the next
19 gentleman, and Margie.
20   Q.   Okay.
21   A.   I'm sorry.
22   Q.   Scott?
23   A.   Scott.
24   Q.   That's okay.  He is a gentleman.

Page 21

1        And the three of you met and
2  they provided documents, or did you also
3  bring with you documents?
4    A.   I brought in a couple documents.
5    Q.   Okay.  And, were these documents
6  you reviewed documents that were kept in
7  the ordinary course of business at Henry
8  Schein?
9    A.   Yes, sir.
10   Q.   Were you asked to produce
11 documents from your own files months ago
12 in response to discovery requests in this
13 case?
14   A.   Absolutely.
15   Q.   And, were the documents you
16 brought with you provided at that time?
17   A.   Yes.
18   Q.   So, there was nothing new that
19 you brought to the table yesterday?
20   A.   No, sir.
21   Q.   Okay.  Thank you.
22       And, in reviewing the documents,
23 was there anything that you reviewed that
24 was new to you that you hadn't seen

Page 22

1  before, don't believe was in your custody
2  and control?
3      A.   There was some documents prior
4  to my joining Henry Schein in 2013.
5      Q.   And, did you review any
6  testimony in this case?
7      A.   No.
8      Q.   Do you know Shaun Abreu?
9      A.   I do.
10     Q.   And you know that Shaun Abreu
11 testified in this case?
12     A.   I do.
13     Q.   Did you talk to Shaun about his
14 testimony?
15     A.   I talked to him, but he didn't
16 disclose anything about the testimony.  He
17 said it was a long day.
18     Q.   Okay.  And, did you ever see or
19 review any of the written transcript of
20 his testimony?
21     A.   No, sir.
22     Q.   Did anyone tell you the
23 substance of his testimony?
24     A.   No, sir.

Page 23

1      Q.   Other than the documents that
2  counsel showed you and the documents you
3  brought to the meeting yesterday, is there
4  anything else that you reviewed in
5  anticipation or preparation for --
6      A.   No, sir.
7           MR. McDONALD:  Just be sure to
8  let him finish his question.
9           THE WITNESS:  I'm sorry.
10          MR. McDONALD:  That's okay.
11 BY MR. MIGLIORI:
12     Q.   Okay.  Let me go over your
13 background a little bit first, and then
14 we'll get into Henry Schein.
15          I don't -- do you have a current
16 curriculum vitae?
17     A.   I do.
18     Q.   Is that something you provided
19 to counsel?
20     A.   I don't recall.
21          MR. MIGLIORI:  Okay.  I don't
22 have a copy.
23          And, counsel, if you do and have
24 produced it, I don't -- I don't have

Page 24

1  it.
2           MR. McDONALD:  He didn't.
3           MR. MIGLIORI:  Okay.  Well,
4  we'll go from here and see what
5  happens.
6           (Peacock Exhibit 2, LinkedIn
7  profile of Jeff Peacock, was marked
8  for identification, as of this date.)
9  BY MR. MIGLIORI:
10     Q.   Best I can do is what you put
11 online on LinkedIn.
12          I show you Exhibit Number 2.
13 It's obviously very superficial, but let's
14 go over it.
15          Could you go over your
16 educational background?
17     A.   Sure.
18     Q.   So, you went to Cornell
19 University undergraduate?
20     A.   Correct.
21     Q.   And graduated in 1979?
22     A.   Yes.
23     Q.   With a bachelor of science
24 degree in animal physiology?

Page 25

1      A.   Correct.
2      Q.   And then it looks like you had a
3  four-year master's program in medical
4  biology and immunology?
5      A.   It was at night, so it took four
6  years to get, but I was working at the
7  time.
8      Q.   And, what is LIU Post?
9      A.   Long Island University.
10     Q.   Okay.
11     A.   C.W. Post campus.
12     Q.   Got you.
13          When you graduated in 1990, you
14 were -- you said you were working at the
15 time?
16     A.   Yes, sir.
17     Q.   And, I'm looking at this.  It
18 seems that you worked at Memorial
19 Sloan-Kettering Cancer Center from 1985 to
20 1986?
21     A.   That's correct.
22     Q.   And, what were you doing there?
23     A.   I was the manager of the
24 epidermal growth factor receptor

Page 26

1  laboratory that was run by Dr. John
2  Mendelsohn, and we were doing research on
3  monoclonal antibodies for cancer
4  therapies, and a product that we worked on
5  actually became a drug called Erbitux.
6      Q.   Okay.
7      A.   Which is sold by Bristol-Meyers.
8      Q.   Do you think the Israelis have
9  found a cure?
10     A.   I hope so.
11     Q.   Sounds like they're optimistic.
12          That's the kind of work you were
13 doing though?
14     A.   Yes.
15     Q.   Research on medications?
16     A.   Yeah.
17          I was -- prior to that, I had
18 two other jobs.  I was working in research
19 doing, you know, monoclonal antibody
20 development, looking at, you know,
21 different bacterial infections, means to
22 detect them with monoclonal antibodies,
23 and that was the --
24     Q.   Were you doing any work at this

Page 27

1  time on controlled substances?
2      A.   No.
3      Q.   After that, there's a reference
4  to EZEM.
5          What is that?
6      A.   It was a pharmaceutical medical
7  device company.
8      Q.   And, what did you do for them?
9      A.   I did a lot for them.  So, I had
10 multiple -- multiple jobs.  I came as a
11 kind of an immunochemist when I was
12 working in their research laboratory.  We
13 started the department there called
14 Enteric Products where we commercialized
15 the protein from the Baylor College of
16 Medicine, and it was for detection of a
17 bacteria called Helicobacter pylori.  So
18 we had kind of spun off part of the
19 business, and we ran an incubator out at
20 Stony Brook University.  Relatively small
21 staff which we over the years built up
22 when but we started to commercialize this
23 product, put it through the FDA, and, you
24 know, sold it to major laboratories like

Page 28

1  Quest Laboratories, Quest Diagnostics.
2      Q.   So, is it fair to say you were
3  heavily involved in the research and
4  development and regulatory process for new
5  drugs?
6      A.   This was a diagnostic, so it
7  wasn't a drug.
8      Q.   Okay.  It was a --
9      A.   Yeah, it was a diagnostic.
10          After that, so, I was there
11 from, you know, '86 to about 2000.  There
12 was a new president brought on, and I was
13 brought in to the corporate fold where I
14 did -- ran clinical trials, quality
15 control, quality assurance.
16     Q.   That started in 2000?
17     A.   That started in 2000.
18     Q.   Same company though?
19     A.   Same company.
20     Q.   And that company is based in
21 Lake Success, New York?
22     A.   It's closed now.  We were
23 purchased in 2008.
24     Q.   By?

Page 29

1      A.   By Bracco Diagnostics.  It's the
2  next company on the list.
3          And I was --
4      Q.   Before we leave EZEM though.
5          At any time during your 21 years
6  there, did you work in any way with
7  controlled substances or opioids?
8      A.   No.
9      Q.   The company was bought out in
10 2008.
11          What did your responsibilities
12 become?
13          What was the name of the
14 company?
15     A.   The company was Bracco
16 Diagnostics.
17     Q.   Okay.  And, what, if any,
18 additional responsibilities did you have?
19     A.   So, in that role, I took on the
20 VP of operations, and in that role I was
21 overseeing the manufacturing of some of
22 the contract manufactured pharmaceuticals,
23 as well as some of the -- we -- EZEM made
24 barium products, barium sulphate for

Page 30

1 swallows, enemas, things like that. And
2 then in that role, I took over the
3 manufacturing responsibilities, 'cause of
4 my prior experience, of the facility that
5 we had in Montreal, as well as several
6 contract manufacturers throughout the U.S.
7    Q.   Okay.  And --
8    A.   Both in devices and drugs.
9         I'm sorry.
10    Q.   That was going to be my next
11 question.
12         On the drug side, did you have
13 any direct involvement with agencies, FDA,
14 DEA?
15    A.   Yes.
16    Q.   What kind of involvement did you
17 have?
18    A.   Well, we were audited fairly
19 regularly.  There was a -- you know, with
20 the device and the drug business, it was
21 almost every year we were being audited.
22    Q.   Okay.  Any controlled
23 substances?
24    A.   No, sir.

Page 31

1    Q.   You stayed there for how long?
2    A.   Five years.
3    Q.   And then what happened?
4    A.   Then I was recruited to come to
5 Schein.  The prince -- the Bracco
6 Diagnostics was based out of Princeton.  I
7 was commuting from Long Island to
8 Princeton and did that for five years, and
9 then I was recruited and I came to Henry
10 Schein.
11    Q.   Who recruited you?
12    A.   I don't know the name of the
13 recruiting firm.  It's a Long Island
14 company.  APR, something like that.
15         I'm sorry I don't know the name.
16    Q.   And, into what position did they
17 recruit you?
18    A.   I was the VP of Quality
19 Assurance and Regulatory Affairs.
20         MR. MIGLIORI:  I'm going to show
21 you what I'm just going to mark as
22 Exhibit 3.



Page 32

1

Page 33

22    Q.   How did you get educated, or how
23 did you educate yourself to understand
24 your responsibilities in your new position

Page 34

1 relative to controlled substances at Henry
2 Schein?
3     A.   So, there was initially training
4 with the team.  So we -- we would meet and
5 go over what the processes were.
6 Generally it was on-the-job training.
7     Q.   Okay.  And, who were the folks,
8 when you got there, that had the knowledge
9 about the Controlled Substances Act and
10 the obligations of Henry Schein relative
11 to controlled substances that you learned
12 from on the job?
13     A.   Yeah.  So, primarily would be
14 Sergio Tejeda, who had been with the
15 company for a long time prior to my coming
16 on.
17     Q.   Okay.  And, we'll go through,
18 but he now reports to you, right?
19     A.   Correct.
20     Q.   Okay.  Who else?
21     A.   And his team.  So there were
22 people that had been, you know, reviewers,
23 verifiers, et cetera, for a number of
24 years.

Page 35

1     Q.   And, as I understand the
2 structure of Henry Schein, there is the
3 Regulatory Department and then there is a
4 Verifications Department.  Those are two
5 separate departments, but they have some
6 overlap in some of their responsibilities.
7        Is that a fair statement?
8     A.   Yeah.  It's a shared process,
9 right, so.
10     Q.   But Verifications, for example,
11 didn't report to Regulatory?
12     A.   No.
13     Q.   That is they are their own
14 department, and to the extent that there
15 was overlap, there was collaboration
16 between those two departments?
17     A.   Yes.
18     Q.   And, at no point in this process
19 did you have oversight obligations or
20 responsibilities towards Shaun Abreu or
21 those that worked for him in
22 Verifications, correct?
23     A.   That is correct.
24     Q.   Are you aware that Shaun Abreu

Page 36

1 was presented by your company as the
2 person with most knowledge about the
3 suspicious order monitoring programs and
4 the obligations of Henry Schein for
5 controlled substances?
6     A.   I was not aware, no.
7     Q.   Is it, in your view, in your
8 experience, in your on-the-job training,
9 your perception that compliance with the
10 Controlled Substances Act is more of a
11 responsibility of the Verifications
12 Department or of the Regulatory Affairs
13 Department?
14     A.   Could you repeat the question?
15     Q.   Sure.
16        Compliance and reporting to the
17 DEA, is that a function within Henry
18 Schein of the Regulatory Affairs
19 Department or the Verifications
20 Department?
21        MR. McDONALD:  Object to the
22    form.
23     A.   My opinion is it's a shared
24 responsibility.  So, there's functions

Page 37

1 that they do.  There is , you know,
2 processes within the team in the
3 electronic reporting, the ARCOS data, et
4 cetera, but then, you know, other
5 additional advising and oversight is with
6 my group.
7     Q.   Okay.  Is it fair to say then
8 that the primary responsibility to assure
9 compliance with DEA regulations is with
10 the Regulatory Department, but
11 Verification plays a role in that process?
12        MR. McDONALD:  Object to the
13    form.
14     A.   Yeah, I -- I -- I would agree.
15        MR. MIGLIORI:  Okay.  Let me
16    show you Exhibit Number 4.

