1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL          :   HON. DAN A.
PRESCRIPTION OPIATE       :   POLSTER
LITIGATION                :
                          :
APPLIES TO ALL CASES      :   NO.
                          :   1:17-MD-2804
                          :

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

December 18, 2018

- - -

Videotaped deposition of
MICHAEL PERFETTO, taken pursuant to
notice, was held at the offices of Lieff
Cabraser, LLP, 250 Hudson Street, New
York, New York, beginning at 9:09 a.m.,
on the above date, before Michelle L.
Gray, a Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

      ROBBINS GELLER RUDMAN & DOWD, LLP
 3    BY:  AELISH M. BAIG, ESQ.
      Post-Montgomery Center
 4    One Montgomery Street, Suite 1800
      San Francisco, California 94104
 5    (415) 288-4545
      aelishb@rgrdlaw.com
 6
              - and -
 7

      ROBBINS GELLER RUDMAN & DOWD, LLP
 8    BY: CARISSA J. DOLAN, ESQ.
      655 West Broadway, Suite 1900
 9    San Diego, California 92101
      (619) 231-1058
10    cdolan@rgrdlaw.com
      Representing the Plaintiffs
11
12    MORGAN LEWIS & BOCKIUS, LLP
      BY:  STEVEN A. LUXTON, ESQ.
13    1111 Pennsylvania Avenue NW
      Washington, D.C. 20004
14    (202) 739-5452
      steven.luxton@morganlewis.com
15    Representing the Defendant, Teva
      Pharmaceuticals
16
17    LINKLATERS, LLP
      BY:  CAITLIN POTRATZ METCALF, ESQ.
18    601 13th Street, NW
      Washington, D.C. 20005
19    (202) 654-9200
      Caitlin.potratz@linklaters.com
20    Representing the Witness
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)

 2

      KIRKLAND & ELLIS, LLP
 3    BY:  MARTIN L. ROTH, ESQ.
      300 North LaSalle Street
 4    Chicago, Illinois 60654
      (312) 862-7184
 5    martin.roth@kirkland.com
 6          - and -
 7    KIRKLAND & ELLIS, LLP
      BY:  CATIE VENTURA, ESQ.
 8    655 15th Street, NW
      Washington, D.C. 20005
 9    (202) 879-5907
      catie.ventura@kirkland.com
10    Representing the Defendant, Allergan
      Finance

11

12    ALLEGAERT, BERGER & VOGEL, LLP
      BY:  CHRISTOPHER ALLEGAERT, ESQ.
13    111 Broadway, 20th Floor
      New York, New York 10006
14    (212) 616-7060
      callegaert@abv.com
15    Representing the Defendant, Rochester
      Drug Co-Op

16

17    WILLIAMS & CONNOLLY, LLP
      BY:  JOEL S. JOHNSON, ESQ.
18    725 12th Street, NW
      Washington, D.C. 20005
19    (202) 434-5148
      jjohnson@wc.com
20    Representing the Defendant, Cardinal
      Health

21

22

23

24
```

```
 1    APPEARANCES:  (Cont'd.)

 2

      JONES DAY
 3    BY:  SHIRLETHIA V. FRANKLIN, ESQ.
      51 Louisiana Avenue, NW
 4    Washington, D.C. 20001
      (202) 879-3939
 5    Sfranklin@jonesday.com
      Representing the Defendant, Walmart
 6

 7    COVINGTON & BURLING, LLP
      BY:  CLAYTON BAILEY, ESQ.
 8    850 Tenth Street, NW
      Suite 586N
 9    Washington, D.C.  20001
      (202) 662-5769
10    Cbailey@cov.com
      Representing the Defendant, McKesson
11    Corporation

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC APPEARANCES:
 2
      LINKLATERS, LLP
 3    BY:  ADAM LURIE, ESQ.
      601 13th Street, NW
 4    Washington, D.C. 20005
      (202) 654-9200
 5    Adam.lurie@linklaters.com
      Representing the witness
 6
 7    MORGAN LEWIS & BOCKIUS, LLP
      BY:  THEODORE E. DAYNO, ESQ.
 8    600 Anton Boulevard, Suite 1800
      Los Angeles, California 92626
 9    (714) 830-0668
      theodore.dayno@morganlewis.com
10    Representing the Defendant, Teva
      Pharmaceuticals
11
12    REED SMITH, LLP
      BY:  SARAH B. JOHANSEN, ESQ.
13    355 South Grand Avenue, Suite 2900
      Los Angeles, California 90071
14    (213) 457-8135
      sjohansen@reedsmith.com
15
              - and -
16
      REED SMITH, LLP
17    BY:  LUKE PORTER, ESQ.
      101 Second Street, Suite 1800
18    San Francisco, California 94105
      (415) 543-8700
19    lporter@reedsmith.com
      Representing the Defendant,
20    AmerisourceBergen Drug Corporation
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC APPEARANCES:  (Cont'd.)

 2

     BAKER HOSTETLER, LLP
 3   BY:  DOUGLAS SHIVELY, ESQ.
     127 Public Square, Suite 2000
 4   Cleveland, Ohio 44114
     (216) 861-7309
 5   Dshively@bakerlaw.com

 6        - and -

 7   ARNOLD & PORTER KAYE SCHOLER, LLP
     BY:  TIFFANY M. IKEDA, ESQ.
 8   777 Figueroa Street, 44th Floor
     Los Angeles, California 90017
 9   (213) 243-4000
     Tiffany.ikeda@arnoldporter.com
10   Representing the Defendants, Endo Health
     Solutions; Endo Pharmaceuticals, Inc.;
11   Par Pharmaceutical Companies, Inc. f/k/a
     Par Pharmaceutical Holdings, Inc.

12

13   ALLEGAERT, BERGER & VOGEL, LLP
     BY:  LUCY N. ONYEFORO, ESQ.
14   111 Broadway, 20th Floor
     New York, New York  10006
15   (212) 616-7060
     Lonyeforo@abv.com
16   Representing the Defendant,
     Rochester Drug Co-op

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -
 2                     I N D E X
 3                       -   -   -
 4
     Testimony of:
 5
                         MICHAEL PERFETTO
 6
 7        By Ms. Baig                      15
 8
 9
10
11                       -   -   -
12                   E X H I B I T S
13                       -   -   -
14
15   NO.              DESCRIPTION              PAGE
16   Allergan
     Perfetto-1     E-mail 4/19/12        41
17                  Subject, Scanned from
                    Xerox Multifunction
18                  Device
                    ALLERGAN_MDL_00682276-85
19
     Allergan
20   Perfetto-2     E-mail Thread          125
                    2/11/09
21                  Subject, OmniCare
                    Finasteride
22                  ALLERGAN_MDL_02128035-36
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2              E X H I B I T S  (Cont'd.)

 3                        -   -   -

 4
```

NO.                DESCRIPTION                 PAGE

Allergan
Perfetto-3    E-mail Thread         140
             3/17/11
             Subject, Cardinal's
             Oxy 15mg Suspicious
             Ordering
             Acquired_Actavis_
             00265989-90

Allergan
Perfetto-4    E-mail, 4/26/11       160
             Subject, SOM
             ALLERGAN_MDL_02872128-29

Allergan
Perfetto-5    E-mail Thread         174
             5/6/11
             Subject, Meeting Today
             Regarding QK Healthcare
             Oxy Ordering Pattern
             Acquire_Actavis_
             01317298-99

Allergan
Perfetto-6    E-mail Thread         181
             10/21/11
             Subject, SOM &
             Budget Considerations
             ALLERGAN_MDL_01767006

Allergan
Perfetto-7    E-mail Thread         188
             2/14/12
             Subject, Safe and Secure
             ALLERGAN_MDL_02459892-95

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                     -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Allergan
     Perfetto-8     E-mail Thread            199
 7                  3/31/12
                    Subject, Recap of SOM
 8                  Meeting on Wednesday
                    March 21
 9                  ALLERGAN_MDL_02150276-93
10   Allergan
     Perfetto-9     E-mail Thread            213
11                  9/21/12
                    Subject, SOM Training
12                  Completed 9/21/12
                    Acquired_Actavis_
13                  01509414-16
14   Allergan
     Perfetto-10    E-mail, 12/7/12          218
15                  Subject, See Attached
                    Presentations
16                  Acquired_Actavis_
                    00968401
17
     Allergan
18   Perfetto-11    E-mail, 4/8/11           248
                    Subject, Suspicious
19                  Order
                    ALLERGAN_MDL_02128397
20
     Allergan
21   Perfetto-12    E-mail 11/16/10
                    Subject, Oxycodone IR    251
22                  Tabs - Outstanding
                    Orders by Customer
23                  ACTAVIS0632024-27
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.               DESCRIPTION              PAGE
 6    Allergan
      Perfetto-13   E-mail Thread          259
 7                  2/2/11
                    Subject, Walgreens
 8                  2009 vs. 2010 Oxycodone
                    Acquired_Actavis_
 9                  00218780-86
10    Allergan
      Perfetto-14   E-mail Thread          274
11                  3/22/11
                    Subject, Opti-Source
12                  Oxy IR Orders
                    ACTAVIS0524986-00
13
      Allergan
14    Perfetto-15   E-mail Thread          282
                    1/12/12
15                  Subject, 1/11/12
                    Opti-Source Oxy IR
16                  Shipments
                    ALLERGAN_MDL_00677641-42
17
      Allergan
18    Perfetto-16   E-mail Thread          289
                    5/24/12
19                  Subject, Smith Drug
                    Oxycodone 30mg Needs
20                  ACTAVIS0288356-61
21    Allergan
      Perfetto-17   E-mail Thread          297
22                  9/13/12
                    Subject, DEA Meeting
23                  ACTAVIS0238164
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Allergan
      Perfetto-18   E-mail, 2/9/10            320
 7                  Subject, Sales
                    Presentation
 8                  Acquired_Actavis_
                    02233973
 9
      Allergan
10    Perfetto-19   E-mail Thread             339
                    4/9/09
11                  Subject, Oxy
                    Acquired_Actavis_
12                  01169947
13    Allergan
      Perfetto-20   E-mail, 2/20/08           342
14                  Subject, Programs
                    Acquired_Actavis_
15                  00002258-59
16    Allergan
      Perfetto-21   E-mail, 2/25/12           348
17                  Subject, My Presentation
                    From the Sales Meeting
18                  ALLERGAN_MDL_01021248-61
19    Allergan
      Perfetto-22   E-mail Thread             362
20                  3/11/08
                    Subject, Revised Kroger
21                  Choice Program
                    Acquired_Actavis_
22                  00452409-10
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    -   -   -
2          E X H I B I T S  (Cont'd.)
3                    -   -   -
4
5    NO.             DESCRIPTION           PAGE
6    Allergan
     Perfetto-23  E-mail, 9/1/11        396
7                 Subject, Oxymorphone
                  ER Pharmacy Placement
8                 Details via Chargeback
                  & Attachments
9                 Acquired_Actavis_
                  00945856
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2           DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.
 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.
10

11    Stipulations

12    PAGE    LINE
      None.
13

14    Questions Marked

15    PAGE    LINE
      None.
16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1    THE VIDEOGRAPHER:  We are

2    now on the record.

3        My name is Henry Marte.  I'm

4    a videographer with Golkow

5    Litigation Services.

6        Today's date is December 18,

7    2018.  And the time is 9:09 a.m.

8        This videotaped deposition

9    is being held at 250 Hudson

10    Street, New York, New York, in the

11    matter of National Prescription

12    opiate litigation.

13        The deponent today is

14    Michael Perfetto.

15        All appearances are noted on

16    the stenographic record.

17        Will the court reporter

18    please administer the oath to the

19    witness.

20                -   -   -

21        ... MICHAEL PERFETTO, having

22    been first duly sworn, was

23    examined and testified as follows:

24                -   -   -

Highly Confidential - Subject to Further Confidentiality Review

```
1                    EXAMINATION

2                      -  -  -

3   BY MS. BAIG:

4          Q.    Hi, good morning

5   Mr. Perfetto.

6          A.    Good morning to you.

7          Q.    We met briefly off the

8   record, but could you please state your

9   full name and address for the record?

10         A.    Sure.  Michael Perfetto.  93

11  Ros Hill Road, Conklin, New York.

12         Q.    And you've had your

13  deposition taken before, correct?

14         A.    Yes.

15         Q.    And what case was that?

16         A.    Various cases.

17         Q.    Okay.  How many times have

18  you had your deposition taken?

19         A.    I don't know specifically,

20  because I was a corporate witness and

21  there's a lot of depositions that are

22  associated with that.

23         Q.    More than ten or so?

24         A.    Maybe around ten.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And when was the last

2    time you had your deposition taken?

3    A.    When I was with Actavis so

4    it would have been 2012 maybe.  Or '11.

5    '12 or '11.

6    Q.    And have any of those prior

7    depositions related to opioid

8    medications?

9    A.    Not to my knowledge.

10    Q.    Okay.  So you're familiar

11    with the deposition procedure, correct?

12    A.    Yes.

13    Q.    Okay.  And what did you do

14    to prepare for today's deposition?

15    A.    I met with my lawyers

16    yesterday.

17    Q.    And how long did you meet

18    with them for?

19    A.    A few hours.

20    Q.    And did you read any

21    depositions in preparation for this

22    deposition?

23    Did you read any deposition

24    transcripts in preparation for this

Highly Confidential - Subject to Further Confidentiality Review

1    deposition?

2         A.    Other -- other people that

3    have been deposed?

4         Q.    Mm-hmm.

5         A.    No, ma'am.

6         Q.    Okay.  Have you talked to

7    anybody at Allergan or Actavis or any of

8    the Allergan companies with respect to

9    this deposition?

10        A.    No, ma'am.

11        Q.    And are you being paid for

12   testifying today?

13        A.    Your -- your organization

14   sent me $50.

15        Q.    And are you being paid in

16   addition to that for testifying today?

17        A.    No, ma'am.

18        Q.    Okay.  And did you look at

19   any documents in preparation for your

20   deposition today?

21        A.    Yes.

22        Q.    Did any of those refresh

23   your recollection?

24        A.    There was a lot of -- a lot

1    of documents.

2         Q.    Okay.  And did you bring

3    those documents with you today?

4         A.    No, ma'am.

5              MS. BAIG:  Counsel, can you

6         represent that the documents he

7         reviewed have been produced in

8         this action?

9              MR. ROTH:  Yes.

10             MR. LUXTON:  They have been.

11             Can we also just get a quick

12        stipulation on the record before

13        we get started?  Steve Luxton on

14        behalf of the Teva defendants.  I

15        think counsel will stipulate that

16        an objection for one is an

17        objection for all, as to

18        Mr. Perfetto's attorneys for the

19        purpose of this deposition, which

20        would be his personal attorney,

21        Ms. Metcalf, as well as attorneys

22        for Allergan and Teva.

23             THE VIDEOGRAPHER:  There's a

24        microphone right behind your iPad.

1    There's another microphone.

2              MR. LUXTON:  Is that

3         stipulation okay, Counsel?

4              MS. BAIG:  That's fine.

5              MR. LUXTON:  Great.

6    BY MS. BAIG:

7         Q.    Are you familiar with the

8    complaint on file in this action?

9         A.    I know it's -- it has to do

10   with opioids.

11        Q.    What's your understanding of

12   the nature of the complaint?

13        A.    The selling -- it involves

14   the selling of opioids, from my

15   standpoint.

16        Q.    And are you familiar with

17   what the alleged wrongdoing is?

18        A.    Just the -- the selling of

19   opioids in the market.

20        Q.    Can you walk me through,

21   briefly through your education and your

22   work history?

23        A.    Sure.  When do you want to

24   start?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Well, let's start with your

2    education.

3    A.    How -- how far back?

4    Q.    Let's say college level.

5    A.    Okay.  I went in 1978 to

6    Bloomsburg State University in

7    Pennsylvania, and I graduated from there

8    in 1982.  I got a BS in accounting.  It's

9    a business degree.

10    From there I went and I -- I

11    went at nights to get my MBA at

12    University of New Haven in West Haven,

13    Connecticut.  That was in 1982 to 1985.

14    That was primarily a night -- going at

15    night; I got an MBA in marketing.

16    And that would be the extent

17    of my education.

18    Q.    And can you walk me through

19    your work history briefly since then?

20    A.    From the beginning?

21    Q.    Well, just the companies

22    that you've worked with.

23    A.    Oh, okay.

24    Q.    Since that time, for

Highly Confidential - Subject to Further Confidentiality Review

1    starters.

2         A.    I -- I first started with

3    Sikorsky Aircraft, which was a United

4    Technology Company in Stratford,

5    Connecticut.  And I was a pricing

6    analyst, contract negotiator with

7    government contracts.  And I believe I

8    stayed there five years.

9              Then I went to Fisons.  It

10   was a British company, a pharmaceutical

11   brand company.  And they are out of

12   Rochester, New York.  And I started out

13   as a, like what we call a detail rep.  I

14   would be calling on doctors and selling

15   branded products to doctors.  I believe I

16   did that for a year and a half.

17             Then I got promoted to

18   national account manager, or national

19   account rep.  And what I did there was I

20   was calling on trade accounts which would

21   be the wholesalers and the CVSs and Fay's

22   Drugs and Happy Harry's and the Rite Aids

23   of the world.

24             Then I got promoted there to

Highly Confidential - Subject to Further Confidentiality Review

1  national account manager and I picked up

2  some responsibility for --

3  over-the-counter brokers were reporting

4  to me and we were selling a little bit of

5  OTC items along with our branded

6  products.

7                I believe I was there until

8  19 -- right around 1990.  So from Fisons,

9  the branded company, I went to Barr

10  Laboratories in Pomona, which is in

11  Rockland County, New York.

12                And I went there.  And that

13  was primarily a generic company.  And I

14  was there until 2003.  I was selling

15  generics.  I was a national account rep,

16  I believe was the title.  And I called on

17  primarily mail order customers; CVS, the

18  drug chain; Cardinal, the wholesaler;

19  Genovese Drug; Rock Bottom Drug, a lot of

20  small chains, selling generic

21  pharmaceuticals to the trade sector.

22                From there I went to

23  Alpharma.  I became director of sales.  I

24  was -- that's another generic company.

1   It was based in Cranford, New Jersey.  I

2   was director of sales, directing a team

3   of maybe five reps selling primarily

4   generic pharmaceuticals.

5                I was primarily focused on

6   the field.  I wasn't in the corporate

7   office.  I did that for probably a year,

8   maybe two years.  And then I took over

9   the custom service group.  And that was

10  all within Alpharma.

11               Then Alpharma got bought by

12  Actavis.  I think that was around 2005.

13  I don't have a resumé in front of me, so

14  I'm estimating these dates.

15               2005, Actavis, Icelandic

16  company, bought Alpharma, probably around

17  the time I was -- I believe I was still

18  director of sales and customer service:

19  There was a time period where I

20  eventually picked up marketing,

21  eventually picked up contracts and

22  pricing.  That was -- that was like two

23  years down the road, two, maybe three

24  years down the road.  I don't -- without

1   having a resumé in front of me and

2   without having --

3            So eventually at Actavis I

4   became vice president of sales and

5   marketing.

6            Under that I was running the

7   contracts and pricing group, the customer

8   service group, the marketing group, and

9   the sales group.

10            And we were selling generic

11   pharmaceuticals.  That would be up until

12   2012.  And then in 2012, Actavis got

13   bought by -- I guess it's Watson at the

14   time, bought them.  Watson bought

15   Actavis.

16            Because of a duplication,

17   they already had a VP of sales.  My -- I

18   was no longer -- I was no longer needed,

19   so I was released from Actavis.  And that

20   would have been, I think, January -- like

21   January 2nd.  And then I started at Taro,

22   on January 3rd of 2013.  So I didn't give

23   myself much of a break.

24            I was at -- I've been at

1    Taro/Sun from 2013 until August 1st of

2    2nd of calendar year '17.  And then I

3    retired.  At Taro, I was chief commercial

4    officer at Taro of their generic division

5    only.  That's pretty much been a trend

6    throughout my career.  Generic division

7    only.

8                Eventually Taro gave me the

9    over-the-counter business.  So I managed

10   that.

11               And then I got Canada.  So I

12   was running Canada generics business and

13   Canada OTC business.  Then they gave me

14   Israel.  So I ran the generic business in

15   Israel, as well as Canada, as well as the

16   U.S., for Taro.

17               Then in about '15, I think

18   it was early '15, like January, they gave

19   me the Sun business, along with the Taro

20   business.  So I was running -- I had

21   people working for me obviously.  But I

22   had Taro, with all those organizations

23   that I discussed.  And then I had Sun.  I

24   ran their OTC division, their Canadian

1    division, their generic division in the

2    U.S.  And the only thing that I didn't

3    have in the U.S. was business development

4    for Sun, which was run out of -- run out

5    of India.

6            So I think that pretty much

7    gives you an overview.

8        Q.    I think it does.  Thank you.

9        A.    Okay.

10       Q.    Okay.  Which of those

11   companies that you've just mentioned were

12   involved in the manufacture, sale or

13   distribution of opioid products?

14       A.    Actavis and Sun.

15       Q.    How about Watson?

16       A.    I never worked for Watson.

17       Q.    Okay.

18       A.    They -- I mean -- I'm trying

19   to think.  Maybe I -- maybe I wasn't --

20   well, I don't know if I was an -- I don't

21   know.  I mean, I was -- it was that

22   transition period.

23       Q.    Gotcha.

24       A.    I was being phased out.  I'm

1    not sure when the -- if I ever

2    transferred to a Watson employee.

3         Q.    Okay.  So Actavis, Taro.

4    And about what Alpharma?

5         A.    Yeah.  Alpharma, I'm sorry,

6    yeah.  I always think of Actavis and

7    Alpharma as one in my mind.

8         Q.    Okay.  And for Taro, what

9    opioid products does Taro market?

10        A.    I don't -- to the best of my

11   knowledge, I think Sun has some, but I

12   don't think Taro had any opioid products.

13        Q.    Okay.  And what's the

14   relationship between Taro and Sun?  Do

15   you know?  Sun is a subsidiary of Taro or

16   is it something different?

17        A.    Sun is the parent company.

18        Q.    Okay.  And do you know what

19   products Sun has -- opioid products?

20        A.    Oxycodone IRs.  It's funny

21   how you -- how you retire, and it's like

22   not using a language.  It just -- you

23   spoke Italian, and you didn't speak it a

24   while, it would be out of your mind.

1            Oxy IR.  It was a big line,

2  so I'm sure they may -- they may have had

3  more.  I'd have to look at their product

4  line and we can go through it.  But I

5  don't have that in front of me.

6        Q.    Okay.

7        A.    Huge line.

8        Q.    So your first work

9  experience with Schedule II drugs would

10  have been at Alpharma; is that right?

11        A.    Yes, ma'am.

12        Q.    When you were at Alpharma,

13  who did you report to?

14        A.    When I first worked at

15  Alpharma, I reported to Bob Sanzen.

16        Q.    And did that change over the

17  period that you were there?

18        A.    Yes.

19        Q.    Who else did you report to

20  there?

21        A.    Doug Boothe.

22        Q.    Anyone else?

23        A.    There was a time where Doug

24  Boothe had a shared responsibility with

Highly Confidential - Subject to Further Confidentiality Review

1    Divya Patel.  They were like kind of

2    co-CEOs.  So I guess theoretically I

3    reported to Divya Patel as well as Doug.

4         Q.    And then did you and Doug

5    Boothe both move over to Actavis

6    together?

7         A.    Well, Alpharma got bought by

8    Actavis.  So we transitioned to Actavis.

9         Q.    And when you transitioned to

10   Actavis, were you still reporting then to

11   Doug Boothe?

12        A.    Yes.

13        Q.    Did you report to anybody

14   else at Actavis?

15        A.    No.

16        Q.    And do you know who Doug

17   Boothe reported to at Actavis?

18        A.    It would -- it depends on

19   the time period.

20        Q.    Initially when you

21   transitioned to Actavis, who did Doug

22   Boothe report to?

23        A.    To the best of my knowledge

24   without looking at an org chart, Siggi

Highly Confidential - Subject to Further Confidentiality Review

1    Olafsson.  It's an Icelandic name.

2         Q.    And what would Siggi

3    Olafsson's position have been?

4         A.    His title?

5         Q.    If you know it.  Or if you

6    don't know the title, his position.

7         A.    He was -- he was like deputy

8    CEO, I think.

9         Q.    And Doug Boothe at that time

10   would have been, what was his title?

11        A.    North America head.

12   Commercial.

13        Q.    And did that reporting line

14   change while you were at Actavis?

15        A.    What reporting line?

16        Q.    From you to Doug Boothe to

17   Siggi Olafsson.  Did you -- did you

18   suggest a moment ago that you reported to

19   Doug Boothe only for a period of time and

20   then that changed?

21        A.    No, I reported to Doug

22   Boothe all the time.

23        Q.    The whole time at Actavis?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And when you were at

2  Actavis, did you say -- was that when you

3  had about five reports or did you have

4  more reports at Actavis?

5    A.    It -- it depends on the --

6  on the time period.

7    Q.    And let's -- let's start

8  initially and then walk me through the

9  change, that would be great.

10    A.    You want -- okay.  When you

11  say Actavis, do you mean Actavis

12  Alpharma?

13    Q.    So I used Actavis because

14  you used Actavis.  So what did you mean

15  by -- when you said -- oh, I see.

16    A.    There's a -- there's an

17  acquisition there.

18    Q.    Why don't we start with

19  Alpharma.

20    A.    Okay.  I -- when I first

21  came in I was director of sales running

22  the generic division for Alpharma only,

23  and I had probably three to four reps

24  reporting to me.  I was more what I would

1   call a field manager.  I was not in the

2   corporate office.  Probably a year, maybe

3   two years.  I -- along with that I picked

4   up customer service.  So I had a director

5   of customer service and she reported to

6   me.  She had -- this is going back a long

7   time.  She had four, maybe four customer

8   service reps, so they reported to me.

9              Alpharma got bought by

10  Actavis in about '05 I think.  And then

11  that's the status quo.  I was basically

12  running sales and customer service.

13             And then maybe 2007-2008,

14  I'm -- going -- this is going back a

15  long -- ten years ago.  I picked up

16  contracts and pricing which there was

17  another director there.

18             So I would have had my sales

19  reps.  I would have had a director of

20  customer service, a director of contracts

21  and pricing, and then eventually or

22  around the same time, I picked up a

23  director of marketing.

24             And it pretty much stayed

Highly Confidential - Subject to Further Confidentiality Review

1    that way at Actavis until I -- until I

2    was released.

3           Q.    And when you say you picked

4    up director of marketing, you mean that

5    that became one of your titles; is that

6    right?

7           A.    That became one of my

8    responsibilities.  I had a -- I had a

9    woman that was a director of marketing,

10   and she reported directly to me.

11          Q.    I see.  And who was that?

12          A.    Jinping McCormick.

13          Q.    And that was at Alpharma?

14          A.    No, that was at Actavis.

15   About 2008.

16          Q.    Okay.

17          A.    I'm -- I'm guessing.  But

18   2008, 2007, at the time.

19          Q.    So Jinping McCormick did not

20   start at Alpharma?

21          A.    She did but she didn't

22   report to me.

23          Q.    Okay.  Do you recall what

24   her position was at Alpharma?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     In -- she is in marketing.

2        Q.     Okay.

3        A.     I don't know the title.

4        Q.     After you picked up the

5   responsibilities of contracts --

6   contracts and -- and marketing, in

7   addition to sales, about how many people

8   did you have reporting to you?

9              MR. ROTH:  Object to the

10             form.

11             THE WITNESS:  I'm just --

12             I'm thinking between like 20, 24

13             maybe.  Because there's a lot of

14             customer service people.  There's

15             a lot of pricing contracts people.

16             A lot of marketing -- most of

17             those people are internal staff

18             people.

19   BY MS. BAIG:

20       Q.     How -- how large was the

21   marketing department when you were at

22   Actavis?

23       A.     Four people.

24       Q.     And that's just the generic

Highly Confidential - Subject to Further Confidentiality Review

1    marketing department?

2         A.    Yeah, we -- we only -- we

3    only sold generics.

4         Q.    And was it -- that about the

5    same size at Alpharma, do you know?

6         A.    I think Alpharma was -- was

7    a little -- little smaller.  But I --

8    it's going back a long time.  And I

9    was -- I was an external sales rep.  So I

10   wasn't involved in the -- in the office.

11        Q.    And do you remember whether

12   the same people moved from the Alpharma

13   marketing department to the Actavis

14   marketing department?

15        A.    Some did.

16        Q.    Do you remember who?

17              Jinping McCormick was one

18   person you identified.  Anybody else?

19        A.    David Myers.

20        Q.    Anyone else you recall?

21        A.    Karen Stoedter.

22        Q.    Anyone else that you recall?

23        A.    There was a woman, I don't

24   remember her name, that came from -- you

1    know, was part of Amide, which is another

2    company we bought, but I -- I can't think

3    of her name.  She wasn't with us very

4    long.

5         Q.    And for Karen Stoedter?

6         A.    Stoedter, yeah.

7         Q.    Did she stay with Actavis

8    for a period of time, do you -- do you

9    recall?

10        A.    She did.

11        Q.    Do you know where she is

12   now?

13        A.    I believe she retired, but

14   I'm not 100 percent.

15        Q.    Okay.  Do you recall when?

16        A.    I lost track of her after I

17   left Actavis.  But I would think, you

18   know, right -- right around that whole

19   transition with Watson buying Actavis,

20   things -- people were -- people were

21   released because there was duplication

22   of -- of duties.  So it depended on when

23   that was -- everybody was released at

24   various times.  I was kind of on the

Highly Confidential - Subject to Further Confidentiality Review

1    front-end.

2         Q.    Do you understand that you

3    are designated as a custodian of

4    documents to be produced in this case?

5         A.    I --

6         Q.    Do you know what that means?

7         A.    If you would explain it to

8    me please.

9         Q.    It basically means that you

10   were designated as a custodian for whom

11   the defendants were producing documents

12   that you had when you -- when you worked

13   at the company.

14        A.    Okay.

15        Q.    Have you reviewed the

16   documents that were produced from your

17   files in this action?

18        A.    I reviewed a lot of

19   documents yesterday.

20        Q.    Okay.  Roughly how many did

21   you review yesterday, do you know?

22        A.    I -- I couldn't fathom.

23        Q.    So, a lot?

24        A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    When you worked at Alpharma

2  and Actavis, did you -- did you have a

3  company cell phone?

4    A.    Yes.

5    Q.    And did you use that for

6  business purposes?

7    A.    Yes.

8    Q.    And when you left the

9  company, did you return the cell phone?

10    A.    Yes.

11    Q.    And did you use text

12  messaging for business purposes?

13    A.    I believe so.

14    Q.    Do you know whether those

15  text messages have been produced in this

16  action?

17    A.    I don't know.

18    Q.    Did you see any of them

19  yesterday when you were preparing for the

20  deposition?

21    A.    I don't believe so.

22    Q.    Did you use any other e-mail

23  accounts other than your Actavis --

24  Actavis e-mail account for business

1    purposes?

2         A.    No, ma'am.

3         Q.    Did you use any sort of

4    instant messaging accounts or any other

5    types of accounts for business purposes?

6         A.    No, ma'am.

7         Q.    So just text and your

8    business e-mail, correct?

9         A.    Yes.

10             MS. BAIG:  Counsel, can you

11        represent whether the text

12        messages have been produced?

13             MR. ROTH:  I don't know.

14             MR. LUXTON:  I don't know

15        either.

16             MS. BAIG:  Okay.  Can you

17        please check and ask --

18             MR. ROTH:  I can ask

19        people -- well, I don't -- I can't

20        agree to produce, but I can see

21        what we've done and we'll look at

22        the order and see what it says

23        too.

24    BY MS. BAIG:

1    Q.    Did you have any -- do you

2    have any business documents from your

3    time at Alpharma, at Actavis, at home?

4    A.    No, ma'am.

5    Q.    Okay.  You didn't take any

6    with you when you left?

7    A.    No.  No, ma'am.

8    Q.    Any other further sources of

9    documents that -- that you can think of?

10   A.    At home?

11   Q.    Just any other, whether it

12   be electronic or hard copies, are there

13   any other places that you can think of

14   that there might be business-related

15   documents from your time at Alpharma and

16   Actavis?

17   A.    No, ma'am.

18   Q.    All right.  Do you

19   understand that portions of your

20   personnel file have been produced in this

21   action?

22   A.    Yes.

23   Q.    And did you have an

24   opportunity to review that yesterday?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I reviewed a lot of

2   documents.  I -- I don't know if my

3   personnel files were reviewed.  I can't

4   recall that.

5      Q.    Okay.  Let's take a look at

6   what we have here.

7           (Document marked for

8           identification as Exhibit

9           Allergan-Perfetto-1.)

10  BY MS. BAIG:

11     Q.    I'd like to have this

12  document marked as Exhibit 1.

13     A.    Can I read this?

14     Q.    Yeah.  Take a moment to look

15  it over.  I'm not going to ask about

16  every line of it, but I'll direct you to

17  certain -- to certain sections of the

18  document as we look through it.

19     A.    Okay.

20     Q.    Have you seen this document

21  before in the course of your business?

22     A.    Yes.

23     Q.    And for the record, it

24  begins at Bates Number

Highly Confidential - Subject to Further Confidentiality Review

1    ALLERGAN_MDL_00682777, and -- oh sorry.

2    Begins at 2776.

3              And it begins as an e-mail

4    from Patty Frisbee to you on April 19,

5    2012.

6              Do you see that?

7         A.    Yes.

8         Q.    And what is this document?

9         A.    It's an Actavis review form.

10    Per4ma review form.

11        Q.    Okay.  And did you receive

12    these regularly while you worked at

13    Actavis?

14        A.    Maybe not this form, but

15    every year I would get reviewed.  It may

16    be in a different form depending on the

17    year.  Because I was there a long time.

18        Q.    And do you recall what

19    Actavis Per4ma was?  Was that a program?

20        A.    I don't.  I think this is

21    just my review.

22        Q.    Okay.  And was your

23    understanding when you worked at Actavis

24    that your performance was gauged by your

Highly Confidential - Subject to Further Confidentiality Review

1    ability to meet certain targets?

2         A.    Yes.

3         Q.    And what was the certain

4    targets that you were required to meet?

5         A.    Sales.  Sales goals.

6         Q.    Can you -- can you talk a

7    little bit about that process, who

8    designed the targets and how they changed

9    over the years?

10        A.    Well, the goal of the

11   generic team, which I would be

12   responsible for achieving, would -- would

13   be based on the corporation's goals, and

14   they just would funnel down appropriately

15   to each division.

16        Q.    And who provided you with

17   your specific sales targets?

18        A.    Doug Boothe.

19        Q.    Anybody else?

20        A.    It would be Doug.

21        Q.    And is it fair to say that

22   your sales targets increased each year

23   for the years that you were at Alpharma

24   and Actavis?

1        A.    I'd have to look at each

2   year.  We had a year where we had a major

3   recall.  So there could be a -- it may

4   not be increasing because we had a major

5   recall, and one of the -- one of the

6   divisions was shut down.  So that

7   statement would not be correct.

8        Q.    What was the recall -- what

9   was the drug that was recalled?

10       A.    It was Amide site.

11       Q.    I'm sorry?

12       A.    Amide was the company, the

13  division.  The whole site was shut down.

14       Q.    Was Amide the name of the

15  drug?

16       A.    No.  Amide was a company

17  that Actavis -- Actavis also bought --

18       Q.    Okay.

19       A.    -- in New Jersey.

20       Q.    Were they responsible for

21  sales and manufacturing of opioids?

22       A.    Yes.

23       Q.    What opioids, do you know?

24       A.    Oxycodone.

1    Q.    And when was Amide shut

2    down?

3         A.    When I mean shut down.  They

4    weren't manufacturing.  Let me be clear.

5    They weren't manufacturing product due to

6    a manufacturing compliance issue.  I

7    think in -- again, without looking at

8    documentation, I'm thinking around '10.

9         Q.    2010?

10        A.    Maybe '10.  Maybe '9.  I

11   don't know.  I would have to look at --

12   you'd have to show me some documents in

13   order to get a specific date.

14        Q.    And the product that was

15   recalled, was that oxycodone?

16        A.    It was -- there was a lot of

17   products.  It wasn't just oxycodone.

18        Q.    Any other opioids that you

19   recall?

20        A.    Not that I -- there could

21   have been.  You know, it was a whole

22   product line.

23        Q.    Do you recall the reason

24   that the products were recalled?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Compliance -- manufacturing

2  compliance.

3    Q.    Did it have to do with

4  suspicious order monitoring compliance?

5    A.    No.

6    Q.    Did it have to do with --

7  what exactly do you mean by manufacturing

8  compliance?

9    A.    Well, I'm not a quality

10  person.  That statement is kind of a

11  general, from a salesperson.  But just

12  how you make sure that we make product a

13  specific way.

14    Q.    And it was recalled for just

15  a period of time or it was shut down

16  completely?

17    A.    The plant was shut down for

18  approximately a year, I think.

19    Q.    So apart from the shutdown

20  of the Amide plant, do you recall that

21  your sales targets generally would

22  increase from a year-to-year basis?

23    A.    I believe I had a -- I had a

24  growth target, an increase, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what was your salary, if

2  you recall, roughly, when you began at

3  Alpharma?

4    A.    I can't recall.

5    Q.    Do you recall -- do you

6  recall what it was when you began at

7  Actavis?

8    A.    Not without -- if you showed

9  me HR records, I would.  But no.

10    Q.    Okay.  Do you recall that

11  generally year after year your salary

12  increased?

13    A.    Depending on the year and

14  depending if I increased responsibility,

15  it would increase.

16    Q.    Okay.  But it never went

17  down during the years --

18    A.    My salary?

19    Q.    During the years that you

20  were at Alpharma and Actavis?

21    A.    No, I don't think my salary

22  ever went down.

23    Q.    And did you have the

24  opportunity to earn bonuses while you

Highly Confidential - Subject to Further Confidentiality Review

1    were at Alpharma and Actavis?

2           A.    Yes, ma'am.

3           Q.    What was the bonus program

4    or structure, what did that look like?

5           A.    My bonus plan?

6           Q.    Mm-hmm.

7           A.    Depends on the year.  They

8    changed over the years.  So again, you're

9    talking 13 years.  It would have to be

10   every year -- not every year.  But

11   depending on the year, HR would look at

12   it and make adjustments and update it.

13          Q.    And do you recall that

14   roughly what percentage of your salary

15   your bonus would have been?

16          A.    Sitting here now, no.  But

17   if you show me HR documents, we could

18   figure that percentage out.

19          Q.    Do you recall whether or not

20   your bonus was generally more or less

21   than your -- than your salary?

22          A.    Sitting here now in 2018, I

23   believe my bonus most years was less than

24   my -- than my salary.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what were the core

2    metrics that went into determining

3    whether or not you were to receive a

4    bonus each year?  What is your

5    understanding of the metrics by which you

6    were being evaluated for a bonus each

7    year?

8         A.    Again, I'd have to see the

9    plan in order to speak to it.

10        Q.    Did you have an

11   understanding that you needed to meet or

12   exceed your sales targets in order to

13   receive a bonus?

14        A.    From what I recall, I didn't

15   have to achieve it.  I could meet, let's

16   say 75 percent of it and still get a

17   bonus.  Again it fluctuated.  You're

18   talking 13 years.  But I recall there

19   were years -- I didn't have to achieve

20   the number.  I could come in at

21   75 percent and get -- and get a bonus.

