```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

    IN RE NATIONAL PRESCRIPTION  | MDL No. 2804
 4                               |
    OPIATE LITIGATION            | Case No. 17-MD-2804
 5                               |
    APPLIES TO ALL CASES         | Hon. Dan A. Polster
 6

 7                       - - -

 8              Tuesday, April 23, 2019

 9                       - - -

10       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                 CONFIDENTIALITY REVIEW

12                       - - -

13

14

15       VIDEOTAPED DEPOSITION of MATTHEW PERRI, III,

    BS Pharm, Ph.D., RPh, held at Jones Day,

16  1420 Peachtree Street, N.E., Suite 800, Atlanta,

    Georgia, commencing at 9:28 a.m., on the above date,

17  before Susan D. Wasilewski, Registered Professional

    Reporter, Certified Realtime Reporter and Certified

18  Realtime Captioner.

19

20

21                       - - -

22           GOLKOW LITIGATION SERVICES

23       877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    Counsel for Plaintiffs:
 3       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
         BY:  MARK P. CHALOS, ESQUIRE
 4           mchalos@lchb.com
         222 2nd Avenue South, Suite 1640
 5       Nashville, Tennessee 32701-2379
         Phone: (615) 313-9000
 6
 7       CRUEGER DICKINSON LLC
         BY:  KRISTA K. BAISCH, ESQUIRE
 8           kkb@cruegerdickinson.com
         4532 North Oakland Avenue
 9       Whitefish Bay, Wisconsin 53211
         Phone:  (414) 210-4367
10
11
      Counsel for Endo Health Solutions Inc.,
12    Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
      Par Pharmaceutical Companies, Inc., f/k/a Par
13    Pharmaceutical Holdings, Inc.
14       ARNOLD & PORTER KAYE SCHOLER LLP
         BY:  SEAN HENNESSY, ESQUIRE
15           sean.hennessy@arnoldporter.com
         601 Massachusetts Avenue, NW
16       Washington, D.C. 20001-3754
         Phone:  (202) 942-5000
17
18
      Counsel for Walgreens Defendants:
19
         BARTLIT BECK LLP
20       BY:  LESTER C. HOUTZ, ESQUIRE
             lester.houtz@bartlit-beck.com
21       1801 Wewatta Street, Suite 1200
         Denver, Colorado 80202
22       Phone:  (303) 592-3100
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    Counsel for McKesson Corporation:
 3       COVINGTON & BURLING LLP
         BY:  MEGAN L. RODGERS, ESQUIRE
 4            mrodgers@cov.com
         3000 El Camino Real
 5       5 Palo Alto Square, 10th Floor
         Palo Alto, California 94306-2112
 6       Phone:  (650) 632-4700
 7
 8    Counsel for Purdue Pharma L.P., Purdue Pharma Inc.,
      and The Purdue Frederick Company:
 9
         LYNN PINKER COX HURST
10       BY:  JOHN VOLNEY, ESQUIRE
              jvolney@lynnllp.com
11       2100 Ross Avenue, Suite 2700
         Dallas, Texas 75201
12       Phone:  (214) 981-3800
13
14    Counsel for Walmart Inc., f/k/a Wal-Mart Stores,
      Inc.:
15
         JONES DAY
16       BY:  EDWARD M. CARTER, ESQUIRE
              emcarter@jonesday.com
17       325 John H. McConnell Boulevard, Suite 600
         Columbus, Ohio 43215
18       Phone:  (614) 649-3939
19
20    Counsel for Allergan Finance, LLC:
21       KIRKLAND & ELLIS LLP
         BY:  ERICA B. ZOLNER, ESQUIRE
22            erica.zolner@kirkland.com
              ZACHARY A. CIULLO, ESQUIRE
23            zac.ciullo@kirkland.com
         300 North LaSalle Street
24       Chicago, Illinois 60654
         Phone:  (312) 862-3247
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    Counsel for Teva Pharmaceuticals USA, Inc.,
      Cephalon, Inc., Watson Laboratories, Inc., and
 3    Actavis LLC:
 4        MORGAN LEWIS & BOCKIUS, LLP
          BY:  MELISSA M. COATES, ESQUIRE
 5            melissa.coates@morganlewis.com
          200 South Biscayne Boulevard, Suite 5300
 6        Miami, Florida 33131
          Phone:  (305) 415-3000
 7
 8
      Counsel for Rite Aid:
 9
          MORGAN LEWIS & BOCKIUS, LLP
10        BY:  MATTHEW R. LADD, ESQUIRE
              matthew.ladd@morganlewis.com
11        101 Park Avenue
          New York, New York 10178-0060
12        Phone:  (212) 309-6000
13
14    Counsel for AmerisourceBergen Corporation and
      AmerisourceBergen Drug Corporation:
15
          REED SMITH LLP
16        BY:  JOSEPH MAHADY, ESQUIRE
              jmahady@reedsmith.com
17        1717 Arch Street, Suite 3100
          Philadelphia, Pennsylvania 19103
18        Phone:  (215) 851-8100
19
20    Counsel for Johnson & Johnson and the Janssen
      Pharmaceuticals Defendants:
21
          O'MELVENY & MYERS LLP
22        BY:  ROSS B. GALIN, ESQUIRE
              rgalin@omm.com
23        7 Times Square
          New York, New York 10036-6537
24        Phone:  (212) 326-2000
25
```

```
 1   APPEARANCES:
 2   Counsel for Cardinal Health, Inc.:
 3      WILLIAMS & CONNOLLY LLP
         BY:  JOSHUA D. TULLY, ESQUIRE
 4           jtully@wc.com
         725 Twelfth Street, N.W.
 5       Washington, D.C. 20005
         (202) 434-5000
 6
 7

     Counsel for Mallinckrodt LLC:
 8
         ROPES & GRAY LLP
 9       BY:  ELIZABETH BIERUT, ESQUIRE
              elizabeth.bierut@ropesgray.com
10       1211 Avenue of the Americas
         New York, New York 10036-8704
11       Phone:  (212) 596-9000
12
     APPEARANCES VIA TELEPHONE AND STREAM:
13
     Counsel for the Henry Schein Defendants:
14
         LOCKE LORD LLP
15       BY:  BRANDAN MONTMINY, ESQUIRE
              brandan.montminy@lockelord.com
16       2200 Ross Avenue, Suite 2800
         Dallas, Texas 75201
17       Phone:  (214) 740-8445
18
19   Counsel for H.D. Smith LLC:
20       BARNES & THORNBURG LLP
         BY:  MONIQUE HANNAM, ESQUIRE
21           hannam@btlaw.com
         11 South Meridian Street
22       Indianapolis, Indiana 46204
23   ALSO PRESENT:
24       JOSHUA COLEMAN, Videographer
25       JONATHAN JAFFE, jjaffe@its-your-internet.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2                      I N D E X

 3                         - - -

 4  Testimony of:  MATTHEW PERRI III, BS Pharm, Ph.D., RPh

 5                                                    PAGE

 6       DIRECT EXAMINATION BY MR. VOLNEY............   9

 7       CROSS-EXAMINATION BY MS. RODGERS............ 204

 8       CROSS-EXAMINATION BY MR. LADD............... 309

 9       CROSS-EXAMINATION BY MR. CARTER............. 337

10

11                    E X H I B I T S

12            (Attached to transcript)

13   MATTHEW PERRI DEPOSITION EXHIBITS                PAGE

14  Perri Exhibit 1   Expert Report of Matthew Perri   11

                      III, BS Pharm, PhD, RPh

15                    March 25, 2019

16  Perri Exhibit 2   Curriculum Vitae                 11

                      Matthew Perri III

17

    Perri Exhibit 3   Schedule 2:  Perri Prior         11

18                    Testimony and Depositions

19  Perri Exhibit 4   Chapter 5 - Place:  The          207

                      Pharmaceutical Industry Supply

20                    Chain

21  Perri Exhibit 5   Schedule 10: Marketing Messages  247

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    MATTHEW PERRI DEPOSITION EXHIBITS              PAGE
 4
      Perri Exhibit 6    A Practical Introduction to the    247
 5                       Use of Opioids for Chronic Pain
                         By Jennifer P. Schneider, MD
 6                       MCKMDL00578003 through 578009
 7    Perri Exhibit 7    PBI Prescribing Course Module       247
                         1:  Principles of Pain
 8                       Management & Ethical Treatment
                         11-15-14
 9                       Jennifer P. Schneider
                         MCKMDL00577963 through 577991
10
      Perri Exhibit 8    E-mail - Subject: Campaign          253
11                       3578-AMI-Mallinckrdt
                         Hydrocodone has been Released!
12                       MCKMDL00546914 through 546916
13    Perri Exhibit 9    E-mail - Subject:  Pain Care        266
                         Forum
14                       PPLP004086826 and 4086827
15    Perri Exhibit 10   Expert Report of Matthew Perri      286
                         III, BS.Pharm, Ph.D., R.Ph.
16                       JM Smith Corporation v Cherokee
                         Pharmacy, et al.
17
18
19
20
21
22
23
24
25
```

1                        - - -

2           THE VIDEOGRAPHER:  We are on the record.  My

3      name is Josh Coleman.  I'm the videographer for

4      Golkow Litigation Services.  Today's date is

5      April 23rd, 2019.  The time is approximately

6      9:28 a.m.

7           This deposition is being held in Atlanta,

8      Georgia, in the matter of In Re:  National

9      Prescription Opiate Litigation for the United

10     States District Court, Northern District of Ohio,

11     Eastern Division.

12          The deponent is Matthew Perri.  Counsel will

13     be noted on the stenographic record.

14          The court reporter is Susan Wasilewski, who

15     will now swear in the witness.

16          THE COURT REPORTER:  Would you raise your

17     right hand?

18          Sir, do you solemnly swear or affirm the

19     testimony you're about to give will be the truth,

20     the whole truth, and nothing but the truth?

21          THE WITNESS:  Yes, I do.

22          THE COURT REPORTER:  Thank you.

23          MATTHEW PERRI, III, BS Pharma, Ph.D., RPh,

24  called as a witness by the Track One Defendants,

25  having been duly sworn, testified as follows:

```
 1                   DIRECT EXAMINATION

 2   BY MR. VOLNEY:

 3        Q.   Dr. Perri, my name is John Volney.  I

 4   represent Purdue Pharma in this case.  I'm here to

 5   take your deposition as an expert for the plaintiffs

 6   in the matter.  You understand that?

 7        A.   I do.

 8        Q.   Have you given a deposition before?

 9        A.   Yes, I have.

10        Q.   How many times?

11        A.   In matters like this, three, I believe,

12   three times.

13        Q.   So --

14        A.   Possibly four.

15        Q.   So you understand how the process works?

16        A.   Yes, I do.

17        Q.   So it's going to be important today that you

18   let me finish my question before you begin your

19   answer.  Understand?

20        A.   I do.

21        Q.   And I'll do the same.  I will try to provide

22   you the courtesy of letting you finish your question

23   before I ask my next question.  Is that fair?

24        A.   It's fair, and I appreciate that.

25        Q.   And you understand that it's your obligation
```

Highly Confidential - Subject to Further Confidentiality Review

1   today to tell the truth?

2       A.   Yes.

3       Q.   Is there any reason why you can't testify

4   fully and truthfully today?  For example, are you

5   taking any medications?

6       A.   I'm not taking anything that would interfere

7   with my ability to testify or to tell the truth,

8   yes.

9       Q.   Okay.  So I think it's going to be a bit of

10  a slog.  It might last for two days, so if you need

11  a break, please let me know.

12      A.   I definitely will do that.

13      Q.   And I just ask that if there is a pending

14  question, you answer that question before we take

15  the break.  Understand?

16      A.   Agreed.

17      Q.   Now, last point, it's important that you

18  answer verbally, meaning it's hard for Susan to take

19  down nods of the head or shakes of the head.  So you

20  understand you're to give a verbal answer?

21      A.   I do.

22      Q.   All right.  Now, you've been identified as

23  an expert by the plaintiffs in this case.  What is

24  the subject matter of your expertise?

25      A.   The subject matter of my expertise is

Highly Confidential - Subject to Further Confidentiality Review

```
1    pharmaceutical marketing.

2        Q.   Now, I've premarked a few exhibits there in

3    front of you.

4            (Perri Exhibit 1 was marked for

5    identification.)

6    BY MR. VOLNEY:

7        Q.   Could you confirm for me that the report

8    that you've issued in the case, without the

9    schedules, I've marked as Exhibit 1?

10           MR. CHALOS:  Do you have another copy of

11       that?

12           MR. VOLNEY:  Sure.

13       A.   Yes.  Exhibit 1 is the -- entitled Expert

14   Report of Matthew Perri, III.

15           (Perri Exhibit 2 was marked for

16   identification.)

17   BY MR. VOLNEY:

18       Q.   And then Exhibit 2 is a copy of your CV?

19       A.   Yes, it is.

20           (Perri Exhibit 3 was marked for

21   identification.)

22   BY MR. VOLNEY:

23       Q.   And then Exhibit 3 is a copy of your prior

24   testimony in the last four years, fair?

25       A.   Yes, it is.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. VOLNEY:  Counsel had asked for copies.

2      I might shoot some across the table here.

3          (Discussion off the record.)

4   BY MR. VOLNEY:

5      Q.   Now, let's look at your -- your -- you've

6   identified yourself as a -- an expert in

7   pharmaceutical marketing.  What academic degrees do

8   you hold?

9      A.   So I have a BS in pharmacy from Temple

10  University, Philadelphia, Pennsylvania, and a Ph.D.

11  in pharmacy and marketing from the University of

12  South Carolina.

13     Q.   When did you get your BS in pharmacy?

14     A.   I received my BS from Temple University,

15  Philadelphia, 1981.

16     Q.   And then when did you get your Ph.D.?

17     A.   And the Ph.D. from the University of South

18  Carolina was in 1985.

19     Q.   In connection with your education as a -- at

20  Temple University, did you take any courses related

21  to Schedule II or narcotic drugs?

22     A.   I don't remember specific courses; however,

23  I know that the Schedule II or narcotic, or just

24  controlled substances, would have been covered in

25  pharmacology.  They would have been covered in

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing labs where we learned the dispensing

2    process and procedures for controlled substances

3    versus others.

4         So I feel certain that there were lectures

5    and exercises at Temple.  However, I don't believe

6    we had an entire course that was devoted to

7    controlled substances.

8    Q.   Did you have any course work -- have you had

9    any course work in your educational career related

10   to controlled substances, other than what you just

11   explained to me?

12   A.   Just for clarification, I would -- I want to

13   distinguish, you know, that in my overall career,

14   there may have been a continuing education program

15   or something like that, and I would have to look

16   back and see.

17        So I feel certain that at some point in

18   time, I've either been required to take a controlled

19   substances CE, either by South Carolina or Georgia.

20   However, I don't think it's been any formal course

21   work, which is what I think the gist of your

22   question was.

23   Q.   Correct.  Let's look at -- let's look at

24   your CV.  I think there's a -- I think you've

25   indicated in your CV and also in your report that

1    you are a member of the Georgia Drug Utilization

2    Review Board?

3        A.    Yes.

4        Q.    Are you currently a member?

5        A.    Yes.

6        Q.    Tell me, what is -- is that sometimes

7    referred to as the DURB?

8        A.    DURB.

9        Q.    DURB.  What does the DURB do?

10       A.    The Drug Utilization Review Board, or DURB,

11   is the advisory committee to the state of Georgia's

12   Medicaid that recommends changes to their preferred

13   drug list to ensure the health of the citizens in

14   the state of Georgia.

15            And in that capacity, we review clinical

16   information.  We evaluate drugs by class and make

17   decisions regarding their status on the formulary,

18   which we recommend to the department.  It's up to

19   the department to make final decisions.

20       Q.    How long have you been on the DURB?

21       A.    I started working on the Drug Utilization

22   Review Board in about 2001, and I served on the

23   board for a few years before I was appointed

24   chairman of that board.  Traditionally, chairmen

25   serve a one- or two-year term, and I think I served

1    about five or six or seven years as chairman

2    eventually and then retired from the board in 2012,

3    and then in 2018 I was asked to come back, so I did.

4        Q.   So you've been on the DURB for

5    approximately -- I guess your first go-round was 11

6    years, and now you're back on as of 2018?

7        A.   Yes.

8        Q.   Do you know whether any of the Schedule II

9    opioid painkillers that are at issue in this lawsuit

10   are on the approved list for the DURB?

11       A.   I believe some of them are, yes.

12       Q.   In your role as a board member and then

13   chair, did you consider any materials that you would

14   be -- that you would consider to be marketing

15   materials for those opioid pain killers?

16       A.   I'm trying to -- to think about what the

17   right answer to that question is.  I know over the

18   years I've been exposed to marketing materials

19   related to opioids.  I don't recall any specific

20   documents.  I actually recall a salesman or two, but

21   I don't -- I don't recall any specific documents or

22   marketing materials.

23            I do recall -- as part of the DURB board

24   process, we receive, before each meeting, a clinical

25   binder, which is a clinical review of each drug or

 1    each drug class that's being considered on that

 2    meeting.  And so as part of that review, we would be

 3    reviewing studies.

 4         However, there wouldn't be any marketing

 5    material, but there is also what they called the

 6    manufacturers' forum, where manufacturers are

 7    allowed to come and present their views on their

 8    drugs, which gets incorporated into that meeting.

 9    The manufacturers forum does.

10         So yes and no.  I guess I saw some marketing

11    materials over the years.  I don't recall any

12    specific documents, but the board itself, in making

13    decisions, would have reviewed primarily clinical

14    information, but at the same time, as practitioners,

15    we would have also been exposed to marketing efforts

16    that may have been present.

17    Q.   Do you -- do you recall any specific

18    marketing materials that you reviewed in connection

19    with your service on the DURB?  And obviously I'm

20    talking about marketing materials for opioid

21    painkillers.

22    A.   I don't remember a specific document, but as

23    I said, I know that I was exposed to documents

24    during that time period by -- in particular, one

25    salesman that -- sales representative that -- that

Highly Confidential - Subject to Further Confidentiality Review

1    did call on me in his capacity as a sales rep, both

2    as -- through my position as UGA, where I was

3    director of clinical practice, and the service on

4    the DURB board.

5        Q.    Do you recall the particular manufacturer

6    that that sales represented -- representative

7    represented?

8        A.    I do.

9        Q.    Which one was it?

10       A.    It was Purdue.

11       Q.    What do you recall about your meeting with

12   that sales rep?

13       A.    He was very friendly.  He was very dedicated

14   to his job.  He was pretty persistent in getting --

15   trying to set up meetings to come and talk to the

16   clinical practice group at the College of Pharmacy.

17   And I honestly don't recall whether he was ever

18   successful.  I think we tried to set up meetings.

19   I'm not sure that a meeting ever occurred.

20       Q.    Do you know what time frame these

21   interactions occurred, or do you recall?

22       A.    It had to be between 2001 and 2005,

23   somewhere in that time period.

24       Q.    Who puts together the clinical binder that

25   the DURB considers?

1      A.   Over time, it's been different people, but

2    in my -- to the best of my recollection, the only

3    one I'm familiar with in recent 10 years is

4    Northstar Healthcare Consulting.  They're located in

5    Alpharetta, Georgia.

6      Q.   Does -- I take it that the DR -- DURB

7    decides both what drugs to add to the preferred drug

8    list, correct?

9      A.   They -- they decide what drugs they will

10   recommend to be added to the drug list.

11     Q.   Fair.  Recommend.  Does -- is there a --

12   does the DURB have a role to consider what drugs it

13   might recommend to be removed from the list?

14     A.   So just to clarify, a preferred drug list,

15   you can't really not cover something.  As long as

16   the manufacturer participates in the rebate program,

17   their drugs get in the formulary, but we have other

18   tools at our disposal, primarily preferred or

19   nonpreferred status and prior authorization or step

20   therapy.

21          So we don't really remove a drug, which is

22   what I think your question was asking me, but we can

23   make it more difficult to get to a drug.

24     Q.   And what are the ways you make it more

25   difficult to get to a drug?

1      A.    Initially, it would be preferred versus

2    nonpreferred status, which you might be familiar

3    with in terms of tiers, a first, second, or fourth

4    tier in a formulary.  Preferred drug status has a

5    lower copay and is -- generally, there is no barrier

6    to prescribing that drug.

7           A nonpreferred drug has some barrier, but

8    really, it's insignificant.

9           But prior authorization is the most potent

10   tool that we possess, and prior authorization can

11   dramatically change the utilization of a drug.

12     Q.   How does prior authorization work?

13     A.    Prior authorization works through the

14   process where the prescriber has to basically make a

15   case for why the patient needs that particular drug,

16   rather than one that is not required for prior

17   authorization or does not require prior

18   authorization, and hopefully is, you know, either

19   preferred status or nonpreferred without prior

20   authorization.

21           Prescribers generally have to, either

22   through a phone call or a letter or a fax, justify

23   the need in that particular patient.

24           And the prior authorization criteria can be

25   anything.  We have, from time to time, recommended

Highly Confidential - Subject to Further Confidentiality Review

1    prior authorization criteria for Northstar, that is

2    the agent that actually solidifies those criteria.

3         But generally it's just a recommendation.

4    We don't set the criteria.  We don't evaluate the

5    criteria.  We just examine the formulary and make

6    recommendations.

7    Q.   And the formulary that we're talking about

8    is a formulary of drugs would be made available to

9    Georgia Medicaid --

10   A.   Yes.

11   Q.   -- patients?

12   A.   And, sorry, forgive me for calling it a

13   formulary.  I try to always refer to it as the

14   preferred drug list, or PDL, but, essentially, it's

15   a formulary.  It's just a more open version of that

16   because of the Medicaid rebates.

17   Q.   Is the PDL published?

18   A.   Yes, it is.

19   Q.   And something I could find online?

20   A.   Yes, you can.  I know that if you go to the

21   Department of Community Health website, you can go

22   right now and look and see what the status of every

23   drug is, whether it's preferred, nonpreferred, prior

24   authorization.

25   Q.   How often does the DURB meet?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Over the years, we've met as often as

2    monthly, but traditionally we meet quarterly.

3    Q.    What -- is there a record of the meetings

4    that occur, like the minutes of the meeting?

5    A.    As far as I know, Georgia Open Records

6    requires those meetings, except for the executive

7    sessions, to have their minutes maintained in an

8    archive and available to the public.

9    Q.    Are the clinical binders that the DURB

10   considers maintained?

11   A.    That's a good question.  I don't know.  I do

12   know that when I receive those binders, that they

13   are -- as the materials in this case, they're always

14   marked confidential and not for distribution.  So I

15   don't know what the rules are about that.

16   Q.    Earlier, when I was asking you questions

17   about your meetings with sales representatives for

18   drug manufacturers, you indicated that you had met

19   at least one representative for Purdue.  I take it

20   that that was not in connection with your service on

21   the DURB?  That was some other reason you met with

22   them?

23   A.    Actually, I was introduced to him through

24   the Drug Utilization Review Board, and he then, I

25   guess, also learned that I was director of clinical

1    pharmacy practice at the university, and that I had

2    a team of about 10 faculty who were working in

3    community practice that he felt would be a good

4    group for him or someone from his company to meet

5    with.

6        Q.   And sitting here today, you don't recall

7    whether that meeting between him and the clinical

8    practice ever took place?

9        A.   I feel like we set up a meeting, but if it

10   took place, I don't think I was there.  We used to

11   have a -- Friday mornings were kind of a regroup for

12   the group.  We would come together, you know, review

13   the week's activities, plan the next week's

14   activities.

15        And we also, from time to time, had

16   continuing education or in-services by either one of

17   our group or somebody from the outside.  And as I

18   said, I just don't ever recall that occurring with

19   regard to -- it might have.  I just don't recall.

20       Q.   Does the -- in connection with its review of

21   drugs to determine whether to recommend to put them

22   on the PDL, does the DURB consider marketing

23   materials?

24       A.   I think to the extent that as practitioners,

25   most of them are exposed to marketing efforts, that

Highly Confidential - Subject to Further Confidentiality Review

1    that's going to factor into their decision-making in

2    some way.  I think literature would certainly

3    support that the external stimuli of -- of

4    marketing, it's hard to filter out.

5         I do think that -- that we try to rely

6    primarily on the scientific evidence when possible,

7    practice experience when possible, and other

8    information as it is -- as it's presented or as

9    we're exposed to it.

10   Q.   When you talk about the DURB members relying

11   on scientific evidence, what kinds of scientific

12   evidence are you talking about?

13   A.   Well, the -- for example, the clinical

14   binders that are produced by Northstar Healthcare

15   Consulting, they usually are a summary of the most

16   relevant and most recent research related to any

17   particular drug or drug class.

18        So there may be a clinical trial, a review

19   paper, a review of physiology or pathophysiology,

20   and so it -- those are generally not promotional.

21   They are intended to be more pure science.

22   Q.   Does the DURB look at or consider the

23   package insert created for particular drugs?

24   A.   I know that we've never, to my knowledge,

25   reviewed a package insert at a DURB board meeting.

1    However, the -- to say that we didn't consider that

2    would probably not be true because any of us who

3    were exposed to any marketing materials would

4    probably have been exposed to a package insert at

5    some point as well.

6         I don't think we would rely on that very

7    heavily, but it probably would have been present in

8    the mix of things we looked at.

9    Q.   So obviously when a DURB board member shows

10   up for the board meeting, he or she can't erase from

11   his mind his or her practice experience and what

12   they were exposed to outside of the DURB; fair?

13   A.    Yeah.   I certainly think it's fair to say

14   that -- that the experience that you bring to

15   that -- through your clinical experience is valuable

16   to the board, and it would be very hard to filter it

17   out, number one.   And number two, I don't think we

18   would want them to filter that out.

19   Q.   How many members are on the DURB?

20   A.    The board has fluctuated in size over time.

21   I think there are currently about 12 or 14 members.

22   Back when I was serving as chairman, there were as

23   many as 20 to 22 members for a period of time.   The

24   board, as I said, has fluctuated in size.

25         The difference has been when managed

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Medicaid versus fee for service Medicaid first

 2    started, we had representatives from all the

 3    different managed care organizations.

 4         That has changed.  Now we've gone back to

 5    just a standard board with the appropriate

 6    representation from different types of physicians,

 7    pharmacists, nurses, consumers, and so forth.  So

 8    the numbers have -- have changed, as well as the

 9    composition.

10    Q.   How many physicians are -- is there a set

11    number of physicians who need to be on the DURB?

12    A.   I think they have rules, and I haven't

13    reviewed those lately.  I know back when I was

14    chairman back in the mid-2000s, I was -- I was aware

15    of what those ratios needed to be, but I really

16    don't know what they are now.

17    Q.   But there's physicians?  There's nurses?

18    A.   We have had nurses.  I know -- I know we

19    attempt to have a good representation of physicians,

20    pharmacists, and some type of nurse or consumer

21    advocate or somebody that's not necessarily directly

22    tied into the medical profession as a -- as a

23    representative on the board.

24         And I could look, if -- if you'd like, to

25    see what the board's composition is now, because I
```

1    think I know what everybody does, but it would be

2    hard to remember without looking.

3        Q.   In connection with putting together your

4    expert opinions in this case, did you interview or

5    talk to any DURB board members?

6        A.   I think the answer to that is yes, but

7    not -- it wasn't a formal interview.  The coauthor

8    of the Pharmaceutical Market textbook is Brent

9    Rollins, and Brent is a former student of mine.  He

10   earned his Ph.D. back around 2008 or '09, I think.

11            And Brent, when I retired from the board, he

12   was admitted to the board.  And I do recall asking

13   him about this -- not this case, but I remember

14   asking him if the sales rep that I used to know back

15   when I was on the board was still around.  And so

16   it's not really an interview, but I did ask him that

17   question.

18       Q.   What did you learn?

19       A.   He said that he indeed was up until very

20   recently.

21       Q.   Did you make any effort to contact that

22   sales rep?

23       A.   No, I did not.

24       Q.   Why were you asking Mr. Rollins about

25   whether that sales rep was still around?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I asked Dr. Rollins that question --

 2        Q.    Sorry, Dr. Rollins.

 3        A.    Yes.

 4        Q.    Apologies?

 5        A.    It's okay.  I asked him that question just

 6   to -- just out of curiosity.  I remember -- it was

 7   actually -- I remember his name was Michael Packer.

 8   And I asked him, just because I was curious if he

 9   was -- you know, given the fact that the opioids

10   were in the news lately, if Michael was still around

11   and/or, you know, anybody in terms of the sales of

12   the opioids.

13        Q.    So other than your conversation with

14   Dr. Rollins, do you recall any other conversations

15   with any DURB board member in connection with

16   putting together your expert opinions in this case?

17        A.    Actually, the conversation with Dr. Rollins

18   wasn't in connection to this.  It was just

19   curiosity, but just in the interest of full

20   disclosure, I wanted to know -- I wanted you to know

21   that I did ask him that question.

22        Q.    Got it.

23        A.    No.  I have not discussed, for purposes of

24   this report, any -- I haven't asked or interviewed

25   anyone regarding my preparation of this report.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is that -- the way I asked my question

 2   before was whether you talked to any DURB board

 3   member.  I take it if I'd asked you, have you talked

 4   to any practitioner in connection with putting

 5   together your expert opinions in this case, the

 6   answer would be "no."  Is that right?

 7      A.   No, that would not be correct.

 8      Q.   Okay.  What practitioners have you talked

 9   to?

10      A.   I did make an inquiry of two pharmacist

11   colleagues about the ordering of CIIs.  I used to

12   work for Walmart and --

13      Q.   Sorry.  Hold that thought.  There is a phone

14   issue.  They can't hear.  So let's --

15           THE VIDEOGRAPHER:  We are now going off the

16      video record.  The time is currently 9:52 a.m.

17       (Recess from 9:52 a.m. until 9:55?a.m.)

18           THE VIDEOGRAPHER:  We are now back on the

19      video record.  The time is currently 9:55 a.m.

20   BY MR. VOLNEY:

21      Q.   So, Dr. Perri, before we had this

22   interruption, I'd asked you a question about what

23   practitioners you talked to in connection with

24   arriving at your opinions in this case.  And you

25   indicated that you had talked to two pharmacists?
```

 1      A.   Two pharmacist colleagues, that's right.

 2      Q.   Okay.  Who did you talk to and why?

 3      A.   First it was Nancy Shepherd and ███████.

 4  And Nancy is a former Walmart employee, and ████ is

 5  a former CVS employee.

 6           And I wanted to verify with Nancy that my

 7  recollection of Walmart's ordering of CIIs and CIIIs

 8  through V was consistent with her recollection.  And

 9  with ████, because I've never worked with CVS, I

10  wanted to verify how they did order CIIs at CVS.

11           The reason behind that was because I was

12  able to locate information for, for example,

13  Walgreens on how they did their ordering and so

14  forth, but I was not able to nail that down for

15  Walmart or CVS.  So I wanted to make sure that I had

16  the right information in terms of what their

17  ordering practices were.

18           So those were related to the manufacturers

19  as much as it did to just CVS and Walmart.

20      Q.   So what we talk about CIIs or CIIIs or CIVs

21  or CVs, what are we talking about?

22      A.   Controlled substances that usually have

23  special handling and ordering possibly.  And is

24  your -- is your question intended to how they

25  were -- how they were ordered for those -- what I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    found, or something different?

 2        Q.   Well, it's, like, what are they and then why

 3    did it matter to you?

 4        A.   The -- it mattered because the -- the issue

 5    of -- the marketing issue of distribution is

 6    important, and if the chain pharmacies were

 7    distributing and ordering from their own wholesale

 8    distribution centers, that would have -- that would

 9    have bearing -- possibly have bearing on my

10    opinions.

11            So if a -- one of the chains did or didn't

12    distribute CIIs, which it turns out that they all

13    did at some point, but that could have had bearing

14    on my opinions in terms of the marketing of the

15    opioids in this case.

16        Q.   Did you talk to any other practitioners

17    other than the -- the two pharmacists you just

18    identified for me?

19        A.   Practitioners?  No.

20        Q.   Did you interview any prescribers?

21        A.   With respect to the issues in this case, no,

22    I did not interview any particular prescribers, but

23    I've worked with physicians and work with physicians

24    still on a continuous basis.

25        Q.   Well, what work do you do with physicians?
```

```
 1        A.   If -- we could go through the CV and I could

 2   point a few things for you, but --

 3        Q.   Sure.  Let's do it.

 4        A.   Okay.

 5        Q.   Exhibit 2?

 6        A.   Yeah.

 7        Q.   Try out the ELMO here.

 8        A.   Yeah.

 9        Q.   Tell me where you're looking.

10        A.   Just looking at Page 1 of Exhibit 2.

11        Q.   Yeah.

12        A.   If you -- if you look down the list of

13   positions that I've held, there are a couple of them

14   that stand out.

15             1981 through 2007, pharmacist in community

16   practice.  As a pharmacist, we communicated with

17   doctors routinely for a variety of reasons.

18             The position -- I'm looking here to see --

19   2001 through 2006, clinical pharmacist at Athens

20   Primary Care Pharmacy Care Clinic, that was a clinic

21   that was devoted to disease management and health

22   and wellness.

23             And we basically saw patients that were

24   receiving care from their primary care doctor, and

25   we did follow-up assessments, patient education,
```

```
 1    diet and exercise recommendations.  We followed and

 2    maintained their refills, for example, for blood

 3    pressure, cholesterol medicine, and did wellness

 4    assessments, followed diabetes, followed

 5    anticoagulation, those activities.

 6            So we worked in the doctor's office very

 7    closely with physicians during that period of time.

 8    And I say "we."  That was the community practice

 9    group that I was the director of, so that would have

10    been the time period that I did have overlap with

11    the Purdue rep.

12            And also through -- I don't know if I see it

13    on here or not, but I volun -- the only -- the only

14    pharmacy practice I do right now is as a volunteer

15    at the Mercy Health Clinic, and the Mercy Health

16    Clinic is a clinic for indigent care patients, just

17    basically people who have no insurance and no real

18    way to pay.  So they have a full-time pharma -- not

19    full-time, she's part-time, but they have a

20    pharmacist that's there a couple of days a week

21    during the day, but a lot of these folks can't get

22    there during the day, so they have volunteer

23    pharmacists come in at night, along with volunteer

24    physicians.  So we work side by side with the docs

25    at the Mercy Clinic to basically just take good care
```

1    of patients.

2        Q.    In connection with your pharmacy work and

3    community practice, is that volunteer work?

4        A.    The work as a pharmacist in community

5    practice between 1981 and 2007 was usually for a

6    chain drugstore, and it was for -- it was

7    moonlighting.

8             When I was the director of pharmacy practice

9    group, that was -- that was part of my duties at the

10   University of Georgia, so I was also getting paid

11   through that.

12            The Mercy Clinic that we started in or about

13   2001 or 2002 with a group of pharmacists and

14   physicians, there was about four or five of us that

15   got that going, that was all volunteer work and has

16   been to this day.

17       Q.    Do any of those pharmacy or pharmacist

18   positions that you've held involve dispensing

19   Schedule II narcotics?

20       A.    The work in community practice would have

21   involved that as a community pharmacist, but we did

22   not dispense anything at the -- we -- we recommended

23   prescriptions, but did not dispense at the primary

24   care office.  And we do not do anything with

25   controlled substances at the Mercy Clinic.

```
 1      Q.   Okay.  So where was the community practice

 2   located?

 3      A.   So the community pharmacy practice would

 4   have been for a variety of chains.  Initially, it

 5   was a company called Pathmark, which any of you from

 6   up north might recognize, Drug Emporium, the A & P

 7   food stores.  I think I've worked some with Kroger.

 8   Yeah, I've worked with Kroger.  I've worked with

 9   Walmart.

10      Q.   So, okay.  That makes sense.  You said

11   moonlighting, so --

12      A.   Right.

13      Q.   -- while you were teaching, you were also

14   moonlighting as a pharmacist?

15      A.   Right.

16      Q.   And then in connection with your

17   moonlighting from '81 to 2007, you would have

18   dispensed any drugs pursuant to the prescriptions

19   that you received as a pharmacist; fair?

20      A.   That is correct.

21      Q.   And did you receive any particular training

22   related to opioid painkillers as a community

23   pharmacist?

24      A.   Other than what I received in pharmacy

25   school and through my internship training, I don't
```

Highly Confidential - Subject to Further Confidentiality Review

1    think there would have been anything in addition to

2    that.

3        Q.   For example, you didn't receive any

4    additional training about how to identify potential

5    cases of abuse or misuse of Schedule II narcotics?

6        A.   To the best of my recollection, that was not

7    something that I was trained in at that time.

8    However, since that point in time, I have received

9    training in those areas, and I now teach pharmacy

10   students those skills.

11       Q.   And when did you receive that training?

12       A.   That started for me in about 2014 perhaps,

13   '15, somewhere in that -- about that time.  We

14   received a sizable grant from SAMHSA, Substance

15   Abuse and Mental Health Services Administration, to

16   implement SBIRT, Screening, Brief Intervention,

17   Referral to Treatment in the pharmacy curriculum.

18         The grant was also designed to introduce it

19   in psychology and social work, as well at a couple

20   of institutions, including the University of Georgia

21   and Georgia Tech.  So we have now integrated that

22   into the pharmacy curriculum.

23       Q.   And so if we look at your report, which is

24   Exhibit 1, Page 2, Footnote 1, is that what that is

25   referring to, the SAMHSA grant?

Highly Confidential - Subject to Further Confidentiality Review

1     A.   Yes.  UGA SBIRT Interprofessional Training

2     Program, that's it.

3     Q.   Who else is working with you on that grant?

4     A.   The principal investigator is Amanda

5     Abraham, and she's in the School of Public and

6     International Affairs and has a strong focus in

7     addiction and addiction research.

8          The rest of the team is -- I -- I can't

9     pronounce her name, but it's June, and she's in

10    social work.  Let's see.  Who else is on there?

11    Justin is in psychology, and Brian -- Brian McBride,

12    is in -- at Georgia Tech in either psychology or

13    social work, and I'm, of course, the pharmacy

14    connection.

15    Q.   Is there a -- well, let me see if I can ask

16    you in an open-ended way.

17         In pharmacy practice, are pharmacists

18    trained to identify common signs of possible abuse

19    or misuse of narcotics, prescribed narcotics?

20         MR. CHALOS:  Object to the form.

21    A.   Well, I can't speak to all pharmacy schools,

22    but I know what we do at Georgia, and at present we

23    do introduce the concept of the SBIRT program.  The

24    SBIRT starts out with a couple lectures on why it's

25    important, and in that, we -- the idea of being able

Highly Confidential - Subject to Further Confidentiality Review

1    to screen your patients to identify those who have

2    potentially problems with substance abuse in

3    general.  It could be opioids, it could be alcohol,

4    it could be anything.

5        Q.   Could be benzodiazepines, any drugs you

6    could possibly abuse, I take it?

7        A.   Yes.  And we focus primarily on alcohol,

8    opioids, and things like marijuana that -- that we

9    can screen -- we take a public health perspective to

10   it, because we're -- we're looking at it from the

11   angle, does this drug use have a potential to impact

12   the patient's health and their existing care?

13           So what we do at Georgia is we introduce the

14   topics.  We teach the students how to use screening

15   tools to identify patients who might be at risk.  We

16   can't give them a test and say, you're at risk or

17   you're not at risk.  We can say, you know, based on

18   information you've provided, you may be at risk, and

19   here's how that might be impacting your health.

20           So with that information, then a pharmacist

21   who is dispensing, who had that information, could

22   also then know if the patient was at higher risk for

23   addiction or something along those lines.

24       Q.   Is there a prescription monitoring program

25   in Georgia?

```
 1       A.    I believe so, yes.  I don't currently

 2   practice, so I -- I know I've signed up for it, but

 3   I've never accessed it because I'm not currently

 4   practicing.

 5       Q.    Okay.  Fair.  So as a -- as a doctor of

 6   pharmacy, you're not a prescriber of drugs, I take

 7   it?

 8       A.    Clarification.  I am not a doctor of

 9   pharmacy.  I'm --

10       Q.    Sorry.

11       A.    I have a BS in pharmacy.  My doctorate is in

12   pharmacy and marketing, but it's not clinical

13   pharmacy, so it's not a clinical doctorate.  They

14   changed the degree in about 2000, turned it into a

15   PharmD, rather than a BS.  They just added one more

16   year to the curriculum.  So I have a BS in pharmacy

17   and a Ph.D., rather than a PharmD.

18       Q.    Okay.  And the Ph.D. is the Ph.D. that's

19   focused on pharmaceutical marketing?

20       A.    Right.

21       Q.    As a separate subject?

22       A.    Yes.

23       Q.    Is that a marketing degree, or is that a

24   pharmacy degree?

25       A.    That's a good question.  The -- the
```

Highly Confidential - Subject to Further Confidentiality Review

1   situation was -- at the University of South

2   Carolina, when I was recruited to go there back in

3   1981, the College of Pharmacy had just applied for a

4   graduate program, and it was going to be a graduate

5   degree in pharmacy or what they, at that time,

6   called pharmacy care administration.

7           Because that program wasn't approved, they

8   said, well, we're going to have this approved any

9   day now, and so -- but we don't, so currently you're

10  going to have to be enrolled in the marketing

11  program over at the business school.

12          So I took my courses and did the business

13  school program, and about two or three months before

14  I graduated, the pharmacy program finally got

15  approved.  So I had taken all the pharmacy classes

16  that I needed to take, taken all the business

17  classes that I needed to take.  So they basically

18  gave me a dual -- a dual major.

19          The interesting thing about that is you

20  don't get a degree from the University of South

21  Carolina in pharmacy or marketing.  You get a

22  doctorate from the University of South Carolina, and

23  you have an area of focus.  So my focus was

24  marketing and pharmacy.

25      Q.   How long did it take you to get that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Four years.

2        Q.    And give me a sense of what percentage of

3    time you spent taking marketing classes in the

4    business school versus pharmacy classes in the

5    pharmacy school.

6        A.    Wow.

7        Q.    I know it's a long time ago.

8        A.    Probably 75 percent, 80 percent at the

9    business school.  They -- some of the courses

10   weren't in the business school either.  You know,

11   the graduate school has all kinds of requirements.

12   You have to have statistics.  You had to have

13   psychology.  You had to have a foreign language.

14        So probably 20 percent was those outside

15   courses, and then three-quarters of the rest was the

16   business school.  And it was basically marketing,

17   marketing management, marketing theory classes.

18        Q.    So back to my original question:  As a

19   pharmacist, you're not a prescriber of any drugs; is

20   that fair?

21        A.    Yes, for the most part; however, some

22   pharmacists do an -- they -- they do recommend or,

23   under protocol, do some prescribing.  Generally that

24   does not apply to controlled substances.

25        Q.    In order to get access to one of the

Highly Confidential - Subject to Further Confidentiality Review

1  controlled substances that's involved in this

2  lawsuit, you would have to get a prescription from a

3  medical doctor or a doctor of osteopathy; fair?

4      MR. CHALOS:  Object to the form.

5      A.   Or someone who's legitimately able to

6  prescribe it, yes.

7      Q.   Okay.  But you, yourself, are not, in your

8  words, legitimately able to prescribe a Schedule II

9  narcotic; fair?

10     A.   Not by law, that's fair.

11     Q.   Are you -- do you consider yourself

12  qualified to testify about how doctors make the

13  decision to prescribe opioid painkillers?

14     MR. CHALOS:  Object to the form.

15     A.   From a perspective of marketing, absolutely.

16  From a patient care perspective, the decision

17  process is well-known to me.  So I think I do -- I

18  do have skills and expertise in that area, but I

19  didn't -- I didn't do any analysis in this case

20  about how doctors treated their patients or made

21  decisions about opioids.

22     Q.   Do you consider yourself qualified to

23  evaluate whether a particular prescription was

24  medically necessary?

25     MR. CHALOS:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   So that -- again, that was not part of what

 2    I did in this matter.  As a pharmaceutical marketing

 3    expert, that would not be part of an analysis that I

 4    would undertake.

 5             As a pharmacist, if I were to review a case,

 6    and you provided me with the clinical picture, I

 7    think pharmacists -- any pharmacist would be able to

 8    tell you, given a clinical presentation of a

 9    patient, what might or might not be clinically

10    indicated.

11             That's just part of what we do as

12    pharmacists.  We're the -- sort of the final

13    gatekeeper, and so that would be something that we

14    could do, but, again, I did not do that in this

15    matter.

16        Q.   Okay.  Just -- I'm trying to understand the

17    scope of your opinions and your expertise.

18             So my understanding of your responses to my

19    question is that you have pharmacy training that

20    would allow you to evaluate in certain circumstances

21    whether you thought a prescription was warranted or

22    not, but that's not what you're doing in this case?

23             MR. CHALOS:  Object to the form.

24        Q.   Fair?

25        A.   Right.  The analysis in this case was
```

Highly Confidential - Subject to Further Confidentiality Review

 1    limited to -- to pharmaceutical marketing and not

 2    the clinical aspects of patients.

 3        Q.   Are you -- do you have any training in pain

 4    management?

 5        A.   No additional training outside of what I did

 6    in pharmacy school at -- at the time.

 7        Q.   Do you have any training in palliative care?

 8        A.   So training versus experience, I mean, I've

 9    had patients that were under palliative care in the

10    day, but I've -- I've never undertaken any

11    additional training in that area.

12        Q.   Are you -- do you have any particular

13    familiarity with the FDA's advertising regulations?

14        A.   Well, to the extent that FDA rules,

15    guidelines, regulations, impact pharmaceutical

16    marketing, I would be familiar with that.  I don't

17    consider myself an expert on the FDA, though.

18        Q.   Don't consider yourself an expert on

19    FDA's -- sorry.  Strike that.

20             Do you consider yourself an expert on the

21    FDA's marketing regulations?

22             MR. CHALOS:  Object to the form.

23        A.   So I think I'm -- I'm knowledgeable about

24    the aspects of marketing that are controlled by the

25    FDA, again, as far as that goes.  Inner workings of

1    the FDA, I -- that's not something I could provide

2    opinions about.

3       Q.   Have you ever participated in a submission

4    of a new drug application to the FDA?

5       A.   No, I don't -- I have not.

6       Q.   Have you ever drafted marketing materials

7    for FDA approval?

8       A.   So when you say "drafted," for me as a

9    marketer, it has a perfect specific meaning.  And

10   that's somebody sitting at a desk with a graphic

11   design, coming up with, you know, a magazine style

12   slick or something like that, or it could be

13   crafting of a clinical trial.

14          So in the first case, I -- I've never

15   drafted materials for the FDA.  I have drafted

16   materials for use in studies, but I haven't drafted

17   materials that would be submitted to the FDA.

18          I have participated in -- in analysis and so

19   forth that were part of trials or part of research

20   that may have been submitted to the FDA at some

21   point in time, but I would have to look at just a

22   few articles that I coauthored with folks in the

23   clinical side to really evaluate that.

24          So I think the answer to your question is

25   no.

1      Q.   I -- in connection with rendering your

2    opinions in this case, do you intend to render an

3    opinion that any particular defendant in this case

4    violated FDA regulations?

5           MR. CHALOS:  Object to the form.

6      A.   So I don't -- I don't think -- I don't think

7    that opinion is one that I've expressed in my

8    report, but there are opinions that come kind of

9    close to that, and I'm sure we'll get to that at

10   some point.

11     Q.   Have you had any professional experience

12   dealing with FDA warning letters or notices of

13   violation?

14     A.   I have been exposed to FDA warning letters

15   through my work on a couple of cases like this one.

16   I've also been made aware of warning letters through

17   the process of the Drug Utilization Review Board.

18   As I recall, there had been times when warning

19   letters had been discussed at that board.

20           So -- so through the media as well, where

21   I -- where there have been companies that -- that

22   received warning letters or other types of actions

23   by the FDA that's been publicized, I would be

24   exposed to it through that as well.

25     Q.   But in terms of interfacing directly with

1    the FDA with respect to a particular warning letter,

2    I take it the answer is, you -- you have not done

3    that?

4        A.   I've never received a warning letter from

5    the FDA, no.

6        Q.   But you've never -- I mean, I get it, but

7    you've never represented or worked for a

8    manufacturer and helped that manufacturer respond to

9    a warning letter; fair?

10       A.   That's fair.  I -- I get your question now.

11   No, I have not done that.

12       Q.   Do you have any professional experience

13   marketing Schedule II or Schedule III drugs?

14       A.   Only as a receiver of the information, not

15   as a marketer of the information.

16       Q.   Do you know how treatment with opioid

17   analgesics has changed since the mid-1990s?

18       A.   I do.

19           MR. CHALOS:  Object to the form.

20       Q.   You do?

21       A.   I do.

22       Q.   And how do you know that?

23       A.   Well, I've seen a shift in the paradigms

24   about pain management, and that has gone from a very

25   conservative approach to the use of pain medicines

 1    to a much more liberal approach to the use of pain

 2    medicines.

 3       Q.   Has the pendulum started to swing back

 4    towards conservatism?

 5            MR. CHALOS:  Object to the form.

 6       Q.   To your knowledge?

 7            MR. CHALOS:  Object to the form.

 8       A.   So the -- the pendulum -- it's an

 9    interesting analogy, I think.  The -- the problem

10    with looking at the pendulum is that there is a

11    large body of patients that have been exposed to

12    opioids that have developed problems associated with

13    their use.

14            And that group doesn't really get smaller

15    unless somebody dies or gets either put on some kind

16    of maintenance treatment or medication-assisted

17    therapy or some sort of cognitive behavioral

18    therapy, and you know, is basically treated for

19    their addiction.  And in those cases, many times

20    it's still an addiction.  It's just being treated.

21            So to say the pendulum is swinging back is

22    not something I'm sure I can agree with, but I think

23    we have seen a plateau.  And the numbers -- while

24    the numbers remain high, I think that the recent

25    research that I've seen has showed a plateau, that

1    the problem may not be continuing to expand.

2         However, there are many aspects to the

3    opioid addiction issue, many of which I'm not an

4    expert to discuss or to review.

5         But it is -- with specific regard to your

6    question on the pendulum swinging back, I don't

7    think it's swinging back.  I think we've -- we've

8    reached a point at which the pendulum is sort of

9    hanging out there, and we have yet to see what's

10   going to happen as a result.

11   Q.   Let's look back at your report.

12   A.   Excuse me?

13   Q.   Let's look at your report.  Let's look at --

14        MR. CHALOS:  This --

15   Q.   -- Paragraph 8.

16        MR. CHALOS:  This light is red.

17        THE VIDEOGRAPHER:  Looks like --

18        MR. VOLNEY:  Sorry.  Can you hear me?

19        MR. CHALOS:  Sorry if I misspoke.

20        MR. VOLNEY:  It's my fault.  Too much going

21   on in front of me.

22   BY MR. VOLNEY:

23   Q.   Let's look at Paragraph 8.  Just trying to

24   identify in your report what qualifications you have

25   that are specifically related to the area of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioids, and we've talked about the SBIRT that's

 2    identified in Exhibit 1 on Page 2.  Is there

 3    anything else in here in your qualifications or on

 4    your CV related to the area of opioids?

 5        A.    Yes.

 6        Q.    What else is there?

 7        A.    Well, at Footnote 1 is actually two grants.

 8    The first one is a policy analysis at Georgia

 9    Medicaid, which I started in about the same time

10    period that we started the SAMHSA grant.  And that

11    study is designed to evaluate the impact of Medicaid

12    safety measures that they put in place in about

13    2008, 2009 to limit patient exposure to opioids.

14          And that study funded by the National

15    Institute of Health, the National Institute on Drug

16    Abuse, just recently -- we just recently completed

17    it.  We're still finishing all the analysis.

18          But associated with that, we also published,

19    I think, three or four papers, certainly three, and

20    then there's one or two that are still in the

21    developmental stages, assessing Medicaid policies

22    with regard to changes they made to the Medicaid

23    program back in that time period, again, designed as

24    safety measures to limit exposure to opioids where

25    possible.
```

 1           So in addition to that, the training that I

 2     have as a pharmacist certainly, I think, qualifies

 3     me in terms of knowing about opioids and their

 4     impact on patients.

 5           Also, the technical aspects of opioids and

 6     their distribution, the -- from the marketing angle

 7     specifically, opioids are part of the prescription

 8     drug marketing arena, and they have some special

 9     rules that I identify in my report based on the

10     nature of opioids.

11     Q.   Does that cover the -- your work in the area

12     of opioids?

13     A.   So I think the only thing I'd like to add to

14     that is that -- that generally, a lot of the things

15     that I've done over time have related to issues that

16     would be the same whether we're talking about

17     opioids or other prescription medications, and I

18     think those are all tangentially related.  I don't

19     think that there's any that are directly related.

20     Q.   All right.  Let's -- let's look at

21     Exhibit 3.

22     A.   In addition to that, we --

23     Q.   Sure.

24     A.   -- made a couple of presentations at

25     regional, national, international meetings regarding

Highly Confidential - Subject to Further Confidentiality Review

1    opioids.  These are identified in the CV, but these

2    were just -- these -- these would be presentations

3    that were related to the papers that we published as

4    well.

5        Q.    What page are you looking at?

6        A.    This would be on Page 13 of the CV, and I

7    think they there are actually one or two that might

8    be missing here, but I could check, the ones that

9    begin with the name Jawordhana, those two

10   presentations both.

11       Q.    Did you participate in giving those

12   presentations?

13       A.    They -- they were -- as I recall, I

14   participated in the development of the

15   presentations.  I did not present them.  The

16   first -- the first author listed would have been the

17   presenting author.  I would have been the senior

18   author on both of those papers.

19            And that was -- that was the team on the

20   opioid grant.  It's a slightly different team than

21   the SAMHSA grant, but that would include Jayani

22   Jawordhana, Amanda Abraham, who was consistent on

23   both projects, Henry Young, and myself.

24       Q.    Is there -- was there more than one article

25   that was the result of the -- this collaboration?

```
 1      A.   Yes.

 2      Q.   So one of them is Opioid Analgesics and

 3   Georgia Medicaid Trends and Potential Inappropriate

 4   Prescribing Practices by Demographic

 5   Characteristics, 2004 to 2019?

 6      A.   So the article wouldn't be that.  The

 7   article would be listed on Page 4 of the CV.

 8      Q.   All right.

 9      A.   Articles Number -- Number 4, 5, and 6 are

10   the three that were published.

11      Q.   4, 5, and 6?

12      A.   Right.  And we have one that's in

13   preparation right now.  That's listed as Number 1,

14   but the 4, 5, and 6 are the three that are -- that

15   have actually -- I think Number 4 is actually --

16   it's no longer in press.  I think it's been

17   published, but I'd have to check.  Number 5 is

18   definitely in print, and Number 6 is definitely in

19   print.

20      Q.   When you talk about potential inappropriate

21   prescribing practices, what does that mean?

22      A.   So as part of the opioid grant, the policy

23   analysis, one of the variables that we looked at in

24   our regression modeling was whether the prescribing

25   by the physician met certain clinical criteria.
```

1          And some folks out in Utah developed those

2     criteria very specifically.  They've been used in a

3     lot of research nationwide.  It's just referred to

4     generally as appropriate or inappropriate --

5     potentially inappropriate prescribing.

6          As an aside, this is why I mentioned that

7     some of the work I've done elsewhere actually

8     applies here because I've looked at inappropriate

9     prescribing in other categories; for example, in the

10    elderly, not specifically related to opioids, but

11    potentially inappropriate prescribing where some set

12    of clinical criteria that have been developed by

13    experts in the field are applied to a claims

14    database to determine if the prescribing was indeed

15    appropriate or not by that assessment.

16         It does not take into account the clinical

17    picture of the patient, only these objective

18    indicators that can be assessed from a claims

19    database.

20         So potentially inappropriate prescribing

21    would have been situations, for an example where a

22    benzodiazepine was prescribed at the same time as an

23    opioid analgesic, or where there was an overlap of

24    less than seven days between one opioid prescription

25    and another, or when the dose exceeded a certain

Highly Confidential - Subject to Further Confidentiality Review

1    number of morphine milligram equivalents within a

2    particular time period.

3          So those are some examples of the ways we

4    assess objectively appropriateness of prescribing.

5    I think another one is Suboxone along with an

6    opioid.  There might be one or two others.  I -- we

7    can look at that article and see.

8          But again, potentially inappropriate

9    prescribing was assessed objectively through those

10   criteria, and then we simply used that as a variable

11   in our analysis.  So one of the variables on the

12   right-hand side of the equation, the independent

13   variables would have been related to that

14   inappropriate prescribing.

15   Q.    I take it you queried the Georgia Medicaid

16   database and the records that are available via that

17   database and then just identified particular cases

18   where there were these potential inappropriate

19   prescribing practices?

20   A.    That -- generally, that's what we did.

21   We -- we received the database from Medicaid, and

22   then we proceeded to get it into a suitable format

23   for analysis.  The -- the analysis itself, once we

24   identified patients who had taken any opioid during

25   the entire study period, we then looked at -- for

Highly Confidential - Subject to Further Confidentiality Review

1    the -- we looked for those specific potentially

2    inappropriate criteria.

3        Q.    But you're not making a judgment whether, in

4    a particular case or any subset of potential cases,

5    that there was an actual inappropriate prescribing

6    practice.  It was just the potential for that.

7    Fair?

8        A.    I think -- I think that's -- I think that's

9    a fair way to say that what -- what we looked at was

10   not an assessment of whether the prescribing was

11   actually appropriate or inappropriate.  It was just

12   these objective criteria that have been shown over

13   time, by lots of experts, to be pretty good

14   indicators of whether that was the case or not.

15       Q.    Did you find that the most prevalent

16   potential inappropriate prescribing practice by

17   doctors was overlapping opioid and benzodiazepine

18   prescriptions?

19       A.    I don't have the article here in front of

20   me, but I think, as I recall, that was what we

21   found.

22       Q.    What are benzodiazepines?

23       A.    Benzodiazepines are, for example, lorazepam,

24   diazepam, clonazepam.  They're -- they're a category

25   of drugs that are centrally acting and anxiolytic

1    and a muscle relaxant.

2         So there are some reasons why, over time,

3    physicians may have prescribed those along with an

4    opioid for pain, but I think research has borne out

5    over time that it's not a good idea to use those two

6    together.

7    Q.   Do you consider -- well, there's a lot of

8    marketing discussion in your report.  Drugs are

9    marketed -- well, here, the prescription drugs we're

10   talking about here, a particular patient wouldn't

11   get a prescription drug unless a doctor made the

12   medical judgment that it was necessary to write that

13   prescription for that patient; is that fair?

14        MR. CHALOS:  Object to the form.

15   A.   Well, a little bit earlier you asked me if I

16   was going to have opinions about the prescribing

17   process for individual patients, and I told you no.

18   So I probably should stick to my -- my answer on

19   that and say, you know, that's not something I

20   evaluated.

21   Q.   So in terms -- in terms of doing your case

22   study in this -- in this lawsuit, you didn't look at

23   prescribing practices by doctors; fair?

24   A.   I did not look at individual patient level

25   decisions by doctors.  I did look at the decision

1    process that doctors use in making that decision for

2    a patient globally and from a theoretical

3    perspective as -- as relates to the marketing and

4    why marketing impacts that decision.

5        Q.   So you are aware that potential

6    inappropriate prescribing practices can create

7    dangers to patients who are prescribed opioid

8    painkillers; fair?

9            MR. CHALOS:  Object to the form.

10       A.   So in looking at potentially inappropriate

11   prescribing, there's -- there's two parts to that.

12   There's the objectivity of it.  It's been -- it's a

13   criteria that's been developed by experts that if

14   these occur, then we're more likely to see

15   inappropriate prescribing, and bad things happen.

16   At the same time, just because someone used a

17   benzodiazepine and an opioid together, it doesn't

18   mean a bad thing happened.

19           So the analysis is slightly different

20   between those two, and I'm not sure how to answer

21   your question because I didn't evaluate whether

22   those bad things happened.

23           The -- that's actually the focus of the last

24   paper that's not finished yet, where we're looking

25   at patient outcomes and patient outcomes in relation

1    to these -- these potentially inappropriate

2    prescribing.

3         So soon I should know the answer to the

4    question whether or not benzodiazepines and opioids

5    caused a statistically significant increase in

6    negative outcomes for patients, but as we sit here

7    today, I can't tell you that I know the answer to

8    that.

9    Q.   Do you know what a learned intermediary is?

10        MR. CHALOS:  Object --

11   A.   Yes.

12        MR. CHALOS:  -- to the form.

13   A.   Yes, I do.

14   Q.   What is a learned intermediary?

15   A.   A prescriber is a learned intermediary, for

16   example.

17   Q.   So a healthcare provider who is licensed to

18   prescribe a particular drug is a learned

19   intermediary?

20        MR. CHALOS:  Object to the form; calls for a

21   legal conclusion.

22   A.   Could you read that again?

23   Q.   I'm reading from your book --

24   A.   Yeah.

25   Q.   -- Pharmaceutical Marketing --

```
 1     A.    Right.

 2     Q.    -- Page 158 --

 3     A.    Right.

 4     Q.    -- in a chapter written by Mr. or

 5   Dr. Brideau and Dr. Fanning.

 6     A.    Yes.

 7     Q.    Are they colleague of yours?

 8     A.    They're acquaintances, yes.  They work --

 9   they used to work at Philadelphia College of

10   Osteopathic Medicine College of Pharmacy.

11     Q.    And they state under the subheading Brief

12   History of Governmental Prescription Drug

13   Regulations, that:  Prescription medications are not

14   considered consumer goods because their use requires

15   a learned intermediary, quote, a healthcare provider

16   licensed to prescribe, to diagnose the condition

17   treated by the drug, recommend the drug and then

18   monitor the use of the drug, including its

19   effectiveness and adverse events.

20           Do you agree with that statement?

21           MR. CHALOS:  Object to form.

22     A.    Yes.  I have no reason to disagree with

23   that.

24     Q.    Okay.  I mean, you understand from your many

25   years of pharma -- pharmacy practice that there are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    gatekeepers in between potential patients and the --

 2    the Schedule II, Schedule III narcotics; fair?

 3        A.   By gatekeepers, you mean healthcare

 4    professionals that are making decisions on their

 5    behalf, yes.

 6        Q.   Right.  And that includes a doctor?

 7        A.   It would include a doctor or any prescriber.

 8        Q.   Also include a government organization like

 9    the FDA --

10             MR. CHALOS:  Object to the form.

11        Q.   -- who would have to approve the drug?

12             MR. CHALOS:  Object to the form.

13        A.   I guess at some level, the FDA's new drug

14    approval process or abbreviated new drug

15    applications process would have some impact on what

16    was actually available to practitioners, so

17    you couldn't say they were not involved.

18        Q.   And I think you would agree that

19    pharmacists, licensed --

20        A.   Can -- I'm sorry.

21        Q.   Sorry.  I interrupted you.

22        A.   I have a bad habit of thinking before I

23    speak, and I get -- I get stepped on sometimes, but

24    the -- the thing about that is, is that the FDA is

25    making a decision at a global, societal level about
```

1    what's available, whereas the individual

2    practitioner is making a decision for that patient.

3    I think that's an important distinction.

4        Q.    Got it.  You would also consider the -- a

5    pharmacist to be potentially a gatekeeper?

6        A.    At a --

7            MR. CHALOS:  Object to the form.

8        A.    The pharmacist as a gatekeeper is at a

9    different -- I think level in the distribution and

10   supply chain, and so, yes, I would consider them a

11   gatekeeper as well.

12       Q.    Okay.  So I'm about to change subject

13   matters.  Do you want to take a break?

14       A.    I absolutely do.  Thank you.

15       Q.    Okay.

16           THE VIDEOGRAPHER:  We are now going off the

17   video record.  The time is currently 10:35 a.m.

18   This is the end of Media Number 1.

19        (Recess from 10:35 a.m. until 10:49 a.m.)

20           THE VIDEOGRAPHER:  We are now back on the

21   video record with the beginning of Media

22   Number 2.  The time is currently 10:49 a.m.

23   BY MR. VOLNEY:

24       Q.    So I failed to cover sort of one

25   qualification-related matter before we move to the

Highly Confidential - Subject to Further Confidentiality Review

1    case study methodology and then the specific

2    opinions you have in this case.

3           You've identified for us at Schedule 2 of

4    your report, what I've marked as Exhibit 3, which is

5    your prior testimony for the last four years.

6           Do you see that?

7    A.   Yes, I do.

8    Q.   Is this accurate?

9    A.   Yes.

10    Q.   Can you tell me which of these matters

11    involves a use by you of the case study methodology?

12    A.   The -- if -- if -- I assume you're referring

13    to a marketing case study analysis versus a clinical

14    case study analysis?

15    Q.   Correct.  My understanding of your report in

16    this case is that it's a marketing case study

17    analysis.

18    A.   Right.

19    Q.   Fair?

20    A.   The reason I bring that up is because

21    several of these other cases were a patient case

22    study, so it's an individual patient that was being

23    studied.  So it's a similar analysis, different

24    subject matter completely, but similar methodology

25    for formulating opinions.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              But with respect to your question, the 2018

 2    BCBS, et al., v. GSK used -- it sort of -- it was

 3    sort of an abbreviated case, but it was a similar

 4    methodology to the --

 5         Q.   What did that case involve?

 6         A.   Am I at liberty to discuss it?  Because I

 7    did sign a protective order and --

 8         Q.   Well, just generally, is it a products

 9    liability case?  Is it a pharmacy marketing case?

10         A.   It was a marketing case with specific

11    relationship to manufacturing and manufacturing

12    issues as they relate to marketing.

13         Q.   So is that -- of the -- of these half dozen

14    on Exhibit 3, the one that involves a marketing case

15    study analysis is the BCBS versus GSK?

16         A.   Yes, but as I said, that -- it was a very

17    different kind of case.  It was -- number one, it

18    was just one company, and many of the opinions were

19    related to just how things worked in terms of the

20    pharmaceutical marketplace.

21         Q.   All right.  How long have you been a

22    testifying expert career-wise?

23         A.   In -- in matters such as these, I started in

24    about 2007 and --

25         Q.   And what percentage of your income do you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    derive from being a testifying expert or a

 2    consulting expert in litigation matters?

 3        A.    Over -- over the years, it works out to be

 4    anywhere from 10 to 20 percent on an annualized

 5    basis on average.

 6        Q.    Have you ever had any of your -- well,

 7    sitting here today, do you recall any marketing case

 8    study expert opinions that you've given prior to

 9    this one where you've used the same methodology as

10    you're using in this case?

11        A.    Yes.

12        Q.    Okay.  What -- what cases do you recall?

13        A.    So we have to go off this grid to do that,

14    or is that not something we can do?

15        Q.    No.  I think I'm entitled to ask.  We can go

16    off the grid.

17        A.    Okay.  So the first cases that I was

18    involved in was another MDL that was related to

19    average wholesale pricing and what was referred to

20    as spread pricing, and I used a case methodology in

21    that.

22              I also used a case methodology in -- and

23    there were -- one, two -- there were three AWP cases

24    that I used that same methodology for.

25              I used a similar methodology in an off-label
```

Highly Confidential - Subject to Further Confidentiality Review

1       marketing case in about 2009 or '10.

2              Also, a little after that, I was retained by

3       the Department of Justice to examine hospice

4       marketing, and I used the methodology there,

5       although those opinions were not admitted.  The --

6       my understanding is the judge said that while she

7       felt that I was a marketing expert, that because I

8       had not worked in hospice before, that she didn't

9       think I should be providing opinions on hospice.

10              Then the next time I used that -- that same

11      methodology would have probably been -- the exact

12      same methodology would have probably been the Blue

13      Cross Blue Shield case.

14      Q.   So the case where your opinion was excluded,

15      do you -- is that the matter of United States of

16      America vs. Aseracare, Inc.?

17      A.   Yes.

18      Q.   And that was pending in the Northern

19      District of Alabama, Southern Division?

20      A.   Yes.  I think it still is pending, actually.

21      Q.   Still is pending.  And in that case, you

22      were an expert hired by the plaintiff, the United

23      States of America or the Department of Justice?

24      A.   Yes.

25      Q.   And -- all right.  Your opinion was excluded

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in that case, right?

 2        A.   That is my understanding.

 3        Q.   Now, let's see.  How much are you getting

 4    paid in this case?

 5        A.   My hourly rate is $350 per hour.

 6        Q.   And do you know how much you've billed so

 7    far?

 8        A.   I've billed about 700 and -- about 700

 9    hours.

10        Q.   So do the math for me.  That's a lot.  I'm a

11    lawyer, not a mathematician.

12        A.   It's about 210.  If I'm paid everything that

13    I've billed, then it's about $210,000 or a little

14    more than that.

15        Q.   Okay.  That's an issue between you and him.

16             Let's see.  How long -- when were you first

17    hired?

18        A.   First hired versus first contacted?

19        Q.   Well, first contacted.

20        A.   Okay.  First contacted in about 2012, 2013,

21    somewhere in that time range.

22        Q.   And who contacted you?

23        A.   Ms. Linda Singer.

24        Q.   Okay.  What happened next with respect to

25    your contact and getting hired?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Did a little bit of preliminary work at that

 2   time, but my assessment was the document production

 3   needed to be more for me to look at.  I needed to

 4   see specific kinds of marketing documents, so I just

 5   went idle with the case.

 6             And then I was recontacted in July of 2018.

 7        Q.   And who were you contacted by?

 8        A.   Ms. Baisch, Krista.

 9        Q.   Krista, the woman sitting two to your

10   left -- to your right?

11        A.   Yes, to my right.

12        Q.   Okay.  And is she your primary contact

13   person for this matter?

14        A.   She has been.

15        Q.   And since you were hired in 2018, you've

16   spent about 700 hours, all told, on this matter?

17        A.   Approximately, yes.

18        Q.   Is anyone assisting you?

19        A.   I have an assistant, a pharmacist,

20   Dr. O'Dowd, who has helped me on a few tasks.

21        Q.   Who is he or she?

22        A.   She is a pharmacist who, while she was in

23   pharmacy school, was -- took my marketing classes

24   and had an interest in this area.

25        Q.   What has she done?
```

```
1        A.    She has organized documents and worked at my

2   direction to just basically categorize, file, and

3   provide a listing of specific documents.  For

4   example, Table II in my report, I had her

5   primarily -- once the marketing message documents

6   were identified, I had her sort through them and

7   divide them into the categories that we see in that

8   table.

9        Q.    So in terms of Table II, that is, I guess,

10   her work product, but reviewed and approved by you

11   and put into your report?

12        A.    Well, I mean, actually, we worked on it

13   together, and she did -- once -- once the format was

14   laid out and the learning curve about what documents

15   go where was decided, then she did build out the --

16   the actual listings, and then I did go through and

17   review and edit everything.  She did that at my

18   direction, so --

19        Q.    In terms of identifying the documents that

20   you considered to be relevant to your report, how

21   did you go about doing that?

22        A.    So I had access to the Relativity database,

23   where I conducted some of my own searches.  The first

24   thing I did when I was contacted by the plaintiffs

25   was to send them a list of search terms.
```

Highly Confidential - Subject to Further Confidentiality Review

1           As you're probably aware, in July there was

2    a very rapidly approaching deadline that was still

3    on the books.  And I indicated that, you know, for

4    me to conduct all the searches and go through that

5    many documents that quickly would be impossible.

6           So I gave them search terms and said, these

7    are the kinds of documents I need to see.  Can you

8    conduct some searches and provide me with documents?

9           So with that, basically, as I understand it,

10   being done based on my search terms, which I believe

11   I've provided as well --

12   Q.   Uh-huh.

13   A.   -- the individual searches that I did, as

14   well as some searches that Dr. O'Dowd did at my

15   direction, so that would be where the documents came

16   from.

17          So when those documents were identified, I

18   then, you know, requested them to be provided to me

19   in PDF format.  Some of them were and some of them I

20   had to search for myself on the Relativity system.

21   Q.   Is it your testimony that all the defendant

22   documents that are identified in your report, you --

23   you and your assistant were able to identify through

24   the use of your search terms?

25   A.   I don't think that's what I said.  I

1    think the -- the documents that are identified, for

2    example, the schedule that lists all the materials

3    considered, contains documents that we identified,

4    that I identified, some that she identified on her

5    own and reviewed with me, as well as some that were

6    identified by searches that were done by the

7    magicians at Relativity or attorneys or staff.  I

8    don't know who did those searches, but they were

9    conducted.  And so then they provided me with either

10   lists of Bates numbers or links to Relativity

11   documents, which I then reviewed.

12       Q.   Got it.  Tell me, what is the case study

13   methodology?

14       A.   Okay.  The case study methodology is a -- I

15   think a widely accepted method of doing analyses in

16   marketing and in medicine.

17            I realize that's an open-ended question, but

18   I -- but I'm hesitant to go too far with that.

19       Q.   Okay.  So let me split it up.

20       A.   Okay.

21       Q.   Case study methodology in terms of the

22   marketing context, what do businesses or people use

23   the case study methodology for, and how do they do

24   it in the marketing context?

25       A.   So case study methodology from a marketing

Highly Confidential - Subject to Further Confidentiality Review

 1   perspective is extremely useful because it allows us

 2   to look at complex systems of decisions in a real

 3   world context and to evaluate, you know, the -- the

 4   how and the why things were done and what happened.

 5       Q.   Okay.  When you talk about the real world

 6   context in the marketing arena, are you just focused

 7   on the -- what's in the marketing materials, or are

 8   you also trying to figure out how the audience

 9   received and acted on those marketing materials?

10       A.   It's all of the above, because, actually,

11   from a marketing perspective, the -- one of the key

12   components, and actually a principle of marketing,

13   is awareness of the operating environment that

14   you -- that you have to live in.

15          So from a marketer's perspective, a

16   marketing plan or a marketing strategy would be

17   incomplete without assessment of what's going on out

18   there in the marketplace.  So it's both of those

19   issues that you bring up.

20       Q.   And part of assessing what's going on in the

21   marketplace is trying to figure out how consumers

22   are reacting to the marketing?

23       A.   So distinguishing consumers from -- from

24   who -- in a marketing perspective as applied here,

25   you know, we have customers.  And as you've probably

1    noted, I distinguish customers with a "c" versus a

2    capital C, but consumers I look at as a little more

3    broad term.

4         So, yes, to look at consumers including both

5    patients as well as other customers, doctors, other

6    prescribers, third-party payers, insurance

7    companies, wholesalers, independent community

8    pharmacies, so a whole long list of potential other

9    customers.

10        But we would definitely be interested in

11   their behavior, how the marketing impacted them, but

12   not only that, also in the roles that they play and

13   how the information impacts them, the decisions that

14   they make, the way they make those decisions, what

15   they value in terms of information, and so on.

16   Q.   How did you make that -- or did you make

17   that judgment in this case, or evaluate in this case

18   how the marketing impacted particular prescribers,

19   third-party payers, insurance companies,

20   wholesalers, et cetera?

21   A.   So a large part of that assessment was done

22   based on the literature and research that's been

23   done in this area to identify how information

24   impacts, let's say, for example, prescribers.

25   Sections in my report are pretty extensive notated

```
 1    about that literature.
 2            But in addition to that, the marketing plans
 3    and marketing metrics are very detailed in this case
 4    about how customers responded to defendants'
 5    marketing.  So that was a big part of the assessment
 6    as well.
 7        Q.   Did you do any new research; for example,
 8    take a survey?
 9        A.   So -- so in -- in the case study
10    methodology, one of the things that a case
11    researcher might do is interview people making the
12    decision, making judgments, people designing the
13    marketing plans.
14            Unfortunately, in this instance, and it's --
15    happens in most case studies that are done in this
16    type of fashion, you can't do that.
17            But the interviews that you did through your
18    deposition process certainly provided a very similar
19    body of information to the kinds of questions that
20    might be asked of interviews if I were to do those
21    myself.
22        Q.   Now, why can't you do interviews in this
23    case?
24        A.   To my knowledge, I have no mechanism for
25    interviewing people in -- that are involved in -- or
```

Highly Confidential - Subject to Further Confidentiality Review

1    defendants that are involved in the case.

2       Q.   Well, what about prescribers, the folks in

3    Ohio who prescribed these medicines?

4       A.   So -- so, you know, I did not look at the --

5    as part of my marketing analysis, I did not look at

6    prescribers, per se.

7            From a marketing perspective, though, I did

8    look at, as I mentioned earlier, how the information

9    would impact their decisions and how it might

10   influence them.

11      Q.   And I'm trying to understand sort of how you

12   determine how a particular marketing message

13   impacted a particular prescriber, and let me -- let

14   me see if I can fairly recap what you've told me.

15           One thing you've said you've done is you've

16   relied upon the literature that exists in the sort

17   of marketing case study universe, which is cited in

18   your report; fair?

19      A.   I don't --

20           MR. CHALOS:  Object to the form.

21      A.   Yeah.  I don't think I said the marketing

22   case study literature, but I said the literature --

23   there's a body of literature associated with

24   prescribing behavior.  That's the literature I'm

25   referring to.

```
 1        Q.   Okay.  So you're relying on that body of

 2   prescribing behavior literature.

 3             And then second, I think you've identified

 4   for me that you're looking at defendants' own

 5   evaluation of the success or not of their marketing

 6   plans; fair?

 7        A.   Yes.

 8        Q.   Anything else?

 9        A.   Yes.  The -- the marketing literature in

10   general, not necessarily just related to physician

11   prescribing, also structures decision-making

12   processes, and it identifies a number of influences

13   on decision-making that must be considered in

14   analysis like this.  That's also in my report.  I

15   believe it's Figure 1 on Page -- Page 15.

16             So that also sort of structures the

17   theoretical underpinnings.  And then all the

18   research that's been done that we've alluded to just

19   a moment ago impacts this basic decision model.

20        Q.   I just want to make sure I understand, and I

21   apologize for repeating myself, but -- if I am.

22             I take it that you've not really engaged in

23   a quantitative analysis with respect to any

24   particular prescribing decision in the state of Ohio

25   or anywhere -- anywhere else in the United States in
```

1    this case?

2         MR. CHALOS:  Object to the form.

3    A.    So I think I need to break your question

4    down a little bit.

5    Q.    Sure.

6    A.    The -- the -- I'm not sure I understand what

7    you mean by a quantitative prescribing decision.

8    That doesn't really --

9    Q.    Well, I guess what I'm talking about is

10   causation.  You're not going to say Dr. -- you can't

11   say Dr. X prescribed Drug Y because he saw Marketing

12   Material ABC; fair?

13        MR. CHALOS:  Object to the form.

14   A.    No, but I think if -- if I understand my

15   opinions correctly, I do believe that doctors,

16   prescribers, were influenced by marketing that

17   changed the way they prescribe medications, as a

18   general statement.

19   Q.    Okay.  General qualitative statement, I

20   understand that, and I read your report a number of

21   times, and I get that.

22        But in terms of percentage of prescription

23   decisions that were influenced by marketing versus

24   percentage that were not?

25   A.    That would -- that would be a different

Highly Confidential - Subject to Further Confidentiality Review

1    analysis, and I'm not even sure I know how to do

2    that analysis, so I'd have to give that some

3    thought.

4        Q.   But that's not an analysis that you've done

5    in this case, sort of to break it down?

6        A.   Yeah.  In this matter, I have not looked at

7    the individual prescribing by an individual doctor

8    or tried to make an assessment as to why they

9    prescribed based on different inputs into this model

10   that we've talked about on Page 15.

11       Q.   In terms of the universe of documents that

12   you reviewed, did you limit that in any way?  For

13   example, was it just the documents that were

14   produced by the defendants?

15       A.   No.  As I said earlier, I think the -- I was

16   not limited at all in what I had access to.  I know

17   that there were -- I think close to 30 million or

18   more documents in the document database that I had

19   reviewed and searched.  So I had no limitations on

20   that.

21            I did provide the search terms, as I said,

22   and I was provided documents by plaintiffs'

23   attorneys, based on my request for documents within

24   subject areas; for example, marketing plans.  That

25   was the -- the first thing on my list, the first

Highly Confidential - Subject to Further Confidentiality Review

1    priority on my list was to see marketing plans and

2    marketing planning documents.

3         When you -- when you do a search for that on

4    the Relativity database with 29 million documents,

5    you get a lot of returns, and it's a lot of

6    documents to look through.

7    Q.   When you talk about -- I'm on Page 4.

8    A.   Gotcha.

9    Q.   I just have some terminology questions.

10   First of all, the -- Exhibit 1, the report itself,

11   has this been subjected to peer review?

12   A.   Well, certainly the case study methodology

13   has been subjected to peer review over the years.

14   It's not a new technique.  It's -- it's been subject

15   to peer review in many publications regarding case

16   study methodology.

17        The theoretical underpinnings of the

18   research on prescribing behavior and pharmaceutical

19   marketing, those have all been subject to peer

20   review, but as far as I know, I was not at liberty

21   to have anybody review this, this document, prior to

22   it being, you know, used in this matter.

23   Q.   Okay.  So I think the answer to my question

24   is no?

25        MR. CHALOS:  Object to the form.

```
 1       A.    Not exactly.  The -- the --

 2       Q.    And I was asking this particular document,

 3   this -- the conclusions that you reached in your

 4   expert report, it's not -- those particular

 5   conclusions have not themselves been subject to peer

 6   review, correct?

 7       A.    Well, the way you worded it, though,

 8   concerns me, because there are opinions that I

 9   express that are completely consistent with

10   literature that has been peer reviewed.  So, I mean,

11   I think it's just hard to categorize it that way.

12             If you're asking this particular document,

13   no, it has been not -- not been peer reviewed

14   because it's subject to a protective order, but if

15   you're asking, have some of the opinions and -- are

16   they validated elsewhere?  Yeah, absolutely.

17       Q.    When you say in Paragraph 16 that you're

18   examining marketing in a real world context, what

19   does that mean?

20       A.    Well, you know, I think with regard to

21   opioids in particular, to look at the marketing and

22   not consider what was happening at a societal level

23   at any point during the marketing of the opioids

24   would be taking it out of its real world context;

25   for example, omitting that there were, at various
```

1    places along the way, growing awareness of potential

2    problems with opioids, the rapid expansion of the

3    marketplace, so any number of issues that would come

4    up, the numbers of competitors in the marketplace,

5    the numbers of competing alternative goods or drugs

6    that might be used.

7          So there are a number of factors that create

8    the real world context.  For example, the size of a

9    particular sales force is a real world context.

10   Q.   Would you consider changes in thinking,

11   changes in medical judgment about the risks and

12   benefits of opioid painkillers over time to be part

13   of the real world context that you should consider?

14   A.   Yes.  I would -- I would consider -- I would

15   think that the real world context would necessarily

16   include changing paradigms about treatment of pain.

17   Q.   Is part of the real world context that you

18   considered the package inserts for these particular

19   drugs and how they might have changed over time?

20   A.   That -- we're -- we're bordering on outside

21   of real world context, and now we're bordering on

22   actual context of marketing decision-making.  So I

23   have to be careful how I answer that, but to a

24   degree, the -- a change in the package insert

25   could be reflective of a change in thinking at a

1    regulatory agency, that's real world context.

2        Decisions within a company, though, about

3    changing the package insert would not be.  They

4    would be marketing context.  So it's a fine line

5    there, I realize, but it has an important

6    distinction to me.

7        Q.   I'm not following.

8        A.   I'm sorry.  I can try that again.

9        Q.   Try it again.

10       A.   Okay.  So let's take the package insert as

11   an example.  So if Purdue decides that they're

12   changing their package insert for whatever reasons,

13   based on new research or based on a marketing

14   decision that's made, that is not necessarily real

15   world context.  That's Purdue's marketing behavior.

16   It has significance from a marketing perspective.

17       If, however, the FDA comes to Purdue and

18   says, we don't like that package insert, we need you

19   to change it, that's real world context, because

20   it's the outside influencing Purdue, rather than

21   Purdue making a marketing decision and taking that

22   to the marketplace.

23       Q.   Do you know whether that occurred, that

24   particular event occurred in this case?

25       A.   Oh, yes, I do.

1     Q.    And you know that the package insert for

2     OxyContin was changed along the way?

3     A.    Yes.

4     Q.    Did that -- did the changes in the package

5     insert -- are they reflected anywhere in your

6     analysis?

7     A.    I believe so, yes.

8     Q.    And tell me how.

9     A.    Again, I -- I am a little -- I'm the only

10    person in the room -- well, there's one other person

11    that doesn't have a computer, so -- but --

12    Q.    I don't have one.

13    A.    That's true, but to go -- I know that the

14    changing -- it seems in my report there is a section

15    that refers to changes in marketing of opioids over

16    time, and I am pretty sure that it's either

17    referenced or discussed in that section about

18    changes to the Purdue packaging.  So the

19    significance to that is -- is multi, though.

20    There's a lot of different marketing significance.

21    Q.    I'm trying to understand sort of -- I mean,

22    I understand sort of the marketingspeak about it has

23    significance in the marketing perspective, but

24    I'm -- and perhaps we can get beyond this -- my

25    mental block here.

```
 1            You're not prepared to and you're not going

 2     to testify that any particular prescribing physician

 3     was influenced by marketing; fair?

 4            MR. CHALOS:  Object to the form.

 5     Q.    Any -- like a quantitative analysis of 20

 6     percent of prescribing decisions were influenced by

 7     marketing, anything like that?

 8     A.    Yeah.

 9            MR. CHALOS:  Object to the form.

10     A.    I have -- I have not undertaken any

11     quantitative analysis of individual prescribing

12     decisions.  My opinions are related to overall

13     prescribing by physicians in general.

14     Q.    Okay.  And so I kind of view your -- I don't

15     want to quarrel with you about this, but your report

16     is more of a qualitative report?  This -- these are

17     the qualities of the marketing.

18            MR. CHALOS:  Object to the form.

19     A.    So case -- case method research is, by

20     definition, a qualitative research method, so, yes.

21     Q.    Okay.  Good.  What's next?  Let's see.  What

22     is -- were you asked to make any assumptions in

23     connection with your case study in this matter?

24     A.    I'm not sure about assumptions.  I guess it

25     is an assumption.  In the latter part of the report,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I refer to the marketing messages as being false and
 2    misleading.  So the assumption that I guess I was
 3    asked to make is that these -- a group of other
 4    experts will be providing testimony to that effect.
 5    I already had indication of that through the warning
 6    letters from the FDA.
 7        Q.   What other plaintiffs' experts are you
 8    referring to?
 9        A.   I guess, as I recall, Kessler, Shoemaker,
10    Lemke, Valentine, Perrin.  I'm not sure I got them
11    all, but I think there were five.  Did I give you
12    five?
13        Q.   I think so.  So in connection with the case
14    study in this lawsuit, you were asked to make
15    assumptions about -- that the defendants' marketing
16    messages were false, misleading, inaccurate, or
17    designed to misstate the risks and benefits of
18    defendants' drugs; fair?  And I'm looking at --
19        A.   So --
20        Q.   -- Paragraph 154 of your --
21        A.   I'm sorry.  I can't help it.  I have to
22    think about it.
23        Q.   Yeah.
24        A.   The -- I think it's -- I think that's true,
25    but also, as I said, the -- the case study revealed
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   information of its own merit based -- that had basis
 2   to that.
 3       Q.   Is it typical in the case study methodology
 4   that you would be asked to make an assumption that
 5   all of the defendants' marketing messages were
 6   false, misleading, inaccurate, or designed to
 7   misstate the risks and benefits of defendants'
 8   drugs?
 9       A.   It depends.
10            MR. CHALOS:   Object to the form.
11       A.   It depends.
12       Q.   Have -- have you done that before in
13   connection with any, I mean, expert opinion you've
14   given in a lawsuit?
15       A.   I'm hesitating because the answer to that is
16   "yes," but it -- I'm not sure I can discuss it.  I
17   don't know what -- I would need to ask you or these
18   other lawyers here what I'm allowed to say about the
19   GSK matter.
20       Q.   I mean, I've -- I have reviewed the case
21   study research that's identified in your report, and
22   I have not seen a particular piece of literature in
23   the -- that talks about the case study methodology
24   where it says it's appropriate for the person
25   forming the case study to make broad assumptions
```

1    about the truth or falsity of particular materials

2    that they're looking at.  And I am wondering, what

3    is the -- what's the academic basis, the expert

4    basis, for you to do that in this case?

5            MR. CHALOS:  Object to the form.

6        A.   So with the case study method, there are

7    always assumptions that have to be made, always.

8    There's never going to be a time where there aren't

9    assumptions that are made, and the assumptions just

10   depend on the nature of the case.

11       Q.   I mean, those are pretty big assumptions in

12   this case, don't you think?

13           MR. CHALOS:  Object to the form.

14       A.   Well, I think they would be big assumptions

15   if there wasn't a lot of evidence in the case itself

16   that I've mentioned that -- that led a reviewer to

17   see that it was true.

18       Q.   And what evidence are you talking about

19   again?

20       A.   The FDA warning letters in specific.

21       Q.   Is that the sole basis for you to reach that

22   conclusion?

23       A.   I'm not sure how to answer that because I

24   think the basis for it is enough, based on the FDA

25   citing that advertising was false or misleading.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Do you consider yourself to be -- to have

 2   expertise to be able to evaluate whether a

 3   particular drug manufacturer's representations about

 4   the risks and benefits of its drugs are false or

 5   misleading?

 6          MR. CHALOS:  Object to the form.  Object to

 7      the extent it calls for a legal conclusion.

 8      A.   So are you asking if I have the knowledge or

 9   skill to look at an ad and say, hey, this just

10   doesn't sound right to me or --

11      Q.   Well, I'm really -- sorry.  I'm not -- I'm

12   not being clear about what I -- what I -- what I'm

13   trying to understand.

14          I take it that in this case, you're not

15   intending to offer an opinion that particular

16   advertisements are false or misleading; fair?

17   That's somebody else's role, that's Kessler's role,

18   the other guys you -- folks mentioned; fair?

19      A.   Yes, that's true.

20      Q.   So in connection with your case study, you

21   tell us at Paragraph 154 you've just assumed that

22   the marketing messages were false and misleading,

23   right?

24      A.   I'm pretty sure that I also said the part

25   about the FDA.
```

```
 1       Q.   And you said it's at least consistent with

 2   the FDA documents that you've reviewed as well, the

 3   warning letters?

 4       A.   Right.

 5       Q.   Right.  Okay.  Let's look at, sorry, Page 7,

 6   and this is a list -- I guess it's just -- here are

 7   the opinions, 1 through 7?

 8       A.   Yes.  One of the -- one of the things about

 9   the case study method, you know, there are different

10   ways of writing it up.  The -- one of the more

11   important things is to -- to communicate your

12   opinions in a literary way almost.

13            And this was something that was developed

14   by -- or a strategy, I think, that was developed by

15   Dr. Robert Yin, who's really sort of a leader on

16   thought processes on case study methods and case

17   study research.

18            But he says one of the things you can do is

19   put your -- you put your conclusions right out there

20   up front.  And it's -- he calls it a suspense

21   method, where you then -- the reader has to read the

22   rest of the document to see where those opinions

23   came from.

24            So it's part of a strategy that's -- that's

25   accepted in case study reports and certainly one
```

Highly Confidential - Subject to Further Confidentiality Review

1    that I applied in this case.

2        Q.    And are these -- I know this is a synopsis

3    of the seven opinions you intend to offer, but does

4    this cover the waterfront in terms of the opinions,

5    at least the high level waterfront?

6        A.    Yes, it does.

7        Q.    So if I want to know Dr. Perri's opinions in

8    this case, I would just have to look at this report,

9    and the entire -- all of his opinions are included

10   somewhere in this report?

11       A.    All of them are included in this report, and

12   they are summarized on Page 7, 8, and 9.

13       Q.    And are there any other opinions that you

14   intend to offer that aren't in this report?

15           MR. CHALOS:  Object to the form.

16       A.    Not that I'm aware of.

17       Q.    Okay.  I mean, obviously, your report is

18   really long.  So it's chock-full of stuff, but

19   let's -- in terms of your discussion of marketing,

20   did you pull that from any particular resource?  Is

21   that pulled from your Pharmaceutical Marketing

22   textbook?

23       A.    It's pulled from 30 years of experience, and

24   most of it was just drafted, supplemented with

25   citations, and tweaked, so I honestly can't tell you

Highly Confidential - Subject to Further Confidentiality Review

```
1    that -- I know I didn't take anything from the

2    marketing textbook, but I'm sure that -- because

3    I've written over the years, that -- that my writing

4    is going to begin to sound just alike or it's going

5    to be pretty close to the same thing.

6        Q.   Let's look at Paragraph 29.

7        A.   Paragraph 29?

8        Q.   Yeah.  We're on Page 13.  When you -- when

9    you talk about pharmaceutical marketing having a

10   heightened standard -- do you see that -- is that

11   heightened standard published anywhere?

12       A.   So I think this is a generally accepted

13   principle, that prescription pharmaceutical products

14   are, by nature, more dangerous and require a more

15   careful approach to their marketing than other

16   products, like bubble gum or baseball cards.

17            I don't know that -- that it's published in

18   a formal way, but I know that certainly, if you read

19   the introductory paragraphs to just about any of the

20   research that's cited here, they'll talk about the

21   importance of the prescription marketplace, and

22   that -- that drugs carry risks and benefits for

23   patients.

24       Q.   Right, but if I'm a pharmaceutical company

25   and want to write some marketing for my new patent
```

 1    medicine, is there anyplace I can look to determine,

 2    like, what the -- what the rules are?  Like, is

 3    there an FDA regulation, a publication?

 4        A.   I think all of the above.  I think certainly

 5    the FDA has rules and guidelines and regulations.  I

 6    think that you could look to pharmaceutical

 7    marketing literature that is -- has got plenty of

 8    information regarding, sort of the -- the dos and

 9    don'ts.

10            If you look at the Pharmaceutical Research

11    and Manufacturers Association, they have guidelines

12    that they've promulgated, as have other similar

13    organizations around the world.

14        Q.   Do you know what the FDA regulations are

15    related to prescription drug advertisements?

16        A.   I mean, in general, yes.

17        Q.   I mean, specifically.  I mean, you know that

18    the FDA regulates prescription drug advertising.

19    I'm asking, what do you know about that

20    specifically?

21            MR. CHALOS:  Object to the form.

22        A.   Well, if you're talking about -- that's --

23    that's really a broad question.  I mean, it's hard

24    to answer.  I could start at the top and work my way

25    down with that.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Well, are you familiar with the FDA

2     regulations' fair balance requirements?

3     A.    Yes, I am.

4     Q.    What do you know about the fair balance

5     requirements?

6     A.    That when it comes to the communication of

7     information in an advertisement, there has to be a

8     balance of the information, and that balance must be

9     based on an assessment of the benefits and the

10    risks.

11          And the FDA has specific criteria that they

12    use to make that assessment.  Some of the FDA

13    warning letters cited in this report discuss that

14    very issue.

15    Q.    Tell me, when a manufacturer of drugs

16    creates a marketing piece, are they required to

17    submit that to the FDA?

18    A.    They are required to submit to the FDA their

19    ad copy transmittal form -- I think it's a 2253 --

20    prior to that ad being used for the very first time.

21    My understanding is, is that if the FDA does not

22    respond -- sometimes manufacturers will request a

23    specific response, but if they -- if the FDA doesn't

24    respond, the manufacturer is free to move forward

25    with that ad.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Does the -- what's the name of the
 2   organization within the FDA that takes care of or
 3   regulates pharmaceutical advertising?
 4        A.   DDMAC.
 5        Q.   DDMAC?
 6        A.   Division of Drug Marketing and
 7   Communications.
 8        Q.   Yes.  Does it have a new name now?
 9        A.   It does.
10        Q.   What's it called now?
11        A.   I'm old school.  I have not -- it's -- let
12   me think about it.  I'll get it for you.  Yeah.
13        Q.   OPDP?
14        A.   Office of Prescription Drug Promotion,
15   right.  That's it.
16        Q.   Okay.
17        A.   Thank you.
18        Q.   And do those particular organizations
19   maintain or provide consumers, prescribers, the
20   ability to complain about particular advertisements?
21        A.   There is a mechanism, a -- where you can --
22   I think it's called the Bad Ad Program, where you
23   can report a --
24        Q.   Oh, yeah, sorry.  Bad Ad Program, how long
25   has that been in existence?
```

```
1        A.    I think the Bad Ad Program is -- is
2    relatively new, maybe 2010, 2012 era, but I'm not
3    positive on that.  I -- let's put it this way.  I
4    believe there's always been a mechanism for someone
5    to report a bad ad.  I think it's a formal program
6    now that's been in existence about the last seven or
7    eight years.
8        Q.    Let's look at Paragraph 32.  I'm not -- I
9    don't understand your reference here to distortion.
10   What do you mean by that?
11       A.    This is an interesting paragraph, I think --
12       Q.    Yeah.
13       A.    -- because it -- you know, what is the right
14   word to describe a product that its mere consumption
15   requires increased consumption of that product?
16             So I decided to examine it from a marketing
17   perspective, and what happens in terms of marketing
18   is about creating value for customers based on their
19   needs, wants, and demands, but how does it impact
20   needs, wants, and demand.
21             So the opioid distortion is created by the
22   additional need created by use of a product that,
23   over time, requires increased use or increases the
24   desire to use that product, and that's the
25   distortion of the marketplace.  It's a distortion
```

1    from a marketing perspective.

2          You take an antibiotic, and you get -- you

3    get better, or you take a blood pressure medication,

4    and you continue taking it over time, but with

5    regard to opioid use, there is a different factor

6    that comes up that I think has distorted the demand

7    for those drugs.

8    Q.   Well, you know that many people receive

9    prescriptions for -- for opioid pain medications

10   that they use pursuant to doctor's instructions and

11   then stop taking it; fair?

12   A.   I haven't analyzed that.

13          MR. CHALOS:  Object to the form.

14   A.   So I haven't analyzed that, but I -- I'm

15   aware, as a pharmacist outside the scope of this

16   analysis, that patients go to a dentist and get an

17   opioid.  And when their pain is gone, they stop

18   taking it.

19   Q.   So how do you -- have you made any effort to

20   measure this distortion that you talked about?

21   A.   I did not measure the distortion, but the

22   distortion was -- from a marketing perspective, the

23   distortion was evident in the marketing metrics that

24   were collected by the defendants and the successes

25   that they had in their product sales.

1      Q.   In what way are they reflected in the

2   metrics?  Just that sales went up?

3      A.   Well, you know, we have a level of need in

4   the population for pain, pain management, and that's

5   epidemiologically set at a certain level.  We have a

6   certain number of people with low back pain, a

7   certain number with cancer pain.  And that doesn't

8   quadruple from one year to the next.

9           And so that's where the distortion was

10  noted, when we saw huge increases in the utilization

11  of specific products in very short periods of time,

12  which one plausible explanation was that it's

13  because they are opioids, and they've created this

14  distortion.

15     Q.   Okay.  What evidence do you have to support

16  that plausible explanation you've just given me?

17     A.   The marketing metrics that the defendants

18  collected and reported in their documents.

19     Q.   Are defendants' reporting marketing metrics

20  related to people that they think have become

21  addicted to the drugs?

22     A.   No.

23     Q.   Or is it just that sales increased?

24     A.   So it's --

25           MR. CHALOS:  Object; form.  Object to the

1    form.

2         THE WITNESS:  Sorry.  I've got to slow down

3    here.

4    A.   So it is -- it is based on the fact that

5    sales increased, primarily, but part of the case

6    study methodology is to infer, from the facts that

7    are determined, what led to that.  So it's

8    completely consistent with the methodology to

9    evaluate competing alternatives.

10        So one alternative in this case is that we

11   had a huge increase in the number of patients with a

12   particular disease or condition or all diseases and

13   conditions, in reality, or that it was due to a

14   distortion in demand created by the marketing of

15   opioids.

16   Q.   What other alternatives did you consider?

17   A.   The one that I mentioned and the marketing

18   of -- the epidemiological -- in other words, making

19   it an access issue, that the certain number of

20   patients are established that need opioids, and then

21   we see that number growing exponentially over a

22   number of years, which doesn't make sense from an

23   epidemiological perspective, but the marketing

24   continues and the sales continue.  Therefore, the

25   most logical explanation, which is the most simple,

Highly Confidential - Subject to Further Confidentiality Review

1    is that opioids create their own demand.

2        Q.    Are you an epidemiologist?

3        A.    I -- I'm not an epidemiologist by trade, but

4    epidemiology is a pretty broad subject area, and I

5    have people that I work with that are

6    epidemiologists and they study epidemiology.  I have

7    studied disease and the incidence of disease.

8    The -- epidemiologists take a specific way of

9    looking at things, and they have their own

10   methodology.

11        So I didn't look at it from an

12   epidemiological perspective, but I certainly applied

13   that knowledge that I have to evaluating the

14   competing alternatives, which is completely, again,

15   consistent with case study methodology.

16        There are -- there are explanations.  Some

17   are more plausible than others.  You go with what

18   makes the most sense and what is most supported by

19   the data.

20        Q.    Well, I guess I'm a little flummoxed by your

21   answer to me, because I don't understand what is the

22   standard of plausibility that you're -- what

23   evidence is there to support your plausibility

24   determination?  And did you consider any other

25   plausible reasons why opioid prescriptions might

1    have gone up?

2        A.   So let me break it down for you.

3            MR. CHALOS:  Object to the form.  That's

4        okay.

5        A.   Let me try to break it down.  So we're in

6    1995, and opioids are growing at 10 percent a year.

7    And we go from '95 to '96, and they grow at four

8    times that rate.  And the only difference -- we've

9    had no change in disease.  We've had no change in

10   the population other than normal year-over-year

11   growth, but the sales of opioids quadrupled.

12           That provides a pretty sound basis for that

13   explanation, that it was marketing and not patient

14   need that was creating and driving that demand.

15       Q.   Other than the number of prescriptions going

16   up from -- in your example, I think, '94 to '95, is

17   there any other evidence to back up your conclusion?

18       A.   Certainly, because over time, that same

19   scenario was repeated.  Between 1995 and about 2010,

20   there was a 1500 percent increase in that market.

21   So it's not just one data point that I looked at.

22   It was multiple data points with data flowing in

23   from multiple manufacturers' marketing metrics that

24   showed increases -- for the most part, increases in

25   sales, but always the market for opioids was

Highly Confidential - Subject to Further Confidentiality Review

1    growing, and, again, patient demand would not be

2    expected to grow at that rapid of a rate from year

3    to year.

4        Q.   And what is that conclusion based on, you

5    wouldn't expect demand to grow --

6        A.   Well --

7        Q.   -- from year to year at that rate?

8        A.   Well, we saw -- in -- in the marketing

9    documents, we saw that -- that marketing -- that

10   growth in the opioid marketplace was growing at

11   about 10 to 12 percent a year prior to the

12   introduction of OxyContin.

13            After the introduction of OxyContin, when

14   the marketing became much more aggressive, then we

15   saw rapid growth in that product category.  So from

16   a marketing perspective, that just makes sense, too.

17       Q.   Well, just because from the market

18   perspective, it makes sense doesn't mean it's a

19   scientific opinion.  I mean, to me, I'm not sure if

20   we're dealing with science here or just sort of from

21   the marketing perspective, it makes sense.  I don't

22   know if that's science.

23            So I'm trying to get to the science behind

24   your conclusion.  I think what you've told me --

25   and I'm -- is that there was a rapid increase in the

Highly Confidential - Subject to Further Confidentiality Review

1    market for opioids beginning in 1995.

2         And one explanation for that that you're

3    giving is that, at least potentially, some of that

4    increase in the prescribing could have been due to

5    people becoming addicted to the drug; fair?

6         MR. CHALOS:  Object to the form.

7    A.    So the -- that doesn't completely explain

8    the basis, but it's part of the basis.  And the rest

9    of the basis is that that wasn't just '95 and '96.

10   It was beyond that.  It was every year between 1995

11   and 2010 or so, and the -- the rapid and sustained

12   increase in opioid utilization was key to that.

13        And it's all from a marketing perspective.

14   It's not from a, you know, patient care level

15   perspective.  It's all about the marketing.  What

16   were the variables that changed?  What were the

17   variables that remained constant?

18        Population does grow.  People can get

19   sicker, but to see those dramatic of changes would

20   not be expected, and history taught us that they

21   weren't seen prior to the marketing of OxyContin.

22   And then after that marketing began, we did see

23   those changes.

24        So from a marketing perspective, I'm very

25   comfortable with the science behind the conclusion

 1    that -- that it was the opioid marketing that began

 2    in and around that time period that created that

 3    sustained increase in utilization of opioids.

 4        Q.    Let's move on to -- let's see.  We've talked

 5    a little bit about Paragraph 29 and the heightened

 6    standards that you've identified in your -- the

 7    heightened standards for pharmaceutical marketing in

 8    Paragraph 29, but then in Paragraph 35, you talk

 9    about basic standards.

10            Do you see that?

11        A.    Let me get there.  So just a small

12    distinction there.  The heightened standards apply

13    for prescription drugs over other consumer goods,

14    and then these are additional standards that apply

15    to pharmaceutical marketing above and beyond.

16        Q.    I notice that in Footnote 35, which is the

17    backup for the basic standards comment, you've

18    identified a number of articles.

19        A.    Yes.

20        Q.    And it looks like most of those articles

21    come from medical journals or publications from

22    places outside of the United States; is that right?

23        A.    I specifically wanted to -- opioids are a

24    drug that are used worldwide.  And they -- there are

25    agencies, associations, and so forth worldwide

Highly Confidential - Subject to Further Confidentiality Review

1    that -- that have published opinions and so forth,

2    and recommendations, guidelines, if you will.  So I

3    wanted to be sure to be as complete as possible

4    there, but there are also those cited from the

5    United States as well.

6        Q.    Which are which ones?

7        A.    That would be the PhRMA citation.

8        Q.    Oh, the Pharmaceutical Research and

9    Manufacturing Association's Code on Interaction With

10   Healthcare Professionals?

11       A.    Yes.

12       Q.    Are there any others that come from the US?

13       A.    So to the extent that US manufacturers are

14   also involved in some of these other countries, for

15   example, just in general, the World Health

16   Organization, you know, being involved in -- at the

17   global level, there may be some overlap there, but

18   I'm pretty sure that's the only one that is specific

19   to the US.  I mean, yeah, that's --

20       Q.    Is that right?

21       A.    It is.  I -- I just was -- you know, I was

22   looking at it.  It just struck me that, you know,

23   several defendants are, you know, multinational

24   firms, and some of these citations actually come

25   from their home countries, so --

```
 1      Q.   Was that your intent to --

 2      A.   I just wanted to be as complete as possible.

 3      Q.   So why don't we take a break, have lunch,

 4   come back at 12:30.  Is that cool?

 5      A.   That's fine.  Thank you.

 6           THE VIDEOGRAPHER:  We are now going off the

 7      video record.  The time is currently 11:45 a.m.

 8      This is the end of Media Unit Number 1 -- Number

 9      2.

10        (Recess from 11:45 a.m. until 12:59?p.m.)

11           THE VIDEOGRAPHER:  We are now back on the

12      video record with the beginning of Media Number

13      3.  The time is currently 12:59 p.m.

14   BY MR. VOLNEY:

15      Q.   Okay.  Let's -- let's get back to it.  I

16   have some questions -- I want to return to Figure 2

17   in your report, which is Exhibit 1, so maybe you

18   could turn to that.  Frankly, I'm hoping that you

19   can help me understand what this Figure 2 is

20   intended to show.

21           So what is Figure 2 intended to show?

22      A.   Sorry.  Figure 2 is a graphic representation

23   of the decision process that physicians use --

24   actually, any -- anyone would use in deciding

25   whether or not to purchase a product or to utilize a
```

1    product.  That's the -- I'm looking over to my left

2    to see.  It's the blue -- the blue boxes.

3        Q.    The blue boxes show what?

4        A.    So that is sort of the -- it's the -- the

5    short version of the information processing model.

6    It's where the actual decision or product choice

7    gets made.  And that is the -- begins with a

8    patient's need.

9            It's adapted in this case.  This is a model

10   that has been utilized in marketing for literally

11   decades.  It's adapted in this case to apply

12   specifically to the physician prescribing decision.

13           But it begins with patient's need or a

14   recognized -- problem recognition or need

15   identification, and then that's followed by product

16   information search, an evaluation of alternatives by

17   the prescriber, and then choice of a prescription

18   medication, the patient's eventual use of that

19   medication, and then some outcome from that.

20           The patient either was satisfied with the

21   result or not.  In this case, they either found that

22   it relieved their pain or it doesn't.  They found

23   that it made them nauseous or it didn't.  And that

24   information then feeds back into the repeat process

25   for when a repeat use is necessary.  So that's the

1    bottom -- that's the mainstay of the decision

2    process.

3         What's important about this model is it

4    shows you how the information that's available in

5    the marketplace relates to the -- the blue boxes

6    where the decision is made.  So if you look to the

7    right, we have a lot of external influences, things

8    that are innate to the prescriber, perhaps, such as

9    culture or other issues, other -- other

10   characteristics like that.

11        The -- the box below that, individual

12   differences, includes several things that -- that

13   are slightly different, for example, including

14   attitudes and personality.

15        So these -- these factors do play into the

16   decision model because your beliefs, values, your

17   attitudes and perceptions have a big part -- a big

18   part to play in your decision-making.

19        Just -- so, for example, if you held the

20   belief that -- that drug companies were stellar in

21   their -- their research and that the clinical trials

22   that they -- they publish and so forth were just,

23   you know, really the gold standard, then that would

24   positively impact your decisions in this model.

25        If, on the other hand, you thought that

1   there was always the potential for commercial bias

2   when a drug company sponsors research, that might

3   flavor you in a negative way.  So these kinds of

4   influences are important.

5          And if you swing over to the -- to the

6   external stimuli completely opposite that on the

7   left side of the model, we see that there are active

8   stimuli in the marketplace that go beyond a patient

9   showing up with a need or your own individual

10  characteristics or the environment surrounding all

11  of it, and that includes marketer-dominated and

12  marketer -- and nonmarketer-dominated influences in

13  the marketplace.

14         These become important when a physician

15  doesn't have all the information that they need and

16  they are searching for more information so they can

17  provide the best care to their patient.

18         So marketer-dominated and

19  nonmarketer-dominated stimuli that are the result

20  of either company marketing efforts or an article

21  that is read or interaction with colleagues, that

22  all then begins to be processed by the physician or

23  prescriber through the green boxes, which model the

24  steps that you go through in incorporating

25  information that's gleaned from the external stimuli

Highly Confidential - Subject to Further Confidentiality Review

```
 1    into your thought processes and cognition.

 2          So sort of the right-hand side of the model

 3    is more on the affective side, the green boxes are

 4    more on the cognitive side, and something ends up in

 5    your memory, something ends up as a knowledge that

 6    you've gained that when you have a patient that

 7    shows up with a need, back to the blue boxes now,

 8    you then reach back into your memory and pull that

 9    information out and use it.

10          So it is a fairly complete structuring of

11    how different influences impact that ultra-important

12    decision to prescribe a medication for a patient.

13    Q.   Okay.  Looking at this model, where does the

14    physician's training factor in?

15    A.   That could come in a couple of different

16    places.  For example, it could come from memory.

17    They've been taught in school, so they've attended

18    information.  They've understood it or accepted or

19    rejected it, built it into their memory banks.  So

20    it could come under memory.

21          It could also come in terms of their

22    individual differences.  They could have had a

23    professor in medical school that said, hey, never

24    believe anything a drug company tells you, and

25    that's going to impact the way they look at things
```

Highly Confidential - Subject to Further Confidentiality Review

 1    from then on.  So it could affect their perceptions,

 2    their attitudes, their beliefs, but it would come

 3    into play through one of these avenues in the model.

 4        Q.    Okay.  Now, what about a particular

 5    practitioner's clinical experience?

 6        A.    So if you look at the blue boxes again,

 7    where we have a patient outcome, that is -- in

 8    marketing we have -- we have two possible outcomes,

 9    either satisfied or not satisfied.  There can be

10    ranges of that, but ultimately you either decide to

11    use the product again or not.

12            So that information, if you're a prescriber

13    and your patient is not happy or their pain was not

14    relieved, that means I've got to go back to the

15    drawing board and search for the next best

16    alternative or search for the right answer; for

17    example, increase the dose, change the medication,

18    try some other form of therapy, whether it be drug

19    or nondrug therapy, surgery, whatever it might be.

20            If the patient is satisfied, then that also

21    factors back into the model, if you follow the arrow

22    back up, so that the doctor would then or the

23    prescriber would then know that the patient was

24    happy with that alternative, they got a good

25    outcome, and they continue to prescribe.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What about the clinical experience that

2    would have been gleaned by a prescriber who

3    regularly prescribed a certain type of medication to

4    a group of patients?

5    A.    Well, that -- that's -- this is a -- this

6    model is intended to represent a collection of data

7    points, not just an individual patient, although

8    it -- the decision process could apply to an

9    individual patient.

10          So if a doctor has lots and lots of

11   experience with a particular outcome in his patients

12   or her patients, then that information feeds back

13   into their memory as -- and will flavor their future

14   prescribing decisions.

15   Q.    So then conversely, if a doctor had a

16   negative experience with a patient with a particular

17   drug, the doctor might decide -- or might be more

18   reluctant to prescribe that to a new patient or a

19   different patient; fair?

20          MR. CHALOS:  Object to the form.

21   A.    So, again, the -- I can only look at this

22   from the marketing perspective.  So if we talk in

23   terms of satisfaction and dissatisfaction, I'd agree

24   with that.  If the outcome is one that the patient

25   had a good outcome and the doctor deemed that to be

1      a positive, then it would bode well for future use.

2          So within the scope of an individual

3      patient, I can't really comment on that, but within

4      the scope of the marketing outcome, satisfaction and

5      dissatisfaction, I agree with that.

6      Q.   I take it what -- or one of the things I

7      gleaned from this particular diagram is that there

8      is a range of information that's in the mix when a

9      person in a clinical setting, a doctor in a clinical

10     setting, decides whether to prescribe a certain

11     medication; fair?

12     A.   There is a lot of information that has to be

13     processed.  That's absolutely true.

14     Q.   And one of the subsets of information that a

15     doctor would have to process would be marketing

16     information?

17     A.   Yes, that's true.  They would be -- they

18     would need to process that information because --

19     and I -- I'm pretty sure I -- I addressed this to

20     some degree in the report.  They've got to stay

21     current on -- with their drug knowledge and their

22     disease knowledge, and one of the ways they do that

23     is the information provided by marketing.

24     Q.   And I think you would agree with me that in

25     your experience -- I think you've referenced it here

```
 1    today or just now -- that some doctors look down

 2    their nose at pharmacy company advertising; fair?

 3         MR. CHALOS:  Object to the form.

 4    A.    Yeah.  I think that's -- that's something

 5    that if you -- if you look at the citations of --

 6    that are included in the report, you would see that

 7    there are a number of cites, and also agreeing with

 8    that proposition that -- that doctors are skeptical

 9    about the information they see if it's advertising

10    information.

11    Q.    Okay.  Let's -- let's continue on our waltz

12    through the report here.  Let's go to Paragraph 39.

13    A.    Okay.  I'm with you.

14    Q.    So in terms of the decision-making process

15    before an actual patient gets a drug or medicine,

16    there are a number of different potential -- well, I

17    guess earlier we talked about gatekeepers before a

18    drug makes it from a concept to patient, and those

19    gatekeepers include these gatekeepers that you list

20    here, prescribers, payers, sites of care, and

21    influencers; fair?

22    A.    So you refer to them as gatekeepers.  I

23    think -- I think the discussion we had this morning

24    was more -- and I'm not -- not necessarily

25    disagreeing with you, but I think the discussion we
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    had this morning was more focused on, you know, a

2    checks and balances of a gatekeeper.  These are --

3    these -- these customers are -- in this context are

4    facilitators.

5        Q.    Facilitators, what do you mean by that?

6        A.    So in order to sell a product, the

7    pharmaceutical marketer has to appeal to the

8    interest and the needs of these customers to satisfy

9    the needs that they have, and so they're -- they're

10   really not looking at this as a gatekeeper.  It's

11   more of a how do we meet customer needs, and what --

12   who are those customers?  And that's what I've

13   identified in this paragraph.

14       Q.    Okay.  I think you're answering my question

15   from the perspective of the pharmaceutical company;

16   fair?

17       A.    Yes.

18       Q.    But from the perspective of the customer or

19   the -- ultimately the patient, these will be

20   gatekeepers before the drug makes it from the

21   pharmacy to their medicine cabinet; fair?

22       A.    So I think they --

23           MR. CHALOS:  Object to the form.

24       A.    These would be people that would have an

25   influence over what drug ends up in the patient's
```

1    hands.  I agree with that, yes.

2        Q.   And then some of these influences that are

3    reflected here or influences that these people

4    exercise would also go into -- for this physician

5    prescribing information processing model; fair?

6        A.   They would have an entrance to that model,

7    yes.

8        Q.   Okay.  So they're in the mix, in other

9    words?

10       A.   Each of these -- each of these customers

11   could have, in any instance, an impact on the

12   choices available to a -- to a prescriber which

13   would affect their decision process.

14       Q.   Okay.  Do you know, was there any

15   direct-to-consumer marketing by the defendant

16   manufacturers in this case?

17       A.   Direct-to-consumer marketing, yes.

18       Q.   Okay.  What kind of direct-to-consumer

19   marketing are you aware of?

20       A.   So there were numerous patient brochures and

21   patient-oriented materials that were distributed.

22   In addition to -- my assessment, in addition to

23   that, there was the work through advocacy groups

24   that were supported by defendants.  And those are

25   both forms of direct-to-consumer marketing, which I

 1    distinguish in my report from direct-to-consumer

 2    advertising.

 3       Q.   Okay.  What's the difference between

 4    direct-to-consumer marketing and direct-to-consumer

 5    advertising?

 6       A.   So marketing is the broad umbrella, and

 7    advertising would be a very specific -- it's what

 8    you and I see when we wake up in the morning to

 9    Ozempic commercials or something else where we're

10    seeing advertisements that are aimed at product

11    sales directly in the media aimed at consumers.

12       Q.   Do you consider the activities of advocacy

13    groups to be direct consumer marketing by the drug

14    manufacturers?

15       A.   At the end of the day, yes, I do.

16       Q.   And why is that?

17       A.   Their activities were part of their

18    marketing plans and designed to advance the messages

19    and marketing -- and using marketing strategies that

20    the defendants sought to advance in the marketplace,

21    so it becomes a part of their marketing.

22       Q.   Okay.  Let's see.  Have you made an effort,

23    in considering the marketing pieces that you've

24    included in your report and in your chart, to show

25    how -- or take into account how the marketing

1    changed over time?

2        A.   Yes, I think I have.

3        Q.   Are you aware that marketing has changed

4    over time?

5        A.   I think it did -- it did -- there's two

6    answers to that.  The specific tactics remained

7    about the same through the entire period of this

8    case, the strategies and so forth.  The messages

9    changed over time.  The products changed somewhat

10   over time.

11       Q.   You mentioned before our lunch break that

12   part of the reason you feel comfortable making the

13   assumption that defendants' marketing messages at

14   large were misleading is because of the existence of

15   the FDA warning letters.  Is that fair?

16       A.   Yes.

17       Q.   Do you know whether any defendant took

18   corrective action as a result of any warning letter?

19       A.   Yes, I think they did.

20       Q.   Are -- do you know whether that corrective

21   action was successful?

22       A.   I guess it depends on how you define

23   successful.

24       Q.   Well, have you made any effort in your

25   analysis to evaluate whether that corrective action

```
 1    was successful in any particular case?

 2       A.   So, I mean, if we take the package insert

 3    change for OxyContin, and you -- you look at, you

 4    know, what -- what -- the circumstances surrounding

 5    that change, the circumstances on -- that

 6    surround -- which are completely marketing

 7    behaviors, of getting the information that ended up

 8    in the original OxyContin package insert into that

 9    package insert and the negotiations that went on

10    with the FDA, where the FDA got their information,

11    and how the FDA used that information and how it

12    ended up being the way it was, and then you look at

13    the change that was made.

14          The next step is to say, okay, that's good.

15    They made the change to the PI, but what changed in

16    the marketing?  The PI might have changed, but the

17    marketing didn't change.

18          So I fail to see how that would -- would

19    impact the analysis because what I was looking at

20    was the actual messages being used and how those

21    messages were being communicated and the strategies

22    of how those messages were brought to market.

23       Q.   Is the PI part of the mix of information

24    that a prescriber might consider before prescribing

25    a drug to a particular patient?
```

```
 1        A.    If they reviewed the PI, it would become
 2   part of the mix.
 3        Q.    Is it also fair to say that marketing is
 4   only part of the mix to the extent that a particular
 5   prescriber saw the marketing, remembered the
 6   marketing, and sort of put it in his or her brain;
 7   fair?
 8        A.    That is consistent with the information
 9   processioning model and how information is
10   processed, yes.
11        Q.    All right.  So looking at this model, that's
12   what that is sort of intended to show?  If a doctor
13   sees the marketing, is exposed to it, pays attention
14   to it, comprehends it, accept it -- accepts it, and
15   retains it, puts it in his memory, if a particular
16   patient shows up, that particular drug might come to
17   mind as a drug that is appropriate for that patient.
18   Fair?
19             MR. CHALOS:  Object to the form.
20        A.    Yes, I think that's -- that's accurate.
21   The -- I don't want to leave the model completely
22   open, though.  The -- when it says acceptance, there
23   is also the possibility of rejection.  They can
24   reject messages as well.  So acceptance is a -- is a
25   term, it doesn't mean that you will accept every bit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of information that you are provided, and the model

 2    does account for that.

 3        Q.   I think that's a fair point, and I

 4    understand that.  I appreciate your clarification of

 5    that point.  I think that's a -- that's good to

 6    hear.

 7             The -- this physician prescribing

 8    information processing model is not -- what you're

 9    testifying about in this case is the marketing

10    piece, if we look at the stimuli on the left.

11    You're -- you're here to testify about sort of the

12    pharmaceutical marketing input into that prescribing

13    model; is that fair?

14             MR. CHALOS:  Object to form.

15        A.   So my analysis focused on the marketing

16    efforts, the branded and nonbranded marketing, and

17    -- that were designed to influence that memory and

18    cognition, yielding an acceptance, yes.

19        Q.   And so the way you've done that is to

20    identify, through the Relativity database, the

21    various pieces of marketing materials that were

22    produced by the defendants in the case, as well as

23    reading some deposition testimony that was provided

24    to you from the various representatives of the

25    defendant companies; is that fair?
```

```
 1      A.   And relying on the literature that provides

 2   a theoretical underpinning for why those techniques

 3   are effective or not effective.

 4      Q.   Okay.  Got it.  Did you see any marketing

 5   from any defendant in this matter that you

 6   considered to be fair and balanced?

 7           MR. CHALOS:  Object to the form.

 8      A.   I think the -- the pieces of marketing that

 9   had more balance to them than less balance would be

10   pieces that were related to the package insert, for

11   example, which is obviously an approved -- an

12   approved document.

13           But when I look at the marketing plans --

14   and there's -- there's a reason why this is true,

15   that when I look the marketing plans, the

16   information in those marketing plans tends to be

17   heavily skewed towards the side of what can we do to

18   sell more product, not what can we do to withhold

19   product or to keep it from selling too fast.

20      Q.   Isn't that the point of a marketing plan, to

21   market?

22      A.   It -- it is the point of a marketing plan,

23   yes.

24      Q.   And you would agree with me that in the

25   great United States of America, drug manufacturers
```

```
1    are allowed to market their products?

2         MR. CHALOS:  Object to the form.

3    A.   So as I've -- as I've scoped out in my

4    report, I think that that is true as long as they

5    adhere to the standards that have been established

6    and that exist that relate to the marketing of

7    pharmaceuticals.

8    Q.   So the -- the marketing plans themselves are

9    not documents that are intended to be shared with

10   the prescribers, TPPs, et cetera, fair?

11        MR. CHALOS:  Object to the form.

12   A.   So marketing -- marketing plans are intended

13   for, you know, the internal use of the company, but

14   they -- the value that they bring to the table is

15   that the marketing plans integrate the entire scope

16   of marketing, which is why I always get a little bit

17   nervous when we pick out one thing, like the PI, and

18   try to talk about it.

19        Marketing is a integrative process, and

20   that's another figure in my report, but the idea we

21   can look at any one piece of information and know

22   what's going on with marketing is just not valid.

23   It's the entire scope of activities that are

24   combined to create the product image, the perception

25   in a customer's mind, the -- whether or not doctors
```

```
 1   agree or disagree with it and encode it into memory

 2   and then use it in choices for their patients.

 3      Q.   I think -- I mean, I think what you're

 4   pointing out is that it's a fairly complicated

 5   decision-making process involving a number of

 6   different moving parts; fair?

 7      A.   It is -- the decision process has a number

 8   of factors that influence it.  The parts aren't --

 9   aren't really moving, per se, but the -- as

10   information in the marketplace changes, the

11   information would be a moving target, yes.

12      Q.   A doctor's experience with a particular drug

13   might change and then thereafter influence his or

14   her prescribing practice; fair?

15      A.   As the model would indicate, if they've had

16   a positive outcome, that would influence it in a

17   favorable way, and if they've had a negative patient

18   outcome, it might do the opposite.

19      Q.   I think I asked you a question earlier.  I

20   don't know if I got an answer to it.  Have you seen

21   any marketing piece -- and I mean a customer-facing

22   marketing piece -- from a defendant in this case

23   that you would consider to be fair and balanced?  I

24   think you answered my question that you -- at least

25   maybe the product insert in some cases?
```

```
 1        A.   Well, the product insert wouldn't -- I don't

 2   think you --

 3             MR. CHALOS:  Hang on.

 4             Object to the form.

 5        A.   I don't think you qualified it that way

 6   before, because I don't think you said a

 7   consumer-facing product or information piece.  I was

 8   looking at all of the marketing pieces for -- if

 9   you -- specifically talking about information that

10   was targeting consumers, is that what your question

11   is asking?

12        Q.   Right.  That's my question.  I'm sorry if

13   I --

14        A.   I may have --

15        Q.   -- misremembered what I asked.

16        A.   I may have misunderstood.  Sorry.

17             You know, I looked at a number of brochures

18   that were designed to educate patients about pain,

19   pain management, and the use of opioids in general.

20   They had a variety of information in them.

21             From a marketing perspective, there were

22   other important pieces to those documents, but to

23   answer your question in this specific instance, the

24   information was obviously intended to promote the

25   products, but to do it in such a way as there was a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    balance of information.
 2       Q.   So at least with respect to the
 3    consumer-facing documents that you reviewed, you, in
 4    your analysis, identified some of those
 5    consumer-facing marketing pieces that you believed
 6    to have a fair and balanced set of information
 7    provided?
 8       A.   Well, I didn't really do that assessment,
 9    but when I reviewed the documents, of course, I
10    would have formed some sense of whether the
11    information was fairly balanced or not.
12          But the -- the problem that I had with those
13    consumer-facing documents, as you refer to them as,
14    is whether or not they, in every instance, revealed
15    the source of the information in those documents and
16    whether it was promotional material or whether it
17    was sponsored by a company or whether it was
18    completely, you know, without -- without a
19    commercial influence.
20       Q.   So you created a 20-something-page chart
21    with your assistant of what you believed to be
22    misleading marketing messages.  Have you similarly
23    created a 20-page chart of the marketing messages
24    that defendants promulgated that were fair and
25    balanced?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   So I --

 2               MR. CHALOS:   Object to the form.

 3          A.   I have to -- I have to -- to pull you back

 4     on that.  That Table II in my report is not a table

 5     of false and misleading marketing messages.  It is

 6     simply a table of the themes that the marketing

 7     focused on.

 8               They in -- nowhere in my awareness of this

 9     report do other than what is concluded by either the

10     FDA letters or by the assumption that those messages

11     were indeed false.

12               My job, my task, my analysis here was to

13     identify those messages that were employed by

14     defendants in their marketing, not to make that

15     assessment of whether they were false or misleading.

16               So that table, to answer your question, yes,

17     this table contains the messages that were and were

18     not false and misleading.

19          Q.   Okay.  Let's go to -- let's go to Table II,

20     which I think is on 86.

21          A.   Okay.  I'm with you.

22          Q.   Okay.  So I think you testified and

23     explained to me -- well, let's -- let's do it all

24     again so I make sure I'm clear about this.

25               Who identified the marketing messages A
```

1    through -- I think it's X?

2        A.    So they were -- it was an iterative process

3    of coming up with, here's a marketing piece.  Well,

4    what category does this one fit into?  What message

5    is this one focused on?  And so over -- over

6    iteration after iteration of that, these different

7    messages were identified.

8            There may indeed be more or some of those

9    may overlap.  I think I mentioned in my report that

10   these are not mutually exclusive, all of these

11   categories, because there is some overlap, but this

12   would have been developed as a result of that

13   iterative process of just looking at piece after

14   piece of marketing material that identified specific

15   messages in those materials.

16       Q.    Okay.  So this includes both customer-facing

17   marketing materials and internal company documents;

18   fair?

19       A.    Yes, it does.

20       Q.    And so --

21       A.    Can I -- I need to clarify.  When you say

22   customer-facing, are you talking customers with a

23   capital C, or are you talking about patients?

24       Q.    I'm talking about the decision-makers to

25   decide whether to prescribe the drugs or not.

```
 1        A.   I'm sorry, because for me, as from a

 2   marketing perspective, when we use the word, you

 3   know, "consumer-facing," then I get -- I get the

 4   impression that we're talking about --

 5        Q.   Consumer means patient because they're the

 6   ones who are --

 7        A.   Right.

 8        Q.   -- taking the drugs?

 9        A.   Right.

10        Q.   Got it.

11        A.   Okay.

12        Q.   I'm talking about the decision-makers who

13   prescribe the drugs.

14        A.   Okay.

15        Q.   My understanding of your analysis is that

16   you're trying to analyze qualitatively the marketing

17   messages that the manufacturing defendants, and I

18   guess as well as others, promoted to the

19   prescribers, who ultimately made the decision

20   whether to prescribe or not, at least sort of the

21   main thrust of my -- of what I see your report as.

22             But I am going back to A through X.  Are

23   those bullet points that -- the bullet points that

24   you came up with or --

25        A.   As I said, it was -- it was an iterative
```

Highly Confidential - Subject to Further Confidentiality Review

 1     process, and the -- the bullet points reflect the

 2     content of the messages, not so much something that

 3     I came up with.  It was reflecting what the message

 4     was really focused on.

 5         Q.   Okay.  In other words, A through X, here are

 6     the common messages that you, Dr. Perri, saw in the

 7     marketing materials that you reviewed; fair?

 8         A.   Yes.

 9         Q.   And you're not making a judgment about

10     whether those marketing messages, those bullet

11     points, were true or false; fair?

12         A.   I did not personally make that assessment,

13     no.

14         Q.   So, for example, when you say:  Extended --

15     A on page 86:  Extended release drugs and/or Q12

16     dosing had fewer peaks and valleys and less chance

17     of addiction and abuse.

18              You're not making a value judgment about

19     whether that particular marketing message was true

20     or false?

21         A.   That's correct, I did not make that

22     judgment.

23         Q.   And if a particular manufacturing defendant

24     included that marketing message in a customer-facing

25     piece of marketing materials or internal marketing

Highly Confidential - Subject to Further Confidentiality Review

```
1    documents, are you able to say whether that

2    particular manufacturer knew whether that statement

3    was true or false at the time it was made?

4         MR. CHALOS:  Object to the form.

5    A.   I think it would depend.

6    Q.   You haven't done that analysis, that when

7    Purdue put XYZ representation in a marketing piece,

8    Purdue knew that representation to be false?

9    A.   Yeah.  I -- I don't know how to answer that.

10   I -- you know, as far as -- as that goes, the -- for

11   example, the less -- as I said, these are not

12   mutually exclusive.  This one, A, is Q12 dosing, and

13   that means fewer peaks and valleys and less chance

14   of addiction and abuse.

15        I mean, the less chance of addiction and

16   abuse is -- became the subject of the label change.

17   So did they know that it was false?  Well, at some

18   point they did, but, you know, these documents

19   aren't dated and timed in this regard here.

20        So it could be that they knew or maybe they

21   didn't know.  I don't know the answer to that

22   question.  I didn't conduct -- that wasn't part of

23   my analysis.

24        This analysis was designed to enumerate the

25   marketing messages that were employed for these
```

1    products over the period of this case.

2        Q.   Okay.  Just to understand how you put the

3    chart together, if there is a -- for example, your

4    Subsection D on Page 92 identifies a number of

5    documents where the message was to minimize concern

6    about addictive nature of opioids.

7            Do you see that?

8        A.   Yes.

9        Q.   If there was information in the marketing

10   piece that was intended to tell the prescriber that

11   there was a risk of addiction with a particular

12   drug, did you include that in the contents here?

13       A.   So this -- this particular section would not

14   include that because this is intended to demonstrate

15   that -- the message of minimizing the concerns over

16   addiction.

17       Q.   Have you -- I take it you haven't created a

18   Table II-B, where you identify instances in the

19   marketing where a particular manufacturer included a

20   robust warning about addiction, for example?

21       A.   Well, I don't think I actually needed to do

22   that, because any time that the -- the document

23   would be referring to opioids, and once there was a

24   black box warning, there would be that robust

25   warning.  It would be right there on -- on the

1    advertising.  I mean, a black box warning isn't a

2    don't ever prescribe warning.  It's a be careful

3    warning.  So that was there.

4        Q.    Looking at the various categories of

5    representations in Table II, can you tell the jury

6    which ones you consider to be false or misleading?

7        A.    That was not part of my analysis, but I

8    think that I could refer them to other experts that

9    would be -- that have gone through and -- message by

10   message and either discounted or not discounted each

11   of these messages.

12       Q.    So that's not something that you're going to

13   testify about?

14       A.    No.

15       Q.    Sitting here today, have you done anything

16   to measure the efficacy of any particular -- the

17   effectiveness of any particular message in Table II?

18       A.    So the marketing is -- as I described

19   earlier, it's completely interrelated, and any one

20   message by itself has -- has really very little

21   meaning to me.  It's the overall scope of the

22   messages, all of them taken together, literally by

23   all of the defendants together, that has the most

24   meaning.

25       Q.    So I think the answer to my question is no,

1    you haven't done an effective analysis of any

2    particular message?

3            MR. CHALOS:   Object to the form.

4       A.   I'm pausing because I'm trying to recall

5    within the report if there was any message that I

6    singled out as being particularly effective or not

7    effective.  And I -- it would -- it would seem to be

8    inconsistent with my proposition that the marketing

9    is intertwined and interrelated, so I think the

10   answer is "no."

11      Q.   I take it similarly, you haven't done any

12   effectiveness analysis with respect to any

13   particular warning given by any manufacturer in this

14   case?

15      A.   The only -- the only analysis that I did

16   with regard to that was some assessment in later

17   parts of the report where I looked at the balance of

18   benefits versus harms that were conveyed in the

19   marketing messages, and from the documents that I've

20   reviewed -- and I reviewed a lot of documents --

21   there was -- there was a substantial skew towards

22   the benefits side, which, again, from a marketing

23   perspective, that's what you would expect to see,

24   because marketing is designed to sell products, and

25   it does.

Highly Confidential - Subject to Further Confidentiality Review

```
1              So the question is -- then is that an
2     appropriate use of marketing?
3        Q.   I mean, we live in the United States.  We
4     all watch football games.  We are bombarded by -- I
5     guess those are direct-to-consumer advertisements
6     for particular prescription drugs.  Fair?
7              MR. CHALOS:  Object to the form.
8        A.   If we watched TV in the United States, we've
9     seen an advertised prescription medicine, yeah.
10       Q.   And those advertisements are intended to
11    tout the benefits of the particular prescription
12    medicine; fair?
13       A.   That's where fair balance comes in.  They
14    are supposed to have a fair balance, but as you and
15    I and everyone around this table would know, if you
16    watch one of those commercials, it is very
17    persuasive.  And you don't walk away from that
18    necessarily thinking about the risk of cancer that
19    you're going to get from taking this drug, but the
20    way it could possibly help you if you have this
21    disease or condition.
22       Q.   Can you say whether any particular doctor in
23    Cuyahoga County saw, heard, read, comprehended,
24    accepted, and retained any of the particular
25    messages in Table II?
```

```
 1              MR. CHALOS:  Object to the form.

 2       A.    Well, I can get you right up to the point

 3    whether or not they processed and used the

 4    information, but my guess is they did use it.

 5    The -- I reviewed call logs from Cuyahoga County,

 6    and I saw the subject matter of the conversations

 7    that the PSRs, the pharmaceutical sales

 8    representatives, had with the docs and the materials

 9    that they left with them and the things that they

10    discussed.

11              But whether or not any one doctor took that

12    information and used it in making a decision,

13    obviously I can't do that.  I didn't do that

14    analysis.

15       Q.    Yeah, because it could be that certain

16    doctors reject all pharmaceutical company marketing;

17    they're just in it for the free pizza, for example?

18       A.    Right, but at the end of the day, what we

19    look at from a marketing perspective is were there

20    sales of the product in that area, and, of course,

21    there were.

22       Q.    Okay.  But just because there were sales of

23    a particular product doesn't mean that it was the

24    marketing drove the sales for a prescription or a

25    particular product; fair?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CHALOS:  Object to the form.
 2       A.    Well, we're talking marketing in general
 3   now, we're not talking about the -- you gave me a
 4   very specific list before --
 5       Q.    Uh-huh.
 6       A.    -- of things that doctors saw or didn't see
 7   and processed or didn't process, but if you're
 8   talking the capital M marketing now, then I have to
 9   bring up other issues that relate to -- and would
10   relate in Cuyahoga County.
11              The -- one of the primary influences on a
12   physician's process of prescribing is their comfort
13   level with a prescription product.  One of the
14   primary ways they develop that comfort is by what
15   their peers are doing.
16              So if we look at the influence of peers in
17   peer-to-peer marketing, which we know occurred in
18   Cuyahoga County, then, yes, the marketing did have
19   an impact on these doctors, and I would say all of
20   them.
21       Q.    I don't understand what you mean by
22   peer-to-peer marketing.  Is that -- that's not
23   marketing that's done by a drug manufacturer, is --
24       A.    It is -- it is -- if we look at the
25   marketing plans, and we can -- we can pull up just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about any marketing plan that I've seen in this

 2    entire matter.

 3            One of the key areas of emphasis for the

 4    defendants was the use of peer-to-peer marketing,

 5    where they developed key opinion leaders, advocates

 6    for their products.  And these advocates worked both

 7    as speakers for the companies and writing articles

 8    and conducting research and also through advocacy

 9    organizations to promote the themes, the messages,

10    the strategies that the defendants wanted to see

11    furthered in the marketplace.

12       Q.   But whether any particular prescriber -- you

13    don't know whether any particular prescriber saw

14    peer-to-peer marketing in Cuyahoga County or some

15    other county for that matter; fair?

16       A.    I mean, I would need to get out the call

17    logs and search the call logs and see if there is

18    any mention.  I feel certain that there is.  I'm

19    almost positive that there is, that there were

20    discussions between sales reps and customers

21    regarding, for example, a CME on pain management

22    that we're going to have, and it's going to be

23    presented by Dr. So-and-so, and you need to come

24    listen to it; or you should come -- we should be

25    able to come and present this to you and your staff
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    over here at this hospital or that hospital.

 2           So, I mean, I know that those kind of things

 3    occurred.  I -- without getting the materials that I

 4    brought and literally looking through that call log,

 5    I can't give you a specific as we sit here right

 6    now.

 7       Q.   But at the micro level, whether

 8    Dr. So-and-so got a message from his PSR to come see

 9    other doctors speak about the great benefits of

10    opioid painkillers, you don't know, at the micro

11    level, whether that particular doctor went to that

12    presentation, processed the information, and then as

13    a result of that, began prescribing that particular

14    drug; fair?

15           MR. CHALOS:  Object to the form.

16       Q.   You haven't done it at a micro level?

17           MR. CHALOS:  Object to the form.

18       A.   Yeah.  So, you know, I think in that -- in

19    that very narrowly defined instance for a particular

20    doctor at a particular time, but, again, I'd still

21    have to go back to the sales numbers and the sales

22    figures that, you know, clearly show that the

23    defendants were successful in increasing sales in

24    these -- in these territories that we're discussing.

25    So something impacted them.
```

1    And when you look at marketing from a

2    theoretical perspective, what marketing is supposed

3    to do, and all the different types of marketing that

4    were employed, the result was attained that was set

5    out in the marketing plans.

6    Q.   I don't know why you're having such a

7    struggle admitting to me that you don't know

8    particular doctors' prescribing practices and what

9    they relied upon when they made prescription

10   decisions.  I mean, why are we having such a

11   struggle with this particular point?

12       Because I think it's pretty clear from your

13   report that you are not setting out to prove

14   reliance in any particular case, nor intending to

15   prove causation in any particular case, meaning any

16   prescribing decision that ended up in a bad outcome

17   for a patient.

18       MR. CHALOS:  Object --

19   Q.   Is that fair?

20       MR. CHALOS:  Object to the form.

21   A.   So I was with you up until you said "is that

22   fair."  The -- what -- I think it's a very important

23   point that you're bringing up.  And I will agree

24   with you.  I will tell you that, no, I can't point

25   to Dr. Smith and say he was influenced in this way.

1          But I see all the Dr. Smiths and all the

2     Dr. Joneses and everybody else, all the other

3     doctors that were there, and I see what was

4     presented to them.  I see the organized, efficient

5     planning that went into it, the delivery of it, the

6     assessment of it, and the results of it.

7          Doctors prescribed opioids in Cuyahoga

8     County, and there is no question about that.  And

9     the marketing theory that's behind all of this

10    suggests that if they use these techniques, they

11    will work to do exactly what was achieved.

12    Q.   Does the -- in the prescribing context, does

13    the -- does the patient have any, I guess, role or

14    responsibility in the prescribing decision?

15    A.   Yes.

16    Q.   And you would agree with me that in

17    connection with your work on this -- on this case,

18    you know -- and probably your work as a pharmacist,

19    you know that patients engage in drug-seeking

20    behaviors; fair?

21          MR. CHALOS:  Object to the form.

22    A.   Some patients do engage in doctor shopping.

23    They do engage in drug-seeking behaviors.  That's

24    true.

25    Q.   They also engage in activities like

```
 1    diversion of drugs?

 2           MR. CHALOS:  Object to the form.

 3      A.   I can only -- I mean, I can't answer that

 4    based on my analysis here, but I -- if you're asking

 5    me, as a pharmacist, am I aware of that, yes, I am.

 6      Q.   I mean, as part of the work on SBIRT stuff,

 7    you know that there's all sorts of things that

 8    people do to get their hands on drugs illegally;

 9    fair?

10      A.   People find a way to get what they need.

11    Whether it's through a prescribing process through a

12    legitimate doctor or whether it's, you know, a pill

13    mill or whether they're buying it on the street

14    corner, they do have access in different ways.

15           What is also important about that is the

16    drugs have to be there in the first place for them

17    to have access to.  And certainly from a marketing

18    perspective, increasing the supply of drugs in such

19    a dramatic way as we talked about this morning

20    certainly contributed to that.

21      Q.   When you say increasing the supply of drugs,

22    what do you mean?

23      A.   Well, there's several components to that.

24    On the one hand, the aggressive marketing -- and by

25    the way, I define that and justify the basis for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    calling it aggressive marketing in the report.

 2         The aggressive marketing certainly grew the

 3    market very rapidly, which increased access in the

 4    marketplace.  The availability of more and more

 5    generics increased access in the marketplace.  The

 6    ability to have the quotas increased and to seek

 7    increases in quotes for controlled substances

 8    increased access in the marketplace.

 9         So it becomes an issue of access, as well

10    as -- you know, combined with the marketing, if

11    we're talking about the -- specific to the drug

12    diversion we're talking about.

13    Q.   Okay.  Let's look at Page 23.

14    A.   Okay.

15    Q.   The first sentence of Paragraph 42 is:

16    Marketers frequently target prescribers who are most

17    likely to prescribe their drug.

18         Do you see that?

19    A.   I do.

20    Q.   Is that a common practice in the

21    pharmaceutical -- in pharmaceutical marketing?

22    A.   Yes.  High frequency prescribers are your

23    best bet in term of generating future sales.

24    Q.   For example, a doctor who is known to

25    prescribe -- you know, I'm not a doctor, but in this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    case, like a pain management doctor is much more

 2    likely to prescribe an opioid painkiller than a --

 3    you know, maybe a general practitioner or somebody

 4    who is a dermatologist or, you know, other field

 5    that doesn't normally prescribe opioids?

 6              MR. CHALOS:  Object to the form.

 7    A.    So you put a lot of people in there.

 8    Q.    Yeah, I did.  Sorry.  That's a bad question.

 9    A.    Yeah.

10    Q.    Let's -- let's skip that one.

11              Is there anything wrong with a manufacturer

12    targeting a prescriber who is most likely to

13    prescribe its drugs?

14    A.    It depends.

15              MR. CHALOS:  Hang on.

16              Object to the form.

17              THE WITNESS:  Sorry.

18              MR. CHALOS:  My objection is before his

19    answer.

20    A.    I'll repeat my answer.  It depends.

21              THE WITNESS:  And I promise I'm going to try

22    to give you a moment.

23    Q.    That's all right.  Would it be possible for

24    you to link the -- do you have the information

25    available to you to link information contained in
```

1   the call notes to particular prescribers'

2   prescribing -- prescribing practices generally?

3       A.   The call notes do characterize the

4   prescribers from time to time.  It will say things

5   like, Dr. Smith uses a lot of Oxy-IR, you know,

6   immediate release, or they'll characterize

7   prescribers as being high, medium, or low

8   prescribers for opioids.

9       But to link it to specific practices beyond

10  that, I don't know if I could or not.  In other

11  words, I'd have to take -- I would have to undertake

12  a more quantitative analysis and go in and look at

13  every mention of this doctor prescribing or not

14  prescribing and try to correlate that with sales in

15  the -- in the territory, which, by the way, the

16  manufacturers do that, but I didn't have that

17  ability.

18      Q.   Have you identified any prescribers in

19  Cuyahoga or Summit County that you believe to be bad

20  prescribers --

21      A.   I didn't --

22      Q.   -- meaning pill mills.

23      A.   No, I did not undertake any kind of analysis

24  related to that.

25      Q.   Do you know if anybody has undertaken that

 1    analysis?

 2       A.   Honestly, I don't know.

 3       Q.   I want to look at Paragraph 54.  I want to

 4    look at -- let's look at 53.

 5       A.   Paragraph, not page?

 6       Q.   Sorry.  Paragraph -- so Page 29.  When we

 7    talk about -- or when you talk about this hyphenated

 8    term "good-science," tell me what that is.

 9       A.   Good science is science that is --

10       Q.   That's good, right?

11       A.   It's -- actually -- actually --

12       Q.   It's better?

13       A.   I know you don't have drafts of the reports.

14    I'm pretty sure at some point I tried to explain

15    good science, but I can give you an explanation now.

16            Good science is science that is perceived as

17    being free of experimental bias, commercial bias,

18    and accurately measures what it says it's trying to

19    measure, measures it accurately on repeated

20    measurements, is responsive to gaps in our

21    knowledge.  It's science that is helpful when the

22    results can be applied to various situations.

23       Q.   So I think what you're stating here in

24    Paragraph 53 is -- I mean, just sort of an axiomatic

25    or a truism is that doctors want to see good

1    science, but you're not making a judgment about what

2    particular science in this case was good science

3    versus bad science; fair?

4        A.    Similar to the marketing messages, I didn't

5    make that assessment, but that has to be qualified,

6    because from -- some of the materials that I discuss

7    in my report relate to research that was conducted

8    where I believe there may be commercial bias present

9    by virtue of either who supported the research or

10   who funded the researchers who were conducting it,

11   or if those researchers were actually key opinion

12   leaders who were being paid by a company and so

13   forth.  So with that qualification, yes.

14       Q.    Well, is it -- is it your opinion that any

15   research that is funded by a pharmaceutical company

16   would not qualify as, quote, good science?

17       A.    It could.

18       Q.    It could?

19       A.    It could under certain circumstances, yes.

20       Q.    And is it -- have you attempted to go back

21   and look at the journal articles, et cetera, to make

22   a determination whether any particular article

23   contains good science or not?

24       A.    So I didn't take it quite that far to

25   determine the nature of the science, because I

Highly Confidential - Subject to Further Confidentiality Review

```
1    didn't -- I didn't assess any methodologies, per se,

2    but I did -- I did undertake to look at specific

3    articles, who authored them, were the property

4    disclosures made in terms of their relationships

5    with drug companies.  And in some cases they were,

6    and in some cases were not.

7           So up to the point of evaluating the

8    internal reliability and validity of the study, the

9    research design and all that, I did not undertake to

10   do that.

11          I did make some notations about sample sizes

12   in particular, or patient samples, but not the

13   actual structure of the research projects.

14   Q.   So when you were talking about sample sizes

15   of a particular study, is that information that you

16   would have gleaned from the other five plaintiffs'

17   experts who are testifying about --

18   A.   No.  For example, one of the articles by

19   Dr. Portnoy, he had an N of 38 in a study that he

20   did, and I noted that.

21          I think I -- the other article that I cite

22   in my paper, and was cited by defendants on numerous

23   occasions in their marketing materials, was, of

24   course, the Porter and Jick letter in the editor in

25   the New England Journal.  While it had a fairly
```

1    substantial sample size, its sample was very limited

2    in terms of who it could be generalized to.

3        Q.   The N of 38 in the Portnoy article --

4        A.   Yeah.

5        Q.   -- is that disclosed on the face of the

6    article?

7        A.   It's disclosed in the body of the article,

8    but, again, this is -- this is -- this was not

9    something that I undertook to evaluate.  I'm just

10   making -- you asked the question.  I was giving you

11   the answer that there were some opinions that I held

12   based on some of those kinds of factors about the

13   quality of the research itself.

14        It doesn't mean it was a bad study because

15   it had an N of 38.  It just means the study could

16   have been limited.  And I would need to undertake --

17   I actually teach a course on literature evaluation,

18   or have taught at the university.  And you can't

19   just look at a study and say the sample size is N.

20   Therefore, it's no good.  You have to really get

21   into it and take it apart and see how decisions were

22   made, what patients were included, what the

23   exclusion criteria were, all of those kinds of

24   factors.  I did not undertake that.

25        Q.   Are those sorts of lessons -- like, you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    teaching a course, are those lessons also given to

 2    doctors when they're in medical school, typically?

 3        A.   Typically?  I have not found that to be the

 4    case.

 5        Q.   Now, in Paragraph 54, you cite an article by

 6    Avorn, Chen, and Hartley?

 7        A.   What -- I'm sorry, which --

 8        Q.   Paragraph 54 on Page 30.

 9        A.   Yes.

10        Q.   That article is from 1982?

11        A.   Yes.

12        Q.   Do you have any more up-to-date research to

13    support statements you're making in Paragraph 54?

14        A.   You know, I'm sure there are other articles

15    that are cited in the report that either touch on

16    that or would also support that that are more

17    current.  The Avorn article just -- Jerry Avorn is

18    a -- sort of a very well-respected and very highly

19    revered researcher in this area, and his -- this is

20    a seminal work that was done back then.  I've not

21    seen anything that provides evidence to the contrary

22    since that time.

23        Q.   In Footnote on Page 30, you talk about -- or

24    consider physician denial of the influence of

25    industry communication, samples, and gifts.
```

```
 1              Do you see that?
 2      A.    Yes.
 3      Q.    And then you say that that physician denial
 4   may be understood in the context of extensive
 5   findings from behavioral psychology regarding
 6   unintentional and subconscious biases.
 7      A.    Yes.
 8      Q.    Have you attempted to quantify the
 9   unintentional and subconscious bias that comes from
10   things like industry communication, samples, and
11   gifts?
12      A.    So this is a pretty complex area because
13   what happens is -- it's really a concept of
14   obligation.  And when someone provides something,
15   our feeling is they expect something in return, and
16   this is -- this is why I -- in the report I
17   addressed this earlier on when I talk about
18   marketing process and the peer-to-peer influences
19   and so forth.
20              The idea that you're given a gift creates
21   obligation, and this is a subconscious process, and
22   you want to try to please the gift-giver.  And so it
23   becomes -- it becomes a psychological issue, not so
24   much a marketing issue.  It plays very well into the
25   marketing concept.
```

Highly Confidential - Subject to Further Confidentiality Review

1          So quantitative analysis of it?  I don't

2    know that it's possible to even do that without

3    endeavoring to undertake a social psychology study

4    and do some kind of experiment, but the literature

5    on relationship marketing is extensive, and it

6    addresses this issue pretty well, I think.

7       Q.   Okay.  Let's look at the next page,

8    Paragraph 57.

9       A.   57?

10      Q.   57, right.

11      A.   Okay.

12      Q.   I'm really interested in understanding what

13   you mean by your conclusion there.  The second

14   sentence, you say:  This body of literature suggests

15   that regardless of what prescribers may think about

16   their decision-making and the inputs to the

17   decision-making process, the role of the

18   pharmaceutical marketer significantly impacts their

19   prescribing.

20          And I'm -- what do you mean by

21   "significantly impacts"?  Are we able to quantify

22   that, or is that --

23      A.   Well --

24      Q.   -- similar to your answer to my last

25   question?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.  I think that -- I think that all of the

 2    citations in this section of the report point to a

 3    couple of key -- of key prepositions, if you will.

 4    And that is, is that marketing works.

 5            And when marketers provide information,

 6    provide payments, provide gifts, provide free CE,

 7    provide a research study, for any of the other

 8    activities that they engage in, samples, meals, this

 9    impacts prescribing.  And I think the body of

10    literature that's cited in this report -- and we

11    could look at each one in particular and figure out

12    where it relates to this, but it all supports the

13    contention that these efforts impact prescribing.

14        Q.    I got that point.  I mean, I understand

15    marketing works.  I'm the subject of marketing every

16    single day.  I get it, but I'm really struggling

17    with understanding what you mean when you use the

18    adverb "significantly."  How does -- how much -- do

19    you have any idea how much it moves the needle?

20            MR. CHALOS:  Object to the form.

21        A.    Some of these studies actually quantify

22    that.  For example, the Hadland study, I think, does

23    with respect to payments.

24            The last sentence in Paragraph 56 --

25        Q.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    -- each additional meal was associated with

 2   an increase of 0.7 percent in opioid claims.

 3            So there are -- there are quantifications,

 4   and that actually turns out to be a significant

 5   increase that's reported in that article.

 6            I guess I could have just as easily said a

 7   pharmaceutical marketer impacts prescribing, but I

 8   think that the adjective "significantly" or -- yeah,

 9   adjective.

10        Q.    Adverb.

11        A.    Adverb?  Thank you.

12        Q.    It's all right.

13        A.    It's appropriate there, because I think the

14   impact -- one of the things we see is that doctors

15   underestimate the influence that marketers have on

16   them.  And because of that, sometimes they're

17   reluctant to even be aware of how much they're

18   impacted.

19        Q.    Do you know if the federal law has changed

20   with respect to what in-person marketing a

21   particular pharmaceutical manufacturer can do?  I've

22   read about the Sunshine Act.  Do you know about the

23   Sunshine Act?

24        A.    I mean, I'm aware of it, yes, but --

25        Q.    Do you know what that act requires with
```

 1    respect to marketing activities and reporting?

 2        A.    Just that the activities have to be

 3    reported.  For example, the Open Records has the

 4    database where they keep track of all the meals and

 5    anything else that companies paid for, the -- any

 6    engagement.

 7            I know that if somebody meets with me, as a

 8    member of the DUR board, they've got to report that

 9    under the Sunshine -- I guess it's the Sunshine Act

10    that requires that.

11        Q.    Okay.  Let's -- let's continue on.  Let me

12    see where we are now.  Let's move to Page 58.  What

13    is a clinical practice guideline?

14        A.    Clinical practice guideline, also known as a

15    clinical protocol, an evidence-based medicine

16    guidelines, lots of different terms for it, but

17    basically these are structured decision models that,

18    using evidence-based medicine and scientific

19    studies, patient experience, and the combined

20    knowledge of many years of experts, they come up

21    with a plan for treating patients that they think

22    will result in the best care possible.

23        Q.    Do you know whether certain states have

24    implemented prescribing guidelines related to opioid

25    painkillers?

```
 1      A.   I know that the CDC has promulgated

 2   guidelines.  I assume that states followed suit, but

 3   I'm not aware specifically of states.

 4      Q.   Have you evaluated any particular state's --

 5   I take it for that reason, you have not evaluated

 6   any particular state's prescribing guideline; fair?

 7      A.   I have -- I have not undertaken to evaluate

 8   any guidelines that were outside the scope of the

 9   guidelines that were advanced through the marketing

10   messages of the defendants.

11      Q.   Do you have any opinion as to whether the

12   guidelines that were advanced through advocacy

13   groups or key opinion leaders, whether those

14   guidelines were appropriate?

15      A.   So I did not undertake that analysis, but I

16   believe other experts have undertaken that.

17           How long have we been going?

18      Q.   About an hour.  Do you want to have a break?

19      A.   If --

20      Q.   Let's do it.

21      A.   -- if anybody else needs to, I could use a

22   quick break.

23      Q.   Yeah.  Let's do it.

24           THE VIDEOGRAPHER:  We are now going off the

25   video record.  The time is currently 2:03 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      This is the end of Media Number 3.

 2          (Recess from 2:03 p.m. until 2:15?p.m.)

 3          THE VIDEOGRAPHER:  We are now back on the

 4      video record with the beginning of Media

 5      Number 4.  The time is currently 2:15 p.m.

 6  BY MR. VOLNEY:

 7      Q.   So let's -- let's move to Page 53, Paragraph

 8  89, which is your discussion of marketing messages

 9  are different from the package insert.

10      A.   Right.

11      Q.   I think you earlier testified that in

12  connection with a new drug application, one of the

13  things that the FDA looks at and ultimately approves

14  is the package insert for a particular drug.

15      A.   Yes.

16      Q.   Are you just generally familiar with that?

17      A.   Generally, yes.

18      Q.   You yourself haven't had any particular

19  direct involvement in getting a package insert

20  approved; fair?

21      A.   I have not.

22      Q.   And you would agree with me that a package

23  insert is part of a company's marketing?

24      A.   A package insert is part of a company's

25  marketing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    And I think you testified that on the DURB,

2    that's not something that's put in the sort of

3    clinical information and clinical binder you

4    receive?

5        A.    That's correct.  We don't -- we don't see

6    package inserts as part of what we review.

7        Q.    Who are the package inserts provided to?

8        A.    Generally, a package insert has to be

9    provided any time a drug name and its indication are

10   mentioned at the same time.  So if a sales rep is,

11   you know, back in the olden days, giving you a cup

12   that says OxyContin on it, and he mentions the

13   indication, he's got to give you a package insert

14   attached to that cup.

15         And so in today's world, I think anytime

16   that the two are together, the indication in the

17   product name, the package insert is still required.

18       Q.    So is that just for in-person meetings, or

19   is it also for, like, mail pieces?

20       A.    Yeah.  I'm pretty sure it applies to any

21   time, Internet, mail, in-person.  Even if a -- if an

22   article is being distributed by a drug rep and that

23   article mentions the indication and the name of the

24   medication, I'm pretty sure they'd have to include a

25   package insert at that time, too.
```

 1      Q.   So when we're looking at the physician

 2   prescriber model, which I conveniently took off this

 3   ELMO, it -- one of the things that will be in the

 4   total mix of information would be the package

 5   insert, at least it will be available to the

 6   prescriber?

 7      A.   Yes.  Thank you for that, because it's

 8   available.  It doesn't mean -- and as you -- as my

 9   opinion states, it's not often relied upon.

10      Q.   And is that based on anecdotal information,

11   or what?

12      A.   Well, it's -- I don't think it's anecdotal.

13   I think it's the way marketing is conducted.  The

14   package insert is -- I know I don't get to ask the

15   questions, but I'm sure we've all seen a package

16   insert.  It's folded up in a little -- you know,

17   stuck to the prescription bottle or taped to the

18   bottom of the coffee mug or whatever, or it can be a

19   bigger piece, you know, 8?-by-11.  So they come in

20   all different shapes and sizes.  Some are more

21   useful than others.

22          But when the package insert is delivered,

23   it's not necessarily delivered as, oh, here is your

24   package insert, this contains all the prescribing

25   information, but rather, it's delivered as part of

1    the obligation to deliver the package insert.

2         And what -- for example, we're talking about

3    the personal selling effort.  It would be the sales

4    rep's job to then figure out what in that package

5    insert or what in their sales call today is most

6    important to convey to that prescriber and to

7    communicate that information.

8         And in marketing, we know that what works

9    best is to communicate product benefits and turn

10   those -- product features and turn those product

11   features into product benefits.  So, you know, to

12   the extent that a package insert supports that, it

13   would be relied on by the sales rep.  To the extent

14   that it doesn't, it may not be.

15        Now, just an example of that is, early on in

16   the OxyContin marketing, the reps frequently

17   referred to -- when doctors had concerns about

18   addiction, the reps frequently referred to the less

19   risk of addiction in the package insert that we now

20   know was changed later on.

21        So the package insert is variable.  It's not

22   necessarily something that is relied on.  It's

23   certainly not something that's focused on, but it is

24   provided.

25        Q.   Do you know whether the original OxyContin

Highly Confidential - Subject to Further Confidentiality Review

```
 1    package insert had a warning on each page that the

 2    drug may be habit-forming?

 3        A.   I don't know if it had that on it or not.

 4    I've read the original package insert, but I don't

 5    recall that.

 6        Q.   If a -- if a doctor wanted to get the

 7    pharmaceutical manufacturer's disclosures related to

 8    a -- the particular risks of a drug, would the

 9    doctor -- could the doctor look at the package

10    insert?  Let me ask a different question, because

11    that's a bad question.

12             Is the package insert intended to provide

13    information about the risks of a particular drug?

14        A.   I think it's fair to say that the package

15    insert is intended to provide a balanced picture of

16    the drug, including the benefits and the risks, and

17    all the information a doctor would need to know,

18    whether or not they would want to consider

19    prescribing it.

20        Q.   And do you know whether doctors consider the

21    package insert to be useful for that purpose?

22             MR. CHALOS:   Object to the form.

23        A.   So my opinion about package inserts is that

24    they are not heavily relied upon.  There are a lot

25    better sources of information that doctor would use
```

1    that are much more concise and available, especially

2    in today's technology information world.

3         You probably recall the PDR, which was a

4    Physician's Desk Reference, which contained

5    basically all the package inserts for all the drugs

6    that were available.  And so doctors might look up a

7    drug and get package insert information from that,

8    but as time and technology changed, the reliance on

9    the package insert has as well.

10   Q.   What other sources of information out

11   there -- are there out there that are more concise

12   and available?

13   A.   In today's drug information world, there is

14   a number of drug information services, from

15   Epocrates and Micromedex and UpToDate and several

16   other sources that are -- that information is culled

17   from a lot of different sources and summarized for

18   prescribers, pharmacists, nurses, formulary

19   managers, et cetera.

20   Q.   So that more -- that more available and

21   concise information that you're talking about is

22   also information that would go into the total mix of

23   things a prescriber would consider or could

24   consider?

25        MR. CHALOS:  Object to the form.

1      A.   It would be something that, when we're

2   looking at the prescriber information processing

3   model, when the need for information arises and

4   search is engaged, that they might turn to that

5   information to incorporate that or not incorporate

6   it, as the case may be, into their decision model,

7   yes.

8      Q.   Okay.  Let's move to Page 65.  So in this

9   part of your report, you give a sort of background

10   information about the competitive market for

11   opioids.

12          Do you see that?

13      A.   I do.

14      Q.   And you start your story in the 1930s?

15      A.   Yes.

16      Q.   In fact, opioid painkillers have been used

17   since B.C. times; fair?

18      A.   Yes.  They've been used for a very long

19   time.  And --

20      Q.   And the --

21      A.   -- it's my understanding that there's a

22   historian that is -- has been engaged in this case

23   as well that's telling the full story on the

24   history, which is the reason why I didn't go into

25   much of it here.

```
 1      Q.    It has been common knowledge in the medical
 2   profession throughout the 1900s and 2000s that
 3   opioid painkillers bear a risk of addiction; fair?
 4          MR. CHALOS:   Object to the form.
 5      A.    I think the medical thinking has been for a
 6   very long time that opioids are addictive and
 7   dangerous drugs to use.
 8      Q.    Your recounting of the sort of history of
 9   opioid painkillers, you know, beginning in the '70s
10   through the '80s to the '90s, where does that come
11   from?  Is that based on your personal knowledge?
12      A.    I started working in community pharmacy in
13   1977, so some of it is, but the order of what was
14   discussed here was really related more to building a
15   background for the -- what happened prior to and
16   then what happened right around the time of the
17   changes in the marketing practices to a more
18   aggressive nature in about the mid-1990s.  So it was
19   really just to provide a -- just a brief backdrop
20   about what drugs were on the market.
21          Sort of -- you would -- something you would
22   expect to see in a case analysis is a sort of
23   overview of what's going on.  So to just look at
24   opioids cold, without understanding what was in the
25   marketplace and what wasn't, what other competition
```

```
 1    was out there, it would be leaving some questions

 2    unanswered.

 3        Q.   But in terms of your description here of

 4    what motivated Purdue to develop OxyContin and what

 5    Purdue's intent was with respect to development of

 6    OxyContin, that's information that you've gleaned

 7    from the documents you've looked at in this case;

 8    fair?

 9        A.   That, in particular, came from the OxyContin

10    launch plan in 1993 or '94, I believe.

11        Q.   So this is a -- is this, in essence, a

12    paraphrase of that?

13        A.   A paraphrase or just a summary of it, yes,

14    summary of what I learned from it.

15        Q.   And you also talk in here, in this section

16    of your report, about your -- about Endo's launch of

17    the varying strengths of Percocet.

18             Do you see that?  I'm looking at Page 108.

19        A.   Paragraph 108?

20        Q.   67, 108, yes.

21        A.   Yeah.

22        Q.   How long has Percocet been on the market?

23        A.   Percocet, I am pretty sure, was on the

24    market when I started working in '77 or '78.  So

25    that would be the earliest I know.  Well, that was
```

1    Percodan.  I'm not sure when Percocet exactly -- it

2    might have been a little after that.  I'd have to

3    check.

4       Q.    So do you know how long the drug oxycodone

5    has been around?

6       A.    Oxycodone has been around for a while, but

7    the Contin version of oxycodone has not been around

8    since -- but since about 1995.

9       Q.    So the OxyContin version of oxycodone is

10   what's called a long acting or extended release

11   oxycodone product; fair?

12      A.    Yes.

13      Q.    So that is -- that would -- that's what

14   would distinguish OxyContin from just a regular old

15   oxycodone pill; fair.

16      A.    The immediate release version, yes.

17      Q.    There is a discussion on Pages 69 and 70 of

18   your report about Purdue's decision-making with

19   respect to developing a -- a what?  An extended

20   release version of oxycodone?

21      A.    I think.

22      Q.    Tamper-resistant.

23      A.    I think these refer to Dr. Haddox's work

24   related to tamper-resistant formulations.

25      Q.    Has a tamper-resistant formulation of

1    OxyContin been released?

2        A.   Eventually, yes.

3        Q.   Do you know what year it was released?

4        A.   I think it was relatively recently.  I'd

5    have to look back at my notes or the report, but I

6    want to say around 2012 or something like that --

7        Q.   So --

8        A.   -- was when it was finally approved.  They

9    sought approval for it much earlier than that, but

10   it was finally approved in that period.

11       Q.   So ultimately, the FDA made the decision to

12   approve a tamper-resistant version of OxyContin?

13       A.   Yes.

14       Q.   Do you know what decision process or

15   decision-making process the FDA must go through

16   before deciding whether to approve a particular

17   drug?

18       A.   They balance the safety and efficacy and

19   patient needs.

20       Q.   Do you have any criticism of the FDA's

21   decision to approve that particular drug?

22       A.   I certainly wasn't part of the discussion or

23   the analysis, so I really have no opinion about

24   that.

25       Q.   In Paragraph 115 on Page 70 of your report,

Highly Confidential - Subject to Further Confidentiality Review

1     you make some statements about what Dr. Haddox

2     believed and the company's decision-making with

3     respect to focusing on a tamper-resistant drug.

4          Do you see that?

5     A.   Yes.

6     Q.   What's the basis for these conclusions?

7     A.   So the -- the first sentence, in my opinion,

8     Dr. Haddox believed that opioid sales were

9     declining, that's the only thing I think I stated

10    that was a belief and that at this time that he had

11    already -- in the paragraph before, I -- he makes

12    the point in his testimony, I believe, that opioid

13    use had begun to decline.  So I was associating that

14    with that statement in the paragraph preceding.

15         But basically, I think one of the reasons --

16    and this is my opinion now.  This is the part where

17    I'm inferring from the data points.  I think that

18    probably what's happened here is that he is -- he is

19    seeing the decline in OxyContin sales and inferring

20    from that that the opioid market is declining as

21    well.

22         I think if you were to look at overall sales

23    of opioids, I think during this time period they

24    were still growing.

25    Q.   Okay.  Then so how does that fit into the

1    bigger picture in here?  What is the -- what's the

2    conclusion you draw from that?

3        A.   Well, from a marketing perspective, if the

4    folks that are engaging in product promotion see

5    their markets as declining, they're looking at their

6    products as being in a product maturity or product

7    decline phase, even to the point of obsolescence.

8    And so they've got to begin to evergreen the

9    products, figure out a way to extend its life,

10   continue to generate sales.  This is -- this is what

11   marketers do.  It's their job.

12         So from Dr. Haddox's perspective, research

13   designed to identify ways to continue the success of

14   a product that has begun to decline would be very

15   important.

16       Q.   And isn't it common for all drug

17   manufacturers to engage in that sort of thinking and

18   decision-making when their drugs are about to come

19   off patent, for example?

20       A.   Yeah.  So it's typical for a product

21   manufacturer to tweak a formulation or develop a new

22   indication that can be patented, to develop a new

23   dosing schedule.  Lots of ways manufacturers do

24   that, and it's certainly consistent with marketing

25   principles and what we have seen in all product

Highly Confidential - Subject to Further Confidentiality Review

```
 1    categories, you know, across the board over many

 2    years.

 3        Q.   Okay.  Let's get to the -- let's go to Page

 4    73.  Okay.  This is sort of, I guess, the beginning

 5    of the meat of your discussion about the marketing

 6    strategy for opioids for defendants.

 7             When you say at the end of Paragraph 120

 8    that the marketing documents you reviewed were

 9    developed for use nationally and in Ohio?

10             Do you see that?

11        A.   Yes, I do.

12        Q.   Does that mean that necessarily, the

13    marketing documents that you reference here in your

14    report were used in Ohio?

15        A.   Yeah.  I don't think there's any question

16    that the marketing documents that were developed

17    were used in Ohio.  The testimony that I read, which

18    was -- there were a number of deponents that focused

19    on that issue, as well as, you know, just the fact

20    that the marketing plans were developed at the

21    national level to be implemented nationwide.

22             I think there's some -- there's some

23    latitude around that, which would be only reasonable

24    for marketers to adapt, you know, marketing plans

25    for different geographic areas.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              But in the case of Ohio, for example, you

 2     know, with Janssen and the -- you know, Ohio was one

 3     of their biggest markets for Nucynta.  So there was

 4     a big -- you know, a big -- a big market share for

 5     Nucynta in Ohio.

 6              And so there could be increased dollars

 7     spent in a particular area versus we're going to cut

 8     back in this area.  We've got more high decile

 9     prescribers in this area than we do there, in

10     another area, so it's going to impact our personnel

11     needs and so forth.

12              So within the implementation zone being

13     slightly different, the strategies and tactics are

14     approximately the same.

15       Q.   Do you know how many PSRs any particular

16     manufacturing defendant had assigned to Ohio?

17       A.   You know, I do know about the numbers that

18     they had nationally, but I don't know specifically

19     for Ohio.

20       Q.   Do you know whether Purdue currently has any

21     PSRs?

22       A.   My understanding is Purdue does not.

23       Q.   Do you know when Purdue stopped using PSRs?

24       A.   Not from my work in this case, but I -- my

25     understanding is around 2017 or 2018, they ended the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    sales force.

 2        Q.    Do you know how big their sales force was

 3    when they ended it?

 4        A.    It was -- I think it's noted in the report

 5    somewhere, but I'm going to say it was about 500 to

 6    600, perhaps.

 7        Q.    Now, in Paragraph 121 of your report you

 8    state:  Defendants worked to create aggressive

 9    marketing strategies for opioids, which served to

10    distort needs, wants, and demand for opioids.

11        A.    Which paragraph are we in?

12        Q.    121.

13        A.    Gotcha.  Yes.

14        Q.    So is the word "aggressive" a term of art?

15        A.    It can be a term of art.  I note the -- the

16    word "aggressive," I -- I would say I was hesitant

17    to use it myself in my report.  One of the -- one of

18    the rules of case studies is try not to be

19    sensational, and the -- you know, certainly there

20    are examples you can build into a case study that

21    are just that, and they raise eyebrows but they

22    don't make your point necessarily in the scone of

23    the ways.

24              And so I was worried about using the word

25    "aggressive," but from a marketing perspective,

1    aggressive marketing can be easily defined as

2    marketing that is highly detailed, that's

3    strategically planned, with very specific and --

4    goals that are enumerated that set high attainment

5    levels for products.

6        So as a marketer, we have -- the word

7    "aggressive" doesn't carry the same negative

8    connotation as when I read aggressive marketing in a

9    report about a lawsuit or a settlement.  So there is

10   a big difference there.

11       The way I'm using the word "aggressive

12   marketing" is from a marketing perspective, it was

13   marketing that was, as I described here, very

14   detailed, well-planned out, well-integrated within

15   the organization, marketing that had very clear-cut

16   objectives, had good metrics to assess those

17   objectives, and reached out to customers in the most

18   effective ways.  So that's what I mean by

19   aggressive.

20   Q.   Is it common for pharmaceutical

21   manufacturers to using aggressive marketing, using

22   your term?

23   A.   So that's -- that question is one that --

24   you know, and I haven't -- I haven't analyzed a lot

25   of product categories the way I have the opioid

Highly Confidential - Subject to Further Confidentiality Review

 1    category.

 2          The -- aggressive in the marketing sense,

 3    though, I think it would be fair to say that other

 4    manufacturers for other product categories have used

 5    aggressive marketing.

 6          For example, the Ozempic that I referred to

 7    a couple of times today, it's a new drug that's been

 8    on the TV a lot lately.  And to me, I'm sure others

 9    would agree, that that is a aggressive campaign.

10    You see a lot of it.  It's repeated frequently.

11    It's on all the channels.  You can't watch golf

12    without seeing it.  You can't watch baseball without

13    seeing it.  So I think that's true.

14          But the issue that comes up, if we relate it

15    back to the standards and the heightened standards,

16    in particular, for opioids and prescription drugs,

17    the use of those kinds of techniques surrounding

18    opioids to generate the dramatic increases in sales

19    seems to be inappropriate.

20    Q.   Okay.  Seems to be, what do you mean by

21    that?

22    A.   It -- it is -- it is using marketing to

23    expand demand for a dangerous drug beyond that which

24    is the -- let's just say the medically needed amount

25    in our society.  And the expansion of the demand

```
 1    creates more access in the marketplace.  That has

 2    led to the problems that we have in our society

 3    related to the use of opioids.

 4       Q.   I mean, other than knowing that the number

 5    of prescriptions for opioids started going up in

 6    1995 and continued to rise for a period of time,

 7    what have you done to assess the level of

 8    appropriate demand for opioids?

 9       A.   So the -- as I described this morning, we

10    had growth in opioids before 1995.  The growth was

11    just at a much, much lower rate.  After 1995, we had

12    growth that was at a much higher rate, and that

13    growth was sustained for many years.

14            The explanation, the -- there were a couple

15    of possible explanations for that.  And as I said

16    this morning, one of those is that, you know,

17    opioids expanded access and expanded the market

18    through the marketing.

19            The other is that more patients were sicker,

20    and that grew rapidly, and there was utilization.

21    The epidemiology of pain doesn't support that just

22    from a pharmacy perspective.  We would -- we see

23    growth.  It should be a fairly constant rate of

24    growth.  So something about the marketing must have

25    changed the utilization of those drugs.
```

1    Q.   Could patients or people who were suffering

2    from pain conclude that there are now better avenues

3    for relief available to them, and that might account

4    for the expanded market?

5    A.   Yes.  And certainly that's something that I

6    considered.  The question is really, was pain

7    undertreated?  And so the answer -- I think if you

8    look at defendants' marketing documents, that is

9    something the defendants absolutely believed to be

10   true.  They -- that pain management was stigmatized,

11   that the use of pain medications was below levels

12   than it should be at.

13        The problem that I encounter with that in

14   the marketing analysis, though, is -- and by the

15   way, those were the themes that they focused on.  If

16   you look at Themes 1, 2 and 3, this is what

17   manufacturers focused on.  Their use of ads

18   supported those premises.  So that's all consistent

19   and expected from a marketer's viewpoint.

20        But the problem is, is should those

21   messages, once -- once we see the results of this

22   rapid increase in the marketplace, and the negative

23   outcomes from those rapid increases, shouldn't that

24   marketing be identified as inappropriate?

25        So at some point along the way somebody

1    should have said, hey, wait, this isn't -- this

2    is -- we're getting -- too many patients are

3    becoming addicted.  We're having too many deaths as

4    a result of opioids.

5         When opioid use increases, the level of

6    analgesic increases and the level of pain, the level

7    of addiction and the level of death will increase as

8    well, so the more use we have of opioids, the more

9    we're going to have all of these benefits and harms.

10        So that's where the dilemma comes in, but,

11   you know, there is no question that the use of the

12   drugs in terms of the time periods that we're

13   talking about, from 1995 and '96 to 2000, to 2005 up

14   to 2010, dramatically increased.

15        And I think that that is at least temporally

16   associated with the marketing and defendants' own

17   internal marketing documents that were assessing the

18   marketing that are -- you know, the reimbursement of

19   their sales forces to promote the increased sales.

20        So we have all these different data points.

21   So then as a case analysis would charge you to do,

22   we had to then step -- take a step back from that

23   and say, okay, what's going on here?  What's the

24   most likely explanation?

25        And is it that we had a 1500-fold increase

 1    in the level of pain in our society, or is it

 2    because the marketing was so effective, that a drug

 3    that creates a distortion in demand was not only

 4    effective at generating sales, but it began to

 5    perpetuate its own sales.

 6        Q.   Do you -- have you made any effort to

 7    consider what amount of the increase in sales of

 8    opioid painkillers was due to people who, before

 9    then, had untreated pain?

10        A.   I did not undertake that analysis.

11        Q.   Probably pretty difficult to do; fair?

12        A.   For a marketer to do, I think it would be,

13    yes.

14        Q.   I take it from your testimony that there is

15    not a -- at least necessarily, a negative

16    connotation to use of the word "aggressive" to

17    describe a particular defendant's marketing?

18        A.   For -- depending on the context, because I

19    think definitely when you read the commentary about

20    opioid marketing in the lay literature, it's a very

21    negative context.

22            When you read a Department of Justice news

23    brief about a company's marketing, and they use the

24    word "aggressive," that's definitely a negative

25    connotation.

```
 1              So depending on the section of my report, I
 2      think it could have a positive or a negative
 3      connotation.  As I said before, my assessment from a
 4      marketing -- pure marketing perspective is that
 5      aggressive marketing is just a form of marketing.
 6      It's marketing that is designed in certain ways.
 7              However, when it comes to opioids, I think
 8      after you read my report, you would understand that
 9      I have the opinion that aggressive marketing, from
10      anyone's definition, is inappropriate with this
11      class of drugs.
12      Q.   Let's move to Page 75.  Well, I may have a
13      follow-up question.  I take it that aggressive
14      marketing by a pharmaceutical manufacturer is not a
15      violation of any particular FDA regulation?
16      A.   No.  As I -- as I said, the nature of
17      aggressive is -- is a -- it's a -- a marketing, as
18      you referred to earlier, term of art, but at the
19      same time, the violation is of standards, not of the
20      FDA regulation, and those standards are the ones
21      that I enumerated earlier.
22      Q.   Right, but just engaging in aggressive
23      marketing by a pharmaceutical company is not a
24      violation of any law that you know of; fair?
25      A.   Yeah.  I can't make any legal conclusions.
```

1   Sorry.

2   Q.   Looking at Paragraph 123, which is on Page

3   75.

4   A.   Yes.

5   Q.   You throw us a bone in there.  You say:  It

6   should be noted the defendants' marketing documents

7   sometimes referenced the need to disclose safety

8   information for drugs consistent with FDA approved

9   indications and prescribing information contained in

10  the PI, package insert.

11       Do you see that?

12  A.   Yes.

13  Q.   Have you -- is there a schedule, or have you

14  sort of put all that stuff together in a particular

15  pile that we could look at, what you're referring

16  to, or is it just whatever is referenced in -- I

17  guess there is one document in Footnote 245?

18  A.   No, I don't have a schedule, but the

19  footnotes here and the discussion provide several

20  examples, and this is something we alluded to this

21  morning when we were talking about the package

22  insert, where there -- even though the PI is

23  mentioned or cautionary statements are mentioned,

24  the balance of information that is presented is

25  heavily skewed towards the benefits.

```
 1              Again, that makes sense from a marketing

 2     perspective.  The question is, is it appropriate,

 3     but it's balanced -- it's balanced heavily towards

 4     the product features and benefits, not the product's

 5     potential harms.

 6        Q.   What does it mean when a drug is listed on

 7     Schedule II?

 8        A.   It means that it's a controlled substance

 9     that has special purchasing and recordkeeping

10     requirements that is considered to be -- its use

11     needs to be much more carefully considered.

12        Q.   Has Schedule II had that meaning since the

13     mid-1990s?

14        A.   I'm not a historian of the Schedule II

15     books, but my understanding as a pharmacist would be

16     that Schedule II hasn't changed -- other drugs have

17     entered the category, but I don't know that the

18     definition of Schedule II has changed.

19        Q.   And do doctors have to have particular types

20     of licensure to be able to prescribe a Schedule II

21     drug?

22        A.   It is -- it is my understanding that a

23     doctor has to have a DEA license in order to do

24     that, as would a pharmacist have to have a DEA --

25     pharmacists have to sign special order forms that
```

Highly Confidential - Subject to Further Confidentiality Review

 1  enable them to purchase, so --

 2  Q.  Is there any particular type of education

 3  that goes along with a pharmacist getting a DEA

 4  license?

 5  A.  Not that I'm aware of.

 6  Q.  Are -- in a -- in the retail pharmacies that

 7  you've worked in, are there special procedures in

 8  place to deal with Schedule II narcotics?

 9  A.  There are a couple of different ways that's

10  addressed in terms of inventory in the store and

11  purchasing.

12       On the one hand, some pharmacies have a safe

13  with a lock and, you know, it's guarded closely.

14  Other pharmacies just mix them in with their regular

15  inventory to make them harder to find, less subject

16  to potential pilferage.

17       So different pharmacies have different ways

18  of handling the issue.  Some pharmacies have a --

19  you know, what I call a rabbit garden.  They have a

20  few bottles here that are out in plain sight for

21  everybody to see and then all the good stuff is held

22  back somewhere else under lock and key.  So there's

23  many different ways that it's dealt with.

24  Q.  Do you know whether prescribing doctors have

25  to undergo any particular training to get a DEA

Highly Confidential - Subject to Further Confidentiality Review

```
 1    license to prescribe Schedule II narcotics?

 2    A.    I don't know.

 3    Q.    You say here in Paragraph 123 that:  The

 4    preponderance of defendants' messages focused on

 5    translating drug features into drug benefits and

 6    downplayed information that would serve to

 7    discourage prescribing, including potential harms.

 8          Do you see that?

 9    A.    Yes.

10    Q.    So when you use the word "preponderance,"

11    what do you mean?

12    A.    The vast majority.

13    Q.    The vast majority?

14    A.    Yeah.

15    Q.    I mean, do you create two piles?

16    A.    Well, you know --

17    Q.    That indicates -- sorry.  To me that

18    indicates -- I mean, that's a term of art in legal

19    practice.  It indicates you've -- you've engaged in

20    some weighing, and preponderance means 51 percent

21    versus 49.

22    A.    51 or more --

23    Q.    Right.

24    A.    -- in my mind, so -- and I definitely think

25    it was -- I think I meant it that way.  I apologize
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for using a lawyer word.  I try never to do that if
 2    possible.  They always have more meaning for you
 3    than they did to me.
 4            But the preponderance, the way you've
 5    defined it as a lawyer term, I would agree with, and
 6    I meant to use it that way in this case.
 7            The examples that I give on subsequent
 8    paragraphs, I think, explain that a little bit with
 9    specific documents.  Unfortunately, in today's
10    world, we don't have stacks of documents any more.
11    We have electronic files.  So it's a little harder
12    to do that with, but when I look at the -- I was
13    going to say plethora, but I've decided not to.
14            When I look at the large number of documents
15    that I've reviewed in this matter, and I look at the
16    themes that were communicated and the way they were
17    communicated -- take the marketing plans out of it
18    for a minute.
19            But you look at the sales training
20    documents, for example, where sales reps are trained
21    on how to respond to doctors' concerns about
22    addiction, or doctors are trained to -- how to
23    respond to concerns over dependence or tolerance or
24    withdrawal, any of those issues.
25            The documents that I saw were focused on one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of two things, primarily, and this is almost
 2    exclusively.  They were focused on ways to minimize
 3    the doctors' concerns and take them the next step
 4    into changing their perception about that concern or
 5    to just downplay that concern to begin with.
 6           So that's where -- that's the basis for
 7    this.  So there are multiple, multiple documents in
 8    the sales training arena, multiple documents called
 9    objection handlers.  I think -- I saw lots of
10    different types of objection handlers, the training
11    documents about, you know, dealing with objections
12    and some specific sales techniques that were
13    employed.  So that's the basis for that.
14           The preponderance was, you know, the vast
15    majority, almost all the documents weren't focused
16    on, you know, accept this, that opioids are
17    addictive, and let's discuss that.  No, that's not
18    what they did.  It's downplay that it's addictive
19    and shift them to this new way of thinking that --
20    that they can still be prescribed if we monitor the
21    patient closely, for example.  So that's where that
22    basis comes from.
23    Q.   Do you have any opinion as to whether a
24    doctor could appropriately prescribe an opioid as
25    long as that doctor continued to closely monitor his
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    or her patient?

 2      A.    Well, I don't have an opinion in that regard

 3    for this case, but that's my opinion about doctors

 4    and drugs in general.  They should always be

 5    monitoring their patients.

 6      Q.    Let's -- let's move to Paragraph 134, and in

 7    Paragraph 134, you identify particular -- three

 8    general themes?

 9      A.    Yes.

10      Q.    Did you come up with these themes?

11      A.    No.  There were multiple iterations of these

12    themes, and -- but, yes, at the end of the day,

13    these are -- there were the themes, as I saw them,

14    as most appropriate.

15      Q.    The -- I think we've talked about your --

16    what you -- I mean, in coming up with these themes,

17    you looked at the documents, the marketing

18    materials, the presentations, the sales training,

19    whatever documents that you identified through your

20    Relativity searches and whatever documents might

21    have been gathered for you by somebody else, and

22    you've attempted to group them.

23            But in doing that, what you've done is

24    you've basically read the document and, in your

25    head, come up with three themes; fair?
```

```
1        A.   I -- you know, I read many documents and

2    then tried to figure out what was the best way to

3    represent the -- a -- in a couple of bullet points,

4    the best way to represent the majority of all of

5    those documents.

6        Q.   In coming to that sort of bullet point

7    analysis, does that require any particular

8    expertise, other than the expertise of being a smart

9    guy?

10       A.   Well, I -- let me think about that for a

11   second.

12            Can I -- there's a noise coming out of

13   the --

14       Q.   It's a crackle.

15            MR. GALIN:  I think there's someone who is

16       not on mute is typing.

17            MR. VOLNEY:  Hey, folks on the telephone,

18       could somebody mute?

19       A.   So, I mean, I think to answer your question,

20   do you need a particular expertise, I think it takes

21   somebody who can deconstruct the messages from the

22   marketing pieces and then reassemble them into

23   consistent themes.

24            Now, the interesting part about your

25   question, the reason why I'm really thinking about
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it for a minute is because I really learned this

 2    information from the marketing documents themselves.

 3    This wasn't necessarily my way of categorizing these

 4    messages, because these were the themes that -- when

 5    you look at the marketing planning documents, these

 6    were the big core messages that the defendants'

 7    marketing documents really sought to communicate.

 8         And as I said, there were multiple

 9    iterations in, you know, the way these are worded

10    and so forth, but opioids should be used first, you

11    know, that was a -- that was an easy one.  That's

12    one of the main themes, is that opioids need to be

13    used sooner in treating pain.

14         So with that, you know, I think it does

15    require an expertise, perhaps even a combination of

16    expertises.  And beyond that, it requires some type

17    of methodology to keep it all straight and to create

18    a record of what you've done and to be able to

19    report it.

20    Q.   Is it a -- does it require pharmaceutical

21    marketing expertise to read a document and identify

22    what the bullet point pharmaceutical marketing

23    message is?

24         MR. CHALOS:  Object to the form.

25    Q.   I guess what I'm getting at, and I think you
```

```
 1    will anticipate this, is I think I can read these

 2    documents and categorize them by themes just as well

 3    as you can.  I just don't know that you're actually

 4    providing some added benefit as an expert to the

 5    jury.  I'm trying to understand, from your

 6    perspective, what you think you're -- what you're

 7    adding as a pharmaceutical expert.

 8         MR. CHALOS:  Object to the form.

 9    A.    So do you want me to answer that, or was

10    that just a --

11    Q.    Well, it's kind of a statement, but I also

12    want you to answer it.

13         What are you providing that any other person

14    in this room or on the jury couldn't come to their

15    own conclusion about?

16         MR. CHALOS:  Object to the form.

17    A.    So I think there's a number of things, and

18    I'm going to reserve the right to add to my list as

19    we go on.

20    Q.    Sounds good.

21    A.    But at the very highest level, you can look

22    at any advertisement -- and you mentioned you're a

23    consumer, and you get advertised to all the time.

24    You can look at any advertisement and find out what

25    the message or the theme is, and potentially any
```

1    consumer can do that for any product.

2        The problem in this analysis would be how to

3    know whether or not that -- those themes are

4    consistent with the theory of marketing, which --

5    the theoretical basis of marketing that says

6    delivery of that message via this mechanism will

7    provide the biggest bang for our buck.

8        The use of that theme in combination with

9    another theme that is designed to complement it, so

10   integrating the marketing messages, and the

11   consumers, while they can maybe identify a message,

12   they may not be able to synthesize those messages

13   and understand they are part of a bigger picture of

14   marketing.

15       The integration of the various marketing

16   efforts, the use of peer-to-peer influence, I mean,

17   you've asked me many questions today about

18   peer-to-peer marketing, peer-to-peer influence.  So

19   I may be one up on you on that one.

20       But the idea of, can the average person just

21   look at a brochure designed for patients and be able

22   to assess from that what the purpose of a

23   well-orchestrated, well-defined, and aggressive

24   marketing promise might have been, I don't think so.

25       I think it takes somebody that can -- that

```
1    can deconstruct the marketing, break it down into

2    its component parts, and understand how each of

3    those component parts relates to the overall purpose

4    of that marketing and what impact that marketing

5    had.

6              And certainly a consumer who is able to

7    identify a marketing message has no way of knowing

8    whether that was successful or not in achieving its

9    goal.  They may not even understand the concept

10   behind an every 12-hour dosing, and why that would

11   be an effective marketing message for a doctor.

12             So when you add the layer of a physician or

13   the other customers to it, when you add the

14   comprehensive nature of marketing practices to it,

15   when you add that there are very strong theoretical

16   underpinnings that describe why what we do is

17   effective, that's at least the beginnings of the

18   list of why I think you need a pharmaceutical

19   marketing expert.  And I haven't even touched on the

20   issue of standards and regulation and so forth.

21   Q.   So you think it -- does it take a

22   pharmaceutical marketing expert to understand what's

23   included -- what the intent is behind these

24   particular marketing pieces?

25   A.   Let me give you one example.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CHALOS:  Object to the form.

 2       A.    Let me give you one example.  If you give a

 3   patient a PI, it's useless.

 4       Q.    If you give a doctor a PI, is it useless?

 5       A.    It can be.  If they don't read it, it was

 6   useless.

 7       Q.    The same -- the same is true for any piece

 8   of marketing information you give to a prescriber.

 9   If they don't read it, it's useless.

10       A.    Which is exactly --

11       Q.    Fair?

12       A.    Which is exactly why you need a marketing

13   expert to help you understand how this marketplace

14   works.  Do doctors read it or not?  And there is

15   evidence to support the contention that they don't.

16   They don't rely on the package insert, not the way

17   they do on other pieces of information.  And this

18   is -- again, we'll keep adding to the list, but --

19       Q.    I'm -- I guess I'm confused.  Is there -- is

20   there research that -- or have you done any -- have

21   you done any research to identify what percentage of

22   doctors do or do not rely on the PI, what percentage

23   of doctors do or do not rely on advertising, and

24   what percentage of doctors do or do not -- are or

25   are not influenced by key opinion leaders, that sort
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    of thing?

2    A.   I have --

3         MR. CHALOS:  Object to the form.

4    A.   I have not undertaken analysis to assign

5    percentages to any of those characteristics.

6    However, there are -- in the report, there is

7    literature cited that reflects on the use -- the

8    usefulness of the package insert and reliance on the

9    package insert.

10        Also in the report is information on the

11   categories that the pharmaceutical companies spend

12   on the various forms of advertising that they do;

13   for example, detailing or personal selling being the

14   biggest category and the highest expenditure.

15        So if you are a student of marketing, you

16   understand that marketers spend their dollars where

17   they get the most return.  And so if we're spending

18   the most money on detailing, then we know the

19   detailing is providing the most return in most

20   cases.

21   Q.   When you say opioids should be first line

22   therapy for pain, what does -- what does that mean?

23   A.   Basically, they should -- you should use

24   opioids as soon as possible.  When a patient

25   presents with pain, you should use an opioid.
```

1    Q.    Like, with a toothache or, I mean, just like

2    any -- any type of pain, minor pain?

3    A.    Well, that's not my opinion, but I'm saying

4    that that's what the -- that's what the theme that I

5    saw in the marketing documents certainly suggested.

6    Q.    Okay.  I -- let's go back and look at this

7    chart a little bit more.  I just wanted to clarify

8    something.

9    A.    Are we talking about Table II now?

10   Q.    Yeah, we're back to Table II, the chart.  In

11   terms of the marketing messages that you've

12   identified in this chart, which are A through X --

13   A.    Yes.

14   Q.    And I just want to clarify.  Was it your

15   testimony that it was you, Dr. Perri, who came up

16   with those particular marketing messages

17   categorization?

18   A.    It was the defendants' marketing documents

19   that came up with those categories.

20   Q.    Well, you -- who wrote it down in this

21   report?  Not defendants' marketing documents.

22   You're the one who had to look at everything and put

23   it together.

24         MR. CHALOS:  Object to the form.

25   A.    Yes.

1    Q.   Go ahead.

2    A.   So in terms of these specific categories, it

3    would have been my assistant that created this

4    table.  And when we discussed the various categories

5    and the various messages that -- the A, B, C, D, E

6    were just intended to summarize the general theme of

7    the message inside that section of the table.

8    Q.   Okay.  So it's --

9    A.   There were iterations of this as well.

10    Q.   Understood.  Understood.  I mean, it was you

11    and your assistant who looked at the documents and

12    pulled the themes out and then categorized them?

13    A.   Essentially, yes.

14    Q.   And the -- it's likely that particular

15    themes would occur in multiple documents?

16    A.   Yes.

17    Q.   Do you -- do you think that the FDA

18    regulations governing and requiring package inserts

19    are useless?

20         MR. CHALOS:  Object to the form.

21    A.   No.  I think my opinion is just a little

22    different than that.  My opinion is, is that they

23    are not heavily relied upon.

24    Q.   And is that based on your understanding that

25    many doctors will look at -- will shortcut that by

Highly Confidential - Subject to Further Confidentiality Review

```
1    looking at references, like the Physician's Desk

2    Reference or other types of references?

3        A.   It's more than that.  It's all the efforts

4    that a pharmaceutical manufacturer -- pharmaceutical

5    marketer undertake to reach a doctor, and the

6    package insert is just one of those.

7            And if you look at the package insert in

8    comparison to detailing, personal selling, journal

9    ads, articles, guidelines, CME, all the other things

10   that are going on, the package insert is just a very

11   small part.  And it's primarily something that's not

12   attractive and not appealing.

13           So compare that package insert to the

14   well-crafted, carefully crafted messages that are

15   built into a personal selling encounter or a CME

16   program.  There's -- it's got a lot of competition,

17   and it just doesn't measure up that well.

18       Q.   I think you testified earlier that you

19   haven't undertaken a study to assign any sort of

20   percentage to the number of doctors who rely on the

21   package insert; fair?

22       A.   I have not.  There is literature cited in

23   the report, though, that assesses that to some

24   extent.

25       Q.   Do you have an opinion on how widely a
```

```
 1    package insert is relied upon?

 2        A.   My opinion is that it's not heavily relied

 3    upon.

 4        Q.   Okay.  I mean, heavily indicates to me a

 5    judgment call in terms of percentage.  20 percent

 6    rely on it?  50 percent rely on it?  70 percent rely

 7    on it?

 8        A.   I think -- I think --

 9        Q.   Is there any number you can put on that?

10        A.   I think there's evidence that some doctors

11    don't ever look at it, and some doctors look at it

12    some of the time.  And that's -- that would be

13    reflected in the literature that I cited here.

14        Q.   So in terms of answering my question, that's

15    the best you've got?  Some doctors look at it some

16    of the time?

17        A.   And some never look at it.  Yes.

18        Q.   Is it true that some doctors never look at

19    marketing materials at all?

20        A.   It -- that depends, because as we've

21    mentioned already today a few times, that marketing

22    has lots and lots of ways of reaching a doctor.  And

23    the nonbranded marketing is very effective at

24    reaching doctors -- this is addressed in my

25    report -- very effective at reaching doctors that
```

```
 1    won't see sales reps, that won't go to the CME

 2    meetings.

 3         So when they read something from the

 4    American Pain Society that they don't realize has

 5    been sponsored by, developed by, edited by, written

 6    by a drug company, they may be exposed to marketing

 7    and not even know it.

 8    Q.   But again, in terms of percentages, can't

 9    say who relied on unbranded marketed -- marketing

10    rather than branded marketing?

11    A.   I'm a little confused with that because I

12    thought we were talking about something else, the

13    percentages of doctors that look at the PI?

14    Q.   Right.  Versus percentages of doctors who

15    look at, you know, American Pain Management

16    Society's publications.  I mean, I think I've

17    established that in terms of putting raw -- I mean,

18    not raw numbers -- numbers on -- percentages on X

19    amount of doctors saw this and were misled by it,

20    that's not something that you're doing here?

21    A.   No, that's not something that I enlisted.

22    Q.   All right.  Let's --

23    A.   About that time again?

24    Q.   Yeah.  Why -- I mean, don't we take a little

25    break, and I'll see if I can finish up my
```

Highly Confidential - Subject to Further Confidentiality Review

1    examination and pass you off to somebody else.

2        THE VIDEOGRAPHER:  We are now going off the

3    video record.  The time is currently 3:08 p.m.

4    This is the end of Media Number 4.

5        (Recess from 3:08 p.m. until 3:19 p.m.)

6        THE VIDEOGRAPHER:  We are now back on the

7    video record with the beginning of Media

8    Number 5.  The time is currently 3:19 p.m.

9    BY MR. VOLNEY:

10       Q.   Let's look at Page 137.

11       A.   Okay.

12       Q.   We covered this a little bit this morning,

13   but my understanding of your report is that you know

14   that defendants' marketing messages changed over

15   time, but that you didn't make any effort to sort of

16   track the change in those marketing messages from

17   1995 to the present day; fair?

18       A.   I didn't -- I didn't create a detailed

19   timeline of when they changed, but I certainly noted

20   that the messages changed over that period; for

21   example, in about 2006 with the OxyContin PI change

22   or the shift around 2010 towards tamper-resistant

23   formulations.

24          So that was recognized.  It just -- it was

25   part of the overall marketing.  It wasn't something

```
 1    that I thought I needed to distinguish.

 2        Q.    And why is it that you didn't need to

 3    distinguish how the marketing changed over time?

 4        A.    Because the messages maintained consistent

 5    themes with the addition of some new themes; for

 6    example, with respect to tamper resistance, but even

 7    with the tamper resistance, the -- still the message

 8    theme was that addiction was -- or abuse was going

 9    to be harder with those.  So the original message

10    of, you know, lower abuse potential was still being

11    perpetuated, just in a different way.

12        Q.    You state in Paragraph 153 that:  Marketing

13    principles teach us that the impact of the early

14    marketing that was so effective in shifting

15    prescribers' paradigms about opioids would be

16    durable and resistant to change.

17        A.    Yes.

18        Q.    Have you quantified the durability or

19    resistance in any way?

20        A.    The marketing theory, marketing literature

21    is replete with evidence that once beliefs,

22    attitudes, and intentions are formed, that they are

23    very durable.  They're very hard to change.

24            There is a popular book back -- again, I'm

25    old school, but a popular book called Marketing
```

```
 1    Warfare, and that's one of the first things noted in
 2    that book, is that marketing is warfare because once
 3    a position is formed, a perception is formed in a
 4    customer's mind, it's very difficult to change it.
 5        Q.   You state at the end of Paragraph 153 that:
 6    "Marketing principles teach us that two decades of
 7    Defendants' marketing aimed at a paradigm shift,
 8    will take time and effort to correct."
 9        A.   Yes.
10        Q.   And then you -- it looks like you cite your
11    book.
12        A.   Yes, shamelessly.
13        Q.   Shamelessly.  You cite yourself.  I like
14    that.  So it's your say-so.
15             What do you mean by it will take time and
16    effort to correct?
17        A.   The habits -- the prescribing habits that
18    were developed over the time period of aggressive
19    opioid marketing will become engrained, and it will
20    be -- it will take time for those habits to change.
21        Q.   So if -- I mean, isn't it -- isn't it
22    your -- well, I mean, is it your opinion that if a
23    particular prescriber had a bad outcome because of
24    prescribing opioid painkillers to his or her
25    patients, one patient or multiple patients, that
```

 1    they didn't -- then would not be informed by that

 2    outcome and stop prescribing those opioids?

 3         MR. CHALOS:  Object to the form.

 4    A.   That's not exactly how it works.  The --

 5    it's a cumulative process.  So if they have a bad

 6    outcome 20 or 30 times in a row -- or just pick a

 7    number.  They had --

 8    Q.   How about one?

 9    A.   They had repeated bad -- well, that might

10    inform them not to use it in that patient, but it

11    may not extend to other patients.  When they have

12    multiple patients that have a bad outcome, it might

13    get them to extend that thinking to other patients.

14         It depends on what information gets fed back

15    into the system, basically, the outcome of

16    satisfaction or dissatisfaction, whether or not new

17    information gets encoded in the memory, that:  Oh,

18    guess what, opioids are addictive, I've got to build

19    that into my thinking or my thought process.

20         Or:  You know, I've had a lot of patients

21    that have done okay, and they are not as addictive

22    as I once thought, and I need to incorporate that

23    into my thinking.

24         Or it could be that, you know, the message

25    is, is that oxycodone really is more potent than

 1    morphine, rather than less potent, which a lot of

 2    doctors perceived.

 3          So it's got to be -- it's got to be

 4    considered together, integrated, and how the

 5    information of satisfaction or dissatisfaction

 6    builds back into that model is critical.

 7          So patient experience, 1 -- N equals 1, I

 8    don't know how that impacts other than for that

 9    patient, but as doctors gain more and more

10    experience, then that should begin to formulate that

11    comfort zone that they like to have when it comes to

12    prescribing, or not, which would decrease

13    prescribing.

14    Q.   Let's look at Paragraph 164.  There, the

15    first sentence, you say:  Based on metrics I have

16    seen, there is support for the proposition the

17    defendants' positive marketing increased the size of

18    the opioid market, effectively expanding sales and

19    increased the use of these dangerous drugs.

20    A.   Yes, I read that.

21    Q.   What is the -- what are the metrics that

22    you're talking about?

23    A.   So in the -- in the marketing documents,

24    there are numerous -- numerous documents that focus

25    on results, and the results that -- and, again,

```
 1    qualifying that by saying not every product was a

 2    blockbuster, which I address in this report.

 3          But for a majority of the products, products

 4    were meeting the sales goals that they -- that were

 5    established.  And so the sales -- the numbers of

 6    opioids being sold in the marketplace was growing

 7    through that time period of from 1995 through at

 8    least, you know, 2010, 2012, '14, when perhaps there

 9    was a beginning of decline.

10    Q.   The two sentences further on, you say:

11    There is a clear association between opioid

12    utilization and patient outcomes, including

13    increased analgesia -- analgesia, side effects,

14    diversion, overdose, and death.

15          Do you see that?

16    A.   Yes.

17    Q.   Have you made any effort to study drug

18    overdoses and deaths related to the use of

19    prescription painkillers?

20    A.   Other than what I cite here, I know that

21    other experts have investigated that question.

22    Q.   Do you know whether most overdose deaths --

23    do you know whether most overdose deaths involve a

24    combination of drugs?

25    A.   I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   So, for example, in your study for the

2    Georgia Medicaid, you determined that there were a

3    number of patients who were being prescribed both

4    benzodiazepines and opioids?

5    A.   Yes.

6    Q.   Do you know whether the majority of overdose

7    deaths attributed to -- or where there is a finding

8    that an opioid was involved, also other drugs, like

9    benzodiazepines, methamphetamines, or even, like,

10   illegal narcotics?

11   A.   Or alcohol.

12   Q.   Or alcohol, yeah, marijuana?

13   A.   So I don't -- I don't have any way to

14   quantify that.

15   Q.   Okay.  Those are all of the questions I have

16   for you.  I appreciate your patience, and I'll give

17   you back your report.

18        MR. VOLNEY:  So I'm going to pass the

19        witness, too.

20        THE VIDEOGRAPHER:  We are now going -- we

21        are now going off the video record.  The time is

22        currently 3:27 p.m.

23        (Recess from 3:27 p.m. until 3:30 p.m.)

24        THE VIDEOGRAPHER:  We are now back on the

25        video record.  The time is currently 3:30 p.m.

```
 1                    CROSS-EXAMINATION

 2   BY MS. RODGERS:

 3        Q.   Good afternoon, Dr. Perri.  My name is Megan

 4   Rodgers.  We met before the deposition began this

 5   morning.  I'm with the law firm Covington & Burling,

 6   and I'm representing McKesson.

 7        A.   Okay.

 8        Q.   You're aware that there are several

 9   wholesale distributors in this case, right?

10        A.   Yes, I am.

11        Q.   Okay.  And when I use the phrase "wholesale

12   distributors," you understand I'm referring to

13   McKesson, AmerisourceBergen, and Cardinal, right?

14        A.   Are you limiting it to just those three?

15        Q.   Can we agree that I'm -- yeah.

16        A.   Okay.

17        Q.   I'm referring to those three.

18             Were you asked to consider whether you had

19   any opinions with respect to McKesson?

20        A.   With respect to McKesson by itself?

21        Q.   Yes.

22        A.   No.

23        Q.   Okay.  Were you asked to consider whether

24   you had any opinions with respect to Cardinal?

25        A.   Not -- none of the defendants independently.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    They're all -- the opinions are all based on a

 2    collective assessment.

 3        Q.   Okay.  So you have no opinions in this case

 4    regarding specifically McKesson?

 5        A.   None that are related to McKesson only.

 6        Q.   Okay.  And you have no opinions related

 7    specifically to Cardinal?

 8        A.   Same -- nothing is -- while the opinions

 9    apply to each of the wholesaler defendants, none of

10    the opinions are specifically singling them out as a

11    particular defendant regarding that opinion.

12        Q.   Okay.  And the same is true for

13    AmerisourceBergen?

14        A.   Yes.

15        Q.   Okay.  Were you asked to produce materials

16    produced by those wholesale distributors?

17        A.   So, yes, there were -- there were wholesale

18    documents -- wholesaler documents that were provided

19    to me, as well as some that I searched for in the

20    Relativity database.

21        Q.   Okay.  And what was the volume of the

22    materials that --

23        A.   The -- as I recall, the largest share of the

24    distributor documents were contracting documents

25    and, for example, documents specifying purchasing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     arrangements and marketing arrangements for generics

 2     and -- so the largest part of them were -- seemed to

 3     be legal documents.

 4          There were some documents with other types

 5     of information, but the biggest part of them was --

 6     the biggest part of those documents were

 7     distributor -- I'd call them distributor agreements,

 8     that kind of thing.

 9     Q.   Okay.  And, again, what was the overall

10     volume of those materials, would you say?

11     A.   I mean, in -- in the -- so the thousands and

12     thousands of documents that were in the overall set.

13     It was hundreds and hundreds of documents in the

14     distributor set, as I recall.

15     Q.   Okay.  Are those materials all identified in

16     your list of materials considered that you attached

17     to your report?

18     A.   Yes, they are.

19     Q.   Okay.  And did you review materials that

20     were produced by the distributors?

21     A.   Yes, I did.

22     Q.   Okay.  About how long did it take you to

23     review those materials related to the distributors

24     only?

25     A.   I did not keep -- I did not break down the
```

1    time that I spent, but I think it would be

2    proportional, the number of documents to the -- the

3    total numbers of documents.  So if there were, you

4    know, maybe -- I don't -- I can't give you a number

5    because I haven't counted, but let's just say for

6    the sake of argument there were 8,000 overall

7    documents, and there may have been 800 or so.

8        Q.    Uh-huh.

9        A.    Not counting the depositions, because

10   obviously there were a number of depositions related

11   to distributors.

12            So anywhere from 10 to maybe 20 percent in

13   terms of the effort.

14       Q.    Okay.  We talked before about -- a little

15   bit about the book that you wrote on Pharmaceutical

16   Marketing.

17       A.    Yes.

18       Q.    Or co-wrote.

19       A.    Edited.

20       Q.    Yes.  I actually tried to buy if off Amazon,

21   but when I looked, it was sold out.  I see there's

22   another copy.

23       A.    That's wonderful.

24            MR. VOLNEY:  That was me.

25            (Perri Exhibit 4 was marked for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2    BY MS. RODGERS:

 3        Q.   Anyway, I put in front of you one chapter

 4    from that book, and I've marked it as Exhibit 4.

 5    It's Chapter 5.  It's titled "Place:  The

 6    Pharmaceutical Industry Supply Chain."

 7        A.   Yes.

 8        Q.   And I just wanted to kind of start with

 9    basic principles.  I'm sorry that this is so simple,

10    but if you'd turn to Page 112, you'll see that you

11    have this kind of nice diagram on there, and I

12    wanted to start there.

13        A.   So -- oh, I gotcha.

14        Q.   Okay.

15        A.   Yeah, I'm there.  Thank you.

16        Q.   All right.  Would you agree that it's the

17    manufacturer that develops the prescription

18    medication?

19             MR. CHALOS:  Object to the form.

20        A.   I think, yes, manufacturers invent and

21    get -- seek approval for medications, yes.

22        Q.   Okay.  And before the manufacturer can make

23    that medication available to doctors and patients,

24    the FDA has to approve that medication and the

25    labeling as well?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   Yes.

 2         Q.   Okay.  And the manufacturer then sends the

 3    prescription medication to the wholesaler, correct?

 4              MR. CHALOS:  Object to the form.

 5         A.   I mean, there are -- there are arrangements

 6    made between the two to facilitate the distribution

 7    and other services.

 8         Q.   Right.  And the wholesalers sit in the

 9    middle between the manufacturers and the pharmacies

10    in the supply chain, right?

11              MR. CHALOS:  Object to the form.

12         A.   Yes, they do.

13         Q.   Okay.  So wholesalers are receiving the

14    prescription drugs from the manufacturers and then

15    shipping them to the pharmacies, right?

16              MR. CHALOS:  Object to the form.

17         A.   Yes.

18         Q.   Okay.  And meanwhile, the patient might be

19    receiving a prescription from a doctor, correct?

20              MR. CHALOS:  Object to the form.

21         A.   Certainly that's what happens in the supply

22    chain.  Patients get a prescription, and setting

23    aside all the other influences, the third parties,

24    the insurers, the doctors, and everything else, the

25    flow of the physical product, which I've identified
```

1    in the figure in my report we can look at, certainly

2    goes from the manufacturer to the wholesaler to the

3    pharmacy to the patient.

4        Q.    Right.  And the patient, just to -- just to

5    make the record clear, the patient gets the

6    prescription from the doctor or a licensed

7    practitioner?

8            MR. CHALOS:  Object to the form.

9        A.    The written prescription, which is then

10   filled at the pharmacy.

11       Q.    Yes.

12       A.    For a pharmacist, when you say "gets the

13   prescription," we think of the bottle of pills.

14       Q.    Okay.

15       A.    Right.  So -- but the prescription form is

16   filled out by the doctor or the prescriber, yes.

17       Q.    Okay.  So by the time the patient shows up

18   to a pharmacy to pick up that prescription, they

19   have that prescription -- what I refer to as a

20   prescription, they have that order in hand, right?

21       A.    Correct.  And you'd be correct.  That -- it

22   is also referred to as a prescription, so, yeah.

23       Q.    Okay.  And that's just how the supply chain

24   is set up to work, right?

25            MR. CHALOS:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   So that's the physical distribution of the

 2   product.  That's how the supply chain works, yes.

 3        Q.   And there is nothing wrong with being a part

 4   of that supply chain, right?

 5             MR. CHALOS:  Object to the form.

 6        A.   I think in my report, I point out that the

 7   full -- every -- every stakeholder in the supply

 8   chain is critical to the delivery of pharmaceuticals

 9   in our -- in our nation's supply chain.

10        Q.   Every -- every participant has --

11   participant has an important role to play?

12        A.   Yes, they do.

13        Q.   And there's nothing wrong with the roles

14   themselves?

15        A.   You know, the -- I didn't make any

16   assessment of right or wrong, simply, you know, what

17   is the -- what is the role of each in the supply

18   chain.  So is it -- is it right or wrong for a

19   wholesaler to -- you know, to sell opioids?  You

20   know, that wasn't -- it -- that wasn't part of the

21   analysis.  What was part of the analysis is, how did

22   opioids get from inception to the marketplace?

23        Q.   Uh-huh.

24        A.   And so the wholesalers have a role in that.

25        Q.   Right.  And I just -- I'm stepping away from
```

1   opioids for a second.  I'm just trying to ask a very

2   kind of basic question.

3       A.    Okay.

4       Q.    There is nothing inherently wrong with being

5   a part of that supply chain, right?

6             MR. CHALOS:  Object to the form.

7       A.    Yeah.  Every -- every stakeholder is

8   essential to providing drugs in our nation, and

9   that's an essential service to provide.

10      Q.    Okay.  And if you look at Page 108 of your

11  book, I want to direct your attention to one

12  paragraph there.  And it's the first page, and it's

13  the very last sentence on this page.  Could you read

14  that out loud?  Actually, the last two sentences.

15      A.    I'm going to try.

16      Q.    I can read it to you if it's too small.

17      A.    It's pretty blurry on this.

18      Q.    Okay.  So you can tell me if it looks wrong

19  to you, but I read:  Without the wholesaler

20  providing its vital distribution function in the

21  pharmaceutical supply chain, many pharmacies across

22  the country would not be able to serve their

23  customers' patients.  In the worst case scenario,

24  those patients could possibly have to survive

25  without vital medications, such as insulin, pain,

 1    blood pressure, or thyroid medications, among

 2    others.

 3           Did I read that correctly?

 4    A.    You did.

 5    Q.    Okay.  So the wholesaler's role in the

 6    supply chain is vital, right?

 7    A.    I would agree with that.

 8    Q.    And medications like prescription opioids,

 9    pain medications, are vital?

10    A.    In appropriate patients, yes.

11    Q.    Okay.  And it's important for patients who

12    need pain medication to be able to go to the

13    pharmacy and fill those prescriptions, correct?

14    A.    That -- it is important for patients to be

15    able to have access to the medications they need,

16    yes.

17    Q.    Including pain medication?

18    A.    Including pain medication, yes.

19    Q.    And the wholesaler or distributor's job is

20    to make sure that the medicine is available so that

21    the pharmacies can serve those patients, correct?

22    A.    That's one of their functions, yes.

23    Q.    Okay.  And if you turn now to Page 151 of

24    your report, I'm going to direct your attention to

25    approximately Paragraph 184.  I think you're saying

1    essentially the same thing here.

2         You wrote:  As the US drug distribution

3    system currently exists, pharmaceutical

4    manufacturers could not ensure the distribution of

5    their products without both wholesale distributors

6    and pharmacy providers.  Therefore, wholesale

7    distributors and pharmacies are integral to the

8    defendants' marketing of opioids.

9         So it's your opinion that wholesale

10   distributors are integral because they distributed

11   the prescription opioids, right?

12        MR. CHALOS:  Object to the form.

13   A.    The distribution is one aspect, but, yes,

14   that's correct.

15   Q.    That's the aspect that you're referring to

16   right here in Paragraph 184?

17   A.    Well, Paragraph 184 also deals with revenue

18   flows and while I didn't include it here, would also

19   include information flow.

20        But just for example, the role of the

21   wholesaler is very important to the manufacturer in

22   terms of production.  They -- they're able to

23   provide information on sales and how much product is

24   moving through the distribution system, which

25   provides information to manufacturers to gear up or

 1    to gear down production facilities.

 2         So it's all tied together, but I think I

 3    absolutely do agree that this is consistent with the

 4    book in that I think they're integral to the

 5    process.

 6    Q.   Okay.  So you would agree that wholesale

 7    distributors are integral because they distributed

 8    prescription opioids, correct?

 9         MR. CHALOS:  Object to the form.

10    A.   So that is one of the reasons why they're

11    integral, because of the distribution.  The --

12    Q.   And I -- and I'm going to ask you now.  Tell

13    me the other reasons that you think that wholesale

14    distributors are integral.

15    A.   Right.  And so if -- can I refer you to the

16    graph or the chart?

17    Q.   Sure.

18    A.   Yeah.  So that's on Page 63.

19    Q.   Uh-huh.

20    A.   And it's Figure 4.  And so we've addressed,

21    in the question that you've asked so far, we've

22    addressed the physical supply, which I think we

23    agree on, and we've addressed the -- that they're

24    integral.  We agree on that.

25         I just want to make clear that from a

Highly Confidential - Subject to Further Confidentiality Review

```
1    marketing perspective, there are a lot of functions

2    that happen in the distribution system that are --

3    that are very important to the marketing process,

4    and one of those is how things are paid for.  So the

5    system of chargebacks and discounts and money flows

6    within the system become very important, and the

7    wholesalers play a key role in that, as well as the

8    information and data that wholesalers have about

9    products, where they're going, how they're selling,

10   when they're selling, how many are needed in the

11   future, how many have been used in the past.  All of

12   those -- all those information points things become

13   very important.

14        So those are the other -- the other reasons

15   why I think that wholesalers are integral.  They

16   play a vital role.  Without the wholesaler, the

17   pharmaceutical manufacturer would have to do that

18   distribution function on their own, which would be

19   extremely expensive, extremely inefficient, and not

20   in the best interest of patients probably.

21   Q.   Okay.  And it sounds like, from what you're

22   saying, that distributors are integral because of

23   their position in the supply chain, because that's

24   how prescription drugs are distributed, right?

25   A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CHALOS:  Object to the form.

 2      A.   Yes, that's right.

 3      Q.   And that same position in the supply chain

 4   makes them integral to the distribution of insulin

 5   the same way that they're integral to the

 6   distribution of opioids?

 7              MR. CHALOS:  Object to the form.

 8      A.   That's true, yes.

 9      Q.   Okay.  And it's not your opinion, correct,

10   that the distributors are integral because of any

11   advertising that they did?

12              MR. CHALOS:  Object to the form.

13      A.   So the -- my assessment of the distributor

14   advertising that I refer to in the report is that,

15   as expected, the distributor advertising focused

16   primarily on price, quality, availability, special

17   deals, stocking, and incentive-type advertising.

18   And on -- only on rare occasion did it affect -- did

19   it -- did it require a package insert or any product

20   information to be distributed.

21              So the reason that I believe that

22   wholesalers are integral to that process is because

23   of that function and that they did communicate

24   messages that were important to know in the

25   marketplace; for example, which generic immediate
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    release oxycodone product can be purchased at the
 2    best price, so the pharmacy can function more
 3    efficiently, those kind of messages.
 4         I did not notice -- I did not see documents
 5    that the wholesale distributors distributed
 6    marketing messages beyond that, with few exceptions.
 7    For example, in one instance -- and I'd have to look
 8    in the report to get the specific details on this --
 9    a book was distributed through -- I believe it was
10    Cardinal.  And that book did carry with it unbranded
11    marketing messages.
12         So, again, the primary messages, the vast
13    majority of the messages were product, price,
14    availability, quality.  And then there were some
15    instances where it extended slightly beyond that in
16    distribution of information.
17    Q.   Okay.  And so when we talk about the bulk of
18    the -- what you refer to as advertising or the
19    provision of information about, you know, price and
20    product availability, when you look at what you're
21    saying in Paragraph 184 here and you talk about
22    distributors being integral to the defendants'
23    marketing of opioids, that's not what you're talking
24    about?  You're not talking about the provision of
25    information about price and availability, right?
```

```
 1              MR. CHALOS:  Object to the form.

 2     A.    You know, I have to -- I have to largely

 3     agree that the -- you know, the vast majority, the

 4     preponderance of the documents focused on those

 5     issues, but there were instances where it reached

 6     beyond that, but they were in the minority of cases.

 7     Q.    And they weren't integral?

 8              MR. CHALOS:  Object to the form.

 9     A.    Well, you know, that's actually an

10     interesting question, because the opinions that I

11     formed, marketing behaviors are not broken down into

12     this behavior and the next and the next, but all the

13     behaviors are interrelated.

14              So I didn't separate the behaviors out.  I

15     didn't say, well, this is a good message, and this

16     is a bad message.  These are all the messages.  This

17     is how they impacted the marketplace.

18              So the distribution of 162,000 copies of a

19     book on proper pain management certainly qualifies

20     as a market message that was distributed and is part

21     of the overall scheme of marketing.  It's -- it

22     didn't undertake to single out any one activity or

23     any one event or any one means of delivery of

24     marketing messages to associate sort of -- or

25     attribute their -- its impact to the marketing
```

1    program, but the overall marketing and all the

2    things they did collectively contributed to the

3    marketing success.

4        Q.    Okay.  So if you turn to Page 154, please,

5    can you look at Paragraph 187.

6        A.    Okay.

7        Q.    And it says -- it looks to me like you're

8    saying kind of more of the same here:  The increased

9    sales of opioids resulting from defendants'

10   marketing could not have occurred without wholesale

11   distributors and pharmacies, which completed the

12   supply chain system and made opioids available to

13   patients.

14           In your opinion, wholesale distributors are

15   important -- excuse me -- because they ensure that

16   the prescription medication was available at the

17   pharmacy when the patient showed up, right?

18       A.    Yes, absolutely.

19       Q.    And if you look at Paragraph 99 of your

20   report --

21       A.    Okay.  I'm with you.

22       Q.    I'm just trying to find it.  In the second

23   sentence:  Each -- excuse me again -- each

24   stakeholder has the common goal of selling

25   pharmaceuticals by working with and through others

Highly Confidential - Subject to Further Confidentiality Review

1    in the supply chain system.

2           Do you see that?

3       A.   I do.

4       Q.   And you would agree there's nothing wrong

5    with every stakeholder sharing the common goal of

6    selling pharmaceuticals, right?  There's nothing

7    inherently wrong about that?

8           MR. CHALOS:  Object to the form.

9       A.   So, again, it's how it works.  It's not a

10   judgment about is it right or wrong, good, bad,

11   fair, or unfair.  It's just simply that's how the

12   system works.

13      Q.   And there is nothing wrong with that?

14          MR. CHALOS:  Object to the form.

15      A.   Yeah.  I didn't make that assessment.  I

16   didn't -- I didn't make that -- I don't analyze that

17   in this analysis.

18      Q.   You have no opinion on that?

19      A.   Well, I think the opinion that is expressed

20   in the textbook and other -- elsewhere in the report

21   is that wholesalers are essential to -- integral to

22   the process of drug distribution, and that is, in

23   general, a good thing in our society.

24          Does that go beyond that with opioids?  Then

25   we can talk about that, but is -- this is -- I think

1   we're agreeing on all these things, basically, yeah.

2       Q.   There's nothing wrong with -- there's

3   nothing wrong with a common goal of selling

4   pharmaceuticals?

5           MR. CHALOS:  Object to the form.

6       A.   Again, with the caveat that if there is an

7   inappropriate use of marketing, that from a macro

8   perspective, the wholesalers were implicated in that

9   marketing because of their role -- their integral

10  role in the supply chain.

11          And I do draw the opinion in my report that

12  the marketing of opioids was inappropriate or

13  violated standards, so to that extent, they would --

14  the wholesalers, the wholesale distributors, would

15  be part of that process.

16      Q.   And, again, I'm not asking about opioids in

17  this -- in this circumstance.  I'm just saying, each

18  stakeholder has the common goal of selling

19  pharmaceuticals by working with and through others

20  in the supply chain.  That's the supply chain

21  functioning as it's intended to, right?

22          MR. CHALOS:  Object to the form.

23      A.   Yeah.  As long as the marketing is in

24  appropriate fashion, then I agree with that.

25      Q.   Okay.  And then if you look at Paragraph

Highly Confidential - Subject to Further Confidentiality Review

```
 1     100:  Revenue -- revenue flows between various parts

 2     of the supply chain system in a variety of forms,

 3     including payments, rebates, and chargebacks --

 4          MS. RODGERS:  Sorry.

 5     Q.   -- that ensure members of the supply chain

 6     system have data such as utilization, supply, and

 7     distribution showing exactly where each bottle of

 8     pills is going and at what price.

 9          So again, just a basic question:  There is

10     nothing wrong with revenue flowing between various

11     parts of the supply chain, right?

12     A.   That's correct.

13     Q.   Okay.  And if you look at Paragraph 101:

14     Wholesalers offer attractive pricing in connection

15     with their negotiation of volume discounts with

16     manufacturers.

17          Do you see that?

18     A.   Yes.

19     Q.   Okay.  And there's nothing wrong with

20     wholesalers offering attractive pricing to

21     pharmacies in connection with their negotiation of

22     volume discounts with manufacturers, right?

23          MR. CHALOS:  Object to the form.

24     A.   Right.  I think that's -- for pharmacies, at

25     least, that's a vital function to be able to
```

1    increase their efficiency and ability to survive in

2    the marketplace.

3        Q.   Okay.  And that same paragraph goes on to

4    say:  Wholesalers can give preferential treatment to

5    a specific manufacturer's products by stocking only

6    or preferentially selected manufacturer's products

7    for distribution and/or generic purchasing programs.

8             There is nothing wrong with that, either,

9    right?

10            MR. CHALOS:  Object to the form.

11       A.   So we're still -- we're not on opiates,

12   right?

13       Q.   Correct.

14       A.   Yes, I agree.

15       Q.   While a distributor can set different prices

16   for generics, they're not the ones actually writing

17   the prescription for those medicines, right?

18            MR. CHALOS:  Object to the form.

19       A.   The wholesalers do not generate patient

20   level demand, no.

21       Q.   Okay.  It's the doctor that usually makes

22   the decision about whether to prescribe an opioid?

23       A.   Doctor or the prescriber, yes.

24       Q.   And the prescriber decides which opiate --

25   opioid to prescribe?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    In the case of branded pharmaceuticals, yes;
 2   in the case of generics, not generally, no.
 3      Q.    And the prescriber decides what dosage to
 4   prescribe?
 5      A.    Generally speaking, yes, they do.
 6      Q.    And the prescriber prescribes how many bills
 7   to prescribe, right?
 8      A.    Subject -- subject to rules and limits that
 9   insurance may impose, yes.
10      Q.    Okay.  There are some other entities that
11   aren't part of the direct supply chain that we saw
12   in your book, but that nevertheless influence what
13   type of pain medication are available, right?
14           MR. CHALOS:  Object to the form.
15      Q.    I can give you some examples.
16      A.    So if you're referring to third-party
17   payers, PBMs, formulary committees, those kinds of
18   entities and stakeholders, yes, they exist and play
19   a vital role in the marketplace as well.
20      Q.    Correct.  So the FDA also influences what
21   type of pain medications are available?
22      A.    The role of the FDA is a little bit more
23   difficult for me to assess because I'm not an expert
24   on the FDA.  I'm aware of the FDA from a marketing
25   angle.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              But the other part of it is, is the FDA is

 2      provided information by manufacturers.  It doesn't

 3      come from independent third parties.  The

 4      information comes from the party with a commercial

 5      bias built in.  So I would view that a little bit

 6      differently than the others that you mentioned in

 7      your question.

 8      Q.    Okay.  The FDA, nonetheless, can approve or

 9      reject a medication, correct?

10      A.    Yes, they can.  Based on --

11      Q.    Okay.

12      A.    -- information provided to them from

13      manufacturers, yes.

14      Q.    And I think you testified that insurers,

15      third-party payers, and pharmacy benefit managers

16      also influence the availability of pain medication,

17      right?

18              MR. CHALOS:  Object to the form.

19      A.    They don't impact the availability of

20      medications.  They impact access to medications

21      through their formulary decisions and safety

22      measures that they implement in their various

23      insurance plans, programs, and options that they

24      make available to patients, which usually impacts

25      the system through the prescriber because
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prescribers become aware of their patients' ability

 2    to obtain medication on their formulary, in

 3    preferred tiers, with preferred copayments, or

 4    without prior authorization.

 5          So they do impact it, but they don't create

 6    the availability.  They're usually approving the use

 7    of or limiting the use of medications.

 8    Q.    If I could direct your attention to Page 14

 9    of your report, it's the fourth bullet point down.

10    You wrote:  Insurers, third-party payers, and

11    pharmacy benefit managers influence the medication

12    choices available to prescribers through formularies

13    and preferred drug lists.

14          Correct?

15    A.    Yes.

16    Q.    And that was true when you wrote it?

17    A.    Yes.

18    Q.    And that's true now?

19    A.    Yes.

20    Q.    Okay.  And you would agree that government

21    and private insurers and pharmacy benefit managers

22    can implement strategies that could reduce

23    inappropriate prescribing of opioids, right?

24          MR. CHALOS:  Object to the form; incomplete

25          hypothetical.
```

1      A.   I definitely agree to part of that, that

2    third-party payers, PBMs, formulary managers,

3    Medicaid, whoever, can put in place measures that

4    are designed to help ensure appropriate utilization.

5         But as you've noted in many of your

6    questions, the choice of a drug ultimately is the

7    responsibility of the prescriber.  And the things

8    that third-party payers and others can implement

9    have a limited ability to impact the marketplace.

10   Even though some of them are very potent, some of

11   them are not.

12        For example, you know, preferred versus

13   nonpreferred status on the Medicaid formulary or a

14   first versus second versus third tier, compare those

15   all to prior authorization or step therapy.  So

16   there are variable amounts of impact that they can

17   have.

18        That's why -- because of that, that's why

19   it's important to look at the entire system, what's

20   going on.  The inputs to the doctor are generating

21   prescribing demand, and then the third-party payers

22   and so forth are trying to be some type of governor

23   to that.  The whole supply chain works together to

24   try to ensure that this whole system works.

25      Q.   Okay.  And I just want to make sure that I

Highly Confidential - Subject to Further Confidentiality Review

 1    got an answer to my question.  You would agree that

 2    government and private insurers and pharmacy benefit

 3    managers have an ability to impact -- those are your

 4    words -- the prescribing of opioids, right?

 5         MR. CHALOS:  Object to the form; incomplete

 6       hypothetical.

 7    A.    So I think in my answer when I was referring

 8    to they have the ability to impact, you keep saying

 9    prescribing.  The actual fact is that it's not

10    really -- they don't really impact the prescribing

11    necessarily, because the doctor may still make a

12    choice, and then they're -- the doctor is confronted

13    with formulary restrictions or patient copayments.

14         So the insurer can make it easier or harder

15    to access the medicine, but that doesn't necessarily

16    impact prescribing.  Granted, in some cases it does

17    because when a doctor becomes aware -- a prescriber

18    becomes aware that a medication is in a nonpreferred

19    status on the formulary, it may impact their choice.

20         If they are aware that a copay is very high,

21    and there's no copay card available, that may impact

22    their choice, but it doesn't necessarily impact

23    prescribing.  It impacts utilization.

24    Q.    Okay.  And you would agree -- I think you're

25    working on projects related to this -- that

Highly Confidential - Subject to Further Confidentiality Review

1    government and private insurers and PBMs can use

2    claims data to better target policies aimed at

3    reducing opioid use?

4         MR. CHALOS:  Object to the form.

5    A.   So I would agree that they can use claims

6    data to assess the effectiveness of their policies.

7    I don't -- I don't know that they can use the claims

8    data to actually target that.  To the extent that

9    the claims data provides them with information that

10   may be useful, yes, but the claims data and the

11   projects that we have ongoing are really designed to

12   assess things that --

13        MR. CHALOS:  Could you slow down a little

14   bit?  I just want to make sure she can get it all

15   down.

16        THE COURT REPORTER:  I need to hear him

17   better.

18        MR. CHALOS:  Yeah.  Slow down and speak up.

19   Sorry to interrupt.

20   A.   Okay.  So the claims data is most useful for

21   assessing policies that have already been created

22   and for providing information that might help shape

23   future policies.

24   Q.   Okay.  You would also agree that government

25   and private insurers and PBM can use claims data in

Highly Confidential - Subject to Further Confidentiality Review

1    their possession to flag potential inappropriate

2    prescriptions?

3          MR. CHALOS:   Object to the form; incomplete

4      hypothetical.

5      A.   So that -- I'm not sure I can agree with

6    that, because the DUR process, or drug utilization

7    review process, in the claims -- the realtime

8    adjudication of a claim can potentially flag an

9    inappropriate prescription using criteria that --

10   for example, similar to the ones in the paper that

11   we discussed this morning, potentially inappropriate

12   prescribing, such as the use of a benzodiazepine

13   along with an opioid.

14         But the -- those claims data can't just

15   be -- I don't know if the insurers, the third-party

16   payers, and others can use that in realtime to stop

17   a prescription at that moment.  I don't know if they

18   have that capability or not.  I know that a message

19   can be sent back to the pharmacy saying, you know,

20   check this or check that, verify this, verify that.

21         But I -- again, I don't have any firsthand

22   knowledge to -- nor did I assess in this matter, how

23   that data was being used with regard to -- at the

24   pharmacy counter when a patient presents a

25   prescription from a physician or other prescriber,

 1    how that might or might not be used to block that

 2    prescription from being filled.

 3        Q.    But the claims data could provide insight

 4    into whether, for example, a patient is using benzos

 5    at the same time as prescription opioids, right?

 6        A.    Right.  And my understanding is, is that the

 7    claims adjudication process that's in place now --

 8    again, I haven't worked in retail community pharmacy

 9    since 2007.

10        Q.    Uh-huh.

11        A.    The claims adjudication process now would,

12    in fact, flag a potential problem such as that.  It

13    would then be up to the pharmacist and the

14    prescriber to determine if that is okay or not or --

15        Q.    It -- sorry.  It would flag that problem for

16    the pharmacy?

17        A.    Yes, at the point of the prescription being

18    filled.

19        Q.    Okay.  So at that point, the pharmacist

20    could determine whether or not to fill that

21    prescription knowing that the patient is using

22    benzos at the same time as prescription opioids,

23    right?

24        A.    Yes.  And again -- and these are issues that

25    I really didn't look at in this matter, but the --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you know, based on my experience as a pharmacist, I

 2    can -- I can provide an answer to that question.

 3        Q.   Okay.  If you could turn to Page 148 of your

 4    report and look at Paragraph 175.  In this paragraph

 5    you state that:  Wholesale -- wholesaler

 6    distributors were integral to selling the generic

 7    Kadian since these entities can select the generic

 8    manufacturer offering the best pricing and

 9    availability to use in their generic source programs

10    and are pivotal in dictating price to pharmacies.

11            Do you see that?

12        A.   I do.

13        Q.   Okay.  So in other words, distributors could

14    select a price for Kadian that made it more

15    attractive for pharmacies to use over other generic

16    versions of the same product?

17            MR. CHALOS:  Object to the form.

18        A.   To the extent that there is a -- another

19    generic available for Kadian, yes.

20        Q.   And that pricing, that making Kadian cost

21    less than another generic of the same product, that

22    doesn't make doctors write more prescriptions than

23    they otherwise would have, right?

24            MR. CHALOS:  Object to the form.

25        A.   Now, the -- I'm giving pause for that
```

```
 1    because it -- one of the inputs to the prescription

 2    process on the part of physicians, over -- over time

 3    they become more sensitive to the issue of price.

 4    And the availability of generics definitely does

 5    impact prescribing decisions because a physician or

 6    other prescriber may indeed look at a patient in

 7    need of a medication and say, oh, well, there is a

 8    generic available, I'm going to go this way versus

 9    that way.

10         So I think I largely agree with that

11    statement, but there will be cases, there will be

12    times when the availability of a generic does serve

13    to increase access to medications by virtue of a

14    lower priced alternative being available, which, in

15    turn, can stimulate doctors to utilize that

16    medication more.

17    Q.    And on what is your opinion -- you -- so you

18    say sometimes the unavailability of generic could

19    impact prescription writing.  On what is that based?

20    A.    The literature, that, you know, the doctors

21    have had a growing awareness of pricing in their

22    decision-making process.

23    Q.    Is that cited in your report?

24    A.    I'm not positive.  It may be.  I'd have to

25    check.
```

```
 1        Q.   Can you take a look, please.

 2        A.   Not quickly, no.  I can -- like I said, I

 3   don't have a computer here where I can do quick

 4   searches, but I can tell you that there's a lot of

 5   literature on prescription pricing actually

 6   published about physicians' awareness of

 7   prescription operations.

 8             And over time it has grown to the point

 9   where doctors have become -- they generally, in the

10   past, were not very sensitive to price issues, but

11   now they have become more so sensitive to price

12   because of the cost of healthcare and the

13   out-of-pocket costs that patients incur, even since

14   Medicare Part D, with patients incurring a lot more

15   drug costs out of their own pockets.

16             I could -- if you want to take the time, I

17   can look through and see.

18        Q.   No.  That's okay.  I -- does it -- is it

19   your opinion, though, that knowledge of the price of

20   generics overrides the doctor's medical judgment in

21   the exam room?

22        A.   No.  I said it's an input.  It doesn't

23   override a medical judgment.  If a patient needs a

24   medication, a doctor may look at five choices and

25   say, well, four of these are brand name products
```

1    that are expensive, I bet my patient is not even

2    going to buy them, versus the generic that will be a

3    lot more reasonably priced, I'm going to choose that

4    one.

5         I think that's the process that they go

6    through.

7    Q.   Is it your opinion that pharmacists, when

8    they're filling those prescriptions, should be more

9    skeptical of a prescription for a generic drug?

10        MR. CHALOS:   Object to the form.

11   A.   I don't think I've expressed that opinion at

12   all, no.

13   Q.   You don't have that opinion?

14   A.   I wouldn't think that what -- the doctor's

15   choice of generic or brand name would have any

16   impact on the pharmacist's judgment of the veracity

17   or legitimacy of a prescription.

18   Q.   Did you do any assessment about whether

19   physicians' knowledge about the pricing of opioids

20   affected their prescription writing?

21   A.   As a part of this analysis, we looked at, of

22   course, the marketing messages and so forth.  One of

23   the key things that was identified, identified in

24   Table II as well, is the formulary considerations

25   and the use of copay cards and reductions in the

1    amount of patient copays, so to that -- to the

2    extent that those relate to price, yes.

3        Q.   Okay.  Did you do any assessment of whether

4    distributors communicating the price of generic

5    opioids affected the prescription writing of

6    physicians?

7        A.   No, I did not do any analysis related to

8    that issue of generics availability related

9    prescription writing.

10       Q.   Okay.  If you look at Page 29 of your

11   report, there's a section titled "Common

12   Marketing" -- I'll wait for you to get there.

13       A.   Okay.

14       Q.   There's a section called "Common Marketing

15   Techniques Used to Influence Prescribing."

16            Do you see that?

17       A.   Yes, I do.

18       Q.   And I think if you could just flip through

19   that section, it goes from Page 29 to 53, Page 53 of

20   your report.  Can you confirm that for me?

21       A.   Yes, that's correct.

22       Q.   Okay.  And hopefully I can make this quick,

23   but in this section, Pages 29 to 53, you identify

24   various forms of marketing techniques that you

25   believe are used to influence prescribing, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And these various forms of marketing you

 3   identify are specific to the manufacturing

 4   defendants as compared to the distributor

 5   defendants, right?

 6            MR. CHALOS:  Object to the form.

 7        A.    So the answer is, for the most part, these

 8   methods, strategies, tactics, focused on marketing

 9   to physicians and so forth are limited to the

10   manufacturers.

11            However, there -- in some cases there is a

12   role for wholesale distributors to help deliver

13   these in the marketplace, such as, for example,

14   through continuing education programs that may be

15   coordinated or sponsored by the wholesale

16   distributors.

17            And as I mentioned earlier, there's a -- at

18   least a couple examples that are cited in the report

19   that relate to distributors advancing information in

20   the marketplace that focused on the themes that the

21   manufacturers were perpetuating related to the use

22   of opioids.

23        Q.    Okay.  So I'm going to have to ask you --

24   and I apologize.  This is tedious, but I want to

25   make sure we understand exactly what relates to
```

```
 1    which defendant.

 2          Are you alleging or expressing an opinion --

 3    we'll start with McKesson -- that McKesson used any

 4    of the various forms of marketing techniques used to

 5    influence prescribing identified in your report on

 6    Pages 29 to 53?

 7    A.   So my opinion is not formulated -- it will

 8    be the answer -- the same answer for all defendants

 9    you're going to ask me about.

10          I didn't formulate opinions about individual

11    defendants.  I formulated opinions that are about

12    all of the defendants.  And so to the extent that

13    any defendant engaged in one marketing activity,

14    they were all part of the marketing process,

15    integral to that supply chain.

16          And the opinions are formed in the

17    aggregate.  They are not formed based on each

18    defendant.  Even though I did look at the marketing

19    documents from each defendant, I do not have

20    opinions about any defendant with specific focus on

21    that defendant only.

22    Q.   I guess I'm just confused about what your

23    opinion is with respect to my client, McKesson.  And

24    if we're talking about, for example -- and we can

25    break one out -- personal selling in your report, do
```

```
 1    you have an opinion that my client, McKesson,

 2    participated in any personal selling efforts, and --

 3    A.   I am --

 4    Q.   -- if so, what's the basis of that?

 5    A.   Well, I'm --

 6         MR. CHALOS:  Hold on a second.  Object to

 7    the form of the question.

 8    A.   I'm sure that McKesson engaged in personal

 9    selling, because your question is not very specific.

10    They have national account managers.  They have

11    sales representatives that go out to pharmacies and

12    conduct a lot of activities on the part of McKesson.

13    Now, what are they selling?  They're selling

14    McKesson's services, but that's not what you asked

15    me, so --

16    Q.   Do you have an opinion as to whether

17    McKesson engaged in personal selling related to

18    opioids, as discussed in your report on Pages 32 to

19    35?

20    A.   So I don't know if McKesson specifically did

21    that.  I have not seen specific evidence regarding

22    McKesson, that they communicated personal selling

23    messages in the marketplace.

24    Q.   And do you have an opinion as to whether

25    McKesson released publications about the efficacy of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prescription opioids?

 2       A.   I would need to look at the document

 3    database and search through that to know

 4    specifically if they distributed anything.

 5            As I -- as I mentioned earlier, there were

 6    some instances where manufacturers did use

 7    wholesalers to distribute research to physicians or

 8    pharmacies.  I don't -- I don't recall, as I sit

 9    here right now, whether McKesson did that or not.

10    I'd have to look to see if there is any

11    documentation.

12       Q.   And where -- would you look in your report?

13    I mean, that's what you were asked to --

14       A.   No.  I would look at the document database

15    that contains all of the documents that I

16    considered, because I looked at, as I said, hundreds

17    and hundreds of documents from distributors, and

18    every document is not cited here in the report,

19    so --

20       Q.   You're talking about you would look in your

21    list of materials considered that's attached to your

22    report?

23       A.   It would further -- it would take more

24    review than that.  It would require me to look into

25    the documents that I have categorized and placed in
```

 1      the report that relate to those specific subjects.

 2          If there was a McKesson document that

 3      related to personal selling, it would be -- it would

 4      be filed there, and I would be able to go find that

 5      document.

 6      Q.   And that's because it -- I guess I'm just

 7      trying to understand what questions you were trying

 8      to answer in this report.

 9          So it sounds like you don't know the answer

10      to the -- to my question because you weren't asked

11      to consider whether, for example, McKesson released

12      publications about the efficacy of prescription

13      opioids?

14          MR. CHALOS:   Object to the form of the

15      question.

16      A.   So I don't think -- I don't think that I

17      don't know the answer because of that.  I don't know

18      the answer because I didn't know this was a memory

19      test, and I was going to be required to memorize

20      every document that I've seen here.

21          I've cited in my report documents that will

22      demonstrate to you, for example, Footnote 150,

23      that -- I believe it's Cardinal document -- that

24      talks about a CDC proposal where some things are

25      going to be distributed to pharmacies, I believe, or

Highly Confidential - Subject to Further Confidentiality Review

```
 1    someone else.

 2           And, again, without going back to -- and

 3    having a computer and going back and looking for

 4    specific documents, I can't answer that question

 5    because my analysis was not at that micro of a

 6    level.

 7       Q.   Do you intend to offer an opinion, if you're

 8    called to testify at trial, about whether McKesson

 9    engaged in any of the marketing techniques described

10    between Pages 29 and 53?

11           MR. CHALOS:  Object to the form.

12       A.   I intend to offer the opinion that McKesson

13    was part of the -- was integral to the marketing

14    process, but I don't intend to offer specific

15    opinions about McKesson at all.

16       Q.   Okay.  If you could turn to Page 86 --

17    actually, sorry, just one second.

18           Is the same true for Cardinal?  You don't

19    intend to offer any opinions specific to Cardinal?

20           MR. CHALOS:  Object to the form.

21       A.   Yes.  As I -- as I've said, I think, a few

22    times today, I don't have opinions about specific

23    defendants.  And my opinions are presented in the

24    aggregate, because the marketing is completely

25    intertwined, and it can't be separated out.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    So you're not able to say what effect, if

2   any, one defendant's -- one party's marketing

3   efforts had on the prescribing of opioids?

4        MR. CHALOS:  Object to the form.

5        A.    It is my opinion that any one party impacted

6   the marketing and that that marketing increased

7   access to opioids and utilization of opioids in the

8   marketplace, because each of the defendants is part

9   of that opinion in the aggregate.

10       Q.    If we could look at Page 86 briefly, and

11  it's -- I want to direct your attention to Table II,

12  which is "Marketing Messages."

13       A.    Yes.

14       Q.    What does this table show?  I know we've

15  talked about it before, but I just want to go back

16  to it quickly.

17       A.    Table II is a summary of and examples of --

18  and not an exhaustive list, but a summary and a --

19  representative examples of the marketing messages

20  focused on specific themes.  And we talked about

21  this table earlier.  The contents of each section of

22  the table dictate the subject of the letter that

23  entitled that table.

24       Q.    Uh-huh.  And the right-hand column is titled

25  "Defendant," right?
```

1      A.    Yes.

2      Q.    No documents produced by McKesson appear in

3      Table II, right?

4      A.    Well, I think I -- I don't need to

5      necessarily look through.  I don't -- I don't think

6      there is anything, but I can't say that.  At least

7      with respect to the documents cited in Reference

8      Number 150, the Fishman text that I believe was

9      distributed through a wholesaler, I guarantee that

10     that Fishman text is cited in Table II.

11            And with respect to that -- and it's the

12     same as with the distribution of a physical product.

13     The wholesalers were integral to the process of

14     getting these products to market.  They were

15     involved in the marketing process.  They had

16     different messages, largely, than the messages that

17     were sent directly to physicians, but they had the

18     capability certainly of communicating directly with

19     the physician as well.

20            And to the extent that each of the

21     defendants, McKesson, Cardinal, AmerisourceBergen,

22     was involved and integral to the supply chain, they

23     are part of the opinions that I hold, but just to

24     state it again clearly for you, I don't hold a

25     specific opinion about Cardinal, McKesson, or ABC,

 1   and --

 2      Q.   Okay.  And I just want an answer to my

 3   question.  There is no document cited by McKesson in

 4   Table II, right?

 5      A.   As I said, there are documents in Table II

 6   that were distributed by wholesalers, but I don't

 7   know specifically if there was one, McKesson.  I

 8   can -- I can go through and look at each individual

 9   entry.  That would probably take some time, and I'm

10   happy to do that if you'd like.

11      Q.   Okay.  I'm going to represent that there's

12   no documents produced by McKesson, Cardinal, or

13   AmerisourceBergen in Table II.  Do you have any

14   reason to disagree with me?

15      A.   Only that I haven't had a opportunity to go

16   through.

17      Q.   Okay.  Can we talk about Schedule 10?  I

18   don't think we talked about that this morning.  Do

19   you have the full schedule in front of you?

20      A.   Yes.  I don't have it here.

21      Q.   And I guess we should mark that as an

22   exhibit as well, because --

23      A.   This is my copy.

24      Q.   Okay.

25      A.   So --

 1      Q.   Okay.  I'll mark mine.

 2           (Perri Exhibit 5 was marked for

 3      identification.)

 4      BY MS. RODGERS:

 5      Q.   We'll mark it as Exhibit 5 for the report.

 6      What is Schedule 10?

 7      A.   So Schedule 10 is -- let me give you the

 8      official title:  Marketing Messages.

 9      Q.   And what is it?

10      A.   It is a listing of all the documents that

11      were considered to contain marketing messages from

12      which I searched and looked at various documents to

13      compile Table II that's included in my report.

14      Q.   Okay.  There are two documents that were

15      produced by McKesson that appear in this table.  I'm

16      just going to mark them as Exhibits 6 and 7.

17           (Perri Exhibit 6 was marked for

18      identification.)

19           (Perri Exhibit 7 was marked for

20      identification.)

21      BY MS. RODGERS:

22      Q.   So Exhibit 6 is MCKMDL00578003, and

23      Exhibit 7 is MCKMDL00577963.

24           You've seen these documents before, I take

25      it?

```
 1      A.   I think so.  I can't be 100 percent sure.  I
 2   looked at a lot of documents.
 3      Q.   If they're included in Schedule 10, it's
 4   safe to assume you've reviewed these documents,
 5   right?
 6      A.   It's safe to assume that I've reviewed the
 7   vast majority of those documents, but I can't
 8   testify, as I sit here today, I've seen each and
 9   every single document.
10      Q.   Okay.
11      A.   I have no way to verify that.
12      Q.   These documents weren't actually created by
13   McKesson, correct?
14      A.   That's my understanding with regard to this
15   document.
16      Q.   Okay.  It's true for both Exhibits 6 and 7,
17   right?
18      A.   This document I definitely recognize, and in
19   this form or something close to it.  Yep.
20      Q.   You would agree that neither Exhibit 6 nor
21   Exhibit 7 were created by McKesson?
22      A.   As far as I know, they were -- they were not
23   created by McKesson.
24      Q.   So the only two documents in Schedule 10
25   that were produced by McKesson were not created by
```

Highly Confidential - Subject to Further Confidentiality Review

1    McKesson, right?

2        A.    It appears to be so, yes.

3        Q.    Okay.

4            MS. RODGERS:  If we could take a quick

5        break.  We've been going about an hour.

6            THE VIDEOGRAPHER:  We are now going off the

7        video record.  The time is currently 4:26 p.m.

8        This is the end of Media Unit 5.

9            (Recess from 4:26 p.m. until 4:39 p.m.)

10           THE VIDEOGRAPHER:  We are now back on the

11       video record with the beginning of Media

12       Number 6.  The time is currently 4:39 p.m.

13   BY MS. RODGERS:

14       Q.    Because of where wholesale distributors sit

15   in that supply chain, their customers are typically

16   pharmacies, right?

17       A.    No, I don't think I agree with that

18   completely.  I think there are some other

19   circumstances that would -- that they have other

20   customers in the supply chain as well.

21       Q.    They also include hospitals?

22       A.    Hospitals, pharmaceutical manufacturers.

23       Q.    VA centers?

24       A.    Yes.  I -- yes.

25       Q.    Okay.  And when wholesale distributors are

Highly Confidential - Subject to Further Confidentiality Review

```
 1    providing information to other entities, it's to

 2    their customers, right, to these pharmacies and

 3    hospitals and VA centers and manufacturers?

 4        A.   The information and data and the revenue

 5    flows that are -- that they service, those would be

 6    customer relationships to a degree, yes.

 7        Q.   Okay.  And I think you testified earlier

 8    that the information that wholesale distributors

 9    passed along related to opioids was generally

10    limited to price, quality, drug availability, and

11    service, right?

12        A.   The majority of the documents that I saw

13    focused on those issues, of price, quality,

14    availability, yes.

15        Q.   And when you use the term "quality," what do

16    you mean by that?

17        A.   In -- in pharmacyspeak, the issue of quality

18    is related to -- you know, when you buy a generic,

19    you don't want to run into the situation where, when

20    you take the product off the shelf, you open it up,

21    and there is a bottle full of cracked tablets or

22    powder.

23             You want to make sure that the generic

24    products that you're ordering are of sufficient

25    quality.  And to a degree, you know, we rely on the
```

1    wholesaler to select generics that are good quality

2    and to provide them as good prices.

3        Q.   Okay.  So you're not using quality here to

4    mean product efficacy?

5        A.   Not in this context.

6        Q.   Okay.  Would you agree that there was

7    nothing false or misleading about information that

8    the distributors passed on to pharmacies regarding

9    the price of opioids?

10           MR. CHALOS:  Object to the form.

11       A.   And as we discussed earlier today, you know,

12   I didn't make any assessments of the truthfulness or

13   lack of truthfulness of the information that was

14   communicated.  I -- yeah.

15       Q.   So it's not your opinion that there was

16   anything false or misleading about the wholesale

17   distributors passing along information about the

18   price of opioids?

19       A.   Yeah.  I don't have --

20           MR. CHALOS:  Hang on a second.

21           Object to the form.

22       A.   I don't have an opinion one way or the other

23   about that, the pricing.

24       Q.   Okay.  And the same is true about any

25   information that the wholesale distributors passed

 1    on regarding the quality of opioids?

 2         MR. CHALOS:  Object to the form.

 3    A.   Yeah.  I didn't -- I didn't do that

 4    assessment or make that -- include that in the

 5    analysis.

 6    Q.   You have no opinion about whether there was

 7    anything false or misleading about information

 8    related to the availability of opioids that the

 9    wholesale distributors passed on to the pharmacies?

10         MR. CHALOS:  Object to the form.

11    A.   In terms of availability, you know, there

12    were -- there were specific marketing messages that

13    focused on availability, especially new strengths

14    and so forth, but I didn't make any assessment of

15    whether there was any truthfulness to that.  I don't

16    have any reason to have an opinion, really, on that.

17    Q.   And you don't have an opinion about whether

18    the distributors' provision of information to

19    pharmacies regarding the service that they could

20    provide was false or misleading?

21    A.   Again, I didn't make that assessment, no.

22    Q.   Okay.  And all of this information that

23    we've been talking about, the price, quality, drug

24    availability, and service, that information was

25    directed from the wholesale distributors to its

Highly Confidential - Subject to Further Confidentiality Review

 1    customers, the pharmacies, the VA centers, the

 2    hospitals, right?

 3           MR. CHALOS:  Object to the form.

 4       A.   So the information that they communicated

 5    was primarily directed to those customers, yes.

 6       Q.   And it's the doctors and the prescribers

 7    that are writing the prescriptions, right?

 8           MR. CHALOS:  Object to the form.

 9       A.   Yeah.  I think it's well-understood that

10    there are many influences on prescribing.  We've

11    talked about a lot of these here today, but the

12    prescriber is the person or entity responsible for

13    generating the patient's prescription.

14       Q.   The information that we've been talking

15    about, what the distributors share with pharmacies

16    regarding price, quality, availability, service, you

17    refer for all of that information as marketing by

18    the distributors, right, in your report?

19       A.   Yes, I do.  That is all marketing

20    information, yes.

21       Q.   If you look at Footnote 193 of your report.

22           MR. CHALOS:  Which page is that?

23           MS. RODGERS:  It's Page 61.

24       A.   Okay.

25           (Perri Exhibit 8 was marked for

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14      Q.   Okay.  If you look at Paragraph 99 of your

15   report.

16      A.   Okay.

17      Q.   So right after the sentence about "primary

18   messages in relation to wholesale distributors are

19   expected to be focused on price, quality, drug

20   availability, and service," and we talked about

21   that -- you have another sentence that says:

22   "However, pharmacists that dispense prescriptions

23   may also receive promotional messages focused on

24   drug features and benefits, similar to prescribers."

25           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    If you look at Paragraph -- sorry,

 3   Footnote 194, you cite a Purdue document in support

 4   of that conclusion, right?

 5        A.    I do.

 6        Q.    Have you seen any evidence that wholesale

 7   distributors provided pharmacists with "promotional

 8   messages that focused on drug features and

 9   benefits"?

10        A.    So as I understand it, this document was

11   distributed to pharmacists through the wholesalers.

12        Q.    And this document is a "Purdue sponsored

13   counseling guide for pharmacists," right?

14        A.    Yes.  Let me read this first before I -- I

15   take back the yes.  I need to read this and make

16   sure --

17             MR. CHALOS:  Do you have that document,

18        Counsel, to show him?

19             MS. RODGERS:  I do not.  It's his citation

20        here.

21        A.    So, as I recall, this document was

22   distributed through wholesalers or with the

23   assistance of the wholesalers.

24        Q.    This document was written by Purdue,

25   correct?
```

1    A.    This was a document that was a counseling

2    guide.  And again, I don't have the document in

3    front of me, and I don't have a perfect memory.  So

4    this document was written by a person that was

5    sponsored by Purdue, if I recall the document

6    correctly as I sit here.

7    Q.    Okay.  And do you have any other basis for

8    an opinion that wholesale distributors are

9    advertising drug features and benefits to

10   pharmacists?

11   A.    I know there are other examples that I've

12   seen where mailings that went out to pharmacists

13   required the inclusion of a package insert, which

14   indicates that the name of the medication and its

15   indications would have been mentioned at the same

16   time, which would qualify into your question.

17   Q.    Those are the package inserts that I think

18   you said doctors don't look at --

19   A.    I -- I --

20   Q.    -- and patients don't look at.

21   A.    Yes.

22         MR. CHALOS:  Object to the -- object to the

23   form of the question.

24   A.    Yeah.  So the package inserts would be the

25   same that I referred to prior to now in this

1    testimony.

2        Q.    Okay.  And the package inserts are also

3    written by the manufacturers, correct?

4        A.    Yes, they are.

5        Q.    Okay.  On Page 81 of your report, you

6    identify three marketing themes, correct?

7        A.    Yes.

8        Q.    And the first theme you identify is that

9    "Dependence, tolerance, addiction, and withdrawal

10   should not be a concern in prescribing opioids."

11           Would you agree that wholesale distributors

12   did not utilize that marketing message?

13           MR. CHALOS:  Object to the form.

14       A.    So I need to ask you to clarify your

15   question for me, if you can.

16           The question, as I understand it, is asking

17   me, did the wholesalers seek to promote opioids with

18   these marketing messages.

19           Is that what you're asking me?

20       Q.    I'm asking:  Did the wholesale distributors

21   make the first marketing message?

22       A.    So you -- you -- I'm sorry.  Again, I need

23   to clarify because you're asking, did they make it.

24           No, I think it's pretty obvious that the

25   manufacturers created the marketing messages.

```
 1    However, the wholesale distributors did have a role

 2    in distributing some of these messages.

 3       Q.   Okay.  Let's take that -- I want to take

 4    this in two steps, then.

 5            You agree, then, that the distributors

 6    didn't create the marketing message that

 7    "Dependence, tolerance, addiction, and withdrawal

 8    should not be a concern in prescribing opioids"?

 9       A.   Yes, I agree with that.

10       Q.   And the market -- the wholesale distributors

11    did not create the marketing message that "Opioids

12    are effective for, and approve functioning in,

13    patients taking them for long-term and chronic use"?

14       A.   So these messages were initiated by the

15    manufacturers.

16       Q.   Okay.  And one more:  The distributors did

17    not create the message that "Opioids should be the

18    first-line therapy for pain," correct?

19       A.   Same answer, yeah.

20       Q.   Okay.  Now, you used the term "utilized" in

21    Paragraph 134 when you are introducing these

22    marketing messages, right?

23       A.   Yes.

24       Q.   What do you mean by utilized?

25       A.   Defendants communicated specific marketing
```

Highly Confidential - Subject to Further Confidentiality Review

1    messages to customers to accomplish the goals of

2    increasing awareness.

3        Q.    Okay.  So is it your opinion that the

4    wholesale distributors communicated this first

5    marketing message to customers?

6              And I assume we're talking about customers

7    in the little "c" sense.

8              MR. CHALOS:  Object to the form.

9        A.    So I think, as I've said on a number of

10   answers to your questions here, that the majority of

11   the messages did focus on the pricing issues and

12   related details, but some of the messages did focus

13   on these three themes.

14             For example, when we were looking at the

15   last footnote -- I forget which number we were

16   looking at, but that was a Purdue document that was

17   created for pharmacists.  It was distributed through

18   the wholesalers, and it contained many of these same

19   themes.

20             The Fishman book that was distributed

21   through the wholesalers contained many of these same

22   themes.  So the wholesalers did participate in

23   distributing some of these messages, even if they

24   didn't create them.  They facilitated it in the

25   marketplace the same way they facilitate the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    physical distribution of the drugs.

 2        Q.   Let's look at a document I'm going to mark

 3    as Exhibit 9.

 4             (Perri Exhibit 9 was marked for

 5    identification.)

 6             MR. CHALOS:  Is there an Exhibit 5?

 7             MS. RODGERS:  It's Schedule 10 --

 8             MR. CHALOS:  Oh, I see it.

 9             MS. RODGERS:  -- of his report.

10             MR. CHALOS:  Do you have another copy of

11        that?

12             MS. RODGERS:  I do not.  I thought we were

13        going to mark his whole report as one exhibit.

14    BY MS. RODGERS:

15        Q.   Exhibit 9 bears Bates PPLP004086826.

16             And you've seen this document before, right?

17        A.   Yep.  Yes, I have.

18        Q.   This is about the Fishman text that you have

19    referred to several times --

20        A.   Yes.

21        Q.   -- in the last hour?

22        A.   Yes.

23        Q.   And you actually cited this document on

24    Page 153 of your report in Footnote 371, Page 153.

25             If you look at the text of this e-mail, it
```

1    reads:  "Kelly (whose email address I do not have)

2    from your organization mentioned on today's PCF call

3    that the FSMB is looking for support to help

4    publish/distribute the 'Responsible Opioid

5    Prescribing' book."

6          And that's the Fishman book that you've

7    referred to several times today, right?

8    A.   Yes.

9    Q.   "I mentioned that there may be some interest

10   among my membership to consider supporting.  We

11   represent pharmaceutical wholesale distributors such

12   as McKesson and Cardinal Health."

13         Did I read that correctly?

14   A.   Yes.

15   Q.   Now, this e-mail doesn't actually say that

16   McKesson distributed the Fishman text, right?

17   A.   This e-mail in particular does not.  It

18   expresses an interest in doing so.

19   Q.   It doesn't even say that McKesson expresses

20   an interest in distributing the Fish- -- Fishman

21   text, does it?

22   A.   I'm sorry, I --

23         MR. CHALOS:  Object to the form.

24   A.   Yeah, I may have misheard you.

25         Was your question specific to McKesson?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Yes.

 2      A.   Okay.

 3      Q.   So the e-mail does not say that McKesson

 4   distributed the Fishman text, right?

 5      A.   It does not say specifically that McKesson

 6   distributed the text.

 7      Q.   And it doesn't say that Cardinal distributed

 8   the Fishman text either, does it?

 9      A.   It simply says that there is interest in

10   distribution of the text.

11      Q.   Okay.  And it doesn't even say that McKesson

12   is interested in distributing the text, does it?

13           MR. CHALOS:  Object to the form.

14      A.   It seems to me that the subject of the

15   e-mail is McKesson and Cardinal, but it doesn't say

16   specifically in those words that McKesson is

17   interested in distributing the text.

18      Q.   They are listed as examples of what the

19   membership includes, of who the members are, right?

20           MR. CHALOS:  Object to the form; calls for

21        speculation.

22      A.   It's unclear who the -- who the membership

23   is but it -- from the e-mail, it appears to be at

24   least focused on McKesson and Cardinal.

25      Q.   I just want to be clear -- I'm not sure what
```

1    you mean by "focused on."

2          McKesson and Cardinal are identified as

3    members of an organization, right?

4          MR. CHALOS:  Objection; argumentative.

5          He's answered your question.

6     Q.   Let me ask this a different way.

7          You testified that this e-mail doesn't say

8    that McKesson distributed the Fishman text, right?

9          MR. CHALOS:  Object to the form.

10    A.   So this e-mail does not say that McKesson

11   distributed the Fishman text.

12    Q.   Did you do anything to inquire whether any

13   of the distributors in this case were actually

14   involved in the distribution of the Fishman text?

15    A.   Yes.  I did see other documents, and I'm at

16   a disadvantage here because I don't have the other

17   citations in -- that reference 371 to determine if

18   those are actually the documents that led to that

19   conclusion in combination with this e-mail.

20    Q.   And you've seen no evidence that McKesson

21   distributed the Fishman text, right?

22          MR. CHALOS:  Object to the form.

23    A.   So that's not what I said.  I said I'm at a

24   disadvantage because I don't have the other

25   references.  You've shown me only one of three

Highly Confidential - Subject to Further Confidentiality Review

1    documents that I cite in this footnote, and without

2    seeing all three documents, I can't have a

3    conclusion about that.

4        Q.    Aside from the three documents identified in

5    this footnote, did you look anywhere else to see if

6    any of the distributors might have been involved in

7    distribution of the Fishman text?

8        A.    The only thing I would have had to go on

9    would have been any other documents that were in the

10   database that were identified as being from the

11   distributors.

12       Q.    Uh-huh.

13       A.    So again, without -- without my document

14   database to look at, I can't tell you that I saw

15   other documents.

16            I know that I came to the conclusion that

17   this Fishman text was distributed through the

18   wholesalers, and I wouldn't have just invented that.

19   So my belief is, is that either one of these

20   documents, an e-mail or a cover page to one of these

21   other documents was responsible for providing that

22   belief.

23            And certainly, even the document that you've

24   pointed out on a couple of occasions doesn't say

25   McKesson distributed.  It certainly leads you to

Highly Confidential - Subject to Further Confidentiality Review

1    believe McKesson had an interest in it.

2        Q.   It doesn't say that, though?

3            MR. CHALOS:  Object to the form.

4        A.   I think I've answered that already.

5        Q.   You said it leads you to believe.  You're

6    inferring that from the document, right?

7            MR. CHALOS:  Object to the form;

8        argumentative.

9        A.   Yes, you're right.

10       Q.   Okay.  I want to turn back just for a minute

11   to those three marketing themes we talked about, and

12   I believe you testified that the wholesale

13   distributors didn't create those marketing themes

14   but they may have passed that information on from

15   time to time in rare circumstances, right?

16           MR. CHALOS:  Objection to form.

17       A.   Yes, I think I generally agree with that.

18       Q.   And based on that reasoning, television

19   stations also contributed to the marketing, right?

20           MR. CHALOS:  Object to the form.

21       A.   I'm not following your reasoning there.

22       Q.   Well, television stations pass on marketing

23   created by manufacturers, right?

24       A.   So you're saying in general --

25           MR. CHALOS:  Hang on one second.

```
 1              Object to the form.

 2       A.    Are you saying that in marketing in general

 3    that TV stations contribute to the communication of

 4    messages in the marketplace for products in generic

 5    form, for any kind of product?

 6       Q.    I'm saying you've testified that wholesale

 7    distributors contributed to the marketing message by

 8    passing it on from time to time, right?

 9              MR. CHALOS:  Object to the form;

10       mischaracterizes testimony.

11       A.    I thought the question was about TV

12    stations.

13       Q.    Yes.

14       A.    Okay.

15       Q.    We're -- we're getting -- we're taking the

16    steps there.

17       A.    Okay.

18       Q.    You testified to that, correct?

19              MR. CHALOS:  Object to the form; misstates

20       his testimony.

21       A.    So I -- to reiterate my opinion about

22    defendants, is that it is an aggregate opinion based

23    on the marketing being intertwined and basically

24    inseparable because the manufacturers would have had

25    a very -- very difficult time creating the
```

```
 1    distribution of the product in the marketplace

 2    without the distributors.

 3         So my opinion isn't just that -- as you

 4    mentioned, my opinion is, is that working together,

 5    the wholesale distributors, the pharmaceutical

 6    manufacturers and marketers, communicated these

 7    marketing messages, delivered the product to the

 8    marketplace.  And you can't look at any one behavior

 9    by itself, it's all integrated into the marketing

10    process.

11    Q.   Okay, but I -- now you're mixing two

12    concepts, and I want to take them independently.

13         I understand --

14         MR. CHALOS:  Object to the form.  Oh, I'm

15    sorry.

16    Q.   -- that the wholesale distributors delivered

17    product to their customers, the pharmacies.

18         What I'm talking now about are these three

19    marketing messages that you've identified in your

20    report.

21    A.   Okay.

22    Q.   In your opinion, did the wholesale

23    distributors utilize those marketing messages?

24         MR. CHALOS:  Object to the form.  Object to

25    the preamble.
```

```
 1        A.   So when you had me define "utilize" for you

 2   earlier, I used the word "communicate."

 3        Q.   Uh-huh.

 4        A.   So the answer is yes.

 5        Q.   And based on that reasoning, television

 6   stations also communicated the marketing messages of

 7   manufacturers here, right?

 8             MR. CHALOS:  Object to the form.

 9        A.   So are we talking about opioids, or are we

10   talking about -- what are we talking about

11   television stations?

12        Q.   First let's talk about it generally.

13             Television stations communicate marketing

14   messages of manufacturers, right?

15             MR. CHALOS:  Object to the form.

16        A.   To the extent that the manufacturer uses TV

17   advertising, they would be communicating a marketing

18   message, yes.

19        Q.   And the same is true of radio?

20             MR. CHALOS:  Object to the form.

21        A.   Radio communicates marketing messages as

22   well.

23        Q.   And magazines, advertisements?

24        A.   Yes.

25             MR. CHALOS:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    That would be true as well.

 2        Q.    And the Internet also communicates messages

 3   from manufacturers?

 4              MR. CHALOS:  Object to the form.

 5        A.    Yes.

 6        Q.    So all of these different aspects --

 7   television stations, radio, magazines, Internet --

 8   they are all carrying and communicating manufacturer

 9   messages, correct?

10              MR. CHALOS:  Object to the form; incomplete

11         hypothetical.

12        A.    So to the extent that -- you know, in

13   your -- in your example where we're talking about a

14   generic -- sorry.  I shouldn't use the word

15   "generic," because it has too much overlap here, but

16   we're talking about a random product that's being

17   marketed through lots of different mechanisms, and

18   so each -- each of the people -- each of the

19   entities or stakeholders involved in that are part

20   of the marketing process, and that's -- that's -- I

21   think that should be clear in the same way that the

22   wholesale distributors are part of the marketing

23   process for opioids.

24        Q.    Right.  It's true for, again, birth control

25   the same way it's true for prescription opioids?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. CHALOS:  Objection; incomplete

2      hypothetical.

3      A.   And to the extent that a wholesaler would

4      distribute information about a drug regardless of

5      what category that drug is in, they would be

6      integral to that distribution process as part of the

7      marketing.

8      Q.   Okay.  You can't identify any specific

9      distribution of prescription opioids that was caused

10     by these three marketing messages you've laid out in

11     your report, right?

12     A.   I think my opinion on that, as we've talked

13     about earlier today before you began questioning, is

14     that the analysis was not done at the individual

15     prescription level but it was done at the -- at the

16     market level, which I think absolutely all of the

17     marketing related to these products contributed to

18     the utilization of opioids and expansion of the

19     marketplace, in addition to creation of market share

20     for specific companies.

21     Q.   Okay.  And I think -- I think you're talking

22     about prescribing, and I'm talking about -- my

23     question is a little bit different right now.

24          So my question is:  You can't identify any

25     specific distribution of prescription opioids caused

Highly Confidential - Subject to Further Confidentiality Review

1    by the three marketing themes you've identified in

2    your report?

3              MR. CHALOS:  Object to the form.

4        A.    So, no, I have to disagree with that, and

5    the primary reason is because the distribution is a

6    function of the marketing.  If there were no

7    marketing and there was no creation of demand, there

8    would be no need for distribution.  So any

9    distribution that occurred is a direct result of the

10   marketing.

11       Q.    So it's your testimony that every

12   distribution of prescription opioids was a result of

13   the three marketing themes that you are identifying

14   on Page 81 of your report?

15             MR. CHALOS:  Object to the form; misstates

16       his testimony.

17       A.    What page are you looking at?

18       Q.    Page 81.

19       A.    I just need to have them in front of me.  So

20   the -- these three marketing themes were intended to

21   summarize the core messages around the opioid

22   marketing.  They contain -- each of them contains

23   numerous specific messages, and it is my opinion

24   that these themes and the messages contained therein

25   were integral to pharmaceutical marketers' ability

```
 1    to expand demand for opioids in the marketplace.

 2         Part of that, being able to expand demand,

 3    depended on wholesale distributors' ability to get

 4    the product to market and create the access that's

 5    needed, which we talked about at length earlier.

 6    Q.   I think that's still not quite an answer to

 7    my question.  I'm asking whether you can identify

 8    specific distribution -- so, say, a specific

 9    shipment -- from McKesson or Cardinal or

10    AmerisourceBergen that was caused by these three

11    marketing messages?

12         MR. CHALOS:  Object to the form.

13    A.   So in my analysis, the -- you know, you've

14    heard me say a couple of times today that marketing

15    works, and I think that that's a generally accepted

16    concept.  We certainly see that the manufacturers

17    have a primary role in the creation of these

18    marketing messages, the distributors had a role in

19    the distribution of the products.

20         Can I point to a bottle of pills that came

21    from a manufacturing facility that ended up in a

22    Cardinal or McKesson or AmeriSource distribution

23    center and then ended up in Ohio and say that that

24    bottle of pills was directly related to the

25    marketing?  I mean, that -- that's an analogy or a
```

1    connection that I've not really considered having to

2    make because the marketing, we saw, increased the

3    utilization of opioids dramatically from 1995 and

4    beyond.

5         So the question that I think you're asking

6    me is was the marketing completely ineffective and

7    none of the marketing messages that were

8    disseminated in the marketplace had anything to do

9    with anybody buying opioids, and I just can't make

10   that connection.  It's just too clear that the

11   marketing had a significant impact on the

12   utilization of these products.

13   Q.   So I think you answered, in that long

14   response to my question, which was:  You didn't

15   analyze whether any specific shipment of opioids,

16   prescription opioids from Cardinal,

17   AmerisourceBergen, or McKesson was caused by these

18   three marketing messages?

19        MR. CHALOS:  Object to the form.

20   A.   Yeah, and I think I also said that the --

21   Q.   First, can you answer that question?

22        You didn't analyze whether any specific

23   shipment of opioids from Cardinal,

24   AmerisourceBergen, or McKesson was caused by these

25   three marketing messages?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CHALOS:  Object to the form; asked and
 2      answered.
 3      A.   I said my complete answer had -- that I did
 4   not track, I did not analyze, but there was more to
 5   my answer than that, which I would be happy to
 6   restate for you.
 7      Q.   I think you answered my question.
 8      A.   Okay.
 9      Q.   And similarly, you didn't analyze -- do a
10   quantitative analysis of what percentage of
11   distributions by McKesson, AmerisourceBergen, or
12   Cardinal were caused by these marketing messages?
13      A.   Yeah, I think my opinion is, is that the
14   vast majority of the opioid utilization was caused
15   by the marketing messages.
16      Q.   Okay.  Can you quantify "vast majority"?
17      A.   No, I can't.
18      Q.   What does that --
19      A.   I can't quantify that.
20      Q.   -- what does that mean to you?
21      A.   The vast majority.
22      Q.   Explain it to me.
23      A.   Your question is asking me to say something
24   that just doesn't make any sense to me from a
25   marketing perspective.  Your implication is, is that
```

Highly Confidential - Subject to Further Confidentiality Review

1    they did all of this marketing, they spent all this

2    money, they did all these things to promote the use

3    of opioids; and not in one instance did any of those

4    activities result in the sales of a product in Ohio.

5         Q.   I'm asking you to quantify the effect of

6    that.

7         A.   The vast majority.

8         Q.   And you don't intend to offer any opinion

9    about the quantity of distributions that were caused

10   by these three marketing themes?

11        A.   I can't quantify it for you, no.

12        Q.   Okay.  It can't be quantified?

13             MR. CHALOS:  I object to the form.

14        A.   I don't know if it can be quantified or not.

15   You're asking me to draw a conclusion that I don't

16   have the information in front of me to make.

17             I know that if you look at the other expert

18   reports, the Rosenthal regression clearly draws

19   connections between the marketing expenditures and

20   sales of products.  I'm sure that there's some way

21   to -- and I have -- I have documents in the

22   schedules with the overall sales.  I'm sure there is

23   a way to break that down for the state of Ohio, so

24   we can make that connection if it has to be made.

25             But again, your whole -- your whole

Highly Confidential - Subject to Further Confidentiality Review

```
 1    hypothetical just seems -- I'm sorry, I don't mean

 2    to offend you, but it seems ridiculous to me to not

 3    understand that the marketing is impacting the sales

 4    of opioids.

 5        Q.   Okay.  And you testified you can't quantify

 6    that for me, and you have no opinion on the exact

 7    percentage of distributions here that were caused by

 8    these marketing themes, right?

 9        A.   I said I didn't do --

10            MR. CHALOS:  Hold on.

11        A.   -- the analysis.

12            MR. CHALOS:  Objection.  His testimony is

13        what it is.  I don't know why you're summarizing

14        it and putting it in his mouth.

15            So it's an improper question.  I object to

16        the form; I object to the foundation; I object to

17        mischaracterizing his testimony.  His testimony

18        is what it is.

19            MS. RODGERS:  Can I have the next exhibit

20        sticker?

21            THE WITNESS:  Can we take a quick break?

22            MS. RODGERS:  Sure.

23            THE VIDEOGRAPHER:  We are now going off the

24        video record.  The time is currently 5:22 p.m.

25            (Recess from 5:22 p.m. until 5:37?p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE VIDEOGRAPHER:  We are now back on the

 2     video record.  The time is currently 5:37 p.m.

 3   BY MS. RODGERS:

 4     Q.   Dr. Perri, you've spearheaded a training

 5   initiative that prepares pharmacists to recognize

 6   patients with opioid abuse problems, right?

 7     A.   If you're referring to the SBIRT grant that

 8   I was the coinvestigator on, yes.

 9     Q.   Okay.  And SBIRT stands for Screening, Brief

10   Intervention, Referral, and Treatment, right?

11     A.   Yes, it does.

12     Q.   In those trainings, do you identify factors

13   that pharmacists should consider in deciding whether

14   to prescribe or dispense opioids to a given patient?

15            MR. CHALOS:  Object to the form.

16     A.   So I'm not sure I understand your question,

17   but the things that would influence a pharmacist

18   giving opioids to a patient would be the

19   prescription.

20     Q.   I didn't hear you.

21     A.   The factors that would be related to a

22   pharmacist giving opioids to a patient would be the

23   prescription itself.

24            Did you mean to ask if there was some factor

25   that SBIRT identifies as risk factors for that
```

```
 1    patient or -- I don't -- I guess --

 2        Q.    What is the purpose of those trainings?

 3        A.    So that pharmacists can identify patients

 4    whose alcohol consumption or drug consumption could

 5    present them with a risk when it comes to the

 6    medications that they take for legitimate health

 7    concerns.  So it might be a patient that has a

 8    higher risk of addiction, higher risk of substance

 9    abuse of some sort.

10        Q.    And is the point of that so that pharmacists

11    can determine whether to fill a prescription or not

12    for a particular patient?

13        A.    No, it's not the patient engaged in

14    behaviors on their own that would be constructive to

15    their healthcare.

16        Q.    Can you repeat that one more time?

17        A.    Yeah.  It's to identify patients who are at

18    risk --

19        Q.    Uh-huh.

20        A.    -- so that the pharmacist can encourage

21    those patients to engage in more healthy behaviors.

22        Q.    Okay.  Does that training affect whether or

23    not a pharmacist should fill a prescription for a

24    patient?

25              MR. CHALOS:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   The SBIRT method does not impact the filling

 2   of a prescription, no.

 3      Q.   Okay.  Now, at the outset of this, when I

 4   asked you questions, we looked at a passage in your

 5   book.  And I believe you testified that pain

 6   medication is a vital medication, right?

 7           MR. CHALOS:  Object to the form.

 8      A.   I don't -- I don't remember exactly what I

 9   said.  Do you have that --

10      Q.   Would you agree that pain medication is a

11   vital medication?

12      A.   In the --

13           MR. CHALOS:  Object to the form; incomplete

14      hypothetical.

15      A.   In appropriate patients, yes.

16      Q.   It's a needed medication for some patients?

17      A.   In appropriate patients, yes.

18      Q.   And at the end of the day, it's the

19   prescriber that determines whether that pain

20   medication is needed for a patient, right?

21           MR. CHALOS:  Object to the form.

22      A.   Yes.  Generally speaking, yes.

23      Q.   You served as an expert witness in a case

24   called JM Smith Corporation vs. Cherokee Pharmacy in

25   South Carolina, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes, I did.

 2           MS. RODGERS:  I'm going to mark as

 3      Exhibit 10 this document.

 4           (Perri Exhibit 10 was marked for

 5      identification.)

 6           THE WITNESS:  Thank you.

 7           MS. RODGERS:  Hm-hmm.  Sorry.

 8   BY MS. RODGERS:

 9      Q.   And this is a copy of the report that you

10      submitted in that case, right?

11      A.   This appears to be a copy of that report,

12      yes.

13      Q.   And this was in 2014 that you served as an

14      expert in this case, right?

15      A.   Yes.

16      Q.   And you were retained by the pharmacy,

17      Cherokee Pharmacy?

18      A.   I was retained by the attorney representing

19      Cherokee Pharmacy, yes.

20      Q.   Okay.  If you could turn to Page 3 of this

21      report, would you read aloud your first opinion?

22           MR. CHALOS:  You want him to read the whole

23      page?

24           MS. RODGERS:  The first --

25      Q.   Sorry, the kind of title of the first
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opinion there.

 2        A.    "Pharmaceutical wholesalers are not

 3    empowered by the DEA, any other agency or by any

 4    applicable rule, regulation or standard to limit

 5    patient access to needed medications."

 6        Q.    You wrote that statement, right?

 7        A.    Yes.

 8        Q.    And it was true when you wrote it?

 9        A.    Yes.

10        Q.    And you still agree with it today?

11        A.    Yes.

12        Q.    If you look at -- well, let's just do this.

13              Would you agree that oxycodone is a needed

14    medication?

15              MR. CHALOS:  Object to the form; incomplete

16        hypothetical.

17        A.    I think, as I have said over and over a

18    couple of times today, that, in appropriate

19    patients, oxycodone is a medication that might be

20    needed by a patient.

21        Q.    Okay.  And if you look at Paragraph 15, you

22    wrote -- or it reads:  "All pharmaceutical

23    wholesalers are regulated by the National

24    Association of Boards of Pharmacy (NADP) under the

25    provisions of the Prescription Drug Marketing Act of
```

Highly Confidential - Subject to Further Confidentiality Review

1    1987 which outlines the necessary requirements for

2    obtaining licensure as a wholesale distributor.

3    These requirements --" and then in italics, "do not

4    require pharmaceutical wholesalers to exercise

5    control over the pharmacies that they serve in terms

6    of drug distribution."

7            That's an accurate statement still, right?

8            MR. CHALOS:  Object to the form.

9        A.   I'm not sure that this is 100 percent

10   correct in the present day.

11       Q.   Is it your opinion that wholesale

12   distributors are not required to exercise control

13   over the pharmacies that they service in terms of

14   drug distribution?

15       A.   I think there's --

16           MR. CHALOS:  Object -- object to the form.

17           Sorry.

18       A.   I think there is -- there is a role that the

19   wholesalers play with respect to drug distribution

20   and -- yeah, leave it at that.

21       Q.   So when you wrote this report in 2014, was

22   it true that these requirements that you're citing

23   here do not require pharmaceutical wholesalers to

24   exercise control over the pharmacies that they serve

25   in terms of drug distribution?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. CHALOS:  Object to the form.

 2       A.    When I wrote this in 2014, I believed that

 3    to be true.

 4       Q.    And is it true today?

 5       A.    I don't think so.

 6       Q.    So what changed?

 7       A.    I became aware of requirements that were

 8    placed on the wholesalers to do more monitoring of

 9    the orders that were going through their

10    distribution centers.

11       Q.    What requirements are those?

12       A.    Well, I did not analyze any of that in this

13    case, but as I understand it -- and I think some --

14    I haven't read this whole report in, you know, five

15    years, but the -- the gist of my concerns here were

16    the way that the wholesalers were applying the

17    control over the pharmacy.

18             And at the time, I was not aware that the

19    DEA had begun activities, which I learned about

20    through my analysis of this case, to require

21    wholesalers to do a better job, to do more

22    monitoring of the orders that go through their

23    distribution centers.

24       Q.    So you're saying that there are new

25    requirements that were not present in 2014 today
```

Highly Confidential - Subject to Further Confidentiality Review

1    that require wholesalers to exercise control over

2    pharmacies?

3        A.   No, that's not what I'm saying.

4        Q.   So you're saying when you wrote this

5    statement, it was not true?

6             MR. CHALOS:  Object to the form.

7        A.   No.  I think what I said was pretty clear,

8    that when I wrote this, I believed it to be true at

9    that time, and I still that -- believe that -- that

10   you have to look at what this sentence actually

11   means in the context of this case.

12            This was a situation where a pharmacist that

13   had done a very prudent job of documenting what they

14   did at the retail level was basically cut off from

15   supply of prescription medications for controlled

16   substances and, subsequently, all medications.

17            And the -- so it applies to the amount of

18   control that the wholesaler was applying.  And that

19   was my issue in this case, was that the wholesaler,

20   without doing its due diligence, had unilaterally

21   made some decisions that affected this pharmacist's

22   business.  So that's what my opinions in this case

23   related to.

24       Q.   I'm just trying to understand what changed

25   between then and now that leads you to now disagree

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with this document?

 2       A.   Well, I --

 3            MR. CHALOS:  Object -- object to the form.

 4       It's mischaracterizing his testimony.

 5       A.   Yeah.  So as I said -- and I answered your

 6    question earlier, and I said that -- you said

 7    something about changing between then and now.

 8            I became aware, through my involvement in

 9    this case, that in around 2006, '07, or '08, that

10    the DEA had communicated with wholesalers

11    specifically with regard to the -- their oversight

12    of orders that are placed by pharmacies.  That was

13    something that wholesalers had claimed during this

14    2014 time period, but I had no evidence -- and there

15    certainly was no evidence provided in this case --

16    to inform me about that.

17            So what has changed is my awareness of what

18    was going on.

19       Q.   So in other words, you were wrong, in your

20    words, when you wrote this sentence?

21            MR. CHALOS:  Object to the form;

22       mischaracterizes testimony.

23       A.   Yeah, as I said, I don't -- being "wrong" is

24    your words.  I said that the -- being wrong would be

25    a subject of how you interpret this sentence, and
```

```
 1     the sentence reads:  "These requirements do not

 2     require pharmaceutical wholesalers to exercise

 3     control..."

 4          And I think that's still true.  What they do

 5     require is for wholesalers to monitor the pharmacies

 6     and the drug distribution process.

 7          So I think the sentence is still true, but I

 8     think it would be a misrepresentation to just tell

 9     you that, no, that sentence still stands because

10     I -- I think there's more to it than that.

11     Q.   Okay.

12     A.   Basically I'm -- I'm agreeing with a lot of

13     what you're saying, but I think you are

14     mischaracterizing my use in the sentence.

15     Q.   Okay.  I want to look at your third opinion

16     in this report.  I think it's the first sentence of

17     Paragraph 19.

18     A.   Yes.

19     Q.   It reads:  "The role of the pharmacist is to

20     deliver the medication the medical provider orders,

21     ensuring these orders are filled correctly and that

22     the therapy is appropriate in regard to dosing, drug

23     interactions, and possible adverse reactions."

24     A.   Were --

25     Q.   It's your opinion that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Were you reading -- I'm sorry, were you

 2   reading Opinion III?

 3        Q.    The first sentence of Paragraph 19.

 4        A.    Okay, gotcha.  Thank you.

 5        Q.    It's your opinion that pharmacists have a

 6   duty to ensure that each prescription has a

 7   legitimate medical purpose before filling that

 8   prescription, right?

 9             MR. CHALOS:  Object to the form.

10             I'm sorry, are you reading that?  I lost you

11        somewhere.

12             MS. RODGERS:  I read the first sentence of

13        Paragraph 19.

14             MR. CHALOS:  Right.

15             MS. RODGERS:  And then I asked the witness:

16        "It's your opinion that pharmacists have a duty

17        to ensure that each prescription has a legitimate

18        medical purpose before filling that

19        prescription."

20             MR. CHALOS:  Oh, okay.  Well, I object to

21        the form.  It doesn't have anything to do with

22        that, so I object to the form of the specific

23        question, compound.

24        A.    So the summary opinion is that "It is the

25   responsibility of the retail community pharmacist to
```

1    monitor and attempt to ensure the appropriate

2    medication use."

3            And basically the pharmacist has two duties

4    there:  One is to ensure that there is a legitimate

5    relationship between the prescriber and the patient;

6    and Number 2, it's to ensure that the drug won't --

7    won't do any harm to the patient, to the best of

8    their ability to review that prospectively.

9        Q.    And pharmacists, not pharmaceutical

10   wholesalers, are charged with the responsibility to

11   ensure the appropriateness of the prescription

12   process, right?

13           MR. CHALOS:  Object to the form.

14       A.    Yes, that's -- I agree with that.

15       Q.    Okay.  Now, in Paragraph 21, the second

16   sentence, you wrote:  "I am not aware of any laws or

17   regulations that direct wholesalers to evaluate, at

18   the patient level or otherwise, pharmacy dispensing

19   practices."

20           Do you see that?

21       A.    Yes.

22       Q.    And that was true when you wrote it?

23       A.    It was.

24       Q.    And it's true today?

25       A.    Well, as I said, I've become aware since

1    this time that -- through my work in this case, that

2    in and around 2006, 2008, that the DEA directed

3    wholesalers to pay more attention to the orders that

4    were being placed by pharmacists.

5         Now, I don't think any laws have changed.  I

6    know there have been no changes to the Controlled

7    Substances Act or -- and associated rules and

8    regulations, but I do know there is increased

9    scrutiny at the level of DEA on the orders that are

10   placed by pharmacists.  That was not part of the

11   analysis I did in this case, though.

12   Q.   And increased scrutiny isn't laws or

13   regulations, right?

14   A.   That's --

15        MR. CHALOS:  Object to the form.

16   A.   That's right.

17   Q.   Okay.  So you're "not aware of any laws or

18   regulations today that direct wholesalers to

19   evaluate, at the patient level or otherwise,

20   pharmacy dispensing practices"?

21        MR. CHALOS:  Object to the form; misstates

22   his testimony.

23   A.   And so the evaluation that we were just

24   talking about with respect to the pharmacist's duty

25   is different than I see the duty of the wholesaler.

```
 1        Q.   I'm just trying to get an answer to my

 2   question:  "You're 'not aware of any laws or

 3   regulations that direct wholesalers to evaluate, at

 4   the patient level or otherwise, pharmacy dispensing

 5   practices'"?

 6        MR. CHALOS:  Object to the form.

 7        A.   So if you are saying laws or regulations, I

 8   think I already said that I'm not aware that the

 9   Controlled Substances Act has changes -- has changed

10   or that the -- that any other laws have changed.  So

11   to the extent that the laws and regulations haven't

12   changed but given the caveat that there are

13   increased scrutiny on the part of the DEA, I think

14   that the environment has changed.  The marketing

15   environment that we're operating in with respect to

16   these issues has changed.

17        Q.   In the last sentence, you write:  "The

18   responsibility of the wholesaler is to make sure the

19   pharmacy is a legitimate pharmacy business..."

20        Do you see that?

21        A.   I do.

22        Q.   Okay.

23        MR. CHALOS:  I think there is more to that

24   sentence.

25        MS. RODGERS:  Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   ... and to report the required data of the
 2   units of -- on the units of controlled substances
 3   shipped or sold, to the DEA.
 4            Did I read that correctly?
 5        A.   Yes, you did.
 6        Q.   Okay.  Now, ensuring -- I want to talk about
 7   what it means to ensure that "the pharmacy is a
 8   legitimate pharmacy business."
 9            That includes checking licenses and
10   registrations, right?
11        A.   Yes.
12        Q.   It could include verifying that a pharmacy
13   is a brick-and-mortar business rather than some
14   rogue Internet pharmacy?
15        A.   I -- I assume that would include that, yes.
16        Q.   Okay.  And it could include checking that
17   the pharmacy sells an array of products and not just
18   pain medication, right?
19        A.   I don't know the answer to that.  I do know
20   that there are pharmacies that specialize in pain
21   management and I would assume that they also sell
22   other drugs, but I can't say for sure one way or the
23   other.
24        Q.   Okay.  And there's nothing else, in your
25   opinion, that the wholesaler is required to do to
```

Highly Confidential - Subject to Further Confidentiality Review

1    ensure that a pharmacy is "a legitimate pharmacy

2    business"?

3              MR. CHALOS:   Object to the form.

4        A.    Well, at the time that I wrote this, the

5    understanding that I had that related to my

6    understanding and my interpretation of "legitimate

7    pharmacy business" was the -- was also including

8    whether the pharmacist was doing their due diligence

9    in terms of evaluating and screening and filling

10   prescriptions for -- and particularly with regard to

11   this case, for controlled substances, so legitimate

12   business being more -- a little more broadly defined

13   than I need to define it, but certainly the things

14   that you mentioned, I would agree with.

15       Q.    Uh-huh.

16       A.    I would just add that my understanding was,

17   is that legitimacy of the pharmacy, the

18   relationships with their patients and so forth was

19   also a concern.

20       Q.    Okay.  So it would include evaluating the

21   pharmacy's policies with respect to filling

22   prescriptions.

23              Is that an accurate summary of what --

24       A.    That's -- that's close to what I said, I

25   think.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Anything else?

 2        A.   I think that's it.

 3        Q.   Okay.  Let's look at Opinion V.

 4             Now, in the facts of this case where you

 5    were testifying as an expert, the wholesale

 6    distributor unilaterally stopped providing

 7    controlled substances to a pharmacy, right?

 8        A.   Yes.

 9        Q.   And that was, in part, because of that

10    pharmacy's oxycodone orders?

11        A.   That was alleged, yes.

12        Q.   Okay.  And you disagreed with the

13    distributor's decision to stop selling to the

14    pharmacy, right?

15        A.   Based on the fact that the distributor's

16    decision was made using general guidelines rather

17    than guidelines that were specifically considered

18    for that pharmacy, yes.

19        Q.   Okay.  And you note in Paragraph 26 that the

20    distributor's decision to stop selling controlled

21    substances was based on "two primary

22    considerations."  The first you identified was --

23    and this is a quote -- "a superficial internal

24    analysis of the volume of purchases of controlled

25    substances by Cherokee Pharmacy," correct?
```

1      A.    Yes.

2      Q.    And that's because a review of the volume of

3   purchases of controlled substances by a pharmacy

4   alone isn't particularly helpful, right?

5           MR. CHALOS:  Object to the form.

6      A.    Well, it depends.  The volume of purchases

7   for a particular pharmacy can be helpful.  For

8   example, this pharmacy was located next to a

9   hospital with emergency room facilities, so the

10  pharmacy might be expected to have higher volumes of

11  narcotics being sold through the pharmacy.  This

12  pharmacy also happened to be located on a state

13  line, basically, where they had customers coming

14  from two different states.  They were also in a very

15  rural area, which meant their customers traveled

16  further distances.  They were also in an area where

17  there weren't very many employers and lots of folks

18  were farmers and self-employed, which meant a lot of

19  patients paid cash.

20          These are all the warning signs for a

21  wholesaler.  So looking at it superficially, the

22  wholesaler judged that, hey, this pharmacy has got

23  something suspicious going on.

24     Q.    Uh-huh, and I want to talk about all of

25  those --

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MR. CHALOS:  Wait.  Let him finish.  Let him
 2     finish.
 3     A.   So the -- the problem that I have with that
 4     is, you know, without really consulting with the
 5     pharmacy to see if there were reasons for all of
 6     this, they just made the decision to cut that
 7     pharmacy out.
 8     Q.   And they made that decision based purely on
 9     numbers, right?
10          MR. CHALOS:  Hold on.
11          Doctor, were you finished with your answer?
12          THE WITNESS:  I think so, yeah.
13          MR. CHALOS:  Okay.
14          THE WITNESS:  Thank you.
15          MR. CHALOS:  Okay.  Please, Counsel, let him
16     finish his answer.  I know you want to get on to
17     your next question.  I also -- I'll -- maybe we
18     can go another question or two on this, but these
19     opinions are far outside of the scope of his
20     opinions that are being offered in our case here.
21     So I object to further questioning on suspicious
22     order monitoring since that's not part of his
23     opinions here.
24          MS. RODGERS:  I'm sorry.  We're entitled to
25     ask questions about his prior expert testimony to
```

```
 1    the extent --

 2           MR. CHALOS:  I don't think that's true.

 3           MS. RODGERS:  -- it has a bearing on this

 4    case.

 5           MR. CHALOS:  Well, to the extent it has a

 6    bearing on his opinions in this case.

 7           MS. RODGERS:  To the extent it has a bearing

 8    on this case.

 9           MR. CHALOS:  No, I'm sorry, that's not

10    right.

11           MS. RODGERS:  If we need to call the special

12    master, we can, but I'm going to keep asking

13    questions --

14           MR. CHALOS:  Yes, why -- we should do that

15    then probably.

16           You're not entitled to get into suspicious

17    order monitoring when he has no opinions about

18    that in this case.

19           MS. RODGERS:  Okay.  Do you want to let me

20    go a couple more questions, or do you want to

21    call the special master?

22           MR. CHALOS:  It's up to you.  It's your --

23    your deposition, so you can say --

24           MS. RODGERS:  Well, I'm going to keep asking

25    questions, so it's -- it's a question of if
```

Highly Confidential - Subject to Further Confidentiality Review

1      you --

2          MR. CHALOS:  Okay.  Well, yeah, so then why

3      don't we pause here.  I don't think you should

4      ask any more questions about suspicious order

5      monitoring, his opinions, because he hasn't

6      offered any of those in this case.

7          I was trying to be cooperative and give you

8      a few more questions, but you obviously intend to

9      take advantage of that, so we're not going to do

10     any more questions on suspicious order --

11     suspicious order monitoring.

12         If you want to stop the deposition now and

13     call David Cohen, then we can do that.

14         MS. RODGERS:  Okay.  Let's do that.

15         MR. CHALOS:  Okay.

16         THE VIDEOGRAPHER:  We are now going off the

17     video record.  The time is currently 5:59 p.m.

18         (Recess from 5:59 p.m. until 6:09?p.m.)

19         MR. CHALOS:  I believe you're going to tell

20     me why you're entitled to get into opinions that

21     he's not giving in this case.

22         MS. RODGERS:  Yeah.  So Dr. Perri has

23     testified repeatedly about the distributors' role

24     in the supply chain and how their distribution of

25     opioids to pharmacies was integral to the

1    marketing of the supply chain, of -- of opioids

2    in general.  This issue of kind of what --

3    whether distributors should or should not

4    distribute is central and core to that opinion.

5       Moreover, you know, it's a prior expert

6    report that he actually authored himself, so he

7    has held himself out as an expert in this area.

8    You know, it goes -- we're entitled to ask

9    questions for purposes of impeachment, for

10    quality of work, for bias, to test his expertise.

11       You know, it's kind of -- it kind of goes to

12    the foundation of the testimony about roles in

13    the supply chain, and so we think we're entitled

14    to ask these questions.

15       MR. CHALOS:  Okay.  So our position is that

16    you're entitled to ask him questions about the

17    opinions that he's offered within the four

18    corners of his report, which is Exhibit 1 to his

19    deposition.

20       He has said over and over again that he's

21    not giving any opinions about suspicious order

22    monitoring in this case.  We have experts who

23    will do that.  You can ask them all about that,

24    and you can maybe even ask them about Dr. Perri's

25    prior opinions in a different case in a

Highly Confidential - Subject to Further Confidentiality Review

```
 1      completely different context.

 2          But your position that you're entitled to

 3      ask him about any opinion he's given in any case

 4      for any reason and at any time in the past, we

 5      just don't agree with.

 6          So suspicious order monitoring is not part

 7      of his opinions in this case.  We don't think you

 8      are entitled to ask about them.

 9          I was trying to be cooperative and let you

10      get to a point using this Exhibit 10, which is a

11      prior opinion in a different case involving

12      different issues, but you obviously intend to ask

13      him his suspicious order monitoring opinion --

14      opinions, which he does not have in this case,

15      and he's not holding himself out as an expert in

16      that area in this case that we're here about

17      today, so --

18          MS. RODGERS:  And just to clarify, we're

19      intending to ask him questions about whether he

20      thinks distributors should be shipping

21      prescription opioids to certain pharmacies.

22      You're classifying it as "suspicious order

23      monitoring."  I think it's a little bit broader

24      and different than that, and, you know, I think

25      we are entitled for a number of reasons to ask
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      these questions.

 2          MR. CHALOS:  Okay.  Well, we disagree and

 3      you can, you know, call it what you will.  It's

 4      about -- it's about monitoring orders to

 5      pharmacies, and that's not what his opinions are

 6      about here.  It's a marketing -- he's a marketing

 7      guy.  He's giving marketing opinions in this

 8      case, so --

 9          MS. RODGERS:  Do you want me to continue

10      asking questions and you can object, or do you --

11      are you preventing your witness from --

12          MR. CHALOS:  I think we shouldn't waste any

13      more time.  Y'all are telling me you're going --

14          MS. RODGERS:  Well, it's our time to decide

15      how we use it.  So, I guess, are you cutting --

16      are you instructing your witness not to answer

17      these questions, or did you want to reserve your

18      rights to object and --

19          MR. CHALOS:  Yeah.  I'm telling you that

20      it's beyond the scope of his opinions and I don't

21      think it's proper to ask him any more questions

22      about opinions that he doesn't have in this case.

23          So that's right, we'll table this issue,

24      we'll get David Cohen on the phone to have an

25      adjudication of whether you can ask him about
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      suspicious order monitoring or other supply

 2      monitors -- monitoring, but I don't intend to let

 3      him answer any questions about opinions that he's

 4      not giving in this case.

 5           MS. RODGERS:  Okay.  All right.

 6           Can, actually, one of the cocounsel e-mail

 7      Special Master Cohen while we go off the record?

 8           MR. CHALOS:  So why don't we go on to some

 9      other questioning and leave this to the side so

10      we don't have to -- and then we can get a ruling

11      on it and then you can come back to it and ask

12      him.

13           MS. RODGERS:  Okay.

14                (Discussion off the record.)

15          (Recess from 6:13?p.m. until 6:14?p.m.)

16           THE VIDEOGRAPHER:  We are now back on the

17      video record with the beginning of Media

18      Number 7.  The time is currently 6:14 p.m.

19  BY MS. RODGERS:

20      Q.   Okay.  Mr. Perri, I just have a couple more

21  questions pending our conversation with Special

22  Master Cohen, and the first is whether you've

23  completed all the work that you intend to do on this

24  matter.

25      A.   Unless more information is provided.  The
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    only thing that I might -- is if new questions are

 2    posed, but I don't anticipate doing any further work

 3    on the case.

 4        Q.    If new questions are posed to you by whom?

 5        A.    By Counsel, yeah.

 6        Q.    And are you otherwise prepared to testify

 7    about the opinions that you've included in your

 8    report?

 9            MR. CHALOS:  Object to the form.  I think it

10        gets into attorney-client privilege stuff about

11        his preparation.

12            So I'm going to instruct you not to answer

13        that question.

14        Q.    Are you considering any additional opinions

15    that are not otherwise in your report?

16        A.    Not at this time, no.

17        Q.    Okay.

18            MS. RODGERS:  I have no further questions

19        pending resolution of our dispute with Special

20        Master Cohen.

21            MR. CHALOS:  Our dispute is not with Special

22        Master Cohen.  He will be adjudicating our

23        dispute.  We have no dispute with Special Master

24        Cohen.

25            THE VIDEOGRAPHER:  We are now going off the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        video record.  The time is currently 6:15 p.m.

 2             (Recess from 6:15 p.m. until 6:19 p.m.)

 3             THE VIDEOGRAPHER:  We are now back on the

 4        video record.  The time is currently 6:19 p.m.

 5                       CROSS-EXAMINATION

 6   BY MR. LADD:

 7        Q.   Good afternoon, Dr. Perri.  My name is

 8   Matthew Ladd from the law firm Morgan, Lewis &

 9   Bockius representing defendant Rite Aid.  I'm going

10   to ask you a few questions this afternoon.

11        A.   Okay.

12        Q.   Have we met before, prior to today's

13   deposition?

14        A.   I don't think so.

15        Q.   And are you aware that there are several

16   retail pharmacy defendants in this case?

17        A.   Yes.

18        Q.   Do you know who they are?

19        A.   My understanding was they were Walgreens,

20   CVS, and Walmart and a couple of others.  I guess

21   since you're here, that would include Rite Aid.

22        Q.   So you're aware that Rite Aid is also a

23   defendant in this case?

24        A.   Yes.

25        Q.   And do you understand that the retail
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy defendants have been sued in this case in

2    their capacity as distributors?

3        A.    That's my understanding, yes.

4        Q.    So you understand that retail pharmacy --

5    retail pharmacy defendants are not being sued in

6    this case as dispensing pharmacies?

7        A.    Yes, I do understand that.

8        Q.    And you understand that the retail pharmacy

9    defendants in this case are not being sued with

10   respect to dispensing at any of their retail

11   pharmacy stores?

12       A.    That is my understanding, yes.

13       Q.    Is it also your understanding that the

14   retail pharmacy defendants in this case distribute

15   controlled substances only to their own pharmacy

16   stores?

17       A.    So the answer to that is I'm not sure.  I

18   know that the documents that I reviewed in the

19   record, I -- I did draw that conclusion for -- you

20   know, in looking at each defendant individually to

21   formulate a -- you know, an aggregate opinion.  I

22   was able -- I think this was brought up this

23   morning.  I was able to ascertain that Walgreens did

24   distribute Schedule II narcotics through their --

25   for at least a period of time through their central

Highly Confidential - Subject to Further Confidentiality Review

```
 1    warehousing.  Walmart and CVS were a little bit
 2    different.  I don't know for Rite Aid.
 3        Q.   Do you have any reason to believe that Rite
 4    Aid made distributions of controlled substances
 5    other than to its own pharmacy stores?
 6        A.   I don't have any reason to believe that
 7    and -- no, I don't.
 8        Q.   And I want to return to what you said
 9    earlier this morning and ask you a few questions
10    about it.
11         If I remember correctly, you said something
12    to the effect, during Mr. Volney's questioning, that
13    it would have some bearing on your opinions if
14    retail chain pharmacies were ordering from their own
15    distribution centers as opposed to ordering from a
16    wholesale distributor; is that correct?
17         MR. CHALOS:  Object to the form.
18        A.   So I -- I'm not sure I remember the exact
19    testimony this morning, but I think I can answer
20    your question.
21         The -- if a chain pharmacy was engaged in
22    wholesale distribution, they would be engaged in
23    wholesale distribution to their own stores.
24    However, if they did not distribute CII drugs at any
25    point, then they would not be engaged in the
```

1   wholesale distribution that would be part of this

2   case.

3       Q.   And is it your understanding that all the

4   retail pharmacy -- pharmacies in this case did

5   distribute CII drugs?

6       A.   As I said just a moment ago, Walgreens, my

7   analysis of the materials, the answer is yes.

8            For Walmart, they -- they did

9   because they -- well, Walmart -- as far as I

10  understand, Walmart did distribute CIIs through

11  their own central warehouse, and CVS ordered -- CVS

12  distributed controlled substances but not

13  Schedule II.  My understanding is they distributed

14  controlled substances through -- through their

15  warehouse but excluded the Schedule II narcotics in

16  that.

17      Q.   Are you aware also that Rite Aid never

18  distributed CII controlled drugs?

19      A.   As I said, I have not seen documents related

20  to Rite Aid.

21      Q.   Do you have any reason to believe that Rite

22  Aid did distribute Schedule II narcotics at any

23  time?

24      A.   I didn't see any documents or testimony that

25  indicated that they did distribute that or that they

Highly Confidential - Subject to Further Confidentiality Review

```
 1    didn't, so --

 2        Q.   Do you know whether any of the retail

 3    pharmacy defendants in this case are currently

 4    distributing Schedule II narcotics?

 5        A.   I know that -- at least my understanding is,

 6    from the record, is that Walgreens no longer does.

 7    Walmart, I don't know.  CVS never -- never did, as

 8    far as I know, or at least not in a relevant time

 9    period.

10        Q.   Do you know when Walgreens stopped

11    distributing?

12        A.   I saw the documentation about this, and I

13    think it was around 2013 or '14.

14        Q.   Were you asked to review any materials that

15    were produced by the retail pharmacy defendants in

16    this case?

17        A.   I wasn't specifically asked.  I cannot say

18    one way or the other how many documents or -- other

19    than deposition testimony that were from the retail

20    pharmacy defendants, because it was a very small

21    subset of the documents that were produced.

22        Q.   Setting aside deposition testimony, do you

23    have any specific recollection of reviewing any

24    documents that were produced by any of the retail

25    pharmacy defendants?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Just the Walgreens, some Walgreens

2   documents.

3        Q.    Any other?

4        A.    I'm thinking.

5              I could give you a very specific answer to

6   that question if I had my resources available to me,

7   but if we looked at my report as a representative

8   sample of what documents are cited from which

9   defendants, I don't believe there are.  I believe

10  there is a Walgreens document cited, but I don't

11  believe there is a Walmart document.

12             I'd have to look to see for sure, but there

13  were very few documents that I reviewed related to

14  the pharmacy defendants.

15       Q.    And I think you said a moment ago that you

16  did not recall reviewing any documents produced by

17  Rite Aid; is that correct?

18       A.    Yes, I don't recall Rite Aid specifically at

19  all.

20       Q.    Do you recall reviewing any documents

21  produced by CVS?

22       A.    I honestly can't recall, as I sit here right

23  now.

24       Q.    And do you recall what the Walgreens

25  document was that you reviewed?
```

```
 1       A.    I believe it was an e-mail exchange or a

 2   letter that was discussing the issue of ceasing

 3   distribution from the wholesale facility, the

 4   company-run wholesale facility, and discussing that

 5   they would use up existing supplies of CIIs but,

 6   after that, the CIIs would be coming from the

 7   wholesaler.

 8       Q.    Did that document have anything to do with

 9   the marketing of opioids?

10       A.    Only inasmuch as the distribution of the

11   opioids is, in my opinion, a marketing activity.

12       Q.    I understand.

13            So aside from your opinion that the

14   distribution of opioids is a marketing activity,

15   that document contained no other marketing-related

16   substance aside from a discussion about ceasing

17   distribution?

18       A.    I think -- I think you're asking me about

19   marketing messages, such as contained in Table II.

20            And no, it did not.

21       Q.    Aside from what we just talked about, to

22   your recollection, did you review any other

23   materials that were produced by the retail pharmacy

24   defendants?

25       A.    Other than deposition testimony?  No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Correct.

2        A.   No.

3        Q.   And if you had, those documents would have

4    been in Schedule 3 of your report, correct?

5        A.   Yes, it would have been contained in

6    Schedule 3 if -- if documents from each of those

7    defendants were actually in the documents that were

8    either identified and provided to me or documents

9    that I searched for and identified myself.

10       Q.   If you could turn to Exhibit 1, Dr. Perri,

11   I'd like to ask you a few questions about your

12   report, starting on Page 9, under the heading "Basis

13   and Reasons for Opinions," Section 1, "Marketing and

14   Pharmaceutical Marketing."

15       A.   Yes.

16       Q.   Does Section 1, titled "Marketing and

17   Pharmaceutical Marketing," specifically discuss

18   marketing connected by any of the retail pharmacy

19   defendants?

20       A.   Not specifically, no.

21       Q.   So none of the retail pharmacy defendants

22   are, for instance, mentioned by name in Section 1?

23       A.   That's correct.

24       Q.   And there is no specific discussion in

25   Section 1 of any particular marketing efforts
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    conducted or developed specifically by the retail

 2    pharmacy defendants; is that right?

 3        A.   I'm sorry, I -- it's getting late in the

 4    day, and I think I lost you on that one.

 5        Q.   I understand.  I'll repeat the question.

 6             In Section 1, there is no specific

 7    discussion of any particular marketing efforts

 8    conducted or developed specifically by the retail

 9    pharmacy defendants?

10        A.   That's correct, yes.

11        Q.   Is that right?

12        A.   Yes.

13        Q.   If you could turn to Page 64 of your report,

14    please.  I know you've discussed this table before.

15             Do you see the table titled "Table 1:

16    Pharmaceutical Supply Chain System Stakeholders" at

17    the top of Page 64?

18        A.   Yes, I do.

19        Q.   And on the left-hand column, there is a

20    heading that says Entity; is that right?

21        A.   Yes.

22        Q.   And what's your understanding of which

23    entity listed in the left-hand column of this table

24    corresponds to the retail pharmacy defendants?

25             Where do the retail pharmacy defendants fall
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in this list?
 2        A.    Under "Pharmacies" or under "Wholesale
 3    Distributors."  The analysis that I did would not
 4    have included them under "Pharmacies" because I
 5    didn't really look at pharmacy dispensing, but I did
 6    look at wholesale distributors, so they would fall
 7    under "Warehousing Pharmacy Chains."
 8        Q.    So in the context of the opinions in your
 9    report specific to retail pharmacy defendants, you
10    were looking at them as Warehousing Pharmacy Chains;
11    is that right?
12        A.    That's correct.
13        Q.    And in the right-hand column, there's a
14    heading that says Supply Chain System Roles; is that
15    right?
16        A.    Yes.
17        Q.    And there are four roles listed on the
18    right-hand side; is that correct?
19        A.    For wholesale distributors?
20        Q.    Correct.
21        A.    Yes.
22        Q.    And can you just read those out loud for the
23    record, please, each of those four?
24        A.    Manage distribution of products, Facilitate
25    customer discounts and chargebacks, Service
```

```
 1     pharmacies/generic source programs, Negotiate

 2     pricing with pharmacies.

 3         Q.    Thank you.

 4             And is it your opinion that all of those

 5     four supply chain system roles are equally

 6     applicable to warehousing pharmacy chains as they

 7     are to full-service -- full-service wholesalers?

 8         A.    I think my opinion would be that

 9     full-service wholesalers do more than a wholesaling

10     pharmacy chain would do because of their ability to

11     manage data, which the wholesale -- wholesaling

12     pharmacy chains may not do.  They may engage in some

13     of that, but the wholesale distributors are much

14     more able to draw the data transmission that goes on

15     in the industry, to provide the kind of data that's

16     actually useful to a pharmaceutical company.

17             The warehousing pharmacy chains are

18     basically -- my understanding and my experience in

19     working in the industry for so many years was that

20     they were doing that as a cost-saving measure and a

21     way to increase their own internal efficiencies, but

22     not to participate in some of these other -- for

23     example, other activities such as are defined in the

24     flowchart on the page -- in Figure 4 on the page

25     before this.
```

1    Q.   And can you explain to me a little bit more

2    what you mean by managing data and to what extent

3    warehousing pharmacy chains like the retail pharmacy

4    defendants in this case are managing data?

5    A.   Yeah.  So I -- my -- my belief is, is that

6    they are not doing that.  They would be -- in terms

7    of providing data to, for example, a manufacturer on

8    sales movement of products and where resources need

9    to be allocated for future production, I don't think

10   the warehousing chains engage in that.

11        Again, I haven't done any analysis of their

12   business activities, so what I'm speaking to here is

13   not part of what I did in this case but just my

14   understanding of what happens in the industry and

15   based on my experience from working -- my experience

16   in working for at least one of the chains that we're

17   talking about.

18   Q.   And to the extent that retail chain

19   pharmacies are captive distributors -- in other

20   words, to the extent that they are supplying and

21   distributing drugs only to their own stores, any

22   data that they are managing would be in the context

23   of distribution to those stores; is that correct?

24   A.   That's my experience with -- in working with

25   Walmart, yes.

```
 1        Q.   Okay.  Because when talking about customers,

 2   the stores are the retail pharmacies' only

 3   customers; is that right?

 4        A.   Yes.  In terms of the distribution process,

 5   yes.

 6        Q.   Right.  And among these four roles here on

 7   the right-hand side of Table 1, does the word

 8   "marketing" appear in any of these four roles?

 9        A.   It does -- it does -- it does in the first

10   box under "Pharmaceutical Manufacturers."

11        Q.   And so let me rephrase my question.

12             You're looking at the first box on the

13   right-hand side across from the box that says

14   Pharmaceutical Manufacturers, Branded, Generic,

15   Specialty.  Is that right?

16        A.   Yes.

17        Q.   Okay.  Let me bring you down to those four

18   bullet points that we were just talking about, the

19   box on the right-hand side across from the box that

20   says Wholesale Distributors, Full Service

21   Wholesalers, Warehousing Pharmacy Chains, those four

22   bullet points that we just talked about a few

23   moments ago.

24             Does the word "marketing" appear in that

25   box?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    It does not.

 2      Q.    Could we go to Page 86 of your report,

 3   please?

 4            I know that when Ms. Rodgers was asking you

 5   some questions, you answered some questions about

 6   this particular table.  I'm going to ask you a

 7   similar question concerning the retail chain

 8   pharmacy defendants.

 9            This is called -- this is titled Table II:

10   Marketing Messages; is that right?

11      A.    Yes, sir.

12      Q.    And it's a table with four columns, the

13   right-hand column of which reads Defendant; is that

14   right?

15      A.    Yes, it does.

16      Q.    Can you tell me generally what this -- what

17   information this table contains?

18      A.    Table II contains --

19            MR. CHALOS:  Object to the form; asked and

20         answered.

21      A.    Table II contains marketing messages that

22   were summarized by looking at a large volume of

23   marketing-oriented documents grouped together under

24   subheadings that reflected general themes of those

25   marketing messages.
```

```
 1      Q.    Thank you.  And to your knowledge, do the

 2   names of any of the retail pharmacy defendants --

 3   Rite Aid, CVS, Walmart, or Walgreens -- appear at

 4   all in this table?

 5      A.    They did not.

 6      Q.    So it's your understanding that this table

 7   contains no documents or refers to no documents that

 8   were produced by the retail pharmacy defendants; is

 9   that correct?

10      A.    That is my --

11            MR. CHALOS:  Object to the form; asked and

12      answered.

13      A.    That is my understanding, yes.

14      Q.    Could I direct you, Dr. Perri, to Page 151

15   of your report, please?

16      A.    Yes, sir.

17      Q.    And specifically looking at Section H,

18   "Wholesale Distributors and Defendants' Marketing,"

19   that section begins at Paragraph 183 and extends to

20   Paragraph 187 on Page 154; is that correct?

21      A.    That's correct.

22      Q.    And this section of the report does not cite

23   to any documents that were produced by the retail

24   pharmacy defendants; is that right?

25            And you're looking at a binder.  Can you let
```

1      us know exactly what you're looking at?

2      A.   Yes.  In response to the question about the

3    references, I noticed that Schedule 16,

4    "Co-Promotional Marketing with Distributor

5    Defendants" -- I wanted to make sure that, if

6    possible -- and I don't know that it will be, that

7    this did not include any of the retail pharmacies.

8    I don't believe that it does, but I just wanted to

9    verify that and give you the best answer possible.

10          No, you're correct.  I'm sorry.  It does

11   not.

12     Q.   I'll read the question back one more time

13   just so we have a record.

14          This section of the report, Section 3H of

15   your expert report, does not cite to any documents

16   that -- that were produced by the retail pharmacy

17   defendants; is that right?

18     A.   That's correct.

19     Q.   And similarly, this section of your report

20   does not specifically mention any of the retail

21   pharmacy defendants; is that right?

22     A.   It -- it doesn't mention any of them by

23   name, no.

24     Q.   Thank you.

25          Looking at Paragraph 183 of your report, the

1    second sentence of that paragraph, you write:  "In

2    the pharmaceutical industry, the distribution

3    function is provided by pharmaceutical wholesale

4    distributors, and pharmacy chains who provide all or

5    part of the wholesale distribution function through

6    their own vertically integrated wholesale

7    distribution divisions."

8         Did I read that correctly?

9    A.   Yes.

10   Q.   Is it fair to say that what you're saying

11   here concerning pharmacy chains is that retail

12   pharmacies are part of the supply chain?

13   A.   That would be fair to say, yes.

14   Q.   Are you saying anything else in this

15   paragraph concerning any purported marketing efforts

16   by retail chain pharmacies other than that they are

17   part of the supply chain?

18        MR. CHALOS:  Object to the form.

19   A.   My opinions about the pharmacy chains are

20   related specifically to their involvement, if any,

21   in the distribution function as part of the supply

22   chain and not as -- not as pharmacies dispensing

23   prescriptions to patients.

24   Q.   And when you say "through their own

25   vertically integrated wholesale distribution

1    divisions," is that a reference to what we were

2    speaking about a few moments ago as -- as retail

3    pharmacies being captive distributors and

4    distributing to their own stores?

5        A.   Yes, it is.

6        Q.   Could you turn the page to Paragraph 187,

7    the final paragraph of this section?

8            And in Paragraph 187, you write:  "Given the

9    forms of generic marketing, including the essential

10   function of drug distribution in the supply chain

11   system, the increased sales of opioids resulting

12   from Defendants' marketing could not have occurred

13   without wholesale distributors and pharmacies which

14   completed the supply chain system and made opioids

15   available to patients."

16           Did I read that correctly?

17       A.   Yes, you did.

18       Q.   Again, this paragraph is simply reiterating

19   the role in the supply chain that the retail chain

20   pharmacies play and that we discussed a moment ago;

21   is that correct?

22           MR. CHALOS:  Object to the form.

23       A.   I -- and that's partially correct, but when

24   I read the sentence now, it -- it says "completed

25   the supply chain and made opioids available to

1    patients," so it does -- it does certainly seem like

2    I'm including pharmacies in their dispensing role

3    here.  However, I can tell you that I do not have an

4    opinion about that, other than that they were part

5    of the supply chain.

6       Q.   And I guess what I'm trying to get at is

7    that, setting aside dispensing, are you alleging

8    that retail chain pharmacies engaged in any sort of

9    marketing efforts aside from their role in the

10   supply chain, as you discuss here?

11      A.   No, I'm not.

12      Q.   In other words, you're not contending in

13   this report that retail pharmacy defendants

14   advertised opioids to doctors; is that right?

15      A.   No, I'm not.

16      Q.   And you're not contending in this report

17   that the retail pharmacy defendants advertised

18   opioids directly to patients, correct?

19      A.   My analysis did not provide that

20   information.  I am not alleging that, no.

21      Q.   And similarly, you're not alleging in this

22   report that the retail pharmacy defendants

23   advertised opioids to the general public?

24      A.   So you made the -- the distinction with the

25   term "advertised."  I'm trying to recall -- and,

```
 1    again, I'm -- I'm at a slight disadvantage here

 2    because I don't have access to my documents, but the

 3    question that's on my mind and the one that I may

 4    not be able to answer for you right this moment is

 5    whether or not retail pharmacies in general

 6    distributed any patient-level brochures that were

 7    provided by drug companies in their marketing

 8    efforts.

 9           If -- if they did do that -- and I -- again,

10    as I sit here right now, I can't recall whether

11    that's true or false, but it is entirely plausible

12    that that did occur because it's something that does

13    occur in the industry.  It would -- it would engage

14    the retail pharmacies as more of a part of marketing

15    than just the distribution function.

16       Q.   And you're talking about brochures that a --

17    that a retail pharmacy store might provide to a

18    patient or somebody coming in to pick up a

19    prescription?

20       A.   Not the package insert, but more -- more

21    along the lines of some of the brochures that were

22    created by the marketing defendants in the

23    manufacturing sector that focused on patient

24    education materials that would be distributed

25    through doctors' offices.
```

```
 1              And as I said, I can't recall, as we sit

 2      here right now, whether they were distributed

 3      through any pharmacies.  I don't think it's the

 4      case, but I just want to leave open the possibility.

 5      And I do need to check on that.

 6         Q.   Okay.  So let me just break that down and --

 7      because it was kind of a long answer, so I'm going

 8      to ask a handful of follow-up questions.

 9         A.   Sure.

10         Q.   Is there -- is there anything in your

11      report, in Exhibit 1, specifically concerning what

12      you're talking about?

13              You said brochures that -- that patients

14      going to pharmacies might have received.

15         A.   I don't think so.  Again, I don't believe

16      that to be the case.

17         Q.   Okay.  And then, second, any of these

18      patient education materials that would be

19      distributed through doctors' offices, are you trying

20      to say that retail chain pharmacies, as

21      distributors, would have had any role in

22      distributing those sorts of promotional materials?

23         A.   Not as -- not as distributors, per se, but

24      just through the distribution of patient-oriented

25      materials through either the pharmaceutical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    manufacturers or even through advocacy groups.  It's
 2    possible that some of those patient materials ended
 3    up in retail pharmacies.
 4          As I said, I have not seen those documents,
 5    and I cannot recall, as we sit here today, whether
 6    that occurred or not.
 7    Q.   You haven't seen anything in the documents
 8    that you've -- that you have reviewed for this case
 9    indicating that the retail chain pharmacies were
10    distributing patient-oriented materials?
11    A.   Not that I recall.
12    Q.   So returning to my question, when I asked
13    you're not contending in this report that the retail
14    pharmacy defendants advertised opioids to the
15    general public, setting aside this -- the small
16    piece that you can't recall, is there anything else?
17          MR. CHALOS:  Object to the form.
18    A.   I don't think so, no.
19    Q.   Returning, if you would, to Page 64 of your
20    report, Dr. Perri, we discussed warehousing pharmacy
21    chains and this -- this Table 1 entitled
22    "Pharmaceutical Supply Chain System Stakeholders."
23          I'd like to ask you, you mentioned the role
24    of pharmacies in the supply chain system.  And very
25    broadly, pharmacies dispense medication to patients
```

```
 1    with prescriptions; is that right?

 2        A.   Yes.

 3        Q.   And what kinds of dispensing analyses are

 4    you aware of that distributors or other entities

 5    might -- might undertake in order to evaluate the

 6    propriety of a pharmacy's dispensing?

 7        A.   I'm not sure I understand your question.

 8             Are you asking me what a manufacturer or

 9    wholesaler might look at to determine if the

10    pharmacy was a legitimate business or --

11        Q.   I'm asking you generally, what's your

12    understanding of the term "dispensing analysis"?

13        A.   The -- and my understanding of the term

14    "dispensing analysis" would be a review of the

15    information that can be summarized regarding patient

16    pharmacy purchases in a given pharmacy.

17             For example, we were talking about, a few

18    moments ago, whether the -- the numbers of patients

19    that pay cash for their prescriptions, the numbers

20    of patients that receive controlled substances, the

21    numbers of patients who live a certain distance from

22    the pharmacy, and variables such as that that can be

23    determined just based on the raw data that's in the

24    pharmacy prescription computers.

25        Q.   And in your opinion, is a dispensing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    analysis going to be accurate if it does not account

 2    for those variables that you just mentioned?

 3         MR. CHALOS:  Object to the form.

 4    A.    The -- a dispensing analysis, even paying

 5    attention to those variables, might not be accurate

 6    because it must be considered in terms of the

 7    actual -- the pharmacy that's in question.

 8         A few moments ago we were discussing the

 9    specific pharmacy that was being asked about in the

10    questions, and it was my assertion that some of the

11    numbers that were looked at in that dispensing

12    analysis were sort of unfair to the pharmacy because

13    of the pharmacy's location being in a rural area,

14    being in a -- a border between two states, being

15    next to a hospital, and so forth.

16         But again, these are -- these are issues

17    that I really didn't look at in this case and -- and

18    were not part of -- not part of my report or

19    something that I even discussed in my report.

20         MS. RODGERS:  I just want to say for the

21    record he's now going into this report again.  I

22    think we're squarely entitled to ask questions --

23         MR. CHALOS:  No.  He asked him questions and

24    I let him ask one question.  Absolutely we're not

25    waiving anything.  He shouldn't have asked the
```

```
 1      question.  That doesn't mean he can open the door

 2      for you.  I mean, good try, but no.

 3           MS. RODGERS:  He's testifying about it.

 4           MR. CHALOS:  He asked him a question about

 5      it.

 6  BY MR. LADD:

 7      Q.   So I -- I did ask a question, and I want to

 8  go back now, Dr. Perri, and ask you some additional

 9  questions concerning Exhibit 10, which was your

10  prior report in the Cherokee Pharmacy case.

11           MR. CHALOS:  Well, we're not going to --

12      we're not going to do that, subject to the same

13      issue.

14           MR. LADD:  So if that's your -- are you

15      instructing Dr. Perri not to answer any questions

16      about --

17           MR. CHALOS:  I mean, are you going to do the

18      same thing that she tried to do?

19           MR.  LADD:  I'm asking you if you're

20      instructing --

21           MR. CHALOS:  I'm asking you what questions

22      you're going to ask him.  If you're going to ask

23      him about suspicious order monitoring and what

24      duties a distributor has with respect to

25      monitoring the dispensing practices of a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      pharmacy, that's beyond the report that is given

 2      in this case, and I'm not going to let him answer

 3      those questions, subject to the same issue.

 4          I mean, this is not honest -- this is not an

 5      honest undertaking, you trying to do what we're

 6      debating and are going to bring to Special Master

 7      Cohen.

 8          MR. LADD:  I disagree, and for the record, I

 9      would like to say that we intended to ask

10      Dr. Perri questions about this report.  We

11      believe that there are opinions that we --

12          MR. CHALOS:  Which report?  The one from the

13      other case you're talking about?

14          MR. LADD:  The one from the other case.

15          MR. CHALOS:  Okay.

16          MR. LADD:  -- that there are opinions in

17      Dr. Perri's prior report that go directly to the

18      heart of this case and that we are entitled to

19      put any document that we would like in front of

20      Dr. Perri, not just his current expert report,

21      so --

22          MR. CHALOS:  You're arguing the same thing

23      she just argued.  We're -- we're going to have

24      Special Master Cohen rule on that, so don't try

25      to do the same thing that we're going to have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Special Master Cohen rule about.

 2          If you have other questions, ask them.

 3     Otherwise, we'll get a ruling and then you can

 4     come back and ask questions and you can come back

 5     and ask questions if he rules your way, but don't

 6     be dishonest and try to do something sneaky like

 7     that --

 8          MR. LADD:  I'm not being dishonest.

 9          MR. CHALOS:  -- which is what you just did.

10          MR. LADD:  And for the record, I would just

11     like to make clear that your position is you're

12     instructing Dr. Perri not to answer any questions

13     about this report?

14          MR. CHALOS:  Subject to --

15          MR. LADD:  Subject to --

16          MR. CHALOS:  -- an adjudication --

17          MR. LADD:  Subject to Special Master

18     Cohen's --

19          MR. CHALOS:  Listen, I'll -- I'll say my own

20     words.  Okay?

21          Subject to Special Master Cohen considering

22     and ruling on this issue.  And don't be sneaky

23     and try to do something that you know is going to

24     be adjudicated with Special Master Cohen, trying

25     to ask the same questions that we've already
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        decided we're not going to ask him until we get a
 2        ruling on that.
 3             MR. LADD:  So for the record, we, Rite Aid,
 4        reserves all its rights to answer -- to ask any
 5        questions about this prior report subject to
 6        Special Master Cohen's ruling on this dispute.
 7             MR. CHALOS:  Okay.  Don't be sneaky.
 8             MR. LADD:  I'm not sneaky.
 9   BY MR. LADD:
10        Q.   Dr. Perri, does your report contain all the
11   opinions you are providing in this case concerning
12   the retail pharmacy defendants?
13        A.   Yes, it does.
14        Q.   Are you considering any additional opinions
15   with respect to the retail pharmacy defendants that
16   are not currently reflected in your report?
17        A.   No, sir.
18             MR. LADD:  I have nothing else at this time.
19             THE WITNESS:  Thank you.
20             MR. LADD:  Thank you for your time.
21             THE VIDEOGRAPHER:  We are now going off the
22        video record.  The time is currently 6:52 p.m.
23        (Recess from 6:52 p.m. until 6:54 p.m.)
24             THE VIDEOGRAPHER:  We are now back on the
25        video record.  The time is currently 6:54 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                      CROSS-EXAMINATION

2    BY MR. CARTER:

3        Q.    Good afternoon, Dr. Perri.  My name is Ed

4    Carter, and I represent Walmart.  I have some

5    questions for you.

6        A.    Okay.  Have we met, Mr. Carter?

7        Q.    Not to my knowledge.

8              Do you recall meeting me?

9        A.    It seems so, but I could be mistaken.

10       Q.    Okay.  Are you familiar with Dr. Dean

11   Krugman in the marketing department at the

12   University of Georgia?

13       A.    Yes, I am.

14       Q.    Do you consider him an expert on marketing,

15   generally?

16       A.    He's -- I think he's an -- what I would

17   refer to as an advertising expert.  I don't know

18   about his expertise in the field of marketing in

19   general, but I know in advertising, he's top-notch.

20       Q.    How do you define "marketing" versus

21   "advertising"?  What's the distinction you draw?

22       A.    So advertising is a subset of marketing, a

23   very specific subset that relates to communication

24   of messages, specifically.  But the overall

25   marketing process is much more comprehensive than
```

1   just advertising, so there's -- there's more to it

2   than just the communication of the messages.

3           So all these issues we've been talking about

4   here today regarding supply chain considerations

5   and -- and so forth would be part of the marketing

6   program but not necessarily just part of

7   advertising.

8       Q.   When we talk about marketing, marketing can

9   serve a number of different roles, correct?

10      A.   Yeah.  I mean, I generally agree with that,

11  yes.

12      Q.   Marketing can stimulate primary product

13  demand?

14      A.   Oh, I see what you're getting at.

15           Yes, absolutely.

16      Q.   Marketing can also affect allocation or

17  brand switching within a product line, correct?

18      A.   Right.  I refer to that as "market share."

19      Q.   Market share.

20           With respect to your analysis of the

21  aggregate marketing relative to opioids, have you

22  undertaken any quantitative assessment as to which

23  portion was geared towards generating primary demand

24  versus allocation of a brand market share?

25      A.   I know that I reviewed documents that

Highly Confidential - Subject to Further Confidentiality Review

1    discussed those -- those issues.  I know I reviewed

2    metrics that evaluated the capture of market share

3    and market expansion, but I did not quantitatively

4    assess that.

5         The information I was looking for in those

6    kinds of documents was what was the impact of the

7    marketing, and it certainly is clear from the

8    analysis that the metrics that manufacturers

9    recorded showed significant and substantial

10   increases in the size of the opioid market overall,

11   as well as their ability to capture market share

12   from competition.

13   Q.   But in terms of parsing that or categorizing

14   the different documents cited in your reliance

15   materials, you're not able to give a percentage or

16   any kind of quantitative value to the purpose of the

17   marketing materials?

18   A.   I suppose that could be done, but I didn't

19   undertake that analysis.

20   Q.   So you're not prepared to provide that

21   information to the jury in this case?

22   A.   I don't plan on offering any opinions about

23   that, no.

24   Q.   Okay.  Do you agree that marketing is

25   inherently a competitive undertaking?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Generally, I agree with that, yes.

 2      Q.   So when -- when Coca-Cola is marketing,

 3   they're not trying to increase sales of Pepsi?

 4      A.   They might not be trying to, but

 5   inadvertently their marketing efforts will result in

 6   increased sales of Pepsi.  That would be my opinion

 7   on that.  It is very difficult -- there is a lot of

 8   literature about that kind of marketing activity

 9   when -- for example, competitive, Eveready Energizer

10   Bunny versus Duracell that -- that one marketing

11   program impacts the other, and if you have

12   head-to-head comparisons of Duracell to Energizer,

13   it lends credibility to the competitor, the

14   underdog, so to speak.

15           So there's a lot of -- a lot of reasons to

16   consider why that would -- it would be true that

17   marketing raises -- sort of raises the level of the

18   pond in terms of the shared voice that a product

19   category might have in the overall marketplace; and

20   therefore, everybody benefits from marketing when

21   one manufacturer is doing it.

22      Q.   So is it your opinion to the jury in this

23   case that Energizer Bunny commercials sell Duracell

24   batteries?

25      A.   They can, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    You indicated earlier that your
 2   understanding of Walmart --
 3        A.    I'm sorry.  I need to clarify.
 4        Q.    Okay.
 5        A.    When they do a head-to-head comparison
 6   between the two, if Duracell is the underdog and
 7   they compete with Eveready, it lends credibility to
 8   the Duracell brand, yes.
 9        Q.    Okay.  And when Eveready is developing
10   product testing and writing market plans for an
11   Energizer Bunny spot, do you have any reason to
12   believe that their goal is to sell more Duracell
13   batteries?
14        A.    No, I don't think so.
15        Q.    Okay.  That would be antithetical to their
16   purpose?
17        A.    It could be antithetical, but I think they
18   realize as marketers that when they do advertising,
19   it will -- it will promote the brand -- the brand
20   and the category.
21        Q.    Okay.  You indicated earlier that your
22   understanding of Walmart's role as a distributor was
23   a little bit different, and then you indicated that
24   you believe Walmart distributed CII opioids through
25   a warehouse, correct?
```

1     A.   My recollection was that we -- while I never

2   placed any CII orders when I worked for Walmart, was

3   that they were ordered on Sunday and -- one time a

4   week, and it came from a Walmart facility.  That's

5   the best I can give you on that.  I didn't see

6   documents in the record that would have informed me

7   one way or the other beyond that.

8     Q.   Okay.  So sitting here today, do you have an

9   opinion prepared to a reasonable degree of

10  scientific certainty describing Walmart's

11  distribution process of opioids?

12    A.   No, I don't.

13    Q.   Okay.  What was the time frame where you

14  worked at Walmart as a community pharmacist?

15    A.   It was between about 2001 and 2007.

16    Q.   Do you know -- can you narrow that down with

17  any greater specificity?

18    A.   Well, I mean, I worked through that entire

19  period as a relief pharmacist.  It wasn't -- I

20  wasn't employed full-time by Walmart.

21    Q.   Were you ever, at any point in time, a

22  full-time Walmart employee?

23    A.   For no longer than a period of about a week

24  or two, yes.

25    Q.   And why did you stop working part-time at

1     Walmart?

2        A.    When the 4-dollar prescriptions came into

3     being, which was around 2007 or 2008, we were

4     instructed that we were going to have additional

5     staff added to the stores to help meet the increased

6     volume.  That never materialized, and I just

7     basically wasn't willing to put my license on the

8     line to be understaffed.

9        Q.    Now, in terms of your experience at Walmart,

10    did you ever -- were you ever involved in the

11    diversion of controlled substances?

12       A.    No.

13       Q.    Were you ever given instructions from the

14    company to engage in conduct that you thought was

15    unethical or that would result in the diversion of

16    controlled substances?

17       A.    Related to controlled substances?  No.

18       Q.    Okay.  You mentioned -- well, let me ask

19    this:  In your expert report, you do not identify

20    any interviews or Walmart-specific information

21    cited, correct?

22       A.    That's correct.

23       Q.    Okay.  You identified some documents that

24    have been discussed.  You mentioned some deposition

25    testimony.  Did you read the depositions cited in

Highly Confidential - Subject to Further Confidentiality Review

1    your expert report word for word?

2        A.    I used a search tool to identify key words

3    in the depositions and it would -- it would pull up

4    all depositions where those search words were found

5    and then I would read the relevant sections of the

6    depositions that were identified.

7        Q.    Okay.  So for any depositions cited in your

8    report, is there any deposition that you read word

9    for word?

10       A.    Yes, there are.

11       Q.    Are those noted anyway -- well, excuse me.

12             Strike that.

13             Are those noted in a way that we could

14   identify the ones that you did read cover to cover?

15       A.    I can probably tell you which ones I read

16   cover to cover if I had a list of depositions in

17   front of me.  I know I wanted to try to read a key

18   marketing representative for each of the marketing

19   defendants and also -- so that would be six or seven

20   depositions there.  And then I also wanted to read

21   the depositions of physicians that were related to

22   Ohio Medicaid.

23       Q.    Okay.  You've indicated a couple times that

24   you're lacking materials that would help you answer

25   questions.  Is there a reason you didn't bring your

Highly Confidential - Subject to Further Confidentiality Review

```
 1    full set of reliance materials in a way that would

 2    be accessible to you for the purpose of this

 3    deposition?

 4       A.   I just, out of -- not having the, you know,

 5    technological resources or knowledge that I would be

 6    allowed to have a computer here and to look for

 7    things on it.

 8       Q.   And in a --

 9            MR. CHALOS:  We're coming up -- actually,

10    we're way past the time --

11            MR. LADD:  Okay.

12            MR. CHALOS:  -- so...

13            MR. LADD:  I'll do one more for today, and

14    then we'll -- we'll wrap up today.

15    BY MR. LADD:

16       Q.   In the notebook that you brought with you

17    today, does that include any highlighting,

18    handwritten notes, or margin area?

19       A.   No, it's simply a printed report of the

20    entire -- a printed copy of the entire report.

21       Q.   So other than having it punched and in a

22    binder, there is nothing different about what's

23    already been provided to the defendants in this

24    case?

25       A.   That's right.
```

1          MR. CARTER:  Okay.  Those are the questions

2      for today.  I still have additional questioning,

3      but we'll wrap in light of the late hour.

4          THE WITNESS:  Okay.

5          THE VIDEOGRAPHER:  We are going off the

6      video record.  The time is currently 7:04 p.m.

7      This is the end of Media Number 7.

8          (The deposition recessed at 7:04 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                C E R T I F I C A T E

 2           I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby certify

 5    that, pursuant to notice, the deposition of MATTHEW

 6    PERRI III, BS Pharm, Ph.D., RPh, was duly taken on

 7    Tuesday, April 23, 2019, at 9:28 a.m. before me.

 8           The said MATTHEW PERRI III, BS Pharm, Ph.D.,

 9    RPh, was duly sworn by me according to law to tell

10    the truth, the whole truth and nothing but the truth

11    and thereupon did testify as set forth in the above

12    transcript of testimony.  The testimony was taken

13    down stenographically by me.  I do further certify

14    that the above deposition is full, complete, and a

15    true record of all the testimony given by the said

16    witness, and that a review of the transcript was

17    requested.

18

19    _____

20    Susan D. Wasilewski, RPR, CRR, CCP

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

   - ` ` — 

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     - - - - - -

 2                    E R R A T A

 3                     - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____ , do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     through 349, and that the same is a correct

 6     transcription of the answers given by me to the

 7     questions therein propounded, except for the

 8     corrections or changes in form or substance, if any,

 9     noted in the attached Errata Sheet.

10

11

12     _____

13     MATTHEW PERRI III, BS Pharm, Ph.D., RPh          DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                            LAWYER'S NOTES

2     PAGE    LINE

3     _____  _____  _____

4     _____  _____  _____

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

25