Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3

    IN RE NATIONAL PRESCRIPTION   | MDL No. 2804
 4                               |
    OPIATE LITIGATION             | Case No. 17-MD-2804
 5                               |
    APPLIES TO ALL CASES          | Hon. Dan A. Polster
 6

 7                        - - -

 8              Wednesday, April 24, 2019

 9                        - - -

10

            CONFIDENTIAL - SUBJECT TO FURTHER
11
                 CONFIDENTIALITY REVIEW
12
                          - - -
13
                       Volume 2
14

15

            VIDEOTAPED DEPOSITION of MATTHEW PERRI, III,
16  BS Pharm, Ph.D., RPh, held at Jones Day,
    1420 Peachtree Street, N.E., Suite 800, Atlanta,
17  Georgia, commencing at 8:35 a.m., on the above date,
    before Susan D. Wasilewski, Registered Professional
18  Reporter, Certified Realtime Reporter and Certified
    Realtime Captioner.

19

20

21                        - - -

22            GOLKOW LITIGATION SERVICES

23       877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    Counsel for Plaintiffs:
 3       LEIFF CABRASER HEIMANN & BERNSTEIN, LLP
         BY:  MARK P. CHALOS, ESQUIRE
 4           mchalos@lchb.com
         222 2nd Avenue South, Suite 1640
 5       Nashville, Tennessee 32701-2379
         Phone: (615) 313-9000
 6
         CRUEGER DICKINSON LLC
 7       BY:  KRISTA K. BAISCH, ESQUIRE
             kkk@cruegerdickinson.com
 8       4532 North Oakland Avenue
         Whitefish Bay, Wisconsin 53211
 9       Phone:  (414) 210-4367
10
11    Counsel for Endo Health Solutions Inc.,
      Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
12    Par Pharmaceutical Companies, Inc., f/k/a Par
      Pharmaceutical Holdings, Inc.
13
         ARNOLD & PORTER KAYE SCHOLER LLP
14       BY:  SEAN HENNESSY, ESQUIRE
             sean.hennessy@arnoldporter.com
15       601 Massachusetts Avenue, NW
         Washington, D.C. 20001-3754
16       Phone:  (202) 942-5000
17
      Counsel for Walgreens Defendants:
18
         BARTLIT BECK LLP
19       BY:  LESTER C. HOUTZ, ESQUIRE
             lester.houtz@bartlit-beck.com
20       1801 Wewatta Street, Suite 1200
         Denver, Colorado 80202
21       Phone:  (303) 592-3100
22
23
24
25
```

```
 1    APPEARANCES:
 2    Counsel for McKesson Corporation:
 3       COVINGTON & BURLING LLP
         BY:  MEGAN L. RODGERS, ESQUIRE
 4            mrodgers@cov.com
         3000 El Camino Real
 5       5 Palo Alto Square, 10th Floor
         Palo Alto, California 94306-2112
 6       Phone:  (650) 632-4700
 7

      Counsel for Purdue Pharma L.P., Purdue Pharma Inc.,
 8    and The Purdue Frederick Company:
 9       LYNN PINKER COX HURST
         BY:  JOHN VOLNEY, ESQUIRE
10            jvolney@lynnllp.com
         2100 Ross Avenue, Suite 2700
11       Dallas, Texas 75201
         Phone:  (214) 981-3800
12
13

      Counsel for Walmart Inc., f/k/a Wal-Mart Stores,
14    Inc.:
15       JONES DAY
         BY:  EDWARD M. CARTER, ESQUIRE
16            emcarter@jonesday.com
         325 John H. McConnell Boulevard, Suite 600
17       Columbus, Ohio 43215
         Phone:  (614) 649-3939
18
19

      Counsel for Allergan Finance, LLC:
20
         KIRKLAND & ELLIS LLP
21       BY:  ERICA B. ZOLNER, ESQUIRE
              erica.zolner@kirkland.com
22            ZACHARY A. CIULLO, ESQUIRE
              zac.ciullo@kirkland.com
23       300 North LaSalle Street
         Chicago, Illinois 60654
24       Phone:  (312) 862-3247
25
```

```
 1    APPEARANCES:
 2    Counsel for Teva Pharmaceuticals USA, Inc.,
      Cephalon, Inc., Watson Laboratories, Inc., and
 3    Activis LLC:
 4       MORGAN LEWIS & BOCKIUS, LLP
         BY:  MELISSA M. COATES, ESQUIRE
 5           melissa.coates@morganlewis.com
         200 South Biscayne Boulevard, Suite 5300
 6       Miami, Florida 33131
         Phone:  (305) 415-3000
 7
 8
      Counsel for Rite Aid:
 9
         MORGAN LEWIS & BOCKIUS, LLP
10       BY:  MATTHEW R. LADD, ESQUIRE
             matthew.ladd@morganlewis.com
11       101 Park Avenue
         New York, New York 10178-0060
12       Phone:  (212) 309-6000
13
14    Counsel for AmerisourceBergen Corporation and
      AmerisourceBergen Drug Corporation:
15
         REED SMITH LLP
16       BY:  JOSEPH MAHADY, ESQUIRE
             jmahady@reedsmith.com
17       1717 Arch Street, Suite 3100
         Philadelphia, Pennsylvania 19103
18       Phone:  (215) 851-8100
19
20    Counsel for Johnson & Johnson and the Janssen
      Pharmaceuticals Defendants:
21
         O'MELVENY & MYERS LLP
22       BY:  ROSS B. GALIN, ESQUIRE
             rgalin@omm.com
23       7 Times Square
         New York, New York 10036-6537
24       Phone:  (212) 326-2000
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:
 2   Counsel for Cardinal Health, Inc.:
 3      WILLIAMS & CONNOLLY LLP
         BY:  JOSHUA D. TULLY, ESQUIRE
 4           jtully@wc.com
         725 Twelfth Street, N.W.
 5       Washington, D.C. 20005
         (202) 434-5000
 6
 7
     Counsel for Mallinckrodt LLC:
 8
         ROPES & GRAY LLP
 9       BY:  ELIZABETH BIERUT, ESQUIRE
              elizabeth.bierut@ropesgray.com
10       1211 Avenue of the Americas
         New York, New York 10036-8704
11       Phone:  (212) 596-9000
12
13   APPEARANCES VIA TELEPHONE AND STREAM:
14   Counsel for the Henry Schein Defendants:
15      LOCKE LORD LLP
         BY:  BRANDAN MONTMINY, ESQUIRE
16           brandan.montminy@lockelord.com
         2200 Ross Avenue, Suite 2800
17       Dallas, Texas 75201
         Phone:  (214) 740-8445
18
19
     Counsel for H.D. Smith LLC:
20
         BARNES & THORNBURG LLP
21       BY:  MONIQUE HANNAM, ESQUIRE
              Monique.Hannam@btlaw.com
22       11 South Meridian Street
         Indianapolis, Indiana 46204
23
24
25
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:

 2    Counsel for AmerisourceBergen Corporation and

      AmerisourceBergen Drug Corporation:

 3

          REED SMITH LLP

 4        BY:  ANNE E. ROLLINS, ESQUIRE

                arollins@reedsmith.com

 5        1717 Arch Street, Suite 3100

          Philadelphia, Pennsylvania 19103

 6        Phone:  (215) 851-8100

 7

      ALSO PRESENT:

 8

          JOSHUA COLEMAN, Videographer

 9        JONATHAN JAFFE, jjaffe@its-your-internet.com

          ERICA KUBLY, Seeger Weiss

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       - - -

 2                    I N D E X

 3                    Volume 2

 4                       - - -

 5   Testimony of:  MATTHEW PERRI, III, BS Pharm, Ph.D., RPh

 6                                                      PAGE
```

```
 7      CROSS-EXAMINATION BY MR. CARTER............... 364

 8      CROSS-EXAMINATION BY MR. TULLY................ 405

 9      CROSS-EXAMINATION BY MR. GALIN................ 419

10      RECROSS-EXAMINATION BY MS. RODGERS........... 492

11      RECROSS-EXAMINATION BY MR. LADD.............. 524

12      CROSS-EXAMINATION BY MS. COATES............... 544

13      CROSS-EXAMINATION BY MS. ZOLNER............... 567

14      CROSS-EXAMINATION BY MS. BIERUT............... 626

15      CROSS-EXAMINATION BY MR. HENNESSY............ 634
```

```
16

              E X H I B I T S

17

          (Attached to transcript)

18
```

```
     MATTHEW PERRI DEPOSITION EXHIBITS                PAGE

19

20   Exhibit 11    E-mail - Subject: Ohio Prescriber   409

                   Education Draft Proposal

21                 CAH_MDL2804_00846989 through 847005

22   Exhibit 12    E-mail - Subject Ohio Prescriber    409

                   Education Draft Proposal

23                 CAH_MDL2804_00866121 and 866122

24   Exhibit 13    Duragesic Package Insert            432

25
```

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3    MATTHEW PERRI DEPOSITION EXHIBITS          PAGE
 4   Exhibit 14   Duragesic Full Prescribing      435
                  Information
 5
     Exhibit 15   Duragesic Prescribing Information  441
 6
     Exhibit 16   Nucynta Prescribing Information   449
 7
     Exhibit 17   Nucynta Prescribing Information   453
 8
     Exhibit 18   Nucynta ER Prescribing Information  456
 9
     Exhibit 19   Slide Presentation re Nucynta     472
10                JAN00085130 through 85232
11   Exhibit 20   Consumer Updates - A Guide to Safe  482
                  Use of Pain Medicine
12
     Exhibit 21   Article:  Pharmacists turn away    520
13                legitimate pain patients as
                  wholesalers limit shipments of
14                controlled substances
15   Exhibit 22   Fentoar Frequently Asked Question  557
                  (FAQ) and Responses
16                TEVA_CHI_00000509 through 521
17   Exhibit 23   Actiq Prescribing Information      563
18   Exhibit 24   Kadian Documents                  573
                  ACTAVIS0006823 through 6830
19
     Exhibit 25   Kadian 2005 Publication Plan       579
20                ACTAVIS0006930 through 6978
21   Exhibit 26   Kadian Marketing Overview          582
                  ACTAVIS 0264972 through 265018
22
     Exhibit 27   FDA Letter re NDA 20-616            584
23                ALLERGAN_MDL_00798619 through 798643
24   Exhibit 28   Kadian PI Workshop March 2013      589
                  ACTAVIS0567695 through 567736
25
```

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3    MATTHEW PERRI DEPOSITION EXHIBITS              PAGE

 4  Exhibit 29   Kadian Prescribing Information        590

 5  Exhibit 30   Objection Handling Workshop Training  593

                 Class Presentation

 6               ALLERGAN_MDL_00405512 through 405529

 7  Exhibit 31   Testimony of Douglas Boothe           604

 8  Exhibit 32   Health Care Compliance Business       608

                 Rules

 9               ALLERGAN_MDL_01104711 through

                 1104722

10

    Exhibit 33   E-mail - Subject: MSLs & NAMs         619

11               ALLERGAN_MDL_00194340 and 194341

12  Exhibit 34   Opana ER With Intac Digital MVA        653

                 Navigator

13               ENDO-CHI_LIT-00550036 through 550090

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                        - - -

2              THE VIDEOGRAPHER:  We are now back on the

3      video record with the continued deposition of

4      Matthew Perri.  Today's date is April 24th, 2019.

5      The time is approximately 8:35 a.m.

6              THE COURT REPORTER:  Let me remind you that

7      you are still under oath.

8              THE WITNESS:  Thank you.

9              MR. CHALOS:  And, Mr. Carter, before you

10     start with your questions, I would like to just

11     say a quick word about our call with Special

12     Master Cohen last night so we get that on the

13     record.

14             Correct me if I get any of this wrong.

15             So we had, last night, shortly before

16     8:00 p.m., a conference call with Special Master

17     Cohen regarding the dispute that arose here

18     yesterday in connection with Mr. Perri's prior

19     opinions in an unrelated case that I believe were

20     memorialized, at least in some part, in

21     Exhibit 10, I think.

22             And so the dispute was the extent to which

23     the defendants are entitled to question Mr. Perri

24     about those opinions and about any related

25     opinions he might have in connection with the

 1    litigation we're here about today.

 2        It was the plaintiffs' position that he

 3    should not be questioned about opinions as it

 4    relates to this litigation except to the extent

 5    he has opinions that are expressed in his report.

 6        Special Master Cohen ruled that the

 7    defendants would be entitled to ask Dr. Perri

 8    about his --

 9        And I'm sorry I called you Mr. Perri.

10        -- that the defendants would be entitled to

11    ask Dr. Perri about the opinions that he

12    expressed in that prior litigation and they're

13    entitled to ask whether he has opinions about

14    those areas in this case with, as I understood

15    it, the admonishment that if his answer is he

16    does not have opinions about certain areas in

17    this litigation, that the witness is not to be

18    badgered or harassed in any way about those

19    answers.

20        So I tried to accurately summarize his

21    rulings, and I'm sure defense counsel will

22    correct me if I have not done that.

23        MR. LADD:  I think the only thing the

24    defendants have to add is --

25        MR. CHALOS:  Can y'all -- can y'all hear

```
  1    him?

  2         MR. LADD:  I think the only thing the

  3    defendants have to add is that on the call,

  4    Special Master Cohen did say that the questioning

  5    defendants have asked so far in no way amounted

  6    to badgering and the questions so far the

  7    defendants have asked have been, quote, perfectly

  8    legitimate.

  9         MR. CHALOS:  Right, and that's, of course,

 10    without the benefit of having read even a rough

 11    transcript at that point.  He was relying on the

 12    statements of Counsel in making those rulings.

 13         MS. RODGERS:  And one further point:  I

 14    think Mr. Chalos agreed, and Special Master Cohen

 15    was on the line, that he would hold the

 16    deposition open through last night.

 17         MR. CHALOS:  Yes, that's true, and I

 18    considered it open regardless of the pending

 19    dispute, so we comported ourself accordingly and

 20    consistent with the Ohio rules and other

 21    applicable rules to these proceedings.

 22         MATTHEW PERRI, III, BS Pharm, Ph.D., RPh,

 23    called as a witness by the Track One Defendants,

 24    having been previously duly sworn, continued to

 25    testify as follows:
```

```
 1                    CROSS-EXAMINATION

 2   BY MR. CARTER:

 3       Q.   Good morning, Dr. Perri.

 4       A.   Good morning.

 5       Q.   Have you heard the expression in

 6   marketingspeak that half the money spent on

 7   marketing is wasted, but the problem is they don't

 8   know what half?

 9       A.   I have.

10       Q.   Okay.  And that's a quote from earlier in

11   the Twentieth Century, correct?

12       A.   I can't attribute a time to when that

13   actually came from, but I do think it is a relic

14   from the past, because I think modern marketers are

15   a lot smarter, a lot more savvy and sophisticated,

16   and if they are wasting half their money, they are

17   figuring out why and solving that problem.

18       Q.   Now, also, in the course of your training in

19   marketing, tell me if these numbers sound

20   approximately correct to you, that according to

21   industry estimates, the average American is exposed

22   to between 300 and 1500 advertisements and

23   commercials a day.

24            What about that, is that consistent?

25       A.   It sounds about right.
```

```
 1        Q.   And then of those, only 80 are consciously

 2   noted and only 12 result in some form of a response.

 3             Does that generally track the order of

 4   magnitude, in your experience?

 5        A.   It -- I think that needs to be qualified,

 6   though, because the -- the issue of involvement,

 7   which is a -- kind of a big deal in marketing, and

 8   it relates to the personal level of connectedness

 9   you have to an issue.  Involvement completely

10   changes those numbers.

11             So if you're talking about the average

12   customer walking down the street, yeah, I could

13   agree with those, but if we're talking about

14   somebody that is involved in a particular issue,

15   such as a disease, somebody who has high blood

16   pressure and we're advertising a high blood pressure

17   product, you're going to get -- those numbers are

18   going to jump way up.

19        Q.   Would you agree that the quality of a

20   product and the services behind it are also

21   important keys in the growth of a particular product

22   use?

23        A.   Certainly depending on the category, but

24   generally, I would agree with that, and I think

25   there's another saying that's from back in the old
```

1    school days that you usually get what you pay for

2    and you always get what you don't.  So, yes, I would

3    agree with that.

4        Q.   And so even if advertising results in a

5    product trial, if people's experience with that is

6    not satisfactory or if the services are not up to

7    par, advertising is not going to continue -- is not

8    going to cause them to continue using something that

9    they don't have a good experience with, fair?

10       A.   When the consumer is in the driver's seat, I

11   think that's true, yes.

12       Q.   Okay.  And just because money is spent on

13   advertising -- there are plenty of examples of

14   expensive marketing campaigns that have been

15   failures, correct?

16           MR. CHALOS:  Object to the form.

17       A.   I mean, I could think of a few that have

18   come to mind in the last decade or two.

19       Q.   And so while the marketers may be able to

20   control some factors -- such as product, price,

21   distribution, and forms of production -- those

22   factors interact with environmental conditions and

23   consumers that the marketer does not have control

24   over, correct?

25       A.   There are -- there are influences in the

1    marketplace which marketers do not control, that's

2    correct.

3        Q.   And those environmental conditions and the

4    internal decision-making process of the consumer,

5    those often dictate the success or failure of a

6    advertising and marketing campaign; true?

7        A.   Yes.  I'd like to just add, though, that

8    when you mention the environmental factors, I think,

9    since we're talking about whether someone is a savvy

10   marketer or not, being able to impact, let's say,

11   through lobbying -- Coca-Cola can lobby with, you

12   know, the State legislature to create a more

13   favorable environment.  So marketers do go beyond

14   the scope sometimes of their internal manipulation

15   of variables, but to the external market environment

16   as well, so just to make sure that we keep that

17   clear.

18       Q.   And so the external environment, in the

19   general sense, where they are not interacting with

20   it and, again, those -- those factors that they

21   don't control, the consumer's response, those are

22   key factors that often dictate the success or

23   failure of a campaign?

24       A.   Yes, and I think that the key there, when

25   you said dictate the consumer's response, that's why

Highly Confidential - Subject to Further Confidentiality Review

1    the marketer has to do a good job on the production

2    side, to make sure that whatever product they are

3    creating meets customer needs, because if it

4    doesn't, as you pointed out with your question,

5    customers won't be loyal to it.

6        Q.   Do you agree that, in psychological terms,

7    people enter the advertising and marketing

8    communication process with their perceptual defenses

9    up?

10       A.   In some cases, yes, I would agree with that.

11       Q.   Do you agree that consumers understand what

12   advertising is and they have a skepticism to

13   advertising, they know that they are trying to be

14   sold a product or a service?

15       MR. CHALOS:  Object to the form.

16       A.   Yeah, I think we have to be careful with

17   that one, because I think it -- it touches on an

18   issue that is very important in healthcare

19   advertising, and that is, the knowledge of the

20   consumer.

21       A lot of times we'll do -- you'll get a

22   phone call, a survey or something like that that

23   comes on.  You're asked a question about a product

24   or a service or an experience, and you have no basis

25   for making that; yet, people answer anyway.

```
 1              When we apply that to consumer purchases or

 2      decision-making or the way they view the

 3      advertising, which I think is what you're asking me

 4      about, the -- excuse me, the problem is, is if the

 5      consumer is not knowledgeable about that area, they

 6      don't have a basis to formulate an opinion about

 7      whether that should be something that's trustworthy

 8      or not.

 9              Now, given that, I think sometimes

10      consumers -- and there -- there are different

11      categories of consumers, certainly, but I think

12      sometimes consumers are a bit skeptical about

13      advertising or they're distrustful of it, and that

14      certainly applies to -- specifically to various

15      industries in specific.

16              So I think generally I agree with that, but

17      I think it has -- you have to be careful not to just

18      lump everybody into one basket.

19      Q.   Okay.  And so with that explanation, let's

20      take it step by step.

21              As a general, broad principle, you agree

22      that consumers typically enter the advertising and

23      marketing communication exchange with their

24      perceptual defenses up, they're -- they're

25      recognizing that the communicator is trying to sell
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them something, in the general sense?

 2         MR. CHALOS:  Object to the form.

 3    A.   Yeah, I -- I think generally that the

 4    consumer is going to -- depending on their level of

 5    involvement, depending on the level of the impact of

 6    the product.

 7         Just let me give you an example.  You --

 8    you're buying hot dogs for the baseball team to eat

 9    after the last game of the season.  A lot goes into

10    that decision, and you may see advertising for hot

11    dogs.  That's a different decision than when you are

12    buying hot dogs to feed your family on a Tuesday

13    evening.  You may see advertising and evaluate it in

14    a different way.

15         So depending on the circumstances, the

16    situation, the level of involvement -- maybe you're

17    not as involved in the baseball team's nutrition as

18    you are your family's nutrition.

19         All of those factors come into play.  So

20    while I tend to agree with the general premise of

21    what you're saying, you have to be careful not to

22    just lump everyone into one basket and make the

23    broad characterization that everybody has got their

24    radar on when it comes to advertising because it

25    depends on the product situation and the -- and the
```

1    consumer themselves.

2        Some people just have a higher tendency to

3    be attentive and to be critical and to be evaluative

4    about advertising.  Others are just more accepting

5    and yielding to whatever they see or hear.

6        So generally, I think it's okay to say that,

7    but I think you have to be careful and look at the

8    specifics of the situation.

9    Q.   You're actually talking about something

10   slightly different, right?

11       In the course of purchasing a product or

12   service, there are different, like you said, levels

13   of engagement; there's -- there's certain purchasing

14   decisions that are of greater consequence than

15   others.  So there are some that people spend a lot

16   of time researching and considering, and there's

17   others, you know, that they may, kind of, on a whim

18   or more automatically, right?

19       MR. CHALOS:  Object to the form.

20   A.   So impulse purchases versus purchases

21   contemplated, yeah, there are differences between

22   those.  And again, it may sound like I'm talking

23   about something different, but we can't separate

24   them because involvement, as a marketing issue, is

25   an antecedent of all of these other behaviors that

1    we're talking about.  So involvement does dictate

2    whether or not a consumer is going to be more

3    cautious in their interpretation of an ad.

4    Involvement does, as you pointed in your remarks,

5    impact the way we make our purchasing decision.

6         So I just want to be -- I'm not disagreeing

7    with you, but I just want to be very careful that we

8    don't just blanket say this applies to everybody all

9    the time.

10    Q.   Right.  And -- but the one blanket basic

11    point that we would make is -- and that I take it

12    you'd agree with this -- in general, people

13    understand when an -- when they receive an

14    advertising communication, that it's trying to sell

15    them something --

16         MR. CHALOS:  Object to the form.

17    Q.   -- just in the broadest sense?

18         MR. CHALOS:  Sorry.  Object to the form.

19         Didn't mean to interrupt.

20    A.   I hope so.

21    Q.   And in the context of healthcare, the

22    healthcare market, doctors are on the spectrum of

23    people -- you know, potential consumers, they are on

24    the savvier end, more sophisticated end of potential

25    consumers than the run-of-the-mill consumer,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2           MR. CHALOS:  Object to the form.

3      A.   Yeah.  No, I -- unfortunately, doctors are

4    people, too, and they suffer from the same problems

5    as we do and I think it just depends on the doctor.

6    I think some doctors are very sensitive to

7    advertising issues.  In fact, I know some doctors

8    personally that will not see, you know, a sales rep

9    and other doctors that they're pretty much fine with

10   it.

11          So again, in general, I think -- I would

12   agree that doctors are more well-educated and they

13   should be tuned in to those factors.  Can we blanket

14   say every doctor is going to be a better consumer

15   because of that?  I don't think so.

16     Q.   Okay.  Doctors are highly-trained

17   professionals, correct?

18     A.   Yes, they are.

19     Q.   As a result of their license requirements,

20   they are well educated?

21     A.   They are well educated.

22     Q.   And you haven't seen any study or research

23   that suggests that interaction with advertising

24   makes doctors forget their medical training?

25          MR. CHALOS:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I can't imagine a study that could measure

 2   that, but no, I haven't seen anything, no.

 3      Q.   Okay.  Are you aware of any research that

 4   shows that prescription opioid advertising

 5   manipulates people into acting against their will?

 6      A.   That's a very specific research question,

 7   and no, I'm not familiar with research that asks

 8   that specific question.

 9      Q.   Okay.  And I think you said that

10   yesterday -- but just to be clear, you've not

11   interviewed any doctor who prescribed opioids in

12   Cuyahoga or Summit County, have you?

13      A.   As I recall yesterday, I think the way I

14   responded to that was that, no, I had not, but I had

15   read the testimony of two physicians that worked for

16   Ohio Medicaid.

17      Q.   And you have not interviewed any pharmacists

18   in Cuyahoga or Summit County, have you?

19      A.   No, I have not.

20      Q.   And you've not interviewed any patient who

21   filled a prescription for opioids in Cuyahoga or

22   Summit County, have you?

23      A.   No, I have not.

24      Q.   Yesterday you said that you would be able to

25   indicate depositions that you read cover to cover by
```

Highly Confidential - Subject to Further Confidentiality Review

 1    looking at the list of depositions.  Do you have a

 2    list of the depositions you considered?

 3        A.   Yes.  Let me get that.

 4        Q.   As you're getting that, my question will be:

 5    Please identify for the record the depositions that

 6    you read word for word.

 7             MR. CARTER:  The witness is reviewing his

 8        list.  We are still here.

 9             MS. HANNAM:  Okay.  Great. Thanks.

10        A.   Okay.

11        Q.   All right.  Tell me what you find.

12        A.   So to the best of my recollection, these are

13    the ones that I read entirely.  As I was looking

14    through, I saw so many that I have searched through

15    and done the specific word searches that I described

16    yesterday, but the ones that I've read in entirety

17    were Chick and Bingol, Vorsanger, Altier, Snider --

18        Q.   You might want to go a little slower for the

19    court reporter.

20             THE WITNESS:  I'm sorry.  I forgot about

21        you.  I'll start over.

22        A.   Chick, Bingol, Vorsanger, Altier, Snyder,

23    Vordestrasse, which, as I recall, he doesn't

24    pronounce German, he pronounces it Americanly,

25    Deem-Eshleman.  I can't be 100 percent sure that I

1    finished Matt Day, but I think I did -- Matthew Day.

2    Gasdia.  I'm not sure if it's said Seid, and the

3    two, Wharton and Applegate, from Ohio.  I know I've

4    read substantially Boothe and Wickline, but I don't

5    think I've read entirely Wickline.

6        Q.   All right.  Thank you.

7             Switching gears, you testified yesterday

8    that your review of the marketing messages and

9    what's contained in your report, that it doesn't set

10   out or, you know, index marketing that you think is

11   adjudicated to be improper, false, or misleading

12   versus marketing that was appropriate and lawful,

13   it's all put together in the aggregate.

14             Did I understand that correctly?

15       A.   Yes.  Table II is a listing of all the

16   messages that were gleaned from the marketing

17   documents, and it is a representative sample of the

18   messages that I saw.

19       Q.   Okay.  Now I want to focus on marketing that

20   would be considered appropriate and lawful.

21             You don't have any opinion criticizing or

22   taking issue with expansion of the market

23   attributable to lawful or appropriate advertising,

24   do you?

25             MR. CHALOS:  Object to the form.

1      A.   I think this is the whole crux of the matter

2    with regard to marketing and opioids, is that

3    expansion of the market for the sake of selling more

4    products is not appropriate.  And so I think my

5    opinions do focus on even the use of appropriate

6    marketing to expand the opioid market, because I

7    think that's inconsistent with standards that exist

8    in the pharmaceutical industry.

9      Q.   If there is a doctor who has patients who

10   need a product and lawful, accurate marketing raises

11   his awareness of the availability of a solution for

12   his patients and he then redirects his patients to

13   that medication that he believes is appropriate,

14   exercising his medical judgment, and there was

15   nothing false or misleading about that advertising,

16   would you suggest that that's an improper expansion

17   of the market?

18        MR. CHALOS:  Object to the form; incomplete

19      hypothetical.

20      A.   So in that very specific scenario, where the

21   doctor has identified a patient need and marketing

22   has been a positive influence on that, that is

23   contributing to legitimate need for opioids, which

24   would not require expansion of the market.  It

25   would -- it would be normal for the market to

 1    experience that utilization.

 2            And in addition to that, it's just not that

 3    simple, because then that doctor has been exposed.

 4    This information has been encoded into his memory or

 5    her memory, and on the next occasion for need, that

 6    can influence that next decision as well.

 7            So marketing isn't just a one shot, one

 8    message, one reaction, one outcome.  It's about the

 9    collective nature of all of these messages that are

10    compounded and coded into memory, searched for, and

11    utilized by doctors in the decision-making process

12    and then used either appropriately or

13    inappropriately, as the circumstances would dictate.

14            And we could -- we could talk about many,

15    many specific instances where the utilization might

16    be appropriate and the utilization might not be

17    appropriate.

18            And even in the appropriate situations, some

19    of those patients are going to experience problems

20    and negative outcomes from the use of opioids.

21    Q.   What happens downstream when there is a

22    legitimate medical prescription?  That has nothing

23    to do with the propriety of the underlying marketing

24    materials, does it?

25            MR. CHALOS:  Object to the form.

```
 1        A.    When we try to correlate a specific

 2   marketing message with an outcome, we can do that

 3   with -- we can try to do that, and we do that

 4   certainly in marketing to measure its effectiveness.

 5        But the problem with that is that ignores

 6   the richness of the information that we have in

 7   marketing and all of the robust nature of all the

 8   messages, all the strategies, all the tactics that

 9   are used.  So to try to point your finger at one

10   message and say that it's directly related to a

11   downstream outcome, it's almost impossible to do

12   that without a very narrowly defined, very

13   intricately designed experiment that was designed to

14   measure that.

15        But what we do know about marketing is the

16   collective nature of marketing results in outcomes,

17   and I firmly believe and my opinion is that that

18   marketing is directly related to the downstream

19   outcomes because it's -- it's encouraging or

20   discouraging use, it's -- that use then carries with

21   it implications.  And if marketing caused the use,

22   then marketing caused the implications as well.

23        Q.    The problem I'm having understanding where

24   you're going with this is, when you have your

25   aggregate opinion and you say that marketing in the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    aggregate leads to various outcomes in the

 2    aggregate, there is a disconnect between what

 3    actually happens in the real world.  There is no

 4    doctor exposed to the sum aggregate of that

 5    marketing that then dictates those outcomes.

 6         So the situation you're describing in your

 7    opinions actually never happened on an individual

 8    level, true?

 9         MR. CHALOS:  Object to the form.

10    A.   I'd say I disagree with that.

11    Q.   So how could it?  So all -- so there's some

12    doctor in some county that saw all of the marketing

13    in Table II, and then that dictated their patient

14    medical decisions?

15         MR. CHALOS:  Object to the form.

16    A.   Yeah, I would probably agree with you that

17    there is not a single, solitary doctor that saw

18    every single thing.  But I would disagree that most

19    doctors weren't exposed to multiple forms of

20    communication and multiple outreach from the

21    marketing of opioids.

22    Q.   So if there is a doctor that was only --

23    that was exposed to multiple marketing messages for

24    opioids but the ones that that particular doctor was

25    exposed to were all lawful and appropriate

Highly Confidential - Subject to Further Confidentiality Review

1    advertising, how can this aggregate effect that you

2    describe, that wouldn't apply to that situation,

3    would it?

4         MR. CHALOS:  Object to the form.

5    A.    Well, as I think I said earlier, lawful or

6    unlawful, the problem is, is with aggressive

7    marketing, with the outreach to -- you know, to the

8    most highest prescribers, the marketing that I saw

9    in this case was designed to increase the size of

10   the opioid market.  And we see from the results

11   manufacturers received, that that's exactly what it

12   did.

13        So to try to single out a doctor that saw

14   only what you describe as the appropriate or

15   legitimate messages, I just don't see how that's

16   possible because the whole legitimacy of the

17   marketing is challenged by the aggressive nature of

18   it.  So I disagree with your premise that you start

19   out with, that there is appropriate marketing that's

20   occurring in this arena.

21   Q.    So you actually disagree with the FDA, you

22   think there should be no marketing for opioids?

23        MR. CHALOS:  Object to the form.

24   Q.    Even if it conforms to every regulation,

25   your opinion is there should never be marketing for

```
 1    opioids?

 2    A.   I get to say --

 3         MR. CHALOS:  Object to the form.

 4         Sorry.

 5    A.   I get to say what my opinions are.

 6    Q.   You do.  So am I wrong?  Is it --

 7    A.   Yes, you're wrong.

 8         MR. CHALOS:  Hold on.  Hold on.  Object to

 9    the form of the question.

10    Q.   And I'll -- I'll try to not talk over you,

11    so let me ask it this way.  Is it your opinion to

12    the jury in this case that there should not be any

13    marketing for opioids?

14    A.   That is not my opinion, no.

15    Q.   Okay.  So if you believe -- well, let me ask

16    the flip side:  Do you believe that there is an

17    appropriate and lawful place for marketing for

18    opioids that should exist?

19    A.   I think --

20         MR. CHALOS:  Object to the form.

21         Sorry.

22    A.   I think there can be appropriate marketing

23    for opioids, and it would not look like what I've

24    seen in this case.

25    Q.   Okay.  So you do believe there could be
```

Highly Confidential - Subject to Further Confidentiality Review

 1     appropriate marketing for opioids and that the goal

 2     of that marketing would be to increase product use

 3     and market share, so how would you -- oh, you

 4     disagree?  You're shaking your head.

 5             MR. CHALOS:  Hold on.  Don't -- object to

 6        the form of the question.

 7             THE WITNESS:  I'm sorry.

 8             MR. CHALOS:  Don't shake or nod or --

 9        just --

10             THE WITNESS:  Okay.

11             MR. CHALOS:  Let him finish his question,

12        let me make an objection, if there is one, and

13        then please answer.

14             THE WITNESS:  Okay.  I'm sorry.

15     BY MR. CARTER:

16        Q.   So you were disagreeing with me, so --

17        A.   Yeah.

18        Q.   -- where is the disagreement?

19        A.   Well --

20             MR. CHALOS:  And object to the form of the

21        previous question.

22             Go ahead.

23        A.   I'm sorry.  I'm going to just take a deep

24     breath here.

25             I don't like it when people tell me what my

1   opinions are, because I think I've done a pretty

2   good job of laying out exactly what they are and I

3   don't go beyond what my opinions are.  I'm not going

4   to go beyond them.  And I think that they are

5   completely sound and -- based on what I saw in this

6   matter.

7           But when you -- when you start saying that I

8   don't think there would be any appropriate marketing

9   or -- I just -- I can't agree with those things.

10  Q.   Okay.  So there is -- there is appropriate

11  marketing for opioids?

12  A.   And I said there can be appropriate

13  marketing, it just wouldn't look like the aggressive

14  marketing that we saw here.

15  Q.   Okay.  So is it your opinion that every

16  example of marketing you saw was inappropriate?

17  A.   And this takes us back to why I was shaking

18  my head.

19  Q.   Okay.

20  A.   The -- my opinion is the marketing must be

21  considered in the aggregate.  You can't single out

22  any single message, you can't single out any single

23  contact with a doctor or any single strategy or

24  method.  You must consider the full scope of the

25  marketing.

```
 1              Marketing is a process.  I have taken great

 2      lengths to explain that in my report.  Marketing is

 3      something that has an impact that goes beyond the

 4      incident encounter.  It's the sum total of the

 5      activities.

 6          Q.   Have you ever conducted an academic --

 7      academic research or study of a category of

 8      marketing other than opioids where you've -- you've

 9      only considered the propriety of the marketing in

10      the aggregate as opposed to individual messages?

11              MR. CHALOS:  Object to the form.

12          A.   If -- I'm not sure I understand your

13      question but --

14          Q.   Sure.  Let me ask -- let me -- let me

15      withdraw it and ask a different one.

16              There can be individual one-off marketing

17      messages that are -- that are wrong in any industry,

18      correct?

19          A.   Correct.

20          Q.   Coca-Cola could release an inappropriate

21      commercial?

22          A.   I mean, I guess as a -- as a hypothetical,

23      yeah, that could happen.

24          Q.   Okay.  And just -- if Coca-Cola, you know,

25      has an inappropriate, risqué commercial in the Super
```

1    Bowl that gets criticized, that doesn't mean that

2    marketing in the aggregate for soft drinks -- that

3    wouldn't lead to an opinion on marketing in the

4    aggregate for soft drinks, would it?

5         MR. CHALOS:  Object to the form; incomplete

6      hypothetical.

7      A.   So with that specific example, what I can

8    say is, is that if -- you're probably right about

9    that, but I can guarantee you that that one

10   advertisement that they saw during the Super Bowl

11   will impact consumers of Coca-Cola broadly forever.

12   It will always be in the customer's mind, and it

13   will always be an impact on customers' perceptions

14   of Coca-Cola, because that's what marketers work to

15   create, is a perception.

16        And as I said yesterday and I think I've

17   said multiple times during this deposition,

18   perceptions are very hard to change and once they're

19   changed, they're very durable and stable.

20   Q.   So just to make sure I understand your

21   opinions -- and I'm not, in any way, telling you

22   what they are --

23   A.   Thank you.  I apologize.

24   Q.   -- I'm trying to understand those.  So you

25   agree that there are and can be appropriate specific

Highly Confidential - Subject to Further Confidentiality Review

```
 1    messages and marketing that can exist for opioids,

 2    but in this case, you are not looking at that or

 3    acknowledging that because you think even

 4    appropriate marketing messages become subsumed

 5    within an overall aggregate market?

 6         Explain to me this disconnect between how --

 7    how you can have appropriate marketing and you

 8    acknowledge that but then you say that the marketing

 9    in the aggregate was -- was a problem.

10         MR. CHALOS:  Object to the form, and also

11      incomplete hypothetical.

12    A.   So I wanted to shake my head again there,

13    because instead of telling me what my opinion was,

14    you told me what I did or didn't do in this matter,

15    and so I want to make it very clear what I did.

16         I did look at the marketing.  I looked at

17    each defendant, and I looked at those defendants so

18    that I could form an aggregate opinion about the

19    marketing of opioids because that's what is

20    impacting our country, is the marketing of opioids

21    in the aggregate.

22         So the disconnect that -- that I think that

23    we're -- we're talking about right now is if there

24    were some -- and correct me if I'm wrong here, if

25    there were messages out there that were actually
```

Highly Confidential - Subject to Further Confidentiality Review

1    okay from a science or a research perspective, why

2    was the use of those messages inappropriate?

