IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------    )
IN RE: NATIONAL             ) MDL No. 2804
PRESCRIPTION OPIATE         )
LITIGATION                  ) Case No.
------------------------    ) 1:17-MD-2804
                            )
THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster
ALL CASES                   )
------------------------    )
```

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


VIDEOTAPED DEPOSITION OF

DOUGLAS PETERSON


December 20, 2018


Chicago, Illinois


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 16

1    conceptualizing phase?

2        A.   I do both.  I will guide and sometimes

3    design for them or help.

4        Q.   So, are you the one coming up with new

5    plans or programs that need to be implemented or

6    are you the one who gets tasked with actually

7    making sure the plan gets put into place?

8        A.   We are told they need a new program and

9    I basically assign that to a person and try to get

10   it implemented.  Design it and then write the code

11   to implement the programs that they ask for.

12       Q.   So, somebody higher up than you --

13       A.   Yes.

14       Q.   -- tells you that they need a solution

15   to an issue?

16       A.   Yes.

17       Q.   And then you help design and implement

18   the solution?

19       A.   Yes.

20       Q.   You don't make the decision that we need

21   a solution to some issue, whatever it is?

22       A.   No.

23       Q.   You receive an order from somebody

24   higher up and you make sure it gets done?

Page 17

1        A.   Yes.

2        Q.   I got a little sidetracked.  Remind me

3    what you said, the first interaction you had with

4    controlled substances in the early 2000s.

5        A.   I helped build a system for us to

6    warehouse and distribute to our stores controlled

7    drug substances.  C-II as we would refer to them

8    as.

9        Q.   Do you know how long Walgreens has been

10   distributing C-IIs?

11       A.   I don't believe they distribute any

12   longer.  They stopped sometime in I think late

13   2000, but I don't remember exactly.

14       Q.   Okay.  If I said 2013, 2014, would that

15   sound accurate to you?

16       A.   It could be, yes.

17       Q.   My question is a little bit different.

18   Do you know when Walgreens began distributing

19   controlled substances to their own stores?

20       A.   That would have been sometime around the

21   early 2000s.

22       Q.   So, you assisted with implementing a

23   process that assisted Walgreens with distributing

24   controlled substances to their stores?

5 (Pages 14 to 17)

Page 18

1    A.   Yes.

2    Q.   Generally describe what program you were

3 asked to implement in the early 2000s.

4    A.   We were asked to implement an order and

5 picking system as well as a system to print the

6 C -- or the DEA 222 form via a printer instead of

7 having to handwrite them, and then basically

8 maintain the C 22 forms -- the DEA 222 forms, and

9 then that's basically it.

10       The stores would order.  We process that

11 order.  We decide if we are in -- if we have the

12 product in our DC or if it needs to be sent to a

13 jobber, which is a distributor outside of us, and

14 then we would split the order, pick the ones in our

15 DC, send the forms for the other orders, ordered

16 lines to the jobber --

17   Q.   Okay.

18   A.   -- to be picked.

19   Q.   I want to -- you used a couple terms

20 there that I want to make sure that I understand.

21   A.   Sure.

22   Q.   First you said "jobber."  Would it be

23 fair to say that that is an outside vendor, such as

24 Cardinal Health, AmerisourceBergen, McKesson, those

Page 19

1 types of?

2    A.   Yes.

3    Q.   You keep using the term "DC."  Do you

4 mean distribution center?

5    A.   Sorry.  Yes, distribution center.

6    Q.   Okay.  At some point in time in the

7 2000s were you involved in writing or implementing

8 a program that would identify line item limits for

9 orders of controlled substances?

10   A.   Line item limits, no.

11   Q.   What was the next project you worked on

12 related to controlled substances after implementing

13 a system to pick and ship controlled substances?

14   A.   Would have been opening of the next --

15 our next DC.

16   Q.   What was the first DC that opened?

17   A.   Orlando.

18   Q.   What was the second one?

19   A.   Perrysburg.

20   Q.   And these are DCs meant for

21 Schedule IIs, correct?

22   A.   Yes.

23   Q.   Briefly what did you have to do as it

24 relates to the Perrysburg distribution center as

Page 20

1 far as opening?

2    A.   Just setting up the environment, making

3 sure all the programs are there, make sure they

4 tested, make sure they work.  That basically is it.

5 They were already written, so...

6    Q.   What's the next thing you did?

7    A.   That would have been the Woodland

8 distribution center.

9    Q.   Just setting it up, same thing?

10   A.   Same thing.

11   Q.   Okay.  And those are the only three

12 distribution centers Walgreens ever had that

13 distributed C-IIs, correct?

14   A.   That I'm aware of, yes.

15   Q.   Okay.  After you assisted getting these

16 three distribution centers set up in what you

17 believe is the early 2000s, what was the next thing

18 you did related to controlled substances?

19   A.   Really nothing.  Supported them.  So, if

20 something broke, I would fix it, help fix it or

21 assign someone to fix it.

