IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


------------------------   )
IN RE: NATIONAL            ) MDL No. 2804
PRESCRIPTION OPIATE        )
LITIGATION                 ) Case No.
------------------------   ) 1:17-MD-2804
                           )
THIS DOCUMENT RELATES TO   ) Hon. Dan A. Polster
ALL CASES                  )
------------------------   )



HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


VIDEOTAPED DEPOSITION OF

TASHA POLSTER

January 23, 2019


Chicago, Illinois






GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  didn't have the technical know-how or because there
2  wasn't an interface established for you to just
3  kind of click on what you wanted to pull?
4      A.   Both.
5      Q.   All right.  So, there was ultimately a
6  dashboard that was created for Pharmaceutical
7  Integrity, correct?
8      A.   I don't remember dashboard.  I know
9  that -- I mean -- and this was a long time ago.  I
10  remember working with Ray and having him pull data
11  and helping me understand the data.  But when you
12  say dashboard, I don't remember going in and
13  looking at a dashboard or anything like that.
14      Q.   He references even dashboard here, "a
15  quick review of the dashboard."
16          Do you see that?
17      A.   Yes.
18      Q.   All right.  What would you call it if
19  you pull it up and there were a lot of graphs and
20  charts organizing data like quantities for
21  hydrocodone for the store?
22      A.   Again, I don't remember this exact pull.
23  I don't remember what he gave me.  But I never went
24  into my shared drive, ever.  My people, they messed

Page 135

1  with the shared drive.  I did not.  If I needed
2  something, I asked them to send it to me directly.
3      Q.   Okay.  Who is somebody on your staff
4  that -- that you felt like had a good command of
5  the Tableau workbook and knew what information was
6  there?
7      A.   We didn't use Tableau much past 2013.  I
8  mean, after -- after Ray left his job and went to
9  whatever job he went to, I relied pretty heavily on
10  Ed Bratton to put together graphs and charts for
11  me.  But I don't remember if he used Tableau or if
12  he used some other form.
13      Q.   And Steve Mills was a member of your
14  group too, correct?
15      A.   Yes, he was.
16      Q.   Hand you what I will mark as -- it's
17  P-WAG-2619.
18          (WHEREUPON, a certain document was
19           marked as Walgreens-Polster Exhibit
20           No. 7: 4/19/13 e-mail with
21           attachment; WAGMDL00245768 -
22           00245769.)
23  BY MR. MOUGEY:
24      Q.   Do you see this is another internal memo

Page 136

1  between you and Mr. Mills, correct?
2      A.   Yes.
3      Q.   And it's dated February 14, 2013,
4  correct?
5      A.   Yes.
6      Q.   And another reference to Tableau in the
7  third section down, correct?
8      A.   Yep.
9      Q.   And Mr. Mills -- and what was Mr. Mills'
10  role within Pharmaceutical Integrity?
11      A.   He was an analyst that reported up into
12  one of the managers.
13      Q.   So, more -- more of a data guy?
14      A.   Yeah.
15      Q.   And "This week I gained access to the
16  queries Ray uses to create the Tableau tables."
17          Do you see that?
18      A.   Yep.
19      Q.   "I just need Tableau and we will be able
20  to access" -- "and we will be able to create the
21  tables as needed basis without going to Ray."
22          That would make sense, right?
23      A.   Yep.
24      Q.   Your group should be able to do that

Page 137

1  internally as you were building out and the process
2  was being able to build out within your own group,
3  correct?
4      A.   Yes.
5      Q.   Bullet, the next bullet under "Tableau
6  Reporting Dashboards, Rx checklist data is ready to
7  be deployed to the field.  We just need to agree on
8  a day to send out the reports."
9          Do you have an understanding what "Rx
10  checklist data" is?
11      A.   I don't remember what that was.
12      Q.   Let's go to the "Cardinal SOM."
13      A.   Okay.
14      Q.   A part of your job description was third
15  party -- I can't remember the exact terminology.
16      A.   Third party operations.
17      Q.   Third party operations.  Did that
18  include overseeing Walgreens' relationships with
19  third-party vendors who were distributors?
20      A.   No.
21      Q.   Okay.  What was that?
22      A.   Third party operations is the billing of
23  insurance cards.  So, when a patient comes in and
24  brings in insurance -- it has nothing to do with

