IN THE DISTRICT COURT OF CLEVELAND COUNTY

STATE OF OKLAHOMA

No. CJ-2017-816

- - - - - - - - - - - - - - - - X

STATE OF OKLAHOMA, ex rel.,

MIKE HUNTER, ATTORNEY GENERAL

OF OKLAHOMA,

Plaintiff,

v.

(1)  PURDUE PHARMA, L.P., et al.,

Defendants.

- - - - - - - - - - - - - - - - X

COMPLETE CAPTION ON PAGE 2

- - - - - - - - - - - - - - - - X

VOLUME I                               Pages 1-542


DEPOSITION OF RUSSELL PORTENOY, M.D.

Thursday, January 24, 2019, 10:49 a.m.

Shaheen & Gordon, P.A.

107 Storrs Street

Concord, New Hampshire 03301


-- Reporter: Kimberly A. Smith, CSR, CRR, CRC, RDR --

Realtime Systems Administrator

U.S. Legal Support

1          IN THE DISTRICT COURT OF CLEVELAND COUNTY

2            STATE OF OKLAHOMA - No. CJ-2017-816

3

4    STATE OF OKLAHOMA, ex rel.,

5    MIKE HUNTER, ATTORNEY GENERAL

6    OF OKLAHOMA,

7                         Plaintiff,

8       v.

9    (1)  PURDUE PHARMA, L.P.;

10   (2)  PURDUE PHARMA, INC.;

11   (3)  THE PURDUE FREDERICK COMPANY;

12   (4)  TEVA PHARMACEUTICALS USA, INC.;

13   (5)  CEPHALON, INC.;

14   (6)  JOHNSON & JOHNSON;

15   (7)  JANSSEN PHARMACEUTICALS, INC.;

16   (8)  ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC.,

17   n/k/a JANSSEN PHARMACEUTICALS, INC.;

18   (9)  JANSSEN PHARMACEUTICA, INC., n/k/a JANSSEN

19   PHARMACEUTICALS, INC.;

20   (10) ALLERGAN, PLC, f/k/a ACTAVIS PLC, f/k/a

21   ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC.;

22   (11) WATSON LABORATORIES, INC.;

23   (12) ACTAVIS LLC; and

24   (13) ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.,

25                      Defendants.

```
 1   APPEARANCES:

 2

 3       Nix Patterson LLP

 4       By:  Bradley Beckworth, Esq.

 5       and Andrew Pate, Esq.

 6       3600 North Capital of Texas Highway, Suite B350

 7       Austin, TX  78746

 8       (512) 328-5333

 9       bbeckworth@nixlaw.com

10       dpate@nixlaw.com

11                  for the Plaintiff;

12

13       Dechert LLP

14       By:  Hayden Coleman, Esq.

15       Three Bryant Park

16       1095 Avenue of the Americas

17       New York, NY  10036-6797

18       (212) 698-3500

19       hayden.coleman@dechert.com

20                  for the Purdue Defendants;

21

22

23

24

25
```

```
 1   APPEARANCES: (continued)

 2

 3       Morgan, Lewis & Bockius LLP

 4       By:  Brian M. Ercole, Esq.

 5       200 South Biscayne Boulevard, Suite 5300

 6       Miami, FL  33131-2339

 7       (305) 415-3000

 8       brian.ercole@morganlewis.com

 9                 for the Teva, Cephalon, Watson,

10                 and Actavis Defendants;

11

12       O'Melveny & Myers LLP

13       By:  Houman Ehsan, M.D., Esq.

14       and Ryan Snyder, Esq. (via telephone)

15       400 South Hope Street, 18th Floor

16       Los Angeles, CA  90071-2899

17       (213) 430-6000

18       hehsan@omm.com

19       rsnyder@omm.com

20           and

21

22

23

24

25
```

```
 1   APPEARANCES: (continued)

 2

 3        Foliart, Huff, Ottaway & Bottom

 4        By:  Jordyn L. Cartmell, Esq.

 5        Bank of Oklahoma Plaza

 6        201 Robert S. Kerr Avenue, 12th Floor

 7        Oklahoma City, OK  73102

 8        (405) 232-4633

 9        jordyncartmell@oklahomacounsel.com

10                     for the Johnson & Johnson and

11                     Janssen Defendants;

12

13        Shaheen & Gordon, P.A.

14        By:  S. Amy Spencer, Esq.

15        107 Storrs Street

16        Post Office Box 2703

17        Concord, NH  03302-2703

18        (603) 819-4231

19        saspencer@shaheengordon.com

20                     for the Witness.

21

22   Also Present:  Brittany Kellogg, Nix Patterson

23                     James Soto, CLVS, Video Operator

24

25
```

1                    I N D E X

2

3   WITNESS:  Russell Portenoy, M.D.

4

5   EXAMINATION                                    Page

6       By Mr. Beckworth                          10

7                 AFTERNOON SESSION

8       By Mr. Beckworth                          161

9       By Mr. Ehsan                              272

10      By Mr. Coleman                            418

11      By Mr. Ercole                             456

12      By Mr. Beckworth                          512

13      By Mr. Ercole                             538

14

15   EXHIBITS FOR IDENTIFICATION:

16   Portenoy       Description                    Page

17   Exhibit 1   Witness's CV                       19

18   Exhibit 2   Witness's 1/17/19 declaration      23

19   Exhibit 3   JAN-MS-00010801 - JAN-MS-00010821  73

20   Exhibit 4   JAN-MS-00310227 - JAN-MS-00310229  78

21   Exhibit 5   OKEXPERT-00005834 -               104

22               OKEXPERT-00005839

23   Exhibit 6   Tasmanian Alkaloids slides        116

24   Exhibit 7   USA v. Cephalon (PA) plea and     122

25               sentencing memorandum

1  EXHIBITS FOR IDENTIFICATION: (continued)

2  Portenoy        Description                    Page

3  Exhibit 8   1/2019 Reuters news release re     128
4              Insys CEO
5  Exhibit 9   6/8/17 FDA new release re          130
6              Opana ER
7  Exhibit 10  JAN-MS-00312595                    136
8  Exhibit 11  JAN-OK-00144146 - JAN-OK-00144155  139
9  Exhibit 12  JAN-MS-00394853                    141
10 Exhibit 13  JAN-MS-00394856                    142
11 Exhibit 14  JAN-MS-00931726                    143
12 Exhibit 15  TEVA_OK_01483802 -                 144
13              TEVA_OK_01483843
14 Exhibit 16  RP_000139 - RP_000147              148
15 Exhibit 17  PKY180606606                       151
16 Exhibit 18  PKY180606605                       153
17 Exhibit 19  HSGAC Fueling an Epidemic          154
18 Exhibit 20  RP_000001 - RP_000136              157
19 Exhibit 21  PKY183117989                       191
20 Exhibit 22  PDD8901061478 - PDD8901061479      192
21 Exhibit 23  1997 AAPM and APS consensus        201
22              statement
23 Exhibit 24  NEJM Porter/Jick letter to the     220
24              editor
25 Exhibit 25  PPLP004281019 - PPLP004281046      236

Page 8

1  EXHIBITS FOR IDENTIFICATION: (continued)

2  Portenoy        Description                     Page

3  Exhibit 26  Duragesic memo to 275 Sales Force   242

4  Exhibit 27  11/6/03 Janssen marketing           249

5              research briefing document

6  Exhibit 28  10/25/06 Fentora                    254

7              commercialization team update

8  Exhibit 29  CDC graphs                          261

9  Exhibit 30  1/16/19 email: Beckworth/Spencer    279

10  Exhibit 31  1986 Portenoy/Foley paper          313

11  Exhibit 32  2002 Payne/Portenoy presentation   332

12  Exhibit 33  Duragesic packaging label          361

13  Exhibit 34  JAN-MS-00392797 - JAN-MS-00392799  393

14  Exhibit 35  Suffolk (NY) v. Purdue             411

15              defendant's motion to dismiss

16              memorandum

17  Exhibit 36  PDD1701554611 - PDD1701554613      427

18  Exhibit 37  PDD1701430617 - PDD1701430618      433

19  Exhibit 38  PPLPC037000009388 -                435

20              PPLPC037000009390

21  Exhibit 39  PPLPD004322853                     439

22  Exhibit 40  PPLPD004341334 - PPLPD004341336    451

23  Exhibit 41  12/2014 TIRF REMS                  505

24  Exhibit 42  Business Wire news release re      515

25              Kadian

1    EXHIBITS FOR IDENTIFICATION: (continued)

2    Portenoy        Description                      Page

3    Exhibit 43  Morgan Lewis web page re Brian        524

4                Ercole

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Original exhibits retained by reporter to be

25    returned to Nix Patterson LLP

```
 1              THE VIDEO OPERATOR:  Good morning.

 2    We're on the record.  The time on the monitor is

 3    10:49.  Today is the 24th day of January, 2019.

 4    We're here at 107 Storrs Street, Concord, New

 5    Hampshire, for the purpose of taking the videotape

 6    deposition of Dr. Russell Portenoy in the matter of

 7    the State of Oklahoma vs. Purdue Pharma, et al.

 8              The videographer is James Soto, the

 9    court reporter is Kim Smith, both with U.S. Legal

10    Support.  All counsel will be noted in the

11    stenographic record.

12              Please administer the oath.

13              RUSSELL PORTENOY, M.D.,

14       having been first duly sworn by the court

15       reporter, was deposed and testified as follows:

16                   EXAMINATION

17    BY MR. BECKWORTH:

18       Q.  Can you tell the judge and jury your name,

19    please, sir.

20       A.  I'm Dr. Russell Portenoy.

21       Q.  Is it Portenoy?

22       A.  Yes.

23       Q.  I'll do my best with that.  Dr. Portenoy,

24    I am Brad Beckworth.  I represent the State of

25    Oklahoma through its Attorney General, Mike Hunter.
```

1          Do you understand that?

2     A.  Yes.

3     Q.  Now, you are here today to give testimony

4  under oath under penalty of perjury about some

5  things that have happened in your life and career

6  over the last 20 years, correct?

7     A.  Yes.

8     Q.  Let's start with this.  You're currently

9  the executive director of the MJHS Institute For

10  Innovation and Palliative Care and the chief medical

11  officer of MJHS as well, correct?

12     A.  Chief medical officer of MJHS Hospice and

13  Palliative Care.

14     Q.  What is MJHS?

15     A.  It's the d/b/a of Metropolitan Jewish

16  Health System.

17     Q.  And where is that located?

18     A.  New York City.

19     Q.  You've been in this position or working for

20  MJ since about 2014, correct?

21     A.  That's correct.

22     Q.  Prior to that time, you were employed by

23  something called the Beth Israel Medical Center in

24  New York, correct?

25     A.  Correct.

Page 12

1      Q.  While it changed some parts of its name

2  over time, Beth Israel will reflect that entity,

3  correct?

4      A.  Yes.

5      Q.  You worked there from about 1997 to 2014,

6  correct?

7      A.  Yes.

8      Q.  And at some point, you were the chair of

9  Beth Israel's Department of Pain Medicine and

10  Palliative Care?

11      A.  For that entire period.

12      Q.  You understand that today, I'm here on

13  behalf of the State of Oklahoma due to a trial we

14  have against certain pharmaceutical companies?

15              MR. ERCOLE:  Objection to form, leading.

16  BY MR. BECKWORTH:

17      Q.  You understand that, correct?

18      A.  I understand that, yes.

19      Q.  You also understand that one of the

20  defendants in this case is Purdue?

21      A.  Yes.

22      Q.  And related entities to Purdue?

23      A.  Yes.

24      Q.  You also understand that Janssen and

25  Johnson & Johnson are defendants as well?

Page 13

1      A.  Yes.

2      Q.  You understand that Teva is a defendant?

3      A.  Yes.

4      Q.  And Cephalon?

5      A.  Yes.

6      Q.  And you see in your room -- the room we're

7  in today that the drug companies that I've just

8  listed, they're represented by lawyers, correct?

9      A.  Yes.

10          MR. ERCOLE:  Objection to form.

11  BY MR. BECKWORTH:

12     Q.  And as we sit here today, there's only one

13  lawyer from the State of Oklahoma representing any

14  defendant in this case, and this is this lady at the

15  end of the room here with Johnson & Johnson.

16          Do you see her?

17          MR. ERCOLE:  Objection to the form.

18          THE WITNESS:  I see the lady at the end

19  of the table, yes.

20  BY MR. BECKWORTH:

21     Q.  There's no other lawyer licensed in the

22  State of Oklahoma representing any other defendant

23  in this case?

24          MR. ERCOLE:  Objection to form.

25          THE WITNESS:  I wouldn't know where

Page 14

1    licenses derive from.

2    BY MR. BECKWORTH:

3        Q.  Well, you'll be asked questions by some of

4    the drug company lawyers here, and I think you'll

5    see that none of them are licensed in the State of

6    Oklahoma.

7              MR. ERCOLE:  Objection to form.

8    BY MR. BECKWORTH:

9        Q.  I am licensed in the State of Oklahoma,

10   sir, and I have an office in the State of Oklahoma,

11   and it's my great privilege to represent the State

12   of Oklahoma in this case.

13             Now, over the course --

14             MR. ERCOLE:  Objection to form.  Move to

15   strike.  No question was asked.

16   BY MR. BECKWORTH:

17       Q.  Over the course of your career, you have

18   been paid to be a speaker or advisor to many

19   pharmaceutical companies who make opioid products,

20   correct?

21       A.  Correct.

22       Q.  And you've been paid to be a speaker or

23   advisor for the Purdue defendants?

24       A.  Yes.

25       Q.  Also for the Janssen entity?

1     A.  Yes.

2     Q.  And Johnson & Johnson?

3     A.  Yes.

4     Q.  Teva?

5          MR. ERCOLE:  Objection to form.

6          THE WITNESS:  I'm not actually sure

7   about Teva.  Teva acquired another company.

8   BY MR. BECKWORTH:

9     Q.  Cephalon?

10    A.  Cephalon.  Cephalon, yes.

11    Q.  You've done speaking or advising work for

12  Cephalon?

13    A.  Yes.

14    Q.  You may have done it for Teva as well?

15  You're just not sure as you sit here?

16    A.  I'm not sure, right.

17    Q.  You also were involved in a group called

18  the American Pain Society?

19    A.  Yes.

20    Q.  You were on the board?

21    A.  Yes.

22    Q.  And for a few years, you served as its

23  president?

24    A.  Just a single term, single one-year term.

25    Q.  Of the American Pain Society?

Page 16

1     A.  Yes.

2     Q.  You understand that the defendants from the

3  drug world that are here today provided funding to

4  the American Pain Society?

5               MR. ERCOLE:  Objection to form.

6               THE WITNESS:  Yes.

7  BY MR. BECKWORTH:

8     Q.  And they did that while you were on the

9  board?

10              MR. ERCOLE:  Objection to form.

11              THE WITNESS:  I'm not sure who provided

12  funding during that period of time.  I would assume

13  that they did.

14  BY MR. BECKWORTH:

15     Q.  And you understand though that many

16  pharmaceutical companies provided funding to the

17  American Pain Society?

18              MR. ERCOLE:  Objection to form.

19              THE WITNESS:  Yes.

20              MR. BECKWORTH:  Just to be clear, I need

21  to be able to ask my question and get an answer.

22  I understand that you don't want his answers to be

23  heard.  Let him answer or let me finish my question,

24  please.  If not, I will have to get the judge on the

25  phone and we'll have a hearing.

Page 17

1              Some of us will actually be at the trial

2    of this case.  I know that you won't.  We need to

3    let the jury hear it.  I'm not going to argue that

4    you've waived an objection if he starts talking and

5    you didn't get it out first, okay?  We'll have that

6    agreement?

7              MR. ERCOLE:  Are you finished with your

8    commentary?

9              MR. BECKWORTH:  Yes.

10             MR. ERCOLE:  I'm going to now respond to

11   the argumentative commentary you just made.

12             MR. BECKWORTH:  There's nothing funny

13   about the death of opioids, sir.

14             MR. ERCOLE:  I completely agree.

15   There's nothing funny either about you taking the

16   deposition of a witness and asking leading questions

17   from the start when this is your witness, as Judge

18   Hetherington's order clearly makes perfectly clear.

19             MS. SPENCER:  I'll object to that.  He's

20   my witness -- he's my witness.

21             MR. ERCOLE:  Let me just finish.

22             So if you are going to continue in that

23   style, unfortunately, I'm going to be forced to

24   continue to make that objection, which is fine.

25             MR. BECKWORTH:  Are you --

1            MR. ERCOLE:  Let me just finish, just

2    like I will let you finish.  So I will continue to

3    do that and we can move forward.

4    BY MR. BECKWORTH:

5        Q.  Sir, you're not the State of Oklahoma's

6    witness, are you?

7        A.  No.

8        Q.  You don't work for us?

9        A.  No, I do not.

10        Q.  I have no control over you?

11        A.  You do not.

12        Q.  You have no purpose in helping me win our

13    lawsuit?

14        A.  No.

15        Q.  You're here as an independent third party,

16    correct?

17        A.  Yes.

18        Q.  You're represented by your own counsel,

19    correct?

20        A.  I am.

21        Q.  There's nothing to prevent you from saying

22    things that may be adverse to our case, correct?

23        A.  That's true.

24        Q.  You're here to speak the truth?

25        A.  That's true.

Page 19

1      Q.   I have no control over you?

2      A.   That's true.

3      Q.   Now, you also were involved with a group

4   called the American Pain Foundation?

5      A.   Yes.

6      Q.   You served on its board?

7      A.   Yes.

8      Q.   You understand that the drug company

9   defendants that are here in this case provided

10   funding to the American Pain Foundation?

11      A.   Yes.

12      Q.   Now, at some point in your career, you've

13   prepared a résumé, correct?

14      A.   Yes.

15           MR. BECKWORTH:  I'm going to hand to you

16   what we'll mark as Portenoy Exhibit 1.

17           May I have a sticker.  Thank you very

18   much.

19              (Portenoy Exhibit 1 was marked

20               for identification.)

21   BY MR. BECKWORTH:

22      Q.   Sir, this is a document that your attorney,

23   Mrs. Spencer, just provided to me.  It's an updated

24   copy of your résumé.  I'm going to hand this to you

25   as Plaintiff's Exhibit 1 to the Portenoy deposition.

1            Is Exhibit 1 the résumé that your

2    attorney handed us today?

3        A.  Yes.

4        Q.  Does this résumé set out the summary of

5    your work, education, and experience?

6        A.  Yes, it does.

7        Q.  Is it a record that you created?

8        A.  Yes.

9        Q.  Is it a record that you kept?

10        A.  Yes.

11        Q.  And is it a fair statement of the events,

12    conditions, and information set forth in that

13    document?

14        A.  I'm not exactly sure how to interpret those

15    words.

16        Q.  The document that's in front of us is a

17    fair summary of your experience, work, and

18    qualifications as a professional?

19        A.  Yes.

20        Q.  Now, you are a medical doctor?

21        A.  Yes.

22        Q.  You've treated pain patients prior to

23    today?

24        A.  Yes.

25        Q.  You still are doing that?

Page 21

1       A.  Yes.

2       Q.  You have a background in neurology?

3       A.  Yes.

4       Q.  But you are not a trained psychiatrist?

5       A.  That's correct.

6       Q.  You're not a board certified addiction

7    specialist?

8       A.  That's correct.

9       Q.  You do not have experience diagnosing

10   patients with opioid addiction using established DSM

11   criteria as an addiction specialist, correct?

12      A.  That's true.

13              MR. ERCOLE:  Objection to form.

14   BY MR. BECKWORTH:

15      Q.  Your answer was, I'm correct?

16      A.  That's true.  Yes, you are correct.

17      Q.  And you do not have experience treating

18   opioid addiction from a psychiatric point of view?

19      A.  That's true.

20      Q.  Now, you have signed a declaration in this

21   case, correct?

22      A.  Yes.

23      Q.  And just to go over this again.  You and I

24   had never met before today, correct?

25      A.  That's correct.

1      Q.  I met you less than an hour ago here at

2  your attorney's office?

3      A.  That's correct.

4      Q.  We shook hands; we introduced ourselves?

5      A.  Yes.

6      Q.  And you left the room?

7      A.  I did.

8      Q.  Did you and I have any conversation outside

9  the presence of your attorney?

10     A.  No.

11     Q.  Have you ever met with anyone, to your

12  knowledge, representing the State of Oklahoma about

13  this lawsuit prior to this very day?

14     A.  No.

15     Q.  To your knowledge, have I ever been to the

16  State of New Hampshire to meet with your attorney

17  about this case?

18     A.  No.

19     Q.  On Friday, January 18, you, sir, signed a

20  declaration in this case, correct?

21     A.  I'd have to check the date.  I signed a

22  declaration, but I want to be accurate about the

23  date.

24            MR. BECKWORTH:  I'm going to hand you

25  now what we'll mark as Plaintiff's Exhibit 2 to the

Page 23

1    Portenoy deposition.

2                        (Portenoy Exhibit 2 was marked

3                        for identification.)

4                MR. BECKWORTH:  Hand that to you.  If

5    you'll use the copy with the sticker and hand the

6    other one to your attorney, please.

7                THE WITNESS:  Thank you.

8                MS. SPENCER:  Thank you.

9    BY MR. BECKWORTH:

10   Q.  Now --

11               MS. SPENCER:  Before we get into the

12   declaration, I'd like to put a statement on the

13   record.

14               MR. BECKWORTH:  Sure.

15               MS. SPENCER:  This is Amy Spencer.  I am

16   the attorney for Dr. Russell Portenoy.  In reviewing

17   the declaration in preparation for this deposition,

18   I noticed that there is a typo in paragraph 3 of the

19   declaration.  It does not change the substance.

20               However, in the last sentence, it

21   currently reads, "The proffer agreement with those

22   plaintiffs can be voided and the original lawsuits

23   may be reinstated against me if my statements are

24   recklessly and materially not truthful or accurate."

25               Rather than the proffer agreement, it is

Page 24

1   actually the settlement agreement that provides

2   those same terms.  So on the record, I would request

3   that we replace the word "proffer" with

4   "settlement."

5              MR. BECKWORTH:  No objection from --

6              MS. SPENCER:  And that is my -- that is

7   my fault.

8              MR. BECKWORTH:  There's no objection

9   from the State of Oklahoma.

10             MR. COLEMAN:  No objection from the

11  defendants.

12             MS. SPENCER:  Thank you all.

13             MR. BECKWORTH:  We may also have one

14  other typo.  Let's just get that out of the way.

15  I believe that's in paragraph 30.  At the very first

16  of paragraph 30, it says, "Of the defendants and

17  drugs in this case," and it lists several entities.

18  Just for the record, Endo, Insys, Mallinckrodt are

19  not defendants in this case.

20             MS. SPENCER:  No objection.

21             MR. BECKWORTH:  Other than that, that's

22  all the changes that I'm aware of.

23             MR. ERCOLE:  I mean, are we asking the

24  witness questions?  If you have a question about

25  whether the declaration is truthful, ask the witness

Page 25

1    the question.

2                MR. BECKWORTH:  Are you done?  Are you

3    done?

4                MR. ERCOLE:  My point's a clear one.

5    So if you have a question, just ask the witness a

6    question.

7                MS. SPENCER:  I was putting something on

8    the record that --

9                MR. ERCOLE:  Understood.  And that was

10   the point that you made.  And this is a separate

11   issue as to whether the State is unilaterally going

12   to change the declaration.  So I would --

13               MS. SPENCER:  Okay.

14   BY MR. BECKWORTH:

15       Q.  Now, Dr. Portenoy, Exhibit 2 that we just

16   gave you is a declaration that you signed in this

17   case, correct?

18       A.  Yes.

19       Q.  And if you'll turn to the last page,

20   page 35, the date of this is actually January 17,

21   2019, correct?

22       A.  Correct.

23       Q.  Now, your attorney just made for the record

24   some changes in paragraph 3, correct?

25       A.  Correct.

1        Q.  Do you agree with those changes?

2        A.  Yes.

3        Q.  I also put on the record that there are

4    certain entities listed as defendants in this case

5    that actually are not, and those are in paragraph 30,

6    correct?

7        A.  Correct.

8             MR. ERCOLE:  Objection to form.

9    BY MR. BECKWORTH:

10       Q.  And you understand the changes that we just

11   discussed?

12       A.  I do.

13       Q.  Now, this declaration is based on your

14   personal knowledge, correct?

15       A.  Yes.

16       Q.  It is based on your professional

17   experience?

18       A.  Yes.

19       Q.  It's based upon direct interactions that

20   you had with the pharmaceutical industry?

21       A.  Yes.

22             MR. ERCOLE:  Objection to form.

23   BY MR. BECKWORTH:

24       Q.  And those direct interactions include

25   interactions with Purdue and its related companies?

1          MR. ERCOLE:  Objection to form.

2          THE WITNESS:  Yes.

3    BY MR. BECKWORTH:

4      Q.  They include interactions with Janssen?

5          MR. ERCOLE:  Objection to form.

6          THE WITNESS:  Yes.

7    BY MR. BECKWORTH:

8      Q.  Those experiences include interactions with

9    Johnson & Johnson?

10          MR. ERCOLE:  Objection to form.

11          THE WITNESS:  Yes.

12    BY MR. BECKWORTH:

13      Q.  Those experiences include interactions with

14    Teva?

15          MR. ERCOLE:  Objection to form.

16          THE WITNESS:  Again, my only concern

17    about the Teva is that I'm not sure that I worked

18    with Teva representatives or the company that Teva

19    purchased.  So I'll say that I'm not sure about the

20    Teva interactions.

21    BY MR. BECKWORTH:

22      Q.  You understand that you've had interactions

23    with Cephalon?

24      A.  Yes.

25          MR. ERCOLE:  Objection to form.

Page 28

1  BY MR. BECKWORTH:

2      Q.  And Cephalon's an entity that Teva

3  purchased?

4      A.  Yes.

5      Q.  In fact, it purchased it after Cephalon

6  pled guilty to a federal crime?

7          MR. ERCOLE:  Objection to form.

8          THE WITNESS:  My understanding, yes.

9  BY MR. BECKWORTH:

10     Q.  And you're represented by Mrs. Amy Spencer,

11 who's to your left, right?

12     A.  Yes.

13     Q.  You're not represented by any of these drug

14 company lawyers, are you?

15     A.  No.

16     Q.  You notice that every time I ask a

17 question, they object?

18     A.  I do, yes.

19     Q.  Now, let's turn to paragraph 3 of your

20 declaration.  Paragraph 3 of your declaration, you

21 state that you've agreed to cooperate with certain

22 plaintiffs who have entered into settlement

23 agreements with you, dismissing you as a defendant

24 in their cases.

25          Do you see that?

Page 29

1      A.  Yes.

2      Q.  It also says that those plaintiffs agree to

3   dismiss you in exchange for your truthful

4   cooperation, correct?

5      A.  Yes.

6      Q.  And that there is a proffer agreement,

7   which your attorney just clarified as a settlement

8   agreement, that can be voided and those lawsuits can

9   be reinstated against you if your statements are

10  recklessly and materially not truthful or accurate,

11  correct?

12     A.  Correct.

13     Q.  That refers to other litigation, not the

14  case that you're in for today's purposes.

15           Do you understand that?

16     A.  Yes.

17     Q.  Do you understand that, as we talked about

18  a moment ago, you and I have never met before,

19  correct?

20     A.  Correct.

21     Q.  There is no proffer agreement with the

22  State of Oklahoma, correct?

23     A.  Correct.

24     Q.  There is no formal settlement agreement

25  with the State of Oklahoma, correct?

Page 30

1      A.  Correct.

2      Q.  Now, you did do a declaration that's very

3  similar, almost identical to this one, in other

4  cases, correct?

5      A.  Yes.

6      Q.  You have not been deposed or put under oath

7  for trial testimony in those cases, correct?

8      A.  That's correct.

9      Q.  In fact, there was an attempt to do that

10  today, and it's not going forward, correct?

11      A.  Correct.

12      Q.  Now, at some point in those cases, you met

13  with some of the lawyers representing other

14  governments and other persons suing different

15  pharmaceutical-related companies, correct?

16              MR. ERCOLE:  Objection.

17              MS. SPENCER:  Objection, compound.  If

18  you could break down governments and lawyers

19  representing other companies, that would be helpful.

20  BY MR. BECKWORTH:

21      Q.  You understand that in these other cases,

22  there are lawyers that represent states that are

23  suing the pharmaceutical industry?

24              MR. ERCOLE:  Objection to form.

25              THE WITNESS:  I don't actually know

1    whether those firms are representing states or

2    municipalities within those states.

3    BY MR. BECKWORTH:

4       Q.  You understand they're representing some

5    type of government entity?

6       A.  Yes, I do.

7       Q.  And at some point, you met in person with

8    attorneys representing other entities, correct?

9       A.  Yes, I did.

10      Q.  They've met with you?

11      A.  Yes.

12      Q.  In the presence of your attorney?

13      A.  Yes.

14      Q.  And at some point, a draft declaration was

15   provided to you?

16      A.  Yes.

17      Q.  And your attorney?

18      A.  Yes.

19      Q.  Did you just sign the declaration as is

20   that was provided to you?

21      A.  No.

22      Q.  What did you do?

23      A.  I made extensive revisions in the

24   declaration, deleted paragraphs, added paragraphs,

25   and edited other paragraphs.

1       Q.   And when that declaration was provided to

2  you, was it provided to you out of nowhere, or was

3  it the result of meetings and interactions that you

4  and your attorney had had with the attorneys on the

5  other side?

6       A.   The declaration -- the first draft of the

7  declaration was provided to my attorney by

8  plaintiffs, and I received it from my attorney.

9       Q.   But you had already met with them before

10 you got the first draft?

11      A.   I met with plaintiff's attorneys prior --

12 at the proffer session -- only at the time of the

13 proffer session after the proffer agreement was

14 signed.

15      Q.   And the declaration draft that was sent to

16 you is based upon that session and the information

17 that had been exchanged, as I understand; is that

18 correct?

19               MR. ERCOLE:  Objection to form.

20               MS. SPENCER:  He can answer if he knows.

21               THE WITNESS:  I think there's a timing

22 issue here because the declaration actually was

23 produced many months after the proffer session.

24 BY MR. BECKWORTH:

25      Q.   And that's my question.  It came many

Page 33

1    months after the proffer session?

2         A.   That's correct.

3         Q.   What I'm trying to get at, it was the

4    product of interviews and sessions and information

5    that had been gathered?

6                   MR. EHSAN:  Object to form.

7                   MS. SPENCER:  He can only answer if he

8    knows.

9    BY MR. BECKWORTH:

10        Q.   If you know.

11        A.   Yes.  I don't know.

12        Q.   When you got the declaration, you made

13   extensive changes to it?

14        A.   I did, yes.

15        Q.   The declaration that you ultimately signed,

16   sir, those are your words, correct?

17        A.   Correct.

18        Q.   They're words you either drafted or

19   adopted?

20        A.   That's correct.

21        Q.   You would not sign something that was

22   false?

23        A.   That's true.

24        Q.   When you signed the declaration in the

25   other cases, you did so under penalty of perjury?

Page 34

1      A.  Correct.

2      Q.  And is there anyone here holding you

3  against your will that forced you to sign that under

4  duress?

5      A.  No.

6      Q.  When you made agreements in those cases to

7  have lawsuits dropped against you, there was a

8  condition to that, correct?

9      A.  Correct.

10     Q.  If you testify dishonestly, then they don't

11  have to drop those agreements [sic]?

12          MS. SPENCER:  Objection.  It's

13  recklessly and materially not truthful or accurate,

14  for the record.

15  BY MR. BECKWORTH:

16     Q.  If you testify recklessly and materially

17  not truthful or accurately, then any agreements with

18  those entities are off?

19     A.  That's correct.

20     Q.  Meaning that the release of you in those

21  cases is based upon you doing what you swore to do

22  just moments ago, which is to tell the truth,

23  correct?

24     A.  That's correct.

25          MR. ERCOLE:  Objection to form.

Page 35

1    BY MR. BECKWORTH:

2        Q.   Now, in our case, the State of Oklahoma's

3    case, we got a copy of the declaration that was

4    being drafted in that case, and you've agreed to

5    sign a version in our case, correct?

6        A.   Correct.

7        Q.   The differences in the declaration are the

8    names of the parties that are on the front page,

9    correct?

10       A.   Correct.

11       Q.   And as we just went through, like

12   paragraph 30, some of the defendants in this case

13   are different than those in other cases?

14       A.   That's correct.

15       Q.   Now, in our case, there is no proffer

16   agreement?

17       A.   Correct.

18       Q.   There's no formal settlement agreement?

19       A.   Correct.

20       Q.   As we established, we've never met before

21   to negotiate this?

22       A.   True.

23       Q.   And you have signed the declaration that is

24   now Exhibit 2 under penalty of perjury, correct?

25       A.   Correct.

1      Q.  Meaning you swore that the statements in

2   there were true, correct?

3      A.  Correct.

4      Q.  And that they were yours?

5      A.  That's correct.

6      Q.  And as we established earlier, the

7   statements contained in Exhibit 2 are based upon

8   your personal knowledge, experience, skill and

9   training?

10     A.  Yes.

11          MR. ERCOLE:  Objection to form.

12          MR. EHSAN:  Object to form.

13   BY MR. BECKWORTH:

14     Q.  And we're here today, your attorney,

15   Mrs. Spencer, is here in the room?

16     A.  Yes.

17     Q.  You've gotten the declaration in front of

18   you?

19     A.  Yes.

20     Q.  Are these statements that you made in that

21   declaration true to the best of your knowledge?

22     A.  Yes.

23     Q.  Do you adopt the statements in Exhibit 2 in

24   their entirety?

25     A.  I do.

Page 37

1      Q.  Are they true?

2      A.  Yes.

3      Q.  Do you swear that they're true?

4      A.  Yes.

5      Q.  Now, you understand that we have not sued

6   you in our case, correct?

7      A.  Correct.

8      Q.  You also understand that I've represented

9   to your attorney that the State of Oklahoma has no

10   intent to add you as a defendant in our case,

11   correct?

12      A.  Correct.

13      Q.  But we've signed no formal settlement

14   agreement?

15      A.  That's correct.

16      Q.  You're here under the trust that you're

17   going to tell the truth and that what I told your

18   attorney is true?

19      A.  That's correct.

20      Q.  That's the only agreement that you know of

21   in this case?

22      A.  That's true.

23      Q.  Now, you know that the drug companies

24   didn't want this deposition to go forward, correct?

25              MR. ERCOLE:  Objection to form.

Page 38

1                    MS. SPENCER:  He can only answer if he

2      knows.

3                    THE WITNESS:  I don't know the details

4      in that regard, no.

5      BY MR. BECKWORTH:

6         Q.  You know there have been some efforts to

7      have this deposition not occur?

8         A.  Yes.

9                    MR. ERCOLE:  Objection to form,

10     mischaracterizes.

11     BY MR. BECKWORTH:

12        Q.  And you hear the drug companies pretty much

13     every time I ask you a question, they object, right?

14        A.  Yes.

15        Q.  Now, I'd like to go through your

16     declaration in some detail today.  But let's just

17     start with this.

18                    You know that there are people that have

19     accused you of playing some role in creating or

20     causing what's commonly referred to as an opioid

21     crisis in this country?  You're aware of that?

22        A.  Yes.

23        Q.  You're aware that you've been sued by some

24     entities claiming that you had responsibility for

25     that?

Page 39

1      A.  Yes.

2      Q.  You understand though that we haven't sued

3  you for that?

4      A.  Yes.

5      Q.  Now, I'm going to make [sic] a few questions

6  here and we'll see how this goes throughout the day.

7  But I'm going to tell you what -- I'm going to ask

8  you some questions about what I think happened, and

9  you can tell me if I'm wrong.

10          You're a doctor?

11     A.  Yes.

12     Q.  You spent your career dealing with the pain

13  industry?

14     A.  Um --

15     Q.  Or the treatment of chronic pain?

16     A.  Yes.

17     Q.  Palliative care?

18     A.  Yes.

19     Q.  Cancer care?

20     A.  Yes.

21     Q.  You've done quite a bit of work and

22  research and publication about those things?

23     A.  Yes, I have.

24     Q.  You understand that you had influence?

25     A.  Yes.

Page 40

1      Q.  I'm not trying to play to your ego, but you

2   were viewed as an important or influential

3   spokesperson on many issues related to the treatment

4   of pain in America; would you agree with that?

5      A.  I would take -- have some concerns about

6   the word "spokesperson."  I never spoke for anybody

7   except myself.

8      Q.  A speaker?

9      A.  A speaker, yes.

10     Q.  But you were paid to speak?

11          MR. ERCOLE:  Objection to form.

12          THE WITNESS:  In some contexts, yes.

13  At other times, no.

14  BY MR. BECKWORTH:

15     Q.  And you understand through your dealings

16  with the pharmaceutical industry that they advertise?

17     A.  Yes.

18     Q.  That they market?

19     A.  Yes.

20     Q.  And there's a difference between

21  advertising on TV and marketing to health care

22  professionals?

23     A.  Yes.

24     Q.  You understand that some of the ways that

25  the drug company defendants marketed was to have

Page 41

1  dinners and presentations where doctors spoke to

2  other doctors?

3      A.  Yes.

4          MR. ERCOLE:  Objection to form.

5  BY MR. BECKWORTH:

6      Q.  You understand that they used marketing

7  materials?

8      A.  Yes.

9      Q.  That they partnered with different third-

10  party advocacy groups or academic groups to hold

11  seminars and symposiums and conferences?

12          MR. ERCOLE:  Objection to form.

13          THE WITNESS:  Yes.

14  BY MR. BECKWORTH:

15      Q.  And that doctors would attend those types

16  of things, correct?

17      A.  Correct.

18          MR. ERCOLE:  Same objection.

19  BY MR. BECKWORTH:

20      Q.  As well as other health care providers?

21      A.  Yes.

22      Q.  And you understand that doctors could be

23  influenced by the information they obtained from any

24  of the types of things that we just spoke about?

25          MR. ERCOLE:  Same objection.

1              THE WITNESS:  Yes.

2    BY MR. BECKWORTH:

3        Q.   And you understand that pharmaceutical

4    companies, at least the ones here in this room, they

5    weren't providing this type of education pro bono,

6    meaning they just did it for completely altruistic

7    purposes?

8              MR. ERCOLE:  Objection to form.

9    BY MR. BECKWORTH:

10       Q.   You know that?

11       A.   So I interacted with the industry for many

12   years on a large number of educational conferences,

13   as well as individual opportunities to lecture.

14   It has always been clear to me that the dollars that

15   were placed into the effort to expand education had

16   an ultimate purpose to assist their drug in the

17   commercial market.

18            But I also think that at least with

19   respect to chronic pain, there was an effort on the

20   part of some in the industry to make sure that the

21   medical community got educated because the problem

22   of public -- of chronic pain was viewed as such a

23   public health problem.

24       Q.   The view that pain needed to be treated?

25       A.   Yes.

Page 43

1        Q.  And, of course, one of the ways that you

2    treat chronic pain if it's identified as a public

3    health problem is through the drugs that each of the

4    defendants in this room make and sell, right?

5        A.  One of the ways to do it, yes.

6        Q.  Including opioids?

7        A.  That's correct.

8        Q.  And you understand, because you're a

9    doctor, that when you have all of this information

10   coming at you, it forms part of the basis of a

11   doctor's knowledge?

12               MR. ERCOLE:  Objection to form.

13               THE WITNESS:  Yes, that's true.

14   BY MR. BECKWORTH:

15       Q.  And it has the potential to influence

16   decision making?

17       A.  Yes.

18       Q.  And that's part of its intent?

19       A.  That's correct.

20               MR. ERCOLE:  Objection to form.

21   BY MR. BECKWORTH:

22       Q.  Now, what I want to talk with you about

23   today is whether you believe that the drug companies

24   in this room used the work that you did and the work

25   that others did to try to improperly influence the

Page 44

1   decision making of health care providers in this

2   country, okay?

3           MR. ERCOLE:  Objection to form.

4           THE WITNESS:  Okay.

5   BY MR. BECKWORTH:

6       Q.  And you believe, in fact, that that did

7   happen?

8       A.  Yes.

9       Q.  You're just one person?

10      A.  That's true.

11      Q.  You don't have the ability by yourself to

12   create an opioid crisis, do you?

13      A.  I don't.  No, I don't.

14      Q.  If there is one, it took a lot of factors?

15      A.  That's correct.

16      Q.  Including each of the drug company

17   defendants sitting in this room?

18           MR. ERCOLE:  Objection to form.

19           THE WITNESS:  Including some of the

20   actions taken by each of the drug companies, yes.

21   BY MR. BECKWORTH:

22      Q.  Their actions?

23      A.  Their actions.

24      Q.  Including the way they used your work?

25           MR. ERCOLE:  Objection to form.

1          THE WITNESS:  I believe that's true,

2   yes.

3   BY MR. BECKWORTH:

4      Q.  Make sure I heard that right over the

5   objection.  You said what?

6      A.  I believe that that's true, yes.

7      Q.  Thank you.  Now, throughout your career,

8   you accepted financial support -- Well, let's go

9   back to the last question.

10          You said you believe what I said is

11   true, right?

12     A.  Yes.

13     Q.  Again, the drug companies that are sitting

14   here in the room that we're referring to include

15   Purdue, correct?

16     A.  Yes.

17     Q.  Janssen?

18     A.  Yes.

19     Q.  Johnson & Johnson?

20     A.  Yes.

21     Q.  Teva?

22     A.  Yes.

23     Q.  Cephalon?

24     A.  Yes.

25     Q.  All those are included in the statement you

Page 46

1    just made?

2        A.  Yes.

3              MR. ERCOLE:  Objection to form.

4    BY MR. BECKWORTH:

5        Q.  Your answer was yes, all those defendants

6    are included in the statement you made?

7        A.  Yes.

8        Q.  Thank you.

9        A.  That's true.

10       Q.  Now, throughout your career, it is true

11   that one way or another, you accepted financial

12   support from drug companies?

13       A.  Yes.

14       Q.  Those payments included some payments that

15   were made to you directly?

16       A.  Yes.

17       Q.  Those payments also included payments made

18   to your institutional employer to support research

19   or academic activities?

20       A.  That's correct.

21       Q.  And one way that you were paid, sir, is

22   through something called an honoraria for speaking

23   engagements?

24       A.  Yes.

25       Q.  I'm not sure everyone that's going to be

1   listening to you understands what honoraria is.  Can

2   you describe that.

3       A.  An honorarium is a fee paid by the sponsor

4   of a conference so that the speaker will come to the

5   conference and give a lecture.

6       Q.  And oftentimes the drug companies could not

7   pay an honoraria directly for an education

8   conference, right?

9           MR. ERCOLE:  Objection to form.

10          THE WITNESS:  I'm not sure how to

11  interpret the question.  Sorry.

12  BY MR. BECKWORTH:

13      Q.  Well, if you were giving a speech or anyone

14  were giving a speech at certain types of educational

15  conferences, say for a hospital, the drug company

16  could not pay you directly for that work?

17          MR. ERCOLE:  Objection to form.

18          THE WITNESS:  So probably the best

19  example of what you're saying is that if the drug

20  company was sponsoring a conference at a

21  professional society meeting such as an annual

22  meeting of the professional society, the

23  educational -- the educational payment would go to

24  the professional society, and then the professional

25  society may be able to transfer an honorarium to the

Page 48

1    speakers.

2    BY MR. BECKWORTH:

3        Q.  Right.  So that's exactly what I was

4    saying.  So, for example, if you gave a speech at a

5    hospital in Oklahoma for an education event, the way

6    that could work was that the drug company would pay

7    money to the institution, and then your fee would be

8    paid by the institution, not directly from the drug

9    company?

10       A.  Yeah.  In the early part of the time that

11   we're talking about, it was much more common for an

12   honorarium to be offered to the physician personally.

13            Then as the rules pertaining to

14   continuing medical education became more stringent,

15   the pharmaceutical industry began to a much greater

16   extent providing funding to the organizational

17   sponsor of the conference, and then that sponsor

18   would pay the honorarium.  So there was a shift over

19   time to the perspective that you were describing.

20       Q.  So unless somebody in attendance at one of

21   these talks had actually seen the paperwork, they

22   wouldn't know where the speaker's payment was

23   actually coming from?

24            MR. ERCOLE:  Objection to form.

25            THE WITNESS:  In these continuing

1   medical education conferences, especially as the

2   rules became more stringent, there was always

3   disclosure.  So both the speakers individually and

4   the conference planners needed to disclose to the

5   audience the source of funding.

6   BY MR. BECKWORTH:

7       Q.  But that's something that happened not that

8   long ago?

9               MR. ERCOLE:  Objection to form.

10              THE WITNESS:  That increased stringency,

11  I have trouble dating it honestly.  It has been a

12  while, but I can tell you that if we're talking

13  about an epoch that started in the late '80s, it was

14  much less stringent at that time.

15  BY MR. BECKWORTH:

16      Q.  So you also got paid fees for consulting?

17      A.  Yes.

18      Q.  And those fees were paid for consulting

19  with drug companies?

20      A.  Yes.

21      Q.  Including opioid manufacturers?

22      A.  Yes.

23      Q.  The honoraria you received for speaking

24  almost always involved conferences that provided

25  continuing medical education credits?

Page 50

1       A.   Yes.

2       Q.   And as we just discussed, that's where you

3    would speak to health care providers?

4       A.   Yes.

5       Q.   Including doctors who would use opioids to

6    treat pain?

7       A.   Usually doctors.

8       Q.   Usually doctors, correct?

9       A.   Correct.

10      Q.   And sometimes those speaking engagements

11   were organized directly by a drug company?

12      A.   Yes.

13      Q.   Sponsored by a drug company?

14      A.   Yes.

15      Q.   They would -- sometimes the drug companies

16   would pay you?

17              MR. ERCOLE:  Objection to form.

18              THE WITNESS:  They would provide the

19   honorarium.

20   BY MR. BECKWORTH:

21      Q.   Yes.  The drug companies would provide the

22   honorarium?

23      A.   Yes.

24      Q.   They also used something called medical

25   education companies, correct?

Page 51

1      A.  Correct.

2      Q.  And when that happened, you would get paid

3   through the medical education company, correct?

4      A.  That's correct.

5      Q.  And you've remarked that this use of

6   medical education companies to be between the drug

7   company and the speaker is something that increased

8   over your career?

9      A.  Yes, I did.

10      Q.  What is that?

11      A.  Medical education companies are commercial

12   entities that sign contracts with industry partners

13   like the pharmaceutical companies, and they -- and

14   they -- they have different sets of tasks and

15   different expertise.

16          Sometimes they are capable of planning

17   and organizing a conference, getting the speakers,

18   signing the speakers up, providing the speakers with

19   help with transportation and potentially any written

20   materials that go along with the conference.

21          Other medical education companies are --

22   develop programs sponsored by the pharmaceutical

23   companies with payments to them, but those programs,

24   for example, might be online programs that they put

25   on the Internet.

1             So these medical education companies to

2     a much greater extent later in my career than

3     earlier in my career would work with academicians

4     like myself on this kind of programming.

5         Q.   And based on your personal experience and

6     knowledge, when medical education companies would do

7     all that, where were they getting the money for it?

8         A.   From the pharmaceutical companies that were

9     paying their sponsorship of it.

10        Q.   Now, you worked with several different

11    medical education companies in this manner?

12        A.   Yes.

13        Q.   Did any of them ever come to you and say

14    that they worked exclusively for one drug company

15    manufacturer?

16             MR. ERCOLE:  Objection to form.

17             THE WITNESS:  I don't have that

18    recollection, no.

19    BY MR. BECKWORTH:

20        Q.   None of them ever came to you and said,

21    Look, we're going to have you do a speech for

22    Janssen, and if you do that, you can't ever do work

23    for Purdue, Teva, or Cephalon?

24             MR. ERCOLE:  Objection to form.

25             THE WITNESS:  That never happened, no.

Page 53

 1  BY MR. BECKWORTH:

 2      Q.  That never happened?

 3      A.  No.

 4      Q.  In fact, these medical education companies,

 5  to your knowledge, actually did work for all the

 6  defendants in this room?

 7              MR. ERCOLE:  Objection to form.

 8              THE WITNESS:  I don't know that.  I'm

 9  sorry.  I can't . . .

10  BY MR. BECKWORTH:

11      Q.  Because I'm using a pretty broad term.  You

12  understood that certain medical education companies

13  did work for each defendant?

14              MR. ERCOLE:  Same objection.

15              THE WITNESS:  Yes, certain medical

16  education companies.  They were --

17              I should clarify.  So there were medical

18  education companies that had a preferred relationship

19  with one or another company.  But there were also

20  medical education companies that might be involved

21  with several.

22  BY MR. BECKWORTH:

23      Q.  Now, do you know, as you sit here today,

24  which ones have preferred relationships with which

25  companies?

Page 54

1      A.  I'm sorry, it's been so many years, I don't

2   remember any of their names honestly.

3      Q.  Now, there are also two types of payments

4   that can be made to your employer Beth Israel,

5   correct?

6      A.  Yes.

7      Q.  One of those was an educational grant?

8      A.  Yes.

9      Q.  And that's when a grant of money is done to

10  help develop and implement academic conferences or

11  writing regarding educational materials?

12              MR. ERCOLE:  Objection to form.

13              THE WITNESS:  So the educational grant

14  might support a conference, it might support a new

15  program, it might support an online educational

16  program.  As long as the -- as long as the product,

17  the outcome was educational, it would fall under

18  that mechanism.

19  BY MR. BECKWORTH:

20     Q.  The drug companies also paid your employer

21  and institutions like it for something called a

22  research grant?

23              MR. ERCOLE:  Objection to form.

24              THE WITNESS:  That's correct.

25

Page 55

1   BY MR. BECKWORTH:

2       Q.   Now, in addition to these different types

3   of payments, another way that a person like you and

4   you, yourself got paid was through a consulting fee?

5       A.   Yes.

6       Q.   Consulting fees occurred when you did

7   things like attended an advisory board?

8       A.   Yes.

9       Q.   Or assisted a drug company in the

10  development of a research protocol?

11      A.   Yes.

12      Q.   Educational grants to Beth Israel, your

13  employer for many years, were sometimes paid

14  directly by the drug company?

15              MR. ERCOLE:  Objection to form.

16              THE WITNESS:  Yes.

17  BY MR. BECKWORTH:

18      Q.   And as we established a moment ago, they

19  might also be paid through the vehicle of a medical

20  education company?

21      A.   Yes.

22      Q.   And, again, when your employer got money

23  from the medical education company, at some point

24  that money was funded by a pharmaceutical company?

25              MR. ERCOLE:  Objection to form.

1        THE WITNESS:  That's correct.  Those

2   dollars would come from the pharmaceutical company

3   to the hospital, and then it would be placed into an

4   account that I would use as chairman to implement

5   the program.  Those --

6   BY MR. BECKWORTH:

7        Q.  So that money -- sorry.

8        A.  I'm sorry.  Those dollars could be used to

9   offset salaries that were paid by the hospital for

10   the people who were working on the program.  But

11   none of the employees, including myself, received

12   extra money.

13        Q.  They could be used to offset salaries?

14        A.  They could be.

15        Q.  So let's just follow that trail for just a

16   moment if we can.  The money from speaking events

17   like this actually went through several stops.

18   Correct me if I'm wrong.  It goes from the drug

19   company to a medical education company, correct?

20        A.  Yes.

21        Q.  Medical education company to the employer

22   hospital?

23        A.  Yes.

24        Q.  Hospital to whatever its purposes are, that

25   institution, correct?

1      A.   I'm not sure how to interpret that.

2      Q.   Well, the hospital uses it for whatever the

3  agreement was?

4      A.   Whatever the agreement established by the

5  principal of the project, which in the case of my

6  department was usually me.

7      Q.   And then that money could also be used to

8  offset the salaries of the folks involved?

9      A.   Yes.

10      Q.   Now, in addition to all of these

11  different --

12          Sorry.  I'll let you put that back.

13      A.   Sorry.  My apologies.

14      Q.   In addition to all of these different types

15  of payments, third-party academic or advocacy groups

16  also got funding from drug companies, correct?

17      A.   Correct.

18      Q.   And as we discussed, you were with the

19  American Pain Society?

20      A.   Yes.

21      Q.   It received funding from the drug companies?

22      A.   Yes.

23      Q.   You were with the American Pain Foundation.

24  It received funding from the drug companies --

25      A.   Yes.

Page 58

1      Q.  -- correct?

2           And at some point, the American Pain

3   Foundation stopped getting funding from drug

4   companies, correct?

5      A.  Yes.

6      Q.  And that's because at some point, the

7   United States Senate did an inquiry into where it

8   was getting its money?

9      A.  Yes.

10          MR. ERCOLE:  Objection to form.

11          THE WITNESS:  I think that was the

12  precipitant, yes.

13  BY MR. BECKWORTH:

14     Q.  And after that event, the American Pain

15  Foundation no longer took funding from drug

16  companies?

17     A.  Yes.  It actually dissolved.

18     Q.  Tell the jury why it dissolved.

19     A.  Throughout the history -- the American Pain

20  Foundation was set up by some colleagues who were at

21  the American Pain Society, on the board of the

22  American Pain Society, and the American Pain Society

23  felt that it could not handle the requests from the

24  lay population and from patients for information

25  because the American Pain Society is a professional

1    society that caters to the needs of professionals.

2              And there was no entity in the United

3    States that could help consumers and patients get

4    information.  So the American Pain Foundation was

5    created in order to try to develop programming that

6    would provide information and support to patients,

7    their families, and the lay population.

8              Throughout the history of the American

9    Pain Foundation, the vast majority of dollars to

10   support programming was acquired through grant

11   writing to the pharmaceutical company -- companies.

12   And this persisted for all of the years of the

13   foundation.

14             There was an effort made on the part of

15   the management of the foundation to expand their

16   access to dollars by applying to foundations, for

17   example.  But that was not very successful.  So a

18   very large proportion of the American Pain

19   Foundation budget was coming from the pharmaceutical

20   industry.

21             And when the pharmaceutical industry

22   decided they could no longer fund the American Pain

23   Foundation, which temporally took place after the

24   Senate Finance Committee initiated its

25   investigation, there was no more funding for the

Page 60

1    foundation, and the foundation had to dissolve for

2    lack of budget.

3        Q.  That's a lot of information.  Thank you.

4    Let's kind of break that down for a moment.

5              The American Pain Foundation was an

6    influential voice in the area of pain treatment in

7    this country?

8              MR. ERCOLE:  Objection to form.

9              THE WITNESS:  You know, I would qualify

10   that.  The American Pain Foundation had no influence,

11   in my mind, on the professional community.  But I

12   think it became known among patient advocates as a

13   source of information and support.

14             So it was important in that regard, but

15   it wasn't important to the professional community,

16   physicians, for example.

17   BY MR. BECKWORTH:

18       Q.  But to patients it was?

19       A.  I believe it was, yes.

20       Q.  And you've stated that in at least the

21   treatment of pain using opioids, you think it

22   crosses the line if pharmaceutical makers go direct

23   to the consumer to market advertising, agreed?

24             MR. ERCOLE:  Objection to form.

25             THE WITNESS:  I agree with that.

Page 61

1   BY MR. BECKWORTH:

2      Q.  You agree that that's improper for a drug

3   company to go straight to a patient and advertise an

4   opioid?

5              MR. ERCOLE:  Objection to form.

6              THE WITNESS:  I agree with that, yes.

7   BY MR. BECKWORTH:

8      Q.  The American Pain Foundation was a voice

9   that provided information to patients and patient

10  advocates, correct?

11     A.  Correct.

12     Q.  And it received funding from pharmaceutical

13  companies that made opioids?

14     A.  That's correct.

15     Q.  It depended -- at some point, it depended

16  on those funds to operate?

17     A.  That's correct.

18     Q.  And in or around 2012, a committee of the

19  United States Senate sent a request for information

20  about the sources of that funding?

21     A.  Yes.

22     Q.  And at that point in time -- or after that

23  point in time, the American Pain Foundation stopped

24  taking money from pharmaceutical companies that make

25  opioids?

1      A.  Yes.

2      Q.  And after that, it was no longer able to

3  exist?

4      A.  That's correct.

5      Q.  Now, you agree that drug companies are a

6  major source of research funding?

7      A.  Yes.

8      Q.  You agree that this type of funding has the

9  ability to influence study proposals?

10      A.  Yes.

11           MR. ERCOLE:  Objection to form.

12  BY MR. BECKWORTH:

13      Q.  You believe that drug company research

14  grants provided to academics for studies of approved

15  drugs generally fund studies that aim to identify or

16  confirm benefits that will be helpful in marketing?

17           MR. ERCOLE:  Objection to form.

18           THE WITNESS:  I think that's true, yes.

19  BY MR. BECKWORTH:

20      Q.  And by "helpful in marketing," what you

21  mean is it's helpful to the marketing for the drug

22  company that's providing the funding?

23           MR. ERCOLE:  Objection to form.

24           THE WITNESS:  Yes.

25

Page 63

1    BY MR. BECKWORTH:

2        Q.  And you also believe that drug companies

3    pay honoraria fees and grants in a way that elevates

4    specific messages?

5        A.  Yes.

6              MR. ERCOLE:  Objection to form.

7    BY MR. BECKWORTH:

8        Q.  And you believe that the messengers also

9    get elevated?

10             MR. ERCOLE:  Objection to form.

11             THE WITNESS:  I'm sorry.  I didn't

12   understand that last question.  The messengers --

13   BY MR. BECKWORTH:

14       Q.  This is because the drug company lawyer is

15   objecting before my question is finished.  So let me

16   just ask it again.

17             MR. ERCOLE:  Move to strike.

18             MR. BECKWORTH:  There's nobody here to

19   strike anything.  If you guys will just wait until I

20   finish my question --

21             MR. EHSAN:  I would appreciate you not

22   engaging in commentary because you're guessing as to

23   why he couldn't hear your question.  If that's not

24   speculation, I'm not quite sure what it is.  And I'm

25   pretty sure you're not allowed to speculate.

Page 64

1                    MR. BECKWORTH:  You guys, you're going

2       to let me finish my question.  This is an Oklahoma

3       jury, a state that I doubt very seriously you guys

4       will step foot in to try this case.  But if you do,

5       everyone in that jury box right now, those 12 people

6       who are giving up their time want to hear this

7       gentleman's testimony.  And when you step over it so

8       they can't even hear the question, they're going to

9       know that's a drug company lawyer.

10                   So here's the deal.  Let me finish my

11      question.  I'm not going to argue that you waived

12      your objection because you didn't get it started

13      before he talked, okay?  That's fair.  That's an

14      agreement.

15                   MR. EHSAN:  No, that's not an agreement.

16      I'm still entitled to object and you're not allowed

17      to put into the record why you think he didn't hear

18      the question.  It could have been for lots of

19      reasons.

20      BY MR. BECKWORTH:

21         Q.  Sir, you agree that drug companies pay

22      honoraria fees and grants in a way that elevates

23      specific messages and the messengers who agree with

24      the company's preferred messaging?

25                   MR. ERCOLE:  Objection to form.

```
 1                   THE WITNESS:  Yes, I do.

 2    BY MR. BECKWORTH:

 3        Q.  Yes, you do?

 4        A.  Yes, I do.

 5        Q.  And by "preferred messaging," you're

 6    referring to the drug companies' preferred

 7    messaging?

 8                   MR. ERCOLE:  Objection to form.

 9                   THE WITNESS:  Yes.

10    BY MR. BECKWORTH:

11        Q.  Yes?

12        A.  Yes.

13        Q.  They're going to just keep doing it, so if

14    you'll let the drug company lawyers object and

15    then --

16                   MS. SPENCER:  I was going to say, if we

17    could just, you know, put a standing instruction,

18    you know, that the witness will give you the

19    opportunity to ask your question, either the drug

20    companies' attorneys or myself the opportunity to

21    object, and then the witness will start to answer --

22                   THE WITNESS:  Okay.

23                   MS. SPENCER:  -- that would probably

24    make this run more smoothly for everyone.

25                   MR. BECKWORTH:  Yes, sir -- Yes, ma'am.
```

Page 66

1   To both of you.

2   BY MR. BECKWORTH:

3       Q.  You believe the drug companies used the

4   positive statements that you made about opioids to

5   portray opioid treatment as safe and effective,

6   correct?

7               MR. ERCOLE:  Objection to form.

8               THE WITNESS:  Yes.

9   BY MR. BECKWORTH:

10      Q.  You believe the drug companies used your

11  statements without also using your accompanying

12  discussion of the risk that you included in papers

13  and other things that you wrote, correct?

14      A.  Yes.

15              MR. ERCOLE:  Objection to form.

16              THE WITNESS:  Yes.

17  BY MR. BECKWORTH:

18      Q.  Now, based upon your personal knowledge and

19  experience, do you believe that the drug company

20  defendants' research grants to researchers working

21  in academic centers or health care facilities after

22  a drug is approved for marketing almost always align

23  with the drug company defendants' interest in

24  demonstrating the benefits of the drugs they

25  manufacture?

1          MS. SPENCER:  Objection to form.

2          THE WITNESS:  Yes.  The scientific

3    question can be valid, and the scientific question

4    can be of interest to the academician who's doing

5    the research.  But the decision to fund the study

6    needs to be consistent with the interests of the

7    company providing the grant.

8    BY MR. BECKWORTH:

9       Q.  And that's, in fact, what happened?

10      A.  Yes.

11      Q.  And you also -- Do you also believe, based

12   upon your same personal knowledge and experience,

13   education, and understanding, that the defendants

14   did this, provided this funding, with the intent of

15   publishing results that could yield higher sales for

16   them in the future?

17          MR. ERCOLE:  Objection to form.

18          THE WITNESS:  Right.  As I said, the

19   scientific question could be valid.  It could be of

20   interest to the scientist and the company.  It's

21   certainly of interest to the scientist doing the

22   research.

23          But the rationale for the grant will --

24   in my view will include consideration about whether

25   or not the results of the study can be published and

Page 68

1    help the marketing interests of the company.

2    BY MR. BECKWORTH:

3        Q.   The rationale of the grant being the

4    rationale of the defendants who provide the money

5    for the grant?

6        A.   Yes.

7             MR. ERCOLE:   Objection to form.

8             THE WITNESS:   Yes.

9    BY MR. BECKWORTH:

10       Q.   Now, based on interactions you've had with

11   medical education vendors, you believe that

12   academics who are provided with honoraria for

13   producing or editing material have to be vigilant in

14   what they do?

15       A.   Yes, I do.

16       Q.   You believe that they must be vigilant to

17   avoid messages that are not well supported or

18   prudent?

19       A.   Yes, I do.

20       Q.   And that they must avoid messages that are

21   in the interest of the drug company if they don't

22   have a corresponding medical benefit for patients?

23       A.   Yes.

24       Q.   You also believe, do you not, that some of

25   your observations are based on your personal

1    interactions with medical education providers over

2    the course of your career?

3        A.  Yes.

4              MR. ERCOLE:  Objection to form.

5              THE WITNESS:  Yes.

6    BY MR. BECKWORTH:

7        Q.  What did the medical education vendors do

8    that raised this concern for you?

9              MR. ERCOLE:  Objection to form.

10             THE WITNESS:  Well, periodically I would

11   receive information to edit for programs that would

12   be supported by the medical education companies with

13   grant support from the industry.  And I would have

14   to very carefully edit it to make sure that the

15   messages were scientifically justified and

16   incorporated the proper approach for a physician to

17   address a chronic pain problem.

18             I think that what I was trying to get at

19   there is that physicians who are involved in this

20   sort of work who are -- who are creating programming

21   to educate their colleagues that is supported

22   through grants from the pharmaceutical industry need

23   always to be very careful that everything that they

24   publish over their name, everything that they place

25   on the Internet over their name has been carefully

Page 70

1   edited to ensure that it's balanced and it includes

2   all the information necessary for safe and

3   appropriate prescribing, which sometimes means that

4   the information needs to be carefully edited because

5   the information that will be received will not have

6   those elements on it -- in it at the start.

7   BY MR. BECKWORTH:

8       Q.  And is that because there's competing

9   interests?

10                  MR. ERCOLE:  Objection to form.

11                  THE WITNESS:  I couldn't tell you how

12  this all evolves.  And I can only tell you that as a

13  physician/educator who receives information that

14  might be of educational value and as an educator

15  that's asked to contribute to that material and make

16  sure that it's appropriate, that requires frequently

17  editing to ensure that the messages are balanced and

18  they're comprehensive and they're appropriate for

19  physicians.

20  BY MR. BECKWORTH:

21      Q.  Well, you've also stated, have you not,

22  that some of the work that's ostensibly created by

23  academics in their interactions with medical

24  education company vendors will actually reflect the

25  work or influence of the pharmaceutical industry?

Page 71

1                    MR. ERCOLE:  Objection to form.

2                    THE WITNESS:  Yes, I believe that that's

3    true.

4    BY MR. BECKWORTH:

5         Q.  So you have to be very careful to make sure

6    that doesn't happen?

7                    MR. ERCOLE:  Objection to form.

8                    THE WITNESS:  I agree that's true.

9    BY MR. BECKWORTH:

10        Q.  But no matter what, it's happened?

11        A.  I believe that's true, yes.

12        Q.  And when you used the word "ostensibly," as

13   I understand that, do you mean that the work looks

14   like it's the work of the academic, but it actually

15   has the influence of the pharmaceutical industry?

16                   MR. ERCOLE:  Objection to form.

17                   THE WITNESS:  Yes.

18   BY MR. BECKWORTH:

19        Q.  And when that happens, that's a bad thing?

20                   MR. ERCOLE:  Objection to form.

21                   THE WITNESS:  Yes, that's a bad thing.

22   BY MR. BECKWORTH:

23        Q.  It can be misleading?

24        A.  Yes.

25        Q.  And as we established earlier, medical

Page 72

1    education companies like this, they get hired by the

2    drug companies?

3        A.  Yes.

4        Q.  Including the defendants here?

5            MR. ERCOLE:  Objection to form.

6            THE WITNESS:  Yes.

7    BY MR. BECKWORTH:

8        Q.  Your answer was yes, including the

9    defendants here?

10       A.  Yes.

11       Q.  Now, based upon your personal experience,

12   you know that the speaker programs were used by

13   these defendants to help them sell opioids?

14           MR. ERCOLE:  Objection to form.

15           THE WITNESS:  I don't have personal

16   information about that as a stated aim of these

17   programs.  So I'm not -- maybe I could ask you to be

18   more specific in what you're asking me.

19   BY MR. BECKWORTH:

20       Q.  The drug company defendants here use

21   speaker programs, correct?

22       A.  Correct.

23       Q.  And part of their purpose as you understand

24   it based on your personal experience is to help them

25   sell more drugs?

 1                    MR. ERCOLE:  Objection to form.

 2                    THE WITNESS:  What I would say is that

 3      the speaker programs had the primary objective to

 4      educate doctors, but the messages that doctors would

 5      give when giving talks for the speakers bureaus

 6      would generally favor the drugs provided -- created

 7      by those drug companies.

 8                    MR. COLEMAN:  That's all right.

 9                    MR. BECKWORTH:  No.  I'm going to wait

10      until you stop rudely interrupting the deposition.

11      Are you done?

12                    MR. COLEMAN:  Done.

13                    MR. BECKWORTH:  Thank you.  All right,

14      sir, I'm going to hand you a document marked

15      Exhibit 3.  This is a document produced by Janssen

16      that is called the "Nucynta and Nucynta ER 2012

17      Business Plan."

18                         (Portenoy Exhibit 3 was marked

19                          for identification.)

20                    MR. BECKWORTH:  I'll hand that to you.

21                    THE WITNESS:  Yes.

22                    MR. BECKWORTH:  Hand that to each of

23      you.

24      BY MR. BECKWORTH:

25         Q.  Feel free to look through that.  I'm going

Page 74

1    to turn your attention to just a couple parts.  You

2    understand that Nucynta and Nucynta ER are opioids

3    that Janssen put out, right?

4        A.  Yes.

5        Q.  If you'll turn to page 2 of this document,

6    which is a PowerPoint, it lists "Objectives."

7               Do you see that?

8        A.  Yes.

9        Q.  And one of these objectives it says is

10   "Review and gain alignment on 2012 tactics that

11   support identified strategic imperatives"?

12       A.  Yes.

13       Q.  And then you see on the next page it says

14   "2012 Business Plan"?

15       A.  Yes.

16       Q.  Now, if you'll look through this, the very

17   next page, page 4, looks at a chart of Nucynta

18   prescriptions and a forecast over the next year.

19               Do you see that?

20       A.  Yes.

21               MR. ERCOLE:  Objection to form.

22               THE WITNESS:  Yes.

23   BY MR. BECKWORTH:

24       Q.  Now, if you'll turn, sir, to page 8, take a

25   look at that for just a second.  Now, page 8 of

Page 75

1    Exhibit 4 -- I believe it's 4 -- of Exhibit 3 --

2    page 8 of Exhibit 3 has a box there that's titled:

3    "What we've learned from our customers (market

4    research: Second Q 2011)," correct?

5        A.  Yes.

6              MR. ERCOLE:  Objection to form.

7    BY MR. BECKWORTH:

8        Q.  And at the bottom it has a box that says

9    "Nucynta selling efforts," correct?

10       A.  Yes.

11       Q.  I know you've never seen this Janssen

12   document before, but could you read the first bullet

13   point there.

14             MR. ERCOLE:  Objection to form.

15             THE WITNESS:  "Highly promotionally

16   sensitive."

17   BY MR. BECKWORTH:

18       Q.  Then what does it say under that?

19       A.  "Speaker programs often trigger first use."

20       Q.  Referring to Nucynta?

21       A.  Yes.

22       Q.  A drug that Janssen sold?

23       A.  Yes.

24       Q.  Now, if you will turn, please, to page 10,

25   there's another box there, and it says, "Nucynta's

Page 76

1    success requires integrated efforts across

2    stakeholders within their sites of care," correct?

3        A.  Yes.

4        Q.  And then if you look therein, it lists

5    "Prescribers," correct?

6        A.  Yes.

7        Q.  "Payers"?

8        A.  Yes.

9        Q.  And "Influencers"?

10       A.  Yes.

11       Q.  And then it lists "Sites of care," right?

12       A.  Yes.

13       Q.  Right along with prescribers, in the

14   "Influencers" box, it lists several other types of

15   stakeholders, correct?

16       A.  Yes.

17       Q.  And one of those is "Professional and

18   patient advocacy," right?

19       A.  Yes.

20       Q.  Have you ever seen a document like this?

21       A.  I have not seen this document, no.

22       Q.  Were you aware that Janssen viewed the work

23   of speaker bureaus as part of its sales program?

24            MR. EHSAN:  Object to form.

25            THE WITNESS:  No.  I wasn't aware of

Page 77

1   that.

2   BY MR. BECKWORTH:

3       Q.   Were you aware that Janssen knew that the

4   first use of an opioid could be triggered by

5   speakers that they paid to go out and speak in this

6   way?

7       A.   I wasn't --

8               MR. EHSAN:  Object to form.

9               THE WITNESS:  I wasn't aware of that,

10  no.

11  BY MR. BECKWORTH:

12      Q.   But it certainly supports what you've

13  testified to already: that you understand that the

14  speaker programs that drug companies like Janssen

15  used were done to help them sell more drugs?

16              MR. EHSAN:  Objection to form.

17              MR. ERCOLE:  Objection to form.

18              THE WITNESS:  Yes, that's correct.

19  BY MR. BECKWORTH:

20      Q.   They objected, but it's true, isn't it?

21              MR. EHSAN:  Same objection.

22              THE WITNESS:  Yes.

23  BY MR. BECKWORTH:

24      Q.   Do you have a guess why they're objecting?

25              MR. EHSAN:  Objection to form.

Page 78

1                    THE WITNESS:  I don't have a guess, no.

2    BY MR. BECKWORTH:

3         Q.  Well, you just said that Janssen had an

4    intent to use speaker programs to help it get its

5    product used?

6                    MR. EHSAN:  Object to form.

7                    THE WITNESS:  I did, yes.

8    BY MR. BECKWORTH:

9         Q.  And that supports your statement regarding

10   that in your declaration?

11        A.  Yes.

12        Q.  Now, let me show you the next one, sir.

13   Are you familiar with a drug called Duragesic?

14        A.  Yes.

15        Q.  You understand that was a fentanyl product?

16        A.  Yes.

17        Q.  An opioid?

18        A.  Yes.

19        Q.  A Janssen product?

20        A.  Yes.

21                      (Portenoy Exhibit 4 was marked

22                       for identification.)

23   BY MR. BECKWORTH:

24        Q.  I'm going to hand you Exhibit 4, please.

25   You've never seen this document before?

Page 79

```
 1      A.  No, I have not.

 2      Q.  We'll go through certain parts of it.  And

 3  if there's anything I ask you that you need to read

 4  further, just let me know.

 5           This document starts by saying, with

 6  respect to Duragesic, "Coming off a record-breaking

 7  year of $543 million in 2001, the bar has been

 8  raised for Duragesic in 2002 to $692 million in

 9  sales, a 28 percent increase."

10           Do you see that?

11      A.  Yes.

12      Q.  If you go down two sentences, it says,

13  "You are our primary sales force that drives nearly

14  75 percent of the business through pain specialist

15  and primary care physicians."

16           It says that, doesn't it?

17      A.  Yes.

18      Q.  And it says, "Over the past year, we have

19  made considerable progress growing our market share

20  with this audience"?

21      A.  Yes.

22      Q.  Now, it goes down on the bold part that

23  says "Market update."

24           Do you see that?

25      A.  Yes.
```

Page 80

1      Q.  It says, "Market growth has slowed in the

2   first half of 2002 and our need to focus on taking

3   market share from OxyContin by selling head to

4   head."

5              Do you see that?

6      A.  I do, yes.

7      Q.  So we're talking about Duragesic used in

8   reference to taking market share from OxyContin?

9      A.  Yes.

10     Q.  Now, Duragesic's a fentanyl patch?

11     A.  Yes.

12     Q.  OxyContin's a pill?

13     A.  Yes.

14     Q.  Duragesic's made by Janssen?

15     A.  Yes.

16     Q.  OxyContin, name brand made by Purdue?

17     A.  Yes.

18     Q.  And generic versions sold by Cephalon/Teva?

19              MR. ERCOLE:  Objection to form.

20              THE WITNESS:  I don't know that.

21   BY MR. BECKWORTH:

22     Q.  You know there's generic versions of

23   OxyContin?

24     A.  Yes.

25     Q.  Now, if we go to "Strategic focus" here for

Page 81

1    this sales effort, you see something called

2    "Physician target: Call plan attachment" --

3    "attainment/impactful message delivery."

4              Do you see that?

5    A.  Yes.

6    Q.  At the bottom of that it says, "Success

7    means increasing Duragesic share at the expense of

8    OxyContin with all of our targeted physicians, not

9    just concentrating on the highest-deciled targets."

10             Do you see that?

11   A.  I do, yes.

12   Q.  Now, did you know that Janssen referred to

13   health care providers as targets?

14             MR. EHSAN:  Object to form.

15             THE WITNESS:  I didn't know.

16   BY MR. BECKWORTH:

17   Q.  Did you know that during the internal sales

18   process that Janssen and Purdue and Teva used that

19   they referred to the doctors they interfaced with as

20   targets?

21             MR. ERCOLE:  Objection to form.

22             THE WITNESS:  I did not know.

23   BY MR. BECKWORTH:

24   Q.  Did you know that they deployed their sales

25   force to go talk to doctors that were identified

Page 82

1    literally as targets?

2                MR. ERCOLE:  Objection to form.

3                THE WITNESS:  I knew that they deployed

4    their sales force to talk to doctors, not that they

5    labeled the doctors as targets.

6    BY MR. BECKWORTH:

7        Q.  Did you know that they referred to the

8    sales process of going to targets as something

9    called detailing?

10       A.  Yes.

11       Q.  Did you know that these companies obtained

12   prescription data through something called IMS where

13   they could tell the prescribing habits of every

14   doctor that they called upon?

15               MR. ERCOLE:  Objection to form.

16               THE WITNESS:  Yes.  Yes, I knew.

17   BY MR. BECKWORTH:

18       Q.  And did you know that they then took that

19   data to rank their sales targets based on whether

20   the target was likely to prescribe their drug?

21               MR. ERCOLE:  Objection to form.

22               THE WITNESS:  Yes, I know that went on.

23   Yes.

24   BY MR. BECKWORTH:

25       Q.  And did you know that these companies

Page 83

1    ranked those doctors based on something called their

2    value, meaning that if they ranked high enough as a

3    likely candidate to prescribe, then they were worthy

4    of the time, money, and effort it took to go call

5    upon them?

6                    MR. ERCOLE:  Objection to form.

7                    THE WITNESS:  I didn't know that

8    specific -- that level of specificity.

9    BY MR. BECKWORTH:

10       Q.  You've been around a lot of doctors,

11   haven't you?

12       A.  Yes.

13       Q.  You've been around primary care physicians?

14       A.  Yes.

15       Q.  Do you think based on your personal

16   experience, training, your life's work in the pain

17   space, that your average primary care physician

18   knows that when a sales rep comes to them, they are

19   being referred to as a target?

20                    MR. ERCOLE:  Objection to form.

21                    MS. SPENCER:  Objection.  He can only

22   answer what he knows.

23   BY MR. BECKWORTH:

24       Q.  And I'm asking you based on your personal

25   experience with primary care physicians that you

Page 84

1    know.

2                  MR. ERCOLE:  Same objection.

3                  MS. SPENCER:  You may answer.

4                  THE WITNESS:  I don't think they would

5    know that they're being labeled as a target, no.

6    BY MR. BECKWORTH:

7        Q.  Now, here it also says a "Patient target:

8    Expand Duragesic use in nonmalignant pain," correct?

9        A.  Yes.

10       Q.  And for the benefit of the jury -- which

11   I'm sure everyone here understands -- there's a

12   difference in pain treatment between malignant, or

13   cancer, pain and then noncancer pain, right?

14                  MR. ERCOLE:  Objection to form.

15                  THE WITNESS:  There is a difference, but

16   I would just like to clarify this because it's a

17   very important point.

18   BY MR. BECKWORTH:

19       Q.  Sure.

20       A.  Specifically relevant to palliative care.

21   Cancer pain is pain related specifically to a

22   cancer, usually metastatic disease.

23                  Patients who have other types of

24   advanced medical illness are often considered to be

25   appropriate for treatment as if they have cancer

Page 85

1    pain.  So a patient who has very advanced heart

2    failure or very advanced multiple sclerosis might

3    have very severe pain and is considered by the

4    medical community to be comparable to cancer pain,

5    especially by the palliative care community who

6    views those patients to be essentially identical to

7    those patients with cancer pain.

8              Usually and particularly at this time

9    when the term "noncancer pain" or "nonmalignant

10   pain" was used, it was referring to very large

11   populations with chronic musculoskeletal-type pains,

12   like low back pain, chronic neck pain, fibromyalgia,

13   myofascial pain, and headache.

14      Q.   Make sure that is correct.  The nonmalignant

15   pain, as you're referring to these very large

16   chronic neck pain, fibromyalgia and the like?

17      A.   That's correct.

18              MR. ERCOLE:  Objection to form.

19   BY MR. BECKWORTH:

20      Q.   And if you look here just below the last

21   paragraph of this document we were reading, it says,

22   "Our objective is to convince physicians that

23   Duragesic is effective and safe to use in moderate

24   to severe chronic pain such as back pain and

25   degenerative joint disease like osteoarthritis,"

1   correct?

2        A.   Yes.

3        Q.   And that's what you're talking about:

4    nonmalignant, non-palliative --

5        A.   That is correct.

6        Q.   Now, you see what I see, right?  Who is

7    their target?

8        A.   Physicians.

9        Q.   And it says, Our objective is to do

10   something with respect to physicians.  What word did

11   Janssen use?

12       A.   I'm not sure what you mean by the question.

13   I'm sorry.

14       Q.   If you'll look to the third line there in

15   that paragraph, it says, "objective is to"?

16       A.   "Convince physicians that Duragesic is

17   effective and safe to use in moderate to severe

18   chronic pain such as back pain and degenerative

19   joint disease like osteoarthritis."

20       Q.   And the choice they used in this document

21   to their sales force is the word "convince"?

22       A.   Yes.

23       Q.   Convince who?

24       A.   The physician.

25       Q.   So if you'll turn to the next page, please.

Page 87

1    You'll see it says something called -- well, at the

2    first full paragraph there, the first sentence says,

3    "Based on extensive market research, we have

4    enhanced our current promotional message to maximize

5    our product benefits and address relevant issues

6    among chronic pain physicians."

7                    Do you see that?

8        A.  Yes.

9        Q.  And there right below it in bold it says,

10    "Sales materials/programs - new this cycle,"

11    correct?

12        A.  Yes.

13        Q.  And if you go down, there's one that says

14    "Nonpersonal selling/no rep involvement."  And it

15    lists a newsletter and a direct mail program.

16                    Do you see that?

17        A.  Yes.

18        Q.  Let's turn to the next page.  There's

19    another thing listed with respect to the sales

20    effort about convincing doctors, isn't there?

21        A.  Yes.

22        Q.  It's "Medical education/no rep

23    involvement"?

24        A.  That's correct.

25        Q.  And there it lists something that says

1    "National Pain Education Council (NPC)" -- excuse

2    me -- "(NPEC) invitation."

3              Do you see that?

4        A.  Yes.

5        Q.  And lists an audience.  Who is the

6    audience?

7        A.  "Primary care, pain specialties,

8    oncologists, residents, nurses, pharmacists."

9        Q.  And in this sales effort to use NPEC,

10   there's a description of how to do it.  Will you

11   read that for the jury where it says "Description."

12       A.  Yes.  "National Pain Education Council is

13   funded by an educational grant from Janssen.

14   Invitation to participate in a multimedia CME

15   program for physicians and other medical

16   professionals on the appropriate opioid

17   pharmacotherapy for chronic pain management.

18   Announcement invites medical professionals to visit

19   www.npecweb.org website."

20       Q.  Now, you were involved in the NPEC at some

21   point, correct?

22       A.  Yes.

23       Q.  Tell the jury what that was, please, sir.

24       A.  I believe that I was the cochair of NPEC --

25   of the NPEC initiative.

Page 89

1          Q.  And that was a CME, continuing medical

2     education, platform, correct?

3          A.  That's correct.

4               MR. ERCOLE:  Objection to form.

5     BY MR. BECKWORTH:

6          Q.  And it was funded in part by Janssen?

7          A.  I think it was funded -- to my

8     recollection, I think it was funded entirely by

9     Janssen.

10         Q.  And so did you know that, in internal

11    documents about selling Duragesic, that Janssen

12    intended to use that platform this way?

13         A.  No, I did not.

14         Q.  Does it trouble you to know that now?

15              MR. EHSAN:  Object to form.

16              THE WITNESS:  It does, yes.

17    BY MR. BECKWORTH:

18         Q.  Why does it trouble you?

19         A.  The platform was a CME platform.  And

20    continuing medical education is supposed to be based

21    on information that's balanced and comprehensive and

22    medically appropriate.

23              At best, there is a firewall between

24    continuing medical education and marketing.  That

25    firewall has gotten a lot stronger in recent years

1    because of the recognition that things like this

2    were happening.  But this, to me, demonstrates why

3    the firewall was necessary, why the rules have

4    gotten much stronger.

5             Because continuing medical education

6    programming, which was not intended by -- for

7    marketing purposes and certainly the academic people

8    who were devoting their energies to it were not

9    considering themselves as contributing to marketing

10   in any way, was actually being used by the company

11   as a marketing strategy.

12   BY MR. BECKWORTH:

13       Q.  So let's go back through that real quickly

14   because there's some important parts to it.  There

15   were three entities listed there, right?  There are

16   the people that attend these engagements, right?

17       A.  Yes.

18       Q.  Then there's the people that are lecturing

19   or speaking at them, correct?

20       A.  Yes.

21       Q.  And then there's the drug company, which in

22   this case is Janssen, right?

23       A.  Yes.  And --

24       Q.  Of the three, two of them had no idea that

25   Janssen internally was using this platform as a way

Page 91

1    to sell its drugs to doctors?

2              MR. ERCOLE:  Object to form.

3              MR. EHSAN:  Objection to form.

4              THE WITNESS:  Well, certainly I can't

5    speak to whether physicians who attended would know

6    or not.  But I can speak for myself.  And I didn't

7    know.  And I was the cochair of the program.

8    BY MR. BECKWORTH:

9        Q.  They didn't tell you?

10       A.  No.  No, no, no.

11       Q.  That's troubling?

12             MR. EHSAN:  Object to form.

13             THE WITNESS:  Yes.

14   BY MR. BECKWORTH:

15       Q.  Because you -- we talked about this earlier

16   when one person can't do something alone, you're

17   giving your work to do this, and the funding's being

18   paid by Janssen, right?

19       A.  Yes.

20             MR. ERCOLE:  Objection to form.

21   BY MR. BECKWORTH:

22       Q.  And internally they're talking about going

23   at a competitor to increase the profile of a

24   fentanyl opioid drug?

25       A.  Yes.

 1              MR. ERCOLE:  Objection to form.

 2    BY MR. BECKWORTH:

 3       Q.  That's a serious Schedule II narcotic?

 4              MR. ERCOLE:  Same objection.

 5              THE WITNESS:  I'm not sure how to

 6    interpret that last comment.  But I'll endorse the

 7    concept -- I'll endorse the conclusion that as an

 8    academic who was trying to educate professionals and

 9    whose messages about benefit and risk had always

10    been part of that educational programming from the

11    very first time that I started it, that was the goal

12    of this involvement in NPEC, was to provide

13    information of that type.

14              And there was no understanding on my

15    part that it would be used in some way as a

16    marketing strategy.

17    BY MR. BECKWORTH:

18       Q.  And, in fact, they also didn't share with

19    you -- "they" being Janssen in this instance -- that

20    they had internal survey data that showed that

21    speaker bureaus and conferences like this actually

22    help them sell more drugs?

23              MR. ERCOLE:  Objection to form.

24              THE WITNESS:  No.  I don't have any

25    recollection that that was ever shared with me.

Page 93

1   BY MR. BECKWORTH:

2       Q.  You would have liked to have known that?

3       A.  No.  It wasn't my area of interest.  I had

4   no desire with any of these engagements, these

5   initiatives that I did with the drug company

6   funding, in my mind, this was very important to keep

7   separate from any marketing interest.

8           My interest was education of

9   professionals, and the messages had to be

10  comprehensive, they had to be balanced, and they had

11  to be accurate, scientifically accurate.

12      Q.  That's right.  That's what was in your

13  mind, but that's not what's in these documents?

14          MR. EHSAN:  Objection to form.

15          MR. ERCOLE:  Object to form.

16          THE WITNESS:  That's true.

17  BY MR. BECKWORTH:

18      Q.  They didn't tell you about it?

19      A.  No, they did not.

20      Q.  And that was deceptive to you?

21          MR. EHSAN:  Object to form.

22          THE WITNESS:  I wish that I had known.

23  BY MR. BECKWORTH:

24      Q.  So I just want to clean up a few questions

25  that I had.  When you talked about opioids for

Page 94

1   advanced illnesses, you're aware, aren't you, that

2   most patients on long-term opioids do not have pain

3   from advanced illnesses like multiple sclerosis?

4        A.  Yes.

5             MR. ERCOLE:  Objection to form.

6   BY MR. BECKWORTH:

7        Q.  You agree with me?

8        A.  Yes.

9        Q.  You also would agree that most patients on

10  long-term opioids have common conditions like low

11  back pain, chronic headache, and fibromyalgia?

12            MR. ERCOLE:  Objection to form.

13            THE WITNESS:  Yes.

14  BY MR. BECKWORTH:

15       Q.  Now, we were also talking about the Senate

16  Finance investigation into third-party groups?

17       A.  Yes.

18       Q.  And the funding they received; do you

19  remember that?

20       A.  Yes.

21       Q.  Now, do you recall as being involved with

22  APF and APS that there were investigative journal

23  articles that were written prior to the Senate

24  Finance Committee that called into question whether

25  these groups should be receiving funds from

Page 95

```
 1   pharmaceutical companies?

 2              MR. ERCOLE:  Objection to form.

 3              THE WITNESS:  I'm not sure what you mean

 4   by "investigative journal articles."

 5   BY MR. BECKWORTH:

 6      Q.  Well, newspaper/magazine folks.

 7      A.  Oh, in the lay press?

 8      Q.  Yes.

 9      A.  Yes.

10      Q.  And you understand they were raising

11   questions about this?

12      A.  Yes.

13              MR. ERCOLE:  Same objection.

14   BY MR. BECKWORTH:

15      Q.  And you understand, based on your own

16   experience, that after those questions started being

17   asked, there was a Senate inquiry?

18      A.  Yes.

19              MR. ERCOLE:  Objection to form.

20   BY MR. BECKWORTH:

21      Q.  Let's kind of turn your attention to a few

22   other deals.  We were talking about how --

23              MS. SPENCER:  A point of clarification.

24   Are we on P4 or are we done with P4?

25              MR. BECKWORTH:  I'm done with it for
```

1   now.

2   BY MR. BECKWORTH:

3       Q.  Now, you stated in your declaration you've

4   been at MJHS since 2014?

5       A.  Yes.

6       Q.  Since that time, y'all haven't -- you

7   haven't taken consultation fees from the

8   pharmaceutical industry?

9       A.  No.

10      Q.  You listed, I think, one exception where

11  you've been involved in a research grant?

12      A.  Yes.

13      Q.  Why are you no longer taking these types of

14  fees from these defendants?

15              MR. ERCOLE:  Objection to form.

16              THE WITNESS:  Well, there's really two

17  reasons for that.  And one reason is that my current

18  role is devoted entirely to palliative care.  And so

19  I haven't really been asked to participate much in

20  pain education, opioid education.

21              The second reason is that I've been

22  turning down any opportunities that have existed

23  because of the litigation that's going on and my

24  concern about how that would play out.

25

Page 97

1   BY MR. BECKWORTH:

2       Q.  And since you got named in various lawsuits

3   around the country, have any of the defendants in

4   this case come to you and asked you to do work for

5   them?

6               MR. ERCOLE:  Objection to form.

7               THE WITNESS:  I don't believe so, no.

8   BY MR. BECKWORTH:

9       Q.  Not since the lawsuits got filed?

10      A.  Not that I think -- not that I remember, no.

11      Q.  Thank you.  Now if you want to turn to your

12  declaration in paragraph 30, it might help you.

13  I'm going to go through some of the payments that

14  you list there.

15      A.  Um-hum.

16      Q.  In paragraph 30 of your declaration, sir,

17  you list partial payments that you've received,

18  correct?

19      A.  Yes.

20      Q.  And you state that this is the best of your

21  recollection based on the documents you have,

22  correct?

23      A.  Correct.

24      Q.  You admit this list isn't everything?

25      A.  Yes.

Page 98

1      Q.  And I just want you to know, I'm going to

2  go over some other things that we found.  It's not

3  saying "I got you."  I understand that you've

4  provided what you knew, and then we've looked

5  through records, and I'll give you the opportunity

6  to look at other things, okay?

7      A.  Yes.

8              MR. ERCOLE:  Objection to form.

9  BY MR. BECKWORTH:

10     Q.  Now, you were paid, as we discussed, to

11  speak at CMEs and annual conferences where drug

12  company funding provided those resources?

13     A.  Yes.

14     Q.  Often -- Well, let me ask you this.  Was it

15  often the time or the case that when you did that,

16  it was unbranded?

17             MR. ERCOLE:  Objection to form.

18             THE WITNESS:  I need you to clarify what

19  you mean by the word "unbranded."

20  BY MR. BECKWORTH:

21     Q.  So let's use the example we just gave.

22  When Janssen would provide funding for you that

23  internally they viewed as good for sales, they

24  wouldn't go and have you, say, promote specific

25  drugs like Duragesic or Nucynta?

1               MR. EHSAN:  Objection to form, move to

2      strike.

3               THE WITNESS:  That's correct.  I never

4      gave a talk that was specifically intended to

5      promote any drug.

6      BY MR. BECKWORTH:

7         Q.  Right.  Your talks were about treating

8      pain, and one of the ways to do that in the

9      noncancer palliative care space is using opioids?

10              MR. ERCOLE:  Objection to form.

11              THE WITNESS:  That's correct.

12     BY MR. BECKWORTH:

13        Q.  And your work was to talk about and

14     increase attention to using opioids as one of those

15     treatment mechanisms?

16              MR. ERCOLE:  Objection to form.

17              THE WITNESS:  That's correct, yes.

18     BY MR. BECKWORTH:

19        Q.  And so when you spoke in the ways that

20     we've talked about, it was done in a way that was

21     not drug-specific, correct?

22        A.  Yes.

23        Q.  But it often talked about -- or you often

24     talked about using opioids just generally as they

25     might apply to different types of modalities?

```
 1              MR. ERCOLE:  Objection to form.

 2              THE WITNESS:  That's true.

 3   BY MR. BECKWORTH:

 4       Q.  Now, in this list, you state that -- we're

 5   just going to go down it -- from November 30 to

 6   December 1, 2006, you consulted for an advisory

 7   board for Alpharma for the drug Kadian, which is now

 8   distributed by Allergan, correct?

 9       A.  Yes.

10       Q.  You were paid $3,030?

11       A.  Yes.

12       Q.  In 2007, you worked on a multicenter

13   clinical trial for a drug company called Endo,

14   correct?

15       A.  Yes.

16       Q.  Your employer was paid $8,880 for that?

17       A.  Yes.

18       Q.  On February 19, 2007, you participated in a

19   seminar called the:  Breakthrough pain curriculum

20   development workshop"?

21       A.  Yes.

22       Q.  And you were paid $3,000?

23       A.  Yes.

24       Q.  You were paid on that by Advanced

25   Strategies in Medicine, correct?
```

Page 101

1      A.  Yes.

2      Q.  And that's one of these medical education

3  companies?

4      A.  That's correct.

5      Q.  But you understand that was actually

6  financed by Cephalon related to its opioid drug

7  Fentora?

8      A.  Yes.

9          MR. ERCOLE:  Objection to form.

10          THE WITNESS:  Yes.

11  BY MR. BECKWORTH:

12     Q.  On May 15, 2007, you were paid $3,500 for

13  working on an advisory board for Cephalon, again

14  related to its opioid Fentora?

15     A.  Yes.

16     Q.  On November 6, 2007, you presented a

17  continuing medical education program called "Meet

18  the patients: Individualizing therapy for persistent

19  and breakthrough pain"?

20     A.  Yes.

21     Q.  Correct?  You were compensated $2,000?

22     A.  Yes.

23     Q.  And, again, you were paid by Advanced

24  Strategies in Medicine?

25     A.  Yes.

1     Q.  And, again, you believe that was actually

2  paid through Cephalon related to its Fentora

3  product?

4     A.  Yes.

5              MR. ERCOLE:  Objection to form.

6  BY MR. BECKWORTH:

7     Q.  Yes?

8     A.  Yes.

9     Q.  2008, you entered into a consulting

10  agreement with Insys for the purpose of product

11  development?

12     A.  Yes.

13     Q.  Insys paid you at a rate of $500 per hour?

14     A.  Yes.

15     Q.  In 2008, you entered into an advisory board

16  agreement with Endo for purposes of product

17  development?

18     A.  Yes.

19     Q.  And Endo paid you $2,500?

20     A.  Yes.

21     Q.  You also contracted with something called

22  Miller Medical Communications to present a

23  continuing medical education program in Brooklyn,

24  New York on October 30, 2009, correct?

25     A.  Yes.

1     Q.  And that was called "When opioids are

2  indicated for chronic pain: How to optimize

3  therapeutic outcomes and minimize risk"?

4     A.  Yes.

5     Q.  Now, that one was sponsored by King

6  Pharmaceuticals and Purdue Pharma, right?

7     A.  Yes.

8     Q.  You got paid $2,000?

9     A.  Yes.

10    Q.  December 16, 2009, you entered into a

11  two-year master health care professional consultant

12  services agreement with Purdue?

13    A.  Yes.

14    Q.  That same day you entered into a statement

15  of work indicating that the purpose of the agreement

16  "was to provide expert opinion regarding new product

17  opportunities, products currently under development,

18  areas of unmet medical need, and the clinical

19  application/implications of new Purdue products"?

20    A.  Yes.

21    Q.  You believe that that Purdue agreement

22  concerned the opioid Butrans?

23    A.  Yes.

24    Q.  Purdue paid you a total of $40,000 plus

25  expenses for your work on that project?

1    A.  Yes.

2    Q.  Now, during this time frame while you were

3  receiving income from these drug companies for the

4  work we listed, as we discussed, you were advocating

5  for pain treatment to be done, and consider the use

6  of opioids to treat chronic pain that was neither

7  malignant nor palliative?

8              MR. ERCOLE:  Objection to form.

9              THE WITNESS:  Yes.  I was teaching about

10  that extensively, and writing about it.

11  BY MR. BECKWORTH:

12    Q.  There's no secret that that's something you

13  wrote about?

14    A.  Yes.

15    Q.  And that you talked about?

16    A.  Yes.

17    Q.  Now, during many of these years, you worked

18  for the hospital Beth Israel, correct?

19    A.  Yes.

20              MR. BECKWORTH:  I'm going to hand you

21  what we'll mark as Exhibit 5.

22                   (Portenoy Exhibit 5 was marked

23                    for identification.)

24  BY MR. BECKWORTH:

25    Q.  I'll give you a copy, and if you'll pass

Page 105

1    the others to your lawyer, please.

2              Sir, while you look through that,

3    Exhibit 5 is a document called "Department of Pain

4    Medicine and Palliative Care 1997 through 2007."

5              Do you see that?

6    A.  Yes.

7    Q.  And this document --

8              MS. SPENCER:  Can he have a moment to

9    review the document?

10             MR. BECKWORTH:  Absolutely.

11             MS. SPENCER:  Thank you.

12             THE WITNESS:  Okay.

13   BY MR. BECKWORTH:

14   Q.  This document is announcing an anniversary

15   fund and seeking funding?

16   A.  Yes.

17   Q.  If you'll turn to page 5 in this document,

18   it lists the DPMPC's philanthropic partners from

19   1997 through 2007.

20             MS. SPENCER:  I'm not sure if the

21   witness's copy is out of order, but my copy is out

22   of order.  Could we take a minute and reorder the

23   pages so that they're . . .

24             MR. BECKWORTH:  You certainly can do

25   that.  The page that I -- the only page I'm going to

1    ask questions about is --

2              MS. SPENCER:  The one that's marked

3    page 5 or the fifth page?

4              MR. BECKWORTH:  -- marked page 5.

5              MS. SPENCER:  That was my confusion.

6    Thank you.

7              MR. BECKWORTH:  We'll straighten that

8    exhibit up.

9              MS. SPENCER:  I apologize.

10             MR. BECKWORTH:  And the Bates is 5838,

11   for clarification.

12             MS. SPENCER:  That's correct.  Thank

13   you.

14   BY MR. BECKWORTH:

15     Q.  This document lists money that's been

16   provided to DPMPC from '97 up through June 15, 2007,

17   correct?

18             MR. ERCOLE:  Object to form.

19             THE WITNESS:  Yes.

20   BY MR. BECKWORTH:

21     Q.  For the benefit of the jury, can you tell

22   us what DPMPC is.

23     A.  The acronym stands for Department of Pain

24   Medicine and Palliative Care.  That was the

25   department that I chaired at Beth Israel Medical

1   Center for a 15-year period, '97 through 2014.

2       Q.  Now, there's a lot of folks and entities

3   listed here, correct?

4       A.  Yes.

5       Q.  Let's go to the first one.  In the

6   $1 million and up category, who is listed?

7       A.  Endo Pharmaceuticals.

8       Q.  Now, also in that category is Pfizer?

9       A.  Yes.

10      Q.  If you'll go to the $500,000 to $999,999

11  category, the first one listed is Abbott

12  Laboratories?

13      A.  Yes.

14      Q.  Then we see Cephalon, Inc.?

15      A.  Yes.

16      Q.  And Janssen Medical Affairs?

17      A.  Yes.

18      Q.  If you go to the $100,000 to $499,000

19  [sic], we see Russell Portenoy, M.D.?

20      A.  Yes.

21      Q.  Did you provide donations to DPMPC out of

22  your own pocket?

23      A.  Periodically during this period, I would do

24  consulting work or speak, and I would transfer my

25  honorarium or my speaking -- my fee, my consulting

Page 108

1    fee to the department to support the department's

2    activities and the salaries of my colleagues.

3        Q.  So those donations from you would be --

4    I don't mean this in a legal term -- but would be

5    passed through from a payment for a speech to you

6    and then you would take it --

7              MR. ERCOLE:  Objection --

8    BY MR. BECKWORTH:

9        Q.  -- and donate it to the entity?

10             THE WITNESS:  Yes.

11             MR. ERCOLE:  Objection.

12   BY MR. BECKWORTH:

13       Q.  You understand what I'm asking?

14             MR. ERCOLE:  Objection to form.

15   BY MR. BECKWORTH:

16       Q.  Is that correct?

17       A.  That's correct.

18       Q.  So if we go -- right below you, we see

19   Purdue Pharma, L.P., correct?

20       A.  Yes.

21       Q.  In the $50,000 to $999,000 [sic] category,

22   we have Alpharma Pharmaceuticals?

23       A.  Yes.

24       Q.  And at the bottom we have Ortho-McNeil

25   Pharmaceutical, correct?

Page 109

1       A.  That's correct.

2            MR. ERCOLE:  Objection to form.

3  Incomplete statement of all the people listed.  But

4  go ahead.

5  BY MR. BECKWORTH:

6       Q.  You understand that I'm going through and

7  listing certain ones?

8       A.  Yes.

9       Q.  And the document will speak for itself

10 about who else may be listed?

11      A.  Yes.

12      Q.  And if we go to the $5,000 to $9,900 [sic]

13 side of this on the right, one of the entities is

14 King Pharmaceuticals?

15      A.  Yes.

16      Q.  One of them is Eli Lilly and Company,

17 correct?

18      A.  Yes.

19      Q.  There's quite a few drug companies listed?

20      A.  That's right.

21      Q.  And we at least have a Janssen entity, a

22 Purdue entity, and a Cephalon entity listed here,

23 correct?

24      A.  Yes.

25      Q.  Now, during the time that you were working

1    for Beth Israel, what was your average total

2    compensation?

3        A.   I don't have a clear recollection of this.

4    I think it was probably -- probably around $350,000.

5        Q.   Were you the highest paid person there?

6        A.   In the hospital?

7        Q.   Yes.

8        A.   Oh, no.

9        Q.   The highest paid person in the department

10   that you chaired?

11       A.   Yes.

12       Q.   And on your total compensation you just

13   listed and that average rate, that's from the

14   hospital?

15       A.   That was salary, yes.

16       Q.   What about compensation that you got for

17   work outside of your hospital work?

18       A.   That would vary from year to year.  And the

19   range was very large.  Some years it was very --

20   very little.  I would say most of the years that

21   we're talking about in question here, it was

22   probably in the range of 40 or $50,000.

23               There was -- there was a couple of years

24   that I had more consulting or more speaking, and I

25   think the highest year's compensation was a bit

1   higher than $150,000.

2       Q.  Did your income at Beth Israel, was that

3   amount decided based on -- in part at least -- on

4   income that you could bring the hospital through

5   fund-raising efforts?

6       A.  I don't think so, no.

7       Q.  So do you think that the hospital, to your

8   knowledge -- you were fairly high ranking -- did

9   they consider funding that they received from

10  outside sources to be important?

11              MR. ERCOLE:  Objection to form.

12  BY MR. BECKWORTH:

13      Q.  Based on your knowledge?

14      A.  I think that the hospital certainly viewed

15  grants and other income that was brought in by a

16  department to be important to the hospital.  But the

17  compensation of a chairman would just be based more

18  on fair market value for what people who chaired

19  departments get.

20      Q.  Now, we've talked about getting payments to

21  the hospital and to you from each of the defendants

22  in this case, right?

23      A.  Right.

24              MR. ERCOLE:  Objection to form.

25

Page 112

1    BY MR. BECKWORTH:

2        Q.  You knew in 2007 that Purdue pled guilty to

3    a federal felony related to marketing of OxyContin?

4        A.  Yes.

5                MR. ERCOLE:  Objection to form.

6    BY MR. BECKWORTH:

7        Q.  You knew that Purdue's CEO, medical

8    officer, and chief legal officer, all pled guilty to

9    misdemeanors, correct?

10       A.  Yes.

11       Q.  You still did work for Purdue after that?

12       A.  Yes.

13       Q.  Did you ever go to Purdue and tell it that

14   you did not want to do work for Purdue?

15       A.  No.

16       Q.  Did you ever go to Purdue and say that you

17   wanted to disassociate yourself from any criminal

18   activity?

19       A.  No.

20       Q.  You worked for at least Janssen and

21   Cephalon as we've talked about today, correct?

22               MR. ERCOLE:  Objection to form.

23               THE WITNESS:  I think the --

24   BY MR. BECKWORTH:

25       Q.  I said that probably wrong.  You did work

1    that was funded by at least Janssen and Cephalon,

2    correct?

3        A.  That's correct.

4             MR. ERCOLE:  Same objection.

5    BY MR. BECKWORTH:

6        Q.  And you also, as we've established, were

7    involved in various third-party groups --

8        A.  Yes.

9        Q.  -- correct?

10            You also knew that the Robert Wood

11   Johnson Foundation provided funding to some of the

12   groups that you were involved with?

13            MR. EHSAN:  Objection to form.

14            THE WITNESS:  I have a vague

15   recollection that the Robert Wood Johnson Foundation

16   provided some funding to the American Pain Society,

17   but it's not a specific recollection.

18   BY MR. BECKWORTH:

19       Q.  Now, based upon your personal knowledge,

20   did Janssen ever come to you and tell you that it

21   would not provide funding for anything that you were

22   involved with if you continued to be involved with

23   matters funded by Purdue?

24       A.  No.

25       Q.  At any point in time, to your knowledge,

Page 114

1    did Janssen ever come and tell you that it would not

2    provide funding to Beth Israel if you or Beth Israel

3    received funding in any way associated with Purdue?

4         A.  No.

5         Q.  At any point in time, to your knowledge,

6    did Janssen ever tell the American Pain Society that

7    it would not provide funding to the American Pain

8    Society if you continued to be involved in any way

9    with Purdue?

10              MR. EHSAN:  Objection to form.

11              THE WITNESS:  Not to my knowledge.

12   BY MR. BECKWORTH:

13        Q.  At any point in time, to your knowledge,

14   did Janssen ever tell the American Pain Foundation

15   that Janssen would not provide funding to the

16   American Pain Foundation if it continued to receive

17   funding from Purdue?

18        A.  Not to my knowledge, no.

19        Q.  At any point in time, did Johnson & Johnson

20   ever come to you and tell you it would not provide

21   funding to you if you continued to do work that was

22   funded in any way by Purdue?

23        A.  No.

24        Q.  To your knowledge, did Johnson & Johnson

25   ever come and tell that to Beth Israel?

1      A.  No.

2      Q.  To your knowledge, did Johnson & Johnson

3  ever come and make such a demand to the American

4  Pain Society?

5            MR. EHSAN:  Object to form.

6            THE WITNESS:  Not to my knowledge, no.

7  BY MR. BECKWORTH:

8      Q.  To your knowledge, did Johnson & Johnson

9  ever come and make such a demand to the American

10  Pain Foundation?

11      A.  Not to my knowledge, no.

12      Q.  Now, you have some knowledge about what

13  opioids are --

14      A.  Yes.

15      Q.  -- correct?

16            And you understand that, for example,

17  OxyContin, one of the ingredients in it is something

18  called oxycodone?

19      A.  Yes.

20      Q.  Did Janssen ever tell you in all the times

21  that you were doing work for which it may have

22  provided funding about its involvement with Purdue

23  in the making of oxycodone?

24      A.  No.

25            MR. EHSAN:  Object to form.

Page 116

1    BY MR. BECKWORTH:

2        Q.  Did you know that Johnson & Johnson had a

3    subsidiary that grew poppies?

4        A.  No.

5        Q.  Did you know that Johnson & Johnson had a

6    subsidiary that made the active pharmaceutical

7    ingredient oxycodone?

8        A.  No, I did not know that.

9        Q.  Janssen never told you that?

10       A.  No.

11       Q.  Johnson & Johnson never told you that?

12       A.  No.

13              MR. BECKWORTH:  I'm going to hand you

14   what we'll mark as Exhibit 6.

15                  (Portenoy Exhibit 6 was marked

16                  for identification.)

17   BY MR. BECKWORTH:

18       Q.  Sir, these are slides from a slideshow

19   produced in this case that the court has made

20   available to the public.  I have two of them because

21   those are the two that are public.

22              The first one -- and take a second to

23   look at that -- you understand that opioids, at

24   least some, come from something called thebaine?

25       A.  Yes.

Page 117

1      Q.  And thebaine comes from poppy straw?

2      A.  Yes.

3      Q.  Did Johnson & Johnson or Janssen ever tell

4  you about a company called Noramco?

5      A.  No.

6      Q.  Did they ever tell you about a company

7  called Tasmanian Alkaloids?

8      A.  No.

9      Q.  Did you know that Tasmanian Alkaloids grew

10 poppies from which thebaine was derived?

11     A.  No.

12     Q.  Let's turn to the second page of this

13 exhibit, sir.

14          Will you read for the jury what the

15 headline is.

16          MR. EHSAN:  Object to form.

17          THE WITNESS:  "Tasmanian Alkaloids leads

18 the world in poppy technology."

19 BY MR. BECKWORTH:

20     Q.  Now, it says there next that "Patented high

21 thebaine poppy was a transformational technology

22 that enabled the growth of oxycodone."

23          Do you see that?

24     A.  Yes.

25     Q.  And it says that "Dr. Fist was awarded a

```
 1    Johnson Medal."

 2              Do you see that?

 3        A.  Yes.

 4        Q.  Did you know that Noramco made the active

 5    pharmaceutical ingredient oxycodone and supplied it

 6    to Purdue and its related entities?

 7        A.  No.

 8        Q.  Did you know that when Cephalon or Teva

 9    sold a generic version of OxyContin, that they

10    actually got it from Purdue under a supply and

11    distribution agreement?

12              MR. ERCOLE:  Objection to form,

13    foundation, among other things.

14              THE WITNESS:  No.

15    BY MR. BECKWORTH:

16        Q.  They never told you that?

17        A.  No.

18              MR. ERCOLE:  Objection to form.

19    BY MR. BECKWORTH:

20        Q.  Did Purdue ever tell you that when their

21    pharmaceutical sales reps went into the field,

22    including in the State of Oklahoma, that they got

23    sales bonuses that were paid not only for OxyContin

24    sales, but also for the sales of generics made by

25    Cephalon?
```

```
 1                MR. ERCOLE:  Objection to form.

 2                THE WITNESS:  No, I didn't know that.

 3   BY MR. BECKWORTH:

 4      Q.  And no one ever told you that this fellow

 5   right here got the Johnson Medal for patenting the

 6   high thebaine poppy that was transformational

 7   technology that enabled the growth of oxycodone?

 8                MR. ERCOLE:  Objection to form.

 9                THE WITNESS:  No.

10   BY MR. BECKWORTH:

11      Q.  Never told you that?

12      A.  No --

13                MR. ERCOLE:  Same objection.

14                THE WITNESS:  -- I never was told, no.

15   BY MR. BECKWORTH:

16      Q.  Is that information surprising to you?

17                MR. ERCOLE:  Same objection.

18                THE WITNESS:  It's new information for

19   me.

20   BY MR. BECKWORTH:

21      Q.  Well, you certainly see that you were

22   involved in a lot of work funded by the drug

23   companies here today, right?

24      A.  Yes.

25                MR. ERCOLE:  Objection to form.
```

Page 120

1    BY MR. BECKWORTH:

2        Q.  And as we talked about earlier, a lot of

3    the things that they funded weren't specific to a

4    specific brand of drugs?

5                MR. ERCOLE:  Objection to form.

6    BY MR. BECKWORTH:

7        Q.  Right?

8        A.  That's correct, yes.

9        Q.  You understand that if you supply the

10   active pharmaceutical ingredient oxycodone that is

11   in Purdue's drug OxyContin, it would be to your

12   financial benefit if more OxyContin gets prescribed?

13   That's just common sense, isn't it?

14                MR. ERCOLE:  Objection to form.

15                THE WITNESS:  Yes.

16   BY MR. BECKWORTH:

17       Q.  Now, the same types of questions I asked

18   you about Janssen.  Did Teva or Cephalon ever come

19   to tell you that they would not provide funding to

20   anything you were doing if you continued to work for

21   Purdue?

22                MR. ERCOLE:  Objection to form.

23                THE WITNESS:  No.

24   BY MR. BECKWORTH:

25       Q.  Did they ever come, to your knowledge, and

Page 121

1    tell Beth Israel they would not provide funding for

2    work you did with Purdue?

3                    THE WITNESS:  No.

4                    MR. ERCOLE:  Objection to form.

5    BY MR. BECKWORTH:

6        Q.  At any point to your knowledge, did they

7    ever tell the American Pain Society they would

8    provide no funding if you did work related to

9    Purdue?

10                   MR. ERCOLE:  Same objection.

11                   THE WITNESS:  No.

12   BY MR. BECKWORTH:

13       Q.  And at no point in time to your knowledge,

14   did they ever tell the American Pain Foundation they

15   would not do any funding to the American Pain

16   Foundation if you continued to be associated with

17   Purdue?

18       A.  No.

19                   MR. ERCOLE:  Objection to form.

20   BY MR. BECKWORTH:

21       Q.  Now, you also -- as we've shown and we'll

22   look at some things today -- you did do work that

23   was funded by Cephalon from time to time, correct?

24       A.  Correct.

25       Q.  And do you understand that like --

Page 122

1              MS. SPENCER:  Are we done with P6?

2              MR. BECKWORTH:  Yes, ma'am.

3              MS. SPENCER:  I just want to make sure

4    where his attention is.

5    BY MR. BECKWORTH:

6       Q.  You understand that Cephalon also pled

7    guilty to a federal crime, right?

8              MR. ERCOLE:  Objection to form.

9              THE WITNESS:  Yes.

10   BY MR. BECKWORTH:

11      Q.  You understand that Cephalon pled guilty to

12   a misdemeanor, and one of the things that was

13   involved was off-label marketing of its drug Actiq?

14             MR. ERCOLE:  Objection to form.

15             THE WITNESS:  I don't really recall the

16   details of that case.

17             MR. BECKWORTH:  Let me hand you that.

18   I will hand a copy of the plea agreement that

19   Cephalon entered into with the United States

20   Government.  We'll mark this as Portenoy Exhibit 7.

21             I do not have many questions for you.

22   You can pass that along.

23                  (Portenoy Exhibit 7 was marked

24                   for identification.)

25             MS. SPENCER:  These are previously

1    marked from another case?

2              MR. BECKWORTH:  Yes.  I copied -- I put

3    a sticker over that for the ease of the record.

4              MS. SPENCER:  Got it.

5    BY MR. BECKWORTH:

6      Q.  You see on the first page of this it says

7    "Government's memorandum for entry of plea and

8    sentencing"?

9      A.  Yes.

10     Q.  There's a lot in there, and I'm not going

11   to ask you specific questions to test your knowledge

12   on the plea.  I just want to refer to you something

13   on page 10.

14             MS. SPENCER:  There's several different

15   page 10s.

16             MR. BECKWORTH:  The first page 10.  Yes,

17   this is an amalgamation of related documents.

18             THE WITNESS:  Okay, yes.

19             MS. SPENCER:  For point of

20   clarification, it's the one that says "page 10 of

21   41" at the top?

22             MR. BECKWORTH:  Yes, ma'am.

23             MS. SPENCER:  Okay, thank you.

24   BY MR. BECKWORTH:

25     Q.  I'm going to ask you questions about this

Page 124

1   one and the next one just to refresh your memory or

2   give you some information.  Here it lists "Actiq,"

3   and it says, "The case of Actiq is particularly

4   egregious, as this drug is 80 to 100 times more

5   powerful than morphine."

6             Do you see that?

7       A.  Yes.

8       Q.  And it talks about "The FDA-approved label

9   for Actiq"?

10      A.  Yes.

11      Q.  And below that, you'll read, it says,

12  "The label calls for Actiq to be prescribed by

13  oncologists or pain specialists familiar with the

14  use of opioids."

15            Do you see that?

16      A.  Yes.

17      Q.  If you'll turn the page.  At the bottom of

18  that section, it says, "Cephalon management conveyed

19  its disregard for the FDA-approved label for Actiq

20  (opioid-tolerant cancer patients with breakthrough

21  cancer pain, to be prescribed by oncologists or pain

22  specialties familiar with opioids) to the sales

23  force."

24            Do you see that?

25      A.  Yes.

1      Q.  It goes on to say, "Using the mantra 'pain

2   is pain,' Cephalon instructed the sales

3   representatives to focus on physicians other than

4   oncologists, and to promote Actiq for multiple uses

5   other than breakthrough cancer pain," correct?

6      A.  Yes.

7      Q.  This isn't a test on what you know about

8   criminal pleas, but I just wanted to refresh your

9   memory in case you weren't aware, as you sit here

10  today.

11              Now --

12              MR. ERCOLE:  Objection to form, move to

13  strike.

14  BY MR. BECKWORTH:

15      Q.  -- Cephalon pled guilty to a federal

16  misdemeanor; you knew that?

17      A.  Yes.

18      Q.  You still did work for Cephalon after that

19  time?

20      A.  Yes.

21      Q.  We'll go through the same series of

22  questions here.  Did you ever go to Cephalon and

23  tell it that you would not do work for it because it

24  had been involved in conduct for which it pled

25  guilty?

Page 126

1    A.  No.

2          MR. ERCOLE:  Objection to form.

3  BY MR. BECKWORTH:

4    Q.  Did Janssen ever come to you, to your

5  knowledge, and say that they would not be involved

6  with you if you remained involved with Cephalon?

7          MR. EHSAN:  Objection to form.

8          THE WITNESS:  No.

9  BY MR. BECKWORTH:

10    Q.  Did Purdue ever come to you and tell you

11  that Purdue would not provide you funding if you

12  remained engaged in any way with Cephalon?

13    A.  No.

14    Q.  Did Johnson & Johnson ever come to you and

15  tell you that it would not provide you funding if

16  you remained engaged with Cephalon?

17    A.  No.

18          MR. EHSAN:  Object to form.

19  BY MR. BECKWORTH:

20    Q.  To your knowledge, did Purdue ever go to

21  Beth Israel and tell it, As long as you are doing

22  work with Cephalon, no more funding for Beth Israel?

23    A.  No.

24    Q.  Did any of the drug defendants here at the

25  table do that, to your knowledge?

1                MR. ERCOLE:  Objection to form.

2                THE WITNESS:  Not to my knowledge, no.

3      BY MR. BECKWORTH:

4          Q.  Did Purdue ever go to the American Pain

5      Society and tell it it would not provide funding, to

6      your knowledge --

7          A.  No.

8          Q.  -- if work was still -- or funding was

9      still accepted by Cephalon?

10         A.  Not to my knowledge, no.

11         Q.  Did they ever do that to the American Pain

12     Foundation?

13         A.  Not to my knowledge.

14         Q.  What about Janssen & Janssen [sic]?

15                MR. ERCOLE:  Objection to the form.

16                THE WITNESS:  Not to my knowledge.

17     BY MR. BECKWORTH:

18         Q.  What about Teva?

19                MR. ERCOLE:  Objection to form.

20                THE WITNESS:  Not to my knowledge, no.

21     BY MR. BECKWORTH:

22         Q.  And what about -- make sure I got this --

23     how about this -- what about any Janssen & Janssen

24     [sic] or Johnson & Johnson company?

25                MR. EHSAN:  Objection to form.

1              THE WITNESS:  Not to my knowledge, no.

2    BY MR. BECKWORTH:

3        Q.  Did Teva, to your knowledge?

4              MR. ERCOLE:  Objection to form.

5              THE WITNESS:  Not to my knowledge.

6    BY MR. BECKWORTH:

7        Q.  In fact, you are aware that at some point

8    after this, Teva actually acquired Cephalon?

9        A.  Yes.

10             MR. ERCOLE:  Objection to form.

11   BY MR. BECKWORTH:

12       Q.  Now, you also did work for Insys, correct?

13       A.  I know that there was an agreement, but I

14   don't remember the specific work.

15       Q.  And I'm not in any way insinuating you did

16   work.  What I'm about to show you -- I'm just going

17   to ask you a few questions about this -- you

18   understand that recently Insys's CEO pled guilty to

19   a federal crime related to its opioids, right?

20       A.  I was aware of the investigation.  I didn't

21   actually know that there was a guilty plea.

22                   (Portenoy Exhibit 8 was marked

23                    for identification.)

24   BY MR. BECKWORTH:

25       Q.  I'll hand you a very short article on this.

1    If you'll pass it around to your attorney.

2              MS. SPENCER:  And this is P8?

3              MR. BECKWORTH:  Yes.

4    BY MR. BECKWORTH:

5        Q.  Now, in this article that's Exhibit 8, it

6    shows that the CEO of Insys has pled guilty to a

7    federal crime for paying kickbacks to prescribers

8    for prescribing Insys's -- I don't know how you

9    pronounce that -- Insys's sublingual opioid, correct?

10       A.  That's correct, yes.

11       Q.  Now, we're done with that.

12              That's a pretty serious matter?

13       A.  Yes, absolutely.

14       Q.  Having a doctor get paid a kickback?

15       A.  Um-hum.

16       Q.  Yes?

17       A.  Yes, very serious.

18       Q.  Now, same questions.  At any point in time,

19   to your knowledge, did any of the defendants in this

20   case tell you that they would not do work -- or

21   provide funding for any work that you did if you

22   worked in any way with Insys?

23              MR. ERCOLE:  Objection to form.

24              THE WITNESS:  No.

25

Page 130

 1   BY MR. BECKWORTH:

 2       Q.  Same for Beth Israel?

 3              MR. ERCOLE:  Objection to form.

 4              THE WITNESS:  To my knowledge, no, they

 5   did not.

 6   BY MR. BECKWORTH:

 7       Q.  And to your knowledge, they never went to

 8   the APS or APF and said, No funding if you do work

 9   that involves Insys?

10              MR. ERCOLE:  Objection to form.

11              THE WITNESS:  To my knowledge, that

12   didn't happen.

13   BY MR. BECKWORTH:

14       Q.  Now, you're also familiar that Endo made a

15   drug called Opana?

16       A.  Yes.

17       Q.  And that's an opioid?

18       A.  Yes.

19              MR. BECKWORTH:  I'm going to hand you

20   Exhibit 10 -- sorry.  I'll hand you Exhibit 9.

21                   (Portenoy Exhibit 9 was marked

22                    for identification.)

23              MS. SPENCER:  I need another one for

24   defendants -- or is there another one there?

25              THE WITNESS:  No.

Page 131

1            MS. SPENCER:  I'll share with the

2  witness.

3            MR. BECKWORTH:  I don't mind you seeing

4  my highlighted copy.

5            MS. SPENCER:  No, no.  I'll just share

6  with the witness.

7  BY MR. BECKWORTH:

8    Q.  Now, sir, Exhibit 9 is a June 8, 2007 [sic]

9  FDA news release?

10   A.  Yes.

11   Q.  And you're aware that the FDA requested

12  Opana ER to be removed from the shelf, correct?

13   A.  Yes, I was aware of that.

14   Q.  That's a serious matter?

15   A.  I didn't actually take the time to get the

16  details of this, so I'm not sure why this was

17  removed.  Can I take a moment to read this?

18   Q.  You bet.

19            MS. SPENCER:  And I would request if we

20  at some point during the break maybe make another

21  copy so I can have a copy for my records.

22            MR. BECKWORTH:  Sure.

23            THE WITNESS:  I see, yes.

24  BY MR. BECKWORTH:

25   Q.  So here we see that the FDA determined that

1    the risk of abuse of this drug outweighed the

2    benefits?

3         A.  Yes.

4         Q.  And asked that it be removed from the

5    shelves?

6                   MR. ERCOLE:  Objection to form.

7                   THE WITNESS:  That's correct.

8    BY MR. BECKWORTH:

9         Q.  And in this document, there's a statement

10   from a commissioner of the FDA named Scott Gottlieb?

11        A.  Yes.

12        Q.  A medical doctor?

13        A.  Yes.

14        Q.  And it says, "We are facing an opioid

15   epidemic -- a public health crisis, and we must take

16   all necessary steps to reduce the scope of opioid

17   misuse and abuse," correct?

18        A.  Yes.

19        Q.  So we've shown -- or you've shown in your

20   declaration, sir, that Endo was one of the companies

21   that provided funding for various work, correct?

22        A.  Yes.

23        Q.  And at any point in time, did any of the

24   drug companies here tell you that they would not

25   support anything you were doing if you were also

1   receiving money from Endo?

2       A.  No.

3           MR. ERCOLE:  Objection to form.

4           THE WITNESS:  No, they did not.

5   BY MR. BECKWORTH:

6       Q.  And they never said that to Beth Israel, to

7   your knowledge either?

8           MR. ERCOLE:  Objection to form.

9           THE WITNESS:  Not to my knowledge, no.

10  BY MR. BECKWORTH:

11      Q.  Now, continuing on in your list here --

12          MS. SPENCER:  We're back to the

13  declaration?

14          MR. BECKWORTH:  Yes, ma'am, paragraph 30.

15  BY MR. BECKWORTH:

16      Q.  Just a couple of others.  You list that

17  on -- at some point, there was a program in 2010,

18  January 19, when you chaired a meeting to develop a

19  curriculum for a CME program called "Balancing

20  chronic pain management and rational opioid use for

21  primary care providers"?

22      A.  Yes.

23      Q.  And to your knowledge, that program was

24  sponsored by Janssen and Endo?

25      A.  Yes.

Page 134

1      Q.  And that's after the Purdue guilty plea and

2   after the Cephalon plea, correct?

3               MR. ERCOLE:  Objection to form.

4               THE WITNESS:  Yes.

5   BY MR. BECKWORTH:

6      Q.  Now, on August 28, 2010, you list that you

7   participated in a physician advisory board meeting

8   for Purdue, correct?

9      A.  Yes.

10     Q.  And then in May 2010, you moderated an

11  online program called "Medico-legal issues, clinical

12  guidelines and opioid dose conversions" for the

13  website emergingsolutionsinpain.com?

14     A.  Yes.

15     Q.  You understand that online program was

16  supported by Cephalon, Endo, and Purdue?

17     A.  I believe so, yes.

18     Q.  And you were paid $2,000 for that?

19     A.  Yes.

20     Q.  On February 11, 2011, you entered into an

21  advisory board agreement with Cephalon, correct?

22     A.  Yes.

23     Q.  You were paid for that?

24     A.  I presume so.

25               MR. ERCOLE:  Objection to form.

Page 135

1   BY MR. BECKWORTH:

2        Q.  And you also list that on February 5, 2010,

3   you entered into a consulting agreement with

4   Mallinckrodt to advise on pain and addiction

5   medicine?

6        A.  Yes.

7        Q.  You were paid $3,500 for that?

8        A.  Yes.

9        Q.  And then on November 15, 2010, you entered

10  into an educational preceptorship agreement with

11  Mallinckrodt for the purpose of educating

12  Mallinckrodt's medical science liaison on clinical

13  practice?

14       A.  Yes.

15       Q.  You were paid $8,000 for that?

16       A.  Yes.

17       Q.  Now, in addition to all this work as we've

18  discussed, you were on the Janssen Speakers Bureau,

19  correct?

20       A.  I don't recall that.  It's possible.  I'd

21  have to be reminded of the years that that was the

22  case.

23            MR. BECKWORTH:  I'm going to hand you

24  what we'll label as Exhibit 10.

25

1                    (Portenoy Exhibit 10 was marked

2                    for identification.)

3    BY MR. BECKWORTH:

4        Q.  Just for the record, while you're looking

5    at this, Exhibit 10 is a Janssen document.

6                    MS. SPENCER:  It's very small.

7    BY MR. BECKWORTH:

8        Q.  It is very small.  It says "Speaker

9    analysis summary - Duragesic 11/11/2002."

10                   You're mentioned in here.  I'm going to

11   help you get to there.  If you'll turn to -- when

12   you get a second, familiarize yourself with this,

13   and turn to the fifth page, please, sir, and you're

14   close to the bottom.  The third column from the left

15   is in alphabetical order.

16       A.  I'm sorry.  You said on the third page?

17       Q.  No.  I think I said the fifth.

18       A.  Fifth page.  Um-hum.

19       Q.  Do you see your name, sir?

20       A.  Yes.

21       Q.  Now, it lists, "Dr. Russell Portenoy, M.D.,

22   pain management, New York, New York"?

23       A.  Um-hum.

24       Q.  And it gives a phone number, correct?

25       A.  Yes.

Page 137

1      Q.  If you look over there to the next, we see

2  a number 3?

3      A.  Yes.

4      Q.  And I'll represent to you from looking at

5  the first page, that's under the column "Total

6  number 2001 lectures"?

7      A.  Um-hum, yes.

8      Q.  And if you look at the next one, you see

9  a 1?

10     A.  Um-hum.

11     Q.  And if you look at the first page, that

12  refers to "Total number 2002 lectures."

13          Do you see that?

14     A.  Yes.

15     Q.  And then the next one lists a number 4.

16  And it says "Total number of lectures," correct?

17     A.  Yes.

18     Q.  And then beside that, it has "National

19  honorarium," and it has $1,500.

20          Do you see that?

21     A.  Yes.

22     Q.  So this shows that you were on a speaker

23  list for Duragesic at least in this time period,

24  correct?

25          MR. EHSAN:  Object to form.

1              THE WITNESS:  Right.  It doesn't show,

2    however, that I was on a speakers bureau.  I don't

3    have a specific recollection of joining that

4    speakers bureau, which is what I said before.  But I

5    certainly gave talks during this time frame, which

6    is what's indicated here.

7    BY MR. BECKWORTH:

8       Q.  That's fine.  And that's a term -- people

9    use "speakers bureaus," "speakers lists."  So I want

10   to make sure we're accurate.

11      A.  Right.

12      Q.  So you're listed here as a paid speaker

13   during this time period related to Duragesic,

14   correct?

15      A.  Yes.

16              MR. BECKWORTH:  Now, I'm going to hand

17   you a document provided by Johnson & Johnson.  We'll

18   label this as Exhibit 11.

19              MS. SPENCER:  One moment.  The witness

20   is examining the document.

21              THE WITNESS:  That's fine.

22              MS. SPENCER:  Are you okay.

23              MR. BECKWORTH:  Take your time.  Is

24   there anything you need to say about it?

25              THE WITNESS:  No.

Page 139

1                    (Portenoy Exhibit 11 was marked

2                    for identification.)

3    BY MR. BECKWORTH:

4        Q.  I didn't print these, or I promise you the

5    print would not be so small.  This is a document

6    provided by Johnson & Johnson -- we're just going to

7    look at the first page -- that lists payments made

8    to various entities "in response to the Senate

9    Finance Committee request dated May 8, 2012."

10                   Do you see that?

11       A.  Yes.

12       Q.  And I'm just going to focus on ones that I

13   believe you -- I'm going to try to focus on entities

14   that you may have been involved with.  The first one

15   listed is the American Pain Foundation.  And if

16   you'll look over to the right, it shows payments

17   from 1997 to 2012 totaling $633,300, correct?

18       A.  Yes.

19       Q.  Now, the next one is the American Academy

20   of Pain Medicine.  You're familiar with that, right?

21       A.  Yes.

22       Q.  You weren't on the board though?

23       A.  No.

24       Q.  But to the right here it shows during that

25   time period payments of $562,674?

Page 140

1       A.  Yes.

2       Q.  And then the next one is the American Pain

3   Society, correct?

4       A.  Yes.

5       Q.  And during that same time period, it shows

6   payments of $1,793,906, correct?

7       A.  Yes.

8       Q.  And then later on it says "Russell K.

9   Portenoy, M.D."

10              Do you see that?

11      A.  Yes.

12      Q.  And during that same time period, it shows

13  $28,940, correct?

14      A.  Yes.

15      Q.  Now, do you see the Beth Israel Medical

16  Center?

17      A.  Yes.

18      Q.  That shows a zero -- I'm sorry -- during

19  that time period, correct?

20      A.  Yes.

21      Q.  Now, as we talked about earlier, you

22  understand that the Senate Finance inquiry had a

23  negative impact on the American Pain Foundation,

24  correct?

25      A.  Yes.

Page 141

1      Q.  It was no longer able to survive after it

2   stopped taking money from drug companies?

3                MR. ERCOLE:  Objection to form.

4                THE WITNESS:  Yes.

5   BY MR. BECKWORTH:

6      Q.  Now, we know that from time to time,

7   Johnson & Johnson would pay Beth Israel money for

8   work related to you, correct?

9                MR. EHSAN:  Object to form.

10               THE WITNESS:  Yeah.  I'd have to have

11  more specifics about that question.

12               MR. BECKWORTH:  Well, let's just show

13  you an example.  How about that?

14               THE WITNESS:  That would be fine.

15               MR. BECKWORTH:  I'm going to hand you an

16  invoice.

17                    (Portenoy Exhibit 12 was marked

18                     for identification.)

19               MS. SPENCER:  This is P12?

20               MR. BECKWORTH:  Yes, ma'am.

21  BY MR. BECKWORTH:

22     Q.  Sir, Exhibit 12 is an invoice produced by

23  Janssen showing payment made by Ortho-McNeil-Janssen

24  Scientific Affairs to Beth Israel Medical Center,

25  correct?

Page 142

1      A.  Yes.

2      Q.  And it's for services provided by you?

3      A.  I would say it's for services provided by

4  me and my departmental colleagues in creating this

5  material.

6      Q.  And it says, "Description . . . provided:

7  Emerging practices in opioid prescribing for chronic

8  pain - enduring materials on QuantiaMD"?

9      A.  Yes.

10     Q.  "Completion and posting of six lectures,"

11  correct?

12     A.  Yes.

13     Q.  And it shows here a payment of $40,000?

14     A.  Yes.

15     Q.  So this is one of those examples we talked

16  about where the drug company provides funding to the

17  hospital, but it's related to worker services that

18  you and others were actually doing?

19     A.  Yes.

20          MR. BECKWORTH:  Now, I'll give you a

21  couple more of these.  This work was paid in

22  multiple invoices.  I'll hand you what we'll mark as

23  Exhibit 13.

24               (Portenoy Exhibit 13 was marked

25                for identification.)

1   BY MR. BECKWORTH:

2      Q.  While you look at that, I'll represent to

3   you that Exhibit 13 is another invoice related to

4   this same scope of work.  And there, the sum of

5   $20,000 was paid, correct?

6      A.  Yes.

7           MR. BECKWORTH:  Now I'll hand you

8   Exhibit 14.

9              (Portenoy Exhibit 14 was marked

10             for identification.)

11  BY MR. BECKWORTH:

12     Q.  You might keep the one you're looking at

13  handy on this one.  Hand you Exhibit 14, sir.

14     A.  I think this is the same as the last one.

15     Q.  Well, it appears that way at first, but

16  when you look at the invoice numbers, do you see

17  that they're two different ones?

18     A.  Yeah.

19     Q.  So Exhibit 13 and Exhibit 14 have different

20  invoice numbers, correct?

21     A.  Right.

22     Q.  But it shows on Exhibit 14 a payment of

23  $20,000, right?

24     A.  Yes.

25     Q.  Okay.  We're done with those.  Thank you.

Page 144

```
 1                    Now, you also did some work --
 2                    MS. SPENCER:  We've been -- just for
 3      the -- we've been going for a couple of hours now.
 4                    (To the witness:)  Do you need a break
 5      or are you good?
 6                    THE WITNESS:  I'm fine.
 7                    MR. BECKWORTH:  If I could maybe have
 8      five-ish, I can get through this section and we can
 9      move on.
10                    MS. SPENCER:  Sure.  I just didn't know
11      if this was a stopping point or not.
12                    MR. BECKWORTH:  And if this nice lady to
13      my left tells us to stop, we're going to stop.
14                    I'm going to hand you what we'll mark as
15      Exhibit 15.
16                         (Portenoy Exhibit 15 was marked
17                          for identification.)
18      BY MR. BECKWORTH:
19         Q.  You referenced some work for Cephalon.
20      I'll hand you Exhibit 15, sir.
21         A.  Yes.
22                    MR. EHSAN:  Is this 14?
23                    MR. ERCOLE:  15.
24                    MS. SPENCER:  This is a lengthy
25      document.
```

Page 145

1            MR. BECKWORTH:  Yes.

2            MS. SPENCER:  The witness can take a

3    minute and familiarize himself with it.

4            MR. BECKWORTH:  He can, and just to help

5    with that --

6            You can look at all you want.  I'm going

7    to ask you about the type of program that's at issue

8    here, and there's a grant amount on the third page,

9    paragraph 5, it's numbered 5.  If you need to look

10   at more, please do so.

11           MS. SPENCER:  I need a minute to look at

12   the document also.

13           MR. BECKWORTH:  Take your time.

14           MS. SPENCER:  Thank you.

15   BY MR. BECKWORTH:

16     Q.  As you look through here, you'll see this

17   is the culmination of some emails and requests for a

18   grant for presentation of this exhibit.

19     A.  Correct.

20           MR. ERCOLE:  Objection to form.

21           MS. SPENCER:  I need just a few more

22   moments.

23           All right.  I think we're good.  If I

24   need any more time, I'll let you know.

25           MR. BECKWORTH:  Just let me know.

Page 146

1    BY MR. BECKWORTH:

2       Q.  Sir, so if you look through this, this

3    document started after the pages we asked you to

4    look at.  But there was an effort to get funding for

5    a CME that would be happening, correct?

6       A.  Yes.

7       Q.  And ultimately Cephalon agreed to provide

8    some funding --

9       A.  Yes.

10      Q.  -- correct?

11               And on this Exhibit 15, we'll see that

12   on October 26, 2007, there was an agreement entered

13   into to provide funding through a grant to Beth

14   Israel Medical Center, correct?

15      A.  Yes.

16               MS. SPENCER:  What page are you on?

17               MR. BECKWORTH:  Second page of the

18   document.  It ends with 3803.

19               MS. SPENCER:  Thank you.

20   BY MR. BECKWORTH:

21      Q.  And you'll see on the bottom left -- well,

22   where it says "Type of program," it's got the box

23   checked for "Accredited (continuing medical

24   education or 'CME')," correct?

25      A.  Yes.

Page 147

1       Q.  And on "Purpose of educational program," it

2    says, "The educational program is for scientific and

3    educational purposes only and is not intended to

4    promote a Cephalon product, directly or indirectly.

5    The program is not a repeat performance of a prior

6    program," correct?

7       A.  Correct.

8       Q.  Then we have a paragraph titled

9    "Independence."  And then let's turn to the next

10   page.  It shows the amount of the grant here, which

11   is $25,000, correct?

12      A.  Yes.

13      Q.  And then it goes on to talk about use of

14   this money, disclosure, and other things, correct?

15      A.  Yes.

16      Q.  That's all I have of that.  Now, sir, you

17   are -- as we've discussed, you were involved with

18   American Pain Society?

19      A.  Yes.

20      Q.  The American Pain Society had you prepare a

21   disclosure of monies you'd received from the

22   pharmaceutical industry as part of a conflict of

23   interest policy; is that correct?

24      A.  I imagine so, yeah.

25              MR. BECKWORTH:  I'm going to hand you a

Page 148

1    document that involves that, Exhibit 16.

2                    (Portenoy Exhibit 16 was marked

3                    for identification.)

4    BY MR. BECKWORTH:

5        Q.  Exhibit 16 is titled "Conflict of interest

6    disclosure form" for the American Pain Society; do

7    you see that?

8        A.  Yes.

9        Q.  I'm going to walk you through some of it

10   real quickly.  Take your time if you need to look at

11   more.  There's a section labeled "Research funding"?

12                MS. SPENCER:  Where are you?

13                MR. BECKWORTH:  It says "page 4 of 7."

14                MS. SPENCER:  Um-hum.

15   BY MR. BECKWORTH:

16       Q.  And under "Research funding," it lists

17   grants of $10,000 or less between 2003 and 2006 for

18   the DPMPC chaired by you, correct?

19       A.  Yes.

20       Q.  There are quite a few entities listed here?

21       A.  Yes.

22       Q.  We see Endo Pharmaceuticals is one?

23       A.  Yes.

24       Q.  Meeting Concepts, LLC is one?

25       A.  Yes.

Page 149

1      Q.  Purdue Pharma, L.P. is one?

2      A.  Yes.

3      Q.  Now, if we turn to the next page, please,

4  sir.

5      A.  Um-hum.

6      Q.  It lists grants to the DPMPC in the $10,001

7  to $100,000 range?

8      A.  Yes.

9      Q.  And among others, we see Cephalon?

10     A.  Yes.

11     Q.  We see Endo?

12     A.  Yes.

13     Q.  We see Janssen Medical Affairs, LLC?

14     A.  Yes.

15     Q.  We see Purdue?

16     A.  Yes.

17     Q.  Now, if you look to the next part, it lists

18  in that same time period grants to the DPMPC of

19  $100,000 or more, and we see -- among others, we see

20  one from Janssen Medical Affairs, LLC, correct?

21     A.  Yes.

22     Q.  Now, if we go to the next page, it also

23  lists grants for sponsored clinical trials from

24  several companies?

25     A.  Yes.

Page 150

1      Q.  And included there are Cephalon, Inc.?

2      A.  Yes.

3      Q.  Endo Pharmaceuticals, Inc.?

4      A.  Yes.

5      Q.  Purdue Pharma, L.P.?

6      A.  Yes.

7      Q.  And others?

8      A.  Yes.

9      Q.  And then finally, there's an addendum that

10   says during this same time period of 2003 to 2006,

11   you received compensation as a consultant from

12   several companies, correct?

13     A.  Yes.

14     Q.  And in there we see Cephalon?

15     A.  Yes.

16     Q.  Endo?

17     A.  Yes.

18     Q.  And Janssen Pharmaceuticals?

19     A.  Yes.

20     Q.  Among others?

21     A.  Yes.

22     Q.  Thank you.  I've just got a few more and

23   we'll take a break.

24          Now, we talked earlier about how some of

25   this funding actually occurs.  I'm going to hand you

Page 151

1    a document we'll mark as Exhibit 17, sir.  This is a

2    document produced by Purdue.

3                        (Portenoy Exhibit 17 was marked

4                        for identification.)

5    BY MR. BECKWORTH:

6        Q.  If you want to take a second to look at

7    that.

8               Now, Exhibit --

9               MS. SPENCER:  Just hold on.

10              MR. BECKWORTH:  You bet.

11              MS. SPENCER:  Okay.  If the witness is

12   ready.

13              THE WITNESS:  Yes.

14   BY MR. BECKWORTH:

15       Q.  Exhibit 17 is a letter dated February 27,

16   1997, correct?

17       A.  Yes.

18       Q.  It's from you?

19       A.  Yes.

20       Q.  And it's to a gentleman, the director of

21   CME at the Reading Hospital in Pennsylvania,

22   correct?

23       A.  Yes.

24       Q.  And in it, it is you responding to an

25   invitation to speak at the hospital, correct?

1      A.  Yes.

2      Q.  And in there, you say that your honorarium

3  for a two-day visit will be $2,500 plus travel

4  expenses, correct?

5      A.  Yes.

6      Q.  And you say there, "I am a member of the

7  Purdue Frederick, Roxane and Janssen Speakers

8  Bureaus."

9              Do you see that?

10     A.  Yes.

11     Q.  Now, we talked about speakers bureaus

12  earlier and I said we all kind of say it

13  differently.  At least in this document, you see

14  that it's showing that you are a member of the

15  Janssen Speakers Bureau?

16     A.  Right.

17     Q.  And also the Purdue Frederick Speakers

18  Bureau?

19     A.  Right.

20     Q.  And it says from you that perhaps this

21  gentleman could solicit funding from one of these

22  companies to provide your honorarium, correct?

23     A.  That's correct, right.

24     Q.  And we talked about earlier that's how

25  things were done at that time, correct?

Page 153

1    A.  Correct.

2              MR. ERCOLE:  Objection to form.

3              MR. EHSAN:  Objection to form.

4              MR. BECKWORTH:  Now, I'm going to hand

5    you what we'll mark as Exhibit 18.  I don't have a

6    copy so I'll just give it to you.

7                    (Portenoy Exhibit 18 was marked

8                     for identification.)

9              MS. SPENCER:  This is 18?

10             MR. BECKWORTH:  Yes, ma'am.

11   BY MR. BECKWORTH:

12   Q.  Have you had a chance to look at that, sir?

13   A.  Yes.

14   Q.  And in this, you'll see where the payment

15   was actually made, correct?

16   A.  Yes.

17   Q.  And here we have the $2,500 honoraria

18   actually being paid by Purdue Frederick?

19   A.  Yes.

20   Q.  To the entity that you had reached out --

21   that had reached out to you --

22   A.  Yes.

23   Q.  -- correct?

24             And it says to you to make sure that

25   your travel expenses are actually sent to that

Page 154

1    hospital, not Purdue Frederick, correct?

2        A.  Yes.

3            MR. BECKWORTH:  Thank you.  We'll do two

4    more real quick, and we'll take a break --

5            MS. SPENCER:  Sure.

6            MR. BECKWORTH:  -- if that's okay with

7    everybody.

8    BY MR. BECKWORTH:

9        Q.  You're familiar that the United States

10   Senate Committee looked into funding to various

11   entities by pharmaceutical companies, correct?

12       A.  Yes.

13           MR. ERCOLE:  Objection to form.

14           MR. BECKWORTH:  I'm going to hand you a

15   copy of that minority staff report titled "Fueling

16   an epidemic."  It's Exhibit 19.

17                (Portenoy Exhibit 19 was marked

18                for identification.)

19   BY MR. BECKWORTH:

20       Q.  I'm just going to ask you a few questions.

21           MS. SPENCER:  I'm going to need a minute

22   to take a look at this.

23           MR. BECKWORTH:  You bet.  For your

24   reference, I'm going to focus on page 4.

25           MS. SPENCER:  Okay.

Page 155

1              MR. BECKWORTH:  And page 6.

2    BY MR. BECKWORTH:

3        Q.  Sir, if we can turn to page 4 --

4              MS. SPENCER:  I need more time.  I'm

5    sorry.  I'll allow him to answer questions about

6    this obviously.  But you're going to ask him

7    specific questions, you're not asking him to adopt

8    any views outside of the questions that you ask him

9    in this document?

10             MR. BECKWORTH:  Not at all.  You're

11   correct.

12   BY MR. BECKWORTH:

13       Q.  So, sir, on page 4 --

14             MS. SPENCER:  If he's ready, we can

15   proceed.

16             THE WITNESS:  I'm ready.  Thank you.

17   BY MR. BECKWORTH:

18       Q.  -- you'll see that there's a grid there

19   that lists reported manufacture payments to selected

20   groups between 2012 and 2017.

21             Do you see that?

22       A.  Yes.

23       Q.  And it lists Purdue, Janssen, Depomed,

24   Insys -- and I don't know if that's Mylan or Milan.

25             Do you see those?

1      A.  Yes.

2      Q.  With respect to the American Academy of

3  Pain Medicine, it shows $725,584.95 from Purdue?

4      A.  Yes.

5      Q.  And -- correct?

6      A.  Correct, yes.

7      Q.  And $83,975 by Janssen --

8      A.  Correct.

9      Q.  -- during that time period.  Correct?

10     A.  Yes.

11     Q.  And then we also have the American Pain

12  Society, it lists $542,259.52 from Purdue --

13     A.  Yes.

14     Q.  -- correct?

15     A.  That's correct.

16     Q.  And $88,500 from Janssen?

17     A.  That's correct.

18     Q.  And it's limited to that time period,

19  correct?

20     A.  Yes.  That's correct.

21          MR. BECKWORTH:  Thank you.  Now, last

22  one and then we'll take a short break.  I'm going to

23  hand you Exhibit 20.

24          I'll note, Mrs. Spencer, I have no other

25  questions other than it is what it is, and if you'll

Page 157

1    let me ask my question, you may have an easier way

2    to do this.

3                         (Portenoy Exhibit 20 was marked

4                         for identification.)

5    BY MR. BECKWORTH:

6        Q.  We served you with a subpoena for records

7    in this case.  Are you aware of that?

8        A.  Yes.

9        Q.  And through your attorney, records were

10   provided to us, correct?

11       A.  Correct.

12       Q.  And included in that were 1099s and

13   payments that you had in your possession that showed

14   amounts you'd been paid from various entities,

15   correct?

16       A.  That's correct.

17       Q.  And I'll represent to you that what I've

18   handed to you in Exhibit 20 bears a Bates stamp

19   showing documents provided from you, Dr. Portenoy.

20                  Do you see that on the bottom right-hand

21   side?

22       A.  Yes.

23       Q.  And all I want to ask you is if that's a

24   true and correct copy of the documents you provided

25   us?

Page 158

1      A.   To the best of my knowledge, yes.

2      Q.   And those are business records that you

3  provided that show various payments and related

4  memorialization of that from various sources,

5  correct?

6      A.   Correct.

7      Q.   And there's a confidentiality order in its

8  place and I'm sure that -- I know that you've

9  already signed it, so just so you understand your

10 personal information is not going to be sent out to

11 the public.

12     A.   Thank you.

13          MS. SPENCER:  And on that point, I

14 apologize, I forgot to say this at the beginning.

15 This proceeding is subject to that confidentiality

16 agreement and the protective order, correct?

17          MR. BECKWORTH:  He signed it, yes.

18          MS. SPENCER:  No, no.  This proceeding.

19 Nothing that is said or goes on here in this

20 proceeding is subject to public disclosure outside

21 of the confines of the -- like, this is marked

22 confidential, this proceeding?

23          MR. BECKWORTH:  Yes.  There's a

24 procedure for doing that for depositions under the

25 protective order.

Page 159

1              MS. SPENCER:  Right.

2              MR. BECKWORTH:  We'll make sure you have

3   that.

4              MS. SPENCER:  Okay, great.

5              MR. BECKWORTH:  So that you do what you

6   need to do if you want to.

7              MS. SPENCER:  Great.  Thank you.

8              MR. BECKWORTH:  Do y'all want to take a

9   break?

10             MS. SPENCER:  Yes.

11             MR. BECKWORTH:  I wouldn't mind it.

12             THE VIDEO OPERATOR:  Off the record,

13   1:03.

14                   (Whereupon, at 1:03 p.m.,

15                   the deposition was recessed,

16                   to reconvene at 1:45 p.m.

17                   this same date.)

18

19

20

21

22

23

24

25

```
 1                    AFTERNOON SESSION

 2                              (2:20 p.m.)

 3              THE VIDEO OPERATOR:  Back on the record,

 4    2:20.

 5              MR. ERCOLE:  As we move forward, can I

 6    ask, Mr. Beckworth, is this being streamed?  And if

 7    so, to whom?

 8              MR. BECKWORTH:  It's being streamed to

 9    my colleagues.

10              MR. ERCOLE:  Who are your colleagues?

11              MR. BECKWORTH:  My lawyers.

12              MR. ERCOLE:  So it is being streamed?

13              MR. BECKWORTH:  To my legal team, yes.

14              MR. ERCOLE:  Thank you for now letting

15    us know that.

16              MR. BECKWORTH:  Are we going on the

17    record?  All that doesn't count against my time, by

18    the way.  Are we ready to proceed?

19              MS. SPENCER:  Go ahead.

20              MR. BECKWORTH:  Thank you.

21                RUSSELL PORTENOY, M.D.,

22       the witness at the time of recess, having

23       been previously duly sworn, was further

24       deposed and testified as follows:

25
```

Page 161

1                EXAMINATION (continued)

2     BY MR. BECKWORTH:

3         Q.  Dr. Portenoy, you know that during your

4     career you've written many papers regarding the

5     treatment of pain, cancer, noncancer, and

6     palliative, correct?

7         A.  Yes.

8                MR. ERCOLE:  I'm going to renew my

9     objection to the leading questions that the State

10    has asked throughout the entirety of this deposition

11    and just get a standing objection.

12               MR. BECKWORTH:  You don't get a standing

13    objection.

14    BY MR. BECKWORTH:

15        Q.  Now, Dr. Portenoy, you understand that what

16    he's trying to say is that you're a witness that I

17    control.  I don't control you, right?

18        A.  No.

19               MR. ERCOLE:  Objection, form, leading.

20    BY MR. BECKWORTH:

21        Q.  In fact, the State of Oklahoma doesn't

22    represent you?

23        A.  That's correct.

24        Q.  You're not trying to do intentionally

25    anything favorable or disfavorable to our case,

```
 1   right?

 2              MR. ERCOLE:  Objection to form.

 3              THE WITNESS:  Right.

 4   BY MR. BECKWORTH:

 5       Q.  You're here represented by your own

 6   attorney?

 7       A.  Right.

 8       Q.  She represents you?

 9       A.  Yes.

10       Q.  And you have the ability to answer

11   questions truthfully?  That's your choice, correct?

12       A.  Yes.

13              MR. ERCOLE:  Objection to form.

14   BY MR. BECKWORTH:

15       Q.  And you don't have a business relationship

16   with the State of Oklahoma?

17       A.  No.

18       Q.  You have no formal settlement agreement

19   with the State of Oklahoma?

20       A.  No.

21       Q.  You testify truthfully and that's your

22   choice to do so or not to do so, correct?

23       A.  Correct.

24       Q.  Thank you.  Now, you wrote papers

25   throughout your career?
```

1      A.  Yes.

2      Q.  And those papers included the treatment of

3  pain?

4      A.  Yes.

5      Q.  Palliative, cancer, noncancer?

6      A.  Yes.

7           MR. ERCOLE:  I'll renew my standing

8  objection to the leading question.

9           MR. BECKWORTH:  You do not have a

10  standing objection.

11  BY MR. BECKWORTH:

12      Q.  The treatment of pain through opioids was

13  something that prior to 1995 there were a lot of

14  fears about doing that for the chronic noncancer

15  pain area; would you agree?

16           MR. ERCOLE:  Objection to form.

17           THE WITNESS:  I think the fears

18  continued after 1995.  There have been historically

19  always fears about using opioids.

20  BY MR. BECKWORTH:

21      Q.  Opioids had been used prior to 1995 for

22  palliative care?

23      A.  Yes.

24      Q.  In the acute setting, surgeries, things

25  like that?

Page 164

1      A.  Yes.

2      Q.  But broad use of opioids in the chronic

3  pain areas like low back pain and some of the things

4  we discussed earlier, that was not broadly done

5  prior to 1995; do you agree?

6      A.  That's correct, yes.

7           MR. ERCOLE:  Objection to form.

8  BY MR. BECKWORTH:

9      Q.  And there were concerns about some of the

10  negative consequences that can occur with these

11  drugs like tolerance?

12      A.  Yes.

13      Q.  Addiction?

14      A.  Yes.

15      Q.  Physical dependence?

16      A.  Yes.

17      Q.  The risk for abuse?

18      A.  Yes.

19      Q.  And misuse?

20      A.  Yes.

21      Q.  Diversion?

22      A.  Yes.

23      Q.  And the problem of potential addiction?

24      A.  Yes.

25      Q.  Based upon your experience, it is your

Page 165

1  belief that when the drug company defendants used

2  your work, that there were times they did not fully

3  cite to the warnings and qualifications you gave

4  about these and other risks associated with these

5  use of opioids in the chronic pain space, correct?

6           MR. ERCOLE:  Objection to form.

7           THE WITNESS:  Yes.  From the very first

8  paper that I wrote about opioids in 1986, I was

9  always trying to speak about their use with respect

10  to both the potential benefit that I believe they

11  had and can still have today, if they're used

12  appropriately, and also about their risk.

13           The very first guideline -- the very

14  first item in the very first guideline that we

15  published in 1986 said that opioids should only be

16  considered after all other reasonable approaches for

17  pain control have not worked.

18           And it's my view, I've come to conclude

19  that the opioid manufacturers essentially distilled

20  out the positive messages and failed to mention or

21  failed to emphasize appropriately the risks and the

22  context that was included in papers like the very

23  first one that I wrote.

24           And that's what I mean when I made that

25  statement in the declaration: that the materials

1    that I wrote included information that I thought

2    could help destigmatize these drugs, give doctors

3    real information about their actual pharmacology,

4    about the data that was out there, disabuse them of

5    some of the excessive concerns that they had that

6    were not really based on science.

7              But at the same time I always framed

8    that in the context that said, but these drugs could

9    be abused, but these drugs could lead to addiction,

10   and that's why they shouldn't be first used, and

11   that's why they should only be used in carefully

12   selected patients, and that's why they should be

13   monitored in a specific way.

14             And I think that that context and those

15   messages about risk were neglected, de-emphasized,

16   and the pharmaceutical industry, for understandable

17   reasons, would take the positives, distill out the

18   positives for their messaging.

19   BY MR. BECKWORTH:

20     Q.  What do you believe -- or what do you mean

21   by, for understandable reasons, they took only the

22   positive?

23     A.  I think the -- I think that the purpose of

24   doing that was to improve the sales of their drug.

25   And in order -- and obviously to the extent that

Page 167

1    physicians were given a sense of assurance that the

2    risks were not significant, the drug would do better

3    in the marketplace.

4              So that there was that overarching

5    consideration, I think, in the way that the

6    pharmaceutical industry decided to market its

7    products, to speak about the benefits that people

8    like myself were writing about without providing the

9    context related to risk and the caution in selecting

10   the right patient, because the message was more

11   likely to lead to marketing advantage if they did

12   not include the negatives.

13   Q.  And would using the work of you or any

14   academic or doctor in a way that doesn't show both

15   the positive and negative consequences of using

16   these drugs in this way, would that be misleading?

17              MR. ERCOLE:  Objection to form.

18              THE WITNESS:  It can be misleading.

19   And I'll just say that initially we did not see a

20   public health crisis occurring.  In other words, the

21   public health problem of opioids producing an

22   increasing rate of unintended overdose and death,

23   increasing rates of abuse, and increasing rates of

24   addiction, that all occurred after some years of

25   this new way of thinking about opioids was being

1   discussed by the academic community.

2              I think that the drug companies were

3   slow to recalibrate, to change their messages to try

4   to incorporate more about risk as it became clearer

5   that the public health implications of greater

6   opioid use warranted more focus on risk.

7              And in that way, they, again, tended to

8   only emphasize the positive and not provide

9   information about the negative in the context such

10  as people in the academic community were trying to

11  do.

12  BY MR. BECKWORTH:

13     Q.  And being slow to disclose these risks had

14  an opposite effect, which was an increase in

15  prescribing of opioids for noncancer, chronic pain?

16              MR. ERCOLE:  Objection to form.

17              THE WITNESS:  Yeah.  I can't speak to

18  the extent to which those behaviors led to increased

19  prescribing.  I think that's a question for research.

20  I don't really know the answer to that.

21              But I can say that my opinion today is

22  that those -- that that balance between a positive

23  message and a negative message, the context about

24  who to select, what to try before going to opioids,

25  all of those -- all of those risk-related concepts

1  and the context of irreducible risk associated with

2  the use of opioid drugs, that tended to be neglected

3  in the marketing materials, and could have had an

4  impact in the way doctors perceived these drugs and

5  led to more prescribing.

6  BY MR. BECKWORTH:

7      Q.  Now, in 1996, you published a review

8  article on opioid therapy titled "Opioid therapy for

9  chronic nonmalignant pain: A review of the critical

10  issues," in the Journal of Pain and Symptom

11  Management, correct?

12     A.  Yes.

13     Q.  In that paper, you elaborated on aberrant

14  drug-related behaviors that are associated with

15  addiction?

16     A.  Yes.

17     Q.  You agree that people who are opioid

18  addicted can sometimes engage in desperate behaviors

19  to obtain opioids, correct?

20     A.  Yes.

21     Q.  And desperate behaviors to maintain their

22  opioid supply if they need it?

23     A.  People who are addicted?

24     Q.  Yes, sir.

25     A.  Yes.  Yes, of course.

Page 170

1      Q.  You also agree that an opioid-addicted

2   individual might pretend to have pain in order to

3   obtain opioids?

4      A.  Yes, of course.

5      Q.  Or maintain an opioid supply?

6      A.  Yes.

7              MR. ERCOLE:  Objection to form.

8   BY MR. BECKWORTH:

9      Q.  Is it also true that an opioid-addicted

10  individual might try to hide evidence of their

11  addiction from their doctor in order to obtain

12  opioids?

13     A.  Yes.

14     Q.  There is no objective measure like --

15  Let me start over.

16             You're a doctor, right?

17     A.  Yes.

18     Q.  If you want to know someone's temperature,

19  you have a means to check their temperature,

20  correct?

21     A.  Right.

22     Q.  If you want to know someone's pulse, you

23  can check their pulse?

24     A.  That's correct.

25     Q.  If you want to look at their blood oxygen

Page 171

1    level, you can check that?

2        A.   That's right.

3        Q.   There's no such objective test to test for

4    opioid addiction?

5        A.   That's right.

6             MR. ERCOLE:  Objection to form.

7             THE WITNESS:  Opioid addiction is a

8    brain disease with behavioral manifestations.  And

9    the only way that one can make the diagnosis is by

10   monitoring behavior.

11             That was one -- that was the reason that

12   back in the early 1990s, I constructed a table of

13   so-called aberrant drug-related behavior and

14   published that first in a book chapter and then it

15   became published in many other places, and

16   ultimately even was used to create a measurement

17   tool.

18             That initial effort on my part to codify

19   all the different kinds of behaviors that a

20   physician might see was an effort to try to get an

21   educational tool so that physicians would understand

22   that they have to monitor drug-related behavior in

23   order to make an inference that the patient may have

24   the disease of addiction or even just to determine

25   the patient's abusing the drug and there needs to be

Page 172

1   some additional control.

2   BY MR. BECKWORTH:

3       Q.  And that's because it's true, isn't it,

4   that addiction's hard to diagnose?

5               MR. ERCOLE:  Objection to form.

6               THE WITNESS:  I believe that that's

7   true, yes.

8   BY MR. BECKWORTH:

9       Q.  And generally the folks that specialize in

10  addiction diagnosis are psychiatrists?

11      A.  That's right.

12      Q.  And the treatment of addiction is complex

13  as well, correct?

14      A.  That's correct.

15      Q.  There are a lot of behaviors that someone

16  suffering from addiction might manifest that they

17  might try to hide from others?

18      A.  That's true.

19      Q.  Because addiction is a difficult disease?

20      A.  Yes, it's --

21              MR. ERCOLE:  Objection to form.

22              THE WITNESS:  It's a very difficult

23  disease.  It's a very serious disease.

24  BY MR. BECKWORTH:

25      Q.  And if someone becomes addicted, while it

1   might be able to be treated, you can have addiction

2   for the rest of your life?

3                   MR. ERCOLE:  Objection to form.

4                   THE WITNESS:  I think the answer to that

5   is sort of complex because if a person has the

6   disease of addiction and it's been manifest,

7   they've -- in most cases they've declared themselves

8   as having a predisposition in the brain to have that

9   disease.  There's a strong genetic component to that.

10                  Once a person has a diagnosis of

11  addiction, then it should be clear to a health

12  professional that they have a capacity to relapse

13  into that addictive pattern of abuse again.  If they

14  don't have access to the drug or they have a great

15  deal of social support or they have medication-

16  assisted treatment, they may never abuse the drug

17  again.  But they always carry that capacity of

18  becoming addicted again, which was demonstrated by

19  their first diagnosis of addiction.

20  BY MR. BECKWORTH:

21      Q.  And yet another reason why addiction is

22  very complex?

23      A.  Yes.

24      Q.  The consequences of addiction -- and you

25  referred to aberrant behavior -- those behaviors are

1  bad?

2      A.  Yes, they're bad.

3      Q.  They can be tragic?

4      A.  Yes.

5      Q.  They can lead to crime?

6      A.  Yes.

7      Q.  Death?

8      A.  Yes.

9      Q.  I've even seen some folks say that it could

10  lead to things like engaging in prostitution or

11  human trafficking?

12      A.  Yes.

13          MR. ERCOLE:  Objection to form.

14  BY MR. BECKWORTH:

15      Q.  It can rip families apart?

16      A.  Yes.

17      Q.  It can cause people to lose their jobs?

18      A.  Yes.

19      Q.  Destroy marriages?

20      A.  Yes.

21      Q.  Destroy families?

22      A.  Yes.

23      Q.  Destroy communities?

24      A.  Yes.

25      Q.  It's serious?

Page 175

1    A.  It is.

2    Q.  It's no laughing matter?

3    A.  Right.

4    Q.  It's just the opposite; do you agree?

5    A.  I totally agree.

6    Q.  So in your 1996 paper, one of the things

7  that you stated in there is that the data regarding

8  iatrogenic addiction from using opioids for chronic

9  noncancer pain are limited?

10   A.  That's true.

11   Q.  And that was true in 1996?

12   A.  Yes.

13   Q.  You also state in your paper that

14  controlled clinical trials of long-term opioid

15  therapy were still needed as of 1996?

16   A.  Yes.

17   Q.  You believed that when you wrote that paper?

18   A.  Yes.

19   Q.  As you sit here today, sir, can you say

20  with certainty what percentage of patients treated

21  with long-term opioids will develop the disease of

22  addiction?

23           MR. ERCOLE:  Objection to form.

24           THE WITNESS:  We know a great deal more

25  now in 2019 than we knew in 1996.  And the question

1  is a bit complex and needs to be deconstructed

2  because one part of the question is, what's the

3  likelihood of addiction in patients who have no

4  prior history of substance abuse.  That's an

5  important question.

6              Another question is, what's the

7  likelihood of addiction developing in patients who

8  have either a prior history of substance abuse or

9  have other risk factors for substance abuse, like

10  mental illness, for example.  And the answer to

11  those questions are all different.

12              There has been just recently, last year,

13  a new study of the existing literature, a systematic

14  review and a so-called metaanalysis that looked at

15  all of the publications, all of the scientific

16  studies that evaluated patients with no prior

17  history of substance abuse who were given an opioid

18  for pain.

19              And that paper came up with the

20  percentage of about 4.7 percent risk of iatrogenic

21  addiction.  But it noted that in the studies of that

22  group, the studies that existed had a range that was

23  from below 1 percent all the way up to over

24  20 percent.

25              So the studies out there are not

Page 177

1   precise, and physicians have to -- have to recognize

2   that definitive data about risk doesn't exist.

3            And I'll just finish by saying that's

4   why for me, the message has always been to have a

5   clinical approach to patients who are taking opioid

6   drugs that include monitoring their behavior.  And

7   that if their behavior demonstrates aberrancy,

8   meaning to say that they don't follow instructions

9   or they engage in problematic behavior, to do a

10  comprehensive reassessment of that patient and try

11  to make a diagnosis.

12           In some cases you would call that

13  addiction if there's enough reasons to believe the

14  person meets criteria for addiction.  In some cases

15  it would be drug abuse.  In some cases it might be

16  diversion.  And only in that way can a clinician

17  manage that.

18  BY MR. BECKWORTH:

19     Q.  So you deconstructed that answer, and I'm

20  reading it back.  One of the things you said is:

21  "The studies out there are not precise and

22  physicians have to recognize that the definitive

23  data about risk doesn't exist," correct?

24     A.  Yes.  I think that's true.

25     Q.  Definitive data about risk does not exist?

1      A.   That's true.

2      Q.   Even today in January of 2019?

3      A.   Right.

4      Q.   And that's not a change from 1996 or any

5   year prior?

6      A.   Right.  And what I would add to that is

7   definitive data don't exist, but over time, there

8   have been better data about the risk profile.  So --

9   and knowing the risk profile, knowing the risk

10  factors that may predict it, allows clinicians to

11  act in the patient's best interest.

12     Q.  So --

13     A.   But to have a number in hand that says

14  patients with these characteristics have this rate

15  of addiction, those data are not precise enough in

16  the literature to inform medical practice.

17     Q.  Even today?

18     A.  Even today.

19     Q.  And as more information has become

20  available, as you just described, we still find

21  ourselves -- over 20 years after the introduction of

22  OxyContin, we still find ourselves not being able to

23  describe that risk with certainty, correct?

24     A.  Correct.

25              MR. ERCOLE:  Objection to form.

```
 1                THE WITNESS:  That's correct.
 2   BY MR. BECKWORTH:
 3        Q.  So going back to the question I asked you,
 4   the question I asked you was, as you sit here today,
 5   can you say with certainty what percentage of
 6   patients treated with long-term opioids will develop
 7   the disease of addiction?
 8                MR. ERCOLE:  Objection to form.
 9   BY MR. BECKWORTH:
10        Q.  Based on those qualifications, the answer
11   is no?
12        A.  No.
13                MR. ERCOLE:  Objection to form.
14   BY MR. BECKWORTH:
15        Q.  No, I'm correct?
16        A.  You are correct.
17        Q.  Thank you.  Now, we talked about your
18   papers for a minute.  You believe that the drug
19   companies, some of them used your work to promote
20   opioids by referencing the positive statements you
21   made without providing all of the background,
22   analysis, and cautions that you also had in your
23   work, correct?
24        A.  That's correct.
25                MR. ERCOLE:  Objection to form.
```

1    BY MR. BECKWORTH:

2        Q.  And because of that, use of your studies,

3    speeches, and papers in that way lacked balance?

4                MR. ERCOLE:  Objection to form.

5                THE WITNESS:  That's correct.

6                MS. SPENCER:  One clarification.  Okay.

7    Use of the studies lacked balance.  Not that the

8    papers themselves lacked balance?

9                MR. BECKWORTH:  Yes.

10   BY MR. BECKWORTH:

11       Q.  To be clear, use of your papers by the

12   pharmaceutical industry in a way that didn't show

13   all the good and bad lacked balance?

14       A.  Yes.

15               MR. EHSAN:  Objection to form.

16               MR. ERCOLE:  Objection to form.

17   BY MR. BECKWORTH:

18       Q.  And you're troubled by that?

19       A.  Yes.

20       Q.  Now, one example that you provide in your

21   declaration is something called myths about opioids,

22   which was a document that Purdue used in its

23   marketing efforts?

24       A.  Yes.

25       Q.  That was around 2011, correct?

1     A.  Yes.

2              MS. SPENCER:  Are we at paragraph 34?

3              MR. BECKWORTH:  Yes.

4              THE WITNESS:  It's okay if I look at

5     this, right?

6     BY MR. BECKWORTH:

7     Q.  Yes.  And I'm not going to go through

8     specific questions right now.  You reference that

9     document as one that cited you and didn't give all

10    the right disclosures of risk and the negative

11    consequences of using opioids for the treatment of

12    noncancer chronic pain, correct?

13    A.  That's correct.

14    Q.  Also in 1997, Purdue published a brochure

15    that you cite in your declaration as saying that

16    opioid therapy was appropriate, safe, and effective

17    on a long-term basis for selective patients.

18              And in that same document, Purdue said

19    that the risk of taking an opioid and getting

20    addicted for chronic pain was less than 1 percent?

21              Do you understand what I'm talking

22    about?

23    A.  Yes.

24    Q.  And do you believe that saying that the

25    risk of addiction is less than 1 percent when taking

Page 182

1    an opioid for chronic pain is complete and accurate?

2        A.  Yeah.  That's inaccurate.

3        Q.  It's inaccurate because it doesn't give all

4    the types of data that we just talked about?

5        A.  That's right.

6        Q.  And you admit that it doesn't provide all

7    the warnings that are necessary?

8        A.  That's correct.

9        Q.  And you also would agree that if a

10   physician were to read this and not be experienced

11   in addiction diagnosis and treatment, that could

12   cause the physician to not be able to make the right

13   decision?

14            MR. ERCOLE:  Objection to form.

15            THE WITNESS:  If by "the right

16   decision," you're saying that seeing information

17   like this might make inexperienced physicians more

18   likely to prescribe, and particularly more likely to

19   prescribe in situations associated with higher risk,

20   then the answer is yes.

21   BY MR. BECKWORTH:

22       Q.  And it might also cause such a physician to

23   not see the warning signs associated with someone

24   who might actually be an addict?

25            MR. ERCOLE:  Objection to form.

1          THE WITNESS:  Yes.  I think that's true

2   too.

3   BY MR. BECKWORTH:

4      Q.  And as we just talked about a moment ago,

5   you agreed that when we started in 1996 with one of

6   your papers, there were fears about risk associated

7   with using opioids for chronic pain?

8      A.  Yes.

9          MR. ERCOLE:  Objection to form.

10  BY MR. BECKWORTH:

11     Q.  And anytime you diminish those fears

12  without talking about the risk associated with them,

13  you have the possibility that more prescribing will

14  occur?

15         MR. ERCOLE:  Objection to form.

16         THE WITNESS:  I think that that's true.

17  BY MR. BECKWORTH:

18     Q.  Now, you also have stated that this paper

19  we're discussing at the moment did not indicate that

20  opioids should be tried after other reasonable

21  efforts at pain management have been unsuccessful,

22  correct?

23         MS. SPENCER:  I'm sorry.  Which paper?

24  Because we went from his paper to then the Purdue

25  documents.

Page 184

1              MR. BECKWORTH:  Sorry.  Yes.

2    BY MR. BECKWORTH:

3        Q.  Your attorney wants me to make sure I'm not

4    talking about your papers, and to be clear, I'm not.

5    I'm talking about the 1997 Purdue paper that you

6    mention.  You state that that paper did not indicate

7    that opioids should be tried after other reasonable

8    efforts at pain management were unsuccessful,

9    correct?

10       A.  That's correct.

11       Q.  And you understand there's something called

12   the WHO, or World Health Organization, ladder for

13   treatment?

14       A.  Yes.

15       Q.  Correct?

16       A.  Yes.

17       Q.  Strong opioids should never be used in the

18   first instance for moderate pain; do you agree?

19       A.  Yes.  The WHO analgesic ladder created in

20   the mid '80s pertained to cancer pain.  It never was

21   meant to refer to noncancer pain.  It was adapted to

22   noncancer pain in ways that I've been concerned

23   about over the years.

24              And when I lectured about the WHO ladder,

25   I would always mention that the WHO ladder was not

Page 185

1    intended to be about noncancer pain.  And the WHO

2    ladder, for example, doesn't advise trying other

3    modalities for moderate to severe pain before trying

4    opioids.  Just the opposite.

5              It says if the patient has moderate or

6    severe chronic pain, opioids are the first-line

7    drug.  So the WHO ladder specifically contradicts

8    the guidelines that I believed in even back in 1986

9    when I wrote the first set.

10    Q.  For noncancer pain?

11    A.  For noncancer pain.

12    Q.  So let's go back through that and, to use

13    your words, deconstruct because I think that's a

14    long answer you gave.

15              The WHO ladder was for cancer pain,

16    correct?

17    A.  Yes.  That's correct.

18    Q.  And I believe you testified earlier -- I'm

19    going to use my words -- correct me if I'm wrong --

20    but I believe you testified earlier that there are

21    different considerations when you're dealing with

22    cancer or end-of-life pain treatment, correct?

23              MR. ERCOLE:  Objection to form.

24              THE WITNESS:  That's correct.

25

Page 186

1    BY MR. BECKWORTH:

2        Q.   That's what you said, correct?

3        A.   Correct.

4        Q.   Is it your testimony that for anyone to use

5    the World Health Organization ladder and portray it

6    as applying to noncancer, non-palliative chronic

7    pain, that that's wrong?

8                MR. ERCOLE:  Objection to form.

9                THE WITNESS:  That would be wrong

10   without context, without providing the information

11   that this approach is being modified or adapted to a

12   population that it wasn't originally developed to

13   address.

14   BY MR. BECKWORTH:

15       Q.   Because the WHO ladder was never intended

16   to support a slogan like, Start with and stay with

17   an opioid for noncancer chronic pain, was it?

18       A.   No.

19                MR. ERCOLE:  Objection to form.

20   BY MR. BECKWORTH:

21       Q.   Your answer was "no"?

22       A.   "No."

23       Q.   And for a drug company to use that ladder

24   for such a slogan or approach would be wrong?

25                MR. ERCOLE:  Objection to form.

1           THE WITNESS:  It would trouble me if the

2  ladder without any statement of context, without

3  talking about how it was being modified, if that was

4  used to illustrate that slogan, that would not be --

5  that would be wrong.  That's clearly not what the

6  ladder was intended to do.

7  BY MR. BECKWORTH:

8     Q.  And you stated earlier that you were

9  concerned that that was exactly what was happening?

10          MR. ERCOLE:  Objection to form.

11          THE WITNESS:  Stated earlier?  I'm not

12  sure what you're referring to.

13  BY MR. BECKWORTH:

14     Q.  You stated -- Let me go back.  I heard you

15  say -- correct me if I'm wrong -- that at some

16  point, you were concerned that the WHO ladder was

17  being adopted to be used in the noncancer chronic

18  pain treatment.

19          Did you say that?

20     A.  Yes, that's true.

21          MR. ERCOLE:  Objection to form.

22  BY MR. BECKWORTH:

23     Q.  And adopted by who?

24     A.  Well, I can't be precise with that answer

25  because it was happening a lot in the '90s.

Page 188

1     Q.  A lot?

2     A.  A lot.  And if it was happening -- if it

3  was done by the drug companies to promote an idea or

4  for a product, that would not be proper, in my view,

5  in the same way that if it was done by colleagues,

6  I wouldn't agree with it.

7          It was never meant to portray a

8  guideline for the treatment of chronic noncancer

9  pain.

10    Q.  And was it meant for a drug company to

11  teach to your colleagues that this is what the WHO

12  ladder was for?

13          MR. ERCOLE:  Objection to form.

14          THE WITNESS:  Not the chronic noncancer

15  pain.  It was appropriate to teach chronic cancer

16  pain.

17  BY MR. BECKWORTH:

18    Q.  So it could be wrong for a pharmaceutical

19  company who makes or sells opioids to take the WHO

20  ladder and educate doctors that that ladder applied

21  to noncancer pain, correct?

22    A.  Correct.

23          MR. ERCOLE:  Objection to form.

24          THE WITNESS:  Unless, as I said, I can't

25  imagine that with the proper warnings and context it

Page 189

1    could be a tool.  But without those, it's not the

2    right thing to do.

3    BY MR. BECKWORTH:

4        Q.  Now, in paragraph 14 of your declaration,

5    you stated that on December 12, 1995, Purdue Pharma,

6    L.P. introduced OxyContin.

7        A.  Yes.

8        Q.  And after 1996, do you believe that Purdue

9    aggressively marketed the drug OxyContin?

10       A.  Yes.

11       Q.  In your opinion, based on your -- Start

12   over.

13              Based on your experience and

14   understanding of the facts as you know them in your

15   career, have you ever seen a company market an

16   opioid for noncancer chronic pain as aggressively as

17   Purdue had?

18       A.  No.  Purdue did it most aggressively.

19       Q.  To your knowledge, prior to 1996, had any

20   drug company encouraged the use of an opioid for

21   noncancer chronic pain by people who were not pain

22   specialists?

23       A.  Not to my knowledge, no.

24       Q.  When OxyContin hit the market, did we have

25   an opioid crisis in the United States of America?

 1                    MR. ERCOLE:  Objection to form.

 2                    THE WITNESS:  So to the extent that we

 3     had and have a public health problem, it wasn't

 4     present in 1995 and '96.

 5     BY MR. BECKWORTH:

 6        Q.  Based on your experience and knowledge of

 7     the facts and working in the pain field, in December

 8     of 1995 when OxyContin was approved, did this

 9     country have a public health problem related to

10     prescription opioids for noncancer chronic pain

11     treatment?

12                    MR. ERCOLE:  Objection to form.

13                    THE WITNESS:  It wasn't widely

14     considered to be so, no.  There always have been

15     drugs that have been diverted and abused,

16     prescription drugs.  That has always been the case

17     ever since they were available.

18                    But at that time, it was considered to

19     be small relative to the problem, for example, of

20     heroin abuse.

21     BY MR. BECKWORTH:

22        Q.  And you understand, based on your

23     experience, that prescribing of opioids for

24     nonchronic cancer pain increased after OxyContin hit

25     the market; would you agree?

Page 191

1      A.  Yes.

2              MR. ERCOLE:  Objection to form.

3   BY MR. BECKWORTH:

4      Q.  And I went over this earlier.  I used some

5   terms like "target" and "detailing"; do you remember

6   that?

7      A.  Yes.

8      Q.  And you are aware that the drug companies

9   in this case used sales representatives to interface

10  with treating physicians, correct?

11     A.  Yes.

12             MR. ERCOLE:  Objection to form.

13             MR. BECKWORTH:  I'm going to hand you a

14  document we'll label as Exhibit 21.

15             THE WITNESS:  Yes.

16                 (Portenoy Exhibit 21 was marked

17                  for identification.)

18  BY MR. BECKWORTH:

19     Q.  Exhibit 21 is a document produced by Purdue

20  in the State of Oklahoma's case.

21             Do you see that, sir?

22     A.  Yes.

23     Q.  And this shows the average monthly

24  prescriptions on the left-hand side of OxyContin.

25  And on the bottom, it's the average monthly calls

Page 192

1   upon doctors.

2           Do you see that?

3       A.  Yes.

4       Q.  And the title of this page says what?

5       A.  "Total prescription level is highly

6   correlated to call activity."

7               MR. BECKWORTH:  Now, I'm going to hand

8   you an exhibit we'll label as Exhibit 22 to your

9   deposition.

10              (Portenoy Exhibit 22 was marked

11              for identification.)

12  BY MR. BECKWORTH:

13      Q.  Exhibit 22, while you look at it, is from a

14  document produced by Purdue.  This document on

15  page 10, which is the first page you have, says

16  "Targeting the high prescribers."

17          Do you see that?

18      A.  Yes.

19      Q.  And if you look at it, it shows that for

20  called-upon doctors during this time period, there

21  were 58,448 doctors.

22          Do you see that?

23      A.  Yes.

24      Q.  And then it shows the number of

25  prescriptions written between January and May 2010

Page 193

1   by called-upon doctors.  And it shows how many?

2        A.  2,010,233.

3        Q.  And then it shows next to that, that during

4   that time, there were how many called-upon doctors?

5        A.  231,468.

6        Q.  And that was an average of 34 prescriptions

7   per doctor called upon, correct?

8        A.  That's correct.

9        Q.  Now, if you look below that, it lists

10  totals for non-called-upon doctors, right?

11       A.  Right.

12       Q.  And there we see there were 256,337 doctors

13  that weren't called upon?

14       A.  Correct.

15       Q.  How many drug prescriptions for opioids did

16  they prescribe?

17            MR. ERCOLE:  Objection to form.

18            THE WITNESS:  1,176,191.

19  BY MR. BECKWORTH:

20       Q.  The number of calls between January and

21  May 2010 were how many?

22       A.  Were zero.

23       Q.  And the prescriptions per doctor were how

24  many?

25       A.  Four.

Page 194

1              MR. COLEMAN:  Objection to form.

2    BY MR. BECKWORTH:

3        Q.  How many?

4        A.  Four.

5        Q.  So quite a bit less?

6        A.  Yes.

7        Q.  Substantially less?

8        A.  Yes.

9              MR. ERCOLE:  Objection to form.

10   BY MR. BECKWORTH:

11       Q.  Would you agree?

12       A.  Yes, I do.

13       Q.  Now, if you look at the next page, you see

14   "Total prescriptions" there on the left and called-

15   upon data on the bottom, correct?

16       A.  Yes.

17       Q.  And the title of that page says "Overall

18   called-on M.D.s' total prescription volumes slightly

19   increased while non-called-on M.D.s' total

20   prescription volume decreased," correct?

21       A.  Yes.

22       Q.  Thank you.  So according to these documents

23   that you've seen, according to Purdue, there is a

24   correlation between calling upon a doctor who is a

25   target and prescribing conduct?

```
 1              MR. ERCOLE:  Objection to form.

 2              THE WITNESS:  Yes.

 3   BY MR. BECKWORTH:

 4      Q.  It says it right there in black and white?

 5      A.  That's true.

 6      Q.  Now, you stated in your declaration that

 7   you understood that drug company defendants promoted

 8   their drugs aggressively to primary care physicians?

 9              MR. ERCOLE:  Objection to form.

10              THE WITNESS:  Yes.

11   BY MR. BECKWORTH:

12      Q.  You also stated that between 1987 and 2005,

13   the prevalence of long-term opioid use increased by

14   between 61 and 135 percent?

15      A.  Yeah.  That was the data cited in the

16   declaration.  That's right.

17      Q.  Based upon your knowledge and experience,

18   by the late 1990s, at least, you were aware that

19   serious adverse outcomes related to opioid

20   prescribing for noncancer chronic pain were

21   occurring?

22      A.  Yes --

23              MR. ERCOLE:  Objection to form.

24              THE WITNESS:  -- that's true.

25
```

1    BY MR. BECKWORTH:

2        Q.  We had serious hot spots floating up in

3    different parts of the country?

4                  MR. ERCOLE:  Objection to form.

5                  THE WITNESS:  That is true, yes.

6    BY MR. BECKWORTH:

7        Q.  Abuse in the -- diversions were occurring?

8        A.  Yes.

9        Q.  And addiction rates were rising?

10       A.  That's true.

11                 MR. ERCOLE:  Objection to form.

12   BY MR. BECKWORTH:

13       Q.  And you are aware -- I'll ask you this.

14   Are you aware that in 2003, the United States GAO

15   office issued a report about the role of Purdue in

16   creating some of these problems?

17       A.  No, I wasn't aware of that.

18       Q.  Have you ever read that report?

19       A.  Not that I recall, no.

20       Q.  You are aware that in 2007, Purdue pled

21   guilty to a federal crime?

22       A.  Yes.

23       Q.  And as we established earlier, three of its

24   executives pled guilty to a federal crime?

25       A.  Yes.

Page 197

1      Q.   Related to misbranding related to OxyContin?

2      A.   Yes.

3      Q.   And as we talked about earlier, you know

4    that in 2008, Cephalon entered into a guilty plea

5    for misconduct related to, among other things,

6    marketing Actiq?

7              MR. ERCOLE:  Objection to form.

8              THE WITNESS:  Yes.

9    BY MR. BECKWORTH:

10     Q.   And as we discussed earlier today -- I

11   showed you an exhibit on this -- Johnson & Johnson's

12   subsidiary Tasmanian Alkaloids grew the Norman

13   poppy?

14     A.   Yes.

15     Q.   And as you saw in that document, J&J

16   actually gave a medal to a scientist for a specific

17   creation of a poppy because that invention led to

18   the growth of OxyContin?

19             MR. EHSAN:  Objection to form.

20             THE WITNESS:  Yes.  That's what the

21   document said.

22   BY MR. BECKWORTH:

23     Q.   You understand that oxycodone is the active

24   pharmaceutical ingredient in OxyContin?

25     A.   That's correct.

Page 198

1      Q.  And you understand that in addition to

2   Purdue, other companies sell generic versions of

3   OxyContin?

4      A.  Yes.

5            MR. ERCOLE:  Objection to form.

6   BY MR. BECKWORTH:

7      Q.  Now, one of the things you talk about in

8   paragraph 37 of your declaration is the American

9   Pain Society and AAPM consensus statement.

10            Do you recall that?

11      A.  Yes.

12            MS. SPENCER:  Give me just a minute to

13   get to the spot.  Did you say paragraph 37?

14            MR. BECKWORTH:  I believe that's it.

15            THE WITNESS:  Not my 37.

16            MS. SPENCER:  Not my 37 either.

17            MR. BECKWORTH:  Whichever one is the

18   American Pain Society statement.  It's fine if you

19   don't have it; we can talk about it.

20            MS. SPENCER:  I'd rather have it open.

21   Is it 17?

22            MS. CARTMELL:  I think so.

23            MR. BECKWORTH:  Sure.  We can start

24   here.  Thank you.  There's other places, but that's

25   fine.

1   BY MR. BECKWORTH:

2       Q.  You were a board member, as we discussed

3   earlier, of the American Pain Society, correct?

4       A.  Yes.

5       Q.  And you were president for a one-year term?

6       A.  Yes.

7       Q.  You also were a board member of the

8   American Pain Foundation from 2000 to 2012, correct?

9       A.  Yes.

10      Q.  During the time you were on the board, as

11  we discussed earlier, the APF was funded mostly by

12  pharmaceutical company grants?

13      A.  Yes.

14      Q.  And you stated that was a concern of the

15  APF board for many years?

16          MR. ERCOLE:  Objection to form.

17          THE WITNESS:  That's correct, yes.

18  BY MR. BECKWORTH:

19      Q.  You also stated that the APF didn't focus

20  on the rising problem of opioid overdose?

21          MR. ERCOLE:  Objection to form.

22          THE WITNESS:  That's true.

23  BY MR. BECKWORTH:

24      Q.  And your belief about that is what?

25      A.  Well, the APF wrote grants and did projects

1    that were intended to provide support to patients

2    who had pain and their families or to provide

3    information to the public.

4                  So the projects they did were only

5    projects for which grants could be funded.

6    And because the reliance of the APF on the

7    pharmaceutical industry was so high, they were not

8    able to access -- management was not able to access

9    funding for education focused on abuse liability or

10   risk of addiction or concern about overdose.

11                 It was included in some of the materials

12   that were written, but there was no focused

13   educational program comparable to the other kinds of

14   projects they did because they could only do the

15   projects that were funded through the grants that

16   they wrote.

17     Q.  And you believe that the dependence on that

18   type of funding may have influenced the ability of

19   APF to take positions that were contrary to the

20   wishes of the pharmaceutical industry?

21                 MR. ERCOLE:  Objection to form.

22                 THE WITNESS:  Yes.

23                 MR. BECKWORTH:  I'm going to hand you --

24   if you'll pass the extra copies to your lawyer --

25   Exhibit 23, sir.

Page 201

1                      (Portenoy Exhibit 23 was marked

2                      for identification.)

3    BY MR. BECKWORTH:

4        Q.  I've just handed you Exhibit 23, which is a

5    copy of "The use of opioids for the treatment of

6    chronic pain," correct?

7        A.  Yes.

8        Q.  Now, is this what you refer to as the

9    consensus statement?

10       A.  Yes.

11       Q.  This document was published by the American

12   Academy of Pain Medicine and the American Pain

13   Society?

14       A.  That's correct.

15       Q.  The committee chair was David Haddox?

16       A.  Yes.

17       Q.  You know that David Haddox ultimately went

18   to work for Purdue?

19       A.  Yes.

20       Q.  You're listed here as a consultant?

21       A.  Yes.

22       Q.  Why are you listed as a consultant?

23       A.  After the committee did this work, I was

24   sent the document and asked if I had any comments.

25       Q.  So as consultant work, were you paid for

Page 202

1    that?

2        A.  No.

3        Q.  You did look at it for comments?

4        A.  Yes.

5        Q.  Did you make comments?

6        A.  I simply don't remember.

7        Q.  You didn't stop this document from going --

8        A.  No.

9        Q.  I'm sorry.  I didn't finish.  You didn't

10   stop the document from being published?

11       A.  No.

12       Q.  Now, you have stated that the consensus

13   statement presented a very favorable perspective as

14   it related to risk regarding the use of opioids for

15   nonchronic -- sorry -- noncancer chronic pain?

16       A.  Yes.

17       Q.  You believe the consensus statement may

18   have implicitly promoted wider use of opioids?

19       A.  Yes.

20           MR. ERCOLE:  Objection to form.

21   BY MR. BECKWORTH:

22       Q.  Do you also believe the consensus statement

23   differed from the more lengthy articles that you put

24   out that talked about the risk attendant to using

25   opioids in this manner?

1      A.   Yes.   The purpose was to create -- I think

2    the purpose was to create a very shorthand, easily

3    readable document for general consumption.

4      Q.   You also believe, correct, that the

5    consensus statement was widely disseminated?

6      A.   Yes.

7      Q.   Do you recall seeing it distributed at pain

8    society meetings?

9      A.   Yes.

10     Q.   You also believe it was distributed by drug

11   company representatives to prescribers?

12            MR. ERCOLE:  Objection to form.

13            THE WITNESS:  I believe so, yes.

14   BY MR. BECKWORTH:

15     Q.   And do you believe that was done for a

16   purpose?

17            MR. ERCOLE:  Objection to form.

18            THE WITNESS:  Well, I can't really speak

19   to that.  I imagine there was a purpose, but no one

20   ever discussed that purpose with me.

21   BY MR. BECKWORTH:

22     Q.   In your declaration, do you state you

23   believe it was done to help promote their products?

24            MR. ERCOLE:  Objection to form.

25            THE WITNESS:  Yes.

Page 204

1    BY MR. BECKWORTH:

2        Q.  Yes?

3        A.  Yes.

4        Q.  And you also are familiar with a book

5    called "Responsible Opioid Prescribing"?

6        A.  Um --

7        Q.  It's not mentioned in your declaration.

8    I'm just asking if you're familiar with the book.

9        A.  Who is the author?

10       Q.  Fishman.

11       A.  Yes.

12       Q.  And in that book, the consensus statement

13   was included as an appendix?

14       A.  Yes.

15              MR. ERCOLE:  Object to the form.

16   BY MR. BECKWORTH:

17       Q.  Did you know that the AAPM continued

18   disseminating the consensus statement all the way

19   until 2012?

20              MR. ERCOLE:  Objection to form.

21              THE WITNESS:  I did know that.

22   BY MR. BECKWORTH:

23       Q.  You did do work with the AAPM?

24       A.  Aside from this, I don't believe I did.

25       Q.  Have you ever asked anybody to sunset,

1    meaning stop, using the consensus statement?

2        A.  No.

3        Q.  Do you think that document should still be

4    used?

5        A.  No, not today.

6        Q.  And it shouldn't have been used in 2012

7    either?

8            MR. ERCOLE:  Objection to form.

9            THE WITNESS:  Not without context.

10   BY MR. BECKWORTH:

11       Q.  You -- We've talked about this a little bit

12   already.  But you state that your work was not

13   always presented by others with the description and

14   study of risk attendant with opioid prescribing that

15   you had worked on, correct?

16           MR. ERCOLE:  Objection to form.

17           THE WITNESS:  Yes.

18   BY MR. BECKWORTH:

19       Q.  Do you believe that the impact of using

20   your work/studies/book chapters without disclosing

21   all these attendant risks lacked balance?

22           MR. ERCOLE:  Objection to form.

23           THE WITNESS:  Yes.  Yes, I do.

24   BY MR. BECKWORTH:

25       Q.  You understand that oftentimes drug company

Page 206

1    defendants would have their sales reps interface

2    with doctors where they would take them to dinner or

3    to lunch?

4              MR. ERCOLE:  Objection to form.

5              THE WITNESS:  I don't have any specific

6    knowledge about how often that happened and when it

7    stopped happening and when it started.  So as a

8    general concept, at least in the past, I think that

9    occurred.  But I don't have any specifics about it.

10   BY MR. BECKWORTH:

11       Q.  And you also understand that there were

12   drug company seminars, that there were -- Let me

13   start over.

14              You understand that there were seminars

15   and conferences hosted by different third-party

16   groups that the pharmaceutical companies would help

17   fund?

18       A.  Yes.

19              MR. ERCOLE:  Objection to form.

20   BY MR. BECKWORTH:

21       Q.  And during those types of seminars, many

22   doctors and health care providers would come and

23   listen to folks like yourself speak?

24       A.  Yes.

25       Q.  And they could also get materials from drug

1   companies?

2       A.   Yes.

3               MR. ERCOLE:   Objection to form.

4   BY MR. BECKWORTH:

5       Q.   You believe in the marketing that the

6   defendants did, wherever they used your work, they

7   should have always stated that addiction is a

8   disease?

9               MR. ERCOLE:   Objection to form.

10              THE WITNESS:   I believe that the -- it

11  was important even from the earliest days to provide

12  context to the positive statements and arguments

13  that I and others were making about opioids.  We had

14  an interest in trying to teach doctors to have less

15  fear of opioids, especially fears that were not

16  based on the science.

17              But at the same time, even in the

18  earliest days of -- in my writings, I always pointed

19  out that there was a need for a context to that,

20  there was a need to understand that risk was

21  irreducible.  There was always going to be some

22  risk.  And because that risk was always there, it

23  was necessary to consider other types of pain

24  management before considering an opioid.

25              It was important to select a patient and

Page 208

1    if the patient had a high risk of abuse or

2    addiction, to not prescribe.  And it was essential

3    to monitor drug-related behavior during prescribing

4    so that if a patient began to develop aberrant

5    behavior, the doctor could pick it up and either get

6    it under control or stop prescribing.  Those

7    messages weren't included.

8    BY MR. BECKWORTH:

9        Q.  Were not included?

10       A.  They were not included.

11       Q.  And it was wrong to not include all of

12   those messages when a third party would be promoting

13   the use of an opioid for noncancer chronic pain

14   treatment, correct?

15            MR. ERCOLE:  Objection to form.

16            THE WITNESS:  If the third party was

17   participating or creating continuing medical

18   education, then this would have to be with

19   independent -- an independent speaker who would

20   submit slides to another independent party for

21   review.  There were lots of rules about that.

22            But there were also conferences that

23   were called promotional conferences that were not

24   CME.  They didn't carry credit for doctors.  And to

25   the extent that messages like that occurred at those

1    conferences without context and without warnings,

2    that was not the right thing to do.

3    BY MR. BECKWORTH:

4        Q.  It would be misleading?

5        A.  It would be misleading, yes.

6            MR. ERCOLE:  Objection to form.

7    BY MR. BECKWORTH:

8        Q.  I was spoken over.

9            It would be misleading to conduct those

10   kind of conferences and provide that information

11   without disclosing all of the risk information you

12   just described, correct?

13           MR. ERCOLE:  Same objection.

14           THE WITNESS:  Yes.

15   BY MR. BECKWORTH:

16       Q.  Correct?

17       A.  Correct.

18           MR. ERCOLE:  Same objection.

19   BY MR. BECKWORTH:

20       Q.  Now, you mentioned aberrant behaviors.

21   We all pronounce that a little bit differently.

22   Aberrant behaviors are things we talked about

23   earlier like stealing, lying, cheating, committing

24   crimes, correct?

25       A.  Yes.

Page 210

1    Q.  And they can vary in degree?

2    A.  Yes.

3    Q.  While aberrant behavior is not always

4  equivalent to addiction, they can be important signs

5  in assessing addiction; do you agree?

6    A.  I agree.

7    Q.  Is it true that marketing that would tell a

8  physician to ignore or discount signs of aberrant

9  behavior was wrong?

10           MR. ERCOLE:  Objection to form.

11           THE WITNESS:  If marketing took that

12  form, yes, that would be wrong.

13  BY MR. BECKWORTH:

14    Q.  And any marketing that would tell a patient

15  or their family to not worry about the risk of

16  addiction would be wrong too?

17           MR. ERCOLE:  Objection to form.

18           THE WITNESS:  I think that -- I would

19  just say that that's a complicated question because

20  everybody was already worried about addiction.  That

21  was the way things were evolving when these drugs

22  became available.  The concern about addiction was

23  so high that it was interfering with the ability of

24  doctors to treat even cancer pain and postoperative

25  pain.

1            So it's very important that balance be

2    in the messages from day one.  I really do believe

3    that.  But at the same time, at least in these early

4    years, there was an important -- there was high

5    importance to try to reassure physicians that some

6    of their expectations that they had learned about

7    addiction weren't true.

8            As I said earlier today, as the public

9    health problem of abuse, addiction, and overdose

10   increased during the 2000s, it became more important

11   that those messages be included.  And academic

12   people like myself, the professional societies,

13   essentially began to, what I've called recalibrate

14   their messages, and include more messages about risk

15   and risk assessment and diagnosis of addiction and

16   treatment of addiction and what aberrant behavior is.

17           And that's the time during which the

18   pharmaceutical companies in my view really needed to

19   step up and include a balanced message, and to the

20   extent they didn't, that was wrong.

21   BY MR. BECKWORTH:

22     Q.  They needed to step up and include a

23   balanced message but they didn't?

24           MR. ERCOLE:  Objection to form.

25           THE WITNESS:  Right.

1                    MR. ERCOLE:  Mischaracterizes testimony.

2    BY MR. BECKWORTH:

3       Q.  Is it your testimony that they needed to

4    step up and provide a more balanced message, but

5    failed to do so?

6                    MR. ERCOLE:  Objection to form.

7                    THE WITNESS:  Yes, I believe that's

8    true.

9    BY MR. BECKWORTH:

10      Q.  Is it also true that they failed to go back

11   and correct misinformation that had been given

12   earlier?

13                   MR. ERCOLE:  Objection to form.

14                   THE WITNESS:  Yes.  That's -- to me,

15   that's two sides of the same coin.

16   BY MR. BECKWORTH:

17      Q.  And they didn't do it?

18      A.  No.

19                   MR. ERCOLE:  Same objection.

20   BY MR. BECKWORTH:

21      Q.  No, they did not do it?

22      A.  No, they did not.

23      Q.  Now, we talked a little bit earlier about

24   addiction being difficult to assess.

25                   Do you remember that?

Page 213

1        A.   Yes.

2        Q.   There's no objective, easy test like a

3   thermometer?

4        A.   Yes.

5        Q.   It takes specialized training?

6        A.   So that's a complex question as well.

7   I think it takes specialized training to make a

8   diagnosis, a psychiatric diagnosis of addiction.

9              It takes training that I think is within

10  the purview of any physician to identify aberrant

11  behavior and ask the question: Does this aberrant

12  behavior rise to the level of addiction as a likely

13  diagnosis.

14             And that's something that any physician

15  who prescribes opioids has to take on as an

16  obligation: to monitor the behavior and to decide

17  whether or not the behavior they're observing rises

18  to the level that that could represent addiction.

19       Q.   And you agree that a primary care physician

20  generally is not trained in the psychiatric

21  diagnosis of addiction?

22             MR. ERCOLE:  Objection to form.

23             THE WITNESS:  Yes.

24  BY MR. BECKWORTH:

25       Q.   And we saw since 1996 that due to the

Page 214

1  marketing efforts made by the pharmaceutical

2  industry, primary care physicians were targeted,

3  weren't they?

4      A.  Yes.

5          MR. ERCOLE:  Objection to form.

6  BY MR. BECKWORTH:

7      Q.  They were targeted to proscribe opioids for

8  noncancer chronic pain?

9          MR. ERCOLE:  Objection to form.

10         THE WITNESS:  Yes, that's true.

11  BY MR. BECKWORTH:

12     Q.  And when you're dealing with folks that

13  aren't pain specialists and aren't trained in

14  addiction, there's a need to make sure that they're

15  educated properly?

16         THE WITNESS:  Yes.

17         MR. ERCOLE:  Objection to form.

18  BY MR. BECKWORTH:

19     Q.  Do you agree with that?

20     A.  Yes.

21         MR. ERCOLE:  Same objection.

22  BY MR. BECKWORTH:

23     Q.  So to give that subgroup of the prescribing

24  universe incomplete information about the risk and

25  problems associated with opioid therapy for

1    nonchronic cancer pain, that's a problem?

2              MR. ERCOLE:  Objection to form.

3              THE WITNESS:  That's correct.  And in my

4    view, it became a problem when it became clear that

5    the public health problem, the overarching concern

6    about abuse, addiction, and overdose that was

7    affecting the country, that needed to draw the

8    change in the message at that point.

9    BY MR. BECKWORTH:

10    Q.  They should have always -- "they" being the

11   drug companies --

12             MS. SPENCER:  Can I just take a quick

13   break.  I don't want to interrupt.  But I just got

14   this.

15             MR. BECKWORTH:  Let's go off the record.

16             THE VIDEO OPERATOR:  Off the record,

17   3:11.

18                  (Discussion off the record.)

19                  (Recess at 3:11 p.m.,

20                   resumed at 3:31 p.m.)

21             THE VIDEO OPERATOR:  We're back on the

22   record, 3:31.

23   BY MR. BECKWORTH:

24    Q.  Now, sir, you understand that there was a

25   term called "pseudoaddiction" that started to appear

Page 216

1    in the 1989-1990 time frame?

2        A.  Yes.

3        Q.  And that term was coined by Weissman and

4    Haddox?

5        A.  Yes.

6        Q.  And David Haddox ended up going to work for

7    Purdue?

8        A.  Yes.

9        Q.  He worked there for a long time?

10       A.  Yes.

11       Q.  You've stated that this term was used to

12   describe types of aberrant behavior such as

13   complaints for higher doses, frequent calls,

14   demands, and the like?

15              MR. ERCOLE:  Objection to form.

16              THE WITNESS:  Yes.

17   BY MR. BECKWORTH:

18       Q.  And that pseudoaddiction indicates that

19   those things by themselves aren't signs of addiction?

20              MR. ERCOLE:  Objection to form.

21              MS. SPENCER:  Are we on paragraph 44?

22              MR. BECKWORTH:  Yes.

23              MS. SPENCER:  I'd like him to be able to

24   follow along.

25              MR. BECKWORTH:  Sure.

Page 217

1              THE WITNESS:  Sorry.

2              MR. BECKWORTH:  Yes.  That's where

3    that's discussed.

4    BY MR. BECKWORTH:

5        Q.  I'll ask you a new question.

6        A.  Yes.

7        Q.  Sir, the idea behind pseudoaddiction is

8    that when a person presented with some signs -- some

9    of these signs of aberrant behavior, the issue might

10   be that they're actually still in need of pain

11   treatment and a higher dose?

12       A.  Yes, that's true.

13             MR. ERCOLE:  Objection to form.

14   BY MR. BECKWORTH:

15       Q.  We now know that primary care doctors

16   should not have been taught to give higher doses of

17   opioids to patients that appeared to be addicted?

18             MR. ERCOLE:  Objection to form.

19             THE WITNESS:  That's true.

20   BY MR. BECKWORTH:

21       Q.  We know now, do we not, that primary care

22   doctors should have been taught to carefully assess

23   patients with aberrant drug-taking behavior for the

24   possibility of addiction?

25       A.  Yes, that's true.

1          MR. ERCOLE:  Objection to form.

2   BY MR. BECKWORTH:

3      Q.  And if they thought they might be addicted,

4   to refer them to an addiction specialist?

5      A.  If that's possible, yes.

6      Q.  It's also true, is it not, that you now

7   believe that giving -- Let me start over.

8              It's also true that giving higher doses

9   of opioids to patients suffering from opioid

10  addiction is dangerous?

11     A.  If the disease of addiction is active and

12  the patient's engaging in serious aberrant behavior,

13  yes, that would be dangerous.

14     Q.  We also know that opioid-addicted patients

15  could more easily die from respiratory depression if

16  they are in active addiction and given higher doses

17  of opioids?

18     A.  Yes, that's true.

19     Q.  Based upon your personal experience, can

20  you state whether or not you agree that the

21  dissemination of the concept of pseudoaddiction by

22  defendants without also attaching clear messaging

23  about the appropriate response to aberrant behaviors

24  could have led prescribers to continue opioid

25  therapy or even raise dosage when it should have

Page 219

1   been tapered down or stopped?

2            MR. ERCOLE:  Objection to form.

3            THE WITNESS:  Yes, I would agree with

4   that.

5   BY MR. BECKWORTH:

6      Q.  You believe though that this, in fact,

7   happened?

8      A.  Yes.

9            MR. ERCOLE:  Objection to form.

10  BY MR. BECKWORTH:

11     Q.  And you believe that people died as a

12  result?

13           MR. ERCOLE:  Same objection.

14           THE WITNESS:  I can't cite specific

15  examples but I think it would be a risky thing to do.

16  BY MR. BECKWORTH:

17     Q.  Because death could occur?

18           MR. ERCOLE:  Object to form.

19           THE WITNESS:  Because death could occur

20  if the dose is increased and the patient is in an

21  addictive pattern of abuse, yes.

22  BY MR. BECKWORTH:

23     Q.  Now, one of the things that you state in

24  paragraph 43 of your declaration is reference to a

25  1980 letter that appeared in the New England Journal

Page 220

1    of Medicine?

2        A.  Yes.

3        Q.  That letter is commonly referred to as the

4    Porter and Jick letter?

5        A.  Yes.

6            MR. BECKWORTH:  I'm going to hand you,

7    sir, a copy of Exhibit 24.

8                 (Portenoy Exhibit 24 was marked

9                 for identification.)

10           MR. BECKWORTH:  If you don't mind, take

11   a look at it.  Please pass copies.

12           THE WITNESS:  Thanks.

13   BY MR. BECKWORTH:

14       Q.  What you're looking at is the Porter and

15   Jick letter; is that correct?

16       A.  Yes.

17       Q.  Now, in your declaration, you stated that

18   in the 2011 to '12 time frame, you had publicly

19   acknowledged that earlier work you had done left

20   behind evidence in an effort to destigmatize

21   opioids; is that a fair statement?

22       A.  Yes.  I regretted the use of those words:

23   "left behind evidence" because that was a mistake.

24   That was language that I shouldn't have used.

25   I didn't leave behind evidence.

1          But the evidence that I presented was --

2     did not sufficiently focus on risk, including the

3     risk of addiction, because in the early part of my

4     career, the risk of addiction was assumed.  And the

5     problem was to some extent undertreatment, including

6     undertreatment of patients with cancer and acute

7     pain.

8          So although in my early work I presented

9     all of the epidemiology that then existed about the

10    risk of addiction, I didn't -- there was so little

11    data, and the data that did exist generally

12    supported the view that concerns about the risk of

13    addiction were overstated by physicians.  And I did

14    not sufficiently in the early part of my career

15    focus on the risk elements.

16          As time went on and it became clear that

17    we had a public health problem in the United States

18    that was rapidly escalating related to overdose

19    abuse and addiction, I recalibrated my message.  I

20    focused much more on teaching doctors how to assess

21    risk and how to manage risk; which we call risk

22    assessment and management as part of opioid therapy.

23          And that effort evolved as it became

24    clear that we had a problem in the United States

25    occurring because inexperienced prescribers were

Page 222

1   prescribing drugs to the wrong patients and not

2   adequately monitoring them.  And as a result of

3   that, we had, as you -- as you've alluded to, a very

4   large increase in things like overdose mortality.

5       Q.  And to just go back through that answer,

6   one of the things you said was that, We had a public

7   health problem of rapidly escalating overdose,

8   abuse, and addiction, correct?

9       A.  Yes.

10      Q.  You also stated that it became clear that

11  we had a problem in the United States occurring

12  because inexperienced prescribers were prescribing

13  drugs to the wrong patients and not adequately

14  monitoring them, correct?

15      A.  Yes.

16      Q.  And because of that, we had a very large

17  increase in things like overdose mortality?

18      A.  Yes.

19          MR. ERCOLE:  Objection to form.

20  BY MR. BECKWORTH:

21      Q.  All of the defendants that we've talked

22  about today targeted doctors with their sales force,

23  correct?

24          MR. ERCOLE:  Objection to form.

25          THE WITNESS:  Yes.

1   BY MR. BECKWORTH:

2       Q.  Now, Porter and Jick, if you look at it,

3   is something that left evidence behind; would you

4   agree?

5       A.  I wouldn't characterize it like that.

6   I would say that back in 1986 and the early part of

7   the 1990s, there was very, very little epidemiologic

8   data that related to the risk of addiction in

9   patients with pain who were given opioids.

10              The Porter and Jick article was one such

11  article.  There was another article about patients

12  who were treated for burn pain, and the number there

13  was quite large, like 10,000 patients.  But, again,

14  a very reassuring low rate of addiction.  There was

15  another article about the rate of addiction in

16  patients receiving opioids for headache.

17              But we had no good epidemiology of the

18  type that has emerged in many papers between that

19  time and the present, which I alluded to before with

20  that article published last year, which looked at

21  12 papers that describe patients without any prior

22  history of abuse.  None of that epidemiology

23  existed.

24              What I tried to do with my earliest

25  paper in '86 and then again in my reviews that I

1    wrote subsequently such as the one in '90 and '96,

2    is to describe all that epidemiology, indicate that

3    the epidemiology is problematic because it doesn't

4    really relate to the chronic treatment of patients,

5    but to say that the epidemiology that does exist

6    doesn't confirm the expectation that everybody who

7    gets an opioid is going to end up with an abuse

8    problem.

9                 I think saying that at that time was

10   acceptable.  But in retrospect, in hindsight, when I

11   look at the messages that I attached to those

12   epidemiologic papers, in the context of what

13   happened in the country in terms of the public

14   health problem, I'm sorry that I didn't know back

15   then what I got to know later because then I would

16   have messaged it in a different way.

17                 I would have said, These papers are the

18   known epidemiology, but they carry so little

19   relevance to the long-term chronic treatment of

20   patients with chronic noncancer pain that you have

21   to extrapolate them very carefully, if at all.

22       Q.   So let's stop there.  These papers, like

23   Porter and Jick and the 10,000 cancer study, had so

24   little relevance to the long-term chronic treatment

25   of pain for noncancer people that you had to use

Page 225

1    them very carefully, agreed?

2        A.  Yes.

3            MR. ERCOLE:  Objection to form.

4    BY MR. BECKWORTH:

5        Q.  And so to use Porter and Jick, for example,

6    it had many limitations?

7        A.  It did, yes.

8            MR. ERCOLE:  Objection to form.

9    BY MR. BECKWORTH:

10       Q.  It was about treatment of folks in a

11   hospital under the supervision of a doctor?

12           MR. ERCOLE:  Same objection.

13           THE WITNESS:  That's right.

14   BY MR. BECKWORTH:

15       Q.  While in the hospital, correct?

16       A.  Correct.

17       Q.  It did not have an ability to provide

18   probability of future outcomes?

19           MR. ERCOLE:  Objection to form.

20           THE WITNESS:  That's correct.

21   BY MR. BECKWORTH:

22       Q.  It lacked sophisticated statistical

23   analysis?

24       A.  That's correct.

25       Q.  It was published only as a letter?

1      A.   That's correct.

2      Q.   It was not peer reviewed?

3      A.   I'm not sure that letters don't get peer

4  reviewed in that journal.  That was the New England

5  Journal.  But the limitations of the publication

6  were such that the editor made the decision it could

7  only be published as a letter.

8      Q.   And it was not about rates of addiction for

9  people using opioids for chronic pain treatment long

10  term, was it?

11      A.   It was not, right.

12      Q.   So the question presented was actually:

13  What is the incidence of addiction after inpatient

14  exposure to an opioid in a hospital setting?

15      A.   That's correct.

16      Q.   That was it?

17      A.   That was the question that they attempted

18  to answer.

19      Q.   And you would agree that the management of

20  pain in a hospital setting under constant

21  supervision is quite different than a primary care

22  physician using opioids to treat noncancer chronic

23  pain out in the office?

24      A.   Yes, that's true.

25      Q.   So the findings in Porter and Jick were not

Page 227

1    relevant to the question of what is the incidence of

2    addiction in a specific patient population during

3    opioid treatment that continues for months and years?

4                   MR. ERCOLE:  Objection to form.

5                   THE WITNESS:  That's true.

6    BY MR. BECKWORTH:

7        Q.  And so if someone were to say, What's my

8    risk of getting addicted if I use opioids for

9    noncancer chronic pain treatment like lower back

10   pain, if someone were to hand me Porter and Jick and

11   say, You don't really have a risk at all or it's

12   less than 1 percent, that would be misleading?

13                  MR. ERCOLE:  Objection to form.

14                  THE WITNESS:  Yes, I think that would be

15   misleading.

16   BY MR. BECKWORTH:

17       Q.  It would certainly be misleading for any

18   drug company to rely on Porter and Jick, as we sit

19   here today, as being high quality evidence supporting

20   a low risk factor for using opioids to treat

21   nonchronic -- I'm sorry -- noncancer chronic pain?

22       A.  Yes, that's true.

23                  MR. ERCOLE:  Objection to form.

24   BY MR. BECKWORTH:

25       Q.  If Janssen were to sit in testimony under

1  oath and say that Porter and Jick supports the

2  notion that using opioids for noncancer chronic pain

3  is safe and effective and rely on Porter and Jick,

4  that would be wrong?

5          MR. ERCOLE:  Objection to form.

6          THE WITNESS:  That would be wrong, yes.

7  BY MR. BECKWORTH:

8      Q.  Excuse me.  I was objected to.  Your answer

9  was?

10     A.  That would be wrong, yes.

11     Q.  It's also -- based on your personal

12  knowledge and understanding, is it also misleading

13  to refer to Porter and Jick as supporting the idea

14  that there is a less than one percent risk of

15  addiction when taking opioids for noncancer chronic

16  pain therapy?

17     A.  Yes, that's -- I want to make sure that I

18  heard your question correctly and I answer it.

19     Q.  Let me ask it again.

20     A.  Please, yeah.

21     Q.  Based upon your personal knowledge and

22  understanding --

23     A.  Um-hum.

24     Q.  -- can you state whether or not it's

25  misleading to refer to Porter and Jick as supporting

1    the idea that there is a less than one percent risk

2    of addiction when taking opioids for noncancer

3    chronic pain therapy without disclosing the

4    limitations of that letter?

5                   MR. ERCOLE:  Objection to form.

6                   THE WITNESS:  Yes, I agree with that.

7    BY MR. BECKWORTH:

8         Q.  Yes, it would be misleading?

9         A.  It would be misleading.

10        Q.  Let's turn real quickly to paragraph what I

11   believe is 46 of your declaration.  Now, we

12   discussed this a little bit earlier, but let's go

13   back over this.

14                  Based on your professional experience

15   and background, do you have an opinion as to whether

16   direct-to-patient marketing should be done by a drug

17   company that makes themselves opioids?

18        A.  Yes, I have an opinion about that.

19        Q.  What is it?

20        A.  That it should not be done.

21        Q.  At one point you stated that you advised

22   Janssen against a direct-to-consumer campaign,

23   correct?

24        A.  That's true.  Yes.

25        Q.  Now, you stated that with respect to that

Page 230

1    one idea, it wasn't done?

2         A.  Yes.

3         Q.  Are you aware that Janssen actually engaged

4    in a direct-to-patient marketing campaign that was

5    centered upon elder folks?

6                   MR. EHSAN:  Objection to form.

7                   THE WITNESS:  No, I'm not aware of that.

8    BY MR. BECKWORTH:

9         Q.  Would it be wrong for a drug company to go

10   directly to a specific subset of the population,

11   including the elderly, to market the use of opioids

12   for chronic noncancer pain?

13                  MR. ERCOLE:  Objection to form.

14                  THE WITNESS:  Yes.  I don't think that

15   that should be done.

16   BY MR. BECKWORTH:

17        Q.  And the reason is why?

18        A.  Patients don't have the knowledge to make a

19   judgment about what the risks are of that treatment.

20   And if marketing is done that suggests to them that

21   pain relief is a possibility, they're going to focus

22   on that.  And they're going to bring that information

23   to their physicians, and they're going to ask for

24   these drugs, or to push their physicians to

25   prescribe these drugs.

1              And then they just have to be hopeful

2    that their physicians have been adequately educated

3    and have the ability to say no to a patient who

4    perhaps assertively or plaintively says: Treat me,

5    I have terrible pain.  And I think it just increases

6    the risk that inappropriate patients are going to

7    get access to opioids and may suffer consequences,

8    negative consequence as a result of that.

9        Q.  Well, the relationship between a patient

10   and her doctor should be a private one, correct?

11       A.  Yes.

12       Q.  And there should not be interference by

13   outside forces, correct?

14       A.  Yes.

15       Q.  So if a company that sells a drug markets

16   directly to that patient and teaches that patient

17   how to ask for specific things, that interferes with

18   the direct relationship between the patient and the

19   doctor, correct?

20            MR. ERCOLE:  Objection to form.

21            THE WITNESS:  It can.  You know,

22   obviously we live in an era where direct-to-consumer

23   advertising is happening for all kinds of drugs.

24   And I think there's always a risk that when that's

25   done, you encourage patients who lack information

Page 232

1    about safety and effectiveness to have a conversation

2    with a physician who may feel under pressure to

3    prescribe or to prescribe a specific drug.

4                    With respect to the opioids, the risk

5    profile is serious enough, particularly with what

6    emerged as a health concern over the course of time,

7    that I think that's a really terrible idea: to do

8    direct-to-consumer advertising for opioids.

9    BY MR. BECKWORTH:

10    Q.  And you came back to answer this.  But you

11    said that direct-to-consumer advertising happens for

12    all kinds of drugs.  That's not actually 100 percent

13    correct, is it?  We don't have direct-to-consumer

14    advertising for Schedule II narcotics?

15                    MR. ERCOLE:  Objection to form.

16                    THE WITNESS:  What you're saying is

17    true.

18    BY MR. BECKWORTH:

19    Q.  So whether you like to or not, it's quite a

20    different thing to go on a TV commercial about

21    something like Cialis than it is for something like

22    OxyContin, correct?

23    A.  I think it is, yes.

24    Q.  Or Duragesic?

25    A.  Yes.

Page 233

```
 1      Q.  Or Nucynta?

 2      A.  Yes.

 3      Q.  Or any opioid that any of these companies

 4   make?

 5              MR. ERCOLE:  Objection to form.

 6              THE WITNESS:  Yes.

 7   BY MR. BECKWORTH:

 8      Q.  Correct?

 9      A.  I believe that's true, yes.

10      Q.  And when a drug company goes directly to a

11   subset of a patient population and markets directly

12   to that group, that's crossing the line?

13              MR. ERCOLE:  Objection to form.

14              THE WITNESS:  In my opinion, with

15   respect to the opioids, the Schedule II opioids --

16   with respect to any opioid, I think the risks of

17   adverse consequences, not just abuse and addiction,

18   but also adverse consequences like falls and

19   cognitive change, particularly in the elderly, are

20   too grave to justify a direct-to-consumer campaign.

21              The risks of a drug like Cialis don't

22   match up to the risk of drugs that are Schedule II

23   opioids.  And I think it is true that whether you

24   like direct-to-consumer advertising or not as a

25   general concept, in my opinion, direct-to-consumer
```

Page 234

1    advertising for opioids is a mistake.

2    BY MR. BECKWORTH:

3        Q.  Especially in the unbranded area?

4               MR. ERCOLE:  Objection to form.

5               MR. EHSAN:  Objection to form.

6               THE WITNESS:  I'm not sure.  Explain to

7    me what that question is.  I'm not sure.

8    BY MR. BECKWORTH:

9        Q.  Well, it would be one thing if you went to

10   a subset and directly marketed to them and said, Use

11   our product: Fentora, Duragesic, OxyContin.  That's

12   branded direct marketing.

13              Do you understand that?

14       A.  Yes.

15              MR. ERCOLE:  Objection to form.

16   BY MR. BECKWORTH:

17       Q.  But when you go to specific patient

18   populations and just talk about opioids generally

19   and say things like: You should ask your doctor for

20   opioids; don't be scared of them; they're not

21   addictive, that's potentially even more dangerous?

22              MR. ERCOLE:  Objection to form.

23              THE WITNESS:  I'm not sure I would parse

24   it that way.  I don't like either concept, to be

25   honest with you, whether it's branded or unbranded.

1    I don't think that direct-to-consumer advertising

2    for opioids is the right thing to do.

3    BY MR. BECKWORTH:

4        Q.  Both are bad?

5        A.  Both are bad in my opinion.

6        Q.  And you made the remark about how this can

7    interfere with the patient and doctor relationship.

8            Do you remember that?

9        A.  Yes.

10       Q.  But it also causes a problem with people

11   who might have illicit desires, doesn't it?

12       A.  Yes.

13       Q.  Because if someone is truly an unlawful

14   drug user, it teaches her how to go in and tell a

15   doctor the right buzzwords to get prescribed?

16           MR. ERCOLE:  Objection to form.

17           THE WITNESS:  Yes.  I think that's a

18   component of why it's a bad thing.  The risk of

19   addiction is there.  And the risk of addiction

20   developing is much higher in patients who have the

21   disease of addiction.

22           The most important predisposing factor

23   to develop addiction is a prior history of substance

24   abuse.  So patients who have a prior history of

25   substance abuse and particularly a prior history of

Page 236

1   addiction, using information they gain from direct-

2   to-consumer advertising to communicate with a

3   physician just is part of the problems that I'm

4   concerned about.

5   BY MR. BECKWORTH:

6       Q.  It's never good?

7               MR. ERCOLE:  Objection to form.

8               THE WITNESS:  In my opinion, direct-to-

9   consumer advertising is not good.

10  BY MR. BECKWORTH:

11      Q.  It was wrong to do it?

12      A.  Yes.

13              MR. ERCOLE:  Objection to form.

14  BY MR. BECKWORTH:

15      Q.  Yes, it was wrong to do it?

16      A.  Yes, in my opinion.

17              MR. BECKWORTH:  I want to hand you what

18  we'll mark as Exhibit 30 [sic].

19                  (Discussion off the record.)

20              MR. BECKWORTH:  25, yes.  My apologies.

21                  (Portenoy Exhibit 25 was marked

22                  for identification.)

23  BY MR. BECKWORTH:

24      Q.  Sir, this is a long document.  You're

25  welcome to read it all, but I'm going to direct your

Page 237

1    attention to one thing after you look at it.

2              MS. SPENCER:  Give him a chance just to

3    digest it.

4              MR. BECKWORTH:  I will.  I'm just going

5    to read something for the record while he's doing

6    that.  Exhibit 25 is PPLP004281019.  It is entitled

7    "Purdue Pharma, L.P. Corporate Reputation and

8    Visibility Strategic Plan, updated as of January 21,

9    2011."

10   BY MR. BECKWORTH:

11       Q.  Sir, please look through that at your

12   convenience.  I'm going to turn your attention to

13   page 25 as the document itself is numbered.

14       A.  Okay.

15       Q.  So there's a lot in this document.  You're

16   free to look at it all, but I want to focus your

17   attention to page 25 for just a second.

18              Do you remember earlier in the day we

19   were talking about how Janssen had an internal

20   document that they would use speakers as part of the

21   sales effort to sell one of their drugs.

22              Do you remember that?

23       A.  Yes.

24       Q.  So here you see in this document on page 25

25   a section called "Maximizing external relationships,

Page 238

1    create/build new ones"?  Do you see that?

2         A.  Yes, I do.

3         Q.  It says "Key opinion leaders and

4    professional associations can support or interfere

5    with the company's efforts to reach key audiences."

6              Do you see that?

7         A.  Yes.

8         Q.  And it says "KOLs can influence health care

9    professionals' prescribing practices."

10             Do you see that?

11        A.  Yes.

12        Q.  Now, you know that you were viewed as a key

13   opinion leader by Purdue, correct?

14        A.  Yes.

15        Q.  Did you know that internally Purdue took

16   the belief that KOLs that it utilized could

17   influence health care professionals' prescribing

18   practices?

19        A.  I was never informed of a strategic plan

20   that included that, no.

21        Q.  Did you ever know or believe that Purdue

22   would use you as part of a corporate effort to

23   influence health care professionals' prescribing

24   practices?

25        A.  The way that I would respond to that is

1    that I understood the relationship with Purdue and

2    other pharma companies to be one in which they would

3    use my expertise to expand educational opportunities.

4              And if you're asking me, was I aware

5    that there was a vision to use KOLs like myself in

6    marketing strategies, I wasn't aware of that, no.

7        Q.  And that's wrong to do?

8              MR. ERCOLE:  Objection to form.

9              THE WITNESS:  I believe it is wrong to

10   do.

11   BY MR. BECKWORTH:

12       Q.  A company that sells a drug cannot and

13   should not use a KOL or speaker for the intended

14   purpose of selling more of that company's drugs,

15   right?

16             MR. ERCOLE:  Objection to form.

17             THE WITNESS:  Right.

18   BY MR. BECKWORTH:

19       Q.  If they do that, then anything that that

20   person does, it needs to be disclosed to the

21   audience that that person is there speaking with the

22   stated objective of influencing his or her

23   audience's prescribing practices, correct?

24             MR. ERCOLE:  Objection to form.

25             THE WITNESS:  Right.  Again, I would say

1    it's a little bit more complicated, in my view,

2    because the purpose of a KOL engaging in professional

3    education was to -- in my view, it was to create a

4    comfort level on the part of physicians to use this

5    tool appropriately to try to help patients with

6    chronic pain.  To the extent that clinicians gained

7    skills, they might use the drug more.

8              So I had no problem with the concept

9    that my efforts to educate would lead to more

10   prescribing because I assumed, if you will, that it

11   would be an epiphenomenon.  In other words, the

12   phenomenon that I was trying to accomplish was

13   education to try to reduce the stigma attached to

14   these drugs and educate physicians about how to use

15   them.

16             The epiphenomenon is if you feel more

17   comfortable using these drugs, you know what

18   patients to select, you know how to monitor the

19   patients, you're going to use more than you did in

20   the past.  And that would be okay, as long as the

21   patients were the appropriate patients who were

22   being treated in the appropriate way.

23             To the extent that those steps are not

24   articulated by the company and to the extent that

25   the primary aim is for the KOLs to be sort of

1   engaged in changing prescribing behavior for the

2   purpose of increasing prescription on the part of

3   the doctors, that makes me uncomfortable.  That

4   wasn't the role of any of the KOLs.

5   BY MR. BECKWORTH:

6       Q.  As you understood it?

7       A.  As I understood it, correct.

8       Q.  But it was the role as, in this instance,

9   Purdue understood it?

10                  MR. ERCOLE:  Objection to form.

11                  THE WITNESS:  That's what this document

12   seems to imply, yes.

13  BY MR. BECKWORTH:

14      Q.  Purdue never came to you and said: You're

15  part of our advocacy team?

16      A.  No.  No, no.

17      Q.  We want you to influence legislators and

18  doctors and patients?  They never told you that?

19      A.  No, no.

20      Q.  They never told you that you were part of a

21  marketing plan to sell more drugs?

22      A.  No.

23      Q.  Janssen never told you that?

24      A.  That's correct.

25      Q.  Cephalon never told you that --

Page 242

```
 1                   MR. ERCOLE:  Objection to the form.

 2                   THE WITNESS:  That's correct.

 3   BY MR. BECKWORTH:

 4       Q.  -- did it?

 5       A.  No.  That's correct.

 6                   MR. BECKWORTH:  Now, we'll look at a

 7   couple more examples of this.  Remember earlier we

 8   talked about Janssen.  I'm going to hand you what

 9   we'll mark as Exhibit 26.

10                   (Portenoy Exhibit 26 was marked

11                    for identification.)

12   BY MR. BECKWORTH:

13       Q.  Take a moment to take a look at this

14   document, if you don't mind.

15                   Ready?

16       A.  Yes.

17       Q.  So, sir, this is an internal document about

18   Duragesic, do you see that?

19       A.  Yes.

20       Q.  Here at the top it says "Congratulations to

21   the 275 Sales Force.  With your leadership,

22   Duragesic attained numerous all-time highs in

23   prescriptions and dollar volumes in 2000," correct?

24       A.  Yes.

25       Q.  Now, it talks about sales efforts there in
```

Page 243

1    bold.  Do you see that?

2        A.  Yes.

3        Q.  And it says, "Thanks to you, 2001 promises

4    to be an exciting time for Duragesic.  We will

5    surpass half a billion dollars in sales."

6            Do you see that?

7        A.  Yes.

8        Q.  And it goes on to talk about the market

9    update.

10           MS. SPENCER:  I don't think I got one of

11   those.

12           THE WITNESS:  Oh.

13           MS. SPENCER:  Thank you.  Sorry.

14   BY MR. BECKWORTH:

15       Q.  There's a belief that Duragesic will exceed

16   half a billion dollars in 2001.  Do you see that?

17       A.  Yes.

18       Q.  Now, down below it says, "Strategic focus."

19   And the first thing listed is "High deciled

20   physicians," correct?

21       A.  Yes.

22       Q.  And it says, "The high deciled physicians

23   continue to represent significant opportunity for

24   Duragesic due to their high volume prescribing of

25   chronic pain medications and the disparity in share

Page 244

1    between OxyContin and Duragesic."

2              Do you see that?

3        A.  Yes.

4        Q.  It goes on to say that, "Even though our

5    deciling methods has changed, the same 8,000

6    physicians that we focused on in 2000 are still

7    those we will concentrate on in 2001."

8              Do you see that part?

9        A.  Yes.

10       Q.  And it also says, "with even greater

11   emphasis being placed on the top 1,000 who account

12   for 20 percent of all the dollars in the pain

13   market."

14             Do you see that?

15       A.  Yes.

16       Q.  That's a very tight focus on a subset of

17   prescribers who the authors of this document believe

18   represent 20 percent of the overall pain market?

19       A.  Yes.

20       Q.  Do you see that?

21       A.  Yes.

22       Q.  That's a high level of precision; would you

23   agree?

24       A.  Yes.

25       Q.  Now, if you go down to the third bullet

1   there, it says, "Expand Duragesic use in

2   nonmalignant pain," correct?

3       A.  Yes.

4       Q.  And it says -- this is what we've talked

5   about all day -- "Physicians are becoming more

6   comfortable in using opioids in nonmalignant pain"?

7       A.  That's correct, right.

8       Q.  "Our objective is to" --

9           I'm just going to have you read the next

10  sentence for the jury.  What does the next sentence

11  say?

12      A.  "Our objective is to convince them that

13  Duragesic is effective and safe to use in areas such

14  as chronic back pain, degenerative joint disease,

15  and osteoarthritis."

16      Q.  Now, there's that word again: "convince,"

17  right?  And they're referring to who?

18      A.  To probably primary care doctors mostly.

19      Q.  About chronic back pain, osteoarthritis,

20  and degenerative joint disease, right?

21      A.  Right.

22      Q.  Those are areas that we have never used

23  opioids long term to treat prior to 1996?

24      A.  Very uncommonly did, prior to that.

25      Q.  And here at the bottom -- now, you were the

Page 246

1    president of the American Pain Society, correct.

2         A.   Yes.

3         Q.   And if I remember, your presidency occurred

4    in the 2001 time frame?

5         A.   I think so.

6         Q.   What does the next sentence say?

7         A.   "It is important to remind physicians that

8    APS, AAPM, and AGS have all endorsed the appropriate

9    use of opioids to manage chronic nonmalignant pain."

10        Q.   Now, that's a true statement.  You did do

11   that, right?

12        A.   That's right.

13        Q.   You had no idea though, when you were

14   receiving funding from these companies that your

15   endorsement would be used by the sales force to

16   target doctors?

17             MR. EHSAN:  Object to form.

18             THE WITNESS:  That's correct.

19   BY MR. BECKWORTH:

20        Q.   You had no idea?

21        A.   Right.  We did not.

22        Q.   How does that make you feel to see this

23   today?

24        A.   As I said before, and particularly as the

25   years moved forward -- this was in -- early in the

Page 247

1    2000s.  And as the 2000s became 2010 and then beyond

2    that, as the concern about the public health problem

3    became more and more prominent, the idea that any of

4    the documents that were being created for education

5    were also being used for marketing without

6    appropriate caveats and statements of risk would

7    make me very uncomfortable.

8              MS. SPENCER:  If I may just for the

9    record, he was president from 1998 to 1999, not 2001.

10             MR. BECKWORTH:  Thank you.

11             THE WITNESS:  Thank you.

12   BY MR. BECKWORTH:

13      Q.  So to correct that, this occurred after

14   your presidency?

15      A.  Yes.

16      Q.  But while you were still active in APS?

17      A.  I was still active in it, yes.

18      Q.  And to use -- you would agree that APS was

19   influential, correct?

20      A.  Mostly among pain specialists, not among

21   the rest of the medical community.

22      Q.  Well, we have the consensus statement that

23   went out?

24      A.  Yes.

25      Q.  That was sent out broadly?

1      A.   That's true.

2      Q.   And now we have this defendant telling its

3  sales force to refer to the APS in order to help it

4  sell more drugs, right?

5      A.   Yes.

6      Q.   And it's not just to anybody?  It's to a

7  very tightly defined group that represents 20 percent

8  of the prescribing market for that drug?

9            MR. EHSAN:  Objection to form.

10           THE WITNESS:  Yes.  I'm reading this a

11  little bit differently than that.  The high deciled

12  physicians was one category of physicians who were

13  the focus of the marketing.  And the broader group

14  of physicians who were treating most of the

15  noncancer pain, like most of the osteoarthritis, was

16  another category of physicians that were part of the

17  marketing -- were viewed as marketing opportunities.

18  BY MR. BECKWORTH:

19     Q.   And they're targeting right to them?

20           MR. EHSAN:  Objection to form.

21           THE WITNESS:  Yes.  Well, they're

22  targeting both groups.

23  BY MR. BECKWORTH:

24     Q.   And using a group that's supposed to be

25  independent as part of that step?

1          MR. ERCOLE:  Objection to form.

2          THE WITNESS:  I would say using

3    something produced by that group and endorsed by the

4    board of that group and other professional societies

5    as well, and using that educational tool for

6    marketing purposes is improper.

7    BY MR. BECKWORTH:

8      Q.  It's something you didn't know about?

9      A.  Right.

10     Q.  And it's something they didn't tell you

11   about, correct?

12     A.  Right.  Correct.

13     Q.  And it's wrong to do?

14     A.  Right.

15          MR. EHSAN:  Object to form.

16          MR. BECKWORTH:  I'm going to hand you,

17   sir, what we'll mark as Exhibit 27.

18              (Portenoy Exhibit 27 was marked

19               for identification.)

20          MR. COLEMAN:  Can we get a time check?

21   Three hours and 40 minutes; is that what you're

22   saying?

23          THE VIDEO OPERATOR:  Yes.

24          MR. COLEMAN:  Thank you.

25

Page 250

1    BY MR. BECKWORTH:

2       Q.  Now, sir, you've had a chance to look at

3    this document, which is Exhibit 27, correct?

4       A.  Yes.

5       Q.  And that document is a Janssen document

6    dated November 6, 2003, again about Duragesic,

7    correct?

8       A.  Yes.

9       Q.  And I know you just got it, but in the

10   situation analysis, what's happening is there's

11   concern that there is a generic version of Duragesic

12   that's going to hit the market, correct?

13      A.  Yes.

14      Q.  That will be a competitive product, correct?

15      A.  Yes.

16      Q.  And the generic patches, it says, will

17   likely be in a matrix formulation in which the

18   fentanyl is contained within an adhesive layer

19   rather than a reservoir; do you see that?

20      A.  Yes.

21      Q.  If you look down at the conclusions, it

22   says, "Duragesic and the matrix patch are seen as

23   essentially the same product" --

24      A.  Yes.

25      Q.  -- correct?

1      A.   Um-hum.

2      Q.   "Exposure to the product profile and

3    potential counter-detailing messages regarding the

4    matrix patch will likely" -- "will not likely impact

5    physician prescribing."

6              And it goes into multiple reasons for

7    that, correct?

8      A.   Yes.

9              MR. EHSAN:   Objection to form.

10   BY MR. BECKWORTH:

11     Q.   So if you look here to "Recommendations,"

12   the first recommendation said to "Explore ways to

13   involve unbiased third parties."   It lists "(FDA,

14   DEA, and advocacy groups) in educating the market

15   about the potential pitfalls of the matrix patch.

16   Having Janssen sales representative deliver such a

17   message will likely have little impact and may

18   damage the credibility of both the message and the

19   representative."

20              Do you see that?

21     A.   Yes.

22     Q.   Did you ever know that Janssen looked at

23   third-party advocacy groups that way?

24     A.   No.

25              MR. EHSAN:   Objection to form.

Page 252

```
 1    BY MR. BECKWORTH:

 2        Q.  So what we have here -- you can see it for

 3    yourself --

 4        A.  Right.

 5        Q.  -- we've got the sales side of Janssen

 6    looking at ways to squash a new competitive generic

 7    product, right?

 8              MR. EHSAN:  Objection to form.  And

 9    counsel, this doesn't have any Bates stamps on it.

10    Was this document produced?  If so --

11              MR. BECKWORTH:  Some of these were

12    produced in native form.  We can get you a Bates

13    stamp.

14    BY MR. BECKWORTH:

15        Q.  You understand that they're trying to

16    squash a competitive product?

17        A.  Yes.

18              MR. EHSAN:  Object to form.

19    BY MR. BECKWORTH:

20        Q.  And it says that their sales force may not

21    have a credible message because they're tied to

22    Janssen?

23        A.  Yes.

24        Q.  And so who are they trying to leverage to

25    help deliver their sales message?
```

 1              MR. EHSAN:  Object to form.

 2              THE WITNESS:  Independent third parties.

 3   BY MR. BECKWORTH:

 4       Q.  Including advocacy groups?

 5       A.  Yes.

 6       Q.  Which you were part of?

 7       A.  Yes.

 8       Q.  But it's not just them?  It's the federal

 9   government --

10       A.  Yes.

11       Q.  -- right?

12              How does that make you feel?

13              MR. EHSAN:  Object to form.

14              THE WITNESS:  Yeah.  I think to the

15   extent that that -- this idea became policy and was

16   implemented, it would make me uncomfortable.

17   BY MR. BECKWORTH:

18       Q.  Now, you are familiar with the product

19   called Fentora, correct?

20       A.  Yes.

21       Q.  What do you understand Fentora to be?

22       A.  Fentora is one of the transmucosal

23   immediate release formulations of fentanyl, and it's

24   approved for the management of cancer-related

25   breakthrough pain.

Page 254

1      Q.  Cancer-related breakthrough pain?

2      A.  Yes.

3           MR. BECKWORTH:  I'm going to hand you

4   this.

5                (Portenoy Exhibit 28 was marked

6                for identification.)

7   BY MR. BECKWORTH:

8      Q.  And who makes Fentora?

9      A.  I think --

10          MS. SPENCER:  This is 28?

11          MR. BECKWORTH:  I believe so.

12          THE WITNESS:  Fentora was made by

13  Cephalon.

14  BY MR. BECKWORTH:

15     Q.  Now, this is kind of a long document.

16  While you're looking through it, the title of this

17  is "Commercialization team update, Fentora,

18  October 25, 2006."

19               (Discussion off the record.)

20          THE WITNESS:  Okay.

21  BY MR. BECKWORTH:

22     Q.  So if you look in about six pages, you'll

23  see one called "Publications update, abstracts

24  submitted September '06"?

25     A.  Yes.

1     Q.  And Study 3042, "low back pain," is

2   something that's cited, correct?

3     A.  Yes.

4     Q.  And one of the authors of that is you?

5     A.  Yes.

6     Q.  And it says, "Congress: AAPM."

7          What do you understand AAPM to be?

8          MR. ERCOLE:  Objection to form.

9          THE WITNESS:  American Academy of Pain

10  Medicine.

11  BY MR. BECKWORTH:

12    Q.  Have you ever seen this document before?

13    A.  No.

14    Q.  Now, as you flip through it, you'll see --

15  I'm not going to ask you on these because it's not

16  your work -- but you'll see there's lots of

17  forecasts about total prescriptions of Fentora.

18          Do you see that?

19    A.  Yes.

20    Q.  If you'll go a little further in, you'll

21  see a section that says, "Functional area updates"?

22    A.  Yes.

23    Q.  If you flip to the next page, there's one

24  that says "Marketing update, launch materials."

25          Do you see that?

Page 256

1     A.  Yes.

2           MS. SPENCER:  It's a chart?

3           MR. BECKWORTH:  Yes, ma'am.

4  BY MR. BECKWORTH:

5     Q.  And it says "4Q06"?  Do you see that?

6     A.  Yes.

7     Q.  And there's quite a bit here from the sales

8  force and there's all kinds of different tear sheets

9  or flash cards and other things in there about a

10 sales force.

11          Do you see that?

12          MR. ERCOLE:  Objection to form.

13          THE WITNESS:  Yes, I do.

14 BY MR. BECKWORTH:

15    Q.  Do you see it?

16          And on the top left corner, it says

17 "Shipment 1 (10/2)."

18          Do you see that?

19    A.  Yes.

20    Q.  And it's all kinds of things: "RiskMAP

21 flashcard, voucher books, CSP invitations,

22 medication guide."

23          Do you see that?

24    A.  Yes.

25    Q.  But there's one more listed?

Page 257

1     A.  Right.

2     Q.  What's under that?

3     A.  "Taylor/Portenoy abstract."

4     Q.  Your document?

5     A.  Right.  The abstract of my study.

6     Q.  Did you know that your documents were being

7  used by the sales force of Cephalon to sell and

8  launch products?

9              MR. ERCOLE:  Objection to form.

10             THE WITNESS:  No, I didn't know that.

11  BY MR. BECKWORTH:

12    Q.  Did they ever tell you that?

13    A.  No.

14    Q.  When they paid you money to do work and

15  consulting work for them or be a speaker, that was

16  supposed to be unbranded, right?

17             MR. ERCOLE:  Objection to form.

18             THE WITNESS:  Yes.

19  BY MR. BECKWORTH:

20    Q.  You weren't there to market their specific

21  drugs?

22             MR. ERCOLE:  Same objection.

23             THE WITNESS:  Right.

24  BY MR. BECKWORTH:

25    Q.  You were there to educate?

Page 258

1      A.   Just to clarify.  This was a study.  This

2   was an IRB, an institutional review board protocol-

3   directed study that yielded data about efficacy.

4      Q.   That is being used by their sales force,

5   correct?

6      A.   That's correct.

7      Q.   Right along with flash cards and other

8   marketing materials?

9      A.   That's correct.

10           MR. ERCOLE:  Objection to form.

11   BY MR. BECKWORTH:

12      Q.   And you didn't know that?

13      A.   No.

14           MR. ERCOLE:  Same objection.

15   BY MR. BECKWORTH:

16      Q.   If you go to the next page, there's a

17   "Marketing update" with "Key activities."

18           Do you see that?

19           MS. SPENCER:  That's two pages later.

20           MR. BECKWORTH:  Two pages, yes.

21           THE WITNESS:  Yes.

22   BY MR. BECKWORTH:

23      Q.   And if you'll flip just a few more, you'll

24   come to one -- it will be on your left-hand side --

25   called "PR update."

Page 259

1              Do you see that?

2      A.   Yes.

3      Q.   And under the "PR update," it talks about

4  PR, and there's quite a few things listed, correct?

5      A.   Yes.

6      Q.   And one of them is "BTP and Fentora

7  highlighted in third-party group materials."

8              Do you see that?

9      A.   Yes.

10      Q.   And there at the bottom it says "American

11  Pain Foundation," correct?

12      A.   Yes.

13      Q.   "Printed 'Treatment options: A guide for

14  people living with pain.'"  And then -- that was the

15  title of it.  And then it goes on to say

16  "information on BTP and Fentora," correct?

17      A.   Yes.

18      Q.   Sir, when you were doing this work, nobody

19  told you that work that you were doing for research

20  and education was also being leveraged by the sales

21  team at Cephalon, true?

22              MR. ERCOLE:  Objection to form.

23              THE WITNESS:  That's true.

24  BY MR. BECKWORTH:

25      Q.   Never told you that?

Page 260

1            MR. ERCOLE:  Same objection.

2            THE WITNESS:  That's true.

3    BY MR. BECKWORTH:

4        Q.  Would you have liked to know?

5            MR. ERCOLE:  Same objection.

6            THE WITNESS:  Yes.  I think it would

7    have been very important to know that that was the

8    intent, that was the plan because that -- to the

9    extent that research or educational programming was

10   used for marketing, I would have tried to stop that

11   or I would have tried to modify it in a way so that

12   it wasn't used for marketing; it was used for

13   education or for publication purposes.

14   BY MR. BECKWORTH:

15       Q.  But to stop something from being done that

16   you disagree with, you got to know that it's

17   happening?

18           MR. ERCOLE:  Same objection.

19           THE WITNESS:  Right.

20   BY MR. BECKWORTH:

21       Q.  And these folks engaged in all kinds of

22   different funding opportunities with you and your

23   employer, correct?

24       A.  Yes.

25           MR. EHSAN:  Objection.

Page 261

```
 1    BY MR. BECKWORTH:
 2        Q.  And the boards you worked on?
 3        A.  Um-hum.
 4        Q.  "Yes"?
 5        A.  Yes.
 6        Q.  But all the things we've gone over about
 7    how this was being used internally, they didn't tell
 8    you that, did they?
 9        A.  No.
10            MR. ERCOLE:  Objection to form.
11    BY MR. BECKWORTH:
12        Q.  Did they?
13        A.  No.  We had no information about how the
14    marketing teams were going to use different
15    protected information.
16            MR. BECKWORTH:  I'm going to hand you --
17    we're just about done -- Exhibit 29.
18                (Portenoy Exhibit 29 was marked
19                 for identification.)
20    BY MR. BECKWORTH:
21        Q.  There are two documents that we've pulled.
22    The first one I'll represent is from the CDC and the
23    second one is sourced on the bottom.
24            You've probably seen quite a few charts
25    like this in your day?
```

Page 262

1      A.  Yes.

2      Q.  So on the first one here on Exhibit 29,

3  it's titled [as read], Rates of opioid sales,

4  overdose -- or OD -- deaths, and treatment from 1999

5  to 2010, correct?

6      A.  Yes.

7      Q.  And we see on the left-hand corner,

8  whatever the rate that's being depicted in 1999,

9  it's low; would you agree?

10     A.  Yes.

11     Q.  On this chart.  And as we get to 2010,

12  things go up, don't they?

13     A.  Yes.

14     Q.  We have a green line that represents opioid

15  sales in kilograms per 10,000.  That green line from

16  '99 to 2010 goes up considerably, correct?

17             MR. EHSAN:  Objection to form.

18             THE WITNESS:  Yes.

19  BY MR. BECKWORTH:

20     Q.  Opioid deaths -- I believe that's red, to

21  my eyes -- per 100,000 goes up considerably during

22  this time period, correct?

23     A.  Yes.

24             MR. ERCOLE:  Objection to form.

25

1    BY MR. BECKWORTH:

2        Q.  And opioid treatment admissions per 10,000,

3    which I believe is a blue line, goes up considerably

4    during this period of time, correct?

5        A.  Yes.

6                MR. ERCOLE:  Objection to form.

7    BY MR. BECKWORTH:

8        Q.  Now, if you'll turn to the next page, we

9    talked about how when you wrote your '96 paper,

10   there were a lot of fears out about using opioids to

11   prescribe for -- to treat noncancer chronic pain,

12   correct?

13       A.  Yes.

14       Q.  And we also know that about the same time

15   you wrote that paper in December of 1995, Purdue

16   took OxyContin to market, correct?

17       A.  Yes.

18       Q.  And we know that oxycodone is the active

19   pharmaceutical ingredient in OxyContin, correct?

20       A.  Yes.

21       Q.  And I showed you an exhibit from Janssen

22   where Janssen had given -- or Johnson & Johnson had

23   given the Johnson Medal to a scientist for creating

24   the Norman poppy strand of thebaine, correct?

25                MR. EHSAN:  Objection to form.

Page 264

1              THE WITNESS:  Yes.

2   BY MR. BECKWORTH:

3       Q.  And in that document, they gave that medal

4   and it said the creation of that strand of poppy was

5   transformational and it led to the growth of

6   oxycodone.  You saw it with your own eyes, right?

7              MR. EHSAN:  Objection to form.

8              MR. ERCOLE:  Objection to form.

9              THE WITNESS:  Yes.

10  BY MR. BECKWORTH:

11      Q.  The supplier of oxycodone to Purdue, one of

12  them, was Noramco, a company that is a subsidiary of

13  Johnson & Johnson.  You learned that today, didn't

14  you?

15             MR. EHSAN:  Objection.

16             MR. ERCOLE:  Objection to form.

17  BY MR. BECKWORTH:

18      Q.  Now, let's look here at this chart.  The

19  line from 1980 to 1996 for oxycodone consumption

20  measured in milligrams per capita was virtually

21  flat, correct?

22      A.  Yes.

23      Q.  And then something happened around 1996,

24  right?

25      A.  Yes.

Page 265

1      Q.  Did it go up or down?

2      A.  It went up.

3      Q.  Did it go up sharply?

4      A.  Yes.

5      Q.  And it stayed up for a long time, correct?

6      A.  Yes.

7      Q.  And then sometime after 2012, consumption

8  went down, but it still is markedly higher than it

9  was in '96, correct?

10     A.  Correct.

11     Q.  Now, all that's reflected in what appears

12 to me to be a blue line for USA oxycodone; do you

13 see that?

14     A.  Yes.

15          MR. ERCOLE:  Objection to form.

16 BY MR. BECKWORTH:

17     Q.  There's another line under it in red,

18 correct?

19     A.  Yes.

20     Q.  What does that represent?

21     A.  That represents oxycodone consumption in

22 Europe.

23     Q.  And what's happened there?

24     A.  It's basically been flat during this time

25 frame.

1      Q.  Now, you said earlier -- and I'm going to

2  try to find your exact words -- that we had a public

3  health problem rapidly escalating: overdose, abuse,

4  and addiction in this country that you became aware

5  of, correct?

6      A.  Yes.

7              MR. ERCOLE:  Objection to form.

8  BY MR. BECKWORTH:

9      Q.  And when you look at the second page of

10  this exhibit, would you agree with me, sir, that

11  oxycodone consumption measured in milligrams per

12  capita in the United States rapidly escalated after

13  1996?  Is that a fair statement?

14      A.  Yes.

15      Q.  Now, we've been here for a long time, sir.

16  This started out talking about how you've been sued

17  by some different government agencies in various

18  litigation around the country, correct?

19      A.  Yes.

20      Q.  And I told you that we have no intent to

21  sue you, correct?

22      A.  Yes.

23      Q.  But you know that there are folks out there

24  who have blamed you for having some part in creating

25  this public health problem that we have in the

1   United States?  You're aware of that?

2       A.  Yes.

3               MR. ERCOLE:  Objection to form.

4   BY MR. BECKWORTH:

5       Q.  Now, this is your opportunity -- and I'm

6   going to tell you something -- we deposed, put under

7   oath a corporate representative of Janssen and

8   Purdue, Cephalon/Teva, all of them.  We put them

9   under oath.  They're going to answer to this jury.

10  Their drug company lawyers are here.

11              Every single time we've asked them:

12  Do you share even 0.1 percent responsibility for

13  causing the public health problem we have in this

14  country in the State of Oklahoma, do you know what

15  they've said?

16              MR. ERCOLE:  Objection.

17              THE WITNESS:  No.

18  BY MR. BECKWORTH:

19      Q.  Without fail, do you know what they've

20  said?

21              MR. ERCOLE:  Same objection.

22              THE WITNESS:  No.

23  BY MR. BECKWORTH:

24      Q.  I'll represent to you they have all said

25  no.  Just yesterday the head of Teva's generic

Page 268

1    production in the United States of America, which

2    includes the very same OxyContin they produce?

3              Do you know what she said?  0 percent.

4              MR. ERCOLE:  Objection to form.

5    BY MR. BECKWORTH:

6       Q.  I deposed a Purdue Corp representative on

7    Tuesday.  Do you know what he told me?

8       A.  No.

9       Q.  0 percent.  So you can choose to believe

10   me.  I can go get the testimony and show it to you.

11   Take all that aside for a moment.  Can one man

12   create an opioid crisis in the country by himself?

13             MR. ERCOLE:  Objection to form.

14             THE WITNESS:  Yeah.  I don't think so.

15   It's not possible.

16   BY MR. BECKWORTH:

17      Q.  To the extent we have a public health

18   problem in this country, do you think it's right for

19   Purdue to say they bore no responsibility for that

20   problem?

21      A.  Right.  No, I'm on -- I have come to

22   believe that that is not right.

23      Q.  What is right?

24      A.  The pharmaceutical industry should accept

25   partial responsibility for the public health problem

1   that has emerged because they distilled from work

2   that was created in the time frame of this problem

3   evolving, all the positives, all the positive

4   messages and packaged that into marketing without

5   concurrently providing the medical community and the

6   public with the context and the kinds of education

7   related to risk to try to make sure that the

8   patients who had access to this drug were carefully

9   selected to minimize risk, that they had been

10  selective with this therapy only after other

11  approaches of pain management had not worked, and

12  that if this therapy was tried, it was tried

13  according to guidelines that were published

14  repeatedly during this period of time that pointed

15  to the need to be cautious in dosing, to evaluate

16  aberrant behavior, to react to aberrant behavior --

17  all of that messaging about proper patient

18  selection, about appropriate dosing, about

19  monitoring of drug-related behavior, about dealing

20  with problematic drug-related behavior, that

21  messaging was not included in many -- in much of the

22  marketing work that was done by the companies during

23  this period of time.

24              And I have come to believe that that's

25  in part what drove the kind of prescribing by a

1  segment of the physician community that presumably

2  could not select patients appropriately and led to a

3  high risk for patients, including the risk of

4  unintended overdose and mortality.

5      Q.  I know that answer comes after a lot of

6  thought and having a lot of fingers pointed at you.

7          Let me ask you this.  All the things you

8  just said of why these drug companies should bear

9  some responsibility, the reason they should accept

10  some responsibility, according to your personal

11  experience and qualifications dealing directly with

12  this issue is because their conduct was at least a

13  cause of the public health problem that you referred

14  to?  That's true?

15          MR. ERCOLE:  Objection to form.

16          THE WITNESS:  That's right.  Again, I've

17  come to conclude that their conduct in marketing

18  without context and without education about risk

19  produced an increase of inappropriate and unsafe

20  prescribing that contributed to the public health

21  problem.

22  BY MR. BECKWORTH:

23      Q.  And the conduct you referred to was wrong,

24  according to you?

25          MR. ERCOLE:  Objection to form.

Page 271

```
 1              THE WITNESS:  Yes.

 2   BY MR. BECKWORTH:

 3       Q.  And that includes the conduct of Purdue?

 4              MR. ERCOLE:  Objection to form.

 5              THE WITNESS:  Yes.

 6   BY MR. BECKWORTH:

 7       Q.  Teva?

 8       A.  Yes.

 9              MR. ERCOLE:  Same objection.

10   BY MR. BECKWORTH:

11       Q.  Cephalon?

12       A.  Yes.

13              MR. ERCOLE:  Same objection.

14   BY MR. BECKWORTH:

15       Q.  Janssen?

16       A.  Yes.

17       Q.  And Johnson & Johnson?

18       A.  Yes.  Yes.

19              MR. BECKWORTH:  Thank you, sir.  I'll

20   pass the witness.  I appreciate your time today.  I

21   know that it's been a long, difficult day, and maybe

22   we'll have an opportunity to question you again.

23   Thank you.

24              Pass the witness.

25              MR. EHSAN:  Do you want to take a five-
```

Page 272

1    minute break?

2              MS. SPENCER:  That's fine.

3              THE VIDEO OPERATOR:  Off the record,

4    4:25.

5                   (Recess at 4:25 p.m.,

6                   resumed at 4:44 p.m.)

7              THE VIDEO OPERATOR:  We're back on the

8    record, 4:44.

9                   EXAMINATION

10   BY MR. EHSAN:

11       Q.  Good afternoon, Dr. Portenoy.  My name is

12   Houman Ehsan.  I represent Janssen and Johnson &

13   Johnson, defendants in this case.  I introduced

14   myself, I think, before the depo began, but that was

15   a long time ago.

16              I will be asking you some questions and

17   I will try to not retread any old ground, but I may

18   have to go back and clarify some points, if that's

19   okay with you.

20       A.  Yes.

21       Q.  Doctor, you're a resident of New York;

22   is that correct?

23       A.  Yes.

24       Q.  And you work at a New York hospital;

25   is that correct?

Page 273

1      A.  No.  I work in a health system, a community-

2  based health system, not-for-profit, called MJHS.

3      Q.  And is that based in New York?

4      A.  Yes.

5            MS. SPENCER:  I'm sorry.  Houman, if you

6  can raise your voice just a little bit.

7            MR. EHSAN:  Sure.

8            MS. SPENCER:  I'm having a little

9  trouble hearing you.

10           MR. EHSAN:  Absolutely.

11  BY MR. EHSAN:

12     Q.  Do you pay any taxes in New Hampshire?

13     A.  No.

14     Q.  Do you own any property in New Hampshire?

15     A.  No.

16     Q.  As far as you know, do you have any

17  contacts besides your lawyer being located in New

18  Hampshire with New Hampshire?

19     A.  No.

20     Q.  And I understand that you drove up for this

21  deposition from New York; is that correct?

22     A.  Yes.

23     Q.  Must have been a long drive?

24     A.  Yes.

25     Q.  How long did that take you?

Page 274

1      A.   About four hours and 15 minutes.

2      Q.   Doctor, have you had occasion to visit

3   Oklahoma?

4      A.   No.

5      Q.   Have you ever practiced medicine in

6   Oklahoma?

7      A.   No.

8      Q.   Have you ever been licensed to practice

9   medicine in Oklahoma?

10      A.   No.

11      Q.   Have you had interactions with physicians

12   you knew or to be from Oklahoma?

13      A.   Not to my knowledge.

14      Q.   Are you aware of the standards of care in

15   Oklahoma in regard to the management of pain today?

16      A.   No.

17      Q.   Were you aware of the standards of care as

18   it relates to the management of pain in Oklahoma at

19   any point in the past?

20      A.   No.

21      Q.   And you'd agree with me, doctor, that

22   standards of care for treatment vary somewhat from

23   community to community; is that correct?

24      A.   Yes.

25      Q.   Have you had occasion to see any materials

1    that any of the pharmaceutical manufacturers

2    distributed in the State of Oklahoma?

3         A.   The answer is no.

4         Q.   And let me be more specific.

5         A.   Yes.

6         Q.   You don't know which, if any, material was

7    specifically provided to any particular physician in

8    the State of Oklahoma, correct?

9         A.   I do not.

10        Q.   My understanding is, doctor, that you

11   provided a declaration to Mr. Beckworth and the

12   State of Oklahoma in connection with this particular

13   deposition; is that correct?

14             MR. BECKWORTH:  Objection.  The

15   declaration was provided to the State of Oklahoma,

16   not to any individual.

17   BY MR. EHSAN:

18        Q.   Did you, Dr. Portenoy, provide a

19   declaration?

20        A.   My attorney did.

21        Q.   And that declaration, I believe your

22   testimony was, essentially answered substantively

23   identical to the one that you provided to plaintiffs

24   in a different litigation; is that correct?

25        A.   Yes.

Page 276

1    Q.  It would be fair to say that it was

2    essentially a cut-and-paste with some minor edits

3    that we discussed today?

4              MS. SPENCER:  Objection.  That's

5    privileged.

6    BY MR. EHSAN:

7    Q.  Doctor, did you give, yourself, any

8    additional edits or revisions between the version

9    that was submitted to plaintiffs in the other

10   litigation versus the declaration that was submitted

11   in Oklahoma?

12   A.  No.

13   Q.  Would it be fair to say that -- I believe --

14   and correct me if I'm wrong about this -- that you

15   engaged in significant revision and redrafting of

16   the declaration that was initially provided to the

17   other plaintiffs; is that correct?

18   A.  That's correct.

19   Q.  So whatever thinking process and drafting

20   process you engaged in, that got translated over to

21   the declaration in Oklahoma; is that correct?

22   A.  Yes.

23   Q.  Now, I also understood that you were not

24   sued in the State of Oklahoma; is that correct?

25   A.  Not sued by the State of Oklahoma.

1      Q.   Have you ever had any lawsuit from the

2   State of Oklahoma?

3            MS. SPENCER:  Let's -- So are you

4   saying -- When you say "from the State of Oklahoma,"

5   do you mean by the Attorney General, or do you mean

6   by anyone within the State of Oklahoma?  Because he

7   has been named in lawsuits in the State of Oklahoma,

8   but not by the State of Oklahoma.

9            MR. EHSAN:  Let me apologize and let me

10   clarify the question.

11   BY MR. EHSAN:

12      Q.   You provided the declaration to the State

13   of Oklahoma, correct?

14      A.   My attorney did.

15      Q.   Your attorney did.  And as far as you know,

16   the State of Oklahoma has not filed a lawsuit

17   against you; is that correct?

18      A.   That's correct.

19      Q.   If the State of Oklahoma has not filed a

20   lawsuit against you, what was your understanding of

21   why you were providing a declaration to the State of

22   Oklahoma?

23            MS. SPENCER:  I object to the extent

24   that that calls for privileged information.

25            MR. EHSAN:  I'm not --

1              MS. SPENCER:  You're not asking him to

2    say anything --

3              MR. EHSAN:  Not the conversation.

4    BY MR. EHSAN:

5        Q.  But my question is what motivation do you

6    have as Dr. Portenoy to provide that -- I'm not

7    asking you to divulge conversation with your

8    counsel -- but just your state of mind, what is your

9    understanding of why I'm handing this declaration to

10   Oklahoma?

11       A.  My understanding is that in exchange for my

12   truthful testimony at the deposition and the

13   declaration, the State of Oklahoma will not take any

14   action against me in any of the opioid litigation.

15       Q.  And did the State of Oklahoma provide you,

16   as far as you know, anything in writing to that

17   extent?

18       A.  Not that I'm aware of.  Oh, I -- I guess

19   I -- it was an email.  I'm sorry.  I misspoke.

20   There was an email to my attorney.

21       Q.  So you anticipated my question here.

22       A.  Emails are written.

23       Q.  And I apologize.  I'm going to have to dig

24   through some of these documents here.

25              So what is your understanding of what

1    the email from the State of Oklahoma implied for the

2    purposes of you being sued in the State of Oklahoma?

3              MS. SPENCER:  Are you going to show him

4    a copy of an email?

5              MR. EHSAN:  Yes.  I'm trying to find it.

6    I'm just asking him what his recollection is.

7    BY MR. EHSAN:

8        Q.  And if you need to see the email, I'll be

9    glad to give you the email.

10             MS. SPENCER:  He needs to see the email.

11             MR. EHSAN:  The problem with the end of

12   the day is that the documents kind of get unwieldy

13   here.  But somewhere here we have -- Ah, there we go.

14                   (Portenoy Exhibit 30 was marked

15                    for identification.)

16   BY MR. EHSAN:

17       Q.  Doctor, the court reporter has handed you

18   what's been marked as Exhibit 30 to your deposition.

19   Please take a moment to look at it.  It's not a very

20   long email.  And just let me know if this is the

21   email that you had in mind that you just testified

22   to.

23       A.  I didn't -- I don't believe that I saw this

24   specific email, so I don't know if I had this email

25   in mind.  I know that there was an email that

Page 280

1    indicated that in exchange for my truthful testimony

2    and the declaration, that I wouldn't be considered.

3        Q.  And the subject matter of this email is

4    "FYI," correct?

5        A.  Yes.

6        Q.  And it's from Mr. Beckworth to your

7    attorney, Ms. Amy Spencer, correct?

8        A.  Yes.

9        Q.  And it says -- the body of it states,

10   "Per your request, this email is to confirm that the

11   State does not plan to add your client to our suit."

12            Did I read that correctly, sir?

13       A.  Yes.

14       Q.  And is it fair to assume that "State" here

15   is referring to the State of Oklahoma?

16       A.  Yes.

17       Q.  And it goes on to say, "Also, before he

18   signs the final version, would you please delete the

19   word 'defendant' in para 39 re the 2009 APS

20   guidelines?  As is, it indicates all of those listed

21   are named in our case but they are not."

22            Do you see that?

23       A.  Yes.

24       Q.  Were you aware that Mr. Beckworth was

25   suggesting edits to the declaration?

Page 281

1      A.  I wasn't aware that the edit was suggested,

2  but I was aware that there were some slight edits,

3  as we said before.

4      Q.  And this email is dated January 16, and you

5  signed your declaration, I believe you testified, on

6  January 17 --

7      A.  Yes.

8      Q.  -- is that correct?

9      A.  Yes.

10     Q.  So once you became aware that the State was

11 confirming that it wasn't planning to add you to a

12 suit, that is when you executed the declaration,

13 correct?

14     A.  Yes.

15     Q.  Looking at the declaration itself, which I

16 believe is --

17     A.  Exhibit 2.

18     Q.  -- Exhibit 2.  That's right.  You've talked

19 a lot about this at various points, but I wanted to

20 draw your attention to a few items in it.

21           MS. SPENCER:  And I'll make the same

22 request I made of opposing counsel.  If you could

23 note where you are --

24           MR. EHSAN:  Absolutely.

25           MS. SPENCER:  -- and I can follow along.

Page 282

1              MR. EHSAN:  Absolutely.

2      BY MR. EHSAN:

3          Q.  Just for the record, I note paragraphs 1

4      through 3 kind of set out some background

5      information -- or paragraphs 1 and 2 set out some

6      background information about your educational

7      training; is that correct, doctor?

8          A.  Yes.

9          Q.  Specifically looking at paragraph 3, which

10     is on page 3, it states in the declaration, "I have

11     agreed to cooperate with certain plaintiffs who have

12     entered into settlement agreements with me dismissing

13     me as a defendant in their cases ('settling

14     plaintiffs')."

15              Do you see that?

16         A.  Yes.

17         Q.  But you do not have a settlement agreement

18     with Oklahoma, correct?

19         A.  I do not.

20         Q.  So this language about settling plaintiffs

21     seems somewhat inapplicable to the state of

22     Oklahoma; would you agree?

23         A.  Yes.

24         Q.  And it goes on to say, "Settling plaintiffs

25     agreed to dismiss me from their cases in exchange

1   for my truthful cooperation," correct?

2       A.  Yes.

3       Q.  And again, you're not settling with the

4   State of Oklahoma since they haven't named you in a

5   lawsuit, correct?

6       A.  Yes.

7       Q.  Nevertheless, did you understand that if

8   you didn't cooperate with the State of Oklahoma,

9   they may name you in a lawsuit?

10      A.  Yes.

11      Q.  And did that in any fashion or form

12  motivate you to provide them a declaration?

13      A.  Well, the --

14           MR. BECKWORTH:  Can I just object to one

15  thing so the record's clear.  The State of Oklahoma

16  is not a "them."  It's just an "it."  So the reason

17  I'm making that is not to be picky, but there are

18  these subdivisions who filed suit, so just to be

19  clear what we're referring to.

20           MR. EHSAN:  Sure.

21           MR. BECKWORTH:  Thank you.

22  BY MR. EHSAN:

23      Q.  So did the threat by the State of Oklahoma

24  to name you as a plaintiff in a lawsuit motivate you

25  to provide the State of Oklahoma the declaration?

```
 1                  MR. BECKWORTH:  Objection.  It's not
 2   a -- there was no threat by the State of Oklahoma.
 3   What you had asked him was, did he think there was a
 4   threat he might be sued.  The State of Oklahoma has
 5   never threatened him.  And there's no such evidence
 6   in the record.
 7   BY MR. EHSAN:
 8       Q.  I just note that when it's my turn to ask
 9   questions, the State will object.  So it's par for
10   the course for people to object when the other side
11   is asking questions.
12                  That said, did you have an understanding
13   that if you did not cooperate with the State of
14   Oklahoma, the State of Oklahoma may, in fact, name
15   you in a lawsuit?
16       A.  Yes.  And I would be at risk for having
17   that happen, yes.
18       Q.  And I believe, as you note in your -- maybe
19   not in here, but is it true, Dr. Portenoy, that
20   you're facing some financial difficulties?
21       A.  Yes.
22       Q.  And that you are on the precipice of
23   bankruptcy?
24       A.  Yes.  Yes.
25       Q.  So there's potentially a significant
```

Page 285

1    economic risk you face from being named in

2    additional lawsuits, including one perhaps in the

3    State of Oklahoma; would that be a fair assessment?

4        A.  Yes.

5        Q.  And did you consider those factors in

6    deciding whether or not to provide a declaration to

7    the State of Oklahoma?

8        A.  I had an interest in not being named in

9    Oklahoma, yes.  And the ability to offer truthful

10   testimony in exchange for that was an opportunity

11   that I definitely wanted to take because I am

12   covering all of my legal costs without any insurance

13   or any other coverage.

14              And the risk of going bankrupt as a

15   result of that is ever present with all of this

16   litigation.  And the ability to offer truthful

17   testimony in exchange for not being named is an

18   opportunity that I will take.

19       Q.  Did you -- and putting aside the email we

20   discussed and this declaration -- have any other

21   contact with the representatives of the State of

22   Oklahoma?

23       A.  No.

24       Q.  And I'm talking about before today.

25       A.  No, I did not.

Page 286

1      Q.  Now, you state in paragraph 4 of your

2   declaration -- again, on page 3 -- Oh, I should ask.

3   Strike that.  Let me go back and ask a different

4   question.

5           Are you aware of whether or not your

6   counsel had interactions with the State of Oklahoma

7   besides this email and the declaration itself?

8           MS. SPENCER:  I'll object but he can

9   answer "yes" or "no."

10           THE WITNESS:  Yes.

11   BY MR. EHSAN:

12      Q.  Yes, you know that your counsel had other

13   contacts?

14      A.  Yes.

15      Q.  Do you have a rough sense of how many?

16      A.  No.

17      Q.  Do you know over what period of time?

18      A.  Not really, no.

19      Q.  Would you say that they went before, let's

20   say, November of 2018?

21      A.  I wouldn't think it was that far back.

22      Q.  You state in paragraph 4 that this

23   declaration is based on your personal knowledge;

24   is that correct?

25      A.  Yes.

1    Q.  So to loop back to a question I asked you

2    earlier, you have no personal knowledge of any

3    particular marketing effort by any pharmaceutical

4    manufacturer in the State of Oklahoma, correct?

5    A.  Correct.

6    Q.  In your declaration, you speak -- and

7    staying with that paragraph 4 -- I believe you said

8    you came to believe -- I'm reading on page 4 now,

9    the top of the page which is a continuation of

10   paragraph 4 -- "I also came to believe that opioid

11   manufacturers should have tempered their positive

12   messaging about opioids with a greater focus on

13   risk, particularly as early signs of opioid risk

14   emerged, and should have responded as evidence of

15   increasing adverse effects mounted in a more

16   aggressive manner to increase awareness and reduce

17   inappropriate or risky prescribing."

18              Do you see that topic?

19   A.  Yes.

20   Q.  When you're talking about pharmaceutical

21   companies' messaging, are you talking about their

22   labeling?

23   A.  No.

24   Q.  Are you talking about the -- Let me back up.

25              Do you know what REMS are, doctor?

1      A.   Yes.

2      Q.   What is your understanding of what REMS are?

3      A.   "Risk evaluation and mitigation strategies."

4      Q.   And what are REMS in terms of your daily --

5  in a daily practice related to risk mitigation

6  strategies?

7      A.   If a REMS has been implemented by FDA,

8  it can have different criteria, different

9  characteristics.  It depends on what's being risk

10  managed.

11      Q.   Are you aware that scheduled narcotics have

12  a REMS program under the FDA currently?

13      A.   Yes.

14      Q.   And would it be fair to say that those --

15  that those REMS programs include educational

16  material mandated by the Food and Drug

17  Administration?

18      A.   Yes.

19      Q.   Do you have a suggestion -- or in your

20  experience, has there been any attempt to have

21  excess positive messaging in any of the REMS

22  educational material?

23      A.   No, I don't believe so.

24      Q.   We also talked a lot about the primary

25  literature or the published literature.  You have

Page 289

1   published extensively on chronic pain management;

2   is that correct?

3        A.  Yes.

4        Q.  Both in the cancer setting, also in a

5   noncancer setting, correct?

6        A.  Yes.

7        Q.  And just so we get some terminology correct,

8   "palliative care" is synonymous with "end-of-life

9   care"; is that correct?

10       A.  No.  Not anymore.  Palliative care is a

11  subspecialty of medicine and nursing and social work

12  and chaplaincy, and it's related to interventions to

13  try to improve the quality of life with patients

14  with serious chronic illness.

15            Palliative care specialists like myself

16  tend to focus on patients with far advanced illness.

17  But palliative care as a model of care is

18  appropriate throughout the course of a serious

19  illness.

20       Q.  Was there a time where palliative care was

21  considered synonymous with end-of-life care?

22       A.  Yeah.  In the '70s when it first emerged,

23  it was really synonymous with end-of-life care in

24  the cancer population, but there's been dramatic

25  change internationally since that time.

Page 290

1     Q.  And just so that we're also clear on

2  terminology, even if you have chronic pain from

3  cancer, it does not mean that you are necessarily a

4  terminal patient, correct?

5     A.  That's correct.

6     Q.  In fact, many people live with cancer for

7  an extended period of time; is that correct?

8     A.  That's correct.

9     Q.  And then the other terminology is "chronic

10  noncancer pain."  And would it be fair to say that's

11  pain that lasts more than a period of time that's

12  somewhat debatable within the scientific community

13  but one that is not from a cancer origin; is that

14  correct?

15     A.  Yes, that's true.

16     Q.  And from a neurological perspective, is

17  there a difference to the way the brain perceives

18  cancer pain versus noncancer pain?

19     A.  It's difficult to infer how the brain

20  perceives.  So I'm not really sure how to answer

21  that question.

22     Q.  Sure.  Let me put it in slightly different

23  terms.  Is a patient who's suffering from 10 out of

24  10 pain from cancer any different, in your mind,

25  from what they're experiencing versus a patient

1   who's suffering from 10 out of 10 pain that's from a

2   noncancer origin?

3               MR. BECKWORTH:  Objection.

4               MS. SPENCER:  You may answer.

5               THE WITNESS:  So I have always thought

6   for 30 years that the difference between cancer pain

7   and noncancer pain relates more to the population

8   affected rather than to the pain itself.

9               So that the population with chronic

10  cancer pain tends to be older, it tends to be

11  patients with less -- a lower prevalence of comorbid

12  psychiatric pathology than the population with

13  chronic noncancer pain, particularly the common

14  types of chronic noncancer pain we were talking

15  about before: low back pain, neck pain, fibromyalgia,

16  myofacial pain.

17              Cancer pain syndromes related to tumor

18  invasion of different structures in the body have a

19  discrete path of physiology.  More is being learned

20  about that all the time.  But from the perspective

21  of managing the pain in the person who has cancer,

22  it's less about the fact that there's a tumor

23  producing an injury to the body than it is the

24  person who has that tumor producing the pain.

25              I don't know if I'm clear about that.

1    But I have -- I have always been -- always tried to

2    draw commonalities between patients with cancer pain

3    and noncancer pain and point to the need for

4    physicians to do a good, comprehensive assessment of

5    the patient without feeling that simply having a

6    tumor in the body means that there's no risk

7    associated with opioids and you can use them ad lib,

8    or assuming if there's no cancer in the body,

9    opioids are not to be used at all.

10            That dichotomy never made sense to me,

11   beginning really in my fellowship during the 1980s.

12   BY MR. EHSAN:

13       Q.  So if I understood you correctly, you'd

14   make equal effort to treat a patient regardless of

15   the origin of his or her pain; would that be correct?

16       A.  So if I'm understanding your question, of

17   course a clinician should make an equal effort to

18   treat pain irrespective of the etiology, irrespective

19   of the patient who has it.  Of course, that's the

20   case.

21            But the decision about how to position

22   opioids, for example, similar to the position of the

23   question about how to position nerve blocks or how

24   to position stimulators of the brain -- all of those

25   questions about how to use therapies for chronic

Page 293

1    pain are based on a comprehensive assessment that

2    goes beyond thinking that this pain is caused by a

3    tumor in the body and this pain is not.

4              It's based on the total picture, many

5    characteristics of the person who's experiencing

6    that pain.

7        Q.  So if I understood you correctly, doctor --

8    and feel free to correct me -- that the source of

9    the pain is one piece of information.

10             However, the other factors that the

11   patient presents with, including age, comorbidities,

12   potentially social history, family history, genetics,

13   et cetera could all play a role in making a full

14   assessment of the patient's need and the appropriate

15   therapy for that patient?

16       A.  Yes, that's what I'm saying.

17       Q.  And would it be fair to say from your

18   perspective that unless you actually got to see the

19   medical records and preferably the patient him or

20   herself, that you can't just assess a patient for

21   appropriate therapy -- Strike that.

22             Would you agree with me, doctor, that

23   you can't assess a patient for appropriate

24   therapeutic intervention without at least seeing the

25   medical records and preferably the medical records

1    plus having the patient in front of you?

2              MR. BECKWORTH:  Objection.

3              MS. SPENCER:  You may answer.

4              THE WITNESS:  Yes, I agree with that.

5    BY MR. EHSAN:

6       Q.  And it's also true, doctor, that the

7    individual risk profile of a patient can oftentimes

8    outweigh the general risk profile of any particular

9    intervention?

10      A.  You're going to have to clarify what you

11   mean by that question.

12      Q.  Sure.  So I think what we -- what

13   Mr. Beckworth spoke with you about was the fact that

14   there's a variability within the population about

15   the risk of addiction with long-term opioid use in a

16   noncancer setting and the numbers I believe you said

17   ran from less than 1 percent to significantly

18   higher.  And the average, I think in your last

19   paper, was 4.7 percent; is that correct?

20             MR. BECKWORTH:  Objection.  That's not

21   his testimony.

22             MS. SPENCER:  You can answer.

23             THE WITNESS:  Yes.  The last systematic

24   review and metaanalysis of studies that looked at

25   patients without a prior history of substance abuse

1    found an incidence of addiction of 4.7 percent.

2    BY MR. EHSAN:

3        Q.  So that 4.7 percent is a general number.

4    But if you then know, for example, that that patient

5    is, for whatever reason, genetically susceptible,

6    that may override any consideration of that

7    4.7 percent because the individual patient risk

8    profile is such that it completely reshuffles or

9    recalibrates, to use your words, the risk/benefit

10   analysis of the prescriber; is that fair?

11       A.  Yeah.  I don't think that the general

12   number, what you called a general number before, is

13   clinically appropriate to make decisions on.  It may

14   be appropriate to consider a range of therapies

15   based on -- based on a balance between expected

16   benefit and expected risk in a population of

17   patients.

18               I think physicians make those judgments

19   about all sorts of interventions every day.  But the

20   decision to take a specific therapy and administer

21   it requires a benefit-versus-risk analysis of the

22   individual that has to consider a whole range of

23   considerations of the type that you mentioned

24   before.

25       Q.  And likewise, the risk of addiction or

1  abuse or misuse of an opioid is not the only risk

2  that these medications carry; is that correct?

3      A.   That's correct.

4      Q.   And sometimes the other risk of these

5  medications -- for example, increased intracranial

6  pressure -- could be significantly more important to

7  a particular prescribing decision than the potential

8  risk of addiction; is that fair?

9      A.   We wouldn't usually worry about increased

10  intracranial pressure during chronic therapy, but we

11  would worry about things like cognitive impairment,

12  the risk of falls, severe constipation, those kinds

13  of risks.

14      Q.   Certainly those risks are separate and

15  apart from the addiction risk; is that fair?

16      A.   Yes, that's true.

17      Q.   And someone may be susceptible to a

18  different side effect of the medication irrespective

19  of where they sit on the abuse or addiction

20  potential; is that fair?

21      A.   That is fair to say, yes.

22      Q.   So when you -- do you still prescribe

23  opioids today?

24      A.   Yes.  I have a small -- a small practice at

25  this point.

1      Q.  How many patients do you see on a given

2   week?

3      A.  Oh.  It's less than one per week.

4      Q.  When you were last -- when were you last

5   seeing patients on a more regular basis?

6      A.  It's been quite a few years since I had a

7   weekly practice.  Probably at least 10 years.  Maybe

8   even 12 years.

9      Q.  Do you still believe that today in 2019

10   that in the right -- in the right patient, that

11   chronic opioid use can be effective in addressing

12   chronic noncancer pain?

13      A.  Yes.

14      Q.  Do you believe that in the right patient --

15   in the right patient, that the risk of addiction can

16   be outweighed by the benefits that the medication --

17   an opioid medication may provide to that patient?

18      A.  Yes.

19      Q.  Is it true that every patient who takes an

20   opioid develops dependence or abuse -- or goes on to

21   develop dependence or abuse?

22      A.  That's a complex question because you've

23   combined --

24           MS. SPENCER:  I object.  That is

25   compound.

1    BY MR. EHSAN:

2       Q.  Let me break it out.  So -- one second and

3    I'll focus you on something.  One moment.

4              Well, before I get there, let me ask you

5    something because I'm trying to follow your

6    declaration so that you can follow along.

7              If you look at paragraph 5 of your

8    declaration, which is also on page 4, you state

9    that, "I have observed" -- and it's the second

10   sentence -- "I have observed and treated numerous

11   patients with chronic pain, including those with

12   diverse noncancer disorders and those with cancer or

13   other life-limiting illnesses."

14             Do you see that?

15      A.  Yes.

16      Q.  So would it be fair to say you have chronic

17   pain patients whose diagnoses varied significantly

18   once you put cancer aside?

19      A.  Yes.

20      Q.  And have you had occasion to treat patients

21   with opioids for a variety of underlying diagnoses

22   for the cause of the chronic pain?

23      A.  Yes.

24      Q.  Do you think it would be appropriate --

25   it would be appropriate for someone to decide that

Page 299

1    only certain diagnoses should be entitled to opioid

2    therapy and all other diagnoses should not?

3         A.   I don't believe that that's the right

4    medical practice, no.

5         Q.   Would you feel that it would be an intrusion

6    on the practice of medicine by a doctor to restrict

7    opioid medications, for example, to certain

8    categorical lists of diagnoses?

9         A.   Yes, I would.

10        Q.   Do you think it would be an intrusion on

11   the practice of medicine to say that a prescription

12   above a certain morphine milligram equivalent is

13   de facto unnecessary?

14             MR. BECKWORTH:  Objection.

15             MS. SPENCER:  You may answer.

16             THE WITNESS:  Yes.  I agree that it

17   would be inappropriate to do that.

18   BY MR. EHSAN:

19        Q.   Ultimately, as we talked about, the best

20   people to make a decision about what's right for a

21   particular patient is -- are the doctor and that

22   patient sitting in that room with the most

23   information about the risks and the benefits to that

24   particular patient, correct?

25        A.   Correct.

Page 300

1      Q.  If you were asked to assess whether or not

2  a colleague's prescription of an opioid to a patient

3  was medically necessary or not, could you do that

4  without looking at the medical record?

5      A.  No.

6      Q.  Could you do it -- Would you prefer to see

7  the patient?

8      A.  I think that's a complex question.  It

9  depends on what specific question is being asked.

10  I think evaluating a medical record and determining

11  that a physician is repeatedly assessing for

12  analgesia, for side effects, for functional

13  outcomes, and for aberrant drug-related behaviors

14  over time and reacting to the information that he or

15  she is collecting over time would be, to me, very

16  reassuring that the patient is being properly

17  managed.

18          I think if the question was more

19  challenging, like whether or not some aberrant drug-

20  related behaviors that were occurring that the

21  physician was trying to deal with -- whether or not

22  those behaviors represented the disease of addiction

23  or some comorbid psychiatric disorder, that sort of

24  subtle diagnostic challenge would require seeing the

25  patients.

Page 301

1      Q.  But at a minimum, the medical records and

2   possibly the patient him or herself?

3      A.  Yes --

4            MR. BECKWORTH:  Objection.  Compound.

5            THE WITNESS:  Yes.  I would agree with

6   that.

7            MS. SPENCER:  Okay.

8   BY MR. EHSAN:

9      Q.  Can you recall some of the noncancer

10  diagnoses for which you have prescribed chronic

11  opioid therapy for in the past?

12     A.  Sure.  Yes.

13     Q.  Can you just list those.  What comes to

14  mind?

15     A.  I have a long and extensive history in

16  treating patients with musculoskeletal problems like

17  chronic low back pain, chronic neck pain,

18  osteoarthritis pain, myofacial pain syndrome.

19            I have an extensive experience in

20  treating all types of neuropathic pain syndromes,

21  including central post-stroke pain, peripheral

22  neuropathy, posttraumatic neuralgia or posttraumatic

23  mononeuropathy.

24            And I've also had extensive experience,

25  as I mentioned before, in treating patients who

1    don't have cancer but have other serious chronic

2    illnesses such as patients who have advanced heart

3    failure, advanced pulmonary disease, who might have

4    chronic pain and might be considered a chronic

5    noncancer pain patient without recognizing that they

6    are more common -- they have characteristics that

7    make them more comparable to cancer pain population.

8        Q.  And you've had occasion then to treat that

9    diagnosis you just listed with opioids in some

10   patients?

11       A.  Yes.

12       Q.  But certainly it's not necessary to treat

13   every one of those patients with opioids, correct?

14       A.  Correct.

15       Q.  You stated in 1986 -- now I'm moving on to

16   paragraph -- well, let me ask you to go to

17   paragraph 6.  You said [as read], Prior and during

18   the 1980s, opioids were disfavored for use in

19   chronic noncancer pain because of concerns that

20   patients using opioids would develop tolerance and

21   physical dependence and would be at risk for abuse,

22   misuse, addiction, diversion.

23              Do you recall that?

24       A.  Yes.

25       Q.  I think at some point you said the medical

1    community was perhaps a little too hesitant to use

2    opioid medications even in cancer patients, much

3    less in chronic noncancer pain relative to what you

4    felt the data at the time supported; is that correct?

5        A.  I would generalize that comment and say it

6    wasn't my opinion.  It was the general opinion of

7    academics around the world looking at the problem of

8    cancer pain, that it was severely undertreated.

9             That, in fact, continues to be the

10   perception in much of the world, particularly in the

11   developing world, which was documented in a recent

12   publication called the Lancet Commission in 2017,

13   which documented the continuing undertreatment of

14   cancer pain, even in patients with advanced illness

15   today.

16            So the problem of undertreatment didn't

17   begin then and it didn't end after opioids were

18   being used more in chronic undertreatment of

19   populations, even where there's broad agreement that

20   this is the treatment that should be given, it

21   continues even today.

22       Q.  Are you talking just outside the United

23   States or including the United States?

24       A.  This -- studies that have been done in the

25   United States that have tried to evaluate the

Page 304

1    appropriate use of opioid therapy for cancer pain

2    using a metric continue to show undertreatment in

3    the United States at high rates.

4        Q.  So even today for the use of opioids to

5    treat chronic pain associated with cancer is still

6    less than where the scientific literature would

7    suggest it needs to be; is that correct?

8        A.  Yes.

9        Q.  And you believe that that is a detriment to

10   patients who are suffering from pain who are not

11   being adequately treated?

12       A.  Yes, I do.

13       Q.  If those individuals were to be treated

14   adequately for pain, would that include perhaps

15   using opioids for the treatment of their condition?

16       A.  Yes.  In 2019 broadly, there's still

17   agreement that the analgesic ladder concept for

18   cancer pain should still apply to patients who have

19   active metastatic disease and pain or who have

20   advanced chronic illnesses or advanced serious

21   illnesses of other types.

22            And what the analgesic leader guideline

23   for pain says essentially is that any patient with

24   chronic moderate to severe pain should receive an

25   opioid.  And the specific type of opioid selected

1    might vary depending on whether or not the patient

2    has moderate or severe pain or whether or not the

3    patient had prior trials with specific drugs.

4                But the general concept that was

5    promulgated through the analgesic ladder approach

6    since the mid 1980s is that moderate to severe pain

7    related to active cancer should be treated with an

8    opioid as the mainstay therapy.

9        Q.  So despite these medications that we've

10   talked about today having been out for, in some

11   cases, a decade plus, and despite marketing that

12   we've discussed throughout today, there are still

13   individuals who are getting undertreated for

14   legitimate cancer pain for which you believe chronic

15   opioid use is warranted?

16       A.  Yes, I believe that's the case.

17       Q.  So would you agree with me, doctor, that

18   that suggests that the marketing of these opioids

19   did not have a 100 percent effect on getting

20   everyone to accept the appropriateness of these

21   drugs in the, at least, cancer context --

22                MR. BECKWORTH:  Objection.

23   BY MR. EHSAN:

24       Q.  -- is that fair?

25                MR. BECKWORTH:  Sorry.  I didn't mean to

1   speak over you.  Were you done?

2              MR. EHSAN:  Yeah.

3              MR. BECKWORTH:  Objection, form.

4              MS. SPENCER:  You may answer.

5              THE WITNESS:  All the marketing that has

6   been done did not resolve the problem of undertreated

7   cancer pain in the United States.  That's true.

8   BY MR. EHSAN:

9      Q.  How about noncancer pain?  Are there

10  individuals today in the United States who suffer

11  from chronic noncancer pain who are undertreated for

12  their condition?

13     A.  It's a complex question.  Because in order

14  to designate a population of patients as being

15  undertreated, you have to have a consensus that the

16  treatment is appropriate and you have to have data

17  to say what the level of appropriate treatment is.

18              And in the very heterogenous population

19  with chronic noncancer pain, all those separate

20  diagnoses that I talked about before, we have

21  neither the consensus nor do we have a standard of

22  what appropriate level of treatment would be, based

23  on any science.

24              So it's very difficult -- and I have

25  been saying this for many, many years -- it's very

Page 307

1    difficult to designate a population with chronic

2    noncancer pain as being undertreated.

3              However, beginning in the 1980s and

4    extending forward, the effort to consider the use of

5    an opioid therapy in patients with treatment

6    refractory pain -- pain that hasn't resolved with

7    other types of treatments, hasn't resolved with

8    physical therapy, that sort of patient -- that

9    effort to make that treatment available was viewed

10   as the right thing to do because the experience in

11   cancer pain and the data that were accumulating

12   based on the epidemiology of risk suggested that the

13   undertreatment of those patients -- or I'm sorry --

14   the lack of treatment of those patients in every

15   case is inappropriate.

16             So the effort on my part, really

17   beginning since 1986, is to try to create educational

18   messages and simple guidelines that physicians can

19   follow to try to select patients who may be able to

20   benefit, may have benefit greater than risk, and

21   then to have the skills necessary to try the opioid,

22   monitor the outcomes carefully, and for those

23   patients who continue to benefit and don't

24   demonstrate the risk, continue that therapy long

25   term.

1          Q.   I think you alluded to something that I was

2     going to ask you about, is that sometimes once

3     you've identified a particular patient you think may

4     be suitable for opioid -- long-term opioid therapy,

5     you still have no a priori evidence going in whether

6     or not the drug is going to give them the results

7     you hoped to give them and you must be essentially a

8     trial and error to see if the medication, in fact,

9     works; is that correct?

10         A.   That's totally correct.

11         Q.   So even if you prescribe a medication for a

12    patient and it turns out that it doesn't work for

13    them or they suffer a negative adverse effect from

14    the drug, it doesn't necessarily mean that the

15    initial prescribing decision was a mistake, but

16    rather that the trial and error just produced a

17    negative result; is that correct?

18         A.   That's correct.

19         Q.   Now, you also mentioned that in addressing

20    the patient's pain before you get to opioids -- you

21    talk about physical therapy and some other medication

22    options -- is it true that availability of insurance

23    coverage can effectively hinder your ability to

24    prescribe certain nonopioid regimens for your

25    chronic pain patients when you were practicing --

Page 309

1      A.   Yes.

2      Q.   -- more regularly?  I apologize.  And I

3   think you alluded to the word "access."  So I wanted

4   to kind of dig in on that a little bit.

5            In order for a patient to have access to

6   a Schedule II narcotics -- a Schedule II narcotic,

7   he or she must go to a doctor who has a DEA license,

8   correct?

9      A.   Go to a clinician who is able to prescribe.

10  It could be a physician, it could be a nurse

11  practitioner.

12     Q.   Are you aware of nurse practitioners being

13  able to prescribe Schedule II narcotics?

14     A.   Yes.

15     Q.   And in addition to just having the

16  prescription, there's the issue of whether or not

17  it's available in a particular pharmacy, correct?

18     A.   Yes.

19     Q.   And even if it's prescribed and available

20  at a particular pharmacy, then in order for -- if

21  it's going to be reimbursed, it has to be within the

22  formulary structure for that particular patient,

23  correct?

24            MR. BECKWORTH:  Objection.

25            MS. SPENCER:  You may answer.

1            THE WITNESS:  That's correct.

2    BY MR. EHSAN:

3        Q.  And even if it's formulary, it may not

4    necessarily be affordable, depending upon its

5    position within that formulary structure, correct?

6        A.  That's correct.

7        Q.  So there are lots of different facets that

8    control access to Schedule II narcotics, correct?

9        A.  Yes.

10       Q.  That would be also true for Schedule III

11   and IV narcotics, correct?

12       A.  Yes.

13       Q.  So even if -- even if a patient, for

14   example, went to his or her doctor and said, I want

15   to be prescribed a Schedule II narcotic and even if

16   the physician agreed that that would be the best

17   doesn't necessarily mean that that patient has that

18   option depending on the particular -- particular

19   facts associated with insurance coverage, financial

20   means, and other factors, correct?

21       A.  Yes.  That's true.

22       Q.  Are you aware to what extent the State of

23   Oklahoma from 1996 to present has attempted to

24   control or dictate availability of certain

25   Schedule II narcotics within its Medicaid population?

Page 311

1       A.   No.

2       Q.   Are you aware that most states administer

3   their Medicaid insurance programs?

4       A.   Yes.

5       Q.   And Medicare is run by the federal

6   government, correct?

7       A.   Yes.

8       Q.   And there's also private insurance?

9       A.   Yes.

10      Q.   So you have no knowledge of what the State

11  of Oklahoma has or has not done in relation to

12  allowing access or lack thereof for opioids to

13  patients under the Oklahoma Medicaid program,

14  correct?

15      A.   That's correct.  I don't know.

16      Q.   Would that be relevant to you in assessing

17  whether or not the State of Oklahoma could have done

18  more in order to help lessen the number of

19  inappropriate prescriptions that perhaps may have

20  been written in the State of Oklahoma?

21      A.   I'm not sure that I can say that.  I don't

22  have enough information about the kinds of tools

23  that the State would have had in order to influence

24  those outcomes.  So I can't say that that's true.

25      Q.   So, for example, I think you mentioned that

Page 312

1    if a doctor saw a promotional material that

2    necessarily didn't emphasize the risks, but did

3    emphasize the positives of a narcotic, he or she may

4    be influenced by the promotional material; is that

5    correct?

6        A.  Yes.

7             MS. SPENCER:  I'll object.  It wasn't

8    exactly his testimony.  But I'll let him answer.

9    BY MR. EHSAN:

10       Q.  If you want to correct me, please do so.

11       A.  No.  I think the gist of what you said,

12   I would agree with.

13       Q.  Do you have actual personal knowledge of

14   anyone in the State of Oklahoma who was influenced

15   and prescribed an opioid inappropriately after

16   having seen some promotional material?

17       A.  No, I don't.

18       Q.  So putting aside the fact that you don't

19   have any specifics in mind, if that -- if the State

20   of Oklahoma, for example, had restricted the use of

21   opioids for more than, let's say, three months to

22   certain diagnoses, that would potentially curb the

23   ability of that physician to continue to prescribe

24   that patient an opioid, correct?

25       A.  Yeah.  If a rule existed of the type you

1  said in which -- a rule that basically stated that a

2  physician had a three-month window to prescribe,

3  after which the patient would not be able to access

4  the drug, then that would certainly influence what

5  happened to that patient.  Absolutely.

6      Q.  Likewise, if the State of Oklahoma

7  implemented a plan that after -- the patient had to

8  be reevaluated every 30 days, that could alter the

9  physician's prescribing decision on a going-forward

10  basis, correct?

11     A.  I think that's theoretical.  It's possible.

12  But I'm not sure.

13              MR. EHSAN:  We'll get back to that in a

14  minute.

15                  (Portenoy Exhibit 31 was marked

16                   for identification.)

17              MR. EHSAN:  I did not want to speak

18  while her hands were busy with something else.

19              MS. SPENCER:  Sorry.  Yes, thank you.

20  BY MR. EHSAN:

21     Q.  Doctor, I've handed you what -- or the

22  reporter has handed you what's been marked as

23  Exhibit 31 to your deposition.

24              Do you recognize this document?

25     A.  Yes.

Page 314

1      Q.  How do you recognize it?

2      A.  It was an article that I and my colleague,

3   Kathleen Foley, wrote in 1986.

4      Q.  Now, I believe, if you look at paragraph 7

5   of your declaration, you talk at some length about

6   this particular article; is that correct?

7      A.  Yes.

8      Q.  And you report on a group of patients that

9   were selected from two separate pools, I believe, of

10  patients.  And you report on their rate of symptom

11  relief as relates to their pain on opioids as well

12  as some aberrant and potentially addictive behavior;

13  is that correct?

14     A.  Yes.

15     Q.  Sitting here today, do you believe that the

16  substance of this article, as you reported it, are

17  accurate?

18     A.  Yes.

19     Q.  And do you agree that since -- and this was

20  published in a peer-reviewed journal; is that

21  correct?

22     A.  Yes.

23     Q.  So that means other physicians or medical

24  professionals with knowledge of publications and

25  studies had reviewed it and provided their, at least

1    acceptance of it as worthy of publication, correct?

2        A.  Yes.

3        Q.  And would you agree with me, doctor, that

4    if a physician -- or let me strike that.

5              Would you agree with me that someone who

6    has the authority to prescribe an opioid, that, to

7    use your words, has the responsibility to be aware

8    of the risks and benefits of the medication he or

9    she is prescribing?

10       A.  Yes.

11       Q.  And one source of information would be the

12   primary literature, correct?

13       A.  Yes.

14       Q.  And a physician who is capable -- or a

15   health care professional who's able to prescribe

16   would be able to read your article and understand

17   it, correct?

18       A.  Yes.

19       Q.  The reason I ask, you don't need to be a

20   specialist in order to read a journal article,

21   correct?

22       A.  Correct.

23       Q.  They're broken down in a pretty standard

24   format with methods, results, discussion, and a

25   conclusion, correct?

1    A.  Yes.

2              MR. BECKWORTH:  Objection.

3  BY MR. EHSAN:

4    Q.  And that the methods section should clearly

5  lay out what it is that you attempted to do and

6  give some information about the limitations,

7  methodological limitations of the article; is that

8  correct?

9    A.  Limitations are not usually included in the

10  methods section.  They're usually discussed further

11  in the article in sort of the standard format that

12  they use.

13    Q.  You anticipated my next question.  So just

14  reading -- I'll take you, Dr. Portenoy.  If when you

15  read an article -- myself, I always read the methods

16  first.  But when you read an article, do you read

17  the methods section?

18    A.  Yes.

19    Q.  And before you get to the discussion of the

20  limitations in the discussions section, can you

21  already ascertain whether or not the methods were of

22  good quality, moderate quality, poor quality?

23    A.  Yes.

24    Q.  So the methods section, even though it

25  specifically doesn't discuss the limitations, allows

1   the educated reader to be able to assess what kind

2   of study this is and what would be potential risk --

3   the positives and negatives of this kind of study,

4   correct?

5           MR. BECKWORTH:  Objection.

6           MS. SPENCER:  You can answer.

7           THE WITNESS:  Yes.

8   BY MR. EHSAN:

9      Q.  So someone reading your article in 1986

10  would realize that it had, for what it was, data

11  that relates to a certain number of cases that you

12  report with certain restrictive limitations from the

13  methodology involved, but also nevertheless, that it

14  represented some data to take into consideration in

15  connection with the risk of abuse and addiction in

16  chronic opioid use --

17          MR. BECKWORTH:  Objection.

18  BY MR. EHSAN:

19     Q.  -- is that correct?

20          MR. BECKWORTH:  Sorry.  Objection.

21  Can I ask y'all a question real quick?

22          MR. EHSAN:  Sure.

23          MR. BECKWORTH:  I'm going to let you

24  choose since this is maybe a trial depo.  Do you

25  want me to lay out 16 different objections or are

Page 318

1    you good with "Objection"?

2                MR. EHSAN:  "Object to form" is fine.

3                MR. BECKWORTH:  Okay.  Very good.

4    Everybody else agree to that?

5                MR. COLEMAN:  Yes.

6                MR. BECKWORTH:  Brian?

7                MR. ERCOLE:  Yes.  "Object to form."

8                THE WITNESS:  Could you ask the question

9    again.

10   BY MR. EHSAN:

11        Q.  Sure.  Let me ask the question again.

12   So anybody reading this article would be able to

13   understand it represents data with certain

14   limitations about the risk of opioid addiction in a

15   group of patients, correct?

16                MR. BECKWORTH:  Objection.

17   BY MR. EHSAN:

18        Q.  Sorry.  Opioid addiction in a group of

19   patients?

20                MR. BECKWORTH:  Objection.

21                MS. SPENCER:  Can you go back and ask --

22   Let's start from square one.

23                THE WITNESS:  I'm confused too.

24   BY MR. EHSAN:

25        Q.  So if someone read your article in 1986,

Page 319

1   would they be able to understand that it provided

2   data on a group of 38 patients, correct?

3       A.  Yes.

4       Q.  And whether or not a certain number of

5   those patients received benefit from chronic opioid

6   therapy, correct?

7               THE WITNESS:  Yes.

8               MR. BECKWORTH:  Objection.

9   BY MR. EHSAN:

10      Q.  And whether or not a certain number of

11  those patients received -- or had problematic

12  behavior associated with their opioid use, correct?

13      A.  Yes.

14              MR. BECKWORTH:  Objection.

15  BY MR. EHSAN:

16      Q.  And all of that is laid out in the paper,

17  correct?

18      A.  Yes.

19      Q.  And specifically, if you look -- Oh, yes --

20  if you look at Table III on page 175 as paginated --

21              MR. BECKWORTH:  Objection.  Sorry.

22  I missed it.  I'm objecting because I didn't hear

23  the question.

24              MR. EHSAN:  I just asked him to look at

25  page 175.

1              MR. BECKWORTH:  I know you did.  I was

2    talking to his counsel, so I just lodged it to make

3    sure I didn't miss something.  I withdraw it.

4    BY MR. EHSAN:

5        Q.  If you're there, let me know, doctor.

6        A.  I'm here.

7        Q.  The article itself sort of lays out the

8    duration of use by the patients in the study,

9    correct?

10       A.  Yes.

11       Q.  And it also lays out the average morphine

12   milligram equivalent dose that the individuals were

13   taking in the study, correct?

14       A.  Yes.

15       Q.  By the way, in 1986 when this was published,

16   what were the available long-acting opioid

17   medications in the United States?

18       A.  I mean, to my recollection --

19              MS. SPENCER:  Only answer if you know.

20   If you recall.

21              THE WITNESS:  Yeah.  I don't recall.

22   BY MR. EHSAN:

23       Q.  Do you have a recollection that methadone

24   was available?

25       A.  Yes.

1      Q.  Besides methadone, can you think of any

2  other drugs?

3      A.  I can't, no.

4      Q.  Neither could I, but I just wanted to make

5  sure that we were on the same page.  So all of these

6  patients who were taking various medications, none

7  of them were on a long-acting opioid that is at

8  issue in this litigation, correct?

9      A.  Correct.

10      Q.  As a pain specialist, do you have a sense

11  or an experience that long-acting opioids are better

12  suited than short-acting or immediate-release

13  opioids for the treatment of chronic pain?

14      A.  That's a complex question.  I will say that

15  for some years after the advent of the long-acting

16  opioids, the pain expert community felt that they

17  were an advantage because of the likelihood of a

18  higher rate of adherence to the therapy.  Patients

19  would miss fewer doses because of the possibility of

20  sleeping through the night, and because patients

21  would have higher satisfaction.

22          But since that time, there have been

23  studies done trying to determine whether a long-

24  acting regimen and a short-acting regimen vary in

25  outcomes.  And the studies have never been able to

1  show that, to my knowledge.

2          So today -- if you're asking me today in

3  2019 is there good evidence that a regimen of long-

4  acting therapy is better than a regimen of short-

5  acting therapy, I don't think that evidence exists.

6     Q.  Let's talk a little bit about that evidence

7  that you alluded to.  Are there controlled --

8  placebo-controlled randomized clinical trials of

9  opioids going out beyond 52 weeks?

10     A.  Not to my knowledge, no.

11     Q.  Are there randomized placebo-controlled

12  clinical trials of any other pain medication we use

13  going out more than 52 weeks in assessment of pain?

14     A.  Not that I'm aware of.

15     Q.  So we're not in a world in which we have

16  randomized clinical trials that go on forever and

17  ever that could actually answer the question of what

18  happens to a patient in terms of efficacy and, you

19  know, potential side effects going out many years in

20  a controlled environment, correct?

21     A.  That's correct.

22     Q.  And there are lots of logistical reasons

23  why those studies haven't been done, correct?

24     A.  Yes.

25     Q.  Can you identify some?

1      A.   Yes.   It's very challenging to do a long-

2    term study of chronic opioid therapy against placebo

3    because a study like that, first of all, would be

4    very difficult to recruit patients to, patients that

5    would have to not get treated for a long period of

6    time.

7             It's also very challenging because the

8    population that may be treatable with opioids isn't

9    clearly defined.  As I said before, there's no

10   standard of a patient -- a type of patient with

11   chronic noncancer pain that should get an opioid.

12   So all of those questions about what the selection

13   criteria would be would be challenging to define.

14   It's not going to be a population.  It's going to be

15   individuals within that population.

16             It's also -- it's also difficult to

17   envision that a study would go out for a long time

18   without a high dropout rate.  And a high dropout

19   rate, particularly if it was unbalanced, more

20   dropouts among the placebo group than among the

21   active treatment group would make it very difficult

22   to do the analysis.

23             So the combination of difficult

24   recruitment, heterogeneity of the population, and

25   difficulty in maintaining the therapy over time, all

1    of that increases the challenge of a long-term study

2    tremendously.  And as you said, the studies of that

3    type have not been done.

4      Q.  So we're living in a world of imperfect

5    data; is that fair?

6      A.  That's absolutely fair.

7      Q.  Even though we don't have a randomized

8    clinical trial, placebo controlled going out for

9    52 weeks or more, we still do have data that can

10    inform the decision of a prescriber of whether or

11    not to prescribe an opioid both in terms of safety

12    and efficacy, correct?

13      A.  Yes.

14      Q.  And I think we talked about quality of

15    data.  Just because something is of lesser quality

16    doesn't mean that it has no value, but it has to be

17    taken in the context that it has more potential

18    shortcomings than if it was of a higher quality

19    nature; is that correct?

20      A.  It's a little bit more complex than that.

21    Because the quality of the data -- and I should say,

22    as you probably know -- that the field of evidence-

23    based medicine is very new.  It only began in the

24    1990s.

25             And the whole concept of evaluating the

1    quality of research, the quality of the methodology

2    of a piece of research in order to have a -- in

3    order to grade the level of evidence.

4              And the whole process of taking -- I'll

5    continue -- and the whole process of looking at high

6    methodological quality studies and lower

7    methodological quality studies and combining them

8    into what's called a grade of recommendation for

9    clinical practice, that's something that's now done

10   in the development of evidence-based guidelines.

11             But that didn't exist until recent

12   decades.  In other words, that's a new change in

13   medical practice.

14             So what you said is true in the sense

15   that a decision about using a therapy needs to be

16   based on whatever high quality data exists, even if

17   that high quality data doesn't provide much evidence

18   that informs long-term practice.

19             So, for example, a short-term efficacy

20   trial that demonstrates that the opioid works is

21   foundational information.  You have to have that to

22   know that the drug works.  But that trial doesn't

23   inform long-term practice very well because the

24   patients who are entered into that trial are not

25   like the patients who get long-term therapy.

1          And because the therapy only goes on for

2    sometimes two weeks and sometimes at the most three

3    months and you don't get the kind of information

4    that informs what's now called effectiveness.  In

5    other words, the real life ability of the drug to be

6    given to a patient in a way that is likely to

7    produce more benefit than risk.

8          That information, whether or not a drug

9    should be used long term, has to take that efficacy,

10   that high quality data, and combine it with all the

11   other information in the literature, including

12   expert testimony from people who just have

13   experience using the drug.

14   Q.  So you're good at expecting my follow-up

15   question.  So one additional piece of information

16   one could rely on after you have that foundational

17   piece would be the real world experience of

18   prescribers who have used the medicine in real world

19   patients, correct?

20   A.  Yes.

21   Q.  I think you mentioned several places in

22   your declaration that even if you had a long-term

23   study, because randomized clinical trials have a

24   very rigid structure to minimize confounding

25   variables, they don't necessarily translate directly

Page 327

1    to real-world patients because they may be much more

2    complicated or a mixed heterogenous group; is that

3    correct?

4        A.  That's correct.

5              MR. BECKWORTH:  Objection.

6              THE WITNESS:  That's correct.

7    BY MR. EHSAN:

8        Q.  And, in fact, in your paper, you speak

9    about the fact that you have -- or perhaps it was

10   elsewhere, so let me back up.

11             In your declaration, you talk about the

12   fact that you have experienced patients taking

13   long-term opioids for chronic noncancer pain who

14   have had significant relief from their symptoms,

15   at least in your clinical practice, correct?

16       A.  Yes.

17       Q.  And that means at least for that patient,

18   that the therapy worked, correct?

19       A.  Yes.

20       Q.  And that is some evidence that can be

21   communicated to other prescribers that they may

22   consider in making their own prescribing decision,

23   correct?

24       A.  You know, in our current era, you wouldn't

25   call that evidence.  You would call that sort of an

Page 328

1    expert testimony or an anecdotal observation.  So if

2    you're asking me, do anecdotal observations that are

3    analyzed by people who have experience help

4    physicians make decisions, the answer is yes.

5              That still happens today and even in an

6    era of evidence-based medicine, and I think that's

7    always going to happen because you can never get

8    enough evidence to actually inform all the varieties

9    of conditions that are encountered in clinical

10   practice.

11       Q.  And as someone who had by the '90s a

12   significant amount of experience in treating

13   patients with long-term opioid therapies, you were

14   considered one of those experts who could help

15   inform fellow physicians about the real world risks

16   and benefits of these medications, correct?

17       A.  Yes.

18              MR. BECKWORTH:  Objection.

19              THE WITNESS:  Yes.

20   BY MR. EHSAN:

21       Q.  And would it be fair to say you did in fact

22   take that endeavor to inform your fellow colleagues

23   about the risk and benefit of long-term opioid

24   therapy?

25       A.  Yes.

1      Q.   And during that time, to the best of your

2    knowledge at the time you were making statements,

3    did you always try to be truthful about what it was

4    you were saying?

5      A.   Yes.

6      Q.   And looking back at it today -- Well, let

7    me strike that and move --

8           Would you agree with me, doctor, that

9    medicine evolves?

10     A.   Yes.

11     Q.   You trained in neurology in the '80s, so

12   that was before TPA was available for the treatment

13   of stroke?

14     A.   Yes.

15     Q.   So I imagine that today how we treat a

16   stroke is very different than the way you may have

17   treated it in your residency training, correct?

18     A.   Yes.

19     Q.   That doesn't mean that what you did in the

20   '80s was bad or somehow you were doing something

21   wrong, rather that we have more sophisticated

22   approaches today than we did back then, correct?

23     A.   Correct.

24     Q.   Likewise, you may have made a statement

25   about, you know, what is the state of science in

1    1990, which may be very different because -- than

2    the statement you would make today because the

3    science has changed, correct?

4        A.   Correct.

5             MR. BECKWORTH:  Objection.

6    BY MR. EHSAN:

7        Q.   That doesn't make either statement false.

8    It just makes them appropriate for the time that

9    they were given, correct?

10       A.   Yes.

11            MR. BECKWORTH:  Objection.

12   BY MR. EHSAN:

13       Q.   So when you were talking to folks in the

14   context of discussions you had about chronic

15   long-term opioid use, you always gave them fair and

16   balanced information; is that correct?

17       A.   Yes.  I tried to.

18       Q.   And you've given those -- I just want to

19   separate two separate topic areas.  Because I think

20   there was some conflation here between CMEs, which

21   are continuing medical education events; is that

22   correct?

23       A.   Yes.

24       Q.   And promotional speaking engagement, okay?

25       A.   What are now called that.

Page 331

1      Q.  What are now called that?

2      A.  What are now called those.

3      Q.  Names change.  But we'll stick with the CME

4  first.

5      A.  Yes.

6      Q.  In the context of a CME, who had control

7  over the content?

8      A.  The speaker.

9      Q.  So if it was you who was speaking, it would

10  have been you, correct?

11      A.  Yes.

12      Q.  Now, is it possible for a pharmaceutical

13  company to directly or indirectly provide financial

14  support for a CME?

15      A.  Yes.

16      Q.  In your experience, has a pharmaceutical

17  company ever dictated to you the content of a CME

18  where you disagreed about a particular point?

19      A.  No.

20      Q.  And there are strict rules and regulations

21  about disclosures when it comes to a CME, correct?

22      A.  Yes.  And as I mentioned before, those too

23  have been evolving over the years.  Now they're

24  quite strict.  They were less strict in the '80s and

25  '90s.

Page 332

```
 1      Q.  I'm sorry.  Please finish.

 2      A.  I think that was the statement I wanted to

 3  make.  Thank you.

 4              MR. EHSAN:  And just to kind of drive

 5  this point . . .

 6              MS. SPENCER:  Are we done with the 1986

 7  article?

 8              MR. EHSAN:  For now, yes.

 9              (Portenoy Exhibit 32 was marked

10              for identification.)

11  BY MR. EHSAN:

12      Q.  Doctor, the reporter has handed you what's

13  been marked as 32, I believe?

14      A.  Yes.

15      Q.  Exhibit 32.  I'll give you as much time as

16  you like to look at it.  But just looking at the

17  cover, do you recognize what it is?

18      A.  Yes.

19      Q.  And what is your recollection of what it is.

20              MS. SPENCER:  I would give -- give me a

21  second to look at it and give him a moment to

22  familiarize himself with it.

23              MR. EHSAN:  Sure.

24              MS. SPENCER:  Thanks.

25              THE WITNESS:  Yes.
```

Page 333

1           MR. EHSAN:  I'm just waiting for your

2    counsel to be finished.

3           MS. SPENCER:  Sorry, just one moment.

4           MR. EHSAN:  I think you have her at an

5    advantage because she's not familiar with it,

6    so . . .

7           I will comment because this has nothing

8    to do with it.  You look a fair bit younger in the

9    picture.

10          MR. BECKWORTH:  You were.

11          MS. SPENCER:  Okay.

12   BY MR. EHSAN:

13      Q.  Doctor, if I understand this correctly,

14   this is a CME, or continuing medical education

15   program you and Dr. Payne put together, which has at

16   least a release date on this document of June of

17   2002; is that correct?

18      A.  Yes.

19      Q.  That's a good name for a pain specialist.

20      A.  Yes.

21      Q.  Now, in the second page of this, you will

22   see -- or just the backside -- it's double-sided --

23   it states, "This activity is funded through an

24   educational grant from Janssen Pharmaceuticals L.P."

25          Do you see that?

1      A.  Yes.

2      Q.  It goes on, "The content was developed

3  independently by the contributing faculty."

4           Do you see that?

5      A.  Yes.

6      Q.  Is that a correct statement?

7      A.  Yes.

8      Q.  And it goes on to have a discussion or a

9  "Dear Colleagues" letter signed by you and Dr. Payne;

10  is that correct?

11      A.  Yes.

12      Q.  And you state there, "Pain is a complex and

13  challenging phenomenon and varies in etiology and

14  presentation and requires individual treatment."

15           Do you see that?

16      A.  Yes.

17      Q.  Would you agree with that statement today?

18      A.  Yes.

19      Q.  If you go to what is numbered 7 in the

20  document, do you see there's a section titled,

21  "Curriculum committee and disclosures"?

22      A.  Yes.

23      Q.  And you are identified on the top right-

24  hand column, correct?

25      A.  Yes.

1      Q.  And there you identified all sources of

2   funding and current consulting agreements you have,

3   correct?

4      A.  Yes.

5      Q.  So this, even as of 2002, the -- a CME

6   would require disclosure of the grant funder as well

7   as the disclosure of any potential conflicts that

8   the curriculum committee members might have,

9   correct?

10     A.  Yes.

11     Q.  And is it your opinion that at any time a

12  CME course that you were involved in did not

13  adequately provide the positives and negatives

14  associated with the use of opioids in chronic

15  noncancer pain?

16     A.  I think that the courses that I did aimed

17  to do that, to present the balanced view.

18     Q.  I'm not asking about perfection, but at

19  least the idea was to present a fair and balanced

20  sense of the science as it relates to chronic -- or

21  use of opioids in chronic noncancer pain, correct?

22     A.  Yes.

23     Q.  Are you, sitting here today, aware of any

24  colleague -- Let me strike that and ask you this way.

25              Sitting here today, are you aware of any

1  CME course that you are not involved in that you

2  believe did not adequately represent the risk and

3  the benefit of opioid therapy in chronic noncancer

4  patients?

5          MR. BECKWORTH:  Objection.

6          MS. SPENCER:  You can answer.

7          THE WITNESS:  I can only speak to the

8  CME activities that I attended.  And I don't --

9  I never had that experience of watching a CME

10  program and feeling that it was presenting

11  information that was improper.

12  BY MR. EHSAN:

13     Q.  So at least based on your experience,

14  regardless of whether you gave the presentation or

15  you attended the presentation, you believed that

16  over time they have for their particular time period

17  provided an appropriate risk/benefit picture of

18  opioid therapy and chronic noncancer pain, correct?

19          MR. BECKWORTH:  Objection.

20          THE WITNESS:  Yes.  For CME activities,

21  I think that's true.

22  BY MR. EHSAN:

23     Q.  Is there a restriction on who can attend a

24  CME?

25     A.  No.

1      Q.  You, yourself have attended CMEs in which

2  other experts in the field of pain medicine were

3  giving the presentations?

4      A.  Yes.

5      Q.  Is there a Q&A session associated with

6  these CMEs?

7      A.  Usually, yes.

8      Q.  Did you ever feel like you couldn't

9  challenge a particular speaker if you felt like he

10  or she was misrepresenting any particular fact or

11  piece of literature?

12      A.  No.

13      Q.  Are there times where there's actually

14  heated debate or discussions within a CME about what

15  the literature does or doesn't show?

16      A.  I don't recall ever witnessing any.  There

17  would be no reason that it couldn't happen, of

18  course, but I've never seen one.

19      Q.  But this is meant to -- the CMEs are meant

20  to be an open scientific exchange between

21  professionals both presenting and in the audience,

22  correct?

23      A.  Yes.

24      Q.  Now, those are CMEs.  Now let's talk about

25  the promotional side of things.  I believe you said

1    that some of the promotional -- Well, strike that.

2              Have you had occasion to deliver

3    promotional speaking engagements?

4       A.  Once that dichotomy was formalized,

5    I didn't do any promotional activities, any

6    promotional lectures that I recall.  Prior to that

7    formalized distinction between promotional and CME,

8    I think some of the lecturing that I did would

9    probably be called promotional now.

10             Although I will say that I've never used

11   slides, for example, that were created by -- by an

12   industry contractor or by someone who was employed

13   by a company.  I would always use my own slides.

14             And I never gave a talk where I was

15   informed by either someone working for a

16   pharmaceutical company or someone working for a

17   medical education vendor about what to say and what

18   not to say.  I never have had that experience.

19             But having said that, as you know, the

20   rules about what you call CME and what you call

21   promotional are quite strict now.  And if you go

22   back in time prior to when those rules existed,

23   I probably gave some talks that would be called

24   promotional now, even though my activities, I always

25   felt, were representing my true opinion and I

1    controlled the content.

2        Q.  So let me try to unpack that.  So at least

3    in your experience, irrespective of whether CME or

4    non-CME, irrespective of what label it was, if you

5    gave a talk, in your mind, you presented the

6    scientific data fairly and appropriately; is that

7    correct?

8        A.  Yes.  I believe that's true.

9        Q.  With the caveat, of course, that the state

10   of science has evolved over time, correct?

11       A.  Yes.

12       Q.  Have you ever attended -- so we talked

13   about CMEs -- something that wouldn't be considered

14   a CME by today's standards wherein someone presented

15   material you felt were -- was inappropriate or

16   unbalanced in terms of the risk or the benefit for

17   the use of opioid therapy in chronic noncancer pain?

18               MR. BECKWORTH:  Objection.

19               MS. SPENCER:  You can answer if you

20   understand or --

21   BY MR. EHSAN:

22       Q.  I can ask again.

23       A.  No, I think I understand.  I don't think

24   that I can recall a lecture of that type.  So I

25   can't say that I actually personally observed that.

 1      Q.  So sitting here today, you never had any

 2  direct interaction in which either in a CME setting

 3  or non-CME setting, either as a speaker or a

 4  nonspeaker, i.e., in the audience, you were exposed

 5  to what you believe were unbalanced or inappropriate

 6  discussions of the risks and benefits of opioids in

 7  chronic noncancer pain, correct?

 8              MR. BECKWORTH:  Objection.

 9              THE WITNESS:  I can't remember -- I can't

10  recall observing that.  So I would agree with that

11  statement.

12  BY MR. EHSAN:

13      Q.  So I will try to break that down and ask it

14  simpler.  You never sat in any CME course in which

15  the presenter presented materials that were

16  unbalanced or inappropriate in light of the science

17  on use of opioids for chronic noncancer pain,

18  correct?

19              MR. BECKWORTH:  Objection.

20              MS. SPENCER:  Go ahead.  You can answer.

21              THE WITNESS:  Yeah.  Not that I can

22  recall.

23  BY MR. EHSAN:

24      Q.  Likewise, you never gave a CME in which you

25  presented information that was unbalanced or in any

Page 341

1   way inappropriate reflection of the scientific

2   literature as it relates to opioid use for chronic

3   noncancer pain, correct?

4       A.   Correct.

5       Q.   In the setting of the educational material

6   or promotional material speaking engagements, you

7   never attended a promotional speaking engagement in

8   which unbalanced or inappropriate information was

9   conveyed to the use of opioids for chronic noncancer

10  pain, correct?

11      A.   I don't recall doing that, right.

12      Q.   And likewise, to the extent some of your

13  speaking work may be considered promotional by

14  today's standards, in none of those instances did

15  you provide an unbalanced or inappropriate

16  assessment of the literature as it relates to opioid

17  use for chronic noncancer pain, correct?

18              MR. BECKWORTH:  Objection.

19              MS. SPENCER:  You can answer.

20              THE WITNESS:  Correct.

21  BY MR. EHSAN:

22      Q.   Now, when you publish an article, is it

23  your hope that physicians in the community would

24  read your paper?

25      A.   I think that's a complex question.  Depends

1    on the nature of the article.  The community varies

2    in terms of who you hope you're contributing to.  In

3    some cases, a piece of research, for example, is

4    being published in the hope that it's actually going

5    to be evaluated by a very small cadre of people

6    doing that kind of science because you're trying to

7    move the science forward.

8                When I write a paper that's a review

9    article, particularly a paper that's a review

10   article that includes guideline statements, then the

11   hope is that it disseminates more broadly, and you

12   have the hope of improving practice and helping more

13   patients by providing individuals with the skill set

14   that they didn't have before.

15   Q.  Specifically as it relates to your 1986

16   paper when you were hoping to start a discussion

17   about the use of opioids in chronic noncancer pain,

18   did you hope that it would have a broad audience?

19   A.  Yes.

20   Q.  So would you have found it problematic if

21   someone were to hand a prescribing physician a copy

22   of your article?

23   A.  No.  Although I think that, again, the

24   question there is context.  As I said before, if an

25   article was being handed in order to market a

1  specific product or with the intent of trying to

2  convince a prescriber to prescribe, without the

3  primary end being to educate that person or to have

4  that patient -- that person more aware -- raising

5  the consciousness of the potential -- the need to

6  rethink opioid therapy, which was really the goal of

7  that early, early paper, it was out there to say, We

8  think this because the stigma attached to opioids,

9  the risk profile that you think exists may be

10  exaggerated and you may be denying large numbers of

11  patients with the potential of some pain relief by

12  having a better understanding of the pharmacology

13  and the evidence.

14         If that was the aim of distributing the

15  paper, that would be fine, of course.  If the aim

16  was to convince the prescriber to prescribe as part

17  of a marketing strategy, I would have a problem with

18  that.

19     Q.  Would you agree with me that the first

20  thing that would have to happen is for the prescriber

21  to read the article, correct?

22     A.  The first thing for what to happen?

23     Q.  In order for it to have any impact

24  whatsoever on the prescriber, the prescriber would

25  have to read the article, correct?

1      A.   I'm not sure that I can answer that.  You

2    know, you're asking a challenging question.   In

3    other words, to what extent are full articles of

4    this type, reviews, read and digested and analyzed

5    by people who don't have the same expertise versus

6    to what extent are they reading the abstract and

7    then looking at the guidelines.  I don't really know

8    the answer.  I can't really -- I can't really answer

9    that for you.

10     Q.   So sitting here today, you have no idea

11   whether anyone was provided any of your articles as

12   part of an attempt to market, quote/unquote, to him

13   or her -- actually was influenced one way or the

14   other by the inclusion of your article in that

15   material; is that fair?

16     A.   I would have no way --

17             MR. BECKWORTH:  Objection.

18             Go ahead.

19             THE WITNESS:  I would have no way of

20   knowing whether or not they were influenced.

21   BY MR. EHSAN:

22     Q.   So to address Mr. Beckworth's objection,

23   sitting here today, do you have any knowledge of any

24   prescriber being influenced one way or the other by

25   the inclusion of any of your articles in any

1    marketing material presented to that prescriber?

2                  MR. BECKWORTH:  Objection.

3                  THE WITNESS:  I have --

4                  MS. SPENCER:  You can answer.

5                  THE WITNESS:  I have no evidence -- no

6    information about that specifically, that's true.

7    BY MR. EHSAN:

8        Q.  But you personally prefer that that not be

9    done?

10       A.  As part of marketing?

11       Q.  Yes.

12       A.  Yes.  I would personally prefer that my

13   articles not be distributed as part of marketing,

14   but rather as part of education.

15       Q.  Would you agree that physician education

16   can itself increase physician awareness and

17   potentially lead to more prescribing?

18       A.  Yes.

19       Q.  So, therefore, educating physicians and

20   marketing don't have to necessarily be separate and

21   mutually exclusive of one another, correct?

22                  MR. BECKWORTH:  Objection.

23                  THE WITNESS:  I'm going to have to ask

24   you to deconstruct that.  I'm not sure how to

25   interpret that question.

1    BY MR. EHSAN:

2        Q.  Sure.  If -- for example, if you are saying

3    currently in the United States there are certain

4    chronic -- or certain cancer patients who are

5    undertreated for their pain.

6                So if you were to educate those

7    physicians who see those patients about the benefits

8    of opioid therapy for that cancer pain, that would

9    necessarily lead to some additional prescriptions

10   being written because now you're treating an

11   untreated, as of the moment, population, correct?

12       A.  I would say that would hopefully lead to

13   that.  It may not --

14       Q.  It may --

15       A.  -- lead to that.  One would hope that it

16   would.

17       Q.  So purely educating a physician can itself

18   be something that translates to that physician

19   reassessing his or her patients either to potentially

20   increase or decrease depending on what the exact

21   nature of the education piece is of -- or strike

22   that.

23                Educating a physician can help that

24   physician make better patient decisions as it

25   relates to prescribing, correct?

Page 347

1      A.  Correct.

2      Q.  And you have no problem with that, correct?

3      A.  I -- Correct.  I don't have a problem with

4   that.

5      Q.  And are you -- I know you were shown some

6   documents which I've never seen before.  And I

7   raised this -- Strike that.

8           You mentioned context is important.

9   Do you recall that testimony?

10     A.  Yes.

11     Q.  So sometimes you were shown in this

12  deposition documents you'd never seen before,

13  correct?

14     A.  Correct.

15     Q.  Some of those were internal company

16  documents, correct?

17     A.  Correct.

18     Q.  And they used language that you were

19  specifically pointed to, correct?

20     A.  Yes.

21     Q.  Do you have any personal knowledge of why

22  particular words were used in any of those documents?

23     A.  No.

24     Q.  Do you have any understanding of the

25  natural -- or strike that.

1             Do you have any understanding of the

2    course of business in which the companies maintain

3    or assess or internally -- Strike that too because

4    it gets compound.

5             Do you have any sense of what the

6    companies were trying to achieve with any of the

7    documents that you read beyond just the words that

8    were there and being asked to interpret those words

9    as best as you could?

10            MR. BECKWORTH:  Objection.

11            MS. SPENCER:  You can answer.

12            THE WITNESS:  I had not seen those

13   documents before.  And the understanding that I said

14   when I was here just reflected my interpretation of

15   the plain language of the document.

16            I have no information about what went --

17   what went before that document in terms of the

18   process by which the document was created or the

19   thinking that went into the policies in the document

20   or the statements in the document.  But I just

21   looked at the document and commented based on that.

22   That's all my information.

23   BY MR. EHSAN:

24   Q.  Would it be fair to say you lacked any

25   context for the document beyond the written word of

1    the document?

2                    MR. BECKWORTH:  Objection.

3                    THE WITNESS:  Yes, that's true.

4    BY MR. EHSAN:

5        Q.   Would you have liked to have seen some

6    context to better understand perhaps why certain

7    length was used in certain documents?

8        A.   I think that's again a complicated question.

9    The question is, what am I being asked in -- as you

10   know, in today's deposition, I was being asked

11   whether or not the use of materials as part of a

12   marketing strategy -- in other words, whether or not

13   the events depicted on this document, were they to

14   occur -- would represent a problem for me.  And I

15   acknowledged that they would be.

16                    I think if you were asking me what I

17   thought about the actual marketing campaign and the

18   outcomes it had, I'd need a lot more information and

19   context.  But I wasn't judging that today.

20       Q.   But if you don't like a particular word,

21   for example, you have no basis to know why that

22   particular word was used, correct?

23       A.   Right.

24       Q.   And in order to know if that word was just

25   jargon versus have some deeper meaning, you would

Page 350

1    need more context, correct?

2        A.  Yes.

3        Q.  And you certainly don't have any idea what

4    was in the minds of the individuals who prepared

5    that material, correct?

6        A.  Right.  I have no idea.

7        Q.  I think you mentioned somewhere in your --

8    in your declaration that there was a term "street

9    addicts" that you regretted it; do you recall that?

10              MS. SPENCER:  Where are we?

11              MR. EHSAN:  That's a good question.

12              MS. SPENCER:  You know, maybe I can

13   help.

14              MR. EHSAN:  If you can just search, yes.

15              MS. SPENCER:  Perhaps paragraph 12?

16              MR. EHSAN:  That may well be true.

17              MS. SPENCER:  Or at least that's -- Yes,

18   it's paragraph 12.

19   BY MR. EHSAN:

20       Q.  My question was a simple one.  You, in

21   retrospect, wished you had used a slightly different

22   word, right?

23       A.  Yes.

24       Q.  But there was no sinister intent behind the

25   use of that word, correct?

Page 351

1      A.  Correct.

2      Q.  You were trying to communicate a concept

3  using words that, in retrospect, there could have

4  been better words chosen, correct?

5      A.  Correct.

6      Q.  So context matters in that -- in terms of

7  interpreting what those words mean and your intent

8  associated with them, correct?

9      A.  Yes.

10      Q.  Now, I want to go to your paragraph 9,

11  which is -- and specifically page 8.  And I believe

12  this is a table from your 1990 paper; is that

13  correct?

14      A.  Yes.

15      Q.  And you here identify, I think, a -- and

16  I'm using my word here -- a framework for evaluating

17  and potentially prescribing and monitoring a patient

18  on chronic opioid therapy; is that correct?

19      A.  Potentially prescribing opioid therapy to a

20  chronic noncancer pain patient, yes.

21      Q.  So this is a framework by which if you're

22  going to prescribe a patient opioid for chronic

23  noncancer pain, this framework would allow you to go

24  through that process as a prescriber, correct?

25      A.  Yes.

1      Q.  Now, I was struck by the fact that this was

2   written in 1990, which is 28 years ago.  But sitting

3   here today, would you agree with me that this is

4   actually the same process you would follow in 2019?

5      A.  Yeah.  I think overall as a framework, yes,

6   it has stood up to the test of time.

7      Q.  So while other things may have changed,

8   some aspects of practice of medicine haven't really

9   changed a whole lot in the sense that assessing your

10  patient properly, following them carefully, and

11  assessing the benefits and the risk as you observe

12  it in that patient is always a good idea, correct?

13     A.  Yes.

14     Q.  Now, looking at this set of -- or this

15  framework, would you agree with me that a primary

16  care physician would be able to follow Steps 1

17  through 11?

18     A.  Yes.  I think the primary care physician

19  would have to have education, would have to have

20  understanding of opioid pharmacology in order to

21  prescribe the drug safely, to know what dose to

22  select, to how to increase the dose, how to treat

23  the side effects.

24          And they'd have to have some

25  understanding about how to assess the potential for

1    abuse and addiction, at least in order to avoid

2    those -- prescribing to the patients who had a high

3    risk.  So it presumes a certain skill set on the

4    part of the primary care doctor.

5        Q.  And presumably a -- not -- Let me back up

6    and ask it this way.

7            Do all primary care physicians prescribe

8    opioids?

9        A.  No.

10       Q.  Even amongst those who prescribe opioids,

11   do all of those individuals prescribe Schedule II

12   narcotics?

13       A.  No.

14       Q.  So it would take someone who make -- it

15   would take the primary care physician a conscious

16   effort to be able to and, in fact, prescribe a

17   Schedule II narcotic, correct?

18       A.  By "conscious effort," do you mean a

19   decision?

20       Q.  A decision.

21       A.  Self-assessment of the skill set saying,

22   I'm able to do this and then a decision to try it?

23       Q.  Yes.

24       A.  Yes, I would agree with that.

25       Q.  So it's not like, for example, you know --

1    Let me strike that.

2            It's not like prescribing, for example,

3    a nonsteroidal because that's something almost every

4    person would prescribe?  This is a self-selected

5    group of individuals who may want to prescribe a

6    Schedule II narcotic, yes?

7        A.  Yes.  I think there are commonalities even

8    in the prescribing of an NSAID, a nonsteroidal of

9    the type you mentioned.  You still have to know

10   whether or not it's likely to be safe in the patient

11   that you're prescribing.  You still have to have a

12   skill set for selecting the drug and giving the

13   right dose.

14           But the complexity of using opioids

15   safely and effectively is much higher than the

16   complexity to use an NSAID safely and effectively.

17   So the skill set that the clinician would have to

18   perceive that he or she possessed would have to be

19   greater in order for that decision to be made to go

20   forward with therapy.

21       Q.  And in the case of the opioid -- actually,

22   I should take that back.  In the case of either, at

23   a minimum, you would expect a prescriber to read the

24   prescribing information for the medication, correct?

25       A.  I don't know honestly whether or not the --

Page 355

1    and by "prescribing information," I'm assuming you

2    mean the package insert.

3         Q.   Yes.

4         A.   And if you're asking me, is it standard

5    practice for every -- for the prescribers to read

6    the package insert before they decide to use a drug,

7    I can't answer that question.  I don't know if

8    that's true.

9         Q.   No, my question was a little bit more

10   generic than that.  Is it your -- is it your -- as a

11   person who regularly treats pain patients, is it

12   your hope that a person who's going to endeavor to

13   start prescribing Schedule II narcotics, that he or

14   she would take the time to actually read the package

15   insert or label for the medication he or she's going

16   to prescribe to his or her patient?

17              MR. PATE:  Object to form.

18              THE WITNESS:  I would say it's my

19   expectation that they would have the information

20   necessary to prescribe the drug safely and

21   effectively.  That information could be in the

22   package insert.  It could be in other educational

23   materials.

24   BY MR. EHSAN:

25        Q.   So it is your hope that anyone who's going

1   to prescribe a Schedule II narcotic would have the

2   necessary skills and efficiency to actually

3   prescribe that medication to a patient, correct?

4        A.  Correct.

5        Q.  And if that person has the necessary skill

6   and knowledge to prescribe, would that necessarily

7   mean that he or she has an understanding of the

8   risks and the benefits of the medication?

9        A.  Yes.

10            MR. PATE:  Object to form.

11  BY MR. EHSAN:

12       Q.  Therefore, if someone was to follow the

13  Dr. Portenoy method of prescribing an opioid --

14            MS. SPENCER:  I'm going to object to

15  that.  I don't know what you're describing as "the

16  Dr. Portenoy method."

17            MR. EHSAN:  Sure.  Let me back up.

18  BY MR. EHSAN:

19       Q.  If someone were to take the approach or

20  have the skill set that you identified before

21  prescribing, he or she would already know both the

22  benefits, or potential benefits, as well as the

23  potential risks of the medication, correct?

24            MR. PATE:  Object to form.

25            MS. SPENCER:  You can answer.

1                  THE WITNESS:  Yes.  But again, I'd like

2      to point out that it's a complex and evolving

3      situation.  The guidelines that are taught now or

4      should be taught in terms of the skill sets required

5      for safe and effective prescribing are different

6      than these guidelines and are different than the

7      guidelines that predated those.

8                  So the knowledge of what constitutes

9      safe and effective prescribing changes as we learn

10     more about the drug, we get more experience with the

11     drug.  And that's one of the challenges with opioids.

12     There are types of side effects of opioids that now

13     are of concern that didn't even raise concern in the

14     1980s.  There was nothing known about them.

15                 So I think the bottom line is that the

16     answer to your question on my part would be, yes,

17     you have to know that.  But it's not a simple

18     process.  It's an evolving question.

19                 And there's always the question about

20     what is the core knowledge, what is the essential

21     knowledge versus less essential knowledge that the

22     primary care doctor, for example, would need to have

23     in order to prescribe.

24     BY MR. EHSAN:

25          Q.  And I appreciate your -- I appreciate your

1    caveat.  So let me try to ask a better question.

2              At any given point in time, a physician,

3    by your assessment, who is adequately prepared to

4    prescribe the medication would know the risks and

5    the benefit of the medication, correct?

6              MR. PATE:  Object to form.

7              THE WITNESS:  They would know -- they

8    should know the expected risk, the common risks.

9    They may not know the risks that -- every risk

10   that's listed in the package insert, which as you

11   know from reading many package inserts are extensive

12   lists of risks.  Most of which are so uncommon that

13   we have no sense that we need to inform the patient

14   about.

15             They may not know about risks that are

16   beginning to appear in the literature, but are not

17   common risks or are not commonly recognized risks

18   yet across the broad universe of prescribers.

19             So to simply say they need to know the

20   risks and the benefits, I think you do have to

21   attach caveats to them.  They need to know what the

22   expected benefit would be and they need to know how

23   to achieve that expected benefit pharmacologically,

24   which means they need to know how to dose and they

25   need to know how to treat side effects.

1           And they also need to know what the risk

2    profile is and how to monitor for the common risks,

3    including the pharmacological risks like constipation

4    and mental clouding and the risks that I call

5    abuse-related risks, which would be aberrant

6    drug-related behavior that may indicate addiction,

7    it may indicate drug abuse, it may indicate a

8    comorbid psychiatric disorder, it may even indicate

9    diversion.  That they need to know.

10   BY MR. EHSAN:

11      Q.  And would it be fair to say that even if

12   you know the benefits of the medication and the risk

13   of the medication, the individual statistics are

14   always zero or one.

15           And let me clarify what I mean.  The

16   medication will either work or it won't work; is

17   that correct?

18      A.  That's correct.

19      Q.  And you either will have a side effect or

20   you won't have a side effect, correct?

21      A.  That's correct.

22      Q.  So -- and I bring this back to if you have

23   a 3 percent mortality risk of surgery, that doesn't

24   mean 3 die, 3 percent.  That means 3 people die

25   100 percent and 97 people don't die at all.  That's

Page 360

1    an important facet.

2              So even if you understand the general

3    literature, you still don't necessarily know how

4    your patient's going to, in fact, react positively

5    or negatively to the medication you're prescribing,

6    correct?

7        A.  Right.

8        Q.  And that is part and parcel of your

9    recommendation to continue to monitor the patient

10   for the negative aspects as well as the positive

11   aspects of treatment, correct?

12       A.  Correct.

13       Q.  And would you agree with me that the

14   package insert includes all the risks of the

15   medication, at least known or known enough for the

16   FDA to allow the manufacturer to put it in the label?

17              MR. BECKWORTH:  Objection.

18              THE WITNESS:  Yes.  I would agree with

19   that.

20   BY MR. EHSAN:

21       Q.  So one place to get the risk information

22   and all its details would be in the package insert,

23   correct?

24       A.  Yes.

25              MR. BECKWORTH:  Objection.

Page 361

1   BY MR. EHSAN:

2       Q.  And I think you had mentioned that up -- in

3   the mid 2000s, industry didn't do enough to step up

4   and recalibrate its message as it relates to the

5   risk of abuse associated with opioids.

6                   Do you recall that testimony?

7       A.  Yes.

8               MR. EHSAN:  I want to show you a product

9   label.

10                  (Portenoy Exhibit 33 was marked

11                   for identification.)

12  BY MR. EHSAN:

13      Q.  Doctor, I'll just represent to you that

14  this is a package insert for Duragesic transdermal

15  fentanyl from 2005.

16              I want to ask you only about the boxed

17  warning, so you don't need to --

18      A.  Okay.

19              MS. SPENCER:  Can he just take a look

20  at --

21              MR. EHSAN:  Sure, by all means.

22  BY MR. EHSAN:

23      Q.  I guess my first question would be, is this

24  consistent with the label you recall for this

25  medication circa 2005?

Page 362

1        A.  Yes.

2              MR. BECKWORTH:  Does it have a date on

3   it somewhere?

4              MR. EHSAN:  At the very end, I believe

5   it should.  Yes.  It says "Janssen 2003."

6              MR. BECKWORTH:  Well, that's a copyright

7   for your logo.  That doesn't indicate where this

8   document came -- what year it might be.

9              MR. EHSAN:  Let me go back up higher.

10             MS. SPENCER:  I would agree that that's

11  important.

12             MR. EHSAN:  Well, I will represent that

13  this is the label for 2005.  But that's okay.  We

14  can just pull up the label online and I will let you

15  confirm from the FDA's actual website that is, in

16  fact, the label for it.

17             MR. BECKWORTH:  Well, so just so it will

18  help you out and get through this --

19             MR. EHSAN:  Uh-huh.

20             MR. BECKWORTH:  -- you're going to pull

21  up a label from the website that is for a specific

22  year?

23             MR. EHSAN:  Yes.

24             MR. BECKWORTH:  Or for just the label as

25  it is today?

Page 363

1                      MR. EHSAN:  The label for 2005.

2                      MR. BECKWORTH:  Okay.  And so are you

3    wanting him to read that versus this one?

4                      MR. EHSAN:  No.  To confirm that the

5    boxed warning is identical.  I'm not looking for the

6    rest of the document.  I'm only doing this just so

7    that you don't think that I am trying to

8    misrepresent something.

9                      MR. BECKWORTH:  And just to be clear,

10   I'm not suggesting you are.

11                     MS. SPENCER:  Yeah.

12                     MR. BECKWORTH:  I just have no way to

13   know what you're saying is actually correct.

14                     MS. SPENCER:  And likewise, I had no

15   reason to believe that you were trying to

16   misrepresent anything either, just that I can't

17   allow my client to adopt a date as of 2005 unless he

18   can say so with absolute certainty that that's when

19   it came from unless he can confirm that it is

20   identical.

21                     And respectfully, I can't let him adopt

22   a document as from 2005 just based on the box

23   information.  I mean, if it's that important that

24   it's from 2005, he would need to confirm that the

25   entirety of the document is from 2005.

Page 364

```
 1               MR. EHSAN:  So it's your position that
 2  he can't -- Well, let me ask the question of the
 3  doctor.
 4  BY MR. EHSAN:
 5       Q.  Did you prescribe Duragesic in the 2005
 6  time period?
 7       A.  I think it's highly likely that I did.
 8       Q.  Do you recall the labeling for Duragesic in
 9  2005?
10       A.  No.
11       Q.  Then my problem is, the FDA's website has
12  this document.  So you're saying that I can't trust
13  the FDA because the FDA didn't label the . . .
14               MS. SPENCER:  Well, if the FDA website
15  says that it's from 2005, then I can allow him to
16  agree with you that the FDA website says it's from
17  2005.
18               MR. EHSAN:  That's fine.
19               MS. SPENCER:  But if he doesn't have a
20  recollection that that's when it's from, I cannot
21  allow him to adopt as his recollection that -- and
22  that he agrees it's from 2005.
23               MR. EHSAN:  That's fine.  I will just
24  represent to you.
25               MS. SPENCER:  If I can just finish.
```

Page 365

```
 1              MR. EHSAN:  Sure.
 2              MS. SPENCER:  I'll allow him to accept
 3    that that's what the website says.  And even if
 4    that's what you say the website says.  But I just
 5    can't allow him to say, Yes, this is the document
 6    from 2005.
 7    BY MR. EHSAN:
 8       Q.  I'm not asking the question whether this
 9    document is from 2005.  I just want to orient you
10    that -- I will represent to you it's from the mid
11    2000s but you don't have to take my word for it.
12       A.  Right.
13       Q.  Now, doctor, looking at the first bolded
14    section, is that what is commonly referred to as a
15    boxed warning?
16       A.  Yes.
17              MR. BECKWORTH:  And I'm going to object
18    to using a document referencing any date when it's
19    not substantiated.
20    BY MR. EHSAN:
21       Q.  Doctor, could you read the first bulleted
22    paragraph, please.
23       A.  "Duragesic contains a high concentration of
24    a potent Schedule II opioid agonist, fentanyl.
25    Schedule II opioid substances which include
```

1    fentanyl, hydromorphone, methadone, morphine,

2    oxycodone, and oxymorphone have the highest

3    potential for abuse and associated risk of fatal

4    overdose due to respiratory depression.  Fentanyl

5    can be abused and is subject to criminal diversion.

6    The high content of fentanyl in the patches . . .

7    may be a particular target for abuse and diversion."

8        Q.  Would you agree with me, doctor, that

9    that's a pretty succinct statement regarding

10   potential risk of abuse, diversion, and even

11   respiratory problems associated with the use of

12   Duragesic?

13       A.  Yes.

14       Q.  If this was the boxed warning in the 2005

15   label, would you agree with me that in the mid

16   2000s, the drug companies had, in fact, put out

17   clear information in their label that identifies the

18   potential risk of abuse and/or overdoses with

19   Duragesic?

20       A.  Yes.

21       Q.  And is that the kind of thing you would

22   want to see?

23       A.  Yes.

24       Q.  If you go down just a little bit further,

25   it states that "Duragesic is indicated for the

Page 367

1    management of persistent," underlined, comma,

2    "moderate to severe chronic pain that:"

3              Do you see that?

4       A.  Yes.

5       Q.  And the first bullet says, "requires

6    continuous around-the-clock opioid administration

7    for an extended period of time, and" -- both

8    conditions -- "cannot be managed by other means such

9    as nonsteroidal analgesics, opioid combination

10   products, or immediate-release opioids."

11             Did I read that correctly, doctor?

12      A.  Yes.

13      Q.  So if a doctor were to prescribe this

14   medication on-label, i.e., according to the

15   instruction provided in the label, that would mean

16   that it would only be prescribed for a patient that

17   had already failed other medication therapies,

18   including opioids, and required around-the-clock

19   opioid therapy, correct?

20      A.  Yes.

21      Q.  So this would be unlikely to just be

22   someone's first prescription for an opioid, correct?

23      A.  Correct.  If they were to follow the label.

24      Q.  So would you agree that a physician who was

25   going to prescribe a Duragesic patch would have

1   available to him or her this warning in bold with

2   every package that he or she had -- Strike that.

3            The prescribing physician who was going

4   to prescribe Duragesic had available to him or her

5   this language in the prescribing information,

6   correct?

7        A.  Yes.  It would be available -- it used to

8   be available in a book called the PDR.  And then it

9   was available online.

10       Q.  Right.  So it was available in a book

11  called the Physician's Desk Reference, correct?

12       A.  Yes.

13       Q.  I'm not sure about 2005, but at some point

14  it became available online, correct?

15       A.  Correct.

16       Q.  It is also actually folded and included

17  with the medication itself, correct?

18       A.  Correct.

19       Q.  Would you agree, doctor, that the

20  information presented in this label would be an

21  adequate warning or adequate transmittal of

22  information regarding the risks of Duragesic to a

23  prescriber who is going to prescribe it for a

24  patient?

25       A.  I think the -- I would just hesitate on the

1    word "adequate."

2            So it would certainly alert the

3    physician that there are inherent risks that can be

4    very significant with this drug, including risks on

5    the abuse and addiction side and the risks on the

6    pharmacological side such as respiratory depression.

7            So a physician who read this and

8    absorbed this should be alerted that the drugs

9    are -- that the decision to prescribe is a

10   significant decision with the potential for serious

11   toxicity.  And then you would hope that that

12   consciousness would translate into a comprehensive

13   assessment of the patient so that the physician can

14   make a judgment about what the risk versus benefit

15   would be in that individual.

16      Q.  And sitting here today, do you have a

17   recollection of other opioid drugs having -- other

18   Schedule II narcotics having similar language and

19   boxed warnings sometime in the 2000s?

20           MR. BECKWORTH:  Objection.  What drugs?

21           MR. EHSAN:  Schedule II opioids.

22           MR. BECKWORTH:  Janssen drugs or other

23   people's?

24           MR. EHSAN:  Let me ask my question if

25   you don't mind.

Page 370

 1                    MR. BECKWORTH:  Sure.

 2                    MR. EHSAN:  You can object if you like.

 3     BY MR. EHSAN:

 4        Q.  Did you prescribe Schedule II narcotics in

 5     the 2000s?

 6        A.  Yes.

 7        Q.  Are you aware generally of the labeling for

 8     those medications?

 9        A.  Yes.

10        Q.  Do you recall having seen similar language

11     in boxed warnings for other Schedule II narcotics in

12     the 2000s?

13        A.  Yes.

14        Q.  And do you have occasion to prescribe --

15     Strike that.

16                    Now, when you were talking about

17     promotional speaking engagements, do you have an

18     understanding of what the requirements for those

19     promotional speaking engagements are today?

20        A.  I can't say that I do, no.

21        Q.  Would it surprise you to know that the

22     labeling dictates what can be talked about in a

23     promotional speaking engagement?

24                    MR. BECKWORTH:  Objection.

25                    THE WITNESS:  I wouldn't be surprised.

1    I think that -- I didn't know that the labeling

2    circumscribed what could be said.  But I'll accept

3    what you say.  And it seems reasonable.

4    BY MR. EHSAN:

5        Q.  So let me just ask the question more --

6    Because you haven't given a promotional speaking

7    engagement since that became an official separation

8    from that -- from CMEs, you have no basis to know

9    what is dictated or is not dictated in a promotional

10   speaking engagement in terms of content, correct?

11       A.  That's true.

12       Q.  So you would not know either, for example,

13   if the label is actually handed out to physicians,

14   correct?

15       A.  I wouldn't know.

16       Q.  And certainly if the label containing a

17   boxed warning like the language that we just read

18   for Duragesic was included in material, would you

19   agree that that will go towards presenting the

20   downside or the risks associated with the opioid for

21   the audience?

22       A.  Yes.

23             MR. EHSAN:  Now, I was told that 6:30

24   would be a good time for a break for you.  So I'm at

25   a natural stopping point.

1          MS. SPENCER:  If it's a natural stopping

2     point, because it's not an essential time, but if

3     it's a natural time it works for me.

4          MR. COLEMAN:  We don't need to get to

5     essential.

6          MS. SPENCER:  Fair enough.

7          MR. EHSAN:  Why don't we take a break.

8          THE VIDEO OPERATOR:  Off the record,

9     6:30.

10               (Recess at 6:30 p.m.,

11               resumed at 7:13 p.m.)

12          THE VIDEO OPERATOR:  Back on the record,

13     7:13.

14     BY MR. EHSAN:

15     Q.  Dr. Portenoy, I wanted to ask you a couple

16     more questions about just general treatment of

17     patients with chronic pain.  Do you believe that in

18     your practice, chronic opioid use has helped some of

19     your patients who suffer from chronic noncancer

20     pain?

21     A.  Yes.

22     Q.  Has it helped some of them significantly?

23     A.  Yes.

24     Q.  Has it helped some of them significantly

25     over a period of time?

1       A.  Yes.

2       Q.  Do you believe that, knowing everything

3   that you know today, there are still patients who

4   are appropriate for long-term treatment with chronic

5   opioid therapy?

6       A.  Yes.

7       Q.  Including in a noncancer setting?

8       A.  Yes.

9       Q.  Do you have any examples you can think of

10  of a patient that's been a particular success story,

11  not providing names or specific --

12              MS. SPENCER:  I was going to say --

13                  (Court reporter interruption.)

14  BY MR. EHSAN:

15      Q.  Do you have any examples in mind of a

16  patient who did not have -- who had chronic

17  noncancer pain who you recall received significant

18  benefit from chronic opioid therapy that you can

19  share without any of the specific identifying

20  details?

21      A.  Yes.  Well, I can share that the very small

22  practice I currently have that I mentioned before

23  consists of about 25 patients whom I've been

24  treating for between 15 and 20 years with opioids,

25  almost all of them with Schedule II opioids.

1                    I have a patient, for example, who was

2     involved in a serious motor vehicle accident about

3     20 years ago, had multiple orthopedic injuries,

4     chronic deformity of her foot, and multiple sites of

5     pain, musculoskeletal pain related to the injury,

6     who, on opioid therapy, high-dose opioid therapy,

7     was able to be the president of her own company,

8     maintain a family life, essentially have a normal

9     life, and as a result of the opioid therapy, she

10    will tell you, and any effort to lower the dose of

11    the opioid immediately causes her pain to flare.

12                   I have another patient who has a sort of

13    an -- he's a man in his 50s and he has an accelerated

14    problem of osteoporosis and degenerative spine

15    disease, which you see on MRI.  And he has severe

16    pain in the neck, the back, and the arms.  And he

17    has been on high dose opioid therapy for about

18    20 years.  And he was never able to return to work

19    as an attorney.  However, he has been able to live

20    with his family, to raise his family with his wife.

21    His wife works.  He's been a stay-at-home dad, and

22    he has a good quality of life which he attributes

23    very emphatically to the fact that he continues to

24    have access to opioid drugs.

25                   So all of these patients that I have are

Page 375

1    of that ilk.  People that I would swear benefit from

2    chronic opioid therapy at the doses that I've used

3    for them.  And that periodically when I've tried to

4    lower the dose, get worse.  They get more pain and

5    their function declines.

6        Q.  So not only have some of your patients

7    received long-term pain relief from chronic opioid

8    use, but some of them have increased function as a

9    result of chronic opioid use, correct?

10        A.  Right.  There's no question about that.

11        Q.  My understanding is your mother has been on

12    chronic opioid therapy -- now, I have an article in

13    case you find this to be intrusive that actually

14    talks about it, but --

15        A.  I have my mother's permission.

16        Q.  Okay.  With that in mind, is it -- is my

17    understanding correct that your mother's been on

18    long-term chronic -- long-term opioid therapy for

19    chronic pain?

20        A.  Yes.

21        Q.  This is noncancer pain, correct?

22        A.  Yes.

23        Q.  And she has had success with it?

24        A.  Yes.  Oh, yes.

25        Q.  And would you say that you are comfortable

1    with her taking chronic opioid therapy for her pain,

2    given the benefit she's received from it?

3        A.   Oh, yes.

4        Q.   And she's taking opioids for arthritis,

5    correct?

6        A.   Yes.

7        Q.   And as far as, at least the article

8    indicated, she has not had any indicia of abuse or

9    addiction, correct?

10       A.   Correct.

11       Q.   Now, if you look at patients -- or in your

12   experience patients who are undertreated or

13   inappropriately treated for severe pain, can they

14   suffer from depression?

15       A.   Yes.

16       Q.   Can they -- can they have problems holding

17   down a job?

18       A.   Yes.

19       Q.   Can they have problems with activities of

20   daily living?

21       A.   Yes.

22       Q.   Can they become essentially bedbound?

23       A.   It's possible.

24       Q.   Have you, in your experience, seen any

25   patients who began displaying aberrant behaviors

1    such as criminality when their pain wasn't

2    adequately treated?

3         A.  I didn't hear the question.

4         Q.  Sure.  In your experience, have you

5    personally or have you heard of patients who have

6    displayed criminal behavior because their pain was

7    undertreated?

8         A.  That's a complex question.  Very rarely.

9    Really in the realm of two or three cases that I

10   recall, I've had patients engage in aberrant

11   behavior that I thought included diversion or

12   included such egregious aberrant behavior that it

13   crossed the line into criminality.

14              I could not tell you that that behavior

15   occurred because they had unrelieved pain.  I think

16   they had pain.  But I think attributing their

17   behavior to the pain is not possible to say.  And so

18   I couldn't say yes to that.

19        Q.  Are you aware of any -- either in your

20   practice or the practice of colleagues you're

21   familiar with any chronic pain patients who have

22   committed suicide from the chronic pain?

23        A.  This has not been in my practice;

24   fortunately, I have not seen that.  But I have heard

25   of that, yes.

1    Q.  So not only -- and this was in a chronic

2    noncancer pain setting?

3    A.  Yes.

4    Q.  So it's not only a life and death situation

5    in terms of addiction and abuse, but it can be a

6    life and death situation in terms of treatment and

7    management of chronic pain as well, correct?

8    A.  Yes.

9    Q.  I think that goes to the gravity of the

10   physician's role in making a good decision for his

11   or her patient that you testified to earlier.

12            MR. BECKWORTH:  Objection.

13   BY MR. EHSAN:

14   Q.  Now, when you treat patients who have

15   chronic pain with opioids, those opioids have what's

16   called active pharmaceutical ingredients, correct?

17   A.  Yes.

18   Q.  And those active pharmaceutical ingredients

19   are either naturally derived from the poppy plant or

20   are synthetically manufactured, correct?

21   A.  Yes.

22   Q.  To the extent that they're natural opioids

23   from the poppy plant, do you have a sense of where

24   the active ingredients come from?

25   A.  In terms of their manufacturer or . . .

1    Q.  Yes.

2    A.  Not in any specific way, no.

3    Q.  Would it be fair to say you don't assume

4  that the United States is purchasing poppy plants

5  from Afghanistan, correct?

6    A.  I wouldn't assume that, correct.

7    Q.  Would it be fair to say you would want

8  whatever active pharmaceutical ingredient is

9  provided for the U.S. pharmaceutical industry to be

10  held to quality control measures and be in a way

11  that it can assure a supply to allow for

12  manufacturers to adequately meet the needs of

13  patients?

14    A.  Yes.

15          MR. BECKWORTH:  Objection.

16  BY MR. EHSAN:

17    Q.  So there's nothing inherently wrong with

18  manufacturing the active pharmaceutical ingredient

19  for a drug, correct?

20    A.  No.

21    Q.  Even if that drug happens to be an opioid,

22  correct?

23    A.  Correct.

24    Q.  And if you didn't have the active

25  pharmaceutical ingredient, there would be no

Page 380

1    opioids, correct?

2        A.   Correct.

3        Q.   Now, looking at the synthetic side of

4    things, are you aware that there has been an

5    increase in the manufacturing of fentanyl

6    derivatives outside of the United States that are

7    subsequently imported into the United States?

8                  MR. BECKWORTH:  Objection.

9                  THE WITNESS:  Yes, I'm aware of that.

10   BY MR. EHSAN:

11       Q.   Let me break that question down.  Are you

12   aware of illicit manufacturing of fentanyl in China?

13       A.   Yes.

14       Q.   Are you aware that significant amounts of

15   illicit fentanyl has been flooding the United States?

16       A.   Yes.

17       Q.   Are you aware that -- to what extent that

18   illicit fentanyl has contributed to deaths seen

19   associated with overdoses of opioids?

20                  MR. BECKWORTH:  Objection.

21                  THE WITNESS:  Yes.  Yes, I believe --

22   BY MR. EHSAN:

23       Q.   Go ahead.  I'm sorry.

24       A.   Yes, I believe the government has

25   attributed the continuing rise in opioid-related

Page 381

1    mortality after 2011-2012 to mostly the fentanyl

2    products coming into the country.

3        Q.  And would you agree that that illicitly

4    manufactured fentanyl, regardless of whether it's

5    China or somewhere else is not subject to the

6    control of the defendants in this case?

7        A.  Yes, that's true.

8        Q.  And its importation, illegal importation

9    into the United States, would be subject to

10   enforcement by certain U.S. governmental agencies,

11   correct?

12       A.  Yes.

13       Q.  You mentioned that we're having an opioid

14   crisis in the United States.

15              Do you recall that?

16              MS. SPENCER:  Objection.  I don't think

17   that was the witness's testimony.

18              THE WITNESS:  I didn't -- I didn't use

19   the term "opioid crisis."

20   BY MR. EHSAN:

21       Q.  What was the term you recall using?

22       A.  Public health problem, public health issue.

23       Q.  Focusing on that public health issue, is

24   that public health issue driven presently by the

25   death resulting from illicit fentanyl?

Page 382

 1                    MR. BECKWORTH:  Objection.  It's
 2    misleading.  Counsel, you know that in Oklahoma
 3    there's not a fentanyl problem.
 4                    MR. EHSAN:  Again, I will move to strike.
 5                    MR. BECKWORTH:  So will I.
 6                    MR. EHSAN:  We can talk about it.
 7                    MR. BECKWORTH:  You know the statistics.
 8    You've deposed people in the article.  It doesn't
 9    exist.
10    BY MR. EHSAN:
11        Q.  Dr. Portenoy, are you aware of any aspects
12    of the opioid problem or public health issue as it
13    particularly relates to Oklahoma?
14                    MR. BECKWORTH:  Objection.
15    BY MR. EHSAN:
16        Q.  You can answer.
17                    MS. SPENCER:  He can answer if he --
18                    THE WITNESS:  No, I'm not aware of the
19    specifics in Oklahoma.
20    BY MR. EHSAN:
21        Q.  So now let me ask you, are you aware of it
22    on a national level?
23        A.  My knowledge of this is not deep.  It mostly
24    comes from the media.  But I have some information
25    about that.

1       Q.   To the extent you have any knowledge, it's

2    not specific to Oklahoma, correct?

3       A.   Correct.

4       Q.   Would it be that to the extent you do have

5    any knowledge, it relates to the country as a whole?

6       A.   Yes.

7       Q.   Focusing on that public health issue that

8    you have some awareness of at a national level --

9       A.   Right.

10      Q.   -- do you believe that that public health

11   problem is presently being driven by the illicit --

12   by illicit fentanyl in the United States?

13              MR. BECKWORTH:  Objection.

14              MS. SPENCER:  You can answer to the

15   extent that you know.

16              THE WITNESS:  My understanding now is

17   that that -- that the importing of illicit fentanyl

18   is part of the public health problem we now have,

19   particularly with respect to the continuing rise in

20   opioid mortality.

21              We continue to have a problem of

22   substance abuse and addiction, high rates of those

23   problems, as compared to the past with inadequate

24   access to substance abuse treatment.  That problem

25   is not related specifically, as far as I know, to

1    the importation of fentanyl.

2    BY MR. EHSAN:

3        Q.  Are we also seeing -- are you aware of any

4    uptick in the heroin abuse and mortality in the

5    United States?

6        A.  I am, yes.

7        Q.  And is it your understanding that the rates

8    of heroin abuse and mortality have also gone up?

9        A.  Yes.

10       Q.  This is all while prescription opioids have

11   actually decreased in terms of the total number of

12   scripts written, correct?

13       A.  Yes.  The total number of prescriptions

14   have declined, to my knowledge, since 2012.  And the

15   opioid mortality related to prescription opioids

16   have declined since about 2011.

17       Q.  I just want to ask you if you agree or

18   disagree with a couple of statements that I'm going

19   to present to you.

20            Do you believe that at any point you

21   spread misinformation or misleading information

22   related to any opioid therapy?

23       A.  At the time that I discussed opioid therapy,

24   the information that I was providing, I believed to

25   be true and accurate.

1          I have expressed regrets about not

2    knowing then what I now know: that the opioid

3    problem was going to burgeon as it has and become a

4    public health problem at the level that it has.

5    Because if that was known, then the way that I would

6    have created messages about the risk element was --

7    would have changed.

8          In the early years, my focus in my

9    writings and my lecturing was more focused on trying

10   to destigmatize the opioids, trying to provide

11   information that I thought was accurate about the

12   known pharmacology, for example, with respect to

13   physical dependence and tolerance, and to discuss

14   how little we know about the addiction risk.

15         And to try to disabuse physicians of

16   some of the excessive concerns that they had that I

17   thought and still think led to undertreatment, even

18   in those populations where treatment was widely

19   considered to be appropriate, like cancer pain.

20         So the focus in those early years was on

21   trying to reduce that stigma by providing

22   information.  The information I provided at the time

23   was true and accurate.  But the focus of that -- of

24   those writings and that lecturing was more on the

25   destigmatization by presenting information as it

1    existed at that time.

2              What I have said publicly is that time

3    went forward and what we found out happened is that

4    the increasing access to opioids societally became

5    associated with the public health problem that we've

6    described today: increasing rates of addiction and

7    treatment-seeking for addiction, increasing rates of

8    abuse.

9              And most disquieting, increasing rates

10   of opioid mortality, which until 2011 was due to

11   prescription opioids.  And had that -- had I known

12   in 1997, 2001, that that was going to happen, I

13   wouldn't have taught it in the same -- I wouldn't

14   have taught the information in the same way.

15             The last thing I'll just say is that the

16   necessity of messaging, creating information for

17   prescribers, teaching this in a way that balances

18   the risks and benefits for me personally was an

19   issue, even when I was focused more on trying to

20   destigmatize the drug.

21             For example, in the late '90s, I became

22   medical director of a pain and chemical dependency

23   conference, which was an international conference.

24   And over 10 years, we put on eight international

25   conferences.  And we started a pain and chemical

Page 387

1   dependency project, including a listserv, which was

2   international in scope.

3           Because we wanted to bring the addiction

4   medicine community and the pain community together

5   to help work out the appropriate way of teaching

6   this and provide information so that physicians

7   could balance risks and benefits in a more

8   knowledgeable way.

9           I know this is a long response, but it's

10  a complicated question.  I don't think I ever

11  provided misleading information, no.  But I think

12  that -- and I think that early on, I was one of the

13  people nationally who was talking about chemical

14  dependency and those issues: abuse, addiction, and

15  unintended overdose.

16          But I wish that I had known in the late

17  '90s and the early 2000s what I came to know later

18  in the 2000s, which was that we had a very

19  significant public health problem that occurred that

20  more than balanced the public health problem of

21  unrelieved pain, which is what you were alluding to

22  before, and which we still have today.

23          Had I known that we had that public

24  health problem related to addiction and abuse, if I

25  knew that that was going to occur, I think my

1    messages in my writings and my teaching would have

2    been somewhat different.

3              Just as accurate, but somewhat focused

4    on a broader perspective, including more information

5    about risk assessment and management than it did

6    back then.

7        Q.  Did you happen to teach medical students

8    either presently or in the past?

9        A.  No.  I never taught medical students.

10       Q.  How about residents?

11       A.  Yes, of course.

12       Q.  Now, when you were teaching residents, did

13   you focus them on making sure they understood the

14   prescribing information related to drugs they were

15   prescribing?

16       A.  Yes.

17       Q.  Do you believe that -- you, I think,

18   mentioned -- Strike that.  I'm going to start over

19   again.

20             You had said, I think, on occasion had

21   championed discussions related to potential

22   addiction and abuse, correct?

23       A.  In the sense of being the medical director

24   of the pain and chemical dependency project?  Yes.

25       Q.  And I believe in your declaration, you

Page 389

1    state somewhere -- and, again, I don't have the

2    specific paragraph number -- but I'll speak in

3    general terms -- that you had applied to

4    pharmaceutical companies and had received some

5    monies from pharmaceutical companies to address the

6    addiction question; is that correct?

7                    MS. SPENCER:  I think that's

8    paragraph 26.

9                    MR. EHSAN:  Paragraph 26.  Thank you.

10                   THE WITNESS:  Thank you.

11                   MS. SPENCER:  It starts on page 16, I

12   think.  Yes.

13                   THE WITNESS:  I can answer?

14                   MS. SPENCER:  Yes.

15                   THE WITNESS:  Yes.  The pharmaceutical

16   industry -- pharmaceutical companies, manufacturers

17   of opioids, supported the pain and chemical

18   dependency conferences that I put on.

19   BY MR. EHSAN:

20     Q.  And you also mention in paragraph forty --

21   paragraph 46, I believe -- yes -- sorry to make you

22   jump around.

23     A.  That's okay.

24     Q.  -- paragraph 46 that you had communicated

25   on one occasion that you actually recollect, to

Page 390

1  Janssen that the direct-to-consumer advertising

2  campaign that they presented to you was a bad idea,

3  correct?

4      A.  Yes.

5      Q.  And, in fact, in that instance, Janssen did

6  not follow through on that campaign, correct?

7      A.  Correct.

8      Q.  So you've had instances where you've raised

9  issues with the opioid manufacturers, and they, in

10  fact, have listened and taken your advice, correct?

11     A.  I don't know whether or not they took my

12  advice.  I only know that the program that was being

13  discussed with me didn't happen.  So I'm not sure

14  why that didn't happen.

15     Q.  And in the terms of the instances where you

16  requested money for programs, they gave you that

17  money, correct?

18     A.  Yes.

19     Q.  Likewise, when they sent you materials for

20  some of their educational programs, they asked you

21  to edit it, correct?

22     A.  Yes.

23     Q.  And obviously you are -- have more expertise

24  on the subject matter than perhaps someone within an

25  opioid manufacturing company, correct?

Page 391

 1      A.  Yes.

 2              MR. BECKWORTH:  Objection.

 3              MS. SPENCER:  Objection.  To the extent

 4   that you know that.

 5              THE WITNESS:  To the extent that I know

 6   that.

 7   BY MR. EHSAN:

 8      Q.  Well, let me rephrase the question.  You

 9   are one of the world's leading experts on pain

10   management, correct?

11      A.  Some people would consider me that, yes.

12      Q.  Therefore, having you edit materials for

13   accuracy or to accurately reflect the literature

14   would not be surprising, correct?

15      A.  I'm just not sure what you mean by "would

16   not be surprising."

17      Q.  Sure.  So it would not be unusual for

18   someone to ask you to review materials that relate

19   to your field of expertise, given you're a world

20   renowned expert in the area -- to ask for your

21   advice or your input on a particular piece of --

22   a particular document that has substantive material

23   in it, correct?

24      A.  So if you're asking me if I would be

25   surprised that that would happen . . .

1      Q.  So let me ask the question slightly

2   differently.

3      A.  Yes, okay.

4      Q.  To the extent that you had clinical

5   experience with patients and you understood the

6   literature, if you were going to, for example,

7   provide feedback on a piece of educational material

8   from a drug company, it would be perfectly

9   reasonable for them to ask you to comment on it,

10   correct?

11      A.  In my opinion, yes, it would be reasonable

12   for someone who has drafted some education in an

13   area where I have a high level of expertise to get

14   my advice about whether or not what they've drafted

15   represents the best known science and practice.

16   That would be reasonable in my opinion.

17              MS. SPENCER:  Just to be clear, my

18   objection was only to the inference that he had

19   personal knowledge of, you know, what sort of

20   experts may or may not exist within an opioid

21   manufacturing company.

22              MR. EHSAN:  I can strike the question.

23   Let me just try again.

24              THE WITNESS:  Okay.

25

1  BY MR. EHSAN:

2      Q.  I just want to clarify a point that came

3  earlier.  You mentioned that when you got --

4  sometimes when you got educational materials from

5  the pharmaceutical companies, you had to make

6  significant edits to them, correct?

7      A.  Correct.

8      Q.  Given that you have significant patient

9  experience, would it surprise you that you would be

10  in a position to perhaps add value to materials that

11  a pharmaceutical manufacturer of opioids is

12  preparing for doctor education?

13      A.  It wouldn't surprise me that input from me

14  would be perceived as adding value to a piece of

15  education, given my experience in educating in this

16  area.

17      Q.  That's all.  It was not meant to create a

18  long, complicated process.

19              You were shown some documents about some

20  payments made to your school -- at the time, your

21  hospital, Beth Israel Medical Center, from -- by

22  Mr. Beckworth.  And I just want to mark this next

23  item as an exhibit.

24                  (Portenoy Exhibit 34 was marked

25                    for identification.)

```
1              MS. SPENCER:  Do we need to go back to
2   those or are we just moving on?
3              MR. EHSAN:  We can if you'd like.
4   We can look at them.
5              MS. SPENCER:  12, 13, and 14?
6              MR. EHSAN:  Yes.
7              MS. SPENCER:  And this is 34?  Do you
8   have one more for Brad?
9              THE WITNESS:  Oh, I'm sorry.  My
10  apologies.
11             MS. SPENCER:  No problem.  Thank you.
12             THE WITNESS:  Do I need to look at the
13  prior material or not necessary?
14  BY MR. EHSAN:
15     Q.  Not necessary.
16     A.  Okay.
17     Q.  This is an email string, and as you might
18  expect, goes backwards, most recent to the -- so the
19  original email is actually on the second page of the
20  document.
21     A.  Um-hum.
22     Q.  You see there's a Winifred Schein at
23  chpnet.org?
24     A.  Yes.
25     Q.  Emailing someone at -- or someone named
```

Page 395

1    Robyn Kohn; do you see that?

2         A.   Yes.

3         Q.   And do you know who Winifred Schein is?

4         A.   Yes.   She still works with me and has been

5    with me for many years as the director of

6    development and institutional giving.

7         Q.   And the email states, "Hi Robyn.  I hope

8    all is going well for you.  Per my voice message, I

9    am writing on behalf of Dr. Portenoy to invite you

10   to attend as our guest the DPMPC's conference for

11   nurses taking place on November 9 at Beth Israel.

12   This is entitled 'Emerging practices in pain

13   medicine and palliative care: Advances in nursing.'"

14             Do you see that?

15        A.   Yes.

16        Q.   And she attaches the agenda.  And I believe

17   it says, "This is" -- "This also might be something

18   we could put on Quantia, and you may be interested

19   in sponsoring that."

20             Do you see that?

21        A.   Yes.

22        Q.   And if you look at Exhibits 12, 13, and 14,

23   you see that Quantia is the actual educational

24   program that generated the basis for the invoices or

25   the payments that were sent to you?

1       A.  Yes, I --

2       Q.  My question is simply, doctor, in your

3   experience, when you reached out to industry to help

4   support you in your educational endeavor, did you

5   find them to be accommodating?

6       A.  Yes.  During my 16 years at Beth Israel, we

7   put on a very large number of educational programs

8   for physicians and for nurses, programs on pain,

9   programs on palliative care.  And we usually sought

10  industry financial support for these educational

11  programs.

12              And as you know from what we talked

13  about this morning, over the course of these many

14  years, my institution received large sums from

15  pharma companies, which I've been able to use to put

16  on these educational programs and create educational

17  materials.

18      Q.  And were all these education programs on

19  just how to -- Strike that.

20              Were all these education programs

21  focused just on opioid therapy, or were they broader

22  than that?

23      A.  They were broader than that.

24      Q.  Did any of them focus on addiction?

25      A.  Well, the pain and chemical dependency

Page 397

1    conferences, which amounted, I believe, to eight

2    large conferences over ten years, were focused on

3    this interface between chronic pain and chemical

4    dependency.  And typically more than half of that

5    two-and-a-half-day conference was focused on

6    addiction issues.

7        Q.  How about issues of diversion?

8        A.  At those conferences?

9        Q.  Yes.

10       A.  To my recollection, we invited speakers to

11   those conferences, individuals from law enforcement

12   that would help educate the audience, which the

13   audience comprised professionals, mostly physicians.

14            And the goal was to try to enhance

15   communication between law enforcement and physicians

16   so that physicians would understand what law

17   enforcement's expectations were with respect to

18   monitoring for diversion and what to do if it was to

19   occur, and reciprocally to try to educate people in

20   law enforcement about the medical community's issues

21   in trying to treat chronic pain.

22       Q.  So would it be fair to say that the opioid

23   manufacturer provided you or your institutions

24   funding to facilitate education that directly went

25   to the risk associated with opioid prescribing?

1           MR. BECKWORTH:  Objection.

2           MS. SPENCER:  You can answer.

3           THE WITNESS:  Yes.  That's true.

4   BY MR. EHSAN:

5      Q.  So that would be focusing on the negative

6   or the risk side of chronic opioid use, correct?

7      A.  Yes.

8      Q.  Now, doctor, we've gone through a whole lot

9   of science nerdy stuff, so I will try to distill

10   some of that down because sometimes I get into that

11   conversation and now it's just the two of us talking

12   and no one else understands what we're saying.  But

13   maybe others do.

14           MR. BECKWORTH:  Objection.  Disrespectful

15   to the 12 people in the jury box.

16   BY MR. EHSAN:

17      Q.  Doctor, would it be fair to say that at all

18   times, you provided the best possible and most

19   accurate information in your speaking -- Strike

20   that.  Let me start more broadly.

21           You received money from opioid

22   manufacturers, correct?

23      A.  Yes.

24      Q.  It never influenced anything you said with

25   respect to saying something you didn't believe was

1    accurate, correct?

2         A.   Correct.

3         Q.   You also received funding for publications,

4    correct?

5         A.   When you say "publications," you need to be

6    more specific.

7         Q.   Sure.  You received funding for studies,

8    correct?

9         A.   Yes.  Research studies.

10        Q.   Research studies.  And those fundings never

11   dictated to you anything about the conclusions or

12   your findings, correct?

13        A.   That's correct.

14        Q.   You gave a significant number of talks

15   related to opioid use; is that correct?

16        A.   Yes.

17        Q.   And in all of those talks, you tried to

18   present a fair and balanced presentation of the

19   science as we understood it at the time, correct?

20        A.   Yes.

21        Q.   Likewise, you never attended any speaking

22   engagement regardless of the context in which a

23   speaker provided information related to the use of

24   opioids that you did not find -- that you found to

25   be problematic or inappropriate or inaccurate,

1    correct?

2        A.  I don't recall any.

3        Q.  You have, in fact, given talks about

4    addiction, abuse, and diversion, correct?

5        A.  I have given talks that have included

6    information about those areas, yes.

7        Q.  Well, you have put on talks or conferences

8    that address abuse, addiction, and diversion,

9    correct?

10       A.  Yes.

11       Q.  And some of those talks were funded by

12   opioid manufacturers, correct?

13       A.  Yes.

14       Q.  As best as you recall, the labeling for

15   opioid medications included a section on the risks

16   and the benefits of the medication, correct?

17       A.  Yes.

18       Q.  And those included, at least in the 2000s

19   time period that we specifically talked about, a

20   discussion about addiction, diversion, and abuse,

21   correct?

22       A.  Yes.

23       Q.  And at least in the couple of instances

24   that you recalled, in a boxed warning, correct?

25       A.  Yes.

1     Q.   And as you testified, you encourage your

2   residents when you teach them to read the labeling

3   information for the medication they're prescribing,

4   correct?

5     A.   No, I don't think I said that.  When I

6   educate, whether it's residents or fellows, which is

7   a more common trainee level that I educate at --

8   these are people who have finished their residency

9   and getting extra training in pain medicine or in

10  palliative care, when I educate trainees or educate

11  colleagues, the emphasis is always on needing to

12  know what -- what -- needing to know the information

13  necessary to make judgments about what's safe and

14  effective for patients based on the specific

15  characteristics of the patient.

16          It hasn't been my practice to recommend

17  to everyone to read the package label.  That has

18  never been an educational meme of mine, if you will.

19          However, including in my education

20  information about the pharmacology, how to optimize

21  the analgesic outcomes, what expectations should be

22  made for side effect monitoring and how to treat

23  side effects, and then to be aware of the risk of

24  abuse and addiction and in recent years how to

25  actually assess and manage that, that's always been

1   a part of what I've been teaching.

2       Q.  Would you agree with me, doctor, that a

3   boxed warning on a prescribing information is the

4   FDA and the manufacturer's attempt to make sure that

5   certain key facets about either the risks or the

6   benefits of the medication are communicated to the

7   prescriber?

8       A.  Yes.  I think that's true.

9       Q.  And I think you mentioned that as a

10  prescriber of a Schedule II, that prescriber should

11  take on the responsibility of being sufficiently

12  adept at knowing who to prescribe it to and how to

13  prescribe it?

14      A.  Yes.

15      Q.  We talked a lot about the individualized

16  decision that one has to make for a patient in

17  prescribing -- when deciding whether or not to

18  prescribe long-term opioids.  And to the extent that

19  a doctor doesn't take on the responsibility of

20  knowing the risks and benefits of the medication,

21  is that -- Strike that.  Let me ask the question

22  slightly differently.

23          Do you think that a prescriber who

24  doesn't understand or doesn't have the skills

25  necessary to prescribe an opioid bears some

1   responsibility for adverse effects that his or her

2   patients may suffer from those prescribing

3   decisions?

4       A.  Yes.  I think the physician has to bear

5   some responsibility, yes.

6       Q.  Do you think that in some instances,

7   patients who are less than truthful with their

8   physicians bear some responsibility in potentially

9   exposing themselves to a higher risk of side effects

10  from opioid medications?

11      A.  Yes.  To the extent that occurs, that's the

12  patient's responsibility.

13      Q.  Do you believe that pharmacy benefits

14  management companies or others who decide

15  formularies and those who put opioids on a preferred

16  formulary position bear some responsibility for

17  which patients get exposed to chronic opioid

18  therapy?

19      A.  I don't have any specific information about

20  that.  I am aware that the impact of these PBMs on

21  prescribing in the current era is -- can be very

22  onerous for physicians and can reduce choice for

23  patients and reduce choices for physicians.

24              At a hypothetical level, I can agree

25  with what you said, but I don't have any specific

Page 404

1    information about that.

2        Q.  Do you believe that insurance companies'

3    decisions to cover some pharmacological therapies

4    and not other nonpharmacological therapies can

5    contribute to opioid prescribing decisions by

6    physicians?

7        A.  I do believe that that's true, yes.

8        Q.  Do you believe that the federal government

9    could do more to protect the United States from

10   importation of illicit drugs?

11       A.  That's asking me for expertise that I

12   really don't have.  As a citizen, I would say yes.

13   But I don't have any specific knowledge about what's

14   being done and what could be done.

15       Q.  Just to be clear, I think based on your

16   declaration, you're here just to testify on things

17   you know.  And so it's your personal opinion.  And

18   so to that extent, please share it.  I will take it

19   as nothing else.

20             MR. BECKWORTH:  Objection.  That's

21   inappropriate.

22   BY MR. EHSAN:

23       Q.  So, I'm sorry, please answer the question

24   again.

25             MS. SPENCER:  Can you ask the question

 1   again.

 2               MR. EHSAN:  Sure.

 3   BY MR. EHSAN:

 4       Q.  Do you believe, as Dr. Portenoy, that the

 5   government could do more to stem the tide of illicit

 6   drug smuggling into the United States?

 7               MR. BECKWORTH:  And objection.  He said

 8   he doesn't know about that.  And I just want to be

 9   clear, you're asking him to speculate in an answer

10   that he told you he was not qualified to give?

11   I just want to be clear that that's what you're --

12               MR. EHSAN:  I don't think that's what he

13   said.  I can't say -- he's saying as a citizen,

14   that's what I would expect my government to do.

15               MS. SPENCER:  Let me just say, he can

16   answer to the extent that he knows.

17               MR. EHSAN:  Right.

18   BY MR. EHSAN:

19       Q.  To the extent that you have a personal

20   opinion about this.

21       A.  Right.  So --

22       Q.  If you have none, you can say you have no

23   opinion on the matter.

24       A.  I have an opinion.  And, again, it's an

25   opinion that's not informed by a lot of facts about

1  how the government does this.  But we have a very

2  significant problem of importation of very highly

3  potent opioids.  And those are particularly

4  dangerous.

5           And I would expect the government to do

6  more to try to reduce the availability of those

7  highly potent opioids like fentanyl and now

8  carfentanil coming into the country, which are so

9  risky to people.

10     Q.  To the extent that there is a shortage of

11  addiction medicine specialists in the United States,

12  do you think that has contributed to the public

13  health problem we're discussing today?

14     A.  Yes.  Not only the lack of specialists.

15  The lack of specialists is one component of the

16  insufficient access to substance abuse treatment in

17  the United States.

18           The United States historically has not

19  provided adequate funding for substance abuse

20  treatment of all its many types, including access to

21  specialists.  And that is a significant problem that

22  should be addressed.

23     Q.  Likewise, is insurance or lack thereof for

24  substance abuse treatment a potentially contributing

25  factor to the public health crisis we're talking

1    about today?

2       A.   Again, I have no specific knowledge of the

3    extent to which that impacts on access to substance

4    abuse treatment.  But to the extent that it does,

5    that would be a significant problem.

6       Q.   So if you're looking at the big picture,

7    I think Mr. Beckworth asked you, you know, whether

8    it was the pharmaceutical industry or the opioid

9    manufacturers at fault.

10             Would it be fair to say that every facet

11   of society from the patient all the way up to the

12   federal government could have done things

13   differently, which may or may not have had an impact

14   of where we are today with this public health

15   crisis?

16             MR. BECKWORTH:  Objection.

17             MS. SPENCER:  I'm going to object to the

18   term "every facet of society" and ask you to be more

19   specific.

20             MR. EHSAN:  Sure.

21             MS. SPENCER:  I get from -- you know,

22   from the patient all the way up to the federal

23   government, but "every facet of society" I think is

24   too broad for him to answer.

25             MR. EHSAN:  Sure.

1              MR. BECKWORTH:  I agree.  I feel like

2   I'm a facet of society.  So I object.  And the

3   jury's a facet of society, so I object to that as

4   well on their behalf.

5   BY MR. EHSAN:

6      Q.   From patients, prescribers, insurers,

7   PBMs, health care authorities, Food and Drug

8   Administration, drug enforcement agency, specialty

9   training practices and education generally, would

10  you agree that there are lots of folks who have

11  played some part in where we are in this health care

12  crisis?

13             MR. BECKWORTH:  Objection.

14             MS. SPENCER:  It's compound.

15             MR. EHSAN:  Sure.  Let me ask the

16  question again.

17  BY MR. EHSAN:

18     Q.   You can answer if you understand the

19  question.

20             THE WITNESS:  Okay.

21             MS. SPENCER:  You can answer if you

22  understand.

23             THE WITNESS:  I think I understand the

24  question.  And I'm agreeing with the question.  I

25  think the public health problem that has emerged of

1  this rapidly increasing rate of opioid toxicity and

2  abuse and addiction is a multifaceted problem with

3  complex causes and multiple complex possible

4  solutions.

5          And attributing some effect of these

6  various entities -- the FDA response, the public's

7  response, the prescriber's response, the payer's

8  response, the PBM response -- to me is fair because

9  we could all look back and say, What could be done

10 differently.

11         Just as I myself, speaking for myself as

12 an academician, who's been an educator and an

13 investigator in this area, looks back and says, Had

14 I known then what I know now, the way I taught this

15 would have been different.

16         So I think it's fair to say that it's a

17 complex multifaceted problem with many potential

18 inputs that drove the ultimate outcomes that we're

19 dealing with today.

20         And as you know from my testimony this

21 morning, I've come to believe that one of those

22 facets is the pharmaceutical companies' use or

23 distillation of very positive messages without

24 providing context and information about risk and

25 using those messages in marketing strategies that

1    drove -- to some extent, drove prescriber behavior

2    such that patients who shouldn't have had access got

3    access to opioid drugs and physicians who didn't

4    have the skill set were prescribing, and patients

5    were not appropriately monitored after they got the

6    drug.  And to some extent, responsibility, in my

7    opinion, is there as well.

8    BY MR. EHSAN:

9        Q.  And, doctor, just so that I'm clear, are

10   you aware of any specific example of any particular

11   prescriber being unduly influenced to prescribe an

12   inappropriate prescription for an opioid based on

13   the materials you were just talking about?

14               MR. BECKWORTH:  Objection.

15               MS. SPENCER:  You can answer.

16               THE WITNESS:  I'm not aware.  No, I

17   can't point to an individual case of a prescriber

18   that prescribed inappropriately and I knew that that

19   happened as a result of inappropriate marketing.

20   No, I can't do that.

21               MR. EHSAN:  Thank you.

22               MR. COLEMAN:  If we want to take a four-

23   minute break, I think organizationally it would be

24   very helpful.  And then we can wrap up.

25               MR. EHSAN:  I think I'm done with my

Page 411

1    questioning, doctor, so I was going to pass the

2    witness just so that they're more efficient and we

3    swap seats if that's okay.

4                    THE WITNESS:  I see.

5                    MR. BECKWORTH:  Should we stay here?

6                    THE VIDEO OPERATOR:  7:55, off.

7                         (Recess at 7:55 p.m.,

8                          resumed at 8:14 p.m.)

9                    THE VIDEO OPERATOR:  We're back on, 8:14.

10                        (Portenoy Exhibit 35 was marked

11                         for identification.)

12   BY MR. EHSAN:

13       Q.  Dr. Portenoy, I'm going to hand you what's

14   been marked as Exhibit 35.  First I'll ask if you

15   need to take a moment to look at this.  But then my

16   question is, do you recognize this document?

17       A.  I just need a moment.

18       Q.  Sure.

19       A.  I don't remember this particular document.

20       Q.  I will represent to you, doctor, that this

21   is a motion or memorandum of law in support of your

22   motion to dismiss you as a defendant in a lawsuit

23   filed in the State of New York.  And as you can see

24   here, it was authored by your counsel, Ms. Spencer.

25       A.  Yes.

1      Q.  Before I get to two specific questions I

2  have on it, did you at any point review this

3  document before it was filed with the court, or do

4  you have any recollection of reviewing it before it

5  was filed with the court?

6      A.  I don't have any recollection of reviewing

7  it before it was filed.

8      Q.  If you go to the page that -- well, it's

9  got two paginations, but 14 of 26.

10              If you look at the last paragraph on

11  that page, this states, "In addition, as set out in

12  the JMTD" -- and I'll skip some legalese language

13  there -- "the complaint does not and cannot as a

14  matter of law allege facts showing how any of the

15  unbranded materials are deceptive or misleading and

16  viewed, as they must be, in the light of the

17  totality of information available to the person

18  allegedly misled, here, the county."

19              Do you see that doctor?

20      A.  Yes.

21              MR. BECKWORTH:  Objection.

22  BY MR. EHSAN:

23      Q.  Would you agree with me that if you are

24  going to consider certain unbranded material as

25  deceptive or misleading, that you would first have

Page 413

1   to look at it in the context of the totality of the

2   information available?

3             MR. BECKWORTH:  Objection.

4             MS. SPENCER:  You can answer.  If you

5   understand the question.

6             THE WITNESS:  I don't really understand

7   the question.  I'm sorry.

8   BY MR. EHSAN:

9      Q.  That's okay.  So the point here is that in

10  order to -- for any unbranded material, i.e.,

11  opioids, can be used to treat pain, to be deceptive

12  or misleading, it has to be viewed in the context of

13  all available information, for example, the label,

14  the REMS, the FDA publications, the DEA, the

15  literature, et cetera.

16            Do you agree with that proposition?

17     A.  Yes.  I think at a high level, I would

18  agree with that, sure.

19     Q.  Then it goes on to say, "This is especially

20  so when they are considered through the lens of the

21  'informed intermediary doctrine,' and then New York

22  and federal laws governing expectations of physicians

23  prescribing opioids, as they also must be."

24            Do you see that?

25     A.  Yes.

1                    MR. BECKWORTH:  Objection.

2    BY MR. EHSAN:

3         Q.  Do you know what an informed intermediary

4    is?

5         A.  No.

6         Q.  Do you understand that for something to

7    be -- well, for a prescription to be written, it has

8    to be done by a physician, correct -- or a licensed

9    health care professional, correct?

10        A.  Correct.

11        Q.  And that person is considered an informed

12   intermediary, i.e., someone who's educated and then

13   makes a decision --

14                   MS. SPENCER:  I'll object to the extent

15   that you're asking him to -- this -- we all know

16   "informed intermediary" is a legal term.  So I'll

17   object to the extent that you're asking him to

18   describe to the 12 of us sitting in the room the

19   legal term because he's not a legal expert.

20                   MR. EHSAN:  Sure.  I'm not asking --

21                   MS. SPENCER:  I understand but I just

22   needed to put on the record that, you know, he can't

23   explain to you the legal term.

24   BY MR. EHSAN:

25        Q.  But the idea is that whether or not some

1    unbranded materials may contain misinformation has

2    to also be considered in the prism that is being

3    provided to someone who is a prescriber of the

4    medication at issue, correct?

5         A.   Correct.

6         Q.   And that person has certain training,

7    education, background, and expertise, correct?

8         A.   Yes.

9         Q.   And if you go to the next page, which is

10   page 11, on the document, or 15 of 26, you'll see in

11   the big paragraph there's a long string cite with

12   lots of numbers, and I'm picking up with the

13   sentence that follows:

14               "These articles provide further context

15   for the statements in unbranded publications that do

16   nothing more than permissibly express matters of

17   medical opinion or put the medications in the best

18   possible light, as the pharmaceutical and physician

19   defendants are entitled to do."

20               Do you see that?

21        A.   Yes.

22        Q.   Would you agree that a pharmaceutical

23   company has the right to put its medication in the

24   best possible light?

25        A.   Let me just ask you to clarify that question

Page 416

1   again.

2        Q.  Sure.

3        A.  I'm not sure what you mean by "best

4   possible light."

5        Q.  Sure.  So as a manufacturer of any

6   pharmaceutical, the manufacturer is subject to

7   certain FDA regulations, correct?

8        A.  Correct.

9        Q.  As a manufacturer of a controlled substance,

10  a manufacturer is also subject to DEA regulations,

11  correct?

12       A.  Correct.

13       Q.  So those are regulatory agencies that

14  provide information.  Within that framework, do you

15  agree that a manufacturer can put its product in a

16  light that's -- well, strike that -- the best

17  possible light as stated in the motion that your

18  counsel filed?

19              MR. BECKWORTH:  Objection.  Did you

20  strike your entire question or just the last part?

21              MR. EHSAN:  Just the last portion.

22              MR. BECKWORTH:  Objection.

23              MS. SPENCER:  You can answer if you

24  know.

25              THE WITNESS:  Yeah.  So I don't -- I

Page 417

1   don't know.  So I really can't answer specifically.

2   I'm still not clear about what "the best possible

3   light" means in this context.

4   BY MR. EHSAN:

5       Q.   And you understand that this motion to

6   dismiss was filed on your behalf by your attorney?

7       A.   Yes.

8       Q.   And this was your motion in response to a

9   lawsuit that made allegations that you put certain

10  opioid medications in a light that was more

11  favorable than it should have been?

12          MS. SPENCER:  To be clear, objection.

13  Not this lawsuit.

14          MR. EHSAN:  No.  A lawsuit filed in the

15  State of New York.

16          MS. SPENCER:  Objection too.  That's

17  a -- I mean, I don't recall that that was the exact

18  allegations.  But if, you know, you'll accept that

19  that's a generalization of what was alleged, I'll

20  let him answer.

21  BY MR. EHSAN:

22      Q.   At a high level, doctor.  That was not a

23  verbatim recitation of the complaint.

24          MR. BECKWORTH:  Objection.

25          THE WITNESS:  Okay.  At a high level,

1    yes.

2    BY MR. EHSAN:

3        Q.  So let me ask the question over again.  And

4    you understand that this motion was in response to a

5    lawsuit in New York that, generally speaking, made

6    allegations that you, Dr. Portenoy, made statements

7    about opioids that put them in a better light than

8    should have otherwise done?

9        A.  Yes.

10               MR. BECKWORTH:  Objection.

11               MR. EHSAN:  I think that's all I have.

12   I'm going to pass the mic to my colleague here.

13               MR. ERCOLE:  Sure.

14               MR. EHSAN:  Thank you so much for your

15   time, doctor.

16               MR. COLEMAN:  I think I'll change seats

17   with you just to make it a little bit easier.

18                        EXAMINATION

19   BY MR. COLEMAN:

20       Q.  Good evening.  I'm Hayden Coleman.  We had

21   met a little bit earlier, but I'll reintroduce

22   myself.

23               I'm going to direct your attention to

24   what was marked as Exhibit 17.  And we might as well

25   pull Exhibit 18 because they're related.  These were

Page 419

1    exhibits that the State showed you earlier in the

2    deposition.

3        A.  Yes.

4        Q.  So this -- Dr. Portenoy, the first letter,

5    Exhibit 17 is dated February 27, 1997; is that

6    correct?

7        A.  Yes.

8        Q.  And that was sent to you when you were at

9    Memorial Sloan-Kettering?

10        A.  Exhibit 17?

11        Q.  Yes, Exhibit 17.

12        A.  So this is a letter that I sent.

13        Q.  Oh, I'm sorry.  This is a letter that you

14    sent when you were at Memorial Sloan-Kettering.  And

15    it seems to be responding to a request that you come

16    up and speak at Reading Hospital in West Reading,

17    Pennsylvania?

18        A.  Yes.

19        Q.  Where is West Reading, Pennsylvania?

20        A.  I couldn't tell you.

21        Q.  And we're talking about a speech that was

22    planned nearly a year in advance.

23        A.  Yes.

24        Q.  So this seems to be kind of a large event

25    for them at the hospital, would you agree with that?

Page 420

1      A.  I'm sorry.  I just have no recollection of

2  it at all.

3      Q.  Well, let's go to the document and see if

4  this refreshes your recollection a bit.  It says,

5  "I apologize for the delay in responding to your

6  kind invitation . . . to speak at your hospital in

7  1998.  I would be pleased to accept your invitation

8  to make the presentation on Tuesday, April 28 and

9  Wednesday, April 29.  The topic you have asked me to

10  speak" -- "The topics you have asked me to speak on

11  are fine with me.  I will let you know the title of

12  my presentation to your tumor conference as the time

13  approaches."

14           Did I read that correctly?

15      A.  Yes.

16      Q.  So the invitation is coming from the

17  Reading Hospital; is that correct?

18      A.  Yes.

19      Q.  And the subjects are being chosen by the

20  Reading Hospital?

21      A.  They were suggested, according to the

22  letter.

23      Q.  Right.  They suggested and they are fine

24  with you?

25      A.  And they were fine with me.

Page 421

1    Q.  So no pharmaceutical manufacturer

2  whatsoever had anything to do with the selection of

3  these topics --

4    A.  That would be correct.

5    Q.  -- is that --

6          That would be correct.  So the letter

7  continues that [as read], My honorarium for the

8  two-day visit is $2,500 plus expenses.  I am a

9  member of the Purdue Frederick, Roxane, and Janssen

10  Speakers' Bureau; perhaps you would like to solicit

11  funding from them.

12          So let's go to the next exhibit, which

13  is 18.  So on March 18, 1998, there is a letter from

14  Jennifer Henway [sic].  Are you familiar with

15  Jennifer Henway?

16    A.  No.

17    Q.  Henry, sorry.  Are you familiar with

18  Jennifer Henry?

19    A.  No.  I don't have any recollection of her.

20    Q.  But she's at The Purdue Frederick Company.

21    A.  Right.

22    Q.  And her title seems to be coordinator of

23  medical education?

24    A.  Right.

25    Q.  And apparently they're sending a check for

1    $2,500.  Are there any conditions or strings

2    attached to this?

3        A.  Again, I don't have a specific recollection

4    of this conference in 1998.

5        Q.  Right.

6        A.  But in general --

7        Q.  Right.

8        A.  -- my recollection is that conferences like

9    this would have no strings attached at all --

10       Q.  Right.

11       A.  -- from the perspective of the pharma

12   company.

13       Q.  It seems to have absolutely no involvement

14   other than paying for the honorarium?

15       A.  Correct.

16       Q.  And the topics of this conference is --

17   seem to be giving three distinct lectures.  And the

18   first one is "cancer pain syndromes"?

19       A.  Yes.

20       Q.  And that's -- the next one is "cancer pain

21   management."  And that's the tumor conference?

22       A.  Yes.

23       Q.  Is that correct?

24       A.  Yes.

25       Q.  Would you assume that most of the people at

1    a tumor conference are oncologists --

2         A.  Yes.

3              MR. BECKWORTH:  Object.

4    BY MR. COLEMAN:

5         Q.  -- or people that work in the oncology

6    field?

7         A.  Yes.

8         Q.  And the next one is "medical grand rounds."

9    Would you explain what medical grand rounds are.

10        A.  It's a traditional education forum, most

11   hospitals, most medical schools have a grand rounds.

12   It's typically a conference in a lecture hall --

13        Q.  Right.

14        A.  -- on a regular basis, once a month, once a

15   week, with -- sometimes with an outside speaker.

16        Q.  Right.  So this was one of those times?

17        A.  This was one of those times.

18        Q.  And this was planned a year in advance?

19        A.  Right.

20        Q.  So I know you have no specific

21   recollection, but it would seem that this is an

22   event for the Reading Hospital in Reading,

23   Pennsylvania.

24              Would you agree with that?

25        A.  Yes.  I think a two-day -- a two-day

1    arrangement like this would often be framed as a

2    visiting professorship.

3         Q.  Right.

4         A.  And I don't know if that got discussed.

5    But just speaking in general, if an expert is asked

6    to visit a hospital, particularly a hospital that

7    may be in a smaller -- a smaller hospital in a more

8    rural area --

9         Q.  Right.

10        A.  -- that doesn't have access to a lot of

11   outside speakers with expertise or national

12   reputations, they may make an effort to have a

13   two-day visit, call it something like a visiting

14   professorship, and then ask that person to give

15   multiple talks.  And this seems -- again, I'm sorry

16   that I don't have a recollection about it --

17        Q.  Right.

18        A.  -- it's a long time ago.  But this seems to

19   be of that type.

20        Q.  So -- and you were at Sloan-Kettering at

21   the time?

22        A.  Yes.

23        Q.  And Sloan-Kettering is certainly one of, if

24   not the leading cancer center?

25        A.  Yes.

1    Q.  And you were being asked to speak to at

2    least one group of oncologists to talk to them about

3    cancer pain management.  So this --

4    A.  Yes.

5    Q.  -- this is significant in that it has the

6    ability to really affect patient care in a somewhat

7    rural community; would you agree with that?

8               MR. BECKWORTH:  Objection.

9               MS. SPENCER:  To the extent that you

10   know or recall, you can answer.

11              THE WITNESS:  So I think -- I think --

12   BY MR. COLEMAN:

13   Q.  Let me rephrase the question.

14   A.  Yes.  Right.

15   Q.  This is consistent with what you talked

16   about earlier as your educational purpose in being

17   able to talk to other medical professionals and

18   inform them of what you've been doing and learning;

19   is that a fair statement?

20   A.  That's a very fair statement.  I would

21   travel to places like this during that part of my

22   career with the hope of improving medical practice

23   with respect to pain management.  That was what I --

24   how I perceived my professional role.

25   Q.  Right.

1      A.  To be a resource.  Because I did spend time

2   studying this material.  And I'm talking also about

3   cancer pain and cancer pain syndromes.  My expertise

4   in pain was not just about opioids and nonmalignant

5   pain.  It was about chronic pain in general,

6   including cancer pain and palliative care, which,

7   again, palliative care was just a blip on the radar

8   then.  So I would do these talks in the hope that I

9   would change practice.

10      Q.  So this is, to be colloquial, right in your

11   sweet spot?

12      A.  Yes.

13      Q.  And you would have gone and, based your

14   testimony earlier, it would have been your

15   presentation; it would have -- is that correct?

16      A.  Yes, that's correct.

17      Q.  It would have been as fair and balanced as

18   the literature and the science provided in March 18

19   of 19 -- or April 28 of 1998?

20      A.  Yes.

21      Q.  And there was certainly nothing promotional

22   about this -- this symposium; is that correct?

23      A.  Although I have no specific recollection --

24      Q.  It doesn't seem to be?

25      A.  -- it doesn't seem to be.  And I would

Page 427

1    agree with that.

2        Q.  So, again, Purdue was asked to sponsor it,

3    and they did, and that was the total involvement?

4        A.  Yes.

5        Q.  You testified earlier that after Sloan-

6    Kettering, you were -- you took a position as the --

7    I want to get this right -- chairman in new

8    Department of Pain Management and Palliative Care at

9    what at that point was Beth Israel?

10       A.  Yes.  I was asked to found the country's

11   first department devoted either to pain or

12   palliative care in an academic medical center.

13   It was the country's first department.

14               MR. COLEMAN:  Right.  So I'm going to

15   mark this -- I don't know what exhibit we're up to.

16               MS. SPENCER:  36.  Is that right?

17                    (Portenoy Exhibit 36 was marked

18                     for identification.)

19   BY MR. COLEMAN:

20       Q.  So I'll give you time to review this

21   because I . . .

22               So could you explain --

23               MS. SPENCER:  Just one moment so I can

24   look at it.

25               MR. COLEMAN:  Oh, sorry.

1              THE WITNESS:  Yes.

2    BY MR. COLEMAN:

3         Q.  So would you describe what this letter is.

4         A.  So this was a fund-raising letter that I

5    wrote on assuming my new position as the chairman of

6    the Department of Pain Medicine and Palliative Care.

7              As I said in the letter, that department

8    had very ambitious goals.  It included a pain

9    division, a division of chronic pain and acute pain,

10   a palliative care division, and also an institute

11   for education and research, the mission of which was

12   to conduct educational programs and also to do

13   research.

14             And my arrangement with the hospital

15   provided me with some seed money for the goals of

16   the department.  So I had access to some dollars to

17   bring people with me to this -- to this new

18   department, people who would do research and who

19   would help me do programs.

20             But my charge as chair was to acquire

21   funding to support our academic mission.

22        Q.  Right.

23        A.  And this was a letter -- I believe that I

24   sent a letter like this to a variety of potential

25   industry partners, people who -- companies that had

Page 429

1     supported educational programming in my area of

2     interest, to determine whether or not they would be

3     open to providing unrestricted support for

4     infrastructure, staffing, and early program

5     development so that I could get the department off

6     the ground.

7         Q.  Can you explain what you mean by

8     "unrestricted support."

9         A.  Yes.  This would be -- the request of this

10    letter would be for funds that would be for general

11    support of the mission of the organization, of the

12    departments.

13            So there would be no specific link to a

14    requirement to put on this conference or to do this

15    piece of research or to develop a specific program.

16    It would be up to -- up to me about how to use that

17    money to support the mission of the organization.

18        Q.  Right.  So -- and looking at the letter for

19    a moment, it says, "Dear Dr. Lazarus."  And you

20    crossed that out and you said "Harry."

21            That's usually something that you do

22    when you're familiar with somebody and you don't

23    want to be too formal; is that correct?

24        A.  Yes.

25        Q.  And who was Harry?

Page 430

1    A.  So I actually don't recall his -- his title

2   or what specific job he had.  But he interacted with

3   the academic community.

4    Q.  Right.  So this was somebody that you knew

5   beforehand --

6    A.  Yes.

7    Q.  -- and had a business relationship with or

8   professional relationship with?

9    A.  Yes.  You know, he was the person at Purdue

10   Frederick who could be contacted to discuss the

11   potential for support for academic -- academic

12   programs or research programs.

13    Q.  Right.  And the request here is "Would

14   Purdue Frederick consider a request for $100,000 per

15   year for each of the next two years to provide our

16   institute" -- I'm sorry.  I'm reading on page 2, the

17   second-from-the-last paragraph -- "for the next two

18   years to provide our institute with seed monies for

19   a broad-based educational program in pain and

20   palliative care?"

21         So that's the unrestricted grant that

22   you were just explaining to us --

23    A.  Yes.

24    Q.  -- is that correct?

25    A.  That's correct.

Page 431

1      Q.  Do you recall if Purdue gave the grant?

2      A.  When I started the department, I asked for

3   this kind of support from several potential

4   partners.  And we did receive some support.  But I

5   can't recall whether or not Purdue Frederick was one

6   of those partners.

7      Q.  Right.

8      A.  Perhaps you have documentation that . . .

9      Q.  Well, we do know -- I'm not going to get

10   through it, but we do know from our earlier exhibits

11   that the State showed us that there was support from

12   Purdue in the form of unrestricted grants.

13     A.  Right.

14           MR. COLEMAN:  So I don't think we have

15   to dwell on that.

16           The next -- I'm going to mark this for

17   the next exhibit.

18           MS. SPENCER:  For the record, I recognize

19   that, you know, Dr. Portenoy adopted the crossing

20   out of "Dr. Lazarus" and wrote "Harry."  It's not

21   clear to me -- there are other handwritten notes on

22   this document.

23           MR. COLEMAN:  Well, I'll go through

24   that.  I'm glad you mentioned that.  If you hand

25   that back to him.

Page 432

1   BY MR. COLEMAN:

2       Q.  If you look under the signature, under your

3   signature --

4       A.  Yes.

5       Q.  -- do you recognize that handwriting?

6       A.  Yes.  That's me.

7       Q.  And because you're a doctor, I'll ask you

8   to read it.

9       A.  It says, "Harry, Thanks for considering

10  this.  Russ."

11      Q.  So I would assume that the cross-out is in

12  the same handwriting as well?

13      A.  Yes.

14      Q.  So that is you?

15      A.  That is me.

16              MR. COLEMAN:  Okay.  Thank you.

17              MS. SPENCER:  That wasn't the one I was

18  referring to.  Maybe I have a draft that someone

19  else -- I have a little equal sign by the second

20  paragraph.  I have a little note by the second-to-

21  last paragraph.  And I have some notes on the first

22  page above and below the "received."

23              MR. COLEMAN:  I think we can ignore

24  those.  I'm not making anything --

25              MS. SPENCER:  You don't represent that

Page 433

1    they're his?

2              MR. COLEMAN:  No, not at all.  I think

3    those may just be stray marks on the document.  So

4    thank you for clarifying all of that.

5              MS. SPENCER:  Thank you.

6              MR. COLEMAN:  Can we mark this exhibit.

7                   (Portenoy Exhibit 37 was marked

8                    for identification.)

9    BY MR. COLEMAN:

10      Q.  Marking as Exhibit No. 37 --

11              MS. SPENCER:  Thank you.  Just one

12   moment.  If he and I can take a moment.

13              MR. COLEMAN:  Absolutely.  I'm sorry.

14   I'm rushing because we're charged --

15              MS. SPENCER:  I understand completely.

16   I just want to make sure that everyone is clear and,

17   you know, we do this carefully and appropriately on

18   all of our parts.

19              MR. BECKWORTH:  She made me wait too.

20   It's painful.

21              MS. SPENCER:  I made you wait longer.

22              MR. BECKWORTH:  You did.

23              MR. COLEMAN:  I'm showing him much

24   shorter documents.

25              MS. SPENCER:  True.  All true.  Okay.

Page 434

1    BY MR. COLEMAN:

2        Q.  So, Dr. Portenoy, I believe I heard you

3    testify earlier about a worldwide pain conference

4    that you were, I felt, very enthusiastic about

5    being -- about helping organize; is that correct?

6                MS. SPENCER:  Object.  I don't recall

7    that he was excited about that --

8    BY MR. COLEMAN:

9        Q.  Did you testify that you were on the board

10   of a worldwide pain conference?

11       A.  I think that what I testified to before is

12   that I was one of the organizers and the medical

13   director of a pain and chemical dependency

14   conference, a series of those conferences, which

15   were international.

16       Q.  So is that the same or different from this

17   worldwide pain conference?

18       A.  This is entirely different.

19       Q.  Completely different?

20       A.  Right.

21       Q.  So this was -- this was another conference

22   that you were going to be attending and speaking at;

23   is that correct?

24       A.  Yes.

25       Q.  And Purdue provided an honorarium for you

Page 435

1    to do this?

2        A.   Yes.

3        Q.   Is that what the letter suggests?

4        A.   Yes.

5        Q.   And this is in the year 2000?

6        A.   Yes.

7        Q.   And when you attended that conference, you

8    would have provided the best medical information

9    that you had available in the year 2000 --

10       A.   Yes.

11       Q.   -- is that correct?

12       A.   Yes.

13       Q.   And it would have been as factually and

14   medically accurate as it could have been based on

15   that?

16       A.   That's true.

17            MR. COLEMAN:  Okay, thank you.  No more

18   questions on that document.

19            I'll mark this document as 38.

20            (Portenoy Exhibit 38 was marked

21            for identification.)

22            MR. COLEMAN:  So are you ready --

23            THE WITNESS:  I am.

24            MR. COLEMAN:  Amy?

25            MS. SPENCER:  Yeah, he can go ahead.

1    BY MR. COLEMAN:

2         Q.   So can you give context to this letter?

3         A.   Yes.  By 2001, I was participating with a

4    group of people on this project that we called the

5    project on pain and chemical dependency.  And it

6    consisted of an annual or a biannual international

7    conference which we put on in New York in most years

8    and one year we put on in Washington.  It also

9    included a listserv.

10             And it created a membership organization

11   for a short time, an international membership

12   organization that we called the International

13   Association for Pain and Chemical Dependency, which

14   was overseen initially by an Australian physician

15   who was involved in pain and chemical dependency.

16             So there was a fairly significant

17   commitment on my part to do programming, educational

18   programming on this, what we called the interface

19   between pain medicine and chemical dependency.

20   Really the issues related to addiction and abuse as

21   it relates to the therapeutic use of opioids.

22             In 2001, some colleagues expressed

23   interest in possibly joining my department and

24   creating a more formal subunit devoted to that

25   issue.  And I became very excited about the

Page  437

1    possibility of having this created in my department.

2    I thought that if I had this critical mass of

3    experts in my department working with the people who

4    are already there, we could really accomplish a lot

5    in this area.

6                    And I needed, however, external funding

7    to bring these people in and pay their salaries.

8    This was not something that I could create a

9    business plan for, for the hospital nor would the

10   hospital support it.

11                   So the thought was that we would go to

12   multiple opioid manufacturers in the same way that I

13   went to multiple opioid manufacturers when I started

14   my department.  And we would see whether or not the

15   opioid manufacturers wanted to come together as a

16   consortium to support this not-for-profit entity in

17   my department that would try to further the goal of

18   educating and doing program development on this

19   issue of pain and chemical dependency.

20                   That's what the context is in this

21   letter.  And I reached out to Dr. Goldenheim at

22   Purdue to determine whether there might be interest

23   in providing support for that.

24       Q.  So is this also considered an unrestricted

25   grant --

1      A.  When we asked --

2      Q.  -- what you were asking for?

3      A.  Yes.  So it was conceptualized as a

4  completely unrestricted grant to support the

5  infrastructure cost and the startup cost of this new

6  entity.

7      Q.  Right.  So what we're looking at is your

8  kind of written explanation from you to Paul

9  Goldenheim to help get this project up and running --

10     A.  That's right.

11     Q.  -- is that a fair interpretation of what

12 you said?

13     A.  That's right.

14     Q.  Were you able to do this?

15     A.  No.  After we made an attempt to get

16 funding from various sources, it didn't materialize

17 and the project was dropped.

18     Q.  No further questions on this document.

19          Dr. Portenoy, you had testified earlier

20 in going through your declaration -- and I'm going

21 to ask some questions on the declaration --

22          MS. SPENCER:  I'll just ask the same

23 thing that I ask of everybody else, if you could

24 kind of let us know what the paragraph is.  And if

25 you're not sure, I do have an electronic copy that I

Page 439

1    can kind of . . .

2               MR. COLEMAN:  I've got it right here.

3               So first I'm going to mark this exhibit.

4    38, are we?

5               MS. SPENCER:  9.

6               MR. COLEMAN:  39.  I'm sorry.  I only

7    have three of these.

8               MS. SPENCER:  I'll share with the

9    witness.  We can make a copy after the fact.

10              MR. BECKWORTH:  I'll give you my copy.

11              MS. SPENCER:  Thank you, Brad.

12                   (Portenoy Exhibit 39 was marked

13                    for identification.)

14   BY MR. COLEMAN:

15      Q.  So this is a letter to you from Craig

16   Landau, M.D., who is the chief medical officer at

17   Purdue; is that correct?

18      A.  Yes.

19      Q.  And the letter is dated May 12, 2009 --

20      A.  Yes.

21      Q.  -- is that correct?

22      A.  Yes.

23      Q.  And it says, "As a specialty pharmaceutical

24   company focused primarily on the development of new

25   therapies for managing pain, Purdue is constantly

Page 440

1   evaluating new product opportunities.  To supplement

2   our significant internal expertise in evaluating such

3   opportunities, we are forming a multidisciplinary

4   external advisory board.  As a recognized expert in

5   your discipline, we would be pleased to have you as

6   a member of that board."

7            Did I read that correctly?

8   A.  Yes.

9   Q.  I'm going to direct your attention to your

10  declaration, paragraph 30 on page 19 and little (i).

11  And it says, "On December 16, 2009, I entered into a

12  master health care professional consulting [sic]

13  services agreement with Purdue, running through

14  December 31, 2011."

15           And I'm skipping down.  "I believe based

16  on the date of this agreement, this concerned the

17  launch of Purdue's Butrans product.  I was

18  compensated a total of $40,000 plus expenses for my

19  work on this project."

20           Is that correct?

21  A.  Yes.

22  Q.  So does this letter represent the retention

23  that ultimately went to the December 6 agreement?

24  A.  Yes, I believe it does.

25  Q.  So I have that agreement.  I'm not going to

Page 441

1    mark it unless you want to see it, need it to

2    refresh your recollection.  But this -- so that's

3    the retention that you're talking about here?

4       A.  When you -- just define the word "retention"

5    for me.  What do you mean?

6       Q.  Entered into -- well, you're right.

7    I shouldn't use that word.  That is the consulting

8    services agreement that you're talking about here?

9       A.  Yes, it was --

10      Q.  It's linked to --

11      A.  Yes.

12      Q.  -- this offer from Craig Landau in the

13   March 12 letter?

14      A.  Yes.

15      Q.  Can you tell us what an advisory board is,

16   or your understanding of an advisory board in a

17   pharmaceutical company.

18      A.  So my understanding is that a pharmaceutical

19   company will impanel a group of experts.  Sometimes

20   it's for a single meeting to discuss a specific

21   issue.  It could be, for example, to discuss the

22   development of a research protocol.  Or it could be

23   to discuss the unmet need for pain management in a

24   specific population.

25               Sometimes an advisory group will be

Page 442

1    brought together for a series of meetings to provide

2    advice to the drug company about their product

3    pipeline, what drugs they're working on

4    preclinically to determine which ones should go into

5    clinical trials.  So they're seeking -- the drug

6    company executives are seeking the advice of experts

7    that are not employed by the drug company.

8              And so they -- each of these panels will

9    have different types of people.  I would usually

10   participate sort of representing expertise in

11   clinical pain management and also expertise in

12   clinical trials development.

13             So I did advisory boards for the design

14   of research protocols and I did advisory boards to

15   talk about the role of new products, for example, in

16   pain medicine.

17       Q.   Right.  So here you believe that this had

18   to do with a Purdue product, Butrans; is that

19   correct?

20       A.   Among other things.

21       Q.   Right.  So -- and can you describe what

22   Butrans was.

23       A.   Butrans is a --

24       Q.   Is.  Is.

25       A.   Is, yes.  Is a patch that contains the

1    opioid called buprenorphine.  And it's a transdermal

2    patch that can provide analgesia for many days.

3        Q.  So on the advisory panel, I assume as a

4    pain specialist, they would say, Here's a product

5    that we've either developed or are thinking of

6    developing; would this be something that you would

7    consider using in your practice?

8        A.  Sometimes that question would arise.  But

9    typically the people on the advisory board wouldn't

10   be representative of people in general practice.

11   They would be representatives of the academic

12   community.

13       Q.  Right.

14       A.  So they'd want to know about -- more about

15   the status of the pain research that was being done.

16   They'd like us -- like, for example, would want to

17   analyze whether or not there are patients who have

18   chronic pain, who are frail.  And an opioid might be

19   considered, but the dosing -- the available tablets

20   of the different drugs in the marketplace wouldn't

21   make it possible to treat those patients safely.

22            So it's typically not -- honestly, when

23   I did these advisory boards, they didn't -- weren't

24   asking me about my practice.  They would be asking

25   me about areas of my expertise that might relate to

Page 444

1    the science, might relate to my clinical trials

2    knowledge, that sort of thing.

3         Q.  Right.  So Butrans is -- it still is on the

4    market -- a transdermal patch; is that what you said?

5         A.  Yes.

6         Q.  And I believe the dosing is once a week?

7         A.  Yes.

8         Q.  So the idea was if Purdue could put out a

9    patch that you could use once a week rather than

10   taking medication every day, that that would be

11   advantageous to certain patient populations in terms

12   of compliance, consistency, other issues like that?

13        A.  That's correct.  And also buprenorphine was

14   not a drug that was being used for chronic pain, and

15   it has a unique pharmacology.  So the discussion

16   about the Butrans patch was whether or not that

17   pharmacology might prove to be of specific benefit

18   in some populations.

19        Q.  Right.  Doctor, you're aware that Butrans

20   was never really a commercial success?

21        A.  I didn't know that.

22        Q.  Well, I'll represent that to you.  But

23   there was significant -- you know, there was

24   marketing activity on Butrans.  So would you agree

25   that merely marketing an opioid product isn't going

1    to make it a commercial success?

2       A.   I think I don't know enough about the

3    phrase "merely marketing."  I would imagine that

4    marketing can take all different kinds of forms and

5    have all different sorts of resources behind it.

6    So I wouldn't be able to comment on whether or not

7    "merely marketing" is enough.

8       Q.   Fair enough.  I'll try to ask a more

9    specific question.  If you have a medication that

10   does not fit a patient population's need, do all the

11   drug representatives in the world change that fact?

12      A.   So if you're asking me, can products come

13   on the market and not do well because they don't

14   meet an existing clinical need?  And the answer to

15   that question, I believe, is yes.

16           You can have a product fail because it

17   doesn't -- it doesn't pose any advantage over other

18   products or its price is too high relative to

19   existing products that do just as well.  Or what the

20   company thought was an advantage, like a new

21   delivery system, was not viewed as advantageous by

22   the doctors.  So a company -- a product can fail if

23   there's no clinical perceived need.

24      Q.   So a sales representative could have some

25   influence on whether a product gets the attention,

1    but you can't turn a product that doesn't have the

2    characteristics that the patient population and the

3    medical community is looking for into a successful

4    launch or a successful drug; is that a fair

5    statement?

6              MS. SPENCER:  You can answer to the

7    extent you -- I'll object, but you can answer to the

8    extent you know.

9              THE WITNESS:  Yeah.  I think the

10   statement is a little too broad --

11   BY MR. COLEMAN:

12      Q.  Okay.

13      A.  -- and there are too many variables in that

14   equation that I can't comment on.  But to reiterate

15   what I said, can a product come on the market and

16   then fail despite the intent of the manufacturer for

17   the product to do well, and the answer is obviously

18   yes.  And presumably that occurs because the

19   perceived clinical need doesn't materialize.

20              MR. COLEMAN:  Okay.  I have a few quick

21   cleanup questions.  I'm just going to quickly check

22   my time to make sure . . .

23              THE VIDEO OPERATOR:  Seven hours,

24   11 minutes.

25              MR. COLEMAN:  Okay.  I'm going to do

Page 447

1    five minutes and pass.

2              MR. BECKWORTH:  Okay.

3    BY MR. COLEMAN:

4       Q.  On the -- let's stay on the declaration.

5    On paragraph 46, the very last line, the paragraph

6    starts with "I have long believed that direct-to-

7    consumer advertising in the opioid context is a

8    terrible idea."

9              We went through this paragraph earlier

10   in the day, and I'm not going to revisit it.  I did

11   want to clarify one comment.  Now, first, direct-to-

12   consumer advertising we were talking about is ads on

13   TV, ads in Women's Wear Daily, ads in a magazine

14   that you would pick up at the dentist's office.

15             Is that your understanding as well?

16      A.  Yes.

17      Q.  Okay.  So the last sentence says, "I first

18   saw a full-page color advertisement for OxyContin in

19   a general medical journal."

20             There seems to be a disconnect between

21   that statement and the beginning of the paragraph,

22   so -- I understand that the full-page color ad could

23   be in a general medical journal but I don't think

24   you were meaning to suggest it was a direct to

25   consumer?

Page 448

1               MR. BECKWORTH:  Objection.

2               THE WITNESS:  No.  I take the point --

3    no.  These are two different types of advertising.

4    The first part of the paragraph is speaking to

5    direct-to-consumer like a television ad, and the

6    second part of the paragraph is talking about

7    advertising in a medical journal that would be read

8    by physicians.

9               MS. SPENCER:  One clarification.  The

10   sentence right before the one that you read reads,

11   "This concern about advertising also extends to

12   primary care physicians themselves."

13              THE WITNESS:  That's the transition.

14              MR. COLEMAN:  Okay.  That didn't jump

15   out.  That's why I clarified it.

16              THE WITNESS:  Okay.

17   BY MR. COLEMAN:

18     Q.  Going to a document that was designated as

19   Exhibit 22.  I'll give you a chance to get it and

20   reacquaint yourselves with it.

21              MS. SPENCER:  This needs to be in your

22   pile because it's the official one.

23              THE WITNESS:  Yes.

24              MS. SPENCER:  22?

25              MR. COLEMAN:  22, yes.

```
 1              THE WITNESS:  Yes.
 2    BY MR. COLEMAN:
 3         Q.  Do you see down at the bottom -- whoops,
 4    I'm ambushing you.  I'm sorry.
 5         A.  That's all right.
 6         Q.  Do you see down at the bottom it says page --
 7    their page 10, and the next one says page 11?
 8         A.  Yes.
 9         Q.  So does that suggest that this is from a
10    larger document?
11         A.  Yes.
12         Q.  Were you shown the larger document at any
13    time?
14         A.  No.
15         Q.  Are you familiar with the larger document?
16         A.  No.
17         Q.  So you were asked to comment on the calls
18    on M.D.s and the resulting prescriptions based on
19    those calls; is that correct?
20         A.  Yes.
21         Q.  But you don't know what type of M.D.s these
22    are; is that correct?
23         A.  That's correct.
24         Q.  From this?  Would it be safe to assume that
25    there are more calls to doctors who are pain
```

1   specialists or practice in that area --

2           MR. BECKWORTH:  Objection.  Sorry.

3   BY MR. COLEMAN:

4      Q.  -- or there's certainly nothing in this

5   document to suggest that is not the case?

6      A.  That's correct.

7      Q.  And if that were the case, you would expect

8   to see more prescriptions from that population;

9   would you agree with that?

10     A.  I would agree with that.

11     Q.  So a quick question about Document 25.

12     A.  Um-hum.

13     Q.  So you were shown this document earlier in

14  the day, correct?

15     A.  Yes.

16     Q.  You had never seen this document before,

17  as I recall?

18     A.  Right.

19     Q.  And you were shown one paragraph.  If it

20  wasn't on the last page, it was pretty much at the

21  end.  I believe it was on page 25.  But that's the

22  paragraph you were shown and asked to read; is that

23  correct?

24     A.  Yes.

25     Q.  Or thereabouts?

Page 451

1     A.  Yes.

2     Q.  You were not shown on page 9 Purdue's --

3  and, again, this document is "Corporate Reputation

4  and Visibility Strategic Plan."

5            You were not shown extensive information

6  about creating a patient -- I'm on page 9.

7     A.  Yes.

8     Q.  -- a patient access platform?  I'm going to

9  not read that because of the time constraints.  Or

10 the anti-diversion/abuse message platform.  And that

11 goes on for two pages.

12           Do you see that?

13    A.  Yes.

14    Q.  So that was not part of what you discussed

15 earlier on in the day?

16    A.  That's true.

17           MR. COLEMAN:  Dr. Portenoy, I have one

18 last exhibit that I will mark.

19           MS. SPENCER:  We're up to 40.

20               (Portenoy Exhibit 40 was marked

21               for identification.)

22           MR. COLEMAN:  Let me know when you've

23 had a chance to . . .

24           MS. SPENCER:  Just one moment.

25           THE WITNESS:  Okay.

Page 452

1              MS. SPENCER:  Hold on.  I'm not ready.

2    I'm sorry.  I take responsibility, but I need to

3    read this.

4              Go ahead.  Thank you, sorry.

5    BY MR. COLEMAN:

6        Q.  So this is an email exchange, correct?

7        A.  Yes.

8        Q.  It's an email exchange between you and

9    several members of -- several employees of Purdue;

10   is that correct?

11       A.  Yes.

12       Q.  And if you read backwards with it, the

13   first email on the string is from May 10, 2013;

14   is that correct?

15       A.  Yes.

16       Q.  And it says, "Dear Pam, I hope all is well.

17   I have a quick question.  I and many others are

18   named in a suit to which the company is a party.

19   You may know about it.  My hospital's attorneys

20   wanted me to find out whether there had been

21   discussions or plans to provide defense or

22   indemnification to the outside academic physicians

23   (like me).  Are you able to tell me who I could

24   email or could call to find out about this?  Thanks

25   very much.  Russ."

Page 453

1           Did I read that correctly?

2      A.  Yes.

3      Q.  Did you make this request to any other

4  pharmaceutical company --

5      A.  No.

6      Q.  -- that you worked for?

7           So you just -- at the hospital's

8  suggestion, you asked Purdue to indemnify and defray

9  attorney expenses at least for the lawsuits that you

10  are now being named in?

11     A.  No --

12          MS. SPENCER:  Objection.  That is a

13  mischaracterization of this email.  I'll let him

14  answer, but . . .

15  BY MR. COLEMAN:

16     Q.  Okay.  Go ahead.

17     A.  This lawsuit has nothing to do with the

18  current litigation.  This lawsuit is from some years

19  ago and involved a gentleman, I believe in the State

20  of South Carolina, who developed the disease of

21  addiction and engaged in some criminal activity and

22  ended up in prison and chose to sue Purdue and a

23  number of physicians for creating an environment

24  that caused him to become addicted.  And it has

25  nothing at all to do with the current opioid

1   litigation.

2                I went to my hospital attorney -- I was

3   a full-time employee of Beth Israel, and I went to

4   the hospital attorney and asked whether or not I

5   could get some help from the hospital attorney in

6   dealing with this suit.

7                And the hospital attorney said no, that

8   it wouldn't be appropriate, but asked me to find out

9   whether or not Purdue would have some involvement in

10  helping the physicians, the individual physicians

11  who were named defendants on that suit.

12               As you see, Purdue declined to do that.

13  And I and the other physicians hired counsel in

14  South Carolina to put in a motion to have the case

15  dismissed, and it was dismissed.

16     Q.  So did there come a time when you were sued

17  in what you are terming this litigation, this series

18  of litigations?

19               MS. SPENCER:  If that's the question,

20  did there come a time when you were sued in this

21  series of litigations?

22               MR. COLEMAN:  Yes.

23               MS. SPENCER:  You can answer that

24  question.  I'm going to caution, you know, that if

25  you're treading close to privilege areas, I'm going

Page 455

1    to object.

2              MR. COLEMAN:  No.  All I'm going to do

3    is --

4    BY MR. COLEMAN:

5        Q.  Go ahead.

6        A.  Yeah.

7        Q.  That was a "yes," correct?

8        A.  Yes.

9        Q.  And did you seek indemnification from

10   Purdue in that instance?

11       A.  No.

12       Q.  You never sought indemnification from

13   Purdue for the current litigations?

14       A.  No.

15       Q.  Did you seek indemnification from any of

16   the defendants?

17       A.  No.

18             MR. COLEMAN:  Okay.  No more questions.

19   Thank you so much.

20             MS. SPENCER:  Just so we have a sense,

21   where are we on time?

22             THE VIDEO OPERATOR:  Seven hours,

23   22 minutes.

24             MS. SPENCER:  Do you think you'll be

25   there or close?

```
 1                    MR. ERCOLE:  I may go over a little bit.

 2                    MS. SPENCER:  I'm just asking for a

 3      ballpark, there or close?

 4                    MR. ERCOLE:  I will do my best to do

 5      that and then we can have a discussion if things are

 6      going longer, but yes, that's my intent.

 7                    MR. BECKWORTH:  Just so you know, I

 8      finished two minutes short.

 9                    MR. ERCOLE:  I appreciate that.

10                    MR. BECKWORTH:  See what you got.

11                         EXAMINATION

12      BY MR. ERCOLE:

13         Q.  Good evening, Dr. Portenoy.  I'm going to

14      do my best not to show you any additional exhibits

15      because I know you've seen a lot of exhibits today.

16                    Would you agree that --

17                    MS. SPENCER:  Can I just -- for the

18      record, if you could identify yourself for the

19      witness and who you represent.

20                    MR. ERCOLE:  Sure.

21      BY MR. ERCOLE:

22         Q.  My name is Brian Ercole, and I represent

23      several of the manufacturers in this particular

24      litigation, and we'll get into who some of those

25      are.
```

1              Would you agree that opioid

2    manufacturers are not all the same?

3         A.   I'm going to ask you to clarify when you

4    say "not all the same."  In what context?

5         Q.   Sure.  There are different manufacturers of

6    opioids, correct?

7         A.   Correct.

8         Q.   And those companies manufacture different

9    opioid medicines, correct?

10        A.   Yes.

11        Q.   And those companies sell different opioid

12   medicines, correct?

13        A.   Yes.

14        Q.   And some of those medicines may be generic

15   opioids; is that fair?

16        A.   Yes.

17        Q.   And some of those medicines may be brand

18   medications; is that fair?

19        A.   Yes.

20        Q.   And is it also fair to say that different

21   opioid companies engage in different types of

22   marketing?

23        A.   I don't -- I can't answer specifically, but

24   I think that that's a fair statement.

25        Q.   Sure.  And is it fair to say that different

1  opioid manufacturers may say different things about

2  their medicines?

3      A.  That's a fair statement too.

4      Q.  And is it fair to say that with respect to

5  opioid medicines, that they differ?

6      A.  Yes.

7      Q.  Some are long-acting opioids?

8      A.  Yes.

9      Q.  Some are short-acting opioids?

10      A.  Yes.

11      Q.  And there are other differences as well,

12  correct?

13      A.  Yes.

14      Q.  Different delivery systems, for instance?

15      A.  That's right.

16      Q.  Dr. Portenoy, have you ever heard of Watson

17  Laboratories, Inc.?

18      A.  Yes.

19      Q.  And have you heard about Watson

20  Laboratories, Inc. in connection with this case?

21      A.  I --

22          MS. SPENCER:  When you say "this case,"

23  you mean the State of Oklahoma versus these

24  companies involved here today, or do you mean --

25          MR. ERCOLE:  I mean -- Sorry.  I didn't

Page 459

1   mean to cut you off.

2            MS. SPENCER:  -- the more general opioid

3   litigation that is pending, you know, here and

4   elsewhere?

5            MR. ERCOLE:  Sure.

6   BY MR. ERCOLE:

7       Q.  I mean this particular case, the State of

8   Oklahoma versus the pharmaceutical manufacturers,

9   the reason why you're here today.

10      A.  Yeah.  I'm not aware that I heard about

11  Watson Laboratories in this context.

12      Q.  Do you recall any communications that

13  you've had with Watson Laboratories, Inc.?

14      A.  I don't.

15      Q.  Are you aware of any marketing that Watson

16  Laboratories, Inc. has done?

17      A.  I'm not.

18      Q.  Are you aware of any funding that Watson

19  Laboratories, Inc. has given to you or any of your

20  employers?

21      A.  Not that I recall.

22      Q.  Dr. Portenoy -- and just to clarify, going

23  forward, when I refer to "this case," I'm referring

24  to the State of Oklahoma case --

25            MS. SPENCER:  Thank you.

Page 460

1   BY MR. ERCOLE:

2      Q.  -- and if you do have a question or you're

3   not understanding what I'm saying, please just raise

4   that issue --

5      A.  Sure.

6      Q.  -- and I'll clarify for you.

7      A.  Thank you.

8      Q.  Dr. Portenoy, are you familiar with the

9   entity Actavis LLC?

10     A.  Not specifically.

11     Q.  Are you aware of any communications that

12  you've ever had with Actavis LLC?

13     A.  I'm not.

14     Q.  Are you aware of any marketing ever done by

15  Actavis LLC?

16     A.  Not that I'm aware of.

17     Q.  Are you aware of any funding Actavis LLC

18  has ever given to you or any of your employers?

19     A.  Not that I recall.

20     Q.  Dr. Portenoy, are you familiar with the

21  entity Actavis Pharma, Inc.?

22     A.  Not that I recall, no.

23     Q.  Are you aware of -- Strike that.

24         Have you had any communications with

25  Actavis Pharma, Inc.?

Page 461

1        A.   No.

2        Q.   Are you aware of any marketing of any

3   products that Actavis Pharma, Inc. has done?

4        A.   Not that I'm aware of.

5        Q.   Are you aware of any funding that Actavis

6   Pharma, Inc. has given to you or any of your

7   employers?

8        A.   No.

9        Q.   Are you aware of any of the products that

10  Actavis Pharma, Inc. manufactures?

11       A.   I'm not.  But I have to say that, as you

12  know, in the pharmaceutical industry, names change

13  and companies are acquired by other companies.  And

14  it's possible that I've lost track of what products

15  have been sold to other companies.

16            So I don't have a recollection about

17  Actavis.  But if I found out, for example, that they

18  were a manufacturer of one of the drugs involved in

19  the litigation, it wouldn't surprise me.  It means

20  that they just acquired that product and I wasn't

21  aware of it.

22       Q.   Sir, sitting here today, you're not aware

23  of any products that Actavis Pharma, Inc.

24  manufactures, correct?

25       A.   I am not aware, no.

Page 462

1      Q.  And you're not aware of any products that

2   Actavis Pharma, Inc. has manufactured in the past --

3      A.  No.

4      Q.  -- correct?

5      A.  That's correct.

6      Q.  Would the same apply to Actavis LLC?

7      A.  Yes.

8      Q.  Would the same apply to Watson

9   Laboratories?

10     A.  Yes.

11     Q.  Dr. Portenoy, if you can pull up your

12   declaration.  I think it's Exhibit 2.

13     A.  I have it, yes.

14     Q.  Great.  You agree, I think you testified

15   before, that this case is a very serious case,

16   correct?

17     A.  Yes.

18     Q.  And is it fair to say that the assertions

19   made in your declaration are serious too, correct?

20     A.  I think that's true.

21     Q.  Sure.  If you turn to paragraph 30 of your

22   declaration --

23     A.  Um-hum.

24          MS. SPENCER:  Page 19.

25

Page 463

1    BY MR. ERCOLE:

2        Q.  Yes.  Take your time to get there.

3        A.  Um-hum.

4        Q.  The State asked you some questions earlier

5    about paragraph 30.  Do you recall that?

6        A.  Yes.

7        Q.  And by "the State" -- and I mean --

8            MS. SPENCER:  We know.

9    BY MR. ERCOLE:

10       Q.  -- Mr. Beckworth, who's representing the

11   State here.

12       A.  Yes.

13       Q.  And Mr. Beckworth walked you through some

14   of the examples from (a) to (p) in that declaration,

15   correct?

16       A.  Yes.

17       Q.  So if you can turn to paragraph 30(c),

18   do you see that?

19       A.  Yes.

20       Q.  And it refers to, in paragraph 30(c),

21   a seminar titled "Breakthrough pain curriculum

22   development workshop"?

23       A.  Yes.

24       Q.  And in there, it says, "I believe this was

25   financed ultimately by Cephalon, Inc. related to its

Page 464

1   drug Fentora"; do you see that?

2       A.  Yes.

3       Q.  Are you aware of anything false or

4   misleading in that seminar, "Breakthrough pain

5   curriculum development workshop"?

6       A.  I don't have a specific recollection of

7   that workshop.  As a general rule, I would say no,

8   there was nothing false or misleading in workshops

9   like that.

10      Q.  And why would you say that as a general

11  rule?

12      A.  I participated in a number of educational

13  programs devoted to breakthrough pain.  Breakthrough

14  pain was a specific interest of mine.  I developed

15  the first measurement tool for that type of pain and

16  was involved in designing the research protocols

17  that demonstrated how the short-acting drugs work

18  for breakthrough pain.  So it was a specific area of

19  interest.

20          So I participated in a number of those

21  kinds of programs.  And all the programs that I

22  participated in were CME programs that -- for which

23  I created my own messages, used my own slides.

24  There was never any effort on the part of a funding

25  company, the sponsor, to change my messages or ask

Page 465

1    me to use specific slides.

2        Q.  And paragraph 30(c) indicates that you were

3    compensated $3,000 by Advanced Strategies in

4    Medicine.

5             Do you see that?

6        A.  Yes.

7        Q.  Was there anything wrong with being

8    compensated for putting together a seminar that was

9    neither false nor misleading?

10       A.  No, I don't think so.

11       Q.  If you turn to paragraph 30(e) -- Strike

12   that.  The next sort of bullet down, paragraph 30(d),

13   do you see that?

14       A.  Yes.

15       Q.  It says, "On May 15, 2007, I worked on an

16   advisory board for Cephalon, Inc. concerning the

17   drug Fentora, for which I was compensated $3,500"?

18       A.  Yes.

19       Q.  Did I read that correctly?

20       A.  Yes.

21       Q.  And are you aware of anything false or

22   misleading that was discussed at that advisory board

23   meeting on May 15, 2007?

24       A.  I'm not aware of anything.

25       Q.  Was there anything inappropriate about

Page 466

1    being compensated for your work in connection with

2    that advisory board meeting?

3        A.  No.

4        Q.  And is it fair to say that that advisory

5    board meeting was an internal meeting at Cephalon?

6    Strike that.  That's a bad --

7              MS. SPENCER:  I was going to say, he can

8    answer if he recalls.

9              MR. ERCOLE:  Fair enough.

10   BY MR. ERCOLE:

11       Q.  In connection with that advisory board

12   meeting, was there any marketing done external in

13   connection with that?

14             MS. SPENCER:  Objection.

15             You can answer if you recall.

16             THE WITNESS:  Yeah.  I don't recall this

17   specific meeting in 2007.  So I really can't answer

18   that.

19   BY MR. ERCOLE:

20       Q.  As a general matter, did advisory boards

21   engage in marketing?

22       A.  No.  As a general matter, the advisory

23   boards did not discuss marketing.

24       Q.  And sitting here today, with respect to the

25   May 15, 2007 advisory board meeting for Cephalon,

Page 467

1    you're not aware of any marketing that was done in

2    connection with that particular meeting?

3        A.   I'm not aware of any, no.

4        Q.   And you're not aware of anything false or

5    misleading said during that meeting, correct?

6        A.   That's correct.

7        Q.   Paragraph -- turn to the next paragraph,

8    paragraph 30(e).  It says, "On November 6, 2007,

9    I presented a continuing medical education program,

10   'Meet the patients: Individualizing therapy for

11   persistent and breakthrough pain.'"

12             Do you see that?

13   A.   Yes.

14       Q.   Are you aware of anything false or

15   misleading -- Strike that.

16             In connection with that CME program, did

17   you independently develop the content of that

18   program?

19       A.   I don't remember the specific program, but

20   I'll answer yes to that because I developed the

21   content for all of the educational programs that I

22   did.

23       Q.   And with respect to any CME programs you

24   did for -- Strike that.

25             With respect to any CME programs that

Page 468

1    were sponsored by Cephalon, is it fair to say that

2    Cephalon never controlled the content of those

3    programs?

4        A.  That I was involved with?

5        Q.  Yes.

6        A.  Yes, it's fair to say that.

7        Q.  And to the best of your recollection, the

8    November 6, 2007 CME program was no exception?

9        A.  That's -- To the best of my recollection,

10   that's true.

11       Q.  And it indicates in that paragraph that you

12   were compensated $2,000 by Advanced Strategies in

13   Medicine; do you see that?

14       A.  Yes.

15       Q.  Anything improper about you being

16   compensated for your work in creating that CME?

17       A.  I don't think so, no.

18       Q.  If you go down to paragraph 30(j) --

19       A.  Yes.

20       Q.  -- it says, "On April 1, 2009, I

21   participated in a Fentora medical scientific

22   advisory board meeting"?

23       A.  Yes.

24       Q.  Do you see that?

25       A.  Yes.

Page 469

1      Q.  And is the medical scientific advisory

2  board meeting referenced there the same type of

3  advisory board meeting that you've talked about

4  already?

5      A.  I don't remember this specific meeting.

6  I remember, for example, participating in a meeting

7  in which we designed a new research protocol for

8  studying Fentora in -- as a repeated dose

9  administration.

10          So the answer is, it could have been on

11  a research protocol, or it could have been of the

12  type I mentioned before where we were talking about

13  the role of treating breakthrough pain as part of

14  pain medicine.

15      Q.  Anything inappropriate that you recall

16  taking place on April 1, 2009?

17      A.  No, not that I recall.

18      Q.  Anything inappropriate or wrong from your

19  perspective in connection with participating in an

20  advisory board meeting for Fentora?

21      A.  No.

22      Q.  If you turn to paragraph 30(m), it says,

23  "In May 2010, I moderated an online program called

24  'Medico-legal issues, clinical guidelines and opioid

25  dose conversions.'"

 1             Do you see that?

 2      A.  Yes.

 3      Q.  And that was for the website

 4  emergingsolultionsinpain.com?

 5      A.  Yes.

 6      Q.  Do you recall anything false or misleading

 7  that you did in connection with that online program?

 8      A.  No.

 9      Q.  Do you recall anything false or misleading

10  with respect to that online program?

11      A.  No.

12      Q.  Would you have independently created the

13  content of that program?

14      A.  Yes.

15      Q.  Cephalon would not have controlled the

16  content of that program, correct?

17      A.  Let me just clarify what I just said.

18      Q.  Sure.

19      A.  I would have either -- for a program of

20  this type -- I don't have a specific recollection of

21  this program, but for a program of this type, I

22  would either have created the programming or a

23  medical education company would have drafted the

24  programming, and then I would have edited it so that

25  it was appropriate.

Page 471

1    Q.  And is it fair to say that the content of

2  that program was independently created by others

3  than Cephalon?

4    A.  Yes.

5    Q.  And anything in your mind that was somehow

6  inappropriate about receiving $2,000 in connection

7  with that program?

8    A.  No.

9    Q.  And is it fair to say that that $2,000 that

10  you received never influenced the content of that

11  program?

12    A.  Yes.  That's true.

13    Q.  And is it fair to say that with respect to

14  all of the different -- the different programs and

15  advisory board meetings we just discussed, that any

16  payment you received in connection with those never

17  influenced your views?

18    A.  That's true.

19    Q.  And never influenced the content of those

20  programs?

21    A.  That's true.

22    Q.  And would the same -- if you take a look at

23  paragraph 30(p), it says, "On February 11, 2011,

24  I entered into an advisory board agreement with

25  Cephalon, Inc."?

Page 472

1       A.  Yes.

2       Q.  Do you recall anything false or misleading

3   discussed?  Strike that.

4             Do you know whether or not you actually

5   engaged in any type of advisory board discussions

6   after entering into that agreement in February 11?

7       A.  I don't recall, no.

8       Q.  And you don't recall any false or

9   misleading discussions taking place at any advisory

10  board meeting that you've ever had with Cephalon;

11  is that fair to say?

12      A.  That's fair to say, yes.

13      Q.  So with respect to the examples we just

14  discussed, there's no mention of Teva

15  Pharmaceuticals USA; is that correct?

16      A.  Yes.

17      Q.  And will you agree that for purposes of

18  moving this forward when I refer to -- I'm going

19  to use "Teva USA" as a shorthand for "Teva

20  Pharmaceuticals USA"?  Is that fair?  Can we get on

21  the same page there?

22      A.  That would be fine.

23      Q.  Do you recall any communications that

24  you've had with Teva USA?

25      A.  No.

Page 473

1      Q.  Are you aware of any marketing that Teva

2  USA has done?

3      A.  No, I'm not.

4      Q.  Are you aware of anything false or

5  misleading that Teva USA has said about any of its

6  products?

7      A.  No.

8      Q.  Can we turn to paragraph 32 of your

9  declaration, sir.  Do you see that?

10     A.  Yes.

11     Q.  And if you turn -- it starts on page 21 and

12  goes to page 22.

13     A.  Yes.

14     Q.  And it says in here, "A responsible

15  company" -- Do you see the sentence that starts,

16  "A responsible company should disclose relevant

17  risks when communicating with the public"?

18          MS. SPENCER:  It's on the next page.

19  BY MR. ERCOLE:

20     Q.  Sorry, it goes to paragraph --

21     A.  Yes.

22          MS. SPENCER:  I'm just facilitating.

23          MR. ERCOLE:  Thank you.

24          THE WITNESS:  Yes.

25

1    BY MR. ERCOLE:

2        Q.  Are you aware of Cephalon not disclosing

3    any relevant risks when communicating with the

4    public of its medicine?

5        A.  I'm not aware of communications to the

6    public from Cephalon.

7        Q.  And it goes on to say, "the risks

8    associated with opioid abuse and addiction were

9    known at that time."

10            Do you see that?

11       A.  Yes.

12       Q.  That would have been in 2004?

13       A.  Yes.

14       Q.  So in 2004, in your declaration, you're

15   confirming that the risks associated with opioid

16   abuse and addiction were known, correct?

17       A.  Correct.

18       Q.  And they would have been known within the

19   medical community, correct?

20       A.  Yes.

21       Q.  If you turn to paragraph 34 of your

22   declaration, I believe it's page 23.

23       A.  Yes.

24       Q.  It says, "I believe that, over the years,

25   some defendant drug companies have used my work to

Page 475

1    promote opioids by referencing the positive

2    statements that I made repeatedly without providing

3    the background, analysis of the literature, and

4    cautions that accompanied these positive statements."

5              Do you see that?

6    A.  Yes.

7    Q.  Are you aware of any instances where

8    Cephalon did that?

9              MS. SPENCER:  All you can answer is what

10   you know.

11             THE WITNESS:  Yes.  So I'm not aware of

12   an example where Cephalon has done that, no.

13   BY MR. ERCOLE:

14   Q.  And you're not aware of an example of Teva

15   USA doing that?

16   A.  No.

17   Q.  If you turn to paragraph 35 of your

18   declaration.  Do you see that, sir?

19   A.  Yes.

20   Q.  And I think it may be the fourth sentence

21   down.  It says, "Although I personally was never

22   influenced to say things I did not believe," do you

23   see that?

24   A.  Yes.

25   Q.  What did you mean by that?

Page 476

1      A.   Essentially what we were saying before.

2   That in the funding that I received for educational

3   programs or in the funding that I received for

4   research projects, I personally was never asked to

5   craft a specific message or not -- not convey a

6   message that I originally put into some educational

7   materials or to do a specific kind of research or

8   change my research methodology.  I haven't

9   personally experienced that.

10      Q.   And if you keep going where there's a

11   reference to "they used the positive statements that

12   I made about opioids to portray opioid treatment as

13   safe and effective without the accompanying

14   discussion of risk that I included in the papers,

15   chapters, and lectures I produced beginning in the

16   1980s."

17           Do you see that?

18      A.   Yes.

19      Q.   Are you aware of any instance where

20   Cephalon did that with respect to opioids?

21      A.   Yeah.  I don't have any specific

22   recollection of that -- of those materials from

23   Cephalon.

24      Q.   About Teva USA?

25      A.   No.

Page 477

1      Q.  If you turn to paragraph 36.

2      A.  Yes.

3      Q.  It says -- last sentence there --

4  "I believe that the drug companies created material

5  that narrowly focused on the potential for safe and

6  effective treatment of chronic noncancer pain, some

7  of which was attributed to my work, but failed to

8  include an adequate and balanced discussion of the

9  limitations in the relevant science and the risks as

10  they were then known."

11              Do you see that?

12      A.  Yes.

13      Q.  Any instances where Cephalon did that?

14              MR. BECKWORTH:  Objection.

15              MS. SPENCER:  You can answer to the

16  extent that you know.

17              MR. BECKWORTH:  Yeah.  That's my

18  objection.  Are you asking him if he remembers or if

19  there are, in fact, any?

20              MR. ERCOLE:  Well, I appreciate the

21  objection.  So I'll let the question stand.

22  BY MR. ERCOLE:

23      Q.  And you can answer the question if --

24      A.  Yeah.  I don't recall any.

25      Q.  So sitting here, you don't recall any

1    instances where that happened with respect to

2    Cephalon?

3        A.   That's correct.

4        Q.   Would the same hold true with respect to

5    Teva USA?

6        A.   Yes.

7              MR. BECKWORTH:   Same objection.

8    BY MR. ERCOLE:

9        Q.   If you turn to paragraph 38, do you see

10   that?

11       A.   Yes.

12       Q.   It's a reference to the American Pain

13   Foundation?

14       A.   Yes.

15       Q.   And was the American Pain Foundation formed

16   to help patients -- Strike that.

17              Was the American Pain Foundation formed

18   to help patients?

19       A.   Patients, families, and the lay public.

20       Q.   Do you think it did?

21       A.   Yes.

22       Q.   And how do you think it did?

23       A.   It did a variety of programs that

24   accomplished a lot of good.  For example, it had a

25   hotline that patients in distress or family members

1   would call.  And the hotline received thousands of

2   calls from distressed patients asking for

3   information.  It created educational materials at a

4   patient reading level that it distributed about pain

5   management.  Those kind of materials weren't

6   available anywhere else.

7        Q.  And if you go down -- And the American Pain

8   Foundation is no longer in existence today, correct?

9        A.  That's correct.

10       Q.  If you go down to the sentence that begins,

11  "Although management and board members were never

12  induced to create specific messages or change a

13  message that was proposed as part of any project,"

14  do you see that?

15       A.  Yes.

16       Q.  What do you mean by that, sir?

17       A.  I'm not aware of any time that a project

18  that was funded by a pharmaceutical company as part

19  of a grant request was needed to be changed, needed

20  to be modified because the drug company wasn't

21  comfortable with the project and requested specific

22  changes in the messages.

23            I think that all these grants were

24  considered to be unrestricted grants that would fund

25  the project that would be under the control of the

1   management of the APF.

2       Q.  And would it be fair to say that to the

3   best of your knowledge, none of the pharmaceutical

4   companies that have been sued in this case

5   controlled the content of any product put out by the

6   American Pain Foundation?

7       A.  To the best --

8              MR. BECKWORTH:  Objection.

9              THE WITNESS:  To the best of my

10  knowledge, that's true.

11  BY MR. ERCOLE:

12      Q.  Would that hold true for the other third-

13  party societies that you were involved with?

14      A.  Yes.  To the best of my knowledge, that's

15  true.

16      Q.  If you turn to paragraph 40 of your

17  declaration.

18      A.  Yes.

19      Q.  Do you see that?  It says, "I understand

20  that pharmaceutical companies assisted in

21  publicizing these guidelines and relied on them in

22  marketing of publications."

23              Do you see that?

24      A.  Yes.

25      Q.  Are you aware of Cephalon ever doing that?

Page 481

1             MR. BECKWORTH:  Objection.

2             THE WITNESS:  I don't have any --

3             MS. SPENCER:  You can answer.

4             THE WITNESS:  I don't have any specific

5    information about Cephalon.

6    BY MR. ERCOLE:

7        Q.  Are you aware of Teva USA ever doing that?

8             MR. BECKWORTH:  Same objection.

9             THE WITNESS:  No.

10   BY MR. ERCOLE:

11       Q.  And I assume certainly you were never aware

12   of Cephalon and Teva USA doing anything like that in

13   Oklahoma, correct?

14            MR. BECKWORTH:  Objection.

15            THE WITNESS:  Correct.

16   BY MR. ERCOLE:

17       Q.  If you turn to paragraph 42 of your

18   declaration.

19       A.  Yes.

20       Q.  The first paragraph talks about opioid

21   therapy being an appropriate first-line therapy for

22   some types of -- for different types of pain; do you

23   see that?

24       A.  Yes.

25       Q.  And there's a reference there to, "Opioid

Page 482

1    therapy is an appropriate first-line therapy

2    for . . . breakthrough pain in opioid-treated

3    patients with serious illness."

4         A.  Yes.

5         Q.  Do you see that?

6         A.  Yes.

7         Q.  And would that also apply in some instances

8    outside of the cancer context?

9         A.  Let me just clarify the question.  You're

10   asking whether patients who are appropriately

11   receiving chronic opioid therapy for noncancer pain

12   might also be appropriate for opioid treatment of

13   breakthrough pain?

14        Q.  Yes, sir.

15        A.  Yes, that's true.

16        Q.  If you turn the page to paragraph 43.

17        A.  Yes.

18             MS. SPENCER:  It starts at the bottom of

19   that page, right, and then goes on?

20             MR. ERCOLE:  Fair point.

21   BY MR. ERCOLE:

22        Q.  It's paragraph 43 I'd like to direct your

23   attention to, but I'm going to refer to a statement

24   on the next page.

25        A.  Okay.

1      Q.  Do you see where it says -- and it's

2   probably the third sentence from the bottom -- it

3   says, "In retrospect, the inclusion of data from

4   studies (particularly the Porter and Jick letter)

5   that reflected clinical scenarios so removed from

6   the scenario of interest (long-term treatment of

7   chronic pain patients) should not have been used to

8   support the conclusion that opioid risk is very low."

9            Do you see that?

10     A.  Yes.

11     Q.  Are you aware of Cephalon ever using that

12   study to support the conclusion that opioid risk is

13   very low?

14            MR. BECKWORTH:  Objection.

15            MS. SPENCER:  You can answer.

16   BY MR. ERCOLE:

17     Q.  You can answer.

18     A.  I don't have any specific recollection or

19   awareness of that.

20     Q.  How about Teva USA?

21            MR. BECKWORTH:  Same objection.

22            THE WITNESS:  No.

23   BY MR. ERCOLE:

24     Q.  And certainly not in Oklahoma; is that fair?

25            MR. BECKWORTH:  Same objection.

```
 1                THE WITNESS:  Yes, that's fair.
 2   BY MR. ERCOLE:
 3        Q.  So if you turn to paragraph 45, the first
 4   sentence says, "I believe that my work was, over a
 5   period of years, used by drug companies to create
 6   positive messaging about opioid therapy without a
 7   concurrent disclosure and discussion of risks."
 8                Do you see that?
 9        A.  Yes.
10        Q.  Are you aware of Cephalon ever using your
11   work to create positive messaging about opioid
12   therapy without a concurrent disclosure and
13   discussion of risks?
14        A.  I don't have a specific recollection of
15   Cephalon's marketing strategy that did that.
16        Q.  How about Teva USA?
17        A.  No.
18        Q.  And this declaration, sir, is it fair to
19   say this is based upon your personal knowledge,
20   correct?
21        A.  Yes.
22        Q.  So when you were referring in paragraph 45
23   to drug companies, is it fair to say you weren't
24   referring to Cephalon?
25                MR. BECKWORTH:  Objection.
```

1            THE WITNESS:  You know, I think --

2    I think that the paragraph referred to -- the

3    paragraph referred to what happened in our society

4    as the opioids were being marketed.  And I didn't --

5    I didn't specifically factor in which companies did

6    that.

7            It was sort of a general impression of

8    how the opioid manufacturers impacted -- potentially

9    impacted the way the drugs were used based on

10   marketing strategies that pushed positive messages

11   and didn't provide context or risks.

12           I don't have any recollection of

13   specific -- specific marketing strategies used by

14   Cephalon that would be an example of that.

15   BY MR. ERCOLE:

16       Q.  And you agree that it's a pretty serious

17   assertion here, correct?

18       A.  Yes.

19       Q.  And this assertion is based upon your

20   personal knowledge, correct?

21       A.  Yes.

22       Q.  And sitting here today, you don't have any

23   personal knowledge of Cephalon ever engaging in that

24   type of conduct, correct?

25           MR. BECKWORTH:  Objection.  What he said

1    was he didn't recall, not that he has no personal

2    knowledge.

3                    THE WITNESS:  Right.

4    BY MR. ERCOLE:

5        Q.  No.  You can answer the question as I

6    phrased it.

7        A.  I don't have any specific recollection of

8    that as I -- as I think back over the last 15 years.

9        Q.  Do you have any personal knowledge?

10       A.  That Cephalon --

11                   MR. BECKWORTH:  Objection.

12                   THE WITNESS:  That Cephalon engaged in

13   that kind of marketing?

14   BY MR. ERCOLE:

15       Q.  Yes.

16       A.  No.  I can't say that I have any specific

17   knowledge of that.

18       Q.  Do you have any specific knowledge of Teva

19   USA ever doing that?

20       A.  No.

21       Q.  And would that apply to all of the points

22   that we've been discussing in your declaration?

23                   MS. SPENCER:  I'm going to object to

24   that.

25                   MR. ERCOLE:  Fair enough.

1          MS. SPENCER:  I mean, if you want to

2    say, Would that apply to all of the questions I've

3    previously asked specific to specific paragraphs

4    that I've identified, I'll let him answer that in

5    the interest of time.

6          MR. ERCOLE:  Thank you.  I didn't mean

7    to cut you off.  I apologize.

8    BY MR. ERCOLE:

9      Q.  So your counsel articulated a much better

10   and coherent question than I could.

11     A.  Right.

12     Q.  So let me ask what she asked, which is,

13   would the answer you just gave apply to all the

14   questions I previously asked specific to specific

15   paragraphs I've identified with respect to Cephalon?

16          MR. BECKWORTH:  Objection.

17          MS. SPENCER:  You can answer.

18          THE WITNESS:  Yeah.  Again, I'm trying

19   to be very precise, and I'm interpreting the

20   question as, do I have any specific recollection

21   today of witnessing marketing that included, for

22   example, positive messages without context and

23   without warnings from Cephalon.  And I don't have

24   any specific recollection today as examples of that.

25

1    BY MR. ERCOLE:

2        Q.  And is it fair to say, sitting here today,

3    you don't have any knowledge of that that you can

4    share with me today, correct?

5                MR. BECKWORTH:  Objection.

6    BY MR. ERCOLE:

7        Q.  You can answer the question.

8        A.  Right.  I don't have any knowledge --

9    I don't have any knowledge in the sense that I have

10   specific recollections of it.

11       Q.  And that would apply to Teva USA too,

12   correct?

13       A.  Yes.

14       Q.  If you turn to paragraph 46 where you say,

15   "I have long believed" -- paragraph 46, is it fair

16   to say you describe -- you discuss direct-to-

17   consumer advertising?

18       A.  Yes.

19       Q.  Do you have any personal knowledge of

20   Cephalon engaging in direct-to-consumer advertising

21   with respect to opioids?

22       A.  No.

23       Q.  Do you have any personal knowledge of Teva

24   USA engaging in direct-to-consumer advertising with

25   respect to opioids?

Page 489

1      A.  So I should just make sure I understand the

2   question.  I was told today earlier that there was

3   direct-to-consumer advertising.  I was not aware of

4   it prior to being told, but I was told earlier

5   today.  So that's the extent of my knowledge: what I

6   was told today.

7      Q.  Who told you that there was direct-to-

8   consumer advertising today with respect to Teva USA?

9      A.  Unless I'm misremembering, the --

10  Mr. Beckworth indicated that there was advertising

11  to older patients about the use of opioids to treat

12  pain.

13     Q.  Would it surprise you to learn, sir, that

14  what Mr. Beckworth was referring to was not Teva USA?

15     A.  Again, I just learned it for the first

16  time -- I heard it literally in this room earlier

17  today.  So it wouldn't surprise me or not surprise

18  me.  But that's the extent of what I know, is what I

19  heard today.

20     Q.  And so if what you heard today actually

21  didn't involve Teva USA at all, would it be fair

22  then to say that you don't have any knowledge of any

23  direct-to-consumer advertising by Teva USA?

24     A.  Yes, of course.

25     Q.  And is it fair to say at least when you

1   authored this declaration, which was not -- you

2   didn't author this declaration today, did you?

3       A.  No.

4       Q.  Is it fair to say that when you authored

5   this declaration, you were not -- you had no

6   personal knowledge of any direct-to-consumer

7   advertising by Teva USA?

8       A.  That's true.

9       Q.  And certainly no direct-to-consumer

10  advertising by Teva USA in Oklahoma, correct?

11      A.  Correct.

12      Q.  Turn to paragraph 47.

13      A.  Um-hum.

14      Q.  It states, "I believe that drug companies

15  disseminated the results of positive clinical

16  studies of opioid drugs without providing important

17  information that would allow prescribers to

18  understand the extent to which a trial relates to

19  clinical practice."

20          Do you see that?

21      A.  Yes.

22      Q.  Do you have any personal knowledge of

23  Cephalon ever doing that?

24      A.  I don't have any specific recollection of

25  Cephalon distributing publications of the randomized

Page 491

1    clinical trials.

2        Q.  Do you have any personal knowledge of Teva

3    USA ever doing something like that?

4        A.  No.

5        Q.  It goes on -- if you look down in this

6    paragraph, it says, "Drug companies often distribute

7    publications that describe explanatory trials, and I

8    believe that they do not create messaging at the

9    same time that helps physicians understand the

10   connection to practice."

11              Do you see that?

12       A.  Yes.

13       Q.  Any personal knowledge of Cephalon ever

14   doing that?

15       A.  No, I don't have any specific recollection

16   of that.

17       Q.  And any personal knowledge of Teva USA ever

18   doing that?

19       A.  No.

20       Q.  And I assume when you authored this

21   declaration, you didn't have any personal knowledge

22   of Cephalon or Teva USA doing that?

23       A.  Correct.

24       Q.  And would that answer apply to all of the

25   questions that I've asked so far: that when you

Page 492

1    signed the declaration, you didn't have any

2    knowledge of Cephalon or Teva USA engaging in any of

3    the conduct that's been described here?

4         A.  No.  That's true and -- specific

5    recollection involved Cephalon's marketing strategy,

6    no.

7         Q.  If you turn to the last paragraph,

8    paragraph 49 --

9         A.  Um-hum.

10        Q.  -- there's a "Conclusion" before that.

11   Do you see that?

12        A.  Yes.

13        Q.  And there are a number of statements in

14   there.  Do you see that?

15        A.  Yes.

16        Q.  And I'm happy to walk through each of these

17   statements with you.  But for the interest of time,

18   why don't I try to cut to the chase.

19             Anything in this paragraph that you have

20   personal knowledge of Cephalon doing --

21             MR. BECKWORTH:  Objection.  Same

22   objection we've been having.

23             THE WITNESS:  No.  I have no specific

24   recollection that Cephalon engaged in the conduct

25   that I was summarizing in this conclusory paragraph.

Page 493

1    BY MR. ERCOLE:

2       Q.  Any personal knowledge of Teva USA engaging

3    in that conduct?

4       A.  No.

5            MR. BECKWORTH:  Same objection.

6    BY MR. ERCOLE:

7       Q.  Any personal knowledge of Cephalon or Teva

8    USA engaging in that conduct in Oklahoma?

9       A.  No.

10      Q.  Are you aware of anything false or

11   misleading attributed to Cephalon that it caused an

12   inappropriate opioid prescription to be written?

13           MR. BECKWORTH:  Same objection.

14           MS. SPENCER:  You can answer to the

15   extent you know.

16           THE WITNESS:  I'm sorry.  Could you

17   repeat it.

18   BY MR. ERCOLE:

19      Q.  Sure.  Are you aware of anything false or

20   misleading -- I'll reframe it.

21           Are you aware of anything false or

22   misleading that Cephalon has said that has caused an

23   inappropriate opioid prescription to be written?

24      A.  By a specific prescriber?

25      Q.  Just generally.  Are you aware of anything

Page 494

1    that Cephalon has -- anything false or misleading

2    that Cephalon has said that has caused an

3    inappropriate opioid proscription to be written?

4              MR. BECKWORTH:  Same objection.

5              MS. SPENCER:  I think his question is

6    valid.  Do you mean by "has caused an inappropriate

7    prescription to be written" by any particular

8    prescriber or . . .

9              MR. ERCOLE:  Sure.  I'll -- we'll go

10   with that question.

11   BY MR. ERCOLE:

12     Q.  Are you aware of anything false or

13   misleading said by Cephalon that has caused any

14   particular prescriber to write anything -- any

15   opioid prescription that was inappropriate?

16     A.  No, I'm not aware.

17             MR. BECKWORTH:  Same objection.  I've

18   just noted that your four hours are up.  I had left

19   about two minutes of time, which I would request to

20   use.

21             MS. SPENCER:  Where are we just --

22             THE VIDEO OPERATOR:  Eight hours,

23   one minute.

24             MR. ERCOLE:  I mean, I think I can

25   finish, if it's okay with you, counsel, within the

Page 495

1    next 15 minutes.

2              MS. SPENCER:  Okay.

3              MR. BECKWORTH:  Well, that's -- you

4    know, I was respectful of the four-hour time period

5    and kept it short, and now you're going over, which

6    means I'm going to have to go over, or at least

7    request to do that.

8              MR. ERCOLE:  Well, in all fairness,

9    Judge Hetherington's order was pretty clear about

10   the State getting four hours and the defendants

11   getting six hours.

12             MR. BECKWORTH:  No.  It was clear

13   that --

14             MR. ERCOLE:  Let me just -- let me just

15   finish.

16             MR. BECKWORTH:  It's not clear and

17   you're -- you know, it would be one thing if you

18   were actually telling the truth in your questions of

19   this witness, which you're not.

20             I mean, there's 40 million pages of

21   documents, which you know, and all the things you're

22   asking about are just document after document after

23   document after document.  You know that.

24             MR. ERCOLE:  Sir, you may not like his

25   testimony --

Page 496

1              MR. BECKWORTH:  No.  I like his

2    testimony.

3              MR. ERCOLE:  -- but I'm going to ask the

4    questions --

5              MR. BECKWORTH:  It's great.

6              MR. ERCOLE:  -- and let me just put it

7    on --

8              MR. BECKWORTH:  You even qualified him

9    as the world's leading expert on pain, which is also

10   great.  So we're fine with that.  But I'm just

11   telling you I'm --

12             MR. ERCOLE:  Are you done?  Let me know

13   when you're done.

14             MR. BECKWORTH:  With my questions?  I'm

15   going to have questions if Amy will let me ask them.

16             MR. ERCOLE:  Are you done speaking?

17             MR. BECKWORTH:  At this point?

18             MR. ERCOLE:  Yes.

19             MR. BECKWORTH:  Sure.

20             MR. ERCOLE:  I'm going to say something.

21   Is it all right if I finish my statement without you

22   interrupting me?

23             MR. BECKWORTH:  I mean, if you say

24   something objectionable, I'll object, but it depends

25   on what you're going to say.

1              MR. ERCOLE:  So just to get on the

2    record as you're --

3              MS. SPENCER:  Yes, go ahead.

4              MR. ERCOLE:  -- Dr. Portenoy, as your

5    counsel knows, Judge Hetherington indicated that the

6    State would have four hours, the defendants would

7    have six hours.  Now, I appreciate it was a

8    recommendation, and I appreciate we've --

9              MS. SPENCER:  That's not --

10             MR. ERCOLE:  -- made that --

11             MS. SPENCER:  I'll object.  That's not

12   what the order provided.

13             MR. ERCOLE:  Well, we --

14             MR. BECKWORTH:  Told you.

15             MR. ERCOLE:  -- we may disagree on that.

16   But fair enough.  The request is obviously that I'd

17   like maybe 15 more minutes or so and we'll -- I'll

18   wrap up then.

19             MS. SPENCER:  I will absolutely grant

20   you 15 more minutes.  My understanding of the order,

21   and what my agreement is, is that you will have

22   equal time.  So along those lines, I will also

23   permit Attorney Beckworth to ask 15 more minutes --

24   15 minutes' worth of questioning as well.  And

25   that's equal time.

Page 498

 1               MR. ERCOLE:  Sorry, sir.  Before I was
 2    interrupted by the back-and-forth here, I need to go
 3    back and check where I was.  I apologize for that
 4    interruption.
 5               MR. BECKWORTH:  And while you're doing
 6    that, just to be fair, to respect Amy's wishes, if
 7    you don't go that long, that's fine.  If you stop
 8    now, I'll take the three or whatever we're over, to
 9    be fair to everyone --
10               MR. ERCOLE:  Thank you.
11               MR. BECKWORTH:  -- meaning equal time.
12    BY MR. ERCOLE:
13       Q.  So let me -- so my question is, are you
14    aware of any false or misleading statement said by
15    Teva USA that has caused any particular prescriber
16    to write an opioid prescription that was
17    inappropriate?
18               MR. BECKWORTH:  Same --
19               THE WITNESS:  No, not to my knowledge.
20    BY MR. ERCOLE:
21       Q.  And certainly not in Oklahoma; is that fair
22    to say?
23               MR. BECKWORTH:  Same objection.
24               THE WITNESS:  Correct.
25

Page 499

1    BY MR. ERCOLE:

2        Q.  Are you -- Dr. Portenoy, are you aware that

3    Cephalon manufactures a drug by the name of Actiq?

4        A.  Yes.

5        Q.  And are you aware that Cephalon

6    manufactures a drug by the name of Fentora?

7        A.  Yes.

8        Q.  Have you ever prescribed Actiq or Fentora?

9        A.  Yes.

10       Q.  Have you ever prescribed Actiq or Fentora

11   for breakthrough pain in patients who do not have

12   cancer?

13       A.  Yes.

14       Q.  Can you describe some of those

15   circumstances where you've done that.

16             MS. SPENCER:  Again, within the confines

17   of HIPAA, yes.

18   BY MR. ERCOLE:

19       Q.  And I apologize.  Yes.  I don't need you to

20   disclose names or specific information.  Just --

21       A.  Yes.

22       Q.  -- some examples where that has happened.

23       A.  Well, I recall one patient who has a

24   diagnosis of a condition called medullary sponge

25   kidney.  This patient makes kidney stones and has

1  had multiple episodes of kidney stones literally

2  every month.  And she has chronic abdominal and

3  flank pain with frequent flares of pain associated

4  probably with the passage of gravel and stones

5  through her renal system.

6           And that patient is being treated with a

7  long-acting opioid and access to Actiq for the

8  treatment of breakthrough pain.  And she's been

9  receiving that under my care for probably about

10 15 years.

11    Q.  Has she benefitted from the prescriptions

12 of Actiq?

13    A.  Yes, definitely.

14    Q.  And how has she benefitted?

15    A.  She describes having a normal life as a

16 result of continuing access to her opioid.  She's

17 raised a family.  She motorcycles.

18    Q.  Are there other instances where you've

19 prescribed Actiq or Fentora for breakthrough pain in

20 patients who are not -- who don't have cancer?

21    A.  Yeah.  I'm fairly certain that there are,

22 but I can't remember any individual cases now to

23 share with you.  She's the only patient that I

24 continue to treat in that way.

25    Q.  Is it fair to say that if that patient was

Page 501

1    not prescribed Actiq, that that patient might have

2    to go to the emergency room to handle the

3    breakthrough pain?

4        A.   Yes, that's -- I think that would be clear.

5        Q.   And is it fair to say that for her, the

6    Actiq prescriptions that she received enable her to

7    have a more productive life?

8        A.   Yes.

9        Q.   Dr. Portenoy, you have not been -- you've

10   not been designated by the State to provide any

11   expert testimony in this case, correct?

12       A.   Correct.

13       Q.   And you're not sitting here today providing

14   any expert testimony, are you?

15       A.   No.

16            MR. BECKWORTH:  Objection.  To the

17   extent he's qualified to testify based on his

18   knowledge, personal experience and qualifications,

19   he can offer testimony any which way the judge

20   allows.

21            And you qualified him as the -- and I

22   quote -- one of the world's leading experts on pain.

23            MR. ERCOLE:  Well, we'll disagree on

24   that.

25

1   BY MR. ERCOLE:

2      Q.  But thank you for your answer, I appreciate

3   that, sir.

4            Are you aware of something called -- and

5   I promise you I'm wrapping up -- are you aware of

6   something called the Transmucosal Immediate Release

7   Fentanyl Risk Evaluation and Mitigation Strategy?

8      A.  Yes.

9      Q.  Is that euphemistically known as the "TIRF

10  REMS"?

11     A.  Yes.

12     Q.  Was that passed in 2011?

13     A.  I don't know the exact date, but that

14  sounds right.

15     Q.  And what is the TIRF REMS program?

16     A.  It's a program that mandates that the

17  describing of the so-called TIRF products, such as

18  Actiq and Fentora, has to be accompanied by

19  completion of an online educational program by the

20  physician and also has to be accompanied by

21  documentation that the patient has received

22  educational materials.

23     Q.  And so I'm going to -- I don't want to

24  keep -- I don't want to show you lots of additional

25  documents.  So let me ask some questions about this

1    and hopefully you have knowledge of these areas.

2              Have you been enrolled in the TIRF REMS

3    program?

4        A.  Yes.

5        Q.  Are you still enrolled in the TIRF REMS

6    program?

7        A.  Yes.

8        Q.  You mentioned that -- is it fair to say

9    that before a doctor is able to prescribe an Actiq

10   or Fentora prescription, he or she has to complete

11   an online educational program?

12       A.  Yes.

13       Q.  And does that online educational program

14   describe the risks of misuse, abuse, addiction

15   associated with Actiq?

16       A.  Yes.

17       Q.  Does the online program discuss the

18   indications of Actiq and Fentora?

19       A.  Yes.

20       Q.  Does the online program, is it geared

21   towards having Actiq or Fentora prescribed to

22   patients who it would be appropriate for?

23       A.  Yes.

24       Q.  Is it fair to say that a provider before he

25   or she can prescribe Actiq or Fentora has to be

1   certified through that process; is that correct?

2       A.  Yes, that's correct.

3       Q.  And does the provider also have to certify

4   that he or she will review a medication guide for

5   the TIRF medicine with the patient and provide that

6   medication guide to the patient?

7       A.  You know, I don't recall if it has to be

8   provided by the provider, by the prescriber, or by

9   the pharmacist.  But the patient has to receive

10  education on the product.

11      Q.  And what type of education would the

12  patient receive in connection with that?

13      A.  Education about safe dosing, about safe

14  disposal, about keeping the drug away from other

15  people.

16      Q.  Education about the potential for abuse of

17  those medicines?

18      A.  I don't recall.  It's been a while since I

19  read the patient education materials, so I don't

20  recall whether that specific information is down on

21  the patient side.  It's certainly there on the

22  physician side.

23      Q.  When you say "on the physician side," what

24  are you referring to?

25      A.  In the online education program that one

1    has to complete, which incorporates a quiz that you

2    have to score high enough in order to get to

3    certify.

4              MR. ERCOLE:  And so let me just mark

5    this as Exhibit 41.

6                   (Portenoy Exhibit 41 was marked

7                    for identification.)

8    BY MR. ERCOLE:

9        Q.  Dr. Portenoy, you're not a marketing

10   expert, correct?

11       A.  Correct.

12       Q.  Sir, this is a document -- this is the TIRF

13   REMS program document.  It comes from the FDA

14   website.  If you turn to the second page, do you see

15   that?

16       A.  Um-hum, yes.

17       Q.  It talks about "REMS elements"?

18       A.  Um-hum, yes.

19       Q.  And then there's a "B. Elements to assure

20   safe use."

21             Do you see that?

22       A.  Yes.

23       Q.  And it talks about the need for health care

24   providers, before writing a TIRF medicine, to be

25   certified?

Page 506

1      A.  Yes.

2      Q.  And if you turn to, it looks like

3   B(1)(b)(ii), do you see that?

4      A.  Yes.

5      Q.  It says, "Complete and sign the prescriber

6   enrollment form"?

7      A.  Yes.

8      Q.  And it lists a number of requirements that

9   prescribers have to acknowledge before an Actiq or

10  Fentora prescription is written; do you see that?

11     A.  Yes.

12     Q.  And it says, if you look at (b),

13  "I understand that TIRF medicines can be abused and

14  that this risk should be considered when prescribing

15  or dispensing TIRF medicines in situations where I

16  am concerned about an increased risk of misuse,

17  abuse, or overdose, whether accidental or

18  intentional."

19          Do you see that?

20     A.  Yes.

21     Q.  So is it fair to say that at least since

22  the passage of the TIRF REMS program, before a

23  physician can write a prescription for Actiq or

24  Fentora, he or she has to acknowledge that there are

25  significant risks associated with misuse, abuse, or

Page 507

1    overdose with that medicine?

2        A.  Yes.  Since the TIRF program has been in

3    place, that's true.

4        Q.  And are you aware that before the TIRF REMS

5    program was in place, that there were specific risk

6    maps associated with Actiq and Fentora?

7        A.  I have a recollection of that but I don't

8    remember any of the specifics.

9        Q.  But sitting here today, you do recall that

10   there were RiskMAP programs associated with Actiq

11   and Fentora before the passage of TIRF REMS,

12   correct?

13       A.  Yes.  I remember that there were such

14   programs.

15       Q.  And if you go down to B(1)(b)(i), it's on

16   page 3.

17       A.  Yes.

18       Q.  And it talks about "I will complete and

19   sign a TIRF REMS access patient-prescriber agreement

20   form with each new patient, before writing the

21   patient's first prescription for a TIRF medicine,

22   and renew the agreement every two years."

23              Do you see that?

24       A.  Yes.

25       Q.  To the best of your recollection, what is

1   your understanding of the patient-prescriber

2   agreement mandated by the TIRF REMS program?

3        A.  It's a document that's signed by the

4   patient and the prescriber so that the patient and

5   the prescriber have both read the information about

6   the safe use of the drug.

7        Q.  And if you turn to the next page, page 4,

8   we don't need to discuss all of these requirements,

9   but if you look at page 4, it talks about "In

10  signing the patient-prescriber agreement form, the

11  prescriber documents the following:"

12            Do you see that?

13       A.  Yes.

14       Q.  And if you look to (7), it says, "I have

15  counseled my patient or their caregiver about the

16  risks, benefits, and appropriate use of TIRF

17  medicines, including communication of the following

18  safety messages:"

19            Do you see that?

20       A.  Yes.

21       Q.  And then it lists a number of safety

22  messages?

23       A.  Um-hum, yes.

24       Q.  And at least with respect to your

25  prescribing of Actiq and Fentora, have you always

1    complied with the TIRF REMS program?

2        A.  Yes.

3        Q.  Is it your understanding that Actiq or

4    Fentora can't be dispensed to a prescriber who has

5    not enrolled in the TIRF REMS program?

6        A.  Yeah.  Can't be dispensed from a

7    prescription written by a prescriber who hasn't

8    enrolled in the program.

9        Q.  Thank you, sir.  I apologize.  It's late

10   and I'm sure that was a very inarticulate question.

11              And then if you turn to the next page --

12       A.  Yes.

13       Q.  -- it discusses the -- continues to discuss

14   the patient-prescriber agreement; do you see that?

15       A.  Yes.

16       Q.  And it talks about "I will ensure that the

17   patient and/or caregiver understand that . . . "

18              Do you see that?

19       A.  Yes.

20       Q.  And then they document the following and

21   there are a number of pieces there?

22       A.  Yes.

23       Q.  Do you see that?

24       A.  Um-hum.

25       Q.  And it says, "My prescriber has given me a

1    copy of the medication guide for the TIRF medicine I

2    have been prescribed, and has reviewed it with me."

3              Do you see that?

4    A.   Yes.

5    Q.   And that is something that the patient

6    would have to acknowledge, correct, in connection

7    with the patient-prescriber agreement form?

8    A.   Yes.

9    Q.   And the medication guide would contain the

10   product insert for Actiq, correct?

11   A.   Yes.

12   Q.   And it would contain the product insert for

13   Fentora if that's being prescribed?

14   A.   Yes.

15   Q.   And then if you'd turn just to page 7 of

16   the document.

17   A.   Um-hum.

18   Q.   It talks about "TIRF medicines will only be

19   dispensed by pharmacies that are specially

20   certified."

21              Do you see that?

22   A.   Yes.

23   Q.   Do you understand the requirements that

24   pharmacies have to go through in order to be

25   certified to write a prescription of Actiq or

 1  Fentora?

 2      A.  No.

 3      Q.  Is your understanding based upon this

 4  document that there are specific requirements?

 5      A.  Yes.

 6          MS. SPENCER:  We're getting there?

 7          MR. ERCOLE:  Yeah.  Give me 10 seconds

 8  just to check my notes and then I will wrap up, I

 9  promise.

10  BY MR. ERCOLE:

11      Q.  Sitting here today, sir, are you aware of

12  any prescriber in Oklahoma who was not aware of the

13  risks and indications of Actiq or Fentora before

14  they wrote -- before he or she wrote an Actiq or

15  Fentora prescription?

16      A.  No, I'm not.

17      Q.  And given the TIRF REMS program, would you

18  agree that at least since the TIRF REMS program, all

19  doctors, before they write those prescriptions,

20  would have to be aware of the risks of those

21  medicines?

22      A.  Yes.

23      Q.  And they'd have to be aware of the

24  indications of those medicines?

25      A.  Yes.

1          MR. ERCOLE:  Thank you.

2          MS. SPENCER:  All right.  What do we

3    have for time?

4          THE VIDEO OPERATOR:  We're at

5    eight hours, 19 minutes.

6               (Discussion off the record.)

7          MR. BECKWORTH:  Everybody ready?  We'll

8    make this quick and we'll go home.

9                    EXAMINATION

10   BY MR. BECKWORTH:

11      Q.  Dr. Portenoy, it's been a long day, hasn't

12   it?

13      A.  It has.

14      Q.  Just to refresh your memory, my name's Brad

15   Beckworth, and I have the great privilege of

16   representing the State of Oklahoma in this lawsuit.

17          Do you remember that?

18      A.  I do.

19      Q.  Now, I just want to ask you a few questions

20   about what this drug company lawyer just got done

21   asking you.  Now, do you remember when the drug

22   company lawyer started asking you questions, your

23   attorney tried to get him to identify who he worked

24   for?

25      A.  Yes.

1      Q.  And he said, Well, we'll get to that; do
2  you remember that?
3      A.  Yes.
4      Q.  And you were asked a series of questions by
5  that drug company lawyer about what Actavis and
6  other companies made; do you remember that?
7      A.  Yes.
8          MR. ERCOLE:  Objection to form.
9  BY MR. BECKWORTH:
10     Q.  And you said, Well, sometimes these drug
11 companies buy other companies and other drugs and
12 they change, and it's hard to keep track with, right?
13     A.  Yes.
14         MR. ERCOLE:  Objection to form.
15 BY MR. BECKWORTH:
16     Q.  You gave him a chance to tell you about
17 what drugs his companies made, didn't you?
18         MR. ERCOLE:  Objection to form.
19         THE WITNESS:  I did, yes.
20 BY MR. BECKWORTH:
21     Q.  Did he ever stop and slow down with his
22 questions and tell you, You know, you're right.
23 There's some changes that have been had?
24     A.  No.
25     Q.  He didn't do that, did he?

Page 514

```
 1      A.  No.
 2      Q.  All right.  And I don't have the ability to
 3  get a printer right here, so I'm just going to hand
 4  you something on my phone.  This is a Business Wire
 5  ad, if I may pass this to you.  Right there, would
 6  you read for the jury what's in the headline on that
 7  Business Wire ad.
 8                MR. ERCOLE:  Objection to form,
 9  foundation.
10                MR. BECKWORTH:  The foundation is that
11  your company bought a drug company.
12                MR. ERCOLE:  You're not going to print
13  it out and show him the document?  Fine.  Fair
14  enough.  Go ahead and read what's on Mr. Beckworth's
15  phone.
16                MS. SPENCER:  I can --
17                MR. EHSAN:  From his phone?  He objected
18  to my use of something that didn't have a precise
19  date.  Now you're using his phone as a --
20                MS. SPENCER:  I was going to say, I can
21  print this out.  Let me print the document -- I'll
22  print the document if you want to use it.  My
23  assistant printed some documents for you guys
24  earlier today, and I'm happy to print documents for
25  him and for you.
```

1          MR. BECKWORTH:  Let's take a break,

2    everybody can sit tight so we don't lose any time,

3    and I'll send two to Amy right now.  Thank you.

4          THE VIDEO OPERATOR:  Off the record,

5    10:07.

6              (Recess at 10:08 p.m.,

7              resumed at 10:14 p.m.)

8          THE VIDEO OPERATOR:  Back on, 10:14.

9              (Portenoy Exhibit 42 was marked

10             for identification.)

11   BY MR. BECKWORTH:

12     Q.  Dr. Portenoy, we had a little kerfuffle

13   because I showed you my phone, and the lawyers on

14   the other side of the table, they didn't like that

15   very much, now did they?

16     A.  Yeah.

17          MR. ERCOLE:  Objection to form.

18   BY MR. BECKWORTH:

19     Q.  So we went and printed out what was on my

20   phone.  Now, we have added -- what number exhibit is

21   that, sir?

22     A.  42.

23     Q.  Now, when that lawyer over there was asking

24   you about all these different names of companies and

25   you said, Well, it gets a little -- you know,

Page 516

1    sometimes -- I'm paraphrasing -- but it gets a

2    little confusing because they buy and acquire, right?

3        A.  Yes.

4              MR. ERCOLE:  Objection to form.

5    BY MR. BECKWORTH:

6        Q.  He never stopped and told you what's on

7    this document, did he?

8        A.  No.

9        Q.  Now, what's on the headline of that

10   document?

11       A.  "Actavis acquires Kadian; extends specialty

12   drug portfolio in U.S."

13       Q.  And then in the first line of this

14   December 30, 2008 document it says, "Actavis today

15   announced it has acquired the brand name drug Kadian

16   from" who?

17       A.  "King Pharmaceuticals."

18       Q.  Now, when you look in your declaration, we

19   don't have to go through it, but King Pharmaceuticals

20   is one of the companies that provided funding that

21   we talked about today, right?

22       A.  Yes.

23              MR. ERCOLE:  Objection to form.

24   BY MR. BECKWORTH:

25       Q.  Now, I also have handed you Exhibit 7 that

Page 517

1   we looked at earlier today, sir.  And I've turned to

2   that document to something that says "Guilty plea

3   agreement."

4              Do you see that?

5      A.  Yes.

6      Q.  And you were asked by the Cephalon's drug

7   company lawyer about whether you recalled Cephalon

8   making false statements that affected prescribing

9   habits in the United States of America.

10             Do you remember that?

11     A.  Yes.

12     Q.  And they even said in Oklahoma; do you

13  remember that?

14     A.  Yes.

15     Q.  And what he was trying to say was that

16  there were no such statements, but your testimony

17  was simply that you didn't recall them, right?

18             MR. ERCOLE:  Objection to form.

19             THE WITNESS:  That is correct.

20  BY MR. BECKWORTH:

21     Q.  You weren't testifying, were you, that you

22  weren't aware of any statements?

23             MR. ERCOLE:  Objection to form.  His

24  testimony speaks for itself.

25             THE WITNESS:  I said I had no specific

1   recollection.

2   BY MR. BECKWORTH:

3       Q.  You didn't recall?

4       A.  That's right.

5       Q.  Now, I'll represent to you, sir, there's

6   something like 30, 40 million pages of documents

7   produced by the defendants in this case.  Now, your

8   attorney has given me four hours and now about

9   15 extra minutes to talk to you today, right?

10      A.  Right.

11      Q.  There's no way I could have given you every

12  document I have in this case, right?

13      A.  Right.

14      Q.  But you're not suggesting that Cephalon

15  didn't actually make misrepresentations?  It's just

16  that you don't recall them, right?

17              MR. ERCOLE:  Objection to form.

18              THE WITNESS:  That's right.

19  BY MR. BECKWORTH:

20      Q.  Now, did that lawyer over there on the

21  other side of the table, did he show you any

22  documents from Cephalon about them making

23  misstatements?

24      A.  No.

25      Q.  And while he sat in this very room where

1    you were under oath under penalty of perjury, he had

2    you say that you didn't recall any statements that

3    Cephalon made about any opioid, right?

4              MR. ERCOLE:  Objection to form,

5    mischaracterizes testimony.

6              THE WITNESS:  Right.

7    BY MR. BECKWORTH:

8        Q.  Now, he was in the room when I was asking

9    you questions this morning now, wasn't he?

10       A.  Yes.

11       Q.  And he would have had to have been asleep

12   to not see that we went over Exhibit 7, right?

13             MR. ERCOLE:  Objection to form.

14             THE WITNESS:  I can't state that he'd

15   have to be asleep, but he didn't comment on it,

16   right.

17   BY MR. BECKWORTH:

18       Q.  Well, you were here.  Was he sleeping?

19       A.  Not that I was aware of.

20       Q.  And we went over Exhibit 7, didn't we?

21       A.  We did.

22       Q.  Now, let's turn to this page, "Guilty plea

23   agreement."  It's page 29 of 41.  Right there on the

24   top it says, "United States of America vs. Cephalon,"

25   right?

Page 520

```
1        A.  Yes.

2        Q.  Now, that lawyer over there when your

3   lawyer asked him who he represented, he said, We'll

4   get to that, right?

5        A.  Yes.

6        Q.  Did he ever come out and say, I represent

7   Cephalon?

8              MR. ERCOLE:  Objection to form.

9              MS. SPENCER:  You can answer if you

10  know.

11             THE WITNESS:  Not that I recall.

12             MR. ERCOLE:  Sorry, sir.

13             Do you mind -- Amy, is there a way that

14  I can use your exhibit for these questions?  I just

15  want to follow --

16             MR. COLEMAN:  They just got shuffled

17  around.

18             MR. ERCOLE:  Sorry for interrupting your

19  question.

20             MS. SPENCER:  No problem.

21  BY MR. BECKWORTH:

22       Q.  If you'll turn to page 32 of 41, which is

23  page 4 of that "Guilty plea agreement."

24       A.  Yes.

25       Q.  Paragraph 6, Part A says -- it says right
```

Page 521

1    there, "The parties stipulate to the following facts

2    and basis for the plea, criminal fine and

3    forfeiture."

4              Do you see that?

5    A.  Yes.

6    Q.  No. (1) it says Cephalon marketed three

7    different drugs, one of which is Actiq.  Do you

8    remember that?

9    A.  Yes.

10   Q.  And you see it right there in front of your

11   face, correct?

12   A.  Yes.

13             MR. ERCOLE:  Objection to form.

14   BY MR. BECKWORTH:

15   Q.  Now, if you'll turn to page 5 where we get

16   to Actiq, which is how I pronounce it, we've got

17   paragraphs (8) and (9).

18             Do you see that?

19   A.  Yes.

20   Q.  Now, please read for the jury what

21   paragraph (8) says.

22   A.  Paragraph (8) says, "Between January 2001

23   and October 1, 2001, Cephalon promoted Actiq for

24   uses not approved by the FDA, including for

25   noncancer pain uses, such as injuries and migraines.

Page 522

1    Cephalon's promotion of Actiq for these additional

2    intended uses violated" some designated regulation

3    or law "because Actiq's labeling did not bear

4    adequate directions for each of the drug's intended

5    uses."

6         Q.  Now, that's about using an opioid labeled

7    for cancer treatment for noncancer use, correct?

8              MR. ERCOLE:  Objection to form.

9    BY MR. BECKWORTH:

10        Q.  That's what --

11             MR. ERCOLE:  The document speaks for

12   itself.

13             THE WITNESS:  Yes, that's true.

14   BY MR. BECKWORTH:

15        Q.  It does speak for itself and that's exactly

16   what it says, isn't it?

17        A.  Yes.

18        Q.  And in paragraph (9), it says, "Between

19   2001 through October 1, 2001, Cephalon profited by

20   misbranding Provigil, Gabitril, and Actiq, and

21   distributing these drugs in interstate commerce."

22             It says that, right?

23        A.  Yes.

24        Q.  Now, if you'll do me a kind favor of

25   turning to what at the top says page 38 of 41 of

Page 523

1    that document.

2        A.  Yes.

3        Q.  That document is signed on behalf of

4    Cephalon by an attorney.

5                Do you remember that?

6        A.  Yes.

7        Q.  Do you remember a minute ago when Purdue

8    was asking you questions, they pulled out a document

9    in the New York case that your attorney had filed,

10   right?

11       A.  Yes.

12       Q.  And they tried to ask you questions about

13   stuff that your attorney put in a pleading; do you

14   remember that?

15       A.  Yes.  Yes.

16       Q.  Here we've got a lawyer signing a criminal

17   plea agreement for Cephalon as their attorney, don't

18   we?

19       A.  Yes.

20       Q.  And at the top of this document, we see

21   "Gerald J. Pappert, executive vice president and

22   general counsel" for "Cephalon, Inc."

23                Do you see that?

24       A.  Yes.

25       Q.  It's dated September, looks likes, 15, 2008?

Page 524

1      A.  Yes.

2      Q.  And underneath that, Cephalon's attorney

3  signed it, right?

4      A.  Yes.

5      Q.  And can you read the name of that attorney?

6      A.  I believe it's "Eric W. Sitarchuk."

7      Q.  And under that, Mr. Sitarchuk has a law

8  firm that he works for, right?

9      A.  Yes.

10          MR. ERCOLE:  Objection to form.

11  BY MR. BECKWORTH:

12     Q.  And what is the name of that law firm?

13     A.  "Morgan, Lewis & Bockius."

14     Q.  "Morgan Lewis . . . LLP, counsel for

15  defendant"?

16     A.  Yes.

17          MR. BECKWORTH:  I'm going to hand you

18  another exhibit if we can mark this, please.

19              (Portenoy Exhibit 43 was marked

20               for identification.)

21  BY MR. BECKWORTH:

22     Q.  Now, that lawyer over there that was asking

23  you the questions and said surely you don't know of

24  any things that were said in the State of Oklahoma

25  or elsewhere that Cephalon did wrong, can you see

Page 525

1    him?  He's to your right.  There's a nice lady and

2    another man and then another man?

3        A.  Yes.

4        Q.  Can you look at his face right now?

5        A.  Yes.

6        Q.  Now, please look at the exhibit I just

7    handed you.  That's Exhibit 43, right?

8        A.  Yes.

9        Q.  Does that face look familiar to you?

10       A.  Yes.

11       Q.  Whose name is on that document, Exhibit 43?

12       A.  "Brian Ercole."

13       Q.  And can you tell us what law firm it says

14   he works for?

15               MR. ERCOLE:  Objection to form.

16   BY MR. BECKWORTH:

17       Q.  Right there at the top of Exhibit 43.

18       A.  "Morgan Lewis."

19       Q.  "Morgan Lewis."  Now, he didn't tell you

20   that he worked at Morgan Lewis, did he?

21       A.  No.

22               MR. ERCOLE:  Objection to form.

23   BY MR. BECKWORTH:

24       Q.  He didn't tell you -- he did not tell you

25   to look at this page of Exhibit 7 where his law firm

Page 526

1   signed Cephalon's guilty plea, now did he?

2       A.  No.

3       Q.  And I bet he also didn't tell you that he

4   has a law partner by the name of Harvey Bartle that

5   works at that same firm?

6               MR. ERCOLE:  Objection --

7   BY MR. BECKWORTH:

8       Q.  He didn't tell you that either, did he?

9               MR. ERCOLE:  Objection to form.

10              THE WITNESS:  No.

11  BY MR. BECKWORTH:

12      Q.  And he didn't tell you that Harvey Bartle's

13  father is a federal judge who actually presided over

14  Cephalon's criminal plea agreement in the matter

15  before you in Exhibit 7?  Never told you that either,

16  did he?

17      A.  No.

18              MR. ERCOLE:  Objection to form.

19  BY MR. BECKWORTH:

20      Q.  Now, he had every opportunity.  He not only

21  went four hours, but your attorney gave him extra

22  time to complete his questioning, right?

23      A.  Yes.

24              MR. ERCOLE:  Objection to form.  That's

25  not true but --

Page 527

1    BY MR. BECKWORTH:

2        Q.   Neither I nor anyone else in this room

3    tried to stop him from telling you about what was in

4    this exhibit, right?

5        A.   Right.

6                MR. ERCOLE:   Objection to form.

7    BY MR. BECKWORTH:

8        Q.   So let's look at this exhibit a little

9    more.   If you'll turn, please, sir, to page 3 of 41

10   of Exhibit 7, I'm just going to read it for you to

11   save a little time.   It says there in the bottom

12   half, "The information describes the defendant's

13   off-label practices and its training of its sales

14   staff to ignore the legal restrictions on promoting

15   these drugs."

16               Do you see that?

17       A.   Yes.

18       Q.   And it says, "In particular: Cephalon had

19   its sales representatives call on doctors who would

20   not normally prescribe the defendant's drugs in the

21   course of the doctor's practice."

22               It says it right there, doesn't it?

23       A.   Yes.

24       Q.   It says, "Cephalon trained its sales

25   representatives on techniques to prompt the doctors

1    into off-label conversation," right?

2        A.  Yes.

3        Q.  And it says that "Cephalon's compensation

4    and bonus structure encouraged off-label marketing,"

5    right?

6        A.  Yes.

7        Q.  And it says that "Cephalon had its sales

8    representatives tell doctors how to document their

9    off-label use of drugs to get these uses paid by

10   insurers, who often will not pay for off-label uses"?

11       A.  Yes.

12       Q.  And it says, "Cephalon used its grants for

13   continuing medical education" --

14           Now that's something we've talked about

15   today, right?

16       A.  Yes.

17       Q.  -- "for continuing medical education to

18   promote off-label uses."  It says it, doesn't it?

19       A.  Yes.

20       Q.  And -- now we talked about consultant

21   meetings and speakers today, didn't we?

22       A.  Yes.

23       Q.  Right here it says, "Cephalon sent doctors

24   to 'consultant' meetings at lavish resorts to hear

25   the company's off-label message."

Page 529

1              It says that right there, doesn't it?

2       A.  Yes.

3              MR. ERCOLE:  Objection to form.

4   BY MR. BECKWORTH:

5       Q.  Now, if you'll turn to page 10 -- it's

6   actually 10 of 41 -- this is all coming, sir, from

7   the government's memorandum for entry of plea and

8   sentencing.  If you will look at page 10 of 41 where

9   it says "A. Actiq."

10             Do you see that?

11      A.  Yes.

12      Q.  It says right there, "The case of Actiq is

13  particularly egregious, as this drug is 80 to

14  100 times more powerful than morphine."

15             It says that, doesn't it?

16      A.  Yes.

17      Q.  Morphine's an opioid, isn't it?

18      A.  Yes.

19             MR. ERCOLE:  Objection to form.

20  BY MR. BECKWORTH:

21      Q.  And this is 80 to 100 times more powerful

22  than that, right?  Is that right?

23      A.  It's 80 to 100 times more potent.

24      Q.  Potent.

25      A.  It means that a very small quantity can

Page 530

```
 1   carry the same activity as a much larger quantity of

 2   morphine.

 3       Q.   That's right.  Now, you heard Johnson &

 4   Johnson's lawyer refer to you as one of the world's

 5   leading experts on pain, right?

 6       A.   Yes.

 7       Q.   Is being 80 to 100 times more potent than

 8   morphine, is that a big deal?

 9       A.   It increases the risk when you use it,

10   potentially.

11       Q.   Increases the risk, right?

12       A.   Potentially, yes.

13       Q.   So it's not a laughing matter or a little

14   oversight to do false marketing about a drug that's

15   80 to 100 times more potent than morphine?

16              MS. SPENCER:  I'll object.

17              MR. ERCOLE:  Objection to form.

18              MS. SPENCER:  He didn't say -- that's

19   not the witness's words but . . .

20              MR. BECKWORTH:  Those are my words.

21              MR. ERCOLE:  Right.  Objection.

22              MR. BECKWORTH:  I'm asking.  It's not --

23              MS. SPENCER:  If you know, you can

24   answer.

25              THE WITNESS:  Yeah.
```

1              MR. ERCOLE:  Objection to form.

2              THE WITNESS:  I think that the increased

3    potency is not determinative here.  The false

4    advertising, the allegations here, or I guess it's

5    actually a stipulation here, that's a serious

6    business.

7    BY MR. BECKWORTH:

8        Q.  And we're talking about an opioid?

9        A.  Yes.

10       Q.  That Cephalon makes?

11       A.  Yes.

12       Q.  And when you were asked all these questions

13   about what Cephalon may have done about marketing,

14   continuing education, and speakers and whether you

15   recalled anything, that lawyer did not one time

16   reference anything that we just read out of

17   Exhibit 7, did he?

18             MR. ERCOLE:  Objection to form.

19             THE WITNESS:  That's correct.

20   BY MR. BECKWORTH:

21       Q.  Now, you understand this case has more than

22   20 years of facts behind it, right?

23       A.  Right.

24       Q.  And when you testified, you talked about

25   facts based on your personal knowledge over the

Page 532

1    course of your career, correct?

2        A.  Yes.

3        Q.  And that included papers that went back to

4    the mid 1980s?

5        A.  That's correct.

6        Q.  It's a lot of information, right?

7        A.  Yes.

8        Q.  There's no way you could sit here today, is

9    there, and remember everything that you've known in

10   your life?

11       A.  Right.

12            MR. ERCOLE:  Objection to form.

13   BY MR. BECKWORTH:

14       Q.  But when you testified today, did you

15   testify truthfully?

16       A.  Yes.

17       Q.  And when you signed that declaration, did

18   you state the things in there truthfully?

19       A.  Yes.

20       Q.  Under penalty of perjury?

21       A.  Yes.

22       Q.  And you've done that here today, right?

23       A.  Yes.

24       Q.  Now, when we talk about Cephalon, they

25   never told you that Cephalon and Teva make all kinds

Page 533

1    of drugs, did they?

2        A.  No.

3            MR. ERCOLE:  Objection to form.

4    BY MR. BECKWORTH:

5        Q.  They make a fentanyl product, Actiq?

6        A.  Yes.

7        Q.  They make an unbranded version of Actiq --

8            MR. ERCOLE:  Objection to form.

9    BY MR. BECKWORTH:

10       Q.  -- right?

11       A.  Yes.

12       Q.  They make a generic version of OxyContin --

13           MR. ERCOLE:  Objection to form.

14   BY MR. BECKWORTH:

15       Q.  -- right?

16       A.  Yes.

17       Q.  And he never told you that that generic

18   version of OxyContin is bought from Purdue?

19   He never told you that, did he?

20       A.  No.

21           MR. ERCOLE:  Objection to form.

22   BY MR. BECKWORTH:

23       Q.  And he never told you that when Cephalon or

24   Teva's generic version of OxyContin is sold, they

25   have to pay a royalty to Purdue?  Never told you

Page 534

1    that, did he?

2                MR. ERCOLE:  Objection to form.

3                THE WITNESS:  No.

4    BY MR. BECKWORTH:

5        Q.  And he never told you that Purdue actually

6    compensates Purdue's sales representatives based on

7    the number of generic opioids that are sold by both

8    Cephalon and Endo?  He never told you anything about

9    that, did he?

10       A.  No.

11               MR. ERCOLE:  Objection to form.

12   BY MR. BECKWORTH:

13       Q.  Now, he had a full and fair opportunity to

14   do it, right?

15       A.  Yes.

16       Q.  Now, so when you say as you sit here today

17   that you don't recall specific instances that

18   happened in Oklahoma or anywhere else, you're not

19   saying that those things didn't happen; you're just

20   saying you don't recall them as you sit here today?

21               MR. ERCOLE:  Objection to form.

22               THE WITNESS:  That's correct.

23   BY MR. BECKWORTH:

24       Q.  That's right.  And like the gentleman that

25   referred to you as one of the world's leading

1    experts, you understand that in this day and age

2    and, in fact, going back to 1996, much of the

3    marketing and work and speeches and papers that

4    exist in this space, they weren't limited in

5    geography, were they?

6              MR. ERCOLE:  Objection to form.

7              THE WITNESS:  By "limited in geography,"

8    you mean not distributed throughout the country?

9    BY MR. BECKWORTH:

10      Q.  That's correct.

11      A.  That's right.  They were distributed

12   throughout the country.

13      Q.  Throughout the country.  In fact, just like

14   today, this is a case about Oklahoma, and we're

15   sitting in New Hampshire, right?

16      A.  Yes.

17      Q.  And even today, we've looked at papers that

18   you wrote back in 1986, right?

19      A.  Yes.

20      Q.  Let's just go back to it.  You testified at

21   length today, correct?

22      A.  Yes.

23      Q.  You've been represented by your attorney?

24      A.  Yes.

25      Q.  And everything that you said under oath

Page 536

1   when I examined you earlier and just now, you stated

2   truthfully --

3       A.  Yes.

4       Q.  -- to the best of your knowledge?

5       A.  Yes.

6       Q.  Based on your experience and qualifications

7   and your life and your work, correct?

8       A.  Correct.

9       Q.  And your declaration that's admitted into

10  this record was done under penalty of perjury?

11      A.  Yes.

12      Q.  And it's true and correct?

13      A.  Yes.

14          MR. BECKWORTH:  Sir, I thank you for

15  your time.

16          MR. ERCOLE:  I have --

17          MS. SPENCER:  Where are we on time?

18          THE VIDEO OPERATOR:  Eight hours,

19  37 minutes.

20          MR. BECKWORTH:  We can keep going

21  forever, but that's rebuttal.  It's equal time.

22          MR. ERCOLE:  -- a couple questions.

23          MR. BECKWORTH:  It's equal time.

24          MR. ERCOLE:  I don't want to push him to

25  come back.  There's probably three questions that I

Page 537

1    have.

2                    MR. BECKWORTH:  There's no way that this

3    witness is going to have to come back in this case.

4    That's not true.

5                    MR. ERCOLE:  Well, if I don't get to ask

6    my questions, then I will probably --

7                    MR. BECKWORTH:  Sir, trials don't go on

8    forever.

9                    MR. ERCOLE:  Can I finish?

10                   MR. BECKWORTH:  No.  You do not get --

11                   MS. SPENCER:  All right.

12                   MR. BECKWORTH:  You're not the

13   plaintiff.  You don't get a rebuttal of a rebuttal.

14                   MR. ERCOLE:  It's not your decision.

15                   MR. BECKWORTH:  It's her decision.

16                   MS. SPENCER:  So where are we?

17                   THE VIDEO OPERATOR:  Eight hours,

18   38 minutes.

19                   MR. ERCOLE:  I can do it under five

20   questions.

21                   MS. SPENCER:  I'm going to say this.

22   If I give you each five more minutes --

23                   MR. ERCOLE:  I don't need five more

24   minutes.

25                   MR. BECKWORTH:  Five questions is fine.

1          MS. SPENCER:  If I give you each five

2    more minutes, that's what I'm going to do.  It's

3    fair, we don't have to come back here, we don't have

4    to argue about this.  We can all get out of here.

5          MR. BECKWORTH:  Brian said he can do it

6    in five questions, and I bet you I won't have any.

7                     EXAMINATION

8    BY MR. ERCOLE:

9        Q.  Dr. Portenoy, you have prescribed opioids

10   off-label; is that fair to say?

11       A.  Yes.

12       Q.  You've prescribed Actiq off-label, correct?

13       A.  Yes.

14       Q.  You've prescribed Fentora off-label?

15       A.  I don't think I've used Fentora, no.

16       Q.  Is it fair to say that in some situations,

17   off-label prescribing may form the appropriate

18   standard of care?

19       A.  Yes.

20       Q.  With respect to the off-label marketing

21   referenced in Plaintiff's Exhibit 7 --

22       A.  Yes.

23       Q.  -- do you have any knowledge one way or the

24   other -- personal knowledge one way or the other

25   whether Cephalon ever engaged in off-label promotion

Page 539

1    in Oklahoma?

2        A.   I have no personal recollection that I --

3    of that information, no.

4        Q.   And you're not aware of anything in this

5    document that says Cephalon engaged in off-label

6    promotion in Oklahoma, correct?

7        A.   Correct.

8            MR. ERCOLE:   Thank you.

9            MR. PATE:   That was six questions.

10           MS. SPENCER:   But it was less than five

11   minutes, so we're good.

12           MR. BECKWORTH:   We're done.  I've got to

13   go to New Jersey.

14           THE VIDEO OPERATOR:   The time is 10:33.

15   We're off.

16           (Deposition concluded at 10:33 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2         I, Kimberly A. Smith, a Certified Shorthand

 3    Reporter, Certified Realtime Reporter, Certified

 4    Realtime Captioner, Registered Diplomate Reporter,

 5    and Realtime Systems Administrator in and for the

 6    State of New Hampshire, do hereby certify that the

 7    foregoing is a true and accurate transcript of my

 8    stenographic notes of the deposition of RUSSELL

 9    PORTENOY, M.D., who was first duly sworn, taken at

10    the place and on the date hereinbefore set forth.

11         I further certify that I am neither attorney or

12    counsel for, nor related to or employed by any of

13    the parties to the action in which this deposition

14    was taken, and further that I am not a relative or

15    employee of any attorney or counsel employed in this

16    case, nor am I financially interested in this action.

17         THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

18    DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

19    ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

20    DIRECTION OF THE CERTIFYING COURT REPORTER.

21         Signed this 27th day of January, 2019.

22

23         _____

24              KIMBERLY A. SMITH, CSR, CRR, CRC, RDR

25
```

```
 1            ERRATA SHEET DISTRIBUTION INFORMATION

 2          DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

 3

 4

 5            ERRATA SHEET DISTRIBUTION INFORMATION

 6        The original of the Errata Sheet has been

 7   delivered to S. Amy Spencer, Esquire.

 8        When the Errata Sheet has been completed by the

 9   deponent and signed, a copy thereof should be

10   delivered to each party of record and the ORIGINAL

11   forwarded to Bradley Beckworth, Esquire, to whom the

12   original deposition transcript was delivered.

13

14

15                 INSTRUCTIONS TO DEPONENT

16        After reading this volume of your deposition,

17   please indicate any corrections or changes to your

18   testimony and the reasons therefor on the Errata

19   Sheet supplied to you and sign it.  DO NOT make

20   marks or notations on the transcript volume itself.

21   Add additional sheets if necessary.  Please refer to

22   the above instructions for Errata Sheet distribution

23   information.

24

25
```

Page 542

1   ATTACH TO THE DEPOSITION OF RUSSELL PORTENOY, M.D.

2   CASE:   STATE OF OKLAHOMA vs. PURDUE PHARMA, L.P.

3   DATE TAKEN:  January 24, 2019

4                    ERRATA SHEET

5   Please refer to page 541 for Errata Sheet

6   instructions and distribution instructions.

7    PAGE  LINE     CHANGE              REASON

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19     I have read the foregoing transcript of my

20  deposition and except for any corrections or changes

21  noted above, I hereby subscribe to the transcript as

22  an accurate record of the statements made by me.

23     Executed this _____ day of _____, 2019.

24             _____

25                    RUSSELL PORTENOY, M.D.