Highly Confidential - Subject to Further Confidentiality Review

```
1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF OHIO
3                    EASTERN DIVISION
4                       -   -   -
5
    IN RE:  NATIONAL      :   HON. DAN A.
6   PRESCRIPTION OPIATE   :   POLSTER
    LITIGATION            :
7                         :
    APPLIES TO ALL CASES  :   NO.
8                         :   1:17-MD-2804
                          :
9
             - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                    VOLUME I
12
                       -   -   -
13
                  April 17, 2019
14
                       -   -   -
15
16              Videotaped deposition of
    THOMAS PREVOZNIK, taken pursuant to
17  notice, was held at the law offices of
    Williams & Connolly, 725 12th Street,
18  Washington, D.C., beginning at 9:11 a.m.,
    on the above date, before Michelle L.
19  Gray, a Registered Professional Reporter,
    Certified Shorthand Reporter, Certified
20  Realtime Reporter, and Notary Public.
21                      -   -   -
22
            GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

      GREENE, KETCHUM, FARRELL, BAILEY & TWEEL LLP
 3    PAUL T. FARRELL, JR., ESQ.
      419 Eleventh Street
 4    Huntington, WV 25701
      (304) 521-4778
 5    Paul@greeneketchum.com
 6            - and -
 7    MCHUGH & FULLER
      BY:  MICHAEL J. FULLER, ESQ.
 8    97 Elias Whiddon Road
      Hattiesburg, Mississippi 39402
 9    (800) 939-5580
      mike@mchughfuller.com
10

              - and -
11

      MOTLEY RICE, LLC
12    BY:  LINDA SINGER, ESQ.
      401 9th Street, NW, Suite 1001
13    Washington, D.C. 20004
      (202) 386-9626
14    Lsinger@motleyrice.com
      Representing the Plaintiffs
15
16
17
18
19
20
21
22
23
24
```

```
 1    APPEARANCES:  (Cont'd.)
 2    US DEPARTMENT OF JUSTICE
      BY:  DAVID FINKELSTEIN, ESQ.
 3    BY:  NATALIE A. WAITES, ESQ.
      175 N Street, NE, Room 10-2222
 4    Washington, DC 20002
      (202) 616-2964
 5    david.m.finkelstein@usdoj.gov
      natalie.a.waites@usdoj.gov
 6
              - and -
 7
      US DEPARTMENT OF JUSTICE
 8    BY:  JAMES R. BENNETT, II, ESQ.
      United States Courthouse
 9    801 West Superior Avenue,
      Suite 400
10    Cleveland, Ohio 44113
      (216) 622-3988
11    James.bennett4@usdoj.gov
12            - and -
13    US DEPARTMENT OF JUSTICE
      BY:  MARIAMA C. SPEARS, ESQ.
14    8701 Morrisette Drive
      Springfield, Virginia 22152
15    (202) 598-6204
      Mariama.c.spears@usdoj.gov
16    Representing the US DOJ
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Cont'd.)

 2

     WILLIAMS & CONNOLLY, LLP
 3   By:  ENU MAINIGI, ESQ.
     BY:  COLLEEN MCNAMARA, ESQ.
 4   BY:  BRAD MASTERS, ESQ.
     BY:  JENNIFER G. WICHT, ESQ.
 5   725 12th Street, NW
     Washington, D.C. 20005
 6   (202) 434-5148
     emainigi@wc.com
 7   cmcnamara@wc.com
     bmasters@wc.com
 8   Jwicht@wc.com
     Representing the Defendant, Cardinal
 9   Health

10

11   BARTLIT BECK LLP
     BY:  LESTER C. HOUTZ, ESQ.
12   1801 Wewatta Street, Suite 1200
     Denver, Colorado 80202
13   (303) 592-3199
     lester.houtz@bartlit-beck.com
14   Representing the Defendant, Walgreens

15

     ROPES & GRAY LLP
16   BY:  ANDREW O'CONNOR, ESQ.
     BY:  JOSHUA E. GOLDSTEIN, ESQ.
17   800 Boylston Street
     Boston, Massachusetts 02199
18   (617) 951-7234
     Andrew.o'connor@ropesgray.com
19   Joshua.goldstein@ropesgray.com
     Representing the Defendant, Mallinckrodt

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:   (Cont'd.)
 2

      DECHERT, LLP
 3    BY:   JENNA C. NEWMARK, ESQ
      1095 Avenue of the Americas
 4    New York, New York 10036
      (212) 698-3500
 5    Jenna.newmark@dechert.com
      Representing the Defendant, Purdue
 6    Pharmaceuticals
 7

      MARCUS & SHAPIRA, LLP
 8    BY:   JOSHUA A. KOBRIN, ESQ.
      One Oxford Centre, 35th Floor
 9    Pittsburgh, Pennsylvania 15219
      (412) 338-3990
10    Kobrin@marcus-shapira.com
      Representing the Defendant, HBC
11    Service Company
12

      ZUCKERMAN SPAEDER, LLP
13    BY:   R. MILES CLARK, ESQ.
      1800 M. Street NW, Suite 1000
14    Washington, D.C. 20036
      (202) 778-1845
15    Mclark@zuckerman.com
      Representing the Defendant, CVS
16
17    REED SMITH, LLP
      BY:   ROBERT A. NICHOLAS, ESQ.
18    BY:   JOSEPH J. MAHADY, ESQ.
      Three Logan Square
19    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania 19103
20    (215) 851-8226
      rnicholas@reedsmith.com
21    Jmahady@reedsmith.com
      Representing the Defendant,
22    AmerisourceBergen Drug Corporation
23
24
```

```
 1    APPEARANCES:  (Cont'd.)
 2
      MORGAN LEWIS & BOCKIUS, LLP
 3    BY:  JOHN P. LAVELLE, JR., ESQ.
      1701 Market Street
 4    Philadelphia, Pennsylvania 19103
      (215) 963-4824
 5    John.lavelle@morganlewis.com
      Representing the Defendant, Rite Aid
 6    Corporation
 7
      FOLEY & LARDNER, LLP
 8    BY:  KRISTINA J. MATIC, ESQ.
      777 East Wisconsin Avenue
 9    Milwaukee, WI 53202
      (414) 297-5913
10    kmatic@foley.com
      Representing Actavis Laboratories
11    UT, Inc., Actavis Pharma, Inc.,
      ANDA, Inc., and Actavis,  Inc.,
12    (N/k/a Allergan Finance, LLC, Watson
      Laboratories, Inc.
13
14    KIRKLAND & ELLIS, LLP
      BY:  JENNIFER G. LEVY, ESQ.
15    1301 Pennsylvania Avenue, N.W.
      Washington, D.C. 20004
16    (202) 389-5000
      Jennifer.levy@kirkland.com
17
               - and -
18
      KIRKLAND & ELLIS, LLP
19    BY:  KAITLYN COVERSTONE, ESQ.
      300 North LaSalle Street
20    Chicago, Illinois 60654
      (312) 862-7184
21    Kaitlyn.coverstone@kirkland.com
      Representing the Defendant, Allergan
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)

 2

 3    COVINGTON & BURLING, LLP
      BY:  CHRISTOPHER K. EPPICH, ESQ.
 4    1999 Avenue of the Stars
      Los Angeles, California 90067
 5    (424) 332-4764
      Ceppich@cov.com
 6
              - and -
 7

      COVINGTON & BURLING, LLP
 8    BY:  KEVIN KELLY, ESQ.
      850 Tenth Street, NW
 9    Suite 586N
      Washington, D.C. 20001
10    (202) 662-5613
      Kkelly@cov.com
11
              - and -
12

      COVINGTON & BURLING, LLP
13    BY:  MEGHAN E. MONAGHAN, ESQ.
      850 Tenth Street, NW
14    Suite 586N
      Washington, D.C. 20001
15    mmonaghan@cov.com
      (202) 662-5110
16    Representing the Defendant, McKesson
      Corporation
17

18    JONES DAY
      BY:  NEAL J. STEPHENS, ESQ.
19    1755 Embarcadero Road
      Palo Alto, California 94303
20    (650) 739-3939
      Nstephens@jonesday.com
21    Representing the Defendant, Walmart

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)

 2

      BARNES & THORNBURG, LLP
 3    BY:  WILLIAM E. PADGETT, ESQ.
      11 South Meridian Street
 4    Indianapolis, Indiana 46204
      (317) 236-1313
 5    william.padgett@btlaw.com
      Representing the Defendant, H.D. Smith
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2

      LEVIN PAPANTONIO, P.A.
 3    BY:  PETER MOUGEY, ESQ.
      316 Baylen Street
 4    Pensacola, Florida 32502
      (850) 435-7000
 5    pmougey@levinlaw.com
 6         - and -
 7    BARON & BUDD, P.C.
      BY:  WILLIAM G. POWERS, ESQ.
 8    600 New Hampshire Avenue, NW
      The Watergate, Suite 10-A
 9    Washington, D.C. 20037
      (202) 333-4562
10    Wpowers@baronbudd.com
11         - and -
12    BARON & BUDD, P.C.
      BY:  THOMAS SIMS, ESQ.
13    The Centrum
      3102 Oak Lawn Avenue, Suite 1100
14    Dallas, Texas 75219
      (214) 521-3605
15    Tsims@baronbudd.com
16         - and -
17    MOTLEY RICE, LLC
      BY:  AMANDA UNTERREINER, ESQ.
18    401 9th Street, NW
      Suite 1001
19    Washington, D.C. 20004
      (202) 386-9626
20    aunterreiner@motleyrice.com
      Representing the Plaintiffs
21

22

23

24
```

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2
 3   ARNOLD PORTER KAYE SCHOLER, LLP
     BY:  JOSHUA M. DAVIS, ESQ.
 4   601 Massachusetts Avenue, NW
     Washington, DC 20001
 5   (202) 942-5000
     Joshua.davis@arnoldporter.com
 6   Representing the Defendants, Endo Health
     Solutions Endo Pharmaceuticals, Inc.; Par
 7   Pharmaceutical Companies, Inc. f/k/a Par
     Pharmaceutical Holdings, Inc.
 8
 9   REED SMITH, LLP
     BY:  SHANNON E. McCLURE, ESQ.
10   Three Logan Square
     1717 Arch Street, Suite 3100
11   Philadelphia, Pennsylvania 19103
     (215) 851-8226
12   smcclure@reedsmith.com
     Representing the Defendant,
13   AmerisourceBergen Drug Corporation
14
     CAVITCH FAMILO & DURKIN, CO., L.P.A.
15   BY: ERIC J. WEISS, ESQ.
     1300 E. 9th Street
16   Cleveland, Ohio 44114
     (216) 621-7860
17   Eweiss@cavitch.com
     Representing the Defendant, Discount Drug
18   Mart
19
     MORGAN LEWIS & BOCKIUS, LLP
20   BY:  LATIERA RAYFORD, ESQ.
     77 West Wacker Drive
21   Chicago, Illinois 60601
     (312) 324-1481
22   Latiera.rayford@morganlewis.com
     Teva Pharmaceuticals, Inc. Cephalon Inc,
23   Watson Laboratories, Actavis LLC, Actavis
     Pharma, Inc.
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:
      (Cont'd.)
 2
 3

      BAILEY & WYANT P.L.L.C.
 4    BY:  HARRISON M. CYRUS, ESQ.
      500 Virginia Street East
 5    Suite 600
      Charleston, West Virginia 25301
 6    (304) 345-4222
      Hcyrus@baileywyant.com
 7    Representing the Defendant, West
      Virginia Board of Pharmacy
 8
 9    JONES DAY
      BY:  PATRICK J. BEISELL, ESQ.
10    77 West Wacker
      Chicago, Illinois 60601
11    (312) 269-4066
      Pbeisell@jonesday.com
12    Representing the Defendant, Walmart
13
      FOX ROTHSCHILD, LLP
14    BY:  ZACHARY MARTIN, ESQ.
      2700 Kelly Road
15    Suite 300
      Warrington, Pennsylvania 18976
16    (215) 918-3680
      Zmartin@foxrothschild.com
17    Representing the Defendant, Prescription
      Supply Inc.
18
19    VENABLE, LLP
      BY:  JAMES K. O'CONNOR, ESQ.
20    750 E. Pratt Street, Suite 900
      Baltimore, Maryland 21202
21    (410) 244-7742
      Jko'connor@venable.com
22    Representing the Defendant, Abbott
      Laboratories and Abbott Laboratories,
23    Inc.
24
```

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3   LOCKE LORD, LLP
     BY:  MADELEINE E. BRUNNER, ESQ.
 4   2200 Ross Avenue
     Suite 2800
 5   Dallas, Texas  75201
     (214) 740.8758
 6   Maddie.brunner@lockelord.com
     Representing the Defendant,
 7   Henry Schein, Inc
 8

     O'MELVENY & MYERS, LLP
 9   BY:  EMILIE K. WINCKEL, ESQ.
     1625 Eye Street, NW
10   Washington, D.C. 20006
     (202) 383-5300
11   Ewinckel@omm.com
     Representing the Defendants, Janssen and
12   Johnson & Johnson
13

14

     ALSO PRESENT:
15

     Kaitlyn Eekhoff  - Paralegal
16   (Via telephone)
     (Motley Rice)
17

18   VIDEOTAPE TECHNICIAN:
     Chris Ritona
19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                          -  -  -
2                     I N D E X
3                          -  -  -
4

   Testimony of:
5

                                   THOMAS PREVOZNIK
6

   By Ms. Mainigi                         18
7

   By Mr. Eppich                          260
8

   By Mr. O'Connor                        264
9

   By Mr. Stephens                        389
10
11


                          -  -  -
12

                     E X H I B I T S
13

                          -  -  -
14
15   NO.             DESCRIPTION              PAGE
16   DEA
     Prevoznik-1   Notice of Deposition   19
17
     DEA
18   Prevoznik-2   Curriculum Vitae of    19
                   Thomas W. Prevoznik
19
     DEA
20   Prevoznik-3   Prevoznik Depo         20
                   Prep Listing
21
     DEA
22   Prevoznik-4   Report to the          97
                   US Attorney General
23                 CAH-HOUSE-002207-98
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2           E X H I B I T S   (Cont'd.)
 3                    -   -   -
 4
 5    NO.                DESCRIPTION              PAGE
 6    DEA
      Prevoznik-5  Dear Registrant         133
 7                 Letter, 12/27/07
                   RE, In Reference to
 8                 Registration
                   ABDCMDL00269685-86
 9
      DEA
10    Prevoznik-6  E-mail Thread           185
                   5/29/08
11                 Subject, ODL 08-057
                   US-DEA-00005911-17
12
      DEA
13    Prevoznik-7  Statement of            226
                   Demetra Ashley
14                 12/12/17
15    DEA
      Prevoznik-8  DEA Letter, 6/15/18   246
16                 ABDCMDL00269679
17    DEA
      Prevoznik-9  Binder, In Re           305
18                 National Prescription
                   Opiate Litigation
19
      DEA
20    Prevoznik-10 Memorandum for          364
                   All Components
21                 11/16/17
                   Office of Attorney
22                 General
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2           E X H I B I T S   (Cont'd.)
 3                    -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    DEA
      Prevoznik-11 E&C Red Flags and      377
 7                 Warning Signs
                   Ignored
 8                 12/19/18
 9    DEA
      Prevoznik-12 (Clawed Back)          380
10                 US-DEA-00011196-98
11    DEA
      Prevoznik-13 21 CFR 1301.71         395
12                 10/9/14
13    DEA
      Prevoznik-14 Hearing Before         401
14                 The Subcommittee
                   On Oversight and
15                 Investigations
                   4/29/14
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2            DEPOSITION SUPPORT INDEX
 3                    -   -   -
 4
 5   Direction to Witness Not to Answer
 6   PAGE    LINE
     10      28
 7   221     17
     235     16
 8   243     1
     245     1
 9   251     20
     253     9
10   254     7
     254     15
11   257     10
     259     8
12   376     14
13
     Request for Production of Documents
14
     PAGE    LINE
15   None.
16
     Stipulations
17
     PAGE    LINE
18   None.
19
     Questions Marked
20
     PAGE    LINE
21   111     17
22
23
24
```

```
 1                      -  -  -

 2              THE VIDEOGRAPHER:  We are

 3      now on the record.  My name is

 4      Chris Ritona.  I am the

 5      videographer with Golkow

 6      Litigation Services.

 7              Today's date is April 17,

 8      2019, and the time is

 9      approximately 9:11 a.m.

10              This video deposition is

11      being held at Williams & Connolly,

12      LLP, 725 12th Street Northwest,

13      Washington, DC, in the matter of

14      National Prescription Opiate

15      Litigation, MDL No. 2804, case

16      Number 17-MD-2804, for the United

17      States District Court, Northern

18      District of Ohio, Eastern

19      Division.

20              The deponent today is Thomas

21      Prevoznik.  And all counsel will

22      be noted upon the stenographic

23      record.

24              The court reporter today is
```

Highly Confidential - Subject to Further Confidentiality Review

1          Michelle Gray, and she will now

2          please swear in the witness.

3                    -  -  -

4               ... THOMAS PREVOZNIK, having

5          been first duly sworn, was

6          examined and testified as follows:

7                    -  -  -

8               EXAMINATION

9                    -  -  -

10    BY MS. MAINIGI:

11         Q.    Good morning, Mr. Prevoznik.

12         A.    Good morning.

13         Q.    I will begin the

14    questioning.  My name is Enu Mainigi, and

15    I'm going to begin the questioning on

16    behalf of the defendants, and then there

17    are other defendants that may question

18    you after I'm done, and then the

19    plaintiffs will question you thereafter.

20              Mr. Prevoznik, I have put in

21    front of you Exhibit 1.  And Exhibit 1 is

22    the notice of deposition.

23              (Document marked for

24         identification as Exhibit

1          DEA-Prevoznik-1.)

2              (Document marked for

3          identification as Exhibit

4          DEA-Prevoznik-2.)

5    BY MS. MAINIGI:

6          Q.    The notice of videotaped

7    30(b)(6) deposition for your testimony

8    today.

9              Do you see that?

10         A.    Yes, I do.

11         Q.    And do you see that attached

12   to the notice is a letter dated March 22,

13   2019, from the Department of Justice

14   addressed to myself, and Ms. Singer of

15   Motley Rice?

16         A.    Yes.

17         Q.    Have you had a chance to

18   review, either alone or with your

19   counsel, the substance of this March 22nd

20   letter as well as the notice of

21   deposition?

22         A.    Yes, I have.

23         Q.    And do you understand that

24   you are here today testifying in a

Highly Confidential - Subject to Further Confidentiality Review

1   30(b)(6) capacity on behalf of the Drug

2   Enforcement Administration?

3          A.    Yes, I do.

4          Q.    And as I understand it, you

5   will be testifying as to certain topics

6   designated consistent with the letter

7   dated March 22, 2019, correct?

8          A.    Correct.

9          Q.    Okay.  Now, if you could

10  turn to the letter itself, Mr. Prevoznik.

11  And I'm looking specifically at Page 2 of

12  the letter.

13         A.    Okay.

14         Q.    You have been designated to

15  provide testimony on Topic 2, DEA's

16  interpretation and enforcement of and

17  practices related to 21 U.S.C. Section

18  823 and 21 C.F.R. Section 1301.74,

19  subject to the limitations set forth by

20  DOJ in this letter, correct?

21         A.    Correct.

22         Q.    How -- I notice,

23  Mr. Prevoznik, that Exhibit 3 that is in

24  front of you, is a deposition prep chart,

1  correct?

2       A.    Correct.

3            (Document marked for

4       identification as Exhibit

5       DEA-Prevoznik-3.)

6  BY MS. MAINIGI:

7       Q.    Could you -- and feel free

8  to refer to that.  Could you at a high

9  level explain to me how you set about

10  preparing for Topic 2?

11       A.    I reviewed some of the

12  letters, the guidance that was sent out

13  to the registrant community.

14            I reviewed some of the

15  conference materials that were given at

16  registrant conferences that we've held.

17            I've also reviewed some of

18  the MOAs that were agreed upon and

19  settled with some of the registrants.

20            I met with -- I met with and

21  I discussed with fellow DEA colleagues

22  about -- whether it was cases that they

23  had against the defendants or that they

24  had knowledge of some of the policies and

1    practices that DEA has had regarding the

2    suspicious orders.

3          Q.    Do you recall, and I realize

4    this is somewhat difficult to segregate

5    out in your mind.  But looking at

6    Exhibit 3, are you able to identify for

7    me the particular individuals you spoke

8    to in relation to Topic 2?

9          A.    Well, definitely Nancy

10   Jackson and Mark Armstrong.  Nancy Kent,

11   Lenny Levin, Lisa Sullivan, Dave White,

12   Donna Richards, as well as Scott Collier,

13   Ruth Carter, Susan Langston, Loren

14   Miller, and -- oh, Chris Grush and Scott

15   Brinks, Scott Garriott, Lynette Wingert,

16   June Howard, Matt Strait, Kerry Hamilton,

17   Justin Wood.

18          That's probably the best of

19   my recollection at this point.

20          Q.    Thank you, Mr. Prevoznik.

21          Just taking a look at

22   Exhibit 3, entitled "Prevoznik Deposition

23   Prep," is it fair to say that essentially

24   with respect to Topic 2, you spoke to

1    essentially everybody that's on this list

2    except for the attorneys that are

3    representing you from DOJ and DEA?

4         A.    Oh, I'm sorry.  No, I talked

5    to them as well.

6         Q.    Okay.

7         A.    I apologize for that.

8         Q.    No, no, no.  And let me be

9    clear.  Is there anyone that works at DEA

10   that you didn't speak to with respect to

11   Topic 2 that's listed here on Exhibit 3?

12        A.    I think I was pretty

13   thorough on listing everybody.  I

14   apologize if I did not get everybody, but

15   I think I got everybody.

16        Q.    That's completely fine.

17              Did you speak to Joe

18   Rannazzisi in preparation for today's

19   deposition?

20        A.    No, I have not.

21        Q.    Did you speak to Kyle Wright

22   in preparation for today's deposition?

23        A.    No, I have not.

24        Q.    Are you aware that

1    Mr. Wright was deposed in this matter

2    recently?

3              A.    Yes.

4              Q.    Did you have occasion to

5    review his deposition transcript?

6              A.    I reviewed his questions.

7              Q.    You reviewed only the

8    questions that were asked of him at his

9    deposition?

10             A.    Correct.

11             Q.    You were not provided the

12   opportunity to review the answers?

13             A.    I was given the questions.

14   That's what I reviewed.

15             Q.    Did you speak to Demetra

16   Ashley in preparation for today's

17   deposition?

18             A.    No, I did not.

19             Q.    Did you review -- were you

20   aware that Ms. Ashley was deposed in this

21   matter recently?

22             A.    Yes.

23             Q.    Did you review Ms. Ashley's

24   deposition transcript in preparation for

1    today's deposition?

2         A.    Yes, I did.

3         Q.    Did you review the entirety

4    of the deposition transcript?

5         A.    Yes, I did.

6         Q.    Can you explain to me your

7    understanding as to why you only reviewed

8    the questions and not answers for

9    Mr. Wright's deposition transcript?

10              MR. FINKELSTEIN:  I'm going

11         to object and instruct you not to

12         answer to the extent that your

13         answer would call for

14         communications with either DOJ or

15         DEA attorneys.

16              THE WITNESS:  Based on the

17         advice of my attorney.

18    BY MS. MAINIGI:

19         Q.    Did you speak with Mr. Mapes

20    in preparation for today's deposition?

21         A.    No, I did not.

22         Q.    Did you familiar with

23    Mr. Michael Mapes?

24         A.    I know who he is, yes.

1    Q.    And are you aware that

2  Mr. Mapes was involved with

3  communications to distributors in various

4  time periods while he was at DEA?

5    A.    Yes.

6    Q.    Who made the decision as to

7  the individuals that you would speak to

8  in preparation for today's deposition?

9    A.    I did.

10    Q.    And how did you go about

11  making the determination as to which

12  individuals to speak with versus not?

13    A.    I mean, I've been on the job

14  28 years.  So I know quite a few people.

15  I reached out to the main people that I

16  knew would have information, and based on

17  discussing with them, there were

18  suggestions made to reach out to other

19  people.  Some of the people I worked with

20  in headquarters and I worked closely with

21  them, so I -- I knew they knew

22  information that could help me prepare.

23  So that -- that's how I figured out who I

24  should be talking to.

1    But I did consult with DEA

2  and DOJ attorneys on who I was going to

3  talk to.

4    Q.    Did you reach out to any

5  former employees of DEA as part of your

6  preparation?

7    A.    No.

8    Q.    Taking a look at -- and --

9  and I'll come back to the list of

10  individuals that you -- you gave me,

11  Mr. Prevoznik, and -- and perhaps inquire

12  some further about those particular

13  conversations in a few minutes.

14    Did you keep notes of those

15  conversations by any chance?

16    A.    No, not really.

17    Q.    Have you --

18    A.    I mean I had some -- some

19  e-mails from them with like, case

20  investigations.  I asked them to

21  summarize them, the cases, so I -- I do

22  have those.  Mostly it was just oral

23  communication.

24    Q.    How did you -- now you --

Highly Confidential - Subject to Further Confidentiality Review

1    you met with these individuals over a

2    pretty wide span of time, beginning it

3    looks like all the way back to perhaps

4    late January, early February, correct?

5         A.    Correct.

6         Q.    And now we are in mid April.

7    How did you keep track of all of the

8    information that you learned from these

9    individuals if you didn't take notes of

10   those conversations?

11        A.    Well, like I said, I did

12   have some e-mails with them, but in

13   essence, I pretty much -- we would go

14   over certain topics.  We would listen.

15   And then with DOJ attorneys and DEA

16   attorneys, we would discuss that.  So

17   each time we met, we met on a weekly

18   basis, we would go over the same -- same

19   topics, so that it was -- we started to

20   come together on what are -- what are the

21   policies and procedures that DEA has

22   articulated to the registrants.

23             So it was just a natural

24   progression of constantly going over the

Highly Confidential - Subject to Further Confidentiality Review

 1    material with them.

 2         Q.    And do you have, for each

 3    one of the topics, certain talking points

 4    that you have or certain Q&A that you

 5    have prepared to utilize today?

 6              MR. FINKELSTEIN:  Object to

 7         the form.

 8              THE WITNESS:  Well, I mean I

 9         put together the binder to help

10         guide me, so a lot of the

11         documents are -- come from those

12         conversations of -- throughout the

13         years of what we've done, so

14         that's kind of what the binder is,

15         a guide of that.

16              MS. MAINIGI:

17         Mr. Finkelstein, could we get a

18         copy of -- oh, thank you.  We've

19         got a copy of the binder.

20    BY MS. MAINIGI:

21         Q.    With respect to the e-mail

22    exchanges that you had with some certain

23    of these witnesses, were those e-mails

24    where they were forwarding you prior

1  contemporary -- prior e-mails from other

2  time periods, or were those e-mails where

3  they were answering questions that you

4  had?

5       A.    Answering questions that I

6  had.

7       Q.    So for example, you may have

8  asked a witness to answer a particular

9  question or refresh you as to a

10 particular settlement with a defendant.

11 And that individual provided an answer to

12 you via e-mail?

13      A.    Correct.

14      Q.    And are those e-mails

15 included in the binder?

16      A.    No, they are not.

17      Q.    Okay.

18           MS. MAINIGI:  Counsel, we

19           don't have to delay on this right

20           now, but we'd like to make a

21           request to get those e-mails

22           please.

23           MR. FINKELSTEIN:  We'll take

24           it under advisement.

1    BY MS. MAINIGI:

2         Q.    Mr. Prevoznik, taking a look

3    at Topic 3, which is on Page 3 of the

4    March 22nd letter.

5              Is it fair to say that you

6    have also been designated to provide

7    testimony on Topic 3, which is DEA's

8    guidance and communications regarding the

9    criteria for what makes a controlled

10   substances order suspicious, subject

11   again to the limitations set forth by DOJ

12   in this letter?

13        A.    Correct.

14        Q.    Would it be fair to say that

15   your preparation for Topic 3 is

16   consistent and essentially overlaps with

17   your preparation for Topic 2?

18        A.    Yes.

19        Q.    In terms of the time period

20   that you prepared for, Mr. Prevoznik, is

21   it fair to say that you prepared back to

22   the 1996 time period?

23        A.    Yes.

24        Q.    Could you name for me, from

1    your --

2          A.    Actually, if I could --

3          Q.    Please.

4          A.    I did -- I did review some

5    other stuff prior to 1996 as well.

6          Q.    Okay.  And that would be

7    documents prior to 1996?

8          A.    Yes.

9          Q.    Okay.  What documents that

10   you recall did you review prior to 1996?

11         A.    It was the press release

12   from a 1984 Burroughs Wellcome civil

13   settlement.  It was also some

14   correspondence between registrants and

15   DEA headquarters regarding suspicious

16   orders.

17         Q.    Anything else that you

18   remember from the pre-'96 time period?

19         A.    Not off the top of my head.

20               MS. MAINIGI:  Counsel, I

21         will ask you one question.  All

22         the documents that Mr. Prevoznik

23         reviewed, for the purpose of his

24         preparation here today, perhaps

Highly Confidential - Subject to Further Confidentiality Review

1          with the exception of those

2          e-mails that we referenced, have

3          all those documents been produced?

4                MR. FINKELSTEIN:  I can look

5          into it.

6                MS. MAINIGI:  If you could

7          let us know sometime this morning,

8          that would be helpful.

9                MR. FINKELSTEIN:  I'll say

10         that we've produced everything

11         that we've agreed to produce

12         pursuant to the agreed-upon

13         protocol.

14               MS. MAINIGI:  Okay.  We can

15         pick that up during a break.

16    BY MS. MAINIGI:

17         Q.    Mr. Prevoznik, with respect

18    to, let's say, the earlier time period

19    for which you prepared, approximately

20    1996 to, let's call it 2003-2004, can you

21    highlight for me the specific individuals

22    that you named before, who you spoke to

23    that were there during that time period,

24    and you may have gotten information from

1    them about that time period?

2         A.    Can I ask for a

3    clarification on what do you mean by,

4    that were -- where?

5         Q.    I apologize, at the DEA.  So

6    let me -- let me -- let me divide that up

7    into -- into smaller pieces.

8              You prepared back to 1996

9    and in some cases earlier, correct?

10        A.    Correct.

11        Q.    Who were the individuals

12   that you spoke to, to prepare yourself to

13   cover questions regarding the time period

14   of 1996 to 2003?

15        A.    Loren Miller.  Jim Arnold.

16        Q.    Could you speak up?

17        A.    Jim Arnold.  Lauren Miller.

18   Ruth Carter.  Susan Langston.  Scott

19   Collier.  Lanette Wingert.  Scott

20   Garriott I think that's -- those are the

21   DEA folks.

22        Q.    Thank you, Mr. Prevoznik.

23   If anybody else comes to mind, just

24   please let me know.

1    A.    Sure.

2    Q.    If they do.

3          Now continuing on just in

4    terms of identifying the topics.  You

5    have also been designated to provide

6    testimony on Topic 9 subject to the

7    limitations set forth by DOJ, correct?

8    A.    Is that Page 5?

9    Q.    It is Page 5, yes.

10   A.    Correct.

11   Q.    And that topic, again

12   subject to the limitations laid out in

13   the letter, is your procedures and

14   practices relating to obtaining,

15   processing, analyzing and taking formal

16   or informal actions based upon ARCOS

17   data, suspicious order reports or other

18   communications from DEA registrants to

19   identify and stop sources of diversion.

20         Is that correct?

21   A.    Correct.

22   Q.    How did you prepare to

23   testify on this particular topic,

24   Mr. Prevoznik?

1      A.    Similar fashion to how I did

2  it with the SORs.  I also did it with

3  ARCOS.  Primarily I talked to June

4  Howard, Hope Thomas, and Nancy Kent.

5      Q.    What was the first name?

6  I'm sorry.  I missed it.

7      A.    Hope Thomas?  Hope.

8      Q.    Prior to Hope Thomas?

9      A.    Nancy Kent or --

10     Q.    Was it June?

11     A.    June Howard.

12     Q.    June Howard.  Thank you.

13     A.    And Nancy Jackson.

14          MR. FINKELSTEIN:  Can I just

15     interject.  Hopefully this will

16     make the transcript clearer.  The

17     witness said SORs, S-O-R-S, not

18     source.

19  BY MS. MAINIGI:

20     Q.    And, Mr. Prevoznik, you have

21  also been designated to testify -- excuse

22  me, provide testimony on Topic 12, again,

23  subject to the limitations set forth by

24  DOJ, correct?

1        A.    Correct.

2        Q.    And Topic 12 is your

3   decision not to allow DEA-registered

4   distributors access to deidentified ARCOS

5   data prior to February 2018, and your

6   decisions to provide DEA-registered

7   distributors with limited access to

8   certain ARCOS data in February, correct?

9        A.    Correct.

10        Q.    Is there anyone else you

11   spoke with in preparation for your

12   deposition Mr. Prevoznik, that you have

13   not identified thus far?

14        A.    I don't think I've orally

15   identified the DEA and DOJ attorneys.  If

16   you want me to.

17        Q.    Setting aside the DOJ/DEA

18   attorneys, are there any other

19   individuals with whom you spoke in

20   preparation for your deposition that you

21   have not identified so far?

22        A.    Not that I can recall.

23        Q.    Okay.  Are there any

24   deposition transcripts other than

1    Mr. Wright's partial transcript and

2    Ms. Ashley's full transcript that you

3    reviewed in preparation for today's

4    deposition?

5           A.    Deposition testimonies?

6           Q.    Yes.

7           A.    No.  I -- no.

8           Q.    With respect to documents,

9    Mr. Prevoznik, obviously I appreciate you

10   bringing along today a binder of

11   materials that you've reviewed.  I'm

12   assuming that's probably only a partial

13   set of the documents you reviewed in

14   preparation for today; is that correct?

15          A.    Correct.

16          Q.    Can you describe for me what

17   other documents or types of documents you

18   recall reviewing in preparation for your

19   deposition today?

20          A.    Sure.  I reviewed the energy

21   and commerce report.  I reviewed the GAO

22   reports.  I don't have the specific dates

23   off the top of my head.  But I reviewed

24   those.

Highly Confidential - Subject to Further Confidentiality Review

1          I've reviewed federal

2     register notices.  I reviewed memorandums

3     of agree -- of agreement.

4          I reviewed settlements.  I

5     reviewed policy letters, as I had already

6     previously stated.  I reviewed, again,

7     presentations, whether it was

8     presentations to conferences or whether

9     it was presentations from, like, ARCOS,

10    we give a presentation, I reviewed those

11    presentations.  I think that pretty much

12    covers it.

13         Q.   How did you determine which

14    documents to review in preparation for

15    your deposition?

16         A.   Well, as you'll note on my

17    prep sheet, we met on a weekly basis, so

18    we had constant conversation -- constant

19    conversations about, you know, this

20    topic.  We need to cover this topic, so

21    here is some suggestions.  Or I would

22    say, is this something to review.  And

23    that's kind of how we formulated the game

24    plan of which documents to review.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So fair to say the witnesses

2    or the individuals with whom you spoke or

3    who you interviewed for -- to prepare

4    today, might have brought certain

5    documents to your attention as part of

6    that process?

7    A.    Well, I mean, I'm familiar

8    with the big national cases, so I know --

9    I knew where those documents were.  So

10   they didn't have to provide them.  I knew

11   where they were, so...

12   Q.    In terms of policy

13   documents, for example, where did you get

14   those?

15   A.    From our policy unit.  That

16   would be Jim Arnold and Loren Miller.

17   Q.    And with respect to, for

18   example, communications with distributors

19   or other registrants that took place over

20   the years, where did you go to get those?

21   A.    So those were in our

22   regulatory section.  And they provided

23   those.

24   Q.    And remind me,

1    Mr. Prevoznik, who are the individuals

2    from the regulatory section that you

3    spoke with?

4         A.    Well, these are all the

5    people that were there for that time

6    period, so it was Lenny Levin, Lisa

7    Sullivan, Donna Richards, Dave White.  I

8    mean, I've been in headquarters since

9    April 2012.  So I kind of know where --

10   who has the documents.  It's not hard for

11   me to go ask somebody to go pull it.

12         I believe this was all part

13   of the documents for this litigation

14   anyway that were being pulled, so...

15         Q.    I'm going to come back,

16   Mr. Prevoznik, on some of those

17   conversations you had.  And I'm going to

18   spend a little bit of time with you now

19   on your background.

20         A.    Sure.

21         Q.    As I understand it, you

22   currently work for DEA; is that correct?

23         A.    Yes.

24         Q.    And what is your position?

1    A.    I am currently the acting

2  section chief of the pharmaceutical

3  investigations in the diversion control

4  division.

5    Q.    And Mr. Prevoznik, you are

6  somewhat soft-spoken.  If you could keep

7  your voice up.

8    A.    I apologize.  I could be

9  loud.  I just --

10    Q.    I completely understand.

11         And in -- how long have you

12  had that position?

13    A.    I've been acting since

14  mid-January of this year.

15    Q.    How long have you been at

16  DEA overall?

17    A.    Over 28 years.

18    Q.    And is it fair to say that

19  part of the time that you were at DEA,

20  you were in the field, one of the field

21  offices, or several field offices, and

22  part of the time you've been at DEA

23  you've been at corporate headquarters?

24    A.    I've been in the field.

1    I've been in our training academy as an

2    instructor, and I've also went back to

3    the field, and then to headquarters.

4         Q.    Your current position is at

5    headquarters, correct?

6         A.    Correct.

7         Q.    And what -- in that

8    position, do you have any oversight or

9    responsibility related to suspicious

10   order monitoring or reporting?

11        A.    Yes.  My -- well, they just

12   split our unit, our section to a -- so

13   that analytics side, which was ARCOS,

14   which includes drug theft loss, and SORs

15   data, the output side.  They've been

16   moved to another section.  That was like

17   two weeks ago.  But prior to that it'd

18   been under -- under me.

19        Q.    So it was primarily the

20   analytics unit in your current role that

21   had some degree of interaction with

22   suspicious order monitoring or reporting?

23        A.    Well, I'd like to clarify.

24   Because headquarters, we're only --

Highly Confidential - Subject to Further Confidentiality Review

1    currently we're only receiving those

2    suspicious orders that come to us via an

3    MOA that has been entered with the

4    registrants that have gotten in trouble

5    with us or have -- have had an action

6    taken against them by us.  So that those

7    that have been required to report, those

8    who report centrally electronically to us

9    at headquarters, we had those.

10             But regulation requires that

11   actually -- the suspicious orders go to

12   the field, the local field office.  So

13   you have two different pots of suspicious

14   orders.  So we don't see what the field

15   gets.

16        Q.    So by regulation, suspicious

17   order reporting from distributors or

18   other registrants goes to the DEA field

19   offices, correct?

20        A.    Correct.

21        Q.    And the DEA field offices

22   make a determination as to whether any of

23   those suspicious order reports get

24   forwarded on to headquarters, is that

1    right?

2           A.     No.   That's not correct.

3    The field --

4           Q.     Who makes that decision?

5           A.     Well, no, the -- I'm sorry,

6    if I didn't explain to you correctly.

7    But those that have had some sort of

8    administrative action taken against them,

9    in particular regarding suspicious

10   orders, if they've had an action taken in

11   the past -- it started in 2008 where we

12   required them to report electronically

13   and centrally to headquarters, so that

14   those suspicious orders come to

15   headquarters.

16                 But if they haven't had an

17   administrative action and haven't been

18   directed to send it to headquarters, the

19   regulation requires that they submit them

20   to the field office.  The field office

21   will make the determination of what

22   action they're going to take.  So we

23   don't get -- headquarters does not get

24   involved in those actions of determining

Highly Confidential - Subject to Further Confidentiality Review

1    what to do.  Those are field decisions.

2           Q.    So since 2008, suspicious

3    orders from any registrant who has had an

4    administrative action taken, sends their

5    suspicious orders to headquarters?

6           A.    Well, I want to be careful

7    of the -- the way that you're phrasing

8    "any administrative action."  These

9    are -- these are settlement agreements

10   between us and the registrant,

11   typically -- or they have been because

12   they've had difficulty reporting

13   suspicious orders.  So we've had civil

14   settlements, part of the settlement

15   agreements were they will report to

16   headquarters.  Those are the ones that

17   have that.

18           We have taken other

19   administrative actions against other

20   registrants.  It may not be -- if it has

21   nothing to do with suspicious orders,

22   then that would not be part of the

23   settlement or the agreement.  So...

24           Q.    The suspicious orders that

Highly Confidential - Subject to Further Confidentiality Review

1    are being sent to headquarters per the

2    direction of the DEA for those

3    registrants who may have entered into

4    settlements and the like after 2008, are

5    they also being sent to the field

6    offices?

7         A.    So the field actually has

8    access to them.  So they can go in and

9    see them.  So there's actually -- within

10   our system there's actually two sets of

11   SORs.  One is what we call Legacy, that's

12   the older system.  So that's the ones

13   that the MOAs have -- they are the older

14   MOAs.

15              Whereas the vetted side is

16   the newer side.  And what we've done,

17   we've -- we've actually changed it.  So

18   that it still goes -- the SORs system

19   through the vetted side is like -- is on

20   the ARCOS platform.  So that the -- the

21   distributors or the manufacturers are

22   familiar with what the ARCOS platform is,

23   so that when it comes in, it gets vetted,

24   so it get -- gets a QA, quality assurance

Highly Confidential - Subject to Further Confidentiality Review

1    check.  So that if there are issues with

2    what they are reporting, they have to fix

3    it before we will accept it.  So that's

4    the -- that's the newer system.

5         Q.    So just for clarification of

6    the record, Mr. Prevoznik.  Can you give

7    us just a high level definition or

8    explanation of the SORs system, what that

9    is?

10        A.    Well, which one?  The one

11   that goes to the field, the one that's

12   Legacy?  Because we still have

13   registrants that are still submitting via

14   the Legacy system.  And we have a

15   registrant now that is under a current

16   MOA that is filing it in the vetted

17   system.

18        Q.    The Legacy system is

19   referred to as what?

20        A.    We just call it -- they are

21   both SORs, but we call it Legacy.

22        Q.    Okay.  So let's start with

23   the Legacy SORs system.  Can you describe

24   what that is?

1    A.    So it's a system, electronic

2    system in which the registrants that are

3    continuing to report their suspicious

4    orders electronically from their past

5    MOAs, they can upload their information

6    into that system.  We don't force vet it,

7    because that was not what we did in the

8    past.  So that, that was the change to

9    force vet it.  So the newer system has

10   the force vetting.  That's really the

11   only difference between it.

12        Q.    What is that term you used,

13   "force vetting"?  What does that mean?

14        A.    So if -- if the -- if say an

15   NDC number is wrong or a DEA registration

16   number is wrong, it's going to -- it's

17   going to say to the registrant that's

18   trying to upload it, we need to correct

19   this.  So it's correcting -- it's -- it's

20   force correcting the information so that

21   when it comes in it's clean and accurate.

22        Q.    And the Legacy system, the

23   field office -- the field offices have

24   access to the Legacy system?

1    A.    They have access to both.

2    Q.    And does headquarters have

3  access to the Legacy system?

4    A.    We have access to both.

5    Q.    And then what is your

6  terminology or how do you refer to the

7  non-Legacy system?

8    A.    The which one?

9    Q.    The non-Legacy system, the

10  more updated system--

11    A.    Right now we just -- it's --

12  we both refer to it as SORs.  But when

13  you go in, the vetted one is the one that

14  you see first.  But you can -- there's a

15  link to go to Legacy.  So you can toggle

16  between the two.

17    Q.    So just two different

18  databases essentially that exist?

19    A.    Essentially.

20    Q.    Okay.  Both containing

21  suspicious order reporting from

22  registrants?

23    A.    Those that had -- through

24  the settlements had -- were required

1    to -- to send it in.

2            Q.    And --

3            A.    Because you have the -- you

4    still had the field ones as well.

5            Q.    I was just going to get to

6    that next.  So those that have not been

7    required to send in their suspicious

8    order reporting to the SORs system, where

9    are those suspicious orders stored?

10           A.    Well, those go to -- those

11   go to the field.  So the field takes

12   them, reviews them, makes the

13   determination of what action they deem

14   necessary at that point.

15           Q.    And those suspicious orders

16   are reported to the field, as a general

17   matter, electronically; is that right?

18           A.    No.  I mean they could come

19   in e-mail, it could be attached to an

20   e-mail, like a spreadsheet.  They come in

21   as -- I know it's hard to believe, but

22   people still fax.  It comes in snail

23   mail, various different forms.

24           Q.    And ultimately the field

Highly Confidential - Subject to Further Confidentiality Review

1  offices make a determination as to what

2  to do with any of the suspicious order

3  reports that come into the field offices?

4        A.    Yes.  Because one thing

5  that -- that we do is if a registrant

6  sends in a suspicious order and it's not

7  in our area of responsibility, we would

8  then forward it to that office that that

9  falls under, because we wouldn't know

10  that registrant.  So we'd send it -- so

11  if it's not in our AOR, area of

12  responsibility, we would then send it to

13  that office for them to review.

14        Q.    Is -- is there some way for

15  corporate to regularly be apprised of

16  what the field offices are doing with the

17  suspicious order reports that come into

18  them?

19        A.    Apprised in what way?

20        Q.    How -- does corporate know,

21  as a general matter, what happens with a

22  suspicious order reporting that goes just

23  to the field offices?

24        A.    I don't know.  I don't know

1    if they -- I mean, we use them for a

2    variety of different reasons.  Some --

3    sometimes it's to corroborate

4    investigations.  Sometimes it starts an

5    investigation.  So if we're in the middle

6    of an investigation, we're not going

7    to -- we're not going to show our hand

8    whether we're doing something with it or

9    not.  We're going to investigate.  Which

10   is what we do.

11          Q.    So some of the suspicious

12   order reporting that comes in, whether

13   through the field office or to

14   headquarters, may be utilized to start an

15   investigation, true?

16          A.    True.

17          Q.    Or it may be used to

18   corroborate perhaps an ongoing

19   investigation, true?

20          A.    True.

21          Q.    Any other uses of the

22   suspicious order reporting that may come

23   to the field offices or to headquarters?

24          A.    It would also be used in our

1    scheduled investigations.  That's when

2    we're out at the registrants and we use

3    it to review the suspicious ordering

4    monitoring system that they have in place

5    to ensure that they are actually doing

6    what they say they are going to do.

7            Q.    Any other uses?

8            A.    I mean they are used for

9    administrative actions.  They are used

10   for civil, criminal, federal, state

11   cases.

12           Q.    Can you define for us what

13   ARCOS data is?

14           A.    Sure.  ARCOS data is

15   required reporting by manufacturers and

16   distributors of all Schedule I and II,

17   III narcotics, and GHB, gamma hydroxide

18   butyrin I believe.  I hope I didn't

19   butcher that one, but GHB.

20               So that's what's required to

21   be reported through ARCOS.

22           Q.    And how often is it required

23   to be reported?

24           A.    Monthly or quarterly.

1      Q.    And do you know

2   approximately for how long ARCOS data has

3   been required to be reported monthly or

4   quarterly?

5      A.    I think -- I mean, it's been

6   part of the statute since the beginning,

7   so...

8      Q.    So at least since 1996?

9      A.    Oh before that, yeah.

10     Q.    And does the ARCOS data

11  reporting go to headquarters or the field

12  offices?

13     A.    Headquarters.

14     Q.    Not to the field offices?

15     A.    Field offices now have

16  access to it, yeah.  I mean.

17     Q.    And how long has that been

18  the case?

19     A.    They've had -- we've had

20  access for a while.  But it's -- it's

21  changed over the years.

22            Up until the fall of 2009 it

23  was on the mainframe.  So the

24  capabilities were more -- we have

Highly Confidential - Subject to Further Confidentiality Review

1    programmers that provided the details of

2    like what we could look at, whereas once

3    it went off the mainframe, then it become

4    more client service, so that the field

5    could actually do more things with it.

6    So that was roughly the fall -- fall of

7    2009 when it went off the mainframe.

8            Q.    To your understanding, what

9    are the uses of the ARCOS data?

10           A.    Well, it was originally for

11   UN reporting, so it was -- it's used for

12   UN reporting.  It's used for quotas.

13   It's used to show trends.  It's used in

14   our investigations, you know,

15   administrative, civil, criminal.  It

16   supports investigations.  We share it

17   with other federal agencies or state

18   agency, law enforcement, regulatory

19   agencies as well that are all, you know,

20   working to combat the diversion of

21   controlled substances.  So it's working

22   with them in corroboration on

23   investigations.  So it's used in various

24   means.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Thank you.  We'll come back

2    to ARCOS data in a little bit.  Let me

3    take you back -- we took a bit of a

4    tangent on the data, but that was very

5    helpful.  Thank you.

6            Let me bring you back to

7    your job responsibilities currently.  And

8    analytics, which is where SORs and ARCOS

9    is, used to be underneath you, but has

10   moved in the last couple of weeks, true?

11       A.    True.

12       Q.    And I apologize.  You

13   probably told me.  But what department

14   did it move over to?

15       A.    It's actually a new section.

16       Q.    So it's now --

17       A.    It's still in diversion

18   control division.  It's -- but we just

19   put a new section up.

20       Q.    And what was the reason to

21   create a separate section within

22   diversion control for the analytics unit?

23       A.    Well, my section, is the

24   biggest -- was the biggest section within

Highly Confidential - Subject to Further Confidentiality Review

1    the diversion control division.

2              We have, under my section,

3    we have mobile -- two mobile diversion

4    tactical squads.  We have the case

5    coordination unit.  Then we had the ARCOS

6    unit.  So I just had a lot of people

7    under me.

8              We -- in the pharmaceutical

9    investigations section, we provide a lot

10   of guidance and assistance to the field,

11   you know, financial, equipment, that kind

12   of thing.  So we also have various other

13   units that help support the field that's

14   out in the field, to help support.

15        Q.    So is it fair to say that

16   the primary purpose then of your current

17   unit, the pharmaceutical investigations

18   section, is to provide support to the

19   field and their various investigations?

20        A.    Correct.

21        Q.    And those are investigations

22   that they may conduct of registrants,

23   individuals, doctors, and the like?

24        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And they --

2    A.    And if I may, we also work

3  very closely with our chief counsel on

4  orders to show cause and any

5  administrative actions that were -- that

6  were being looked at.

7    Q.    Now, prior to your current

8  title, which is section chief of

9  pharmaceutical investigations, you were

10  the unit chief in the same section; is

11  that right?

12    A.    No.  So in January 2017, I

13  got promoted to the associate section

14  chief up in pharmaceutical

15  investigations.

16         Prior to that I was the unit

17  chief down in our policy and liaison

18  section.  But I was the unit chief over

19  liaison.

20    Q.    And give me a high level

21  description of what your role was there.

22  Or let's start with this.  So that may be

23  a little too much to bite off.

24         Can you just again describe

1    for me at a high level what the purpose

2    of the unit is or the primary goals of

3    the unit?

4          A.    Well, I mean, what I did was

5    I coordinated conferences, whether it was

6    the pharmacy diversion awareness

7    conferences.  I gave a lot of

8    presentations.  We would have to -- we

9    would coordinate with various entities to

10   try to get continuing education credits

11   for the pharmacists, and the techs.  We

12   would do the DEA general conference --

13   conferences.  You know, the distributor

14   conference.  We would help our quota unit

15   with setting up the manufacturing

16   training that they would do.

17              I mean, we were like the

18   spokespeople, as well as coordinating the

19   events themselves.

20         Q.    In the liaison unit, were

21   you speaking primarily with particular

22   groups as a whole, or did you have

23   one-off conversations with particular

24   registrants?

1       A.      I'm not sure what you mean.

2       Q.      Well, for example, could a

3   registrant call the liaison unit to ask

4   questions?

5       A.      If they called us, it was

6   typically to set up a meeting.

7               If it was more specific

8   questions regarding issues or something,

9   that would be our policy section.

10      Q.      And if a registrant was

11  calling the liaison unit to set up a

12  meeting, what type of meeting would that

13  be?

14      A.      It could be the company

15  wants to present new products they have

16  down the line.  It could be -- I'm trying

17  to think.

18              Some of it had to do with

19  treat -- they -- some type of, you know,

20  addiction treatment, that kind of thing,

21  where they wanted to talk about, you

22  know, could they get waivers on how

23  many -- you know, were they really -- you

24  know, was -- their product was so

1    different, could they, you know, not

2    have -- be limited to 100 data waive.

3    That kind of question.

4              It could be -- it runs the

5    gamut where -- a question the registrant

6    may have, so...

7         Q.    Let me ask it this way.

8              The liaison unit, what

9    interaction did the liaison unit have

10   with suspicious order monitoring or

11   reporting?

12        A.    I mean, at the conferences,

13   I mean, I gave presentations in 2013 and

14   '15 to the distributor -- at the

15   distributor conferences.  So, I mean, I

16   know I talked about suspicious orders.  I

17   talked about thresholds.

18        Q.    Let me go through, if I

19   could, with you right now the various

20   types of conferences.  So there is, as I

21   understand it, a distributor conference

22   that the DEA holds from time to time; is

23   that right?

24        A.    Correct.

1    Q.    Is it annual or biannual?

2  How often is it typically?

3    A.    When I came to headquarters

4  in 2012, we did one in 2013.  There

5  was -- there were ones before that.

6  There was a gap.  I'm not sure how many

7  years there was a gap.  There was a

8  slight gap.  We did it in '13, '15, and

9  I'd be guessing, but I know there was at

10  least another one after that.

11    Q.    So in the time that you have

12  been at headquarters, they've occurred

13  about every couple of years --

14    A.    Correct.

15    Q.    -- the distributor

16  conferences?

17          Was there one in '17 that

18  you remember, or sometime after?

19    A.    It could be '17.  I know it

20  was after the '15.

21    Q.    And did you present at the

22  most recent one?

23    A.    No.  I did the '13 and '15.

24    Q.    You presented at the '13 and

1    '15.

2              Now, prior to -- as part of

3    your preparation, did you come to learn

4    of prior distributor conferences that

5    took place?

6         A.    Yes.  Mm-hmm.

7         Q.    Do you recall just

8    approximately what years the other

9    distributor conferences were, just

10   approximately?

11        A.    No.  The distributor

12   conference became more unique around the

13   time that we did it.  But before that it

14   was when they were actually together.  It

15   was like an industry conference.  And

16   that was -- that was more frequent, I

17   believe.  I don't have a time frame for

18   you.

19        Q.    And by industry conference,

20   you mean DEA would just attend an

21   industry conference?

22        A.    No.  It would be a

23   DEA-sponsored conference.

24        Q.    So what would be the

1    difference between what you're referring

2    to as the DEA-sponsored industry

3    conference and the distributor

4    conferences that you presented at in 2013

5    and 2015?

6         A.    Well, the distributor

7    conference was more directed at the

8    distributors.  So the other ones had

9    manufacturers, importers, and wholesalers

10   there.

11        Q.    You mentioned -- excuse me.

12              You mentioned that there

13   was -- you were aware that there was a

14   gap in conferences related to

15   distributors.  About how long of a gap

16   was there?

17        A.    I believe -- I'm not sure.

18        Q.    Well, let me --

19        A.    I -- go ahead.

20        Q.    Let me see if I can jog your

21   memory.

22              I'm aware, and you probably

23   are too, of a distributor conference in

24   2007.  Does that ring a bell?

1          A.     Yes.  Yes.

2          Q.     Do you recall Michael Mapes

3    presented at that distributor conference?

4          A.     He may have.

5          Q.     Between 2007 and 2013, do

6    you recall, based on your preparation,

7    any distributor conferences?

8          A.     Not specific to

9    distributors.

10         Q.     Were there any industry

11   conferences that were DEA sponsored that

12   encompassed distributors?

13         A.     I'm not sure.

14         Q.     Sitting here today, based on

15   your preparation and speaking on behalf

16   of the DEA, is the DEA aware of any

17   conference that may have taken place

18   related to distributors between 2007 and

19   2013?

20         A.     I believe there were, but

21   I'm not 100 percent positive.

22         Q.     Have you seen any

23   documentation of such a conference?

24         A.     Not off the top -- I can't

Highly Confidential - Subject to Further Confidentiality Review

1  recollect right now.

2         Q.    You said that there was a

3  several -- or I took it to be a

4  several-year gap between distributor --

5  distributor conferences.

6              What is your understanding

7  as to why there was a gap?

8         A.    My under -- I mean, I do

9  know there were distributor initiatives,

10  which is different than a conference.

11  But I do know that there was meetings

12  with distributors about their own data

13  and that kind of thing.  So I know that

14  was -- and that went from, so the gap I

15  would say is about 2010 to 2013.

16         Q.    And what is your

17  understanding as to why there was a gap

18  at least between 2010 to 2013 as to

19  distributor conferences?

20         A.    In my research, it was

21  because we were in -- doing

22  investigations and in litigation against

23  quite a few registrants, particular

24  distributors that communication was a

Highly Confidential - Subject to Further Confidentiality Review

1    little hard, in -- either in being --

2    either doing the investigation or in the

3    midst of litigation.

4          Q.    And I'm sorry to belabor

5    this, but just -- I want to make sure

6    that the record is clear.

7                You're not specifically

8    aware of a distributor conference that

9    took place in 2008, 2009, 2010, are you?

10               MR. FINKELSTEIN:  Object to

11          the form.

12               THE WITNESS:  At this time

13          I -- I cannot recollect that.

14   BY MS. MAINIGI:

15          Q.    So is it possible that there

16   was a gap in distributor conferences that

17   ran essentially from 2008 to 2013?

18               MR. FINKELSTEIN:  Objection.

19          Calls for speculation.

20               THE WITNESS:  As I said,

21          I -- at this point I can't

22          recollect.

23   BY MS. MAINIGI:

24          Q.    So my question was a little

1   bit different, Mr. Prevoznik, is -- my

2   question was, is it possible that there

3   was a gap in distributor conferences that

4   ran essentially from 2008 to 2013?

5           MR. FINKELSTEIN:  Objection.

6       Calls for speculation.

7           THE WITNESS:  Based on your

8       question, it is possible.  But I

9       do know that they -- they -- we

10      were meeting with distributors

11      during that -- some of that

12      period.

13  BY MS. MAINIGI:

14      Q.    And in 2008 and 2009 and

15  2010 specifically, you mean there were

16  DEA meetings with distributors?

17      A.    Correct.

18      Q.    And were those --

19      A.    As well as in 2011 with a

20  manufacturer.

21      Q.    And -- and were those

22  meetings essentially one-off meetings

23  with particular distributors, to your

24  knowledge?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    What do you mean by one-off?

2    Q.    Well for example, there

3  weren't multiple distributors, or

4  representatives of multiple distributors

5  in the room with the DEA.

6         When you were meeting in

7  '08, '09, and '10, it was a meeting with

8  one distributor, correct?

9    A.    One distributor that may

10  have a number of different registrations.

11  Not one registration -- it could be one

12  registration.  But most distributors have

13  more than one.

14    Q.    But you were not -- and did

15  you impart guidance at those meetings in

16  '08, '09 and '10?

17    A.    Me personally?

18    Q.    The DEA.

19    A.    Yes.

20    Q.    And -- yes.

21    A.    Yes.

22    Q.    And I -- I apologize, let me

23  just interrupt what we're going for a

24  second.

 1              You are here primarily as

 2    the DEA, which I realize can make things

 3    a bit artificial.

 4              Unless I say otherwise, when

 5    I say you, or the DEA, or the

 6    administration, I'm generally referring

 7    to the entity that is the Drug

 8    Enforcement Administration.

 9         A.    Okay.  Thank you.

10         Q.    So with respect to policies

11    that were imparted at these individual

12    meetings, could you describe the types of

13    topics that were covered by these

14    policies at these meetings?

15         A.    Well, I went over their

16    requirements.  Went over the statute,

17    went over the requirements within the

18    C.F.R.  Records and reports.

19              Went over -- in particular,

20    we went over 1301.74 about their -- the

21    registrants responsibilities to design

22    and operate a system that could detect

23    suspicious orders, and that they were to

24    notify us upon discovery.

1    Q.    Were these meetings in '08,

2    '09 and '10 continuing meetings as part

3    of the distributor initiative?

4    A.    Yes.

5    Q.    And how long would you say

6    that the distributor initiative lasted,

7    when did it end?

8    A.    Oh, it hasn't ended.

9    Q.    It's ongoing?

10   A.    Yes.

11   Q.    And in the context of -- of

12   the multiyear distributor initiative,

13   were you meeting with the same

14   distributors multiple times sometimes?

15   A.    No, I don't -- no.  I -- it

16   was -- it was different distributors, so

17   that we -- we were meeting with -- we

18   were trying to meet with each one of them

19   so that we can go over their own

20   material, their own data that they had

21   provided us.

22   Q.    So one of the functions of

23   the distributor initiative was to go over

24   the data that had been provided by that

1    distributor through ARCOS as well as

2    SORs?

3        A.    Definitely ARCOS and we went

4    over the requirements for suspicious

5    orders.  I mean, the -- the focus was to

6    show their own data and the abnormalities

7    that their data was showing, and to

8    remind them of suspicious orders.  That's

9    why we had litigation and settlements,

10   because they weren't being reported.

11           And I do know that some --

12   some of it we are circling back on some

13   of the registrants with more, you know,

14   meeting again with the -- through the

15   distributor initiative.

16       Q.    So when -- when you showed

17   distributors data at some of these

18   distributor initiative meetings, you

19   identified aberrations in the data that

20   you pointed out to the distributors?

21       A.    Correct.

22       Q.    And were those aberrations

23   that the DEA had followed up on in -- in

24   some manner previously?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FINKELSTEIN:  Objection.

2      Vague.

3          THE WITNESS:  Could you give

4      me a little more guidance on what

5      you mean by followed up with?

6  BY MS. MAINIGI:

7      Q.    So -- so generally when the

8  DEA sees an aberration in -- in the data,

9  does the DEA follow up?

10         MR. FINKELSTEIN:  Objection.

11     Vague.

12         THE WITNESS:  I mean, we --

13     we open investigations on some of

14     the customers.  We open

15     investigations on some of the

16     distributors that said they were

17     going to fix it and didn't fix it.

18     So...

19  BY MS. MAINIGI:

20     Q.    So the answer is yes, if you

21  see aberrations in the data, the DEA does

22  tend to follow up?

23     A.    Correct.  Correct.

24         MR. FINKELSTEIN:  Object to

1    the characterization.

2              THE WITNESS:  I'm sorry.

3              MR. FINKELSTEIN:  Wait for

4        me to object.

5              THE WITNESS:  Okay.

6    BY MS. MAINIGI:

7         Q.    With respect to the

8    distributor initiative, is it fair to say

9    the early years of the distributor

10   initiative, the individuals that attended

11   the distributor meetings were Kyle Wright

12   and Michael Mapes?

13        A.    Yes.

14             MS. SINGER:  Objection.

15        Lack of foundation.

16   BY MS. MAINIGI:

17        Q.    And then in -- who were the

18   individuals from the DEA that were

19   primarily attending the distributor

20   briefings in the '08, '09, and '10 time

21   period?

22        A.    It would still be Kyle, Kyle

23   Wright.  Lisa Sullivan.  Dave White.  And

24   then Lenny Levin.  Lenny Levin.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In that time period, you

2    were still in the field offices or

3    training, so you would not have attended

4    any of the distributor briefings

5    personally --

6         A.    Correct.

7         Q.    -- Mr. Prevoznik?

8         A.    Correct.

9         Q.    Why don't we finish out your

10   experience, and then we'll take a short

11   break.  Is that okay?

12        A.    Sure.

13        Q.    With respect to conferences,

14   just to close the loop on those, and we

15   may have further questioning on this,

16   were there -- you mentioned there was a

17   Pharma conference in 2011?

18        A.    I didn't --

19        Q.    Or for the pharmaceutical

20   industry?  I could have that wrong.  Was

21   there a separate conference for

22   pharmaceutical manufacturers?

23        A.    There was -- the distributor

24   conference came later, but there was an

Highly Confidential - Subject to Further Confidentiality Review

1    industry conference in which we brought

2    manufacturers, distributors, importers,

3    together.

4           Q.    And was there any conference

5    that included just -- well, when was the

6    first year there was a conference just

7    for manufacturers?

8           A.    Well, we've always had like

9    a side -- like ARCOS quotas because

10   that -- quotas really pertains to the

11   manufacturers.  So we would meet with --

12   it's like a side training, which was done

13   by our quota unit, as well as the ARCOS

14   unit would be there to go over stuff with

15   them as well.

16           I mean, that -- that's --

17   that was going on for a while.

18           Again, we had that little

19   hiatus where, because of the litigation

20   and things that were going on, it was

21   decided not to hold it.  And then we

22   brought them back.  So they've been

23   meeting, it's usually two places a year.

24   We try to do east coast, west coast or

Highly Confidential - Subject to Further Confidentiality Review

1    something like that, so we can get as

2    many registrants that have those

3    questions.

4         Q.    And that's primarily for

5    registrants that are manufacturers?

6         A.    Yeah, manufacturers or

7    importers, but, yeah.

8         Q.    And so the -- the ARCOS

9    quotas sessions that you're referencing,

10   do you know what years those took place?

11             MR. FINKELSTEIN:  Object to

12        the scope.

13             You can answer if you know.

14             THE WITNESS:  I don't know

15        off the top of my head.  We do

16        post all our meetings on -- those

17        types of conferences on our DEA

18        diversion website.  So if you went

19        to the past meetings, all of that

20        would be there.

21   BY MS. MAINIGI:

22        Q.    What about for pharmacies?

23   Is there a separate conference that takes

24   place for pharmacies?

1      A.    In 2010 -- no, in 2000 --

2    I'm trying to remember the first one.  It

3    was in -- it was in Ohio.  We started

4    what we called the pharmacy diversion

5    awareness conference.  And the goal was

6    to hit all 50 states, and we did that.

7    And we met with pharmacists, pharmacy

8    techs in all the states and provided

9    continuing education credits for

10    pharmacists and techs.

11      Q.    And so there are periodic

12    conferences that occur just for

13    pharmacies put on by the DEA now?

14      A.    Well, that was what we did

15    at headquarters.  I know that we also go

16    to the associations for pharmacists.  I

17    mean, within the field divisions, they do

18    their own conferences with pharmacists.

19    So, I mean, we're out there.

20      Q.    Okay.  Now, prior to you

21    joining the liaison unit in 2014, you

22    served for a couple of years in the role

23    of diversion staff coordinator.

24            How did that role intersect

Highly Confidential - Subject to Further Confidentiality Review

1    with suspicious order monitoring and

2    reporting?

3              A.    I was in -- I was a staff

4    coordinator in the liaison section.  So

5    all I did was -- it's a -- not really a

6    promotion.  You're at the same grade

7    level, but you just get a title.  You're

8    supervising people of your same --

9              Q.    So your responsibilities

10   from May 2012 forward were the same as

11   you just described?

12             A.    Yeah.

13             Q.    Prior to that time, you were

14   diversion group supervisor in New Jersey

15   and diversion investigator in New Jersey?

16             A.    Correct.

17             Q.    Can you describe at a high

18   level what your responsibilities were?

19             A.    For which one?

20             Q.    For both of those.  I'm

21   sorry.  If they are -- obviously --

22             A.    Well, I mean, as a

23   supervisor you are in charge of the

24   group -- I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. FINKELSTEIN:  Hang on.

2      Let her finish.

3           MS. MAINIGI:  Sorry, my

4      fault.

5           THE WITNESS:  I apologize.

6      No, it's my fault.

7  BY MS. MAINIGI:

8      Q.    Why don't we start with

9  diversion investigator.  Describe for us

10  what a diversion investigator does

11  generally.

12      A.    Okay.  So as a diversion

13  investigator, we conduct -- we conduct

14  investigations, whether it's scheduled

15  investigations, where we're out at the

16  registrants' facilities.  It's doing

17  administrative investigations, civil

18  investigations, criminal investigations,

19  compliant investigations.

20           It's answering questions of

21  the public.  It's answering questions of

22  the registrants at times.  It runs the

23  full gamut of what the whole program is

24  about.

1   Q.   You were a -- you were also

2   a diversion investigator from

3   February '91 to September of 2001,

4   correct?

5   A.   Correct.

6   Q.   And was your role from

7   February '91 to September 2001 the same

8   as you have generally described it from

9   when you were a diversion investigator in

10  2006 to 2008?

11  A.   Correct.

12  Q.   Now, for part of that time

13  period, as a diversion investigator, did

14  you receive and review excessive purchase

15  reports?

16  A.   Excessive purchase reports?

17  Q.   Yes.

18  A.   Yes.

19  Q.   And describe for me what an

20  excessive purchase report is.

21  A.   An excessive purchase

22  report, it's an after -- it's a

23  transaction that has already occurred.

24  So it's sales data that it -- that was

1    provided by the registrants.  So we would

2    review it when it came in.

3              Again, we would separate it

4    by AORs.  If -- you know, if I'm in

5    Philadelphia, and I had stuff in New

6    Jersey, I would separate and send New

7    Jersey theirs.  And if we had Pittsburgh

8    stuff we would send Pittsburgh their

9    stuff.  Maryland got their stuff.  So we

10   would review that.

11        Q.    And the excessive purchase

12   reports were coming in primarily from

13   distributors?

14        A.    Yeah, primarily.

15        Q.    And did you -- and so you

16   investigated excessive purchase reports

17   when they came in?

18        A.    Yeah, we would review them.

19   And then we would take action if we

20   deemed it necessary.

21        Q.    Now, you stopped being --

22   let's see.  You stopped being a diversion

23   investigator in December 2008, correct?

24        A.    Well, I didn't really stop

Highly Confidential - Subject to Further Confidentiality Review

1   being one.  I still --

2           Q.    You're always a diversion

3   investigator?

4           A.    Yes, I've been one for

5   28 years.

6           Q.    Okay.  Your primary

7   responsibilities, you were no longer

8   primarily operating as a diversion

9   investigator after December 2008, fair?

10          A.    When I became the

11  supervisor?

12          Q.    Yes.  As a supervisor, did

13  you continue to function as a diversion

14  investigator as a primary part of what

15  you were doing?

16          A.    Not as primary.

17          Q.    But sometimes as a

18  general -- in terms of the supervision of

19  investigators, you would provide advice

20  and guidance on what they ought to do?

21          A.    Correct.

22          Q.    Okay.  Is it fair to say

23  that the excessive purchase reports

24  continued to be received by field offices

Highly Confidential - Subject to Further Confidentiality Review

1    till some time in the 2008 time period?

2                MS. SINGER:  Objection.

3          Foundation.

4                THE WITNESS:  Can you please

5          repeat the question?

6    BY MS. MAINIGI:

7          Q.    Sure.  I'll just read it

8    back.

9                Is it fair to say that the

10   excessive purchase reports continued to

11   be received by field offices till

12   sometime in the 2008 time period?

13         A.    Yeah.  We would still get

14   them.

15         Q.    And in that time period,

16   just as in the earlier years, the

17   diversion investigators would continue to

18   investigate the excessive purchase

19   reports?

20               MR. FINKELSTEIN:  Objection

21         to the scope.

22               THE WITNESS:  So we would --

23         we would review them, again

24         separate by AORs, or we would

1       review them to take whatever

2       action we deem necessary at that

3       point.

4   BY MS. MAINIGI:

5       Q.    And separate by AOR, can you

6   describe what that means?

7       A.    Area of responsibility.

8   Again, New Jersey is New Jersey.

9   Pennsylvania is Pennsylvania.  And then

10  within each state is a different office.

11      Q.    And then you spent some time

12  also -- we may come back to the diversion

13  investigator role, Mr. Prevoznik.  But

14  let me jump over to the work that you did

15  training.

16          What areas did you train in,

17  was it primarily diversion control?

18      A.    It was all diversion

19  control.

20      Q.    All diversion control?

21      A.    Yeah, I mean I would assist

22  with some of the special agent stuff,

23  but...

24      Q.    How much training do

Highly Confidential - Subject to Further Confidentiality Review

1  diversion investigators as a general

2  matter get?

3              MS. SINGER:  Objection.

4        Scope.

5              THE WITNESS:  It's 12 weeks.

6        The training at Quantico.

7  BY MS. MAINIGI:

8        Q.    All on diversion control?

9        A.    Correct.

10       Q.    And what are the components

11 of that training at a high level?

12             MS. SINGER:  Objection to

13       scope.

14             MR. FINKELSTEIN:  I'll join

15       that objection.

16             THE WITNESS:  So it would be

17       the -- the law, we would have law.

18       You would have the record

19       requirements.  It would be

20       interviewing.  It would be audits.

21       Like reviewing records for

22       pharmacy audit.  Reviewing records

23       for distributor audit.  Reviewing

24       records for a manufacturing audit.

1          Ethics training.  Just a lot of

2          interviewing, practicals.  We did

3          various practicals as well, just

4          to give them like a real life --

5          try to give them a real life

6          experience as best we could.

7     BY MS. MAINIGI:

8          Q.    And after the initial

9     12-week training, are there any refresher

10    courses that are -- or refresher training

11    that is provided to diversion

12    investigators?

13         A.    Yes, there is --

14         Q.    How often is that?

15         A.    It depends.  Each -- it --

16    it's typically within three to

17    five years.

18         Q.    And how long is the

19    refresher training?

20         A.    I believe it was about a

21    week.

22              MS. MAINIGI:  Okay.  Why

23         don't we go ahead and take a short

24         break.  Thank you.

 1              THE VIDEOGRAPHER:  It's

 2         10:30.  We are off the video

 3         record.

 4              (Short break.)

 5              THE VIDEOGRAPHER:  10:47.

 6         We are on the video record.

 7    BY MS. MAINIGI:

 8         Q.    Mr. Prevoznik, what does the

 9    registrant mean in DEA parlance?

10         A.    The registrant?

11         Q.    What is the meaning of that

12    word?

13         A.    A registrant is authorized

14    to handle controlled substances for

15    whichever schedules that their state

16    authority allows them to.

17         Q.    And the registrant's

18    responsibility to identify and report

19    suspicious orders is established by

20    regulation, correct?

21         A.    By statute.

22         Q.    By statute.  And do you

23    recall the statute?

24         A.    823.

1    Q.    And also relevant is

2    21 C.F.R. 1301.74?

3         A.    Correct.

4         Q.    The statute and the

5    regulation, do you know how long they

6    have been in place?

7         A.    Since it was enacted.

8         Q.    Which is when approximately?

9         A.    1971, I think.

10        Q.    And have either the statute

11   or regulation been amended or altered

12   since 1971 to your knowledge?

13        A.    No, they have not.

14        Q.    Now, before the break we

15   discussed excessive purchase reports.  Do

16   you recall that?

17        A.    Yes.

18        Q.    Can you define for me an

19   excessive purchase report?

20        A.    Well, again, an excessive

21   purchase report is after the sale has

22   been consummated.  So it would be -- I

23   mean, we've seen -- it basically looks

24   like sales of -- of this is what happened

Highly Confidential - Subject to Further Confidentiality Review

1    for this month or this is what happened

2    for this quarter.  We would -- we would

3    see that.

4         Q.    To be clear, the excessive

5    purchase reports were not all sales that

6    a particular company had, right?

7         A.    It -- it came in various

8    forms and sizes.  So sometimes it -- it

9    was all sales.  Sometimes it was partial

10   sales.  It was -- it was whatever the

11   registrant sent -- sent us.

12        Q.    Is it fair to say that at

13   least some of the reports that were

14   received were reports of sales that were

15   over a certain benchmark or threshold,

16   hence the name excessive purchase

17   reports?

18        A.    Well, it would depend on

19   what we received.  And it's -- it was

20   incumbent upon the registrant to identify

21   if they had thresholds.  It was -- if

22   that was their system to do it, it was

23   incumbent upon the registrant.

24        Q.    So if a registrant set a

1 certain threshold over which it would

2 report particular sales to the DEA, the

3 DEA wanted to obviously see what that

4 threshold was?

5        A.    Well, I guess I'm getting a

6 little confused on your use of the term

7 of "thresholds," because what -- what the

8 requirement of the statute and the law

9 and -- and the regulations is, is to

10 design and operate a system that can

11 detect suspicious orders, which is

12 different than excessive purchases.

13 So...

14        Q.    I'm not sure -- let me

15 interrupt you, but I don't think you're

16 answering my question --

17              MR. FINKELSTEIN:  No, no.

18        Don't -- don't interrupt the

19        witness.  Let the witness finish

20        his answer and -- and you can

21        clarify if you'd like.

22 BY MS. MAINIGI:

23        Q.    You can go ahead and finish

24 your answer.  But I will let you know

Highly Confidential - Subject to Further Confidentiality Review

1    that I'm just going to have to re-ask the

2    same question, because I -- I think

3    you're going off on a tangent.  Go -- go

4    ahead and --

5              MR. FINKELSTEIN:

6         Mr. Prevoznik, were you -- were

7         you done with your answer?

8              THE WITNESS:  Could I --

9         could you repeat what I --

10   BY MS. MAINIGI:

11        Q.   Let me withdraw the

12   question, and I will ask a different

13   question.

14              Excessive purchase reports

15   were, as you testified earlier, were

16   received through about the 2008 time

17   period, by the DEA, correct?

18        A.   No.  Not -- not just --

19   from -- just in 2008?  No, it was

20   previous to that.

21        Q.   No, through -- yes, I'm

22   sorry --

23              MR. FINKELSTEIN:  Let the

24        witness finish his answer.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. MAINIGI:

2        Q.    So -- well, let me -- let me

3    ask it this -- when do you recall the DEA

4    first began receiving excessive purchase

5    reports?

6        A.    I remember them when I first

7    got into Philadelphia in 1991.

8        Q.    And were excessive purchase

9    reports -- well, excessive purchase

10   reports were not always called excessive

11   purchase reports.  Different distributors

12   may have called them different things; is

13   that correct?

14       A.    I -- I knew them as

15   excessive purchase reports.

16       Q.    And did they usually come in

17   paper form or electronically; in what

18   form did they come?

19       A.    Could you give me a time

20   period?

21       Q.    Sure.  Let's deal with the

22   1990s first.

23       A.    It was primarily paper.

24   Snail mailed.

1    Q.    And what's your recollection

2    as to when approximately they began

3    evolving into electronic?

4    A.    I mean, to the field it was

5    always faxes, it was -- it was paper.

6    That -- that's how it came in.

7             So 2008 was when we had our

8    first MOAs with the registrants that --

9    that had an action taken against them.

10   So that was when we said you will file

11   electronically with us here at

12   headquarters.

13   Q.    And the form of what got

14   filed with headquarters in that time

15   period also changed, correct?

16   A.    The --

17             MR. FINKELSTEIN:  Object to

18        the characterization.

19             THE WITNESS:  The form of?

20   BY MS. MAINIGI:

21   Q.    You said as part of the MOAs

22   in 2008 there was a requirement in some

23   cases to file electronically, correct?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The form of what got filed

2    electronically in -- in those cases also

3    changed; is that right?

4    A.    Changed in what way?

5    Q.    Well, the -- perhaps the

6    reports changed to suspicious order

7    reports; is that right?

8         MR. FINKELSTEIN:  Objection:

9         Object to the form.

10        THE WITNESS:  They were

11        always required to report

12        suspicious orders.  I mean, that's

13        been in the law and the

14        regulations from the beginning, as

15        we discussed when we first came

16        back from break.  So I'm not

17        really sure what you're asking.

18   BY MS. MAINIGI:

19        Q.    Well, the excessive purchase

20   reports that were received by the DEA

21   field offices, was something that was

22   done by essentially most of the

23   distributors in the industry.  Is that

24   fair?

1    A.    It's hard to characterize,

2    like, all distributors.  The ones that

3    sent them, sent them.  You know, I can't

4    say whether or not every single one sent

5    them.

6    Q.    Do you recall -- do you

7    recall distributors sending anything

8    other than something called an excessive

9    purchase report or something that looked

10   like an excessive purchase report in the

11   1990s?

12   A.    I know that in my review of

13   some of the correspondence that we

14   received, that there were suspicious

15   orders, where in fact the distributors

16   said where we looked at the pattern and

17   we cut off some -- some registrant --

18   registrants that were not in compliance.

19   So we did get some suspicious orders.

20   Q.    Let me ask -- let's go ahead

21   and mark this.

22        (Document marked for

23        identification as Exhibit

24        DEA-Prevoznik-4.)

1     BY MS. MAINIGI:

2          Q.    I have put in front of you,

3     Mr. Prevoznik, the report to the U.S.

4     Attorney General by the suspicious orders

5     task force.  And it's dated October 1998.

6     Do you see that?

7          A.    Correct.

8          Q.    Did you review this document

9     in preparation for your deposition today?

10         A.    I reviewed part of it.

11         Q.    Which part did you review?

12         A.    Basically -- basically

13    the -- what they were describing as the

14    system that they were going to look to

15    implement.

16              MR. FARRELL:  Excuse me.

17         Can you tell me the exhibit number

18         again.

19              MS. MAINIGI:  Exhibit 4.

20    BY MS. MAINIGI:

21         Q.    "They" being the DEA?

22         A.    Well, it was -- it was part

23    of the -- Comprehensive Methamph- --

24    Control Act task force between the DEA

1    and the registrant community, get

2    together to talk about putting together a

3    suspicious order system for chemicals.

4    So that's what this was.  This was a

5    requirement by the Act for us to sit down

6    and come up with a monitoring system.

7        Q.    And so DEA officials

8    participated in the task force, correct?

9        A.    Correct.

10        Q.    If you take a look at the

11    bottom there, where there are some

12    numbers, and look at 2283.

13        A.    I'm sorry.  I'm losing you.

14    Okay, I got you.

15        Q.    So at 2283 forward, there is

16    the membership of the suspicious orders

17    task force, correct?

18        A.    Correct.

19        Q.    And the chairman is from the

20    DEA office of diversion control; is that

21    right?

22        A.    Correct.

23        Q.    And then it looks like there

24    are also various DEA employees from

1    various field offices; is that fair?

2         A.    Other than Page 2283?

3         Q.    Yes.  You can feel free to

4    look at other pages.

5         A.    I just see the ones on 2283.

6         Q.    And who are the other ones

7    on 2283.

8         A.    David Walkup, and Edward Van

9    Patten.

10        Q.    And so Mr. Walkup was from

11   the DEA St. Louis division, correct?

12        A.    Correct.

13        Q.    And then Mr. Van Patten was

14   from the DEA Sacramento office, correct?

15        A.    Correct.

16        Q.    As you were, I think,

17   alluding to earlier, the purpose of this

18   task force primarily was to provide

19   recommendations for suspicious order

20   reporting of List 1 chemicals; is that

21   right?

22        A.    Correct.

23        Q.    And List 1 chemicals are

24   different from controlled substances like

1    prescription opioids, right?

2         A.    Yes.

3         Q.    Take a look at Page 2230,

4    please.  Now, did you read this part of

5    the report when you prepared before?

6         A.    Yes.

7         Q.    If you want to just take a

8    moment and just make sure you're familiar

9    with it again.

10        A.    Okay.

11        Q.    Now, one of the things that

12   this task force did in this report was to

13   provide recommendations to various parts

14   of the supply chain, correct?

15        A.    Correct.

16        Q.    And the page we're looking

17   at, 2230, are some recommendations to

18   wholesale distributors, correct?

19        A.    Correct.

20        Q.    Now, if we take a look at

21   B1.  Could you read out loud the first

22   sentence.

23        A.    "That those in the wholesale

24   drug distribution supply chain who are

1    able" -- "who are able use the

2    DEA-approved suspicious order monitoring

3    system in use by wholesale drug

4    distributors for controlled substances as

5    enhanced by the task force in Appendix A,

6    Exhibit 2, for the reporting of

7    potentially suspicious orders of listed

8    chemicals, including ephedrine,

9    pseudoephedrine, and

10   phenylpropanolamine."

11        Q.    In developing its

12   recommendations, it appears that the task

13   force considered systems that registrants

14   were already using to report suspicious

15   orders of controlled substances, correct?

16        A.    Yes.

17        Q.    And as we saw from the

18   members of the task force, the DEA was

19   involved in developing these

20   recommendations and preparing this

21   report, correct?

22        A.    Correct.

23        Q.    The reference to the

24   DEA-approved suspicious order monitoring

1    system in use by wholesale drug

2    distributors for controlled substances,

3    do you see that reference that you just

4    read?

5         A.    Yes.

6         Q.    Is it fair to say then,

7    there was in fact at this point in time,

8    in 1998, a DEA-approved suspicious order

9    monitoring system for controlled

10   substances?

11        A.    I would say no, because

12   there was never a -- DEA never had an

13   approved system.  The system that the

14   statute requires and the regulations

15   require is the registrant is to design

16   and operate that system.

17             They come to us and they

18   say, here's our system, and we may have

19   discussions with them about it.  So you

20   can have a great system in paper, but

21   when you implement it, are you actually

22   implementing what you say.

23             So that's part of our job,

24   when we go out there for schedule

1   investigation, is to look at that program

2   and are they doing what they're saying,

3   is it actually detecting suspicious

4   orders.

5          Q.    So, Mr. Prevoznik, try to

6   listen to my question and answer it.  I

7   realize that you would like to speechify

8   a little bit and get out your talking

9   points, but please restrain --

10              MR. FINKELSTEIN:  Try not to

11          argue with the witness.

12  BY MS. MAINIGI:

13          Q.    -- from doing that.

14              MR. FINKELSTEIN:  You can

15          ask your questions.  And you're

16          not here to abuse him.

17  BY MS. MAINIGI:

18          Q.    So, Mr. Prevoznik, let's

19  back up.  The DEA helped to write this

20  report, right?

21          A.    Correct.

22          Q.    And someone from the office

23  of diversion control at the DEA was in

24  fact the chair of the group that wrote

1    this report, correct?

2            A.    Correct.

3            Q.    The terminology that they

4    used in 1998 referenced a DEA-approved

5    suspicious order monitoring system in use

6    by drug distributors for controlled

7    substances, right?  That's what the

8    report references?

9            A.    Correct.

10           Q.    Are you aware in all of the

11   work that you did, any sort of amendment

12   to this report that came out that perhaps

13   we may not have been privy to that

14   changed this language we've been

15   referring to that says "DEA-approved

16   suspicious order monitoring system for

17   controlled substances"?

18               MR. FINKELSTEIN:  Objection.

19           Vague.

20               THE WITNESS:  No, I am not

21           aware of any.

22   BY MS. MAINIGI:

23           Q.    Did you personally know any

24   of the individuals from the DEA involved

Highly Confidential - Subject to Further Confidentiality Review

1    in putting this report together?

2         A.    Yes.

3         Q.    Who was that?

4         A.    I knew Bill Wolf and I knew

5    Dave Walkup.

6         Q.    Did you read this report

7    when it came out?

8         A.    I don't recall.

9         Q.    In the field would you have

10   been privy to reading this report?

11        A.    What do you mean privy to

12   it?

13        Q.    Would you have received

14   it --

15        A.    Like they hand it to us?

16        Q.    I'm sorry.

17              Would you have received a

18   copy of this report as a diversion

19   investigator?

20        A.    Maybe.  It's a

21   recommendation.  So I don't -- it would

22   be maybe.

23        Q.    Okay.  Are you -- do you

24   think Mr. Wolf would just make up that

1   language if it didn't exist?

2          MR. FINKELSTEIN:  Objection.

3      Argumentive.

4          THE WITNESS:  I -- I

5      don't -- no, I -- no, I know Bill.

6   BY MS. MAINIGI:

7      Q.   So at least in Mr. Wolf's

8   mind, there was a DEA approved suspicious

9   order monitoring system for controlled

10  substances, fair?

11         MR. FINKELSTEIN:  Objection.

12     Calls for speculation.

13         THE WITNESS:  I don't know.

14  BY MS. MAINIGI:

15     Q.   To your knowledge, the DEA

16  has never disavowed this task force

17  report, correct?

18     A.   Well, I know it never got

19  implemented.

20     Q.   Okay.  And did the DEA ever

21  write to the task force and say you are

22  completely incorrect about some of these

23  things in here?

24     A.   I'm not aware of that.

1    Q.    And did you read far enough

2    in the report to see that there was, in

3    fact, an algorithm that was contained as

4    an exhibit to the report?

5    A.    Do you have a page number?

6    Q.    Sure:  Bates Number 2247.

7          Did you review this page

8    previously?

9    A.    Yes.

10    Q.    Okay.  And -- and this page

11    essentially contains a calculation or

12    algorithm for both List I chemicals and

13    Schedule II controlled substances,

14    correct?

15    A.    Correct.

16    Q.    Now, DEA did not require

17    distributors to use a particular

18    algorithm or metric to identify excessive

19    purchases of controlled substances,

20    correct?

21    A.    Could you please repeat

22    that?

23    Q.    DEA did not require that a

24    distributor use a particular calculation

1    or algorithm to identify excessive

2    purchases of controlled substances,

3    correct?

4         A.    Correct.

5         Q.    But, the DEA was aware that

6    certain registrants were using a

7    calculation or metric or algorithm to

8    identify an excessive purchase, correct?

9              MR. FINKELSTEIN:  Objection.

10        Vague as to time.

11             THE WITNESS:  I -- I just

12        want to make sure I'm clear on

13        this.  We're talking about

14        excessive purchases or are we

15        talking about suspicious orders?

16   BY MS. MAINIGI:

17        Q.    Well, right now I'm talking

18   about excessive purchase reports in this

19   time period.

20             Was the DEA aware that in

21   approximately the 1998 time period, that

22   distributors were using a particular

23   algorithm or calculation to identify

24   excessive purchases of controlled

1  substances?

2         A.    I don't know if they used it

3  for -- to determine excessive purchases.

4  It was -- like, this, this report is

5  about suspicious orders.  So that's why

6  I'm a little confused on -- on that.  If

7  you could help clarify it.

8         Q.    Well, the first -- do you

9  see terms and definitions on this page?

10        A.    Mm-hmm.

11        Q.    Could you read the first

12 sentence out loud?

13        A.    "This formula is used to

14 calculate the quantity which, if exceeded

15 in one month, constitutes an order which

16 may be considered excessive or

17 suspicious."

18        Q.    So you see that term and

19 definition does refer to both excessive

20 and suspicious, correct?

21        A.    Correct.

22        Q.    Okay.  So were you aware

23 that certain registrants were using an

24 algorithm or calculation to identify

1    excessive purchases?

2        A.    Well, I'm -- I'm going to go

3    with what this says, excessive or

4    suspicious.  Because it sounds like they

5    are being used simultaneously.  So yes,

6    we were aware.

7            MR. FARRELL:  Maybe to save

8            some time, can you clarify whether

9            your questions are pertaining to

10           List I chemicals or controlled

11           substances?

12           MS. MAINIGI:  I think the

13           questioning is clear, Paul.  If

14           you think it's not, you can

15           clarify it when you do your

16           questioning.

17           MR. FARRELL:  Thank you.

18           Can I ask the court reporter

19           to tag this area of the transcript

20           so we can revisit it tomorrow?

21   BY MS. MAINIGI:

22       Q.    So continuing to look at

23   Exhibit 2 of the suspicious order task

24   force report from 1998, Mr. Prevoznik, on

Highly Confidential - Subject to Further Confidentiality Review

1    Page 2247, as you see up top how is the

2    calculation -- how is the calculation

3    described at the top of the page?

4              MR. FINKELSTEIN:  Objection.

5         Vague.

6              THE WITNESS:  Above terms

7         and definitions --

8    BY MS. MAINIGI:

9         Q.    Do you see the --

10        A.    -- or below it?

11        Q.    Yes.  Yes, above.

12        A.    The current calculation

13   being used of List I chemicals and

14   Schedule II through V controlled

15   substances.

16        Q.    So Schedule II controlled

17   substances includes oxy, correct?

18        A.    Correct.

19        Q.    And this chart that's an

20   exhibit to this report notes that the

21   below is the current calculation being

22   used for Schedule II substances, correct?

23             MR. FARRELL:  Objection.

24        Misstates the document.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I'm not -- I'm

2         not sure what the calculation --

3         what -- is it -- it could be the

4         ARCOS calculation.  I don't

5         really -- I can't tell from this

6         document what the -- what

7         calculation they are applying it

8         to.

9    BY MS. MAINIGI:

10        Q.    Well --

11        A.    Because --

12        Q.    -- it's being applied to, as

13   you read before, an order which may be

14   considered excessive or suspicious,

15   right?

16        A.    Yes, that's correct.

17        Q.    So is it fair to say that

18   this document that the DEA participated

19   in putting together in 1998, reflects

20   that there was a calculation that was

21   being used for Schedule II controlled

22   substance reporting?

23             MR. FARRELL:  Objection.

24        Misstates the document.

1          THE WITNESS:  Again, I'm not

2      sure what the calculation --

3      what -- how they're using -- where

4      they got the calculation from.  If

5      it's an ARCOS -- an ARCOS

6      calculation, or -- or how they got

7      it.  There's nothing on this --

8      this particular sheet that tells

9      me that.

10 BY MS. MAINIGI:

11      Q.    Well, you did some due

12 diligence around this time period,

13 correct?

14      A.    Correct.

15      Q.    And you were personally even

16 aware that, since you were a diversion

17 investigator, that there were excessive

18 order reports that were being sent in

19 periodically by distributors, correct?

20      A.    So now it's excessive

21 orders, correct?  So suspicious orders?

22      Q.    I -- I'm asking you about

23 excessive order reports.

24      A.    Well, I'm -- I'm aware that

1    we got excessive purchase reports which

2    are after sales things.  We also got

3    reports, suspicious order -- some

4    suspicious order reports as well, which

5    is before the transaction occurs.

6              Chemicals, it was phone

7    calls, it was various forms of

8    information given to us to tell us what

9    those orders were.

10             This -- this is a proposed

11   system, which was never enacted.

12        Q.   Well, that's -- that's where

13   we're having --

14             MR. FINKELSTEIN:  Hey.

15        That -- that's, I'll note for the

16        record, the fourth time you've

17        interrupted the witness's answer.

18        I'll ask again nicely to please

19        let the witness finish his

20        answers.

21             MS. MAINIGI:  I think I did

22        let him finish his answer.

23   BY MS. MAINIGI:

24        Q.   In case I didn't,

1    Mr. Prevoznik, I apologize.

2              I think what we just went

3    over is the fact that there is a current

4    calculation still in place for

5    Schedule II controlled substances, right?

6              MR. FARRELL:  Objection.

7         Misstates the testimony and

8         misstates the document.

9              THE WITNESS:  Again, I --

10        I -- again, I don't know where

11        the -- what the calculation is.

12        Is it from ARCOS?  Is it from --

13        is this a algorithm that the

14        industry has in place?  I'm not

15        really sure where the algorithm

16        came from.  So it's hard for me to

17        answer that question without

18        knowing where that came from.

19   BY MS. MAINIGI:

20        Q.    Well, it says up top "For

21   use in automated tracking systems,"

22   right?

23        A.    Right.  Which goes back to

24   what the statute and the regulations say,

Highly Confidential - Subject to Further Confidentiality Review

1   is that the registrant is to design and

2   operate the system.  So I don't know if

3   this is a system that the industry did or

4   are they using a calculation based off of

5   ARCOS, because there's calculations that

6   are based off of ARCOS.

7          Q.    The DEA today does not

8   necessarily endorse or bless a particular

9   system for suspicious order reporting,

10  correct?

11         A.    Correct.

12         Q.    The DEA goes out of its way

13  to not provide guidance as to what should

14  or should not be contained in a system

15  for suspicious order reporting, correct?

16              MR. FINKELSTEIN:  Objection.

17         Object to the form.

18              THE WITNESS:  No, I would

19         disagree with that.

20  BY MS. MAINIGI:

21         Q.    Does the DEA provide

22  guidance as to what a distributor should

23  put into their suspicious order

24  monitoring system?

1    A.    I believe we provided quite

2    a bit of -- quite a bit of guidance to

3    the registrant.

4    Q.    And on the issue of the

5    suspicious order monitoring system, can

6    you describe where I could find that

7    guidance, what should go into a

8    suspicious order monitoring system?

9    A.    Okay.  Well, as is the --

10    Q.    Just tick them off for me.

11    We'll go back to them later.

12    A.    Well, I just want to go

13    through the regulations because --

14    Q.    The regulations.  Okay.

15    What's next?

16    A.    We gave guidance in 2006 to

17    "Dear Registrant."  And then in 2007.

18    We've given guidance at the distributor

19    initiatives of various topics that should

20    be looked at.

21         We've given it at

22    conferences.  We've given it through

23    policy letters.

24    Q.    What policy letters?

1          A.      2006.

2          Q.      The same ones that you just

3    talked about?

4          A.      Yeah.

5          Q.      The "Dear Registrant"

6    letters?

7          A.      Yes.

8          Q.      Do you have policy letters

9    besides the Joe Rannazzisi 2006, 2007

10   letters?

11         A.      I don't particularly have

12   them with me.

13         Q.      Are you aware of them?

14         A.      There were some letters sent

15   in, specific from registrants to our

16   policy section.

17         Q.      That went to the entire

18   industry?

19         A.      No.

20         Q.      So can something be a policy

21   letter if it's just sent to one entity?

22              MR. FINKELSTEIN:  Objection.

23         Calls for a legal conclusion.

24              THE WITNESS:  I don't --

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. MAINIGI:

2          Q.    Okay.  So the guidance --

3    just to be clear, the guidance that you

4    are recalling right now related to how a

5    suspicious order monitoring system should

6    be put together, is the following:  The

7    regulation, the Rannazzisi 2006, 2007

8    letters, what was said at distributor

9    initiatives and conferences.  Anything

10   else?

11         A.    I'm aware of guidance from,

12   like, national associations.

13         Q.    Was that guidance endorsed

14   by the DEA?

15         A.    I know NABP, we reviewed it,

16   the red flags.

17               The -- I think that's it off

18   the top.

19         Q.    So NABP red flags, was there

20   an endorsement of those red flags by the

21   DEA?

22         A.    We reviewed it.  We were

23   listed on the document.

24         Q.    Is that an endorsement?

1    A.    What do you mean in terms of

2  endorsement?

3    Q.    Did you put that out to the

4  industry as red flags that the DEA says

5  the industry should be aware of?

6    A.    Well, it was more than just

7  DEA -- it was more than just NABP.  It

8  was the industry helped write them.  So

9  it was associations.  It was a couple

10  manufacturers, a couple wholesalers,

11  various associations.  So it was more

12  than just DEA and NABP.  It was the

13  industry trying to address the opioid

14  crisis.

15    Q.    Now, as you've described,

16  did the -- the DEA understood that the

17  excessive purchase reports listed orders

18  that had already been shipped, correct?

19    A.    Correct.

20    Q.    And you referenced the

21  Rannazzisi letters just a moment ago, so

22  I take it you're familiar with those

23  letters?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And are you familiar

2  with the fact that the December 2007

3  Rannazzisi letter advised the industry

4  that they should no longer submit

5  excessive order reports?

6    A.   Yes.

7    Q.   Prior to 2007, did the

8  administration, the DEA administration,

9  issue any guidance to the industry

10  stating that excessive order reports

11  should not be submitted?

12    A.   I am not aware of any.

13    Q.   Is it fair to say that the

14  submission of excessive purchase reports

15  was an accepted practice until about the

16  2008 time period?

17         MR. FINKELSTEIN:  Objection.

18    Vague.

19         THE WITNESS:  Could you

20    please repeat it?

21  BY MS. MAINIGI:

22    Q.   Is it fair to say that the

23  submission of excessive purchase reports

24  was an accepted practice until about the

Highly Confidential - Subject to Further Confidentiality Review

1    2008 time period?

2              MR. FINKELSTEIN:  Same

3         objection.

4              THE WITNESS:  I mean, if the

5         registrant wanted to send them in,

6         they sent them in, so...

7              What we were trying -- what

8         we were trying -- what we were

9         saying is that the suspicious

10        order, you need to look at it

11        before it gets shipped.  So we

12        were reiterating what's in the

13        regulations and in the statute,

14        the effective controls guarding

15        against diversion.  So that's what

16        we were doing.

17   BY MS. MAINIGI:

18        Q.    And to be clear, that's what

19   you were doing in 2007 when the

20   December 2007 letter said, no more

21   excessive order reports, correct?

22              MR. FINKELSTEIN:  Object to

23        the characterization of the

24        letter.

1          THE WITNESS:  Could you

2      please repeat it?

3  BY MS. MAINIGI:

4      Q.    And to be clear, that's what

5  you were doing in 2007 when the

6  December 2007 letter said, no more

7  excessive order reports?

8          MR. FINKELSTEIN:  Same

9      objection.

10          THE WITNESS:  Yes.

11  BY MS. MAINIGI:

12      Q.    Is it fair to say that the

13  DEA understood that excessive order

14  reports were being submitted by some

15  registrants consistent with their

16  obligations under the law?

17          MR. FINKELSTEIN:  Objection.

18      Vague.

19          THE WITNESS:  I don't -- I

20      don't -- I can't answer what was

21      in the mind of the registrants for

22      doing that.

23  BY MS. MAINIGI:

24      Q.    Let me repeat the question.

1          Is it fair to say that the

2    DEA understood that excessive order

3    reports were being submitted by

4    registrants in order to comply with their

5    obligations under the law?

6               MR. FARRELL:  Objection.

7         Foundation.

8               MR. FINKELSTEIN:  Objection.

9         Vague.  Calls for speculation.

10              THE WITNESS:  I would say --

11         I would say that's not fair,

12         because we did keep -- through the

13         years, we have underscored the

14         fact that the regulation requires

15         upon discovery a suspicious order,

16         which is not to be -- it's

17         after -- it's before the purchase.

18              So we have been consistent

19         on that, that the industry needs

20         to identify these suspicious

21         orders upon discovery, and they're

22         supposed to tell us.

23    BY MS. MAINIGI:

24         Q.   Prior to the -- I think

1    we've already determined that prior to

2    December of 2007, you're not aware of the

3    DEA saying to the industry, no more

4    excessive purchase reports, right?

5              MR. FINKELSTEIN:  Object to

6         the characterization of the

7         witness's testimony.

8              THE WITNESS:  I would say

9         if -- we would take any data that

10        anybody wants to give us, so...

11   BY MS. MAINIGI:

12        Q.    That didn't answer my

13   question.

14        A.    I'm sorry.

15             MR. FINKELSTEIN:  Objection.

16        Argumentive.

17   BY MS. MAINIGI:

18        Q.    We've already established

19   that prior to 2007 you're not aware of

20   the DEA saying, no more excessive

21   purchase reports, right?

22        A.    Right.  Correct.

23             MR. FINKELSTEIN:  Let me

24        object.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Sorry.

2           MR. FINKELSTEIN:  Object to

3      the characterization.  You can

4      answer.

5           THE WITNESS:  Correct.

6   BY MS. MAINIGI:

7      Q.    And the DEA was aware that

8   there were, in fact, being routinely

9   submitted by distributors excessive

10  purchase reports on a regular basis,

11  right?

12     A.    We were aware.

13     Q.    And you were also aware that

14  there were employees of the DEA that had,

15  in fact, blessed certain excessive

16  purchase reporting systems, right?

17          MR. FINKELSTEIN:  Objection.

18          MR. FARRELL:  Objection.

19     Foundation.

20          THE WITNESS:  I'm not aware

21     of employees --

22  BY MS. MAINIGI:

23     Q.    This isn't about you, this

24  is the DEA.

Highly Confidential - Subject to Further Confidentiality Review

1            Was the DEA aware that

2    certain employees had, in fact, blessed

3    the excessive purchase reporting systems?

4            MR. FARRELL:  Objection.

5        Foundation.

6            THE WITNESS:  I don't know

7        which employees you're speaking

8        of.

9    BY MS. MAINIGI:

10       Q.    Just employees.  Is -- is it

11   fair to say that the DEA did, in the late

12   '90s and early aughts, from time to time

13   review the reporting systems of

14   distributors and essentially give them a

15   yay or nay as to whether they thought

16   that the reporting system was suspicious?

17           MR. FARRELL:  Objection.

18       Foundation.

19           MR. FINKELSTEIN:  Objection.

20       Vague.

21           THE WITNESS:  You lost me on

22       the last part.

23   BY MS. MAINIGI:

24       Q.    Okay.  Let me start over.

Highly Confidential - Subject to Further Confidentiality Review

```
1                We -- we established before

2       that the DEA today does not review

3       reporting systems, right?

4                MR. FINKELSTEIN:  Objection.

5           Mischaracterizes the witness's

6           testimony.

7                THE WITNESS:  I mean, we --

8           we reviewed McKesson's, the new

9           one.

10      BY MS. MAINIGI:

11          Q.    And you left it --

12          A.    -- we reviewed it, we -- we

13      did not -- we --

14               MR. FINKELSTEIN:  Let the

15          witness answer the question.

16               THE WITNESS:  I don't know

17          what you mean by the term

18          "blessing it."

19      BY MS. MAINIGI:

20          Q.    Okay.

21          A.    Because as I had said

22      previously, that you -- you can write the

23      best system in the world, but if you

24      don't implement it and you don't stick to
```

Highly Confidential - Subject to Further Confidentiality Review

1    it, it doesn't mean anything.

2             So that's part of our

3    review, when we go out and do schedule

4    investigations, is to review, are they

5    factually, in fact -- did -- is -- are

6    they operating a system that can detect a

7    suspicious order.

8    BY MS. MAINIGI:

9        Q.    And that's something that

10   the DEA reviews periodically as part of

11   its auditing process, correct?

12       A.    Correct.

13       Q.    So as part of the audit

14   process, operating systems that are

15   designed to review suspicious orders are

16   reviewed by the DEA?

17       A.    Well, it's not just the

18   schedule.  I mean it could be a

19   pre-registration, somebody is coming on

20   and they have -- we have to go through

21   the whole public interest of, you know,

22   what do you have in place to operate and

23   detect a system.  So it's not just a

24   schedule investigation.  There are

1    schedule investigations that we follow

2    up, and we do that as well.  So it comes

3    in -- it comes in various times that

4    we're going to review somebody's

5    operating system, whether we're on

6    schedule investigation, or whether we're

7    doing an investigation on a pharmacy or

8    something like that, where we're going to

9    look at how many SORs were submitted or

10   not submitted, or we're going to look at

11   the ARCOS data, how much did they buy.

12          We're going to look at

13   various things to make the determination

14   on what is going on.

15       Q.    And if either in the

16   pre-registration process or in the audit

17   process the DEA determines that a

18   registrant's system is not adequately

19   detecting suspicious orders, is that

20   something that is conveyed to the

21   registrant?

22       A.    Yeah, we -- we would tell

23   them, you need to add something.

24       Q.    It's clear in the Rannazzisi

Highly Confidential - Subject to Further Confidentiality Review

1  letters that there was a line that the

2  DEA was drawing, that they would not

3  provide formal approval of a particular

4  system for reporting suspicious orders,

5  correct?

6          MR. FINKELSTEIN:  I'm just

7      going to note that the letters are

8      not in front of the witness.

9          You can answer if you

10     remember.

11         THE WITNESS:  Can I have the

12     letters?

13  BY MS. MAINIGI:

14     Q.    I think you have it in your

15  binder, so please feel free to open it

16  up.

17     A.    Which -- which letter?

18     Q.    It's the December 27, 2007,

19  Rannazzisi letter.  Why don't we -- you

20  can look at your copy or the exhibit

21  copy.

22         But why don't we go ahead

23  and just mark it.

24         MR. FINKELSTEIN:  You -- you

Highly Confidential - Subject to Further Confidentiality Review

 1              can look at the letter.

 2                   (Document marked for

 3              identification as Exhibit

 4              DEA-Prevoznik-5.)

 5                   THE WITNESS:  So --

 6      BY MS. MAINIGI:

 7              Q.    Do you need my question read

 8      back?

 9              A.    Oh, I thought you just said

10      to review it first.  I'm sorry -- I'm

11      sorry --

12              Q.    Go ahead.  I'm sorry.

13                   MR. FINKELSTEIN:  Let me

14              just say, there's a lot of

15              paperwork.  So you -- you can

16              review either copy, that's fine.

17                   THE WITNESS:  I'll go with

18              what she has, that's fine.

19                   MR. FINKELSTEIN:  Just don't

20              get confused.

21                   MR. FULLER:  This is

22              Exhibit 5?

23                   MS. MAINIGI:  Yes.

24                   THE WITNESS:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

 1   BY MS. MAINIGI:

 2        Q.    Exhibit 5 is a December 27,

 3   2007, letter written by Joseph Rannazzisi

 4   on behalf of the DEA to registrants,

 5   correct?

 6        A.    Correct.

 7        Q.    And this letter was sent

 8   industrywide; is that right?

 9        A.    Correct.

10        Q.    And this is the letter that

11   we were referring to which referenced the

12   concept that excessive purchase reports

13   were no longer acceptable by the DEA,

14   correct?

15        A.    Correct.

16        Q.    And can you read to me the

17   specific sentence from this letter that

18   states that?

19        A.    The one that says, "Filing a

20   monthly report of completed transactions,

21   for example excessive purchase report or

22   high unit purchases, does not meet the

23   regulatory requirement to report

24   suspicious orders"?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yes.  The DEA was

2    communicating to the industry that,

3    through this letter, that they did not

4    want to any longer accept excessive

5    purchase reports, correct?

6              MR. FINKELSTEIN:  Objection.

7         Mischaracterizes the letter.

8              THE WITNESS:  It just says

9         it doesn't meet regulatory

10        requirement.  It doesn't say we

11        don't want them.

12   BY MS. MAINIGI:

13   Q.    Does this refresh your

14   recollection also, Mr. Prevoznik, that

15   excessive purchase reports were sometimes

16   called other things like high unit

17   purchases, for example?

18   A.    Yes.

19   Q.    Do you remember any other

20   names given to excessive purchase reports

21   over the years?

22   A.    No.

23   Q.    But there were other names

24   that different distributors put on those

Highly Confidential - Subject to Further Confidentiality Review

1    reports, correct?

2        A.    Possibly, yes.

3        Q.    And in your capacity as a

4    diversion investigator, you actually

5    reviewed excessive purchase reports,

6    correct?

7        A.    Yes.

8        Q.    Now, prior to this letter,

9    had the agency issued any guidance, any

10   written guidance to the industry in the

11   same manner as they are sending out this

12   December 27, 2007, letter stating that

13   excessive purchase reports did not comply

14   with 21 C.F.R. 1301.74?

15       A.    Could you please repeat the

16   question?

17       Q.    Prior to December 27th,

18   2007, the date of this Rannazzisi letter,

19   had the agency issued any written

20   guidance to the industry stating that

21   excessive purchase reports did not comply

22   with the requirements the industry had

23   under 21 C.F.R. Section 1301.74?

24       A.    I'm not aware.

1      Q.   Now, the DEA also says in

2   the last sentence of the second

3   paragraph, "Past communications with DEA,

4   whether implicit or explicit, that could

5   be construed as approval of a particular

6   system for reporting suspicious orders,

7   should no longer be taken to mean that

8   DEA approves a specific system."

9           Do you see that?

10      A.   Yes.

11      Q.   Does that refresh your

12   recollection that there were past

13   circumstances where it was understood by

14   at least a registrant that the DEA had

15   provided implicit or explicit approval of

16   their system for reporting suspicious

17   orders?

18           MR. FINKELSTEIN:  Objection.

19        Argumentive.

20           THE WITNESS:  What it

21        refreshes my memory is that --

22        this goes back to whether it was

23        preregistration or a schedule

24        investigation, in which we're

1      explained this is how it's going

2      to operate, so that's where that

3      may -- where they felt that, but

4      we were also explicit that you

5      needed to be -- you needed to

6      identify suspicious orders.

7  BY MS. MAINIGI:

8      Q.    Mr. Prevoznik, you have

9  spoken to a lot of people to prepare for

10  this deposition, right?

11      A.    Mm-hmm.

12      Q.    And you were a diversion

13  investigator in the field for quite a

14  long time, right?

15      A.    Yes.

16      Q.    And you were a trainer of

17  diversion investigators, right?

18      A.    Yes.

19      Q.    Are you seriously sitting

20  here and telling me under oath that

21  you're not aware as the DEA in this

22  deposition, that you're not aware that

23  the DEA, from time to time in prior time

24  periods, did implicitly or explicitly

1  provide approval of systems for reporting

2  suspicious orders?

3         MR. FINKELSTEIN:  Hang on.

4     Objection.  Argumentive.  The

5     witness is aware of his oath.

6     Your suggestion to the contrary is

7     unnecessary.

8         MS. MAINIGI:  We don't need

9     speaking objections, David.

10        MR. FINKELSTEIN:  I'm not

11    done.  Your suggestion to the

12    contrary is unnecessary.  I'd ask

13    you not to do that --

14        MS. MAINIGI:  We don't need

15    speaking objections, David.

16        MR. FINKELSTEIN:  I ask you

17    not to do that in the future.

18        And if you understand the

19    question, you can answer.

20        THE WITNESS:  Could you

21    please repeat the question?

22        MS. MAINIGI:  I'll ask the

23    court reporter to read it back.

24        (Whereupon, the court

Highly Confidential - Subject to Further Confidentiality Review

1          reporter read back the requested

2          portion of testimony.)

3                THE WITNESS:  I don't

4          believe that's what I testified

5          to.  I believe what I was

6          trying -- what I was trying to

7          show you is that there are times

8          when we are given the

9          documentation of this is what the

10         operating system would be.  We

11         would say, "Fine."

12              So if you want to say that

13         that's implicit or explicit,

14         that's fine.

15              But then there's the other

16         side of it, is when we do the

17         investigations, schedule

18         investigations, whatever

19         investigations we're doing, are we

20         in fact -- are they in fact doing

21         what they said they're doing.

22              So I apologize if you think

23         I'm not answering the question.  I

24         think I am answering the question

1    because I don't know what's in the

2    mind of the registrant when DEA

3    looks at their protocol that they

4    have written and we say, "Yeah, it

5    looks good."  Because we do do

6    that.

7         But if it's not implemented

8    and they're not following what

9    they are saying, that's when we

10   take action.

11 BY MS. MAINIGI:

12      Q.   So, Mr. Prevoznik, let me

13 approach it then a different way,

14 since -- since you do think that there's

15 sometimes may be -- in the past may have

16 been implicit or explicit approval.

17           MR. FINKELSTEIN:  Objection.

18 BY MS. MAINIGI:

19      Q.   Is it fair to say that in

20 time periods prior to 2008, there were

21 communications that the DEA had with

22 certain registrants, whether implicit or

23 explicit that could be construed as

24 approval of a particular system for

1    reporting suspicious orders?

2            MR. FINKELSTEIN:  Objection.

3            You don't have to accept

4        Ms. Mainigi's characterization of

5        your testimony.

6            MS. MAINIGI:

7        Mr. Finkelstein, would you please

8        stop with the coaching and the

9        speaking objections?  Otherwise

10       we're going to have to reach out

11       to Special Master Cohen.

12           MR. FINKELSTEIN:  I will

13       respond to what you just said.

14       You can ask your questions.  I

15       will continue to make my

16       objections, and the witness can

17       answer those questions subject to

18       my objections.

19           THE WITNESS:  Could you

20       please repeat it.

21           MS. MAINIGI:  Sure.  I

22       will -- I will ask the question

23       again.

24    BY MS. MAINIGI:

1    Q.    Is it fair to say that in

2  time periods prior to 2008, there were

3  communications that the DEA had with

4  certain registrants, whether implicit or

5  explicit, that could be construed as

6  approval of a particular system for

7  reporting suspicious orders?

8            MR. FINKELSTEIN:  I'll note

9        for the record that wasn't the

10        question.

11            But you can answer.

12            THE WITNESS:  Yes.

13  BY MS. MAINIGI:

14    Q.    And that included systems

15  for reporting excessive purchase reports,

16  correct?

17            MR. FINKELSTEIN:  Objection.

18        Vague.

19            THE WITNESS:  For excessive

20        purchase reports?

21  BY MS. MAINIGI:

22    Q.    Including - that approval

23  included approvals for excessive purchase

24  reporting systems, correct?

```
 1            MR. FINKELSTEIN:  Objection.
 2       Vague.
 3            THE WITNESS:  I'm not the --
 4       I'm not the registrant.  I mean
 5       the regs required them to op -- to
 6       be able to detect a suspicious
 7       order.  So the excessive purchases
 8       is different than the suspicious
 9       order.
10  BY MS. MAINIGI:
11       Q.   Are you aware that the DEA
12  did provide implicit or explicit approval
13  of excessive purchase reporting systems
14  of registrants?
15            MR. FINKELSTEIN:  Objection.
16       Vague as to time.
17            THE WITNESS:  Again, I'm not
18       sure what -- like I said, if -- if
19       the registrant construed it based
20       on us meeting with them and
21       reviewing their system, and we
22       said, "Yeah, looks good," then
23       yes.  But it also has to go with
24       the other side of when you go out
```

1          and look at it, are they doing

2          actually what they said they're

3          doing.

4    BY MS. MAINIGI:

5          Q.    You've referenced -- where

6    you seem to be going, Mr. Prevoznik,

7    is -- is many years later, you want to

8    take the position that excessive order

9    reports were submitted, but people should

10   have been looking for suspicious orders

11   too, right?  That's the position that you

12   want to take?

13            MR. FINKELSTEIN:  Objection

14         to the characterization and

15         argumentive.

16            THE WITNESS:  I don't think

17         that's what -- the angle that I'm

18         going with.  I'm trying to tell

19         you that from the very beginning,

20         we both went through the statute

21         and agreed that the regs have not

22         changed since this began.

23            So the regs are very clear

24         on the -- the statute is clear on

1    maintaining -- guarding --

2    maintaining effective controls of

3    diversion.  The regulations

4    support that the onus is on the

5    registrant to design and operate a

6    system that can identify that, to

7    identify a suspicious order.  And

8    then it gets into the, is it an

9    excessive size, is it a varying

10   pattern, or is it -- I'm sorry,

11   frequency, unusual frequency.  So

12   they're not -- you know, it's not

13   an all-encompassing list of

14   things.

15        We've given guidance since

16   then on those things.

17 BY MS. MAINIGI:

18        Q.    Did the DEA tell registrants

19 in the 1990s that excessive order

20 reporting systems did not meet their

21 suspicious order reporting requirements?

22        A.    I'm not sure if they -- no,

23 I'm not sure that -- I know there was

24 discussions that you need to also

1  identify the suspicious order.  So we --

2  we distinctly separated the excessive

3  purchase -- or excessive purchase orders

4  were post and that suspicious orders were

5  before the consummation of the

6  transaction.  So we were -- we -- we did

7  articulate that at sites and during

8  investigations that there was the

9  difference between the two.

10         Q.    Does the DEA have any record

11  evidence of that sitting here today?

12         A.    Oh, I don't know what you

13  have in your stack.

14         Q.    Well, you looked at a stack

15  back at the office, right?

16         A.    Yes.

17         Q.    In your stack did you find

18  the DEA telling registrants in the 1990s,

19  oh, also make sure you're doing this

20  separate suspicious order reporting?

21         A.    And I saw letters that said

22  that.

23         Q.    You did?

24         A.    Yes.

1             MS. MAINIGI:  Okay.  I'd ask

2        the government to go ahead and

3        produce those letters that said

4        that, that Mr. Prevoznik reviewed

5        apparently in preparation for

6        today.

7   BY MS. MAINIGI:

8        Q.    Who are those letters to?

9        A.    Registrants.

10        Q.    Do you remember any

11   particular ones?

12        A.    Not off the top of my head.

13        Q.    I see.  Now, you noted that

14   from time to time while you were out in

15   the field the registrants would report

16   suspicious orders in your view, right?

17        A.    I don't think I said that.

18        Q.    Well, you said you would get

19   excessive order reports or excessive

20   purchase reports and you would also get

21   suspicious orders sometimes --

22        A.    On occasion -- on occasion.

23        Q.    On occasion --

24        A.    And most of that -- most of

1    that was chemicals, because we were

2    dealing -- in the 1990s we were dealing

3    with the methamphetamine issue at that

4    time.

5            Q.    And how about the early

6    aughts?  Let's say through 2004.  Were

7    you getting the excessive purchase

8    reports and also on occasion suspicious

9    order reporting?

10           A.    I think we got both.

11           Q.    And how often were you

12   getting the suspicious order reporting

13   through 2004, let's say approximately?

14           A.    Not as often as the

15   excessive purchases.

16           Q.    So, how often?

17           A.    I mean it could be weekly,

18   it could be monthly.

19           Q.    And from all the

20   distributors, or are you saying that

21   maybe once a month or once a week you

22   might have gotten a report of a

23   suspicious order?

24           A.    Oh, I don't -- I don't know

Highly Confidential - Subject to Further Confidentiality Review

1    that I -- I don't know that it was once a

2    week.  I mean, it was -- a suspicious

3    order?  It -- it was pretty rare that --

4    for -- for controlled substances, right?

5         Q.    Correct, correct.

6         A.    Yes.  Yes.  Those were

7    pretty rare.

8         Q.    And as a diversion

9    investigator, did you ever say to your

10   supervisors or headquarters, I'm asking

11   you now personally, hey, shouldn't we be

12   getting more suspicious order reporting

13   related to controlled substances?

14              MR. FINKELSTEIN:  Objection.

15         Scope.

16              THE WITNESS:  I don't know

17         that I articulated that.

18         Especially, especially during that

19         time period, because I was in

20         training.  So I wasn't in the

21         field at that time.

22   BY MS. MAINIGI:

23         Q.    Well, when you were in the

24   field.

 1          So anytime you were in the

 2   field or in training, did you ever -- did

 3   you ever get -- did you ever say to your

 4   supervisors or headquarters, hey,

 5   shouldn't we be getting more suspicious

 6   order reporting on controlled substances?

 7               MR. FINKELSTEIN:  Objection.

 8          Scope.

 9               THE WITNESS:  Well, back

10          then, it was much more of a

11          regional local issue that we were

12          dealing with, in terms of

13          diversion.  It's with the onset of

14          the internet where it became

15          national.  So it really changed

16          the dynamic of diversion when it

17          went to the internet.

18   BY MS. MAINIGI:

19          Q.   Are you aware of -- are you

20   aware that the case you're here giving a

21   deposition in relates to the state of

22   Ohio, the jurisdictions are in the state

23   of Ohio?

24               MR. FINKELSTEIN:  Objection.

1          Scope.

2               THE WITNESS:  I'm aware of

3          that.

4    BY MS. MAINIGI:

5          Q.   And do you have knowledge of

6    the amount of suspicious order reporting

7    that was -- the frequency of the

8    suspicious order reporting that was

9    occurring in -- related to jurisdictions

10   in Ohio from let's say 1996 through 2004?

11              MR. FINKELSTEIN:  Objection.

12         Scope.

13              THE WITNESS:  I'm not aware.

14   BY MS. MAINIGI:

15         Q.   But where you were in

16   New Jersey and Philadelphia, it was

17   relatively rare during that time period?

18              MR. FARRELL:  Objection.

19         Outside the scope of personal

20         knowledge.

21              THE WITNESS:  Am I answering

22         as me or the agency?

23   BY MS. MAINIGI:

24         Q.   I'm asking you now, in your

1  personal capacity.  We already did the

2  corporate.

3          A.    Okay.  So, could you please

4  repeat the question?

5          Q.    Sure.  You were a diversion

6  investigator in early '90s and early

7  aughts in New Jersey and Pennsylvania,

8  right?

9          A.    Yes.

10          Q.    How often did you see

11  suspicious order reporting?

12          A.    Like I said, it was more

13  chemicals.

14          MR. FARRELL:  Excuse me.  I

15      need to place an objection and

16      clarification.

17          Is the DEA putting up

18      Mr. Prevoznik today in his

19      individual capacity for

20      examination?

21          MR. FINKELSTEIN:  No.

22          MS. MAINIGI:  The usual

23      protocol, Paul, to answer the

24      question that you're about to

1          formulate, I think, is that the

2          practice in a deposition of a

3          30(b)(6) witness is if the witness

4          can't answer a question

5          necessarily in a corporate

6          capacity or is asked a question in

7          a personal capacity, that you

8          can't -- it's not proper to

9          instruct the witness not to

10         answer.

11              It may be that it's

12         ultimately not admissible, but --

13         but you can't instruct the witness

14         not to answer in my understanding.

15              MR. FINKELSTEIN:  And I'll

16         note for the record that no one's

17         instructed the witness not to

18         answer.

19              But I will admonish the

20         plaintiffs to the extent that they

21         are tempted to do so, to let me

22         make such instructions.

23              MR. FARRELL:  I'm trying to

24         figure out what I just got

Highly Confidential - Subject to Further Confidentiality Review

```
 1              admonished for.
 2                   MR. FINKELSTEIN:  You
 3              didn't.  You didn't instruct him
 4              not to answer.  I'm just noting
 5              that no one instructed him not to
 6              answer yet.
 7                   MR. FARRELL:  I guess what
 8              I'm trying to prepare myself for
 9              is that when it's my turn to ask
10              questions, that I get to ask him
11              questions --
12                   MS. MAINIGI:  Can we not
13              take up time right now?  Off the
14              record you can have that
15              discussion.
16                   MR. FARRELL:  I just got
17              admonished again.
18      BY MS. MAINIGI:
19           Q.    The -- the rare cases of
20      suspicious order reporting,
21      Mr. Prevoznik, that -- that you
22      referenced, in what form might that
23      reporting come?
24                   Would it be a fax, would it
```

1    be a phone call?  What forms do you

2    recall?

3              MR. FINKELSTEIN:  Objection.

4         Vague as to time.

5              THE WITNESS:  I don't -- I

6         don't remember off the top of my

7         head what it looked like.  It was

8         usually -- back then it was paper.

9    BY MS. MAINIGI:

10        Q.    Is it fair to say that from

11   time to time you might get a report of a

12   suspicious order via a telephone call

13   from a distributor?

14             MR. FINKELSTEIN:  Objection.

15        Vague as to time.

16             THE WITNESS:  I'm not aware.

17   BY MS. MAINIGI:

18        Q.    When you say --

19        A.    It could be chemical, we

20   might have somebody call.

21        Q.    But you don't think a

22   suspicious order for a controlled would

23   come in via a telephone call?

24             MR. FINKELSTEIN:  Objection.

1          Vague as to time.

2                THE WITNESS:  It could.  But

3          I'm not aware of it.

4    BY MS. MAINIGI:

5          Q.    Meaning you just never

6    received one?

7          A.    Me personally, no, I never

8    received one.

9          Q.    Why would it be more

10   frequent, a telephone call for chemicals?

11         A.    Well, back then, that was --

12   when I was in the field in Philadelphia,

13   that was the big issue was

14   methamphetamine.  So some of the

15   chemicals that were being used illicitly,

16   we would get calls from various companies

17   and informants.

18         Q.    Now, you referenced internet

19   pharmacies becoming a big problem at some

20   point in time, correct?

21               MR. FINKELSTEIN:  Objection

22         to the characterization.

23               THE WITNESS:  Correct.

24   BY MS. MAINIGI:

1    Q.    And did the advent of

2  internet pharmacies bring about a greater

3  problem with controlled substances?

4           MR. FINKELSTEIN:  Objection.

5       Vague.

6           THE WITNESS:  I believe what

7       I said, it went from a

8       local/regional issue to a national

9       issue.

10  BY MS. MAINIGI:

11   Q.    The internet pharmacy

12  problem caused the DEA, or prompted the

13  DEA to launch the internet distributor

14  initiative in late 2005, correct?

15   A.    Yes.

16   Q.    And the purpose of the

17  initiative was to educate DEA registrants

18  regarding their obligations and possible

19  role in supplying internet pharmacies; is

20  that right?

21   A.    Yes.

22   Q.    And the internet distributor

23  initiative entailed meeting with

24  individual registrants?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Correct.  Again, some of

2  them had more than one registration, so

3  we were doing it more corporate.

4          Q.    And as I understand it,

5  there was a PowerPoint presentation that

6  was reviewed with the registrant as a

7  general matter during these meetings?

8          A.    Correct.

9          Q.    And was that -- we saw in

10  Mr. Wright's deposition the PowerPoint

11  presentation that was used in, let's say

12  the '05, '06 time period.  Are you aware

13  of a later PowerPoint that's used in '08,

14  '09, '10?

15          A.    Yeah.  Yeah.  It changed.

16          Q.    And you've reviewed those

17  for the purposes of your deposition?

18          A.    Mm-hmm.

19          MR. FINKELSTEIN:  Answer

20      audibly.

21          THE WITNESS:  Yes.  Sorry.

22  BY MS. MAINIGI:

23          Q.    And what's the difference

24  that you see, because I'm not aware of

1    seeing the later ones?

2            MS. MAINIGI:  So, Counsel,

3        I'd ask that you produce those, if

4        you haven't.

5    BY MS. MAINIGI:

6        Q.    What's the evolution you see

7    from the earlier drafts to the later

8    drafts?

9            MR. FINKELSTEIN:  Hang on.

10       I'll represent that one's in the

11       binder.

12           You can answer.

13           MS. MAINIGI:  So you're

14       saying that you just produced it

15       today?

16           MR. FINKELSTEIN:  No.  I'm

17       saying it's been produced

18       previously.

19           THE WITNESS:  Yeah, can I

20       look at my binder?

21   BY MS. MAINIGI:

22       Q.    Well, my question really

23   relates to what you're recalling as far

24   as the evolution --

1    A.    That's fine.

2    Q.    -- from the earlier

3  briefings to the later briefings.

4    A.    Right.  So the earlier ones

5  focused more on the internet.  But there

6  were questions that could also be

7  applicable to what happened later, such

8  as the percentage between noncontrolled

9  and controlled, those types -- those

10  types of things.

11          In the later stages it was

12  more the red flags that we received from

13  the pain clinics, talking about cocktails

14  and various different things.  Different

15  drugs.  Again, it was their data that we

16  used to show it.

17    Q.    So the earlier time period

18  would be '05, '06 and '07?

19    A.    I mean, still going in '08,

20  because the Ryan Haight Act didn't come

21  in until 2008.

22    Q.    And then the change in

23  emphasis to the red flags from the pain

24  clinics was essentially '09 forward?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I think it was still

2   evolving probably then, because that -- a

3   lot -- we were doing a lot of stuff down

4   in Florida at that time.  So it was

5   probably still in that transition phase

6   of going into more of the red flags.

7      Q.    And then did -- did it

8   evolve again from the red flags related

9   to the pain clinics into something else?

10          MR. FINKELSTEIN:  Objection.

11          Vague.

12          THE WITNESS:  Yeah, I mean

13          it's still -- I mean, the crux of

14          it is still what are the

15          requirements, what are your

16          recordkeeping requirements, what

17          is your responsibilities.  It's

18          still all that.  So the shift is

19          more of maybe the drugs may have

20          changed a little bit.  Trends --

21          trends are going different ways.

22   BY MS. MAINIGI:

23      Q.    In terms of the trends and

24   the emphasis, you said you're still doing

1  distributor initiative meetings through

2  today, right?

3          A.    I don't know if we have any

4  today.  But we've done some recently,

5  yes.

6          Q.    Okay.  The more recent ones,

7  where is the focus and where is the

8  trends?

9          A.    Well, I think what we've

10  been showing, and as it's been reported,

11  we're seeing a decline in the number of

12  opioid prescriptions.  We've seen

13  increase in amphetamines and

14  methylplenidate.  We're seeing -- the one

15  opioid we still see an increase in is

16  Suboxone, buprenorphine, for drug

17  treatment.  We're seeing a little bit of

18  shift of the drugs.

19          Q.    So the trends and the

20  problem areas are unfortunately always

21  changing and shifting.  Is that fair?

22          A.    Well, there tends to be a

23  shift, yeah.

24          Q.    And the DEA does its best to

Highly Confidential - Subject to Further Confidentiality Review

1    try to identify the changes and the

2    shifts in the trends, correct?

3          A.    Well, I mean, the data --

4    the data shows that, so it's not DEA

5    doing it.  You know, there's been a lot

6    of hard work by a lot -- a lot of

7    different people, including the industry.

8    So...

9          Q.    The data from the industry

10   helps everyone identify the shifts in the

11   trends, correct?

12         A.    Yeah.

13         Q.    Including the DEA?

14         A.    Yeah.  Yes.

15         Q.    And because of the shifts in

16   the trends and the fact that there is a

17   constant change, is that one of the

18   reasons why the DEA takes the position

19   that registrants must design their own

20   system for suspicious order monitoring

21   and reporting?

22               MR. FINKELSTEIN:  Objection.

23         Vague.

24               THE WITNESS:  I don't think

1          that's our -- I mean, it's what

2          Congress passed and enacted, so

3          the onus -- they put the onus on

4          the registrant.

5    BY MS. MAINIGI:

6          Q.    With respect to the

7    expectations of the DEA, is it fair to

8    say that the DEA expects registrants to

9    regularly update their suspicious order

10   monitoring systems to be responsive to

11   the change in trends?

12         A.    Yeah.  You would hope they

13   would.

14         Q.    Coming back to the

15   Rannazzisi letter from December of '07,

16   if you would, please.  I'm on the third

17   paragraph.  Let me know when you're

18   ready.

19         A.    Okay.  The one that starts,

20   "The regulation"?

21         Q.    Yes.  So as we discussed

22   earlier, Mr. Prevoznik, this letter says,

23   "The regulation also requires that the

24   registrant inform the local DEA division

Highly Confidential - Subject to Further Confidentiality Review

1    of suspicious orders when discovered by

2    the registrant," correct?

3         A.    Correct.

4         Q.    And "when discovered" is a

5    proxy for prior to shipping; is that

6    right?

7              MR. FINKELSTEIN:  Objection.

8         Vague.

9              THE WITNESS:  Correct.

10   BY MS. MAINIGI:

11        Q.    So, this letter is advising

12   registrants that they should stop

13   shipment of orders that they deem

14   suspicious, correct?

15             MR. FINKELSTEIN:  Objection.

16        Form.

17             THE WITNESS:  Well, it's

18        reiterating what the regulations

19        are.  It's not advising.  It's

20        reiterating the responsibilities

21        of -- of what they are supposed to

22        do.

23   BY MS. MAINIGI:

24        Q.    Does --

1      A.    So yes, they're -- we're

2    highlighting that they should be looking

3    at that to maintain effective controls

4    guarding against diversion.

5      Q.    Did the Controlled

6    Substances Act contain any language that

7    states whether or not a distributor could

8    ship a suspicious order?

9      A.    It doesn't say specifically

10   that.  It does say that it needs to be --

11   it has to maintain -- maintain effective

12   control against diversion.

13     Q.    Is it fair to say -- now at

14   this point in time, 2007, remind me where

15   you were.  You were still in the field?

16     A.    This is probably the hardest

17   question.

18     Q.    I have your CV here so I can

19   tell you.

20     A.    I was in Atlantic City.

21     Q.    Yes, you were.

22           MR. FINKELSTEIN:  Could the

23       people on the phone put their

24       phones on mute if they are not

1          going to talk?

2     BY MS. MAINIGI:

3          Q.    Is it fair to say that in

4     this time period, let's say, 2007-2008,

5     there was confusion among registrants

6     about the do-not-ship policy?

7               MR. FINKELSTEIN:  Objection.

8          Calls for speculation.

9               THE WITNESS:  I -- I don't

10         believe so.

11    BY MS. MAINIGI:

12         Q.    You don't think so?

13         A.    No.

14         Q.    You don't recall in the

15    field getting questions about what the

16    do-not-ship policy meant?

17               MR. FINKELSTEIN:  Objection.

18         Scope.

19               THE WITNESS:  The -- what --

20         what was, was the registrant --

21         was the registrant had to make the

22         decision whether to ship or not.

23               So that goes back to the

24         statute that says, do you have --

1        do you maintain effective control

2        against diversion.  So that's

3        where that goes from.  So the --

4        the distributor has to make that

5        decision whether to ship or not

6        ship.

7            And we have said in past

8        stuff that that is -- that you

9        need to identify those and not --

10       and it's -- just because you

11       report it, doesn't mean you're

12       exonerated from it.  You still

13       have to maintain effective control

14       over it.

15           So, you know, that's --

16       that's a business decision for

17       them to ship or not ship.  But it

18       still falls under the statute of

19       what's the effective means that

20       you're guarding against diversion.

21   BY MS. MAINIGI:

22       Q.   I have forgotten what

23   question I asked you.

24               MR. FINKELSTEIN:  Is that a

Highly Confidential - Subject to Further Confidentiality Review

1    question?

2              MS. MAINIGI:  Let me -- let

3        me re-ask the question.

4    BY MS. MAINIGI:

5        Q.    Do you recall when you were

6    in the field, in this time period,

7    '07-'08, getting questions either from

8    other diversion investigators or from

9    registrants about what the do-not-ship

10   policy meant?

11             MR. FINKELSTEIN:  Objection.

12       Scope.

13             THE WITNESS:  Is this -- can

14       I ask, is this me personally --

15   BY MS. MAINIGI:

16       Q.    Yes.

17       A.    -- or is this -- I am not

18   aware of that.

19       Q.    Are you generally aware from

20   all the people that you talked to at the

21   DEA, are you generally aware as the DEA,

22   that in the '07-'08 time period, there

23   was confusion in the industry as to the

24   meaning of the do-not-ship policy?

1          MR. FINKELSTEIN:  Object to

2     the characterization.

3          THE WITNESS:  For the people

4     I talked to?  I'm just trying to

5     remember what we -- what we talked

6     about.

7          It was -- from my

8     recollection of talking to the

9     folks was that again it was a

10    business decision on whether to

11    ship or not ship.  That we, DEA

12    were not going to direct a

13    registrant don't ship or not ship

14    at that time.

15 BY MS. MAINIGI:

16    Q.   In 2008?

17    A.   So -- I'm sorry, 2 -- no,

18 that was prior to that.  Because in -- in

19 '7 that's when it came out that --

20    Q.   So in '7 it was clear that

21 you were now directing registrants do not

22 ship?

23    A.   Right.  Because of --

24 because of the internet.

1    Q.    And prior to 2 --

2    December 2007 it was a business decision

3    by each registrant recognizing what their

4    own obligations were?

5    A.    Correct.

6    Q.    Okay.  And so how could

7    there not have been confusion about that

8    shift, the DEA went from it's up to you,

9    to we're telling you not to ship?

10         Didn't that create confusion

11   for some period of time?

12         MR. FINKELSTEIN:  Objection.

13         Scope.  Calls for speculation.

14         THE WITNESS:  Well, I don't

15         know if there was confusion or

16         not.  Because the -- quite a few

17         registrants continued to do what

18         they continued to do, which was

19         continued to sell, to ignore

20         suspicious orders and they would

21         continue to sell huge volumes down

22         the line through retail --

23   BY MS. MAINIGI:

24         Q.    And ship to suspicious

1  orders?

2       A.    Right.   So they weren't

3  following our obligation to maintain

4  effective controls.   That's why we --

5  that's why we had settlements with them,

6  civil settlements.   And then we started

7  meeting with them and getting into MOAs,

8  about you need to report them to the

9  headquarters now, because you're not

10  following what you're supposed to be

11  doing.

12       Q.    And in the meeting with

13  distributors, you've not heard anyone

14  report that there was confusion about the

15  changes to the policy?

16       A.    No, not -- not me

17  personally.

18       Q.    Well, in the interviews you

19  did for this -- this deposition.

20       A.    I am not aware.

21       Q.    Okay.   Now, given the shift

22  in focus with respect to internet

23  pharmacies and given the shift with

24  respect to the do-not-ship policy, the

Highly Confidential - Subject to Further Confidentiality Review

 1   DEA understood that its new suspicious

 2   order policy would require registrants to

 3   either -- to either enhance or supplement

 4   their suspicious order monitoring

 5   systems, right?

 6                MR. FINKELSTEIN:  Object to

 7          the characterization.

 8                THE WITNESS:  Well, I would

 9          say from the distributor

10          initiatives, when we sat down with

11          them in '05, '06, '07, that they

12          were already told they've got to

13          change something because you are

14          not doing what you are supposed to

15          do.  And the hope was that they

16          would do it.  But they didn't do

17          it.

18                Again, it goes back to, you

19          can -- you can have the best

20          policy in the world, that's going

21          to, you know, identify every bad

22          suspicious order out there.  And

23          then you can choose to ignore it.

24          So...

1    BY MS. MAINIGI:

2          Q.    So, the -- I'm sorry.

3          A.    Go ahead.

4          Q.    I didn't mean to interrupt

5    you.  Are you --

6          A.    Yeah.

7          Q.    Okay.  So in '05, '06 and

8    '07, as I understand it from Mr. Wright's

9    testimony, he and Mr. Mapes primarily

10   handled the distributor initiative

11   briefings, correct?

12         A.    Correct.

13         Q.    And you have talked to

14   neither Mr. Wright nor Mr. Mapes,

15   correct?

16         A.    Correct.

17         Q.    So you don't know sitting

18   here today what Mr. Mapes or Mr. Wright

19   said or heard in those distributor

20   initiative briefings, correct?

21              MR. FINKELSTEIN:  Objection.

22         Argumentive.

23              THE WITNESS:  No.

24   BY MS. MAINIGI:

Highly Confidential - Subject to Further Confidentiality Review

1   Q.    The people you have talked

2   to in preparation for this deposition,

3   are the people that went to the

4   distributor initiative briefings

5   beginning in '08; is that right?

6   A.    Yes.  But let me clarify.

7   I -- I had the PowerPoints that Mr. Mapes

8   and Kyle gave.  We have the written

9   summaries that they did after they met

10  with them.  So I have a good idea of what

11  was said at those meetings and what was

12  covered.

13  Q.    And the primary piece of

14  information that you have is the

15  PowerPoint?

16  MR. FINKELSTEIN:  Objection.

17  Misstates the witness's testimony.

18  THE WITNESS:  And the

19  report.

20  MR. FINKELSTEIN:  I'm going

21  to ask that we take our lunch

22  break soon.

23  MS. MAINIGI:  Okay.  I

24  thought you wanted to keep going.

Highly Confidential - Subject to Further Confidentiality Review

1    So I was trying to honor that.

2         MR. FINKELSTEIN:  What I

3    said was five-minutes breaks.

4         MS. MAINIGI:  But let me get

5    to a good breaking point.

6         MR. FINKELSTEIN:  How much

7    more?

8         MS. MAINIGI:  I don't know,

9    but give me a second to evaluate

10   where a good breaking point would

11   be.  But I understand your

12   request, and I will do my best to

13   honor it.

14  BY MS. MAINIGI:

15       Q.    After this Rannazzisi

16  letter, the December 2007 Rannazzisi

17  letter, did DEA provide any guidance to

18  registrants as to how to design or

19  implement their suspicious order

20  monitoring systems?

21       A.    Well, yeah, with the MOAs

22  that we -- and settlements that we got

23  with them.

24       Q.    And in the MOA meetings, you

1    provided guidance as to what your

2    expectations were as to the suspicious

3    order monitoring systems going forward,

4    correct?

5         A.    That's where we -- yes.

6         Q.    What about the distributors

7    that didn't have MOAs?  How did they get

8    guidance from the DEA as to how to design

9    their -- or implement their suspicious

10   order monitoring systems in 2008 forward?

11        A.    So it would be through the

12   distributor, if we did an initiative with

13   them.  It could be through the

14   pharmaceutical conferences.  Again, I'm

15   not sure when we -- when we did them.

16   But it would be through that.  It would

17   be through their scheduled investigations

18   when we're out there.

19        Q.    So essentially there was no

20   industrywide guidance that was provided

21   in 2008 or forward as to how to design or

22   implement suspicious order monitoring

23   systems, true?

24              MR. FINKELSTEIN:  Object to

1        the characterization.

2              THE WITNESS:  Nationwide,

3        correct.

4    BY MS. MAINIGI:

5        Q.    Instead, one-off guidance

6    was perhaps provided in the context of

7    individual distributor meetings, correct?

8        A.    Yes.  Along with the MOAs

9    and the settlements that were done.

10        Q.    And is there documentation

11    of what was said at the individual

12    distributor meetings?

13        A.    It would be the PowerPoints

14    and the report -- after report.

15        Q.    And this is an internal DEA

16    report?

17        A.    Yes.

18        Q.    And have you reviewed those

19    internal DEA reports for the purpose of

20    preparing for your testimony today?

21        A.    Some of them.

22        Q.    Now, does the DEA agree that

23    there's more than one way to design and

24    operate a system that can identify and

1   report suspicious orders?

2       A.    Yes.

3       Q.    And there's no single

4   feature that makes a suspicious order

5   monitoring system compliant, correct?

6       A.    Correct.

7       Q.    And the DEA leaves it up to

8   the registrant to design a system that

9   works with its own business model and

10  customer base, correct?

11      A.    Correct.

12      Q.    Does it matter to the DEA

13  whether a registrant reviews orders

14  manually or uses an automated system?

15      A.    No, it doesn't matter.

16      Q.    Other than requiring that

17  the report, suspicious order report

18  clearly indicate that the order is

19  suspicious, does DEA require suspicious

20  order reports to follow a particular

21  format?

22      A.    That's correct.

23      Q.    Let me ask the question

24  again.  The DEA does not require

1  suspicious order reports to follow a

2  particular format, correct?

3          A.    Well, I mean, they have to

4  follow what the regs say about unusual

5  size, unusual patterns, or frequency.  I

6  mean, that's in there.  We also ask that

7  the red flags and, you know, looking at

8  newspapers articles to see, you know,

9  what the overdoses are.  You know, are

10  they looking at more than just the data,

11  because the data is only as good as --

12  you know, you can set the threshold too

13  high, you can set it too -- it's never

14  going to pick up something, or you're not

15  going to see patterns, because it's a new

16  customer that gets onboarded, and they're

17  already high, and you don't question it

18  or you don't look at it, you don't see

19  the population size, you don't see what's

20  their percentage of control versus not

21  control.  I mean, there's a lot of

22  different factors that go in it.  So

23  however they design it, they need to get

24  the big picture so that they truly know

1   what is their customer doing.

2          Q.    Is there --

3                MR. FINKELSTEIN:  Hang on.

4          Five minutes ago, I asked for a

5          break.  We've been on the record

6          for more than an hour and a half.

7          Can you tell us when you are going

8          to be done?

9                MS. MAINIGI:  Just a couple

10         more minutes.

11  BY MS. MAINIGI:

12         Q.    Is the review -- is it fair

13  to say then that the identification of

14  suspicious orders can be a subjective

15  process?

16                MR. FINKELSTEIN:  Objection.

17         Vague.

18                THE WITNESS:  What do you

19         mean by "subjective"?

20  BY MS. MAINIGI:

21         Q.    Well, do you understand the

22  meaning of the word "subjective"?

23         A.    I'm asking you in terms of

24  this, what do you mean by subjective?

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Well, what I mean is that

2   you and I looking at the same data,

3   sometimes, not always, may come to

4   different conclusions, as to whether an

5   order is suspicious.  Is that possible?

6       A.    That is --

7             MR. FINKELSTEIN:  Hang on.

8       Objection.  Calls for speculation.

9   BY MS. MAINIGI:

10      Q.    I didn't hear -- you said

11  that is --

12      A.    That is possible.

13      Q.    And so, therefore, the

14  identification of suspicious orders is a

15  somewhat subjective process?

16            MR. FINKELSTEIN:  Objection.

17      Vague.

18            THE WITNESS:  I mean, when

19      it comes down to a suspicious

20      orders, what is triggering may --

21      it's the whole point of the

22      suspicious order is to identify --

23      hold on one second.  Okay.

24            A suspicious order is an

Highly Confidential - Subject to Further Confidentiality Review

1    order in which the recipient of

2    the order detects through their

3    suspicious order monitoring

4    system, a reason or reasons that

5    may indicate that that order may

6    be -- that order may be diverted

7    outside the legitimate scientific,

8    medical, and industry channels.

9    That's what it is.

10       So the subjectivity would be

11   not just us looking at it.  I

12   mean, we would look at it.  They

13   would look at it.  And that's why

14   many have gotten in trouble,

15   because they didn't look at it and

16   changed stuff.  So, you know, when

17   we get -- if we go to court or

18   whatever, it's going to be up to

19   the jury and the judge to decide.

20  BY MS. MAINIGI:

21       Q.   Because it's subjective,

22  right?

23       MR. FINKELSTEIN:  Objection.

24   Vague.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Yeah, it can

2     be subjective.

3           MS. MAINIGI:  Let's take a

4     break.

5           THE VIDEOGRAPHER:  All

6     parties agree to go off the

7     record?

8           MR. FINKELSTEIN:  Yes.

9     Thank you.

10          THE VIDEOGRAPHER:  Thank

11    you.  12:24, we are off the video

12    record.

13               -  -  -

14          (Lunch break.)

15               -  -  -

16    A F T E R N O O N   S E S S I O N

17               -  -  -

18          THE VIDEOGRAPHER:  1:32, we

19    are on the video record.

20  BY MS. MAINIGI:

21          Q.   Good afternoon.  Let me hand

22  you Exhibit 6 to take a look at.

23          (Document marked for

24    identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1           DEA-Prevoznik-6.)

2    BY MS. MAINIGI:

3           Q.    Exhibit 6 is what -- what --

4    let me ask you first as you're reviewing

5    this document.

6                Did -- did you review this

7    back and forth during the course of your

8    prep for this deposition?

9           A.    No, I did not.

10          Q.    Okay.  So let's start with

11    the attachment, the first letter that

12    came -- excuse me -- from the NCPA.

13                Are you familiar with that

14    group, the NCPA?

15          A.    No.

16          Q.    The National Community

17    Pharmacists Association.

18                The National Community

19    Pharmacy Association sent a letter to

20    Mr. Rannazzisi dated March 7, 2008.  Do

21    you see that?

22          A.    Yes.

23          Q.    And in their letter they

24    reference Mr. Rannazzisi's December 27,

Highly Confidential - Subject to Further Confidentiality Review

1    2007, letter to manufacturers and

2    distributor registrants.  Do you see

3    that, in the fourth paragraph?

4          A.    Could I just ask, since I

5    haven't seen it, could I just review it?

6          Q.    Sure, of course.

7          A.    I apologize.

8          Q.    Please go ahead.

9          A.    Okay.

10         Q.    So a trade association of

11   community pharmacists sent Mr. Rannazzisi

12   a letter in March of 2008, correct?

13         A.    Correct.

14         Q.    And as you saw from the

15   letter, the registrants, the -- the group

16   of community pharmacists voiced concerns,

17   about the potential implications of the

18   distributors' anti-diversion efforts on

19   patient care.

20               Did you get that from the

21   letter?

22         A.    Yes.

23         Q.    And if you take a look at

24   the third paragraph, they note in

1    italics, "We write to express our concern

2    that recent efforts by DEA aimed at

3    pharmaceutical wholesalers and

4    distributors to combat the illicit

5    distribution of controlled substances

6    have had unintended consequences and are

7    harming patient care."

8              Do you see that?

9         A.    Yes.

10        Q.    And then in the next

11   paragraph the writer of the letter ties

12   this recent action to Mr. Rannazzisi's

13   December 2007 letter that we just

14   reviewed -- reviewed a little while ago.

15   Do you see that?

16        A.    Yes.

17        Q.    And the first sentence of

18   that paragraph states, "Perhaps the key

19   factor in wholesalers acting overbroadly

20   is your December 27, 2007, letter to

21   manufacturer and distributor registrants

22   of controlled substances."

23             Do you see that?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Is it -- was the DEA aware

2    that distributors took the type of

3    actions that were described in this

4    letter in the aftermath of

5    Mr. Rannazzisi's December 27, 2007,

6    letter?

7            MR. FINKELSTEIN:  Objection.

8        Vague.

9            THE WITNESS:  I'm not sure I

10       understand your question.

11   BY MS. MAINIGI:

12       Q.    Well, was the DEA aware --

13   let me ask it more generically.

14       A.    Sure.

15       Q.    Was the DEA aware that in

16   the aftermath of -- of Mr. Rannazzisi's

17   December 27, 2007, letter, that the

18   distributors were doing their best to

19   comply with what they perceived as

20   stepped up -- stepped up interpretations

21   of the regulations?

22            MS. SINGER:  Objection.

23       Lack of foundation.

24            MR. FINKELSTEIN:  Objection

1    to the characterization.

2         You can answer.

3         THE WITNESS:  One more time.

4    BY MS. MAINIGI:

5         Q.    Did --

6         A.    I apologize.  I just want to

7    make sure I got it.

8         Q.    No, no, no, no.  Let me try

9    it another way.

10        Did -- did the -- so we have

11   the -- the Rannazzisi December 27, 2007,

12   letter, correct?

13        And I think that in the file

14   there are lots of letters and issues in

15   the aftermath of that December 27, 2007,

16   letter.  And this letter is just one of

17   them, in March of 2008.

18        Did DEA understand that in

19   the aftermath of Mr. Rannazzisi's

20   December 27, 2007, letter, that

21   distributors took actions that resulted

22   in a number of complaints by pharmacies

23   that distributors were acting

24   precipitously?

1           MR. FINKELSTEIN:  Objection.

2      Vague.

3           THE WITNESS:  We -- we heard

4      complaints.

5  BY MS. MAINIGI:

6      Q.    Complaints from whom?

7      A.    From -- it could be

8  pharmacies.  It could be -- it could be

9  patients saying I can't get my meds.

10     Q.    And so there were complaints

11 from pharmacies, kind of the variety we

12 see in Exhibit 6, basically saying

13 distributors are taking actions that are

14 unfair to the pharmacies as a result of

15 Mr. Rannazzisi's letter, true?

16          MR. FINKELSTEIN:  Objection.

17     Mischaracterizes.

18          THE WITNESS:  I'm not sure

19     that it's just the letter, because

20     this was also the time that we

21     started getting into settlement

22     agreements with the industry as

23     well.  So it wasn't just the

24     letter.  It was...

1    BY MS. MAINIGI:

2         Q.    But there was -- I'm sorry.

3         A.    No.  Go ahead.

4         Q.    But there was -- and so

5    there were complaints from pharmacies to

6    the DEA, correct?

7         A.    Correct.

8         Q.    And there were complaints

9    from patients to the DEA also, correct?

10        A.    Yeah.

11        Q.    And this is -- these are

12   complaints from patients who are worried

13   that they are not able to get their meds

14   because distributors are restricting

15   their distribution of meds in part as a

16   result of the various actions with DEA,

17   correct?

18             MS. SINGER:  Objection.

19        Lacks foundation.

20             THE WITNESS:  I'm not -- I'm

21        not sure that that's completely

22        correct.  The -- the actions that

23        we were taking were against

24        internet pharmacies, so

1          pharmacists that the public would

2          walk into.  That was not -- we

3          were targeting -- we were dealing

4          with this certain group of

5          registrants that are out of line,

6          that are not maintaining effective

7          controls.  And that's what we

8          targeted.  So we were -- we were

9          targeting the internet pharmacies

10          at this time.

11              So if --

12  BY MS. MAINIGI:

13          Q.    At the time of Exhibit 6?

14          A.    Well, no, I mean, this is --

15  this was the culmination of litigations

16  and investigations and, you know.  Again

17  like I said, we were getting into

18  settlements with some of the distributors

19  on, you know, you didn't do what you --

20  you said you were going to change, you

21  didn't change.  Now we're at the table

22  trying to settle this, and -- and, you

23  know, hopefully protect the public

24  health.  That -- that was the goal.

1         I mean part of -- the other

2    part of our mission besides preventing

3    and detecting and investigating the

4    diversion is we also had the

5    responsibility to ensure that there's

6    enough for -- of an adequate supply.  So,

7    a twofold mission.  So...

8         Q.    So was the perception of

9    some in the market that the distributors

10   had overreacted to what DEA was saying?

11        MR. FINKELSTEIN:  Objection.

12        Scope, calls for speculation.

13        THE WITNESS:  I -- I don't

14        know what the wholesalers were

15        thinking.  I -- if -- I mean, I

16        know from my own experience with

17        the -- with the pharmacy diversion

18        awareness conferences where we had

19        pharmacists coming up and saying

20        hey, they are putting thresholds

21        on, they are cutting us off, this

22        is affecting patient care.  And

23        they said well, DEA sets the

24        threshold.  And we said, no,

Highly Confidential - Subject to Further Confidentiality Review

1          that's not true, we did not set

2          the thresholds.  The industry sets

3          the thresholds.

4              That was an eye-opener for

5          them, because they were being

6          told -- somebody was telling them

7          the DEA set thresholds.  We don't

8          set thresholds on that -- on that

9          part, with -- in regards to that.

10             So, pushing back, you know,

11         and then you get -- then we -- we

12         take action against pharmacists,

13         you have a similar situation with

14         a pharmacist saying oh, the DEA

15         said we're not allowed to fill

16         these prescriptions.  DEA does

17         not -- does not regulate the

18         practice of medicine.  And,

19         those -- you know, that's the

20         pharmacist's decision whether to

21         fill the prescription or not.

22    BY MS. MAINIGI:

23         Q.    But it appeared to you that

24    there was an uptick in complaints from

1    pharmacists, pharmacies and patients in

2    the aftermath of the December 2007

3    Rannazzisi letter, correct?

4         A.    I think --

5              MR. FINKELSTEIN:  Objection.

6         Mischaracterizes.

7              THE WITNESS:  I think it's

8         both.  It's both the letter and

9         the actions that we had taken

10        against them.  So I can't say in

11        particular the letter triggered

12        all this, because I think the

13        actions also triggered stuff too.

14   BY MS. MAINIGI:

15        Q.    And so the collective

16   actions of DEA, including the Rannazzisi

17   letter, including the settlements and so

18   forth in 2007, you noticed an increase in

19   complaints from pharmacists from seasoned

20   patients in 2008, for example?

21        A.    Yes.

22        Q.    It was not DEA's intention

23   to interfere with patients' ability to

24   fill legitimate prescriptions for

1    controlled substances, correct?

2         A.    Correct.

3         Q.    So did DEA provide any

4    additional guidance to distributors to

5    prevent -- to prevent the type of

6    incidents that were complained of from

7    happening?

8              MR. FINKELSTEIN:  Objection.

9         Vague.

10             THE WITNESS:  I'm not sure

11        what you're asking.

12   BY MS. MAINIGI:

13        Q.    Well, so, let's go ahead and

14   take a look at this letter again.

15             The writer of this letter,

16   Mr. Roberts from NCPA, asked the DEA to

17   hold the meeting with wholesalers,

18   consumer groups and community pharmacies

19   so that all parties could clearly

20   understand DEA's expectations and attempt

21   to comply with them, right?

22        A.    Just to make sure, on 5917?

23        Q.    Yes.

24        A.    And specifically the second

Highly Confidential - Subject to Further Confidentiality Review

```
1   paragraph?

2        Q.    Correct.

3        A.    "We did request"?

4        Q.    Yes.

5        A.    Yes.

6        Q.    Okay.  The request by the

7   community pharmacists as Mr. Roberts

8   characterizes it, at least, was that the

9   DEA refused to meet with this group,

10  correct?

11       A.    Correct.

12       Q.    Now, you said that you were

13  not aware of this particular issue as

14  part of your review process, right?

15       A.    No.  I think you asked me if

16  I had reviewed this letter in particular.

17  I said no.

18       Q.    Okay.  But was it generally

19  your understanding that in this time

20  period, meaning 2008, that the DEA at

21  that point in time, was declining to meet

22  with registrants or others, to discuss

23  DEA's suspicious order reporting

24  expectations?
```

1          A.     Well, first, NCPA is not a

2     registrant.  We were still doing

3     distributor initiatives at that time.  So

4     we were still meeting with the industry

5     at that time.

6          Q.     The pharmacies may be

7     registrants, right?

8          A.     The pharmacies are

9     registrants, yes.

10         Q.     So it was a group of

11    pharmacies that wanted to meet with the

12    DEA, wholesalers, and others, to

13    determine what was actually being

14    required by the DEA, and the DEA said no,

15    apparently, according to this letter,

16    correct?

17         A.     Correct.

18              MR. FINKELSTEIN:  Object to

19         the characterization.

20    BY MS. MAINIGI:

21         Q.     And do you have an

22    understanding of why?

23         A.     I believe that it was

24    because we were still in the litigation

1    and investigating the pharmacies and

2    wholesalers at that time, that we were

3    either in litigation or still

4    investigating outliers that were still

5    doing those kind of businesses.

6            Q.    Now, that's what -- this

7    morning that's what you told me was the

8    reason why you couldn't provide further

9    guidance in the 2010 to 2013 time period,

10   right?

11                MR. FINKELSTEIN:  Object to

12           the characterization of the

13           witness's testimony this morning.

14                THE WITNESS:  You asked me

15           about this specific meeting, so

16           I'm answering what my

17           understanding --

18   BY MS. MAINIGI:

19           Q.    Understood.

20           A.    -- what I --

21                MR. FINKELSTEIN:  Hang on,

22           let him finish.

23   BY MS. MAINIGI:

24           Q.    Sorry.  This morning you

1    told me that for the 2010-2013 time

2    period, because of litigation and other

3    things, there were not necessarily

4    briefings or distributor conferences held

5    in that time period correct?

6           A.    There were -- we had stopped

7    with the distributor initiative and we

8    had stopped with the conferences with the

9    wholesalers, yes.

10          Q.    In 2010 to 2013?

11          A.    Right.

12          Q.    And you told me the main

13   reason was because of litigation and

14   investigations, right?

15          A.    Correct.

16          Q.    And is it your position that

17   also in the 2008 to 2010 time period, for

18   the same reason, litigation and

19   investigations, DEA was also unwilling to

20   meet with various constituent groups?

21              MR. FINKELSTEIN:  Objection.

22          Vague.

23              THE WITNESS:  As I said,

24          this is my -- my belief is that

1          this particular meeting was

2          because -- wasn't held because

3          they are not registrants.  We were

4          looking at -- we were doing

5          investigations and litigation

6          against somebody, some pharmacies.

7          Not all of them are independent,

8          some of them are chain.  So I

9          think that's probably why this

10          meeting wasn't held.

11              I think that's the question

12          you asked was why we didn't hold

13          this meeting.  So I'm trying to

14          answer that question.

15     BY MS. MAINIGI:

16          Q.    I thought you said earlier

17     maybe it was because of litigation and

18     investigations this meeting wasn't held?

19          A.    I thought that's what I -- I

20     thought I just explained that.

21          Q.    Okay.  If you look at the

22     cover e-mail response -- well, actually,

23     I apologize.  Let's look at the letter

24     from Mr. Rannazzisi.  And this letter, I

Highly Confidential - Subject to Further Confidentiality Review

1    take it, reflects DEA's policy position

2    as of May 2008, correct?

3         A.    Correct.

4         Q.    And that includes the

5    concept that, if you look at the

6    penultimate paragraph, that DEA, while

7    understanding the concerns that NCPA has

8    raised, is unable to require anything

9    more concerning this matter than what is

10   stated in the Controlled Substance Act

11   and its implementing regulations.

12             Do you see that?

13        A.    I'm sorry, where are you at?

14        Q.    Second-to-last paragraph.

15        A.    Second page?

16        Q.    Yes.

17        A.    Correct.

18        Q.    And so the DEA says, we

19   can't tell you anything more than what

20   the Controlled Substance Act and its

21   implementing regulations say, right?

22        A.    Correct.

23        Q.    And this communication was

24   sent via e-mail all around the department

Highly Confidential - Subject to Further Confidentiality Review

1    to senior diversion investigators,

2    diversion program managers and group

3    supervisors.

4            Do you see that?

5       A.   Yes.

6       Q.   And the e-mail reads in

7    part, "Please be sure to share this

8    information with the diversion

9    investigators in your group."

10           Do you see that?

11      A.   Yes.

12      Q.   And isn't that because

13   Mr. Rannazzisi's articulation of the

14   DEA's current position was not exactly

15   consistent with the interpretation that

16   DEA had had some years prior?

17      A.   I'm not following you.

18      Q.   Well, isn't it fair to say

19   that the reason this fairly unremarkable

20   letter from Mr. Rannazzisi was circulated

21   to all of these people was because

22   headquarters wanted to ensure that those

23   in the field understood that this was now

24   the official position of the DEA?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I don't see any difference

2   between this and the letters that you

3   sent out on the position in '07 to be --

4   to the -- it's repeating exactly what the

5   regulations are.

6        Q.    Is it the same as letters

7   that were sent out in '03 or '04 or would

8   those have been different letters?

9            MR. FINKELSTEIN:  Objection.

10        Vague.

11            THE WITNESS:  I was speaking

12        in terms of the '06 and '07, the

13        reiteration of what the

14        regulations are.

15   BY MS. MAINIGI:

16        Q.    Headquarters wanted to

17   ensure in this time period that the field

18   was following the latest guidance from

19   headquarters, as far as diversion

20   control, correct?

21        A.    Correct.

22        Q.    And that is why, one of the

23   reasons why they sent this e-mail,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2         MR. FARRELL:  What was

3    Exhibit 5?

4         MR. FINKELSTEIN:  2007 "Dear

5    Registrant" letter.

6  BY MS. MAINIGI:

7    Q.    Let me take you back to that

8  letter for a moment, Mr. Prevoznik, the

9  second paragraph of Mr. Rannazzisi's

10 letter.

11        What does the first sentence

12 of Mr. Rannazzisi's letter dated May 2008

13 say, if you could read it out loud?

14   A.    When it starts in addition

15 to?

16   Q.    In the last few years.

17        MR. FINKELSTEIN:  Now I

18   don't know where you're directing

19   him.

20 BY MS. MAINIGI:

21   Q.    The Exhibit 6 that we were

22 just looking at?

23   A.    Oh I'm sorry --

24   Q.    I'm sorry.  That's my fault.

1      A.    -- I thought you said you

2    went back to Exhibit 5.

3      Q.    Exhibit 6.  Mr. Rannazzisi's

4    response, second paragraph, first

5    sentence.

6            Could you read that out

7    loud?

8      A.    Sure.

9            "In the last few years there

10   has been a significant" -- "a significant

11   increase in the diversion and abuse of

12   pharmaceutical" -- "pharmaceutical

13   controlled substances."

14     Q.    So I think this is

15   consistent with what you were saying

16   earlier this morning, which is, the DEA

17   only noticed an increase in the diversion

18   of prescription opioids in the few years

19   leading up to 2008; is that correct?

20           MR. FARRELL:  Objection.

21       Foundation.

22           MR. FINKELSTEIN:  Objection.

23       Mischaracterizes the letter.

24           THE WITNESS:  I think it's

1          consistent with what I said in

2          regards that this was the

3          beginning of the switch from

4          regional diversion issues of

5          controlled substances to now a

6          national scale of the -- via the

7          internet.

8     BY MS. MAINIGI:

9          Q.    Now, Mr. Rannazzisi's

10    response at the bottom of the first page

11    also references a concept called knowing

12    your customer.  Do you see that?

13         A.    The last sentence?

14         Q.    Yes.

15         A.    Yes.

16         Q.    And specifically the last

17    sentence reads, "DEA encourages

18    manufacturers and wholesalers to know

19    their customers to determine when or if

20    an order for controlled substances meets

21    the designation of suspicious."

22              Do you agree with that

23    sentence?

24         A.    Yes.

1    Q.    Now, did the Controlled

2  Substances Act in this time period state

3  that the registrants must know their

4  customer to decide whether an order is

5  suspicious or not?

6    A.    It does not have that

7  specific language.  But the statute still

8  has to maintain effective controls over

9  diversion.

10          And if you also look at

11  1301.71(a), the first sentence there,

12  "All applicants and registrants shall

13  provide effective controls and procedures

14  to guard against theft and diversion of

15  controlled substances."

16          So neither one of those

17  changed from when this got enacted.

18    Q.    And is there any DEA

19  regulation that states that in order to

20  determine whether an order is suspicious

21  or not, that a registrant must know their

22  customer to make that decision?

23    A.    Could you repeat that?

24    Q.    Sure.  I'm sorry.

1              Is there any DEA regulation

2    that says in order for a registrant to

3    make a determination as to whether an

4    order is suspicious or not, they must

5    know their customer to decide?

6         A.    It doesn't specifically have

7    that language.  But again it goes back to

8    the statute of have -- maintaining

9    effective controls to guard against

10   diversion.

11        Q.    And --

12        A.    So it -- so it's -- it's --

13   it's implicit.

14        Q.    Well, it was --

15        A.    You have to know -- I

16   mean --

17        Q.    Is it -- is it explicit --

18        A.    -- if you're going to

19   make --

20             MR. FINKELSTEIN:  No, wait,

21        hang on.  You're entitled to

22        answer your -- to complete your

23        answer.  And when you start to

24        answer, please try to finish your

1         answer.

2              THE WITNESS:  Yeah, I

3         apologize.

4    BY MS. MAINIGI:

5         Q.    No, no, no, my fault too.

6         A.    Where was I?

7         Q.    Is the know your customer --

8    I think you've answered my question.

9              The -- the know your

10   customer concept is not explicitly stated

11   in the regulation, correct?

12        A.    Correct.

13        Q.    And that's true even today,

14   correct?

15        A.    Well, I mean it -- it still

16   goes back to maintaining control.

17             I mean, the whole structure

18   of the Controlled Substance Act, the

19   regulations, this is how you do business.

20   If you're going to do it -- be authorized

21   to handle controlled substances, this is

22   the way you're going to do it.  So if

23   you're going to be selling to customers,

24   you need to know who your customers are.

1    Q.    Today, does the regulation

2  explicitly reference knowing your

3  customer?

4    A.    No.

5    Q.    Has DEA ever approved or

6  endorsed any specific methodology to be

7  used by manufacturers or distributors to

8  know their customers?

9            MR. FINKELSTEIN:  Objection.

10        Vague.  Scope.

11            THE WITNESS:  Can you please

12        repeat?

13  BY MS. MAINIGI:

14    Q.    Sure.  Has DEA ever approved

15  or endorsed any specific methodology to

16  be used by manufacturers or distributors

17  to know their customer?

18            MR. FINKELSTEIN:  Same

19        objection.

20            THE WITNESS:  No.

21  BY MS. MAINIGI:

22    Q.    Has DEA ever issued any

23  guidance documents or best practices

24  regarding the methodology that

Highly Confidential - Subject to Further Confidentiality Review

1   distributors and manufacturers should use

2   to know their customer?

3          A.    I mean, the regulations

4   define -- they have to safeguard against

5   diversion.

6               It also identifies what

7   suspicious orders are.  So I mean I think

8   that there is guidance in that.  We also,

9   with the conferences, and the scheduled

10  investigations that were out there, where

11  we're meeting with the manufacturers and

12  the distributors, that those are

13  opportunities that we also discuss those

14  with them.

15       Q.    So we just -- you just

16  referenced the guidance as having best

17  practices in it for knowing your

18  customer?

19            MR. FINKELSTEIN:  Objection.

20       Mischaracterizes.

21            THE WITNESS:  I don't

22       believe I -- if I -- if that's

23       what you got, I apologize, that's

24       not what I meant.  It's not --

1          it's not a guidance thing.

2               It's -- we're talking to

3          them about, you know, they are

4          saying this is their system, we'll

5          look at their system.  We'll

6          advise.  You know, you might want

7          to think of this.  There's --

8          there's varying ways to talk to --

9          to the registrants.  And that is

10         what we try to do is talk to them

11         as best we can.

12    BY MS. MAINIGI:

13         Q.   Do you agree that the best

14    way, and the most consistent way to

15    communicate to an industry is through

16    written guidance?

17              MR. FINKELSTEIN:  Objection.

18         Scope.

19              THE WITNESS:  I mean it

20         definitely helps.  I don't know if

21         it's the best way to do it.  I

22         know when we -- I know when we do

23         conferences, that is pretty --

24         that's pretty helpful, you get

```
1              face-to-face.  Schedule

2              investigations with them.  You get

3              to know who the people are at

4              the -- the facility.  You build a

5              rapport.  You build a working

6              relationship with them.

7                  So I don't -- I don't -- I

8              don't know that I can characterize

9              and say that -- that written is

10             the best way.

11      BY MS. MAINIGI:

12          Q.    And just to make sure the

13      record from before is clear.  To your

14      knowledge, the DEA has not issued any

15      best practices regarding what methodology

16      to use to know your customer for

17      distributors and manufacturers?

18                  MR. FINKELSTEIN:  Objection.

19             Vague.  Mischaracterizes.

20                  THE WITNESS:  For -- we're

21             just talking specifically about

22             controlled substances, because we

23             did provide it for chemical --

24             chemical handlers.
```

1    BY MS. MAINIGI:

2        Q.    So I'll restate the

3    question.

4            To your knowledge the DEA

5    has not issued any best practices

6    regarding what methodology to use to know

7    your customer to distributors and

8    manufacturers in the controlled

9    substances context?

10       A.    Correct.

11           MR. FINKELSTEIN:  Objection.

12       Vague.  Scope.  You can answer.

13           THE WITNESS:  Correct,

14       correct.

15   BY MS. MAINIGI:

16       Q.    And there's no requirement

17   for distributors and manufacturers to

18   document their "know your customer"

19   process, correct?

20           MR. FINKELSTEIN:  Objection.

21       Form.

22           THE WITNESS:  There's not a

23       written -- written requirement --

24       regulation or requirement of that.

1           However, if you're going to

2      maintain effective control for

3      diversion, you're going to have to

4      be able -- you're going to have to

5      be able to explain how you made

6      that assessment.  Was this --

7      especially in terms of suspicious

8      orders, how you came to the

9      conclusion that this was not a

10     suspicious order.  So...

11 BY MS. MAINIGI:

12     Q.    Is there a best practice

13 document that was distributed to

14 distributors and manufacturers that says

15 that?

16          MR. FINKELSTEIN:  Objection.

17     Vague.

18          THE WITNESS:  No.

19 BY MS. MAINIGI:

20     Q.    Now, you mentioned in the

21 chemicals context, the DEA has in fact

22 issued guidance on knowing your customer;

23 is that correct?

24     A.    Correct.

1    Q.    And at a high level, are you

2  able to describe for me the guidance?

3    A.    Well, I mean with the

4  chemicals, there's thresholds already

5  built in on what a -- on a retail sale of

6  what a customer can buy specifically of

7  ephedrine or pseudoephedrine on a single

8  transaction, on a monthly transaction.

9    We talk about -- in that

10  guidance, we also talk about forms of

11  payment, are they coming to pick it up.

12  Those are some of the higher level ones.

13    Q.    Could the DEA have issued

14  guidance in the controlled substances

15  context for knowing your customer?

16    MR. FINKELSTEIN:  Objection.

17    Scope.  Calls for speculation.

18    THE WITNESS:  I mean I think

19    with the regs and the statute and

20    the guidance that we've given

21    through the 2006, 2007 letters, I

22    think with the conference, or the

23    distributor initiative where we

24    have met with them and we've

1      discussed red flags and gone

2      through it, I think they've been

3      given guidance on this.

4           It's not all inclusive list.

5      It's a list of, you scratch --

6      it's basically this doesn't make

7      sense to me.

8           So I don't know that we can

9      pigeonhole.  And I think we've

10     given proper guidance to it.

11  BY MS. MAINIGI:

12     Q.    So to be clear, in the

13  chemical context, DEA has issued written

14  guidance on knowing your customer when it

15  comes to chemicals, correct?

16     A.    So chemicals, those are also

17  embedded in the regulations too.  So it's

18  a reiteration of the regulations

19  themselves, because they are in there as

20  well.

21     Q.    So the DEA has in fact

22  issued written guidance on knowing your

23  customer in the chemical context,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2                MR. FINKELSTEIN:  Objection.

 3          Vague.

 4                THE WITNESS:  Sorry.

 5    BY MS. MAINIGI:

 6          Q.    The DEA has not issued

 7    written guidance elaborating on best

 8    practices or methodology for knowing your

 9    customer in the controlled substances

10    context, correct?

11                MR. FINKELSTEIN:  Objection.

12          Vague.

13                THE WITNESS:  I believe --

14    BY MS. MAINIGI:

15          Q.    I think that's a yes or no?

16          A.    Correct, correct, correct.

17                MR. FINKELSTEIN:  No, you

18          can answer the question.

19                THE WITNESS:  It is correct,

20          but sitting with them and going

21          over the distributor initiative at

22          the distributor conferences where

23          we've gone over the requirements,

24          what their responsibilities are,
```

1              and gone through all the red

2              flags, they understand what

3              they -- they understand it.

4    BY MS. MAINIGI:

5         Q.    And so you think that you

6    know what the distributors understand?

7         A.    No --

8              MR. FINKELSTEIN:  Hang on.

9              Objection.  Argumentive.

10             Mischaracterizes the witness's

11             testimony.

12   BY MS. MAINIGI:

13        Q.    So you think -- was it ever

14   considered by the DEA to issue written

15   guidance in the controlled substances

16   context to know your customer?

17             MR. FINKELSTEIN:  Objection.

18             I'm going to instruct you not to

19             answer outside of the scope of

20             your written authorization.

21             THE WITNESS:  Yeah based on

22             the advice of my attorney, I can't

23             answer that.

24             MS. MAINIGI:  He can't

1          answer yes or no whether it was

2          considered?

3                    MR. FINKELSTEIN:  You heard

4          my instruction.

5    BY MS. MAINIGI:

6          Q.    Your position is,

7    Mr. Prevoznik, that whatever has been

8    said in distributor initiative meetings

9    or industry conferences, is sufficient to

10   advise manufacturers and distributors on

11   best practices for knowing your customer?

12                   MR. FINKELSTEIN:  Objection.

13         Mischaracterizes the witness's

14         testimony.

15                   THE WITNESS:  I don't think

16         that's what I said.

17   BY MS. MAINIGI:

18         Q.    Is it your position that at

19   distributor initiative meetings and

20   industry conferences that you have laid

21   out DEA's expectations regarding

22   manufacturers and distributors knowing

23   their customer?

24         A.    Well, the onus of

Highly Confidential - Subject to Further Confidentiality Review

1    operating -- designing and operating is

2    upon the registrant.  So it's on the

3    manufacturers and distributors, since

4    that's what we're talking about that.  So

5    the onus is on them to design it.

6              So if they want to discuss

7    it with us, we have discussed it with

8    them.  We've had MOAs with them.  We

9    discuss when we go out on our scheduled

10   investigation, so it's not just a

11   conference thing.  We've had meetings

12   with them where we talk about different

13   things.  And if they have suggestions on

14   things, we listen to it.  And if we can

15   implement them, we will.

16        Q.    So my question was, is it

17   your position that at distributor

18   initiative meetings and industry

19   conferences, that you have laid out DEA's

20   expectations regarding manufacturers and

21   distributors knowing their customers?

22              MR. FINKELSTEIN:  Objection.

23        Asked and answered.

24              THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. MAINIGI:

2         Q.    And this would be reflected

3    in what documents?  Where could we go to

4    find out what those expectations were

5    that DEA laid out?

6              MR. FINKELSTEIN:  Objection.

7         Argumentive.

8              THE WITNESS:  Well, I mean,

9         they -- they got -- they've had --

10        they've been to the conferences.

11        So if you want to see the

12        PowerPoints from the conferences,

13        you can go to our website.  The

14        distributor initiatives, they were

15        given the PowerPoints when they

16        came.

17             They -- you know, they know

18        when we've been out on a scheduled

19        investigation.  So they know when

20        we've been out there.  It's my --

21        it's our understanding that when

22        we're out there, they document

23        everything that we do and say out

24        there.

```
 1    BY MS. MAINIGI:

 2         Q.    You think the industry

 3    documents it?

 4              MR. FINKELSTEIN:  Objection.

 5         Calls for speculation.  Outside

 6         the scope.

 7    BY MS. MAINIGI:

 8         Q.    Why not just issue the

 9    written guidance?

10              MR. FINKELSTEIN:  Objection.

11         Outside the scope.

12              THE WITNESS:  I can't answer

13         that.

14    BY MS. MAINIGI:

15         Q.    Are you familiar with who

16    Demetra Ashley is?

17         A.    Yes.

18         Q.    And who is Ms. Ashley?

19         A.    Now -- she's retired now.

20    She was our deputy assistant

21    administrator.

22         Q.    And she was number two at

23    DEA, essentially, for a period of time?

24         A.    Yes.
```

1    Q.    And I think you testified

2    earlier that you reviewed her deposition

3    in preparation for today, correct?

4         A.    Correct.

5              (Document marked for

6              identification as Exhibit

7              DEA-Prevoznik-7.)

8    BY MS. MAINIGI:

9         Q.    I've put in front of you as

10   Exhibit 7 a statement from Ms. Ashley of

11   her testimony before the Judiciary

12   Committee of the United States Senate.

13              It's for a hearing entitled,

14   "Oversight of the Ensuring Patient Access

15   and Effective Drug Enforcement Act."

16              Her testimony is from

17   December 2017.

18              I'm just going to draw your

19   attention to the very last page and ask

20   you just a couple of questions about one

21   particular sentence.

22              And that is on Page 8 of her

23   testimony, third paragraph.  In the

24   context of talking about the opioid

1    crisis Ms. Ashley says as follows:

2            "That being said, it is

3    necessary that we accurately inform

4    manufacturers, distributors, and sellers

5    of what they are expected to do to be in

6    compliance with their regulatory

7    responsibilities."

8            Do you see that?

9        A.    Yes.

10       Q.    Does the DEA agree with that

11   statement by Ms. Ashley?

12       A.    Yes.

13       Q.    Now, do you know what the

14   HDA is, or the HDMA, as it used to be

15   known?

16       A.    Yes.

17       Q.    And what is that?

18       A.    It's an association of

19   distributors.

20       Q.    And from time to time the

21   HDA or HDMA reached out to the DEA in an

22   effort to sit down and seek further

23   clarification and guidance regarding

24   distributor efforts to prevent diversion,

1    correct?

2         A.    Correct.

3              MR. FINKELSTEIN:  I know

4         this is one of the plaintiffs'

5         topics.  Can you explain to me why

6         this is within the scope of your

7         notice?

8              MS. MAINIGI:  It relates to

9         guidance.

10             MR. FINKELSTEIN:  To

11        registrants is what your notice

12        says.

13             MS. MAINIGI:  Yes.

14             MR. FINKELSTEIN:  HDA is not

15        a registrant.

16             MS. MAINIGI:  It's made up

17        of registrants.

18             MR. FINKELSTEIN:  It's not a

19        registrant.  It's not within your

20        notice, you can go because it's in

21        the plaintiffs' notice.  But I'm

22        going to control this.

23             MS. MAINIGI:  Okay.

24   BY MS. MAINIGI:

1    Q.    So HDMA, which as you said

2    was made up of a number of distributors

3    who are registrants, correct?

4    A.    Correct.

5    Q.    HDMA, and these distributors

6    sought guidance from time to time from

7    DEA regarding their efforts to prevent

8    diversion, correct?

9    A.    Correct.

10    Q.    And, in fact, HDA sent

11    written communication to the DEA seeking

12    clarification, correct?

13        MR. FINKELSTEIN:  Object to

14        the scope.  You can answer.

15        THE WITNESS:  Yes.

16    BY MS. MAINIGI:

17    Q.    Did the DEA ever provide a

18    response to those questions?

19        MR. FINKELSTEIN:  Objection.

20        Vague.  Vague as to time.

21        THE WITNESS:  I don't know

22        what time frame you are talking

23        about.

24    BY MS. MAINIGI:

1    Q.    Let me get -- while we are

2    getting that document marked, let me

3    bring you back to Ms. Ashley's testimony,

4    Mr. Prevoznik.

5              Pull up that same page in

6    front of you if you could.

7          A.    I -- I just want to make

8    sure.  Exhibit 7?

9          Q.    I'm sorry?

10         A.    7?

11         Q.    Yes.  Exhibit 7, please.

12    And Page 8.

13         A.    Okay.

14         Q.    Do you see the paragraph

15    right above the conclusion?

16         A.    As we move forward?

17         Q.    Yes.

18         A.    Yes.

19         Q.    Could you read out loud the

20    first sentence please?

21         A.    "As we move forward, we

22    recognize the importance of working with

23    registrants, not just at workshops and

24    conferences, but in writing that they can

1    count on, to provide them all the

2    information and especially the certainty

3    that they need to be in full compliance

4    as they want to be and as we expect them

5    to be."

6            Q.    Do you agree with that

7    sentence?

8            A.    Yes.

9            Q.    Is it fair to say that the

10   general view of DEA is that the

11   distributors would like to be in

12   compliance?

13                 MR. FINKELSTEIN:  Objection.

14           Vague.  Calls for speculation.

15                 MS. SINGER:  Objection to

16           scope as well.

17                 THE WITNESS:  Yes.  Yes, I

18           believe they do.

19   BY MS. MAINIGI:

20           Q.    And certainly as you are

21   aware, from time to time, they have

22   reached out to the DEA seeking

23   clarification and further guidance,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FINKELSTEIN:  Objection.

2      Vague as to time.

3          THE WITNESS:  I'm not -- I'm

4      not sure of what specific topics,

5      if you have a specific topic in

6      mind.  But yes, they do reach out.

7  BY MS. MAINIGI:

8      Q.   And let's say in this time

9  period that we've been lately talking

10  about, the 2008 to 2013 time period,

11  sometimes when distributors and their

12  trade group have reached out, DEA has not

13  felt that they could provide them with

14  complete answers or clarification to

15  their questions, correct?

16          MS. SINGER:  Objection.

17      Vague.

18          THE WITNESS:  Could you

19      please repeat that?

20  BY MS. MAINIGI:

21      Q.   Sure.

22          In that 2008 to 2013 time

23  period that we've focused on, is it fair

24  to say that when registrants such as

1  distributors and their trade associations

2  have reached out to seek clarification,

3  that sometimes DEA has not been able to

4  provide clarification?

5       A.    So in this time frame is

6  2008 to 2013?

7       Q.    Correct.

8       A.    Which was the time when we

9  were investigating and litigating?  Yeah,

10  that -- we -- we did not talk at that

11  point.

12       Q.    You did not talk to

13  distributors in the 2008 to 2013 time

14  period generally?

15       A.    Well, yeah, I mean up until

16  2010 we were doing the distributor

17  initiative.  And then we stopped that for

18  a period because of the litigations and

19  the investigations going on.

20       Q.    And so what you did say was,

21  as Ms. Ashley alluded to, you might tell

22  them something at a workshop or

23  conference, correct?

24            MR. FINKELSTEIN:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. MAINIGI:

2          Q.    She references here?

3                MR. FINKELSTEIN:  Objection.

4          Vague.  And vague as to time.

5                THE WITNESS:  That's what it

6          says there, correct.  I don't know

7          what exact time frame she's

8          talking about, but yes, that's

9          what it says.

10   BY MS. MAINIGI:

11         Q.    But certainly the

12   expectation in 2017 was that the DEA felt

13   it was important to work with registrants

14   and to provide information to them in

15   writing that they could count on,

16   correct?

17         A.    That's what it says,

18   correct.

19         Q.    And since that time, has

20   that happened?

21               MR. FINKELSTEIN:  Objection.

22         Vague.

23               THE WITNESS:  Has what

24         happened?

1    BY MS. MAINIGI:

2          Q.    Since 2017, has the DEA

3    provided distributors with any additional

4    guidance on suspicious order

5    monitoring --

6          A.    I don't --

7          Q.    Written guidance.

8          A.    Not written guidance that

9    I'm aware of.

10         Q.    There was some discussion in

11   the last several years of a modification

12   to the suspicious order regulation,

13   correct?

14         A.    Correct.

15         Q.    And why was that?

16         MR. FINKELSTEIN:  Objection.

17         I'm going to instruct you not to

18         answer, because this was something

19         that we specifically didn't

20         authorize.

21         THE WITNESS:  I'm following

22         the instruction of my attorney.

23   BY MS. MAINIGI:

24         Q.    Did, in fact, DEA make any

Highly Confidential - Subject to Further Confidentiality Review

1   proposals outside of DEA to modify the

2   suspicious order regulations in the last

3   several years?

4           MR. FINKELSTEIN:  I'm going

5       to instruct you not to answer to

6       the extent that your answer would

7       call for deliberative

8       conversations within DEA that --

9       that were not -- did not result in

10      a final action.

11          THE WITNESS:  The only --

12      based on my attorney's advice, the

13      only thing that I can say is that

14      we did provide a tool to the

15      industry back in 2018 to help them

16      with the identified data with

17      ARCOS.

18  BY MS. MAINIGI:

19      Q.   And what was that tool that

20  was provided in 2018?

21      A.   It was that the -- they

22  could put the pharmacies DEA's

23  registration in it and it would show a

24  number of suppliers of base code.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what would that allow

2  distributors to do?

3    A.    That would allow

4  distributors to see how many customers --

5  how many other distributors that were

6  servicing that customer or --

7    Q.    And that would allow

8  distributors to, therefore, recognize and

9  have visibility into a customer who was

10  ordering from two or more distributors at

11  one time, correct?

12    A.    Yes.  But it also --

13  hopefully it would also, because we did

14  run into a situation in which it was --

15  the company had multiple registration,

16  and it showed the number two, but it was

17  actually in fact the same company, it was

18  just different registrants.  So it's

19  really just a pointer.

20    Q.    But it does have the effect

21  of enhancing distributors anti-diversion

22  efforts, correct?

23    A.    Correct.

24    Q.    And is that the type of

1    change that distributors had been

2    suggesting for years?

3              MR. FINKELSTEIN:  I'm going

4         to interject something for the

5         record because it clarifies my

6         earlier objection.  Topic 2 had

7         asked for --

8              MS. MAINIGI:  Excuse me.

9         There's not a question pending.

10             MR. FINKELSTEIN:  I'm going

11        to make my record.  And then you

12        can respond.

13             MS. MAINIGI:  You're going

14        to interrupt a different line of

15        questioning to make your record,

16        because you've just now figured

17        out where you need to go in your

18        letter?

19             MR. FINKELSTEIN:  As I

20        said --

21             MS. MAINIGI:  Okay.  Go

22        ahead, David.  Let's give you the

23        floor.

24             MR. FINKELSTEIN:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Thank you.  You had asked for

2    communications with third parties

3    concerning potential amendments to

4    or updates 1301.74.  We had said

5    that we asked you to identify with

6    specificity which communications

7    you wanted.

8        As we received no further

9    clarity on the meaning of third

10   parties, Mr. Prevoznik is not

11   authorized to provide testimony on

12   the aforesaid topic.  So that's

13   the basis for my instruction not

14   to answer.

15       MS. MAINIGI:  Well, thank

16   you so much.

17       MR. FINKELSTEIN:  You're

18   welcome.

19       MS. MAINIGI:  Let's go back

20   to the question, Mr. Prevoznik,

21   that was pending when your counsel

22   interrupted.

23       MR. FINKELSTEIN:  And --

24   never mind.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. MAINIGI:
 2         Q.    So the change that was made
 3    in -- so, for sake of identification,
 4    what you are talking about, what the DEA
 5    made available in 2018 was something
 6    called ARCOS online reporting?
 7         A.    No.
 8         Q.    What was it called?
 9         A.    It was -- I don't know what
10    we call it to be honest with you.  It was
11    a tool enhancement.
12         Q.    Okay.  So it was a tool
13    enhancement that allowed distributors to
14    have greater visibility in some manner
15    into the scope of where their customers
16    were ordering from?
17         A.    Correct.
18         Q.    And was this a change that
19    the distributors had been asking for?
20              MR. FINKELSTEIN:  Objection.
21         Vague.
22              THE WITNESS:  To my
23         knowledge, because I'm the one
24         that suggested it, I am not aware
```

1          of distributors asking for it at

2          that time.

3               We've always, with our

4          dialogue with the distributors,

5          it's always been, this is our

6          business strategy, protect -- this

7          is proprietary protected.  And as

8          an agency, that's how we always

9          treat their -- their data.

10              So it really came to my

11         attention when I moved upstairs to

12         pharmaceutical section, that

13         dealing with a lot of FOIAs and

14         things like that, this might --

15         this might work.  So I made the

16         suggestion to Ms. Ashley at that

17         time.

18    BY MS. MAINIGI:

19         Q.   And Ms. Ashley followed your

20    suggestion?

21         A.   Well, we eventually got it

22    in there, yes.  So yes.

23         Q.   And is the suggestion that

24    was implemented allowing distributors

1    greater visibility into their customers'

2    ordering, is that something that could

3    have been implemented years earlier?

4            MR. FINKELSTEIN:  Objection.

5        Calls for speculation.

6            THE WITNESS:  I don't know.

7    BY MS. MAINIGI:

8        Q.    Is there any reason that you

9    have to believe that the change that you

10   had effected in 2018 couldn't have been

11   effected in 2012?

12           MR. FINKELSTEIN:  Objection.

13       Scope.

14           THE WITNESS:  I don't --

15       we've made some vast changes to

16       ARCOS.  So the technology today is

17       way different than what it was

18       back then.  So that I don't know

19       that it would have been as good

20       back then, but it's certainly

21       something that could have been

22       explored.

23   BY MS. MAINIGI:

24       Q.    And was it explored in 2012?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. FINKELSTEIN:  Objection.

2           I'm going to instruction not

3       to answer, to the extent that your

4       answer calls for internal

5       conversations within the DEA.

6           THE WITNESS:  Based on that,

7       I'm going to listen to my

8       attorney.

9    BY MS. MAINIGI:

10       Q.    You have no reason to

11   believe that this was a proposal or a

12   change that DEA advocated outside of DEA

13   be made prior to 2018, correct?

14       A.    I'm sorry.  One more time.

15       Q.    You have no reason to

16   believe that the DEA advocated for the

17   change that was made in 2018 to be made

18   earlier than 2018 outside of DEA?

19           MS. SINGER:  Objection.

20       Scope.

21           THE WITNESS:  I'm not sure.

22       I don't know.

23   BY MS. MAINIGI:

24       Q.    If HDMA and the distributors

Highly Confidential - Subject to Further Confidentiality Review

1    sent a letter in 2011 asking the DEA a

2    number of questions, to which they hoped

3    for clarification, I take it your

4    response would be the reason the DEA

5    didn't provide a response was because of

6    litigation?

7              MR. FINKELSTEIN:  You can

8         answer the questions.  You don't

9         have to accept her answer.

10             MS. SINGER:  Objection.

11        Scope.

12             THE WITNESS:  I don't think

13        it was just litigation.  I think

14        it was ongoing investigations at

15        that point.

16   BY MS. MAINIGI:

17        Q.   But because of litigation

18   and ongoing investigations, the DEA did

19   not want to provide distributors with

20   greater clarity to their questions on

21   anti-diversion?

22             MR. FINKELSTEIN:  Object to

23        the characterization.

24             And the same instruction

Highly Confidential - Subject to Further Confidentiality Review

1    that don't answer to the extent

2    that your answer calls for

3    internal deliberative process

4    information.

5         THE WITNESS:  I don't know.

6  BY MS. MAINIGI:

7         Q.   You don't know any

8  reasons -- excuse me.  You don't know any

9  reasons --

10        A.   No, I'm agree -- I'm

11 following my attorney's advice regarding

12 internal discussions.

13        MS. MAINIGI:  Why don't we

14        take a short break.  I think I'm

15        ready to pass this witness.

16        MR. FARRELL:  To me?

17        MS. MAINIGI:  No.  To

18        someone this way.

19        MR. FINKELSTEIN:  Five

20        minutes, Counsel.  Who is next?

21        THE VIDEOGRAPHER:

22        2:33 p.m., we are off the video

23        record.

24        (Short break.)

Highly Confidential - Subject to Further Confidentiality Review

1           THE VIDEOGRAPHER:  2:47, we

2       are on the video record.

3   BY MS. MAINIGI:

4       Q.    Mr. Prevoznik, just a few

5   more questions from me right now.

6               (Document marked for

7       identification as Exhibit

8       DEA-Prevoznik-8.)

9   BY MS. MAINIGI:

10      Q.    I'm going to hand you

11  Exhibit 8.  Sorry.

12      A.    No problem.

13      Q.    And if I could draw your

14  attention -- you're obviously welcome to

15  read the entire thing, but I'm going to

16  really focus on the bottom paragraph on

17  the first page, forward.  Just let me

18  know when you've read through it.

19              MR. FARRELL:  Since this is

20      an evidentiary deposition and the

21      witness is reading and I'm not

22      taking your time, I'm going to

23      make an objection to this on

24      foundation purposes, and I've

1    asked you to lay a proper

2    foundation before getting into

3    this document.

4        MS. MAINIGI:  That would be

5    a form objection.  The way we do

6    it is we say, "Objection, form."

7        MR. FULLER:  You say we.

8    Who is we?

9        MR. FARRELL:  I have

10   transcripts that say otherwise as

11   you'll recall.  But I do think a

12   foundation needs to be established

13   or none of this is going to be

14   admissible.

15       Do you agree?

16       MS. MAINIGI:  I have no

17   comment, Paul.  If -- if you make

18   an objection down the road, that's

19   your prerogative.

20       MR. FARRELL:  So you're

21   waiving foundation?

22       MS. MAINIGI:  No, I'm

23   absolutely not waiving foundation.

24       MR. FARRELL:  That's what I

Highly Confidential - Subject to Further Confidentiality Review

1          asked --

2               MS. MAINIGI:  I'm waiving

3          discussion of it today or I'm

4          deferring discussion of it today.

5     BY MS. MAINIGI:

6          Q.    Just let me know when you're

7     ready, Mr. Prevoznik.

8          A.    Okay.  Which paragraph in

9     particular?

10         Q.    Let's just first identify

11    the -- the letter.  The letter that is

12    marked Exhibit 8 is an exchange -- well,

13    it's a letter from the DEA and

14    specifically James Arnold from the DEA to

15    Mr. Kevin Nicholson who is at the

16    National Association of Chain Drug

17    Stores, correct?

18         A.    Correct.

19         Q.    And what is Mr. Arnold's

20    role, or what was Mr. Arnold's role in

21    2018?

22         A.    He was the section chief of

23    the policy liaison section.

24         Q.    And that was -- that's one

1    of the sections that will, from time to

2    time, have communications with the

3    industry; is that right?

4          A.    Correct.

5          Q.    And that communication could

6    relate to guidance; is that right?

7                MR. FINKELSTEIN:  Objection.

8          Vague.

9                THE WITNESS:  I'm not really

10         sure what you mean by the word

11         guidance.

12   BY MS. MAINIGI:

13         Q.    Well, guidance related to

14   anti-diversion efforts or anti-diversion

15   regulations.

16                MR. FINKELSTEIN:  Objection.

17         Vague.

18                THE WITNESS:  I mean, the --

19         the policy section answers a lot

20         of different things.  It's not

21         just the anti-diversion stuff.

22         It's all kinds of things.

23   BY MS. MAINIGI:

24         Q.    But anti-diversion would be

1    one of the areas that the policy section

2    might provide a response onto third

3    parties?

4         A.    Yes.

5              Sorry.

6         Q.    And Mr. Nicholson -- excuse

7    me.  Mr. Arnold in this letter -- well,

8    let me just draw your attention to -- to

9    the bottom paragraph.  Could you read

10   that paragraph out loud, please?

11        A.    The one that starts finally?

12        Q.    Yes, please.

13        A.    "Finally, the DEA has

14   proposed to revise its regulations

15   relating to suspicious orders of

16   controlled substances.  The proposed rule

17   defines the term 'suspicious order' and

18   specifies the procedures a registrant

19   must follow upon reviewing such orders.

20   You can monitor the progress of the

21   suspicious orders of the substances" --

22   "of controlled substances proposed rule

23   on the unified agenda located at

24   www.regulations.gov.  And the above

Highly Confidential - Subject to Further Confidentiality Review

1   stated proposal rule has been assigned

2   regulatory identification Number (RIN)

3   1117-AB47.

4            MS. SINGER:  Object to this

5        line of questions, because it's

6        outside of the scope for the

7        reasons that the Department of

8        Justice previously offered.

9            MS. MAINIGI:  Okay.  We

10       believe this line of questioning

11       relates to Topics 2 and 3.

12           But obviously someone else

13       will ultimately decide.

14  BY MS. MAINIGI:

15       Q.    So, Mr. Prevoznik, when did

16  the DEA first communicate to the public

17  that there were potential changes that

18  may be coming with respect to its

19  suspicious order regulations?

20           MR. FINKELSTEIN:  Hang on.

21       I'm going to instruct you not to

22       answer that question.

23           The basis again is our

24       March 22, 2019, letter where we

```
 1              said he is not authorized to

 2              provide testimony on this

 3              subtopic.

 4                   MS. MAINIGI:  This relates

 5              to Topics 2 and 3.  And in

 6              particular, guidance.  Because if

 7              there are changes to guidance,

 8              that's relevant.  And there have

 9              been changes to guidance over the

10              years which we have already

11              discussed in this deposition to

12              date.

13                   So I can't control what you

14              do in terms of instructing your

15              witness.  But we think it is very

16              much in scope.

17                   MR. FINKELSTEIN:  You are

18              correct that you can't control

19              what I do as to instructing the

20              witness.  We're not going to argue

21              an appeal from our authorization

22              letter right here.  Unless you

23              want to.

24                   So you can proceed with your
```

1          questions and I'll instruct

2          appropriately.

3     BY MS. MAINIGI:

4          Q.    So, Mr. Prevoznik, when did

5     the DEA communicate to the public for the

6     first time that there were changes that

7     were being considered related to

8     suspicious orders?

9               MR. FINKELSTEIN:  Instruct

10         you not to answer.

11              THE WITNESS:  I follow the

12         advice of my attorney.

13    BY MS. MAINIGI:

14         Q.    Is it fair to say,

15    Mr. Prevoznik, that some of the changes

16    that were being considered would have

17    provided greater definition and -- and

18    greater specificity to the term

19    "suspicious order"?

20              MR. FINKELSTEIN:  Calls for

21         speculation.  But because it's

22         outside the scope, I instruct you

23         not to answer.

24    BY MS. MAINIGI:

1    Q.    Is it further fair to say,

2   Mr. Prevoznik, that the proposed rule

3   would have also offered procedures a

4   registrant, such as a distributor, must

5   follow upon receiving an order that they

6   believe to be suspicious?

7            MR. FINKELSTEIN:  Instruct

8        you not to answer.

9            THE WITNESS:  Following the

10       advice of my attorney.

11  BY MS. MAINIGI:

12   Q.    IS it fair to say that the

13  change in regulation is no longer under

14  consideration by the DEA?

15           MR. FINKELSTEIN:  Different

16       objection.  Instruct you not to

17       answer to the extent that your

18       answer would call for deliberative

19       communications.

20           THE WITNESS:  Could you

21       repeat the question?

22  BY MS. MAINIGI:

23   Q.    Is it fair to say that the

24  change in regulations is no longer under

Highly Confidential - Subject to Further Confidentiality Review

1    consideration by the DEA?

2              MR. FINKELSTEIN:  The

3         instruction is, don't testify

4         based on internal DEA

5         communications regarding any

6         possible change in regulation.

7    BY MS. MAINIGI:

8         Q.    Now, it looks like from this

9    letter -- oh, I'm sorry, are -- are you

10   not answering the question,

11   Mr. Prevoznik?

12        A.    Could you repeat your

13   instruction one more time?

14             MR. FINKELSTEIN:  Do you

15        want to repeat the question?

16             MS. MAINIGI:  It's in the

17        record.

18             MR. FINKELSTEIN:  Without

19        hearing -- without hearing the

20        question back, the witness isn't

21        going to know how to follow my

22        instruction.

23             MR. FARRELL:  Do you want me

24        to read it?

Highly Confidential - Subject to Further Confidentiality Review

1           MS. MAINIGI:  If I could ask

2      the court reporter to read it

3      back, please.

4           (Whereupon, the court

5      reporter read back the requested

6      portion of testimony.)

7           MR. FINKELSTEIN:  And the

8      instruction is, don't testify

9      based on internal DEA

10     communications.

11          THE WITNESS:  I would say

12     no.

13  BY MS. MAINIGI:

14     Q.    Mr. Prevoznik, if I go to

15  this website that is referenced in this

16  June 2018 letter, at regulations.gov and

17  put in this regulatory identification

18  number, will I find, to your knowledge,

19  the proposed rule?

20          MR. FINKELSTEIN:  Objection.

21     Scope.

22          Yeah.  Excuse me.

23     Objection.  Scope, calls for

24     speculation.

1          You can answer if you know.

2          THE WITNESS:  I don't know.

3     BY MS. MAINIGI:

4          Q.    The proposed rule entitled

5     "Suspicious Orders of Controlled

6     Substances Proposed Rule," was that at

7     one time published online and had

8     specifics related to redefinition of the

9     term "suspicious order"?

10          MR. FINKELSTEIN:  Instruct

11          you not to answer.

12          THE WITNESS:  Following the

13          advice of my attorney.

14     BY MS. MAINIGI:

15          Q.    You can't answer if it was

16     online at some point and gave greater

17     specificity to the term "suspicious

18     order"?

19          MR. FINKELSTEIN:  We asked

20          you what to prep the witness for.

21          You can answer based on your

22          personal knowledge.

23          THE WITNESS:  I'm a little

24          confused, because I thought I

1       answered that one.

2  BY MS. MAINIGI:

3       Q.    Let me ask it again.  I will

4  endeavor to ask the same question,

5  perhaps just slightly differently.  And

6  that is, what was published on the

7  website, did that actually include the

8  specifics of the proposed change in

9  definition to suspicious order?

10              MR. FINKELSTEIN:  This is

11          outside the scope of the witness's

12          authorization.

13              But you can answer based on

14          your personal knowledge.

15              THE WITNESS:  I don't know.

16  BY MS. MAINIGI:

17       Q.    Do you know whether the

18  proposed rule that was online provided

19  specifics as to the procedures a

20  registrant would follow with the

21  modification?

22              MR. FINKELSTEIN:  Same

23          objection.  Same instruction.

24              THE WITNESS:  I don't know.

1    BY MS. MAINIGI:

2         Q.    What was perceived to be the

3    need that led to the change in the

4    terminology for suspicious order and the

5    additional procedures for dealing with a

6    suspicious order?

7              MR. FINKELSTEIN:  Instruct

8         you not to answer.

9              THE WITNESS:  Following the

10        advice of my attorney.

11             MS. MAINIGI:  Okay.  Well,

12        we will go ahead and move on to

13        the next questioner.  We don't

14        agree with your objections on

15        scope.  We don't agree with your

16        instructions to the witness not to

17        answer.  And we'll consider

18        whether to follow up on that

19        either in the next two days or

20        thereafter.

21             MR. FINKELSTEIN:

22        Understood.

23             MS. MAINIGI:  Thank you,

24        Mr. Prevoznik, very much for your

Highly Confidential - Subject to Further Confidentiality Review

1        time.

2                THE VIDEOGRAPHER:  Agree to

3        go off the record?

4                MR. FINKELSTEIN:  Yes.

5                THE VIDEOGRAPHER:  2:58.  We

6        are off the video record.

7                (Brief pause.)

8                THE VIDEOGRAPHER:  3:03.  We

9        are on the video record.

10                      -   -   -

11                   EXAMINATION

12                      -   -   -

13    BY MR. EPPICH:

14        Q.    Good afternoon,

15    Mr. Prevoznik.  My name is Chris Eppich,

16    I represent the McKesson company in

17    this -- in this litigation.  I just have

18    a few questions for you about the

19    Controlled Substances Act and the -- and

20    the corresponding regulations.  You're

21    familiar with the Controlled Substances

22    Act, aren't you?

23        A.    Yes.

24        Q.    The CSA -- I'll abbreviate

1    it the CSA.  The CSA does not require

2    distributors to report the suspicious

3    orders of other distributors, does it?

4           A.    Correct.

5           Q.    And the CSA does not require

6    distributors to share information with

7    each other about suspicious orders,

8    correct?

9           A.    Correct.

10          Q.    Now, similarly, the

11   regulations do not require distributors

12   to report suspicious orders of other

13   distributors, correct?

14          A.    Correct.

15          Q.    And the regulations do not

16   require distributors to communicate with

17   each other about suspicious orders,

18   correct?

19          A.    Correct.

20          Q.    In fact, the regulations

21   only apply to the suspicious orders that

22   a distributor receives from its own

23   customers, correct?

24          A.    You lost me on the

1  customer --

2      Q.    Well, the right --

3            MR. FINKELSTEIN:  You can

4      finish your answer.  Please do.

5            THE WITNESS:  You lost me on

6      where you said that the customer

7      gives you the --

8  BY MR. EPPICH:

9      Q.    I'll ask it again.

10     A.    Sure.

11     Q.    Isn't it true that the

12 regulations only apply to the suspicious

13 orders that a distributor receives from

14 its own customers?

15     A.    You still lost me.  How is

16 the -- how is the distributor getting --

17 getting the suspicious order from their

18 customer?

19     Q.    I'll strike the question.

20           You're generally familiar

21 with distributors' suspicious order

22 monitoring programs?

23     A.    Correct.

24     Q.    And DEA is aware that the

Highly Confidential - Subject to Further Confidentiality Review

1    distributors programs, they set a monthly

2    threshold for a customer's controlled

3    substances purchases?

4              MR. FINKELSTEIN:  Objection.

5         Calls for speculation.

6              THE WITNESS:  To my

7         knowledge, yes.

8    BY MR. EPPICH:

9         Q.    And DEA never instructed

10   distributors to set a monthly threshold

11   at a specific level, did they?

12        A.    No.

13        Q.    DEA never instructed

14   distributors to set monthly thresholds

15   for controlled substances at 8,000 dosage

16   units, did they?

17        A.    No.

18              MR. EPPICH:  That's all the

19        questions I have for you this

20        afternoon.  Let me pass the

21        witness.

22              THE VIDEOGRAPHER:  Going off

23        the record, 3:05 p.m.  We are off

24        the video record.

1               (Brief pause.)

2               THE VIDEOGRAPHER:  3:08.  We

3       are on the video record.

4                  -   -   -

5                  EXAMINATION

6                  -   -   -

7    BY MR. O'CONNOR:

8        Q.    Mr. Prevoznik, good

9    afternoon.  I'm Andrew O'Connor.  I

10   represent one of the manufacturers in the

11   case.  I appreciate your time today?

12       A.    Thank you.

13       Q.    I want to pick up where

14   Mr. Eppich left off.  Is it fair to say

15   that the Controlled Substances Act does

16   not require manufacturers to report

17   suspicious orders submitted to other

18   manufacturers?

19       A.    Manufacturers reporting

20   other --

21       Q.    Orders submitted to other

22   manufacturers, correct.

23       A.    Well, if there would be one,

24   then they would -- because a manufacturer

Highly Confidential - Subject to Further Confidentiality Review

1    can sub to another manufacturer.

2         Q.    I see.

3         A.    So there could be one.

4         Q.    Does a manufacturer under

5    the CSA have an obligation to report an

6    order that's placed with another

7    manufacturer?

8              MR. FINKELSTEIN:  Objection.

9         Vague, incomplete hypothetical.

10              THE WITNESS:  Could you --

11   BY MR. O'CONNOR:

12        Q.    Sure.  So if you had a

13   situation where Manufacturer A received a

14   suspicious order from Distributor A, is

15   it fair to say that Manufacturer B does

16   not have an obligation to report that

17   order?

18              MR. FINKELSTEIN:  Same

19         objection.

20              THE WITNESS:  I'm trying to

21         follow your logic on this one.

22         Can you give me -- try one more

23         time.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. O'CONNOR:

2         Q.    Sure.  Manufacturer A

3    receives a suspicious order from

4    Distributor A.  Does Manufacturer B, a

5    separate manufacturer, have any duty to

6    report that order from the distributor to

7    the other manufacturer?

8         A.    I think I'm getting lost,

9    because I am not understanding the

10   manufacturer getting a suspicious order

11   from a distributor.  So is the -- I'm

12   lost on that one.

13        Q.    Okay.  A minute ago you

14   testified that a distributor does not

15   have an obligation to report the order,

16   the suspicious order of another

17   distributor.

18            Do you recall that?

19        A.    Yes, and now that you

20   reminded me, because of what you just

21   asked your first question, I need to

22   clarify that, because you could have a

23   distributor selling to another

24   distributor, which could trigger a

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order of that sale.

2         Q.    Okay.  But assuming in that

3    case that the distributors weren't buying

4    from one another, there is no obligation

5    of a distributor to report the suspicious

6    orders going to all the other

7    distributors, correct?

8              MR. FINKELSTEIN:  Objection.

9         Incomplete hypothetical.

10             THE WITNESS:  So there's

11        so -- there's so many things --

12   BY MR. O'CONNOR:

13        Q.    All right.  Well, we'll move

14   on --

15        A.    I apologize.  It's --

16   it's --

17        Q.    -- we'll circle back.  We'll

18   move on for now.

19             Are you familiar with the

20   term "closed system of distribution"?

21        A.    Yes.

22        Q.    What does that mean to you?

23        A.    That is the system in which

24   Congress enacted for the authorized

1     handling of controlled substances.  So it

2     requires DEA -- DEA registration;

3     everybody needs to be registered.  And

4     then the rules and the regulations that

5     promulgate that system, so that it -- it

6     can account for all the different

7     transactions that are within the system.

8     So manufacturer to distributor, I mean

9     there's always going to be a different

10     circle.  But if I could just go straight

11     down the line.

12         Q.    Sure.

13         A.    It would be manufacturer to

14     distributor to -- to retail level.  And

15     then it stops at the retail level.

16         Q.    Okay.  So in general terms,

17     the closed system of distribution

18     includes manufacturers who then sell to

19     distributors who then sell to pharmacies?

20         A.    Correct.  Retail would be

21     pharmacies.  You have some practitioners

22     buying, it could be teaching

23     institutions, hospitals, narcotic

24     treatment programs.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And under the CSA, the

2    registrant's responsibilities depend in

3    part on where they sit within that

4    distribution chain, correct?

5         MR. FINKELSTEIN:  Objection.

6    Vague.

7         THE WITNESS:  I'm not sure

8    what exactly you're asking.

9    BY MR. O'CONNOR:

10   Q.    Well, a manufacturer has

11   certain obligations that are different

12   from, for example, a pharmacist.  Is that

13   fair?

14   A.    Correct.

15   Q.    Okay.  So whereas a

16   pharmacist might have to have some

17   obligations with respect to particular

18   prescriptions, a manufacturer does not

19   have an obligation to review or -- or

20   monitor particular prescriptions,

21   correct?

22   A.    The -- the prescriptions

23   from a pharmacy?

24   Q.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1        A.    No, they don't.

2        Q.    Okay.  Are you familiar with

3   C.F.R. -- 21 C.F.R. 1301.74?

4        A.    Yes.

5        Q.    That's the suspicious order

6   monitoring regulation?

7        A.    Yes.

8        Q.    Fair if I call it that?

9              Okay.  With respect to

10  manufacturers, what is a suspicious order

11  for controlled substances?

12             A.    Well, I mean, 823, the

13  statute -- statutory requirement that you

14  have to have effective controls against

15  diversion.  So it starts with that.  Then

16  you go to 1301.74.  They, as -- as

17  manufacturer and the distributor, would

18  have the same requirements of designing

19  and building a system to identify

20  suspicious orders.  So it's incumbent

21  upon a manufacturer to build that system.

22             Q.    So with respect to

23  manufacturers, what is a suspicious order

24  for controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FINKELSTEIN:  Objection.

2     Vague.

3          THE WITNESS:  Well, I mean

4     if you go to 1301.74(b), it would

5     still -- you would still apply the

6     same sales of orders, including

7     unusual size, orders deviating

8     substantially from a normal

9     pattern or would result in unusual

10     frequency.  Because

11     manufacturers -- its --

12     manufacturers also distribute to

13     the practitioner level as well.

14          So, so if they are selling

15     to a practitioner, not that

16     they -- they -- they would --

17     that's their customer.  So they

18     would have to have the same

19     effective controls as the

20     distributor would, because it's

21     going to the retail level.  So

22     there's -- there's that part.

23          There's also the part of --

24     there' -- is their product going

1      straight to the distributor level?

2      Is it going straight to the

3      pharmacy level?  Is it going to

4      another -- a repackager,

5      re-labeler?

6           I mean, manufacturer has

7      various options.  So it's -- it's

8      going to have to set a system that

9      can identify, detect, a suspicious

10     order.  So whatever realm

11     that's --

12  BY MR. O'CONNOR:

13     Q.   So --

14     A.   -- where it goes.

15     Q.   -- would -- would a

16  definition of a suspicious order change

17  depending on what type of customer the

18  manufacturer is selling to?

19     A.   I don't know that it's --

20  it's just ironclad that it's the customer

21  you're selling to.  It -- it's -- it's

22  the gambit of unusual size.  It's the

23  same if it's going into, say, one

24  particular state and they have

1    information regarding that.  Then they

2    would.

3         Q.    You mentioned orders of

4    unusual size, frequency, or deviating

5    substantially from normal pattern.  I

6    want to spend some time on those.

7              With respect to orders that

8    are placed to manufacturers, what

9    constitutes an order of unusual size in

10   the DEA's view?

11        A.    Well, as you know from the

12   statute regulations, the onus is on the

13   registrant to identify it.  It's not for

14   us to identify it.  It's for the

15   registrant to identify it.

16             So, I don't know the -- the

17   situation.  I mean it would be all

18   hypothetical situations that I would be

19   proposing.  And I'm not sure that I can

20   cover every single hypothetical for you.

21        Q.    So 21 C.F.R. 1301.74 is a

22   regulation, correct?

23        A.    Correct.

24        Q.    DEA promulgated that

1    regulation?

2         A.    Correct.

3         Q.    And that regulation includes

4    the term "suspicious orders," does it

5    not?

6         A.    Correct.

7         Q.    Okay.  So I'm asking you as

8    a representative of DEA, the meaning of

9    suspicious orders.

10             MR. FINKELSTEIN:  That's a

11         different question.

12             THE WITNESS:  Yeah, that's

13         a -- so you want to know what a

14         suspicious order is?

15    BY MR. O'CONNOR:

16         Q.    Let's start there and then

17    we can get back to unusual size.

18         A.    Okay.  So a suspicious order

19    is an order which the order recipient

20    detects through its suspicious monitoring

21    program an order that the -- the

22    detection provides a reason or reasons

23    that the sale or the transaction may

24    be -- I'm sorry, may be diverted into the

1    other -- other legitimate -- other than

2    the legitimate channels of scientific,

3    medical or industry channels.

4         Q.   Okay.  How would a

5    manufacturer tell whether an order

6    indicates a reason or reasons that the

7    sale or transaction may be diverted into

8    other than legitimate channels?

9         A.   Well, I mean we are familiar

10   with one case with chargeback data where

11   the manufacturer knew their customer.

12   They also knew their customers' customer,

13   where the product was going.  And they

14   were able to ascertain from that, from

15   their own data, that quite -- over --

16   almost 60 percent of their product was

17   going into one state.

18              MR. FARRELL:  I'm sorry,

19        I -- I couldn't hear you.

20        Which -- which manufacturer did

21        you say?

22              THE WITNESS:  I didn't.

23              MR. FARRELL:  Oh.

24              MR. FINKELSTEIN:  If you can

1    try to speak up a little bit.

2             THE WITNESS:  I'm sorry.

3             MR. FINKELSTEIN:  Big room.

4    BY MR. O'CONNOR:

5        Q.    So let's go back to the --

6    the issue of unusual size.

7             How does the manufacturer

8    determine whether an order is of an

9    unusual size as that term is used under

10   the DEA regulations?

11       A.    Well, I mean, again, these

12   are -- this is going to be hypothetical,

13   because I don't know where this is --

14   where this sale is taking place.  Is it

15   going to a practitioner?  Is it going

16   directly to the pharmacy?  Is it going to

17   another distributor?  Is it going to

18   another manufacturer?

19       Q.    Well --

20       A.    Because unusual size could

21   be -- it's going to be different if it

22   goes to a practitioner.  It may be -- I

23   mean, again, I'm speculating, so I don't

24   know.

1    Q.    So let's say it's an order

2    placed by a distributor to a

3    manufacturer.  How does a manufacturer go

4    about determining whether an order is

5    unusually -- unusually size -- unusual in

6    size?

7    A.    Well, I mean, these are --

8    this is not an inclusive list.  So it

9    could be one of them.  It could be a

10   number of them.  It could be patterns of,

11   you know, this product has -- I mean, I

12   don't know which products we're talking

13   about.  But this product, which has had

14   very little movement all of the sudden

15   explodes and is -- you know, how did that

16   happen?

17         So those would be kind of

18   questions that I would want to look at.

19   I would want to look at, you know, who --

20   who are their customers and try to get a

21   better understanding of what are they

22   doing with the product.

23   Q.    So to make this a little

24   more concrete, let's say we had an order

1    from a distributor to a manufacturer for

2    oxycodone.  How big of an order would be

3    an order of unusual size?

4         A.   I wouldn't know.  I can't

5    give you a figure on that.  I don't know

6    the distributors' ranges of how far they

7    extend out to their customer base.  It

8    could be multiple states.  It could be

9    one state.  It could...

10        Q.   Fair to say that you can't

11   determine whether an order is unusually

12   large by simply looking or considering

13   one factor?

14             MR. FINKELSTEIN:  Objection.

15        Vague.

16             THE WITNESS:  Well, again if

17        it goes to a practitioner, it

18        probably could, or a pharmacy it

19        probably could.  But --

20   BY MR. O'CONNOR:

21        Q.   And let's say it went to a

22   practitioner.  How would you know what's

23   unusually large?

24        A.   Well, you would want -- part

Highly Confidential - Subject to Further Confidentiality Review

1   of your figuring it out would be -- is

2   what is the percent that other

3   practitioners of similar specialty who

4   are ordering, how much do they order.  I

5   mean, there's a variety of different

6   things that you could look at to try to

7   make that determination.  I don't think

8   you can just take the number alone and

9   say, "Oh, that's big."

10          Q.    So with respect to orders

11  placed by distributors to manufacturers

12  how can a manufacturer tell if an order

13  deviates substantially from a normal

14  pattern?

15          A.    So this is a -- is this

16  sales to a manufacturer to a distributor?

17          Q.    Correct.

18          A.    So you would want to look at

19  the history of what is that relationship

20  and what has been a typical order.  And

21  it could potentially trigger, that seems

22  a little odd.  So let me at least -- what

23  it does is just detects and says, all

24  right, this is something that we probably

Highly Confidential - Subject to Further Confidentiality Review

1    need to follow up on.

2            Q.    Okay.  And how can you tell

3    if an order is a typical order versus one

4    that deviates substantially from a normal

5    pattern?

6            A.    Well, I apologize.  It's --

7    I don't know if you can say what the

8    difference is a typical order and that.

9    What you have is you have a history of

10   what are -- what are the sales to that

11   distributor.  So you would start with

12   that.  But as you -- as you -- as the

13   customers -- you know, what questions are

14   you asking the distributors?  Are you

15   asking them for their customers?  And,

16   you know, who are they selling to?

17               And then you can look at

18   newspaper articles and see the overdose

19   deaths.  You can see this is affecting

20   these communities that these product,

21   your products, are going into, because

22   that distributor is putting them in

23   there.  So you would have to start asking

24   those questions.

1    Q.    But when a manufacturer

2    receives an order from a distributor, how

3    do you tell whether that particular order

4    deviates from a normal pattern, even

5    looking at the sales history to that

6    distributor?

7    A.    I'm not sure I'm following.

8    Q.    Well, I'm just asking you,

9    DEA has imposed this obligation on

10   manufacturers.  And I'm wondering whether

11   DEA has a position on how a manufacturer

12   should determine whether a particular

13   order that comes into it from a

14   distributor, deviates from a normal

15   pattern?

16   A.    Well, I mean, you can go

17   back to the internet days when it was --

18   the pattern was all of the sudden

19   products that were skyrocketing to the

20   millions and hundreds of thousands that

21   were never there.

22   Q.    So you're saying if a

23   product was not being purchased at all

24   previously and then skyrocketed --

1    A.    I'm not saying not at all.

2  But if it's -- if it's not been used

3  much, and then all of the sudden it takes

4  off.

5    Q.    Okay.  And if it does take

6  off, is that enough to conclude that the

7  product is being diverted?

8    A.    I don't think it's enough to

9  conclude that it's diverted, just based

10  on that.  But it should be enough to make

11  it a suspicious order, to at least report

12  it.

13    Q.    Okay.  And how big an

14  increase do you have in mind when you say

15  skyrocket?

16    A.    I don't have a number in

17  mind.

18    Q.    It sort of depends on the

19  situation?

20    A.    It depends on the situation,

21  yeah.

22    Q.    All right.  How about with

23  respect to unusual frequency?  When a

24  manufacturer receives an order from a

1    distributor, how does it determine

2    whether the order is one of unusual

3    frequency?

4         A.    Well, again, are they

5    ordering more and more?  I mean, again,

6    it depends on the situation.  Again,

7    these are not -- not one particular

8    thing.  It could be two of them, it could

9    be three of them.  It could be any

10   information that you have obtained that

11   has and shows or that indicates that your

12   product may be being diverted, then you

13   have the responsibility to guard that

14   from doing that.  So that would trigger a

15   suspicious order.

16        Q.    So fair to say whether an

17   order is of an unusual frequency requires

18   some -- some judgment?

19        A.    Yes.

20        Q.    It's fair to say that it's

21   in the eye of the beholder?

22        A.    I don't think it's in the

23   eye of the beholder because it's -- the

24   data is going to show you what is going

1    on.  So the data is going to tell you,

2    oh, I might need -- this might -- this

3    doesn't make sense.  This sort of makes

4    sense.

5         Q.    But as you sit here today,

6    you can't tell us exactly how frequent an

7    order would have to be for it to be

8    unusually frequent?

9         A.    No, I can't.

10        Q.    Has the DEA provided any

11   written guidance to manufacturers

12   regarding how to identify suspicious

13   orders?

14        A.    I mean, we've gone through

15   the Rannazzisi letters of 2006 and 2007.

16        Q.    Okay.  Aside from the

17   Rannazzisi letters of 2006 and 2007, has

18   the DEA provided manufacturers with any

19   other guidance on how to determine

20   whether an order is suspicious?

21        A.    I know we've met with some

22   of them, with -- in part of the

23   distributor initiative, we actually met

24   with some of the manufacturers.  The

1    guidance was provided to them, very

2    similar to what the distributor

3    initiative was.

4            Q.    How many manufacturers did

5    you meet with?

6            A.    I don't recall off the top

7    of my head.

8            Q.    Okay.  More than ten?  Less

9    than ten?

10           A.    I would say -- I'd be

11   guessing on that.  I think it's less than

12   ten.

13           Q.    Okay.  Fair to say not every

14   manufacturer was met with?

15           A.    Correct.

16           Q.    And aside from those 2006

17   and 2007 letters from Joe Rannazzisi, was

18   there any other written guidance provided

19   to manufacturers regarding how to

20   identify a suspicious order?

21           A.    No.

22           Q.    If a registrant had a

23   question about how to comply with its

24   obligations under the suspicious order

1    monitoring regulation, what part of DEA

2    should it take that question to?

3           A.    It depends -- I mean, we

4    have contacts within the field offices.

5    So you can start with the field office.

6           Q.    Okay.

7           A.    If the field office felt

8    that this rose, they would instruct --

9    they would instruct the manufacturer to

10   write to the policy section of

11   headquarters.

12          Q.    Okay.  Are you aware of any

13   instances in which the manufacturer -- a

14   manufacturer did write to the policy

15   section requesting guidance on suspicious

16   orders?

17          A.    I am not aware of it.

18          Q.    Okay.  You -- you mentioned

19   that the manufacturer might also go to

20   the field office.  Is the field office

21   the -- the DEA location that's in the

22   manufacturer's geographic area?  Is

23   that -- is that what that refers to?

24          A.    Yeah, our -- our area of

1    responsibility.

2          Q.    Okay.  When a -- a DEA

3    diversion investigator, for example,

4    provides instructions to a registrant in

5    its geographic region, does the DEA

6    expect the registrant to follow that

7    instruction?

8          A.    I don't know what the

9    instruction is, but, yeah, I would -- I

10   would think so.

11         Q.    And if a manufacturer asked

12   a question of someone in the DEA field

13   office and -- and they received an

14   answer, would it be fair for that

15   registrant to rely on what the field

16   office said?

17              MR. FINKELSTEIN:  Objection.

18         Vague.

19              THE WITNESS:  Again, I don't

20         know exactly what the question

21         you're asking is, so...

22   BY MR. O'CONNOR:

23         Q.    When someone in the DEA

24   field office tells a registrant

Highly Confidential - Subject to Further Confidentiality Review

1    something, does the DEA expect the

2    registrant to ignore that?

3         A.    No.

4         Q.    The DEA would expect the

5    registrant to -- to comply with the

6    instructions from the field office,

7    correct?

8         A.    Yeah, again I -- I don't

9    know what the issue is that you're

10   talking about, so...

11        Q.    Okay.  Has the DEA ever

12   issued a model suspicious order

13   monitoring policy?

14        A.    No.  We have the regulations

15   and the statute as well as the guidance

16   and the letters.

17        Q.    And when you say the

18   letters, you mean the 2006 and 2007

19   letters?

20        A.    Right.  And -- and the

21   initiatives, if we sat down with you.  It

22   would also be guidance in there as well.

23        Q.    Okay.  Why hasn't the DEA

24   issued a model suspicious order

1    monitoring policy?

2            MR. FINKELSTEIN:

3        Objection --

4            MS. SINGER:  Objection.

5        Beyond the scope.

6            MR. FINKELSTEIN:  Objection.

7        Instruct you not to answer to the

8        extent that your answer calls for

9        internal DEA communications.

10            THE WITNESS:  Could you

11        repeat the question?

12    BY MR. O'CONNOR:

13        Q.    Sure.

14            Why hasn't the DEA issued a

15    model suspicious order monitoring policy?

16        A.    Based on the advice of my

17    attorney, I can't answer that.

18        Q.    Earlier today you mentioned

19    scheduled investigations.  Remind me

20    again what a scheduled investigation is.

21        A.    Schedule investigation

22    are -- it's basically our work -- a

23    diversion investigator's work plan.  So

24    they will be assigned certain registrants

Highly Confidential - Subject to Further Confidentiality Review

1    that we will go out and inspect their

2    facility, their registration.

3         Q.    And is that inspection or

4    visit different from what might be

5    referred to as a DEA audit or are they --

6         A.    They're the same.

7         Q.    The same.  Got it.

8              And during a scheduled

9    investigation or audit, does the DEA

10   review a registrant's written policies?

11        A.    Their protocols?

12        Q.    Yes.

13        A.    Yes.

14        Q.    And if the DEA has concerns

15   about those policies, does it raise those

16   concerns with the registrant?

17             MS. SINGER:  Objection.

18        Calls for speculation.

19             THE WITNESS:  To my -- yes,

20        they do.

21   BY MR. O'CONNOR:

22        Q.    Does DEA make -- make

23   determinations about whether particular

24   orders are suspicious if they are asked

Highly Confidential - Subject to Further Confidentiality Review

1    to by registrants?

2              MR. FINKELSTEIN:  Objection.

3         Vague.

4              THE WITNESS:  I'm not sure I

5         understand.

6    BY MR. O'CONNOR:

7         Q.    If a registrant came to

8    someone at DEA and said, is this

9    particular transaction suspicious, would

10   the DEA, as a matter of policy and

11   procedure, provide them an answer to that

12   question?

13        A.    The statute and the regs

14   require the registrant to identify it as

15   suspicious.  It's not us to do it.

16   It's -- it's incumbent upon the

17   registrant to make that determination.

18        Q.    So --

19        A.    We don't have all the

20   information.

21        Q.    So that scenario, the DEA

22   would refuse to make a determination as

23   to whether the order was suspicious or

24   not, correct?

1              MR. FINKELSTEIN:  Objection.

2       Mischaracterizes.

3              THE WITNESS:  Could you

4       repeat that?

5  BY MR. O'CONNOR:

6       Q.    Sure.

7              So in the scenario, the DEA

8  would refuse to make a determination as

9  to whether a particular order was

10  suspicious or not, correct?

11      A.    Again, it's the registrants

12  that has to make that determination,

13  whether it's suspicious or not.

14             If -- if we're going to make

15  that determination, then investigation

16  has led us down that road that we will --

17  we will -- we will look at all the orders

18  and see if we can determine.

19             But even if we determine,

20  it's still going to be ultimately up to

21  the jury and -- to make the decision.

22      Q.    But if a registrant came to

23  you today and said I am trying to decide

24  whether this order is suspicious, am I

1    correct that the DEA's policy is that the

2    DEA will not provide a yes or no answer

3    to that question?

4              MR. FINKELSTEIN:  Objection.

5         Incomplete hypothetical.  But you

6         can answer.

7              THE WITNESS:  I would be

8         extremely concerned if you as a

9         registrant came to me and asked me

10        to make that determination.

11        Because you are basically telling

12        me that you -- you do not have the

13        ability to effectively -- to

14        maintain effective guards against

15        diversion if you're coming to us

16        with that hypothetical.  Which

17        would be grounds for us to revoke

18        your registration.

19   BY MR. O'CONNOR:

20        Q.    So the DEA -- the DEA's

21   position is that if a registrant comes to

22   the DEA with a question about whether an

23   order is suspicious, that may be grounds

24   to start an investigation of that

1  registrant?

2          MR. FINKELSTEIN:  Objection.

3      Mischaracterizes the witness's

4      testimony.

5          THE WITNESS:  No, that's not

6      what I -- if that's how it --

7      that's not what I said.

8  BY MR. O'CONNOR:

9      Q.    Okay.  So just to be clear,

10 if the DEA receives a question from a

11 registrant regarding a particular order

12 and the registrant wants DEA's input on

13 whether or not it's suspicious, would the

14 DEA answer that question?

15         MS. SINGER:  Objection.

16     Asked and answered.

17         MR. FINKELSTEIN:  Vague.

18     You can answer.

19         THE WITNESS:  I thought I

20     just answered it.

21 BY MR. O'CONNOR:

22     Q.    What is the answer?

23     A.    The answer, is I would be

24 very concerned that if you're coming to

Highly Confidential - Subject to Further Confidentiality Review

1   us to ask us if this is a suspicious

2   order, you no longer have the -- you are

3   no longer maintaining effective --

4        Q.    So --

5        A.    You're not guarding -- you

6   are not guarding against diversion if

7   you're asking us to make that

8   determination of that.

9             If you're asking us to

10  review -- to review your system, that's a

11  different question.  But if you're coming

12  to us, asking us to make the

13  determination, you're pretty much -- to

14  me, you're pretty much telling us, we

15  don't know what we're doing.

16       Q.    What -- what if the

17  registrant made a determination, just

18  asked DEA, did we get it right, would

19  your answer change?

20            MR. FINKELSTEIN:  Objection.

21       Vague.

22            THE WITNESS:  I'm -- these

23       are all hypotheticals.  I don't --

24       I'd have to -- it would be more

1        than just this -- this.  I

2        wouldn't make an assessment based

3        on that.

4   BY MR. O'CONNOR:

5        Q.   So you can't say what your

6   answer -- what the DEA's answer would be

7   in that situation?

8        A.   Well, I mean, we would look

9   into all the different factors.  Again if

10  you're coming to us and asking us if it's

11  a suspicious order, again we would be

12  wondering, do you really have control

13  over what you're doing.

14       Q.   You spoke earlier today

15  about the training DEA diversion

16  investigators receive.  Does that

17  training include instruction on

18  suspicious order monitoring?

19       A.   The training where?

20       Q.   The training that diversion

21  investigators receive?

22       A.   At Quantico, in the basics

23  school or where?

24       Q.   Let me ask you that in a

Highly Confidential - Subject to Further Confidentiality Review

1    different way.  What training do

2    diversion investigators receive with

3    respect to suspicious order monitoring?

4              MR. FINKELSTEIN:  Objection.

5         Scope.

6              You can answer if you know.

7              THE WITNESS:  That would be

8         part of the law and the

9         recordkeeping -- recordkeeping

10        curriculum.  That would be part of

11        that.

12   BY MR. O'CONNOR:

13        Q.    Just to be clear, is it the

14   case that diversion investigators do

15   receive training with respect to

16   suspicious order monitoring?

17        A.    Yes.  Sorry.

18              MR. FINKELSTEIN:  Scope.

19        But...

20              THE WITNESS:  Sorry.

21   BY MR. O'CONNOR:

22        Q.    I'm going to turn back to

23   another topic you spoke about earlier

24   today referred to the distributor

1   initiative.

2           What, in DEA's view, is the

3   distributor initiative?

4      A.    Back in 2005 when we

5   started, that was when we were addressing

6   the internet. So it went from the

7   regional local diversion issues to a more

8   national -- not a more -- I mean it went

9   national.

10          So the distributor

11   initiative was to be able to sit down

12   with the distributors and go over their

13   own data with them to discuss, A, their

14   requirements; B, their duties; and the

15   data that showed abnormalities so that

16   they would have a better understanding of

17   what was going on with the internet.

18      Q.    Was there any manufacturer

19   initiative around the same time?

20      A.    No.

21      Q.    I want to turn to what's

22   already been marked as Exhibit 5. It's

23   the 2007 Rannazzisi letter.

24          Is this letter in front of

1    you the first guidance provided to

2    manufacturers regarding the obligation to

3    monitor suspicious orders?

4          A.    Could I refresh my memory?

5          Q.    Sure.

6                MR. FINKELSTEIN:  There is

7          an index in the front.

8                THE WITNESS:  Yeah.  You

9          said written guidance?

10   BY MR. O'CONNOR:

11         Q.    Yes.  Actually, I apologize.

12   I said the first guidance.

13         A.    First what?

14         Q.    First guidance, not limited

15   to written guidance.

16         A.    I mean, we had seminars

17   earlier that we had talked to them.

18         Q.    And which seminars were

19   those?

20         A.    The one in particular that

21   I'm referring to was the one in San

22   Antonio, Texas, April 7th and 9th of

23   1987.  It says "Seminar Report,

24   Controlled Substance Manufacturers and

1    Wholesale Seminar."

2         Q.    And just for the record,

3    what document are you using to refresh

4    your recollection?

5              MR. FINKELSTEIN:  Don't take

6         it out.

7              THE WITNESS:  Oh.  I mean, I

8         read it to you.  It was "Seminar

9         Report, Controlled Substance

10        Manufacturers and Wholesalers

11        Seminar," San Antonio, Texas,

12        April 7th and 9, 1987.

13   BY MR. O'CONNOR:

14        Q.    Between 1987 and the 2007

15   Rannazzisi letter, did DEA provide

16   manufacturers with any other guidance

17   regarding the obligation to monitor

18   suspicious orders?

19        A.    I mean, there were industry

20   meetings.  I don't know the dates of

21   them, besides that one, that also went

22   over that information.

23              I'm still looking for the

24   2006 letter.

1    Q.    And what were manufacturers

2    told during those industry meetings

3    regarding their obligation to monitor

4    suspicious orders?

5    A.    Again, it was the statute

6    and the regulations.

7    Q.    They were informed of the

8    statute and the regulations?

9    A.    Yeah.

10   Q.    Were they provided any

11   further detail about how to identify a

12   suspicious order during those seminars?

13   A.    I think it was -- it was a

14   reminder of the, you know, the -- being

15   able to identify the order before being

16   consummated as a purchase.

17   Q.    But the DEA didn't provide

18   any further detail about how the

19   manufacturer should go about identifying

20   a suspicious order, correct?

21   A.    That's my understanding.

22   Q.    And when you say it was a

23   reminder of being able to identify the

24   order before being consummated as a

1    purchase, when were manufacturers

2    informed of that?

3           A.    Like I was explaining in

4    this San Antonio document, there's a

5    section on Page 10 called "Excessive

6    Order Monitoring Programs."  And it says,

7    "First, any system must be capable of

8    both detecting individual orders which

9    are suspicious, or orders which are" --

10   become suspicious over a time due to

11   frequency, quantity, or pattern.

12              The national wholesaler -- I

13   forget what the title -- National

14   Wholesale Druggist Association had a

15   system they were pushing.  It says, "The

16   NWDA system, for example, provides an

17   excellent lookback or trend system, but

18   the ability to identify one-time

19   suspicious orders should not be

20   overlooked as an element of a program.

21          Q.    I apologize if I missed it.

22   Where in there did it say that suspicious

23   orders must be reported before they're

24   shipped?

1       A.      Well, that goes back to the

2    statute where it says maintaining

3    effective controls over diversion.

4       Q.      But the statute doesn't say

5    that suspicious orders need to be

6    reported before they're shipped, does it?

7       A.      Not in that specific

8    language.  But it does -- it does

9    indicate that if you're going to have an

10   effective system to detect it, because

11   you're not maintaining -- you're not

12   maintaining the effective -- you're not

13   maintaining effective control against

14   diversion if you're constantly selling

15   product.

16      Q.      But you would agree with

17   me -- go ahead.

18      A.      Sure.  Go ahead.

19      Q.      You would agree with me that

20   the statute itself does not contain the

21   express instruction that a registrant

22   should hold an order and not ship it if

23   it determines it to be suspicious,

24   correct?

1    A.    Correct.

2         Q.    And that explicit

3    instruction is not found in the document

4    you are currently looking at either,

5    correct?

6         A.    Well, it does continue with,

7    "Another area of issue was whether DEA

8    would take action against a registrant

9    which reported an order and then shipped

10   it.  DEA pointed out that the company is

11   still responsible, under the regulations,

12   for acting in the public interest.

13   Requiring the order" -- "Reporting the

14   order does not in any way relieve the

15   firm from the responsibility for the

16   shipment."

17        Q.    Okay.  That does not say

18   that suspicious orders need to be

19   reported before they're shipped, does it?

20        A.    Well, it doesn't say that

21   specifically.  But it says reporting

22   orders does not in any way relieve the

23   firm for the responsibility for the

24   shipment.  So again, it's maintaining

Highly Confidential - Subject to Further Confidentiality Review

1    effective controls against diversion.

2         Q.    Just for the clarity of the

3    record, I think I'd like to mark --

4              MR. O'CONNOR:  Should I mark

5         the whole binder?  Let's go ahead

6         and mark the whole binder.  What

7         are we on?  Eight?  Nine?

8              (Document marked for

9         identification as Exhibit

10        DEA-Prevoznik-9.)

11             MR. FINKELSTEIN:  And just

12        for the record, we are talking

13        about Tab 4 of what's been now

14        marked as Exhibit 9.

15             MR. O'CONNOR:  Thank you.

16   BY MR. O'CONNOR:

17        Q.    Since 2007 and the letter

18   from Joe Rannazzisi, has the DEA provided

19   manufacturers with any further written

20   guidance regarding the obligation to

21   monitor suspicious orders?

22        A.    No.

23        Q.    Is every order that's

24   unusually large -- strike that.

1          Does every order that's

2     unusually large necessarily lead to

3     diversion?

4          A.    I have no idea.

5               MS. SINGER:  Objection.

6          Scope.

7               THE WITNESS:  I have no idea

8          what you mean by unusually large.

9     BY MR. O'CONNOR:

10         Q.    Okay.  As the term

11    "unusually large" is used in the

12    suspicious order monitoring regulation,

13    are orders that are unusually large

14    necessarily diverted?

15         A.    Well, for example, a bottle

16    of 100 Vicodin from a manufacturer to a

17    vet, is that unusually large?

18         Q.    Is it?

19         A.    I don't think it's unusually

20    large, but it would raise my eyebrows of

21    why would -- why would a vet be ordering

22    that bottle when they know that the

23    toxicity to cats and dogs would kill

24    them.  So I don't think you can just look

1    at a number and say that's too big.

2            MR. O'CONNOR:  Whoever is on

3        the phone needs to go on mute.

4            MR. FINKELSTEIN:  Whoever is

5        on the phone please mute your

6        phone.

7    BY MR. O'CONNOR:

8        Q.    Before we get back to my

9    question, I just want to be clear.

10   Are -- are vets required to obtain a DEA

11   registration before they order controlled

12   substances?

13       A.    Yes.

14       Q.    And the DEA issues some

15   veterinarians registrations to allow them

16   to purchase controlled substances?

17       A.    Correct.

18       Q.    Okay.  I do -- I do want to

19   get back to my original question though,

20   which was, is an order that is unusually

21   large, does that order necessarily lead

22   to diversion?

23           MR. FINKELSTEIN:  Objection.

24       Vague.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  It may or

2      may -- it may or may not.

3  BY MR. O'CONNOR:

4      Q.    Would the same be true of an

5  unusually frequent order?

6          MR. FINKELSTEIN:  Same

7      objection.  You can answer.

8          THE WITNESS:  Correct.  It

9      may or may not.

10  BY MR. O'CONNOR:

11      Q.    And the same would be true

12  of an order that deviates substantially

13  from the normal pattern?

14          MR. FINKELSTEIN:  Same

15      objection.  You can answer.

16          THE WITNESS:  Correct.  It

17      may or may not.

18  BY MR. O'CONNOR:

19      Q.    Okay.  And putting that

20  together, that means that not every

21  suspicious order leads to diversion,

22  correct?

23          MR. FINKELSTEIN:  Objection.

24      Scope.  You can answer.

1          THE WITNESS:  Could you

2      please repeat that?

3  BY MR. O'CONNOR:

4      Q.    Not every suspicious order

5  leads to diversion, correct?

6      A.    Correct.

7      Q.    I want to talk a little bit

8  about how suspicious order reports are --

9  are used within DEA.

10          Is it fair to say that most

11  suspicious order reports are submitted to

12  field offices?

13      A.    I would say based on the

14  fact that the big three are filing

15  electronically, I would say the majority

16  electronically.

17      Q.    When an order or when

18  suspicious order reports are filed

19  electronically, does that mean they are

20  filed with headquarters?

21      A.    Yes.  On the Legacy and the

22  vetted system.

23      Q.    Okay.  And do registrants

24  that are not reporting electronically to

1    headquarters, do they report to their

2    field offices as specified in the

3    regulation?

4         A.    Correct.

5         Q.    Who at DEA has access to the

6    SORs available in the Legacy and vetted

7    systems at headquarters?

8         A.    Diversion investigators --

9              MR. FINKELSTEIN:  Hang on.

10             Vague as to time.  You can answer.

11             THE WITNESS:  Diversion

12             investigators.  The ARCOS

13             targeting analysis group, they

14             also have it.  The field

15             investigators have it.  Some of

16             our special agents in tactical

17             diversion squads have acces to it.

18             But primarily it's the

19             diversion investigators that have

20             it.

21   BY MR. O'CONNOR:

22        Q.    When you say diversion

23   investigators, do you mean the diversion

24   investigators in the field offices?

1    A.    Correct.

2    Q.    Had they always had access

3  to the electronic Legacy and vetted

4  systems at DEA?

5    A.    The vetted system started in

6  2017.  So they've had access to that.

7      Previous to that they've not

8  always had access to it.

9    Q.    So before 2017, diversion

10  investigators in the field didn't have

11  access to the centrally stored suspicious

12  order reports at DEA headquarters?

13      MR. FINKELSTEIN:  Objection.

14    Mischaracterizes.

15      THE WITNESS:  They -- they

16    would get quarterly reports sent

17    out from the -- from headquarters

18    to the field.  Like that.

19  BY MR. O'CONNOR:

20    Q.    So before 2017, the

21  diversion investigators in the field

22  would receive reports of the SORs that

23  were submitted once a quarter.  Do I have

24  that right?

 1              MR. FINKELSTEIN:  Objection.

 2         Mischaracterizes.

 3              THE WITNESS:  It would be --

 4         it would be like on a quarterly

 5         basis they would get it.

 6    BY MR. O'CONNOR:

 7         Q.    Okay.

 8         A.    But that wasn't all the

 9    time.

10         Q.    Okay.  So just so the record

11    is clear, how often would the diversion

12    investigators in the field receive

13    suspicious order reports from

14    headquarters before 2017?

15              MS. SINGER:  Objection.

16         Asked and answered.

17              THE WITNESS:  It varied over

18         a certain period of time.  But it

19         was -- when they did get it, it

20         was on a quarterly basis.

21    BY MR. O'CONNOR:

22         Q.    And those were the -- of the

23    suspicious orders that were reported in

24    the prior quarter?

1    A.    No.  It's the -- it's

2  everything has been reported.

3    Q.    Everything that's been

4  reported over the past three months,

5  correct?

6    A.    No.  It's been reported for

7  the year.

8    Q.    Okay.  So once a quarter the

9  DIs would receive suspicious orders that

10  had been reported prior to that date?

11    A.    So, there were periods where

12  they would get a quarterly report.  So it

13  would be either FY first quarter of

14  whatever year.  Then it would be the

15  second quarter.  Then it would be the

16  third quarter.  But that varied in some

17  years.

18    Q.    I want to talk about the

19  reports that were submitted directly to

20  field offices.

21          The report -- the suspicious

22  order report is submitted to the field

23  office.  Is it necessarily sent up to

24  headquarters?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     From the field?

2      Q.     Yeah.

3      A.     No.

4      Q.     Are those reports sent to

5   other field offices?

6      A.     They would -- they would

7   send it to the AOR that that registrant

8   was being reported as a suspicious -- if

9   it wasn't in their AOR, which is the area

10  of responsibility, it would be sent to

11  that other office.

12     Q.     Okay.  Got it.  So if a

13  report was sent to the field office in

14  New York that report would not be sent to

15  a field office in Florida, correct?

16     A.     So the man -- the -- I'm

17  sorry, the manufacturer in New York is

18  reporting to the New York office?

19     Q.     Correct.

20     A.     The New York office would

21  be -- send the Florida -- the SORs that

22  are identified to down to the Florida

23  office, whichever office it is.  So it's

24  Miami, West Palm, Tampa.

1    MR. FINKELSTEIN:  Counsel,

2    can I ask for a comfort break

3    pretty soon?

4    MR. O'CONNOR:  Sure.  We can

5    take one now.

6    MR. FINKELSTEIN:  Okay.

7    Thank you.

8    THE VIDEOGRAPHER:  4:00 p.m.

9    We are off the video record.

10    (Short break.)

11    THE VIDEOGRAPHER:  4:17.  We

12    are on video record.

13    BY MR. O'CONNOR:

14    Q.    Welcome back.  Before the

15    break you had mentioned that the field

16    offices receive quarterly reports of the

17    suspicious order reports that are

18    submitted to headquarters.  Do I have

19    that --

20    A.    The Legacy.

21    Q.    -- right?

22    Was there ever any time when

23    the field offices did not receive those

24    reports from headquarters?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    There were periods where

2  they did not.

3    Q.    Okay.  What were those

4  periods?

5    A.    It was when Kyle Wright was

6  in charge of that unit.

7    Q.    Okay.  Do you remember

8  approximately when that was?

9    A.    I don't -- I don't know the

10  years.

11    Q.    But during the years while

12  Kyle Wright was there, the suspicious

13  order reports that were submitted to

14  headquarters were not sent out to the

15  field offices?

16    A.    No.  There would be -- they

17  would go out sporadically, quarterly, so

18  you could have a period where they

19  weren't sent out, and you would have a

20  period where they were sent out.

21    Q.    Okay.  But they did not go

22  out quarterly?

23    A.    Typically when they went

24  out, they went out quarterly when they

Highly Confidential - Subject to Further Confidentiality Review

1   did go out.  When they didn't go out, it

2   would be the next, you know, whatever,

3   that Kyle sent out.

4        Q.   Okay.  So fair to say that

5   there were longer periods, six months or

6   a year where the reports didn't go out?

7        A.   I -- I don't recall if it

8   was that long.  But there were periods

9   where they did not go out.

10       Q.   All right.  I'd like to go

11   back to Exhibit 4, which you should still

12   have a copy of.

13       A.   Which one is that?

14       Q.   Exhibit 4.

15       A.   Got it.

16       Q.   And do you recognize this

17   document?

18       A.   Yes.

19       Q.   What -- what is it?

20       A.   It's the report to the U.S.

21   Attorney General regarding the suspicious

22   orders task force under the Comprehensive

23   Methamphetamine -- Methamphetamine

24   Control Act of 1996.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  I'm going to direct

2   your attention to the page that ends in

3   2212.  It's towards the beginning.

4        A.    I'm sorry.  What was the

5   last number?

6        Q.    2212.

7        A.    Okay.

8        Q.    And specifically, the first

9   full paragraph that begins, "The task

10  force concluded that a single listing of

11  meaningful numerical parameters would be

12  difficult for the majority of registrants

13  which do not have highly automated

14  computer systems" -- "computer ordering

15  and tracking systems, the indicators

16  contained in Appendix A" -- exhibit --

17  and it's hard to read -- "represent

18  expanded guidance to be considered."

19             Then it continues.  "For

20  the" -- "For the segments of industry who

21  have highly automated ordering and

22  tracking systems, the task force

23  recommends a system which starts with

24  quantifiable parameters which track
```

Highly Confidential - Subject to Further Confidentiality Review

1    frequency of orders, deviation from prior

2    orders, and size of orders.  See Appendix

3    A, Exhibit 2."

4              When this document talks

5    about recommending a system, they are

6    talking about a suspicious order

7    monitoring system, correct?

8         A.    Right.  For chemicals, List

9    1 chemicals.

10        Q.    Okay.  But it is a

11   suspicious order monitoring system,

12   agree?

13        A.    Yes.

14        Q.    Okay.  And it says, "See

15   Exhibit" -- I'm sorry.  Strike that.

16             It says, "See Appendix A,

17   Exhibit 2."

18             Let's turn there.

19        A.    Okay.

20        Q.    And I can tell you the

21   number at the bottom ends in 2247.

22        A.    Okay.  2247?

23        Q.    2247.

24        A.    Okay.

1    Q.    So that sentence referring

2    to suspicious order monitoring refers to

3    this exhibit.

4         Could you please read the

5    first five lines starting with,

6    "Exhibit 2."

7    A.    Under terms and definition

8    or above?

9    Q.    Above.

10    A.    "Suspicious order reporting

11    system of 1998 for use in automated

12    tracking systems.  The current

13    calculation being used for List 1

14    chemicals and Schedule II through V

15    controlled substances."

16    Q.    Okay.  So according to that

17    title, the calculation that's discussed

18    in this exhibit is being used for

19    Schedule II through V controlled

20    substances, correct?

21         MR. FARRELL:  Objection.

22         THE WITNESS:  That's what it

23    says.  Yes, that's what it says.

24    BY MR. O'CONNOR:

1    Q.    And looking down to Number

2  4, where it says "Note:"  Could you

3  please read that sentence?

4    A.    "Note:  Factor equals 3 for

5  C-II and C-III controlled substances

6  containing List 1 chemicals and eight for

7  C-III and V" -- I don't know what --

8  "controlled substances and noncontrolled

9  OTC product containing List 1 chemical

10  items."

11    Q.    So this document again is

12  discussing controlled substances, not

13  just list chemicals, correct?

14    MR. FARRELL:  Objection.

15  Misstates.  Foundation.

16  BY MR. O'CONNOR:

17    Q.    You can answer the question.

18    A.    Yes.  It's talking about

19  both.  It's listed -- controlled

20  substances with listed chemical,

21  controlled substances and noncontrolled.

22    Q.    Okay.  Take a look at Item

23  5.  Could you please read that paragraph.

24    A.    Sure.  "At the end of each

1    month, a report will be transmitted to

2    DEA, separate reports for List 1

3    chemicals and Schedules II through V

4    controlled substances.  Of all purchases

5    of List 1 chemicals and/or C-II through V

6    controlled substances and

7    List-1-containing OTC items by any

8    customers, any customer whose purchase

9    quantities exceed the parameters above,

10   any two consecutive months or in three,

11   if any, moving six-month period."

12          Q.    So this document, labeled

13   Exhibit 2 to the suspicious order task

14   force report is discussing a system that

15   pertains to controlled substances,

16   correct?

17          A.    Yes.  That's what it's

18   talking about.

19          Q.    Okay.  You can put that

20   aside.  Mr. Prevoznik have you heard the

21   term "know your customers' customers"

22   before?

23          A.    Yes.

24          Q.    When was the first time you

1   heard that term?

2          A.    It had to do with the

3   Mallinckrodt investigation.

4          Q.    Okay.  Do you remember

5   approximately what year you heard the

6   term?

7          A.    It was, I believe -- can I

8   look at my report?

9          Q.    Sure.

10          A.    Actually I have to correct

11   myself.  It was actually during the

12   briefing with Mallinckrodt when we met

13   with them back in 2011.

14          Q.    Okay.  And before that

15   briefing in 2011, you had not heard the

16   term "know your customers' customer"

17   before, correct?

18          A.    Yes, correct.

19          Q.    What do you understand know

20   your customers' customer to mean?

21          A.    So what I -- what I know it

22   to mean is that you have who your

23   customer is that you sell to, but you

24   have information regarding customers that

1    they're selling to.  Selling or filling

2    prescriptions to.  So it's any

3    information, data, could be newspaper

4    articles.  It could be whatever, that if

5    you have data that shows that additional

6    customer, that's what that is.  So that

7    would be knowing your customers'

8    customer.

9         Q.    So it means knowing about

10   the customers who are purchasing product

11   from your customers; is that fair?

12        A.    It would be who you're

13   selling to, and then their customers.

14        Q.    Does the DEA have a position

15   as to whether manufacturers are obligated

16   to know their customers' customers?

17        A.    The statute requires to

18   maintain safe -- effective controls over

19   diversion.  And 1301.71, right here --

20   sorry.  1301.71(a), just the first

21   sentence, "All applicants and registrants

22   shall provide effective controls and

23   procedures to guard against theft and

24   diversion of controlled substances."

Highly Confidential - Subject to Further Confidentiality Review

1   Q.    But neither the statute nor

2   the regulation says explicitly that

3   manufacturers need to know their

4   customers' customers, do they?

5   A.    It does not say that

6   explicitly.  But it does say that you

7   need to guard against diversion.

8   Q.    Has the DEA ever provided

9   guidance to the industry in writing

10  informing registrants that they are to

11  know their customers' customers?

12  A.    Not that I'm aware of.

13  Q.    Has DEA provided any other

14  kind of guidance, besides written

15  guidance, informing manufacturers of any

16  duty to know their customers' customers?

17  A.    Well, again it comes down to

18  what information you have.  So if you

19  have that information, you have the duty

20  to protect and guard against the

21  diversion.

22  So if you have that

23  information, you're to guard against

24  diversion of controlled substances.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But to my question, has the

2    DEA ever provided any kind of guidance to

3    manufacturers informing them that they

4    were to know their customers' customer?

5    A.    No, not to my knowledge.

6    Q.    Okay.  Let's talk for a

7    minute about ARCOS.

8          Generally speaking, what

9    sorts of information does ARCOS contain?

10   A.    ARCOS contains the

11   manufacturers and distributors that are

12   to report all transactions for

13   Schedule I, Schedule II, Schedule III

14   narcotics, and GHB, and manufacturers

15   also have reported -- additional

16   reporting requirements for some

17   psychotropics.

18   Q.    Okay.  Would ARCOS contain

19   all of the distributions of prescription

20   opioids by manufacturers to distributors?

21   A.    So the transactions for

22   manufacture -- yes, manufacturer to a

23   distributor?  Yes.

24   Q.    Would ARCOS contain all the

Highly Confidential - Subject to Further Confidentiality Review

1   distributions of prescription opioids

2   from distributors to pharmacies or other

3   retail outlets?

4        A.    For those items, yes.

5        Q.    Does ARCOS data provide any

6   details about those transactions, like

7   the amount, the recipients --

8        A.    Yes, it tracks the quantity.

9   It has the DEA number of the registrant

10  that -- whether it's a sale.  It could be

11  a sale, it could be a purchase.  It could

12  be a disposition of, you know, getting

13  wasted.  Any transaction that -- that

14  could fall within the system that --

15  that's trackable, that would be in there,

16  for those items.

17       Q.    Okay.  Through ARCOS, can

18  DEA see the type of medication that's

19  being purchased?

20       A.    Well, it's in there by NDC

21  number.

22       Q.    Okay.  And the NDC number

23  would -- would allow the DEA to determine

24  which product we are talking about?

1       A.      Correct.

2       Q.      So whether that was a -- the

3  DEA would know whether it was a oxycodone

4  5-milligram tablet, for example?

5       A.      Correct.

6       Q.      That level of detail?

7       A.      Yes.

8       Q.      Okay.  And the DEA receives

9  that information for each tablet that the

10  manufacturers sell to distributors,

11  correct?

12       A.      Each tablet?

13       Q.      Yes.

14       A.      It's by bottle size, because

15  NDC code also has the bottle size within

16  it.

17       Q.      Got it.  So -- so the DEA

18  can see each and every bottle that's

19  shipped between a manufacturer and a

20  distributor?

21       A.      As long as that's what they

22  are reporting, yes.

23       Q.      Okay.  And through ARCOS,

24  DEA can also see each and every bottle of

Highly Confidential - Subject to Further Confidentiality Review

1  opioids that's transmitted from a

2  manufacturer -- I'm sorry.  Strike that.

3           And through ARCOS, DEA can

4  see each and every bottle of opioids

5  that's transferred from a distributor to

6  a pharmacy for example, correct?

7      A.    Correct.

8      Q.    And they'll know the

9  location of that pharmacy?

10     A.    Correct.

11     Q.    Do they have the address for

12 the pharmacy?

13     A.    Yes.  It's linked to the DEA

14 registration.

15     Q.    Okay.  So through ARCOS, the

16 DEA has precise information about how

17 much of certain products is being shipped

18 to which geographic areas, correct?

19     A.    Correct.

20           Could I get a clarification

21 on what time frame you're talking about?

22     Q.    Sure.  So I would say 1996

23 to the present.  Does the answer change

24 at all during that time period?

1      A.    Well, I just -- as I

2   explained earlier this morning, that when

3   it was on the mainframe, there was a

4   delay of -- of reporting.  We were

5   limited to a million transactions a

6   night.  It could only be one at night.

7      Q.    Okay.

8      A.    So --

9      Q.    So remind me during which

10  period the mainframe was causing this

11  issue?

12      A.    I mean, that's how it's been

13  since it started -- well, it started on

14  paper.  So we had -- we still have people

15  that -- we still have registrants that

16  are reporting in paper to us.

17              And then it went to magnetic

18  tapes.  And it went to discs, and

19  spreadsheets.  We've slowly evolved into

20  joining the technology world so that now

21  we have ARCOS online.  We have EDI which

22  went into effect in 2004 which took the

23  magnetic tapes out.

24              But again, went on -- when

1    we were on the mainframe, we were limited

2    to only be able to download at night.

3    And the cutoff was a million

4    transactions.  That's just the way the

5    system worked.

6           Q.    Okay.  You mentioned that

7    caused some delays?

8           A.    It wouldn't -- you -- it

9    would -- you know, I mean you are talking

10   millions and millions of transactions,

11   either monthly or on a quarterly basis.

12   So it's going to take us a while to

13   process it, do -- do the Q&A on it.  If

14   there's errors, we have to reach back out

15   to the registrant, say here, you need to

16   fix your errors.  So then, those errors

17   wouldn't get fixed until the next time

18   they reported.  So yes, there was a

19   delay.

20          Q.    How much of a delay are we

21   talking about?

22          A.    It depended.  It depended if

23   the registrant fixed the errors.  Was it

24   monthly, quarterly.  If they didn't fix

1  it, you'd have to go back out to them,

2  say did you fix it.

3         Q.    With respect to the delays

4  caused by the mainframe's processing

5  limitations, did that delay things by

6  days, weeks?

7         A.    Oh no, you're talking

8  months.

9         Q.    Months.  Okay.  And once

10 that information was processed what

11 happened to it?

12        A.    What do you -- what do you

13 mean --

14               MR. FINKELSTEIN:  Objection.

15        Vague.

16               THE WITNESS:  What do you

17        mean by what happened to it?

18 BY MR. O'CONNOR:

19        Q.    What would DEA do with the

20 information once it was done processing

21 through the mainframe?

22        A.    Like I -- like I said

23 earlier this morning, it's used for UN

24 reporting.  It's used for quotas.  It's

1    used for law enforcement.  It's used for

2    regulatory -- when you work with state

3    regulatory boards, you share information

4    with them.  If we're working on cases

5    regarding the diversion of controlled

6    substances.  We use it for trending.

7              It's used for -- researchers

8    often use a lot of the data.  They use

9    the reports that are -- the summary

10   reports that we post online.

11             We use it to corroborate

12   investigations.  We use it to -- for

13   targeting, like oh here is -- here is a

14   potential target.  We use it in a variety

15   of different ways.

16        Q.   Did the delays you spoke of

17   give the DEA any concern about its

18   ability to use that data effectively to

19   discharge its obligations?

20             MR. FINKELSTEIN:  Objection.

21        Vague.

22             THE WITNESS:  Well, you're

23        saying excessive purchases so that

24        was even -- that was more

1          up-to-date for us.  So we looked

2          at that.  That's why we went

3          through that stuff.

4   BY MR. O'CONNOR:

5          Q.    But did the delays give you

6   any concern about DEA's ability to do its

7   job?

8              MR. FINKELSTEIN:  Objection.

9          Vague.

10             THE WITNESS:  No.  We -- we

11         do our job.

12  BY MR. O'CONNOR:

13         Q.    Okay.  Getting back to the

14  analysis of the ARCOS data.  Is there a

15  particular unit within DEA that's charged

16  with analyzing ARCOS data?

17         A.    So there's actually two

18  units.  There's the input side.  They

19  actually deal with the down -- you know,

20  upload from the registrants so there's

21  constant communication with them whether

22  regarding errors or, you know, trying to

23  fix some of the data that was submitted.

24             We don't change the data.

Highly Confidential - Subject to Further Confidentiality Review

1   It's always the registrant has -- changes

2   the data.  We don't -- we don't change

3   it.

4            And then the output side

5   would be the targeting group.  So there's

6   QCs on the input side and there's also

7   QCs on the out -- output side.

8        Q.    With respect to the

9   targeting group, what sort of analysis

10  does it perform on the ARCOS data?

11       A.    Trends.  They support case

12  investigations, doing charts, graphs.

13  They'll -- they can show the comparison

14  of what the national average is, what the

15  state average and compare that with the

16  registrant itself.

17       Q.    And they can see that

18  information for -- for every registrant?

19       A.    Well, if it's an ARCOS

20  reportable item.  You don't see

21  everything -- all you see is the ARCOS

22  reportable stuff.  You don't see

23  non-ARCOS stuff.

24       Q.    But the sort of trends

1    analysis you're talking about, they have

2    the ability to -- to look at data from

3    every registrant that makes ARCOS

4    reports, correct?

5         A.    The only thing -- if they

6    make it an ARCOS report, correct.

7         Q.    What was the purpose of that

8    unit doing those kinds of trend analyses,

9    for example?

10        A.    Well, case support, when we

11   do presentations, whether it's part of

12   the distributor initiative, when we sit

13   down with the companies' own data, they

14   pull the data and put it in charts and

15   show us and provide all those graphs for

16   us.  We use them in our presentations

17   when we were talking to the registrant

18   community, whether it's at a distributor

19   conference or if it's when we're, you

20   know, meeting with the manufacturers,

21   going over quotas and ARCOS with them,

22   we'll show them graphs and stuff from

23   that.

24              We also -- I mean, case

1    specifically we'll do whatever the

2    attorney or the investigators need for

3    their case to support it.

4         Q.    Does the DEA use ARCOS data

5    to generate leads for investigations?

6         A.    It can be.

7         Q.    Without getting into any

8    details, can you think of occasions where

9    an analysis of ARCOS data led the DEA to

10   initiate an investigation?

11              MR. FINKELSTEIN:  Don't talk

12        about any non-public ones.

13              THE WITNESS:  So I could say

14        yes.

15   BY MR. O'CONNOR:

16        Q.    Okay.  Fair enough.  And

17   roughly how many people within DEA are

18   involved in the type of analysis of ARCOS

19   data that you were just talking about?

20        A.    So right now on the input

21   side we have four program analysts.  And

22   then on the output side, we have six.

23        Q.    Okay.  And the six people on

24   the output side, is dealing with the

Highly Confidential - Subject to Further Confidentiality Review

1    ARCOS data their full-time job?

2         A.    Yes.

3         Q.    Okay.  Do they receive any

4    sort of training before taking on the

5    role of analyzing ARCOS data?

6              MR. FINKELSTEIN:  Objection.

7         Scope.

8              THE WITNESS:  Yes.

9    BY MR. O'CONNOR:

10        Q.    And in your view, are they

11   fully qualified to be effectively

12   analyzing ARCOS data?

13             MR. FINKELSTEIN:  Objection.

14        Scope.  You can answer.

15             THE WITNESS:  Yes.

16   BY MR. O'CONNOR:

17        Q.    Okay.  Changing gears a

18   little bit, have you ever heard of the

19   term "chargeback"?

20        A.    Yes.

21        Q.    When did you first hear that

22   term?

23        A.    Through credit cards and

24   stuff like that, chargeback.

1    Q.    Okay.  Did you -- when did

2    you first hear the term chargeback in

3    connection with pharmaceuticals?

4              MR. FINKELSTEIN:  Hang on.

5         Are you asking him in his personal

6         capacity?

7              MR. O'CONNOR:  I'm asking

8         him as DEA.

9              MR. FINKELSTEIN:  When was

10        the DEA first aware of chargeback?

11             THE WITNESS:  I don't know.

12        I don't know.

13   BY MR. O'CONNOR:

14   Q.    How about in your personal

15   capacity?

16   A.    Well, all right, I don't

17   know if this -- because I can answer

18   both.

19   Q.    Okay.

20   A.    But I don't know that that's

21   the initial stage in which we learned

22   about chargeback data.  But there was a

23   point in the early 2000s where we were

24   using ChoicePoint which is some of us --

1    it was ChoicePoint or SearchPoint.  So

2    that was data that was being sold from

3    pharmacies.

4         Q.    So what is ChoicePoint data?

5         A.    So it would be pharmacy data

6    that the pharmacists was selling through

7    this company and then we tried -- we had

8    a contract with them.  We were -- we were

9    told that we were going to be able to see

10   a certain percentage of the prescriptions

11   that were filled, controlled substances

12   that was going to be filled.

13              We never, ever saw what they

14   promised.  So that contract did not last

15   very long.  I would say maybe three

16   years.

17        Q.    Was SourcePoint different

18   from ChoicePoint?

19        A.    No.  I think they were the

20   same company, but it was the same.

21        Q.    And when you indicate that

22   they didn't provide what you thought they

23   would, what was missing?

24              MR. FINKELSTEIN:  We're well

Highly Confidential - Subject to Further Confidentiality Review

1          outside the scope.

2                  But you can answer if you

3          know.

4                  THE WITNESS:  They were

5          telling us that we would see a

6          certain percentage of what was

7          being done out there.  And it was

8          pretty quick that we saw we were

9          not getting what they said.

10     BY MR. O'CONNOR:

11          Q.    To your knowledge, did

12     these -- did the ChoicePoint data involve

13     chargebacks at all?

14          A.    I just understood it as they

15     were getting the -- the pharmacies were

16     selling the data to them to...

17          Q.    Okay.  What is the DEA's

18     understanding of a chargeback?

19          A.    Well, my understanding of it

20     is that you're getting -- the customer is

21     getting a discount price.  And in

22     exchange for that discount price you're

23     getting data back from that customer.  So

24     your customer's customers --

1    Q.    Okay.  What is that data --

2    A.    I'm sorry.  Customer's

3    customer.

4    Q.    Your customer's customer.

5    A.    Right.

6    Q.    So what role, if any, do

7    chargebacks play in suspicious order

8    monitoring?

9    A.    Well, I think it goes

10   directly back to maintaining effective

11   controls over diversion.  So if you know

12   your customer's customer is doing

13   something wrong, then you have the

14   obligation and the requirement to keep

15   effective controls over controlled

16   substances.

17          So it's not to be diverted.

18   So if you know that, that it's not for

19   legitimate medical purpose, then you know

20   that, and that's -- you have to take the

21   steps to do that.

22   Q.    How does a manufacturer tell

23   if its customer's customer is doing

24   something wrong?

Highly Confidential - Subject to Further Confidentiality Review

1  MR. FINKELSTEIN:  Objection.

2  Vague.  Calls for speculation.

3  THE WITNESS:  Could you

4  repeat it, please.

5  BY MR. O'CONNOR:

6  Q.  Yeah.  How does a

7  manufacturer tell if a customer is, in

8  your words, doing something wrong?

9  I'm sorry.  Strike -- strike

10  that.

11  How does a manufacturer tell

12  if its customer's customer is, in your

13  words, doing something wrong?

14  A.  Well, as I had mentioned

15  earlier, the one investigation that we

16  did, it was -- that registrant told us,

17  we can see exactly where our stuff is

18  going, not just to the distributor.  We

19  can see where it's going down into the

20  pharmacy area, to the pharmacies.  And it

21  went into a state where it was less than

22  6 percent of the population at 60 percent

23  of the product that they made.  Oxy 30s

24  was all going into that state.  So that's

1   a little hard to...

2        Q.    And to be clear, how would

3   the manufacturer know that a particular

4   customer's customer was doing something

5   wrong?

6        A.    Well, I mean they sold it --

7   they sold the data that showed who was

8   filling the prescriptions, you know,

9   which doctor was prescribing, they would

10  show that.  So if you see, it's just one

11  group of -- one pain clinic of one

12  doctor, whether it's at the pharmacy or

13  in Florida where it was the physicians

14  themselves, you would know that there's a

15  problem.

16       Q.    When you say they sold the

17  data who showed who was filling the

18  prescriptions, who is "they"?

19       A.    So the discount price.  So

20  they're offered the discount price.  But

21  they had to get data to them in order to

22  get the discount price.  If they didn't

23  get the discount price -- if they didn't

24  get the data, then they didn't get the

1    discount price, so your customer would be

2    cut off, because the customer didn't want

3    to do that.

4         Q.   So I'm a little bit

5    confused.

6              So if -- who sold the data

7    to whom in this scenario?

8              MR. FINKELSTEIN:  Objection.

9         Mischaracterizes.

10             THE WITNESS:  I cannot -- I

11        would like to refer, to refresh my

12        memory.

13   BY MR. O'CONNOR:

14        Q.   Okay.  And you're referring

15   to the binder that's marked as Exhibit 9?

16        A.   Yes, yes.  And in

17   particular --

18             MR. FINKELSTEIN:  Either Tab

19        11 or Tab 12.

20             THE WITNESS:  Tab 11.

21        Mallinckrodt distributor briefing.

22        This was a briefing held at DEA

23        headquarters on August 23rd, 2011.

24             Page 2.  Do you have it?

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. O'CONNOR:

2         Q.    Yeah.

3         A.    It says, "Ms. Duft explained

4    the cash-back system which allows

5    Mallinckrodt to view who their customers

6    are selling to and to what products they

7    are selling.  Ms. Duft stated

8    Mallinckrodt has been reviewing this

9    system since last fall, though it's been

10   available to them for several years."  So

11   they've had -- they've had the data for a

12   few years.

13        Q.    At any point before that

14   time, had anyone at DEA ever told a

15   manufacturer that it should review

16   chargeback data?

17             MR. FINKELSTEIN:  Objection

18        to the scope.

19             Industrywide guidance was

20        the authorization, but you can

21        answer if you know.

22             THE WITNESS:  I don't know.

23   BY MR. O'CONNOR:

24        Q.    Just to be clear, at any

1    point before that time, had the DEA ever

2    issued any industrywide guidance

3    indicating that manufacturers should

4    review chargeback data?

5         A.    Not to my knowledge.

6         Q.    Earlier you mentioned

7    something about prescription data.

8    Chargeback data doesn't involve

9    prescription data, does it?

10        A.    It depends what data -- for

11   SearchPoint and ChoicePoint data that the

12   pharmacies were selling to it.

13        Q.    But SearchPoint data was not

14   chargeback data, correct?

15             MR. FINKELSTEIN:  Scope.

16             THE WITNESS:  It was an

17        exchange of money for their data,

18        so...

19   BY MR. O'CONNOR:

20        Q.    Is DEA aware of whether

21   chargeback data provides information on

22   every sale of the Schedule I and II

23   opioids?

24             MS. SINGER:  Objection.

1        Scope.

2            MR. FINKELSTEIN:  Scope.

3            THE WITNESS:  Schedule I?

4    BY MR. O'CONNOR:

5        Q.    Schedule II and III.

6        A.    I -- could you repeat the

7    question?

8        Q.    Yeah.  Sure.  I'm sorry, I

9    did say Schedule I.  Strike that.  I'll

10   ask a new question.

11            Is the DEA aware whether

12   chargeback data provides information on

13   every sale of Schedule II and

14   Schedule III opioids?

15       A.    I don't know that.

16       Q.    Is DEA aware whether

17   chargeback data provides information

18   regarding every sale?

19            MR. FINKELSTEIN:  Scope.  If

20       we don't get to something that's

21       within his authorization pretty

22       quick, I'm going to start

23       instructing him not to answer.

24            But you can answer that

1        question.

2                THE WITNESS:  I don't know.

3    BY MR. O'CONNOR:

4        Q.    So let me get to the -- let

5    me get to the scope issue.

6                Does -- does DEA believe

7    that reviewing chargeback data is part of

8    the purported obligation to know one's

9    customer's customer?

10       A.    DEA believes that if you

11   have the data and it shows it, then you

12   need to take effective means to stop

13   diversion.

14       Q.    When you say shows it,

15   what -- what do you mean exactly?

16       A.    Well, if it -- if it's an

17   indicator that -- that things may be

18   diverted out of the legitimate channels

19   into the illicit market, then you should

20   be report -- reporting that as

21   suspicious.

22       Q.    In the context of chargeback

23   data, what's an indicator that things may

24   be diverted?

1    A.    It depends what date --

2    what's in the dataset that you have.  We

3    don't see everything that's in there.  So

4    I -- you -- you have the data, so...

5    Q.    DEA analyzes ARCOS data,

6    correct?

7    A.    Correct.

8    Q.    And ARCOS data has all

9    transactions of certain substances,

10   correct?

11   A.    For the ARCOS reportable

12   data, yes.  It does not have all the

13   non-ARCOS reportable stuff.  So if your

14   chargeback data includes other

15   information in there such as the trinity

16   or the holy trinity of the cocktails that

17   are out there, and that information that

18   you have shows that, that is -- that is

19   not taking effective control safeguarding

20   from diversion.

21   Q.    Well, what do you mean by

22   "the holy trinity"?

23   A.    So the holy trinity, the

24   cocktail of that is oxycodone, an

Highly Confidential - Subject to Further Confidentiality Review

1    oxycodone product, a benzo, and a muscle

2    relaxer.

3        Q.    Okay.  Outside of the

4    example that chargeback data might

5    indicate that combination, are there any

6    other indicators in chargeback data that

7    might suggest diversion?

8            MR. FINKELSTEIN:  Objection.

9        Scope.

10           THE WITNESS:  Again, I'm not

11       sure exactly what data you're

12       looking for.  But you might see

13       within that data somebody

14       self-prescribing.  You may see a

15       prescriber that's prescribing to

16       family members.

17   BY MR. O'CONNOR:

18       Q.    And when you say prescribing

19   to family members, that would be based on

20   looking at the prescription?

21       A.    No.  As I started with my

22   statement, I don't know exactly what data

23   you are looking for, but if that data is

24   in there, those are some of the things

Highly Confidential - Subject to Further Confidentiality Review

1    that I would be looking for.  I would be

2    looking for somebody that's

3    self-prescribing, prescribing for family

4    members.  Those are -- those are

5    indicators or red flags of potential

6    diversion.

7         Q.    Outside of self-prescribing,

8    are there any other factors in DEA's view

9    that would -- would suggest diversion

10   when examining chargeback data?

11            MR. FINKELSTEIN:  Objection.

12        Scope.

13            This is the last one outside

14        the authorization I'm going to

15        allow.

16            MR. O'CONNOR:  Well, to --

17        to be clear, he testified that

18        this was part -- reviewing

19        chargeback data was part of the

20        purported obligation to know your

21        customers' customer.  The

22        authorization clearly allows

23        questioning around the know your

24        customers' customer obligation.

1    BY MR. O'CONNOR:

2         Q.    Do you need the question

3    back?

4         A.    No.

5              Another example would be --

6    again, I don't know exactly what the data

7    that you have.  But if the data in there

8    is showing people driving long distances

9    from Kentucky and New Jersey and

10   Tennessee, and coming down to Florida,

11   that's -- to see their doctor to fill the

12   prescription there.

13             You could also see where the

14   prescriber -- I mean, again, I don't know

15   what data you are exactly looking at, but

16   if you had data that shows how the

17   distance between a prescriber and a

18   pharmacy -- this is the only pharmacy

19   within 200 miles that's filling at, all

20   indicators of diversion.

21        Q.    Okay.  As you sit here

22   today, are there any others that you can

23   think of that you haven't mentioned so

24   far?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    If it was fresh in the

 2   morning, I could probably keep going.

 3          Q.    But as you sit here now?

 4          A.    Not right now.

 5              MR. FINKELSTEIN:  Speaking

 6          of which, if we could take our

 7          last break pretty soon?

 8              MR. O'CONNOR:  Sure.  We can

 9          take a break.

10              MR. FINKELSTEIN:  Can we

11          make it quick?

12              MR. O'CONNOR:  Certainly

13          try.

14              THE VIDEOGRAPHER:  4:58.  We

15          are off the video record.

16              (Short break.)

17              THE VIDEOGRAPHER:  5:11.  We

18          are on video record.

19   BY MR. O'CONNOR:

20          Q.    All right.  Welcome back.

21   We're almost done for the day anyway.

22              Before we broke, you had

23   mentioned information related to patients

24   driving for example, to -- to get
```

1    medications.  In connection with whatever

2    DEA views as manufacturer's obligation to

3    know their customers' customers or report

4    suspicious orders, how is a manufacturer

5    supposed to know if a patient is driving

6    long distances to fill a prescription?

7          A.    I think what I had said was

8    depending on the information that you

9    have from the chargeback data, if that

10   information is in there, that would be

11   indicative of diversion.

12         Q.    Okay.

13         A.    So you would see where the

14   patient came from.

15         Q.    Okay.  Does -- does the DEA

16   know whether that information is

17   contained in chargeback data?

18         A.    Well, that's why I

19   quantified my comment based on, if you

20   have that data in there, that would be

21   indicative of it.

22         Q.    Is the DEA aware of whether

23   chargeback data includes completed sales

24   versus open orders?

1             MR. FINKELSTEIN:  Scope.

2             THE WITNESS:  From --

3        from -- open orders where?

4   BY MR. O'CONNOR:

5        Q.    Do you know if chargeback

6   data is retrospective versus prospective?

7             MR. FINKELSTEIN:  Scope.

8             THE WITNESS:  I don't know.

9   BY MR. O'CONNOR:

10       Q.    Backing up a bit.  In the

11  DEA's view, do non-registrants have any

12  obligation to monitor for suspicious

13  orders?

14       A.    Non-registrants, they're not

15  part of the closed system of

16  distribution.

17       Q.    Is DEA aware of whether

18  chargeback data reflects prescriptions?

19       A.    Depending on whatever format

20  or information you're getting from them,

21  so you're the one getting the

22  information, so you would -- you would

23  know.  We would know if we put a subpoena

24  on you and said, "What information do you

1    have?"

2         Q.    But as you sit here today,

3    you do not know whether chargeback data

4    typically includes prescription

5    information?

6              MS. SINGER:  Objection.

7         Scope.

8    BY MR. O'CONNOR:

9         Q.    You can answer.

10        A.    Yeah, I don't know.

11        Q.    Earlier today, you testified

12   regarding suspicious order monitoring

13   programs that exist on paper but aren't

14   implemented.  I believe you indicated

15   that whether the program actually

16   functioned was more important than

17   whether it existed on paper, correct?

18             MS. SINGER:  Objection.

19        Mischaracterizes witness's

20        testimony.

21             THE WITNESS:  I don't think

22        I said that.

23   BY MR. O'CONNOR:

24        Q.    Okay.  Would you agree with

Highly Confidential - Subject to Further Confidentiality Review

1    me that the way -- the way the program

2    functioned, is more important than what's

3    described on paper?

4              MR. FINKELSTEIN:  Vague.

5              THE WITNESS:  I don't know.

6         You'd have to assess both to see.

7         I mean, you would hope that it

8         would function better, yes.

9    BY MR. O'CONNOR:

10        Q.   Because what matters is

11   whether the program identifies suspicious

12   orders when they come in, correct?

13             MR. FINKELSTEIN:  Objection.

14        Vague.

15             THE WITNESS:  What matters

16        is, do you have an effective means

17        to safeguard against diversion.

18        That's what matters, because we're

19        trying to protect the public.

20   BY MR. O'CONNOR:

21        Q.   Does it say anywhere in the

22   relevant regulations that registrants are

23   required to have a written policy with

24   respect to suspicious order monitoring?

1     A.    No.

2     Q.    Okay.  You spent some time

3   in the liaison policy -- or the policy

4   liaison section, correct?

5     A.    Correct.

6     Q.    And could you describe for

7   me the modes of communication that that

8   office or other offices used to

9   communicate guidance to the registrant

10   community?

11           MR. FINKELSTEIN:  Objection.

12       Vague.

13           THE WITNESS:  The -- it's

14       basically two sections, or units.

15       One is policy and the other one is

16       liaison.  I was in the liaison

17       section.  So that would be the

18       interact -- pretty much the

19       physical interaction with people,

20       whether it's registrants or

21       associations, that type, you know,

22       where we're physically meeting

23       with them or physically doing

24       conferences, doing presentations,

Highly Confidential - Subject to Further Confidentiality Review

1           going to association meetings and

2           doing a table.

3               That would be -- that would

4           be what we did in liaison; whereas

5           in policy, those would be the

6           questions that came in, whether

7           e-mail, letters, asking specifics

8           about interpretations, asking --

9           seeking waivers for, you know, it

10          could be for an employment waiver,

11          somebody that's been, you know,

12          convicted of a drug felon, and

13          asking for a waiver.  It could be

14          that type of communication.

15              So that would be more

16          written.  Sometimes it's oral.

17          They would go with us to do some

18          tables and stuff like that.

19     BY MR. O'CONNOR:

20          Q.   Okay.  And so sometimes it

21     was the in-person communication.  Is it

22     fair to say that DEA could also

23     communicate with registrants through

24     written letters?

1          A.     Absolutely.  And that would

2     be our policy section.

3          Q.     And DEA could also issue

4     formal guidance documents if it chose,

5     correct?

6          A.     Correct.

7          Q.     It could also engage in

8     notice-and-comment rulemaking, right?

9          A.     Yes.  That's a different

10    section though.

11         Q.     It could also post guidance

12    on its website, correct?

13         A.     Correct.

14         Q.     With the exception of the

15    Rannazzisi letters in 2006 and 2007, DEA

16    did not take any of those steps with

17    respect to communicating guidance on

18    suspicious order monitoring to

19    manufacturers, true?

20              MR. FINKELSTEIN:  Objection.

21         Mischaracterizes prior testimony.

22              THE WITNESS:  No.  I mean we

23         did meet with a few of the

24         manufacturers and went over their

1          data with them.  So that was

2          individual.

3                  So we did sit down with

4          those that -- when we went through

5          the ARCOS data, there were

6          abnormalities to it.  So those are

7          the ones that we met with to

8          discuss that.

9                  So we went over their duties

10         and responsibilities with them.

11  BY MR. O'CONNOR:

12         Q.    But with certain individual

13  registrants?

14         A.    Correct.

15         Q.    But other than the two

16  letters from Mr. Rannazzisi, DEA did not

17  send any letters to registrants regarding

18  their obligation under the suspicious

19  order monitoring program, correct?

20         A.    Written letters, correct.

21         Q.    And DEA did not post any

22  guidance with respect to suspicious order

23  monitoring on its website, did it?

24                  MR. FINKELSTEIN:  Objection.

1        Form.

2              THE WITNESS:  That's

3        correct.

4   BY MR. O'CONNOR:

5        Q.    And DEA did not engage in

6   notice-and-comment rulemaking to provide

7   further guidance on suspicious order

8   monitoring to registrants, correct?

9        A.    I am not -- I'm not in the

10  reg drafting section.  So I don't know if

11  they -- the letter that we saw earlier

12  today, I'm not sure if that was --

13       Q.    But since 1974 --

14       A.    -- in there.

15       Q.    I'm sorry.

16             But since 1974, DEA has not

17  promulgated any regulation providing

18  further guidance to registrants on the

19  supposed obligation to monitor and report

20  suspicious orders, correct?

21       A.    Correct.

22       Q.    With respect to suspicious

23  order monitoring, does DEA agree that

24  providing registrants with clear guidance

Highly Confidential - Subject to Further Confidentiality Review

1    is important?

2         A.    I think clear guidance is

3    very important.

4         Q.    Okay.  Would you agree that

5    the clearest guidance is through

6    notice-and-comment rulemaking?

7              MR. FINKELSTEIN:  Objection.

8         Vague.

9              THE WITNESS:  Could be.  I

10        don't know that I completely agree

11        with it.  Yes could be.

12             MR. O'CONNOR:  We'll mark

13        Exhibit 10.

14             (Document marked for

15        identification as Exhibit

16        DEA-Prevoznik-10.)

17   BY MR. O'CONNOR:

18        Q.    Take a moment to look at

19   that.  Exhibit 10 is a memorandum from

20   the Attorney General of the United States

21   dated November 16, 2017.

22             Are you familiar with this

23   document?

24        A.    No.

1      Q.    I'll direct your attention

2   to the last sentence of the second

3   paragraph where it says, "Not only is

4   notice-and-comment rulemaking generally

5   required by law, but it has the benefit

6   of availing agencies of more complete

7   information about a proposed rule's

8   effects than the agency could ascertain

9   on its own and, therefore, results in

10   better decisionmaking by regulators."

11          With respect to suspicious

12   order monitoring and knowing your

13   customer's customer, would you agree that

14   notice-and-comment rulemaking would

15   result in better decisionmaking by

16   regulators?

17          MR. FINKELSTEIN:  Asked and

18       answered.

19   BY MR. O'CONNOR:

20      Q.    You can answer the question.

21      A.    Answer the question?

22          MR. FINKELSTEIN:  Yeah.

23       Answer the question.

24          THE WITNESS:  Could you

Highly Confidential - Subject to Further Confidentiality Review

1      repeat it?  Sorry.

2   BY MR. O'CONNOR:

3          Q.     Sure.  With respect to

4   suspicious order monitoring and knowing

5   your customers' customer, would you agree

6   that notice-and-comment rulemaking would

7   result in better decisionmaking by

8   regulators?

9              MS. SINGER:  Objection.

10         Asked and answered.

11             THE WITNESS:  I -- I don't

12         know.  I mean, it says that here.

13         Yes, it's nice to get the -- the

14         opinions and all that.  But you

15         get varying opinions from the

16         regulators.  You get varying

17         opinions from different --

18         different people as well.  So

19         sometimes it can be -- it could be

20         confusing.  But it also could be

21         helpful.  So, yes.  So open lines

22         of communication are good.

23   BY MR. O'CONNOR:

24         Q.     I'd like you to look at the

1    next paragraph in the third sentence.

2              MR. FARRELL:  Are you going

3         to skip the first two sentences?

4              MR. O'CONNOR:  Yes.

5              MR. FINKELSTEIN:  Okay.

6         Which one is the third, just so I

7         know where you --

8              MR. O'CONNOR:  It starts

9         with but.

10             MR. FINKELSTEIN:  But.

11   BY MR. O'CONNOR:

12        Q.    "But guidance may not be

13   used as a substitute for rulemaking.  It

14   may not be used to impose new

15   requirements on entities outside the

16   executive branch."

17             With respect to suspicious

18   order monitoring and any obligation to

19   know your customer's customer, do you

20   agree with that statement by the Attorney

21   General?

22             MR. FINKELSTEIN:  Objection.

23        Calls for a legal conclusion.

24        Outside the scope.  You can answer

Highly Confidential - Subject to Further Confidentiality Review

1     if you understand.

2          THE WITNESS:  I don't quite

3     understand your question.

4  BY MR. O'CONNOR:

5          Q.    My question is simply

6  whether you agree with the statement by

7  the Attorney General that guidance may

8  not be used as a substitute for

9  rulemaking and may not be used to impose

10  new requirements on entities outside the

11  executive branch, with respect to

12  suspicious order monitoring or any

13  obligation to know your customer's

14  customer?

15          MR. FINKELSTEIN:  Objection.

16     Calls for a legal conclusion.  You

17     can answer.

18          THE WITNESS:  I'm not sure I

19     understand your question.  Can you

20     repeat it?

21  BY MR. O'CONNOR:

22          Q.    What -- what aren't you sure

23  about?

24          A.    I'm not sure what you're

1    asking me.

2            Q.    I'm asking --

3            A.    Go ahead.

4            Q.    I'm asking if you agree with

5    the statement that guidance may not be

6    used as a substitute for rulemaking.  It

7    may not be used to impose new

8    requirements on entities outside the

9    executive branch when it comes to

10   suspicious order monitoring or knowing

11   your customer's customer.

12                MR. FINKELSTEIN:  And I'm

13           objecting to the scope and

14           objecting that it calls for a

15           legal conclusion.  Subject to

16           those objections, you can answer.

17                THE WITNESS:  I guess I'm

18           stuck on and may not be used to

19           impose new requirements.  What?

20           Guidance, or rulemaking?

21   BY MR. O'CONNOR:

22           Q.    Guidance.  Do you agree with

23   the statement that guidance may not be

24   used to impose new requirements on

1    entities outside the executive branch

2    when it comes to suspicious order

3    monitoring or knowing your customer's

4    customer?

5              MR. FINKELSTEIN:  Do you

6         understand the objections?

7    BY MR. O'CONNOR:

8         Q.    I just need a yes or no

9    answer.

10        A.    Well --

11             MR. FINKELSTEIN:  You -- you

12        can answer as you feel like you

13        need to, to answer.

14             THE WITNESS:  Okay.  I

15        don't -- I don't understand how

16        guidance is a new requirement.

17        Rulemaking would make a new

18        requirement.

19             So I think what you're

20        asking me is the opposite of what

21        you're looking for.  Because

22        guidance is not going to create a

23        new rule.

24    BY MR. O'CONNOR:

1      Q.    So it's -- just to be clear,

2  do you agree that guidance may not be

3  used to impose new requirements when it

4  comes to suspicious order monitoring or

5  knowing your customer's customer?

6            MR. FINKELSTEIN:  Now we're

7        way outside the scope.  I'll --

8        I'll let you answer it.

9            THE WITNESS:  One more time.

10       Repeat it.  Sorry.

11 BY MR. O'CONNOR:

12     Q.    Do you agree that guidance

13 may not be used to impose new

14 requirements when it comes to suspicious

15 order monitoring or knowing your

16 customer's customer?

17           MS. SINGER:  Objection.

18       Scope.  And calls for a legal

19       opinion.

20           MR. FINKELSTEIN:  Scope.

21       I'll stipulate that the witness

22       hasn't been briefed on Seminole

23       Rock or Skidmore or any of that.

24       But you can answer.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FARRELL:  Who is

2     Skidmore?

3          MR. FINKELSTEIN:  It's a

4     case.

5          THE WITNESS:  I honestly

6     don't know.  And I don't

7     understand the question.

8  BY MR. O'CONNOR:

9     Q.    So is it DEA's position that

10 when it comes to suspicious order

11 monitoring and knowing your customer's

12 customer, it does not intend to abide by

13 the direction that guidance may not be

14 used to impose new requirements?

15          MR. FARRELL:  Objection.

16     That not only misstates the DEA's

17     position here, it misstates its

18     position in the DC circuit court

19     of appeals in the master's case

20     that rejected what you said.

21          MR. O'CONNOR:  I'm asking

22     the DEA the question.  And I would

23     like DEA's answer.

24          MR. FINKELSTEIN:  Hang on,

1    I'm going to object that that's

2    argumentive.  But you can answer.

3           THE WITNESS:  All right.

4           MR. FINKELSTEIN:  Do you

5    need the question back?

6           THE WITNESS:  Yeah.  It's --

7    you can read it back.

8           (Whereupon, the court

9    reporter read back the requested

10   portion of testimony.)

11          MR. FINKELSTEIN:  The

12   objection was that it was

13   argumentive.

14          THE WITNESS:  And my

15   understanding of the question is

16   that guidance is not imposing new

17   requirements.  It's not -- it's

18   not imposing them.

19   BY MR. O'CONNOR:

20      Q.    And guidance should not

21   impose new requirements, correct?

22          MR. FINKELSTEIN:  Objection.

23   Scope.  Legal conclusion.

24          Next one I'm going to

1        instruct him not to answer.

2              THE WITNESS:  One more time

3        with yours.

4    BY MR. O'CONNOR:

5        Q.    And guidance should not

6    impose new requirements, correct?

7        A.    I don't believe guidance

8    is -- any guidance is imposing new

9    requirements.

10       Q.    Okay.

11       A.    It's still falling in the

12   parameters of the statute.  You need to

13   have effective means of safeguarding

14   diversion.

15       Q.    Going back to ARCOS data.

16   Does the DEA rely on any

17   computer-assisted technology when

18   analyzing ARCOS data?

19             MR. FINKELSTEIN:  Objection.

20       Vague.

21             THE WITNESS:  What was the

22       question?

23   BY MR. O'CONNOR:

24       Q.    Does the DEA rely on any

1    computer-assisted technology when

2    analyzing ARCOS data?

3        A.    Computer-assisted

4    technology, what does that mean?

5        Q.    Does the DEA when analyzing

6    ARCOS data use a computer, let's start

7    there?

8        A.    Yes.  We use a computer.

9        Q.    Do they use a particular

10   computer program?

11       A.    Yes.

12       Q.    Okay.  What is that program?

13       A.    Cognos.

14       Q.    Okay.  And do they use that

15   program to run any sort of algorithms

16   over the ARCOS data?

17       A.    I don't know -- Cognos is

18   used to summarize and aggregate large

19   volumes of data.

20            MR. FARRELL:  I'm sorry.  I

21        don't mean to interrupt.  Can you

22        ask him to spell that?

23            THE WITNESS:  Cognos?

24        C-O-G-N-U-S.  Cognos.  Or N-O-S.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. O'CONNOR:

2     Q.    You testified earlier that

3  DEA sometimes uses ARCOS data to generate

4  leads for an investigation.  Do you

5  recall that testimony?

6     A.    Yes.

7     Q.    How does the DEA generate

8  leads from the ARCOS data?

9          MR. FINKELSTEIN:  Instruct

10         you not to answer to the extent

11         that your answer calls for law

12         enforcement-sensitive information.

13         Do you understand?

14         THE WITNESS:  Yes.  Based on

15         that I will not answer that

16         question.

17  BY MR. O'CONNOR:

18     Q.    Does -- does the DEA engage

19  in any kind of statistical analysis with

20  respect to ARCOS data?

21     A.    It's on our statistical

22  summary -- retail summary reports that

23  are posted on our website.  So that

24  analysis is kind of first look --

1    Q.    Do you know if DEA applies

2  any sort of regression analysis, for

3  example?

4    A.    What kind of?

5    Q.    Regression analysis?

6    A.    What's that?

7    Q.    Okay.  It's a type of

8  statistical analysis.  Fair to say that

9  DEA does not apply a regression analysis?

10         MR. FINKELSTEIN:  Hang on.

11    Objection.  The witness just said

12    that he doesn't understand.

13         THE WITNESS:  I don't know.

14  BY MR. O'CONNOR:

15    Q.    So you're not sure whether

16  DEA applies any kind of statistical

17  analysis?

18    A.    No.  We do some statistical

19  analysis, but I don't know if it's

20  regression analysis, on what analysis.

21         (Document marked for

22    identification as Exhibit

23    DEA-Prevoznik-11.)

24  BY MR. O'CONNOR:

1    Q.    Marking Exhibit 11, which is

2   a report from the Energy and Commerce

3   Committee, House of Representatives.

4          MR. FARRELL:  Andrew, what

5      is it, the number?

6          MR. O'CONNOR:  11.

7          MR. FARRELL:  You guys are

8      doing all my work for me tomorrow.

9          MR. O'CONNOR:  Like to give

10     you a head start, Paul.

11  BY MR. O'CONNOR:

12     Q.    Do you recognize this

13  document?

14     A.    Yes.

15     Q.    What is it?

16     A.    It's the Energy and

17  Commerce, "Report on red flags and

18  warning signs.  Ignored opioid

19  distribution and enforcement concerns of

20  West Virginia."

21     Q.    Okay.  If you would turn to

22  Page 11.  I take that back.  It's

23  actually Page 10.  I apologize.

24          Turn your attention to the

1    fifth bullet point.  "Prior to 2010, DEA

2    primarily used ARCOS data reactively in

3    enforcement cases."

4            Do you agree with that

5    statement?

6        A.    Yes.

7        Q.    "According to DEA, technical

8    limitations and data errors made it

9    difficult for DEA to utilize ARCOS data

10   to identify investigative leads."

11           Do you agree?

12       A.    Yeah.  Yeah.  I mean, it

13   made it slightly difficult.

14       Q.    And in the next bullet, it

15   says, "Had DEA more proactively used

16   ARCOS data, it could have discovered that

17   between 2006 and 2012, distributors

18   shipped more than 30" -- or "13 million

19   doses of hydrocodone and oxycodone to

20   Sav-Rite Pharmacy Number 1."

21           Do you agree with that

22   statement?

23           MR. FINKELSTEIN:  Objection.

24       Scope.

```
 1    BY MR. O'CONNOR:

 2         Q.    It relates to the analysis

 3    of ARCOS data.  Can you answer the

 4    question?

 5              MR. FINKELSTEIN:  With

 6         respect to a particular pharmacy,

 7         it's outside the scope.

 8              But you can answer.

 9              THE WITNESS:  Yes.  But I

10         would like to point out between

11         2006, that six years, we came off

12         the mainframe in fall of 2009.

13              MR. FARRELL:  Since we are

14         on this topic, can we figure out

15         which distributors the DEA should

16         have investigated with that ARCOS

17         data?

18              MR. O'CONNOR:  You'll get

19         your chance tomorrow, Paul.

20    BY MR. O'CONNOR:

21         Q.    Let's look at -- I'm going

22    to mark, actually, another exhibit.

23              (Document marked for

24         identification as Exhibit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEA-Prevoznik-12.)

 2     BY MR. O'CONNOR:

 3         Q.    It's two pages.

 4              MR. FINKELSTEIN:  Wait till

 5         we all have it.  Counsel, what's

 6         been marked as Exhibit 12, we're

 7         going to ask to clawback.

 8              MR. O'CONNOR:  Okay.  On the

 9         basis of?

10              MR. FINKELSTEIN:  On the

11         basis of attorney/client and

12         deliberative process privilege.

13         We believe that it was produced

14         inadvertently.

15              MR. EPPICH:  What's the

16         Bates number on that?

17              MR. FINKELSTEIN:  DEA 10892.

18              MR. FARRELL:  Can we keep a

19         copy?  Is it okay if I keep a

20         copy?

21              MR. FINKELSTEIN:  I mean,

22         look, it's in the database.  But

23         we're attempting to claw it back.

24              MR. FARRELL:  Okay.  Well,
```

```
 1              procedurally you can talk to Enu.

 2                   MR. FINKELSTEIN:  What

 3              should we talk about?

 4                   MR. O'CONNOR:  Okay.  So

 5              we're reserving our rights to ask

 6              questions about this document

 7              we're -- we were just discussing.

 8                   I won't ask questions about

 9              the document.  But I do have a

10              couple of questions on the subject

11              of suspicious order reports.

12   BY MR. O'CONNOR:

13          Q.   Would you agree that

14   suspicious order reports are not

15   maintained by DEA consistently throughout

16   the field division?

17                   MR. FINKELSTEIN:  Oh, well,

18              since we're clawing it back, I'm

19              going to take the document from

20              you.  Don't worry about it.

21                   THE WITNESS:  Oh, so don't

22              look at it?

23                   MR. FINKELSTEIN:  Yeah.

24                   THE WITNESS:  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FINKELSTEIN:  Don't

2     testify based on the document for

3     now.

4          THE WITNESS:  Okay.

5          MR. O'CONNOR:  Yeah.

6          MR. FINKELSTEIN:  Can you

7     repeat your question for me?

8  BY MR. O'CONNOR:

9     Q.    Sure.  So in the DEA's view,

10 were suspicious order reports maintained

11 consistently across the field offices?

12     A.    No.

13          MR. FINKELSTEIN:  Objection.

14     Vague.

15          THE WITNESS:  Sorry.

16          MR. FINKELSTEIN:  Go ahead.

17          THE WITNESS:  No.

18 BY MR. O'CONNOR:

19     Q.    And were suspicious order

20 reports shared in a systematic way across

21 the field offices?

22          MR. FINKELSTEIN:  Objection.

23     Vague.

24          THE WITNESS:  I mean, I

Highly Confidential - Subject to Further Confidentiality Review

1          testified earlier that we would

2          break it up by AOR, and then it's

3          the field's responsibility to

4          review and deem whatever action

5          they deem necessary.  So -- so

6          those that went to the field,

7          that's how they are handled.

8   BY MR. O'CONNOR:

9          Q.   Okay.  But as a matter of

10  practice and policy, were suspicious

11  order reports submitted to one field

12  office necessarily transmitted to all the

13  others?

14               MR. FINKELSTEIN:  Scope.

15       You can answer.

16               THE WITNESS:  Can you repeat

17       it?

18  BY MR. O'CONNOR:

19          Q.   Sure.  As a matter of

20  practice and policy, were suspicious

21  order reports submitted to one field

22  office necessarily transmitted to all of

23  the others?

24               A.   From my personal experience,

1    I know that's what we did.

2         Q.    Okay.  And speaking for DEA,

3    can you testify here today that as a

4    matter of practice, suspicious order

5    reports that were submitted to one field

6    office were always distributed to the

7    other field offices around the country?

8              MR. FINKELSTEIN:  Vague as

9         to time and scope.

10             THE WITNESS:  I'm not

11        comfortable with the word

12        "always."  Those people that I did

13        talk to about how this was done,

14        that's how they said it was done,

15        that they would send it off to the

16        respective field offices.  But I

17        can't answer for every single

18        investigator out there.

19   BY MR. O'CONNOR:

20        Q.    You can't say in every case

21   that every suspicious order report was

22   shared across the various field offices?

23        A.    Correct.

24        Q.    If a registrant did not meet

1    its obligations to report suspicious

2    orders, does the DEA have authority to

3    suspend or revoke it's registration?

4            A.    I'm sorry?

5            Q.    If a registrant does not

6    meet its obligations to report suspicious

7    orders, does the DEA have authority to

8    suspend or revoke its registration?

9            A.    It would fall under -- not

10   specifically that, that wording.  But it

11   would fall under 823, that -- for failure

12   to maintain effective controls over

13   diversion.

14           Q.    If a registrant were failing

15   to report suspicious orders in such a way

16   that DEA believed it posed a threat to

17   the public health, would it seek to

18   suspend or revoke that registrant's

19   registration?

20                 MR. FINKELSTEIN:  Objection.

21        Incomplete hypothetical.

22                 THE WITNESS:  There is a

23        wide variety of things that we --

24        that we could do.  We could take

Highly Confidential - Subject to Further Confidentiality Review

1      administrative actions.  We could

2      take civil actions.  We could move

3      to do an order to show cause.  If

4      we could show that there was

5      imminent danger to the public --

6      public, we could go for immediate

7      suspension order.  We can do an

8      injunctive action with the civil,

9      or we can take criminal action.

10     So there's a wide variety of

11     different ways we could go about

12     it.

13  BY MR. O'CONNOR:

14      Q.   So it's fair to say that if

15  the DEA believed a registrant posed a

16  risk to the public health because it was

17  failing to report suspicious orders, it

18  would take some sort of action, correct?

19      A.   Yes, correct.

20          MR. O'CONNOR:  If we can

21     just take a couple-minute break.

22          MR. FINKELSTEIN:  Okay, but

23     we've got a hard stop at 6:00.

24          MR. O'CONNOR:  Understood.

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  5:43.  We

2       are off the video record.

3          (Short break.)

4          THE VIDEOGRAPHER:  5:49.  We

5       are on the video record.

6          THE WITNESS:  If I could,

7       just before we begin.  I -- I

8       believe I misstated something in

9       your -- one of the last questions.

10          I think you said that did we

11       disperse out the suspicious orders

12       to all field's -- field offices,

13       that was -- that's not correct.

14       We wouldn't -- we would send it to

15       the respective AORs.  I just

16       wanted to clarify.

17   BY MR. O'CONNOR:

18       Q.    Okay.  So the suspicious

19   order reports were not sent to all field

20   offices, just to the --

21       A.    To the relevant one that

22   it -- that -- into that -- where that

23   registrant was.

24       Q.    So it would go to where the

1    reporting registrant was?

2         A.    So it would -- say the

3    reporter is in Pennsylvania and who they

4    are reporting on is in New Jersey.  It

5    would go to the New Jersey office.  It

6    wouldn't go all across country.

7              Thank you.

8                   -  -  -

9              EXAMINATION

10                  -  -  -

11   BY MR. STEPHENS:

12        Q.    Mr. Prevoznik, good

13   afternoon.  My name is Neal Stephens, I'm

14   with the Jones Day law firm.  And I

15   represent Walmart.  I will be asking you

16   some questions on behalf of retail chain

17   pharmacies, which will include Walmart,

18   CVS, Rite Aid, Walgreens and HBC Giant

19   Eagle.

20        A.    Okay.

21        Q.    What I'd like to do is I'd

22   like to start by asking you a few

23   questions about DEA's interpretation and

24   enforcement of some of the relevant

1    provisions of the Controlled Substances

2    Act.  Okay?

3          A.    Okay.

4          Q.    And including some basic

5    introductory questions to understand

6    DEA's mission under the Controlled

7    Substances Act, which you testified a

8    little bit earlier today, right?

9          A.    Correct.

10          Q.    Okay.  Now, for DEA's

11    diversion control unit, the mission has

12    two core elements, right, to prevent the

13    diversion of controlled substances while,

14    secondly, ensuring an adequate supply for

15    legitimate medical needs, true?

16          A.    True.

17          Q.    And the Controlled

18    Substances Act is drafted with those two

19    goals in mind, true?

20                MR. FINKELSTEIN:  Calls for

21          speculation.

22                THE WITNESS:  That would be

23          my understanding.

24    BY MR. STEPHENS:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  So let's start with

2   the second piece of that, ensuring an

3   adequate supply.  Are you with me?

4      A.    Yes.

5      Q.    All right.  As to ensuring

6   an adequate supply, for legitimate

7   medical needs, Title 21 U.S.C. 801 states

8   that "many of the drugs included within

9   the subchapter have a useful and

10  legitimate medical purpose and are

11  necessary to maintain the health and

12  general welfare of the American people."

13            Is that your understanding

14  of Title 21 U.S.C. 801?

15            MR. FINKELSTEIN:  Scope.

16        You can answer.

17            THE WITNESS:  Yes.

18  BY MR. STEPHENS:

19     Q.    Okay.  And that provision

20  refers to drugs, right, the word drugs?

21     A.    Yes.

22     Q.    Okay.

23            Prescription opioids would

24  be some of those drugs that are referred

Highly Confidential - Subject to Further Confidentiality Review

1  to in that provision we just covered,

2  right?

3        A.    Yes.

4        Q.    All right.  DEA agrees that

5  chronic pain is a serious problem for

6  many Americans, true?

7              MS. SINGER:  Objection.

8        Scope.

9              THE WITNESS:  Yeah, people

10       have back pain.

11 BY MR. STEPHENS:

12       Q.    And DEA also agrees that

13 it's crucial for physicians who are

14 engaged in legitimate pain treatment not

15 to be discouraged from providing proper

16 medication to patients as medically

17 justified?

18             MR. FINKELSTEIN:  Scope.

19             MS. SINGER:  Objection.

20       Scope.

21             THE WITNESS:  Yes.

22 BY MR. STEPHENS:

23       Q.    Okay.  And DEA agrees that

24 opioids, properly prescribed by DEA

1    registered medical doctors, are an

2    appropriate medication for many

3    Americans?

4              MS. SINGER:  Objection.

5         Scope.

6              MR. FINKELSTEIN:  Scope.

7         Incomplete hypothetical.

8              THE WITNESS:  Yes.

9    BY MR. STEPHENS:

10        Q.    DEA also agrees that there's

11   a legitimate medical need under Title 21

12   U.S.C. 801 for prescription opioids to

13   treat pain in patients in the United

14   States?

15             MS. SINGER:  Objection.

16        Scope.

17             THE WITNESS:  For a

18        legitimate medical purpose, yes.

19   BY MR. STEPHENS:

20        Q.    DEA also agrees that

21   prescription opioids are necessary to

22   maintain the health of the American

23   people?

24             MS. SINGER:  Objection.

1          MR. FINKELSTEIN:  Scope.

2          THE WITNESS:  For all the

3     American people or those that need

4     it?

5  BY MR. STEPHENS:

6     Q.    Those that need it.

7     A.    Those that need it, yes.

8     Q.    Okay.  And DEA also agrees

9  that prescription opioids are necessary

10  to maintain the general welfare of

11  American people who need them?

12     A.    Correct.

13     Q.    Patients who are properly

14  prescribed opioid medications should be

15  able to obtain their medications from a

16  pharmacy?

17          MS. SINGER:  Objection.

18     Scope.

19          I think this has been a long

20     line of questions outside of the

21     scope.  And at some point I'd

22     request that DOJ instruct the

23     witness.

24          MR. FINKELSTEIN:  I agree

1          that this is outside the scope.

2          I'll let the witness answer for

3          now if you have understanding.

4                THE WITNESS:  Yes.

5   BY MR. STEPHENS:

6          Q.    Is it also true under -- you

7   testified earlier today about the C.F.R.

8   regulations, correct?

9          A.    Correct.

10         Q.    And under Title 21 -- or I'm

11  sorry, under 21 C.F.R. 1301.71(b), it's

12  true that the regulation regarding

13  suspicious order monitoring does not

14  require strict compliance, it requires

15  substantial compliance?

16               MR. FINKELSTEIN:  Did you

17         mean 74?

18               MR. STEPHENS:  It might be

19         74.

20               MR. FARRELL:  1301.74(b)?

21               MR. STEPHENS:  Yes.  No,

22         actually -- here.  Let me just

23         mark it.

24               (Document marked for

1      identification as Exhibit

2      DEA-Prevoznik-13.)

3  BY MR. STEPHENS:

4      Q.    I'll show the witness what's

5  been marked as Exhibit 13.

6      A.    So, (b)?

7      Q.    (B), right.

8      A.    Okay.

9      Q.    So (b) states substantial

10 compliance with the standards set forth,

11 right?

12     A.    Yes.

13     Q.    Okay.  And that could be

14 deemed sufficient, correct?

15     A.    Yes.  That's what it says.

16     Q.    It does not say strict

17 compliance, correct?

18     A.    Correct.

19     Q.    Like manufacturers and

20 distributors, DEA also considers doctors

21 who prescribe opioids to their patients

22 to be registrants?

23     A.    Correct.

24     Q.    Okay.  The prescribing

1    doctors have an obligation under the

2    Controlled Substances Act to prescribe

3    opioids responsibly so the controlled

4    substances will not be diverted, true?

5                    MR. FINKELSTEIN:  Scope.

6                    THE WITNESS:  Yes.

7    BY MR. STEPHENS:

8           Q.    Do you agree that

9    prescribers are the registrants who are

10   best situated to assess whether a patient

11   has a legitimate medical need for

12   prescription opioids?

13                   MR. FINKELSTEIN:  Scope.

14                   MS. SINGER:  Objection.

15          Scope.

16                   THE WITNESS:  It has to be

17          in the course of their usual

18          practice and for a legitimate

19          medical purpose.  So it has to be

20          under those guise.  If they're

21          writing prescriptions just to

22          write prescriptions and not

23          practicing medicine, then I would

24          disagree.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. STEPHENS:

2         Q.    Okay.  But prescribers, not

3   manufacturers, distributors, or

4   pharmacists are required to have medical

5   degrees, right?

6         A.    That's correct.

7         Q.    Okay.  And the physicians,

8   not manufacturers, distributors, or

9   pharmacists, are licensed to practice

10  medicine, right?

11        A.    Correct.

12        Q.    Okay.  And it's the

13  physicians, not manufacturers,

14  distributors, or pharmacists, that have

15  full access to a patient's MRI results,

16  their blood test work and other medical

17  test results?

18              MS. SINGER:  Objection.

19        Scope.

20              MR. FINKELSTEIN:  Incomplete

21        hypothetical.

22              THE WITNESS:  If all those

23        things are done.

24  BY MR. STEPHENS:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    DEA by agreeing to provide a

2  registration to a physician has provided

3  the doctor with the authority to write

4  prescriptions to patients for controlled

5  substances like opioids?

6              MR. FINKELSTEIN:  Scope.

7         I'm going to note for the record

8         that this is line of questions

9         with respect to a CSA section that

10        the witness has not been

11        authorized to testify about.

12             But since the witness is

13        familiar with this section, I'll

14        let him answer the question.

15             THE WITNESS:  Can you please

16        repeat it.

17  BY MR. STEPHENS:

18        Q.    Sure.  DEA, by agreeing to

19  provide a registration to a physician,

20  has provided the doctor with the

21  authority to write prescriptions to

22  patients for controlled substances like

23  opioids?

24        A.    Yes.  But some -- some may

Highly Confidential - Subject to Further Confidentiality Review

 1  not be authorized to write for opioids

 2  because they've gotten in trouble.  It

 3  depends on their state authority.  It

 4  depends on whether we've taken an action

 5  against them.  So there could be some

 6  limitations on what they are allowed to

 7  prescribe and what schedules.  We could

 8  limit their schedules as well.

 9       Q.    Okay.  I'm talking about a

10  doctor with an active registration with

11  DEA.

12       A.    Well, I mean, you can still

13  have an active DEA registration and be

14  limited on what schedule you're allowed

15  to do or what things you're not allowed

16  to do.  So your DEA registration can be

17  active, but there could be limitations or

18  restrictions on it.

19       Q.    Okay.  As to prescription

20  opioids DEA believes that the

21  overwhelming majority of prescribing in

22  America is conducted responsibly?

23            MS. SINGER:  Objection.

24       Scope.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. FINKELSTEIN:  Scope.

2              THE WITNESS:  Can you please

3         repeat it.

4    BY MR. STEPHENS:

5         Q.    Sure.  As to prescription

6    opioids, DEA believes that the

7    overwhelming majority of prescribing in

8    America is conducted responsibly?

9         A.    Yes, correct.

10        Q.    And DEA has stated that

11   99.5 percent of prescribers do not

12   overprescribe opioids?

13             MR. FINKELSTEIN:  Scope.

14             You can answer if you know.

15             THE WITNESS:  I don't know

16        that we said 99.5 percent.  I've

17        heard the figure 1 to 2 percent.

18   BY MR. STEPHENS:

19        Q.    Okay.  Well, let me show you

20   the transcript.

21             MR. FARRELL:  Can you

22        reference the transcript, please.

23             MR. STEPHENS:  Yes, sir.

24             (Document marked for

1      identification as Exhibit

2      DEA-Prevoznik-14.)

3   BY MR. STEPHENS:

4      Q.    The transcript is dated

5   April 29, 2014.  It's a subcommittee

6   hearing on oversight investigations by

7   the Committee of Energy and Commerce.

8          MR. FINKELSTEIN:  We're at

9          6:00.  I'll let you ask this

10         question and then we're going to

11         break for the day.

12  BY MR. STEPHENS:

13     Q.    I'd ask you to turn to Page

14  76.

15     A.    Page 76.

16     Q.    Page 76, Mr. Prevoznik.  And

17  we're looking at, like, the

18  second-to-last paragraph where

19  Mr. Rannazzisi is talking.

20         Do you see that?

21     A.    Mm-hmm.

22     Q.    And there's a question from

23  a Mr. Burgess ahead of that, correct?

24         Do you see that?

1     A.    Yes.

2     Q.    Okay.  And Mr. Burgess says

3  something to the effect that

4  Mr. Rannazzisi seems to imply that we are

5  overprescribing.  Mr. Rannazzisi then

6  responds and says, "I think that if you

7  are talking about 99.5 percent of the

8  prescribers, no, they are not

9  overprescribing.  But our focus is in

10 rogue pain clinics and rogue doctors who

11 are overprescribing."

12          Did I read that accurately?

13    A.    Yes.

14    Q.    Okay.  So my question for

15 you, the initial question was, DEA has

16 publicly stated that 99.5 percent of the

17 prescribers are not overprescribing,

18 correct?

19    A.    Correct.

20          MR. STEPHENS:  All right.

21    That's all I have for the day.

22          MR. FINKELSTEIN:  We're

23    going to excuse the witness so we

24    can argue about what's going to

1    happen tomorrow.

2         THE VIDEOGRAPHER:  6:01 p.m.

3    We are off the video record.

4         MS. MAINIGI:  The only thing

5    that I want to put on the record

6    is the defendants are reserving

7    time for recross as we have in all

8    other DEA depositions.

9         MR. FARRELL:  The plaintiffs

10   reserve the right to recross the

11   recross since we'll be calling the

12   witness in our case in chief.

13        MS. MAINIGI:  I think you

14   have done that before, so that's

15   fine, and I think it's just a

16   matter of scope.

17        MR. FARRELL:  Matter of

18   what?

19        MS. MAINIGI:  Scope.

20        (Excused.)

21        (Deposition concluded at

22   approximately 6:03 p.m.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6    deposition is a true record of the
    testimony given by the witness.

7

               It was requested before
8    completion of the deposition that the
    witness, THOMAS PREVOZNIK, have the
9    opportunity to read and sign the
    deposition transcript.

10

11

12    _Michelle L Gray_____
    MICHELLE L. GRAY,
13    A Registered Professional
    Reporter, Certified Shorthand
14    Reporter, Certified Realtime
    Reporter and Notary Public
15    Dated:  April 22, 2019

16

17

18              (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)

23

24

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4     over carefully and make any necessary

5     corrections.  You should state the reason

6     in the appropriate space on the errata

7     sheet for any corrections that are made.

8              After doing so, please sign

9     the errata sheet and date it.

10             You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14             It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                    -  -  -  -  -  -

                  E R R A T A

2                    -  -  -  -  -  -

3

4     PAGE   LINE   CHANGE

5     _____  _____  _____

6        REASON: _____

7     _____  _____  _____

8        REASON: _____

9     _____  _____  _____

10       REASON: _____

11    _____  _____  _____

12       REASON: _____

13    _____  _____  _____

14       REASON: _____

15    _____  _____  _____

16       REASON: _____

17    _____  _____  _____

18       REASON: _____

19    _____  _____  _____

20       REASON: _____

21    _____  _____  _____

22       REASON: _____

23    _____  _____  _____

24       REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 1 - 409, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16     THOMAS PREVOZNIK                  DATE
17
18
19    Subscribed and sworn
      to before me this
20    _____ day of _____, 20_____.
21    My commission expires:_____
22

      _____
23    Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

1                          LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____    _____

4        _____  _____    _____

5        _____  _____    _____

6        _____  _____    _____

7        _____  _____    _____

8        _____  _____    _____

9        _____  _____    _____

10       _____  _____    _____

11       _____  _____    _____

12       _____  _____    _____

13       _____  _____    _____

14       _____  _____    _____

15       _____  _____    _____

16       _____  _____    _____

17       _____  _____    _____

18       _____  _____    _____

19       _____  _____    _____

20       _____  _____    _____

21       _____  _____    _____

22       _____  _____    _____

23       _____  _____    _____

24       _____  _____    _____