Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5
          IN RE:  NATIONAL      :  HON. DAN A.
 6        PRESCRIPTION OPIATE    :  POLSTER
          LITIGATION             :
 7                               :
          APPLIES TO ALL CASES   :  NO.
 8                               :  1:17-MD-2804
                                 :
 9
               - HIGHLY CONFIDENTIAL -
10
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                      VOLUME II
12
                     -  -  -
13
                  April 18, 2019
14
                     -  -  -
15
16            Continued videotaped
        deposition of THOMAS PREVOZNIK, taken
17      pursuant to notice, was held at the law
        offices of Williams & Connolly, 725 12th
18      Street, Washington, D.C., beginning at
        8:16 a.m., on the above date, before
19      Michelle L. Gray, a Registered
        Professional Reporter, Certified
20      Shorthand Reporter, Certified Realtime
        Reporter, and Notary Public.
21
                     -  -  -
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2
      GREENE, KETCHUM, FARRELL, BAILEY & TWEEL LLP
 3    PAUL T. FARRELL, JR., ESQ.
      419 Eleventh Street
 4    Huntington, WV 25701
      (304) 521-4778
 5    Paul@greeneketchum.com
 6           - and -
 7    MCHUGH & FULLER
      BY:  MICHAEL J. FULLER, ESQ.
 8    97 Elias Whiddon Road
      Hattiesburg, Mississippi 39402
 9    (800) 939-5580
      mike@mchughfuller.com
10
             - and -
11
      MOTLEY RICE, LLC
12    BY:  LINDA SINGER, ESQ.
      401 9th Street, NW, Suite 1001
13    Washington, D.C. 20004
      (202) 386-9626
14    Lsinger@motleyrice.com
      Representing the Plaintiffs
15
             - and -
16
      THE DUGAN LAW FIRM
17    BY:  BONNIE A. KENDRICK, ESQ.
      One Canal Place
18    365 Canal Place, Suite 1000
      New Orleans, Louisiana 70130
19    (504) 648-0180
      bonnie@dugan-lawfirm.com
20    Representing the Plaintiffs
21
22
23
24
```

```
 1    APPEARANCES:   (Cont'd.)
 2    US DEPARTMENT OF JUSTICE
      BY:  DAVID FINKELSTEIN, ESQ.
 3    BY:  NATALIE A. WAITES, ESQ.
      175 N Street, NE, Room 10-2222
 4    Washington, DC 20002
      (202) 616-2964
 5    david.m.finkelstein@usdoj.gov
      natalie.a.waites@usdoj.gov
 6
 7
              - and -
 8
      US DEPARTMENT OF JUSTICE
 9    BY:  JAMES R. BENNETT, II, ESQ.
      United States Courthouse
10    801 West Superior Avenue
      Suite 400
11    Cleveland, Ohio 44113
      (216) 622-3988
12    James.bennett4@usdoj.gov
13            - and -
14    US DEPARTMENT OF JUSTICE
      BY:  MARIAMA C. SPEARS, ESQ.
15    8701 Morrisette Drive
      Springfield, Virginia 22152
16    (202) 598-6204
      Mariama.c.spears@usdoj.gov
17    Representing the US DOJ
18
19
20
21
22
23
24
```

```
 1    APPEARANCES:  (Cont'd.)
 2
      WILLIAMS & CONNOLLY, LLP
 3    By:  ENU MAINIGI, ESQ.
      BY:  COLLEEN MCNAMARA, ESQ.
 4    BY:  BRAD MASTERS, ESQ.
      BY:  JENNIFER G. WICHT, ESQ.
 5    725 12th Street, NW
      Washington, D.C. 20005
 6    (202) 434-5148
      emainigi@wc.com
 7    cmcnamara@wc.com
      Bmasters@wc.com
 8    Jwicht@wc.com
      Representing the Defendant, Cardinal
 9    Health
10
11    BARTLIT BECK LLP
      BY:  LESTER C. HOUTZ, ESQ.
12    1801 Wewatta Street, Suite 1200
      Denver, Colorado 80202
13    (303) 592-3199
      lester.houtz@bartlit-beck.com
14    Representing the Defendant, Walgreens
15
      ROPES & GRAY LLP
16    BY:  ANDREW O'CONNOR, ESQ.
      BY:  JOSHUA E. GOLDSTEIN, ESQ.
17    800 Boylston Street
      Boston, Massachusetts 02199
18    (617) 951-7234
      Andrew.o'connor@ropesgray.com
19    Joshua.goldstein@ropesgray.com
      Representing the Defendant, Mallinckrodt
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:   (Cont'd.)

 2

 3    DECHERT, LLP
      BY:   JENNA C. NEWMARK, ESQ
 4    1095 Avenue of the Americas
      New York, New York 10036
 5    (212) 698-3500
      Jenna.newmark@dechert.com
 6    Representing the Defendant, Purdue
      Pharmaceuticals
 7

 8    MARCUS & SHAPIRA, LLP
      BY:   JOSHUA A. KOBRIN, ESQ.
 9    One Oxford Centre, 35th Floor
      Pittsburgh, Pennsylvania 15219
10    (412) 338-3990
      Kobrin@marcus-shapira.com
11    Representing the Defendant, HBC
      Service Company
12

13    ZUCKERMAN SPAEDER, LLP
      BY:   R. MILES CLARK, ESQ.
14    1800 M. Street NW, Suite 1000
      Washington, D.C. 20036
15    (202) 778-1845
      Mclark@zuckerman.com
16    Representing the Defendant, CVS

17
      REED SMITH, LLP
18    BY:   ROBERT A. NICHOLAS, ESQ.
      BY:   JOSEPH J. MAHADY, ESQ.
19    Three Logan Square
      1717 Arch Street, Suite 3100
20    Philadelphia, Pennsylvania 19103
      (215) 851-8226
21    rnicholas@reedsmith.com
      Jmahady@reedsmith.com
22    Representing the Defendant,
      AmerisourceBergen Drug Corporation
23

24
```

```
 1    APPEARANCES:  (Cont'd.)

 2

 3    MORGAN LEWIS & BOCKIUS, LLP
      BY:  JOHN P. LAVELLE, JR., ESQ.
 4    1701 Market Street
      Philadelphia, Pennsylvania 19103
 5    (215) 963-4824
      John.lavelle@morganlewis.com
 6    Representing the Defendant, Rite Aid
      Corporation
 7

 8    FOLEY & LARDNER, LLP
      BY:  KRISTINA J. MATIC, ESQ.
 9    777 East Wisconsin Avenue
      Milwaukee, Wisconsin 53202
10    (414) 297-5913
      kmatic@foley.com
11    Representing Actavis Laboratories
      UT, Inc., Actavis Pharma, Inc.,
12    ANDA, Inc., and Actavis, Inc.,
      (N/k/a Allergan Finance, LLC, Watson
13    Laboratories, Inc.

14

      KIRKLAND & ELLIS, LLP
15    BY:  JENNIFER G. LEVY, ESQ.
      1301 Pennsylvania Avenue, N.W.
16    Washington, D.C. 20004
      (202) 879-5211
17    Jennifer.levy@kirkland.com
18           - and -
19    KIRKLAND & ELLIS, LLP
      BY:  KAITLYN COVERSTONE, ESQ.
20    300 North LaSalle Street
      Chicago, Illinois 60654
21    (312) 862-7184
      Kaitlyn.coverstone@kirkland.com
22    Representing the Defendant, Allergan

23

24
```

```
 1    APPEARANCES:   (Cont'd.)

 2

 3    COVINGTON & BURLING, LLP
      BY:  CHRISTOPHER K. EPPICH, ESQ.
 4    1999 Avenue of the Stars
      Los Angeles, California 90067
 5    (424) 332-4764
      Ceppich@cov.com
 6
              - and -
 7

      COVINGTON & BURLING, LLP
 8    BY:  KEVIN KELLY, ESQ.
      850 Tenth Street, NW
 9    Suite 586N
      Washington, D.C. 20001
10    (202) 662-5613
      Kkelly@cov.com
11
              - and -
12

      COVINGTON & BURLING, LLP
13    BY:  MEGHAN E. MONAGHAN, ESQ.
      850 Tenth Street, NW
14    Suite 586N
      Washington, D.C. 20001
15    mmonaghan@cov.com
      (202) 662-5110
16    Representing the Defendant, McKesson
      Corporation
17

18    JONES DAY
      BY:  NEAL J. STEPHENS, ESQ.
19    1755 Embarcadero Road
      Palo Alto, California 94303
20    (650) 739-3939
      Nstephens@jonesday.com
21    Representing the Defendant, Walmart

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)

 2

      BARNES & THORNBURG, LLP
 3    BY:  WILLIAM E. PADGETT, ESQ.
      11 South Meridian Street
 4    Indianapolis, Indiana 46204
      (317) 236-1313
 5    william.padgett@btlaw.com
      Representing the Defendant, H.D. Smith
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2
      LEVIN PAPANTONIO, P.A.
 3    BY:  PETER MOUGEY, ESQ.
      316 Baylen Street
 4    Pensacola, Florida 32502
      (850) 435-7000
 5    pmougey@levinlaw.com
 6          - and -
 7    BARON & BUDD, P.C.
      BY:  STERLING CLUFF, ESQ.
 8    Encino Plaza
      15910 Ventura Boulevard,
 9    Suite 1600
      Encino, California 91436
10    (818) 839-2333
      Scluff@baronbudd.com
11
            - and -
12
      BARON & BUDD, P.C.
13    BY:  WILLIAM G. POWERS, ESQ.
      600 New Hampshire Avenue, NW
14    The Watergate, Suite 10-A
      Washington, D.C. 20037
15    (202) 333-4562
      Wpowers@baronbudd.com
16
            - and -
17
      BARON & BUDD, P.C.
18    BY:  THOMAS SIMS, ESQ.
      The Centrum
19    3102 Oak Lawn Avenue, Suite 1100
      Dallas, Texas 75219
20    (214) 521-3605
      Tsims@baronbudd.com
21    Representing the Plaintiffs
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2
 3   MOTLEY RICE, LLC
     BY:  AMANDA UNTERREINER, ESQ.
 4   401 9th Street, NW,
     Suite 1001
 5   Washington, D.C. 20004
     (202) 386-9626
 6   aunterreiner@motleyrice.com
     Representing the Plaintiffs
 7
 8   ARNOLD PORTER KAYE SCHOLER, LLP
     BY:  JOSHUA M. DAVIS, ESQ.
 9   601 Massachusetts Avenue, NW
     Washington, DC 20001
10   (202) 942-5000
     Joshua.davis@arnoldporter.com
11   Representing the Defendants, Endo Health
     Solutions Endo Pharmaceuticals, Inc.; Par
12   Pharmaceutical Companies, Inc. f/k/a Par
     Pharmaceutical Holdings, Inc.
13
14   REED SMITH, LLP
     BY:  SHANNON E. McCLURE, ESQ.
15   Three Logan Square
     1717 Arch Street, Suite 3100
16   Philadelphia, Pennsylvania 19103
     (215) 851-8226
17   smcclure@reedsmith.com
     Representing the Defendant,
18   AmerisourceBergen Drug Corporation
19
     CAVITCH FAMILO & DURKIN, CO., L.P.A.
20   BY:  ERIC J. WEISS, ESQ.
     1300 E. 9th Street
21   Cleveland, Ohio 44114
     (216) 621-7860
22   Eweiss@cavitch.com
     Representing the Defendant, Discount Drug
23   Mart
24
```

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2
 3   MORGAN LEWIS & BOCKIUS, LLP
     BY:  LATIERA RAYFORD, ESQ.
 4   BY:  ZACHARY R. LAZAR, ESQ.
     77 West Wacker Drive
 5   Chicago, Illinois 60601
     (312) 324-1481
 6   Latiera.rayford@morganlewis.com
     Zachary.lazar@morganlewis.com
 7   Teva Pharmaceuticals, Inc. Cephalon Inc,
     Watson Laboratories, Actavis LLC, Actavis
 8   Pharma, Inc.
 9
     BAILEY & WYANT P.L.L.C.
10   BY:  HARRISON M. CYRUS, ESQ.
     500 Virginia Street East
11   Suite 600
     Charleston, West Virginia 25301
12   (304) 345-4222
     Hcyrus@baileywyant.com
13   Representing the Defendant, West
     Virginia Board of Pharmacy
14
15   FOX ROTHSCHILD, LLP
     BY:  ZACHARY MARTIN, ESQ.
16   2700 Kelly Road
     Suite 300
17   Warrington, Pennsylvania 18976
     (215) 918-3680
18   Zmartin@foxrothschild.com
     Representing the Defendant, Prescription
19   Supply Inc.
20
     JONES DAY
21   BY:  PATRICK J. BEISELL, ESQ.
     77 West Wacker
22   Chicago, Illinois 60601
     (312) 269-4066
23   Pbeisell@jonesday.com
     Representing the Defendant, Walmart
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3   VENABLE, LLP
     BY:  JAMES K. O'CONNOR, ESQ.
 4   750 E. Pratt Street, Suite 900
     Baltimore, Maryland 21202
 5   (410) 244-7742
     Jko'connor@venable.com
 6   Representing the Defendant, Abbott
     Laboratories and Abbott Laboratories,
 7   Inc.
 8
     LOCKE LORD, LLP
 9   BY:  MADELEINE E. BRUNNER, ESQ.
     2200 Ross Avenue
10   Suite 2800
     Dallas, Texas 75201
11   (214) 740.8758
     Maddie.brunner@lockelord.com
12   Representing the Defendant,
     Henry Schein, Inc.
13
14   O'MELVENY & MYERS, LLP
     BY:  EMILIE K. WINCKEL, ESQ.
15   1625 Eye Street, NW
     Washington, D.C. 20006
16   (202) 383-5300
     Ewinckel@omm.com
17   Representing the Defendants, Janssen and
     Johnson & Johnson
18
19
20
21
22
23
24
```

```
1    APPEARANCES:    (Cont'd.)

2

3    ALSO PRESENT:

4

     Kaitlyn Eekhoff  - Paralegal
5    (Via telephone)
     (Motley Rice)

6

     Jenna Forster - Paralegal
7    (Motley Rice)

8

9    VIDEOTAPE TECHNICIAN:
     Chris Ritona

10

11   LITIGATION TECHNICIAN:
     John Knowles

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2                 I N D E X

 3                    -   -   -

 4

     Testimony of:

 5

                       THOMAS PREVOZNIK

 6

 7   By Mr. Stephens                    430

 8   By Mr. Farrell                     597

 9

10

11

12                    -   -   -

13              E X H I B I T S

14                    -   -   -

15

16   NO.           DESCRIPTION          PAGE

17   DEA

     Prevoznik-15 Hearing Before        437

18                The Subcommittee

                  On Oversight and

19                Investigations

                  5/8/18

20                Challenges and

                  Solutions in the

21                Opioid Crisis

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    -  -  -
2            E X H I B I T S   (Cont'd.)
3                    -  -  -
4
5    NO.              DESCRIPTION              PAGE
6    DEA
     Prevoznik-16 DEA Letter,            450
7                  9/27/06
                   In Re:  In Reference
8                  To Registration
                   US-DEA-00022459
9
     DEA
10   Prevoznik-17 Hearing Before        466
                  The Subcommittee
11                On Oversight and
                  Investigations
12                3/20/18
                  The Drug Enforcement
13                Administration's Role
                  In Combating the Opioid
14                Epidemic
15   DEA
     Prevoznik-18 Hearing Before        473
16                The Committee on the
                  Judiciary US Senate
17                5/16/17
                  Rogue Online Pharmacies
18
     DEA
19   Prevoznik-19 DEA Announces Tool     536
                  For Registered Drug
20                Manufacturers
21   DEA
     Prevoznik-20 Hearing Before the     571
22                Permanent Subcommittee
                  On Investigations
23                Combatting the Opioid
                  Crisis
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2           E X H I B I T S   (Cont'd.)
 3                    -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   DEA
     Prevoznik-21 (Clawed Back)        585
 7                   US-DEA-00011196-98
 8   DEA
     Prevoznik
 9   P-1             21 USCA 801              685
10   DEA
     Prevoznik
11   P-2             House Report No.         686
                     91-1444
12                   9/10/70
13   DEA
     Prevoznik
14   P-3             HathiTrust               686
                     Drug Abuse Control
15                   Amendments 1970
16   DEA
     Prevoznik
17   P-4             Proposed Rule            687
                     Making, Part 301
18                   Federal Register
                     Vol. 36
19                   3/13/71
20   DEA
     Prevoznik
21   P-5             Rules & Regulations      688
                     Title 21 Food and
22                   Drugs
                     Federal Register
23                   Vol. 36
                     4/24/71
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -
 2           E X H I B I T S   (Cont'd.)
 3                     -   -   -
 4
 5     NO.             DESCRIPTION              PAGE
 6     DEA
       Prevoznik
 7     P-6             21 CFR 1301.74           688
 8
       DEA
 9     Prevoznik
       P-7             NWDA Suspicious          689
10                     Order Monitoring
                       System
11                     CAH-MDL2804-01465723-34
12     DEA
       Prevoznik
13     P-8             Plaintiff Cardinal    691
                       Health Reply in Support
14                     Of Motion for
                       Preliminary Injunction
15
       DEA
16     Prevoznik
       P-9             CSMP Page 16             691
17                     MCKMDL00409239
18     DEA
       Prevoznik
19     P-10            DEA Letter               703
                       Request No. 03-1134-F
20                     Subject, Diversion
                       Investigators Manual
21                     CAH-MDL2804-02203353-57
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2           E X H I B I T S   (Cont'd.)
 3                      -  -  -
 4
 5    NO.              DESCRIPTION             PAGE
 6    DEA
      Prevoznik
 7    P-11             Report to the          709
                       US Attorney General
 8                     By the Suspicious
                       Orders Task Force
 9                     October 1998
                       CAH_HOUSE_002207-98
10
      DEA
11    Prevoznik
      P-12             Reservation of Rights 730
12                     Cardinal Health's Third
                       Supplemental Objections
13
      DEA
14    Prevoznik
      P-13             Chemical Handler's     754
15                     Manual A Guide to Chemical
                       Control Regulations
16                     1/2004
                       CAH 032635-703
17
      DEA
18    Prevoznik
      P-14             DEA Letter, 9/27/06    760
19                     In Re, In Reference
                       To Registration
20
21    DEA
      Prevoznik
22    P-15             DEA Letter, 12/27/07   764
                       In Re, In Reference
23                     To Registration
                       ABDCMDL00269685-86
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                         -   -   -

2            E X H I B I T S   (Cont'd.)

3                         -   -   -

4

5     NO.              DESCRIPTION              PAGE

6     DEA

      Prevoznik

7     P-16            Federal Register        772

                      Vol. 73 9/10/08

8                     08-33

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                      -   -   -
 2            DEPOSITION SUPPORT INDEX
 3                      -   -   -
 4
 5   Direction to Witness Not to Answer
 6   PAGE    LINE
     485     4
 7   489     8
     489     16
 8   608     1
 9
     Request for Production of Documents
10
     PAGE    LINE
11   None.
12
     Stipulations
13
     PAGE    LINE
14   None.
15
     Questions Marked
16
     PAGE    LINE
17   None.
18
19
20
21
22
23
24
```

```
 1                 -   -   -

 2            THE VIDEOGRAPHER:  Good

 3       morning.  Today is April 18, 2019,

 4       8:15 a.m., and this is the

 5       continuation of the deposition of

 6       Thomas Prevoznik.

 7                 -   -   -

 8            ... THOMAS PREVOZNIK, having

 9       been previously sworn, was

10       examined and testified as follows:

11                 -   -   -

12            THE VIDEOGRAPHER:  I

13       apologize.  We need to go off the

14       record.  8:16.  We are off the

15       video record.

16            (Brief pause.)

17            THE VIDEOGRAPHER:  8:18, we

18       are on the video record.

19                 -   -   -

20            EXAMINATION

21            (Continued)

22                 -   -   -

23  BY MR. STEPHENS:

24            Q.   Mr. Prevoznik, good morning.
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Good morning.

2        Q.     Let me introduce myself.

3   I'm Neal Stephens.

4               MR. FINKELSTEIN:  Guys.

5   BY MR. STEPHENS:

6        Q.     I represent Jones Day, and

7   I'm asking you questions on behalf of the

8   retail pharmacies.  You remember that

9   from yesterday, right?

10       A.     Yes, I do.

11       Q.     Okay.  So let me -- let me

12  go back to where we were yesterday.  And

13  we were talking through --

14       A.     Could I just clarify

15  something from yesterday, please?

16       Q.     Sure.

17       A.     Okay.  First of all I want

18  to thank everybody for allowing me to try

19  to catch my train.  Of course with DC

20  around here, my train was delayed.  And

21  while I was delayed, I went to our

22  website because I was reflecting on my

23  testimony earlier.

24               And one of the things that

1    came up was guidance as well as

2    conferences.  And I know I didn't mention

3    the conferences and the dates.  So I just

4    went to our website.  And on our website

5    we do have meetings and it has past

6    meetings.  So I just looked on there.  I

7    want to be able to say that in 2007 and

8    2009, '7 was in Houston, 2009 was in

9    Oregon, Portland.

10            Those were pharmaceutical

11   industry conferences.  That was

12   wholesalers, distributors, some

13   importers.  So those conferences were

14   there.

15            And then somehow I

16   completely forgot about the

17   manufacturers, importers, and exporter

18   conferences that were in '13 and '15, in

19   particular the '15 one because I actually

20   gave a presentation.  So I apologize for

21   that.  But I just wanted to clarify that.

22        Q.    Where was the location of

23   the 2013 conference?

24            A.    The manufacturers?

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Correct.

2       A.    Both were Inner Harbor in

3   Maryland.

4       Q.    Okay.  And the 2015 was in

5   Maryland as well?

6       A.    Yes.

7       Q.    All right.  Thank you for

8   that.

9            And if I could,

10  Mr. Prevoznik, I'd like to go back to

11  where I ended last evening and pick back

12  up there again today.  I just have a few

13  predicate questions to ask you before we

14  go back into it.  Okay.

15      A.    Yes.

16      Q.    All right.  We were talking

17  through Topic 2 and Topic 3 of your

18  30(b)(6) designation.  And would you

19  agree that who is diverting in the

20  marketplace is relevant to how someone is

21  designing their SOMs program?

22            MR. FINKELSTEIN:  Objection.

23      Vague.

24            THE WITNESS:  Could you

Highly Confidential - Subject to Further Confidentiality Review

1              expand on --

2    BY MR. STEPHENS:

3         Q.    DEA looks to where diversion

4    is occurring in the United States, right?

5         A.    Correct.

6         Q.    Where it's happening in the

7    marketplace?

8         A.    Correct.

9         Q.    Okay.  My point is when

10   you're designing a SOMs system, it's

11   relevant where diversion is occurring as

12   to how you develop your SOMs system,

13   right?

14             MR. FINKELSTEIN:  Objection.

15        Vague.

16             THE WITNESS:  Well, within

17        the closed system of distribution,

18        the whole -- the whole point of

19        the system is to have effective

20        means to guard against diversion.

21        So each -- it's all

22        interconnected.

23             So I don't want to say one

24        is more important than the other

1      one because each step affects the

2      next step --

3  BY MR. STEPHENS:

4      Q.    Okay, but.

5      A.    -- in either direction.

6      Q.    Okay.  Sorry.  I didn't mean

7  to interrupt you there.

8          Would you agree that to --

9  and these are just predicate questions.

10 To assess if an order is suspicious, it's

11 relevant where the shipping is going?

12     A.    That's -- yeah.

13     Q.    Okay.

14     A.    That's one of -- yes.

15 That's one of the --

16     Q.    Not the only criteria --

17     A.    Right.  That's one of them.

18     Q.    -- it's one of them.

19          Okay.  So if it's relevant

20 where it's going, where diversion is

21 occurring in the marketplace is relevant,

22 right?  One characteristic of relevance?

23     A.    Yes.

24     Q.    Yes, okay.  That's the only

Highly Confidential - Subject to Further Confidentiality Review

1    point I'm trying to make.

2          A.    Okay.

3          Q.    All right.  So I would then

4    like to continue asking you questions

5    about DEA's interpretation and

6    enforcement of the Controlled Substances

7    Act and the relevant regulations and how

8    that relates to the design of a

9    reasonable SOMs system.  Okay?

10         A.    Okay.

11         Q.    All right.  Now, yesterday

12   when we stopped, I believe we had just

13   referred to Exhibit 14, which was

14   statements that Mr. Rannazzisi had made

15   to Congress about 99.5 percent of the

16   prescribers not overprescribing.  Do you

17   recall that testimony?

18         A.    Yes.

19         Q.    Okay.  That testimony

20   occurred in 2014, right?

21         A.    Yes.

22         Q.    Okay.  Now, more recently,

23   in 2018, Mr. Patterson testified in front

24   of Congress that 99.9 percent of doctors

Highly Confidential - Subject to Further Confidentiality Review

1    are all trying to do right by their

2    patients.  Are you familiar with that?

3           A.    Could I see the testimony?

4           Q.    Sure.

5                (Document marked for

6                identification as Exhibit

7                DEA-Prevoznik-15.)

8    BY MR. STEPHENS:

9           Q.    Mr. Prevoznik, I marked as

10   Exhibit Number 15 a hearing dated May 8,

11   2018, entitled "Challenges and Solutions

12   in the Opioid Crisis" before the

13   Committee of the Judiciary, House of

14   Representatives.  I would direct you to

15   Page 32.

16                If you look at the top of

17   32, there's a paragraph that indicates

18   that Mr. Patterson is talking.

19          A.    Correct.

20          Q.    Do you see that?

21          A.    Yes.

22          Q.    Now, Robert Patterson in

23   2018 was the director -- I'm sorry, the

24   administrator of DEA?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Acting administrator.

2          Q.    Acting administrator.

3          A.    Right.

4          Q.    It's the number one position

5    at DEA?

6          A.    Correct.

7          Q.    Okay.  So here Mr. Patterson

8    was asked a question, and in part of his

9    response he says, "But I go back to the

10   fact that I look at the vast majority of

11   doctors, 99.99 percent are all trying to

12   do right by their patients."

13              Do you see that?

14         A.    Correct.

15         Q.    Did I read that accurately?

16         A.    Yes.

17         Q.    Okay.  DEA agrees, as of

18   2018, that 99.9 percent of doctors are

19   all trying to do right by their patients,

20   right?

21              MR. FINKELSTEIN:  Scope.

22              THE WITNESS:  I don't -- I

23         mean, he's stated that, but I

24         don't think it's a static number.

1          So I mean, I think -- it will

2          fluctuate depending on what a

3          prescriber eventually does.

4   BY MR. STEPHENS:

5          Q.    Okay.  As of --

6          A.    As of that date, that's what

7   was said, yes.

8          Q.    Okay.  He was the number one

9   person at DEA when he made that

10  statement, right?

11         A.    Right.

12               MR. FINKELSTEIN:  Asked and

13         answered.

14               MR. FARRELL:  Excuse me.

15         Could you please repeat the

16         exhibit number?

17               MR. STEPHENS:  Sure.  That's

18         number 15, Paul.

19               MR. FINKELSTEIN:  And wait

20         for my objections.

21  BY MR. STEPHENS:

22         Q.    Mr. Prevoznik, if

23  99.99 percent of prescribers acted

24  appropriately, the diversion problems DEA

1    confronts are generated by the remaining

2    one-tenth of 1 percent of the

3    prescribers?

4              MR. FINKELSTEIN:  Objection.

5         Foundation.  Mischaracterizes

6         prior testimony.

7              THE WITNESS:  If you go with

8         that number, yes, that's correct.

9    BY MR. STEPHENS:

10        Q.    Okay.  DEA currently has

11   more than 1.7 million registrants?

12        A.    Correct.

13        Q.    Okay.  And as you recall

14   yesterday, we talked about prescribing

15   doctors being registrants, right?

16        A.    Yes.

17        Q.    Okay.  You would agree --

18             MR. FINKELSTEIN:  I'm sorry.

19        Can I just interrupt for one

20        second.  Your -- the softness of

21        your answer is creating problems

22        for the transcript.  I just

23        noticed.  Please speak louder.

24             THE WITNESS:  Okay.  Sorry.

1    BY MR. STEPHENS:

2         Q.    All right.  You would agree

3    that not all registrants distributed

4    controlled substances to the one-tenth

5    of 1 percent of the prescribers who

6    diverted opioids from 1998 to present?

7              MR. FINKELSTEIN:  Objection.

8         Scope.  Foundation.

9         Mischaracterizes prior testimony.

10             THE WITNESS:  I'm sorry.

11        Could you repeat?

12   BY MR. STEPHENS:

13        Q.    Sure.  So we're talking

14   about the one-tenth of 1 percent, right,

15   of prescribers?

16        A.    Right.

17        Q.    Okay.  You would agree that

18   not all registrants distributed

19   controlled substances to the one-tenth of

20   1 percent of prescribers who diverted

21   opioids?

22             MR. FINKELSTEIN:  Same

23        objections.

24             THE WITNESS:  What was the

Highly Confidential - Subject to Further Confidentiality Review

1          time frame?

2    BY MR. STEPHENS:

3          Q.    1998 to present.

4          A.    This statement was in 2018.

5    So the percentage -- the percentage would

6    have been different of that.

7          Q.    Do you have --

8                MR. FINKELSTEIN:  Tom, a

9          little louder.

10               THE WITNESS:  Okay.  You're

11         asking me from 1998 forward, and

12         this statement was made May 8,

13         2018.

14   BY MR. STEPHENS:

15         Q.    All right.

16         A.    So the percentage -- that

17   number would not be 99.99 percent.

18   Again, it's not a static number that goes

19   year to year.

20         Q.    In 2014, Mr. Rannazzisi

21   estimated 99.5 percent, right?

22         A.    Correct.

23               MR. FINKELSTEIN:

24         Foundation.  Mischaracterizes

1    prior testimony.  Scope.

2            You can answer.

3            THE WITNESS:  Correct.

4    BY MR. STEPHENS:

5        Q.    That's one-half of one

6    percent, right?

7        A.    Correct.

8        Q.    2018, Mr. Patterson said

9    99.99 percent.

10           MR. FINKELSTEIN:  Asked and

11       answered.

12   BY MR. STEPHENS:

13       Q.    That's one-tenth of 1

14   percent, right?

15           MR. FINKELSTEIN:  Asked and

16       answered.

17           You can answer again.

18           THE WITNESS:  Correct.

19   BY MR. STEPHENS:

20       Q.    Okay.  Do you have a number

21   from 2005?

22           MR. FINKELSTEIN:  Objection.

23       Scope.  You can answer if you

24       know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I don't know.
 2   BY MR. STEPHENS:
 3        Q.    Okay.  Do you have a number
 4   from 1998?
 5                    MR. FINKELSTEIN:  Objection.
 6           Scope.  You can answer if you
 7           know.
 8                    THE WITNESS:  I don't know.
 9   BY MR. STEPHENS:
10        Q.    Okay.  Do you have any basis
11   to say that it's less than 99 percent of
12   prescribers?
13                    MR. FINKELSTEIN:  Objection.
14           Scope.
15                    Counsel, do you have any
16           questions within the scope of this
17           notice?
18                    MR. STEPHENS:  I've already
19           established that they are within
20           the scope.
21                    MR. FINKELSTEIN:  We
22           disagree.  We'll let this continue
23           a little bit longer.
24                    You can answer if you know.
```

1            THE WITNESS:  With the

2       pharmacy diversion awareness

3       conferences, I was with

4       Mr. Rannazzisi at those

5       conferences.  And when we did the

6       presentation, so that was from --

7       when I joined -- when I went to

8       headquarters in April 2012,

9       Atlanta was the first PDAC that I

10      went to.  So from that point on,

11      pretty much every time that we had

12      a presentation, we would say 1 to

13      2 percent.  So that is the figure

14      that I know of, 1 to 2 percent.

15 BY MR. STEPHENS:

16      Q.    Okay.  Would you agree then

17 that not all registrants distributed

18 controlled substance to the 1 or

19 2 percent of prescribers who diverted

20 opioids from 2005 to 2018?

21            MR. FINKELSTEIN:  Objection.

22      Scope.

23            THE WITNESS:  I believe I'd

24      be speculating, but -- I would be

Highly Confidential - Subject to Further Confidentiality Review

1          speculating on that, but, yes.

2  BY MR. STEPHENS:

3        Q.   Okay.  I'd like to continue

4  by asking you some additional questions

5  about interpretation enforcement of

6  Title 21 U.S.C. 23, the regulations and

7  how those relate to the design of a

8  reasonable SOMs system.  Okay?

9        A.   Yes.

10       Q.   Okay.  So yesterday you --

11  you testified about different

12  distributors having different business

13  models, right?

14       A.   Correct.

15       MR. FINKELSTEIN:  Objection.

16  Scope.  Characterization.

17  BY MR. STEPHENS:

18       Q.   Is it fair to say that a

19  SOMs systems is not a one-size-all

20  proposition, one-size-fits-all

21  proposition?

22       A.   Correct.

23       Q.   And DEA understands that not

24  all registrants distribute opioids to the

1    same customers, right?

2         A.    Correct.

3         Q.    DEA understands that

4    registrants have different business

5    models?

6         A.    Correct.

7         Q.    And DEA expects that each

8    registrant will review its own business

9    model and design a SOM system that fits

10   its specific method of distribution?

11              MR. FINKELSTEIN:  Objection.

12        Vague.

13              THE WITNESS:  That's correct

14        as -- as per the regulations.

15   BY MR. STEPHENS:

16        Q.    Okay.  Some registrants

17   distribute to hospitals?

18        A.    Correct.

19        Q.    Some don't?

20        A.    Correct.

21        Q.    Some registrants distribute

22   to hospice centers?

23        A.    Correct.

24        Q.    Some don't?

1      A.    Correct.

2      Q.    Some registrant distribute

3   to independent pharmacies that the

4   registrants do not own?

5      A.    Correct.

6      Q.    Some registrants, like

7   retail chain pharmacies, do not

8   distribute to independent pharmacies that

9   they do not own?

10     A.    I don't know if I completely

11  agree with that.  Because you can have --

12  you could have a -- a

13  registrant-to-registrant sale of -- a

14  distribution from a chain store to an

15  independent store.  You can do it.  So I

16  can't say carte blanche that that

17  doesn't -- hasn't occurred or -- I just

18  can't say that --

19     Q.    Okay.

20     A.    -- because that's not an

21  ARCOS reportable transaction.

22     Q.    So let -- let me follow up

23  with a different question.  Come at it

24  this way.

1        Retail chain pharmacies

2    commonly use a self-distributing model

3    where they distribute to chain pharmacy

4    locations that they own.

5            MR. FINKELSTEIN:  Objection.

6        Scope.  Answer if you know.

7            THE WITNESS:  Some do, and

8        some have changed.

9    BY MR. STEPHENS:

10        Q.   Okay.  For example,

11   Walmart's distribution centers only

12   distributed to Walmart pharmacies at

13   Walmart store locations?

14            MS. SINGER:  Objection.

15            MR. FINKELSTEIN:  Objection.

16        Scope.  Calls for speculation.

17            THE WITNESS:  That was

18        correct, yes.

19   BY MR. STEPHENS:

20        Q.   All right.  I'd like to ask

21   you some questions about Topic 3 related

22   to the guidance that DEA provides

23   regarding the adequacy of SOM systems.

24            Okay?

1       A.    Yes.

2       Q.    All right.  DEA expected

3  that each registrant would take

4  reasonable steps to avoid shipping

5  prescription opioids to individuals who

6  would divert the controlled substances?

7       A.    Is that a question?

8       Q.    Yes.

9       A.    I thought it was a

10  statement.  Yes.

11      Q.    All right.  Let me show you

12  Exhibit 16 which will be the dear

13  registrant letter dated September 27,

14  2006.

15           (Document marked for

16           identification as Exhibit

17           DEA-Prevoznik-16.)

18  BY MR. STEPHENS:

19      Q.    Mr. Prevoznik, you're

20  familiar with Exhibit Number 16, correct?

21      A.    Correct.

22      Q.    All right.  I direct your

23  attention, do you see on the first page

24  where it says background?

1      A.    Yes.

2      Q.    I would direct you to the

3   second paragraph.  And the first sentence

4   says, "The CSA was designed by Congress

5   to combat diversion by providing for a

6   closed system of drug distribution in

7   which all legitimate handlers of

8   controlled substances must obtain a DEA

9   registration, and, as a condition of

10  maintaining such registration, must take

11  reasonable steps to ensure that the

12  registration is not being utilized as a

13  source of diversion."

14           Do you see that?

15     A.    Yes.

16     Q.    Do you agree with that

17  statement?

18     A.    Yes.

19     Q.    Okay.  So the -- the

20  direction -- the statement here is that

21  distributors need to take reasonable

22  steps, right?

23     A.    Yes.

24     Q.    The -- the letter does not

1    state that registrants need to take every

2    possible step, does it?

3         A.    No.  It says reasonable.

4         Q.    Okay.  Now, one key point of

5    the Controlled Substances Act is that DEA

6    wanted registrants to set up their supply

7    chain so they did not supply controlled

8    substances to customers who diverted

9    them, right?

10        A.    Correct.

11        Q.    Okay.  Would DEA agree that

12   a distributor was acting reasonably if it

13   structured its business so that it only

14   distributed to retail chain pharmacies

15   who were among the 98 to 99.9 percent of

16   registrants who did not divert controlled

17   substances?

18             MR. FINKELSTEIN:  Objection.

19        Incomplete hypothetical, and I

20        will instruct you not to answer to

21        the extent that that answer

22        requires information relating to

23        ongoing enforcement actions or

24        investigations.

Highly Confidential - Subject to Further Confidentiality Review

1           Subject to that objection,

2     you can answer.

3           THE WITNESS:  Could you

4     please repeat it?

5 BY MR. STEPHENS:

6           Q.    Sure.  DEA would agree that

7 a distributor was acting reasonably if it

8 structured its business so it only

9 distributed to retail chain pharmacies

10 who were among the 99 -- 98 to

11 99.9 percent of registrants who did not

12 divert controlled substances?

