```
 1                  UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3
      IN RE: NATIONAL         )
 4    PRESCRIPTION            )   MDL No. 2804
      OPIATE LITIGATION       )
 5    _____ )   Case No.
                              )   1:17-MD-2804
 6                            )
      THIS DOCUMENT RELATES   )   Hon. Dan A.
 7    TO ALL CASES            )   Polster
 8
                     FRIDAY, MAY 17, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                        - - -
12           Videotaped deposition of Thomas
13    Prevoznik, Volume III, held at the offices of
14    WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
15    NW, Washington, DC, commencing at 8:10 a.m.,
16    on the above date, before Carrie A. Campbell,
17    Registered Diplomate Reporter and Certified
18    Realtime Reporter.
19
20
21                        - - -
22
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
 3       GREENE, KETCHUM, FARRELL, BAILEY
         & TWEEL LLP
 4       BY:  PAUL T. FARRELL, JR.
              paul@greeneketchum.com
 5       419 Eleventh Street
         Huntington, West Virginia 25701
 6       (314) 525-9115
 7
 8       MOTLEY RICE LLC
         BY:  LINDA SINGER
 9            lsinger@motleyrice.com
              SARA D. AGUINIGA
10            saguiniga@motleyrice.com
              AMANDA UNTERREINER
11            aunterreiner@motleyrice.com
              (VIA REALTIME STREAM)
12       401 Ninth Street NW, Suite 1001
         Washington, DC 20004
13       (202) 232-5504
14
15       MCHUGH FULLER LAW GROUP
         BY:  MICHAEL J. FULLER, JR.
16            mike@mchughfuller.com
         97 Elias Whiddon Road
17       Hattiesburg, Mississippi 39402
         (601) 261-2220
18
19
         THE DUGAN LAW FIRM
20       BY:  BONNIE A. KENDRICK
              bonnie@dugan-lawfirm.com
21       One Canal Place
         365 Canal Place, Suite 1000
22       New Orleans, Louisiana 70130
         (504) 648-0180
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        LEVIN PAPANTONIO THOMAS MITCHELL
          RAFFERTY PROCTOR, P.A.
 2        BY:  PAGE POERSCHKE
               ppoerschke@levinlaw.com
 3             (VIA REALTIME STREAM)
          316 South Baylen Street
 4        Pensacola, Florida 32502
          (850) 435-7000
 5        Counsel for Plaintiffs
 6
 7        NAPOLI SHKOLNIK, PLLC
          BY:  HUNTER J. SHKOLNIK
 8             hunter@napolilaw.com
               (VIA TELECONFERENCE)
 9        360 Lexington Avenue, 11th Floor
          New York, New York 10017
10        (212) 397-1000
          Counsel for Cuyahoga County
11
12
          BRANSTETTER STRANCH & JENNINGS, PLLC
13        BY:  JOE P. LENISKI, JR.
               joeyl@bsjfirm.com
14        223 Rosa L. Parks Avenue, Suite 200
          Nashville, Tennessee 37203
15        (615) 254-8801
          Counsel for the Tennessee Action
16
17
          US DEPARTMENT OF JUSTICE
18        BY:  DAVID FINKELSTEIN
               david.m.finkelstein@usdoj.gov
19             NATALIE A. WAITES
               natalie.a.waites@usdoj.gov
20        175 N Street, NE, Room 10-2222
          Washington, DC 20002
21        (202) 616-2964
22
          and
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        US DEPARTMENT OF JUSTICE
          BY:  JAMES R. BENNETT, II
 2            james.bennett4@usdoj.gov
          United States Courthouse
 3        801 West Superior Avenue, Suite 400
          Cleveland, Ohio 44113
 4        (216) 622-3988
 5
          and
 6
 7        US DEPARTMENT OF JUSTICE
          BY:  MARIAMA C. SPEARS
 8            mariama.c.spears@usdoj.gov
          8701 Morrisette Drive
 9        Springfield, Virginia 22152
          (202) 598-6204
10        Representing the US DOJ and the Witness
11
12        WILLIAMS & CONNOLLY LLP
          BY:  ENU MAINIGI
13            emainigi@wc.com
              COLLEEN MCNAMARA
14            cmcnamara@wc.com
              BRAD MASTERS
15            bmasters@wc.com
          725 Twelfth Street, N.W.
16        Washington, DC 20005
          (202) 434-5331
17        Counsel for Cardinal Health, Inc.
18
19        COVINGTON & BURLING LLP
          BY:  CHRISTOPHER K. EPPICH
20            ceppich@cov.com
          1999 Avenue of the Stars
21        Los Angeles, California 90067
          (424) 332-4764
22
23        and
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        COVINGTON & BURLING LLP
          BY:   ANDREW STANNER
 2              astanner@cov.com
                KEVIN M. KELLY
 3              kkelly@cov.com
          850 Tenth Street, NW
 4        Washington, DC 20001-4956
          (202) 662-6000
 5        Counsel for McKesson Corporation
 6
 7        REED SMITH LLP
          BY:   ROBERT A. NICHOLAS
 8              rnicholas@reedsmith.com
                JOSEPH J. MAHADY
 9              jmahady@reedsmith.com
                SHANNON MCCLURE
10              smcclure@reedsmith.com
                (VIA REALTIME STREAM)
11              ABIGAIL PIERCE
                abigail.pierce@reedsmith.com
12              (VIA REALTIME STREAM)
                ANNE E. ROLLINS
13              arollins@reedsmith.com
                (VIA REALTIME STREAM)
14        Three Logan Square
          1717 Arch Street, Suite 3100
15        Philadelphia, Pennsylvania 19103
          (215) 851-8100
16        Counsel for AmerisourceBergen
17
18
          BARTLIT BECK LLP
19        BY:   LESTER C. HOUTZ
                lester.houtz@bartlit-beck.com
20        1801 Wewatta Street, Suite 1200
          Denver, Colorado 80202
21        (303) 592-3100
22
          and
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
        BARTLIT BECK LLP
 2      BY:  KATHERINE SWIFT
             kswift@bartlit-beck.com
 3           (VIA REALTIME STREAM)
        54 West Hubbard Street, Suite 300
 4      Chicago, Illinois 60654
        (312) 494-4400
 5      Counsel for Walgreens
 6
 7      JONES DAY
        BY:  TARA A. FUMERTON
 8           tfumerton@jonesday.com
             PATRICK J. BEISELL
 9           pbeisell@jonesday.com
             (VIA REALTIME STREAM)
10      77 West Wacker
        Chicago, Illinois 60601-1692
11      (312) 782-3939
        Counsel for Walmart
12
13
        ZUCKERMAN SPAEDER LLP
14      BY:  ANTHONY M. RUIZ
             aruiz@zuckerman.com
15      1800 M Street NW, Suite 1000
        Washington, DC  20036-5807
16      (202) 778-1800
        Counsel for CVS Indiana, LLC, and
17      CVS RX Services, Inc.
18
19      ROPES & GRAY LLP
        BY:  ANDREW O'CONNOR
20           andrew.o'connor@ropesgray.com
             JOSHUA E. GOLDSTEIN
21           joshua.goldstein@ropesgray.com
        800 Boylston Street
22      Boston, Massachusetts 02199-3600
        (617) 951-7000
23      Counsel for Mallinckrodt
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MARCUS & SHAPIRA LLP
            BY:  JOSHUA A. KOBRIN
 2               kobrin@Marcus-Shapira.com
            301 Grant Street, 35th Floor
 3          Pittsburgh, Pennsylvania 15219-6401
            (412) 338-4690
 4          Counsel for HBC
 5
 6          DECHERT LLP
            BY:  MELANIE MACKAY
 7               melanie.mackay@dechert.com
            35 West Wacker Drive, Suite 3400
 8          Chicago, Illinois  60601
            (312) 646-5800
 9          Counsel for Purdue Pharma
10
11          BARNES & THORNBURG LLP
            BY:  WILLIAM E. PADGETT
12               william.padgett@btlaw.com
            11 South Meridian Street
13          Indianapolis, Indiana  46204
            (317) 236-1313
14          Counsel for HD Smith
15
16          MORGAN, LEWIS & BOCKIUS LLP
            BY:  JOHN P. LAVELLE, JR.
17               john.lavelle@morganlewis.com
            1701 Market Street
18          Philadelphia, Pennsylvania 19103-2921
            (215) 963-5000
19          Counsel for Rite Aid
20
21          KIRKLAND & ELLIS, LLP
            BY:  KAITLYN COVERSTONE
22               kaitlyn.coverstone@kirkland.com
            300 North LaSalle Street
23          Chicago, Illinois 60654
            (312) 862-7184
24          Counsel for Allergan Finance, LLC
25
```

```
 1        FOLEY & LARDNER, LLP
          BY:  KRISTINA J. MATIC
 2             kmatic@foley.com
          777 East Wisconsin Avenue
 3        Milwaukee, Wisconsin 53202
          (414) 297-5913
 4        Counsel for Actavis Laboratories
          UT, Inc., Actavis Pharma, Inc.,
 5        ANDA, Inc., and Actavis, Inc.,
          (N/k/a Allergan Finance, LLC, Watson
 6        Laboratories, Inc.
 7
 8        LOCKE LORD LLP
          BY:  MADELEINE E. BRUNNER
 9             maddie.brunner@lockelord.com
               (VIA TELECONFERENCE)
10             SARAH LANCASTER
               (VIA REALTIME STREAM)
11        2200 Ross Avenue, Suite 2800
          Dallas, Texas 75201
12        (214) 740-8445
          Counsel for Henry Schein, Inc., and
13        Henry Schein Medical Systems, Inc.
14
15        FOX ROTHSCHILD LLP
          BY:  STEPHAN CORNELL
16             Scornell@foxrothschild.com
               (VIA TELECONFERENCE)
17        2700 Kelly Road, Suite 300
          Warrington, Pennsylvania  18976-3624
18        (215) 918-3615
          Counsel for Prescription Supply, Inc.
19
20
          O'MELVENY & MYERS LLP
21        BY:  RYAN SNYDER
               rsnyder@omm.com
22             (VIA TELECONFERENCE)
          1999 Avenue of the Stars, 8th Floor
23        Los Angeles, California 90067
          (213) 430-6326
24        Counsel for Janssen and Johnson &
          Johnson
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ALSO PRESENT:
 2          SPECIAL MASTER DAVID R. COHEN
            david@specialmaster.law
 3          24400 Chagrin Boulevard, Suite 300
            Cleveland, Ohio 44122
 4          (216) 831-0001
 5
            JENNA N. FORSTER, paralegal, Motley
 6          Rice
 7          KAITLYN EEKHOFF, paralegal, Motley Rice
            (VIA REALTIME STREAM)
 8
 9

      VIDEOGRAPHER:
10          DAN LAWLOR,
            Golkow Litigation Services
11
12

      TRIAL TECHNICIAN:
13          JAMES BELL,
            Golkow Litigation Services
14
                        - - -
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                           INDEX
 2                                         PAGE
 3    APPEARANCES................................. 784
 4    EXAMINATIONS
 5      BY MR. FARRELL............................ 801
 6      BY MS. SINGER............................. 861
 7      BY MR. MAHADY.............................1060
 8      BY MS. FUMERTON...........................1169
 9      BY MR. O'CONNOR...........................1187
10      BY MR. EPPICH.............................1201
11      BY MS. MAINIGI............................1203
12
13                         EXHIBITS
14      No.         Description                  Page
15   Prevoznik P17  Seminar Report Controlled     800
                    Substances Manufacturers and
16                  Wholesalers Seminar, San
                    Antonio, Texas, April 7-9,
17                  1987,
                    US-DEA-00025656 -
18                  US-DEA-00025659
19   Prevoznik P18  NWDA Suspicious Order         806
                    Monitoring Systems,
20                  US-DEA-00026139 -
                    US-DEA-00026150
21
     Prevoznik P19  December 27, 1988 letter      811
22                  from Ronald W. Buzzeo to
                    Walgreen Company,
23                  US-DEA-00025683
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

| 1 | Prevoznik P20 | December 8, 1993 letter, Excessive Purchase Reports, Phillip E. Jordan and Gene R. Haislip, US-DEA-00026154 - US-DEA-00026155 | 816 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | Prevoznik P21 | Federal Register, Volume 62, Number 233, Wednesday, November 19, 1997, Notices, US-DEA-00025302 | 828 |
| 6 | | | |
| 7 | Prevoznik Defendant 22 | July 23, 1998 letter from Patricia M. Good to Bergen Brunswig Corporation, US-DEA-00025671 | 1070 |
| 8 | | | |
| 9 | | | |
| 10 | Prevoznik P22 | August 16, 2005 DEA Memorandum on Internet Presentation with AmerisourceBergen on August 10, 2005, US-DEA-00000147 - US-DEA-00000164 | 834 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | Prevoznik Defendant 23 | Bergen Brunswig Corporation September 30, 1996 letter to Mr. G. Thomas Gitchel, ABDCMDL00269355 - ABDCMDL00269358 | 1079 |
| 15 | | | |
| 16 | | | |
| 17 | Prevoznik P23 | August 23, 2005 DEA Memorandum on Meeting with Cardinal Health, Inc., Concerning Internet Pharmacies, US-DEA-00000352 - US-DEA-00000366 | 834 |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | Prevoznik P24 | December 6, 2005 DEA Memorandum on Conference Call with Mr. John Gilbert, US-DEA-00000369 - US-DEA-00000370 | 834 |
| 22 | | | |
| 23 | | | |
| 24 | Prevoznik Defendant 24 | Not Marked | |
| 25 | | | |

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Prevoznik<br>Defendant 25 | December 30, 1997 letter<br>from Bergen Brunswig<br>Corporation to Mr. G. Thomas | 1122 |
| 2 | | Gitchel, | |
| 3 | | ABDCMDL00269350 -<br>ABDCMDL00269351 | |
| 4 | | | |
| 5 | Prevoznik P25 | January 23, 2006 DEA<br>Memorandum on Meeting<br>Between Office of Diversion | 834 |
| 6 | | Control (OD) and McKesson<br>Corp. On January 3, 2006, | |
| 7 | | US-DEA-00000371 -<br>US-DEA-00000373 | |
| 8 | | | |
| 9 | Prevoznik<br>Defendant 26 | October 29, 1996 Letter to<br>Bergen Brunswig Corporation<br>from Mr. G. Thomas Gitchel, | 1102 |
| 10 | | US-DEA-00025672 -<br>US-DEA-00025673 | |
| 11 | | | |
| 12 | Prevoznik P26 | January 14, 2008 letter to<br>Larry Cote from Jodi<br>Avergun, | 850 |
| 13 | | CAH_MDL2804_01376788 -<br>CAH_MDL2804_01376809 | |
| 14 | | | |
| 15 | Prevoznik<br>Defendant 27 | January 14, 2004 letter from<br>John R. McCarty to Mr. Steve<br>Mays, | 1140 |
| 16 | | ABDCMDL00315827 | |
| 17 | Prevoznik P27 | January 23, 2008 letter from<br>Ronald W. Buzzeo to Jodi | 856 |
| 18 | | Avergun,<br>CAH_MDL2804_03309960 - | |
| 19 | | CAH_MDL2804_03309971 | |
| 20 | Prevoznik<br>Defendant 28 | AmerisourceBergen Memorandum<br>dated October 25, 2004, | 1144 |
| 21 | | Subject ABC Awarded DEA<br>Certificate of Appreciation, | |
| 22 | | ABDCMDL00315829 -<br>ABDCMDL00315861 | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Prevoznik Defendant 29 | US DOJ DEA Diversion Control Pharmaceutical Industry Conference, September 11 & 12, 2007 - Houston, Texas printout | 1158 |
| 2 | | | |
| 3 | | | |
| 4 | Prevoznik P29 | NWDA Suspicious Order Monitoring System timeline | 862 |
| 5 | | | |
| 6 | Prevoznik Defendant 30 | DEA Pharmaceutical Industry Conference, Wholesale Distribution, Diversion Control Program, September 11, 2007, ABDCMDL00037184 - ABDCMDL00037205 | 1160 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | Prevoznik P30 P31 and P32 | Not Marked | |
| 11 | Prevoznik P33 | DEA Diversion Investigators Manual, CAH_MDL_PRIORPROD_DEA07_ 01176247 - CAH_MDL_PRIORPROD_DEA07_ 01176558 | 866 |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | Prevoznik P34 | 5126 Requirement to Report Suspicious Orders, 96-2 Diversion Investigators Manual 04/16/96 | 871 |
| 16 | | | |
| 17 | Prevoznik P35 | Controlled Substances Manual, National Wholesale Druggists' Association, HDA_MDL_000219360 - HDA_MDL_000219632 | 874 |
| 18 | | | |
| 19 | | | |
| 20 | Prevoznik P36 | NWDA Develops DEA Compliance Institute to Reduce Industry Exposure to Fines | 875 |
| 21 | | | |
| 22 | Prevoznik P37 | DEA Compliance Manual, Cardinal Health, CAH_MDL_PRIORPRO_DEA07_ 01178834 - CAH_MDL_PRIORPRO_DEA07_ 01179179 | 885 |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Prevoznik P38 | Transcript of Videotaped Deposition of Thomas Prevoznik, April 17, 2019 | 893 |
| 2 | | | |
| 3 | Prevoznik P39 | Industry Compliance Guidelines, HDMA Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, CAH_MDL2804_00988458 - CAH_MDL2804_00988472 | 899 |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | Prevoznik P40 | Draft DEA Comments from the 6-04-08 Meeting on Suspicious Orders, CAH_MDL2804_03234535 - CAH_MDL2804_03234540 | 923 |
| 9 | | | |
| 10 | | | |
| 11 | Prevoznik P41 | US DEA September 27, 2006 letter from Joseph T. Rannazzisi, MNK-Ti_0000421086 - MNK-Ti_0000421089 | 935 |
| 12 | | | |
| 13 | | | |
| 14 | Prevoznik P42 | "American Pain: The largest U.S. Pill Mill's Rise and Fall," Felix Gillette, June 6, 2012 | 948 |
| 15 | | | |
| 16 | Prevoznik P43 | Re: Report on House Energy & Commerce Subcommittee on DEA and FDA Transparency, MCKMDL0066143 - MCKMDL0066145 | 951 |
| 17 | | | |
| 18 | | | |
| 19 | Prevoznik P44 | Summary of DEA-HDMA Meeting (Dec. 19, 201) By the Healthcare Distribution Management Association, Confidential, ABDCMDL00139028 - ABDCMDL00139031 | 955 |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Prevoznik P45 | Draft Options for Controlled Substance Regulatory and Related Activity for Review Purpose Only - Not for External Circulation, CAH_MDL2804_01530082 - CAH_MDL2804_01530084 | 958 |
| 5 | Prevoznik P46 | E&C, Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia, Prepared by the Energy and Commerce Committee, Majority Staff, PPLP0300001799742 | 963 |
| 9 | Prevoznik P47 | DEA/OD 11th Pharmaceutical Industry Conference, Risk Management of Pharmaceutical Controlled Substances, Tuesday, September 16, New Orleans, Louisiana, PPLP0300001799742 | 981 |
| 13 | Prevoznik P48 | Office of Chief Counsel, DEA PowerPoint, CAH_MDL2804_00889528 - CAH_MDL2804_00889540 | 986 |
| 16 | Prevoznik P49 | 15th Annual Controlled Substance, PDMA and State Conference, It's What You Know and Who You Know, D. Linden Barber, April 19, 2012, Anda_Opioids_MDL_0000476052- Anda_Opioids_MDL_0000476080 | 993 |
| 20 | Prevoznik P50 | Slide on Dr. Syed Jawed Akhtar-Zaidi - Solon, OH | 1000 |
| 22 | Prevoznik P51 | Slide on Dr. Adolph Harper - Akron, OH | 1002 |

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Prevoznik P52   United States of America vs.   1002
                      Adolph Harper, Jr.,
 2                    Government's Sentencing
                      Memorandum,
 3                    PLTF_2804_000013676 -
                      PLTF_2804_000013694
 4
      Prevoznik P53   Photo of monkeys, hear no      1008
 5                    evil, see no evil, speak no
                      evil
 6
      Prevoznik P54   DEA Update Notes, Mark         1012
 7                    Caverly and James Crawford,
                      MNK-T1_0008504654 -
 8                    MNK-T1_0008504657
 9    Prevoznik P55   Executive Summary Regarding    1015
                      the HDMA document,
10                    MCKMDL00561303 -
                      MCKMDL00561306
11
      Prevoznik P56   DEA Enforcement Actions        1022
12                    Against Distributors and
                      Pharmacies timeline
13
      Prevoznik P57   US DOJ January 30, 2018        1040
14                    letter to Honorable Dan A.
                      Polster
15
      Prevoznik P58   Declaration of Michael L.      1049
16                    Arpaio,
                      DEA_Rannazzisi-00006060 -
17                    DEA_Rannazzisi-00006061
18    Prevoznik P59   Statement of Demetra Ashley    1055
                      before the Judiciary
19                    Committee, United States
                      Senate, December 12, 2017
20
      Prevoznik P60   US DEA PowerPoint              1058
21                    "Prescription Opioids to
                      Heroin:  A Natural
22                    Progression," June 14, 2014,
                      DEA_Rannazzisi-00003482
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2     CERTIFICATE................................1265

 3     ACKNOWLEDGMENT OF DEPONENT.................. 1267

 4     ERRATA....................................1268

 5     LAWYER'S NOTES.............................1269

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    VIDEOGRAPHER:  We are now on

 2         the record.  My name is Dan Lawlor.

 3         I'm a videographer with Golkow

 4         Litigation Services.

 5                    Today's date is May 17, 2019,

 6         and the time is 8:10 a.m.

 7                    This video deposition is being

 8         held in Washington, DC, in the matter

 9         of National Prescription Opiate

10         Litigation, MDL Number 2804.

11                    The deponent is Thomas

12         Prevoznik.

13                    Counsel will be noted on the

14         stenographic record.

15                    The court reporter is Carrie

16         Campbell and will now swear in the

17         witness.

18

19                    THOMAS PREVOZNIK,

20     of lawful age, having been first duly sworn

21     to tell the truth, the whole truth and

22     nothing but the truth, deposes and says on

23     behalf of the Plaintiffs, as follows:

24                       (Prevoznik Plaintiff Exhibit

25         P17 marked for identification.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              EXAMINATION (continued)

 2    QUESTIONS BY MR. FARRELL:

 3         Q.     Good morning.

 4         A.     Good morning.

 5         Q.     Welcome back to day three of

 6    your deposition, Mr. Prevoznik.

 7              I'll remind you or let me ask

 8    you to recall that today you'll be testifying

 9    on behalf of the United States Drug

10    Enforcement Administration, the DEA, on

11    subject matters that have been requested in

12    this litigation.

13              Continuing the line of

14    discussion, I'm going to -- I have marked,

15    premarked, and am showing you Plaintiff's

16    Exhibit 17, and the first thing I'd like to

17    do is I'd like to direct your attention to

18    the bottom right-hand corner.

19              And you see the numbers

20    US-DEA-00025656?

21         A.     Yes, I do.

22         Q.     I'll represent to you that's a

23    Bate stamp number provided by the Department

24    of Justice.  And what I wanted to do was to

25    lay a little foundation on the documents that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    bear such a Bate stamp.

 2              The DEA has produced through

 3    the United States Department of Justice more

 4    than 6,000 documents in this litigation

 5    spanning more than 26,000 pages.

 6              Do you acknowledge as the

 7    representative of the DEA that all such

 8    documents bearing the US DEA Bates stamp are,

 9    in fact, true and accurate photocopies of

10    documents in the possession, custody and

11    control of the DEA?

12        A.    Yes.

13              Sorry.

14              MR. FINKELSTEIN:  Tom.  Scope.

15              You can answer.

16              MR. EPPICH:  Objection.

17        Foundation.

18              THE WITNESS:  Yes.

19    QUESTIONS BY MR. FARRELL:

20        Q.    And the DEA is, in fact, the

21    custodian of these documents?

22              MR. FINKELSTEIN:  Scope.

23              MR. O'CONNOR:  Objection.

24        Foundation.

25              THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     QUESTIONS BY MR. FARRELL:

2          Q.     So as the DEA, you acknowledge

3     that the documents produced by the Department

4     of Justice bearing this Bates stamp number

5     are documents that come from the DEA which

6     are held in the usual course of the regularly

7     conducted activity of the DEA?

8               MR. FINKELSTEIN:  Scope.

9               MR. EPPICH:  Objection.

10        Foundation.

11              MR. O'CONNOR:  Objection.

12              MR. FINKELSTEIN:  You can

13        answer.

14              THE WITNESS:  Yes.

15    QUESTIONS BY MR. FARRELL:

16         Q.     All right.  Moving to the first

17    document, P17.

18              Do you recognize this document?

19    And this isn't Jeopardy.  This document

20    actually was included in your reliance

21    materials.

22              But could you tell the jury

23    what this document is?

24         A.     This document is a report based

25    off of a meeting, a conference that was held
```

1    for manufacturers and wholesalers that we

2    sponsor.

3         Q.     And what is the date?

4         A.     April 7th through the 9th,

5    1987.

6         Q.     I'm going to have you flip to

7    the very back page of the four-page document

8    that was provided by the DEA, and you'll see

9    there that there is a provision that talks

10   about excessive order monitoring program.

11             Is this a document that was

12   prepared by the DEA?

13             MR. EPPICH:  Objection.

14        Foundation.

15             THE WITNESS:  Yes.

16   QUESTIONS BY MR. FARRELL:

17        Q.     So when you're reading this on

18   behalf of the DEA, the very first sentence

19   referenced the fact that the program was

20   chaired by Ronald Buzzeo.

21             Does the DEA know Ronald

22   Buzzeo?

23        A.     Yes.

24        Q.     Who is Ronald Buzzeo?

25        A.     He was a senior manager within

```
 1    DEA back at this time.  I don't know what his

 2    specific title was back then.

 3         Q.    You'll see that in the

 4    provision on the demonstrative that I've

 5    highlighted, the last sentence of the first

 6    paragraph, would you please read that into

 7    the record?

 8              MR. FINKELSTEIN:  Starting with

 9         "another area" or somewhere else?

10              MR. FARRELL:  No, right above

11         it.  The last sentence of that first

12         paragraph.

13              THE WITNESS:  The NWA?

14    QUESTIONS BY MR. FARRELL:

15         Q.    Yes, sir.

16         A.    "The NWA system, for example,

17    provide an excellent look-back, or trend

18    system, but the ability to identify one-time

19    suspicious orders should not be overlooked as

20    an element of a program."

21         Q.    Is that consistent with the

22    guidance the DEA has provided manufacturers

23    and distributors regarding their obligations

24    under the Controlled Substances Act and the

25    regulations promulgated by the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. EPPICH:  Object to form.

 2                MS. MAINIGI:  Objection.

 3                THE WITNESS:  Yes.

 4      QUESTIONS BY MR. FARRELL:

 5           Q.    Okay.  So when we're talking

 6      about the NWDA system, we have previously put

 7      into the record the NWDA, but recently we've

 8      gotten another document, another version of

 9      the document, and I'm going to have it marked

10      as P18.

11                (Prevoznik Plaintiff Exhibit

12           P18 marked for identification.)

13      QUESTIONS BY MR. FARRELL:

14           Q.    So this is identical to the

15      document that has been circulated in

16      litigation before, but as you recall from the

17      last time we met, there were two pages at the

18      back of this document that were missing.

19                So the first thing I want to do

20      is note that -- you see at the bottom

21      right-hand corner there is a US DEA Bates

22      stamp of 00026139?

23           A.    Correct.

24           Q.    And what I'd like to do is I'd

25      like to address your attention to what is
```

```
 1     page 7 of this policy.

 2               And again, building on the

 3     testimony from the previous two days without

 4     repeating it, I'm going to show you the

 5     bottom right-hand corner is US-DEA-00026146,

 6     and I'd ask you to read Roman Numeral IX into

 7     the record.

 8          A.     "Single suspicious orders.

 9     Single orders of unusual size or deviation

10     must be reported immediately.  The submission

11     of a monthly printout of after-the-fact sales

12     will not relieve a registrant from the

13     responsibility of reporting these single

14     excessive or suspicious orders.  DEA has

15     interpreted 'orders' to mean prior to

16     shipment."

17          Q.     So my question to you is, is

18     this consistent with the guidance provided by

19     the DEA to wholesalers and distributors?

20               MR. EPPICH:  Objection.

21          Foundation.

22               MS. MAINIGI:  Objection.

23          Foundation.

24               THE WITNESS:  Yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Is this consistent with the

 3    guidance provided by Ronald Buzzeo at the

 4    San Antonio conference hosted by the DEA?

 5              MR. EPPICH:  Objection.

 6         Foundation.  Calls for speculation.

 7              MR. FINKELSTEIN:  Scope.

 8              You can answer, if you know.

 9              MS. MAINIGI:  Scope.

10              THE WITNESS:  Looking at the

11    two, yes.

12    QUESTIONS BY MR. FARRELL:

13         Q.    Now, I'm going to have you turn

14    to the NWDA policy and the comments that come

15    from the DEA that were previously discussed,

16    but I'm going to reference the Bates stamp

17    numbers in the bottom right-hand corner,

18    including US-DEA-00026148.  It's dated

19    April 24, 1984.

20              Have you found it?

21         A.    Yes.

22         Q.    Okay.  And again, we've already

23    established the foundation for this, but

24    we'll do it again.

25              Do you recognize this document?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Object to the

 2          form.

 3                    THE WITNESS:  Yes.

 4     QUESTIONS BY MR. FARRELL:

 5          Q.    Okay.  As the DEA, can you tell

 6     me on page 2 who the author of this document

 7     is?

 8          A.    Thomas Gitchel.

 9          Q.    And who is Thomas Gitchel?

10          A.    He was -- at this point he was

11     the acting chief of diversion operations.

12          Q.    Of the DEA?

13          A.    Of the DEA.

14          Q.    Okay.  And I've highlighted

15     down -- a particular provision for emphasis

16     to build on the previous two days' testimony.

17     Beginning with "As previously discussed,"

18     could you read that provision into the

19     record?

20          A.    "An after-the-fact computer

21     printout of sales data does not relieve a

22     registrant of its responsibility to report

23     excessive or suspicious orders when

24     discovered."

25          Q.    Is this consistent with the
```

1    guidance the DEA has provided to the

2    wholesalers and manufacturers of prescription

3    opioids?

4                    MR. EPPICH:  Object to form.

5                    THE WITNESS:  Yes.

6    QUESTIONS BY MR. FARRELL:

7         Q.    I'm going to show you -- which

8    is the last page of this document.  And

9    you'll see in the bottom right-hand corner is

10   US-DEA-00026150.  It has the stamp of May 16,

11   1984.

12                   And I would ask do you

13   recognize this document?

14        A.    Yes.

15        Q.    And what is it?

16        A.    It's a letter from Mr. Gitchel,

17   again, from DEA to the National Wholesales

18   Druggists' Association.

19        Q.    And again, I've highlighted for

20   your convenience the last sentence of the

21   first paragraph beginning with the word

22   "however," and I'd ask for you to read it

23   into the record.

24        A.    "However, I want to make it

25   clear that the submission of a monthly

```
 1    printout of after-the-fact sales will not

 2    relieve a registrant from the responsibility

 3    of reporting excessive or suspicious orders.

 4    DEA has interpreted 'orders' to mean prior to

 5    shipment."

 6         Q.    Is this consistent with the

 7    guidance the DEA has provided to wholesalers

 8    and manufacturers of prescription opioids?

 9              MS. MAINIGI:  Objection.

10              MR. EPPICH:  Objection.

11              THE WITNESS:  Yes.

12              (Prevoznik Plaintiff Exhibit

13         P19 marked for identification.)

14    QUESTIONS BY MR. FARRELL:

15         Q.    The next document I'm going to

16    have marked as Plaintiff's Exhibit 19, it

17    bears Bate stamp US-DEA-00025683.  I'll give

18    you a second to take a look at it, but I'm

19    assuming you're familiar with this document.

20              Do you see the bottom

21    right-hand corner, it bears the Bates stamp

22    US DEA?

23         A.    Yes.

24         Q.    Do you recognize this document?

25         A.    Yes.
```

```
 1          Q.      What is it?

 2          A.      It's a letter from Mr. Buzzeo,

 3    who was at that point the deputy director of

 4    diversion control, to Walgreens.

 5          Q.      And what's the date?

 6          A.      December 27, 1988.

 7          Q.      Okay.  Would you read the first

 8    sentence that's emphasized on your monitor?

 9          A.       "References made to our

10    November 4, 1988 meeting regarding a proposed

11    system of detecting and reporting excessive

12    orders."

13          Q.      All right.  If you look down at

14    the -- you can read the rest -- the first

15    paragraph, but I'm going to direct your

16    attention to the beginning of the second

17    paragraph where it states, "The Drug

18    Enforcement Administration supports the

19    effort by the Walgreen Company to provide a

20    uniform reporting procedure for its

21    warehouses."

22                  Do you see that?

23          A.      Yes.

24          Q.      In fact, is this consistent

25    that the DEA has encouraged wholesalers and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributors of prescription opioids to adopt

 2    uniform reporting procedures?

 3                 MR. EPPICH:  Object to form.

 4         Foundation.

 5                 THE WITNESS:  Yes.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    All right.  What I'm going to

 8    emphasize is the very last two sentences that

 9    begin with "the submission."

10                 Do you see that provision?

11         A.    Yes.

12         Q.    And I'd ask you to read that

13    into the record.

14         A.    "The submission of a monthly

15    printout of after-the-fact sales does not

16    relieve the registrant of the responsibility

17    of reporting excessive or suspicious orders.

18    These regulations require that a registrant

19    maintain a system to detect excessive orders

20    rather than sales of controlled substances."

21         Q.    Is this statement consistent

22    with the guidance provided by the DEA to

23    wholesale distributors and manufacturers of

24    prescription opioids?

25                 MR. EPPICH:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Foundation.

 2                 THE WITNESS:  Yes.

 3      QUESTIONS BY MR. FARRELL:

 4           Q.    Now, not only being consistent,

 5      this, in fact, is the actual statement

 6      provided by the DEA to Walgreens, agreed?

 7                 MR. EPPICH:  Object to form.

 8           Foundation.

 9                 THE WITNESS:  Yes.

10      QUESTIONS BY MR. FARRELL:

11           Q.    Would you agree with me that

12      since at least 1988, Walgreens has been on

13      notice from the DEA that if they rely upon

14      after-the-fact sales to comply with the

15      Controlled Substances Act and the regulations

16      promulgated by the DEA, that they may not be

17      in compliance with federal law?

18                 MR. EPPICH:  Object to form.

19           Foundation.

20                 THE WITNESS:  Yes.

21      QUESTIONS BY MR. FARRELL:

22           Q.    If any of the wholesale

23      distributors or manufacturers of prescription

24      opioids rely upon after-the-fact reporting of

25      excessive orders to -- as the system they
```

```
 1    designed under 1301.74(b), is that sufficient

 2    to comply with federal law?

 3                    MR. EPPICH:  Object to form.

 4        Foundation.

 5                    MR. MAHADY:  Objection.  Vague.

 6                    THE WITNESS:  Could you please

 7        repeat it?

 8    QUESTIONS BY MR. FARRELL:

 9        Q.    If any distributor of

10    prescription opioids relies upon

11    after-the-fact sales reporting as the full

12    scope of its compliance with 1301.74(b), does

13    the DEA believe that it's sufficient to

14    satisfy the obligations under federal law?

15                    MS. MAINIGI:  Objection.

16                    MR. EPPICH:  Object to form.

17        Foundation.  Vague.

18                    THE WITNESS:  No.

19    QUESTIONS BY MR. FARRELL:

20        Q.    If any expert witness in this

21    litigation argues that after-the-fact sales

22    are sufficient to comply with federal

23    regulations, is the expert witness right or

24    wrong?

25                    MS. MAINIGI:  Objection to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           form.  Scope.

 2                   MR. EPPICH:  Objection.

 3                   THE WITNESS:  They would be

 4           wrong.

 5                   (Prevoznik Plaintiff's Exhibit

 6           P20 marked for identification.)

 7      QUESTIONS BY MR. FARRELL:

 8           Q.    The next document I'm going to

 9      have marked is P20.

10                   And I'll direct your attention

11      to the bottom right-hand corner with the

12      Bates stamp US-DEA-00026154.  It has the

13      stamp of December 8, 1993, and I'm going to

14      ask you if you recognize this document.

15           A.    Yes.

16           Q.    What is this document?

17           A.    This is an internal document

18      from Gene Haislip, our director of Office and

19      Diversion Control DEA, to the SAC, or special

20      agent in charge, of our Dallas field

21      division.

22           Q.    Okay.  Is this the type of

23      document that the DEA keeps in the course of

24      its regularly conducted activity?

25           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    Okay.  Was this record made at
2    or near the time of someone with knowledge
3    about the conversations therein?
4               MR. FINKELSTEIN:  Scope.
5               MR. EPPICH:  Objection.
6               MS. MAINIGI:  Objection.
7         Scope.  Form.  Foundation.
8               MR. FINKELSTEIN:  Scope.
9               You can answer.
10              THE WITNESS:  Yes.
11   QUESTIONS BY MR. FARRELL:
12        Q.    It appears, to give you the
13   short form of it, that this is a discussion
14   between Mr. Haislip and a Mr. Jordan.
15              Who is Mr. Haislip?
16        A.    He was the director of the
17   Office of Diversion Control for DEA.
18        Q.    What does that mean?
19        A.    He's in charge of the diversion
20   program within DEA.
21        Q.    So in the ranking, in my mind,
22   where does that put him in the rank?
23        A.    He's the top.
24        Q.    And then Mr. Jordan.  Who is
25   Mr. Jordan?
```

```
 1          A.      He's the special agent in

 2    charge of our Dallas field division, so he's

 3    the head of the entire DEA Dallas field

 4    division.

 5          Q.      And how many different field

 6    divisions are there?

 7          A.      At this time or now?

 8          Q.      At this time.

 9                  If the DEA remembers in its

10    official capacity.

11          A.      Yeah, I don't -- I'd be

12    speculating.  I think it was 20.

13          Q.      20?

14          A.      We're now up to 23.

15          Q.      And how many people were in the

16    cog between the field division boss and the

17    director?

18                  Is there two levels, three

19    levels of reporting or direct?

20                  MR. FINKELSTEIN:  Vague as to

21          time.

22    QUESTIONS BY MR. FARRELL:

23          Q.      In 1993.

24          A.      I'm not sure I understand what

25    you're asking.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     I'm just trying to figure out

 2    this communication.

 3                 Is it normal for a field

 4    division boss to be communicating directly

 5    with the director?

 6          A.     Yeah.  I mean, they're both

 7    SESes, so they're both --

 8          Q.     Okay.

 9          A.     They're both the same level.

10          Q.     They're the same rank?

11          A.     Yes.

12          Q.     All right.  So it appears that

13    this is a discussion on whether or not the

14    DEA is going to provide guidelines on

15    suspicious order reporting.

16                 Do you see that?

17          A.     Yes.

18          Q.     And I'd ask you to begin

19    reading, as you see in the second paragraph,

20    their discussion 1301.74(b).

21                 Do you see that?

22          A.     Yes.

23          Q.     Now, this is in 1993.

24                 Is 1301.74(b) the same in 1993

25    as it is today?
```

```
 1        A.     Yes.

 2        Q.     And is it the same in all

 3   meaningful ways to what it looked like when

 4   it was enacted in 1971?

 5        A.     Yes.

 6        Q.     So beginning with

 7   "Section 1301.74(b)," could you read the next

 8   sentence?

 9        A.     "1301.74(b) of Title 21 of the

10   Code of Federal Regulations clearly places

11   the responsibility for designing and

12   operating a system to identify suspicious

13   orders of controlled substances on the

14   registrant.  Implicit in this regulation is

15   the idea that the registrant should not

16   merely be accumulating data on what appear to

17   be excessive purchases for eventual

18   submission to DEA but rather that the system

19   be monitored so that any such orders will be

20   apparent to the registrant so that they -- so

21   that they can be reported to DEA upon

22   discovery and, whenever possible, before the

23   order is shipped."

24        Q.     Is this consistent with the

25   guidance provided by the DEA to wholesale
```

```
 1    distributors and manufacturers of

 2    prescription opioids?

 3                 MR. EPPICH:  Object to form.

 4         Foundation.

 5                 THE WITNESS:  Yes.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    Now, again, we're going to be

 8    talking about the NWDA again.

 9                 Do you see the beginning of the

10    second paragraph?

11                 And it references the fact that

12    the DEA was, in fact, aware that the -- some

13    of the distributors were adopting the NWDA

14    suspicious order monitoring system.

15                 Beginning with where I've

16    highlighted, can you please read that into

17    the record?

18         A.    Start with "can"?

19         Q.    You can, like, ad lib to get to

20    can, but, yeah.

21                 MR. EPPICH:  Objection.

22                 THE WITNESS:  "The NWDA

23         suspicious order monitoring system,

24         SOM, which has been adopted by many

25         distributors throughout the United
```

1        States, can be an effective monitoring

2        and reporting system provided that the

3        firm's using it to recognize their

4        responsibility to actively monitor

5        sales to detect suspicious orders."

6    QUESTIONS BY MR. FARRELL:

7        Q.    Is this consistent with the

8    guidance provided by the DEA to wholesale

9    distributors and manufacturers of

10   prescription opioids?

11            MR. EPPICH:  Object to form.

12       Foundation.

13            THE WITNESS:  Yes.

14   QUESTIONS BY MR. FARRELL:

15       Q.    Now, at the very bottom, there

16   is a discussion from the director beginning

17   with the last paragraph on the bottom of the

18   page beginning "what is -- what is of

19   particular concern."

20            Can you please read that into

21   the record?

22       A.    "What is of particular concern

23   to me is the statement that appears on the

24   report submitted by the McKesson Corporation

25   in Fort Worth, Texas.  For example, 'With the

1    submission of this report, we are leaving to

2    the DEA the final determination of whether

3    they are suspicious or unusual.'  This

4    position is unacceptable and clearly in

5    contravention to the requirements of 21 CFR

6    1301.74(b).

7              "A registrant whose own

8    personnel are in the best position to

9    determine what is excessive or unusual based

10   on knowledge of their customers and usual

11   purchasing practices may not abrogate its

12   responsibility to identify suspicious orders

13   and to determine whether to ship or refuse to

14   ship the controlled substance order.

15             "The registrant must also

16   report any suspicious orders as soon as

17   possible to the DEA.  This has been conveyed

18   to the McKesson national management in San

19   Francisco, and they have agreed to remove the

20   statement from reports."

21        Q.    So on behalf of the DEA, can

22   you validate that this is a true and accurate

23   summary of the conversation between the DEA

24   and McKesson?

25             MR. FINKELSTEIN:  Scope.

```
 1                    MR. MAHADY:  Object to form.

 2                    THE WITNESS:  Yes.

 3      QUESTIONS BY MR. FARRELL:

 4          Q.    Is this consistent with the

 5      guidance that DEA provided not only to

 6      McKesson but to every other wholesale

 7      distributor and manufacturer of prescription

 8      opioids?

 9                    MR. EPPICH:  Object to form.

10          Foundation.

11                    MR. MAHADY:  Objection.

12                    MR. FINKELSTEIN:  Scope.

13                    THE WITNESS:  Yes.

14      QUESTIONS BY MR. FARRELL:

15          Q.    Now, follow up real quick.  You

16      see here where it says that "a registrant may

17      not abrogate its responsibility"?  I have a

18      follow-up question to that.

19                    Is a registrant permitted to

20      delegate this -- its obligations to design

21      and operate a system to maintain effective

22      control against diversion to a third party

23      and avoid being held responsible by the DEA?

24                    MR. EPPICH:  Object to form.

25                    THE WITNESS:  Could you please
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            repeat that?

 2      QUESTIONS BY MR. FARRELL:

 3            Q.    Is a registrant allowed to

 4      delegate its obligations under 1301.74(b) to

 5      another party to perform and escape liability

 6      from the DEA for failure to comply?

 7                 MR. EPPICH:  Objection to form.

 8                 MR. MAHADY:  Foundation.

 9                 MR. FINKELSTEIN:  Scope.

10                 THE WITNESS:  No.

11      QUESTIONS BY MR. FARRELL:

12            Q.    So if a registrant that has an

13      obligation under the CSA delegates the

14      responsibilities to, say, UPS and/or Federal

15      Express and a violation occurs, is the

16      registrant ultimately still responsible for

17      those violations?

18                 MR. EPPICH:  Objection to form.

19            Calls for a legal conclusion.  Scope.

20                 MR. FINKELSTEIN:  Incomplete

21            hypothetical.

22                 THE WITNESS:  I'm sorry, can

23            you please repeat it?

24      QUESTIONS BY MR. FARRELL:

25            Q.    If Actavis delegates to UPS
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    their obligations to maintain effective

 2    control, and the DEA determines in their best

 3    judgment and upon investigation that a

 4    violation has occurred, does the DEA take the

 5    position that Actavis is still ultimately

 6    responsible for the violation?

 7              MS. MATIC:  Objection to form.

 8              MR. EPPICH:  Object to form.

 9         Calls for a legal conclusion.  Scope.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. FARRELL:

12         Q.    Would the DEA in fact

13    investigate and, if they found probable

14    cause, prosecute both UPS and Actavis under

15    that hypothetical?

16              MS. MAINIGI:  Objection.

17         Scope.  Calls for a legal conclusion.

18         Hypothetical.  Form.

19              MR. FINKELSTEIN:  Let me

20         object.  Scope.

21              THE WITNESS:  I would agree we

22         would investigate.  I don't -- I don't

23         know where the investigation would go,

24         but we would investigate it.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. FARRELL:

 2         Q.     And if you found that UPS

 3     violated the Controlled Substances Act, would

 4     you prosecute both UPS and Actavis?

 5         A.     It, again, depends --

 6             MS. MAINIGI:  Same objections.

 7             MR. FINKELSTEIN:  Scope.

 8             THE WITNESS:  Depends on what

 9         the evidence shows, but we would

10         investigate it, both parties.

11     QUESTIONS BY MR. FARRELL:

12         Q.     That's fair.  It's tough to

13     give a hypothetical with this scenario, so

14     let me see if I can be more direct.

15             If Cardinal Health delegates

16     its obligations under 1301.74(b) to CVS to

17     police themselves, is that -- does the DEA

18     consider that in compliance with federal law?

19             MS. MAINIGI:  Objection.

20         Scope.  Incomplete hypothetical.

21         Foundation.  Form.

22             MR. FINKELSTEIN:  Join as to

23         incomplete hypothetical.

24             THE WITNESS:  No.

25             (Prevoznik Plaintiff's Exhibit
```

```
 1              P21 marked for identification.)

 2    QUESTIONS BY MR. FARRELL:

 3         Q.     I'm going to mark next what's

 4    going to be P21 and hand it to you.  And I'll

 5    have you look at the bottom right-hand

 6    corner.  You'll note that there's a Bates

 7    stamp US-DEA-00025302.

 8              Do you recognize this document?

 9         A.     Yes.

10         Q.     What is it?

11         A.     It's a Federal Register

12    announcing that there's going to be a meeting

13    for the task force on suspicious orders

14    December 16th and 17th of 1997.

15         Q.     Does the DEA publish in the

16    Federal Register notices for the entire world

17    that can read English to read?

18              MS. MAINIGI:  Objection.

19              THE WITNESS:  Yes.

20    QUESTIONS BY MR. FARRELL:

21         Q.     You'll note that this in

22    particular Federal Register action has been

23    labeled "Notice of Establishment of Task

24    Force on Suspicious Orders."

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Is this a different...

2          Q.     It should be the same one.  If

3     you look at what I highlighted there, it's

4     only one page.

5          A.     It's only one page?

6          Q.     Yeah.  You see where my finger

7     is right here?

8          A.     That one.  Sorry.  Yeah.

9     Sorry, I'm good.

10         Q.     All right.  Now, if you look,

11    I'm going to -- I'm going to give you a

12    chance to take a read, but I'm going to

13    summarize it for you.

14               Is this the DEA's publication

15    and notice to the public that it was forming

16    a task force on suspicious orders pursuant to

17    the Comprehensive Methamphetamine Control Act

18    of 1996?

19               MR. FINKELSTEIN:  Take your

20        time to read it if you need to.

21               MS. MAINIGI:  Objection.

22               THE WITNESS:  Yes.

23    QUESTIONS BY MR. FARRELL:

24         Q.     All right.  Now, when you look

25    at the public notice, it states that "the DEA

1    is establishing a task force on suspicious

2    orders for the purpose of developing

3    proposals to define suspicious orders of

4    listed chemicals."

5                    Do you see that?

6        A.    Yes.

7        Q.    As we discussed at length

8    before, prescription opioids are not

9    necessarily listed chemicals, are they?

10                   MR. EPPICH:  Object to form.

11       Foundation.  Calls for speculation.

12                   THE WITNESS:  Yes.

13   QUESTIONS BY MR. FARRELL:

14       Q.    Well, let's be a little more

15   direct.

16                   The DEA makes proposals and

17   provides input on what should be a listed

18   chemical and what should be a controlled

19   substance, agreed?

20       A.    Agreed.

21       Q.    And the listed chemicals that

22   they're referencing in this public notice for

23   this task force relate to the Methamphetamine

24   Act and ephedrine and pseudoephedrine used to

25   make methamphetamine --

1          MR. EPPICH:  Object to the

2      form.

3  QUESTIONS BY MR. FARRELL:

4      Q.    Agreed?

5          MR. EPPICH:  Objection.  Form.

6          THE WITNESS:  Yes.

7  QUESTIONS BY MR. FARRELL:

8      Q.    And as we discussed previously,

9  suspicious orders of listed chemicals used to

10 make methamphetamine are defined as orders

11 that are extraordinary in size, agreed?

12         MR. FINKELSTEIN:  Objection to

13     form.  Calls for speculation.

14         THE WITNESS:  Agreed.

15 QUESTIONS BY MR. FARRELL:

16     Q.    And there's a different

17 standard and a different regulation that

18 govern controlled substances or suspicious

19 orders of controlled substances, agreed?

20         MR. EPPICH:  Objection to form.

21         THE WITNESS:  Agreed.

22 QUESTIONS BY MR. FARRELL:

23     Q.    Now, when you look at this

24 notice, it says, "The proposals establish

25 guidelines that will adequately define

```
 1     suspicious orders of listed chemicals."

 2               Do you see that?

 3        A.     Yes.

 4        Q.     Does the DEA believe this task

 5     force was assigned the project of defining

 6     suspicious orders of controlled substances

 7     that don't contain listed chemicals?

 8               MR. EPPICH:  Object to form.

 9          Calls for speculation.  Foundation.

10               THE WITNESS:  No.

11     QUESTIONS BY MR. FARRELL:

12        Q.     So the DEA not only was on this

13     task force, it was assigned the obligation by

14     Congress to form this task force.  So I'm not

15     asking you to speculate.  I'm asking the DEA

16     itself.

17               When you promulgated this

18     report to the Attorney General, were you

19     intending to provide any guidance to the

20     wholesale distributors and manufacturers of

21     prescription opioids that it should be using

22     the standards therein to measure whether or

23     not a suspicious order of controlled

24     substances falls under the federal

25     regulations?
```

```
 1                    MR. EPPICH:  Object to form.

 2                    MR. O'CONNOR:  Objection.

 3          Foundation.

 4                    MS. MAINIGI:  Also scope.

 5                    THE WITNESS:  No.

 6     QUESTIONS BY MR. FARRELL:

 7          Q.    Now, if you look at the bottom

 8     right-hand corner, you'll see who the DEA was

 9     tasked to add to this task force.

10                    Did the DEA, in fact, add to

11     this task force a member from the National

12     Association of Boards of Pharmacy?

13          A.    Yes.

14          Q.    And members from the Chemical

15     Manufacturers Association?

16          A.    Yes.

17          Q.    And members from the National

18     Association of Chemical Distributors?

19          A.    Yes.

20          Q.    And a member from the

21     Nonprescription Drug Manufacturers

22     Association?

23          A.    Yes.

24          Q.    And, in fact, four members from

25     the wholesale and retail pharmaceutical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    marketing associations?

 2         A.    Yes.

 3              (Prevoznik Plaintiff Exhibits

 4         P22, P23, P24 and P25 marked for

 5         identification.)

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    All right.  I've got three

 8    documents I'm going to show you now, and

 9    they're going to be marked separately P22,

10    P23 and P24.  Oops, and P25.  There's four

11    documents in total.

12              And I'll give you a second to

13    review it while we pass it around the table.

14              MR. FINKELSTEIN:  I have three

15         documents.  Because mine are not

16         marked, perhaps you can just tell me

17         which is which in terms of exhibit

18         number?

19              MR. FARRELL:  Yeah, the

20         first -- they should be in

21         chronological order.  So it should go

22         AmerisourceBergen first.  The top

23         right is August 16, 2005, Bates stamp

24         US-DEA-00000147.

25              The next one should be --
```

```
 1              MR. FINKELSTEIN:  You didn't

 2         give me 147.

 3              Okay.  147 is 22, correct?

 4              MR. FARRELL:  Yes.

 5              MR. FINKELSTEIN:  Okay.

 6              MR. FARRELL:  The next one is

 7         Cardinal Health, I believe, and it

 8         bears Bates stamp US-DEA, a bunch of

 9         zeros, and then 352.

10              MR. FINKELSTEIN:  Okay.

11              MR. FARRELL:  Then the next

12         one, I believe, should be December 6,

13         2005, and in the bottom right-hand

14         corner is US-DEA-00000369.

15              And then the final one is dated

16         January 23, 2006, in the bottom

17         right-hand corner is US-DEA-00000371.

18              MR. FINKELSTEIN:  Okay.

19    QUESTIONS BY MR. FARRELL:

20         Q.   Let me know when you're ready

21    to proceed.

22              Do you want to take a few

23    minutes to read these?

24         A.   Yes, please.

25         Q.   Do you want to take a quick
```

```
 1    break while we do so?

 2                MS. SINGER:  Let's keep going.

 3                MR. EPPICH:  Do we typically go

 4         off the record to review documents?

 5                SPECIAL MASTER COHEN:  No.

 6                MR. FARRELL:  I didn't say

 7         that.  I said -- I asked him if he

 8         wanted to take a break, and he said

 9         no.

10    QUESTIONS BY MR. FARRELL:

11         Q.    I don't know if this will save

12    you some time.  I'm not intending on quizzing

13    you on the contents of these, other than

14    establishing what they are and the foundation

15    for what the DEA was doing.

16         A.    Okay.

17         Q.    I'm going to ask you first:  Do

18    you recognize these documents?

19         A.    Yes.

20         Q.    Okay.  What are they

21    collectively?

22         A.    Collectively they represent

23    what happened with meetings with the

24    respective registrants, AmerisourceBergen,

25    Cardinal, McKesson and -- I see McKesson
```

Highly Confidential - Subject to Further Confidentiality Review

 1    twice.

 2           Q.     Okay.  So in general, are these

 3    the documents the DEA created to internally

 4    memorialize the initial meetings in and

 5    around 2005 that the jury has heard about

 6    related to what's called the distributor

 7    initiative?

 8           A.     Yes.

 9           Q.     Now, these documents weren't

10    provided to the registrants, were they?

11           A.     These reports?

12           Q.     Correct.

13           A.     Correct.

14           Q.     But these documents were

15    created -- let me back up.

16                  Do you have knowledge of

17    whether these documents were made at or near

18    the time of the meetings?

19                  MR. EPPICH:  Objection.

20           Foundation.

21                  THE WITNESS:  Well, from the

22           date stamp, it's around those dates.

23    QUESTIONS BY MR. FARRELL:

24           Q.     Is this reflective of the

25    practice of the DEA, with regard to the

1    distributor initiative, to document what

2    happened during the meetings with

3    registrants?

4          A.    Yes.

5          Q.    Now, the DEA has conducted

6    hundreds of these meetings, correct?

7               MS. MAINIGI:  Objection.

8               THE WITNESS:  Correct.

9    QUESTIONS BY MR. FARRELL:

10         Q.    So rather than go through all

11   of them, if one of these memorandums contains

12   a Bates stamp of US DEA and is produced by

13   the Department of Justice in this litigation,

14   is it the DEA's position that the photocopy

15   being submitted is a true and accurate copy

16   of the original?

17              MR. MAHADY:  Objection.

18         Foundation.

19              THE WITNESS:  Yes.

20   QUESTIONS BY MR. FARRELL:

21         Q.    Does the DEA acknowledge that

22   all of those such documents bearing the

23   US DEA Bates stamp are, in fact, in the

24   possession, custody and control of the DEA

25   and document the discussions and contents of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    each distributor initiative meeting?

 2         A.    Yes.

 3         Q.    So in particular what I'd ask

 4    you to do is to go to the very -- is to go to

 5    the first one, which is AmerisourceBergen's,

 6    and you'll see that this is the summary of

 7    the meeting on August 10, 2005.

 8               Do you see that?

 9         A.    Yes.

10         Q.    And it goes through and it

11    describes all of the things that were

12    discussed in the documents that were provided

13    during the meeting.

14               Do you see that?

15         A.    Yes.

16         Q.    Now, I'll represent to you that

17    I'm not going to produce all of the thousands

18    of pages as an exhibit, but I'll represent to

19    you that there are, in fact, exhibits that go

20    with this that the DEA produced in this

21    litigation.

22               Agreed?

23               MR. MAHADY:  Objection.  Form.

24         Objection to foundation.

25               THE WITNESS:  Yes.
```

1    QUESTIONS BY MR. FARRELL:

2         Q.    Now, one of the things I'd like

3    to direct your attention to is that many of

4    the distributors have made the statement that

5    this presentation was only related to

6    Internet pharmacies.  And in fact, I believe

7    they asked you that question during the time

8    that they deposed you for the previous two

9    days.

10             What I'd ask you to do is I'd

11   ask you to turn to page 7 of the PowerPoint

12   presentation with AmerisourceBergen.

13             And you see where it says,

14   "Report suspicious orders to DEA when

15   discovered"?

16             Do you see that?

17        A.    Yes.

18        Q.    So this is the PowerPoint slide

19   by the DEA with AmerisourceBergen as early as

20   2005.

21             Agreed?

22        A.    Agreed.

23        Q.    And if you look at the next

24   slide, it states, "Reporting a suspicious

25   order to the DEA does not relieve the

1    distributor of the responsibility to maintain

2    effective controls against diversion."

3              Did I read that accurately?

4        A.    Yes.

5        Q.    Okay.  Why did the DEA put the

6    word "not" in all caps?

7        A.    To emphasize that they had to

8    provide the suspicious order, not just -- not

9    just after-sales reports.

10       Q.    The next slide, it says, "The

11   DEA cannot tell a distributor if an order is

12   legitimate or not" and that "the distributor

13   must determine which orders are suspicious

14   and make a sales decision."

15              Is this similar to all of the

16   other slide shows the DEA provided to the

17   distributors back in the 2000 -- 2005, 2006

18   time frame?

19              MR. MAHADY:  Objection to form.

20        Objection to foundation.

21              THE WITNESS:  Yes.

22   QUESTIONS BY MR. FARRELL:

23       Q.    In other words, this PowerPoint

24   presentation, was it a stock PowerPoint

25   presentation that was shown to Cardinal

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Health?

 2          A.     Yes.

 3          Q.     Was it shown to McKesson?

 4          A.     Yes.

 5          Q.     Was it shown to CVS?

 6                 MS. FUMERTON:  Objection.

 7          Form.  Lack of foundation.

 8                 MR. FARRELL:  That actually

 9          might be right.

10    QUESTIONS BY MR. FARRELL:

11          Q.     Was it -- to all of the

12    distributors that the DEA met with in 2005

13    and 2006, is this the stock PowerPoint

14    presentation that was used?

15          A.     Yes.

16                 MS. FUMERTON:  Objection.

17    QUESTIONS BY MR. FARRELL:

18          Q.     So I'm also going to have you

19    flip to page 12.

20                 In the summary slides, the very

21    last bullet point, can you read what that

22    says?

23          A.     "Not limited to Internet

24    pharmacies."

25          Q.     What does that mean?
```

```
 1                  MR. EPPICH:  Object to form.

 2          Foundation.

 3     QUESTIONS BY MR. FARRELL:

 4          Q.     Go ahead.

 5          A.     It's not just the -- what the

 6     Internet pharmacies was, but it would be any

 7     pharmacy, retail.

 8          Q.     The very next slide, it says,

 9     "A pattern of drugs being distributed to

10     pharmacies who are diverting controlled

11     substances demonstrates the lack of effective

12     controls against diversion by the

13     distributor."

14                  This PowerPoint presentation in

15     the distributor initiative meeting, it was

16     not just limited to rogue Internet

17     pharmacies, was it?

18                  MR. EPPICH:  Object to form.

19          Foundation.  Calls for speculation.

20                  THE WITNESS:  No.  The emphasis

21          was regarding the Internet, but it was

22          for the totality of their

23          responsibilities as a registrant.

24     QUESTIONS BY MR. FARRELL:

25          Q.     But as consistent with the very
```

1    next sentence, did the DEA make it clear to

2    those distributors that it met with in 2005

3    and 2006 that if they didn't comply with

4    federal law regarding the detection, the

5    reporting and the halting of suspicious

6    orders, that the DEA may revoke their

7    registration?

8              MR. MAHADY:  Objection to form.

9              THE WITNESS:  Yes.

10   QUESTIONS BY MR. FARRELL:

11        Q.    Cardinal Health is the next

12   plaintiff's exhibit, Bates-stamped

13   US-DEA-352.  And just to make sure that

14   there's no hanky-panky, you'll see that the

15   PowerPoint slide is attached to this document

16   as well and is consistent with all the other

17   PowerPoint slides provided to the -- or all

18   the other distributor initiative meetings.

19              Would you agree with that?

20              MS. FUMERTON:  Objection.

21        Form.

22              THE WITNESS:  Yes.

23              MS. FUMERTON:  Lack of

24        foundation.

25

```
 1    QUESTIONS BY MR. FARRELL:

 2        Q.    Now, the next one is McKesson,

 3    and we're going to take a real quick stop to

 4    take a look at this one.

 5              This is dated -- the first one

 6    is December 6, 2005, and it appears to be a

 7    conference call with Mr. John Gilbert.

 8              Do you see that?

 9        A.    Yes.

10        Q.    And Mr. Mapes and Kyle Wright

11    of the DEA.

12              Who are Mr. Mapes and

13    Mr. Wright of the DEA?

14        A.    Mr. Mapes was the section chief

15    of our E-Commerce section, and Kyle Wright at

16    this time was a staff coordinator in

17    Mr. Mapes' section.

18        Q.    So the next plaintiff's exhibit

19    has the Bates stamp at the bottom corner of

20    US-DEA-00000371, and you'll see that it's

21    dated January 23, 2006, but it's referencing

22    a January 3, 2006 meeting.

23              Do you see that?

24        A.    Yes.

25        Q.    And in it you can see where it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    looks like it contains -- this is the

 2    memorandum of the meeting between McKesson

 3    and the DEA as a result of the distributor

 4    initiative.  Agreed?

 5              MR. EPPICH:  Object to form and

 6         foundation.

 7              THE WITNESS:  Yes.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.    Now, what I'm going to ask you

10    to do is I'm going to ask you to go to the

11    end of page 2.  And at the bottom, starting

12    with the word "after," the very last

13    paragraph, I'd ask you to read that into the

14    record.

15         A.    "After the conclusion of this

16    meeting, it was learned from Gary Hilliard of

17    McKesson Corp that one of the reasons they

18    were not able to realize the full volume of

19    hydrocodone product going out to the Florida

20    pharmacies was that their reports only

21    included the name brand hydrocodone products

22    distributed and was leaving out the generic

23    products."

24         Q.    The next sentence.

25         A.    "It was only after realizing
```

1    that the generic were not being reported was

2    McKesson Corp then able to see the large

3    quantities that DEA was bringing to

4    McKesson's attention."

5         Q.    So I don't know how to say this

6    any other way, but in 2006 when the DEA met

7    with McKesson with its distributor initiative

8    program, was it discovered that McKesson was

9    only tracking the brand name prescription

10   opiates?

11              MR. EPPICH:  Object to form.

12         Foundation.  Calls for speculation.

13         Scope.

14              THE WITNESS:  Could you please

15         repeat it?

16   QUESTIONS BY MR. FARRELL:

17         Q.    This document, following the

18   distributor initiative meeting between the

19   DEA and McKesson, appears to present the fact

20   that the DEA discovered McKesson was only

21   tracking brand name prescription opiates.

22         A.    Correct.

23              MR. EPPICH:  Object to the

24         form.  Foundation.  Calls for

25         speculation.

```
 1                    THE WITNESS:  Correct.

 2    QUESTIONS BY MR. FARRELL:

 3         Q.     If, in fact, McKesson was only

 4    tracking brand name prescription opiates and

 5    leaving out the generic products, is that a

 6    violation of federal law?

 7                    MR. EPPICH:  Object to form.

 8          Foundation.  Calls for speculation.

 9          Calls for a legal conclusion.

10                    THE WITNESS:  Yes.

11    QUESTIONS BY MR. FARRELL:

12         Q.     Sitting here today as the

13    custodian of ARCOS and the institutional

14    knowledge of the Drug Enforcement

15    Administration, if this is true, how many

16    generic prescription orders do you estimate

17    that McKesson missed prior to 2005?

18                    MR. EPPICH:  Object to the

19          form.  Calls for speculation.  Calls

20          for a legal conclusion, and I believe

21          it would be outside the Touhy

22          authorization.

23                    MS. MAINIGI:  Join.

24                    MR. FINKELSTEIN:  Scope.  Calls

25          for speculation.
```

```
 1                    You can answer in your personal

 2          capacity, but not on behalf of the

 3          DEA.

 4                    THE WITNESS:  I have no idea.

 5      QUESTIONS BY MR. FARRELL:

 6          Q.    A lot?

 7                    MR. EPPICH:  Same objections.

 8                    MR. FINKELSTEIN:  Same

 9          objection.

10                    THE WITNESS:  Yes.

11      QUESTIONS BY MR. FARRELL:

12          Q.    All right.  On a scale of 0 of

13      10 of screw-ups, how big of a screw-up is

14      this?

15                    MR. EPPICH:  Object to form.

16          Argumentative.

17                    MR. FINKELSTEIN:  Same

18          objection.

19                    You can answer in your personal

20          capacity, but not on behalf of the

21          DEA.

22                    THE WITNESS:  In my personal

23          capacity, a big one, a really big one.

24      QUESTIONS BY MR. FARRELL:

25          Q.    Epic?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2                 MR. EPPICH:  Same objections.

 3                 (Prevoznik Plaintiff's Exhibit

 4          P26 marked for identification.)

 5   QUESTIONS BY MR. FARRELL:

 6          Q.     We're now going to jump ahead a

 7   little bit.  I'm going to show you what's

 8   next marked as Plaintiff's 26.

 9                 This is a series of letters

10   that the DEA, institutionally and with

11   perfect recollection, will recall that --

12   between the lawyers for Cardinal Health and

13   the DEA, the first time they got in trouble

14   for breaking the law in 2008.

15                 MS. MAINIGI:  Objection.

16          Scope.  Foundation.  Form.

17   QUESTIONS BY MR. FARRELL:

18          Q.     Now, without having to go

19   through all of the nuances, what I'm going to

20   ask you to do is I'm going to make a

21   reference now.  At the bottom right-hand

22   corner is Bates stamp CAH_MDL2804_01376799.

23                 Do you see that?  799 are the

24   last three numbers.

25          A.     Yes, I have it.
```

```
 1           Q.      Now, in it, in this letter,

 2    Larry -- to Larry Cote from Cardinal Health's

 3    lawyers, it seems to indicate that controlled

 4    substances that are sold by Cardinal Health

 5    to CVS, Walgreens, Kroger, Kmart and Winn

 6    Dixie, which are large, national or regional

 7    chains, pose no threat of diversion due to

 8    their sophisticated anti-diversion systems

 9    and historical record of compliance.

10                Do you see that?

11                MS. MAINIGI:  Objection.  Form.

12         Scope.  Foundation.

13                THE WITNESS:  Yes.

14    QUESTIONS BY MR. FARRELL:

15         Q.      Did I read that accurately?

16         A.      Yes.

17                MS. MAINIGI:  Objection.

18                THE WITNESS:  Yes.

19    QUESTIONS BY MR. FARRELL:

20         Q.      Aside from me reading that

21    accurately, is it true that large, national,

22    regional chains of pharmacies pose no threat

23    of diversion of prescription opioids?

24                MS. MAINIGI:  Objection.  Form.

25         Scope.  Foundation.
```

```
 1                    THE WITNESS:  It's not true.

 2     QUESTIONS BY MR. FARRELL:

 3          Q.     In fact, the DEA has

 4     investigated and prosecuted many of the large

 5     national or regional chains, including CVS

 6     and Walgreens?

 7                    MS. MAINIGI:  Objection.  Form.

 8          Scope.  Foundation.

 9                    MR. FINKELSTEIN:  Objection.

10                    Do not testify based on current

11          or ongoing investigations.  You can

12          answer based on historical

13          investigations or prosecutions.

14                    THE WITNESS:  Yes.

15     QUESTIONS BY MR. FARRELL:

16          Q.     If a wholesale distributor

17     decides not to monitor a chain store

18     pharmacy, is that a per se violation of

19     federal law?

20                    MR. EPPICH:  Object to form.

21          Calls for a legal conclusion.

22                    MS. MAINIGI:  Scope.

23     QUESTIONS BY MR. FARRELL:

24          Q.     According to the DEA.

25                    MR. EPPICH:  Same objection.
```

```
 1                    THE WITNESS:  Could you please

 2        repeat it?

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    Does the DEA consider -- if a

 5   wholesale distributor came to the DEA and

 6   said, "I've got a new customer and it's CVS,

 7   which is a national chain store, and because

 8   they have such swell security, I don't want

 9   to monitor them for suspicious orders.  Is

10   that okay?"

11                    MR. EPPICH:  Object to the

12        form.

13   QUESTIONS BY MR. FARRELL:

14        Q.    What would the DEA say?

15                    MR. EPPICH:  Object to form and

16        incomplete hypothetical.  Calls for a

17        legal conclusion.  Foundation.

18                    MS. MAINIGI:  Scope.

19                    THE WITNESS:  They can't do

20        that.

21   QUESTIONS BY MR. FARRELL:

22        Q.    And what if I said, "I'm going

23   to do it anyway"?

24                    MR. EPPICH:  Same objection.

25                    MS. MAINIGI:  Same objection.
```

```
 1                  THE WITNESS:  It's a decision

 2          that they're making, and we're going

 3          to investigate it and we're going to

 4          do what we -- what we need to do to

 5          protect the public.

 6     QUESTIONS BY MR. FARRELL:

 7          Q.    And what would you need to do

 8     to protect the public?

 9                  MR. FINKELSTEIN:  Hang on.

10          Incomplete hypothetical.

11                  MS. MAINIGI:  Objection.  Form.

12                  THE WITNESS:  We would

13          investigate to see where the orders

14          went and how much went and who was --

15          what they were filling and who had

16          knowledge of what.  What we normally

17          do with our investigations.

18     QUESTIONS BY MR. FARRELL:

19          Q.    All right.  Would the DEA

20     provide guidance to such a wholesale

21     distributor, that regardless of whether its

22     customer is a national chain pharmacy, the

23     distributor still must comply with

24     1301.74(b)?

25          A.    Yes.
```

```
 1                    MR. EPPICH:  Objection to form.

 2     QUESTIONS BY MR. FARRELL:

 3          Q.    What if I said to you, "Well,

 4     how about this:  How about if I only start

 5     monitoring them after they reach a cap of

 6     20,000 pills in a month?"  Would you deem

 7     that to be compliant with federal law?

 8                    MR. EPPICH:  Object to the

 9          form.  Incomplete hypothetical.  Calls

10          for a legal conclusion.

11                    MR. FINKELSTEIN:  Incomplete

12          hypothetical.

13                    THE WITNESS:  No.

14     QUESTIONS BY MR. FARRELL:

15          Q.    Now, in these correspondence

16     Cardinal Health's lawyers represent that

17     they're going to retain -- let me see if I

18     can find the right word and avoid an

19     objection.

20                    You'll see here a consulting

21     firm named Cegedim Dendrite and that they're

22     going to provide the reports on controlled

23     substance orders to the DEA.

24                    Do you see that?

25          A.    What page are we on?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Well, I would prefer to know
 2      what page we're on.
 3           Q.    Okay.  This is the -- the last
 4      three digits are 803.  And it's the first
 5      full paragraph.
 6           A.    Okay.
 7           Q.    There's another reference in
 8      here to Cegedim Dendrite, and I'll represent
 9      to you that the correspondence indicates that
10      Cardinal Health was telling the DEA, "Please
11      don't revoke our license or suspend our
12      license or fine us.  We're going to hire this
13      outside consultant, and we're going to share
14      the report with you."  I'm going to make that
15      representation.
16                  Has the DEA, in fact, ever seen
17      that report?
18                  MR. FINKELSTEIN:  Scope.
19                  THE WITNESS:  I don't know.  I
20           don't know.
21                  (Prevoznik Plaintiff's Exhibit
22           P27 marked for identification.)
23      QUESTIONS BY MR. FARRELL:
24           Q.    I'm going to have marked as
25      Plaintiff's Exhibit 27 and circulate a
```

```
 1     document that bears the Bates stamp in the

 2     bottom right-hand corner

 3     CAH_MDL2804_03309960.

 4              Have you -- has the DEA, in its

 5     vast institutional knowledge, ever seen this

 6     document before?

 7              MS. MAINIGI:  Objection.

 8          Scope.  Objection.  Form.

 9              MR. FINKELSTEIN:  Scope.

10              MS. MAINIGI:  Mr. Finkelstein,

11          I'm assuming when you make a scope

12          objection that means you're

13          instructing him to answer in his

14          individual capacity?

15              MR. FINKELSTEIN:  When I make a

16          scope objection and when I have made

17          such objections in the past, it should

18          be understood that you can answer

19          based on your personal knowledge in

20          your individual capacity, but your

21          answers do not bind the DEA.

22              Do you understand that?

23              THE WITNESS:  Yes.

24              MR. FARRELL:  So we're going

25          to -- David, we're going to need you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I did not understand that when

 2           you made an objection for scope that

 3           we needed to preserve the right to be

 4           able to -- that I was waiving my right

 5           to have that objection ruled or

 6           overruled.

 7                    So I disagree that every time

 8           the Department of Justice makes an

 9           objection on scope that transforms the

10           witness from a Rule 30(b)(6) designee

11           into a witness testifying in his own

12           capacity, because we did not notice

13           the deposition of Mr. Prevoznik in his

14           individual capacity.  We noticed

15           him -- we noticed the DEA put a

16           witness up in its capacity.

17                    That being said, perfectly

18           willing to allow the record to be

19           preserved with appropriate objections

20           to be addressed with Judge Polster,

21           but I believe Judge Polster has the

22           ultimate say in whether or not our

23           questions are admissible and whether

24           or not they fall inside or outside of

25           the scope of the 30(b)(6) notice.
```

```
 1                MR. FINKELSTEIN:  So my
 2        response would be if Judge Polster
 3        disagrees with my objections, then
 4        Judge Polster will make appropriate
 5        rulings.
 6                If you disagree with my
 7        objections, my proposal would be to
 8        review the objections I've made at a
 9        break, and we can take them up with
10        the Special Master as necessary.
11                MR. FARRELL:  All right.  We've
12        been going for an hour, so maybe this
13        is the right time to take a quick
14        break.
15                VIDEOGRAPHER:  We're going off
16        the record.  The time is 9:12.
17         (Off the record at 9:12 a.m.)
18                VIDEOGRAPHER:  We are back on
19        record.  Beginning of Media File 2.
20        The time is 9:27.
21                SPECIAL MASTER COHEN:  So with
22        regard to the issue that came up just
23        before we went off the record, I think
24        to make the record clear as we go
25        forward, it would help if, rather than
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           merely saying "scope," when the DEA

 2           has an objection that the answer is

 3           outside the scope of Touhy authority,

 4           that you just say that, "outside the

 5           scope of Touhy authority."

 6                 With regard to the question of

 7           whether it is outside the scope of

 8           Touhy authority, I think the Court

 9           does retain jurisdiction to make that

10           determination in the final event, as

11           with any objection.

12                 And I will add that my own

13           understanding is that it's unclear

14           exactly whether a witness is allowed

15           to answer questions even though he

16           doesn't have authority under Touhy.  I

17           think that's actually an open question

18           legally.  But in any event, we don't

19           have to address that question now.

20                 So when you are directed,

21           Mr. Prevoznik, to answer only within

22           the scope of your personal knowledge

23           and not as a -- with DEA authority,

24           that's what we'll assume you're doing.

25                 Okay?
```

```
 1                    THE WITNESS:  Yes.
 2                    SPECIAL MASTER COHEN:
 3            Everybody understand that?  Any
 4            questions?
 5                    MS. SINGER:  Nope.
 6                    MR. FINKELSTEIN:  I'm happy to
 7            expand on my objections, and I'm happy
 8            to explain them as necessary.
 9                    SPECIAL MASTER COHEN:  No, we
10            can do it in shorthand.  I just want
11            to make sure we understand things,
12            that we're all on the same page going
13            forward.
14                    Okay?
15                    MS. MAINIGI:  There will be no
16            ruling on those objections?
17                    SPECIAL MASTER COHEN:  Correct.
18                    EXAMINATION
19    QUESTIONS BY MS. SINGER:
20         Q.     All right.  Good morning,
21    Mr. Prevoznik.  Mr. Farrell was nice enough
22    to cover some of the things I was planning
23    to, so we're going to shorthand our way
24    through some of the opening topics.
25                    Now, remind the jury, how long
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    have you been with the DEA?

2         A.     Over 28 years.

3         Q.     Okay.  And during the course of

4    your 20 years with the DEA, I imagine that

5    the drugs being diverted may have changed; is

6    that correct?

7         A.     Yeah, that's trend shifts.

8         Q.     And the means of diverting

9    those drugs may have changed over time as

10   well?

11        A.     Yes.

12        Q.     And the focus of DEA's

13   enforcement activities may have changed also

14   during that time; is that correct?

15        A.     Correct.

16        Q.     But the DEA's rules and

17   expectations with respect to the Controlled

18   Substances Act and CFR 1301.74, those have

19   remained the same, have they not?

20             MS. MAINIGI:  Objection.

21             THE WITNESS:  Yes.

22             (Prevoznik Plaintiff's Exhibit

23        P29 marked for identification.)

24   QUESTIONS BY MS. SINGER:

25        Q.     All right.  So we're going to
```

1    go quickly through the guidelines you talked

2    about.  We're going to start with a

3    shorthand.  And the first refers to what we

4    marked as Exhibit 18, is the backup for that.

5               So here you'll see the NWDA

6    suspicious order monitoring system, which we

7    were shown as Exhibit 18.

8               Is that familiar to you?

9    A.    Yes.

10   Q.    Okay.  So in 1984 --

11             MR. FINKELSTEIN:  I'm sorry,

12        Counsel, is this 18 or 29?

13             MS. SINGER:  I think it's 18.

14             MR. FINKELSTEIN:  It's marked

15        as 29.

16             MS. SINGER:  I'm sorry.  Oh,

17        I'm sorry, the new exhibit is 29.  The

18        backup of the whole policy is

19        Exhibit 18.

20             MR. FINKELSTEIN:  Okay.

21   QUESTIONS BY MS. SINGER:

22   Q.    Okay.  And just directing your

23   attention very quickly to 2, sub 2, on your

24   monitor -- I'm sorry, 9 on your monitor,

25   single suspicious orders, is it correct that

Highly Confidential - Subject to Further Confidentiality Review

```
1    this suspicious order monitoring system

2    publication from 1984 established that

3    "single orders of unusual size or deviation

4    must be reported immediately, the submission

5    of monthly printout of after-the-fact sales

6    will not relieve a registrant from the

7    responsibility of reporting these single

8    excessive or suspicious orders.  DEA has

9    interpreted orders to mean prior to

10   shipment"?

11            Does that accurately reflect

12   the policy of the DEA?

13        A.    Yes.

14        Q.    And that's as of 1984, correct?

15        A.    Correct.

16        Q.    All right.  Turning next to

17   1987 is our next marker in the timeline.

18            And I'm sorry, just to be

19   perfectly clear, from 1971 to the present,

20   when the Controlled Substances Act was first

21   enacted in '71, has it been the DEA's

22   position that ILRs are not suspicious order

23   reports?

24            MS. MAINIGI:  Objection.

25            THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MS. SINGER:

2         Q.    And do ILRs relieve a

3    registrant -- does submitting ILRs relieve a

4    registrant of the obligation to report

5    suspicious orders?

6              MS. MAINIGI:  Objection.

7              THE WITNESS:  No.

8    QUESTIONS BY MS. SINGER:

9         Q.    All right.  The next marker,

10   1987, is that seminar report which was

11   Prevoznik 17, and that established any system

12   must be capable of both detecting individual

13   orders or -- which are suspicious orders,

14   which become suspicious over time due to

15   frequency, quantity or pattern.

16              Is that consistent with the

17   DEA's policy?

18        A.    Yes.

19        Q.    And the DEA pointed out that

20   the company is still responsible under their

21   registrations for acting in the public

22   interest, reporting the order does not in any

23   way relieve the firm from the responsibility

24   for the shipment.

25              Does that also reflect the
```

```
 1    DEA's policy consistently over time?

 2                MS. MAINIGI:  Objection.

 3                MR. O'CONNOR:  Objection.

 4                THE WITNESS:  Yes.

 5                (Prevoznik Plaintiff Exhibit

 6        P33 marked for identification.)

 7    QUESTIONS BY MS. SINGER:

 8        Q.    Okay.  I want to turn next to a

 9    new document, and that's the DEA's Diversion

10    Investigators Manual.

11                Can we mark this as -- what are

12    we up to?

13                MR. FINKELSTEIN:  30.

14                MS. SINGER:  Thank you.

15                (Prevoznik Exhibit 33 marked

16        for identification.)

17                MR. FINKELSTEIN:  Is there no

18        28?  Have we skipped 28?  I don't

19        mind.  I just want to make sure I have

20        everything.

21    QUESTIONS BY MS. SINGER:

22        Q.    Mr. Prevoznik, showing you

23    Exhibit 33.  Do you recognize this document?

24        A.    Yes.

25        Q.    And what do you recognize that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   document to be?

 2                  MS. MAINIGI:  Excuse me,

 3           Counsel.  May I have a copy?

 4   QUESTIONS BY MS. SINGER:

 5           Q.     What do you recognize that

 6   document to be?

 7           A.     DEA's Diversion Investigators

 8   Manual.

 9           Q.     And what is that -- what is the

10   Diversion Investigators Manual used for?

11                  MR. EPPICH:  Objection.  Form.

12                  THE WITNESS:  It's used to

13           guide us, diversion investigators, on

14           how to do our jobs.

15   QUESTIONS BY MS. SINGER:

16           Q.     Okay.  And so that is internal

17   guidance provided by the DEA to its diversion

18   investigators, correct?

19           A.     Correct.

20           Q.     Okay.  And do you know the year

21   of that version of the manual?

22                  And again, it's not a quiz.

23   Does it seem like 1990, which was the

24   information provided to us, is accurate?

25                  MR. EPPICH:  Objection.  Calls
```

Highly Confidential - Subject to Further Confidentiality Review

 1          for speculation.

 2               THE WITNESS:  Yes.

 3     QUESTIONS BY MS. SINGER:

 4          Q.    Okay.  And is the Diversion

 5     Investigators Manual updated periodically by

 6     the DEA?

 7          A.    Yes.

 8          Q.    And do you know whether at

 9     least parts of the Diversion Investigators

10     Manual have been provided to distributors

11     through public record requests?

12               MS. MAINIGI:  Objection.

13          Scope.  Or outside Touhy

14          authorization.

15               THE WITNESS:  I don't know.

16     QUESTIONS BY MS. SINGER:

17          Q.    Okay.  All right.  I'd like to

18     turn your attention to Section 5126, which is

19     Bates number ending 301.

20               And I'm sorry, the Bates number

21     for this document is CAH_MDL_PRIOR

22     PRODUCTION_DEA07_01176247.

23               All right.  So turning to 301,

24     which I think has been tabbed in your copy,

25     Mr. Prevoznik.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yep.

 2          Q.      All right.  Can you read the

 3    third paragraph beginning "registrants"?

 4          A.       "Registrants who routinely

 5    report suspicious orders, yet fill these

 6    orders with reason to believe they are

 7    destined for the illicit market, are

 8    expressing an attitude of irresponsibility

 9    that is a detriment to the public health and

10    safety as set forth in 21 USC 823 and 824."

11          Q.      And 21 USC 823 and 824 the

12    Controlled Substances Act?

13          A.      Yes.

14          Q.      Okay.  And does that statement

15    that you just read accurately reflect the

16    policy of the DEA in 1990?

17          A.      Yes.

18          Q.      And has that remained true

19    since then?

20          A.      Yes.

21          Q.      Okay.  And then read from there

22    "suspicious orders"?

23          A.       "Suspicious orders include

24    those which are in excess of legitimate

25    medical use or exhibit characteristics
```

1    leading to possible diversion, such as orders

2    of unusual size, unusual frequency, or those

3    deviating substantially from the -- from a

4    normal pattern."

5         Q.    And keep going.

6         A.    "The supplier can determine

7    whether the order is excessive by checking

8    their own sales and establishing the average

9    amount of controlled substances shipped to

10   registrants of the same apparent size in a

11   particular geographic area.  If the customer

12   exceeds this threshold, the request should be

13   viewed as suspicious."

14        Q.    One more sentence.

15        A.    "This activity over extended

16   periods of time would lead a reasonable

17   person to believe that controlled substances

18   possibly are being diverted."

19        Q.    And does the passage you just

20   read again reflect the DEA's policy?

21        A.    Yes.

22              MR. EPPICH:  Form.

23   QUESTIONS BY MS. SINGER:

24        Q.    And has that policy remained

25   the same since 1990 when this manual was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    issued?

 2               MS. FUMERTON:  Object to form.

 3               THE WITNESS:  Yes.

 4               (Prevoznik Plaintiff's Exhibit

 5         P34 marked for identification.)

 6    QUESTIONS BY MS. SINGER:

 7         Q.    Okay.  Now, moving to the next

 8    version of the -- of the Diversion

 9    Investigators Manual, we're going to mark

10    that Exhibit 34.

11               And, Mr. Prevoznik, we only

12    have a piece of that manual.

13               Do you recognize the document

14    that I've just shown you as Exhibit 34?

15         A.    Yes.

16         Q.    And what do you recognize that

17    document to be?

18         A.    As being a section from our --

19    the Diversion Investigators Manual.

20         Q.    Okay.

21         A.    DEA.

22         Q.    And with respect to its

23    provisions on suspicious orders, which are

24    the first paragraph of Section 5126, is that

25    the same as what you just read previously?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     I'm sorry, which paragraph?

 2               MR. EPPICH:  Object to form.

 3               THE WITNESS:  "Registrants"?

 4   QUESTIONS BY MS. SINGER:

 5        Q.     I'm sorry.  I don't have it up

 6   on my monitor, so...

 7               MS. MAINIGI:  Counsel, may I

 8        ask why this document is not

 9        Bates-stamped?

10               MS. SINGER:  Excuse me?

11               MS. MAINIGI:  Why is this

12        document not Bates-stamped?

13               MS. SINGER:  I don't know.

14        Because it came from the DEA.  I think

15        the reliance materials for

16        Mr. Prevoznik.

17               MS. MAINIGI:  Is that in fact a

18        representation you're making?

19               MS. SINGER:  Excuse me?

20               MS. MAINIGI:  Is that in fact a

21        representation that you know for

22        certain, or are you guessing?

23               MS. SINGER:  So you can ask

24        your questions in your time.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    Mr. Prevoznik, just to clarify

 3    for Cardinal's counsel's benefit, do you

 4    recognize this from the materials you

 5    reviewed in preparation for your deposition?

 6         A.    Yes.

 7         Q.    Okay.  And do you know if this

 8    was part of the binder that was provided to

 9    counsel in advance of your deposition?

10         A.    Yes.

11         Q.    Okay.  So can you read aloud

12    that first paragraph?

13         A.    "Registrants are required to

14    inform DEA of suspicious orders in accordance

15    with 21 CFR 1301.74(b).  DEA field offices

16    are not to approve or disapprove supplier

17    shipments of controlled substances.  The

18    responsibility for making the decision to

19    ship rests with the supplier.  An exception

20    to this occurs when a supplier" --

21         Q.    You can stop there.

22         A.    Okay.

23         Q.    All right.  And the section you

24    just read, does that reflect DEA's policy?

25                MS. MAINIGI:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  Yes.
 2      QUESTIONS BY MS. SINGER:
 3           Q.     And do you know, by the way,
 4      the date of this version of the Diversion
 5      Investigators Manual?
 6           A.     I can tell from the -- there
 7      was an update on 4/16 of 1996.
 8           Q.     Okay.  And then if you go down
 9      to the third paragraph, "Registrants who
10      routinely report suspicious orders," is that
11      the same language that you read previously?
12                   MR. EPPICH:  Object to form.
13                   THE WITNESS:  Yes.
14                   (Prevoznik Plaintiff's Exhibit
15           P35 marked for identification.)
16      QUESTIONS BY MS. SINGER:
17           Q.     Okay.  All right.  Let's turn
18      now to Exhibit 35.
19                   All right.  And this is --
20                   MR. FINKELSTEIN:  While this is
21           being handed out, since we talked
22           about the reliance materials, I note
23           that the witness doesn't have a copy
24           of his reliance materials in front of
25           him and that I ask that he be provided
```

```
 1          with that at some point.

 2               We left it with the court

 3          reporter.  That was his reliance

 4          binder.

 5               MS. SINGER:  So because we have

 6          a different court reporter, I don't

 7          think we have it.  If -- we can try to

 8          muster an additional copy, but any

 9          document I show him, we will have

10          today.

11               MR. FINKELSTEIN:  Okay.

12     QUESTIONS BY MS. SINGER:

13          Q.    All right.  So Exhibit 35 is

14     the NWDA Controlled Substances Manual, Bates

15     number HDA_MDL_000219360.

16               Mr. Prevoznik, have you seen

17     that document before?

18          A.    It looks familiar.

19          Q.    Okay.  Now, I want to show you

20     also -- we're going to mark this Exhibit 36.

21               (Prevoznik Plaintiff's Exhibit

22          P36 marked for identification.)

23     QUESTIONS BY MS. SINGER:

24          Q.    Exhibit 36 is from a website.

25     It's titled "NWDA Develops DEA Compliance
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Institute to Reduce Industry Exposure to

 2    Fines."

 3              All right.  Giving you a second

 4    to look at the document, I just want to read

 5    aloud the first paragraph.

 6              "In response to increasingly

 7    complex regulations, aggressive enforcement

 8    and the potential for fines, the National

 9    Wholesale Druggists' Association, NWDA, has

10    developed an industry institute on DEA

11    compliance," continued.

12              Would you agree that the DEA

13    had been aggressively enforcing --

14              MS. MAINIGI:  Objection to the

15         use of this document.

16              MS. SINGER:  I haven't even

17         finished --

18              MS. MAINIGI:  I'm sorry.  Go

19         ahead.

20              MS. SINGER:  -- a question.

21              MS. MAINIGI:  Sorry.

22    QUESTIONS BY MS. SINGER:

23         Q.    Would you agree that the DEA

24    was aggressively or actively enforcing the

25    Controlled Substances Act in 1997 when
```

 1    this doc -- when this press release was

 2    issued?

 3              MS. MAINIGI:  Objection to the

 4         use of this document.  Objection.

 5         Foundation.  Scope.

 6              THE WITNESS:  I'm not sure what

 7         you mean by the term "aggressively."

 8         We were doing our job, so that

 9         wouldn't...

10    QUESTIONS BY MS. SINGER:

11         Q.    All right.  And then going down

12    to the third paragraph -- or fourth

13    paragraph -- you know what?  We're going to

14    leave that one there.  Let's move on.  Let's

15    go back to the manual itself, Exhibit 34.

16              So I want to turn first to --

17              MR. FINKELSTEIN:  34 or 35?

18              THE WITNESS:  35?

19    QUESTIONS BY MS. SINGER:

20         Q.    35, thank you.

21              -- to Bates number 435, which

22    is tabbed in your copy.  It's titled

23    "Suspicious Orders - Controlled Substances."

24              Let me know when you've found

25    it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yep, I'm good.

 2          Q.      Okay.

 3                  MS. MAINIGI:  I'm sorry,

 4          Counsel, what's the page number?

 5                  MS. SINGER:  435.

 6     QUESTIONS BY MS. SINGER:

 7          Q.      It says there, "Distributors

 8     are responsible for designing and operating a

 9     system that will disclose to the distributor

10     suspicious orders."

11                  Do you agree that that is the

12     distributor's responsibility?

13          A.      Yes.

14          Q.      Okay.  And then the note, "Many

15     distributors have been cited for failing to

16     establish and maintain such a system."

17                  Is that also accurate?

18          A.      Yes.

19                  MS. MAINIGI:  Objection.

20                  MR. EPPICH:  Form.

21     QUESTIONS BY MS. SINGER:

22          Q.      Move to the next paragraph.

23     "Distributor establishing suspicious order

24     criteria.  Distributors should establish

25     written criteria of what constitutes a
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious order.  DEA leaves it to the

2    distributor to make this determination.  The

3    key for the distributor is to establish

4    reasonable criteria based upon customer

5    purchasing patterns and then to adhere to

6    them in monitoring orders."

7              Does that several-step passage

8    that I just read accurately reflect a

9    distributor's duties under the CSA?

10             MS. MAINIGI:  Objection.

11        Foundation.  Scope.  Form.

12             MR. EPPICH:  Objection.

13             THE WITNESS:  Yes.

14   QUESTIONS BY MS. SINGER:

15        Q.    And do you see in this

16   description of suspicious order criteria any

17   expression of confusion or lack of clarity

18   about what a suspicious order is?

19             MR. EPPICH:  Object to form.

20             MS. MAINIGI:  Objection.

21        Foundation.

22             THE WITNESS:  No.

23   QUESTIONS BY MS. SINGER:

24        Q.    And then moving to the next

25   page, Bates number 436, you see the bullet
```

1    that begins, "Establish trigger levels"?

2    About middle of the page.

3         A.    Yes.

4         Q.    Okay.  So it says here,

5    "Establish trigger levels, close quote, that

6    only kick out purchasers buying substantially

7    above the average for an item.  The trigger

8    level is established by multiplying the

9    calculated average by an arbitrary factor.

10   It is recommended that at the outset three

11   times the average be used for ARCOS items and

12   four times the average for non-ARCOS items."

13             Do you see where I've just

14   read?

15        A.    Yes.

16        Q.    Okay.  Is it DEA's position

17   that a fixed multiplier is a sufficient

18   system to identify suspicious orders?

19             MR. EPPICH:  Object to form.

20             MS. MAINIGI:  Foundation.

21        Scope.

22             THE WITNESS:  Could you please

23        repeat it?

24             MS. SINGER:  Yes.

25   QUESTIONS BY MS. SINGER:

```
 1          Q.      Is it DEA's position that a

 2   fixed multiplier of order levels is

 3   sufficient as a system to identify suspicious

 4   orders?

 5               MR. EPPICH:  Object to form.

 6               THE WITNESS:  It could be one

 7        criteria, but it can't be the only

 8        one.

 9   QUESTIONS BY MS. SINGER:

10          Q.      Okay.  And it says here, if you

11   keep reading on, "After the monitoring

12   program has been tested with live data and

13   the results analyzed, it may be necessary to

14   revise the factors."

15               Is it DEA's position that

16   distributors have an obligation to make sure

17   that any trigger or threshold they use

18   actually identifies suspicious orders?

19               MS. MAINIGI:  Objection.

20               MR. FINKELSTEIN:  Object to

21        form.

22               MS. MAINIGI:  Form.  Scope.

23               THE WITNESS:  Yes.

24   QUESTIONS BY MS. SINGER:

25          Q.      Okay.  Moving next to Bates
```

```
 1    number 437.  Do you see the note is -- why

 2    don't you go ahead and read that note.

 3                "It is DEA's position."

 4         A.     "It is DEA's position that

 5    after-the-fact monitoring program as

 6    previously described, whether computer or

 7    manual, does not relieve the distributor of

 8    responsibility for policing individual orders

 9    that appear excessive."

10         Q.     Keep going.

11         A.     "In these situations, DEA

12    should be notified before the order is

13    shipped, and a copy of all such orders should

14    be maintained in the distributor's suspicious

15    orders file, with a notation reflecting the

16    date and person contacted at DEA as well as

17    any guidance received."

18         Q.     Go ahead and finish the

19    paragraph, please.

20         A.     "The file also should indicate

21    whether the order was shipped.  DEA usually

22    leaves the responsibility for determining

23    whether to ship to the distributor."

24         Q.     And does this statement that

25    you just read from the NWDA manual of 1997
```

1    accurately describe the DEA's position on

2    what distributors should be -- or what

3    registrants should be doing?

4                MS. MAINIGI:  Objection.

5                THE WITNESS:  Yes.

6    QUESTIONS BY MS. SINGER:

7         Q.    All right.  And then I want you

8    to turn to the chemical control program at

9    Appendix L.  So that, I think, should be

10   marked by the last tab.  Nope.  Nope.

11   There's one more, I'm sorry.  So L6, yes,

12   which is Bates number 571.

13               Do you see the heading there

14   "Suspicious Orders"?

15               MR. FINKELSTEIN:  571.  69, 71.

16               THE WITNESS:  Okay.

17   QUESTIONS BY MS. SINGER:

18        Q.    All right.  So the heading

19   there says, "Suspicious Orders," but it's

20   under 21 CFR 1310.05, correct?

21        A.    Correct.

22        Q.    And that's the provision that

23   relates to suspicious orders of List I

24   chemicals; is that correct?

25        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  And there it -- the

 2   first sentence reads, "DEA has not provided a

 3   clear definition of what constitutes a

 4   suspicious order."

 5                 Now that relates to a

 6   suspicious order of List I chemicals,

 7   correct?

 8          A.     Correct.

 9          Q.     Okay.  And there NWDA is saying

10   we don't have a clear definition, correct?

11          A.     Correct.

12          Q.     And we didn't see that earlier

13   in the manual, correct?

14          A.     Correct.

15          Q.     All right.  Then let's move to

16   Appendix M, which is one more page.  Bates

17   number 574, number 7:  "What does DEA

18   consider to be a suspicious order?"

19                 And if you can read that first

20   sentence?

21          A.     "A registrant must report a

22   suspicious order for controlled substances,

23   which DEA defines as an order of unusual

24   size, orders deviating substantially from a

25   normal pattern and orders of unusual
```

Highly Confidential - Subject to Further Confidentiality Review

1    frequency."

2          Q.    Okay.  Keep going all the way

3    to the end of that paragraph.

4          A.    21 CFR 1301.74(b).

5    "Registrants should set thresholds as a first

6    step in identifying potential suspicious

7    orders.  However, registrants should refrain

8    from reporting all orders above the threshold

9    without a further review of the order or

10   customer.  DEA expects that registrants will

11   only report orders that the registrant has

12   determined to be truly suspicious."

13         Q.    And does the section you just

14   read reflect the policy of the DEA that

15   registrants should be reporting orders that

16   it deems suspicious?

17               MS. MAINIGI:  Objection.

18               THE WITNESS:  Yes.

19               (Prevoznik Plaintiff's Exhibit

20         P37 marked for identification.)

21   QUESTIONS BY MS. SINGER:

22         Q.    All right.  Let's move next to

23   Exhibit 37.  We have a lot of paper today.

24               Exhibit 37 is Bates number

25   CAH_MDL_PRIOR PRODUCTION_DEA07_01178834, and

Highly Confidential - Subject to Further Confidentiality Review

1    it's titled "DEA Compliance Manual, Cardinal

2    Health."

3              Mr. Prevoznik, have you seen

4    this document before?

5        A.    No.

6        Q.    Okay.  I just want to point you

7    to a few pages.  Let's turn first to

8    Bates number 880, which is also tabbed in

9    your copy.

10             Tell me when you're there.

11       A.    I'm there.

12       Q.    Okay.  So it says, "Complying

13   with 21 CFR 1301.74(b) is a two-step process.

14   First, each Cardinal division submits to DEA

15   on a monthly basis an ingredient limit

16   report."

17             Have I read that correctly?

18       A.    Yes.

19       Q.    Okay.  And then it goes down to

20   the next paragraph.  "Second, on a daily

21   basis, cage and vault personnel" --

22             Do you know what that means?

23       A.    Yes.

24       Q.    What is that?

25       A.    It's the person -- the people

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that were -- that are authorized to work in

 2    the cage or the vault, which are the secure

 3    areas that contain the controlled substances.

 4         Q.    Okay.

 5               -- "should be policing and

 6    identifying individual orders that appear

 7    excessive in relation to what other customers

 8    are buying and/or the customer's purchase

 9    history.  In most situations, DEA should be

10    notified, if possible, before the order is

11    shipped, and a copy of all such orders should

12    be maintained in the division's suspicious

13    order file, along with a regulatory agency

14    contact form, Form 1, noting any specific

15    instructions from DEA."

16               Have I read that correctly?

17         A.    Yes.

18         Q.    Okay.  And does this Cardinal

19    compliance manual accurately reflect a

20    registrant's obligation to notify DEA before

21    a suspicious order is shipped?

22               MS. MAINIGI:  Objection.

23         Outside the scope of the Touhy

24         authorization.  Form.  Foundation.

25               THE WITNESS:  Well, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          regulations require immediately upon

 2          discovery, so it's not...

 3     QUESTIONS BY MS. SINGER:

 4          Q.    Okay.  If that was added, that

 5     they should be notified -- that the DEA

 6     should be notified immediately before a

 7     suspicious order is shipped, would that be

 8     accurate?

 9              MS. MAINIGI:  Objection -- same

10          objections.

11              THE WITNESS:  Yes.

12     QUESTIONS BY MS. SINGER:

13          Q.    Okay.  And would DEA expect

14     that a registrant would remain -- excuse me,

15     would maintain copies of a suspicious order

16     reported to the DEA?

17          A.    Yes.

18          Q.    Let's turn then to the next

19     tab, which is -- oh, nope, we don't need to

20     do that.  Never mind.

21              All right.  Let's go back to

22     the slides we started with.

23              So, Mr. Prevoznik, we went

24     through the NWDA suspicious order monitoring

25     system, the seminar report that you went over
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with Mr. Farrell was skipped over this time,

 2    the DEA Diversion Investigators Manual, the

 3    NWDA Controlled Substances Manual in 1997 and

 4    Cardinal's compliance manual.

 5              In each of those manuals, just

 6    to be clear, was it true that DEA and the

 7    industry recognized that suspicious orders

 8    must be reported immediately when they are

 9    discovered, not after they are shipped?

10              MS. MAINIGI:  Objection.

11         Outside the scope of the Touhy

12         authorization.  Foundation.  Form.

13              THE WITNESS:  Yes.

14    QUESTIONS BY MS. SINGER:

15         Q.    And that suspicious -- that

16    orders that a registrant identifies as

17    suspicious cannot be shipped; is that

18    correct?

19              MS. MAINIGI:  Objection.  Form.

20         Foundation.

21              THE WITNESS:  Correct.

22    QUESTIONS BY MS. SINGER:

23         Q.    All right.  Now, we think about

24    suspicious orders under CFR 1301.74, but the

25    registrant that ships suspicious orders also
```

```
 1    fails to maintain effective controls to

 2    prevent diversion; is that correct?

 3              MR. MAHADY:  Objection.  Form.

 4        Objection.  Foundation.  Calls for a

 5        legal conclusion.

 6              THE WITNESS:  Correct.

 7    QUESTIONS BY MS. SINGER:

 8        Q.    And would it make sense to DEA

 9    that a registrant could identify an order as

10    suspicious, report it to the DEA and then

11    send it out to be sold or used?

12              MR. EPPICH:  Objection.  Form.

13        Calls for a legal conclusion.

14              THE WITNESS:  And not do

15        anything to relieve the suspicion?

16    QUESTIONS BY MS. SINGER:

17        Q.    That's right.

18        A.    No, they shouldn't --

19              MR. EPPICH:  Objection.  Form.

20    QUESTIONS BY MS. SINGER:

21        Q.    Can you say your answer again?

22        A.    Could you repeat your question?

23        Q.    Would it make sense to the DEA

24    that a registrant could identify an order as

25    suspicious, report it to the DEA, not dispel
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    their suspicion, and then go ahead and ship

 2    it so that it could be sold or used?

 3              MR. EPPICH:  Object to form.

 4         Calls for a legal conclusion.

 5              MS. MAINIGI:  Incomplete

 6         hypothetical.  Outside the scope.

 7              THE WITNESS:  No, it would not

 8         be correct.

 9    QUESTIONS BY MS. SINGER:

10         Q.    Why?

11         A.    Because they're not maintaining

12    effective controls over diversion.

13              MS. MAINIGI:  Same objections.

14    QUESTIONS BY MS. SINGER:

15         Q.    And what happens if they go

16    ahead and just ship that suspicious order?

17              MS. MAINIGI:  Same objections.

18              MR. EPPICH:  Object to the

19         form.  Calls for speculation.

20              THE WITNESS:  Well, it's --

21         there was a -- there was a reason it

22         triggered the suspicion, so the

23         possibility or potential for it to be

24         diverted into the illicit market is

25         enhanced because it triggered a
```

Highly Confidential - Subject to Further Confidentiality Review

1         suspicious order within their system.

2              So that being the underlying

3         cause for it to be triggered, that --

4         the potential for it to be diverted,

5         now it's going -- the potential now is

6         greater that it's going into the

7         public and is going to affect the

8         public health and safety.

9    QUESTIONS BY MS. SINGER:

10        Q.    Okay.  And would going ahead

11   and shipping suspicious orders demonstrate an

12   attitude of irresponsibility, which I think

13   is the language of the Diversion

14   Investigators Manual, to the detriment of the

15   public health?

16              MS. MAINIGI:  Objection.

17        Outside the scope of Touhy

18        authorization.  Form.

19              MR. EPPICH:  Objection.

20              THE WITNESS:  Yes.

21   QUESTIONS BY MS. SINGER:

22        Q.    And has that always been true,

23   that shipping a suspicious order is a failure

24   of effective controls to prevent diversion?

25              MR. MAHADY:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Objection to foundation.

 2                   THE WITNESS:  Yes.

 3                   (Prevoznik Plaintiff's Exhibit

 4         P38 marked for identification.)

 5    QUESTIONS BY MS. SINGER:

 6         Q.    Now, one of the -- during the

 7    first or second day of your deposition -- and

 8    let's turn to your deposition.  I'm sure just

 9    what you want to relive.

10                   All right.  So we'll mark this

11    as Exhibit 38.

12                   And, Mr. Prevoznik, can I

13    direct you -- and this is the deposition of

14    Tom Prevoznik, April 17, 2019.

15                   All right.  And if you could

16    turn to page 171.  All right.  And I want to

17    direct your attention to the middle of the

18    page where you testify:  "It was a business

19    decision on whether to ship or not ship, that

20    we, DEA, were not going to direct a

21    registrant don't ship or not ship at that

22    time."

23                   Do you see where I am?

24                   MS. FUMERTON:  Objection.

25         Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.
 2    QUESTIONS BY MS. SINGER:
 3          Q.     Okay.  And then if you turn the
 4    page -- I'm sorry.  At the bottom of
 5    page 171, because -- so in 7, it was clear
 6    that you were now directing registrants:  Do
 7    not ship.
 8                    And you said, right, because of
 9    the Internet.
10                    And then there's a question:
11    "And prior to December 2007, it was a
12    business decision by each registrant
13    recognizing what their own obligations were,
14    correct?"
15                    MR. EPPICH:  Object to form.
16                    THE WITNESS:  Yes.
17    QUESTIONS BY MS. SINGER:
18          Q.     Have I read that accurately?
19          A.     Yes.
20          Q.     And I just want to be clear.
21    Between -- before and after 2007, was it
22    always the policy of the DEA that registrants
23    could not ship suspicious orders?
24                    MR. EPPICH:  Object to form.
25                    MS. MAINIGI:  Objection.  Form.
```

```
 1              Testimony speaks for itself.

 2                   THE WITNESS:  Yes.

 3                   MR. MAHADY:  Foundation.

 4    QUESTIONS BY MS. SINGER:

 5         Q.    And when you talk about a

 6    change in 2007, you go on to say at the

 7    bottom of 172, "Well, I don't know if there

 8    was confusion or not because the -- quite a

 9    few registrants continue to do what they

10    continue to do, which was continue to sell,

11    to ignore suspicious orders, and they

12    continue to sell huge volumes down the line

13    through retail."

14                   Do you see what I've just read?

15         A.    Yes.

16         Q.    And I've read that accurately?

17         A.    Yes.

18         Q.    And is that the change you're

19    referring to in 2007, was DEA's recognition

20    that registrants continued to sell suspicious

21    orders?

22                   MS. MAINIGI:  Objection.

23         Testimony speaks for itself.

24                   THE WITNESS:  Yes.  Because

25         when we met with them in 2005, we
```

```
 1          showed them their own data and said,

 2          "These are the things that we see,

 3          that we see as very suspicious."

 4                So we were telling the

 5          registrants up front, "Look, there is

 6          a problem.  This is what we're

 7          seeing."

 8                And then they would say, "Yes,

 9          we want to be -- we want to fix this."

10                And then we continued to see

11          those same things continue for some of

12          them.  Some of them did correct it,

13          but some of them continued to go and

14          sell those things.

15     QUESTIONS BY MS. SINGER:

16          Q.    Okay.  And then continuing on

17     in your testimony, page 184, you're talking

18     in the middle of the page about the

19     subjective of shipping, of determining a

20     suspicious order.

21                Do you see where I am in the

22     middle of the page?

23          A.    Yes.

24          Q.    And Cardinal's counsel,

25     Ms. Mainigi, asked you:  "Because it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    subjective," right?

 2              Do you see where I am?  Towards

 3    the bottom of the page?

 4         A.    Yes.

 5         Q.    And then on the next page you

 6    answered:  "WITNESS:  Yeah, it can be

 7    subjective."  Top of page 185.

 8              Do you see where I am?

 9         A.    Yes.

10         Q.    Okay.  And I want to make sure

11    that your testimony is clear.  When you say

12    whether a suspicious order is subjective, do

13    you mean that it varies from case to case, or

14    it depends on who's looking at it?

15              MS. MAINIGI:  Objection to

16         form.

17              THE WITNESS:  Both, really.  It

18         depends who's looking at it and

19         what system do they have that's

20         triggering the suspicious order.  So

21         it's whatever that registrant

22         designed, which is specific to that

23         registration.

24    QUESTIONS BY MS. SINGER:

25         Q.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    But a suspicious order is a
 2    suspicious order that's an order of unusual
 3    size -- you can say it better than I can, so
 4    please go ahead.
 5                    MS. MAINIGI:  Objection.  Form.
 6          Foundation.
 7                    THE WITNESS:  Unusual --
 8          unusual size, deviating from a --
 9          substantially deviating from a normal
10          pattern, and unusual frequency.
11    QUESTIONS BY MS. SINGER:
12          Q.    Okay.  And that's universally
13    factually true, correct?
14                    MS. MAINIGI:  Objection.
15          Foundation.  Vague.  Outside scope.
16                    THE WITNESS:  Correct.  And
17          it's disjunctive.  So it could be one,
18          it could be two, it could be other
19          things that we've given guidance on.
20                    We gave guidance in the
21          distributor initiative when we went
22          through the various red flags.  We put
23          them in guidance letters as well -- or
24          not guidance, reiteration of the
25          regulations in 2006 and 2007 letters
```

```
 1            from Mr. Rannazzisi.

 2    QUESTIONS BY MS. SINGER:

 3         Q.    And those criteria don't vary

 4    from registrant to registrant, correct?

 5                 MR. EPPICH:  Object to form.

 6         Vague.

 7                 THE WITNESS:  Correct.

 8    QUESTIONS BY MS. SINGER:

 9         Q.    And what differs is whether an

10    order triggers a suspicious {sic} based on a

11    customer's history, their buying patterns,

12    frequency, et cetera, correct?

13                 MR. EPPICH:  Object to form.

14         Vague.

15                 THE WITNESS:  Yes, as well as

16         the registrants, have they made any

17         changes to the system.

18                 (Prevoznik Plaintiff's Exhibit

19         P39 marked for identification.)

20    QUESTIONS BY MS. SINGER:

21         Q.    Okay.  Let's turn very quickly

22    to the industry compliance guidelines.

23                 All right.  I'm going to show

24    you what's been marked as Exhibit 39.

25                 And this is Bates number
```

```
 1    CAH_MDL2804_00988458.

 2              Mr. Prevoznik, have you seen

 3    this document before?

 4         A.     Yes.

 5         Q.     Okay.  And do you recognize

 6    this to be the Healthcare Distribution

 7    Management Association's industry compliance

 8    guidelines?

 9         A.     Yes.

10         Q.     Okay.  And do you know -- I

11    don't know if they have a date on them, but

12    does it sound right that they were issued in

13    2008?

14              MR. EPPICH:  Objection.

15         Foundation.  Calls for speculation.

16    QUESTIONS BY MS. SINGER:

17         Q.     Or do you know what year they

18    were issued?

19         A.     I don't know.

20         Q.     Okay.

21         A.     I don't know.

22         Q.     Okay.  And if you look at the

23    first page, the third paragraph:  "At the

24    center of a sophisticated supply chain,

25    distributors are uniquely situated to perform
```

Highly Confidential - Subject to Further Confidentiality Review

1    due diligence in order to help support the

2    security of the controlled substances they

3    deliver to their customers."

4              Do you see what I've just read?

5         A.    Yes.

6         Q.    And does the DEA agree with

7    that statement?

8         A.    Yes.

9              MS. MAINIGI:  Objection.

10   QUESTIONS BY MS. SINGER:

11        Q.    And did the DEA approve these

12   industry compliance guidelines?

13        A.    No.

14        Q.    Now, I just want to go through

15   some specifics with you very briefly, I hope,

16   to see if the DEA agrees that these elements

17   comply with the Controlled Substances Act.

18   Let's start with Bates number 461.

19              Does the DEA agree that a

20   registrant should investigate a customer

21   before agreeing to ship them controlled

22   substances?

23              MS. MAINIGI:  Objection.

24              MR. EPPICH:  Objection.  Form.

25              THE WITNESS:  Am I supposed to

```
 1          be looking at something here or --

 2     QUESTIONS BY MS. SINGER:

 3          Q.     No, just a general statement.

 4          A.     Oh, okay.

 5                 MR. EPPICH:  Object to form.

 6     QUESTIONS BY MS. SINGER:

 7          Q.     Do you want me to repeat the

 8     question, or do you have it?

 9          A.     No.  Repeat it.

10          Q.     Does the DEA agree that a

11     registrant should investigate a customer

12     before agreeing to ship them controlled

13     substances?

14                 MR. EPPICH:  Object to form.

15                 THE WITNESS:  What do you mean

16          by the term "investigate"?  Know who

17          they are?

18     QUESTIONS BY MS. SINGER:

19          Q.     That they should know their

20     customer.

21                 MR. EPPICH:  Object to form.

22                 THE WITNESS:  Yes.

23     QUESTIONS BY MS. SINGER:

24          Q.     Okay.  And in this guide, it

25     lays out certain elements, including -- if
```

Highly Confidential - Subject to Further Confidentiality Review

 1    you look towards the bottom of the page under

 2    the information-gathering step, would

 3    include -- I'm sorry, let's start at the top

 4    of the page.

 5              Under the first paragraph,

 6    Introduction:  "Before opening an account" --

 7    do you see where I am?

 8         A.    Yes.

 9         Q.    -- "the distributor should,

10    one, obtain background information on the

11    customer and the customer's business; review

12    that information carefully and, where

13    appropriate, verify that information; and

14    independently investigate the potential

15    customer."

16              Do you see what I've just read?

17         A.    Yes.

18         Q.    And does the DEA agree that

19    those are appropriate and necessary steps for

20    a registrant to take before shipping

21    controlled substances?

22              MR. EPPICH:  Object to form.

23              THE WITNESS:  Yes.

24    QUESTIONS BY MS. SINGER:

25         Q.    Okay.  And then moving down the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    page, second bullet talks about a background

 2    questionnaire.

 3              Do you see that?

 4    A.    Yes.

 5    Q.    And that should cover the

 6    average number of prescriptions filled each

 7    day, average number of CS item prescriptions

 8    filled each day.

 9              Do you see where I am?

10    A.    Yes.

11    Q.    And CS probably means

12    controlled substances, yes?

13              MR. EPPICH:  Objection.

14    Foundation.  Calls for speculation.

15              THE WITNESS:  Yes.  In my

16    experience, yes.

17    QUESTIONS BY MS. SINGER:

18    Q.    Okay.  And then percentage of

19    controlled substances purchased compared to

20    overall purchases?

21    A.    Yes.

22    Q.    Would the DEA agree that those

23    are things that a registrant should be

24    looking at before shipping controlled

25    substances to a new customer?
```

```
 1                    MR. EPPICH:  Object to form.

 2                    THE WITNESS:  Yes.

 3     QUESTIONS BY MS. SINGER:

 4          Q.     All right.  And turning to the

 5     next page, identify -- bottom bullet:

 6     "Identification of physicians and other

 7     treatment centers that are the potential

 8     customer's most frequent prescribers or

 9     highest purchasing doctors."

10                    Do you see where I am?

11          A.     Yes.

12          Q.     And is that something that a

13     registrant should be doing as well?

14                    MR. EPPICH:  Object to form.

15                    THE WITNESS:  Yes.

16     QUESTIONS BY MS. SINGER:

17          Q.     Okay.  Turning to the next

18     page, independent investigation, subheading

19     D, it says at the first line, "The

20     distributor should independently investigate

21     the potential customer as follows:"  Checking

22     with the local DEA office, state oversight

23     authorities, DEA website and Federal

24     Register, and conducting an Internet search.

25                    Do you see each of those
```

```
 1    elements?

 2         A.    Yes.

 3         Q.    And does the DEA agree that

 4    those are things that a responsible

 5    registrant should be doing before shipping

 6    controlled substances to a customer?

 7              MS. MAINIGI:  Objection.  Form.

 8         Foundation.  Vague.

 9              THE WITNESS:  Yes.

10    QUESTIONS BY MS. SINGER:

11         Q.    And merely checking to see

12    whether a customer has a DEA registration,

13    would that be sufficient due diligence or

14    knowing your customer?

15              MR. EPPICH:  Object to form.

16         Calls for a legal conclusion.

17              THE WITNESS:  No.

18    QUESTIONS BY MS. SINGER:

19         Q.    And it says here under

20    Additional Recommendations and Documentation,

21    the third bullet, "The performance and

22    results of all steps in the customer review

23    process should be fully documented as to each

24    potential customer, and such documentation

25    should be retained in an appropriate file."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see what I've just read?
 2         A.    Yes.
 3         Q.    And does the DEA also agree
 4    that that is an appropriate element, that
 5    documenting due diligence or knowing your
 6    customer is an appropriate element of that
 7    program?
 8                    MR. EPPICH:  Object to form.
 9         Calls for a legal conclusion.
10                    THE WITNESS:  Yes.
11    QUESTIONS BY MS. SINGER:
12         Q.    All right.  Turning to 465, so
13    two pages ahead, you see the section Develop
14    Thresholds to Identify Orders of Interest?
15         A.    Yes.
16         Q.    Okay.  So it says here that
17    distributors -- I'm down at the second set of
18    bullets, the bottom bullet:  "Thresholds for
19    all new customer accounts should be
20    established at the lowest level indicated by
21    information obtained during the know your
22    customer due diligence review."
23                    Do you see where I've just
24    read?
25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     And does the DEA agree that

 2   that is appropriate?

 3                MR. EPPICH:  Object to form.

 4                MS. MAINIGI:  Objection.

 5                THE WITNESS:  I guess my

 6        concern would be that if you're --

 7        what is the lowest level?  Is it what

 8        the customer is reporting what they

 9        said they ordered or is it -- you

10        know, it could be like really a large

11        amount, or is the registrant saying

12        this is what we are going to say is

13        the lowest amount.

14                So I have a little trouble with

15        that one.

16   QUESTIONS BY MS. SINGER:

17        Q.     Okay.  So just making sure that

18   we get this clear for the jury, the amount

19   that a customer reports may be too high,

20   correct?

21                MR. EPPICH:  Object to form.

22                MS. MAINIGI:  Objection.

23                MR. EPPICH:  Incomplete

24        hypothetical.

25                THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.     And the registrant should be

 3    making its own judgment about what is not

 4    suspicious for a particular customer and not

 5    just accepting what they've previously

 6    ordered, correct?

 7              MR. EPPICH:  Object to form.

 8         Calls for a legal conclusion.

 9              THE WITNESS:  Correct.

10    QUESTIONS BY MS. SINGER:

11         Q.     And they shouldn't be building

12    in some excess above that level, correct?

13              MR. EPPICH:  Object to form.

14         Calls for a legal conclusion.

15              THE WITNESS:  Yes.

16    QUESTIONS BY MS. SINGER:

17         Q.     All right.  And then looking at

18    the section Cumulative Reviews/Thresholds,

19    the industry compliance guidelines also

20    indicate that "there should be a mechanism to

21    compare percentages of orders for controlled

22    substances, individual products and/or

23    families to orders of noncontrolled substance

24    prescription drugs so as to identify a shift

25    in a customer's business focus that may
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    warranty further review."

 2              Do you see what I've just read?

 3        A.    Yes.

 4        Q.    And does the DEA agree that a

 5    registrant should not just be looking at a

 6    customer's controlled substances orders but

 7    their controlled substance orders relative to

 8    other products they're ordering?

 9              MR. EPPICH:  Object to form.

10        Calls for a legal conclusion.

11              THE WITNESS:  Yes.

12    QUESTIONS BY MS. SINGER:

13        Q.    All right.  And then Bates

14    number 466 under E, the last sentence:

15    "Based on the distributor's knowledge of his

16    or her customer's overall drug purchasing

17    trends, information available from DEA and

18    elsewhere, distributors are encouraged to

19    allow for alternative criteria, in addition

20    to those incorporated into the electronic

21    system, to serve as indicators of an order of

22    interest."

23              Do you see what I've just read?

24        A.    Yes.

25        Q.    And is it DEA's view that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and I think you testified to this earlier --

 2    that a registrant should be looking at other

 3    indicators of suspicion, not just an order

 4    history?  Correct?

 5                 MR. EPPICH:  Object to form.

 6                 THE WITNESS:  Yes.

 7    QUESTIONS BY MS. SINGER:

 8         Q.     And is the DEA aware that

 9    distributors have sales representatives or

10    account managers who visit pharmacies, for

11    instance?

12                 MR. EPPICH:  Object to form.

13         Foundation.

14                 THE WITNESS:  Yes.

15                 MS. MAINIGI:  Scope.

16    QUESTIONS BY MS. SINGER:

17         Q.     And should distributors be

18    looking at the -- should they be

19    incorporating or factoring the observations

20    of their account managers or sales reps into

21    their evaluation of customers and their

22    orders?

23                 MR. EPPICH:  Object to form.

24         Calls for a legal conclusion.

25         Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.  But I would

 2           also -- they're drivers as well,

 3           because it's on a daily basis they're

 4           in the pharmacies.

 5    QUESTIONS BY MS. SINGER:

 6           Q.    Okay.  All right.  And then

 7    looking at the bottom of the page, still at

 8    Bates number 466, "The drug or drugs that

 9    cause an order to become an order of interest

10    should not be shipped to the customer placing

11    the order while the order is an order of

12    interest."

13                    Do you see what I've just read

14    there?

15           A.    Yes.

16           Q.    And do you understand that to

17    be saying that while an order is being

18    evaluated as to whether it's suspicious, it

19    should not be shipped?

20           A.    Yes.

21                    MS. MAINIGI:  Objection.  Form.

22    QUESTIONS BY MS. SINGER:

23           Q.    And it -- again, that is the --

24    that is what the Controlled Substances Act

25    requires, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Object to form.

 2         Calls for a legal conclusion.

 3                    MR. MAHADY:  Foundation.

 4                    THE WITNESS:  Correct.

 5    QUESTIONS BY MS. SINGER:

 6         Q.    All right.  Next page, the top

 7    of the page:  "It's recommended that the

 8    distributor designate a person with suitable

 9    training and experience to investigate orders

10    of interest."

11                    Do you see what I've just read?

12         A.    Yes.

13         Q.    And does the DEA agree that a

14    registrant should have appropriately trained

15    and experienced compliance staff executing

16    its suspicious order monitoring and due

17    diligence process?

18                    MR. EPPICH:  Objection.

19                    MS. MAINIGI:  Objection.  Form.

20                    MR. EPPICH:  Foundation.

21                    THE WITNESS:  Yes.

22    QUESTIONS BY MS. SINGER:

23         Q.    All right.  Bates number 468,

24    subsection D, Documentation, it says under

25    that, "All investigations should be fully
```

1    documented, and all records of the

2    investigation should be retained in an

3    appropriate location within the firm, such as

4    with other records relating to the particular

5    customer."

6               Does the DEA agree with that

7    element of a compliant suspicious order

8    monitoring program?

9               MR. EPPICH:  Object to form.

10        Calls for a legal conclusion.

11              THE WITNESS:  Yes.

12   QUESTIONS BY MS. SINGER:

13        Q.    And in the middle of the next

14   paragraph:  "The documentation should include

15   a clear statement of the final conclusion of

16   the investigation, including why the order

17   investigated was or was not determined to be

18   suspicious.  That statement should be signed

19   and dated by the reviewer.  Copies of any

20   written information provided by the customer

21   should also be retained as part of the

22   documentation of the investigation."

23              Does the DEA agree that's

24   appropriate?

25              MR. EPPICH:  Objection to form.

```
 1              Calls for a legal conclusion.

 2                   THE WITNESS:  Yes.

 3    QUESTIONS BY MS. SINGER:

 4         Q.    All right.  Very last paragraph

 5    on that page, "Orders that are determined to

 6    be suspicious should be reported to DEA under

 7    Section 1301.74(b) immediately upon being so

 8    determined."

 9                   I think you've already

10    testified that that's a requirement, correct?

11                   MR. EPPICH:  Objection to form.

12                   THE WITNESS:  Correct.

13    QUESTIONS BY MS. SINGER:

14         Q.    "It is assumed that the order

15    will continue to be placed on hold and/or

16    canceled once it has been identified as

17    suspicious."

18                   Is that also consistent with

19    the DEA's interpretation of the Controlled

20    Substance Act's requirements?

21                   MR. EPPICH:  Object to form.

22         Calls for a legal conclusion.

23                   THE WITNESS:  Yes.

24    QUESTIONS BY MS. SINGER:

25         Q.    Now, if the -- if an order is
```

```
 1    identified as suspicious and not shipped but

 2    held and then released the next month when a

 3    threshold is reset, does the DEA believe that

 4    the registrant is still shipping a suspicious

 5    order?

 6              MR. EPPICH:  Object to form.

 7         Calls for a legal conclusion and

 8         incomplete hypothetical.

 9              MS. MAINIGI:  Outside the

10         scope.

11              THE WITNESS:  Could you please

12         repeat that?

13    QUESTIONS BY MS. SINGER:

14         Q.    Now, if an order is identified

15    as suspicious and not shipped but then held,

16    you know, not shipped, held until the next

17    month when a threshold resets, is that order

18    still suspicious?

19              MR. EPPICH:  Object to form.

20         Calls for a legal conclusion and

21         incomplete hypothetical.

22              MR. FINKELSTEIN:  Incomplete

23         hypothetical.

24              THE WITNESS:  Yes.

25
```

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    And should the registrant be

 3    shipping that the next month?

 4              MR. EPPICH:  Object to form.

 5         Calls for a legal conclusion.

 6    QUESTIONS BY MS. SINGER:

 7         Q.    Without first dispelling the

 8    suspicion?

 9              MR. EPPICH:  Object to form.

10         Calls for a legal conclusion.

11         Incomplete hypothetical.

12              THE WITNESS:  Yes, they should

13         be relieving -- or ascertaining is

14         there suspicion or not.

15    QUESTIONS BY MS. SINGER:

16         Q.    And not shipping unless they

17    eliminate the basis for that suspicion?

18         A.    Correct.

19              MR. EPPICH:  Object to form.

20         Calls for a legal conclusion.

21         Incomplete hypothetical.

22    QUESTIONS BY MS. SINGER:

23         Q.    469, sub F, Future Customer

24    Orders.  "In instances where a distributor

25    concludes that an order is or remains
```

```
 1    suspicious after conducting an investigation,

 2    in addition to notifying DEA, it is

 3    recommended that the distributor evaluate its

 4    business relationship with the customer that

 5    placed that order."

 6              Do you see what I've just read?

 7         A.    Yes.

 8         Q.    "The distributor may consider

 9    whether to subject future orders from that

10    same customer -- from that same customer for

11    the same drug code product or all controlled

12    substances to more rigorous scrutiny than was

13    applied before the determination that the

14    order is suspicious.  The distributor may

15    also consider whether to cease filling all

16    future orders of that drug product code or

17    all controlled substances placed by that

18    customer."

19              Does the DEA agree that when a

20    registrant identifies a suspicious order,

21    they should also be looking more generally at

22    that customer?

23              MS. MAINIGI:  Objection to

24         form.

25              THE WITNESS:  Yes.
```

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.     And making a decision as to not

 3    only whether to fill that order but to

 4    continue filling orders for that customer?

 5              MR. EPPICH:  Object to form.

 6         Calls for a legal conclusion.

 7              THE WITNESS:  Yes.

 8    QUESTIONS BY MS. SINGER:

 9         Q.     All right.  Bottom of page 469.

10    An endless document for one so short.  It

11    says at the bottom bullet, "For example, the

12    distributor may identify information that

13    leads them to believe that a potential

14    customer, prior to entering a formal business

15    arrangement with that customer, may

16    intend" -- on the next page -- "to order

17    controlled substances -- controlled substance

18    products with a frequency, volume or other

19    indicator that could be considered

20    suspicious.  In such instances, the

21    distributor should provide DEA with a report

22    of this information under 21 CFR

23    Section 1301.74(b)."

24              Do you see what I've just read?

25         A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And would the DEA agree that if

 2    a distributor is evaluating a potential

 3    customer, sees indications that it may be

 4    engaged in diversion, it is not sufficient

 5    for the distributor to simply not do business

 6    with that customer, but that they should also

 7    be reporting that customer -- that potential

 8    customer to the DEA?

 9               MR. EPPICH:  Object to form.

10          Calls for a legal conclusion.

11               THE WITNESS:  Yes.

12    QUESTIONS BY MS. SINGER:

13          Q.     All right.  Subsection B on

14    Bates number 470, under Correspondence For

15    Reporting, "It is recommended that all

16    correspondence to DEA containing reports of

17    suspicious orders should be sent registered

18    mail with a return receipt requested, by

19    electronic mail or by another system that

20    creates for the distributor a permanent

21    record that DEA has received the

22    notification."

23               Does the DEA agree with that?

24               MS. MAINIGI:  Objection to

25          form.
```

```
 1                    THE WITNESS:  Well, we have two

 2           different things going on.  We have

 3           those that report to the field and

 4           those that have been under an action

 5           that is now dictated to go through

 6           electronically to headquarters.

 7                    So, yes, if it's going to the

 8           office, that would be a great way to

 9           do it, to track that.

10   QUESTIONS BY MS. SINGER:

11           Q.    Okay.  And that C,

12   Documentation, "All additional contact with

13   DEA, either by telephone or in person, should

14   be documented, and a record of the contact

15   should be maintained."

16                    Does the DEA agree with that?

17           A.    Yes.

18           Q.    And is it fair to say that the

19   DEA would agree that a registrant should be

20   maintaining records of suspicious orders they

21   report to the DEA?

22                    MR. EPPICH:  Object to form.

23           Calls for a legal conclusion.

24           Foundation.

25                    THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    So while registrants, in going

 3    through all of these different elements of

 4    the industry compliance guidelines, which

 5    we're now thankfully finished with, would the

 6    DEA agree that whatever suspicious order

 7    monitoring algorithm or system that a

 8    registrant uses, that all of these elements

 9    we just went through are elements of a

10    responsible and compliant program to prevent

11    diversion?

12              MR. EPPICH:  Object to form.

13         Calls for a legal conclusion.

14              THE WITNESS:  Yes.

15    QUESTIONS BY MS. SINGER:

16         Q.    All right.

17              MR. FINKELSTEIN:  Why don't we

18         take a five-minute break.

19              MS. SINGER:  Can I do one more

20         document that connects with this and

21         then --

22              MR. FINKELSTEIN:  Okay.  One

23         more.

24              MS. SINGER:  Thank you.

25              (Prevoznik Plaintiff's Exhibit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P40 marked for identification.)

 2    QUESTIONS BY MS. SINGER:

 3         Q.     All right.  Mr. Prevoznik,

 4    Exhibit 40 is entitled "Draft DEA Comments

 5    From the 6-04-08 Meeting on Suspicious

 6    Orders."  It's Bates number

 7    CAH_MDL2804_03234535.

 8              Have you seen this document?

 9         A.     No.

10         Q.     Okay.  Do you see here at the

11    top of the document a list of DEA attendees?

12         A.     Yes.

13         Q.     And do you recognize those to

14    be people who have worked for the DEA?

15         A.     Yes.

16         Q.     Okay.  And do you recognize the

17    HDMA attendees?  Somebody from Williams &

18    Connolly, people identified as with HDMA?

19         A.     I don't recognize the names.

20         Q.     Okay.  All right.  If you go

21    down to the middle of the page, P.4,

22    Item 1.B, it says, "DEA was pleased to see

23    that the questionnaire would be notarized or

24    provided with the statement declaring that it

25    is true and correct.  DEA does not want
```

Highly Confidential - Subject to Further Confidentiality Review

1    changes but wants us to be aware that merely

2    obtaining a signed document isn't going to be

3    enough of a defense.  Distributors will have

4    to do more to identify the pharmacy's

5    legitimacy."

6              Do you understand what this is

7    referring to?

8              MS. MAINIGI:  Objection.

9         Foundation.  Outside the scope of the

10        Touhy authorization.

11             THE WITNESS:  I don't know what

12        question they're talking about.

13   QUESTIONS BY MS. SINGER:

14        Q.    Okay.  Would the DEA agree that

15   in addition to completing a question --

16   having a potential customer complete a

17   questionnaire before a registrant agrees to

18   ship them a controlled substance, that a

19   registrant has to verify that the answers to

20   that questionnaire are accurate and complete?

21             MR. EPPICH:  Object to the

22        form.  Calls for a legal conclusion.

23             THE WITNESS:  Yes.

24   QUESTIONS BY MS. SINGER:

25        Q.    And then turning to page 2 of

```
 1    this document, which is Bates number 536, it

 2    says, "DEA seemed to think that, quote,

 3    thresholds, focus principally on volumes, and

 4    they express the view that an exclusive or

 5    even principal focus on volumes is

 6    inadequate."

 7              Is that consistent with the

 8    testimony you've given that just using volume

 9    thresholds aren't sufficient to identify

10    suspicious orders?

11              MR. FINKELSTEIN:  The portion

12         you read isn't in front of the

13         witness.

14              Do you know where she's reading

15         from?

16              THE WITNESS:  No.

17    QUESTIONS BY MS. SINGER:

18         Q.    I'm sorry.  It's the bottom of

19    page 536, the underscored language.

20              MS. FUMERTON:  Object to form.

21              MR. EPPICH:  Object to the

22         form.  Calls for a legal conclusion.

23         Vague.

24              THE WITNESS:  Sorry, can you

25         repeat it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    Yeah.

 3              Do you agree with that first

 4    underlined sentence, "DEA seemed to think the

 5    thresholds focus principally on volumes, and

 6    they express the view that an exclusive or

 7    even principal focus on volumes is

 8    inadequate"?

 9         A.    Yes.

10         Q.    Okay.  They also want the

11    initial screen of orders to focus on, "A,

12    patterns of ordering, comparing the present

13    order to the past orders from the same

14    customers, including whether the frequency of

15    orders is suspicious; 2, orders are from

16    similar customers; and, 3, orders from the --

17    from other establishments of the same type in

18    the locale or region; and on, B, combinations

19    of controlled substances ordered."

20              Does DEA agree that that is

21    also a necessary element of monitoring for

22    suspicious orders?

23              MR. EPPICH:  Object to the

24         form.  Calls for a legal conclusion.

25              THE WITNESS:  Yeah, I'm not --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the word "necessary," I mean, it's

 2          very important.  It's part of the

 3          criteria that should be included.

 4   QUESTIONS BY MS. SINGER:

 5          Q.    Okay.  And then on Bates

 6   number 538, looking at the highlighted

 7   language toward the bottom of the page:  "In

 8   general" --

 9          I want to make sure you see

10   where I am.

11          A.    Yes.

12          Q.    -- "DEA did not object to our

13   recommendation that the particular drug or

14   drugs that cause an order to be an order of

15   interest or a suspicious order should not be

16   shipped but other drugs can be.  Their point

17   was that in some circumstances the connection

18   between that drug and another drug in the

19   order should lead the wholesaler not to ship

20   the other drug as well.  Again, in their

21   view, looking at a volume order drug by drug

22   is not enough, and basing thresholds solely

23   on volume is not enough.  Even an order for a

24   drug that does not meet a volume threshold

25   may be suspicious in light of other aspects
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     of the order."

 2               Does DEA agree with that

 3     statement?

 4               MR. EPPICH:  Object to the

 5          form.  Calls for a legal conclusion.

 6               THE WITNESS:  Yes.

 7     QUESTIONS BY MS. SINGER:

 8          Q.    Okay.  And then the final

 9     section of this document, Bates number 539,

10     if you look at the bullets on the bottom of

11     the page, additional comments/points raised.

12               Do you see where I am?

13          A.    Yes.

14          Q.    "DEA was emphatic that if there

15     were questions about an order, the order

16     should not be shipped."

17               Do you agree with that

18     statement?

19               MR. EPPICH:  Object to form.

20          Calls for a legal conclusion.

21               THE WITNESS:  Yes.

22     QUESTIONS BY MS. SINGER:

23          Q.    And why do you think the

24     "should not" is underscored there?

25               MR. EPPICH:  Object to the
```

```
 1          form.  Foundation.  Calls for

 2          speculation.

 3               MS. MAINIGI:  Objection.

 4          Foundation.

 5               MR. FINKELSTEIN:  Calls for

 6          speculation.

 7               MS. SINGER:  You know what?

 8          Withdrawn.  Don't answer that.

 9    QUESTIONS BY MS. SINGER:

10          Q.    The next bullet, "They wanted

11    reports on all suspicious orders even if the

12    order was not shipped."

13               Does the DEA agree that

14    registrants should be reporting all

15    suspicious orders, even orders that aren't

16    shipped?

17               MR. EPPICH:  Object to the

18          form.  Calls for speculation.  Calls

19          for a legal conclusion.

20               THE WITNESS:  Yes.

21    QUESTIONS BY MS. SINGER:

22          Q.    "Timeliness is very important.

23    DEA wants us to emphasize the need for rapid,

24    timely reporting."

25               Is that a point that DEA made
```

```
 1    clear to registrants?

 2                MR. MAHADY:  Objection to form.

 3          Objection to foundation.

 4                MR. EPPICH:  Calls for

 5          speculation.

 6                THE WITNESS:  It's also

 7          regulation upon discovery, so it's

 8          immediately upon discovery.

 9    QUESTIONS BY MS. SINGER:

10          Q.    So that's a yes?

11          A.    Yes.

12                MS. SINGER:  Okay.  All right.

13          Let's take a break.

14                VIDEOGRAPHER:  We're going off

15          record.  The time is 10:30.

16          (Off the record at 10:30 a.m.)

17                VIDEOGRAPHER:  We're going back

18          on the record.  Beginning of Media

19          File 3.  The time is 10:45.

20                MR. FINKELSTEIN:  Before we

21          resume, I just have a request of the

22          parties and of the special master as

23          well.

24                Since it appears that we are

25          deferring argument over the scope of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              the Touhy authorization until sometime

 2              later, we would ask that we be copied

 3              on briefings regarding the scope of

 4              the Touhy authorization and that we be

 5              given an opportunity to respond.

 6                   MS. MAINIGI:  Fine with us.

 7                   MR. FINKELSTEIN:  And I ask

 8              that those be e-mailed directly to

 9         James Bennett.

10                   MR. BENNETT:  That's fine.

11                   SPECIAL MASTER COHEN:  So

12              stipulated.

13                   MS. SINGER:  All right.  Are we

14         ready?

15    QUESTIONS BY MS. SINGER:

16         Q.    All right.  Mr. Prevoznik, on

17    the one hand, industry has complained that

18    you didn't give -- you, the DEA, didn't give

19    them enough guidance or the right kind of

20    guidance on identifying suspicious orders,

21    but then one of the lawyers in your first two

22    days of deposition suggested that the

23    Rannazzisi letters, those 2006, 2007 letters,

24    were improper and should have gone through a

25    rulemaking process.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you remember what I'm
 2   referring to?
 3                    MR. EPPICH:  Object to form.
 4                    MS. MAINIGI:  Objection.
 5                    THE WITNESS:  Yes.
 6   QUESTIONS BY MS. SINGER:
 7        Q.    Okay.  Is DEA able to swear
 8   these positions, that you didn't give enough
 9   guidance, but you also should have given more
10   guidance?  I just said the same thing.
11                    MR. EPPICH:  Objection.
12   QUESTIONS BY MS. SINGER:
13        Q.    Is the DEA able to swear those
14   positions, that the guidance you gave was
15   improper but you should have given more
16   guidance?
17                    MR. EPPICH:  Object to form.
18        Vague.
19                    MS. MAINIGI:  Outside the scope
20        also.
21                    THE WITNESS:  I'm not sure what
22        you're asking me.
23   QUESTIONS BY MS. SINGER:
24        Q.    So when industry complains you
25   didn't give them enough guidance on
```

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders but also said that the

2    Rannazzisi letters were improper because they

3    didn't go through a rulemaking process, are

4    you able to reconcile those positions?

5                What should DEA have done?

6                MR. EPPICH:  Object to form.

7                MS. MAINIGI:  Objection.

8         Outside the scope of the Touhy

9         authorization.  Improper hypothetical.

10               MR. FINKELSTEIN:  I'll join the

11        scope objection.

12               You can answer if you

13        understand.

14               THE WITNESS:  I'm still not

15        sure what you're asking.

16               MS. SINGER:  Okay.  Skip it.

17   QUESTIONS BY MS. SINGER:

18        Q.    Okay.  Let me ask it

19   differently.

20               Did the Rannazzisi letters, the

21   2006, 2007 letters, change the obligations of

22   registrants?

23        A.    No.

24               MR. EPPICH:  Object to form.

25        Calls for a legal conclusion.

Highly Confidential - Subject to Further Confidentiality Review

```
1      QUESTIONS BY MS. SINGER:

2           Q.    Did they reflect a new policy

3      or interpretation by DEA?

4                 MR. EPPICH:  Object to the

5           form.

6                 THE WITNESS:  No, we were just

7           being more proactive to get the

8           registrants to see this was what was

9           going on.  That's why we did the

10          distributor initiatives, to show them

11          with their own data, these are the

12          anomalies that we were seeing and

13          explaining to them this is what we

14          saw, and you should be paying

15          attention to these as well.

16                So the guidance letter -- or

17          not the guidance.  The reiteration of

18          what their legal obligations were,

19          both statutorily and regulatory, were

20          in those letters, and it was to stop

21          what was going on at that time.

22     QUESTIONS BY MS. SINGER:

23          Q.    And "stop" meaning the --

24          A.    The diversion of controlled

25     substances into the illicit market.
```

```
 1                  (Prevoznik Plaintiff's Exhibit

 2          P41 marked for identification.)

 3     QUESTIONS BY MS. SINGER:

 4          Q.    Okay.  Showing you Exhibit 41.

 5     Do you recognize this, Mr. Prevoznik, as one

 6     of Joe Rannazzisi's letters from

 7     September 27, 2006?

 8          A.    Yes.

 9          Q.    And turn to page 3 of that

10     letter, please.

11                  Do you see a heading at the top

12     of the page, Circumstances That Might Be

13     Indicative of Diversion?

14          A.    Yes.

15          Q.    And does this letter then go

16     through a list of ten factors that

17     registrants might look to to determine

18     whether an order is suspicious?

19                  MS. MAINIGI:  Objection.

20                  THE WITNESS:  Are you talking

21     the middle 10 or the four above it?

22     QUESTIONS BY MS. SINGER:

23          Q.    The 1 through 4 -- I'm sorry,

24     and then 1 through 10, so a total of 14.

25          A.    Yes.
```

```
 1         Q.      Your math is better than mine.

 2                 And does this, in fact, reflect

 3     information, clarification, that DEA provided

 4     to registrants to help them identify

 5     suspicious orders?

 6         A.      Yes.

 7         Q.      Okay.

 8                 MR. EPPICH:  Object to form.

 9     QUESTIONS BY MS. SINGER:

10         Q.      All right.  Now, many of the

11     registrants represented by counsel here are

12     sophisticated, multi-billion dollar

13     companies; is that correct?

14                 MR. EPPICH:  Object to form.

15                 MS. MAINIGI:  Object to form.

16         Scope.

17                 MR. FINKELSTEIN:  Hang on.

18         I'll join the scope objection.

19                 You can answer.

20     QUESTIONS BY MS. SINGER:

21         Q.      Does DEA believe that they

22     needed DEA to explain the rules to them?

23                 MR. EPPICH:  Object to form.

24         Argumentative.

25                 MS. MAINIGI:  Scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Well, I mean,
 2           it's -- our job as DEA is as a
 3           regulatory and as a law enforcement,
 4           is to ensure that the right -- that
 5           it's staying within the closest in the
 6           distribution.  So that's -- our job is
 7           to investigate, detect and pro -- and
 8           detect where this might be occurring.
 9           So, I mean, that's what our job is.
10    QUESTIONS BY MS. SINGER:
11           Q.    Okay.  So let me ask it
12    slightly differently.
13                    In your experience, did these
14    companies have lawyers and lobbyists to help
15    them explain the rules for preventing
16    diversion and reporting suspicious orders?
17                    MR. EPPICH:  Objection.  Form.
18           Calls for speculation.  Foundation.
19                    MS. MAINIGI:  Outside the
20           scope.
21                    THE WITNESS:  Yes.
22    QUESTIONS BY MS. SINGER:
23           Q.    And do you think, does DEA
24    think, that the industry's failure to comply
25    with the Controlled Substances Act was due to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     a failure to understand what the law required

2     of them?

3               MR. MAHADY:  Objection.  Form.

4               MS. MAINIGI:  Foundation.

5          Scope.

6               MR. EPPICH:  Objection.  Calls

7          for a legal conclusion.

8               MR. FINKELSTEIN:  Calls for

9          speculation.

10              THE WITNESS:  No.

11    QUESTIONS BY MS. SINGER:

12         Q.    And do you think that

13    industry's failure to comply with the

14    Controlled Substances Act and maintain -- and

15    the failure to maintain effective controls

16    was due to -- I'm sorry, let me say that

17    again.

18              Do you think that industry's

19    failure to maintain effective controls to

20    prevent diversion was based on a lack of

21    recognition that diversion imperils public

22    health and safety?

23              MR. EPPICH:  Objection to form.

24         Foundation.  Calls for a legal

25              conclusion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. FINKELSTEIN:  Calls for

 2         speculation.

 3                 THE WITNESS:  Can you please

 4         repeat it?

 5    QUESTIONS BY MS. SINGER:

 6         Q.     Yeah.  I'll put it differently.

 7                 Do you think that the reason

 8    that the industry didn't comply with the

 9    rules is because they didn't understand what

10    would happen if they permitted the diversion

11    of controlled substances?

12                 MR. EPPICH:  Objection to form.

13         Calls for speculation.

14                 MS. MAINIGI:  Outside the scope

15         of the Touhy authorization.

16                 MR. FINKELSTEIN:  Calls for

17         speculation.

18                 THE WITNESS:  Can you give it

19         to me one more time?  I'm just having

20         a little hard time interpreting.

21    QUESTIONS BY MS. SINGER:

22         Q.     Do you think that industry

23    failed to understand that permitting the

24    diversion of controlled substances

25    jeopardizes public health and safety?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. EPPICH:  Objection to form.
 2         Calls for speculation.  Scope.
 3              MR. FINKELSTEIN:  Same
 4         objection.
 5              THE WITNESS:  Yes, I would
 6         agree that they didn't.
 7    QUESTIONS BY MS. SINGER:
 8         Q.    And put a different way,
 9    because I've got a lot of negatives in there,
10    do you think industry understood that
11    diversion leads to negative consequences for
12    public health and safety?
13              MR. EPPICH:  Object to form.
14         Calls for speculation.  Legal
15         conclusion.  Scope.
16              MS. MAINIGI:  Foundation.
17              MR. FINKELSTEIN:  Calls for
18         speculation.
19              THE WITNESS:  I think they
20         obviously do now.  I don't know at
21         that time that they realized how bad
22         it was getting.
23    QUESTIONS BY MS. SINGER:
24         Q.    But they did understand that
25    the purpose of the controlled -- of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     closed system is to prevent diversion and

2     protect public safety and the public

3     interest?

4               MR. EPPICH:  Objection to form.

5               MS. MAINIGI:  Objection to

6          form.  Outside the scope of the Touhy

7          authorization.

8               Special Master Cohen, I do

9          think that this entire line of

10         questioning where somehow the DEA is

11         supposed to define what industry was

12         thinking in some broad sense is

13         totally improper.

14              MR. EPPICH:  Objection.  Calls

15         for speculation.

16              MR. FINKELSTEIN:  Join the

17         speculation objection.

18              SPECIAL MASTER COHEN:

19         Eventually there will be an

20         admissibility ruling on this.  I'm not

21         going to preclude the questions from

22         being asked at this juncture.

23    QUESTIONS BY MS. SINGER:

24         Q.    Did you answer the question,

25    that --
```

```
 1          A.      I'm not sure if I answered or

 2    not.

 3          Q.      Okay.  Let me ask one more.

 4                  Is the -- did the DEA, in the

 5    Controlled Substances Act, make clear to

 6    industry that the failure to prevent

 7    diversion was a threat to public safety and

 8    the public interest?

 9                  MR. EPPICH:  Objection to form.

10          Foundation.

11                  THE WITNESS:  Yes, I think it's

12          established in 823 where it's part of

13          our -- part of the registrant that is

14          applying to be a registrant

15          understands that they have to maintain

16          effective controls.  They have to

17          follow the state laws.  They have to

18          not be convicted of, you know,

19          felonies or anything like that.

20                  But also they also know that

21          these drugs themselves are scheduled

22          controlled substances for a particular

23          reason, because they're addictive,

24          psychologically and physically they're

25          addictive, so they know that these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          drugs have these properties within

 2          themselves.

 3                  So they would understand that

 4          these drugs are categorized or

 5          scheduled in that manner because they

 6          have the potential to hurt.

 7                  MR. FINKELSTEIN:  For what it's

 8          worth, the witness said 823, not E 23.

 9   QUESTIONS BY MS. SINGER:

10          Q.    Now, you were asked in the

11   first two days of your deposition some

12   questions about whether DEA implicitly or

13   explicitly approved of distributors'

14   compliance programs.

15                  Do you remember that line of

16   questioning?

17          A.    Yes.

18          Q.    Okay.  And you testified that

19   if the DEA found problems, like not reporting

20   suspicious orders, you would let the

21   registrant know they needed to make

22   adjustments; is that correct?

23          A.    Now, I don't understand that

24   that's the totality of what I stated.

25          Q.    Okay.  So --
```

```
 1                    MR. EPPICH:  Well, let me

 2          object to it misstates prior

 3          testimony, please.

 4     QUESTIONS BY MS. SINGER:

 5          Q.    Okay.  So would the DEA let a

 6     registrant know if it was aware of problems

 7     with its suspicious order monitoring system?

 8                    MS. MAINIGI:  Objection.

 9          Vague.  Form.  Foundation.

10                    MR. FINKELSTEIN:  Incomplete

11          hypothetical.

12                    MS. MAINIGI:  And time period.

13                    THE WITNESS:  So how I would

14          respond to this particular question is

15          when we sit down with a registrant and

16          they're explaining their system to us,

17          we are in a listening mode.  We are

18          listening to what they say:  "This is

19          what we're going to do.  This is how

20          we're going to implement it.  These

21          are the thresholds.  These are the" --

22          whatever.  They're explaining the

23          system to us, so we listen to what

24          they're saying.

25                    If we, in listening to that,
```

```
 1          they ask -- or we hear something that

 2          doesn't sound quite right, we would

 3          offer and say, "Well, you might want

 4          to look at this."

 5               Sort of exactly like the

 6          Rannazzisi letters in which we laid

 7          out the foundation of these are the

 8          things that we're seeing.  We're

 9          having trouble trying to figure out

10          why this is going on.  So we're asking

11          you to ask the same questions of

12          yourselves of the data that you're

13          seeing.

14               So what we're trying to do is

15          we're trying to put people in

16          compliance so that this stops, that

17          the diversion stops.  So, yes, we

18          would -- we would offer suggestions to

19          them.

20               However, if we're into an

21          investigation or something where it --

22          where we are either investigating or

23          litigating, that might -- that

24          conversation might slow down.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MS. SINGER:

 2          Q.      Understood.

 3                  And the fact that DEA doesn't

 4      alert a registrant to a problem with their

 5      suspicious order monitoring program doesn't

 6      mean the problem doesn't exist, does it?

 7                  MR. EPPICH:  Object to form.

 8          Calls for speculation.  Calls for a

 9          legal conclusion.

10                  MS. FUMERTON:  And lack of

11          foundation.

12                  THE WITNESS:  Yes.

13      QUESTIONS BY MS. SINGER:

14          Q.      Yes.  Okay.

15                  So, for instance, if I turn in

16      my taxes and the IRS cashes the check and

17      doesn't send me an audit letter, it doesn't

18      mean that they've approved of a tax shelter

19      that I may have?

20                  MR. EPPICH:  Objection.

21          Incomplete hypothetical form.

22      QUESTIONS BY MS. SINGER:

23          Q.      Not that I do.

24                  MR. EPPICH:  Objection.  Form.

25          Incomplete hypothetical.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. FUMERTON:  Outside the

 2         scope.

 3                  MR. FINKELSTEIN:  Scope.

 4         Unless you're talking about my taxes.

 5                  THE WITNESS:  Yes.

 6    QUESTIONS BY MS. SINGER:

 7         Q.    Okay.  So you testified, too,

 8    that things can look good on paper or look

 9    fine on paper, but what matters is how they

10    work in practice, correct?

11                  MR. EPPICH:  Objection to the

12         extent it misstates prior testimony.

13                  THE WITNESS:  Well, the

14         regulations require two things:

15         design and operate.  So the design

16         would be this is what we propose, this

17         is what our system looks like, and

18         then becomes, well, what, in fact, did

19         you do with the operation of it.

20    QUESTIONS BY MS. SINGER:

21         Q.    Okay.  And you, the DEA, can't

22    always see what distributors don't do or do

23    wrong, especially if they're trying not to be

24    caught, correct?

25                  MR. EPPICH:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            form.  Foundation.

 2                 MS. MAINIGI:  Incomplete

 3            hypothetical and outside the scope.

 4                 THE WITNESS:  Correct.

 5                 (Prevoznik Plaintiff's Exhibit

 6            P42 marked for identification.)

 7       QUESTIONS BY MS. SINGER:

 8            Q.    Okay.  I want to turn to

 9       Exhibit 42.

10                 It is Exhibit Number 7 to the

11       Boggs deposition.  It's called "American

12       Pain:  The Largest US Pill Mill's Rise and

13       Fall."

14                 Have you seen this article

15       before?

16            A.    I don't -- I don't know of this

17       one in particular.  I've seen a lot of

18       articles.

19            Q.    Okay.  And I want you to turn

20       to the -- I don't know if it's tabbed on your

21       copy, but page -- the page that starts

22       "Harvard Drug" on the top.  I think it's the

23       fifth page.

24                 Do you see that page?

25            A.    Yes.
```

```
 1          Q.     And if you go down towards the

 2    bottom of the page, there's a paragraph that

 3    begins with "Gary Boggs, special agent with

 4    the DEA's Office of Diversion Control."

 5                 Do you see where I am?

 6          A.     Yes.

 7          Q.     And do you know who Gary Boggs

 8    is?

 9          A.     Yes.

10          Q.     And who is Gary Boggs?

11          A.     He was one of the assistants to

12    Joe Rannazzisi when Joe was the head of the

13    diversion program.

14          Q.     Okay.  And this article, if you

15    look at page 1, is dated 2012.

16                 Do you know if Gary Boggs was

17    with DEA in 2012?

18                 Or it identifies him here as a

19    special agent with DEA's Office of Diversion

20    Control.

21          A.     Yeah, I'm just trying to think,

22    because I got to headquarters in 2012, so he

23    was there for part of it, but I think he may

24    have -- not 100 percent, but he may have

25    retired towards the end of the year.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  So it says here, "Gary

 2   Boggs, special agent with the DEA's Office of

 3   Diversion Control, says the cases that the

 4   DEA has brought in recent years involved

 5   wholesalers knowingly making enormous sales

 6   to customers that were per se in violation of

 7   DEA's rules."

 8              Do you see where I'm reading?

 9        A.    Yes.

10        Q.    And does the DEA agree with

11   that statement?

12              MR. EPPICH:  Object to the

13         form.  Foundation.  Scope.

14              THE WITNESS:  Yes.

15   QUESTIONS BY MS. SINGER:

16        Q.    And then it goes on quoting

17   Mr. Boggs, "The notion put out by HDMA that

18   somehow or another the DEA is not providing

19   essential information to them is simply not

20   accurate, says Boggs.  It's a smokescreen.

21   It's a step out of desperation."

22              Do you see that statement?

23        A.    Yes.

24        Q.    Okay.  Do you agree with that

25   statement?
```

```
 1                    MR. EPPICH:  Objection to the

 2         form.  Scope.  Foundation.

 3                    MR. FINKELSTEIN:  Object to the

 4         form.

 5                    THE WITNESS:  Yes.

 6                    (Prevoznik Plaintiff's Exhibit

 7         P43 marked for identification.)

 8    QUESTIONS BY MS. SINGER:

 9         Q.    All right.  Moving to the next

10    exhibit.

11                    By the way, do you know what

12    Gary Boggs does now?

13                    MR. EPPICH:  Objection to form.

14         Calls for speculation.

15                    THE WITNESS:  He works for

16         McKesson.

17    QUESTIONS BY MS. SINGER:

18         Q.    All right.  Exhibit 43,

19    Mr. Prevoznik.

20                    This is MCKMDL00661483.

21                    MR. FINKELSTEIN:  Can I get

22         another copy of this, please?

23    QUESTIONS BY MS. SINGER:

24         Q.    All right.  And this is an

25    e-mail Re: Report on House Energy and
```

```
1    Commerce Subcommittee Hearing on DEA and FDA

2    Transparency.

3              And I'll direct you to the

4    middle of the e-mail from Ann Berkey.

5              Do you see where I am?

6        A.    Yes.

7        Q.    Okay.  And it's dated Tuesday,

8    April 8, 2014.

9              And if you look in the text of

10   that e-mail, it says, "I met today with Gary

11   Boggs, the new senior director of reg affairs

12   for US pharma for the east of the Mississippi

13   River, that is, who is based in Livonia.

14   He's a former top official with the DEA, and

15   we talked extensively about this bill, the

16   hearing, ways we can work with the Agency, et

17   cetera.  He outlined in some detail the

18   processes that the DEA has had in place for

19   years to, quote, collaborate with wholesalers

20   in the way in which our industry, CAH" --

21              Do you know what CAH refers to?

22              MR. EPPICH:  Objection.

23   Foundation.  Calls for speculation.

24              THE WITNESS:  No, I don't.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    Do you know if that might be

 3    Cardinal Health?

 4         A.    It could be.

 5               MR. EPPICH:  Objection.

 6         Foundation.

 7               MS. MAINIGI:  Outside the

 8         scope.

 9               MR. EPPICH:  Asked and

10         answered.

11               MS. MAINIGI:  Ms. Singer, we

12         would appreciate it if you were not

13         testifying.

14               MS. SINGER:  I don't think I

15         was.

16    QUESTIONS BY MS. SINGER:

17         Q.    -- "has blown them off to the

18    point that the DEA is now hammering all of

19    us."

20               Does this accurately reflect

21    the sense of the -- is it true that the DEA

22    felt that the industry did not respond to

23    their guidance and request for compliance?

24               MR. MAHADY:  Objection.  Form.

25         Objection.  Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     MS. MAINIGI:  Outside the

 2         scope.

 3                     MR. EPPICH:  Objection.  Form.

 4         Calls for speculation.  No foundation.

 5                     MR. FINKELSTEIN:  Vague as to

 6         time.

 7                     THE WITNESS:  Yes.

 8    QUESTIONS BY MS. SINGER:

 9         Q.     And this is as of 2014,

10    correct?

11                     MR. EPPICH:  Objection.

12         Foundation.  Misstates the document.

13         Form.

14                     THE WITNESS:  Yes, that's the

15         date on the e-mail.

16    QUESTIONS BY MS. SINGER:

17         Q.     All right.  Turn to the next

18    page, please.  It says, towards the top, "Per

19    our discussion with Rep Burgess."

20                     Do you see where I am?

21         A.     Yes.

22         Q.     "Per our discussion with Rep

23    Burgess on Saturday, his office called me

24    this afternoon before the hearing and asked

25    me for questions he could ask DEA."  Stop
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     there.

 2               Now, do you know who Ann Berkey

 3     is?

 4               MR. EPPICH:  Objection.  Calls

 5          for speculation.

 6     QUESTIONS BY MS. SINGER:

 7          Q.     No?

 8          A.     No.

 9          Q.     Okay.  Were you aware that the

10     HDA was providing questions to members of

11     Congress, or Representative Burgess in

12     particular, to ask DEA at an upcoming

13     hearing?

14               MR. EPPICH:  Objection.

15          Foundation.  Scope.  Form.

16               MR. FINKELSTEIN:  I'll join the

17          scope objection.

18               THE WITNESS:  Me personally,

19          no, I did not know that.

20               (Prevoznik Plaintiff's Exhibit

21          P44 marked for identification.)

22     QUESTIONS BY MS. SINGER:

23          Q.     Okay.  Next exhibit.

24               Okay.  Exhibit 44.  This is

25     ABDCMDL00139028.
```

```
 1                    It's called Summary of DEA HDMA

 2     meeting, December 19, 2011.

 3                    Do you recall a meeting between

 4     the DEA and HDMA in 2011?

 5                    MR. EPPICH:  Objection.

 6          Foundation.

 7                    THE WITNESS:  I don't.

 8     QUESTIONS BY MS. SINGER:

 9          Q.    The DEA did meet with the HDMA

10     periodically, correct?

11                    MR. EPPICH:  Objection.

12          Foundation.

13                    THE WITNESS:  Correct.

14     QUESTIONS BY MS. SINGER:

15          Q.    Okay.  And down at the bottom

16     of the page here, in the last paragraph, it

17     says, "HDMA asked if there was any -- if

18     there were any noncompliance trends

19     throughout the wholesale distribution

20     industry we should inform our members about."

21                    Do you see where I am?

22          A.    Yes.

23          Q.    Okay.  "Gary Boggs" --

24                    Who we talked about just a

25     minute ago, correct?
```

```
 1          A.      Yes.

 2                  MR. EPPICH:  Objection.

 3      QUESTIONS BY MS. SINGER:

 4          Q.      -- "the executive assistant to

 5      the deputy administrator for diversion

 6      control, led this response.  He stated that

 7      DEA's single greatest concern was their

 8      belief that wholesaler distributors were lax

 9      in analysis, review and acting on their own

10      ARCOS data.  He stated that sometimes the

11      data were pretty egregious.  He went on to

12      explain," turning the page, "that the Agency

13      had not seen changes in registrants' behavior

14      that it expected after presenting its

15      analysis of ARCOS data to them, so we have --

16      quote, 'so we have upped our game.'"

17                  Is this consistent with the

18      DEA's view and your testimony that

19      registrants were lax in their analysis,

20      review and acting on their own ARCOS data?

21                  MR. EPPICH:  Object to form.

22          Misstates testimony.  Foundation.

23                  THE WITNESS:  Yes.

24      QUESTIONS BY MS. SINGER:

25          Q.      And was it pretty egregious?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. EPPICH:  Objection to form.

 2         Foundation.

 3              MS. MAINIGI:  Vague.

 4              THE WITNESS:  Yes.

 5   QUESTIONS BY MS. SINGER:

 6         Q.    And when it says here that DEA

 7   had "upped its game," do you know what that's

 8   referring to?

 9              MR. EPPICH:  Objection to form.

10         Foundation.

11              MS. MAINIGI:  Outside scope.

12              THE WITNESS:  At this time

13         period, we were investigating and

14         litigating against the wholesalers.

15   QUESTIONS BY MS. SINGER:

16         Q.    Okay.  Prompted by DEA's sense

17   that that's what they needed to do given a

18   lack of voluntarily compliance, correct?

19              MR. EPPICH:  Object to the

20         form.  Misstates testimony.

21         Foundation.

22              THE WITNESS:  Yes.

23              (Prevoznik Plaintiff's Exhibit

24         P45 marked for identification.)

25
```

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    Exhibit 45.  This is

 3    CAH_MDL2804_01530082.  And I'll represent

 4    that this is an HDMA document.

 5              And I'd like to direct you to

 6    page 2.  I'm sorry, not page 2, page 1,

 7    number 2.  Just throwing you for a loop.

 8              Do you see the row that

 9    indicates "Petition DEA for a regulation to

10    clarify suspicious orders and/or suspicious

11    order monitoring expectations"?

12              Do you see where I am?

13         A.    Yes.

14         Q.    Okay.  And it says in the far

15    right column, "Favored this option above all

16    the others.  Unlikely that DEA would create

17    such a regulation; therefore, low risk of

18    resulting in something overly restrictive or

19    difficult to follow.  A good ask.  The optics

20    would be positive.  We go on the record as

21    asking for clarity.  Recognize that this may

22    be -- this may tie into what is done on the

23    Hill or in a PR campaign, as external

24    pressure may be desirable and/or a legislator

25    may use it as the basis of a new bill.  Some
```

 1     went so far as to state we should do this.

 2     Urged HDMA to carefully articulate, one, what

 3     we believe DEA should address; and two, DEA

 4     should only inspect/enforce against what is

 5     specified in the regulations."

 6               Have I just read that

 7     accurately, Mr. Prevoznik?

 8          A.    Yes.

 9          Q.    And was DEA aware that the

10     reason HDMA was pressing for clarification of

11     suspicious order and suspicious order

12     monitoring expectations was for the optics of

13     it?

14               MR. EPPICH:  Object to form.

15          Foundation.  Calls for speculation.

16               MS. MAINIGI:  And outside

17          scope.

18               THE WITNESS:  No.

19     QUESTIONS BY MS. SINGER:

20          Q.    Or that they recognized that it

21     was unlikely that DEA would actually create

22     such a regulation?

23               MR. EPPICH:  Object to form.

24          Foundation.  Scope.

25               MS. MAINIGI:  Misstates the

 1          document, and it's outside the scope

 2          of the Touhy authorization.

 3                    THE WITNESS:  Can you repeat

 4          that, please?

 5     QUESTIONS BY MS. SINGER:

 6          Q.    Or that they recognized that it

 7     was unlikely that DEA would create such a

 8     regulation, so it was a low risk for

 9     industry?

10                    MS. MAINIGI:  Same objections.

11                    THE WITNESS:  Correct.

12     QUESTIONS BY MS. SINGER:

13          Q.    When you were testifying -- and

14     you can put that away, Mr. Prevoznik.

15                    When you were testifying

16     earlier in your deposition --

17                    MR. BENNETT:  If I might

18          interrupt for one second, I believe

19          there was -- in the record you asked

20          the question, and I think the witness

21          said "correct," and it was transcribed

22          as "no."  But I just want the record

23          to be clear what your answer was to

24          her last question.

25                    THE WITNESS:  I believe it was

Highly Confidential - Subject to Further Confidentiality Review

```
1          "correct."

2              MS. SINGER:  Thank you.

3     QUESTIONS BY MS. SINGER:

4          Q.    All right.  In your testimony

5     on day one or day two, you were asked whether

6     suspicious orders always lead to diversion.

7              Do you remember?

8          A.    Yes.

9              MS. MAINIGI:  Objection to

10         form.  Vague.

11    QUESTIONS BY MS. SINGER:

12         Q.    Okay.  And I think your answer

13    to that was, no, it doesn't always lead to

14    diversion.

15             Does that seem right to you?

16             MR. EPPICH:  Objection.  The

17         transcript speaks for itself.

18             THE WITNESS:  Yes.

19    QUESTIONS BY MS. SINGER:

20         Q.    Okay.  And is that because,

21    Mr. Prevoznik, not all suspicious orders turn

22    out to actually be suspicious?

23         A.    Correct.

24             MR. EPPICH:  Objection to form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MS. SINGER:

2         Q.    Okay.  But if a distributor

3    doesn't investigate a suspicious order, it

4    wouldn't know whether that order was being

5    diverted, right?

6              MR. EPPICH:  Object to the

7         form.  Calls for speculation.

8              THE WITNESS:  Yes.

9    QUESTIONS BY MS. SINGER:

10        Q.    And to use the language we

11   quoted earlier from the Diversion

12   Investigators Manual, sending out potentially

13   suspicious orders without investigating them

14   reflects a, quote, attitude of

15   irresponsibility.

16             Does DEA agree?

17             MS. MAINIGI:  Objection to

18        form.  Outside the scope.  Vague.

19             THE WITNESS:  Yes.

20             (Prevoznik Plaintiff's Exhibit

21        P46 marked for identification.)

22   QUESTIONS BY MS. SINGER:

23        Q.    Let's turn to the Energy and

24   Commerce.  Since we don't have previous --

25   the exhibits from last time, we're going to
```

Highly Confidential - Subject to Further Confidentiality Review

1    remark the Energy and Commerce report as

2    Exhibit 46.  It's the same report that went

3    in earlier in your testimony.

4              And industry lawyers asked

5    you -- they showed you a piece of the report

6    that said that DEA could have acted earlier.

7              Do you remember those

8    questions?

9         A.    Vaguely, but, yes.

10        Q.    Okay.  And certainly this

11   Energy and Commerce report finds the DEA

12   could have done more than it did, correct?

13        A.    Correct.

14        Q.    Okay.  But it's also highly

15   critical of distributors, is it not?

16             MR. EPPICH:  Objection.

17             MS. MAINIGI:  Objection.

18        Foundation.  Outside the scope.

19             MR. FINKELSTEIN:  Join the

20        scope objection.

21             THE WITNESS:  Yes.

22   QUESTIONS BY MS. SINGER:

23        Q.    Okay.  And just for context, I

24   want to direct you to page 5 of the report.

25             On the bottom of the page, it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    says in that last paragraph, "As the opioid

 2    epidemic began to surge, the DEA, by 2005,

 3    realized that traditional policing of

 4    individual doctors and pharmacies was no

 5    longer an effective approach against the

 6    oncoming avalanche of opioids from rogue

 7    Internet pharmacies and pill mills.  Instead,

 8    DEA's focus turned to the drug wholesale

 9    distributors, a choke point in the

10    pharmaceutical supply chain, who transfer

11    drugs from manufacturers to businesses such

12    as clinics, hospitals and pharmacies where

13    they can be dispensed to patients.

14    Distributors in previous years had not

15    received enforcement attention from the DEA.

16    The new focus looked for greater impact for

17    the highly consolidated industry given the

18    three -- given that the three major drug

19    distributors - AmerisourceBergen, Cardinal

20    Health and McKesson - control about

21    85 percent of the drug supply."

22              Do you agree with the statement

23    I've just read?

24         A.    Yes.

25              MS. MAINIGI:  Objection.
```

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    And then "Beginning in 2005,

 3    the DEA undertook a series of initiatives

 4    meant to educate wholesale drug distributors

 5    about their legal obligations to prevent

 6    controlled substance diversion.  The DEA's

 7    distributor initiative included one-on-one

 8    meetings with wholesale distributors in which

 9    DEA officials provided specific examples

10    regarding distributors' own customers whose

11    ordering habits were suggestive of trends

12    indicating the presence of diversion and

13    illicit Internet pharmacies.  Of the five

14    distributors investigated by the committee,

15    AmerisourceBergen, Cardinal, HD Smith and

16    McKesson, each had one-on-one meetings with

17    DEA as part of this initiative.  In addition,

18    during 2006 and 2007, the DEA sent a series

19    of three letters, sent to all DEA-registered

20    distributors outlining their legal

21    obligations to conduct due diligence and

22    report suspicious orders."

23              Is that also an accurate

24    statement of what happened?

25              MR. EPPICH:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Foundation.  Calls for speculation.

 2                   THE WITNESS:  Yes.

 3    QUESTIONS BY MS. SINGER:

 4         Q.      "Apparently the DEA soon

 5    realized that the largest distributors were

 6    not taking their compliance requirements with

 7    sufficient seriousness.  In 2007 and 2008,

 8    the DEA took enforcement action through legal

 9    settlements against the three largest

10    wholesale distributors in the US for alleged

11    violations of the CSA, with multi-million

12    dollar fines involving two of them."

13                   Is that also accurate?

14                   MR. EPPICH:  Object to form.

15                   MS. MAINIGI:  Objection to

16         form.

17                   THE WITNESS:  Yes.

18    QUESTIONS BY MS. SINGER:

19         Q.      Last paragraph.  "Despite these

20    settlement agreements and the subsequent

21    policy enhancements that the three

22    distributors made in their aftermath, the

23    committee found that the distributors

24    continued to ship large volumes of opioids

25    into West Virginia.  The three largest
```

```
 1    wholesale drug distributors in the United

 2    States - AmerisourceBergen, Cardinal Health

 3    and McKesson - sent more than 900 million

 4    doses of hydrocodone and oxycodone to West

 5    Virginia between 2005 and 2016.  Cardinal

 6    Health was the largest supplier of controlled

 7    substances to West Virginia out of the five

 8    companies examined as part of the Committee's

 9    investigation, and distributed more than 366

10    million doses of hydrocodone and oxycodone to

11    West Virginia pharmacies between 2005 and

12    2016.  From April 2006 through 2016, McKesson

13    supplied 299.87 million doses of hydrocodone

14    and oxycodone to West Virginia pharmacies,

15    AmerisourceBergen distributed 248.16 million

16    doses of hydrocodone and oxycodone to West

17    Virginia pharmacies between 2005 and 2016."

18               Is that also consistent with

19    DEA's understanding of what had occurred?

20               MR. EPPICH:  Object to the

21         form.  Foundation.

22               THE WITNESS:  Yes.

23    QUESTIONS BY MS. SINGER:

24         Q.    Turn the page, please.  "Among

25    the Committee's findings, distributors
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suffered a series of breakdowns or had a lack

 2    of follow-through in their -- through in

 3    their due diligence evaluations of

 4    prospective pharmacy customers.  As

 5    demonstrated in the report, the committee

 6    found instances of insufficient due diligence

 7    by distributors who merely required

 8    pharmacies to complete new customer

 9    applications."

10              Now, we talked about that

11    earlier, correct?

12              MR. EPPICH:  Object to the

13         form.

14              THE WITNESS:  Correct.

15    QUESTIONS BY MS. SINGER:

16         Q.    And that is not sufficient to

17    comply with the registrant's obligation to

18    know their customers, correct?

19              MR. EPPICH:  Object to the

20         form.  Foundation.

21              MS. MAINIGI:  Calls for a legal

22         conclusion.

23              THE WITNESS:  Correct.

24    QUESTIONS BY MS. SINGER:

25         Q.    "There were cases where data
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    submitted by a new customer was not

 2    critically analyzed to identify any red flags

 3    of controlled substance diversion, for

 4    example, potential red flags regarding a

 5    pharmacy's prescribing physicians that raised

 6    concerns about possible diversion were not

 7    questioned."

 8              Is that consistent with DEA's

 9    understanding of what occurred?

10              MR. EPPICH:  Object to form.

11         Foundation.

12              THE WITNESS:  Yes.

13    QUESTIONS BY MS. SINGER:

14         Q.    Goes on to say, "The

15    investigation found instances where there

16    were failures to monitor the volume of

17    controlled substances sold to customers.

18    Some distributors used thresholds to track

19    customers' purchases of controlled substances

20    and flag orders as suspicious when purchases

21    exceeded those limits.  But some of these

22    thresholds were assigned arbitrarily and not

23    effective.  Committee found instances in

24    which distributors set thresholds but failed

25    to enforce them, assigned artificially high
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    hydrocodone threshold limits with little to

 2    no documented justification, or continued to

 3    raise threshold levels without thoroughly

 4    investigating or documenting the

 5    justifications presented by a customer

 6    pharmacy."

 7              Again, is that what DEA

 8    observed happened during this time period?

 9              MR. EPPICH:  Object to the

10         form.  Foundation.  Calls for

11         speculation.

12              MS. MAINIGI:  Join.

13              THE WITNESS:  Yes.

14    QUESTIONS BY MS. SINGER:

15         Q.    Okay.  And is that failure to

16    flag suspicious orders, to approve them

17    without justification and to continue to

18    raise thresholds, a violation of the

19    Controlled Substances Act?

20              MS. MAINIGI:  Objection.  Calls

21         for a legal conclusion.  Outside the

22         scope.

23              MR. EPPICH:  Objection to the

24         form.

25              MR. FINKELSTEIN:  Object to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        form.

 2               THE WITNESS:  Yes.

 3    QUESTIONS BY MS. SINGER:

 4        Q.    It goes on, "Despite efforts by

 5    DEA to educate distributors about their

 6    responsibility to report suspicious orders,

 7    the companies reviewed by the committee

 8    failed to address suspicious orders" -- I'm

 9    sorry -- "suspicious order monitoring in

10    critical ways.  Rather than reporting

11    individual suspicious orders as they were

12    identified, some distributors reported a

13    variety of other types of information to DEA

14    over the years.  This information included

15    excessive orders encompassing drug shipments

16    that had already been shipped and suspicious

17    customers such as pharmacies with which

18    distributors had terminated business

19    relationships.  Neither of these types of

20    reports informed DEA about suspicious orders

21    in realtime, nor did they guarantee the

22    suspicious orders reported to DEA were also

23    blocked by the distributors.  The committee

24    also found that one distributor lacked any

25    formal order monitoring program.  Rather, the
```

```
 1   distributor's employees relied on subjective

 2   criteria to investigate {sic} orders it

 3   considered suspicious."

 4              Does that also reflect what the

 5   DEA knew to happen during this time period?

 6              MS. MAINIGI:  Objection.  Form.

 7        Foundation.  Outside scope.

 8              MR. FINKELSTEIN:  Object to the

 9        form.

10              THE WITNESS:  Yes.

11   QUESTIONS BY MS. SINGER:

12        Q.     And the last paragraph.

13   "Another critical failure identified by the

14   Committee involved instances in which

15   distributors appeared to turn a blind eye to

16   red flags of possible drug diversion.

17   Despite available information, distributors

18   at times took only minimal steps to

19   investigate possible warning signs of

20   diversion and continued to ship controlled

21   substances to suspect pharmacies.  In several

22   cases, distributors either failed to fully

23   investigate potentially troubling information

24   they obtained from customer pharmacies or

25   willfully ignored it.  These failures raise
```

```
 1    substantial concern given that DEA has said

 2    existing knowledge of a geographic area's

 3    problem with controlled substance abuse is a

 4    factor that distributors should take into

 5    account when evaluating customers."

 6                 Now, is that true, that DEA had

 7    said knowledge of a geographic area's problem

 8    with controlled substance abuse is a factor

 9    that should be taken into account by

10    registrants?

11                 MR. EPPICH:  Object to the

12         form.

13                 MS. MAINIGI:  Object to form.

14                 THE WITNESS:  Yes.

15    QUESTIONS BY MS. SINGER:

16         Q.    Okay.  "West Virginia has the

17    highest drug overdose rate in the country,

18    meaning distributors should have been

19    particularly attuned to any red flags

20    encountered when conducting due diligence on

21    pharmacies in that state."

22                 Is that also an accurate

23    reflection of a registrant's duty when

24    shipping controlled substances into West

25    Virginia or other hotspots?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. EPPICH:  Object to form.

 2        Calls for a legal conclusion.

 3              MS. MAINIGI:  Outside the

 4        scope.

 5              THE WITNESS:  Yes.

 6   QUESTIONS BY MS. SINGER:

 7        Q.    Okay.  And this whole paragraph

 8   that I just read, does that also reflect the

 9   DEA's understanding of what happened during

10   this time period?

11              MR. EPPICH:  Object to the

12        form.  Vague.  Calls for a legal

13        conclusion.

14              MR. FINKELSTEIN:  Join in the

15        form objection.

16              THE WITNESS:  Yes.

17   QUESTIONS BY MS. SINGER:

18        Q.    Okay.  Turn to page 10, please.

19   Bottom of page 10 there's a bullet that says,

20   "For due process reasons, it is current DEA

21   practice not to inform distributors or other

22   registrants about customers that may have

23   engaged in improper behavior."

24              Do you see where I am?

25        A.    The bottom?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Yes.

 2          A.     Yes.

 3          Q.     And does that accurately

 4   reflect DEA's policy?

 5                 MR. EPPICH:  Objection to form.

 6                 MR. FINKELSTEIN:  Hang on.  We

 7          had a different witness to testify

 8          about this.  You declined to ask her

 9          questions.  I'm going to instruct him

10          not to answer now.

11                 MS. SINGER:  Okay.

12   QUESTIONS BY MS. SINGER:

13          Q.     So turning to page 16.

14                 And I want to be respectful of

15   the scope of your authorization and not ask

16   you about individual investigations or

17   current matters.  But to the extent you can

18   testify consistent with your authorization, I

19   want to point you to the third bullet:

20   "McKesson supplied just under 300 million

21   doses of hydrocodone and oxycodone to West

22   Virginia pharmacies between April 2006 and

23   2016."

24                 Is that accurate?

25                 MR. EPPICH:  Object to the
```

```
 1          form.  Foundation.  Calls for

 2          speculation.

 3                  MS. MAINIGI:  Outside scope.

 4                  MR. EPPICH:  May be outside the

 5          Touhy authorization as well.

 6                  MS. MAINIGI:  That's what I

 7          meant.

 8                  THE WITNESS:  I mean, I don't

 9          have the data in front of me to

10          confirm those numbers.

11   QUESTIONS BY MS. SINGER:

12          Q.    Okay.  What about the next

13   bullet:  "McKesson did not submit suspicious

14   order reports to the DEA regarding orders

15   placed by West Virginia pharmacies until

16   August 1, 2013."

17                  Do you know whether that's

18   accurate?

19                  MR. EPPICH:  Object to form.

20          Foundation.  Calls for speculation.

21          Outside the Touhy authorization.

22                  MR. FINKELSTEIN:  This is

23          outside the Touhy authorization to the

24          extent that it calls for information

25          about West Virginia specifically.
```

```
 1                MS. MAINIGI:  The entire report
 2         calls for information that relates to
 3         West Virginia.
 4                MR. FINKELSTEIN:  And our
 5         authorization to the plaintiffs was --
 6         concluded investigations and
 7         settlements with the defendants, but
 8         we specifically didn't authorize
 9         region-specific investigations.
10                MS. SINGER:  Okay.  We will
11         skip this then.
12     QUESTIONS BY MS. SINGER:
13         Q.    Okay.  Let's turn to page 319.
14               You with me?  You at page 319?
15         A.    Uh-huh.
16         Q.    Okay.  Turning towards the
17     middle of the page, just below it, the second
18     paragraph from the bottom.  "But as
19     demonstrated by the Committee's
20     investigation, the DEA did not always receive
21     the level of compliance required under the
22     CSA.  The five distributors whose actions in
23     West Virginia were examined by the Committee
24     each had unique failures.  The companies had
25     various policies and procedures in place to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prevent diversion but in some cases did not

 2    adequately follow or carry out those

 3    policies.  As evidenced in the case studies

 4    discussed in each section, distributors had

 5    failings on multiple fronts."

 6                 Is that consistent with the

 7    DEA's conclusions?

 8                 MR. EPPICH:  Object to the

 9          form.  Foundation.  Calls for

10          speculation.  Outside the Touhy

11          authorization.

12                 THE WITNESS:  Yes.

13    QUESTIONS BY MS. SINGER:

14          Q.     "For instance, it is not

15    sufficient due diligence for a distributor to

16    only require prospective or existing

17    customers to complete pharmacy questionnaires

18    or supply supplemental data.  The information

19    disclosed on such questionnaires or the data

20    submitted must also be critically analyzed to

21    identify any red flags of controlled

22    substance diversion."

23                 Does that accurately reflect a

24    distributor's obligations or a registrant's

25    obligations?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Object to the

 2        form.

 3                    THE WITNESS:  Yes.

 4    QUESTIONS BY MS. SINGER:

 5        Q.     "Once distributors bring

 6    pharmacies on board, they need to monitor the

 7    volume of controlled substances sold to

 8    customers."

 9                    Does that also accurately

10    reflect a registrant's duties?

11                    MR. EPPICH:  Object to form.

12        Calls for a legal conclusion.

13                    THE WITNESS:  Yes.

14    QUESTIONS BY MS. SINGER:

15        Q.     And the last sentence,

16    "Subsequently, when distributors set

17    thresholds for customers, they should be

18    enforced.  In such cases where thresholds are

19    adjusted, distributors should be able to

20    document the justification for these

21    changes."

22                    Does that also accurately

23    reflect a registrant's obligations?

24                    MR. EPPICH:  Object to the

25        form.  Calls for a legal conclusion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. MAINIGI:  Vague as to time.

 2                    THE WITNESS:  Yes.

 3    QUESTIONS BY MS. SINGER:

 4         Q.    All right.  We can leave this

 5    report.

 6                    Okay.  In questioning during

 7    the first two days of your deposition,

 8    Mr. Prevoznik, do you remember discussing the

 9    fact that a small percentage of doctors are

10    engaged in unlawful prescribing?

11                    I think it was .5 percent.

12                    Do you remember that

13    conversation?

14         A.    Yes.

15                    (Prevoznik Plaintiff's Exhibit

16         P47 marked for identification.)

17    QUESTIONS BY MS. SINGER:

18         Q.    Okay.  So I want to turn to

19    Exhibit 47, please.

20                    And that is Bates number

21    PPLP0300001799742.

22                    If you turn to the first slide,

23    it's titled "DEA/OD 11th Pharmaceutical

24    Industry Conference."

25                    Do you recognize this
```

Highly Confidential - Subject to Further Confidentiality Review

 1    presentation?

 2         A.     Do we know what year?

 3         Q.     And what is it?

 4         A.     No, I said, "Do we know what

 5    year?"

 6         Q.     Oh.  So it's Tuesday,

 7    September 16th.  And if you look at the

 8    calendar in the years that are referenced, we

 9    believe it to be 2003 because of when

10    Tuesday -- when September 16th is a Tuesday.

11              MR. EPPICH:  Objection.

12              THE WITNESS:  I've never seen

13         this before.

14    QUESTIONS BY MS. SINGER:

15         Q.     Okay.  It does have on the

16    front page DOJ, DEA logos, correct?

17         A.     Yes.

18         Q.     Okay.  And does it look -- from

19    your knowledge, is this a presentation by the

20    DEA?

21              MR. EPPICH:  Objection.

22         Foundation.  Form.

23              THE WITNESS:  Yes.

24    QUESTIONS BY MS. SINGER:

25         Q.     Okay.  And if you turn to the

Highly Confidential - Subject to Further Confidentiality Review

```
1    fifth page, with the slide "retail

2    diversion," 90 percent at doctor, pharmacy,

3    hospital levels.

4              Do you see that slide?

5         A.    Yes.

6         Q.    Okay.  And if you look at the

7    notes that are at the bottom of that slide,

8    do you see the bottom section that starts,

9    "Estimated 1.5 percent of doctors are

10   negligent and/or dishonest"?

11             Do you see where I'm reading?

12        A.    Yes.

13        Q.    Okay.  It says, "That portion

14   of DEA-registered physicians is many

15   thousands.  Their CS, or controlled

16   substance, prescribing would total hundreds

17   of thousands of scripts/millions of dosage

18   units into illicit market."

19             Is that accurate?

20             MR. EPPICH:  Objection.

21        Foundation.  Form.  Misstates the

22        document.  Calls for speculation.

23             MR. FINKELSTEIN:  Object to the

24        scope.

25             THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      QUESTIONS BY MS. SINGER:

2           Q.    And is it true, as it says

3      here, that it is impossible for DEA to

4      investigate and discipline that number of

5      professionals?

6                 MR. EPPICH:  Object to form.

7           Foundation.

8                 MS. MAINIGI:  Scope.

9                 THE WITNESS:  I mean, we do the

10          best we can.

11     QUESTIONS BY MS. SINGER:

12          Q.    But that's a lot of --

13          A.    It's a lot.

14                MR. EPPICH:  Object to the

15          form.

16     QUESTIONS BY MS. SINGER:

17          Q.    And the last line here, "Far

18     more effective, address the risk at the apex

19     of the distribution center {sic}."

20                Is that accurate, that that is

21     a more effective way of enforcing compliance

22     with the Controlled Substances Act?

23                MR. EPPICH:  Object to form.

24          Foundation.

25
```

```
 1     QUESTIONS BY MS. SINGER:

 2          Q.    Or an important tool for the

 3     DEA?

 4                MR. EPPICH:  Object to form and

 5          foundation.

 6                THE WITNESS:  Yes.

 7     QUESTIONS BY MS. SINGER:

 8          Q.    Okay.  And in fact, that's part

 9     of the foundation of the Controlled

10     Substances Act, that each participant in the

11     supply chain has to police its own

12     participation in that supply chain, correct?

13                MR. EPPICH:  Object to form.

14          Calls for a legal conclusion.

15          Misstates.

16                THE WITNESS:  Yes.

17     QUESTIONS BY MS. SINGER:

18          Q.    All right.  And during the

19     questioning by some of the industry counsel

20     during the first two days of depositions, do

21     you remember the suggestion that prescribers

22     were better situated to identify improper

23     prescriptions?

24                Do you remember that testimony?

25                MR. EPPICH:  Objection to form
```

```
 1          to the extent it misstates prior

 2          testimony.

 3                  THE WITNESS:  Not really.

 4                  (Prevoznik Plaintiff's Exhibit

 5          P48 marked for identification.)

 6   QUESTIONS BY MS. SINGER:

 7          Q.    Okay.  Is it -- let's just turn

 8    to the document.

 9                  All right.  I'm showing you

10    Exhibit 48.  And the level -- and I'm sorry,

11    this is CAH_MDL2804_00889528.

12                  Do you recognize the logo on

13    the front of this presentation?

14          A.    Yes.

15          Q.    And what is it?

16          A.    It's our Chief Counsel's logo.

17          Q.    Okay.  And if you turn to the

18    inside first page, How to Keep Or Lose Your

19    DEA Registration, do you recognize this

20    presentation?

21          A.    Yes.

22          Q.    And what do you recognize it to

23    be?

24          A.    It was one of the -- it was --

25    it was given at a conference that we held.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     A conference --

 2          A.     For the industry.

 3          Q.     Okay.  A conference that DEA

 4     had for industry?

 5          A.     Yes.

 6          Q.     And do you know who gave this

 7     presentation?

 8                 Do you know if would have been

 9     Linden Barber?

10                 MR. EPPICH:  Objection.  Form.

11          Calls for speculation.

12                 THE WITNESS:  I believe it was

13          Linden that gave this.

14     QUESTIONS BY MS. SINGER:

15          Q.     Okay.  And Linden Barber was

16     with the Chief Counsel's Office of DEA,

17     correct?

18          A.     Yes.

19          Q.     Okay.  And if you turn to

20     page 4 of the presentation, titled "Effective

21     Controls Against Diversion," the first point

22     there is what, the first bullet point?

23          A.     "Good recordkeeping is

24     essential."

25          Q.     Do you agree with that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    statement?

 2         A.     Yes.

 3         Q.     In DEA's experience, is the

 4    absence of documentation a fairly good

 5    indication that something didn't happen in a

 6    registrant's compliance program?

 7                MR. EPPICH:  Object to the

 8         form.  Calls for a legal conclusion.

 9                THE WITNESS:  Yes.

10    QUESTIONS BY MS. SINGER:

11         Q.     Okay.  Turning to page 9, this

12    is what doesn't work, or how to lose your DEA

13    registration.

14                The second bullet point, what

15    does that say?

16         A.     "It is not my job to

17    second-guess the doctor."

18         Q.     Okay.  And that's not an excuse

19    that the DEA will accept from a registrant,

20    correct?

21                MR. EPPICH:  Objection to form.

22         Vague.

23                THE WITNESS:  Yes.

24    QUESTIONS BY MS. SINGER:

25         Q.     And that's because it's a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    registrant's responsibility to act on

 2    information that points to diversion,

 3    correct?

 4              MR. EPPICH:  Object to form.

 5         Calls for a legal conclusion.

 6              THE WITNESS:  Correct.

 7    QUESTIONS BY MS. SINGER:

 8         Q.    And it's not that the

 9    registrant is being asked to judge a

10    prescription or a patient, but to look at red

11    flags like the volume or dose or appearance

12    of a practice, et cetera, correct?

13              MR. EPPICH:  Object to the

14         form.  Calls for a legal conclusion.

15         Vague.

16              THE WITNESS:  Yes, they should

17         look into totality of everything

18         that's presented to them.

19    QUESTIONS BY MS. SINGER:

20         Q.    Okay.  And the last excuse on

21    this slide, "I'm not responsible for what my

22    customer does with the drugs."

23              Is that an excuse that the DEA

24    accepts from a registrant?

25              MR. EPPICH:  Object to form.
```

```
 1            Vague.

 2                  THE WITNESS:  No.

 3     QUESTIONS BY MS. SINGER:

 4         Q.    And that's because a registrant

 5     is responsible to make sure that they are not

 6     supplying to potential diversion, correct?

 7                  MR. EPPICH:  Object to the

 8            form.  Calls for a legal conclusion.

 9            Vague.

10                  THE WITNESS:  Correct.

11     QUESTIONS BY MS. SINGER:

12         Q.    And do you know what Linden

13     Barber does now, by the way?

14                  MS. MAINIGI:  Objection.

15            Outside the scope.

16                  THE WITNESS:  I believe -- I

17            believe he's still with Cardinal.

18     QUESTIONS BY MS. SINGER:

19         Q.    Now, you were asked by --

20                  MR. FINKELSTEIN:  Let's take

21            our last break before lunch.

22                  MS. SINGER:  Okay.

23                  VIDEOGRAPHER:  We're going off

24            record.  The time is 11:36.

25             (Off the record at 11:36 a.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    VIDEOGRAPHER:  We're going back

 2          on the record.  Beginning of Media

 3          File 4.  The time is 11:48.

 4   QUESTIONS BY MS. SINGER:

 5          Q.    So, Mr. Prevoznik, just turning

 6   back for a minute to the Linden Barber

 7   presentation we were talking about before the

 8   break, which is Bates number 889528, I want

 9   to ask you to turn to page 13, please.

10                 And it's a slide titled "How to

11   Keep Your DEA Registration."

12                 Do you see that?

13          A.    Yes.

14          Q.    Okay.  And it says in the --

15   under the first master bullet, "Master the

16   obvious:  Recordkeeping, reporting," and the

17   last item, "Does it quack like a diverting

18   duck."

19                 Is what Mr. Barber is saying

20   here, what the DEA is saying, is if it looks

21   like a suspicious order, it's a suspicious

22   order?

23          A.    Yes.

24          Q.    And that if it has the signs,

25   quacks like a duck, walks like a duck,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    whatever that expression is, that it's a
 2    duck; it's a suspicious order, correct?
 3                MS. MAINIGI:  Objection.  No
 4         foundation.  Outside the scope of the
 5         Touhy authorization.
 6                THE WITNESS:  Yes.
 7    QUESTIONS BY MS. SINGER:
 8         Q.    Okay.  And then it goes on to
 9    say, "Know your customers and, where
10    applicable, the prescriber's business or
11    professional practice."
12                Is that also the DEA's guidance
13    to industry as to what's required?
14         A.    Yes.
15         Q.    And "know the statutory
16    factors, the DEA's final orders," and then
17    lastly, "act consistently with DEA's goal:
18    protect the public health and safety from the
19    harms caused by diversion."
20                Is that also the guidance that
21    DEA gave to industry about complying with the
22    Controlled Substances Act?
23         A.    Yes.
24                MS. MAINIGI:  Objection.  Form.
25                (Prevoznik Plaintiff's Exhibit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          P49 marked for identification.)

 2    QUESTIONS BY MS. SINGER:

 3          Q.    Okay.  And then I want to turn

 4    you to what we'll mark as Bates -- as

 5    Exhibit 49.

 6                And this is

 7    Anda_Opioids_MDL_0000476052.  It's "What You

 8    Know and Who You Know," a presentation by

 9    Linden Barber.

10                Do you see where I'm reading

11    from?

12          A.    Yes.

13          Q.    And it's dated April 19, 2012,

14    correct?

15          A.    Yes.

16          Q.    Okay.  And at this point Linden

17    Barber is no longer with the DEA, correct?

18          A.    Correct.

19          Q.    Okay.  And it seems that he's

20    with Cegedim.

21                We heard that name before,

22    correct?

23                MS. MAINIGI:  Objection.

24          Foundation.  Outside the scope of the

25          Touhy authorization.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. FINKELSTEIN:  Scope.

 2                  You can answer, if you know.

 3                  THE WITNESS:  I'm not sure.

 4     QUESTIONS BY MS. SINGER:

 5          Q.    Okay.  I'd like to direct you

 6     to page 10 of the presentation, Bates

 7     number 6061.

 8                  And I'm sorry, before you go

 9     there, on the title page of the presentation

10     it indicates Linden Barber is the director of

11     DEA compliance operations at Quarles & Brady?

12          A.    Yes.

13          Q.    Okay.  All right.  So turning

14     to slide 10, Bates number 6061, it says,

15     "Know Your Regulator."

16                  Do you see where I'm reading?

17          A.    Yes.

18          Q.    "Access to customer due

19     diligence files."  And it says under the

20     second bullet, "What is a customer's due

21     diligence file?  Not a record required by law

22     to be made or kept.  Proof that a

23     distributor -- the distributor is attempting

24     to prevent diversion.  Proof that the

25     distributor heeded DEA's warning.  Exhibit A
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in DEA's case against you."

 2                Do you understand what

 3    Mr. Barber is saying here?

 4                MS. MAINIGI:  Objection.

 5           Foundation.  Outside the scope of the

 6           Touhy authorization.

 7                MR. FINKELSTEIN:  Calls for

 8           speculation.  I agree with the scope

 9           objection.

10                MS. SINGER:  Okay.  Let me --

11           I'm sorry.  Let me rephrase it.

12    QUESTIONS BY MS. SINGER:

13        Q.    Is it the DEA's position that a

14    customer due diligence file is not required

15    to be made or kept?

16                MS. MAINIGI:  Objection.  Asked

17           and answered.  Objection.  Form.

18    QUESTIONS BY MS. SINGER:

19        Q.    It's certainly not -- when

20    Mr. Barber was with DEA in that presentation

21    we just looked at, he encouraged

22    recordkeeping, correct, as a way a registrant

23    could keep their DEA license, correct?

24        A.    Correct.

25        Q.    Okay.  And here he's saying not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      a record required by law to be made or kept,

 2      correct?

 3                  MS. MAINIGI:  Objection to

 4           form.  Objection.  Outside the scope

 5           of the Touhy authorization.  Calls for

 6           a legal conclusion.

 7                  THE WITNESS:  What he's saying

 8           is that -- I'm speculating on this,

 9           but what he's saying, to me, is that

10           the actual terms "due diligence" is

11           not in the regulations; however, I

12           mean, the statute's to prevent -- to

13           have effective means to guard against

14           diversion, you would have to know who

15           your customer is.

16                  And so doing that, you would

17           have -- I mean, dealing with as many

18           customers that each of these

19           distributors have, you would have to

20           know who your customers are.  So if

21           you don't have files on them, it would

22           be very hard to maintain effective

23           controls.

24      QUESTIONS BY MS. SINGER:

25           Q.    Right.  Understood.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    All right.  We can leave this
 2      document.
 3                    Now, you were asked during
 4      day one or two of your deposition how a
 5      manufacturer would know if a prescriber was
 6      suspicious.
 7                    Do you remember those
 8      questions?
 9           A.    Yes.
10                    MR. EPPICH:  Object to the
11           form.
12                    THE WITNESS:  Yes.
13      QUESTIONS BY MS. SINGER:
14           Q.    Would DEA agree that a
15      significant increase in a prescriber's volume
16      is a sign of potential diversion?
17                    MR. EPPICH:  Object to the
18           form.  Calls for a legal conclusion.
19                    THE WITNESS:  Just volume
20           alone?
21      QUESTIONS BY MS. SINGER:
22           Q.    That it is one sign of
23      potential diversion, yes.
24           A.    It --
25                    MR. EPPICH:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              form.

2                      THE WITNESS:  Potentially, yes.

3      QUESTIONS BY MS. SINGER:

4              Q.    Okay.  And that a prescriber

5      who is prescribing at very high volume

6      relative to other practitioners, that would

7      also be another potential red flag of

8      diversion, correct?

9                      MR. EPPICH:  Object to the

10             form.  Form.  Vague.  Improper

11             hypothetical.  Calls for a legal

12             conclusion.

13                     THE WITNESS:  It could be.  It

14             just depends on what is the

15             physician's practice; does he

16             specialize in end of life or something

17             like that.  I mean, you'd have to take

18             in other factors.

19     QUESTIONS BY MS. SINGER:

20             Q.    Right.  You have to look at the

21     whole picture.

22                     But that's one sign that might

23     alert you to take a closer look, correct?

24             A.    Correct.

25                     MR. EPPICH:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          form.

 2     QUESTIONS BY MS. SINGER:

 3          Q.     Okay.  And if the prescriber is

 4     prescribing at very high doses, again, one

 5     factor, depending on their specialty and

 6     patients, that might alert a registrant to

 7     potential diversion, correct?

 8               MR. EPPICH:  Object to the

 9          form.  Foundation.  Calls for

10          speculation.  Calls for a legal

11          conclusion.

12               THE WITNESS:  Correct.

13     QUESTIONS BY MS. SINGER:

14          Q.     Okay.  And these are the kinds

15     of commonsense red flags that a registrant

16     should know to apply without the DEA telling

17     them to apply them, correct?

18               MR. EPPICH:  Object to form.

19          Foundation.  Calls for speculation.

20               MR. FINKELSTEIN:  Object to the

21          form.

22               THE WITNESS:  Can you repeat

23          it, please?

24     QUESTIONS BY MS. SINGER:

25          Q.     These are the kinds of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    commonsense red flags that a registrant

 2    should know to apply in looking for diversion

 3    without the DEA telling them specifically to

 4    look for them, correct?

 5                 MR. EPPICH:  Same objections.

 6                 THE WITNESS:  Yes.

 7                 (Prevoznik Plaintiff's Exhibit

 8         P50 marked for identification.)

 9    QUESTIONS BY MS. SINGER:

10         Q.    I'm showing you Exhibit 50,

11    Mr. Prevoznik.  These are two -- oh, I'm

12    sorry, this is a prescriber in Solon, Ohio.

13    I'm sorry.  I'm not -- okay.

14    Dr. Akhtar-Zaidi in Solon, Ohio.

15                 And it says here, "Wrote over

16    21,000 opioid prescriptions in 2011 when the

17    average doctor in his specialty wrote 500."

18                 Would the DEA consider that to

19    be a red flag of potential diversion?

20                 MR. MAHADY:  Object to form.

21         Objection.  Foundation.  Objection to

22         the scope.  Outside the Touhy

23         authorization.

24                 MR. FINKELSTEIN:  Hang on.

25                 MR. MAHADY:  And also, where is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          this information from, what is this

 2          document?  Where was it created?  Was

 3          it created by the plaintiffs?

 4               MS. MAINIGI:  It says an expert

 5          report of Lacey Keller.

 6               MR. FINKELSTEIN:  Additionally,

 7          information concerning this doctor may

 8          be subject to various law enforcement

 9          privileges, and it's outside the

10          scope.

11               But I'm going to specifically

12          instruct you not to testify about

13          ongoing investigations.

14     QUESTIONS BY MS. SINGER:

15          Q.    So would writing 21,000

16     prescriptions in a year when the average

17     doctor in the same specialty wrote 500 be a

18     red flag of potential diversion to the DEA?

19               MR. EPPICH:  Object to form.

20               MR. MAHADY:  Objection to form.

21          Objection to scope.  Incomplete

22          hypothetical.  Foundation.

23               THE WITNESS:  Yes.

24     QUESTIONS BY MS. SINGER:

25          Q.    Okay.  And then turning to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    next page of that slide.  I'm sorry --

 2           A.     I don't have it.

 3           Q.     Okay.  Sorry.

 4                  (Prevoznik Plaintiff's Exhibits

 5           P51 and P52 marked for

 6           identification.)

 7    QUESTIONS BY MS. SINGER:

 8           Q.     Showing you slide 51,

 9    Dr. Adolph Harper in Akron, Ohio.

10                  I'm also going to show you the

11    sentencing memo.  We'll mark that as

12    Exhibit 52.

13                  MR. FINKELSTEIN:  So while

14           we're shuffling paper, I can get my

15           concerns and objection on the record.

16                  My understanding is that the

17           task force officers have been

18           authorized to give testimony about

19           this doctor and this information.  I

20           can tell you this witness has not been

21           prepped to.

22                  And so I'm going to instruct

23           you not to answer questions about this

24           specific doctor.

25                  And I think you have a witness
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          who will.

 2              MS. SINGER:  All right.  I'm

 3          only asking about whether these are

 4          red flags generally.

 5              MR. FINKELSTEIN:  You can

 6          answer about general red flags.

 7              MS. SINGER:  Okay.

 8   QUESTIONS BY MS. SINGER:

 9      Q.    So if you turn on exhibit --

10   which exhibit is this?  53?  52?

11              Okay.  The sentencing memo --

12              MR. COOPER:  Do you have an

13          extra copy of the sentencing memo?

14   QUESTIONS BY MS. SINGER:

15      Q.    Which is PLTF_2804_000013676.

16   It's the government's sentencing memo,

17   memorandum in United States of America versus

18   Adolph Harper.

19              You on the right document?

20      A.    Uh-huh, yes.

21      Q.    Okay.  And if you turn to

22   page 4, in the second paragraph, the first

23   full paragraph of the page, it says, "The

24   atmosphere of Harper's office, like his

25   prescribing practices, was more akin to a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    street-level drug trafficking operation

 2    rather than medical office.  Harper's

 3    customers waited for hours to see Harper.

 4    Many of those customers exhibited behaviors

 5    consistent with drug abuse.  Witnesses

 6    reported seeing customers passed out in the

 7    hallway and office while waiting to see

 8    Harper, were vomiting or urinating on the

 9    floor while waiting in the waiting room.

10    Customers were also combative and aggressive

11    with Harper's staff members if there was any

12    delay in receiving their drugs."

13              Would a registrant observing

14    this medical office have seen a red flag of

15    potential diversion?

16              MR. MAHADY:  Objection to form.

17         Objection to foundation.  Outside the

18         scope of the Touhy authorization as

19         the government just explained it.

20              Question specifically relates

21         to a doctor whose name was used at

22         least four or five times in forming

23         your question.

24              THE WITNESS:  Can you repeat

25         it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    Yes.

 3               Would those signs observed by a

 4    registrant about a prescriber's practice have

 5    been red flags of potential diversion?

 6               MR. MAHADY:  Same objections.

 7               THE WITNESS:  Yes.

 8    QUESTIONS BY MS. SINGER:

 9         Q.    Are these kinds of red flags

10    that we just went through with these two

11    prescribers things that registrants who are

12    observing the practices or seeing this data

13    should have been able to figure out for

14    themselves, should have been able to identify

15    them as red flags?

16               MR. MAHADY:  Objection to form.

17         Foundation.  Same objection regarding

18         the scope.

19               THE WITNESS:  Yes.

20    QUESTIONS BY MS. SINGER:

21         Q.    Did a manufacturer who observed

22    a doctor's office that looked like a drug

23    trafficking operation, with patients passed

24    out or vomiting in the office or urinating on

25    themselves, have a duty to do more than just
```

```
1     stopping to market to that doctor but also to

2     report that doctor to the DEA?

3                    MR. COOPER:  Objection.  Form.

4          Foundation.  Scope.

5                    MR. FINKELSTEIN:  Objection.

6          Foundation.  Incomplete hypothetical.

7                    THE WITNESS:  Could you repeat

8          it?

9     QUESTIONS BY MS. SINGER:

10         Q.    Did a manufacturer who observed

11    that kind of practice that we just described

12    have an obligation to report that doctor to

13    the DEA or other law enforcement or just to

14    stop marketing to that doctor?  Would that

15    have been enough?

16                   MR. O'CONNOR:  Objection.

17    Form.  Foundation.  Scope.

18                   MR. EPPICH:  Objection.

19         Incomplete hypothetical.

20                   THE WITNESS:  So I just want to

21         make sure I'm clear on the question.

22                   If the manufacturer had seen

23         this?

24    QUESTIONS BY MS. SINGER:

25         Q.    That's correct.
```

```
 1        A.      Right.

 2                They should stop shipments?

 3        Q.      Is it enough to stop marketing

 4    to the doctor, or do they also have to report

 5    that doctor as part of maintaining effective

 6    controls to prevent diversion?

 7                MR. O'CONNOR:  Same objections.

 8                THE WITNESS:  I mean, they

 9        should be telling us that.

10    QUESTIONS BY MS. SINGER:

11        Q.      Now, does the fact that there

12    are bad doctors who are writing illegitimate

13    prescriptions or pharmacies that are

14    dispensing illegally relieve distributors or

15    manufacturers of their duty to review their

16    own information and data for suspicious

17    orders and signs of diversion?

18                MS. MAINIGI:  Objection.

19        Vague.  Objection.  Outside the scope

20        of the Touhy authorization.

21        Objection.  Foundation.

22                MR. FINKELSTEIN:  I'll object

23        to the form.

24                THE WITNESS:  No.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MS. SINGER:

 2          Q.     And in fact, in a closed

 3     system, the participants in the supply chain,

 4     those who are on the inside, have a duty to

 5     look out for bad doctors and bad pharmacies,

 6     correct?

 7               MR. EPPICH:  Object to the

 8          form.  Foundation.  Calls for a legal

 9          conclusion.

10               THE WITNESS:  Yes.

11               (Prevoznik Plaintiff's Exhibit

12          P53 marked for identification.)

13     QUESTIONS BY MS. SINGER:

14          Q.     Okay.  Let's go to the -- I'm

15     going to show you Exhibit 53.  No Bates

16     number, just monkeys.

17               Do you recognize this image of

18     the see no evil, hear no evil, speak no evil,

19     Mr. Prevoznik?

20          A.     Yes.

21               MR. MAHADY:  Objection.  Form.

22          Foundation.  Relevance to anything.

23               MS. MAINIGI:  It's completely

24          outside the scope of the Touhy

25          authorization.  I think it's highly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              inappropriate to be marking this in a

 2              deposition.

 3       QUESTIONS BY MS. SINGER:

 4              Q.     Do registrants who close their

 5       eyes, fail to report signs of suspicious

 6       order, comply with the Controlled Substances

 7       Act?

 8                     MR. MAHADY:  Objection.  Form.

 9              Foundation.  Calls for a legal

10              conclusion.

11                     THE WITNESS:  No, they don't.

12       QUESTIONS BY MS. SINGER:

13              Q.     We can take down the monkeys.

14       They're probably not compliant with the CSA

15       either.

16                     MR. EPPICH:  Objection.

17       QUESTIONS BY MS. SINGER:

18              Q.     You testified before that the

19       DEA doesn't know what range of information

20       registrants have available to them, correct?

21              A.     Correct.

22              Q.     And they don't have to share

23       with the DEA all the data and information

24       they have on their customers, correct?

25              A.     Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Now, you talked about the fact

 2    that DEA doesn't set a formula or a threshold

 3    for industry to apply, correct?

 4          A.     Correct.

 5          Q.     And is that -- is the reason

 6    for that because the DEA wouldn't necessarily

 7    be able to capture what the industry knows

 8    about its own customers in setting a

 9    threshold?

10               MR. EPPICH:  Object to the

11          form.  Vague.

12               THE WITNESS:  I think it's

13          part -- a part of -- certainly that's

14          part of it, but the other part would

15          also be we don't regulate the practice

16          of medicine, so we're not interfering

17          with what doctors are doing to treat

18          their patients.

19               So in discussions with -- when

20          these thresholds and things -- it also

21          affects the opposite side.  So it's

22          not only the diverted side, but it's

23          also legitimate patients who can't get

24          them because of these thresholds that

25          are in place.  So it's affecting both
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          sides of the -- it's a delicate

 2          balance.

 3   QUESTIONS BY MS. SINGER:

 4          Q.    And so you leave that to a

 5   registrant who has all of that information,

 6   correct?

 7               MR. EPPICH:  Objection.

 8          Foundation.  Form.

 9               THE WITNESS:  Correct.

10   QUESTIONS BY MS. SINGER:

11          Q.    Okay.  And the danger is if the

12   DEA were to set the threshold too high, it

13   wouldn't be a real check on identifying

14   suspicious orders, correct?

15               MR. EPPICH:  Object to the

16          form.  Incomplete hypothetical.

17               MS. MAINIGI:  Speculation.

18               THE WITNESS:  Yes.

19   QUESTIONS BY MS. SINGER:

20          Q.    And if you set it too low, as

21   you said, patients might not be able to get

22   medicine they need, correct?

23               MR. EPPICH:  Object to the

24          form.  Incomplete hypothetical.  Calls

25          for speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.

 2    QUESTIONS BY MS. SINGER:

 3         Q.    And so it's not that the DEA

 4    has some answer on what the threshold should

 5    be and isn't telling industry; it's that the

 6    DEA is actually saying that industry knows

 7    better from its own customers, correct?

 8              MR. EPPICH:  Object to the

 9         form.  Calls for speculation.

10              THE WITNESS:  They're in a

11         better position than we are.

12              (Prevoznik Plaintiff's Exhibit

13         P54 marked for identification.)

14    QUESTIONS BY MS. SINGER:

15         Q.    Okay.  So let's go to -- I'm

16    showing you Exhibit 54.

17              So do you recognize

18    MNK-T1_0008504654?

19         A.    I recognize the names.

20         Q.    Okay.  Which names do you

21    recognize?

22         A.    Mark Caverly and James

23    Crawford.

24         Q.    And who are they?

25         A.    Former employees of DEA.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.     Okay.  And it says -- if you

2     look down this document, you see

3     Mr. Crawford, I think, three paragraphs from

4     the bottom.  Okay.  I'm sorry, let's go up

5     from that to the question.

6              "During the distributor

7     breakout session, suspicious order monitoring

8     was certainly a hotbed of discussion.  Are

9     there any plans for DEA to publicize

10    information to implement SOM, or suspicious

11    order monitoring, incorporate algorithms

12    where products are more likely to be

13    diverted?"

14              Do you see where I'm reading?

15       A.     Yes.

16       Q.     Okay.  And then can you read

17    Mr. Crawford's response?

18       A.      "Whatever we put out will be

19    outdated by the time we put it out.  You're

20    looking at a number.  Tell me how much --

21    tell me how much that we can't exceed.  DEA

22    can't do that.  It's part of your due

23    diligence, knowing your customer."

24       Q.     And does that reflect what you

25    just testified to in the guidance that DEA
```

```
 1    gave industry?

 2         A.     Yes.

 3                MR. MAHADY:  Objection.  Form.

 4                THE WITNESS:  Yes.

 5    QUESTIONS BY MS. SINGER:

 6         Q.     And then can you read

 7    Mr. Caverly's comment at the bottom of the

 8    page?

 9         A.     From the question "What does

10    the DEA expect?"

11         Q.     That's right.

12         A.     "Previously, DEA sat down with

13    the National Drug Association with an

14    algorithm DEA standpoint - you know your

15    customers better than we do.  DEA stepped

16    away from providing guidelines.  It's not

17    going to happen."

18         Q.     Does that also reflect DEA's

19    view as to why it wouldn't provide a

20    threshold to industry?

21                MR. EPPICH:  Object to the

22         form.  Foundation.  Calls for

23         speculation.

24                THE WITNESS:  Yes.

25                (Prevoznik Plaintiff's Exhibit
```

```
 1              P55 marked for identification.)

 2    QUESTIONS BY MS. SINGER:

 3         Q.    Okay.  Showing you Exhibit 55.

 4    My goal here is to make your pile go up and

 5    mine go down.

 6              All right.  This is

 7    MCKMDL00561303, executive summary regarding

 8    the HDMA document.

 9              Have you seen this document

10    before, Mr. Prevoznik?

11         A.    I'm not sure.

12         Q.    Okay.  Let me direct you to the

13    last page, Bates number 306.  It says in that

14    top bullet to question 10, "This is another

15    area that we have made great strides in over

16    the past few years.  Our analytical

17    capabilities provide us with greater insight

18    into our own customer base.  We have this

19    data already and frankly are in a position to

20    provide better information to DEA than they

21    could provide to us."

22              Does DEA agree with that

23    statement?

24              MR. EPPICH:  Object to the

25         form.  Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.

 2      QUESTIONS BY MS. SINGER:

 3            Q.     And it says as a sidenote, "DEA

 4      does not have dispensing data, nor do they

 5      have noncontrol data," correct?

 6            A.     Correct.

 7            Q.     Okay.  All right.  Let's move

 8      to -- no, new area.

 9                   In the first two days of your

10      deposition, you were offered -- you were

11      asked a series of questions about things DEA

12      could have done differently:  Did you set up

13      task forces or use ARCOS platforms in a

14      different way.

15                   Do you remember that line of

16      questioning?

17            A.     Yes.

18            Q.     Now, when you came into DEA,

19      what was your first position?

20            A.     Diversion investigator in the

21      Philadelphia field office.

22            Q.     Okay.  So you were out there

23      doing investigations and inspections and

24      building cases, correct?

25            A.     Correct.
```

```
 1          Q.     Okay.  Based on your experience

 2    in all of your years at DEA in management and

 3    as a diversion investigator and as the

 4    representative of the DEA here today, did DEA

 5    make the best judgments it could at the time

 6    to use your authority and resources most

 7    effectively to prevent diversion?

 8               MR. EPPICH:  Object to form.

 9          Vague.

10               MS. MAINIGI:  And objection.

11          Outside the scope of the Touhy

12          authorization.

13               THE WITNESS:  Yes, I think we

14          did.

15    QUESTIONS BY MS. SINGER:

16          Q.     Had distributors reported

17    suspicious orders to the DEA as the law

18    required would DEA have been able to use its

19    resources more effectively to identify and

20    prevent diversion?

21               MR. EPPICH:  Object to the

22          form.  Calls for a legal conclusion.

23          Vague.

24               MS. MAINIGI:  And outside the

25          scope of the Touhy authorization.
```

```
 1              MS. DO AMARAL:  Incomplete

 2         hypothetical.

 3              THE WITNESS:  I believe so.

 4              MR. EPPICH:  I second the

 5         outside the scope of the Touhy

 6         authorization.

 7    QUESTIONS BY MS. SINGER:

 8         Q.    Could you state your answer

 9    again?

10         A.    I believe so.

11         Q.    Okay.  And if registrants had

12    reported suspicious orders to the DEA, does

13    the DEA believe that there would have been

14    less diversion, less abuse and less death?

15              MR. EPPICH:  Objection.  Form.

16         Foundation.  Calls for speculation.

17         Incomplete hypothetical.  Outside the

18         scope of the Touhy authorization.

19              MR. FINKELSTEIN:  Scope.  Calls

20         for speculation.

21              THE WITNESS:  Yes.

22    QUESTIONS BY MS. SINGER:

23         Q.    Would you agree that this line

24    of questions about what the DEA could have

25    done or should have done sounds a lot like
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    blaming the DEA for not catching industry at

 2    breaking the law?

 3              MR. EPPICH:  Object to the

 4         form.  Foundation.  Incomplete

 5         hypothetical.  Outside the scope of

 6         the Touhy authorization.

 7              MR. FINKELSTEIN:  Scope.  Calls

 8         for speculation.

 9              THE WITNESS:  Could you please

10         repeat it?

11    QUESTIONS BY MS. SINGER:

12         Q.    Would you agree that this line

13    of questions about what the DEA could have

14    done and should have done sounds a lot like

15    blaming the DEA for not catching the industry

16    in breaking the law?

17              MR. EPPICH:  Same objections.

18              MR. FINKELSTEIN:  Same

19         objections.

20              THE WITNESS:  You're asking me

21         personally?

22    QUESTIONS BY MS. SINGER:

23         Q.    Yes.

24              MR. EPPICH:  Same objections.

25              THE WITNESS:  Me, personally,
```

```
 1          it certainly would have made a huge

 2          difference.

 3   QUESTIONS BY MS. SINGER:

 4          Q.    Does the obligation to maintain

 5   effective controls to prevent diversion exist

 6   whether or not you are caught?

 7                MR. EPPICH:  Objection to the

 8          form.  Incomplete hypothetical.  Calls

 9          for a legal conclusion.  Outside the

10          scope of the Touhy authorization as it

11          may divulge the deliberative process

12          of the DEA.

13                MR. FINKELSTEIN:  I appreciate

14          your concern about our deliberative

15          process.

16                You can answer.

17                THE WITNESS:  Yes.

18   QUESTIONS BY MS. SINGER:

19          Q.    And is it true that the cost of

20   doing a business, of getting a license that

21   allows you to make money by making and

22   selling and distributing narcotics, is that

23   you have to do your best to follow the law

24   and prevent those narcotics from ending up

25   on -- in the street or in the pockets of a
```

```
 1    12-year-old or anyplace else they shouldn't

 2    be?

 3              MR. EPPICH:  Object to the

 4         form.  Incomplete hypothetical.  Calls

 5         for a legal conclusion.  Scope.

 6         Vague.

 7              MR. FINKELSTEIN:  I'll object

 8         to the form.

 9              THE WITNESS:  Yes.

10    QUESTIONS BY MS. SINGER:

11         Q.   And do you think there's

12    anything about that rule that isn't clear or

13    fair to registrants?

14              MR. EPPICH:  Object to the

15         form.  Vague.  Incomplete

16         hypothetical.  Scope.  Calls for a

17         legal conclusion.

18              MR. FINKELSTEIN:  I'm going to

19         object that that's outside the scope

20         of the Touhy authorization.

21              You can answer in your personal

22         capacity.

23              THE WITNESS:  Could you please

24         repeat it?

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MS. SINGER:

 2          Q.     I have to scroll back through a

 3     lot of objections.

 4               Is there anything about that

 5     rule, to follow the law to prevent diversion,

 6     that isn't clear or fair to registrants?

 7                    MR. EPPICH:  Same objections.

 8                    THE WITNESS:  My personal

 9          perspective, no, there isn't.

10                    (Prevoznik Plaintiff's Exhibit

11          P56 marked for identification.)

12     QUESTIONS BY MS. SINGER:

13          Q.     I'm going to show you

14     Exhibit 56.

15               Mr. Prevoznik, this is our

16     effort to put in a timeline the actions DEA

17     took against defendants in this litigation.

18               Does this capture the major

19     enforcement initiatives that DEA took against

20     distributors, manufacturers and distributors,

21     including pharmacies?

22                    MR. EPPICH:  Object to the

23          form.  Objection.  Foundation.

24          Objection to inaccuracy of the data

25          that may or may not be in the
```

1    document.

2         MS. MAINIGI:  Outside the scope

3    of the Touhy authorization.

4         MR. FINKELSTEIN:  Yeah, I'm

5    going to repeat my concern about the

6    scope.  You've been authorized to

7    testify about administrative actions

8    in closed settlements with the

9    defendants.

10         MS. SINGER:  That's what's

11    here.

12         MR. FINKELSTEIN:  If you're

13    representing that, then subject to

14    that instruction, you can answer.

15         MR. MAHADY:  I'm also going to

16    object to the extent that the

17    demonstrative clearly shows things

18    that are not an enforcement action,

19    including references to letters --

20         MS. MAINIGI:  Right.

21         MR. MAHADY:  -- that are not

22    from the DEA, DOJ and, in fact, come

23    from the defendant.

24         MS. MAINIGI:  That is not what

25    it is represented by plaintiffs to be.

```
 1              MR. RUIZ:  Also object in it

 2         lists the alleged enforcement actions

 3         and do not relate to distribution.

 4              MR. MAHADY:  And enforcement

 5         actions by the state courts.

 6              MS. SINGER:  So these are all

 7         facts that have been established or

 8         will be established in the course of

 9         this litigation.

10              To the extent that defendants

11         have an argument that something here

12         wasn't tied together, that's an

13         argument they can make as to

14         admissibility.

15              MS. MAINIGI:  You're asking

16         this corporate representative to

17         somehow bless your document when

18         you've just created it and provided it

19         to him.

20              If you want to go point by

21         point through this document and ask

22         him if he knows about those and

23         whether they're enforcement actions,

24         go ahead.

25              MS. SINGER:  So you're welcome
```

```
 1          to do those questions.

 2     QUESTIONS BY MS. SINGER:

 3          Q.     I'm just asking if this

 4     represents the scale and number of

 5     enforcement actions that DEA took against the

 6     defendants in this litigation.

 7               MR. EPPICH:  Objection to form

 8          and foundation.

 9     QUESTIONS BY MS. SINGER:

10          Q.     To the extent you know.

11               MR. FINKELSTEIN:  And my

12          instruction to you is you're

13          authorized to answer based on

14          administrative actions and/or

15          settlements that the DEA has entered

16          into with any of the defendants, but

17          limit your answer to that.

18               MR. RUIZ:  And objection to the

19          extent that this chart has enforcement

20          actions against entities who are not

21          named defendants in this action.

22               MR. FINKELSTEIN:  Do you

23          understand my instruction?

24               THE WITNESS:  Yeah.

25               It appears to have most of the
```

```
 1        highlights.

 2   QUESTIONS BY MS. SINGER:

 3        Q.    Okay.  And is it fair to say

 4   that the DEA has investigated or taken action

 5   against virtually every major distributor of

 6   opioids over the last 15 years?

 7             MR. EPPICH:  Object to form and

 8        foundation.  Calls for speculation.

 9             THE WITNESS:  Yes.

10             MS. FUMERTON:  Also vague.

11   QUESTIONS BY MS. SINGER:

12        Q.    And also the major pharmacy

13   chains that distribute opioids?

14             MR. EPPICH:  Same objections.

15             THE WITNESS:  Yes.

16   QUESTIONS BY MS. SINGER:

17        Q.    And also manufacturers like

18   Mallinckrodt and Purdue, correct?

19             MR. EPPICH:  Same objections.

20             THE WITNESS:  Correct.

21   QUESTIONS BY MS. SINGER:

22        Q.    Now, this chart doesn't reflect

23   additional actions that the DEA took against

24   doctors and pharmacists, correct?

25             MR. EPPICH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Foundation.  Calls for speculation.

 2         Form.

 3                   THE WITNESS:  Yes.

 4    QUESTIONS BY MS. SINGER:

 5         Q.    Or actions you took against

 6    independent pharmacies.

 7                   And I take it the DEA also took

 8    enforcement action against non-chain

 9    pharmacies, correct?

10                   MR. EPPICH:  Objection.

11         Foundation.  Calls for speculation.

12         Form.

13                   MR. FINKELSTEIN:  Scope.  I

14         don't want to ask questions.

15                   You can answer in your personal

16         capacity.

17                   THE WITNESS:  Yes.  In my

18         personal capacity, yes, we would.

19    QUESTIONS BY MS. SINGER:

20         Q.    Okay.  So this isn't everything

21    the DEA did in this time period, correct?

22         A.    Correct.

23         Q.    Okay.  All right.  Moving on.

24                   Now, industry has talked about

25    their inability to get access to ARCOS data
```

```
 1    on other distributors, correct?

 2                Do you remember those

 3    questions?

 4         A.    Yes.

 5         Q.    Okay.  Now, isn't it true that

 6    even without information on a competitor's

 7    orders, that registrants can identify

 8    suspicious orders and potential diversion?

 9                MR. EPPICH:  Objection to form.

10         Foundation.  Calls for speculation.

11                THE WITNESS:  So essentially

12         their own data.

13    QUESTIONS BY MS. SINGER:

14         Q.    Yes.

15         A.    Yes.

16         Q.    Okay.  And when you've taken --

17    when you, the DEA, has taken enforcement

18    actions or entered into settlement agreements

19    with registrants, you've looked at their own

20    data, correct?

21         A.    Yes.

22         Q.    And what those registrants

23    should have known or did know about their own

24    customers, correct?

25         A.    Correct.
```

```
 1                  MR. EPPICH:  Object to the

 2         form.

 3   QUESTIONS BY MS. SINGER:

 4         Q.    And you haven't taken those

 5   actions based on data from other registrants,

 6   correct?

 7                  MR. EPPICH:  Object to the

 8         form.  Vague.

 9                  THE WITNESS:  Correct.

10   QUESTIONS BY MS. SINGER:

11         Q.    Right.

12                  So just to be perfectly clear,

13   you didn't expect Cardinal to know what

14   McKesson or AmerisourceBergen was supplying

15   to a customer, correct?

16         A.    Correct.

17                  MS. MAINIGI:  Objection.  Form.

18   QUESTIONS BY MS. SINGER:

19         Q.    Is it the DEA's experience that

20   suspicious orders filled by manufacturers,

21   distributors and pharmacies were suspicious

22   in their own right without anybody else's

23   data?

24                  MR. EPPICH:  Object to the

25         form.  Calls for a legal conclusion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Vague.

 2              MR. RUIZ:  Foundation.

 3              THE WITNESS:  Yes.

 4    QUESTIONS BY MS. SINGER:

 5          Q.    And when distributors take on

 6    or registrants take on a new customer, DEA

 7    recommends that they ask whether that

 8    customer uses other distributors, correct?

 9              MR. EPPICH:  Object to the

10          form.  Foundation.

11              THE WITNESS:  Yes.

12    QUESTIONS BY MS. SINGER:

13          Q.    And with dispensing data -- I'm

14    sorry.

15              And they also -- the DEA also

16    recommends that a registrant obtain -- or a

17    distributor -- let me try that again.

18              DEA also recommends that a

19    distributor obtain dispensing data from a

20    pharmacy before they take them on as a

21    customer, correct?

22              MR. EPPICH:  Object to form.

23          Foundation.  Vague as to time.

24              THE WITNESS:  Yes, if they can

25          get it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    Okay.  And with dispensing

 3    data, it would be obvious to a distributor if

 4    the pharmacy received controlled substances

 5    from more than one distributor, correct?

 6              MR. EPPICH:  Object to form.

 7         Foundation.  Calls for speculation.

 8              MS. MAINIGI:  Outside the scope

 9         of the Touhy authorization.

10              MR. FINKELSTEIN:  Join in the

11         scope objection.

12              THE WITNESS:  Could you run

13         that by me again?

14    QUESTIONS BY MS. SINGER:

15         Q.    Yeah, let me try to be clearer

16    in my question.

17              If you get the dispensing

18    data -- if a distributor gets the dispensing

19    data from a customer and it gets more

20    controlled substances than that distributor

21    supplies, then the distributor knows that

22    it's getting controlled substances from other

23    distributors, correct?

24              MR. EPPICH:  Object to form.

25         Foundation.  Calls for speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Outside the scope.

 2                  THE WITNESS:  It could be from

 3          another distributor, or it could be

 4          from another pharmacy selling stuff to

 5          them.  So it's not necessarily another

 6          distributor.  It could be another

 7          registrant that's selling them.

 8    QUESTIONS BY MS. SINGER:

 9          Q.    Okay.  But it's another

10    supplier other that -- or distributor,

11    correct?

12          A.    Yes.

13                MR. EPPICH:  Same objections.

14    QUESTIONS BY MS. SINGER:

15          Q.    Now, if a pharmacy won't

16    provide dispensing information to a

17    distributor, would that be a red flag that

18    the distributor needs to look more closely at

19    that customer?

20                MR. EPPICH:  Object to the

21          form.  Vague as to time.

22                MS. MAINIGI:  Scope.  Outside

23          the scope of the Touhy authorization.

24                MR. FINKELSTEIN:  Incomplete

25          hypothetical.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. EPPICH:  Objection.  Calls

 2         for speculation.

 3                 THE WITNESS:  Yes, they should

 4         be.

 5    QUESTIONS BY MS. SINGER:

 6         Q.    They should?

 7         A.    They should.

 8         Q.    A distributor should ask?

 9         A.    Should ask for it.

10                 MR. EPPICH:  Same objections.

11    QUESTIONS BY MS. SINGER:

12         Q.    And if a pharmacy directed a

13    distributor that it should not -- or could

14    not go into its store and talk with its

15    personnel or get a feel for that store,

16    should that be another red flag to that

17    distributor?

18                 MR. EPPICH:  Same objections.

19                 MR. FINKELSTEIN:  Incomplete

20         hypothetical.

21                 THE WITNESS:  Yes.

22    QUESTIONS BY MS. SINGER:

23         Q.    Okay.  And that's true whether

24    it's a chain pharmacy or an independent

25    pharmacy, correct?
```

```
 1                    MR. EPPICH:  Same objections.

 2                    THE WITNESS:  Correct.

 3     QUESTIONS BY MS. SINGER:

 4          Q.    Now, distributors have

 5     information on both controlled and

 6     noncontrolled substances that are ordered by

 7     a customer, correct?

 8                    MR. EPPICH:  Objection.

 9          Foundation.  Form and vague.

10                    THE WITNESS:  Yes.

11     QUESTIONS BY MS. SINGER:

12          Q.    And that lets them see where a

13     customer's order of controlled substances is

14     disproportionate to its other orders,

15     correct?

16                    MR. EPPICH:  Objection.  Form.

17          Foundation.  Calls for speculation.

18          Vague.

19                    THE WITNESS:  Yes.

20     QUESTIONS BY MS. SINGER:

21          Q.    And so if a customer is

22     ordering a lot of opioids and very little

23     antibiotics or diabetes medicine, that would

24     be one potential red flag of diversion,

25     correct?
```

```
 1                MR. EPPICH:  Objection.  Form.

 2        Foundation.  Calls for a legal

 3        conclusion.

 4                THE WITNESS:  Yes, it could

 5        potentially be a red flag.

 6   QUESTIONS BY MS. SINGER:

 7        Q.     A red flag?

 8        A.     Yes.

 9        Q.     Okay.  And it's also true that

10   pharmacies that order a certain mix of drugs

11   that are abused together, that that can be

12   another red flag of potential diversion,

13   correct?

14                MR. EPPICH:  Objection.  Form.

15        Foundation.  Calls for a legal

16        conclusion.

17                THE WITNESS:  Yes.

18   QUESTIONS BY MS. SINGER:

19        Q.     Now, distributors have that

20   data on other noncontrolled substance orders,

21   correct?

22                MR. EPPICH:  Objection.  Form.

23        Foundation.  Calls for speculation.

24                MR. FINKELSTEIN:  Scope.  Calls

25        for speculation.
```

```
 1                THE WITNESS:  Yes.

 2     QUESTIONS BY MS. SINGER:

 3          Q.    But DEA doesn't get reporting

 4     from distributors on noncontrolled substances

 5     ordered by customers, correct?

 6          A.    No, we do not.

 7                We do have some distributors

 8     that have told us -- like now everybody is

 9     looking at gabapentin, so the distributors

10     have said, "We are going to take a harder

11     look at that, that one."

12          Q.    Okay.  But in general, and

13     certainly over the time period we've been

14     talking about from 1996 until now, you --

15          A.    There's been -- I mean, there's

16     been other substances that they've said --

17     you know, I remember ketamine.  That was one

18     they said, oh, it was not a noncontrol and we

19     made it controlled.

20                So there's been other drugs

21     that they have stepped up and said, you know,

22     "We need to keep an eye on these.  We're

23     going to -- can we put them in the controlled

24     substance cage because we are seeing that?"

25     So we have had those dialogs with them as
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    well.

2         Q.    Okay.  But you don't routinely

3    get antibiotics or other non-diverted or

4    abused drugs, correct?

5              MR. EPPICH:  Objection.  Asked

6         and answered.  Form.

7              THE WITNESS:  Correct.

8    QUESTIONS BY MS. SINGER:

9         Q.    And DEA doesn't have

10   prescribing information in ARCOS, correct?

11             MR. EPPICH:  Objection.  Form.

12        Vague.

13             THE WITNESS:  Correct.

14   QUESTIONS BY MS. SINGER:

15        Q.    But that information is

16   certainly useful in detecting suspicious

17   orders or potential diversion, correct?

18             MR. EPPICH:  Objection.  Calls

19        for a legal conclusion.  Form.

20             THE WITNESS:  Correct.

21   QUESTIONS BY MS. SINGER:

22        Q.    Is DEA aware that registrants

23   have information -- have access to

24   information on cash payments that are

25   received by pharmacies?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. EPPICH:  Objection.  Form.

 2       Calls for speculation.

 3              MR. FINKELSTEIN:  Scope.  Calls

 4       for speculation.

 5              THE WITNESS:  I believe we do.

 6       I believe they do.

 7   QUESTIONS BY MS. SINGER:

 8       Q.     They do?

 9       A.     Yeah.

10       Q.     And does DEA have that

11   information?

12              MR. EPPICH:  Objection.

13              THE WITNESS:  If we subpoena

14       it.

15   QUESTIONS BY MS. SINGER:

16       Q.     Okay.  But not in the regular

17   course --

18       A.     No.

19       Q.     -- of identifying potential

20   diversion?

21       A.     Right.

22       Q.     Now, does ARCOS data tell you

23   whether a customer is near a hospital or a

24   cancer center or a hospice treatment

25   facility?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      No, it's just transactional

 2      data.

 3              Q.      Okay.  But distributors and

 4      manufacturers would learn that information in

 5      their due diligence on customers, correct?

 6                      MR. EPPICH:  Objection.  Form.

 7              Foundation.  Calls for speculation.

 8                      THE WITNESS:  Yes.

 9      QUESTIONS BY MS. SINGER:

10              Q.      Okay.  And when you get, for

11      instance, a -- when you, DEA, gets, for

12      instance, a big stack of ingredient limit

13      reports, you can't tell from that whether

14      orders of large numbers are by facilities

15      that are near hospitals or oncology centers

16      or anything like that, correct?

17                      MR. EPPICH:  Object to the

18              form.

19                      THE WITNESS:  I'm sorry, could

20              you repeat it?

21      QUESTIONS BY MS. SINGER:

22              Q.      So when you get, you know, a

23      big stack of excess order reports or

24      ingredient limit reports, you can't tell if a

25      large order is from a customer that's near an
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     oncology center or a hospital, for instance,

2     correct?

3                  MR. EPPICH:  Object to the

4           form.

5                  THE WITNESS:  Correct.  From

6           the reports, you cannot.

7     QUESTIONS BY MS. SINGER:

8           Q.    Does the DEA get chargeback

9     data?

10          A.    No.

11                (Prevoznik Plaintiff's Exhibit

12          P57 marked for identification.)

13    QUESTIONS BY MS. SINGER:

14          Q.    All right.  Let's go to the

15    letter.  Exhibit 57.

16                This is a letter from the

17    DEA -- I'm sorry, from the Department of

18    Justice to the Honorable Dan A. Polster dated

19    January 30, 2018.

20                Have you seen this letter?

21          A.    Yes.

22          Q.    Okay.  And it's signed by

23    Demetra Ashley --

24          A.    Yes.

25          Q.    -- is that correct?
```

```
 1                    Okay.  And this represents the

 2    official position of the Department of

 3    Justice and DEA, correct?

 4                    MR. EPPICH:  Objection.  Form.

 5         Foundation.

 6                    THE WITNESS:  Yes.

 7    QUESTIONS BY MS. SINGER:

 8         Q.    Okay.  Turning to page 4,

 9    please.  The middle paragraph, second

10    sentence says, "Release of the personally

11    identifiable information of individual

12    registrants without their consent would

13    violate the Privacy Act."

14                    Do you see where I'm reading?

15         A.    Yes.

16         Q.    "Therefore, DOJ objects to the

17    production thereof under its Touhy

18    regulations.  Disclosure would improperly

19    reveal trade secrets without the owners'

20    consent, and, therefore, the DOJ objects to

21    the production thereof under its Touhy

22    regulations," citing them.  "Production of

23    this data would reveal specific details

24    regarding the scope and breadth of their

25    market share, which is likely to cause
```

1    manufacturers and distributors substantial

2    competitive harm."

3              Have I read that correctly?

4         A.    Yes.

5         Q.    Okay.  And it goes on to say,

6    "In Freedom of Information Act litigation,

7    registrants have articulated the competitive

8    harm that would result from the release of

9    this information in several ways.  For

10   example, registrants have expressed concern

11   that ARCOS information, if made publicly

12   available, could be used by competitors to

13   determine market share and sales trends in

14   specific areas and would enable competitors

15   to target existing customers and attempt to

16   take away business.  For" --

17              So have I read all of that

18   correctly?

19        A.    Yes.

20        Q.    "For this reason, registrants

21   have repeatedly asserted that they rely on

22   DEA to protect the confidential business

23   information that they report to DEA through

24   ARCOS."

25              Have I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Yes.

 2          Q.      And is it the DEA's experience

 3    that registrants have objected to sharing

 4    ARCOS data with their competitors?

 5          A.      Yes.

 6                  MR. EPPICH:  Object to form and

 7          foundation.

 8    QUESTIONS BY MS. SINGER:

 9          Q.      All right.  You can put that

10    aside.

11                  So all registrants have the

12    same duty to maintain effective controls to

13    protect diversion and to detect, report and

14    stop shipment of suspicious orders; is that

15    correct?

16                  MR. EPPICH:  Objection.  Calls

17          for a legal conclusion.

18                  MS. FUMERTON:  Objection.

19          Form.

20                  THE WITNESS:  Yes.

21    QUESTIONS BY MS. SINGER:

22          Q.      And I think you testified

23    before that the obligation depends on where

24    you sit in the supply chain.

25                  Do you remember that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. EPPICH:  Objection.

 2                  THE WITNESS:  You mean in terms

 3        of --

 4   QUESTIONS BY MS. SINGER:

 5        Q.     Let me put it a different way

 6   rather than focusing on what you testified

 7   to.

 8                  Is it true that your

 9   obligations are the same, but what you may

10   observe and have data on depends on where you

11   are in the supply chain, correct?

12                  MR. EPPICH:  Object to the

13        form.  Vague.

14                  THE WITNESS:  Yes.

15   QUESTIONS BY MS. SINGER:

16        Q.     So you have the same

17   obligation -- or a registrant has the same

18   obligation to report and prevent diversion,

19   regardless of where they are in the supply

20   chain, correct?

21                  MR. EPPICH:  Object to the

22        form.  Calls for a legal conclusion.

23                  THE WITNESS:  Correct.

24   QUESTIONS BY MS. SINGER:

25        Q.     And the difference is what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diversion you can see from where you sit,

 2    correct?

 3                  MR. EPPICH:  Objection to form.

 4          Calls for a legal conclusion.  Vague.

 5                  THE WITNESS:  Yes.

 6    QUESTIONS BY MS. SINGER:

 7          Q.    And if a registrant has

 8    information that would alert it to diversion,

 9    it has an obligation under the Controlled

10    Substances Act to use that information to

11    prevent diversion, correct?

12                  MR. EPPICH:  Object to form.

13          Calls for a legal conclusion.  Vague.

14                  THE WITNESS:  Correct.

15    QUESTIONS BY MS. SINGER:

16          Q.    And you can't be like that

17    monkey, hiding your eyes --

18                  MR. EPPICH:  Objection.

19    QUESTIONS BY MS. SINGER:

20          Q.    -- and say, "We only use that

21    data for marketing" --

22                  MR. EPPICH:  Objection.

23    QUESTIONS BY MS. SINGER:

24          Q.    -- "or accounting."

25                  You have to use that data for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   compliance, too, correct?

 2              MR. EPPICH:  Objection.

 3              THE WITNESS:  Yes.

 4   QUESTIONS BY MS. SINGER:

 5        Q.    Before manufacturers sell

 6   opioids to a distributor, that manufacturer

 7   must make sure that the distributor has an

 8   adequate and effective suspicious order

 9   monitoring program, correct?

10              MR. O'CONNOR:  Objection.

11         Form.  Foundation.

12              THE WITNESS:  Yes.

13   QUESTIONS BY MS. SINGER:

14        Q.    And that would include doing a

15   site visit of the distributor, correct?

16              MR. O'CONNOR:  Objection.

17         Form.

18              THE WITNESS:  Yes.

19   QUESTIONS BY MS. SINGER:

20        Q.    And examining its suspicious

21   order monitoring program, correct?

22        A.    Yes.

23        Q.    And if a manufacturer sees

24   evidence that a distributor is shipping and

25   failing to report suspicious orders, that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    should suggest to the manufacturer that the

 2    distributor does not have effective controls,

 3    correct?

 4                    MR. O'CONNOR:  Objection.

 5         Form.

 6                    MS. MACKAY:  Incomplete

 7         hypothetical.

 8                    THE WITNESS:  Correct.

 9    QUESTIONS BY MS. SINGER:

10         Q.    And if the information a

11    manufacturer has available to them points to

12    diversion by prescribers, by pharmacies, a

13    manufacturer has an obligation to notify DEA

14    of those prescribers and pharmacies, correct?

15                    MR. O'CONNOR:  Objection.

16         Form.  Incomplete hypothetical.

17                    THE WITNESS:  Yes.

18    QUESTIONS BY MS. SINGER:

19         Q.    And does a manufacturer comply

20    with its obligations to report suspicious --

21    I'm sorry.

22                    Does a manufacturer comply with

23    the Controlled Substances Act when it reports

24    that potential diversion to its distributor

25    but not the DEA?
```

```
 1                    MR. O'CONNOR:  Objection.

 2        Form.

 3                    THE WITNESS:  I'm sorry, can

 4        you run --

 5    QUESTIONS BY MS. SINGER:

 6        Q.    So if the manufacturer only

 7    tells its distributor and not the DEA, have

 8    they satisfied their obligation under the

 9    Controlled Substances Act?

10                    MR. O'CONNOR:  Objection.

11        Form.

12                    MR. FINKELSTEIN:  Incomplete

13        hypothetical.

14                    THE WITNESS:  No.

15    QUESTIONS BY MS. SINGER:

16        Q.    Are distributors -- and I'm

17    sorry.  Mr. Farrell asked you these questions

18    about chain pharmacies and whether there are

19    different compliance obligations for chain

20    pharmacies.

21                    Do you remember that?

22        A.    Yes.

23        Q.    And I just want to show you one

24    document.

25                    (Prevoznik Plaintiff's Exhibit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P58 marked for identification.)

 2    QUESTIONS BY MS. SINGER:

 3         Q.     Exhibit 58.  It is

 4    DEA_Rannazzisi, a lot of zeros, 6060.  It's

 5    titled "Declaration of Michael Arpaio."

 6              Do you recognize this document?

 7         A.     No.

 8         Q.     Okay.  Do you know who Michael

 9    Arpaio is?

10         A.     Yes.

11         Q.     And who is that?

12         A.     He is a former DEA diversion

13    investigator.

14         Q.     Okay.  And if you turn to

15    page 2, backside.  Now -- I'm sorry, go back

16    to the first page, the caption.

17              Can you read the caption for

18    this, in the matter of Cardinal Health?

19         A.     Cardinal Health.

20         Q.     Okay.  I'm sorry, now read

21    paragraph 5, if you would, please.

22         A.     "I told Mr." --

23              Is it Moné?

24         Q.     Yes.

25         A.     "I told Mr. Moné that due
```

 1   diligence investigations must be performed on

 2   all customers."

 3        Q.     And if you go back for one

 4   second, if you read the top line of

 5   paragraph 4, it may explain who Mr. Moné is.

 6        A.     "Consequently, on July 29,

 7   2009, I spoke via teleconference to Mike

 8   Moné, quality and regulatory affairs vice

 9   president, anti-diversion and supply chain

10   services, who is headquartered in Cardinal

11   Health's Dublin, Ohio, facility but at the

12   time was in Washington, DC."

13        Q.     Okay.  You can stop there.

14               And I'm sorry, if you can pick

15   up where you were in paragraph 5.

16        A.     Just start --

17        Q.     Just start from the beginning

18   on paragraph 5.

19        A.     "I told Mr. Moné that due

20   diligence investigations must be performed on

21   all customers, chain pharmacies included,

22   when it appears that suspicious high volume

23   orders of controlled substances are

24   requested, and questionnaires should be sent

25   to those -- to these chains.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    "Mr. Moné, in turn, stated that

 2      QRA is unable to look at chain pharmacy

 3      systems in order to identify problem areas

 4      when there is not an order of interest or

 5      their threshold is not exceeded.  I repeated

 6      the chain store due diligence reviews must

 7      not be treated any differently than

 8      independent retail pharmacy customers."

 9           Q.    In that last sentence that

10      "chain store due diligence reviews must not

11      be treated any differently than independent

12      retail pharmacy customers," does that

13      represent the view of the DEA?

14           A.    Yes.

15                 MS. MAINIGI:  Objection.  Form.

16      QUESTIONS BY MS. SINGER:

17           Q.    And that is the guidance that

18      DEA gave to registrants, correct?

19                 MS. MAINIGI:  Objection to

20           form.  Objection.  Outside the scope

21           of the Touhy authorization.

22           Objection.

23                 MR. EPPICH:  Objection to the

24           prior question.

25                 MS. MAINIGI:  Objection to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            prior question and there also to this

2            current question.

3      QUESTIONS BY MS. SINGER:

4            Q.      Go ahead.

5                    That's the guidance that DEA

6      gave to registrants?

7            A.      Correct.

8            Q.      All right.  Should distributors

9      be looking at all of the volume of opioids

10     they supply into a geographic area in

11     determining whether orders may be suspicious?

12                   MR. EPPICH:  Object to the

13           form.  Foundation.  Vague.  Calls for

14           a legal conclusion.

15                   THE WITNESS:  It would

16           definitely help.

17     QUESTIONS BY MS. SINGER:

18           Q.      Okay.  Meaning if they're

19     supplying in ways that are very

20     disproportionate to the population, that

21     should be a sign that they're not supplying

22     to a legitimate market, correct?

23                   MR. EPPICH:  Objection to the

24           form.  Calls for a legal conclusion.

25                   THE WITNESS:  Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    And distributors may not know

 3    all of the pills that are going into an area,

 4    but they certainly know what pills they're

 5    sending, correct?

 6              MR. EPPICH:  Objection to the

 7         form.  Calls for a legal conclusion.

 8              MS. MAINIGI:  No foundation.

 9         Outside the scope of the Touhy

10         authorization.

11              THE WITNESS:  Correct.

12    QUESTIONS BY MS. SINGER:

13         Q.    Are orders that are below a

14    threshold set by a distributor sometimes

15    suspicious, too?

16              MR. EPPICH:  Objection.  Calls

17         for a legal conclusion.  Form.  Vague.

18              THE WITNESS:  Yes, they can be.

19    QUESTIONS BY MS. SINGER:

20         Q.    And should registrants be

21    reporting orders that are within threshold

22    but are still suspicious for other reasons?

23              MR. EPPICH:  Objection to form.

24         Calls for a legal conclusion.  Scope.

25              THE WITNESS:  Yes.
```

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    If an order exceeds a threshold

 3    set by a registrant, is it no longer

 4    suspicious if the registrant cuts the order

 5    to threshold and ships it anyway?

 6              MR. EPPICH:  Objection.  Form.

 7         Incomplete hypothetical.  Calls for a

 8         legal conclusion.  Vague.

 9              MS. MAINIGI:  Outside the scope

10         of the Touhy authorization.

11              MR. FINKELSTEIN:  Incomplete

12         hypothetical.

13              THE WITNESS:  Could you repeat

14         it?

15    QUESTIONS BY MS. SINGER:

16         Q.    Yes.  Let me do it as an

17    example.

18              If the threshold says that an

19    order of 10,000 dosage units exceeds

20    threshold and a customer orders 50,000 dosage

21    units, can the distributor just cut the order

22    to 10,000 units and ship it without

23    investigating whether it's suspicious or not?

24              MR. EPPICH:  Objection.  Form.

25         Incomplete hypothetical.  Calls for a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            legal conclusion and vague.

 2                    THE WITNESS:  Well, in your

 3            hypothetical it sounded like it was

 4            already triggered as a suspicious

 5            order, so immediately upon discovery

 6            they were supposed to tell us anyway

 7            that this happened.

 8    QUESTIONS BY MS. SINGER:

 9        Q.    And shipping less of it doesn't

10    make it not suspicious anymore.  If it's a

11    suspicious order, it's a suspicious order,

12    correct?

13                    MR. EPPICH:  Objection to form.

14            Calls for a legal conclusion.

15                    THE WITNESS:  Right.  So they

16            can either not ship it or they can

17            investigate to determine -- to

18            alleviate the suspicions that they

19            have.

20    QUESTIONS BY MS. SINGER:

21        Q.    Okay.  Let's go to...

22                    (Prevoznik Plaintiff's Exhibit

23            P59 marked for identification.)

24    QUESTIONS BY MS. SINGER:

25        Q.    Okay.  This is exhibit -- can
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you see the number, Mr. Prevoznik?  I forgot

 2    to check it.

 3         A.     59.

 4         Q.     Okay.  And do you recognize

 5    this as the testimony of Demetra Ashley from

 6    the Office of Diversion Control at DEA?

 7         A.     Yes.

 8         Q.     I believe it was an exhibit in

 9    the first two days of your deposition.

10         A.     Yes.

11         Q.     All right.  And it's dated

12    December 12, 2017, correct?

13         A.     Correct.

14         Q.     Okay.  So I believe that

15    Cardinal's counsel read you some of this, and

16    I just want to complete the record on it.

17                So, first, if you could turn to

18    page 7.

19                Under the title "Ensuring

20    Patient Access and Effective Drug Enforcement

21    Act," first sentence, "The United States is

22    currently facing an opioid epidemic."

23                Is that the view of the DEA?

24         A.     Yes.

25                MR. EPPICH:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SINGER:

 2         Q.    And turning the page, I believe

 3    you were asked to read the last sentence of

 4    the middle paragraph, "The DEA needs every

 5    tool."

 6              Can you just read the first

 7    part of that paragraph, too, so we have a

 8    complete record and not just an

 9    out-of-context sentence?

10              MR. EPPICH:  Object to that

11         commentary.

12              THE WITNESS:  "The DEA needs

13         every tool it can to combat the opioid

14         crisis.  DEA supports changing the

15         Ensuring Patient Access and Effective

16         Drug Enforcement Act to allow DEA to

17         more effectively stop bad actors from

18         engaging in opioid diversion.  We are

19         dealing with very dangerous drugs that

20         can result in addiction and even

21         death."

22    QUESTIONS BY MS. SINGER:

23         Q.    Okay.  I think that completes

24    the record.  You read the last sentence

25    previously.
```

```
 1                    All right.  Let's now go to

 2      the...

 3                    MR. FINKELSTEIN:  I'm going to

 4           ask for our lunch break in a minute.

 5                    MS. SINGER:  Okay.  I'm just

 6           about done.

 7                    (Prevoznik Plaintiff's Exhibit

 8           P60 marked for identification.)

 9      QUESTIONS BY MS. SINGER:

10           Q.    Okay.  Exhibit 60.

11                 And this is

12      DEA_Rannazzisi_00003482.  And that title page

13      is "Prescription Opioids to Heroin:  A

14      Natural Progression, June 14, 2014, Joseph

15      Rannazzisi."

16                 Do you recognize this document?

17           A.    Yes.

18           Q.    And what do you recognize it

19      as?

20           A.    Mr. Rannazzisi's presentation.

21           Q.    Okay.  And that was an official

22      DEA presentation, correct?

23           A.    Correct.

24           Q.    Okay.  And there aren't slide

25      numbers.
```

```
 1                    Do we have that tabbed?

 2                    If you could go to the second

 3        tab, please, which is titled "Migration of

 4        Pain Clinics."

 5                    Are you at that page with a

 6        map?

 7            A.     Yes.

 8            Q.     Okay.  Can you explain what

 9        this map represents in terms of DEA's

10        enforcement?

11                    MR. O'CONNOR:  Objection.

12              Foundation.

13                    MS. MAINIGI:  Outside the scope

14              of the Touhy authorization.

15                    MR. FINKELSTEIN:  You can

16              answer this question, but this will be

17              the last question before our lunch

18              break.

19                    THE WITNESS:  Okay.

20                    What this means is after we

21              took the enforcement actions we did in

22              Florida, this was what the pain -- the

23              bad pain clinics did, the rogue pain

24              clinics did, was they went -- moved --

25              as you can see the directions they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              moved into.  They moved into states

 2              that had weak laws governing pain

 3              clinics.  So this was the movement of

 4              the rogue pain clinics from Florida

 5              out.

 6      QUESTIONS BY MS. SINGER:

 7              Q.    Okay.  And this reflects DEA's

 8      experience that when you take enforcement

 9      action someplace, the diversion can move into

10      other areas, correct?

11              A.    Correct.

12                    MS. MAINIGI:  Objection.

13              Outside the scope.  Vague.

14                    VIDEOGRAPHER:  Okay.  We're

15              going off the record.  The time is

16              12:46.

17                (Off the record at 12:46 p.m.)

18                    VIDEOGRAPHER:  We're going back

19              on the record.  Beginning of Media

20              File 5.  The time is 1:37.

21                        EXAMINATION

22      QUESTIONS BY MR. MAHADY:

23              Q.    Mr. Prevoznik, good afternoon.

24      My name is Joe Mahady.  I, along with my

25      colleague, Robert Nicholas, are counsel for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      AmerisourceBergen in this litigation.

 2                 Before we begin, I do want to

 3      sincerely thank you for your patience over

 4      last two and a half days.  I know it's been a

 5      lot, and it is appreciated.

 6                 I want to start my questioning

 7      with the testimony you provided relating to

 8      after-the-fact reporting of suspicious

 9      orders.

10                 Okay?

11           A.    Uh-huh.

12           Q.    All right.  And when we're

13      talking about after-the-fact reporting of

14      suspicious orders, what we are talking about

15      is registrants who report suspicious -- who

16      ship suspicious orders after they've been

17      reported to DEA, correct?

18           A.    After they reported it?

19           Q.    Yes.

20                 After-the-fact reporting is

21      when the suspicious order has been shipped

22      and then reported to DEA; is that correct?

23           A.    Those were excessive purchases.

24           Q.    Okay.

25           A.    So it was after-the-fact sales.
```

```
 1        Q.      Okay.  And my understanding of
 2   your testimony is that the DEA has always
 3   interpreted orders to mean prior to shipment;
 4   is that correct?
 5        A.      Correct.
 6        Q.      All right.  And that the DEA
 7   has consistently provided the guidance --
 8   that guidance to registrants, correct?
 9        A.      Correct.
10        Q.      All right.  And that the DEA
11   has never told registrants that
12   after-the-fact reporting is compliant with
13   federal law; is that correct?
14        A.      Well, the use of the term -- of
15   the absolute "never," there might be an
16   employee that did, but DEA policy has always
17   been --
18        Q.      Okay.  So nobody from DEA
19   headquarters has ever told a registrant, to
20   your knowledge, that after-the-fact reporting
21   is compliant with federal law, correct?
22        A.      Well, again, you started it
23   with the "never" -- did somebody at DEA
24   headquarters ever do it.  So I'm -- I can't
25   say that somebody didn't say something, but I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    can say DEA policy is that they should not.

2          Q.    Okay.  I appreciate that.

3                And I believe you testified

4    that the DEA has consistently advised

5    registrants that they should not ship an

6    order that they report as suspicious; is that

7    correct?

8          A.    Correct.

9          Q.    And when you say

10   "consistently," you were referring to the

11   time period from 1971 when the Controlled

12   Substances Act was passed until present day;

13   is that right?

14         A.    Yes.

15         Q.    So approximately a 50-year

16   period.  Your testimony is that the DEA

17   guidance on that point has been consistent,

18   correct?

19         A.    Correct.

20         Q.    All right.  You joined the DEA

21   in 1991, correct?

22         A.    Yes.

23         Q.    In my home city of

24   Philadelphia?

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.

 2          A.    Where you from?

 3          Q.    Philadelphia.

 4                Where?

 5          A.    Yeah.

 6          Q.    Well, now I'm in the 'burbs.

 7    We had to move.  But I was in city.

 8                So -- and you joined

 9    headquarters in 2012, correct?

10          A.    Yes.

11          Q.    Okay.  So I want to understand

12    a little bit better how you can testify that

13    the guidance was consistent for that entire

14    50-year period.

15                Okay?

16          A.    Sure.

17          Q.    Okay.  So in preparing for your

18    deposition as the representative from the

19    DEA, who did you speak with that -- well, let

20    me back up.

21                You don't have any firsthand

22    knowledge of the guidance that the DEA

23    offered from 1971 until you joined the DEA in

24    1991, correct?

25          A.    I have the statute and the
```

Highly Confidential - Subject to Further Confidentiality Review

  1    regulations that haven't changed since then.

  2         Q.    Okay.

  3         A.    So that's what I relied on.

  4         Q.    So you relied -- for the period

  5    from 1971 to 1991, you relied entirely on the

  6    statute and the regulation, correct?

  7              MR. FINKELSTEIN:  Objection.

  8         Argumentative.  Mischaracterizes prior

  9         testimony.

 10              THE WITNESS:  No, because we

 11         went through some of the letters that

 12         I had seen in the 1980s in which those

 13         topics were discussed in there.

 14              But I also know that Burles

 15         Vulcom {phonetic}, there was a press

 16         release that they had to pay a heavy

 17         fine back in the 19 -- mid-1980s

 18         because they weren't reporting

 19         suspicious orders.

 20              So I was reviewing documents

 21         that would show what was DEA's

 22         position and what did we say.  So I

 23         was looking at correspondence, any

 24         correspondence, I could find in the

 25         1980s, 1990s, anything that showed

Highly Confidential - Subject to Further Confidentiality Review

1           that consistent -- what did we say,

2           what was our policy.

3       QUESTIONS BY MR. MAHADY:

4           Q.    Okay.  And what did we say

5       regarding the guidance relating to reporting

6       a suspicious order and then shipping it.

7       That's what we're talking about specifically,

8       right?

9           A.    Right.

10          Q.    Okay.  Did you speak with

11      anyone at the -- in preparation for your

12      30(b)(6), did you speak with anyone at the

13      DEA who was knowledgeable about the guidance

14      offered by the DEA on that issue from 1971 to

15      1980?

16              MR. FINKELSTEIN:  I'm going to

17          object and note for the record that

18          the witness had a prep sheet which was

19          to stay with his prep materials that

20          has not been provided to him today.

21              MR. MAHADY:  Okay.  And that

22          was a prep sheet that the Department

23          of Justice brought with them last

24          time, so it's not a document that we

25          were to bring.  So --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FINKELSTEIN:  No, it was a

 2          document that was marked as an

 3          exhibit, provided to everyone and kept

 4          with the witness himself, kept with

 5          the court reporter, so he could rely

 6          on them.

 7                    MR. MAHADY:  Okay.

 8                    MR. FINKELSTEIN:  This

 9          specifically listed his prep.

10                    MR. MAHADY:  Okay.  That's

11          fine.

12                    MR. FINKELSTEIN:  And so now

13          he's going on memory, where we

14          specifically prepared an exhibit for

15          you.

16                    MR. MAHADY:  I appreciate that.

17                    MS. MAINIGI:  We'll try to find

18          it.  I think the exhibits went with

19          the prior court reporter, so I think

20          that's what happened.

21                    MR. MAHADY:  Okay.

22     QUESTIONS BY MR. MAHADY:

23          Q.    In preparation for your

24     30(b)(6), you did not speak with Michael

25     Mapes, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.

 2          Q.     And you did not speak with Kyle

 3   Wright, correct?

 4          A.     No.

 5          Q.     There was a reference to a Tom

 6   Gitchel earlier today; is that right?

 7          A.     Tom Gitchel, yes.

 8          Q.     And who is Tom Gitchel?

 9          A.     Tom Gitchel was a senior

10   manager within the diversion program at DEA.

11          Q.     Okay.  And did you speak with

12   Tom Gitchel in preparation for providing

13   testimony on behalf of the DEA?

14          A.     No.

15          Q.     Okay.  How about Patricia Good?

16   Did you speak with Patricia Good?

17          A.     No.

18          Q.     How many field offices does the

19   DEA have?

20          A.     Currently we have 23.

21          Q.     Okay.  And do you know how many

22   field offices the DEA had in the 1990s?

23                 MR. FINKELSTEIN:  Objection.

24          Scope.

25                 THE WITNESS:  I believe it was
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        18 and went to 20.

2   QUESTIONS BY MR. MAHADY:

3        Q.    Okay.  And in preparing for

4   your deposition as a 30(b)(6) on behalf of

5   the DEA, how many representatives from field

6   offices did you speak with?

7        A.    Probably about 10 to 12.

8        Q.    Okay.

9        A.    Sort of off the top of my head.

10       Q.    And how many of those

11  individuals worked at field offices in the

12  1990s?

13       A.    Worked in the field offices?

14       Q.    Correct.

15       A.    Eight to ten of them.

16       Q.    Okay.  Mr. Prevoznik, are you

17  aware that the DEA has, in fact, approved a

18  suspicious order monitoring system where

19  suspicious orders were to be reported after

20  the purchase was complete?

21       A.    No.

22       Q.    Okay.  Would it surprise you

23  that the DEA has approved a suspicious order

24  monitoring system where suspicious orders

25  were to be reported after the purchase has
```

```
 1    been complete?

 2              MR. FINKELSTEIN:  Object to

 3         form.

 4              THE WITNESS:  Yeah.

 5              (Prevoznik Exhibit 22 marked

 6         for identification.)

 7    QUESTIONS BY MR. MAHADY:

 8         Q.    Okay.  I'm going to mark this

 9    as Prevoznik 22.

10              Mr. Prevoznik, let me know when

11    you've had a chance to read this.

12         A.    Okay.

13         Q.    Okay.

14              MR. FARRELL:  Before you do so,

15         I'm going to place an objection on the

16         record.  This is correspondence dated

17         1998 between Bergen Brunswig

18         Corporation and the DEA, and the scope

19         of this document violates CMO 2, where

20         the defendants requested and the Court

21         granted a limitation with temporal

22         scope of discovery to 2006.

23              MR. MAHADY:  This document was

24         produced to the DEA, was identified as

25         a document that Mr. Prevoznik reviewed
```

```
1           in preparing for his corporate

2           designee deposition today.

3                I will also note that the

4           plaintiffs spent a majority of their

5           questioning on issues that predate

6           2007, including using documentation

7           that was between DEA and other

8           registrants that was pre-2007.

9                SPECIAL MASTER COHEN:  Just to

10          clarify, you said produced to the DEA.

11          Did you mean by the DEA?

12                MR. MAHADY:  From the DEA.

13     QUESTIONS BY MR. MAHADY:

14          Q.    Mr. Prevoznik, this morning

15     Mr. Farrell asked you questions about

16     documents that bear a US DEA Bates number,

17     correct?

18          A.    Yes.

19          Q.    All right.  And those are

20     documents that the DEA has produced, correct?

21          A.    Correct.

22          Q.    Okay.  And these were documents

23     that were in the custody and control of the

24     DEA, correct?

25          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     Okay.  Have you seen this
 2   document before?
 3        A.     Yes.
 4        Q.     When was the first time you saw
 5   this document?
 6        A.     It was during my prep.  I don't
 7   have a specific date.
 8        Q.     Did you see -- so you've been
 9   deposed on three separate days, correct?
10        A.     Yes.
11        Q.     And the first two days of your
12   deposition were, I believe, April 17th and
13   April 18th.
14               Did you see this document
15   before you were deposed on April 17th and
16   April 18th?
17        A.     Yes.
18        Q.     Okay.  Are you aware that the
19   Department of Justice did not produce this
20   document until Tuesday of this week?
21        A.     No.
22        Q.     Okay.
23               MS. MAINIGI:  I believe it got
24        to us Wednesday.
25               MR. MAHADY:  Correction for the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          record.  It was Wednesday of this week
 2          we received it.
 3                  MS. MAINIGI:  Actually, it was
 4          hand-delivered to Williams on Tuesday.
 5                  MR. MAHADY:  Well, the point
 6          isn't Tuesday or Wednesday, it's
 7          that --
 8                  MR. FINKELSTEIN:  No, it was
 9          hand-delivered.  So you knew you had
10          represented previously that it was
11          Federal Express'd, but it wasn't.
12                  MR. MAHADY:  Okay.  Well,
13          the -- I would just like to --
14                  MS. MAINIGI:  That's what I
15          understood.
16                  MR. FINKELSTEIN:  And you were
17          wrong.
18                  MR. MAHADY:  -- note for the
19          record that this document was reviewed
20          by the witness in advance of the first
21          two days of his deposition and was
22          produced a month after the fact.
23                  MR. FINKELSTEIN:  And now you
24          have it.  Go ahead and ask questions
25          about it.
```

```
 1                    MR. MAHADY:  I will.  Thank

 2        you.

 3                    MR. FINKELSTEIN:  You're

 4        welcome.

 5   QUESTIONS BY MR. MAHADY:

 6        Q.     Mr. Prevoznik, can you please

 7   direct your attention to the bottom of this

 8   document?

 9        A.     Yes.

10        Q.     And before we get there, I'm

11   sorry, this document is dated what?

12        A.     July 23, 1998.

13        Q.     And this document was sent to,

14   while the name is redacted, the regulatory

15   compliance and security services of Bergen

16   Brunswig Corporation; is that correct?

17        A.     Correct.

18        Q.     And it's signed, or stamped, by

19   Patricia M. Good, chief liaison and policy

20   section; is that right?

21        A.     Yes.

22        Q.     Okay.  Can you direct your

23   attention to the bottom of the page below the

24   section that has been redacted, and can you

25   please read for me the subject line?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      "Approved suspicious order

 2    monitoring system."

 3        Q.      Okay.  Now, if you can please

 4    read to me for the record the first sentence

 5    of the letter after "dear."

 6        A.      "This is to grant approval of

 7    your request to implement on a nationwide

 8    basis your newly developed system to identify

 9    and report suspicious orders for controlled

10    substances and regulated chemicals."

11        Q.      Okay.  Can you -- so as

12    required by the federal regulations, correct?

13        A.      Oh, I'm sorry, yes.

14        Q.      Okay.  Can you read the next

15    sentence, please?

16        A.      "DEA managers who have been

17    involved with the testing of the system have

18    relied -- have relayed their positive

19    opinions regarding its ability to provide

20    information in a fashion which is not only

21    useful overall but is also responsive to the

22    needs of individual DEA offices."

23        Q.      Okay.  And we can agree that

24    this is an explicit approval from the DEA of

25    a particular system, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FINKELSTEIN:  Objection.

 2          Mischaracterizes the document.

 3                    THE WITNESS:  No, it's a --

 4          it's a granting -- they asked could

 5          they implement this on a nationwide --

 6          their newly designed system.  So it's

 7          this particular registrant, Bergen

 8          Brunswig, who developed their own

 9          system and asked can we -- can we

10          apply this nationwide.

11                    And we said, yes, you may apply

12          it nationwide.

13   QUESTIONS BY MR. MAHADY:

14          Q.    Okay.  So --

15          A.    It's not approving the system.

16                    MR. FINKELSTEIN:  Let the

17          witness finish his answer.

18                    MR. MAHADY:  I appreciate that.

19                    THE WITNESS:  It's just

20          approving the fact that they can now

21          put it nationwide.

22   QUESTIONS BY MR. MAHADY:

23          Q.    Okay.  So notwithstanding the

24   fact that the subject line of the letter is,

25   "Subject:  Approve suspicious order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    monitoring system," the position of the DEA

 2    is that this was not an approval of the

 3    system; is that correct?

 4              MR. FINKELSTEIN:  Objection.

 5         Argumentative.  Asked and answered.

 6              You can answer again.

 7              THE WITNESS:  Can you please

 8         repeat it?

 9    QUESTIONS BY MR. MAHADY:

10         Q.    Notwithstanding the fact that

11    the subject line of this letter is "approve

12    suspicious order monitoring system," it is

13    the position of the DEA here today, 20-some

14    years later, that this was not an approval of

15    the actual program itself; is that correct?

16              MR. FINKELSTEIN:  Same

17         objections.

18              THE WITNESS:  Yeah, that's not

19         what the letter says.  The letter says

20         we approve your request to implement

21         your system on a nationwide basis.

22         Your system, Bergen Brunswig system.

23    QUESTIONS BY MR. MAHADY:

24         Q.    And do you know if that system

25    was developed in coordination with the DEA?
```

```
1          A.     Well, it appears that we had

2     some input into it, so it's no different than

3     when I previously testified that you have --

4     the regulations require the registrant to

5     design.  So this is designing it.

6                 So when -- as I said earlier

7     today, when we go in to listen to the design

8     or what is the system that you're going to

9     implement, DEA is in listening mode, we will

10    make suggestions.

11                If we -- as we listen to it, we

12    will make suggestions:  Oh, you may want to

13    think of this; you may want to think of that.

14         Q.     Okay.

15         A.     So then it jumps to the

16    operational side.  So you now have the

17    design, but now you have to operate it.  So

18    what is the operation, what was actually --

19    how did the system operate.

20                And that is the registrant

21    running that system, not DEA.

22         Q.     Okay.  So the DEA approved the

23    design of the system but not the operation;

24    is that what you're saying?

25                MR. FINKELSTEIN:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Mischaracterizes his prior testimony.

 2                   THE WITNESS:  No, we said we

 3         approve the request to implement the

 4         system nationwide.

 5    QUESTIONS BY MR. MAHADY:

 6         Q.    Okay.  So in the eyes of DEA,

 7    there's a distinction between approving the

 8    system and approving the nationwide

 9    implementation of a system.

10                   Do I understand you correctly?

11         A.    Well, I understand the request

12    seems to be that they asked, "Can we put this

13    nationwide?" and we said, "Yes, go ahead."

14              (Prevoznik Exhibit 23 marked

15         for identification.)

16    QUESTIONS BY MR. MAHADY:

17         Q.    Okay.  I'm going to mark the

18    next document as Prevoznik 23.

19                   MR. FINKELSTEIN:  Do you have a

20         copy for me?

21                   MR. MAHADY:  I do.

22                   MR. FINKELSTEIN:  Wait till I

23         get my copy before you answer

24         questions.

25                   THE WITNESS:  Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FARRELL:  Again, for the
 2         record, I'm going to place an
 3         objection.  This is not a document
 4         produced by the DEA.  This is a
 5         document bearing the ABDC Bates number
 6         in the bottom right-hand corner, a
 7         document dated 1996.
 8              The defendants argued for and
 9         received an order preventing the
10         plaintiffs from conducting discovery
11         on DEA communications with the
12         wholesalers prior to 2006, and yet now
13         they're attempting to introduce
14         selected documents on the very subject
15         matter.
16              So we reserve our right to make
17         a request to the Court to allow us to
18         reopen discovery in this regard.
19              MR. MAHADY:  Special Master
20         Cohen, this issue has been addressed
21         in e-mail correspondence to you this
22         week.  I believe it -- the last
23         request from you was to plaintiffs
24         asking that this resolve the issue.
25         That was over two days ago.  There was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          no response.
 2                So I'm going to ask you to
 3          instruct Mr. Farrell, who is trying to
 4          slow down and impede the questioning,
 5          that he not continue to raise this
 6          same issue with every document that's
 7          introduced.
 8                MR. FINKELSTEIN:  I'll note
 9          that we let them ask and we're letting
10          you ask, but it appears that you all
11          had a copy of what you were
12          complaining you didn't receive a copy
13          of for a long time, so...
14                MR. MAHADY:  And I'll represent
15          to the Department of Justice that the
16          copy that the Department of Justice
17          produced is different in a material
18          way than the copy that was in the
19          possession of AmerisourceBergen.
20     QUESTIONS BY MR. MAHADY:
21          Q.    Mr. Prevoznik, are you ready?
22          A.    Yes.
23          Q.    Okay.
24                MR. FARRELL:  Hold on.  Am I
25          being instructed not to lodge
```

```
 1          objections?

 2               SPECIAL MASTER COHEN:  You

 3          certainly can lodge an objection in

 4          the same way that the defense were

 5          objecting to questioning by the

 6          plaintiffs.

 7               What I suggest you do, though,

 8          is find a which to say an objection in

 9          five words or less.

10               MR. FARRELL:  If I can have my

11          objections preserved for the record,

12          then I won't need to object at all.

13               SPECIAL MASTER COHEN:  Will you

14          give him a continuing objection on

15          that basis?

16               MR. MAHADY:  That's fine.

17               Can we go off the record?

18               VIDEOGRAPHER:  Going off

19          record.  The time is 1:57.

20            (Off the record at 1:57 p.m.)

21               VIDEOGRAPHER:  We're going back

22          on the record.

23               MR. FINKELSTEIN:  Go ahead,

24          back on the record.

25               VIDEOGRAPHER:  Going back on
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            the record.  Beginning of Media

2            File 6.  Time is 1:58.

3                  MR. FINKELSTEIN:  Mr. Mahady,

4            you had represented that there were

5            significant differences.  Do you want

6            to explain those?  Because I have your

7            production right here, and the only

8            difference is it seems that you had an

9            unredacted version of this document.

10                 MR. MAHADY:  Sure,

11           Mr. Finkelstein.  I'd just like to

12           start first with that it's not the

13           same document that I just made that

14           representation relating to.  I was

15           referring to the 1998 letter.

16                 In the copy of the document

17           that was produced by the Department of

18           Justice, there are redactions, and

19           redactions in areas of the document

20           where there is no text in the version

21           that was in the possession of

22           AmerisourceBergen.

23                 I will also note that at the

24           bottom of the version that was

25           produced by the Department of Justice,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        there is a subject line, a subject,

2        "approve suspicious order monitoring

3        system," which is material and

4        relevant.

5             I would also like to note for

6        the record that the version of the

7        documents that are in possession of

8        AmerisourceBergen were provided to the

9        Department of Justice yesterday

10       afternoon around one o'clock for

11       purposes of completeness and in

12       advance of today's deposition, and I

13       received no response from anyone at

14       the DOJ.

15            MR. FINKELSTEIN:  So we had

16       fewer than 24 hours.

17            But what I'm seeing is two

18       letters dated July 23, 1998.  One is

19       addressed to Chris Zimmerman; the

20       other is addressed to a redacted name.

21       One says, "Dear Mr. Zimmerman," the

22       other says, "redacted."  In every

23       other respect, apart from the

24       redactions and the subject, they

25       appear to be identical.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I think you have three hours to
 2          ask the witness about the redacted
 3          draft.
 4                    MR. MAHADY:  And I think we're
 5          talking about the document from
 6          September 30, 1996, that's before the
 7          witness.
 8   QUESTIONS BY MR. MAHADY:
 9          Q.    Mr. Prevoznik, can you please
10   read the first paragraph of this letter --
11   before we get there.
12                    Thomas Gitchel.  Thomas Gitchel
13   is identified as the chief liaison and policy
14   section of the DEA, correct?
15          A.    Correct.
16          Q.    And he held that position in
17   1996?
18          A.    Yes.
19          Q.    Now, if a registrant has
20   questions about the regulation or the DEA's
21   interpretation of the regulations, those
22   questions are directed to the liaison and
23   policy section of the DEA, correct?
24          A.    Correct.
25          Q.    And is the chief the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    highest-ranking member of that section?

 2         A.    Yes.

 3         Q.    Okay.  This letter dated

 4    September 30, 1996, to Thomas Gitchel was

 5    sent by Chris Zimmerman of Bergen Brunswig.

 6               Do you know Chris Zimmerman?

 7         A.    I know the name.

 8         Q.    Okay.

 9         A.    I don't know if we've ever met.

10         Q.    Okay.  I want to start -- and

11    I'll actually read the first paragraph for

12    purposes of time.

13               "The purposes of this letter is

14    to introduce the Drug Enforcement

15    Administration to an innovative new system

16    under development by Bergen Brunswig Drug

17    Company to monitor and report customer orders

18    of controlled substances which fit the

19    suspicious order criteria outlined in 21 CFR

20    1301.74(b)."

21               Did I read that correctly?

22         A.    Yes.

23         Q.    Okay.  And that is the section

24    that we've been discussing today, right?

25         A.    Yes.
```

```
 1          Q.      Okay.  And that's the section

 2    that governs the reporting of suspicious

 3    orders?

 4          A.      Yes.

 5          Q.      Okay.  Beginning with the next

 6    sentence, "By way of background, as you know,

 7    BBDC participated in the development of a

 8    model excessive purchase report now in use by

 9    many distributor registrants."

10                  Were you aware that there was a

11    model excessive purchase report that was

12    being used by the registrants?

13          A.      A model?  Yes.

14          Q.      Okay.  It says, "As used by

15    BBDC, the excessive purchase report lists

16    total customer purchases for the reported

17    month which exceed predetermined multiples of

18    the average monthly purchase of BBDC's total

19    customer base."

20                  Did I read that correctly?

21          A.      Yes.

22          Q.      Okay.  So in describing the

23    model excessive purchase report, it refers to

24    customer purchases, correct?

25          A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      And a monthly report, correct?

 2        A.      Correct.

 3        Q.      Okay.  And it goes on to say at

 4   the end of that paragraph, "This report is

 5   produced in hard copy form monthly and is

 6   sent via certified mail to each DEA field

 7   office having responsibility for the

 8   reporting BBDC locations."

 9                Did I read that correctly?

10        A.      Yes, you did.

11        Q.      And is that your understanding

12   of how it worked?

13        A.      Yes.

14                MR. FINKELSTEIN:  Wait.  Hang

15        on.  Give me time to object.

16                THE WITNESS:  I'm sorry.

17                MR. FINKELSTEIN:  Objection.

18        Scope.

19   QUESTIONS BY MR. MAHADY:

20        Q.      Next paragraph.  "While

21   feedback from DEA users over the years has

22   generally confirmed our belief that the

23   report standing alone is a useful law

24   enforcement tool, BBDC suspicious order

25   compliance program also involves the
```

```
 1    telephonic reporting of customer orders to

 2    DEA."

 3              Now, is it your understanding

 4    that DEA users did consider the excess

 5    purchase reports to be a useful law

 6    enforcement tool?

 7        A.    Yes.

 8        Q.    Okay.  And is it your

 9    understanding that distributors like Bergen

10    Brunswig also placed telephonic report --

11    also performed telephonic reporting to the

12    DEA for suspicious orders in the '90s?

13        A.    Yes, that's my understanding.

14        Q.    Okay.  And it goes on to say

15    that "in an average year, BBDC logs over

16    12,000 telephone calls to DEA field offices

17    nationwide to quarterly customer orders of

18    controlled substances which it believes could

19    fit the suspicious order criteria set forth

20    in 1301.74(b)."

21              Did I read that correctly?

22        A.    Yes.

23        Q.    And you have no reason to

24    dispute the fact stated here that Bergen

25    Brunswig was placing 12,000 calls to DEA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    field offices a year, do you?

 2               MR. FINKELSTEIN:  Objection.

 3         Scope.

 4               THE WITNESS:  No, I don't.

 5    QUESTIONS BY MR. MAHADY:

 6         Q.    Okay.  And then it goes on to

 7    say that "In nearly every instance, the

 8    telephonic contacts are made to report orders

 9    which later appeared on the month end

10    excessive reports sent to DEA."

11               Did I read that correctly?

12         A.    Yes.

13         Q.    Okay.  So the orders that were

14    being reported to the DEA daily,

15    telephonically, were also being included on

16    the month-end excessive purchase reports,

17    correct?

18               MR. FINKELSTEIN:  Objection.

19         Scope.

20               THE WITNESS:  That's what it

21         says.

22    QUESTIONS BY MR. MAHADY:

23         Q.    Okay.  Was that your

24    understanding?

25               MR. FINKELSTEIN:  Scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Based on this,
 2          yes, that's my understanding.
 3     QUESTIONS BY MR. MAHADY:
 4          Q.    Okay.  Now, next paragraph,
 5     second sentence, "Some field offices have
 6     insisted that BBDC not telephonically report
 7     suspicious orders at all" --
 8                    MR. FINKELSTEIN:  Where are
 9          you?
10                    MR. MAHADY:  Bottom of the
11          page.
12     QUESTIONS BY MR. MAHADY:
13          Q.    -- "but rather to mail or fax
14     copies of the order documents, 222 forms or
15     invoices of them instead."
16                    Did I read that correctly?
17          A.    Yes.
18          Q.    Okay.  So a DEA field office
19     could give guidance to registrants about how
20     they wanted suspicious orders reported,
21     correct?
22                    MR. FINKELSTEIN:  Scope.
23                    THE WITNESS:  Yes.
24     QUESTIONS BY MR. MAHADY:
25          Q.    Okay.  And your --
```

```
 1              MS. MAINIGI:  If I could

 2         interrupt, why is that scope?

 3              MR. FINKELSTEIN:  Because the

 4         authorization letter is explicit that

 5         he is authorized to testify about

 6         industrywide guidance but not

 7         individual communications to specific

 8         registrants.

 9              MS. MAINIGI:  Okay.  Well, I

10         think that's industrywide, but thank

11         you for that clarification.

12              MR. FINKELSTEIN:  Specific

13         phone calls to Bergen Brunswig is

14         industrywide?

15              MS. MAINIGI:  I don't think

16         that's the scope of the question, but

17         I'll -- I apologize for interrupting.

18         I just wanted to know the answer.

19              MR. FINKELSTEIN:  Do you

20         understand my objection?

21              THE WITNESS:  Yeah.

22              MR. FINKELSTEIN:  Okay.

23    QUESTIONS BY MR. MAHADY:

24         Q.    So just to go back.

25              DEA field offices could provide
```

1    guidance to registrants about the suspicious

2    order reporting requirements, correct?

3              MR. FINKELSTEIN:  Scope.

4              THE WITNESS:  Yes.

5    QUESTIONS BY MR. MAHADY:

6         Q.    Okay.  And the DEA's

7    expectation would be that the registrants

8    listened to the guidance they were receiving

9    from the field offices, correct?

10        A.    Yes.

11        Q.    Okay.  And if a DEA field

12   office told to -- advised a registrant to

13   report a suspicious order in one form versus

14   another, they should listen to that DEA field

15   office, correct?

16        A.    Yes.

17        Q.    Okay.

18        A.    Yes.

19        Q.    Now, the next sentence there,

20   it says, "Some offices have diplomatically

21   attempted to offer guidance as to the types

22   of orders that their offices would deem

23   reportable in an effort to limit the number

24   of telephone contacts."

25              Did I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Yes.

 2            Q.     Are you aware that some DEA

 3    field offices in the '90s were trying to

 4    limit the number of suspicious orders being

 5    reported telephonically by the registrants?

 6                   MR. FINKELSTEIN:  Foundation.

 7            Exceeds the scope of the Touhy

 8            authorization.

 9                   You can answer in your personal

10            capacity.

11                   THE WITNESS:  I'm not

12            personally aware of that.

13    QUESTIONS BY MR. MAHADY:

14            Q.     Okay.  But you have no reason

15    to dispute the accuracy of that statement?

16                   MR. FINKELSTEIN:  Scope.  Calls

17            for speculation.

18                   You can answer.

19                   THE WITNESS:  I don't.

20    QUESTIONS BY MR. MAHADY:

21            Q.     Okay.  I want to go down to the

22    middle of the page where it says, "Against

23    this backdrop."

24                   Do you see it?

25            A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.  "Against this backdrop,

 2    BBDC set to work on the development of a

 3    suspicious order reporting system that would

 4    provide better quality information to DEA in

 5    a more efficient manner."

 6                  Did I read that correctly?

 7          A.      Yes.

 8          Q.      And you would agree with me

 9    that that's a laudable goal to have for a

10    registrant?

11          A.      A lot of what?

12          Q.      That's something that a

13    registrant should strive to do, is to provide

14    better quality information to the DEA?

15          A.      Yes.

16          Q.      Okay.  Now, I'm going to read

17    the next paragraph, which describes the plan.

18                  "Our plan involves the creation

19    of a computer program that compares a

20    customer's controlled substance orders

21    expressed in metric units of the active

22    ingredient against a standard representing an

23    average of the customer's prior four months

24    of orders.  Customers whose order exceed by a

25    specified percentage their prior four-month
```

1    average order history would be printed on a

2    summary report."

3             Did I read that correctly?

4        A.    Yes.

5        Q.    Okay.  "BBDC's mainframe

6    computer in Orange, California, would

7    automatically fax this report simultaneously

8    to each respective DEA field office daily in

9    the early a.m. hours after the distribution

10   center has completed order processing

11   activities."

12            Did I read that correctly?

13       A.    Yes.

14       Q.    Okay.  So what's contemplated

15   here is that BBDC would generate a report at

16   the end of the night, after it had completed

17   its order processing for the day, correct?

18            MR. FINKELSTEIN:  Objection.

19       Scope.  Calls for speculation.

20            THE WITNESS:  So they pulled --

21       so the orders were already pulled and

22       already ready to ship?

23   QUESTIONS BY MR. MAHADY:

24       Q.    Yes.  Okay.

25            MR. FINKELSTEIN:  Scope.  Calls

Highly Confidential - Subject to Further Confidentiality Review

```
 1              for speculation.

 2                   You can answer.

 3    QUESTIONS BY MR. MAHADY:

 4         Q.      "When DEA offices open each

 5    day, the summary report would be waiting for

 6    their review.  DEA offices could also elect

 7    to receive a month-end version of this report

 8    via US mail.  The summary report would show

 9    the customer name, address, DEA number, item

10    description, NDC number, order date, active

11    ingredient volume ordered, active ingredient

12    shipped and customer allowance, i.e., average

13    of customer's prior four-month orders."

14                   Did I read that correctly?

15         A.      Yes.

16         Q.      Now, what's contemplated here

17    in the summary report that would be faxed

18    daily to the DEA, so the DEA field offices

19    would have it in the morning, included active

20    ingredient shipped, correct?

21                   MR. FINKELSTEIN:  Scope.  Calls

22         for speculation.

23                   THE WITNESS:  It's what it

24         says.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. MAHADY:

2         Q.    Okay.

3         A.    But again, these are all

4    after-the-fact shipping.

5         Q.    Correct.

6               So these would be suspicious

7    orders that were reported to the DEA after

8    they had already been shipped, right?

9         A.    Right.

10              MR. FINKELSTEIN:  Wait.

11              THE WITNESS:  I'm sorry.

12              MR. FINKELSTEIN:  Calls for

13         speculation.

14   QUESTIONS BY MR. MAHADY:

15        Q.    And Bergen Brunswig is seeking

16   to implement a program that would do just

17   that, report -- I'm sorry, ship and then

18   report suspicious orders, right?

19              MR. FINKELSTEIN:  Scope.  Calls

20         for speculation.

21              THE WITNESS:  But in -- as this

22         morning's testimony, in all these

23         various communications we have stated

24         that a suspicious order is prior to

25         shipment.
```

```
 1      QUESTIONS BY MR. MAHADY:

 2           Q.     Okay.

 3           A.     So you're giving us, again,

 4      after the fact, which does not -- just

 5      because you report it doesn't alleviate that

 6      you maintain effective controls over

 7      diversion.

 8           Q.     Okay.  But Bergen Brunswig is

 9      specifically saying, "We're going to report

10      suspicious orders after they had already been

11      shipped," correct?

12                  MR. FINKELSTEIN:  Scope.  Calls

13           for speculation.

14                  You can answer in your personal

15           capacity.

16      QUESTIONS BY MR. MAHADY:

17           Q.     That's what they're proposing

18      to implement.  That's all I'm trying to ask

19      you based off of this document.

20           A.     Right, and --

21                  MR. FINKELSTEIN:  You can

22           answer based on your personal

23           understanding of what Bergen Brunswig

24           is proposing to implement.

25      QUESTIONS BY MR. MAHADY:
```

```
 1         Q.     Okay.  And your answer was

 2    "right," that's your understanding of what

 3    they're proposing?

 4         A.     That's my understanding of it,

 5    yes.

 6         Q.     Okay.  Next page.  "Our intent

 7    is to receive DEA's permission to replace our

 8    current manner of daily suspicious order

 9    reporting with the daily electronic facsimile

10    report," correct?

11         A.     Yes.

12         Q.     Okay.  "We would like to have

13    DEA input on the final product because DEA

14    will be the primary users.  One suggestion

15    would be to coordinate with one of your field

16    offices, perhaps the Los Angeles office, to

17    meet with our project development team."

18                Did I read that correctly?

19         A.     Yes.

20         Q.     Okay.  It goes on to

21    say, "While your field office could beta test

22    the report and provide us with input on

23    aesthetics and content, there are some key

24    questions that DEA would need to provide

25    input on before the report is finalized.  One
```

Highly Confidential - Subject to Further Confidentiality Review

1    question would be the assigned -- assignment

2    of the percentage value that a customer's

3    order would have to exceed before that order

4    would appear on the report."

5              Did I read that correctly?

6         A.    Yes.

7         Q.    Okay.  And then it goes on to

8    say, "Tom, we are excited about the

9    opportunity to make constructive changes in

10   our suspicious order reporting system.  By

11   working in a partnership with your office, we

12   can perhaps lead the way to developing a new

13   system that everyone feels good about."

14             Did I read that correctly?

15        A.    Yes.

16        Q.    Okay.  And as the

17   representative from the DEA, was it your

18   understanding that Bergen Brunswig in 1996

19   was trying to work with the DEA as part of a

20   partnership to develop a system that everyone

21   could feel good about?

22             MR. FINKELSTEIN:  Scope.  Calls

23        for speculation.

24             You, Tom Prevoznik, can answer.

25             THE WITNESS:  Yes, that's what

Highly Confidential - Subject to Further Confidentiality Review

```
 1          it appears to be.
 2                  (Prevoznik Exhibit 26 marked
 3          for identification.)
 4     QUESTIONS BY MR. MAHADY:
 5          Q.     Okay.  I'm going to mark P,
 6     Prevoznik 24 {sic}.
 7                  Okay.  And there is a back.
 8          A.     Okay.  Thank you.
 9          Q.     Okay.  Again, this document has
10     a US DEA Bates number; is that correct?
11          A.     Yes.
12          Q.     All right.  So this document
13     was in the possession, custody and control of
14     the United States DEA, correct?
15          A.     Correct.
16                  MR. FINKELSTEIN:  And appears
17          to be identical to ABDC269353.
18                  MR. MAHADY:  And I did not say
19          it wasn't.
20                  MR. FINKELSTEIN:  Progress.
21     QUESTIONS BY MR. MAHADY:
22          Q.     This document is dated
23     October 29, 1996, right?
24          A.     It looks like 1996.
25          Q.     Yeah, the stamp is really not
```

```
 1    the best.

 2         A.    Yeah, it's a little hard to

 3    say, but, yeah, it looks like 1996.

 4         Q.    Okay.  And that's just under

 5    one month after Mr. Zimmerman sent his letter

 6    describing the proposed program to Thomas

 7    Gitchel; is that right?

 8         A.    Yes.

 9         Q.    Okay.  And in the first

10    paragraph of this letter which is sent to

11    Bergen Brunswig from Mr. Gitchel, he said

12    that "reference is made to your recent letter

13    in which you requested that Bergen Brunswig

14    be permitted to replace its current

15    telephonic reporting of suspicious orders

16    with a daily report transmitted by

17    facsimile."

18              Did I read that correctly?

19         A.    Yes.

20         Q.    Okay.  So the DEA understood

21    that Bergen Brunswig was trying to replace

22    its daily suspicious order reporting with

23    this summary fax, right?

24              MR. FINKELSTEIN:  Objection to

25         the characterization.
```

```
 1                 THE WITNESS:  It looks like --
 2          yes, so that's what it looks like, but
 3          it -- because it's a daily report of
 4          sales that have been commenced, it
 5          would be the excessive purchase
 6          reports.
 7     QUESTIONS BY MR. MAHADY:
 8          Q.    Okay.  But they're specifically
 9     referring to suspicious orders?
10          A.    I see that's what -- what
11     they're saying, but I'm just -- I'm telling
12     you that we've already shown and have been
13     clear that suspicious orders are prior to
14     shipment.
15              So you're giving us a -- in
16     reading this, you're giving us after-the-fact
17     purchase reports, and that was --
18          Q.    Okay.  So would -- I'm sorry.
19          A.    And that was part -- and we at
20     DEA at this time in particular, 1996, where
21     ARCOS was at least 9 to 12 months not being
22     accurate or being caught up to speed, this
23     was -- this was a very good tool for us
24     because it was more up-to-date information
25     than we would have if we waited the 9 or 12
```

```
 1    months for ARCOS data to catch up.

 2         Q.    Okay.

 3         A.    To catch up.  So...

 4         Q.    But at least Bergen Brunswig

 5    was saying to the DEA these are suspicious

 6    orders that we're reporting, correct?

 7         A.    That's what it says, yes.

 8         Q.    Okay.  So your expectation

 9    would be that the DEA would have corrected

10    them and said, no, you certainly can't be

11    referring to suspicious orders if you're

12    referring to after-the-fact sales; is that

13    right?

14              MR. FINKELSTEIN:  Objection.

15         Mischaracterizes.  Calls for

16         speculation.

17              THE WITNESS:  I'm sorry, can

18         you repeat that?

19    QUESTIONS BY MR. MAHADY:

20         Q.    Bergen Brunswig was developing

21    a program to meet with their suspicious order

22    reporting requirements, correct?

23              MR. FINKELSTEIN:  Objection.

24         Scope.  Calls for speculation.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. MAHADY:

 2         Q.     That's what these letters are

 3    about?

 4         A.     Well, I mean, it started with

 5    an excessive -- we started with an excessive

 6    purchase model, and now you jumped to

 7    suspicious orders, so --

 8         Q.     Right.

 9                So there was a reference in the

10    last document to excessive purchase reports?

11         A.     Right, which are -- which are

12    after the fact.

13         Q.     After the fact.

14         A.     Right.

15         Q.     And this new fax system is to

16    replace the daily phone calls.

17                Are we on the same page?

18         A.     Right.

19         Q.     Okay.  And the daily phone

20    calls were to report suspicious orders,

21    correct?

22         A.     Okay.

23         Q.     Okay.  And these faxes are to

24    report suspicious orders as well, as

25    represented by Bergen Brunswig?
```

```
 1              MR. FINKELSTEIN:  Objection.

 2         Foundation.

 3              THE WITNESS:  Well, it's a

 4         little confusing because you're saying

 5         that you're going to pull the orders

 6         and then you're going to fax the

 7         summaries to us after the fact.

 8    QUESTIONS BY MR. MAHADY:

 9         Q.    Well, let's look at the DEA's

10    response.

11         A.    Right?

12         Q.    Let's look at the DEA's

13    response.  This is from the DEA.  "Reference

14    is made to your recent letter in which you

15    requested that Bergen Brunswig be permitted

16    to replace its current telephonic reporting

17    of suspicious orders with a daily report

18    transmitted by facsimile."

19              Okay?  So the DEA is saying

20    your request is to report your daily

21    suspicious order reporting, correct?

22         A.    Correct.

23         Q.    Okay.  The DEA goes on to say,

24    "We have reviewed your proposal and feel that

25    it could be a viable alternative to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    current system.  It is our understanding that
 2    a computer program has been created that can
 3    compare a customer's controlled substances
 4    orders to an average of the customer's order
 5    for the prior four months.  Customer orders
 6    that exceed their four-month average order
 7    history by an as-yet unspecified percentage
 8    would be shown on a summary report that would
 9    be sent to the appropriate DEA field office
10    on a daily basis."
11              Did I read that correctly?
12        A.    Yes.
13        Q.    Okay.  And they are talking
14    here about suspicious orders, correct?
15              MR. FINKELSTEIN:  Objection.
16        Scope.  Mischaracterizes.
17              THE WITNESS:  Well, no.  If you
18        keep going, it gets down to a reading
19        of both ordered and shipped.  So
20        they're indicating it's after the
21        fact.
22    QUESTIONS BY MR. MAHADY:
23        Q.    Right.
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      So it wouldn't be a suspicious

 2    order.  It would be an excessive purchase.

 3          Q.      Okay.  Let's keep reading.

 4          A.      It's an after-the-fact

 5    purchase.

 6          Q.      "As proposed, the summary

 7    report would include the customer's name,

 8    address and DEA number, a description of the

 9    item ordered, the NDC number, date ordered,

10    active ingredient volume ordered and shipped,

11    and the customer's allowance on average -- or

12    average order."

13                  Did I read that correctly?

14          A.      Yes.

15          Q.      Okay.  And what the DEA is

16    saying is that we understand that you want to

17    replace your daily suspicious order reporting

18    with a summary fax that would include, among

19    other information, the amount of product that

20    was shipped.

21          A.      Right.  So they're reporting

22    excessive -- they're doing an excess purchase

23    report, is what they're doing.

24          Q.      Okay.  Now, do you see anywhere

25    in the first two paragraphs where the DEA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    clarifies that what you are proposing Bergen

 2    Brunswig is an excessive purchase reporting

 3    system, not a suspicious order reporting

 4    system?

 5         A.    No, I don't.

 6         Q.    Okay.  They -- the DEA says

 7    suspicious order, right?

 8               MR. FINKELSTEIN:  Objection.

 9         Mischaracterizes the document.

10    QUESTIONS BY MR. MAHADY:

11         Q.    The first sentence.

12         A.    Yes, it's reference to your

13    letter.

14         Q.    Suspicious order?

15         A.    Yeah.

16         Q.    Okay.  Now, these excessive

17    purchase reports, just because we've talked

18    about them in the last document, you just

19    brought them up, the DEA understood that

20    these were also suspicious order reports,

21    right?

22         A.    No, because they were after the

23    fact.

24         Q.    Okay.  So the DEA did not

25    understand that the monthly reports were
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious order reports?
2         A.     Well, I can just tell you
3    what D -- DEA policy has been not to approve
4    a system.  It has also been that a suspicious
5    order is prior to shipment.
6         Q.     Is it possible that the DEA
7    deviated from their policy?
8              MR. FINKELSTEIN:  Objection.
9         Calls for speculation.
10             THE WITNESS:  I can just tell
11        you what the policy is of DEA.
12   QUESTIONS BY MR. MAHADY:
13        Q.     I appreciate that.
14             Is it possible that they
15   deviated from their policy?
16             MR. FINKELSTEIN:  Calls for
17        speculation.
18             THE WITNESS:  Anything is
19        possible.
20   QUESTIONS BY MR. MAHADY:
21        Q.     Okay.  And it's possible that
22   they deviated from their policy in approving
23   for implementation nationwide a suspicious
24   order monitoring system that reported
25   suspicious orders after the order had already
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    been shipped?

 2                 MR. FINKELSTEIN:  Calls for

 3         speculation.

 4                 THE WITNESS:  Can you please

 5         repeat it?

 6                 MR. MAHADY:  Can you read that

 7         back?  Because I probably can't do it

 8         as well the second time.

 9                 (Court Reporter read back

10         question.)

11                 MR. FINKELSTEIN:  Calls for

12         speculation and mischaracterizes the

13         document.

14                 You can answer.

15                 THE WITNESS:  Yeah, I don't

16         know.

17    QUESTIONS BY MR. MAHADY:

18         Q.    It's possible?

19                 MR. FINKELSTEIN:  Calls for

20         speculation.

21                 THE WITNESS:  It's possible.

22    QUESTIONS BY MR. MAHADY:

23         Q.    Okay.  Now, the next -- the

24    third paragraph.  "We note that unlike the

25    program that generates Bergen Brunswig's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    monthly suspicious order report, the new

 2    program will compare the customer's order to

 3    his or her previous orders rather than to

 4    orders placed by other customers."

 5              Did I read that correctly?

 6         A.    Yes.

 7         Q.    Now, the DEA is the one

 8    referring to the monthly report as a

 9    suspicious order report, correct?

10         A.    Yes.

11         Q.    Okay.  So at least some

12    individuals at the DEA understood the monthly

13    report of after-the-fact sales to be

14    suspicious order reports, based off of this

15    document?

16              MR. FINKELSTEIN:  Calls for

17         speculation.

18              THE WITNESS:  I don't know.  I

19         mean, it -- I think at this time

20         excessive purchase and suspicious

21         orders were sometimes understood as

22         one or the other, but clearly a

23         suspicious order that we have been

24         clear on, the suspicious order was not

25         to be -- was prior to shipment.
```

```
 1                     So summary reports, if -- any

 2            summary report that showed sales that

 3            were commenced and done were

 4            considered excessive purchase orders.

 5            They were not suspicious orders,

 6            because suspicious orders would be

 7            before the shipment.

 8    QUESTIONS BY MR. MAHADY:

 9        Q.     That's not in the regulation,

10    correct?

11                 MR. FINKELSTEIN:  Objection.

12            Argumentative.  Mischaracterizes the

13            regulation.

14    QUESTIONS BY MR. MAHADY:

15        Q.     Does the regulation say that a

16    suspicious order needs to be reported prior

17    to shipment?

18        A.     It says immediately upon

19    discovery.

20        Q.     Okay.

21        A.     And the statute says you

22    have -- that each registrant is to maintain

23    effective controls of that.

24        Q.     I appreciate that.

25                 But very specifically, does
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    the registrate -- does the statute or the

2    implementing regulations say that a

3    suspicious order must be reported prior to

4    shipment?

5              MR. FINKELSTEIN:  Asked and

6         answered.

7              MR. MAHADY:  I don't believe he

8         answered the question, that specific

9         question.

10             MR. FINKELSTEIN:  I believe he

11        did.

12             You can answer again.

13             THE WITNESS:  I thought I did,

14        too.

15             The statute requires to have

16        effective control to guard against

17        diversion.

18   QUESTIONS BY MR. MAHADY:

19        Q.    I appreciate that.

20        A.    So if you have a suspicious

21   order, which is prior to shipping, you have a

22   reason or reason to believe that that -- that

23   is going to be diverted into the illicit

24   market, right?  So your system is designed to

25   give -- to find that reason or reasons why
```

```
 1    this shipment -- or why this order is to be

 2    suspicious.  That is prior to shipping.

 3              Q.    Okay.

 4              A.    So in order to maintain

 5    effective controls, you would then have to

 6    look at the suspicion.  What triggered the

 7    suspicion -- we're in Bergen Brunswig.  Let's

 8    go with Bergen.  What triggered Bergen to

 9    say, "Wait a minute, something's not right

10    with this order."

11              Q.    Okay.

12              A.    So then they should halt and

13    try to figure out, what can we alleviate

14    that.

15              Q.    Okay.

16              A.    What can we alleviate to that

17    suspicion.

18                    So if you're just giving us

19    summary reports at the end where we've

20    already shipped it and say, "these are all

21    suspicious orders," well, what did you -- how

22    did you maintain any effective controls?

23    That would be my question.

24              Q.    Okay.  I have a very specific

25    question --
```

```
 1          A.      Sure.

 2          Q.      -- and I'm just talking about

 3    the text of the regulations.  Okay?

 4               Does the text of the

 5    regulations contain anything that explicitly

 6    says that a suspicious order must be reported

 7    to the DEA prior to shipment?

 8          A.      No, it says immediately upon

 9    discovery.

10          Q.      Okay.  Now --

11               MR. FINKELSTEIN:  Counsel, I'm

12          going to ask for a break in five

13          minutes.

14               MR. MAHADY:  Sure.

15    QUESTIONS BY MR. MAHADY:

16          Q.      Tom Gitchel, okay, he's the one

17    that wrote this letter, right?

18          A.      Yes.

19          Q.      And at least to Tom Gitchel,

20    Bergen Brunswig's monthly report was a

21    suspicious order report?

22               MR. FINKELSTEIN:  Calls for

23          speculation.  Scope.

24               THE WITNESS:  I'm not sure what

25          Tom -- yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. MAHADY:

 2          Q.     But Tom refers to it as a

 3      monthly suspicious order report, correct?

 4          A.     Right.

 5          Q.     All right.  And at least to Tom

 6      Gitchel, his understanding of what was being

 7      proposed is a daily fax of suspicious orders

 8      that would include, among other information,

 9      the amount that was shipped, correct?

10          A.     Correct.

11                 MR. FINKELSTEIN:  Scope.  Calls

12          for speculation.

13      QUESTIONS BY MR. MAHADY:

14          Q.     Now, if you can turn to the

15      next page, last paragraph, "We look forward

16      to working with you on this new project which

17      we, too, hope will lead to a more efficient

18      suspicious order reporting system."

19                 Did I read that correctly?

20          A.     Yes.

21          Q.     Now, they clearly were

22      developing a suspicious order reporting

23      system, right?

24                 MR. FINKELSTEIN:  Objection.

25          Vague.  Scope.  Calls for speculation.
```

```
 1                    THE WITNESS:  Again, I can only
 2          reiterate what the DEA policy is.
 3          Suspicious orders are prior to
 4          shipment.
 5   QUESTIONS BY MR. MAHADY:
 6          Q.    But you're here on behalf of
 7   the DEA and registrant that was provided --
 8   or guidance that was provided to registrants.
 9                    Tom Gitchel was the chief
10   liaison -- the chief of the liaison and
11   policy section, right?
12          A.    Yes.
13          Q.    He's not some low-level DEA
14   employee, right?
15          A.    No.
16          Q.    He's pretty high up?
17          A.    Yes.
18          Q.    Okay.  And his section was the
19   one that was responsible for interpreting the
20   regulations, correct?
21                    MR. FINKELSTEIN:  Objection.
22          Scope.  Foundation.
23                    You can answer.
24                    THE WITNESS:  Yes.
25
```

```
 1    QUESTIONS BY MR. MAHADY:

 2         Q.    And at least to Tom Gitchel,

 3    the monthly reports, the monthly excessive

 4    purchase reports, were suspicious order

 5    reports, correct?

 6              MR. FINKELSTEIN:  Objection.

 7         Scope.  Calls for speculation.  Asked

 8         and answered.

 9              THE WITNESS:  We've also read

10         letters --

11    QUESTIONS BY MR. MAHADY:

12         Q.    Mr. Prevoznik --

13         A.    I'm just telling you that

14    Mr. Gitchel also wrote letters that we went

15    through this morning that also said what I

16    had said the DEA's policy is.

17         Q.    Okay.

18         A.    It's after the shipment --

19    suspicious orders prior to shipment.

20         Q.    So was Mr. Gitchel giving

21    inconsistent guidance to the registrants, in

22    your opinion?

23              MR. FINKELSTEIN:  Scope.

24              You can give your opinion.

25              THE WITNESS:  Slightly, yes.
```

```
 1                    MR. MAHADY:  Okay.  We can take

 2         a break.

 3                    VIDEOGRAPHER:  We're going off

 4         record.  The time is 2:32.

 5          (Off the record at 2:32 p.m.)

 6                    VIDEOGRAPHER:  We're going back

 7         on record.  Beginning of Media File

 8         Number 7.  The time is 2:45.

 9    QUESTIONS BY MR. MAHADY:

10         Q.    All right.  Mr. Prevoznik,

11    sticking with Exhibit Prevoznik 24 for just

12    one more question or two.

13                    Turning back to the first page

14    of that document from Mr. Gitchel to

15    Mr. Zimmerman at Bergen Brunswig, it says

16    that -- Mr. Gitchel said, "We agree that it

17    would be prudent to test this new program

18    before instituting it nationwide and concur

19    with your suggestion to use the DEA Los

20    Angeles division office for the beta test."

21                    Did I read that correct?

22         A.    Yes.

23         Q.    All right.  And it says, "We

24    would appreciate it if you could postpone

25    starting the testing until after February 1,
```

```
 1    1997, as Ms. Betsy Willis, who has been

 2    selected for the diversion program manager

 3    position in the Los Angeles field division,

 4    will not be reporting for duty until the end

 5    of January."

 6              Did I read that correctly?

 7         A.    Yes.

 8         Q.    All right.  And in preparing

 9    for your deposition today, did you have the

10    opportunity to speak with Ms. Betsy Willis?

11         A.    No, I did not.

12         Q.    I would like to mark Prevoznik

13    25.

14              (Prevoznik Exhibit 25 marked

15         for identification.)

16    QUESTIONS BY MR. MAHADY:

17         Q.    For the record, while the

18    witness has an opportunity to read the

19    document, the Bates number is

20    ABDCMDL00269350.

21              It's a letter from Chris

22    Zimmerman to Thomas Gitchel, chief liaison

23    and policy section, US DEA, December 30,

24    1997.

25         A.    Okay.
```

```
 1          Q.     Okay.  Let's start with the

 2   first paragraph of the letter from

 3   Mr. Zimmerman to Mr. Gitchel.

 4                "This letter serves as a follow

 5   up to previous written correspondence, copy

 6   enclosed, and telephone conversations

 7   between -- Bergen Brunswig Drug Company has

 8   had with the DEA pertaining to BBDC's newly

 9   developed system to monitor and report

10   customer orders of controlled substances

11   which fit the suspicious order criteria

12   outlined in 21 CFR 1301.74(b)."

13                Did I read that correctly?

14          A.     Yes.

15          Q.     Okay.  So this correspondence

16   relates to Bergen Brunswig's development of a

17   new suspicious order monitoring system to

18   meet the requirements of 21 CFR 1301.74(b),

19   correct?

20                MR. FINKELSTEIN:  Scope.

21                THE WITNESS:  Yes.

22   QUESTIONS BY MR. MAHADY:

23          Q.     Okay.  Next paragraph.  "The

24   system is clearly described in the enclosed

25   September 30, 1996 correspondence.  Per your
```

```
 1    instruction, BBDC began beta testing the new

 2    suspicious order reporting system with the

 3    DEA Los Angeles field office in March 1997.

 4    Our BBDC Valencia division began the new

 5    suspicious order reporting to the LA DEA

 6    office in March 1, 1997; BBDC Corona division

 7    began the new reporting to the Riverside DEA

 8    office on April 1, 1997; and BBDC Hawaii

 9    began this new reporting to the LA DEA office

10    on May 1, 1997; and BBDC Orlando began the

11    new reporting to the Tampa DEA office on

12    June 1, 1997.  All BBDC test divisions are

13    currently reporting suspicious orders to DEA

14    via the automated fax function of the new

15    reporting system."

16            Did I read that correctly?

17       A.    Yes.

18       Q.    Okay.  And in preparing for

19    your testimony today, did you speak with

20    anyone who was at the Los Angeles field

21    office in 1997?

22       A.    No.

23       Q.    In preparing for your testimony

24    today, did you speak with anyone who was at

25    the Riverside DEA office on April 1, 1997?
```

```
 1         A.      I don't believe so.

 2         Q.      Okay.  And what about anyone

 3    who was at the Tampa DEA office in June

 4    of 1997?

 5         A.      I'm trying to remember where

 6    everybody was.  I'm not sure.

 7         Q.      Okay.  Did you speak with

 8    anyone who was involved -- anyone at the DEA

 9    who was involved in the development and

10    testing of the Bergen Brunswig suspicious

11    order monitoring system in 1990 -- between

12    1996 and 1998, to your knowledge?

13         A.      Not to my knowledge.

14         Q.      Okay.  The next paragraph.  "We

15    have had several conversations/meetings with

16    Ms. Betsy Willis, DEA diversion program

17    manager; Ms. Valencia Abrams, DEA Los Angeles

18    division group supervisor; Mr. Thomas Cox,

19    DEA Riverside diversion group supervisor; and

20    Mr. Arthur Fierman-Rentas, DEA Tampa

21    diversion group supervisor.  All DEA

22    personnel currently involved with the beta

23    test program have been very pleased, and

24    Ms. Willis has given BBDC permission to

25    discontinue the submission of monthly ARCOS
```

```
 1    suspicious order report, parens, variance

 2    report, to DEA for the BBDC Corona, Valencia

 3    and Hawaii divisions.  Correspondence

 4    enclosed."

 5              Sitting here today, you have no

 6    reason to dispute that all the individuals

 7    involved with the testing were very pleased

 8    with the suspicious order monitoring program

 9    being developed?

10         A.    I have no idea.

11              MR. FINKELSTEIN:  Wait.  Scope.

12         Calls for speculation.

13              You can answer in your personal

14         capacity.

15              THE WITNESS:  I have no idea.

16    QUESTIONS BY MR. MAHADY:

17         Q.    It goes on to say at the end of

18    the page, "BBDC has approached other DEA

19    field offices regarding the implementation

20    and beta testing of our new suspicious order

21    reporting system.  However, those DEA field

22    offices have indicated that they would not

23    implement the new reporting system until they

24    received direction from Washington, DC."

25              Did I read that correctly?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      Top of the next page.  "BBDC

 3   has already made several changes to our

 4   proposed new reporting system at the

 5   direction of the DEA field offices in whose

 6   jurisdiction it is being tested.  It has been

 7   an extremely positive experience working

 8   closely with DEA to develop a suspicious

 9   order reporting system that benefits both the

10   wholesaler and the DEA."

11              Did I read that correctly?

12          A.      Yes.

13          Q.      Okay.  Based off of this

14   document, Bergen Brunswig Drug Corporation

15   developed this suspicious order reporting

16   system in '96 to '98 with the DEA?

17              MR. FINKELSTEIN:  Scope.

18          Foundation.  Calls for speculation.

19              THE WITNESS:  From the various

20          letters that you've given me, Bergen

21          Brunswig came with a system that they

22          wanted to show us, asked us for our

23          input.  So they showed us the design

24          of what they were -- the design of the

25          system that they were proposing to put
```

```
 1          nationwide.

 2                    So we provided input.  We

 3          tested it with them.  So, yes.

 4   QUESTIONS BY MR. MAHADY:

 5          Q.    Okay.  So, yes, the DEA

 6   developed the program -- the design of the

 7   program with Bergen Brunswig, correct?

 8                    MR. FINKELSTEIN:  Asked and

 9          answered.  Scope.  Foundation.

10                    You can answer.

11                    THE WITNESS:  We did not design

12          it.  It said -- I mean, if we go back

13          to the September letter, it says it's

14          to introduce the DEA to the innovative

15          new system under development by Bergen

16          Brunswig.

17                    So Bergen Brunswig, as of

18          September 30th, was the one that says,

19          "Hey, we have this new system."  So

20          they came to us and said, "Hey, could

21          you review it, help us with it," which

22          is exactly what we do with

23          registrants.  We do do that.  We

24          listen.  We present -- the registrant

25          is to design it; not us.  So in
```

```
 1          designing it, Bergen Brunswig came to

 2          us.  So this is between Bergen and us.

 3    QUESTIONS BY MR. MAHADY:

 4          Q.    Between Bergen and the DEA?

 5          A.    DEA, right.

 6          Q.    Okay.  And in designing it, the

 7    DEA provided input on the design, correct?

 8          A.    Yes.

 9                MR. FINKELSTEIN:  Wait, scope.

10                THE WITNESS:  Sorry.

11    QUESTIONS BY MR. MAHADY:

12          Q.    And the DEA tested the program,

13    correct?

14                MR. FINKELSTEIN:  Scope.

15                THE WITNESS:  Yes.

16    QUESTIONS BY MR. MAHADY:

17          Q.    And the DEA, based off of this

18    document, was very pleased with how the

19    suspicious order monitoring program was being

20    run, correct?

21                MR. FINKELSTEIN:  Scope.  Calls

22        for speculation.

23                THE WITNESS:  That's what it

24        appears from the letter.

25
```

```
 1    QUESTIONS BY MR. MAHADY:

 2         Q.    Okay.  Next paragraph.  "We are

 3    confident that this new suspicious order

 4    reporting system will benefit both BBDC and

 5    DEA and are optimistic that we will be able

 6    to begin implementation of the new suspicious

 7    order -- or suspicious reporting system

 8    nationwide.  I believe that the new system

 9    will not only save both BBDC and DEA valuable

10    time and resources, but will also provide DEA

11    with a more useful tool with which to detect

12    diversion."

13              Did I read that correctly?

14         A.    Yes.

15         Q.    Okay.  "BBDC is excited about

16    this opportunity and would like to continue

17    moving forward with the implementation of our

18    new suspicious order reporting system."

19              Did I read that correctly?

20         A.    Yes.

21         Q.    So there's no dispute here that

22    this is -- this relates to the development of

23    a suspicious order reporting system, correct?

24              MR. FINKELSTEIN:  Scope.

25              THE WITNESS:  Well, I mean, it
```

Highly Confidential - Subject to Further Confidentiality Review

1           references back to the September 30 --

2           September 30, 1996, where they explain

3           what it is, which we just talked

4           about, excessive purchase

5           after-the-fact reporting.

6   QUESTIONS BY MR. MAHADY:

7           Q.    Mr. Prevoznik, they were

8   developing a suspicious order reporting

9   system, correct?

10              MR. FINKELSTEIN:

11          Argumentative.  Asked and answered.

12          Scope.  Calls for speculation.

13              You can answer.

14              MR. FARRELL:  Objection, again,

15          on behalf of plaintiffs.  We've never

16          even seen this system that they're

17          talking about.

18              THE WITNESS:  Could you please

19          repeat it?

20              MR. MAHADY:  Just note for the

21          record that plaintiffs have had this

22          document for approximately ten months.

23              MR. FARRELL:  The ABDC system,

24          suspicious order monitoring system,

25          from 1996?

```
 1                MR. MAHADY:  You've had these
 2          documents for ten months, Paul.
 3                MR. FARRELL:  Yeah.  My
 4          understanding is the last version of
 5          the suspicious order monitoring system
 6          produced by ABDC is when?
 7                Excuse me.  My point is that --
 8                MR. NICHOLAS:  He doesn't have
 9          to answer your questions.
10                MR. MAHADY:  Paul, I don't have
11          to answer your questions.
12                MR. NICHOLAS:  You're running
13          the clock.  Okay.  Let him ask his
14          questions.  You don't have to smirk
15          about it either.  It's not that funny.
16                Go ahead.
17                THE WITNESS:  I'm sorry, can
18          you please repeat it?
19                MR. MAHADY:  Neither of us
20          remember it, so I'll take a shot.
21     QUESTIONS BY MR. MAHADY:
22          Q.    The DEA and Bergen Brunswig
23     were developing a suspicious order monitoring
24     system that Bergen Brunswig intended to meet
25     the requirements of the regulations, correct?
```

```
 1                    MR. FINKELSTEIN:  Scope.

 2          Foundation.  Calls for speculation.

 3          That one mischaracterizes prior

 4          testimony.  Asked and answered.

 5                    You can answer again.

 6                    THE WITNESS:  Can you -- can

 7          you --

 8     QUESTIONS BY MR. MAHADY:

 9          Q.    Bergen Brunswig and the DEA

10     were developing a suspicious order monitoring

11     system, correct?

12                    MR. FINKELSTEIN:

13          Mischaracterizes prior testimony.

14          Scope.

15                    MR. MAHADY:  It was a question.

16          It wasn't even about his prior

17          testimony.  I'm just asking a

18          question.

19                    THE WITNESS:  Bergen Brunswig

20          was designing a system, and they asked

21          us to review it and test it with them.

22          That's what we did.

23     QUESTIONS BY MR. MAHADY:

24          Q.    And the system they were

25     designing was a suspicious order monitoring
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    system, correct?

 2              MR. FINKELSTEIN:  Asked and

 3         answered.  Calls for speculation.

 4              You can answer again.

 5              THE WITNESS:  Based on the

 6         regulations and the statute to

 7         maintain effective controls, the

 8         September 30th letter talks about

 9         after-the-fact shipping.  So it

10         doesn't -- it's not in accordance with

11         DEA policy as being -- suspicious

12         orders are prior to shipping.

13    QUESTIONS BY MR. MAHADY:

14         Q.    Okay.  And the DEA --

15         A.    So the September 30th is

16    specifically talking about shipping.  So it's

17    been shipped.  That's what it -- that's what

18    the September 30th letter you gave me

19    indicates, that it's been shipped.

20         Q.    Now, we've seen at least two

21    responses from DEA about the program.

22    They're approving a suspicious order

23    monitoring system, right?

24              MR. FINKELSTEIN:

25              Argumentative.  Asked and answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You can answer.

 2                    THE WITNESS:  They're approving

 3          the system -- they're approving the

 4          implementation of the system that

 5          Bergen Brunswig designed.  That's what

 6          they're approving.

 7   QUESTIONS BY MR. MAHADY:

 8          Q.    Okay.  We can go back to

 9   Prevoznik 22, please.

10          A.    22.

11          Q.    Mr. Prevoznik, we've already

12   looked at this document, but now that we've

13   reviewed what the program consisted of, I

14   just want to ask a couple follow-up

15   questions.

16                    First sentence of this document

17   from Patricia Good, chief liaison and policy

18   section, states, "This is to grant approval

19   of your request to implement on a nationwide

20   basis your newly developed system to identify

21   and report suspicious orders for controlled

22   substances and regulated chemicals as

23   required by federal regulation."

24                    Correct?

25          A.    Correct, that's what it says.
```

1      Q.      And the subject of this

2    document that was drafted by the DEA, within

3    the possession, custody and control of the

4    DEA and produced in {sic} the DEA in this

5    litigation, is "approved suspicious order

6    monitoring system"; is that correct?

7      A.      Yes, that's what it says.

8      Q.      Okay.  Mr. Prevoznik, before

9    the break I think we established that

10   Mr. Gitchel, who at one time served as the

11   chief of the liaison and policy section, was

12   inconsistent in the guidance he reported to

13   registrants relating to the suspicious order

14   regulations, correct?

15             MR. FINKELSTEIN:  Objection.

16        Foundation.

17             THE WITNESS:  That was --

18             MR. FINKELSTEIN:  Wait.  Scope.

19        You can answer in your personal

20        capacity.

21             THE WITNESS:  Yeah, I answered

22        in my personal capacity.  I said yes.

23   QUESTIONS BY MR. MAHADY:

24      Q.      Okay.  And I believe what we

25   were comparing there was Mr. Gitchel's

Highly Confidential - Subject to Further Confidentiality Review

1    guidance in 1984 versus the guidance that he

2    was providing in relation to the more recent

3    development of the Bergen Brunswig suspicious

4    order monitoring system, correct?

5                    MR. FINKELSTEIN:  Foundation.

6         Scope.

7                    THE WITNESS:  Can you give it

8         to me one more time?

9    QUESTIONS BY MR. MAHADY:

10        Q.     The inconsistency that

11   Mr. Gitchel was providing to the registrants,

12   one was in 1984 where, based off of your

13   testimony, Mr. Gitchel was advising

14   registrants that they should not ship orders

15   that they reported as suspicious, correct?

16                    MR. FINKELSTEIN:  Vague.

17        Foundation.  Mischaracterizes the

18        document.

19                    THE WITNESS:  Yes.

20   QUESTIONS BY MR. MAHADY:

21        Q.     Versus 1996 or '7 where

22   Mr. Gitchel, who was then the chief of the

23   liaison policy section of the DEA, is

24   referring to a monthly report of

25   after-the-fact purchases as a suspicious

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order report and also advising on a

 2    suspicious order monitoring system that would

 3    entail after-the-fact reporting, right?

 4                 MR. FINKELSTEIN:  Object to the

 5           form.

 6                 THE WITNESS:  Make sure I got

 7           this right.

 8                 The design is by the

 9           registrant.  Then we get into the

10           operate -- the operation of it by the

11           registrant.

12                 So the inconsistency -- which

13           I'm talking of me answering this

14           question -- is that the -- it just

15           seems a little convoluted, from me

16           reading this, that the excessive

17           purchase and the suspicious orders

18           were being referred to as the same

19           thing when indeed they are not.

20                 Because the reg -- because the

21           statute and regulations of then DEA

22           policy, regulations haven't changed

23           since they came into effect.  The

24           statute hasn't changed.

25                 So we have been consistent
```

```
 1            with -- DEA's consistency has been

 2            that, where I think the

 3            inconsistency -- this is me

 4            speaking -- is that those two words

 5            have been interchanged.  Because it's

 6            still referring to after-the-fact

 7            shipments, and suspicious orders are

 8            before shipment.

 9     QUESTIONS BY MR. MAHADY:

10            Q.    Okay.  Mr. Prevoznik, the DEA

11     approved for implementation nationwide a

12     suspicious order monitoring system that

13     reported suspicious orders to the DEA on a

14     daily basis after the report -- after the

15     orders had already been shipped, correct?

16            A.    Yes.

17            Q.    Mr. Prevoznik, are you aware

18     that Bergen Brunswig merged with Amerisource

19     in or around 2001 to become AmerisourceBergen

20     Corporation?

21                  MR. FINKELSTEIN:  Objection.

22            Scope.

23                  THE WITNESS:  I know they

24            merged.  I don't know what year.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. MAHADY:

 2         Q.    That's fair.

 3               And what was your role at the

 4    DEA in the early 2000s?

 5         A.    2001 I was -- I got promoted to

 6    instructor at DEA officer training.

 7         Q.    Okay.  And in your role as --

 8    at the office of training, you were

 9    personally familiar with AmerisourceBergen,

10    Bergen Brunswig's, system, correct?

11         A.    What do you mean?

12         Q.    Do you recall taking the

13    training classes to the Bergen Brunswig,

14    AmerisourceBergen distribution centers in

15    Richmond, Virginia?

16         A.    Yes.

17               (Prevoznik Exhibit 27 marked

18         for identification.)

19               MR. MAHADY:  Okay.  I'm going

20         to mark this next document as

21         Prevoznik 27.

22               Unfortunately, I have short

23         arms, Mr. Prevoznik, so...

24               MR. FINKELSTEIN:  The important

25         thing is, do you have extra copies?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1               MR. MAHADY:  I do.  And I'll

2       use my short arms to get you one.

3               MR. FINKELSTEIN:  Thank you.

4    QUESTIONS BY MR. MAHADY:

5       Q.    Okay.  I'm going to read this

6    letter, which is dated January 14, 2004,

7    Bates number ABDC MDL 00315827.  And it's

8    from a John R. McCarty, special agent in

9    charge, to Mr. Mays, manager of regulatory

10   affairs, AmerisourceBergen.

11              I want to read the first

12   paragraph of this letter.

13              "This letter is to confirm

14   previous arrangements made by the Drug

15   Enforcement Administration, DEA, office of

16   training class coordinator, Thomas Prevoznik,

17   for a tour of the Bergen Brunswig facility in

18   Richmond, Virginia, by our diversion

19   investigator trainees.  I appreciate your

20   cooperation, and I'm certain that the visit

21   to your distribution plant will be a valuable

22   learning experience for our students."

23              Okay.  So I believe you already

24   testified that you do recall some trainings

25   that were provided by AmerisourceBergen at
```

1    its distribution center in Virginia to the

2    diversion investigator trainees, correct?

3         A.    Yes.

4         Q.    Okay.  And do you recall those

5    trainings involved discussions about the

6    applicable rules and regulation that govern

7    distributors?

8         A.    Yes.

9         Q.    Okay.  And by bringing your

10   diversion investigator trainees to

11   AmerisourceBergen, you obviously thought that

12   there was value in AmerisourceBergen advising

13   them of what their understanding of the

14   regulations were, correct?

15             MR. FINKELSTEIN:  Objection.

16        Scope.

17             You can answer.

18             THE WITNESS:  I'm sorry, can

19        you repeat the -- repeat the question?

20   QUESTIONS BY MR. MAHADY:

21        Q.    Well, by bringing your

22   diversion investigator trainees to

23   AmerisourceBergen and having

24   AmerisourceBergen present on the DEA's rules

25   and regulations, you certainly thought that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    AmerisourceBergen was complying with those

 2    rules and regulations, right?

 3              MR. FINKELSTEIN:  Objection.

 4         Scope.  Mischaracterizes the document.

 5              THE WITNESS:  I mean, the goal

 6         wasn't for them to -- the goal was to

 7         expose them to a real registrant.  So

 8         give them -- they had -- we go through

 9         security, we go through records,

10         reports, all of those kinds of things

11         while we're at training.

12              We don't have huge cages.  We

13         don't have a bunch of cameras.  We

14         don't have any of the practical things

15         that the registrant has, especially

16         Bergen Brunswig.  At this time at this

17         distribution center they had cages,

18         the locks, the alarms, that kind of

19         thing.

20              So that was -- that was to get

21         them out to expose them to that type

22         of a real practical application.

23    QUESTIONS BY MR. MAHADY:

24         Q.    Understood.

25         A.    Right?
```

Highly Confidential - Subject to Further Confidentiality Review

 1              So part of it was they also --

 2    I believe Steve actually gave the

 3    presentation.  And he talked about the

 4    interaction with DEA, because that's what we

 5    were trying -- these were all new trainees,

 6    so they had never been exposed to any of

 7    this.

 8              So we thought this was a great

 9    opportunity for that --

10         Q.    Okay.

11         A.    -- collaboration.

12         Q.    And that was valuable -- that

13    was, in fact, a valuable experience for your

14    diversion investigator trainees?

15              MR. FINKELSTEIN:  Scope.

16              THE WITNESS:  Yes.

17    QUESTIONS BY MR. MAHADY:

18         Q.    Okay.  And AmerisourceBergen

19    partnered with you to provide that training,

20    right?

21         A.    Yes.

22              (Prevoznik Exhibit 28 marked

23         for identification.)

24    QUESTIONS BY MR. MAHADY:

25         Q.    Okay.  I'm going to mark

Highly Confidential - Subject to Further Confidentiality Review

```
 1    exhibit Prevoznik 28.  Provide a copy to the

 2    government.

 3              You're free to look at the

 4    presentation, but I'm only going to ask you

 5    questions about the cover document.

 6         A.    Okay.

 7         Q.    Let me know when you're ready.

 8    The document is Bates-labeled ABDC MDL

 9    00315829.

10              Ready?

11         A.    Yeah.

12         Q.    This is an internal

13    AmerisourceBergen memorandum dated

14    October 25, 2004.  Subject, ABC awarded DEA

15    certificate of appreciation.

16              I'm going to read the document.

17              "As many of you already know,

18    CSRA regularly provides training for

19    diversion investigator trainees from DEA's

20    Quantico, Virginia training academy.  This

21    training takes place at AmerisourceBergen's

22    Richmond distribution center and includes a

23    tour of the facility.

24              "At the conclusion of the

25    training on Friday, October 22, 2004, DEA
```

Highly Confidential - Subject to Further Confidentiality Review

1    presented AmerisourceBergen Corporation with

2    a certificate of appreciation in recognition

3    of ABC's contributions to drug enforcement

4    and to DEA's training program.  Steve Mays

5    accepted the award on behalf of

6    AmerisourceBergen."

7              Do you recall DEA awarded

8    AmerisourceBergen a certificate of

9    appreciation in 2004?

10             MR. FINKELSTEIN:  Scope.

11             THE WITNESS:  Yes.

12   QUESTIONS BY MR. MAHADY:

13        Q.    Okay.  And they were deserving

14   of that recognition?

15             MR. FINKELSTEIN:  Scope.

16             THE WITNESS:  Yes.

17   QUESTIONS BY MR. MAHADY:

18        Q.    You can put that document

19   aside, Mr. Prevoznik.

20             Now, fortunately for you, I do

21   want to revisit P22, which is the DEA

22   memorandum summarizing the distributor

23   initiative conference presentation with

24   AmerisourceBergen.

25        A.    Thank you.

```
 1              MR. FINKELSTEIN:  This is

 2        Prevoznik 22 or Plaintiff's 22?

 3              MR. MAHADY:  Plaintiff's 22.

 4              MR. FINKELSTEIN:  Plaintiff's

 5        22.  Give me a second.

 6              THE WITNESS:  It's way at the

 7        bottom.

 8   QUESTIONS BY MR. MAHADY:

 9        Q.    I know you already looked at

10   this this morning.

11              Are you okay for me to proceed

12   asking questions?

13        A.    Yes.

14        Q.    All right.  Again, internal

15   memorandum of the DEA.  This document

16   summarizes the DEA's understanding or summary

17   of the meeting, correct?

18        A.    Correct.

19        Q.    Okay.  You do not attend these

20   meetings?

21        A.    No.

22        Q.    Okay.  And just, again, so the

23   record's clear, it's from Michael Mapes.

24              You did not speak with Michael

25   Mapes in preparation for your testimony
```

```
 1    today?

 2         A.    No.

 3         Q.    Okay.  The last sentence of the

 4    first paragraph, it says, "The purpose of the

 5    meeting was to address the illegal domestic

 6    Internet pharmacy problem and their source of

 7    supply."

 8               Did I read that correctly?

 9         A.    Yes.

10         Q.    And that's your understanding

11    of the purpose of the meeting?

12         A.    Yes.

13         Q.    Okay.  If we turn to the next

14    page, I want to start -- I want to read the

15    sentence -- the paragraph that starts, "In

16    consultation with Mr. Trant."

17               Do you know who Mr. Trant is?

18         A.    He was an attorney with our

19    Chief Counsel.

20         Q.    Okay.  So he's DEA?

21         A.    Yes.

22         Q.    Okay.  And E-Commerce

23    Operations, ODCO, that's DEA as well, right?

24         A.    Yes, that was Mr. Mapes'

25    section.
```

```
 1          Q.     Got it.

 2                 And based off of the DEA's

 3    summary of the meeting, it says, "In

 4    consultation with Mr. Trant, it was agreed

 5    that if E-Commerce Operations, ODCO, were to

 6    identify a highly suspicious pharmacy to

 7    which AmerisourceBergen was the wholesaler,

 8    ODCO would notify AmerisourceBergen via

 9    e-mail of the suspicious activity for

10    AmerisourceBergen to review and take the

11    actions the company deems appropriate."

12                 Did I read that correctly?

13          A.     Yes.

14          Q.     Okay.  So at this meeting, the

15    DEA represented to Mr. Steve Mays of

16    AmerisourceBergen that if the DEA identified

17    a highly suspicious pharmacy to which

18    AmerisourceBergen was the wholesaler, it

19    would notify AmerisourceBergen via e-mail of

20    that pharmacy, correct?

21          A.     That's what it says.

22          Q.     Okay.  As the representative of

23    the DEA, do you know if the DEA identified

24    highly suspicious pharmacies to

25    AmerisourceBergen?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FINKELSTEIN:  I'm going to
 2           object and instruct you not to answer.
 3                    We had a separate witness for
 4           this topic.  AmerisourceBergen had the
 5           opportunity to ask questions then and
 6           they didn't.  This witness has not
 7           been designated to answer questions
 8           about this topic.
 9                    MR. MAHADY:  This witness has
10           already testified in response to
11           questions from plaintiffs about the
12           substance of these meetings.  These
13           questions are based directly on what
14           was represented by the DEA at the
15           meeting.
16                    MR. FINKELSTEIN:  So he can
17           definitely talk about the distributor
18           initiative briefing, including the one
19           to AmerisourceBergen.  But if the
20           question is DEA's practice of
21           notifying registrants when a different
22           registrant suspended orders to a
23           particular suspicious customer, that's
24           a separate topic.
25                    We had a whole different
```

```
 1            witness, we had a deposition of that

 2            witness, and this is not the witness.

 3                    MR. MAHADY:  Let's keep moving.

 4      QUESTIONS BY MR. MAHADY:

 5            Q.     This one-and-a-half-page

 6      summary of the meeting prepared by DEA about

 7      the DEA's meeting with AmerisourceBergen,

 8      does it say in here, in this summary,

 9      anywhere, that the DEA advised

10      AmerisourceBergen that it should not ship

11      orders that it reports as suspicious in

12      the -- I'm not talking about the

13      presentation, we'll get to that in a second,

14      but in the summary itself.

15            A.     No.

16            Q.     Okay.  If you can turn to --

17      sticking with this document but turning to

18      the PowerPoint, I want to revisit the slide

19      that you looked at earlier with either

20      Mr. Farrell or Ms. Singer about suspicious

21      orders.  It's on page 7, Bates ending in 155.

22            A.     Okay.

23            Q.     Okay.  "Suspicious orders.

24      Reporting a suspicious order to DEA does not

25      relieve the distributor of the responsibility
```

1    to maintain effective controls against

2    diversion."

3              If I understood your testimony

4    earlier, you testified that this was the DEA

5    telling the registrants in 2005 that they

6    should not report orders that they deemed

7    suspicious; is that correct?

8              MR. FINKELSTEIN:  Objection.

9         Mischaracterizes the testimony.

10             THE WITNESS:  Did you just say

11        that the DEA -- I'm not sure I

12        understood what you just said.  I

13        thought you said that they weren't

14        supposed to tell us.

15   QUESTIONS BY MR. MAHADY:

16        Q.    You testified this morning --

17        A.    Right.

18        Q.    -- and correct me if I'm wrong,

19   that it was this slide through which the DEA

20   was telling the distributors that they should

21   not ship an order that they report to the DEA

22   as suspicious.

23             Was that your testimony this

24   morning?

25        A.    The reporting of suspicious

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order to the DEA does not relieve -- so after

 2    the fact, yeah.

 3         Q.    Okay.  If the DEA did not want

 4    the distributors to ship orders that were

 5    reported as suspicious, or stated

 6    differently, after-the-fact reporting, why

 7    didn't the DEA just say that?

 8         A.    I think it does say that.

 9         Q.    This --

10         A.    Because the statute says you

11    have to maintain effective controls to guard

12    against diversion.

13         Q.    Right.

14               But we've already --

15               MR. FINKELSTEIN:  Let the

16         witness answer.

17    QUESTIONS BY MR. MAHADY:

18         Q.    Go ahead.

19         A.    So the statute's already saying

20    you have to have something in place to

21    maintain effective controls.  So if you

22    identify a suspicious order, which is prior

23    to shipping, you have to alleviate that.

24    Otherwise, you're just shipping -- you're

25    just shipping suspicious -- the orders that
```

1    you have a reason or reason to believe that

2    it's going to be going to the illicit market.

3              So if you don't take the step

4    to alleviate the suspicions, then the

5    suspicions are still going down the line.

6    It's not -- it's not stopping.

7         Q.     Mr. Prevoznik, I think we've

8    already established that the regulation does

9    not explicitly say do not ship orders that

10   you report as suspicious, right?

11        A.     I agree with that, but the

12   statute says you have to have effective

13   means.  So if -- effective means is -- if

14   you're -- this whole business is purchasing

15   and selling of controlled substances.

16             A DEA registration, that's what

17   gives you the authority to do it legally in

18   the United States.  So once you become a DEA

19   registrant, there's statutes and there's

20   regulations that you have to follow.

21        Q.     Understood.

22        A.     And the public interest

23   requires that you maintain effective controls

24   of diversion.

25             So if a suspicious order is

```
 1    prior to shipment, which is -- DEA's

 2    interpreted that, then it just -- a

 3    reasonable deduction is that you shouldn't be

 4    sending these down the line if you don't

 5    alleviate that suspicion.

 6         Q.    Mr. Prevoznik, we've already

 7    established that the DEA approved a system

 8    with after-the-fact reporting.

 9              MR. FINKELSTEIN:  Objection.

10    QUESTIONS BY MR. MAHADY:

11         Q.    We also established that the

12    guidance from the DEA, including the guidance

13    provided by the chief of the section

14    responsible for interpreting the DEA, was at

15    times inconsistent on this very issue, right?

16              MR. FINKELSTEIN:  Objection.

17         Argumentative.  Also object as to the

18         form.

19    QUESTIONS BY MR. MAHADY:

20         Q.    We've already established that.

21              MR. FINKELSTEIN:  Objection.

22         Argumentative.

23              You don't have to accept

24         counsel's representations as to what

25         we've established.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. MAHADY:  That's a speaking
 2           objection.  We can limit the
 3           objections, please.
 4                 MR. FINKELSTEIN:  He's arguing
 5           with the witness about what we've
 6           established.
 7                 SPECIAL MASTER COHEN:  You can
 8           answer the question.
 9                 THE WITNESS:  I would say -- I
10           said from my personal view of reading
11           the thing that there was
12           inconsistency.  I'm not speaking on
13           the DEA's behalf on that.  So I don't
14           think that's consistent with what your
15           interpretation of what I said was.
16      QUESTIONS BY MR. MAHADY:
17           Q.    Okay.  And --
18           A.    And I also said that the
19      request was can we implement the system that
20      Bergen designed.  And we said yes, and we
21      worked with you to do that.
22           Q.    Okay.
23           A.    So again, it's the design, and
24      now we go to operation.
25           Q.    Got it.
```

```
 1                   And the system --

 2                   MR. FINKELSTEIN:  Let the

 3          witness answer.

 4      QUESTIONS BY MR. MAHADY:

 5          Q.    I'm sorry, Mr. Prevoznik.  Were

 6      you done or not?

 7          A.    So the operation now becomes

 8      what was actually implemented.

 9          Q.    Okay.

10          A.    Did Bergen follow it.  So

11      that's why we do scheduled investigations.

12      That's why we come out and we review, and we

13      look at your -- are you following what you

14      say you're following.  That's what we do.

15          Q.    Okay.  And the system that was

16      designed, that the DEA approved to implement,

17      using your words, had after-the-fact

18      reporting, correct?

19                   MR. FINKELSTEIN:  Asked and

20          answered.

21                   THE WITNESS:  Yes.

22      QUESTIONS BY MR. MAHADY:

23          Q.    Okay.  Mr. Prevoznik, I believe

24      on day one of your testimony you were asked

25      questions about specific DEA pharmaceutical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     industry conferences, correct?

 2          A.     Yes.

 3          Q.     And I believe you came back

 4     from a break and you identified some of the

 5     industry conferences that have been held over

 6     the years.

 7          A.     Yes, I forgot them.

 8          Q.     Perfectly understandable.

 9                 And one of the ones that you

10     identified was the Houston pharmaceutical

11     industry conference in September of 2007,

12     right?

13          A.     Yes.

14          Q.     Okay.  And I'm going to mark

15     this as an exhibit.

16                 (Prevoznik Exhibit 29 marked

17          for identification.)

18     QUESTIONS BY MR. MAHADY:

19          Q.     You can feel free to read the

20     whole document.  I'm going to ask you about

21     this section, suspicious orders, on page 2.

22                 Okay?

23          A.     Okay.

24          Q.     This document does not have a

25     Bates number.  I'll represent for the record
```

1      that I printed it from the DEA's website

2      yesterday.

3              A.      Okay.

4              Q.      Okay.  On page 2, section

5      captioned "Suspicious Orders."

6                      With me?

7              A.      Yep.

8              Q.      Okay.  The document reads,

9      "Michael Mapes, chief DEA regulatory section,

10     and Chris Zimmerman, vice president,

11     corporate security and regulatory affairs,

12     AmerisourceBergen, updated the attendees on

13     when suspicious orders -- reports should be

14     submitted to authorities."

15                     Did I read that correctly?

16             A.      Yes.

17             Q.      Okay.  If you go to the end of

18     that section, it says, "Presentation slides

19     attached."

20                     Have you reviewed any

21     presentation slides from the 2007 industry

22     conference relating to the presentation

23     provided by Mr. Zimmerman and Mr. Mapes?

24             A.      No.  We couldn't find them.

25             Q.      Okay.  And a company can't just

1    show up and present at the DEA's industry

2    conference; they have to be invited to

3    present by the DEA, right?

4         A.    Yes.

5         Q.    Okay.  And based off of this

6    summary from the DEA's website, Mr. Zimmerman

7    and Mr. Mapes, who was then at the DEA, were

8    updating the attendees on when suspicious

9    order reports should be submitted to

10   authorities.

11              Did I read that correctly?

12        A.    Yes.

13              (Prevoznik Exhibit 30 marked

14        for identification.)

15   QUESTIONS BY MR. MAHADY:

16        Q.    Okay.  Now, I'm going to mark

17   as Prevoznik 30 a copy of the September 11,

18   2007 presentation that Mr. Zimmerman and

19   Mr. Mapes gave at the conference.

20              And I'm not going to ask you

21   about the entire presentation.  I'm only

22   going to ask you about a couple different

23   slides.

24              So let me know when you're

25   ready for questions.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I'm ready.

 2          Q.     All right.  And before I do so,

 3     do you remember --

 4               MR. FINKELSTEIN:  What's your

 5          basis for saying Mr. Mapes gave this

 6          presentation?

 7               MR. MAHADY:  The printout from

 8          the DEA's website that Mr. Mapes and

 9          Mr. Zimmerman gave a presentation on

10          suspicious order.

11               MR. FINKELSTEIN:  But this just

12          says Zimmerman on it.

13               MR. MAHADY:  That's fine.  I

14          can restate.

15               I'll represent for the record

16          that the document only says

17          Mr. Zimmerman.

18     QUESTIONS BY MR. MAHADY:

19          Q.     This morning, in response to

20     questions from Ms. Singer, I believe you

21     testified that the DEA has consistently

22     advised registrants that chain pharmacies

23     should be treated no differently than

24     independent retail pharmacies.

25               Was that your testimony?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Yes.

2          Q.      Okay.  And if you turn to

3    ABDCMDL0037190, I have a couple questions on

4    that point.

5                  You with me?

6          A.      Yep.

7          Q.      All right.  The slide is

8    captioned, "New Customer Due Diligence."  The

9    first bullet, "Know your customer, due

10   diligence, investigations completed on all

11   new retail and wholesale accounts."

12                 Did I read that correctly?

13         A.      Yes.

14         Q.      It then says, "Retail chain

15   pharmacies are exempted."

16                 That -- did I read that

17   correctly?

18         A.      Yes.

19         Q.      Okay.  And that piece of

20   information was presented by Mr. Zimmerman at

21   the DEA distributor initiative conference,

22   correct?

23         A.      Yes.

24         Q.      And that piece of guidance was

25   provided to all registrants in attendance,
```

```
 1    correct?

 2              MR. FINKELSTEIN:  Object to the

 3         characterization.

 4              THE WITNESS:  Yes, this is

 5         Mr. Zimmerman's presentation.  Yes.

 6    QUESTIONS BY MR. MAHADY:

 7         Q.    Okay.  Are you aware that the

 8    DEA informed AmerisourceBergen that retail

 9    chain pharmacies were exempted from the know

10    your customer requirements?

11              MR. FINKELSTEIN:  Objection.

12         Foundation.

13              THE WITNESS:  No.

14    QUESTIONS BY MR. MAHADY:

15         Q.    Okay.  But this was a

16    presentation that Chris Zimmerman gave at the

17    invitation of the DEA, correct?

18         A.    Correct.

19         Q.    Okay.  Now, if you turn two

20    slides -- before we get to -- this is the

21    slide captioned "Order Monitoring Program."

22         A.    Is that 192?

23         Q.    Yep.

24              Before we talk about the slide

25    itself, Chris Zimmerman, he was the
```

```
 1    individual from Bergen Brunswig who was

 2    communicating with Mr. Gitchel and later

 3    Ms. Good of the DEA, right?

 4         A.    Yes.

 5         Q.    Okay.  And so he was very

 6    familiar with the program that was approved

 7    for implementation by the DEA, right?

 8              MR. FINKELSTEIN:  Objection.

 9         Scope.  Calls for speculation.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. MAHADY:

12         Q.    Okay.  Mr. Zimmerman says here,

13    "Historically" -- in the second bullet,

14    "Historically, controlled substances listed

15    chemical order monitoring has been based on a

16    ship and report process."

17              Did I read that correctly?

18         A.    Yes.

19         Q.    And "ship and report," that's

20    in bold, right?

21         A.    Yes.

22         Q.    So he's emphasizing the ship

23    and report, right?

24              MR. FINKELSTEIN:  Objection.

25         Scope.  Calls for speculation.
```

```
 1    QUESTIONS BY MR. MAHADY:

 2         Q.    Correct?

 3         A.    Yes, it appears to be.

 4         Q.    Okay.  And then it goes on to

 5    say, "ABC's OMP process is now based on

 6    identify, capture, investigate and report

 7    suspicious orders, all prior to shipment."

 8               Did I read that correctly?

 9         A.    Yes.

10         Q.    And "prior to shipment" is

11    emphasized?

12         A.    Yes, it's in bold.

13         Q.    Okay.  Did anyone at DEA stand

14    up at this conference and say,

15    "Mr. Zimmerman, what are you talking about?

16    Order monitoring has never been based on a

17    ship and report process"?

18               MR. FINKELSTEIN:  Scope.

19               THE WITNESS:  I don't know.  I

20         wasn't there.  I don't know.

21               I do know based on what's on

22         the line, it said Mr. Mapes stated

23         that the responsibility for making the

24         decision to ship rests with the

25         supplier.
```

```
 1    QUESTIONS BY MR. MAHADY:

 2         Q.     But online --

 3         A.     Registrants who routinely

 4    report suspicious orders, yet fill these

 5    orders with reason to believe they are

 6    destined for the illicit market, are failing

 7    to maintain effective controls against

 8    diversion.

 9         Q.     Okay.

10         A.     That's what Mr. Mapes said --

11         Q.     Right.  And that's --

12         A.     -- according to this report.

13         Q.     And I appreciate that, and

14    that's based off of the 2007 guidance.

15                But it also says, "Michael

16    Mapes, chief, regulatory section, and Chris

17    Zimmerman, vice president, corporate security

18    of regulatory affairs, AmerisourceBergen,

19    updated the attendees on when suspicious

20    order reports should be submitted to

21    authorities."

22                This is the update, right?

23                MR. FINKELSTEIN:  Objection.

24         Argumentative.  Scope.

25                You can answer.
```

```
 1              THE WITNESS:  Well, no, I would

 2        say this -- Mr. Zimmerman presented

 3        what he understood as

 4        AmerisourceBergen, and Mr. Mapes then

 5        clarified what our position was when

 6        he made that statement.

 7   QUESTIONS BY MR. MAHADY:

 8        Q.    Okay.

 9        A.    But I'm just basically going

10   off the documents because I wasn't there.

11        Q.    All right.

12              MR. FINKELSTEIN:  Let's take

13        our next break in a couple of minutes.

14              MR. MAHADY:  Yep.

15   QUESTIONS BY MR. MAHADY:

16        Q.    Earlier today Ms. Singer showed

17   you Diversion Investigator Manuals, correct?

18        A.    Yes.

19        Q.    You don't have to take them

20   out.

21        A.    Okay.

22        Q.    I don't think so.

23              Diversion Investigator Manuals,

24   those are internal DEA documents, right?

25        A.    Yes.
```

```
 1          Q.      Okay.  And what's contained in

 2    the Diversion Investigator Manuals is not

 3    shared with the public, correct?

 4          A.      Correct.

 5          Q.      Okay.  And so a registrant

 6    can't just go online and look up the DEA's

 7    Diversion Investigator Manuals from 1990,

 8    correct?

 9          A.      Correct.

10          Q.      Okay.  And so when those

11    Diversion Investigator Manuals were in

12    effect, AmerisourceBergen did not have a copy

13    of that manual, right?

14                  MR. FINKELSTEIN:  Calls for

15          speculation.  Scope.

16                  THE WITNESS:  Not to my

17          knowledge.

18    QUESTIONS BY MR. MAHADY:

19          Q.      Okay.  And the guidance that

20    was in those Diversion Investigator Manuals,

21    there was no tracking system at the DEA to

22    ensure that all diversion investigators were

23    getting guidance consistent with what was

24    contained in those manuals, correct?

25                  MR. FINKELSTEIN:  Vague.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I'm not sure I'm

 2        following you on that one.

 3   QUESTIONS BY MR. MAHADY:

 4        Q.     There's no way to know whether

 5   or not the diversion investigators deviated

 6   from what was in those manuals, correct?

 7        A.     Correct.

 8                MR. FINKELSTEIN:  Vague.

 9        Scope.

10                THE WITNESS:  Sorry.  Sorry.

11                No.

12                MR. MAHADY:  Let's take our

13        break.

14                MR. FINKELSTEIN:  Okay.  Thank

15        you.

16                VIDEOGRAPHER:  We're going off

17        record.  The time is 3:40.

18         (Off the record at 3:40 p.m.)

19                VIDEOGRAPHER:  We're going back

20        on the record.  Beginning of Media

21        File Number 8.  The time is 3:51.

22                     EXAMINATION

23   QUESTIONS BY MS. FUMERTON:

24        Q.     Good afternoon, Mr. Prevoznik.

25   My name is Tara Fumerton.  And I know we met
```

1    during the break, but just for the record, I

2    represent Walmart in this litigation, and I

3    just have a few questions for you that

4    hopefully we'll be able to get through

5    quickly.  I'm going to jump around a little

6    bit, so I apologize if it doesn't quite flow.

7            Just as a cleanup and to orient

8    you, during the second day of your testimony

9    you confirmed that the DEA did not meet with

10   CVS, Rite Aid, Walmart, Walgreens or HBC

11   Giant Eagle as part of DEA's distributor

12   initiative concerning Internet pharmacies,

13   correct?

14       A.    Correct.

15       Q.    And my colleague then asked you

16   a follow-up question to that, and the answer

17   got a little bit muddled, so I just wanted to

18   clear it up.

19            He asked whether the DEA

20   conducted a distributor briefing with these

21   same retail chain pharmacies related to rogue

22   pain clinics.

23            And just so that the record is

24   clear, the DEA did not conduct any

25   distributor briefing with the retail chain

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacies related to rogue pain clinics,

 2    correct?

 3              MR. FINKELSTEIN:  Vague.

 4              THE WITNESS:  Yes, but we did

 5         meet with them in the fall of 2013,

 6         the chain -- the chain pharmacies'

 7         managements.

 8    QUESTIONS BY MS. FUMERTON:

 9         Q.    And when you say "the chain

10    pharmacies' management," what do you mean?

11         A.    We had been doing the pharmacy

12    diversion awareness conferences, and during

13    like the first four, I think it was the first

14    four of these meetings, during breaks we

15    would be kind of scattered and being pulled

16    aside by a lot of -- quite a few pharmacists

17    and pharmacy techs.  Sometimes they would say

18    where they were from.  A lot of times they

19    would say they were from a chain.  And we

20    would have discussions about what was going

21    on in those chains.

22              So after about the fourth

23    conference, Mr. Rannazzisi said, all right,

24    I've had enough.  Let's get the top 33 chain

25    pharmacies.  I want their executive
```

```
 1    management there at a meeting at NABP.

 2                 I was not at that meeting, but

 3    it was held at NABP.  And the topics that the

 4    pharmacists and the pharmacy techs from those

 5    chain stores had -- that were brought up were

 6    discussed with the executive management.

 7        Q.    So to be clear, you're talking

 8    about a side meeting that occurred at an

 9    industrywide conference; is that correct?

10        A.    It's not -- it wasn't an

11    industry -- it was specifically for like the

12    top 30, 30, 35 chain pharmacies, that we

13    invited them to come to NABP, the National

14    Board of Pharmacies.

15        Q.    And that's 2013, correct?

16    Approximately?

17        A.    I think it was the fall

18    of 2012, to be honest with you.

19        Q.    Okay.  But that was not a

20    distributor --

21        A.    No.

22        Q.    -- briefing --

23        A.    Correct.

24        Q.    -- that you had testified about

25    previously, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Correct.

 2          Q.      So there was not a distributor

 3    briefing with the chain pharmacies, correct?

 4          A.      Correct.

 5                  MR. FARRELL:  I'm not going to

 6          take your time.  You used the chain

 7          pharmacies with a different lingo.

 8                  When you're talking chain

 9          pharmacies, are you talking about in

10          their role as a distributor?

11                  MS. FUMERTON:  Yes.

12    QUESTIONS BY MS. FUMERTON:

13          Q.      Now, this morning Ms. Singer

14    asked you a series of questions about HDMA

15    industry compliance guidelines marked as

16    Plaintiff's Exhibit 39 and various HDMA

17    activities.

18                  Do you recall that line of

19    questioning?

20          A.      Yes.

21          Q.      You were aware that Walmart was

22    not a member of HDMA, correct?

23                  MR. FINKELSTEIN:  Objection.

24          Scope.

25                  THE WITNESS:  I was not aware.
```

```
 1    QUESTIONS BY MS. FUMERTON:

 2         Q.    Do you know one way or another

 3    whether or not Walmart was a member of HDMA?

 4         A.    I don't.  I personally don't

 5    know.

 6         Q.    If I represent that Walmart was

 7    not a member of HDMA, do you have any reason

 8    to disagree with that representation?

 9              MR. FINKELSTEIN:  Scope.  Calls

10         for speculation.

11              THE WITNESS:  No.

12    QUESTIONS BY MS. FUMERTON:

13         Q.    But you do know, because you

14    testified previously about this, that Walmart

15    only distributed controlled substances to

16    their own stores, correct?

17              MR. FINKELSTEIN:  Scope.  Calls

18         for speculation.

19              THE WITNESS:  Yes.  I don't --

20         I don't know if there was a Walmart

21         pharmacy that may have sold to

22         somebody else, but that would be down

23         the line.

24              Overall I know that it was --

25         Walmart's distribution centers sent it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to Walmart stores.

 2     QUESTIONS BY MS. FUMERTON:

 3          Q.     And your other commentary after

 4     you said "yes" was simply pure speculation on

 5     your part, correct?

 6          A.     Correct.

 7          Q.     Walmart was not a wholesale

 8     distributor of controlled substances,

 9     correct?

10               MR. FINKELSTEIN:  Scope.

11               THE WITNESS:  What do you mean

12          by that?

13     QUESTIONS BY MS. FUMERTON:

14          Q.     Well, various terms have been

15     used by plaintiffs when asking questions, and

16     what I'm distinguishing between are

17     distributors who distribute the wholesale to

18     many different pharmacies, independent and

19     the like, and a distributor like Walmart that

20     only self-distributes controlled substances.

21               Do you understand that

22     distinction?

23          A.     Yes, correct.

24          Q.     Okay.  So under that

25     distinction, Walmart is not a wholesale
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributor of controlled substances,

 2    correct?

 3                    MR. FINKELSTEIN:  Scope.

 4                    THE WITNESS:  Correct.

 5    QUESTIONS BY MS. FUMERTON:

 6         Q.    And that's true for Rite Aid as

 7    well, correct?

 8                    MR. FINKELSTEIN:  Scope.

 9                    THE WITNESS:  Yes.

10    QUESTIONS BY MS. FUMERTON:

11         Q.    And Walgreens, CVS and HBC

12    Giant Eagle, correct?

13                    MR. FINKELSTEIN:  Scope.

14                    THE WITNESS:  Yes.

15    QUESTIONS BY MS. FUMERTON:

16         Q.    And would you agree that

17    nonmembers -- well, let me strike that.

18                    You would agree that there may

19    be reasons why nonmembers of HDMA do not need

20    to follow HDMA guidelines, correct?

21                    MR. FINKELSTEIN:  Scope.

22         Vague.

23                    THE WITNESS:  I don't even know

24         that the HDMA members have to follow

25         the guidelines either.  I mean, the
```

```
 1              registrants have to make their

 2              decisions based on the registration.

 3                   HDMA is not a registrant.

 4    QUESTIONS BY MS. FUMERTON:

 5         Q.    You would agree that nonmembers

 6    of HDMA might have different business models

 7    than HDMA members, correct?

 8         A.    Yes.  Yes.

 9                   MR. FINKELSTEIN:  Wait a

10         minute.

11                   THE WITNESS:  Oh, sorry.

12                   MR. FINKELSTEIN:  Scope.  Calls

13         for speculation.

14    QUESTIONS BY MS. FUMERTON:

15         Q.    And the DEA expects that each

16    registrant will review its own business model

17    and design a SOM system that fits its

18    designed method of distribution, correct?

19         A.    Yes.

20         Q.    Mr. Prevoznik, you're familiar

21    with immediate suspension orders, correct?

22         A.    Yes.

23         Q.    Are immediate suspension orders

24    also sometimes referred to as ISOs?

25         A.    Yes.
```

```
 1          Q.      And an immediate suspension

 2     order gives DEA the power, without notice, to

 3     immediately freeze the prescribing ability of

 4     a doctor who DEA believes is diverting

 5     prescription opioids, correct?

 6          A.      Well, it could be used for

 7     that.  It could be used for other things,

 8     too.

 9          Q.      But that's one of the things

10     that it could be used for, correct?

11          A.      Correct.

12          Q.      And an immediate suspension

13     order is an important tool to DEA because it

14     immediately stops the hemorrhaging caused by

15     a doctor who is diverting prescription

16     opioids, correct?

17          A.      Again, yes, but it could be

18     more than that.

19          Q.      So an immediate suspension

20     order gives DEA the ability to immediately

21     stop the diversion and then backtrack and

22     build a criminal case against the diverting

23     doctor, correct?

24          A.      Well, sometimes they run

25     parallel.
```

```
 1         Q.     Sometimes --

 2         A.     So it's already -- both are

 3   already ongoing.

 4         Q.     Sometimes it can run parallel.

 5   But are you also aware that during the 2006

 6   to 2015 time frame when Mr. Rannazzisi ran

 7   DEA's Office of Diversion Control, DEA

 8   sometimes delayed filing an immediate

 9   suspension order to allow investigators to

10   gather evidence for a criminal case?

11              MR. FINKELSTEIN:  Scope.

12              THE WITNESS:  I don't have

13         specifics, but I know that that did

14         happen.

15              MS. FUMERTON:  And just to

16         briefly address the scope objection,

17         Mr. Farrell started out with one of

18         his very first questions on day two to

19         Mr. Prevoznik:  "The million dollar

20         question right out of the gate is why

21         didn't the DEA do more?"  And then he

22         went on to ask a series of questions

23         relating to the DEA's actions and to

24         Mr. Patterson's -- and played

25         Mr. Patterson's testimony.
```

```
1              And the government didn't once

2        make an objection to scope as to any

3        of that testimony.

4              So I would ask that either I'm

5        permitted to ask these questions or

6        all of Mr. Farrell's testimony -- or

7        all of Mr. Farrell's questions along

8        those lines be stricken.

9              MR. FINKELSTEIN:  Without

10       prejudice to your motion to strike,

11       are you asking for an instruction that

12       I not object to your questions?

13             MS. FUMERTON:  No, I'm asking

14       for --

15             MR. FINKELSTEIN:  Good.  I'll

16       make my objections.  Thank you,

17       Counsel.

18             MS. FUMERTON:  Okay.  Well, I

19       will also then continue.

20             And as I want to make for the

21       record, though, the fact that the

22       government is being inconsistent with

23       respect to its objections regarding

24       scope, depending on whether or not

25       plaintiff's counsel or defendant's
```

```
 1          counsel is asking the question.

 2               MR. FINKELSTEIN:  We believe

 3          we're being consistent.

 4               You can ask your next question.

 5               MR. FARRELL:  And I prefer my

 6          questions not be stricken.

 7               MS. FUMERTON:  And with that,

 8          I've lost track of where we are.  Give

 9          me one second.

10     QUESTIONS BY MS. FUMERTON:

11          Q.    Okay.  So you -- just to

12     reorient us, you agree that sometimes the DEA

13     would delay issuing an ISO with respect to a

14     doctor that it was investigating for

15     potentially diverting controlled substances,

16     correct?

17               MR. FINKELSTEIN:  Scope.

18               And I'm going to add that

19          you're instructed not to testify based

20          on nonpublic, law-enforcement-

21          sensitive information.

22               THE WITNESS:  Based on that,

23          that advice, I can't answer that one.

24     QUESTIONS BY MS. FUMERTON:

25          Q.    Okay.  Well, I'm going to show
```

1    you what was previously marked as Prevoznik

2    Exhibit 17.

3              And I apologize, I only have

4    two copies because I thought we would have

5    other copies here.

6              And, Mr. Prevoznik, do you

7    recall --

8              MS. SINGER:  I'm sorry, what is

9         it?

10              MS. FUMERTON:  It's Exhibit 17.

11   QUESTIONS BY MS. FUMERTON:

12        Q.    Do you recall reviewing this

13   exhibit in your prior testimony?

14        A.    Yes.

15        Q.    I think your instruction by

16   counsel was to not answer the question unless

17   it was public information; is that correct?

18        A.    Law enforcement sensitive.

19        Q.    Well, Exhibit 17 is testimony

20   before Congress, correct, dated March 20,

21   2018?

22        A.    Yes.

23        Q.    And you previously testified

24   about Mr. Patterson's other comments at this

25   hearing, correct?

```
 1          A.      Correct.

 2                  MR. FINKELSTEIN:  Lest there be

 3          any doubt, you're permitted to testify

 4          about Prevoznik 17.

 5   QUESTIONS BY MS. FUMERTON:

 6          Q.      So I want to turn your

 7   attention to page 54.

 8          A.      Okay.

 9          Q.      Okay.  And specifically turn to

10   questioning, just to orient everybody, by

11   Congresswoman Susan Brooks to Mr. Patterson.

12   And if you look about three -- one-third way

13   down the page, you'll see a question by

14   Mr. -- I'm sorry, by Mrs. Brooks, and she

15   asks:  "Are there instances in which the DEA

16   pursues an immediate suspension order, the

17   ISO, in parallel with related potential

18   criminal investigation?"

19                  Do you see that?

20          A.      Yes.

21          Q.      And Mr. Patterson replies:

22   "So, ma'am, since October, so the

23   administration's -- the administrator's

24   position signs the ISOs when they're issued.

25   What I've traditionally seen is because of
```

```
 1    the process of where a criminal case is being

 2    investigated, there's been a delay in the ISO

 3    process as they're gathering evidence.  One

 4    of the concerns I have, and it goes back to

 5    again what Mr. Griffith said, is that cuts

 6    against the very argument that we have an

 7    imminent problem that we are trying to deal

 8    with."

 9              Do you see that?

10         A.    Yes.

11         Q.    And so Mr. Patterson was

12    testifying here that the DEA, in fact, was

13    delaying in issuing ISOs to allow criminal

14    investigations to occur, correct?

15              MR. FINKELSTEIN:  Objection.

16         Mischaracterizes the document.

17              You can answer.

18              THE WITNESS:  Yes.

19              MS. SINGER:  Can I just

20         interject and ask that you get copies

21         at the next break in case there's any

22         redirect that needs to be done here?

23         It's a little unfair to question the

24         witness when there isn't a copy of the

25         exhibit.
```

```
 1                    MS. FUMERTON:  Well, you can

 2            use one of the government's exhibits

 3            or we can get a copy if you need that

 4            as well.  But it was used previously,

 5            so you should have a copy from the

 6            prior time's exhibit.

 7                    MS. MAINIGI:  It's your

 8            document, Linda.

 9      QUESTIONS BY MS. FUMERTON:

10            Q.     And then if you go down on that

11      same page, about to the bottom third, you'll

12      see another question from Mrs. Brooks, and

13      she asks:  "And are you saying that the US

14      Attorneys were asking -- as a former

15      US Attorney, are you saying that US Attorneys

16      were asking or telling DEA not to issue

17      ISOs?"

18                    And Mr. Patterson replies:  "In

19      trying to gather evidence in their criminal

20      case."

21                    Mrs. Brooks responds:  "I

22      understand, but that can take months, if not

23      years, sometimes in criminal cases.  Do you

24      believe that's what happened prior to you

25      coming in October of 2017, that delays
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    happened?"

 2                 And Mr. Patterson replies:  "I

 3    think that's been an ongoing theme of what

 4    some of these delays are caused by."

 5                 Do you see that?

 6        A.    Yes.

 7        Q.    Do you have any reason to

 8    disagree with Mr. Patterson's testimony?

 9                 MR. FINKELSTEIN:  Scope.

10                 THE WITNESS:  No.

11    QUESTIONS BY MS. FUMERTON:

12        Q.    And so that meant that for

13    months, if not years, while these

14    investigations were occurring, the DEA

15    permitted doctors it believed were diverting

16    opioids to continue to divert opioids,

17    correct?

18                 MR. FINKELSTEIN:  Foundation.

19         Argumentative.

20                 THE WITNESS:  I'm sorry, can

21         you repeat it?

22    QUESTIONS BY MS. FUMERTON:

23        Q.    Sure.

24                 And so that means that for

25    months, if not years, the DEA permitted
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    doctors it believed were diverting opioids to

 2    continue to divert opioids, correct?

 3                MR. FINKELSTEIN:  Same

 4         objections.

 5                THE WITNESS:  It's possible,

 6         yeah.

 7                MS. FUMERTON:  I am going to

 8         pass the witness at this time.

 9                Thank you very much for your

10         time.

11                Can we go off the record while

12         we switch?

13                VIDEOGRAPHER:  We're going off

14         the record.  The time is 4:07.

15          (Off the record at 4:07 p.m.)

16                VIDEOGRAPHER:  We're going back

17         on record.  Beginning of Media File

18         Number 9.  Time is 4:08.

19                     EXAMINATION

20    QUESTIONS BY MR. O'CONNOR:

21         Q.    Mr. Prevoznik, I'm Andrew

22    O'Connor.  I represent one of the

23    manufacturers in the case.  We met last time

24    we were here.

25         A.    Good to see you again.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Good to see you.

2              I'll try to be brief here.

3              Is it fair for me to say that

4      DEA does not advise registrants on whether

5      they have an adequate and effective

6      suspicious order monitoring program?

7      A.      We don't advise?

8      Q.      Correct.

9      A.      No, I don't think that's fair

10     to say that.  I think when we -- when we sit

11     down and talk to them and they present what

12     they're having, we're in listening mode.  We

13     offer suggestions, so that would be advising.

14     Q.      Okay.  Does DEA approve any

15     particular suspicious order monitoring

16     program?

17     A.      No.

18     Q.      And why is that?

19     A.      Because it's ultimately -- it's

20     incumbent upon the registrant to design and

21     operate the system, so it's a business

22     decision made by the registrant.

23     Q.      And I believe you testified

24     earlier to the fact that one of the reasons

25     is because the registrant is the one that has

Highly Confidential - Subject to Further Confidentiality Review

```
1    relevant information.

2              Is that a fair characterization

3    of what you said earlier?

4         A.    They're in a better position.

5    They deal with the customer on a more daily

6    basis.

7         Q.    And would you say they're in a

8    better position than DEA?

9         A.    To assess their customer?  Yes.

10        Q.    And to assess the adequacy and

11   effectiveness of their suspicious order

12   monitoring program?

13        A.    I'm sorry, you're losing me on

14   that one.

15        Q.    Would you say that a registrant

16   is in a better position than DEA to assess

17   the adequacy and effectiveness of its

18   suspicious order monitoring program?

19              MR. FINKELSTEIN:  Objection.

20        Vague.

21              THE WITNESS:  No, I wouldn't

22        agree with that.

23   QUESTIONS BY MR. O'CONNOR:

24        Q.    Okay.  So DEA is in a better

25   position than the registrant to assess the
```

```
 1    program?

 2              MR. FINKELSTEIN:  Vague.

 3         Mischaracterizes prior testimony.

 4              THE WITNESS:  I think -- I

 5         think, again, it's the design and it's

 6         the operating.  So what is the

 7         operating -- what is the registrant

 8         doing to make the -- when they

 9         implement it, what are they -- what

10         are -- are they following the

11         guidelines that they said that they

12         were going to design, or are they

13         starting the shift to change when a

14         customer comes in and asks for -- is

15         on-boarding.  Are they looking at all

16         the parameters that the customer --

17         whether it's the questionnaire.  Are

18         they validating all those types of

19         things.

20              It has to do with are they

21         increasing thresholds when they're

22         asked for a threshold increase.  Are

23         they just arbitrarily increasing it to

24         some higher number or is there a

25         scientific basis that makes that
```

```
 1          determination.

 2                    So that's what we look at when

 3          we go back and look at the system.

 4     QUESTIONS BY MR. O'CONNOR:

 5          Q.    I just want to get back to my

 6     question, because I had understood your

 7     testimony earlier today to be that DEA would

 8     not weigh in on the adequacy of a suspicious

 9     order monitoring program because it was the

10     registrant and not DEA who had the right

11     information to make that assessment.

12                    MR. FINKELSTEIN:  Asked and

13          answered.  Mischaracterizes prior

14          testimony.

15     QUESTIONS BY MR. O'CONNOR:

16          Q.    Do you agree with my

17     characterization of what you said earlier

18     today?

19          A.    No, I don't agree with your

20     characterization.

21          Q.    Okay.  So do you think the DEA

22     then is in a better position to make

23     assessments about the suspicious order

24     monitoring programs than the registrants are?

25                    MR. FINKELSTEIN:  Vague.  Asked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          and answered.
 2               THE WITNESS:  The suspicious
 3          order monitoring system is incumbent
 4          upon the registrant to design it and
 5          operate it.  They are in the position
 6          that knows their customers.  We don't
 7          know their customers.
 8   QUESTIONS BY MR. O'CONNOR:
 9          Q.    Okay.  Only the registrant --
10          A.    So therefore --
11               MR. FINKELSTEIN:  Let him
12          finish.
13               THE WITNESS:  So, therefore,
14          the registrant is in a better position
15          to assess their customers.
16               How they assess it is something
17          that they do and that we do.
18   QUESTIONS BY MR. O'CONNOR:
19          Q.    Okay.  Earlier today I believe
20   you testified that manufacturers should make
21   sure that distributors' suspicious order
22   monitoring programs are adequate and
23   effective.
24               Did I get that right?
25          A.    Yeah, they should know what
```

1    their customer -- if the next -- if the next

2    line down is to the distributors, they should

3    know what kind of program they have.

4         Q.    And I believe you indicated

5    it's DEA's position that manufacturers are

6    supposed to make that assessment of the

7    distributor's suspicious order monitoring

8    program before they begin a business

9    relationship with the distributor; is that

10   fair?

11        A.    Yes.  Know your customer.

12        Q.    And just to be clear,

13   manufacturers are supposed to assess whether

14   the distributor's program is adequate and

15   effective?

16        A.    They should know what it is,

17   but, again, as I -- manufacturers also

18   distribute not just to distributors.  They

19   also go to practitioners, sometimes

20   pharmacies, directly.  So they also have to

21   have the ability to have a suspicious order

22   monitoring system for those registrants as

23   well in place.

24        Q.    I understand.

25              I just want to be very clear

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about what the DEA contends a manufacturer

 2    has to do, because earlier it sounded like

 3    you were saying they need to assess whether a

 4    distributor's suspicious order monitoring

 5    program was, in fact, effective.

 6              Is that correct?

 7        A.    Well, they should know if their

 8    customer's system is guarding -- is it

 9    guarding against the diversion into the

10    illicit market.

11        Q.    And is the DEA's position that

12    they should make that assessment even in

13    situations where the DEA has refused to make

14    that assessment?

15              MR. FINKELSTEIN:

16         Argumentative.  Foundation.

17              THE WITNESS:  You lost me on

18         that one.

19    QUESTIONS BY MR. O'CONNOR:

20        Q.    Well, DEA doesn't tell a

21    registrant whether its program works or not,

22    does it?

23        A.    Well --

24              MR. FINKELSTEIN:

25         Mischaracterizes prior testimony.
```

```
 1                    THE WITNESS:  When --

 2                    MR. O'CONNOR:  Just a question.

 3                    THE WITNESS:  When we sit with

 4          the registrant, the registrant

 5          explains what their ordering sys --

 6          their suspicious order system is to

 7          us.

 8                    So then when we come back, we

 9          look.  Are, in fact, they -- are they

10          doing what they said they're doing,

11          and is the system able to identify

12          suspicious orders.  That's what we do.

13                    And our parameters of doing

14          that are the public interest.  So are

15          there -- do they have in place the

16          means to identify them and also

17          safeguard and have effective measures

18          to not allow for diversion.

19     QUESTIONS BY MR. O'CONNOR:

20          Q.    Is there any statute or

21     regulation that you're aware of that says

22     manufacturers are supposed to assess whether

23     a distributor's suspicious order monitoring

24     program is adequate?

25          A.    Not specifically that language.
```

```
1          Q.      Okay.

2          A.      It would fall under the statute

3     of effective means.

4          Q.      And that provision that talks

5     about effective controls doesn't mention

6     anything about assessing another registrant's

7     suspicious order monitoring program, correct?

8          A.      Correct.

9          Q.      And DEA never issued any

10    guidance to manufacturers informing them that

11    they were supposed to assess another

12    registrant's program, correct?

13         A.      Not to my knowledge.

14         Q.      DEA never sent a letter to that

15    effect to manufacturers?

16         A.      Probably happened in the

17    manufacturing -- when we met with the

18    manufacturer.  Like the distributor

19    initiative with a manufacturer, we went over

20    that.

21         Q.      Can you say, sitting here today

22    under oath, that that happened?

23         A.      I don't know, but I --

24         Q.      Okay.  Earlier today I believe

25    you testified that manufacturers should
```

```
 1    review -- or registrants generally should

 2    review information regarding physician

 3    prescribing information.

 4              Is that a fair assessment of

 5    what you said?

 6         A.    Yes, if they have it.

 7         Q.    Okay.  Did DEA have physician

 8    prescribing information?

 9              MR. FINKELSTEIN:  I'm going to

10         instruct you not to answer about the

11         availability of data sources to the

12         extent that they're nonpublic.

13              THE WITNESS:  Could you repeat

14         the question?

15    QUESTIONS BY MR. O'CONNOR:

16         Q.    Sure.

17              Did DEA have physician

18    prescribing information?

19              MR. FINKELSTEIN:  And my

20         instruction, no nonpublic data or

21         techniques.

22              THE WITNESS:  Right.  No, we

23         didn't -- we have to get it through a

24         different means.

25    QUESTIONS BY MR. O'CONNOR:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.     Okay.  Let me ask you this:

 2    Are you familiar with IMS or IQVIA data?

 3           A.     Yes.

 4           Q.     Did DEA have access to IMS or

 5    IQVIA data that described the number of

 6    prescriptions written by particular

 7    physicians?

 8                  MR. FINKELSTEIN:  Scope.  No

 9           law-enforcement-sensitive information.

10           Okay?

11                  THE WITNESS:  Yes.

12                  We do use IQVIA data, but

13           that's for quotas.  Quota section uses

14           that.  It doesn't go down to that

15           granular -- that's my understanding,

16           it does not go down to that granular

17           level that you're describing.

18                  We have asked.  We have been

19           trying to get that data, but we have

20           been unsuccessful at this point.

21    QUESTIONS BY MR. O'CONNOR:

22           Q.     And as someone who oversees the

23    targeting and analysis unit, if there was

24    information available publicly that you felt

25    was useful to the DEA identifying diversion,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     you would seek it out, correct?

2              MR. FINKELSTEIN:  Incomplete

3         hypothetical.

4              THE WITNESS:  Yes.

5     QUESTIONS BY MR. O'CONNOR:

6         Q.    Okay.  But you do not have

7     prescriber-level IMS or IQVIA data, true?

8              MR. FINKELSTEIN:  Same

9         instruction.

10             THE WITNESS:  As I previously

11        said, we do have some, but it's used

12        at the quota level, not to the

13        granular level that you're talking

14        about.  We do not have it.

15    QUESTIONS BY MR. O'CONNOR:

16        Q.    And there is no statute or

17    regulation that you're aware of that

18    indicates that manufacturers were required to

19    analyze prescriber-level data in connection

20    with their DEA compliance activities,

21    correct?

22             MR. FINKELSTEIN:  Asked and

23        answered.

24             THE WITNESS:  Correct.  But if

25        they have it, then they should look at
```

```
 1        it.

 2    QUESTIONS BY MR. O'CONNOR:

 3        Q.     Even though it's not in the

 4    statute or the regulation?

 5        A.     It's knowing your customer.

 6    It's putting effective means -- guarding

 7    against diversion.  So if the information

 8    helps you understand your customer better and

 9    stops diversion, then you should be looking

10    at it.

11        Q.     Did DEA ever indicate in any

12    kind of written guidance document that

13    manufacturers should be analyzing prescriber

14    data in order to fulfill their DEA

15    obligations?

16        A.     Not to my knowledge.

17        Q.     DEA never sent any letters to

18    the industry to that effect?

19        A.     I'm not aware of it.

20        Q.     And DEA never posted anything

21    on its website informing manufacturers of its

22    view on this issue?

23        A.     Not to my knowledge.

24               MR. O'CONNOR:  Thank you for

25        your time.
```

```
 1                    Go off the record.

 2                    VIDEOGRAPHER:  Going off the

 3            record.  The time is 4:19.

 4             (Off the record at 4:19 p.m.)

 5                    VIDEOGRAPHER:  Going back on

 6            the record.  Beginning of Media

 7            File 10.  The time is 4:20.

 8                        EXAMINATION

 9    QUESTIONS BY MR. EPPICH:

10        Q.     Good afternoon, Mr. Prevoznik.

11    You may recall my name is Chris Eppich, and I

12    represent the McKesson distributors in this

13    litigation.  I just have a couple of

14    questions for you this afternoon.

15                    Are you aware of the federal

16    sentencing guidelines?

17                    MR. FINKELSTEIN:  Scope.

18                    THE WITNESS:  Yes.

19    QUESTIONS BY MR. EPPICH:

20        Q.     Are you aware that the federal

21    sentencing guidelines are used by courts in

22    sentencing after a verdict in a criminal

23    case?

24                    MR. FINKELSTEIN:  Scope.

25                    THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. EPPICH:

 2         Q.    The DEA doesn't use the federal

 3     sentencing guidelines to evaluate

 4     registrants' suspicious order monitoring

 5     programs, correct?

 6              MR. FINKELSTEIN:  Scope.

 7         Vague.

 8              THE WITNESS:  Yes.  Correct.

 9     QUESTIONS BY MR. EPPICH:

10         Q.    Correct that they do not?

11         A.    Do not.

12         Q.    Thank you, sir.

13              Now, when you were training

14     diversion investigators, did you ever

15     instruct diversion investigators to rely on

16     the federal sentencing guidelines to evaluate

17     registrants' suspicious order monitoring

18     programs?

19              MR. FINKELSTEIN:  Scope.

20              THE WITNESS:  No.

21              MR. EPPICH:  Thank you.  Let's

22         go off the record.

23              VIDEOGRAPHER:  Going off

24         record.  The time is 4:21.

25          (Off the record at 4:21 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  We're going back

 2        on record.  Beginning of Media

 3        File 11.  The time is 4:23.

 4                EXAMINATION

 5  QUESTIONS BY MS. MAINIGI:

 6        Q.    Mr. Prevoznik, you recall we

 7  met a few weeks ago on the first day or two

 8  of your deposition.

 9                I'm going to ask you some more

10  questions.  I'm here representing Cardinal

11  Health.

12                Mr. Prevoznik, you did not

13  speak to Mr. Mapes prior to coming here

14  today, did you?

15                MR. FINKELSTEIN:  Asked and

16        answered several times.

17                THE WITNESS:  No.

18  QUESTIONS BY MS. MAINIGI:

19        Q.    Okay.  And you had not spoken

20  to him prior to day one and day two?

21        A.    Correct.

22        Q.    And you did not speak to

23  Mr. Wright prior to coming today?

24                MR. FINKELSTEIN:  Asked and

25        answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Correct.

 2    QUESTIONS BY MS. MAINIGI:

 3         Q.    And is it true that you've only

 4    still reviewed the questions from

 5    Mr. Wright's deposition, not the answers?

 6         A.    Yes.

 7         Q.    You've never gone back to

 8    review the answers to Mr. Wright's

 9    deposition, only the questions?

10         A.    Correct.

11         Q.    And that was at the instruction

12    of your counsel?

13                    MR. FINKELSTEIN:  Objection.

14                    I'm going to instruct you not

15            to answer that.

16                    MS. MAINIGI:  I think he

17            answered that before.

18                    I'll withdraw the question.

19                    MR. FINKELSTEIN:  I don't think

20            he did, but I appreciate you

21            withdrawing the question.

22    QUESTIONS BY MS. MAINIGI:

23         Q.    Mr. Prevoznik, you arrived at

24    the DEA in 1991; is that right?

25         A.    Yes.
```

```
 1          Q.      And you were a diversion

 2    investigator until 2001?

 3          A.      Well, I still think I am.

 4          Q.      That's right.

 5          A.      Still have the same job series.

 6          Q.      Your primary duty was as a

 7    diversion investigator until 2001?

 8          A.      Yes.

 9          Q.      And in that situation, you were

10    out in the field offices?

11          A.      Yes.

12          Q.      Okay.  And you joined the

13    Office of Diversion Control at headquarters

14    in May 2012?

15          A.      I believe it was April.

16          Q.      Okay.  Now, the last several

17    days you've been asked a number of questions

18    about suspicious orders, true?

19          A.      True.

20          Q.      And suspicious, that term has a

21    particular meaning in the context of

22    controlled substances, correct?

23          A.      Correct.

24          Q.      And the CFR defines suspicious

25    order as including orders of unusual size,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders of unusual frequency and orders that

 2    deviate substantially from a normal ordering

 3    pattern, correct?

 4         A.    Correct.

 5         Q.    Excuse me.

 6               Now, not every order of unusual

 7    size is indicative of diversion, correct?

 8               MR. FINKELSTEIN:  Asked and

 9         answered.

10               THE WITNESS:  Correct.

11    QUESTIONS BY MS. MAINIGI:

12         Q.    There could be legitimate

13    reasons for a pharmacy to place an order of

14    unusual size, correct?

15               MR. FINKELSTEIN:  Asked and

16         answered.

17               THE WITNESS:  Correct.

18    QUESTIONS BY MS. MAINIGI:

19         Q.    Can you think of any examples

20    that come to mind for that, Mr. Prevoznik?

21               MR. FINKELSTEIN:  Calls for

22         speculation.

23               THE WITNESS:  For which one?

24    QUESTIONS BY MS. MAINIGI:

25         Q.    Why a pharmacy may place a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      larger than usual order.

 2                  MR. FINKELSTEIN:  Scope.  Calls

 3          for speculation.

 4                  You can answer in your

 5          individual capacity.

 6                  THE WITNESS:  It could be a new

 7          hospital opened, a new clinic opened.

 8          A new hospice center could have

 9          opened.  Any one of those.

10      QUESTIONS BY MS. MAINIGI:

11          Q.    And, Mr. Prevoznik, not every

12      order of unusual frequency is indicative of

13      diversion, correct?

14                  MR. FINKELSTEIN:  Asked and

15          answered.

16                  THE WITNESS:  Correct.

17      QUESTIONS BY MS. MAINIGI:

18          Q.    There could be legitimate

19      reasons for an order of unusual frequency,

20      true?

21                  MR. FINKELSTEIN:  Same

22          objection.

23                  THE WITNESS:  True.

24      QUESTIONS BY MS. MAINIGI:

25          Q.    Can you think of some examples
```

1    as to why a pharmacy may place an order that

2    is of unusual frequency?

3                    MR. FINKELSTEIN:  Scope.  Calls

4          for speculation.

5                    You can answer in your

6          individual capacity.

7                    THE WITNESS:  Again, it could

8          be a new customer base, prescriber, a

9          new doctor's office opened.

10                    That probably would be for a

11          period of time, and then it would not

12          keep going and going.  It would level

13          out at some point.

14    QUESTIONS BY MS. MAINIGI:

15          Q.    But it could certainly explain

16    a deviation that resulted in an unusual

17    frequency for a month or two, correct?

18                    MR. FINKELSTEIN:  Vague.

19                    THE WITNESS:  Yes.

20    QUESTIONS BY MS. MAINIGI:

21          Q.    Now, Mr. Prevoznik, not every

22    order that deviates substantially from a

23    normal ordering pattern is indicative of

24    diversion, correct?

25                    MR. FINKELSTEIN:  Asked and

```
 1           answered.

 2                 THE WITNESS:  Correct.

 3     QUESTIONS BY MS. MAINIGI:

 4           Q.    And could there be legitimate

 5     reasons for an ordering pattern that is

 6     abnormal in some manner?

 7           A.    Yeah, there could be.

 8           Q.    And what are some of those

 9     reasons?

10                 MR. FINKELSTEIN:  Scope.  Calls

11           for speculation.

12                 You can answer in your

13           individual capacity.

14                 THE WITNESS:  I'm not really

15           sure I have an example off the top of

16           my head on that one right now.

17     QUESTIONS BY MS. MAINIGI:

18           Q.    Well, how does one define a

19     normal ordering pattern or something that

20     diverges from a normal ordering pattern?

21           A.    Well, the example I would give

22     you is you have a pharmacist, they have their

23     order, and they will put two down.  But they

24     don't see that one of their employees, who is

25     either working or not working, has added to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the order.  So they could be at their house,

 2    whatever, added a bottle, two bottles, but

 3    it's later.

 4              So at the end of the day, the

 5    pharmacist -- they know the pattern of the

 6    pharmacist is not to review, that they just

 7    hit "submit," but they know that they're

 8    going to be on the job the next day.  So they

 9    come in the next day, they already know

10    there's two extra bottles or an extra bottle

11    coming in.  So that they've been doing this

12    for months and month and months, that they've

13    been stealing from, diverting out of the

14    pharmacy, because they know the habits of the

15    pharmacist.

16              It could be at a hospital.  It

17    could be at a -- just anywhere.  If they know

18    the habits, they're going to figure it out.

19        Q.    So the placing of an order of

20    unusual size, pattern or frequency, standing

21    alone, does not indicate that a customer is

22    diverting controlled substances, correct?

23        A.    Well, I mean, it's disjunctive,

24    so it could be one of them; it could be two

25    of them; it could three of them; it could be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a combination.

 2                 And so in the example I

 3    would -- I would say is -- I think I've used

 4    it before was the veterinarian that is

 5    ordering Vicodin with the acetaminophen that

 6    is toxic to cats and dogs.  So that in

 7    itself, an order of that, would be why are

 8    they doing that.

 9         Q.    But standing alone, without

10    follow-up due diligence, it is not

11    necessarily always possible to determine

12    whether an order that is an unusual size,

13    unusual pattern or frequency is, by itself,

14    for that reason, indicative of diversion,

15    correct?

16                 MR. FINKELSTEIN:  Asked and

17         answered.  Incomplete hypothetical.

18                 THE WITNESS:  Correct.

19    QUESTIONS BY MS. MAINIGI:

20         Q.    And so some sort of follow-up

21    due diligence needs to be done by the

22    distributor or registrant, correct?

23                 MR. FINKELSTEIN:  Incomplete

24         hypothetical.  Asked and answered.

25                 THE WITNESS:  Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.    And with respect to -- we've

 3    talked a bit about due diligence in the last

 4    couple of days of your deposition.

 5               Do you recall that?

 6         A.    Yes.

 7         Q.    Okay.  And with respect to --

 8    you've been asked questions by both

 9    Mr. Farrell and Ms. Singer about

10    documentation related to due diligence.

11               Do you recall that?

12         A.    Yes.

13         Q.    And I believe that you

14    indicated that there was not any sort of

15    requirement by the DEA of the maintenance of

16    due diligence files, correct?

17               MR. FINKELSTEIN:

18         Mischaracterizes prior testimony.

19               THE WITNESS:  Yes.

20    QUESTIONS BY MS. MAINIGI:

21         Q.    Now certainly the DEA's view

22    appears to be that due diligence is a good

23    practice or a best practice, fair?

24               MR. FINKELSTEIN:  Foundation.

25         Mischaracterizes prior testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes, it would be
 2         good practice.
 3    QUESTIONS BY MS. MAINIGI:
 4         Q.     And but the DEA has not issued
 5    any sort of guidelines indicating how due
 6    diligence should be conducted, true?
 7         A.     I mean, I would say that the
 8    letters in 2006 and 2007 have certain
 9    questions to be asked, so that's a guide of
10    what should be asked or what should be looked
11    for.
12         Q.     Those are Mr. Rannazzisi's
13    letters?
14         A.     Yes.
15         Q.     And Mr. Rannazzisi's letters
16    touched on a few different areas, correct?
17         A.     Correct.
18         Q.     Let me try to focus on
19    guidelines that might be specific to the idea
20    of due diligence.
21                    Are there -- are you aware of
22    DEA ever issuing any guidelines specific to
23    due diligence that describe how due diligence
24    should be conducted?
25                    MR. FINKELSTEIN:  Asked and
```

```
 1              answered.

 2                      THE WITNESS:  No, not -- it's

 3              the statute and the regulation.

 4      QUESTIONS BY MS. MAINIGI:

 5              Q.    And the statute and regulation

 6      do not specifically speak to due diligence,

 7      correct?

 8                      MR. FINKELSTEIN:  Asked and

 9              answered.

10                      THE WITNESS:  No.  I mean, they

11              do, because they're saying you have to

12              have effective means to guard against

13              diversion.  So that's the guide.

14      QUESTIONS BY MS. MAINIGI:

15              Q.    Let me come back to -- it's

16      effective controls, correct?

17              A.    Effective.

18              Q.    Let me come back to that.

19      Let's focus just on the phrase "due

20      diligence."

21                      Are you aware of the phrase

22      "due diligence" being in either the statute

23      or the regulation?

24                      MR. FINKELSTEIN:  Asked and

25              answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  It's not.
 2     QUESTIONS BY MS. MAINIGI:
 3          Q.     Now, you've referred, I think,
 4     just now and in the last several days to the
 5     term "effective controls," correct?
 6          A.     Correct.
 7          Q.     And that term is in the statute
 8     or the regulation, correct?
 9                    MR. FINKELSTEIN:  Asked and
10            answered.
11                    THE WITNESS:  Correct.
12     QUESTIONS BY MS. MAINIGI:
13          Q.     Okay.  Has the DEA ever
14     explained in guidance what effective controls
15     means?
16                    MR. FINKELSTEIN:  Vague.  Asked
17            and answered.
18                    THE WITNESS:  Effective
19            controls.  Well, they have to follow
20            the rest of the statute to meet
21            effective controls to guard against
22            diversion.
23     QUESTIONS BY MS. MAINIGI:
24          Q.     So has the DEA ever issued any
25     guidance, Mr. Prevoznik, that serves as a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    checklist, for example, of everything that

 2    would go into effective controls?

 3                    MR. FINKELSTEIN:  Vague.  Asked

 4        and answered.

 5                    THE WITNESS:  Not to my

 6        knowledge.

 7    QUESTIONS BY MS. MAINIGI:

 8        Q.    Coming back to the concept of

 9    due diligence, the DEA has not issued any

10    guidance specifying how long a registrant

11    must hold on to due diligence, correct?

12        A.    Correct.

13        Q.    Does the DEA have any sort of

14    guidelines as to how long the DEA is required

15    to hold on to certain types of documents?

16                    MR. FINKELSTEIN:  Scope.

17                    You can answer, if you know.

18                    THE WITNESS:  Yes, they do.

19    QUESTIONS BY MS. MAINIGI:

20        Q.    Can you describe some for me?

21        A.    I don't know.

22                    MR. FINKELSTEIN:  Scope.

23                    THE WITNESS:  I don't know

24        them, but I know they're out there.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MS. MAINIGI:

 2          Q.     They might have some sort of

 3     requirement to hold on to documents or data

 4     for seven years or something of the sort?

 5               MR. FINKELSTEIN:  Scope.

 6          Foundation.

 7               You can answer in your personal

 8          capacity.

 9               THE WITNESS:  I know that there

10          are certain years that certain

11          documents can be -- that are supposed

12          to be either archived or -- and then

13          once it gets archived, I have no idea.

14     QUESTIONS BY MS. MAINIGI:

15          Q.     Are there certain documents

16     that you hold on to in your job at DEA that

17     you hold on to for a certain number of years

18     because you know you're required to?

19               MR. FINKELSTEIN:  Scope.

20               THE WITNESS:  Yes.

21     QUESTIONS BY MS. MAINIGI:

22          Q.     And what kind of documents are

23     those?

24          A.     Oh --

25               MR. FINKELSTEIN:  Scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. MAINIGI:  I'm sorry.

 2                    THE WITNESS:  I was waiting for

 3          him.

 4                    MR. FINKELSTEIN:  Scope.

 5                    You can answer in your personal

 6          capacity.

 7                    THE WITNESS:  I know that we

 8          hold on to ARCOS, ARCOS data, drug

 9          theft loss.

10     QUESTIONS BY MS. MAINIGI:

11          Q.     And do you know approximately

12     how long you're required to hold on to ARCOS

13     data?

14                    MR. FINKELSTEIN:  Scope.

15                    THE WITNESS:  I don't know.

16     QUESTIONS BY MS. MAINIGI:

17          Q.     The DEA has certainly never

18     issued any sort of guidance indicating that

19     registrants must hold on to due diligence

20     files for 15 years, correct?

21          A.     Yes.  The only guidance I know

22     is it's two years, two years for

23     recordkeeping for the registrant.

24          Q.     Okay.

25          A.     For us.
```

1     Q.     But there's no requirement that

2     a due diligence file even be maintained,

3     correct?

4     A.     Correct.

5     Q.     So the two-year rule does not

6     apply to any due diligence files, per se,

7     correct?

8     A.     Correct.  I was just pointing

9     out that within the regs, there is records

10    for a two-year period.

11    Q.     Due diligence is certainly an

12    important part of this process, right?

13              MR. FINKELSTEIN:  Vague.

14              THE WITNESS:  Yes.

15    QUESTIONS BY MS. MAINIGI:

16    Q.     Why do you think the DEA has

17    never issued any specific guidance on due

18    diligence?

19              MR. FINKELSTEIN:  Vague.

20              Instruct you not to answer to

21        the extent that the answer calls for

22        predecisional deliberative

23        communications within the Department

24        of Justice.

25              THE WITNESS:  I don't know.

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.    Now, is there any sort of

 3    requirement -- I'm going to come back to

 4    suspicious orders.

 5              Is there any kind of

 6    requirement to hold on to suspicious orders

 7    themselves that are reported?

 8              MR. FINKELSTEIN:  Vague.

 9              THE WITNESS:  I'm not sure I'm

10         following on that.

11    QUESTIONS BY MS. MAINIGI:

12         Q.    Well, so, for example, if -- I

13    think when you were talking to one of the

14    other questioners, there was some reference

15    to perhaps at some point in time suspicious

16    orders being faxed in to the DEA.

17              Do you remember that

18    discussion?

19         A.    Yes.

20         Q.    Is there any sort of

21    requirement, either by the DEA or by the

22    registrant, to hold on to an actual

23    suspicious order being reported to the DEA?

24              MR. FINKELSTEIN:  Scope.

25         Vague.  Calls for speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  No.
 2    QUESTIONS BY MS. MAINIGI:
 3         Q.    Has the DEA issued any sort of
 4    guidance indicating how long a suspicious
 5    order that's been reported must be
 6    maintained?
 7         A.    No.
 8         Q.    Now, I think with one of the
 9    prior questioners there was reference to --
10    well, let me back up.
11                You prepared back to 1996 for
12    this deposition, approximately, correct?
13         A.    Well, I mean, I had -- I --
14    from the letters that you saw, I had some
15    letters from 1980s that I saw.
16         Q.    So you prepared for various
17    earlier periods of time?
18         A.    I looked for what I could find.
19         Q.    Okay.  And did you speak to any
20    folks in the field offices to help yourself
21    prepare for this deposition?
22                MR. FINKELSTEIN:  Asked and
23         answered.
24                THE WITNESS:  Yes.
25
```

```
 1     QUESTIONS BY MS. MAINIGI:

 2          Q.    And who were the folks you

 3     spoke to from the field office?

 4               MR. FINKELSTEIN:  Asked and

 5          answered.

 6               THE WITNESS:  Scott Collier,

 7          Ruth Carter, Susan Langston, Lisa

 8          Sullivan, David White, Scott Garriott.

 9          I'm trying to think.

10     QUESTIONS BY MS. MAINIGI:

11          Q.    And those were all folks that

12     were in the field offices in years prior?

13          A.    Yeah, they were in the field.

14     They've been -- they're in the field now.

15          Q.    Okay.  So you're aware through

16     your own experience in the field as well as

17     the conversations you had that the

18     requirement of the regulation and the statute

19     is that suspicious orders generally are

20     reported to the local or regional DEA

21     offices, correct?

22          A.    Correct.

23          Q.    And then it's up to the local

24     or regional DEA offices to ultimately make a

25     decision about whether to investigate a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suspicious order, correct?

 2         A.    That's part of the process.

 3    The other part is if it's not in their area,

 4    then they would send it to that respective

 5    office.  So that would be the other part.

 6         Q.    But once it gets to the right

 7    regional office, it is incumbent upon that

 8    regional office to make a decision about what

 9    to do with a suspicious order, correct?

10         A.    Correct.

11         Q.    And is it fair to say not every

12    suspicious order that is reported to a

13    regional office actually results in some sort

14    of investigation?

15              MR. FINKELSTEIN:  Asked and

16         answered.

17              THE WITNESS:  Yes.

18    QUESTIONS BY MS. MAINIGI:

19         Q.    Do you have any sense of how

20    many, percentagewise, ballpark, of actual

21    reported suspicious orders result in

22    investigations by the DEA?

23              MR. FINKELSTEIN:  Scope.  Asked

24         and answered.  Calls for speculation.

25              THE WITNESS:  No, I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.    Do you think more than half do?

 3              MR. FINKELSTEIN:  Same

 4         objections.

 5              You can answer in your personal

 6         capacity.

 7              THE WITNESS:  No, I don't.  I

 8         don't know.  I couldn't put a number

 9         on it.

10    QUESTIONS BY MS. MAINIGI:

11         Q.    You don't have any sort of

12    educated guess on that even?

13              MR. FINKELSTEIN:  Same

14         objection.

15              You can answer in your personal

16         capacity.

17              THE WITNESS:  The reports that

18         you got, it would be -- when we would

19         go out, we would be like, was one

20         filed or wasn't one filed.

21              So if one was filed, then we

22         would know -- we would typically go

23         out and ask:  Why did you file this?

24              Because sometimes -- I mean, I

25         don't know -- what is the time frame
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            we're talking about?  That would help

 2       me a little bit.

 3   QUESTIONS BY MS. MAINIGI:

 4       Q.    I'm sorry.  Let's say 1996

 5   through 2006 for the first time period.

 6       A.    So if they came in, then we

 7   would follow up with the registrant and ask:

 8   Why did you file this?  Ask for a reason as

 9   to why you filed this.  Because sometimes it

10   was just a sheet of paper that said,

11   diazepam, one bottle of 500.  Well, that

12   doesn't really give us much of a --

13   information to act on, so we would have to

14   follow up on that.

15       Q.    And I think you spoke to

16   earlier the fact that sometimes suspicious

17   orders would be called in to the regional

18   office, correct?

19       A.    Yes.

20       Q.    And I assume that -- if we kind

21   of use 1996 as a baseline, that in the late

22   '90s, early aughts, there were often

23   suspicious orders called in to the regional

24   offices, true?

25            MR. FINKELSTEIN:  Scope.  Calls
```

 1          for speculation.

 2               THE WITNESS:  I wouldn't say

 3          often.  I mean, it was more the

 4          excessive purchase reports is what we

 5          got.

 6     QUESTIONS BY MS. MAINIGI:

 7          Q.    Well, and I asked you to just

 8     focus on whatever universe of suspicious

 9     orders you got in that time period.  Let's

10     say late '90s, early aughts.

11               Of the suspicious orders that

12     were being reported in that time period, is

13     it fair to say that a good number were called

14     in to the regional offices?

15               MR. FINKELSTEIN:  Scope.

16          Vague.  Calls for speculation.

17               THE WITNESS:  I personally

18          don't know because I worked in the

19          Philadelphia office, so I don't know

20          how registrants were reporting during

21          that period in '96.

22     QUESTIONS BY MS. MAINIGI:

23          Q.    But you were in the

24     Philadelphia regional office, correct?

25          A.    Correct.

```
 1          Q.     And were you generally aware of

 2    registrants calling in to report suspicious

 3    orders from time to time?

 4                 MR. FINKELSTEIN:  Scope.

 5                 THE WITNESS:  At that point, it

 6          was more chemicals.  They were calling

 7          in chemicals.

 8    QUESTIONS BY MS. MAINIGI:

 9          Q.     Because that --

10          A.     That would be it.  It was the

11    methamphet -- we had the methamphetamine

12    epidemic at that point.

13          Q.     Because there was an obligation

14    to report not just suspicious orders of

15    controlled substances but suspicious orders

16    of meth as well, true?

17          A.     Listed chemicals to -- that

18    make meth.

19          Q.     But --

20          A.     We would have loved to have the

21    means for meth, but...

22                 MR. FINKELSTEIN:  Tom, answer

23          the questions.

24    QUESTIONS BY MS. MAINIGI:

25          Q.     The suspicious orders of -- the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suspicious orders that were reported for

 2    controlled substances from time to time did

 3    get phoned in, correct?

 4         A.    There were some that were

 5    phoned in, yes.

 6         Q.    And there were some that were

 7    faxed in, correct?

 8         A.    Correct.

 9         Q.    And what are the other means

10    that suspicious orders came in to the field

11    offices?

12         A.    Mailed in.  Pretty much it.

13    They were phone, fax or mail.

14         Q.    Okay.  And if a suspicious

15    order was phoned in, how did the DEA then

16    maintain a record of that suspicious order?

17              MR. FINKELSTEIN:  '96 to 2006?

18              MS. MAINIGI:  Sure.  Go with

19         that.

20              THE WITNESS:  Document.

21    QUESTIONS BY MS. MAINIGI:

22         Q.    Documented?

23         A.    Document.

24         Q.    And then are those documents

25    still in existence?
```

```
 1                    MR. FINKELSTEIN:  Scope.

 2                    You can answer, if you know.

 3                    THE WITNESS:  Don't know.

 4      QUESTIONS BY MS. MAINIGI:

 5           Q.     You don't know how long the DEA

 6      was required to hold on to suspicious orders

 7      reported?

 8                    MR. FINKELSTEIN:  Scope.

 9                    THE WITNESS:  I don't know.

10      QUESTIONS BY MS. MAINIGI:

11           Q.     Okay.  And would the suspicious

12      orders that were phoned or faxed in or mailed

13      in, for that matter, to the regional offices,

14      would they ever even find their way to

15      headquarters for any reason?

16           A.     It was on --

17                    MR. FINKELSTEIN:  Scope.  Calls

18           for speculation.

19                    THE WITNESS:  If it was on a

20           report it would, because the reports

21           get -- go to headquarters.

22      QUESTIONS BY MS. MAINIGI:

23           Q.     If it was on what type of

24      report?

25           A.     One of our official reports.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      An internal report?

2       A.      An internal report, yes.

3       Q.      And what are some of the type

4    of internal reports?

5               You don't need to describe them

6    for me, but just what are some of the types

7    of internal reports that would get sent from

8    the field offices to headquarters --

9               MR. FINKELSTEIN:  Scope.

10   QUESTIONS BY MS. MAINIGI:

11      Q.      -- that would contain

12   suspicious orders?

13              MR. FINKELSTEIN:  Scope.

14              THE WITNESS:  It could be

15        scheduled investigation reports.  It

16        could be part of the preregistration.

17        It could just be the suspicious order

18        itself.

19   QUESTIONS BY MS. MAINIGI:

20      Q.      And what are some of the

21   reasons that the suspicious orders would be

22   sent up to headquarters?

23      A.      We have a system that all

24   reports have to go to this one section to

25   update a system that we have.

```
 1          Q.      That's the ARCOS system or some

 2     other system?

 3          A.      No, some other system.

 4          Q.      What's the name of the system?

 5                  MR. FINKELSTEIN:  Scope.

 6                  THE WITNESS:  I mean, it's --

 7                  MR. FINKELSTEIN:  Wait.  Hang

 8     on.  If this was law enforcement

 9     sensitive, don't testify.

10     QUESTIONS BY MS. MAINIGI:

11          Q.      Is this related to law

12     enforcement?

13          A.      Yes.

14          Q.      Okay.  We can -- I can withdraw

15     that question.

16                  Now, let me take you -- let me

17     switch gears for a moment here.

18                  I think either -- I think the

19     second day you testified, you were asked if

20     the DEA agreed that if the distributor

21     determined that an order is suspicious and

22     should be blocked, the distributor should

23     terminate all sales to that customer until

24     they can rule out diversion is occurring.

25                  Do you recall that question?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yeah, I recall the question.

 2          Q.      Vaguely?

 3          A.      Vaguely.

 4          Q.      Okay.  Do you remember

 5    answering along the lines of yes to that

 6    question?

 7          A.      I might have.  I don't

 8    remember.

 9          Q.      Well, is that the case?

10                  If the distributor determines

11    an order is suspicious and should be blocked,

12    the distributor needs to terminate all sales

13    to a customer?

14                  MR. FINKELSTEIN:  Incomplete

15          hypothetical.

16    QUESTIONS BY MS. MAINIGI:

17          Q.      Until they can rule out that

18    diversion is occurring?

19          A.      Yeah, it should hold it until

20    they can rule out the suspicion.

21          Q.      Now, has DEA ever issued any

22    sort of guidance or pronouncement essentially

23    saying that you must -- as a distributor in

24    that circumstance, you must terminate all

25    future controlled substance sales to a
```

```
 1    customer if you report an order to the DEA?

 2              MR. FINKELSTEIN:  Asked and

 3         answered.  Mischaracterizes the

 4         testimony.

 5              THE WITNESS:  Well, it depends

 6         what they're -- what are they sending

 7         as the order.  What is the order that

 8         they're saying is suspicious, correct?

 9    QUESTIONS BY MS. MAINIGI:

10         Q.    Well, the distributor reports a

11    suspicious order for customer X.

12         A.    Of what?

13         Q.    Of controlled substances.

14         A.    So they're reporting the entire

15    order as being suspicious?

16         Q.    Correct.

17              That's what they're obligated

18    to do, correct?  Right?

19         A.    Correct.

20         Q.    Okay.  So they report a

21    suspicious order to the DEA for customer X.

22              Customer X may have other

23    orders that are pending down the line.

24    Should the distributor cut off all orders to

25    customer X?
```

```
 1              MR. FINKELSTEIN:  Asked and

 2         answered.  Incomplete hypothetical.

 3              THE WITNESS:  Well, first of

 4         all, I think you started your

 5         statement with the DEA reports it.

 6         It's not DEA that reports the

 7         suspicious order.  It's the registrant

 8         that --

 9    QUESTIONS BY MS. MAINIGI:

10         Q.     I'm sorry if I misspoke.

11         A.     That's fine.  I just want to

12    make sure we're clear on that.

13         Q.     Absolutely.

14         A.     So it's the registrant that

15    has -- the system that they have has deemed a

16    suspicious order, for a reason or reasons,

17    that they believe that this will -- that has

18    the potential to be diverted.

19         Q.     Correct.

20         A.     So that registrant has made the

21    decision -- has -- from their system they've

22    deemed it a suspicious order.  So they should

23    not ship until -- if they choose to, if they

24    want to alleviate that suspicion.  If they

25    choose not to, then they shouldn't ship.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  But if they choose to, then it
 2     becomes they need to look into it further to
 3     alleviate that suspicion.
 4                  MR. FINKELSTEIN:  Let's --
 5     QUESTIONS BY MS. MAINIGI:
 6          Q.    So they shouldn't ship the
 7     order, right?
 8                  MR. FINKELSTEIN:  Just a
 9          second.  Let's take our final break
10          when you're done with this line of
11          questioning.
12     QUESTIONS BY MS. MAINIGI:
13          Q.    So they shouldn't ship the
14     order, right?
15                  MR. FINKELSTEIN:  Incomplete
16          hypothetical.
17                  THE WITNESS:  When they deem --
18          when they've determined that it's
19          suspicious --
20     QUESTIONS BY MS. MAINIGI:
21          Q.    Correct.
22          A.    -- a suspicious order?
23                  Correct.
24          Q.    They shouldn't ship it?
25          A.    Correct, they should not ship
```

```
 1    it.

 2         Q.    Okay.  But they could choose to

 3    ship it if they wanted to.  That's a business

 4    judgment, right?

 5              MR. FINKELSTEIN:

 6         Mischaracterizes prior testimony.

 7              THE WITNESS:  They could ship

 8         it if they -- yeah, it's a business

 9         decision.

10    QUESTIONS BY MS. MAINIGI:

11         Q.    So let's say they choose to not

12    ship it and hold the order.  Are they then

13    required to not ship any orders to that same

14    customer?

15              MR. FINKELSTEIN:  Incomplete

16         hypothetical.  Asked and answered.

17              THE WITNESS:  Have they

18         alleviated the suspicion?  Did they do

19         anything to alleviate the suspicion?

20              If they haven't alleviated the

21         suspicion, then it's still a

22         suspicious order.

23    QUESTIONS BY MS. MAINIGI:

24         Q.    Okay.  I'm not talking about

25    that order; I'm talking about any additional
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders that may not appear suspicious.

 2              So let's say they take a while

 3    to investigate that particular suspicious

 4    order.  They don't send it out.  But in the

 5    meantime they have in the queue other orders

 6    from that pharmacy that do not look

 7    suspicious to them.

 8              MR. FINKELSTEIN:  Incomplete --

 9    QUESTIONS BY MS. MAINIGI:

10         Q.    Are they okay to ship those

11    orders?

12              MR. FINKELSTEIN:  Incomplete

13         hypothetical.

14              THE WITNESS:  Well, I think if

15         they have one in the queue that's

16         already saying it's suspicious, then I

17         would -- I would think that they would

18         be at least questioning it like, well,

19         what are they doing?

20    QUESTIONS BY MS. MAINIGI:

21         Q.    Are they required to hold the

22    other orders that they don't deem to be

23    suspicious, or is it okay to exercise their

24    business judgment to send those orders on?

25              MR. FINKELSTEIN:  Asked and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          answered.  Incomplete hypothetical.

 2                   And I'd appreciate the break.

 3                   THE WITNESS:  Could you please

 4          repeat it?

 5   QUESTIONS BY MS. MAINIGI:

 6          Q.    Are they required to hold the

 7   other orders that they don't view to be

 8   suspicious, or is it okay for the distributor

 9   in that instance to exercise their business

10   judgment and send those nonsuspicious orders

11   out?

12                   MR. FINKELSTEIN:  Asked and

13          answered.  Incomplete hypothetical.

14                   THE WITNESS:  Yes.

15   QUESTIONS BY MS. MAINIGI:

16          Q.    Yes what?

17          A.    They can.

18          Q.    Okay.  They can ship those

19   other orders out?

20          A.    Yes.

21                   MS. MAINIGI:  Okay.  Let's go

22          ahead and take your break.

23                   VIDEOGRAPHER:  We're going off

24          record.  The time is 4:53.

25           (Off the record at 4:53 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  We're going back

 2        on record, beginning of Media File

 3        Number 12.  The time is 5:03.

 4   QUESTIONS BY MS. MAINIGI:

 5        Q.     So, Mr. Prevoznik, just

 6   following up on our last line of questioning,

 7   is it fair to say that DEA has no internal

 8   policy defining the circumstances under which

 9   a distributor is required to terminate the

10   distribution of controlled substances to a

11   pharmacy?

12                MR. FINKELSTEIN:  Objection.

13        Mischaracterizes his prior testimony.

14                THE WITNESS:  Could you please

15        repeat that?

16   QUESTIONS BY MS. MAINIGI:

17        Q.     Sure.

18                Is it fair to say that DEA has

19   no internal policy defining the circumstances

20   under which a distributor is required to

21   terminate the distribution of controlled

22   substances to a pharmacy?

23        A.     Yes.

24        Q.     Now, do you recall being asked

25   last time a number of questions about the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    NWDA suspicious order monitoring system?  And

 2    we may have even looked at it today.

 3                 Do you remember that?

 4         A.    Yes.

 5         Q.    And I believe it was

 6    Exhibit P7.  If you don't have it handy, I am

 7    sure we can get you a new copy.

 8                 MR. FINKELSTEIN:  May the

 9            record reflect that James is now

10            screwing with my exhibits, but I

11            appreciate it.

12                 MS. MAINIGI:  I think that's

13            obvious.  It doesn't even need to be

14            reflected on the record.

15    QUESTIONS BY MS. MAINIGI:

16         Q.    You got one, Mr. Prevoznik?

17         A.    Yes.

18         Q.    Okay.  Perfect.

19                 And I think it had been

20    previously marked P7 for the record.

21                 Now, you testified you were --

22    you were familiar with this document.  You

23    had looked at it in preparation for your

24    deposition?

25         A.    Yes.
```

1    Q.    Okay.  And the NWDA, just for

2  the record, is the National Wholesale

3  Druggists' Association?

4    A.    Yes.

5    Q.    And that was the trade

6  organization for distributors at this point

7  in time, which is about 1993?

8    A.    Yes.

9    Q.    Now, can you tell us your

10  understanding of the purpose of this document

11  that describes the NWDA suspicious order

12  monitoring system?

13        MR. FINKELSTEIN:  Calls for

14    speculation.

15        THE WITNESS:  I think it was --

16    the association was assisting their

17    members to come up with a suspicious

18    order monitoring system that they

19    could use.

20  QUESTIONS BY MS. MAINIGI:

21    Q.    And it appears that the NWDA

22  was working at that point in time with both

23  DOJ and the DEA in establishing controls

24  aimed at reducing diversion, fair?

25        MR. FINKELSTEIN:  Scope.  Calls

1          for speculation.

2                    THE WITNESS:  I'm not sure

3          where I see DOJ.

4                    I see DEA listed.  I don't see

5          DOJ.

6     QUESTIONS BY MS. MAINIGI:

7          Q.     So if we take a look at page 1

8     of the NWDA document, Mr. Prevoznik --

9          A.     Yes.

10         Q.     -- second paragraph under

11    background, could you read that out loud?

12         A.     "The National Wholesale

13    Druggists' Association voluntarily began

14    working with the Department of Justice, Drug

15    Enforcement Administration, in establishing

16    controls clearly aimed at reducing or

17    eliminating illegal product distribution."

18         Q.     And why would the DEA have

19    worked with this trade organization to help

20    develop these controls?

21                    MR. FINKELSTEIN:  Foundation.

22         Calls for speculation.

23                    THE WITNESS:  To protect the

24         public.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.    And the DEA at that point in

 3    time thought it was a good thing to help a

 4    trade organization develop guidelines because

 5    it would help everybody, correct?

 6              MR. FINKELSTEIN:  Foundation.

 7         Calls for speculation.

 8              THE WITNESS:  I -- yeah, I

 9         mean -- yeah.

10    QUESTIONS BY MS. MAINIGI:

11         Q.    Most of all, it would help the

12    public, as you said?

13         A.    Yes.

14         Q.    Now, the system -- I think you

15    went over this earlier.  The system that they

16    came up with had two components to it, right?

17    It had the monthly after-the-fact reporting?

18         A.    Are you on a specific page?

19         Q.    It had the monthly

20    calculations, page 2.

21              Do you see it?

22              MR. FINKELSTEIN:  Page 2 where?

23              MS. MAINIGI:  Page 2 under

24         monthly calculations.

25              MR. FINKELSTEIN:  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  Okay.

 2     QUESTIONS BY MS. MAINIGI:

 3           Q.     And then it had -- so was that

 4     the monthly after-the-fact reporting?

 5           A.     Yes.

 6           Q.     Okay.  And so essentially --

 7     and then I think it's further described at

 8     page 4.

 9                   Do you see that?

10           A.     Where specifically on page 4?

11     The report --

12           Q.     I think the top, the top part

13     of page 4.  It kind of rolls into page 3 and

14     then the top part of page 4.

15           A.     Okay.

16           Q.     And then this also -- I think

17     Mr. Farrell asked you, and Ms. Singer may

18     have as well.  On page 7, there's a part 2 to

19     the reporting.  In addition to the

20     after-the-fact monthly reporting, there's a

21     reference to the single suspicious orders.

22                   Do you see that?

23           A.     Yes.

24           Q.     Now, the DEA did not require

25     the single suspicious orders to be reported
```

1    in a specific way; is that right?

2              MR. FINKELSTEIN:  Vague as to

3         time.

4              THE WITNESS:  That's correct.

5    QUESTIONS BY MS. MAINIGI:

6         Q.    And the DEA worked with NWDA to

7    come up with a reporting system for the

8    monthly after-the-fact reports, correct?

9              MR. FINKELSTEIN:  Foundation.

10        Scope.

11             THE WITNESS:  From my review of

12        the document, yes.

13   QUESTIONS BY MS. MAINIGI:

14        Q.    And those monthly

15   after-the-fact reports were sometimes called,

16   but not always, excessive purchase reports,

17   true?

18        A.    Yes, correct.

19        Q.    So in working with the NWDA,

20   the DEA essentially supported the concept of

21   two tiers of reporting, true?

22        A.    The excessive purchase after

23   the fact and identifying the suspicious order

24   prior to shipping?  Yes.

25        Q.    And is it fair to say that a

1    distributor that was sending in the excessive

2    purchase reports after the fact and was

3    calling or faxing in suspicious orders was in

4    compliance with these guidelines that DEA

5    worked on with the NWDEA {sic}?

6                    MR. FINKELSTEIN:  Vague.

7         Incomplete hypothetical.  Scope.

8                    THE WITNESS:  So again, this

9         goes back to the design and the

10        operating.  So this is the design.

11                   So what -- what did the

12        registrant do to operate?  I don't

13        know.  It's --

14   QUESTIONS BY MS. MAINIGI:

15        Q.    Well, in my hypothetical -- in

16   my hypothetical, Mr. Prevoznik, if the

17   registrant was submitting the excessive

18   purchase reports pursuant to some of the

19   guidelines in this document, the NWDA

20   document, and calling in suspicious orders,

21   that's the execution, right?

22                   They were essentially in

23   compliance with at least these guidelines

24   that the NWDA put out, right?

25                   MR. FINKELSTEIN:  Incomplete

Highly Confidential - Subject to Further Confidentiality Review

```
 1          hypothetical.  Scope.
 2               THE WITNESS:  I don't have
 3          enough information to make that
 4          determination because there could
 5          be -- it could be just what they're
 6          reporting.  There could be a whole
 7          bunch of things they're not reporting
 8          to us.
 9               So it goes back to these are --
10          these are the orders that they did
11          report, and these are the orders they
12          did not report, which is essentially
13          why a lot of -- we took enforcement
14          actions on quite a few of these
15          distributors because they were not
16          reporting.
17               So it's only based on what
18          they're reporting to us.
19     QUESTIONS BY MS. MAINIGI:
20          Q.    Operationally, however, having
21     a two-tier system in place that includes the
22     excessive purchase reports and then the
23     reporting separately of suspicious orders,
24     operationally in this time period, in the
25     late '90s, that was a system that certainly
```

```
 1    seemed to make sense to the DEA, correct?

 2                MR. FINKELSTEIN:  Foundation.

 3                THE WITNESS:  I think it made

 4         sense in terms of the -- at this point

 5         we were in -- we were dealing with the

 6         meth situation.  We were -- and I

 7         think I believe I testified to this,

 8         that this was more -- at this point

 9         this was more of a regional issue.

10                With the on -- with the

11         Internet and things like that where it

12         became a national thing, that's when

13         it was -- that's when orders were

14         clearly not being reported to us.

15    QUESTIONS BY MS. MAINIGI:

16         Q.    So my question was a little bit

17    different, right?

18                The structure itself for the

19    late -- that was in place in the late '90s,

20    as outlined by the NWDA suspicious order

21    monitoring system document, that was a system

22    that the DEA thought worked for that time

23    period, correct?

24                MR. FINKELSTEIN:  Foundation.

25                THE WITNESS:  I think they were
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           leaving it up to the -- to the

2           registrant to do that, because it --

3           in here it's with the -- the number 9,

4           single suspicious order, we determined

5           orders to mean prior to shipment.  So

6           it's incumbent upon that registrant.

7                So this is -- this is a

8           whole -- this is a wholesaler

9           association, so its members are going

10          to put this into -- implement it into

11          their system.  So if they're following

12          what they're supposed to be doing,

13          then you would hope that it was

14          identifying the suspicious orders as

15          they should have.

16   QUESTIONS BY MS. MAINIGI:

17        Q.    Well, let's take a look.  We

18   remember Mr. Gitchel, right?  Let's take a

19   look at what he wrote.

20                And I think we've got a couple

21   of letters of his attached that relate to

22   this system.

23                So if you take a look at the

24   very last page, page 11, Mr. Gitchel, who at

25   that point was -- what was his role?
```

```
 1            A.      He was the IP chief over

 2     operations, diversion operations.

 3            Q.      So he was the top dog, right,

 4     in diversion at DEA?

 5            A.      Just over operations.

 6            Q.      And he was communicating with a

 7     lot of people during this time period, right?

 8     We've seen a few of his letters?

 9            A.      Yes.

10            Q.      Okay.  And if you take a look

11     at the letter which is on page 11, he writes

12     a letter to Ronald Streck of the National

13     Wholesale Druggists' Association, right?

14            A.      Yes.

15            Q.      Okay.  And did you review this

16     letter in preparation for your deposition

17     here today?

18            A.      Yes.  In the past I did, yes.

19            Q.      Okay.  So you're familiar with

20     this letter?

21            A.      (Witness nods head.)

22            Q.      Can you read -- do you see a

23     sentence that begins with "this system" in

24     the middle of the first paragraph?

25            A.      "This system as proposed will
```

```
 1    test the reporting" -- will test or meet --

 2    "will meet the reporting requirements of 21

 3    CFR 1301.74(b)."

 4         Q.    So what does that mean to you?

 5              MR. FINKELSTEIN:  Calls for

 6         speculation.

 7              THE WITNESS:  I'm not sure what

 8         he's saying, because the next two

 9         sentences below that are -- he's --

10    QUESTIONS BY MS. MAINIGI:

11         Q.    Well, what's he saying in this

12    sentence?

13              MR. FINKELSTEIN:  Let the

14         witness finish his answer.

15              THE WITNESS:  The next two

16         sentences after that are talking about

17         the after-the-fact sales, and it

18         doesn't relieve the registrant from

19         the responsibility of reporting

20         excessive or suspicious orders.

21              So -- and he clearly, again,

22         reiterates what I've been saying.

23         DEA's interpreted orders to mean prior

24         to shipment.

25
```

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.    Okay.  So we just went over

 3    this system that the DEA obviously had input

 4    into that included two components, right?

 5         A.    Yes.

 6         Q.    And the two components -- what

 7    was the first component?

 8         A.    It was the after sales.

 9         Q.    Okay.  So the excessive

10    purchase, right?

11         A.    Yes.

12         Q.    What was the second component?

13         A.    The -- let me check.  The

14    suspicious orders.

15         Q.    Right.

16               So those are the two components

17    of the NWDA system, right?

18         A.    Yes.

19         Q.    And the sentences that he's got

20    after the one I asked you to read, he's

21    essentially saying, doing the first doesn't

22    relieve you of the obligation to do the

23    second, right?

24         A.    Correct.

25         Q.    Okay.  So read that sentence to
```

1    me again that begins with "this system."

2        A.    "This system, as proposed, will

3    meet the reporting requirements of 21 CFR

4    1301.74."

5        Q.    And what is 1301.74(b) of 21

6    CFR?

7        A.    Suspicious orders.

8        Q.    Okay.  So Mr. Gitchel, who's

9    acting chief of diversion operations, is

10   saying in this letter that this two-component

11   system that we've been discussing, as

12   proposed, will meet the reporting

13   requirements of suspicious orders, correct?

14       A.    That's what it says.

15       Q.    And so a distributor --

16            MR. FINKELSTEIN:  I signaled

17        ten minutes remaining to the witness.

18   QUESTIONS BY MS. MAINIGI:

19       Q.    A distributor, Mr. Prevoznik,

20   who in that time period followed this system

21   that NWDA proposed, their system, at least,

22   would be in compliance with 21 CFR

23   1301.74(b), correct?

24            MR. FINKELSTEIN:  Incomplete

25        hypothetical.

```
 1                    THE WITNESS:  Yes, but this
 2          date is 1984.  You've been asking me
 3          1996 to 2006, so -- so, yeah, 1984.
 4   QUESTIONS BY MS. MAINIGI:
 5          Q.    Do you -- are you aware of any
 6   communication by Mr. Gitchel subsequently
 7   that overruled his statements?
 8                    MR. FINKELSTEIN:  Scope.
 9                    THE WITNESS:  Not to my
10          knowledge.
11   QUESTIONS BY MS. MAINIGI:
12          Q.    Now, in this letter that
13   Mr. Gitchel wrote, he doesn't say anything
14   about halting shipment of excessive or
15   suspicious orders, right?
16          A.    No.
17          Q.    Now, the next time there is
18   some sort of communication with the industry
19   in written form, or an industry group in
20   written form, about approaches to suspicious
21   order monitoring are Mr. Rannazzisi's letters
22   in 2006 and 2007, right?
23                    MR. FINKELSTEIN:  Foundation.
24                    THE WITNESS:  No, we had -- we
25          had those conferences.  I mean, I
```

```
 1              think we had one from 1987, the one in

 2              San Antonio, so we were meeting with

 3              manufacturers and distributors.

 4      QUESTIONS BY MS. MAINIGI:

 5              Q.     The one in 2007?

 6              A.     No.  19 -- it's in here

 7      somewhere.

 8              Q.     Well, just listen to my

 9      question, though.

10              A.     Sure.

11              Q.     So Mr. Gitchel was

12      communicating with a trade group, right?

13              A.     Yes.

14              Q.     The National Wholesale

15      Druggists' Association, right?

16              A.     Yes.

17              Q.     And that was a trade group that

18      communicated then with its distributors, its

19      member distributors, right?

20                     MR. FINKELSTEIN:  Calls for

21              speculation.

22                     THE WITNESS:  Yes.

23      QUESTIONS BY MS. MAINIGI:

24              Q.     And distributor conferences or

25      conferences that DEA has, those are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    definitely important, but there's no

 2    guarantee that you're going to reach every

 3    single distributor out there, right?

 4         A.    No, but I thought you were

 5    asking what guidance DEA has given.

 6         Q.    No.

 7         A.    Okay.

 8         Q.    The question that I asked you

 9    was:  So Mr. Gitchel wrote a communication to

10    the NWDA which theoretically could have been

11    shared with its member distributors, right?

12              MR. FINKELSTEIN:  Calls for

13         speculation.

14              THE WITNESS:  Yes.

15    QUESTIONS BY MS. MAINIGI:

16         Q.    And it gave them some guidance

17    about their suspicious order monitoring

18    system, correct?

19         A.    Correct.

20         Q.    And next time the DEA issued

21    any sort of guidance, or anything that could

22    be called guidance, in a written form out to

23    all distributors about their suspicious order

24    monitoring systems was in the form of

25    Mr. Rannazzisi's letters in 2006, 2007?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FINKELSTEIN:  Foundation.

 2                    THE WITNESS:  Yes.

 3    QUESTIONS BY MS. MAINIGI:

 4         Q.    And obviously we had

 5    conversations previously about the statements

 6    in those letters, right?

 7         A.    Yes.

 8         Q.    Now, prior to Mr. Rannazzisi's

 9    letters, you all, the DEA, began the

10    distributor initiative, right?

11                    MR. FINKELSTEIN:  Asked and

12         answered.

13                    THE WITNESS:  Yes.

14    QUESTIONS BY MS. MAINIGI:

15         Q.    And I think you mentioned that

16    some of the earlier distributor initiatives

17    took place in the fall of 2005; is that

18    right?

19                    MR. FINKELSTEIN:  Asked and

20         answered.

21                    THE WITNESS:  I actually think

22         it was August.  Some of the documents

23         today were August.

24    QUESTIONS BY MS. MAINIGI:

25         Q.    Okay.  Do you want to find your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    document?  Let's find the Cardinal one.
 2              There's a meeting with
 3    Cardinal, and you're right, it's August.  At
 4    least the date of this memo is August 23,
 5    2005.
 6         A.    August 23rd, got it.  P23.
 7         Q.    Perfect.  Thank you.
 8              Now, you did not attend this
 9    meeting with Cardinal Health, right?
10              MR. FINKELSTEIN:  Asked and
11         answered.
12              THE WITNESS:  No.
13    QUESTIONS BY MS. MAINIGI:
14         Q.    Mr. Mapes and Ms. Seeger
15    attended the meeting?
16         A.    Yes.
17         Q.    And all DEA has at this point
18    in time reflective of what got said or not
19    said at this meeting is this memo and the
20    attached PowerPoint, true?
21         A.    Yes.
22         Q.    What points were emphasized at
23    this meeting in 2005 versus any meeting that
24    took place in 2009, 2010, you're not in a
25    position to say beyond the documents you have
```

```
1    in front of you, correct?

2         A.    Correct.

3         Q.    Now, look at the last paragraph

4    of this memo.  Do you see that Cardinal was

5    requesting that DEA provide them with certain

6    information?

7         A.    Yes.

8         Q.    Do you know if the DEA ever

9    provided Cardinal with that information it

10   was seeking?

11            MR. FINKELSTEIN:  Scope.

12            THE WITNESS:  I don't know.

13            MR. FINKELSTEIN:  Vague.

14   QUESTIONS BY MS. MAINIGI:

15        Q.    Now, do you recall the industry

16   group that represented distributors at some

17   point morphed its name into HDMA, correct?

18        A.    Correct.

19        Q.    So it went from NWDA to HDMA,

20   right?

21        A.    Yeah.  I don't know if there

22   was one in between, but, yes.

23        Q.    And now I think they're HDA.

24   Does that sound right to you?

25        A.    Yeah.
```

```
 1          Q.      I don't know why they keep
 2   changing their names.
 3                  But do you recall that that was
 4   a group that continued to want to meet with
 5   DEA to continue to give guidance on how to
 6   update their suspicious order monitoring
 7   systems?
 8                  MR. FINKELSTEIN:  Scope.  Calls
 9         for speculation.
10                  THE WITNESS:  Yes.
11   QUESTIONS BY MS. MAINIGI:
12          Q.      Do you recall though that
13   within DEA there was an evolution of thought
14   related to dealing with groups like HDMA
15   where, let's say, from 2007 through to 2013
16   DEA did not want to sit down and provide
17   specific guidance or guidelines to the HDMAs
18   of the world as to how to put their
19   suspicious order monitoring systems together?
20                  MR. FINKELSTEIN:  Scope.
21         Foundation.
22                  THE WITNESS:  Is that a
23         question?
24   QUESTIONS BY MS. MAINIGI:
25          Q.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Can you repeat it?

2          Q.      Sure.

3                  Do you recall from the time

4    period of about 2007 to 2013, DEA did not

5    want to sit down with HDMA to provide them

6    with guidance or guidelines related to an

7    adequate suspicious order monitoring system?

8          A.      Yes.

9          Q.      "Yes" meaning they did not want

10   to sit down with HDMA?

11         A.      Right.

12         Q.      Whereas in the late '90s, we

13   saw that they were willing to sit down with

14   HDMA, right?

15         A.      Correct.

16         Q.      And sitting down with HDMA or

17   its predecessor organization in the late '90s

18   helped the public, right?

19                 MR. FINKELSTEIN:  Calls for

20         speculation.

21   QUESTIONS BY MS. MAINIGI:

22         Q.      Isn't that what you told me, it

23   helped the public?

24         A.      What, by meeting with them?

25         Q.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Yes.  Well, we hoped that it
2    helped the public, yes.  But, again, it's the
3    registrants that have to design the system
4    and operate the system.  It's not NWDA, and
5    it's not HDA, and it's not HDMA.  It's the
6    registrant, which is why we shifted to that.
7          Q.     Okay.  You didn't want to sit
8    down with HDMA to help the public?
9          A.     No.
10               MR. FINKELSTEIN:  Wait.  Vague.
11         Argumentative.  Mischaracterizes prior
12         testimony.
13               THE WITNESS:  No, we sat
14         with -- we did the distributor
15         initiative because of what we saw, and
16         we saw that the registrants needed to
17         be -- have -- to sit down with the
18         registrants, talk to them and go over
19         their own data with them to show the
20         anomalies that are going on, in the
21         hope that they would stop what they
22         were doing.
23               They said they were going to
24         fix it; they didn't fix it.  So we
25         weren't going to go to a trade
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          association if the registrant isn't

2          going to fix their own internal system

3          that they have.

4               MR. FINKELSTEIN:  One minute,

5          Ms. Mainigi.

6     QUESTIONS BY MS. MAINIGI:

7          Q.    With respect to -- you made

8     some reference, and I think you're doing it

9     again, to some failures in the industry.  Do

10    you remember that?  Failures by the industry

11    to comply.

12              Do you remember having those

13    discussions with Ms. Singer earlier today?

14         A.    Yes.

15         Q.    Okay.  And by "failures in the

16    industry," I assume you're referring to the

17    various legal actions that distributors had

18    with Cardinal, true?  Or excuse me, the

19    various legal actions that distributors had

20    with DEA, true?

21         A.    Yes.

22         Q.    And so various distributors at

23    various points in time entered into legal

24    settlements with the DEA, true?

25         A.    True.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FINKELSTEIN:  We're at

 2         2:30, Special Master.  I'd ask to go

 3         off the record.

 4              SPECIAL MASTER COHEN:  I think

 5         we're done.

 6              MS. MAINIGI:  Thank you very

 7         much, Mr. Prevoznik.

 8              VIDEOGRAPHER:  All right.  This

 9         concludes today's deposition.  The

10         time is 5:30.

11      (Deposition concluded at 5:30 p.m.)

12              - - - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2
 3            I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 5    of the examination, Thomas Prevoznik was duly
      sworn by me to testify to the truth, the
 6    whole truth and nothing but the truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14
15
16
           _____
17         CARRIE A. CAMPBELL,
           NCRA Registered Diplomate Reporter
18         Certified Realtime Reporter
           Notary Public
19
20         Dated:  May 21, 2019
21
22
23
24
25
```

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4     carefully and make any necessary corrections.

 5     You should state the reason in the

 6     appropriate space on the errata sheet for any

 7     corrections that are made.

 8              After doing so, please sign the

 9     errata sheet and date it.  You are signing

10     same subject to the changes you have noted on

11     the errata sheet, which will be attached to

12     your deposition.

13              It is imperative that you return

14     the original errata sheet to the deposing

15     attorney within thirty (30) days of receipt

16     of the deposition transcript by you.  If you

17     fail to do so, the deposition transcript may

18     be deemed to be accurate and may be used in

19     court.

20

21

22

23

24

25
```

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I,_____, do

      hereby certify that I have read the foregoing

 5    pages and that the same is a correct

      transcription of the answers given by me to

 6    the questions therein propounded, except for

      the corrections or changes in form or

 7    substance, if any, noted in the attached

      Errata Sheet.

 8

 9

10

11

12    _____

      Thomas Prevoznik, Volume III          DATE

13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                        ERRATA

 2                    - - - - - - -

 3     PAGE     LINE    CHANGE/REASON

 4     _____    _____   _____

 5     _____    _____   _____

 6     _____    _____   _____

 7     _____    _____   _____

 8     _____    _____   _____

 9     _____    _____   _____

10     _____    _____   _____

11     _____    _____   _____

12     _____    _____   _____

13     _____    _____   _____

14     _____    _____   _____

15     _____    _____   _____

16     _____    _____   _____

17     _____    _____   _____

18     _____    _____   _____

19     _____    _____   _____

20     _____    _____   _____

21     _____    _____   _____

22     _____    _____   _____

23     _____    _____   _____

24     _____    _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                    LAWYER'S NOTES

 2                    - - - - - - -

 3      PAGE    LINE

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____

25
```