```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                       EASTERN DIVISION

 4

 5

 6   ********************************

 7   IN RE:

 8   NATIONAL PRESCRIPTION OPIATE       MDL No. 2804

     LITIGATION                         Case No. 17-md-2804

 9                                      Hon. Dan A. Polster

     This document relates to:

10

     All cases

11

     ********************************

12

13       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14                CONFIDENTIALITY REVIEW

15               VIDEOTAPED DEPOSITION OF:

16                    AMY PROPATIER

17                     MOTLEY RICE

18                    55 Cedar Street

19               Providence, Rhode Island

20            November 29, 2018      9:15 a.m.

21

22                Darlene M. Coppola

23              Registered Merit Reporter

24              Certified Realtime Reporter
```

```
 1    APPEARANCES:

 2    Representing the Plaintiffs:

 3         LEVIN PAPANTONIO THOMAS MITCHELL

 4         RAFFERTY PROCTOR PA

 5         316 Baylen Street

 6         Pensacola, FL 32502

 7         BY:  WILLIAM BAKER, ESQUIRE

 8              STEPHANIE HACKMAN, PARALEGAL

 9         T 850.485.4160

10

11    Representing the Plaintiffs:

12         WEISMAN, KENNEDY & BERRIS CO., L.P.A.

13         101 West Prospect Avenue

14         Midland Building

15         Suite 1600

16         Cleveland, OH 44115

17         BY:  DANIEL P. GOETZ, ESQUIRE

18              JAMES A. DE ROCHE, ESQUIRE

19              (via telephone)

20         T 216.781.1111

21         E dgoetz@weismanlaw.com

22           Jderoche@weismanlaw.com

23

24    (Continued on the next page)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2    Representing the Plaintiffs:

 3    (Via telephone)

 4         MOTLEY RICE, LLC

 5         28 Bridgeside Boulevard

 6         Mount Pleasant, SC 29464

 7         BY:  MICHAEL E. ELSNER, ESQUIRE

 8         T 843.216.9000

 9         E Melsner@motleyrice.com

10

11    Representing the Defendant CVS Indiana, CVS RX

12    Services and the Witness, Amy Propatier:

13         ZUCKERMAN SPAEDER LLP

14         1800 M Street NW

15         Suite 1000

16         Washington, DC 20036

17         BY  GRAEME W. BUSH, ESQUIRE

18         T 202.778.1800

19         E gbush@zuckerman.com

20

21

22

23    (Continued on the next page)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    APPEARANCES (Continued)

2    Representing the Defendant Discount Drug Mart:

3    (Via telephone)

4        CAVITCH FAMILO & DURKIN, CO., L.P.A.

5        1300 East Ninth Street

6        Twentieth Floor

7        Cleveland, OH 44114

8        BY:  L. WILLIAM "CHIP" ERB, ESQUIRE

9        E LWErb@cavitch.com

10

11   Representing the Defendants Endo Health

12   Solutions Inc., Endo Pharmaceuticals Inc.,

13   Par Pharmaceutical, Inc.; Par Pharmaceutical

14   Companies, Inc. (FKA Par Pharmaceutical

15   Holdings, Inc.):

16   (Via telephone)

17       ARNOLD & PORTER KAYE SCHOLER, LLP

18       777 South Figueroa Street

19       44th Floor

20       Los Angeles, CA 90017-5844

21       BY:  ERIC SHAPLAND, ESQUIRE

22           ANDREW BERGMAN, ESQUIRE

23       T 213.243.4238

24       E Eric.Shapland@arnoldporter.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2   Representing the Defendants Defendants

 3   AmerisourceBergen Drug Corporation,

 4   AmerisourceBergen Corporation:

 5   (Via telephone)

 6        REED SMITH LLP

 7        1301 K Street, N.W.

 8        Suite 1000  East Tower

 9        Washington, DC  20005

10        BY:  MOLLY Q. CAMPBELL, ESQUIRE

11        T 202.414.9200

12        E mqcampbell@reedsmith.com

13

14   Representing the Defendant Prescription

15   Supply, Inc:

16        PELINI, CAMPBELL & WILLIAMS, LLC

17        Bretton Commons

18        Suite 400

19        8040 Cleveland Avenue NW

20        North Canton, OH 44720

21        BY:  NICOLE H. RICHARD, ESQUIRE

22        T 330.305.6400

23        E mrichard@pelini-law.com

24   (Continued on next page)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Appearances (Continued):

 2    Representing the Defendant Rite Aid of

 3    Maryland:

 4    (Via telephone)

 5         MORGAN LEWIS & BOCKIUS, LLP

 6         1000 Louisiana Street

 7         Suite 4000

 8         Houston, TX 77002

 9         BY:  JAMES NORTEY, ESQUIRE

10         T 713.890.5472

11         e james.nortey@morganlewis.com

12

13    Representing the Defendant Walmart:

14    (Via telephone)

15         JONES DAY

16         325 John H. McConnell Boulevard

17         Suite 600

18         Columbus, OH 43215

19         BY:  EDWARD M. CARTER, ESQUIRE

20         T 614.469.3939

21         E emcarter@jonesday.com

22

23    (Continued on the next page)

24
```

```
 1    APPEARANCES (Continued):

 2    Representing the Defendant HBC Company:

 3     (Via telephone)

 4         MARCUS & SHAPIRA LLP

 5         One Oxford Centre

 6         35th Floor

 7         Pittsburgh, PA 15219

 8         BY:  PAUL M. MANNIX, ESQUIRE

 9         T 412.471.3490

10         E mannix@marcus-shapira.com

11

12    Representing the Defendant McKesson:

13     (Via telephone)

14         COVINGTON & BURLING LLP

15         1999 Avenue of the Stars

16         Los Angeles, CA 90067

17         BY: MICHAEL LANOSA, ESQUIRE

18         T 424.332.4780

19         E mlanosa@cov.com

20

21

22

23     (Continued on next page)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2    Representing the Defendant Cardinal Health:

 3     (Via telephone)

 4         WILLIAMS & CONNOLLY LLP

 5         725 Twelfth Street, NW

 6         Washington, DC 20005

 7         BY:  MIRANDA PETERSEN, ESQUIRE

 8         T 202.434.5686

 9         E mpetersen@wc.com

10

11

12    Also Present:

13    Gina Veldman, Trial Services

14    Robert Martignetti, CLVS

15

16

17

18

19

20

21

22

23

24
```

```
 1                      INDEX

 2                    EXAMINATION

 3   Witness Name                              Page

 4   AMY PROPATIER

 5     Direct By Mr. Baker ............................. 14

 6     Continued Direct By Mr. Baker ..................... 201

 7     Cross By Mr. Goetz ............................. 299

 8

 9                    EXHIBITS

10   Propatier-CVS    Description              Page

11   No. 2           Diversion Control          19
                     Division Document
12
     No. 1           Subchapter 1, Control      21
13                   and Enforcement, Part
                     C, Section 823, of 21
14                   U.S. Code
15   No. 3           United States Drug         23
                     Enforcement
16                   Administration Office
                     of Diversion Control
17                   Chart
18   No. 19          Press Release,             40
                     CVS-MDLT1-000003070
19                   through 3071
20   No. 23          E-mail,                    43
                     CVS-MDLT1-000003749
21                   through 3777
22   No. 25          Track One,                 56
                     CVS-MDLT1-000007362
23                   through 364

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX
 2                       EXHIBITS
 3    Propatier-CVS    Description              Page
 4    No. 100          CVS SOP,                   58
                       CVS-MDLT1-000034375
 5                     through 378
 6    No. 37           E-mail dated 1/14/2014     61
                       and Attached Letter
 7                     dated December 27,
                       2007
 8
      No. 61           E-mail,                    68
 9                     CVS-MDLT1-000055266
                       through 269
10
      No. 12           SOM Program,               72
11                     CVS-MDLT1-000002188
12    No. 98           E-mail,                    83
                       CVS-MDLT1-000089188
13
      No. 97           E-mail,                    87
14                     CVS-MDLT1-000088956
                       through 89025
15
      No. 94           E-mail,                    93
16                     CVS-MDLT1-000087889
                       through 890
17
      No. 81           E-mail,                    97
18                     CVS-MDLT1-000075299
                       through 5312
19
      No. 36           E-mail,                   105
20                     CVS-MDLT1-000012286
21    No. 17           Memoranduml,              109
                       CVS-MDLT1-000024539
22                     through 552
23    No. 67           E-mail,                   114
                       CVS-MDLT1-000055834
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         INDEX
 2                        EXHIBITS
 3   Propatier-CVS      Description                    Page
 4   No. 82            E-mail,                         118
                        CVS-MDLT1-000075542
 5
     No. 55            Business Idea                   122
 6                      Description,
                        CVS-MDLT1-000034175
 7                      through 177
 8   No. 54            E-mail,                         134
