Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      - - -

 5    IN RE:  NATIONAL        )

      PRESCRIPTION OPIATE     )  MDL No. 2804

 6    LITIGATION              )

      _____)  Case No. 1:17-MD-2804

 7                            )

      THIS DOCUMENT RELATES   )

 8    TO ALL CASES            )  Hon. Dan A. Polster

 9                      - - -

10

11          Thursday, December 6, 2018

12      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                CONFIDENTIALITY REVIEW

13

14                      - - -

15        Videotaped deposition of Gilberto Quintero,

16    held at the offices of BakerHostetler, 200 Civic

17    Center Drive, Suite 1200, Columbus, Ohio, commencing

18    at 7:04 a.m., on the above date, before Sara S. Clark,

19    Registered Merit Reporter and Notary Public.

20

21                      - - -

22

23            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  A P P E A R A N C E S:
 2    On behalf of the Plaintiffs:
 3         McHUGH FULLER LAW GROUP
                AMY J. QUEZON, ESQUIRE
 4              amy@mchughfuller.com
                MICHAEL J. FULLER, JR., ESQUIRE
 5              (via teleconference)
                mike@mchughfuller.com
 6         97 Elias Whiddon Road
           Hattiesburg, Mississippi  39402
 7         601-261-2220
                   and
 8         GRAY & WHITE
           BY:  MARK K. GRAY, ESQUIRE
 9              mgray@grayandwhitelaw.com
                MATTHEW L. WHITE, ESQUIRE
10              mwhite@grayandwhitelaw.com
           713 East Market Street
11         Louisville, Kentucky  40402
           502-805-1800
12                 and
           SIMMONS HANLY CONROY, LLC
13         BY:  RICK KROEGER, ESQUIRE
                rkroeger@simmonsfirm.com
14              HOLLY NIGHBERT, ESQUIRE
                hnighbert@simmonsfirm.com
15         One Court Street
           Alton, Illinois  65002
16         618-259-2222
17    On behalf of Cardinal Health, Inc.:
18         WILLIAMS & CONNOLLY LLP
           BY:  JENNIFER WICHT, ESQUIRE
19              jwicht@wc.com
                NEELUM WADHWANI, ESQUIRE
20              nwadhwani@wc.com
                MIRANDA PETERSEN, ESQUIRE
21              mpetersen@wc.com
           725 Twelfth Street, N.W.
22         Washington, DC  20005
           202-434-5331
23         CARDINAL HEALTH, INC.
           BY:  CAITLIN E. ANDERSON, ESQUIRE
24              caitlin.anderson@cardinalhealth.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                A P P E A R A N C E S
 2    On behalf of AmerisourceBergen:
 3         REED SMITH LLP
           BY:  BRIAN T. HIMMEL, ESQUIRE
 4              bhimmel@reedsmith.com
           Reed Smith Centre
 5         225 Fifth Avenue, Suite 1200
           Pittsburgh, Pennsylvania  15222
 6         412-288-4058
 7    On behalf of Walmart:
 8         JONES DAY
           BY:  BRANDY H. RANJAN, ESQUIRE
 9              branjan@jonesday.com
           325 John H. McConnell Boulevard, Suite 600
10         Columbus, Ohio  43215-2673
           614-469-3939
11
12    On behalf of McKesson:
13         COVINGTON & BURLING, LLP
           BY:  MEGHAN MONAGHAN, ESQUIRE
14              mmonaghan@cov.com
           850 Tenth Street, NW
15         Washington, DC  20001
           202-662-5531
16
17    On behalf of Prescription Supply, Inc.:
18         FOX ROTHSCHILD, LLP
           BY:  ZACHARY MARTIN, ESQUIRE
19              (via teleconference)
                zmartin@foxrothschild.com
20         2700 Kelly Road, Suite 300
           Warrington, Pennsylvania  18976-3624
21         215-345-7500
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S
 2   On behalf of CVS Indiana, LLC and CVS RX Services,
     Inc.:
 3
             ZUCKERMAN SPAEDER LLP
 4           BY:  R. MILES CLARK, ESQUIRE
                  (via teleconference)
 5                mclark@zuckerman.com
             1800 M Street NW, Suite 1000
 6           Washington, DC  20036-5807
             202-778-1800
 7
 8   On behalf of Endo Pharmaceuticals, Inc., and
     Endo Health Solutions, Inc.:
 9
             ARNOLD & PORTER KAYE SCHOLER, LLP
10           BY:  BRYAN L. ADKINS, ESQUIRE
                  bryan.adkins@arnoldporter.com
11                (via teleconference)
             601 Massachusetts Avenue, NW
12           Washington, DC  20001
             202-942-5000
13
14   On behalf of the Allergan Defendants:
15           KIRKLAND & ELLIS LLP
             BY:  TUCKER HUNTER, ESQUIRE
16                tucker.hunter@kirkland.com
                  (via teleconference)
17           300 North LaSalle
             Chicago, Illinois  60654
18           312-862-3429
19   On behalf of Validus:
20           FOX ROTHSCHILD, LLP
             BY:  EILEEN OAKS MUSKETT, ESQUIRE
21                (via teleconference)
                  emuskett@foxrothschild.com
22           1301 Atlantic Avenue
             Midtown Building, Suite 400
23           Atlantic City, New Jersey  08401-7212
             609-572-2355
24
```

```
 1              A P P E A R A N C E S

 2   On behalf of C&R Pharmacy:

 3         COLLINSON, DAEHNKE, INLOW & GRECO

           BY:  AMANDA E. ROSENTHAL, ESQUIRE

 4             (via teleconference)

              amanda.rosenthal@cdiglaw.com

 5         2110 E. Flamingo Road, Suite 305

           Las Vegas, Nevada  89119

 6         (702) 979-2132

 7   ALSO PRESENT:

 8         Darnell Brown, Videographer

           Zachary Hone, Trial Technician

 9

10                      - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X
 2                      - - -
 3   WITNESS                                    PAGE
 4   GILBERTO QUINTERO
 5   Examination By Mr. Kroeger:                  12
 6   Examination By Mr. Gray:                    249
 7                      - - -
 8   EXHIBIT            DESCRIPTION             PAGE
 9   Cardinal-Quintero 1   2010-2012 Org Chart,   30
                           P1.4591
10
     Cardinal-Quintero 2   Declaration of Gilberto  36
11                         Quintero, Bates
                           CAH_MDL_PRIORPROD_DEA12
12                         _00000518 through 533
13   Cardinal-Quintero 3   2008 MOA, Bates         114
                           CAH_MDL2804_02309014
14                         through 9062
15   Cardinal-Quintero 4   3/11/13 e-mail from de  121
                           Gutierrez-Mahoney,
16                         Bates MCKMDL00545341
                           through 47
17
     Cardinal-Quintero 5   2/22/12 Government's    127
18                         Prehearing Statement,
                           Bates
19                         CAH_MDL_PRIORPROD_DEA12
                           _00000001 through 54
20
     Cardinal-Quintero 6   9/19/10 e-mail from     146
21                         Rausch, Bates
                           CAH_MDL2804_00704499
22                         through 504
23
24
```

| | EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | Cardinal-Quintero 7 | 10/22/10 e-mail from Rausch, Bates CAH_MDL2804_01103874 through 76 | 153 |
| 3 | | | |
| 4 | | | |
| 5 | Cardinal-Quintero 8 | 3/22/12 e-mail from Rausch, Bates CAH_MDL2804_01087475 through 490 | 162 |
| 6 | | | |
| 7 | Cardinal-Quintero 9 | 1/6/11 letter to Farley, Bates CAH_MDL_PRIORPROD_DEA12 _00011853 through 854 | 178 |
| 8 | | | |
| 9 | | | |
| 10 | Cardinal-Quintero 10 | Warrant for Inspection, Bates CAH_MDL_PRIORPROD_DEA12 _00003808 through 817 | 195 |
| 11 | | | |
| 12 | Cardinal-Quintero 11 | 11/3/11 e-mail, Bates CAH_MDL2804_00864847 through 849 | 201 |
| 13 | | | |
| 14 | Cardinal-Quintero 12 | Attachment 48 to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, P1.4050 through P1.4050.5 | 252 |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | Cardinal-Quintero 13 | 21 CFR 1301.74, P1.4915 | 262 |
| 19 | Cardinal-Quintero 14 | 2/15/18 Letter from Congress, P1.43 through P1.43.11 | 269 |
| 20 | | | |
| 21 | Cardinal-Quintero 15 | Attachment 15 to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, P1.4019 through P1.4019.6 | 297 |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Highly Confidential - Subject to Further Confidentiality Review

```
 1   EXHIBIT                 DESCRIPTION              PAGE

 2   Cardinal-Quintero 16    Administrative            316

                             Memorandum of

 3                           Agreement, P1.565

                             through P1.565.8

 4

     Cardinal-Quintero 17    Consent Order, P1.4222    322

 5                           through P1. 4222.12

 6                                - - -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2            P R O C E E D I N G S

 3                    - - -

 4            VIDEOGRAPHER:  Good morning.  We

 5       are now on the record.  My name is

 6       Darnell Brown, and I'm the videographer

 7       with Golkow Litigation Services.

 8       Today's date is December 6th, 2018, and

 9       the time is 7:04 a.m.

10            This video deposition is being

11       held in Columbus, Ohio, in the matter of

12       National Prescription Opioid Litigation

13       for the United States District Court for

14       the Northern District of Ohio.  The

15       deponent is Gilberto Quintero.

16            Counsel, please identify

17       yourselves for the record.

18            MR. KROEGER:  Rick Kroeger for

19       Plaintiffs.

20            MS. NIGHBERT:  Holly Nighbert for

21       the Plaintiffs.

22            MS. QUEZON:  Amy Quezon,

23       Plaintiffs.

24            MR. GRAY:  Mark Gray for the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Plaintiffs.

2              MR. WHITE:  Matt White for the

3           Plaintiffs.

4              MS. RANJAN:  Brandy Ranjan from

5           Jones Day on behalf of Walmart.

6              MS. MONAGHAN:  Meghan Monaghan

7           from Covington & Burling on behalf of

8           McKesson.

9              MR. HIMMEL:  Brian Himmel from

10          Reed Smith for AmerisourceBergen

11          Corporation.

12             MS. ANDERSON:  Caitlin Anderson,

13          in-house counsel at Cardinal Health.

14             MS. PETERSEN:  Miranda Petersen,

15          Williams & Connolly, Cardinal Health.

16             MS. WADHWANI:  Neelum Wadhwani,

17          Williams & Connolly, Cardinal Health.

18             MS. WICHT:  Jennifer Wicht from

19          Williams & Connolly, also for Cardinal

20          Health.

21             VIDEOGRAPHER:  Counsel on the

22          phone?

23             MS. MUSKETT:  Eileen Muskett from

24          Fox Rothschild for Validus.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MARTIN:  Zach Martin of Fox
 2          Rothschild on behalf of Prescription
 3          Supply.
 4                    MR. HUNTER:  Tucker Hunter from
 5          Kirkland & Ellis on behalf of Allergan
 6          Finance, LLC.
 7                    MR. CLARK:  Miles Clark from
 8          Zuckerman Spaeder on behalf of CVS
 9          Indiana, LLC and CVS RX Services, Inc.
10                    MR. FULLER:  Mike Fuller on behalf
11          of Plaintiffs.
12                    MR. ADKINS:  Bryan Adkins,
13          Arnold & Porter, on behalf of the Endo
14          and Par Defendants.
15                    MS. ROSENTHAL:  Amanda Rosenthal
16          from Collinson, Daehnke, Inlow & Greco,
17          on behalf of C&R Pharmacy.
18                    VIDEOGRAPHER:  Anyone else?
19                    The court reporter is Sara Clark,
20          who will now swear in the witness.
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              GILBERTO QUINTERO

 2         being by me first duly sworn, as hereinafter

 3    certified, testifies and says as follows:

 4                   EXAMINATION

 5    BY MR. KROEGER:

 6         Q.    Would you state your full name for

 7    the record, please.

 8         A.    My name is Gilberto Quintero.

 9         Q.    Mr. Quintero, where are you

10    currently employed?

11         A.    I'm currently employed at Cardinal

12    Health.

13         Q.    And you've been with Cardinal

14    Health since December of 2009; is that right?

15         A.    December 1st, 2009, that's

16    correct.

17         Q.    Prior to that, what did you do?

18         A.    I used to work for the -- Wyeth

19    Pharmaceutical, and -- which was acquired by

20    Pfizer.

21         Q.    And at Wyeth, what was your job?

22    What were your duties?

23         A.    I had different roles while at

24    Wyeth.  I was section leader for a period of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    time.  I also was the manager of an R&D group.

 2    I was associate director of quality control, I

 3    was director of quality operations.  I was

 4    assistant vice president of quality operations,

 5    and I was vice president of technical services.

 6            Q.    Okay.  So essentially, what were

 7    your specific duties, if you can recall?

 8            A.    Is manage a small group of

 9    scientists.

10            Q.    Who were doing research for Wyeth?

11            A.    Research for Wyeth.

12            Q.    And that goes back to your sort of

13    analytical chemistry background?

14            A.    Exactly.

15            Q.    And then manager of R&D with

16    Wyeth, what were your duties there?

17            A.    Is similar.  Managing a group of

18    scientists that develop analytical methods, and

19    also were involved in product development.

20            Q.    And then did you say associate

21    director of quality control?

22            A.    Yes.

23            Q.    And your duties there?

24            A.    I manage a laboratory that was
```

Highly Confidential - Subject to Further Confidentiality Review

1   responsible for ensuring that the products that

2   we made at the manufacturing facility were made

3   according to the specifications that we had for

4   the product and that we made the regulatory

5   requirements that the government had for us.

6          Q.    Okay.  So just so I understand, so

7   that would be more of the -- you were quality

8   control for the manufacturing, the creation of

9   some sort of a pharmaceutical product?

10         A.    Right.  I'm making sure the

11  product was made right, according to the

12  regulation and according to our specifications.

13         Q.    And then after the associate

14  director?

15         A.    Yeah.  I became the director of

16  that particular manufacturing facility.

17         Q.    So same duties, just a step up?

18         A.    Higher, but also I have the

19  quality assurance group, the communication

20  group, the deviations group, the change control

21  group.

22         Q.    And then what was your next

23  position at Wyeth?

24         A.    System vice president of quality

Highly Confidential - Subject to Further Confidentiality Review

1    operations.  That was in Puerto Rico.  I was

2    sent to Puerto Rico for two years to address

3    some regulatory compliance issues that our

4    company had at the manufacturing site in Puerto

5    Rico.

6            Q.    So were those issues related to

7    the -- following proper guidelines, things like

8    that, with regard to the creation of products?

9            A.    No.  Making the product according

10   to the government expectations.

11           Q.    Okay.  And so was that the final

12   position at Wyeth before you joined Cardinal on

13   December 1st?

14           A.    No.  I then came to the

15   headquarters of the pharmaceutical business in

16   Collegeville, Pennsylvania.  I became the head

17   of technical services.

18           Q.    And at technical services -- head

19   of technical services, what were your duties?

20           A.    My duties was ensuring -- I mean,

21   working with the manufacturing facility across

22   the world, making sure that the execution of the

23   processes were optimized, that we improved the

24   quality of our work processes and systems.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Processes and systems related to

2    production of product?

3    A.    Product -- products, yeah.

4    Q.    At any point while you were at

5    Wyeth, did you oversee distribution services

6    that Wyeth had?

7    A.    I managed manufacturing facility,

8    we had a warehouse and we distributed products

9    to our distribution centers.

10    Q.    But not the same kind of

11    distribution services that Cardinal provides?

12    A.    Not like we do here, no.  It went

13    from our manufacturing facility to a

14    distribution center.

15    Q.    And your primary duties at Wyeth

16    was to oversee how the product was made, whether

17    it followed guidelines and manufacturing

18    requirements?

19    A.    Correct.

20    Q.    And so then in December of 2009,

21    Cardinal brought you in and they brought you

22    straight into senior vice president of QRA,

23    which is quality regulatory -- remind me the A.

24    It's not affairs, it is --

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    It's regulatory affairs.

 2            Q.    Okay.  And so your duties in that

 3   position were what?

 4            A.    Was supposed to make sure that the

 5   departments that I managed comply with the

 6   regulations and expectations from the

 7   government, and that we execute according to our

 8   quality procedures.

 9            Q.    And you were brought in to -- you

10   were brought in by Cardinal to make sure that

11   QRA was improving, correct?

12            A.    Yes.

13            MS. WICHT:  Objection to the form

14       of the question.

15            Go ahead.  You can answer.

16            A.    I was brought in to make sure that

17   we have a solid quality and regulatory program

18   at Cardinal Health.

19            Q.    You were brought in, though, to

20   fix QRA, right?

21            MS. WICHT:  Object to the form of

22       the question.

23            A.    I don't believe I -- you know, my

24   understanding, I was brought in to make sure the
```

 1   company had a robust quality and regulatory

 2   compliance program.

 3          Q.    And when you got there, did it

 4   have a robust quality and regulatory program?

 5          A.    There were some things that I

 6   wanted to improve, like my philosophy over my

 7   career is to take what is -- what we have today

 8   and try to make it better.

 9          Q.    And that's why Cardinal brought

10   you in?

11                MS. WICHT:  Object to the form of

12          the question.

13          A.    I mean --

14          Q.    To your knowledge, that's why

15   Cardinal brought you in?

16                MS. WICHT:  Object to the form of

17          the question.

18          A.    To my knowledge, Cardinal brought

19   me in to make sure that the company had a robust

20   quality and regulatory compliance program.

21          Q.    And the purpose of the quality

22   regulatory compliance at Cardinal is to

23   prevent -- to prevent diversion of their

24   products; is that one of the primary goals?

```
 1                   MS. WICHT:  Object to the form of

 2          the question.

 3          A.    They are -- I mean, I was

 4   responsible for different compliance programs.

 5   Repack -- our -- I was responsible for our

 6   repackaging operations, for our pharmacy

 7   services operations.  I was responsible for the

 8   over-the-counter sourcing program.

 9                   And one of the programs that I was

10   responsible for, too, it was the anti-diversion

11   program.

12          Q.    And aside from anyone who was

13   above you at Cardinal, you were solely

14   responsible for overseeing the anti-diversion

15   and those who were working in that department,

16   correct?

17          A.    When I came --

18                   MS. WICHT:  Object.

19                   If you could just pause for one

20          moment before you answer, just in case I

21          need to lodge an objection.

22                   THE WITNESS:  Okay, sorry.

23                   MS. WICHT:  No, that's fine.  No

24          problem.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Object to the form of the

 2          question.

 3                  And now you can answer, if you

 4          remember what the question was.

 5          A.    Can you repeat the question,

 6   please?

 7   BY MR. KROEGER:

 8          Q.    Sure.  So you had at least one

 9   person above you when you joined Cardinal,

10   right?

11          A.    I had reporting to Craig Morford.

12          Q.    Okay.  And there was no one

13   between you and Craig Morford who was also

14   responsible for the anti-diversion; is that

15   right?

16          A.    Correct.

17          Q.    And then you oversaw the

18   anti-diversion program in its total?

19          A.    There were -- when I got there,

20   there were two people between me and the vice

21   president of the anti-diversion program.

22          Q.    Who were those two people?

23          A.    Mark Hartman was reporting

24   directly in to me, and then Michael reported in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to Mark Harman.

 2           Q.   By "Michael," you mean Michael

 3   Moné?

 4           A.   Michael Moné, yes.

 5           Q.   But as you said, Hartman reported

 6   to you, correct?

 7           A.   Correct.

 8           Q.   And you then reported to

 9   Mr. Morford?

10           A.   And I reported in to Craig

11   Morford, yes.

12           Q.   And so I'm just trying to

13   understand the chain of command there.  There's

14   not an equal to you; there's Mr. Hartman, who's

15   reporting to you, Mr. Moné, who is reporting to

16   him; is that right?

17           A.   That was the chain of command,

18   yes.

19           Q.   Okay.  And so then that puts you

20   on top of the anti-diversion for Cardinal at the

21   time you entered, correct?

22              MS. WICHT:  Object to the form of

23           the question.

24           A.   That put me in charge of that
```

Highly Confidential - Subject to Further Confidentiality Review

1  program, as well as other programs at Cardinal

2  Health.

3       Q.   No, I understand that Cardinal

4  gave you many duties.  But in particular, you

5  were responsible for the anti-diversion programs

6  at Cardinal, correct?

7            MS. WICHT:  Object to the form of

8       the question.

9       A.   Myself and other folks in my

10  management team.

11      Q.   The other folks reported to you,

12  though, correct?

13      A.   Reported to me, and correct, I

14  reported to Craig Morford.

15      Q.   Okay.  In that role, you had to

16  oversee compliance with the DEA; is that right?

17            MS. WICHT:  Object to the form of

18       the question.

19      A.   I was supervising the group that

20  was responsible for ensuring compliance with DEA

21  regulations.

22      Q.   And that group that you were

23  supervising, you were responsible for ensuring

24  that their decisions were within guidelines the

1   DEA had put forward; is that right?

2              MS. WICHT:  Object to the form of

3         the question.

4         A.    We were responsible -- I was

5    responsible for making sure that we have robust

6    processes and systems to ensure that we comply

7    with the regulations set in -- by DEA.

8         Q.    Okay.  But my question -- and I

9    understand what your answer was, but the

10   question I was asking was:  You were responsible

11   for ensuring that those below you were complying

12   and making decisions that were in compliance

13   with DEA regulations?

14        A.    My role was to supervise the

15   group.

16        Q.    Right.

17              So the buck stopped with you in

18   terms of that, aside from it going up to

19   Mr. Morford should he disagree with decisions

20   you made?

21              MS. WICHT:  Object to the form of

22        the question.

23        A.    The responsibility is mine, as

24   well as my direct reports, and as well as my

Highly Confidential - Subject to Further Confidentiality Review

1    boss, and other people in the company, too.

2          Q.    Okay.  And then that's true, also,

3    for compliance with FDA regulations?

4                MS. WICHT:  Object to the form of

5          the question.

6          A.    Similarly.

7          Q.    And with regard to boards of

8    pharmacy for various states --

9                MS. WICHT:  Same objection.

10               Sorry.

11   BY MR. KROEGER:

12         Q.    If the question isn't clear,

13   because I know it was a half question.  Let me

14   just say it another way.

15               So your duties to supervise those

16   who were dealing with compliance, your duty to

17   ensure that the company was in compliance, was

18   also with regard to regulations put forth by

19   state boards of pharmacy, correct?

20               MS. WICHT:  Object to the form of

21         the question.

22               You can answer.

23         A.    My role is to ensure that we have

24   robust system and management control to ensure

 1    that we comply with the regulations from Board

 2    of Pharmacy, as well as federal agencies.

 3         Q.    So a robust system to comply -- do

 4    you want to say it one more time for me?

 5              MS. WICHT:  Say his answer again?

 6              MR. KROEGER:  If you don't mind.

 7         A.    Repeat the question.

 8         Q.    Well, it seems that you have --

 9    your job was to create a robust system to comply

10    with -- and then you have -- you said something

11    else.

12         A.    My role is to ensure that we have

13    processes, systems in place to ensure that we

14    adhere to federal and Board of Pharmacy

15    regulations.

16         Q.    Okay.  In addition to compliance

17    with DEA, FDA, Boards of Pharmacy regulations,

18    did you also have a voice in trade

19    organizations?

20              MS. WICHT:  Object to the form of

21         the question.

22         A.    I was not an active member of

23    trade organizations.  I participated in several

24    meetings, but myself, I was not on the board or

```
 1    any -- any leadership position with trade

 2    groups.

 3            Q.    But in your role as senior vice

 4    president of QRA and Cardinal, did you have a

 5    voice with, for instance, the HDMA or HDA?

 6                  MS. WICHT:  Object to the form of

 7            the question.

 8            A.    We participated in meetings where

 9    we provided our opinion and position as a

10    company.

11            Q.    Okay.  And so within Cardinal's

12    company position that they would present to HDA

13    or HDMA, you had a voice in that process; is

14    that right?

15                  MS. WICHT:  Object to the form of

16            the question.

17            A.    In some meetings I did.

18            Q.    Okay.  During your time at

19    Cardinal, and in your role -- you're still at

20    Cardinal, correct?

21            A.    I'm still at Cardinal, yes,

22    correct.

23            Q.    And your position, you're still

24    with QRA; is that right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     But your position has changed a

3     bit, I think in title, and you've moved up,

4     correct?

5          A.     I'm the chief quality and

6     regulatory affairs officer with the focus on

7     manufacturing operations.

8          Q.     Okay.  So more back to your

9     background that you had at Wyeth?

10              MS. WICHT:  Object to the form of

11          the question.

12          A.     I have some similar

13     responsibilities that I had at Wyeth but with a

14     wider scope now.

15          Q.     Okay.  How long were you senior

16     vice president of QRA?

17          A.     Specifically to a segment or

18     specifically to the company as a whole?

19          Q.     I don't know that I know the

20     difference.  So you were brought in

21     December 1st, 2009 as senior vice president of

22     quality regulatory affairs, correct?

23          A.     For the pharmaceutical segment.

24          Q.     Okay.  And the other segment is

Highly Confidential - Subject to Further Confidentiality Review

1    the --

2              A.    Medical segment.

3              Q.    Okay.  So that's like medical

4    devices and the like?

5              A.    Yes, correct.

6              Q.    Okay.  So how long were you senior

7    vice president for QRA of pharmaceuticals?

8              A.    From -- still have responsibility

9    over some portions of the pharmaceutical

10   segment, so I started in December 2009, I

11   believe, until September 2015, I believe.  But I

12   still have some responsibilities in the

13   pharmaceutical segment.

14             Q.    Because that falls under the

15   umbrella of the chief of QRA?  Is that what --

16   I'm sorry.  Your title -- current title is

17   chief --

18             A.    Quality and regulatory affairs

19   officer.

20             Q.    Okay.  And so you still have the

21   pharmaceutical under you because you have all of

22   QRA for Cardinal?

23             A.    There are portions of the

24   pharmaceutical segment quality unit that do not

Highly Confidential - Subject to Further Confidentiality Review

1    report in to me.

2           Q.    Okay.  And that's as of 2015?

3           A.    As of 2015 and there have been

4    some minor changes to it after that.

5           Q.    Which portion of the

6    pharmaceutical QRA no longer reports to you?

7           A.    The anti-diversion group.

8           Q.    Oh.  And when did that start?

9           A.    That was September 2015.

10          Q.    So in September of 2015, the

11   anti-diversion portion of QRA was -- was it

12   moved, or were you moved?  How did that happen

13   that it no longer reported to you?

14          A.    I received additional

15   responsibility over the medical segment, and

16   that particular department was transferred

17   directly to my boss.

18          Q.    Which is Craig Morford?

19          A.    Craig Morford.

20          Q.    So from 2015, and is that

21   currently still the case?

22          A.    I think Todd Cameron now reports

23   in to Jessica Mayer.

24          Q.    Todd Cameron reports in to who?

1    I'm sorry.

2          A.    Jessica Mayer.

3                      - - -

4     (Cardinal-Quintero Exhibit 1 marked.)

5                      - - -

6    BY MR. KROEGER:

7          Q.    Okay.  So from 2009 to '15 -- I'm

8    going to hand you 4591.

9                If you could just take a look at

10   that for me.  So obviously 2009 is when you

11   started, December 1st, but there's only a month

12   of 2009 and then we get to 2010.

13               So from the beginning of 2010

14   until 2012, does this accurately reflect the

15   chain of command for QRA?

16         A.    I never --

17               MS. WICHT:  Can I just pause?

18               I just want to ask a clarifying

19          question.  Is this a document that was

20          produced, or is this something -- like a

21          demonstrative that plaintiffs created?

22               MR. KROEGER:  To my knowledge,

23          it's something that we've created,

24          but...

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. WICHT:  Okay.  I just wanted
 2           to clarify which was the case.  Okay.
 3           A.    I don't believe it is 100 percent
 4   correct.  I never interacted with Gary Dolch,
 5   so...
 6           Q.    Okay.
 7           A.    I know that he was in the company
 8   before me, but I don't know who he is.
 9           Q.    He may not have --
10           A.    I've never met him.
11                 Also, lacking from this
12   organizational chart is Mark Hartman that was
13   with me for a portion of 2010.
14           Q.    And as we said earlier, Mark
15   Hartman reported to you, correct?
16           A.    Yes.
17           Q.    So generally speaking, aside from
18   Gary Dolch, your not being familiar with him
19   having worked with you or for you, and missing
20   Mark Hartman, this is accurate?
21           A.    No, because Michael Moné and Steve
22   Reardon, during that period of time, reported in
23   to Mark Hartman.
24           Q.    I see.  Okay.
```

 1                     And then from 2010 -- I'm sorry,

 2    2012 to '15, who reported to you; do you recall?

 3    It's not on that.

 4           A.    Okay.  I have recollection.  I

 5    have many people reporting to me, including

 6    Michael Moné, Steve Reardon.

 7                     What was the period of time again?

 8           Q.    '12 to '15.

 9           A.    Kathy Kwarcinski was reporting in

10    to me at one point.

11           Q.    Are these direct reports?

12           A.    Yeah, direct reports.

13                     I have, from what I remember,

14    between five and seven direct reports, but I

15    will have to review the organizational chart

16    from that period of time to be able to tell you

17    exactly how many people reported in to me.

18           Q.    Michael Moné, though, was a direct

19    report of yours from when you started until

20    2015; is that fair?

21           A.    Not from when I started.

22           Q.    Not from when you started?

23           A.    No.

24           Q.    Because he reported to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Mr. Hartman, who reported to you?

 2          A.    Correct.

 3          Q.    And then Mr. Hartman left in 2010,

 4   sometime in 2010, he left Cardinal; is that

 5   right?

 6          A.    I believe that he left sometime in

 7   2010 or early 2011.  I don't recall the exact

 8   date.

 9          Q.    And once he left, is that when

10   Mr. Moné became a direct report to you?

11          A.    Correct.

12          Q.    During your time at Cardinal, I

13   think you've made a declaration in the past that

14   millions have been devoted to anti-diversion; is

15   that true?

16                MS. WICHT:  Object to the form of

17          the question.

18          A.    We have invested millions of

19   dollars in creating a program that is effective

20   against the prevention of diversion of drugs.

21          Q.    How many millions would you

22   estimate?

23          A.    I will say with certainty, more

24   than $25 million, but I don't recall the exact
```

```
 1    amount.

 2           Q.    And that's over the course of the

 3    time you've been with Cardinal?

 4           A.    That is over the time that I was

 5    at Cardinal.  Probably some of this investment

 6    was before I got there, too.

 7           Q.    So that's not a yearly $25 million

 8    investment, that's a sum total from possibly

 9    right before you got there until now?

10           A.    And when --

11                 MS. WICHT:  Object to the form of

12           the question.  Mischaracterizes prior

13           testimony.

14           A.    When I was talking about

15    investment, I thought you were asking me about

16    capital investment.  We continuously invest.  We

17    have a program with people that we pay on an

18    annual basis, and those investments are ongoing.

19           Q.    And how much over those same

20    number of years would you imagine or do you know

21    Cardinal has invested in sales?

22                 MS. WICHT:  Object to the form of

23           the question.

24           A.    I wouldn't know that because I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1    not part of the sales group.

2          Q.    So you have no idea how many

3    millions Cardinal may have invested over those

4    same years?

5               MS. WICHT:  Object to the form of

6          the question.

7          A.    I don't know the answer to that

8    question.

9          Q.    And can you explain the purpose of

10   anti-diversion?  I think we've kind of touched

11   on it, but specifically, what is the purpose of

12   having an anti-diversion program at Cardinal?

13         A.    The purpose is to make sure that

14   we comply with the element of the Controlled

15   Substances Act, that we have effective controls

16   against diversion, that we identify and report

17   suspicious orders to the government.

18         Q.    Okay.

19         A.    Plus --

20         Q.    Go ahead.  Sorry.  I didn't want

21   to cut out off.

22         A.    That's basically the foundation of

23   our responsibility of the anti-diversion

24   process.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2        (Cardinal-Quintero Exhibit 2 marked.)

 3                      - - -

 4   BY MR. KROEGER:

 5        Q.    I'm going to hand you what's been

 6   marked as Exhibit 2.  And since this is the

 7   first exhibit I'm handing you with multiple

 8   pages, I want to explain a little bit about how

 9   we're trying to keep track of page numbers, just

10   to avoid confusion.

11              If you notice at the top right

12   corner of the document that you have, there's a

13   P1 number.

14        A.    Uh-huh.

15        Q.    P1.4091.

16        A.    Yes.

17        Q.    If you turn to the second page

18   you'll notice there's now 4091.2.

19        A.    Uh-huh.

20        Q.    So throughout the day, any

21   exhibits that we use, we're going to be

22   referring to the page numbers at the top because

23   some of these documents may have disjointed page

24   numbers, other issues.  This is just a way to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    keep track.

2           A.    Okay.

3           Q.    So if I ask you to go to Page 2,

4    which I am, you'll go to that top right corner.

5                 So if you'll go to Page 2 of

6    Exhibit 2, and I want to draw your attention to

7    Paragraph 4.

8           A.    Uh-huh.

9           Q.    So your responsibilities, if you

10   could -- in this role, do you see that sentence

11   in Paragraph 4?

12          A.    Yes, I do.

13          Q.    Could you read that, please.

14          A.    "I have held the current position,

15   senior vice president of quality and regulatory

16   affairs, since I joined Cardinal Health in

17   December of 2009.  In this role, I am

18   responsible for overseeing all the quality and

19   compliance programs within the company's

20   pharmaceutical segment."

21          Q.    Okay.  So it's all quality and

22   compliance programs within the pharmaceutical

23   segment that you're overseeing, correct?

24          A.    Correct.
```

1          Q.    And if we can go down to Paragraph

2    5, the second sentence in Paragraph 5, if you

3    could read that.

4          A.    "We have invested millions of

5    dollars in people and technology to support our

6    anti-diversion programs."

7          Q.    Continue, please.

8          A.    "To the best of my knowledge, the

9    company has not distributed controlled

10   substances to any customer that it believed

11   would divert those drugs into other than

12   legitimate medical channels."

13         Q.    So since 2009 -- and I know this

14   statement that you're looking at actually was

15   from April of 2012.  So it's not necessarily

16   current, but you still stand by that statement?

17               MS. WICHT:  Object to the form of

18         the question.

19         A.    I stand by the statement that we

20   have a program in place that provides effective

21   controls against diversion.

22         Q.    So since 2012, you're backing off

23   of your statement that you don't believe

24   Cardinal has distributed controlled substances

Highly Confidential - Subject to Further Confidentiality Review

1   to any customer that it believed would divert

2   those drugs into other than legitimate medical

3   channels?

4           A.    We have never --

5                 MS. WICHT:  Object to the form of

6           the question.  Mischaracterize.

7           A.    To the best of my knowledge, we

8   have never distributed drug products other than

9   for legitimate medical purposes.

10          Q.    But it sounds like you've backed

11  off from this statement a bit since 2012.

12                MS. WICHT:  Object to the form of

13          the question.

14          A.    I don't believe so.

15          Q.    Okay.  So --

16          A.    It's consistent with what I'm

17  saying.

18          Q.    All right.  Just let me -- to be

19  clear, then, as you sit here today, 2018, you

20  believe that, to the best of your knowledge, the

21  company, Cardinal Health, has not distributed

22  controlled substances to any customer that it

23  believed would divert those drugs into other

24  than legitimate medical channels?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I believe so.

2        Q.    Okay.  In order to get there, to

3    come to that belief, you've had to supervise and

4    oversee the anti-diversion program.

5              How many employees did you have in

6    the anti-diversion program over the -- when you

7    started and until you left?

8        A.    I do not recall the exact count,

9    but I can tell you some of the numbers.  In

10   people that were reporting directly into Michael

11   Moné's group, we had between 16 and 22,

12   somewhere in that range.  And people that

13   reported in to Steve Reardon, we had anywhere

14   from 20 to 30 employees.  Those numbers may have

15   changed over time as we were, you know, either

16   adding resources for investigations.

17             We also brought in companies from

18   the outside to help us with several of the

19   elements of the anti-diversion program.

20       Q.    So 16 to 22 people from Michael

21   Moné?

22       A.    In that range.

23       Q.    And what specifically was he

24   tasked with within anti-diversion?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    He was tasked with -- this program

 2    has several elements.  He has a -- part of his

 3    program was our Know Your Customer program.

 4    Part of his program was the monitoring of

 5    orders.  Part of his program was making

 6    decisions of which customers to continue selling

 7    drug product and which customers we should

 8    terminate because they had the potential to pose

 9    a risk for diversion of drug product.

10              Q.    Okay.  And so with regard to

11    Michael Moné's responsibility for the Know Your

12    Customer portion of anti-diversion, he reported

13    to you with regard to that, correct?

14              A.    All his responsibility, you know,

15    he reported in to me.  I was his supervisor.

16              Q.    Okay.  And I just want to make

17    sure, though.  I want to be clear that there

18    wasn't a part of this, there's not -- the Know

19    Your Customer or the order monitoring or the

20    customer decisions in terms of termination or

21    continuing, none of those were reported to

22    someone besides you, correct?

23              A.    He reported directly in to me.

24              Q.    On all of those issues?
```

```
 1            A.    On the activities of his

 2   department.

 3            Q.    And so you had oversight and had

 4   to determine whether or not he was doing those

 5   things properly?

 6                  MS. WICHT:  Object to the form of

 7            the question.

 8            A.    My job was to, you know, supervise

 9   him and assess his performance.

10            Q.    And to make sure that he was doing

11   his job well?

12                  MS. WICHT:  Object to the form of

13            the question.

14            A.    Correct.

15            Q.    And to make sure that he was doing

16   his job correctly?

17                  MS. WICHT:  Object to the form of

18            the question.

19            A.    To supervise activities that he

20   was performing, yes.

21            Q.    And you mentioned briefly earlier

22   about complying with DEA regulations and the

23   like, correct?

24                  MS. WICHT:  Object to the form of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              the question.

2         Q.    You mentioned it?  That's the

3    question right now.

4         A.    One of his roles was to make sure

5    that we, you know, met the regulations.

6         Q.    And so one of your roles as his

7    supervisor was to ensure that his decisions were

8    in line with those regulations?

9              MS. WICHT:  Object to the form of

10             the question.

11        A.    My role as his supervisor was to

12   supervise his activities and determine whether

13   or not he was doing an adequate job or he needed

14   some guidance from me.

15        Q.    Okay.  And the question, though,

16   is a slightly different one than what you're

17   answering.  So as you're supervising him and his

18   duties and deciding whether or not he was doing

19   well or needed additional guidance from you,

20   part of that supervision was to ensure that his

21   actions and decisions were in line with DEA

22   regulations?

23        A.    To supervise --

24             MS. WICHT:  Object to the form of
```

1          the question.  Sorry.