Page 38



15    That's you, correct?
16  A.   That is correct.
17  Q.   Do you remember giving this
18  presentation?
19  A.   Yes, sir.
20  Q.   And, who had you given it to?
21  A.   My immediate boss.
22  Q.   Which was who at the time?
23  A.   Walter Siegel.
24  Q.   And, what was his title?

Page 39

1   A.   He's the chief counsel, senior
2   vice-president, chief counsel.
3   Q.   Okay.  And, what was the purpose
4   of the presentation?
5   A.   I was just taking on, I don't
6   know exactly the dates, but I had been
7   expanded and promoted for global
8   responsibility.  So this was one of the
9   kind of overviews that I did.
10  Q.   Okay.  So, at some point, you
11  went from regular -- the vice-president of
12  Regulatory Affairs to the vice-president
13  of Global Quality Assurance and Regulatory
14  Affairs?
15  A.   Yes.
16  Q.   And this would have been some
17  time approximately right after that
18  transition in 2016?
19  A.   I would assume.  I --
20  Q.   Okay.
21  A.   -- can't be sure, but --
22       MR. McDONALD:  And, to be clear,
23  Don, looking at your question, he
24  previously -- so we have a clear

Page 40

1   record, because Tejeda was
2   vice-president of Quality Assurance
3   and Regulatory Affairs and then it
4   changed to Global, still Quality
5   Assurance and Regulatory Affairs.
6       MR. MIGLIORI:  Did I --
7       MR. McDONALD:  You skipped
8   Quality Assurance in his initial
9   title.
10      MR. MIGLIORI:  In his initial,
11  fair enough.
12  A.   Actually, he's correct because
13  when I was hired, it was Regulatory
14  Affairs, and I split the department into
15  Quality Assurance and Regulatory Affairs.
16  That was one of the functions that I did.
17  Q.   Wait.  Can you repeat that
18  again, he's correct?  No, just the "he's
19  correct" part.
20  A.   Yeah, you're correct.
21       No, but the offer letter was
22  basically for Regulatory Affairs.
23  Q.   Right.
24  A.   And then over the course of, you

Page 41

1   know, a year or so, I broke the department
2   into Quality Assurance and Regulatory
3   Affairs.
4   Q.   I think that's why I pulled that
5   out of my head because we just pulled that
6   out of the letter.
7       So, you went from the
8   vice-president of Regulatory Affairs and
9   then it became the vice-president of
10  global -- I'm sorry, of Quality Assurance
11  and Regulatory Affairs.
12      Does trade compliance --
13  A.   That was rolled in, yeah.
14  Q.   Rolled into it as well?
15  A.   Yeah.
16  Q.   And then at some point, you --
17  they expanded that to not just domestic
18  U.S. responsibilities, but worldwide
19  responsibilities?
20  A.   Global, correct.
21  Q.   And this would have been a
22  presentation now of what's going on both
23  domestically and worldwide?
24  A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Page 42

1    Q.   And you were making this
2 presentation to your immediate report,
3 your supervision, correct?
4    A.   Mm-hm.
5    Q.   And, when you say compliance --
6 you said, sounded like a lawyer.  I forget
7 the counsel or something.
8        Who did you give this to, this
9 presentation?
10   A.   It was chief counsel.
11   Q.   Chief counsel.
12       So, is that within the Legal
13 Department?
14   A.   Yep.

Page 45

11   Q.   Okay.  So, are there any folks
12 within Regulatory Affairs, other than
13 those listed in this chart?
14   A.   So, I'm a little confused.  I
15 apologize.
16       So, if you go back to are there
17 any?  There's some of the DEA auditors
18 were in Indy, Jacksonville and Denver.  So
19 we had three of them there.
20   Q.   Okay.  You had -- so, you had
21 internal DEA auditors?
22   A.   Yeah, our internal DEA team.
23   Q.   Right.
24   A.   Would perform, you know, your

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  customer end audits, site audits.
2      Q.   And, is there a person -- is
3  there a managing person of that team, of
4  the internal --
5      A.   So, Sergio's the ultimate
6  director of that team.  There was a
7  manager who was left -- who had left, and
8  then there was a new manager who was
9  brought in.
10      Q.   Okay.  Who is the manager that
11  left?
12      A.   Her name was Tina Steffanie-Oak.
13      Q.   Okay.  And, who's the one that
14  replaced Tina Steffanie-Oak?
15      A.   His name is Frank O'Regan.
16      Q.   Okay.  And, what is the
17  responsibility of the internal DEA team,
18  audit team?
19      A.   So, they work with Verifications
20  when there is any Know Your Customer Due
21  Diligence that needs to be done.  They
22  review the files.  They review the
23  doctors.  They review the questionnaires.
24  They speak to them on occasion, and they

Page 47

1  may visit the site on occasion.
2      Q.   Okay.  What roles do they have
3  relative to audits?  Is it their own
4  auditing?
5          When you say DEA audits, are
6  they also responsible for external audits?
7      A.   Yes, of customers.
8      Q.   Okay.  Just of customers.
9      A.   They support the managing
10  director of the facilities, the
11  distribution centers.
12      Q.   Right.
13      A.   So, the operations people, they
14  would support the DEA audits when they
15  come to audit us.
16      Q.   Got you.
17      A.   These people would be support
18  for questions, et cetera.
19      Q.   And, so, this department, and,
20  this -- this department is under Sergio
21  Tejeda within Regulatory Affairs, correct?
22      A.   Correct.
23      Q.   And, from time to time, if
24  Verifications couldn't clear a pended or

Page 48

1  suspicious order, they would seek review
2  from this department?
3      A.   Correct.
4      Q.   And there were times throughout
5  the course, at least of your experience,
6  that those pended orders were cleared and
7  released within the Verifications
8  Department, correct?
9      A.   That is correct.
10      Q.   That is it didn't involve
11  Regulatory Affairs at all?
12      A.   Yes.
13      Q.   Is that still true today?  Is
14  that still part of the process?
15      A.   Yes.
16          MR. MIGLIORI:  Is that our
17      phone?
18          MR. McDONALD:  No.  It's next
19      door.  They just fixed it.
20          MR. MIGLIORI:  Okay.
21  BY MR. MIGLIORI:
22      Q.   And, can you remember, in the
23  time that you've been there from 2013 to
24  the present, any other people on this team

Page 49

1  just by name, on the -- the internal --
2      A.   You want the name of the people?
3      Q.   Yeah.  Just other folks that
4  worked with Tina or Frank.
5      A.   Beverly Butcher, Liam Schemer.
6      Q.   Anyone else that you can think
7  of?
8      A.   There was Pete Schmidt, Nick
9  DeLucia, Glenn Lonnquist.  And I believe
10  that's it.
11      Q.   Okay.  Did this group meet
12  regularly?
13      A.   Yes.
14      Q.   And, you said they were spread
15  out all over the country, or were they all
16  in Melville?
17      A.   All over -- well, most of them
18  were on -- on their -- different sites.
19      Q.   Okay.  And, so, how often would
20  they meet?  Was there a regular meeting
21  for them?
22      A.   There was a regularly
23  once-a-month meeting and, you know, there
24  was a lot of interface within the team.

Page 50

1    Q.   And, were there minutes of those
2 meetings?
3    A.   Yes.
4    Q.   And, were those minutes --
5    A.   Not all. I can't say all, but
6 certainly some for sure.
7    Q.   And those minutes would be
8 shared with Sergio, or would Sergio be at
9 these meetings as well?
10    A.   Sergio was likely at those
11 meetings.
12    Q.   Okay. And then would you get a
13 monthly report of those meetings?
14    A.   Sometimes I was present at those
15 meetings.
16    Q.   Okay. Were they webinars? Did
17 you link in visually? Was it a phone
18 conference?
19    A.   Phone conference.
20    Q.   Okay. And, was somebody's
21 responsibility to document any of the
22 decisions or concerns or events of the
23 month?
24    A.   I can't say specifically. I

Page 51

1 mean, I -- you know, the minutes I think
2 drove what --
3    Q.   Okay.
4    A.   -- occurred.
5    Q.   And, if you were to ask to see
6 the minutes, where would you go? On what
7 database, what system?
8        Or would you just call Lydia?
9    A.   I probably would have received
10 them.
11    Q.   Okay. And, so, you would have
12 somewhere in your files a file of the
13 monthly meetings of the DEA Audit Team,
14 correct?
15    A.   Mm-hm.
16    Q.   Yes?
17    A.   Yes.
18    Q.   All right. And that's something
19 that's kept in the ordinary course of your
20 business?
21    A.   Yes.
22    Q.   All right. Any other teams
23 underneath Regulatory Affairs besides this
24 DEA Audit Team?

Page 52

1    A.   So, the teams that are listed
2 here, the Andi Tiller's team, she runs the
3 facility in Bastian, Virginia. Gary
4 Tiamsic's team runs what we call the Major
5 Projects.
6    Q.   Okay.
7    A.   So, in 2013, there were two
8 legislations, the Drug Quality Security
9 Act for the FDA for serialization of
10 pharmaceutical products, as well as unique
11 device identification for barcoding and
12 identification of medical devices for
13 counterfeiting, et cetera. So, those are
14 two large initiatives, as you might
15 imagine, and he's the project manager
16 running those projects.
17    Q.   When you say "running the
18 project," is it implementation? Is it
19 lobbying? How -- what role did Gary have?
20    A.   Well, it's a multifunctional.
21 So, you know, we have disciplines and
22 operations. We have IT, et cetera.
23        So, during the meetings with the
24 vendors sourcing out the solutions that we

Page 53

1 have put in place, discussing negotiated
2 with those vendors for pricing, ultimately
3 managing a budget with myself. You know,
4 I had sign-off authority on it. Writing
5 minutes to the meetings. Making sure that
6 we were on timelines. Being able to
7 report how the progress of the, you know,
8 projects are going 'cause there are
9 certain timelines based on a class of
10 medical devices or who's, you know, the
11 manufacturer or distributors for
12 pharmaceuticals, there were different
13 dates that need to occur. So we wanted to
14 make sure that we had, you know, process
15 in place to meet those deadlines.
16    Q.   Did Major Projects track
17 state-specific obligations in regulations;
18 for example reporting requirements to
19 Boards of Pharmacy and the like?
20    A.   That would be within the
21 Regulatory under Sergio's DEA team.
22        These were company-wide big
23 projects.
24    Q.   Sure. Okay.