22   I'm just using reference -- again, you'd

23   have to show me.  But I thought it was

24   almost a tiered type thing.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Tiered in the sense that the
 2    more that you were able to drive sales,
 3    the larger bonus you would receive?
 4                    MR. ROTH:  Object to form.
 5                    THE WITNESS:  Can you repeat
 6         the question?
 7    BY MS. BAIG:
 8              Q.    When you say tiered, do you
 9    mean it in the sense that the more that
10    you were able to drive sales and the
11    closer that you were able to get to your
12    sales targets, the higher the bonus you
13    would receive?
14                    MR. ROTH:  Objection to
15         form.
16                    MR. LUXTON:  Same objection.
17                    THE WITNESS:  No.
18    BY MS. BAIG:
19              Q.    So there was -- are you
20    telling me there was no relationship
21    between your driving of sales or
22    increasing of sales and your bonus
23    potential?
24                    MR. LUXTON:  Objection to
```

1      form.

2              THE WITNESS:  No.  I'm

3      telling you that the first

4      question you asked me was, did I

5      have to achieve -- did I have to

6      achieve the target in order to get

7      a bonus.  And I'm saying to you

8      that I didn't.  I could get

9      lower -- a lower, not make the

10     number, have a pretty good year.

11     Instead of getting an A, I got a B

12     or a C, and I still would get a

13     percent of my bonus, if that

14     explains it better.

15   BY MS. BAIG:

16        Q.    Did you understand that

17   driving sales was one of the metrics that

18   was considered for you to receive a

19   bonus?

20        A.    Yes.

21        Q.    And you understand -- you

22   understood that they were setting

23   ambitious targets?

24              MR. LUXTON:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1        form.

2              THE WITNESS:  They were

3        targets.  Ambitious, I can't

4        comment on.

5   BY MS. BAIG:

6        Q.    If you take a look at Page 2

7   of the document that's in front of you.

8   If you look at the second paragraph.  It

9   states, "In order to meet our ambitious

10  targets we need to build a high

11  performance culture and develop a shared

12  vision of how we do things."

13       A.    Is it this page, Miss?

14             MR. LUXTON:  Could you just

15       give the Bates number for it.

16             MS. BAIG:  Sure.  The Bates

17       number is 00682777.

18             THE WITNESS:  Okay.

19  BY MS. BAIG:

20       Q.    And do you see in the third

21  paragraph that begins, "Actavis is a

22  company that creates value in

23  pharmaceuticals for all its stakeholders,

24  and we all play a very important role in

1   this."

2           Do you see that?

3       A.    Second paragraph?  Oh, yeah,

4   second paragraph.

5       Q.    Depends on whether you count

6   that first sentence as a paragraph.

7       A.    Yeah.

8       Q.    "In order to meet" -- it

9   goes on.  Do you see that?  "In order to

10  meet our ambitious targets, we need to

11  build a high performance culture and

12  develop a shared vision of how we do

13  things.  Per4ma is about achieving these

14  two aims."

15          Do you see that?

16      A.    I do.

17      Q.    All right.  You understood

18  that there was an expectation that you do

19  your best to meet these ambitious

20  targets, correct?

21      A.    I met -- I tried to meet the

22  targets that were provided to me.

23      Q.    Okay.

24      A.    I didn't write this

1    paragraph.

2        Q.    No, I understand that.

3        A.    Okay.

4        Q.    But you understood that that

5    was something that you were -- you were

6    trying to do, is to meet the targets?

7        A.    Yes, ma'am.

8        Q.    And in the next paragraph it

9    says, "We are expected to walk the Orange

10   Way."

11              What is "walking the Orange

12   Way," do you know?

13       A.    The Orange Way was -- was

14   some broad goals that HR set out as a

15   company of the way -- kind of like the

16   company culture is what I would describe

17   that.  I don't remember the details of it

18   though.

19       Q.    Do you remember -- remember

20   any aspects of what that Orange Way

21   company culture was?

22       A.    If you showed me it, I

23   probably could, but I don't have it.

24       Q.    But it says here, "We are

Highly Confidential - Subject to Further Confidentiality Review

1    expected to walk the Orange Way to

2    deliver on our targets."

3                Do you see that?

4         A.    I do.

5         Q.    And Per4ma was the system

6    that was to help Actavis tell its people

7    how well they are achieving these goals,

8    do you see that?

9         A.    I do.

10        Q.    Was that your understanding

11   at the time?

12        A.    Yes.

13        Q.    And was the single most

14   important aim to increase sales and

15   maximize profit?

16              MR. ROTH:  Object to form.

17              MR. LUXTON:  Same objection.

18              THE WITNESS:  Repeat the

19        question.

20   BY MS. BAIG:

21        Q.    Was the single most

22   important aim to increase sales and

23   maximize profit?

24              MR. ROTH:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I -- I mean,

2     my review was based on -- on

3     various metrics.  Not just that.

4  BY MS. BAIG:

5     Q.    But that was one of the core

6  metrics, would you agree?

7     A.    Yeah, I would say.

8     Q.    If you turn to the next

9  page.  At the top entitled "The Winning

10  Formula."  Do you see that?

11     A.    Yes.

12     Q.    And in the top right there's

13  a reference to $535 million.  Do you see

14  that?

15     A.    I do.

16     Q.    And was that a sales target

17  that you had for the given year?

18     A.    For the generic Rx budget.

19     Q.    And the generic Rx budget

20  would be the budget that included the

21  generic opioids that Actavis was selling,

22  correct?

23     A.    With -- without looking at

24  sales, because there's a year that we

Highly Confidential - Subject to Further Confidentiality Review

1  didn't have -- we had the recall.  So --

2  so I'd have to look at -- this is -- this

3  is '11.  So I'd have to look at a list of

4  our sales that make up the -- how -- how

5  our sales results came back by product in

6  order to answer that question.

7       Q.    So you don't recall whether

8  or not Actavis was selling any generic

9  opioids in 2011?

10      A.    Not without looking at my --

11  it's been years.  I mean '11 is seven

12  years ago.  I don't know when -- when

13  the -- when the recall was on the -- on

14  the Amide plant.

15      Q.    When though was it -- for

16  the time period for which there was a

17  recall of the Amide plant, did that

18  recall serve to shut down all of generic

19  opioids for Actavis or just a portion of

20  them, do you know?

21      A.    Just the ones made at that

22  site.  I can't recall what other ones we

23  had at the time.

24      Q.    Okay.  So the $535 million

Highly Confidential - Subject to Further Confidentiality Review

1  sales target, that was the generic

2  prescription drug budget, correct, or

3  the -- or the sales target, correct?

4       A.   That was the sales target.

5       Q.   And to the extent that

6  those -- that you had generic opioids,

7  those would have been included in that at

8  the time, correct?

9            MR. ROTH:  Objection, asked

10       and answered.

11            THE WITNESS:  Can you repeat

12       the question?

13  BY MS. BAIG:

14       Q.   To the extent that Allergan

15  was -- or Actavis was manufacturing or

16  selling generic opioids, those would have

17  been included in the sales target,

18  correct?

19            MR. ROTH:  Object to form.

20       Asked and answered.

21            THE WITNESS:  Again, I'd

22       have to see the build-up.  I

23       would -- I could answer it clearly

24       if I saw the details of what --

1          and there is -- should be details

2          of what the 535, because that is

3          build-up by product.  It would be

4          easier for me to answer that

5          question.

6     BY MS. BAIG:

7          Q.    Well, can you think of any

8     other -- any other divisions that would

9     have provided a sales target for generic

10    opioids?

11         A.    I don't understand the

12    question.

13         Q.    Well, you're saying that the

14    535 million was a sales target for

15    generic drugs, correct?

16         A.    That's right.  For my team.

17         Q.    For your team.  Was there

18    any other team dealing with the sales of

19    generic drugs that would have received a

20    sales target for generic drugs?

21              Only your team, correct?

22    You have to answer audibly.

23         A.    Yes.

24         Q.    So to the extent that we can

1  establish that Actavis was actually

2  selling generic opioids --

3          A.    Okay.

4          Q.    -- they would have fallen

5  within this sales target of 535 million

6  for this year, correct?

7          A.    Yes.

8          Q.    Do you see on the left-hand

9  side under midyear comments, it says,

10  "Analysis of the $100 million to fill

11  voids."

12             Do you have an understanding

13  of what that means?

14          A.    In the budget, in the budget

15  there -- there was $100 million -- there

16  was $177 million of new products that we

17  didn't get approvals for.  That's what --

18  what that means.

19          Q.    I see.  And it says, "Less

20  Kadian generic ($33 million)."  Do you

21  see that?

22          A.    Yeah.

23          Q.    What does that mean?

24          A.    I'm not -- I'm not sure.

1    I'm not sure how this calculation works

2    at this point.

3           Q.    Did you oversee the

4    marketing and sale of Kadian generic?

5           A.    Yes.

6           Q.    Did you oversee the

7    marketing and sale of the branded Kadian

8    drug, of the branded Kadian drug?

9           A.    No.

10          Q.    What department would have

11   overseen the marketing and sale of the

12   branded Kadian?

13          A.    The -- the branded Rx team

14   at -- at Actavis.

15          Q.    And that would have been the

16   team that Jennifer Altier is on; is that

17   correct?

18          A.    I don't know that woman.

19          Q.    Okay.  And do you see on the

20   right-hand side it says, "The generics

21   team is on track to achieve our goal of

22   $535 million even with the late launch of

23   generic Kadian compared to budget"?

24                Do you see that?

1        A.     I do.

2        Q.     And was that your

3    understanding at the time?

4               MR. ROTH:  Object to form.

5               THE WITNESS:  Yes.

6    BY MS. BAIG:

7        Q.     And a little further down,

8    it says, "There's a reference to

9    strategic programs in place and the sales

10   team using those strategic programs to

11   increase sales and maximize profit."

12              Do you see that?

13       A.     Is it -- where is it?

14       Q.     About four lines down, five

15   lines down.  If you look at your screen.

16   Have you got it?

17       A.     Yeah.

18       Q.     What were the strategic

19   programs that were in place to -- that

20   the sales team was utilizing to increase

21   sales and maximize product?

22              MR. ROTH:  And I'm sorry,

23          are you looking at the sentence

24          that starts McKesson and ABC?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. BAIG:  Yes.

 2                    THE WITNESS:  It -- it would

 3           vary by -- it would vary by

 4           customer.  We'd have to look at

 5           each contract.

 6    BY MS. BAIG:

 7           Q.    What was your sense just in

 8    terms of, without providing detail by

 9    detail, but the general nature of these

10    types of strategic programs?

11                    MR. LUXTON:  Objection to

12           form.

13                    THE WITNESS:  Again, it's

14           too -- it's by customer, what we

15           negotiated by product.  We'd have

16           to look at each individual

17           contract.

18    BY MS. BAIG:

19           Q.    Would this be -- would it

20    include, for example, volume incentive

21    programs?

22                    MR. ROTH:  Object to form.

23                    THE WITNESS:  It could.

24    BY MS. BAIG:
```

1    Q.    And -- and the offering of

2    rebates based on certain thresholds of

3    sales to these customers?

4    A.    I -- I don't know without --

5    it's too long ago, and I don't know

6    without looking at specific contracts.

7    Q.    Okay.

8    A.    Could -- they're -- they're

9    kind of customized to the customer.

10    Q.    But these were strategic

11    programs that Actavis was offering to

12    its -- to its distributor customers in

13    order to increase sales and maximize

14    profit, correct?

15         MR. ROTH:  Object to form.

16         THE WITNESS:  Can you repeat

17    the question?

18    BY MS. BAIG:

19    Q.    These were strategic

20    programs that Actavis was offering or had

21    in place with certain of its distributor

22    customers in order to increase sales and

23    maximize profit, correct?

24         MR. ROTH:  Object to form.

1           MR. LUXTON:  Same objection.

2           THE WITNESS:  That was the

3       intent.  Sometimes it didn't end

4       that way.

5   BY MS. BAIG:

6           Q.   And the sales marketing,

7   about four lines down it says, "The

8   sales, marketing, CS and contract team

9   work together in a professional and

10  productive manner."

11          Do you see that?

12          A.    I do.

13          Q.    What's the CS team?

14          A.    Customer service.

15          Q.    And those teams would work

16  together to try to implement these

17  strategic programs with the purpose of

18  increasing sales and maximizing profit,

19  correct?

20          MR. ROTH:  Object to form.

21          MR. LUXTON:  Object to form.

22          MR. ROTH:  Mischaracterizes

23      the document.

24          THE WITNESS:  The sales,

1    marketing, and customer service

2    team, contracts team -- I got to

3    hear the question again.

4  BY MS. BAIG:

5         Q.    They -- they would work

6  together to try to implement these types

7  of strategic programs in order to, as it

8  says, "increase sales and maximize

9  profit"; is that right?

10             MR. ROTH:  Object to form.

11  BY MS. BAIG:

12        Q.    Was that your understanding

13  at the time?

14             MR. ROTH:  Object to form.

15        Mischaracterizes the document.

16             THE WITNESS:  Just -- I

17        can't hear his comment.

18             MR. ROTH:  Object to form.

19        Mischaracterizes the document.

20             MS. BAIG:  I'm going to

21        object to coaching the witness.

22             MR. ROTH:  That's the basis

23        for my objection.

24             MS. BAIG:  You can object to

Highly Confidential - Subject to Further Confidentiality Review

1    form.   That's what you're allowed

2    to object to.

3         THE WITNESS:  The -- the

4    commercial team worked together

5    to -- to achieve our goals.

6  BY MS. BAIG:

7         Q.   And by "commercial team,"

8  are you including sales, marketing,

9  customer service, and contract team?

10        A.   Yes.

11        Q.   Did they work together to

12 try to implement the strategic programs

13 that you put in place with your

14 customers?

15        MR. ROTH:  Object to form.

16        THE WITNESS:  Did they -- to

17   various degrees.

18 BY MS. BAIG:

19        Q.   And did they work together

20 to use those programs to increase sales

21 and maximize profits?

22        MR. LUXTON:  Objection to

23   form.

24        MR. ROTH:  Asked and

1          answered twice now.

2     BY MS. BAIG:

3          Q.    And I'll direct you to the

4     line.  Do you see here where it says,

5     "The team is utilizing these programs to

6     increase sales and maximize profit"?

7          A.    Where are you, which

8     paragraph?

9          Q.    If you look at your screen,

10    you'll see that.

11              MS. METCALF:  The screen is

12         not on.

13              MS. BAIG:  Oh, your screen

14         is not working.

15    BY MS. BAIG:

16         Q.    So if you look about --

17              MR. ROTH:  Zoom it in.

18              THE WITNESS:  I can't see

19         it.

20              MR. ROTH:  And read the

21         whole sentence in.

22              THE WITNESS:  I got it.

23         Okay.

24    BY MS. BAIG:

1    Q.    Do you see that it states

2    that, "The sales team is utilizing these

3    programs to increase sales and maximize

4    profits"?

5          Do you see that?

6    A.    Yes.

7    Q.    And was that your

8    understanding at the time?

9    A.    That was our intent.

10    Q.    Thank you.  What does DB

11    stand for, further down, where it says

12    "DB comments"?

13    A.    That's Doug Boothe.

14    Q.    And it states here that,

15    "Mike was able to overdeliver versus

16    budget via combination of smart

17    placement, pricing, and product decisions

18    (add Perfetto, and you get all four Ps)."

19          Do you see that?

20    A.    I do.

21    Q.    And he was praising you for

22    your good work.  Is that right, was that

23    your understanding?

24    A.    That's what it reads.

1            Thank you.  Thank you.

2       Q.    Do you see on the next page

3  at the top it says, "Objective fully

4  achieved, 100 percent."

5       A.    I do.

6       Q.    And so do you take from that

7  you -- that you met your sales -- met

8  your sales target?

9            MR. ROTH:  Object to form.

10 BY MS. BAIG:

11      Q.    Met or exceeded?

12      A.    I believe so.

13      Q.    And do you see on the

14 right-hand side where it says completion

15 criteria?

16      A.    Yes.

17      Q.    And there's a reference to

18 a, "Development of a written manual that

19 details the relevant department

20 functions, responsibilities, and

21 protocols to carry out day-to-day

22 operations."

23            Do you see that?

24      A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall that that was

2    one of your job responsibilities at the

3    time?

4    A.    I don't.

5    Q.    Do you recall developing

6    this manual?

7    A.    At this time I don't -- I

8    don't recall the manual.

9    Q.    So you don't recall what the

10   manual was --

11   A.    No.

12   Q.    -- about?

13        MR. LUXTON:  Objection to

14        form.

15        THE WITNESS:  No.

16   BY MS. BAIG:

17   Q.    Do you see a little further

18   down under the director of contracts

19   section?

20   A.    I do.

21   Q.    You were considered a

22   director of contracts at that time?

23   A.    I was not.

24   Q.    So what is this?  This is

Highly Confidential - Subject to Further Confidentiality Review

1    the director of contracts that's

2    commenting, or what's your understanding

3    of what this is?

4         A.    Director of contracts worked

5    for me.

6         Q.    I see.  So you're letting

7    them know what one of your reports has

8    completed in terms of the SOPs?

9         A.    Yes.

10        Q.    Okay.  And there's a

11   reference there to, "Contract data system

12   are being developed with IT but has not

13   been completed."

14              Do you see that?

15        A.    Yes.

16        Q.    What was the contract data

17   system?

18        A.    From a broad standpoint, it

19   was tracking the accounts with the

20   products we sell to them, with the

21   pricing that -- the contract pricing that

22   we had with the account.

23        Q.    Was there another name for

24   the contract data system?

1        A.      I don't recall that.

2        Q.      And further down, you see

3   that Doug Boothe made another comment

4   that, "Many of these efforts were key

5   enablers behind our strong 2011 results."

6              Do you see that?

7        A.      Mm-hmm.   I do.

8        Q.      Towards the bottom of the

9   page, there's a section entitled

10  "End-of-Year Comments."   Do you see that?

11       A.      We're still on the same

12  page, right?

13       Q.      Yes.

14       A.      2779?

15       Q.      Yes.

16       A.      Okay.

17       Q.      And do you see where it

18  states, "Nancy Baran along with other

19  team members, including me, have been

20  working with an outside consultant to

21  develop an SOM system.   The system will

22  enhance our existing program.   The system

23  will ensure we are compliant with all DEA

24  regs."

1          Do you see that?

2     A.    Mm-hmm.

3     Q.    And then it goes on to

4  state, "The SOM system that tracks our

5  inhouse direct orders will be completed

6  by end of year.  I am proud of the focus

7  and attention the entire team has given

8  this important project."

9          Do you see that?

10    A.    I do.

11    Q.    So was it your understanding

12 that the SOM system was -- was to be

13 created by the end of 2011?

14         MR. LUXTON:  Objection to

15    form.

16         MR. ROTH:  Mischaracterizes

17    the document.

18         MS. BAIG:  Well, do you see

19    here -- can you stop coaching the

20    witness, please.

21 BY MS. BAIG:

22    Q.    Do you see here where it

23 says, "The SOM system that tracks our

24 inhouse direct orders will be completed

1    by end of year"?

2            A.    We had a system.  This was

3    enhancing our existing system.

4            Q.    Okay.  And what was the

5    initial system and how was it enhanced?

6            A.    The -- we had initial

7    suspicious order monitoring system.  It

8    was enhanced by bringing in experts and

9    also creating a cross-functional team

10   that would improve the system, make it

11   world class.

12           Q.    And did you work with an

13   outside consultant to revise the system?

14           A.    I believe a few.

15           Q.    And do you recall who they

16   were?

17           A.    Dendrite, but they changed

18   their name to something else.  I don't --

19   I can't recall the name.

20                 And then ValueCentric was

21   two of them that I can recall.

22           Q.    And do you remember who you

23   worked with at Dendrite?

24           A.    I do not.

1    Q.    Do you remember who you

2    worked with at ValueCentric?

3    A.    I do not.

4    Q.    Did you work with those

5    organizations directly?

6    A.    I was in meetings.  I was

7    not the lead.

8    Q.    Who was the lead?

9    A.    Nancy Baran would have been

10   the commercial lead working with

11   Dendrite.  But again, it was more of a

12   cross-functional team.

13   Q.    And what was Nancy Baran's

14   position again?

15   A.    She was my director of

16   customer service.

17   Q.    Did customer service fall

18   under the marketing division?

19           MR. ROTH:  Object to form.

20           THE WITNESS:  No.  She

21      reported directly to me.

22   BY MS. BAIG:

23   Q.    Didn't marketing report to

24   you as well?

1        A.      True.

2        Q.      So she was reporting to you,

3    but not part of the marketing department,

4    fair?

5        A.      She was her own director of

6    customer service with a customer service

7    team that was a -- an own entity

8    reporting to me directly.

9        Q.      Was it your understanding at

10   the time that the SOM system that tracks

11   the inhouse direct orders would be

12   completed by the end of 2011?

13             MR. ROTH:  Object to form.

14   BY MS. BAIG:

15       Q.      Do you see where it says

16   that?

17       A.      Can you repeat the question?

18       Q.      I'm just tracking the

19   document.  Do you see here where I'm

20   pointing?

21       A.      I do.

22       Q.      Was it your understanding

23   that the SOM system that tracks the

24   inhouse direct orders would be completed

Highly Confidential - Subject to Further Confidentiality Review

1    by the end of 2011?

2                    MR. ROTH:  Object to form.

3           Asked and answered.

4                    THE WITNESS:  The enhanced

5           SOP (sic) system would be.  We

6           already had an SOP system.  This

7           was an enhanced improved SOP

8           system.

9    BY MS. BAIG:

10          Q.    Do you see any reference to

11   the former SOM system on this document?

12          A.    I do.

13          Q.    Where?

14          A.    "The system will enhance our

15   existing system."  Last line, first

16   paragraph.

17          Q.    And do you have an

18   understanding of when the first system

19   was put into place?

20          A.    I do not.

21          Q.    How was it that you -- do

22   you have an understanding of what the

23   first system looked like?

24                    MR. LUXTON:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1      form.

2           THE WITNESS:  I -- I mean,

3      not sitting here today I do not.

4  BY MS. BAIG:

5      Q.    Do you recall how your daily

6  work changed when the SOM system was

7  changed?

8      A.    My daily work, my personal

9  daily work did not change.

10      Q.    Okay.  And by SOM, we're

11  talking about the suspicious order

12  monitoring system, correct?

13      A.    Yes.

14      Q.    Do you see on the next page,

15  there's a section that starts,

16  "End-of-year comments, Actavis marketing

17  conducted the following."

18           Do you see that?

19      A.    I can see it here now.  I'm

20  looking up there.

21      Q.    Do you see that --

22      A.    Put your pen where you are,

23  please.

24      Q.    Do you see this?

Highly Confidential - Subject to Further Confidentiality Review

1    "Oxymorphone, mailings to doctors, e-mail

2    to pharmacist."

3              Do you see that?

4         A.    I do.

5         Q.    And did you oversee mailings

6    to doctors for purposes of marketing

7    oxymorphone?

8         A.    Marketing would have done

9    that.

10        Q.    But this is in your -- but

11   marketing reported to you, correct?

12        A.    Yes.

13        Q.    So did you have oversight

14   with respect to the mailings to doctors

15   regarding oxymorphone?

16        A.    Yes.

17        Q.    And did you see those

18   mailings to doctors?

19        A.    I probably reviewed them

20   before they went out.

21        Q.    And do you recall anything

22   about the mailings to doctors with

23   respect to oxymorphone?

24        A.    The mailing was to inform

1    doctors and pharmacists that we now had a

2    generic available of that product.

3         Q.    And do you recall anything

4    else about the mailings to doctors?

5         A.    That was the intent of the

6    mailing, was to inform that there was an

7    alternative generic available on the

8    market.

9         Q.    Do you recall anything about

10   the language on those mailings?

11        A.    I do not.

12        Q.    And do you recall anything

13   about the e-mails to pharmacists with

14   respect to marketing of oxymorphone?

15             MR. LUXTON:  Objection to

16        form.

17             THE WITNESS:  I do not,

18        without -- without seeing them.

19   BY MS. BAIG:

20        Q.    And do you see, further

21   down, so the next line says, "Several

22   customized customer market programs."

23             Do you see that?

24        A.    Yes.

1    Q.    And what were the customized

2    customer market programs for oxymorphone

3    when you were there?

4    A.    Again, I think that's

5    dealing with -- with the broad line,

6    not -- not oxymorphone.

7    Q.    Sure.  But it would have

8    included oxymorphone, correct?

9    A.    Every -- every customer

10   marketing program is customized to the

11   customer and what products we sell to

12   them.  So -- so, and the rep, the rep has

13   to develop that with the contracts team.

14   Q.    So do you recall any of the

15   customized customer marketing programs

16   that were developed to market

17   oxymorphone?

18   A.    I do not.

19   Q.    Do you recall any of the

20   customized customer market programs that

21   were developed to market the fentanyl

22   patch?

23            MR. LUXTON:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I am sure if

2      I -- again, this is going back to,

3      what, '11?  I'm sure if I -- if I

4      saw a program where we secured the

5      business with the marketing

6      program, it -- I mean, it's so

7      tailored and so customized, that

8      it's hard for me sitting here now

9      to, to really remember a specific

10     program and whether it got

11     executed and whether it went to

12     fruition.  It would be very

13     difficult for me to answer that

14     question.

15  BY MS. BAIG:

16     Q.    Do you recall the mailings

17  that Actavis sent out to VA hospitals to

18  increase share for the fentanyl patch?

19          MR. ROTH:  Object to form.

20          THE WITNESS:  I don't recall

21     that mailing at this time.

22  BY MS. BAIG:

23     Q.    Your understanding was that

24  there were such programs, customer market

1  programs for oxymorphone and fentanyl

2  patch when you were there; is that

3  correct?

4          MR. ROTH:  Object to form.

5  BY MS. BAIG:

6      Q.   Even though you cannot

7  recall the details?

8      A.   No.  They would be more -- I

9  believe when this is referencing more of

10  a broad portfolio, or whatever the --

11  again it's customized to what the

12  customer was buying.

13          So if the customer wasn't

14  buying oxymorphone or fentanyl, we

15  wouldn't have a -- we wouldn't have a

16  market share program.  So it depends on

17  the customer.

18      Q.   Sure.  Sure.  But do you

19  recall that oxymorphone was one of your

20  biggest selling drugs at the time?

21          MR. LUXTON:  Objection to

22      form.

23          THE WITNESS:  Without

24      looking at my sales data, I

1    couldn't make -- I couldn't -- I

2    didn't --

3  BY MS. BAIG:

4        Q.    You don't know the answer to

5  that?

6            MR. LUXTON:  Object to form.

7            THE WITNESS:  I would if you

8        showed me my sales data.

9  BY MS. BAIG:

10        Q.    Okay.  Well, let's just

11  assume for purposes of this question that

12  oxymorphone was one of your biggest

13  selling drugs at the time.  Do you have

14  any reason to doubt that there were

15  not -- that there were customized

16  customer programs for oxymorphone at the

17  time?

18            MR. LUXTON:  Objection to

19        form.

20            THE WITNESS:  I think you're

21        asking me to ask a question that

22        makes a lot of assumptions.  And

23        I'm under oath, and I don't feel

24        comfortable answering it.

1    BY MS. BAIG:

2         Q.    So you recall only that

3    there were customized customer market

4    programs for the products that were being

5    sold, but you don't recall whether there

6    were such programs for oxymorphone.  Is

7    that what you're saying?

8              MR. LUXTON:  Objection to

9         form.

10             THE WITNESS:  What I'm

11        saying is, if a customer was

12        buying a specific item or specific

13        items, because this is a large

14        portfolio, we would develop a

15        program to -- to help them

16        market -- or help them sell the

17        product.  We don't really market

18        products.

19   BY MS. BAIG:

20        Q.    A market program, right?

21             MR. LUXTON:  Objection to

22        form.

23             THE WITNESS:  A -- a program

24        to sell the product to their -- to

1        their customers.

2   BY MS. BAIG:

3        Q.    Which is referred here on

4   this document as a customized customer

5   market program, correct?

6        A.    Yes.

7        Q.    Do you know what a sizzle

8   slide is, four lines down?

9        A.    Yeah, I do.

10       Q.    What is a sizzle slide?

11       A.    That's a term I developed

12  for a one-page summary update of the

13  company that, instead of doing a full

14  presentation which -- that the reps could

15  present to customers.

16            Does that make sense?

17       Q.    And what type of information

18  would be on the -- the sizzle slide that

19  the reps would present to customers?

20       A.    The sizzle slide was updated

21  every quarter, so it varied.

22       Q.    Would it be -- include

23  information about specific products?

24       A.    Yes.

1  Q.   Do you see a little further

2  down it states, "Our customers recognize

3  that Actavis is moving ahead and that we

4  are flexible in finding win-win

5  commercial programs tailored to the

6  specific needs of our customers"?

7  A.   Can you put your pencil

8  again, please?  Okay.

9  Q.   Do you see that?

10  A.   Yeah, those would be Doug

11  Boothe's comments.

12  Q.   And do you have an

13  understanding of what commercial programs

14  are being referred to here?  Are they the

15  same as the customized customer market

16  programs referred to above or is this

17  something different, do you know?

18  A.   I would believe it would be

19  similar programs.

20  Q.   And do you see the last line

21  where he states, "A super combination of

22  both hunter and farmer, his efforts in

23  team leadership driving outstanding

24  business results"?

1          A.     I do.

2          Q.     And that's -- that -- that

3    was Doug Boothe's way of praising you for

4    your outstanding -- achieving outstanding

5    business results, correct?

6               MR. LUXTON:  Objection to

7          form.

8               THE WITNESS:  That's his way

9          of reviewing me.

10   BY MS. BAIG:

11         Q.     And is that Doug Boothe's

12   signature on the last page?

13         A.     It is.  I have it on the

14   right.

15         Q.     Yes.  I do too.

16         A.     Sorry.

17         Q.     Do you see just above that

18   it states, "There's a reference to site

19   visits for customers"?  I'm pointing to

20   it here.

21         A.     It says, "This has allowed

22   me to focus on the customers' needs with

23   more site visits," yes.

24         Q.     Okay.  And can you tell me

Highly Confidential - Subject to Further Confidentiality Review

1    about those site visits?  What were the

2    site visits being referred to here?

3         A.    Well, as a commercial lead I

4    would go in and visit their corporate

5    offices and try to meet with -- network

6    with their senior management.  So a lot

7    of meetings at the CVS headquarters, the

8    Walgreens headquarters, the McKesson

9    headquarters, and more commercial focused

10   in -- in networking to make sure we knew

11   all the important players within these

12   major customers.

13        Q.    And the purpose of those

14   meetings was -- was to forge

15   relationships with the key players at

16   those customers so that you could drive

17   sales, correct?

18             MR. LUXTON:  Object to form.

19             THE WITNESS:  My -- my job

20        is -- as a commercial lead is to

21        know my customer.  The direct

22        customers, the major direct

23        customers.

24             So -- so I -- it would -- I

1    would go there.  The intent is

2    that hopefully if you had a better

3    relationship, you could have more

4    sales.

5          Can we -- can we take a

6    break?

7          MS. BAIG:  Absolutely.  Any

8    time you need a break just let us

9    know.

10         THE WITNESS:  Thank you.

11         THE VIDEOGRAPHER:  Remove

12    your microphones.  The time is --

13    the time is 10:27 a.m.  Going off

14    the record.

15         (Short break.)

16         THE VIDEOGRAPHER:  Okay.  We

17    are back on the record.  The time

18    is 10:46 a.m.

19  BY MS. BAIG:

20         Q.   Is it your recollection that

21  you received performance evaluations like

22  these or similar to these -- or similar

23  to this one for each year that you were

24  at Alpharma and Actavis?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    As I sit here today, I think

2  at Actavis, I would say yes.  At

3  Alpharma, they -- there was -- depending

4  on the boss, was not the best at reviews.

5  So primarily at Actavis, I would get

6  reviewed every year.  It's more

7  formalized.

8    Q.    When you left Actavis, did

9  you enter into any sort of severance

10  agreement?

11    A.    I believe I had a severance

12  agreement, yes.

13    Q.    When was the last time that

14  you reviewed the severance agreement?

15    A.    Probably 2012.

16    Q.    You understood when you

17  worked at Actavis that opioids were

18  controlled substances, correct?

19    A.    Yes.

20    Q.    And that they were Schedule

21  II by the DEA, correct?

22         MR. ROTH:  Object to form.

23         THE WITNESS:  Schedule --

24    Schedule II, right?

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. BAIG:

2            Q.    Yes.

3            A.    Yes.

4            Q.    And that they were

5    narcotics, correct?

6            A.    Yes.

7            Q.    And did you understand that

8    they were Schedule II because they have a

9    high potential for abuse?

10                MR. LUXTON:  Object to form.

11                MR. ROTH:  Object to form.

12                THE WITNESS:  I'm not a

13           doctor.  I don't know what the

14           criteria is to -- for DEA to make

15           a selection of a C-II product.

16   BY MS. BAIG:

17           Q.    What was your general

18   understanding as to why certain drugs

19   were categorized as Schedule II?

20                MR. LUXTON:  Objection to

21           form.

22                THE WITNESS:  I don't really

23           have a good understanding, because

24           it varies.  Their classification

Highly Confidential - Subject to Further Confidentiality Review

1      is varied, and it's determined by

2      different -- I've seen drugs that

3      I've questioned that are on the

4      list.  So I -- they have a

5      different criteria that I don't

6      really understand their criteria

7      for classification.

8  BY MS. BAIG:

9      Q.   Did you understand the

10  difference between Schedule II and

11  Schedule III to be that Schedule II have

12  a higher potential for abuse or

13  diversion?

14      MR. ROTH:  Object to form.

15      THE WITNESS:  Again, in my

16      mind, I know Schedule II drugs are

17      controlled drugs.  I'm not a

18      doctor, so I don't know why -- and

19      I'm not the DEA -- why they were

20      classified as Schedule II.

21      I'm sure that's -- there's a

22      broad reason for that.

23  BY MS. BAIG:

24      Q.   So you never had any

1    understanding as the difference -- as to

2    the difference between a Schedule II drug

3    and a Schedule III drug?

4                MR. LUXTON:  Objection to

5           form.

6                THE WITNESS:  I know a

7           Schedule II drug is a DEA product

8           and requires more documentation

9           than a Schedule III drug.

10   BY MS. BAIG:

11        Q.    And did you ever have any

12   layman's understanding as to why that

13   was?

14        A.    There's various -- in my

15   mind there's various reasons.

16        Q.    What was your understanding

17   of what those reasons were?

18        A.    As I sit here today, if they

19   were -- they were sold -- could be sold

20   on the street or something like that.

21        Q.    So you understood that

22   Schedule II drugs had a higher potential

23   for abuse, meaning that there was a

24   street -- there could have been a street

1    value for some of them?

2              MR. LUXTON:  Objection to

3         form.

4              THE WITNESS:  Again, I --

5         the DEA has a classification

6         that -- there's a lot of Schedule

7         II drugs, and I'm sure if we went

8         through it, there would be a

9         reason for each of them being in

10        that classification.

11   BY MS. BAIG:

12        Q.    But you never had your own

13   layman's understanding of why certain

14   drugs were Schedule II; is that right?

15             MR. LUXTON:  Objection.

16             THE WITNESS:  I may have had

17        an understanding, you know, years

18        ago.  But the classification is

19        set by the DEA, and I follow --

20        try to follow the rules of the

21        DEA.

22   BY MS. BAIG:

23        Q.    But did you know why certain

24   drugs were labeled Schedule II and

1    certain were labeled Schedule III?

2              MR. LUXTON:  Same objection.

3              THE WITNESS:  I would think

4         that, again, it depends on the

5         drug and what the DEA has

6         determined -- I'm not determining

7         the classification.  The DEA has

8         determined the classification.  So

9         they would -- they would have a

10        history of these drugs and

11        understand why they should be a

12        Class II or Class III.  And I

13        remember that they used to move

14        drugs from classes to classes at

15        times.

16   BY MS. BAIG:

17        Q.   So I appreciate that it's

18   the DEA that categorized the drugs and

19   not you, but I'm simply asking whether

20   you ever had any understanding as to the

21   difference between a Class II and a Class

22   III drug.  And if you didn't, then the

23   answer's simply no.  But I'm asking for

24   your understanding.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I don't think I have a full

2   understanding of that.

3      Q.    You have no -- did you have

4   any understanding of the difference

5   between the Class II and Class III drug?

6      A.    Class II drugs, from a

7   commercial standpoint, you -- you have a

8   lot more regulations, ordering, and

9   processing with Class II drugs and the

10  handling of Class II drugs.

11     Q.    And did you have any

12  understanding as to why Class II drugs

13  were more heavily regulated?

14     A.    It depend -- again, it would

15  depend -- we'd have to look at each drug.

16     Q.    So you didn't have any

17  understanding when you worked at Actavis

18  as to why Class II drugs required more

19  paperwork and had more regulation?

20          MR. LUXTON:  Objection to

21       form.

22          THE WITNESS:  I have an

23       understanding of Class II drugs.

24       And the requirement as the

1          commercial lead that -- that we

2          had different forms that were

3          associated and there was a lot

4          more controls and warehousing.

5          There was a lot more commercial

6          legwork even at the warehouse

7          level.  They had to be locked up

8          so that they were -- they were

9          protected.

10    BY MS. BAIG:

11          Q.    And was it your

12    understanding at the time that the reason

13    that there was more paperwork and the

14    reason that they had to be locked up, was

15    that they had a higher potential for

16    abuse?

17          A.    Again --

18                MR. ROTH:  Object to form.

19          Asked and answered.

20                THE WITNESS:  -- it would

21          depend on each product.  I'm sure

22          the FDA has a reason for each

23          product being in that

24          classification.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. BAIG:

2         Q.    It's been asked, but it

3    hasn't been answered.

4              My question is did you have

5    an understanding at the time as to

6    whether the Class II drugs had a higher

7    potential for abuse.  And if you didn't,

8    then the answer is no.

9              MR. LUXTON:  Objection to

10        form.  It -- it has been asked and

11        it has been answered, but --

12             MS. BAIG:  I -- it's been

13        asked but not answered.

14             MR. LUXTON:  We'll do it one

15        more time, but after --

16             THE WITNESS:  Again, I

17        didn't classify -- I -- you're

18        asking me a question that was --

19        there's a lot of C-II products,

20        and each C-II product is in that

21        bucket for various reasons.  And I

22        would be making a broad statement

23        that I'm not comfortable with.