3           Is that what your question is?

4    Q.    That will -- that's one question.  I'll ask

5    that one.

6           So when you look in the aggregate, did you

7    see examples of executions in isolation that you

8    think were appropriate?

9           MR. CHALOS:  Object to the form.

10   A.    So just to remind everybody, I didn't -- I

11   didn't evaluate the messages one by one and say, are

12   they true or false.  There are other experts that

13   undertook that task.

14          My task was to identify the messages and to

15   analyze the marketing.  My analysis for the

16   marketing was very detailed, very specifically

17   planned.  It was comprehensive, it was aggressive.

18   It utilized the exact techniques that marketers

19   would use to maximize the expansion of the market

20   and capture market share in instances where that was

21   the goal.  And I formed my opinions based on that.

22          So the question of whether this message or

23   this ad was appropriate or not, it wasn't on my

24   radar, it wasn't something I was asked to do, and it

25   wasn't part of this analysis.

Highly Confidential - Subject to Further Confidentiality Review

 1          But whether or not the marketing together

 2     expanded the market was, and that's exactly what I

 3     did.

 4       Q.    Okay.  So because of your aggregate

 5     analysis, you are not -- are you prepared to opine

 6     whether the role and the -- withdrawn.

 7          I'll rephrase the question.

 8          Do you have an opinion whether any expansion

 9     of the market was attributable to lawful

10     advertising?

11          MR. CHALOS:  Object to the form.

12       A.    You know, this was -- this analysis was not

13     designed to be nor was I asked to provide a

14     quantitative assessment of the impact of any

15     individual ad or collection of ads or messages or

16     strategies or tactics.  It was to examine the

17     aggregate nature of that.

18       Q.    To the extent the aggregate body of

19     advertising and marketing in this space included

20     lawful messages, would those lawful messages -- have

21     you evaluated the impact of the lawful messages

22     versus ones that other experts might consider were

23     improper?

24          Do you know how the impact compares between

25     lawful and improper messages?

```
 1              MR. CHALOS:  Object to the form.

 2       A.   I think that's what I just answered.  Is

 3   that just a different way of asking me the same

 4   question?

 5       Q.   I don't understand it to be that, so let me

 6   ask you, do you -- do you have an expert opinion

 7   regarding the impact, potential impact of a lawful

 8   message versus an unlawful message?

 9       A.   So the analysis did not evaluate individual

10   ads based on their expected or measured impact in

11   the case.

12       Q.   Okay.  And as a principle, it's not an

13   opinion that you intend to offer to the jury, is it,

14   that misleading ads are more impactful?

15       A.   Actually, no.  I don't -- I don't -- I don't

16   believe -- I don't even believe that.  I think that

17   the marketing can't be broken down; therefore, the

18   positive, constructive, appropriate messages

19   combined with whatever messages are determined to be

20   false are what impacted this market.  And it doesn't

21   matter whether it was the good or the bad.  They all

22   impacted the market, and they impacted the market in

23   a way that expanded the market in an inappropriate

24   way.

25       Q.   Okay.  So you think the aggregate marketing
```

Highly Confidential - Subject to Further Confidentiality Review

 1    impacted the market in a negative way.

 2            Am I understanding you correctly?

 3            MR. CHALOS:  Object to the form.

 4    A.   I mean, I want to be more specific if -- if

 5    I'm going to phrase it that way, but the aggregate

 6    advertising that was done by the opioid marketers

 7    expanded the opioid market in a way that was not

 8    consistent with the standards that have been

 9    established in the pharmaceutical industry for

10    marketing products like that.

11    Q.   Okay.  And so as a -- due to the nature of

12    your aggregate opinion, you would fault the

13    defendants in this case for the aggregate

14    advertising, even including otherwise lawful and

15    appropriate messaging?

16            MR. CHALOS:  Object to the form.

17    A.   As I've said, I didn't evaluate lawful or

18    appropriate.  I just identified the advertising.

19    And it's my opinion that you can't separate the

20    advertising and break it down and look at one piece

21    of it and say, was this okay or not and how much

22    impact it did have.  I don't believe that analysis

23    can be done, given -- given what we have to look at

24    here.

25    Q.   Okay.  So you have not -- as you've

1    explained, you have not undertaken any -- any

2    qualitative analysis of what's -- what comprises the

3    aggregate market to break it into appropriate or

4    inappropriate messages, and your opinion -- you just

5    take it all together and say that the aggregate

6    created the expansion?

7            MR. CHALOS:  Object to the form.

8       A.   And so the first part of that where you said

9    you haven't looked at the components of the

10   aggregate, or something like that --

11      Q.   You haven't conducted a qualitative analysis

12   as to what percentage of appropriate or

13   inappropriate messages comprise that aggregate?

14      A.   That, I can agree with, yes.

15      Q.   Okay.  All right.

16           And so to the extent your opinion is

17   critical of the impact of the aggregate marketing,

18   do you think that the FDA should ban marketing in

19   this space?

20           MR. CHALOS:  Object to the form.

21      A.   You know, I -- I don't think I'm the person

22   to ask what the FDA should do.

23      Q.   Okay.  Based on your review of the materials

24   in this case, any evidence that Walmart ever

25   generated primary demand for a prescription opioid?

```
 1              MR. CHALOS:  Object to the form.

 2       A.    You know, with respect to the case, I think

 3   the answer is no.

 4       Q.    Okay.  I want to talk about your areas of

 5   expertise.  You're not an expert in epidemiology,

 6   are you?

 7       A.    I use epidemiology in my work all the time,

 8   but I don't hold myself out as a -- I'm a

 9   pharmaceutical marketing expert.

10       Q.    Do you hold yourself out as an expert in

11   addiction medicine?

12       A.    I do not, no.

13       Q.    Do you hold yourself out as an expert

14   historian?

15       A.    No.

16       Q.    Do you hold yourself out as an expert in

17   interpretation of pharmacy defendant documents?

18       A.    Is there such a category of expert?

19       Q.    Well, there was an objection yesterday about

20   interpreting documents.  So let me ask, do you hold

21   yourself out as someone who has some specialized

22   training that allows you to describe the meaning and

23   intent of internal company documents?

24       A.    I'm not sure I know how to answer.

25              MR. CHALOS:  Object to the form.  Sorry.
```

1       A.   I'm not sure I know how to answer that

2   question because I wasn't aware that there was an

3   area of expertise called "reviewing expert

4   documents," so -- so -- but to that point, I spent

5   the last 35 years of my career evaluating literature

6   and understanding how to take data and interpret

7   that data and then have that -- turn that into an

8   article of publication, a book, some other scholarly

9   work, and have that be reviewed by others.

10          And I've published, you know, literally

11  hundreds of times in -- in peer-reviewed space, so I

12  guess I have an expertise in that area, if there is

13  such an area, but I don't -- I don't really -- I

14  mean, I'm an expert in pharmaceutical marketing.  In

15  order to be an expert in pharmaceutical marketing, I

16  have to be able to look at marketing documents,

17  understand and interpret, analyze, synthesize the

18  data from those documents.  So, yeah, I think I'm

19  expert in doing that.

20      Q.   But you don't hold yourself out as an expert

21  in divining the intent of an author of a document,

22  do you?

23          MR. CHALOS:  Object to the form.

24      A.   So as a rule, I can never know what someone

25  was thinking.  What I can know is what the document

Highly Confidential - Subject to Further Confidentiality Review

1    means in relation to other documents.  I can know

2    how that document was, perhaps, used or not used.  I

3    can know what the implications of that document were

4    and if any follow-up was done.

5         And this is -- this is integral to the case

6    study analysis methodology, because in a case study

7    analysis, this is what provides the context around

8    the solution of the case.

9    Q.    In 2012, when Ms. Singer first contacted you

10   to work on opioid litigation -- I want to focus on

11   the time prior to your first contact with

12   Ms. Singer.  Prior to that, had you published

13   anything in peer-reviewed sources related to

14   pharmaceutical opioid marketing?

15   A.    I don't think there were any -- any articles

16   that I published during that time period that

17   focused specifically on opioids.  I know I had

18   published several studies on drug utilization in

19   general, including use in the elderly, and we

20   evaluated a lot of drugs, including opioids, in that

21   population.

22        I would be happy to tell you about that

23   study if you'd like to hear about it, but there was

24   a pain or analgesia component to that study.  The

25   reason I remember that study is because it was

Highly Confidential - Subject to Further Confidentiality Review

1    prior -- just -- just prior to Darvocet being

2    removed from the market, and in that study we found

3    that you had a 254 percent greater chance of dying

4    if you were over the age of 65 and took Darvocet.

5         Q.   Any other publications prior to Ms. Singer

6    contacting you that dealt with the marketing of

7    prescription opioid medications?

8         A.   I think that's the -- yeah, I think that's

9    the only study that -- no.  I think there was one

10   other, but it was, again, focused on the same

11   issues, the use of drugs in the nursing home

12   population and one component of that was opioids and

13   pain -- analgesia in general.

14        Q.   Prior to Ms. Singer contacting you, had you

15   ever undertaken the study of the marketing plans or

16   practices of the defendants in this case?

17        A.   Yes.

18        Q.   Okay.  When did you do that?

19             THE WITNESS:  Mark, am I allowed to talk

20   about other cases that --

21        Q.   Were you disclosed?

22        A.   Yes.

23        Q.   Okay.

24             THE WITNESS:  Does that mean, yes, I talk

25   about it or --

```
 1              MR. CHALOS:  Well, yeah.  That's -- that's a

 2      little bit tricky.  I'm not sure exactly what

 3      case you're talking about but --

 4              MR. CARTER:  Let's table that, and you can

 5      confer on a break --

 6              MR. CHALOS:  Yeah, let's do that.

 7              MR. CARTER:  -- and figure out how to

 8      instruct.

 9              MR. CHALOS:  I know there were some cases

10      where he was disclosed but under a protective

11      order, and I'm not sure I've even seen the

12      protective orders in some of those cases but --

13              MR. CARTER:  Okay.

14              MR. CHALOS:  -- we'll -- we'll try to work

15      this out.

16              MR. CARTER:  Okay.

17      BY MR. CARTER:

18      Q.   All right.  Switching gears, a couple of

19      odds and ends and then I'll hand off to someone

20      else.

21              You mentioned around the end of your tenure

22      at Walmart, the beginning of the $4 generic program.

23      A.   Yes, sir.

24      Q.   Now, the $4 program at Walmart did not

25      include controlled substances, CIIs were not in that
```

1    program, true?

2        A.    I'm pretty sure that's true, yes.

3        Q.    You said yesterday that you did not believe

4    you reviewed any documents produced by Walmart in

5    this case.  You made a reference generally in terms

6    of being at a disadvantage because of your material.

7              So I just want to ask you:  Has that changed

8    since yesterday?  Have you recalled any

9    Walmart-produced documents that you reviewed?

10             MR. CHALOS:  Object to the form.

11       A.    I'm glad you said "recalled," because I can

12   tell you that when I got home last night, I didn't

13   even look at anything, I just went straight to bed,

14   but the -- my recollection today is the same as it

15   was yesterday.  I don't remember seeing a lot of, if

16   any, Walmart documents.

17       Q.    Okay.  You mentioned early yesterday morning

18   an individual named Nancy Shepherd?

19       A.    Yes.

20       Q.    Who is she?

21       A.    Nancy is the pharmacist in charge of the

22   store that I worked, it was Store 2811 in Athens.

23       Q.    Okay.  And where does she currently work?

24       A.    I think she may be retired now, but she left

25   Walmart maybe five or six years ago.

1      Q.   Do you know the circumstances under which

2   she left Walmart?

3      A.   I do not.

4      Q.   Why did you reach out to her?

5      A.   She was the only Walmart -- I know many

6   Walmart pharmacists.  She was the only one that I

7   had in my phone, and so I called her.

8      Q.   Okay.  Now, did you -- when was it that you

9   called her?

10      A.   A month or two ago.

11      Q.   So by that point, you understood that

12   Walmart was a defendant in this case represented by

13   counsel, right?

14      A.   Yes.

15      Q.   Did you ask anyone for permission to reach

16   out to a former Walmart employee?

17          MR. CHALOS:  Hold on.  Object to the form to

18      the extent you're talking about communications

19      between him and us, which I think are protected.

20          But you can -- except for any communications

21      you had with lawyers on our side, you can answer.

22      A.   No, I did not ask for permission --

23      Q.   Okay.

24      A.   -- nor did I discuss anything about the

25   case.  I just asked the question:  How did Walmart

Highly Confidential - Subject to Further Confidentiality Review

1    order CIIs?  That was it.

2        Q.    Okay.  And was that where the source of your

3    information in terms of the Sunday orders?

4        A.    That was my recollection, but I really

5    couldn't recall if we did anything else.  And Nancy

6    was a long-time Walmart employee, so I figured she

7    would be the person to ask.

8        Q.    When you reached out to Nancy, did you tell

9    her why you were calling?  Did you say you were

10   working as an expert for plaintiffs in litigation

11   and wanted some information about Walmart's

12   practices?

13       A.    No.  As I just said, I just asked her about

14   how CIIs were ordered.  And then we talked about my

15   new grandbaby, and that was the end of the

16   conversation.

17       Q.    Okay.  So when you talked to Ms. Shepherd,

18   she -- well, strike that.

19            Does Ms. Shepherd know you're working as an

20       expert for the plaintiffs in this litigation?

21       A.    I don't think so, no.

22       Q.    Other than that question, is there anything

23   else you asked her about Walmart or this litigation?

24       A.    No.  I asked her how she was doing, that's

25   it.

Highly Confidential - Subject to Further Confidentiality Review

 1     Q.    Because it was that single question, I take

 2   it you didn't take any notes from that call?

 3     A.    No.

 4     Q.    Okay.  Did you list Ms. Shepherd or that

 5   conversation in your expert report as a reliance

 6   material?

 7     A.    No.

 8     Q.    And based on the limited information you

 9   received from her, I take it you don't rely on that

10   for your opinions in this case; is that true?

11     A.    You know, it's my understanding, as an

12   expert, I can -- I can talk to other people about

13   what goes on in the industry, and that's all I was

14   doing.

15     Q.    And my question --

16     A.    Yeah.

17     Q.    -- with respect, is just:  Are you relying

18   on that conversation for purposes of your opinions?

19     A.    No.

20          MR. CHALOS:  Object to the form.

21     Q.    Okay.  Now, on your CV, you don't include

22   the part-time work that you did moonlighting at

23   Walmart, do you?

24     A.    Yes, I do.

25     Q.    Where in your CV was that?

```
 1       A.   It's on the first page.  It says community

 2  pharmacy practice, and I worked for a number of

 3  different employers, so I didn't list them all.

 4  There just wasn't room.

 5       Q.   Okay.  So --

 6       A.   The CV is already 30 some pages long.  I'm

 7  trying to keep it shorter.

 8       Q.   Okay.  So Walmart would be listed -- would

 9  be subsumed within the community pharmacy line of

10  your CV?

11       A.   Yes.

12       Q.   But Walmart was not identified by name?

13       A.   Walmart was not.  None of the -- none of the

14  employers that I've worked for over the years were

15  identified by name, and there are a large number of

16  them.

17       Q.   Okay.  Do you know that Walmart no longer

18  distributes controlled opioids?

19       A.   That's my understanding, yes.

20       Q.   Okay.  Now, when you worked as a community

21  pharmacist, were you aware that opioids posed a risk

22  of addiction?

23       A.   Yes.

24       Q.   Okay.  Were you aware of that back to your

25  training as a pharmacist?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    And during your time working the counter as

 3    a community pharmacist at Walmart, did you ever

 4    violate your corresponding responsibility?

 5       A.    No.

 6       Q.    Okay.

 7             MR. CARTER:  Those are all the questions I

 8       have for you.  Thank you.

 9             THE WITNESS:  Thank you.

10             MR. CHALOS:  Do you want to stay there?  We

11       could talk about that issue and then come back

12       and --

13             MR. CARTER:  If you're going to -- if folks

14       want to break now; otherwise, do we want to keep

15       moving?

16             MR. CHALOS:  Well, we have to answer your

17       question.

18             MR. CARTER:  Someone -- someone else can

19       follow up on that, or however you want to do it.

20       I don't --

21             MR. CHALOS:  That's fine.  That's fine.  I

22       just don't want to have you come back to answer

23       those questions.

24             MR. CARTER:  Yeah.  Do folks want to take a

25       break or just switch questioners?
```

```
 1              MS. COATES:  Sure.

 2              MR. CARTER:  Okay.  We'll take a break.

 3              MS. COATES:  Yes, the court reporter wants

 4         to take a break.

 5              MR. CARTER:  All right.  We'll take a break.

 6              THE VIDEOGRAPHER:  We are now going off the

 7         video record.  The time is currently 9:34 a.m.

 8         This is the end of Media Number 1.

 9              (Recess from 9:34?a.m. until 9:51 a.m.)

10              THE VIDEOGRAPHER:  We are now back on the

11         video record with the beginning of Media

12         Number 2.  The time is currently 9:51 a.m.

13    BY MR. CARTER:

14         Q.   I wanted to follow up on the question I

15    asked regarding whether prior to 2012 you had

16    reviewed marketing from the defendants, and so

17    here's my follow-up question:  Prior to Ms. Singer

18    contacting you in 2012, had you ever reviewed

19    marketing materials from any of the defendants in

20    this case specifically related to opioid products?

21         A.   No, I have not.

22              MR. CARTER:  All right.  Thank you.

23         A.   You asked another question that I remembered

24    something to.

25         Q.   Okay.
```

```
 1      A.   You were asking about publications prior to
 2   2012.
 3      Q.   Yes.
 4      A.   The textbook did come out in, I think, 2009,
 5   or '10, '11, somewhere in there, and it certainly
 6   doesn't deal with opioids specifically, but it deals
 7   with all drugs.
 8      Q.   Okay.  Does that textbook chapter express
 9   the opinion that the aggregate effect of opioid
10   marketing wrongfully increased the demand?
11      A.   It doesn't deal with opioids specifically at
12   all, so that's not --
13      Q.   So that's not in there?
14      A.   It's not in there.
15           MR. CARTER:  All right.  Thank you.  No
16      further questions from me.
17                     CROSS-EXAMINATION
18   BY MR. TULLY:
19      Q.   Good morning, Doctor.  My name is Josh Tully
20   on behalf of Cardinal Health.
21      A.   Good morning, Josh, Mr. Tully.
22      Q.   Good morning.  Do you know anything about
23   Cardinal Health's First Fax Program?
24      A.   I don't believe so, no.
25      Q.   Do you know what information was
```

1    communicated through that program?

2       A.   No.

3       Q.   Do you know the intended audience for that

4    program?

5       A.   As I said, I'm not familiar with it, so, you

6    know, I can't help you with that.

7       Q.   Okay.  Do you know anything about Cardinal

8    Health's Order Express service?

9       A.   I can tell you I'm not familiar with any of

10   the specific proprietary methods that Cardinal is

11   using.  I've not -- I've worked in pharmacies that

12   ordered from Cardinal before but it's been so long,

13   I'm sure that systems have changed.  As I said

14   yesterday, my last work experience in community

15   practice where we would have ordered medications was

16   in 2007, so no.

17      Q.   So I would be correct in concluding that you

18   do not -- that you do not know what information was

19   communicated through that program, correct?

20      A.   The first one or the second one that you

21   mentioned?  The answer is the same for both, no.

22      Q.   Okay.  Do you know what information was

23   communicated through Cardinal Health's First Script

24   Program?

25      A.   I don't.  That program seems to ring a bell

1   but I can't say that I know what it was.

2       Q.   Do you know the intended audience for that

3   program?

4       A.   No.

5       Q.   Do you know anything about that program?

6       A.   I don't.  As I recall, I thought that that

7   was a autostocking program, it could have been

8   called something else at the time, but I really, as

9   I said, I don't know anything about the proprietary

10  services that are offered by Cardinal.

11      Q.   Okay.  I'll just run through a couple more

12  here just to confirm that.

13          Do you know what information was

14  communicated through Cardinal's Rx Deals Program?

15      A.   Just generally the -- I'm not sure if it was

16  related specifically to the generic sourcing, but it

17  was just pharmacy supply, pharmacy purchasing

18  information.

19      Q.   Do you know anything else about that

20  program?

21      A.   No.

22      Q.   Do you know what information was

23  communicated through Cardinal Health's Service Flash

24  Program?

25      A.   No.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Do you know the intended audience for that

2  program?

3      A.   I do not.

4      Q.   Do you know anything about that program?

5      A.   No.

6      Q.   Do you know what information was

7  communicated through the Pharmacy Health Network?

8      A.   Nothing specific, no.

9      Q.   Anything general?

10     A.   Just that there are programs out there that

11  are designed to, you know, provide services to

12  independent and smaller chain pharmacies and I think

13  that was related to those services, but I can't be

14  sure.

15     Q.   Do you know anything else about that

16  program?

17     A.   No.

18     Q.   Yesterday Ms. Rodgers asked you some

19  questions in connection with a text written by

20  Dr. Scott Fishman.  Do you remember that?

21     A.   Yes.

22     Q.   She introduced Exhibit 9 with Bates stamp

23  PPLP004086826, which is one of the documents you

24  cite in Footnote 371.  Do you remember that?

25     A.   I think we still have it here.  So I have

1    here Exhibit 9 in front of me.

2        Q.    Okay.   In Footnote 371 you cite two other

3    documents which I will provide you copies of.   The

4    first one is Bates stamped CAH_MDL2804_00846989,

5    which I will mark as Exhibit 11.

6            (Perri Exhibit 11 was marked for

7    identification.)

8    BY MR. TULLY:

9        A.    Give it a good push.   Thank you.

10       Q.    The second document you cite in Footnote 371

11   bears Bates stamp CAH_MDL2804_00866121, which I will

12   mark as Exhibit 12.

13           (Perri Exhibit 12 was marked for

14   identification.)

15   BY MR. TULLY:

16       Q.    So now you have copies of all three

17   documents that you cite in Footnote 371, correct?

18       A.    Yes, I do.

19       Q.    You're welcome to review those documents

20   before I ask you some questions about them, just let

21   me know when you're ready.

22       A.    Okay.   Okay.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MR. TULLY:  I have no further questions.

22          THE VIDEOGRAPHER:  We are now going off the

23   video record.  The time is currently 10:14 a.m.

24        (Recess from 10:14 a.m. until 10:20 a.m.)

25          THE VIDEOGRAPHER:  We are now back on the

```
 1        video record.  The time is currently 10:20 a.m.

 2                        CROSS-EXAMINATION

 3   BY MR. GALIN:

 4      Q.    Dr. Perri, my name is Ross Galin.  I'm from

 5   O'Melveny & Myers and I represent Janssen and J&J in

 6   this matter.  I would say nice to meet you but we've

 7   been sitting beside each other for many hours now.

 8            Bear with me, if you would.  I am going to

 9   attempt to streamline my questions for you that will

10   most likely result in a fair amount of me fumbling

11   about trying to put jigsaw pieces together after

12   having crossed stuff out that my colleagues have

13   already asked you about, so I apologize if I'm

14   fumbling about, but I do want to preserve some of

15   their time and your time and don't want to retread

16   ground.

17            But with that said, there is a -- there are

18   a couple of pieces of retreading, ground to be

19   retread just briefly to set the parameters.

20            Am I correct, based on what I have heard in

21   your testimony so far, that you are not offering any

22   Janssen-specific opinions in your report or

23   testimony?

24      A.    Yes, that's correct.  The opinions are not

25   specific to any one defendant, and that includes all
```

1    defendants.  They are general aggregate opinions

2    about all of the defendants in this matter.

3        Q.   Okay.  And if called to testify at trial,

4    you will not be offering any Janssen-specific

5    opinions; is that correct?

6        A.   Yes, that is correct.

7             MR. CHALOS:  Object to the form.

8        A.   That's correct.

9        Q.   Another point that has come up repeatedly,

10   so I apologize but I'm doing my housekeeping:  You

11   have no opinions that you are offering as to whether

12   any Janssen marketing claims are false or

13   misleading; is that correct?

14       A.   That's correct.  The assessment of the false

15   and misleading nature of the ads was done by other

16   experts.

17       Q.   And consistent with that, my understanding,

18   based on your testimony in this matter so far, is

19   that to the degree that you are making

20   determinations about false or misleading, it is

21   based on reliance on -- I believe you listed five

22   other experts retained by plaintiffs in this matter;

23   is that correct?

24       A.   Yes.  There was one additional.  It was the

25   FDA warning letters as well, so -- but you're

1    correct in the five other experts.

2        Q.   And is there a particular FDA warning letter

3    directed at Janssen on which you are relying?

4        A.   I don't want to take your time now to look

5    through here.  I don't recall -- somewhere in the

6    report there is a list of the specific warning

7    letters.  I can't recall if there was a Nucynta

8    letter or not.

9        Q.   Okay.

10       A.   I want to leave that open that I can correct

11   that when I figure that out.

12       Q.   Well, how about if we -- are you willing to

13   agree that if the warning letter is not listed in

14   the report, in this section, it is not something

15   you're relying on?

16       A.   Yes.

17       Q.   Okay.  Let me apologize up front again for

18   what will be something of a slog here, but I just

19   want to go through this.  Can I ask you to look at

20   Exhibit 1, which is your report, as you are

21   familiar.

22       A.   Yes.

23       Q.   And if I could ask you to turn to Table II

24   on Page 86.

25       A.   I'm there.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  Now that I've done that, I'm actually

2    going to -- well, first, you've testified several

3    times that what the table reflects is messages that

4    you've seen, representative messages across the

5    various defendants in this case, put into various

6    categories that are listed A through X, correct?

7    A.   Correct.

8    Q.   Okay.  Can I ask you to skip to Page 92, if

9    you would, and we'll begin our little bit of a slog

10   here, which is to say you see D on Page 92 is:

11   "Minimize concerns about addictive nature of

12   opioids."

13        And 90 -- and D covers Pages 92 to 93 in

14   your report, correct?

15   A.   Yes.

16   Q.   Am I correct that you do not list any

17   Janssen documents in this section of the table?

18   A.   In Part D of Table II I do not see any

19   Janssen documents.

20   Q.   Okay.  Can I ask you to look below that in

21   Letter E?  It reads:  "Science now showing opioids

22   are not as addictive as once thought."

23        Is that correct?

24   A.   That's correct.

25   Q.   And there are three documents listed in

Highly Confidential - Subject to Further Confidentiality Review

```
1    Section E of the table, correct?

2        A.   Yes.

3        Q.   None is a Janssen document, correct?

4        A.   That's correct.

5        Q.   Okay.  If we turn to Page 100, H:  "Problems

6    only occur when opioids are abused or used

7    illegally - addicts are bad people who knowingly

8    abuse the drugs, not good people who were seeking

9    treatment for legitimate ailments."

10           Did I read that correctly?

11       A.   Yes.

12       Q.   And the documents listed under H span from

13   Page 100 of the report into Page 101; is that

14   correct?

15       A.   It is.

16       Q.   And no Janssen document is listed there,

17   correct, in that section, correct?

18       A.   That's correct.

19       Q.   Okay.  And if we go down to -- if we move

20   ahead to Page 111 -- you're probably picking up on

21   the theme here.

22       A.   Yes.

23       Q.   Letter N, that category is:  "Even patients

24   at high risk of addiction can be safely prescribed

25   opioids by using risk-mitigation strategies such as
```

Highly Confidential - Subject to Further Confidentiality Review

1    pain contracts."

2          Did I read that correctly?

3    A.   Yes.

4    Q.   And that letter, the documents under Letter

5    N span from Page 111 into Page 112, correct?

6    A.   Yes.

7    Q.   And again, am I correct that there are no

8    Janssen documents listed in this portion of the

9    table?

10   A.   You are correct.

11   Q.   Okay.  If we could move ahead to Page 114,

12   I'll direct your attention to Letter P:

13   "Undertreated pain should be treated with opioids."

14         Did I read that correctly?

15   A.   Yes.

16   Q.   Okay.  And P spans from 114 to the top of

17   Page 116; is that correct?

18   A.   Yes.

19   Q.   And am I correct that, again, no Janssen

20   documents are listed in this section of the report?

21   A.   You are correct.

22   Q.   Okay.  Page 116, Q:  "There is more risk of

23   leaving pain untreated than using opioids to treat

24   pain. "

25         Did I read that correctly?

```
 1        A.   Yes.

 2        Q.   And Q lasts all the way to Page 118?

 3        A.   Yes.

 4        Q.   Okay.  And am I correct that there are no

 5   Janssen documents listed in that section of this

 6   report as well?

 7        A.   Yes, you are.

 8        Q.   Okay.  And below on Page 118, R is:

 9   "Opioids offer more effective pain control and are

10   safer than alternatives."

11             And I believe that is only on Page 118.  Am

12   I correct that under Letter R there are no Janssen

13   documents listed?

14        A.   Yes, you are.

15        Q.   Okay.  We could go ahead to Page 123, easier

16   said than done for me, apparently.  At the bottom of

17   123, Letter U is:  "Opioids can be prescribed for

18   any pain condition without risk."

19             Did I read that correctly?

20        A.   You did.

21        Q.   And Section U, so to speak, runs from 123 to

22   the top of 125; is that correct?

23        A.   Yes.

24        Q.   And again, no Janssen documents are listed

25   in that section of the table, correct?
```

1      A.    Yes.

2      Q.    Okay.  Also on Page 125, there are two

3    documents listed under V, which is:  "Opioids can be

4    prescribed to any age group without risk."

5            Is that correct?

6      A.    Yes, sir.

7      Q.    And again am I correct that neither of the

8    documents are Janssen documents?

9      A.    You are.

10      Q.    All right.  And good news, I get to say

11   finally, on Page 125, W is:  "'Round the clock'

12   dosing should be used for chronic pain rather than

13   'as needed' dosing."

14            And W runs from 125 to Page 126; is that

15   correct?

16      A.    That is correct.

17      Q.    And am I correct that there are no Janssen

18   documents listed in that section?

19      A.    Yes, you are.

20      Q.    All right.  Thank you.  Dr. Perri, I just

21   want to ask you a couple of questions or a few

22   questions.

23            Do you agree that chronic pain is a serious

24   medical condition?

25            MR. CHALOS:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   So it's -- of course it's out -- that's

2     outside the scope of what I did here, but as a

3     pharmacist, I would agree that chronic pain is

4     serious, yes.

5        Q.   Okay.  And will you agree with me that

6     chronic pain affects millions of people in the

7     United States?

8             MR. CHALOS:  Object to the form.

9        A.   If you have a statistic, I'd be happy to

10    entertain it.  I don't -- I don't follow the

11    numbers, so I can't say that it affects millions or

12    tens of millions, I just don't know, but I agree

13    it's a serious problem and a lot of people are

14    affected.

15       Q.   Okay.  And will you agree with me that

16    chronic pain affects people in Summit County, Ohio

17    and Cuyahoga County, Ohio?

18            MR. CHALOS:  Object to the form.

19       A.   Certainly, yes.

20       Q.   Okay.  Will you agree with me that there are

21    risks associated with untreated chronic pain?

22            MR. CHALOS:  Object to the form.

23       A.   So I have to be real careful here because I

24    don't -- I don't want to, you know, go beyond my

25    ability to have a basis for knowing that, and I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1    not a doctor and so I can't really evaluate what

2    patients face for not being treated for pain, and I

3    think there are other experts that are better suited

4    to answer that question.

5        Q.   So if I were to ask you questions, as I have

6    been to a degree, about the treatment of pain, is it

7    your position that your answers would be that you

8    are not an expert and able to answer those

9    questions?

10       A.   Yeah, I'm not an expert on pain management,

11   so I don't hold myself out as one and I -- I am a

12   pharmacist, so I've provided care to patients who

13   are in pain, but it's very different than diagnosing

14   and following and monitoring and caring for a

15   patient over a long period of time who has chronic

16   pain.

17       Q.   Okay.  Well, would you agree with me that

18   it's the role of the prescribing physician to weigh

19   the risks and benefits of any pain medications when

20   treating an individual with pain patient?

21       A.   Yes, I would, I would agree with that

22   statement.

23       Q.   Okay.  Would you agree with me that for some

24   patients opioids may be the only effective treatment

25   for chronic noncancer pain?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           MR. CHALOS:  Object to the form; also
 2      outside the scope of his opinions.
 3      A.   You know, again, the -- to talk about these
 4      kinds of issues -- I realize it's important for you
 5      to do that and I want to try to give you an answer,
 6      but I have to qualify it and say that, you know,
 7      this is not what I did in my analysis here.  I can
 8      answer that question as a pharmacist, and -- you
 9      know, so given that, my sentiment about that is, is
10      that that's a downstream conclusion.  When a patient
11      is first starting out, there are always alternatives
12      and it may end up that some of those patients end up
13      that an opioid is the only alternative, I agree with
14      that, but at the beginning of care -- and there's a
15      lot of -- a lot of the messages in these tables that
16      we just went through focused on using opioids sooner
17      in the disease process, using them preferentially.
18           So I think I want to be real careful and
19      just say that the end result, it's possible that
20      opioids might be the only alternative for a patient,
21      but getting to that point, it's -- that's definitely
22      not true.
23      Q.   Okay.  Thank you.  Dr. Perri, you've said in
24      some form throughout your testimony over the last
25      day, and now a quarter, so -- that there is a drug
```

1   problem in this country.  And am I correct that

2   you've testified in this deposition that there is a

3   drug problem in this country?

4        MR. CHALOS:  Object to the form.

5      A.   I know we've talked about that.  I believe

6   that there is a drug problem in this country, yes.

7      Q.   Okay.  And I take it you believe there --

8   well, I'll just ask you.

9        Do you believe there is a drug problem in

10  Cuyahoga County?

11     A.   I think it exists everywhere in the United

12  States, and probably other places in the world too.

13     Q.   Okay.  And do you believe that drug problem

14  involves heroin?

15       MR. CHALOS:  Object to the form; beyond the

16       scope of his opinions here.

17     A.   So, you know, I mentioned earlier I'm not an

18  expert in pain management, and I'm also not an

19  expert on addiction.  I've done some work in the

20  area, so I'm familiar with -- I've published in the

21  area of opioids, so I've read a lot of literature

22  about it, but, you know, I didn't -- I didn't look

23  at anything in my review of this case that focused

24  on illicit drug utilization.  I was completely

25  focused on the prescription opioid market.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    I'll just ask this one last question:  Do

 2   you believe that the drug problem in this country

 3   that you've referred to predates the 1990s and the

 4   growth that you've discussed of opioids?

 5        MR. CHALOS:  Object to the form.

 6        A.    So I didn't -- I didn't really do a

 7   historical review, and I know -- I know another

 8   expert did, so I think we can defer to that expert

 9   to get an answer to that question.

10             I think the data that I did see, the data

11   points that were identified through my analysis of

12   the marketing of defendants certainly indicate that

13   there was a point in time in the mid '90s where the

14   opioid utilization began to increase rapidly and

15   sustainably for many years, and alongside that there

16   was a parallel track of a growing, you know,

17   national, literally, catastrophe about drug use.

18             And so with that background and caveat that

19   I'm not a historian, I think that's about as much as

20   I can stay about it.

21        Q.    Okay.  I'm going to try to get the payoff

22   now from all this premarking we did.

23        MR. CHALOS:  Wait, I thought that was just

24        your one last question.

25        MR. GALIN:  Only on that.  The judge I
```

```
 1        clerked for, by the way, always said never trust

 2        a lawyer who tells you he only has one question.

 3             MR. CHALOS:  That one question in 86 parts.

 4             MR. GALIN:  Yeah.  That's the old Rodney

 5        Dangerfield.

 6             (Perri Exhibit 13 was marked for

 7        identification.)

 8   BY MR. GALIN:

 9        Q.   I'm going to show you what has been

10   premarked as Exhibit 13.

11             MR. GALIN:  I'll throw those over.  I

12        suppose if I were more adept, I would use the

13        Elmo now, but I think that's probably only going

14        to make this --

15             MR. CHALOS:  Are they both the same?

16             MR. GALIN:  Yes.  Yeah.

17             MR. CHALOS:  Okay.

18             MR. GALIN:  That's only going to make things

19        last longer.

20   BY MR. GALIN:

21        Q.   Dr. Perri, do you recognize this document?

22        A.   Yes, I do.

23        Q.   What is this?

24        A.   Duragesic package insert.

25        Q.   This is the FDA-approved package insert for
```

Highly Confidential - Subject to Further Confidentiality Review

1    Duragesic?

2        A.    It appears to be, yes.

3        Q.    Okay.  And because I don't believe the date

4    is on here --

5        A.    1990.

6        Q.    There you go.  I'm glad you found it,

7    because I didn't.  It is the 1990 insert?

8        A.    Uh-huh.

9        Q.    Could you read for me below the Duragesic,

10    the header, the first thing that is stated on the

11    label?

12        A.    "Fentanyl transdermal system."

13        Q.    Okay.  And then, I'm sorry, right below

14    that?

15        A.    "Warning:  May be habit forming."

16        Q.    Okay.  Can I ask you to turn to -- I

17    apologize, the page numbers aren't numbered but to

18    -- if you go one, two -- three pages in.  I

19    recognize that they are double-sided.  I'm talking

20    about the actual page rather than the page number.

21    At the top of the page it says "Chronic Pulmonary

22    Disease."

23        A.    Yes.

24        Q.    Okay.  We're on the same page.  I'll give

25    your attorneys a chance to make sure that they are

Highly Confidential - Subject to Further Confidentiality Review

1    there.

2            MR. CHALOS:  I lost you.  Three pages in?

3            MR. GALIN:  It's three full pages, not on

4        both.  The top is "Chronic Pulmonary Disease."

5            MR. CHALOS:  Oh, the back of the third page.

6            MR. GALIN:  Yeah.

7            MR. CHALOS:  Okay.  Got it.  I'm there.

8            MR. GALIN:  Later, when we have section

9        numbers, it will get a lot easier.