22   Q.   Are you aware of the concept that

23 Walgreens has certain obligations related to

24 controlled substances under federal statutes and

Page 21

1 federal regulations?

2    A.   No, I am not.

3    Q.   Are you aware of the concept of

4 reporting suspicious orders of controlled

5 substances?

6    A.   No.

7    Q.   Have you had any involvement in your

8 time with supply chain logistics related to

9 implementing thresholds or excessive query reports?

10   A.   We have an excessive order query that

11 was written for all of our distribution centers

12 that would look at orders before we processed them

13 through our system.

14   Q.   Okay.  And were you involved with

15 writing that excessive order query?

16   A.   I was -- I believe I was involved or I

17 was leading someone to actually write it.

18   Q.   Okay.  And when did that process happen?

19   A.   That would have been in early 1990s when

20 we went to our new distributions -- our warehouse

21 management system.  Sorry.

22   Q.   Okay.  I want to make sure we got our

23 dates right.

24       So, you think in the early 1990s is when

6 (Pages 18 to 21)

Page 22

1    you wrote the -- what would you call it?  Is it an
2    excessive quantity query, excessive order query?
3        A.   Excessive order query.
4        Q.   And you've told me a couple times that
5    you believe the C-II distribution from Walgreens
6    began in the early 2000s, correct?
7        A.   I believe so, yes.
8        Q.   But this excessive order query was
9    written you believe in the early '90s?
10       A.   Yes.
11       Q.   And what involvement did you have in
12   writing the excessive order query?
13       A.   I probably led the -- I'm trying to
14   remember exactly, but I know I led my team or a
15   team member in how to write it and get it created.
16       Q.   Do you remember who else you worked with
17   on that?
18       A.   I don't.  I'm sorry.  No.
19       Q.   Okay.  What was the purpose of
20   implementing an excessive order query?
21       A.   The purpose of it is to try and catch
22   invalid -- product that was entered in excess of
23   what should normally be a normal value.
24       Q.   Would it be fair to characterize it as

Page 23

1    an inventory management type system?
2        A.   It's not really a management system.  It
3    just looked at orders that came in from a store,
4    checked against a value and if it was larger than
5    that, put it on a report.
6        Q.   Why did you want to see orders that
7    might be larger than a certain value?
8        A.   Because if product is not really wanted
9    and it was a mistake, then there was a lot of
10   excessive work that needed to be done both from the
11   distribution center and the store.  So, if it could
12   be prevented upfront, it would save trouble for
13   all.
14       Q.   So, the excessive order query was
15   implemented to catch mistakes that were coming in
16   from the Walgreens stores?
17       A.   Yes, on orders, yes, quantities.
18       Q.   Walgreens didn't want to have a
19   situation where they had an order come in with an
20   extra zero on it where they shipped the product to
21   the store and then had to go through the hassle of
22   getting it back?
23       A.   Yes.
24       Q.   And that process was in place for a

Page 24

1    significant period of time before Walgreens began
2    distributing any controlled substances?
3        A.   Yes, it was.
4        Q.   Anything change about the excessive
5    order query when Walgreens began distributing
6    controlled substances?
7        A.   No.
8        Q.   Any amendments or modifications made to
9    the excessive order query?
10       A.   We had to put their distribution center
11   number into the query so it would only look at its
12   orders and not pick up anything else.
13       Q.   But you didn't have to change the
14   formula?
15       A.   Nope, no.
16       Q.   There weren't any other factors or
17   criteria that were considered in tweaking the
18   formula for controlled substances?
19       A.   No.
20       Q.   What was the criteria that was utilized
21   to generate the excessive order query?
22       A.   It -- it looked at the order quantity
23   and if it was larger than a -- if it was greater
24   than a value that the distribution center entered

Page 25

1    into the query, it would report it, that particular
2    product on the report.
3        Q.   Was there any algorithm involved in that
4    excessive order query?
5        A.   No.
6        Q.   Was there any calculation involved in
7    establishing that excessive order query?
8        A.   No.
9        Q.   Was that excessive order query built
10   solely around a number that somebody at the
11   distribution center would type in for a particular
12   product?
13       A.   Yes.  And it's not product.  It's for
14   the entire order, store order.
15       Q.   Okay.  Thank you for that clarification.
16            Help me understand that a little bit.
17   Would it be -- obviously a particular pharmacy
18   might order Claritin, an allergy medication.  Is
19   the line item query written specifically for
20   Claritin or is it written for all orders of all
21   cold medications or allergy medications coming from
22   a particular store?
23            MR. LEVINE:  Objection to form.  You can
24   answer if you understand.

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

BY THE WITNESS:

A. It's for all items carried in the warehouse, in the Walgreens stores.

BY MR. GADDY:

Q. But is it line by line? Is it product by product that is the -- why don't you explain for me what you meant when you told me that it's for the entire store as opposed to by product?

A. Well, the store can order any product. I mean, we distribute products for most of the items in our Walgreens store. So, any ordered item it would look at irregardless of what type of item it is. It could be paper towels. It could be toilet paper, shampoo. It will look at any item we have and if it is greater than the value specified, it will appear on the report.