Page 138

1    Pharmacy Integrity.  Completely different
2    workstream entirely.
3         So, when you or a patient comes in with
4    your insurance card from Cigna or whatever, hand it
5    to the pharmacy.  Pharmacy has to enter in the data
6    and then you have a -- when the prescription gets
7    processed, the co-pay comes out, and we ensure that
8    it's billed correctly.
9    Q.  If you had --
10   A.  Patients are taken care of.
11   Q.  Sorry.  Didn't mean to interrupt you.
12        If you had -- do you have an estimate in
13   2013 of how much of your time went to
14   Pharmaceutical Integrity and how much of your time
15   went to the third party operations you just
16   described?
17   A.  The majority of the work -- of the time
18   went to Pharmaceutical Integrity because it was new
19   and just getting up to speed and I'm still hiring
20   people and making sure they know what to do.
21   Q.  Did your pay come from two different
22   groups within Walgreens?
23   A.  My paycheck?
24   Q.  Your paycheck.

Page 139

1    A.  No.
2    Q.  Was it split between budget items
3    between two different groups?
4    A.  Oh. No.
5    Q.  So, when you say majority of your time,
6    is that 55, 60% went to Pharmaceutical Integrity?
7    A.  I'd say probably 75%.
8    Q.  Was that consistent all the way through
9    '13 or did it get -- lighten up?
10   A.  No, it stayed pretty consistent.  A
11   lot -- the majority of the time that I spent was on
12   Pharmaceutical Integrity because the third party
13   operations team was already up and running and I
14   had leaders on that team.
15   Q.  So, let's just go down to the Cardinal
16   entry.  I just want to understand.
17   A.  Sure.
18   Q.  You would agree that in addition to
19   Walgreens as a distributor, Walgreens also used the
20   services of other third party distributors,
21   correct?
22   A.  Yes.
23   Q.  Cardinal was one of them, correct?
24   A.  Yes.

Page 140

1    Q.  ANDA was another, correct?
2    A.  I don't remember when ANDA came on
3    board, but they are a distributor for us now.
4    Q.  Yes, ma'am.  And ABC as well, correct?
5    A.  Yes.
6    Q.  AmerisourceBergen.  Now, we're going to
7    get into the specifics of the suspicious order
8    monitoring policy, but while we are on this doc,
9    just bear with me for a second.
10        You've mentioned and just in the last
11   series of questions we talked about the number of
12   orders that your team was reviewing, correct?
13   A.  Yes.
14   Q.  And if an order exceeded a certain
15   threshold, Walgreens reduced that order, correct?
16   A.  No, we didn't reduce it.
17   MS. FIX MEYER:  Objection.
18   BY MR. MOUGEY:
19   Q.  That you canceled the order and told the
20   pharmacy that it had to be -- couldn't be any
21   higher than X, correct?
22   MR. HOUTZ:  Object to form.
23   BY THE WITNESS:
24   A.  Not exactly.

Page 141

1    BY MR. MOUGEY:
2    Q.  You just tell me what you think you did.
3    A.  Well, I can tell you what I know I did.
4    Q.  Go ahead.
5    A.  So, when the order exceeded the limit,
6    the store was not shipped product.  And then we
7    developed a tool to let the stores know if they
8    were reaching their ceiling, and we gave them
9    visibility into the number of bottles that they
10   would be able to order but they couldn't go over
11   the order unless they filled out the controlled
12   substance order form that had all the proper
13   documentation as to why they needed it.
14   Q.  Yes, ma'am.  I'm sure they did.
15        So, once you told them what the
16   threshold was and told them what they could order,
17   then they ordered up to that amount, correct, and
18   that's called -- that's called a threshold?
19   MR. HOUTZ:  Object to form.
20   MS. FIX MEYER:  Objection; form.
21   BY THE WITNESS:
22   A.  In some cases they used it.  In a lot of
23   cases they didn't.  It took a long time to get them
24   trained.