13           MR. FINKELSTEIN:  Also

14     foundation.

15           You can answer.

16           MR. FARRELL:  Excuse me.  I

17     need -- I think I need to place an

18     objection on the record.

19           Objection.  I think I need

20     to say something on the record.

21           Noting that you represent

22     Walmart, I just want to make sure

23     that we -- the questions that

24     you're asking are tailored in

1          terms of Walmart's capacity as a

2          distributor, instead of Walmart's

3          capacity as a dispenser, because

4          as you know, we've long had

5          litigation quarrels on whether or

6          not we can get into dispensing

7          practices.

8               So I just want to make sure

9          the record is clear that the

10         plaintiffs and the PEC are not

11         waiving their right to one day

12         open discussions on dispensing

13         practices.

14              MR. STEPHENS:  Paul, if --

15         if you look at my question, my

16         question only talks about

17         distribution.

18              MR. FARRELL:  Then you

19         talked about the 99 percent of

20         prescribers.  So that's why I was

21         concerned whether or not --

22              MR. STEPHENS:  It's -- it's

23         simply distribution.  That's all

24         I'm asking.  That's why the

1          question has got two references to

2          distribution, period.

3               MR. FARRELL:  Okay.  Very

4          good.  Sorry.

5               MR. FINKELSTEIN:  Do you

6          remember the question?

7               THE WITNESS:  One more time

8          please.

9     BY MR. STEPHENS:

10          Q.    DEA would agree that a

11    distributor was acting reasonably if it

12    structured its business so it only

13    distributed to retail chain pharmacies

14    who were among the 99.5 percent,

15    98 percent of registrants who did not

16    divert controlled substances?

17               MR. FINKELSTEIN:  The

18          objections are foundation,

19          incomplete hypothetical, and don't

20          answer based on confidential law

21          enforcement information.

22               THE WITNESS:  Okay.  Again,

23          I think this goes back to, you can

24          have the best plans, but in terms

1          of execution and implementation of

2          that plan, that business plan

3          you're talking about, we did have

4          a chain that it was specifically

5          on their distribution center that

6          did not report suspicious orders

7          and that was part of a civil

8          settlement of $80 million.

9               So that company thought they

10         had a business strategy in place

11         and they ended up with their

12         distribution center in Florida not

13         doing what they said they were

14         going to do.

15    BY MR. STEPHENS:

16         Q.   Okay.  Let me re-ask it from

17    a different angle.

18         A.   Sure.

19         Q.   Does DEA agree the

20    distributor is acting reasonably if it

21    structured its business model so it

22    distributes to customers who are not

23    among the 1 or 2 percent of people who

24    divert prescription opioids?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. FINKELSTEIN:  Incomplete

2         hypothetical.

3              MR. FARRELL:  Again, my

4         objection is you laid the

5         foundation that the 1 or 2 percent

6         included doctors trying to do the

7         right thing.  So I just want to

8         make it clear that if we're

9         getting into dispensing claims,

10        that's a big issue for the

11        plaintiffs.

12             MR. STEPHENS:  I'm not.

13             THE WITNESS:  I would just

14        repeat that you can have the best

15        strategy planned, but are you

16        executing that plan.

17   BY MR. STEPHENS:

18        Q.   Okay.  All right.  But if a

19   distributor, just generally, a

20   distributor -- if a distributor is not

21   distributing prescription opioids to

22   someone who is diverting them, is the

23   distributor acting reasonably in the eyes

24   of DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FINKELSTEIN:  Incomplete
 2         hypothetical.  That was the third
 3         time you asked.
 4              You can answer a third time.
 5              THE WITNESS:  The --
 6         their -- according to your --
 7         my -- what I understand you're
 8         asking is, it's a distributor, a
 9         company distributor is sending to
10         their own pharmacies, correct?
11  BY MR. STEPHENS:
12         Q.    No.  I've changed that.
13         A.    Okay.
14         Q.    Okay.  So my question is, if
15  a distributor is not distributing
16  prescription opioids to someone who is
17  diverting them, is the distributor acting
18  reasonably in the eyes of DEA?
19              MR. FINKELSTEIN:  Incomplete
20         hypothetical.  Asked and answered.
21              THE WITNESS:  This -- this
22         isn't just, I mean, just opioids,
23         you have responsibility for all
24         controlled substances that are
```

1          distributed.  It's not just

2          opioids.  The responsibility is

3          all controlled substances.

4    BY MR. STEPHENS:

5          Q.   Okay.  So let me re-ask the

6    question.  If a distributor is not

7    distributing controlled substances to

8    someone who is diverting them, is the

9    distributor acting reasonably in the eyes

10   of DEA?

11              MR. FINKELSTEIN:  Incomplete

12         hypothetical.  Asked and answered.

13              Go ahead and answer again.

14              THE WITNESS:  So there's no

15         controlled substances being

16         distributed?

17   BY MR. STEPHENS:

18         Q.   Let me re-ask the question.

19         A.   Sure.

20         Q.   If a distributor is not

21   distributing controlled substances to

22   someone who is diverting them, is the

23   distributor acting reasonably in the eyes

24   of DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FINKELSTEIN:  Incomplete
 2           hypothetical.  Asked and answered.
 3                    THE WITNESS:  To -- give me
 4           the last part?  Who is it going
 5           to?
 6    BY MR. STEPHENS:
 7           Q.    If a distributor is not
 8    distributing controlled substances to
 9    someone who is diverting them and
10    distributing to others, is the
11    distributor acting reasonably in the eyes
12    of DEA?
13                    MR. FINKELSTEIN:  Same
14           objections.
15                    THE WITNESS:  Yes.
16    BY MR. STEPHENS:
17           Q.    Okay.  The diversion control
18    group at DEA headquarters in Washington
19    DC understand that DEA field division
20    offices across the country will interest
21    act with registrants, true?
22           A.    True.
23           Q.    And DEA personnel from DEA
24    field offices will communicate with
```

1   registrants about a registrant's SOMs

2   system, true?

3           A.    Yes.  True.

4           Q.    DEA headquarters expects a

5   registrant to listen to the information

6   it receives from DEA field office

7   personnel, true?

8                 MR. FINKELSTEIN:  Vague.

9                 THE WITNESS:  Yeah.  It

10          depends what they are asking,

11          sure.

12  BY MR. STEPHENS:

13          Q.    Okay.  And the registrants

14  who are visited by DEA field office

15  personnel can rely on the information

16  that they receive from DEA field division

17  personnel regarding SOMs systems, true?

18                MR. FINKELSTEIN:  Vague.

19          Incomplete hypothetical.

20                THE WITNESS:  Yeah, they get

21          guidance.

22  BY MR. STEPHENS:

23          Q.    Would you agree that it's

24  important for DEA's diversion control

Highly Confidential - Subject to Further Confidentiality Review

1    leadership at DEA headquarters in

2    Washington DC to clearly communicate its

3    interpretation of the requirements of the

4    CSA and its regulations related to

5    suspicious order monitoring to DEA's

6    field offices?

7                    MR. FINKELSTEIN:  Asked and

8            answered.  I'll note that every

9            set of attorneys has asked a

10           version of this question.

11                   But you can answer again.

12                   THE WITNESS:  Yes.

13   BY MR. STEPHENS:

14           Q.    Okay.  You would agree that

15   providing clear direction to DEA's field

16   divisions one of the most important

17   functions of the diversion control group

18   leadership at headquarters?

19           A.    Yes.

20           Q.    If DEA headquarters does not

21   clearly communicate its interpretation of

22   the regulations and statutes related to

23   the suspicious order monitoring programs

24   to DEA's field offices, the field offices

1    may give inaccurate information to

2    registrants?

3              MR. FINKELSTEIN:  Vague.

4              MS. SINGER:  Objection.

5         Calls for speculation.

6              THE WITNESS:  I don't -- I

7         don't know specifically what every

8         field office has provided that

9         guidance and oftentimes when there

10        is a question regarding that, we

11        will -- the field is instructed to

12        have the registrant reach out to

13        headquarters for an official

14        review.

15   BY MR. STEPHENS:

16        Q.    Okay.

17        A.    So the official review would

18   come from the headquarters side.

19        Q.    Okay.  My question is a

20   little bit -- I understand what you're

21   saying.  My question is just a little bit

22   different.

23              My question is, if the field

24   office doesn't necessarily understand

1    headquarter's position on something

2    related to the statute and the

3    regulations, there's a risk that they

4    could provide inaccurate information to

5    registrants in the field?

6              MS. SINGER:  Objection.

7         Calls for speculation.

8              MR. FINKELSTEIN:  I'll join.

9         Add vague, incomplete

10        hypothetical.

11             THE WITNESS:  I would -- if

12        they don't know, and don't ask,

13        then yes, hypothetically, yes.

14   BY MR. STEPHENS:

15        Q.   All right.  So let's now

16   talk about communications between DEA and

17   the registrants.  All right?

18        A.   Yes.

19        Q.   Okay.  Agree that at some

20   point after -- well, let me strike that

21   and start over.

22             Mr. Rannazzisi ran the

23   diversion control group from 2006 to

24   about 2015, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.   That sounds about

2   right.

3      Q.    Okay.   After Mr. Rannazzisi

4   left DEA in 2015, DEA's leadership

5   recognized that it needed to make some

6   important changes to improve how DEA

7   communicated with registrants, true?

8           MR. FINKELSTEIN:   Objection.

9      Vague.

10          MS. SINGER:   Lack of

11     foundation.

12          THE WITNESS:   I mean, yeah,

13     yeah.

14  BY MR. STEPHENS:

15     Q.    DEA's leadership after

16  Mr. Rannazzisi left DEA in 2015 wanted to

17  increase collaboration with registrants

18  to decrease diversion, correct?

19     A.    Correct.

20     Q.    DEA's current leadership has

21  acknowledged that it needs to do better

22  in its efforts to collaborate with

23  manufacturers, distributors, and retail

24  chain pharmacies, true?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I believe we all need to do

2  it.

3      Q.    Okay.

4      A.    Not just one.  It's --

5  everybody has to be involved.

6      Q.    My question is maybe a

7  little bit different than your answer.

8  So let me restate it.

9      A.    Sure.

10      Q.    DEA's current leadership has

11  acknowledged that it needs to do better

12  in its efforts to collaborate with

13  manufacturers, distributors and retail

14  chain pharmacies?

15      A.    Correct.

16          MR. FINKELSTEIN:  Just wait.

17          (Document marked for

18          identification as Exhibit

19          DEA-Prevoznik-17.)

20  BY MR. STEPHENS:

21      Q.    Mr. Prevoznik, I'm showing

22  you what has been marked as Exhibit

23  Number 17.  It is more summit -- or

24  congressional materials.

Highly Confidential - Subject to Further Confidentiality Review

1           This one is dated March 20,

2    2018.  It's a hearing in front of the

3    subcommittee of oversight and

4    investigations.  The committee on energy

5    and commerce entitled, "The Drug

6    Enforcement Administration's Role in

7    Combatting the Opioid Epidemic."

8           Do you see that?

9    A.    Yes.

10    Q.    All right.  I would direct

11    you to Page 21.

12           MR. FINKELSTEIN:  Counsel,

13        whose highlighting is this?

14           MR. STEPHENS:  We can get a

15        clean version at a break.  That

16        highlighting would be -- it may be

17        mine.

18           MR. FINKELSTEIN:  Okay.

19    BY MR. STEPHENS:

20    Q.    On Page 21 do you see in

21    bold in the middle of the page it talks

22    about DEA's lessons learned and the

23    response of the proliferation of CPDs?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And if you look at

2  the -- the first sentence there, it

3  reads, "Due to the complexity of DEA's

4  regulatory program, the diversion control

5  division has worked aggressively to

6  improve its communication and cooperation

7  with its more than 1.7 million

8  registrants who represent medical

9  professionals, pharmaceutical drug

10  manufacturers, and those in the drug

11  chain" -- "drug supply chain."

12         Do you see that?

13    A.    Yes.

14    Q.    Have I read that accurately?

15    A.    Yes.

16    Q.    Okay.  And -- and this is a

17  statement indicating that DEA's

18  leadership in March 20th of 2018 was

19  working aggressively to improve its

20  communication and cooperation with

21  registrants, right?

22    A.    Right.

23    Q.    Okay.  DEA also recognizes

24  that if it improves on its communication

Highly Confidential - Subject to Further Confidentiality Review

1    responsibilities with its registrants, it

2    would help in the effort to reduce

3    prescription drug abuse?

4              MR. FINKELSTEIN:  Vague.

5         Incomplete hypothetical.

6              THE WITNESS:  That's the

7         goal.

8    BY MR. STEPHENS:

9         Q.    Okay.  And would you agree

10   that current leadership at DEA is now

11   willing to collaborate with registrants

12   who can help DEA reduce diversion?

13        A.    Yes.

14        Q.    Fair to say that DEA's

15   current leadership understands that

16   treating potential good faith

17   collaborators as adversaries is not an

18   effective way to reduce diversion?

19             MR. FINKELSTEIN:  Incomplete

20        hypothetical.

21             THE WITNESS:  Correct.

22   BY MR. STEPHENS:

23        Q.    All right.  Mr. Prevoznik,

24   I'd like to transition a little bit here

1  and ask you some questions about the

2  internet distributor initiative,

3  including why DEA gave those internet

4  distributor initiative briefings, when

5  the briefings occurred and who generally

6  received them.  Okay?

7          A.    Sure.

8          Q.    This is 30(b)(6) Topic 3.

9  Okay?

10         A.    Yes.

11         Q.    All right.  And -- and you

12  testified about some of this yesterday.

13  I'll try and go quickly through that.

14  All right?

15         A.    Yes.

16         Q.    In 2006, DEA implemented the

17  internet distributor initiative, right?

18             MR. FINKELSTEIN:  Asked and

19         answered.

20             THE WITNESS:  2005.

21  BY MR. STEPHENS:

22         Q.    Okay.  2005, right.  So DEA

23  implements it in 2005, right?

24         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And the -- the

2   program is initially designed to educate

3   wholesale distributors related to rogue

4   internet pharmacies, and then downstream,

5   a little bit later, it was to diverting

6   rogue pain clinics, right?

7             MR. FINKELSTEIN:  Asked and

8        answered.

9             THE WITNESS:  Correct.

10  BY MR. STEPHENS:

11   Q.    Okay.  All right.  I was

12  just trying to remind you from where we

13  were yesterday.

14             All right.  My question is,

15  did DEA ever have a retail chain pharmacy

16  initiative?

17   A.    No.

18   Q.    Did DEA ever meet with CVS,

19  Rite Aid, Walmart or Walgreens, HBC Giant

20  Eagle, as part of DEA's internet

21  distributor initiative?

22   A.    Not to my knowledge.

23   Q.    Okay.  Now at the time, you

24  know, taking you back to 2005, 2006, DEA

1   believed that some of these internet

2   pharmacies were rogue pharmacies, meaning

3   that those pharmacies were diverting

4   opioids?

5            MR. FINKELSTEIN:  Asked and

6       answered.

7            THE WITNESS:  Correct.

8   BY MR. STEPHENS:

9       Q.    Okay.  The DEA also

10  understood that not all pharmacies

11  operating on the internet diverted

12  controlled substances, true?

13      A.    Correct.

14      Q.    So some internet pharmacies

15  were rogue and diverted opioids, and

16  other internet pharmacies were not rogue

17  and did not divert opioids, true?

18           MS. SINGER:  Objection.

19       Scope.

20           THE WITNESS:  Could you

21       repeat that?

22  BY MR. STEPHENS:

23      Q.    Sure.  Some internet

24  pharmacies were rogue and diverted

1    opioids in the eyes of DEA.  And others

2    were not rogue and did not divert

3    opioids, correct?

4              MR. FINKELSTEIN:  Calls for

5         speculation.

6              THE WITNESS:  I am not aware

7         of any pharmacies not on the --

8         the latter part of your question.

9              Because not all -- not all

10        internet pharmacies were

11        dispensing opioids, but they could

12        be dispensing other controlled

13        substances, and that would be

14        diversion of those controlled

15        substances.

16             (Document marked for

17        identification as Exhibit

18        DEA-Prevoznik-18.)

19   BY MR. STEPHENS:

20        Q.   Mr. Prevoznik, I've placed

21   in front of you a transcript from the --

22   a hearing before Congress dated May 16,

23   2007.  It's a hearing before the

24   committee on the judiciary of the United

1    States Senate entitled, "Rogue Online

2    Pharmacies:  The Growing Problem of

3    Internet Drug Trafficking."

4              Do you see that?

5         A.    Yes.

6         Q.    Okay.  If I could direct you

7    to Page 52.

8              If you look at the top of

9    Page 52, Mr. Prevoznik, it's entitled,

10   "Rogue Online Pharmacies:  The Growing

11   Problem of Internet Drug Trafficking,"

12   dated May 16, 2007.  Questions for the

13   hearing record for Joseph Rannazzisi,

14   deputy assistant administrator, office of

15   diversion control, Drug Enforcement

16   Administration, United States Department

17   of Justice.

18             Do you see that?

19        A.    Yes.

20        Q.    Okay.  The very first

21   question is from Chairman Leahy, do you

22   see that?

23        A.    Yes.

24        Q.    And 1.a. asks:

Highly Confidential - Subject to Further Confidentiality Review

1     "Approximately how many websites

2     currently offer to sell controlled

3     substances illegally over the internet?"

4              Do you see that?

5     A.     Yes.

6     Q.     Okay.  Now, if you look down

7     towards the -- the middle of the

8     response, there's a state -- there's a

9     sentence that starts it should be noted.

10    Do you see that?

11    A.     Yes.

12    Q.     The statement reads:  "It

13    should be noted that there are legitimate

14    pharmacies that provide controlled

15    substances via the internet and operate

16    daily within the boundaries of the law."

17             Do you see that?

18    A.     Yes.

19    Q.     Do you agree with that?

20             MR. FINKELSTEIN:  Scope.

21    Calls for speculation.

22             THE WITNESS:  Yeah, this is

23    before the Ryan-Haight Act.  So,

24    yes.

1    BY MR. STEPHENS:

2        Q.    Okay.  So my -- my point

3    was, some internet pharmacies in the eyes

4    of DEA were rogue and diverted opioids --

5    or diverted controlled substances, fair?

6        A.    Fair.

7        Q.    All right.  Other online

8    internet pharmacies were not rogue

9    pharmacies and operated within the

10   boundaries of the law in the eyes of DEA

11   as of May 16, 2007, based on what DEA

12   told the Senate, right?

13       A.    Correct.

14       Q.    Okay.  Now, did DEA blame

15   the internet pharmacies who were acting

16   within the boundaries of the law for the

17   actions of the rogue internet pharmacies

18   who DEA thought were diverting

19   prescription opioids?

20           MS. SINGER:  Objection.

21       Scope.

22           MR. FINKELSTEIN:  Vague.

23       Incomplete hypothetical.

24           THE WITNESS:  Not really

Highly Confidential - Subject to Further Confidentiality Review

1          sure what you mean by the use of

2          the word "blame."

3     BY MR. STEPHENS:

4          Q.    Did DEA take any action,

5     civil, regulatory, administrative,

6     against legitimate internet pharmacies

7     who DEA thought was acting within the

8     boundaries of the law for the actions of

9     the other internet pharmacies who DEA

10    thought were rogue and were diverting

11    controlled substances?

12              MR. FINKELSTEIN:  Vague.

13          Incomplete hypothetical.

14              THE WITNESS:  I'm not aware

15          of it.

16    BY MR. STEPHENS:

17          Q.    Okay.  So one aspect that

18    DEA included in its internet distributor

19    briefing related to the percentage of

20    controlled versus noncontrolled

21    substances that a particular pharmacy

22    ordered, right?

23              MR. FINKELSTEIN:  Vague.

24              THE WITNESS:  Correct.

1   BY MR. STEPHENS:

2       Q.    Okay.  And you testified

3   about this a little bit yesterday, right?

4       A.    Yes.

5       Q.    Okay.  All right.  So I've

6   got a few more questions related to that.

7   I will try not to repeat the exact

8   question.

9             And one characteristic the

10  DEA noticed about rogue internet

11  pharmacies that were diverting controlled

12  substances was an imbalance that they had

13  between the ratio of controlled

14  substances compared to non-controlled

15  substances that they distributed, right?

16      A.    That would be one criteria.

17  Yes.

18      Q.    And some of the rogue

19  internet pharmacies that were diverting

20  controlled substances had a ratio where

21  they distributed 95 percent controlled

22  substances against 5 percent

23  non-controlled substances, right?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And DEA viewed a ratio of

2    95 percent controlled substances versus 5

3    percent non-controlled substances as a

4    possible indication that the internet

5    pharmacy was diverting the controlled

6    substances true?

7    A.    I don't -- I don't think we

8    locked in on those specific numbers.  I

9    mean, that was an example he gave of 95

10    and five.  But we were -- we were

11    comparing against a brick-and-mortar

12    store of what typically happens there.

13    Q.    Yeah.  Okay.  So -- and a

14    brick-and-mortar store would be like a

15    Walmart or CVS, a Rite Aid, HBC Giant

16    Eagle, CVS, right?

17    A.    As well as independent

18    pharmacies as well, yes.

19    Q.    Okay.  And Walmart

20    pharmacies never had a ratio of

21    controlled to noncontrolled substances

22    that approached anything like the 95

23    percent to 5 percent ratio that the DEA

24    saw at some rogue internet pharmacies,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2              MR. FINKELSTEIN:  Wait.

3         Scope, calls for speculation.

4              THE WITNESS:  Not to my

5         knowledge.

6    BY MR. STEPHENS:

7         Q.    Okay.  CVS, Walgreens, Rite

8    Aid, HBC Giant Eagle, they never had a

9    ratio of controlled to noncontrolled

10   substances that was 95 percent controlled

11   to 5 percent non-controlled, right?

12             MR. FINKELSTEIN:  Scope.

13        Calls for speculation.

14             THE WITNESS:  Not to my

15        knowledge.

16             MR. FINKELSTEIN:

17        Mr. Videographer, what's our

18        on-the-record time?

19             THE VIDEOGRAPHER:

20        42 minutes.

21             MR. FINKELSTEIN:  We're past

22        seven hours.  So everybody knows.

23   BY MR. STEPHENS:

24        Q.    DEA has acknowledged and has

1    acknowledged in presentations that it

2    gave that no chain pharmacies were rogue

3    pharmacies, right?

4         A.    Correct.

5              MR. FINKELSTEIN:  Hang on

6         one second.  I am just reading the

7         question.

8              Okay.

9    BY MR. STEPHENS:

10        Q.    Your answer was "correct,"

11   right?

12        A.    Yes.

13        Q.    Walmart, CVS, Rite Aid,

14   Walgreens, HBC Giant Eagle are all chain

15   pharmacies, true?

16        A.    True.

17        Q.    DEA is generally aware that

18   Walmart only distributes controlled

19   substances to its own Walmart store

20   pharmacies, right?

21             MR. FINKELSTEIN:  Objection.

22        Scope.  Calls for speculation.

23             THE WITNESS:  Well, that

24        just changed.  But prior to the

Highly Confidential - Subject to Further Confidentiality Review

1    change, yes.

2    BY MR. STEPHENS:

3        Q.    Okay.  And the change now is

4    that they don't distribute at all, right?

5        A.    Correct.

6        Q.    Okay.  Walmart did not

7    distribute controlled substances to

8    internet pharmacies, right?

9            MR. FINKELSTEIN:  Scope.

10        Calls for speculation.

11            THE WITNESS:  I don't know.

12        I can't answer that, because I

13        don't know if there were any sales

14        store -- from the store to one of

15        those -- one of those potentially

16        rogue pharmacies.

17    BY MR. STEPHENS:

18        Q.    I'm only talking about --

19            MR. FINKELSTEIN:  Let him

20        finish his answer.

21            MR. STEPHENS:  I've let him

22        finish his answer.

23            MR. FINKELSTEIN:  No, you

24        haven't let him finish his answer.

1          MR. STEPHENS:  All morning

2     long.

3  BY MR. STEPHENS:

4          Q.   Mr. Prevoznik, have I been

5  interrupting you this morning?

6          A.   I'm fine.

7          Q.   Okay.  Thank you.

8          CVS did not distribute

9  controlled substances to rogue internet

10  pharmacies, correct?

11          MR. FINKELSTEIN:  Vague.

12          THE WITNESS:  Again, I don't

13     know if there were transactions

14     between the -- a pharmacy to

15     pharmacy.

16  BY MR. STEPHENS:

17          Q.   I'm talking about

18  distribution.

19          MR. FINKELSTEIN:  Scope.

20     Incomplete hypothetical.  Vague.

21          THE WITNESS:  Well, now that

22     you've added distribution in that,

23     then no, not to my knowledge.

24  BY MR. STEPHENS:

1    Q.    My question, Mr. Prevoznik,

2    just to reconfirm, all deal with

3    distribution here.

4    A.    Okay.

5    Q.    Okay.  So I'll re-ask it.  I

6    think we got an answer.  But let me

7    re-ask it so the record is clear.

8         CVS did not distribute

9    controlled substances to rogue internet

10   pharmacies right?

11   A.    Not --

12        MS. SINGER:  Objection

13   scope.

14        MR. FINKELSTEIN:  Wait, Tom.

15        Scope.  Incomplete

16   hypothetical.  Vague.  We're past

17   seven hours, and you're still

18   outside the scope.  I'm going to

19   start instructing him not to

20   answer.

21        You can answer this time.

22        THE WITNESS:  Not to my

23   knowledge.

24   BY MR. STEPHENS:

1        Q.    And Rite Aid didn't

2   distribute controlled substances to

3   internet pharmacies, right?

4                MR. FINKELSTEIN:  Scope.

5                I instruct you not to

6           answer.

7                MR. STEPHENS:  What's the

8           basis for that?

9                MR. FINKELSTEIN:  It's

10          outside the scope.  You've spent

11          more than seven hours with this

12          witness.  Ask questions within the

13          scope of the deposition that is.

14               MS. MAINIGI:

15          Mr. Finkelstein, if I may just

16          note on the record.  I don't know

17          what relevance seven hours has and

18          why you continue to reference

19          seven hours to this particular

20          deposition.  The manner in which

21          the time is calculated, as you

22          know, was per Judge Cohen --

23          Special Master Cohen's order.

24               The seven hours is

1      irrelevant.  I think it would

2      certainly be relevant in that we

3      wouldn't want to burden the

4      witness by going longer than seven

5      hours, perhaps, in the course of

6      one particular day.  But I don't

7      think there's any need, the

8      morning of the deposition, to keep

9      referencing seven hours.

10          MR. FINKELSTEIN:  You've

11     noted your position that the seven

12     hours is irrelevant.  My

13     instruction stands.  And we can

14     revisit this with the special

15     master.

16          MS. MAINIGI:  If there's

17     something to revisit, we're happy

18     to do that.  I don't see anything

19     to revisit.

20          MR. FINKELSTEIN:  Good.  I

21     agree.

22          THE REPORTER:  You have to

23     speak up.  There's no mic.

24          MR. KOBRIN:  Sorry.  I'm

```
 1            Josh Kobrin for HBC.  Mr. Stephens
 2       is representing all of the chain
 3       pharmacies.  And to cut him off
 4       when he's trying to ask questions
 5       on behalf of all those chain
 6       pharmacies when he's in the middle
 7       of a question that is clearly not
 8       a hypothetical.  On the basis that
 9       it's a hypothetical, is totally
10       improper.
11            MR. FINKELSTEIN:  Your
12       objection is noted.
13            MR. STEPHENS:  I would also
14       note that the answers that the
15       witness started with this morning
16       about diversion, where to -- who
17       diverts is relevant to the
18       adequacy of a SOMs program, and
19       where diversion occurs being
20       relevant to the adequacy of a SOMs
21       program, and to -- to assess a
22       suspicious order, where the
23       shipment goes and it's distributed
24       to is relevant, puts me well
```

Highly Confidential - Subject to Further Confidentiality Review

1          within Topic Number 2 and Topic

2          Number 3, that deal with DEA's

3          interpretation and enforcement of

4          the Controlled Substances Act, its

5          regulations, what is suspicious,

6          know your customer, and DEA's

7          guidance on the adequacy of a SOMs

8          program.

9                MR. FINKELSTEIN:  Let -- let

10          me answer.  You are asking him

11          what a specific retail chain

12          pharmacy actually does in

13          operation.  That's outside the

14          scope, and I've instructed him not

15          to answer that question.

16                You can ask your next

17          question.

18                MR. STEPHENS:  Who they

19          distribute to.

20     BY MR. STEPHENS:

21          Q.    Rite Aid did not distribute

22     controlled substances to internet

23     pharmacies, correct?

24                MR. FINKELSTEIN:  Instruct

Highly Confidential - Subject to Further Confidentiality Review

```
 1           you not to answer.

 2                 THE WITNESS:  Correct.

 3                 MR. FINKELSTEIN:  Tom.  Tom.

 4     BY MR. STEPHENS:

 5           Q.    Walmart -- Walgreens did not

 6     distribute controlled substances to

 7     internet pharmacies, correct?

 8                 MR. FINKELSTEIN:  Instruct

 9           you not to answer.

10                 THE WITNESS:  Taking the

11           advice of my attorney.

12     BY MR. STEPHENS:

13           Q.    HBC Giant Eagle did not

14     distribute controlled substances to

15     internet pharmacies, correct?

16                 MR. FINKELSTEIN:  Instruct

17           you not to answer.

18                 THE WITNESS:  Following my

19           attorney's instructions.

20     BY MR. STEPHENS:

21           Q.    Okay.  Mr. Prevoznik,

22     after -- you mentioned the Ryan-Haight

23     Act in 2008, right?

24           A.    Correct.
```

1    Q.    Okay.  The Ryan-Haight Act

2    in 2008 dealt with a legislative attempt

3    to try and deal with the problem that DEA

4    was seeing with rogue internet

5    pharmacies, fair?

6            MS. SINGER:  Objection.

7        Scope.

8            THE WITNESS:  Correct.

9    BY MR. STEPHENS:

10    Q.    Okay.  So I'm again going to

11   ask you some questions about where DEA

12   saw diversion occurring, okay?

13    A.    Yes.

14    Q.    Okay.  Now, the -- after the

15   Ryan-Haight Act, DEA took some

16   enforcement actions against rogue

17   internet pharmacies, right?

18    A.    Yes.  As -- as well as some

19   distributors.

20    Q.    Okay.  And -- and after

21   that, in the 2008-2009 time period, DEA

22   began to see issues with rogue pain

23   clinics, right?

24            MR. FINKELSTEIN:  Asked and

Highly Confidential - Subject to Further Confidentiality Review

1           answered.

2                   THE WITNESS:  Correct.

3                   MR. STEPHENS:  I'm just

4           trying to set the time frame for

5           the witness.

6    BY MR. STEPHENS:

7           Q.    Do you understand what I'm

8    saying, Mr. Prevoznik?

9           A.    Yes.

10          Q.    Okay.  All right.  So it was

11   in the -- in -- approximate time frames

12   here, and clarify to whatever degree you

13   feel you need to, Mr. Prevoznik.  But

14   roughly in 2009, 2010, and shortly after

15   that, the DEA started to have more issues

16   with rogue pain clinics, right?

17          A.    Correct.

18          Q.    Okay.  Did DEA ever conduct

19   a distributor briefing with retail chain

20   pharmacies related to rogue pain clinics?

21                  MR. FINKELSTEIN:  Asked and

22          answered.

23                  THE WITNESS:  Correct.

24   BY MR. STEPHENS:

1    Q.    Okay.  So now like rogue --

2    or I'm sorry, strike that.  Let me re-ask

3    the question.

4          Like internet pharmacies,

5    DEA -- DEA would agree that not all pain

6    clinics diverted controlled substances?

7          MR. FINKELSTEIN:  Calls for

8          speculation.  Asked and answered.

9          THE WITNESS:  Correct.

10   BY MR. STEPHENS:

11   Q.    Okay.  There was some good

12   pain clinics who operated within the

13   boundaries of the law and there were some

14   rogue pain clinics that operated outside

15   the boundaries of the law.

16          Is that fair?

17          MS. SINGER:  Same objections

18          as to scope of the questioning

19          here.

20          THE WITNESS:  Yes.

21   BY MR. STEPHENS:

22   Q.    Okay.  Did DEA file any

23   lawsuits against the good pain clinics to

24   try and make them pay for the harm caused

Highly Confidential - Subject to Further Confidentiality Review

1    by the rogue pain clinics?

2                MR. FINKELSTEIN:  Objection.

3         Vague.

4                THE WITNESS:  Not that I'm

5         aware of.

6    BY MR. STEPHENS:

7         Q.   Okay.  And like the rogue

8    internet pharmacies that preceded them,

9    these rogue pain clinics that were

10   diverting controlled substances typically

11   distributed a lopsided ratio of

12   controlled substances to noncontrolled

13   substances?

14               MS. SINGER:  Objection.

15        Scope.

16               THE WITNESS:  To my -- yes.

17   BY MR. STEPHENS:

18        Q.   Okay.  The -- rogue pain

19   clinics were not full service pharmacies

20   like a retail chain pharmacy like Walmart

21   or CVS, Rite Aid or Walgreens, right?

22               MR. FINKELSTEIN:  Calls for

23        speculation.  Foundation.

24               THE WITNESS:  I'm not sure

1    what you mean by --

2            MS. SINGER:  Objection as to

3        scope.

4    BY MR. STEPHENS:

5        Q.    All right.  So rogue pain

6    clinics didn't sell cornflakes, greeting

7    cards, Oreo cookies, that type thing,

8    right?

9            MR. FINKELSTEIN:  Calls for

10        speculation.

11            MS. SINGER:  Objection.

12        Scope.

13            THE WITNESS:  Correct.

14    BY MR. STEPHENS:

15        Q.    Okay.  But retail chain

16    pharmacies do sell a full service of

17    other things to their customers, right?

18            MR. FINKELSTEIN:  Calls for

19        speculation.

20            THE WITNESS:  Yes.

21    BY MR. STEPHENS:

22        Q.    Mr. Prevoznik, if I could

23    I'd like to transition to Topic Number 9

24    which -- of your 30(b)(6), which relates

1    to ARCOS.  Okay?

2          A.    Yes.

3          Q.    And I'd like to ask you a

4    few questions about why DEA processes and

5    analyzes ARCOS data to identify and stop

6    sources of diversion.

7                Okay?

8          A.    Yes.

9          Q.    Okay.  So -- and you've

10   answered some questions about ARCOS

11   yesterday, right?

12         A.    Yes.

13         Q.    Okay.  So I'll try not to

14   re-ask those.  I'll do the best I can.

15   I'll -- I may have to touch on some of

16   them just to set where I'm going with the

17   other questions that I want to ask.

18                All right?

19         A.    Yes.

20         Q.    Okay.  So yesterday you

21   mentioned that the ARCOS database has the

22   ability to generate investigative leads

23   that DEA could pursue proactively to

24   discover the identity of individuals

Highly Confidential - Subject to Further Confidentiality Review

1    responsible for diverting opioids, true?

2              MR. FINKELSTEIN:  Letting

3         this go for now.  You can answer.

4              THE WITNESS:  Yes.

5    BY MR. STEPHENS:

6         Q.    And those ARCOS leads could

7    be helpful to DEA's efforts in the field,

8    right?

9         A.    Yes.

10        Q.    And that would support DEA's

11   mission to prevent diversion where it's

12   occurring, right?

13        A.    It points to it.  It might

14   not just be that source.  There's going

15   to be other issues as well, so...

16        Q.    Would you agree with a

17   general principle that more investigative

18   leads generated by ARCOS would equate to

19   more proactive investigations of

20   potential diverters?

21              MR. FINKELSTEIN:  Incomplete

22        hypothetical.

23              THE WITNESS:  Yeah.  It's a

24        point.

1    BY MR. STEPHENS:

2         Q.    And more proactive

3    investigations of potential diverters

4    should result in more actions filed

5    against suspected diverters?

6              MR. FINKELSTEIN:  Incomplete

7         hypothetical.

8              THE WITNESS:  What kind of

9         actions?

10   BY MR. STEPHENS:

11        Q.    Any.  Admin, civil,

12   criminal.

13             MR. FINKELSTEIN:  Same --

14   BY MR. STEPHENS:

15        Q.    Basically, the more leads

16   you have, the more cases you can make,

17   right?

18             MR. FINKELSTEIN:  Same

19        objection.

20             THE WITNESS:  Yes.

21   BY MR. STEPHENS:

22        Q.    More leads is a good thing

23   for an investigator, right?

24             MR. FINKELSTEIN:  Same

1        objection.

2              THE WITNESS:  Yes.

3    BY MR. STEPHENS:

4        Q.    All right.  So let me ask

5    you a few questions about DEA's procedure

6    regarding who at DEA processes the ARCOS

7    data to generate the leads to identify

8    and stop diversion, okay?

9        A.    Yes.

10        Q.    Topic 9 in your 30(b)(6)

11    designation.

12              Yesterday you testified

13    that, as I understand it, there are

14    currently ten employees who work on the

15    ARCOS unit that analyzes the data; is

16    that right?

17        A.    Yeah.  Yes, they analyze the

18    data.

19        Q.    Four input, and six output,

20    right?

21        A.    Yes.

22        Q.    Okay.  The six output, would

23    those be the DEA employees who analyze

24    the data to put out to the field

Highly Confidential - Subject to Further Confidentiality Review

1    proactive investigative leads that the

2    field can use?  Am I understanding that?

3          A.    Actually, the field has

4    access to it as well.  So the field can

5    generate their own leads off it.  So

6    our -- the group at headquarters assists

7    with -- assists -- often assists with

8    case investigations as well.  So the

9    leads could come from either the field

10   themselves, the field investigators

11   themselves, or they may come from our

12   group at headquarters.

13             So it's a combination of

14   either source that would -- that could

15   potentiate those leads.  So I know it's

16   not one particular group that does it.

17   There's various people doing it all

18   across the field.

19          Q.    All right.  Are you done?

20          A.    Mm-hmm.

21          Q.    Okay.  I just wanted to make

22   sure I didn't interrupt you.