                        CVS-MDLT1-000034168
 9                      through 171
10
     No. 53            E-mail,                         203
11                      CVS-MDLT1-000033579
                        through 581
12
     No. 45            E-mail,                         210
13                      CVS-MDLT1-000022896
                        through 22900
14
     No. 104           E-mail,                         212
15                      CVS-MDLT1-000103329
16   No. 76            E-mail,                         225
                        CVS-MDLT1-000059258
17                      through 260
18   No. 102           E-mail,                         231
                        CVS-MDLT1-000091508
19                      through 518
20   No. 68            E-mail,                         239
                        CVS-MDLT1-000057736
21                      and 737
22   No. 103           E-mail,                         251
                        CVS-MDLT1-000093961
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      INDEX
 2                     EXHIBITS
 3   Propatier-CVS   Description                Page
 4   No. 34          Copies of DOJ Business     257
                     Cards,
 5                   CVS-MDLT1-000010525
                     and 530
 6
     No. 33          Inventory,                 260
 7                   CVS-MDLT1-000010522
                     and 558
 8
     No. 92          E-mail,                    267
 9                   CVS-MDLT1-000083855
10   No. 101         E-mail,                    275
                     CVS-MDLT1-000090581
11                   with attachment
12   No. 99          E-mail,                    278
                     CVS-MDLT1-000089768
13
     No. 78          Settlement Agreements,     281
14                   CVS-MDLT!-0000805,
                     856, 872, 907, 847,
15                   839
16   No. 223         E-mail,                    301
                     CVS-MDLT1-000066963
17                   through 966
18   No. 224         Shared P&Ps,               305
                     CVS-MDLT1-000066969
19                   through 976
20   No. 62          E-mail,                    309
                     CVS-MDLT1-000013534
21                   through 536
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          INDEX

 2    PREVIOUSLY MARKED EXHIBITS -- REFERRED TO

 3    Exhibit           Description                Page

 4    No. 204           SOP Manual Excerpt,          75

                        CVS-MDLT1-000008506
 5                      through 8571

 6
      No. 205           E-mail,                      163

 7                      CVS-MDLT1-000066574

                        and 575

 8
      No. 203           SOP Manual,                  168

 9                      CVS-MDLT1-000066576

                        through 6641

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  We are now on

 2      the record.  My name is Robert Martignetti.

 3      I'm a videographer for Golkow Litigation

 4      Services.  Today's date is November 29, 2018

 5      and the time is 9:15 a.m.  This is this video

 6      deposition is being held in Providence, Rhode

 7      Island.  In re:  National Prescription Opiate

 8      Litigation.  The deponent is Amy Propatier.

 9      Counsel will be noted on the stenographic

10      record.  The court reporter is Darlene Coppola

11      and will now swear in the witness.

12

13                    AMY PROPATIER,

14              witness, having first been

15      satisfactorily identified and duly sworn,

16      testifies and states as follows:

17

18                    DIRECT EXAMINATION

19      BY MR. BAKER:

20          Q.   Good morning.  My name's William

21      Baker.  Today's date is November 29, 2018 and

22      we are here with Ms. Amy Propatier; is that

23      correct?

24          A.   Propatier.
```

```
 1              Q.    Propatier.  Could you please tell us

 2       who your employer is?

 3              A.    CVS Pharmacy.

 4              Q.    How long have you been employed with

 5       CVS Pharmacy?

 6              A.    Since May of 1999.

 7              Q.    What was your position when you first

 8       came onboard in May of 1999?

 9              A.    I was the customer service rep for

10       store services.

11              Q.    Was that in retail?

12              A.    It was at the corporate office, yes,

13       for retail stores.

14              Q.    Did that include pharmaceutical

15       products?

16              A.    No.

17              Q.    When did you change positions?

18              A.    I changed positions in 2003 to

19       transportation and in 2005 that position moved

20       to logistics planning where I started getting

21       involved in pharmaceuticals.

22              Q.    What is was your job in

23       pharmaceuticals in 2005?

24              A.    2005, I was called a logistics liaison
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        for the distribution centers, so I was support

 2        between the distribution centers and the

 3        corporate office, just helping them contact

 4        people in the corporate office for support for

 5        store ordering, standard operating procedures.

 6             Q.   Where did you move to in 2006?

 7             A.   In 2006?

 8             Q.   What was your position in 2006?

 9             A.   Oh, it was still -- it was called

10        hazardous material and logistics liaison.

11             Q.   What did you do in 2007?

12             A.   The same position.

13             Q.   What did you do in 2008?

14             A.   My position changed to logistics Rx

15        services manager.

16             Q.   What is an Rx services manager?

17             A.   It was a similar position.  I was a

18        liaison between the distribution center and

19        the corporate office.  I was doing ARCOS

20        reporting, state drug reporting, SOP

21        consolidation and maintenance, coding

22        hazardous materials that came into the

23        distribution centers.

24             Q.   What did you do in 2009?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    The same position.

 2              Q.    What about 2010?

 3              A.    Same position.

 4              Q.    Have you maintained that same position

 5       since 2008?

 6              A.    No.  I changed positions in February

 7       of 2014.

 8              Q.    To what?

 9              A.    A pharmacy inventory manager.

10              Q.    So if we were to describe what your

11       position was from 2006 through 2014, begin

12       with 2006, and then tell us what it was.

13              A.    My position?

14              Q.    Yes, ma'am.

15              A.    Oh.  I was hazardous materials

16       specialist and logistics liaison.

17              Q.    And then in 2008 is when you switched?

18              A.    The position evolved, yes, to the

19       logistics Rx services manager.

20              Q.    So physically where were you located

21       from 2008 forward?

22              A.    One CVS Drive in Woonsocket, Rhode

23       Island.

24              Q.    That's near Providence, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes.

 2          Q.   Are you familiar with the term

 3     "narcotics"?

 4          A.   Yes.

 5          Q.   Do you agree that opioids are

 6     narcotics?

 7          A.   Yes.

 8          Q.   Do you agree that hydrocodone and

 9     hydrocodone combination products are

10     narcotics?

11          A.   Yes.

12          Q.   Do you agree that OxyContin is

13     narcotics?

14          A.   Yes.

15          Q.   Do you agree that a oxymorphone is

16     narcotics?

17          A.   Yes.

18          Q.   Do you agree that narcotics are drugs

19     that are controlled under the federal law of

20     the Controlled Substances Act?

21          A.   Yes.

22          Q.   Could you pull up Exhibit No. 2,

23     please?

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Exhibit No. 2 marked for

 2          identification.)

 3

 4          BY MR. BAKER:

 5              Q.   And could you highlight Section

 6          1301.74B?

 7                        MR. BUSH:  Could you give us the

 8          copy?

 9                        MR. BAKER:  I'm sorry, sir.

10                        VOICE:  If you could read into

11          the record what Exhibit 2 is, that would be

12          much appreciated.

13                        MR. BAKER:  Okay.  Exhibit 2 is

14          a copy of Title 21, Code of Federal

15          Regulation, Part 1301, specifically directing

16          you to Part 1301.74, Subparagraph B.

17                        MR. BUSH:  This was Exhibit 2;

18          is that correct?

19                        MR. BAKER:  Yes, yes.

20          BY MR. BAKER:

21              Q.   Do you see that?

22              A.   Uh-huh.

23              Q.   Yes, ma'am?

24              A.   Yes.
```