2          A.    It was to supervise him and ensure

3     that he was executing according to my

4     expectations and that we were executing

5     according to the regulations.

6          Q.    Okay.  So it was -- the

7     regulations was part of your consideration with

8     determining whether or not he was executing

9     things properly?

10          A.    It was one of the factors, yes.

11          Q.    You certainly wouldn't have wanted

12     him to make decisions outside of the

13     regulations?

14          MS. WICHT:  Object to the form of

15          the question.

16          A.    No.

17          Q.    And then with Mr. Reardon, what

18     were his responsibilities?

19          A.    His responsibility was to manage

20     and supervise the compliance personnel that we

21     had at our distribution centers.

22          Q.    And the compliance personnel, was

23     that -- were those the individuals -- there was

24     maybe one at each distribution center?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     In general, we have one person at

 2     each distribution center.

 3              Q.     And Mr. Reardon supervised those

 4     27 individuals?

 5              A.     Well, he supervised people that

 6     supervised those individuals.  He also managed

 7     the -- some of the training activities that we

 8     had, and he also managed our document management

 9     system.

10              Q.     "Document management system,"

11     meaning what?

12              A.     The system that we use to publish

13     standard operating procedures.

14              Q.     I'm sorry.  I didn't understand.

15     To --

16              A.     To manage and distribute standard

17     operating procedures.

18              Q.     Okay.  Any other duties with

19     regard to anti-diversion for Mr. Reardon at that

20     time?

21              A.     He managed -- he was responsible

22     for ensuring that we had the proper controls in

23     place at the distribution center to make sure

24     that we don't have internal diversion of product
```

Highly Confidential - Subject to Further Confidentiality Review

1   and that our carriers were complying with our

2   expectation in terms of delivering products to

3   our customers.

4           Q.    So then is it fair to say that

5   between Mr. Moné and Mr. Reardon, they both had

6   certain oversight with regard to distribution

7   centers?

8                 MS. WICHT:  Object to the form of

9           the question.

10          A.    Mr. Moné was responsible for the

11  anti-diversion program, mainly dealing with our

12  customers, and Mr. Reardon had responsibilities

13  for our internal controls that we had at the

14  distribution center to ensure that we did not

15  have internal diversion of product.

16          Q.    Okay.  So Mr. Reardon -- the

17  diversion that Mr. Reardon was most concerned

18  with, then, was internal diversion, so if an

19  employee might steal drugs or lose drugs or

20  something to that effect?  Is that an accurate

21  description?

22          A.    He had those responsibilities, but

23  he also had responsibility for making sure if

24  employees at the distribution center saw an

Highly Confidential - Subject to Further Confidentiality Review

 1    order that, for them, was of unusual size, that

 2    they could raise the hand and notify Michael

 3    Moné's group for an investigation.

 4            Q.    Okay.  So a picker or a checker,

 5    are those the people you're talking about?

 6            A.    Picker or checker.

 7            Q.    So if a picker or checker sees an

 8    order that seems too large to them, they then

 9    report to Mr. Reardon, we have an order that's

10    suspicious because it's just too big,

11    Mr. Reardon then tells Mr. Moné?

12                  MS. WICHT:  Object to the form of

13            the question.

14            A.    Essentially, it's a little bit

15    different than that.  It's if a picker or a

16    checker determined the order was unusual, it

17    goes through their supervisor.  Supervisor

18    communicates to the compliance officer, which

19    then has some communications with personnel in

20    the anti-diversion group.

21            Q.    Which personnel in the

22    anti-diversion group?

23            A.    Could be a pharmacist in the

24    anti-diversion group.  I don't recall exactly

Highly Confidential - Subject to Further Confidentiality Review

```
 1   what was the chain of communication, but it was

 2   somebody in the anti-diversion group.

 3        Q.    And whichever somebody that may

 4   have been in the anti-diversion group, that was

 5   someone whose decisions you were also

 6   responsible for, correct?

 7             MS. WICHT:  Object to the form of

 8        the question.

 9        A.    I was responsible for supervising

10   Michael Moné's team.

11        Q.    And those anti-diversion personnel

12   you were talking about are on Michael Moné's

13   team, correct?

14        A.    That's correct.

15        Q.    So decisions that they made,

16   Michael Moné was responsible for ensuring that

17   they were proper, correct?

18             MS. WICHT:  Object to the form of

19        the question.

20        A.    He was responsible for supervising

21   people in his group.

22        Q.    And within his responsibilities

23   for supervising people within his group, that

24   included ensuring that they made proper, lawful
```

```
 1    decisions?

 2              MS. WICHT:  Object to the form of

 3         the question.

 4         A.    That they made decisions with --

 5    in the spirit of complying with our own internal

 6    expectations and with the regulatory

 7    requirements.

 8         Q.    Okay.  You added a bit of a caveat

 9    there.  So you said "in the spirit of

10    complying."  Was that in the spirit of complying

11    with Cardinal's internal, or in the spirit of

12    complying with Cardinal's internal policies and

13    in the spirit of complying with the law?

14              MS. WICHT:  Object to the form of

15         the question.

16         A.    With the intent of complying with

17    both.

18         Q.    Completely?

19              MS. WICHT:  Object.

20         A.    Our intent to comply with

21    regulations.

22         Q.    Completely?

23              MS. WICHT:  Object to the form of

24         the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    It's our intent always to comply
2    with regulations.
3            Q.    Okay.  The only reason I'm asking
4    this in this way is because you said "in the
5    spirit of complying" to start this answer.  And
6    so I want to ensure that I know whether or not
7    the job was to comply with regulations and laws
8    and policies partially because it's in the
9    spirit of it or completely because it simply has
10   to be followed?
11           MS. WICHT:  Object to the form of
12       the question.
13           A.    Maybe because English is my second
14   language, but it's with the intent of complying
15   with the regulations.
16           Q.    Completely?  With your -- it's the
17   intent to comply with the regulations
18   completely?
19           MS. WICHT:  Object to the form of
20       the question.
21           A.    Our intent is always to comply
22   with the regulations.
23           Q.    And why is it that you won't say
24   your intent is to comply with the regulations
```

Highly Confidential - Subject to Further Confidentiality Review

1 completely?

2          MS. WICHT:  Object to the form of

3      the question.

4      A.    Because our intent, that's

5 implied.  If our intent is to comply with the

6 regulations, it means the same thing that you're

7 saying.

8      Q.    And that's why I was asking,

9 because I wanted to make sure that it does.  So

10 I was choosing that word carefully, I wanted to

11 make sure.

12          So the intent is to comply with

13 regulations completely?

14          MS. WICHT:  Object to the form of

15      the question.

16      A.    Our intent is to always comply

17 with federal regulatory requirements.

18      Q.    Okay.  So you just -- okay.

19          Was there also a group of

20 executives who met and regularly looked at

21 anti-diversion?

22          MS. WICHT:  Object to the form of

23      the question.

24      A.    We provided updates to my boss and

Highly Confidential - Subject to Further Confidentiality Review

1    other members of the leadership team.

2         Q.    And is that the name of that

3    group, was the leadership team?

4         A.    That's the way that I call it.  I

5    don't think that there was a specific name.

6         Q.    And you said "we provided that

7    information."  Who's the "we"?

8         A.    Michael Moné, myself, Bob

9    Giacalone, which was -- he is our senior

10   regulatory counsel, and we provided updates on

11   our program to Craig Morford and to Mike

12   Kaufmann at that time.

13        Q.    Within -- I'm trying to figure out

14   who's where.  So were there -- it sounds like

15   Mr. Reardon's compliance personnel that reported

16   to him, they were generally located at the

17   distribution centers; is that accurate?

18        A.    We have many of them that are --

19   were in distribution centers.  Others were

20   regional directors that managed those folks.

21   They worked from home or from one of the DCs.

22   And we had a few individuals that worked in our

23   Dublin headquarters.

24        Q.    Did they work in the Dublin

1    headquarters because they had a particular need

2    to be in Dublin for executive reasons, or it

3    just happened that that's where they worked?

4            A.    It could be because they were

5    managing the document management system, which

6    for standard operating procedures, and we did

7    that out of our headquarters.  It could be

8    because they were managing a region that were

9    near the headquarters.

10           Q.    Okay.  And then with Mr. Moné's

11   group, you said 16 to 22 people who would

12   oversee Know Your Customer policies, also

13   oversee order monitoring, and decide on

14   customers to terminate or keep, were those

15   people centered in Dublin?

16           A.    We have a large portion of those

17   people in Dublin, but we also have some people

18   sitting at distribution centers.  I'm trying to

19   recall.

20               To the best of my knowledge, most

21   of them were either in Dublin, distribution

22   centers, or there were field investigators that

23   worked out of their home.

24           Q.    Sure.

Highly Confidential - Subject to Further Confidentiality Review

1           Because the field investigators

2    had to actually go to various places, so there

3    was no need for them to be in Dublin?

4           A.    Correct.

5           Q.    But the other part of Mr. Moné's

6    team that you oversaw was centered in Dublin,

7    sort of an executive group who decided on -- who

8    monitored and made decisions about orders,

9    monitored and made decisions about customers?

10          MS. WICHT:  Object to the form of

11          the question.

12          A.    The day-to-day decisions on

13   threshold events and shipping orders was not

14   done by the executive team.  It was done by

15   either analysts and pharmacists that their job

16   was to evaluate threshold events and make

17   decisions on suspicious orders.

18          Q.    And those evaluations and

19   decisions on suspicious orders ultimately were

20   the responsibility of Mr. Moné, as well,

21   correct, in that he was overseeing those people?

22          A.    He oversaw the people that made

23   those decisions.

24          Q.    Because of that, he took -- had to

Highly Confidential - Subject to Further Confidentiality Review

1  have responsibility for how those decisions were

2  made?

3          MS. WICHT:  Object to the form of

4      the question.

5      A.   He had responsibility for

6  supervising, managing, and developing procedures

7  to execute those decisions.

8      Q.   And ensuring that those decisions

9  were made in compliance with Cardinal rules and

10  laws?

11          MS. WICHT:  Object to the form of

12      the question.

13      A.   Can you repeat the question again?

14      Q.   In supervising those and

15  overseeing those decisions, he had to also

16  ensure that those decisions were made in

17  compliance with Cardinal rules, as well as laws?

18      A.   In supervising that group, he was

19  responsible for having processes in place to

20  make sure that his people were following our own

21  internal procedures, as well as meeting

22  regulatory requirements.

23      Q.   And as Mr. Moné's supervisor, you

24  were also then, in turn, responsible for those

Highly Confidential - Subject to Further Confidentiality Review

1   decisions and ensuring that they were in

2   compliance with Cardinal rules, as well as laws,

3   correct?

4           MS. WICHT:  Object to the form of

5       the question.

6       A.    As Michael Moné's supervisor, my

7   responsibility is that Michael had the proper

8   program to execute our anti-diversion program,

9   to ensure that we meet the regulations, and also

10  meet our own internal procedures.

11      Q.    With regard to those internal

12  procedures, were there -- you had a number of

13  different standard operating procedures within

14  Cardinal, correct?

15      A.    We have hundreds of standard

16  operating procedures within Cardinal.

17      Q.    And some of those -- let's focus

18  on the anti-diversion standard operating

19  procedures.  There would be one for how

20  distribution centers are supposed to monitor

21  orders, right?

22      A.    I'm assuming so.  I don't recall

23  all of the procedures that we had.

24      Q.    To your knowledge, though, the

Highly Confidential - Subject to Further Confidentiality Review

1    standard operating procedures, the very reason

2    that they're called that is because they apply

3    company-wide, correct?

4           A.    They applied to more than one

5    facility.

6           Q.    So the distribution centers would

7    be acting under the same standard operating

8    procedures?

9           A.    In most cases.

10          Q.    What cases would they not?

11          A.    Well, if they do something

12   different.  If they don't -- I mean, they have a

13   different -- for example, if a distribution

14   center doesn't have a vault and doesn't

15   distribute C2 substances, so that would not be

16   applicable to those.

17          Q.    But then all distribution centers

18   that have a vault and do distribute C2

19   substances -- and for the record, controlled

20   substance Schedule II -- those would all have

21   the same operating procedure with regard to how

22   they handle those drugs?

23          A.    In the same business units, yes.

24          Q.    Same business units?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yeah.

2          Q.     Meaning what?

3          A.     Well, we had other business units

4    that we acquired over time.  We had bought a

5    distribution business in China, so they may have

6    different operating procedures according to

7    their regulations in China.

8          Q.     Sure.

9                 Kind of like the Puerto Rico

10   distribution center and some of the issues there

11   were different than the United States --

12         A.     Yep.  Puerto Rico had some

13   different requirements based on local laws.

14         Q.     But within the United States,

15   within the -- there were 27 distribution centers

16   in the United States?

17         A.     I don't recall the exact number.

18   I know that it's somewhere between 20 and 30,

19   but it's possible it's 27.  I don't recall.

20         Q.     And to your knowledge, they -- if

21   they had a vault, if they were distributing

22   controlled substances -- Schedule II controlled

23   substances, they would be following the same

24   standard operating procedures as to those?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    Only if it was noted in a

 2    procedure that somebody else had a different

 3    procedure.

 4           Q.    Unless a distribution center said

 5    they had their own procedure, they followed the

 6    standard procedure?

 7           A.    No.  There may be specific reasons

 8    why -- like I use the example of China, the

 9    example of Puerto Rico.

10           Q.    Sure.  But I want to stick with

11    just the United States-based distribution

12    centers.  I understand that there may be other

13    distribution centers across the world that have

14    different rules for a variety of reasons.  I'm

15    focused solely on, and my question is only

16    about, the distribution centers in the United

17    States.

18           A.    Including Puerto Rico?  Because

19    Puerto Rico is part of the United States.

20           Q.    It is.  It is.  And I certainly

21    don't intend to say that it's not.  But because

22    of local laws and local policies in Puerto Rico,

23    I want to exclude that from this particular

24    question.  Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Okay.

 2              Q.     Okay.  So the question, then, is:

 3     Within -- and we can just say The Continental

 4     United States, I think, to really capture it as

 5     well as I need to -- within The Continental

 6     United States, the distribution centers all

 7     acted under the same standard operating

 8     procedures as one another?

 9              A.     The pharmaceutical distribution

10     centers operate under similar procedure -- under

11     the same procedures.

12              Q.     So, for instance, the facility --

13     the distribution center in Auburn, Washington,

14     has the same standard operating procedures as to

15     pharmaceuticals as the distribution center in

16     Wheeling, West Virginia?

17              A.     To the best of my knowledge,

18     that's the case.

19              Q.     And you were supervising those

20     distribution centers in your role as senior vice

21     president of QRA?

22                     MS. WICHT:  Object to the form of

23              the question.

24              A.     They were -- those distribution
```

1    centers, the compliance officers reported in

2    to -- through the chain of command through -- in

3    to somebody that reported in to me.

4          Q.    So it ultimately came to you,

5    those decisions and compliance with those

6    procedures?

7               MS. WICHT:  Object to the form of

8          the question.

9          A.    It is part of my role to ensure

10   that our company complies with our standard

11   operating procedures and the regulations.

12         Q.    Okay.  And so just like Auburn

13   distribution center and Wheeling distribution

14   center have the same standard operating

15   procedure with regard to pharmaceuticals,

16   Wheeling distribution center and Lakeland have

17   the same standard operating procedures?

18         A.    To the best of my knowledge, they

19   have the same standard operating procedures.

20         Q.    And that's been true from the day

21   you started December 1st, 2009 until today, to

22   your knowledge?

23         A.    To the best of my knowledge,

24   that's the case.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KROEGER:  How long have we

 2        been going?

 3              VIDEOGRAPHER:  51 minutes.

 4              MR. KROEGER:  I don't know if now

 5        is a good time.  I know you have a

 6        scheduled flight.  That was the other

 7        thing we weren't sure about this

 8        morning.  We were trying to remember.

 9        You need to be out of here by when to

10        catch your flight?

11              MS. WICHT:  I would say probably

12        4:30, if that's workable, but we're

13        happy to talk with you about it

14        throughout the day.

15              MR. KROEGER:  Okay.  All right.

16        Why don't we go off the record and take

17        a break.

18              MS. WICHT:  Sure.  Thank you.

19              VIDEOGRAPHER:  Time is now 7:56.

20        Going off the record.

21              (Recess taken.)

22              VIDEOGRAPHER:  Time is now 8:14.

23        Back on the record.

24
```

```
 1    BY MR. KROEGER:

 2           Q.    Mr. Quintero, I wanted to go back

 3    to a couple things that you said.  You mentioned

 4    the $25 million in capital investments over your

 5    time at Cardinal.

 6           A.    I believe so.

 7           Q.    So that was 25 million in capital,

 8    and that was since -- December of 2009, maybe

 9    2010?

10           A.    I think that was --

11                 MS. WICHT:  Object to the form of

12           the question.

13           A.    I believe that some of those

14    investments were made before I got into Cardinal

15    Health, but I cannot tell you the exact time of

16    that.

17           Q.    So, then, at least, like, 10,

18    maybe 11 or 12 years, that that $25 million

19    capital investment has been spent?

20                 MS. WICHT:  Object to the form of

21           the question.  Mischaracterizes his

22           prior testimony.

23           A.    I cannot tell you the exact

24    amount.  Sorry.
```

```
1            Q.    But you did say, though, that it

2    went -- precedes your time starting there, so

3    it -- you can say that it's at least the time

4    that you've been there that 25 million capital

5    investment has been spent?

6            MS. WICHT:  Object to the form of

7        the question.

8            Q.    That's your testimony so far?

9            A.    From the time that I've been

10   there, I believe -- I don't recall the exact

11   amount, but I recall that we have invested

12   significant amount of money in our

13   anti-diversion program.

14           Q.    Earlier in your testimony, though,

15   was that it was around 25 million; that was the

16   number that you said, correct?

17           MS. WICHT:  Object to the form of

18       the question.  Mischaracterizes.

19           A.    To the best of my knowledge,

20   around $25 million have been invested in capital

21   as part of our anti-diversion program.  I cannot

22   tell you the beginning or the end date of that.

23           Q.    Okay.  And so can you explain to

24   the jury what that capital investment of
```

```
 1    $25 million was.

 2              MS. WICHT:  Object to the form of

 3         the question.

 4         A.    We have invested in an electronic

 5    monitoring system.  We invested in an

 6    anti-diversion centralization system.  We have

 7    invested in analytical tools to evaluate

 8    customers.  We have invested in software.  We

 9    have invested in physical security at our

10    distribution centers.

11         Q.    When you say "physical security,"

12    are you talking about the cages and vaults?

13         A.    Cages, vaults, cameras.  Reports

14    that we generate for the distribution personnel.

15         Q.    When you talked about the

16    electronic monitoring system, what is that?

17         A.    The electronic monitoring system

18    that we use to monitor orders.

19         Q.    So software?

20         A.    It is software.  It is -- they use

21    codes.

22         Q.    Algorithms?

23         A.    Algorithms.

24         Q.    And is that something you got
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    through Deloitte, for instance?

 2              MS. WICHT:  Object to the form of

 3         the question.

 4         A.   I don't recall who was the person

 5    who developed the electronic monitoring system.

 6         Q.   Was Deloitte a company that you

 7    believed that $25 million -- part of that $25

 8    million capital investment would have gone to?

 9              MS. WICHT:  Object to the form of

10         the question.

11         A.   We have used Deloitte in parts of

12    our anti-diversion program.

13         Q.   Which parts?

14         A.   The parts that I can talk to is

15    the part where I used them.  I used them for

16    project management on some improvements that we

17    wanted to our anti-diversion program.

18         Q.   And how much do you think that

19    Cardinal spent on Deloitte's services?

20         A.   I don't recall.

21         Q.   Do you have a ballpark that you --

22              MS. WICHT:  Object to the form of

23         the question.

24         A.   I don't recall.
```

```
 1              Q.     Have you ever had to send those

 2   numbers to anyone else in Cardinal?

 3                     MS. WICHT:  Object to the form of

 4              the question.

 5              A.     Trying to recollect, but I don't

 6   recall.

 7              Q.     Ever send the numbers or

 8   expenditures for Deloitte to Mike Kaufmann, for

 9   instance?

10              A.     It's possible, but I don't

11   recollect.

12              Q.     You sent -- you did send

13   expenditures to Mike Kaufmann, though, over your

14   time there, didn't you?

15                     MS. WICHT:  Object to the form of

16              the question.

17              A.     My expenditures were approved by

18   my boss, Craig Morford, not by Mike Kaufmann.

19              Q.     Did you ever have an opportunity

20   to send reports of any sort to Mike Kaufmann?

21                     MS. WICHT:  Object to the form of

22              the question.

23              A.     What kind of reports are you

24   talking here?
```

```
 1              Q.    Any.  I don't -- I -- I'm trying

 2    to learn more about the inner workings of

 3    Cardinal so I understand how things function and

 4    don't.  So to that extent I don't know what kind

 5    of reports.

 6                    Let me say it this way:  You

 7    said -- in a declaration you mentioned at some

 8    point that you had a dotted line connection

 9    to -- or dotted line reporting, dotted line

10    relationship to Mike Kaufmann.

11              A.    I don't believe I said that today.

12              Q.    Not today, no, no, no.  I think it

13    was a dec -- the declaration that you have in

14    front of you.  I can find it.  But do you think

15    that you've never had a dotted line

16    relationship --

17              A.    I --

18                    MS. WICHT:  Go ahead.  Sorry.  I

19              was looking at the document.  Maybe you

20              can repeat the question so we know what

21              it is.

22              Q.    Currently, are you saying that

23    you've never previously had a dotted line

24    relationship to Mike Kaufmann?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     I don't believe I said that.

 2              Q.     Okay.  So you have had a dotted

 3     line relationship to Mike Kaufmann?

 4              A.     I had a dotted line to Mike

 5     Kaufmann.

 6              Q.     And what does that mean?

 7              A.     That I was supposed to give him

 8     updates on our quality programs and provide him

 9     advice on quality and regulatory compliance to

10     him.

11              Q.     And was he the chief financial

12     officer at the time you had that dotted line

13     connection?

14              A.     No.

15              Q.     What was his position when you had

16     that?

17              A.     He was the chief executive officer

18     of the pharmaceutical segment.  I have never

19     reported to anybody in the finance organization.

20              Q.     Aside from what you mentioned

21     already about Deloitte sometimes helping you

22     with presentations and the like -- is that what

23     you said?

24              A.     I didn't say "presentations."  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    said "project management."
 2            Q.     Project management.
 3                   What else did Deloitte do for
 4    Cardinal?
 5                   MS. WICHT:  Object to the form of
 6            the question.
 7            A.     During the time that I was there,
 8    their primary role was project management.  They
 9    also provided, you know, labor that could help
10    us, either do calculations or evaluate certain
11    things.
12            Q.     Do you recall which projects
13    Deloitte worked on?
14            A.     Not all.  I recall they worked for
15    me in some of the improvements that I wanted to
16    make on the anti-diversion program.
17            Q.     Okay.  So within the
18    anti-diversion program, what were the projects
19    they worked on for you?
20            A.     We were working on developing a
21    threshold methodology using additional
22    information that we had collected.
23            Q.     Can you explain that to me?  I
24    don't -- what is the threshold methodology you
```

Highly Confidential - Subject to Further Confidentiality Review

1    and Deloitte were able to come up with?  What

2    was it?

3            A.    Well, I don't think Deloitte came

4    up with.  I mean, we provided the information --

5    some of the information to Deloitte and they

6    helped us develop some of the principles of our

7    threshold methodology.

8            Q.    Which principles?

9    ▮    ████████████████████████████████

▮  ███████████████████████████████

▮  ███████████████████████████████

▮  ████  ██████████████████  ████████

▮  ████████████████████████████████

▮  █████████████

▮  ████  ██████████████████████████

▮  ██████████████████  ██████████

▮  ████████████████████████████

▮  ████████████████████

▮  ████  █████████████████

▮  █████████████████████████████████

▮  ████████████████████████████

▮  ████████████████

▮  ████  ██████████████████████

▮  ██████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          A.     The primary role of Deloitte was,

17   you know, project management and they provided

18   additional resources as we required them.  But

19   they work under our direction.

20          Q.     What other projects do they work

21   on?

22          A.     Projects on different aspects of

23   our anti-diversion program, but if you ask me

24   the details at this point in time, I don't

Highly Confidential - Subject to Further Confidentiality Review

1  recall all of the products that they worked.  I

2  can tell you --

3          Q.    Can you tell me the ones you do?

4          A.    The one that are most significant

5  to me was our project of establishing a new

6  threshold methodology.

7          Q.    And when was that new threshold

8  methodology?

9          A.    It was a process that probably

10 started in -- sometime in 2012, but I don't

11 remember the exact date.

12         Q.    And when did that project get

13 completed?

14         A.    We're continuously looking at how

15 to improve our system, so I cannot tell you

16 after my departure in 2015 if other changes were

17 made.

18         Q.    So at the time you shifted anti --

19 at the time that anti-diversion was no longer

20 under you in 2015, was Deloitte still assisting

21 with the threshold methodologies?

22         A.    I don't believe so.

23         Q.    Any other projects you recall

24 Deloitte working on?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Not that I recall.

 2          Q.    Who did your algorithms?

 3                MS. WICHT:  Object to the form of

 4          the question.

 5          A.    Can you elaborate on that?

 6          Q.    You talked about algorithms

 7    briefly.  Did you come up with the algorithms

 8    yourself?

 9                MS. WICHT:  Object to the form of

10          the question.

11          A.    No, we did not come up with the

12    algorithms ourselves.  It was a combination --

13    it was an evolution.  We used some internal

14    statisticians in our department.  We also hired

15    a mathematician.

16          Q.    Do you recall who that was?

17          A.    Her first name was Jen Marie.  She

18    is no longer with the company.  She moved out of

19    state.

20                We also used -- we validated some

21    of our models through a college professor at

22    Ohio State.

23          Q.    Is that the same college professor

24    who worked on Generation Rx?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I believe it is a different

 2    person.

 3              Q.    Do you recall who?

 4              A.    I don't recall his name.  I mean,

 5    most of the dealings with that college professor

 6    was done by our anti-diversion team.

 7                    We also hired a company called

 8    Healthcare Advising.

 9              Q.    Who are they?

10              A.    They're an outfit out of San

11    Antonio, Texas.

12              Q.    What do they do?

13              A.    They do -- they advise the company

14    on healthcare, and they had some capabilities on

15    statistics.

16              Q.    When did you first work with

17    Healthcare Advising?

18              A.    The exact period of time, I don't

19    recall.  It had to be between '12 -- '07 and '12

20    or '07 and '13, in that period of time.

21              Q.    And do you recall for how long you

22    worked with Healthcare Advising?

23              A.    I don't recall the exact

24    engagement period that they worked for us.
```

1         Q.    Any other projects that Deloitte

2    worked on?

3         A.    I believe you asked me that

4    question already, and I don't recall any other

5    projects.

6         Q.    Did you ever work with Dendrite?

7         A.    We used their services.

8         Q.    What services of theirs did you

9    use?

10        A.    To the best of my knowledge, we

11   used them to do field inspections.

12        Q.    Can you explain that to me,

13   please.

14        A.    Inspections or reviews of

15   pharmacies in the field.  Customers.

16        Q.    So Dendrite would send individuals

17   out to do a site visit; is that what you mean?

18        A.    Yes.

19        Q.    What kind of oversight did

20   Cardinal have of Dendrite personnel?

21             MS. WICHT:  Object to the form of

22             the question.

23        A.    Those people were supervised by

24   one of their supervisors, but they provided

Highly Confidential - Subject to Further Confidentiality Review

```
 1   different work of site visits.

 2           Q.    Framework of -- I'm sorry.  I

 3   didn't understand.

 4           A.    Of the site visits.

 5           Q.    Of the site visits, okay.

 6                 So they would provide the

 7   framework of the site visits?

 8           A.    (Nods head.)

 9           Q.    What does that mean?  Does that --

10                 MS. WICHT:  Object to the form of

11           the question.

12                 Sorry.  Go ahead.

13                 I don't know who -- you said

14           "they" in your question, and it's not

15           clear to me that we're all talking about

16           the same person.

17                 MR. KROEGER:  Yeah.

18   BY MR. KROEGER:

19           Q.    You were talking about Dendrite,

20   and the role -- and I was asking about the role

21   that they played in site visits.  I was also

22   asking about what oversight Cardinal had of

23   Dendrite personnel and what specifically

24   Dendrite personnel did with regard to site
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    visits.  And so my understanding is that you

 2    said that Dendrite employees would provide a

 3    framework for the site visits.  Is that

 4    accurate?

 5            A.    No, I did not say that.

 6            Q.    Okay.

 7            A.    They provide the services of doing

 8    the site visit.  We provided the forms that they

 9    had to complete during site visits and we

10    provided the list of the customers that we

11    wanted them to visit.

12            Q.    When you say you provided the

13    forms, you mean physical forms, Cardinal would

14    provide paper forms that Dendrite personnel

15    would then go to a pharmacy and fill out?

16            A.    It could be paper, it could be

17    electronic forms.

18            Q.    But a questionnaire of sorts that

19    they would have to answer?

20            A.    They would be the forms that we

21    use to document our customer visits.

22            Q.    And when is it that Cardinal began

23    to delegate site visits to Dendrite personnel?

24                  MS. WICHT:  Object to the form of
```

1    the question.

2        A.    The word "delegation" is probably

3    not the right -- we used their services to help

4    us complete a number of visits.  We didn't

5    delegate.  We used their services.

6        Q.    Was it Cardinal personnel that was

7    performing the site visits, or was it Dendrite

8    personnel?

9        A.    We had both.  We have our own

10   personnel, and we used the services from

11   Dendrite at that time, I believe, to help us

12   perform some of the visits.

13       Q.    And was that because Cardinal

14   didn't have sufficient personnel to do all the

15   site visits needed on their own?

16            MS. WICHT:  Object to the form of

17       the question.

18       A.    It was because we were reacting to

19   changes in the regulatory environment, and there

20   were some additional visits that we wanted to

21   perform in a short period of time, so we used

22   outside resources to assist us with that.

23       Q.    Okay.  So the first question I

24   have about that is:  What period of time are we

1    talking about that Dendrite was assisting you,

2    Cardinal, with site visits?

3          A.    To the best of my knowledge, they

4    were involved with some of our site visits from

5    sometime in 2012 and sometime in 2013, but I

6    don't recall the exact dates.

7          Q.    And you said this was due to

8    changes in the regulatory environment.  What

9    were the changes in the regulatory environment

10   that led Cardinal to decide we need to hire or

11   bring on Deloitte -- or Dendrite personnel to

12   assist us in site visits?

13         A.    Where we follow, you know, what's

14   going on in the public media, so we understand

15   there's, you know, an increase in use of certain

16   drugs in certain markets.  We may ask our team

17   to go to those markets and review the stores

18   that we have as customers or that we have

19   concerns.

20         Q.    Maybe I missed it, but I don't

21   understand where in your answer you talked about

22   changes in the regulatory environment.

23         A.    Well, there's changes in -- have

24   been changes in the expectations in the

Highly Confidential - Subject to Further Confidentiality Review

1    regulatory environment over time.  So -- and

2    expectations of pharmacies, expectations of

3    distributors.

4         Q.    And what were the changes?

5         A.    There have been changes over time.

6         Q.    Okay.  But specific to what we're

7    talking about right at this moment, is there's a

8    point in time, you think it's in 2012 to

9    sometime in 2013 -- you're not certain of the

10   dates -- but in that two-year period, you said

11   that Cardinal enlisted assistance from Dendrite

12   to do site visits because there were changes in

13   the regulatory environment.  So those are the

14   specific changes I'm asking about right now.

15             What were those changes in 2012

16   and '13 that you're talking about?

17             MS. WICHT:  Object to the form of

18        the question.

19        A.    Some of the changes is the

20   expectations that the agency had with us and

21   other registrants.

22        Q.    The agency, being the DEA?

23        A.    DEA.

24        Q.    Drug Enforcement Agency of the

1    United States?

2            A.     (Nods head.)

3            Q.     Is that a yes?

4            A.     Yes.

5            Q.     Sorry.  That's just for the

6    record.  Sometimes we have the nods of the head,

7    which the camera will catch it but the

8    transcript won't.

9                    So what were the changes in

10   expectations that the agency had with Cardinal

11   and other registrants in 2012 and '13?

12           A.     One of the changes that I recall,

13   we had an understanding with the DEA that we

14   will investigate threshold events, and if we

15   found that those threshold events resulted in

16   customer that had the potential for diversion,

17   that they wanted us to communicate those to

18   them.

19           Q.     So your testimony today is that

20   sometime in 2012 or 2013, the DEA, for the first

21   time, said that Cardinal and other registrants

22   need to investigate threshold events, and if

23   they find that a customer has a potential for

24   diversion, they need to report that to the DEA?

1          A.      When we terminated the customer.

2                  MS. WICHT:  Object to the form of

3          the question.

4          Q.      Say again?

5          A.      Is when the termination of that

6    particular customer, they wanted us, based on

7    the communications between my staff and the DEA,

8    that's the information that they wanted us to

9    communicate as suspicious order.  Later in time,

10   we learned that the agency had changed their

11   expectations and they wanted to know every

12   single order that hit a threshold event after a

13   small investigation, had to be communicated to

14   them.

15         Q.      So it's the every single threshold

16   event after a small investigation has been

17   communicated to the DEA, that's the change that

18   occurred in 2012 and '13?

19         A.      That's the -- yes.

20         Q.      And what was the small

21   investigation that would have to occur after a

22   threshold event?

23         A.      Is like a quick review of the

24   customer order to determine whether the customer

Highly Confidential - Subject to Further Confidentiality Review

 1   was likely due to a typographical error, and we

 2   were, you know, expected to make a decision very

 3   quickly.  And if we could not resolve that order

 4   in a short period of time, we had to report it

 5   to the DEA and continue our investigation in

 6   regards to the customer, because that takes a

 7   longer period of time.

 8            Q.    And this review, this short

 9   investigation, where did that occur?

10               MS. WICHT:  Object to the form of

11            the question.

12            A.    That review of investigation

13   occurs as part of our electronic monitoring

14   system with the personnel that is responsible

15   for that.

16            Q.    And so do you recall, who at the

17   DEA communicated this change to Cardinal?

18            A.    The initial agreement between

19   Cardinal Health and the DEA occurred between --

20   to the best of my knowledge, between Michael

21   Moné, Barbara Boockholdt, Sue Langston, and Nick

22   Rausch, I believe, was at that meeting, too.

23            Q.    But you were not?

24            A.    I was not.  That was before I

Highly Confidential - Subject to Further Confidentiality Review

1    joined Cardinal Health.

2          Q.    So there was a meeting with those

3    four individuals you just named.  Nick Rausch

4    and Michael Moné are the two Cardinal

5    representatives?

6          A.    That is my understanding.

7          Q.    And when you started, was it

8    conveyed to you that this is a new change we

9    have?

10          A.    My understanding was these are the

11    expectations from the agency, that we evaluate

12    orders, determine if the customer had the

13    potential to divert the order, and our practice

14    was:  Terminate the customer and communicate

15    that termination to the DEA.

16          Q.    And so what I'm confused about now

17    is that you're talking about a meeting prior to

18    you joining Cardinal between Michael Moné, Nick

19    Rausch and the DEA, correct?

20          A.    Correct.

21          Q.    And that is in response to me

22    asking you about the regulatory changes that

23    took place in 2012 and '13 that required

24    Cardinal Health to employ Dendrite to assist in

1    site visits?

2           A.    Well, we had --

3           MS. WICHT:  Object to the form of

4       the question.