Page 54

1  So, none of them were truly just
2 specific to controlled substances or to a
3 particular drug?  It was more universal
4 projects?
5  A.  Yeah.  So, I mean, he does other
6 things as well.  So, you know, it's part
7 of just running projects, but not the
8 controlled substance part.
9  Q.  Okay.  The person for controlled
10 substances is Sergio Tejeda?
11  A.  Correct.
12  Q.  All right.  Did this group,
13 Major Projects, have regular meetings and
14 minutes similar to the DEA team?
15  A.  Yes.
16  Q.  All right.  And those would be
17 kept in the same --
18  A.  Yes.
19  Q.  -- course as the other minutes
20 that you have?
21  A.  Yes.
22  Q.  Okay.  And then, I'm sorry I
23 missed it, but what did Andi Tiller run?
24  A.  She runs the facility in

Page 55

1 Bastian, Virginia.  And, you know, it's
2 one of our distribution centers, but it's
3 also a pharmaceutical repackaging.  So
4 it's kind of a misnomer, repackaging, but
5 we take packs of ten, we don't open the
6 content, et cetera.  We just individualize
7 them for, you know, doctors that only want
8 one out of a package of ten.
9  Q.  So that has its own set of
10 controls and --
11  A.  It's an FDA-regulated process.
12  Q.  And, does Andi have any
13 responsibilities relative to controlled
14 substances or opiates?
15  A.  There are controlled substances
16 in our facility.
17  Q.  Okay.  So, that process of
18 repackaging could actually be for opioids
19 as well?
20  A.  No, I don't believe that it's
21 true.
22  Q.  All right.  But it's just for
23 other classes?
24  A.  Yes.

Page 56

1  Q.  All right.  They met regularly,
2 had their own minutes, reported to you as
3 well?
4  There's a "did" in there that I
5 didn't say.
6  Is that a group that had a
7 regular meeting, or the repackaging was
8 just simply a function that was managed
9 out of that?
10  A.  So, they reported on a monthly
11 basis on what the progress was and what
12 they had done, any issues like that.  They
13 have management review meetings, which,
14 you know, one's happening today.
15  Q.  More operational report?
16  A.  Yeah.
17  Q.  And then the open manager
18 position DEA, what role is that?  And who
19 filled it?
20  A.  The person who filled it was
21 Frank O'Regan, as I mentioned before.  He
22 had retired from the DEA, and he had
23 joined us to lead the team that does the
24 Know Your Customer surveillance.

Page 57

1  Q.  Do you know when he joined to
2 fill that position?
3  And again, just for orientation,
4 this presentation was created in December
5 9th of 2016.
6  A.  I don't have the date.
7  I'm sorry.
8  Q.  But it would be after that --
9  A.  Yes.
10  Q.  -- if my date is correct?
11  A.  Correct.
12  Q.  All right.  And, the Know Your
13 Customer components, at that point, you
14 had become aware that, prior to your
15 hiring into Henry Schein, there was a
16 project to get current with the Know Your
17 Customer Due Diligence files at the
18 company, correct?
19  MR. McDONALD:  Object to the
20 form.
21  A.  Yeah, I'm not quite clear.
22  Prior to my --
23  Q.  There was an observation made,
24 earlier before your arrival at Henry

Page 58

1  Schein, that 60 percent of the files had
2  no Know Your Customer Due Diligence
3  letters in them.
4        You were made aware of that when
5  you got there, correct?
6     A.   Maybe not immediately, but at
7  some point, yes.

Page 60

3        I'm sorry.
4     Q.   All right.  We'll show it to
5  you.  It's at the end of this.  But let me
6  finish this before I leave the document.
7        So, in terms of the regulatory
8  affairs and quality assurance, this team
9  here is the team, this open position was
10 ultimately taken by Frank O'Regan.
11       Does he still hold that
12 position?
13    A.   No, he does not.
14    Q.   Did somebody replace him?
15    A.   Somebody is starting on Monday.
16    Q.   Okay.  And, when did Frank no
17 longer have this position?
18    A.   December 20th.
19    Q.   Of this -- of 2018?
20    A.   Yes, sir.
21    Q.   And, why did he -- did he leave?
22    A.   He did leave.
23    Q.   And, why did he leave?
24    A.   So, he had applied through the

Page 61

1  state for a -- he took a test about four
2  years ago for a new position, 'cause he
3  had been in the DEA, and four years after
4  it, he had worked for us probably
5  year-and-a-half or two years, I don't
6  remember exactly the time frame, they
7  called him and said you got the job.  And
8  he basically wrestled with it and took it.
9     Q.   Okay.  And that's with the State
10 of New York?
11    A.   Yes.  Nassau County DA,
12 actually.
13    Q.   And, so, is he continuing to
14 work with compliance --
15    A.   Yes.
16    Q.   -- and controlled substances?
17    A.   That's correct.
18    Q.   Is Andi Tiller still in this
19 position?
20    A.   Yes.
21    Q.   How about Gary Tiamsic?
22    A.   Yes.
23    Q.   And Sergio still is as well?
24    A.   Yes.



**Page 62**

**Page 63**

17      Who is Liz Ernst?
18    A.  Liz Ernst is the director at the
19 time, now VP of Regulatory and Quality at
20 Animal Health.
21    Q.  Okay.  And, so, is this for
22 research and development?  Is this for
23 regulatory compliance?  What roles would
24 that column have relative to the things

**Page 64**

1 that I'm -- that I'm asking you about, DEA
2 and opioids, if any?
3    A.  Well, they're a distributor.  So
4 they do have controlled substances.
5    Q.  Okay.  So, where are they?
6    When you say they're a
7 distributor.  Are they a distributor of
8 controlled substances to the animal health
9 business?
10    A.  The veterinary business, yes.
11    Q.  Okay.  And, so, do they have
12 their own set of rules or their own
13 compliance people?
14    A.  Yes.
15    Q.  And, who is the compliance
16 person within the animal health division?
17    A.  Liz Ernst is the lead.
18    Q.  Okay.  And, do they report to
19 you?
20    A.  No.
21    Q.  Do they have separate reporting
22 requirements?  I mean, do they -- do any
23 of their --
24    MR. MIGLIORI:  Strike that.

**Page 65**

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 92

Page 93

20        MR. MIGLIORI:  Okay.  Let's take
21    a break and see if I can get my voice
22    back.
23        THE VIDEOGRAPHER:  All right.
24    The time is 10:29 a.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 Going off the record.
2 (Recess taken.)
3 THE VIDEOGRAPHER: We are back
4 on the record.
5 The time is 10:48 a.m.
6 MR. MIGLIORI: I appreciate the
7 education you gave me on the systems
8 of the company. I want to take a step
9 back and talk about opioids
10 specifically and your obligations on
11 opioids.
12 Let me show you Exhibit
13 Number 5.
14 (Peacock Exhibit 5, Title 21
15 United States Code Annotated Section
16 801, was marked for identification, as
17 of this date.)
18 BY MR. MIGLIORI:
19 Q. As the vice-president of, among
20 other things, Regulatory Affairs, you
21 agree with me that it's within your
22 department ultimately that you are
23 responsible for compliance with the
24 Controlled Substance Act, correct?

Page 95

1 A. Yes, sir.
2 Q. And Congress made certain
3 findings about controlled substances, like
4 opioids.
5 Have you ever seen these before?
6 MR. McDONALD: In this form?
7 MR. MIGLIORI: And I'm referring
8 to Exhibit 5 is the -- is the direct
9 Congress findings in the Controlled
10 Substance Act relative to controlled
11 substances.
12 A. I have not.
13 Q. Let's see if you understand that
14 this is part of your charge and
15 responsibility within Regulatory Affairs
16 at Henry Schein.
17 It says Congress --
18 MS. BORSAY: I'm sorry to
19 interrupt. This is Casteel Borsy with
20 Jones Day on the phone.
21 I'm having a really difficult
22 time hearing the questions now. I
23 could hear them before the break. So
24 I don't know if you moved or don't

Page 96

1 have a microphone.
2 MR. MIGLIORI: As I was saying
3 at the break, I developed a cold and
4 my voice is starting to fade.
5 So, I will try to talk louder,
6 but it -- I feel like I'm screaming.
7 But I'll keep -- there's no way to
8 move the phone. The microphones are
9 built into the table.
10 MS. BORSAY: Okay. Thank you.
11 MR. MIGLIORI: But I'll do my
12 best.
13 BY MR. MIGLIORI:
14 Q. It says: Congress makes the
15 following findings. Many of the drugs
16 included within the subchapter have a
17 useful and legitimate medical purpose and
18 are necessary to maintain the health and
19 general welfare of the American people.
20 You understand that to be true
21 for controlled substances?
22 A. Yes, sir.
23 Q. The illegal importation,
24 manufacture, distribution or possession of

Page 97

1 improper use of controlled substances have
2 a substantial and detrimental effect on
3 the health and general welfare of the
4 American people.
5 Do you agree with that
6 statement?
7 A. I do.
8 Q. Do you believe today that we are
9 in an epidemic with respect to the abuse
10 and misuse of opioids?
11 A. I --
12 MR. McDONALD: Object to the
13 form.
14 Go ahead.
15 A. I do.
16 Q. We talked about this a little
17 earlier, but controlled substances have a
18 schedule. Schedule II opioids are, A, the
19 drug or other substance -- are classified
20 as this: The drug or substance has
21 a high potential for abuse.
22 You understand that to be true
23 for opioids, correct?
24 A. That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    Q.   The drug or other substance has
2  a currently accepted medical use in
3  treatment in the United States or
4  currently accepted medical use with severe
5  restrictions.
6         Do you appreciate that?  Do you
7  agree with that?
8    A.   Accepted medical use, yes.
9    Q.   And that there are severe
10 restrictions on that use, correct?
11        MR. McDONALD:  Object to the
12 form.
13        If you know, tell him.
14   A.   In terms of -- not -- I don't --
15 I'm not following what it says.
16   Q.   That there are severe
17 restrictions placed on the use of --
18   A.   In the ability to acquire them?
19   Q.   And distribute them.
20   A.   Yep.  Yes.
21   Q.   Okay.  The abuse of the drug or
22 other substance may lead to severe
23 psychological or physical dependence.
24        Do you understand that to be

Page 99

1  part of the classification of a Schedule
2  II drug?
3    A.   Yes, sir.
4    Q.   Is there somebody at Henry
5  Schein that is specifically tasked with
6  overseeing the compliance with Schedule II
7  controlled substances, or is that a
8  general obligation within your department,
9  of all people that work for you?
10   A.   In the Regulatory Department,
11 it's general.
12   Q.   And you understand that you have
13 a registration that is given by the
14 attorney general of the United States to
15 distribute Schedule II controlled
16 substances which requires you to be in
17 compliance with the Controlled Substances
18 Act, correct?
19   A.   That is correct.
20   Q.   And that failure to comply with
21 the Controlled Substances Act could cause,
22 among other things, the suspension or
23 revocation of that DEA registration,
24 correct?