24    BY MS. BAIG:

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Okay.  So it was never your
2    understanding that Class II drugs had a
3    higher potential for abuse; is that
4    right?
5                MR. LUXTON:  Same objection.
6                MR. ROTH:  Mischaracterizes
7          testimony.
8                THE WITNESS:  I -- I think I
9          answered the question.
10   BY MS. BAIG:
11         Q.    Did you ever have an
12   understanding that Class II drugs had a
13   higher potential for abuse?
14               MR. LUXTON:  Asked and
15         answered.
16   BY MS. BAIG:
17         Q.    Yes -- it's a yes or no
18   question.  It's not --
19               MR. LUXTON:  You don't have
20         to answer it yes or no.  Asked and
21         answered.
22   BY MS. BAIG:
23         Q.    The answer -- the answer is
24   not what the DEA did or what the DEA
```

Highly Confidential - Subject to Further Confidentiality Review

1    required.  I'm simply asking whether or

2    not you ever had an understanding as

3    to -- as to whether Class II drugs had a

4    higher potential for abuse.

5             Did you ever have that

6    understanding or not?

7             MR. LUXTON:  Asked and

8        answered.

9             THE WITNESS:  Again, the DEA

10       classifies the products.  They are

11       classified in there for various

12       reasons.  We'd have to go

13       through -- and -- and I'm sure

14       they -- they give you the -- why

15       they are classified.

16   BY MS. BAIG:

17       Q.    I'm not asking for the DEA's

18   understanding.  I'm asking for your

19   understanding.

20             Did you ever have an

21   understanding that OxyContin for example,

22   had a high potential for abuse?

23             MR. LUXTON:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Did I

2     understand?  Again, I'm not a

3     doctor to determine abuse so I

4     don't think I can answer that

5     question.

6  BY MS. BAIG:

7     Q.    You don't understand the

8  question?

9     A.    No.

10    Q.    Did you ever have an

11 understanding that there were certain

12 dangers associated with Class II drugs

13 that were not associated with Class III

14 drugs?

15    A.    Depending on the product.

16    Q.    So you had an understanding

17 of that for some products, but not for

18 others?

19    A.    No.  It depends on the

20 product, what the -- again, it goes back

21 to why the DEA put the drug in the

22 classification of the -- of the II

23 status.

24    Q.    And what's your

Highly Confidential - Subject to Further Confidentiality Review

1    understanding as to why certain drugs

2    would be classified as Class II as

3    opposed to Class III?

4         A.    They're -- they create

5    higher risk, they are at a higher risk --

6    they are high risk products.

7         Q.    Higher risk for what?

8         A.    Numerous -- again numerous

9    reasons, depending on what the DEA feels

10   that the risk is of the product.

11        Q.    Did you have any

12   understanding of the numerous reasons

13   that a product could be categorized as

14   high risk?

15             MR. ROTH:  Object to form.

16             THE WITNESS:  Not at this --

17        not at this stage of my life.

18   BY MS. BAIG:

19        Q.    You don't recall any of

20   those?

21        A.    No.

22        Q.    Did you understand when you

23   were at Actavis that opioid sales were

24   increasing exponentially nationally?

Highly Confidential - Subject to Further Confidentiality Review

1     MR. LUXTON:  Objection to

2  form.

3     THE WITNESS:  Again I'd have

4  to -- I'd have to see my sales

5  figures.  And I -- you know, we

6  could look at -- at the trends.

7  BY MS. BAIG:

8     Q.   But you don't have any

9  recollection of the fact that opioid

10  sales were increasing substantially

11  during that time?

12     A.   They were increasing, I

13  don't think I would use the word -- I --

14  it depends on your reference point of

15  substantially and my reference point of

16  substantially.

17     Q.   So you recall only that they

18  were increasing?

19     A.   Again, every year is

20  different.  We'd have to look at each

21  year and what -- what the increase was.

22     Q.   Do you have an understanding

23  as you sit here today that opioid sales

24  increased exponentially nationally during

Highly Confidential - Subject to Further Confidentiality Review

1    the time that -- that you were in sales

2    at Allergan?

3              MR. ROTH:  Object to form.

4              THE WITNESS:  I wasn't in

5         sales at Allergan.  At Actavis you

6         mean?

7    BY MS. BAIG:

8         Q.    At Actavis.

9         A.    Our sales increased on --

10   but again I don't -- I don't know what

11   your reference point is.

12        Q.    So you've never heard that

13   opioid sales increased exponentially

14   during the time that you were at Actavis

15   on a national basis?

16        A.    I -- I hear it now on the

17   news and -- and that.

18        Q.    And when was the first time

19   that you became aware of that?

20        A.    I don't recall.  Probably

21   when I was working at Actavis.

22        Q.    And do you recall how you

23   became aware of that?

24        A.    No.

1        Q.      Did you at some point become

2   aware of an opioid epidemic in the

3   country?

4                MR. ROTH:  Object to form.

5                THE WITNESS:  I -- I don't

6         remember that term being used by

7         anybody.

8   BY MS. BAIG:

9        Q.      You've never heard the term

10  "opioid epidemic" be used on the news or

11  anywhere?

12       A.      No, I haven't heard that.

13       Q.      Have you ever heard the term

14  "opioid crisis"?

15       A.      I have heard that recently.

16       Q.      But you didn't hear it when

17  you were working at Actavis?

18       A.      I don't believe that term

19  was used when -- when I was -- it's

20  more -- more of a current -- since I've

21  been retired, it's been -- it's been more

22  public.

23       Q.      Did you ever have

24  conversations with your colleagues at

Highly Confidential - Subject to Further Confidentiality Review

1    Actavis about the rise of opioid use

2    generally and the rise of overdose deaths

3    generally?

4          A.    I didn't hear what you said.

5          Q.    Did you ever have

6    conversations with your colleagues at

7    Actavis about the rise of opioid use

8    generally and the rise of overdose deaths

9    generally?

10          A.    I don't believe so.

11                THE VIDEOGRAPHER:  Can you

12          raise your microphone up?  Okay.

13          Perfect.  Thank you.

14                THE WITNESS:  Do you want

15          this back?

16                MR. LUXTON:  Put it to the

17          side.  She'll let you know if she

18          wants you to reference it again.

19                THE WITNESS:  Okay.

20    BY MS. BAIG:

21          Q.    So you understood that

22    Allergan was required to have a

23    suspicious order monitoring system in

24    place, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     I didn't -- I didn't work

2    for Allergan.

3        Q.     Sorry.  Actavis.

4        A.     Acquired by whom?

5        Q.     Do you -- let's backtrack a

6    little.

7        A.     Okay.

8        Q.     Are you familiar with the

9    Controlled Substances Act?

10       A.     As we sit here today I don't

11   have much knowledge of it.  But I'm sure

12   back then I had some -- some

13   understanding of it.

14       Q.     And you were aware that the

15   manufacture and distribution of opioids

16   must comply with the Controlled

17   Substances Act?

18       A.     I mean I'm not a regulatory

19   or compliance person.  But I'm sure I got

20   direction that we -- we met the needs of

21   the requirements.

22       Q.     Do you recall receiving

23   training on the Controlled Substances

24   Act?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I could have.  I -- I don't

2  recall right now as I sit here today.

3    Q.    Did you understand that --

4  that Actavis was a DEA registered

5  manufacturer and distributor for purposes

6  of the Controlled Substances Act?

7            MR. ROTH:  Object to form.

8            THE WITNESS:  I didn't hear

9        the...

10  BY MS. BAIG:

11    Q.    Did you understand that

12  Actavis was a DEA registered manufacturer

13  and distributor for purposes of the

14  Controlled Substances Act?

15    A.    I knew we were DEA

16  registered.

17            And what was the second,

18  what was the next part?

19    Q.    That's my question --

20    A.    Yeah, we were DEA --

21    Q.    -- you understood that you

22  were registered?

23    A.    Yeah.  We were registered.

24    Q.    And what was your

Highly Confidential - Subject to Further Confidentiality Review

1    understanding of Actavis'

2    responsibilities under the Controlled

3    Substances Act, if you had one?

4          A.    I -- I couldn't speak to

5    that today.  I probably knew it or

6    knew -- had some direction of it from --

7    from our compliance office and our legal

8    team back in 2010.  But now I -- I

9    wouldn't -- I'd be -- I'd be guessing.

10         Q.    Did you understand that

11   Actavis was required to have a suspicious

12   order monitoring system in place?

13         A.    Yes.

14         Q.    And did you understand that

15   Actavis was required to identify and halt

16   shipments of suspicious orders to its

17   clients?

18              MR. ROTH:  Object to form.

19              THE WITNESS:  Can you repeat

20        the question?

21   BY MS. BAIG:

22         Q.    And did you understand that

23   Actavis was required to identify and halt

24   shipments of suspicious orders to its

Highly Confidential - Subject to Further Confidentiality Review

1    clients?

2              MR. ROTH:  Object to form.

3              THE WITNESS:  We -- we

4         monitored our orders.  I don't --

5         again, I can't recall the DEA law.

6         So I think you're making -- I

7         don't want to make the assumption

8         without knowing the DEA law,

9         whether we -- we were required to

10        halt the -- but we did have an

11        SOP -- so -- sorry, SOM system in

12        place.

13   BY MS. BAIG:

14        Q.    Were there any other

15   policies or procedures in place at

16   Actavis to comply with the Controlled

17   Substance Act to your knowledge?

18             MR. ROTH:  Object to form.

19             MR. LUXTON:  Same objection.

20   BY MS. BAIG:

21        Q.    Under the SOM process that

22   we talked about?

23             MR. ROTH:  Object to form.

24        Lacks foundation, calls for

Highly Confidential - Subject to Further Confidentiality Review

1        speculation.

2             THE WITNESS:  I mean -- I --

3        I don't recall, as I sit here

4        today, the -- what was it called?

5  BY MS. BAIG:

6        Q.    Suspicious order monitoring?

7        A.    No, the -- the law, the --

8        Q.    The Controlled Substances

9  Act?

10       A.    Yeah, I don't recall that.

11  I'm sure I had some knowledge of it for

12  sure when I was -- when I was vice

13  president of sales and marketing.  But

14  for me to answer that question now, I

15  would have to have a better understanding

16  of that law.  Is it a law?

17       Q.    I'm just asking you --

18       A.    Oh, okay.

19       Q.    -- if you're familiar with

20  any other policies and procedures that

21  Actavis had in place to prevent

22  diversion, other than the SOM policies

23  and procedures?

24             MR. ROTH:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

1    Lacks foundation.  Calls for

2    speculation.

3         THE WITNESS:  Okay.  I can't

4    recall sitting here today.

5  BY MS. BAIG:

6         Q.    Do you recall whether

7  Actavis outsourced any of its duty to

8  prevent diversion under the Controlled

9  Substance Act --

10         MR. LUXTON:  Objection.

11  BY MS. BAIG:

12         Q.    -- or to oversee compliance

13  itself?

14         MR. LUXTON:  Sorry.  My

15    apologies.  Objection to form.

16         THE WITNESS:  I don't

17    understand what they did, but we

18    used UPS as a -- as a distributor

19    to distribute our products.  And

20    they also had a compliance

21    program.  That would be the extent

22    of it.

23  BY MS. BAIG:

24         Q.    And what was your

Highly Confidential - Subject to Further Confidentiality Review

1  understanding of UPS's compliance

2  program?

3         A.    I don't have a full

4  understanding.  I just know that it was

5  another safeguard.

6         Q.    Do you have any

7  understanding of UPS's compliance

8  program?

9         A.    I do not at this time.

10         Q.    Were there any other third

11  parties that you recall that had any

12  involvement with respect to Allergan's

13  efforts, if any, to prevent diversion of

14  controlled substances?

15             MR. ROTH:  Object to form.

16             THE WITNESS:  It would be

17         Actavis.  I'm Actavis.  I don't --

18         I want -- because I'm answering

19         the question.

20  BY MS. BAIG:

21         Q.    Actavis.

22         A.    Sorry.  I hope that doesn't

23  offend you.

24         Q.    No, it doesn't.

1          MR. ROTH:  We need to keep

2      fixing it.

3          THE WITNESS:  So when you do

4      that, I get --

5  BY MS. BAIG:

6      Q.    Sorry.

7          Were there any other third

8  parties that you recall that had any

9  involvement with respect to Actavis'

10 efforts if any to prevent diversion of

11 controlled substances?

12     A.    Well, we had consultants

13 that were helping us enhance the SOP

14 system.

15     Q.    And who were those

16 consultants?

17     A.    ValueCentric and Dendrite.

18 There may have been more.  That's the

19 ones that I can recall.

20     Q.    But you don't recall any

21 aspects of what ValueCentric and Dendrite

22 did in that regard, correct?

23         MR. ROTH:  Object to form.

24 BY MS. BAIG:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Or do you?

2    A.    Repeat the question.

3    Q.    Do you recall what

4  ValueCentric did to enhance the SOM

5  system, if anything?

6    A.    I mean, my staff would have

7  known at the time.  I'm sure I was

8  involved in meetings, but at this time

9  it's hard for me to know what those --

10  other than they consulted and advised us

11  on enhancing the suspicious order

12  monitoring.

13    Q.    Do you have any further

14  recollection with respect to Dendrite?

15    A.    All I can recall is that

16  Dendrite were all ex-DEA people, or the

17  majority of them that came in.  So they

18  were very well informed in the DEA sector

19  of the business.

20    Q.    And how many of them came

21  in?

22    A.    I recall just one or two.

23    Q.    Do you remember the names?

24    A.    And it's again -- no.

Highly Confidential - Subject to Further Confidentiality Review

1    Sorry.

2         Q.    And do you recall how long

3    they worked with Actavis?

4         A.    I do not.

5         Q.    Do you remember how many

6    meetings you had with them?

7         A.    I do not.

8         Q.    What actions did Actavis

9    take if any to seek to prevent diversion

10   of its opioid products?

11        A.    When?

12        Q.    Ever?

13        A.    We had -- we had suspicious

14   order monitoring program.

15        Q.    Anything else that you can

16   recall?

17        A.    Site visits.

18        Q.    Anything else?

19        A.    Personal review of orders

20   coming in above and beyond the suspicious

21   order monitoring, communication within

22   the organization, and a cross-functional

23   team working together to ensure that we

24   were -- we were control -- we had a

Highly Confidential - Subject to Further Confidentiality Review

1   controlled environment for the

2   distribution of these products.

3              I'm sure there's more,

4   but...

5        Q.    How did the site visits work

6   to prevent diversion?

7        A.    It depends on -- it depends

8   on when we are talking.

9        Q.    During your tenure at

10  Actavis.

11       A.    Site visit, my site visits

12  are more commercial, so more financial.

13  So different than a site visit by the

14  suspicious order monitoring person would

15  be -- would be -- have a different focus.

16       Q.    Were you aware that there

17  were site visits made by the suspicious

18  order monitoring person?

19       A.    I believe Nancy Baran --

20  it's hard for me to remember right now.

21  But I believe Nancy Baran and Kelly -- I

22  forget her last name -- of security did

23  make site visits to customers.

24       Q.    And do you recall any

1    discussions regarding those site visits?

2         A.    Not as I sit here today.  I

3    don't remember specific calls on site

4    visits.

5         Q.    But your understanding was

6    that the purpose of those site visits was

7    what?

8         A.    It depends on who, you know,

9    who's on the call.  I mean, if a -- if a

10   finance person is going to make a site

11   visit, he's going to see if the customer

12   is -- has the financial backing to -- you

13   know, we'd go visit somebody to make sure

14   they're financially strong, that they

15   wouldn't -- that they wouldn't stop

16   paying us.

17         And if I went, I would be

18   going to see if they -- if they have a

19   true commercial business, with customer

20   service reps, with sales reps, and

21   they're -- they are a true commercial

22   company.  So it depends on who was going

23   to the site visit.

24         Q.    Do you have any independent

Highly Confidential - Subject to Further Confidentiality Review

1    recollection for certain that any SOM

2    person was making site visits?

3              MR. ROTH:  Object to form.

4              THE WITNESS:  As we sit here

5         today, you know, without showing

6         me some sort of document, I'd be

7         guessing at when and what people

8         were doing at that time.

9    BY MS. BAIG:

10        Q.    So is it fair to say that

11   you can't tell me as you sit here today

12   how those site visits by SOM persons, if

13   they existed, actually served to prevent

14   diversion?

15             MR. LUXTON:  Objection to

16        form.

17             THE WITNESS:  I think you

18        would have to ask the person that

19        actually went on the visit.

20   BY MS. BAIG:

21        Q.    If they went on the visit,

22   correct?

23        A.    No, I -- again, I'm not

24   making the assumption that they didn't.

1    We'd have to look at documents to ensure

2    and see what the visit was and if there

3    was a document that summarized the visit.

4         Q.    As you sit here today,

5    you're not sure one way or another

6    whether any SOM person ever conducted

7    site visits; is that right?

8         A.    No, I -- as I sit here

9    today, I would have to say Nancy made

10   visits to accounts to discuss suspicious

11   order monitoring.

12              Do I have a specific -- a

13   specific date, a specific account, a

14   specific person she met with?  I can't do

15   that right now.

16        Q.    Okay.

17        A.    Yeah.

18        Q.    But you are sure that she

19   did make some site visits?

20        A.    I'm sure she went out and

21   reviewed her suspicious order monitoring

22   enhancements to customers.  And to me

23   that's a site visit.

24        Q.    So she went out to share

Highly Confidential - Subject to Further Confidentiality Review

1   Actavis' SOM --

2          A.    Yes.

3          Q.    -- policy with customers; is

4   that right?

5          A.    I'm sure she -- I'm sure she

6   did that.  But I don't -- you're asking

7   me who.  And I don't -- I don't know who

8   without looking at a document.

9          Q.    Okay.  In addition to site

10  visits, you mentioned the personal review

11  of orders coming in?

12         A.    Yep.

13         Q.    And what was your

14  understanding as to how that process

15  worked and whether that process was

16  distinct from the SOM process?

17         A.    Well, again, I wasn't in the

18  weeds of the SOM program.  But the way I

19  understood it is that the -- the team, I

20  saw enough e-mails over my life that the

21  team, the customer service rep would --

22  what I would use the term, actually look

23  at the order, if she thought it was --

24  was odd, talk to marketing, talk to

Highly Confidential - Subject to Further Confidentiality Review

1    Nancy.

2              That was -- that was part of

3    the whole process.  Also, you had

4    suspicious order monitoring, which is

5    more IT-driven, more system-driven.  So

6    there was a hands-on approach as well as

7    a system approach to it.

8         Q.    And what was your

9    understanding as to the definition of a

10   suspicious order while you were there in

11   terms of being able to assess whether a

12   particular order was suspicious or not

13   suspicious?

14              MR. LUXTON:  Objection to

15         form.

16              MR. ROTH:  Object to form.

17              THE WITNESS:  I don't think

18         I can answer at this time that

19         without looking at documents.  We

20         had an SOP for the SOM

21         specifically outlining this.

22   BY MS. BAIG:

23         Q.    Do you recall whether it was

24   based on certain thresholds?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    It had -- it was not linear.

2  It was very diverse.  I remember that it

3  was -- had -- it was like an octopus.  It

4  had a lot of tentacles.

5      Q.    And -- and the department

6  that over -- oversaw SOM was what?

7      A.    That was a cross-functional

8  team between Nancy Baran -- because

9  that's where the orders first come in, is

10  in customer service.

11          IT was involved.  Legal was

12  involved.  Compliance was involved.  And

13  marketing was involved.  And then this --

14  this Kelly, I -- I don't know her last

15  name.  She got involved.  Kelly -- she

16  was in security.  I don't know what the

17  last name is, sorry.

18      Q.    Let's have this document

19  marked as Exhibit 2.

20          (Document marked for

21          identification as Exhibit

22          Allergan-Perfetto-2.)

23  BY MS. BAIG:

24      Q.    This document is

Highly Confidential - Subject to Further Confidentiality Review

1    Bates-stamped ALLERGAN_MDL_02128035

2    through 28036.

3              It starts as an e-mail from

4    Michael Perfetto to Jinping McCormick and

5    Bill Ostrowski dated February 11, 2009.

6         A.    I -- I don't think I have

7    the right document.

8              MR. LUXTON:  I think -- he's

9         going backwards to see where it

10        starts, and you're starting from

11        the first page of the document.

12        But I think he has it.  I think

13        she's just saying --

14   BY MS. BAIG:

15        Q.    If you look at the first

16   page?

17             MR. LUXTON:  That's where

18        she's referencing.

19   BY MS. BAIG:

20        Q.    Do you see it's an e-mail

21   from you to Jinping?

22        A.    Yeah, but you said it

23   started.  And I -- I went back to where

24   it started.

Highly Confidential - Subject to Further Confidentiality Review

1    MR. LUXTON:  Yeah.

2  BY MS. BAIG:

3    Q.    I was looking at the first

4  page.

5    A.    So I always go back to see

6  the history --

7    Q.    You're right --

8    A.    You know, and I --

9    Q.    -- the string begins later.

10    But the first page of this

11  document, just for the record, is

12  Allergan 02128035, correct?

13    A.    Yes.

14    Q.    Okay.  And do you recall

15  receiving -- or drafting this e-mail?

16    A.    I'm sure I drafted it.  It

17  has my name.  But I don't recall it.

18  It's 2009.  It's 11 years ago.

19    Q.    Okay.  And do you recall a

20  discussion with Jinping about the initial

21  SOM policy that Actavis had in place?

22    A.    I don't recall having a

23  conversation with Jinping in 2009.

24    Q.    And looking at that --

1    looking a little further down on the

2    page --

3         A.    Can I read -- can I read --

4         Q.    Sure.

5         A.    -- that -- because I -- I

6    haven't seen this.

7         Q.    Go ahead.  Take a look at

8    it.

9         A.    If I saw it, I saw it

10   11 years ago.

11        Q.    Now, I believe you testified

12   that you don't recall or -- or you don't

13   know when the initial SOM procedure was

14   put into place at Actavis; is that right?

15             MR. ROTH:  Object to form.

16        Mischaracterizes his prior

17        testimony.

18   BY MS. BAIG:

19        Q.    Do you recall?

20        A.    I do not recall when it was

21   put into place, the initial program.

22        Q.    Okay.  And do you recall

23   having discussions at all with Nancy

24   Baran or others regarding the

Highly Confidential - Subject to Further Confidentiality Review

1    inadequacies of the initial SOM program?

2         A.    At this time, I don't recall

3    specific conversations on that subject.

4         Q.    And do you see here that

5    Nancy Baran is pointing out, "I explained

6    to her that the DEA suspicious report is

7    not everything people often make it out

8    to be"?

9         A.    I see that.

10        Q.    Did you have a different

11   understanding of the DEA suspicious

12   report system at the time?

13             MR. ROTH:  Object to form.

14             THE WITNESS:  As we sit here

15        today, the -- I don't -- I don't

16        recall the suspicious order

17        monitoring system in 2009 and the

18        details of it.

19   BY MS. BAIG:

20        Q.    Okay.  And do you see she

21   goes on to state with respect to the SOM

22   program, "This is not the mechanism to

23   prevent shipping excess product that one

24   may believe.  For starters, the report is

1    not cumulative.  For example, if a

2    customer's monthly usage is 3,000 units,

3    they can order 2,999 units everyday of

4    the month and it would not be caught."

5             Do you see that?

6        A.    I see it.

7        Q.    Do you have any reason to

8    doubt that that's what the program

9    entailed at the time?

10       A.    I -- I don't know the

11   details of the actual program in 2009.

12       Q.    But you don't have any

13   reason to doubt that what Nancy Baran

14   stated in this e-mail to you at the time

15   is inaccurate; is that right?

16       A.    You -- you would have to ask

17   Nancy what she was using as a reference.

18   She -- I think 2009 she is relatively new

19   to the company.

20       Q.    And she goes on, "At the

21   same time the percentage of times an

22   order comes up on this report where we

23   would actually stop the order is a

24   fraction of 1 percent."

1      Do you see that?

2      A.   Yeah.  Again, we'd have -- I

3  didn't write this letter or e-mail.  But

4  we'd have to sit with Nancy and see what

5  she used as a reference and see if her

6  comments were accurate.  It could be

7  wrong, talk to IT, talk to the

8  cross-functional team at the time.

9      Q.   Her comments could be wrong

10  or they could be right, you don't know as

11  you sit here today; is that right?

12     A.   I don't know, no.

13     Q.   And she goes on to state,

14  "Orders come in all day long over the

15  25 percent threshold."

16        Do you see that?

17     A.   Yeah.  Again, it's her --

18  her comments.  I don't know what she's

19  using as a reference.

20     Q.   Do you recall that

21  25 percent was the threshold being used

22  at the time to trigger a suspicious

23  order?

24     A.   As I sit here today, no.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    She goes on to state

2    further, "If we stopped to question and

3    put on hold every one of these orders, it

4    would be crippling.  The intent of the

5    DEA suspicious report was designed to

6    prevent excessive shipments of controlled

7    products.  In my opinion, it does a lousy

8    job at even that."

9        A.    I think she states it's her

10   opinion.  This is her opinion.  It's

11   not -- again, it's not documented.  We'd

12   have to have Nancy here to understand

13   the -- the facts.

14       Q.    And do you see a couple

15   paragraphs down, she goes on to state,

16   "The DEA suspicious report is on a long

17   list of items to be addressed.  In this

18   case, we really need to start from

19   scratch and have a new report designed

20   that meets our needs as a business."

21           Do you see that?

22       A.    I do.

23       Q.    And is this -- this is dated

24   2009.  Do you know when it was that the

1    new program was implemented?

2                MR. LUXTON:  Objection to

3         form.

4                THE WITNESS:  As I sit here

5         today, I do not without seeing

6         documents.

7                I might need a two-minute

8         break.  Is that all right?

9                MS. BAIG:  Sure.

10               THE VIDEOGRAPHER:  Let's go

11        off the record.  The time is

12        11:26 a.m.  Going off the record.

13               (Short break.)

14               THE VIDEOGRAPHER:  We are

15        back on the record.  The time is

16        11:33 a.m.

17   BY MS. BAIG:

18        Q.    So going back for a moment

19   to Exhibit 2.  This was an e-mail string

20   from in or about February of 2009,

21   correct?

22        A.    Yes.

23        Q.    In which Nancy Baran was

24   pointing out, in her opinion, certain

Highly Confidential - Subject to Further Confidentiality Review

1  inefficiencies in the current SOM system,

2  correct?

3      A.    Can you repeat that?

4      Q.    In which Nancy Baran was

5  pointing out, in her opinion, certain

6  efficiencies in the current SOM system at

7  Actavis, correct?

8      A.    That's what it appears to

9  be.

10      Q.    And I think my last question

11  to you was, did you recall when the SOM

12  system was revamped.  And you testified

13  that you couldn't recall without seeing

14  documents, correct?

15      A.    Right.  I know it was

16  enhanced, is the word I would use.

17      Q.    Okay.  And if you go back to

18  Exhibit 1.

19      A.    Okay.

20      Q.    On the page Bates-stamped

21  682779.

22      A.    Yes.

23      Q.    Do you see where it says,

24  "The SOM system that tracks our inhouse

Highly Confidential - Subject to Further Confidentiality Review

1    direct orders will be completed by end of

2    year"?  Right here?

3            A.    Yeah.

4            Q.    And this document was

5    discussing fiscal year 2011, correct?

6            A.    It was, but it says will be.

7    So I'm not sure sitting here today --

8            Q.    Does this --

9            A.    -- when it was specifically

10   completed.

11           Q.    Right.  But does this

12   refresh your recollection that it may be

13   that the enhancements to the SOM system

14   wouldn't -- did not take place until

15   2011?

16               MR. ROTH:  Object to form.

17               THE WITNESS:  Again, I'd

18          have to see.  It could have been

19          '12, it could have been '11.

20               I'd have to see when -- when

21          the actual system, or we would

22          have to talk to the

23          cross-functional team.

24   BY MS. BAIG:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you see at the bottom of

2    the document in front of you, it's dated

3    January 2011?

4    A.    I see that.

5    Q.    And the sentence within the

6    document states that, "The SOM system

7    that tracks our inhouse direct orders

8    will be completed by the end of the

9    year."

10    So does this refresh your

11    recollection that at least the intent was

12    that the SOM system would be enhanced in

13    2011?

14    MR. ROTH:  Object to form.

15    THE WITNESS:  Again, it --

16    the intent was it would be

17    enhanced.

18    BY MS. BAIG:

19    Q.    In 2011?

20    A.    I don't know when it

21    actually was enhanced, what the

22    implementation date.

23    Q.    But you can tell from

24    reading this document that it wasn't

1    before January 2011, correct?

2         A.    Again, this is -- this is

3    talking about our inhouse direct orders.

4    There's enhancements that were made to

5    the system.  There could have been

6    enhancements, without seeing

7    documentation, that were made in '10 or

8    made in '9, the end of '9.  We would have

9    to do due diligence in order to -- this

10   is just referencing one sector of the

11   suspicious order -- suspicious order

12   monitoring, sorry.

13              There are -- it's almost

14   like it's a very tangled web with a lot

15   of different aspects.

16              So there could have been

17   other enhancements to the system.  Even

18   before I got to Alpharma, there could

19   have been -- so I really can't answer

20   that question without looking at each

21   sector of the -- of the suspicious order

22   monitoring system.

23        Q.    But would you agree that

24   this document suggests that at least one

1    set of enhancements were going to take

2    place or were intended to take place in

3    January of 2011?

4            A.    I don't know if you can say

5    January 2011.  This -- this --

6            Q.    In 2011?

7            A.    In 2011, okay.  That was the

8    intent.

9            Q.    And going back to Exhibit 2.

10           A.    Yeah.

11           Q.    In response to Ms. Baran's

12   comments about the current SOM program,

13   do you see your reply?

14           A.    I do.

15           Q.    And you stated, "This is an

16   ongoing issue," correct?

17           A.    I did.

18           Q.    And you did not contradict

19   any of the statements that she made about

20   the then-current SOM program, correct?

21                 MR. ROTH:  Object to form.

22   BY MS. BAIG:

23           Q.    At least not in this e-mail?

24                 MR. ROTH:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

 1                THE WITNESS:  I'm not sure I
 2          even read Nancy e-mail.  I may --
 3          I think I was -- when I read this,
 4          I was more upset about finasteride
 5          getting wiped out.
 6   BY MS. BAIG:
 7          Q.    Is there anything in your
 8   response to her e-mail that contradicts
 9   what she states about the then-current
10   SOM program?
11                MR. ROTH:  Object to form.
12          Asked and answered.
13                THE WITNESS:  It doesn't
14          even look like I read her e-mail.
15          Again, I think the way my e-mail,
16          when I read it here, I was focused
17          on the wipe-out of a key product.
18          Finasteride was a key product for
19          us.  And this product manager
20          allowed it to get -- to get
21          OmniCare to come in and take our
22          inventory.
23                That's -- once I get upset
24          on something, I kind of focus on

1          it.

2    BY MS. BAIG:

3          Q.    Your response to her was,

4    "This is an ongoing issue.  Nice to have

5    a system to prevent this wipe-out order

6    system (sic)," correct?

7          A.    Yes.

8          Q.    Are you testifying that you

9    didn't read her e-mail when you received

10    it?

11          A.    I don't recall if I read

12    this e-mail in detail.

13          Q.    Okay.  But you did respond

14    to it, correct?

15          A.    I did.

16          Q.    Let's have the next document

17    marked as Exhibit 3.

18          (Document marked for

19          identification as Exhibit

20          Allergan-Perfetto-3.)

21    BY MS. BAIG:

22          Q.    And this is a document

23    Bates-stamped Acquired_Actavis_00265989

24    through 5995.

1        A.      Okay.  Can I just read it a

2    little bit?

3        Q.      Sure.

4        A.      Okay.

5        Q.      And did you receive this

6    e-mail in the course of your business at

7    Actavis?

8        A.      I probably did.  My name is

9    on it.

10        Q.      Okay.  And it's an e-mail

11    from Rachelle Galant to yourself and

12    others, correct?

13        A.      Yes.

14        Q.      And it's dated March 17,

15    2011?

16        A.      Yes.

17        Q.      And it appears to be an

18    e-mail which attaches an SOM protocol,

19    correct?

20        A.      That's what it appears to

21    do.

22        Q.      And do you see where it

23    states, "Cardinal's ordering on the

24    15-milligram oxy IR tabs is in excess of

1    their rolling six-month average."

2              Do you see that?  First

3    line.

4         A.    I do see that.

5         Q.    Okay.  And it goes on to

6    state, "Their six-month average is

7    12,480.  Month-to-date, they have been

8    shipped 20,112 bottles.  Based on where

9    we are in the month (52 percent), this

10   falls under our SOP of suspicious

11   ordering."

12             Do you see that?

13        A.    I do.

14        Q.    And is it your understanding

15   that this was an example of an order that

16   was flagged for being excessive under the

17   SOM program?

18             MR. JOHNSON:  Object to

19        form.

20             THE WITNESS:  I -- you know,

21        as I sit here today, I'm trying to

22        digest this e-mail.  I -- I can't

23        recall this specific e-mail and

24        what Nancy -- not Nancy, but

Highly Confidential - Subject to Further Confidentiality Review

1       Rachelle was getting at.

2   BY MS. BAIG:

3       Q.    Sure.  But does it appear to

4   you that -- that what's happening here is

5   an example of what we talked about with

6   respect to the SOM program, that an order

7   was flagged for being excessive?

8               MR. JOHNSON:  Same

9           objection.

10              THE WITNESS:  I don't know.

11          I would have to read -- let me

12          just -- let me just digest this

13          e-mail.

14              To me, and again we'd -- I

15          didn't write the e-mail.

16              It talks about them being

17          behind in ordering in the next

18          line.  So I don't know.  I -- we'd

19          have to talk to Rachelle and see

20          what her intent was on this

21          e-mail.  I'm confused.

22  BY MS. BAIG:

23      Q.    Do you see the part that

24  says, "Based on where we are in the month

1  (52 percent), this falls under our SOP of

2  suspicious ordering," do you see that?

3        A.    I do see that.

4        Q.    Does that suggest to you

5  that this was flagged as part of the SOM

6  process at Actavis?

7              MR. JOHNSON:  Object to

8        form.

9              THE WITNESS:  I don't know.

10 BY MS. BAIG:

11       Q.    The next sentence says, "Can

12 you please contact the customer and

13 inquire as to what the reason is behind

14 the ordering?  I know the market is

15 seeing shortages with our competitors.

16 We need documentation to continue

17 shipping Cardinal on the 15 milligrams."

18             Do you see that?

19       A.    I do.

20       Q.    Was your understanding of

21 the process that if an order was flagged

22 to be excessive, that you would need to

23 go back to the customer and receive

24 documentation as to why the order was

1    higher than usual?

2              MR. JOHNSON:  Object to

3         form.

4              THE WITNESS:  It was my

5         understanding that the team, as I

6         can see here, were working

7         together, if -- if there was -- if

8         there was excess of ordering,

9         they'd work with the sales rep.  I

10        don't know why I got involved,

11        because it's -- Cardinal was not

12        my account.  And they would get

13        appropriate documentation to

14        validate.  Because we had controls

15        on the selling of this product.

16   BY MS. BAIG:

17        Q.    On the selling of oxy, at

18   the 15-milligram level, correct?

19        A.    Oxy IR was -- we had -- we

20   had a controlled documented SOP -- SOP --

21   SOM system.

22        Q.    And the next paragraph says,

23   "Attached is the SOP for your reference.

24   Please contact me with any questions.  If

1    you could target getting back to me

2    within three business days, that would be

3    appreciated.  Cardinal's future orders

4    for 15 milligrams oxy IR will not be

5    shipped until we have resolution."

6              Do you see that?

7         A.    Yeah, I see it.

8         Q.    And so if you switch two

9    pages in, there's a suspicious order

10   report for oxycodone IR tablets.  What's

11   your understanding of what this document

12   is?

13             A.    My understanding is the

14   team -- internal team and the -- combined

15   with the system worked together to flag

16   the organization, the commercial

17   organization, that their -- we have to

18   contact the customer and understand the

19   market dynamics of their purchases on

20   this product.

21        Q.    And the second line on the

22   document states, "Standard operating

23   procedure," correct?

24             A.    The second -- the second --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. LUXTON:  It's the very

2     top of the page.

3  BY MS. BAIG:

4     Q.    I'm pointing to it.

5     A.    Yeah, SOP.

6     Q.    Is it your understanding

7  that this was the SOP that was in place

8  at that time?

9     A.    I -- I have no knowledge to

10  say differently.

11     Q.    That's what you would take

12  from this document, correct?

13     A.    Yeah.  Yes.

14     Q.    Do you see under Number 1

15  where it references monitor monthly

16  customer orders?

17     A.    I do.

18     Q.    Who was in charge of that,

19  if anyone?

20     A.    Based on this document it

21  says marketing product manager.

22     Q.    Do you know who that was?

23     A.    Depends on the product.

24     Q.    So it would -- would have

1    been somebody from the marketing

2    department?

3          A.    Yes.

4          Q.    And did you see the monthly

5    reports that were generated, if any?

6          A.    Sitting here today, I can't

7    remember them.  But I could have.

8          Q.    And do you recall that they

9    were exported into Excel and stored on

10   the shared marketing file for oxycodone

11   IR suspicious order tracking?

12         A.    Where do you read that?

13         Q.    Last line of the box with

14   Number 1.

15         A.    If that was the SOP, then

16   that's what the team would have done,

17   based on that.

18         Q.    And do you recall there

19   being a shared marketing file for

20   oxycodone IR suspicious order tracking?

21         A.    If -- if that was the SOP,

22   then there would have been a shared --

23   shared -- because they were a

24   cross-functional team, so they would be

Highly Confidential - Subject to Further Confidentiality Review

1    sharing information.

2         Q.    And would you have had

3    access to that file?

4         A.    Yeah.  I -- at this point I

5    don't think I recall ever -- ever -- I

6    could have, you know, but at this time I

7    don't remember a drive.  It's a drive, is

8    that what they are calling it?

9         Q.    Shared marketing file.

10        A.    File, okay.  I'm sure I --

11   I'm sure at the time I did.  But I don't

12   remember as we -- as we say in 2018 here.

13        Q.    And do you see, the next

14   box, there's a reference to DC level at

15   the end of the first line.  What's DC

16   stand for?

17        A.    Distribution level.  So

18   distribution center of a -- the

19   customer's distribution center.

20   Warehouse is the way I would define that.

21        Q.    And it states, "Compare the

22   month-to-date orders for each customer

23   down to the customer DC level, against

24   the rolling six-month order history."

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Right.

2    Q.    "Identify any individual

3  customer locations that have ordered

4  50 percent or greater than their

5  established six-month order average.

6  These customers will be noted in the

7  suspicious order tracking form.  See

8  Attachment A."

9         Do you see that?

10   A.    I do.

11   Q.    Does that refresh your

12  recollection that the threshold for

13  label -- for flagging an order as

14  suspicious was 50 percent or greater than

15  the established six-month order average?

16         MR. ROTH:  Object to form.

17         THE WITNESS:  It tells me

18      that this is one of the criterias,

19      as I've stated before.  The

20      suspicious order monitoring was --

21      was a -- not a linear system.

22  BY MS. BAIG:

23   Q.    So one of the criteria was

24  to flag orders that were 50 percent or

Highly Confidential - Subject to Further Confidentiality Review

1    greater than their established six-month

2    order average, correct?

3              A.    That's what it reads here.

4              Q.    And is -- who is in charge

5    of doing that?  Was that again the

6    marketing product manager?

7              A.    Based on this document, it

8    says product manager.  So it would be

9    whoever the specific product manager is

10   for the specific product.

11             Q.    The marketing product

12   manager?

13             A.    Yes.

14             Q.    And those customers were

15   then noted in suspicious order tracking

16   forms, like the one at Attachment A.  Do

17   you see that?

18             A.    I do.

19             Q.    And do you recall seeing

20   such forms in your business at Actavis?

21             A.    As I sit here today, I don't

22   recall this form, but probably in '11 or

23   '12, I would -- I probably got it.

24             Q.    And those forms would have

1    been saved in the shared file, shared

2    marketing file?

3         A.    If that's what the SOP said.

4         Q.    It says, in Box B, "Forward

5    the suspicious customer order tracking

6    form to the VP of sales and individual

7    sales team account representatives with

8    details of order history and current

9    month-to-date order status," correct?

10        A.    Yes.

11        Q.    So would that have been you,

12   forward the suspicious customer order

13   tracking forms to the VP of sales, would

14   that have been you at the time?

15        A.    I would have been the VP of

16   sales.  It also mentions the rep there.

17        Q.    Yeah.  So it would have been

18   circulated to you and to individual sales

19   team account representatives, correct?

20        A.    There would have been

21   communication, yes.

22        Q.    The next line says that the

23   action to be taken was to, "Contact

24   customer service and have the open orders

¹ for the specific account placed on hold

² status until the inquiry is completed and

³ resolved."

⁴            Do you see that?

⁵        A.    I do.

⁶        Q.    And who were the people that

⁷ were supposed to do the inquiry?

⁸        A.    It would have been the sales

⁹ team, along with potentially Nancy Baran,

¹⁰ potentially -- again, another

¹¹ cross-functional team.  Kelly could have

¹² been on the call.  So initially the rep.

¹³ If we didn't get sufficient

¹⁴ documentation, I would get involved,

¹⁵ maybe, with the account.  Nancy Baran,

¹⁶ Kelly -- I forget Kelly's last name, in

¹⁷ security.  But again more of a

¹⁸ cross-functional team, to understand --

¹⁹ understand the suspicious order.

²⁰        Q.    The person who's designated

²¹ as having that responsibility on this

²² chart is the product manager, correct?

²³        A.    No.  No.  It --

²⁴        Q.    In the right-hand column?

1    A.    It says -- you're talking

2    about the customer inquiry, right?

3    Q.    I'm just looking at the area

4    of responsibility.  Do you see that third

5    column?  It says "responsibility"?

6    A.    What paragraph are you

7    referencing?

8    Q.    B and C?

9    A.    Of 3?

10    Q.    No.  Of 1.

11    A.    Oh, we're back to 1.

12    That would be their job to

13    forward the information to myself or the

14    sales rep.

15    Q.    Do you see, in the box

16    identified Number 2, it states, "Contact

17    each customer within a target time frame

18    of three business days, who is on the

19    monthly suspicious order tracking

20    form" --

21    A.    Right.

22    Q.    -- "either by mail, in

23    person or phone regarding the higher

24    volume orders.  Note reasons for the

Highly Confidential - Subject to Further Confidentiality Review

1    order volume and duration that the orders

2    will be increased."

3                    Do you see that?

4           A.      I do.

5           Q.      And did that fall under your

6    responsibility as VP of the sales team?

7           A.      It would be my

8    responsibility with my rep that

9    specifically had that account.

10          Q.      Okay.  And do you recall

11   that?  Do you recall that procedure being

12   in place?

13          A.      I -- I recall at times

14   calling customers.

15          Q.      To ask them why they were --

16          A.      Yeah.

17          Q.      -- ordering --

18          A.      I'm sure.

19          Q.      -- a high number of --

20          A.      I don't know what

21   specific -- sitting here now in '18.  But

22   sure, we -- the best thing is

23   communication, to understand and --

24   understand these situations.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then in documentation

2 follow-up, in Box 3, it says, "Forward

3 all the details of customer

4 communications to the marketing product

5 manager via e-mail within a one-week time

6 frame."

7         Do you see that?

8    A.    I do.

9    Q.    And in Item C it says, "This

10 file will be stored on marketing shared

11 drive."

12         Do you see that?

13    A.    I do.

14    Q.    Is it your understanding

15 that all of these -- this documentation

16 follow-up was stored on a marketing

17 shared drive?

18    A.    I mean the SOP, they should

19 have followed the SOP.  I can't sit here

20 today without looking at the shared drive

21 to tell you if they did it.  But the SOP

22 follows -- this was the SOP for the

23 suspicious order monitoring.

24    Q.    And Box 4 discusses the

Highly Confidential - Subject to Further Confidentiality Review

1    decision regarding future customer

2    shipments.

3              Do you see that?

4         A.    I see decision regarding

5    future customer shipments, yes.

6         Q.    Okay.  And the area of

7    responsibility -- the person identified

8    for responsibility for that -- for that

9    box is marketing/customer service/sales

10   team, correct?

11        A.    I do see that.

12        Q.    And essentially it states,

13   "Based on feedback from the customer,

14   make a determination whether to continue

15   shipping to the customer.  The following

16   criteria may be applied to help with the

17   decision:  New customer (still

18   establishing six-month history), market

19   growth, market shortage, expansion of

20   customer business (adding new stores and

21   channels)."

22              Do you see that?

23        A.    I do.

24        Q.    Those were the types of

1    reasons that would justify -- that were

2    being used to justify the shipments of

3    orders that had been flagged as

4    suspiciously high; is that right?

5            MR. LUXTON:  Objection to

6        form.

7            THE WITNESS:  Those are --

8        those are potential.  There could

9        have been -- I don't know.  There

10       could have been more reasons.

11   BY MS. BAIG:

12       Q.    These are the -- these are

13   some examples of reasons, correct?

14       A.    Examples of reasons?

15   Finish.

16       Q.    That were used to justify

17   the shipment of orders that had been

18   flagged as suspicious, but based on

19   customer feedback were being shipped

20   anyway?

21           MR. LUXTON:  Objection to

22       form.

23           THE WITNESS:  I believe that

24       to be so.

1    BY MS. BAIG:

2           Q.    And in the next box it

3    states, "If the decision has been made to

4    not ship the customer's open orders,

5    notify customer service to have the

6    orders/accounts placed on suspended

7    status."

8                  Do you see that?

9           A.    I do.

10          Q.    Do you recall -- do you

11   recall certain orders that were

12   identified as suspicious being halted?

13          A.    Not sitting here in 2018.

14   But again, this is a -- this was a

15   process that they should have followed.

16          Q.    And the next item states,

17   "Notify appropriate personnel with the

18   details of the orders and order history.

19   Keep the open orders and any new orders

20   that come in on the customer location on

21   hold status until clearance is given to

22   resume shipping the customer."

23                  Correct?

24          A.    Yes.

1    Q.    Your understanding from

2    reading this is that all of this would

3    have been documented for any suspicious

4    orders, correct?

5    A.    To the best of my knowledge

6    sitting here today.

7    Q.    And saved in the shared

8    marketing file?

9    A.    Yeah, I presume, based on

10    the suspicious order monitoring -- I mean

11    the SOP.

12    But again, I don't -- I

13    don't know the details of what the actual

14    person was doing.

15    Q.    No, understood.  We would

16    have to look at the documents to see

17    which ones were flagged as suspicious and

18    which ones were ultimately shipped or not

19    shipped, correct?

20    A.    Yep.

21    Q.    Let's have this document

22    marked as Exhibit 4.

23    (Document marked for

24    identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1          Allergan-Perfetto-4.)

2    BY MS. BAIG:

3          Q.    It's a document that's

4    Bates-stamped ALLERGAN_MDL_0728129 --

5    sorry -- 72128 and 72129.  It begins with

6    an e-mail from Michael Perfetto to Doug

7    Boothe dated April 16, 2011.

8          A.    Okay.

9          Q.    And do you see in -- on the

10   first page it states, "Umesh put together

11   the summary for us.  We can review next

12   week and move on."

13         A.    Mm-hmm, yes.

14         Q.    Who was Umesh?

15         A.    He was IT person that worked

16   for Bill Ostrowski.

17         Q.    And who is Bill Ostrowski?

18         A.    Head of IT.

19         Q.    And do you see the second

20   page is titled "Suspicious Order

21   Monitoring Reporting Summary"?

22         A.    I do.

23         Q.    And have you had a moment to

24   review the document?

1    A.    No.  I need to.

2    Q.    Okay.

3    A.    Okay.

4    Q.    Do you -- do you recall

5  receiving this in the regular course of

6  your business?

7    A.    I do not.

8    Q.    Do you have any reason to

9  doubt that you received it, given that it

10  has your name on it?

11    A.    No, I -- based on the

12  computer trail, I had it.

13    Q.    Okay.  And does this refresh

14  your recollection looking at the first

15  paragraph, that the DEA required

16  registrants who distribute controlled

17  substances to have a mechanism to

18  identify and subsequently report all

19  suspicious orders?

20    A.    This is what Umesh wrote.  I

21  don't know what he used as a reference.

22  He's an IT guy.

23    Q.    But you received this,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And do you recall being

3  aware that the DEA had imposed strict

4  sanctions and significant fines on

5  Cardinal, McKesson and AmerisourceBergen

6  and CVS in amounts as high as $34 million

7  for noncompliance with the Controlled

8  Substance Act?

9      A.    I believe I read public

10  documentation on that when it happened.

11      Q.    Okay.  And do you remember

12  having discussions with colleagues at

13  work about that?

14      A.    As I sit here today, it's

15  hard for me to remember conversations in

16  '11.  So I can't say yes or no on that

17  really.  But I do remember reading --

18  reading newspaper articles on the subject

19  matter.

20      Q.    And do you remember that

21  Harvard had had their license temporarily

22  revoked in or about June of 2010?

23      A.    No, I can't recall -- I

24  can't recall Harvard Drug.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you remember whether

2    Harvard was a customer of yours?

3         A.    They were a customer, yes.

4         Q.    But you don't recall them

5    having their license revoked?

6         A.    No, not in 2010.

7         Q.    Okay.  Do you see the next

8    sentence says, "SOM has become one of the

9    largest hot topics in the eyes of the DEA

10   within the industry right now"?

11        A.    I see it.

12        Q.    And do you recall that being

13   the case at the time?

14        A.    I think, you know, again,

15   there's some -- this is Umesh's opinion

16   of the market being an IT guy.  I -- I

17   don't know when I recall that it became a

18   major -- a major point for DEA, what year

19   that was.  So I couldn't sit here and

20   tell you that, when that was.

21        Q.    You recall that it did at

22   some point; is that right?

23        A.    I recall the articles about

24   CVS and Walgreens specifically.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall having

2    meetings with the DEA?

3    A.    What was that?

4    Q.    Do you recall having any

5    meetings with the DEA?

6    A.    I personally never met with

7    the DEA.

8    Q.    Okay.  Do you recall others

9    from Actavis having meetings with the DEA

10   and briefing you on those meetings?

11   A.    I believe -- I believe

12   Michael Clarke had one meeting with the

13   DEA.

14   Q.    What do you recall about

15   hearing about that meeting?

16   A.    I don't -- I don't recall

17   the details without seeing documentation

18   of what happened at -- you know, I -- I'm

19   not sure -- I'm sure I was briefed.  I

20   can't sit here today and give you details

21   on -- on what I was briefed on.

22   Q.    Looking at the next sentence

23   of that paragraph.  It states, "It has

24   been said that the focus of the DEA has

Highly Confidential - Subject to Further Confidentiality Review

1   shifted to manufacturers."  Do you recall

2   that being the case or being aware of

3   that?

4           A.    Again, I think this is

5   Umesh -- I don't know where Umesh got

6   his -- he's an IT guy making a lot of

7   compliance comments.  So I -- we'd have

8   to talk to Umesh, where his -- what his

9   reference was.

10          Q.    Did Umesh report to you?

11          A.    No, he did not.

12          Q.    Who did he report to?

13          A.    Bill Ostrowski, who was your

14   chief information -- he is an IT guy

15   also.

16          Q.    And you don't know who

17   directed Umesh to put this together, if

18   anyone?

19          A.    I don't.  Umesh didn't work

20   for me.  I -- we'd have to ask Umesh.

21          Q.    But would it have been his

22   department that flagged orders to be

23   suspicious based on the -- the certain

24   thresholds, the 50 percent threshold?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    IT was part of the

2  cross-functional team that I speak of on

3  suspicious order monitoring.  Not his

4  department, but he would have been

5  involved in the IT development of the

6  enhancement program.

7    Q.    Okay.  And do you see the

8  next sentence says, "Current SOM

9  processes at Actavis are threshold-based

10  and present a risk to Actavis for

11  noncompliance with current standards.  As

12  a result this requires us to upgrade to a

13  more statistical-based model."

14        Do you see that?

15    A.    I see that.

16    Q.    Do you know what risk he was

17  discussing?

18    A.    No.  I think again he's an

19  IT guy making a lot of compliance

20  comments that are -- that are out of his

21  area of expertise.

22    Q.    Do you know whether or not

23  the program was upgraded to a more

24  statistical-based model?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The program was enhanced

2  to -- in -- in all various ways.

3    Q.    But do you know what -- what

4  is meant by this upgrade to a more

5  statistical-based model, what's meant by

6  that?

7    A.    I don't know what he meant.

8    Q.    Did -- did you have an

9  under -- do you have an understanding of

10  what that means, moving from a

11  threshold-based program to a

12  statistical-based program?

13    A.    Well, I -- I don't agree

14  that we just had -- again, he doesn't

15  know enough about our SOM.  We didn't

16  have just a threshold-based system.  I

17  think I've discussed that before.  We had

18  a system that was -- marketing was

19  looking at, customer service was

20  hand-holding orders, catching them.  They

21  had the IT system.  It was a very -- it

22  was not linear.

23         To me a threshold -- the

24  word threshold means linear.  It doesn't

Highly Confidential - Subject to Further Confidentiality Review

1   include frequency of orders.  So --

2        Q.    Well, threshold includes

3   frequency of orders, right?

4        A.    Not -- not -- it depends on

5   how we define it.

6        Q.    Oh, I see.

7              Okay.  So, but here he's

8   talking about a shift from a

9   threshold-based model to a

10  statistical-based model, and I'm just

11  trying to understand what that means.

12  If -- if you have a threshold-based

13  model, I understand that.  It's what we

14  looked at before, something that if you

15  have 50 percent higher orders in a

16  six-month average.

17             But what is -- what is a

18  statistical-based model?  Do you have an

19  understanding of that or no?

20       A.    No.  I think -- I think

21  that's beyond my understanding of the

22  suspicious order monitoring.  I would be

23  guessing.  And I'm not prepared to guess

24  under oath.