10   MR. GALIN:

11       Q.   If I were to direct your attention about

12   just halfway down, do you see in there that it's

13   Drug or Abuse [sic] Dependence, that section?

14       A.   I do.

15       Q.   All right.  Would you mind reading the text

16   under that header for me?

17       A.   "Use of Duragesic in combination with

18   alcoholic beverages and/or other CNS depressants can

19   result in increased risk to the patient.  Duragesic

20   should be used with caution in individuals who have

21   a history of drug or alcohol abuse, especially if

22   they are outside a medically controlled

23   environment."

24       Q.   Can we flip over a page now?  Again I'm

25   using pages.  It's about two pages of text beyond.

```
 1    You see at the top there is a section "Drug Abuse

 2    and Dependence."

 3       A.   Yes.

 4       Q.   Okay.  To be fair, I'll bear the brunt of

 5    reading at this point.  It says:  "Fentanyl is a

 6    Schedule II controlled substance and can produce

 7    drug dependence similar to that produced by

 8    morphine.  Duragesic therefore has the potential for

 9    abuse."

10           Did I read that correctly?

11       A.   Yes, you did.

12       Q.   Okay.  I believe, but let me confirm, that

13    is all I'd like with this exhibit, so you can set

14    that one aside.

15           (Perri Exhibit 14 was marked for

16    identification.)

17    BY MR. CHALOS:

18       Q.   I am now going to show you what has been

19    marked as Exhibit 14.  I'll throw that and try not

20    to wound anyone.  These get thicker by the moment.

21           MR. CHALOS:  Wait.  14?

22           MR. GALIN:  Yes.

23           MR. CHALOS:  This one was --

24           MR. GALIN:  That was 13.

25           MR. CHALOS:  Oh, okay.  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GALIN:

2        Q.   Dr. Perri, do you recognize this document?

3        A.   This a later package insert, prescribing

4    information, for Duragesic as well.

5        Q.   All right.  And maybe you've identified the

6    date on your own, but if not, I will represent to

7    you that this is the 2005 Duragesic package insert.

8        A.   Actually, is it 2005?  I thought it was

9    earlier than that.  Yeah, it's 2003.

10       Q.   Yes, this is 2003.  Excuse me.  I apologize.

11   I think this is actually the one that was in effect

12   in '05 but was modified in '03.

13       A.   Yes.

14       Q.   So just so that we're clear, just so you're

15   aware, I'm showing you from what was in effect in

16   '05 but was approved in '03.

17       A.   Yes.

18       Q.   Do you recognize -- I'll just -- on the

19   front page of this you see that there is text that

20   is inside a black outlined box that continues on to

21   Page 2 of the label?

22       A.   I see that.

23       Q.   And am I correct this is what is typically

24   referred to as a black box warning?

25       A.   You're correct.

1     Q.   What is a black box warning, Dr. Perri?

2     A.   It is a -- in my mind, the way I consider a

3    black box warning is a flag that goes up that says,

4    hey, be careful with this drug because it has some

5    special considerations that people need to know

6    about before they prescribe it.  It doesn't mean

7    don't use it, it doesn't mean that using it is going

8    to have a negative outcome automatically.  It just

9    means be aware, prepare the patient for whatever

10   potential could befall them, make sure they are

11   ready to deal with anything that could come up, and

12   that the prescriber, the pharmacist, anyone involved

13   in their care is aware of the added danger that

14   exists along with the use of this medication.

15    Q.   Okay.  There are warnings and precautions in

16   every FDA-approved label; is that correct?

17    A.   Yes.  The black box warning does go a little

18   bit further than that.  It sets it apart and makes

19   sure that you see that first.

20    Q.   In fact, am I correct that the black box

21   warning is meant to signal the most pressing of

22   warnings and draw extra attention to the prescriber

23   about the concerns included within the black box; is

24   that correct?

25        MR. CHALOS:  Object to the form.

```
 1      A.   Yeah, I think that's consistent with what I

 2   described.  I used different words but I think it's

 3   consistent.

 4      Q.   So let me ask it this way.  Not all products

 5   have black box warnings, correct?

 6      A.   Yes, that's true.

 7      Q.   What -- what prompts a black box warning for

 8   a product as opposed to one that doesn't have one?

 9           MR. CHALOS:  Object to the form.

10      A.   Yeah, so I, you know, I've said many times

11   I'm not an FDA expert so I can't tell you the exact

12   criteria that they use, but my understanding as a

13   pharmacist about when a drug gets a black box

14   warning is when we have what are called

15   postmarketing surveillance data, or something we've

16   learned about the drug since it's been on the market

17   that needs to be included in the labeling that

18   warrants special attention.

19      Q.   Okay.  And will you agree with me that the

20   purpose of the black box warning is to convey to the

21   prescriber that there are particular heightened

22   risks associated with the product bearing the black

23   box warning?

24           MR. CHALOS:  Object to the form.

25      A.   I think we're saying the same thing, yes.
```

```
 1       Q.   Okay.  Just wanted to make sure.

 2            Would you mind reading to me the first

 3  paragraph within the black box warning?

 4       A.   Yes, and I will read it slowly.

 5       Q.   Sorry.

 6       A.   "Duragesic contains a high concentration of

 7  a potent Schedule II opioid agonist, fentanyl.

 8  Schedule II opioid substances which include

 9  fentanyl, hydromorphone, methadone, morphine,

10  oxycodone, and oxymorphone have the highest

11  potential for abuse and associated risk of fatal

12  overdose due to respiratory depression.  Fentanyl

13  can be abused and is subject to criminal diversion.

14  The high content of fentanyl in the patches

15  (Duragesic) may be a particular target for abuse and

16  diversion."

17       Q.   Thank you, Doctor.  If we flip over to

18  Page 2, we're still in the black box warning,

19  correct?

20       A.   Yes.

21       Q.   If you look down into the fourth paragraph,

22  am I correct that it reads:  "Duragesic can be

23  abused in a manner similar to other opioid agonists,

24  legal or illicit.  The risk should be considered

25  when administering, prescribing or dispensing
```

Highly Confidential - Subject to Further Confidentiality Review

1    Duragesic in situations where the health care

2    professional is concerned about increased risk of

3    misuse, abuse or diversion."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   Okay.  And that is within the black box

7    warning of this 2003-2005 period label?

8    A.   Yes.

9    Q.   I'm going to attempt to help the court

10   reporter.  I don't know if that helps or not.

11        And then the next paragraph down, midway

12   into it, this is the paragraph that begins:

13   "Persons at increased risk for opioid abuse

14   include..."

15        And then the next sentence says:  "Patients

16   should be assessed for their clinical risks for

17   opioid abuse or addiction prior to being prescribed

18   opioids.  All patients receiving opioids should be

19   routinely monitored for signs of misuse, abuse and

20   addiction."

21        Is that correct?

22   A.   Yes.

23   Q.   Okay.  I'm now going to flip ahead in this

24   to Page 11.  Happily we now have page numbers so it

25   should be easier to find.  And in this section you

 1     will see there is a section towards the bottom of

 2     the page, "Misuse, Abuse and Diversion of Opioids,"

 3     correct?

 4        A.   Yes.

 5        Q.   And again, this section discusses that:

 6     "Fentanyl is an opioid agonist of the morphine-type.

 7     Such drugs are sought by drug abusers and people

 8     with addiction disorders and are subject to criminal

 9     diversion."

10             Did I read that correctly?

11        A.   You did.

12        Q.   And the next paragraph is:  "Fentanyl can be

13     abused in a manner similar to other opioids, legal

14     or illicit."

15             And is actually -- it goes on, it's a

16     similar -- the similar warning to what we just read

17     in the black box section, correct?

18        A.   It is, yes.

19        Q.   Okay.  And if we page ahead, I think we can

20     set this -- okay.  Let's set this one aside, as fun

21     as it is reading labels.

22             You can put that aside, Dr. Perri.

23             (Perri Exhibit 15 was marked for

24     identification.)

25     BY MR. GALIN:

```
 1        Q.   I will now show you what has been marked

 2   Exhibit 15.

 3             MR. GALIN:  Oops.  I'm trying to balance the

 4        getting it to you without being aggressive.

 5   BY MR. GALIN:

 6        Q.   All right.  Do you recognize this document,

 7   Dr. Perri?

 8        A.   I believe so, yes.  I know what it is, yes.

 9        Q.   Okay.  This is the current -- I will

10   represent to you this is the current Duragesic

11   package insert, and if you flip to the very last

12   page you will see it's dated 2009, so it's the label

13   that's been in effect since 2009.

14        A.   Right.

15        Q.   Do you agree with me that that's what this

16   is?

17        A.   I believe that to be the case, yes.

18        Q.   Okay.  Again, I'll have you look, if you

19   would, at the first page of this, and again am I

20   correct that there is a black box warning?

21        A.   There is.

22        Q.   And would you read for me the first portions

23   or the title of the black box warning?

24        A.   "Warning:  Addiction, abuse and misuse;"

25        Q.   I'll let you stop.  I won't make you read
```

Highly Confidential - Subject to Further Confidentiality Review

 1    the whole thing, unless you feel it necessary.

 2        A.    No.

 3        Q.    But that's -- okay.  So the start of this

 4    black box warning calls out addiction, abuse and

 5    misuse risk; is that correct?

 6        A.    It does.

 7        Q.    Okay.  And then if we go down the first --

 8    there are bullets under the header for this black

 9    box warning, correct?

10        A.    There are.

11        Q.    And the first bullet, would you mind -- I

12    hate to keep making you read, but read in the first

13    bullet into the record for me, please.

14        A.    "Duragesic exposes users to risks of

15    addiction, abuse and misuse, which can lead to

16    overdose and death.  Assess patient's risk before

17    prescribing, and monitor regularly for these

18    behaviors or conditions."

19        Q.    Okay.  And can I trouble you to read to

20    second one for me?

21        A.    "To ensure that the benefits of opioid

22    analgesics outweigh the risks of addiction, abuse

23    and misuse, the Food and Drug Administration (FDA)

24    has required a Risk Evaluation and Mitigation

25    Strategy (REMS) for these products."

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  And then to give you a break, I'll

 2   take over.  On the fifth bullet down, it reads:

 3   "Prolonged use of Duragesic during pregnancy can

 4   result in neonatal opioid withdrawal syndrome which

 5   may be life-threatening if not recognized and

 6   treated."

 7        Did I read that correctly?

 8      A.   Yes.

 9      Q.   Okay.  Can I ask you to page ahead to

10   Page 13, which is Section 5 of the label?  Are we

11   there?

12      A.   Yes.

13      Q.   Great.  Would you mind reading the title of

14   Section 5.1 to me under the warnings and precautions

15   section?

16      A.   "Addiction, Abuse, and Misuse."

17      Q.   Okay.  And could I trouble you to read that

18   first paragraph?

19      A.   "Duragesic contains fentanyl, an opioid

20   agonist and a Schedule II controlled substance.  As

21   an opioid, Duragesic exposes users to the risks of

22   addiction, abuse, and misuse.  Because

23   modified-release products such as Duragesic deliver

24   the opioid over an extended period of time, there is

25   a greater risk for overdose and death due to the
```

```
 1    larger amount of fentanyl present."

 2        Q.    Thank you.  And then the second paragraph

 3    reads:  "Although the risk of addiction in any

 4    individual is unknown, it can occur in patients

 5    appropriately prescribed Duragesic.  Addiction can

 6    occur at recommended doses and if the drug is

 7    misused or abused."

 8            Did I read that correctly?

 9        A.    Yes.

10        Q.    And then the next paragraph reads:  "Assess

11    each patient's risk for opioid addiction, abuse, or

12    misuse prior to prescribing Duragesic, and monitor

13    all patients receiving Duragesic for the development

14    of these behaviors and conditions.  Risks are

15    increased in patients with a personal or family

16    history of substance abuse (including drug or

17    alcohol abuse or addiction) or mental illness (e.g.,

18    major depression)."

19            Did I read that correctly?

20        A.    I think so.

21        Q.    All right.  5.1 continues on the next page

22    and mentions that:  "Opioids are sought by drug

23    abusers and people with addiction disorders and are

24    subject to criminal diversion.  Consider these risks

25    when prescribing or dispensing Duragesic."
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2      A.   Yes.

3      Q.   And Section 5.2 discusses opioid analgesic

4   Risk Evaluation and Mitigation Strategy, REMS.

5          Dr. Perri, what is a REMS?

6      A.   It's exactly what the name suggests.  It's a

7   way to -- it's a mandated program that's designed to

8   help enure that drug use will be appropriate by

9   implementing a few steps, for example, having people

10  who prescribe a drug with a REMS complete an

11  educational program related to that product or the

12  REMS program itself, it includes information to be

13  passed out.  It includes warnings and precautions

14  and other information that prescribers would need to

15  know, pharmacists would need to know in order to

16  make sure the patient was prescribed and monitored

17  properly.

18     Q.   Am I correct that the purpose of a REMS in

19  this situation is to ensure that patient -- or

20  excuse me, that physicians are well educated on the

21  risks associated with using this product?

22         MR. CHALOS:  Object to the form.  It's

23      outside the scope of his opinions here.

24     A.   The -- to the extent that the -- that most

25  of the REMS that I'm familiar with require some type

```
 1    of education program, I guess that would -- that

 2    would mean that your statement is true.  I haven't

 3    evaluated that or I'm not an expert on REMS programs

 4    to tell you that they are effective or not

 5    effective, but I think certainly the intent of the

 6    REMS, as I understand it as a pharmacist, even

 7    though it's not really related to what I did here,

 8    was to make sure that the information that needed to

 9    be out in the marketplace about a particular drug

10    would be there, and precautions were in place.

11        Q.   You've said, and your lawyer objected that

12    it's outside the scope of what you've done here, you

13    said you didn't review it, but you did in fact cite

14    to the REMS documents and training materials in your

15    report, did you not?

16        A.   Yes, I referenced the REMS programs and I'm

17    generally familiar with them, but I don't -- I did

18    not evaluate whether any of them were effective at

19    accomplishing their goals or not.

20        Q.   Okay.  Right.  But you reviewed the REMS as

21    part of your review and included it in your report?

22        A.   I did -- I did read the various documents

23    associated with some of the REMS programs.  I'm sure

24    I haven't seen all of them over every instance in

25    time, but I've seen many of them, yes.
```

```
 1        Q.   Fair enough.  Okay.  Could I ask you to page

 2   ahead to page 33?

 3        A.   Okay.

 4        Q.   Do you see Section 9?

 5        A.   Yes.

 6        Q.   What is the title of Section 9?

 7        A.   "Drug Abuse and Dependence."

 8        Q.   Okay.  And Section 9.2 is titled "Abuse."

 9   Am I correct?

10        A.   Yes.

11        Q.   Within Section 9.2, one of the -- the final

12   sentence is:  "Duragesic can be abused and is

13   subject to misuse, addiction, and criminal

14   diversion."

15             Citing back to the warning we read before in

16   Section 5.1; am I correct?

17        A.   Yes.

18        Q.   Okay.  The next paragraph says that:  "The

19   high drug content in long-acting formulations adds

20   to the risk of adverse outcomes from abuse and

21   misuse."

22             Is that correct?

23        A.   Yes.

24        Q.   And the next paragraph:  "All patients

25   treated with opioids require careful monitoring for
```

```
 1    signs of abuse and addiction, because use of opioid

 2    analgesic products carries the risk of addiction

 3    even under appropriate medical use."

 4         Did I read that correctly?

 5    A.   Yes.

 6    Q.   Okay.  Set that aside for the moment.

 7    Hopefully for good.

 8         So the good news, Dr. Perri, is we've gone

 9    through all the labels I want to show you for

10    Duragesic.  The bad news is we have a second product

11    in this case.  So now we're going to do a similar

12    exercise, if you will bear with me, for Nucynta.

13    Again, I'm going to show you what's been previously

14    marked Exhibit 16.

15         (Perri Exhibit 16 was marked for

16    identification?)

17    BY MR. GALIN:

18    Q.   Do you recognize this document, Doctor?

19    A.   Yes.

20    Q.   What do you recognize this document to be?

21    A.   It's to be -- appears to be the prescribing

22    information for Nucynta.

23    Q.   Indeed this is the 2008 Nucynta package

24    insert or product label, depending on the

25    terminology you want to use.
```

```
1       A.   Yes, it is.

2       Q.   And if you look at the very -- there are two

3   columns on the front page.  If you look at the top

4   right, there is a bullet.  Could you read that

5   bullet for me?

6       A.   "Abuse potential may occur.  Monitor

7   patients closely for signs of abuse and addiction."

8       Q.   Okay.  And if we were to go to -- that

9   references parenthetically 5.4, which is Section 5.4

10  of the label.  So if we turn to Page 5, which has

11  Section 5.4 on it --

12      A.   Yes.

13           MR. CHALOS:  Let me just interpose an

14      objection.  My copy says "Tradename TM" on it.

15      Is that -- am I looking at the right document?

16           MR. GALIN:  Yes.

17           MR. CHALOS:  Okay.  How do we know this is

18      Nucynta?

19           MR. GALIN:  I will represent to you that

20      it's Nucynta and that is the -- it isn't -- the

21      words used on here is the clinical name rather

22      than the marketing name.

23           MR. CHALOS:  This is the final version of

24      the label?

25           MR. GALIN:  Of the 2008 version, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1              MR. CHALOS:  Okay.

  2              MR. GALIN:  As you may guess, we'll get to

  3         look at some subsequent in a moment.

  4              MR. CHALOS:  So we'll accept your

  5         representation.  I don't know if that's true or

  6         not but just -- I -- let me interpose an

  7         objection subject to your questions that, you

  8         know, we trust you, we believe you are telling us

  9         the truth, but I just want to note that it

 10         doesn't say that on the document, so --

 11              MR. GALIN:  Understood and appreciated and

 12         noted.

 13    BY MR. GALIN:

 14    Q.   So 5.4, just to throw your counsel even

 15    further off, uses the other clinical name,

 16    tapentadol, which is the more commonly understood

 17    name for Nucynta, says:  "Tapentadol is a mu-opioid

 18    agonist.  Such drugs are sought by drug abusers and

 19    people with addition disorders."

 20              Is that correct, what I wrote --

 21    A.   Do pronunciations count?

 22    Q.   Yeah.  Mu.

 23    A.   Yes.  Thank you.

 24    Q.   Fair enough.  Yes, my apologies for that.

 25              It goes on to say that:  "Tradename can be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    abused in a manner similar to other opioid agonists,

 2    legal or illicit.  This should be considered when

 3    prescribing or dispensing Tradename in situations

 4    where the physician or pharmacist is concerned about

 5    an increased risk of misuse and abuse."

 6           Again, as your lawyer pointed out, Tradename

 7    was the placeholder.  This is the final version with

 8    Nucynta put it in and you saw Tapentadol.

 9           Did I read that correctly?

10    A.    Yes.

11    Q.    Okay.  It goes on to say that:  "Tapentadol

12    may be abused by crushing, chewing, snorting or

13    injecting the product.  These practices pose a

14    significant risk to the abuser that could result in

15    overdose and death."

16           And it cites to Section 9.  Is that correct?

17    A.    Yes.

18    Q.    And if we were to head up to Section 9,

19    which is on Page 12, Drug Abuse and Dependence, 9.1,

20    Controlled Substance, discusses that:  "This product

21    has an abuse potential similar to hydromorphone, can

22    be abused and is subject to criminal diversion."

23           Do you see that at the very bottom of

24    Page 12?

25    A.    I do.
```

```
 1        Q.   Okay.  And I won't subject us all to all of

 2   the reading of 9.2 on Page 13, but that's entitled

 3   "Abuse," correct?

 4        A.   Correct.

 5        Q.   And discusses addiction as a primary chronic

 6   neurobiological disease with genetic, psychosocial

 7   and environmental factors influencing its

 8   development and manifestations, correct?

 9        A.   Yes.

10        Q.   Okay.  And if you turn the page, 9.3

11   discusses dependence, correct?

12        A.   Yes.

13        Q.   Okay.  Let's set this one aside.  I promise

14   you we are getting closer.  I'm going to show you

15   what has been premarked 17.

16             (Perri Exhibit 17 was marked for

17   identification.)

18   BY MR. GALIN:

19        Q.   Do you recognize this document?

20        A.   This appears to be the 2011 version of the

21   Nucynta extended release package insert or

22   prescribing information.

23        Q.   Okay.  And am I correct that if you look on

24   the top left of this, this is the 2011, it says

25   "Initial US Approval:  2011"?
```

1      A.    Yes.

2      Q.    And if you look on the final page of this

3    document, it confirms this is the 2011 version?

4      A.    Yes.

5      Q.    And am I correct that just below that on the

6    front page is yet another black box warning?

7      A.    It is.

8      Q.    Okay.  And will you read the first line

9    underneath -- within the black box warning?

10      A.    "Potential for abuse, proper patient

11    selection and limitations of use."

12            The first word was "Warning."  I'm sorry.

13      Q.    Thank you.  And then if you could read the

14    bolded material just below "See full prescribing

15    information."

16      A.    "Nucynta ER contains that tapentadol, a

17    mu-opioid agonist and Schedule II controlled

18    substance, with risk of misuse, abuse, and

19    diversion, similar to other opioid analgesics."

20      Q.    Thank you.  Can we page ahead to Page 8,

21    Section 5.5.  I will say on Page 7 you will see

22    Section 5 is entitled "Warnings and Precautions,"

23    and on Page 8, Section 5.5 is entitled "Misuse and

24    Abuse."  Correct?

25      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Similar language to what we just read about

2    tapentadol being "a mu-opioid agonist and is a

3    Schedule II controlled substance.   Such drugs are

4    sought by drug abusers and people with addiction

5    disorders."   Correct?

6        A.    Yes.

7        Q.    And then if we go down two paragraphs, there

8    is a paragraph that says:   "Nucynta ER can be abused

9    in a manner similar to other opioid agonists, legal

10   or illicit.   This should be considered when

11   prescribing or dispensing Nucynta ER in situations

12   where the physician or pharmacist is concerned about

13   an increased risk of misuse and abuse."

14           Am I -- did I read that correctly?

15       A.    I think so, yes.

16       Q.    And if we flip to the next page, the top of

17   Page 9:   "Drug abusers may attempt to abuse Nucynta

18   ER by crushing, chewing, snorting or injecting the

19   product.   These practices may result in the

20   uncontrolled delivery of Nucynta ER and pose a

21   significant risk to the abuser that could result in

22   overdose and death."

23           Did I read that correctly?

24       A.    Yes.

25       Q.    Okay.   And if we were to page ahead to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Page 18 here in Section 9 of the label or package

 2    insert, and this is entitled "Drug Abuse and

 3    Dependence," correct?

 4        A.   Yes.

 5        Q.   In the second paragraph, under 9.2, is --

 6    the section entitled "Abuse," the second paragraph

 7    reads:  "The risks of misuse and abuse should be

 8    considered when prescribing or dispensing Nucynta

 9    ER."

10             Correct?

11        A.   Yes.

12        Q.   Okay.  You can set this one aside.  Good

13    news, the final of these labels, which has been

14    premarked 18.

15             (Perri Exhibit 18 was marked for

16    identification.)

17    BY MR. GALIN:

18        Q.   Do you recognize this, Dr. Perri?

19        A.   This is also Nucynta ER from 2008.

20        Q.   Okay.  '18, I believe.  2018, Is that what

21    you said?

22        A.   No, this one is 2008, I believe.  Well, no,

23    that's the initial approval date, so let's see.

24        Q.   If you look in the bottom right-hand corner,

25    where it says "Revised" on the front page.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes, 2018.  Generally, the very last line --
 2   yes, there it is, September 2018.
 3      Q.   And again, this has a black box on the front
 4   left?
 5      A.   It does.
 6      Q.   And it again starts with:  "Warning:
 7   Addiction, abuse, and misuse."
 8           Correct?
 9      A.   Yes.
10      Q.   Okay.  And this contains a similar
11   discussion of the risks associated with addiction,
12   abuse, and misuse, and the use during pregnancy that
13   we've read in the previous labels.  Am I correct?
14      A.   Yes.
15      Q.   Okay.  We can happily read them, but I think
16   people will prefer we don't, so we'll skip ahead to
17   5.1.  Section 5.1 is "Warnings and Precautions,"
18   correct?
19      A.   Yes, Section 5 is "Warnings and
20   Precautions."
21      Q.   Yes.  And 5.1 is "Addiction, Abuse, and
22   Misuse"?
23      A.   Yes.
24      Q.   And I will just read.  The first paragraph
25   under 5.1 reads:  Nucynta ER contains tapentadol, a
```

```
 1    Section II controlled substance.  As an opioid,

 2    Nucynta ER exposes users to the risks of addiction,

 3    abuse, and misuse.  Because extended-release

 4    products such as Nucynta ER deliver the opioid over

 5    an extended period of time, there is a greater risk

 6    for overdose and death due to the larger amount of

 7    tapentadol present."

 8         Did I read that correctly?

 9    A.   I think you said Section II controlled

10    substances, instead of Schedule II.  I may have

11    misheard you, though.

12    Q.   I probably misspoke but if I did, I

13    appreciate you correcting it.  It's a Schedule II

14    controlled substance.

15         And then the next paragraph:  "Although the

16    risk of addiction in any individual is unknown and

17    can occur in patients appropriately prescribed

18    Nucynta ER, addiction can occur at recommended doses

19    and if the drug is misused or abused."

20         The next paragraph goes on to direct the

21    physician to:  "Assess each patient's risk for

22    opioid addiction, abuse, or misuse prior to

23    prescribing Nucynta ER, and monitor all patients

24    receiving Nucynta ER for the development of these

25    behaviors and conditions."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Have I read all that correctly?

 2       A.    Yes.

 3       Q.    Okay.  And Section 9, again, is "Drug Abuse

 4   and Dependence."  Do you see that?

 5       A.    Yes.

 6       Q.    And again, 9.2 is "Abuse" and contains

 7   lengthy warnings and directions to the physician

 8   regarding the potential for abuse of this product;

 9   is that correct?

10       A.    Yes.

11       Q.    Okay.  You can set that aside.

12              Doctor and, frankly, everyone, I appreciate

13   your patience with me as we went through that

14   exercise, but I think it's an important one.

15              Did you review the -- these labels or

16   product inserts as part of your effort in this

17   matter?

18       A.    Yes.  I made -- to the best I could, I made

19   a specific effort to make sure I'd seen the PIs for

20   all of the drugs.

21       Q.    Do you agree with me that after that lengthy

22   exercise, there is significant and extensive

23   warnings regarding addiction, abuse, misuse, abuse,

24   and dependence issues in each version of the

25   Duragesic, Nucynta and Nucynta ER labels?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CHALOS:  Object to the form.

 2       A.   So based on what we've seen, I would agree

 3   with you that there is plenty of warning information

 4   in the PI.  The only thing I would say about that is

 5   I think I've expressed my opinions about the utility

 6   of the PI in the overall mix of the marketing

 7   materials, but yes, I agree that there are warnings

 8   contained in all of the PIs that we just reviewed.

 9       Q.   Okay.  And just so that -- because your

10   lawyer objected, I will go with am I correct that

11   there is -- that warning information is in each of

12   the Duragesic labels?

13              MR. CHALOS:  Same objection.

14       A.   Yes.  The ones we just reviewed, the

15   warnings, different -- over time the warnings

16   change, but the warnings were present in all of the

17   PIs that we looked at.

18       Q.   And that includes Nucynta as well?

19       A.   Yes.

20       Q.   And Nucynta ER?

21       A.   Yes.

22       Q.   Okay.  Doctor, you said that you believed

23   the product inserts have limited utility, correct?

24       A.   They are a piece of the puzzle, but they are

25   not the only piece, so their utility has to be
```

1    considered with respect to that, and as we read

2    through them, they're fairly long and very detailed

3    in some cases, so their utility for physicians is

4    limited by that.

5         But I think the main thing that -- the main

6    opinion that I've expressed is that the PI is just

7    one piece of the marketing that was presented, and

8    certainly these are all good examples that they

9    provide warnings.

10   Q.   Okay.  And in fact -- we will come back to

11   that, but one of the things you mentioned is --

12   yesterday, I can't remember who was speaking with

13   you, it might have been Mr. Volney, that -- I think

14   you testified that any time the product name and

15   indication are mentioned, I think you've used be it

16   even on a mug, it has to be -- the product insert or

17   label, package insert, product label, must be

18   provided; is that correct?

19   A.   Yes, and it was in reference to my

20   understanding of when they had to provide a PI,

21   which was any time they did those two actions

22   together.  And the mug example was an old-school

23   reference, because, of course, we know they don't do

24   that -- no one does that any more, but I remember,

25   you know, years passed getting a coffee mug that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would say Nucynta or whatever and there would be an
 2    annoying package insert folded up very tightly stuck
 3    to the side of it.  So...
 4        Q.   Okay.  And am I correct that in your review
 5    of -- well, let me --
 6           In your review of the documents for Janssen,
 7    for this exercise, did you gain an understanding of
 8    whether Janssen's sales representatives were
 9    required to provide the package insert when engaging
10    in what I believe you referred to as personal
11    selling?
12        A.   Depending on the nature of their visit, my
13    answer would be yes, but I think that -- I don't see
14    evidence that the package inserts were distributed
15    inappropriately at any point.
16        Q.   And when you say distributed
17    inappropriately, the only inappropriate would mean
18    if they weren't distributed, correct?
19        A.   Right.  I think that's something that
20    industry people pay a lot of attention to because
21    it's a well-understood requirement and I think
22    everyone wants to be as diligent as possible making
23    sure the package insert is presented when it needs
24    to be.
25        Q.   So as you sit here today you have no reason
```

1    to believe that sales reps for Janssen did not

2    distribute the package insert whenever discussing

3    the product and its indications, correct?

4         MR. CHALOS:  Object to the form.

5    A.    That's -- I -- yes, I agree that I haven't

6    seen any evidence that they didn't do that.  I still

7    have to say, though, I question the utility of it

8    given the big picture of the marketing, but I

9    certainly agree with that statement.

10   Q.    So let me talk about the question about the

11   utility.  Why is it that you question the utility of

12   the package insert?

13   A.    Well, I think we've established through

14   these last two days that, you know, physicians are

15   busy folks and they need information.  They also

16   need information that is succinct and relevant to

17   the decision they are making at that moment in time.

18        The package insert, as we've just gone

19   through, these are extensive documents and they are

20   generally not in this nice of a fashion to read.

21   They are generally a big sheet with print so small

22   you can't even really read them.  But the main point

23   is, is that they are one piece of a much larger

24   program of marketing that is presented related to

25   all of these products, Nucynta and Duragesic

```
 1    included, that focuses on product features and

 2    product benefits, the things that are most at the

 3    front of physicians' minds when they are trying to

 4    make a decision about what their patient needs, and

 5    what might be the best choice for their patient.

 6          And certainly those bigger -- the bigger

 7    more fuller scope focuses on the well-crafted and

 8    well-defined, well-thought-out, well-planned

 9    strategies that defendants have figured out will be

10    the most effective at increasing sales of these

11    products.

12          So for that reason, given the busy nature of

13    the physician, given the presentation of the

14    material in the PI not being the most user friendly

15    in many cases, and the large volume of other

16    marketing materials, and that includes the CE

17    programs and the use of key opinion leaders and all

18    the different ways that manufacturers reach out to

19    physicians to educate them about their drugs, the

20    package insert plays a role but it's a smaller role

21    than most of the other types of marketing just in

22    terms of how much utility it has during that patient

23    encounter for a decision-making.

24    Q.    You've mentioned a couple of times the large

25    and dense nature, so to speak, of the package
```

Highly Confidential - Subject to Further Confidentiality Review

1    insert.  Am I correct that one of the ways meant to

2    address the depth and breadth of it is to provide

3    the black box warning up front, that in a succinct

4    way, as you put it, directs the physicians to that

5    warning information?

6         MR. CHALOS:  Object to the form.

7         A.   Yeah, that's -- that's true.

8         Q.   And in fact, as we looked at, with one

9    exception, which was the first Duragesic label,

10   every one of the labels we looked at had a black box

11   warning that covered addiction, abuse, and misuse;

12   is that correct?

13        A.   That statement is correct, yes.

14        Q.   Okay.  And in fact, in that one Duragesic

15   label that we looked at, and you have it, it's

16   Exhibit 13 if you would like to go back, I think I

17   asked you to read the very first thing under the

18   name on the top of the label and I believe you read

19   a warning about abuse risk; is that correct?

20        A.   As I recall, yes, that's correct.

21        Q.   Okay.  You -- do you know whether or not

22   physicians are trained or taught either in medical

23   school or otherwise the importance of reviewing and

24   understanding package inserts?

25        A.   I don't know specifically what their

```
 1    training involves.  My understanding about what

 2    physicians get in medical school in terms of

 3    pharmacology training is that it's very minimal and

 4    that most of their drug knowledge comes from their

 5    practice experience on medical school campuses,

 6    where they first begin seeing patients and

 7    prescribing medications.

 8         And from a marketing perspective, we also

 9    know that marketers tend to spend a lot of time in

10    those environments, to be there present during a

11    physician's early training years.  So that's my --

12    that's about the extent of my knowledge about what

13    they get in terms of training.  I don't know that

14    they're -- or that they are or are not trained on

15    how to interpret a package insert.

16    Q.    Well, do you think that doctors understand

17    the importance of a package insert?

18    A.    I think over time that perhaps has been --

19    there would be a different answer to that question,

20    because I know back in the 1990s we didn't have

21    handheld pharmaceutical reference capabilities.  Now

22    certainly we do, and I don't know any doctor that

23    refers to the PDR ever anymore, but I do -- and in

24    fact, they stopped making the PDR at some point in

25    the mid 2000s.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                The PDR was a collection of package inserts,

 2      and so at least during the time period that the PDR

 3      was around there would have been more reliance on

 4      that, but since that point in time, with the advent

 5      of all the handheld and computer-based drug

 6      information systems, I think the importance of the

 7      package insert is greatly diminished.

 8      Q.   The FDA still considers the package insert

 9      an important part of marketing and information -- a

10      source of information for physicians, correct?

11                MR. CHALOS:  Object to the form.

12      A.   So the FDA's characterization of it, I don't

13      know what they call it, but I can tell you from my

14      perspective what I look at the -- the PI is what

15      sets the boundaries around which a pharmaceutical

16      manufacturer who wants to market their product can

17      engage, and the package insert outlines that, I

18      think, in a lot of detail.  The black box warning is

19      required, the indications, all of that are laid out.

20                So within the scope of the package insert as

21      your boundaries, those are the things that can be

22      discussed, so it's an important part of the

23      marketing, I agree.  I don't know what the FDA

24      thinks but to me it's an important part of

25      marketing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Are you familiar with the term Important
 2   Safety Information or ISI?
 3        A.   Yes.
 4        Q.   What is ISI?
 5        A.   The information that's usually contained in
 6   the package or prescribing information relative to
 7   safe use of the product.
 8        Q.   And am I correct that pharmaceutical
 9   manufacturers are required to include the ISI within
10   their -- in a fair and balanced way on their
11   marketing pieces?
12        A.   Yes, that's my understanding.
13        Q.   Okay.  And in your review of Janssen's
14   documents, have you seen any indication that it ever
15   failed to include the ISI in its marketing pieces?
16        A.   I don't recall anything specific where they
17   did not include the important safety information --
18        Q.   Okay.
19        A.   -- in a marketing piece.
20        Q.   To the extent that the product insert is
21   given to -- or the package insert is given to
22   physicians, as you've said it's your understanding
23   it is, is it the manufacturer's fault that it is not
24   read or it is not considered by the physician, if in
25   fact that's the case?
```

1          A.    Gosh.  I mean, I hate to use the word fault,

2     but what comes to my mind about that is, is that,

3     you know, the manufacturer has a lot of options when

4     they decide what information to present, and I think

5     my opinion is, is that the package insert generally

6     is a boundary and I think most people respect that

7     boundary, most manufacturers do.

8          The problem arises in what information is

9     focused on.  It's one thing to bring lunch to a

10    doctor's office and leave a package insert.  It's

11    another thing to meet personally with that doctor

12    and to discuss the talking points that are designed,

13    mapped out weeks ahead of time, strategized a year

14    ahead of time by a marketing planner, and expect the

15    doctor to pay more attention to the package insert

16    than the personal communication.

17          So is it -- is it their fault?  I mean,

18    essentially, it's designed so that the information

19    that's remembered by the doctor is the information

20    that will promote the product, not restrict its use,

21    so in -- at the end of the day, the marketing pieces

22    that are designed to focus on product features and

23    the benefits that those bring to patients and

24    doctors who use them.

25          The reasons why this drug is better than the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    competition, the reasons why this drug works better

 2    than other therapies, those are all the messages

 3    that get recalled.

 4         So at the end of the day, I guess I don't

 5    like to use the word their fault, but I guess in a

 6    marketing sense, it's because of their actions that

 7    those are the things that are remembered and that

 8    the PI is not relied on.

 9    Q.   In a number of the documents you looked at,

10    am I correct that they said "cannot be left behind"?

11    A.   There were documents that did say "this is

12    not a leave behind," "do not share with customers."

13    I can't recall a specific one right now to point you

14    to, but the -- I know that on many of the documents

15    I saw in the data -- in the document production,

16    there would be designations about whether a document

17    is permissible to be left behind or not, or if it

18    was intended to be left behind, "this is approved

19    for distribution."

20    Q.   And yet, as you said, the package insert is

21    always left behind, correct?

22         MR. CHALOS:  Object to the form.

23    A.   The package insert is left behind when it

24    meets those criteria for why it needs to be left

25    behind.  So if the -- if you're talking about
```

Highly Confidential - Subject to Further Confidentiality Review

 1   Nucynta and its indications, then you would need to

 2   leave a package insert.

 3      Q.   So we -- if something is going to stay

 4   behind, it will be the package insert in those cases

 5   with the black box warning on it, correct?

 6          MR. CHALOS:  Object to the form.

 7      A.   Yeah, depending on the circumstance.  If it

 8   was a -- if they meet the criteria for needing to

 9   leave a package insert, I'm sure they probably would

10   have.