Q. So, the distribution center enters in a quantity or a number for paper towels, correct?

A. No, they're entering a number just -- it's not item-specific. It's just a number and if it's greater than that number, it will display on a report. So, it's not product-specific.

Q. Okay. So, it's one number that's entered for all products within the store?

Page 27

A. Yes.

Q. One number whether it's paper towels, whether it's toilet paper, whether it's Claritin, or whether it's OxyContin?

A. Yes.

Q. And that number is chosen by an individual at the distribution center?

A. Yes. It's chosen by someone at the distribution center.

Q. Do you know the position of the person at the distribution center that makes that determination?

A. No, I do not.

Q. Have you heard the position of SAIL coordinator, S-A-I-L coordinator?

A. Yes. I know SAIL coordinator.

Q. Do you know whether or not the SAIL coordinator is the person that makes the decision that a certain number is going to be entered as the criteria?

A. I can't say for sure.

Q. Regardless of who it is, that person has discretion to raise or lower that number, correct?

A. That is correct.

Page 28

Q. Is there any approval process that you're aware of for that person to raise or lower that number?

A. Not that I am aware of.

Q. In the 2000s when Walgreens began distributing controlled substances to its own stores, from your understanding, is the excessive order query just as you've been describing it thus far?

A. Yes.

Q. Are you aware of any special practices or procedures or approvals required regarding the excessive order query as it related to controlled substances in the 2000s?

A. No, I am not.

Q. And you were the person that helped implement this program, correct?

A. That is correct.

Q. Were you ever asked to make any changes or amendments to the program over the life of it?

A. Not that I remember.

Q. How often would that excessive query report be run?

A. It's really up to the DCs to determine

Page 29

that. It could be daily. It could be -- it's up to their decision to how many times they would or when they would run it.

Q. From your understanding, do orders come into the distribution center from -- from stores pretty much on a daily basis?

A. Yes.

Q. It would make sense to run the report daily?

Let me ask it this way: If your goal is to catch orders that might have been entered in error, which I think is what you told us the intention of the report was, it would make sense to run it daily so that you don't ship any product that wasn't intended to be shipped?

A. Yes.

Q. Are you aware of any policy or procedure for what is supposed to be done if there are certain orders that populate on that excessive order query?

MR. LEVINE: Objection; lacks foundation.

BY THE WITNESS:

A. I'm not -- I'm not sure. I don't know of any policies personally, no.

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

BY MR. GADDY:

Q. Were you asked to implement or design any policies or procedures as far as what individuals or what anybody was supposed to do if any orders populated on that query?

A. No. I would just -- I just wrote the program -- actually the query that created the data. I wasn't involved in policies.

Q. Okay. You don't work in the distribution center, correct?

A. I do not work in the distribution center, no.

Q. Have you ever worked in a distribution center?

A. No, I have not.

Q. Have you visited distribution centers?

A. Yes.

Q. Have you ever been to a distribution center and watched the process of them running this excessive order query?

A. Not that query in particular, no.

Q. That process of the excessive order query, as far as you know, does that still happen today?

Page 31

A. Yes.

Q. As far as you're aware, have there been any changes or amendments to that -- to that process, the excessive order query?

MR. LEVINE: Objection; foundation.

BY THE WITNESS:

A. I don't know of any, no.

BY MR. GADDY:

Q. Have you or your team within supply and logistics been asked to make any changes or amendments to the excessive order query?

A. No.

Q. At any point in time was you or your team or anybody else that you're aware of in supply and logistics asked to make any changes or amendments to the excessive order query as it related to running that report for controlled substances?

A. No.

Q. Did the excessive order query report ask or -- excuse me. Strike that.

Did the excessive order query report suggest or recommend any particular line limit or threshold that would be used to trigger any

Page 32

excessive orders?

A. Can you repeat that? I'm sorry.

Q. Sure. I think you told us that the excessive order query would populate a report for any items that were ordered in excess of whatever a line limit was, is that accurate?

A. Yes.

Q. And I think you told us that that line limit is inputted by somebody at the distribution center?

A. That is correct.

Q. Was there any recommended or suggested value for what that line limit should be that you're aware of?

A. Not that I'm aware of, no.

Q. Did the report that you wrote, that implemented that you wrote the code for, did it suggest or recommend any particular line limit?

A. No. That was up to the DC to make that determination. Distribution center. Sorry.

Q. Sure. You can say "DC." I just wanted to make sure we were clear on what you were talking about.

Were the -- were the line limits that

Page 33

were implemented at distribution centers, do you know whether or not they were static, the same across all distribution centers, or do you not know that?

A. I do not know that.

Q. Are you aware of any policies or procedures about setting the line limits for stores?

A. No, I am not aware of any.

Q. And, again, whatever line limit is set would be the same for paper towels, for cold medication and for controlled substances, correct?

A. Yes.

Q. Outside of writing the code and implementing the excessive order query, during your time at Walgreens have you been involved in any other projects related to thresholds or ceilings as it relates to controlled substances?

A. No.

Q. During your time at Walgreens have you -- in supply and logistics have you been involved in any projects that involve ARCOS reporting?