36 (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  BY MR. MOUGEY:

2      Q.  I'm sure it did.  So, under "Cardinal

3  SOM," that stands for suspicious order monitoring,

4  correct?

5      MS. FIX MEYER:  Object to form.

6  BY THE WITNESS:

7      A.  Yes.

8  BY MR. MOUGEY:

9      Q.  On the third bullet down, "About 60% of

10  these orders are legitimate orders that should be

11  canceled."

12      The last sentence says, "These are

13  stores who are over their corporate ceiling."  And

14  corporate ceiling is Walgreens' corporate ceiling,

15  correct?

16      A.  Yes.

17      Q.  Means that they weren't allowed to order

18  any more, correct?

19      A.  Without proper documentation, yes.

20      Q.  And -- but "they are going to Cardinal

21  to request the product."

22      Do you see that?

23      A.  Yep.

24      MS. FIX MEYER:  Objection to form.

Page 143

1  BY MR. MOUGEY:

2      Q.  So, Walgreens' system, if a store

3  exceeded the ceiling, they were told no more

4  Schedule II or Schedule III controlled substances

5  from us, correct, Walgreens?

6      A.  They didn't know.  So --

7      Q.  They knew they couldn't order any more,

8  correct?

9      A.  They wouldn't know because -- they

10  wouldn't know until the order was due to show up.

11      Q.  And it didn't show up and they knew they

12  didn't get it, correct?

13      A.  Right, but they didn't know why.

14      Q.  So, they knew they didn't get the order

15  from Walgreens, correct?

16      A.  Correct.

17      Q.  And they didn't know why, but they

18  didn't get it from Walgreens but then Walgreens

19  allowed up until a period in time for that store to

20  put in an order from another vendor, correct?

21      MR. HOUTZ:  Object to form and foundation.

22  BY THE WITNESS:

23      A.  Walgreens -- any pharmacy has secondary

24  wholesalers if the one wholesaler -- I'm just

Page 144

1  telling you the truth.  I mean, you got to take

2  care of the patients.  And so --

3  BY MR. MOUGEY:

4      Q.  The question I asked you was simple.

5      Does the store have the ability to go to

6  another vendor and order controlled substances

7  after they hit the ceiling at Walgreens?

8      MR. HOUTZ:  Next time please let her finish

9  her answer before you interrupt.

10      MR. MOUGEY:  The next time I'd like to have an

11  answer to the question that I asked.

12  BY MR. MOUGEY:

13      Q.  The vendors --

14      MR. HOUTZ:  If you allow her to finish your

15  answer, you may get an answer.

16  BY MR. MOUGEY:

17      Q.  The vendors -- I'm sorry.

18      The pharmacies are allowed to order

19  additional controlled substance, highly addictive,

20  like OxyContin that we talked about earlier, once

21  they hit the ceiling, that store can go to Cardinal

22  and order additional oxycodone, correct?

23      MS. FIX MEYER:  Objection; form, foundation.

24      MR. HOUTZ:  Same objection.

Page 145

1  BY MR. MOUGEY:

2      Q.  Yes or no.

3      A.  I'm not going to yes or no answer that.

4  I'm going to tell you what happened.

5      Q.  No, I want to know if they have the

6  ability.  That's all I asked.

7      A.  Yes.

8      Q.  Do they have the ability to order --

9      A.  Yes.

10      Q.  -- more oxycodone from another vendor

11  like Cardinal after Walgreens' ceiling has been

12  hit?

13      MS. FIX MEYER:  Objection; form, foundation.

14  BY THE WITNESS:

15      A.  On this date, yes.

16  BY MR. MOUGEY:

17      Q.  Yes.  Thank you.

18      MR. MOUGEY:  Les, if it's okay with you, it's

19  a good stopping point for me for lunch.