23             And my question may be more

24   artfully framed.  Can you describe for me

1    the difference between the duties that

2    the four input analysts have at DEA

3    headquarters and compare that against the

4    duties that the six output employees have

5    at headquarters?

6            A.    Sure.  So the input duties

7    are -- that's the uploaded, as the

8    registrants upload their data.  They --

9    that's what the input side does.  They

10   deal with the -- to ensure that the data

11   is going in correctly, that errors are

12   being fixed.  There's constant

13   communication with the registrants on,

14   you know, you have to fix these errors.

15   Is this what you meant?  If they see

16   anomalies, they will call the registrant,

17   say, you know, your decimal point looks

18   like it may be off.  Could you look at

19   your data?

20            And so there's that constant

21   communication to try to verify that what

22   they're reporting is true and accurate.

23   So that's the input side.

24            The output side takes that

1    data that comes from the registrants, and

2    then it -- through case support with the

3    field and with investigations, they do

4    the online statistical reports that we

5    upload.  They respond to FOIAs.  They

6    respond to doing -- for presentations.

7                    They also do assessments,

8    trends assessments.  They also do threat

9    assessments for the field.  So that's

10   part of our -- building our scheduled

11   work plan.  So it's a variety of

12   different things that that group does.

13        Q.    Okay.  That's helpful.

14   Thank you.

15                    So there are ten people

16   there currently, right?

17                    MR. FINKELSTEIN:  Asked and

18         answered.

19                    THE WITNESS:  Yes.

20   BY MR. STEPHENS:

21        Q.    Okay.  And you supervised

22   this group for a while?  Did you

23   supervise these ten employees for a

24   while?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    I was never their direct
 2   supervisor.  I'm a step higher.
 3         Q.    Okay.  No, I understand that
 4   you're senior in the org chart.  I'm just
 5   trying to make sure that I understand at
 6   some point these ten people were in your
 7   reporting chain of command.
 8         A.    Yes, that's correct.
 9         Q.    Okay.  They are not
10   currently?
11         A.    Correct.
12         Q.    Okay.  All right.  Has the
13   number -- and what's this -- what's this
14   unit called, this ARCOS unit, what does
15   DEA call it?
16         A.    ARCOS unit or targeting and
17   analysis.
18         Q.    Okay.  So if I call it the
19   ARCOS unit you understand what I'm
20   talking about?
21         A.    Correct.
22         Q.    Okay.  All right.  It
23   currently has ten employees.  How many
24   employees did the -- this ARCOS unit have
```

Highly Confidential - Subject to Further Confidentiality Review

1    in, say, 2015?

2        A.    I'd speculate, because I

3    wasn't up there at that point.  But

4    probably about ten.

5        Q.    Okay.  Can you identify any

6    period during your time at DEA where it

7    had more -- that the ARCOS unit had more

8    than ten employees on it?

9        A.    Oh, I'm sorry.  What I meant

10   by ten, you had ten in the output side

11   and you had about three on the input

12   side.  So it was a slight increase.  I

13   know -- I believe we're three under right

14   now on our organizational chart.

15       Q.    So -- and you've been in DEA

16   for -- since '91?

17       A.    Yeah.

18       Q.    Okay.  And just -- can you

19   identify any period of time between 2006

20   and 2015 where this ARCOS unit had more

21   than ten people working on it?

22            MR. FINKELSTEIN:  Asked and

23       answered.

24            THE WITNESS:  I don't know.

1      I don't know.

2   BY MR. STEPHENS:

3        Q.   Okay.  So DEA currently uses

4   ARCOS data in a proactive way to identify

5   targets to investigate for diverting

6   prescription opioids, right?

7        A.   Correct.

8        Q.   And in DEA terms, a

9   proactive investigation is where DEA

10  would identify a target and build a

11  forward-looking case using investigative

12  tools at DEA's disposal, right?

13            MR. FINKELSTEIN:  Vague.

14            THE WITNESS:  Yes.

15  BY MR. STEPHENS:

16       Q.   Okay.  And in contrast, a

17  reactive case is a situation where a

18  diversion investigator may have already

19  built a case and then, you know looks to

20  ARCOS for some information to confirm its

21  case against someone that's already been

22  built out, right?

23       A.   I wouldn't say that it's all

24  the way to, like, the conclusion where we

Highly Confidential - Subject to Further Confidentiality Review

 1   come in.  It's usually we are working

 2   together through it --

 3          Q.    Okay.

 4          A.    -- as --

 5          Q.    Describe for me the

 6   difference --

 7                MR. FINKELSTEIN:  Wait.  Let

 8          him finish his answer.

 9   BY MR. STEPHENS:

10          Q.    Mr. Prevoznik, was I

11   interrupting you?

12                MR. FINKELSTEIN:  You just

13          did interrupt him.

14   BY MR. STEPHENS:

15          Q.    I'm sorry.  Did you feel

16   that I was interrupting you?

17          A.    I'm fine.

18          Q.    Okay.  Thank you.

19                MR. FINKELSTEIN:  The record

20          is going to reflect that he didn't

21          finish his answer.  And I'm asking

22          counsel please let him finish his

23          answer.

24   BY MR. STEPHENS:

1    Q.    Mr. Prevoznik, I'll work

2    with you all day long to let you finish

3    your answers.  If you don't think I am, I

4    apologize.  All right?

5    A.    I'm good.

6    Q.    Okay.  Thank you.  All

7    right.  I'm just trying to understand in

8    DEA land what the difference is between

9    proactive and reactive, right.

10          So how would you describe

11   and define what reactive means?

12   A.    Well, to me reactive would

13   be the field generated.  So they are

14   turning to the ARCOS unit to say hey, I'm

15   either at the beginning part, middle

16   part, or I need charts.  The U.S.

17   attorneys asked me to get charts on this.

18   So that would be reactive.

19          Proactive would be something

20   that that group puts out.

21   Q.    Right.  I got it.

22          One is an existing

23   investigation.  They are just trying to

24   confirm something through the use of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ARCOS.  And another one would be a

 2    proactive lead generated from

 3    headquarters to try and build a case,

 4    right?  Like a threat assessment.

 5           A.    Correct.

 6           Q.    A threat assessment would be

 7    a proactive use of ARCOS, right?

 8                 MR. FINKELSTEIN:  Objection.

 9           Vague.

10                 THE WITNESS:  Yes.

11    BY MR. STEPHENS:

12           Q.    And in your view, producing

13    threat assessments to the field is a good

14    thing?

15                 MR. FINKELSTEIN:  Objection.

16           Vague.

17                 THE WITNESS:  Yes.

18    BY MR. STEPHENS:

19           Q.    Between 2006 and 2015, under

20    the leadership of Joe Rannazzisi, ARCOS

21    analysts did not provide quarterly threat

22    assessments to the 22 field divisions at

23    DEA, right?

24                 MR. FINKELSTEIN:  Vague.
```

Highly Confidential - Subject to Further Confidentiality Review

 1              You can answer.

 2                   THE WITNESS:  Well, again,

 3              we -- in 2010 when we all went off

 4              the mainframe, the field had -- I

 5              mean, we always had access to

 6              ARCOS, so you did have the field

 7              generating their own leads.  So

 8              they -- that -- that's what they

 9              would do.  They would use that

10              data for that.

11   BY MR. STEPHENS:

12         Q.    Okay.  All right.  My

13   question is a little bit different.  I

14   understand your response.  My question is

15   a little bit different.

16              Between 2006 and 2015 under

17   the leadership of Joe Rannazzisi, the

18   ARCOS group at DEA headquarters did not

19   provide quarterly threat assessments to

20   the field divisions at DEA, true?

21                   MR. FINKELSTEIN:  Vague.

22                   THE WITNESS:  To my

23              knowledge, you're right.

24                   MS. SINGER:  Is this a good

Highly Confidential - Subject to Further Confidentiality Review

1          time to take a break, or soon?

2     BY MR. STEPHENS:

3          Q.    You okay?  I've got -- I've

4     got a little bit more on these topics.

5          A.    About five minutes?

6                About five minutes?

7          Q.    Okay.  Yeah, just let me

8     know.

9          A.    I just need a break.

10         Q.    Okay.

11              All right.  So I've got some

12    additional questions that will focus on

13    the 2006 to 2015 time period.  Okay?  As

14    it relates to ARCOS.

15         A.    Yes.

16         Q.    Fair to say that DEA's

17    current leadership has improved how DEA

18    uses ARCOS data in its diversion

19    investigations after Mr. Rannazzisi

20    retired in 2015?

21              MR. FINKELSTEIN:  Vague.

22              THE WITNESS:  I'm not sure

23         what you mean by improvements.

24    BY MR. STEPHENS:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Well, like using threat

2   assessments and sending those to the

3   field.  You view those as a good thing,

4   right?

5              THE WITNESS:  Yes.

6              MR. FINKELSTEIN:  Objection.

7        Vague.

8   BY MR. STEPHENS:

9      Q.    And that happened after

10  Mr. Rannazzisi left in 2015, right?

11     A.    Yes.

12     Q.    And the purpose of putting

13  those threat assessments out to the field

14  division is the hope that they will

15  reduce diversion, right?

16             MR. FINKELSTEIN:  Vague.

17             THE WITNESS:  Yes.  But I do

18        want to emphasize that ARCOS is

19        not the only system that we use to

20        send -- that's analyzed to send

21        field -- leads out to the field.

22        I mean there's other databases

23        that we use and we work with other

24        federal agencies and share data.

Highly Confidential - Subject to Further Confidentiality Review

1          So ARCOS is just a -- one part of

2          a vast array of analysis that's

3          used.

4    BY MR. STEPHENS:

5          Q.    Okay.  Between 2006 and 2015

6    under Mr. Rannazzisi's leadership, did

7    DEA have any published policy about what

8    happens after an ARCOS lead is generated?

9          A.    Not to my knowledge.

10         Q.    Between 2006 and 2015, under

11   Mr. Rannazzisi's leadership, did DEA have

12   any process where it maintained any

13   report indicating how many ARCOS leads

14   were sent to DEA field investigations for

15   investigation?

16              MR. FINKELSTEIN:  Vague.

17              THE WITNESS:  Not to my

18         knowledge.

19   BY MR. STEPHENS:

20         Q.    Between 2006 and 2015, under

21   Mr. Rannazzisi's leadership, did DEA have

22   any process where it maintained any

23   report indicating how many ARCOS leads

24   were actually investigated at the field

Highly Confidential - Subject to Further Confidentiality Review

1    division level?

2         A.    Not to my knowledge.

3         Q.    Between 2006 and 2015 under

4    Mr. Rannazzisi's leadership, did DEA have

5    any process where it maintained any

6    report indicating how many ARCOS leads

7    were referred out but not by DEA

8    headquarters, but not investigated at the

9    field division level?

10         A.    Not to my knowledge.

11         Q.    Between 2006 and 2015 under

12    Mr. Rannazzisi's leadership, did DEA have

13    any process where it maintained any

14    report indicating how many ARCOS leads

15    resulted in formal actions by DEA against

16    suspected diverters?

17              MR. FINKELSTEIN:  Vague.

18              THE WITNESS:  Not to my

19         knowledge.

20    BY MR. STEPHENS:

21         Q.    Between 2006 and 2015 under

22    Mr. Rannazzisi's leadership, did DEA have

23    any process where it maintained any

24    report indicating how many immediate

Highly Confidential - Subject to Further Confidentiality Review

1  suspension orders DEA obtained based on

2  ARCOS leads?

3        A.    Not to my knowledge.

4        Q.    Between 2006 and 2015 under

5  Mr. Rannazzisi's leadership, did DEA have

6  any process where it maintained any

7  report indicating how many orders to show

8  cause DEA generated based on ARCOS leads?

9        A.    Not to my knowledge.

10        Q.    Between 2006 and 2015 under

11  Mr. Rannazzisi's leadership, did DEA have

12  any process where it maintained any

13  report indicating how many convictions

14  DEA obtained of diverters based on ARCOS

15  leads?

16              MR. FINKELSTEIN:  Vague.

17              THE WITNESS:  Not to my

18        knowledge.

19  BY MR. STEPHENS:

20        Q.    Between 2006 and 2015 under

21  Mr. Rannazzisi's leadership, did DEA have

22  any process where it maintained any

23  report indicating how many indictments

24  DEA returned following ARCOS leads that

Highly Confidential - Subject to Further Confidentiality Review

1    had been generated?

2                    MR. FINKELSTEIN:  Vague.

3                    THE WITNESS:  Not to my

4          knowledge.

5                    MR. FINKELSTEIN:  Seems like

6          we are at a pause.  Can we take a

7          break?

8                    MR. STEPHENS:  Sure.

9                    THE VIDEOGRAPHER:  9:27.  We

10         are off the video record.

11              (Short break.)

12                   THE VIDEOGRAPHER:  9:48.  We

13         are on the video record.

14   BY MR. STEPHENS:

15         Q.    Mr. Prevoznik, let me ask

16   you a couple quick questions and then

17   I'll get back into ARCOS.

18              Okay?

19         A.    Sure.

20         Q.    You had mentioned at the

21   start today that you had looked at DEA's

22   website and figured out a couple

23   conferences.  You gave us that

24   information, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  As to the 2007

3  conference in Houston, you were not

4  physically present at that conference,

5  right?

6    A.    Correct.

7    Q.    You did not attend, correct?

8    A.    Correct.

9    Q.    Okay.  All right.

10         Now, one other question.

11  Does a nonregistrant have an obligation

12  to maintain effective controls to prevent

13  diversion?

14         MR. FINKELSTEIN:  Vague.

15         THE WITNESS:  A

16  nonregistrant?

17  BY MR. STEPHENS:

18    Q.    Right.

19    A.    They're not within the

20  closed system of distribution.

21    Q.    Okay.  So they have no duty

22  to maintain effective controls to prevent

23  diversion, correct?

24         MR. FINKELSTEIN:  Vague.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  Correct.

2    BY MR. STEPHENS:

3         Q.    All right.  Turning back to

4    ARCOS.  Between 2006 and 2015, did DEA

5    maintain any report that would show how

6    many ARCOS leads got sent to DEA offices

7    in Ohio in any particular year?

8                    MR. FINKELSTEIN:  Scope.

9                    THE WITNESS:  Not to my

10            knowledge during that particular

11            period, and we don't do it today,

12            so...

13   BY MR. STEPHENS:

14        Q.    Okay.  Between 2006 and

15   2015, did DEA have any process that

16   required the ARCOS team to run pattern

17   evaluation tests to verify whether ARCOS

18   was generating high quality investigative

19   leads as opposed to suboptimal

20   investigative leads?

21                   MR. FINKELSTEIN:  Vague.

22                   MS. SINGER:  Objection.

23            Foundation.

24                   THE WITNESS:  Could you

1    explain that?

2    BY MR. STEPHENS:

3         Q.    Sure.  Pattern evaluation

4    test is a qualitative measure by which

5    you look at a computer program and try

6    and determine whether what the output is,

7    is of high quality or suboptimal quality.

8    Was DEA doing anything along those lines

9    between 2006 and 2015 as it related to

10   ARCOS data?

11        MR. FINKELSTEIN:  Vague.

12        THE WITNESS:  I don't know.

13   BY MR. STEPHENS:

14        Q.    Between 2006 and 2015 under

15   Mr. Rannazzisi's leadership, did DEA have

16   any procedure that required DEA special

17   agent in charges in the various field

18   divisions to report back to DEA

19   headquarters to give process reports

20   about what the field division had done to

21   investigate ARCOS leads?

22        A.    Not to my knowledge.

23        Q.    Okay.  And just for

24   definitional purposes, each DEA field

Highly Confidential - Subject to Further Confidentiality Review

1   position has a number one agent that runs

2   that field division.  That agent's title

3   is a special agent in charge, the SAC,

4   right?

5        A.    Correct.

6        Q.    SAC.  Correct.  Was there

7   any policy at DEA between 2006 and 2015

8   that would have prevented the deputy

9   administrator in charge of diversion

10  control from instituting that procedure?

11       A.    Not to my knowledge.

12       Q.    Between 2006 and 2015, did

13  DEA have any procedure that prevented a

14  field -- that prevents a field division

15  from simply ignoring ARCOS information

16  sent to them by DEA headquarters?

17       A.    Not to my knowledge.

18       Q.    Was there anything

19  preventing the deputy administrator in

20  charge of diversion control,

21  Mr. Rannazzisi, from instituting a

22  process to ensure that DEA's field

23  divisions would not ignore ARCOS leads in

24  their work?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. SINGER:  Objection.

2     Foundation.

3          MR. FINKELSTEIN:  Objection.

4     Foundation.  Misstates his title.

5          THE WITNESS:  Not to my

6     knowledge.

7  BY MR. STEPHENS:

8     Q.    Did the diversion control

9  group under Mr. Rannazzisi's leadership

10  ever form an ARCOS review committee to

11  analyze ARCOS data for leads to identify

12  where diversion was occurring?

13          MR. FINKELSTEIN:  Vague.

14          THE WITNESS:  Could you

15     please repeat that?

16  BY MR. STEPHENS:

17     Q.    Sure.  Did the diversion

18  control group under Mr. Rannazzisi's

19  leadership from 2006 to 2015 ever form an

20  ARCOS review committee to analyze ARCOS

21  data for leads to identify where

22  diversion was occurring?

23          MS. SINGER:  Objection.

24     Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FINKELSTEIN:  Same

2     objection.

3          THE WITNESS:  Not to my

4     knowledge.

5  BY MR. STEPHENS:

6          Q.    Okay.  Between 2006 and

7  2015, under Mr. Rannazzisi's leadership,

8  did DEA ever institute any procedure

9  whereby field divisions were required to

10 establish an ARCOS review committee to

11 analyze any ARCOS leads or information

12 received by the field from DEA

13 headquarters to assess how that

14 information from ARCOS could identify

15 where diversion was occurring in that

16 district?

17          MR. FINKELSTEIN:  Vague.

18          THE WITNESS:  Not to my

19     knowledge.

20 BY MR. STEPHENS:

21          Q.    Was there any policy at the

22 Drug Enforcement Administration between

23 2006 and 2015 that would have prevented

24 Mr. Rannazzisi from doing so?

```
 1                  MR. FINKELSTEIN:  Vague.
 2                  THE WITNESS:  Not to my
 3          knowledge.
 4   BY MR. STEPHENS:
 5          Q.    Between 2006 and 2015 under
 6   Mr. Rannazzisi's leadership, did DEA ever
 7   institute any procedure whereby field
 8   divisions needed to establish an ARCOS
 9   review committee to analyze the leads
10   received from DEA to assess how those
11   leads could stop diversion?
12                  MR. FINKELSTEIN:  Asked and
13          answered.  Vague.
14                  THE WITNESS:  Not to my
15          knowledge.
16   BY MR. STEPHENS:
17          Q.    Was there any policy at DEA
18   between 2006 and 2015 that would have
19   prevented Mr. Rannazzisi, who ran the
20   diversion control group, from instituting
21   a procedure where the field divisions
22   needed to establish an ARCOS review
23   committee to analyze the leads
24   received -- or any leads received from
```

1    DEA headquarters to assess how those

2    leads could stop diversion?

3              MR. FINKELSTEIN:  Asked and

4         answered.

5              MS. SINGER:  Same objection

6         to lack of foundation.

7              THE WITNESS:  Not to my

8         knowledge.

9    BY MR. STEPHENS:

10        Q.    Between 2006 and 2015 under

11   Mr. Rannazzisi's leadership, did DEA

12   headquarters ever institute a procedure

13   where it placed diversion investigators

14   at DEA headquarters as opposed to a field

15   division who would be responsible for

16   conducting proactive investigations based

17   on leads generated by ARCOS?

18              MS. SINGER:  Objection.

19         Foundation.

20              MR. FINKELSTEIN:  Vague.

21              THE WITNESS:  Could you

22         please repeat that.

23   BY MR. STEPHENS:

24        Q.    Sure.

Highly Confidential - Subject to Further Confidentiality Review

1          Between 2006 and 2015, under

2    Mr. Rannazzisi's leadership of the

3    diversion control group, did DEA

4    headquarters under Mr. Rannazzisi's

5    leadership ever institute a procedure

6    where it placed diversion investigators

7    at DEA headquarters as opposed to being

8    housed in a field division who would be

9    responsible for conducting proactive

10   investigations based on leads generated

11   by ARCOS?

12          MS. SINGER:  Objection.

13          THE WITNESS:  At one point

14       there were no DIs in the ARCOS

15       unit.  But there are -- there were

16       DIs placed in the ARCOS unit

17       during that period.  Kyle Wright

18       was one.  Nancy Jackson was one.

19       Noreen Valentine was one.  So the

20       investigators were placed into

21       that unit.

22   BY MR. STEPHENS:

23       Q.    That's three.  Can you

24   identify any others?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Not off the top of my head.
 2        Q.    Okay.  If -- if the deputy
 3   administrator in charge of the diversion
 4   control group was concerned that ARCOS
 5   information was being ignored by the
 6   field division, he could have assembled a
 7   full squad of diversion investigators,
 8   stationed them at DEA headquarters under
 9   his direct command to pursue that ARCOS
10   information, true?
11             MS. SINGER:  Objection.
12        Foundation.
13             MR. FINKELSTEIN:  Incomplete
14        hypothetical.  Calls for
15        speculation.
16             THE WITNESS:  Could you
17        please repeat that.
18   BY MR. STEPHENS:
19        Q.    Yeah.  This is just -- it's
20   like a structural org chart-related-type
21   question.  Okay, Mr. Prevoznik?
22        A.    Mm-hmm.
23        Q.    Verbal.  Okay?
24        A.    I gotcha.  I just want you
```

Highly Confidential - Subject to Further Confidentiality Review

1    to repeat the question.  That's all.

2         Q.    No, fair.  I know you do.

3    And I'm going to.  I'm just trying to

4    give you a little basis of the -- why I'm

5    asking the question.

6              My question is, if

7    Mr. Rannazzisi was concerned that ARCOS

8    leads were being ignored by the field

9    divisions, he could have assembled a full

10   team of DEA's diversion investigators and

11   stationed that squad at DEA headquarters

12   under his direct command to pursue ARCOS

13   leads, true?

14             MR. FINKELSTEIN:  Incomplete

15        hypothetical.  Foundation.

16             THE WITNESS:  He could do

17        that if he felt that.  But I don't

18        know if he ever felt that.

19   BY MR. STEPHENS:

20        Q.    Okay.  He never did that,

21   right?

22        A.    He never did that, and we

23   still haven't done that.

24        Q.    Okay.  Between 2006 and 2015

Highly Confidential - Subject to Further Confidentiality Review

1    under Mr. Rannazzisi's leadership, did

2    DEA headquarters ever institute a

3    procedure where it placed diversion

4    investigators at headquarters as opposed

5    to a field division who would be

6    responsible for investigating suspicious

7    order report leads?

8                MR. FINKELSTEIN:  I withdraw

9          my objection.

10               THE WITNESS:  So for -- our

11         investigations are -- are usually

12         from the field, so the field is

13         investigating, headquarters does

14         not investigate.  We support and

15         help coordinate a case.  So the

16         actual investigation is done at

17         the field level, not at

18         headquarters.

19   BY MR. STEPHENS:

20         Q.    Okay.  So if I understand

21   your response, your response to my

22   question is no, headquarters never

23   instituted a procedure where it placed

24   diversion investigators at headquarters

Highly Confidential - Subject to Further Confidentiality Review

1    as opposed to a field division who would

2    then be responsible for investigating

3    suspicious order report leads, correct?

4                    MR. FINKELSTEIN:  Do you

5          understand counsel's question?

6                    THE WITNESS:  I do now.

7                    MS. SINGER:  Objection.

8                    MR. FINKELSTEIN:  Okay.  You

9          can answer counsel's question.

10                   THE WITNESS:  No, we did not

11         put anything in there.

12   BY MR. STEPHENS:

13         Q.   Okay.  I apologize.  I've

14   got a double negative here that I just

15   want to confirm.  I know what you're

16   saying I think, but let me make sure I've

17   got a clean record.  Okay?

18                   Between 2006 and 2015, did

19   DEA ever institute a procedure where it

20   placed diversion investigators at DEA

21   headquarters as opposed to a field

22   division to investigate suspicious order

23   report leads?

24                   MR. FINKELSTEIN:  Asked and

Highly Confidential - Subject to Further Confidentiality Review

1          answered.

2                    THE WITNESS:  No.

3     BY MR. STEPHENS:

4          Q.    If a deputy administrator

5     who ran division control from 2006 to

6     2015 was concerned that suspicious order

7     report leads were being ignored by the

8     field divisions, he could have assembled

9     a team of DEA's diversion investigators,

10    placed that squad at DEA headquarters

11    under his command to pursue those leads,

12    right?

13                   MS. SINGER:  Objection.

14         Lack of foundation.

15                   MR. FINKELSTEIN:  Incomplete

16         hypothetical.  Lack of foundation.

17                   THE WITNESS:  So he could

18         have done that.  He didn't do it.

19         And we still haven't done it.

20                   MR. FINKELSTEIN:  Can I just

21         make sure I'm following this?

22         Because I want to make an

23         appropriate objection.

24                   Before you were asking about

Highly Confidential - Subject to Further Confidentiality Review

1          ARCOS analysis.  Now you're asking

2          about SORs, right?

3                  MR. STEPHENS:  I just had

4          that one question on SORs because

5          it was similar to the ARCOS

6          question.

7                  I will be asking him about

8          SORs which is another 30(b)(6)

9          topic here in a little bit,

10         counsel.

11    BY MR. STEPHENS:

12         Q.    All right.  Let's return

13    back to ARCOS.

14                Okay, Mr. Prevoznik?

15         A.    Yes.

16         Q.    Yesterday, you had mentioned

17    in 2018 DEA changed its process to

18    provide more information out to

19    registrants that related to ARCOS

20    information?

21                MR. FARRELL:  Objection.

22         Foundation.

23                MR. STEPHENS:  I'm just

24         trying to -- to get back to where

1      we were yesterday.

2           MR. FINKELSTEIN:

3      Mischaracterizes prior testimony.

4           THE WITNESS:  Are you

5      referring to the ARCOS tool?

6  BY MR. STEPHENS:

7      Q.    Yes.

8           So you testified yesterday

9  about an ARCOS tool in 2018, right?

10     A.    Yes.

11     Q.    Okay.  I'm going to give you

12 what my understanding of your testimony

13 was.  You tell me if I've got anything

14 wrong.  Okay?

15          My understanding of what you

16 testified yesterday was in 2018, DEA

17 leadership decided to provide some more

18 information out to registrants from the

19 ARCOS database that DEA had.  Is that

20 fair?

21     A.    Yes.

22     Q.    Okay.  And the information

23 that DEA decided to provide, and this

24 was -- I'm sorry.  Strike that and re-ask

1  a new question.

2           This was one of your ideas,

3  right?

4       A.   Yes.

5       Q.   Okay.  And this was one of

6  your ideas because you were trying to

7  reduce diversion, right?

8           MS. SINGER:  Objection.

9       Foundation.

10          THE WITNESS:  Yeah -- yes.

11  BY MR. STEPHENS:

12      Q.   Okay.  The information in

13  2018 that DEA decided to share was with

14  other -- with other distributors -- was

15  whether other -- let me strike it and

16  restate it.

17          And I'm going to -- I'm

18  going to use like Distributor A,

19  Distributor B, and Distributor C just for

20  illustrative purposes.

21          Okay, Mr. Prevoznik?

22      A.   Yes.

23      Q.   The information that DEA

24  decided to provide in 2018 to a

Highly Confidential - Subject to Further Confidentiality Review

1    registrant was the number of other

2    distributors who were supplying a

3    particular customer, true?

4                MR. FINKELSTEIN:  Objection.

5          Mischaracterizes.

6                THE WITNESS:  It -- it's --

7          it doesn't have to be a

8          distributor.  It's a supplier.  So

9          it could be manufacturer too.  So

10         whoever supplied that base code of

11         drug, it would give the numerical

12         of how many suppliers.

13   BY MR. STEPHENS:

14         Q.    Right.  Right.  So let me

15   state it this way, and you just tell me

16   if I've got it right or I got it wrong.

17               In 2018, if I'm

18   Distributor A, and I'm supplying

19   Customer A, and Distributors B, C, and D

20   are supplying the same Customer A, DEA

21   would tell me, Distributor A, there are

22   three other distributors supplying

23   Customer A.

24               That's the information that

Highly Confidential - Subject to Further Confidentiality Review

1   was being provided?  Do I have that

2   right?

3          A.     Almost.

4          Q.     Okay.  Tell me what --

5          A.     Because it would include

6   you.

7          Q.     Okay.  So you would then --

8   we've got A, B, C and D, right, that's

9   four?

10          A.     Correct.

11          Q.     So at -- in 2018, what DEA

12   would tell me, Distributor A, is there

13   are four distributors including yourself

14   who are supplying Customer A; is that

15   right?

16                 MR. FINKELSTEIN:  Hang on.

17          Objection, Counsel.  It -- it was

18          Customer A first --

19                 MR. STEPHENS:  Well, I'm --

20          then I may have misspoken.

21   BY MR. STEPHENS:

22          Q.     I don't think I did.  Let me

23   restate it, Mr. Prevoznik, and just tell

24   me if I've got it wrong.

Highly Confidential - Subject to Further Confidentiality Review

1          In 2018, the change that was

2    made was DEA would now tell Distributor A

3    that there are four distributors

4    including yourself who are supplying

5    Customer A; is that right?

6          A.    Correct.

7          Q.    Okay.

8          A.    If I could --

9          Q.    Yeah.

10          A.    -- just based on the base

11    code.  Drug base code.

12          Q.    Okay.  And what do you mean

13    by that?

14          A.    Like hydrocodone.  It's not

15    going into specific products.  It's

16    hydrocodone.

17          Q.    Okay.  In 2018, DEA did not

18    tell me, Distributor A, the quantities

19    that were being supplied to Customer A by

20    Distributor B, C, and D, correct?

21          A.    Correct.

22          Q.    In 2019, DEA amended its

23    process and now provides that

24    information?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.  De-identified.
2                MR. FINKELSTEIN:  Note for
3          the record that the witness wasn't
4          authorized to testify about
5          decisions on or after
6          February 2018.  But as the witness
7          is knowledgeable, I'll allow
8          testimony.
9                MR. STEPHENS:  And -- and,
10         Counsel, for your benefit, I'm
11         just trying to identify time
12         frames and all that so the record
13         is complete.  That's it.
14               MR. FINKELSTEIN:  Okay.
15               MR. FARRELL:  The plaintiffs
16         continue their objection to any
17         attempt by you to establish
18         evidence that's probative of your
19         affirmative defenses and
20         prejudicial to our case in chief.
21               MR. STEPHENS:  I understand
22         that you don't want me to get
23         evidence that might hurt your
24         case, Paul, but I think that's my
```

1    job.

2         And if I understand,

3    yesterday, the testimony from the

4    DEA is the DEA does their job, and

5    I'm not here to testify, but I am

6    here trying to do my job.  I hope

7    you respect that.  All right.

8         MR. FINKELSTEIN:  We don't

9    have copies.

10         MR. STEPHENS:  Yes, sir.

11    Yeah, we do.

12         (Document marked for

13    identification as Exhibit

14    DEA-Prevoznik-19.)

15    BY MR. STEPHENS:

16         Q.    All right.  Mr. Prevoznik,

17    I'm showing you what's been marked as

18    Exhibit Number 19, which is a DEA press

19    release dated February 26, 2019.

20         Do you see that?

21         A.    Yes.

22         Q.    So in two-thousand -- if you

23    look at the fourth paragraph on the first

24    page, the very first sentence, I think

1   addresses what we had just been talking

2   about, Mr. Prevoznik.  It states, "In

3   February 2018, DEA launched a new tool in

4   it's ARCOS online reporting system to

5   assist drug manufacturers and

6   distributors with their regulatory

7   obligations under the Controlled

8   Substances Act."

9            Do you see that?

10       A.    Yes.

11       Q.    And that refers to your

12   idea, right?

13       A.    Yes.

14       Q.    And that's where you are

15   giving a distributor the number of

16   distributors supplying to Customer A,

17   right?

18       A.    Correct.

19       Q.    Okay.  If you look at the

20   third sentence in that paragraph, it

21   talks -- it says, "The enhancement will

22   allow a DEA-registered manufacturers and

23   distributors to view and download the

24   number of distributors and the amount,

Highly Confidential - Subject to Further Confidentiality Review

1    anonymized data, in both grams and dosage

2    units, each distributor sold to a

3    prospective customer in the last

4    available six months of data."

5              Correct?

6         A.    Could I get another copy,

7    because the exhibit went off the bottom.

8    Cut off the last part of that sentence.

9    I just want to make sure.

10             MR. FINKELSTEIN:  You can

11        look at mine.

12             THE WITNESS:  Correct.

13   BY MR. STEPHENS:

14        Q.    And the sentence that I just

15   read about providing the volumes, that's

16   the change that DEA made in 2019, right?

17             MR. FINKELSTEIN:

18        Mischaracterizes.

19             THE WITNESS:  Correct.

20   BY MR. STEPHENS:

21        Q.    Okay.  And then if you look

22   at the last paragraph in this DEA press

23   release, it states, "Manufacturers and

24   distributors have consistently expressed

Highly Confidential - Subject to Further Confidentiality Review

1   a desire for assistance from DEA in

2   fulfilling these obligations and have

3   requested ARCOS information to help them

4   make informed decisions about whether new

5   customers are purchasing excessive

6   quantities of controlled substances."

7           Do you see that?

8      A.   Yes.

9      Q.   So DEA in 2019 understood

10  that manufacturers and distributors have

11  consistently expressed a desire for

12  assistance from DEA in fulfilling their

13  obligations, and as part of that,

14  requested ARCOS information from DEA,

15  right?

16          MR. FINKELSTEIN:  Objection.

17      Form.

18          MS. SINGER:  Objection.

19      Foundation.

20          THE WITNESS:  Well, over the

21      years they've expressed this is

22      business strategy protected.  So

23      we've done -- we've done that.

24          But once the new tool, the

1    first tool went out in 2018, we

2    had feedback from quite a few of

3    the distributors that said, hey,

4    this would be great if we could

5    get de-identified data.  So that's

6    why we put it in there.  We were

7    able to -- we felt comfortable

8    enough to put that out there,

9    because they had requested it at

10   that point.

11        They had -- to my knowledge,

12   they had not expressed that they

13   wanted that.  When we had

14   mentioned it, they were always --

15   that's business data.  Don't

16   provide it.  So...

17  BY MR. STEPHENS:

18        Q.   You would agree that

19  manufacturers and distributors have

20  consistently expressed a desire for

21  assistance from DEA in fulfilling these

22  obligations and have requested ARCOS

23  information to help them make informed

24  decisions, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FINKELSTEIN:

 2         Mischaracterizes.  Asked and

 3         answered.

 4              THE WITNESS:  I think I just

 5         answered it.

 6    BY MR. STEPHENS:

 7         Q.    Well, is this -- is this

 8    press release accurate?

 9         A.    Well, yeah, because they --

10    because I said, after the first came out,

11    one of the complaints was -- that we've

12    heard a number of times, it's not -- it's

13    not enough.

14         Q.    Are you --

15         A.    So I'm just relaying what I

16    know from my -- my personal discussions

17    with some of the distributor registrants

18    that asked for that.  So that was the

19    first time that I had heard that they

20    wanted that.  So -- and then the Support

21    Act came in, and we were -- that was

22    something that we were told that we

23    needed to do, so -- statutorily, so...