1          Q.   Are you familiar with that?

2               Let me read it to you.  It says, "The

3      registrant shall design and operate a system

4      to disclose to the registrant suspicious

5      orders of controlled substances.  The

6      registrant shall inform the field division

7      office of the administration in his area of

8      suspicious orders when discovered by the

9      registrant.  Suspicious orders include orders

10     of unusual size, orders deviating

11     substantially from a normal pattern, and

12     orders of unusual frequency."

13              Did I read that correctly?

14         A.   Yes.

15         Q.   Are you familiar with that law?

16         A.   Yes.

17         Q.   Is that law part of what guides you in

18     your job?

19         A.   In my job today?

20         Q.   Yes, ma'am, in your job between 2008

21     and 2014.

22              It's a yes or no.

23         A.   Yes.

24         Q.   Were you guided by that law in your

Highly Confidential - Subject to Further Confidentiality Review

```
1     job between 2008 and 2014?

2         A.   Yes.

3         Q.   Let's go to exhibit -- let's go to

4     Exhibit 1, please.

5

6              (Exhibit No. 1 marked for

7     identification.)

8

9              MR. BAKER:  Exhibit 1 is

10    Subchapter 1, Control and Enforcement, Part C,

11    Section 823, of 21 U.S. Code.

12    BY MR. BAKER:

13        Q.   Could you highlight, at the bottom,

14    Subsection E, Parentheticals 1 and 2?

15             Let me read this to you.  It's titled

16    21 U.S. Code, Section 823, Subsection E,

17    Parenthetical 1 and 2.

18             It says, "The attorney general" --

19    it's talking about distributors of controlled

20    substances in Schedules III, IV, or V.

21             "The attorney general shall register

22    an applicant to distribute controlled

23    substances in Schedule III, IV, V unless he

24    determines that the issuance of such
```

```
 1        registration is inconsistent with the public

 2        interest.  In determining the public interest,

 3        the following factors shall be considered:

 4        No. 1, maintenance of effective controls

 5        against diversion of particular controlled

 6        substances into other than legitimate medical

 7        scientific and industrial channels;

 8        Subparagraph 2, compliance with applicable

 9        state and local law."

10             Did I read that correctly?

11        A.   Yes.

12        Q.   Have you seen this law before?

13        A.   I can't say that I've read it directly

14        from here, no.

15        Q.   Have you been tutored in this law

16        within your job or trained in this law within

17        your job?

18        A.   Yes.

19        Q.   Between the period of 2008 through

20        2014, who trained you in this law within your

21        job?

22        A.   I can't recall a particular person

23        that trained me in this law.

24        Q.   Were you guided by this law in your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      job between 2008 and 2014?

 2          A.   Yes.

 3          Q.   Do you agree that you had a duty to

 4      follow this law between 2008 and 2014 in your

 5      position with CVS?

 6          A.   Yes.

 7          Q.   Would you agree that this country has

 8      been in the midst of an opioid crisis for the

 9      past ten years?

10          A.   Yes.

11          Q.   Could you pull up Exhibit 3, please?

12

13              (Exhibit No. 3 marked for

14      identification.)

15

16                  MR. BAKER:  It's composite

17      Exhibit 3.  Off record while that's being

18      pulled up.

19                  THE VIDEOGRAPHER:  The time is

20      9:25 a.m.  We're off the record.

21

22                  (Recess taken from 9:25 a.m.

23                  to 9:28 a.m.)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE VIDEOGRAPHER:   The time is 9:28

 2      a.m.  On the record.

 3      BY MR. BAKER:

 4           Q.   Could you pull up Exhibit 3, please?

 5      Exhibit 3 is a United States Drug Enforcement

 6      Administration Office of Diversion Control

 7      chart depicting a bar graph of drug-poisoning

 8      deaths involving opioid analgesics or heroin

 9      in the United States from 1999 through 2013.

10                Ma'am, my question is have you ever

11      seen this chart before?

12           A.   No.

13           Q.   Ma'am?

14           A.   No.

15           Q.   As part of your job, you are

16      responsible for DEA compliance of CVS with

17      respect to their suspicious order monitoring

18      programming; am I correct?

19           A.   No.

20           Q.   As part of your job, what do you do to

21      reference the DEA website, if anything?

22           A.   I didn't need to reference the website

23      for my job.

24           Q.   Let me ask you, are you familiar with
```

1      who the DEA is?

2          A.   Yes.

3          Q.   Okay.   That's the Drug Enforcement

4      Administration, which is an arm of the

5      Department of Justice of the United States.

6      You understand that, correct?

7          A.   Yes.

8          Q.   And you understand that the DEA is who

9      CVS would report suspicious orders to in the

10     event that their suspicious order monitoring

11     program showed a suspicious order to exist?