5           A.    -- we had a regulatory action from

6    the agency in 2012.  So that was definitely --

7    there was a change in the expectation from the

8    agency from what we had done before, which had

9    been reviewed in numbers of time, not only by

10   the meeting the DEA had at our corporate

11   headquarters, but also during dozens of cyclical

12   inspections.  We did not express concern until

13   we received the administrative action from the

14   agency.

15          Q.    So Cardinal Health was

16   communicated changes -- regulatory changes that

17   the DEA expected in -- prior to December 1st,

18   2009, when Michael Moné and Nick Rausch meets

19   with the DEA, correct?

20          A.    We presented the program that we

21   had for anti-diversion, our intent on how to

22   execute the program.  And my understanding was

23   that there was an agreement that the program

24   fulfilled the expectations of the agency and

Highly Confidential - Subject to Further Confidentiality Review

1    that met the regulatory requirements.

2         Q.    And that was at a meeting prior to

3    you joining Cardinal?

4         A.    That was the meeting that occurred

5    before I joined Cardinal Health.

6         Q.    And did you ever see any agreement

7    in writing between the DEA and Cardinal with

8    regard to that meeting?

9         A.    I did not see any agreement in

10   writing, but I got a consistent message from

11   Michael, from Bob Giacalone, from Mr. Morford

12   that that was our agreement with the agency, so

13   we needed to make sure that we keep compliant

14   with that agreement.

15        Q.    And as the supervisor of

16   anti-diversion, you didn't confirm that in

17   writing?

18             MS. WICHT:  Object to the form of

19        the question.

20        A.    I believe the information that was

21   provided by my staff, by our senior legal

22   regulatory counsel, and by my boss.

23        Q.    And what I'm still trying to

24   understand is, this meeting occurred before you

1    joined Cardinal on December 1st, 2009.  And in

2    that meeting was conveyed to Cardinal that the

3    DEA had additional expectations with regard to

4    reporting threshold events after a small

5    investigation, correct?

6                    MS. WICHT:  Object to the form of

7            the question.

8            A.    My understanding of what occurred

9    in the meeting was we provided a presentation to

10   two members of the Drug Enforcement

11   Administration.  That presentation was an

12   overview of our anti-diversion program and our

13   suspicious order monitoring program.  And the

14   agency didn't have any objections, didn't have

15   any concerns with the way that we were executing

16   our program.

17           Q.    But I thought you said that this

18   meeting -- we're talking about one meeting that

19   happened before you got there, just to be clear,

20   there's only one meeting we're talking about

21   between Michael Moné, Nick Rausch, as

22   representatives of Cardinal, and the DEA.

23                    I thought your testimony earlier

24   was that at that meeting the DEA conveyed to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Cardinal regulatory changes, in particular, that

 2   upon a threshold event, Cardinal would do a

 3   small investigation and then report to the DEA

 4   if a customer had to be terminated?

 5            MS. WICHT:  Object to the form of

 6        the question.

 7        A.    That's incorrect.  I didn't say

 8   that.

 9        Q.    Okay.

10        A.    I didn't say that.  I think as a

11   result of the regulatory action that we had in

12   2012, those were new expectations that were

13   communicated to us.

14        Q.    Okay.  So you're testifying that

15   in 2009 -- well, I'm sorry.  Before you joined

16   Cardinal in 2009, there was a meeting between

17   Michael Moné, Nick Rausch and the DEA, and at

18   that meeting, there weren't new expectations --

19   new regulatory changes that were conveyed to

20   Cardinal.  That's your testimony now?

21            MS. WICHT:  Object to the form of

22        the question.

23        A.    That is not what I said.  What I

24   said was, there was a meeting between
```

Highly Confidential - Subject to Further Confidentiality Review

1    representative from DEA and Cardinal Health,

2    where Cardinal Health presented our suspicious

3    order monitoring program to the agency.  As we

4    were executing the program at that time, the

5    agency appeared to be satisfied with our

6    execution of the program, did not express any

7    concern.

8                Also, that program has been

9    presented to the agency during multiple

10   inspections of our distribution centers.  And to

11   the best of my knowledge, there has not been a

12   single concern about that until we got the

13   administrative action in 2012.

14        Q.    And so between your start date of

15   December 1st, 2009 and the action in 2012 --

16   early February, 2012, does that sound --

17        A.    Sounds about right.

18        Q.    -- sounds about right?

19                Between December 1, 2009 and early

20   February 2012, did you ever have any contact

21   with the DEA to determine if the suspicious

22   order monitoring program of Cardinal was in line

23   with their expectations?

24        A.    I personally did not have a

Highly Confidential - Subject to Further Confidentiality Review

1    meeting with DEA.  Members of my staff did.

2    Michael Moné, I believe, was in routine

3    communication with Barbara Boockholdt and other

4    members of the DEA.  I also attended, you know,

5    presentations from the DEA but never had

6    personal interaction with the agency.

7             Michael had most of those

8    interactions, and Steve Reardon and some other

9    members of my staff.

10        Q.    How about above you?  Did Craig

11   Morford ever have conversations or contact with

12   the DEA, to your knowledge?

13        A.    I would speculate if I say yes or

14   no.  I don't know that.

15        Q.    So you're not aware of any time

16   that he did?

17             MS. WICHT:  Object to the form of

18        the question.

19        A.    During that period of time, I

20   would not be able to recall.

21        Q.    All right.  Well, during the

22   period of time that you've been with Cardinal,

23   from December 1st, 2009, are you aware of any

24   time that Craig Morford had contact with the

1    DEA?

2           A.    I have personally not been in any

3    of the meetings that either Craig or somebody

4    else may have with personnel from the DEA.

5           Q.    Okay.  And maybe you weren't

6    present, but I'm asking right now if you're

7    aware of any meetings between Craig Morford and

8    the DEA.

9           A.    I believe there was a meeting --

10   one meeting between Cardinal Health and DEA

11   where we made another presentation of our

12   program.  And my understanding was Craig may

13   have been there.  I'm not 100 percent sure.  I

14   know Todd Cameron was there.

15          Q.    And when was that?

16          A.    I cannot tell the date, but it

17   could be '15 to '17.  But I don't even recall if

18   I was involved with the program at that time or

19   not.

20          Q.    And do you know who from the DEA

21   was involved?

22          A.    I'm trying to recollect if I

23   remember.  I'm not very good with names.  But I

24   do not recall from the top of my head.

1    Q.    Is it fair to say, then, if you

2  can't recall, that at least it wasn't Barbara

3  Boockholdt?

4            MS. WICHT:  Object to the form of

5       the question.

6       A.    I don't recall.  I mean -- or they

7  didn't tell me who was there, or I don't recall

8  if Barbara was there or not.

9       Q.    Okay.  That's fair.

10            So we -- I want to go back because

11  I still don't think I have a full understanding

12  of what it was in 2012 that was communicated to

13  Cardinal that led Cardinal to employ the

14  services of Dendrite to assist with site visits.

15      A.    Our understanding was that the

16  agency expectations and definition on suspicious

17  orders had changed.

18      Q.    In what way?

19      A.    In the past, the program that we

20  presented to the agency, which the agency had no

21  objection, was that when we had a threshold

22  event, we had to investigate the threshold event

23  if we concluded that the customer had posed a

24  risk for diversion or we couldn't conclude

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that -- at that point in time, after an

 2    investigation, that we should report that

 3    customer as suspicious.

 4              The expectations changed in 2012

 5    were the time frame that we were allowed to do

 6    an investigation, and the agency decided that

 7    each threshold event, after a quick

 8    investigation -- when I say "quick

 9    investigation," is a very short period of time

10    to be communicated to them as a suspicious

11    order, even though that threshold event not

12    necessarily met all of the requirements of a

13    suspicious order.

14         Q.   So what kind of threshold events

15    would not meet the requirements of a suspicious

16    order?

17              MS. WICHT:  Object to the form of

18         the question.

19         A.   For example, we're reporting them

20    as suspicious, ████████████████████████

      ██████████████████████████████████████

      ██████████████████████████████████████

      ██████████████████████████ I mean, that

24    will -- potentially could hit a threshold event.
```

```
 1            Q.    Could potentially also signal that

 2   a number of people have decided they want to buy

 3   a bunch of oxycodone for a party on the weekend,

 4   couldn't it?

 5                  MS. WICHT:  Object to the form of

 6            the question.

 7            A.    Not necessarily.

 8            Q.    Not necessarily, but it could,

 9   couldn't it?

10                  MS. WICHT:  Object to the form of

11            the question.

12            A.    Not necessarily.  Everything is

13   possible, but it's not necessarily.  So we want

14   to do an investigation on that customer to look

15   at the fact on why there was an increase in

16   order, and we want -- that takes time.  But with

17   our current system and the current expectations

18   of the agency, we report those as suspicious.

19            Q.    You said you want to investigate

20   those but that takes time.  I don't understand.

21   What kind of time does it take to find out if a

22   threshold event is suspicious or not?

23            A.    It takes -- to determine if the

24   order is likely to be diverted, it takes time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It takes some time, customer visit.  It takes

 2    time interacting with the customer.  It takes

 3    time maybe having a salesperson drive by to get

 4    additional information.

 5              It takes time to evaluate an order

 6    and determine whether Cardinal Health feels

 7    comfortable either filling that order or we

 8    decide to -- not to longer do business with that

 9    particular customer because it poses a risk of

10    diversion.

11         Q.    And in order to meet that

12    requirement, Cardinal employed Dendrite to

13    assist with site visits?

14              MS. WICHT:  Object to the form of

15         the question.

16         A.    We used Dendrite to help us to --

17    more site visits so we can have more recent

18    information on our customer.

19              MR. KROEGER:  There's someone on

20         the phone who is not muted.  If you

21         could please mute.

22         Q.    But prior to 2012, you did not use

23    Dendrite to assist with site visits, correct?

24         A.    During the time that I was there
```

1    in 2009 to 2012, I don't recall us using

2    Dendrite.  That doesn't necessarily mean that we

3    had not used them, but I don't recall.

4          Q.    But your testimony is that, to

5    your knowledge, Dendrite was employed by

6    Cardinal in order to assist with this new

7    requirement from the DEA that threshold events

8    get a fast investigation?

9               MS. WICHT:  Object to the form of

10              the question.

11         A.    Not -- not for that.  It was to

12   assist us to do -- we wanted to have more site

13   visits done.  We wanted to refresh all of our

14   files, so we used Dendrite to help us do

15   additional visits.

16         Q.    And you say you wanted, but in

17   2012, didn't the DEA tell you that you had to do

18   those site visits within 120 days?

19         A.    I don't recall the terms of the

20   agreement.  It could be in the agreement, but I

21   would have to review the agreement to say if

22   that was the case.

23         Q.    Okay.  We can do that.

24               But your testimony so far is that

Highly Confidential - Subject to Further Confidentiality Review

1    you, Cardinal, that Cardinal employed Dendrite

2    to assist with these site visits because you

3    wanted to do more of them; is that correct?

4            A.    I believe that we wanted to do

5    more site visits.

6            Q.    And you think that this is

7    something that Cardinal decided on its own, its

8    own accord, to do more site visits in 2012; is

9    that your testimony?

10                 MS. WICHT:  Object to the form of

11           the question.

12           A.    I can tell you as a member of the

13   management team, we wanted to do more site

14   visits.  And even today, we continue to do a lot

15   of site visits.

16           Q.    And why is it -- strike that.

17                 In 2010 and 2011, why is it that

18   Cardinal didn't have the same desire to visit

19   all the sites to which they sold controlled

20   substances that they did in 2012?

21                 MS. WICHT:  Object to the form of

22           the question.

23           A.    We did plenty of site visits.  We

24   investigated every single suspicious customer

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and every single suspicious order was reported

 2    to the agency, based on the understanding that

 3    we had at the time.

 4         Q.    What was that understanding?

 5         A.    I already explained to you the

 6    understanding that we had of investigating the

 7    order, investigating the customer, and if we

 8    deemed that a customer had the potential for --

 9    to pose a risk for diversion to -- the agency

10    wanted to know that suspicious order and that

11    suspicious customer that was terminated.

12         Q.    But suddenly in 2012 Cardinal had

13    a greater desire to do site visits than it had

14    in 2010 and '09 -- or 2010 and '11; is that

15    right?

16         A.    Well, we had --

17              MS. WICHT:  Object to the form of

18         the question.

19         A.    We had a regulatory action, so to

20    me, the agency had changed the expectations on

21    how we executed the program.  So we wanted to

22    make sure that we cover all the bases.  We do

23    not want another regulatory action against

24    Cardinal Health, and we employ not only internal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    resources, but external resources to make sure

 2    that we not only met the expectations of the

 3    agency, but that we exceeded those.

 4           Q.    But Cardinal didn't have the same

 5    desire to avoid that regulatory action or exceed

 6    expectations of the DEA in 2010 or '11?

 7                 MS. WICHT:  Object to the form of

 8           the question.

 9           A.    That's not what I said.

10           Q.    But Cardinal decided to wait until

11    2012 to ask Dendrite to assist with site visits

12    across the country?

13           A.    Cardinal always had the same

14    desire to comply with all regulatory

15    requirements.  That desire has never changed as

16    far as I know.  At least since I joined the

17    company.  I can attest to that.  Our management

18    team has to have -- wants to have a good

19    regulatory record, which we have demonstrated

20    over many, many years.

21                 These regulatory actions that we

22    got in 2012 was a surprise to us because, to the

23    best of my knowledge, we were meeting the

24    expectations of the agency.
```

```
 1                MS. WICHT:  And if you would note

 2          my objection to the form of the last

 3          question.  I didn't want to interrupt,

 4          Mr. Quintero.  Thank you.

 5   BY MR. KROEGER:

 6          Q.   But, again, just to be clear, it

 7   wasn't until 2012 when the regulatory action

 8   commenced against Cardinal that Cardinal

 9   decided, we want to and need to employ Dendrite

10   to assist with site visits across the country?

11   That's your testimony, correct?

12                MS. WICHT:  Object to the form of

13          the question.

14          A.   My testimony is that since I got

15   to Cardinal Health on December 1st, 2009, the

16   company intended to comply with all regulatory

17   requirements, including DEA regulations, and

18   that we executed a program that was presented to

19   the agency, that the agency accepted as a good

20   program, we executed according to those

21   expectations.

22                We did hundreds of visits.  We cut

23   hundreds of customers during that period of time

24   before 2012.  To the best of my knowledge, we
```

 1  cut over 300 customers during that period of

 2  time.

 3          Q.    And yet it wasn't until 2012 that

 4  you -- that Cardinal realized it needed

 5  assistance to conduct appropriate site visits?

 6              MS. WICHT:  Object to the form of

 7          the question.  Foundation.

 8          Mischaracterizes.

 9          A.    We were always conducting

10  appropriate visits.  We decided to increase the

11  number of site visits that we did because the

12  expectations of the agency appeared to have

13  changed and we were adapting to the changes in

14  expectations from the agency.

15              But in terms of whether or not we

16  were doing inspections according to the

17  expectations of the agency at that time, we were

18  doing hundreds of inspections.  We dedicated

19  personnel to do those inspections.  We used our

20  compliance officers to do inspections, too.  And

21  we required our salespeople to notify us of any

22  concerns that they had with any customer.

23              And those inspections were

24  conducted and they resulted in over 300

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customers being cut, which most of them today

 2    still have a DEA license to dispense product.

 3         Q.    How many customers does Cardinal

 4    distribute controlled substances to?

 5         A.    I will speculate.  I'm not

 6    involved with that particular group now, so I

 7    would be speculating on a number.

 8         Q.    Prior to 2012?

 9         A.    There were thousands of customers.

10         Q.    Thousands.  Tens of thousands?

11               MS. WICHT:  Object to the form of

12         the question.

13         A.    I wouldn't know the exact number.

14    So if I tell you a number, I would be

15    speculating.  I would have to go and ask

16    somebody in the sales department to tell me the

17    exact number of customers that we have.

18         Q.    Okay.  Aside from assisting with

19    site visits in 2012, what else did Dendrite do

20    for Cardinal?

21         A.    I'm trying to recollect.

22               To the best of my knowledge, that

23    was their primary services that they were

24    providing to Cardinal Health.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And to the best of your knowledge,

 2    did that -- did those services end in 2012, '13,

 3    or do they continue?

 4              A.    I think we have used them after

 5    that, but since I was removed from the -- I

 6    mean, I'm not in the department anymore managing

 7    that particular area, I couldn't tell.  But I

 8    know that we have used them occasionally.

 9              Q.    So we've talked about Deloitte.

10    Dendrite.  Health Advisory.

11              A.    Uh-huh.

12              Q.    What other outside organizations

13    has Cardinal used for anti-diversion assistance?

14              A.    We used IBM Watson.

15              Q.    What do you use IBM Watson for?

16              A.    We use IBM Watson to help us

17    develop our anti-diversion -- it's called ADC.

18    It's --

19              Q.    It's called what?  I'm sorry.

20              A.    ADC.

21              Q.    ADC.

22              A.    ADC.  Centralized system.  I'm

23    trying to recall the meaning of each one of

24    those words.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And what is that system?

2          A.    It is a centralized system where

3     we have information about customers, we see

4     threshold events that they had in the past.  We

5     can even have a street view of where the

6     pharmacy is located to see the surroundings.

7          Q.    And that system -- the one benefit

8     of a centralized system such as that is so that

9     people who are at corporate headquarters in

10    Dublin can determine if there are suspicious

11    customers who may need to be shut down in Texas,

12    right?

13              MS. WICHT:  Object to the form of

14         the question.

15         A.    It is used to review customers and

16    also to review customers' orders.

17         Q.    But the -- is it true, though,

18    that having a centralized system in Dublin,

19    Ohio, or a system that's accessible in Dublin,

20    Ohio, the capital -- the headquarters of

21    Cardinal, allows the executives at Cardinal to

22    see what might be going on at distribution

23    centers around the country?

24              MS. WICHT:  Object to the form of

1          the question.  Foundation.

2          A.    First, I mean, the activity of

3    review of customers is done by different levels

4    of employees.  The executive -- like, I don't

5    know what you call.  I consider myself an

6    executive.  We generally are not involved in the

7    day-to-day review of those threshold events.

8          Q.    But you have access to that

9    information through the centralized system?

10         A.    I can ask one of the analysts in

11   the group or one of the members of that team to

12   provide me with that information that is there.

13         Q.    And that's one of the many ways

14   that you supervise the anti-diversion programs

15   within Cardinal?

16              MS. WICHT:  Object to the form of

17        the question.

18         A.    One of the ways that I inquired

19   about information that I may be interested at a

20   particular time.

21         Q.    Okay.  What else, besides the ADC,

22   did IBM provide Cardinal?

23         A.    To the best of my knowledge --

24   they may have done other things -- that's what

Highly Confidential - Subject to Further Confidentiality Review

1    they performed for us.

2          Q.    Any other outside agencies or

3    corporations, companies that Cardinal has

4    employed for anti-diversion?

5          A.    We had Avantha.

6          Q.    What's Avantha do for Cardinal?

7          A.    What Avantha did for Cardinal

8    Health, they provided an expert in the field

9    that will advise us on anti-diversion and any

10   other trends that were going on in the

11   regulatory environments regarding to DEA.

12         Q.    During what time period did

13   Avantha provide such services?

14         A.    I don't recall the exact time.  I

15   will have to go back and look at the engagement.

16   It could have been '12, '13, '14 and '15.  I

17   don't recall the exact time frame.

18         Q.    What other outside organizations

19   or companies?

20         A.    We use Healthcare Advising.

21         Q.    What do they do?

22         A.    They provided assistance with

23   developing a new threshold methodology with some

24   of the information that we received from other

1    sources.

2            Q.    What other sources?

3            A.    Symphony or IMS or our own

4    internal data.

5            Q.    What other outside organizations

6    do you recall?

7            A.    We use also another organization,

8    use Pharmacy Services or Pharmacy Solutions.  I

9    don't recall the name.

10           Q.    What services did they provide

11   Cardinal?

12           A.    They provided resources to do --

13                 VIDEOGRAPHER:  Counsel on the

14           phone, could you put yourself on mute,

15           please.

16   BY MR. KROEGER:

17           Q.    I'm sorry.  Could you repeat that

18   answer, please.

19           A.    I don't recall the exact name, but

20   it was Pharmacy Services or Pharmacy Solutions,

21   one of the two.  They provided resources,

22   investigators, to do field visits.

23           Q.    Was this also in 2012 and '13?

24           A.    It was during 2012, '13.  Could

```
 1   have been '14, too.

 2          Q.    Any other outside services

 3   Cardinal received?

 4          A.    There could be others, but those

 5   are the ones that I recall, to the best of my

 6   knowledge.

 7          Q.    Okay.

 8                MR. KROEGER:  I think this is

 9          probably a good time for a quick break.

10                MS. WICHT:  Okay.

11                VIDEOGRAPHER:  Time is now 9:11.

12          Going off the record.

13                (Recess taken.)

14                VIDEOGRAPHER:  Time is now 9:33.

15          Back on the record.

16   BY MR. KROEGER:

17          Q.    Mr. Quintero, I just wanted to

18   clarify something that we were going through, I

19   think, a number of times.

20                You were talking about the change

21   in regulations -- the changing expectations of

22   the DEA.

23          A.    Yeah.  I never have spoken about

24   changes in regulations.  The regulations were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   established in 1971 and still basically the same

 2   regulations.

 3           Q.    Right.  But there was -- your

 4   testimony was that there was a change in the

 5   expectations of the agency with regard to

 6   Cardinal and other distributors, correct?

 7           A.    That was my testimony, yes.

 8           Q.    And prior to that change, Cardinal

 9   had been reporting to the DEA when there was a

10   suspicious customer that Cardinal had determined

11   they needed to terminate; is that right?

12           A.    Yes.  And --

13           MS. WICHT:  Object to the form of

14       the question.

15           Go ahead.

16           A.    Yes.  And in some examples also

17   where we couldn't collect enough information to

18   determine whether or not, you know, the customer

19   was suspicious -- there was no reason to believe

20   the customer was suspicious, but we didn't have

21   enough information.  So we reported some of

22   those orders, too.

23           Q.    Okay.  But generally speaking, the

24   suspicious order policy of Cardinal, prior to
```

Highly Confidential - Subject to Further Confidentiality Review

1    2012, was to report suspicious customers when

2    Cardinal deemed appropriate to terminate them,

3    and then a handful of other suspicious orders

4    that you just couldn't figure out?

5                MS. WICHT:  Object to the form of

6         the question.

7         A.    Based on the agreement that we

8    have with the agency, our practice was, you

9    know, customer would have threshold events,

10   we'll investigate those threshold events, do an

11   in-depth investigation, determine if the

12   customer posed a risk of diversion, and if we

13   determine that there was a potential for that,

14   then we communicated that to the agency, we

15   reported that.

16        Q.    Reported the customer?

17        A.    We reported the customer that had

18   that order placed, that triggered the reason for

19   us to look at the customer.

20        Q.    When you started at Cardinal, did

21   anyone show you the Memorandum of Agreement with

22   regard to the 2007-2008 events for Cardinal?

23        A.    I don't recall.  I don't recall.

24   Could have.  Could have not, but I don't recall

Highly Confidential - Subject to Further Confidentiality Review

1    whether or not they show it to me.

2          Q.    Are you aware of what happened for

3    Cardinal in 2007-2008?

4          A.    I believe --

5                MS. WICHT:  Object to the form of

6          the question.

7          A.    I believe I read, before joining

8    Cardinal, that had something to do with sales to

9    Internet pharmacies.

10          Q.    And distribution centers having

11   the registration suspended?

12          A.    That's my understanding.

13          Q.    But then when you started in

14   December of 2009, no one, to your recollection,

15   showed you the Memorandum of Agreement as to

16   what Cardinal's duties were?

17                MS. WICHT:  Object to the form of

18          the question.

19          A.    I requested an overview of, you

20   know, what happened in 2008 and what were the

21   actions that Cardinal took to address the

22   concerns that the agency had.  That overview was

23   provided to me by members of my staff, as well

24   as our senior legal regulatory counsel, as well

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as my boss.

 2              And the communication that I got

 3    from each one of them was very consistent with

 4    the agreement that had been made with the agency

 5    and the program that we've put in place that was

 6    deemed acceptable by the agency after the agency

 7    had reviewed our program.

 8                        - - -

 9        (Cardinal-Quintero Exhibit 3 marked.)

10                        - - -

11    BY MR. KROEGER:

12         Q.   I'm going to hand you what I'm

13    marking as Exhibit 3.  It's Document 3813.

14              MR. HUNTER:  Can you give the

15         Bates number for that document?

16              MR. KROEGER:  I can for this one.

17         It's CAH_MDL2804_02309017.

18         Q.   Mr. Quintero, if you would turn to

19    Page 4 --

20              MS. WADHWANI:  Sorry.  014.

21              MR. KROEGER:  Sorry.  Thank you.

22         Neelum corrected it.  It's 014.

23    BY MR. KROEGER:

24         Q.   If you'll turn to Page 4 of this.
```

1           A.    This is the top of the page, that

2    4 here or 4 --

3           Q.    Correct, 4 top right.

4           A.    Okay.

5           Q.    And if you want to look, I mean

6    obviously you're more than welcome to look at

7    this document, look at the first page to see

8    what it is, but I'll represent to you that it's

9    the memorandum of understanding -- of agreement

10   between Cardinal and the DEA that we were just

11   talking about.

12               If you go to -- because I see what

13   you're looking at.  If you go --

14          A.    What does it mean -- I mean, just

15   a question because I'm reading, and it's

16   different to what you read.  It says "2008 MOA

17   Reference in Background."  What does that mean?

18          Q.    So this was an appendix, and this

19   document, if you turn to what is actually Page 2

20   of the exhibit itself, you will see the title of

21   the document that we're going to be talking

22   about.

23          A.    Where is it?

24          Q.    It is in Appendix B.  Okay?  And

Highly Confidential - Subject to Further Confidentiality Review

```
 1   if you'll turn to Page 4 --

 2              MS. WICHT:  So this copy came --

 3         is -- this copy is Appendix B to some

 4         other document?

 5              MR. KROEGER:  Yes.

 6              MS. WICHT:  But you're not asking

 7         right now about whatever that other

 8         document is or what --

 9              MR. KROEGER:  I'm asking about a

10         very specific part of this MOA that I

11         have from this appendix, which is

12         attached to the 2012 action, but...

13              MS. WICHT:  Okay.

14              MS. ANDERSON:  For clarification,

15         which page number are you on?

16              MR. KROEGER:  4.  P1, top right,

17         P1, 4.

18   BY MR. KROEGER:

19         Q.   Most importantly, Mr. Quintero, do

20   you see Roman numeral II, Number 1, Paragraph A,

21   "Obligations of Cardinal"?

22         A.   Uh-huh.

23         Q.   Can you read that to us, please.

24         A.   "Cardinal agrees to maintain a
```

1   compliance program designed to detect and

2   prevent diversion of controlled substances as

3   required under the CSA and applicable DEA

4   regulations.  This program shall include

5   procedures to review orders for controlled

6   substances, orders that exceed established

7   thresholds and criteria will be reviewed by a

8   Cardinal employee trained to detect suspicious

9   orders for the purpose of determining whether,

10  (I) such orders should not be filled and

11  reported to the DEA based on a detailed review,

12  the order is for a legitimate purpose and the

13  controlled substances are not likely to be

14  diverted into other than legitimate medical,

15  scientific, and industrial channels.

16              "Orders identified as suspicious

17  will be reported to the DEA as discussed in

18  Subsection II(1)(c).  This compliance program

19  shall apply to all customers and future Cardinal

20  distribution centers registered with the DEA in

21  the United States and its territories and

22  possessions.

23              "Cardinal acknowledges and agrees

24  that the obligations undertaken in this

Highly Confidential - Subject to Further Confidentiality Review

1   subparagraph do not fulfill the totality of its

2   obligations to maintain effective controls

3   against the diversion of controlled substances

4   or to detect and report the suspicious orders

5   for controlled substances."

6          Q.    So, Mr. Quintero, this is the

7   agreement that Cardinal signed after a number of

8   its distribution centers were investigated,

9   suspended, et cetera?

10         A.    (Nods head.)

11         Q.    And identifying suspicious orders

12  and reporting those to the DEA is a baseline

13  that Cardinal agreed to; isn't that true?

14               MS. WICHT:  Object to the form of

15         the question.

16         A.    Yeah, but there's additional

17  language here, you know, which says, you know,

18  established threshold criteria and --

19         Q.    Show me in that paragraph where

20  Cardinal agreed to report customers when they

21  decided to terminate those customers?

22         A.    As I told you, we reported

23  suspicious orders as the agreement that was

24  reached between Cardinal Health and senior

Highly Confidential - Subject to Further Confidentiality Review

```
 1    members from the DEA based on the program and

 2    the interpretation of the agreement.

 3            Q.    So you're saying that the DEA

 4    allowed Cardinal, after a meeting, to supplement

 5    this Memorandum of Agreement and do less than

 6    what it says here?

 7                  MS. WICHT:  Object to the form of

 8            the question.  Foundation.

 9            Mischaracterizes.

10            A.    I don't believe that's what I

11    said.  I said that Cardinal had an

12    interpretation of the agreement.  That

13    interpretation of the agreement was shared with

14    senior members of the DEA and DEA was in

15    agreement with that definition.

16                  And it was reviewed in the 2009

17    meetings, and also it was reviewed during dozens

18    of cyclic inspections and we were never found to

19    be in noncompliance with the agreement.

20            Q.    And -- but it's still your

21    position that it was in 2012 that the DEA

22    suddenly wanted Cardinal to report all

23    suspicious orders --

24                  MS. WICHT:  Object to --
```

```
1              Q.     -- and that was a new

2    understanding?

3              MS. WICHT:  Object to the form of

4         the question.  Foundation.

5         Mischaracterizes.

6              A.    My position is that the

7    interpretation and the expectations of the

8    agency of what was suspicious order had changed

9    over time; that to the best of my knowledge,

10   Cardinal Health, every time, reported suspicious

11   orders, from the time that I was there in 2009

12   until recent, based on the interpretation that

13   it had other regulations and the understanding

14   that we had from the agency.

15             MS. WICHT:  I'm sorry to

16        interrupt.

17             Madam Court Reporter, the -- this

18        is indicating it has a low battery.  It

19        is below 10 percent.  Is it possible to

20        have a charger that connects to this?

21             MR. KROEGER:  We can go off the

22        record for a moment.

23             VIDEOGRAPHER:  Time is now 9:45.

24        Going off the record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Discussion held off the record.)

 2                    VIDEOGRAPHER:  Time is now 9:46.

 3               Back on the record.

 4                         - - -

 5          (Cardinal-Quintero Exhibit 4 marked.)

 6                         - - -

 7    BY MR. KROEGER:

 8          Q.    I'm going to hand you what I've

 9    marked as Exhibit 4.  We talked earlier about

10    the fact that you sometimes would attend HDMA

11    events, sometimes had a voice in the company for

12    HDMA.

13                    If you would read this e-mail.  Do

14    you know a Bill de Gutierrez-Mahoney?

15                    MS. WICHT:  May I -- while the

16               witness is looking at the document, may

17               I just inquire, since it's a -- this is

18               a McKesson highly confidential document,

19               whether permission has been granted to

20               show it and use it in this document?

21                    MR. KROEGER:  It has been noticed

22               and used at previous Cardinal

23               depositions.

24                    MS. WICHT:  Okay.  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. MONAGHAN:  I would like to

2         note for the record --

3              MR. HUNTER:  Excuse me.  Do you

4         mind just reading the Bates numbers when

5         you're entering exhibits because we need

6         to know which document it is, who is on

7         the phone.

8              MS. MONAGHAN:  I would like to

9         note for the record that we agreed to

10         allow the use of this document in Steve

11         Reardon's deposition.  We did not permit

12         it in this deposition and we were not

13         asked permission for this deposition.

14              MS. QUEZON:  Are you objecting to

15         the use of it?

16              MS. MONAGHAN:  You can proceed.

17         I'm just noting our objection for the

18         record.

19  BY MR. KROEGER:

20         Q.   Mr. Quintero, did you have a

21  chance to look at this document I've handed you?

22         A.   I've reviewed Page 1 and I'm

23  starting to read Page 2.

24         Q.   I'm only going to ask you about
```

```
 1   Page 1.

 2          A.    Okay.

 3          Q.    This is an e-mail.  Do you

 4   recognize the names at the top:  Bill

 5   Gutierrez-Mahoney, and Donald Walker, Bruce

 6   Russell, Gary Hilliard?

 7          A.    I remember Gary Hilliard.

 8                I remember Gary and Don.  The

 9   other two names are not that familiar to me.

10          Q.    And this e-mail is from March of

11   2013.  Do you see that?

12          A.    Yep.

13          Q.    And apparently there had been a

14   conference the week before, an HDMA conference,

15   that Gary and Bill had attended.

16                And would you read the second

17   paragraph of the e-mail, please.

18          A.    It says, "Gary and I attended the

19   HDMA conference last week.  These are my notes.

20   Perhaps the most surprising revelation was Steve

21   Reardon and Gilberto Quintero saying that

22   Cardinal Health does not report to DEA --

23   suspicious orders to DEA.  No upside."

24          Q.    So as of 2013, you were still not
```

Highly Confidential - Subject to Further Confidentiality Review

1    reporting suspicious orders?

2              MS. WICHT:  Objection to form.

3         Foundation.

4         A.    This is not true.  I don't know

5    why -- who is this -- Bill de Gutierrez-Mahoney

6    wrote that, because that's not the fact.

7         Q.    You started reporting suspicious

8    orders in 2012 when the DEA amended their

9    expectations of Cardinal?

10        A.    We reported --

11             MS. WICHT:  Object to form.

12        Foundation.  Mischaracterizes prior

13        testimony.

14        A.    We reported -- if you look at the

15   record and the number of suspicious orders to

16   DEA, we reported thousands of orders in 2012 and

17   thousands of orders in 2013, '14, '15 as

18   suspicious orders.

19        Q.    So the years you just chose to

20   list are '12, '13, '14, and '15, correct?

21        A.    Yes.  Because you're giving me a

22   document that is dated 2013.

23        Q.    Did you report thousands of

24   suspicious orders in 2011?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    We reported suspicious orders, as

2    defined by our program and as agreed by DEA, in

3    2009, '10, and '11.

4          Q.    So the answer is no?

5                MS. WICHT:  Objection to the form.

6          Mischaracterizes.

7          A.    The answer is no to what?

8          Q.    That Cardinal reported thousands

9    of suspicious orders in 2011.

10         A.    We -- the answer is we reported

11   suspicious orders, as defined by our program, as

12   defined with agreement with DEA in 2009, '10,

13   and '11.

14         Q.    Mr. Quintero, are you aware of an

15   opioid epidemic in this nation?

16         A.    I'm aware that there's an opioid

17   epidemic in this nation.

18         Q.    And to your knowledge, what does

19   that mean?

20         A.    That means that there are

21   individuals in society that are using opiates

22   for other than legitimate medical use.

23         Q.    A few, or thousands?

24         A.    I believe thousands.

```
 1            Q.    Hundreds of thousands?

 2            A.    I could not say that.  If I had

 3   documents in front of me that -- from healthcare

 4   professionals that have done the studies, but I

 5   do not recollect what the number is.

 6            Q.    And to your knowledge, what role

 7   did Cardinal play in causing that opioid

 8   epidemic in the United States?

 9            A.    We did not --

10            MS. WICHT:  Object to the form of

11            the question and on the basis that I

12            believe Special Master Cohen has ruled

13            that's an inappropriate area for

14            questioning in depositions in this case.

15            But I'll allow you to answer,

16            Mr. Quintero.

17            A.    I do not believe Cardinal Health

18   played a role in the opioid epidemic.  We had a

19   program in place that was designed to prevent --

20   to -- we had the proper controls against

21   diversion of drug products other than for

22   legitimate medical uses, as demonstrated by the

23   actions that we have taken, as demonstrated by

24   the hundreds of pharmacies that we have
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    terminated, not because we know they are

2    diverting.  It's because we may have the

3    suspicion that they may engage in practices that

4    they are not consistent with the expectations

5    that we have.

6                        - - -

7         (Cardinal-Quintero Exhibit 5 marked.)

8                        - - -

9    BY MR. KROEGER:

10         Q.    I'm going to hand you what is

11   marked as Exhibit 5,

12   CAH_MDL_PRIORPROD_DEA12_000001.  We have it

13   listed as P1.4085.  And I'd ask you to turn to

14   Page 4 of that, Mr. Quintero.  You're welcome to

15   take a look at the document and familiarize

16   yourself with it, but I'm going to ask you about

17   Page 4 to start.

18         A.    Is this our document or the

19   government document?

20         Q.    It's the government's document.

21               So if you turn to Page 4.  If I

22   could get you to -- well, I'll read it for you.

23   The first full paragraph.

24               "The illicit pain clinics, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacies that fill the scripts, and the

 2    wholesale distributors who supply pharmacies

 3    without appropriate due diligence (including

 4    Respondent), have caused and continue to cause

 5    millions of dosage units of oxycodone and other

 6    controlled substances to be diverted and pose an

 7    imminent threat to public health and safety.

 8              "According to the Florida Medical

 9    Examiner's Office, they have seen a 345.9

10    percent increase in the number of overdose

11    deaths associated with oxycodone between 2005

12    and 2010.  For 2010, their data showed that

13    approximately 4,091 persons died in Florida

14    alone from an overdose caused by just five

15    drugs:  Methadone, oxycodone, hydrocodone,

16    benzodiazepines, or morpheme.

17              "This is an average of 11.2

18    persons dying in the state of Florida every day

19    from just these five drugs alone."

20              Clearly the government,

21    Mr. Quintero, disagrees with your position that

22    Cardinal had no role in causing the opioid

23    epidemic.

24              MS. WICHT:  Object to the form of
```

1          the question.