Page 100

1    A.   Correct.
2    Q.   And part of that obligation of
3  Henry Schein is to maintain an effective
4  control against diversion of particular
5  controlled substances into other than
6  legitimate medical, scientific and
7  industrial channels.
8         Do you understand that to be
9  Henry Schein's obligation as a DEA
10 registrant?
11   A.   Yes, sir.
12   Q.   In carrying out that obligation,
13 do you understand that there's a specific
14 provision of the Controlled Substance Act,
15 this is Exhibit Number 6, that requires
16 Henry Schein, as a DEA registrant, to
17 design and operate a system to disclose to
18 the registrant suspicious orders of
19 controlled substances?
20        Do you understand that is the
21 obligation of Henry Schein to design and
22 operate that system?
23   A.   Yes, sir.
24        (Peacock Exhibit 6, Title 21

Page 101

1  Code of Federal Regulations Section
2  1301.74, was marked for
3  identification, as of this date.)
4  BY MR. MIGLIORI:
5    Q.   (Reading)  The registrant shall
6  inform the field office -- field division
7  office of the administration in his area
8  of suspicious orders when discovered by
9  the registrant.
10        Do you understand that
11 suspicious orders are to be, and have been
12 since 1971, reported to the DEA field
13 office when they are discovered?
14        MR. McDONALD:  Object to the
15 form.
16   A.   Yes, sir.
17   Q.   (Reading)  Suspicious orders
18 include orders of unusual size, orders
19 deviating substantially from a normal
20 pattern, and orders of unusual frequency.
21        Do you understand that to be, in
22 part, the definition of a suspicious
23 order?
24        MR. McDONALD:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1　form.
2　　A.　I do.
3　　Q.　So, an order that deviates from
4　a prior order in size, in pattern, or in
5　frequency, by this definition, is presumed
6　suspicious until determined otherwise,
7　correct?
8　　　　MR. McDONALD:　Object to the
9　　form.
10　　A.　Yes.　Yes.
11　　Q.　In your review of the historical
12　suspicious ordering monitoring programs of
13　Henry Schein, did you ever learn that the
14　suspicious order monitoring program
15　through 2009, at least, did not measure
16　deviations in frequency or pattern?　Did
17　you ever learn that fact?
18　　A.　I did not.
19　　Q.　Okay.
20　　A.　I had no understanding, no.
21　　Q.　And, to the extent that that is
22　true or not, that is something you leave
23　to those that were there at the time,
24　correct?

Page 103

1　　A.　I would have to investigate.
2　Can't really make a determination, sir.
3　　Q.　I guess my question is more
4　simple then.　You're not the person to
5　either refute that or affirm that
6　statement, correct?
7　　A.　That's correct.
8　　Q.　Are you aware that in Ohio, in
9　searching for suspicious orders in this
10　case, Henry Schein represented and
11　represents that it found no suspicious
12　orders reported to the DEA from 2009 to
13　the present, that is during the period of
14　time that it had transactional
15　information?
16　　　　MR. McDONALD:　Object to the
17　　form; mischaracterizes and misstates
18　　the assertions of Henry Schein in this
19　　case.
20　BY MR. MIGLIORI:
21　　Q.　Were you aware of that?
22　　　　MR. McDONALD:　Object.　Same
23　　objection.
24

Page 104

1　BY MR. MIGLIORI:
2　　Q.　You can answer.
3　　A.　Could you reclarify or restate,
4　please?
5　　　　I'm sorry.
6　　Q.　Were you asked to help prepare
7　answers to interrogatories in this case,
8　or provide information so that the company
9　could respond to written questions in this
10　case?
11　　A.　No, I was not.
12　　Q.　Did you review yesterday any of
13　the written responses of the company in
14　this case?
15　　A.　No, I did not.
16　　Q.　Did they show you that Henry
17　Schein has not produced any suspicious
18　orders for Ohio in this case?
19　　A.　No, they had not.
20　　Q.　Does it surprise you that there
21　are no suspicious orders reported to the
22　DEA by Henry Schein in this case?
23　　　　MR. McDONALD:　Object to the
24　　form.

Page 105

1　　A.　I would have to see what the
2　ordering patterns are, how much the
3　volumes were.　There's no way I could make
4　a determination just without any
5　information, sir.
6　　Q.　You would agree with me that if
7　there were no suspicious orders for Ohio
8　from 2009 to present, it would mean that
9　there were no orders that deviated in
10　size, frequency, or pattern, by
11　definition, correct?
12　　　　MR. McDONALD:　Object to the
13　　form.
14　　A.　So, I think, you know, I'd have
15　to understand what the -- what the scope
16　of this, you know, question is.
17　　　　So, if we looked at sales
18　volumes, numbers, et cetera, what's the
19　practices are there, what's the percentage
20　of our total sales, et cetera, I'd be
21　better apt to answer that question.
22　　Q.　Fair enough.　But I'm not asking
23　you about reporting.
24　　　　I'm just simply saying that if

Page 106

1 there were an order that deviated in size,
2 frequency, or pattern --
3　A.　Yes.  Then yes.
4　Q.　-- then it would be a suspicious
5 order, correct?
6　A.　Yes.
7　Q.　And, at the time of discovering
8 that deviation in size, frequency, or
9 pattern, under the obligations that we
10 just read, it would have had to have been
11 reported at the time of discovery,
12 correct?
13　　MR. McDONALD:  Object to the
14　form.
15 BY MR. MIGLIORI:
16　Q.　That's the law, correct?
17　　MR. McDONALD:  Object to the
18　form.
19　　He's not a lawyer.
20　　MR. MIGLIORI:  He's a Regulatory
21　Affairs vice-president.
22　　MR. McDONALD:  And you --
23 BY MR. MIGLIORI:
24　Q.　What is your understanding of

Page 107

1 your obligation to comply with the DEA as
2 the person in the company worldwide
3 responsible for DEA compliance?
4　　MR. McDONALD:  Objection.
5 BY MR. MIGLIORI:
6　Q.　Who's not a lawyer.
7　A.　I am not a lawyer.
8　　MR. McDONALD:  Hang on.  Hang
9　on.
10　Q.　I understand.
11　　MR. McDONALD:  Object to the
12　form; vague as to time.
13　　You can give your understanding.
14 BY MR. MIGLIORI:
15　Q.　Do you understand my question?
16　A.　Yes, I do.
17　Q.　All right.
18　　Do you have an answer?
19　A.　I would say yes.
20　Q.　Okay.  So, to make sure we
21 understand it, after all of that
22 interchange between me and your counsel.
23　　MR. McDONALD:  There wasn't that
24　much.

Page 108

1　　MR. MIGLIORI:  Well, I almost
2　forget my own question.
3 BY MR. MIGLIORI:
4　Q.　The -- the existence of a
5 deviation in size, frequency, or pattern,
6 once discovered, at the time of discovery,
7 is required to be reported to the field
8 office of the DEA under the regulations,
9 correct?
10　　MR. McDONALD:  Object to the
11　form.
12　A.　Yes, that's my understanding.
13　Q.　Those regulations, to your
14 understanding, go back to 1971, even
15 before OxyContin was on the market,
16 correct?
17　　MR. McDONALD:  Object to the
18　form.
19　A.　Yeah, I -- I was not involved in
20 anything regarded to controlled substance
21 prior to 2013.  So I never researched when
22 it officially went into effect.
23　　So I can't answer specifically,
24 but --

Page 109

1　Q.　Okay.
2　　(Peacock Exhibit 7, letter dated
3　December 21, 2018 from Locke Lord,
4　with attachment, was marked for
5　identification, as of this date.)
6 BY MR. MIGLIORI:
7　Q.　I'm going to show you Exhibit
8 Number 7.  Your counsel had a concern that
9 I was misrepresenting what Henry Schein
10 said.  So I just -- I don't want to put
11 words in your mouth or the company's
12 mouth.
13　　This is Exhibit Number 7.  This
14 is a December 21st letter of Locke Lord in
15 this case to the Court, and I'm just going
16 to direct your attention to the bottom
17 where it says "Suspicious Order Reports."
18　　It says:  As previously noted,
19 the Schein defendants have searched for
20 and located no suspicious order reports
21 with respect to any of its customers with
22 whom they have transacted business in
23 Summit County, Ohio, for the time period
24 for which they have transactional data.

Page 110

1   Do you see that?
2   A.   I do.
3   MR. McDONALD:  And, to be clear,
4   you previously said the State of Ohio.
5   And this clearly says Summit County.
6   MR. MIGLIORI:  That's why I'm
7   doing this.  I'm not being -- I'm
8   trying to clarify the objection.
9   MR. McDONALD:  Awesome.
10  MR. MIGLIORI:  I'm not a hostile
11  person.
12  MR. McDONALD:  I know you're
13  not.  You just have a cold.
14  MR. MIGLIORI:  I do have a cold.
15  MR. McDONALD:  I'm trying to
16  help you out.
17  BY MR. MIGLIORI:
18  Q.   So, in searching all of Summit
19  County, Ohio for the time period that
20  Schein maintains transactional data, Henry
21  Schein has found no suspicious orders
22  which would mean, under the law, that
23  Henry Schein found no deviations in size,
24  frequency, or pattern in any of its

Page 111

1   controlled substance orders for the time
2   period that they had data, correct?
3   MR. McDONALD:  Object to the
4   form.
5   A.   That's what it says.  That's
6   correct.
7   Q.   Okay.  And, if a deviation in
8   size, frequency or pattern did -- did
9   arise, the obligation would have been at
10  the time of identifying it for Summit
11  County that Schein report that deviation
12  of size, frequency, or pattern of ordering
13  opioids to the field office for Ohio,
14  correct?
15  MR. McDONALD:  Object to the
16  form.
17  A.   Yeah.  Again, so back to my
18  comment if it failed to meet the
19  requirements, then yes, it would need to
20  be reported.  But, you know, depends on
21  what the volumes were and all the other
22  issues, so.
23  Q.   Sure.
24  A.   There's no data to look at, so.

Page 112

1   Q.   This is much more definitional
2   than anything specific.  It just simply
3   said if there were a deviation in size,
4   frequency or pattern in any drug, in any
5   opioid distributed by Henry Schein in
6   Summit County, that deviation in size,
7   frequency or pattern, under the Controlled
8   Substance Act, would have had to have been
9   reported at the time it was discovered to
10  the field office of the Drug Enforcement
11  Agency, correct?
12  MR. McDONALD:  Object to the
13  form.
14  A.   Correct.
15  Q.   And, based at least on the
16  exhibit in front of you, Exhibit 7, no
17  such reports to the DEA have been located
18  at Schein for that time period in Summit
19  County, correct?
20  A.   According to this document.
21  But I have no knowledge of who,
22  what, when, where, why this was done.
23  Q.   Fair enough.  Thank you.
24  Are you familiar with the -- the

Page 113

1   Healthcare Distribution Management
2   Association or its successor, the
3   Healthcare Distribution Association?
4   A.   Yes, sir.
5   Q.   Are you a member of it?
6   A.   Our company is.  I've attended a
7   meeting.  I get, you know, monthly
8   updates, blog, newsletters, things like
9   that.
10  Q.   Are you provided with minutes or
11  accounts of HDA meetings attended by
12  various Henry Schein employees?
13  A.   May or may not have been.
14  Depends.  We go every year.  So,
15  generally, somebody in the organization,
16  whether it's in regulatory or others,
17  we've had, you know, many -- many
18  different people may have attended.
19  Q.   Is there somebody at Henry
20  Schein who serves on the board, to your
21  knowledge?
22  A.   Vaguely familiar, but I couldn't
23  name the person, sir.
24  Q.   Okay.  But you understand

Page 114

1  that -- that that is the trade association
2  for distributors of -- of pharmaceuticals,
3  including controlled substances, correct?
4      A.   That's correct.
5      Q.   And Henry Schein is one such
6  distributor, correct?
7      A.   That is correct.
8      Q.   Other members include
9  manufacturers of controlled substances,
10  correct?  Do you know that?
11     A.   I don't know for sure.
12     Q.   All right.  And, relative to the



Page 116

Page 115

Page 117

Highly Confidential - Subject to Further Confidentiality Review



Page 122

11    Q.   They should review the
12 information carefully and, where
13 appropriate, verify it.
14       That's what your Verifications
15 Department would do, correct?
16    A.   Yes.
17    Q.   Independently investigate the
18 potential customer.
19       That's an important part of due
20 diligence, correct?
21    A.   Yes.
22    Q.   And the -- when we refer to Know
23 Your Customer Due Diligence, that is a
24 component part of your obligation to

Page 123

1 comply with DEA regulations, correct?
2       MR. McDONALD:  Objection.
3 BY MR. MIGLIORI:
4    Q.   That is the Know Your Customer
5 obligation exists beyond identifying
6 changes or deviations in size, frequency,
7 and pattern, correct?
8       MR. McDONALD:  Object to the
9    form.
10 BY MR. MIGLIORI:
11    Q.   Do you understand my question?
12    A.   Yeah.  I'm trying to relate it
13 to what the, you know-
14    Q.   I could break it down.
15    A.   Yeah, please.
16       I'm sorry.  I'm getting stuck on
17 semantics here.
18    Q.   Know Your Customer is an
19 obligation that you have to be compliant
20 with DEA even before you supply the first
21 opioid or controlled substance to that
22 customer, correct?
23       MR. McDONALD:  Object.
24    A.   Yes.