```
 1            Q.     Okay.  And you don't recall

 2     a shift to a statistical-based model, do

 3     you?

 4            A.     It could have been part of

 5     the enhancement, but sitting here today,

 6     I -- I would have to look at documents in

 7     order -- when is this, when is this?

 8     Like '11?

 9            Q.     This is 2011.

10            A.     Oh, okay.

11            Q.     This is April 2011.  So if

12     you recall, the -- the performance

13     evaluation that's stated that you were

14     going to try to enhance the program was

15     January 2011.

16            A.     Right.

17            Q.     So this was just a few

18     months after --

19            A.     Right.

20            Q.     -- and I would imagine part

21     of the enhancement, would you agree, or

22     part of the effort to enhance?

23            A.     If I recall the -- the

24     review, which we reviewed, it was the
```

Highly Confidential - Subject to Further Confidentiality Review

1    direct order portion that was being

2    enhanced at that time.

3              As I stated before, it was

4    enhanced in various other ways.  I don't

5    know what the timing of that is.

6         Q.    Does this e-mail suggest to

7    you that in or about April 2011 they were

8    looking at another way to potentially

9    enhance the program?

10        A.    Again, I think -- I think

11   that this is an ongoing process to

12   enhance the program.

13        Q.    And it -- it appears, a few

14   lines down, it states, "We concluded that

15   a third-party expert would help us

16   minimize the risk."

17             Do you see that?

18        A.    I do.

19        Q.    And is that likely the same

20   person that you referred to earlier as --

21   as being, I think you -- you suggested

22   that there were two organizations that

23   were hired to help in this regard, or was

24   this somebody different, do you know?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Dendrite is -- renamed

2    themselves, this -- you get it --

3                 MR. LUXTON:  Cegedim.

4                 THE WITNESS:  Cegedim?

5    BY MS. BAIG:

6          Q.     Okay.  Cegedim Compliance

7    Solutions?

8          A.     I actually like Dendrite

9    better.

10          Q.     I do too.

11          A.     Yes.

12          Q.     And then there's a

13    cross-benefit analysis.  Do you see that?

14          A.     Yes.

15          Q.     Associated with moving to a

16    statistical model?

17          A.     Yes.

18          Q.     Says T&E, do you know what

19    T&E is?

20          A.     Travel and -- travel and

21    expenses I think.

22          Q.     And do you see the fourth

23    arrow under cost benefit?  References

24    increased customer confidence, selling

¹ point.  Do you see that?

²      A.    Yes.

³      Q.    Was the SOM program used as

⁴ a marketing tool with -- with your

⁵ customers to increase their confidence?

⁶      A.    I -- I don't -- I don't

⁷ recall the sales team doing that.

⁸      Q.    Do you recall anybody doing

⁹ that?

¹⁰      A.    I mean it's -- it was -- it

¹¹ was the right thing to do to enhance a

¹² suspicious order monitoring.

¹³      I can't recall us going out,

¹⁴ the sales team -- the way this reads is a

¹⁵ selling point.  I don't see the -- the

¹⁶ suspicious order monitoring being a

¹⁷ selling point.

¹⁸      Q.    But the document suggests it

¹⁹ could have been, correct?

²⁰      A.    Right.  But this is an IT

²¹ guy that's talking out of -- in my

²² opinion, way out of his league with --

²³ with a lot of different areas.

²⁴      Q.    So you -- you took this

Highly Confidential - Subject to Further Confidentiality Review

1   document from him and forwarded it on to

2   Doug Boothe, correct?

3          A.     I did.

4          Q.     And to Bill Ostrowski,

5   correct?

6          A.     Yes.

7                 MS. BAIG:  Let's have this

8          document marked as Exhibit 5.

9                 (Document marked for

10         identification as Exhibit

11         Allergan-Perfetto-5.)

12   BY MS. BAIG:

13         Q.     This document begins as an

14   e-mail from you to Kelly Smith and

15   others.

16         A.     Oh, that's --

17         Q.     Is that the Kelly you were

18   referring to earlier?  We've got her.

19                Okay.  It's Bates-stamped

20   Acquired_Actavis_01317298 to 01317299.

21         A.     Okay.

22         Q.     And the subject line is

23   "Meeting today regarding QK healthcare

24   oxy ordering pattern."

Highly Confidential - Subject to Further Confidentiality Review

1                Do you see that?

2        A.    I do.

3        Q.    And is this the Kelly that

4   you referred to earlier?

5        A.    Yes.

6        Q.    And what was her position

7   again?

8        A.    Some sort of security.  Like

9   director of security, maybe.

10       Q.    What does QK stand for?

11       A.    Quality King.

12       Q.    Quality what?

13       A.    Quality King.

14       Q.    Is that a customer?

15       A.    It is.

16       Q.    Do you see at the bottom of

17  the first page, in an e-mail from Kelly

18  Smith to you and Rachelle Galant and

19  others, she states, in the last

20  paragraph, "Mike, per our class

21  discussion, you hired a vendor to develop

22  an enhanced suspicious order program.

23  Are they on board right now?"

24                Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And up above he states in

3  response, "Yes, we have engaged Dendrite

4  and have an internal team that I'd like

5  you to be involved with."

6         Do you see that?

7    A.    I do.

8    Q.    Does that refresh your

9  recollection that Dendrite may have been

10 hired in or about early 2011?

11   A.    They may have been hired in

12 '10.  I -- I don't -- they are hired as

13 of this date.

14   Q.    Okay.  And Kelly Smith goes

15 on in that last paragraph:  "Further, I

16 believe that before we bring these

17 companies on board, we should do

18 increased due diligence.  Sales and

19 marketing may not be the best outlet for

20 this."

21   A.    Okay.

22   Q.    Do you recall discussions

23 about sales and marketing potentially not

24 being the best outlet for SOM due

1    diligence?

2         A.    I do not at this time.

3         Q.    Do you have an understanding

4    as to why that might be?

5              MR. ROTH:  Object to the

6         form.

7              THE WITNESS:  No, we'd have

8         to ask Kelly that.  Kelly was, I

9         believe, relatively new when

10        this -- in this -- in this role.

11   BY MS. BAIG:

12        Q.    So as you sit here today,

13   you don't have any understanding that

14   sales and marketing might not be the best

15   team to perform SOM procedures merely by

16   virtue of the fact that sales employees'

17   compensation is typically based on

18   driving and increasing sales?

19              MR. LUXTON:  Objection to

20         form.

21   BY MS. BAIG:

22        Q.    Does that suggest there's a

23   tension to you, or no?

24        A.    I think you're -- the

Highly Confidential - Subject to Further Confidentiality Review

1  marketing/customer service team, along

2  with compliance, along with legal, was a

3  cross-functional team along with IT.  It

4  wasn't -- it wasn't just the sales team.

5  Okay.

6          Q.    Sure, but she's suggesting

7  here that sales and marketing may not be

8  the best outlet for this.  And I'm just

9  asking if you have an understanding as to

10 why that might be or not.

11         A.    We would have to ask Kelly.

12         Q.    I know.  But I'm asking for

13 your understanding.

14         A.    To me --

15         Q.    Maybe you don't have one.

16         A.    I don't have -- I don't have

17 the opinion on that.

18         Q.    Okay.  She goes on to state,

19 "Perhaps security and legal should be

20 involved."

21               Do you see that?

22         A.    I do.

23         Q.    And she goes on to state,

24 "As you know, many illegitimate companies

Highly Confidential - Subject to Further Confidentiality Review

1    are looking for new suppliers due to

2    recent DEA scrutiny and close of previous

3    suppliers due to these sort of problems."

4              Do you see that?

5         A.    I do.

6         Q.    And the subject line is "The

7    Healthcare Oxy Ordering Pattern."

8    Correct?

9         A.    Yep.

10        Q.    Do you recall that there

11   were a number of illegitimate companies

12   that were looking for new suppliers due

13   to the recent DEA scrutiny?

14             MR. ROTH:  Object to form.

15             THE WITNESS:  As we sit here

16        in 2018, I do not.  But if you

17        showed me documentation, I

18        probably could answer.

19   BY MS. BAIG:

20        Q.    Well, based on this

21   document, does that suggest to you that

22   that was the case?

23             MR. LUXTON:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  No.

2    BY MS. BAIG:

3          Q.    So you don't agree with what

4    Kelly Smith is stating here?

5          A.    I don't know if she's

6    referencing us or referencing the

7    industry.

8          Q.    Well, no, I'm merely asking

9    if you had an understanding of what she's

10   stating here, which is, "As you know,

11   many illegitimate companies are looking

12   for new suppliers due to recent DEA

13   scrutiny and closure of previous

14   suppliers due to these sorts of

15   problems."

16          Did you have an

17   understanding generally that that was

18   going on in the industry?

19          A.    As we sit here today, I

20   could have.  I don't remember.

21          I need to take another break

22   once you're done with questioning on

23   this.

24          Q.    Can we just finish this one

Highly Confidential - Subject to Further Confidentiality Review

1    document?

2         A.    Yeah.

3         Q.    Probably done in a couple

4    minutes.  Is that good?

5         A.    That's good.

6         Q.    In your opinion -- strike

7    that.

8              MS. BAIG:  Okay.  Done with

9         that document.

10             THE WITNESS:  Thank you.

11             THE VIDEOGRAPHER:  Please

12        remove your microphones.  The time

13        is 12:20 p.m.  Going off the

14        record.

15                  -   -   -

16             (Lunch break.)

17                  -   -   -

18    A F T E R N O O N   S E S S I O N

19             THE VIDEOGRAPHER:  We are

20        back on the record.  The time is

21        1:19 p.m.

22                  -   -   -

23             EXAMINATION   (Cont'd.)

24                  -   -   -

Highly Confidential - Subject to Further Confidentiality Review

1              MS. BAIG:  Okay.  So let's

2         have this document marked as

3         Exhibit 6.

4              (Document marked for

5         identification as Exhibit

6         Allergan-Perfetto-6.)

7    BY MS. BAIG:

8         Q.    This is a document

9    Bates-stamped ALLERGAN_MDL_07167006, and

10   it's one page.  And it's an e-mail from

11   Bill Ostrowski to you and others, dated

12   October 21, 2011.

13             Just take a moment to look

14   at it.

15             Do you recall some

16   discussion -- or let's back up for a

17   moment.  I think you had made a

18   distinction when talking about the

19   enhancing of the suspicious order

20   monitoring program that was referenced in

21   your performance evaluation, about that

22   enhancement being limited to direct

23   customers; is that right?

24             MR. ROTH:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MS. BAIG:

 2          Q.    Do you remember talking

 3    about the enhancement to suspicious order

 4    monitoring in your performance

 5    evaluation?

 6          A.    Yes.

 7          Q.    And I think a couple of

 8    times on the record, you -- you

 9    referenced that that was specific to

10    direct customers; is that right?

11          A.    That's what I read in the

12    review at -- today.  That's why I

13    referenced it.

14          Q.    Correct.  And I just wanted

15    to ask, you know, do you have an

16    understanding of a separate enhancement

17    that was made with respect to indirect

18    customer --

19          MR. ROTH:  Object to form.

20    BY MS. BAIG:

21          Q.    -- and suspicious order

22    monitoring?

23          A.    As I stated before, there --

24    there were various enhancements.  There

Highly Confidential - Subject to Further Confidentiality Review

1    was additional enhancements on indirect

2    customers.

3        Q.    Okay.  And what is your

4    understanding as to the enhancements that

5    were made with respect to suspicious

6    order monitoring and indirect customers?

7        A.    I believe they -- it was --

8    it was more of an IT system development

9    working with an outside firm, I don't

10   know who the outside firm was, to

11   develop -- or to -- to enhance the

12   indirect system.

13       Q.    And by indirect system, we

14   mean -- we mean to enhance suspicious

15   order monitoring of your customers'

16   customers; is that right?

17       A.    As I sit here today, I --

18   that seems right.

19       Q.    Okay.  And you see in this

20   e-mail from Bill Ostrowski from October

21   of 2011?

22       A.    Right.

23       Q.    He's stating that "Mike and

24   I spoke today about the game plan for

1    suspicious order monitoring, so just

2    wanted to summarize some key points and

3    also sync up on budgeting," right?

4         A.    Yep.

5         Q.    And then he goes on to state

6    that "we had initially agreed that

7    monitoring direct orders are the

8    priority.  It seems indirects are equally

9    important and we need to move on both

10   fronts in parallel."

11             Do you -- do you see that?

12        A.    Yes.

13        Q.    Does this suggest to you

14   that the enhancement for the indirect

15   aspect of the suspicious order monitoring

16   program was taking place in or about

17   October of 2011?

18        A.    It was -- it was being

19   enhanced or discussed at that time.

20        Q.    And he's talking about

21   syncing up on the requirements.  Do you

22   see that?

23        A.    Yes.

24        Q.    And then he goes on to state

1    certain aspects of that proposed

2    enhancement or enhancement.  And he

3    states, "Determine criteria for

4    activities that constitute suspicious

5    indirect orders/customers."

6              Do you see that?

7        A.    Yes.

8        Q.    Do you know -- know whether

9    those criteria for indirect customers and

10   suspicious order monitoring were -- were

11   created or determined at that time?

12       A.    I don't know.

13       Q.    Do you know what the

14   criteria were?

15       A.    Not looking at this

16   document.

17       Q.    And you don't have an

18   independent recollection of that?

19       A.    No.

20       Q.    Okay.  He goes on to state,

21   "Determine the data that is most suitable

22   to flag suspicion as per first bullet."

23              There's a reference to

24   chargebacks, 844, or sales out from

Highly Confidential - Subject to Further Confidentiality Review

1  wholesalers, 867?

2       A.    Yep.

3       Q.    And then he goes on to

4  state, "Neither is 100 percent complete

5  so need to assess tradeoffs and take a

6  position.  Other data required."

7            Do you see that?

8       A.    Yep.

9       Q.    What's your understanding

10  of -- of what this means as you read it

11  now?

12       A.    I know what chargebacks are.

13  I don't know what 867 data is.  I

14  don't -- I don't know what his

15  language -- I didn't write this.  I don't

16  know what his language -- neither hundred

17  percent -- neither is 100 percent

18  complete -- I don't know what he was

19  referencing there about a tradeoff.

20       Q.    Okay.  But you understand

21  that he was trying to determine what data

22  was most suitable to flag suspicious

23  orders, correct?

24       A.    He was -- he's an IT guy.

Highly Confidential - Subject to Further Confidentiality Review

1  So he was trying to figure out with the

2  enhancement program, what path he would

3  take.

4          Q.     In order to flag suspicious

5  orders for indirect customers, correct?

6          A.     In order to enhance our --

7  our suspicious order monitoring system.

8          Q.     Do you see the second bullet

9  where it says determine the data that is

10 most suitable to flag suspicion?

11         A.     I do.

12         Q.     Does that suggest to you

13 that he was trying to figure out which

14 data to use to flag suspicious orders for

15 indirect customers?

16         A.     Again, it's almost slang.  I

17 don't know what he -- he means by that.

18         Q.     And it suggests that you

19 were working with Dendrite in the last

20 sentence.  Do you see that?

21         A.     Yeah, I -- to me this looks

22 like he's -- he's trying to get his

23 budget in place to support the

24 enhancement.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    We'll have the next document

2   marked as Exhibit 7.

3              (Document marked for

4         identification as Exhibit

5         Allergan-Perfetto-7.)

6   BY MS. BAIG:

7        Q.    This is a document

8   Bates-stamped ALLERGAN_MDL_02459892

9   through 9895.  It begins as an e-mail

10  from you to Jinping McCormick and

11  Rachelle Galant dated February 14, 2012.

12       A.    Okay.

13       Q.    Do you recall there being a

14  procedure in place whereby orders were

15  first flagged as being ordered -- orders

16  of interest and then flagged as being

17  suspicious orders?

18       A.    Can I just go back to the

19  beginning of this, and see what's --

20  what's going on?

21       Q.    Sure.

22       A.    Because I haven't seen it in

23  six years.

24       Q.    Understood.

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Okay.

2     Q.    Do you recall there being a

3 tiered level of suspicious orders perhaps

4 one first being orders flagged as being

5 orders of interest before they were

6 flagged as being suspicious orders?

7     A.    I don't recall that as, you

8 know, as I'm sitting here now, I don't.

9     Q.    Okay.  Do you have -- if you

10 look at the second-to-last page at the

11 bottom, it's an e-mail from you to Ara

12 Aprahamian.

13     A.    Yep.

14     Q.    And he was the director of

15 pricing and contracts, correct?

16     A.    He was, yep.

17     Q.    And you say, "This is my

18 first shot at this."

19     A.    Yep.

20     Q.    The first bullet is,

21 "Utilize the ValueTrak system, Safe and

22 Secure system."  Is that a system for SOM

23 that was devised by ValueTrak, the

24 organization that you mentioned earlier?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.  To the best of my
2   knowledge as I sit here today, yes.
3        Q.    Okay.  Do you have any
4   recollection of what that system was?
5        A.    No, unless you show me some
6   more documentation.  Maybe I can refresh
7   myself.
8        Q.    And you see the next bullet
9   says, "Focus on products of interest."
10        A.    Okay.
11        Q.    Do you have an understanding
12   of what products were of interest?
13        A.    No.  I think this is just --
14   if I read this, in the way I wrote this,
15   it was kind of a framework, initial idea
16   of some process that I wanted to put
17   together.
18        Q.    Okay.  Do you know whether a
19   process like this was put together?
20        A.    I don't know.
21        Q.    Do you see the last bullet
22   refers to, "Calls with top wholesalers to
23   review retail customers of interest"?
24        A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you have an understanding

2    of whether a process like that was ever

3    put into place or not?

4    A.    I don't know but again this

5    looks like -- "this is my first shot at

6    this" means that I'm just throwing ideas

7    on a piece of paper.

8    Q.    Okay.  And do you see in

9    response, there's an e-mail from Ara

10   Aprahamian sent to you --

11   A.    Yep.

12   Q.    -- entitled -- with the

13   subject line "Safe and Secure"?

14   A.    Yes.

15   Q.    And this is February 10,

16   2012, correct?

17   A.    Yes.

18   Q.    And he says, "MP, think it

19   gets us started.  Here are some

20   suggestions/changes."

21   MP is Mike Perfetto, right?

22   A.    That's me.

23   Q.    Okay.  And he writes,

24   "Develop written SOPs to govern the

Highly Confidential - Subject to Further Confidentiality Review

1    functions and scope of suspicious order

2    monitoring."

3              Do you see that?

4         A.    Yep.

5         Q.    Do you understand from this,

6    that he was suggesting that the company

7    develop written SOPs to govern the

8    functions and scope of suspicious order

9    monitoring?

10        A.    I -- I don't know what --

11   what -- the subject matter has me

12   confused, Safe and Secure.  So I'm not

13   sure -- I'm not sure where -- what he was

14   referencing.

15             Again, these e-mails are not

16   as crystal clear right now.

17        Q.    If you go back to the very

18   first e-mail from you to him with the

19   subject line "Safe and Secure"?

20        A.    Yeah.

21        Q.    Do you see in the first

22   bullet point it says, "Utilize the

23   ValueTrak system," and then in parens it

24   says "Safe and Secure system"?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Okay.

2          Q.     Does that suggest to you

3    that the Safe and Secure system was the

4    SOM system that was -- that was provided

5    by the ValueTrak system?

6          A.     It appears that way.

7          Q.     And so then, on February 10,

8    2012, Ara Aprahamian is suggesting that

9    the company develop written SOPs to

10   govern the functions and scope of

11   suspicious order monitoring, correct?

12         A.     What he's suggesting.

13         Q.     Yes.  Is that right?

14         A.     He's suggesting changes.

15   "Here are some suggestions/changes to the

16   SOP."

17         Q.     Mm-hmm.  And the first one

18   says, "Develop written SOPs to govern the

19   functions and scope of suspicious order

20   monitoring, correct?

21         A.     He did.

22         Q.     And then it goes on to

23   state -- it goes on to break out two

24   categories.  One is on direct orders.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And the other is on retail

3  level, which means customers' customers,

4  correct?

5      A.    Yes.

6      Q.    Okay.  So for the direct

7  orders, he's suggesting that the company

8  use Cegedim-developed SOM model to flag

9  orders of interest daily.  Do you see

10 that?

11     A.    Yes.

12     Q.    Do you know whether that was

13 ever implemented?

14     A.    I'm sure it was part of the

15 enhancement program.  I don't know when

16 it was implemented, but I'm sure it was

17 part of the enhancement program.

18     Q.    And do you know who

19 implemented it?

20     A.    The enhancement team, the

21 cross-functional team that I've been

22 discussing.

23     Q.    Okay.  And did you see the

24 orders flagged?

1            MR. ROTH:  Object to form.

2            THE WITNESS:  As I sit here

3        today, you know, I can't recall if

4        somebody came to me when they

5        flagged orders.

6    BY MS. BAIG:

7        Q.    And but you see that it

8    says, it refers to flagging orders of

9    interest and not necessarily flagging

10   suspicious orders.

11            Do you see that?

12        A.    Go ahead, repeat that again.

13        Q.    Do you see that Bullet Point

14   1 says -- references flagging orders of

15   interest?

16        A.    Okay.

17        Q.    It doesn't reference

18   flagging suspicious orders.  And I'm just

19   wondering if you know the difference

20   between an order of interest and a

21   suspicious order?

22        A.    I don't.  We'd have to ask

23   Ara what he was -- what he was trying to

24   do with this e-mail.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    He goes on to suggest that

2   it be implemented that the company

3   investigate order of interest with input

4   from commercial team, document the

5   investigation and decision.

6          A.    Okay.

7          Q.    Right?

8          A.    I read that.

9          Q.    And he goes on to suggest

10   the company communicate with customer

11   service on order decision.

12                Do you see that?

13          A.    I do.

14          Q.    And then the fourth one

15   states, "Established letters/e-mails sent

16   to wholesalers and chains informing them

17   of our findings of order of interests (if

18   deemed suspicious)" --

19          A.    Okay.

20          Q.    -- "and/or limits of

21   quantities - compliance and marketing."

22          A.    Okay.

23          Q.    And then in parentheses it

24   says, "Established quantities only."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.     Yes.

3     Q.     So again, there's that

4  distinction between orders of interest

5  and suspicious orders, but you're not

6  sure what that means, correct?

7     A.     No.

8     Q.     Okay.

9     A.     That would be hard for me to

10  answer that question.

11     Q.     And then it goes on to the

12  second category, which is the retail

13  level, customers' customers, right?

14     A.     Yep.

15     Q.     And your understanding is

16  he's proposing SOM measures be

17  implemented for your customers'

18  customers, right?

19     A.     Yep.

20     Q.     And he's suggesting that you

21  utilize ValuTrak's Safe and Secure model.

22          Do you see that?

23     A.     I do.

24     Q.     And he also references a

1    daily analysis or focus on products of

2    interest and that that analysis might be

3    done by the compliance group.

4              Do you see that?

5         A.    I do.

6         Q.    You don't know whether that

7    was ever implemented or not, though; is

8    that right?

9         A.    Again, we would have to look

10   at documents like the SOP to see -- this

11   is his suggestions, and see if some of

12   these suggestions were approved and

13   implemented by the cross-functional team.

14        Q.    And do you see, if you go

15   down towards the end of the page, the

16   second-to-last paragraph.  He states,

17   "SOPs will need to be developed.  No big

18   thing.  Can be early or as we go along,

19   but must have everything documented."

20             Do you see that?

21        A.    I do.

22        Q.    All right.  So do you

23   understand from that, that in or about

24   February 2012, he was proposing that SOPs

Highly Confidential - Subject to Further Confidentiality Review

1    be developed?

2           A.    I agree.

3                 (Document marked for

4           identification as Exhibit

5           Allergan-Perfetto-8.)

6    BY MS. BAIG:

7           Q.    We'll have this document

8    marked as Exhibit 8.  And it's a document

9    that's Bates-stamped Allergan

10   ALLERGAN_MDL_02150276 through 2150293.

11   And it begins as an e-mail from you to

12   Doug Boothe dated March 31st, 2012.

13                Do you see that?

14          A.    Yeah.

15          Q.    And just take a moment to

16   page through it.

17          A.    Okay.

18          Q.    And do you see that it

19   starts as an e-mail chain, and then

20   there's a customer questionnaire form.

21   And then there appears to be a draft of

22   "Actavis suspicious order monitoring

23   indirect customer sales SOP."

24                Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     What page?

2     Q.     For the SOP, it's 02150289.

3     A.     Okay.

4     Q.     And so you see the draft

5  SOP, correct?

6     A.     Yep.

7     Q.     And the customer

8  questionnaire form, do you see that at

9  2150281?

10     A.     I see it.

11     Q.     And it appears from the

12  e-mail chain, does it not, that there was

13  an SOM meeting on March 28th -- sorry, on

14  March -- well, in March of 2012?

15     A.     It appears that this is a

16  part of the -- the improvement of the

17  SOP -- SOM process.

18     Q.     This was -- this was a

19  meeting that was held to that end; is

20  that right?

21     A.     Yes.

22     Q.     Okay.  And were you present

23  at the meeting?

24     A.     I don't recall.

1    Q.    Okay.

2    A.    Does -- does it say I was

3    present?

4    Q.    Actually, if you look

5    halfway down on the first page, it says

6    in attendance, Nancy Baran, Rachelle

7    Galant, and Umesh Solanki.

8         Do you see that?

9    A.    I wasn't.

10   Q.    You weren't present.  But

11   you received the minutes of the meeting;

12   is that right?

13   A.    I received this e-mail.

14   Q.    Okay.  And there's a section

15   on compliance agreement forms process.

16   Do you see that?

17   A.    What number, please?

18   Q.    The very first one on the

19   first page.  Compliance agreement forms

20   process.

21   A.    That little paragraph?

22   Q.    Mm-hmm.

23   A.    Okay.

24   Q.    Do you have an understanding

Highly Confidential - Subject to Further Confidentiality Review

1    of what the compliance agreement forms

2    were or what they -- what they were used

3    for?

4           A.    This -- this Michael is --

5    is Michael Clarke, not Michael Perfetto.

6    You --

7           Q.    Okay.

8           A.    Just to clarify that.

9           Q.    Okay.

10          A.    So he's your compliance

11   officer.  I've never -- I never -- nobody

12   ever calls me Michael in any -- I just

13   want to make sure that you were fully

14   aware of that.

15          Q.    I was not.  So thank you.

16          A.    Okay.  So he -- he would

17   have, I guess, drafted a form for then,

18   Michael Clarke, that was a compliance

19   agreement form.

20                Is it attached?

21          Q.    Well, I was going to ask

22   you, if -- if that's the form, the

23   customer questionnaire, which begins

24   three pages later, the compliance

Highly Confidential - Subject to Further Confidentiality Review

1    agreement form?

2         A.    Yeah, I -- I couldn't answer

3    that.

4         Q.    Actually, right before the

5    customer questionnaire, there is a

6    compliance agreement form.

7         A.    There is?  What page?

8         Q.    2150280.

9         A.    It's a heck of an e-mail.

10         Okay.

11         Q.    So do you know whether or

12    not the process was implemented whereby

13    you would use this compliance agreement

14    form?

15         A.    Let me just read the form

16    first.

17         Q.    Okay.

18         A.    And your question?

19         Q.    Do you know whether a form

20    such as this was ever adopted and used at

21    Actavis?

22         A.    I believe a form maybe not

23    quite like this.  But there was a --

24    there was -- there was a form, a

1   compliance agreement form, I believe.

2          Q.    That was adopted as a result

3   of -- of this meeting and potentially

4   other meetings around this time?

5          A.    As I recall sitting here, I

6   believe there was some sort of -- some

7   sort of a compliance form that was mailed

8   out to customers.  I don't know if the

9   wording is exactly like this wording.

10  You'd have to show me the -- the -- this

11  is a draft I believe, a reading, right --

12         Q.    Yeah, I think you're

13  right --

14         A.    -- of the enhancement

15  program?

16         Q.    I think you're right.

17  Because you can see that there are

18  comments noted on the right-hand side.

19         A.    Okay.  Okay.

20         Q.    So this was -- this

21  discussion, this e-mail and -- and the

22  circulation of these documents, was this

23  part of the process of enhancing the SOM

24  program so that it would apply to your

Highly Confidential - Subject to Further Confidentiality Review

1    customers' customers?

2         A.    I think this is a summary of

3    the cross-functional team, not just what

4    you're speaking of, but of the total

5    improvement of the SO -- SOM system.

6         Q.    Including an enhancement so

7    that it would apply to your customers'

8    customers, correct?

9         A.    It would -- it would improve

10   all aspects of the process.  It's an

11   update of the entire process.  We had a

12   process.  This is an update of the entire

13   process.

14        Q.    No, I understand that.  But

15   I'm wondering --

16        A.    Yeah.

17        Q.    -- if part of that update

18   was to expand the program so that it

19   would cover your customers' customers and

20   not just cover direct customers.

21        A.    I believe, and I can't

22   recall 100 percent, but I'm not sure I

23   can say that, because we -- we've -- we

24   may have had -- we may have had a system

Highly Confidential - Subject to Further Confidentiality Review

1    prior to this for the customers'

2    customers.

3            Q.    So you don't recall when the

4    program was expanded to --

5            A.    I don't.

6            Q.    -- include your customers'

7    customers?

8            A.    I don't.  Not -- not without

9    seeing some kind of document and maybe a

10   signed agreement with a consulting firm

11   or something.

12           Q.    Do you see on the second

13   page, under the first bullet and the

14   second arrow, do you see where it states,

15   "Finalize comprehensive list of customers

16   purchasing controls, (combining list

17   provided by Ara and IT, understanding is

18   that it will include both direct and

19   indirect)."

20               Do you see that?

21           A.    I do.

22           Q.    Does that suggest to you

23   that this -- the SOM program is being

24   expanded to include both direct and

Highly Confidential - Subject to Further Confidentiality Review

1    indirect customers?

2           MR. LUXTON:  Objection to

3        form.

4           THE WITNESS:  Again, it's an

5        enhancement program.  I can't make

6        the assumption that indirects were

7        not part of the SOM before without

8        seeing documentation.

9    BY MS. BAIG:

10       Q.    Do you know whether these

11   customer questionnaires were sent to all

12   customers?  And when I say these, I

13   don't -- I don't mean this particular

14   one, but the -- the final one, assuming

15   there was one?

16       A.    I wouldn't say all

17   customers, because we had -- we -- all --

18   I would say no to all customers.

19       Q.    Because why?

20       A.    Because some don't buy --

21   don't buy C-IIs.  Some don't buy -- some

22   of our customers didn't buy Rx product.

23   They just bought OTC items.  So it

24   depends on the customer.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know whether a form
2    like this was sent to all customers
3    that -- that bought Schedule II opioids?
4         A.    I would believe that this
5    was sent to customers that -- as part of
6    the improvement, that this was sent to
7    the customers that were buying the C-II
8    products.
9         Q.    After -- after it was
10   developed, correct?
11        A.    Yeah.  Again not -- I don't
12   know if this -- this is a draft.  I'm not
13   sure of the exact letter.
14        Q.    Understood.  And looking --
15   turning to the draft Actavis suspicious
16   order monitoring indirect customer sales
17   SOP.  Do you see that?
18        A.    What page?
19        Q.    2150289.
20        A.    I do.
21        Q.    And this appears to be
22   exactly what it says at the top, right,
23   an SOP developed for suspicious order
24   monitoring just for your indirect

Highly Confidential - Subject to Further Confidentiality Review

 1    customers; is that right?

 2         A.    That's what it reads.

 3         Q.    Okay.

 4         A.    It doesn't read the word

 5    "just" though.

 6         Q.    Right.  And if you turn to

 7    Page 2 at the bottom.

 8         A.    Okay.

 9         Q.    There's a section entitled

10    "Indirect customers buying high

11    quantities of controlled products."

12              Do you see that?

13         A.    Yes.

14         Q.    And it states that "Actavis

15    indirect customer sales will be monitored

16    through ValueTrak safe and secure module

17    or a comparable program on a monthly

18    basis."

19              Do you see that?

20         A.    Yes.

21         Q.    Is it your understanding

22    that -- that that was put into place?

23         A.    I believe we engaged

24    value -- ValueTrak.  I don't know when.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And it goes on to state that

2   "the sales will be monitored for higher

3   than average purchases of a single

4   product based on the previous three

5   months of purchases," correct?

6        A.    Yes.

7        Q.    And it goes on to state that

8   "if a pharmacy or individual store's

9   previous 30-day purchases exceeds

10  50 percent higher than their established

11  three-month average, notification will be

12  sent by Actavis to the point-of-sale

13  wholesaler or distributor highlighting

14  the current order quantity and historical

15  average."

16        Do you see that?

17       A.    Yes.

18       Q.    Do you recall that such

19  notifications were sent to your

20  customers?

21       A.    As I sit here today I

22  can't -- I can't testify that I recall us

23  sending those letters.  But this is

24  part -- if this was finalized, this is a

Highly Confidential - Subject to Further Confidentiality Review

1    draft.  They would have -- they would

2    have executed through it.

3         Q.    And do you notice this is a

4    little different than the one that we

5    looked at earlier that had a 50 percent

6    threshold for a six-month average?  This

7    is a 30-day, 50 percent threshold.  Do

8    you remember a shift?

9         A.    That was -- we were looking

10   at direct before.

11        Q.    I see.

12        A.    This is indirect.

13        Q.    Okay.  Do you see in the

14   very last paragraph --

15        A.    Of the document?

16        Q.    Of the next page.

17        A.    Okay.

18        Q.    There is a Section 10 that

19   says, "Reporting suspicious activity to

20   the DEA."

21        A.    Yes.

22        Q.    Were you ever involved in

23   reporting suspicious activity to the DEA?

24        A.    I wasn't personally.

1    Q.    Do you recall seeing reports

2    of suspicious activity to the DEA?

3    A.    Not as I sit here today.  I

4    probably wouldn't be -- we didn't -- we

5    as a commercial group didn't interact

6    with the DEA on an ongoing basis.

7    Q.    Do you know who, if anyone,

8    at Actavis interacted with the DEA?

9    A.    I'm sure people did, I don't

10   know who.

11   Q.    You don't know which

12   department or which individuals?

13   A.    Michael Clarke.  I mean,

14   he's your compliance person.  I'm sure

15   Kelly was probably involved.  I don't

16   know -- I don't know everybody in the --

17   on that sector of the business.

18   Q.    Okay.  But you had no

19   involvement and don't recall seeing --

20   seeing the reports?

21   A.    Yeah, I never -- I never

22   dealt with DEA.

23   Q.    Okay.  I'll have the next

24   document marked as Exhibit 9.

Highly Confidential - Subject to Further Confidentiality Review

1                (Document marked for

2          identification as Exhibit

3          Allergan-Perfetto-9.)

4    BY MS. BAIG:

5          Q.    This is a document

6    Bates-stamped ACQUIRED_ACTAVIS_01509414

7    through 9416.  It's an e-mail from Nancy

8    Baran -- to Nancy Baran --

9          A.    Okay.

10         Q.    -- sent September 21st,

11   2012.

12                Do you see that?

13         A.    I do.

14         Q.    And it states at the top,

15   "SOM training completed."

16                Do you see that?

17         A.    I do.

18         Q.    And then it states, "In

19   attendance, Michael Perfetto," a few

20   lines below.

21                Do you see that?

22         A.    I see that.

23         Q.    Do you -- do you recall

24   completing your SOM training in or about

Highly Confidential - Subject to Further Confidentiality Review

1    September of 2012?

2         A.    I don't recall it, but, I

3    mean, I'm sure this document says that I

4    was at this meeting.

5         Q.    Okay.  So you don't have any

6    reason to doubt that?

7         A.    No.

8         Q.    Okay.  And if you look to

9    the very bottom of the page, in the last

10   paragraph it says, "About one year ago

11   engaged Cegedim Compliance Solutions.

12   Implemented an enhanced statistical model

13   into our order management system."

14             Do you see that?

15        A.    Yep.

16        Q.    Does that suggest to you

17   that that change took place in or about

18   September of 2011?

19        A.    It suggests that.

20        Q.    It goes to state that, "The

21   model was developed based on an extensive

22   review/analysis of historical data.

23   Series of mathematical calculations

24   provides an overall score based on a

Highly Confidential - Subject to Further Confidentiality Review

1    number of order

2    characteristics/attributes."

3         A.    Right.

4         Q.    "Each has different

5    significance/importance.  Output is the

6    system recommends orders of interest."

7              Do you see that?

8         A.    Yep.

9         Q.    Does that suggest to you

10   that the new program that was implemented

11   flagged orders of interest?

12        A.    It does, but I don't know

13   how you define "interest."

14        Q.    Okay.  Who would you ask at

15   Actavis if you wanted to know that?

16        A.    Nancy.

17        Q.    Okay.

18        A.    Baran.

19        Q.    Can you read the next

20   paragraph to yourself for a moment.  Does

21   this refresh your recollection as to

22   whether or not this program was ever

23   implemented or not?

24        A.    I believe parts of the

Highly Confidential - Subject to Further Confidentiality Review

1    enhancement system were implemented.  I'm

2    not sure because this is getting towards

3    the end of my career at Actavis, what was

4    actually -- I can't answer if it was

5    100 percent implemented.  But I'm sure

6    the enhancements -- some of the

7    enhancements were implemented.

8         Q.    But the specific one that's

9    being discussed here, being the Cegedim

10   Compliance Solutions enhanced statistical

11   model --

12        A.    Right.

13        Q.    -- it's unclear to me from

14   reading this e-mail whether that ever was

15   implemented or not.  And I'm just

16   wondering if you know?

17        A.    I wouldn't know, but Nancy

18   would know, because she was the head of

19   the cross-functional team.  She also

20   stayed on with Watson after I left.  So

21   she would know what it was.

22        Q.    And then if you move down a

23   little bit, a few paragraphs, it says,

24   "Plan is such that we will continue to

Highly Confidential - Subject to Further Confidentiality Review

1    run the old SOM model for a few weeks."

2         A.    Okay.

3         Q.    "We start officially using

4    the new model in full test/parallel mode

5    on Monday."

6         A.    Okay.

7         Q.    "The model is doing

8    everything it would except it is not

9    physically holding the orders, so that

10   gives us an opportunity to warm up and

11   not impact our operations with slower

12   than normal order releases.  Plan to

13   fully go live by mid-October."

14        A.    Okay.

15        Q.    Do you see that?  Were you

16   there in mid-October still?

17        A.    I was.  I left the end --

18   the end of December.

19        Q.    2012?

20        A.    Yes.

21        Q.    Okay.  But you're not sure

22   whether it went live by mid-October or

23   not; is that right?

24        A.    Yeah.  Without seeing an

Highly Confidential - Subject to Further Confidentiality Review

1  announcement or something that said, you

2  know, our new, improved system is

3  implemented.

4       Q.   Do you know who Michael

5  Schmylik (ph) is?

6       A.   I do not.

7            (Document marked for

8            identification as Exhibit

9            Allergan-Perfetto-10.)

10 BY MS. BAIG:

11      Q.   I'll have this document

12 marked as Exhibit 10.  This document is

13 Bates-stamped ACQUIRED_ACTAVIS_00968401

14 through 968404.

15           But I'll note for the record

16 that it's -- a multi-page PowerPoint is

17 attached to the e-mail.  And each page of

18 that PowerPoint has the same Bates stamp,

19 968404.

20           All right.  Do you see this

21 is an e-mail attaching a PowerPoint

22 entitled "Suspicious Order Monitoring,

23 Morristown, New Jersey"?

24      A.   Mm-hmm.

1    Q.    And what's in Morristown,

2    New Jersey?

3    A.    That's where Actavis had

4    their corporate office.

5    Q.    And do you know who created

6    this presentation?

7    A.    I do not.

8    Q.    Did you create -- do you

9    know if you created it?

10   A.    I did not.

11   Q.    You know that you didn't or

12   you're not sure?

13   A.    I'm 100 percent sure that I

14   didn't create this.

15   Q.    You did not create this?

16   A.    No.

17        MR. ROTH:  Just so the

18        record's clear, I think there's a

19        few presentations that are in

20        there.

21        THE WITNESS:  Oh, there is,

22        sorry.

23        MR. ROTH:  There's one 403

24        and one is 404.  It looks like two

Highly Confidential - Subject to Further Confidentiality Review

1    different decks.  Yeah, and they