11      Q.   Okay.  Are --

12          THE WITNESS:  How long have we been going?

13          MR. CHALOS:  Over an hour.

14          MR. GALIN:  Do you want to take a --

15          THE WITNESS:  I kind of need to take a short

16   break.

17          MR. GALIN:  Certainly.  Absolutely.

18          THE WITNESS:  Thank you.

19          THE VIDEOGRAPHER:  We are now going off the

20   video record.  The time is currently 11:28 a.m.

21   This is the end of the Media Number 2.

22      (Recess from 11:28 a.m. until 11:40?a.m.)

23          THE VIDEOGRAPHER:  We are now back on the

24   video record with the beginning of Media

25   Number 3.  The time is currently 11:40 a.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. GALIN:  Thank you.

 2     BY MR. GALIN:

 3        Q.   Dr. Perri, before the break, one of the

 4     things you were mentioning was that time is spent

 5     preplanning the way pharmaceutical manufacturers

 6     will discuss product features and attributes during

 7     personal selling in advance of those sales calls,

 8     correct?

 9        A.   Yes.

10        Q.   Okay.  During the break I placed before you

11     what's been marked as Exhibit 19 and I've shared

12     with your counsel.

13             (Perri Exhibit 19 was marked for

14     identification.)

15     BY MR. GALIN:

16        Q.   You may recognize this.  I know you looked

17     at a lot of documents, but you may recognize this as

18     some -- a Janssen document Bates stamped JAN00085130

19     that is cited in your report at Page 75, Footnote

20     245.  I won't blame you if you don't actually

21     remember this specific document.

22        A.   Actually, I do.

23        Q.   Oh, great.  I really -- you don't -- you're

24     obviously entitled to look through all of it, but I

25     will tell you I really only want to ask you a
```

Highly Confidential - Subject to Further Confidentiality Review

1    question about what is the first substantive slide

2    on Page 2 of this printout deck.  Do you see that

3    slide?

4        A.   I do.

5        Q.   And the title is "Compliance is Essential,"

6    correct?

7        A.   It is.

8        Q.   Am I correct that the first bullet reads:

9    "As a sales representative, it is my responsibility

10   to" and then a colon?

11       A.   Yes.

12       Q.   Okay.  The first bullet under the colon,

13   could you read that for me?

14       A.   "Always promote the benefit and safety of

15   our products consistent with the FDA-approved

16   indications and prescribing information."

17       Q.   And the second.

18       A.   "Disclose safety information for all

19   company-promoted products."

20       Q.   Okay.  And if you look in the talking

21   points, so to speak, the speaker notes that are

22   underneath the print, there is one listed, "Slide

23   Objective."

24       A.   Yes.

25       Q.   And it says:  "Stress that compliance is

Highly Confidential - Subject to Further Confidentiality Review

```
1    essential in everything we do when we are selling to

2    our customers we must stay within the guidelines."

3         Did I read that correctly?

4    A.   Yes.

5    Q.   Okay.  So this document reflects, does it

6    not, Dr. Perri, that Janssen took being compliant

7    and sharing safety information seriously, correct?

8    A.   I think that's one of the things this

9    document definitely shows, yeah.

10   Q.   Okay.  You can set that aside.  This is

11   where I really get jumbled trying to sort of piece

12   stuff together, as I warned before, and to move this

13   along, so bear with me for a second, but where I

14   think I would like to go next is back to Table II of

15   your report and Page 89 in particular.

16        So if I could ask you to -- this is

17   actually -- well, let's start on Page 88 of the

18   report, which is Letter B of Table II.

19   A.   Okay.

20   Q.   Letter B on Page 88 is "Abuse deterrent

21   formulations deter abuse."

22   A.   Yes.

23   Q.   And if you flip to Page 89, there is a

24   Janssen entry that is the second entry on the page

25   and it reads, and I quote -- quote you quoting from
```

```
 1    a document JAN-MS-00259893, quote:  "only AP-48

 2    combines the superior potency of fentanyl with

 3    naltrexone in a proprietary formulation to safeguard

 4    against unintended usage."

 5            Did I read that correctly?  Do you see that?

 6    A.   Yes.

 7    Q.   Do you know what AP-48 is?

 8    A.   Off the top of my head, I don't recall, no.

 9    Q.   Okay.  Do you know -- I will represent to

10    you that AP-48 is, as is suggested by the quote that

11    you have in the table, a developmental version of

12    the fentanyl patch Duragesic meant to safeguard

13    against abuse.

14    A.   Okay.

15    Q.   Does that sound familiar?  I take it you

16    don't know.

17    A.   Yeah.  I'm trying to remember the specific

18    document but --

19    Q.   I could show it to you if you want --

20    A.   No, that's --

21    Q.   -- but my question --

22    A.   Tell me what your question is, yeah.

23    Q.   Well, my question is do you know if AP-48

24    ever made it to market?

25    A.   I am not familiar with any fentanyl and
```

1    naltrexone combinations that made it to market.

2         Q.    In fact, I will represent that it did not.

3         A.    Right.

4         Q.    Okay.  So considering that it did not make

5    it to market, do you believe that this document from

6    which you quote was used in marketing?

7              MR. CHALOS:  Object to the form.

8         A.    So no, I don't believe this document was

9    used in the marketing; however, as I've mentioned in

10   prior questions like this, it shows the thought

11   process, what was going on internally within

12   defendants to look at abuse deterrent formulations

13   and to bring abuse deterrents to the marketplace.

14   That was important to the marketing.  There were a

15   number -- not a number, there were a few products

16   that were developed, some got very far along, some

17   did not, but yet the processes that were engaged for

18   those products were very similar to, if not

19   identical to in terms of the plans and strategies,

20   to products that didn't make it to market as the

21   ones who did.

22             So I did include -- and there are other

23   examples in this table of products that or messages

24   that never made it to market because there was

25   either a problem with the message or the product

1    never made it to market.

2        Q.    I guess what I'm struggling to understand

3    then, Dr. Perri, is if Table II, as I understand it

4    from your testimony, is meant to reflect examples or

5    the aggregate message that, as you said, has

6    influenced prescribers and led to this increased

7    growth, as you've stated, in opioid prescriptions,

8    why messages that were never actually used and why

9    messages about a product that never actually made it

10   to the market would be included in your table?

11       A.    I guess the best answer I can give you for

12   that is, is that I wanted to be complete in my

13   presentation of what the manufacturers planned and

14   executed, and just because something didn't make it

15   to market didn't mean they didn't think about it.

16           The abuse-deterrent concept was important.

17   It was important to more than just Janssen, and I

18   think it was -- including that was one way of

19   showing that there was an attempt made, there were

20   considerations given, to an abuse-deterrent

21   formulation.  It didn't work out, but yet it's

22   important to note that from a -- the product

23   development perspective, this was something that was

24   on the radar because at this time -- and I shouldn't

25   say at this time because I don't know when this

1  document relates to specifically time-wise as I'm

2  sitting here right now, but over time manufacturers

3  became more interested in abuse-deterrent

4  formulations because of a growing awareness

5  societally that we had a drug abuse problem in this

6  country, and that was one of the things that was

7  leading people to look at these abuse-deterrent

8  formulations.

9      Q.   I guess what I'm struggling with again,

10  Dr. Perri, is there is nothing in your table, is

11  there, that distinguishes messages that made it to

12  the public and to physicians and messages that never

13  got outside the walls of the various defendants.

14  Correct?

15     A.   The table summarizes messages that were in

16  the marketing materials.  That's certain.  The

17  majority of the messages, as I recall, were from

18  items that are certainly items that were distributed

19  in the marketing materials.  A few of the items in

20  there, such as this one that you've pointed out

21  today, were -- and others, for example, MoxDuo, that

22  never made it to market.  Another example I can give

23  you from Endo that cites to the use -- or to

24  promoting the use for an incorrect indication, which

25  was caught eventually, but it had other things in

1    that document that I was interested in making sure

2    made it to my table.

3         So there are a number of documents in there,

4    just a few, that never made it, but yet they reflect

5    thinking.  And I can give you specifically with the

6    Endo document, for example, it references what I

7    considered to be a vulnerable population:  Veterans.

8    And so regardless of whether it made it to market in

9    that form, it showed consideration of targeting

10   veterans in the opioid marketing.

11        So the requirements for ending up in this

12   table were just that it was something that was in

13   the marketing process within defendants' marketing.

14   It doesn't necessarily mean that they made it to

15   market, although I'll represent that they did mostly

16   make it to market, and we can know for any one of

17   these whether it made it to market or not.  That's

18   not -- I mean, it's a possibility that that could be

19   another column in the table, "Did it make it to

20   market or not."  I just didn't do that at this

21   point.

22   Q.   Okay.  I'll let my colleagues representing

23   Endo deal with the discussion about Endo for you.

24   A.    I'm sure they noticed that as well, so --

25   Q.    I suspect they probably did.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            I will skip ahead in the purpose of time, if

 2    you would, to I believe it is Page 104 of your

 3    report, and there are a number of -- actually,

 4    excuse me.  It's 103 that I want to look at.  Oh,

 5    actually, bear with me for one moment.  All right.

 6            Yes, it's 104.  If you look under K, it

 7    says:  "Patients can be easily tapered off opioids."

 8            Is that correct?

 9        A.   That's correct.

10        Q.   And under K, the second document is a

11    Janssen document that's referenced by its Bates

12    number JAN00222151, correct?

13        A.   Correct.

14        Q.   Would you read the -- for me the quote

15    there?

16        A.   "Physical dependence is not the same as

17    addiction.  It may be managed by gradually reducing

18    the dosage of the drug if the doctor decides it is

19    appropriate to discontinue therapy."

20        Q.   I don't see anything or didn't hear anything

21    in there about it being easy, and yet this appears

22    under something that says "patients can be easily

23    tapered off of opioids."

24            Why is that?

25        A.   We'd have to get the whole document to get a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sense of, you know, how it was being presented, but
 2    I think certainly the sentiment that patients can be
 3    tapered, and I think easily tapered, was something
 4    that shows up in many documents, and, you know,
 5    maybe the words that I've used to describe K aren't
 6    perfect, but I don't think there would be any
 7    argument that this phrase that's listed here,
 8    "physical dependence is not the same as addiction,"
 9    is making a statement.  It's clearly saying just
10    because your patient is dependent, it doesn't mean
11    they're addicted.  Okay?  So that sort of sets the
12    tone for it.  And it may be managed by gradually
13    reducing the dose, so here's the solution.
14          This is indicative of just exactly how I saw
15    the marketing messages being used by defendants.
16    There's a problem, it's a barrier to opioid use.
17    I've identified these barriers in my report and
18    there are categories, I think five barriers that
19    I've pointed out.  One of them is this exact thing,
20    that withdraw is a big concern.
21          And so the way that this is dealt with in
22    the marketing documents is to minimize the concern
23    and tell what the solution is.  What does that do?
24    That promotes the use of opioids.  That doesn't
25    necessarily promote the appropriate use or the
```

1    inappropriate use, and I did not make that judgment,

2    but it promotes the use of opioids, which is why

3    when looking at all of these documents and all of

4    the messages and all of the other marketing that

5    went on, I was able to form the conclusion that the

6    marketing of the opioids, which focused on product

7    features and benefits, heavily focused on the

8    reasons why you should buy the product and not the

9    reasons why you shouldn't, led to the expansion of

10   the opioid market.

11       Q.   Okay.  I would, in a different time, go

12   through with you the discussion as to how -- the

13   overall cite, but since it is -- the document to

14   which you cite is the Nucynta website -- or excuse

15   me, the Duragesic website from 2006.  It's hundreds

16   upon hundreds of pages and I'll spare all of us that

17   fun, but I do want to show you what I will mark

18   Exhibit 20, which is a printout from a different

19   website.

20           (Perri Exhibit 20 was marked for

21   identification.)

22   BY MR. GALIN:

23       Q.   This, if you look at the first page, you

24   will see that Pagevault captures the key facts as to

25   where this website comes from.  This is the -- the

```
 1     URL indicates that it's the FDA's website and the

 2     section is for consumers and it's a consumer update

 3     captured just this month on April 4th, 2019?

 4          Do you see what I'm referring to?

 5     A.   I do.

 6     Q.   Okay.  If you were to go to the second page

 7     of the printed version of the website, you will see

 8     just past halfway down is a section -- and I

 9     apologize for the small type, one of the problems

10     with a screen grab -- is "Misuse and Abuse."  Do you

11     see the section I'm looking at?

12     A.   Yes.

13     Q.   And its second paragraph reads under this --

14     well, for completeness or -- I'll read.  The first

15     paragraph is:  "Misuse and abuse of pain medication

16     can be extremely dangerous.  This is especially so

17     in regard to opioids.  These medications should be

18     stored in a place where they cannot be stolen."

19          The second paragraph reads:  "According to

20     the National Institutes of Health, studies have

21     shown that properly managed medical use of opioid

22     analgesic compounds (taken exactly as prescribed) is

23     safe, can manage pain effectively, and rarely causes

24     addiction."

25          Did I read that correctly?
```

1     A.   You did.

2     Q.   So will you agree with me that the FDA is

3     stating that when properly prescribed and man --

4     opioids can manage pain effectively and rarely cause

5     addiction?

6          MR. CHALOS:   Object to the form.

7     A.   That's what this says, yes.

8     Q.   Okay.  You can set that aside, Dr. Perri.

9          I'm mindful of the time and if my colleagues

10    want to go.  Let me sort of wrap up by going back to

11    something.

12         When we started our discussion at least, one

13    of the things you mentioned was that you have not

14    made any determinations as to whether or not any of

15    the marketing claims that you've reviewed are false

16    or misleading, correct?

17    A.   I did not, that's correct.

18    Q.   And in fact, you were relying on five other

19    experts and the FDA warning letters, I believe you

20    said, correct?

21    A.   Yes.

22    Q.   One of the things you've also said -- and

23    just around that, you, when putting together your

24    report, were asked to assume, in fact, that the

25    marketing claims were false and misleading; is that

Highly Confidential - Subject to Further Confidentiality Review

 1    correct?

 2       A.   That's generally the way it was placed, yes.

 3       Q.   Okay.  And one of the things you said

 4    earlier today when my colleague Mr. Carter was

 5    speaking with you, and I think you said at least

 6    once, if not twice, yesterday is, in essence, that

 7    -- the term used, "the crux of the matter" here, is

 8    that the marketing of opioids has violated the

 9    standards of marketing.  I certainly don't want to

10    tell you what you said, but do you recall something

11    along that effect?

12            MR. CHALOS:  Object to the form.

13       A.   Yeah, I'm not sure I used those exact words

14    but I think that's roughly a paraphrase of it.

15       Q.   Let me use words that are yours from

16    Paragraph 192 on Page 155 at the end of your -- the

17    final presignature paragraph of your report?

18       A.   Okay.

19       Q.   You write:  "Defendants violated marketing

20    standards by creating and disseminating false or

21    misleading marketing messages that downplayed or

22    minimized the risks associated with opioids while

23    emphasizing the benefits of their drugs, and by

24    disguising their support of activities aimed at

25    increasing sales of their own products."

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    If in fact it turns out that the assumptions

 3   that you've been asked to make, that our marketing

 4   was in some way false or misleading, turns out to be

 5   an incorrect assumption, does that not vitiate the

 6   conclusions that you reach in your report?

 7            MR. CHALOS:  Object to the form; incomplete

 8        hypothetical.

 9        A.    Let me read my sentence again and see how

10   taking the word false or misleading out would impact

11   the meaning of that sentence, and just give me one

12   second.

13        Q.    Of course.

14        A.    So if I -- if I take out the words

15   "disseminating false and misleading," it would just

16   say "disseminating marketing messages that

17   downplayed or minimized the risks associated with

18   opioids while emphasizing the benefits of their

19   drugs, and by disguising their support of activities

20   aimed at increasing sales of their own products."

21            I think the sentence remains true.

22        Q.    So if I'm understanding correctly, and I

23   certainly don't want to put words in your mouth, but

24   let me ask, am I correct in understanding that what

25   you are telling me is that it's not necessary for
```

1    our marketing, our being defendants' marketing, and

2    I use us as a whole because you're talking about in

3    the aggregate you haven't found anyone -- yes.

4        A.    I'm sorry.  The first part -- I focused on

5    the last part of the sentence.  I didn't look at the

6    "violated marketing standards."  That part of it I

7    have to think about.  I haven't -- I just think that

8    the -- I guess what I was trying to say is that

9    the -- and I know that folks around this table are

10   probably tired of hearing me say that marketing

11   works.

12       Q.    Then we'll stop asking.

13       A.    But the -- I think that the marketing,

14   even -- whether the messages are false or

15   misleading, that wasn't really relevant.  The

16   marketing, what did it do, how did it do it, those

17   opinions that I've expressed I think they remain

18   true.

19            I need to think about this part, about did

20   they violate marketing standards, that part I have

21   to think about, because I know for some of them

22   there would still be a violation of the marketing

23   standards.  For example, the use of key opinion

24   leaders where the relationship between the company

25   and the KOLs was not disclosed, so in cases like

1    that.

2          So I would need to go through each and every

3    part of it and verify that each standard was or

4    wasn't violated.  Does that provide you with an

5    answer you --

6      Q.   It provides me with your answer, which is

7    all I can ask for.

8      A.   Okay.

9      Q.   But what I'm really also trying to

10   understand here is you had said before, to your

11   point, you've said a few times in this deposition

12   that marketing is important and it worked, or that

13   marketing works.  I think in response to Mr. Carter

14   earlier you said that marketing itself isn't

15   inappropriate.

16         If I understand correctly, what you believe

17   the defendants did inappropriately was violating the

18   standards of marketing, as you refer to in

19   Paragraph 192.  Am I correct about that?

20         MR. CHALOS:  Object to the form.

21     A.   The judgment about whether any particular

22   message being appropriate or inappropriate wasn't

23   critical.  The false and misleading, that does

24   relate to some of the standards.  So false and

25   misleading, as -- when you asked me the question

1    earlier, it does affect some of my judgment about

2    the marketing, but taking that out, it would only

3    probably affect a few of the several standards that

4    are listed.

5         If we took out some of the other words in

6    the sentence, it might also -- so it wasn't just

7    from the false and misleading perspective.

8         And you're right, I didn't examine the

9    nature of the ads, I relied on others to provide

10   that information.

11        So I think we can break this down piece by

12   piece and get out each standard and look at just how

13   it impacts that opinion, but I think the overall

14   opinion is that some marketing standards were still

15   violated even if we take out the false and

16   misleading nature that I relied upon in the

17   assumption to verify.

18   Q.   And which standards would those be?

19        MR. CHALOS:  Object to the form; incomplete

20        hypothetical.

21   A.   If you look at Page 19, this is in the

22   section on the standards that apply to

23   pharmaceutical marketing, Paragraphs 34 through 36.

24   The -- assuming that what we're talking about is

25   taking out the words "false and misleading" from

Highly Confidential - Subject to Further Confidentiality Review

1    that statement, it -- again, I need to give this a

2    lot more thought because I spent a lot of time

3    working on this report and a lot of time analyzing

4    documents, and just to jump into it here and give

5    you a quick opinion, I'm doing that because you've

6    asked the question, but I do like to think about

7    things.

8        Q.   Okay.  That's fair.

9        A.   But it says that:  "Marketing must always be

10   truthful.  Marketing must never make false or

11   misleading statements to the medical community."

12            So if we take those out the question would

13   be do the -- do the FDA documents still give me

14   pause and make me think that there is false and

15   misleading marketing?

16            If we take away the FDA documents and the

17   assumption of false and misleading, then I would

18   get -- I would probably formulate an even different

19   opinion.  So depending on the specific nature of the

20   hypothetical that we're talking about, I would yield

21   to you that if the ads were -- none of them were

22   false or misleading, that I wouldn't say they

23   violated the standard of not being truthful.  It

24   could still be, though, that the learning that would

25   take place from those ads would violate some other

Highly Confidential - Subject to Further Confidentiality Review

1    standard, for example, not promoting the rational

2    use of medication, promoting a use that goes beyond

3    what we would call rational or appropriate use of

4    medicines.

5         So I would have to analyze it very carefully

6    and look at all the details and all the facts.

7         Just looking further on down this list,

8    "Accurately disclosing information about the risks

9    of their drug in addition to the benefits being

10   marketed," that requires a sort of different

11   analysis, but it wouldn't be impacted by the false

12   and misleading.

13        It should not be disguised, that we've

14   addressed in terms of the information being

15   disclosed about what is being supported and so

16   forth.

17        Good science and transparency.

18        So false and misleading would affect at

19   least one of these standards.

20   Q.   Okay.  While I would enjoy discussing this

21   more, I want to be respectful of my colleagues and I

22   appreciate your patience with me and I will turn the

23   microphone over to someone else, but I suspect

24   everyone is ready for a lunch break probably.

25        MR. CHALOS:  I hear the lunch carts rolling.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE VIDEOGRAPHER:  We are now going off the

 2       video record.  The time is currently

 3       12:07 a.m. -- excuse me, p.m.

 4         (Recess from 12:07?p.m. until 12:44?p.m.)

 5            THE VIDEOGRAPHER:  We are now back on the

 6       video record.  The time is currently 12:44 p.m.

 7                      RECROSS-EXAMINATION

 8   BY MS. RODGERS:

 9       Q.   Dr. Perri, my name is Megan Rodgers.  Again,

10   I'm with Convington & Burling representing McKesson.

11            I want to pick off where we left off -- pick

12   up where we left off yesterday, and I believe

13   yesterday you had testified that it was not

14   appropriate for a distributor to conduct kind of a

15   numbers-only analysis of a pharmacy's purchasing

16   history because it failed to take into account other

17   relevant considerations, right?

18            MR. CHALOS:  Object to the form.

19       A.   I'm sorry.  Are you reading from the

20   testimony that I provided yesterday or --

21       Q.   I am summarizing your testimony yesterday.

22            MR. CHALOS:  Object to the form.

23       A.   There was a lot in there.  I need to take

24   that, you know, piece by piece.  I would like to

25   look at it, if you -- if you have it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    I don't have your testimony in front of me.

 2   Let's take it piece by piece, though.

 3        A.    Okay.

 4        Q.    You would agree that it's not appropriate

 5   for a distributor to conduct a numbers-only analysis

 6   of a pharmacy's purchasing history, right?

 7            MR. CHALOS:  I object.  That's outside of

 8        the scope of the opinions that he's given in his

 9        report, which is Exhibit 1 to this deposition.

10            MS. RODGERS:  And if you want to just have a

11        standing objection to these --

12            MR. CHALOS:  No, I'd like to make them.  I

13        think we need to make them each time for purposes

14        of keeping the record clear.

15            MS. RODGERS:  Okay.

16            MR. CHALOS:  Standing -- standing -- I've

17        never found standing objections to be

18        particularly effective because then it is not

19        clear when I am making it, so I'd rather just

20        make them for each question.

21            MS. RODGERS:  Okay.

22        A.    So in the questions that you were asking me

23   yesterday, and one other attorney was asking me

24   yesterday, dealing with this issue of what is

25   appropriate for the wholesalers to do, I just -- I
```

Highly Confidential - Subject to Further Confidentiality Review

 1    want to be clear on the record that I did not do any

 2    of that analysis or make any of those decisions or

 3    have any opinions about that in this report that

 4    I've written.  I understand that you all have the

 5    right to ask me questions about this, so I will try

 6    to give you as good of answer as I can.  I think, as

 7    we established yesterday, though, this report was

 8    written five years ago and there has been learning

 9    that has occurred since then.

10        Q.   There has been, I'm sorry, what?

11        A.   There has been learning that has occurred

12    since then and I'm more familiar with the matters at

13    hand.  However, I'm not an expert on suspicious

14    order monitoring or what wholesalers should or

15    shouldn't do.

16        Q.   And when you say there has been learning on

17    this matter, you mean that you've learned more

18    information in connection with your participation in

19    this lawsuit?

20        A.   The -- what I mean is that since this 2014

21    case, I have become aware, as I mentioned yesterday,

22    that the DEA has put wholesalers sort of on notice

23    that they need to do a better job of monitoring

24    these orders.  I don't know much about that.

25    only -- that's the extent of what I know about it.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And you learned about that in connection

2    with your participation in this lawsuit?

3      A.   Yes.

4      Q.   Okay.  And I think you testified yesterday

5    that it's not your understanding that any laws or

6    regulations changed since you wrote this expert

7    report, correct?

8           MR. CHALOS:  Object to the form.

9      A.   That is a pretty broad statement.  I can

10   tell you that I think what I said yesterday was that

11   I'm not aware that there have been any changes to

12   the Controlled Substances Act since it was written.

13     Q.   Okay.  And so let's -- let me point you to

14   Page 6 of your -- of Exhibit 10, which is your prior

15   expert report.

16     A.   Okay.

17     Q.   And in Paragraph 26 you say:  Based on my

18   review of the documents --

19           (Speakerphone interruption.)

20            (Discussion off the record.)

21           THE VIDEOGRAPHER:  We are now going off the

22   video record.  The time is currently 12:47 p.m.

23        (Recess from 12:47 a.m. until 12:49 p.m.)

24           THE VIDEOGRAPHER:  We are now back on the

25   video record.  The time is currently 12:49 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RODGERS:

 2        Q.    Sorry about that interruption.

 3        A.    It's quite all right.

 4        Q.    I think we were looking at Paragraph 26, and

 5    in that paragraph you wrote:  "Based on my review of

 6    the documents provided, the decision to reduce and

 7    then suspend controlled substances deliveries to

 8    Cherokee Pharmacy appears to have been based on two

 9    primary considerations.  First, a superficial

10    internal analysis of the volume of purchases of

11    controlled substances by Cherokee Pharmacy."

12            Do you see that?

13        A.    I do.

14        Q.    And why did you believe that that internal

15    analysis was superficial?

16        A.    I don't recall.  This is five years ago, so

17    I don't -- I don't really recall the documents or

18    why I would have used that term.  Yeah.

19        Q.    Okay.  Let's look at Paragraph 27 then,

20    where you wrote:  "With respect to its own internal

21    monitoring, Smith tracked and allotted certain

22    levels of controlled drugs to the pharmacies it

23    serviced.  Part of this analysis was done by the

24    'Suspicious Order Monitoring System' that tracked

25    not only actual product purchases but also attempted
```

Highly Confidential - Subject to Further Confidentiality Review

1    orders that were not filled by Smith in response to

2    customer's orders.  Smith's analysis was limited to

3    the numbers of units dispensed for specific time

4    periods."

5         Is that refreshing your recollection?

6    A.   A little bit it does, yes.

7    Q.   Okay.  And the paragraph goes on:  "This

8    numbers-only oriented analysis does not take into

9    account the utilization patterns and the communities

10   served by Cherokee Pharmacy, its new store location

11   which was poised for growth, the demographics and/or

12   changes in the prescribing community, the patient

13   mix, incidence of disease or other factors (e.g.,

14   insurance, formulary restrictions, or policies and

15   procedures put in place by Cherokee Pharmacy to

16   screen controlled substance prescriptions) impacting

17   controlled substances utilization."

18        Do you see that?

19   A.   I do.

20   Q.   And you agree that those are the limitations

21   of the numbers-only oriented analysis conducted by

22   the distributor, correct?

23        MR. CHALOS:  Object to the form.

24   A.   That, I don't know, because we were talking

25   about something completely different.  Where did the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    numbers-only -- where is that?  Is that --

 2       Q.   It's part of the sentence, sir.  "This

 3    numbers-only oriented analysis..."

 4            MR. CHALOS:  Object to the form.  Object, I

 5       think it's misleading.

 6       A.   Okay.  I see where you're at now.  "The

 7    numbers-only oriented analysis does not take into

 8    account..."

 9            Okay.  And your question about that was?

10       Q.   My question was you agree that the

11    limitations you've identified here were the

12    limitations of that numbers-only oriented approach

13    taken by the distributor in this case?

14            MR. CHALOS:  Hang on a second.  Object to

15       the form.  I think that's misstating what this

16       document says.

17       A.   So I -- this does refresh my memory

18    slightly, and the thing that jumps out at me here

19    is, as I recall in this case, Mr. Forshee, who was

20    the pharmacist who owned Cherokee Pharmacy, and the

21    documents that I reviewed, he had placed multiple

22    orders for the exact same order that he had been

23    placing for his controlled substances.  In other

24    words, he ordered, let's say, five bottles of

25    OxyContin on Saturday and it didn't come in on
```

 1    Monday, so he placed that order again on Tuesday and

 2    it didn't come in on Wednesday, so he placed that

 3    order again on Thursday.

 4         And what jumps out -- the recollection that

 5    jumps out at me is that the way HD Smith -- I think

 6    it was -- it was either HD or JM Smith, I can't

 7    remember which one it was.  The way they -- they

 8    counted all of those towards his quota, and I think

 9    that also referred to the "numbers-only," and I'm

10    not sure why they did that.  I don't know what

11    processes or procedures they had in place, I just

12    know that from the documents that I saw and the

13    testimony that came out, was that any order placed,

14    whether it was filled or not, counted against his

15    purchases of controlled sub -- which greatly

16    inflated his apparent utilization, which the

17    wholesaler did not take into account, and I think

18    that was the real crux of what was going on here.

19    Q.   Okay.  I'm just going to ask this question

20    again because that was a long answer that wasn't

21    entirely responsive.

22         So let me ask it a different --

23         MR. CHALOS:  Objection.

24    Q.   Let me ask it a different way and see if you

25    better understand my question.

1           "A numbers-only oriented analysis does not

2     take into account the utilization patterns and the

3     communities served by Cherokee Pharmacy, its new

4     store location which was poised for growth, the

5     demographics and/or changes in the prescribing

6     community, the patient mix, incidence of disease or

7     other factors."

8           Do you agree that an analysis by a

9     distributor should take those into account?

10          MR. CHALOS:  Object to the form of the

11          question, and the opinion its seeking is beyond

12          the scope of the opinions that he's offered in

13          this case.

14     A.   So when I did the analysis back in 2014, I

15     certainly agree that the wholesaler should have

16     taken into account these factors.  This was a very

17     different case and very different issues than we

18     have here, and as I said, I haven't provided any

19     opinions about this in this matter.

20     Q.   Do you agree those are always factors that

21     should be considered by a distributor?

22          MR. CHALOS:  Object to the form; also beyond

23          the scope of the opinions he's offered in this

24          case as reflected in Exhibit 1 to this

25          deposition, his report.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    And just to be clear, I'm not asking you to

2   opine on whether any distributors' decision on any

3   given pharmacy was correct or incorrect right now.

4   I'm just asking as a general matter, do you agree

5   with the statement written here, that a numbers-only

6   oriented analysis is flawed and that instead, you

7   should take into account these other factors?

8        MR. CHALOS:   I object to the form.  I also

9        object that it is beyond the scope of the

10        opinions that he's offered in this case as

11        reflected in his report, which is Exhibit

12        Number 1 to this deposition.

13        A.    So the danger in me saying that these are

14   the things that need to be reviewed will maybe lead

15   people to think that I know the exact nature of what

16   needs to be reviewed by a wholesaler, and I don't.

17            I can tell you that in this case, based on

18   the documents that I saw in this specific instance,

19   it appeared that the decision that had been made had

20   been made based on what I refer to in the paragraph

21   as a numbers-only analysis and it did not take into

22   consideration these factors.  In that case, back in

23   2014, I apparently felt that it should have.

24        Q.    And are there situations you can think of

25   where a distributor should not take those factors
```

1    into account?

2        MR. CHALOS:  Hang on a second.  Object to

3        the form, but I also object that it's beyond the

4        scope of the opinions that he's given in this

5        case as included in Exhibit Number 1 to this

6        deposition.

7    A.   So I don't know.  I would need to think

8    about that.  I would need to figure out -- you know,

9    if I'm going to be asked questions about what I

10   think is -- you're referring to, and I know I

11   referred to it here, as suspicious order monitoring,

12   which at the time was a new term to me, the answer

13   would need to be analyzed.  So should they always do

14   this?  Should they never this?  Should they do this

15   sometimes?  I don't know.

16   Q.   So let me ask you about the suspicious order

17   monitoring.  Do you have expertise in suspicious

18   order monitoring?

19   A.   I'm pretty sure I have said before that I do

20   not.

21   Q.   Then why did you opine about it in this

22   case?

23   A.   Because this case wasn't about suspicious

24   order monitoring.  This case was about a pharmacist

25   whose supply of all drugs was curtailed by his

```
 1    wholesaler, including controlled substances, and it

 2    was based on the wholesaler's lack of awareness of

 3    the business operations at this pharmacy, which

 4    placed the pharmacy in jeopardy, and in fact, as I

 5    understand it, the pharmacy is no longer in

 6    business, but the crux of this matter was the

 7    wholesaler stopped providing drugs which made the

 8    pharmacist not able to sell, generate revenue, and

 9    then not able to pay their bills to the wholesaler.

10    So that was -- that was what was going on here.

11    This wasn't about suspicious order monitoring or

12    anything.  It was just about a decision that the

13    wholesaler made that, in my assessment, wasn't fair

14    to the pharmacy.

15        Q.   And the decision that you made, the decision

16    that -- sorry -- that you were assessing or

17    considering in this case, the -- in other words, the

18    distributor's decision to stop providing controlled

19    substances to this pharmacy, part of the analysis,

20    in your words, that went into that decision was done

21    by the suspicious order monitoring system of that

22    distributor, correct?

23             MR. CHALOS:  Object to the form.

24        A.   This is something that would have come from

25    one of the documents that I reviewed.  This was not
```

Highly Confidential - Subject to Further Confidentiality Review

1    something that was based on my own knowledge.  It

2    was something that I learned as a process of

3    reviewing the materials in this case.

4        Q.    So you put that into your report without

5    knowing or understanding what the suspicious order

6    monitoring system of the distributor was?

7             MR. CHALOS:  Object to the form.

8        A.    That's not fair at all.  That's not fair at

9    all to say that.  What I said was I learned about

10   this from the documents that I reviewed in this

11   case.  So I don't know why you would say that I put

12   it in there without learning about that system.  I

13   learned what I needed to know to formulate this

14   opinion.

15       Q.    So you learned about suspicious order

16   monitoring for this distributor?

17       A.    I learned about what was happening in this

18   case at this time.  I was unaware that at that point

19   in time there was a formal process known as

20   suspicious order monitoring.  This was something

21   that at the time I thought was unique to HD Smith or

22   JM Smith, whoever it was.

23       Q.    And then you rendered a decision about the

24   distributor's analysis under their suspicious order

25   monitoring system, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1                MR. CHALOS:  Object to the form.

2        A.   No, no.

3                MR. CHALOS:  Misstates the document.

4        Q.   What was your ultimate conclusion about the

5   wholesale distributor's decision to terminate the

6   sale of controlled substances to this pharmacy?

7                I'm not trying to trick you but I think it's

8   in bold listed as Opinion V on Page 5.

9        A.   I'm going to read the entire document

10  because I want to know what I'm talking about here.

11  It's been five years since I've seen this and you're

12  asking me a lot of questions and I don't know where

13  they're coming from, so if you'll please bear with

14  me.

15               MS. RODGERS:  Can we go off the record while

16       he reviews this document?

17       A.   I'm sorry, there is a question pending and

18  I'm reviewing the document in response to your

19  question.

20               MS. RODGERS:  I think we need to go off the

21       record for this.

22               MR. CHALOS:  I don't agree to go off the

23       record.

24               SPEAKER:  We have done that in other cases,

25       like Doug Boothe, when --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. CHALOS:  I don't know -- I don't know

 2       anything about that, but I'm not -- I don't agree

 3       to go off the record here.

 4            MR.  LADD:  We have done that in other

 5       cases.  We've gone off the record when the

 6       witness expresses the desire to review an entire

 7       document.  We've gone off the record to give the

 8       witness a chance to review the document and gone

 9       back on the record once the witness has finished

10       reviewing the document and is ready to answer

11       questions about the document.

12            MR. CHALOS:  Well, I don't agree.

13            MR. CIULLO:  It's a courtesy we extended to

14       the plaintiffs.

15            MR. CHALOS:  I know.

16            MS. BAISCH:  You didn't in my deposition.

17            MR. CIULLO:  You were deposed?

18            MS. RODGERS:  Okay.  I'm going to preserve

19       the objection so we can revisit this time

20       allocation later.  I think we should go off the

21       record right now.

22            MR. CHALOS:  I don't agree.

23            MS. RODGERS:  I'm preserving the objection.

24            MS. ZOLNER:  At a minimum, can we keep track

25       of the amount of time the witness is using to
```

```
 1        review the document?  (The time is 1:03 p.m.)

 2        A.   (The time is 1:05 p.m.)  Okay.  Thank you

 3   for giving me that time.  If you could ask your

 4   question again, I think I'm prepared to answer.

 5        Q.   Sure.  What was your ultimate conclusion

 6   with respect to the distributor's decision to

 7   terminate controlled substances here?

 8        MR. CHALOS:  Object to the form.

 9        A.   In this case, after having reviewed the

10   document, which has refreshed my memory about what

11   all was going on here, was that Smith Wholesale

12   suspended the sales of controlled substances to

13   Cherokee Pharmacy with what I referred to as an

14   incomplete or flawed analysis.

15        Q.   And it was incomplete or flawed because it

16   didn't take into account -- and I'm looking again at

17   Paragraph 7 -- 27 rather:  "The utilization patterns

18   in the community, its new store location which was

19   poised for growth, the demographics and/or changes

20   in the prescribing community, the patient mix,

21   incidence of disease, or other factors."

22        Correct?

23        MR. CHALOS:  Object to the form.

24        A.   That is what's written in the report, yes.

25        Q.   And you agree that business growth is a
```

 1    legitimate reason for increasing a pharmacy's

 2    permissible order limits?

 3         MR. CHALOS:  Object to the form; also is

 4      seeking opinions that are beyond the scope of the

 5      opinions that he's offered in this opioids

 6      litigation as reflected in Exhibit Number 1 to

 7      his deposition.

 8      A.   So at least in this matter I did -- I did

 9    come to that conclusion based on the documents that

10    I reviewed, that there were a number of factors that

11    were not considered, one of which was the pharmacy

12    was relatively new and it was in a growth phase,

13    yes.