A. The system that we run at the DCs

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    created a file that fed ARCOS, but that's as far as
2    my limitations went.
3        Q.    Tell me what you mean by that.
4        A.    As we ship out our product to the
5    stores, there is a -- the data is written to a file
6    that will feed into the ARCOS system, and we
7    created that file; but after that, I had no
8    involvement with the ARCOS system itself.
9        Q.    Okay.  Have you in your time at
10   Walgreens in supply chain and logistics had any
11   involvement with reporting of any controlled
12   substance information to the DEA?
13       A.    No.
14       Q.    During your time in supply and logistics
15   at Walgreens, have you had any involvement in
16   generating suspicious order reports?
17       A.    No.
18       Q.    Have you had any involvement in your
19   time with the supply chain and logistics at
20   Walgreens with any type of due diligence reports as
21   it relates to controlled substances?
22       A.    No.
23       Q.    During your time at Walgreens did you
24   become aware that the controlled substance

Page 35

1    distribution center in Jupiter, Florida was
2    investigated by the DEA?
3        A.    I became aware of it when they asked us
4    to stop sending orders through it.
5        Q.    Tell me how you became aware that the
6    Jupiter distribution center was under investigation
7    by the DEA.
8        A.    I believe my boss at the time said we
9    need to look at ways to prevent orders from going
10   to -- to the Jupiter DC.
11       Q.    Okay.
12       A.    From a programmer point of view.
13       Q.    So, there is a -- would it be fair to
14   say there is an electronic system by which the
15   stores order product, including controlled
16   substances, from distribution centers?
17       A.    Yes, there is.
18       Q.    How long has that been an electronic
19   process?
20       A.    Since the early 1990s.
21       Q.    And also in the early 1990s is when
22   Walgreens began running these excessive order
23   queries?
24       A.    Yes.

Page 36

1        Q.    And specifically you were asked what, to
2    prevent controlled substances from going to stores
3    that are typically serviced by the Jupiter
4    distribution center?
5        A.    We were asked to, if I -- I don't
6    remember exactly.  But I believe it was to redirect
7    the orders to a different distribution center other
8    than Jupiter.
9        Q.    There were only three Walgreens
10   distribution centers that distributed controlled
11   substances, correct?
12       A.    That is correct, to my knowledge.
13       Q.    And that's Jupiter in Florida, correct?
14       A.    Yes.
15       Q.    Perrysburg in Ohio?
16       A.    Yes.
17       Q.    And Woodland in California?
18       A.    Yes.
19       Q.    When you were first asked by your
20   supervisor to or -- excuse me -- first informed by
21   your supervisor that you needed to have the orders
22   for stores that are typically serviced by Jupiter
23   diverted elsewhere, were they diverted to another
24   Walgreens distribution center or were they diverted

Page 37

1    to a jobber?
2        A.    I'm trying -- that was a long time ago.
3    But probably to both I would guess, but I don't
4    remember exactly.  Sorry.
5        Q.    Do you know why the orders that
6    typically were serviced by the Jupiter distribution
7    center for controlled substances needed to be
8    outsourced to either other Walgreens C-II
9    distribution centers or to jobbers?
10       A.    Not exactly except I was asked to do it.
11       Q.    Were you given any high level
12   presentation about why the DEA was involved in
13   Jupiter?
14       A.    No.
15       Q.    Were you given any explanation from
16   anybody higher than you at Walgreens about what was
17   going on as it related to the DEA and controlled
18   substances at the Jupiter distribution center?
19       A.    Not that I remember, no.
20       Q.    Were you aware that at some point in
21   time Walgreens and the DEA actually entered into a
22   settlement regarding the allegations stemming from
23   the Jupiter distribution center as it related to
24   controlled substances?

Highly Confidential - Subject to Further Confidentiality Review



Page 38

**REDACTED**

```
 1      A.   No, I do not.
 2      Q.   Did anybody at Walgreens ever give you
 3  any information about any litigation or settlement
 4  between the DEA and Walgreens relating to -- to
 5  that DEA investigation of the Jupiter distribution
 6  center?
 7      A.   No.
 8      Q.   Let me show you what we're going to mark
 9  as -- I'm going to show you P-WAG-1, which we're
10  going to mark as Peterson 1.
11           (WHEREUPON, a certain document was
12            marked as Walgreens-Peterson
13            Exhibit No. 1:  Binder, "Settlement
14            and Memorandum of Agreement";
15            WAGMDL00490963 - 00490978 with
16            attachments.)
17  BY MR. GADDY:
18      Q.   Mr. Peterson, you can flip open that
19  page.  Do you see the top of the first page -- if
20  you look, I'm going to use -- at the bottom
21  right-hand corner there is page numbers and you
22  should be on page 1 out of 343.
23           Do you see that?
24      A.   Yeah.  1 out of 13 you mean?
```

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Page 250

1 your team does from time to time?

2 A. We investigate issues, yes.

3 Q. You say that "I was asked by John

4 Merritello if our current system would adjust C-II

5 jobber orders if there was a line limit on an item.

6 Because Jupiter is sending everything to the

7 jobbers, I took a quick look at Jupiter and noticed

8 that were line limit insufficient codes on working

9 order scan. Therefore, I assume we were sending

10 line limit insufficients to the stores. But the

11 e-mail below suggested that I assume incorrectly."