20      MR. HOUTZ:  Sure.

21      MR. MOUGEY:  I am planning on using the seven

22  hours today.  So, I just want to give everybody a

23  heads-up as we go through.  I'm happy to take a

24  shorter or longer lunch as you and Ms. Polster

37 (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    would like with that.
2         MR. HOUTZ:  Let's do the 45 minutes lunch.
3         MR. MOUGEY:  45?  How much time have we used?
4         THE VIDEOGRAPHER:  We have been on the record
5    for 2 hours and 32 minutes.
6         MR. MOUGEY:  2-1/2 hours.  Thank you.  We will
7    take a 45-minute lunch.  So, it means, let's just
8    come back in at 1:00.  How's that?
9         MR. HOUTZ:  We'll back at 1:00.
10        MR. MOUGEY:  Thank you.
11        THE VIDEOGRAPHER:  We are off the record at
12   12:13 p.m.
13             (WHEREUPON, a recess was had
14              from 12:13 to 1:05 p.m.)
15        THE VIDEOGRAPHER:  We are back on the record
16   at 1:05 p.m.
17   BY MR. MOUGEY:
18        Q.   Ms. Polster, you're familiar with Edward
19   Bratton, correct?
20        A.   Yes.
21        Q.   And he's a member of your team, correct?
22        A.   Yes.
23        Q.   And he came on with Pharmaceutical
24   Integrity in the beginning of 2013, correct?

Page 147

1         A.   Yes.
2         Q.   And I think you mentioned that your
3    group was busy with its charge of working on issues
4    related to Walgreens as a distributor and a
5    pharmacy ensuring that it was in compliance with
6    federal regs and statutes, correct?
7         A.   Yes.
8         Q.   And the frequent meetings continued as
9    you brought new people on board like Mr. Bratton,
10   correct?
11        A.   Yes.
12        Q.   And Mr. Bratton was part of the process
13   of getting up to speed about what was necessary to
14   fill your group's mission, correct?
15        A.   Yes.
16        Q.   And just like all the members of your
17   group, you all had regular meetings covering the
18   topics that were necessary for you all to ensure
19   Walgreens was in compliance as a distributor,
20   correct?
21        A.   Yes.
22        Q.   And part of the topic of those meetings
23   was that you all looked at Walgreens' previous
24   system before your group was in place, correct?

Page 148

1         A.   No, we focused on the system that we
2    were using at the time for suspicious order
3    monitoring.
4         Q.   On Day 1, it didn't -- was there a
5    Day 1, when Pharmaceutical Integrity started?
6         A.   Well, the task force was doing its work
7    and then my team started getting hired and brought
8    in and then they handed over the suspicious order
9    monitoring to my team once I had people in place.
10        Q.   But the question I asked you was:  You
11   all focused on the previous system.  You said no,
12   we were using the system that was in place.
13             So, was there a clean line of on Monday
14   morning we began with our system and there was no
15   more previous system?
16        A.   No, but there was tweaks along the
17   system.  So, I need to understand which system you
18   were talking about, but --
19        Q.   Actually I need to understand which
20   system you're talking about.
21        A.   Okay.
22        Q.   So, when you say there are tweaks, the
23   previous system, our system, I'm not quite
24   understanding.  Okay?

Page 149

1         A.   Okay.
2         Q.   The basis for the system that
3    Pharmaceutical Integrity used was the algorithm
4    that Wayne Bancroft wrote, correct?
5         A.   Yes.
6         Q.   How about we'll call that the "Wayne
7    Bancroft algorithm"?
8         A.   Okay.
9         Q.   Okay.  And that was the foundation of
10   the system from 2008 all the way until Walgreens
11   stopped distributing, correct?
12        MR. HOUTZ:  Object to form.
13   BY THE WITNESS:
14        A.   I don't know.
15   BY MR. MOUGEY:
16        Q.   What part of that do you not know, from
17   the 2008 part?
18        A.   Correct.
19        Q.   So, how about from 2012 when you became
20   part of the controlled substance task force until
21   Walgreens stopped distributing, you're comfortable
22   that the Bancroft algorithm was the foundation?
23        A.   Yes.
24        Q.   And there were, I think in your words,

38 (Pages 146 to 149)