24         Q.    Mr. Prevoznik, do you view
```

Highly Confidential - Subject to Further Confidentiality Review

1   this, sharing of more information with

2   industry, as an example of DEA's current

3   leadership taking additional steps to

4   collaborate with industry to help reduce

5   diversion?

6            MS. SINGER:  Objection.

7       Foundation.

8            THE WITNESS:  Yes.

9   BY MR. STEPHENS:

10       Q.   And do you think that's a

11  good thing?

12           MR. FINKELSTEIN:  Vague.

13           THE WITNESS:  Yes.

14  BY MR. STEPHENS:

15       Q.   All right.  Are you familiar

16  with an INNER JOIN process related to

17  database management for databases like

18  ARCOS?

19           MR. FINKELSTEIN:  Vague.

20       Hang on.  Don't testify based on

21       law enforcement sensitive

22       information.

23           MS. SINGER:  Objection.

24       Scope.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I don't know

2     what an INNER JOIN --

3  BY MR. STEPHENS:

4          Q.    Okay.  An INNER JOIN process

5  is a common SQL database concept that has

6  been in existence for decades in a

7  relationable database management systems

8  where you can anonymize data and provide

9  data to people who are sending products

10  to the same individuals by using an

11  individual, like customer A here, by

12  using their Tax ID number, their

13  registration number or something along

14  those lines.

15          Is anybody at DEA familiar

16  with INNER JOIN database management

17  protocols from 2006 to 2015 that you're

18  aware of?

19          MS. SINGER:  Objection.

20     Scope, and the witness's

21     competence on these issues.

22          MR. FINKELSTEIN:  Scope.

23     Calls for speculation.

24          Do you understand the

1        question?

2              THE WITNESS:  It sounds like

3        it's a software -- it sounds like

4        to me it's a software question.

5        We do have competent people within

6        DEA.  I am not one of the ones who

7        would claim competency for that.

8              MR. FARRELL:  Can you spell

9        that, INNER JOIN?

10              MR. STEPHENS:  Yeah, it's

11        INNER JOIN, I-N-N-E-R, J-O-I-N.

12        And if you look it up under SQL --

13        SQL database management.

14   BY MR. STEPHENS:

15        Q.    All right.  So you do have

16   people on staff at DEA who are tasked

17   with understanding ARCOS's capabilities

18   and maximizing the efficiency of ARCOS,

19   true?

20        A.    True.

21        Q.    And you had mentioned COGNOS

22   yesterday.  Can you explain to me again

23   what COGNOS is?

24        A.    So COGNOS basically allows

1    you to take huge chunks of data, be able

2    to pull it down, and summarize it or --

3              MR. FINKELSTEIN:  Can you

4         spell COGNOS?

5              THE WITNESS:  C-O-G-N-O-S, I

6         believe.  It's either N-O-S or

7         N-U-S.

8    BY MR. STEPHENS:

9         Q.   So COGNOS -- well, let me

10   ask ARCOS first.

11             Is ARCOS a system that DEA

12   built, or is it a system that DEA

13   purchased from a software vendor?

14             MS. SINGER:  Objection.

15        Scope.

16             THE WITNESS:  It's my

17        understanding it's a system that

18        we built.

19   BY MR. STEPHENS:

20        Q.   Okay.  So then, if DEA built

21   it, then DEA is going to have the

22   expertise inhouse to understand how it

23   works, right?

24        A.   Correct.

1       Q.    Okay.  And how does COGNOS

2   relate to ARCOS?

3       A.    COGNOS is a software that's

4   used so that you can take the ARCOS data,

5   huge quantities of ARCOS data, and be

6   able to actually use it to do an analysis

7   on it.

8       Q.    Okay.  Is COGNOS software

9   database or software system that DEA

10  purchased from a vendor or did DEA create

11  it?

12      A.    I believe it's a vendor.

13      Q.    It's a --

14      A.    I believe it's IBM.

15      Q.    Okay.  IBM.  A fine company,

16  right?

17              MR. FINKELSTEIN:  Scope.

18              MR. FARRELL:  If you're

19          representing IBM...

20              MR. STEPHENS:  All right.

21          We'll stipulate to that.  It's a

22          fine company.

23  BY MR. STEPHENS:

24      Q.    All right.  But -- but so,

1    you know, part of the function with --

2    with COGNOS and ARCOS is to understand

3    its capabilities.  And if an INNER JOIN

4    process would have been beneficial to

5    reducing diversion, you would have hoped

6    that someone at DEA would have worked on

7    that, right?

8              MR. FINKELSTEIN:  Scope.

9         Calls for speculation.

10        Foundation.

11             You can answer if you

12        understand.

13             THE WITNESS:  I'm not sure I

14        understand.  I mean, we've been

15        making improvements with -- with

16        the system since we started so...

17   BY MR. STEPHENS:

18        Q.    But can you agree with me

19   that -- that the DEA would want to

20   maximize the efficiency of that ARCOS

21   database to do everything possible in the

22   DEA's powers to reduce diversion?

23        A.    Yes.

24        Q.    And if using an INNER JOIN

Highly Confidential - Subject to Further Confidentiality Review

1    process earlier would have been

2    beneficial to that effort, you would have

3    supported it, had you known about it?

4              MS. SINGER:  Objection.

5         Foundation.

6              MR. FINKELSTEIN:

7         Foundation.  Scope.  Incomplete

8         hypothetical.

9              You can answer.

10             THE WITNESS:  Me personally?

11   BY MR. STEPHENS:

12        Q.    Correct.

13        A.    Well, I mean, I'm not in a

14   position to make a decision like that of

15   what software we're going to use.

16   That's -- that's an agency decision.

17        Q.    Would you agree that if the

18   people at DEA who are responsible for

19   managing the architecture of this

20   database and its efficiency were aware of

21   an INNER JOIN process earlier and that

22   would have been beneficial to DEA's use

23   of ARCOS, DEA would have supported doing

24   that, right, using an INNER JOIN process?

```
 1            MR. FINKELSTEIN:

 2       Foundation, scope.  Incomplete

 3       hypothetical.

 4            You can answer if you

 5       understand.

 6            THE WITNESS:  I'm just

 7       having a little bit -- because I

 8       don't know what INNER JOIN is.

 9       You can tell me it's a SQL.  You

10       can tell me whatever.  But is

11       it -- does it have to work off the

12       internet?  Is it -- you know,

13       that's what I'm saying.  I'm not

14       competent enough to -- to be

15       answering that question.

16  BY MR. STEPHENS:

17       Q.    Let me just ask a more

18  general question.

19       A.    Sure.

20       Q.    You would agree with me that

21  if people at DEA who are responsible for

22  managing the architecture of the ARCOS

23  database understood that there was a more

24  efficient way to use ARCOS by making a
```

Highly Confidential - Subject to Further Confidentiality Review

1    change, you would have supported them

2    making that change to make it more

3    efficient and effective, true?

4              MS. SINGER:  Objection.

5              MR. FINKELSTEIN:

6         Foundation.  Incomplete

7         hypothetical.

8              You can answer.

9              THE WITNESS:  Yes.

10   BY MR. STEPHENS:

11        Q.   Okay.  I had asked you one

12   question a little bit earlier about

13   suspicious order reports.  I would now

14   like to turn to that topic and ask you a

15   few questions about how and why DEA

16   analyzes suspicious order reports to

17   identify and stop sources of diversion.

18             Okay?

19        A.   Yes.

20        Q.   This is Topic 9 of your

21   30(b)(6) designation.

22             Now, yesterday you had

23   mentioned, in reporting suspicious order

24   reports, you had said some come to

1  headquarters, and some go to the field,

2  right, if I understood what you said?

3        A.    Yes.  Per the reg, they are

4  supposed to go to the field.  If they --

5  if we've had some sort of action against

6  a registrant, and we directed them to

7  send it to headquarters, those would send

8  it electronically.

9        Q.    Okay.  And yesterday you had

10  mentioned a "big three," right?

11        A.    Yes.

12        Q.    Okay.  Walmart is not one of

13  the big three, right?

14        A.    No.

15        Q.    And the other retail chain

16  pharmacies that we've talked about today,

17  they are not part of the big three,

18  right?

19        A.    Well, just to clarify, we're

20  talking -- because we started with

21  distributors that you wanted to talk

22  about distributors of, you know, of your

23  chain stores.  And then now you're

24  asking -- or you're -- are you talking

Highly Confidential - Subject to Further Confidentiality Review

1    the distributors of Walmart, or are you

2    talking the pharmacies of Walmart in

3    terms of this?

4           Q.    No, no, no -- no, no, no.

5    I'm just trying to say, you had said the

6    big three sends stuff to headquarters,

7    right?

8           A.    Right.  Distributors.

9           Q.    The big three distributors?

10          A.    Right.

11          Q.    And all I'm saying is -- is

12   that when you said big three, you weren't

13   referring to Walmart, right?

14          A.    Well, I just want -- I just

15   want to clarify that we are talking about

16   the big three distributors, because

17   Walmart is a pretty big -- one of the

18   bigger chain pharmacies out there.  So I

19   just want to make sure we're clear on

20   that.

21          Q.    Right.

22          A.    That's all.  I'm just

23   clarifying that.

24          Q.    Okay, okay.  All right.

1           So when you said big three

2    yesterday, were you referring to Walmart

3    or not?

4           A.    No.

5           Q.    Okay.  That -- that's all I

6    was asking, Mr. Prevoznik.  I'm sorry.

7           A.    Okay.

8           Q.    Would you agree that a

9    suspicious order report presents DEA with

10   a possible investigative lead that could

11   result in DEA identifying someone who is

12   diverting controlled substances?

13              MR. FINKELSTEIN:  Asked and

14         answered.

15              THE WITNESS:  Yes.

16   BY MR. STEPHENS:

17         Q.    If DEA investigates

18   suspicious order reports, DEA expects and

19   hopes that those investigations will lead

20   to a reduction in diversion, fair?

21         A.    If -- if that's where it

22   leads to.  Not every -- not every SORs

23   report is going to lead to diversion.

24         Q.    Okay.  But does DEA hope

Highly Confidential - Subject to Further Confidentiality Review

1    that investigations of SORs reports will

2    lead to a reduction in diversion?

3         A.    Yes.

4         Q.    Has DEA identified sources

5    of diversion based on information it

6    received in suspicious order reports?

7              MR. FINKELSTEIN:  Don't

8         testify based on ongoing

9         investigations or enforcement

10        activities.

11             You can answer.

12   BY MR. STEPHENS:

13        Q.    Just yes or no.

14        A.    Could you repeat, please?

15        Q.    Sure.

16             MR. FINKELSTEIN:  No current

17        enforcement investigations, yes or

18        no question.

19             Do you want to repeat it?

20   BY MR. STEPHENS:

21        Q.    Yes, let -- let me repeat

22   the question.  And I'm just asking for a

23   yes or no.  This is a baseline question.

24             A.    I know, but I have to listen

Highly Confidential - Subject to Further Confidentiality Review

1  to my instruction too.

2      Q.    Understood.

3           Has DEA identified sources

4  of diversion based on information DEA has

5  received in suspicious order reports?

6      A.    Yes.

7      Q.    Okay.  When DEA identifies a

8  source of diversion via information in a

9  suspicious order report, does DEA want to

10 stop the supply of opioids to that source

11 of diversion?

12     A.    Yes.

13     Q.    And does DEA want to stop

14 the supply of opioids to that source of

15 diversion as soon as DEA learns the

16 identity of the suspected diverter?

17          MR. FINKELSTEIN:  Vague.

18          THE WITNESS:  Yes.

19 BY MR. STEPHENS:

20     Q.    All right.  Between 2007 and

21 2018, DEA received over 1.2 million

22 electronic suspicious order reports from

23 registrants.

24     A.    Is that a -- it sounds like

Highly Confidential - Subject to Further Confidentiality Review

1    it was a statement.  I'm sorry.

2         Q.    It's a question.  Is that

3    true?

4         A.    Could you -- could you

5    repeat the question.

6         Q.    Sure.

7               Between 2007 and 2018 DEA

8    received over 1.2 million electronic

9    suspicious order reports from

10   registrants, true?

11        A.    Yes.

12        Q.    Let me -- if I could point

13   you back to Exhibit 17, which is the

14   transcript from March -- or the senate

15   congressional record from March 20, 2018.

16              Do you have that in front of

17   you?

18        A.    Yes.

19        Q.    I direct you to Page 93,

20   Mr. Prevoznik.

21        A.    Okay.

22        Q.    And this is a Q&A, written

23   Q&A between Congress and DEA, right?

24        A.    That's what it looks like.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Question Number 25

2  there on Page 93, Mr. Prevoznik.  Are you

3  with me?

4      A.    Yes.

5      Q.    It says, "How many

6  suspicious order reports does DEA now

7  receive from distributors annually?"

8          Did I read that right?

9      A.    Yes.

10     Q.    Okay.  And the response, on

11 the last sentence at the bottom of Page

12 93 says, "DEA headquarters has received

13 1,204,400 electronic suspicious order

14 reports from 135 distinct registrants

15 from 2007 to 2018."

16         Do you see that?

17     A.    Yes.

18     Q.    Okay.  Does that give you a

19 little bit more precise number that DEA

20 had on March 20th of 2018 when it was

21 reporting back to Congress?

22     A.    Yes.

23     Q.    Okay.  All right.  So I have

24 a few questions for you about how DEA

1    analyzes those SORs -- analyzed SORs

2    between 2006 and 2015.

3              Is it fair to say that DEA's

4    current leadership has been working hard

5    to improve how DEA reviews suspicious

6    order reports?

7         A.    Yes.

8         Q.    Between 2006 and 2015 under

9    Mr. Rannazzisi's leadership, did DEA have

10   a published policy that ensured that

11   someone at DEA would investigate every

12   suspicious order report that DEA

13   received?

14             MS. SINGER:  Objection.

15        Lack of foundation.

16             THE WITNESS:  Not that I'm

17        aware of.

18   BY MR. STEPHENS:

19        Q.    Okay.  Was there any policy

20   at DEA that would have prevented

21   Mr. Rannazzisi, who ran the diversion

22   control group, from instituting a

23   practice or policy that ensured that

24   someone from DEA would investigate every

1    suspicious order report that DEA

2    received?

3              MR. FINKELSTEIN:  Objection

4         to form.

5              MS. SINGER:  Objection.

6         Foundation.

7              THE WITNESS:  Not to my

8         knowledge.

9              MR. FINKELSTEIN:  For the

10        record, I noticed the witness

11        reached to his binder which

12        contains DEA policies.  Do you

13        want to reference that to refresh

14        your --

15             THE WITNESS:  Yeah, could

16        I -- could I reference it?

17             MR. STEPHENS:  That's fine.

18        Do you want to go off the record

19        and do that?  Let's do that.

20             MR. FINKELSTEIN:  Well,

21        let's wait until there is a

22        question pending.

23             MR. STEPHENS:  Okay.  That's

24        fine.  I just don't want to burn

1        my time on the clock.  If you need

2        to review something, you want to

3        take a break to do it, I'm fine

4        with that, Mr. Prevoznik.  Okay?

5        Just let me know.

6            MR. FINKELSTEIN:  But you're

7        allowed to review it if you need

8        to to answer his question.

9            THE WITNESS:  Right.  Thank

10        you.

11  BY MR. STEPHENS:

12        Q.    Yeah.  Are we good?

13        A.    Yeah.

14        Q.    Okay.  All right.  Have you

15  ever heard of a suspicious activity

16  report known as a SAR?

17        A.    No.  That doesn't --

18        Q.    Are you aware in banking

19  circles that banks report SARs --

20        A.    Yeah.

21        Q.    -- suspicious activity

22  reports, related to suspect transactions

23  that they see traveling through their

24  banks?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FINKELSTEIN:  Hang on.

 2                    MS. SINGER:  Objection.

 3          Scope.

 4                    MR. FINKELSTEIN:  Scope.

 5          You can answer if you know.

 6                    THE WITNESS:  Yes.

 7   BY MR. STEPHENS:

 8          Q.    Okay.  Mr. Prevoznik, who is

 9   the greatest law enforcement agency in

10   the world at investigating money

11   laundering investigations?

12                    MS. SINGER:  Objection.

13                    MR. FINKELSTEIN:  Objection.

14          Scope.  Calls for speculation.

15          You can answer.

16                    THE WITNESS:  Do I have to?

17                    FBI.

18   BY MR. STEPHENS:

19          Q.    Oh, you think it's FBI.

20                    Okay.  Mr. Prevoznik, hold

21   on.  Hold on.  Hold on.

22                    Mr. Prevoznik, you would

23   agree with me that the Drug Enforcement

24   Administration is one of the greatest law
```

Highly Confidential - Subject to Further Confidentiality Review

1    enforcement agencies on the planet

2    investigating money laundering

3    investigations, correct?

4              MR. FINKELSTEIN:  Vague.

5         Scope.

6              THE WITNESS:  Yes, correct.

7    BY MR. STEPHENS:

8         Q.   Okay.  And DEA, through

9    OCDETF, the Organized Crime Drug

10   Enforcement Task Force, participates with

11   other agencies, like your colleagues at

12   the FBI, like your colleagues at the IRS,

13   to do the most sophisticated money

14   laundering investigations in the world,

15   right?

16             MR. FINKELSTEIN:  Scope.

17             THE WITNESS:  Correct.

18   BY MR. STEPHENS:

19        Q.   All right.  Now, in

20   conducting those money laundering

21   investigations, it's common for the

22   United States government, including DEA,

23   to work on SAR review committees to

24   review SARs to advance the money

1    laundering investigations that they're --

2    that they're working on through banking

3    institutions, right?

4              MS. SINGER:  Objection.

5         Scope.

6              MR. FINKELSTEIN:  We're well

7         outside the scope.

8              MS. SINGER:  This is so far

9         beyond.

10             MR. FINKELSTEIN:  You can

11        answer if you know.

12             THE WITNESS:  Yeah -- yes.

13   BY MR. STEPHENS:

14        Q.   Okay.  Between 2006 and

15   2015, under the leadership of

16   Mr. Rannazzisi, did DEA headquarters have

17   a procedure by which it formed a SORs

18   review committee, a suspicious order

19   review committee, at DEA headquarters to

20   analyze all of the SORs received by DEA

21   from registrants?

22             MR. FINKELSTEIN:  Vague.

23             MS. SINGER:  Lack of

24        foundation.

1              THE WITNESS:  No.  We still

2         haven't, and you have the SORs

3         that go to the field, as well as

4         the SORs electronically, so...

5    BY MR. STEPHENS:

6         Q.    Okay.  Is there any central

7    body anywhere within DEA that's organized

8    and formed to review SORs, to have a

9    central point of contact to determine

10   whether a particular SOR would be really

11   good for an investigation for DEA to

12   pursue?

13             MR. FINKELSTEIN:  Vague as

14        to time.  Vague.

15   BY MR. STEPHENS:

16        Q.    Let me restate it.

17             Between 2006 and 2015, under

18   the leadership of Mr. Rannazzisi, was

19   there any central body anywhere within

20   DEA organized and formed to review

21   suspicious order reports so that DEA

22   would have a central point of contact to

23   determine whether a particular suspicious

24   order report should be pursued for an

1  investigation by DEA?

2          MR. FINKELSTEIN:

3      Foundation.  Vague.

4          THE WITNESS:  Not to my

5      knowledge.

6  BY MR. STEPHENS:

7      Q.    Was there any policy at DEA

8  that would have prevented Mr. Rannazzisi

9  from forming a SORs review committee at

10  DEA headquarters to analyze all of the

11  SORs, the suspicious order reports,

12  received by DEA from registrants between

13  2006 and 2015?

14          MR. FINKELSTEIN:  Vague.

15          THE WITNESS:  Not to my

16      knowledge.

17  BY MR. STEPHENS:

18      Q.    Between 2006 and 2015 under

19  Mr. Rannazzisi's leadership, did DEA have

20  any field division institute a SORs

21  review committee to analyze suspicious

22  order reports received from registrants

23  in that field division?

24      A.    Not -- no, not for those

Highly Confidential - Subject to Further Confidentiality Review

1   that received.  But we were doing

2   investigations and analysis on those that

3   we never received.

4          Q.    Okay.  So my question is a

5   little bit different.  Let me reframe it.

6   I think I understand your answer.

7          Between 2006 and 2015, under

8   Mr. Rannazzisi's leadership, did any DEA

9   field division form a SORs review

10  committee to analyze all SORs, suspicious

11  order reports, received from registrants

12  in that jurisdiction?

13         MR. FINKELSTEIN:  Vague.

14         THE WITNESS:  Not to my

15      knowledge.

16  BY MR. STEPHENS:

17         Q.    Okay.  Was there any policy

18  at DEA between 2006 and 2015, that would

19  have prevented Mr. Rannazzisi from

20  instituting a procedure by which field

21  divisions were required to form a

22  suspicious order review committee to

23  analyze all of the suspicious order

24  reports received within that field

Highly Confidential - Subject to Further Confidentiality Review

1    division?

2                    MR. FINKELSTEIN:  Vague.

3                    THE WITNESS:  Not to my

4         knowledge.

5    BY MR. STEPHENS:

6         Q.    Between 2006 and 2015 under

7    Mr. Rannazzisi's leadership, did DEA

8    headquarters institute any policy whereby

9    DEA field divisions were required to

10   DEA -- to update DEA headquarters

11   regarding what, if anything, the field

12   division had done to investigate inbound

13   suspicious order reports?

14                   MS. SINGER:  Objection.

15        Foundation.

16                   THE WITNESS:  Could you

17        please repeat that?

18   BY MR. STEPHENS:

19        Q.    Sure.

20                   Between 2006 and 2015 under

21   Mr. Rannazzisi's leadership, did DEA

22   headquarters institute any policy whereby

23   DEA field divisions were required to

24   update DEA headquarters regarding what,

1    if anything, the field division had done

2    to investigate inbound suspicious order

3    reports the field division had received

4    from registrants?

5         A.    Not to my knowledge.

6         Q.    Was there any policy at DEA

7    between 2006 and 2015 that would have

8    prevented Mr. Rannazzisi from instituting

9    a practice that required the field

10   divisions to update headquarters about

11   what the field division had done to

12   investigate inbound suspicious order

13   reports?

14              MR. FINKELSTEIN:  Vague.

15              MS. SINGER:  Objection.

16        Foundation.

17              THE WITNESS:  Not to my

18        knowledge.

19   BY MR. STEPHENS:

20        Q.    Between 2006 and 2015 under

21   Mr. Rannazzisi's leadership did DEA have

22   any process that would have allowed the

23   diversion control group at DEA

24   headquarters to know what percentage of

Highly Confidential - Subject to Further Confidentiality Review

1   suspicious order reports were

2   investigated by the field divisions?

3            MR. FINKELSTEIN:  Asked and

4        answered.

5            THE WITNESS:  Not to my

6        knowledge.

7   BY MR. STEPHENS:

8        Q.    Was there any policy at DEA

9   that would have prevented Mr. Rannazzisi

10  and the diversion control group from

11  instituting a practice that required the

12  field division to update headquarters

13  regarding the percentage of SORs reports

14  that the field division had investigated?

15           MR. FINKELSTEIN:  Objection.

16           MS. SINGER:  Continuing

17       objection to this.  Lack of

18       foundation.

19           MR. FINKELSTEIN:  Asked and

20       answered.

21           THE WITNESS:  Not to my

22       knowledge.

23  BY MR. STEPHENS:

24       Q.    Between 2006 and 2015 under

```
 1    Mr. Rannazzisi's leadership, did DEA
 2    headquarters have any procedure whereby
 3    someone at DEA input the suspicious order
 4    reports into any DEA central database for
 5    tracking purposes?
 6               MR. FINKELSTEIN:  Vague.
 7          Foundation.
 8               THE WITNESS:  Could -- we
 9          don't input.  We don't input it,
10          the registrants -- if it's going
11          in electronically, the registrant
12          sends it in via electronic.  We
13          don't input.
14    BY MR. STEPHENS:
15          Q.    Okay.  I gotcha.
16               Between 2007 and 2015 under
17    Mr. Rannazzisi's leadership, what
18    percentage of suspicious order reports
19    did DEA convert into immediate suspension
20    orders?
21               MR. FINKELSTEIN:  Asked and
22          answered.
23               THE WITNESS:  I don't know.
24    BY MR. STEPHENS:
```

1          Q.     Okay.

2                 (Document marked for

3          identification as Exhibit

4          DEA-Prevoznik-20.)

5   BY MR. STEPHENS:

6          Q.     Mr. Prevoznik, I'm showing

7   you what has been marked as DEA

8   exhibit -- or I'm sorry.  What has been

9   marked as Exhibit Number 20.

10                Do you have it in front of

11  you?

12         A.     Yes, I have it.  Yes.

13         Q.     Okay.  And this is a hearing

14  transcript from January 25, 2018, related

15  to "Combatting the Opioid Crisis:

16  Exploiting Vulnerabilities in

17  International Mail," before the permanent

18  subcommittee on investigations.

19                Do you see that?

20         A.     Yes.

21         Q.     Okay.  And I would direct

22  you to Page 275.

23         A.     That's the top number?

24         Q.     Yeah, at the top.

1          All right.  And -- so let me

2     also direct you to Page 269 which is the

3     second page of this exhibit.  Just to set

4     the context, Mr. Prevoznik.

5          A.    Okay.

6          Q.    So on -- on 269, these are

7     questions for the record, Drug

8     Enforcement Administration before the

9     permanent subcommittee on investigations

10     on January 25, 2018, right?

11          A.    Yes.

12          Q.    And it's -- it's common for

13     DEA to receive written questions from

14     Congress and then provide written

15     responses, right?

16          A.    Yes.

17          Q.    Okay.  And then if you look

18     at Page 275, there's a question and an

19     answer.  Do you see that?

20          A.    I'm getting there, yep.

21          Q.    Okay.  And before we get

22     there, let me ask you one follow-up

23     question.

24               Who at the Drug Enforcement

Highly Confidential - Subject to Further Confidentiality Review

1  Administration at headquarters was

2  reviewing suspicious order reports, if

3  anybody?

4          A.    What time, time period?

5          Q.    Say 2018.

6          A.    So the field had -- the

7  field has access to it, so the field

8  would review them.

9          Q.    Okay.

10         A.    That's part of their duties,

11  is to review it.

12         Q.    Okay.  Between 2006 and

13  2015, was anyone at DEA headquarters

14  reviewing suspicious order reports or was

15  it all done in the field?

16         A.    It was done in the field,

17  and I believe it was done at headquarters

18  as well.  It would be with Kyle Wright

19  when he was in charge of the unit.

20         Q.    Okay.  Anybody else at

21  headquarters?

22         A.    Not that I'm aware of.

23         Q.    Okay.  So it would have been

24  Mr. Wright and Mr. Wright's team or

1    squad, right?

2         A.    Correct.

3         Q.    Okay.  Now, turning back to

4    Exhibit Number 20.

5              The -- you'll see that

6    the -- the question is -- well, the --

7    the question states:  "The argument has

8    been made in the Washington Post and

9    elsewhere that enforcement efforts at DEA

10   slowed down long before the 2016 law,"

11   right?

12             Do you see that?

13        A.    Yes.

14        Q.    Okay.  And in response, part

15   of the response, "DEA provides actions

16   leading to registration revocation

17   statistics."

18             Do you see that?

19        A.    Did you read that from

20   somewhere or?

21        Q.    So I'm just looking at

22   the -- at the top of the chart right

23   here, Mr. Prevoznik.

24        A.    Oh okay.  All right.  Yeah,

Highly Confidential - Subject to Further Confidentiality Review

1    I just wanted --

2          Q.    Yeah, sure.

3          A.    I wasn't sure exactly where

4    you were.  Go ahead.

5          Q.    So DEA provided to Congress

6    a chart of statistics in this response,

7    right?

8          A.    Yes.

9          Q.    And the chart reflects the

10   actions leading to registration

11   revocation for fiscal year 2007 to 2017,

12   right?

13         A.    Yes.

14         Q.    And the government's fiscal

15   year runs from October 1st to

16   September 30th, right?

17         A.    Yes.

18         Q.    All right.  If you look, the

19   question that I had asked before we went

20   to this chart was whether you knew the

21   percentage of suspicious order reports

22   that DEA converted into immediate

23   suspension orders, right?

24              MR. FINKELSTEIN:  Asked and

Highly Confidential - Subject to Further Confidentiality Review

1           answered.

2                    THE WITNESS:  Yes.

3    BY MR. STEPHENS:

4           Q.    Okay.  Now, you would agree

5    with me, wouldn't you, that in the

6    suspension orders that are identified

7    here from 2007 to 2017, not all of those

8    were the result of DEA following up on a

9    suspicious order report; is that fair?

10                   MR. FINKELSTEIN:  Calls for

11           speculation.

12                   THE WITNESS:  Well, I mean

13           some of them were because they

14           weren't being filed, so...

15   BY MR. STEPHENS:

16          Q.    Okay.

17                   MR. FINKELSTEIN:  You can

18           finish your answer.

19                   THE WITNESS:  So they

20           would -- it was registrants that

21           had not filed.  So there was

22           action taken against those that

23           did not file.  So it would be

24           either -- fall under an ISO, order

Highly Confidential - Subject to Further Confidentiality Review

1          to show cause, and perhaps they

2          got suspended.  There was some

3          administrative action because they

4          did not report them.

5     BY MR. STEPHENS:

6          Q.    All right.  But my point,

7     Mr. Prevoznik, is simply that the 254

8     immediate suspension orders that are

9     listed here between 2007 and 2017, not

10    every one of them was the result of DEA

11    following up on a suspicious order report

12    that had been sent to DEA; is that fair?

13              MR. FINKELSTEIN:  Are you

14         representing to the witness that

15         these numbers add up to 254?

16              MR. STEPHENS:  Yes.

17    BY MR. STEPHENS:

18         Q.    I will represent to you that

19    for the immediate suspension orders, the

20    totals from 2007 to 2017, is 254.  I will

21    represent to you that the order to show

22    cause filed from 2007 to 2017 is 638.

23    And I'll also represent to you that the

24    total column from 2007 to 2017 is 9,851.

Highly Confidential - Subject to Further Confidentiality Review

1    Okay?

2            A.    Okay.

3                  MR. FINKELSTEIN:  Counsel is

4        telling you that.

5                  THE WITNESS:  Okay.

6                  MR. FINKELSTEIN:  We haven't

7        checked his math.

8                  MR. STEPHENS:  You're

9        welcome to do so.

10   BY MR. STEPHENS:

11           Q.    So my question,

12   Mr. Prevoznik, was, would you agree with

13   me that the 254 suspension orders that

14   are listed here from 2007 to 2017, not

15   every one of them was generated as the

16   result of DEA following up on an

17   investigation of a SOR report the DEA had

18   received; is that fair?

19                 MR. FINKELSTEIN:  Asked and

20       answered.

21                 THE WITNESS:  Yes.

22   BY MR. STEPHENS:

23           Q.    Okay.  For today's purposes,

24   let's assume that every one of these 254

Highly Confidential - Subject to Further Confidentiality Review

1  was generated by the -- were all the

2  result of DEA receiving and investigating

3  a suspicious order report.  All right.

4  I'll give you the benefit of that, okay?

5          A.    Okay.

6          Q.    If you take 254 against the

7  one point -- against the 1,204,400 SORs

8  reports the DEA received, that would

9  equate to something along the lines of

10  2/100 of 1 percent.  Do you agree with

11  that?

12          A.    I didn't do the math, but

13  I'll go with -- I'll go with you.

14          Q.    Okay.  So would you agree

15  the DEA would have obtained less than

16  1 percent of immediate suspension orders

17  off the 1.2 million suspicious order

18  reports that DEA received?

19              MR. FARRELL:  Objection.

20          Foundation.  And I think you just

21          bait and switched here a little

22          bit.

23              MR. STEPHENS:  I didn't mean

24          to.  So let me check my question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STEPHENS:
 2         Q.    So my question is this:
 3    Assuming that all 254 of the immediate
 4    suspension orders that DEA received from
 5    2007 to 2017 were based off of suspicious
 6    order reports, and DEA received
 7    1.2 million suspicious order reports, you
 8    would agree with me that the percentage
 9    of suspicious order reports that DEA
10    converted into immediate suspension
11    orders was less than 1 percent?
12              MR. FINKELSTEIN:
13         Foundation.  Misstates prior
14         testimony.
15              THE WITNESS:  Well, I mean,
16         I think that's a unique way to
17         look at it.  You can also do the
18         flip side and say how many weren't
19         reported that we had cases on.
20         And to just limit it to the ISOs
21         doesn't take you to putting people
22         in compliance, whether through
23         letters of admonition or MOAs that
24         we've come to with companies
```

Highly Confidential - Subject to Further Confidentiality Review

1     regarding that.

2              I mean, it's a hypothetical.

3     BY MR. STEPHENS:

4         Q.    Between 2007 and 2017, the

5     percentage of suspicious order reports

6     the DEA received and converted into

7     immediate suspension orders is less than

8     1 percent, true?

9         A.    Yes.  In your hypothetical,

10    true.

11        Q.    All right.  So between 2007

12    and 2017, the percentage of suspicious

13    order reports that DEA converted into

14    orders to show cause, the 638 here,

15    that's also less than 1 percent.  It is

16    .005 or 5/100 of 1 percent?

17             MR. FARRELL:  Objection.

18        Foundation.

19             MR. FINKELSTEIN:

20        Foundation.  Misstates prior

21        testimony.

22             THE WITNESS:  It's a

23        hypothetical.  I'll go with you.

24

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. STEPHENS:

 2         Q.    Okay.  Between 2007 and

 3    2017, if you include everything in the

 4    table, orders to show cause, immediate

 5    suspension orders filed, voluntary

 6    surrenders, the 9,851 totaled from 2007

 7    and 2017, the percentage of those against

 8    the 1.2 million of suspicious order

 9    reports would result in a conversion rate

10    of less than 1 percent?

11              MR. FARRELL:  Objection.

12         Fuzzy math.

13              MR. FINKELSTEIN:  Which rule

14         is that?

15              Foundation.  Misstates prior

16         testimony.

17              You can answer if you

18         understand.

19    BY MR. STEPHENS:

20         Q.    Let me ask you a more

21    precise question.

22         A.    All right.

23         Q.    Okay.  What I want you to

24    do, is I'm going to ask about the 9,851,

Highly Confidential - Subject to Further Confidentiality Review

1    the full total, okay.  Are you with me?

2            A.    I'm with you.

3            Q.    Okay.  So between 2007 and

4    2017, if you include the voluntary

5    surrenders, immediate suspension orders,

6    the order to show causes, the percentage

7    of suspicious order reports that DEA

8    converted of the suspicious order reports

9    is less than 1 percent?

10                MR. FINKELSTEIN:

11           Foundation.  Misstates prior

12           testimony.

13                THE WITNESS:  In your

14           hypothetical situation, yes.

15   BY MR. STEPHENS:

16           Q.    Okay.  Do you know what

17   percentage of suspicious order reports

18   DEA converted into criminal indictments

19   between 2007 and 2017?

20                MR. FINKELSTEIN:  Vague.

21                THE WITNESS:  I do not.

22   BY MR. STEPHENS:

23           Q.    Do you know -- okay.  So

24   between 2007 and 2017, would you know

Highly Confidential - Subject to Further Confidentiality Review

1    what percentage of suspicious order

2    reports DEA converted into criminal

3    convictions?

4                MR. FINKELSTEIN:  Vague.

5                THE WITNESS:  I do not.

6    BY MR. STEPHENS:

7         Q.    Does DEA keep those kind of

8    statistics?

9         A.    No, we don't.

10        Q.    Okay.  You're aware that DEA

11   keeps those kind of statistics,

12   investigations initiated, indictments

13   returned, convictions obtained on all of

14   their OCDETF cases and reports them.  Are

15   you aware of that?

16        A.    Correct, yes.

17        Q.    Okay.

18        A.    I thought you were asking

19   specific to suspicious order reports.

20        Q.    I absolutely was.

21              Is there a reason why DEA

22   does not report the number of indictments

23   returned, investigations initiated, and

24   convictions obtained based on information

Highly Confidential - Subject to Further Confidentiality Review

1    from suspicious order reports like it

2    does in its OCDETF reporting where it

3    identifies investigations initiated,

4    indictments returned, convictions

5    obtained?

6              MR. FINKELSTEIN:  Calls for

7         speculation.

8              And I instruct you not to

9         answer based on internal

10        deliberative communications.

11             THE WITNESS:  We do have

12        those statistics for that.  But

13        not based off of a SOR lead or an

14        ARCOS lead.  Those are just

15        pointers.  There's various other

16        factors get into what a case --

17        how a case started, where it went,

18        and what its final disposition

19        was.

20             (Document marked for

21        identification as Exhibit

22        DEA-Prevoznik-21.)

23   BY MR. STEPHENS:

24        Q.   Okay.  Mr. Prevoznik, I'm

```
 1    showing you what's been marked as Exhibit

 2    Number 21.

 3                 MR. STEPHENS:  I'm sorry,

 4         Counsel.

 5                 MR. FINKELSTEIN:  We're

 6         going to attempt to claw 21 back

 7         too.

 8                 MR. STEPHENS:  Basis?

 9                 MR. FINKELSTEIN:

10         Deliberative process.

11         Attorney/client.  21 is an e-mail

12         attaching, I can't remember what

13         exhibit number, but we previously

14         notified you that we were going to

15         clawback.

16                 MR. STEPHENS:  This one?

17                 MR. FINKELSTEIN:  Yes.

18                 MR. STEPHENS:  Okay.  I sent

19         this one in -- to counsel on

20         Monday with a stack of potential

21         exhibits and didn't hear anything

22         back.

23                 MR. FINKELSTEIN:  And we're

24         telling you, as we told you
```

 1        yesterday, that we're attempting

 2        to claw it back.

 3              If you ask the witness

 4        questions I'll instruct him not to

 5        answer.

 6              MR. BENNETT:  Okay.  And --

 7        and for the record, you did send

 8        that to me.  I was never able to

 9        access it and open it.  So I never

10        reviewed your documents.  They

11        didn't come through.

12              MR. STEPHENS:  All right.

13        So I didn't hear that back --

14              MR. BENNETT:  Well, and I

15        was traveling, so -- yeah, you're

16        right --

17              MR. STEPHENS:  Okay.  But

18        again for the record --

19              MR. BENNETT:  But I never

20        looked at them.

21              MR. STEPHENS:  That's fine.

22              For the record, James, I

23        sent it to everybody on the DEA

24        team.  Okay?

Highly Confidential - Subject to Further Confidentiality Review

1          Everyone who is counsel here

2     today, all four of you received

3     that from me.

4          MR. FINKELSTEIN:  And you

5     have our answer.

6          MR. FARRELL:  Okay.  So just

7     to be clear, am I allowed to read

8     this or not allowed to read this?

9          MR. FINKELSTEIN:  We're

10     attempting to claw it back.

11          MR. STEPHENS:  And -- and

12     for the record, let me apologize.

13     If this was used yesterday, I am

14     down at the end of the table, I

15     didn't get a copy of it.  So I --

16     I wasn't aware -- I reserve, as my

17     colleague reserves, our position

18     on this document.

19  BY MR. STEPHENS:

20     Q.   Mr. Prevoznik?

21          MR. FARRELL:  Not to be

22     rude, but is there an expected

23     break time soon?

24          MR. STEPHENS:  Yeah, like

Highly Confidential - Subject to Further Confidentiality Review

1      five minutes.

2              MR. FARRELL:  And then after

3      that, what do you think?

4              MR. STEPHENS:  Yeah, I'll

5      need to confer with my colleagues.

6              MR. FARRELL:  Oh, so you're

7      getting close?

8              MR. STEPHENS:  Yes.

9   BY MR. STEPHENS:

10      Q.    Mr. Prevoznik, in enforcing

11  the Controlled Substances Act does DEA

12  believe that every individual is entitled

13  to due process in every investigation

14  that DEA conducts to enforce the

15  Controlled Substances Act?

16              MR. FINKELSTEIN:  Scope.

17      Calls for a legal conclusion.

18              You can answer.

19              THE WITNESS:  Yes.

20  BY MR. STEPHENS:

21      Q.    Does DEA believe that the

22  DEA must assess the facts as to each

23  individual actor separately to determine

24  whether an individual has violated the

Highly Confidential - Subject to Further Confidentiality Review

1    Controlled Substances Act?

2          A.    Yes.

3          Q.    DEA would not take the

4    actions of a few bad actors and seek to

5    indict everyone who might live in the

6    same neighborhood as those bad actors,

7    fair?

8          A.    Correct.

9                MS. SINGER:  Objection.

10        Scope.

11   BY MR. STEPHENS:

12         Q.    You'd agree that simply

13   being close in proximity to a bad actor

14   does not mean that an individual has done

15   anything wrong, right?

16               MR. FINKELSTEIN:  Vague.

17        You can answer.

18               THE WITNESS:  Correct.

19   BY MR. STEPHENS:

20         Q.    For example, if someone

21   overdoses on Colombian cocaine in

22   Cleveland, would DEA arrest every

23   Colombian native who leaves in Cleveland

24   and charge them for causing that

```
 1    overdose?