12         A.   Yes.

13         Q.   And do you do that as part of your

14     job?  Do you help do that?

15         A.   No.

16         Q.   Are you familiar with the statistics

17     depicted in this chart that I'm showing in

18     front of you?  Do you see the statistics

19     there?

20         A.   Yes.

21         Q.   Are you familiar with those

22     statistics?

23         A.   Familiar as in knowing them offhand,

24     no.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.   Are you familiar with them in  general

2         knowing that there has been a steady increase

3         in the number of thousands of deaths that have

4         occurred as a result of drug-poisoning deaths

5         involving opioid and analgesics or heroin in

6         the United States from 1999 to 2013?

7              A.   No.

8              Q.   You didn't know that?

9              A.   Not these numbers, no.

10             Q.   But you knew in general that --

11             A.   Oh, in general --

12             Q.   That there was --

13             A.   -- yes.

14             Q.   You knew in general that there was an

15        increase in the thousands of drug-poisoning

16        deaths involving opioid analgesics or heroin

17        in the United States from 1999 to 2013,

18        correct?

19             A.   Yes.

20             Q.   And you see that that number reached,

21        from 1999, a figure of 4,000 all the way up to

22        16.9 thousand in 2011 and it stayed at about

23        that 16,000 level all the way through 2013

24        and -- 2012 and 2013.  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes.

 2          Q.   Do you see what that comparison is to

 3     the deaths of heroin?

 4          A.   Yes.

 5          Q.   For instance, in 2013, heroin deaths

 6     accounted for 8.3 million deaths whereas

 7     opioid analgesic deaths were at 16.2 million,

 8     correct?

 9          A.   Yes.

10               MR. BUSH:  Objection.

11     BY MR. BAKER:

12          Q.   Is that what the chart indicates?

13          A.   Yes.

14          Q.   Does the chart indicate, according to

15     DEA statistics, that there were 8.3 million

16     heroin deaths in the year 2013 and 16.2

17     million opioid analgesics deaths?  Does the

18     chart indicate that?

19          A.   No.  It says thousands.

20          Q.   8.3 thousand, I'm sorry.  And 16.2

21     thousand opioid deaths?

22          A.   Yes.

23          Q.   Is that correct?

24          A.   (Witness nodding.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.   That's all part of your knowledge of

 2        the fact there's an opioid epidemic in the

 3        United States that's been going on for over

 4        ten years; is that correct?

 5                        MR. BUSH:  Objection.

 6        BY MR. BAKER:

 7              Q.   Is that correct, ma'am?

 8              A.   Can you say that again?

 9              Q.   This helps with your knowledge of the

10        fact that there's been an opioid epidemic in

11        the United States for at least the past ten

12        years?

13                        MR. BUSH:  Objection.

14                        MR. BAKER:  I'll withdraw the

15        question.

16        BY MR. BAKER:

17              Q.   Could you move on to the next chart,

18        please?  Go to the U.S. rate of opioid

19        overdose death sales and treatment admissions

20        from 1999 to 2010.

21                        MR. BUSH:  Hold on, could you

22        show me that chart because this is not in the

23        same order?

24                        MR. BAKER:  Right here.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BUSH:  This one?

 2                    MR. BAKER:  This one right here.

 3       BY MR. BAKER:

 4            Q.   Have you ever seen this chart that's

 5       published by the United States Drug

 6       Enforcement Administration?

 7            A.   No.

 8            Q.   I'd like you to look at that chart for

 9       the period between 1999 and 2010.  And it

10       graphs the correlation between opioid sales,

11       opioid deaths, and opioid treatment

12       admissions; is that correct?

13            A.   Yes.

14            Q.   Okay.  Do you see the top line, opioid

15       sales -- the increase in opioid sales from

16       1999 to 2000.  Do you see that, the rate of

17       increase?

18            A.   Yes.

19            Q.   Okay.  And do you see the rate of

20       increase in opioid deaths correlate with that

21       in the red line right below it?

22            A.   Yes.

23                    MR. BUSH:  Objection.

24       BY MR. BAKER:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Do you see that, ma'am?

 2          A.   Yes.

 3          Q.   Would you agree that those two lines

 4     correlate, meaning that the number of opioid

 5     sales, as opioid sales have increased over

 6     that same period of time, between 1999 and

 7     2010, so have opioid deaths correspondingly

 8     increased?

 9                    MR. BUSH:  Objection.

10     BY MR. BAKER:

11          Q.   Would you agree with that?

12                    MR. BUSH:  I'm sorry, objection.

13     BY MR. BAKER:

14          Q.   Ma'am?

15          A.   I can't say I agree.

16          Q.   Would you agree that those lines run

17     parallel to each other upward on the graph?

18                    MR. BUSH:  Objection.

19     BY MR. BAKER:

20          Q.   Just look at the red line and look at

21     the green line.  Would you agree that those

22     lines --

23          A.   Uh-huh.

24          Q.   -- correlate and run parallel to each
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        other increasingly between 1999 and 2010; yes

 2        or no?

 3                     MR. BUSH:  Objection.

 4        BY MR. BAKER:

 5             Q.   Ma'am?

 6             A.   Yes, they're parallel.

 7             Q.   Okay.  That would show correlation

 8        between those two; is that correct?

 9                     MR. BUSH:  Objection.

10        BY MR. BAKER:

11             Q.   Opioid sales and opioid deaths,

12        correct?

13                     MR. BUSH:  Objection.

14        BY MR. BAKER:

15             Q.   Yes?

16             A.   I can't say what the correlation is.

17             Q.   Would you look at the -- at the next

18        line, opioid treatment admissions?  Does that

19        line also run parallel to the lines above it,

20        which is opioid deaths and opioid sales?

21                     MR. BUSH:  Objection.

22        BY MR. BAKER:

23             Q.   Yes or no?

24             A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.   Would you agree there's a correlation

 2     between opioid treatment, opioid deaths, and

 3     opioid sales as depicted by this graph of

 4     reporting information through the United

 5     States Drug Enforcement Administration?

 6                 MR. BUSH:  Objection.

 7           A.   I can't say what the correlation is.

 8     BY MR. BAKER:

 9           Q.   You can't say that looking at this

10     graph?  Honestly, look at this graph and tell

11     me whether you think you could or couldn't say

12     that.

13                 MR. BUSH:  Objection.

14           A.   I can't say what the correlation is.

15     BY MR. BAKER:

16           Q.   Can you say that those lines do

17     correlate?

18           A.   I can say the line increased.

19           Q.   That they do correlate?

20                 MR. BUSH:  Objection.

21           A.   I can say it increased.

22     BY MR. BAKER:

23           Q.   That they increased correspondingly?

24                 MR. BUSH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.   I don't know.

2     BY MR. BAKER:

3          Q.   You don't know from looking at this

4     chart?  Look at this chart, ma'am.  Look at

5     those three lines.