2          Q.    Do you believe that illicit pain

3    clinics are responsible for the opioid epidemic?

4               MS. WICHT:  Object to the form of

5          the question.

6          A.    There are many reports from

7    different healthcare professionals that have

8    theories on how the epidemic was initiated, why

9    we still have an epidemic.  And so there are

10   healthcare professionals out there still

11   debating what is the cause.  I still do not have

12   a firm position on who initiated this, what is

13   the cause of this.

14         Q.    I'm talking about a cause.  A

15   cause.

16         A.    I couldn't say that we are a

17   cause, because we have the proper controls in

18   place to prevent diversion, and we do not sell

19   products to pharmacies that we believe are

20   dispensing products for other than legitimate

21   medical use.

22         Q.    Would you agree that illicit pain

23   clinics, as mentioned here, are part of a cause

24   of the opioid epidemic?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. WICHT:  Object to the form of

2             the question.  Asked and answered.

3        A.    To be honest with you, without

4    having a conclusion that can be reached, a

5    consensus among healthcare professionals, that

6    what is the cause of this epidemic, it will be

7    very difficult for me to have a clear position

8    for that because the issue is still being

9    debated.

10        Q.    So sitting here today, as the

11   person who has been overseeing anti-diversion at

12   Cardinal Health from 2010 until 2015, you can't

13   say whether you think illicit pain clinics are a

14   problem in the -- or a cause in the opioid

15   epidemic?

16                    MS. WICHT:  Object to the form of

17             the question.

18        A.    It could but it could not.  I

19   mean, I would have to have more in-depth studies

20   done by people that are experts in the field for

21   me to reach that conclusion.

22        Q.    Do you understand --

23        A.    There are still debates on that

24   issue.
```

```
 1            Q.    Do you understand that illicit

 2    pain clinics are clinics in which there is no

 3    real or actual doctor/patient relationship?

 4                  MS. WICHT:  Object to the form of

 5            the question.

 6            A.    I'm not --

 7                  MS. WICHT:  Foundation.

 8            A.    I'm not an expert in the field.  I

 9    wouldn't know that.

10            Q.    And yet, December 1st, 2009,

11    Cardinal tasked you with overseeing their

12    anti-diversion programs?

13                  MS. WICHT:  Object to the form of

14            the question.

15            A.    Cardinal asked me in December 1st,

16    2009 to oversee a number of programs, while the

17    regulatory compliance program, including

18    anti-diversion.  And it's my belief that we had

19    a good program in place that was agreed with the

20    agency and that we were meeting the expectations

21    of the agency at that particular time.

22            Q.    What were the expectations of the

23    agency at that time, prior to 2012, with regard

24    to Cardinal reporting chain pharmacies?
```

```
 1                    MS. WICHT:  Object to the form of

 2           the question.

 3           A.    Can you repeat that question

 4      again?

 5           Q.    What were the expectations of the

 6      agency, prior to 2012, in terms of Cardinal

 7      reporting chain pharmacies?

 8                    MS. WICHT:  Object to the form.

 9           A.    My understanding on the agreement

10      that we had with the agency is that we could

11      rely on the investigation from the

12      anti-diversion program from the chain pharmacies

13      to make our decisions in terms of -- in terms of

14      suspicious orders and whether or not we should

15      continue the sales to those pharmacies.

16           Q.    Okay.  I'm going to ask you to

17      return to Exhibit 3, if you would.  P1.3813.

18                    And if you'll go to Page 4, and

19      will you show me under the "Obligations of

20      Cardinal," the paragraph we've already read,

21      where it says that Cardinal can rely on chain

22      pharmacies to do their due diligence and

23      Cardinal doesn't have to report chain pharmacies

24      to the DEA?
```

 1               MS. WICHT:  Object to the form of

 2          the question.  Mischaracterizes his

 3          testimony.

 4          A.    I just can tell you about the

 5     agreements that were reached between the agency

 6     and Cardinal Health, which I was not there but

 7     those agreements were communicated to me by

 8     members of my staff, by Bob Giacalone, which was

 9     our senior regulatory counsel at that time, by

10     my boss, and that we were meeting all the

11     expectations of the agency at that point in

12     time.

13               Now, one of the agreements that

14     was made is that we relied on investigations

15     done by the headquarters of chain pharmacies

16     when we have threshold events that needed to be

17     investigated.

18          Q.    Can you show me in the document

19     that I handed you where it says that, under

20     Cardinal's obligations?

21          A.    What I'm communicating to you

22     is --

23          Q.    I'm just -- I'm asking if you can

24     show it to me.  It's a yes or no, either you can

Highly Confidential - Subject to Further Confidentiality Review

1    and you do, or you can't.

2              MS. WICHT:  Object to the form.

3         Q.    Can you show me, Mr. Quintero,

4    where, under the "Obligations of Cardinal," it

5    says that Cardinal may rely on the due diligence

6    done by a chain pharmacy to determine if a

7    suspicious order has been placed?

8         A.    What I can tell you is, we reached

9    the agreement.  That agreement was reviewed

10   during many years between 2012, including the

11   meeting between Barbara Boockholdt, Sue

12   Langston, Michael Moné and Nick Rausch.  We

13   never got a single call from the FDA saying,

14   hey, by the way, Gilberto, I have concerns that

15   you guys are not meeting the spirit of the MOA

16   during the cyclic inspection.  We never got that

17   indication.

18        Q.    Can you show me in the document in

19   front of you where that is?

20        A.    I cannot show you that, but I can

21   show you the discussions between -- I can tell

22   you about the discussions that --

23        Q.    Would you agree --

24        A.    -- that occurred between --

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    You've told me about the

 2   discussions.  But would you agree that under the

 3   Memorandum of Agreement that was signed by

 4   Cardinal Health and the United States

 5   Government, through the DEA, that that is not in

 6   here?

 7           A.    The interpret --

 8                 MS. WICHT:  Object to the form of

 9           the question.

10           A.    The interpretation of this

11   agreement was discussed with members of the

12   agency, which have found it to be -- which was

13   found at that time to be satisfactory with the

14   spirit of the agreement or the language of the

15   agreement.

16           Q.    And there's that word again, "the

17   spirit" of the agreement.  You said that earlier

18   with regard to your supervision of

19   anti-diversion, making sure that people are

20   acting within the spirit of the rules and the

21   laws.

22                 What I have asked and you have not

23   answered still is:  Is there anywhere in that

24   document in front of you a spot where it says,
```

Highly Confidential - Subject to Further Confidentiality Review

1    Cardinal may rely on the due diligence done by

2    chain pharmacies to determine suspicious orders?

3            MS. WICHT:  Object to the form of

4        the question.

5        A.    (Witness reviews document.)

6            Repeat the question again so I

7    can -- now that I've read the paragraph again, I

8    can answer your question.

9        Q.    Okay.  Is there anywhere in that

10   document in front of you, a spot where it says,

11   Cardinal may rely on the due diligence done by

12   chain pharmacies to determine suspicious orders?

13           MS. WICHT:  Object to the form.

14       A.    There's not that language, but

15   there's no language that says that we could not

16   rely on that either.

17       Q.    Okay.  So your position is that

18   because you don't see anything that says you

19   can't rely on someone else's due diligence, that

20   it's okay?

21           MS. WICHT:  Object to form.

22       Foundation.  Calls for a legal

23       conclusion.

24       A.    No.  That's -- you're not

1    characterizing my testimony appropriately.  What

2    I said, there's not language here either that

3    says that we cannot rely on other sources as

4    part of our due diligence process.  And in

5    communications with the agency, when we told

6    them we designed our program, they were in

7    agreement with that.

8            Q.    If you would turn to Exhibit 5

9    again.  And you may want to keep that one aside

10   because we're going to talk about that one quite

11   a bit today.

12                MS. WICHT:  3, you mean?

13                MR. KROEGER:  5.

14                MS. WICHT:  5.

15                MR. KROEGER:  It's P1.4085.

16   BY MR. KROEGER:

17           Q.    If you could turn to Page 12.

18   Down towards the bottom of the full paragraph,

19   have you heard the name Mike Arpaio before?

20           A.    No.

21           Q.    I'm going to read this for you.

22   "DEA staff coordinator Mark -- Mike Arpaio

23   communicated to Mr. Moné" -- that would be

24   Michael Moné, wouldn't you imagine?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    -- "that due diligence

 3    investigations must be performed on all

 4    customers, chain pharmacies included, when it

 5    appears that suspicious high volume orders are

 6    requested of controlled substances and

 7    questionnaires should be sent to these chains.

 8                    "Mr. Moné stated in turn that QRA

 9    is unable to look at chain pharmacy systems in

10    order to identify problem areas when there is

11    not an order of interest or their threshold is

12    not exceeded."

13                    So from this, DEA staff

14    coordinator Mark -- Mike Arpaio communicated to

15    Cardinal prior to 2012 that chain pharmacies and

16    retail -- independent retail pharmacies should

17    be treated alike, correct?

18                    MS. WICHT:  Object to form.

19              Foundation.

20              A.    I was not a party to that

21    conversation.  I don't have that knowledge of

22    that that particular conversation occurred, the

23    time that it occurred.  I don't know what role

24    Mark [sic] Arpaio had in the agency.  So I mean,
```

Highly Confidential - Subject to Further Confidentiality Review

1    I would be speculating if I gave you an answer.

2          Q.    So if -- if the government has

3    pled in this that Mike Arpaio communicated that

4    to Mr. Moné, are you sitting here today

5    disagreeing with that?

6                MS. WICHT:  Object to the form.

7          A.    I wasn't a party of the

8    communication between the both of them.  You

9    would have to ask Mark Arpaio and Michael Moné.

10         Q.    Did Michael Moné communicate to

11   you that Cardinal, based on communications with

12   the DEA, was able to treat chain pharmacies

13   different than independent retail pharmacies?

14         A.    My understanding from Michael,

15   from the time that I came here, is that we have

16   reached an agreement with the agency and senior

17   members of the agency on how we were to manage

18   our program.  We provided a description of our

19   program, which includes the reliance of

20   investigations from chain pharmacy as part of

21   our due diligence process.

22                And to the best of my knowledge,

23   that agreement was in place in 2012.  So I do

24   not recognize Mark Arpaio's name.  I do not

Highly Confidential - Subject to Further Confidentiality Review

1    recall the conversation -- Michael having a

2    conversation with Mark Arpaio.  I was not a

3    party in that conversation.

4         Q.    You do supervise Michael Moné or

5    you did at this time, didn't you?

6         A.    Yes, I did.

7         Q.    Part of your job, within Cardinal,

8    was to ensure that he was following DEA

9    regulations, correct?

10             MS. WICHT:  Object to the form of

11         the question.

12        A.    My job is to make sure that we

13   have a system that will have programs to ensure

14   that we comply with regulatory requirements.

15        Q.    And you've talked a bit about the

16   fact is that it was in 2012 that the DEA

17   suddenly changed their expectations in terms of

18   what Cardinal and other distributors had to do;

19   is that right?

20        A.    I think it was a surprise to us

21   that we got an administrative action against

22   Cardinal Health, because to the best of our

23   knowledge, at that time, we were complying, not

24   only with the regulations, but also with the

1    expectations of the agency.

2          Q.    So that surprise came in 2012; is

3    that what you're saying?

4          A.    That surprise came in 2012.  Late

5    2011, when we had an investigational warrant.

6    We were surprised that we got one because, to

7    the best of our knowledge, at that time we were

8    complying with the expectations of the agency

9    and we were meeting our regulatory requirements.

10         Q.    Will you turn to Page 13 of

11   Exhibit 5.  Same one you're on, 4085.  Page 13.

12   Middle of the page, it was in July, July 7th,

13   2011, that DEA representatives from DEA

14   headquarters met with Cardinal.  And moving

15   down, "DEA representatives further advised

16   Cardinal Health that, with respect to their due

17   diligence responsibilities, Cardinal Health

18   should examine their Florida customers,

19   particularly Cardinal Health's retail pharmacy

20   chain customers."

21              So in July, you were notified --

22   Cardinal was notified of an issue in Florida,

23   and specifically about chain customers; isn't

24   that correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. RANJAN:  Object to form.

 2           A.    I was not a party of that

 3   conversation.  I don't know.  It doesn't say

 4   between who in DEA and who at Cardinal Health,

 5   so I don't know the facts behind this statement

 6   dated July 7th, 2011.

 7           Q.    So do you dispute that the letter

 8   was sent from the DEA warning Cardinal about the

 9   chain retail pharmacies in Florida, or do you

10   just say that as the senior vice president of

11   QRA, you were unaware of that warning from the

12   DEA?

13                    MS. WICHT:  Object to form.

14           Foundation.  Mischaracterizes the

15           document.

16                    MR. KROEGER:  Counsel, can we keep

17           it as object to form, please, as

18           protocol requires.

19           A.    That there was a letter?  I mean,

20   I don't see here there was a letter.

21           Q.    I apologize.  They advised

22   Cardinal.  The letter came later.

23                    Do you deny that DEA

24   representatives advised Cardinal in July of 2011
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    of their -- with respect to their due diligence

2    responsibilities that Cardinal should examine

3    their Florida customers, particularly Cardinal

4    Health's retail pharmacy chain customers?

5            A.    I cannot --

6                  MS. WICHT:  Object to form.

7            A.    I cannot confirm or deny that

8    particular statement, but I can tell you, me

9    personally, if I was DEA and they were having

10   problems with a compliance program, it would

11   have taken a single call for them to tell me

12   that they had concern.  They never did that.

13   And I called DEA more than once, and those calls

14   were never returned to me.

15           Q.    And then on -- if you move down

16   the next paragraph, after a meeting that DEA had

17   with Mallinckrodt, Mallinckrodt sent a letter to

18   43 distributors, including Cardinal Health.

19   "The letter stated that it was no longer

20   processing chargebacks from distributor sales of

21   Mallinckrodt's product to certain pharmacies,

22   including Gulf Coast Pharmacy."

23                 Moving down that they "made our

24   decision based on our recent site visits to
```

Highly Confidential - Subject to Further Confidentiality Review

1    these locations and suggested that if you have

2    sold controlled substances to any of these

3    pharmacies, you consider conducting an on-site

4    audit as part of your suspicious order

5    monitoring program."

6              Do you recall receiving that

7    letter from Mallinckrodt?

8        A.    I remember Cardinal Health

9    having -- communications with Cardinal Health,

10   including several letters that they sent.

11       Q.    Warning you of particular

12   customers?

13             MS. WICHT:  Object to the form.

14       A.    Which in every single case, those

15   customers were investigated and decisions were

16   made whether or not to continue doing business

17   with those customers.  The particular one that

18   is mentioned in this letter, Cardinal Health

19   terminated that customer.

20       Q.    And what investigations did

21   Cardinal Health do before Mallinckrodt told them

22   that they were going to cut off their

23   chargebacks if they didn't investigate Gulf

24   Coast?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    We --

 2                  MS. WICHT:  Object to the form.

 3            A.    We -- I think, for this particular

 4      customer, recall, we had multiple site visits

 5      and investigations.

 6            Q.    None of which led to termination

 7      until after Mallinckrodt's letter?

 8            A.    I'm not sure if we cut them before

 9      Mallinckrodt letter or after Mallinckrodt

10      letter, but I can tell you, we investigated

11      every time that Mallinckrodt had a concern

12      because they had better visibility than us on

13      the purchases of drugs from pharmacies.

14                  And every time, every single time

15      that we were told that they had a concern about

16      a pharmacy, we investigated the pharmacy and we

17      made a conclusion whether or not we should

18      continue doing business with that pharmacy

19      because that pharmacy represented a potential

20      for diversion.

21            Q.    And I want to go back to 2010,

22      because you had additional notice of the issues

23      in Florida besides the DEA communication to

24      you -- to Cardinal, the letter from
```

Highly Confidential - Subject to Further Confidentiality Review

1    Mallinckrodt.

2              You yourself were aware of some

3    issues that CVS in particular had in Florida,

4    weren't you?

5              MS. WICHT:  Object to the form of

6         the question.

7         A.   I was concerned about some of the

8    trends that we were seeing in some of the CVS

9    Florida pharmacy.

10                  - - -

11        (Cardinal-Quintero Exhibit 6 marked.)

12                  - - -

13   BY MR. KROEGER:

14        Q.   I'm going to hand you what has

15   been marked as Exhibit 6.  It's P1.3778.

16              MR. HUNTER:  Can you provide the

17        Bates number, please?

18              MR. KROEGER:  Yes.  It's

19        CAH_MDL2804_00704499 the underscores

20        between CAH, MDL, and then 280400.

21        A.   (Witness reviews document.)

22        Q.   Mr. Quintero, have you had a

23   chance to look at the document?

24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Do you recognize that?

2              A.    I recognize as a document that

3    Nick Rausch may have sent to me.  Do not recall

4    all of the details of it.

5              Q.    September 19th, 2010 is when

6    Mr. Rausch sent this to you, correct?

7              A.    Yes.  From Nick Rausch to me and

8    Michael Moné, yes.

9              Q.    Yes.  And if you'll turn to Page 4

10   of the document, it's an analysis of SOM events.

11   And "SOM" is suspicious order monitoring?

12             A.    Yes.  Threshold events, yes.

13             Q.    Can you read the first bullet

14   point for me, please.

15             A.    "August 2010 experienced a

16   19 percent increase in the number of SOM events

17   when compared to previous four months."

18             Q.    And the underlying reasons for the

19   increase include -- can you read the next?

20                   MS. RANJAN:  Object to form.

21                   MR. KROEGER:  Who's objecting?

22                   MS. RANJAN:  Brandy.

23             Q.    You can go ahead.

24                   THE WITNESS:  Do I go ahead?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Somebody objected?

 2                 MS. WICHT:  Yes.  She objected to

 3            the form.  I think he's just asking you,

 4            as I understand it, to read the text

 5            that's on the page.

 6            A.    Oh, the text, okay.

 7    BY MR. KROEGER:

 8            Q.    Yes.  "The underlying reasons for

 9    increase include," and then if you could read

10    after that.

11            A.    So jumping to the third bullet,

12    "Underlying reasons for the increase include:

13    Increased number of SOM events within national

14    chain segment, specifically CVS; increase in

15    demand of oxycodone products (reformulation of

16    Oxycontin); AAP, which is a GPO, continued

17    increase in controlled substances demand;

18    competitive pricing, changes drove increased

19    demand; increased demand in Florida -- Lakeland

20    had twice the number of SOM events as any other

21    distribution center."

22            Q.    So as of September of 2010, you

23    were aware, based on this slide sent from Nick

24    Rausch to you, that there were increased SOM
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    events and that in particular, Lakeland had

 2    twice the number of SOM events as any other

 3    distribution center in Cardinal's centers?

 4            A.    I was aware of this, yes.  I was

 5    aware of this document.

 6            Q.    Okay.  And because of this

 7    agreement you think that you had with the DEA,

 8    there was no additional due diligence you needed

 9    to do with regard to CVS because they were a

10    chain pharmacy, correct?

11            MS. WICHT:  Object to form.

12            Foundation.  Mischaracterizes.

13            A.    I disagree with that.  Something

14    that is not included in this is that in -- I

15    don't believe -- I don't recall it was 2009,

16    2010, Florida didn't allow prescribing

17    physicians to dispense C2 products in the

18    doctor's office, so that volume went to some

19    pharmacies, including some national pharmacies,

20    some retail pharmacies.

21                 However, I will have to say that

22    we took this seriously and we increased our

23    scrutiny of Florida stores, including chains.

24            Q.    And when you say that Florida
```

```
 1   prohibited doctors from prescribing and

 2   dispensing the drugs at the same time --

 3          A.    They could prescribe, but I

 4   believe they were not allowed to dispense

 5   drugs -- controlled substances that are C2s.  I

 6   don't recall the schedules that were included,

 7   but I remember C2 were one of them.

 8          Q.    And those --

 9          MS. WICHT:  Mr. Quintero, I'm

10          sorry, could you -- the videographer is

11          asking if you could move your microphone

12          up just a little bit, please, because I

13          think it's rubbing when you're sitting.

14          THE WITNESS:  A little bit more?

15   Can you hear me okay?  Okay.

16   BY MR. KROEGER:

17          Q.    What you're talking about are the

18   illicit pain clinics we were talking about

19   earlier today that you said you're not an expert

20   so you can't say whether or not they were a

21   cause of the opioid epidemic?

22          A.    Well, I wouldn't say --

23          MS. WICHT:  Object to the form of

24          the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I would be speculating it was in

 2     at least the pain clinic.  I think that law

 3     applied to all physicians.

 4              Q.    And as the person who was brought

 5     in by Cardinal to help improve and make a more

 6     robust system for anti-diversion, you would

 7     agree, wouldn't you, that the reason, or one of

 8     the reasons, that Florida may have enacted such

 9     a law would be because a lot of people were

10     illegitimately getting controlled substances

11     through those pain clinics, wouldn't you?

12              MS. WICHT:  Objection to form.

13              Foundation.  Speculation.

14              A.    I don't know the reason why the

15     Florida legislature implemented that.  We had to

16     adapt to that reality.  I'm assuming that that

17     also limited the ability of oncologists to

18     dispense pain medication to cancer patients.

19              Q.    Okay.  But as the senior vice

20     president of QRA brought in, you would agree

21     that a tremendous amount of illegitimate

22     controlled substances were gained through those

23     pain clinics, wouldn't you?

24              MS. WICHT:  Object to the form.
```

```
 1           A.    I wouldn't say that all of that

 2    volume went to pharmacies.  Actually, in a

 3    deposition made by Joe Rannazzisi to Congress,

 4    he said 99 percent of the pharmacies do good

 5    business and they fill prescriptions for

 6    legitimate medical use.

 7           Q.    That's not my question in the

 8    slightest.

 9           A.    What was your question?

10           Q.    As the senior vice president of

11    QRA, would you agree, and in your role -- many

12    roles you've had overseeing anti-diversion,

13    would you agree that those pain clinics where

14    there was a doctor prescribing and dispensing

15    and they were shut down, would you agree that

16    those were a large contributor to the

17    illegitimate opioid products getting into the

18    country?

19                 MS. WICHT:  Object to form.

20           A.    I wouldn't know what the

21    percentage of the pain clinics were doing

22    illicit business versus doing business that were

23    not in the best interests of patient.  I

24    couldn't tell you that number.
```

```
1              Q.    And since you couldn't tell me

2    that number, you also couldn't tell me how many

3    of those illegitimate patients were now getting

4    their drugs from CVS, could you?

5              MS. WICHT:  Object to form.

6         Foundation.

7              A.    There's no way for us to know the

8    reasons why patients are getting their

9    medications -- I mean, there is government

10   regulations that prevent us from having access

11   to individuals' medical records.

12                        - - -

13        (Cardinal-Quintero Exhibit 7 marked.)

14                        - - -

15   BY MR. KROEGER:

16             Q.    I hand you Exhibit 7.  It's 3786.

17   The Bates is CAH_MDL2804_01103874.

18             A.    Uh-huh.

19             Q.    If you would take a look at that

20   document for me, please.

21             A.    (Witness reviews document.)

22                   Yep.

23             Q.    And this is another e-mail sent

24   from Nick Rausch to you in 2010; is that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Correct.

 2              Q.    October 22nd, 2010, Nick sent this

 3    to you?

 4              A.    Correct.

 5              Q.    And on Page 2, you see a specific

 6    pharmacy that this is in relation to, don't we?

 7              A.    Yeah.  It's pharmacy -- CVS

 8    Pharmacy 219.

 9              Q.    That's a familiar number, right?

10              A.    Yep.

11              Q.    So as early as October of 2010,

12    you had asked for and received information

13    specific to this one pharmacy in Sanford,

14    Florida, correct?

15              A.    Uh-huh.

16              MS. WICHT:  Object to the form.

17              Q.    And that pharmacy, as you'll see

18    on Page 2, had high quantities when compared to

19    other CVS stores, high quantities of oxycodone,

20    correct?

21              A.    Correct.

22              Q.    In fact, they had 2800 percent

23    more than average CVS store over the past three

24    months, 725,000 units of oxycodone compared to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    average of 25,000.  Correct?

 2         A.    Correct.

 3         Q.    So when you received this

 4    information in 2010, did you report 219 to the

 5    DEA?

 6         A.    No.  We requested to have the

 7    meeting with CVS to better understand why this

 8    particular pharmacy had an increase in the

 9    purchase of some controlled substances.  CVS

10    committed to do a thorough investigation on the

11    reasons why, and they provided us with a

12    statement on why those particular stores were

13    buying more than the average CVS store.

14         Q.    Okay.  If you'll go back to

15    Exhibit 5 for me.  It's the 4085.  And you'll

16    turn to Page 27, please.  It's the large one

17    we've been doing.

18         A.    Uh-huh.

19         Q.    If you will turn to Page 27, I

20    think we can find the text of that response.

21         A.    27?

22         Q.    Yes, sir.

23               You see at the top how it says,

24    "Carter will also testify"?  I just want to make
```

Highly Confidential - Subject to Further Confidentiality Review

1  sure we're on the same page.

2      A.    Yes, we're on the same page.

3      Q.    And this is in regard to CVS 219

4  and an e-mail dated September 30th, 2010.

5  Skipping down to the middle of the paragraph,

6  the e-mail stated that, "At that time, CVS

7  experienced an increase in sales of oxycodone

8  due to the DEA closing stores in the area.

9  Again earlier this week, because of our request,

10  he sent another e-mail to LP (loss prevention)

11  asking them to take a fresh look.  He received a

12  response yesterday and they have reviewed the

13  store's activities and they have been closely

14  monitoring store 219 for a couple of weeks.

15          "None of these stores show

16  significant growth or shrink issues.  They

17  acknowledge that Florida has been cracking down

18  on 'pill mills' and that is driving more

19  legitimate traffic to CVS stores."

20          Is this the response you're

21  talking about?

22          MS. WICHT:  Object to form.

23      A.    This is some of the language that

24  was used in -- I believe in a memo that was sent

Highly Confidential - Subject to Further Confidentiality Review

```
 1    back to us.
 2           Q.    What's a "pill mill"?
 3           A.    My understanding of a pill mill is
 4    a pharmacy that may fill some of their
 5    prescriptions for other than legitimate medical
 6    use.  But that there's a language here that it
 7    was driving legitimate traffic to the CVS
 8    stores.
 9           Q.    So Florida cracks down on pill
10    mills, which you acknowledge are places where
11    illegitimate pills may be sold, right?
12           A.    Could be part of the sales of that
13    particular store maybe for legitimate medical
14    reasons and not for legitimate medical reasons.
15           Q.    Florida cracks down on those pill
16    mills and then suddenly CVS has a growth in
17    business?
18                 MS. WICHT:  Object to the form.
19           A.    If there's less pharmacies in the
20    area, I'm assuming that some of that will drive
21    legitimate traffic to the CVS stores.
22           Q.    So if the flow of opioids going to
23    pill mills is diverted by the government
24    shutting them down, then that flow is going to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   go to CVS?  Would you agree?

2              MS. WICHT:  Object to the form of

3         the question.

4         A.    I wouldn't say that would be the

5   case.  I'm assuming the pharmacists at CVS were

6   doing their correspondence responsibility in

7   determining whether or not those particular

8   scripts were for legitimate medical purposes and

9   that the traffic -- that additional traffic that

10  they were getting was as a result of other

11  stores in the area that had been closed.  That

12  may have had legitimate traffic as well as

13  traffic that is illegitimate.

14        Q.    So you're agreeing, then, that

15  there may be illegitimate traffic that had gone

16  to CVS as a result of the pill mills?

17        A.    No, I never said that.

18             MS. WICHT:  Object to the form of

19        the question.

20        A.    I never said that.  I said that,

21  you know, my understanding at that time was that

22  the pharmacist at CVS was doing their

23  corresponding responsibility, and according to

24  the text, is that they -- if the traffic that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was getting to the CVS stores were legitimate

 2    traffic, as stated here by -- this document, I

 3    think, came from Ruth Carter.

 4         Q.    So as a senior vice president of

 5    QRA, responsible for the entire anti-diversion

 6    program of Cardinal Health, is it your testimony

 7    that when Florida shuts down these pill mills

 8    that you acknowledge are a source of

 9    illegitimate opioids, that the resulting flow of

10    opioid patients, people getting opioids, only

11    the legitimate people go to CVS?

12              MS. WICHT:  Object to the form.

13         A.    The illegitimate?

14         Q.    The legitimate.

15         A.    Well, I couldn't tell -- I

16    couldn't answer that question, but I can answer

17    that, in addition to this document that we got

18    from CVS, I sent one member of my staff to park

19    in front of store 219 and determine whether

20    there were obvious signs of diversion, like cars

21    with license plates from out of states, long

22    lines.  And when he came back to me, he said, I

23    did not see anything unusual in 219.

24         Q.    What time did he go?  What time of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   day did he go?

 2          A.    I don't recall the time.  I cannot

 3   tell you from the top of my head.

 4          Q.    Morning, afternoon, evening?

 5                MS. WICHT:  Object to form.

 6          A.    I cannot remember from the top of

 7   my head when he go, but when he went there --

 8   and he was there for a period of time -- he did

 9   not observe a single sign of diversion.  So I

10   mean, I trust his judgment, I -- that his

11   opinion, with the language that we got from CVS,

12   led me to believe that that store at that

13   particular time was operating as any good

14   pharmacy should operate.

15          Q.    A store that had a 2800 percent

16   more oxycodone over three months than the

17   average CVS, and you as the senior vice

18   president of QRA for Cardinal Health took CVS's

19   word and one site visit to determine that it was

20   all legitimate traffic?

21                MS. WICHT:  Object to the form.

22          Mischaracterizes.

23          A.    Based on the information that I

24   received from CVS, as well as our own site
```

```
 1    visit, we did not have a reason to believe that

 2    CVS 219 was filling prescriptions other than for

 3    legitimate medical purposes.

 4            Q.    And who did the site visit?

 5            A.    Chris Forst.

 6            Q.    And you don't know what time of

 7    day Chris Forst went?

 8            A.    Don't recall.

 9            Q.    Are you aware that this CVS was

10    selling so much oxycodone that they regularly

11    ran out before noon?

12                 MS. WICHT:  Object to the form.

13            A.    I don't know that.

14            Q.    Okay.  As senior vice president of

15    QRA, shouldn't you?

16                 MS. WICHT:  Object to form.

17            A.    I don't monitor when drugs are

18    being dispensed.  I don't think that that is

19    possible to do.

20            Q.    To be clear, are you saying it's

21    not possible for Cardinal to monitor when drugs

22    are being sold?  Is that what you just said?

23            A.    You will have to have --

24                 MS. WICHT:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    You will have to have somebody in

 2     front of the store 24/7 to see when the drugs

 3     are being filled.  If you want me to tell you,

 4     you know, my assumption is, customer goes to

 5     pharmacies throughout the day, not only at one

 6     particular time.  I don't even remember if these

 7     are 24-hour stores or not.  Could be.  But it

 8     would require having a member of my staff in

 9     front of each single pharmacy in the United

10     States to see the dispensing patterns of all

11     those stores.

12              Q.    Or it might just require some due

13     diligence; would you agree?

14              MS. WICHT6:  Object to the form.

15         Is that a question?

16              MR. KROEGER:  It is.  I said

17         "would you agree."

18              MS. WICHT:  Object to the form.

19              Why don't you answer that before

20         you -- or --

21              A.    We did our due diligence.

22                          - - -

23         (Cardinal-Quintero Exhibit 8 marked.)

24                          - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. KROEGER:

 2            Q.    I've handed you 3782,

 3    CAH_MDL2804_01087475.

 4                  THE WITNESS:  Is that this one?

 5                  MS. WICHT:  Yes, that's this

 6            document.  That was the number that he

 7            read in, I believe.

 8                  THE WITNESS:  Okay.

 9    BY MR. KROEGER:

10            Q.    Do you have 3782 at the top?

11            A.    Yep.

12            Q.    Okay.  We can walk through this.

13    This is -- can you tell who this e-mail is from?

14            A.    This is from Nick Rausch.

15            Q.    When did he send it to you?

16            A.    Sent it to me in -- on March 22,

17    2012.

18            Q.    And what is it exactly that he is

19    sending you?

20            A.    Sending me a PowerPoint

21    presentation of CVS stores that were being

22    reviewed.

23            Q.    When were they being reviewed?

24            A.    I'm assuming in -- when he sent me
```

```
1    the e-mail.

2         Q.    Okay.  And that's -- I wanted to

3    try to clarify.  So if you could stay on the

4    first page real quick.  Just -- I want to make

5    clear what this is.

6              It says, "Gilberto, per your

7    request, attached please find the presentation

8    prepared for the December 2010 meeting with

9    CVS."

10        A.    Okay.  So it's likely that it was

11   for a presentation that we made to CVS in 2010.

12        Q.    Do you remember that meeting in

13   2010 that you had with CVS?

14        A.    Yes, I remember that meeting.

15        Q.    And the purpose of that meeting

16   was what?

17        A.    Was to discuss with CVS our -- I

18   need to -- can I go over the slides just to

19   refresh my mind first?

20        Q.    Absolutely.

21        A.    (Witness reviews document.)

22              (Pause in proceedings.)

23        A.    Yes.

24        Q.    Do you recall this presentation?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yeah, I remember this presentation

2    now.

3      Q.    And this was from a meeting that

4    you were personally at with CVS in 2010?

5      A.    I was with Michael Moné and some

6    of the members of the CVS management team.

7      Q.    But you were personally there?

8      A.    I was there.

9      Q.    Okay.  And it was December of 2010

10   that you had the meeting?

11     A.    It appears that was the date.  I

12   don't have any reason to believe that it did not

13   occur during December 2010.

14     Q.    If you turn to Page 5 of this.

15     A.    You asked me first, and I didn't

16   answer your question, which I don't know if I

17   should, is what was the purpose of the meeting.

18     Q.    Go ahead.

19     A.    Do you want me to answer that

20   question?

21     Q.    Sure.

22     A.    Should we -- sorry about that.

23           MS. WICHT:  I won't object to the

24           witness' own question.  That's okay.

1              Go ahead.

2        A.    The purpose of the meeting was to

3    go over our program with CVS and provide them

4    with a few of -- some stores that we needed more

5    information.

6        Q.    Okay.  And on Page 5, CVS stores

7    created 468 suspicious order monitoring events

8    in 2010.

9        A.    Uh-huh.

10       Q.    How many of those were resolved

11   with the order being released?

12       A.    I could not say that.

13       Q.    If you look down the slides, you

14   can.

15       A.    I guess, according to this

16   document, it's 90 percent of them were reviewed

17   and resolved and the order was released.

18       Q.    So that means that there was a

19   suspicious order monitoring event and -- 468 of

20   them, and 90 percent of the time those orders

21   were reviewed and released, correct?

22       A.    According to this document, that's

23   what it says, yes.

24       Q.    And 6 percent of the 468

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring events were

2    confirmed order entry errors; is that right?

3           A.    That's what it says there.

4           Q.    So then, does that mean that only

5    4 percent of the 468 suspicious order monitoring

6    events had any issue at all that was suspicious?

7                 MS. WICHT:  Object to the form of

8           the question.

9           A.    I wouldn't say that the event

10   itself, just by hitting the threshold was

11   suspicious, it required the analysts or the

12   investigators to do additional evaluation and do

13   that determination.

14          Q.    Do you know what evaluation they

15   did?

16          A.    I don't recall.  This was -- this

17   happened in 2010, so I don't recall exactly what

18   was going on.  I recall that we requested CVS

19   additional information about the stores that are

20   listed in this document.

21          Q.    So if we turn to Page 11, CVS

22   pharmacy 1136, November of 2010.

23                Do you see that?

24          A.    Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     November of 2010, quantity is 537

2    percent above CVS store monthly average of 8300

3    dosage units.

4          A.     Uh-huh.

5          Q.     That caused concern?

6                 MS. WICHT:  Object to the form.

7          Q.     That caused Cardinal some concern,

8    didn't it?

9          A.     That caused, you know, us being

10   concern of wanting to have more information

11   about that particular store.

12         Q.     And if that had been an

13   independent retail pharmacy, would you have

14   asked that independent retail pharmacy the

15   reason, or would you have done your own due

16   diligence?

17                MS. WICHT:  Object to form.

18         A.     We would have first called the

19   pharmacy to try to understand the reason.

20         Q.     And if they gave you any reason at

21   all, would you just accept it?

22                MS. WICHT:  Object to form.

23         A.     Depending on the reason that it is

24   and whether or not it seems credible or not.

```
1              Q.    What's a credible reason for 537

2    percent above the monthly average of 8300 dosage

3    units?