Page 124

1       MR. McDONALD:  Object to the
2    form.
3 BY MR. MIGLIORI:
4    Q.   In other words, it's not driven
5 or triggered only by a deviation in size
6 or frequency or pattern order.  It's
7 triggered by your obligation as a DEA
8 registrant who will supply or intends to
9 supply controlled substances to that
10 customer, correct?
11       MR. McDONALD:  Object to the
12    form.
13    A.   Yeah.  I'm not a lawyer.  I
14 mean, at the end of the day, I believe
15 you're correct.
16    Q.   Right.  And I'm asking these
17 questions in your role as a reg -- as the
18 vice-president of Regulatory Affairs, not
19 as a lawyer.
20       So, to the extent you can answer
21 it as a vice-president of Regulatory
22 Affairs and compliance with DEA, from that
23 perspective, that's all I'm asking.
24    A.   Okay.

Page 125

1    Q.   So, the Know Your Customer
2 requirement starts as you onboard a new
3 client, right?
4       MR. McDONALD:  Object to the
5    form.
6    A.   Yes.  Verifications of
7 licensing, et cetera is part of the
8 process.
9    Q.   And sometimes it's a site visit
10 to see what kind of -- what kind of
11 customers might be in the waiting rooms of
12 the -- either the dispensary or the
13 doctor's office, correct?
14    A.   I mean, there's many forms.  I
15 don't do those audits, so I really can't
16 speak to what the specifics of the actions
17 are.
18    Q.   Well, you gave a couple examples
19 recently.
20       You're familiar with certain red
21 flag items are for --
22    A.   Yeah.
23    Q.   -- Know Your Customer Due
24 Diligence, correct?

Page 126

1  A.  Yes, sir.
2  Q.  Some of them involve is the
3  patient paying with cash or insurance.
4      That's one red flag issue,
5  correct?
6  A.  Yes.
7  Q.  Cars in parking lots with
8  out-of-state license plates is another red
9  flag issue, right?
10  A.  It would appear to be, sure.
11  Q.  And a doctor that orders a
12  disproportionate amount of controlled
13  substances to non-controlled substances
14  raises a red flag concern that should be
15  investigated, correct?
16  A.  You know, would depend on the
17  circumstance.  A pain clinic, maybe not.
18      So, it depends on what the
19  circumstance of what the practice is.
20  That would also be considered.
21      With the license plate issue, it
22  depends on if they're on the border of
23  someplace.  That might have some --
24  Q.  Henry Schein has --

Page 127

1  A.  It's a variable.
2  Q.  I'm sorry.
3      Henry Schein has a due diligence
4  form that it sends to all of its
5  customers, correct?
6  A.  That is correct.
7  Q.  And when it discovered that 60
8  percent of them didn't have this form,
9  this process that you've been reporting on
10  is to get that form out to the customers
11  and get that feedback from the customers
12  about various things, including where
13  their office is, what kind of practice
14  they have, what types of controlled
15  substances they -- what percentage of
16  controlled substances they use, et cetera,
17  correct?  Those are different elements of
18  your --
19  A.  Of the questionnaire, yes.  Some
20  of that information would have already
21  been captured on the customer setup form
22  in the JDEwards that would allow us to,
23  you know, ship the product.
24  Q.  And, so, that -- those are the

Page 128

1  different types of information that are
2  part of your ongoing consistent obligation
3  to know your customer, not just those that
4  are triggered by a deviation in size,
5  frequency and pattern of -- of order,
6  correct?
7      MR. McDONALD:  Object to the
8    form.
9  BY MR. MIGLIORI:
10  Q.  That's an ongoing obligation?
11      MR. McDONALD:  Object to the
12    form.
13  A.  Yes.  It's part of what we do.
14  Yes.
15  Q.  Okay.  This HDMA guidance
16  actually gives a bunch of questionnaire
17  suggestions.
18      Do you see it here on the bottom
19  of page '616?
20  A.  Yes.
21  Q.  It talks about the business
22  background and the customer base and the
23  average number of prescriptions filled
24  each day.

Page 129

1      You don't ever recall getting
2  this kind of guidance in -- at Henry
3  Schein when you started in this position?
4  A.  So, the process of some of these
5  were in place at the time.
6  Q.  Okay.
7  A.  So, it was a review of what the
8  practices were.  That's what I was
9  basically my job -- on-the-job training
10  was about.
11  Q.  Okay.  And, when you got there,
12  you were aware that Henry Schein in 2013
13  was somewhat behind on the Know Your
14  Customer Due Diligence side of compliance,
15  and it was part of your job to get caught
16  up, correct?
17      MR. McDONALD:  Object to the
18    form.
19  A.  I'm not exactly sure when I
20  learned of the -- the backlog, but
21  ultimately, yes.
22  Q.  And that was one of the -- one
23  of the measures, even for your own
24  performance within the company, was your

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  ability to sort of rectify this problem
2  that pre-existed you at the company,
3  correct?
4      A.   Correct.
5      Q.   All right.  And today, as of
6  today, has that now been caught up, to
7  your knowledge?
8      A.   To my knowledge, yes.
9      Q.   Okay.  And is that process of
10 catching up on all that backlog due
11 diligence, was that something that was
12 primarily the responsibility of the
13 Verifications Department and Shaun Abreu's
14 side of things?
15     A.   Primarily.
16     Q.   But in order to be compliant, in
17 order for your department to report
18 compliance with DEA, that's something that
19 you would have had a sort of joint
20 responsibility for --
21     A.   That's correct.
22     Q.    -- at least accountability for,
23 correct?
24     A.   That's correct.

Page 131

23         To your knowledge, does Henry
24 Schein check with those boards prior to

Page 132

1  onboarding a new client?
2      A.   In relate to both of them would
3  be their licenses.  If there's any issues
4  with licenses, we would certainly do that.
5  I'm not aware that we check specifically
6  and call and say is Dr. Jones okay.
7      Q.   Okay.  And I think Mr. Abreu
8  talked about this, but the verification
9  process would be to make sure that the
10 license is in good standing?
11     A.   Right.
12     Q.   And that at Henry Schein is
13 performed online as an online source?
14     A.   An automatic source, yes.
15     Q.   Do you check with any
16 disciplinary counsel or medical licensure
17 board of doctors, to your knowledge?
18         MR. McDONALD:  Object to the
19     form.
20     A.   I'm not aware.  Not that close
21 to that process.
22     Q.   What about criminal background,
23 do you do any criminal background check on
24 doctors that you're supplying to?

Page 133

1      A.   Not to my knowledge.
2      Q.   And, as you understand it today,

Highly Confidential - Subject to Further Confidentiality Review

Page 134



Page 135



20      Do you agree that the form
21  should change over time?
22      A.   Continuous improvement is always
23  what everyone should live by in quality
24  regulatory.

Page 136

1      Q.   And, do you agree that the
2  performance and results of all steps in a
3  customer review process should be fully
4  documented as to each potential customer
5  and such documentation should be obtained
6  in the appropriate file?
7      A.   The records are important.
8  Absolutely.
9      Q.   In fact, there's an adage that
10  if it's not written down and recorded, it
11  doesn't exist.
12          Correct?
13      A.   Yeah.
14      Q.   And that is true in regulatory
15  compliance, correct?
16      A.   That is correct.
17      Q.   The distributor may include
18  provisions for notification of state and
19  federal authorities of an unlawful
20  activity identified under the Know Your
21  Customer Due Diligence as required by
22  local, state, or federal law.
23          You would agree with me that
24  that's an important component part.  It's

Page 137

1  not just enough to identify such potential
2  activity, but to share it with local law
3  enforcement and DEA, correct?
4      A.   I agree --
5          MR. McDONALD:  Hang on.
6      I object to the form.
7      You need to pause, okay.
8          THE WITNESS:  I'm sorry.
9          MR. McDONALD:  That's okay.
10  BY MR. MIGLIORI:
11      Q.   Are you involved at all in the
12  establishment, development of any of the
13  thresholds or algorithms used to identify
14  changes or deviations in size, pattern, or
15  frequency of orders by your customers?
16      A.   I was not involved, no.
17      Q.   To the extent that the
18  automization or the re-tuning of the
19  system happened or occurred, in terms of
20  the specifics of that change, that's not
21  something you would be directly involved
22  in, correct?
23      A.   I was not, no.
24      Q.   It's fair to say that that's

Page 138

1 something ultimately your department's
2 responsible for, but you relied on Sergio
3 Tejeda for the entire time that you've
4 held this position at Henry Schein, to
5 make sure that the algorithms and the
6 assumptions of the algorithms were
7 appropriate and consistent with DEA
8 regulations, correct?
9    A.   It wasn't Sergio.  It was the
10 outside consultants that we hired.  So
11 there was outside, you know, groups that
12 came in and did the re-tuning of the
13 algorithms.
14    Q.   I have some of those here, and
15 I'll show them to you.
16       But, the outside consultants
17 that came in, they -- they proposed the
18 changes, but they would have to be
19 approved at Henry Schein first, correct?
20    A.   Mm-hm.
21    Q.   Yes?
22    A.   Yes.
23    Q.   How -- how does that work at
24 Henry Schein?  Who would receive the

Page 139

1 certain Dendrite, Buzzeo, what was the
2 other one, Hyman Phelps, who would receive
3 those recommendations at Henry Schein and
4 make a decision to-go and no-go on a
5 particular recommendation?
6    A.   So, depending on the
7 circumstance, could be either the Customer
8 Verifications and Sergio would come
9 together, see what was, you know, needed,
10 put together a statement of work, reach
11 out to the consultant, have the consultant
12 come in and then they would agree, and I
13 probably would sign off on the final
14 purchase order for the -- for the service.
15    Q.   But, do you know how the
16 algorithms work?  Have you ever --
17    A.   I have not dealt into how the
18 algorithms work.
19    Q.   So you will rely on Sergio and
20 Shaun, those are the -- that's Regulatory
21 Affairs and Verifications, you would rely
22 on them for their input on how a threshold
23 was established, correct?
24    A.   That is correct.