2    have different dates on them.

3         THE WITNESS:  Yeah, one is

4    '11.

5         MS. BAIG:  Where does your

6    second one start?

7         MR. ROTH:  0968404 and the

8    other one is 403.  The first

9    presentation has got 13 pages.

10   The second one looks like it has

11   also 13 pages.  And the cover

12   e-mail references both of these as

13   being attached.

14   BY MS. BAIG:

15        Q.    So the first one you have is

16   entitled "Suspicious order monitoring,

17   Morristown, New Jersey," correct?

18        A.    What -- what's the date on

19   the front page?

20        Q.    October 26, 2012.

21        A.    Okay.  That's the date that

22   you want to focus on?

23        Q.    Yes.  Okay.  Great.  We've

24   got two presentations.  One is dated

1    October 26, 2012, and one is dated

2    October 26, 2011.  Do you see that?

3           A.    I do.

4           Q.    Okay.  Why don't we start

5    with the first attachment, which is

6    October 26, 2012.

7                 And you said you didn't --

8    you don't know who created this.  Do you

9    know who created the other one?

10          A.    I don't.  But it doesn't --

11   I don't.  I don't -- nobody seems to

12   have -- it could have been a

13   cross-functional team.

14          Q.    But it was sent to you from

15   Rosemarie Casilli, correct?

16          A.    Right.  She was the -- she

17   was my admin for the department.  So it

18   could have been -- again, it could have

19   been a cross-functional team between

20   compliance, Nancy, Jinping.  I don't

21   know.  I'd be guessing.

22                Nobody -- nobody put their

23   author -- usually you would put something

24   here.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And do you see on the

2    second page of the first presentation?

3    A.    Yep.

4    Q.    It says -- there are a

5    number of bullets.  Is it your

6    understanding that these are bullets that

7    were part of the SOM process?

8    Or what is your

9    understanding of what this PowerPoint is,

10   if you have one?

11   A.    I don't know what it is.  It

12   could even be that training.  I -- I

13   don't know.  I -- I don't -- it's an

14   update of suspicious order monitoring --

15   Q.    Okay.

16   A.    -- to give to somebody.  And

17   this deck doesn't say who was in the

18   meeting.

19   Q.    Okay.

20   A.    So I'm not even sure if this

21   was presented.

22   Q.    Okay.  And you see, on the

23   first page of the first presentation,

24   first substantive page.  It says, "Know

Highly Confidential - Subject to Further Confidentiality Review

1    your customer initiative"?

2          A.    Yes.

3          Q.    Are you familiar with what

4    that initiative was?

5          A.    I -- I lost your page.

6    Where -- where are you?

7          Q.    Do you see the presentation

8    that begins October 26, 2012?

9          A.    Yes.

10         Q.    And if you flip to the first

11   substantive page there.

12         A.    Oh, "know your customers"

13   initiative?

14         Q.    Mm-hmm.

15         A.    Okay.

16         Q.    Do you know what that

17   initiative was?

18         A.    I don't.  Maybe it's

19   described in here.  I don't know.

20         Q.    Do you know whether that

21   initiative was prompted by meetings that

22   you had with the DEA that suggested that

23   you should know your customer's customer?

24                MR. LUXTON:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                THE WITNESS:  I don't see

3          how you get to know your customer

4          from that.

5     BY MS. BAIG:

6          Q.    Okay.

7          A.    I -- whoever put this deck

8     together would have to define that to me.

9          Q.    Okay.  But you don't have

10    any recollection of it?

11         A.    No.

12         Q.    And do you have a

13    recollection of the difference between

14    the direct SOM process and the indirect

15    SOM process there?

16         A.    I understand the basics of

17    how the suspicious order monitoring

18    worked for direct and how it worked for

19    indirect.

20         Q.    What was the -- what was the

21    difference?

22         A.    The direct -- the suspicious

23    order monitoring system on direct

24    monitored incoming direct orders and

Highly Confidential - Subject to Further Confidentiality Review

1  had -- had a whole system that tracked

2  the Cardinals of the world, the Walgreens

3  of the world, and how they are ordering,

4  and used our orders as a basis.

5          The indirect used value --

6  whatever it was.

7      Q.    ValueTrak?

8      A.    ValueCentric or whatever it

9  is.  So they used a more technical system

10  to track the -- it's more -- it's a lot

11  more complicated in my mind because

12  there's more indirect customers.

13      Q.    Do you know whether they

14  used Actavis' chargeback data to track

15  the indirect SOMs?

16      A.    I'm not as IT smart enough

17  to know whether this ValueTrak uses your

18  chargeback as a basis.  I -- I believe it

19  does, but I'm not -- you'd have to ask an

20  IT guy like Umesh that.

21      Q.    And if you turn to the next

22  page you see there's some language with

23  respect to the Controlled Substances Act.

24  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Do you have a -- a

3  recollection of having a basic

4  understanding of what the Controlled

5  Substances Act was at or about this time?

6    A.    At -- at that time I would

7  have been in meetings, I would have had

8  an understanding.  Today I don't, but at

9  that time I probably would have a general

10  understanding of -- of it.

11    Q.    And do you see on the next

12  page there's a discussion of the enhanced

13  SOM systems and processes?

14    A.    I do.

15    Q.    And then there's the "know

16  your customer" due diligence.  Do you see

17  that?

18    A.    I do.

19    Q.    And did you have an

20  understanding of what that due diligence

21  process was?

22    A.    I'm sure there was an SOP

23  for new customers that was developed as

24  part of this enhancement.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you see the next item

2    is know your customers' customer?

3        A.    I -- I see that.

4        Q.    And what was your

5    understanding as to how you were supposed

6    to know your customers' customers, if you

7    had one?

8        A.    By utilizing the -- the SOM

9    ValueTrak, or ValueCentric.  I forget the

10   actual name -- people change their names.

11   Utilizing that system to track the

12   customers' customers.

13       Q.    And to track specifically

14   what -- how many -- how many pills and

15   whether -- how many pills were being

16   ordered and whether those orders were

17   suspicious?

18       A.    To track I think -- I don't

19   know the specifics.  But to -- to track

20   orders of the indirect purchases.

21       Q.    To see whether or not they

22   were excessive or not; is that right?

23           MR. LUXTON:  Objection.

24           THE WITNESS:  We'd have to

Highly Confidential - Subject to Further Confidentiality Review

1          look at the -- we'd have to look

2          at the final SOP and it would --

3          would specifically say that, what

4          it was.

5     BY MS. BAIG:

6          Q.    Is it your understanding

7     that this is -- that this is a summary of

8     the final SOP dated October 26, 2012?

9          A.    I don't know what -- I don't

10    know what this was meant for.

11         Q.    And it says under Item 4,

12    "Develop SOPs, processes, best

13    practices," right?

14         A.    Yeah.  Yeah.

15         Q.    Does that suggest to you

16    that they are still developing the SOPs

17    for SOM?

18              MR. ROTH:  Object to form.

19              THE WITNESS:  Again, it --

20         there -- there may have been some

21         SOPs, but there's always a

22         constant improvement of the

23         system.  So I'd be -- I'd be

24         really guessing to answer that

Highly Confidential - Subject to Further Confidentiality Review

1                question.

2    BY MS. BAIG:

3         Q.    So looking at the next page,

4    there's a box that is labeled SOM

5    steering committee.  Do you see that?

6         A.    Yep.

7         Q.    Were you on the steering

8    committee?

9         A.    I believe so.

10        Q.    And do you see under the

11   "know your customer" box?

12        A.    Yep.

13        Q.    It says, "New customer

14   approval process."

15              Do you know what that

16   process was?

17        A.    As I sit here today, I

18   don't.  But if you showed me the SO --

19   the final SOP, I'm sure there'd be

20   something in there regarding this matter.

21        Q.    If you go two bullets down

22   in that same box, do you see where it

23   says, "Monitor indirect sales, know your

24   customers' customer, ValueCentric, EDI

Highly Confidential - Subject to Further Confidentiality Review

1    data at aggregate level"?

2          A.    Yes.

3          Q.    Does that refresh your

4    recollection that it was, in fact,

5    ValueCentric and the EDI data that was

6    being used for this?

7          A.    That's what it's saying

8    here.

9          Q.    Do you have any recollection

10   of ever looking at suspicious orders

11   and -- and making decisions as to whether

12   or not those orders' shipments ought to

13   be halted for any of your customers?

14                MR. ROTH:  Object to form.

15                THE WITNESS:  I mean, as I

16          sit here today, I don't remember

17          doing that, but it -- I'm sure,

18          that's probably an e-mail or some

19          kind of document -- I'm sure, if I

20          got involved and it was elevated

21          to me, I would make the decision.

22   BY MS. BAIG:

23          Q.    But you don't remember any

24   that were so big that you can remember

1   off the cuff right now?

2          A.    You know, not -- not from --

3   if I had documentation and we could --

4   and we could see the chain I would -- I

5   would be able to answer that question.

6   But as I sit here today, I can't.  I

7   can't remember what I did in 2012 or '11

8   or '10.

9          Q.    If you turn to Page 9 of

10  that same PowerPoint.  There's an OI

11  summary by product group.  Do you know if

12  OI stands for orders of interest?

13         A.    I never used that term.  So

14  I -- I would -- it's not a term that I

15  ever used.

16         Q.    And looking at this, at this

17  chart here with the lines graph and

18  dollars graph, do you have an

19  understanding of what this is or you

20  don't?

21         A.    I mean lines are orders,

22  I -- I would -- don't know, I'd be

23  guessing.  This is like customer

24  service-type language.

1    Q.    So you -- you don't

2  understand what this chart is -- is being

3  used to convey?

4    A.    Not well enough under oath

5  to talk about it.

6    Q.    Well, I'm just asking

7  what -- how you would read this chart,

8  given your lengthy career?

9         Do you have a way of reading

10  this chart, or you -- you don't

11  understand what this means?

12    A.    It's an odd chart, the first

13  chart.  Because it's on -- on the one

14  side it doesn't even have a graph.  I

15  think it's just showing, of our total

16  lines -- of our total lines, meaning our

17  total orders, this is the percentage of

18  orders -- orders that -- orders of

19  interest.  OI, I presume, is orders of

20  interest.

21    Q.    The highest being fentanyl

22  patch, correct?

23    A.    That's correct.

24    Q.    And the second highest being

Highly Confidential - Subject to Further Confidentiality Review

1  morphine sulfate?

2          A.    That's right.

3          Q.    And the third highest being

4  oxycodone, correct?

5          A.    Yes.

6          Q.    And the chart underneath

7  shows what?

8          A.    It looks like dollars.

9          Q.    And that would be dollars

10  for the orders of interest?

11          A.    Yes.

12          Q.    And so you have -- for the

13  fentanyl patch -- I mean, it says

14  dollars, but it's showing percentages.

15  Do you understand what this is conveying?

16          A.    To me, this -- this bucket

17  is just showing you, of these products,

18  what percentage -- which mixed

19  amphetamine had 45 percent of the dollars

20  of the orders.

21          Q.    So looking at fentanyl

22  patch, 26.23 percent of the dollars

23  ordered for fentanyl patch were orders of

24  interest; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't read it that way.

2    Q.    How do you read it?

3    A.    I read it, of the whole

4  basket, but I could be totally wrong.  I

5  didn't put this presentation together.

6  We have to ask whoever put this together

7  what they meant.  It's really not

8  depicted correctly.

9    Q.    So fentanyl -- fentanyl

10  patch is showing 26.23 percent of total

11  dollars, correct?

12    MR. ROTH:  Objection.  Lacks

13    foundation.  Calls for

14    speculation.

15  BY MS. BAIG:

16    Q.    Again, I -- well, if you

17  look at the second line under the

18  heading, it says -- look at the heading.

19  It says, "OI summary by product group."

20  The first line says, "Percent of total

21  lines," which we've already discussed.

22  The second one says, "Percent of total

23  dollars," correct?

24    A.    Okay.

1    Q.    I think what you've

2  suggested is you're unclear as to what

3  the total dollars are, right?

4    A.    I am.

5    Q.    Okay.  But we can look at

6  fentanyl patch and see that, at least as

7  reflected on this chart, 26.23 percent of

8  total dollars, whatever that is, were

9  orders of interest.  Is that how you read

10  this?

11    A.    No, I don't.

12    Q.    How do you read it?

13    A.    I read it as 26 percent of

14  the dollars of all these products.  But

15  again, I didn't put this slide together.

16    Q.    I see.  The 26 percent of

17  the dollars of all of these products --

18    A.    That's how I read it.

19    Q.    -- were fentanyl patch

20  orders of interest?

21    A.    That's how I read it.  But

22  I'm not an expert on this.  I didn't put

23  this slide together.

24    Q.    And the next page shows an

Highly Confidential - Subject to Further Confidentiality Review

1    order of interest summary by customer

2    family?

3            A.    Okay.

4            Q.    According to the heading,

5    correct?

6            A.    Mm-hmm.

7            Q.    And again, we have percent

8    of total lines and percent of total

9    dollars, correct?

10           A.    Yep.

11           Q.    Does this suggest to you on

12   the first chart that AmerisourceBergen

13   has the second highest percent of total

14   lines that were flagged as orders of

15   interest?

16               MR. PORTER:  Object to form.

17               THE WITNESS:  I'm really not

18          prepared to answer, because I

19          don't know what -- both of us are

20          struggling -- whoever did this, is

21          using as a basis.

22               It's a little confusing to

23          me.  Somebody would have to walk

24          me through this to explain it to

Highly Confidential - Subject to Further Confidentiality Review

1       you, you know?

2  BY MS. BAIG:

3       Q.    In any event, it's an order

4  of interest summary by customer family,

5  correct?

6       A.    That's what it appears to

7  be.

8       Q.    Broken down by percent of

9  total lines and percent of total dollars,

10  correct?

11       A.    Total lines and total

12  dollars, yes.

13       Q.    And does this suggest to

14  you, looking at the second chart, that

15  McKesson Drug had -- actually, is it

16  46.31 percent of total dollars were

17  orders of interest, correct?

18            MR. ROTH:  Objection to

19       form.

20            MR. LUXTON:  Objection to

21       form.

22            THE WITNESS:  Again, I --

23       you'd have to -- you'd have to see

24       how -- how, whoever developed

1    this, whether it was marketing or

2    customer service, or a combination

3    of fewer people -- they don't give

4    you -- without being here and

5    explaining it, it's hard to

6    speculate what they use as a

7    reference.

8         The mix of the products

9    could reflect a change in the

10   percentage as dollars.  So I would

11   be -- I would be total --

12   totally -- this is totally out of

13   my realm to discuss this without

14   an expert that put the slides

15   together.

16   BY MS. BAIG:

17        Q.    Well, you do see that

18   McKesson Drug is identified as having

19   46.31 percent of total dollars, correct?

20        A.    I see that fact, yes.  I

21   don't know what it means.

22        Q.    And do you see that Cardinal

23   Health is identified as having, I

24   believe, 48.21 percent of total dollars?

1          Do you see that?

2          A.    If that's the case, the

3    Cardinal -- the Cardinal blue -- blue

4    bucket should be higher than the McKesson

5    bucket.

6          Q.    Maybe it's 43 -- it's hard

7    to read it.

8          A.    Okay.

9          Q.    But it's -- maybe it's

10   43.21 percent.

11          Do you see that?

12          A.    Yep.

13          Q.    Making McKesson Drug the

14   biggest one; is that right?

15          A.    They're the biggest

16   wholesaler.

17          Q.    And if you look to the next

18   page, you see the orders of interest

19   summary by reason code.

20          A.    Okay.

21          Q.    And it looks like it appears

22   to be a breakdown --

23          A.    Yep.

24          Q.    -- based on six-month total.

1   You have a number of categories at the

2   bottom, right?  You've got the six-month

3   total is above historic average, and it

4   tells you the percentage for which that's

5   the case, correct?

6          A.    Yes.

7          Q.    And then you have the 12

8   monthly total is above historic average.

9   And it tells you the percentage is

10  19.46 percent, correct?

11         A.    I am just reading what

12  you're reading.

13         Q.    Is that how you read it?

14         A.    That's what I read here.

15         Q.    Okay.  And then you have the

16  six-month total is above projected amount

17  at 14.25 percent, correct?

18         A.    Yes.

19         Q.    And then you have a 12

20  monthly total is above projected amount

21  at 8.6 percent.

22              Do you see that?

23         A.    Yes.

24         Q.    And then you just have just

Highly Confidential - Subject to Further Confidentiality Review

1    frequent ordering at 3.1 percent.

2              Do you see that?

3         A.    I do.

4         Q.    Do you understand why this

5    chart was put together?

6         A.    It's a summary of -- by

7    reasons, reason code.

8         Q.    And do you understand for

9    what purpose this chart was put together?

10        A.    Not 100 percent, because I

11   don't know who -- what they use -- we're

12   not sure what this -- what this deck was

13   used for.

14        Q.    Does this chart suggest to

15   you that depending on whether you use a

16   six-month average or a 12-month average

17   as your base for determining orders of

18   interest, it -- the number of orders of

19   interest will change?

20        A.    I don't know.

21        Q.    Looking at the second

22   PowerPoint that's attached to this

23   exhibit, dated October 26, 2011.

24        A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do you see on the first page

2  there's an addendum?

3      A.    Yeah.

4      Q.    And do you see at 10:30 to

5  11:15 it states, "Knowing your customers'

6  customer, DEA requirement."

7      A.    Yes.

8      Q.    Do you recall that being a

9  DEA requirement?

10     A.    I don't -- I don't -- as we

11  sit here today, I don't know if it was a

12  DEA requirement, without seeing the DEA

13  regs.

14     Q.    And looking at the next

15  page, does this suggest to you that you

16  were at this meeting?

17     A.    This suggests that I was

18  there.

19     Q.    Okay.  And do you see

20  there's two -- there are two persons

21  identified under Cegedim Compliance

22  Solutions, Robert C. Williamson and

23  Jonathan Kuhn?

24     A.    I do.

1    Q.    Now that you've seen those

2  names, does that reflect your --

3  reflect -- refresh your recollection that

4  those were the individuals that were

5  involved from Cegedim?

6    A.    They were at this meeting.

7    Q.    Do you remember them now

8  that you see their names, or no?

9    A.    I remember the PharmD.  I

10  don't remember the other gentleman.

11    Q.    You remember Jonathan Kuhn?

12    A.    Jonathan Kuhn?

13    Q.    Is that the one that you

14  remember?

15    A.    I don't remember.  I knew

16  somebody had a really -- like -- you

17  don't meet many Ph.D.s, so I remember

18  meeting -- I don't remember the actual

19  face.  I remember somebody from that

20  group had a -- I was impressed.  Somebody

21  impressed me with the fact that they had

22  a Ph.D. in physics, or mathematics or

23  something.  So I was impressed that they

24  brought that level of quality person to

Highly Confidential - Subject to Further Confidentiality Review

1    our meeting.

2         Q.    And do you remember anything

3    about his presentation, if there was one?

4         A.    Not as I sit here today.

5    I'm sure if I reviewed this deck, I

6    may --  may understand it.

7         Q.    If you look to Slide 6 of

8    this deck.

9         A.    Yep.

10        Q.    You see suspicious order

11   validation logic.

12             Do you recall SOVL being a

13   thing at Actavis?

14        A.    I -- I don't remember that

15   term.

16        Q.    Okay.  If you look at the

17   right side of this flowchart, you see --

18   well, moving from the bottom up to the

19   top of the right side you see that

20   there's a formula by which it appears

21   certain issues are being -- certain

22   orders are being flagged as orders of

23   interest.  Is that how you read this?

24        A.    I do see "deemed as order of

Highly Confidential - Subject to Further Confidentiality Review

1    interest."

2         Q.    Okay.  And it suggests that

3    that formula is being applied to the

4    total orders in order to flag certain

5    orders as orders of interest; is that

6    right?

7         A.    That's what it appears to

8    be.

9         Q.    And then -- and then a hold

10   was being placed to investigate and

11   document, correct?

12        A.    I -- I don't know if this is

13   an actual procedure or is this a

14   suggestion or a plan at this -- I don't

15   know what this -- again, does it say what

16   the meeting was?

17              So I'm not sure whether this

18   is Dendrite's plan to us or Actavis

19   showing what we have currently.  I'm not

20   sure.

21        Q.    All right.  So you don't

22   have an independent recollection that

23   this was the process in place, correct?

24        A.    No.  It could have been,

1    I -- I don't know.

2         Q.    You don't know one way or

3    the other.  Okay.

4              If you look at Slide 12, the

5    second to last slide?

6         A.    Yep.

7         Q.    Do you see under adequate

8    controls, it says, "Orders of interest

9    status is not visible during order

10   entry"?

11        A.    I do.

12        Q.    And that it -- orders of

13   interest status cannot be applied

14   manually?

15        A.    I do.

16        Q.    And do you know -- do you

17   know how orders of interest status worked

18   at all at Actavis when you were there?

19        A.    I do not.

20        Q.    Okay.

21             MR. LUXTON:  Can we take a

22        break before you go to the next

23        document?

24             MS. BAIG:  Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. LUXTON:  Thanks.

2          THE VIDEOGRAPHER:  Stand by,

3     please.  The time is 2:32 p.m.

4     Going off the record.

5          (Short break.)

6          THE VIDEOGRAPHER:  So we are

7     back on the record.  The time is

8     2:53 p.m.

9          MS. BAIG:  I'll have the

10    next document marked as

11    Exhibit 11.

12          (Document marked for

13    identification as Exhibit

14    Allergan-Perfetto-11.)

15  BY MS. BAIG:

16     Q.    Do you recall there ever

17  being a question in your mind as to

18  whether or not suspicious order

19  monitoring applied to your indirect

20  customers?

21     A.    Is this in reference to

22  this?

23          MR. LUXTON:  Objection to

24    form.

Highly Confidential - Subject to Further Confidentiality Review

BY MS. BAIG:

Q.    Well, before we get to that.

A.    I was like -- excuse me.
Can I get -- sorry.

Q.    Do you recall there ever
being a question in your mind or a
discussion at work as to whether or not
suspicious order monitoring applied to
your indirect customers?

MR. LUXTON:  Objection to
form.

THE WITNESS:  Answer it
again.  Because I'm trying -- I'm
trying to -- you got me going on
this.  I started reading that.  So
I had my mind half on that.  Go
ahead.

BY MS. BAIG:

Q.    Do you recall --

A.    Yeah.

Q.    -- whether or not there was
ever a question as to whether or not
suspicious order monitoring should be
applied to your indirect customers?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Do I recall?  As I sit here

2  today, you know, I don't -- I don't

3  recall discussions about that.  Could

4  have been.  I just don't remember.

5    Q.    Okay.  So if you look at the

6  document that's been marked as

7  Exhibit 11.  It appears to be an e-mail

8  from Terri Nataline to you and Jinping --

9    A.    Okay.

10    Q.    -- McCormick.  Subject is

11  "Suspicious Order."  Date is April 8,

12  2011.  She states to you, "We don't need

13  to monitor to the retail level."

14         Do you see that?

15    A.    I do.

16    Q.    And your response was,

17  "Good," and you forwarded it on to Ara

18  Aprahamian and Nancy Baran, correct?

19    A.    Yes.

20    Q.    Do you take from this that

21  your understanding at that time, in or

22  about April of 2011, was that suspicious

23  order monitoring did not need to be

24  conducted at the retail level?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't know what Terri is

2  using as a -- she was VP of regulatory, I

3  believe.  And I'm not sure what she was

4  using as her reference.  Was it a

5  regulatory policy, you know, just to look

6  at one e-mail and to make that decision.

7    Q.    Sure.  But the subject is

8  "Suspicious Order," correct?

9    A.    Yes.

10    Q.    And she states, "We don't

11  need to monitor to the retail level."

12          Was that your understanding

13  at that time?

14    A.    That's what Terri is saying.

15    Q.    Right.  Did you have that

16  understanding at that time?

17    A.    I don't know what I had

18  in -- I don't know where I was on that

19  point, I'll be honest with you, in 2011.

20    Q.    But your response was,

21  "Good," correct?

22    A.    Good.  I don't know even

23  what I --

24    Q.    You don't know what you

Highly Confidential - Subject to Further Confidentiality Review

1   meant by that?

2        A.    "Good" meaning that she

3   replied to me?  "Good" I'm okay?  I'm not

4   sure what I meant.

5             (Document marked for

6        identification as Exhibit

7        Allergan-Perfetto-12.)

8   BY MS. BAIG:

9        Q.    I'll have this document

10  marked as Exhibit 12.

11            It's a document

12  Bates-stamped ACTAVIS_0632024 through

13  2027.

14            It starts as an e-mail from

15  Michael Perfetto to Michael Dorsey cc'g

16  Rachelle Galant, in or about -- dated

17  November 16, 2010.

18       A.    Okay.

19       Q.    Subject line is "Oxycodone

20  IR Tabs, Outstanding Orders By Customer."

21            Do you see that?

22       A.    Yep.

23            MR. ROTH:  And just so the

24       record is clear, so Exhibit 12 has

1          an Actavis Bates stamp, and

2          there's no confidentiality

3          designation.  We have reproduced

4          all of those with Allergan Bates

5          stamps with confidentiality

6          designations so we don't have to

7          do this on the record, we'll swap

8          out the exhibits afterwards so

9          that the properly denoted

10          confidentiality designation lives

11          on the deposition exhibit.

12               MS. BAIG:  We can take that

13          up when we have an opportunity to

14          see what you want to swap it out

15          with.

16               MR. ROTH:  Okay.

17     BY MS. BAIG:

18          Q.   Now, if you look to the

19     bottom of the first page, do you see in

20     the e-mail from Rachelle Galant to you

21     and others, she's providing a snapshot of

22     the current order status of your

23     customers on oxycodone IR 15-milligram

24     and 30-milligram tablets?

1           Do you see that?

2      A.    I see it.

3           MR. ALLEGAERT:  Put the

4      whole thing up.

5  BY MS. BAIG:

6      Q.    And she goes on to state

7  that, "Below shows the following

8  customers that have open orders that

9  exceed their normal monthly ordering

10  pattern on either the 15-milligram,

11  30-milligram, or both."

12           Do you see that?

13      A.    I do.

14      Q.    And down below, there's a

15  series of numbers.

16      A.    Is this the attachment?

17      Q.    She says below and then

18  underneath the e-mail, you see that

19  there's a series of numbers.

20           Do you see that?

21      A.    No.  I see -- I see an image

22  attachment on the -- on the front of the

23  e-mail.  I was wondering where that was.

24      Q.    I don't know.  This document

Highly Confidential - Subject to Further Confidentiality Review

1   was produced to us like this.

2         A.    Okay.

3         Q.    All I can say is that in the

4   e-mail she states that below -- "Please

5   see below for a snapshot of the current

6   order status."

7          Do you see that?

8         A.    I see that.

9         Q.    And do you see the numbers

10  below that show, for example, oxy IR

11  15 milligrams, oxy IR 30 milligrams, and

12  there's a designation received, open

13  received, open.  And then there's Bellco.

14  144, 360, 408, 648.

15        Do you see that?

16       A.    I do.

17       Q.    Do you understand what --

18  what this is conveying?

19       A.    It's messed up.  I don't --

20  because it's messed up.  If it was in an

21  organized chart, I could probably figure

22  it out.  But it looks like you have four

23  numbers and there's only two SKUs on top.

24  So I'm not sure why this got jazzed up

Highly Confidential - Subject to Further Confidentiality Review

1    when she printed it.  I think there -- it

2    looked like there was an image, is what I

3    look on the front here.

4              MS. BAIG:  Again, I guess I

5         would ask counsel to take a look

6         at this document and just see if

7         it was produced in a way that was

8         not the way that it was initially

9         kept.

10             MR. ROTH:  We'll take a look

11        at it.

12             MS. BAIG:  Thank you.

13   BY MS. BAIG:

14        Q.    And do you see on Page 2, in

15   the paragraph that begins, "My plan right

16   now"?

17        A.    Yep.

18        Q.    She states, her plan right

19   now is, "To ship the next monthly order

20   to all customers who have outstanding

21   orders on December 1st up to the amount

22   that is their normal monthly order."

23        A.    Okay.

24        Q.    "If customers have open

1    orders in excess of their normal monthly

2    order, then we will ship out the next

3    monthly allocation on January 4th."

4              Do you see that?

5         A.    Yep.

6         Q.    Is it your understanding as

7    to whether -- is it your understanding

8    that that was the process in place for

9    shipping excessive orders?

10        A.    I wouldn't -- I wouldn't

11   know that.

12        Q.    You don't know whether the

13   process in place at that time was to wait

14   a month and then ship the excessive

15   orders?

16              MR. LUXTON:  Objection to

17         form.

18              THE WITNESS:  I -- I don't

19         know the -- I didn't write this

20         e-mail, so it's hard for me to

21         know.  She didn't write the

22         history.  It looks like we had a

23         backorder.

24              So if you read this, it's

Highly Confidential - Subject to Further Confidentiality Review

1          backorders.  So she's allocating

2          based on a back order.

3                  So this is -- this is why

4          this e-mail is sent.

5  BY MS. BAIG:

6          Q.    You don't know whether or

7  not that was your process in place at the

8  time or not; is that right?

9                  MR. LUXTON:  Objection to

10         form.

11                 THE WITNESS:  Process in

12         place for what?

13  BY MS. BAIG:

14         Q.    For shipping excessive

15  orders?

16         A.    Again --

17         Q.    Or for shipping orders that

18  exceed their normal monthly ordering

19  pattern?

20         A.    I do not.  I -- again, we'd

21  have to look at the process -- the actual

22  documented process, not just look at this

23  one e-mail that appears to be a backorder

24  situation.

Highly Confidential - Subject to Further Confidentiality Review

1          (Document marked for

2          identification as Exhibit

3          Allergan-Perfetto-13.)

4     BY MS. BAIG:

5          Q.    I'll have this document

6     marked as Exhibit 13.  Bates-stamped

7     Acquired_Actavis_00218780 through 18786.

8              It begins as an e-mail from

9     you to Doug Boothe dated February 2,

10    2011, do you see that?

11             Do you see at the bottom of

12    the last page where the e-mail chain

13    begins from Rachelle Galant to you and

14    others, the subject is 100,000 bottles

15    today.  Do you see that?

16             Well, actually the subject

17    is oxy IR 30 milligrams orders:  100,000

18    bottles today.  Do you see that?

19         A.    Okay.  The last page?

20         Q.    Second to last page.

21             Do you know who Noemi Rebeco

22    is?

23         A.    I knew the name.  She worked

24    in the plant.  I don't know what she did.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How about Weldon Chin?

2    A.    He -- he was a plant person.

3    Q.    And Doug Plassche?

4    A.    Plant -- he -- he was also

5    a -- man -- when I say plant,

6    manufacturing person.

7    Q.    Okay.  So they are all

8    Actavis employees?

9    A.    Yes.

10   Q.    And do you see that Rachelle

11   Galant is indicating to Noemi and Weldon,

12   "I already spoke with Noemi a moment ago,

13   but we received orders in today for oxy

14   30 milligrams 100,000 bottles."

15   A.    Yes.

16   Q.    "74,000 of those bottles

17   were orders from Walgreens."

18        Do you see that?

19   A.    I do.

20   Q.    And she goes on to state

21   that "for oxy IR, 15 milligrams, orders

22   today equaled 38,000 bottles."

23        Do you see that?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And she states, "There

2  appears to be a market shortage out

3  there"?

4    A.    That's what she says.

5    Q.    "And we absolutely need API

6  inhouse immediately to help us fill our

7  demand."

8          Do you see that?

9    A.    I do.

10   Q.    What is API?

11   A.    Active pharmaceutical

12  ingredient.

13   Q.    And she is basically asking

14  for an expedited release; is that right?

15   A.    She's saying any expediting

16  you can do the next release would be

17  appreciated.

18   Q.    The next release of oxy

19  30 milligrams would be appreciated,

20  right?

21   A.    Yes.  Yep.

22   Q.    "We only have 40,000 bottles

23  available," right?

24   A.    That's what it reads.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And you see, from

2  you, you write, "I spoke with Mike Allen

3  today."

4         Who's Mike Allen?

5    A.   Allen was -- was a

6  purchasing person at Walgreens at the

7  time.

8    Q.   And did you communicate with

9  him because you were trying to ascertain

10  a reason for their increased usage?

11         MR. ROTH:  Objection to

12     form.

13         THE WITNESS:  Can you repeat

14     the question?

15  BY MS. BAIG:

16    Q.   Did you communicate with him

17  because you were trying to obtain a

18  reason for their increased usage?

19    A.   Based on this e-mail it

20  appears I reached out to him to see what

21  the -- why they had increased their

22  usage.

23    Q.   And you wrote here that "he

24  will send me a response in writing on

Highly Confidential - Subject to Further Confidentiality Review

1    increased usage," correct?

2         A.    That's what I wrote.

3         Q.    And then you went on to

4    state, "It will also help to show the

5    crazy pulls"?

6         A.    Yes.

7         Q.    Does that mean excessive

8    order -- or -- or increased order?  What

9    did you mean by crazy pulls?

10              MR. ROTH:  Object to form.

11              THE WITNESS:  Increased

12         orders is -- is how I would define

13         it.

14   BY MS. BAIG:

15        Q.    Okay.  And then if you move

16   further up, you see -- in the e-mail

17   chain, you see from Rachelle Galant to

18   you and others, it states, "Based on

19   Walgreens' six-month historical average

20   with Actavis on the oxy IR tabs, we are

21   concerned that the January shipments plus

22   open orders are tracking higher than

23   expected," correct?

24              A.    That's what it reads.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then it provides the

2    numbers of the orders.  Do you see that?

3        A.    I do.

4        Q.    And the six-month average

5    was 54,124 for oxycodone at the

6    15-milligram level?

7        A.    That's what it says.

8        Q.    And what does the

9    126 percent figure refer to?

10       A.    It says, "Current month

11   ship" -- "shipment tracking."

12       Q.    Do you know what that means?

13       A.    I don't.

14       Q.    You don't know?

15            What's ship plus open mean?

16       A.    The orders we shipped plus

17   the open orders.

18       Q.    So that would be 180 percent

19   of the six-month average?

20       A.    I don't know.  We'd have to

21   ask Rachelle, she wrote the e-mail.

22       Q.    Sure.  But your long history

23   and experience of working at Actavis, how

24   do you read this e-mail?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. LUXTON:  Objection to

2        form.

3              THE WITNESS:  Again, I'd be

4        speculating.  I didn't write the

5        e-mail.  I didn't -- I didn't -- I

6        don't have a calculator here to

7        figure out the numbers.

8    BY MS. BAIG:

9        Q.   So you have no understanding

10   of what -- what this e-mail means as you

11   read it today?

12             MR. LUXTON:  Objection to

13        form.

14             THE WITNESS:  I -- I have an

15        understanding.

16   BY MS. BAIG:

17        Q.   What is your understanding?

18        A.   I have an understanding that

19   they -- they are ordering higher than

20   their six-month average.  And it's

21   creating an e-mail chain.

22        Q.   And you had asked her for an

23   e-mail that you could send to Walgreens,

24   correct?

1    A.    Yes.

2    Q.    And does she write -- write

3    one then in her response to you?  Is that

4    what this is?  "Please help us understand

5    the dynamic that Walgreens is seeing in

6    their pharmacies to account for this

7    higher demand.  We also would like to

8    know what measures are being put in place

9    by Walgreens to help control abuse of

10   this product.  We are committed to

11   serving Walgreens to the best of our

12   ability."

13             Do you see that?

14   A.    I do.

15   Q.    Do you know if you

16   ultimately sent an e-mail like that to

17   Walgreens?

18   A.    I don't know at this time.

19   I'm looking at the chain to see if it

20   references it.

21             I don't know if I sent in

22   2011, an e-mail -- do you have

23   documentation that shows I sent the

24   e-mail?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm -- I'm just looking at

2   this document that I have in front of me.

3         A.    Okay.

4         Q.    And trying to understand it.

5         Do you -- do you have a

6   recollection of sending an e-mail to

7   Walgreens asking them to explain their

8   increased demand?

9         A.    I don't at this time.

10        Q.    Okay.  And -- but your

11  response to her, you can see, was that,

12  "I'm thinking we need to soften a

13  little."

14        Do you see that?

15        A.    I do.

16        Q.    And why -- why would you

17  suggest to soften it?

18        A.    I don't -- I don't know at

19  this time why I would say that.

20        Q.    Was that just because you

21  wanted to preserve your relationship with

22  Walgreens and you didn't want to send

23  something that was too -- too strong or

24  hard for them about their increased

Highly Confidential - Subject to Further Confidentiality Review

1    order?

2                    MR. ROTH:  Objection to

3         form.

4                    MR. LUXTON:  Objection to

5         form.

6                    THE WITNESS:  I don't know

7         today what I meant in 2011 with

8         that comment.

9    BY MS. BAIG:

10        Q.    And what was Michael

11   Dorsey's position then?

12        A.    He was a sales rep for me.

13        Q.    And so Michael Dorsey

14   responds by providing you some historical

15   figures; is that right?

16        A.    Apparently.

17        Q.    And Rachelle Galant then

18   responds, "I would want to understand

19   where the demand is coming from to help

20   give us justification from a DEA

21   perspective.  I'm not seeing this swing

22   in demand on other pharmacy customers."

23                    Do you see that?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then do you see at the
2    top of Page 2, Michael Dorsey writes an
3    e-mail stating, "If our sales to
4    Walgreens are up 80 percent from 2009 to
5    2010, but their representation of the
6    total market share was from 12 percent to
7    14 percent," and he asks, "Is this
8    correct Rachelle?  If so, then what has
9    the total market grown?"
10           Do you see that?
11    A.    I do.
12    Q.    Were you aware at the time
13    that your sales to Walgreens were up
14    80 percent from 2009 to 2010?
15    A.    At this time I don't recall
16    that kind of growth.
17    Q.    But you don't have any
18    reason to doubt that based on -- on what
19    you're reading here, do you?
20    A.    I don't -- you know, again,
21    without looking at data, I'm going off of
22    Mike Dorsey's numbers.  And if he did the
23    calculation right, I'd have to -- I'd
24    have to make that assumption.  I'm -- I'm

Highly Confidential - Subject to Further Confidentiality Review

1    not sure he did the calculation right.

2    So we'd have to look at the -- the data.

3         Q.    Okay.  And you see Rachelle

4    Galant's response is that "overall market

5    has grown an estimated 53 percent from

6    2009 to 2010."

7         A.    Okay.

8         Q.    And she writes, "576 to

9    882 million."

10        A.    Okay.

11        Q.    And the title of that is

12   "Walgreens 2009 to 2010 oxycodone."

13        A.    Okay.

14        Q.    Did you have an

15   understanding at the time that oxycodone

16   growth was pretty significant?

17             MR. ROTH:  Object to form.

18   BY MS. BAIG:

19        Q.    In the overall market?

20             MR. ROTH:  Object to form.

21             THE WITNESS:  2009 to '10?

22        I probably knew there was growth.

23        But I don't know if, sitting here

24        today I knew the actual

1          percentages.

2     BY MS. BAIG:

3          Q.    But you knew it when she

4     sent it to you in or about February of

5     2011, correct?

6               MR. ROTH:  Same objection.

7               THE WITNESS:  I mean, I

8          don't know it -- today I don't

9          know it.  I -- if I read this

10         e-mail, and I read it clearly, it

11         was documented.  But I don't know

12         if I -- if I -- if you asked me in

13         2011 if I knew what the percentage

14         growth, I probably wouldn't know

15         the actual number.

16    BY MS. BAIG:

17         Q.    But you would have known

18    that there was significant growth for

19    oxycodone at that time --

20              MR. LUXTON:  Objection to

21         form.

22    BY MS. BAIG:

23         Q.    -- in the -- in the overall

24    market, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. ROTH:  Asked and
2         answered.
3              THE WITNESS:  I'm not sure
4         if at this point whether --
5         whether I knew there was that type
6         of growth.  I'm not sure.
7    BY MS. BAIG:
8         Q.    And she suggest here that
9    the estimated numbers were using Wolters
10   Kluwer's data; is that right?
11        A.    Yes.
12        Q.    And that the IMS data was
13   showing 51 percent, correct?
14        A.    Yes.
15        Q.    So from her perspective, she
16   was seeing that that is good validation
17   of the figures, correct?
18        A.    That's what she wrote.
19        Q.    And did Actavis have access
20   to both the Wolters Kluwer's data and the
21   IMS data?
22        A.    I believe so.
23        Q.    And do you know if Actavis
24   was paying for that data?
```