14      Q.   Okay.  And when you say in this paragraph

15    "changes in the prescribing communities," you meant

16    general increases in prescribing that were happening

17    around the country?

18      A.   No, I don't believe so.  I think this was

19    specifically to this case, which the changes in the

20    prescribing community in this instance had to do

21    with the -- if I remember correctly, and I think

22    this is the case, there was a pain clinic with a

23    nurse practitioner that had just opened near the

24    hospital that was also adjacent to Cherokee

25    Pharmacy.  I'm pretty sure that's what that relates

1    to, and this is five years ago, so --

2    Q.   Okay.  Yeah.  And that would be a legitimate

3    reason for increasing a pharmacy's permissible order

4    limits?

5          MR. CHALOS:  Object to the form of the

6          question.  I also object to the question on the

7          grounds that it is outside of the scope of the

8          opinions that Dr. Perri has given in the opioids

9          litigation that we're here about today as

10         reflected in Exhibit Number 1 to this deposition.

11    A.   So with respect to this case, the volume of

12    documents that I looked at included a number of

13    factors why I felt as though the process that Smith

14    used to decide not -- to no longer sell

15    prescriptions to Cherokee Pharmacy, that was one of

16    the factors, but there were many.

17    Q.   Okay.  And demographics, patient mix, and

18    incidence of disease, those are also other factors

19    that could lead a distributor to increase a

20    pharmacy's permissible order limits, right?

21         MR. CHALOS:  Object to the form.  Hang on

22         one second.  Object to the form.  I also object

23         to the question on the ground that it is outside

24         the scope of the opinions that he's given in the

25         opioids litigation as reflected in Exhibit

1        Number 1 to this deposition.

2        A.   I hate to ask but you can you repeat that

3    question again?

4        Q.   Demographics, patient mix, an incidence of

5    disease, those are also factors that could lead a

6    distributor to increase a pharmacy's permissible

7    order limits, correct?

8            MR. CHALOS:   Same objections.

9        A.   Okay.  So that -- that actually -- I'm glad

10   I had you repeat that, because I thought I had

11   detected something in there that concerned me.

12           I did not evaluate increasing order limits

13   under -- at any point in this case.  The only

14   question that I had in front of me was the complete

15   cut off of supply to that pharmacy of controlled

16   substances.

17           So the question of should his allotments be

18   increased was never on my radar in this case.

19       Q.   Okay.  That's -- let me withdraw and

20   rephrase.

21       A.   Okay.

22       Q.   Demographics, changes in the prescribing

23   community, and patient mix, incidence of disease,

24   those are all factors that a distributor should

25   consider in deciding whether to service a pharmacy

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with controlled substances?

 2         MR. CHALOS:  Object to the form of the

 3    question.  I also object on the ground that it is

 4    seeking opinion testimony that's beyond the

 5    opinions that he's offered in this litigation as

 6    reflected in Exhibit Number 1 to this deposition.

 7    A.   So my answer to that is at least in this

 8    case, I think those are things I should have

 9    considered.  I don't know beyond this.

10    Q.   Okay.  Let's look at the top of Page 7.

11    A.   Okay.

12    Q.   And I'm just going to read a statement and

13    ask if you agree with it.  It is the second

14    paragraph on the -- on Page 7:  "Pharmacies of

15    different sizes and geographic locations have vastly

16    different dispensing patterns due to their location,

17    the number and types of prescribers nearby, and the

18    demographics of the patients served.  Each of these

19    variables can impact the volume and mix of

20    prescriptions dispensed."

21         Do you agree with that statement?

22    A.   I do.

23    Q.   Okay.  In the second bullet point you note

24    that the Pro Compliance report had based its

25    assessment on spacial data, which was the distance
```

1    of the prescriber or patient from the pharmacy.

2    Would you agree that that's not an adequate

3    justification to withhold sale of controlled

4    substances -- controlled substances to a pharmacy?

5            MR. CHALOS:  Object to the form of the

6        question.  I also object on the ground that it

7        seeks opinion testimony beyond and outside the

8        scope of the opinions that he is offering in this

9        litigation as reflected in Exhibit Number 1 to

10       this deposition.

11   A.    So in this particular matter, there was a

12   unique concern that I had because of the location of

13   Cherokee Pharmacy.  Cherokee Pharmacy was located on

14   the border between Georgia and Tennessee, and as

15   such, they had a lot of patients that came -- and in

16   addition to that, they were located near Chattanooga

17   or outside Chattanooga, so they both drew patients

18   from the Chattanooga area, as well as the rural

19   areas around.  So they had many patients that

20   traveled 50 or 75 miles to get to their pharmacy.

21   They had patients that traveled from out of state.

22           And based on what I recall from this case

23   and the Pro Compliance report, that Pro Compliance,

24   the company that evaluated the pharmacy computer

25   data for JM Smith, assessment was that the pharmacy

Highly Confidential - Subject to Further Confidentiality Review

 1    was suspicious, or whatever other word they were

 2    using, I don't recall what it was, but the

 3    suspicious word is in this report, so I guess it

 4    could be that, because -- or the orders were suspect

 5    because of the distance that patients were traveling

 6    to get to that pharmacy.

 7         Now, to then not take that a step further

 8    and look at it and say, "Oh, well, this pharmacy is

 9    unique because of its geographic location," seemed

10    inappropriate to me and that's one of the basis for

11    the opinions that I expressed here.

12    Q.   In other words, there is nothing inherently

13    wrong with patients having to travel some distance,

14    you have to look a little closer at what's going on?

15         MR. CHALOS:  Object to the form, and object

16      to the extent it's calling for an opinion that's

17      beyond the scope of the opinions that he's

18      offering in this litigation as reflected in

19      Exhibit Number 1 to this deposition.

20    A.   So to answer your question, the -- if this

21    was a pharmacy in Athens, Georgia, that has a number

22    of pharmacies around and a completely different

23    geographic makeup, if patients are traveling 75 or

24    100 miles or coming from South Carolina or Tennessee

25    or North Carolina to shop in Athens, that would be

1    very suspicious to me.  Again, I'm not basing this

2    on any kind of expertise in the order -- in the area

3    of knowing what a suspicious order looks like.  I'm

4    basing it on the fact that I'm a pharmacist and I

5    have seen, at least in this case, the way rules --

6    whatever rules by whoever imposed them were being

7    applied, and I thought it was unfair in the case

8    against Cherokee Pharmacy.

9        Q.    Okay.  The third bullet point you wrote:

10   "The Pro Compliance report notes that Tennessee has

11   one of the highest accidental drug overdose rates.

12   This is not relevant to the filling of legitimate

13   prescriptions by licensed pharmacists acting on

14   medical providers' orders.  While a significant

15   problem, this must be addressed from a variety of

16   perspective, including through educating patients,

17   not by withholding needed medications."

18            Do you agree with that statement?

19            MR. CHALOS:  Object to the form.  I also

20       object to the extent it's calling for -- I object

21       on the ground that it is calling for opinion

22       testimony that's beyond the opinions that he's

23       offered in this opioids litigation as reflected

24       in Exhibit 1 to this deposition.

25       A.    There is actually another factor that came

```
 1    into play here in the fact that Mr. Forshee's

 2    pharmacy actually drew from -- primarily from

 3    Georgia and not Tennessee, and I'm not sure why

 4    that's not noted here, but I do recall that from --

 5    as I'm getting more into this, I'm remembering more

 6    about this case.

 7         But in general, I would agree that

 8    pharmacies may have or they may not have procedures

 9    in place that can safeguard patients and the filling

10    of prescriptions.  We've all heard the term "pill

11    mills" before, and so if a pharmacy is just

12    indiscriminantly filling prescriptions without

13    vetting patients, not doing anything to protect

14    patients in any way, and I know from reviewing this

15    document over the last few minutes, Mr. Forshee had

16    an extensive procedure when a patient comes into the

17    pharmacy, where they collect page after page after

18    page of information to get to know the patient, to

19    help the patient understand how they were going to

20    meet their needs in term of providing pain

21    medications and things like that.

22         So in this particular instance, I definitely

23    agree with this.  I don't know if I could agree with

24    this in another instance, but at least here for

25    Cherokee Pharmacy, I definitely agree with this.
```

1    Q.   You agree with the statement that I read to

2    you earlier:  "This is not relevant to the filling

3    of legitimate prescriptions by licensed pharmacists

4    acting on medical providers' orders.  While a

5    significant problem --" again the accidental drug

6    overdose rates -- "this must be addressed from a

7    variety of perspectives, including through educating

8    patients, not by withholding needed medications."

9        MR. CHALOS:  Object to the form, and I also

10       object to the extent it's calling for opinion

11       testimony beyond the scope of the opinions that

12       he's offering in this case as reflected in

13       Exhibit Number 1 to this deposition.

14   A.   So to the extent that this -- these two

15   sentences relate to Cherokee Pharmacy, I definitely

16   agree with them.

17   Q.   Thank you.  If you look at the next bullet

18   point, you note that:  "The Pro Compliance report

19   does not mention that Tennessee is the 3rd highest

20   in the US in terms of utilization of all

21   prescription medications..."

22       And then I'm skipping down to the next

23   paragraph there.  Do you agree that that "highlights

24   that average numbers of prescriptions per capita in

25   Tennessee will be different than the rates reported

Highly Confidential - Subject to Further Confidentiality Review

 1      in other states and national averages"?

 2           MR. CHALOS:  Object to the form.  I also

 3           object to the extent it's calling for -- I object

 4           on the ground that it is calling for opinions

 5           that are beyond to scope of the opinions he's

 6           offered in this case.

 7      A.   So is your question do I agree that

 8      Tennessee is third, is that --

 9      Q.   I'm saying first, do you agree that the fact

10      that Tennessee is third highest in the US in term of

11      utilization of all prescription medications means

12      that the average numbers of prescriptions per capita

13      in Tennessee will be different than the rates

14      reported in other states and national averages?

15           MR. CHALOS:  Object to the form.  I also

16           object on the ground that it is seeking expert

17           testimony and opinions beyond the scope of the

18           opinions he's offered in this case.

19      A.   So that was the -- the footnote to that is

20      referenced to the Kaiser Family Foundation, so I

21      will defer to them to assess whether that's accurate

22      or not.  I certainly think the Kaiser Family

23      Foundation is a well-respected repository of date

24      regarding this type of utilization.

25           With regard to the next statement, I think

1    that flows from the citation from Kaiser.

2        Q.   Which next -- that "interestingly"?

3        A.   Yes.

4        Q.   Okay.  Let me ask this a different way.  Why

5    did you include this point, that Tennessee is the

6    third highest in the US in terms of utilization of

7    all prescription medications in your report?

8        A.   So I guess the reason that was included was

9    because the drug utilization in different parts of

10   the country, and we've seen in this case that Ohio

11   has a fairly high utilization of certain drugs,

12   other parts of the country have less utilization, so

13   I think sensitivity should be applied at least in

14   this case of Cherokee Pharmacy, that I think was

15   treated unfairly by the wholesaler, based on this

16   report and my recollection of what I did in this

17   case, that the -- that whatever system the

18   wholesaler had in place, whatever data they were

19   using should have been sensitive to the fact that

20   they are in a high drug utilization area, and that

21   mean -- that might mean that they are more sensitive

22   or it might mean that they are less sensitive, but

23   it should have at least been considered and it was

24   not apparently considered.

25       Q.   Okay.  It should be considered even in the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    context of hydrocodone, which is I believe what

 2    prompted this report?

 3          MR. CHALOS:  Object to the form and object

 4       to the extent it's seeking an opinion that is

 5       beyond the scope of the opinions he's offering in

 6       the current litigation as reflected in Exhibit 1

 7       to this deposition.

 8    A.   So for clarification, is hydrocodone the

 9    drug that was at issue in this case?

10    Q.   I believe it's actually oxycodone in

11    Paragraph 29.

12    A.   Okay.

13          MR. CHALOS:  Same objection.

14    A.   I'm sorry.  Is there a question now?

15    Q.   Sure.  My question is is your opinion that

16    distributors should have considered the fact that

17    Tennessee is the third highest in the US in terms of

18    utilization of all prescription medications when

19    making a decision about whether to terminate the

20    sale of controlled substances?

21          MR. CHALOS:  Object to the form.  Object to

22       that question on the ground that it's seeking

23       opinion testimony that is outside the scope of

24       the opinions he's offering in this litigation as

25       reflected in Exhibit Number 1 to this deposition.
```

```
 1      A.   So I think I just answered that.  So if I

 2   didn't -- if you don't think I did, then I need to

 3   make sure we're communicating properly here, because

 4   I said I think with regard to this case that

 5   something that --

 6           MR. CHALOS:  This case being?

 7      A.   I'm sorry.  Yes, the Cherokee Pharmacy case,

 8   that it's something that the wholesaler should have

 9   considered, Pro Compliance should have considered,

10   but they did not apparently consider, and I said it

11   could be that they would be more sensitive to

12   utilization because it's a high-use area, or they

13   might be less sensitive because it's a high-use

14   area.  So that was, I think, what the gist of my

15   answer was before.  Or is that the response as you

16   recall it?

17      Q.   Yes, I believe that was to a different

18   section, but that -- I appreciate your response now.

19   Thank you.  I want to ask you just one other

20   question about a document that you cite at

21   Footnote 8, and I brought a copy of that and marked

22   it as Exhibit 21.

23           (Perri Exhibit 21 was marked for

24   identification.)

25   BY MS. RODGERS:
```

1    Q.   This is an article in Pharmacist.com, which

2    is titled:  "Pharmacists turn away legitimate pain

3    patients as wholesalers limit shipments of

4    controlled substances."

5         You've seen this document before, I take it?

6    A.   Yes.

7    Q.   This article?

8    A.   Yes.

9    Q.   What is the National Community Pharmacists

10   Association?

11   A.   NCPA is a group of -- I believe NCPA is the

12   association that used to be the National Association

13   of Retail Druggists and they've changed their name

14   to National Community Pharmacists Association, and

15   they represent our nation's independent community

16   pharmacies and some small chains, I think.

17   Q.   Okay.  And are you or have you been -- have

18   you ever been a member of that association?

19   A.   I've never been a member of NCPA or NARD;

20   however, during the early part of my career I was

21   frequently asked to speak at their meetings on

22   issues related to helping community pharmacists run

23   their businesses more efficiently, especially

24   related to marketing topics.

25   Q.   And I just want to direct your attention to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right after the header "NCPA:  The pendulum has

 2    really swung too far."

 3         A.   Okay.

 4         Q.   Where it says:  An online survey released in

 5    January by the National Community Pharmacists

 6    Association found that three out of four (75%) of

 7    the nearly 1,100 responding pharmacies had

 8    experienced three or more delays or issues caused by

 9    stopping shipments -- stopped shipments of their

10    controlled substances over the past 18 months.

11              I'm just going to stop there.

12         A.   Okay.

13         Q.   Would you -- is it your opinion that that's

14    a problem, would you agree that that's a problem?

15              MR. CHALOS:  Object to the form.  I also

16         object on the ground that it seeks opinion

17         testimony beyond the scope of the opinions that

18         he has offered in this case as reflected in

19         Exhibit 1 to his deposition.

20         A.   Yeah.  So to answer your question, I -- you

21    know, I've cited this document in this report to

22    show that this wasn't a problem just for Cherokee

23    Pharmacy, but that other pharmacies are reporting

24    the same kinds of problems.  I did no analysis or

25    evaluation of that, I didn't verify those numbers,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    so I really can't tell you what they're all about

 2    other than it's a report from a fairly reputable

 3    trade magazine that says, hey, this is a problem for

 4    other pharmacies, and I think that's the real reason

 5    why I cited it here.

 6            As far as whether I agree with it or not, I

 7    certainly think that there is a heightened

 8    sensitivity on the part of community pharmacists in

 9    the area of being able to meet their patients'

10    needs.  I know that some pharmacies feel as though

11    the behavior of certain stores, certain groups of

12    stores, has negatively impacted the marketplace and

13    that's why they feel like their orders are being

14    reduced or cut back.

15            So I think this is a real issue.  I don't

16    really have any opinions about it or any analysis

17    associated with it, but with respect to Cherokee

18    Pharmacy, this was something I felt as though

19    would -- to highlight for whoever was reading this

20    report at the time, the fact that this is not just

21    an isolated incidence, perhaps there are other

22    incidences that are occurring.

23            MS. RODGERS:  Okay.  I have no further

24       questions.  Thank you for your time.

25            THE WITNESS:  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We are now going off the

 2        video record.  The time is currently 1:23 p.m.

 3           (Recess from 1:23 p.m. until 1:27?p.m.)

 4              THE VIDEOGRAPHER:  We are now back on the

 5        video record with the beginning of Media

 6        Number 4.  The time is currently 1:27 p.m.

 7                      RECROSS-EXAMINATION

 8     BY MR. LADD:

 9        Q.  Good afternoon, Mr. Perri.  My name again is

10     Matthew Ladd, and we spoke yesterday, from Morgan

11     Lewis representing Rite Aid.  I have a handful of

12     questions for you as you correctly intuited

13     concerning your prior expert report in Cherokee

14     Pharmacy which has been marked Exhibit 10.

15              Do you still have that exhibit in front of

16     you?

17        A.  Yes, I do.

18        Q.  Could you turn, please, to Page 4 of that

19     exhibit, and specifically let me direct your

20     attention to Paragraph 19.

21        A.  Okay.

22        Q.  Do you see where I am?

23        A.  Yes.

24        Q.  If you would look down, the fourth sentence

25     beginning "If the pharmacist believes," do you see
```

Highly Confidential - Subject to Further Confidentiality Review

1    that sentence?

2       A.   Yes, I do.

3       Q.   And to save time, I'll just read it into the

4    record.  You wrote here:  "If a pharmacist believes

5    that a particular drug might not be the best therapy

6    for a patient, they may explain their findings to

7    the medical provider, but the final decision is that

8    of the medical provider and the order must be filled

9    exactly as written."

10          Did I read that sentence correctly?

11      A.   Yes.

12      Q.   And was this part of the opinion in your

13   expert report that you submitted in the Cherokee

14   Pharmacy case?

15      A.   Yes, it was.

16      Q.   And did you agree with this statement when

17   you wrote it?

18      A.   Of course.  I agree with it now.

19      Q.   Thank you.  If you look to the next

20   statement, I'll ask a series of similar questions:

21   "Pharmacists have a professional duty to provide the

22   medications selected by the prescriber when a

23   legitimate patient-prescriber relationship exists."

24          Did I read that sentence correctly?

25      A.   Yes, you did.

1      Q.    And did you agree with that statement when

2    you wrote your prior report?

3      A.    Yeah.  And I would like to just add, though,

4    that this is, with respect to the bigger context of

5    the pharmacist's duty when they bring a patient into

6    the pharmacy, the -- this doesn't apply to any

7    particular drug or drug category.  This is for all

8    drugs.

9      Q.    I understand this is for all drugs.

10     A.    Right.

11     Q.    Including controlled substances?

12     A.    Yes.

13     Q.    Including opioids?

14     A.    Yes, that's right.

15     Q.    And you agreed with this statement when you

16   wrote it?

17     A.    I did.

18     Q.    And you agree with this statement now?

19     A.    It's part of the Pharmacy Practice Act, yes.

20     Q.    Thank you.  If you could turn to the next

21   page, at the top of Page 5, the last sentence in

22   Paragraph 20, you wrote:  "The role of the

23   pharmacist is not one of second guessing medical

24   providers, but rather to work to ensure appropriate

25   drug therapy, the integrity of the prescription

1    process, and to guarantee the delivery of

2    medications to patients."

3         Did I read that sentence correctly?

4    A.    Yes.

5    Q.    And did you agree with that statement when

6    you wrote it?

7    A.    There's a lot in there but I did agree with

8    it then and I do agree with it now.

9    Q.    Thank you.  In other words, the point is

10   pharmacists should not interfere with the

11   physician-patient relationship; is that correct?

12        MR. CHALOS:  Object to the form.  It also is

13        asking for opinions outside of the opinions he's

14        offered in this litigation, the opioids

15        litigation, as reflected in Exhibit 1 to his

16        deposition.

17   Q.    And to rephrase, Dr. Perri, if I may, the --

18   I'll withdraw that question and ask another one.

19        Part of your opinion in this prior report

20   was that pharmacists should not interfere with the

21   physician-patient relationship; is that correct?

22        MR. CHALOS:  Object to the form.

23   A.    So, actually, no, that's not -- that's not

24   really what I'm trying to imply here.  When you say

25   it should not interfere, it's more like they should

1    intervene in a positive and appropriate way when

2    there is a problem.

3           So if you go back to the paragraphs that we

4    looked at just before, the duty to ensure that there

5    is a legitimate prescriber-patient relationship, the

6    duty to do a prospective drug utilization review and

7    ensure that the medication that is being prescribed

8    is not going to do any harm to the patient, these --

9    if you intervene in that, you're not interfering

10   with the patient-physician relationship, you are

11   intervening to ensure appropriate care.  So I

12   disagree with your use of the word interfering.

13          But with that being said, I think that the

14   pharmacist has the role as I've described in my

15   answer, and also the general Pharmacy Practice Act

16   that we all work underneath the authority of,

17   certainly it would support these statements.

18   Q.    And to be clear, and just to give some

19   context to this statement that you just gave, your

20   opinion in this report was that -- part of your

21   opinion in this report was that when a legitimate

22   patient-prescriber relationship exists, pharmacists

23   have a professional duty to provide the medication

24   selected by the prescriber; is that correct?

25          MR. CHALOS:  Object to the form.

 1      A.    Yes, and -- but there is two parts to that,

 2   and the second part of it is that the pharmacist's

 3   duty extends beyond just the legitimacy of the

 4   patient-prescriber relationship, even though that's

 5   the first part and if it's not met, then everything

 6   stop, but the second part is, is to ensure that the

 7   drugs is not going to do any harm.  So though -- but

 8   those things, they have to go together, in my mind.

 9      Q.    I understand.  Thank you, Dr. Perri, for

10   clarifying.

11      A.    Thank you.

12      Q.    Can you go to Paragraph 25 of this expert

13   report, please?

14      A.    Okay.

15      Q.    And you discussed yesterday with

16   Ms. Rodgers, just to refresh your recollection, this

17   particular part of the report dealt with a

18   distributor, Smith Wholesale, that in this case

19   unilaterally ceased providing controlled substances

20   to Cherokee Pharmacy; is that correct?

21      A.    Yes.

22      Q.    And you write in your report, and I'm

23   looking now at the last sentence before the two

24   bullet points:  "This action had two significant and

25   immediate effects on the operation of the pharmacy

```
 1    and its patients."

 2         Do you see that sentence?

 3    A.    Yes.

 4    Q.    And did I read that correctly?

 5    A.    Yes.

 6    Q.    Thank you.  And one of the significant and

 7    immediate effects that you noted in your prior

 8    report was that the pharmacy could not provide

 9    needed medications to its patients; is that correct?

10    A.    Yes.

11    Q.    And the second significant and immediate

12    effect of the distributor unilaterally ceasing to

13    provide controlled substances to the pharmacy was

14    that legitimate patients with serious medical

15    conditions were unable to obtain their controlled

16    substances medication from the pharmacy; is that

17    right?

18    A.    Yes.

19    Q.    Thank you.

20    A.    So --

21    Q.    Can you go to the next paragraph, please?

22         MR. CHALOS:  Hold on.  Do you have

23    something --

24         THE WITNESS:  No, it's okay.  I can -- I'll

25    bring this up.
```

1      Q.   If you looked at Paragraph 26 at the top of

2    Page 6, is it fair to say that this particular

3    paragraph, based on the review of your prior report

4    that you were conducting during Ms. Rodgers'

5    examination, deals with two separate analyses that

6    had been done, one by the distributor and one by a

7    third party, Pro Compliance; is that correct?

8         MR. CHALOS:   Object to the form.

9

10     A.   It seems to me that JM Smith did some kind

11   of a superficial analysis and that they got a Pro

12   Compliance report.  There were a couple of issues

13   that were going on here with regard to these -- the

14   timing of all of this.  Smith -- and there is one

15   other issue that I feel like I have to tell you as

16   well because it has bearing on this whole report and

17   why this incident came about.

18        But the initial analysis, whatever Smith

19   did, and I don't know exactly -- I don't recall and

20   I don't know if I ever knew exactly what they did,

21   but whatever it was, it prompted them to order this

22   Pro Compliance report, and Mr. Forshee didn't want

23   to do the Pro Compliance report for some reason, as

24   I recall, because he felt like it was a violation of

25   HIPAA in some way, because the wholesaler would then

1    be looking at his actual patient data in his

2    computer:  Names, addresses, phone numbers, ZIP

3    codes, all that kind of stuff.

4          So there was this back-and-forth between

5    them, and Mr. Young, who was the Smith

6    representative -- what has -- what has occurred to

7    me in all of this is that nothing -- something that

8    hasn't come up at all was the real reason that came

9    out in this whole case about why Mr. Forshee's

10   supply was being cut was because Smith didn't want

11   to do business with him anymore because he got very

12   rude with him on the telephone, and these were all

13   things that were being acting as if they were a

14   smoke screen to cloud the issue of why they were

15   really cutting him off as a supplier.

16         So there were these other layers to what was

17   going on, and I don't think that's come out before,

18   and really, as I'm getting back into this, I'm just

19   remembering more and more about the case.  So --

20   Q.   I --

21   A.   I was going to say but to answer your

22   question, there were -- there were two things that

23   were related to the orders, there was the conflict

24   between Mr. Forshee, as far as the releasing his

25   patient data to a third party that he didn't have

1   any real knowledge of, and then the issues

2   related -- also the issues related to Mr. Forshee's

3   belief that the wholesaler shouldn't be interfering

4   with his patient relationships.

5        So there were four things, I think.  You

6   mentioned two.

7        Q.   Thank you, Dr. Perri.  So just to go back to

8   my question, there were two analyses referred to in

9   this particular paragraph; is that correct, one

10  superficial internal analysis done by the

11  distributor, and one partial analysis of dispensing

12  statistics provided by Pro Compliance?

13       A.   So to that question, yes, there were two

14  analyses.  I thought the prior question had asked me

15  what the factors were.

16       Q.   And I apologize if I was unclear, but this

17  paragraph is just addressing these two analyses, one

18  by the distributor and one by Pro Compliance; is

19  that right?

20       A.   That's right.

21       Q.   Okay.  And in your opinion in this report

22  and I'm just reading from your report here, in your

23  opinion both the distributor's internal analysis and

24  the Pro Compliance report had serious flaws that

25  rendered these analyses largely useless; is that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2         MR. CHALOS:  Where is that?  Where are you

 3    reading from?

 4    Q.    So this is from the fourth sentence of

 5    Paragraph 26.

 6    A.    That's what I said at the time, yes.

 7    Q.    And they were largely useless in evaluating

 8    the appropriateness of the dispensing of controlled

 9    substances at the pharmacy; is that right?

10    A.    Based on the documents I had seen in this

11    matter, that's -- that was the conclusion I came to.

12    Q.    Thank you, Dr. Perri.  And just because I'm

13    not positive we got this on the record yesterday, if

14    you will go to Paragraph 29.

15    A.    Okay.

16    Q.    In your expert report in this case, Cherokee

17    Pharmacy, you stated that the distributor lowered

18    the allotment for oxycodone by as much as 50

19    percent; is that correct?

20    A.    You know, I don't recall that but I see that

21    it's in the report here in Paragraph 29.

22    Q.    Okay.  Thank you.  And as a result of that,

23    Cherokee Pharmacy could not fill all prescription

24    requests for oxycodone; is that right?

25         MR. CHALOS:  Object to the form.  I think
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       that misstates the -- what this is saying here.

 2       Q.   So let me try the question a different way.

 3   I'll read directly from your report.

 4       A.   Okay.

 5       Q.   "The fact that the distributor lowered the

 6   allotment for oxycodone to Cherokee Pharmacy by as

 7   much as 50 percent meant that Cherokee Pharmacy

 8   could not fill all prescription requests for this

 9   product."

10            Is that correct?

11            MR. CHALOS:  Object to the form; misstates

12       the document.

13       A.   So the real issue here, as I'm looking at

14   this, was that not only they were -- they were

15   cutting the quota, but they were also not telling

16   Mr. Forshee what his new magic number was going to

17   be.

18       Q.   I understand.

19       A.   So he ran the risk of if he placed an order

20   and it exceeded his allotment, that he was going to

21   then be held accountable for that order that he

22   never received once again, as he was in prior

23   orders, which was going to add to the demerits

24   against him and his pharmacy in the overall system

25   that Smith was using.
```

1          So that actually contributed to my questions

2     about how the Smith system could be effective in

3     actually doing what it was purporting to do.

4          Q.   Thank you.   That's helpful.   And because of

5     that, you opined in your report:   "Patients would

6     have to seek to have their medication filled

7     elsewhere or go without needed medication."

8          Is that correct?

9          MR. CHALOS:   Object to the form.

10         A.   In the event that these things actually

11    happened and he didn't receive an order, and he

12    didn't have inventory to fill it, yes, they would

13    have needed to go somewhere else.

14         Q.   Thank you, Dr. Perri.   Could you turn to the

15    next page?

16         A.   Yes.

17         Q.   Actually, go two more pages in, on Page 8,

18    and then we'll jump back because I have a few more

19    questions about the Pro Compliance report that you

20    discussed with Ms. Rodgers just a few moment ago.

21         A.   Okay.

22         Q.   My first question has to do with the

23    conclusion that you arrived at in Paragraph 32.   You

24    stated here:   "The actions taken by Smith Drug

25    Company to arbitrarily impose restrictions on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    dispensing of controlled substances by Cherokee

 2    Pharmacy interfered with its patients' ability to

 3    get needed medications."

 4         Is that correct?

 5         MR. CHALOS:  Object to the form.

 6    A.   That's the conclusion that I drew here.

 7    Q.   Thank you.  And just so we have it on the

 8    record, did you alter or change this opinion in any

 9    way after you submitted it, to your recollection?

10         MR. CHALOS:  Object to the form.

11    A.   I don't know that there would even be a

12    mechanism to do that.  You mean like filing a

13    supplemental report or something like that?

14    Q.   Correct.  You're not aware of having changed

15    or altered your opinions in this case in any way?

16    A.   No.

17    Q.   Thank you.  If you could look back on Page 7

18    to the discussion of the Pro Compliance report, and

19    specifically the second bullet point, you spoke a

20    few moments ago with Ms. Rodgers concerning the Pro

21    Compliance report basing its assessment on spacial

22    data; is that correct?

23         MR. CHALOS:  Object to the form; a vague,

24         unclear question.

25    Q.   You can answer.
```

1      A.   I'm looking for the word "spacial" so I --

2    oh, there it is.  Gotcha.  The second bullet point.

3    Okay.

4         Yes.

5      Q.   You remember discussing that with

6    Ms. Rodgers just a few minutes ago?

7      A.   Yes.

8      Q.   And if you look to the paragraph directly

9    after that beginning with the sentence "This is

10   flawed," do you see that?

11     A.   Yes, I do.

12     Q.   You wrote:  "This is flawed because no

13   standards are presented nor assessment of the actual

14   distances reported.  This is likely due to the lack

15   of defensible benchmark for these statistics given

16   the vast differences that would be seen between

17   rural and metropolitan areas."

18         Do you see that?

19     A.   I see that.

20     Q.   My question for you is in this case, what

21   would have been a defensible benchmark, in your

22   opinion?

23         MR. CHALOS:  Object to the form.  Are you

24      talk -- when you say "in this case," that's my

25      beef with the question.  Are you talking about in

Highly Confidential - Subject to Further Confidentiality Review

```
 1        this case we are here about today, or in Smith?
 2              MR. LADD:  In the case in Smith, in Smith.
 3              MR. CHALOS:  Okay.  Yeah, because --
 4              MR. LADD:  In which he wrote the prior
 5        report.  Understood.
 6              MR. CHALOS:  Okay.
 7   BY MR. LADD:
 8        Q.   In Smith, what would a -- what would a
 9   defensible benchmark have looked like, in your
10   opinion?
11        A.   You know, I wasn't asked to come up with the
12   right answer, I was just making a notation here that
13   they hadn't developed a benchmark, they just said
14   that the patients were traveling too far but they
15   didn't say how far that was or why.  So I don't know
16   what the right number would be.
17              I do know that it would be different than an
18   in-town center city pharmacy because of the rural
19   location, and distance between two much bigger
20   cities than where Cherokee Pharmacy is located.
21        Q.   Thank you.  And I believe you said a moment
22   ago when you were being asked questions by
23   Ms. Rodgers that this was an unusual situation
24   because there was was a rural community that was
25   located between two larger cities?
```

1    A.    And on the border.

2    Q.    Is that correct?

3    A.    Right.  And on the border.

4    Q.    And on the border.  So is it your

5    understanding that this particular city, Cleveland,

6    Tennessee, was the only community in the United

7    States that was both on the border of a state and

8    located between two much larger cities?

9    A.    It's the only one in Cleveland, Tennessee

10   that has those characteristics.  I don't know about

11   the rest of the country.

12   Q.    I understand.  Is it your understanding that

13   there are other rural communities in the United

14   States that are located between two much larger

15   cities?

16   A.    I'm sure that we could identify some if we

17   pulled out a map.  I think the point isn't whether

18   there is other cities or not, the point is, is

19   whatever rules were in place, were they being

20   applied appropriately to Cleveland -- Cleveland,

21   Tennessee and to Cherokee Pharmacy, which was the

22   analysis that I was trying to do in the Cherokee

23   Pharmacy case.

24   Q.    I understand.  But in your view in this

25   prior expert report, part of the reason there was a

Highly Confidential - Subject to Further Confidentiality Review

 1    lock of a defensible benchmark was that the

 2    dispensing analysis that took place did not take

 3    into account the particular geographical

 4    characteristics of the pharmacy in question; is that

 5    right?

 6       A.   I think, basically, that is something I

 7    would agree with.

 8       Q.   Okay.  And so in this -- so your

 9    understanding at the time was that for a dispensing

10    analysis of a pharmacy's dispensing practices to be

11    accurate or to be accurate as possible, it would

12    need to take into account whatever geographical

13    particularities or characteristics that pharmacy

14    had?

15           MR. CHALOS:  Object to the form, and object

16       to the extent it's seeking opinions here in our

17       case, the opioids case, that are beyond the scope

18       of his opinions as reflected in Exhibit 1.

19       A.   So the answer to your question is, you know,

20    I don't know what needs to be done for other stores.

21    I did a pretty thorough analysis here of Cherokee

22    Pharmacy back when this all happened and I had a lot

23    of data, I could look at a lot of things.  I looked

24    at prescription numbers, the volumes, the actual

25    numbers of controlled substances that Mr. Forshee

1    was ordering.  So I had a lot of information on that

2    so I could actually make an informed decision about

3    whether what was happening to him seemed to be

4    appropriate or not.

5          Beyond the scope of his store, I can't make

6    any conclusions or have any opinions about what's

7    right or wrong for other stores or what should be

8    done at the wholesaler level or any other level.

9    Q.    Understood.  But could you say at this time,

10   when you wrote this report, to a reasonable degree

11   of certainty that a dispensing analysis of a

12   pharmacy would likely be more accurate if it took

13   into account geographical characteristics of a

14   particular pharmacy than if it did not?

15         MR. CHALOS:  Object to the form, and object

16        to the extent it's calling for opinion testimony

17        beyond the scope of the opinions he's offering in

18        the opioids litigation.

19   A.    So with respect to Cherokee, I definitely

20   agree with that.  I don't know beyond that because

21   there may be more -- there may be some

22   one-size-fits-all that's appropriate.  I haven't

23   undertaken to study that.  I'm not an expert in that

24   area and I haven't looked at it at Cherokee nor in

25   our case today, the opioid case.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   You're not aware of any one-size-fits-all

2    dispensing analysis that would be appropriate in

3    Cherokee or any other case?

4        MR. CHALOS:  Object to the form.  I also

5        object to the extent it's -- object on the ground

6        that it is seeking opinion testimony beyond the

7        scope of the opinions he's offering in this

8        litigation as reflected in Exhibit 1 to his

9        deposition.

10     A.   So I guess what I'm saying is I leave open

11   the possibility that there is some rule that could

12   be applied, and I think you referred to it as a

13   dispensing analysis.

14     Q.   Yeah.  Yeah.

15     A.   And I think that's the Pro Compliance

16   report, is a dispensing analysis.  Am I correct in

17   that assumption?

18     Q.   Yes, that's correct.

19     A.   So if -- I would leave open the possibility

20   that there is some one-size-fits-all rule that could

21   be developed that would be an initial or prescreen

22   for any potential problems in a dispensing analysis.

23   Again, I don't know what that rule might be, I

24   haven't undertaken to analyze that, and I'm not an

25   expert in that area, and I didn't provide any

Highly Confidential - Subject to Further Confidentiality Review

1    opinions in the opioid case about things like that.

2        Q.    And just be clear, you're not aware of any

3    such one-size-fits-all rule as you sit here today?

4        A.    Well, I think what Cherokee was being

5    subjected to was a one-size-fits-all rule, which was

6    if you are traveling more than 25 miles, and I think

7    that's what we assumed they were using at the time,

8    just as my recollection is, is that number came into

9    my head, that seems to be what they were using, but

10   it didn't apply to Cherokee.

11        So it would -- that would at least be

12   evidence in my mind that a one-size-fits-all doesn't

13   work for anybody.

14        MR.   LADD:  Thank you, Dr. Perri.  Those are

15     all the questions I have for you today.

16        THE VIDEOGRAPHER:  We are now going off the

17     video record.  The time is currently 1:47 p.m.

18        (Recess from 1:47 p.m. until 1:49?p.m.)

19        THE VIDEOGRAPHER:  We are now back on the

20     video record.  The time is currently 1:49 p.m.

21                    CROSS-EXAMINATION

22   BY MS. COATES:

23        Q.    Hello, Dr. Perri.  My name is Melissa Coates

24   and I represent the Teva defendants in this matter.

25   I am going to try my best not to retread any ground

Highly Confidential - Subject to Further Confidentiality Review

```
 1    but stick to some questions specific to my client.

 2        A.   Okay.

 3        Q.   And I'm -- am I correct, based on what I

 4    heard in your testimony so far, that you are not

 5    offering a Teva-specific opinion in your report or

 6    your testimony?