12 Do you see that?

13 A. Yes, I do.

14 Q. Does that make sense to you?

15 A. Yes.

16 Q. Okay. Can you explain it to me? I

17 don't completely follow.

18 A. It looks like our programs were working

19 as they were supposed to and we were -- were

20 creating insufficients, but it also looks like we

21 were still sending the order quantity on.

22 Q. Okay. Even if it was being ordered in

23 excess of the line limit?

24 A. Yes.

Page 251

1 Q. Do you know how long that was happening

2 for?

3 A. No, I do not remember.

4 Q. Okay. You say, "I then looked at the

5 jobber history file and saw that the insufficient

6 code for the item below was 10 (no regular

7 quantity). This suggests to me that once OP" --

8 what's OP?

9 A. Order processing. That's a system that

10 we run our orders through.

11 Q. "This suggests to me that once order

12 processing determines that an item is insufficient

13 for no regular quantity that it does not check any

14 other insufficients (which is what I would expect).

15 Is it possible that you or somebody else on your

16 team could verify this? Any help would be

17 appreciated."

18 Do you see that?

19 A. Yes, I do.

20 Q. So, for some period of time we

21 understand from this issue that you had to -- that

22 you were asked to look into and investigate by John

23 Merritello that there was an issue within the order

24 processing system for C-IIs being ordered out of

Page 252

1 Jupiter that were allowing the stores to order

2 product in excess of the line limit?

3 A. It's saying there is possibly an issue,

4 but does not identify if there is or not. That's

5 why I was asking help from someone else.

6 Q. Okay. Well, you were sent a spreadsheet

7 that had several examples of several stores that

8 had been permitted to order C-IIs over their line

9 limit, correct?

10 A. That spreadsheet that's attached to here

11 showed that, yes.

12 Q. And, so, it looks like that was an issue

13 as it related to orders coming through the Jupiter

14 distribution center and you were asking somebody to

15 try to look into that and try to help you out?

16 A. Yes.

17 Q. Do you remember whether or not you were

18 able to solve that issue?

19 A. No, I do not remember.

20 Q. Do you know whether or not the order

21 processing system was ever remedied to prevent

22 stores from ordering controlled substances above

23 their line limit?

24 A. I don't remember a change like that, no.

Page 253

1 Q. Is it possible that you weren't able to

2 fix that problem?

3 A. Anything is possible, but I believe we

4 would have fixed it.

5 Q. Do you know how long it would have taken

6 you?

7 A. I don't remember.

8 Q. Do you know how long stores were able to

9 order controlled substances above their line limits

10 before this problem was brought to your attention?

11 A. No, I do not remember.

12 Q. I will show you what I will mark as

13 Peterson No. 28. It's two pages, but I'm pretty

14 sure it's the same document twice in a row.

15 (WHEREUPON, a certain document was

16 marked as Walgreens-Peterson

17 Exhibit No. 28: Document,

18 "Handling Suspicious Drug Orders";

19 WAGFLDEA00001584 - 00001855.)

20 BY MR. GADDY:

21 Q. Do you recognize this document?

22 A. No, I do not recognize this.

23 Q. Do you know if you've ever seen this

24 before?

Page 254

1    A.   To the best of my knowledge, I've never
2  seen this before.
3    Q.   Okay.  I'm just going to ask you a
4  couple questions about it.
5       Do you see below the text there it says
6  that -- the last thing written is that this policy
7  originated 9/8/98, and then right above it it says
8  it was revised 2/15/05?
9    A.   Yes, I see that.
10   Q.   If we go down to the bottom of the page,
11 do you see an address that looks like this document
12 came from the Walgreens intranet?
13   A.   Yes, I would call that the Walgreen
14 Internet.
15   Q.   Okay.
16   A.   Intranet I mean.
17   Q.   Sure.  And are you familiar with the
18 concept that Walgreens at least at some places in
19 some times maintained some types of policies or
20 procedures on that intranet that its employees
21 could access?
22   A.   I understand that the distribution
23 centers write their own SOPs.  I don't normally --
24 I never look at them.  But yes.

Page 255

1    Q.   The reason I wanted to ask you about
2  this one is because it references Logistics and
3  Planning Department.  So let me just read this to
4  you and then ask if this is anything that you were
5  involved with.
6       It says, "The Logistics and Planning
7  Department sends the Suspicious Control Drug Orders
8  report to all distribution centers."
9       Do you see that?
10   A.   Yes, I do.
11   Q.   Okay.  It says -- let me pause there and
12 ask you a couple questions about that.
13      The Logistics and Planning Department.
14 Do you know what that is?
15   A.   I'm sorry.  Go back up one second.  Mine
16 is a little different than your document.
17   Q.   Okay.  That's not good.
18   A.   I mean, I don't -- I read it here, but I
19 don't see it on my document unless I'm misplacing
20 it.
21   MR. LEVINE:  It looks like the pages of what
22 you handed to me are different than the pages that
23 the witness has.