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    tweaks to the Bancroft algorithm from the
2    controlled substance task force until Walgreens
3    stopped distributing.  Is that fair?
4        A.   We're still using that system today, but
5    yes.
6        Q.   Right.  But you're not distributing
7    today, correct?
8        A.   Correct.
9        Q.   So, that's why in my questions, so I
10   didn't have the confusion and the objections from
11   Mr. Les over there about continuing past the time
12   you were no longer distributing.
13           Walgreens stopped distributing late
14   2014.  Fair enough?
15       A.   Yes.
16       Q.   Okay.  So, I'm talking about from when
17   you joined the task force in September of 2012 to
18   the point when Walgreens stopped distributing in
19   late '14, the Bancroft algorithm was the
20   foundation?
21       A.   Yes.
22       Q.   Is that fair?
23       A.   Yes.
24       Q.   Okay.  And there were modifications or

Page 151

1    tweaks made along the way, correct?
2        A.   Yes.
3        Q.   Now, so, when we were talking about what
4    system's in place, the core is Mr. Bancroft's
5    algorithm?
6        A.   Okay.
7        Q.   All right.  So, was part of the mission
8    of the controlled substance task force to look at
9    the algorithm that was in place from Mr. Bancroft
10   and add or tweak or modify?
11       A.   Not exactly in terms of looking at the
12   algorithm.
13       Q.   That the algorithm itself wasn't
14   changed, but there were kind of add-ons?
15       A.   Yes.
16       Q.   Some controls.  Is that fair?
17       A.   Yes.
18       Q.   So, is one of those controls -- why
19   don't you just walk me through what your
20   understanding or your recollection of the controls
21   were?
22       A.   So, the -- the system is designed to do
23   a historical lookback by NDC number, and one of
24   controls that is put in place is that if the store

Page 152

1    does not have previous sales for that particular
2    drug, the system would not order in quantities as
3    readily as what they would need it.
4        Q.   Okay.
5        A.   So, for example, if a new manufacturer
6    became our primary for a certain NDC number, if we
7    didn't make a tweak in the system, none of the
8    stores would have gotten more than one bottle even
9    if they started dispensing it.
10           So, we would have to make a tweak in the
11   system in order to basically move the reordering
12   from the old NDC number to the new NDC number.
13       Q.   Okay.  Can I stop you there?  Am I
14   interrupting anything?
15       A.   Yeah.
16       Q.   So, what I'd like you to do is kind of
17   give me a laundry list that you can remember about
18   the modifications that were made.
19       A.   Sure.
20       Q.   Or the controls.
21       A.   Sure.
22       Q.   And then we'll drill down a little bit
23   more specifically.
24           So, what would you call what you just

Page 153

1    described?  The new manufacturer, is that --
2        A.   Yeah, yeah.  New manufacturer --
3        Q.   New manufacturer.
4        A.   -- was a tweak.
5        Q.   What was another tweak?
6        A.   Ensuring that every order went through
7    the system first before a store could get a product
8    regardless of where they were getting it from.
9        Q.   Okay.  So, whether they got it from
10   another vendor or interstore, it had to go through
11   the algorithm?
12       A.   Correct.
13       Q.   So, what do you want to call that, that
14   the algorithm reviewed all controlled substance
15   orders?
16       A.   Yes.
17       Q.   Is that fair?
18       A.   Yep.
19       Q.   Okay.  So, what other modifications?
20       A.   I don't remember.  Those are -- those
21   were the main ones that come to mind.
22       Q.   How about the modification about that --
23   that was pre-you -- that an order that was flagged
24   by the Bancroft algorithm was cut?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    A.    You mean not shipped?
2    Q.    Yes, ma'am.
3    A.    What about it?
4    Q.    That's pre-you, though, wasn't it?
5    A.    Yes.
6    Q.    Yes.  When you got there, if an order
7  was flagged by the Bancroft algorithm, it was -- is
8  the word "cut"?  Are you okay with that?  Or what's
9  the right terminology you'd use?
10   A.    It was not shipped at all.
11   Q.    Not shipped?
12   A.    Right.
13   Q.    But the store was allowed to order up to
14 that threshold, correct?  They had to enter a new
15 order in?
16   A.    Yes.
17   Q.    So, it was not shipped, but then the
18 store could reenter an order up to the ceiling
19 level, correct?
20   A.    Yes, but the store didn't have
21 visibility into that ceiling level.
22   Q.    I understand.
23   A.    Okay.
24   Q.    I understand that's your drumbeat.