 2             MR. FINKELSTEIN:  Scope.

 3         Incomplete hypothetical.

 4             MR. FARRELL:  This has a

 5         traumatic impact upon like the

 6         Colombian nationality, so you have

 7         to be careful here.

 8             MR. STEPHENS:  Trust me.  I

 9         always was.

10    BY MR. STEPHENS:

11         Q.    Can you answer the question?

12         A.    Not to my knowledge.

13         Q.    You'd agree that DEA needs

14    individualized proof to establish exactly

15    who caused that overdose death before

16    deciding to charge anyone with a crime,

17    right?

18             MR. FINKELSTEIN:  Hang on.

19         Incomplete hypothetical.  Scope.

20             THE WITNESS:  Can you repeat

21         it?

22    BY MR. STEPHENS:

23         Q.    You would agree the DEA

24    needs individualized proof to establish
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   exactly who caused that overdose death
 2   before deciding to charge anyone with a
 3   crime?
 4              MS. SINGER:  Objection.
 5       Scope.
 6              THE WITNESS:  Yes.
 7   BY MR. STEPHENS:
 8       Q.    Okay.  And to counsel's
 9   point, it might be a mistake for DEA to
10   assume it was a Colombian native who sold
11   the cocaine to the victim, right?
12              MR. FINKELSTEIN:  Incomplete
13       hypothetical.  Vague.
14              THE WITNESS:  Yes.
15   BY MR. STEPHENS:
16       Q.    Okay.  And it's important
17   not to bring any potential bias in
18   analyzing evidence because it could cloud
19   the judgment of the investigator, right?
20              MR. FINKELSTEIN:  Vague.
21       Incomplete hypothetical.
22              MS. SINGER:  Scope.
23              THE WITNESS:  Yes.
24   BY MR. STEPHENS:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You would agree that due

2  process principles that existed in our

3  legal system for generations demand that

4  DEA not haul innocent actors into court

5  to answer for the actors for a few bad

6  actions?

7            MS. SINGER:  Scope.  And

8        calls for a legal analysis and

9        conclusion.

10           MR. FINKELSTEIN:  Scope.

11       Calls for a legal conclusion.  And

12       based on your representation that

13       it will be about five minutes, I'm

14       going to let the witness answer.

15           MR. STEPHENS:  Two minutes.

16           THE WITNESS:  Correct.

17  BY MR. STEPHENS:

18    Q.    And DEA agrees that those

19  due process principles still protect

20  innocent actors even when the legal issue

21  involves something as tragic as a heroin

22  overdose, right?

23           MS. SINGER:  Continuing

24       objection.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. FINKELSTEIN:  Calls for

2         a legal conclusion.  You can

3         answer.

4              THE WITNESS:  Correct.

5    BY MR. STEPHENS:

6         Q.    Does DEA believe that the

7    same due process principles that require

8    individualized proof also apply to the

9    diversion investigations DEA conducts to

10   enforce the provisions of the Controlled

11   Substances Act?

12             MR. FINKELSTEIN:  Calls for

13        a legal conclusion.  You can

14        answer.

15             THE WITNESS:  I was waiting

16        to see -- correct.

17   BY MR. STEPHENS:

18        Q.    And you would agree that

19   every manufacturer, distributor, and

20   retail chain pharmacy is entitled to

21   individualized review of its own conduct

22   before being accused for potential

23   violations of the Controlled Substances

24   Act committed by someone else?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2        Q.    For example, you'd agree

 3   that DEA should not accuse a retail chain

 4   pharmacy of diversion committed by a

 5   rogue internet pharmacy where there is no

 6   evidence showing any connection between

 7   the retail chain pharmacy and -- and the

 8   rogue internet pharmacy?

 9             MR. FINKELSTEIN:   Incomplete

10        hypothetical.

11             MR. STEPHENS:   I'll withdraw

12        the question.

13             All right.  Let me take a

14        break.

15             THE VIDEOGRAPHER:   The

16        parties agree?

17             MR. FINKELSTEIN:   Yes.

18             THE VIDEOGRAPHER:   10:57.

19   We are off the video record.

20             (Short break.)

21             THE VIDEOGRAPHER:   11:34, we

22   are on the video record.

23             MR. STEPHENS:   I think I'm

24        at the end of my questions.  I do
```

1    have one question for you though,

2    David, and it's to make sure that

3    I understand your complete basis

4    for clawing back the document

5    which is the -- I think it was

6    marked Number 12.  It's the

7    June 3rd, 2017, communication

8    between Mr. Patterson and

9    Mr. Rosenberg that includes a

10   communication from AUSA and Leslie

11   Wizner from Detroit.

12        MR. FINKELSTEIN:  Correct,

13   the basis for the clawback request

14   was that this document is

15   deliberative process, intra-DOJ

16   discussions regarding improvements

17   and enforcement protocols under

18   the Controlled Substances Act and

19   also attorney/client privilege.

20        MR. STEPHENS:  Thank you.

21   And at this point we'll pass the

22   witness.

23        Thank you for your time,

24   Mr. Prevoznik.

1          THE WITNESS:  Thank you.

2                  -   -   -

3               EXAMINATION

4                  -   -   -

5   BY MR. FARRELL:

6          Q.    Will you state your name,

7   rank, and title?

8          A.    Thomas Prevoznik.  I am the

9   acting section chief of pharmaceutical

10  investigations for the DEA's diversion

11  control division.

12         Q.    Mr. Prevoznik, my name is

13  Paul Farrell, and I am one of the lawyers

14  representing the plaintiffs.  And so I

15  thank you for coming here today.  And I

16  just wanted to set for the record, we

17  sent a list of subject matters to the

18  United States Drug Enforcement Agency and

19  asked for somebody to be designated to

20  testify on its behalf.

21              You understand that the

22  questions that I ask you today are not in

23  your individual capacity, but we're

24  asking for answers as if it was coming

1    from the DEA itself.

2         A.    Correct.

3         Q.    So the million-dollar

4    question right out of the gate is, why

5    didn't the DEA do more?

6              So what I want to do is, I

7    have the testimony from the former acting

8    administrator, Robert Patterson.  And I'm

9    going to show you a video clip and then

10   ask some follow-up questions.  Okay?

11             MS. MAINIGI:  Objection.

12             THE WITNESS:  Okay.

13             MR. FARRELL:  523.

14   BY MR. FARRELL:

15        Q.    This is Mr. Patterson's

16   opening statement I believe his testimony

17   before Congress on March 20, 2018, in

18   front of the subcommittee on oversight

19   and investigations, the committee on

20   Energy and Commerce.

21             You're aware that

22   Mr. Patterson testified?

23        A.    Yes.

24        Q.    And he testified on behalf

Highly Confidential - Subject to Further Confidentiality Review

1    of the DEA?

2          A.    Yes.

3          Q.    To Congress under oath?

4          A.    Yes.

5                MR. FARRELL:  Show the first

6          clip, please.

7                (Video clip played as

8          follows:)

9                MR. PATTERSON:  Where

10         license revocation is not

11         necessary, we've aggressively

12         pursued civil actions and MOUs

13         designed to ensure compliance.

14         Over the last decade, DEA has

15         levied fines totalling nearly

16         $390 million against opioid

17         distributors nationwide and

18         entered into MOUs with each.

19                (Video concluded.)

20   BY MR. FARRELL:

21         Q.    Mr. Prevoznik, can you

22   verify the accuracy of that statement?

23         A.    Yes.

24         Q.    So the DEA has in fact

Highly Confidential - Subject to Further Confidentiality Review

1  attempted to impose civil penalties and

2  conducted investigations into opioid

3  distribution and diversion?

4       A.    Correct.

5       Q.    I'm going to go to the next

6  clip.  This is where the follow-up really

7  begins.

8            (Video clip played as

9            follows:)

10            MR. PATTERSON:

11            Administrative actions, civil

12            fines, and criminal cases are all

13            important steps.  Where we have

14            fallen short in the past, it is by

15            not proactively leveraging the

16            data that has been available to

17            us.

18            (Video concluded.)

19  BY MR. FARRELL:

20       Q.    Mr. Prevoznik, are you

21  familiar with that complaint?

22       A.    Yes.

23       Q.    I'm also going to show you

24  what has been previously referenced in

1    this trial, the jury has heard probably

2    several times, is the Energy and

3    Commerce's report following the testimony

4    of Mr. Patterson as well as the testimony

5    from numerous others.

6              Are you familiar with this

7    report?

8         A.    Yes, I am.

9         Q.    And this is on one

10   particular page, one of the findings and

11   the markings up are the lawyers, not from

12   Congress.  You'll see where I put the

13   Star.  And it basically says, "Had

14   HDA" -- "Had DEA more proactively used

15   ARCOS data, it could have discovered, in

16   a period of time at a place called

17   Sav-Rite Pharmacy Number 1 that there

18   were a lot of pills that were shipped."

19             Are you familiar with this

20   finding from Congress?

21             MS. MAINIGI:  Objection.

22             THE WITNESS:  Yes.

23   BY MR. FARRELL:

24        Q.    So when you and I walk

Highly Confidential - Subject to Further Confidentiality Review

1    through the ARCOS data, what we're

2    talking about is this dataset of

3    information that you had, correct?

4          A.    Correct.

5          Q.    And these are transactions

6    between manufacturers and distributors,

7    between distributors and pharmacies, that

8    are stored in a large database maintained

9    by the DEA?

10         A.    Correct.

11         Q.    Okay.  So what -- what does

12   it mean when the DEA's position is that

13   you are not proactively using the ARCOS

14   data during this time frame?

15         A.    Well, back during that time

16   frame, we were on what we called the

17   mainframe.  So the process was slower of

18   ARCOS data, so when it would be uploaded

19   and processed.  And so we were months

20   behind on getting that data up into the

21   system.

22              It was -- we were restricted

23   to a million transactions of upload per

24   night.  And we received millions of

Highly Confidential - Subject to Further Confidentiality Review

1  transactions.  So that took a while.

2            In addition to that, you

3  also had, when they uploaded, there would

4  be errors, the most typical errors would

5  be wrong NDC code, wrong DEA number, or

6  the wrong DEA 222 order form number.

7       Q.    It's my understanding that

8  today these transactions are stored

9  digitally with the DEA ARCOS database; is

10  that correct?

11       A.    Correct.

12       Q.    And now we are able to

13  presently and retrospectively look back

14  and figure out what happened.  Is that

15  fair?

16            MS. MAINIGI:  Objection.

17            MR. EPPICH:  Object to form.

18            MR. STEPHENS:  Objection.

19            MR. O'CONNOR:  Object to

20       form.

21            THE WITNESS:  Yes.

22  BY MR. FARRELL:

23       Q.    Okay.  Now, this may be a

24  terrible analogy, but my mind, what I'm

1  thinking is, just like -- let's say if

2  the NSA keeps a log of everybody's cell

3  phone calls in the country, they're not

4  actively listening to everyone's call,

5  but they have the ability to go backwards

6  and piece together what happened.  Is

7  that similar to what the DEA was doing

8  with ARCOS?

9          MS. MAINIGI:  Objection.

10          MR. STEPHENS:  Objection.

11          THE WITNESS:  Yes.

12  BY MR. FARRELL:

13      Q.    Same thing with the SEC.

14  There are billions of trades that happen

15  on Wall Street, but the SEC isn't

16  necessarily the clearinghouse for these

17  trades, but it has the capacity to look

18  on a computer backwards and figure out

19  what happened if somebody broke the law.

20  Is that akin to what is going on with the

21  DEA and ARCOS during this time frame?

22          MR. EPPICH:  Objection to

23      form.

24          MR. STEPHENS:  Objection.

```
 1              THE WITNESS:  Yes.
 2   BY MR. FARRELL:
 3         Q.    So going back and looking
 4   backwards from this very same energy and
 5   commerce report, I happened to be
 6   familiar with it because of the West --
 7   because of West Virginia.  The Sav-Rite
 8   Pharmacy from Page 125, Congress went
 9   back and looked at the old ARCOS data.
10   And from it, what it's determined was
11   that McKesson Corporation -- are you
12   familiar with the company called
13   McKesson?
14         A.    Yes, I am.
15         Q.    And who are they?
16         A.    They are a wholesaler,
17   distributor.
18         Q.    McKesson Corporation sold
19   five million doses in 2006 and 2007 of
20   opium pills to a pharmacy in Kermit, West
21   Virginia.  Can you, by looking at this
22   exhibit, tell me how many people,
23   according to Congress, live in Kermit,
24   West Virginia?
```

Highly Confidential - Subject to Further Confidentiality Review

1              MR. STEPHENS:  Objection to
2         form and scope.
3              MR. O'CONNOR:  Objection.
4              MR. EPPICH:  Objection.
5         Foundation.
6              THE WITNESS:  406.
7    BY MR. FARRELL:
8         Q.   All right.  So under any
9    reasonable -- is there any possibly way
10   that a town of 406 has a medical need for
11   over five million pills of opium in a
12   span of two years?
13             MR. EPPICH:  Objection.
14        Foundation.  Calls for
15        speculation.  Scope.
16             MR. STEPHENS:  Scope as
17        well.
18             MR. FINKELSTEIN:  I'll join
19        the scope objection.
20             You can answer if you
21        understand.
22             THE WITNESS:  Could you
23        repeat it, please, one more time?
24   BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yeah.  Is there any basis

2    that you can make up in reality or

3    otherwise where a town of 400 people have

4    a medical need for five million pills of

5    opium in a span of 24 months?

6              MR. EPPICH:  Objection.

7         Form.  Foundation.  Scope.  Calls

8         for speculation.

9              THE WITNESS:  Correct.

10        There isn't.  There isn't.

11   BY MR. FARRELL:

12        Q.    There is absolutely no way,

13   is there?

14             MR. EPPICH:  Same

15        objections.

16             THE WITNESS:  No.

17   BY MR. FARRELL:

18        Q.    So while some people may ask

19   the DEA why you didn't catch this, my

20   question to the DEA is why didn't you

21   indict McKesson?

22             MR. EPPICH:  Objection to

23        form --

24             MR. FINKELSTEIN:  I'm going

1      to instruct you not to answer

2      that.

3              MR. EPPICH:  -- calls for a

4      legal conclusion.  Scope.

5      Foundation.

6              THE WITNESS:  Based on my

7      attorney's advice I'm not going to

8      answer that.

9              MR. FARRELL:  Go to the next

10     video clip, please.

11             (Video clipped played as

12     follows:)

13             ROBERT PATTERSON:  I think

14     when you go back to that time

15     frame on the suspicious orders

16     reports, there was two major

17     failures --

18             MR. FARRELL:  Stop right

19     there for a second.

20             ROBERT PATTERSON:  -- there

21     was either a lack of information

22     contained therein.  Or not filing

23     them in -- in this instance that

24     they had.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I -- I think that started
 2         the problem, quite frankly, and a
 3         lot of the frustration came from
 4         chasing down the registrants and
 5         ultimately reminding them of their
 6         responsibility in this regulated
 7         area.
 8              (Video concluded.)
 9         MR. FARRELL:  So I'm going to
10         strike that and we're going to
11         start over, because I didn't lay a
12         proper foundation for that part.
13    BY MR. FARRELL:
14         Q.   Beyond the opening statement
15    from the DEA to Congress through
16    Mr. Patterson here, there were also
17    questions and answers.
18              So one of the questions
19    Congress asked the DEA was:  Why did the
20    DEA communications with industry fail to
21    prevent the kinds of major breakdowns
22    apparent in West Virginia?
23              I'm going to play for you
24    Mr. Patterson's response.
```

1              (Video clip played as

2         follows:)

3              ROBERT PATTERSON:  I think

4         when you go back to that time

5         frame on the suspicious orders

6         reports, there was two major

7         failures.  One was either a lack

8         of information contained therein,

9         or not filing them in -- in this

10        instance that they had.  I think

11        that started the problem, quite

12        frankly, and a lot of the

13        frustration came from chasing down

14        the registrants and ultimately

15        reminding them of their

16        responsibility in this regulated

17        area.

18             (Video concluded.)

19   BY MR. FARRELL:

20        Q.   My first question to you is,

21   is which registrants is he referencing?

22             MR. EPPICH:  Objection.

23             MR. NICHOLAS:  I'm going to

24        object on the basis that we're

```
 1              talking about different

 2              geographical -- with different

 3              geography, this is a Track 1 case

 4              relating to Track 1 jurisdictions

 5              only.  I object on that basis.

 6                   These are questions about

 7              West Virginia?

 8                   MR. FARRELL:  Yes, sir.  So

 9              for the purposes of creating a

10              record, I understand that you're

11              preserving that right on CT 1.

12              However, the DOJ has requested

13              that we not put up Mr. Prevoznik

14              for all 1600 cases and would

15              prefer him to just to testify

16              once.

17                   So to the extent this is

18              relevant to CT 2, I'm going to go

19              down this line.

20                   MR. NICHOLAS:  Are you

21              saying that you're not going to

22              introduce this portion of the

23              testimony or seek to introduce it

24              in the Track 1 case?
```

1      MR. FARRELL:  No.  What I'm

2      saying is you preserved your

3      objection to this for the CT 1,

4      and we haven't made a decision on

5      what we'll present in CT 1 or

6      CT 2.

7      MR. NICHOLAS:  I made my

8      objection.

9      MR. EPPICH:  I'll further

10     object that this -- this line of

11     questioning lack -- he lacks

12     foundation for it.  Calls for

13     speculation.

14     MR. FARRELL:  Who do you

15     represent?

16     MR. EPPICH:  McKesson.

17     MR. FARRELL:  Okay.  Pretty

18     good.

19 BY MR. FARRELL:

20     Q.   Okay.  Back on -- back on

21 the questions.

22          My question to you is, who

23 is the DEA referencing when they are

24 talking about chasing down registrants.

Highly Confidential - Subject to Further Confidentiality Review

1                    Are we talking about the
2    wholesale distributors?
3         A.    Yes.
4                    MR. EPPICH:  Objection.
5         Form.  Foundation.
6    BY MR. FARRELL:
7         Q.    And then it says that the
8    DEA was -- part of their frustration was
9    having to chase down the registrants and
10   remind them of their responsibilities.
11                   Can you explain what that
12   means?
13                   What does the DEA mean when
14   it says this to Congress?
15                   MR. EPPICH:  Objection to
16        form.  Calls for speculation.
17                   THE WITNESS:  It means that
18        we, with our letters in 2006, we
19        were reiterating what their
20        responsibility was to report
21        suspicious orders.  They may
22        needed to -- that the registrants
23        needed to meet effective controls
24        to guard against diversion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FARRELL:
 2         Q.    Was it the DEA's assessment
 3    during this time frame, which is 2006 and
 4    2007, was that the wholesale distributors
 5    as an industry were not complying with
 6    their regulatory duties?
 7                MR. STEPHENS:  Object to
 8          form.
 9                MR. FARRELL:  Excuse me.
10          Let me -- let me make sure I
11          finish my question before you make
12          your objection and let -- and then
13          we'll get it all preserved.
14                MR. STEPHENS:  I thought you
15          were finished.
16                MR. FARRELL:  So --
17                MR. STEPHENS:  I wanted to
18          make sure I had the objection
19          lodged before he answered the
20          question.  I apologize.
21                MR. FARRELL:  No question.
22                So let me repeat the
23          question.
24    BY MR. FARRELL:
```

1    Q.    Was it the DEA's assessment

2  during the time frame of 2006 and 2007

3  that the wholesale distributors, as an

4  industry, were not complying with their

5  regulatory duties?

6              MR. STEPHENS:  Object to

7         form.

8              THE WITNESS:  Correct.

9  BY MR. FARRELL:

10    Q.    Now, we're going to go to

11  the next clip.

12              The follow-up with the DEA

13  is that a congressman asked the DEA about

14  the settlements with industry in the

15  past.  And asked them why the past

16  settlements were not effective in

17  achieving compliance.

18              Here is Mr. Patterson's

19  response on behalf of the DEA.

20              (Video clip played as

21         follows:)

22              ROBERT PATTERSON:  And

23         again, this goes back to the

24         frustration of the day.  And I

1          know that the -- the folks that

2          were in diversion back in 2010 and

3          2012 struggled with the fact that

4          these MOU or MOAs had been put in

5          place with these companies and

6          they blatantly violated them

7          again.

8               (Video concluded.)

9     BY MR. FARRELL:

10          Q.    So my question to you is, is

11    what can the DEA do if the civil

12    penalties that they are imposing are not

13    prohibitive or do not cause the wholesale

14    distributors to change their conduct?

15               MS. MAINIGI:  Objection.

16          Scope.  Objection to form.

17               MR. EPPICH:  Object to the

18          form.  Calls for speculation.

19               THE WITNESS:  Okay.  We

20          could take -- we could file an

21          order to show cause on them.  If

22          we could show imminent danger to

23          the public, we could file an ISO

24          against them.  We could perhaps

Highly Confidential - Subject to Further Confidentiality Review

1       take other civil action or an

2       injunctive action against the

3       company, or we could criminally

4       prosecute.

5   BY MR. FARRELL:

6       Q.    Was the DEA in fact

7   frustrated that registrants were

8   blatantly violating the MOUs from prior

9   administrative actions?

10          MR. EPPICH:  Object to form.

11          THE WITNESS:  Yes.

12  BY MR. FARRELL:

13      Q.    And which registrants are we

14  talking about in particular?

15          MS. MAINIGI:  Objection.

16      Scope.  I would like to go ahead

17      and get an objection on the record

18      and get a response from DOJ as

19      well as it relates to individual

20      defendants or individual

21      registrants.

22          Our understanding is that

23      individual registrants or

24      defendants are outside the scope

1          of this deposition.

2                   MS. SINGER:  Just to respond

3          to that, I think counsel for

4          defendants asked numerous

5          questions about whether Rite Aid

6          or Walmart or various different

7          entities engaged in certain

8          conduct.

9                   This is consistent with that

10         testimony that defendants

11         themselves have elicited.

12                  MS. MAINIGI:  It has nothing

13         to do with the scope of what has

14         been allowed by the --

15                  MR. STEPHENS:  Nor was I

16         talking about current or former

17         investigations.

18                  MR. FINKELSTEIN:  Well,

19         you're certainly not authorized to

20         talk about current investigations.

21                  Topic 2 is about enforcement

22         activities.  The clarification is,

23         with respect to the type of

24         enforcement activities, counsel

Highly Confidential - Subject to Further Confidentiality Review

1              for plaintiffs explained that

2              plaintiffs seek information

3              regarding administrative actions

4              and/or settlements that DEA has

5              entered into with any of the

6              defendants, and our response is

7              Mr. Prevoznik is authorized.

8                   So I'm not going to stop the

9              witness from answering that

10             question.

11                  MS. MAINIGI:  Mr. Prevoznik

12             is authorized to speak as to what?

13                  Because with respect to our

14             Touhy requests, as I understand

15             it, and there may be somebody who

16             has it more at their fingertips

17             than I do, I believe that you

18             indicated that there could not be

19             questioning as it relates to

20             individual companies.  And I think

21             it's clearly stated in the

22             response to one of the topics,

23             either 2 or 3, I believe.

24                  MR. FARRELL:  I'll tell you

1                what.  It's ten till 12:00.  If

2                it's okay with the DOJ, why don't

3                we take a lunch break now, and we

4                can argue about this during lunch.

5                     MR. FINKELSTEIN:  Sure.

6                     THE VIDEOGRAPHER:  11:53, we

7                are off the video record.

8                          -  -  -

9                     (Lunch break.)

10                          -  -  -

11            A F T E R N O O N   S E S S I O N

12                          -  -  -

13                     THE VIDEOGRAPHER:  1:09.  We

14                are on the video record.

15                          -  -  -

16                     EXAMINATION

17                     (Continued)

18                          -  -  -

19      BY MR. FARRELL:

20           Q.    Mr. Prevoznik, when we took

21      our lunch break, the last question and

22      answer was followed by a bunch of

23      objections.  And so what I'm going to do

24      is I'm going to withdraw the question

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that -- where I asked you generally which

 2    registrants we are talking about.

 3              And I'm going to go and give

 4    you more specific information.

 5              So the last question that

 6    was pending and answered, I asked:  "Was

 7    the DEA in fact frustrated that

 8    registrants were blatantly violating the

 9    MOUs from prior administrative actions?"

10              And your answer was:  "Yes."

11              There were appropriate

12    objections that were made that will be

13    resolved one day in the future.  So

14    here's where my follow-up questions

15    comes.

16         A.    Okay.

17         Q.    Does that include Cardinal

18    Health's 2008 MOU and settlement which

19    resulted in a second DEA fine?

20         A.    Yes.

21              MS. MAINIGI:  Objection.

22         Objection.  Scope.  Objection.

23         Form.  Let me just go ahead and

24         begin at least noting, and then
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          someone else may continue, the
 2          fact that there was a discussion
 3          off the record during the lunch
 4          break between us, DOJ, as well as
 5          the plaintiffs about the scope of
 6          what DOJ has allowed.  I don't
 7          think that there was resolution of
 8          that, but for the record,
 9          defendants do object to this
10          ongoing line of questioning which
11          involves discussion of individual
12          defendants or individual actions
13          that have been taken in the past
14          against defendants.
15              MR. EPPICH:  And for the
16          record, McKesson further objects
17          to the scope of this as really
18          outside the Touhy request.  You
19          know, the defendants are -- see
20          this as seeking non-public
21          information, information on
22          ongoing investigations,
23          investigation that may implicate
24          the deliberative process or to the
```

1       specific activities of the DEA.

2           The defendants have not been

3       permitted to question into these

4       lines with other witnesses or

5       yesterday, and the defendants

6       simply are requesting equality in

7       the application of the Touhy.  And

8       that will be our objection on the

9       record.

10          MR. FINKELSTEIN:  To be as

11      clear as I possibly can about the

12      scope of the authorization in the

13      hope that we don't have to keep

14      having this conversation, what we

15      have authorized is information

16      regarding administrative actions

17      and/or settlements that the DEA

18      has entered into with the

19      defendants in this case.

20          What we have not authorized

21      is information regarding

22      investigations that haven't

23      resulted in settlements, or

24      investigative techniques, or for

1          that matter deliberative process

2          or law enforcement sensitive

3          information.

4               I will continue to make

5          appropriate objections, and where

6          appropriate instruct the witness

7          not to answer.  The defendants

8          have made their objections and

9          have preserved them for the

10         record.

11              You can answer.

12    BY MR. FARRELL:

13         Q.   Does that include McKesson's

14    2008 MOU and settlement which resulted in

15    a second DEA fine?

16              MR. EPPICH:  Objection.

17         Scope.

18              THE WITNESS:  Yes.

19    BY MR. FARRELL:

20         Q.   I'm not going to play this

21    video clip.  Instead I'm going to ask it

22    in a form of a question.

23              During the same testimony

24    acting -- is it administrator?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Acting Administrator Robert

3  Patterson testified that the DEA has

4  1,500 people to monitor 1.73 million

5  registrants.  Is that an accurate number?

6         MR. EPPICH:  Objection to

7    form.  Vague.

8         THE WITNESS:  Yes.

9         (Whereupon, a discussion was

10   held off the record.)

11        THE VIDEOGRAPHER:  1:14, we

12   are off the video record.

13        (Brief pause.)

14        THE VIDEOGRAPHER:  1:17.  We

15   are on the video record.

16 BY MR. FARRELL:

17   Q.    Again, the last reference

18 that I'm going to bring up with regard to

19 Mr. Patterson's testimony before Congress

20 on behalf of the DEA, is a segment that

21 again talks about the shortcomings in the

22 use of the ARCOS data historically.

23        MR. FARRELL:  Would you

24   please play that clip.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Video clip played as
 2          follows:)
 3                    MR. PATTERSON:  So the key
 4          is for us to work together on
 5          that, and again, I can say
 6          repeatedly in 2008, '9, '10, we
 7          did not use this data in the way
 8          that we are now using it.  And I
 9          think that's the key.
10                    I get that we have this
11          issue from a decade ago that we
12          have to resolve, you know, in
13          terms of how we use it.  And
14          again, where we fell short in
15          that, we'll take responsibility
16          for it.
17                    (Video playback ended.)
18   BY MR. FARRELL:
19          Q.    So has the DEA, in fact,
20   changed the way in which they are using
21   the ARCOS data?
22          A.    Yes.
23          Q.    And to be clear, to be
24   clear, what we are talking about is the
```

Highly Confidential - Subject to Further Confidentiality Review

1    DEA's use of the ARCOS data to

2    retrospectively identify and prosecute

3    criminals?

4              MR. EPPICH:  Object to form.

5              THE WITNESS:  Yes.

6    BY MR. FARRELL:

7         Q.    I apologize that I'm going

8    to jump out of order.  There is a system

9    to my madness.

10             What I'm going to do is, is

11   I'm going to hit one particular subject

12   here, and then I'm going to go back

13   and -- and ask some questions as if, you

14   know, a priority from the beginning.

15        A.    Okay.

16        Q.    So my question is this.  I

17   want to -- I want to ask you if the DEA

18   agrees with the following statement from

19   Cardinal Health:

20             "Cardinal Health's policy

21   about which it informed DEA as early as

22   2009, was that if a customer's order

23   could not be filled because it was

24   suspicious, Cardinal Health would

1    terminate controlled substance sales to

2    the customer and report the termination

3    to the DEA."

4              Do you understand what I

5    just read to you?

6              MS. MAINIGI:  Objection.

7        Form.  Objection.  Scope.

8              THE WITNESS:  Can I get the

9        first -- the first part of the

10       question?

11   BY MR. FARRELL:

12       Q.    Yes.  So specifically what

13   I'm referencing is Cardinal Health's

14   reply brief, in Cardinal Health versus

15   Eric Holder, which was a preliminary

16   injunction filed by Cardinal Health in a

17   DC District Court.  And in it -- in the

18   reply brief there's a provision in here

19   that I read to you.  And in essence what

20   it says is that if you get a suspicious

21   order, and you block it, that Cardinal

22   Health would terminate that customer and

23   not sell to it anymore.

24              Do you agree that if a

Highly Confidential - Subject to Further Confidentiality Review

1    wholesale distributor gets a flag of a

2    suspicious order, that they've determined

3    to be a suspicious order, and that they

4    block that shipment, that they should

5    terminate all future sales to that same

6    customer until they can rule out that

7    diversion is occurring?

8              MS. MAINIGI:  Objection.

9         Form.  Objection.  Scope.  Calls

10        for a hypothetical.

11             MR. EPPICH:  Objection to

12        the foundation.  Calls for

13        speculation.

14             THE WITNESS:  Yes, I would

15        agree.

16   BY MR. FARRELL:

17        Q.    The same thing applies to a

18   document involving McKesson.

19             On August 13, 2014, the

20   United States Department of Justice was

21   communicating with the lawyer for

22   McKesson which ended up resulting in a

23   $150 million fine.

24             And in this discussion, the

Highly Confidential - Subject to Further Confidentiality Review

1    DEA notes, and I'm reading from Bates

2    Stamp MCKMDL 00409224, that the McKesson

3    operations manual says the following

4    quote:

5              "Once McKesson deems an

6    order and/or a customer suspicious,

7    McKesson is required to act.  This means

8    all controlled substance sales to that

9    customer must cease and the DEA must be

10   notified."

11             Does the DEA agree with

12   those duties?

13        A.    Yes.

14             MR. EPPICH:  Objection.

15        Scope.  Objection to the extent it

16        mischaracterizes the document.

17        Lacks foundation.  Calls for

18        speculation.  Form.

19             MR. FINKELSTEIN:  The

20        witness has answered the question.

21             I just note that there are

22        no documents in front of him.

23        There are no exhibits.  If you're

24        going to ask him about exhibits,

Highly Confidential - Subject to Further Confidentiality Review

```
 1              then you should mark them as

 2              exhibits.

 3                   MR. FARRELL:  I can

 4              absolutely do that.  And -- and I

 5              think that I was trying to save us

 6              some time.  To the extent that

 7              I've misread anything or the

 8              context of it, I apologize.

 9                   We have those documents and

10              I can circulate them.  I'm just

11              trying to create a quick record

12              before we move on.

13                   MR. FINKELSTEIN:  It's your

14              deposition.

15                   MR. EPPICH:  We'll have an

16              ongoing objection then, to the

17              extent you're reading from a

18              document that's not in front of us

19              to check, and -- and where you

20              haven't established a foundation,

21              then we will obviously object.

22                   MR. FARRELL:  So if it's --

23              if it's not clear, I'm trying to

24              create a record for our experts as
```

1          well.

2                    MR. EPPICH:  I got that,

3          thank you.

4    BY MR. FARRELL:

5          Q.    So, cleaning up a couple of

6    other things.

7                    There was some testimony

8    yesterday, or today actually, from my

9    learned colleague, that 1.2 million

10   suspicious orders were reported to the

11   DEA between 2007 and 2018.

12                   Do you recall that

13   testimony?

14         A.    Yes.

15                   MR. EPPICH:  Object to form.

16   BY MR. FARRELL:

17         Q.    If those suspicious orders

18   were filled, is that a, per se, violation

19   of federal law?

20                   MR. EPPICH:  Objection to

21         form.

22                   THE WITNESS:  Yes.

23                   MS. MAINIGI:  Objection.

24         Calls for speculation, calls for a

1    legal conclusion.

2         THE WITNESS:  Yes.

3    BY MR. FARRELL:

4         Q.    The foundation of our

5    democracy arises out of the U.S. code.

6    So I'm going to ask a couple of general

7    questions about some code provisions that

8    I'm sure you're very familiar with.

9         MS. MAINIGI:  Objection.

10   Outside the scope.

11   BY MR. FARRELL:

12        Q.    The first one is the statute

13   of United States Code Section 801.  And I

14   ask for it to be shown on the screen.

15        So you've been asked in the

16   past, with the focus on Subparagraph 1,

17   that many of the controlled substances

18   that are distributed in America,

19   prescribed and dispensed, have a useful

20   and legitimate medical purpose and that

21   they are necessary to maintain the health

22   and general welfare of the American

23   people.

24        That's a true statement, is

1   it not?

2           MS. MAINIGI:  Objection.

3       Form.

4           MR. FINKELSTEIN:  Same scope

5       objection.  I allowed the

6       defendants to ask so I'll allow

7       you to ask.

8   BY MR. FARRELL:

9       Q.    So we're going to skip down

10  to the part they omitted, which is

11  Subparagraph 2, and I'd ask for you to

12  read that into the record.

13          MR. EPPICH:  Object to form.

14          THE WITNESS:  "The illegal

15      importation, manufacture,

16      distribution and possession and

17      improper use of controlled

18      substances have a substantial and

19      detrimental effect on the health

20      and general welfare of the

21      American people."

22  BY MR. FARRELL:

23      Q.    Is this consistent with the

24  guidance provided by the DEA to

Highly Confidential - Subject to Further Confidentiality Review

1    registrants?

2              MR. EPPICH:  Object to form.

3         Vague.

4              THE WITNESS:  Yes.

5    BY MR. FARRELL:

6         Q.    The next provision is

7    Section 812.  And this is the scheduling

8    of -- by the United States Congress,

9    which identifies Schedule II drugs, which

10   include prescription opioids.

11              And Subparagraph A, would

12   you please read into the record?

13        A.    "The drug or other substance

14   has" -- "has a high potential for abuse."

15        Q.    Subparagraph B?

16        A.    "The drug or other substance

17   has a currently accepted medical use and

18   treatment in the United States or a

19   currently accepted medical use with

20   severe restrictions."

21        Q.    And Paragraph C?

22        A.    "Abuse of the drug or other

23   substances may lead to severe

24   psychological or physical dependence."

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And are these provisions

2  consistent with the guidance provided by

3  the DEA to registrants?

4            MR. EPPICH:  Objection to

5       form.  Vague.

6            THE WITNESS:  Yes.

7  BY MR. FARRELL:

8    Q.    Go to the next section which

9  is Section 821.  This is the enabling

10  statute from the United States Congress

11  that authorizes the Attorney General to

12  promulgate regulations regarding

13  prescription opioids.

14            Has, in fact, the DEA used

15  this authority to enact, in particular,

16  21 C.F.R. 1301.74?

17            MR. FINKELSTEIN:  Calls for

18       a legal conclusion.  You can

19       answer.

20            THE WITNESS:  Yes.

21  BY MR. FARRELL:

22    Q.    Go to the next slide.  And

23  this is the United States Code Section,

24  which has a registration requirement.

1    And it includes a duty imposed upon the

2    registrants to comply with Paragraph 1.

3    Will you please read that into the

4    record?

5          A.      "Maintenance of effective

6    control against diversion of particular

7    controlled substances into other than

8    legitimate medical, scientific, and

9    industrial channels."

10         Q.      And is this consistent with

11   the guidance provided by the DEA to

12   registrants?

13              MR. EPPICH:  Objection to

14         form.  Vague.

15              THE WITNESS:  Yes.  Yes.

16   BY MR. FARRELL:

17         Q.      Now, the next thing that I'm

18   going to do is to peer a little bit

19   deeper into some congressional intent

20   from the congressional record.

21              MR. FARRELL:  Can you pull

22         up the next slide.

23   BY MR. FARRELL:

24         Q.      I'm not going to ask you to

1    be a legal scholar or an academic

2    scholar.  I'm going to ask you some

3    specific questions.

4              This comes from the

5    congressional record from the 1970

6    Controlled Substances Act.

7              MR. FARRELL:  And so if

8        you'll go to the next slide.

9    BY MR. FARRELL:

10       Q.    Title II, Control

11   Enforcement, states, "This bill provides

12   for control by the Justice Department of

13   problems related to drug abuse through

14   registration of manufacturers,

15   wholesalers, retailers, and all others in

16   the legitimate distribution chain, and

17   makes transactions outside the legitimate

18   distribution chain illegal."

19              Is this consistent with the

20   guidance the DEA provided to registrants?

21              MS. MAINIGI:  Objection.

22              MR. EPPICH:  Objection to

23       form.

24              THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. FARRELL:

 2         Q.    If you violate Section 823,

 3    or the provisions, the regulations

 4    enacted by the DEA related to the

 5    distribution of controlled substances,

 6    those acts are illegal.  Agreed or

 7    disagree?

 8              MS. MAINIGI:  Objection.

 9         Calls for a legal conclusion.

10              THE WITNESS:  Agreed.

11    BY MR. FARRELL:

12         Q.    The DEA considers violation

13    of federal law related to the

14    distribution of controlled substances as

15    illegal and unlawful?

16              MR. EPPICH:  Objection to

17         form.

18              THE WITNESS:  Yes.

19              MR. FARRELL:  Go to the next

20         slide.

21    BY MR. FARRELL:

22         Q.    The quote from the

23    congressional record is, "The bill is

24    designed to improve the administration

1  and regulation by the manufacturer" --

2  "by the manufacturing, distribution and

3  dispensing of controlled substances by

4  providing a quote-unquote closed system

5  of drug distribution for legitimate

6  handlers of such drugs.

7           "Such a closed system should

8  significantly reduce the widespread

9  diversion of these drugs out of

10  legitimate channels into the illicit

11  market, while at the same time providing

12  the legitimate drug industry with a

13  unified approach to narcotic and

14  dangerous drug control."

15           Is this consistent with the

16  guidance provided by the DEA to

17  registrants?

18           MR. EPPICH:  Object to form.

19       Vague.

20           THE WITNESS:  Yes.

21  BY MR. FARRELL:

22       Q.   You were asked previously

23  whether every suspicious order results in

24  diversion.  Do you recall that testimony?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2                    MR. EPPICH:  Object to form.

 3      BY MR. FARRELL:

 4              Q.    And your answer was, "No,

 5      not every suspicious order results in

 6      diversion.  That's my recollection."

 7                    I would like to ask you some

 8      corollary to that if you don't mind.

 9                    MS. MAINIGI:  Objection.

10                    THE WITNESS:  Okay.

11      BY MR. FARRELL:

12              Q.    You would agree with me --

13      strike that.

14                    Does the DEA take the

15      position that the purpose of the

16      Controlled Substances Act and its federal

17      regulations is to prevent diversion?

18              A.    Yes.

19              Q.    And diversion is foreseeable

20      if registrants fail to comply with

21      federal law?

22                    MS. MAINIGI:  Object.

23                    MR. EPPICH:  Object to form.

24                    MR. FINKELSTEIN:  Vague.
```

1            MR. O'CONNOR:  Object.

2     BY MR. FARRELL:

3            Q.    Does the DEA agree that

4     diversion is foreseeable if registrants

5     fail to comply with federal law?