6          A.   Yeah.

7          Q.   Using common sense, would you say that

8     those three lines run parallel to each other

9     correlate; yes or no?

10              MR. BUSH:  Objection.

11         A.   I can say they run parallel.  I don't

12    know how they correlate.  I can't say how they

13    correlate.

14    BY MR. BAKER:

15         Q.   Could you pull up the top ten list,

16    please, as the next chart?  It's the United

17    States Drug Enforcement Administration top ten

18    list of consumers in kilograms of opioid

19    analgesics.

20              MR. BUSH:  Objection.  Actually,

21    my objection is I don't really see where it

22    says that.

23              MR. BAKER:  Narcotic drugs in

24    grams.  We'll just go with narcotic drugs in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        grams.  The source

 2        BY MR. BAKER:

 3            Q.   Let's do it this way.  Let's go to

 4        this chart right here.

 5                 Have you ever seen this chart?

 6            A.   No.

 7            Q.   Are you familiar with the statistics

 8        reported by the United States DEA that the

 9        U.S. was the country, in 2012, with the

10        highest consumption of hydrocodone, which is

11        approximately 45.5 tons or 99 percent of

12        global consumption?  Were you familiar with

13        that?

14            A.   No.

15            Q.   Would you agree that this chart

16        indicates that?

17            A.   The chart -- yeah.

18            Q.   Yes?

19            A.   Yes, the statement indicates it.

20            Q.   Would you go to the next chart, which

21        is the Ohio -- 2012 Ohio drug overdose deaths

22        chart.  Do you see that chart?  Do you have

23        that chart in front of you, ma'am?

24            A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.   Do you see at the bottom where the

 2      source of this information is the Ohio

 3      Department of Health Office of Vital

 4      Statistics Analysis Conducted by Injury

 5      Prevention Program?  Do you see that?

 6           A.   Yes.

 7           Q.   So this is a publication by the Ohio

 8      Department of Health.  Are you familiar with

 9      the Ohio Department of Health?

10                MR. BUSH:  Objection.

11           A.   Familiar with it?

12      BY MR. BAKER:

13           Q.   Yes, ma'am.

14           A.   I've heard of it.  I can't say how

15      familiar I am.

16           Q.   Do you see what's reported in there?

17      At the top of that chart, it says, "Drug

18      overdose deaths continued to be a public

19      crisis in Ohio with a 366 percent increase in

20      the number of deaths from 2000 to 2012."

21      And it references that chart at the bottom.

22                Do you see it?

23           A.   Yes.

24           Q.   Do you see there where it says that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        opioid -- "Opioids, prescription or heroin,

2        remain the driving factor behind the

3        unintentional drug overdose epidemic in Ohio.

4        Approximately two-thirds or 1,272 or 66.5

5        percent of the drug overdoses involved any

6        opioid in 2012 similar to 2011."

7                Do you see that?

8        A.   Uh-huh.

9        Q.   Is that yes?

10       A.   Yes.

11       Q.   Is that all part of a crisis that you

12       have been aware of that's been going on in the

13       United States for the past several years?

14                    MR. BUSH:  Objection.

15       BY MR. BAKER:

16       Q.   When I asked you initially in your

17       deposition if you were familiar with the

18       opioid crisis that was going on in the United

19       States for the past ten years, your answer was

20       yes; is that correct?

21                    MR. BUSH:  Objection.

22       A.   Yes.

23       BY MR. BAKER:

24       Q.   Okay.  Is this part of what you're
```

```
 1         talking about, the increased opioid deaths in

 2         Ohio as depicted in this chart?

 3                    MR. BUSH:  Objection.

 4    BY MR. BAKER:

 5         Q.   Is this what you're talking about?

 6         A.   I can't say specifically.

 7         Q.   Can you say generally that's what

 8    you're talking about?

 9                    MR. BUSH:  Objection.

10         A.   Generally, yes.

11    BY MR. BAKER:

12         Q.   Okay.  Do you see where it says, right

13    below that, "Prescription opioids are involved

14    in most of the unintentional drug overdoses

15    and have largely driven the rise in deaths

16    over the past decade."

17              Do you see that?

18         A.   Yes.

19         Q.   Would you agree with that statement?

20                    MR. BUSH:  Objection.

21         A.   I -- I don't have enough information.

22    BY MR. BAKER:

23         Q.   Would you disagree with that

24    statement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. BUSH:  Objection.

2          A.   I can't agree or disagree.

3      BY MR. BAKER:

4          Q.   Could you pull up the next chart,

5      which is the drug diversion migration out of

6      Florida?  Have you seen this chart before?

7          A.   No.

8          Q.   You have not?

9          A.   No.

10         Q.   Are you familiar with what's called

11     the opioid express?

12                    MR. BUSH:  Can I just make a

13     statement, Bill, on the record?  This, at

14     least the version of this I'm seeing on the

15     screen and in our copy, is largely

16     illegible.

17                    MR. BAKER:  This is how it was

18     presented to us in the CVS documentation.

19                    MR. BUSH:  Okay.

20                    MR. BAKER:  Okay.  So we just

21     have to live with it.

22                    MR. BUSH:  It does say McKesson

23     at the top.  This is a CVS document.

24                    MR. BAKER:  This is a CVS
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      document.  I'll show you, but it is a CVS

 2      document.

 3                      MR. BUSH:  Okay.  I accept your

 4      representation.

 5                      MR. BAKER:  Okay.

 6      BY MR. BAKER:

 7          Q.   Have you seen this document before?

 8          A.   No.

 9          Q.   Are you familiar with the Oxy Express?

10      Are you familiar with that?

11          A.   No.

12          Q.   Are you familiar with the way drugs

13      are diverted out of Florida up through states

14      north of Florida into Ohio?

15          A.   No.

16          Q.   You're not familiar with that?

17          A.   No.

18          Q.   Let's move on.  Could you pull up

19      Exhibit 103, please.  Strike that.

20               Let's pull up Exhibit No. 19, please,

21      and go to page 2.

22                      MR. BAKER:  We'll mark that as

23      the next number.

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



    10        BY MR. BAKER:

    11            Q.    2007 would be before you assumed your

    12        new position in 2008, correct?

    13            A.    Yes.

    14            Q.    And when you assumed your new position

    15        in 2008, did you study up on the existence of

    16        the opioid epidemic?