4                    MS. WICHT:  Object to form.

5              A.    There could be many valid reasons.

6    I don't know for this particular one, but I can

7    tell you that sometimes, pharmacies take over

8    hospices to provide drugs to cancer patients

9    that are about to die and they have a new

10   account with a hospice, or there may be a new

11   hospital opening nearby.  There are many -- it

12   could be they bought, you know, the script

13   from -- the account from other pharmacies that

14   closed in the nearby area.

15             Q.    Okay.

16             A.    So there are many reasons for

17   that.  And these particular reasons, I do not

18   recall from the top of my head.

19             Q.    As senior vice president of QRA at

20   the time, is that something you would like to

21   have known?

22                   MS. WICHT:  Object to form.

23             A.    Our process, as I described

24   before, and during this deposition, is we had an
```

Highly Confidential - Subject to Further Confidentiality Review

1    agreement with DEA that we will use the

2    investigations from the chain pharmacies to help

3    us reach our own conclusions.

4              In this particular case, I

5    remember asking the members of the CVS staff to

6    do an investigation of all these particular

7    stores and to get to me back in writing the

8    conclusions of their investigations, which they

9    did at a future date.

10             Q.   Okay.  To try to summarize what I

11   think you just said -- I want to be clear -- it

12   sounds to me as if you're saying that you

13   believed the DEA had told Cardinal that you

14   could rely on CVS to do the due diligence as to

15   these kinds of suspicious orders, and because of

16   that agreement with the DEA, CVS gave you a

17   reason that you found sufficient, then you

18   needed to do nothing more?

19             MS. WICHT:  Object to form.

20             A.   I'm not saying that.  In many

21   cases we did more investigation, our own

22   investigations, like what I showed you in 219.

23   CVS gave us a reason.  I wanted to confirm that

24   the reason was credible, so I sent my own

```
 1    investigator to CVS 219 to do a surveillance

 2    inspection of that particular pharmacy, and he

 3    didn't find a single sign of diversion at that

 4    time.

 5          Q.    Okay.  If you turn to Page 12 for

 6    me, please.  This is another CVS.  CVS Pharmacy

 7    0174.  And another November 2010 quantity.  This

 8    one is 6977 percent above CVS store monthly

 9    average of 700.  And that causes Cardinal some

10    concern, doesn't it?

11                MS. WICHT:  Object to form.

12          A.    It gave us concern and we wanted

13    to know the reasons why the store had an

14    increased volume for particular controlled

15    substances.  We wanted an explanation --

16    investigation and an explanation in writing from

17    CVS, which they submitted at a later time.

18          Q.    And in this particular case, store

19    174, over 60 percent of purchases are for

20    controlled substances.

21                Would that be a red flag to you?

22          A.    Not necessarily, because CVS

23    warehouses all their noncontrolled substances.

24    We only sell a fraction of what CVS store sells
```

Highly Confidential - Subject to Further Confidentiality Review

1    in their stores.  But they do not have a vault,

2    so we are their primary supplier of controlled

3    substances, at least for those stores in that

4    region of the country.

5          Q.    So because they don't have a

6    vault, a nearly 7,000 percent over monthly

7    average isn't concerning?

8          A.    That was --

9                MS. WICHT:  Object to form.

10          A.    That wasn't the question that you

11    asked me.  You asked me if 60 percent of the

12    purchases, if that was concerning that they were

13    controlled substances.  And I said, probably not

14    because we had the agreement with CVS because

15    they don't a vault, we supply all of their C2.

16    They supply most of their other drugs out of

17    their own warehouses.

18          Q.    Including, at that time,

19    hydrocodone?

20          A.    I don't recall at that time if

21    that particular warehouse that CVS was using had

22    a vault.

23          Q.    And if you'll turn to Page 13.

24    Again, another CVS with, this time, 453 percent

Highly Confidential - Subject to Further Confidentiality Review

```
1    above CVS store monthly average of dosage units

2    of oxycodone.  Right?

3         A.    Yep.  That's what it says in the

4    document.

5         Q.    And that caused you concern, is

6    Cardinal Health distributing that much oxycodone

7    to a single CVS store?

8         A.    The increase gave us concern.

9    That's why we met with CVS.  We expressed our

10   concerns, and we requested an investigation of

11   these stores that are listed in this document.

12        Q.    And on Page 14, CVS 3639 had a 244

13   percent above CVS monthly average of 8,300; is

14   that right?

15        A.    Correct.  That's what it says in

16   the document.

17        Q.    And again, that caused Cardinal

18   concern?

19        A.    All the stores that are presented

20   in this document we highlighted as stores that

21   we needed more information from CVS.

22        Q.    Okay.

23        A.    So the answer is the same for all

24   the stores.  We wanted to have additional
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    information from CVS.  Our system were to

 2    identify stores that we needed additional

 3    information, and according to our process and

 4    the agreement that we had with the agency, we

 5    executed that.  And on top of that, we sent

 6    people with some of the stores to do

 7    surveillance inspections.

 8            Q.    And some of these stores in

 9    particular?

10            A.    Well, I don't know if this store,

11    but some of the CVS stores we have performed

12    surveillance inspections.

13            Q.    Well, these are the stores that in

14    December of 2010 you thought suspicious enough

15    that you wanted to bring it to CVS's attention

16    directly, right?

17            A.    Yep.  And --

18                  MS. WICHT:  Object to the form of

19            the question.

20            A.     -- these were stores that the data

21    provided here gave -- an analysis that we did

22    highlighted these stores as stores that we

23    needed additional information and that we

24    requested additional information from CVS.  We
```

Highly Confidential - Subject to Further Confidentiality Review

1    requested for them to do an investigation of

2    each one of those stores and to provide us with

3    the conclusion of their investigation.

4           Q.    And for any of these stores, did

5    Cardinal do any of its own due diligence, aside

6    from asking CVS?

7                 MS. WICHT:  Object to the form.

8           A.    Right now, I recall me asking

9    about going to 219, but I'm not in a position to

10   say whether or not we went to any of these

11   stores.  Michael Moné may have made that

12   request.  Nick Rausch may have made that

13   request.  I do not remember that.  I do not

14   know.

15          Q.    Anything besides site visits that

16   you can recall for any of these stores that

17   Cardinal did with regard to due diligence?

18          A.    I know there were conversations

19   between Michael and members of the CVS

20   anti-diversion program.

21          Q.    And all of that would be

22   documented in the due diligence files for each

23   of these stores?

24                MS. WICHT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    I cannot tell you whether or not
2     we documented every single conversation that we
3     had with CVS.
4            Q.    Can you tell me that Cardinal
5     documented the due diligence that you did with
6     regard to these stores?
7            A.    We documented, you know --
8                  MS. WICHT:  Object to the form.
9            A.    -- the outcome of our presentation
10    to CVS and also the conclusion of their
11    investigation.  I know that for a fact, because
12    I remember seeing those documents.  Anything
13    else, I'm not into the day-to-day execution of
14    the program, so you're asking me for questions
15    that are based on day-to-day execution, and I'm
16    not the best person to answer those.
17           Q.    No.  But you, at this time,
18    oversaw all of those people and were responsible
19    for them following the law, weren't you?
20           A.    I over --
21                 MS. WICHT:  Object to the form of
22           the question.
23           A.    I oversee over 2,000 people in my
24    department.  I don't have intimate knowledge of
```

Highly Confidential - Subject to Further Confidentiality Review

1    what each one of those members in my department

2    execute on a daily basis.

3         Q.    Ultimately, the responsibility

4    comes all the way up to you for them doing their

5    job correctly, though, doesn't it?

6         A.    I have responsibility --

7              MS. WICHT:  Object to the form.

8         A.    I have responsibility for having

9    programs to help Cardinal Health meet all of the

10   regulatory requirements.

11        Q.    Okay.  And so you said for each of

12   these stores, you -- the purpose of this meeting

13   was to have CVS look into these stores and then

14   they would let you know what they found?

15        A.    Correct.

16        Q.    And that was the due diligence you

17   were going to do for these particular stores, to

18   your knowledge?

19              MS. WICHT:  Object to form.

20        A.    Based on the agreement that we had

21   with DEA in 2009, the process was, when we had a

22   concern about a chain store is to have the chain

23   stores perform an investigation on any pharmacy

24   that belonged to them that we had, you know, the

```
1    need for additional information.

2           Q.    Okay.  And after that December

3    2010 meeting, CVS got back to you with the

4    results of their investigation, correct?

5           A.    CVS wrote us a memo.

6                        - - -

7       (Cardinal-Quintero Exhibit 9 marked.)

8                        - - -

9    BY MR. KROEGER:

10          Q.    I'm going to hand you what's been

11   marked as Exhibit 9.  It's 4334.  It is

12   CAH_MDL_PRIORPROD_DEA12_00011853.

13          A.    Uh-huh.

14          Q.    If you would look at that,

15   Mr. Quintero.  Is this the memo that you're

16   talking about that CVS got back to you?

17          A.    (Witness reviews document.)

18                (Pause in proceedings.)

19          A.    Yes, this is the -- one of the

20   memos that I'm talking about.

21          Q.    Were there any other memos that

22   they may have sent?

23          A.    I wouldn't know, but I remember

24   seeing this particular one.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And if they had sent any other,

2    would those go in the due diligence files for

3    those particular stores?

4               MS. WICHT:  Object to the form.

5          A.    I'm assuming they are in the

6    possession of somebody at Cardinal Health.  I

7    would assume that.

8          Q.    But this isn't something that

9    would go into a due diligence file for store

10   174, for instance?

11         A.    It will go to -- it will be filed.

12   But like I told you before, I don't have an

13   intimate knowledge of what -- every single

14   activity that is done out of the 2000 people

15   that report into my organization.  So my

16   assumption is they have some kind of filing

17   system, and I recall this document.  This

18   document was important to me because I was part

19   of that meeting, so I requested to see this

20   document.

21         Q.    And as senior vice president of

22   QRA for Cardinal at this time, you don't know

23   what goes into the due diligence files?

24         A.    I know --

```
 1                 MS. WICHT:  Object to form.

 2          A.    I know information that goes into

 3   the due diligence file, but you were asking me

 4   if every single document goes into due diligence

 5   file, and I couldn't tell you that.

 6          Q.    So you know what goes into it but

 7   you don't know what doesn't go into it?

 8                 MS. WICHT:  Object to the form.

 9          Q.    I'm unclear.

10          A.    Unclear about what?

11          Q.    About what you mean when you say

12   you know what goes into the due diligence files

13   but you don't know if this would have gone into

14   it or not.

15          A.    I know about the content of some

16   due diligence files because I have seen some of

17   the due diligence files.  Can I tell you that I

18   know every single document that goes into a due

19   diligence files?  I don't think that I can tell

20   you that.

21          Q.    And after you had this

22   presentation -- or Cardinal had this

23   presentation with CVS in December of 2010, CVS,

24   as we go down to the last two paragraphs of this
```

1   page, Page 1, they let you know that they --

2   that teams interviewed pharmacy staff, reviewed

3   controlled substance ordering, receiving and

4   dispensing procedures, controlled substance

5   records and reports and security.  The teams

6   also audited certain drugs.

7               Do you know which drugs?

8       A.    No, I don't know what drugs they

9   were referring to.

10      Q.    Okay.  But CVS let you know that

11  they audited certain drugs?

12      A.    They did that.

13      Q.    Do you know which pharmacy staff

14  they interviewed?

15      A.    In the previous paragraph that you

16  are not reading, it says they met with CVS

17  stores 0174, Daytona Beach; 1136 in Homestead;

18  2732 Hollywood; 2848 in Pompano Beach; and

19  3939 -- 36 -- pardon me, 3639 in Bushnell.

20              I'm assuming -- the assumption is

21  that they visited those stores and they talked

22  to personnel from those stores, including

23  pharmacy staff, according to the previous

24  paragraph.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Right.  But you don't know which

2    pharmacy staff at those various stores that they

3    talked to?

4          A.    It indicates pharmacy staff.

5          Q.    And my question to you is:  Do you

6    know which pharmacy staff they spoke to at those

7    stores?

8          A.    I could not tell you.  I would be

9    speculating if I tell you which pharmacy staff.

10          Q.    But you're aware there are

11    multiple different types of jobs and roles and

12    positions in a pharmacy, right?

13               MS. WICHT:  Object to the form.

14          A.    In a pharmacy, there may be

15    different people at the pharmacy.

16          Q.    Pharmacists in charge, or

17    pharmacist tech; any number of different

18    positions in a pharmacy, right?

19          A.    Uh-huh.

20          Q.    But you can't say which of those

21    staff members CVS may or may not have spoken to

22    at these stores?

23               MS. WICHT:  Object to the form.

24          A.    Or in the previous paragraph, two
```

1    paragraphs before that, they talk about meeting

2    with the pharmacist at the site to make sure

3    that they understood, you know, the

4    dispensing --

5            Q.    Go ahead and read directly from

6    it, if you don't mind.

7            A.    "Since our meeting, CVS has

8    undertaken action to address your concerns about

9    those specific pharmacies to address suspicious

10   ordering and dispensing generally.  CVS has

11   distributed guidelines that reinforce the

12   company's position that pharmacists use their

13   professional judgment when determining whether

14   to fill prescriptions.

15               "The guidelines identify

16   inappropriate prescription-seeking behavior and

17   advise pharmacists how to minimize risk of

18   dispensing for other than legitimate

19   prescriptions."

20           Q.    So this paragraph doesn't say that

21   CVS went and interviewed pharmacists; it says

22   that it sent guidelines to those pharmacists,

23   correct?

24               MS. WICHT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    My assumption, when reading the
 2    letter, is that the team interviewed pharmacy
 3    staff included pharmacists, because they're the
 4    one dispensing the product.
 5            Q.    But you don't know that based on
 6    what CVS told you, do you?
 7            A.    I think that would be a good
 8    assumption to make, based on this memo.
 9            Q.    So when you take the time to meet
10    with CVS, present to them a number of stores
11    that cause Cardinal concern, you as a senior
12    vice president of QRA feel comfortable basing
13    your decision to continue shipping to these
14    stores on an assumption that they must have
15    talked to the pharmacist?
16                 MS. WICHT:  Object to form.
17            Mischaracterizes.
18            A.    It is not -- not on the
19    assumption.  This is based on the facts that CVS
20    conducted an investigation of those particular
21    pharmacies and that they deemed that those
22    pharmacies were dispensing product for
23    legitimate medical purpose.
24            Q.    What receiving --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                A.    As stated in the last paragraph of

2    Page 1.

3                Q.    We'll get there.

4                      What receiving and dispensing

5    procedures did CVS review with -- in this

6    investigation?

7                A.    I don't know the details of that.

8    I wasn't there during the investigation.

9                Q.    No, you weren't.

10                     What controlled substance records

11   and reports did they review?

12               A.    I wasn't there during the

13   investigation, so I cannot tell you that.

14               Q.    What security did they review?

15               A.    I cannot tell you that because I

16   was not part of the investigation.

17               Q.    But CVS told you that they did

18   some sort of a review of all of these things,

19   but you don't know what specifically they

20   reviewed, do you?

21                     MS. WICHT:  Objection.  Asked and

22           answered.

23               A.    Can you repeat the question again?

24               Q.    CVS told you that they reviewed a
```

Highly Confidential - Subject to Further Confidentiality Review

1  number of different things, but you don't

2  actually know what specifically they reviewed.

3  You don't know which pharmacy staff they

4  interviewed, do you?

5         MS. WICHT:  Objection.  Asked and

6     answered.

7     A.    Here it's stated on Paragraph --

8  "The teams interviewed pharmacy staff, reviewed

9  controlled substances ordering, receiving,

10  dispensing procedures, controlled substances

11  records and report and security.  The teams also

12  audited certain drugs."

13         But it chose that they did an

14  investigation, including those elements listed

15  in -- in Paragraph 4.

16     Q.    And again, the question, though,

17  is:  The specifics of those reviews, you don't

18  know anything more than what's right here, do

19  you?

20     A.    Again, I have --

21         MS. WICHT:  Objection.  Asked and

22     answered.

23     A.    I have told you that I was not a

24  party in the audit, so I cannot tell you the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specifics of it, but I trust that CVS did what

 2    they committed to us, which was to do an

 3    investigation based on the data that we

 4    presented to them and that the investigation was

 5    valid.

 6            Q.    Do you know if CVS has any sort of

 7    profit motive in their business model?

 8                 MS. WICHT:  Object to the form.

 9            A.    I don't understand --

10                 MS. WICHT:  And speculation.

11            A.    I don't understand the question.

12            Q.    Do you think that CVS is a

13    corporation that seeks to make profits?

14                 MS. WICHT:  Object to the form.

15            A.    I believe CVS is a public company,

16    that like all the public companies, seek to make

17    a profit.

18            Q.    And would you agree that if CVS

19    doesn't receive opioids from Cardinal, they will

20    lose some of those profits because they can't

21    sell them?

22                 MS. WICHT:  Object to form.  Calls

23            for speculation.

24            A.    I wouldn't -- I couldn't tell you
```

Highly Confidential - Subject to Further Confidentiality Review

1    the proportion of opiates that is their business

2    versus other business.

3         Q.    Would you agree, though, that

4    whatever proportion it is, it could be directly

5    impacted by Cardinal deciding not to sell

6    opioids to CVS?

7              MS. WICHT:  Object to form.  Calls

8         for speculation.

9         A.    That would be speculating if I

10   give you a specific answer.  I do not know that.

11        Q.    And counsel has done a good job of

12   guiding you into that answer.  But would you

13   agree that CVS, as a public corporation that has

14   a profit motive, would lose some profits if it

15   was no longer able to sell opioids that Cardinal

16   distributed?

17             MS. WICHT:  Object to form.  Calls

18        for speculation.

19             MR. KROEGER:  Can you keep it to

20        object to form, please?

21             MS. WICHT:  I understand you're

22        accusing me of coaching.  You're asking

23        the witness to testify about the profit

24        structure and the income of an entirely

Highly Confidential - Subject to Further Confidentiality Review

```
1            separate company.

2                   MR. KROEGER:  All objections are

3            to be as to form only.

4                   MS. WICHT:  Object to form.  Calls

5            for speculation.

6            A.    You know, if -- I don't even know

7     if -- there are sometimes that you have to carry

8     products in a supermarket that makes no profit,

9     but you have to have it in order for the -- to

10    be a complete offering.  I don't know if they

11    sold -- I mean, what are the profits of opioids

12    for CVS?  I don't work there.

13                  And even if I work there, I'm a

14    quality professional, not a salesperson or in

15    the finance department to determine what is the

16    profit margin on opioids that they made.  I

17    don't know that.  I don't even know if that will

18    stop other customers from going to the store.  I

19    do not know that.  I would be speculating.

20    You're asking me to answer something that I have

21    no knowledge of.

22           Q.    You were the senior vice president

23    of QRA at Cardinal Health, correct?

24           A.    I am.
```

1          Q.     And in that role, a primary duty

2    was to ensure a robust anti-diversion program

3    from Cardinal, correct?

4          A.     It requires us to meet our

5    regulatory requirements, yes.

6          Q.     And the only reason -- well,

7    you're now also saying that you don't know if

8    opioids are profitable for CVS?

9          A.     I don't know the profit structure

10   of -- CVS has on opioids.  I cannot tell you

11   that.

12         Q.     You won't even go so far as to say

13   that you believe, as someone who has worked with

14   CVS and who has worked in the business world,

15   you won't even go so far as to say that CVS

16   likely profits off of opioids?

17                MS. WICHT:  Object to the form.

18         A.     I cannot tell you the answer to

19   that because I would be speculating.  I don't

20   know how much money they make in opioids, what

21   are the investment that they have to do to be

22   able to sell opioids.  So I cannot tell you

23   that.  I mean, you're asking me to answer a

24   question that is beyond my understanding about

Highly Confidential - Subject to Further Confidentiality Review

```
 1   CVS business model.

 2          Q.    I'm asking you to answer a real

 3   world question about the fact that opioids are

 4   profitable for corporations.

 5                MS. WICHT:  Is that a question?

 6                MR. KROEGER:  Yeah.

 7                MS. WICHT:  What's the question?

 8   BY MR. KROEGER:

 9          Q.    Can you tell me if they are?

10                MS. WICHT:  Object to the form.

11          Calls for speculation.

12          A.    Yeah.  I would be speculating,

13   so...

14          Q.    Okay.  So then, let's move down to

15   the final paragraph on Page 1.  CVS's conclusion

16   that they sent to you, "The teams found no

17   evidence of controlled substance diversion or

18   significant losses.  CVS is confident that

19   pharmacists and their staff at these pharmacies

20   understand how to minimize the risk of

21   dispensing controlled substances, particularly

22   opioids for pain management for nonlegitimate

23   purposes."

24                That's the conclusion CVS sent to
```

```
 1   Cardinal; is that right?

 2              MS. WICHT:  Object to the form.

 3         A.    And there's more language in there

 4   on the second page, too.

 5         Q.    But that paragraph, is that

 6   correct?

 7         A.    That paragraph that you read is in

 8   the letter, yes, correct.

 9         Q.    So based on some sort of a review

10   that you weren't a part of, so you don't know

11   the details of, CVS has told you that they found

12   no evidence of controlled substance diversion or

13   significant losses?

14         A.    That's the information --

15              MS. WICHT:  Object to the form.

16         A.    That's the information that was

17   provided to us by CVS.

18         Q.    And then if we turn to the last

19   paragraph that you were -- based on that review

20   that you don't know the details of, CVS is

21   telling you, "CVS is comfortable with Cardinal

22   continuing to ship controlled substances to

23   these pharmacies and look forward to continuing

24   to work with you to address matters of mutual
```

1    concern.  Please let me know if you still have

2    concerns about these pharmacies or if you have

3    concerns about others."

4         A.    Uh-huh.

5         Q.    So after a meeting with CVS in

6    December of 2010, where you outlined a number of

7    pharmacies that had anywhere from 200 percent

8    over the average to 6,799 percent over the

9    average, this is the result of CVS's due

10   diligence, correct?

11              MS. WICHT:  Object to the form.

12        A.    This is a summary of the

13   conclusion of their investigation.

14        Q.    And it's based on this summary of

15   their conclusion of their investigation that

16   Cardinal determined it was appropriate to

17   continue shipping to these individual CVS

18   stores, correct?

19              MS. WICHT:  Object to the form.

20        A.    We didn't have any reason to

21   believe that the information provided to us was

22   not valid.

23        Q.    What reason did you have to

24   believe that it was valid?

```
 1              A.    Is that representations that they

 2    make to us, the meeting that we had with them,

 3    they expressed, you know, concerns that we were

 4    concerned about these stores, and they committed

 5    to do thorough investigations on these

 6    particular pharmacies.

 7              Q.    And at no point did Cardinal do

 8    any of its own due diligence on these

 9    pharmacies?

10              MS. WICHT:  Object to the form.

11          Mischaracterizes his prior testimony.

12              A.    Like I told you, you know, we, you

13    know, kept looking at trends of pharmacies.  We,

14    on occasion, visited CVS pharmacy.  I cannot

15    tell you which specific one.  The only one that

16    I recall from the top of my head is 219.  It is

17    possible that we went to some other stores.

18              Q.    Later in 2011 --

19              MS. WICHT:  Would it be a good

20          time for a short break?

21              MR. KROEGER:  Now is fine.

22              VIDEOGRAPHER:  Time is now 11:14.

23          Going off the record.

24              (Recess taken.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    VIDEOGRAPHER:  Time is now 11:33.

 2            Back on the record.

 3   BY MR. KROEGER:

 4            Q.    Mr. Quintero, we have talked a bit

 5   about what happened in terms of the DEA action

 6   against Cardinal in late 2011, early 2012 today.

 7                 The first thing that happened,

 8   though, was that an administrative investigative

 9   warrant was served?

10            A.    (Nods head.)

11            Q.    Do you recall that being served?

12            A.    Yes, I do.

13            Q.    Did you see a copy of it?

14            A.    I saw a copy of that at that time.

15                      - - -

16        (Cardinal-Quintero Exhibit 10 marked.)

17                      - - -

18   BY MR. KROEGER:

19            Q.    This will be Exhibit 10.  It's

20   3776.  And the Bates is

21   CAH_MDL_PRIORPROD_DEA12_00003808.

22                 So this is the warrant for

23   inspection.  Did you receive this at some point?

24            A.    Yes, we did.  I got a copy of this
```

1    at one point.

2           Q.    And one of the things that was

3    requested is in Paragraph c -- 2c, do you see

4    that, "To inspect all records, files, papers,

5    processes, controls, facilities appropriate for

6    verification of the records, reports and

7    documents required to be kept under the

8    provisions of the act and regulations

9    promulgated thereunder."

10          Do you see that?

11          A.    Correct.

12          Q.    Now, this is a warrant served on

13   Cardinal with regard to Lakeland Distribution

14   Center, correct?

15          A.    Correct.

16          Q.    And this is the DEA telling

17   Cardinal that we want more information about

18   Lakeland Distribution Center, correct?

19          MS. WICHT:  Object to the form.

20          A.    This is an inform -- I mean, a

21   warrant for inspection, which some of the

22   requirements have to inspect records and they

23   ask for records.

24          Q.    And they're looking

Highly Confidential - Subject to Further Confidentiality Review

1    specifically -- at least one part of what

2    they're looking for are the records that are

3    required to be kept under the act, the

4    Controlled Substances Act, correct?

5           A.    Correct.

6           Q.    And if Cardinal has an agreement

7    with the DEA and an understanding in terms of

8    what their obligations are to -- as to what to

9    record and report, then Cardinal should have

10   what the DEA's looking for under the provisions

11   of the act.  Wouldn't you agree?

12              MS. WICHT:  Object to the form.

13              Calls for a legal conclusion, I think,

14              if I'm understanding it.

15          A.    We should have the records that

16   are required.  Per the regulations, we should

17   have that.

18          Q.    Okay.  And was Cardinal or was

19   Cardinal not keeping proper records of its due

20   diligence during -- prior to October 26, 2011?

21              MS. WICHT:  Object to the form.

22          A.    My understanding is Cardinal

23   Health has always kept all the records required

24   per the regulations.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And was Cardinal Health, prior to

2    October 26th, 2011, doing all of the due

3    diligence that had been required of it?

4               MS. WICHT:  Object to the form.

5          A.    What was the question again?

6          Q.    Was Cardinal, prior to

7    October 26th, 2011, doing all of the due

8    diligence required of it with regard to

9    controlled substances?

10              MS. WICHT:  Object to the form.

11         A.    We were executing according to the

12   regulatory requirement stated in the act.

13         Q.    And you were keeping records of

14   such due diligence actions, correct?

15              MS. WICHT:  Object to the form.

16         A.    We were keeping records that are

17   required by the act to be kept.

18         Q.    So when you received this warrant

19   to inspect from the DEA, you should be able to

20   comply and show them that Cardinal has done its

21   due diligence, correct?

22              MS. WICHT:  Object to the form.

23         A.    We should provide the agency with

24   all the records that are required, per the
```

Highly Confidential - Subject to Further Confidentiality Review

1   regulations.

2        Q.   Are there records required of

3   Cardinal that are not in the regulation?

4        A.   That are required of Cardinal?

5        Q.   Yeah.

6        A.   The only records that are required

7   are the ones that are in the regulation, right?

8        Q.   I would imagine.  And so I'm

9   asking -- because you said, we kept all of the

10  records that were required of the regulation,

11  correct?

12       A.   Yeah.  And we filed those with the

13  DEA, like the ARCOS report.

14       Q.   Okay.  And you did all of the due

15  diligence that was required of the act, as well,

16  correct?

17            MS. WICHT:  Object to the form.

18            Foundation.  Calls for a legal

19            conclusion.

20       A.   We -- what I'm telling you, we did

21  everything that was required per the regulation

22  that we had to do.

23       Q.   So, then, wouldn't the

24  conclusion -- logical conclusion be that if you

Highly Confidential - Subject to Further Confidentiality Review

1    provided all of those records that you did keep

2    because you were required to, that showed you

3    did the due diligence that you were required to,

4    that if you had provided that to the DEA, this

5    investigation would likely end?

6              MS. WICHT:  Object to the form.

7         Foundation.  Speculation.

8         A.    I need to hear the question again.

9         Q.    Sure.  And I know it's -- it's --

10   would you agree that because Cardinal was doing

11   what it was supposed to do under its due

12   diligence requirements and keeping records of

13   all such actions, that if Cardinal provided all

14   of those records to the DEA in response to this

15   warrant, that the investigation would likely

16   end?

17             MS. WICHT:  Object to the form.

18        Foundation.  Speculation.

19        A.    I would be speculating if I say

20   that.  I know that we kept all the records that

21   were required by the regulations, and we

22   provided all the records that the regulations

23   required to the agency.

24        Q.    Okay.  So in your mind -- and your

Highly Confidential - Subject to Further Confidentiality Review

```
 1    testimony is that Cardinal had complied

 2    completely with the regulations, both with

 3    regard to due diligence and recordkeeping as to

 4    that due diligence, correct?

 5             MS. WICHT:  Object to the form.

 6         Foundation.

 7         A.    I mean, I keep stating that we

 8    provided all the records that are required by

 9    the regulation.  To the best of my knowledge, we

10    did that, and there's not missing records that

11    we did not provide to the agency that are

12    required by regulations.

13         Q.    Okay.  And you have no reason,

14    sitting here today, as having been the senior VP

15    of QRA back in October of 2011, to believe that

16    Cardinal didn't do its due diligence, do you?

17             MS. WICHT:  Object to the form.

18         A.    I do not have any reason to

19    believe that we did not meet the requirements of

20    the regulations in 2011, as you stated.

21         Q.    Okay.

22                       - - -

23       (Cardinal-Quintero Exhibit 11 marked.)

24                       - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. KROEGER:

2            Q.    I'm going to hand you what's been

3    marked as Exhibit 11.  It's 3773.

4                  (Pause in proceedings.)

5            A.    Yes.

6            Q.    So, Mr. Quintero, per the e-mail,

7    you can see that this document is from Monday,

8    October 31st, 2011, correct?

9            A.    Correct.

10           Q.    If we go to Page 3 of the exhibit,

11   we see the actual release that was sent as an

12   attachment to that e-mail?

13                 MS. WICHT:  Object to the form.

14           Q.    Correct?

15           A.    What date are you referring to?

16   October 31st?

17           Q.    Yes, sir.

18           A.    I'm assuming that's the date this

19   version was approved.

20           Q.    Correct.  Because it says,

21   "Approved version, October 31st, 4:00 p.m.

22   eastern."

23           A.    Yeah.  I don't know when it was

24   sent out.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    If you look back -- we can go

2    through it -- the initial e-mail from Jon

3    Giacomin -- is that how you pronounce it?

4              A.    Jon Giacomin.

5              Q.    Jon Giacomin was sent Monday,

6    October 31st, 2011 at 9:43 a.m., correct?

7              A.    Yes, on the 31st, 2011.

8              Q.    And later in that day, we see Kara

9    Forester has attached a document, "Support Team

10   Talking Points," correct?

11             A.    They have -- they are talking

12   points on -- this says -- does it say talking

13   points?

14             Q.    If you look at the PDF -- if you

15   look at the screen, if you don't mind, or you

16   can go to Page 1 of the document, you'll see the

17   Support Team Talking Points.LA.

18             A.    I see talking points, yes.

19             Q.    And that's the document that's

20   attached as Page 3 to this exhibit.

21             A.    Okay.

22             Q.    So this document was approved five

23   days after the DEA served the warrant on

24   Lakeland; is that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. WICHT:  Object to the form.

 2           A.    What was the date the warrant was

 3    served?

 4           Q.    October 26th, 2011.

 5           A.    I see October 25.  I see it signed

 6    on 25.  I don't see when it was served.

 7           Q.    Okay.  25, 26.

 8           A.    Okay.

 9           Q.    Within a week of the warrant being

10    served on Cardinal.

11                 And Cardinal's response -- well,

12    first, Cardinal -- is this -- this is something

13    that would have been put out for the employees,

14    correct?

15           A.    I don't think this message was

16    intended to the general employees.  I see in the

17    "to" list members of the legal team and some

18    members of -- that reported in to either Jon

19    Giacomin or Mike Kaufmann.

20           Q.    And you had a chance to review

21    this document, the talking points document?

22           A.    I can glance through it if you

23    could give me a little bit of time.

24           Q.    We'll read it together.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  "The prescription drug abuse

 2   problem."

 3          A.     Uh-huh.

 4          Q.     "The prescription drug abuse

 5   problem has continued to grow throughout the

 6   United States.  One of the most problematic

 7   areas of the country is Florida, where pill

 8   mills are prevalent."

 9                  Do you agree that that's what it

10   says?

11          A.     That's what is in the document.

12          Q.     "Last week, Drug Enforcement

13   Administration (DEA), alongside with state and

14   local authorities, announced increased measures

15   to combat the prescription drug abuse problem in

16   Florida, Operation Pill Nation II."

17                  Do you agree with that?

18                  MS. WICHT:  Agree that's what --

19          A.     I agree that that's the language

20   that is in the document.

21          Q.     This is the language that's in the

22   document that Cardinal agreed or approved on

23   October 31st, 2011 at 4:00 p.m., correct?

24                  MS. WICHT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    That's the language that is in

2    this document that somebody in Cardinal approved

3    on October 31st.  The approval, I don't

4    believe, was my approval.

5          Q.    And "These measures included a

6    number of arrests of pharmacists and

7    physicians"?

8          A.    That's in the third bullet of this

9    document.

10          Q.    Okay.  And it talks -- the next

11    section is about -- it says, "What Cardinal

12    Health is doing."

13              And I want you to read the second

14    bullet.  It's, "Our suspicious order monitoring

15    system evaluates pharmacy orders to determine if

16    the orders are unusually large, unusually

17    frequent, or deviate from the normal pattern."

18          A.    Correct.

19          Q.    Skipping to the -- skipping one,

20    "Since 2008, Cardinal Health has conducted

21    hundreds of on-site pharmacy inspections, ceased

22    distribution to more than 300 pharmacies we

23    believe presented a significant risk of

24    diversion, and in the last two years, we have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    denied the applications from over 40 pharmacies

 2    seeking to have a controlled substance

 3    relationship with us."

 4           A.    Yes, I see that statement there.

 5           Q.    Do you agree with that statement?

 6           A.    I believe that statement is likely

 7    accurate.

 8           Q.    "We believe in the foundational

 9    elements of our SOM program and are continuously

10    working to improve it.  We have also partnered

11    with the Ohio State University College of

12    Pharmacy on a Generation RX outreach initiative,

13    a free program designed to create awareness

14    about the dangers of prescription drug abuse and

15    diversion."

16                Do you agree with those statements

17    in terms of what Cardinal Health is doing?

18           A.    I agree that we were executing all

19    of the stuff that is in the -- in that

20    particular section of this document.

21           Q.    And earlier, you also said that

22    with regard to Lakeland and the due diligence,

23    Cardinal has done its due diligence and has the

24    proper records of that due diligence as required
```

Highly Confidential - Subject to Further Confidentiality Review

1   by regulation?

2           MS. WICHT:  Object to the form.

3       Foundation.

4       A.    What I told you is that Cardinal

5   Health retained all the records required by the

6   regulations.

7       Q.    Okay.  And in response to the DEA

8   serving a warrant on Cardinal asking for those

9   records to show it had done its due diligence,

10  Cardinal decides to create a business continuity

11  plan.  You can read along.

12           "Due to the increased DEA activity

13  in Florida, we have decided to ready our

14  business continuity plans for Lakeland, Florida.

15  Part of this preparation includes steps that we

16  need to take to be ready to transfer customers

17  from Lakeland to the designated secondary

18  distribution center, Jackson or Greensboro."

19           What does that mean?

20           MS. WICHT:  Object to the form.

21       Foundation.

22       A.    It means that we have business

23  continuity plans for many different reasons,

24  including hurricanes, potential closure of

```
 1    sites.  So we were initiating a business

 2    continuity plan.

 3            Q.    Okay.

 4            A.    For Jackson and Greensboro.

 5            Q.    So -- well, the business

 6    continuity plan was for Lakeland, Florida,

 7    right?

 8            A.    For Lakeland, but --

 9            Q.    And so --

10            A.    Service centers were out of

11    Lakeland.

12            Q.    Do you remember October of 2011?

13            A.    Yes, I do.

14            Q.    Were you expecting any hurricanes

15    in Florida in October of 2011?

16            A.    No.  I don't know -- I don't

17    know -- I mean, I don't remember.

18            Q.    Do you think --

19            A.    October is hurricane season, but

20    I -- I do not know if there was hurricanes in

21    that time.

22            Q.    But that's the first reason you

23    chose to give in terms of why a continuity plan

24    would be --
```

```
 1              A.    No.  I told you there are many

 2    reasons for it.

 3              Q.    And the first you chose to list

 4    was hurricane?

 5              A.    Because that's the primary reason

 6    that we have business continuity plans, is for

 7    natural disasters.

 8              Q.    And in this particular case of

 9    Lakeland in October of 2011, was it a natural

10    disaster that Cardinal was concerned about?

11              A.    We were concerned --

12              MS. WICHT:  Object to the form of

13              the question.