Page 140

1    Q.   Even though you have a science
2 background and research and development
3 background, at Henry Schein you don't --
4 you have not gotten into the specifics of
5 suspicious order monitoring design
6 implementation and refinement, correct?
7 That's not -- you sign off on it, but you
8 don't know at any given moment what the
9 actual algorithm is or how it works,
10 correct?
11    A.   That is correct.
12    Q.   And, if I were to go talk to the
13 person that knew the most about it, not
14 outside the company, but within the
15 company, who would that be?
16    A.   I'd say a combination of Sergio
17 and Shaun.
18    Q.   Okay.  That may have saved you a
19 lot of time today.
20    A.   Fact.
21    Q.   And I appreciate it.  That's all
22 I'm trying to get to is facts.
23       So, to the extent the HDMA
24 provided guidances on what is a proper way

Page 141

1 to set a threshold or how far back in time
2 to look at a dispensing history, those
3 aren't parameters, those aren't data
4 points that you have any particularized
5 knowledge about or -- or command of,
6 correct?
7    A.   Yes, that's correct.
8    Q.   And, what about the -- when, in
9 fact, an order is in your system pended or
10 identified or flagged, do you have any --
11 do you play any role in establishing what
12 causes that event to -- to get
13 investigated?  Do you --
14    A.   Me personally, no.
15    Q.   Okay.
16    A.   I do not.
17    Q.   So, that's all sort of the
18 functional operational part of your
19 department that ultimately you have to
20 rely upon Sergio and Shaun Abreu to -- to
21 advise you of, make recommendations for
22 your sign-off?
23    A.   Yeah.  And Frank O'Regan when he
24 was with us also.  I mean, he's, you know,

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  previously a DEA investigator.  So he was
2  adding a lot of value in terms of training
3  and bringing the staff up to speed and
4  making determinations.  He was making
5  those determinations.
6      Q.   Okay.  So, are those the three
7  sort of top people that you rely on for
8  establishment of thresholds: Frank, Shaun
9  and Sergio?
10     A.   The threshold for?
11     Q.   For identification of suspicious
12 orders by size, frequency or pattern.
13         MR. McDONALD:  And you're
14     referring to internally, right?
15         MR. MIGLIORI:  Yeah.
16     A.   Yeah, so, the algorithm is based
17 on the ERP system would initially set
18 that.  How that was set would be -- I
19 don't think Frank was involved, maybe
20 later, but mostly Shaun and Sergio.
21     Q.   You understand that some -- so,
22 some companies may set a threshold based
23 on three months of prescribing history,
24 while others may use 24 months.  You

Page 143

1  understand that -- that there are
2  different decisions that need to be made
3  in terms of establishing a threshold?
4      A.   Sure.
5      Q.   And, in terms of what decisions
6  are made relative to those parameters, is
7  that something that Frank and Sergio and
8  Shaun would do, or is that something you
9  would be a part of deciding?
10     A.   I was not part of deciding, but
11 I believe it would come from the
12 consultants and what they felt and were
13 informing us were, like, industry
14 standards.
15     Q.   Okay.  So, so it's fair to say
16 when it comes to the specifics of
17 algorithms and automated suspicious order
18 monitoring, you relied upon the outside
19 consultants and internally you relied upon
20 the input from Frank O'Regan, Sergio
21 Tejeda, and Shaun Abreu?
22     A.   Correct.
23     Q.   And based on that input from
24 those four difference sources, and from

Page 144

1  time to time others, Tina, you ultimately
2  would be the person that signed off on it,
3  correct?
4      A.   That's correct.
5      Q.   But you would not, at that
6  point, educate yourself to the level of
7  understanding the inner workings of it.
8  You were relying on this advice, correct?
9      A.   That is correct.

22     Q.   But controlled substance, you
23 agree with me, has a heightened
24 sensitivity within the company.  That

Page 145

1  is --
2      A.   Right.
3      Q.   -- it is a highly restricted
4  area of distribution and the potential for
5  abuse and misuse is, by definition,
6  extremely high, correct?
7          MR. McDONALD:  Object to the
8      form.
9  BY MR. MIGLIORI:
10     Q.   As a Schedule II drug, correct?
11         MR. McDONALD:  Object to the
12     form.
13     A.   A Schedule II, yes.
14     Q.   It is recommended that employee
15 training include a review of DEA rules and
16 regulations.
17         Do you have today an employee
18 training for those that work within
19 Regulatory Affairs and within
20 Verifications of the DEA rules and
21 regulations?
22         And by training, I'm talking
23 about formal training.
24     A.   Could you define formal

Page 146

1  training?
2  Q. Classroom, didactic.
3  A. We've had classroom training.
4  Q. What -- where and who gave that
5  training?
6  A. Ken Romeo, one of our premier --
7  prior employees, and we had a session with
8  the HDA and some others a little over a
9  year ago. I believe it was in October of
10  '17.
11  Q. All right. When did Ken Romeo
12  give a presentation?
13  A. Probably in -- I don't know for
14  sure. I'm sorry.
15  Q. Were you at the company at the
16  time?
17  A. I was, yes.
18  Q. So it's some time after July of
19  2013?
20  A. Yes.
21  Q. Were you there?
22  A. I was. For part -- part of it.
23  Not -- it was a two-day training. So part
24  of the sessions I was there. Maybe two or

Page 147

1  three hours of it.
2  Q. And, was it required?
3  A. Customer Verifications and the
4  staff, yes.
5  Q. Was it required of anybody in
6  Regulatory Affairs?
7  A. The staff in Regulatory Affairs.
8  Q. Okay.
9  A. That team, yes.
10  Q. And, when you say Verifications,
11  that's Shaun and the folks that work for
12  him, correct?
13  A. Correct.
14  Q. Okay. Was there a Power Point
15  presentation of some sort, or --
16  A. Yeah, there were some Power
17  Point presentations, I believe, yes.
18  Q. Did you present at all?
19  A. I introduced it. That's all.
20  Q. Other than that one
21  presentation, do you recall any other --
22  set aside the HDA for a second.
23  Do you recall any other internal
24  or recurrent Henry Schein training on DEA

Page 148

1  rules and regulations?
2  A. So, we have a monthly, you know,
3  call, and there are discussions about the
4  rules and regulations.
5  Q. Okay.
6  A. We referred to that earlier
7  today.
8  Q. So, that's the -- those -- those
9  generally have minutes and those minutes
10  are kept on the share file?
11  A. Correct.
12  Q. And that's attended by
13  Verifications and by Regulatory Affairs?
14  A. Not Verifications.
15  Q. Just Regulatory Affairs?
16  A. Yes.
17  Q. So, those monthly calls, to the
18  extent they have DEA rules and regulations
19  trainings, would only be for Regulatory
20  Affairs folks, not for Shaun Abreu and the
21  Verifications folks?
22  A. That's correct.
23  Q. Anything else that you can
24  recall?

Page 149

1  A. I cannot.
2  Q. Who were some of the people that
3  you know on the front line of
4  Verifications that would be making the
5  decisions today about whether an order
6  should be further investigated, somehow it
7  got pended automatically and requires
8  further due diligence? Do you know any of
9  those folks?
10  A. I know Shaun obviously for a
11  long time and Lisa Matalon, who's his
12  supervisor. I've met a few of the
13  individuals, but I don't know them
14  specifically by name or, you know.
15  Q. And Regulatory Affairs does not
16  have any regular systematic training of
17  those frontline staff members or
18  Verification Team members in terms of
19  their obligations under the Controlled
20  Substance Act, correct?
21  A. I'm not aware.
22  Q. Okay. And then tell me about
23  this October of 2017 HDA presentation.
24  A. So, again, we had a two-day

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  meeting.  Several individuals from the HDA
2  came to visit.  We had several, you know,
3  guest speakers during the -- the process.
4  And again, we addressed some of the
5  ongoing regulations, some of the issues
6  that they brought to our attention or they
7  were, you know, giving us information on.
8  And the staff from around the country flew
9  in to be there.
10     Q.    Is this in the aftermath of the
11  Masters Pharmaceutical decision?
12     A.    The Masters was discussed at
13  that meeting, yes.
14     Q.    And, was this sort of a industry
15  advisory about the implications of what
16  Masters means for day-to-day operation
17  within the distributors?
18     A.    Could you repeat the question?
19     Q.    Sure.
20        Did HDA request to hold this
21  presentation?
22     A.    No.  It was our -- it was our
23  training and we invited them to speak on,
24  you know, current topics, et cetera.

Page 151

1     Q.    And the current topic of the end
2  of 2017 was a recent decision in the
3  Masters Pharmaceutical case, correct?
4     A.    That is correct.
5     Q.    And the implications of that
6  decision in terms of obligations and
7  compliance with the Controlled Substances
8  Act as a distributor, correct?
9     A.    Yes, sir.
10     Q.    And one of the key issues in
11  that decision was when to halt an order
12  from shipment and when to ship, correct?
13        MR. McDONALD:  Object to the
14     form.
15     A.    Yes.  That's my understanding.
16     Q.    Do you remember any of the --
17  the representations made of the HDA at
18  that meeting in terms of the Masters
19  decision, its implications, et cetera?
20     A.    I think it was evolving at the
21  time.  So I don't know the specifics of
22  what they presented.  I'd have to see the
23  presentations again, et cetera.  But, you
24  know, obviously this was something that

Page 152

1  they felt was becoming a big topic for
2  discussion and potentially implementation.
3     Q.    Okay.  Did -- and when you say
4  folks from all over the country came to
5  attend --
6     A.    Our team.
7     Q.    Okay.
8     A.    So our team in the different
9  DCs.
10     Q.    And that would be Regulatory
11  Affairs?
12     A.    Yes.
13     Q.    Do you know if Verifications
14  attended?
15     A.    Management.  Shaun was there,
16  I'm sure.
17     Q.    Okay.  But the -- the frontline
18  people that are actually getting the
19  pended orders and doing -- sending out the
20  letters, to your recollection, they didn't
21  attend that training, correct?
22        MR. McDONALD:  Object to the
23     form.
24     A.    Can't recall.

Page 153

1     Q.    Okay.  And, as a result of the
2  Masters decision and/or this HDA
3  presentation in the fall of 2017, did
4  Henry Schein change any of its standard
5  operating procedures or suspicious mon --
6  order monitoring systems?
7     A.    We were evolving too, yes.
8     Q.    So, what came of that?  That is,
9  what, if anything, do you attribute to a
10  change in the Henry Schein compliance with
11  the Controlled Substances Act as a result
12  of the Masters decision, if any?
13     A.    The decision of Masters was
14  evaluated for a period of time.  HDA was
15  solidifying the discussions, and then we
16  began to implement the process through the
17  IT teams, et cetera.  So, the implication
18  was that orders that had pended, all of
19  those were orders would be immediately
20  reported to the DEA.
21     Q.    Because they were, at the time
22  they were discovered, deviations in size,
23  frequency and pattern, correct?
24     A.    Yes.

Page 154

1    MR. MIGLIORI: Exhibit Number 9.
2    (Peacock Exhibit 9, interoffice
3    memorandum dated December 23, 2013,
4    Bates No. HSI-MDL-00622244 to
5    00422250, was marked for
6    identification, as of this date.)
7    BY MR. MIGLIORI:

12    You said Ken Romeo was the guy
13 that gave a presentation of some sort, or
14 a training of some sort to Regulatory
15 Affairs, correct?
16    A.   That is correct.  He was on the
17 team at the time.
18    Q.   So, what was Ken Romeo's job
19 title at this point in 2013?
20    A.   I don't know exactly.  He was a
21 Regulatory Affairs specialist or senior
22 specialist, something of that nature.
23    Q.   Okay.  But he worked underneath
24 Sergio Tejeda?

Page 155

1    A.   Tina and then Sergio at that
2 time, yes.
3    Q.   So he was part of the DEA Audit
4 Team?
5    A.   Correct.
6    Q.   And, in December of 2013, who's
7 Jim Mullins?
8    A.   Jim Mullins, he's in charge of
9 operations, and he was over Shaun Abreu.

19    Q.   And this is certainly before the
20 Masters Pharmaceutical decision came out
21 in 2017, correct?
22    A.   Correct.
23    Q.   All right.  Did you review this
24 in preparation for today?

Page 156

1    A.   I read it yesterday, yes.
2    Q.   All right.  And, do you recall,
3 having read this yesterday, do you recall
4 the meeting surrounding this?
5    A.   Vaguely.