1      A.    I believe we paid for that

2  data.

3      Q.    And what did the data show

4  generally?

5      A.    I -- I would just give you a

6  top line.

7      Q.    Yeah, that's fine.

8      A.    IMS is market share of the

9  generics.  And then Wolters Kluwer, I

10  never dealt with.  I don't know what the

11  market -- you'd have to ask somebody in

12  marketing.

13      Q.    And why did you purchase

14  that data?

15      A.    To manage our business.

16      Q.    So you could have an

17  understanding of Actavis' market share

18  for various of its products?

19      A.    For all of our products.

20      Q.    And part of your response up

21  above, you state, "The price point is

22  half of what you thought."

23            Do you know what you're

24  referring to there?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Doug probably had a price

2    for what he thought the product was

3    selling for, and it's half of what he

4    thought.

5          Q.     The oxycodone?

6          A.     Yes.

7          Q.     Okay.  And what does that

8    mean, the next line, "It's still 30s on

9    GP at WAGS"?

10         A.     30 percent margin.

11         Q.     On GP, what's GP?

12         A.     Gross profit.

13         Q.     And WAGS?

14         A.     Walgreens.

15         Q.     In the 50s at HD.  What's

16   that?

17         A.     50 percent gross profit

18   compared to 30 at Walgreens.

19         Q.     And HD is another customer,

20   HD Smith, correct?

21         A.     Yes.

22         Q.     And then you go on to say,

23   "We want the business.  It's a needle

24   mover."

1                 What were you saying was the

2    needle mover?

3          A.    Oxy was a -- was a key

4    product for us.  It was an important

5    product.  We were -- it wasn't a product

6    that we were -- that we were selling at

7    $100,000 a year.  It was a -- one of the

8    top 20 products, let's say.

9                 (Document marked for

10         identification as Exhibit

11         Allergan-Perfetto-14.)

12   BY MS. BAIG:

13         Q.    Let's have this document

14   marked as Exhibit 14.  It's a document

15   that's Bates-stamped ACTAVIS_524986

16   through 525000.  You can see we have the

17   same issue in terms of certain numbers

18   that are identified, but they don't look

19   like they've been produced in a form --

20         A.    Yeah, they are --

21         Q.    -- in which they were

22   initially created.

23                 MS. BAIG:  So I would just

24         ask if counsel could check.

1    MR. ROTH:  Yeah, we looked
2    at the other one.  I think it's
3    just the e-mail signature image
4    that's the attachment.  But we'll
5    double-check this again too.
6         MS. BAIG:  Sure.  But do you
7    have an e-mail in which these
8    figures are produced in chart form
9    and not just in a long string,
10   because you can't really determine
11   what they are or what they signify
12   in the form that they've been
13   produced.
14        MR. ROTH:  I don't believe
15   so.  But we will look at that.
16        MS. BAIG:  Okay.  Thank you.
17        THE WITNESS:  This is --
18        MR. ROTH:  Right, and this
19   is a similar issue, where it
20   should have been -- we did produce
21   this document with a different
22   Bates stamp.
23        MS. BAIG:  Okay.  We can
24   take that issue up.

1    BY MS. BAIG:

2         Q.    And you see the subject line

3    of this e-mail from Rachelle Galant to

4    you and others on March 22nd, 2011, is

5    "Opti-Source, oxy IR orders."

6              Do you see that?

7         A.    Mm-hmm.

8         Q.    And Opti-Source was a

9    customers of yours; is that right?

10        A.    It was, yes.

11        Q.    And if you turn to the

12   second-to-last page you see, for example,

13   it looks like a chart that is not created

14   in chart form.  But you have customer

15   contact procedure, date, strength,

16   six-month shipment average, current month

17   ship, Actavis sales team member, date,

18   form of communication.

19              Does this look like a form

20   that would have been created to address

21   an order that was flagged as either being

22   an order of interest or a suspicious

23   order?

24        A.    I don't know.  I don't

Highly Confidential - Subject to Further Confidentiality Review

1    recall this specific form.

2         Q.    But do you remember

3    generally that part of the process was to

4    go back and get a reason for -- from the

5    customer for any higher volume in orders?

6         A.    I believe that was the

7    process that marketing would go back and

8    get a reason from the customer.

9         Q.    And you see that's part of

10   the second-to-last page, "Reason given

11   for higher volume in orders"?

12              Do you see that?

13        A.    Yeah.

14        Q.    And then you see on the page

15   before that, it says, "Oxycodone IR

16   tablets and suspicious order tracking."

17              Do you see that?

18        A.    I just have a page with oxy

19   IR tablets and suspicious order tracking.

20        Q.    Yes.  That's all I have.

21        A.    Oh, okay.  And the

22   customer's name on the bottom.

23        Q.    Opti-Source?

24        A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And do you see on the next

2  page, moving forward, there's an e-mail

3  from Rachelle Galant to you and Michael

4  Dorsey --

5      A.    Yep.

6      Q.    -- cc'g Jinping and Nancy

7  Baran?

8      A.    Yep.

9      Q.    And it's flagging

10  Opti-Source as excessive order.  It says,

11  "Opti-Source's ordering on the

12  30-milligram oxy IR tabs is in excess of

13  their rolling six-month average."

14           Do you see that?

15      A.    I do.

16      Q.    It goes on to state, "Their

17  six-month average is 11,928."

18      A.    Right.

19      Q.    "Month-to-date, they have

20  shipped 13,896 bottles.  Based on where

21  we are in the month (52 percent) this

22  falls under our SOP of suspicious order."

23           Do you see that?

24      A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Does this suggest to you

2   that this e-mail chain was created as

3   part of the suspicious order monitoring

4   process when an order was flagged for

5   Opti-Source?

6           MR. LUXTON:  Objection to

7        form.

8           THE WITNESS:  It appears

9        that the excess orders triggered

10        an e-mail chain that contacted the

11        sales rep.

12   BY MS. BAIG:

13      Q.    Triggered an e-mail chain

14   that what?

15      A.    Contacted the sales rep to

16   get involved with this --

17      Q.    That required the sales rep

18   to contact the customer and get a reason

19   for the excessive order, correct?

20      A.    Yes, yes.

21      Q.    Okay.  And that's what she's

22   referring to in the next line where she

23   states, "I know we are filling their

24   primary demand right now, but we need to

Highly Confidential - Subject to Further Confidentiality Review

1   get a statement from them for our files."

2              Do you see that?

3         A.    Yes.

4         Q.    And would those letters have

5   been kept in the shared file that we

6   discussed earlier if they were received?

7         A.    If they stuck to the SOP,

8   yes.

9         Q.    And as you scroll through

10  the pages --

11        A.    Yep.

12        Q.    -- scroll forward.  These

13  numbers, do these make sense to you or

14  no?

15        A.    The numbers or the verbiage?

16        Q.    The numbers on the --

17  there's list of numbers, 24, 24, 120,

18  Dakota Anoka.  Do you know what that

19  refers to?

20        A.    These are -- Opti-Source is

21  a conglomerate of distributors.  These

22  are the distributors that are in the

23  Opti-Source.

24        Q.    Okay.  And do you know what

Highly Confidential - Subject to Further Confidentiality Review

1    the numbers refer to?

2        A.    I don't, because there's

3    no -- it's -- it's not laid out

4    correctly.

5        Q.    And do you see on the first

6    page then, from Rachelle Galant, it

7    suggests that they were trying to get a

8    statement from the buying group; is that

9    right?

10        A.    That's what she wrote.

11        Q.    Okay.  And in the last line

12    of -- of that -- of her e-mail, she

13    writes, "Of course I'm all about

14    democracy, and if this group wants to go

15    with an internal explanation, we can

16    document it and close the report."

17                Do you see that?

18        A.    I do.

19        Q.    Do you know whether an

20    explanation was ever received by the

21    company for the excessive order?

22        A.    I don't.

23        Q.    Do you know whether or not

24    the excessive order was shipped?

Highly Confidential - Subject to Further Confidentiality Review

1           A.    I don't.

2                 (Document marked for

3           identification as Exhibit

4           Allergan-Perfetto-15.)

5    BY MS. BAIG:

6           Q.    I'll have this document

7    marked as Exhibit 15, please.  This

8    document is Bates-stamped

9    ALLERGAN_MDL_0067641 through 643.

10                MR. LUXTON:  You are up to

11          15 on this?

12                MS. BAIG:  Yep.

13                MR. LUXTON:  All right.

14   BY MS. BAIG:

15          Q.    And you see this is an

16   e-mail chain, at least beginning on the

17   first page, from Rachelle Galant to you,

18   correct?

19          A.    I do.

20          Q.    And again it's about

21   Opti-Source oxy IR shipments.  Do you see

22   that?

23          A.    I do.

24          Q.    And do you see on the second

Highly Confidential - Subject to Further Confidentiality Review

1    page it starts from Rachelle Galant to

2    Mike Dorsey, and she states, "I've been

3    seeing a higher ordering pattern for oxy

4    IR tabs recently from the Opti-Source

5    group members."

6                Do you see that?

7        A.    I do.

8        Q.    And she goes on to state,

9    "Several of our orders have been flagged

10   by the suspicious order monitoring as

11   excessive in quantity."

12               Do you see that?

13       A.    I do.

14       Q.    And she says, "Can you

15   please reach out to Rick and other

16   members if necessary to see the reason

17   for the increased orders."

18               Do you see that?

19       A.    I do.

20       Q.    Is this -- does this appear

21   to you to be another e-mail chain that is

22   part of the suspicious order monitoring

23   system which requires a reason to be

24   obtained from the customer before

1  shipping excessive orders?

2         A.    It appears that way.

3         Q.    Okay.  And she goes on to

4  state, "Attached is the recent shipments.

5  You'll be able to see that we have

6  shipped a full month on oxy already for

7  the month, and we have approximately

8  20,000 bottles in open orders, mainly on

9  the oxy IR 30 milligrams."

10         Do you see that?

11         A.    Mm-hmm.

12         Q.    And then you see the

13  attachment that reflects -- reflects

14  those numbers?

15         A.    Yes.

16         Q.    Okay.  And that attachment

17  comes from what data system at -- at

18  Actavis if you know?

19         A.    I think we had a system

20  called Q4bis that put it in this format.

21  But that -- that would be my -- at this

22  stage my guess.

23         Q.    It's Q?

24         A.    Q -- Q --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Oh, Q?

2    A.    4bis.

3    Q.    Okay.  And -- and what was

4  the Q4bis system?

5    A.    It's -- this is the --

6  that's the user-friendly system that puts

7  data into this format.

8    Q.    Is the data saved in Q4bis

9  or is it saved elsewhere?

10    A.    I don't know that right now.

11    Q.    And do you know at the top

12  left of this chart what MFGPRO means?

13    A.    I do not.

14    Q.    How about DSGM?

15    A.    I do not.

16    Q.    All right.  But this is the

17  data that she was attaching to show that

18  Opti-Source had placed an excessive

19  order, correct?

20    A.    To me this -- this is a --

21  this shows the history by month of oxy

22  tablets by bottles, but I'm not sure, it

23  doesn't say whether it's the 15 or

24  30-milligram on this slide.

1    Q.    And this is what she

2    attached to -- to show that there was a

3    higher ordering pattern for oxy IR tabs

4    from the Opti-Source group members,

5    correct?

6        A.    That's what it appears.

7        Q.    And then do you see a little

8    further down, Michael Dorsey responds to

9    Rachelle by stating that "orders have

10   been coming in heavier due to

11   Mallinckrodt and recently Qualitest's

12   lack of shipments"?

13           Do you see that?

14       A.    I do.

15       Q.    Do you know why orders would

16   have been coming in heavier due to

17   Mallinckrodt?

18       A.    Because they were -- they

19   were not supplying.

20       Q.    Why were they not supplying,

21   do you know?

22       A.    No, I do not.

23       Q.    Okay.  But you gather that

24   from the lack of shipments at the end, is

1  that -- is that how you're reading that?

2       A.   I -- just because of what he

3  wrote.

4       Q.   Okay.  And then she goes on

5  to state that "we have already shipped

6  them a full month and they have another

7  month on order and are calling Sarah

8  everyday."

9            Do you see that?  At the

10 very top.

11           MR. LUXTON:  At the top.

12           THE WITNESS:  I do.

13 BY MS. BAIG:

14      Q.   And do you know whether or

15 not they actually shipped the excessive

16 order?

17      A.   I don't.

18      Q.   But that information would

19 be stored in the -- in the shared drive,

20 correct?

21           MR. LUXTON:  Objection to

22      form.

23           THE WITNESS:  It would be --

24      it should be documented somewhere

Highly Confidential - Subject to Further Confidentiality Review

1    within the company.

2           Can we take like a

3    five-minute break.

4           THE VIDEOGRAPHER:  Stand by,

5    please.  Remove your microphones.

6    The time is 3:36 p.m.  Off the

7    record.

8           (Short break.)

9           THE VIDEOGRAPHER:  We are

10   back on the record.  The time is

11   3:45 p.m.

12          (Document marked for

13   identification as Exhibit

14   Allergan-Perfetto-16.)

15   BY MS. BAIG:

16       Q.    We'll have the next document

17   marked as Exhibit 16.

18       A.    Yep.

19       Q.    This document begins -- is

20   an e-mail from Mike Dorsey to Rachelle

21   Galant, May 24th, 2012, and it's

22   ACTAVIS_0288356 through 288361.

23          And you can see, if you look

24   a few pages in, that you're on a portion

Highly Confidential - Subject to Further Confidentiality Review

1 of this string.  And it appears to be

2 another example of the types of documents

3 that we've been looking at, which is an

4 order that was flagged as excessive, for

5 which additional documentation was being

6 discussed.

7           Do you see if you look at

8 the second-to-last page at the bottom,

9 from Mike Dorsey to Rachelle, it's

10 titled, "Smith Drug oxycodone

11 30-milligram needs."

12           Do you see that?

13      A.    I do.

14      Q.    And Mike Dorsey is saying,

15 "Smith Drug is requesting another 6,000

16 bottles of 30 milligrams."

17           Do you see that?

18      A.    I see that.

19      Q.    And then in parens, he has

20 "(2,400, 1,200, 2,400 in their respective

21 DCs)."

22           Do you know what that refers

23 to?

24      A.    Distribution center.  So --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I see.  So they have three

2    different distribution centers?

3    A.    It appears so.

4    Q.    Okay.  And if you move

5    further up the chain, it states that,

6    "Smith Drug is requesting 6,000 in

7    additional bottles of oxy 30 milligrams

8    this month."

9    Do you see that?

10   A.    Yes.

11   Q.    And a little further down it

12   says, "From Actavis, Smith Drug's average

13   purchase volume on the 30-milligram is

14   averaging 11,500 bottles a month.  This

15   month they received 9,500 bottles MTD."

16   Do you see that?

17   A.    Yes.

18   Q.    What's MTD?

19   A.    Month to date.

20   Q.    In my world it's motion to

21   dismiss.

22   A.    Motion to dismiss.

23   Q.    Okay.  "In April, they only

24   ordered and received 5,500 bottles."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    I do.

3     Q.    "My question is, can we ship

4  Smith Drug an additional 6,000 bottles,

5  30-milligrams, as they are requesting,

6  and document it as market shortage using

7  justification that they underordered in

8  April?"

9          Do you see that?

10    A.    I do.

11    Q.    And if you move to the prior

12 page, your response is, "I say do it."

13         Do you see that?

14    A.    I do.

15    Q.    And then if you move to the

16 prior page, you see from -- from you to

17 Nancy Baran and others, "I would ask for

18 documentation to support your concerns.

19 Full disclosure, which I presume the

20 customer would do to cover both of them

21 and us."

22         Do you see that?

23    A.    I do.

24    Q.    Do you know whether you got

Highly Confidential - Subject to Further Confidentiality Review

1  documentation on this particular

2  excessive order?

3        A.    I don't.

4        Q.    And do you see just above

5  that, there is an e-mail from Donna

6  Pruitt at Smith Drug with the subject

7  "Product Shortage"?

8        A.    Right above my e-mail,

9  above -- asking for documentation?

10       Q.    Yeah, at the top of that

11  page.  The name Donna Pruitt is on the

12  bottom of the prior page.

13             MR. LUXTON:  Bottom of 57.

14             THE WITNESS:  Oh, oh, I see

15       why I couldn't -- I couldn't

16       figure it out.  Okay.

17  BY MS. BAIG:

18       Q.    So you see that Donna Pruitt

19  from Smith Drug is --

20       A.    Yeah, I just want to read

21  what she wrote.

22       Q.    -- is providing a reason.

23  She basically states that she has a

24  supplier of oxycodone 30 milligrams that

Highly Confidential - Subject to Further Confidentiality Review

1    is backordering product.

2              Do you see that?

3         A.    I do.

4         Q.    And then Michael Dorsey --

5    sorry -- Rachelle Galant's response to

6    that is a question mark, "Is she saying

7    that she normally orders 6,700 a month

8    with supplier M and 8,700 a month with

9    us?"

10             Do you see that?

11        A.    Yes.

12        Q.    And Rachelle Galant

13   responds, "Yes, but her numbers are off."

14             Do you see that, at the

15   bottom of the first page?

16        A.    Yeah.  I think that's from

17   Mike Dorsey.

18        Q.    Yes.  You're right, to

19   Rachelle Galant -- to Rachelle Galant.

20        A.    Yeah.

21        Q.    And do you know whether or

22   not this order was ultimately shipped?

23        A.    I don't recall.

24        Q.    And do you see from Rachelle

Highly Confidential - Subject to Further Confidentiality Review

1    Galant, halfway up the page, it says, "I

2    don't want to be the one who points it

3    out, but her e-mail closes the door on

4    getting extra inventory from us.  We've

5    already shipped Smith's full requirements

6    on oxy 30 milligrams."

7              Do you see that?

8         A.    I do.

9         Q.    And you don't know whether

10   it was shipped or not, correct?

11        A.    Not -- not in two -- not

12   without looking at --

13        Q.    Sure.

14        A.    -- have Nancy Baran looking

15   at the actual orders that went out.

16        Q.    So you don't have an -- and

17   don't have an independent recollection of

18   it being halted, correct?

19        A.    I don't know if it was

20   shipped or not shipped or -- or -- I

21   don't know what individual orders did.

22        Q.    But that is information that

23   should have been saved in the shared

24   drive pursuant to the SOP, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     It should be shared

2     somewhere with -- somewhere within --

3     within Actavis' universe of orders.

4          Q.     And I believe you testified

5     earlier that you have not had

6     communications with anyone at the DEA --

7          A.     I have not.

8          Q.     -- about anything, right?

9          A.     I've never -- I've never

10    spoken to anybody that I can recall right

11    now at the DEA.

12         Q.     And have you been made aware

13    of Actavis' communications with the DEA

14    about the Controlled Substance Act?

15         A.     I recall that there was a

16    meeting with the DEA that I wasn't at.

17         Q.     Okay.  What do you recall

18    about learning about that meeting?

19         A.     I just recall that Nancy was

20    at a DEA meeting.  I'd have to look at

21    documents to know what was -- what was

22    the -- what was discussed.

23         Q.     Do you recall ever learning

24    that the DEA had a meeting with Actavis

Highly Confidential - Subject to Further Confidentiality Review

1   about the -- the influx of opioids into

2   the state of Florida?

3              MR. ROTH:  Object to form.

4              THE WITNESS:  I don't -- I

5         don't recall a specific meeting.

6         I know they had a DEA meeting.  I

7         don't recall a specific meeting

8         on -- on that subject.

9   BY MS. BAIG:

10        Q.   Do you remember hearing --

11  you don't remember hearing about a

12  meeting on that subject?

13        A.   I'm sure right now I don't

14  have the details, but I'm sure I was

15  briefed by Nancy.

16             (Document marked for

17        identification as Exhibit

18        Allergan-Perfetto-17.)

19  BY MS. BAIG:

20        Q.   Let's have this document

21  marked as Exhibit 17.  It's Bates-stamped

22  Actavis 238164.

23        A.   Okay.

24        Q.   It begins with an e-mail

1    from you to Michael Clarke and Doug

2    Boothe, dated September 13, 2012, with

3    the subject DEA meeting.  Do you see

4    that?

5         A.    Okay, yeah.

6         Q.    And you were not at this DEA

7    meeting that's referenced, correct?

8         A.    I was not at that DEA

9    meeting that's referenced.

10        Q.    Did you understand that

11   there had been a tough meeting with the

12   DEA about the status of where the

13   oxycodone pills were ending up in

14   Florida?

15             MR. ROTH:  Object to form.

16             THE WITNESS:  Can you repeat

17        that?

18   BY MS. BAIG:

19        Q.    Did you ever have an

20   understanding that Actavis had had a

21   tough meeting with the DEA about the

22   status of where Actavis' oxycodone pills

23   were ending up in Florida?

24             MR. ROTH:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          Mischaracterizes the e-mail.

2                    MR. LUXTON:  Objection to

3          form.

4                    THE WITNESS:  I knew they

5          had a meeting.  I don't -- I

6          didn't -- I didn't hear the

7          adjective "tough."

8     BY MS. BAIG:

9          Q.    Okay.  Do you recall hearing

10    that the DEA had lectured -- had lectured

11    Actavis regarding the extent to which

12    oxycodone was being diverted and abused

13    in Florida?

14                    MR. LUXTON:  Objection to

15          form.

16                    THE WITNESS:  I -- as I sit

17          here today, I don't recall being

18          lectured by anybody on this, or

19          that we got lectured by the DEA.

20    BY MS. BAIG:

21          Q.    Well, you weren't at the

22    meeting.  But you --

23          A.    I mean that we --

24          Q.    -- you don't recall hearing

1    that Mike Clarke or anybody else got

2    lectured by -- by the DEA either; is that

3    right?

4         A.    I -- I don't remember being

5    briefed by Mike Clarke -- Mike Clarke, is

6    that his -- I didn't deal with -- Michael

7    Clarke, I didn't deal with him very much

8    with him at all.  I would have been

9    briefed by Nancy.

10        Q.    Okay.  But you see this

11   e-mail here from Mike Clarke to you and

12   Doug Boothe, correct?

13        A.    I do.

14        Q.    And it says here, "I just

15   left you a voicemail with some detail,

16   but we should talk."

17              Do you see that?

18        A.    I do.

19        Q.    And he goes on to state,

20   "The DEA meeting was essentially a

21   lecture on the status of where our

22   oxycodone pills are ending up in Florida,

23   using market data and DEA license numbers

24   to track our product to specific Florida

1    towns and pharmacies in 2010, '11 and

2    '12."

3              Do you see that?

4         A.    Yes.

5         Q.    And he goes on to state,

6    "They spent about 90 minutes and 100

7    slides walking us through the number of

8    pills dispensed in Florida, compared to

9    some other states and the national

10   averages to make the case that a

11   significant number of high volume of

12   pharmacies or both" -- sorry.  "A

13   significant number of high volume of

14   scripts in Florida must be directed

15   towards inappropriate uses, either

16   through bad doctors, shady pharmacies or

17   both."

18        A.    Okay.

19        Q.    He goes on to state, "They

20   are challenging all manufacturers and

21   distributors to put controls in place to

22   handle the potential diversion of

23   oxycodone.  Walgreens and Happy Harry

24   were pharmacies with particularly high

Highly Confidential - Subject to Further Confidentiality Review

1    numbers of oxy scripts in remote sections

2    of Florida."

3            Do you recall being briefed

4    that Walgreens and Happy Harry were

5    pharmacies with particularly high oxy

6    scripts in Florida?

7            MR. LUXTON:  I'll just

8        object because I think you missed

9        a line.

10            But go ahead and answer.

11            THE WITNESS:  Briefed by

12        whom?

13   BY MS. BAIG:

14        Q.    Well, in this e-mail by

15   Michael Clarke or by anybody else.

16        A.    I -- I don't recall being

17   briefed by Michael Clarke.

18        Q.    Okay.  Do you recall

19   receiving this e-mail?

20        A.    No, but I'm sure I -- I got

21   this e-mail.

22        Q.    Okay.  Do you recall talking

23   about the subject matter of this e-mail

24   with anybody at Actavis?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Today as I sit here, I don't

2   recall conversations on this -- on this

3   subject matter.