 7        A.   Yes.

 8        Q.   And similarly, you are not offering any

 9    Cephalon-specific opinion in your report or your

10    testimony?

11        A.   Yes.

12        Q.   Okay.  If we could turn -- we can go back to

13    Exhibit 1 to your report, and if we could turn to

14    Paragraph 165.

15        A.   Okay.

16        Q.   All right.  This is under Subsection G,

17    Defendants' Generic Marketing; is that correct?

18        A.   Yes, it is.

19        Q.   And it looks to me like Subsection G goes

20    through Paragraph 182; is that correct?

21        A.   Yes.

22        Q.   And does this Section G, Paragraphs 165

23    through 182, represent the entirety of the opinions

24    you're giving on generic marketing, generics

25    marketing?
```

```
 1              MR. CHALOS:  Object to the form.

 2      A.   I think so.  I think the only other place

 3   there might be something related to marketing of

 4   generics would be in the section on the distribution

 5   channels, the supply chain earlier in the report,

 6   but it wouldn't be anything different.  It just

 7   might be supplemental.

 8      Q.   Okay.  And what do you mean, just so that we

 9   can be clear, when you refer to generic marketing?

10      A.   So the marketing for brand name

11   pharmaceuticals and marketing for generics, in my

12   experience, is slightly different.

13      Q.   Okay.

14      A.   So I felt as though I should distinguish

15   between the two in the report.  So to the extent

16   that different methods are used or different themes

17   are used, I wanted to have a section that

18   specifically related to the themes used with

19   generics.

20      Q.   Okay.  And this is specific to generic

21   prescription medicines, and in this case opioids,

22   it's not generic in the sense of nonspecific or

23   unbranded, it's generic prescription medicines and

24   opioids?

25      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   All right.  If we could turn to Paragraph

2    173.

3       A.   Okay.

4       Q.   And the last sentence of that paragraph

5    reads:  The key marketing messages are focused on

6    competitive prices and the assurance of consistent

7    supply of quality generic medicines -- medications.

8            Did I read that correctly?

9       A.   Yes, you did.

10      Q.   Thank you.  And I think you reference that

11   just a minute ago, that those marketing messages are

12   different than what you've seen with the branded

13   marketing messages; is that correct?

14      A.   Yes.

15      Q.   Okay.  And generic manufacturers do not

16   promote the safety, efficacy, or benefits of their

17   generic medications; is that correct?

18           MR. CHALOS:  Object to the form.

19      A.   I would agree that they generally don't do

20   that, but if there is not -- I can't say that that's

21   never done with respect to generics.  And if we

22   qualify that just a little bit, for example,

23   sometimes with generics there are -- references are

24   made to other products or comparable products, the

25   branded product itself.  So when that occurs, the
```

 1    generic is sort of linking itself to the branded

 2    rather than just standing alone on its own.  So with

 3    those qualifications -- generally, I completely

 4    agree with this, and this is what I see in the vast

 5    majority of the marketing messages associated with

 6    generics that I saw in the opioid matter, was that

 7    they focused on consistency of supply, pricing and

 8    quality of the products.

 9        Q.   Okay.  Thank you.  And turning to

10    Paragraph 182 -- sorry, 181, but just above still on

11    page 151.

12        A.   Okay.

13        Q.   Although we can read the sentence from the

14    beginning, just go back to page 150.  The sentence

15    starting:  "From a marketing and business

16    perspective, for each generic manufacturer who

17    decided to enter the opioid market, the profit

18    potential outweighed any barriers or potential

19    negative aspects of market entry, including concerns

20    over the risks of selling opioids."

21            Did I read that correctly?

22        A.   You did.

23        Q.   And this calculus, that profits outweigh the

24    risks and costs of a particular product, that

25    calculus is not unique to a decision to enter a

Highly Confidential - Subject to Further Confidentiality Review

1    market for opioids; is that correct?

2        A.    Yes, that's true, the go/no go decision

3    described in this section on my report, it would be

4    true for any generic product being considered.

5        Q.    Okay.  And medications that are available by

6    prescription, as opposed to, say, over the counter,

7    that is because there is some degree of risks

8    associated with those medications, correct?

9        A.    I think by definition, prescription

10   medications are more dangerous or more -- have more

11   potential for harms than over-the-continuer

12   medicines, yes.

13       Q.    Okay.  So a pharmaceutical manufacturer is

14   going to undergo a similar calculus when deciding to

15   manufacture or enter the market for any drug,

16   correct?

17       A.    I think there would be a contemplative

18   decision that would be made and they would -- they'd

19   have criteria.  Certainly I think the criteria for a

20   branded product may be different and certainly have

21   higher implications in terms of the amount of

22   investment that you've got to put into the product,

23   the amount of time that it would take to develop and

24   bring to market, but the overall "should we do this

25   or not" is going to be pretty similar at the end of

Highly Confidential - Subject to Further Confidentiality Review

1    the day:  Is this a market where we can find enough

2    customers to satisfy a model that's going to

3    generate the revenues we need to make to maximize

4    shareholder wealth and stay in business?

5        Q.   Okay.  And you're not giving an opinion that

6    there is anything wrong with selling generic opioid

7    medications; is that correct?

8        A.   No, I'm not giving an opinion that there is

9    anything wrong with that.

10       Q.   You're not giving an opinion that any

11   generic manufacturers in this case engaged in some

12   wrongful act; is that correct?

13           MR. CHALOS:  Object to the form.

14       A.   To the extent that, you know, opioid --

15   generic opioid manufacturers are part of the opinion

16   that, you know, the marketing expanded the opioid

17   market, they would be implicated in that, I think,

18   but I'm not making the assessment of right or wrong,

19   only that the marketing resulted in this expansion.

20   So I think the answer to your question is no, I'm

21   not giving that opinion, but there are opinions that

22   are related to that in the report just about the

23   expansion of the market, and certainly generics did

24   have a role in the expansion of the market.

25       Q.   Okay.  And generic opioids are subject to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DEA quotas; is that correct?

 2        A.   Yes.

 3        Q.   So --

 4        A.   As far as I know, yes.

 5        Q.   Okay.  So manufacturers cannot simply

 6    manufacture as much product as they want, correct?

 7        A.   That's my understanding how the opioid quota

 8    system works, yes.

 9        Q.   Okay.  And are you familiar with the duty of

10    sameness when it comes to generic prescription

11    medicines?

12        A.   I don't know if I've heard that exact

13    phrase, but the -- I'm familiar with the

14    requirements for a generic are.

15        Q.   Okay.  And can you explain those

16    requirements to me, in your understanding?

17        A.   Right.  So a generic can come to market

18    without doing the clinical testing that the brand

19    name product has to do, but the generic must be

20    bioequivalent and it must have the same

21    bioavailability.  In other words, there is a -- I

22    think it used to be 85/120 rule, that the drug must

23    be within certain parameters.  So as long as the

24    drug is within those parameters of bioavailability

25    and bioequivalence, that it's essentially the same
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as the branded product.

 2        Q.   And it's required to have the same label as

 3    the branded product?

 4        A.   Yes, that's part of it as well.  I was

 5    taking it from a little bit different angle, but --

 6    so -- but the indications, the safety information,

 7    would all be exactly the same.

 8        Q.   Okay.  If we could turn to Paragraph 128.

 9        A.   Okay.

10        Q.   And if -- if you look at that paragraph and

11    Footnote 253 cited in Paragraph 128, you're citing

12    to the Boyer Teva deposition; is that correct?

13        A.   Yes.

14        Q.   And I believe you testified earlier that

15    this was not one of the depositions that you read in

16    its entirety; is that correct?

17        A.   Yes, that's correct.

18        Q.   Okay.  And the first sentence reads:

19    "Mr. Boyer, former President and CEO of Teva,

20    testified that using sales representatives to

21    communicate with doctors about the proper use and

22    risks of opioids was cost prohibitive and not done

23    by Teva."

24             Did I read that correctly?

25        A.   Yes, you did.
```

```
 1       Q.   This testimony relates to Teva's generic

 2    business; is that correct?

 3       A.   Yes, generally speaking, yes.

 4       Q.   Do you recall from reviewing the deposition

 5    transcript whether this was specific to Teva's

 6    generic business?

 7       A.   As I recall, it was, yes.

 8       Q.   Okay.  And is it your opinion, then, that

 9    generic manufacturers failed to warn about the risks

10    of their generic opioid medications by failing to

11    use sales representatives to communicate with

12    doctors?

13       A.   No, I don't think that's my opinion

14    exactly..  I think that this was -- this was just

15    to -- again, you know, a case study analysis, you

16    have to look at so many different data points and

17    one of the data points that I was concerned about

18    was the balance of information in terms of whether

19    or not the -- you know, we spent a lot of time going

20    through a lot of package inserts earlier today, and

21    certainly those package inserts have warnings in

22    them and that's important.  That has to be

23    considered.

24           But then if you -- if you have a product and

25    it was simply a way of assessing whether or not, for
```

```
 1    Teva's generic products, whether there was any

 2    effort on the parts of sales, which there are a lot

 3    of sales reps out there bringing share of voice way

 4    up for opioids, were there any sales reps out there

 5    promoting the -- or communicating with doctors about

 6    the proper use of the generic opioids?  So it was

 7    just -- it's just a data point.

 8            It's not really -- I mean, I don't really

 9    even consider this judgmental against Teva.  It's

10    just simply that when we look at the overall balance

11    for generics, we generally aren't going to see a lot

12    of personal selling and we're not going to see a lot

13    of personal selling related to the risks or possible

14    harms of opioids.  It's just an artifact of the

15    market.  Again, it's not judgmental, it's just this

16    is the state of where we are, this is what's

17    typically done in that marketing.

18    Q.   What do you understand the public policy

19    reasons for making generic medications available in

20    the market to be?

21    A.   I think I address, to a certain extent, I

22    address that in the last section that we -- around

23    Paragraph 180, where we just were.  Generics

24    provide -- and we can certainly flip to that, but

25    just in general, generics provide a lower cost
```

1    alternative that enables, from a couple of

2    perspectives, access to medications to be increased.

3         On the one hand we have third-party payers

4    who have a preference towards generics because they

5    are cheaper and it makes it a better deal for their

6    insurers and for their pharmacy benefit managers and

7    eventually for the patients as well.

8         For cash payments, generics present a lower

9    cost alternative that they may be able to afford

10   when indeed they can't afford a brand name product.

11   So public policy-wise I see generics as a positive

12   thing.

13        Q.   And if generic manufacturers were using

14   sales representatives to put out that voice, that

15   would affect their ability to offer those low

16   prices; is that correct?

17        A.   I mean, I don't -- I don't know the inner

18   workings of the generic manufacturers and what it

19   would cost them to do that if they already have a

20   sales force or if they don't.  The ins and outs of

21   that, my guess is it would cost them more money but

22   I haven't undertaken that analysis and certainly

23   don't know specifically for Teva, or any of the

24   manufacturers, if they could or couldn't, would or

25   wouldn't, and what it would cost, so -- but with

Highly Confidential - Subject to Further Confidentiality Review

1    that as a -- as sort of a caveat, I think certainly

2    the conclusion could be drawn that if generics

3    started marketing exactly the way brand name

4    products did, they would cost more.

5        Q.   Okay.  Thank you.  Let's turn to Paragraph

6    137.  The first sentence there reads:  "Fears were

7    also minimized through marketing communications that

8    indicated problems like addiction occur only when

9    opioids are abused or used illegally."

10            And then there is a Footnote 275.  Is that

11   correct?

12       A.   Yes.

13       Q.   Okay.  And if we look at 275 Footnote, it

14   starts:  "See generally, e.g."

15            And e.g. there means "for example," correct?

16       A.   Uh-huh.

17       Q.   So what follows is going to be an example to

18   support that first clause of Paragraph 137; is that

19   correct?

20       A.   Yes.

21       Q.   Okay.  So if we read after the e.g. in

22   Footnote 275, it says:  "Proper assessment of

23   patients, proper prescribing practices, periodic

24   reevaluation of therapy, and proper dispensing and

25   storage are appropriate measures to help limit abuse

Highly Confidential - Subject to Further Confidentiality Review

1    of opioid drugs."

2          Did I read that correctly?

3    A.   Yes.

4    Q.   So the quoted passage is about means to

5    limit abuse, correct?

6          MR. CHALOS:  Object to the form.

7    A.   The quoted passage does, yes.

8    Q.   Okay.  And do you agree that the things

9    listed in the quoted passage can be done to limit

10   abuse?

11   A.   Yes.  I think we would need to look at this

12   whole document, though, to get the reason why that's

13   being cited at 275, yeah.

14   Q.   Okay.  And the quoted passage at least does

15   not specifically mention addiction, is that correct?

16   A.   Well, it doesn't mention addiction.  It

17   mentions abuse, so, yeah.  Yeah.

18   Q.   Okay.  And it does not mention illegal use,

19   correct?

20   A.   Right.

21   Q.   Okay.  So I'm going to mark the document as

22   Exhibit 22.

23          (Perri Exhibit 22 was marked for

24   identification.)

25   BY MS. COATES:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   I'll give you that copy.

 2        A.   Good throw.

 3        Q.   That one is not going to make it quite as

 4   far.

 5             All right.  And that quote references

 6   Page 11, right?  And just for comparison, the Bates

 7   Number is TEVA_CHI_00000509.  And that's the same

 8   Bates Number on the document that I gave you,

 9   correct?

10        A.   Yes.

11        Q.   Okay.  And so if we turn to Page 11, and if

12   you look at the second bullet point, it says:  "All

13   patients treated with opioids require careful

14   monitoring for signs of abuse and addiction, since

15   use of opioid analgesic products carry the risk of

16   addiction even under appropriate medical use."

17             Did I read that correct?

18        A.   Yes.

19        Q.   So this is acknowledging that addiction can

20   occur when appropriately prescribed, correct?

21        A.   Yes.

22        Q.   And it does not actually state anything

23   about addiction occurring only when abused or used

24   illegally, correct?

25             MR. CHALOS:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.   I'm finding myself wanting to look at this

2   whole area so I can make sure.

3     Q.   Please.

4     A.   I'm still trying to figure out if the

5   citation, you know -- why this was cited in this

6   particular occasion.

7     Q.   Okay.  Go ahead.

8     A.   Thanks.  Okay.  Now, if you don't mind,

9   would you ask me your question?

10    Q.   Sure.  So I'm struggling to see anything on

11  Page 11 that's stating that addiction occurs only

12  when abused or used illegally, which is the

13  proposition that you cited this document as an

14  example of.  Is that correct or --

15         MR. CHALOS:  Object to the form.

16    A.   So this section of the report, and this

17  particular -- this Paragraph 137, one of my -- one

18  of my contentions is that the marketing messages

19  minimized concerns over addiction -- dependence,

20  tolerance, addiction, withdrawal.  So the -- in this

21  sales training, which the topic of this page is

22  "Abuse, Addiction & Diversion," so this is a

23  question-and-answer that is designed to -- if you

24  look at the very first page of this document, it's

25  teaching a way -- a selling technique to minimize

```
 1    concerns and focus on the product's benefits and

 2    features, and the reasons why it's okay to use the

 3    project -- product, basically.

 4           So I agree with you, this is not a -- the

 5    best example I probably could have cited here, but

 6    it does meet the criteria of what I would say, that

 7    it's a communication, that's training in the sales

 8    force, designed to alleviate fears about abuse, and

 9    the question-and-answer, it does a job of taking the

10    doctor's fear, taking the prescriber's fear, and

11    reducing or minimizing that concern so that there

12    will be less trepidation about using the product.

13       Q.   Okay.  Thank you.  Do you know what branded

14    products -- branded opioid products in particular

15    Teva or Cephalon manufactures?

16       A.   Yes.

17       Q.   What are those products?

18       A.   I believe Fentora and Actiq, and the new one

19    that's eluding me right now, the newer one.  I'm --

20    I'm drawing a blank on the name of the newer

21    product, so --

22       Q.   I'm not aware of any new product, so I can't

23    help you there.

24       A.   Well, Hang on just one second because I'm

25    thinking of something.  So Fentora and Actiq I know
```

 1    for sure, and it may have been a competitor's

 2    product but I thought there was another transmucosal

 3    or transbuccal immediate release fentanyl.  Give me

 4    just a second.

 5          It strikes me this is the first time in this

 6    entire process that anybody has asked me about drug

 7    names.  It takes me a minute to adjust.

 8    Q.   Sure.

 9    A.   Ah, okay.  It was -- it says here Subsys.

10    That's it.  I'm good.

11    Q.   That's correct.  Thank you.

12          Okay.  And you testified earlier that you're

13    relying on other experts to determine whether any

14    branded marketing by Teva or Cephalon was false or

15    misleading; is that correct?

16    A.   The assessment of the specific messages and

17    their false and misleading, incorrect, whatever,

18    yes, I'm relying on other experts for that.

19    Q.   And are you familiar with the TIRF REMS

20    Access program?

21    A.   I'm generally familiar with it as I am all

22    the different REMS -- well, there weren't a lot of

23    different REMS but there were a couple of different

24    REMS that were involved here, so I'm generally

25    familiar with the requirement of that REM, yes.

```
 1        Q.    And are you aware that since 2012, Actiq and

 2   Fentora have been subject to the TIRF REMS Access

 3   program?

 4        A.    I don't know the exact date of when that

 5   happened but I think that's about the right time

 6   period as I have it in my mind.

 7        Q.    Okay.  Do you know what the prescriber

 8   requirements of the TIRF REMS Access program are?

 9        A.    I -- as I recall, they are very similar to

10   the other opioid REMS and it's requiring prescriber

11   training and education and a few other features I

12   don't recall specifically.

13        Q.    Do you know if there is a reason that TIRF

14   products have their own specific REMS?

15        A.    Yes, because of the difference in

16   administration and the potential for problems to

17   occur if they are not used properly.

18        Q.    And so being subject to their own specific

19   TIRF REMS, presumably those TIRF REMS have different

20   requirements or additional requirements to the other

21   REMS?

22        A.    They're different, yes.  Again, I don't

23   recall exactly the details in the REMS, but I am

24   familiar that it's -- that exists and that it was --

25   as I recall, it was slightly different, but at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    same time similar to the others.

 2              (Perri Exhibit 23 was marked for

 3    identification.)

 4    BY MS. COATES:

 5      Q.   Okay.  I'm going to hand you what I'm going

 6    to mark as Exhibit 23.

 7      A.   Thanks.  Good job.

 8      Q.   That one slides.  This one is harder.

 9           MR. CHALOS:  That was a good one.

10           MS. COATES:  Thank you.

11      Q.   Do you recognize this document?

12      A.   I recognize it as the Actiq package insert

13    from 2011 era.  It was complete prescribing

14    information, I should say.  Oh, there is a med guide

15    here as well.

16      Q.   And do you see the date on this package

17    insert anywhere?

18      A.   December 2011.

19      Q.   Okay.  And so as I think we discussed, this

20    would be just before the TIRF REMS program was

21    implemented, but if we turn to the fourth page in

22    Section 5.10 --

23      A.   Yes.

24      Q.   -- it discusses what the requirements of the

25    TIRF REMS Access program are going to be in
```

Highly Confidential - Subject to Further Confidentiality Review

1    Section 5.10 titled "Transmucosal Immediate Release

2    Fentanyl (TIRF) Risk Evaluation and Mitigation

3    Strategy (REMS) Access Program."

4         Did I read that correctly?

5    A.   You did.

6    Q.   And if you look underneath the first full

7    paragraph there, it goes through the required

8    components of the TIRF REMS Access program.

9    A.   Yes.

10   Q.   And so the first requirement is that:

11   "Healthcare professionals, who prescribe Actiq for

12   outpatient use, must review the prescriber

13   educational materials for the TIRF REMS Access

14   program, enroll in the program, and comply with the

15   REMS requirements."

16        Did I read that correct?

17   A.   You did.

18   Q.   And the second bullet:  "To receive Actiq,

19   outpatients must understand the risks and benefits

20   and sign a Patient-Prescriber Agreement."

21        Did I read that correct?

22   A.   You did.

23   Q.   And "Pharmacies that dispense Actiq must

24   enroll in the program, and agree to comply with the

25   REMS requirements."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Did I read that correct?
 2       A.   Yes.
 3       Q.   And "Wholesalers and distributors that
 4   distribute Actiq must enroll in the program, and
 5   distribute only to authorized pharmacies."
 6              Is that correct?
 7       A.   Yes.
 8       Q.   So these are requirements that are specific
 9   to this class of medications; is that correct?
10       A.   Well, these requirements are -- yes, I
11   agree, they are specific to Actiq and this class of
12   drugs.  They are not unique in terms of REMS.  There
13   are other programs that pharmacists and doctors have
14   to enroll and so forth, but this is certainly unique
15   to the other opioids.
16       Q.   Okay.  Thank you.  And I'm not going to go
17   through multiple iterations of labels with you, but
18   I do just want to confirm that there is a boxed
19   warning or a black box warning, however you want to
20   refer to it --
21       A.   Yes.
22       Q.   -- applicable to these medications as well.
23       A.   There is.
24       Q.   Okay.  Can we turn to Table II of your
25   report?  I believe it starts on page 86.  And as
```

 1    we've discussed, Table II is sort of your

 2    categorization of the marketing messages that you

 3    reviewed; is that correct?

 4        A.    Yes.

 5        Q.    And as we discussed, these are not typically

 6    the type of marketing messages that generic

 7    manufacturers are going to be communicating, that

 8    these marketing messages would be more related to

 9    branded manufacturers; is that correct?

10        A.    Yes, essentially, that's correct.

11        Q.    Okay.  And Section A, your first marketing

12    message:  Extended release drugs or q12 dosing had

13    fewer peaks and valleys and less chance of addiction

14    and abuse.

15            Is that correct?

16        A.    Yes.

17        Q.    And I guess I should have asked you this

18    previously, but Actiq or Fentora are not extended

19    use drugs, is that correct, extended release drugs?

20        A.    They are not used in this fashion, no.

21        Q.    Okay.  And there are no Teva documents

22    listed in this section; is that correct?

23        A.    No, there are not.

24            MS. COATES:  Okay, Doctor.  I think that I

25        am done with my questions, I tried to be short

```
 1        and sweet, and I think we can now take a break.

 2            THE VIDEOGRAPHER:  We are now going off the

 3        record.  The time is currently 2:20 p.m.

 4          (Recess from 2:20 p.m. until 2:36?p.m.)

 5            THE VIDEOGRAPHER:  We are now back on the

 6        video record with the beginning of Media

 7        Number 5.  The time is currently 2:36 p.m.

 8                     CROSS-EXAMINATION

 9    BY MS. ZOLNER:

10        Q.   Good afternoon, Dr. Perri.  My name is Erica

11    Zolner.  I've been sitting on this side of the room,

12    so I'm not sure we've seen each other much in the

13    last couple of days, but I represent Allergan

14    Finance and I'm going to be asking you some

15    questions specifically about my client.

16        A.   Okay.

17        Q.   And just to be clear, although I think there

18    have been many people asking you these questions,

19    you are not offering any Allergan-specific opinions,

20    correct?

21            MR. CHALOS:  Object to the form.

22        A.   Yes, that's correct.

23        Q.   And you're also not offering any

24    Actavis-specific opinions, right?

25            MR. CHALOS:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes, that's correct.

 2       Q.   Let's turn to your report.

 3       A.   Okay.

 4       Q.   And I think you already have a copy which

 5   was previously marked Exhibit 1.

 6       A.   Yes.

 7       Q.   Could you look at Paragraph 174?

 8       A.   Okay.

 9       Q.   In that paragraph you state that Actavis

10   marketed an opioid medication called Kadian,

11   correct?

12       A.   Yes.

13       Q.   Are you aware that Actavis acquired Kadian

14   from a company called Alpharma?

15       A.   I believe that's correct, yes.

16       Q.   Do you know when Actavis acquired Kadian

17   from Alpharma?

18       A.   I don't have an exact date, no.

19       Q.   Okay.  And I'm not expecting it to be a

20   memory test.  I'll represent to you that it was in

21   December of 2008.  Do you have any reason to

22   disagree with that date?

23       A.   No, that seems about what I -- that seems

24   about right to me.

25       Q.   Does your report cite marketing statements
```

1    by Alpharma?

2        A.    With respect to the family of companies

3    related to Actavis, I'm pretty sure they are all

4    referenced as -- let me took at Table II just to be

5    sure.

6        Q.    While you are looking at that, you're not

7    suggesting that Alpharma is part of the Actavis

8    or Allergan family of companies,

9        A.    Say that again.

10       Q.    Sure.  You're not suggesting that Alpharma

11   is part of the Allergan or Actavis family of

12   companies?

13       A.    Okay.  So your question was specific to

14   Alpharma?

15       Q.    That's right.

16       A.    Yeah.  So I know that Alpharma is not cited

17   in Table II or anywhere, yes.

18       Q.    Okay.

19       A.    So yes.

20       Q.    Could you look at Page 93 of your report?

21       A.    Okay.

22       Q.    At the bottom of that page you quote a

23   document stating:  "Over time, your body may become

24   tolerant of your current dose.  You may require a

25   dose adjustment to get the right amount of pain

```
 1    relief.  This is not addiction.  It is just your

 2    body getting used to the drug."

 3          Did I read that correctly?

 4    A.   Yes.

 5    Q.   You attribute that statement to Allergan,

 6    right?

 7    A.   That's what I was going to say a little bit

 8    earlier, is that all of -- anything that has to do

 9    with this family of defendants is -- Actavis and

10    Allergan, would be listed as Allergan.

11    Q.   I guess I'm confused by what you mean by

12    "family of defendants."

13    A.   With all the mergers --

14          MR. CHALOS:  Sorry.  Let her finish her

15    question, if you would.  Sorry.  You can answer.

16    Q.   Thank you.  We talked earlier about the fact

17    that Actavis acquired Kadian, the branded drug, from

18    Alpharma in December 2008, right?

19    A.   We did talk about that.

20    Q.   And you understand that Actavis did not

21    acquire Alpharma, right?

22    A.   Yes.

23    Q.   Okay.  So maybe you can describe to me what

24    you mean when you keep saying that there is a family

25    of defendants?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. CHALOS:  Object to the form.
 2        A.   So in my report I have a tab for Schedule 6
 3   that is the ARCOS Opioid Drugs and Defendant
 4   Corporate Groupings, and among other things it lists
 5   the name of a drug, the status of that drug, who the
 6   defendant is, and then manufacturers of that, and
 7   the -- so I was careful in this table to list only
 8   companies that are listed as a defendant, whether
 9   they were --
10            So, for example, with the product fentanyl,
11   I'm looking at Table 1 in this Exhibit 6.  For
12   fentanyl, the defendant includes Actavis, Endo,
13   Mallinckrodt and Teva, and under the Actavis tab,
14   Actavis and Watson are both listed.  So I -- that's
15   what I'm referring to as the corporate families or
16   groupings of defendants.
17        Q.   Okay.  But let's try to break that down.  Do
18   you understand that Alpharma is not a defendant in
19   this litigation?
20        A.   Yes, I have -- I can check on that, too.
21   Let me see.
22            Schedule 5 is the list of the defendants in
23   the case --
24        Q.   Right.  And you've listed them in
25   alphabetical order, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Right.

 2      Q.    And I do not see Alpharma listed there?

 3      A.    That's correct.

 4      Q.    Okay.  So Alpharma is not part of the family

 5   of defendants in this litigation, correct?

 6      A.    Did I say that they were?

 7      Q.    I'm confused by your term "family of

 8   defendants" because defendants have specific meaning

 9   in the context of litigation.

10      A.    Okay.

11      Q.    So maybe let's just take one step back.

12      A.    Okay.

13      Q.    Isn't it correct that Alpharma is not part

14   of this lawsuit?

15      A.    That's my understanding, yes.

16      Q.    And it's also your understanding that

17   Alpharma is not part of the family of defendants

18   that's part of the Allergan umbrella, correct?

19            MR. CHALOS:  Object to the form.

20      A.    I assume so.  The comings and goings of the

21   different companies, the mergers, acquisitions,

22   licensing, purchasing of products, I looked at the

23   products themselves and their marketing.  I didn't

24   really focus extensively on the -- you know, who was

25   making it when.  It was when did a product come to
```

```
 1    market, what was the marketing planning, what was

 2    the metrics that were used to evaluate it, what

 3    tactics were used, what strategies were used.

 4        Q.   Got it.  But you were looking at the

 5    question of when a product came to market?

 6        A.   Right.

 7        Q.   I think that's what you just testified to.

 8    And you were also including dates in the documents

 9    that you cited throughout your report, correct?

10        A.   Wherever possible, yes.

11        Q.   So let's take a look at a document that I'm

12    going to mark Exhibit 24.

13             (Perri Exhibit 24 was marked for

14    identification.)

15             MS. ZOLNER:  This table is so long.

16             MR. CHALOS:  Do you have another copy of

17        that?

18             MS. ZOLNER:  I'll try to shuffle it across.

19             (Discussion off the record.)

20    BY MS. ZOLNER:

21        Q.   Dr. Perri, if you could just look at the

22    first page in the upper left-hand corner, do you see

23    there where it's marked "Kadian"?

24        A.   I'm confused.  Upper left-hand corner?

25        Q.   Upper right-hand corner.  My apologies.
```

```
 1       A.    Thank you.  Yes.

 2       Q.    And then under that it says:  "Learn more

 3   about customized pain control with Kadian."

 4       A.    Yes.

 5       Q.    And then you quote from language in your

 6   report on the fourth page of this PDF, correct?  And

 7   just for clarification, that's the page that's

 8   marked ACTAVIS0006826, and I believe in your report

 9   on page 93, which was the portion of your report we

10   were looking at before I showed you Exhibit 24, we

11   were looking at that language that I quoted earlier.

12       A.    Okay.

13       Q.    The "over time, your body..."  section.

14       A.    Yes.

15       Q.    Do you recall that?

16       A.    Yes.

17       Q.    Do you see that language quoted on Page 4 of

18   Exhibit 24?

19       A.    Yes.

20       Q.    If you turn to the last page of Exhibit 24,

21   do you see in the bottom right -- bottom left-hand

22   corner there is a copyright date, and it's copyright

23   2007, Alpharma Branded Products Division?

24       A.    Okay.

25       Q.    Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I do.

 2        Q.    And then do you see that the document is

 3    also dated in the next line March 2007?

 4        A.    Okay.

 5        Q.    And you'll recall several questions ago I

 6    represented to you that Actavis acquired Kadian in

 7    December of 2008.  Do you remember that?

 8        A.    You did.

 9        Q.    So that was over a year before -- this

10    document was published over a year before Actavis

11    acquired Kadian, correct?

12        A.    That's right.

13              MR. CHALOS:  Hold on.  Object to the form.

14        Q.    Do you have any reason to believe that

15    Actavis ever used this document after it acquired

16    Kadian?

17        A.    I don't have any reason to suspect that they

18    did or didn't.  I wouldn't know.

19        Q.    What about Allergan, do you have any reason

20    to suspect Allergan ever used this document?

21        A.    I wouldn't know based on this document.

22        Q.    Did you do any research to determine when

23    Actavis acquired Kadian from Alpharma prior to your

24    deposition today?

25        A.    You know, that's -- I appreciate the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    question and the answer, I think, is no but maybe.
 2    I was concerned with the marketing of Kadian.  I
 3    wasn't concerned with who made it, when they made
 4    it, and I wanted to see the marketing for Kadian and
 5    that's what I focused on.
 6            That's why I don't have independent opinions
 7    about each individual defendant or another.  The --
 8    what I was focused on was the marketing of opioids.
 9    So whether Kadian was owned by you or someone else,
10    I wanted to know what was happening with Kadian and
11    that's what I stayed with.
12    Q.   Understood.  And you weren't paying
13    attention to ownership lines or who was responsible
14    for manufacturing the drug in your review of the
15    marketing materials?
16    A.    I tried to pay attention to that, but it was
17    impossible to keep that straight at all points for
18    every drug at every point in time because there were
19    so many mergers, acquisitions, licensing and so
20    forth that -- I did the best that I could, I think,
21    in keeping track of where everybody was with respect
22    to ownership and all that.
23            And I know certainly from reading some of
24    the depositions, and particularly with regard to
25    Allergan Financial, that there was a lot of question
```

1    about ownership and things like this, so I

2    appreciate your concern over this and I'm sure you

3    all will figure out an answer to that, but from my

4    perspective, this was about Kadian, not about who

5    owned it at that time.

6        Q.   Understood.  So just for points of

7    clarification, as you sit here today you can't

8    recall any specific research you did to determine

9    when Actavis acquired Kadian from Alpharma?

10       A.   Not other than what I would have read in the

11   deposition transcripts about the timing of when

12   things happened, yeah.

13       Q.   Could you turn to Page 96 of your report

14   now?

15       A.   Okay.

16       Q.   Do you see where you wrote -- and this is by

17   the Actavis document in your chart, 0006930, do you

18   see that?

19       A.   Yes.

20       Q.   "It is important for these audiences to

21   understand the difference between addiction and

22   pseudoaddiction, which involved medication-seeking

23   behavior solely for the sake of pain relief.  While

24   tolerance to opioids can occur, a dose increase of

25   switch to another agent will often yield the needed

1    pain relief.  Tolerance can also work advantageously

2    for the patient, since it also applies to adverse

3    events."

4           Did I read that right?

5       A.   You did.

6       Q.   And you attribute that statement to

7    Allergan, right?

8       A.   Yes, for the reason I explained earlier,

9    yes.

10      Q.   And by "the reason I explained earlier," you

11   mean that you weren't focused on the dates of

12   ownership for any particular drug?

13      A.    Not just that, but that is part of it.

14   The -- it's just Allergan as a named defendant.  I

15   wanted the column, this last column, to be a named

16   defendant, so whatever defendant family might have

17   been there.  So while it may have been an Actavis

18   document, it's listed under Allergan as the

19   defendant.

20      Q.   Okay.  Even though Allergan didn't own the

21   drug at the time, it's still listed under Allergan?

22      A.    Again, if that's the case, then that's like

23   the last example.  I wasn't focused enough on the

24   dates.

25      Q.   Understood.  The statement did come from

Highly Confidential - Subject to Further Confidentiality Review

```
1    ACTAVIS0006930, that's the document you're quoting,

2    right?

3        A.   You know, I've looked at all of these

4    documents, so I know that it came from that

5    document, but I can't tell you the time frame of it,

6    so --

7        Q.   Understood.  Why don't -- why don't we mark

8    that document.

9        A.   Okay.

10       Q.   Let's mark it Exhibit 25.

11           (Perri Exhibit 25 was marked for

12    identification.)

13    BY MS. ZOLNER:

14       A.   Good job.

15       Q.   We should bring a carrier pigeon.

16           I think the good news here is we're just

17    going to look at the first page.

18       A.   Okay.

19       Q.   So do you see where it says in the middle of

20    the page, "Kadian 2005 Publication Plan"?

21       A.   Yes.

22       Q.   It also says this document was prepared by

23    Alpharma on January 20th, 2005.  Do you see that?

24       A.   I do.

25       Q.   Do you have any reason to disagree with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what's written on the first page of Exhibit 25?

 2        A.   No, I do not.

 3        Q.   As you sit here today, do you know if

 4    Actavis ever used this document?

 5        A.   What I was undertaking here was to look at

 6    the contents specifically to refresh my memory about

 7    what may have been going on in this planning

 8    document, and then my thought was to get ahold of an

 9    Actavis document, Actavis marketing plan for Kadian

10    and then compare them and see, and then maybe draw

11    the conclusion that they are similar or they're not

12    very similar and I could possibly answer your

13    question, but since I don't have the second

14    document, I can't really do that.

15        Q.   My question was a simple one.  I just was

16    asking do you know if this document was ever used by

17    Actavis?

18        A.   As I sit right now, I don't know.

19        Q.   Okay.  What about Allergan, as you sit here

20    now do you know if this document was ever used by

21    Allergan?

22        A.   I do not know that.

23        Q.   And I'm speaking about Exhibit 25, just for

24    the record.

25        A.   Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    In the case of Actavis, are you aware of any

 2   regulatory or administrative action by the FDA?

 3              MR. CHALOS:  Object to the form.

 4        A.    I don't recall as I sit here.

 5        Q.    What about Allergan, are you aware of any

 6   further regulatory or administrative action by the

 7   FDA against Allergan?

 8              MR. CHALOS:  Object to the form.

 9        A.    Again, as I sit here, I don't recall.

10        Q.    Let's go back to your report and I'm looking

11   at Paragraph 137 now.  Let me know when you're

12   there.

13        A.    127?

14        Q.    137.

15        A.    Okay.

16        Q.    Paragraph 137.

17        A.    I'm there.  I'm there.

18        Q.    Okay.  You state here that:  "Fears were

19   also minimized through marketing communications that

20   indicated problems like addiction occur only when

21   opioids are abused or used illegally, and if opioids

22   are taken as prescribed, the risk of addiction is

23   rare, less than 1 percent."

24              Did I read that correctly?

25        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Looking at your support materials, I want to
 2   start with Footnote 276, and there you're citing a
 3   document which is ACTAVIS0264972.
 4            Do you see that?
 5       A.   Yes.
 6       Q.   Okay.  And in that footnote, Footnote 276,
 7   it says:  "See generally, e.g. 'long history of
 8   safety and efficacy when used as indicated' Kadian
 9   Marketing Overview, ACTAVIS0264972, page 31."
10            Did I read that right?
11       A.   Yes.
12       Q.   And as you note in your footnote, the
13   document states that for Kadian, there is a long
14   history of safety and efficacy when used as
15   indicated, right?
16       A.   Yes.
17       Q.   I'd like to now mark Exhibit Number 27 --
18   26.  I'm sorry.
19            (Perri Exhibit 26 was marked for
20   identification.)
21   BY MS. ZOLNER:
22       Q.   And again, this is -- the document that we
23   have just marked Exhibit 26 is a Kadian Marketing
24   Overview from Sales Representative Training on
25   October of 2011.  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Could you look at Page 31?  It's the page

 3   that says "Efficacy" at the top.