24   THE WITNESS:  Yes.

Page 256

1    MR. LEVINE:  In other words, they are both two
2  pages but the order is switched.
3    MR. GADDY:  Okay.  Mark, let me give this to
4  you first.  Does that look like what you have?
5    MR. LEVINE:  That's the first page of what I
6  got.
7    MR. GADDY:  Okay.
8  BY MR. GADDY:
9    Q.   I'm only going to -- I'm only going to
10 show you the first page.  Okay?  I think you got
11 the right one now.
12   A.   Yes.
13   Q.   Okay.  All right.  Thanks for pointing
14 that out, Mr. Peterson.  All right.  Let's start
15 over.
16      You have Peterson 28 in front of you?
17   A.   Yes, I do.
18   Q.   Okay.  And, again, if you look at the
19 bottom of the page, do you see the indication of
20 the Walgreens intranet?
21   A.   Yes, I do.
22   Q.   Okay.  And if you go back up to the top,
23 is the name of the document "Handling Suspicious
24 Drug Orders"?

Page 257

1    A.   Yes.
2    Q.   And same, the dates look to be the same
3  as I read earlier, "Originated 9/8/98.  Revised
4  2/15/05."  Is that correct?
5    A.   Yes, it is.
6    Q.   Okay.  And let's try again with the body
7  of the document.  It says, "The Logistics and
8  Planning Department sends the Suspicious Control
9  Drug Orders report to all distribution centers."
10      Do you see that?
11   A.   Yes, I do.
12   Q.   Are you aware of what the Logistics and
13 Planning Department is?
14   A.   No, I don't.  I mean -- let me.  Sorry.
15 I know what Logistics and Planning Department is,
16 yes.
17   Q.   Okay.
18   A.   Within Walgreens.
19   Q.   Is that -- you're supply and logistics.
20 Is that the same as or different than this?
21   A.   It would be different than that.
22   Q.   Okay.  What is the Logistics and
23 Planning Department?
24   A.   Well, it's another division within

65 (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  logistics that does more probably the planning --
2  Q. Are they --
3  A. -- area.
4  Q. -- IT folks or?
5  A. I'm -- from this e-mail, we don't have
6  an IT department that I know of that's called that.
7  So, it looks like it's a business area.
8  Q. Are you able to give me like a
9  30,000-foot view of what the Logistics and Planning
10  Department does?
11  A. No, I couldn't.
12  Q. Okay.
13  A. Off the top of my head, no.
14  Q. Okay. It says that that particular
15  department sends the control -- the Suspicious
16  Control Drug Orders report to all distribution
17  centers.
18      Do you see that?
19  A. Yes, I see that.
20  Q. Do you know what a Suspicious Control
21  Drug Order report is?
22  A. No, I do not.
23  Q. Have you ever heard of that phrase
24  before?

Page 259

1  A. No.
2  Q. Okay. I'm going to show you what I'm
3  going to mark as Peterson 29.
4      (WHEREUPON, a certain document was
5      marked as Walgreens-Peterson
6      Exhibit No. 29:  Document,
7      "Handling Suspicious Orders and
8      Loss of Controlled Drugs";
9      WAGFLDEA00000028.)
10  BY MR. GADDY:
11  Q. And this should be a one-page document,
12  right?
13  A. Yes, it is.
14  Q. And we should see the Walgreens intranet
15  down at the bottom of the page again?
16  A. Yes.
17  Q. And, again, looking at the chronology of
18  this particular policy, do you see that it
19  originated in '98, revised in 2005 and revised
20  again in April of 2012?
21  A. Yes.
22  Q. And the policy here is or the title is
23  "Handling Suspicious Orders and Loss of Controlled
24  Drugs."

Page 260

1      Do you see that?
2  A. Yes.
3  Q. It says, "Distribution centers must file
4  all Suspicious Control Drug Order reports for five
5  years."
6      You've already told us you don't know
7  what that means, right?
8  A. True.
9  Q. It goes on to say, "Effective calendar
10  year 2012, the Controlled Substance Order
11  Monitoring and Prevention System."
12      Let me stop right there.
13      Do you know what that is?
14  A. No, I do not.
15  Q. It says that particular system,
16  "prevents suspicious control drugs from being
17  shipped to the store.  In calendar year 2012,
18  because of the program mentioned, suspicious
19  control drug reports are no longer generated as
20  their shipment is prevented by the system."
21      Do you see that?
22  A. Yes.
23  Q. Now, Mr. Peterson, when I read that, it
24  occurred to me that it sounded like that was

Page 261

1  something that was probably designed or implemented
2  by an IT department.
3      So, my question for you is, based on
4  what we just read, does that sound familiar to you
5  as any type of program or protocol or solution that
6  you or your team was ever asked to implement during
7  your time at Walgreens?
8  A. No, it is nothing I'm familiar with.
9  Q. Okay. Is that anything that you've ever
10  heard of, even if it's not you or your team, any of
11  the other IT teams at Walgreens being involved in
12  as far as designing a system that would prevent
13  suspicious control drugs reports from being
14  generated?
15  A. No, I'm -- no, I'm not.  I do not know.
16  Q. When you had the opportunity to talk
17  with Mr. Bratton, did any of your conversations
18  revolve around suspicious order -- or excuse me --
19  Suspicious Control Drug Order reports?
20  A. No.
21  Q. In any of your conversations with
22  Mr. Bratton, did you tell him that the excessive
23  order queries were designed to detect suspicious
24  orders of controlled substances?