Page 155

1    A.    Yeah.
2    Q.    But right now if the order wasn't
3  shipped, they were allowed to ship up to that
4  ceiling level, correct?
5    A.    Sure.
6    Q.    Okay.  Now, your team knew that there
7  were modifications that needed to be made to the
8  Bancroft algorithm, correct?
9          Actually, you corrected me before about
10 the Bancroft.  Let's use your language, whatever
11 you feel comfortable with.
12         So, rather than me saying changing the
13 algorithm, how about your team was aware that there
14 were -- that controls were needed to ensure that
15 all orders were going through the Walgreens
16 suspicious order monitoring system?
17     MR. HOUTZ:  Object to form.
18 BY THE WITNESS:
19   A.    I don't agree when you say they were
20 aware.
21 BY MR. MOUGEY:
22   Q.    Okay.
23   A.    I think as time progressed, things would
24 pop up and then we would ask for a change to be

Page 156

1  made based on that new information.
2    Q.    So, as you learned more and as you got
3  up to speed, there were a different -- there were
4  additional controls that needed to be implemented?
5    A.    There were -- there were changes that
6  needed to be made, yes.
7    Q.    All right.  And it didn't all happen at
8  once --
9    A.    Right.
10   Q.    -- is what you're saying.  It was over a
11 period of time?
12   A.    Right.
13   Q.    And when -- and I'm trying not to use --
14 I'm trying to use the word you feel comfortable
15 with.  Is control, an additional control?  What
16 term would you use?
17         You didn't like the modification to the
18 algorithm.  So, I'm trying to find a word you're
19 comfortable with.
20   A.    Yeah, controls, that's fine.
21   Q.    Is control okay?
22   A.    Yeah.
23   Q.    That there were issues that your team
24 was identifying along the way, they were trying to

Page 157

1  find solutions and then implementing a control to
2  kind of close --
3    A.    The goal was to have consistency on how
4  the stores would order; and as things popped up
5  that created confusion for patient care and was
6  happening at store level, then we made adjustments
7  along the way to, you know, decrease any type of
8  confusion a store would have in getting a product.
9    Q.    Would you feel comfortable with the word
10 that when Pharmaceutical Integrity started, that
11 there were loopholes in the system that needed to
12 be closed with additional controls to ensure
13 compliance with Walgreens' duties as a distributor?
14   A.    Those -- I think there were gaps.  I
15 don't know about loopholes.
16   Q.    Let's use the word "gaps."  I'm
17 comfortable with "gaps."
18   A.    Okay.
19   Q.    So, there were gaps in Walgreens'
20 policies and procedures with its distribution of
21 controlled substances that your team was
22 identifying and addressing throughout '13 and early
23 '14?
24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    Q.   Now, would you agree that those gaps
2  enabled some stores to have significant growth in
3  shipments of Schedule II and Schedule III opiates
4  without being flagged and stopped as part of
5  Walgreens' system?
6    A.   No.
7    Q.   Let me hand you what we're going to mark
8  as P-WAG-1988, Bates No. WAGMDL429440.
9         And I apologize.  I'm going to change.
10  Shift gears.  It's P-WAG-1146, WAGMDL21425.
11        I will hand you what we will mark as
12  Polster 8.
13        (WHEREUPON, a certain document was
14         marked as Walgreens-Polster Exhibit
15         No. 8:  8/9/13 e-mail string;
16         WAGMDL00021425 - 00021427.)
17  BY MR. MOUGEY:
18    Q.   Mr. Bratton is a manager in
19  Pharmaceutical Integrity, correct?
20    A.   Yes.
21    Q.   And has remained in Pharmaceutical
22  Integrity for quite some time, correct?
23    A.   Yes.
24    Q.   And had an area of significant