6               MS. MAINIGI:  Objection.

7               MR. EPPICH:  Objection.

8         Form.  Calls for a legal

9         conclusion.  Vague.

10              THE WITNESS:  Correct.

11    BY MR. FARRELL:

12           Q.    And failure to comply

13    enables more diversion.  Does the DEA

14    agree with that?

15              MR. O'CONNOR:  Object to

16        form.

17              MR. EPPICH:  Objection.

18              MR. STEPHENS:  Objection.

19              MR. NICHOLAS:  Objection.

20              MS. MAINIGI:  Objection.

21              MR. EPPICH:  Calls for a

22        legal conclusion.

23              MR. FINKELSTEIN:  Join as to

24        vagueness.

1            THE WITNESS:  Yes.

2    BY MR. FARRELL:

3        Q.    Does the DEA believe that

4    more diversion is detrimental to public

5    health and safety?

6            MR. O'CONNOR:  Object to

7        form.  Scope.

8            THE WITNESS:  Yes.

9    BY MR. FARRELL:

10       Q.    Does the DEA agree that the

11   more pills which unlawfully enter the

12   market results in more diversion?

13           MR. O'CONNOR:  Objection to

14       form.  Scope.

15           THE WITNESS:  Yes.

16           MR. FARRELL:  Go to the next

17       slide.

18   BY MR. FARRELL:

19       Q.    This is a provision about

20   penalties.  Does the DEA agree that the

21   price for participation in illegal

22   traffic of controlled substances should

23   be prohibitive?

24           MR. O'CONNOR:  Objection.

```
 1              MR. EPPICH:  Objection to
 2        form, foundation.
 3              MR. STEPHENS:  Objection.
 4              MR. NICHOLAS:  Objection.
 5              MS. MAINIGI:  Objection.
 6              MR. O'CONNOR:  Scope.
 7              MR. EPPICH:  Calls for
 8        speculation.
 9              MR. FINKELSTEIN:  Scope.
10        You can answer.
11              THE WITNESS:  Yes.
12   BY MR. FARRELL:
13        Q.   Is this one of the reasons
14   that the DEA has escalated the amount of
15   fines that it has levied against
16   registrants that are repeated violators?
17              MR. O'CONNOR:  Objection.
18        Leading.
19              MR. EPPICH:  Objection to
20        form.  Calls for speculation.
21              MR. FINKELSTEIN:  Scope.
22              THE WITNESS:  Yes.
23   BY MR. FARRELL:
24        Q.   Next slide.  Titles II and
```

Highly Confidential - Subject to Further Confidentiality Review

1  III of the bill deal with law enforcement

2  and aspects of drug abuse and provide

3  authority for the Department of Justice

4  to keep track of all drugs subject to

5  abuse manufactured or distributed in the

6  United States in order to prevent

7  diversion of these drugs from legitimate

8  channels of commerce.

9            Is this consistent with the

10  guidance provided by DEA to registrants?

11            MR. EPPICH:  Objection to

12       form.  Vague.

13            MR. O'CONNOR:  Objection.

14       Scope.

15            THE WITNESS:  Yes.

16            MR. FARRELL:  Next slide,

17       please.

18            Next slide.

19  BY MR. FARRELL:

20       Q.    Congress found the illegal

21  importation, manufacture, distribution

22  and possession of improper use of

23  controlled substances have a substantial

24  detrimental effect on the public's health

1    and general welfare.

2              Does the DEA agree with this

3    statement, and is this consistent with

4    the guidance provided by the DEA to

5    registrants?

6              MR. O'CONNOR:  Objection to

7         form and to scope.

8              MR. EPPICH:  Objection to

9         the extent it misstates the

10        document.

11             BY MR. FARRELL:  Very well.

12        That's a good point.  I'll back

13        up.

14   BY MR. FARRELL:

15        Q.    In the congressional record

16   is the following statement:

17             "The illegal importation,

18   manufacture, distribution and possession

19   and improper use of controlled substances

20   have a substantial detrimental effect on

21   the public's health and general welfare."

22             Does the DEA agree with this

23   statement?

24             MR. O'CONNOR:  Objection to

1          form and scope.

2               MR. EPPICH:  Objection.

3          Calls for speculation.

4               MR. FINKELSTEIN:  Scope.

5               THE WITNESS:  Yes.

6     BY MR. FARRELL:

7          Q.    Is this statement consistent

8     with the guidance provided by the DEA to

9     registrants?

10              MR. O'CONNOR:  Objection to

11         form and scope.

12              MR. EPPICH:  Objection.

13         Vague.

14              THE WITNESS:  Yes.

15              MR. FARRELL:  Next slide

16         please.

17              There's no more?

18    BY MR. FARRELL:

19         Q.    All right.  Now we're going

20    to dig a little bit deeper.  These aren't

21    the congressional record.  This comes

22    from the hearing involving the 1970

23    Controlled Substances Act.

24              So, if you go to the front

1    page, this is a 900-page document that --

2    from the -- I always mispronounce this.

3    The HathiTrust?  HathiTrust?

4              And it contains all of the

5    hearings that are -- that surrounded the

6    enactment of the 1970 Controlled

7    Substances Act.  And there's some

8    particular statements that are made.  I'm

9    not going to ask you to verify them.  I'm

10   going to just ask whether the DEA agrees

11   or disagrees with the premise.

12             The first one comes from a

13   statement of the manager of -- of

14   distribution from a firm called Smith,

15   Kline & French Laboratories.

16             If you --

17             MR. NICHOLAS:  I'll

18        object -- I'm sorry.  I don't want

19        to interrupt.  If you're not done,

20        keep going.

21             MR. FARRELL:  So if you'll

22        go ahead and pull it up.

23             MR. NICHOLAS:  Okay.  Can I

24        just interpose an objection?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FARRELL:  Sure.
 2              MR. NICHOLAS:  I don't want
 3         to mess with your flow here, but
 4         you're showing these documents
 5         that are not -- they are not --
 6         they are not being offered as
 7         evidence.  They are not being
 8         marked.
 9              It's a direct examination.
10         I kind of feel like there needs to
11         be a little more formality to the
12         presentation.  Like, you know,
13         these have to be exhibits or
14         something, right?
15              MR. FARRELL:  Noted.
16              MR. NICHOLAS:  So that's my
17         objection.  I don't think you
18         should be able to proceed in this
19         manner without sort of producing
20         these things as exhibits or laying
21         a foundation for these documents.
22              MR. FARRELL:  I will note we
23         spent most of the morning doing
24         the exact same thing with other
```

Highly Confidential - Subject to Further Confidentiality Review

1              aspects of the congressional

2              record.

3                   MR. NICHOLAS:  This is a

4              direct examination.

5                   MR. FARRELL:  Understood.

6              So -- can we stipulate to that?

7                   MR. NICHOLAS:  I mean, it's

8              your position that it's a direct,

9              right?

10   BY MR. FARRELL:

11        Q.   All right.  So if we go to

12   Page 269, I'm going to read to you this

13   statement:

14              "We cannot overemphasize,

15   however, that no regulatory program will

16   work unless it is backed by sufficient

17   manpower and resources to do what it is

18   designed to do.  The federal and state

19   enforcement agencies in the drug field

20   are all too well aware of this truism.

21   They are often the target for unjustified

22   public criticism for not doing a job that

23   would take many times their present

24   resources to do."

1           The D --

2           MS. MAINIGI:  Go ahead.

3    BY MR. FARRELL:

4           Q.    Does the DEA agree with this

5    statement?

6           MS. MAINIGI:  Objection to

7       form, scope.

8           And can we see a copy of

9       this, Counsel?  Because we have no

10      way to know what exactly you are

11      reading from within this document.

12          MR. FULLER:  Here you go.

13          MS. MAINIGI:  What page?

14          MR. FARRELL:  269.

15          Go to the next slide,

16      please.

17          MR. EPPICH:  I'll object to

18      foundation.

19   BY MR. FARRELL:

20          Q.    Go to the next slide,

21   please.

22          This is a statement from the

23   Washington representative for the

24   National Association of Retail Druggists.

Highly Confidential - Subject to Further Confidentiality Review

1            "MR. ROGERS.  As we ask

2    groups as they come in where they feel

3    diversion comes from or illegal traffic,

4    when you get to the manufacturers, they

5    don't feel that" -- "that any comes from

6    there.

7            "Then we get to the

8    wholesaler, and they don't think there is

9    any there.  And then we get down to the

10   doctors and they tell us it is not in

11   that segment, and the retail druggist now

12   tells us there is none there.  Well,

13   where do you feel all of this comes from?

14   We have 900 agents supposedly to track

15   all of this down and they come up with

16   4,000 arrests, five per man for the year.

17   I don't know how society gets inundated

18   with all of these drugs from no sources.

19   Where do you think it mainly comes from?

20   I don't believe there are enough

21   robberies out of warehouses to supply all

22   of this."

23            And then from the National

24   Association of Retail Druggists, their

Highly Confidential - Subject to Further Confidentiality Review

1    response is:

2              "I don't believe there are

3    either.  I think this is a factor and I

4    can certainly appreciate your concern.  I

5    think, Mr. Chairman, that you put your

6    finger on the real problem that has to be

7    dealt with."

8              So my question to the DEA:

9    Is this consistent with the DEA's

10   understanding of the purpose and effect

11   of the Controlled Substances Act, as well

12   as the regulations enabled thereunder, is

13   to prevent diversion that happens in the

14   entire chain of distribution?

15             MR. EPPICH:  Object to form.

16             MR. O'CONNOR:  And scope.

17             MS. MAINIGI:  Objection.

18        Outside the scope as well.

19             MR. NICHOLAS:  Can we -- can

20        we know the date of this

21        statement, when it was made?

22             MS. MAINIGI:  It is in 1970

23        prior to opioids that are at issue

24        here.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. NICHOLAS:  Is that

2       correct, it's a pre-1970

3       statement?

4           MR. FINKELSTEIN:  Are you

5       guys done with objections?

6           MS. MAINIGI:  Well, it says

7       1970.

8           Paul, could you clarify

9       though.  Is it 1970?

10          MR. FARRELL:  I've already

11      made the record that I'm going to

12      make.

13          MR. FINKELSTEIN:  Once you

14      are done -- are you guys done?

15          MR. NICHOLAS:  Yeah.

16          MR. FINKELSTEIN:  I object

17      to the scope.  Vague.

18          You can answer if you

19      understand.

20          THE WITNESS:  Yes.

21  BY MR. FARRELL:

22      Q.   Even if it's not admissible,

23  you agree with me that's pretty

24  consistent with what the DEA hears today

Highly Confidential - Subject to Further Confidentiality Review

1    from those in the chain of distribution.

2                    MR. EPPICH:  Object to form.

3                    MR. O'CONNOR:  And scope.

4                    THE WITNESS:  Could you

5        repeat the question?

6    BY MR. FARRELL:

7        Q.    Even if this is from 1970,

8    are those sentiments that we just read

9    consistent with what the DEA presently

10   hears from the manufacturers,

11   distributors, doctors, and pharmacies in

12   the chain of distribution?

13                   MR. STEPHENS:  Object to

14       form.

15                   MR. FINKELSTEIN:  Vague.

16                   MR. O'CONNOR:  Object to

17       scope.

18                   THE WITNESS:  Yes.

19   BY MR. FARRELL:

20       Q.    All right.  The next thing

21   we're going to go to is the C.F.R. that

22   Congress enabled to be adopted.  And the

23   first thing is going to be from March 13,

24   1971 and it's the rule proposal.  And

1    we're going to flip down to Page 9.

2              Does the DEA recognize the

3    structure of this provision?

4         A.    Yes.

5              MS. MAINIGI:  Objection.

6         Foundation.  Scope.  Form.

7              MR. FARRELL:  Well, the

8         foundation of this exhibit is this

9         is part of the rulemaking process

10        which resulted in the adoption of

11        21 C.F.R. 1301.74.

12             MS. MAINIGI:  I don't think

13        you can testify, Mr. Farrell.  You

14        have to establish foundation in

15        other ways.

16   BY MR. FARRELL:

17        Q.    The next slide I'm going to

18   show you comes from once public notice

19   was made for this provision.

20             MR. FARRELL:  Will you

21        please show that.

22   BY MR. FARRELL:

23        Q.    It comes from April 24,

24   1971.  At the very top of it, I'll have

1    you read that.

2           A.     "Many manufacturers and

3    distributors objected to security

4    controls set forth in 301.91 to 301.97."

5           Q.    And I'll represent to you

6    that these provisions they are

7    referencing are in fact the security

8    requirements in 1301.74(b).  And I'll ask

9    the DEA:  Do you still have records of

10   the objections lodged by manufacturers

11   and distributors to this regulatory

12   provision?

13              MR. EPPICH:  Objection to

14         form.

15              MS. MAINIGI:  Objection to

16         form, foundation, scope.

17              MR. EPPICH:  Object to

18         scope.  This is way outside of

19         Topic 1 of plaintiffs' topics.

20              MR. FINKELSTEIN:  Scope.

21         You can answer.

22   BY MR. FARRELL:

23         Q.    If you know.

24         A.    I don't know.

1    Q.    Is it something that DEA can

2    look into for me?

3              MR. EPPICH:  Same

4         objections.

5              MS. MAINIGI:  Objection.

6              THE WITNESS:  Yes.

7    BY MR. FARRELL:

8    Q.    Because it would be swell

9    if, like, some of the manufacturers and

10   distributors that are here objecting to

11   the DEA have been objecting since 1971.

12             MS. MAINIGI:  Is that a

13        question?

14             MR. EPPICH:  Objection to

15        the characterization.

16             MR. FARRELL:  That was just

17        commentary.

18             MR. EPPICH:  I know.

19   BY MR. FARRELL:

20   Q.    The next slide is going to

21   be the actual regulation that exists

22   today, which is 21 C.F.R. 1301.74(b).

23             MR. FINKELSTEIN:  That's not

24        it.

1          MR. STEPHENS:  Paul, just

2      for clarification, are you marking

3      these so that we have a hard copy

4      that we can use in redirect?

5      You're just throwing stuff up on

6      the screen and playing stuff and

7      moving on.

8          MS. MAINIGI:  And sometimes

9      not even waiting for an answer.

10          MR. FARRELL:  Understood.

11          MR. STEPHENS:  Do you

12      understand my point?  If you're

13      using a document, I want to see

14      the whole document so if I've got

15      questions that I can use it in

16      redirect.

17          MR. FARRELL:  We do have

18      copies.  You've got copies of

19      stuff here too.  Yeah, we got

20      copies.

21          MS. MAINIGI:  I thought you

22      were sending these all

23      electronically.

24          MR. FARRELL:  I think you

1      scoffed at me when I made that

2      recommendation.

3              MS. MAINIGI:  I did laugh at

4      you.  That's true.  But I thought

5      you were still doing it.

6              MR. FARRELL:  We'll move on.

7   BY MR. FARRELL:

8        Q.    I've shown you up on the

9   screen, which is a verbatim copy of --

10  from the regulations enacted.

11             Does the DEA recognize and

12  acknowledge that 21 C.F.R. 1301.74 is a

13  regulation enacted and under its

14  authority?

15             MS. MAINIGI:  Objection.

16             MR. EPPICH:  Objection.

17             MR. FINKELSTEIN:  Calls for

18      a legal conclusion.

19             THE WITNESS:  Yes.

20  BY MR. FARRELL:

21       Q.    And would you please read

22  subparagraph (b) into the record?

23       A.    "The registrant shall design

24  and operate a system to disclose to the

Highly Confidential - Subject to Further Confidentiality Review

1    registrant suspicious orders of

2    controlled substances.  The registrant

3    shall inform the field division office of

4    the administration in his area of

5    suspicious orders when discovered by the

6    registrant.

7              "Suspicious orders include

8    orders of unusual size, orders deviating

9    substantially from a normal pattern, and

10   orders of unusual frequency."

11        Q.    Is this consistent with the

12   guidance provided by the DEA to

13   registrants?

14        A.    Yes.

15        Q.    And has this regulation

16   materially changed since it was

17   originally enacted in 1971?

18        A.    No.

19        Q.    All right.  The next

20   document that I'm going to show you comes

21   from discovery in this case.  And it's

22   the NWDA suspicious order monitoring

23   system.

24              And I believe that the

1    government has it included in its folder,

2    its materials file.

3              Have you seen this document

4    before?

5         A.    Can I see more than that?

6         Q.    I think it's under -- it's

7    in one --

8         A.    In my tabs, my folder?

9         Q.    Yeah.

10        A.    Yes.

11        Q.    I'll give you a second if

12   you want to flip through it.

13        A.    That's all I see.

14              I'm familiar with this.

15        Q.    This is a document that was

16   in the files of Cardinal Health.  And

17   it's stamped as received in 1993, but

18   I'll represent to you that it contains

19   some older 1984 references later on.

20              I'm going just to ask you a

21   few basic questions about it.  And I'll

22   represent to you that the NWDA is a trade

23   group for the wholesale distributors at

24   some point in time.

```
 1                    Go to Page 3.

 2                    MR. FARRELL:  Take that down

 3          first if you don't mind.  I'm

 4          sorry.  I was talking to John.

 5          Take out the blowup.

 6                    Go ahead.  Put it back up.

 7     BY MR. FARRELL:

 8          Q.    So this is something very

 9     specific that I want to ask the DEA.

10                    MS. MAINIGI:  Objection.

11          Let me object first to the manner

12          in which you're questioning.  You

13          cannot be testifying about various

14          aspects of this document.

15                    But objection.  Form.

16          Foundation.  This guy hasn't --

17          this is not a DEA document.

18          You're essentially trying to use

19          him as a vehicle to get testimony

20          from the document itself.  It's

21          ridiculous and objectionable and

22          outside the scope.

23                    MR. FARRELL:  You can make

24          your objections without making
```

1    demeaning comments.  So I'm going

2    to ask you --

3         MS. MAINIGI:  Okay.  Well,

4    it is a mockery of the process.

5         MR. FARRELL:  That's your

6    second demeaning comment.  The

7    third one, we'll get the special

8    master on the phone.

9         MS. MAINIGI:  That's fine.

10   I actually would love that.  Go

11   ahead.

12        MR. FARRELL:  We can do it

13   on a break after we get through

14   this document.

15        MS. MAINIGI:  Sounds fine to

16   me.

17   BY MR. FARRELL:

18        Q.   So what I'm going to ask you

19   is, if you look in the middle of the page

20   where it says, "Current month ingredient

21   limit," and then there's a note that says

22   "NN.NN will be provided by the DEA."

23             Do you see that?

24             MS. MAINIGI:  Objection.

1          Form.  Scope.  Foundation.

2                    THE WITNESS:  Yes.

3     BY MR. FARRELL:

4          Q.    Okay.  Cardinal Health has

5     represented that the DEA provided that

6     factor to them for controlled substances.

7     Is the DEA aware of ever providing the

8     factor for the current month ingredient

9     limit to anybody in industry?

10                   MS. MAINIGI:  Objection.

11         Form.  Scope.  Foundation.

12                   THE WITNESS:  I don't know.

13    BY MR. FARRELL:

14         Q.    Go all the way to Page 7.

15    In the middle of the page in Paragraph 9,

16    "Single suspicious orders."  For purposes

17    of context I'd like you to read this

18    aloud.

19                   MS. MAINIGI:  Objection to

20         form, scope, foundation.

21                   THE WITNESS:  "Single orders

22         of unusual size or deviation must

23         be reported immediately.  The

24         submission of a monthly printout

257 of 373. PageID #: 245783
Review

```
 1              of after-the-fact sales will not

 2              relieve a registrant from the

 3              responsibility of reporting these

 4              single excessive or suspicious

 5              orders.

 6                   "DEA has interpreted orders

 7              to mean prior to shipment."

 8    BY MR. FARRELL:

 9         Q.    Is this statement consistent

10    with the guidance provided by the DEA to

11    registrants?

12         A.    Yes.

13              MR. O'CONNOR:  Objection.

14              MR. EPPICH:  Objection.

15              MR. STEPHENS:  Objection.

16              MR. NICHOLAS:  Objection.

17              MS. MAINIGI:  Objection.

18         Form.

19              MR. EPPICH:  Foundation,

20         form, calls for speculation.

21    BY MR. FARRELL:

22         Q.    I'm not asking you to

23    speculate.  As a matter of fact, is this

24    consistent with what the DEA has told its
```

1    registrants is required to comply with

2    federal law?

3                MS. MAINIGI:  Objection.

4                MR. EPPICH:  Objection.

5         Form.  Foundation.  Calls for

6         speculation.  Vague as to time.

7                MR. FINKELSTEIN:  I'll join

8         the objection as to the vagueness

9         as to time.

10               THE WITNESS:  Yes.

11   BY MR. FARRELL:

12        Q.    Is the DEA aware of ever in

13   its history of saying anything

14   inconsistent with what you just read?

15               MR. EPPICH:  Objection.

16        Form, foundation, calls for

17        speculation, outside the scope.

18               THE WITNESS:  I have --

19        could you -- could you re-read it?

20   BY MR. FARRELL:

21        Q.    I'll strike it.  I got the

22   answer.  I'll strike it.

23               The next thing I'm going to

24   do is I'm going to show you from Page 8,

Highly Confidential - Subject to Further Confidentiality Review

 1    attached to this in the Cardinal Health

 2    files, is a cover sheet that says letters

 3    from DEA approving the format.

 4                    And if you look, the first

 5    letter is dated April 27, 1984.

 6                    Are you familiar with this

 7    correspondence?

 8                    MS. MAINIGI:  Objection.

 9             Outside the scope.  It's 1984.

10             Form and foundation.

11                    MR. FARRELL:  Well, the

12             irony of it is, is that Cardinal

13             Health specifically referenced

14             this document in its combined

15             discovery responses.

16                    So I'm going to ask you --

17                    MS. MAINIGI:  Outside the

18             scope of this deposition.

19                    MR. FARRELL:  I'm going to

20             ask the witness again --

21    BY MR. FARRELL:

22             Q.    Are you familiar with this

23    document?

24             A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    When you look at the
2    reliance materials that you have in front
3    of you, you can flip through it and find
4    if it's not in the back.
5               MS. MAINIGI:  Objection.
6         Form, foundation.
7               THE WITNESS:  No.
8    BY MR. FARRELL:
9          Q.    Okay.  So what I'm going to
10   ask you is, is to flip to Page 2 and see
11   Mr. Thomas Gitchell, acting chief
12   diversion of operations section.  Are you
13   familiar with Mr. Gitchell?
14         A.    Yes, I know who he -- I know
15   who he is.
16         Q.    Is Mr. Gitchell authorized
17   to speak on behalf of the DEA at this
18   time?
19               MS. MAINIGI:  Objection.
20         Outside the scope.  Form.
21         Foundation.
22               MR. FINKELSTEIN:  Objection.
23         Vague.
24               MR. EPPICH:  Objection.

```
 1           Calls for speculation.

 2                MR. FARRELL:  It can't be

 3           speculation.  It's the DEA

 4           testifying on whether or not the

 5           chief of the diversion operation

 6           section has the authority to make

 7           statements on behalf of the DEA.

 8                MR. EPPICH:  In 1983?

 9                MR. FARRELL:  Correct.

10           Which is reliance by Cardinal

11           Health and others as to its

12           suspicious order monitoring

13           system.

14                MR. EPPICH:  Outside the

15           scope of the authorization.

16                MR. FARRELL:  It's -- this

17           is going to be related to the

18           guidance provided by the DEA.

19                MR. EPPICH:  Well, we'll let

20           him answer.

21     BY MR. FARRELL:

22           Q.   So, go back to the prior --

23     prior page.  All right.

24                So taking off --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FARRELL:  If you'll take
 2         off the blow-off first.
 3    BY MR. FARRELL:
 4         Q.    The date is April 27, 1984.
 5    You'll see in the bottom right-hand
 6    corner this is a document that is in the
 7    Cardinal Health files.
 8              MS. MAINIGI:  Objection.
 9         Form, scope, foundation.
10    BY MR. FARRELL:
11         Q.    And so I'm going to ask that
12    the -- that the main paragraph be blown
13    up so we can read it.
14              So the NWDA policy that
15    was -- that we just walked through, is
16    what this reference is to.
17              And I'd ask for you to read
18    it, the portion that's highlighted.
19         A.    "The NWDA's draft format for
20    a suspicious order" -- "order monitoring
21    system provides an excellent framework
22    for distributor registrants to design and
23    operate a system to disclose to the
24    registrant suspicious orders of
```

Highly Confidential - Subject to Further Confidentiality Review

1  controlled substances."

2      Q.   Very good.

3           Now I'd like you to read the

4  next sentence.

5           MS. MAINIGI:  Objection.

6      Form, scope, foundation.

7           THE WITNESS:  "However, I am

8      compelled to note, as I have in

9      our previous discussions, that any

10     automated data processing system

11     may provide the means and

12     mechanism for compliance when the

13     data is carefully reviewed and

14     monitored by the wholesaler."

15  BY MR. FARRELL:

16      Q.   Is this statement consistent

17  with guidance provided by the DEA to

18  registrants?

19           MS. MAINIGI:  Objection.

20      Outside the scope.  Form,

21      foundation.

22           MR. EPPICH:  Objection.

23      Vague.

24           MR. FINKELSTEIN:  Vague as

1       to time.

2              THE WITNESS:  Yes.

3    BY MR. FARRELL:

4       Q.    Now, go to the final

5    sentence.  Will you please read this

6    aloud?

7       A.    "As previously discussed, an

8    after-the-fact computer printout of sales

9    data does not relieve a registrant of its

10   responsibility to report excessive or

11   suspicious orders when discovered.  I am

12   enclosing a copy of your draft with my

13   pen and ink changes."

14      Q.    Is this consistent with the

15   guidance provided by the DEA to

16   registrants?

17             MS. MAINIGI:  Objection.

18      Form, scope, foundation.

19             THE WITNESS:  Yes.

20   BY MR. FARRELL:

21      Q.    Is after the fact reporting

22   of suspicious orders in full compliance

23   with federal law?

24             MS. MAINIGI:  Objection.

1          Form, scope, foundation, and vague

2          as to time.

3                MR. EPPICH:  Objection.

4          Calls for a legal conclusion.

5                THE WITNESS:  Could you

6          repeat it?

7    BY MR. FARRELL:

8          Q.    Has after the fact reporting

9    of suspicious orders ever been in

10   compliance with federal law according to

11   the DEA's guidance provided to

12   registrants?

13         A.    No.

14               MS. MAINIGI:  Objection.

15         Form, foundation.

16               MR. EPPICH:  Objection.

17         Vague.

18               MR. FINKELSTEIN:  For -- for

19         the witness and Paul, we'll go

20         another half hour and then take a

21         break.

22               MR. FARRELL:  Yeah, actually

23         I've got one more page and then it

24         might be a good break point.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FINKELSTEIN:  Okay.

2    BY MR. FARRELL:

3          Q.    So from the Cardinal Health

4    files comes a second letter from the DEA.

5    And it's dated approximately three weeks

6    later, May 16, 1984.  And it's again from

7    the DEA.

8                This letter was specifically

9    referenced by Cardinal Health in its

10   discovery responses as a blessing of

11   after the fact reporting of suspicious

12   orders.  I'll represent that to you.

13               So what I'd like you to do

14   is we're going to blow up the first

15   paragraph and we're going to walk through

16   it again.

17               Do you see there right in

18   the middle?  Would you read the

19   highlighted provision?

20               MS. MAINIGI:  Objection.

21        Form, foundation, scope.

22               THE WITNESS:  "In order to

23        clarify any misinterpretations, I

24        want to assure you that the DEA

Highly Confidential - Subject to Further Confidentiality Review

1          fully supports the NWDA effort to

2          introduce a uniform reporting

3          system among its members."

4    BY MR. FARRELL:

5          Q.    And then the very next

6    sentence, please read it.  This is the

7    one quoted by Cardinal Health.

8          A.    This --

9                MS. MAINIGI:  Objection.

10         Form, foundation, scope.

11               MR. EPPICH:  Object to the

12         characterization.

13   BY MR. FARRELL:

14         Q.    Go ahead.

15         A.     "This system as proposed

16   will meet the reporting requirements of

17   21 C.F.R. 1301.74(b)."

18         Q.    Now, what I'd like you to do

19   is read the next sentence which is

20   omitted from the discovery responses

21   filed by Cardinal Health.

22               MS. MAINIGI:  Objection.

23         Form, foundation, and scope.

24               And DOJ, I'd like to ask a

Highly Confidential - Subject to Further Confidentiality Review

```
1          question on the record.  Yesterday
2          we were prohibited --
3                MR. FARRELL:  Hold on.  You
4          can do it after he finishes
5          answering the question.
6                MS. MAINIGI:  Well, I know.
7          They can answer whenever they want
8          to, but --
9                MR. FARRELL:  Counsel for
10         Cardinal, I'm going to ask you not
11         to make another speaking
12         objection.
13               MS. MAINIGI:  It's --
14               MR. FARRELL:  Your objection
15         is made, it's on the record.  And
16         then you can create whatever
17         record you want as soon as the
18         witness is done.
19               So I'm going to ask the
20         witness to read the highlighted
21         section.
22               MS. MAINIGI:  My question
23         is, yesterday --
24               MR. FARRELL:  You are
```

Highly Confidential - Subject to Further Confidentiality Review

1          becoming disruptive.  You're

2          becoming disruptive.

3                    MS. MAINIGI:  Then --

4                    MR. FARRELL:  And you are

5          intervening.  And -- and we will

6          get Special Master Cohen on.

7                    MS. MAINIGI:  That's fine.

8                    I was prohibited from

9          asking, or somebody was prohibited

10         from asking the question --

11                   MR. FARRELL:  If

12         Judge Polster were sitting here

13         right now, he would sanction you.

14                   MS. MAINIGI:  Well, then I

15         guess lucky for me he is not.  But

16         will you let me get my objection

17         out?

18                   MR. FARRELL:  No, this is my

19         direct testimony, and you're

20         making a speaking objection.

21                   MS. MAINIGI:  Just like you

22         made yesterday multiple times.

23                   But this is a question to

24         the DEA.  It's not a speaking

 1          objection.

 2                  And the question is:

 3          Yesterday, we were prohibited and

 4          the witness was instructed to not

 5          answer questions on communications

 6          with trade organizations.

 7                  Is the DEA/DOJ going to

 8          allow this question which is the

 9          same type?

10                  MR. FINKELSTEIN:  I disagree

11          with your characterization of what

12          happened yesterday.  You can ask

13          your questions and I will make my

14          objections, and counsel can ask

15          his questions and I will make my

16          objections.

17  BY MR. FARRELL:

18          Q.    Would you please read the

19  highlighted section.

20          A.    "However, I want to make it

21  clear that the submission of a monthly

22  printout of after-the-fact sales will not

23  relieve a registrant from the

24  responsibility of reporting excessive or

1    suspicious orders.  DEA has interpreted

2    orders to mean prior to shipment."

3         Q.    Is this statement consistent

4    with the guidance the DEA has always

5    provided to registrants?

6              MS. MAINIGI:  Objection.

7         Form.  Foundation.  Scope.

8              THE WITNESS:  Yes.

9              MR. FARRELL:  This might be

10        a good break point if the DOJ

11        agrees.

12             MR. STEPHENS:  Before we

13        break, Paul, just real quick, can

14        we please get a copy of the

15        presentation and the documents so

16        that we can review them

17        simultaneously while you're doing

18        this so we can handle our

19        redirect?

20             MR. FARRELL:  Yes, yes.

21             MR. STEPHENS:  Okay.  If we

22        get them afterwards, then we're

23        going to need time to study them.

24             MR. FARRELL:  Yeah, you're

1      going to have more than time.

2      You're going to have days before

3      we reconvene for your redirect.

4            MR. STEPHENS:  You

5      understand what I'm saying.

6      You're handing me things.  I'm

7      doing the same to you.  I've never

8      been in a situation where the

9      witness is being examined and I

10     don't have the document in front

11     of me.

12           MR. FARRELL:  I'm putting

13     the document up on the screen as a

14     demonstrative point and then

15     asking the DEA to comment on it.

16     There is nothing that I have shown

17     anybody that is not in the record

18     and that hasn't been used in prior

19     testimony.

20           In fact, it's specifically

21     referenced in y'all's discovery

22     responses.

23           MS. MAINIGI:  The 1970

24     hearings?

1           MR. FARRELL:  So at this

2       point in time -- at this point at

3       time, can we go off the record for

4       a break?

5           MR. FINKELSTEIN:  Oh, I

6       thought we already were.

7           THE VIDEOGRAPHER:  2:04.  We

8       are off the video record.

9           (Short break.)

10          MR. FARRELL:  As one of the

11      co-leads for the plaintiffs' PEC

12      in the MDL litigation, I'll report

13      to you what David Cohen said.

14          Special Master Cohen

15      admonished us and reminded us of

16      his prior orders that we are to

17      eliminate speaking objections,

18      we're all to make sure that when

19      we state an objection, it's

20      concise.

21          He advised both plaintiffs

22      and defendants to make sure you

23      comply with it.  He's not going to

24      tolerate speaking objections or

Highly Confidential - Subject to Further Confidentiality Review

1      coaching of witnesses.  We've

2      discussed this in other

3      depositions.

4          He also instructed that it's

5      not for us to be disputing or

6      debating the Touhy, that that's

7      for the government and for the

8      government to make the decisions.

9      And the discussion of

10     admissibility is for another day,

11     and that he expects us to conduct

12     ourselves like professionals and

13     move forward as best as we can.

14         And then on day three he's

15     volunteered to make himself

16     available.

17         Is there anything else that

18     anybody else would like to add?

19         MR. BENNETT:  Yes, he also

20     made it very clear that there will

21     not be a fourth day.

22         MR. FARRELL:  All right.

23     Now, what I would like to do is

24     I'm going to provide demonstrative

Highly Confidential - Subject to Further Confidentiality Review

1        exhibits.

2            MR. FINKELSTEIN:  One more

3        thing.  We did take issue from the

4        fact that we've been excluded from

5        many of the parties' conversations

6        with the court concerning

7        government witnesses and

8        government rights.  We asked the

9        court formally, as we have in the

10        past, as we have asked the parties

11        many times in the past, to be

12        included in conversations with the

13        court, and the court unambiguously

14        required the parties to do so.

15            MR. FARRELL:  Very good.

16            So the first set of

17        demonstrative exhibits are four

18        slides that I'll have marked as

19        Plaintiffs' 1.  And it is the four

20        sections of the United States

21        code, including 801, 812, and 823.

22        These are the same slides that

23        were used in the McKesson 30(b)(6)

24        deposition.

```
 1                   (Document marked for

 2            identification as Exhibit

 3            DEA-Prevoznik-P-1.)

 4                   MR. FINKELSTEIN:  So just to

 5            be clear, you're handing these out

 6            to us so that we have them.

 7                   MR. FARRELL:  I'm having

 8            this marked as an exhibit and then

 9            the government can have it.

10                   The second demonstrative

11            exhibit, Plaintiffs' 2 is the

12            United States USCCAN, U-S-C-C-A-N,

13            and it was referenced from the

14            congressional history.

15                   MR. FINKELSTEIN:  Are you

16            going to mark it?

17                   THE VIDEOGRAPHER:  They want

18            video for this.

19                   MR. FARRELL:  Okay.  We'll

20            start over.

21                   THE VIDEOGRAPHER:  2:47.  We

22            are on the video record.