    17            A.    No.

    18            Q.    You did no study at all on that?

    19            A.    No.

    20            Q.    Did you try to do any reading on it?

    21            A.    No, not that I recall.

    22            Q.    It just didn't concern you at all?

    23            A.    I can't recall.

    24            Q.    Turn to Bates Number 3755 at the

Highly Confidential - Subject to Further Confidentiality Review

```
 1     bottom.  Do you see it?

 2          A.   Uh-huh.

 3          Q.   Yes?

 4          A.   Yes.

 5          Q.   You see where it talks about the

 6     prescription drug abuse is an epidemic in the

 7     United States, that prescription drugs cause

 8     more deaths than heroin or cocaine combined.

 9               Do you see that?

10          A.   Yes.

11          Q.   At the bottom it says "The U.S.

12     consumes 83 percent of the world's oxycodone

13     and 99 percent of the world's hydrocodone, two

14     highly prescribed opioid drugs for pain."

15               Do you see that?

16          A.   Yes.

17          Q.   As part of your job, do you know that

18     hydrocodone is a highly prescribed opioid drug

19     for pain?

20                    MR. BUSH:  Objection.

21          A.   No, I don't know that.

22     BY MR. BAKER:

23          Q.   You don't know that.

24               Go to Bates Number 3761, all part of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Exhibit No. 23.  Could you highlight in the

2        first -- every portion that deals with Ohio

3        under oxycodone, hydrocodone, hydromorphone,

4        and oxymorphone?

5             Do you see the report here, that

6        current drug -- prescription drug diversion

7        trends dealing with states with the highest

8        pharmacy dispensing in 2012 shows that

9        oxycodone -- that Ohio is the fifth

10       highest-rated state for oxycodone relative to

11       the states with the highest pharmacy

12       dispensing in 2012?  Do you see that?

13                  MR. BUSH:  Objection.

14         A.   Yes, I can see that.

15       BY MR. BAKER:

16         Q.   Do you see that this chart indicates

17       that Ohio is the seventh highest state with

18       pharmacy dispensing in 2012 with respect to

19       the drug hydrocodone?  Do you see that?

20                  MR. BUSH:  Objection.

21         A.   Yes, I see that.

22       BY MR. BAKER:

23         Q.   Do you see in this chart where Ohio is

24       the eighth highest pharmacy dispensing state
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       in 2012 for the drug hydromorphone?

 2                     MR. BUSH:  Objection.

 3            A.   Yes, I see that.

 4       BY MR. BAKER:

 5            Q.   Do you see that Ohio is the seventh

 6       highest pharmacy dispensing state in 2012 for

 7       the drug oxymorphone?

 8                     MR. BUSH:  Objection.

 9            A.   Yes, I see that.

10       BY MR. BAKER:

11            Q.   Did you know these statistics before I

12       just showed them to you?

13            A.   No, I did not.

14            Q.   Do you remember that chart that I

15       showed you about drug diversion migration out

16       of Florida that -- if you go to Bates Number

17       3766.  Do you remember that drug migration

18       chart that I showed you just a few minutes ago

19       in a prior exhibit?

20            A.   Uh-huh, yes.

21            Q.   Yes?

22            A.   Yes.

23            Q.   Okay.  This is where this came from.

24       This is a document -- that's a CVS document,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Bates Number 3766, which means that it was

 2      produced to us by CVS in this litigation.  You

 3      understand that?

 4                   MR. BUSH:  Objection.

 5          A.   Yes.

 6      BY MR. BAKER:

 7          Q.   Okay.  Do you see where in this chart

 8      it delineates where drugs divert out of

 9      Florida, up through Georgia, up through

10      Tennessee, Kentucky, ultimately into Ohio?  Do

11      you see that?

12                   MR. BUSH:  Objection.

13      BY MR. BAKER:

14          Q.   Do you see that on that?  Is that

15      what's depicted on that chart?

16          A.   I see lines, yes.

17          Q.   And do you -- have you read about or

18      studied about the drug diversion migration out

19      of Florida as part of your job?

20          A.   No.

21          Q.   Have you been taught about that as

22      part of your job?

23          A.   No.

24          Q.   Have you attended DEA conferences on
```

```
 1      drug diversion?

 2           A.   No.

 3           Q.   Your employer does not send you to DEA

 4      conferences to learn about drug diversion?

 5           A.   No.

 6           Q.   And you've never attended a DEA

 7      conference on drug diversion?

 8           A.   I've been to a DEA conference.

 9           Q.   Dealing with the topic of drug

10      diversion with respect to opioids?

11           A.   I don't recall what the topics were

12      that were discussed.

13           Q.   Which DEA conference did you attend,

14      in what year, and what was the name of it?

15           A.   I don't recall the name of it.  It was

16      in October of 2013.

17           Q.   Where was it located?

18           A.   Outside Washington, D.C.

19           Q.   Was it at the Gaylord hotel?

20           A.   Yes.

21           Q.   Now, in general, CVS has distribution

22      centers that serve or that supply opioid

23      medications to CVS retail stores; is that

24      correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes.

 2          Q.   And those are narcotic drugs,

 3     correct?

 4          A.   Yes.

 5          Q.   And the --

 6          A.   Some.

 7          Q.   -- the CVS distribution center

 8     licensures that you know to exist are for

 9     Schedule III through Schedule V drugs; is that

10     correct?

11          A.   Yes.

12          Q.   And you know that Schedule III drugs,

13     up until October of 2014, included hydrocodone

14     and hydrocodone combination products,

15     correct?

16          A.   Yes.

17          Q.   And you know that Schedule II drugs,

18     up until October 2014 and continuing, have

19     included OxyContin- and oxymorphone-related

20     drugs?

21          A.   I can't say if I specifically know

22     that they were Schedule II.

23          Q.   You know that hydrocodone combination

24     products were rescheduled to Schedule II by
```

```
 1        the FDA October 6 of 2014?  Do you know

 2        that?

 3                    MR. BUSH:  Objection.

 4        A.   I didn't know that.

 5   BY MR. BAKER:

 6        Q.   With respect to the distribution

 7   centers located in Indianapolis -- you're

 8   familiar with that, the Indianapolis

 9   distribution center, correct?

10        A.   Yes.

11        Q.   And you're familiar with the

12   distribution center in Chemung, New York; is

13   that correct?

14        A.   Yes.

15        Q.   What is your job in the context of

16   having any contact with or review of anything

17   that is shipped to or shipped out of those

18   distribution centers?

19        A.   As reviewing shipments?

20        Q.   Anything.  Do you have any -- does

21   your job have any connection to those two

22   distribution centers whatsoever?

23        A.   Not for reviewing shipments, no.

24        Q.   What connection does your job have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      with respect to those two distribution

 2      centers?

 3          A.   My job now or previous?

 4          Q.   Between 2008 and 2013.

 5          A.   I was a liaison for the distribution

 6      centers, so they would reach out to me when

 7      they needed to get assistance as far as being

 8      a central point of contact for the corporate

 9      office.

10          Q.   Are you familiar with whether or not

11      those two distribution centers served the CVS

12      stores that are retail pharmacies in the state

13      of Ohio?

14          A.   I can't say off the top of my head if

15      I knew what states they serviced.

16          Q.   Let me show you what's marked as

17      Exhibit No. 25.

18

19               (Exhibit No. 25 marked for

20      identification.)

21

22      BY MR. BAKER:

23          Q.   It's the Track 1 CVS store

24      information.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                What I've shown you is a list of CVS

 2       pharmacy stores that are located in Ohio.

 3       Have you ever seen this list before?

 4          A.   No, not this list.

 5          Q.   And you're telling me you don't know

 6       one way or the other if the Chemung, New York,

 7       distribution center or the Indianapolis

 8       distribution center served these Track 1 CVS

 9       stores in Ohio?  You don't know?

10          A.   I don't -- I don't recall which

11       distribution center services which stores.

12          Q.   Do they -- do any of the -- did any of

13       those two distribution centers or either of

14       those two distribution centers serve any of

15       these stores on this list?

16          A.   I can't say -- I don't recall which

17       distribution center services which stores, off

18       the top of my head.

19          Q.   Let's move on.  Let's go to the next

20       one.

21                MR. BAKER:  Let's take a short

22       break off record.

23                THE VIDEOGRAPHER:  The time is

24       10:01 a.m.  We're off the record.
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                    (Recess was taken from 10:01 a.m.

3                    to 10:08 a.m.)

4

5                         THE VIDEOGRAPHER:  The time is

6        10:08 a.m. and we're on the record.

7        BY MR. BAKER:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3

4

5

6          Q.   Do you know that the Controlled

7     Substance Act has been on the books since

8     1971?

9          A.   No, I did not know.

10         Q.   Did you know that the Controlled

11    Substance Act established the concept of

12    controlled substances, combined narcotics and

13    dangerous drugs?  Did you know that?

14         A.   No.

15         Q.   Is that what that document

16    indicates?

17         A.   The document indicates, yes.

18         Q.   Did you know that it places

19    enforcement into the Department of Justice of

20    those types of drugs?

21         A.   No, I didn't know that.

22         Q.   Did you know that there are

23    established quotas with respect to those types

24    of drugs?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    No, I did not know that.

2          Q.    Did you know that it provides for a

3     closed system of distribution for those types

4     of drugs?

5          A.    I did not know that.

6          Q.    Do you know what closed system of

7     distribution even is with respect to narcotic

8     drugs?

9          A.    I can't say I know the details, no.

10         Q.    So let's move on to the next exhibit,

11    please.

12

13              (Exhibit No. 37 marked for

14    identification.)

15

16    BY MR. BAKER:

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15        Q.   And this document says that "Amy

16   Propatier (CVS DEA compliance coordinator) and

17   Frank Devlin, director of logistics loss

18   prevention."  Is that correct?

19        A.   Yes.

20        Q.   Were you, at the time of this

21   document, the CVS DEA compliance

22   coordinator?

23             MR. BUSH:  Well, objection.

24        A.   That was a title for reference in
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        SOPs.  My title -- my job position title was

2        logistics pharmacy services manager.

3        BY MR. BAKER:

4            Q.   Did you ever hold the title of CVS DEA

5        compliance coordinator?

6            A.   Yes.  As a title for SOP reference,

7        yes.

8            Q.   And did you perform duties as a DEA

9        coordinator or not -- DEA compliance

10       coordinator for CVS?  Let me repeat the

11       question.

12              Did you perform duties as a CVS DEA

13       compliance coordinator while under the employ

14       of CVS?

15           A.   What type of duties?  I don't know

16       what you mean.

17           Q.   Did you perform any type of DEA

18       compliance coordinator duties while under the

19       employ of CVS?

20           A.   I submitted ARCOS reporting, yes.

21           Q.   Did you have anything at all to do

22       with suspicious order monitoring?

23                  MR. BUSH:  Objection, but you

24       can answer.
```