14              A.    We were concerned about the

15    administrative action of the inspection warrant

16    that we received from DEA, which surprised us,

17    because to the best of our knowledge at that

18    particular time, we felt that we were complying

19    with the regulatory requirements of the

20    Controlled Substances Act.

21                   So we were completely caught off

22    guard when we got this inspection warrant and we

23    could not understand why the agency was having

24    any concerns about the Lakeland facility,
```

Highly Confidential - Subject to Further Confidentiality Review

1    especially because Michael has been in

2    continuous contact with Barbara Boockholdt and

3    have never shown an indication in which she was

4    concerned about the way that we were executing

5    our program and also meeting the regulatory

6    requirements of the Controlled Substances Act.

7            Q.    So Cardinal Health believes it's

8    done all its due diligence, has the proper

9    records of having done that due diligence,

10   believes that they have an agreement with the

11   DEA that all such due diligence and records are

12   appropriate and what is required, and yet in

13   response to a warrant asking for that

14   documentation, Cardinal decides to initiate a

15   business continuity plan for Lakeland

16   Distribution Center?

17           A.    Like I --

18                 MS. WICHT:  Object to the form.

19           Foundation.  Mischaracterizes the

20           testimony on the document.

21                 Sorry.  Go ahead.

22           A.    We were caught off guard, and we

23   could not understand why DEA was giving us an

24   inspection warrant.  They could have asked us

Highly Confidential - Subject to Further Confidentiality Review

1   for the information over the phone.  Barbara had

2   a good line of communication between her and

3   Michael.  Why she didn't do that and they went

4   directly to an inspection warrant, we could not

5   understand that, but we have an obligation to

6   serve patients that need this medications in all

7   parts of the United States.  So we were caught

8   off guard and we were concerned of why.

9           Q.    If the DEA is going to suspend a

10  distribution center, as they did, Cardinal

11  initiates a business continuity plan to ensure

12  that all of the drugs that were going to be

13  shipped out of that suspended facility get

14  shipped, correct?

15          MS. WICHT:  Object to the form.

16          A.    We try to serve all our customers

17  that need drugs for legitimate medical purposes

18  out of any facility that we have.

19          Q.    So in response to a DEA warrant

20  and this business continuity plan, is there

21  anywhere in this business continuity plan where

22  Cardinal says, we need to reevaluate the orders

23  out of Lakeland that landed us in getting a

24  warrant?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MS. WICHT:  Objection to --
 2          Q.    Is that part of the business
 3   continuity plan?
 4                 MS. WICHT:  Objection to the form.
 5          A.    The business continuity plan is
 6   separate from what we do in our anti-diversion
 7   program.  It's completely different.
 8          Q.    This plan is just to make sure
 9   that all the opioids and everything else just
10   keeps getting shipped?
11                 MS. WICHT:  Objection to form.
12          Foundation.  Mischaracterizes.
13          A.    The plan is to ensure that
14   customers that need drugs, all kind of drugs,
15   for legitimate medical use, they can have those
16   drugs available to serve their patients.
17                 VIDEOGRAPHER:  Counsel on the
18          phone, could you put yourself on mute.
19   BY MR. KROEGER:
20          Q.    If you go back to Exhibit 5, it's
21   the 4085 document, and if you can turn to
22   Page 16 of that document.
23                 The first full paragraph there,
24   "Based on its review of the documents Cardinal
```

Highly Confidential - Subject to Further Confidentiality Review

1    Health provided in response to the October 26,

2    2011 AIW and the November 8th, 2011

3    administrative subpoena, the investigation at

4    respondent revealed a persistent failure to

5    exercise due diligence to ensure that controlled

6    substances were not being diverted."

7              So that's the conclusion the DEA

8    reached in reviewing the documents Cardinal

9    Health provided in response to the warrant and

10   the subpoena.  Do you disagree with the DEA's

11   conclusion?

12             MS. WICHT:  Objection to form.

13        A.    I disagree with that conclusion

14   because my understanding is that we were

15   retaining all the documents that were required

16   by regulation.

17        Q.    Do you have that additional

18   requirement in writing anywhere?

19        A.    Additional requirement of what?

20        Q.    Well, several times today you've

21   talked about this agreement that Cardinal Health

22   had with the DEA that was separate and apart

23   from the 2008 Memorandum of Agreement.  Because

24   we looked at that document and you couldn't show

```
1    me anywhere where these different requirements

2    were.

3              So is there anything in writing

4    that Cardinal Health has from the DEA saying,

5    Cardinal Health, these requirements, on top of

6    or below the Memorandum of Agreement, apply to

7    Cardinal?

8              MS. WICHT:  Object to the form.

9         A.   The agreement -- the agreement's

10   not the regulation.  That's citing the

11   regulations, not the agreement.

12        Q.   I'm asking if you have anything in

13   writing.  Does Cardinal have anything in writing

14   to support that this agreement had been made

15   with Cardinal Health and the DEA, outside of the

16   Memorandum of Agreement?

17        A.   I don't know if we have anything

18   in writing.

19        Q.   As the senior vice president of

20   QRA for Cardinal Health, shouldn't you know?

21              MS. WICHT:  Object to the form of

22         the question.

23        A.   Like I told you before, when I

24   came to Cardinal Health, I was given an overview
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    of our anti-diversion program and the agreements

2    that were made between the agency and Cardinal

3    Health.  I was updated on the visit that Barbara

4    Boockholdt and Sue Langston had in our building,

5    and the review of the presentation that was

6    given to them.  And there was not a single sign

7    out there, not even from that meeting or from

8    other interactions with the agency, that our

9    agreement was not valid and that they had some

10   concerns about us.

11         Q.    But you, as the senior vice

12   president of QRA in charge of anti-diversion,

13   never saw such an agreement in writing, did you?

14         A.    I don't believe I requested to see

15   the agreement in writing, and I requested to

16   have the information that was agreed by not only

17   Michael Moné, but I verified that information

18   from Bob Giacalone and also from my boss.

19         Q.    From your boss, Mr. Corford?

20         A.    Mr. Craig Morford.

21         Q.    Morford.

22               So Craig Morford also acknowledged

23   to you that the DEA had agreed to this with

24   Cardinal Health?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. WICHT:  Object to the form.

2          A.    There was a consistent message

3    between Craig Morford and myself, Michael Moné

4    and myself, Bob Giacalone and myself, that DEA

5    had reviewed our program as it was in 2009 when

6    I got there, and that they have found our

7    program satisfactory and that they had not

8    expressed any concerns.

9          Q.    Okay.  And obviously we know from

10   what happened to Lakeland in 2012 that the DEA

11   concluded otherwise in 2012, correct?

12                   MS. WICHT:  Object to the form.

13         Calls for speculation.

14         A.    We were completely surprised by

15   the inspection warrant that we got in 2012,

16   because all the -- in 2011, because all the

17   indications that we had up to that point was

18   that we were meeting the expectations of the

19   agency.  And it's my understanding, and I

20   believe so, that we were meeting all of the

21   regulatory requirements.

22         Q.    Okay.  We'll continue on Page 16.

23   Just following along where we were already.

24                   "The DEA concluded that over a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   period of approximately three years, November

 2   2008 to December 2011, respondent's

 3   anti-diversion controls were inadequate to meet

 4   their due diligence responsibilities.  This

 5   conclusion was based on the totality of several

 6   factors.

 7              "Some of the most important

 8   factors were:  Exceedingly large increasing

 9   volume of shipments of oxycodone to its largest

10   Florida retail customers, which volumes were

11   supported by inadequate documentation."

12              Do you disagree with that

13   conclusion by the DEA that --

14              MS. WICHT:  Object to -- I'm

15         sorry.

16         Q.    -- Cardinal had an exceedingly

17   large increasing volume of shipments of

18   oxycodone to its largest Florida retail

19   customers and that those volumes were not

20   supported by -- or were supported by inadequate

21   documentation?

22         A.    I disagree --

23              MS. WICHT:  Object to the form.

24         A.    I disagree that we were not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   meeting our regulatory requirements and that we

 2   were not meeting the agreement that we had with

 3   the agency in 2009.

 4           Q.    Okay.  And you have made that

 5   abundantly clear today.  What I'm asking right

 6   now is if you disagree with the DEA's conclusion

 7   that one of the factors was that exceedingly

 8   large increasing volume of shipments of

 9   oxycodone to its largest Florida retail

10   customers, which volumes were supported by

11   inadequate documentation, was part of the reason

12   that they concluded you were not meeting your

13   due diligence responsibilities?

14           A.    That was the conclusion of the

15   agency --

16                 MS. WICHT:  Objection to form.

17           A.    -- not my conclusion.

18           Q.    So you disagree with the agency's

19   conclusion?

20                 MS. WICHT:  Object to the form.

21           A.    I disagree with the fact that the

22   agency agreed with us in 2009 on the execution

23   of our anti-diversion program, and we were

24   executing according to our understanding of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    agreement that we had with the agency and

 2    meeting all the regulatory requirements.

 3           Q.    And do you also disagree with

 4    factor number 2, that there was a low number of

 5    suspicious orders reported?

 6               MS. WICHT:  Object to the form.

 7           A.    Again, what I -- I go back to the

 8    meeting that we have in 2009 on how our program

 9    was executed and the agreement that the agency

10    made with our personnel, and there were, you

11    know, high levels of DEA at that meeting,

12    Barbara Boockholdt and Sue Langston, and both of

13    them agreed that our execution of the program

14    was appropriate.

15           Q.    So I don't know if that means you

16    agree or disagree with the fact that there may

17    have been a low number of suspicious orders

18    reported.

19               Do you agree or disagree that

20    there was a low number of suspicious orders

21    reported?

22           A.    I will agree that --

23               MS. WICHT:  Object to the form of

24               the question.
```

Highly Confidential - Subject To Further Confidentiality Review

```
1              A.    I will agree that we reported the

2      number of suspicious orders as our program was

3      designed in 2009.

4              Q.    And was that number low or high?

5                    MS. WICHT:  Object to the form of

6              the question.

7              A.    That number was adequate based on

8      the program that we had at that time.

9              Q.    And do you agree or disagree that

10     there was a low number of on-site visits to

11     these top retailers and no site visits to retail

12     chain pharmacy customers?

13                   MS. WICHT:  Object to the form.

14             A.    I know that we have visited

15     hundreds of pharmacies.  I cannot tell you the

16     distribution of -- I don't recall the number of

17     store visits that we did in Florida, so I could

18     not agree with that statement because I don't

19     have those facts in front of me.

20             Q.    Well, do you put site visits into

21     the due diligence files?  Is that -- let me

22     rephrase that.

23                   When Cardinal -- when someone from

24     Cardinal does a site visit, does that then go
```

1    into the due diligence file for the store to

2    which they did the site visit?

3            A.    They go into a system that we call

4    Content Manager.

5            Q.    Is that system that's called

6    Content Manager, is that a system that tracks

7    the due diligence and on-site visits per store?

8            A.    It stores the visits that we do to

9    stores.

10           Q.    And when the DEA served a warrant

11   and a subpoena on you asking for those -- for

12   all such due diligence files, did you give them

13   the contents of that?

14           A.    My assumption is that we gave all

15   the information that was asked by the agency at

16   that time.

17           Q.    So if there were site visits, they

18   would have received those?

19           A.    They received --

20                 MS. WICHT:  Object to the form.

21           A.    They received all the information

22   that they requested from us.

23           Q.    And in that information that they

24   received, there were no site visits to retail

Highly Confidential - Subject to Further Confidentiality Review

```
 1    chain pharmacy customers?

 2              MS. WICHT:  Object to the form.

 3         A.    I don't recall that.  I don't

 4    recall the document production for that

 5    particular time, so I cannot say that.

 6         Q.    Okay.  Lastly, do you agree or

 7    disagree that there's evidence -- there was

 8    evidence that respondent's due diligence

 9    practices were inconsistent with both the 2008

10    MOA and Cardinal Health's own policies, the

11    purpose of which was to reduce diversion?

12              MS. WICHT:  Object to the form.

13         A.    I completely disagree with that as

14    shown by the fact that we have terminated over

15    300 pharmacies at that point in time, and most

16    of those pharmacies continue to have a DEA

17    license today and they're still in business.

18         Q.    Cardinal still has a DEA license

19    and is still in business, correct?

20         A.    We regained our DEA license for

21    Lakeland.

22         Q.    So that doesn't necessarily prove

23    or disprove due diligence at any given time,

24    does it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. WICHT:  Object to the form.

 2          A.    I'm not aware that DEA has taken

 3   action against all of those pharmacies that we

 4   have terminated.  Maybe a fraction of them they

 5   have, but most of those pharmacies continue to

 6   have their license.  I'm not aware that DEA has

 7   taken an action against those pharmacies.

 8          Q.    Are you familiar with the numbers

 9   of opioids that were sent to the two CVSs that

10   were at issue in Lakeland?

11          A.    I don't recall.

12          Q.    If you turn to Page 18 of this

13   Exhibit 5.  Do you see the paragraph starting

14   with "Publix"?

15          A.    I'm on the wrong page.

16          Q.    18 on the top right.

17                Do you see the paragraph that

18   starts with "Publix"?

19          A.    Yep.

20          Q.    "Publix Pharmacy Number 0641,

21   located at 5240 West State Road 46, Sanford,

22   Florida 32771, is within two miles of CVS 5195.

23   In 2011, CVS 5195 purchased 1.2 million dosage

24   units of oxycodone, while Publix Pharmacy 0641
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    purchased only 25,700 units of oxycodone."

2               Do you dispute those numbers?

3               MS. WICHT:  Objection.

4        A.    Those are the numbers that are in

5    the document.  I don't have any reason to

6    dispute the numbers.

7        Q.    Do you have any reason to believe

8    that in response to those numbers, Cardinal did

9    even a site visit to CVS 5195?

10              MS. WICHT:  Objection to the form.

11       A.    I don't recall if we did a visit

12   or we didn't do a visit.

13       Q.    Well, according to what we read

14   just a moment ago, the DEA received no

15   documentation of any site visits to any chain

16   pharmacies, correct?

17              MS. WICHT:  Object to the form.

18       A.    We may have done a visit, but I

19   don't know that.

20       Q.    In order for you to have done a

21   visit, you would have had to do it and then not

22   document it.  Is that fair given that the DEA

23   never received any documentation of it?

24              MS. WICHT:  Object to the form.
```

```
 1              A.    I wouldn't know that.  If somebody

 2      did a surveillance visit and they didn't put it

 3      in the file, I mean that could happen, but I

 4      don't know that.

 5              Q.    Were you -- were people at

 6      Cardinal in the practice of doing site visits to

 7      CVSs and not putting it in the file?

 8              A.    We did some site visits to some

 9      CVS stores.  I don't -- I was not running the

10      day-to-day of activities of the program, so I'm

11      not a good person to say that every single site

12      visit was included in Content Manager.  I cannot

13      attest to that.

14              Q.    The next paragraph, "Two

15      pharmacies are located within one mile of CVS

16      219.  Walgreens 6970, located at 3803 South

17      Orlando Drive, Sanford, Florida, and Walmart

18      Pharmacy number 10-0857, located at 3653 Orlando

19      Drive, Sanford, Florida.  In 2011, CVS 219

20      purchased 1.8 million dosage units of oxycodone,

21      while the Walgreens 6970 purchased 176,500

22      dosage units of oxycodone and Walmart Pharmacy

23      10-0857 purchased 30,500 dosage units of

24      oxycodone."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    Do you dispute those numbers?

2                    MS. WICHT:  Objection.  Asked and

3         answered.

4         A.    I think those numbers are what is

5    quoted in there.

6         Q.    And after selling 1.8 million

7    dosage units of oxycodone to a single CVS in

8    Sanford, Florida, was there a site visit in the

9    due diligence file for that store?

10                   MS. WICHT:  Object to the form.

11        A.    I'm sure there was a site visit

12   because I requested a site visit for that store

13   and I was provided with a summary of the site

14   visit.

15        Q.    And since you were directly in

16   contact with the person who did the site visit,

17   directly requested it, certainly you would have

18   also ensured that it made it into the due

19   diligence file for CVS 219, wouldn't you?

20                   MS. WICHT:  Object to the form.

21        A.    Like I told you below -- before, I

22   don't run the details of the program on a

23   day-to-day basis.  I was interested on

24   information -- asking for additional information
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on CVS 219.  I personally requested a visit to

 2    that -- the pharmacy to see if there was obvious

 3    signs of diversion, and the conclusion of that

 4    visit was provided to me by the person that did

 5    the visit.

 6           Q.    Did you review the due diligence

 7    file for CVS store 219 at any point in 2010 or

 8    '11?

 9           A.    I reviewed information that was

10    provided to me by Nick Rausch.

11           Q.    Was that the due diligence file of

12    CVS 219?

13           A.    That was information that Nick

14    Rausch provided to me.  I don't know what was in

15    the due diligence file for any of those stores.

16    It's the day-to-day execution of the program.

17           Q.    But this was a store that you took

18    a personal interest in.

19           A.    I did.

20           Q.    You directed a site visit.  That's

21    not something you do on a daily basis, is it?

22           A.    No.

23           Q.    And yet you still didn't look at

24    the due diligence file for that store?
```

1          MS. WICHT:  Object to form.

2       Mischaracterizes.

3       A.    I didn't.  I rely on my staff to

4    review the diligence files, and for this

5    particular one, I was provided some additional

6    information from Nick Rausch, and I believe that

7    it was appropriate to conduct a site visit of

8    219 to confirm that information that CVS had

9    given us was credible.

10          And the report that I got back for

11   219 is that the visit resulted in no obvious

12   signs of diversion when our investigator was

13   doing a surveillance audit of that particular

14   pharmacy.

15      Q.    Do you agree that selling 1.8

16   million dosage units of oxycodone to a single

17   CVS in Sanford, Florida should cause concern?

18          MS. WICHT:  Object to the form.

19      A.    I think selling large amounts of

20   controlled substances to any pharmacy is a good

21   reason to review that pharmacy, and we did.

22      Q.    And based on a single site visit

23   and CVS saying, we've done our own internal

24   investigation, you felt comfortable continuing

1    to sell 1.8 million dosage units of oxycodone to

2    a single CVS in Sanford, Florida?

3                MS. WICHT:  Object to the form.

4         A.    We believed that all of the sales

5    to that store were for legitimate medical use,

6    and we didn't have any reason to believe

7    otherwise based on the information that we had

8    obtained.

9         Q.    And if you had reason to believe

10   that there might be a risk of diversion, what

11   would you have done?

12               MS. WICHT:  Object to the form.

13        A.    We would have -- if we had a

14   reason to believe that was suspicious or likely

15   of those drugs to be sold or prescription be

16   filled for orders not legitimate medical use, we

17   would have stopped shipment for that particular

18   store and we would have reported that store to

19   DEA, as we did in many, many occasions.

20        Q.    Would you agree that one of the

21   ways to determine if there's a likelihood of

22   diversion is to follow Cardinal Health's own

23   suspicious order monitoring plan?

24               MS. WICHT:  Object to the form.

```
1            A.    It's following the regulation and

2    executing according to our standard operating

3    procedures.

4            Q.    Sorry.  I said "plan."  I should

5    have said "standard operating procedures."  So

6    let me say that again.

7                  You would agree, wouldn't you,

8    that a key to stopping diversion, spotting

9    stores that might be the source of diversion, is

10   to follow the suspicious order monitoring

11   standard operating procedure that Cardinal has

12   in place?

13                 MS. WICHT:  Object to the form.

14           A.    It is following the regulations

15   and agree -- adhering to the program that we had

16   in place at that time.

17           Q.    Okay.  If you'll turn to Page 19

18   of this Exhibit 5.  This is part of Cardinal's

19   suspicious order monitoring program.

20                 It says --

21                 MS. WICHT:  No.  This is the

22           government's --

23                 MR. KROEGER:  This is the

24           government's finding.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MS. WICHT:  Okay.

 2   BY MR. KROEGER:

 3          Q.    But as part of your suspicious

 4   order monitoring SOP, you set thresholds, didn't

 5   you?

 6          A.    We set thresholds.

 7          Q.    Okay.  And Paragraph i says,

 8   "Respondent set monthly thresholds for oxycodone

 9   distributions to each of its stores.  But from

10   April 2009 to August 2011, respondent

11   disregarded the oxycodone thresholds for its top

12   four retailers at least 44 times.  Sometimes by

13   a few thousand pills, and sometimes by tens of

14   thousands.  This unexplained disregard for its

15   own thresholds suggests that respondent did not

16   take its own policies seriously."

17                 Do you disagree with that

18   statement from the DEA?

19          A.    I completely disagree with that

20   statement.  Threshold is a reason for us to

21   evaluate an order, and the analyst reviews the

22   information that they have available to them and

23   they make decisions whether or not to release

24   the order or not.  So we didn't disregard these
```

Highly Confidential - Subject to Further Confidentiality Review

1  threshold events.  Every one of them was

2  evaluated.  The system doesn't allow for

3  thresholds to be released without somebody

4  evaluating the threshold.

5       Q.    Okay.  So you disagree with that

6  conclusion the DEA reached with regard to --

7       A.    Completely disagree with that

8  conclusion.

9       Q.    Okay.  If you'll turn to Page 21,

10 Paragraph i.  "According to DEA review, Cardinal

11 Health's SOM policies do not exclude chain

12 retailers from the site visit requirement.

13 Indeed, the written policies made available to

14 DEA do not indicate any company policy of

15 treating chain retailers differently than

16 independent retailers in terms of the diligence

17 Cardinal Health's distribution centers are

18 required to conduct."

19            Do you disagree with that

20 statement?

21       A.    I disagree with that statement.  I

22 believe that our agreement with the agency in

23 2009 was very clear, and explained how we were

24 going to treat chain pharmacies.

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.    So, then, this is talking about

 2    the -- Cardinal's own SOM policy.  So based on

 3    what you're saying, then, if we went back to the

 4    2009, 2010, 2011 suspicious order monitoring

 5    program standard operating procedure that

 6    Cardinal had in place, it would clearly outline

 7    that chain pharmacies are to be dealt with

 8    differently than independent retail pharmacies?

 9          A.    I will have to --

10                MS. WICHT:  Object to the form.

11          A.    I will have to look at the SOP.  I

12    don't have the SOP available to determine if

13    that's the case or not.

14          Q.    Well, this conclusion that you

15    just disagreed with in Paragraph i is the DEA

16    saying that you -- that Cardinal Health failed

17    to follow its own SOM policies.

18          A.    My understanding is that the

19    program that we put in place in 2009 was

20    consistent with the expectations of the agency

21    and that it was the understanding and the

22    agreement that chain pharmacies will conduct

23    their own investigation and provide those

24    investigations to us.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    If you'll turn to Page 22.  In the
 2   middle of the Paragraph i under Subsection D,
 3   low numbers of suspicious orders reported, "From
 4   October 1st, 2008" -- do you see where I am?
 5              A.    Uh-huh.
 6              Q.    -- "through October 26th, 2011,
 7   respondent reported only 41 suspicious orders to
 8   the DEA."
 9                    So in a three-year period,
10   Cardinal reported 41 -- sorry, Lakeland reported
11   41 suspicious orders to the DEA.  Is that
12   number -- do you agree with that number?
13              A.    It -- I'm assuming that number is
14   correct.  I will have to verify the fact, but my
15   assumption is that is correct.
16              Q.    And do you believe that number to
17   be the proper number of suspicious orders to
18   have been reported during that time?
19              A.    Based on the understanding that we
20   have with the agency at that time, it was the
21   correct number.  The agreement that we had with
22   the agency at that time is that we will do
23   investigation of threshold events.  If those
24   investigations led us to believe that the
```

1    pharmacy was potentially engaging in practices

2    that were not consistent with filling legitimate

3    prescriptions or that we couldn't get enough

4    information to make that assessment, that we

5    would report them as suspicious orders.  As it

6    happened, out of those 41 customers, 19 of those

7    customers we terminated.

8            Q.    Right.

9                  Once you terminate a customer, you

10   can no longer profit from them anyway, so

11   reporting their orders doesn't really hurt the

12   profit of Cardinal, does it?

13                 MS. WICHT:  Object to the form of

14           the question.

15           A.    I don't even -- I don't understand

16   the question.

17                 MS. WICHT:  Is that a serious

18           question?

19                 MR. KROEGER:  Yeah, it is.

20           A.    I don't understand the question.

21           Q.    So when a pharmacy orders opioids

22   from Cardinal Health, Cardinal Health makes a

23   profit on those opioids that they distribute to

24   that pharmacy, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. WICHT:  Object to the form of

 2          the question.

 3          A.    I'm not in the finance or in the

 4   sales team.  We sell product for legitimate

 5   medical use.  I'm assuming that we make money

 6   making the product.  I don't know if we make any

 7   money on opioids, to be honest with you.

 8          Q.    You don't give them away, do you?

 9          A.    Well, there are sometimes that we

10   do things and we don't make any profit because

11   if -- consistent with the total offerings that

12   we have to offer.

13          Q.    As an executive with Cardinal

14   Health, who was at one time the senior vice

15   president of QRA and is now chief QRA officer,

16   you're not honestly sitting here telling me you

17   don't know if Cardinal Health profits from

18   opioids, are you?

19          A.    No.

20                  MS. WICHT:  Object to the form of

21          the question.  Argumentative.

22          A.    No.  Because, I mean, selling

23   opioids is -- is -- to have all the system in

24   place that you need to have is a lot more
```

1   expensive than we have for our regular drugs.

2   You have to have a cage.  You have to have a

3   vault.  You have to have employees in the cage

4   and the vault.  You have to have audits of those

5   cages and the vault.  You have reporting

6   responsibility.  You have to do a lot more work

7   to sell one dosage unit of oxycodone than one

8   dosage unit of Lipitor.  A lot more work.

9          Q.    A lot more work.

10              But, Mr. Quintero, you're not

11  telling me that you believe Cardinal Health,

12  this Forbes 500 -- I think 21st on the Forbes

13  500 list, would continue to sell opioids if the

14  cost of doing that business was greater than the

15  profit made from it, are you?

16              MS. WICHT:  Object to the form.

17         A.    I don't know.  It is possible, but

18  I don't know.

19         Q.    Okay.

20         A.    My role in the company is

21  regulatory compliance, and I stick to my role

22  and make sure that my team executes according.

23         Q.    You don't do your job for free, do

24  you?

```
 1              A.    I don't do -- I work for Cardinal

 2      for a salary.

 3              Q.    Yes.

 4                    Now, after the warrant was served

 5      in October of 2011, Paragraph ii, "Between

 6      October 26th, 2011 (the day following the

 7      execution of the AIWs) and January 31st,

 8      2012" -- so in this three-month period --

 9      "respondent terminated 28 customers."

10              A.    Uh-huh.

11              Q.    Is there any reason for that

12      increase in three months compared to the only 19

13      previously?

14                    MS. WICHT:  Object to the form.

15              A.    Like I told you, we -- during that

16      period of time, we have terminated over 300 -- I

17      feel like the number was 343 customers in the

18      United States.  I don't know the exact number in

19      Florida.  We were concerned with the inspection

20      warrant that was filed.  We could not understand

21      why, so we became, you know, concerned that the

22      agency had changed their expectation of the

23      standards.  So I mean, we changed -- we were

24      changing with the expectations of the agency.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    As the senior vice president of

2    QRA, did you personally have any concern that

3    Cardinal itself was not following its own

4    policies and procedures?

5            A.    I believe --

6                  MS. WICHT:  Object to the form.

7            A.    I believe that Cardinal Health was

8    following our policies and procedures and that

9    we were meeting regulatory requirements and

10   expectations of the agency.

11           Q.    If you'll turn to Page 37 of

12   Exhibit 5.  Towards the bottom of the page, five

13   lines up, "On October 5th."

14                 Do you see that?

15           A.    Yep.

16           Q.    "On October 5th, 2010,

17   Mr. Moellering" --

18                 Do you know who Mr. Moellering is?

19           A.    Yes, Vince Moellering.

20           Q.    Who is he?

21           A.    He is one of the field

22   investigators.

23           Q.    Employed by Cardinal?

24           A.    Employed by Cardinal Health.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Employed to do site visits?

 2              A.    That's -- that was his role, to do

 3    site visits.

 4              Q.    And in that role, his job was to

 5    communicate to Cardinal up the chain to people

 6    in anti-diversion whether or not a store was

 7    high or low risk of diversion, correct?

 8              A.    The form had a portion at the end

 9    of the investigation form that provided

10    different rankings for pharmacies.

11              Q.    And that was part of his duty, was

12    to communicate that ranking to people above him,

13    correct?

14              A.    To communicate that ranking to the

15    head of the investigations group, which was

16    Steve Morris.

17              Q.    And that's because, just like you

18    can't be involved in every day-to-day decision,

19    people directly beneath you or one or two steps

20    beneath you, can't be involved in every single

21    site visit, right?

22              A.    It's impossible to be at every

23    single site.

24              Q.    So just as you rely on Michael
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Moné and Steve Reardon to make the right

 2    decisions with regard to policies, procedures,

 3    and regulations, they, in turn, have to rely on

 4    those below them to do the same, correct?

 5              MS. WICHT:  Object to the form.

 6         A.   We relied on our staff to execute

 7    procedures and make sure that we are meeting

 8    our -- all of the regulatory requirements.

 9         Q.   Do you have any reason, sitting

10    here today, to believe that Mr. Moellering

11    didn't do his job well?

12              MS. WICHT:  Object to the form of

13         the question.

14         A.   I did not supervise Mr. Moellering

15    directly.  My understanding is that he was --

16    his performance was acceptable.

17         Q.   Okay.  And then the next -- and

18    Mr. Moro.  Do you know who Mr. Moro is?

19         A.   I don't recall who Mr. Moro is.

20         Q.   So you can't say whether he was or

21    was not a good employee either way?

22         A.   I don't recall.

23         Q.   Okay.

24         A.   It's possible, but I don't recall
```

1    a person working in my team, which last name is

2    Moro.  It's possible, but I don't recall.

3         Q.    And October 5th, 2010, anyone

4    doing site visits would have been part of your

5    team, correct?

6         A.    Correct.

7         Q.    So Mr. Moellering and Mr. Moro

8    conducted a site visit.  The notes from this

9    particular site visit reflected the following:

10   CAH -- that's Cardinal Health, right?

11        A.    Uh-huh.

12        Q.    PBC, what's that stand for?

13        A.    I believe -- I'm trying to

14   recollect.  Somebody -- now that I'm reading the

15   context, it's probably Lenny Moro is somebody in

16   the sales team, but I don't know that for sure,

17   but I believe that's...

18   ███    █████████████████████

███  ███████████████████████████

███  ████████████████████████

███  ██████████    █████████████

███  █████████████████

███  █████████████████

███  ██████████

```
 1                   If you turn the page, "Dispensing

 2    data revealed that 462,776 units of oxycodone

 3    dispensed within two months.  ██████████████

 █    █████████████████████████████████████████████

 █    ██████████████████████████████████

 █    ███████████  I have requested permission to

 7    contact DEA to resolve this issue.  High risk of

 8    diversion.

 9                   "Despite Mr. Moellering's findings

10    and recommendations, respondent did not contact

11    the DEA.  Respondent not only continued to ship

12    oxycodone 30 milligram tablets to Gulf Coast,

13    but subsequently increased shipments shortly

14    thereafter -- shortly afterwards.  On

15    November 24th, 2010, respondent adjusted Gulf

16    Coast's monthly volumes of oxycodone from

17    141,000 to 207,200."

18                   Is that the appropriate response

19    under Cardinal's suspicious orders -- under

20    their -- the standard operating procedures to

21    respond to a site visit that results in a high

22    risk of diversion by increasing opioids from

23    141,000 to 207,000?

24                   MS. WICHT:  Object to the form of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              the question.

 2         A.    I'm familiar with some of the

 3    aspects of this particular visit, and I'm -- I

 4    believe, to the best of my knowledge, that there

 5    were follow-up conversations between Mr. Morse,

 6    which is the pharmacist which used to work for

 7    the Board of Pharmacy, and the pharmacist in

 8    charge at Gulf Coast to understand increase in

 9    involve.

10              My understanding is that Gulf

11    Coast was nearby or part of a medical plaza or

12    medical center or across from a hospital.

13    That's my recollection.  It's my recollection

14    too that Vince Moellering tried to call DEA,

15    left a message, but the message was never

16    responded back to him.

17         Q.    So do you have reason to believe

18    that Mr. Moellering was incorrect with the high

19    risk of diversion in his conclusion?

20         A.    Based on --

21              MS. WICHT:  Object to the form.

22         A.    Based on the facts at that point

23    in time, Mr. Morse reevaluated the pharmacy

24    based on the information that he received from
```

Highly Confidential - Subject to Further Confidentiality Review

1    the pharmacist at Gulf Coast and made the

2    determination that the pharmacist was not high

3    risk at that point in time.

4          Q.    Do you know what happened in 2011

5    to Gulf Coast?

6          A.    I believe we stopped selling

7    prescription to Gulf Coast before the

8    administration warrant was provided to us based

9    on additional site visits and additional

10   analysis that we performed on that particular

11   pharmacy.

12         Q.    So you -- QRA received a site

13   visit report of high risk of diversion,

14   continued to increase the dosage units to that

15   very pharmacy, and a year later that pharmacy

16   surrendered its DEA registration?

17               MS. WICHT:  Object to form.

18         Mischaracterizes his testimony.

19         A.    My understanding of the situation

20   with Gulf Coast was there was an inspection done

21   by Vince.  Vince expressed some concern to his

22   management, identified the pharmacy as high

23   risk.  The person in charge of the investigation

24   group requested additional information from the

1   pharmacy.  The pharmacy provided that

2   information.

3              Mr. Morse felt that the volume was

4   justifiable based on the location of the

5   pharmacy and other facts.  He decided to

6   maintain the pharmacy as a customer but to keep

7   monitoring that pharmacy.  Additional visits

8   were performed, and we terminated that pharmacy

9   at one point in time because we didn't feel

10  comfortable with explanation given by the

11  pharmacist anymore.

12       Q.   So the explanation given in

13  October 2010 became unsatisfactory sometime

14  later on?

15             MS. WICHT:  Objection to form.

16       Mischaracterizes.

17       A.   If I knew all the facts, if we

18  knew all the facts then that we knew at the time

19  that we terminated the pharmacy, we would have

20  caught the pharmacy much sooner.  But we learn

21  about certain facts after.

22       Q.   It sounds like you learned about

23  those facts in October of 2010 and chose to

24  ignore them and increase the oxycodone.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I don't agree with that statement.

 2                  MS. WICHT:  Is that a question?

 3            It sounded like a statement.

 4            A.    I don't agree with the statement.

 5                  MR. KROEGER:  Now is a good time

 6            for a break.

 7                  VIDEOGRAPHER:  Time is now 12:35.

 8            Going off the record.

 9                         - - -

10                  Thereupon, the luncheon recess was

11            taken at 12:35 p.m.

12                         - - -

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    December 6, 2018

 2                    Thursday Afternoon Session

 3                    1:18 p.m.

 4                         -  -  -

 5              VIDEOGRAPHER:   Time is now 1:18.

 6         Back on the record.

 7                    EXAMINATION

 8   BY MR. GRAY:

 9         Q.    Mr. Quintero, my name is Mark

10   Gray.  We met briefly before your deposition.

11   I'm going to ask some follow-up questions and

12   some additional questions possibly.

13              And you understand you're still

14   under oath even though somebody else is

15   questioning you?  You understand that?

16         A.    Yes, I understand.

17         Q.    Okay.  So when you first -- before

18   you came to Cardinal, you were with Wyeth, the

19   pharmaceutical company; is that right?

20         A.    Wyeth Pharmaceutical.

21         Q.    Okay.  And prior to taking your

22   position in December of 2009 with Cardinal, had

23   you ever worked for a distributor of opioid

24   narcotic drugs?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    No.

2            Q.    Okay.  So in 2009, when you went

3      to work at Cardinal Health, that was your first

4      experience in regulatory with a distributor of

5      opioid drugs, correct?

6            A.    Not controlled substances, but

7      opioids, yes.

8            Q.    And when you took that position,

9      would you have expected Cardinal to give you all

10     of the information that you needed to do your

11     job?

12                 MS. WICHT:  Object to the form.

13           A.    I expected Cardinal to allow me to

14     work with my staff to learn the programs that we

15     were executing.

16           Q.    Well, you wanted them to give you

17     all the information you needed to do your job,

18     didn't you?

19           A.    I was expecting -- my job is

20     highly broad, so I was expecting my staff to

21     give me orientations on the different programs

22     that we had.  And I educated myself on the

23     different regulatory requirements that we were

24     obligated to meet.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And if Cardinal withheld

2    anything from you that would be important to

3    your job, you wouldn't have expected that, would

4    you?

5                    MS. WICHT:  Object to the form.

6              A.    I don't believe Cardinal ever

7    withheld any information that I requested.

8              Q.    Okay.  And you would expect out of

9    your employees and the people that worked with

10   you and around you, that you wanted them not to

11   withhold any information from you, as well,

12   correct?

13                   MS. WICHT:  Object to the form.

14             A.    My expectation is if I request

15   that information, that the employees that work

16   in my department make that information available

17   to me.

18             Q.    And if it was important for you to

19   do your job, whether you asked for it or not,

20   they should have given you that information,

21   correct?

22                   MS. WICHT:  Object to the form.

23             A.    If I have to -- I expect my

24   employees to give me information that is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    relevant, they believe is relevant for them and

 2    that they need to escalate to me.