Page 157

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 162

Page 164

Page 163

Page 165





Page 170

Page 172

Page 171

Page 173



Page 174

Page 176

Page 175

Page 177



Page 178

Page 180

Page 179

Page 181





Page 182

Page 184

1 in terms of, you know, managing the
2 systems for that.
3     Q. And who, at this time in 2013,
4 when this was being reported to you, who
5 would have been the IT person that, if you
6 recall?
7     A. Liaison currently for Regulatory
8 is Gavin D'Souza, and I would venture that
9 he was probably it back then.
10     Q. Okay. And, who would then --
11 who would he have interacted with within
12 your department?
13     A. Sergio.
14     Q. Sergio, okay.

ons

19     That's something you said
20 FileMaker Pro addressed in 2018, correct?
21 The interactive?
22     A. That was the ultimate goal. I
23 think that there was other enhancements
24 prior to this.

Page 183

Page 185

1     Q. You can't recall any of the
2 specifics?
3     A. No.
4     Q. All right. Do you have any
5 other additional medical training other
6 than what Ken Romeo did right after this
7 report, medical training of the
8 verification decisionmakers?
9     A. I do not.
10     Q. And as you sit here today,
11 you're not familiar with any verification
12 decisionmakers recurrent training program
13 at Henry Schein?
14     A. Yeah, they don't report to me.
15 So I'm not sure.
16     Q. (Reading) Provide any
17 additional training relative to account
18 due diligence techniques.
19     Do you know if any additional
20 training had been implemented at Henry
21 Schein for due diligence techniques as a
22 result of this audit in 2013?
23     A. I believe Ken Romeo's training,
24 from both a medical and due diligence

12     Do you know if that was ever
13 done?
14     A. I believe it was, sir.
15     Q. Okay. And, who would have
16 implemented that? That is, technically,
17 who would have verified that? Who would
18 have implemented it and then quality
19 controlled it that it was working at the
20 company?
21     A. I think a combination of the IT
22 teams and potentially Regulatory and
23 Customer Verifications, but all of the
24 activities would be driven by the IT team

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  techniques, covered -- covered both
2  topics.
3      Q.  Okay.  And so, to your
4  knowledge, and to your recollection,
5  anyway, the only -- the only training was
6  whatever Ken did in that one- or two-day
7  presentation after this report?
8      A.  Correct.

14     Q.  When was that ultimately done?
15     A.  I'd have to go back and look.  I
16  don't know specifically off the top of my
17  head, sir.
18     Q.  So, at the end of 2013, if the
19  SOM computer system was outdated, do you
20  have any recollection in your tenure as
21  vice-president of, among other things,
22  Regulatory Affairs of when the system was
23  switched?
24         MR. McDONALD:  Object to the

Page 187

1  form.
2  BY MR. MIGLIORI:
3      Q.  It would have happened during
4  your time --
5      A.  Yeah, there's been two re-tunes,
6  I believe.
7      Q.  Okay.
8      A.  But I don't know the dates, sir.
9      Q.  Okay.  Enhance regulatory
10  training on medical aspects of a field
11  audit.
12         Other than what you've already
13  described, are you aware of any other
14  enhanced regulatory training on medical
15  aspects?
16     A.  Yeah, that would be the monthly
17  reports where the auditors themselves
18  discuss what they find and what challenges
19  they've come across, et cetera.
20     Q.  But that would only be within
21  the Regulatory Affairs Department.  It
22  would not involve Verifications.
23         Correct?
24     A.  Correct.

Page 188

13     Q.  And, since your role as
14  vice-president in this area in 2013, is
15  that you've tried to do over the past
16  five years, be more proactive in getting
17  the Regulatory Affairs Department involved
18  with the verification system?
19     A.  In my opinion, yes.
20     Q.  Okay.  But as we sit here today,
21  it is still possible for a pended order,
22  or an order that is kicked out of the
23  automated system as being potentially
24  suspicious or suspicious and it is -- it

Page 189

1  is possible that that today, that order
2  can be determined or deemed by a
3  Verifications person to be okay to ship
4  without Regulatory involvement, correct?
5      A.  That's my understanding.
6      Q.  Okay.
7         MR. MIGLIORI:  Why don't we take
8  a lunch break?
9         MR. McDONALD:  Sure.
10        THE VIDEOGRAPHER:  All right.
11  Stand by.
12        The time is 12:18 p.m.
13        Going off the record.
14        (Luncheon recess taken.)
15  A F T E R N O O N  S E S S I O N
16             - - -
17        THE VIDEOGRAPHER:  We are back
18  on the record.
19        The time is 1:03 p.m.
20             - - -
21        (Peacock Exhibit 10, interoffice
22  memorandum dated December 19, 2012,
23  Bates No. HSI-MDL-00622252 to

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    00622258, was marked for
2    identification, as of this date.)
3  BY MR. MIGLIORI:



Highly Confidential - Subject to Further Confidentiality Review

Page 194



²⁰ added or put into the value of that
²¹ account. So the total sales may be
²² misstated because it's not just controlled
²³ substances. It could potentially be other
²⁴ medical devices or capital equipment.

Page 195

¹ Q. So, as it relates to DEA
² compliance, which was the focus of this
³ audit, does that mean that it -- it was
⁴ possible that some of the sales data being
⁵ reported through ARCOS was misstated
⁶ because it included not just controlled
⁷ substances, but capital purchases?
⁸     MR. McDONALD: Object to the
⁹ form.
¹⁰     If you know, tell him. But
¹¹ don't guess.
¹² A. I don't know.
¹³ Q. Okay. You agree with me this is
¹⁴ a finding related to DEA compliance. I
¹⁵ mean, that's --
¹⁶ A. That's in the report, yes.
¹⁷ Q. Do you have any sense of why
¹⁸ that would be in this report?
¹⁹ A. I don't recall, sir. I'm sorry.
²⁰ Q. Okay. That's fair enough.
²¹     MR. MIGLIORI: All right. You
²² can set that aside.
²³     (Peacock Exhibit 11, interoffice
²⁴ memorandum dated December 30, 2013,

Page 196

¹ Bates No. HSI-MDL-00621989 to
² 00621996, was marked for
³ identification, as of this date.)
⁴ BY MR. MIGLIORI:

97

Highly Confidential - Subject to Further Confidentiality Review



Page 198

21    memorandum dated February 14, 2014,
22    Bates No. HSI-MDL-00622219 to
23    00622224, was marked for
24    identification, as of this date.)

Page 199

1   BY MR. MIGLIORI:

Page 200

Highly Confidential - Subject to Further Confidentiality Review





Page 206

Page 208

17    MR. MIGLIORI:  So, that's
18  Exhibit Number 13.  We're cruising
19  now.
20    (Peacock Exhibit 14, DEA
21  Compliance Update October 2, 2014,
22  Bates No. HSI-MDL-00575077 to
23  00375079, was marked for
24  identification, as of this date.)

Page 209

07

1  BY MR. MIGLIORI:

15    (Peacock Exhibit 13, interoffice
16  memorandum dated February 17, 2014,
17  Bates No. HSI-MDL-00499366 to
18  00499371, was marked for
19  identification, as of this date.)
20  BY MR. MIGLIORI:
21    Q.   This is Exhibit 13.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 220

4      (Peacock Exhibit 15, email chain
5      ending May 7, 2018, with attachment,
6      Bates No. HSI-MDL-00572919 to
7      00572922, was marked for
8      identification, as of this date.)
9   BY MR. MIGLIORI:





Highly Confidential - Subject to Further Confidentiality Review



Page 242

Page 244



```
 9        (Peacock Exhibit 16, email dated
10     July 19, 2018, with attachment, Bates
11     No. HSI-MDL-00433692, was marked for
12     identification, as of this date.)
13   BY MR. MIGLIORI:
```





```
23          MR. MIGLIORI:  Let's do this one
24    quickly.  This is number 17.
```



Page 254

1      (Peacock Exhibit 17, email chain
2   ending July 18, 2018, with attachment,
3   Bates No. HSI-MDL-00209427 to
4   00209428, was marked for
5   identification, as of this date.)
6  BY MR. MIGLIORI:



Page 258

Page 260

Page 259

1    MR. MIGLIORI:  Let me do a
2  couple more documents.  Then we'll
3  take a break, and then we'll finish
4  up.
5    (Peacock Exhibit 18, email chain
6  ending January 26, 2016, Bates No.
7  HSI-MDL-00156897 to 00156899, was
8  marked for identification, as of this
9  date.)
10    MR. MIGLIORI:  This is
11  Exhibit 18.
12    (Pause.)
13  BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review



Case: 1:17-md-02804-DAP Doc #: 1983-1 Filed: 07/24/19 68 of 84. PageID #: 243151
Highly Confidential - Subject to Further Confidentiality Review

Page 268



11    MR. McDONALD:  We've been going
12  a while.  So why don't we take a break
13  whenever you get to a good spot.
14    MR. MIGLIORI:  Yes.  I'm
15  thinking maybe let me do this one
16  document, 'cause I just --
17    MR. McDONALD:  You're so excited
18  about it.
19    MR. MIGLIORI:  No, I'd rather
20  just move on to the next topic at the
21  end of the break instead of being in
22  the middle of one.
23    But, if you don't mind, just
24  give me one second.

Highly Confidential - Subject To Further Confidentiality Review

| Page 270 | Page 272 |
|---|---|



```
1        And I'm going to claim sickness
2    as my basis for my request.
3        THE WITNESS:  I'm not feeling
4    well either.
5        MR. MIGLIORI:  Excellent
6    response.
7        Yeah, let's take a break here
8    this way I can fine tune.
9        THE VIDEOGRAPHER:  Okay.  Re
10   the microphones.
11       The time is 2:19 p.m.
12       Off the record.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  Okay.  We
15   back on the record.
16       The time is 2:33 p.m.
```



15       (Peacock Exhibit 19, letter
16   dated November 9, 2012, Bates No.
17   HSI-MDL-00397293 to 00397294, was
18   marked for identification, as of this
19   date.)
20   BY MR. MIGLIORI:



```
 5          MR. MIGLIORI:  Okay.  Let me
 6      show you Exhibit Number 20.
 7          (Peacock Exhibit 20, letter
 8      dated May 8, 2013, with attachment,
 9      was marked for identification, as of
10      this date.)
11  BY MR. MIGLIORI:
12      Q.   Now, you signed on to -- you
13  signed on to Henry Schein in May of 2013,
14  correct, and you started in July, correct?
15      A.   I started in July, correct.
16      Q.   All right.
17      A.   I accepted the position in May.
18      Q.   All right.  In May, Exhibit 20,
19  the cover page is a letter from the State
20  Medical Board of Ohio to a Dr. Brian Heim
21  in Akron, Ohio, and it says:  Dr. Heim,
22  Please find enclosed certified copy of the
23  findings, order and journal entry approved
24  and confirmed by the State Medical Board
```

Page 286

1 meeting in regular session on May 8th,
2 2013.
3       One of the verifications or due
4 diligence resources for Henry Schein would
5 be the state medical licensure boards,
6 correct?
7     A.   Please repeat.
8     Q.   Sure.
9       The Know Your Customer program
10 at Henry Schein includes looking to, among
11 other things, state medical licensure
12 boards for information, correct?
13    A.   Yes, sir.
14    Q.   It would also include boards of
15 pharmacy in states, correct?
16    A.   That's correct.
17      MR. McDONALD:  Object to the
18 form.
19 BY MR. MIGLIORI:
20    Q.   All right.  On May -- if you
21 turn to, I don't know how to identify it
22 for you other than there's one page that's
23 got an Exhibit 1 sticker on it that's
24 about halfway through the stack.  They're