4      Q.     Do you recall being aware

5   generally that the DEA had -- had a

6   meeting with Actavis in which they

7   briefed -- briefed Actavis about a high

8   number of -- of scripts in Florida that

9   were being directed towards inappropriate

10  uses?

11     A.     I -- I knew they had a

12  meeting.  I -- today I can't remember

13  whether -- what the details of the

14  meeting were, other than what I read in

15  this e-mail.

16     Q.     Do you recall being aware

17  that there was a problem in Florida with

18  oxy abuse?

19     A.     I was aware via -- via the

20  newspaper and magazines that several

21  wholesalers and Walgreens and I believe

22  CVS had -- had gotten fines from the DEA.

23  That was public information in newspapers

24  and trade magazines.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And when was that?

2    A.    I believe in -- in '12.  It

3  could have been -- yeah, I believe in

4  '12.  It could have been in the -- in

5  the -- no, I think -- I don't think it

6  went into '13.  I think it was just

7  primarily '12.  Could have been the end

8  of '11.  There was documentation in

9  public record.

10    Q.    Do you recall Actavis taking

11  any action as a result of this DEA

12  meeting to prevent diversion of oxycodone

13  in Florida or anywhere else?

14    A.    We had our suspicious order

15  monitoring system, and then we were

16  continuing to enhance it.  So that would

17  have been our -- that was our process, to

18  continually -- to improve the actual

19  system that we had.

20    Q.    As you sit here today, can

21  you -- can you identify any enhancements

22  that happened as a result of or after

23  this DEA meeting?

24         MR. ROTH:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1     THE WITNESS:  I can't.

2  BY MS. BAIG:

3     Q.   Did you ever hear that your

4  downstream customers were targeting pill

5  mills in order to increase sales?

6     A.   Who are downstream?  Who are

7  you --

8     Q.   Your customers' customers.

9     A.   My customers' customers were

10  targeting pill mills?  I don't remember

11  this comment.

12     Q.   Did you ever hear that --

13  are you familiar with the concept of pill

14  mills and what a pill mill is?

15     A.   Can you define that?

16     Q.   I'm asking you if you have

17  an understanding.

18     A.   Oh.

19     Q.   I have my definition, but

20  I'm wondering if you, you know, based on

21  your -- your experience at the company,

22  if you have an understanding of what a

23  pill mill is.

24     A.   Pill mill.  I've read that

Highly Confidential - Subject to Further Confidentiality Review

1  term in the paper or in -- in articles

2  about this.  And I think it's doctors'

3  offices that dispense -- dispensed

4  controlled drugs.

5       Q.   All doctors' offices that

6  dispense controlled -- controlled drugs,

7  is that --

8       A.   I'm trying to go off a

9  memory of an article I read that

10  described that term, and I thought it was

11  in Wall Street, years and years ago,

12  right around this time.

13       Q.   And did you ever hear of the

14  notion that sales reps would target pill

15  mills in order to increase sales?

16       A.   Not my sales reps.

17       Q.   Anywhere.  I'm just saying

18  have you heard that that happened

19  generally.

20       A.   Oh who -- whose -- whose

21  sales reps?

22       Q.   Anybody's.  Have you heard

23  of that tactic for increasing sales?

24       A.   I -- I'm not familiar with

Highly Confidential - Subject to Further Confidentiality Review

1  how -- I heard the term in Wall Street

2  Journal.  I believe it was Wall Street.

3           I'm not sure how these

4  people would have gotten -- my -- my

5  sales team was not selling to doctors'

6  offices or calling on doctors' offices.

7        Q.    Do you recall who your

8  biggest and best oxy sellers' sales reps

9  were?

10       A.    No.

11       Q.    Who designed the sales

12  targets for your sales reps?

13       A.    The -- the targets, my

14  target is set for the generic, the entire

15  generic team, the sales team.  And then

16  marketing I would -- would allocate based

17  on accounts, which sales reps had which

18  accounts.  And it would be allocated that

19  number, the top number would be allocated

20  to the -- to the -- I think we had four

21  reps.

22           Yeah, we had four reps.  So

23  we split it up based on the accounts and

24  based on the projected volume for the

Highly Confidential - Subject to Further Confidentiality Review

1    upcoming year.  So that was done in

2    coordination with my marketing folks.

3         Q.    And Doug Boothe designed

4    your sales targets, correct?

5         A.    Designed is a --

6         Q.    Well, created.

7         A.    Gave me my sales targets.

8         Q.    Okay.  Do you think that

9    he's not the one that developed what

10   those targets should be, was there

11   somebody else that did that?

12        A.    I think sales targets has

13   come down from where the corporate

14   targets are.

15        Q.    Okay.  So who -- who creates

16   those?

17        A.    So whoever the corporate

18   office was at Actavis at the time.

19        Q.    And who was that?

20        A.    Depends what year.

21        Q.    Well, when you started?

22        A.    Alpharma or?

23        Q.    When you started at Actavis.

24        A.    When I started at Actavis,

Highly Confidential - Subject to Further Confidentiality Review

1    like when we got -- so that would have

2    been based out of Iceland.  They would

3    have given Doug a number for North

4    America, and then he would have given me

5    a target for the generic portion of the

6    U.S.

7         Q.    Okay.  And then at the end

8    of your tenure there, who would have done

9    it then?

10        A.    Claudio Albrecht was the

11   CEO.

12        Q.    The CEO of?

13        A.    Actavis.  Albrecht --

14   Albrecht.

15        Q.    And she was the person --

16        A.    No, he, Claudio.  Claudio.

17        Q.    He was the person that would

18   have designed the sales targets for your

19   group?

20        A.    No.  He would have set the

21   corporate number out of Switzerland then.

22   Doug would have gotten his number, his

23   target, his negotiated target -- I'm just

24   going through the process -- for North

1    America, because he was North America

2    head.  Then he would have given me my

3    target for the generic portion of the

4    business.

5         Q.    Okay.  And then you would

6    give your sales reps their targets based

7    on what your target was, correct?

8         A.    Based on their account base.

9         Q.    Based on what?

10        A.    Their account -- the

11   accounts that they cover.  Each rep has

12   accounts.  So you would base it on the

13   account that they are managing.

14        Q.    Based on both their account

15   base and what your ultimate target was,

16   correct?

17        A.    Right.

18        Q.    Are you aware that their

19   targets generally increased over the

20   years while you were there for selling

21   opioids, generic opioids?

22             MR. LUXTON:  Objection to

23        form.

24             THE WITNESS:  Again, it

1    would depend on the year.  We did

2    have the one year we discussed

3    earlier with the recall that we

4    lost half -- probably half the

5    line.

6  BY MS. BAIG:

7       Q.    Apart from that, are you

8  aware that the sales targets generally

9  increased during your tenure for your

10  sales reps for generic opioids?

11          MR. LUXTON:  Same objection.

12          THE WITNESS:  I would

13    have -- I would have to look at

14    our -- at our year by year.  There

15    would be years that there would be

16    increases.  It could be flat in

17    certain years.  I'd have to

18    look -- I'm sure we have this

19    documentation -- and look at each

20    year and each product.

21  BY MS. BAIG:

22       Q.    And were the sales reps,

23  were they offered bonuses as part of

24  their compensation?

1        A.     Yes.

2        Q.     Were those bonuses in part

3  based on whether or not they met their

4  sales targets?

5        A.     Part of it, yes.

6        Q.     As VP of generic sales, you

7  understood that it was your job to do

8  what you could to drive generic sales for

9  the company, correct?

10             MR. LUXTON:  Objection to

11        form.

12             THE WITNESS:  Yes.

13  BY MS. BAIG:

14        Q.     And what opioids were you

15  responsible for increasing sales for?  Do

16  you recall?

17             MR. LUXTON:  Object to form.

18             THE WITNESS:  Can you repeat

19        that question.

20  BY MS. BAIG:

21        Q.     What opioids -- opioid

22  products were you responsible for

23  increasing sales for?

24             MR. LUXTON:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  It depends on

2     the year.

3 BY MS. BAIG:

4          Q.    Well, over the -- over your

5 tenure, do you recall generally what

6 opioid products you were responsible for?

7          A.    I mean, not without having a

8 product catalog and going through what

9 those --

10          Q.    Was oxycodone one of them?

11          A.    Yes.

12          Q.    Was the -- was the generic

13 brand of Kadian one of them?

14          A.    The authorized generic.

15          Q.    Was that one of them?

16          A.    Yes.

17          Q.    Was oxymorphone one of them?

18          A.    Yes.

19          Q.    Was fentanyl one of them?

20          A.    For a time, and then we

21 discontinued fentanyl.

22          Q.    And was oxy ibuprofen one of

23 them?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And your bonus was tied in

2  part to your ability to increase sales

3  for those products; is that right?

4              MR. ROTH:  Object to form.

5              THE WITNESS:  Can you repeat

6        the question?

7  BY MS. BAIG:

8        Q.    Your bonus was tied in part

9  to your ability to increase sales for

10  those products; is that right?

11              MR. ROTH:  Same objection.

12              THE WITNESS:  My bonus was

13        tied to making my target for an

14        aggregate of all the products for

15        the U.S.

16  BY MS. BAIG:

17        Q.    Which included those

18  products, correct?

19              MR. ROTH:  Same objection.

20              THE WITNESS:  Yes.

21  BY MS. BAIG:

22        Q.    And I think you testified

23  that you didn't recall what your bonus

24  was.  But you do recall that you received

1   one each year; is that right?

2        A.    Excuse me.

3        Q.    I think you testified that

4   you couldn't recall what your bonus was

5   each year.  But do you recall that you

6   did, in fact, receive one each year while

7   you were at Actavis?

8        A.    I will answer that most

9   years.  I can't answer definitely that I

10  received it every year.

11       Q.    Okay.  And what marketing

12  tools did Actavis use to drive sales of

13  these generic products while you were

14  there?

15            MR. LUXTON:  Objection to

16       the form.

17            THE WITNESS:  We -- we

18       don't -- we don't market products.

19       We sell generics.  We don't use

20       marketing.  We actually don't use

21       promotion.

22            We use -- because if you

23       look at generics, we're all the

24       same product.  So we use quality,

Highly Confidential - Subject to Further Confidentiality Review

1    product supply, and pricing

2    primarily to sell our products.

3  BY MS. BAIG:

4        Q.    So are you saying that you

5  don't use any marketing tools to sell --

6  or you didn't use any marketing tools to

7  sell your generic --

8              MR. LUXTON:  Objection to

9        form.

10  BY MS. BAIG:

11       Q.    -- opioid products while you

12  were at Actavis?

13       A.    Because typically when you

14  think of marketing, you think of

15  promoting to the doctors with samples and

16  calling on -- in the pharmaceuticals, and

17  calling on the doctors.  We don't do any

18  of that.

19             So our -- our primary job is

20  to provide an alternative to the branded

21  product at a discount to the branded

22  product on price, have good quality, good

23  supply, and that's how the reps are

24  selling, plus their relationships with

1    the accounts.

2              We don't -- we don't

3    promote --

4    BY MS. BAIG:

5         Q.    Can you define --

6         A.    We don't promote our

7    products.  Promote -- we don't do any

8    what I would call pure promotion, like a

9    branded pharmaceutical company would do.

10        Q.    So you define marketing

11   solely as -- as detailing doctors in

12   doctors' offices?

13        A.    Sampling of products, trying

14   to generate prescriptions.  That would be

15   the marketing of products.

16        Q.    But in terms of marketing to

17   your customers, what tools did you use to

18   market your generic lines to your

19   customers?

20              MR. LUXTON:  Same objection

21        as before.

22              THE WITNESS:  Again, we

23        would -- we would do awareness.

24        Ads would be the very, very --

Highly Confidential - Subject to Further Confidentiality Review

1     just awareness ads in trade

2     magazines would be the very

3     minimum thing that we would do.

4     Or awareness ads on very rare

5     occasions to physicians' offices

6     to let them know that there's an

7     alternative product available.

8   BY MS. BAIG:

9     Q.    Okay.  So you did awareness

10   ads.  Anything else that you can think of

11   to market your generic products to your

12   customers?

13          MR. LUXTON:  Objection to

14     the word "marketing."  You can

15     answer.

16          MS. BAIG:  The special

17     master has defined marketing as

18     anything that you do to sell your

19     product, to get people to buy more

20     of your product.  So let's go with

21     that definition.

22   BY MS. BAIG:

23     Q.    That's the definition that

24   I'm using.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    We don't -- we don't use any

2  promotion to say -- I mean, it's a very

3  unique situation that we're selling on

4  our relationship, the quality of the

5  company, the quality of the product, and

6  distribution.  And that's how we sell.

7  We don't -- we don't sell based on --

8  based on sampling or doing ads on TV.

9  That's what I call marketing.

10    Q.    Didn't you testify earlier

11  that you had a marketing department that

12  was reporting to you?

13    A.    I do have a marketing

14  department that's reporting to me, yes.

15    Q.    When you were at Actavis?

16    A.    Yes.

17    Q.    Okay.  And that marketing

18  department was marketing generic drugs,

19  correct?

20    MR. LUXTON:  Objection to

21    form.

22  BY MS. BAIG:

23    Q.    That was not a branded

24  marketing -- that was not a marketing

1    department that was marketing branded

2    drugs.  That was a marketing department

3    that was marketing generic drugs; is that

4    right?

5            A.    Yes.  Their -- their --

6    their job primarily is not marketing of

7    the products.  It is to manage the

8    product.  They're product managers, from

9    a supply standpoint.  And they're

10   primarily forecasting products, and you

11   can see that over and over in e-mail.

12           They were not marketing as

13   you would think a pharmaceutical company

14   would do.

15           Q.    Well, I'll tell you that the

16   definition that I'm using of marketing is

17   broader than detailing doctors.  And the

18   definition that the special master in

19   this court is using for marketing is

20   broader than merely detailing doctors.

21           But why don't we take a look

22   at --

23           MR. LUXTON:  That's not a

24       question, so you don't need to

Highly Confidential - Subject to Further Confidentiality Review

1    respond.

2    BY MS. BAIG:

3          Q.    -- the next exhibit.  We'll

4    have it marked as Exhibit 18.

5                (Document marked for

6          identification as Exhibit

7          Allergan-Perfetto-18.)

8    BY MS. BAIG:

9          Q.    This is a document that's

10   Bates-stamped ACQUIRED_ACTAVIS_022339773

11   through 0239774.  I'll represent for the

12   record that there is a PowerPoint

13   presentation for this multi-page, which

14   is Bates-stamped 02239774.  It appears to

15   be an e-mail from you to David Myers,

16   Rachelle Galant, and others, sent on

17   February 9, 2010, with the subject "Sales

18   Presentation."

19                Do you see that?

20         A.    I do.

21         Q.    And it says, "Sales meeting

22   February '10."  Presumably that's 2010.

23                Do you see that?

24         A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you have an
2  understanding of what this document is?
3    A.    This is my sales
4  presentation at the 2010 meeting.
5    Q.    At the 2010 sales meeting?
6    A.    Yes.
7    Q.    Okay.  And who was present
8  at that meeting?
9    A.    My sales reps.  I don't know
10  if -- probably -- definitely my sales
11  reps.  Let's see if -- I'm not sure who
12  was working for me in 2010.  That's my
13  problem, whether -- I don't know if Ara
14  was at the company yet.  This is going
15  back so long ago.
16    Q.    And --
17    A.    So definitely my sales reps.
18    Q.    Was there an annual
19  salespeople meeting that you conducted?
20    A.    No.
21    Q.    Okay.  This was just a
22  one-off sales meeting in February of 2010
23  or were there regular sales meetings?
24    A.    No.  We probably had three

Highly Confidential - Subject to Further Confidentiality Review

1    sales meetings a year.

2         Q.    And typically, it was just

3    you and your reps, or were there other

4    departments there as well?

5         A.    No.  But it fluctuated.  And

6    I -- without having who attended, I'd be

7    guessing in 2010 whether Jinping was

8    there, whether Nancy -- I don't know if

9    Nancy was working for me.  I don't

10   have -- I don't have a vision of who was

11   actually at the meeting, other than the

12   reps.  And I'm not even sure which reps

13   were working for me in 2010.

14        Q.    Okay.  So if you've turned

15   to the next page.

16        A.    Yep.

17        Q.    It says, "2009, a great

18   success story."

19             Do you see that?

20        A.    I do.

21        Q.    And did you create this

22   document, by the way?

23        A.    Probably not.

24        Q.    Who typically created these

1    documents for you?

2         A.    Marketing does PowerPoints

3    for me.

4         Q.    Marketing would have created

5    this document for you.  And then would

6    you have been the one to present it?

7         A.    I would.

8         Q.    Who at marketing?

9         A.    Jinping's group.

10        Q.    And on the first -- on the

11   first page you're -- you're stating the

12   success story for 2009, correct?

13        A.    Yes.

14        Q.    And the first row of the

15   chart you have there is for generic

16   prescription products, correct?

17        A.    Yes.

18        Q.    And it's showing growth of

19   22 percent; is that right?

20        A.    Growth of 22 percent, yes.

21        Q.    And that's for all of your

22   generic prescription products, correct?

23        A.    No.  There's -- there's

24   products in the three buckets below too.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Oh, is this -- so the

2    reference to Kadian is a Kadian generic

3    or is it --

4    A.    Kadian generic.

5    Q.    Okay.  Why was Kadian

6    generic set out separately from other

7    generic prescription products, do you

8    know?

9    A.    I don't know why.

10   Q.    What does CR stand for, do

11   you know?

12   A.    Where do you see that?

13   Q.    Next page, first bullet.

14   I'm ahead of you.

15   A.    Oh.  CR is oxy -- oxy --

16   oxycodone controlled release.

17   Q.    Okay.  So it says launched

18   oxycodone IR?

19   A.    Right.

20   Q.    Which stands for?

21   A.    Immediate release.

22   Q.    And CR, controlled-release.

23   Is CR the same as extended-release?

24   A.    Yes.

1    Q.    Okay.  Achieving annual

2   sales of $93 million, correct?

3        A.    Right.

4    Q.    And then you have listed

5   below price increases resulted in

6   24 million.  You have Acetasol resulted

7   20 million.  And Diltiazem in 43 million.

8        So is it fair to say that

9   oxycodone IR and CR were your biggest

10  products for 2009 for $93 million?

11       A.    We probably have that listed

12  somewhere within this deck I would think.

13       Q.    I think we'll get there.

14  But is that a fair statement?

15       A.    I'd like to see how it --

16  how it compares, if it's in here.

17       Q.    If you want to skip the

18  three pages --

19       A.    Yeah.

20       Q.    -- three pages later --

21       A.    Yeah.

22       Q.    -- we see that oxycodone ER

23  is ranked Number 1 in terms of net sales?

24       A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    At 49.9 million, correct?

2    A.    I see that.

3    Q.    Okay.  And so oxycodone ER

4    for 2009 was your top product; is that

5    right?

6    A.    Yes.

7    Q.    And morphine sulfate ER,

8    which is generic Kadian, was your third

9    top product at $30.4 million; is that

10   right?

11   A.    That is.

12   Q.    And oxycodone IR was your

13   sixth top product at 24.1 million in net

14   sales, correct?

15   A.    Yes.

16   Q.    And fentanyl was your

17   seventh top product at 21.8 million in

18   net sales, correct?

19   A.    Yes.

20   Q.    And this actually, at the

21   top states, top products for 2010, right?

22   A.    That's right.

23   Q.    But -- but it looks as if

24   this meeting was held in February of

Highly Confidential - Subject to Further Confidentiality Review

1    2010.  So would these have been your top

2    products for 2009?

3          A.    I don't know.  Let me --

4          Q.    In any event, you identified

5    them for purposes of this presentation as

6    being --

7          A.    Yeah, maybe in year.

8          Q.    -- top products?

9          A.    Might have been for '11.

10          Q.    If you go back two pages to

11    where it says 2009 sales and marketing

12    success.

13          A.    Mm-hmm.

14          Q.    You see that you're calling

15    out the marketing success?

16          A.    I think --

17          Q.    In the heading on the third

18    page?

19          A.    -- I think -- I think '11,

20    the number in -- oh wait.  Maybe I'm

21    reading this wrong.

22          Q.    I'm looking at the --

23          A.    What are you --

24          Q.    -- the third page of the

1    PowerPoint which is the fourth page of

2    the document.

3                  Do you see that?

4         A.     I'm looking at your screen.

5         Q.     Perfect.

6         A.     Okay.

7         Q.     Do you see the heading says

8    "2009 sales and marketing success"?

9         A.     Yep.

10        Q.     So you are calling out your

11   team's marketing success for 2009; is

12   that right?

13        A.     Yep.

14        Q.     And do you see here that --

15   that you're stating that oxycodone IR and

16   CR had -- had the largest annual sales,

17   do you see that?

18        A.     I'm saying that we achieved

19   $93 million in sales.

20        Q.     And that's the largest one

21   on this page, correct?

22        A.     On this page, yes.

23        Q.     And on the next page, you

24   have sales performance list -- listed, do

Highly Confidential - Subject to Further Confidentiality Review

1    you see that?

2          A.    Yes.

3          Q.    And are these your sales

4    reps, Berryman, Cohen, Pehlke, Dorsey and

5    Thad Demos?

6          A.    They are.

7          Q.    Okay.  And in the -- the

8    last column it says, "2H percent, target

9    achieved."

10          Do you see that, at the top

11   of the last column?

12          A.    I do.

13          Q.    And what does 2H percent

14   mean?

15          A.    Second half of the year.

16          Q.    Okay.  And so this -- this

17   shows that all except for one exceeded

18   their sales target; is that right?

19   Because they're all over 100 percent?

20          A.    That's what it shows.

21          Q.    With the exception of Pehlke

22   who is at 80.7 percent, correct?

23          A.    That's true.

24          Q.    Okay.  And --

1      A.    For direct -- for the direct

2   side of the business.

3      Q.    Okay.  So that's for direct

4   sales.  And then down below you have

5   again a list of your sales reps for

6   indirect sales, correct?

7      A.    Right, but --

8      Q.    And it looks like they are

9   the same but in a different order; is

10  that right?

11     A.    Yes.  Same -- same reps.

12     Q.    So is it -- the same reps.

13  Was that the way it was structured, that

14  the same reps who marketed the -- who --

15  who sold the generic drugs to the direct

16  customers were the ones who sold generic

17  drugs to indirect customers?

18     A.    I just want to clarify for

19  you, indirect customers to these people

20  would be major warehouse people that

21  don't -- major accounts that don't have a

22  warehouse.  Not -- not independent

23  pharmacies.

24          So -- I'm trying to give you

1    an example.  SuperValu, I think, would be

2    one example, or -- or maybe like Giant

3    Foods didn't have a warehouse.  So

4    they -- or -- or Safeway out by you,

5    wouldn't have a warehouse.  So these

6    indirect accounts are not independent --

7    in -- what you're thinking of

8    independent -- my reps did not call on

9    independent pharmacies on the corner of

10   the street in New York City or something.

11              These are large, very large

12   accounts that bought through wholesalers,

13   that we could do contracting with.  Does

14   that make sense?

15        Q.    Yes.  But my question was,

16   is it the same reps who were marketing

17   generic drugs to your direct customers as

18   it was who marketed generic drugs to your

19   indirect customers?

20        A.    The same reps sold product

21   to direct customers as well as sold

22   product to indirect customers.

23        Q.    And these are -- what was

24   the difference in terms of how they sold

Highly Confidential - Subject to Further Confidentiality Review

1  the product to direct customers and

2  indirect customers?

3        A.    It's -- it's the price,

4  product supply, quality of the product,

5  consistent supply.

6        Q.    What do you mean by quality

7  of the product, aren't they selling the

8  same product?

9        A.    They are, but some -- some

10 people had a lot of recalls, some

11 competitors.

12             So that the quality of the

13 product, meaning that -- they are all the

14 same product, but if you don't have

15 consistent supply and you are having a

16 lot of recalls -- when I think of

17 quality, I think of recalls.  That would

18 hurt your sales.

19       Q.    But they are selling the

20 same product to their direct customers as

21 they are selling to their indirect

22 customers, right?

23       A.    Right, but you --

24       Q.    I'm trying to get at what

1    the difference is between how they market

2    or sell their product to direct customers

3    and how they do it to indirect customers.

4          A.    They -- they sell -- that's

5    what I'm getting at.  They sell the same

6    way.

7          Q.    Okay.  So there's no real

8    difference?

9          A.    They sell the same way.

10         Q.    And on the next page it

11   looks like Mr. Thad, a/k/a Tad was the

12   highest regarded salesperson for --

13         A.    Yeah.

14         Q.    -- for 2009; is that right?

15         A.    Yes.

16         Q.    And did he get some sort of

17   recognition for being the -- the top

18   seller?

19         A.    I don't think it was

20   substantial.

21         Q.    You don't think what?

22         A.    I don't think it was

23   substantial.

24         Q.    No substantial recognition

Highly Confidential - Subject to Further Confidentiality Review

1    for being the top seller?

2         A.    If I recall, this was kind

3    of like a candy bar and a $100, if I

4    recall.  Some -- it was kind of a -- a

5    little bit of a joke with it.  I mean,

6    when you only have four reps or five reps

7    so...

8         Q.    But he would have most

9    likely received his bonus, correct?

10        A.    He received his bonus if

11   he -- well, Thad was a consultant so I'm

12   just trying to think whether he was on

13   our -- I don't -- I'd have to look at --

14   at the document.

15             He was a consultant, sales

16   consultant.  I believe he was on the same

17   program.  But -- but he would have

18   made -- he would have gotten his bonus

19   payout if -- his maximum bonus payout if

20   he met the three criteria -- there -- it

21   was broken down into three criterias, the

22   program.

23        Q.    Meaning your sales targets

24   and what else?

1      A.    We had a team bucket, so

2  they had to -- we had to meet our total

3  number as a team in order to get

4  100 percent payout.

5           Their specific, what I would

6  call their specific targets, and then I

7  had what I call a soft bucket based on

8  their performance and management of -- of

9  their territory.  It fluctuated over the

10  years -- treatment, their professionalism

11  in the field, just what I call a soft

12  budget.

13      Q.    And if you turn to the next

14  page.  Do you see the page that starts,

15  "Top ten accounts"?

16      A.    Yeah.

17      Q.    And were those your biggest

18  customers listed there, Cardinal Health,

19  McKesson Drug, AmerisourceBergen?

20      A.    Yes.

21      Q.    VA, what's VA?

22      A.    Veterans -- Veterans

23  Administration, association -- whatever

24  the vet -- whatever we call our vet

1    hospitals.

2          Q.    Yeah.

3          A.    Yeah.  They had a big mail

4    order company.

5          Q.    Okay.  Walgreens is your

6    fifth largest company, correct?

7          A.    In --

8          Q.    In generic?

9          A.    In this -- whatever this

10   year is.  I think this is '9.

11         Q.    2009?

12         A.    Because this is -- I don't

13   know if I made a mistake.  But I think

14   this is the calendar year '9.  It doesn't

15   say the year.

16         Q.    Okay.  On the next page, you

17   have, "Path for sales success"?

18         A.    Yes.

19         Q.    It begins with, "Focus on

20   key profitable products and key

21   customers," correct?

22         A.    Yes.

23         Q.    And the key profitable

24   products that we just saw or the most

Highly Confidential - Subject to Further Confidentiality Review

1    profitable product at that point was

2    oxycodone ER, correct?

3         A.    Right.

4         Q.    And the key customers are

5    identified on the prior page, correct?

6         A.    Yes.

7         Q.    "Sell on Actavis growth

8    story."  What was Actavis' growth story

9    that you were using to market the drugs?

10        A.    The company was -- had a lot

11   of acquisitions globally.

12        Q.    And how did you use that to

13   sell the drugs?

14        A.    It showed that we had growth

15   by acquisition, and that you wanted --

16   the customer -- you told the customers

17   they wanted to partner with a company

18   that is buying other companies.

19        Q.    And the next one, it says,

20   "Sell on Actavis global position."  What

21   would -- what did that mean?

22        A.    It means that we had a

23   global footprint, so we could compete

24   with -- with other major players because

1    we had plants throughout the world with

2    low costs and with the ability to -- to

3    make unique products.

4            Q.    And that was something that

5    you used to market your products to the

6    distributors or to your -- to your

7    customers?

8            A.    It was part -- one of the

9    selling story lines for the reps.

10           Q.    And what was, "Keep the

11   snowball rolling to make it bigger"?

12   What does that refer to?

13           A.    That's just a little slang

14   that if you start business with a

15   customer, and you get an item, you can

16   build upon it, just a building block,

17   just another way of saying building

18   block.

19           Q.    Okay.  And the last -- and

20   the last slide sets forth the sales

21   target for the sales and marketing teams;

22   is that right?

23           A.    Yes.

24           Q.    And it was set at

Highly Confidential - Subject to Further Confidentiality Review

1       $477.5 million.

2                   Do you see that?

3           A.      I do.

4           Q.      And --

5                   (Document marked for

6           identification as Exhibit

7           Allergan-Perfetto-19.)

8    BY MS. BAIG:

9           Q.      I'll have this marked as

10   Exhibit 19.

11                  When somebody says, "I may

12   cut orders," what does that mean?  Does

13   that mean reduce orders?

14          A.      No.  That means -- that

15   means they are going to --

16          Q.      Place orders?

17          A.      -- physically place orders.

18          Q.      Okay.  So you see at the

19   bottom of this e-mail chain there's --

20   this document is Bates-stamped

21   ACQUIRED_ACTAVIS_01169947, and the bottom

22   begins as an e-mail from Joe Lefebvre,

23   who is from AmerisourceBergen, correct?

24          A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    To you, on April 8, 2009,

2  and he's basically stating to you that he

3  may place oxy orders next week; is that

4  right?

5    A.    That's what he wrote.

6    Q.    And you forward that on to

7  Doug Boothe --

8    A.    I did.

9    Q.    -- who you're reporting to,

10 correct?

11   A.    Yes.

12   Q.    As good news, correct?

13   A.    Yes.

14   Q.    And he responds that it's

15 positive.  And then you respond back

16 that, "All focused on driving sales on

17 oxy."

18         Do you see that?

19   A.    I do.

20   Q.    How did you -- how did you

21 focus on driving sales of oxy?

22   A.    This is, I believe, the

23 relaunch after we were off the market for

24 a year, just going off of the fact that

1    we had short dated product.  So I

2    would -- I would sell oxy by explaining

3    to people that we were back in the

4    market.  We were making it.  I believe we

5    moved it to our Elizabeth site.  So it

6    was a better -- it was a higher quality

7    site.  It was no longer being made at

8    Amide.

9              And -- and I would tell them

10   that we had product to sell and

11   inventory.

12        Q.    Do you know what ADM stands

13   for?

14        A.    I do not.

15        Q.    If you wrote to -- from you

16   to Doug Boothe and you signed it, "Your

17   ADM," do you know what that means?

18        A.    Is it on here?

19        Q.    No, it's on a different

20   document which I might not need.  But I

21   was just wondering if you knew --

22        A.    ADM?  ADM.  I do not.  If I

23   saw the whole e-mail I might be able to

24   figure it out.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2          identification as Exhibit

3          Allergan- Perfetto-20.)

4    BY MS. BAIG:

5          Q.    Let's have this document

6    marked as Exhibit 20.

7              MR. LUXTON:  After you're

8          done with this one, can we take a

9          quick break?

10             MS. BAIG:  Sure.

11             MR. LUXTON:  Thanks.

12   BY MS. BAIG:

13         Q.    This is a document

14   Bates-stamped ACQUIRED_ACTAVIS_00002258

15   to 2259.  It starts as an e-mail from you

16   to Doug Boothe on February 20th, 2008.

17   And the subject is "Programs."  And the

18   attachment is "Strategic Program Tracking

19   Sheet."

20         A.    Mm-hmm.

21         Q.    And you write to him, "Let

22   me know if I missed anything, your ADM."

23             Do you see that?

24         A.    I think I meant admin.

1    Q.    Your admin?

2    A.    Because I had -- because of

3  what I put together, your admin.

4    Q.    Okay.  And then you've got

5  on the next page, "Strategic program

6  tracking sheet," right?

7    A.    Yes.

8    Q.    And what -- so for

9  example -- well, what is this document?

10    A.    It docs -- what we were

11  potentially trying to do with each of the

12  major customers, and where we were with

13  the strategic program with them.

14    Q.    And are these marketing

15  programs?

16    A.    No.  They are more

17  contract -- contract negotiation

18  programs, I would call them.  They are

19  usually financially driven.

20    Q.    And who creates the

21  contracts?  Who drafts the contracts?

22  The contracts department?

23    A.    They do, yes.

24    Q.    And that was Ara

1  Aprahamian's unit?

2      A.    He would draft the formal

3  contract.  The negotiation would be,

4  depending on the size of the account,

5  with the rep, myself, maybe Ara.  Again,

6  a cross-functional team.  Maybe Doug.

7  Depending on the size of the team.

8      Q.    Was Jinping involved in that

9  as well?

10     A.    Occasionally.  Not as much.

11     Q.    So if you look a little more

12  than halfway down --

13     A.    Yep.

14     Q.    -- ANDA is listed.  And in

15  the program type, it says, "Expand

16  existing strategic program (fentanyl)" --

17     A.    Yep.

18     Q.    -- and another drug?

19     A.    Nifedipine.

20     Q.    -- "to include new 2008

21  approvals.  Propose Actavis strategic

22  points program for targeted accounts."

23          What was the strategic point

24  program?

Highly Confidential - Subject to Further Confidentiality Review

1       A.     That was a program.  I

2  couldn't give you the details to save my

3  life right now.  But it was a program

4  developed by -- actually I misspoke.  I

5  didn't look at the date here.  Ara

6  Aprahamian was not with the company in

7  2008.  Sorry.

8       Q.     Okay.

9       A.     I just want to qualify.  You

10  asked if he -- I didn't realize this was

11  this old of a --

12       Q.     Okay.

13       A.     So it was a program that was

14  not around a long time.  But it was a

15  program that Terry Fullem and Joe

16  Corsetti established.

17       Q.     What division were they in?

18       A.     They worked for Doug

19  directly.  It was before I had -- I had

20  contracts in pricing.  They worked for

21  Doug directly.  This is going back 2008.

22       Q.     And they were in what

23  division?

24       A.     They were in the generics.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Generics?

2    A.    Yeah.

3    Q.    They were not in a

4  subdivision of generics at all?

5    A.    No.

6    Q.    And do you recall what the

7  strategic points program was?

8    A.    I recall that it was a very

9  convoluted, confusing program.

10   Q.    But you don't recall what

11  the existing program was or how it was

12  being changed for fentanyl?

13   A.    No, I do not.

14   Q.    Or how it was being expanded

15  for fentanyl?

16   A.    I do not.

17   Q.    And do you see in the next

18  square right next to that it says,

19  "Compliance programs underway to drive

20  additional fentanyl and Nifedipine" --

21   A.    Nifedipine ER.

22   Q.    "Nifedipine ER conversion"?

23   A.    Yep.

24   Q.    What does that mean?

1           What compliance programs

2    were underway to drive fentanyl?

3           A.    Fentanyl had a very poor

4    substitution rate for generic so these

5    were programs to try to see if customers

6    could -- could utilize the generic more

7    than the brand.

8                 MR. LUXTON:  Are you going

9           to the next document?

10                MS. BAIG:  Mm-hmm.

11                MR. LUXTON:  Do you want to

12          take a quick break?

13                MS. BAIG:  Mm-hmm.

14                MR. LUXTON:  Thanks.

15                THE VIDEOGRAPHER:  Please

16          remove your microphones.  The time

17          is 4:43 p.m.  We are off the

18          record.

19                (Short break.)

20                THE VIDEOGRAPHER:  We are

21          back on the record.  The time is

22          4:57 p.m.

23                (Document marked for

24          identification as Exhibit

1          Allergan-Perfetto-21.)

2    BY MS. BAIG:

3          Q.    I'll have this document

4    marked as Exhibit 21.

5               This document begins as an

6    e-mail from you to Doug Boothe, cc'g

7    Jinping McCormick.  Bates-stamped

8    ALLERGAN_MDL_ 0121248 through 21261.

9               And it appears to be a

10   presentation that you were sending to

11   Doug Boothe, a -- just a presentation.

12              Do you see that?

13         A.    I do, yes.

14         Q.    And this was prepared for

15   the Actavis sales meeting on February 15,

16   2012?

17         A.    Yes.

18         Q.    And was this a presentation

19   created by you?

20         A.    It would be created by

21   Jinping's group.

22         Q.    Jinping group was a

23   marketing group, right?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And was it created to

2  motivate your generic sales team to drive

3  sales of their -- of their generic

4  products?

5    A.    It was a sales meeting

6  presentation.

7    Q.    And the title is "Bring your

8  a Game."

9    A.    The theme of the meeting.

10    Q.    Was to bring your a game?

11  To motivate your sales guys, right?

12    A.    Yeah.  That's what you have

13  a sales team for.

14    Q.    Okay.  And was this a

15  similar type of meeting as the one that

16  we just went through with the other

17  PowerPoint presentation?

18    A.    Similar, yeah.

19    Q.    And do you recall who was

20  there?

21    A.    Just based on the agenda,

22  Jinping was there.  Ara was there.  It

23  looks like -- this meeting, I think, was

24  held in Morristown.  So I see Michael

1    Clarke did give a 30-minute presentation.

2    OTC team gave a presentation.  So if --

3    if it was held in Morristown, these

4    people would be just brought in to update

5    the sales team.

6            Q.    Okay.  And here, you're

7    touting, "Another great success story for

8    2011, three years in a row," right, on

9    the next page?

10           A.    I am, yes.

11           Q.    And is the purpose of this

12   to show the reps how they compare to each

13   other in terms of their sales targets?

14           A.    Just to show them results

15   for the year.

16           Q.    And it appears from the last

17   column that each of them met their sales

18   targets with the exception of Berryman,

19   who was at 98.99 percent; is that right?

20           A.    That's true.

21           Q.    So they all either met or

22   exceeded their sales targets; is that

23   right?

24           A.    They did that year.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And Ms. Lisa Pehlke was

2    called out for being an outstanding sales

3    rep; is that right?

4    A.    It appears that way in the

5    letter.

6    Q.    And on the next page, it

7    shows top accounts for growth in fiscal

8    year 2011.

9    Do you see that?

10   A.    I do.

11   Q.    And again it calls out

12   McKesson and Walgreens and Opti-Source,

13   Medco and Kaiser as being your top

14   customers; is that right?

15   A.    It's top accounts for

16   growth.  I'm not sure if it's top

17   accounts to our top customers.

18   Q.    Okay.  So these customers

19   grew the most?

20   A.    Yes.  That's the way I read

21   it.

22   Q.    For generic products, right?

23   A.    Yes.

24   Q.    And it says down here,

1    "Combined sales greater than 10 million

2    in 2011."

3             Do you see that?

4         A.    Mm-hmm.

5         Q.    That was just for these

6    customers?

7         A.    To make this list you had to

8    have combined sales, so I could have

9    had -- the reason that's in there is, you

10   could have a very small account that had

11   200 percent growth but it's a very small

12   account, so it's not relevant.

13        Q.    I see.  So each of these

14   customers had no -- it's not that each of

15   these customers had sales greater than 10

16   million, is it?  Or is it?

17        A.    Yes, yes, yes.

18        Q.    Okay.  So each of these

19   customers had more than $10 million in

20   sales?