 4        A.   Yes.

 5        Q.   The very first bullet on Page 31 of

 6   Exhibit 26 says:  "Kadian contains morphine as its

 7   active ingredient and has a long history of safety

 8   and efficacy when used as indicated."

 9             Did I read that correctly?

10        A.   Yes.

11        Q.   Again, I know you've testified repeatedly

12   that you're not here to offer FDA expertise, but I

13   have a question on this.

14             Are you aware that before the FDA approves a

15   drug for marketing, it must first determine if a

16   drug is effective?

17        A.   Safe and effective, yes, safe and effective,

18   yes.

19        Q.   Okay.  And are you also aware that the FDA

20   is responsible for making sure that the benefits

21   outweigh its potential risks to patients?

22             MR. CHALOS:  Object to the form.

23        Q.   Let me rephrase that.

24             One of the other issues that the FDA is

25   considering before approving a drug for marketing is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    whether the benefits outweigh potential risks to

 2    patients, correct?

 3        A.   That's my understanding of what the FDA's

 4    goal is.

 5        Q.   Let's look now at Exhibit 27.

 6             (Perri Exhibit 27 was marked for

 7    identification.)

 8    BY MS. ZOLNER:

 9        Q.   Thank you.  This, Dr. Perri, is -- the

10    document that we just marked Exhibit 27 is the FDA

11    approval letter for Kadian that came in on July the

12    3rd, 1996, correct?

13        A.   Yes.

14        Q.   And the first paragraph of this letter

15    written to Mr. Wagner is:  Please refer to your June

16    29, 1995 new drug application, or NDA, submitted

17    under Section 505(b) of the Federal Food, Drug, and

18    Cosmetic Act for Kadian (morphine sulfate) Sustained

19    Released Capsules, 20 milligrams, 50 milligrams and

20    100 milligrams.

21             Did I read that correctly?

22        A.   Yes.

23        Q.   If you look down to the fourth paragraph,

24    this explains that in approving Kadian, the FDA

25    concluded that Kadian was safe and effective for the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    use as indicated, correct?

2        A.   Yes.

3        Q.   Are you aware if the FDA ever requested that

4    Kadian be removed from the market?

5        A.   I don't know.

6        Q.   Do you know if Kadian is still sold today?

7        A.   I know that the generic forms pretty much

8    took over the marketplace for Kadian eventually, so

9    I don't know if it's still sold as a branded product

10   or not.

11       Q.   You just don't know one way or the other?

12       A.   No.

13       Q.   Okay.  Is it accurate to say that the

14   statement, "Kadian has a long history of safety and

15   efficacy when used as indicated," comes directly

16   from the FDA approval letter?

17            MR. CHALOS:  Object to the form.

18       Q.   And again, I was looking specifically at

19   Paragraph 4.

20       A.   Yes, I see that.

21            MR. CHALOS:  Object to the form.

22       A.   I see that.

23       Q.   Is it accurate to say that that statement

24   comes from Paragraph 4 of the FDA approval letter?

25            MR. CHALOS:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A.   Yes.

 2     Q.   I'm sorry.  I couldn't hear your answer.

 3     A.   Yes.

 4     Q.   Do you have any reason to dispute that the

 5   language in the FDA approval letter is accurate?

 6          MR. CHALOS:  Object to the form.

 7     A.   I have no reason to dispute that.

 8     Q.   Could you go back to your report now,

 9   please?  Sorry to have you shuffle so many papers.

10     A.   That's okay.

11     Q.   I'm looking now at Footnote 275.

12     A.   Okay.

13     Q.   You cite a document, ACTAVIS0567695 in

14   Note 275, right?

15     A.   Yes.

16     Q.   And in that footnote you cite that document

17   for the quote:  "Opioid agonists are sought by drug

18   abusers and people with addiction disorders and are

19   subject to criminal diversion.  These risks should

20   be considered when prescribing or dispensing Kadian

21   in situations where there is concern about increased

22   risk of misuse, abuse, or diversion.  Concerns about

23   abuse, addiction, and diversion should not, however,

24   prevent the proper management of pain."

25          And that come from the Kadian PI Workshop
```

```
 1    with the Bates number ACTAVIS0567695, Page 17.

 2            Did I read that right?

 3    A.    Yes.

 4    Q.    So that cite is part of a document that was

 5    entitled the Kadian PI Workshop?

 6    A.    Yes.

 7    Q.    Did you review that document?

 8    A.    Yes.

 9    Q.    Would you remind the jury what PI means?  I

10    know you previously gave a definition, but just for

11    purposes of my recollection.

12    A.    Well, it's either package insert or

13    prescribing information, one or the other.

14    Q.    A pharmaceutical manufacturer's marketing

15    claims must be consistent with PI; isn't that right?

16    A.    Yes.

17    Q.    In your report at Paragraph 89 --

18    A.    Okay.

19    Q.    -- you include a quote right after Footnote

20    166 that says:  "This means marketers can be

21    selective in what they choose to talk about in a

22    sales encounter, but the information selected must

23    be consistent with the P.I."

24            Correct?

25    A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Going back to Note 275, you state that
 2   the --
 3           MR. CHALOS:  Hold on.
 4           MS. ZOLNER:  Sure.
 5           MR. CHALOS:  Okay.
 6           MS. ZOLNER:  Let me know when you're both
 7       there.
 8           MR. CHALOS:  Oh, yeah.  No, I'm sorry.
 9           MS. ZOLNER:  Okay.
10           MR. CHALOS:  It's more important that you're
11       there.
12           MS. ZOLNER:  I'll wait for both of you.
13      A.   I'm there too, so --
14      Q.   Okay.
15      A.   Yeah.
16      Q.   At Note 275 you state that the Kadian PI
17   Workshop makes the following claim, and this is I
18   think the third sentence in -- well, it's more than
19   the third sentence in that paragraph but it starts:
20   "Concerns about abuse, addiction, and diversion
21   should not, however, prevent the proper management
22   of pain."
23           Did I read that correctly?
24      A.   Yes.
25           MS. ZOLNER:  Can we mark the PI Workshop,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the Kadian PI Workshop?  It's Tab 15.

 2            (Perri Exhibit 28 was marked for

 3     identification.)

 4     BY MS. ZOLNER:

 5        Q.   I will turn your attention to Page 17 of the

 6     document that we just marked Exhibit 28, Page 17.

 7        A.   Okay.

 8        Q.   This is under the heading "Abuse Potential,"

 9     and if you look at the third bullet, I think that's

10     where we found the quote that we just found in your

11     report in Paragraph 137, Note 275.  Again the

12     language is identical:  "Concerns about abuse,

13     addiction, and diversion should not, however,

14     prevent the proper management of pain."

15        A.   Okay.

16        Q.   That's the statement you cited, right, from

17     the PI Workshop document?

18        A.   Wrong page.  Yes.

19        Q.   And if you turn to the front of this

20     document, the Kadian PI Workshop is dated March

21     2013.  Do you see that?

22        A.   I do.

23        Q.   Okay.  Now I'm going to show you -- yes.

24     I'm going to show you a different document.  This is

25     Exhibit 29.
```

1      A.   Should I be keeping all these documents open

2   or --

3      Q.   You can just put them in a pile.  I don't

4   think we'll come back to any.

5      A.   Okay.

6           (Perri Exhibit 29 was marked for

7   identification.)

8           MS. ZOLNER:  We will come back to this one?

9   BY MS. ZOLNER:

10     Q.   My colleague tells me you might want to put

11  this one to the side after we talk about it because

12  we might talk about it twice.

13     A.   Okay.

14     Q.   So this is Exhibit 29.  Dr. Perri, if you

15  will look in the bottom right-hand corner, do you

16  see the revised date of July 2012?

17     A.   Yes.

18     Q.   Do you agree that this was the Kadian PI

19  that was in effect in July of 2012?

20          MR. CHALOS:  Object to the form.

21     A.   That looks like what that -- it looks as to

22  be -- it looks like this is what that is, yes.

23     Q.   Okay.  Could you turn to Page 6 of this

24  document, and I don't know that the pages are

25  numbered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A.    Section?

 2    Q.    I'm actually looking at the page -- Section

 3    5, Warnings and Precautions.

 4          Right.  So it's Page 6 if you are counting

 5    manually, and I am -- it's the reference ID in the

 6    bottom -- I think, actually, all those numbers are

 7    the same, but I am -- Section 5, Warnings and

 8    Precautions, 5.1, Abuse Potential.

 9    A.    I'm there.

10    Q.    Okay.  Could you read the last sentence in

11    the first paragraph under that subpoint?  It

12    starts --

13    A.    "Concerns about abuse, addiction, and

14    diversion should not, however, prevent the proper

15    management of pain."

16    Q.    Dr. Perri, would you agree that the sentence

17    you just read is identical to the sentence in the

18    FDA-approved prescribing information?

19    A.    Yes, I would agree with that.

20          MR. CHALOS:  Object to the form.

21    Q.    In your report on Page 93 you cite this

22    statement again, quoting a document called the

23    Kadian Stocking Offer, that's a document that is

24    again under the chart on Page 93, an Actavis --

25    acquired Activis document marked 00369188.  Just let
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    me know when you are there.
 2         A.    Okay.  I'm there.
 3         Q.    That's the same sentence again, correct?
 4         A.    It is.
 5         Q.    "Concerns about abuse, addiction, and
 6    diversion should not, however, prevent the proper
 7    management of pain."
 8               Is that sentence identical?
 9         A.    It is.
10         Q.    Your report cites several statements found
11    in the Kadian marketing and training materials that
12    come directly from the Kadian PI, right?
13         A.    That's correct.
14         Q.    Let's look at Page 101 of your report where
15    you cite a July 2010 document.  That one has a Bates
16    number of ALLERGAN_MDL_00405512.  Could you read me
17    what you have in quotes by that document?  And the
18    date of that document is July 30th, 2010 in your
19    report.
20         A.    "Proper assessment of the patient, proper
21    prescribing practices, periodic reevaluation of
22    therapy and proper dispensing and storage are
23    appropriate measures that help limit the abuse of
24    opioid drugs."
25         Q.    Do recall what that -- do you recall what
```

1    document that language comes from?

2        A.    I would have to see the document to make

3    sure, but -- I mean, I don't remember the specific

4    document.

5        Q.    Okay.  I'll show it to you.  Let's mark this

6    Exhibit 30.

7        A.    Oh, yeah.

8            (Perri Exhibit 30 was marked for

9    identification.)

10   BY MS. ZOLNER:

11       Q.    This document is titled:  Objection Handling

12   Workshop, Training Class July 7th and 8th, 2010.

13           Correct.

14       A.    Yes.

15       Q.    In going back to your report, you explain in

16   Paragraph 135, Note 264 -- it's a footnote to

17   Paragraph 135, that:  "Sales personnel were trained

18   on how to handle objections to multiple issues,

19   including concerns over addiction.  See, e.g.,

20   Kadian objection handler ACTAVIS0003698."

21           And I think my question is a simple one.  Is

22   the Objection Handling Workshop document that we

23   just marked Exhibit 30 the type of training

24   presentation that you're talking about in Paragraph

25   135?

 1          MR. CHALOS:  Object to the form.

 2     A.   Yes.

 3     Q.   Earlier in your report, on Paragraph --

 4   under Paragraph 89 you have a Note 169 where you

 5   explain that:  "Handling objections and reducing

 6   concerns prescribers may have about a medication is

 7   a staple of sales training and development."

 8          Let me know when you are there.  I'm sorry.

 9   I thought you were already on Paragraph 89.  I'm

10   looking specifically at Note 169.

11     A.   Yes, I'm there.

12     Q.   Looking again at Exhibit 30, I'm just asking

13   you to compare and contrast your report with what

14   I've marked as Exhibit 30, the Objection Handling

15   Workshop.  If you turn to Page 8 of this document,

16   Exhibit 30, you see the statement you cited about

17   proper assessment of the patient, right?  And it's

18   the page that begins with -- says at the top:

19   "Objection 4.  I'm concerned about the abuse

20   potential of Kadian."

21     A.   Right.

22     Q.   Again, if you could just read that first

23   bullet.

24     A.   "Proper assessment of the patient, proper

25   prescribing practices, periodic reevaluation of

Highly Confidential - Subject to Further Confidentiality Review

```
1    therapy, and proper dispensing and storage are

2    appropriate measures that help to limit abuse of

3    opioid drugs."

4        Q.   Okay.  And I told you you were going to need

5    Exhibit 29 again.  That was the one I said to keep

6    close at hand.  If you look at page 15 of that

7    document, this is Section 9.2, it's titled "Abuse."

8        A.   Okay.

9        Q.   Could you please read the second full

10   paragraph under 9.2?

11       A.   "Drug abuse is the intentional and

12   nontherapeutic use -- "

13       Q.   Actually, I'm sorry, I don't want you to

14   read something that you don't need to read.  That is

15   not the right section.

16            Next page.  Sorry about that.  This is the

17   second full paragraph at the top of the next page,

18   right before you get to Section 9.3, Dependence.

19       A.   "Proper assessment of the patient, proper

20   prescribing practices, periodic reevaluation of

21   therapy, and proper dispensing and storage are

22   appropriate measures that help to reduce abuse of

23   opioids."

24       Q.   Do you agree that the statement that you

25   cited from the Objection Handling Workshop,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit 30, comes directly from the Kadian

 2    prescribing information that we marked as

 3    Exhibit 29?

 4        A.   Yes.

 5             MR. CHALOS:  Object to the form.  I'm sorry.

 6        I lost you.  Where did you say he -- I'm back

 7        on -- I may be a few questions behind.  Where did

 8        he cite that in his report?

 9             MS. ZOLNER:  Where did he cite what?

10             MR. CHALOS:  That sentence you just had him

11        read.

12             MS. ZOLNER:  The sentence that I just read

13        was cited in his report in Paragraph 1 -- oh,

14        101.

15             MR. CHALOS:  Page 101?

16             MR. CIULLO:  Yes.

17             MR. CHALOS:  Okay.  Sorry.  I'm just

18        having -- you're moving quickly through your

19        outline.  I'm having trouble keeping up.  Page

20        101.

21    BY MS. ZOLNER:

22        Q.   Dr. Perri, again, not to be repetitive, but

23    can you identify a single specific physician or

24    prescriber in Cuyahoga or Summit County to whom

25    Actavis communicated any of the statements in any
```

```
 1    version of the Kadian learning system?

 2       A.    I did not -- I did not undertake that

 3    specific analysis, but I know from the testimony and

 4    the documents in this case that the marketing plans

 5    and the marketing documents that I saw were

 6    distributed nationally and used even locally in

 7    Ohio.

 8       Q.    Do you know that these documents that we've

 9    been looking at today were distributed in Cuyahoga

10    and Summit Counties?

11       A.    Specifically this document, I don't have

12    any -- anything that points to its actual use there

13    other than, as I said, the testimony that the

14    marketing plans and the marketing materials were

15    developed nationally and implemented in Ohio.

16       Q.    I think you're referring to what you've

17    referred to all day as some of the aggregate data

18    that you were referring to, right?

19            MR. CHALOS:  Object to the form.

20       A.    There is actually a citation in my report I

21    think from -- quoting testimony from defendants that

22    specifically relates to this issue.  So I can look

23    for that and point you to that if you need me to.

24       Q.    I think my question is much more simple.  I

25    just want to know if you can identify any physician
```

1    or prescriber in Cuyahoga or Summit who Actavis or

2    Allergan communicated with with respect to anything

3    related to Kadian marketing?

4        A.    I guess I'm confused because it sounds like

5    to me that your question is asking me that if I say

6    no, I can't, then the conclusion that you would draw

7    from that is that none of the materials that we're

8    looking at today were used in Ohio and specifically

9    to these counties, and that's not accurate.

10       Q.    My question is a yes-or-no question.  Can

11   you identify a single physician or prescriber in

12   either Cuyahoga or Summit County to whom Actavis or

13   Allergan communicated any of the marketing

14   information we've looked at today?

15           MR. CHALOS:  Object to the form.

16       Q.    And if you don't have any names, then --

17           MR. CHALOS:  Well, object to the form.

18       A.    I actually have a long list of physicians

19   names in Cuyahoga and the other county that you

20   mentioned, they are from call notes from another one

21   of the defendants, so I don't know that they would

22   reflect any activities by your company, but they

23   would reflect the names of physicians who were the

24   recipients of the marketing that occurred in Ohio.

25       Q.    But you can't link it back to Allergan or

Highly Confidential - Subject to Further Confidentiality Review

```
1    Actavis, correct?

2      A.   Well, this kind of goes along with what I

3    was saying yesterday, that -- when I was asked

4    another question along these same lines, that, you

5    know, the fact that I can't link a specific

6    advertisement to a specific doctor doesn't mean that

7    the advertisements weren't present in the

8    marketplace, it doesn't mean the doctors didn't see

9    them, it just means that I haven't the tools at my

10   disposal to make that connection.

11     Q.   And you haven't made that connection,

12   correct?

13     A.   I make the connection by virtue of the fact

14   that I know these materials were used in Ohio and I

15   know that doctors in Ohio saw them.

16     Q.   My question is a different one.

17          Can you identify any of the doctors who saw

18   them?

19          MR. CHALOS:  Object to the form.

20     A.   Yeah, I mean, I can give you the -- I can

21   give you doctors' names but it would be a

22   presumption that they did or didn't see it in any

23   individual case.

24     Q.   Okay.  You talk about KOLs in your report.

25     A.   Yes.
```

1      Q.   And KOLs are key opinion leaders, right?

2    The acronym KOL stands for key opinion leader?

3      A.   That's right.

4      Q.   In your report you talk about how KOLs are

5    influencers, right?

6      A.   Yes.  I -- that's not my terminology

7    necessarily.  That's either industry or in some of

8    the defendants' terminology.

9      Q.   Understood.  So in Paragraph 67 of your

10   report, you include a quote:  "Peer-to-peer

11   marketing uses key opinion leaders, or influencers,

12   and word of mouth to create an expanding awareness

13   and more rapid adoption of new pharmaceuticals by

14   prescribers and other stakeholders."

15         Did I read that right?

16     A.   Yes.

17     Q.   Would you agree that in the context of this

18   case, a KOL is an influential doctor in the field of

19   pain management?

20         MR. CHALOS:  Object to the form.

21     A.   KOL could be a pain management, it could be

22   addiction, it could be just -- in this case, it

23   could have been a general practitioner.  It could

24   have been a nurse, it could have been a lot of

25   different people.

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.    Does simply being a doctor make someone a

2   KOL?

3      A.    No.  The --

4            MR. CHALOS:  Hold on.  Object to the form;

5      incomplete hypothetical.

6      A.    So the requirements for KOL are completely

7   subjective and they are really up to the company

8   hiring the KOL or employing that strategy.  The KOL

9   would be -- and I saw a lot of documents in the

10  record that were evaluations of people who were

11  being considered as key opinion leaders, of

12  databases of people who were either past, present or

13  being considered for the future key opinion leaders,

14  and those people would be evaluated.  Some of them

15  were eliminated because they weren't meeting up to

16  certain criteria.

17           So the whole idea of key opinion leadership

18  is one that is subjective to the company and if the

19  company thinks that it's a person that's an

20  influential prescriber or other type of

21  practitioner, then that's up to them to decide.  The

22  point about what they are is that they are people

23  who influence the opinions of others, and in my

24  report I refer to it -- and it was not my word, it

25  was the word of one of the defendant's witnesses --
```

1     that said key opinion leaders are used to infect

2     other doctors with the ideas that they have.

3        Q.   Do you have any opinion as you sit here

4     today as to whether Actavis worked with key opinion

5     leaders?

6        A.   I think the answer to that is that I do

7     have -- I have seen evidence that Actavis did --

8     well, Actavis I don't know specifically.  Allergan

9     or Actavis, because in my analysis I made a note to

10    try and determine if each company did indeed work

11    with key opinion leaders or have key opinion leaders

12    in their sort of cadre of people that they went to,

13    and I know that I have a schedule in my report that

14    we can look at that's broken down by manufacturer.

15    So we can go to that if you need me to look for a

16    document that shows that.

17       Q.   Sure.  I mean, do you know if Allergan or

18    Actavis worked with key opinion leaders?  Is that

19    part of your opinion in this case?

20       A.   I will let you know.

21            So it appears that for Allergan I have four

22    entries:  Dr. Chester Chorazy, David Sua, a person

23    called Nutel and Stewart Lewis.

24       Q.   Are you looking at -- Dr. Perri, are you

25    looking at Schedule 18 in your report?

```
 1       A.   Yes, "Amounts Paid to Key Opinion Leaders."

 2       Q.   Okay.

 3       A.   Let me finish my review here.

 4       Q.   Sure.  You just let me know when you are

 5   done with your review.

 6       A.   Yes, ma'am.  I'm sorry.  It's taking just a

 7   moment but these materials were originally in a

 8   spreadsheet that was a lot easier to click on tabs

 9   than it is to look through them.

10       Q.   It's easier to search too, I'm sure.

11       A.   Yep.  Okay.  So other than those four I

12   mentioned, I don't see anything else that I can

13   point to at this time.

14       Q.   Okay.  And you've just identified four

15   names, right?

16       A.   Yes.

17       Q.   So let's take a step back.  I know earlier

18   today you mentioned that you read -- I think you

19   said portions of Doug Boothe's testimony in this

20   case.  Is that accurate?

21       A.   Yes.

22            MS. ZOLNER:  Do we have his testimony

23       available?

24            MR. CIULLO:  Uh-huh.

25            MS. ZOLNER:  Can we mark that?  Is that
```

```
 1        Exhibit 31?  It's Page 363.

 2             (Perri Exhibit 31 was marked for

 3        identification.)

 4   BY MS. ZOLNER:

 5        Q.   Dr. Perri, we are going to flip specifically

 6   to Page 363.  Are you aware that Doug Boothe was the

 7   CEO of Allergan?

 8        A.   As I recall, his title was -- I can't recall

 9   his exact title.

10        Q.   Okay.  Well, I'll represent to you that he

11   was the CEO.  And if you could look at Page 363,

12   starting at line 23, I'll read to you the question

13   and I'll eliminate the objections and then read the

14   answer.  Line 23 of page 363 of Doug Boothe's

15   deposition.

16             Question:  Were you aware of any KOL

17        development at either Alpharma or Actavis when

18        you were there?

19             Answer:  As I previously said, we at Actavis

20        did no KOL activity for Kadian or any of our

21        generic approved products.

22             Question:  Were you aware of any KOL

23        development for any opioid products at Alpharma

24        or Actavis?

25             Let's just focus on the first part.  Do you
```

1    see where he said:  Actavis did no KOL activity for

2    Kadian or any of our generic approved products?

3        A.   Yes.

4        Q.   Do you have any basis to dispute that

5    testimony?

6        A.   No.

7        Q.   Now, you referred to Schedule 18 of your

8    report.

9        A.   Uh-huh.

10       Q.   Which is the section about amounts paid to

11   KOLs and you first mentioned Chester Chorazy, right?

12       A.   Yes.

13       Q.   Who is Chester Chorazy?

14       A.   I don't know.

15       Q.   How long has he been a KOL?

16       A.   I don't know.

17       Q.   Who is he employed by?

18       A.   I don't know.

19       Q.   On what basis do you claim he was a KOL for

20   Allergan?

21       A.   On the basis that he is on this list, but we

22   can pull that document and answer those questions.

23       Q.   Do you know anything about Mr. Chorazy's

24   background as a KOL?

25       A.   No, I don't.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you know anything about his area of

 2   expertise?

 3        A.   As I said, his presence on this list tells

 4   me there were amounts paid to him.  That's what I

 5   know.

 6        Q.   Okay.  What about David Sua, Nutal, or

 7   Stewart Lewis, would the answer be the same for all

 8   of those individuals?

 9        A.   Same answer for all of those, yes.

10        Q.   In other words, you don't know who they are

11   and you don't know how long they worked as a KOL?

12        A.   I don't recognize those specific names, yes.

13        Q.   Do you have any opinion as to whether

14   Actavis worked with pain advocacy organizations to

15   promote opioids?

16        A.   I don't think they did.

17        Q.   Do you have any opinion as to whether

18   Allergan worked with pain advocacy organizations to

19   promote opioids?

20        A.   Same answer.

21        Q.   I know this morning a drug called MoxDuo

22   came up, and I don't want to put words in your mouth

23   but according to my notes, I think you mentioned

24   MoxDuo as an example of a drug that never made it to

25   market, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Yes.  It was not approved, right.

2    Q.   Okay.  So it was not approved by the FDA; is

3  that accurate?

4    A.   Not approved by the FDA and not marketed by

5  the company, either one.

6    Q.   Okay.  So that means no patient was ever

7  prescribed MoxDuo?

8         MR. CHALOS:  Object to the form.

9    A.   I guess that's true, yes, unless somebody

10  did something untoward.

11    Q.   And your voice dropped.  I think you said

12  that MoxDuo was never marketed; is that accurate?

13         MR. CHALOS:  Object to the form.

14    A.   That is my understanding, that MoxDuo didn't

15  ever launch.

16    Q.   Do you have any opinion as to whether

17  Actavis was involved in continuing medical education

18  courses?

19    A.   I don't recall.

20    Q.   What about Allergan, do you have any opinion

21  as to whether Allergan was involved in any

22  continuing medical education courses?

23    A.   Again, I don't recall specifically Allergan.

24    Q.   Is there anything that you could use to

25  refresh your recollection on those?

```
 1      A.   Well, if I looked -- if I pulled the Kadian

 2   marketing plans or other marketing plans, perhaps,

 3   that would -- if they were going to do it, it would

 4   be, generally speaking, in the marketing plans, so

 5   we could look at that.

 6      Q.   Yes.  Okay.  So that's going to be Exhibit

 7   Number 32.

 8           (Perri Exhibit 32 was marked for

 9   identification.)

10   BY MS ZOLNER:

11      Q.   I'm going to show you another document,

12   Dr. Perri.  This is ALLERGAN_MDL_01104711, for the

13   record.  The document is titled "Healthcare

14   Compliance Business Rules."

15      A.   Okay.

16      Q.   Have you seen this document before?

17      A.   It does not look familiar to me, but I've

18   looked at a lot of documents.

19      Q.   You have looked at a lot of documents.

20      A.   I'm just beginning.  Let me scan through it

21   and --

22      Q.   Sure.

23           MR. CHALOS:  Is this number 32?

24           MS. ZOLNER:  It is.

25      A.   There are certainly things in here that look
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    familiar to me, but again, I can't say I've seen

 2    this specific document.

 3        Q.   The title of this document is "Sales

 4    Representative's Interactions with Healthcare

 5    Professionals & Patients," correct?

 6        A.   Yes.

 7        Q.   And the effective date of this document is

 8    January 5th, 2010?

 9             MR. CHALOS:   Hold on.  Object to the form.

10        He just said he's never seen this document.  If

11        you are just asking him to read it and say that's

12        what it says, that's one thing, but I don't think

13        you can ask him to affirm that that's true.

14        Q.   Does the document represent that it was

15    effective as of January 5th, 2010?

16        A.   Yes.

17        Q.   If you could look at Page 7, under

18    Educational Grants -- this is Section 12.0.

19        A.   Yes.

20        Q.   Do you see under Section 12.2 in bold it

21    says:  "At this time Actavis will not be offering

22    any educational grants?"

23        A.   It does say that in this document, yes.

24        Q.   Do you have any basis to dispute that

25    Actavis was not offering educational grants at this
```

Highly Confidential - Subject to Further Confidentiality Review

1   time?

2        MR. CHALOS:  Object to the form.

3    A.  So, I -- yeah.  I -- I mean, I'm not

4   disputing that they are not involved.  I don't have

5   a specific recollection of them being involved in

6   these programs, but I'm just uncomfortable drawing

7   conclusions from, you know, this cursory look at

8   this document that I haven't really had a chance to

9   review or a document that I am not exactly sure

10   where it fits into the big picture of things that

11   I've examined in this case.  I know that this --

12   what this appears to be is a document where

13   Allergan/Actavis was sort of setting out the rules

14   of the road for a sales force that they were going

15   to employ.

16    Q.  Right.

17    A.  So it -- it looks like it's consistent with

18   what I would expect to see and it definitely says at

19   this time Actavis will not be offering any

20   educational grants.  What I would point out is that

21   offering of educational grants is typically

22   something you find in the marketing plans for

23   branded products.  So the fact that they are saying

24   they're not going to do it at this time doesn't tell

25   me that they never did it.  It just says they

Highly Confidential - Subject to Further Confidentiality Review

```
 1    weren't planning on doing it right now.

 2       Q.   Right.  But a couple of questions ago I

 3    think that you testified that you don't have any

 4    recollection of whether Allergan or Actavis was

 5    involved in any continuing medical education,

 6    correct?

 7            MR. CHALOS:  Object to the form.

 8       A.   I think what I said was I didn't have a

 9    specific -- a specific program that I could point to

10    that -- yes, so the answer is yes.

11       Q.   What about general?

12            MR. CHALOS:  Object to the form.

13       Q.   Do you have any general knowledge of any

14    continued medical education that Allergan or Actavis

15    was involved with?

16            MR. CHALOS:  Object to the form.

17       A.   As I sit here right now, I can't -- I can't

18    have a -- I don't have an answer for that because I

19    just don't remember.

20       Q.   Okay.  Do you have any opinion as to whether

21    Actavis ever hosted speakers bureaus?

22       A.   Again, I need to look at the Actavis

23    marketing or the marketing plans because --

24       Q.   Have you not looked at those plans?

25       A.   No, I have.  I've just -- I've looked at
```

Highly Confidential - Subject to Further Confidentiality Review

1    hundreds and hundreds of marketing plans and I can't

2    tell you off the top of my head what's in every

3    single one of them.  So if you are going to ask me a

4    specific question about that, I need to look at the

5    marketing plans to see if they laid out plans and

6    then I would know which documents or what to look at

7    to know if those were actually enacted.

8        Q.   Do you have any opinion as to whether

9    Allergan ever hosted speakers bureaus?

10       A.   Same answer.

11       Q.   Okay.  You just -- you don't know as you sit

12   here right now?

13       A.   I would need to look the marketing plans to

14   refresh my memory about what they did or didn't do

15   specifically in each category for all of the

16   categories of marketing that I put in my report.

17       Q.   You understand that Allergan is one of seven

18   manufacturing defendants that has been sued in this

19   MDL, correct?

20            MR. CHALOS:  Object to the form.

21       A.   The list is longer than seven but I

22   understand that that's what we're talking about here

23   today.

24       Q.   In preparation for your deposition today did

25   you do anything to try to determine which

1    manufacturers were involved in what specific

2    marketing activity for purposes of preparation for

3    your deposition today?

4         MR. CHALOS:  Object to the form.

5    A.   I did a lot of review and a lot of

6    preparation for this deposition but, unfortunately,

7    I don't -- I don't have a perfect memory and can't

8    recall every single thing that I've seen.

9    Q.   I understand that, but I think you testified

10   earlier that you spent over 700 hours on this case

11   and you've been paid somewhere around $210,000, and

12   I am sure you spent a lot of time preparing for your

13   deposition today, and one of the key areas of

14   expertise you are providing expert opinion on is

15   peer-to-peer marketing, and I'm asking you questions

16   about that.

17        And so what I'm trying to figure out is if

18   you have any understanding of whether Actavis or

19   Allergan ever hosted speakers bureaus?

20        MR. CHALOS:  Object to the form;

21        argumentative.  It's a long admonishment

22        preceding a question that he's already answered.

23        MS. ZOLNER:  To be clear, I am not trying to

24        admonish the witness at all.  I'm just trying to

25        make sure I understand his answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CHALOS:  Okay.  Then don't admonish him.
 2              MS. ZOLNER:  Agree to disagree on whether it
 3         was an admonishment.  I think we're having a very
 4         pleasant exchange.
 5              MR. CHALOS:  Object to the form.
 6         A.   So a couple of things:  Number one, I didn't
 7    testify that I have been paid $210,000.  I gave that
 8    as an estimate and I said if I get paid everything
 9    that I billed.
10         Q.   Understood.
11         A.   That's number one.
12         Q.   I know how that works.
13         A.   Number two, in my preparation I've looked --
14    I can tell you all kinds of things about Jennifer
15    Altier and the marketing plans for Kadian, I just
16    can't remember as I sit here right now whether
17    continuing medical education or advisory boards were
18    part of all that.  I do recall this, and I will give
19    you this information, that from her testimony, she
20    said that the marketing was basically like a
21    glorified package insert, so my thinking is maybe
22    I'm not remembering because it didn't happen, but
23    until I see the documents, I can't tell you for sure
24    one way or the other.
25              MR. CHALOS:  Why don't we take a break?
```

1      We've been going a little over an hour.

2      Q.   Do you want to take a break?

3      A.   Yes.

4      Q.   Okay.

5      A.   Yeah.

6           MS. ZOLNER:  Let's go off the record.

7           THE VIDEOGRAPHER:  We are now going off the

8      video record.  The time is currently 3:36 p.m.

9      This is the end of Media Number 5.

10          (Recess from 3:36 p.m. until 3:49 p.m.)

11            (Mr. Chalos is no longer present.)

12          THE VIDEOGRAPHER:  We are now back on the

13     video record with the beginning of Media

14     Number 6.  The time is currently 3:49 p.m.

15     BY MS. ZOLNER:

16     Q.   Dr. Perri, do you have any opinion as to

17     whether Actavis ever worked with medical science

18     liaisons?

19     A.   I don't recall specifically in the materials

20     that I reviewed reading about MSLs at Actavis, but

21     the -- I might not have seen that in the marketing

22     documents because MSLs are separate from marketing.

23     I might have seen it as a result of overlap, but I

24     don't recall specific to your -- to your defendant.

25     Q.   What about anything general that relates to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Actavis?

 2        A.   I only saw a couple of documents that

 3    related to MSLs.  There is one place in my report

 4    that I recited -- I cited MSLs with respect to

 5    gathering of information at a -- like an American

 6    Pain Society meeting, and I'm trying to remember

 7    what the section of the report was, but I -- as I

 8    sit here, I would have to look to see which

 9    defendant that was.

10        Q.   But you don't recall specifically that it

11    would have been Actavis; is that right?

12        A.   I don't think it was Actavis, but again, I

13    wish I could type in MSL and go right to that

14    section in my report and give you an exact answer to

15    that question, because it is possible, I just need

16    to look, so --

17        Q.   What about Allergan, do you have any opinion

18    as to whether Allergan ever worked with medical

19    science liaisons?

20        A.   Same answer for Allergan.

21        Q.   Do you have any general opinions as to

22    whether Allergan --

23        A.   Did you or didn't you want me to get an

24    answer to that for you?  Because I was looking --

25        Q.   Oh, I'm sorry.  I didn't realize you were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    looking.

 2        A.    Yeah.

 3        Q.    Dr. Perri, are you looking for where you

 4    talk about MSLs in your report?

 5        A.    Yes.

 6        Q.    Do you want me to give you some help?

 7        A.    It's up to you.

 8        Q.    You might be looking at Paragraph 60.

 9        A.    I'm at 69 going in that direction, so I was

10    in the right place.

11        Q.    Okay.  It's been a long day, so -- ease of

12    reference.

13        A.    Yeah.  So it was Allergan that is the

14    example that I cited in my report.

15        Q.    Are you referring to the line of your

16    report:  Allergan -- for example, Allergan MSLs

17    collected marketing intelligence at an American Pain

18    Society meeting focused on the potential dangers of

19    opioid use; is that right?

20        A.    Yes.

21        Q.    What Allergan MSLs are you speaking of here?

22        A.    Whichever ones the deponent was speaking

23    about in that deposition testimony.  I don't think I

24    have names.

25        Q.    You don't have any names.  Do you know what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    MSLs were collecting the market intelligence at an

 2    American Pain Society meeting?

 3       A.    So I remember this document pretty well but

 4    I don't remember the specifics of who, but I know

 5    there were -- there were sections for -- of input

 6    from MSLs providing what I refer to as market

 7    intelligence on the landscape of the pain -- on the

 8    opioid market.

 9       Q.    Do you know how many MSLs were at that

10    meeting?

11       A.    Without -- and I think -- I think I cite

12    that document in Number 88, so I'm sure if it's

13    important for you to know how many were there, we

14    can pull that document and look at it.

15       Q.    In your report it says:  For example,

16    Allergan MSLs collected marketing intelligence at an

17    American Pain Society meeting focused on the

18    potential dangers of opioid use.

19            It's singular in this report.  Is that

20    accurate?

21       A.    That it was one meeting?  An example, this

22    is a singular example, yes.

23       Q.    Okay.  Let's look at Exhibit 33.

24            MS. ZOLNER:  Thank you.  This is a document

25            that's Bates numbered Allergan_MDL_00194340.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Perri Exhibit 33 was marked for

 2    identification.)

 3              THE WITNESS:  Good idea.  Thank you.

 4              MS. BAISCH:  Do you have another one of

 5      those?

 6              MR. CIULLO:  I do.

 7    BY MS. ZOLNER:

 8      Q.    This document is dated June 27, 2012.

 9      A.    Yes.

10      Q.    And if you go down to the first e-mail, the

11    initial e-mail in this chain, it's from Terrence

12    Fullem.  Do you see where I am?

13      A.    Yes.

14      Q.    It says:  "All, as you know, we have had to

15    let the MSLs and NAMs go due to the CRL on Moxduo."

16              First of all, what is a NAM?

17      A.    National account manager.

18      Q.    Okay.  Do you have any understanding of what

19    this sentence means?

20              MS. BAISCH:  Object to form.

21      A.    So my purpose of citing this MSL example

22    here was to simply show the utility of these kind of

23    personnel within the marketing organization and to

24    demonstrate the role that they could play.  Whether

25    they were fired later on or let go because of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    status of the product they might have been working

2    on, Moxduo not being launched, is really not

3    relevant to my analysis.  What is relevant is this

4    is how MSLs can interact within the marketing

5    organization within a company, that's all.

6        Q.   Understood.  And I'm just trying to

7    understand exactly to what extent Actavis or

8    Allergan used MSLs, and that's why I'm asking these

9    questions, just to get a sense of magnitude or lack

10   of magnitude.

11       A.   Okay.

12       Q.   The NAM that's referenced here, you've

13   defined that.  What about the CRL, what does that

14   acronym stand for?