Page 262

1     A.   No, I did not.
2     Q.   And you agree that the suspicious order
3   query -- excuse me -- the excessive order queries
4   was not designed by you to be a tool required by
5   the Controlled Substance Act to monitor or detect
6   for suspicious orders of controlled substances?
7     A.   No, it was not.
8     Q.   I will show you what I'll mark as
9   Peterson 30.
10         (WHEREUPON, a certain document was
11          marked as Walgreens-Peterson
12          Exhibit No. 30:  2/11/11 e-mail
13          string; WAGFLDEA00000891 -
14          00000901.)
15  BY MR. GADDY:
16    Q.   Again, the format is a little funky
17  here.  This is going to be P-WAG-1016.
18         The format is a little funky here, but
19  you recognize this to be another e-mail chain?
20    A.   Yes, it looks that way, yes.
21    Q.   Okay.  And if you flip to the Bates
22  number ending in 900.
23    A.   Yes.
24    Q.   And you see that this is an e-mail

Page 263

1   starting on the top left-hand corner of the
2   page from Victoria Lau and it looks like it's to
3   Kristine Atwell.
4          Do you see that?
5     A.   Yes, I do.
6     Q.   And do you know who either of those
7   individuals are?
8     A.   No.  I do not.
9     Q.   And the subject of this e-mail is
10  "Oxycodone 30 milligram tab"?
11    A.   Yes.
12    Q.   At this point in time, in February of
13  2011, the excessive order query that you designed
14  back in the early '90s was -- was operational and
15  in effect, correct?
16    A.   As far as I know, yes.
17    Q.   The e-mail from Victoria says,
18  "Kristine, I know you're out of WIC 682971 again."
19         Do you see that?
20    A.   Yes.
21    Q.   And just so we can make sure we know
22  what that is, if you look up in the subject of the
23  e-mail, do you see that same number indicating the
24  hydrocodone?

Page 264

1     A.   Yes, I do.
2     Q.   "I know you are out of hydrocodone" --
3   excuse me.  Did I say hydrocodone?  I meant
4   oxycodone.
5     A.   Okay.
6     Q.   It says, "I know you are out of
7   oxycodone again.  The vendor was able to secure
8   some more supply and will be overnighting 5,136
9   tomorrow and shipping 31,680 ground.  I know it
10  won't last you that long but it's the most I could
11  obtain at this time."
12         Do you see that?
13    A.   Yes, I do.
14    Q.   And if you flip the page, do you see the
15  signature block for Victoria Lau and it indicates
16  that she's a replenishment buyer?
17    A.   Yes, it does.
18    Q.   Are you familiar with that position at
19  Walgreens?
20    A.   I'm familiar with buyers, yes.
21    Q.   Generally speaking, what would her role
22  be?
23    A.   To replenish.  They buy product for
24  our...

Page 265

1     Q.   So, as it relates to this particular
2   e-mail, it's talking about a particular store or
3   stores needing oxycodone, Victoria would be in
4   charge of buying the oxycodone from, I guess, the
5   manufacturers that would sell it.  Is that your
6   understanding?
7     A.   I'm not 100% sure about her herself, but
8   based on the e-mails, it looks like she's helping
9   to procure some medicine.
10    Q.   And that's your general understanding of
11  what the buyers do?
12    A.   Basically, yes.
13    Q.   Okay.  If you turn up a page or two,
14  we'll start at 898.
15    A.   Okay.
16    Q.   And it looks like Kristine responds to
17  Victoria.  Do you see that?  It's starting in the
18  middle of the page.
19    A.   Yes, I do.
20    Q.   Okay.  And then if you flip to the next
21  page, we're still in the same subject line, the
22  "Oxycodone 30 milligram tablets."
23         Do you see that?
24    A.   Yes.

Page 266

1    Q.   And it looks like Kristine says,
2  "I received a small pallet today but they were
3  oxycodone 15s and not 30s."
4       Do you see that?
5    A.   Yes, I do.
6    Q.   Do you have a general understanding that
7  many drugs, including oxycodone, can be different
8  strengths?
9    A.   Yes, I know they can have different
10  strengths.
11    Q.   For example, oxycodone can come in 15
12  milligram pills or 30 milligram pills?
13    A.   Not familiar with that particular one
14  but...
15    Q.   You see in the subject line she is
16  talking specifically about hydrocodone 30 milligram
17  pills?
18    A.   Yes.
19    Q.   And you have a general understanding
20  that a 30 milligram pill would be a stronger pill
21  than the 15 milligram pill?
22    A.   Would be a higher dosage?
23    Q.   Correct.
24    A.   Yes.

Page 267

1    Q.   Kristine says, "I received a small
2  pallet today but they were oxycodone 15s, not 30s.
3  Can you confirm that the 30s were set to delivery
4  today?  Also, how long will we continue to struggle
5  getting this product if the manufacturer is
6  producing?"
7       Do you see that?
8    A.   Yes, I see it.
9    Q.   If you flip the page, it looks like we
10  see the response and she says, "Hi Kristine, I will
11  follow up again with the vendor to see if I can
12  obtain tracking.  I did alert them that you were
13  out of 30 and that is what they were supposed to
14  overnight.  I'll keep you posted on their
15  response."