Page 159

1  responsibility in Pharmaceutical Integrity,
2  correct?
3    A.   Yes.
4    Q.   And was an important component of the
5  Pharmaceutical Integrity team, correct?
6    A.   Yes.
7    Q.   And was part of the educational process
8  from the beginning of Pharmaceutical Integrity
9  throughout the summer of 2013, correct?
10    A.   Yes.
11    Q.   And this is -- what I put in front of
12  you is an e-mail from Mr. Bratton dated August 19,
13  2003 -- I'm sorry -- 2013.
14        Do you see that?
15    A.   Yes.
16    Q.   And I'm at the very top of the e-mail in
17  the second paragraph.
18        And Mr. Bratton, when speaking with
19  another Walgreens employee or exchanging e-mails,
20  relayed to her that "The previous system would
21  continue to send additional product to the store
22  without limit or review which made possible the
23  runaway growth of dispensing of products like
24  oxycodone."

Page 160

1        Did I read that correctly?
2    A.   Yes.
3    Q.   And this was at the time that
4  Mr. Bratton had been in your group for several
5  months in Pharmaceutical Integrity, correct?
6    A.   Yes.
7    Q.   And he was managing an entire geographic
8  region in Pharmaceutical Integrity, correct?
9    A.   Yes.
10    Q.   He was part of the process for reviewing
11  suspicious orders, correct?
12    A.   Yes.
13    Q.   He was part of the process in looking at
14  overrides, correct?
15    A.   Yes.
16    Q.   He was part of the process of
17  identifying gaps and specific controls to fill
18  those gaps, correct?
19    A.   Yes.
20    Q.   And based upon his work and what he
21  relayed to Ms. Patel is that the lack of those
22  controls allowed runaway growth for drugs like
23  OxyContin.  Do you see that?
24    A.   I see what he wrote, but I don't know

Page 161

1  what he meant.
2    Q.   Yes, ma'am.  It's confusing, isn't it,
3  where he says, "The previous system would continue
4  to send additional product to the store without
5  limit or review which made possible the runaway
6  growth of dispensing of products like oxycodone."
7        It's crystal clear what he meant, is it
8  not?
9    A.   There were a lot of tweaks to the system
10  and the system got changed many times.  So, yeah,
11  he is correct that the system was designed and
12  built way back in the day to ensure that the store
13  was able to get the product in that they needed to
14  take care of their patients.
15    Q.   Yes, ma'am.  And the lack of controls up
16  and to when your group took over in '13 allowed for
17  runaway growth of drugs like OxyContin, correct?
18    A.   I don't -- I don't agree with his --
19  with his language there.
20    Q.   That was one of your managers in your
21  group responsible for an entire geographic region,
22  that was his assessment, correct?
23    A.   That was his words.
24    Q.   I hand you -- it's P-WAG-5140, Bates

41 (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    No. 77015 and Polster 9.
2         (WHEREUPON, a certain document was
3         marked as Walgreens-Polster Exhibit
4         No. 9: 7/2/12 e-mail with
5         attachment; WAGMDL00077015 -
6         00077023.)
7    BY MR. MOUGEY:
8    Q.   Now, this is an e-mail from Raymond
9    Stukel, right? Did I pronounce that correct?
10   A.   Yeah.
11   Q.   And Mr. Stukel, as you just identified,
12   was the gentleman that was in loss prevention and
13   using the Tableau interface to review Walgreens'
14   data, correct?
15   A.   Yes.
16   Q.   And the subject is "Discussion of
17   ceiling limits."
18        Do you see that?
19   A.   Yep.
20   Q.   And the ceiling limits are part of the
21   Bancroft algorithm that was used in Pharmaceutical
22   Integrity, correct?
23   A.   Yes.
24   Q.   That was just -- that was one of the

Page 163

1    lingos, ceiling limits and thresholds were two of
2    the tests, correct?
3    A.   Yes.
4    Q.   And ceiling limits replaced the
5    frequency?
6    A.   I think you're right there, but I'm not
7    100% sure.
8    Q.   You're not sure. Pre-Tasha Polster?
9    A.   Right.
10   Q.   How does that sound?
11   A.   Yeah, that sounds great.
12   Q.   Okay. So, Mr. Stukel is sending out an
13   e-mail to Mr. Merritello, Kristie Provost, Wayne
14   Bancroft and Ferdinand Dungca.
15        Do you see that?
16   A.   Yes.
17   Q.   And if you would turn to Bates No. 16,
18   this appears to be an overview of the controlled
19   substance order review web-based exception report,
20   correct?
21   A.   That's what it appears. I have never
22   seen this document before.
23   Q.   I understand. So, what I want to --
24   what I want you to do is help me look at this