23                   MR. FARRELL:  Can I have

24            that back, please.
```

Highly Confidential - Subject to Further Confidentiality Review

1              Plaintiffs' Exhibit 1 is the

2         four slides that demonstrate the

3         United States Code 21 U.S.C. 801,

4         812, 821 and 823.

5              Plaintiffs' 2.

6              (Document marked for

7         identification as Exhibit

8         DEA-Prevoznik-P-2.)

9              MR. FARRELL:  Is HR REP

10        Number 1444, 91st Congress.

11        Second session, 1970.  This is the

12        congressional record from the

13        Controlled Substances Act.  It's

14        the same document that was entered

15        in the McKesson 30(b)(6)

16        deposition.

17             (Document marked for

18        identification as Exhibit

19        DEA-Prevoznik-P-3.)

20             MR. FARRELL:  Plaintiffs' 3

21        is from the HathiTrust, and it is

22        the drug abuse control amendments

23        from the 1970 hearings, 91st

24        Congress, second session.  900

1       pages of which we referenced only

2       a couple.

3              This is the first time that

4       was referenced in deposition as --

5       and in the MDL that I'm aware of.

6              (Document marked for

7       identification as Exhibit

8       DEA-Prevoznik-P-4.)

9              MR. FARRELL:  Plaintiffs' 4

10      is -- we referenced Page 9 of the

11      Federal Register.  Volume 36,

12      Number 80, from March 13, 1971.

13             MR. STEPHENS:  This is

14      Number 4, Paul?  Number 4?

15             MR. FINKELSTEIN:  This is

16      Number 4.

17             MR. FARRELL:  Number 5 was

18      the Federal Register from proposed

19      rulemaking from Saturday, March --

20      actually, that's -- this is

21      another copy.  What was that

22      number?  I'm sorry.

23             MR. FINKELSTEIN:  That was

24      4.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FARRELL:  Did I make a
 2         mistake?  Sorry I got that
 3         backwards.
 4              Number 4 is from March 13,
 5         1971.  It's Volume 36, Number 50,
 6         from the Federal Register.
 7              Plaintiffs' Exhibit 5 is
 8         from April 24, 1971, from the
 9         Federal Register, Volume 36,
10         Number 80.
11              (Document marked for
12         identification as Exhibit
13         DEA-Prevoznik-P-5.)
14              MR. FARRELL:  And we
15         referenced Paragraph 6 at the top
16         of the first page.
17              (Document marked for
18         identification as Exhibit
19         DEA-Prevoznik-P-6.)
20              MR. FARRELL:  Plaintiffs' 6
21         is another slide that's been used
22         in the McKesson depositions of
23         Nate Hardle, 30(b)(6).  And it's
24         simply a demonstrative exhibit of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       21 C.F.R. 1301.74.
2            (Document marked for
3       identification as Exhibit
4       DEA-Prevoznik-P-7.)
5            MR. FARRELL:  Plaintiffs' 7
6       is a document produced by Cardinal
7       Health in discovery and MDL2804.
8            It begins with Bates stamp
9       CAH_MDL2804_01465723, and it
10      extends all the way through
11      CAH_MDL2804_01465734.
12           It's Plaintiffs' Exhibit 7.
13      And I'll represent that it was
14      also in the government reliance
15      materials that they produced
16      yesterday at deposition.
17           That brings us up-to-date
18      for all of the demonstrative
19      exhibits that were used so far on
20      the record.
21           MR. STEPHENS:  Thank you.
22           MR. FINKELSTEIN:  So should
23      we go off the record and bring the
24      witness back?
```

Highly Confidential - Subject to Further Confidentiality Review

1              MR. FARRELL:  Yes.

2              MS. MAINIGI:  Yes.

3              THE VIDEOGRAPHER:  2:51.  We

4       are off the video record.

5              (Brief pause.)

6              THE VIDEOGRAPHER:  2:55.  We

7       are on the video record.

8              MR. FARRELL:  More

9       housecleaning.  Earlier today we

10      referenced -- more housecleaning.

11             Earlier we referenced a

12      position taken by Cardinal Health

13      in a pleading.  It's United States

14      District Court for the -- United

15      States District Court for the

16      District of Columbia, Cardinal

17      Health versus Eric Holder, Case

18      Number 1:12-cv-00185-RBW.

19             It is Document 16 in the

20      pleading index, filed on

21      February 13, 2012.  It's

22      previously been circulated, I'll

23      show it to you, even though it's

24      not being admitted through this

```
1      witness.

2           For the record that's the

3      document that I referenced.

4           (Document marked for

5      identification as Exhibit

6      DEA-Prevoznik-P-8.)

7           MR. FARRELL:  Same thing

8      with earlier today, I referenced

9      what's being marked now -- that

10     was Plaintiff 8.  This is going to

11     be Plaintiff 9.

12          (Document marked for

13     identification as Exhibit

14     DEA-Prevoznik-P-9.)

15          MR. FARRELL:  And this is a

16     single page from a document with a

17     Bates stamp MCK MDL 00409239.  And

18     again, this is a document that was

19     produced by McKesson in discovery

20     that I referenced and asked

21     questions about it with this

22     witness.

23          MR. FINKELSTEIN:  Are you

24     going to provide me with copies?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FARRELL:  Yes.

2          Did you get a copy of the

3      NWDA policy?

4          MR. FINKELSTEIN:  Thanks.

5          MR. FARRELL:  That's

6      previously been made.

7          MR. FINKELSTEIN:  Just wait

8      for a question.

9  BY MR. FARRELL:

10         Q.   Mr. Prevoznik, the next

11 document I'm going to reference is

12 actually in your notebook.

13         A.   Okay.

14         Q.    In the reliance materials

15 that you disclosed yesterday.

16         And it's the -- from the

17 1996 diversion investigators manual.

18 Section 5126.

19         MR. FARRELL:  Bring it up on

20      the screen.  And pass it down.

21         Here is some extra copies in

22      case people didn't bring their

23      notebooks back.

24 BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    On behalf of the DEA, do you

2    recognize this document?

3    A.    Yes, I do.

4    Q.    What is it?

5    A.    It is part of our diversion

6    investigators manual.

7    Q.    What does that mean?

8    What -- what is a diversion

9    investigators manual?

10    A.    It's a manual that breaks

11    down our responsibilities, our job.

12    It -- it covers the whole gambit of what

13    registration is -- what a registrant is,

14    down to record reports, requirements.  It

15    goes through our scheduled

16    investigations, pre-registration

17    investigations, how to -- conducting

18    audits when we do the scheduled

19    investigation, what topics, what areas to

20    cover.

21    It covers controlled

22    substances -- controlled substances.  It

23    also covers the chemicals, List I

24    chemicals, the requirements of that, as

1   well as preregistration investigations of

2   chemicals, applicants.

3          It covers the -- the gambit

4   of exactly what our job is.

5          Q.   Are these -- in this page

6   that we're showing here, the bottom

7   right-hand corner is a Bates stamp.  Can

8   you read that Bates stamp?

9          A.   00025231.

10         Q.   Okay.  Is this a document

11  produced by the DEA in this litigation at

12  the request of counsel for the diversion

13  investigators manual from 1996?

14             MR. FINKELSTEIN:  Scope.

15             We'll stipulate that we

16        produced it.

17             MR. FARRELL:  Thank you.

18  BY MR. FARRELL:

19         Q.   So the title of Section 5126

20  says what?

21         A.   Requirement to report

22  suspicious orders.

23         Q.   Would you read the first

24  sentence of the first paragraph aloud?

1        A.      "Registrants are required to

2   inform DEA of suspicious orders in

3   accordance with 21 C.F.R. 1301.74(b).

4   DEA field offices are not to approve or

5   disapprove supplier shipments of

6   controlled substances.  The

7   responsibility for making the decision to

8   ship rests with the supplier.  No (sic)

9   exception to this occurs when a supplier

10  complies with a DEA field office's

11  request to initiate a controlled delivery

12  of controlled substances."

13        Q.    Is this consistent with the

14  guidance provided by the DEA to

15  registrants?

16              MS. MAINIGI:  Objection.

17              THE WITNESS:  Yes.

18              MR. FARRELL:  Now, if you'll

19      go down to -- keep going.

20  BY MR. FARRELL:

21        Q.    Beginning with

22  "registrants," could you begin reading,

23  please.

24              A.     "Registrants who routinely

1   report suspicious orders, yet fill these

2   orders, with reason to believe they are

3   destined for the illicit market, are

4   expressing an attitude of

5   irresponsibility that is detriment to the

6   public health and safety as set forth in

7   21 U.S.C. 823 and 824."

8          Q.    Thank you.  Is this

9   consistent with the guidance provided by

10  the DEA to registrants?

11             MS. MAINIGI:  Objection to

12         form.

13             MR. FINKELSTEIN:  Objection.

14         Form.

15             THE WITNESS:  Yes.

16  BY MR. FARRELL:

17         Q.    So this is the official

18  policy of the DEA as of 1996, agreed?

19         A.    Yes.

20         Q.    Is this the position that

21  the DEA was instructing its diversion

22  investigators to take when looking into

23  cases involving the distribution of

24  controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. MAINIGI:  Objection to
 2        form.
 3                MR. FINKELSTEIN:  Vague as
 4        to time.
 5   BY MR. FARRELL:
 6        Q.    In 1996.
 7        A.    Yes.
 8        Q.    Are you aware of any
 9   deviation or change from that position by
10   the DEA since 1996?
11                MS. MAINIGI:  Objection.
12                THE WITNESS:  No.
13   BY MR. FARRELL:
14        Q.    So the next sentence is just
15   a recitation of the suspicious order
16   definition.  What I'd like you to do is
17   go down to where it starts, "The supplier
18   can determine," and begin reading aloud.
19        A.    "The supplier can determine
20   whether the order is excessive by
21   checking their own sales and establishing
22   the average amount of controlled
23   substances shipped to registrants of the
24   same apparent size in a particular
```

Highly Confidential - Subject to Further Confidentiality Review

1    geographic area."

2        Q.    Read the next sentence,

3    please.

4        A.    "If the customer exceeds

5    this threshold, the request should be

6    viewed as suspicious."

7        Q.    Is this consistent with the

8    guidance that the DEA provided to

9    registrants since at least 1996?

10           MS. MAINIGI:  Objection to

11       form.

12           THE WITNESS:  Yes.

13   BY MR. FARRELL:

14       Q.    Is this the position that

15   the DEA -- strike that.

16           The reading of this seems to

17   indicate that if you exceed an average

18   amount, if a customer exceeds an average

19   amount -- let me start over.

20           This directive that DEA had

21   internally seems to indicate that it

22   considered that an order in excess of a

23   customer's average amount should be

24   deemed suspicious.  Is that a fair

```
1    depiction?
2         A.    Could you please --
3              MS. MAINIGI:  Objection to
4         form.
5              THE WITNESS:  Could you
6         please repeat that.
7    BY MR. FARRELL:
8         Q.    Yeah.  When I read this, it
9    seems to indicate that a wholesale
10   distributor should watch the average
11   purchase by a customer over time, and if
12   that average is exceeded, it should be
13   deemed suspicious.  Is that a fair
14   reading of this provision?
15             MR. FINKELSTEIN:  Object to
16        the characterization.
17             MS. MAINIGI:  Object to
18        form.  Calls for a legal
19        conclusion.
20             THE WITNESS:  Well, I think
21        it also includes that it has to
22        look at the other registrants in
23        that area.  It's not just the
24        registrant that's ordering, but
```

1           it's also comparing against the

2           other registrants in that area.

3     BY MR. FARRELL:

4           Q.    So if you take an average of

5     the registrants in the area and you

6     calculate that, if a customer exceeds

7     that average, is that a red flag for a

8     wholesale distributor that the order may

9     be suspicious?

10              MS. MAINIGI:  Objection.

11          Calls for speculation.  Objection

12          to form.

13              THE WITNESS:  Yes.

14    BY MR. FARRELL:

15          Q.    And is that consistent with

16    the directives the DEA has given to

17    registrants since at least 1996?

18              MS. MAINIGI:  Objection to

19          form.

20              THE WITNESS:  Yes.

21    BY MR. FARRELL:

22          Q.    The next sentence, would you

23    read, please.

24          A.    I forgot where I stopped.

1    Q.    "This activity."

2    A.    "This activity, over

3  extended periods of time, would lead a

4  reasonable person to believe that

5  controlled substances possibly are being

6  diverted.

7    Q.    Now, so what I'm asking you

8  is, when you read this, is it fair to

9  assume that this is consistent with the

10  DEA's guidance to industry since at least

11  1996?

12    MR. FINKELSTEIN:  Objection.

13    Vague.

14    MS. MAINIGI:  Objection to

15    form.

16    THE WITNESS:  Yes.

17  BY MR. FARRELL:

18    Q.    Would you read the next

19  sentence, please.

20    A.    "An investigation will be

21  conducted for possible violation of the

22  CSA and regulations upon determining that

23  the reporting registrant, as a general

24  practice, does not voluntarily halt

1    shipments of controlled substances to

2    registrants involved in suspected

3    diversion or to registrants against whom

4    previous action has been taken."

5         Q.    Is this consistent with the

6    guidance provided by the DEA to

7    registrants since at least 1996?

8         A.    Yes.

9              MS. MAINIGI:  Objection to

10        form.

11   BY MR. FARRELL:

12        Q.    This last sentence that you

13   read contains a statement that "a

14   registrant shall not ship a suspicious

15   order."  Is that a fair reading?

16             MR. FINKELSTEIN:  Objection.

17             MR. EPPICH:  Objection to

18        form.

19             MR. FINKELSTEIN:  Object to

20        the form.

21   BY MR. FARRELL:

22        Q.    Strike that.  I'll ask it

23   again.

24             Based upon this 1996

```
1   document, was it the DEA's position that

2   a registrant should halt shipments of

3   controlled substances that are involved

4   in suspected diversion?

5        A.    Yes.

6        Q.    And does that include when a

7   registrant has placed orders repeatedly

8   in excess of the regional average?

9              MR. EPPICH:  Objection to

10        form.

11             MS. MAINIGI:  Objection to

12        form.

13             THE WITNESS:  Yes.

14             (Document marked for

15        identification as Exhibit

16        DEA-Prevoznik-P-10.)

17  BY MR. FARRELL:

18        Q.    I'm going to have marked

19  next Plaintiffs' Exhibit 10.  And I'll

20  show it to you and provide a copy to

21  counsel and ask that you take a look at

22  it, please.

23             MR. FINKELSTEIN:  Let me

24        make sure that I get one of those.
```

```
 1              MR. FARRELL:  And for

 2         reference to counsel this is

 3         Bates-stamped

 4         CAH_MDL2804_02203353.

 5   BY MR. FARRELL:

 6         Q.    Mr. Prevoznik, do you

 7   recognize this type of document?

 8              MS. MAINIGI:  Objection to

 9         form.

10              THE WITNESS:  Yes.

11   BY MR. FARRELL:

12         Q.    And what is it that you're

13   looking at?

14         A.    A FOIA request.

15         Q.    And the FOIA request was

16   sent by whom?

17         A.    Cardinal Health.

18         Q.    And to whom was it sent?

19         A.    Robert -- I don't know how

20   to say his last name -- Giacalone.

21         Q.    All right.  So let's back

22   up.

23              This is a request -- this

24   isn't a request by Cardinal Health.  The
```

```
 1    document is from whom?

 2              MS. MAINIGI:  Objection to

 3         form.  Foundation.

 4              THE WITNESS:  I'm sorry,

 5         it -- it's Katherine Myrick.  It's

 6         from Katherine Myrick, chiefs

 7         operations unit, our FOIA records

 8         management section.

 9    BY MR. FARRELL:

10         Q.    What is this document that

11    you're looking at, do you recognize it?

12              MS. MAINIGI:  Objection.

13         Form.  Foundation.

14    BY MR. FARRELL:

15         Q.    Not the attached document,

16    the cover letter.

17              MS. MAINIGI:  Same

18         objections.

19              THE WITNESS:  Yeah, I've --

20         I've seen forms very similar to

21         this.

22    BY MR. FARRELL:

23         Q.    Okay.  And so what does the

24    DEA use this form for?
```

1          MS. MAINIGI:  Objection.

2     Form.  Foundation.

3          THE WITNESS:  To respond

4     to --

5          MR. FINKELSTEIN:  Scope.

6          THE WITNESS:  To respond to

7     FOIA requests.

8  BY MR. FARRELL:

9     Q.    Okay.  So you see where it

10 says request number?

11    A.    Yes.

12    Q.    Okay.  Does the DEA know

13 what that number means or represents?

14         MR. FINKELSTEIN:  Scope.

15         MS. MAINIGI:  Objection.

16    Scope.  Foundation.

17         THE WITNESS:  Yes.

18 BY MR. FARRELL:

19    Q.    Okay.  What does that number

20 mean?

21         MS. MAINIGI:  Same

22    objection.

23         THE WITNESS:  That is the

24    number that is assigned to this

```
1              FOIA request when it comes in.
2    BY MR. FARRELL:
3         Q.    Is there any particular
4    significance of the first two letters
5    being -- numbers being 03?
6              MR. FINKELSTEIN:  Scope.
7    BY MR. FARRELL:
8         Q.    To -- to the extent that you
9    know as the Drug Enforcement Agency that
10   wrote this document?
11        A.    It's the year.
12             MS. MAINIGI:  Objection.
13        Scope.  Foundation.
14   BY MR. FARRELL:
15        Q.    So this is, to the DEA's
16   best knowledge and information, a
17   document that was generated in the year
18   2003?
19        A.    Yes.
20             MR. EPPICH:  Object to form.
21   BY MR. FARRELL:
22        Q.    And it was generated by you,
23   the DEA, and sent to Cardinal Health?
24             MS. MAINIGI:  Objection.
```

1          Foundation.  Scope.

2                    MR. FINKELSTEIN:  Scope.

3                    THE WITNESS:  Yes.

4     BY MR. FARRELL:

5          Q.    And then when you look at

6     the document that is attached, can you

7     tell me what it -- that document is if

8     you know?

9          A.    It's a section from our

10    diversion investigators manual.  And this

11    is the cover sheet from our diversion

12    investigators manual.

13         Q.    And what year is this

14    diversion investigators manual?

15         A.    1996, April 1996.

16         Q.    If you would take a moment,

17    could you tell me whether or not this

18    document that was produced by Cardinal is

19    consistent with the diversion

20    investigators manual that we just went

21    over, produced by the federal government?

22                    MS. MAINIGI:  Objection.

23    Form.  Foundation.

24                    THE WITNESS:  Yes, it does.

```
1    BY MR. FARRELL:

2         Q.    Is it fair to reach the

3    conclusion that the DEA disclosed to

4    Cardinal Health in the year 2003

5    Section 5126 of the 1996 diversion

6    investigators manual?

7              MS. MAINIGI:  Objection.

8         Scope.  Foundation.

9              MR. FINKELSTEIN:  Scope.

10             THE WITNESS:  Yes.

11   BY MR. FARRELL:

12        Q.    The next document that I am

13   going to reference, it was produced and

14   circulated yesterday, but we have

15   additional copies, is the 1998 Janet Reno

16   report.

17             (Document marked for

18        identification as Exhibit

19        DEA-Prevoznik-P-11.)

20   BY MR. FARRELL:

21        Q.    I'm going to hand you what

22   has been premarked as deposition

23   plaintiff Exhibit 11.  And have you take

24   a look at it.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FARRELL:  Does anybody

2      else need another copy from

3      yesterday?

4          It's the same one.  It's

5      Bates Stamp CAH_HOUSE-002207.  And

6      it's double-Bates-stamped as

7      CAH_MDL_PRIORPROD_HOUSE_0002207.

8          Off the record.

9          (Whereupon, a discussion was

10     held off the record.)

11  BY MR. FARRELL:

12     Q.   Mr. Prevoznik, do you

13  recognize this document?

14     A.   Yes.

15     Q.   What is it?

16     A.   It's a report to the U.S.

17  attorneys -- Attorney General.  It's a

18  report by the suspicious orders task

19  force that was mandated to convene, and

20  it's their report based on the

21  Comprehensive Methamphetamine Control Act

22  in 1996.

23     Q.   To the best of your

24  knowledge, is this a true and accurate

Highly Confidential - Subject to Further Confidentiality Review

1    copy of the report provided by the United

2    States Drug Enforcement Administration to

3    Attorney General Janet Reno?

4        A.    To the best of my knowledge,

5    yes.

6        Q.    What is the date of the

7    document?

8        A.    October 1998.

9        Q.    All right.  Go to the next.

10            So I'm going to refer you to

11   page Bates stamp 2211.  So this is in the

12   executive summary.  And if you'll see the

13   second full sentence.  There it is.

14            Can you tell me what the

15   implementation mandate was for this

16   report provided by the DEA to Attorney

17   General Janet Reno?

18            MS. MAINIGI:  Objection.

19       Foundation.

20            THE WITNESS:  It was the

21       mandate that this task force

22       convene together and come up with

23       a report based on their

24       discussions.

1    BY MR. FARRELL:

2         Q.    All right.  So in general,

3    can you just, as the DEA, tell me, when

4    we reference this document, can we just

5    call it the Reno report?

6         A.    Yes.

7         Q.    Can you tell me in general,

8    do you -- does the DEA have an

9    understanding of what the purpose was of

10   this report that it generated for the

11   Attorney General?

12        A.    It is our understanding that

13   this report was to discuss how to put a

14   suspicious ordering system forward to

15   handle the listed chemicals because of

16   the methamphetamine problem that we were

17   having in the United States.

18        Q.    Now, this is also from the

19   executive summary.  And it says that "the

20   charter required the establishment of a

21   task force to prepare recommendations

22   concerning additional guidelines to be

23   used by the chemical industry in

24   complying with 21 U.S.C. 830(b)(1)(A)."

Highly Confidential - Subject to Further Confidentiality Review

1      Did I read that accurately?

2      A.    Yes.

3      Q.    Are you familiar with

4   21 U.S.C. 830(b)(1)(A)?

5      A.    Can I look at it and refresh

6   my memory?

7      Q.    You can.  We have a -- I

8   believe we have a slide for you.  And

9   it's also probably in -- in --

10          MR. FARRELL:  You have it?

11      There we go.

12   BY MR. FARRELL:

13      Q.    And I'm going to show you

14   the hardcopy of it and then we have

15   copies of this --

16          MR. FINKELSTEIN:  He has his

17      own copy.

18   BY MR. FARRELL:

19      Q.    Very good.

20          This provision that we're

21   looking at, and the distinction that I

22   want to make, what is the DEA's

23   understanding of the types of

24   transactions that should be reported as

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious pursuant to 21 U.S.C. 830?

2                    MR. FINKELSTEIN:  Scope.

3                    MS. MAINIGI:  Objection.

4          Form.  Foundation.  Scope.

5                    THE WITNESS:  To regulate

6          a -- regulated transactions, a

7          transaction for -- in this

8          particular section, regarding

9          chemicals.

10   BY MR. FARRELL:

11        Q.    So we are talking about

12   List I chemicals, not controlled

13   substances?

14        A.    Correct.

15        Q.    And when we are talking

16   about methamphetamine, what we are

17   specifically talking about are regulated

18   chemicals the DEA refers to as List I,

19   which include ephedrine and

20   pseudoephedrine?

21                   MR. FINKELSTEIN:  Scope.

22                   THE WITNESS:  Correct.

23                   MS. MAINIGI:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FARRELL:
 2         Q.    I promise I'll get there in
 3    a second.
 4              So under this report, it's
 5    my understanding, is that the DEA was
 6    complying with Section 21 U.S.C. 830,
 7    which, if you read Paragraph 1(a) out
 8    loud, requires what?  Reports to the
 9    Attorney General.  It says, "Each
10    regulated person shall report to the
11    Attorney General."  And what does A say?
12              MR. STEPHENS:  Object to
13         form.
14              THE WITNESS:  "Any regulated
15         transaction involving an
16         extraordinary quantity of a listed
17         chemical, an uncommon method of
18         payment or delivery, or any other
19         circumstance that the regulated
20         person believes may indicate that
21         the listed chemical will be used
22         in violation of this subchapter."
23    BY MR. FARRELL:
24         Q.    So, I'm asking the DEA, the
```

1    Reno report from 1998, its authority

2    arises out of the Methamphetamine Act; is

3    that right?

4                    MR. STEPHENS:  Object to

5          form.

6                    MS. MAINIGI:  Objection.

7          Scope.

8                    MR. FINKELSTEIN:  Scope.

9                    THE WITNESS:  Yes.

10   BY MR. FARRELL:

11         Q.    And the definition of a

12   suspicious order under the

13   Methamphetamine Act is what?  What size

14   transaction?

15         A.    The extraordinary quantity.

16         Q.    All right.  Now, controlled

17   substances are not governed by the

18   methamphetamine act unless they contain

19   ephedrine or pseudoephedrine; is that

20   right?

21                    MR. STEPHENS:  Object to

22         form.

23   BY MR. FARRELL:

24         Q.    I'm asking you, the DEA?

```
 1            A.    Yeah.  I'm waiting to make

 2    sure --

 3              MS. MAINIGI:  Objection.

 4         Scope and foundation.

 5              MR. FINKELSTEIN:  Scope.

 6              THE WITNESS:  Yes.

 7    BY MR. FARRELL:

 8            Q.    What size transaction should

 9    registrants look for when they're looking

10    for suspicious orders of controlled

11    substances?

12            A.    Unusual -- excessive.

13    Excessive.

14            Q.    And a definition of

15    suspicious order in the regulation, is

16    unusual what?

17            A.    Unusual quantity.

18              MS. MAINIGI:  Objection to

19         form.

20    BY MR. FARRELL:

21            Q.    Unusual size --

22              MS. MAINIGI:  Objection to

23         form.

24              THE WITNESS:  Unusual size,
```

Highly Confidential - Subject to Further Confidentiality Review

1        patterns deviating from a

2        normal -- can I refresh my memory

3        just looking at it?

4    BY MR. FARRELL:

5        Q.   Go ahead, yeah.  You see

6    where I'm going with this.  I'm trying to

7    figure out the difference and whether

8    there's a difference between the

9    definition of a suspicious order, if it

10   contains a List I chemical versus the

11   definition of suspicious order if it's a

12   controlled substance.

13        MS. MAINIGI:  Objection.

14        Coaching the witness.  Objection

15        to form.

16        THE WITNESS:  So suspicious

17        orders for controlled substances

18        include orders of unusual size,

19        orders deviating substantially

20        from a normal pattern, and orders

21        of unusual frequency.

22   BY MR. FARRELL:

23        Q.   So from the DEA's

24   perspective, what is bigger?  Unusual or

1    extraordinary?

2              MS. MAINIGI:  Objection.

3         Scope.  Objection.  Form.

4              MR. EPPICH:  Objection.

5         Calls for a legal conclusion.

6              MR. FINKELSTEIN:  I object

7         to the scope.  You can answer.

8              THE WITNESS:  Can you repeat

9         it?

10   BY MR. FARRELL:

11        Q.    Yeah.  From the DEA's

12   perspective and guidance that it provides

13   to industry, what is larger, an order

14   that's unusual, or an order that's

15   extraordinary?

16             MS. MAINIGI:  Objection.

17        Scope, form, foundation.

18             MR. EPPICH:  Objection.

19        Calls for a legal conclusion.

20             MR. FINKELSTEIN:  Scope,

21        calls for a legal conclusion.

22             THE WITNESS:  I believe it's

23        going to be dependent on the

24        product too.  So it's not -- it's

```
1           not just on size or extraordinary.
2           It's varying criteria.  It could
3           be other criteria.  So is it a
4           chemical?  Is it a controlled
5           substance?  What schedule is it
6           in?  That kind of thing.
7    BY MR. FARRELL:
8        Q.    Because it -- comparing a
9    List I chemical to a controlled
10   substance, is comparing apples to
11   oranges; is that fair?
12           MR. STEPHENS:  Object to
13       form.
14           THE WITNESS:  Yes.
15           MR. EPPICH:  Objection.
16       Vague.
17   BY MR. FARRELL:
18       Q.    Okay.  So when you're trying
19   to apply -- if you're selling an
20   extraordinary quantity of opioids, is
21   that more than, equal to, or less than
22   unusual sizes?
23           MS. MAINIGI:  Objection.
24       Scope.  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1           MR. EPPICH:  Objection.

2      Calls for a legal conclusion.

3           MR. FINKELSTEIN:  Object to

4      the form.

5           THE WITNESS:  Can you please

6      repeat it.

7   BY MR. FARRELL:

8      Q.   Yeah, I'm trying to get

9   there.  I'm trying to establish --

10  because has the DEA ever told any

11  distributor of prescription opioids that

12  it can use the definition of suspicious

13  order from the Methamphetamine Act?

14          MR. EPPICH:  Objection to

15     form.  Foundation.

16          THE WITNESS:  The term --

17     the term that you used, "ever,"

18     that's all encompassing.  So I

19     don't know that I can -- I cannot

20     testify that no one has ever said

21     that.

22  BY MR. FARRELL:

23     Q.   So what I'm going to refer

24  back to is this.

Highly Confidential - Subject to Further Confidentiality Review

1              Let's go to Page 2247 of the

2     Reno report.  This was discussed at

3     length yesterday.  Do you recall this,

4     Exhibit 2?

5          A.    Yes.

6          Q.    Okay.  So the first thing I

7     want you to -- so the first thing that

8     we're going to do is we're going to look

9     at where it says "Note:  Factor equals

10    three."

11             Okay.  So this was discussed

12    yesterday.  I'm just trying to find

13    clarification.

14             This Reno report, according

15    to this note, applies to List I

16    chemicals, agreed?

17         A.    Yes.

18             MR. FINKELSTEIN:  Wait.

19             THE WITNESS:  Sorry.

20             MR. FINKELSTEIN:  Scope.

21             MS. MAINIGI:  Objection.

22    Foundation.

23    BY MR. FARRELL:

24         Q.    Second -- secondly, it can

Highly Confidential - Subject to Further Confidentiality Review

1  apply to Control II and Control III

2  controlled substances that contain List I

3  chemicals.  Agreed or disagree?

4          MS. MAINIGI:  Objection.

5      Scope.  Foundation.

6          MR. O'CONNOR:  Objection to

7      form.

8          THE WITNESS:  Agreed.

9  BY MR. FARRELL:

10     Q.    And it applies to Control

11  III.  And what does that mean N-V?  "N-V

12  controlled substances and noncontrolled

13  over-the-counter products containing

14  List I chemical items."

15          Do you know what that means?

16     A.    Looking at it, I would be

17  speculating what it means.

18          Based on what I know, that

19  looks like III-N, would be III,

20  non-narcotic.

21     Q.    So more directly, has the

22  DEA ever provided -- I keep using that

23  word "ever."

24          Has the DEA -- does the DEA

1    believe that this algorithm is

2    appropriate for measuring as a metric

3    suspicious orders of controlled

4    substances that do not include List I

5    chemicals?

6            MR. EPPICH:  Object to form.

7            MS. MAINIGI:  Objection.

8        Scope.

9            THE WITNESS:  Can you please

10       repeat that.

11   BY MR. FARRELL:

12       Q.    Yes.  We agree that this

13   document we're looking at from the Reno

14   report is guidance from the DEA to

15   registrants under the Methamphetamine Act

16   regarding looking for orders of

17   extraordinary size involving List I

18   chemicals.  That's been established.  And

19   I'm asking you whether or not you agree

20   with it.

21           MR. FINKELSTEIN:  Scope.

22           MS. MAINIGI:  Objection to

23       form.

24           MR. EPPICH:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.
 2    BY MR. FARRELL:
 3          Q.    There was a suggestion made
 4    by some of defense counsel yesterday
 5    during your examination that it also
 6    applies to controlled substances.
 7                    And so what I would like you
 8    to do is take a look at the note and tell
 9    me whether or not that note indicates,
10    pursuant to the DEA's understanding,
11    whether or not this applies to all
12    controlled substances, or just controlled
13    substances that contain List I chemicals
14    or some other interpretation that I'm
15    missing?
16                    MS. MAINIGI:  Objection.
17          Form.
18                    Objection.  Coaching the
19          witness.
20                    MR. FINKELSTEIN:  I object
21          to the scope.
22                    But you can answer in your
23          personal capacity, if you know.
24                    THE WITNESS:  Yes, I agree.
```

```
 1    BY MR. FARRELL:

 2         Q.    So the DEA agrees that this

 3    applies only to List I chemicals and

 4    controlled substances that contain List I

 5    chemicals, agreed?

 6               MR. FINKELSTEIN:  Hang on.

 7          My instruction was you could ask

 8          Tom Prevoznik if he agrees,

 9          because this is not within the

10          scope of his authorization.

11               MS. SINGER:  Though it does

12          relate to guidance the DEA

13          provided to registrants.  That is

14          the context in which defendants

15          offered it yesterday.

16               MR. FINKELSTEIN:  I

17          understand the defendants

18          offered -- offered it yesterday.

19          And I made the same objections

20          there.

21               This is about chemicals.  We

22          are talking about controlled

23          substances.  You can answer in

24          your personal capacity.
```

1          MR. FARRELL:  Well, I -- I

2      don't -- respectfully don't need

3      his personal capacity.  I need the

4      DEA's position on whether or not

5      the Reno report is --

6  BY MR. FARRELL:

7      Q.    Let me ask you this.  Let me

8  ask you in a different way.

9          Has the DEA ever provided

10 guidance to a registrant that it is

11 appropriate in the context of controlled

12 substances, which do not include List I

13 chemicals, to define suspicious orders as

14 orders of extraordinary quantity?

15         MR. EPPICH:  Objection.

16     Foundation.

17         MS. MAINIGI:  Objection.

18     Form.

19         THE WITNESS:  Again, you

20     used the word ever.  I can't -- I

21     don't know if that's never not

22     happened.

23 BY MR. FARRELL:

24     Q.    That's -- that's fair.

Highly Confidential - Subject to Further Confidentiality Review

1      Speaking on behalf of the

2  DEA, do you believe that the Reno report

3  is an appropriate standard to measure

4  suspicious orders of controlled

5  substances that do not contain List I

6  chemicals?

7      MS. MAINIGI:  Objection.

8  Scope.  Foundation.

9      MR. EPPICH:  Form.

10      THE WITNESS:  Please repeat

11  that.

12  BY MR. FARRELL:

13      Q.   Has the DEA provided

14  guidance to registrants that it can

15  monitor suspicious orders of List I

16  chemicals using the Reno report?

17      A.   Not to my knowledge.

18      Q.   I forgot what I asked you.

19      (Whereupon, the court

20  reporter read back the requested

21  portion of testimony.)

22  BY MR. FARRELL:

23      Q.   What is the purpose of the

24  Reno report?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FINKELSTEIN:  Scope.

2          MS. MAINIGI:  Objection.

3          MR. EPPICH:  Objection.

4    Foundation.

5          MR. FARRELL:  You're right.

6          This is -- is she back yet?

7          Do we have the Cardinal

8    Health documents yet?

9          Let's take a quick break if

10   you don't mind.

11         MR. FINKELSTEIN:  Okay.  I'd

12   like this to be our last break.

13   And we're going to break for the

14   day at 5.

15         MR. FARRELL:  Yeah.

16         THE VIDEOGRAPHER:  3:35.  We

17   are off the video record.

18         (Short break.)

19         THE VIDEOGRAPHER:  3:49.  We

20   are on the video record.

21   BY MR. FARRELL:

22   Q.    I'm going to try to go at

23   this through a different route.

24         I'm going to show you what

1    has been premarked as Plaintiffs'

2    Exhibit 12 to your deposition.

3             (Document marked for

4         identification as Exhibit

5         DEA-Prevoznik-P-12.)

6             MR. FARRELL:  I have copies,

7         four copies for counsel.  I have a

8         copy for the DOJ.  And a copy for

9         you.

10            THE WITNESS:  Thank you.

11   BY MR. FARRELL:

12       Q.    And I'll represent to you

13   that this is not a document that you've

14   seen before.

15            But this is Cardinal

16   Health's Third Supplemental Objections

17   and Responses to Plaintiffs' First

18   Combined Discovery Requests served in

19   this litigation.

20            And I -- I'll give you a

21   moment to get oriented with it.  But

22   eventually I'm going to be directing your

23   attention to Page 12.

24            Now, specifically what I'm

Highly Confidential - Subject to Further Confidentiality Review

```
1    going to reference you to on Page 12 is

2    the last paragraph.

3              And it -- and Cardinal

4    Health says, "From at least 1995 through

5    late 2007, Cardinal Health understood DEA

6    to want suspicious orders reported to the

7    administration in the form of ingredient

8    limit reports."

9              Do you see that?

10   A.    Yes.

11             MS. MAINIGI:  Objection to

12        form.

13   BY MR. FARRELL:

14   Q.    My question to you as the

15   representative from the DEA, is, has the

16   DEA ever provided guidance to Cardinal

17   Health that it could -- that it could

18   report suspicious orders through the use

19   of ingredient limit reports?

20             MS. MAINIGI:  Objection.

21        Scope.  Objection.  Form.

22        Objection.  Foundation.

23             MR. FINKELSTEIN:  I join the

24        scope objection to the extent that
```

1           it calls for guidance outside of

2           the distributor initiative.

3    BY MR. FARRELL:

4           Q.    You can answer.

5           A.    I'm just reading -- can I --

6           Q.    Absolutely.

7           A.    Again, I'm just getting

8    familiar with it.

9                 Please repeat the question.

10          Q.    Yeah, what I'll do is I'll

11   start over.

12                The very first sentence,

13   you'll see Cardinal Health represents

14   from at least '95 through 2007, Cardinal

15   Health understood DEA to want suspicious

16   orders reported to the administration in

17   the form of ingredient limit reports.

18                Do you see that sentence?

19                MS. MAINIGI:  Objection to

20          form.

21   BY MR. FARRELL:

22          Q.    That's exactly what it says,

23   correct?

24          A.    Yes.

 1          MS. MAINIGI:  Objection.

 2      Coaching the witness.

 3  BY MR. FARRELL:

 4          Q.   And so the next sentence,

 5  could you read it aloud?