Highly Confidential - Subject to Further Confidentiality Review

1              A.    No, only updating the SOP with what

2        was provided for the program.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          Q.   Okay.  Well, let's just go over them,

17      if we could, beginning with the letter dated

18      September 26, of 2007.  It talks about the

19      background on the first page.  We go to

20      background and we'll go to Paragraph 2 and

21      talk about what the purpose of the Controlled

22      Substances Act is.

23              If you highlight under background --

24      Paragraph 2 starts with "thus CSA."  We're

Highly Confidential - Subject to Further Confidentiality Review

```
1        looking at the letter dated September 27,

2        2006.  I'm going to read this to you and I

3        want you to tell me if I've accurately stated

4        what this letter says.

5             It says, "Background:  The CSA was

6        designed by congress to combat diversion by

7        providing for a closed system of drug

8        distribution in which all legitimate handlers

9        of controlled substances must obtain a DEA

10       registration and as a condition of maintaining

11       such registration must take reasonable steps

12       to ensure that the registration is not being

13       utilized as a source of diversion."

14            Isn't that what it says?

15       A.   Yes.

16       Q.   So you know from reading this, you're

17       informed by reading this, that the purpose of

18       the Controlled Substances Act is, in part, to

19       prevent diversion of narcotics, correct?

20                  MR. BUSH:  Objection.

21       BY MR. BAKER:

22       Q.   You know that from reading this,

23       right?

24                  MR. BUSH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    (Witness reviews document.)

2                 Yes.  From reading this, it says that.

3      BY MR. BAKER:

4           Q.    And this is something that was

5      available for you to read, whether you did or

6      not, when it was sent to you February 21 of

7      2008, correct?

8           A.    I don't recall it.

9           Q.    Go to the next page of that letter.

10     And about halfway down it begins with, "The

11     DEA regulations require."  If you could

12     highlight that in the subparagraph right below

13     it.

14                This says, "The DEA regulations

15     require all distributors to report suspicious

16     orders of controlled substances, specifically

17     the regulations within 21 CFR 1301.74 B, the

18     registrant shall design and operate a system

19     to disclose to the registrant suspicious

20     orders of controlled substances.  The

21     registrant shall inform the field division

22     office of the administration in his area of

23     suspicious orders when discovered by the

24     registrant.  Suspicious orders include orders
```

Highly Confidential - Subject to Further Confidentiality Review

1    of unusual size, orders deviating

2    substantially from a normal pattern, and

3    orders of unusual frequency."

4            That's what that letter says,

5    correct?

6        A.   Yes.

7        Q.   And so it gives you a clear definition

8    of what a suspicious order is, correct?

9                MR. BUSH:  Objection.

10       A.   It gives a definition, yes.

11       Q.   Okay.  And the definition that they

12   gave you is that suspicious orders include

13   orders of unusual size, orders deviating

14   substantially from a normal pattern, and

15   orders of unusual frequency, correct?

16       A.   Correct.

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          Q.    And what is VAWD?

16          A.    Verified accredited wholesale

17     distributor.

18          Q.    And the CVS distribution centers would

19     want to be VAWD certified, correct?