 3           Q.    Okay.  Let's look at 4050.

 4                        - - -

 5        (Cardinal-Quintero Exhibit 12 marked.)

 6                        - - -

 7    BY MR. GRAY:

 8           Q.    Mr. Quintero, I'm going to show

 9    you a document which has been marked P1.4050,

10    Exhibit 12 to your deposition.  And if you turn

11    to the second page of that document, do you see

12    this -- have you ever seen this letter before?

13           A.    Yes, I have.

14           Q.    Okay.  And when did you see this

15    letter for the first time?

16           A.    I've seen it many years ago.

17           Q.    When you first started working,

18    correct?

19           A.    Probably soon after.

20           Q.    Okay.  And this is a letter from

21    the US Department of Justice Drug Enforcement

22    Administration, correct?

23           A.    It seems that way, yeah.  It's

24    titled Drug Enforcement Administration at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   top, so...

 2           Q.    Okay.  And that's to Cardinal

 3   Health, correct?

 4           A.    It's to Cardinal Health.

 5           Q.    Okay.  And was this one of the

 6   documents that you looked at to understand what

 7   the regulatory process was and -- with respect

 8   to the distribution of opioid narcotics, as well

 9   as what the DEA expected of Cardinal Health?

10                 MS. WICHT:  Object to the form.

11           A.    One of the first documents that I

12   looked at was actually the actual regulation,

13   the Controlled Substances Act.

14           Q.    Okay.  But did you also look at

15   this one at the time to familiarize yourself, as

16   you testified earlier, to --

17           A.    I looked at this record, yeah.

18           Q.    -- what the DEA expected in the

19   regulatory framework?

20           A.    This letter is not regulations.

21   It's just a letter.

22           Q.    Okay.  But did you understand my

23   question?

24           A.    Not entirely.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Just listen to my question.

2            Was this one of the documents that

3   you looked at to familiarize yourself with what

4   the Drug Enforcement Administration of the

5   United States Department of Justice expected of

6   Cardinal Health?

7      A.    I reviewed the letter, yes, I did.

8            MS. WICHT:  Object to the form.

9      Q.    Was the purpose of reviewing the

10  letter so you could understand the framework

11  that the DEA expected of Cardinal Health in

12  distributing opioid narcotics?

13           MS. WICHT:  Object to the form.

14     A.    It is one of the tools that I used

15  to educate myself on the expectations of the

16  agency, and I used -- also went to the

17  Controlled Substances Act to understand the

18  regulation.

19     Q.    Okay, sir.  So let's look at the

20  expectations of the agency.  Let's look at the

21  next page, 4050.3.  And if you look, sir, at the

22  third paragraph.

23     A.    Okay.

24     Q.    And as you know, sir, you also

Highly Confidential - Subject to Further Confidentiality Review

1    have it on the screen, correct?  It's on that

2    screen and the screen in front of you, if you

3    need to refer to that.

4         A.    Okay.

5         Q.    Second sentence of the third

6    paragraph, "Listed first among these factors is

7    the duty of a distributor to maintain effective

8    controls against diversion of controlled

9    substances into other than legitimate medical

10   scientific and industrial channels."

11             Do you see that, sir?

12        A.    Yes, I do.

13        Q.    And after you reviewed this when

14   you first took the job at Cardinal Health, did

15   you understand that it was the duty of a

16   distributor to maintain effective controls

17   against diversion?

18        A.    It's a regulatory --

19             MS. WICHT:  Object to the form.

20        A.    It's a regulatory requirement to

21   maintain controls against diversion of

22   controlled substances.

23        Q.    Okay, sir.  But not just controls,

24   but effective controls.  You understand that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I believe that's the language that

2     is used in the regulations, as well.

3          Q.     Okay.  But do you understand that

4     that's what the DEA told Cardinal Health, that

5     they had to have effective controls against

6     diversion?

7          A.     Which is consistent with the

8     regulations, yes.

9          Q.     Okay.  And then if you go down to

10    the indented paragraph, which is the next one,

11    one down, "The registrant" -- that's Cardinal

12    Health, correct?

13         A.     Yes.

14         Q.     -- "shall design and operate a

15    system to disclose to the registrant suspicious

16    orders of controlled substances."

17                You understand that to be one of

18    the requirements, correct?

19         A.     The requirement in the regulation

20    is to report suspicious orders, have a system to

21    report.

22         Q.     Yeah, okay.  Report suspicious

23    orders.  And "Suspicious orders include orders

24    of an unusual size."

```
 1                     You understand that, correct?

 2            A.    Uh-huh.

 3                     MS. WICHT:  Object to the form.

 4            Q.    "Orders deviating substantially

 5   from a normal pattern," correct?

 6            A.    Uh-huh.

 7            Q.    "And orders of unusual frequency."

 8                     You understand that, too, correct?

 9            A.    Yes.

10            Q.    Okay.  So a suspicious order is

11   something that has -- is an order that's of

12   unusual size, correct?

13                     MS. WICHT:  Object to the form.

14            A.    Unusual size is, yeah, one of the

15   components.

16            Q.    Okay.  Well, it's one of the ways

17   that you have a suspicious order, is unusual

18   size.  That's what the DEA's telling you in this

19   letter, correct?

20                     MS. WICHT:  Object to the form.

21            A.    That's what it says in the letter.

22            Q.    Okay.  And it's not only what it

23   says in the letter, but you said earlier, this

24   is one of the expectations that the DEA had of
```

Highly Confidential - Subject to Further Confidentiality Review

1    Cardinal Health.  That's the way you interpreted

2    this when you looked at it; is that correct?

3            A.    Yeah.  We --

4                  MS. WICHT:  Object to form.

5            A.    We discussed our interpretation

6    with members of the Drug Enforcement

7    Administration, and our interpretation of our

8    suspicious order monitoring, our reporting

9    requirements, was executed in agreement with the

10   agency after the meeting of 2009.

11           Q.    Well, do you have -- did they send

12   you a letter like this P1.4050, after this 2009

13   meeting that somebody at Cardinal Health had?

14           A.    It was not a letter, but it was an

15   interactive session between members of Cardinal

16   Health and members of the Drug Enforcement

17   Administration.

18           Q.    And who was there for Cardinal

19   Health?

20           A.    Was Michael Moné.

21           Q.    Well, let me ask you this.  Were

22   you there?

23           A.    I wasn't there.

24           Q.    So you weren't there, so you don't

1    actually know what was said?  It was just

2    something that Mr. Moné conveyed to you,

3    correct?

4          A.    Mr. Moné, not only Mr. Moné, but

5    also Mr. Bob Giacalone and Mr. Craig Morford.

6          Q.    And did they ever give you a piece

7    of paper or a letter from the DEA, like this

8    document here that we've been looking at, that

9    gave you guidance so you could read it and

10   understand it?

11         MS. WICHT:  Object to the form of

12         the question.

13         A.    They gave me an overview of our

14   suspicious order monitoring program, gave me an

15   update on the meeting that they had in our

16   corporate center with members of DEA, including

17   Barbara Boockholdt, Sue Langston, and also the

18   results of all the inspections that we were

19   having.  And no indication whatsoever that we

20   were not meeting the expectations of the agency.

21         Q.    Sir, what I'd really like is if

22   you just listen to my question, okay, and see if

23   you can answer the question that I'm asking.

24   Okay?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    I thought I was answering your

2     question.

3              Q.    I know.  I know you thought you

4     were, but I just want you to listen to what I'm

5     asking you.

6                    What I'm asking you is, this group

7     of people that you've talked about, did they

8     ever give you a document or a letter, similar to

9     4050 that we've just looked at, that outlined

10    from the DEA what they expected of Cardinal

11    Health after this meeting that you've talked

12    about?

13                   MS. WICHT:  Object to --

14             Q.    Yes or no?

15                   MS. WICHT:  Object to the form.

16             A.    I don't have a document from them.

17             Q.    They never gave you a document?

18             A.    (Shakes head.)

19             Q.    So if they withheld that document

20    from you, that would be something that would

21    have been difficult for you to do your job, them

22    withholding it, correct?

23                   MS. WICHT:  Object to the form.

24                   Speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    I don't believe they had any cause

2    to be withholding any documents from me.

3              Q.    Okay.  You just said the DEA never

4    sent a document out about it, correct?

5              MS. WICHT:  Object to the form of

6         the question.

7              A.    What did you say again?  I didn't

8    hear you.

9              Q.    You can strike the question.

10             So the only document -- how many

11   documents have you seen -- how many letters like

12   this have you seen from the DEA?

13             A.    I believe two letters.

14             Q.    Okay.  One in 2006 and one in

15   2007?

16             A.    Yep.

17             Q.    And the 2006 is the one we just

18   referenced here?

19             A.    Yep.

20             Q.    And from 2007 forward until -- you

21   haven't seen any other letters from the DEA

22   describing Cardinal's responsibilities?

23             A.    It is possible, but I don't

24   recall.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  And if we could look also

 2    at P1.4915.

 3                         - - -

 4       (Cardinal-Quintero Exhibit 13 marked.)

 5                         - - -

 6               MR. HUNTER:  What are the Bates

 7         numbers, please?

 8    BY MR. GRAY:

 9            Q.    And, sir, this is 21 CFR Section

10    1301.74.  You're familiar with this section; is

11    that correct?

12            A.    With the 21 CFR, yes.  Not within

13    the specific of all the sections, so I will have

14    to review this one.

15               MS. WICHT:  This is -- it's one

16         section of it, correct?

17               MR. GRAY:  Correct.

18               (Pause in proceedings.)

19            A.    Yeah, I read the content.

20            Q.    And when did you first become

21    familiar with 21 CFR 1301.74?

22            A.    I was -- I started reading soon

23    before and soon after, educating myself on some

24    of the aspects of the regulation.  I was
```

1    familiar with some of the regulation because one

2    of my -- the manufacturing facilities that I was

3    responsible for had controlled substances, so we

4    had to be familiar with the Controlled

5    Substances Act.

6            Q.    Okay.  And you understood, as we

7    talked about in the previous exhibit, 4050, that

8    one of the requirements that the law placed upon

9    Cardinal Health was that "The registrant shall

10   design and operate a system to disclose the

11   registrant's suspicious orders of controlled

12   substances," correct?

13           MS. WICHT:  Object to the form.

14           A.    The regulatory requirement is to

15   operate a system to detect and report suspicious

16   orders, which we did.

17           Q.    And that "The registrant shall

18   inform the field division office of the

19   administration in his area of suspicious orders

20   when discovered by the registrant," correct?

21           A.    My understanding is we were

22   operating a system consistent with this

23   requirement as we agreed on the interpretation

24   of this requirement during the 2009 meeting

Highly Confidential - Subject to Further Confidentiality Review

1    between DEA and Cardinal Health.

2          Q.    Yeah.  Well, we're going to talk

3    about that later.  But what I'm asking you right

4    now is, you understood that as the registrant

5    shall inform the DEA of suspicious orders when

6    discovered by the registrant.  You understood

7    that was the rule and the law of the United

8    States as it related to Cardinal Health

9    distributing opioid narcotics, correct?

10          MS. WICHT:  Object to the form.

11          A.    Correct.  I agree with the

12   regulatory requirements stated in 21 CFR

13   1301.74.

14          Q.    And this regulation has never

15   changed, has it?

16          A.    Not to the best of my knowledge.

17          Q.    Okay.  So -- and then further,

18   "The suspicious orders include orders of unusual

19   size."

20          You understand that, don't you?

21          MS. WICHT:  Object to the form.

22          A.    Unusual size, yeah.  That's one of

23   the elements.

24          Q.    And suspicious orders also include

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "orders deviating substantially from a normal

 2    pattern."

 3                    You understand that, don't you?

 4         A.    It's what the regulation says.

 5         Q.    And you understand that the

 6    regulation tells Cardinal Health that suspicious

 7    orders include orders of unusual frequency, as

 8    well, correct?

 9         A.    That's what the regulation says.

10         Q.    Okay, sir.  Could you look back at

11    Exhibit 5, which is P1.4085.

12                    Do you have that in front of you,

13    sir?

14         A.    Yes.

15         Q.    And Page 12, down at the bottom.

16    My colleague was asking you, Mr. Kroeger, about

17    this earlier.  Do you have that, sir?

18                    Down at the bottom, Mr. Arpaio of

19    the DEA "communicated to Mr. Moné that due

20    diligence investigations must be performed on

21    all customers, chain pharmacies included, when

22    it appears that suspicious high volume orders

23    are requested of controlled substances and

24    questionnaires should be sent to these chains."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Now, did Mr. Moné ever tell you

 2   about his conversation with the DEA Mike Arpaio?

 3            MS. WICHT:  Object to form.

 4       A.   I don't recall this particular

 5   conversation, if he had it with me or not.

 6       Q.   Well, if he would have had it with

 7   you, do you think you would have recalled it?

 8   Because at the time, you were not doing that

 9   with chain pharmacies, were you?  You were not

10   doing due diligence investigation on chain

11   pharmacies.

12            MS. WICHT:  Object to the form.

13       A.   We were doing -- we were -- had a

14   threshold system applied to chain pharmacies,

15   and when they trigger the threshold events, each

16   threshold event was investigated and determined

17   whether or not additional information was needed

18   before we could classify that as a suspicious

19   order.

20       Q.   But you weren't doing due

21   diligence investigation on chain pharmacies,

22   were you?

23       A.   We were doing --

24            MS. WICHT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

1              Sorry.

2         A.    We did investigations in

3    partnership with chain pharmacies.

4         Q.    Okay.  Well, what you actually did

5    was you called or otherwise corresponded with

6    the chain and had them do their investigation

7    and get back with you about whether or not they

8    felt like it was suspicious or not, correct?

9              MS. WICHT:  Object to the form.

10        A.    We communicated with the chain and

11   requested additional investigation on particular

12   pharmacy, which included the results of their

13   investigation.

14        Q.    But you relied on the results of

15   their investigation, correct?

16             MS. WICHT:  Object to the form.

17        A.    We used the result of the

18   investigation as one of the elements to -- for

19   us to make a decision.  Like, for example, on

20   219, I requested one of our members of our staff

21   to go to the store and do a surveillance

22   inspection.

23        Q.    Okay.  And -- but Mr. Moné never

24   informed you of what Mr. Arpaio of the DEA said

```
 1   concerning chain pharmacies, or at least you

 2   don't recall having that -- understood that?

 3          A.    I don't recall having that

 4   conversation with Michael.

 5          Q.    Okay.  Would that have been

 6   something that you think you would have

 7   recalled?  Because that's pretty important.

 8   It's a DEA communication to Mr. Moné, who at the

 9   time was head of anti -- or was underneath you

10   in anti-diversion, correct?

11              MS. WICHT:  Object to the form.

12          A.    Don't recall this conversation.

13   Don't recall -- I don't know who Mike Arpaio is.

14   So to the best of my knowledge, I cannot judge

15   whether this conversation took place or not.

16   You will have to ask Mr. Moné or Mike Arpaio

17   about this conversation.

18          Q.    So Mr. Moné would be a better

19   person to discuss his communication with the DEA

20   Mike Arpaio than you because you don't recall

21   the conversation Mr. Moné had with you and

22   whether he did or not, correct?

23          A.    Mr. Moné would be a better person

24   to comment on any interaction that he may have
```

Highly Confidential - Subject to Further Confidentiality Review

1    or not have with Mike Arpaio.

2                        - - -

3        (Cardinal-Quintero Exhibit 14 marked.)

4                        - - -

5    BY MR. GRAY:

6        Q.    Mr. Quintero, I've showed you what

7    has been marked as Plaintiff's Exhibit 14 to

8    your deposition, P1.43.

9        A.    Uh-huh.

10       Q.    And I'd ask you if you've ever

11   seen this document before.

12       A.    No, I haven't.

13       Q.    No one at Cardinal Health ever

14   showed you Exhibit 14 to your deposition?

15       A.    I'm not -- I was not in charge of

16   the anti-diversion department at this point in

17   time, so I did not have responsibilities over

18   this.

19       Q.    But you've never been shown this

20   letter before?

21       A.    I don't recall me having this

22   document or seeing this document before.

23       Q.    And no one ever discussed this

24   document with you before at Cardinal Health?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. WICHT:  You should just --
 2           Mr. Quintero, if there's -- I don't know
 3           whether there have been conversations
 4           that you would have had with lawyers for
 5           Cardinal about this document.  If there
 6           were, you should just exclude those from
 7           your answer because those would be
 8           privileged.  But you can answer
 9           otherwise.
10  BY MR. GRAY:
11           Q.    Have you ever had -- go ahead and
12  answer my question if you can.
13           A.    To be honest with you, I don't
14  recall seeing this document before.  This is the
15  first time that I've -- that I believe I've seen
16  it.
17           Q.    And you don't recall ever having
18  any conversations with anyone about this
19  document, correct?
20           A.    I don't recall that.
21           Q.    Okay.  And, well, let's just go
22  through this document.  It's from the Congress
23  of the United States House of Representatives.
24                Do you see that at the very top?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I see it, yes.

2          Q.    So it's a letter from United

3    States Congress to George Barrett.

4                Who's Mr. Barrett?

5          A.    George used to be the CEO for the

6    corporation.  He became executive chairman of

7    the board.

8          Q.    And Michael Kaufmann, who is

9    Michael Kaufmann?

10         A.    Michael Kaufmann used to be the

11   chief executive officer for the pharma segment

12   and chief financial officer for the corporation

13   and became the chief executive officer for

14   Cardinal Health.

15         Q.    Okay.  And if you look at the

16   second paragraph, it says, "As part of our

17   investigation, the committee wrote to you on

18   May 8th, 2017."

19               Did you ever see a letter from the

20   Congress of the United States to Cardinal Health

21   dated May 8, 2017, to your recollection?

22         A.    I don't recollect seeing that

23   letter.  Like I told you before, you know, my

24   involvement with the anti-diversion program

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ended sometime in 2015, so I was not involved

 2    with the day-to-day activities of this

 3    particular program.

 4          Q.    All right.  And if you turn to the

 5    next page, sir.  And the reason why I wanted to

 6    know if anybody ever discussed this document

 7    with you is because if you look in the very

 8    first paragraph, it involves the sale of

 9    hydrocodone and oxycodone in West Virginia by

10    Cardinal Health there 2007 through 2012.

11               Do you see that?

12          A.    I see that.

13          Q.    And so that was a period of time

14    that you were the vice president of regulatory,

15    correct?

16          A.    That period of time.  Not entire

17    time.  I became --

18          Q.    2009, you became -- you were

19    there?

20          A.    December 2009.

21          Q.    Yes, sir.

22               So 2009 to 2012, so that was a big

23    portion of the time that you were the vice

24    president, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. WICHT:  Object to the form.

 2          A.    I was the vice president of QRA

 3   for the pharmaceutical segment from

 4   December 1st, 2009.  That included 2012.

 5          Q.    Yeah.

 6                So -- and that's what we're

 7   talking about here, right, or the Congress of

 8   the United States is asking Mr. Barrett and

 9   Mr. Kaufmann about, about the sale and

10   distribution of hydrocodone and oxycodone from

11   2009 to '12.  That's a big portion of this 2007

12   to '12 time frame, isn't it?

13                  MS. WICHT:  Object to the form.

14          A.    So they're asking Mr. Kaufmann and

15   Mr. Barrett about 2007 to 2012, I see that.

16          Q.    Yeah, okay.  But nobody ever came

17   to you, Mr. Kaufmann or Mr. Barrett, and said,

18   hey, we got this letter from Congress?  This is

19   when you -- a lot of this time was when you were

20   in charge, can we talk to you about it?

21          A.    I did not talk to Mr. Kaufmann or

22   Mr. Barrett about this letter.

23          Q.    Okay.  You didn't talk to anybody

24   about the letter, did you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Not that I recall.

 2              Q.    All right.  Let's look at what the

 3     Congress of the United States is saying to

 4     Cardinal.  They're saying that you distributed

 5     from 2007 to 2012 -- this is the first

 6     paragraph -- 241,122,241 doses of hydrocodone

 7     and oxycodone to West Virginia.

 8                    Now, do you believe those numbers

 9     to be true?

10              A.    I don't have the information.  I'm

11     assuming that Congress collected this

12     information from somebody, but I don't have

13     information in front of me.  So -- and I haven't

14     done the analysis, so I don't know if that

15     number is accurate or not.

16              Q.    Okay.  Well, you don't think

17     Congress got it wrong, do you?

18                    MS. WICHT:  Object to the form of

19          the question.

20              A.    I don't have the data to say

21     Congress calculated the numbers right or

22     Congress calculated the numbers wrong, because I

23     don't have the data.

24                    MS. WICHT:  They put the source of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              their information in the letter, so it's

2              whatever it is.

3         Q.    Now when you were -- are you --

4              MR. GRAY:  Counsel, object to the

5              form if you'd like.

6  BY MR. GRAY:

7         Q.    When you were vice president of

8  regulatory, did you receive the number of doses

9  of hydrocodone and oxycodone distributed to West

10 Virginia from 2009 to 2012?

11        A.    We did analysis, but I don't

12 recall specifically somebody gave me a number

13 for dosage that went to West Virginia.  Our

14 analysis were based on a pharmacy-by-pharmacy

15 basis, and that's how our program operated,

16 based on pharmacy and our assessment of their

17 due diligence in terms of filling prescriptions

18 for legitimate medical purpose.

19        Q.    Did you ever receive information

20 on a statewide basis of the number of oxycodone

21 or hydrocodone doses distributed to a specific

22 state for a specific year when you were vice

23 president of regulatory?

24        A.    I remember some hit maps based on
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    distribution of drug product, but I don't recall

2    that they contained the actual number.  I don't

3    remember.

4         Q.    Would that have been important to

5    you in your job to know that there were

6    241,122 -- or 241,122,241 doses of hydrocodone

7    and oxycodone being distributed to West Virginia

8    between 2007 and 2012?

9              MS. WICHT:  Object to the form.

10        A.    All of the information that is

11   provided in terms of dosage unit has to be taken

12   into context with the number of pharmacies that

13   we serve in a particular state, size of the

14   state, number of hospitals in the state, the

15   type of customers that we have in the state.  So

16   there's -- all that information has to be taken

17   into consideration in regards to the volume.

18        Q.    When you were vice president of

19   regulatory, did you ever go to West Virginia?

20        A.    I've been in West Virginia.  I

21   went to our Wheeling DC at least once that I

22   remember.

23              (Reporter clarification.)

24        Q.    And do you know what the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    population of the state of West Virginia is?

 2            A.    Not aware of that.

 3            Q.    1.8 million.

 4                  Is 241,122,241 doses of

 5    hydrocodone and oxycodone in relation to 1.8

 6    million people an unusual size?

 7                  MS. WICHT:  Object to the form.

 8            A.    I wouldn't know.  We have to take

 9    into the context and I would have to do an

10    analysis to determine that whether or not -- I

11    mean, this is total volume, you know.  How many

12    pharmacies?  I don't know.  The size of the

13    pharmacies.  So there's a lot of information

14    that is needed for me to be able to have a

15    judgment on that.

16            Q.    Well, why do you need to know any

17    more than the population?  Why does the number

18    of pharmacies matter?  Isn't it driven by the

19    population of the state?

20                  MS. WICHT:  Object to the form.

21            A.    The number of pharmacies that we

22    have is that we have as customers is relevant to

23    the analysis.

24            Q.    Well, if the ratio between 1.8
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    million people and 241 million dosage units, is

 2    that relevant to what -- to unusual size?

 3            A.    Like I tell you --

 4            MS. WICHT:  Object to the form.

 5    Sorry.

 6            A.    -- we can take one piece of

 7    information in isolation.  It has to be done in

 8    totality, including other information that are

 9    relevant to the analysis.  It cannot be done

10    only when -- like if you send 2 million dosage

11    units to a veteran hospital, is that a high

12    size?  Yeah, but it's probably a hospital that

13    needs 2 million dosage unit.

14            Q.    Let's go down to Family Discount

15    Pharmacy, Mount Gay-Shamrock, West Virginia.

16            A.    Uh-huh.

17            Q.    Do you know where Mount

18    Gay-Shamrock, West Virginia, is?

19            A.    No, sir.  I'm not from West

20    Virginia.  I'm from Puerto Rico.  Lived in

21    Texas, Tennessee, Virginia, Pennsylvania, Ohio,

22    but never in West Virginia.

23            Q.    Okay.  But do you know what county

24    Mount Gay-Shamrock, West Virginia is in?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    Sorry, sir.  I don't know exactly
 2    where that county is.
 3           Q.    Let's look at this.  It says, in
 4    the middle of that paragraph, "According to the
 5    DEA data, between 2006 and 2016, Family Discount
 6    Pharmacy in Mount Gay-Shamrock received a total
 7    of ███████doses of hydrocodone and oxycodone
 8    from all distributors.  According to US census
 9    data in 2010, Mount Gay-Shamrock had a
10    population of 1,779 people."
11                 Do you see that?
12           A.    I see that.
13           Q.    Now, is that ratio significant to
14    you, 1,779 people, as far as the population,
15    receiving ███████ dosage units?
16           A.    I don't know where --
17                 MS. WICHT:  Object to the form.
18           A.    I don't know where Mount Gay is
19    located.  I don't know if there are other
20    population centers close to Mount Gay.  I don't
21    know if there's a cancer hospital in Mount Gay.
22    There's a lot of information that I will have to
23    do an assessment on the question that you're
24    asking me.
```

```
1          Q.    But that in and of itself is not

2    significant to you?

3               MS. WICHT:  Object to the form.

4          Q.    The population and the number of

5    pills?

6               MS. WICHT:  Object to the form.

7          A.    What I'm saying is that to make a

8    fair assessment of any distribution to any

9    region of the country, you need to have

10   additional data.  And many healthcare

11   professionals would agree with me.

12         Q.    Let's go down to the next full

13   paragraph.  "The DEA Automation of Reports and

14   Consolidated Orders System (ARCOS) data provided

15   to the committee and referenced in the chart

16   below indicate that over a five-year period,

17   Cardinal Health supplied Family Discount

18   Pharmacy with over 6.5 million hydrocodone and

19   oxycodone pills."

20              Do you see that, sir?

21         A.    Yes.

22         Q.    Now, was that 6.5 million pills to

23   one pharmacy, correct, sir?

24         A.    Over a period of five years.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Yeah.

2                    Do you see that, sir?

3              A.    According to this document.

4              Q.    Yeah.

5                    Now, we know from looking up top

6     that there's only 1,779 people in Mount Gay.  So

7     wouldn't that be an unusual size?

8              A.    Like I told you --

9                    MS. WICHT:  Object to the form.

10             A.    -- you need to take the totality

11    of the information, not only the volume.  There

12    are other factors that would make a volume like

13    that justifiable.

14             Q.    Okay.  And if -- keep going.  "If

15    accurate, this means that during this period,

16    Cardinal Health shipped an average of 3,561

17    hydrocodone and oxycodone pills every day to

18    this one pharmacy in rural West Virginia."

19                   Would that meet the definition,

20    under the CFR, of unusual frequency?

21                   MS. WICHT:  Object to the form.

22             A.    Like I said before, you would need

23    the totality of the information to make an

24    assessment whether or not that volume is
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    appropriate for that particular pharmacy.  I

2    don't know if that pharmacy was serving a

3    hospice clinic or hospice facility.  I would

4    have to have a lot more information to make that

5    assessment.

6             Q.    And when your staff brought this

7    information at Family Discount Pharmacy to your

8    attention, did you do that analysis that you're

9    talking about?

10            MS. WICHT:  Object to the form.

11            A.    I don't -- I review hundreds of

12   pharmacy.  I don't review this particular

13   pharmacy.

14            Q.    Okay.  You never reviewed this

15   one?  Nobody ever brought this one to your

16   attention?

17            A.    No, I'm not saying that.  I'm

18   saying that I don't recall the review of this

19   particular pharmacy.

20            Q.    So this size volume just really

21   didn't hit your radar screen?  Because you would

22   have recalled it if it was something that was

23   significant, wouldn't you?

24            MS. WICHT:  Object to the form.
```

```
 1              Mischaracterizes.

 2         A.    I disagree with your statement.  I

 3   review hundreds of pharmacies with my team, and

 4   the recollection of the name of a particular

 5   pharmacy is not something that I could tell you

 6   that I remember this particular one or any other

 7   particular one.

 8         Q.    Last sentence, "This means that

 9   Cardinal Health alone shipped an average of

10   approximately 731 opioid pills per year to every

11   man, woman, and child in Mount Gay."

12              Now, that, sir, that would be an

13   unusual size order pursuant to 21 CFR that we

14   discussed earlier, correct?

15         A.    I could not say that --

16              MS. WICHT:  Object to the form.

17         A.    I could not say that without

18   reviewing the totality of information that we

19   have for this particular pharmacy.

20         Q.    All right.  Let's go to 43.4.

21   Hurley -- in the middle there, Hurley Drug

22   Company, Williamson, West Virginia.

23              Do you know where Williamson, West

24   Virginia is?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No, sir.  Sorry about that.

 2              Q.    Never been there?

 3              A.    I don't remember ever being in

 4    Williamson, West Virginia.

 5              Q.    Okay.  What if I told you that

 6    Williamson County -- Williamson, West Virginia

 7    is in Mingo County and Family Discount Drug is

 8    in Logan County, they're right next to each

 9    other?  Two small, little counties in West

10    Virginia.

11                    MS. WICHT:  Object.  I don't know

12              what the question is.

13    BY MR. GRAY:

14              Q.    You don't know?  You've never

15    investigated, never been to West Virginia,

16    except one time to your DC, correct?

17                    MS. WICHT:  Let him ask a question

18              before you give an answer, please.

19              Okay?

20                    Go ahead and pose a question.

21    BY MR. GRAY:

22              Q.    Is that true, sir?  The only

23    place --

24              A.    What was the question?
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      The only place you've been in West

2   Virginia is your DC?

3        A.      I've driven by West Virginia.  I

4   don't remember ever staying in West Virginia.  I

5   remember visiting our DC.  I don't remember if

6   it was once or more than once, but I have

7   visited our DC in West Virginia.

8        Q.      Never been to Mingo County?

9               MS. WICHT:  Objection.  Asked and

10          answered.

11       A.      Sir, I don't know where Mingo

12   County is.

13       Q.      Okay.  According -- right under

14   this, Hurley Drug, Williamson, West Virginia.

15   I'm reading this.  "According to DEA data,

16   ████████████████████████████████████████████

    ██ ████████████████████████████████████████████

    ██ ██████████████████████████████████████

19              Do you see that, sir?

20       A.      Is that on the next page?

21              MS. WICHT:  I think he's on 4.

22              THE WITNESS:  4?

23              MS. WICHT:  Yeah.

24       A.      That's what it says in this

Highly Confidential - Subject to Further Confidentiality Review

```
1    document.

2    BY MR. GRAY:

3         Q.    Okay, sir.  And down at the

4    next-to-the-last paragraph, it says, "According

5    to US census data, Williamson's population was

6    3,191 in 2010."

7              Do you see that?

8         A.    Where is that in the document?

9         Q.    Page 43.4.

10        A.    Okay.  Towards the end of the

11   document.

12        Q.    Very last paragraph.

13        A.    Okay.

14        Q.    So, again, the ratio of population

15   to the amount of pills, 3,191 population, and

16   ██████████████████████  under the rules and

17   regulations that we talked about, the letter and

18   the CFR, does that -- as the vice president of

19   regulatory, is that something that you would say

20   is an unusual size under the regulation?

21             MS. WICHT:  Object to the form.

22        A.    The letter is not the regulation.

23   The regulation is the Controlled Substances Act.

24        Q.    Under the Controlled Substances
```

```
 1   Act, would you say that's an unusual size for a

 2   population of 3,191 people?

 3           A.    You would have to see the totality

 4   of information, like I told you before.  You'd

 5   have to look at other factors to determine if

 6   that particular size was appropriate for that

 7   pharmacy during that period of time.

 8           Q.    Okay.  And what are the factors

 9   you would want to look at?

10           A.    There's many factors as

11   demographics of the area.

12           Q.    What specifically about the

13   demographics of 3,191 people?

14           A.    Demographics in terms of, we have

15   employees, workers' compensation because they've

16   got injuries, you have to check their hospitals

17   in the area, if they serve hospice, if that

18   particular county is close to other counties

19   that have larger population.  Many, many

20   factors.

21                 Our focus is -- in the due

22   diligence process is, is the pharmacy conducting

23   their due diligence and filling prescriptions

24   for legitimate medical use.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    How big would the hospice need to

2  be?

3            MS. WICHT:  Object to the form of

4        the question.

5      A.    I personally do not know that, but

6  is one of the -- is one of the information that

7  my team at that time will ask the pharmacy if

8  they served hospices.

9      Q.    So that would be something that

10  Mr. Moné would be better to answer, right, the

11  size of -- that a hospice would need to be?

12            MS. WICHT:  Object to the form.

13      A.    I think Mr. Moné had more details

14  on the mechanics of the program at that time

15  than I do in terms of the details.

16      Q.    And in a town of 3,191 people, how

17  many beds would the hospital need to have?

18            MS. WICHT:  Object to the form.

19      A.    You're asking me for details that

20  I was not involved in the day-to-day execution

21  of the program and the evaluation of this

22  pharmacy, but I'm sure my staff evaluated this

23  pharmacy, then made decisions according to their

24  best judgment and information that they had.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Well, you just told us that you

 2    looked at hundreds of pharmacies every year,

 3    right?

 4              A.    I look -- I have looked at

 5    hundreds of pharmacies.

 6              Q.    Do you recall looking at Hurley

 7    Drug Company in Williamson, West Virginia?

 8              A.    I don't recall.  It's possible,

 9    but I don't recall.

10              Q.    Doesn't stand out to you, correct?

11              MS. WICHT:  Object to the form.

12              A.    I don't recall.  I've reviewed so

13    many pharmacies.  I've had -- reviewed so many

14    pieces of information in my company that I don't

15    recall every single item that I have reviewed

16    over a nine-year period.

17              Q.    So in your role as vice president

18    at Cardinal Health over regulatory, a pharmacy

19    like Hurley Drug Company would not stand out,

20    and doesn't stand out, because you don't recall

21    it, correct?

22              MS. WICHT:  Objection to the form.

23              Mischaracterizes testimony.

24              A.    I think the characterization is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    inaccurate.  I think it would have been reviewed

 2    by somebody.  I don't know when and how and the

 3    determinations that were made.  I don't recall

 4    that.