Page 287

1 not Bates numbered, and I apologize.
2     A.   Is this it up here?
3     Q.   Yeah.  So, it looks like this
4 (indicating).
5       It says Daniel Horrigan May 8th,
6 2012, 3:10 p.m. in the Court of Common
7 Pleas, County of Summit, Ohio.  Indictment
8 type.
9     A.   Yep.
10    Q.   You see that on -- this is filed
11 on May 18th of 2012, an indictment for
12 aggregated -- aggravated -- I'm sorry.
13 Aggravated trafficking in drugs,
14 aggravated trafficking in drugs tampering
15 with evidence.  And it relates to Brian D.
16 Heim of Akron, Ohio.
17      Do you see that?
18    A.   Yes.
19    Q.   All right.  When you're -- when
20 Henry Schein does due diligence, does it
21 turn to criminal records, or does it rely
22 on representations of its doctors about
23 criminal activity?
24      MR. McDONALD:  Object to the

Page 288

1 form.
2       If you know, tell him.
3 BY MR. MIGLIORI:
4     Q.   If you understand my question.
5     A.   I do not know whether or not we
6 look at criminal records like this.
7     Q.   I'm going to have you just set
8 that aside for a moment and show you the
9 next document.
10      (Peacock Exhibit 21, Memorandum
11      in Support of Motion For Summary
12      Judgment in the United States of
13      America versus Brian D. Heim, was
14      marked for identification, as of this
15      date.)
16 BY MR. MIGLIORI:
17    Q.   The next document is Exhibit 21.
18      This document is a pleading in
19 an action where the United States
20 Government seeks forfeiture of assets of
21 Dr. Heim because of his activity
22 relevant -- related to controlled
23 substances.  I'm going to have you turn to
24 the third page.  Page number 3 it gives a

Page 289

1 brief history of Dr. Heim.  It says:
2 Defendant was licensed under the laws of
3 Ohio to practice medicine.  Was also
4 registered under - this is a federal
5 statute - by the DEA to dispense
6 controlled substances to the extent
7 permitted by federal law.  Defendant has a
8 history of drug violations.  In 1998,
9 defendant entered a guilty plea to 24
10 felony counts of theft of drugs and 21
11 felony counts of illegal processing of
12 drug documents.  His medical licensure was
13 revoked and he was given treatment in lieu
14 of conviction.  Defendant's medical
15 license was later reinstated with
16 restrictions and he was put on probation
17 until January of 2005.
18      My first question is are you
19 aware of Dr. Heim or what Dr. Heim was
20 doing?
21    A.   Never heard of the gentleman
22 before today.
23    Q.   All right.  Would you agree with
24 me that in knowing your customer, assuming

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 this is a customer of Henry Schein, that
2 in knowing your customer, those facts that
3 I just read to you from this pleading
4 would be relevant facts?
5     A.   Would they be relevant?  Yes.
6         What I find very disturbing
7 about this is that the DEA would reissue
8 his license.  To me that's the most
9 disturbing because that's the first thing
10 that a company will look at, right.  So if
11 the DEA hasn't done its due diligence, I
12 have, you know, a hard time understanding
13 how they're reinstating the doctor who's
14 got counts against him and then, you know,
15 we have to go and double check the DEA.
16         That's what this is -- that's
17 what you're implying, sir.
18     Q.   No, I'm not implying.  I'm just
19 reading the facts.  And the fact are here.
20 It says the defendant's medical license
21 was reinstated.  It doesn't say DEA
22 registration.
23     A.   Okay.
24     Q.   All right.  I just want to make

Page 291

1 sure we're on the same page.
2         I understand your concern about
3 DEA, but there's no reference to DEA --
4     A.   Okay.
5     Q.   -- registration, other than the
6 initial granting of it.
7         Do you see that?  I don't want
8 to imply anything.
9     A.   No, I got it.  I see it.
10     Q.   All right.
11     A.   So it was never restricted?
12     Q.   I don't know.
13         I'm just asking whether those
14 facts, a criminal history and a loss of
15 medical licensure --
16     A.   Yes.
17     Q.   -- are facts that are relevant
18 to a --
19     A.   Sure.  That would be reported.
20     Q.   Okay.  I want you to then go and
21 look at the bottom of page 4.  The bottom
22 of page 4 says:  The inspection and
23 subsequent investigation revealed that
24 defendant purchased 11,500 tablets of

Page 292

1 hydrocodone on 14 separate dates between
2 August 17th, 2011 and June 5th, 2013 from
3 Henry Schein Inc., a distributor of
4 pharmaceutical drugs.
5         So, at least for purposes of
6 this question, will you at least accept
7 the purported representation that Henry
8 Schein was a supplier of certain
9 controlled substances to Dr. Heim?
10         MR. McDONALD:  Object to the
11 form.
12 BY MR. MIGLIORI:
13     Q.   Do you see that in the pleading?
14     A.   I do see that in the pleading.
15     Q.   All right.
16         Henry Schein provided a summary
17 of these purchases to DEA on July 11th,
18 2012.
19         Do you see that?
20     A.   Mm-hm.
21     Q.   Exhibit B Summary of Purchase
22 Records.
23         And then it actually gives a
24 table of the 11,500 pills - these are

Page 293

1 based on pills - of hydrocodone in this
2 record, okay.  That is the, by invoice,
3 order date, size, total drug strength,
4 that is Henry Schein's information it
5 provided to the DEA, again, on July 11th,
6 2012.
7         Do you see that?
8     A.   Yep.
9     Q.   Okay.  I'm going to show you
10 Exhibit 22.
11         MR. McDONALD:  Well, and I'll
12 just tell you, state for the record
13 that I don't have any idea if any of
14 this is true or not because your
15 statement that you read earlier said
16 that the sales were between August
17 17th, 2011 and July 5 of 2013, and
18 that the report was made to DEA on
19 July 11th, 2012.  I'll represent to
20 you that's probably impossible to do.
21 That is to provide a report in July of
22 2012 about sales that were made
23 through June 5th, 2013.
24         MR. MIGLIORI:  Well, we can --

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    MR. McDONALD: Something's wrong
2  with the dates.
3    MR. MIGLIORI: Yeah. The
4  indictment -- you could reconcile the
5  dates. The date that's wrong is not
6  the one that you think it is, but I
7  appreciate your spoken objection.
8    MR. McDONALD: There's something
9  wrong with the dates, and I don't know
10 what it is 'cause I've never seen this
11 before either.
12   MR. MIGLIORI: That's okay.
13   MR. McDONALD: And I have no
14 idea why it's remotely relevant to
15 this witness.
16   MR. MIGLIORI: You're a nice
17 person. I'm not going to make a big
18 deal about it, but that's more of an
19 objection than you're supposed to be.
20   MR. McDONALD: Well, you and I
21 both know otherwise, but that's okay.
22   MR. MIGLIORI: I'm okay with it.
23   MR. McDONALD: Thank you.
24   MR. MIGLIORI: I'll remember to

Page 295

1  do it when you do it to my client.
2    MR. McDONALD: Fair enough.
3    (Peacock Exhibit 22, Customer
4  Service Imaging printout, Bates No.
5  HSI-MDL-00001198 to 00001210, was
6  marked for identification, as of this
7  date.)
8  BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review





Case: 1:17-md-02804-DAP Doc #: 1983-1 Filed: 07/24/19 77 of 84. PageID #: 243160
Highly Confidential - Subject to Further Confidentiality Review

Page 304

2    MR. MIGLIORI:  Why don't we take
3    a break and let me just make sure I've
4    covered everything I wanted to.
5        THE VIDEOGRAPHER:  The time is
6    3:10 p.m.
7        Going off the record.
8        (Recess taken.)
9        THE VIDEOGRAPHER:  The time is
10   3:13 p.m.
11       Back on the record.
12   BY MR. MIGLIORI:

Highly Confidential - Subject To Further Confidentiality Review

| Page 306 | Page 308 |



| Page 309 |

```
14        (Peacock Exhibit 23, Cegedim
15     Dendrite Draft Schein SOM Procedural
16     Review, Bates No. HSI-MDL-00404369 to
17     00404383, was marked for
18     identification, as of this date.)
19  BY MR. MIGLIORI:
```







4    Q.   All right.
5         MR. MIGLIORI:  Last sticker.
6         (Peacock Exhibit 24, email chain
7    ending February 27, 2015, Bates No.
8    HSE-MDL-0039634, was marked for
9    identification, as of this date.)
0    BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review



**Page 326**

8  the DEA Compliance Team to not send a
9  suspicious order letter to the DEA.
10      That is not consistent with
11  Henry Schein's policies and procedures for
12  restricted accounts, correct?
13      A.   Yes.  I can't -- I can't defend
14  why this had happened.  It does not follow
15  our --
16      Q.   This should not have happened?
17      A.   -- policy.
18          MR. McDONALD:  Well, object to
19  the form.
20  BY MR. MIGLIORI:
21      Q.   This should not have happened,
22  correct?
23          MR. McDONALD:  Object to the
24  form.

**Page 327**

1      A.   Doesn't follow our policies.
2          MR. MIGLIORI:  All right.  I
3  really appreciate your time.
4          I appreciate you tolerating my
5  weak voice.
6          THE WITNESS:  No worries.
7          MR. MIGLIORI:  But I do
8  appreciate you being here.  I don't
9  have anything else.
10          MR. McDONALD:  You pass the
11  witness?
12          I'll reserve my questions.
13          MR. MIGLIORI:  Okay.
14          MR. ASFENDIS:  I'm here and
15  counsel for Cardinal tells me he has
16  nothing either.
17          THE VIDEOGRAPHER:  All right.
18  Stand by, please.
19          This marks the end of today's
20  deposition.
21          The time is 3:34 p.m.
22          Off the record.
23          (Deposition adjourned at
24  approximately 3:34 p.m.)

**Page 328**

1      A C K N O W L E D G M E N T
2
3  STATE OF        )
4                  :ss
5  COUNTY OF       )
6
7      I, JEFFREY S. PEACOCK, hereby certify
8  that I have read the transcript of my
9  testimony taken under oath in my
10  deposition of January 30, 2019; that the
11  transcript is a true and complete record
12  of my testimony, and that the answers on
13  the record as given by me are true and
14  correct.
15
16
17  _____
          JEFFREY S. PEACOCK
18
19  Signed and subscribed to before me this
20  _____ day of _____, 2019.
21
22  _____
23  Notary Public, State of
24

**Page 329**

1      E R R A T A
2  PAGE / LINE / CHANGE  /  REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

Highly Confidential - Subject to Further Confidentiality Review

Page 330

```
 1        C E R T I F I C A T E
 2   STATE OF NEW YORK
 3   COUNTY OF NEW YORK
 4
 5        I, Marie Foley, RMR, CRR, a
 6   Certified Realtime Reporter and Notary
 7   Public within and for the State of New
 8   York, do hereby certify:
 9        THAT JEFFREY S. PEACOCK, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that such
12   deposition is a true record of the
13   testimony given by the witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I am
17   in no way interested in the outcome of
18   this matter.
19        IN WITNESS WHEREOF, I have
20   hereunto set my hand this 2nd day of
21   February, 2019.
22
23   _____
          MARIE FOLEY, RMR, CRR
24
```

Page 331

```
 1        LAWYER'S NOTES
 2   PAGE / LINE
 3   ____ ____ _____
 4   ____ ____ _____
 5   ____ ____ _____
 6   ____ ____ _____
 7   ____ ____ _____
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
```