21        A.    To make this slide.

22        Q.    Yes.

23        A.    To be a posted -- to be

24   written on this slide.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And each of them had a

2    growth rate greater than 20 percent in

3    2010, correct?

4         A.    Yes.

5         Q.    Okay.  Actually in 2011,

6    correct?

7         A.    '11, yes.

8         Q.    Okay.  Excluding Kadian.

9    Why is Kadian carved out here?  This is

10   the brand name Kadian being carved out?

11        A.    No.  We never sold the

12   brand.  We sold the authorized generic of

13   Kadian.  My team -- excuse me, my team

14   never sold Kadian brand.

15              I'm not sure why.  I

16   don't -- at this day, I don't know why

17   that was excluded.  But there had to be a

18   reason.  I don't know why the reason is.

19        Q.    Was it -- was it -- could it

20   have been because the company was also

21   selling branded Kadian, and so the

22   generics division was not pushing generic

23   Kadian?

24        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    On the next page, you see

2  the top ten products for 2011?

3    A.    I do.

4    Q.    And you see that the

5  fentanyl patch has actually moved up from

6  the place it was in on the last

7  PowerPoint to Slot Number 2 here.

8         Do you see that?

9    A.    I do.

10    Q.    And oxycodone remains at the

11  highest selling product, correct?

12    A.    I do.

13    Q.    And it shows here the

14  generic revenue target as being

15  $610 million.

16         Do you see that on the next

17  page?

18    A.    It is.

19    Q.    And that's an increase from

20  the last year's -- or from the last

21  generic revenue target that we saw from

22  the last PowerPoint presentation,

23  correct?

24    A.    From the 2011?

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     From the PowerPoint

2   presentation that was dated February of

3   2010.

4        A.     I believe so.

5        Q.     That had a sales target of

6   $477.5 million, correct?

7        A.     Yes.

8        Q.     So it's grown, over -- over

9   the course of those years, correct?

10              MR. ROTH:   Object to form.

11              THE WITNESS:   Yes.

12  BY MS. BAIG:

13       Q.     On the next page, do you see

14  it says, "AG opportunities and review of

15  competitors' product lines for additional

16  revenues"?

17       A.     Mm-hmm.

18       Q.     What's AG?

19       A.     Authorized generic.

20       Q.     On the next page, do you see

21  it says, "Key products needle movers with

22  key customers follow the POA"?

23       A.     Yes.

24       Q.     What is POA?

1    A.    Plan of action.

2    Q.    What is the 80/20 rule?

3    A.    It's Italian philosopher's

4  rule that -- I'm trying to think of the

5  actual philosopher.  Does anybody...

6         It -- it means that in life,

7  80 percent -- in sales, let's use sales

8  because we are talking sales here, but in

9  life it works too.  80 percent of your

10  business comes from 20 percent of your

11  customers.

12    Q.    And on the next page you

13  have sales improvement areas.  Do you see

14  that?

15    A.    Yes.

16    Q.    The first one being

17  accountability.  What did you mean by

18  that?

19    A.    It means that the sales reps

20  need to take accountability for their

21  actions and their -- and their accounts,

22  and what their responsibility is as a

23  sales rep.  Calling on the accounts.

24  Being professional.  Following up with

1    internal people.  That's accountability.

2         Q.    And do you see the second

3    bullet says, "Less e-mails, more phone

4    calls or meetings"?

5         A.    Yes.

6         Q.    And why were you suggesting

7    that the sales reps use less e-mails?

8         A.    Because I find that

9    people -- I -- I have a -- that's a pet

10   peeve -- personal pet peeve of mine.

11   People say I sent you an e-mail, and

12   there's -- they -- especially reps who

13   are in the field -- and then they wipe

14   their hands that they are done with this.

15   That's where accountability falls in.

16             Call people up on the phone,

17   set up a meeting, just don't say in an

18   e-mail.

19        Q.    And the next bullet says,

20   "Don't ask, don't get field information"?

21        A.    That's right.

22        Q.    Why were you suggesting that

23   the sales reps should not be asking about

24   or getting field information?

1    A.    No, I'm telling them, that

2    means don't ask, don't get, meaning you

3    have to ask in order to get.  We -- we

4    needed the -- part of their -- their

5    compensation was -- was getting -- we --

6    we can't manage the business from

7    corporate without having an understanding

8    of the market dynamics.  So if you don't

9    ask for field information, you don't get

10   it.

11   Q.    And the next bullet says,

12   "How can you be better than Watson, if

13   you expect the same outcome with the same

14   input?"

15   What did you mean by that?

16   A.    This was a time that Watson

17   was -- when was this meeting?  So

18   Watson -- this -- the -- again, the

19   Watson was buying Actavis.  So I was

20   trying to prepare the reps that there

21   would be a selection process.  That they

22   needed to do -- they needed to be -- they

23   really needed to focus and -- and do

24   their best this calendar year '12,

1  because it would be the last year.

2  And -- and Watson would be picking the

3  best team to go forward with.  So that's

4  what that -- I meant by that.

5       Q.    And the next one says, "Take

6  more risk."  What type of risk were you

7  suggesting the sales reps take?

8       A.    I don't -- I don't know.

9  Just -- just in general push the

10  envelope.  I really don't know.

11       Q.    Then the next page has the

12  2012 direct and indirect targets.  Do you

13  see that?

14       A.    I do.

15       Q.    Why are the second half of

16  the year targets lower than the first

17  half of the year?

18       A.    Probably expected

19  competition on products.

20       Q.    On the next page it states,

21  "Focus on the needle mover products."

22            Do you see that?

23       A.    Yeah.

24       Q.    And for fentanyl patch it's

1    showing the estimated December 2011 share

2    as 10 percent and the target additional

3    share is 3 percent.

4           A.    That --

5           Q.    Do you see that?

6           A.    That's right.

7           Q.    What does that mean?

8           A.    It means that we have

9    10 percent of the generic fentanyl patch

10   business.  And I want three additional

11   points.

12          Q.    Okay.  And why does

13   oxymorphone ER have an N/A?

14          A.    Let's see.  Maybe I can

15   figure it out.

16          Q.    If you look in the comments

17   box?

18          A.    This -- this product is very

19   unique in that when we launched, the

20   brand discontinued the strengths.  So we

21   had no reference drug.

22          Q.    I see.  So you had no -- so

23   you couldn't figure out the share for

24   that, is that what you're saying?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.  It's a very unique

2  product in that we were -- we -- we

3  launched with the certain milligram and

4  the brand had -- before we launched, the

5  brand had discontinued the product.

6  So -- so that the -- their scripts were

7  going down.  So I don't think we could

8  get an accurate analysis of the share.

9    Q.    So on the last page, you

10  have -- you are setting a target for your

11  sales and marketing team of $610 million,

12  correct?

13    A.    Yes, ma'am.

14    Q.    And that's an increase from

15  the last one; is that right?

16    A.    Yes.

17      (Document marked for

18      identification as Exhibit

19      Allergan-Perfetto-22.)

20  BY MS. BAIG:

21    Q.    I'll have this document

22  marked as Exhibit 22.  Who is Joseph

23  Corsetti?

24    A.    He was contracts and pricing

1  at Alpharma, probably the time period of

2  2008.

3  Q.  And this, you'll see, is an

4  e-mail from you to Joseph Corsetti and

5  others on -- in March 11, 2008.  Subject

6  line is Kroger Choice program offer --

7  well, Kroger Choice menu, and Kroger

8  Choice program offer.  And it's

9  Bates-stamped Acquired_Actavis_00452409

10  through 52411.

11  Do you see that?

12  A.  Yeah.

13  Q.  Okay.  And the second page

14  is a chart that lists a number of your

15  products, the form, the strength, the

16  size, the brand, the status and the

17  points.  Do you know what this chart

18  reflects?

19  A.  This is the Choice program

20  that you asked me about that I told you

21  was a convoluted -- convoluted --

22  convoluted program.  Very confusing

23  program, let's put it that way.

24  Q.  Okay.  And what are the

Highly Confidential - Subject to Further Confidentiality Review

1    points in the last column?

2         A.    You -- you got points,

3    just -- just a number, if you selected

4    certain products.

5         Q.    You being the customer?

6         A.    Yeah.  Like a -- it's almost

7    like a -- I don't know.  I really -- I

8    didn't develop this program.  And I -- I

9    don't think we -- we were able -- to the

10   best of my knowledge, we weren't able to

11   execute on this program.

12        Q.    Who developed the program?

13        A.    Joe Corsetti and Terry

14   Fullem.

15        Q.    And under the program, your

16   customers were offered certain points if

17   they placed for example, oxycodone

18   15 milligrams and 30 milligrams onto --

19   onto their contract; is that right?

20        A.    Onto their formulary.

21        Q.    Onto their formulary.

22        A.    Yeah.  Their -- their retail

23   or mail order formulary.

24        Q.    And so, looking at this

Highly Confidential - Subject to Further Confidentiality Review

1    chart, if they placed oxycodone

2    15 milligrams or 30-milligram tablets

3    onto their formulary, they would receive

4    2.2 points, right?

5         A.    Yeah.

6         Q.    And what would they use the

7    2.2 points for?

8         A.    I -- I think you've had the

9    more products -- well, it should be

10   described on the next slide.

11        Q.    Let's take --

12        A.    I don't remember this

13   program, it's 2008, without referencing

14   the slide.

15        Q.    Sure.  Let's take a look at

16   it.

17        A.    I didn't really --

18        Q.    It appears from the next

19   page that there was a 25-point program

20   and a 50-point program.  Do you see that?

21        A.    Right.  Right.  I do.

22        Q.    And -- and it -- and under

23   the 25-point program, if Kroger selected

24   certain products totaling 25 points in

Highly Confidential - Subject to Further Confidentiality Review

1   value, then they would receive an upfront

2   incentive payment from Actavis, correct?

3           A.      Yep.

4           Q.      And they would additionally

5   receive a 15 percent rebate for all new

6   products -- products added under the

7   program for the length of the agreement;

8   is that right?

9           A.      That's right.

10          Q.      Okay.  And then the 50 --

11  50-point program has slightly different

12  terms, but it's -- it's similar in

13  concept, correct?

14          A.      And this is a proposal.

15          Q.      Okay.  So do you know

16  whether this program was ever

17  implemented?

18          A.      With Kroger?

19          Q.      With anyone.

20          A.      I don't -- I -- sitting here

21  now, in 2008 -- is it 2008?  I -- I don't

22  know if it was implemented with anybody.

23          Q.      And what was finasteride?

24  Do you know what kind of drug that is?

1        A.     Yeah, I do.  It's a BPH
2    drug.
3        Q.     What's BPH?
4        A.     It's for men with prostate
5    problems, non -- non-cancerous prostate
6    problems.  It's a female hormone.
7        Q.     Okay.  So the drug with --
8    with the first amount of points was
9    finasteride, correct, on the preceding
10    page?
11        A.     Yeah.  Yes.
12        Q.     And the drug with the second
13    amount of points was oxy and ibuprofen;
14    is that right?
15        A.     I think this is just an
16    example that they developed.
17        Q.     So you don't know whether
18    this was ever offered to Kroger?
19        A.     I wanted to see if they
20    e-mailed it to Kroger.  I don't recall.
21    And I don't know whether -- it could have
22    been offered to Kroger, but I don't
23    believe it was executed upon with Kroger.
24        Q.     Why -- why do you think it

1  wasn't?

2        A.    I don't -- I think it's too

3  complicated.  It's very complicated in

4  what is -- it's very confusing.  It was

5  always very confusing to me, this

6  program.  So it's hard to sell it.

7        Q.    So you're not aware one way

8  or the other whether the Marketing Choice

9  Point program was ever implemented with

10 any customer; is that right?

11       A.    I would think you could --

12 if it was, it would be in our contract

13 system.

14       Q.    Okay.

15       A.    Maybe there's one or two or

16 three accounts.  I'm not going to say --

17 I cannot sit here in 2018, 10 years ago,

18 and say ABC agreed to this.  I have no

19 idea.

20       Q.    And do you recall

21 offering -- apart from the Marketing

22 Choice Point program, do you recall

23 offering rebates to certain of your

24 clients?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And how did the rebate

3  program work?

4    A.    It depended on the customer.

5    Q.    Generally speaking, though,

6  how did the rebate program work?  Was it

7  that if they placed drugs on formulary

8  they would get a rebate or was it if they

9  purchased a certain amount of quantity

10  they would get a rebate?

11    A.    It really, really is

12  specific.  Every contract negotiation is

13  specific to the customer and trying to do

14  better than the other generic

15  manufacturers, with also keeping the

16  company profitable at the same time.

17    Q.    And do you know what the

18  range of rebates offered was?

19    A.    No, I do not.

20    Q.    Do you know -- do you know

21  whether there were in fact rebates

22  offered that were basically volume

23  incentive?

24    A.    We had volume incentive

1    rebates, again, with specific customers.

2        Q.    Okay.  What other types of

3    rebates did you have?

4        A.    I mean, product-specific

5    rebates.  Rebate -- it's hard for me to

6    think of what other rebates we had at

7    this point.

8        Q.    Did you have any other

9    volume incentive programs?

10       A.    Clarify that.

11       Q.    Did you have any other

12   volume incentive programs that you used

13   with your customers to incentivize them

14   to purchase more of a drug in exchange

15   for something?

16       A.    Typically you have a volume

17   incentive rebate that's based on annual

18   purchases for the product line.

19       Q.    Any other types of volume

20   incentive programs that you can recall?

21       A.    I can't recall any.

22       Q.    Did Actavis attend trade

23   shows?

24       A.    Yes.

1    Q.    And how often did they
2  attend trade shows?
3    A.    How often -- we probably
4  attended, you know, once a month, we were
5  at a different type of trade show.
6    Q.    Your division was?
7    A.    Yeah.  I'm estimating here.
8    Q.    Sure.
9    A.    We attended trade shows.
10  They attended a lot of trade shows.
11    Q.    Okay.  And what types of
12  trade shows did they attend?
13    A.    The wholesalers had trade
14  shows.  The chains had trade shows.  The
15  distributors had trade shows or meetings.
16  You know, when I think of trade shows,
17  meetings, that type of thing.
18    Q.    And what was the purpose of
19  attending the trade shows?
20    A.    Depends on the trade show.
21  If it was a -- if it was a national chain
22  association, it would be mostly chains
23  and wholesalers there.  So you would meet
24  with your customers.

1    Q.    And who would attend this --

2    the trade shows?  Would it be the

3    marketing team or the sales team or both?

4    A.    Again, it depends on, you

5    know, there's some key trade shows.

6    There's some smaller trade shows that

7    we'd be sending just the rep.  On a key

8    trade shows, like an NACDS, national

9    chain drug, we would bring most of the

10   team, the sales team.

11   Q.    And how about the marketing

12   team?

13   A.    We may, depending on -- I

14   mean, I know Jinping attended a lot of

15   trade shows, and maybe one of her product

16   managers.

17         We brought different --

18   different people to expose them to

19   customers.  And sometimes as an award for

20   doing a good job in the year we would

21   take them to a trade show.

22   Q.    To a trade show that was in

23   a nice location?  Is that why it's an

24   award?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    No.  I mean, they're in

2   Boston or --

3        Q.    But they liked going?  Is

4   that what you're saying.

5        A.    Huh?

6        Q.    They liked going?  Is that

7   what you're saying?

8        A.    Well, it just showed that

9   they were part of the team and they got

10  exposure to customers.

11       Q.    Okay.  And when you went to

12  trade shows, would you set up booths?

13       A.    Most of the time, yes.

14       Q.    And would you have brochures

15  that you passed out?

16            MR. ROTH:  Object to form.

17            THE WITNESS:  What I would

18       call ad slicks.

19  BY MS. BAIG:

20       Q.    Ad slicks?

21       A.    One-page ad slicks.

22       Q.    How are you spelling that?

23  Ad and then slicks?

24       A.    A-D, slicks, S-L-I-C-K-S.

1    Q.    Okay.  And what did the ad

2    slicks look like?

3    A.    One page showing either a

4    product we just launched -- and again,

5    getting -- showing people that we have

6    launched a new generic.

7    Q.    Any other types of materials

8    that you would pass out at trade shows?

9    A.    Pens, pads, sticky notes.

10    Q.    Anything else with your --

11    information about the drugs that you were

12    marketing?

13          MR. LUXTON:  Objection to

14          form.

15          THE WITNESS:  At this point

16          I don't -- I don't recall anything

17          but primarily ad slicks and what I

18          call trinkets, like pens or

19          trinkets.

20    BY MS. BAIG:

21    Q.    Okay.  Do you recall sending

22    out mailers to customers about certain of

23    your drugs?

24    A.    Depending on the product,

Highly Confidential - Subject to Further Confidentiality Review

1    yes.

2          Q.    And did you do that on a

3    pretty regular basis?

4                MR. LUXTON:  Objection to

5          form.

6                THE WITNESS:  Excuse me?

7    BY MS. BAIG:

8          Q.    Did you do that on a pretty

9    regular basis?

10         A.    I think it was not regular.

11   I would think it's more of a relatively

12   unique for us thing to do mailers.

13         Q.    Do you recall -- do you

14   recall any mailers being used for

15   oxycodone?

16         A.    I do not.

17         Q.    How about Kadian?

18         A.    I do not.

19         Q.    Oxymorphone?

20         A.    I believe so.

21         Q.    What do you recall about

22   that mailer?

23         A.    The fact that, again, as I

24   stated earlier, I believe that drug

1    was -- the brand discontinued the

2    strengths that we launched.  So we needed

3    to inform people that an alternative

4    generic was available in the market.

5         Q.    And did you send out mailers

6    with respect to fentanyl?

7         A.    I don't believe so.

8         Q.    How about oxy ibuprofen?

9         A.    I don't believe so.

10        Q.    Did you -- did you pay any

11   of your customers to market your products

12   for you?

13        A.    Did I pay any of my

14   customers to market my product for me?

15             MR. LUXTON:  Objection to

16        form.

17             THE WITNESS:  I mean, as I

18        said, we don't market our product.

19        To sell -- I would say sell our

20        products.

21   BY MS. BAIG:

22        Q.    We don't want to spend time

23   going around on this.  Obviously my

24   definition of market is broader than

Highly Confidential - Subject to Further Confidentiality Review

1    yours, since your definitions purely

2    going into doctors' offices.

3              But my question to you is

4    whether you had any marketing agreements

5    with your customers such that they would

6    market or sell your products to their

7    downstream customers for you, and you

8    compensated them to do that?

9              MR. LUXTON:  Objection to

10        form.

11             THE WITNESS:  I can't think

12        of one that I can, like, bring up

13        right now and identify it.

14   BY MS. BAIG:

15        Q.   Do you recall generally that

16   that was a -- was something that was

17   done?

18             MR. LUXTON:  Objection to

19        form.

20             THE WITNESS:  I can't speak

21        generally, because I can't --

22        without seeing a document, I

23        wouldn't be able to pull program

24        and give you an example here.

1    BY MS. BAIG:

2         Q.    Do you recall using any

3    outside agencies to market any of the

4    generic products?

5               MR. LUXTON:  Objection to

6         form.

7               THE WITNESS:  Outside

8         agencies to sell our product?

9         Define "agencies."

10   BY MS. BAIG:

11        Q.    Organizations, any third

12   party.  Was there anybody other than your

13   division selling your generic products?

14        A.    We sell to our distributors

15   and our wholesalers, and then they sell.

16        Q.    Yes.  But did Actavis hire

17   anybody to help sell their products,

18   their generic products?

19        A.    To -- to other --

20               MR. ROTH:  Objection to

21         form.

22               MR. LUXTON:  To your

23         knowledge.

24               THE WITNESS:  No, I don't

1    believe so.

2  BY MS. BAIG:

3        Q.    Okay.  Are you -- are you

4  familiar with a company named inVentiv?

5        A.    I think the branded company

6  used them.

7        Q.    Okay.  Did you ever have any

8  dealings with inVentiv?

9        A.    I don't believe so.

10        Q.    Okay.  Did your division

11  ever have any dealings with inVentiv to

12  your knowledge?

13        A.    I don't recall having --

14  meeting with anybody at this point in

15  time from inVentiv and working with

16  anybody from inVentiv.

17        Q.    Do you recall ever hearing

18  from anybody in your division was working

19  with inVentiv?

20        A.    In what regard?  I'm -- I'm

21  trying to understand it.

22        Q.    To sell generic products.

23        A.    If you show me something, I

24  might be able to -- to discuss it.  But

Highly Confidential - Subject to Further Confidentiality Review

1    I -- as we sit here today, I can't think

2    of them selling -- and when you're saying

3    selling, selling to our distributors, our

4    chains, people like that.

5         Q.    Selling to anyone.  I would

6    presume they are your distributors of

7    chains.  But are you aware of inVentiv

8    selling any products for Actavis or were

9    you ever aware of that?

10             MR. LUXTON:  Objection to

11        form.  Asked and answered.

12             THE WITNESS:  I -- I don't

13        recall as of today them doing

14        that.

15   BY MS. BAIG:

16        Q.    To the extent that -- that

17   there were agreements with your customers

18   by which you would pay them to market

19   your products, would those be reflected

20   in the contracts with those customers?

21             MR. ROTH:  Objection to

22        form.

23             THE WITNESS:  Any --

24        anything -- any contract -- any

1       rebate or allowance that we

2       provided to the customer would be

3       in a contract and would be in our

4       contract system.

5   BY MS. BAIG:

6       Q.    And would marketing

7   allowances be in the same contract or

8   would there -- there be a separate

9   contract for that?

10          MR. ROTH:  Objection to

11      form.

12          THE WITNESS:  They could be

13      in the same contract.  They could

14      be a standalone contract.  But

15      they would be in our contract

16      database.

17  BY MS. BAIG:

18      Q.    And the person to ask about

19  the separate marketing allowance

20  contracts, if there are any, would be?

21      A.    Ara.

22      Q.    Ara.

23      A.    In -- from when he started.

24  He started in I think '10, maybe.  I'm

Highly Confidential - Subject to Further Confidentiality Review

1    trying to think -- yeah, around '10.

2        Q.    2010?

3        A.    Yes.

4        Q.    Do you recall ever tracking

5    how your customers marketed your product,

6    if at all?

7            MR. LUXTON:  Objection to

8        form.

9            THE WITNESS:  Can you repeat

10       the question?

11   BY MS. BAIG:

12       Q.    Do you recall ever tracking

13   how your customers marketed your product?

14           MR. ROTH:  Objection to

15       form.

16           THE WITNESS:  I mean we

17       track sales of our customer.  So

18       we knew what McKesson was selling

19       of our customer work.  So in that

20       respect, yes, we tracked the

21       customers, what they are selling.

22   BY MS. BAIG:

23       Q.    Okay.  But if McKesson was

24   handing out brochures about product that

Highly Confidential - Subject to Further Confidentiality Review

1    you sold to McKesson, would you have seen

2    those brochures or were you not tracking

3    them?

4         A.    I -- I probably would not

5    see them.

6         Q.    Okay.  Did you have

7    negotiations with your customers about

8    formulary placement?

9         A.    Retail formulary placement,

10   yes.

11        Q.    Okay.  And what did that

12   look like?

13             Who had those negotiations

14   and -- and what were they about?

15        A.    Again, it's getting a

16   product -- CVS to stock a product in

17   their retail stores and in their mail

18   order.  That's -- so it would include the

19   rep, myself, and maybe Ara, maybe Doug,

20   depending on the size of the account.

21        Q.    And would the outcome of

22   those negotiations be in a single

23   contract with everything else or would

24   that be part of a separate standalone

Highly Confidential - Subject to Further Confidentiality Review

1   contract?

2          A.    Depends on the account.

3   Some, like CVS was every contract --

4   every product stood on its own two feet.

5          Q.    You mean --

6          A.    Depends.

7          Q.    -- for CVS, every product

8   had its own contract?

9          A.    Yep.

10         Q.    And for CVS, if they had --

11  if they had a contract for oxycodone,

12  would the formulary placement be in that

13  one contract or would it be in a separate

14  contract?

15         A.    It would be -- it's one --

16  it's a one-page document for each

17  product.

18         Q.    Okay.

19         A.    Just giving you -- every

20  customer is unique with their needs.  So

21  we have to tailor -- they are the boss.

22  We have to tailor our contracting

23  negotiation through their needs.

24         Q.    So you mentioned earlier the

Highly Confidential - Subject to Further Confidentiality Review

1    National Association of Chain Drug

2    Stores?

3         A.    I did.

4         Q.    And did you go to a number

5    of conferences with National Association

6    of Chain Drug Stores?

7         A.    Yes.

8         Q.    And what was the purpose of

9    those?

10         A.    To meet with chains and the

11    major -- the major chains, all the

12    chains, and the whole -- some of the

13    larger wholesalers at that meeting.

14         Q.    And apart from the chain

15    drug stores and the larger wholesalers,

16    who else would attend those meetings?

17         A.    Vendors, generic vendors,

18    branded vendors.

19         Q.    Generic vendors like who?

20         A.    Actavis.

21         Q.    And your competitors?

22         A.    Sometimes.  I don't -- you

23    know, whoever -- whoever paid to attend

24    these meetings.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    All drug vendors or just

2    generic drug vendors?

3          A.    No.  At any CDS,

4    generic/branded companies, OTC companies,

5    food vendors, anything that a CDS store

6    sells, their vendors would be there.

7          Q.    Would the manufacturers

8    of -- of your products be there?

9          A.    I'm -- I'm a manufacturer.

10          Q.    Sorry.  Sorry.

11               Anybody else that would

12    attend those meetings that you can

13    recall?

14          A.    Associations like any CDS,

15    the wholesaler association, the -- the

16    people from Washington DC that run these

17    associations that -- that they have

18    there.

19          Q.    Any pain advocacy groups

20    that you recall?

21          A.    I don't recall any pain --

22    meeting with any pain -- what did you

23    call it?

24          Q.    Pain advocacy groups.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I don't recall them being at

2    any CDS.

3          Q.     How about Pain Care Forum?

4          A.     I don't even know what that

5    is.

6          Q.     American Pain Society?

7          A.     I don't know who they are.

8          Q.     Have you heard of any of

9    these, let's go through the list, HDA

10   Research Foundation?

11         A.     What is it?

12         Q.     HDA Research Foundation?

13         A.     No.

14         Q.     Center for Healthcare Supply

15   Chain Research?

16         A.     No.

17         Q.     National Wholesale Druggist

18   Association?

19         A.     There's like a -- sorry.

20   But there's --

21         Q.     National Wholesale Druggist

22   Association?

23         A.     Yes.

24         Q.     You've heard of that one?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And would that be the type

3 of organization that would attend trade

4 shows like those put on by NACDS?

5    A.    Possibly.

6    Q.    And how about American

7 Academy of Pain Medicine?

8    A.    No.

9    Q.    Federation of State Medical

10 Boards?

11    A.    I don't recall them being

12 there.

13    Q.    You don't recall them being

14 at NACDS's trade show or at any of the

15 trade shows?

16    A.    No, we are just speaking

17 NACDS.

18    Q.    All right.  Do you recall

19 Federation of State Medical Boards

20 attending any of the other trade shows?

21    A.    I -- they -- they could have

22 been there.  They didn't meet with us.

23 So I don't recall meeting with these

24 people today when we -- when I attended

1    those shows for NACDS for Actavis.

2         Q.    Okay.  How about -- are you

3    familiar with the Alliance For Patient

4    Access?

5         A.    No.

6         Q.    How about the U.S. Pain

7    Foundation?

8         A.    No.

9         Q.    American Geriatric Society?

10        A.    No.

11        Q.    Pharmaceutical Research and

12   Manufacturers of American -- of America?

13        A.    No.

14        Q.    Cares Alliance?

15        A.    There's Care Alliance that

16   was a distributor, I believe.  But they

17   may not be the same one you're

18   referencing.

19        Q.    Was the Care Alliance -- did

20   you have interaction with Care Alliance?

21        A.    Was it -- where was it

22   located?

23        Q.    I don't know.

24        A.    Oh.  Because if that were

1  Care, it was a distributor -- I never

2  dealt with Care Alliance.  But there was

3  a -- you asked me if I ever heard of

4  them.  There was a Care -- there was a

5  buying group I thought that had that

6  name.

7       Q.    Okay.  Have you heard of

8  Healthcare Distribution Alliance?

9       A.    No.

10      Q.    Did you ever hear that

11 Actavis participated in any advisory

12 boards?

13      A.    I -- I was on the McKesson

14 advisory board for one or two years.  And

15 I was on the -- maybe the NACDS planning

16 board for a year.  I was on a few -- few,

17 what I call planning boards for meetings.

18      Q.    Any other boards, advisory

19 boards that you are aware that Actavis

20 was involved in?

21      A.    Actavis generic?  Can I --

22      Q.    Actavis generally.

23      A.    I -- any boards that we were

24 involved in?  No.  I think what I stated.

Highly Confidential - Subject to Further Confidentiality Review

1  McKesson -- I was on the McKesson vendor

2  board, and I believe I was on the NACDS

3  planning board for one year and maybe a

4  small grocery store meeting.

5      Q.    And what were your

6  responsibilities on the McKesson advisory

7  board?

8      A.    I attended a -- it was maybe

9  a four-hour meeting on -- on ways

10  McKesson could improve working with

11  vendors.

12      Q.    Do you recall what was

13  recommended to McKesson to improve on --

14  in their --

15      A.    I do not.

16      Q.    You don't recall anything

17  about that?

18      A.    I do not.

19      Q.    Were there notes -- notes

20  taken of that meeting?

21      A.    Not by me.

22      Q.    Do you recall what your

23  responsibilities were with respect to the

24  NACDS planning board?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Suggest -- reviewing the

2    format of the meeting and -- and just top

3    line inputting from a vendor standpoint

4    to NACDS how to improve the meeting so it

5    was more productive.

6        Q.     Well, what was the purpose

7    of the meeting?

8        A.     To get -- to give NACDS

9    vendor input and advise -- advise NACDS

10   to improve -- how ways they can improve

11   their meeting, either the schedule,

12   maybe -- maybe the booth layout.  Maybe

13   the -- the meals they were serving,

14   things like that.

15       Q.     Meaning how NACDS could

16   improve their trade show?

17       A.     Yes.  Yes.

18       Q.     And how many meetings did

19   you attend as part of the NACDS planning

20   board?

21       A.     This again goes back

22   probably five or six years.  I

23   probably -- I can recall one for sure.

24       Q.     But there may have been

Highly Confidential - Subject to Further Confidentiality Review

1    more?

2         A.    Not many more.  Maybe less

3    than -- one or two I would say, to my

4    knowledge right now that I attended.

5         Q.    And who else was on those

6    boards with you, was on the NACDS

7    planning board with you?

8         A.    Other vendors across --

9    across -- it could be food vendors.  It

10   could be plastic bag vendors.  It could

11   be cookie vendors.  It was across --

12        Q.    Who else involved in

13   pharmaceuticals was on the NACDS planning

14   board with you?

15        A.    I don't recall --

16        Q.    You don't recall anybody?

17        A.     -- anyone from that advisory

18   board as I sit here today, who was on

19   with me.

20        Q.    Okay.  Do you recall anyone

21   that was on the McKesson advisory board

22   with you?

23        A.    Maybe the woman from

24   Greenstone.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What's Greenstone?

2    A.    It's a generic manufacturer,

3  a generic division of Pfizer.

4    Q.    Do you recall anybody else

5  on the McKesson advisory board with you?

6    A.    Yeah.  I believe -- I

7  believe Andy Boyer was on that with me

8  too.

9    Q.    Where is he from?

10    A.    Watson.

11    Q.    Anybody else?

12    A.    I mean, this is awhile ago

13  too.  A representative from Teva, but I

14  don't know who -- who that was.

15    Q.    Anybody else?

16    A.    Not that I can think of.

17    Q.    Can you recall if anybody

18  from Purdue was on the advisory board,

19  the McKesson advisory board?

20    A.    No.  These were generic

21  manufacturers.

22    Q.    And do you -- do you recall

23  if Mallinckrodt was -- anybody from

24  Mallinckrodt was on either of those

Highly Confidential - Subject to Further Confidentiality Review

1   advisory boards?

2       A.   I don't, as we sit here now,

3   I don't recall if somebody was from

4   Mallinckrodt at that meeting, or at the

5   advisory board for McKesson.

6       Q.   You don't recall either way?

7       A.   I don't -- without looking

8   at a list of attendees, I wouldn't know

9   if -- and I believe I attended it one or

10  two years.  I'm not sure if someone from

11  Mallinckrodt was there.

12      Q.   And those years would have

13  been when exactly?

14      A.   I think '11 and '12, I

15  believe, to the best of my ability.

16      Q.   And when were the NACDS

17  planning board meetings?

18      A.   They're a long time ago.

19      Q.   For NACDS, would that also

20  have been '11 and '12?

21      A.   No.  That was, I would say,

22  '8, '9.

23      Q.   2008, 2009?

24      A.   Yeah, I can't even barely

1    remember that advisory board.

2          Q.    Okay.  Were you aware that

3    Actavis was tracking data for -- for all

4    orders of all of its generic drugs, not

5    only for its distributor customers, but

6    also for its downstream customers?

7                MR. ROTH:  Object to form.

8                MR. LUXTON:  Objection to

9          form.

10                THE WITNESS:  I'm confused

11          by your question.

12    BY MS. BAIG:

13          Q.    Did Actavis track data for

14    its drugs for not only its distributor

15    customers, but also for their customers?

16                MR. LUXTON:  Objection to

17          form.

18                THE WITNESS:  Did Actavis

19          track -- for all products?

20    BY MS. BAIG:

21          Q.    For the generic -- for the

22    generic opioid products which were in

23    your division.

24          A.    I believe that to be part of

1    our suspicious order monitoring of

2    knowing the customers' customer.

3         Q.    And where was that data

4    kept?

5         A.    I don't know.

6              MS. BAIG:  Let's have this

7         document marked as Exhibit 23.

8              (Document marked for

9         identification as Exhibit

10        Allergan-Perfetto-23.)

11             MS. BAIG:  That's one

12        document.

13             MR. LUXTON:  One document.

14             MS. BAIG:  One exhibit.

15        Here's a copy of it.

16             MR. LUXTON:  Thanks.  Is

17        there one copy?  Yeah, so -- okay.

18        I just saw -- thanks.

19             MS. BAIG:  They are

20        staggered because they're not

21        stapled.

22             MR. LUXTON:  Yeah, that's

23        all right.  It's three altogether,

24        right, a cover page and two?  All

1    right.  Got it.

2  BY MS. BAIG:

3        Q.    This is a document which

4  begins as an e-mail from Jinping

5  McCormick to you --

6        A.    Yep.

7        Q.    -- dated September 1st,

8  2011.

9              Do you see that?

10       A.    Yep.

11       Q.    It's ACQUIRED_ACTAVIS Bates

12  stamp 00945486.

13             Do you see that?

14       A.    Yes.

15       Q.    Okay.  And it says, "All,

16  the detailed chargeback finance has

17  processed provide us a good picture of

18  oxymorphone ER stocking at the pharmacy

19  level.  Since launching in July 15th, a

20  total number of 671 pharmacies had

21  submitted chargeback data for 883 bottles

22  on 15 milligrams.  Details of pharmacy

23  locations are in the attached file.  Hope

24  this helps pinpoint the pharmacy location

1    with our product.  Walmart is leading the

2    chargeback.  We sell products directly to

3    Walgreens, 15 milligrams only, which is

4    why we don't have visibility via

5    chargeback."

6              Do you see that?

7         A.    Yes.

8         Q.    Okay.  And the subject of it

9    is, "Oxymorphone ER pharmacy placement

10   details via chargeback," correct?

11        A.    Yes.

12        Q.    And when you look at the

13   attachment, does this look like to be a

14   example of the chargeback data that was

15   being kept for various of the drugs, or

16   what is this?

17        A.    Again, this product is the

18   product I discussed earlier that the

19   brand -- the brand discontinued the

20   milligram that we launched generically.

21        Q.    Okay.  So --

22        A.    So we had to do extra effort

23   in order to find out where the product

24   was, so that -- and just a lot more

Highly Confidential - Subject to Further Confidentiality Review

1    administrative stuff because -- to sell

2    this product, because we didn't have the

3    brand being written by doctors anymore,

4    because the brand had eliminated the 15

5    and 30-milligram Opana ER in anticipation

6    of us launching a generic.

7         Q.    So is it your understanding

8    that Actavis was maintaining the data for

9    the drugs that it sold all the way down

10   to the pharmacy level?

11        A.    I believe finance has

12   chargebacks data.  Finance does

13   chargebacks.  So finance would have had

14   the chargeback data.  I'm not sure

15   whether they have it for every product,

16   but for wholesalers is who you get

17   chargebacks from.

18        Q.    Okay.  And did you have

19   access to that data?

20        A.    Me personally?

21        Q.    Mm-hmm.

22        A.    I would believe I would have

23   access, yeah.

24        Q.    Okay.  Do you recall ever --

Highly Confidential - Subject to Further Confidentiality Review

1    ever seeking that data, or looking at it

2    on a regular basis?

3            A.    I would -- I would

4    occasionally look at -- not chargeback

5    data, but reports that are developed off

6    of chargebacks.

7            Q.    For what purpose?

8            A.    To see what our indirect

9    sales were, because chargeback -- it's

10   never -- it can be more than down to the

11   pharmacy level.  It can be to a major

12   customer that's buying indirect.

13                MS. BAIG:  All right.  I

14           don't have any further questions.

15                THE WITNESS:  Thank you.

16                MR. LUXTON:  No questions.

17                MS. BAIG:  Thank you for

18           your time.

19                THE WITNESS:  Thank you.

20           Thanks a lot.

21                THE VIDEOGRAPHER:  This

22           marks the end of today's

23           deposition.  The time is 5:50 p.m.

24           Going off the record.

Highly Confidential - Subject to Further Confidentiality Review

1                    (Excused.)

2                    (Deposition concluded at

3          approximately 5:50 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2                          CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
       witness was duly sworn by me and that the
6       deposition is a true record of the
       testimony given by the witness.

7

               It was requested before
8       completion of the deposition that the
       witness, MICHAEL PERFETTO, have the
9       opportunity to read and sign the
       deposition transcript.

10

11

12
               _____
               MICHELLE L. GRAY,
13              A Registered Professional
               Reporter, Certified Shorthand
14              Reporter, Certified Realtime
               Reporter and Notary Public
15              Dated:  December 21, 2018

16

17

18              (The foregoing certification
19       of this transcript does not apply to any
20       reproduction of the same by any means,
21       unless under the direct control and/or
22       supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1        INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1
— — — — — —

E R R A T A

2
— — — — — —

3

4    PAGE    LINE    CHANGE

5    _____  _____  _____

6        REASON: _____

7    _____  _____  _____

8        REASON: _____

9    _____  _____  _____

10       REASON: _____

11   _____  _____  _____

12       REASON: _____

13   _____  _____  _____

14       REASON: _____

15   _____  _____  _____

16       REASON: _____

17   _____  _____  _____

18       REASON: _____

19   _____  _____  _____

20       REASON: _____

21   _____  _____  _____

22       REASON: _____

23   _____  _____  _____

24       REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

ACKNOWLEDGMENT OF DEPONENT

          I,_____, do
hereby certify that I have read the
foregoing pages, 1 - 407, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.


_____
MICHAEL PERFETTO                    DATE


Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____


_____
Notary Public

Highly Confidential - Subject to Further Confidentiality Review

1

## LAWYER'S NOTES

2  PAGE   LINE

3  _____  _____  _____

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10 _____  _____  _____

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24 _____  _____  _____