15       A.   That, I don't know.  I've seen a lot of

16   acronyms that --

17       Q.   I think it might be a misprint and I think

18   it might be CLR -- or CRL, complete response letter?

19       A.   It could be that.  When I first saw it I

20   thought clinical research liaisons, but that doesn't

21   make any sense in the context of the sentence, so --

22       Q.   But this seems to indicate that in this

23   particular instance that you've cited in your

24   report, that the MSLs were released after the FDA

25   rejected the Moxduo product, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. BAISCH:  Object to form.

2       A.   I don't think I cited that in my report.  I

3    think that's evidenced here in this e-mail.

4       Q.   Would you agree that this suggests that

5    Actavis was working with MSLs for purposes of going

6    to market with Moxduo?

7              MS. BAISCH:  Object to form.

8       A.   So given my recollection, even though we

9    don't have the document here in front of us, of the

10   document that's cited in Reference 88, the e-mail

11   and slide presentation, that lists a lot of the

12   factual things that the MSLs actually provided in

13   terms of market intelligence, and given this

14   document, it seems like that the MSLs were used

15   prior to the launch of Moxduo, and at least this

16   document says that the MSLs were let go because of

17   the fact that Moxduo didn't launch.

18      Q.   Are you speculating right now?

19      A.   I mean, I thought I was agreeing with you,

20   actually, but do you have a specific question?

21   Because maybe I --

22      Q.   Let me try to unpack this in a different

23   way.  We talked earlier about the fact that Moxduo

24   was a drug that never went to market, correct?

25      A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And this document that we have marked

 2   Exhibit Number 31 --

 3      A.   33.

 4      Q.   -- 33, thank you, Dr. Perri, suggests that

 5   MSLs were being used for purposes of Moxduo and a

 6   potential launch of that drug, right?

 7      A.   Actually, I don't really read it that way,

 8   it's that because Moxduo wasn't launching, they had

 9   to let them go.  I mean, it could be financial, it

10   could be that they just couldn't afford it anymore.

11      Q.   Fair enough.

12      A.   So I don't try to draw conclusions about

13   that.

14      Q.   Fair enough.  Well, let me ask you a simpler

15   question.  Do you have any basis to believe that

16   Actavis worked with MSLs in connection with any

17   other drug besides Moxduo?

18      A.   Well, I can tell you for sure that any

19   information they gained on the opioid marketplace as

20   a result of their attending of the American Pain

21   Society meeting that I cite in Reference 88 would

22   have benefited the companies marketing organization

23   for any product they were bringing to market.

24      Q.   That wasn't my question.  Do you have any

25   basis to believe that Actavis worked with MSLs in
```

1    connection with any other drug besides Moxduo?

2        A.    Again, you're making the connection that

3    this was completely related to Moxduo and I don't

4    draw that conclusion in my report.

5        Q.    Can you give me other examples of Allergan

6    working -- Allergan or Actavis working with MSLs,

7    other than the document that we're looking at here

8    and the document you cite?

9        A.    Okay.  So let me finish what I was saying.

10       Q.    Sure.  I didn't mean to interrupt you.

11       A.    So the connection that you're making is

12   that -- and it may be true, I don't know the answer

13   to this question, but you're drawing the conclusion

14   that the MSLs in this example were working for

15   Moxduo.  It's possible that's true.  It's possible

16   that it's not true.  I don't -- I don't know the

17   answer to that question based on what I have here in

18   front of me.

19           What I do know is from a marketing

20   perspective, and this is my analysis in the case,

21   what I was concerned about, what I was focused on

22   was did Allergan -- did any of the defendants

23   utilize MSLs in any way related to their marketing

24   organization, because in my experience, MSLs are a

25   valuable resource when it comes to providing

Highly Confidential - Subject to Further Confidentiality Review

 1    information to the marketing department.  And while

 2    they aren't in the sales force, they're a very

 3    valued part of the company and play a vital role.

 4    So I was simply using this as an example to show how

 5    the MSLs could collect information.

 6         These other issues about Moxduo and whether

 7    they were working for Moxduo or for something else

 8    weren't on my radar screen.

 9    Q.   Got it.  Okay.  Will you opine in this case

10    that any particular opioid medication is more

11    dangerous than another?

12    A.   I don't carry a specific opinion about the

13    drugs in this case per se, so no.

14    Q.   What about general?

15    A.   Just that opioids are dangerous drugs,

16    that's all.

17    Q.   But again, you're not going to be opining on

18    any particular opioid medication being more

19    dangerous than another?

20    A.   No, I don't think so, no.

21    Q.   Will you opine that marketing for one type

22    of opioid product is more problematic than others?

23    A.   No, and I'll just -- I will reiterate that

24    my analysis was based on the collective marketing

25    and the marketing is intertwined and you can't

1    single out one drug's marketing from the rest

2    without losing the richness of the context of the

3    marketing of opioids.

4        Q.   You're looking at marketing in an aggregate

5    form, you're not looking at the sum of the parts?

6        A.   I looked at the parts to form the aggregate

7    opinion.

8        Q.   Is it your testimony that you looked at all

9    of the parts?

10       A.   I looked at as many parts as I could locate

11   and had time to analyze, yes.

12       Q.   But again, you're not offering any opinions

13   about any of the specifics about any of the

14   defendants in this case, meaning that when we first

15   started talking earlier today I asked if you were

16   offering any specific opinions about Allergan and

17   Actavis and you said no.

18       A.   That's right.

19       Q.   And I think that would be the case for all

20   of the defendants that are involved in this

21   litigation, correct?

22       A.   It is, but I'm sure that everyone will still

23   ask me that question.

24       Q.   You're right.

25       A.   But just to be 100 percent clear, I don't

Highly Confidential - Subject to Further Confidentiality Review

```
1    have any opinions about any drugs or any particular

2    single actions.  My opinions are the summation of

3    what I've reviewed all taken together.  So while the

4    marketing behaviors were examined individually, in

5    other words, I did look at the Kadian marketing plan

6    by itself, regardless of whether Kadian was a

7    product of your company or some other company, I

8    looked at the Kadian marketing plan, and then beyond

9    that, I looked at the companies to the best degree

10   that I could, and then took all of those companies

11   together to form my aggregate opinion.

12         MS. ZOLNER:  Thank you, Dr. Perri.  I

13      appreciate your time.

14         THE WITNESS:  Thank you.

15         MS. ZOLNER:  I don't have any further

16      questions at this point.

17         THE WITNESS:  Thanks.

18         THE VIDEOGRAPHER:  We are now going off the

19      video record.  The time is currently 4:02 p.m.

20        (Recess from 4:02 p.m. until 4:05 p.m.)

21         THE VIDEOGRAPHER:  We are now back on the

22      video record.  The time is currently 4:05 p.m.

23                    CROSS-EXAMINATION

24   BY MS. BIERUT:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



        Q.   Okay.  And earlier today in response to

19   questioning by Mr. Carter you listed the transcripts

20   you read in full, correct, deposition transcripts

21   that you read in full?

22        A.   Yes.  Yes.

23        Q.   And Mr. Webb's 30(b)(6) deposition was not

24   one of the ones you read in full?

25        A.   I don't believe that it was.  That was, you

Highly Confidential - Subject to Further Confidentiality Review

1    know, based upon a memory of what I was looking

2    through, that list of depositions.  I know that

3    there were several sections of his that I recall,

4    but I can't say for sure, so I didn't include him on

5    the list.

6       Q.   Okay.  And how about Mr. Webb's fact

7    deposition, did you read that as well?

8       A.   See, and that's the part that makes me

9    wonder if I read his 30(b)(6), because it is ringing

10   a bell, but again, I can't promise -- he asked me if

11   I read each and every word of those depositions, and

12   as I recall with Mr. Webb, I read part of his

13   depositions and other parts I skipped over.

14      Q.   How did you identify which parts to read?

15      A.   Well, for example, the parts on people's

16   background and education, if they had been deposed

17   before, I would skip through a lot of that.

18      Q.   Okay.  Let's turn to your report at

19   Page 135, and at "Theme Three:  Opioid should be

20   first-line therapy for pain."

21      A.   Yes.

22      Q.   Did I read that correctly?

23      A.   Uh-huh.

24      Q.   Okay.  And then on Page 136, Note 311, one

25   of the documents you cite here is "Exalgo Account

1    Executive Customer Presentation," correct?

2    A.   Yes.

3    Q.   And it's Bates number MNK-T1_0002321267?

4    A.   Yes.

5    Q.   Did you read this entire document before you

6    cited it?

7    A.   I'm sure I did.  I'd need to look at the

8    document to see what is contained in it so I know

9    for sure.

10   Q.   Yeah.  And are you aware that Exalgo is

11   indicated for a risk-tolerant -- I'm sorry, for

12   opioid-tolerant patients only?

13   A.   Yes.

14   Q.   Okay.

15   A.   Yeah.

16   Q.   Let's go to Page 82.

17   A.   Give me just one second, please.

18        So just in terms of that, this document is

19   cited with respect to breakthrough paper, so I'm

20   pretty sure that's why it's in this reference.  So

21   I'm not sure exactly about your question, but we are

22   within a section but within that section there are

23   different topics being discussed.

24   Q.   Okay.  But you do know that Exalgo is

25   indicated for breakthrough pain -- I'm sorry, for

1    opioid-tolerant patients only?

2      A.   Yes.  I mean, it's once daily dose sort of

3    dictates that that would be the case, yes.

4      Q.   Okay.

5      A.   Good.

6      Q.   Moving toward Page 82 of your report, you

7    state that:  "One of the barriers to opioid

8    prescribing has been the potential for and fear of

9    addiction.  Numerous marketing messages used by

10   Defendants communicated information that supported a

11   change in the paradigm regarding the link between

12   addiction and opioids."

13          Do you see that?

14     A.   I do.

15     Q.   Okay.  And one of your examples is on the

16   next page, Page 83:  "Mallinckrodt's communication

17   of the message that MNK-795 (oxycodone/APAP extended

18   release), 'provides fast-acting and long-lasting

19   relief without concerns about abuse.'"

20          Do you see that?

21     A.   I do.

22     Q.   And then in Footnote 266 --

23     A.   Yes.

24     Q.   -- you state that:  "This is a compound that

25   would come to market as Xartemis."

```
 1              Correct?

 2        A.   Yes.

 3        Q.   So are you aware that Xartemis launched in

 4   March 2014?

 5        A.   About then, yes.

 6        Q.   Okay.  And then -- we're making good time.

 7              Direct you to look at your report on

 8   Page 14.

 9        A.   Page 14?

10        Q.   Uh-huh.  The last bullet on that page -- I'm

11   sorry.

12        A.   Yes.

13        Q.   Okay.  The last bullet on that page is:

14   "Pharmaceutical marketers take advantage of the

15   medical community's reliance on scientific evidence

16   by not only providing science-based messages

17   directly through their marketing, but also through

18   funding and sponsoring clinical research, clinical

19   practice guidelines, and continuing medical

20   education."

21              Do you see that?

22        A.   I do.

23        Q.   And on page 86 is your marketing messages

24   table?

25        A.   Yes.
```

```
 1        Q.    The first entry there is a presentation at a

 2   2015 American Academy of Pain Medicine Annual

 3   Meeting with a Mallinckrodt-sponsored study; is that

 4   right?

 5        A.    Yes.

 6        Q.    And you cite in the Bates column a link to

 7   the abstract?

 8        A.    Yes.

 9        Q.    So was it clear to you from this citation

10   that the study was sponsored by Mallinckrodt?

11        A.    Do you happen to have a copy of the abstract

12   there or --

13        Q.    Not on me.

14        A.    As I recall, and again, lots of documents

15   here, that it was linked to a support by

16   Mallinckrodt.

17        Q.    Okay.  And did you read the study itself?

18        A.    I know I read the abstract at least, yes.

19        Q.    So you have no opinions on the scope of the

20   study?

21        A.    Just what I would glean from the abstract,

22   which is basically included in this paragraph.

23        Q.    And no opinion on the methodology of the

24   study?

25        A.    No, I don't have an opinion on the
```

1    methodology as we sit here.

2         Q.    And no opinion on whether the conclusion was

3    sound from a clinical perspective?

4         A.    No.

5              MS. BIERUT:  That's it for me.  Thank you.

6              THE VIDEOGRAPHER:  We are now going off the

7    video record.  The time is now currently

8    4:13 p.m.

9         (Recess from 4:13 p.m. until 4:16?p.m.)

10             THE VIDEOGRAPHER:  We are now back on the

11   video record.  The time is currently 4:16 p.m.

12                        CROSS-EXAMINATION

13   BY MR. HENNESSY:

14        Q.    Good afternoon, Dr. Perri.  My name is Sean

15   Hennessy and I'm with the law firm Arnold & Porter

16   and I'm here today on behalf of the Endo and Par

17   Pharmaceutical defendants.  I understand that I'm

18   the last person that stands between you and the

19   door, so I will do my best to be appropriately

20   focused with my questions.

21        A.    Thank you.

22        Q.    Am I correct that you are not offering any

23   Endo-specific opinions in your report?

24        A.    Yes, you are.

25        Q.    Okay.  And I'm also correct that you're not

Highly Confidential - Subject to Further Confidentiality Review

```
 1    offering any Par-specific opinions in your report?

 2        A.    That would be correct.

 3        Q.    And to put a finer point on that question,

 4    specifically, you're not offering any opinion in

 5    this case that any of Endo's marketing statements

 6    were false or misleading?

 7        A.    I was relying on other experts to make that

 8    judgment, if they made it.

 9        Q.    And you've stated in your report that the

10    assumption, relying on other experts, is consistent

11    with FDA documents, in particular warning letters,

12    regarding the false and misleading nature of

13    defendants' marketing; is that correct?

14        A.    For some products, yes.

15        Q.    Okay.  To your knowledge did Endo receive

16    any warning letters for any of its Opana promotional

17    materials?

18        A.    I can't recall, and I know that there is a

19    citation that lists all the drugs here in the

20    report, and there are about 11 or 12 that are named.

21    I just, as I sit here, I can't recall if Opana is

22    one of them.

23        Q.    And if the citations in your report don't

24    include any FDA warning or other letters regarding

25    Endo's Opana labeling, is it fair to say that you're
```

1   not aware of any?

2       A.   I'm not aware of any in addition to this,

3   that's right.

4       Q.   Okay.  And we've talked a little bit or a

5   lot today about Table II in your report.  I noticed

6   that Table II in your report doesn't include any

7   Endo marketing statements regarding Percocet.  Does

8   that sound right?

9       A.   That's probably correct, yes.

10      Q.   Does any part of your opinion concern Endo's

11  marketing of Percocet?

12      A.   That is a more difficult question to answer

13  because the opinion apply -- my opinion applies to

14  all opioids being marketed, because it's my -- it's

15  my contention that the marketing by any -- the

16  marketing of any opioid is impacting the marketing

17  of all opioids by virtue of the impact that it has

18  on the marketplace, the education of physicians and

19  other prescribers, the other stakeholders, the

20  supply chain, so it's all interrelated.

21      Q.   Is it fair to say that you haven't

22  identified any specific messages relating to

23  Percocet that Endo used?

24      A.   I'm sure that's true.  There may be -- there

25  may be messages in the more complete listing of

1    search -- the search results for marketing messages

2    that I requested contains a lot of documents that I

3    didn't cite in Table II, so there may be some in

4    there related to Percocet, but as I recall, I have

5    not seen specific marketing documents related to

6    Percocet other than perhaps a marketing plan, an old

7    marketing plan or something like that.

8        Q.    Am I correct that you have not attempted to

9    measure the extent to which Endo's marketing

10   influenced opioid prescribing decisions?

11       A.    Yes.  So my opinion is that opioid marketing

12   influenced prescribing decisions, but I did not

13   undertake any analysis to assign blame or

14   percentages to any one drug or any one manufacturer.

15       Q.    Okay.  Are you offering any opinion as to

16   which doctors in Summit or Cuyahoga Counties

17   prescribed opioids because they were influenced by

18   Endo's marketing?

19       A.    I think my opinion is, is that all doctors

20   in Summit and Cuyahoga Counties were influenced by

21   opioid marketing, but I cannot draw a link between a

22   particular ad and a particular doctor and say that

23   this ad caused that doctor to do some other

24   behavior.  I've been asked that question a lot of

25   times today and I guess I am struggling with some

1    way to answer it better, because I don't seem to be

2    getting my point across very well with it, but at

3    the end of the day, from a marketing perspective,

4    opioid marketing impacted doctors' prescribing.  We

5    see that in the results the companies obtained

6    themselves in their marketing metrics and other

7    documents.

8         So to say that there is no link between

9    them, I can't do that, but again, I haven't

10   quantitated it and I can't point to a specific

11   doctor.

12   Q.   And you can't point to a specific

13   manufacturer related to a doctor either; is that

14   correct?

15   A.   That's right.  My analysis was in the

16   aggregate, so I wouldn't point -- I wouldn't point

17   to any one manufacturer.

18   Q.   Okay.  Yesterday, if my memory serves me

19   correctly, I believe you testified that you reviewed

20   defendants' sales calls notes; is that correct?

21   A.   Yes, but I think the sales calls notes were

22   primarily from just a couple manufacturers.  I think

23   it was primarily Purdue.

24   Q.   Do you remember if you reviewed Endo's sales

25   call notes?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I don't recall Endo's sales call notes.

2    Q.   And so fair that you didn't identify any

3    Endo sales call notes indicating that any doctor

4    changed his or her prescribing decision in any way

5    as a result of Endo's marketing?

6         MS. BAISCH:   Object to form.

7    A.   I think my answer to your previous question

8    would require me to answer that question the same

9    way, is that I don't -- I didn't do that analysis to

10   assign a doctor's behavior to a particular cause on

11   the marketing side.

12   Q.   Can you say to a reasonable degree of

13   scientific certainty that the opioid crisis would

14   look any different in Cuyahoga or Summit Counties if

15   Endo did not market and sell opioids?

16   A.   You know, that's -- again, that's not

17   something that I examined, but if you -- if you look

18   at my opinions and my Opinion 7 is that the opioid

19   marketing expanded the opioid market.  If you were

20   to take -- in a hypothetical situation, if you were

21   to take one manufacturer out, that would have left

22   some kind of a void, would somebody else have filled

23   that void?  I just don't know the answer to that

24   question, so I think the answer is I don't know.

25   Q.   Okay.  Do you have Exhibit 1 in front of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you, your report?

 2         A.   I do, yes, sir.

 3         Q.   My understanding is that you identified

 4    three marketing themes that you allege were used by

 5    the defendants in this case, and one of those

 6    themes, which I believe is cited on Page 82 of your

 7    report, is that -- I'm quoting it.  I should quote

 8    from the document.

 9              Is that:  "Dependence, tolerance, addiction

10    and withdrawal should not be a concern in

11    prescribing opioids."

12              Is that correct?

13         A.   That is one of the themes that I settled on,

14    yes.

15         Q.   Okay.  And I believe you testified that you

16    reviewed the FDA-approved prescribing information

17    for the defendants in this lawsuit; is that correct?

18         A.   Yes.  I said that I made an effort to find

19    the package inserts for the various products

20    involved in this litigation over time, and while I

21    can't -- I don't have a table that says I saw one

22    from each year, I think I've seen the vast majority

23    of the PIs that were available.

24         Q.   Do you recall whether you reviewed Endo's --

25    any of Endo's FDA-approved PIs for Opana ER?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I'm sure I did, yeah.

 2        Q.    Are you aware that Endo's FDA-approved Opana

 3   ER PI warned about the risks of dependence,

 4   tolerance and addiction?

 5        A.    Yes, I am.

 6        Q.    And are you aware that among other places,

 7   those risks were warned about in the black box

 8   warning section of Endo's Opana ER PI?

 9        A.    Yes.

10        Q.    You got a question earlier today about the

11   meaning or the significance of a black box warning,

12   and is it fair to say that a black box warning is a

13   concise and prominent way to warn about the serious

14   risks associated with a prescription opioid product?

15        A.    Precise I would agree with you.  Prominent

16   with respect to the PI itself, but in terms of the

17   overall marketing, no, I wouldn't agree with that,

18   so --

19        Q.    But as to the PI, would you agree with that

20   statement, that the black box warning is a concise,

21   prominent warning containing the serious risks

22   associated with an opioid product?

23        A.    And if you add to that within the PI --

24        Q.    Within the PI?

25        A.    Yes.
```

```
 1        Q.    In your review did you identify any

 2   FDA-approved PIs for Opana ER that did not warn

 3   about the risks of dependence, tolerance and

 4   addiction?

 5        A.    No, I did not.

 6        Q.    I believe you've acknowledged in your

 7   report, and in your testimony as well, that

 8   pharmaceutical manufacturing materials -- excuse me.

 9   Strike that.

10             I believe that you've acknowledged in your

11   report and in your testimony that pharmaceutical

12   manufacturers' marketing materials must be

13   consistent with the FDA-approved PI; is that

14   correct?

15        A.    Yes, and beyond that I've said that the PI

16   provides the boundaries as far as, you know, the

17   latitude that you have to -- the information.  So

18   it's not surprising at all that many of the

19   marketing messages are things that are found in the

20   PIs, as we've seen in some of the other testimony

21   and documents that I've been shown today.

22             The thing that I feel like it's overlooked

23   in all of this is two things:  Number one is that

24   the PI is not a prominent piece of information that

25   people, you know, are constantly relying on, are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    constantly being exposed to, and the other is, is
 2    that it -- the information in the PI is expected to
 3    be communicated in marketing.  That's why so many
 4    times it's shown up in Table II.  The question is
 5    what does all that marketing do, and that's what
 6    I've tried to analyze in my report.
 7        Q.   I believe that you also testified that
 8    you've reviewed sales training materials as part of
 9    your analysis; is that correct?
10        A.   I have reviewed some sales training
11    materials, yes.
12        Q.   Did you review Endo's sales training
13    materials?
14        A.   I would have to look to see specifically
15    what from Endo I might have seen.  The sections in
16    my report that deal with objection handlers and
17    those types of sales training materials would be
18    where I would go to look.
19        Q.   If it's helpful, there are a couple of sales
20    training materials for Endo that you cite in
21    Table II.
22        A.   Okay.
23        Q.   So that would suggest that you, as part of
24    your analysis, you reviewed Endo sales training
25    materials?
```

```
 1       A.    At least -- at least those documents, yes,

 2    and my expect -- if they are cited in Table II, my

 3    expectation is they are probably cited elsewhere

 4    too.

 5       Q.    Are you aware that Endo trained its sales

 6    representatives on the promotional messages that

 7    were approved for use with healthcare providers?

 8       A.    The -- I think I answered that just a moment

 9    ago when I said that the PI sets out the boundaries

10    and that the messages contained in the PI are the

11    ones that I would expect to see in the sales

12    training materials, so I think yes.

13       Q.    Okay.  And as part of your analysis did you

14    learn that Endo provided its sales reps with

15    approved promotional materials that they were

16    permitted to use when they were detailing healthcare

17    providers?

18       A.    Yes, Endo and others were -- had materials

19    that they had both approved for use and materials

20    that were not for general distribution, yes.

21       Q.    And often the materials that fall under the

22    latter category, not for general distribution, were

23    labeled as such with a footer or other sort of

24    marketing; is that correct?

25       A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Did you cite any materials that fall under

 2   that latter category, that were not for promotional

 3   use in Table II, do you recall?

 4      A.   I don't recall off the top of my head.  I

 5   feel like in my report, though, there are places

 6   where materials that were not intended for

 7   distribution were cited, yes.

 8      Q.   You testified yesterday, I believe --

 9      A.   Can I add something to that?

10      Q.   Sure.

11      A.   Specifically with respect to Endo, I know

12   that there were materials that are cited with regard

13   to Endo in particular that were never distributed.

14   Whether they were marked not to be distributed or

15   not, I can't recall, because it was -- it was -- the

16   example that's coming to mind is one that, as I

17   mentioned this morning, and you maybe are going to

18   ask me --

19      Q.   I'm going to ask you about that.

20      A.   Okay.  Well, I'll just save it.  That's

21   fine.

22      Q.   I believe you testified yesterday that you,

23   in your analysis, you relied on defendants'

24   marketing plans; is that correct?

25      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And you would agree that marketing plans are

 2   not used by pharmaceutical companies in their

 3   communications with healthcare providers; is that

 4   fair?

 5      A.   Yes, that's fair.  The marketing plans are

 6   internal company documents that are very detailed,

 7   very specific, very much the rules of the road when

 8   it comes to what we're going to do and not going to

 9   do, and they are intended to guide and direct the

10   marketing effort.

11      Q.   And you haven't seen any instances where

12   Endo's sales representatives took a marketing plan

13   out into the field and presented that to a doctor;

14   is that correct?

15      A.   I have not, and that wouldn't make any sense

16   for them to do that.  It wouldn't be relevant to

17   their -- to their efforts with the doctors, but what

18   the marketing plans do map out is the strategy, the

19   themes, the core messages, the focus.

20      Q.   Marketing plans are not distributed to

21   anyone outside the company for promotional purposes?

22      A.   In my experience, I have not seen that

23   happen, no.

24      Q.   Are you familiar with Endo's master visual

25   aids for Opana ER?
```

```
 1        A.    Master visual aids?  That's not ringing a

 2   bell.

 3        Q.    Okay.  There is one that you --

 4        A.    Oh, yeah.

 5        Q.    There is one that you cite and I'm going to

 6   show you that one in a moment.  You cite it in

 7   Table II.  I'm just curious, do you recall whether

 8   or not you reviewed all of the master visual aids

 9   for Endo for Opana ER, or just that single --

10        A.    The whole concept of the master visual aids,

11   I recall that term now, and I know that there were

12   numerous visual aids that were referred to in that

13   context, yeah.

14        Q.    Do you understand that that master visual

15   aid for -- as far as Endo goes, it's the primary

16   document that Endo's sales representatives were

17   required to use when they were detailing doctors?

18        A.    As I recall, that was the purpose of that

19   document.

20        Q.    In formulating your report, did you consider

21   Endo's guidance to its sales representatives

22   concerning the information that they were required

23   to present to healthcare providers?

24        A.    Could you do that one more time.

25        Q.    Sorry.
```

```
 1      A.   I lost you on the front end of that.

 2      Q.   Let me go a little slower on this one.  In

 3   formulating your report, did you consider Endo's

 4   guidance to sales representatives concerning the

 5   information that they were required to present to

 6   healthcare providers?

 7      A.   Yes.

 8      Q.   Okay.  And so do you understand that Endo's

 9   sales representatives were required to present the

10   complete indication for Opana ER?

11      A.   Yes, I do know that.

12      Q.   And do you understand that Endo's sales

13   representatives were required to present the product

14   risks when they were detailing doctors?

15      A.   The Opana marketing plans definitely would

16   support that, yes.

17      Q.   And do you understand that Endo's sales

18   representatives were specifically instructed that

19   they must present the black box warning and the

20   important safety information for Opana ER?

21      A.   Yes.  Also, the marketing plans would

22   support that.

23      Q.   Okay.  Are you aware that Endo monitored its

24   sales representatives to ensure that they complied

25   with these promotional policies?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   I know Endo monitored its employees, yes, to

2    the extent for monitoring that specific -- those

3    specific behaviors, and others, such as their sales

4    performance and so forth.

5       Q.   You identified in your report, I think it's

6    maybe in a couple places, the PhRMA, P-h-R-M-A, Code

7    of Interactions with Healthcare Providers as an

8    example of a standard that pharmaceutical companies

9    should adhere to in their marketing.  Is that right?

10      A.   That's correct.

11      Q.   Are you aware that Endo voluntarily adopted

12   the PhRMA code?

13      A.   I don't know that I was aware of that or

14   not.  I know that -- my understanding is, is that

15   all companies have adhered -- voluntarily adhered to

16   that.

17      Q.   Are you aware that Endo incorporated the

18   PhRMA code into its own compliance policies

19   requiring that all of its employees follow those

20   requirements?

21      A.   I don't have an opinion one way or the other

22   about that.  I -- it sounds like it would be

23   correct, if they are voluntarily adhering to the

24   code.

25      Q.   Is that something that you considered in
```

```
 1    formulating your opinion?

 2    A.   So, you know, in the opinion it -- there are

 3    different levels of adherence to the code.  I mean,

 4    at one level we have:  "Hey, that's a great idea."

 5         At another level:  "What are we doing in

 6    your planning?"

 7         In another level:  "What are we doing

 8    operationally?"

 9         But the analysis that I undertook was

10    slightly different than that.  It was to examine the

11    marketing of the opioids without respect to Endo or

12    Allergan or anybody else, but to look at the

13    marketing that was implemented for the opioids, and

14    then to assess at the end of the day did that

15    marketing, not Endo or somebody else, but did that

16    marketing violate principles in those codes, and

17    that was the analysis that I undertook.

18         That's why looking at the individual

19    behaviors of each company or for each drug were

20    important, but at the end of the day, what was most

21    important in my analysis was what did the

22    marketing -- what was the impact of the marketing,

23    why was it done, what impact did it have.

24    Q.   You talked about -- this may be my

25    characterization -- a couple of different ways that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you could implement or adopt the PhRMA code.  Do you

 2    happen to know specifically how Endo went about

 3    adopting that code and incorporating it into its

 4    compliance policies?

 5        A.   So, again, with regard to Endo specifically,

 6    I didn't do that analysis.  I looked at the

 7    marketing, I looked at the marketing for Opana and

 8    how that fits into the big picture of marketing for

 9    opioids, and then assessed whether the marketing of

10    opioids adhered to that code.

11        Q.   Do you understand that Endo took

12    disciplinary action against sales representatives

13    that failed to adhere to its compliance policies?

14        A.   I don't have specific examples that I

15    recall, but I'm sure that that's consistent with

16    what my expectation would be for a pharmaceutical

17    company.

18        Q.   And as part of your analysis, did you review

19    Endo's compliance policies?

20        A.   I know I've reviewed compliance policies but

21    I can't specifically cite to an Endo document, no.

22        Q.   Are you familiar with Endo's policy that it

23    only promoted Opana ER to experienced opioid

24    prescribers?

25        A.   I recall from the Opana marketing plans that
```

 1    that was -- that was the strategy that was employed,

 2    yes.

 3        Q.   Do you agree that experienced opioid

 4    prescribers are more likely to understand the risks

 5    associated with opioids?

 6        MS. BAISCH:  Object to form.

 7        A.   That, I don't know for sure.  You know, that

 8    fits into marketing a couple of different ways.

 9    Experienced prescribers could be high prescribers,

10    but they might not be, they might just be more

11    experienced.  So it would have a different impact on

12    the marketing assess -- marketing analysis,

13    depending on the outcome of that.

14         In terms of the -- whether or not, you know,

15    that impacted my analysis of Endo, it was part of

16    Endo's marketing but again, I didn't look at Endo's

17    marketing, I looked at the marketing of opioids.

18        Q.   As part of your analysis did you become

19    familiar with Endo's internal promotional material

20    review process?

21        A.   I am aware that they have a promotional

22    review committee or a process for that.  I did not

23    undertake to assess the rules their -- the rules of

24    the road or the criteria that they use.

25        Q.   And so you -- fair to say you didn't factor

Highly Confidential - Subject to Further Confidentiality Review

```
1    the policies and procedures of that committee into

2    your analysis or your opinions?

3        A.   Again, I wasn't looking at the integrity of

4    their marketing messages.  I was looking at what the

5    messages were.  So I didn't need to undertake that

6    analysis to understand, you know, if it was approved

7    or not approved.  I assume that anything that made

8    it to market was approved.  I know that there are

9    plenty of documents that discuss, you know, this is

10   being forwarded for approval or it's going to be

11   sent, or this has not yet been approved, so don't

12   use it for this or that or the other.

13          Again, the level of analysis that I did

14   was -- that wasn't critical.  I needed to understand

15   what messages were used, if they were approved or

16   not approved, okay, but the messages that were

17   employed and what was the impact of those messages.

18       Q.   Okay.

19          (Perri Exhibit 34 was marked for

20   identification.)

21   BY MR. HENNESSY:

22
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1 ████████████████████████████████████████

▓ █████████████████████████████

▓                    ████████████████████████████████████████

▓ ████████████████████████████████████████████

▓    ███████████████████

▓      ████   ██████

7    Q.    You can put this one aside for a moment -- I

8    think for good.

9         I'm going to ask you about Table II,

10   although I don't think you need to look at it.  I

11   believe you testified that Table II includes

12   references from documents that you know never became

13   live actual marketing documents that were used in

14   the field.  Is that fair?

15   A.    I don't know that they were never used in

16   there, but I know they were not used in the form

17   they were presented in Table II, yes.

18   Q.    So if they were used --

19   A.    They would have been corrected.

20   Q.    -- they would have been corrected?

21   A.    Yes.

22   Q.    Okay.  Is it fair to say that Table II

23   contains other documents that you don't know one way

24   or the other if they ever turned into public

25   marketing messages?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I -- it's fair to say that there are

2   certainly other documents that didn't make it to

3   market, for example, there are documents related to

4   Moxduo in here, so it's fair to say that there are

5   some but I wouldn't say that it's the predominance

6   of the documents by any means.

7        Q.    I looked through --

8   ████ ████████████████████████████ ████████████

    █ ████████████████████████████████████████████████

    █ █████████████████████████████████████████████

    █ ████████████████████████████████████████

    █ ██████████████████████████████████████████████

    █ ███████████████████████████████████████

    █ ██████████████████████████████████████████████████

    █ ██████

    █        ████████████████████████████████████

    █ ████████████████████████████████████████

    █ █████████████████████████████████████████████

    █ ██████████████████████████████████████████

    █ ██████ ██████████████████████████████████████████

    █ ████████████████████████████

22            And, you know, as I've been answering

23   questions for the last two days, I've tried to make

24   that clear, that I didn't evaluate the messages from

25   a falsehood perspective, it was simply what messages
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    were being used.
2          So that's why it didn't really matter if it
3    was for internal use only or external use.  It
4    didn't really matter if -- you know, for example,
5    with the Endo document in Table II that never got
6    used because it was incorrect, it was to simply show
7    the processes that were in place and how the
8    marketing messages were developed.
9      Q.    Okay.  So to your last point, I looked
10   through Table II.  By my count there are at least 18
11   Endo documents that are internal documents that
12   weren't actually approved in final promotional
13   pieces, that weren't documents that were ever used
14   with doctors.
15     A.    Okay.  Would that include Exhibit 34?
16     Q.    I didn't include Exhibit 34 in there because
17   it's a sales training document and those messages
18   were delivered to doctors.
19     A.    Okay.
20     Q.    These were more of the category of marketing
21   plans, other internal use only documents.
22     A.    Okay.  So, again, with any of the
23   documents that -- so 18 -- first of all, there are
24   hundreds of documents in these table -- in Table II,
25   but when you said there were marketing plans, for
```

Highly Confidential - Subject to Further Confidentiality Review

1    example, the marketing plans would never have been

2    expected to be distributed to customers, even though

3    they would have contained core messages that might

4    have been.

5         So we have to be careful not to, you know,

6    distort the view of what we're actually looking at,

7    messages that were contemplated, messages that were

8    implemented, some that were not ever presented to

9    customers, I think that's a very small number,

10   certainly not 18, and overall, I think we just have

11   to understand that this table is simply to identify

12   messages that were found in the marketing materials

13   without making judgment about those messages.

14   Q.   If you don't mind, I would just like to ask

15   a couple more questions about Table II and I think

16   we're close to wrapping up.

17        If a message is from an internal document

18   and you haven't cited a document where that specific

19   message was ever used with a healthcare provider, is

20   it fair to say that you're not going to offer the

21   opinion that that statement from the internal

22   document influenced any prescribing decision?

23   A.   Yes, I absolutely agree with that.  I would

24   never make that quantum leap, that a message that

25   was never presented to a customer influenced

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10      Q.   Did you find an example where a final piece

11   was ever used?

12      A.   I haven't found that yet, but I need to look

13   for that if I'm going to say that it was used.

14      Q.   And I looked and was not able to find a

15   final example of this piece being used.

16      A.   I want to ask -- I want to ask a question

17   but I know that's not my -- so --

18           MR. HENNESSY:  Thank you very much for your

19      time.  I appreciate it.

20           THE VIDEOGRAPHER:  We are now going off the

21      video record.  The time is currently 4:55 p.m.

22      This is the end of Media Number 6.

23           (Whereupon, the deposition concluded at

24      4:55 p.m.)

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 C E R T I F I C A T E

 2            I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby certify

 5    that, pursuant to notice, the deposition of MATTHEW

 6    PERRI, III, BS Pharm, Ph.D., RPh, was duly taken on

 7    Wednesday, April 24, 2019, at 8:35 a.m. before me.

 8            The said MATTHEW PERRI, III, BS Pharm, Ph.D.,

 9    RPh, was duly sworn by me according to law to tell

10    the truth, the whole truth and nothing but the truth

11    and thereupon did testify as set forth in the above

12    transcript of testimony.  The testimony was taken

13    down stenographically by me.  I do further certify

14    that the above deposition is full, complete, and a

15    true record of all the testimony given by the said

16    witness, and that a review of the transcript was

17    requested.

18

19    _____

20    Susan D. Wasilewski, RPR, CRR, CCP

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

```
 1                        - - - - - -

 2                      E R R A T A

 3                        - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____   _____

 6       REASON: _____

 7     _____   _____   _____

 8       REASON: _____

 9     _____   _____   _____

10       REASON: _____

11     _____   _____   _____

12       REASON: _____

13     _____   _____   _____

14       REASON: _____

15     _____   _____   _____

16       REASON: _____

17     _____   _____   _____

18       REASON: _____

19     _____   _____   _____

20       REASON: _____

21     _____   _____   _____

22       REASON: _____

23     _____   _____   _____

24       REASON: _____

25
```

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, _____, do hereby

 4   acknowledge that I have read the foregoing pages,

 5   352 through 669, and that the same is a correct

 6   transcription of the answers given by me to the

 7   questions therein propounded, except for the

 8   corrections or changes in form or substance, if any,

 9   noted in the attached Errata Sheet.

10

11

12   _____

13   MATTHEW PERRI, III, BS Pharm, Ph.D., RPh        DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   _____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```