16       Do you see that?
17    A.   Yes, I do.
18    Q.   She goes on to say, "The issue with this
19  item is the usage keeps increasing."
20       Do you see that?
21    A.   Yes.
22    Q.   "It's nearly doubled in usage in one
23  year and the C-II manufacturers have quotas on what
24  they can ship per the DEA."

Page 268

1       Do you see that?
2    A.   Yes.
3    Q.   "It has been confirmed" -- excuse me.
4       "It hasn't been confirmed but I am
5  hearing that this is mainly an issue in Florida and
6  it pertains to the issues surrounding the pain
7  clinics and dispensing."
8       Do you see that?
9    A.   Yes, I see it.
10    Q.   In the February 2011 time frame when
11  this particular e-mail traffic is happening within
12  Walgreens, that excessive order query that you
13  designed in the early '90s continued to be
14  operational, correct?
15       MR. LEVINE:  Objection; asked and answered,
16  form.
17  BY THE WITNESS:
18    A.   To the best of my knowledge, yes.
19  BY MR. GADDY:
20    Q.   Flip two pages for me, please, to 896.
21  Are you with me?
22    A.   Yes, I am with you now.
23    Q.   And it looks like Kristine responds at
24  the bottom of the page.  She says, "You are exactly

Page 269

1  correct regarding the Florida pain clinics.  I have
2  stores that try to order 1,000 bottles per week.  I
3  have alerted their pharmacy supervisors, but they
4  have all said that they require that much to fill
5  scripts."
6       Do you see that?
7    A.   Yes.
8    Q.   And we see there Kristine Atwell's
9  signature block that she is the C-II function
10  manager at Jupiter?
11    A.   Yes.
12    Q.   Do you have an understanding of the role
13  of the C-II function manager?
14    A.   They manage the distribution center
15  there.  That's my understanding.
16    Q.   And specifically they would manage the
17  controlled substances for the distribution center?
18    A.   With hers, yes.  Hers is C-II.
19    Q.   Would your understanding be that -- we
20  have talked about Deb Bish a little bit -- that she
21  would have an equivalent position at the Perrysburg
22  distribution center?
23    A.   Yes, I think so.
24    Q.   Okay.  If you flip for me, please, to

68 (Pages 266 to 269)

Page 270

1   894.  And it looks like we get Victoria's response
2   to Kristine, and we see it at the bottom of the
3   page.
4        And she says, "1000/ week per store?
5   That is unbelievable.  Well, I did hear back from
6   the vendor and below was her response.  I hope this
7   helps you out."
8        And if we turn the page, we see a report
9   from the vendor.  It says, "Victoria, as promised,
10  a total of 5,136 units of the Oxy 30 milligrams
11  were shipped to Jupiter Florida yesterday for
12  delivery today.  UPS tracking shows this order on
13  the truck for delivery.  In addition to these 5,136
14  units we also shipped a total of 31,680 units out
15  yesterday via regular delivery.  I am working on
16  getting that tracking as we speak."
17        Do you see that?
18  A.  Yes.
19  Q.  So, it looks like Victoria was able to
20  secure these approximately 36,000 additional
21  oxycodone 30s for the Walgreens Jupiter
22  distribution center, correct?
23  MR. LEVINE:  Objection; lacks foundation.
24  BY THE WITNESS:

Page 271

1   A.  I wouldn't know that myself.
2   BY MR. GADDY:
3   Q.  Okay.  Is that what Victoria has
4   indicated in her e-mail there?
5   MR. LEVINE:  Objection; lacks foundation.
6   BY THE WITNESS:
7   A.  I don't really know.
8   BY MR. GADDY:
9   Q.  Okay.  I'm going to show you what I'm
10  going to mark as Peterson 31.
11        (WHEREUPON, a certain document was
12        marked as Walgreens-Peterson
13        Exhibit No. 31:  Document,
14        "Threshold Violations-Monthly";
15        WAGMDL00674619.)
16  BY MR. GADDY:
17  Q.  Can you tell me what this report is?
18  A.  No, I am not familiar with this report.
19  Q.  Do you see up at the top center of the
20  page that's underlined it says "Threshold
21  Violations-Monthly"?
22  A.  I see that, yes.
23  Q.  You see to the right of that up top,
24  it's got an order or -- excuse me -- a date of

Page 272

1   9/23/09?
2   A.  Yes.
3   Q.  And below that it says "Suspicious
4   Order"?
5   A.  Yes.  I see that.
6   Q.  Below "Suspicious Order" it has it looks
7   like a month start and end date of 9/1 through
8   9/30.
9        Do you see that?
10  A.  Yes, I do.
11  Q.  And then down below that, do we see
12  several -- I guess let's start in the chart, start
13  on the left-hand side, it looks like it has a
14  district number and then a store number.
15        Do you see that?
16  A.  Yes.
17  Q.  And it looks like on this particular
18  page it's the same store?
19  A.  Yes.
20  Q.  And then to the -- to the right of that
21  we have a WIC number and then an item description.
22        Do you see that?
23  A.  Yes, I do.
24  Q.  And the column to the right of that

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

REDACTED