Page 164

1    document and see if this kind of comports with your
2    understanding of the system that you inherited in
3    Pharmaceutical Integrity. Okay?
4    A.   Okay.
5    Q.   All right. So, the date, as we just
6    went through, is July 12th -- I'm sorry --
7    July 2012.
8         Do you see that?
9    A.   No.
10   Q.   Very first page in the e-mail. I'm
11   sorry.
12   A.   Oh, sorry. Yeah. I was looking at
13   June 22. Okay.
14   Q.   So, this is approximately 60 days before
15   the controlled substance task force that you're a
16   part of when you start attending the frequent
17   meetings, correct?
18   A.   Yes.
19   Q.   And this is what I could find as kind of
20   the last kind of culmination, right when you start,
21   of what the system looked like. Okay?
22   A.   Okay.
23   Q.   So, what I want you to do is tell me
24   yes, this kind of comports with my understanding or

Page 165

1    my recollection of the -- of the Bancroft algorithm
2    and the controls in place when I inherited it. Is
3    that -- is that fair?
4    A.   Sure.
5    Q.   Okay. So, underneath the first top of
6    Bates No. 16, under "Ordering" do you see those
7    kind of wheels or gears, A, B and C.
8         Do you see that?
9    A.   Yes.
10   Q.   And then off on the side it's
11   referencing phases and there is phase 3, phase 4
12   and phase 5. Okay? Do you see that in the first
13   box?
14   A.   Oh, yes, yes.
15   Q.   Okay. So, phase 3, it says "In QA,"
16   which I would mean quality assurance?
17   A.   Yeah, testing.
18   Q.   Testing.
19        "Phase 4: In design."
20        And then you see in the upper right-hand
21   side, "Phase 5: In design, ceilings trump step A
22   below if/when necessary."
23        And you recall that ceilings were
24   ultimately put in place, correct?

42 (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

REDACTED

1    A.   Yes.
2    Q.   Okay.  So, if you go to A, "Ongoing
3  Controlled Substance Order Review Logic includes
4  PSE."
5         Do you see that?
6    A.   Yes.
7    Q.   All right.  And then B is "Manual Line
8  Limits for select drugs" and C is "Automated
9  Ceilings."
10        Did I get all that?
11   A.   Yes.
12   Q.   And off to the left it says, "Interim
13 solution until automated ceilings are deployed."
14 Correct?
15   A.   I see that here.
16   Q.   Now, when you took over in late '12,
17 early '13, were the automated solutions deployed?
18   MR. HOUTZ:  Object on foundation.
19 BY THE WITNESS:
20   A.   I don't know.
21 BY MR. MOUGEY:
22   Q.   You don't know.  Okay.  So, the
23 right-hand side -- do you know what automated
24 ceilings are?

Page 167

1    A.   No.
2    Q.   Do you know what ceilings are?
3    A.   Yes.
4    Q.   What is your understanding of what a
5  ceiling is?
6    A.   A ceiling is the amount of drug that a
7  store can have at a -- at a point in time.
8    Q.   So, when it hits that point in time, and
9  you and I discussed this earlier, that order is
10 canceled and a pharmacy is allowed to enter an
11 order up to the ceiling limit, correct?
12   MR. HOUTZ:  Object to form and foundation.
13 BY THE WITNESS:
14   A.   You're making generalizations and you're
15 not really accurate.  So, can I tell you how it
16 worked?
17 BY MR. MOUGEY:
18   Q.   Go ahead.  You educate me on how this
19 works.
20   A.   All right.  So, yes, if the store hit
21 the ceiling or maybe the store didn't hit the
22 ceiling and they tried to order above the ceiling,
23 the order never got shipped.  But they wouldn't
24 know what the ceiling was.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**