 6          A.   "Based on guidance from the

 7  DEA, see example,

 8  CAH_MDL_PRIORPROD_HOUSE_0002207 --

 9          Q.   Stop right there for a

10  second.  Do you recognize that Bates

11  stamp number?

12          A.   Yes.

13          Q.   Where do you recognize that

14  Bates stamp number from?

15          A.   The Reno report.

16          Q.   The exhibit that we just

17  went over?

18          A.   That we referred -- yes,

19  right.

20          Q.   So this is Cardinal Health

21  representing in this litigation that it

22  understood that it was based on guidance

23  from the DEA using that Reno report.

24              My question to you is, is

```
1    the DEA ever aware of providing such

2    guidance to Cardinal Health?

3                    MS. MAINIGI:  Objection.

4            Form.  Objection.  Scope.

5            Objection.  Coaching the witness.

6                    THE WITNESS:  Again, the use

7            of ever, I don't -- I don't -- I

8            don't know.

9    BY MR. FARRELL:

10           Q.    Do you have any knowledge of

11   providing such guidance to Cardinal

12   Health?

13                   MS. MAINIGI:  Objection.

14           Asked and answered.  Objection.

15           Form.  Scope.

16                   THE WITNESS:  I am not

17           aware.

18   BY MR. FARRELL:

19           Q.    Will you continue reading?

20           A.    "Cardinal Health understood

21   DEA to want orders for opioids reported

22   that exceeded a calculation endorsed by

23   DEA or that a wholesale distributor

24   otherwise identified as unusual in size,
```

1   pattern or frequency."

2          Q.    Are you aware of the DEA

3   ever endorsing a calculation for opioids

4   to identify orders of unusual size,

5   pattern, or frequency?

6          A.    No.

7                MS. MAINIGI:  Objection.

8          Form.  Objection.  Scope.

9   BY MR. FARRELL:

10         Q.    Is it appropriate and

11  compliant with federal law for a

12  registrant to use the Reno report as the

13  methodology in which it measures

14  suspicious orders of opioids that do not

15  contain List I chemicals?

16               MS. MAINIGI:  Objection.

17         Calls for a legal conclusion.

18         Form.

19               MR. FINKELSTEIN:  Vague.

20               THE WITNESS:  Well, the

21         statute requires the registrant to

22         design and operate the system.

23  BY MR. FARRELL:

24         Q.    Let's be clear about which

Highly Confidential - Subject to Further Confidentiality Review

```
1    statute we are talking about.
2           A.    Correct.
3           Q.    Which one are you reading
4    from?
5           A.    I'm reading from the C.F.R.
6           Q.    For List I chemicals?
7           A.    Controlled substances.
8           Q.    Controlled substances.  And
9    how does it define suspicious orders?
10          A.    Again, "Suspicious orders
11   include orders of unusual size, orders
12   deviating substantially from a normal
13   pattern, or" -- "and orders of unusual
14   frequency."
15          Q.    Now, I'd like you to flip to
16   List I chemicals.  What is the DEA's rule
17   on looking for suspicious orders of
18   List I chemicals?
19                MS. MAINIGI:  Objection.
20   Scope.  Form.
21   BY MR. FARRELL:
22          Q.    Do you have the C.F.R. or
23   the --
24          A.    C.F.R.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    It's one of the exhibits.

2   Try 1310.05.

3      A.    .05 and what section?  A-1.

4      Q.    A-1.

5      A.    "Extraordinary quantity of a

6   listed chemical, an uncommon method of

7   payment or delivery, or any other

8   circumstance that the regulated person

9   believes may indicate that the listed

10  chemical will be used in violation of

11  this part."

12     Q.    So my question to the DEA,

13  is, did the DEA ever provide guidance to

14  Cardinal Health that it could use the

15  Reno report's definition of suspicious,

16  which is extraordinary size, as the

17  algorithm for measuring unusual orders of

18  controlled substances?

19         MS. MAINIGI:  Objection.

20      Scope, form.

21         MR. FINKELSTEIN:  Scope.

22         THE WITNESS:  Not to my

23      knowledge.

24  BY MR. FARRELL:

1    Q.    This is Cardinal Health in

2  its pleading in this litigation, telling

3  the court that the DEA endorsed it to use

4  the Reno report to monitor suspicious

5  orders of controlled substances,

6  including opioids.  Is that statement

7  true or not true?

8         MS. MAINIGI:  Objection.

9  Form.  Coaching witness.  Scope.

10        MR. FINKELSTEIN:  Scope.

11        THE WITNESS:  Can you repeat

12  the question?

13 BY MR. FARRELL:

14    Q.    Cardinal Health is stating

15 in its discovery responses to the court

16 that the DEA provided guidance to them,

17 that they could use the Reno report and

18 its algorithm for orders of extraordinary

19 size to identify unusual orders of

20 controlled substances.

21        Are you aware of the DEA

22 providing such guidance to Cardinal

23 Health?

24        MS. MAINIGI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Form.   Coaching the witness.

 2            Scope.

 3                    MR. FINKELSTEIN:   Scope.

 4                    THE WITNESS:   I am not

 5        aware.

 6    BY MR. FARRELL:

 7            Q.    Is it the DEA's position

 8    that using an algorithm for extraordinary

 9    size is an appropriate measurement of

10    orders of unusual size for controlled

11    substances?

12                    MS. MAINIGI:   Objection.

13        Form.

14                    MR. EPPICH:   Objection.

15        Scope.

16                    MR. FINKELSTEIN:   Form.

17                    THE WITNESS:   No.

18    BY MR. FARRELL:

19            Q.    In fact, in the Reno report,

20    the DEA provided recommendation and

21    guidance to registrants that it could

22    look for orders of extraordinary size of

23    List I chemicals using a factor of three.

24    Is that correct?
```

1          MR. EPPICH:  Object to form.

2          MS. MAINIGI:  Objection

3      scope.

4          MR. FINKELSTEIN:  Scope.

5          THE WITNESS:  Yes.

6  BY MR. FARRELL:

7      Q.    Would it be appropriate for

8  a registrant to use a factor of four to

9  look for orders of unusual size of

10 controlled substances?

11         MS. MAINIGI:  Objection.

12     Foundation.  Objection.  Scope.

13         MR. FINKELSTEIN:  Incomplete

14     hypothetical.

15         MR. EPPICH:  Objection.

16     Form.

17         THE WITNESS:  I don't know.

18     I don't know what factor three,

19     factor four -- factor -- I don't

20     know what those factors are.

21 BY MR. FARRELL:

22     Q.    Okay.  So let's go and look

23 at page -- on the Reno report,

24 Bates-stamped 2247.  So if you look at

1   Paragraph 1, is this the guidance that

2   the DEA was providing to registrants as

3   the current calculation being used to

4   look for orders of extraordinary size of

5   List I chemicals?

6             MR. EPPICH:  Objection.

7         Foundation.

8             MR. FINKELSTEIN:  Scope.

9             THE WITNESS:  Yes.

10  BY MR. FARRELL:

11       Q.    So there appear to be five

12  steps that DEA was providing guidance

13  for, agreed?

14             MR. EPPICH:  Objection.

15         Foundation.  Form.

16             THE WITNESS:  Yes.

17  BY MR. FARRELL:

18       Q.    And will you read paragraph

19  Step 1?

20       A.    "Add purchase quantities for

21  the last 12 months for all customers

22  within same distribution center and for

23  customer type (hospital, pharmacy or

24  other) for any List I chemical-containing

Highly Confidential - Subject to Further Confidentiality Review

1    item stocked by the distribution center."

2         Q.    So in Step 1, it appears

3    that the guidance the DEA is providing is

4    for a registrant to add the purchase

5    quantities for the last 12 months by a

6    customer of List I chemicals within the

7    same distribution center for the same

8    customer type, agreed?

9              MR. FINKELSTEIN:  Scope.

10             MS. MAINIGI:  Objection.

11        Scope.

12             MR. EPPICH:  Objection.

13        Form.  Foundation.

14             THE WITNESS:  Yes.

15   BY MR. FARRELL:

16        Q.    And then on Number 2, it

17   says, "Add customer months for every

18   record used in above total."

19             Did I read that accurately?

20             MR. EPPICH:  Objection.

21        Form and foundation.

22             THE WITNESS:  Yes.

23   BY MR. FARRELL:

24        Q.    Step 3 is to divide that

Highly Confidential - Subject to Further Confidentiality Review

1    total quantity by the total customer

2    months.

3                Did I read that accurately?

4                MR. EPPICH:  Objection form

5         and foundation.

6                THE WITNESS:  Yes.

7    BY MR. FARRELL:

8         Q.    Very good.  Now, once we do

9    this math -- it's not so fuzzy -- what it

10   gives us, is it gives us the average

11   purchases by a customer per month for the

12   past year, agreed?

13               MR. EPPICH:  Object to form.

14               MR. FINKELSTEIN:  Scope.

15               THE WITNESS:  Agreed.

16   BY MR. FARRELL:

17        Q.    And then under Paragraph 4,

18   it says multiply that by a factor.  And

19   that gives us the maximum amount that the

20   customer can order per month before

21   showing up on a suspicious order report.

22   Do you see that?

23        A.    Yes.

24        Q.    So again, this is for List I

1   chemicals arising out of methamphetamine

2   act and the guidance provided by the DEA

3   to Attorney General Janet Reno, and the

4   recommendation is that when you're

5   looking for orders of extraordinary size

6   of List I chemicals, ephedrine,

7   pseudoephedrine, a registrant should look

8   for like-size groups of customers from a

9   distribution facility, add up the total

10  by base weight over the past 12 months,

11  divide it by 12, and multiply it by a

12  factor.  Agreed?

13          MR. EPPICH:  Objection to

14      form.

15          MS. MAINIGI:  Objection to

16      form.  Mischaracterizes the

17      report.

18          MR. EPPICH:  Objection.

19      Foundation.

20          MR. FINKELSTEIN:  Scope.

21      You can answer.

22          THE WITNESS:  Agreed.

23  BY MR. FARRELL:

24          Q.   It says here, "The" -- "The

1  factor should be for three, for

2  Control II and Control III controlled

3  substances containing List I chemicals."

4          Do you see that?

5     A.   Yes.

6          MR. EPPICH:  Objection to

7     form.

8  BY MR. FARRELL:

9     Q.   Now, if it's just a pure

10  List I chemical, and it doesn't

11  contain -- I'm sorry, the other way

12  around.

13          If you take the factor of

14  three for List I chemicals, it gives you

15  the maximum amount before a suspicious

16  order is triggered.  That's the factor

17  the DEA is recommending registrants use

18  for List I chemicals.

19          Agreed?

20          MR. EPPICH:  Object to form.

21          MR. FINKELSTEIN:  Scope.

22          THE WITNESS:  Agreed.

23  BY MR. FARRELL:

24     Q.   Okay.  So my question to you

1    is, is it appropriate to use this

2    standard for controlled substances that

3    don't include List I chemicals?

4                MS. MAINIGI:  Objection.

5         Form.  Foundation.

6                MR. FINKELSTEIN:  Can I get

7         the question back?

8                I'm sorry, because my

9         realtime -- can you ask it again?

10               (Whereupon, the court

11        reporter read back the requested

12        portion of testimony.)

13               MR. FINKELSTEIN:  Okay.  You

14        can answer.

15               THE WITNESS:  Can you repeat

16        it?

17               MR. FINKELSTEIN:  Can you

18        repeat it?

19   BY MR. FARRELL:

20        Q.    By using this methodology,

21   you are providing guidance to registrants

22   to identify extraordinary orders of

23   List I chemicals by using a multiplier of

24   three times the monthly average for a

Highly Confidential - Subject to Further Confidentiality Review

1    similar customer.

2              Is that fair?

3              MR. EPPICH:  Object to the

4         form.

5              MS. MAINIGI:  Objection.

6         Form.  Foundation.

7              THE WITNESS:  Correct.

8    BY MR. FARRELL:

9         Q.    Has the DEA provided

10   guidance to registrants of controlled

11   substances that don't include List I

12   chemicals that it can multiply the

13   monthly average by three to identify

14   orders that are merely unusual?

15             MS. MAINIGI:  Objection.

16        Foundation.  Form.

17             MR. EPPICH:  Objection.

18        Scope.

19             THE WITNESS:  Not to my

20        knowledge.

21   BY MR. FARRELL:

22        Q.    So if you're using a

23   measuring stick that the DEA has

24   provided --

1          MS. MAINIGI:  May I ask for

2      clarification, Counsel?  Is that

3      to your personal knowledge?

4          MR. FARRELL:  Enu, you --

5      you can have redirect.  He's

6      testifying in his official

7      capacity, so --

8          MR. FINKELSTEIN:  I'll say

9      he's here to testify about

10      industrywide guidance, and I took

11      the question in that spirit.

12          And you can ask -- you can

13      ask your next question.

14  BY MR. FARRELL:

15      Q.    So if -- if a registrant is

16  making -- are you aware of ever making --

17  providing guidance to a registrant that

18  it could use the Reno report as an

19  effective tool to monitor suspicious

20  orders of controlled substances that

21  don't include List I chemicals?

22          MS. MAINIGI:  Objection.

23      Form.  Foundation.  Scope.

24          MR. FINKELSTEIN:  That

1          question isn't about industrywide

2          guidance.  I join the scope

3          objection.

4    BY MR. FARRELL:

5          Q.    Let me try it again then.

6                Has the DEA ever provided

7    industrywide guidance that it could use

8    the definition of suspicious order for

9    the List I chemicals under the

10   methamphetamine act for orders of

11   controlled substances that do not include

12   List I chemicals?

13         A.    Not to my knowledge.

14               MS. MAINIGI:  Objection to

15         form.

16   BY MR. FARRELL:

17         Q.    So now let's go back to

18   Cardinal's combined discovery requests.

19   Page 12.

20               In the context of the first

21   sentence, has the DEA ever provided

22   guidance to registrants, which are, in

23   this case, distributors of Control II

24   prescription opioids, that it satisfies

1    its compliance obligations under federal

2    law by submitting after-the-fact

3    ingredient limit reports?

4              MS. MAINIGI:  Objection.

5         Form.  Objection.  Foundation.

6              MR. FINKELSTEIN:  Scope.

7              THE WITNESS:  Not to my

8         knowledge.

9    BY MR. FARRELL:

10        Q.    Now, you'll recall from the

11   1996 diversion investigators manual, if

12   you'll flip back to it, which is

13   Exhibit 11.

14        A.    I'll use mine.  The '96 one?

15        Q.    The '96 one.

16              Is there any reference to

17   an -- an approved factor to be used by a

18   registrant to identify unusual orders of

19   controlled substances?

20              MS. MAINIGI:  Objection --

21        excuse me.  Objection to form.

22              THE WITNESS:  No.

23   BY MR. FARRELL:

24        Q.    If a registrant used a

Highly Confidential - Subject to Further Confidentiality Review

1    factor to increase -- that's a bad

2    question.

3              Are you aware of the DEA

4    ever endorsing the use of a factor to use

5    in the calculation of unusual orders of

6    controlled substances that do not include

7    List I chemicals?

8              MR. EPPICH:  Objection to

9         form.

10             MR. FINKELSTEIN:  Scope.

11             THE WITNESS:  Again, it's

12        the use of the word ever.

13             I am not -- I am not aware,

14        but I have concerns of the word of

15        the use ever.

16   BY MR. FARRELL:

17        Q.   Is a registrant that uses

18   the factor when calculating orders of

19   unusual size of controlled substances

20   that do not include List I chemicals,

21   compliant with federal regulations?

22             MR. STEPHENS:  Object to

23        form.

24             MR. FINKELSTEIN:  Calls for

Highly Confidential - Subject to Further Confidentiality Review

1          a legal conclusion.

2                    MS. MAINIGI:  Join.

3                    THE WITNESS:  Could you

4          please repeat it?

5     BY MR. FARRELL:

6          Q.     Would the DEA ever endorse a

7     methodology for use by a registrant that

8     multiplied a monthly average by four to

9     determine orders of unusual size?

10                   MR. EPPICH:  Object to form.

11         Foundation.

12                   MS. MAINIGI:  Calls for

13         speculation.

14                   THE WITNESS:  DEA doesn't

15         endorse the systems.

16    BY MR. FARRELL:

17         Q.     Is using a factor of four

18    when calculating orders of unusual size

19    compliant with federal regulations

20    according to the DEA?

21                   MS. MAINIGI:  Objection.

22         Calls for a legal conclusion.

23         Form.

24                   THE WITNESS:  Not to my

1    knowledge.

2    BY MR. FARRELL:

3       Q.    Now, in -- in other places

4    I'll represent to you that some

5    registrants of controlled substances that

6    do not include List I chemicals are

7    relying upon the chemical handlers

8    manual.  That fact will be established in

9    the record.

10          So my question to you first

11   is, are you familiar with the DEA's

12   chemical handlers manual?

13          MS. MAINIGI:  Objection.

14       Coaching the witness.  Objection

15       to form.

16          MR. EPPICH:  Object to form.

17          THE WITNESS:  Yes.

18   BY MR. FARRELL:

19       Q.    I'm going to show you what's

20   going to be marked as?

21          MR. FINKELSTEIN:  13.

22          MR. FARRELL:  So what did

23       you say?

24          MR. FINKELSTEIN:  13.  I

1    think it's 13.

2            (Document marked for

3        identification as Exhibit

4        DEA-Prevoznik-P-13.)

5    BY MR. FARRELL:

6        Q.    13?  Plaintiffs' 13.  And it

7    is Bates stamped

8    CAH_MDL_PRIORPROD_DEA07_01198690.

9            I'll hand that to you.

10            MR. FARRELL:  I've got

11        insufficient number of copies.

12        Bonnie will be e-mailing it around

13        as well.

14    BY MR. FARRELL:

15        Q.    I'll give you a moment to

16    review it.  And my first question is

17    going to be is whether or not you

18    recognize this document.

19        A.    Yes, I recognize it.

20        Q.    What is it?

21        A.    It's a manual that we put

22    together for those that are handling

23    List I chemicals.

24        Q.    Is it publicly available?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    And is this a true and

3    accurate version of the 2004 chemical

4    handler's manual published by the DEA?

5              MR. FINKELSTEIN:  Scope.

6              MS. MAINIGI:  Objection to

7         form.

8              THE WITNESS:  Yes.

9    BY MR. FARRELL:

10       Q.    Again, is this a document

11   that applies to List I chemicals,

12   including ephedrine and pseudoephedrine

13   and the chemicals used to make

14   methamphetamine?

15       A.    Yes.

16             MS. MAINIGI:  Objection to

17        form.

18             MR. FINKELSTEIN:  Scope.

19   BY MR. FARRELL:

20       Q.    Does the DEA provide

21   guidance that this document is an

22   appropriate reference point for

23   monitoring suspicious orders of

24   controlled substances that do not include

Highly Confidential - Subject to Further Confidentiality Review

1    List I chemicals?

2                    MR. EPPICH:  Objection.

3                    MS. MAINIGI:  Objection to

4         form.

5                    MR. FINKELSTEIN:  Scope.

6                    THE WITNESS:  No.

7    BY MR. FARRELL:

8         Q.    Now, I'm going to have you

9    flip to Bates stamp 01198713 which is

10   Page 19.  I'm going to have you go down

11   and look first at the third full

12   paragraph.

13                   MR. FINKELSTEIN:  "When a

14        regulated person suspects"?

15                   MR. FARRELL:  Yes, sir.

16   BY MR. FARRELL:

17        Q.    At the top of the page,

18   you'll see it says, "Recognizing

19   suspicious orders."  And then I'm going

20   to ask you to read the first -- read the

21   paragraph that begins, "When a regulated

22   person."

23        A.    "When a regulated person

24   suspects that an order may be intended

1  for illicit purposes, good practice

2  requires that every reasonable effort be

3  made to resolve those suspicions.  In

4  addition to making the required reports,

5  the transaction should not be completed

6  until the customer is able to eliminate

7  the suspicions.  The distributor may have

8  to forego some transactions.  When DEA

9  reviews distributors' decisions, minor

10  events are not cause for government

11  action.

12          "At the same time, a

13  regulated person who fails to implement a

14  system to prevent diversion will be

15  closely scrutinized and, if warranted,

16  may be subject to civil, administrative,

17  or criminal penalties."

18      Q.    So with regard to List I

19  chemicals that a registrant determines

20  that are suspicious, what guidance has

21  the DEA provided on whether or not the

22  order should be shipped?

23          MS. MAINIGI:  Objection.

24      Scope.  Foundation.

1          THE WITNESS:  That they

2     should not do it.

3  BY MR. FARRELL:

4          Q.    So is this consistent with

5  the guidance that the DEA provided to

6  registrants of controlled substances that

7  do not include List I chemicals?

8          MS. MAINIGI:  Objection.

9     Vague.  Timing.

10          THE WITNESS:  Yes.

11  BY MR. FARRELL:

12          Q.    Now, you'll see directly

13  above that, there's a reference to

14  Exhibit E.  So I'm going to have you flip

15  to Page 41, which is Bates-stamped

16  01198735.

17          Now, if you look at the top

18  left-hand corner there's an appendix

19  number, Appendix E-3.

20          A.    I see that.

21          Q.    And when you read the

22  language of Appendix E-3, does this track

23  the language from the Reno report?

24          MS. MAINIGI:  Objection.

```
 1          Scope, form, foundation.

 2               MR. FINKELSTEIN:  Scope.

 3               THE WITNESS:  Yes.

 4    BY MR. FARRELL:

 5          Q.    So if a registrant of --

 6    that is a wholesale distributor of

 7    controlled substances that do not include

 8    List I chemicals is using E-3 to identify

 9    suspicious orders of unusual size,

10    frequency, or pattern, is that compliant

11    with federal law?

12               MS. MAINIGI:  Objection.

13          Calls for a legal conclusion.

14          Form.

15               MR. FINKELSTEIN:  Calls for

16          a legal conclusion.

17               THE WITNESS:  Please repeat.

18    BY MR. FARRELL:

19          Q.    If a registrant that is a

20    wholesale distributor of controlled

21    substances, excluding those that contain

22    List I chemicals, is using E-3 to

23    identify suspicious orders of unusual

24    size, frequency or pattern, is that
```

1    compliant with federal law, according to

2    the DEA?

3              MR. EPPICH:  Object to form.

4              MS. MAINIGI:  Objection.

5         Calls for a legal conclusion.

6         Form.

7              THE WITNESS:  No.

8    BY MR. FARRELL:

9         Q.    So I'm going to make this

10   easier.  I'm going to mark as the next

11   sequential exhibit, which is Plaintiffs'

12   Exhibit --

13        A.    Oh, right, 14.

14        Q.    I'm terrible at exhibit

15   numbers.

16             (Document marked for

17             identification as Exhibit

18             DEA-Prevoznik-P-14.)

19   BY MR. FARRELL:

20        Q.    And to make it easier for

21   everybody, this is from the DEA reliance

22   materials that were circulated yesterday.

23   This is the DEA's letter dated

24   September 27th, 2006, that I'll ask you

1  to take a look at.  And tell me if you

2  recognize this document.

3          A.    Yes.

4          Q.    What is it?

5          A.    It's a letter that DEA sent

6  to the distributors, registrants, by

7  Joe -- by Joe Rannazzisi who was the head

8  of the diversion program of DEA, it's

9  dated September 27th, 2006.

10         Q.    Is this a true and accurate

11 copy of the letter sent by the DEA to all

12 registrants in the chain of distribution

13 of controlled substances?

14         A.    Yes.

15         Q.    Can you verify and validate

16 that this letter was sent to every

17 wholesale distributor and manufacturer

18 that sells or distributes controlled

19 substances and are registered with the

20 DEA?

21              MR. STEPHENS:  Object to

22         form.

23              MR. EPPICH:  Object to form.

24         Objection.  Foundation.

```
 1                    MR. O'CONNOR:  Objection to

 2          form.

 3                    MS. MAINIGI:  Objection.

 4                    THE WITNESS:  There were

 5          actually two mailings of this.

 6          This was one, and then there was

 7          one in February.  So it did go out

 8          to all of them.

 9     BY MR. FARRELL:

10          Q.    So did they go out to all --

11     let me back up.

12                    What was the purpose of the

13     February letter?

14          A.    It was the same.  It was the

15     same letter, but to make sure that all

16     the wholesalers got it.

17          Q.    So the same letter was sent

18     twice?

19          A.    Yes.

20          Q.    And to the DEA's knowledge,

21     was there a shortcoming on the first

22     distribution of the letter, or why did

23     you send it out a second time?

24                    MS. MAINIGI:  Object to
```

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  I'm not sure.

3    BY MR. FARRELL:

4          Q.    But you know it was sent out

5    twice?

6          A.    Yes.

7          Q.    Can you validate and affirm

8    that the DEA sent this letter to every

9    wholesale distributor of prescription

10   opioids that are registered with the DEA?

11                   MS. MAINIGI:  Objection.

12         Scope, form, foundation.

13                   MR. EPPICH:  Objection to

14         form.

15                   THE WITNESS:  Back at this

16         time?

17   BY MR. FARRELL:

18         Q.    Yes.

19         A.    Yes.

20         Q.    What about to manufacturers?

21         A.    This did not go to the

22   manufacturers.

23         Q.    Just to the distributors?

24         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    So without belaboring the

2   point in going through this, is it the

3   DEA's position that anything in that

4   letter is a new rule?

5             MS. MAINIGI:  Objection.

6         Form.

7             MR. FINKELSTEIN:  Vague.

8             THE WITNESS:  No.

9   BY MR. FARRELL:

10    Q.    I'm going to ask you the

11  same questions.  I'm going to have

12  marked -- the 2007 letter that's in my

13  book from reliance materials is just one

14  page.

15            So I'm going to have marked

16  as the next sequential exhibit, which is

17  Plaintiffs' 15.

18            (Document marked for

19        identification as Exhibit

20        DEA-Prevoznik-P-15.)

21            MR. FARRELL:  Document

22        bearing Bates stamp

23        US-DEA-00022459.  And I'm going to

24        hand it to you.

```
1    BY MR. FARRELL:

2         Q.    Do you recognize this

3    document?

4         A.    It's the same one that you

5    just gave me.

6         Q.    I meant to give you the 2006

7    version.

8              MR. FINKELSTEIN:  You did

9         give him the 2006 version.

10             MR. FARRELL:  I just did it

11        again with 2006, huh?

12             MR. FINKELSTEIN:  Correct.

13   BY MR. FARRELL:

14        Q.    Previously been marked as

15   Exhibit 5 in yesterday's deposition.  And

16   I'm going to try to find a clean copy.

17   Now, I'm going to ask you the same

18   question.

19             Is this a true and accurate

20   copy of the second Rannazzisi letter sent

21   by the DEA to wholesale distributors of

22   prescription opioids dated December 27,

23   2007?

24        A.    It went to manufacturers and
```

Highly Confidential - Subject to Further Confidentiality Review

1    distributors.

2           Q.     This one did?

3           A.     Yes.

4           Q.     Is -- is this a true and

5    accurate copy of that letter?

6           A.     Yes.

7           Q.     Does the DEA believe that

8    there's anything in this letter that

9    constitutes a new rule?

10          A.     No.

11                 MS. MAINIGI:  Objection to

12          form.

13                 MR. FARRELL:  Bear with me

14          for a second, please.

15                 All right.  So the next

16          thing that I'm going to show you

17          is the testimony from Cardinal

18          Health's 30(b)(6) deponent.  And

19          then after we show you the video

20          clip I'm going to ask you a

21          question.

22                 Go ahead and play Norris.

23                 (Video clip played as

24          follows:)

```
 1                NORRIS:  This letter sets
 2        forth the obligations --
 3                (Video stopped.)
 4                MR. FARRELL:  Can you stop
 5        it.  Start it.
 6                I'm sorry, we had a little
 7        technical gaffe.
 8                (Video clip played as
 9        follows:)
10                MR. FARRELL:  So as of
11        September 27, 2006, you
12        acknowledge that this letter sets
13        forth the obligations under the
14        Controlled Substances Act and
15        under the code of federal
16        regulations for Cardinal Health?
17                MS. MAINIGI:  Objection.
18        Scope.  Objection.  Form.
19                THE WITNESS:  As to the
20        reiteration of the reporting
21        requirement, yes.
22                Again, the shipping
23        requirement, to use short form,
24        was a new -- new idea to Cardinal
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Health at the time they received

 2          this letter.  So it was not -- I

 3          do not agree that that was an

 4          obligation in the statute going

 5          back."

 6               (Video concluded.)

 7               MR. FARRELL:  Play the next

 8          one, please.

 9               MS. MAINIGI:  Is there a

10          question, Mr. Farrell?

11               Just an ongoing objection to

12          just playing video from Cardinal

13          Health's 30(b)(6).

14               (Video clip played as

15          follows:)

16               MR. FARRELL:  During this

17          time frame prior to 2007, did

18          Cardinal report orders as

19          potentially suspicious or

20          suspicious orders, and then still

21          send the shipments out?

22               MS. MAINIGI:  Objection.

23          Time period.

24               THE WITNESS:  Yes, that is

1          the direction we received from the

2          DEA.  We made the reports as

3          required and there was not a

4          shipping requirement.

5                (Video concluded.)

6    BY MR. FARRELL:

7          Q.    So my question to you is, is

8    did the DEA ever provide such instruction

9    to a registrant?

10               MS. MAINIGI:  Outside --

11         objection.  Outside the scope.

12         Objection.  Form.

13               MR. EPPICH:  Objection.

14         Foundation.

15               MR. FINKELSTEIN:  Scope.

16               THE WITNESS:  Could you

17         please repeat it?

18   BY MR. FARRELL:

19         Q.    Did the DEA ever provide

20   guidance to a registrant that it could

21   report a suspicious order and then still

22   ship it?

23               MS. MAINIGI:  Objection.

24         Scope.  Objection.  Form and

1          foundation.

2                    MR. EPPICH:  Scope.

3     BY MR. FARRELL:

4          Q.    All right.  So let me repeat

5     it.

6                    Cardinal Health claims that

7     it received direction from the DEA that

8     it could report suspicious orders and

9     then still ship it.

10                    Is the DEA aware of

11    providing such guidance?

12                    MS. MAINIGI:  Objection.

13          Scope.  Objection.  Form.

14          Objection.  Misstates Cardinal

15          Health testimony.  Vague as to

16          time.

17                    THE WITNESS:  Not to my

18          knowledge.

19    BY MR. FARRELL:

20          Q.    Does the DEA take the

21    position that a registrant of controlled

22    substances has a duty to block shipment

23    of suspicious orders of controlled

24    substances?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. MAINIGI:  Objection.
2         Form.  Objection.  Vague as to
3         time.
4              THE WITNESS:  Can you please
5         repeat it?
6    BY MR. FARRELL:
7         Q.    Does the DEA take the
8    position that a registrant of controlled
9    substances has a duty to block shipments
10   of suspicious orders?
11             MS. MAINIGI:  Objection.
12        Form.  Objection.  Vague as to
13        time.
14             THE WITNESS:  Yes.
15   BY MR. FARRELL:
16        Q.    Is that now and always been
17   the law in the United States of America?
18             MS. MAINIGI:  Objection.
19        Form.  Outside the scope.
20             THE WITNESS:  Yes.
21   BY MR. FARRELL:
22        Q.    And if a registrant says
23   that it was allowed to ship suspicious
24   orders, is that -- has that ever been
```

Highly Confidential - Subject to Further Confidentiality Review

 1    blessed by the DEA?

 2                    MS. MAINIGI:  Objection.

 3            Form.  Objection.  Scope.

 4                    MR. FINKELSTEIN:  Scope.

 5                    MR. EPPICH:  Objection.

 6            Hypothetical.

 7                    THE WITNESS:  Please repeat

 8            it.

 9    BY MR. FARRELL:

10            Q.    Okay.  You saw the testimony

11    from Cardinal Health.

12                    Do you believe the testimony

13    is accurate?

14                    MS. MAINIGI:  Objection.

15            Form.  Objection.  Scope.

16                    MR. EPPICH:  Objection.

17            Vague.

18                    THE WITNESS:  No.

19    BY MR. FARRELL:

20            Q.    I apologize, I don't have --

21    I've got a copy for you.  And I've got

22    a -- that I'll mark as Plaintiffs'

23    Exhibit 16.

24                    (Document marked for

1          identification as Exhibit

2          DEA-Prevoznik-P-16.)

3              MR. FARRELL:  And for

4      everybody's reference, I'm -- I'm

5      referring to the Novelty

6      Distributors, Inc., revocation of

7      registration, Federal Register

8      Volume 73, Number 176, dated

9      September 10, 2008.

10             I believe it was referenced

11     yesterday at some point in time.

12  BY MR. FARRELL:

13         Q.   Do you recognize the form of

14  this document?

15         A.   Yes.

16         Q.   What is it?

17         A.   It's a Federal Register of

18  notice.

19         Q.   And what is the date of it?

20         A.   Wednesday, September 10,

21  2008.

22         Q.   Is this a publication that

23  is available to the general public?

24         A.   Yes.

1    Q.    Is this a true and accurate

2   copy of the revocation of registration of

3   a wholesale distributor published by the

4   Drug Enforcement Agency?

5            MS. MAINIGI:  Objection.

6        Scope.

7            MR. FINKELSTEIN:  Join the

8        scope objection.

9            THE WITNESS:  Yes.

10  BY MR. FARRELL:

11    Q.    I'm going to direct your

12  attention now to Bates -- or the page

13  Number 52699.  In the top right-hand

14  corner.  In the middle paragraph of the

15  middle column.  And I'd ask you to read

16  aloud the highlighted section.

17    A.    "Fundamental to its

18  obligation to maintain effective controls

19  against diversion, a distributor must

20  review every order and identify

21  suspicious transactions.  Further, it

22  must do so prior to shipping the

23  products.  Indeed, a distributor has an

24  affirmative duty to forgo a transaction

Highly Confidential - Subject to Further Confidentiality Review

1    if, upon investigation, it is unable to

2    determine that the proposed transaction

3    is for legitimate purposes.  See DEA

4    chemical handler's manual 21.

5              "Respondents procedure of

6    post-transaction review is incompatible

7    with its obligation to identify and

8    forego suspicious transactions."

9         Q.    Is this consistent with the

10   guidance the DEA provided to registrants?

11             MS. MAINIGI:  Objection.

12        Vague as to time period and scope.

13             THE WITNESS:  Yes.

14   BY MR. FARRELL:

15        Q.    Is this consistent with the

16   2006 and 2007 letters sent by the DEA,

17   authored by Joe Rannazzisi, to

18   registrants that are involved in the

19   closed system of controlled substances?

20             MS. MAINIGI:  Objection to

21        form.

22             MR. FINKELSTEIN:  I object

23        to the pronunciation of his name.

24             But you can answer.

```
 1              THE WITNESS:  I would

 2         clarify that it went to -- the

 3         first one went to distributors.

 4         And the 2007 went to manufacturers

 5         and distributors.  So yes.

 6    BY MR. FARRELL:

 7         Q.    Now, go to the very next

 8    portion.  I'm going to reference a

 9    footnote.

10         A.    Same page?

11         Q.    No.  It is 52702.  It's

12    Footnote 52, I believe.

13         A.    Okay.  I see it.

14         Q.    And over on the very last

15    thing, it says, "Moreover, field

16    personnel may approve the renewal of a

17    registration" --

18              Wait a minute.

19              It says -- can I see my copy

20    back real quick?

21              MR. FARRELL:  You can take

22         that down for a second.  I

23         apologize.  We're running out of

24         clock, but I want to get to one
```

Highly Confidential - Subject to Further Confidentiality Review

1   final point.

2       I think I'm going to ask for

3   relief to continue the deposition

4   until we get back together again.

5   Ten till 5:00.

6       MR. FINKELSTEIN:  Okay.

7       MR. FARRELL:  With your

8   permission, we'll adjourn until

9   Day 3.

10      MR. FINKELSTEIN:  Well, we

11  will certainly adjourn.  I

12  understand the parties are going

13  to demand a Day 3.

14      THE VIDEOGRAPHER:  4:50.  We

15  are off the video record.

16      (Excused.)

17      (Deposition adjourned at

18  approximately 4:50 p.m.)

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

           It was requested before
8   completion of the deposition that the
    witness, THOMAS PREVOZNIK, have the
9   opportunity to read and sign the
    deposition transcript.

10

11

12   _Michelle L Gray_____
    MICHELLE L. GRAY,
13   A Registered Professional
    Reporter, Certified Shorthand
14   Reporter, Certified Realtime
    Reporter and Notary Public
15   Dated:  April 22, 2019

16

17

18          (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1              INSTRUCTIONS TO WITNESS

2

3                   Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                   After doing so, please sign

9    the errata sheet and date it.

10                   You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                   It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  -   -   -   -   -   -

                     E R R A T A

 2                  -   -   -   -   -   -

 3

 4     PAGE   LINE   CHANGE

 5     _____  _____  _____

 6        REASON:    _____

 7     _____  _____  _____

 8        REASON:    _____

 9     _____  _____  _____

10        REASON:    _____

11     _____  _____  _____

12        REASON:    _____

13     _____  _____  _____

14        REASON:    _____

15     _____  _____  _____

16        REASON:    _____

17     _____  _____  _____

18        REASON:    _____

19     _____  _____  _____

20        REASON:    _____

21     _____  _____  _____

22        REASON:    _____

23     _____  _____  _____

24        REASON:    _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2           ACKNOWLEDGMENT OF DEPONENT

3

4           I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 410 - 782, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    THOMAS PREVOZNIK                    DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____    _____

 4      _____  _____    _____

 5      _____  _____    _____

 6      _____  _____    _____

 7      _____  _____    _____

 8      _____  _____    _____

 9      _____  _____    _____

10      _____  _____    _____

11      _____  _____    _____

12      _____  _____    _____

13      _____  _____    _____

14      _____  _____    _____

15      _____  _____    _____

16      _____  _____    _____

17      _____  _____    _____

18      _____  _____    _____

19      _____  _____    _____

20      _____  _____    _____

21      _____  _____    _____

22      _____  _____    _____

23      _____  _____    _____

24      _____  _____    _____
```