20          A.    Correct.

21          Q.    And that was a big deal, correct?

22          A.    It was -- it was nice to have.

23          Q.    And, in fact, some states, it's

24     necessary in order to distribute drugs.  Are

Highly Confidential - Subject to Further Confidentiality Review

```
 1        you aware of that?

 2             A.   I'm not sure.

 3             Q.   Do you remember, in 2010, when CVS had

 4        a problem with its VAWD certification?

 5             A.   I don't recall.

 6             Q.   Do you -- are you aware that VAWD

 7        resurveys the facilities every three years?

 8             A.   Yes.

 9             Q.   And so if there was a survey in mid to

10        late 2010, we can assume that the earlier

11        survey was mid to late 2007, correct?

12             A.   I would imagine, yes.

13             Q.   I'm going to show you what's been

14        marked as Exhibit 203 and -- 223.  And I

15        apologize, I only have two copies.  I haven't

16        marked it.

17

18                  (Exhibit No. 223 marked for

19        identification.)

20

21                       VOICE:  Is there a Bates number?

22                       MR. GOETZ:  There is a Bates

23        number, 66963.

24                       VOICE:  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BUSH:  To 66966.

 2      BY MR. GOETZ:

 3           Q.   Are you done reviewing it?  Take your

 4      time.

 5           A.   (Witness reviews document.)

 6                Yeah.

 7           Q.   Did you have a chance to review

 8      that?

 9           A.   I looked at it, yes.

10           Q.   Do you recognize that document?

11           A.   I don't recall it.

12           Q.   It's an e-mail that you are copied on,

13      at least part of the string, correct?

14           A.   Yes.

15           Q.   And it's an e-mail related to the VAWD

16      recertification where CVS was having problems

17      with VAWD recertification, correct?

18           A.   I don't know if it's problems, but it

19      talks about, yes, recertification.

20           Q.   Well -- I'm sorry, did I cut you off?

21           A.   No, no, I'm okay.

22           Q.   If you -- let's -- instead of going

23      through all three pages, if you --

24           A.   Yeah.
```

```
 1          Q.   -- look at 66965 --

 2          A.   Okay.

 3          Q.   -- there's an e-mail from Paul Hamby.

 4     Do you know who Paul Hamby is?

 5          A.   I don't recall who he is.

 6          Q.   Do you know who Cegedim is?

 7          A.   I don't think that's how you say it,

 8     but you've seen the name, yeah.

 9          Q.   Do you know how to say it?

10          A.   I think they say it Cegedim, Cegedim

11     Dendrite.

12          Q.   We've been call it CCS because I don't

13     know how to say it.

14          A.   Don't worry.

15          Q.   It's Paul Hamby to Frank Devlin.  And

16     it says, "Hi, Frank.  I understand you guys

17     may need some help with NABP/VAWD.  I think I

18     understand from Ron you need assistance with

19     resolving some items to get your VAWD renewals

20     processed."

21               Did I read that correctly?

22          A.   You did.

23          Q.   Okay.  And so that is the first e-mail

24     in this string that relates to some VAWD
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        issues that have to be resolved?

 2        A.    Uh-huh.

 3        Q.    Correct?

 4        A.    Yes.

 5        Q.    And the last e-mail of the string is

 6    actually from Frank Devlin.

 7              Do you see that?

 8        A.    The at the very top?

 9        Q.    Yes.

10        A.    Yes.

11        Q.    It's to Ron Link, correct?

12        A.    Uh-huh, yes.

13        Q.    And it says, "VAWD items," correct?

14        A.    Yes.

15        Q.    And it has an importance of high?

16        A.    Yes.

17        Q.    And if you're sending something to Ron

18    Link who's high up at CVS, it has to be

19    important if you're sending it high

20    importance.  Do you agree?

21        A.    I don't know if I disagree, so.

22        Q.    Did you send much e-mail to Ron Link?

23        A.    I've sent him e-mails.  I can't recall

24    specifically how many or what they regarded,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        but I did send him e-mails.

 2            Q.   It was unusual?

 3            A.   I don't know -- I wouldn't say if it

 4        was unusual.

 5            Q.   Okay.  It says -- this is what Frank

 6        says:  "Ron, we need to get our VAWD

 7        recertification completed.  Amy is continuing

 8        to run into issues.  I have enlisted Buzzeo's

 9        group to work with her, Frank."

10                Can you tell me what issues you were

11        running into?

12            A.   I don't recall.

13            Q.   Do you remember that a report was

14        generated?

15            A.   I remember they gave, like, a report.

16            Q.   Okay.  And do you remember what that

17        report said?

18            A.   I don't recall.

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9           MR. GOETZ:  That is all I have.

10      Thank you for clearing that up.

11           THE WITNESS:  Oh, thank you.

12           MR. BUSH:  Anybody else?  All

13      done?

14           MR. BAKER:  I'm done.

15

16           (Exhibit No. 62 marked for

17      identification.)

18

19           THE VIDEOGRAPHER:  The time is

20      4:07 p.m.  This deposition has concluded and

21      we are off the record.

22

23           (Deposition concluded at 4:07 p.m.)

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATION

 2          I, DARLENE M. COPPOLA, a Notary Public, do hereby

 3     certify that AMY PROPATIER, after having satisfactorily

 4     identifying herself, came before me on the 29th day of

 5     November, 2018 in Providence, Rhode Island, Massachusetts,

 6     and was by me duly sworn to testify to the truth and

 7     nothing but the truth as to her knowledge touching and

 8     concerning the matters in controversy in this cause; that

 9     she was thereupon examined upon her oath and said

10     examination reduced to writing by me; and that the

11     statement is a true record of the testimony given by the

12     witness, to the best of my knowledge and ability.

13          I further certify that I am not a relative or

14     employee of counsel/attorney for any of the parties, nor a

15     relative or employee of such parties, nor am I financially

16     interested in the outcome of the action.

17          WITNESS MY HAND THIS 2nd day of December, 2018.

18

19

20

21     DARLENE M. COPPOLA              My commission expires:

22     NOTARY PUBLIC                   November 11, 2022

23     REGISTERED MERIT REPORTER

24     CERTIFIED REALTIME REPORTER
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE NORTHERN DISTRICT OF OHIO

 3                        EASTERN DIVISION

 4

 5

 6      **********************************

 7      IN RE:

 8      NATIONAL PRESCRIPTION OPIATE

        LITIGATION

 9

        This document relates to:

10

        All cases

11

        **********************************

12

13           I, AMY PROPATIER, say that I have read the

14      foregoing deposition and hereby declare under penalty of

15      perjury the foregoing is true and correct:

16      (as prepared)  (as corrected on errata.)

17           Executed this _____ day of _____ 20____,

18      at _____, _____.

19

20

21

22           _____

23                    AMY PROPATIER

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          CORRECTION PAGE

 2           DEPONENT:   AMY PROPATIER

 3           DATE TAKEN: NOVEMBER 29, 2018

 4           CASE:       NATIONAL PRESCRIPTION OPIATE LITIGATION

 5           **************************************************

 6           PAGE / LINE / SHOULD READ/REASON

 7           _____/_____/_____

 8           _____/_____/_____

 9           _____/_____/_____

10           _____/_____/_____

11           _____/_____/_____

12           _____/_____/_____

13           _____/_____/_____

14           _____/_____/_____

15           _____/_____/_____

16           _____/_____/_____

17           _____/_____/_____

18           _____/_____/_____

19           _____/_____/_____

20           _____/_____/_____

21           _____/_____/_____

22           _____/_____/_____

23           _____/_____/_____

24           _____/_____/_____
```