 5            Q.    Did you ever instruct your staff

 6    on these issues about how big a pharmacy -- I

 7    mean, how big a hospice should be or how big a

 8    hospital should be?  Did you ever have

 9    discussions with them about that in these --

10    concerning these small, rural counties in West

11    Virginia?

12                  MS. WICHT:  Object to the form.

13            A.    I don't recall having specific

14    discussions on the size of hospice.  ███████████
```

Highly Confidential - Subject to Further Confidentiality Review

███ ████████████████████████████ █

███ ████████████████████████

3          Q.    And in your discussions, did you

4     ever -- well, during the period of time that you

5     were vice president of regulatory, did West

6     Virginia, as a state in the amount and number of

7     opioid drugs being distributed by Cardinal

8     Health to West Virginia, was that ever a focus

9     at any meetings that you had with your team?

10          A.    I remember reviewing pharmacies in

11     West Virginia.

12          Q.    But the state as a whole, did you

13     ever look at the state as a whole?

14          A.    I remember reviewing several

15     pharmacies in West Virginia.  I do not have

16     recollection of the names of those pharmacies.

17          Q.    You don't recall any of those

18     pharmacies, correct?

19               MS. WICHT:  Object to the form.

20          A.    If you ask me to mention name of

21     pharmacies right now, I would not recollect.  We

22     have thousands of customers.

23          Q.    And when -- and no one ever came

24     to you after Cardinal received this letter to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    discuss Hurley Drug with you, correct?

 2           A.    I don't recall --

 3           Q.    And no one --

 4           A.    -- this letter being discussed

 5    with me.

 6           Q.    Okay.  Well, Hurley Drug, did they

 7    ever come to you to discuss Hurley Drug with

 8    you?

 9           A.    I don't recall.

10           Q.    And did they ever come and discuss

11    with you Family Discount Pharmacy?

12           A.    I don't recall.

13           Q.    And when you were vice president

14    of regulatory, in your role, did you ever

15    discuss with your team the volume of opioids

16    being distributed in the state of West Virginia?

17                 MS. WICHT:  Object to the form of

18           the question.

19           A.    I recall us discussing volumes to

20    specific pharmacies in West Virginia, but do not

21    recall specific what pharmacies we evaluated.

22           Q.    Okay, sir.  I really want you to

23    listen to my question, okay, because I know

24    you've got a flight to catch, and you need to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    listen to my question and see if you can answer

2    it.  Okay?

3            A.      Uh-huh.

4            Q.      My question is:  When you were the

5    vice president at Cardinal Health in charge of

6    regulatory, did you ever discuss the amount of

7    opioid narcotics being distributed by Cardinal

8    Health in the entire state of West Virginia?

9    Yes or no?

10           MS. WICHT:  Object to the form.

11           A.      I cannot say that I recall one way

12   or another.  ███████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████████

██  ██████████████████████████████████  ██

██  ████████████████████████████████████

██  ████████████████████

18           Q.      For a state of 1.8 million people,

19   what would be a large volume of opioids being

20   distributed in that state per year?

21           MS. WICHT:  Object to the form.

22           A.      Sir, I cannot tell you.  What I

23   told you before, you have to look at the

24   totality of information.
```

```
 1              Q.    Okay.  Well, why don't you know

 2     the totality of West Virginia?  I mean, Cardinal

 3     Health had a distribution center, didn't they,

 4     in West Virginia?

 5              MS. WICHT:  Object to the form.

 6              A.    We did have -- we do have a

 7     distribution center in Wheeling, West Virginia.

 8              Q.    Okay.  And did you ever spend the

 9     night in West Virginia?

10              A.    I don't remember spending the

11     night.  It's possible that I stay in West

12     Virginia when I visited them, but it's possible

13     that I drove back that day.  I don't recall.

14              Q.    You don't recall, all right.

15              Do you have -- are you familiar,

16     in your role as vice president of regulatory

17     that distributed narcotic opioids to West

18     Virginia, how many hospitals there are in West

19     Virginia?

20              A.    Sir, I don't have that -- I don't

21     recall that information.  I don't have that

22     information.

23              Q.    How about how many hospices there

24     are?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Sir, I don't recall that
2    information.
3            Q.    How about any of the demographics
4    that you talked to me about earlier, do you know
5    that about West Virginia?
6            A.    I don't --
7                  MS. WICHT:  Object to the form.
8            A.    I don't recall any of that
9    information about West Virginia or any other
10   state in the nation.
11           Q.    Okay.  Don't know about it Ohio,
12   do you?
13           A.    I don't -- know the population of
14   Puerto Rico.  I think it's 3.4 million.  But
15   other than that, I cannot tell you what the
16   population of Ohio is.
17           Q.    Don't know what the population of
18   Ohio is.
19                 Do you know the population of
20   Cuyahoga County, Ohio?
21           A.    No, sir.
22           Q.    How about Summit County, do you
23   know that population?
24           A.    No, I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Do you know the demographics of

2    Cuyahoga County, Ohio?

3              A.    I don't know, sir.

4              Q.    Do you know the demographics of

5    Summit County, Ohio?

6              A.    (Shakes head.)

7              Q.    Do you know where Cuyahoga County

8    is?

9              A.    No, sir.

10             Q.    You don't know --

11             A.    I know Franklin County.

12             Q.    You're telling this jury that you

13   don't know where Cuyahoga County, Ohio is?

14             MS. WICHT:  Object to the form of

15        the question.

16             A.    I don't know that, sir.

17             Q.    Are you telling this jury you

18   don't know where Summit County, Ohio is?

19             A.    Sir, I don't know where Summit,

20   Ohio, County is.

21             Q.    Never been there, as far as you

22   know?

23             A.    I don't know.  I could have driven

24   by it in my -- some place.  I drive all over the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    place, so I'm assuming I've been in many

 2    different places.  But if you tell me a county,

 3    I will not know what the name of the county.

 4    Counties that I'm familiar with:  Franklin

 5    County, Delaware County.  That's where I reside

 6    and that's where I work.

 7           Q.    Okay.  Do you know the population

 8    of Cuyahoga County?

 9           A.    Sir, I told you I didn't know

10    where Cuyahoga County was, so how can I know the

11    population if I don't even know where it is.

12           Q.    How about Puerto Rico, do you know

13    the population of Puerto Rico?

14           A.    Around 3.4 million people.

15           Q.    How about San Juan?

16           A.    I'm not sure of the population.  I

17    think it's closer to a million, but I'm not sure

18    of that either.

19           Q.    Closer to a million?

20           A.    I think.  I'm not sure.

21           MR. GRAY:  4019, please.

22                       - - -

23      (Cardinal-Quintero Exhibit 15 marked.)

24                       - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GRAY:

 2          Q.    Sir, let me show you what is

 3   P1.4019, if you turn to Page 2.  We've marked

 4   that as Plaintiff's Exhibit Number 15 to your

 5   deposition.

 6                Have you ever seen this document

 7   before, sir?

 8          A.    Yes, I have seen this document

 9   before.

10                MS. WICHT:  Maybe mine is just

11          missing some pages.  I don't have a

12          Page 1 or a Page 2 in my copy.

13                MR. GRAY:  Oh, really?

14                MS. WICHT:  It may be that the

15          witness does.  I can't tell whether we

16          have the same thing or not.

17                MR. GRAY:  I'm sorry.

18                MS. WICHT:  It's okay.

19                MS. WADHWANI:  I don't either, but

20          I'm not necessary.

21                MR. GRAY:  I apologize.

22                MS. WICHT:  That's okay.  I just

23          want to make sure it's the same thing.

24          That's all.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Would you turn to Page 3 on yours
 2          and I can just check that it's the same
 3          thing?
 4                  MR. GRAY:  Why don't you check and
 5          make sure he's got --
 6                  MS. WICHT:  Okay.  It appears to
 7          be.  It's -- we can go ahead, and if
 8          there's something I need to take a look
 9          at, I will do that.
10                  MR. GRAY:  Okay.  I'm sorry.
11                  MS. WICHT:  That's okay.
12   BY MR. GRAY:
13          Q.   Actually, sir, if you look at
14   Page 3, 40193 --
15          A.   Yes.
16          Q.   -- now -- well, actually, if you
17   turn back to Page 2.  I'm sorry.  Just the first
18   sentence of paragraph -- numbered paragraph 2
19   which says, "On September 30th, 2008, Cardinal
20   entered into an Administrative Memorandum of
21   Agreement with the DEA."
22                  Do you see that, sir?  I'm just
23   using it as a reference.  And you talked to my
24   colleague, Mr. Kroeger, about the 2008 MOA.
```

```
 1                     Do you recall that?

 2          A.    Uh-huh.

 3          Q.    Okay.  And if you turn to the next

 4   page, despite the -- and if you look at

 5   Paragraph 3, "Despite the MOA, the specific

 6   guidance provided to Cardinal by the DEA, and

 7   despite the public information readily available

 8   regarding oxycodone epidemic in Florida,

 9   Cardinal has failed to maintain effective

10   controls against the diversion of controlled

11   substances into other than legitimate medical,

12   scientific, and industrial channels, in

13   violation of 21 USC Section 823(b)(1) and

14   (e)(1)."

15                     Do you see, that sir?

16          A.    I see that language in the

17   document.

18          Q.    And so the DEA indicated here that

19   they gave you specific guidance and you failed

20   to follow it.

21                     Do you see that?

22                     MS. WICHT:  Object to the form.

23          A.    This is in the first sentence it

24   says that?
```

```
 1              Q.    Yeah.  And, in fact, they're

 2   telling you that you violated the law, correct?

 3              MS. WICHT:  Object to the form.

 4              A.    I think the language there says in

 5   violation of 21 USC (b)(1) and (1)(e) -- I

 6   believe that's an (l) or (1).

 7              Q.    And do you recall earlier when we

 8   were going through the 2006 letter that you

 9   looked at when you first came to 2009, that it

10   talked about what 21 USC -- what the DEA thought

11   21 USC Section 823 instructed Cardinal on?  Do

12   you recall that?

13              MS. WICHT:  Object to the form,

14         foundation.

15              MR. GRAY:  You can look at the

16         foundation.  It's in the letter.  You

17         and I talked about it.  It's effective

18         controls.

19              THE WITNESS:  Is this the document

20         you're talking about (indicating)?

21              MR. GRAY:  No, sir.  It's this

22         document here, 4050, the letter that you

23         reviewed from 2006 from the DEA.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. GRAY:

 2         Q.    Specifically, sir, if you just go

 3   back and look at 4050.3.

 4               Could you pull that up, sir.

 5               4050.3, and in the third full

 6   paragraph, 21 USC 823(e).

 7               Do you see that in the middle,

 8   sir?  And what the DEA in this letter's telling

 9   Cardinal Health is that they have a duty of a

10   distributor to maintain effective controls

11   against diversion of controlled substances into

12   other than legitimate medical, scientific and

13   industrial channels.

14               And you understood that; we talked

15   about it earlier.  You understood that was one

16   of the requirements that the DEA placed on

17   Cardinal Health in order to distribute opioids,

18   correct?

19               MS. WICHT:  Object to the form of

20          the question.

21         A.    The regulations of the Controlled

22   Substances Act requires us to have effective

23   controls against diversion, which I believe --

24         Q.    Yes, sir.
```

1          A.     -- we have and we have done in the

2     past.

3          Q.     Well, I know you believe it, but

4     if you go to this document that I've just shown

5     you, P1.4019, Page 3, the DEA said you failed to

6     maintain effective controls against diversion in

7     violation of the law, correct?

8          A.     We disagree with that statement.

9     We have fulfilled our regulatory requirements of

10    developing effective controls against diversion

11    of controlled substances, as we had shown by our

12    termination over 350 customers during the period

13    of time that I remember.

14         Q.     Sir --

15         A.     I believe that number is probably

16    much higher now.

17         Q.     Okay.  Well, sir, are you aware

18    that your company paid a $34 million fine for

19    this failure?

20              MS. WICHT:  Object to the form of

21         the question.

22         A.     I'm aware that we reached a

23    settlement with the US Department of Justice and

24    that we paid a sum of money as part of the

Highly Confidential - Subject to Further Confidentiality Review

```
1    settlement.

2            Q.    Do you understand it was

3    $34 million?

4            A.    I understand that we paid in

5    settlement.

6            Q.    You don't know it was 34 million?

7            A.    I think it's -- I don't recall the

8    exact number.  Don't have any reason not to

9    believe that it's 34, but I would have to check

10   the settlement to refresh my mind.

11           Q.    It's really 44 million, but we'll

12   get to that.  But for this problem, you paid

13   34 million.

14                 Do you understand that?

15                 MS. WICHT:  Objection.

16           Q.    Did anybody at Cardinal Health

17   ever tell you that they paid $34 million for

18   this failure?

19                 MS. WICHT:  Object to the form of

20           the question.

21           A.    Repeat the question again.

22           Q.    Did anybody at Cardinal Health

23   ever tell you they paid $34 million for this

24   failure to maintain effective controls?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                MS. WICHT:  Object to the form of
2         the question.
3         A.    Cardinal Health, they had -- I was
4    told that we paid an amount of money, and I
5    don't disagree with $34 million, as part of a
6    settlement that we reached with the food and
7    drug -- I mean, the Drug Enforcement
8    Administration.
9         Q.    Is $34 million a lot of money to
10   Cardinal Health?
11               MS. WICHT:  Object to the form of
12         the question.
13        A.    $34 million is a lot of money.
14        Q.    It's more than you put into your
15   capital improvements for diversion, correct?
16               MS. WICHT:  Object to the form of
17         the question.  Mischaracterizes prior
18         testimony.
19        A.    $34 million is a lot of money.
20        Q.    A lot of money, okay.
21               And you put $25 million into your
22   capital improvements, right?
23               MS. WICHT:  Object to the form.
24        Q.    To your -- during the period of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    time that you were in diversion?

 2                  MS. WICHT:  Object to the form of

 3          the question.

 4          A.    Plus thousands of dollars and

 5    millions of dollars in operating the

 6    anti-diversion system.

 7          Q.    Do you know what the total revenue

 8    of Cardinal Health was from 2009 to 2018?

 9          A.    Don't recall, sir.

10          Q.    Trillion dollars.  More than a

11    trillion.

12                  Is 25 million a lot compared to a

13    trillion?

14                  MS. WICHT:  Object to the form of

15          the question.

16          A.    It depends what the profit margin

17    is for those amount of money.  I don't believe

18    that we made that much money in profit.

19          Q.    Yeah, profit's important.

20                  Okay.  Let's go back to 4019.3.

21    Let's look at what the DEA said.  I want to ask

22    you some questions about that.

23                  In 4a, from 2008 to 2009,

24    Cardinal's sales to its top four retail pharmacy
```

Highly Confidential - Subject to Further Confidentiality Review

 1    customers increased to approximately 803

 2    percent.

 3              Now, what I want to ask you about

 4    that is, you and I have talked about the law.

 5    Do you think that 803 percent increase is

 6    unusual size or frequency for pattern?

 7              MS. WICHT:  Object to the form of

 8         the question.

 9         Q.    And I'm asking you this in your

10    context as a vice president of regulatory.

11         A.    It's an --

12              MS. WICHT:  Same objection.

13         A.    It's an increase in volume that

14    should be looked at.

15         Q.    Okay.  So it would meet one of

16    those three criteria, correct, as a suspicious

17    order?

18              MS. WICHT:  Objection to the form

19         of the question.

20         A.    I did not -- I did not say that

21    and you're mischaracterizing my answer.  It's a

22    volume that I think would be appropriate to

23    evaluate to determine if it's concerning or not.

24         Q.    Well, if we go back to 21 CFR

Highly Confidential - Subject to Further Confidentiality Review

```
1    Section 1301.74, which is P1.419 [sic], which we

2    have up here on the screen, at the very last

3    sentence, sir, it says, "Suspicious orders

4    include orders of unusual size."

5             Okay?  And then it says,

6    "Suspicious orders include orders deviating

7    substantially from a normal pattern."  And then

8    it says, "Suspicious orders include orders of

9    unusual frequency."

10            So this 803 percent in one year,

11   which one of those three would it -- in your

12   mind, as vice president of regulatory, which one

13   of those three would it meet?

14            MS. WICHT:  Object to the form of

15        the question.  Foundation.

16        Mischaracterize.

17        A.    The increase would hit likely a

18   threshold event, which requires other members of

19   our staff to assess whether or not that increase

20   is justifiable for legitimate medical reasons.

21   And if it is justifiable, that was the system

22   that we had at that time and that was agreed

23   with the agency in our meeting of 2009 that the

24   order didn't have to be reported as suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    after that assessment was done.

 2          Q.    Yeah, but --

 3          A.    It cannot be determined to be

 4    suspicious until an assessment was done.  That

 5    was the agreement that we had with the agency at

 6    that time.

 7          Q.    Now, I want you to -- it's right

 8    there on the screen.  I want you to look at the

 9    law, and I want you to tell me where all of that

10    that you just said is in the law.

11          A.    It says --

12                MS. WICHT:  Object to the form of

13          the question.

14          A.    The interpretation that we had

15    with the agency at that time, based on the

16    meeting that we had in 2009 with Ruth Carter and

17    Sue Langston was the definition that we were

18    using to determine what was a suspicious order,

19    which was consistent with the regulatory

20    requirements as we understood it and as we

21    thought expectations of the agency were at that

22    time.

23          Q.    Okay.  Well, obviously you got it

24    wrong, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. WICHT:  Object to the form of
 2        the question.  Argumentative.
 3        A.    I wouldn't say that we got it
 4   wrong.  I would say that the agency changed the
 5   interpretation of the regulations and we had
 6   multiple opportunities for the agency to tell us
 7   that our interpretation was wrong and it was
 8   never done.
 9        Q.    Okay.  Well, go back to my
10   question.  Where in the law does it say all of
11   that stuff you're talking to me about?  What the
12   law says is, suspicious orders include orders of
13   unusual size; suspicious orders include orders
14   deviating substantially from the normal pattern;
15   orders of unusual frequency.
16            So this 803 percent, which one of
17   those would it be?
18            MS. WICHT:  Objection.  Asked and
19        answered.
20        Q.    Is it unusual size, or is it
21   deviating from normal pattern or frequency?
22   Which one is it?
23            MS. WICHT:  Objection.  Asked and
24        answered.
```

1          Q.    I want you to look at the law, not

2     your interpretation.

3                MS. WICHT:  Objection.  Asked and

4          answered.  Several times.

5          A.    I'm looking at -- I've answered

6     that question more than once.  And I told you,

7     you know, we had a meeting with the DEA --

8          Q.    Sir, sir, I'm not asking about the

9     meeting --

10         A.    -- in 2009 where, we discussed --

11         Q.    -- what I'm asking about is the

12    law.  The law.

13               MS. WICHT:  Okay.  Let him answer

14         the question.

15               MR. GRAY:  We're going to be here

16         all day.

17               MS. WICHT:  Well, you have seven

18         hours total, so keep going.

19    BY MR. GRAY:

20         Q.    Where under the law is Section 21

21    CFR 1301.74, P1.4915, does it say anything other

22    than a suspicious order includes orders of

23    unusual size, orders deviating substantially

24    from a normal pattern, and orders of unusual

Highly Confidential - Subject to Further Confidentiality Review

1    frequency?

2              MS. WICHT:  Object to the form.

3         And asked and answered.

4         A.    We were following the regulations

5    as we understood at that time.

6         Q.    Sir, answer my question.  Where

7    does it say anything other than what I read?

8              MS. WICHT:  Object to the form.

9         A.    I maintain my previous answer

10   that, this language was discussed with members

11   of DEA and headquarters.  We agreed on the

12   interpretation of the language and we were

13   executing our program according to that

14   interpretation.

15        Q.    Okay.  And you weren't at this

16   meeting?

17        A.    Like I told you before, I got to

18   Cardinal Health December 1st, 2011.  That

19   meeting occurred earlier that year.

20        Q.    And nobody ever showed you a

21   document from the DEA about that meeting?

22             MS. WICHT:  Objection.  Asked and

23        answered.

24        A.    I had updates from several members

Highly Confidential - Subject to Further Confidentiality Review

1    of the Cardinal Health team, including Michael

2    Moné, including Bob Giacalone, including my

3    boss, with a consistent interpretation of the

4    outcome of the meeting with the DEA.  The DEA

5    had plenty of opportunity to tell us that our

6    interpretation was not adequate during the

7    dozens and dozens of cyclic inspections that we

8    had, and that was --

9         Q.    And that's exactly what they're

10   doing in this document, 4019, is telling you

11   that you failed and you broke the law, correct?

12        A.    We were --

13        MS. WICHT:  Object to the form of

14        the question.

15        Q.    Is that true, sir?

16        A.    We were surprised by the agency

17   taking this action against us because it was our

18   understanding that we were meeting the

19   expectations of the agency.  And it was our

20   understanding that we were performing according

21   to the regulatory requirements of the Controlled

22   Substances Act.

23        Q.    Well, you were -- you were so

24   surprised -- did Cardinal Health put you in

Highly Confidential - Subject to Further Confidentiality Review

```
1    charge of trying to get the $34 million back you

2    paid in a fine?

3                   MS. WICHT:  Object to the form of

4          the question.

5          A.    I don't work for sales.  My job is

6    in regulatory, it's make sure that we have

7    regulatory programs that helps the company

8    comply with the regulatory requirements.

9          Q.    In fact, you were so surprised

10   that you were just clearly interpreting the

11   rules and regulation and laws concerning

12   distribution just completely improperly, right?

13                  MS. WICHT:  Object.

14         Q.    I mean, you're going --

15         A.    I don't believe that --

16                  MS. WICHT:  Object to the form of

17         the question.

18         A.    I don't believe at that time we

19   had that understanding.  At that time, we felt

20   that we were meeting our regulatory

21   requirements, as I told you, and that was the

22   understanding that we had with -- from the

23   meeting that we had with Barbara Boockholdt and

24   Sue Langston.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And despite this document in front

 2   of you right now, P1.4019.2 and the $34 million

 3   fine and everything that's contained in it,

 4   you're still surprised, aren't you?

 5              MS. WICHT:  Object to the form of

 6         the question.

 7         A.    I was -- we were surprised at that

 8   time and we made changes to the program.

 9         Q.    And you're still surprised.  My

10   question is, are you still surprised?

11              MS. WICHT:  Let him finish his

12         answer, please.

13              MR. GRAY:  Well, he's not

14         answering the question.

15   BY MR. GRAY:

16         Q.    Are you still surprised?  That's

17   the question.

18         A.    We were surprised at that time,

19   and no longer surprised.  I mean, that happened

20   a long time ago, so we -- I was surprised at

21   that time.  We made changes to our program

22   according to the new expectations from the

23   agency.

24              MS. WICHT:  We've been going about
```

```
 1              an hour and ten minutes.  Whenever it is

 2              a good time to take a short break.

 3                   MR. GRAY:  Okay.  That's fine.

 4                   VIDEOGRAPHER:  Time is now 2:28.

 5              Going off the record.

 6                   (Recess taken.)

 7                   VIDEOGRAPHER:  Time is now 2:46.

 8              Back on the record.

 9                        - - -

10         (Cardinal-Quintero Exhibit 16 marked.)

11                        - - -

12    BY MR. GRAY:

13         Q.    Mr. Quintero, I'm showing you what

14    we've marked as Plaintiff's Exhibit 16 to your

15    deposition, P1.565.  I want to ask you if you've

16    ever seen this document before.

17         A.    I believe I have seen this before.

18         Q.    And at the very top,

19    "Administrative Memorandum of Agreement," do you

20    see that, sir?

21         A.    Yep.

22         Q.    Okay.  And if you look at 5a, can

23    you read that into the record for me, please.

24         A.    5a?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Yes, sir.

 2          A.    "The Order to Show Cause" --

 3          Q.    No, 5 -- well, just 5a.

 4          MS. WICHT:  You can't read a

 5     subparagraph without reading the

 6     heading.

 7          MR. GRAY:  He can read the whole

 8     document in the record.  That's fine.

 9          MS. WICHT:  Sure.

10          MR. GRAY:  If counsel doesn't like

11     you to read just a sentence, go ahead

12     and just read the whole thing.

13          MS. WICHT:  Just trying to not be

14     misleading.

15          MR. GRAY:  Okay.  I'll tell you

16     what.

17     BY MR. GRAY:

18          Q.    5a, I'll read it.  "Despite the

19     2008 MOA, Cardinal Lakeland failed to maintain

20     effective controls against diversion of

21     particular controlled substances into other than

22     legitimate medical, scientific, and industrial

23     channels as evidenced by sales of certain

24     customers of Cardinal."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that, sir?

 2          A.    I see that.

 3          Q.    And did anyone at Cardinal Health,

 4    or did you direct anyone at Cardinal Health, to

 5    do a list of all the problems that the DEA found

 6    at the Cardinal Lakeland facility?

 7                    MS. WICHT:  Object to the form of

 8              the question.

 9          A.    Repeat that again.

10          Q.    Let's do it this way.  Did you

11    direct anyone to come up with a list of all of

12    the ways that Cardinal Health Lakeland failed to

13    maintain effective controls against diversion?

14                    MS. WICHT:  Object to the form of

15              the question.

16          A.    I spoke with my staff about some

17    of the allegations made by the agency, and we

18    talked about, how do we make sure that we meet

19    the new requirements that the agency was

20    imposing on us.

21          Q.    These aren't really allegations,

22    are they?

23                    MS. WICHT:  Object to the form of

24              the question.  The document refers to it
```

1           as an allegation, counsel.

2           A.    This says above "alleged."

3           Q.    Okay.  Let's look at the next

4     page.  First paragraph, "Cardinal admits that

5     its due diligence efforts for some pharmacy

6     customers and its compliance with the 2008 MOA,

7     in certain respects, was inadequate."

8                 Do you see that?

9           A.    I'm trying to locate where that

10    language -- what number?

11          Q.    Do you see it?  See it?  See it?

12    "Cardinal admits."  Do you see that?  First

13    paragraph.

14          A.    Oh.

15          Q.    Yeah.

16                Do you see that admission,

17    "Cardinal admits"?

18          A.    I see that's what it says in the

19    agreement -- the Memorandum of Agreement.

20          Q.    Okay.

21          A.    But my understanding is that we

22    were meeting the expectations of the agency, and

23    those expectations changed over time.

24          Q.    Well, you said you'd seen this

```
 1   document.  Who did you talk to about Cardinal's

 2   admission that its due diligence efforts for

 3   some pharmacy customers and its compliance with

 4   the 2008 MOA, in certain respects, were

 5   inadequate?  Who did you talk to at the company

 6   about that?

 7              MS. WICHT:  Mr. Quintero, you

 8         can -- I don't know whether you had

 9         discussions with lawyers about that

10         subject.

11              MR. GRAY:  If you had it with

12         lawyers, don't tell me what you -- the

13         discussion with the lawyers, but you can

14         tell me you had it with legal.

15              MS. WICHT:  Sir, I'll instruct him

16         on issues of privilege.  It's Cardinal

17         Health's privilege, and I'll instruct

18         him about what he can and cannot reveal

19         under the privilege.

20              I agree that if -- what I was

21         about to tell him, if you wouldn't have

22         interrupted me, was that if he had

23         discussed it with lawyers, he could

24         identify those lawyers, but he should
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            not reveal the substance of any

 2            communications.

 3       A.    Most of those conversations that I

 4   remember, probably all conversations, were in

 5   front of our chief legal regulatory counsel, Bob

 6   Giacalone, or with Mr. Morford, our chief legal

 7   counsel.

 8       Q.    Okay.  So you had -- and as your

 9   lawyer said, you don't have to tell us the exact

10   discussions, but you learned of this -- these

11   Cardinal admissions with discussions with legal,

12   correct?

13            MS. WICHT:  Object to the form of

14       the question.

15            THE WITNESS:  Can I answer?

16            MS. WICHT:  You can answer that

17       yes or no, if you're able to, if you

18       understand the question.

19       A.    Yes.

20   BY MR. GRAY:

21       Q.    Okay, sir.

22            Just so the record's clear, sir,

23   you were the vice president of regulatory when

24   that last exhibit, 565, was in place, correct,
```

Highly Confidential - Subject to Further Confidentiality Review

1    2012?

2         A.    I was the senior vice president of

3    quality and regulatory affairs for the

4    pharmaceutical segment.

5                    - - -

6       (Cardinal-Quintero Exhibit 17 marked.)

7                    - - -

8    BY MR. GRAY:

9         Q.    Let me show you what's P1.4224

10   [sic], and has been marked as Plaintiff's

11   Exhibit 17 to your deposition, sir, and ask you

12   if you've ever seen this document.

13        A.    What's the date of the document?

14        Q.    12/22/16.  It's on the front

15   stamped.

16        A.    I don't recall seeing this

17   particular document.  This document was probably

18   produced after I did not have direct

19   responsibility for supervising the

20   anti-diversion program.

21        Q.    Okay.  When did you leave that

22   position?

23        A.    I believe during the summer of

24   2015.  Could have been August or September of

 1   2015.

 2          Q.    Okay.  And no one at the company

 3   has ever showed you this consent order before?

 4          A.    I don't remember seeing it.

 5          Q.    Okay.  Did anyone at the company

 6   ever discuss this consent order with you?

 7          A.    We may have had some conversations

 8   with the members of the legal team.

 9          Q.    Okay.  All right.  Sir, if you

10   look at 4222.2, the next page, third paragraph.

11   "Whereas, the complaint alleges that between

12   January 1, 2011 and May 14, 2012."

13                Now, that period of time, you were

14   the vice president of QRA, correct?

15          A.    I was senior vice president --

16          Q.    Senior vice president.

17          A.    -- of quality and regulatory

18   affairs for the pharmaceutical segment.

19          Q.    Okay.  And it indicates, "The

20   complaint alleges that between January 1, 2011

21   and May 14, 2012, Defendant committed reporting

22   violations of the CSA regulations by failing to

23   adequately operate a system designed to identify

24   suspicious orders of controlled substances and

```
 1    inform the DEA of those suspicious orders

 2    pursuant to 21 CFR Section 1301."

 3              Do you see that, sir?

 4         A.    Yes, I see it.

 5         Q.    Okay.  And if you -- if we can go

 6    back to P1.1941, please.  I believe that's

 7    Exhibit -- I'm not exactly sure what exhibit it

 8    is.  Exhibit 4 to your deposition.

 9              Do you have it, sir?  Mr. Kroeger

10    asked you about this document.  Now, in 4222.2,

11    the government is indicating that you failed to

12    inform the DEA of suspicious orders pursuant to

13    21 CFR 1301, and in Exhibit 4, 1941, Mr. Mahoney

14    is indicating that you told them that Cardinal

15    does not report suspicious orders to the DEA.

16              Do you see that?

17              MS. WICHT:  Object to the form of

18         the question.

19         A.    Yeah.  And I told you that -- told

20    your colleague that statement is completely

21    incorrect.  If you see, during that period of

22    time of 2013, we had reported thousands of

23    suspicious orders to DEA.  Thousands.

24         Q.    In 4222, Exhibit 17, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   government's saying you didn't do it.  You

 2   didn't report suspicious orders pursuant to

 3   21 CFR Section 1301.

 4             Do you see that?

 5        A.   We always report suspicious

 6   orders, and if you look at the record, during

 7   when conversation took place, I'm not sure who

 8   Mr. Mahoney is, but he has his information

 9   incorrect, because at this point in time, I can

10   tell you we were reporting thousand of orders to

11   DEA.

12        Q.   Well, what I want you to look at,

13   sir, is 4222.  Okay?  Exhibit 17 to your

14   deposition.  Do you see that?

15        A.   Uh-huh.

16        Q.   Okay.  Well, the DEA -- the

17   government's saying -- actually, the United

18   States Attorney for the Southern District of New

19   York in Manhattan is saying that your company

20   failed to inform the DEA of those suspicious

21   orders pursuant to 21 CFR Section 1301.

22             Do you see that?

23        A.   If you're asking me about this and

24   about the memo, they're two different dates
```

Highly Confidential - Subject to Further Confidentiality Review

1    related here.

2           Q.    Okay.

3           A.    But I can assure you that we were

4    reporting thousands of suspicious orders in

5    March 11th, 2013, where Mr. Mahoney was

6    attesting that we didn't.  And I can assure you,

7    without any doubt, that we were reporting

8    thousands of orders.

9           Q.    Okay.  Well, let's talk about 4222

10   and all those thousands of orders you reported

11   and what the US Attorney for the Southern

12   District of Manhattan found.  And if you go down

13   to numerical Paragraph Number 2, why don't you

14   read that into the record.

15                MS. WICHT:  I'm sorry.

16                Paragraph 2, is that what you said?

17                MR. GRAY:  Yes.  Numerical

18                Paragraph 2.

19          A.    "Defendant admits, acknowledges,

20   and accepts responsibility for the following

21   violations of the regulations promulgated by DEA

22   pursuant to its authority in the Controlled

23   Substances Act."

24          Q.    Okay.  Next paragraph.

Highly Confidential - Subject to Further Confidentiality Review

1           A.     "Between January 1st, 2011 and

2     May 14, 2012, Defendant failed to inform DEA

3     that certain orders for controlled substances it

4     received from some customers were suspicious, as

5     required by 21 CFR 1301.74."

6           Q.     Okay.  So the government, the

7     United States Department of Justice from

8     Manhattan, found that, just like you said over

9     here in 1941, that you didn't report suspicious

10    orders.

11          A.     I didn't ever say --

12                 MS. WICHT:  Object to the form of

13          the question.  Mischaracterizes the

14          document.

15          A.     You mischaracterize what I said.

16    I never said that we have failed to report

17    suspicious --

18          Q.     Well, we'll ask Mr. Mahoney what

19    you said to him.  But what I'm saying is, if you

20    look at 4222.2, the United States Government

21    Department of Justice made those allegations

22    against Cardinal and they admitted it, didn't

23    they?

24                 MS. WICHT:  Object to the form of

Highly Confidential - Subject to Further Confidentiality Review

```
1            the question.

2            A.    They made -- I believe they made

3    those allegations.  Me personally, I disagree

4    with those allegations.  I believe that we were

5    reporting suspicious orders as our program was

6    designed and consistent with the regulatory

7    requirements.

8            Q.    Okay.

9            MS. WICHT:  Counsel, I'm sure you

10           know Mr. Mahoney has already been asked

11           and has testified that those notes are

12           wrong, so I just urge you to not ask

13           misleading questions on the record.

14           MR. GRAY:  Strike the testimony of

15           the lawyer from the record.

16   BY MR. GRAY:

17           Q.    What I'm asking you is, during the

18   period of time that you were the vice president,

19   okay, this -- senior vice president, January 1,

20   2011 through May 14, 2012.

21           Do you see that period of time?

22           A.    I see that period of time.

23           Q.    Your company admitted that they

24   failed to inform the DEA of certain orders of
```

```
 1    controlled substances, you understand that,

 2    correct?

 3            A.    I was not --

 4                  MS. WICHT:  Object to the form of

 5            the question.

 6            A.    -- a party in the write-up of the

 7    agreement between the Department of Justice and

 8    DEA -- and Cardinal Health, but I can tell you

 9    today, and I have told you throughout the day

10    today, to the best of my knowledge, we were

11    complying with the Controlled Substances Act and

12    we have been reported since the time that I

13    joined the company in 2009 suspicious orders to

14    the government.  The expectations have changed

15    over time and we have adapted to the

16    expectations of the agency.

17            Q.    Okay.  But the law hasn't changed,

18    right?

19            A.    The law still --

20                  MS. WICHT:  Object to the form of

21            the question.

22            A.    The law is still the same until --

23    from, I believe, 1970 -- I don't remember the

24    exact year, until today.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    The law stayed the same, but as
2    you read this document -- I mean, you're still
3    an employee of Cardinal Health, right?
4              A.    I still am an employee of Cardinal
5    Health, correct.
6              Q.    And what's your current position?
7              A.    Chief quality and regulatory
8    affairs officer.
9              Q.    So you're chief quality in
10   regulatory affairs.  Is that higher than senior
11   vice president?
12             A.    Similar role, but in a
13   different -- in a different capacity.
14             Q.    The chief's higher up on the
15   order -- the chain of command than senior vice
16   president, right?
17                   MS. WICHT:  Object to the form of
18            the question.
19             A.    I think we have -- I believe we
20   have the same pay grade, if that's what you
21   mean.
22             Q.    And in that capacity, you
23   understand this document to mean that Cardinal
24   Health admitted that they violated the law when
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    they didn't inform the DEA of certain orders of

2    controlled substances; you understand that?

3              MS. WICHT:  Object to the form of

4         the question.  Mischaracterizes the

5         document.

6         A.    Understand what?  The language

7    that is in the document?  I see the language

8    that is in the document.  It doesn't mean that I

9    agree with the language.

10        Q.    Okay.  And then it goes on to say

11   your company paid a $10 million fine for that

12   problem.

13             Do you understand that?

14        A.    It says in the document that the

15   Defendant shall pay $10 million to the United

16   States.

17        Q.    And that $10 million were for acts

18   and actions while you were the senior vice

19   president over regulatory, January 1, 2011

20   through May 14, 2012, correct?

21        A.    According to this document, there

22   was an agreement made by Cardinal Health and the

23   Department of Justice and that was the

24   settlement agreement that they reached.
```

1          MR. GRAY:  Nothing further.

2          VIDEOGRAPHER:  Time is now 3:04.

3     Going off the record.

4          MS. WICHT:  You wouldn't mind if

5     we just consult for a minute or two?

6          MR. GRAY:  No.

7          (Recess taken.)

8          VIDEOGRAPHER:  Time is now 3:12.

9     Back on the record.

10          MS. WICHT:  We have no questions.

11     We will read and sign.

12          And the transcript is highly

13     confidential under the terms of the

14     protective order for a period of time

15     until we make more detailed

16     designations.  Thank you.

17          MR. GRAY:  Okay.  Thank you.

18          VIDEOGRAPHER:  Time is now 3:12.

19     This concludes the deposition.

20          Going off the record.

21          (Signature not waived.)

22               - - -

23          Thereupon, at 3:12 p.m., on Thursday,

24     December 6, 2018, the deposition was concluded.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE

 2    STATE OF OHIO         :

                           SS:

 3    COUNTY OF FRANKLIN    :

 4

 5            I, GILBERTO QUINTERO, do hereby certify that

 6    I have read the foregoing transcript of my

 7    cross-examination given on December 6, 2018; that

 8    together with the correction page attached hereto

 9    noting changes in form or substance, if any, it is

10    true and correct.

11    _____

12    GILBERTO QUINTERO

13            I do hereby certify that the foregoing

14    transcript of the cross-examination of GILBERTO

15    QUINTERO was submitted to the witness for reading and

16    signing; that after he had stated to the undersigned

17    Notary Public that he had read and examined his

18    cross-examination, he signed the same in my presence

19    on the _____ day of _____, 2018.

20

      _____

21

      NOTARY PUBLIC - STATE OF OHIO

22    My Commission Expires:

      _____, _____.

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2  STATE OF OHIO          :
                              SS:
 3  COUNTY OF DELAWARE      :
 4          I, Sara S. Clark, a Registered Merit
    Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named GILBERTO QUINTERO was by
 6  me first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the cause
 7  aforesaid; that the deposition then given by him was
    by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
    transcript of the deposition so given by him; that the
 9  deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).
13
            IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office at Delaware, Ohio
    on this 11th day of December 2018.
15
16
17
18
    _____
19
    SARA S. CLARK, RMR
20  NOTARY PUBLIC - STATE OF OHIO
    My Commission Expires:  March 10, 2023.
21
22                    - - -
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2    I, GILBERTO QUINTERO, have read the transcript

      of my deposition taken on the 6th day of December

 3    2018, or the same has been read to me.  I request that

      the following changes be entered upon the record for

 4    the reasons so indicated.  I have signed the signature

      page and authorize you to attach the same to the

 5    original transcript.

 6    Page  Line  Correction or Change and Reason:

 7    ____  ____  _____

 8    ____  ____  _____

 9    ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    Date _____ Signature _____
```