```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL        )   MDL No. 2804
     PRESCRIPTION OPIATE    )
 4   LITIGATION             )   Case No.
                            )   1:17-MD-2804
 5                          )
     THIS DOCUMENT RELATES TO  )   Hon. Dan A.
 6   ALL CASES              )   Polster
                            )
 7
 8
 9                   __ __ __
10            Monday, May 13, 2019
                     __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12             CONFIDENTIALITY REVIEW
                     __ __ __
13
14
15
16        Videotaped Deposition of JAMES E.
     RAFALSKI, held at Weitz & Luxenburg PC, 3011
17   West Grand Avenue, Suite 2150, Detroit,
     Michigan, commencing at 9:20 a.m., on the
18   above date, before Michael E. Miller, Fellow
     of the Academy of Professional Reporters,
19   Registered Diplomate Reporter, Certified
     Realtime Reporter and Notary Public.
20
21
22
                     __ __ __
23
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | fax 917.591.5672
                deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         MCHUGH FULLER LAW GROUP
           BY:  MICHAEL J. FULLER, ESQUIRE
 3              mike@mchughfuller.com
                ALLAN "AJ" ELKINS, JR., ESQUIRE
 4              aj@mchughfuller.com
                AMY QUEZON, ESQUIRE
 5              amy@mchughfuller.com
           97 Elias Whiddon Road
 6         Hattiesburg, Mississippi 39402
           (601) 261-2220
 7         Counsel for MDL Plaintiffs
 8
 9         BRANSTETTER STRANCH & JENNINGS PLLC
           BY:  TRICIA HERZFELD, ESQUIRE
10              triciah@bsjfirm.com@bsjfirm.com
           223 Rosa L. Parks Boulevard
11         Suite 200
           Nashville, Tennessee 37203
12         (615) 254-8801
           Counsel for Tennessee Plaintiffs
13
14         REED SMITH LLP
           BY:  ROBERT A. NICHOLAS, ESQUIRE
15              rnicholas@reedsmith.com
                ABIGAIL M. PIERCE, ESQUIRE
16              abigail.pierce@reedsmith.com
           1717 Arch Street
17         Suite 3100
           Philadelphia, Pennsylvania 19103
18         (215) 851-8100
           Counsel for AmerisourceBergen Drug
19         Corporation
20
           WILLIAMS & CONNOLLY LLP
21         BY:  STEVEN M. PYSER, ESQUIRE
                spyser@wc.com
22              BRAD MASTERS, ESQUIRE
                bmasters@wc.com
23         725 Twelfth Street, N.W.
           Washington, D.C. 20005
24         (202) 434-5000
           Counsel for Cardinal Health Inc.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         JONES DAY
           BY:  NEAL J. STEPHENS, ESQUIRE
 3              nstephens@jonesday.com
           1755 Embarcadero Road
 4         Palo Alto, California 94303
           (650) 739-3939
 5         Counsel for Walmart Corporation
 6
 7         ROPES & GRAY LLP
           BY:  ANDREW O'CONNOR, ESQUIRE
 8              andrew.o'connor@ropesgray.com
                WILLIAM DAVISON, ESQUIRE
 9              william.davison@ropesgray.com
           Prudential Tower
10         800 Boylston Street
           Boston, Massachusetts 02199
11         (617) 951-7000
           Counsel for Mallinckrodt Pharmaceuticals
12
13         COVINGTON & BURLING LLP
           BY:  CHRISTOPHER K. EPPICH, ESQUIRE
14              ceppich@cov.com
           1999 Avenue of the Stars
15         Los Angeles, California 90067
           (424) 332-4800
16         Counsel for McKesson Corporation
17
18         COVINGTON & BURLING LLP
           BY:  MEGHAN MONAGHAN, ESQUIRE
19              mmonaghan@cov.com
           One City Center
20         850 Tenth Street, N.W.
           Washington, D.C. 20001
21         (202) 662-6000
           Counsel for McKesson Corporation
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2        LOCKE LORD LLP
          BY:  C. SCOTT JONES, ESQUIRE
 3            sjones@lockelord.com
          2200 Ross Avenue
 4        Suite 2800
          Dallas, Texas 75201
 5        (214) 740-8000
          Counsel for Henry Schein, Inc. and
 6        Henry Schein Medical Systems, Inc.
 7
 8        FOLEY & LARDNER LLP
          BY:  JAMES W. MATTHEWS, ESQUIRE
 9            jmatthews@foley.com
          111 Huntington Avenue
10        Boston, Massachusetts 02199
          (617) 342-4000
11        Counsel for Anda Inc.
12
13        ARNOLD & PORTER KAYE SCHOLER LLP
          BY:  DAVID D. FAUVRE, ESQUIRE
14            david.fauvre@arnoldporter.com
          601 Massachusetts Avenue, N.W.
15        Washington, D.C. 20001
          (202) 942-5000
16        Counsel for Endo Health Solutions
          Inc., Endo Pharmaceuticals Inc., Par
17        Pharmaceutical, Inc. and Par
          Pharmaceutical Companies, Inc.
18
19        KIRKLAND & ELLIS LLP
          BY:  ERICA B. ZOLNER, ESQUIRE
20            erica.zolner@kirkland.com
              KAITLIN L. COVERSTONE, ESQUIRE
21            kaitlyn.coverstone@kirkland.com
          300 North LaSalle
22        Chicago, Illinois 60654
          (312) 862-2000
23        Counsel for Allergan Finance LLC
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        MORGAN LEWIS & BOCKIUS LLP
          BY:  MAUREEN K. BARBER, ESQUIRE
 3            maureen.barber@morganlewis.com
          One Oxford Centre
 4        Thirty-Second Floor
          Pittsburgh, Pennsylvania 15219
 5        (412) 560-3300
          Counsel for Teva Pharmaceuticals
 6        USA Inc., Cephalon Inc., Watson
          Laboratories Inc., Actavis LLC, and
 7        Actavis Pharma Inc. f/k/a Watson
          Pharma Inc.
 8
 9        ZUCKERMAN SPAEDER LLP
          BY:  GRAEME W. BUSH, ESQUIRE
10            gbush@zuckerman.com
              PAUL B. HYNES, JR., ESQUIRE
11            phynes@zuckerman.com
              (via teleconference)
12        1800 M Street, N.W.
          Suite 1000
13        Washington, D.C. 20036
          (202) 778-1800
14        Counsel for CVS Indiana LLC and
          CVS Rx Services Inc.
15
16        DECHERT LLP
          BY:  ERIK W. SNAPP, ESQUIRE
17            erik.snapp@dechert.com
          35 West Wacker Drive
18        Suite 3400
          Chicago, Illinois 60601
19        (312) 646-5800
          Counsel for Purdue Pharma
20
21        O'MELVENY & MYERS LLP
          BY:  AMY R. LUCAS, ESQUIRE
22            alucas@omm.com
          1999 Avenue of the Stars
23        8th Floor
          Los Angeles, California 90067
24        (213) 430-6000
          Counsel for Janssen Pharmaceuticals Inc.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         MARCUS & SHAPIRA LLP
           BY:  JOSHUA A. KORBIN, ESQUIRE
 3              korbin@marcus-shapira.com
           One Oxford Centre
 4         35th Floor
           Pittsburgh, Pennsylvania 15219
 5         (412) 471-3490
           Counsel for HBC Services
 6

 7

           BARTLIT BECK LLP
 8         BY:  KATHERINE M. SWIFT, ESQUIRE
                katherine.swift@bartlit-beck.com
 9         54 West Hubbard Street
           Suite 300
10         Chicago, Illinois 60654
           (312) 494-4400
11         Counsel for Walgreens Company
12

13         BARNES & THORNBURG LLP
           BY:  WILLIAM LEEDER, ESQUIRE
14              bill.leeder@btlaw.com
           171 Monroe Avenue, N.W.
15         Suite 1000
           Grand Rapids, Michigan 49503
16         (616) 742-3930
           Counsel for H.D. Smith
17

18         CAVITCH FAMILO & DURKIN CO. L.P.A.
           BY:  ERIC J. WEISS, ESQUIRE
19              eweiss@cavitch.com
                (via teleconference)
20         1300 East 9th Street
           Cleveland, Ohio 44114
21         (216) 621-7860
           Counsel for Discount Drug Mart
22

23

24

25
```

```
 1    A P P E A R A N C E S:
 2        FOX ROTHSCHILD LLP
          BY:  STEPHAN A. CORNELL, ESQUIRE
 3             scornell@foxrothschild.com
               (via teleconference)
 4        2700 Kelly Road
          Suite 300
 5        Warrington, Pennsylvania 18976
          (215) 345-7500
 6        Counsel for Prescription Supply Inc.
 7
 8        MORGAN LEWIS & BOCKIUS LLP
          BY:  CAROLYN A. SILANE, ESQUIRE
 9             carolyn.silane@morganlewis.com
               (via teleconference)
10        101 Park Avenue
          New York, New York 10178
11        (212) 309-6000
          Counsel for Rite Aid
12
13    VIDEOGRAPHER:
14         David Lane,
           Golkow Litigation Services
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         INDEX
 2
      APPEARANCES                              2
 3
      PROCEEDINGS                             11
 4
 5
      EXAMINATION OF JAMES E. RAFALSKI:
 6
            BY MR. NICHOLAS                   14
 7
            BY MR. PYSER                     242
 8
            BY MR. EPPICH                    333
 9
            BY MR. JONES                     387
10
11
      CERTIFICATE                           406
12
      ERRATA                                408
13
      ACKNOWLEDGMENT OF DEPONENT            409
14
      LAWYER'S NOTES                        410
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      DEPOSITION EXHIBITS
                         JAMES E. RAFALSKI
 2                        May 13, 2019
 3     NUMBER                DESCRIPTION              PAGE
 4     Rafalski-1    9/30/96 Zimmerman Letter          78
                     ABDCMDL00215791 -
 5                   ABDCMDL00315794
 6     Rafalski-2    10/29/96 Gitchel Letter,          90
                     ABDCMDL00315789 -
 7                   ABDCMDL00315790
 8     Rafalski-3    7/23/98 Good Letter,             109
                     ABDCMDL00315783
 9
       Rafalski-4    12/27/07 Rannazzisi             119
10                   Letter, ABDCMDL00269685 -
                     ABDCMDL00269694
11
       Rafalski-5    2/6/18 Nicholson Letter,        141
12                   MCKMDL00561146 -
                     MCKMDL00561147
13
       Rafalski-6    5/10/19 GAO Publication         147
14                   on Prescription Drugs
                     [No Bates]
15
       Rafalski-7    10/25/04 CSRA Memo              216
16                   w/Attachment(s),
                     ABDCMDL00315829 -
17                   ABDCMDL00315861
18     Rafalski-8    McCarty Memo to Mays            219
                     w/Attachment(s),
19                   ABDCMDL00315862 -
                     ABDCMDL00315881
20
       Rafalski-9    9/11-12/07 Meeting             235
21                   Agenda, DEA Diversion
                     Control Division
22                   [No Bates]
23     Rafalski-10   10/98 Report to the U.S.       246
                     Attorney General,
24                   CAH_HOUSE-002207 -
                     CAH_HOUSE-002298
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS
 2
      Rafalski-11    Ingredient Limit Report,      261
 3                   CAH_MDL_PRIOROD_DEA07_01465435 -
                     CAH_MDL_PRIOROD_DEA07_01465712
 4
      Rafalski-12    Regulatory Agency Contact     277
 5                   Sheet,
                     CAH_MDL_PRIOROD_DEA07_00868973
 6
      Rafalski-13    Declaration of Michael A.     299
 7                   Mon?,
                     CAH_MDL_PRIOROD_DEA12_00014053 -
 8                   CAH_MDL_PRIOROD_DEA12_00014081
 9    Rafalski-14    1/10/08 Brantley Memo         307
                     w/Attachment(s),
10                   CAH_MDL2804_00000606 -
                     CAH_MDL2804_00000618
11
      Rafalski-15    Rafalski Expert Report        338
12
      Rafalski-16    Witness' Copy of Rafalski     338
13                   Expert Report
14    Rafalski-17    Henry Schein SOP,             397
                     HSI-MDL-00404226 -
15                   HSI-MDL-00404228
16    Rafalski-18    7/17/12 Rausch Memo           314
                     w/Attachment(s),
17                   CAH_MDL2804_00000204 -
                     CAH_MDL2804_00000219
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   PROCEEDINGS
 2           (May 13, 2019 at 9:20 a.m.)
 3               (The following proceedings were
 4        conducted off the videotaped record.)
 5               MR. NICHOLAS:  Before we get
 6        started, Mr. Fuller, counsel for
 7        plaintiffs, just handed me a Touhy
 8        authorization letter that's dated
 9        April 12th of 2019.  This is the first
10        we've seen it.  I'm going to proceed
11        with the deposition.
12               I will reserve our right to
13        come back if there's anything about
14        our receipt of this or something in
15        the letter that requires us to come
16        back and ask more questions since
17        we're seeing it for the first time,
18        and that's what I wanted to say.
19               MR. FULLER:  Sure.  And we'll
20        put on the record that as everyone
21        here knows, Mr. Rafalski is a former
22        DEA agent, therefore Touhy
23        authorization would have to be
24        obtained, similarly to the 20 former
25        DEA employees that the defendants
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        requested Touhy clearance on before

 2        disclosing some of their expert

 3        reports.

 4            I've been asked to remind that

 5        the DEA wasn't noticed of this depo,

 6        even though he's a former agent, by

 7        the defense.  They weren't necessarily

 8        happy with that.  They asked for

 9        everybody to comply with the Touhy

10        authorization, which, similar to the

11        other authorizations in this case,

12        allows the witness to testify to --

13        well, a little different with Rafalski

14        because he's reviewed a lot of the

15        documents produced by all the

16        defendants, testified from the

17        discovery produced in this case and

18        anything nonprivileged as set out in

19        the Touhy authorization.

20            MR. NICHOLAS:  Okay.  There's

21        too many things to argue about in this

22        case to get into a big argument --

23            MR. FULLER:  Sure, sure.

24            MR. NICHOLAS:  -- but I will

25        just say that he's your retained
```

1    expert.  You've had this letter for a

2    month; you're just giving it to us

3    today.

4         So I don't get the part where

5    the DEA -- if the DEA is unhappy,

6    maybe they're unhappy with you guys,

7    but they shouldn't be unhappy with us

8    because he's your person.

9         But like I said, we don't need

10   to spend any more time on it.

11        THE VIDEOGRAPHER:  Ready to

12   begin?

13        MR. NICHOLAS:  I am.

14        (Whereupon the videotaped

15   record begins.)

16        THE VIDEOGRAPHER:  We're now on

17   the record.  My name is David Lane,

18   videographer for Golkow Litigation

19   Services.  Today's date is May 13th,

20   2019.  Our time is 9:22 a.m.

21        This deposition is taking place

22   in Detroit, Michigan in the matter of

23   National Prescription Opiate

24   Litigation.  Our deponent today is

25   James E. Rafalski.

Highly Confidential - Subject to Further Confidentiality Review

 1              Counsel will be noted on the

 2        stenographic record.  Our court

 3        reporter is Mike Miller, and he will

 4        now swear in the witness.

 5              JAMES E. RAFALSKI,

 6            having been duly sworn,

 7            testified as follows:

 8                 EXAMINATION

 9    BY MR. NICHOLAS:

10        Q.    Good morning, Mr. Rafalski.  My

11    name is Bob Nicholas.  I represent

12    AmerisourceBergen.  I'm here to ask you

13    questions in connection with the MDL opioid

14    litigation and specifically the Track 1 and

15    Track 2 -- just the Track 1 cases that are

16    currently scheduled to go to trial in

17    October.

18        A.    Good morning, sir.

19        Q.    Good morning.

20              You are here as a retained

21    expert on behalf of the Track 1 plaintiffs in

22    this case; is that right?

23        A.    Yes, sir, I am.

24        Q.    Okay.  And you are being paid

25    for your time?

```
1              A.      Yes, sir, I am.

2              Q.      Tell me what you're being paid

3       in terms of just what's your rate?

4              A.      $300 an hour.

5              Q.      Okay.  And is that for

6       everything you do or is that for -- just for

7       reviewing papers and in connection with your

8       report?

9              A.      It's for everything I do.

10             Q.      So are you -- you're not being

11      paid a different rate to testify?

12             A.      Yes, sir.

13             Q.      You are being paid a different

14      rate to testify?

15             A.      Yes, for my deposition, or for

16      this deposition today, it's at $500 an hour.

17             Q.      Okay.  And if there's a trial

18      and you testify at the trial, that would be

19      at $500 an hour?

20             A.      That's never been discussed, so

21      I don't know what rate that would be.

22             Q.      Okay.  Might be higher?

23             A.      I would guess it at least will

24      be $500 an hour.

25             Q.      Sure.  Tell me, if you could --
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Could I make a little

2    correction to that?

3        Q.     Sure, of course.

4        A.     So when I first started, it was

5    at a $200 rate.  And then at some point I was

6    approached and it increased to 300.  So my

7    initial rate was at $200 an hour.

8        Q.     When did you start?

9        A.     August of 2017, I signed my

10   retainer.

11       Q.     Okay.  And so your August 2017

12   retainer had a rate of $200 an hour?

13       A.     Yes, sir.

14       Q.     And how long was that your

15   rate?

16       A.     Until -- I believe it was

17   October of 2018.

18       Q.     Okay.

19       A.     Either August or October of

20   2018.

21       Q.     And you said you were

22   approached.  What do you mean -- who

23   approached you?

24       A.     Well, in discussions with one

25   of the attorneys, my original retainer

Highly Confidential - Subject to Further Confidentiality Review

1    expired and we had some conversations about

2    my rate.  It came to my attention that other

3    experts of at least equal skill were

4    receiving $300 an hour, so when I brought

5    that topic up, there was an agreement to pay

6    me $300 an hour.

7         Q.    Okay.  So it was in the form of

8    a negotiation; is that right?

9         A.    Well, I guess you could

10   consider that.  It was more of a

11   conversation, came up in conversation so

12   there was no need to negotiate.  It was just

13   agreed upon when it was brought up.

14        Q.    Okay.  I'm going to get back to

15   the work you've done in a second, but let me

16   just ask you just a couple of basic questions

17   about yourself.

18             You were a police officer for a

19   number of years, right?

20        A.    Yes, sir.

21        Q.    Okay.  How many years?

22        A.    27 total with two different

23   police departments, police agencies.

24        Q.    Okay.  Which were the police

25   agencies?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The first one was the Wayne

2  County Sheriff's Department, 1976 to 1981,

3  and I left employment at the Wayne County

4  Sheriff's Department, which would be in

5  Detroit, Michigan, all of Wayne County,

6  that's where we're at today.  And then I

7  moved to Romulus Police Department, which is

8  Romulus, Michigan.  That's the community

9  where probably most everyone flew in.  It's

10  around the Detroit Metropolitan Airport.

11    Q.    Okay.  So 27 years as a police

12  officer, right?

13    A.    Yes, sir.

14    Q.    Okay.  And then you joined the

15  DEA; is that correct?

16    A.    At some point.  I retired in

17  2002.  I did not join the DEA until 2004.

18    Q.    What happened in those two

19  years?  Just retirement?

20    A.    No, I kind of had an aspiration

21  to be a teacher, so I started to do some

22  teaching.  I got a vocational certification,

23  and I was a teacher with -- I did some

24  substitute teaching and some baseball

25  coaching with the Romulus school district,

1    and then I did vocational certification with

2    the Livonia Public Schools and I taught there

3    for one year before leaving for the DEA.

4         Q.    What did you teach?

5         A.    I was called a shared time

6    teacher.  So in Michigan, property owners pay

7    property taxes which fund the public schools,

8    while private schools are tuition based.  So

9    there was some kind of decision, and I don't

10   know the law or the legality of it, but -- I

11   shouldn't say legality, but what caused it.

12             So then public school teachers

13   would go into private schools and instruct

14   private students, mostly religious schools,

15   faith-based schools.  So I taught computers,

16   some mathematics and some physical education.

17        Q.    Okay.  And after a couple of

18   years of that, you joined the DEA; is that

19   correct?

20        A.    Yes, sir.

21        Q.    And you were with the DEA from

22   when to when?

23        A.    2014 until June 2017.

24        Q.    2014 or 2004?

25        A.    2004.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.

 2          A.      Sorry.

 3          Q.      It's okay.  2004 to 2017.

 4                  Now, during the time that you

 5     were at the DEA, what was your position?

 6          A.      Diversion investigator.

 7          Q.      Okay.  Did that job ever

 8     change?

 9          A.      My title, no, sir.

10          Q.      Your title, yeah.

11          A.      No, sir.

12          Q.      Okay.  And in 2017, did you

13     retire, full-time retire or what?

14          A.      Yes, sir, that was my

15     intention.

16          Q.      Okay.  But then you got this

17     thing?

18          A.      Yes, sir.

19          Q.      Okay.  Now, just so I know a

20     few more things, you are not -- let me start

21     again.

22                  Have you ever been certified as

23     an expert witness in a case before?

24          A.      I have not been certified

25     before, no, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Have you ever served as an

 2   expert witness on a consulting basis before?

 3          A.      No, sir, I have never served as

 4   an expert in the capacity of a consultant.

 5          Q.      Okay.  Have you ever written

 6   any articles that were published?

 7          A.      No, sir.

 8          Q.      Have you ever written anything

 9   of any kind that was published?

10          A.      As a police officer, I wrote an

11   article at the request of the Detroit News.

12   It was in regards to the effectiveness of the

13   DARE program.

14          Q.      Okay.  So you wrote something

15   for the Detroit -- is it the Detroit News?

16          A.      Detroit News, it's the

17   publication.

18          Q.      Did that used to be the Detroit

19   Free Press or is that a different paper?

20          A.      Different paper.  Still two

21   papers in Detroit.

22          Q.      Okay.  Was that like an op-ed,

23   like an editorial kind of thing?

24          A.      Sure.  They published two, I

25   guess, opinions, a pro and a con opinion.
```

```
 1      Mine was the pro opinion of DARE, and there

 2      was a side-by-side con opinion of the

 3      effectiveness of that program.

 4           Q.     Okay.  So you wrote that.  Is

 5      there anything else you've ever written

 6      that's been published?

 7           A.     Not that I'm aware of, not that

 8      I gave any authorization for, no, sir.

 9           Q.     Okay.  Have you -- and this is

10      pretty obvious, but you're not an attorney;

11      is that correct?

12           A.     Not an attorney, no, sir.

13           Q.     So in giving your opinions

14      today, you're not trying to give legal

15      opinions; is that right?

16           A.     Well, the opinion I'm trying to

17      give is based on my training and experience

18      and my knowledge of the law and the

19      regulations that are required to be adhered

20      to by the companies.  I'm not publishing a

21      legal opinion as an attorney.

22           Q.     Well, what I'm asking you is

23      whether you -- are you offering today or in

24      your report a legal -- a legal conclusion?

25           A.     I think, yes, I am.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Okay.  Let me ask you a little

 2      about the work you've done in connection with

 3      this report.

 4              First of all, the report is 180

 5      pages, I believe.

 6              A.      It is, sir.

 7              Q.      Did you write it?

 8              A.      Yes, sir.

 9              Q.      Okay.  You wrote it yourself or

10      did you write it with help?

11              A.      I wrote it with help.

12              Q.      Okay.  How much time did you

13      spend preparing your report?

14              A.      Well, I didn't keep track if

15      you're going to ask me the exact hours, but I

16      would say a considerable amount of time.  It

17      pretty much consumed me.

18              Q.      When did you start working on

19      the report?

20              A.      Well, probably in the fall of

21      2018, I started having discussions about the

22      type of documents and records that I would

23      need, some of the topics in potential

24      depositions, questions I would need to

25      answer.  So I started to give the framework
```

1    and the guidelines of what information would

2    be required.  It was around that time when I

3    had a pretty clear understanding of what I

4    would give an opinion on.

5              When I first started I was more

6    of a consultant than an expert witness, so,

7    you know, I wasn't exactly sure what I was

8    going to be asked to give an expert opinion

9    on.

10        Q.    So until the fall of 2018, is

11   it correct that you were working as a

12   consultant for the plaintiffs in this case?

13        A.    Well --

14        Q.    Starting in 2017.

15        A.    -- I guess that would be my

16   capacity.  I didn't do any testifying, so I

17   guess I wouldn't be considered an expert

18   witness.  I don't know that there was a

19   capacity at that time, so I think that's a

20   fair statement.

21        Q.    But did you work -- did you put

22   work into this case from the time you were

23   retained in 2017 up until 2018 when you

24   started working on the report?

25        A.    I would say yes, but it would

1    be a different kind of work because obviously

2    when the discovery came in and the records

3    were available and the depositions began,

4    then there was a different kind of

5    information.  But there was always a little

6    bit of a process because I knew at some point

7    I was going to be potentially asked to

8    publish an opinion.

9        Q.    Okay.  Do you know how many

10   hours you spent or how many days or how many

11   weeks you spent working on the case

12   from two-thousand-and -- let's say from the

13   time you were retained in 2017 until the fall

14   of 2018?

15       A.    Somewhere a little below or

16   above 400 hours.

17       Q.    Okay.  And that takes you up to

18   the fall of 2018, right?

19       A.    That takes me today.

20       Q.    I see.  So you spent about

21   400 hours from the beginning of being

22   retained until today working on this matter?

23       A.    Yes, sir.

24       Q.    Okay.

25       A.    I'd like to add that I'm

1    probably not as diligent on my billing as I

2    should be.  I know some people might bill for

3    every minute.  I don't do that, so -- but

4    that would be an accurate amount of time that

5    I -- at least that I submitted for billing.

6        Q.    Okay.

7        A.    I probably spent more than

8    400 hours on the project.

9        Q.    So do you know how much in

10    terms of dollars you have submitted for

11    billing?

12        A.    Well, 101,000 and a little over

13    that.

14        Q.    Okay.  Tell me how you made --

15    tell me how you obtained the materials you

16    needed to prepare your report?

17        A.    Both in -- mostly in verbal

18    requests and discussions.  I think there were

19    some -- I crafted some e-mails, which had

20    specific types of documents that I would need

21    and submitted them to the attorneys.  That

22    started a discussion on the types of

23    documents I'd need to review.

24        Q.    Okay.  And how did -- if you

25    don't mind my asking, how did you know what

Highly Confidential - Subject to Further Confidentiality Review

1  to ask for?  There are millions of documents

2  in this case and many, many depositions.  How

3  did you know what to request?

4      A.    Based on my experience in

5  conducting similar type of investigations of

6  both distributors and manufacturers, I had a

7  pretty good idea of the type of records and

8  documents or questions I would need answered

9  to formulate an opinion.

10           Certainly there were things

11  that -- documents that were submitted or

12  deposition answers or questions that I hadn't

13  thought of, but they also became available to

14  me.

15      Q.    How did they become available

16  to you?

17      A.    Well, in drafting my report,

18  there would be certain topics regarding the

19  maintenance of effective controls, suspicious

20  order systems.  People would also assist me

21  in reviewing the documents and they would

22  find articles or statements or policies that

23  would be brought forward to my attention,

24  sometimes with a written explanation or draft

25  explanation, and I'd review those and

Highly Confidential - Subject to Further Confidentiality Review

1     either -- not dismiss them, but review them

2     and either incorporate them or not

3     incorporate them in my report.

4          Q.     When you say people would

5     review things and send them to you, are you

6     talking about the plaintiffs' attorneys?

7          A.     Yes, sir.

8          Q.     Okay.

9          A.     Only the -- well, let me

10    correct that.

11               My communications would flow

12    through just a couple of specific attorneys,

13    and they would come back from them.  So I

14    don't know if they were attorneys or legal

15    aides or -- I don't know exactly who would

16    draft some of the information I would review.

17         Q.     What were the name -- who were

18    you dealing with?

19         A.     Mr. Fuller, Mr. Elkins, and for

20    a period of time a Laura Baughman.  I think

21    she left her law firm.  So those were

22    primarily the three people.

23         Q.     Okay.  Did you have anyone else

24    assisting you with this report?

25         A.     No, sir.

1          Q.     Who typed the report?

2          A.     I typed it.

3          Q.     Now, you said that they

4    would -- that Mr. Fuller and Ms. Baughman and

5    Mister -- I'm sorry --

6          A.     Elkins.

7          Q.     -- Elkins, who I guess is

8    sitting next to Mr. Fuller?

9          A.     He is.

10          MR. NICHOLAS:  Hello,

11     Mr. Elkins.

12          MR:  ELKINS:  Good morning.

13   BY MR. NICHOLAS:

14          Q.     Would send you drafts of things

15   and you would review them.  What do you mean?

16   Did they send you drafts of portions of the

17   report?

18          A.     Sure.  There may be a section

19   of the report, maybe a policy, or there may

20   be some specific documents that they would

21   give an evaluation of or at least describe

22   it, and I would review it and make edits,

23   corrections, deletions and either incorporate

24   it into my report or not incorporate it in my

25   report.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And is it fair to say that

2    that's how the report was written, that the

3    plaintiffs' lawyers sent you draft sections,

4    you would review them and revise them as you

5    saw fit, and that is how the report came to

6    be?

7    A.    I wouldn't say that's an

8    accurate statement.  I mean, I wrote the

9    report, it's my report.  I put pen to paper.

10   There may be sections in here that I

11   incorporated, but every section would have

12   been edited, drafted, corrected or reviewed

13   by me.

14   Q.    Right.

15   A.    So there's no sections in here

16   that I just plugged in that someone else

17   wrote.  It's all my work product.

18   Q.    Which -- roughly, okay?  Can

19   you tell me how -- what percentage of this

20   report started with a first draft from the

21   plaintiffs versus a first draft from you?

22   A.    I'm not really sure how to

23   answer that.  Are you looking for like a

24   percent or --

25   Q.    I don't know.  Number of pages.

1    You know, how much of this 180-page report,

2    how many pages -- for how many pages did you

3    write the first draft and how many pages did

4    the plaintiffs write the first draft?

5         A.     Well, I'm unsure of how to give

6    you a number, because I really didn't -- it

7    wasn't a kind of draft where I knew exactly

8    how many pages the first time.  It was

9    substantial at the beginning, I would say

10   around the 100-page mark, and then as more

11   records were found, more documents, as the

12   report was written, one section would trigger

13   an analysis that would lead to another

14   section and it would probably be a lot

15   thicker if I would have had the ability to

16   work around the clock and stay up all night

17   because it's -- you know, it's a complex

18   matter.

19            There's numerous companies,

20   millions and millions of documents.  I by no

21   means am trying to represent to you or the

22   court that I've read every document in

23   regards to the discovery because I don't

24   think that's physically possible.

25         Q.     Do you know whether you --

Highly Confidential - Subject to Further Confidentiality Review

1    well, so you have not reviewed all the

2    documents that have been produced in

3    discovery, right?

4         A.    No, that would be impossible.

5         Q.    Right.  Do you know whether

6    you've reviewed the most important documents

7    in the case?

8         A.    I believe I have with the

9    assistance I was provided, being I gave the

10   guidelines of the type of documents I wanted

11   to be provided or reviewed.  And I'm -- I'm

12   fairly confident -- I'm very confident that

13   I've got enough information to make this

14   opinion, and I'm sure that if I've missed

15   some documents, I'm going to hear about it in

16   the next two days.

17        Q.    Who -- who made -- who sent you

18   the documents?  The plaintiffs' lawyers?

19        A.    Yes.

20        Q.    Okay.

21        A.    Primarily Mr. Elkins.

22        Q.    Okay.  So, for example, if

23   there were -- I don't know how many

24   depositions have been taken in the case, but

25   there have been many, many depositions.

1          How did you know -- how did you

2    know which ones to ask for, which transcripts

3    to ask for?

4          A.    Well, at the beginning I

5    started to read them, and I realized that it

6    was impossible for me to read and take notes,

7    so I read a couple at the beginning which, by

8    probably more luck than anything because they

9    just started to come to me in writing, not

10   electronic, I read some depositions that were

11   key to the discovery -- I mean key to the

12   investigation.

13          At a later point, attorneys

14   obviously would know based on the type of

15   questions I wanted answered and the positions

16   of the people who were being deposed that

17   some depositions were more crucial than

18   others.

19          Q.    So the attorneys made the

20   decisions as to which of the depositions you

21   should review, right?

22          A.    I don't know if they made the

23   decisions.  I think they pointed me to

24   depositions where they thought there was

25   content that would be important to me, and I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would review those sections of those

 2    depositions.

 3          Q.    Okay.  So just by way of

 4    example, do you know who Kyle Wright is?

 5          A.    I am -- I do.  Yes, sir.

 6          Q.    Okay.  Did you read his

 7    deposition?

 8          A.    I believe I read a portion of

 9    it.  I didn't read the entire deposition.

10          Q.    Because I don't think your

11    report reflects that you've reviewed his

12    deposition.  That's why I'm asking.

13          A.    I'm not sure that he had any

14    information in his deposition I would have

15    used, but I did review -- I didn't review his

16    entire deposition, but I do recall that I did

17    review some of it, yes, sir.

18          Q.    If you reviewed his deposition,

19    is there a particular reason why you didn't

20    say in your report that you reviewed his

21    deposition?  Was it just an oversight?

22          A.    I don't know that I would be

23    required to put that in my expert report,

24    whether or not -- I reviewed a lot of

25    depositions and not all of them are --
```

Highly Confidential - Subject to Further Confidentiality Review

1    there's no notation that that occurred in

2    this report.

3        Q.    Well, I think we need to know

4    everything you reviewed in order to be able

5    to ask you questions about your report, so if

6    there are -- are you saying there are things

7    that you reviewed in connection with this

8    report that you didn't identify as having

9    reviewed?  Kyle Wright's deposition is one

10   example.  Are there others?

11       A.    Well, recently I reviewed a

12   portion of Thomas Prevoznik's deposition.

13   I'm sure there are some other depositions

14   that I reviewed that aren't cited in my

15   report.  Possibly those individuals didn't

16   have any information that would have provided

17   me with any guidance in my opinion.

18            For example, I recall reading

19   one on a sales personnel.  Might have been

20   from AmerisourceBergen or Cardinal, and

21   really, there was nothing relative to that

22   that would help me make my expert opinion in

23   regards to the conduct of that company.

24       Q.    So you didn't identify that in

25   your report as something you read?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      No, sir.  I did prepare a list

 2     of documents that I utilized and provided it

 3     to the attorneys at their request.

 4          Q.      Okay.  So there are documents

 5     that you reviewed for this report, and right

 6     now we don't know what they are because you

 7     haven't identified them.  That's all I want

 8     to know.

 9          A.      That's a true statement.  There

10     were probably some depositions that I took or

11     some records -- not every record I looked at

12     is documented in this report.  There's

13     multiple, multiple depositions.  There's

14     5 million documents.  I was never instructed

15     as a witness that I had to keep a laundry

16     list of everything I looked at or everything

17     I reviewed.

18          Q.      Did you find anything in

19     your --

20               MR. FULLER:  Form to the last

21          question.

22               MR. NICHOLAS:  Say again.

23               MR. FULLER:  Form to the last

24          question.  Counsel, you stated that --

25               MR. NICHOLAS:  It's okay.  You

Highly Confidential - Subject to Further Confidentiality Review

1        made your objection.

2                MR. FULLER:  No.  You stated

3        that there are documents in here that

4        he reviewed related to his report.  I

5        think the testimony is that he

6        reviewed documents but they didn't

7        impact his report.

8                MR. NICHOLAS:  They didn't

9        impact your report.

10   BY MR. NICHOLAS:

11        Q.     In your review of all of these

12   documents and all these depositions that you

13   read, did you find anything in any of them

14   that was in any way favorable to any of the

15   defendants in the case?

16        A.     There were a couple of things

17   that I thought were -- I wouldn't say

18   favorable.  That I thought were a positive

19   measure by the companies.

20        Q.     Did you reference those in your

21   report?

22        A.     Both of the things that I'm

23   thinking of happened right at -- the timeline

24   would have been right near the end of the

25   2013 -- or, I mean, sorry, one was right

1    before 2017, and the other one was with a

2    company and right about when they were making

3    those changes, they gave up their authority

4    or their distribution of controlled

5    substances, so I did not make comment on

6    that.  It didn't impact their conduct during

7    the timeline of my report.

8          Q.      That's one.  What was the other

9    one?

10         A.      Well, there's two.  One was

11   right near the end of -- in 2017, they were

12   making some changes to their suspicious order

13   monitoring system that I thought were pretty

14   positive and significant, but it was right at

15   the very end of the timeline.  That was one

16   company.  That would have been McKesson.

17              And then CVS made some changes

18   right near the end of the time they handled

19   controlled substances.  I think it was around

20   2000 -- I don't want to say a date.  I want

21   to check my report.  I don't want to be

22   inaccurate.  But at some point they just gave

23   up distributing controlled substances, and it

24   was right near that time period.

25         Q.      Are these two facts in your --

1          A.      No, sir.

2          Q.      You didn't put those in your

3    report?

4          A.      No, sir.

5          Q.      Other than those two things, is

6    there anything that you reviewed in all of

7    the documents that was in any way positive or

8    favorable to any of these 12 defendants?

9          A.      I would have to say, sir, in

10   looking at all the records, in the records

11   that I asked for -- and I'm going to restate,

12   I didn't read all 5 or 6 million documents

13   that were provided.  The documents that I

14   reviewed or that were provided to me, I would

15   have to say no.

16              There was -- I was actually

17   somewhat shocked by the level of failure in

18   the documents that I reviewed, by the

19   companies.

20         Q.      The documents that were sent to

21   you by the plaintiffs' lawyers?

22         A.      And that I elected to review

23   based on what they were, policies,

24   procedures, descriptions of systems,

25   particular depositions where people that had

Highly Confidential - Subject to Further Confidentiality Review

1    knowledge how the system would work or

2    whether it was utilized.

3                So it wasn't just -- just so

4    I'm clear, I wasn't being spoon-fed just

5    particular documents.  I just want to make it

6    clear to the court and to the judge that I

7    couldn't physically look at every document.

8         Q.     How many documents did you

9    review, do you know?

10        A.     Well, no, I have no idea.

11   Extensive.

12        Q.     Okay.  Did you speak with

13   plaintiffs' lawyers in connection with

14   drafting this report?

15        A.     Could you explain that

16   question?

17        Q.     Did you talk to Mr. Fuller or

18   Mr. Elkins or Ms. Baughman about the content

19   of the report?

20        A.     I think there was some general

21   conversation, just -- just not what to write,

22   but I've never written an expert opinion,

23   report before, so obviously I needed a little

24   bit of guidance on how it would flow.  So how

25   it's laid out, the beginning with my

1    experience, somehow how it's divided by

2    company.  I mean, some of the general

3    formatting, you know, that I had to come to

4    some conclusions.

5                I was told what topics that I

6    would be expected to give an opinion on.  I

7    was also told to stay within the guidelines

8    of those opinions, not to, you know, get into

9    topics that were outside of that, those -- my

10   opinions.

11       Q.     And what topics were you told

12   to give an opinion on?

13       A.     Maintenance of effective

14   controls to prevent diversion, which is both

15   in the law and federal regulations, and

16   suspicious -- designing and operating a

17   suspicious order system, CFR 1301.74(b).

18       Q.     Did you ever meet with any of

19   the other experts in the case?

20       A.     I have.

21       Q.     That are -- let me start again.

22                Did you ever meet with any of

23   the other experts in the case who were

24   working with the plaintiffs?

25       A.     Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Who did you meet with?

2    A.    Physically I had a meeting with

3    Mr. McCann in Arlington on two different

4    occasions.

5    Q.    Okay.

6    A.    By telephone, there was an

7    expert witness, and I hopefully have his name

8    correct.  I think it was Seth Whitehill or

9    Whitehall.

10    Q.    Uh-huh.

11    A.    And then there was another

12    expert opinion and -- I was anticipating this

13    question, I was trying to remember.  I

14    believe -- I only remember her first name.  I

15    think it was Hui, but I don't -- I'm sorry --

16    I don't -- you know, I have a recollection --

17    Q.    That was a phone call or a

18    meeting?

19    A.    That was a phone conversation.

20    One phone conversation with her.  I had two

21    phone conversations with Mister -- Seth.  I

22    remember his first name.  It was either

23    Whitehill or Whitehall.

24    Q.    And two in-person meetings with

25    Mr. McCann?  One?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Well, I don't know so much that

2     I would call them meetings.

3          Q.      What would you call them?

4          A.      Well, the first one is we went

5     to his company in -- me and some other

6     people, and that's when they had received the

7     ARCOS data, and it came in in a native

8     format, just as a string of numbers, EDI

9     format.  I think they were maybe anticipating

10    it was going to come in in a different, more

11    readable style.

12               So I met with them just to kind

13    of give them some guidance on what the ARCOS

14    materials should look like.  Would you like

15    an example?

16         Q.      Not right now.  Let me ask

17    you --

18         A.      And then the second meeting?

19         Q.      Yeah.

20         A.      The second meeting was right

21    after Christmas.  There was some kind of a

22    work product that Mr. McCann did, and it went

23    out to some groups of people, and I was asked

24    to go to his office and sit in the

25    conversation room in case I received any

1    calls from plaintiff attorneys that had

2    questions about the data that they had

3    received.  And I received no calls, so it

4    was just -- sat in a room, had a casual

5    conversation with Mr. McCann, but it wasn't

6    in regards to any of the analysis or any of

7    the work.

8          Q.    Okay.  I need to -- I think I

9    need to understand this just a little better.

10         A.    Sure.

11         Q.    So the first meeting with

12   Mr. McCann had to do with the ARCOS data and

13   making it sort of more understandable?

14         A.    Yes.

15         Q.    Right?

16         A.    So -- yep.

17         Q.    Okay.

18         A.    So you want an explanation of

19   it?

20         Q.    No.

21         A.    Okay.

22         Q.    I guess what I want to know is:

23   Was anyone else there?

24         A.    Yes.

25         Q.    Who else was there?

```
 1              A.      There was a couple other

 2     experts -- well, I guess consultants, former

 3     DEA employees were there present, and also

 4     there was one attorney, one plaintiffs'

 5     attorney.

 6              Q.      Who were the other consultants?

 7              A.      James Geldhof.  I'm trying to

 8     think who was all there.  Frank Younkers, and

 9     I think there may have been one more.  I'm

10     not sure.  And one attorney.

11              Q.      Who was the attorney?

12              A.      Peter Mougey.

13              Q.      How long was that meeting?

14              A.      Well, I wouldn't really

15     consider it a meeting.  It was kind of a --

16              Q.      Were you in a room together?

17              A.      Yes.

18              Q.      Okay.

19              A.      So it wasn't like a formal

20     meeting where we had discussions.  There was

21     just basically some back-and-forth on trying

22     to understand how to get the ARCOS into a

23     usable format.

24              Q.      Whether you call it a meeting

25     or all sitting in a room together and
```

1    talking, how long was it?

2         A.    Oh.  It was the better part of

3    a day.  The first day, six or seven hours.

4    The second day it was a partial part of the

5    day.

6         Q.    Okay.  So it was a meeting that

7    occurred over two days?

8         A.    Yeah.

9         Q.    And that was in Arlington,

10   Virginia?

11        A.    Yes, sir.

12        Q.    All right.  Had you ever met

13   any of those guys before?

14        A.    I had.  Well, I had not met

15   Mr. McCann before.

16        Q.    Okay.

17        A.    But I had met Mr. Frank

18   Younkers and James Geldhof.  There was

19   another expert, and his -- I remember his

20   name.  David Schiller.  I had never met him

21   prior to that day.  He was a former DEA

22   employee also.

23        Q.    And Younkers and Geldhof you

24   knew from what, DEA days?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  I don't want to get into

2   a big thing about it, but where did they --

3   how did you know -- how did you know them

4   from DEA days?  What did they do?

5      A.     Mr. Geldhof, he was the

6   diversion program manager.

7      Q.     Where?

8      A.     Let me back up.

9      Q.     Yeah.

10     A.     When I first started, he was my

11  immediate supervisor for a short period of

12  time, and then he was promoted, so he was in

13  the Detroit division office as the diversion

14  program manager, which would be one level

15  above my supervisor.

16         Frank Younkers was the group

17  supervisor in the Cincinnati DEA office,

18  Cincinnati, Ohio.  I did some cases in

19  Cincinnati and I met him just as an

20  introduction and say hi.  I never really

21  worked with him or had any supervision by

22  him.

23     Q.     Okay.  But Mr. McCann and

24  Mr. Whitehall and the woman that you

25  referenced are all people you'd never met

1    before?

2          A.    That's correct.

3          Q.    You were introduced by the

4    plaintiffs' attorneys basically?

5          A.    Yes, sir.

6          Q.    Okay.  And the phone call with

7    Mr. Whitehall was about what?

8          A.    Well, my expert opinion has to

9    deal with the companies' actions and

10   compliance with regulations and the law, and

11   my -- I guess my understanding of what

12   Mr. Whitehill does is he looks at the

13   companies for more of a larger corporate type

14   of compliance, maybe how the companies set up

15   their compliance in more of a big, broader

16   overview.

17              I really didn't see any

18   connection between what his opinion was going

19   to be and my opinion, but at the request of

20   plaintiff counsels, we had a couple of

21   discussions.

22         Q.    So you talked more than once?

23         A.    Yes, sir.

24         Q.    On the phone?

25         A.    Yes, sir.

1    Q.    Were lawyers on the phone with

2    you when you talked?

3    A.    Yes, sir.

4    Q.    Who were they?

5    A.    Well, for sure I knew Amy

6    Quezon was on the phone.  She's the one who

7    arranged the phone conferences.  I believe

8    Mr. Fuller might have been.  I'm not sure.  I

9    think he might have been off and on.  And

10   it's possible Mr. Elkins.  It wasn't the kind

11   of a formal meeting where everyone announced

12   themselves.  There was an introduction

13   between me and Mr. Whitehill, and I think

14   Amy, Ms. Quezon, helped with the

15   introduction.

16        So it wasn't where I took a

17   roll call or notes, so I'm not sure, but I

18   believe those people at some point might have

19   been on the conversation.

20   Q.    Were you ever on --

21        I'm sorry, I didn't mean to

22   interrupt.

23   A.    No, that's okay.

24   Q.    Were you ever on the phone with

25   any of the other experts in the case or in a

Highly Confidential - Subject to Further Confidentiality Review

 1    meeting with any of the other experts in the

 2    case where there weren't also at least one

 3    plaintiffs' lawyer there?

 4        A.    So, I know you -- we aren't

 5    agreeing on the term "meeting."  There were

 6    some periods of time where I was reviewing

 7    depositions and James Geldhof was also tasked

 8    with doing -- reading depositions.

 9            So we would review depositions

10    and then once a week we would meet and we

11    would compare our review of those

12    depositions.  And at the conclusion we put a

13    product together to send to the attorneys.  I

14    would put a product together.

15        Q.    So you were working with

16    Mr. Geldhof on your report?

17        A.    It wasn't on my report at that

18    time.  I hadn't really started writing my

19    report because the discovery material,

20    really, wasn't available -- I don't know if

21    it was in, but it wasn't available to me.

22    But the depositions were underway.  And

23    actually, I wasn't even aware they were

24    underway.

25            I remember receiving a phone

1  call and kind of asked what I was doing, and

2  I said nothing.  I hadn't heard from the

3  plaintiffs in a couple of months during the

4  summer months, which I wasn't complaining

5  about because I was enjoying my summer.  And

6  then they said they wanted to start sending

7  depositions and for me to review them.  So

8  then boxes started to arrive at my house.

9        I immediately knew that I would

10 never be able to read all of the depositions,

11 so I started with one particular company and

12 started reviewing those depositions.

13        Mr. Geldhof had already -- he

14 was a lot more diligent than me in reading

15 the depositions.  So the ones that we both

16 read, it wasn't like a concerted effort; we

17 would just meet and discuss our review of the

18 depositions.

19     Q.    All I'm really trying to

20 understand is whether, for your report, you

21 had anyone else working with you or for you,

22 whether it's Mr. Geldhof or anyone else?

23     A.    No, sir.  No, sir.  The only

24 person I had those discussions with was

25 Mr. Geldhof.  Now, he may have seen something

```
 1    in a deposition that I missed or didn't bring

 2    to my attention, so I would go back, take

 3    some notes, review the deposition myself, and

 4    either find that it was useful and

 5    incorporate it, or dismiss it.

 6         Q.     In connection with putting

 7    together your report, did you speak with

 8    anyone or interview anyone from Summit or

 9    Cuyahoga County?

10         A.     No, sir.

11         Q.     Did you visit any pharmacies in

12    Cuyahoga or Summit County in connection with

13    putting your report together?

14         A.     No, sir, I did not visit any

15    pharmacies.

16         Q.     Okay.  Did you spend any time

17    in Cuyahoga or Summit County at all in

18    connection with putting together your report?

19         A.     Well, in a broad sense I'd have

20    to answer yes, and that's because I attended

21    some of the court hearings at the request of

22    the plaintiffs' attorneys, so I was able to

23    hear some of the presentations that were

24    made, which I guess would be useful in some

25    ways of guiding me.
```

```
 1              I wasn't -- I don't think I was

 2      requested to be there for that particular

 3      purpose to use that information, but I think

 4      any information that I received in regards to

 5      this report and -- I keep calling it

 6      investigation -- my evaluation, was impactful

 7      in crafting my report.

 8          Q.      Which -- do you remember which

 9      court hearings you went to?

10          A.      I went to the one, and I don't

11      remember the date, I'm sorry, where

12      Mr. Rannazzisi testified, and there was a

13      document presented on behalf of the DEA.  I

14      think it was -- it was a large hearing.  I

15      know that.

16          Q.      I remember it.

17          A.      Okay.  I was there.

18          Q.      I was there, too.

19          A.      Only because they made me sit

20      up at the very front, which I wasn't very

21      comfortable with.

22          Q.      Well, get used to it.  You may

23      have to testify in the case, you know.

24          A.      Well, I know.  I understand

25      that, but when everyone's in the courtroom
```

1    and you're told to sit up here in the front,

2    kind of in front of the jury box, I was a

3    little nervous up there.

4         Q.    And did you go to any other

5    hearings?

6         A.    No, sir.

7         Q.    Okay.  So did you review any of

8    the deposition transcripts of any of the

9    Summit or Cuyahoga County officials?

10        A.    No, sir.

11        Q.    Okay.  Did you ask for them?

12        A.    No, sir.

13        Q.    Did the plaintiffs' lawyers

14   send them to you?

15        A.    I have numerous boxes of

16   depositions at my house that I haven't went

17   through them all, so I can't answer one way

18   or another if one of them may be in there.

19   So I have to say I don't know.

20        Q.    Do you know who Demetra Ashley

21   is?

22        A.    I do.

23        Q.    Did you overlap with her at all

24   in Detroit?  Because she worked in Detroit as

25   well.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      So during -- we hadn't

 2     discussed this, but during my career as a

 3     Romulus police officer, I was actually a

 4     sergeant, I was head of a narcotics unit for

 5     the city police department.  So in the course

 6     of some narcotic investigations, I got an

 7     invitation from the DEA to become a task

 8     force officer.

 9              So I left my department for a

10     period of about -- almost five years and

11     worked in the capacity that would be similar

12     to an agent, which is different than a

13     diversion investigator.

14              I believe she was there then.

15     I'm pretty sure she was there then, so if I

16     met her, it was just casually.

17              My only recollection -- to be

18     honest with you, I didn't know that diversion

19     even existed in my law enforcement career,

20     and -- not that I want to digress, but they

21     would destroy drugs once a month, so I'd come

22     to work and everybody would be in the hallway

23     just getting rid of cough syrup and there

24     would be this awful smell.  And it would be

25     like kind of a joke that day, on drug
```

Highly Confidential - Subject to Further Confidentiality Review

1   destruction day.  And I'm sure that I met her

2   in that time period.

3        Q.    Okay.  And are you aware that

4   there came a time in 2015 when she actually

5   moved into one of the top positions at the

6   DEA?

7        A.    Yes, sir.

8        Q.    In fact, she and Mr. Milione

9   kind of replaced Mr. Rannazzisi.  You knew

10  that, right?

11       A.    Yeah, so -- and I don't know if

12  this would be something that your question --

13  that I should have answered previously.  She

14  was in her capacity near the end of my career

15  where one of my cases, there was

16  negotiations, and she -- or discussions about

17  the case, and she was part of those

18  discussions.

19       Q.    Okay.  You did not -- your

20  report doesn't say that you reviewed her

21  deposition either.  Did you review her

22  deposition?

23       A.    I started to review it, but I

24  would probably say maybe the first 20 pages.

25       Q.    Just 20 pages?

1           A.      I think so.

2           Q.      Okay.

3           A.      Maybe a few more, but I did not

4    read the full deposition.

5           Q.      Okay.  Thank you for all that.

6           A.      Yep, you're welcome, sir.

7           Q.      I apologize for taking so much

8    time on this background stuff, but someone's

9    got to do it.

10          A.      I understand.

11          Q.      Are you familiar with the

12   regulation that discusses suspicious orders,

13   regulation 1301.74, subpart (b)?

14          A.      Yes, sir.

15          Q.      All right.  And does that

16   regulation define suspicious orders?

17          A.      I think the regulation itself

18   is a broad regulation and, I think, for a

19   good purpose.  I think it gives some guidance

20   on a suspicious order, but I think the actual

21   full definition is up to the registrant,

22   depending on a lot of factors; the scope of

23   their business and the scope of those

24   customers that receive products from them.

25                  So I think -- I know there's a

1    lot of criticism about the -- or there's some

2    criticism about the regulation.  I think it's

3    a perfect regulation for industry to adhere a

4    specific program to.

5         Q.    The regulation defines

6    suspicious orders as orders of unusual size,

7    orders deviating substantially from a normal

8    pattern, and orders of unusual frequency; is

9    that correct?

10        A.    Well, that is what the

11   regulation says, but -- but I'm not so sure I

12   agree if you're saying the word "defines"

13   says that suspicious orders could only be

14   those things.

15             I think that's up to the

16   registrant to -- because there could be other

17   factors where a suspicious order could be

18   identified other than those three parameters.

19        Q.    Does the order tell the

20   registrant what is meant by an order of

21   unusual size?

22             MR. FULLER:  Form.

23        A.    No, I think that's up for the

24   registrant to define based on their

25   application of their maintenance of effective

Highly Confidential - Subject to Further Confidentiality Review

1    controls.  You know, that question has come

2    up before.  I think the important thing first

3    for a company or a registrant is define what

4    "usual" is, and that would be their due

5    diligence and their maintenance of effective

6    controls.

7              Many companies focus on trying

8    to define an unusual order when they don't

9    sufficiently understand what a usual order is

10   in regards to what kind of business they're

11   operating and the scope of their business.

12             MR. FULLER:  Bob, and not to

13        pick on your flow, but your last

14        question was does the order tell the

15        registrant.

16             MR. NICHOLAS:  Oh, my mistake.

17             MR. FULLER:  That's why I

18        objected.

19             MR. NICHOLAS:  I appreciate it.

20        Well, then I appreciate it.

21             MR. FULLER:  But Rafalski still

22        answered it.

23             MR. NICHOLAS:  That's fine.

24             THE WITNESS:  I thought I had

25        to.

1          MR. FULLER:  No, but he asked

2      does the order tell the registrant.

3          THE WITNESS:  I'm sorry.

4          MR. FULLER:  But you meant the

5      regulation.

6          MR. NICHOLAS:  Yeah.

7          MR. FULLER:  Fair enough.

8          THE WITNESS:  So is my answer

9      correct?  I mean, not correct.  Was it

10     on point?  I'll take it back.

11         MR. NICHOLAS:  We're going to

12     sync up your answer with my screwed-up

13     question with the correction, and it's

14     going to work.

15         THE WITNESS:  Sorry.

16  BY MR. NICHOLAS:

17     Q.    So is it fair to say that the

18  determination as to whether an order is of

19  unusual size is a subjective determination?

20     A.    No, I don't think so.

21  Generally speaking, I think if --

22  hypothetically, I think that if a company,

23  especially a large company, has sufficient --

24  sufficient data that they can come up with a

25  reasonable, usual amount that a customer

Highly Confidential - Subject to Further Confidentiality Review

1    would be expected to purchase, and I think

2    that a purchase that would exceed that as a

3    system that would trigger that order to be of

4    unusual size, I don't think that's a

5    subjective nature.

6                Certainly, I guess companies

7    could just hire people to just look at orders

8    and then say that's an unusual order and that

9    would be more of a subjective, but I think

10   any system that's designed takes the

11   subjective nature out of it.

12               Now, subsequent decisions may

13   be subjective, but the actual identification

14   would not be.

15        Q.    What do you mean by "subsequent

16   decisions"?

17        A.    So an order is -- triggers as

18   unusual order based on the size, and then the

19   company has a couple of decisions to make.

20   One, and this is based on my experience and

21   based on the Masters case, is they could

22   report it to the DEA and then not ship it and

23   that could be the end of it.

24               So if they want to make a

25   determination on whether or not they want to

1    ship it, they have to dispel the fact that

2    it's a suspicious order to make sure that

3    it's not diverted.

4              So someone obviously would have

5    to gather some facts, and I guess make an

6    evaluation of those facts.  So what facts

7    that that person, he or she, gathers and

8    their opinion on whether or not it's

9    suspicious, I think there has to be some

10   level of subjectivity in there.

11             You could have a checklist and

12   you could have a lot of formal procedures,

13   but ultimately, someone has to make some

14   decision.

15        Q.    I would ask you the same

16   question about orders that deviate

17   substantially from a normal pattern.  Is the

18   determination of whether orders deviate

19   substantially from a normal pattern a

20   subjective determination?

21        A.    My answer is kind of going to

22   run parallel to the size.  I think an unusual

23   pattern start -- you know, first a company

24   has to establish what's a usual pattern.

25             In regards to the preparation

1    of my report and review of the policies, one

2    of the most common patterns -- well, I

3    wouldn't say common, but one pattern that

4    some companies elect to look at are the

5    relationship between the purchase of controls

6    and noncontrols.

7              So they can establish with

8    their own records what would be a normal

9    range of noncontrols related to controls.  So

10   any change in the purchasing of that would be

11   an example of an unusual pattern.

12             Another one that some companies

13   in my preparation of my report would be cash

14   payments versus insurance payments, so that a

15   change in the percentage there.  That would,

16   of course, only occur if the companies were

17   diligent, asked that question on a periodic

18   basis.

19             There are many other patterns

20   that are overlooked in my preparation of the

21   report by companies.  One of the easiest

22   would be companies generally seem to be

23   looking at drugs as families, and what I mean

24   by that is lumping all the oxycodone products

25   into one family or by their drug code.

Highly Confidential - Subject to Further Confidentiality Review

1          So within those families,

2     there's -- my experience in doing these cases

3     is there's generally a hierarchy of drugs

4     where some drugs are ordered more often than

5     others.  They're just generally prescribed

6     more.

7          So during the course of when a

8     potential diversion would occur, there could

9     be one strength of drug which actually

10    occurred -- which really impacted what

11    happened in America -- the oxycodone 30

12    product became a highly abused product.  So

13    companies should or would want to monitor

14    within that drug family if there was a change

15    in pattern where one drug started to get

16    ordered in a much greater amount than the

17    other drugs.

18          Along those same lines, another

19    pattern is how companies order drugs.

20    Typically in the old days they used DEA

21    Form 222s.  That's a paper form with ten

22    lines.  Some companies generally order drugs

23    in the same manner.

24          I've reviewed countless number

25    of forms, and as you go through the forms day

1    by day, you'll see patterns on how drugs are

2    ordered, certain groups together.  In the

3    cases I've worked, when that pattern changes,

4    so an easy one would be all of a sudden you

5    see an order form with ten lines and all ten

6    lines have oxycodone 30.  If a company would

7    start to change a pattern of orders like

8    that, that would be an easy one.

9         Q.    Is it also possible that

10   patterns or size or frequency can change

11   suddenly based on changed circumstances in a

12   particular community?

13        A.    Sure, anything is possible.

14        Q.    Well, I don't just mean

15   anything is possible.  I mean, yes, anything

16   is possible, but I'd like to be a little more

17   specific.

18        A.    Okay.

19        Q.    Let's say -- let's say a

20   hospital opens up in an area.  Would that

21   change patterns and could it change ordering

22   patterns and size of orders and frequency of

23   orders?

24        A.    Well, I think that obviously

25   has a possibility to cause some change.  I'm

1    not sure that it would change the pattern.

2    It may change the amounts or the types.  So

3    another -- as was one of my examples, the

4    types could change.

5              Anytime a business model

6    changes or a new contract -- a better

7    example, if I could give you a better

8    example.

9        Q.    Sure.

10       A.     Is a pharmacy could enter into

11   a contract with a long-term care facility,

12   and if they didn't provide guidance or

13   information to their distributor, they could

14   just start ordering a controlled substance

15   that would be out of the norm of something

16   they ever ordered before.

17             That's kind of the essence of

18   the suspicious order system because you would

19   hope the system would trigger to stop that

20   order.  Then it requires some due diligence

21   where a company would actually call and they

22   would learn about that contract.  And then

23   subsequent to that, the distributor or the

24   person making the sale would probably confirm

25   that that actual contract occurred and that

1   business relationship occurred.

2                So...

3        Q.      So patterns can change?

4        A.      Sure.

5        Q.      Size can -- you know, unusual

6   size can change.  Frequency can change

7   depending on the circumstances that occur in

8   a particular community, right?

9        A.      I've learned in my experience

10  that the ordering and distribution of drugs

11  is not static.  It's heavily patterned,

12  especially the more the customers, the more

13  the established pattern, sizes and frequency.

14  But new drugs could be introduced.

15                There's a lot of reasons why it

16  could change.  And that's not a bad thing,

17  but those are the things that would trigger

18  your system to stop an order and then you to

19  evaluate it to make sure that -- not you

20  personally, but so that it's evaluated, and

21  then there's no chance of diversion.

22        Q.      So while that investigation is

23  going on, you're saying that those drugs

24  should not be shipped to a place where let's

25  say there's a new -- a new long-term facility

Highly Confidential - Subject to Further Confidentiality Review

1    in town or a pharmacy has a relationship with

2    a new long-term facility?  You would stop

3    shipment of those drugs?

4         A.    I think that's what the

5    regulation calls for, yes, sir.

6         Q.    Okay.

7         A.    Well, not the regulation, but

8    the maintenance of effective controls.

9    Because to just go ahead and make shipment

10   without confirming that diversion is

11   occurring, I think the flipside of your

12   question is probably, you know, just as

13   drastic, to allow drugs to go for a purpose

14   when you've already identified that there's

15   the potential for diversion.

16        Q.    I mean, it's also drastic if

17   drugs are not going to people who need them,

18   correct?

19        A.    That's correct, but in most

20   cases, the drugs we're talking about -- well,

21   let me stop to answer that way.

22              First, the situation would be

23   as I would hope that companies would take

24   into account -- or not that they would have

25   to clear that order in a reasonable amount of

```
 1    time, we're not discussing weeks or months.

 2    And I certainly don't speak for the

 3    companies, but I'm certain that they act in a

 4    fairly quick manner to resolve that.  And,

 5    you know, I'm not so sure that the drugs

 6    we're talking about are -- in a long-term

 7    care facility would be life-threatening, but

 8    I'm not a doctor, so -- but just generally

 9    speaking through my experience.

10         Q.    I guess I should have asked you

11    at the beginning.  You're not a licensed

12    physician, are you?

13         A.    I am not.

14         Q.    You're not a pharmacist, right?

15         A.    I am not.

16         Q.    Okay.  But it is correct, isn't

17    it, that the drugs we're talking about,

18    opioids, do serve an important medical

19    purpose, correct?

20         A.    Absolutely.  I think there's a

21    segment of the population in America that

22    need those drugs.

23              And I think that's an important

24    question and an important answer because, you

25    know, through my career there's a lot of
```

1    accusations that the DEA works to impede

2    that, and I find that far from the truth.  I

3    mean, the number one goal as far as I'm

4    concerned and in our mission statement is to

5    make sure that there's an uninterrupted

6    supply to those people who need those drugs.

7        Q.    And sometimes those people need

8    those drugs because they are terminally ill

9    and have a limited amount of time to live and

10   are in tremendous pain in their last days,

11   right?

12       A.    There's all --

13             MR. FULLER:  Form, scope.

14             MR. NICHOLAS:  Go ahead.

15       A.    Sure.  There's all kinds of

16   reasons why those drugs are a necessity to

17   people that have a medical need for them.  I

18   agree.

19   BY MR. NICHOLAS:

20       Q.    Okay.  I'm going to ask you

21   just a few questions, not many, about three,

22   four pages in your report, pages 10 to 13, in

23   which you discuss something called Discovery

24   Ruling 12.

25       A.    Yes, sir.

1      Q.     Do you remember that?  Do you

2    know what I'm talking about?

3      A.     Yes, sir.

4      Q.     Okay.  And this is a discovery

5    ruling that was issued by Special Master

6    Cohen; is that right?

7      A.     Yes, sir, in regards to the

8    Masters Pharmaceuticals case.

9      Q.     And you understand that the

10   Special Master's role in the litigation is to

11   address discovery issues, right?

12     A.     Generally speaking, yes, sir.

13     Q.     Okay.  And he is not -- he's

14   great, but he's not the judge, right?

15     A.     Understood.

16     Q.     Okay.  And he's not the jury

17   either.

18     A.     Understood.  I -- so I think

19   that's one of his roles.  I only -- I say

20   that because when I read some of the

21   depositions, I see there's some conversation

22   back and forth about we may have to call

23   Cohen, so I think he maybe makes rulings in

24   regards to deposition matters too.

25     Q.     Yeah, and that's part of the

Highly Confidential - Subject to Further Confidentiality Review

1    discovery process.

2           A.      Oh, discovery process, okay.

3           Q.      Depositions are part of

4    discovery.

5           A.      Understood.  Okay.

6           Q.      Now, when you discussed his

7    ruling, you put four pages in the report on

8    his ruling.  How did you know to do that?  I

9    mean, how did you even know that that thing

10   existed?  Who told you about that?

11          A.      It was provided to me by the

12   plaintiffs' attorneys.

13          Q.      Okay.  And what did they give

14   you?  Did they give you his ruling?

15          A.      Yes, sir.

16          Q.      Okay.  And so is it your

17   position that his ruling is the -- the --

18   states the law with regard to the regulatory

19   obligations of the various defendants in this

20   case?

21          A.      Well, my understanding is his

22   ruling kind of breaks down the Masters

23   Pharmaceutical case and the appellate court

24   decision that resulted from that case, and he

25   kind of gives a general understanding of what

1    my -- my section was the suspicious order

2    system, how it works, the reasonableness of

3    it, and the maintenance of effective

4    controls.  And his was an interpretation.

5         Q.    An interpretation?

6         A.    Of -- well, I wouldn't say an

7    interpretation because obviously he's not

8    going to interpret the appellate court

9    ruling.  I think it's kind of a common sense

10   or just kind of a good written product of the

11   Masters Pharmaceutical case.  That was my

12   investigation.

13        Q.    And so you referenced Discovery

14   Ruling 12, and then I didn't see any

15   reference to his next ruling on this motion,

16   which had to do with withdrawing a portion of

17   Discovery Ruling 12.

18             Do you remember that?

19        A.    I don't think I reviewed that.

20   I wasn't provided that.

21        Q.    Okay.  So you weren't provided

22   with Special Master Cohen's follow-up ruling

23   on Discovery Ruling 12, correct?

24        A.    I do not recall that.

25        Q.    And you wouldn't have known

Highly Confidential - Subject to Further Confidentiality Review

1    about it -- I mean, you wouldn't have known

2    to ask for it because you didn't know it

3    existed, right?

4         A.    Right.  I was provided so many

5    documents, I don't have any recollection of

6    reviewing it.  But I'd like to leave the slim

7    chance that maybe I did and I just don't

8    recall.  I know it's not referenced in my

9    report.

10        Q.    Right.  Okay.  So maybe there's

11   a slim chance.  I didn't see it in any of the

12   documents.

13        A.    Well, you know what, I'm

14   drawing a blank on that particular, but there

15   is a possibility that I guess at some point.

16   I get so many of these documents that it may

17   have been provided to me.

18        Q.    Okay.  So you don't know that

19   Special Master Cohen wrote that his -- and

20   I'm just reading from his follow-up report,

21   which you have -- his follow-up ruling, which

22   you did not see:  Second, the discourse was

23   not meant to be authoritative or conclusive

24   on how all suspicious order monitoring

25   systems must work.  As distributors note,

```
 1    resolution of whether their SOMS met

 2    applicable legal requirements over time is a

 3    question for another day.

 4              So you didn't see that?

 5              MR. FULLER:  Form.

 6         A.    No.

 7    BY MR. NICHOLAS:

 8         Q.    Okay.  And you didn't --

 9         A.    So -- I'm sorry.

10         Q.    Well, I just want to know

11    whether you remember seeing that.

12              MR. FULLER:  You can finish

13         answering that question.  Go ahead.

14              MR. NICHOLAS:  Yeah.

15         A.    I don't remember seeing that

16    particular statement.

17    BY MR. NICHOLAS:

18         Q.    Okay.  And so you also don't

19    remember -- or do you remember seeing this

20    statement:  In sum, distributors are correct

21    that Discovery Ruling No. 12 was exactly

22    that, a discovery ruling, and not a

23    definitive pronouncement on their legal

24    obligations.

25              Do you remember seeing that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FULLER:  Form.

 2        A.      I do not recall seeing that.

 3                    MR. NICHOLAS:  Okay.  Let's

 4        take our first break, if that's okay.

 5        Five minutes.

 6                    THE VIDEOGRAPHER:  Going off

 7        the record, 10:26 a.m.

 8                    (Recess taken, 10:26 a.m. to

 9        10:38 a.m.)

10                    THE VIDEOGRAPHER:  We're back

11        on the record.  The time is 10:39 a.m.

12   BY MR. NICHOLAS:

13        Q.      Mr. Rafalski, it's correct,

14   isn't it, that there was a time when the DEA

15   approved suspicious order monitoring

16   programs, correct?

17        A.      Sir, I'm never aware of any

18   time where there was an approval of a

19   particular system.

20        Q.      Okay.  If there was ever an

21   approval of a particular system, that would

22   be like highly relevant information, right?

23        A.      Well, it could be, but I'm just

24   testifying from my review of records and my

25   experience, mainly my expertise and my
```

Highly Confidential - Subject to Further Confidentiality Review

1    training with the DEA where it's clearly

2    stated from the day I was employed that the

3    DEA doesn't approve systems.

4        Q.    Okay.  Did you ever review any

5    documents in this case that have been

6    produced in the case having to do with

7    AmerisourceBergen's suspicious order

8    monitoring system?

9        A.    I'm sure I did in the

10   preparation of my report.  If you want to --

11   is there a particular document that you want

12   to...

13       Q.    There is.

14            MR. NICHOLAS:  Let me start

15       with -- let me start with Tab 17.  So

16       just for everybody's information, we

17       have -- we didn't bring like 20 of

18       these things, all right, but I have

19       one for the witness.  I have one for

20       me.  I have one for Mr. Fuller and

21       then what do we have?  Maybe one

22       other?  We have six copies.  The rest

23       of you guys can share.

24            MR. FULLER:  They're stickers.

25       You just peel them off and put them

Highly Confidential - Subject to Further Confidentiality Review

```
 1           on.

 2                MR. NICHOLAS:  Okay.

 3                (Whereupon, Deposition Exhibit

 4           Rafalski-1, 9/30/96 Zimmerman Letter

 5           ABDCMDL00215791 - ABDCMDL00315794, was

 6           marked for identification.)

 7      BY MR. NICHOLAS:
```

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

13          Q.     Okay.  And you can take a

14   minute to review the report -- to review the

15   letter if you need to, but let me start by

16   asking you:  Have you seen this letter

17   before?

18          A.     I believe I have.

19          Q.     Okay.  Then so you recall its

20   contents?

21          A.     No, I'd like an opportunity to

22   read it, if I could have a minute or two.

23          Q.     Sure, why don't you take a

24   minute to look at it.

25                 (Document review.)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



**REDACTED**

10          MR. NICHOLAS:  Not the biggest

11      point in the world.  I was really just

12      bickering back and forth with you

13      because you said something, so I'm

14      going to --

15          THE WITNESS:  I don't want to

16      bicker.  I just want to give you some

17      facts.

18          MR. NICHOLAS:  I know.  I'm

19      self-correcting.

20          THE WITNESS:  I apologize if I

21      engaged in bickering.

22          MR. NICHOLAS:  As do I.

23  BY MR. NICHOLAS:

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



24          Q.      That's okay.  Let's just -- I

25     want to stick with --

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Just -- you characterized that

 2    I ignored it, and I'm pretty sure that I have

 3    a section in my report about that
```

REDACTED

```
12          Q.      No, you can go back -- your

13    lawyer can do that with you later.  I have

14    another question.

15              MR. FULLER:  No, if you want to

16        go to the report --

17              THE WITNESS:  Well, if --

18              MR. NICHOLAS:  No, no, no.

19              MR. FULLER:  Hold on.  You

20        don't ask permission.  You go to your

21        report.

22              THE WITNESS:  I'd like to

23        clarify that, so...

24              MR. NICHOLAS:  Okay.  Well,

25        looks like you and Mr. Fuller are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          taking over the questioning for a

 2          minute, but...

 3               MR. FULLER:  Just like any

 4          expert, he's allowed to go to his

 5          report if he wants to go to his

 6          report.

 7               MR. NICHOLAS:  Of course.

 8          You're going to be able to question

 9          him at the end of this thing.  You can

10          question him to your heart's desire.

11               (Document review.)

12     A.     So it's on page 82, the second

13  paragraph.

14  BY MR. NICHOLAS:

15     Q.     Okay.
```

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

18      A.      Well, let me confirm that.

19      Q.      No, you know something --

20              MR. FULLER:  No, no.

21              MR. NICHOLAS:  I'm not asking

22      you --

23              MR. FULLER:  Counsel, you

24      asked.  You asked.  You asked the

25      question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. NICHOLAS:  Counsel, I'm not
 2           asking him to confirm it.  You can go
 3           back to it and he can do it later.
 4           I'm not running clock here like that,
 5           so we can keep going and we will keep
 6           going.
 7                    Just give me one second.
 8                    THE WITNESS:  Sure.
 9      BY MR. NICHOLAS:
10           Q.    Had you seen this letter before
11      preparing your report, would you have viewed
12      it as relevant information to be included in
13      the report?
14           A.    Well, the opinion that I was
15      offered -- I was requested to make wasn't an
16      analysis of the DEA's actions; it was whether
17      or not the systems in place were effective.
18                    So it wouldn't have changed my
19      opinion on whether the system utilized by
20      AmerisourceBergen met the regulatory
21      compliances.
22           Q.    I didn't ask you whether this
23      letter would change your opinion.  I did ask
24      you whether, had you seen this letter, you
25      would have thought it relevant for purposes
```

Highly Confidential - Subject to Further Confidentiality Review

1    of inclusion in your report.  That's my

2    question.

3         A.    I'd like to just stay with my

4    previous comment.  Other than by including it

5    or not including it, it wouldn't have changed

6    my opinion on whether the system utilized was

7    effective or met regulatory compliance.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

19          Q.      Okay.  Before we leave that

20     subject, you are familiar with the letters

21     that Mr. Rannazzisi wrote to registrants in

22     2006 and 2007, right?

23          A.      Yes, sir, I am.

24          Q.      Okay.  And I'm going to ask you

25     just to take a look for a very limited

Highly Confidential - Subject to Further Confidentiality Review

1     purpose right now at his December 27th, 2007

2     letter, which we'll mark, I guess, as

3     Exhibit 4.

4                    (Whereupon, Deposition Exhibit

5            Rafalski-4, 12/27/07 Rannazzisi

6            Letter, ABDCMDL00269685 -

7            ABDCMDL00269694, was marked for

8            identification.)

9                    MR. NICHOLAS:  There you go.

10                   THE WITNESS:  Thank you.

11    BY MR. NICHOLAS:

12         Q.    And I'm really only going to

13    ask you about the -- the last sentence of the

14    second full paragraph.  You see it?

15         A.    Yes, sir.  Would you like me to

16    read it?

17         Q.    Yeah.

18         A.    Past communications with DEA,

19    whether implicit or explicit, that could be

20    construed as approval of a particular system

21    for reporting suspicious orders should no

22    longer be taken to mean that DEA approves a

23    specific system.

24         Q.    Now, Mr. Rannazzisi is writing

25    this letter to registrants in 2007, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes, sir.

 2              Q.      And he says that past

 3     communications that could be construed as

 4     approval should no longer be taken to mean

 5     the DEA approves a specific system.

 6                      Do you see that?

 7              A.      Yes, sir.

 8              Q.      So when he says that these

 9     communications should no longer be taken to

10     mean that the DEA approves a specific system,

11     do you agree that prior to this letter, such

12     communications were taken as approvals and

13     the DEA understood that?

14                      MR. FULLER:  Form.

15              A.      Well, I'm not sure what

16     Mr. Rannazzisi knew or didn't know when he

17     composed the letter.  My interpretation when

18     I read that is it's kind of just a

19     notification to -- you know, to the industry.

20                      I'm aware that -- in my

21     experience that oftentimes you're on-site or

22     you're having contact with a registrant and

23     the registrant makes -- this would be the

24     implicit -- would make some assumptions on

25     what you're saying or what you're approving
```

Highly Confidential - Subject to Further Confidentiality Review

1    or if you don't find an error, that that --

2    or a problem, that that means that it's

3    approval.

4              So the explicit, you know,

5    that's a different situation, so I -- I just

6    think it's just a clarification.  I'm not

7    aware that he was specifically talking about

8    any particular communication.

9    BY MR. NICHOLAS:

10        Q.    It says should no longer be

11   taken.

12        A.    It does say that, yes, sir.

13        Q.    Yeah.  So that means that

14   previously he knew that it was being -- that

15   these -- that these communications were being

16   taken as approvals, right?

17              MR. FULLER:  Object to form.

18        A.    I don't know what he thought.

19   BY MR. NICHOLAS:

20        Q.    Okay.

21        A.    Or if that was his intention

22   with that statement, that he assumed that was

23   occurring.

24        Q.    Well, that's -- I'm just sort

25   of going by the words.  That's how it reads,

1    isn't it?

2        A.    That's how it reads, but as I

3    testified to earlier, you know, I had several

4    cases where there were comments made or there

5    was understandings made with contacts between

6    registrants and companies where they believed

7    that something was approved or was ordered of

8    them, which was not accurate.

9            So I'm not -- but I'll just go

10   back and say I'm not exactly sure what

11   Mr. Rannazzisi's intent was with that

12   particular statement.  Just it's clear

13   what -- moving forward what his intent was.

14       Q.    Now, Mr. Rannazzisi also sent a

15   letter on September 27th of 2006 to the

16   various registrants, and I'll just read it.

17   I don't even have to mark it.  I can just

18   read one sentence from it and ask you whether

19   you agree with it, because it's just a

20   general statement.

21            The sentence that

22   Mr. Rannazzisi wrote is:  DEA recognizes that

23   the overwhelming majority of registered

24   distributors act lawfully and take

25   appropriate measures to prevent diversion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you agree with that

 2   statement that Mr. Rannazzisi made?

 3                    MR. FULLER:  Form, outside of

 4        his scope.

 5        A.     Can you read it one more time

 6   for me?

 7   BY MR. NICHOLAS:

 8        Q.     Yes.

 9                    DEA recognizes that the

10   overwhelming majority of registered

11   distributors act lawfully and take

12   appropriate measures to prevent diversion.

13        A.     Well, based on my work on this

14   matter and my review of records and systems,

15   which I didn't have any previous knowledge of

16   previous to when I did that, I would probably

17   disagree with that statement by

18   Mr. Rannazzisi, in looking at the historic

19   failures by the companies to be in compliance

20   with the suspicious order situation -- or

21   regulation and just a general broad

22   maintenance of effective controls to prevent

23   diversion.

24                    MR. NICHOLAS:  It's been --

25        well, let's take a short break.  We'll
```

Highly Confidential - Subject to Further Confidentiality Review

1    go another 45 minutes after that and

2    have lunch, if that's okay.

3              THE VIDEOGRAPHER:  Going off

4    the record, 11:34 a.m.

5              (Recess taken, 11:34 a.m. to

6    11:45 a.m.)

7              THE VIDEOGRAPHER:  We're back

8    on the record at 11:45 a.m.

9    BY MR. NICHOLAS:

10        Q.    The DEA requires the retention

11   of records to be for at least two years; is

12   that correct?

13             MR. FULLER:  Form.

14   BY MR. NICHOLAS:

15        Q.    By policy?

16        A.    Well, by regulation --

17        Q.    By regulation.

18        A.    -- the requirement is -- and

19   that two-year applies to required records.

20   So within the CFR, there are certain records,

21   examples would be biannual inventories, order

22   forms.  Any of the records that are in the

23   records section of the CFR have a two-year

24   retention.

25             And there's a carve-out that if

1    a state has a longer retention period, that

2    the registrant could be subjected to that,

3    but that two years only applies to those

4    certain records that are cited in the CFR.

5         Q.    So -- but the carveout that

6    you're talking about doesn't apply to

7    suspicious order reports, right?  That's

8    within the two -- that's subject to the

9    two-year regulation?

10              MR. FULLER:  Form.

11        A.    No.  The suspicious order

12   reports aren't part of the two-year

13   retention.

14   BY MR. NICHOLAS:

15        Q.    They don't have to be retained

16   at all?

17        A.    Well, under my opinion, it

18   would be they would be retained forever.

19        Q.    Right, but, I mean, the

20   regulation doesn't require -- I understand

21   that might be your opinion, but is there any

22   regulation that says they have to be retained

23   for any length of time?

24        A.    I would say the maintenance of

25   effective controls to prevent diversion would

Highly Confidential - Subject to Further Confidentiality Review

1    be applicable to say that they should retain

2    the suspicious order reports or any due

3    diligence related to them.

4         Q.    There are specific sections --

5    there are specific regulations that address

6    records retention, correct?

7         A.    Yes, sir.

8         Q.    And those --

9              MR. FULLER:  Form.

10   BY MR. NICHOLAS:

11        Q.    -- regulations identify the

12   categories of records that have to be kept

13   and for how long, correct?

14             MR. FULLER:  Form.

15        A.    The CFR does address that, but

16   those are the required records.  For example,

17   there are some records that registrants keep

18   in the course of their business that aren't a

19   required record.  So just so we're on the

20   same understanding as to -- the two-year

21   retention is only under those required

22   records; dispensing records for a dispensing

23   doctor, two-year retention; biannual

24   inventories, order forms, those are all part

25   of the required records.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NICHOLAS:

 2         Q.     So the things we're talking

 3    about now, suspicious order reports or due

 4    diligence documents, are not part of the

 5    kinds of records that are required to be

 6    retained under the CFR and the regulations?

 7         A.     Well --

 8         Q.     That's a yes or a no.

 9                MR. FULLER:  Object to form.

10         He's already testified they were.

11                MR. NICHOLAS:  That's not what

12         he said.

13                Go ahead.

14                THE WITNESS:  So could you

15         restate the question?  I'm sorry.

16    BY MR. NICHOLAS:

17         Q.     Does the CFR or its regulations

18    require in writing and as identified

19    suspicious order reports?

20                MR. FULLER:  Form.

21                MR. NICHOLAS:  I'll ask it

22         again.  It was a crappy question.

23    BY MR. NICHOLAS:

24         Q.     Does the CFR identify

25    suspicious order reports as among the
```

Highly Confidential - Subject to Further Confidentiality Review

1    documents that have to be retained for at

2    least two years?

3         A.    I would say yes, under the

4    maintenance of effective controls, but I

5    think there's not a lot of clarity on whether

6    that is essentially a required record.

7         Q.    Does the CFR identify due

8    diligence documents as documents that are

9    required to be retained for at least two

10   years?

11        A.    I'm going to respond the same:

12   Under maintenance of effective controls, I

13   think that requirement requires the retention

14   of due diligence records.  The CFR doesn't

15   speak specifically to a due diligence record,

16   but that would be a record that would be

17   maintained within the requirement of that

18   regulation.

19        Q.    For at least two years?

20        A.    Again, my opinion, they should

21   be kept permanently.

22        Q.    No, I'm not asking about your

23   opinion.  I'm asking under -- what the

24   requirement is under the law as you

25   understand it.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Under the regulation as I

2   understand it --

3      Q.     Yeah.

4      A.     -- it doesn't speak

5   specifically to due diligence records.  So

6   I -- a two-year retention -- if a registrant

7   was to review the CFR, there's no mention of

8   a due diligence record, so I would say it's

9   not two years.

10          But again, I'd just restate

11   that I would see no reason why they wouldn't

12   retain them indefinitely.

13      Q.     Okay.  I just want to go back

14   for one second to when you said several times

15   that -- you talked about your understanding

16   about how the DEA -- or your belief that the

17   DEA does not -- has never given approvals of

18   suspicious order monitoring systems, and you

19   said that the manual said you're not supposed

20   to and all that.

21          When did you start at the DEA?

22      A.     2004.

23      Q.     Okay.  When you refer to the

24   manuals, to the Diversion Control Manual, you

25   were referring to a manual that you read in

Highly Confidential - Subject to Further Confidentiality Review

```
1    2004, right?  Or after.
2         A.    Well, I -- I was also referring
3    to the manual that I read as part of my
4    opinion in 1996, and my -- and my opinion on
5    the suspicious orders on approval, it's
6    broader than just the manuals.  Multiple
7    trainings, my witnessing of a distributor
8    briefing, the comments made in the training
9    provided; also, my review of communication
10   that I believe Mr. Gitchel made in 1984 where
11   he made that statement.
12              So -- plus my on-the-job
13   training, my -- there's never been a time
14   where I can ever remember that DEA -- there
15   was a comment made to me that the DEA had
16   approved suspicious order systems.
17        Q.    Wait, you reviewed a statement
18   that Mr. Gitchel made in 1984?
19        A.    I don't know if it was a
20   statement.  He made -- I believe he was the
21   one who made a written comment to NWDA in
22   regards to a suspicious order reporting
23   program that was worked on way back then, and
24   he made a comment about not being able to
25   approve any specific.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.      Is that in your report?

 2          A.      I believe it is.

 3          Q.      Okay.  No, no --

 4          A.      No, I'd like to talk to you

 5     about it.

 6          Q.      I just want to know if it's in

 7     your report.

 8          A.      Yeah, but --

 9          Q.      Is it -- that's a yes or no.

10     You can check to see if it's in your report,

11     yes or no.

12          A.      Well, let me review my report.

13              MR. NICHOLAS:  It's a 200-page

14          report.  We can go off the record and

15          stop the clock running during this

16          review.

17              MR. FULLER:  No, we need to

18          stay on the record.

19              (Document review.)

20              MR. FULLER:  I think it's on

21          page 32.

22              THE WITNESS:  I'm getting

23          there.  I don't want to waste time.

24              (Document review.)

25          A.      So I discussed that

1    communication on page 32 of my report.

2    BY MR. NICHOLAS:

3         Q.    Okay.  Hold up.  Yeah.

4               I just want to know -- I mean,

5    all I really wanted to know is did you put in

6    your report that Mr. Gitchel said in 1984

7    that the DEA doesn't approve --

8         A.    No, I think I may have

9    misspoke.  I think it was in regards to

10   stopping shipments of --

11        Q.    Okay.

12        A.    -- orders.

13        Q.    Okay.  All right.  That's fine.

14        A.    That's why I wanted to review

15   my report, to make sure.

16        Q.    This was an instance where you

17   reviewed your report and found something --

18   and found something that I agree -- supported

19   my point, so that's good.  I should let you

20   review your report more often.

21        A.    Yeah, you tried to stop me.

22   But I just want to be factually correct.

23   It's an important subject.

24        Q.    I appreciate it.

25        A.    And I had a recollection that

1    that was discussed, but it was about stopping

2    an order, so...

3         Q.    All right.  So since we are

4    talking about sort of what -- since you just

5    sort of brought up the shipping requirement.

6         A.    Yes, sir.

7         Q.    First of all, just so the -- so

8    we've got it on the record, what do you

9    understand -- it's a weird word, because it's

10   a shipping requirement, but it really -- it's

11   a reference to not shipping.

12             So can you just explain what

13   the shipping requirement is to your

14   understanding?

15        A.    Well, first, I've never --

16   there's never really been a formal term.  A

17   shipping requirement, I don't know if that's

18   an industry term or just somehow got created,

19   but it never was referred to as just a

20   shipping requirement.

21             I mean, it's -- it's the mere

22   fact that when a company uses a suspicious

23   order system and identifies a suspicious

24   order, they don't ship that order until they

25   dispel the suspicion about it and whether or

Highly Confidential - Subject to Further Confidentiality Review

1     not it's going to be diverted to ensure that

2     gets properly distributed.

3          Q.     Okay.  So let me ask a couple

4     of basic questions here.

5               Does the CFR or the regulations

6     related to the CFR on this subject say

7     anywhere that there is a requirement that

8     distributors not ship suspicious orders?

9          A.     I think they give guidance to

10    distributors under the maintenance of

11    effective controls.  Only saying that because

12    if a distributor discovers a suspicious

13    order, to ship it without dispelling the

14    suspicion, that kind of violates the

15    maintenance of effective controls.

16               So I don't want to say it's

17    just a commonsense interpretation, but to

18    identify something suspicious that is

19    suspicious of diversion and then just

20    shipping it without stopping it and

21    dispelling it, that's at the core of that

22    regulation.

23         Q.     Does the --

24         A.     And the law.

25         Q.     Does the regulation say

1    anything about ship -- does the regulation in

2    words, words, say anything about shipping?

3            A.     No, in words, the regulation

4    does -- and just the --

5            Q.     It does or does not?

6            A.     It does not say the word

7    "shipping."

8            Q.     Okay.

9            A.     But again, I go back to the

10   maintenance of effective controls, and

11   secondly, it's been since the day I started

12   at DEA, that's been the interpretation of the

13   DEA, and I think there's been several

14   communications, Mr. Rannazzisi's letters.

15           Q.     Okay.

16           A.     All the way back -- now I can

17   go back to Mr. Gitchel's letter in 1984,

18   about stopping an order because that was the

19   topic that I discussed -- that I confused on

20   your earlier question.

21           Q.     Do you -- is it your testimony

22   that the decision as to whether to ship or

23   not to ship an order that's been reported to

24   the DEA is left to the discretion of the

25   distributor?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So I think the discretion on

2    whether to ship or not ship is solely the

3    decision of the distributor.  The DEA doesn't

4    inform a distributor if or when to ship an

5    order or not to ship an order.  So the answer

6    to that would be yes.

7    Q.    And if a distributor asks the

8    DEA -- if the distributor came to the DEA and

9    said, we've got this order, we have questions

10   about it, should we ship it or not ship it,

11   the DEA won't answer that question?

12   A.    So I'm not sure that I'm

13   comfortable speaking for the entire DEA, but

14   how I'd like respond to that is through my

15   experience and what has occurred in the past.

16        So there may be a time when you

17   receive a call from a registrant that may ask

18   a question like that or a similar question,

19   so generally, you can -- first, I would

20   always state there's two -- two situations,

21   and we're just going to talk about suspicious

22   orders -- or, I mean, about distributions.

23        And first, I'll always state

24   that I can't tell a distributor when to ship

25   or not to ship, but I may ask a lot of

Highly Confidential - Subject to Further Confidentiality Review

1    questions of the distributor that makes it

2    easier for them to make that decision.

3           Q.      Okay.

4           A.      Now, that's my personal

5    experience.  I'm not speaking that the entire

6    DEA does that.

7           Q.      Now, you spent some time in

8    your report talking about the Masters

9    decision; is that correct?

10          A.      Yes, sir.

11          Q.      That decision came out in 2017,

12   correct?

13          A.      Yes, sir.  Right after I

14   retired.

15          Q.      Although you were on the team

16   that investigated Masters, right?

17          A.      I was.  There was no team.  It

18   was just me.

19          Q.      Well, then, I want to say

20   there's no I in team, but somehow that

21   doesn't quite fit, but I'd like to say it

22   anyway.

23          A.      Well, I would say that there's

24   always another investigator with me, but it

25   was my case.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      Okay.  Now, Masters, your
 2    investigation of Masters was of
 3    Masters Pharmaceutical, correct?
 4           A.      Yes.
 5           Q.      It was not -- you were not
 6    investigating any other distributors in
 7    connection with that, correct?
 8           A.      No, that's not actually a
 9    correct statement.  I would disagree with the
10    statement.  During the course of that
11    investigation, there were some -- they call
12    them gray distributions.  I don't know, maybe
13    that's an internal DEA.  So that would be
14    distributions from Masters to other
15    distributors.
16                   So I -- you know, that didn't
17    lead me personally to investigate other
18    distributors, but it did -- it did cause me
19    to make notifications about other -- to other
20    offices about other distributors.
21           Q.      You did not -- my question to
22    you was:  You were only investigating
23    Masters Pharmaceutical, right?
24           A.      Yes, sir.
25           Q.      Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.     That was the assignment of the

2  investigation.

3     Q.     All right.

4     A.     Maybe I misunderstood your

5  question.  I didn't want you to think that I

6  didn't look at any distributions of other --

7  to other distributors or --

8     Q.     And Masters, the company,

9  ultimately challenged the DEA's findings from

10  your investigation, right?

11     A.     Yes, they did.

12     Q.     And in so doing, they took the

13  case up to the D.C. Circuit, right?

14     A.     Yes, sir.

15     Q.     And the case before the

16  D.C. Circuit was about Masters's system

17  alone, right?

18     A.     Well, I think the factor that

19  caused it to go to the D.C. court was

20  Masters's system and their use of the system,

21  but I think to me, or more importantly, I

22  believe, to the DEA, I think it was a

23  reiteration of what the expectations were of

24  registrants, and because sometimes I see some

25  commenting that that was the -- that's the

Highly Confidential - Subject to Further Confidentiality Review

1    way that the interpretation is moving

2    forward.  I believe that's the way the

3    interpretation of the regulations always was,

4    always was in place.

5         Q.    But the issue in Masters was

6    Masters's compliance with its own policies

7    and procedures, right?

8              MR. FULLER:  Objection, form,

9         misstates the case.

10        A.    Well, it's at the core of one

11   of the issues or at the core of the

12   administrative hearing.

13   BY MR. NICHOLAS:

14        Q.    Masters came out in 2017.  Did

15   I ask you that already?

16        A.    It did.  I think it was the

17   week after I retired.

18        Q.    That's right.  You said that

19   too.

20              Now, when the Masters decision

21   came out, do you recall that the industry was

22   confused by the decision?

23              MR. FULLER:  Form.  How would

24        he know?

25        A.    I'm not aware of any

Highly Confidential - Subject to Further Confidentiality Review

1   information that would make that a true

2   statement.

3           MR. NICHOLAS:  Okay.  We'll

4       mark as our next exhibit, Exhibit 5.

5           (Whereupon, Deposition Exhibit

6       Rafalski-5, 2/6/18 Nicholson Letter,

7       MCKMDL00561146 - MCKMDL00561147, was

8       marked for identification.)

9   BY MR. NICHOLAS:

10      Q.    And while you're looking at it,

11  I'll just say for the record, this is a

12  letter dated February 6th of 2018 to Demetra

13  Ashley, the acting assistant administrator

14  for Diversion Control Division of the DEA.

15          It is written -- it is signed

16  by Kevin Nicholson, the vice president for

17  policy -- public policy and regulatory

18  affairs for the National Association of Chain

19  Drug Stores.

20          (Document review.)

21      A.    Okay.  I've read the letter.

22  I've also read this previously.

23  BY MR. NICHOLAS:

24      Q.    Okay.  Does this refresh your

25  memory or cause you to want to change your

1    answer about the question of whether industry

2    was confused by the Masters decision?

3              MR. FULLER:  Form.

4         A.    No, it does not.

5    BY MR. NICHOLAS:

6         Q.    Okay.  Can you look at the

7    first paragraph, the second sentence, from

8    the second sentence to the end.

9         A.    Starting with "The National"?

10        Q.    Yeah.

11        A.    Like me to read it?

12        Q.    Yeah, that would be great.

13        A.    The National Association of

14   Chain Drugstores (NACDS), respectfully

15   request that DEA promulgate regulations to

16   affected registrants regarding their

17   suspicious order monitoring regulatory

18   obligations in light of the Masters decision.

19              We are aware that the DEA has

20   been working on regulations to clarify

21   registrants' responsibilities under

22   21 CFR 1301.74(b).

23              We believe the D.C. Circuit's

24   ruling in the Masters case necessarily

25   increases the urgency of DEA's promulgation

Highly Confidential - Subject to Further Confidentiality Review

 1    of guidance concerning affected registrants'

 2    suspicious order monitoring responsibilities.

 3         Q.    Are you aware that the DEA has

 4    been working on regulations to clarify

 5    registrants' responsibilities under

 6    21 CFR 1301.74(b)?

 7         A.    I did review either a document

 8    or a deposition, and I don't recall of which,

 9    that spoke to this, and I believe there was

10    one document that indicated they were, but

11    another document or a deposition which

12    indicated they no longer were.

13              So I guess that's kind of an

14    ambiguous answer, but if you were to ask me

15    what I believe is occurring right now, I do

16    not believe they're working on changing

17    1301.74(b).  That would be my opinion.

18         Q.    Are you aware that for a period

19    of time from 2015 to 2019, they were working

20    on a revision to the regulation?

21              MR. FULLER:  Form.

22         A.    I'm not aware of that.

23              MR. FULLER:  Form.  And as far

24         as the Touhy compliance, let's just

25         make sure, Mr. Rafalski, that you're

Highly Confidential - Subject to Further Confidentiality Review

1          basing it on information that you

2          gained from this litigation and not

3          your work at the DEA.

4   BY MR. NICHOLAS:

5          Q.     So you're unaware of this; is

6   that right?

7          A.     That they were working on the

8   regulation?

9          Q.     Yeah.

10         A.     Well, I don't have any direct

11  recollection that someone told me that the

12  DEA is working on this particular regulation,

13  but at the DEA, up in policy, and they're

14  always working on regulations, and it's not

15  something that's communicated to the field.

16  So I just -- I don't really have any

17  knowledge whether they were or weren't.

18         Q.     Well, in your review of all the

19  documents in this case, the documents that

20  you were provided, did you see either a

21  report from the GAO or a summary of a report

22  from the GAO concerning diversion control

23  matters?

24         A.     I believe I did.

25         Q.     Do you recall that the GAO

1    specifically recommended that the DEA revise

2    the regulation -- revise the regulation

3    pertaining to suspicious orders to provide

4    greater clarity?

5         A.    I don't really want to speak on

6    that document.  Do you have a copy?

7         Q.    I do.  But right now I want to

8    know whether you remember it.

9         A.    Well, no.  Well, I don't

10   remember that -- I remember the document.  I

11   don't remember that specific statement.  And

12   I don't know that it addressed back to 2015

13   unless we've moved from the previous

14   question, so...

15        Q.    Do you recall that the GAO had

16   three specific recommendations that it issued

17   to the DEA on the topic of improving

18   communication with registrants and industry?

19   Do you recall that?

20        A.    I remember there were

21   recommendations.

22        Q.    Do you remember that there were

23   three of them, only three of them?

24        A.    No, sir.

25        Q.    And do you remember that one of

Highly Confidential - Subject to Further Confidentiality Review

1    the three was to revise the regulation

2    pertaining to suspicious order reporting in

3    order to provide greater clarity?

4         A.    I'd like to see the document.

5    I don't have independent recollection of that

6    statement.

7         Q.    Okay.  Let's see if I can find

8    it.

9              Before we look at it, if indeed

10   the GAO -- I think GAO stands for Government

11   Accounting Organization; is that right?

12   Government --

13        A.    Accountability.

14        Q.    -- Accountability --

15        A.    Office.

16        Q.    -- Office.  I should know these

17   things.

18              If that was the GAO's -- and

19   what is the Government Accountability

20   Office's job?  Do you know?

21        A.    Kind of exactly what it says.

22   They're tasked with -- and I don't know what

23   initiates them to come in and do an

24   accountability study, whether it's a

25   directive from the legislature or how they go

Highly Confidential - Subject to Further Confidentiality Review

1    about doing an accountability, but they come

2    in to organizations within the government and

3    evaluate topics at the -- I'm just not sure

4    at the request of who.  Maybe the document

5    would say that.

6         Q.    So in this case they did an

7    accountability study of the DEA, correct?

8         A.    I do remember that they did a

9    study, and I think it was on the -- I don't

10   think it was specific to this particular

11   topic.  I think it was of the organization.

12           My recollection -- well, I

13   don't want to speak about my recollection if

14   we could just use the document.

15        Q.    Okay.  Let's just take a look

16   at it.

17           (Whereupon, Deposition Exhibit

18           Rafalski-6, 5/10/19 GAO Publication on

19           Prescription Drugs [No Bates], was

20           marked for identification.)

21   BY MR. NICHOLAS:

22        Q.    What I'm going to show you is

23   something from the GAO's website, actually,

24   and you can just -- we can identify it.  Just

25   the heading of it is Prescription Drugs:

1    More DEA information about registrants'

2    controlled substances roles could improve

3    their understanding and help ensure access.

4              That's the heading of the

5    document.

6         A.    Uh-huh.

7              MR. FULLER:  For the record,

8         it's not the actual GAO report,

9         correct?

10             MR. NICHOLAS:  No, it's a

11        website summarizing aspects of the

12        report.

13             MR. FULLER:  Got it.  Thanks.

14   BY MR. NICHOLAS:

15        Q.    And this is dated May of 2019,

16   so I don't want to misrepresent that this is

17   a document that came out in 2015, although

18   that document is -- that date is on here, but

19   this I believe was run off on May of 2019.

20             And if you go to the second

21   page, and the second recommendation, the

22   recommendation reads as follows:  In order to

23   strengthen DEA's communication with and

24   guidance for registrants and associations

25   representing registrants as well as

Highly Confidential - Subject to Further Confidentiality Review

1    supporting the Office of Diversion Control's

2    mission of preventing diversion while

3    ensuring an adequate and uninterrupted supply

4    of controlled substances for legitimate

5    medical needs, the deputy assistant

6    administrator for the Office of Diversion

7    Control should solicit input from

8    distributors or associations representing

9    distributors and develop additional guidance

10   for distributors regarding their roles and

11   responsibilities for suspicious order

12   monitoring and reporting.

13            Do you see that?

14       A.    Yes, I do.

15       Q.    Okay.  And the comment that the

16   DEA provided in response to that

17   recommendation was as follows:  In

18   February 2018, DEA reported that the agency

19   had reviewed and revised the current

20   regulation regarding suspicious orders and

21   that the revised draft rule was undergoing

22   internal DEA review.  DEA reported in August

23   of 2018 that they anticipated sending the

24   draft rule to the Department of Justice's

25   Office of Legal Policies by the end of the

1    first quarter of fiscal year 2019.

2             We plan to continue to monitor

3    the agency's efforts in this area and this

4    recommendation remains open.

5             So you see that?

6        A.    I see that.

7        Q.    So it's clear from this that

8    the -- that the DEA was, in fact, for some

9    period of time working on revising the

10   regulation pertaining to suspicious orders,

11   correct?

12       A.    Well, when you read this, I

13   mean, that's the assumption you would make.

14   I'm not aware of any changes or how they

15   change it.  And it doesn't influence my

16   opinion on what the responsibilities were in

17   regards to my report or what the requirements

18   of the regulation were all the way back till

19   it came into place in 1971.

20       Q.    Well, we have a -- we just

21   looked at a letter from the National

22   Association of Chain Drug Stores in which

23   that organization, on behalf of various chain

24   drug stores, expressed a desire for greater

25   clarity in the regulation.

1    You saw that, right?

2    A.    Yes, sir.

3    Q.    Okay.  And now we have the GAO

4    acknowledging -- I'm sorry, we have the DEA

5    acknowledging in response to a recommendation

6    from the GAO that they are, in fact -- that

7    they were, in fact, working on a revision to

8    the regulation, correct?

9    A.    That's what that says, yes,

10   sir.

11   Q.    Okay.  And do you know whatever

12   became of that revised regulation, proposed

13   revised regulation?

14   A.    I don't have any direct

15   knowledge or recollection or anyone has ever

16   told me what the status was of that

17   regulation, but I'd just like to reiterate,

18   whether or not the regulation has changed or

19   going to be changed, it doesn't change my

20   opinion because -- because of that, of what

21   was required of these companies during the

22   timeline of my report.

23        I would say that I think the

24   DEA was providing a lot of communication to

25   the industry, and I -- I don't know that they

Highly Confidential - Subject to Further Confidentiality Review

1    provided it to the NACDS.  I know it seemed a

2    little unusual that they were having

3    individual meetings with registrants, doing

4    distributor briefings.  They do conferences,

5    industry conferences.

6            And it's been my knowledge and

7    my experience that any registrant that

8    requests a meeting with the DEA at

9    headquarters, they're always provided.  Maybe

10   not as timely as they'd like, but I'm not

11   aware of the DEA just refused to ever meet

12   with anyone.

13           Now, I'm a little concerned

14   because I don't really in my experience deal

15   with organizations that aren't registrants.

16   I'm a little cautious about -- or in the DEA

17   realm of dealing with -- I don't know if this

18   is a lobbying group or if it's just a trade

19   association, that they would make comments to

20   trade associations when I think they would

21   rather directly deal with registrants, so...

22       Q.    Is it significant to you in any

23   way that the DEA, for a period of several

24   years, worked on revising the regulation

25   pertaining to suspicious order reporting and

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring?  Is it significant to you in any

2    way?

3         A.     In a broad answer to that

4    question, I think the DEA should always be

5    looking at and evaluating regulations and how

6    they affect the industry, not just a

7    suspicious order system.

8              In regards to how they were

9    going to change it or what new statement they

10   were going to make, I have no awareness of

11   that, but I would hope that the DEA or any

12   governmental organization wouldn't just have

13   regulations that they just allow to remain

14   static if they, you know -- I would hope

15   they're always under review.

16        Q.     Well, this regulation had

17   remained the same in language since 1974?

18        A.     '1.

19        Q.     '1, '71?

20        A.     1971.

21        Q.     So not one word of it had been

22   changed from 1971 until the present -- until

23   the present, correct?

24        A.     Well, it's my opinion there's a

25   reason for that, and --

1    Q.    So I'm just asking you whether

2    it's correct that it hasn't changed since

3    1971.

4    A.    Well --

5    Q.    Has it changed since 1971?

6    A.    It's exactly the same as 1971.

7    And I'd like to just reiterate --

8    Q.    You can, but wait a minute.

9    Hold on.

10         And do you believe that it is

11   appropriate to update that language?

12         MR. FULLER:  So object to the

13         form of the last question prior to

14         this and cutting off the witness.  He

15         has a right to finish his answers, and

16         let the record reflect that the

17         answers are incomplete as taken.

18         MR. NICHOLAS:  Understood.

19         THE WITNESS:  Could you state

20         your -- this question one more time,

21         please?  I'm sorry.

22   BY MR. NICHOLAS:

23   Q.    Do you believe that it is

24   appropriate to update the language of the

25   regulation?

Highly Confidential - Subject to Further Confidentiality Review

1          A.       I think I stated that in my

2     previous answer.  Of this regulation or any

3     regulation?

4          Q.       This one.

5          A.       No, I think the regulation is

6     fine exactly as it stands.

7          Q.       And would you continue to say

8     that if you understood that both industry and

9     people within the DEA have expressed

10    confusion about the meaning of the language?

11         A.       Well, I'm only speaking from my

12    experience and conducting my investigations

13    in dealing with registrants, and I guess

14    sometimes when I look at that regulation and

15    if I thought I had the role of being a

16    distributor or a manufacturer, I would want

17    it to be as nonrestrictive and broad as

18    possible to design the best system based on

19    the type of company that I had and the scope

20    of my business model and who my customers

21    were.

22              So I think changing the

23    regulation is a -- I hope that if it is

24    changed, that it takes that into

25    consideration because I don't really think

Highly Confidential - Subject to Further Confidentiality Review

1    there's a one-size-fits-all.

2              I think there's some

3    expectations of the regulation, but I hope

4    that my experience, again -- I keep harkening

5    back -- is that industry has always been

6    asking for just what is a system and design

7    it.  And that's not possible because there's

8    so many different types of businesses and

9    types of customers.  It's got to be tailored

10   to the company's business.

11        Q.     And the customers change, the

12   customers' businesses change, the hospitals

13   and the doctors change.  All that stuff is

14   constantly changing, correct?

15        A.     That's exactly my point.

16        Q.     Yeah.

17        A.     It's never a static industry.

18   The types of diversion change, the types of

19   drugs change, and to make a regulation that

20   would be very restrictive would probably

21   cause diversion.

22             MR. NICHOLAS:  We'll just do

23        one more segment here and then we can

24        break for lunch.

25             MR. FULLER:  Sure.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NICHOLAS:

2         Q.    Now, you talked a few minutes

3    ago about what you referred to as the DEA

4    distributor initiative briefings?

5         A.    Yes, sir.

6         Q.    Okay.  And you also talk about

7    those in your report; is that right?

8         A.    Yes, sir.

9         Q.    Okay.  And in your report, if I

10   have this correct, you refer to DEA

11   distributor initiative briefings in 2005 and

12   2006 and in 2017; is that right?

13             I'm not sure that you refer to

14   any others.  I don't believe you do.

15        A.    What -- what part specifically

16   are you...

17        Q.    You know, I don't have -- I

18   don't have a page number for you in your

19   report.  How about if we do it from memory,

20   and then if you want to look at your report,

21   you can.

22        A.    No, I'm not comfortable.  I

23   might get a detail wrong.

24        Q.    All right.

25        A.    So if you're talking about the

Highly Confidential - Subject to Further Confidentiality Review

```
1    actual briefings that occurred, they were

2    specific to -- specific to some of the

3    companies, and there was one that occurred in

4    2017.

5              There's -- in my report or in

6    my personal knowledge, I know that they

7    continued on long after 2005, and they went

8    for some period.  There was a couple years,

9    two or three years, where they stopped and

10   then resumed.

11        Q.    Why did they stop?

12        A.    I never was aware they did

13   until working on this case, or actually, I

14   don't know that I ever saw -- let me retract

15   that.

16              I think it was in a deposition

17   that I -- there may have been a discussion

18   where they had stopped for a period of years,

19   and I'm not sure why.

20        Q.    Well, did you read about why?

21   I mean, when you read about it, did you read

22   any explanation as to why, in whatever you

23   read?

24              What did you read?

25        A.    I read that they had stopped
```

Highly Confidential - Subject to Further Confidentiality Review

1   doing it for a period of years and then

2   resumed them, but I don't remember what the

3   reason was stated.

4        Q.    Do you remember who said that?

5        A.    I don't want to guess, no, sir.

6        Q.    Okay.  And you don't remember

7   any reason being given?

8        A.    Well, I don't remember reading

9   any reason being given.  I don't -- I'm not

10  sure whether there was a reason.

11       Q.    Did you -- I believe you told

12  us earlier that you only reviewed about 20

13  pages of Demetra Ashley's deposition.

14            Do you recall saying that this

15  morning?

16       A.    Yeah, I think I might have

17  corrected it and said or a few more, but I

18  don't recall reading it all the way to

19  conclusion.

20       Q.    Why not?  Why didn't you read

21  it all the way to -- what was -- why did you

22  decide to stop reading that deposition after

23  20 or so pages?

24       A.    Well, I think I said -- I

25  didn't say the definitive amount.  I think I

Highly Confidential - Subject to Further Confidentiality Review

1    corrected myself.  I -- I don't want to say I

2    didn't see much value in it.  I just --

3         Q.    After 20 pages?

4         A.    No, I read it a lot longer than

5    20 pages.

6         Q.    Wait.  Did you read it a lot

7    longer than 20 pages?  Did you read 20 pages?

8    Did you read a little longer?  Do you not

9    know?

10        A.    I'm not exactly sure how long.

11   I know I didn't read it to conclusion.  I

12   don't really have an explanation.  I just was

13   in the middle of finalizing or working on my

14   report.  I just didn't see -- I don't want to

15   say a lot of value in it because everything

16   has value, but I just -- I don't know why.  I

17   just didn't complete reading it.

18        Q.    So you didn't see her

19   discussion in the deposition about the fact

20   that these distributor initiative briefings

21   were stopped for a period of time and why?

22        A.    I don't recall that in her --

23   that I read that in her deposition.  If you

24   were just asking me to give a recollection, I

25   would think it was Mr. Prevoznik's, but I'm

Highly Confidential - Subject to Further Confidentiality Review

1    not sure.

2         Q.    Well, do you recall what

3    Mr. Prevoznik's explanation was, was that

4    they were stopped for a period of time

5    because of pending litigation?

6              Do you recall that?

7         A.    I don't remember the

8    litigation.  I thought maybe it said

9    investigations or some kind of pending

10   matter, but I don't remember that it was

11   litigation.

12        Q.    Well, I'll represent to you

13   that he actually said litigation.

14        A.    Okay.

15        Q.    Does that seem appropriate to

16   you?

17        A.    That they suspend them for

18   litigation purposes?

19        Q.    Yeah.  Yeah.

20             MR. FULLER:  Object to form.

21        A.    I don't know what the

22   litigation was, so I don't really have a

23   comment on that.

24   BY MR. NICHOLAS:

25        Q.    Well --

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I guess that's Mr. Prevoznik's

2     issue to comment on.

3                  I'm not sure, under my

4     authorization from the DEA, if I even knew I

5     could comment on that.

6          Q.      In your report -- and you can

7     turn to the pages if you want.  Starting on

8     page 40, you make reference to five different

9     methodologies that address the issue of the

10    number of suspicious orders that were and

11    weren't reported in the Track 1

12    jurisdictions, correct?

13         A.      I think I report dosage amounts

14    based on the methodologies.

15         Q.      I'm sorry.  I'm sorry.  I

16    apologize.  Dosage amounts.

17                 So we're talking about the

18    number of -- however you want to describe it,

19    the number of pills or the number of dosage

20    amounts of pills that are going into these

21    jurisdictions over a period of time; is that

22    right?

23         A.      Yes, based on that particular

24    methodology.

25         Q.      Okay.  Well, you say that

```
 1    particular methodology.  You used -- you

 2    referenced five methodologies, correct?

 3         A.     Yes, sir.

 4         Q.     Okay.  Did you figure out those

 5    methodologies yourself, or did Mr. McCann do

 6    that?

 7         A.     No, those are mine based on --

 8         Q.     These five methodologies are

 9    yours?

10         A.     Yes.  Well, they are

11    methodologies that are mirroring suspicious

12    order systems that are utilized by one or

13    more companies in my report.

14         Q.     Okay.  So did you -- you put

15    these -- did you put these charts together

16    yourself?

17         A.     No, I did not.

18         Q.     Who put the charts together?

19         A.     I -- I'm sorry.

20                Well, this is based on

21    McCann's -- Mr. McCann takes -- took my

22    methodology, and these were the results of

23    his application of my methodology to the

24    ARCOS data.

25         Q.     I see.
```

Highly Confidential - Subject to Further Confidentiality Review

1           So you -- you came up with

2     these five methodologies?

3           A.      Yes, sir.

4           Q.      Okay.  And tell me -- tell me

5     why you chose these five methodologies.  I

6     think you started to do it, but just go ahead

7     and explain it to me.

8           A.      Well, because these are

9     methodologies that were used by one or more

10    companies in my report, during the time frame

11    of my report.  Each one of these were not

12    invented by me, but they were actually used.

13          Q.      Okay.  Can you -- let's start

14    with the first one.  Methodology A is maximum

15    monthly trailing six-month threshold.

16          Can you explain to me what you

17    were trying to express here?

18          A.      Well, this is the Masters case

19    methodology.

20          Q.      Okay.

21          A.      Or I shouldn't say methodology.

22    This is their suspicious order system.  So

23    it's a rolling six-month, and it looks for a

24    current month that exceeds the highest

25    previous amount in the six months.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Okay.  And so when you refer to

2    flagged orders, you've got -- you know, your

3    top column, it's a grid.

4          A.      Yep.

5          Q.      And from left to right, across

6    the top, first it's the name of the

7    distributor.  Then it says:  Flagged orders

8    of oxycodone (dosage units).  Then it says:

9    Flagged orders of hydrocodone (dosage units).
```

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

7        Q.      So are you saying -- well, what

8     are you saying when you express this?  I

9     shouldn't say.

10              I mean, you're showing it.

11     What does it mean?

12        A.      So the methodologies applied to

13     the distribution, once the suspicious order

14     is identified, the criteria I used is if

15     there was no due diligence to dispel the

16     suspicious order or it wasn't reported, then

17     every subsequent distribution would be a

18     suspicious order.

19        Q.      Let me -- I hate this

20     expression, but I'm going to have to unpack

21     that.

22              So the criteria you used -- you

23     say once the suspicious order is identified?

24        A.      By the company -- or by the

25     methodology, I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     I mean, that's my first source

2     of confusion is, are these suspicious orders

3     or are these what you are suggesting should

4     have been suspicious orders, that you're

5     basing this on?

6          A.     Well, it's not suspicious --

7               MR. FULLER:  Objection to form.

8          A.     It's not suspicious orders.

9     It's dosage amounts that resulted from

10    suspicious orders.  So the methodology -- my

11    understanding of what Mr. McCann did -- and I

12    don't want to speak for him.

13    BY MR. NICHOLAS:

14         Q.     Okay.

15         A.     -- is he looks at the

16    distribution, the ARCOS data for the

17    distribution for AmerisourceBergen drug

18    company, he applies the methodology, and if

19    there are no suspicious orders, it just runs

20    along the distribution.

21              At some point, if there's a

22    month that exceeds the greatest month in the

23    previous six-month, that stops and it's a

24    suspicious order.  So at that point, if there

25    was a due diligence to dispel that suspicious

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order, if I could find that in my

 2    investigation, then it would continue on.

 3              If there was no due diligence

 4    and, as my report details, there wasn't

 5    during the early time periods -- during most

 6    of the time period there was no due diligence

 7    to dispel suspicious orders, so every

 8    subsequent order would become a suspicious

 9    order.

10         Q.    On what basis are you saying

11    that there was no due diligence done to --

12    with regard to flagged orders?  What is your

13    basis for saying that?

14         A.    There were review of records

15    submitted on discovery.

16         Q.    Records for --

17         A.    Now, let me -- can I correct

18    this?

19         Q.    Yeah.

20         A.    I don't want to say none

21    whatsoever.  I believe that probably there

22    may have been some individual instances of

23    due diligence, but in a general statement, at

24    a systematic level, there was insufficient

25    due diligence.  Or none.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what is your basis for that

2    statement?

3         A.    Reviewing records.

4         Q.    Reviewing records provided to

5    you by the plaintiffs?

6         A.    By the drug companies under

7    discovery.

8         Q.    You only had access to the

9    records that the drug companies supplied in

10   discovery to the extent they were sent to you

11   by the plaintiffs' lawyers that were

12   retaining you, correct?

13              MR. FULLER:  Object to form.

14        A.    I'm not sure how to answer that

15   because I guess I hope I got all the records.

16              Now, I'm not indicating that I

17   looked at every one, but I looked at enough

18   to draw a conclusion or an opinion that there

19   was insufficient due diligence.

20   BY MR. NICHOLAS:

21        Q.    Well, if you weren't sent

22   records that are -- that exist, how do you

23   know how many of the -- how many -- how do

24   you know whether you looked at a few, some,

25   most or all of the records?  How do you know?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I think that's kind of a

2    hypothetical question.

3        Q.      No, it's not hypothetical.  You

4    told me that -- you told me that you obtained

5    records from plaintiffs' counsel, correct?

6        A.      And it's my belief that I had

7    access to all the records.  Now, there's no

8    way that I would know if that occurred or

9    not.  That's -- I'm hopeful, as their expert

10   opinion, that I had access to all of the

11   records.

12               I can't affirmatively say that

13   they gave me every record.  I -- that's why

14   it's kind of a hypothetical.

15       Q.      Well, right now it is a

16   hypothetical because we really have no idea

17   what records you were provided, what records

18   you were provided and what you weren't

19   because I think you told us that you didn't

20   write down all the records that were provided

21   to you.

22       A.      Well, I would say that in

23   regards to this matter, I reviewed sufficient

24   due diligence records to draw -- to make my

25   opinion.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Now, sticking with that for a

2 minute, just because you did not review due

3 diligence records from 2010, 2011, 2012 --

4 let's assume you didn't see due diligence

5 records or as many as you would have liked.

6 That doesn't mean that the due diligence

7 wasn't done, does it?

8    A.    Well, as far as the DEA is

9 concerned, if there's no documentation or

10 record of it, a due diligence file, my

11 opinion would be based on that that doesn't

12 exist.

13    Q.    Well, we've already discussed

14 the fact that there was no requirement in the

15 regulations as to the retention of due

16 diligence records --

17         MR. FULLER:  Object to form.

18 BY MR. NICHOLAS:

19    Q.    -- for any period of time,

20 right?

21         MR. FULLER:  Object to form.

22    That's not the witness's testimony.

23    A.    So I don't think that's exactly

24 what my statement was.  I think my statement

25 was is that it wasn't contained as a required

1    record in the recordkeeping section of the

2    CFR.

3    BY MR. NICHOLAS:

4         Q.    Yeah.

5         A.    But it was of my opinion that

6    it's covered under the maintenance of

7    effective controls, and it would be my

8    opinion as -- with my experience and my

9    training and my knowledge, is that it should

10   be kept forever.  It's a historical record,

11   and it should be kept by the registrant much

12   greater than two years.

13        Q.    Now, you keep saying that the

14   requirement to maintain records is contained

15   in the section pertaining to maintenance of

16   effective controls, but just so the record is

17   clear, there's nothing in the section on the

18   maintenance of effective controls that makes

19   any reference to records, correct?

20        A.    Well, I --

21              MR. FULLER:  Form.

22        A.    I think within the statements,

23   that's what that statement means.

24   BY MR. NICHOLAS:

25        Q.    Means.  But I'm asking whether

Highly Confidential - Subject to Further Confidentiality Review

1   there's any actual written reference to

2   records or the retention of records in that

3   section?

4          A.     Well, so in the maintenance of

5   effective controls?

6          Q.     Yeah.

7          A.     It doesn't specifically say

8   that, if that's what you're...

9          Q.     Okay.  Okay.  Now -- so just --

10  we'll break for lunch, but just so I

11  understand, the methodologies that -- the

12  five methodologies described here were

13  selected -- were identified or selected by

14  you.  Is that -- based on what you saw the

15  various companies had done over the years; is

16  that correct?

17         A.     Yes, sir.

18         Q.     And you provided just those

19  methodologies, the concepts, to Mr. McCann

20  and he plugged in the numbers; is that

21  correct?

22         A.     Yes, but just as a

23  clarification, I personally didn't discuss

24  that with Mr. McCann.  I discussed it with

25  counsel and then counsel relayed that to

1    Mr. McCann.  And then it didn't come -- I

2    didn't have -- I've never had a personal

3    discussion with Mr. McCann about this.  It

4    was relayed through attorneys and back.

5         Q.    Okay.  Now, there are five

6    methodologies here.  Which one are you

7    endorsing?

8         A.    None.

9         Q.    You don't endorse any of them?

10        A.    No, sir.

11        Q.    Okay.

12        A.    I used these methodologies

13   because they were used by the industry.  So I

14   didn't want to impose a methodology that

15   wasn't, you know, recognized or utilized by

16   one or multiple distributors.

17              MR. NICHOLAS:  Okay.  Okay.

18        Let's take a break.

19              THE VIDEOGRAPHER:  Going off

20        the record at 12:46 p.m.

21              (Recess taken, 12:46 p.m. to

22        1:30 p.m.)

23              THE VIDEOGRAPHER:  We're back

24        on the record at 1:30 p.m.

25              MR. FULLER:  Counsel, I think

```
 1            Mr. Rafalski had something he wanted
 2            to clarify related to his last -- or
 3            your last question.
 4                 THE WITNESS:  I don't know if
 5            it was the last or one of the last.  I
 6            apologize, I think I was more focused
 7            on going to the bathroom than the
 8            question.
 9                 But you asked if I endorsed a
10            methodology.
11                 MR. NICHOLAS:  Uh-huh.
12                 THE WITNESS:  I guess I
13            understood -- or I believed that
14            question was asking if I endorsed a
15            methodology as a suspicious order
16            system or whether I endorsed it as one
17            of my methodologies.
18                 So I'm -- I answered it because
19            I thought you thought I would endorse
20            it as a suspicious order system, so
21            I'm not sure how you asked that
22            question.  So I --
23       BY MR. NICHOLAS:
24            Q.    Okay.  No, I appreciate that.
25       I'm glad you did the clarification.
```

```
1              So you don't -- so --
2       A.     I didn't want to say that I
3   didn't endorse my own methodology.
4       Q.     Okay.  So of these five, which
5   methodology, if any, do you favor or endorse
6   for purposes of the analysis you're doing?
7       A.     That would be the Masters.
8       Q.     Okay.
9              MR. FULLER:  Which is the first
10         one, right?
11             THE WITNESS:  And that's --
12         yes, that's methodology one.
13      A.     And essentially because it has
14  been reviewed and an order issued -- or an
15  opinion issued by the D.C. court.
16  BY MR. NICHOLAS:
17      Q.     Now, just work with me here,
18  because I want to make sure I'm understanding
19  what you're saying and also what you're not
20  saying, okay?
21             Let's just look at the column
22  for -- I'm on page 41.
23      A.     Okay.
24      Q.     The column for, I don't know,
25  flagged orders of oxycodone dosage units, and
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you go right down each company, all right.
2    You've got one, two, three, four, five
3    companies, and in the case of each one,
4    you've got a parenthetical that says that
5    somewhere between -- that identifies
6    somewhere between 86.5% and 95.3% of total
7    dosage units, okay?
8         A.    Yes, sir.
9         Q.    All right.  And that means
10   what?  Is that the number of dosage units
11   that in your opinion should not have been
12   shipped?
13        A.    Well, in my report, if we -- I
14   actually make a statement in regards to that
15   on page 46.
16        Q.    Okay.
17        A.    So it starts after the
18   footnote 151:  However, it is my opinion to a
19   reasonable degree of professional certainty
20   that applying the tests set forth in the
21   Masters Inc. and Drug Enforcement
22   Administration provides a reasonable estimate
23   and initial trigger on a first step to
24   identifying orders of unusual size.
25        Q.    So are you saying that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Well --

 2            Q.      -- this is the number of --

 3            MR. FULLER:  Well, go ahead and

 4       finish your answer.

 5            MR. NICHOLAS:  Okay.  I thought

 6       you were done.  Sorry.

 7            A.      So -- and I can read the rest

 8  of the paragraph.

 9  BY MR. NICHOLAS:

10            Q.      Don't read.  I'd rather you

11  just tell me just in words, in your words,

12  what -- you know, what is it you're trying to

13  convey here?
```

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

 5                    Now, that --

 6         Q.    Okay.  All right.  So my

 7    question is -- all right.  So let me try

 8    this.

 9               Are you suggesting in your

10    report that more orders should have been

11    reported as suspicious?

12         A.    Well, I don't think it suggests

13    that.  I'll restate it again.

14               So when the system triggers a

15    suspicious order, it doesn't reset to the

16    next order to be a suspicious order.  So how

17    I interpret the regulations and how my

18    training is and how the Masters ruling and

19    some of the documents I've read in regards

20    from McKesson and Cardinal and Prevoznik's

21    deposition testimony, is that once a

22    suspicious order is identified by registrant,

23    it should be stopped and there should be a

24    due diligence to dispel whether or not that

25    suspicious order is in fact suspicious.

Highly Confidential - Subject to Further Confidentiality Review

1            If the registrant takes no

2    action and just continues to ship subsequent

3    orders in that order, then they're all

4    suspicious orders.

5            Now, my last paragraph kind of

6    sums up that this is how I applied this, and,

7    you know, it's in regards to how the court

8    would or would not accept it and there would

9    be other methodologies.  So that's how I

10   interpret it.

11      Q.    You know, on this subject I

12   think -- well, are you able to tell us -- are

13   you able to -- well, let's see.

14            Let's say an order is

15   identified by a distributor as suspicious,

16   okay?

17      A.    Yes, sir.

18      Q.    And it's reported to the DEA as

19   suspicious.

20      A.    Yes, sir.

21      Q.    Okay.  You agree that that

22   doesn't necessarily mean that that order --

23   that the pills associated with that order are

24   going to be diverted, right?

25      A.    No, I think that's exactly what

1    it means.

2         Q.      You think every time that an

3    order is reported as suspicious that those

4    pills turn out to be diverted?

5         A.      I don't know that I could draw

6    that conclusion, but I --

7         Q.      That's the conclusion I'm

8    asking you about.

9         A.      Well, I wouldn't draw that

10   conclusion.  The only conclusion I would draw

11   is that if a registrant is adhering to the

12   law and the regulations and has a suspicious

13   order system in place and their system

14   identifies that, I would hope that they

15   believe that they're reporting to the DEA

16   what they believe to be a suspicious order.

17        Q.      I'm asking you a completely

18   different question, okay?

19              My question to you is:  When an

20   order was reported as suspicious -- strike

21   that.  Strike that, because I -- I asked a

22   confusing question.

23              I think what you're saying is

24   that there are -- but tell me if I'm wrong --

25   is that more orders should have been reported

Highly Confidential - Subject to Further Confidentiality Review

1    as suspicious than were reported; is that

2    right?

3         A.    No.

4         Q.    Okay.  So you think that the

5    appropriate number of orders --

6         A.    I --

7         Q.    -- into Track 1 and Track 2

8    jurisdictions that were reported as

9    suspicious was indeed appropriate, that the

10   right number was reported?

11        A.    This methodology doesn't look

12   at it that way because there was no due

13   diligence so --

14        Q.    Hold on.  Let me stop you

15   there.

16             MR. FULLER:  Well, object --

17             MR. NICHOLAS:  Go ahead.  No,

18   I'm sorry.  You're right.  You're

19   right.  Go ahead.

20        A.    Because there was no due

21   diligence.  So the methodology is not applied

22   to identify future orders that are

23   suspicious, because when you don't dispel the

24   suspicion or the potential that it's going to

25   be diverted and you can clear it to say that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it's not going to be diverted, then every

 2    subsequent order, in my -- in the way I've

 3    applied this, would be a suspicious order

 4    based on the policies and the guidance and my

 5    experience with the DEA.

 6    BY MR. NICHOLAS:

 7         Q.    So your entire analysis here

 8    rests on the premise that no due diligence

 9    was done on the orders that you're reporting

10    on here; is that right?

11              MR. FULLER:  Object to form,

12         misstates his prior testimony.

13         A.    No -- either no or insufficient

14    due diligence.

15    BY MR. NICHOLAS:
```

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

```
 5                So it's -- you know, the

 6      critical thing I think that we -- that, you

 7      know, that we are having trouble

 8      communicating --

 9           Q.     We're definitely not

10      communicating right now and I'm sure I'm

11      not understanding this.

12           A.      -- back and forth is the

13      concept that when you don't do due diligence,

14      that that makes every subsequent order a

15      suspicious order.

16                Now --

17           Q.     That's what you're saying?

18           A.     Yes, if there is insufficient

19      or there's incomplete or there's no due

20      diligence.

21                Now, that's a methodology

22      that's, I think, up to the court whether or

23      not to accept, but that's -- so it's just as

24      long as you understand clearly on how I had

25      this methodology applied.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      So again, your methodology

2   rests on your --

3      A.      Opinion.

4      Q.      -- conclusion or opinion that

5   either no due diligence was applied or

6   insufficient due diligence was applied -- you

7   know, was utilized by any of these companies,

8   and that results in these large numbers of

9   dosage units and these percentages; is that

10  right?

11     A.      Yes, sir.  My -- I'd like to

12  add to that as my final -- the final in

13  the -- on again, on 46, and this will maybe

14  be a clarification of what I said earlier,

15  the last sentence of the first paragraph:  I

16  say this understanding that the litigation

17  will be advanced by selecting a methodology

18  qualifying a volume of pills that entered the

19  CT1 jurisdictions unlawfully and providing

20  this data to an economist to measure harm

21  caused by this volume.

22     Q.      Yeah.  You say in the -- the

23  first sentence of that paragraph says:  I've

24  been asked to identify the number of opioid

25  pills that entered Cuyahoga and Summit

Highly Confidential - Subject to Further Confidentiality Review

1    Counties unlawfully.  This is an impossible

2    task due to the defendants' failure to comply

3    with their federal, statutory and regulatory

4    requirements.

5              What failure are you referring

6    to?  The failure to do due diligence?

7         A.    That would be the main

8    obligation under the law, the maintenance of

9    effective controls would be to do due

10   diligence, or I guess as you have asked me

11   earlier, if due diligence occurred and

12   there's no documentation, there's no way for

13   me to know that it ever existed, nor is it

14   for the registrant to know if an order came

15   in two days later.  There's no historical

16   record of it.

17        Q.    So part of the assumption

18   here -- because you're going back in this

19   methodology to 1996, right?

20        A.    Yes, sir.

21        Q.    And so what you're saying is

22   that if you don't see documentation of due

23   diligence from 1996 or 1997, say, then you're

24   concluding for purposes of this report that

25   the due diligence didn't occur?

1      A.      That's not what I respond --

2  how I answered the question just a couple of

3  questions ago.

4              So there could have been at

5  some point for each of these companies where

6  they designed or developed a system where

7  they met the regulatory and the legal

8  requirements.  They had due diligence.  They

9  had an effective system, and they began to

10  identify suspicious orders, and they -- they

11  did a -- more than a cursory approval and

12  they did due diligence.  So that would stop

13  the count.

14              And then the methodology would

15  be applied again, and every one that was

16  identified, if there was effective due

17  diligence, it wouldn't be counted as a

18  distribution to the CT1.

19      Q.      Did you stop the count at any

20  point in this analysis?

21      A.      No, sir.

22      Q.      And that's because you assumed

23  that there was no due diligence done at any

24  point from 1996 to your end date here --

25              MR. FULLER:  Object --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NICHOLAS:
 2         Q.     -- at least for the purposes of
 3    your numbers?
 4              MR. FULLER:  Object to form.
 5         A.     It's not an assumption.  It's
 6    based on my review of records and depositions
 7    and documents that I couldn't find a time
 8    period where I believed there was sufficient
 9    due diligence -- well, there was actually a
10    complete failure.
11              There was the failure to stop
12    suspicious orders, there was ineffective
13    suspicious order systems, but in regards to
14    what caused these large numbers, it was the
15    failure to have the maintenance of effective
16    controls to prevent diversion, which is the
17    act of the due diligence, the reviewing those
18    orders to approve them as was detailed in the
19    Masters opinion.
20    BY MR. NICHOLAS:
21         Q.     Okay.  Now, see if we can agree
22    on one thing here, which is this:  There
23    could be an order of unusual size or
24    frequency or pattern that is shipped.
25    Whether it should have been or shouldn't have
```

1   been, we can put aside for another day.

2   Okay?  Let's just say that there's an order

3   of unusual size, frequency, pattern, that, in

4   fact, was shipped and it -- you can even

5   say -- and let's say it should have been

6   reported as a suspicious order, but it

7   shipped.  All right?

8               Do you agree that even though

9   that order was shipped and even though you

10  say it shouldn't have been shipped, it

11  doesn't necessarily mean that the pills that

12  underlie that order are going to be diverted.

13  You don't know.

14              MR. FULLER:  Object to form.

15  BY MR. NICHOLAS:

16      Q.     Correct?

17      A.     So I'll answer that question by

18  saying that if it's identified as suspicious

19  order by unusual size or unusual frequency or

20  deviating form -- you know, substantial

21  deviation from a pattern, so to me that puts

22  it as a probable, greater than 51% that it's

23  going to be diverted because it's been

24  identified.

25              So I can't draw the conclusion

1    that I don't know that it's going to be

2    diverted.  I probably can't draw a definitive

3    statement that it is, but I'm going to say

4    that it's more probable because the system

5    identified it.

6        Q.    So you got it at 51% above,

7    it's going to be diverted; is that what

8    you're telling me?

9        A.    Well, that's the definition of

10   probable.  If it's an effective suspicious

11   order system, I believe the percents would

12   rise much higher than that, but I guess that

13   depends on the effectiveness of the

14   suspicious order system.

15       Q.    Where are you getting that

16   percent from?  Where are you getting that

17   from, just your own --

18       A.    What?

19       Q.    The 51, the probable, where are

20   you getting that it's probable?

21       A.    That's my belief of what

22   probable means.

23       Q.    Okay.  Other than your belief,

24   is it written down anywhere?  Is there any

25   research on that?  Is there any data on that?

Highly Confidential - Subject to Further Confidentiality Review

1    Is this just -- just your belief?

2          A.      Not that I can cite.

3          Q.      Okay.

4                  MR. FULLER:  Vegas odds.

5                  MR. NICHOLAS:  Okay.

6    BY MR. NICHOLAS:

7          Q.      Did you look at any individual

8    orders from any pharmacies in the Cuyahoga or

9    Summit Counties?

10         A.      I looked at some DEA 222 forms,

11   but I believe my recollection, it was out of

12   maybe the Boston area, so I would say no.

13         Q.      Okay.

14         A.      No original records.  I

15   reviewed no original records.

16         Q.      You reviewed data that was in

17   the aggregate, right, totals?  Correct?

18         A.      No.  I reviewed -- so just so

19   we're clear on, you know, what we're talking

20   about, so there's no confusion.

21         Q.      Uh-huh.

22         A.      So to me, in the DEA world, an

23   original record is the actual DEA order form,

24   the invoice or a CSOS electronic order form.

25   So that's what I would consider an original

1    record.  Also provided to me, there's the

2    ARCOS data, which is not an original record,

3    and there were some electronic databases that

4    appeared to me to be an electronic

5    spreadsheet or an electronic format of orders

6    that distributors or registrants had

7    submitted as part of the discovery.  But none

8    of those would be what I would consider an

9    original record.

10        Q.    Can you identify a particular

11   order from a particular pharmacy that you

12   believe should have been reported as

13   suspicious?

14        A.    Well, in my assignment to

15   create this and do the investigation to come

16   to this opinion, there wasn't a requirement

17   for me to actually find specific orders that

18   were suspicious.

19             First of all, it would require

20   the use of the suspicious order system of the

21   registrant, like what would be the criteria.

22   The -- and the thing I found in doing my

23   opinion is that probably the most critical

24   part of setting up a suspicious order system

25   is the due diligence or sometimes in the

Highly Confidential - Subject to Further Confidentiality Review

1    industry they call it the onboarding, and

2    that's to establish what the criteria is.  I

3    said earlier what the usual is.

4              And I found it difficult

5    because I didn't really find an adequate

6    effort to set up what actually would be a

7    usual or what would be an expected order.  So

8    for me to go in and try to make that kind of

9    analysis wouldn't be possible.

10       Q.    So sitting here today, you

11   can't identify a particular order from a

12   particular pharmacy that should have been

13   reported as suspicious that wasn't; is that

14   correct?

15             MR. FULLER:  Form.

16       A.    I don't know because I didn't

17   task myself to do that.

18   BY MR. NICHOLAS:

19       Q.    Sitting here today, can you do

20   it?  I know you didn't -- I know it wasn't

21   part of your job description here.  That's

22   all I want to know is can you do it today?

23   Is it part of your report?

24       A.    Well, actually, let me retract.

25   I think I did that and I think it's on

Highly Confidential - Subject to Further Confidentiality Review

1    page 59 of my report.  I think I used a

2    methodology.  I believe it was the Cardinal

3    methodology, cage pickers, and I applied

4    their methodology to the orders and I believe

5    I came up with a total.  Yes, it's on

6    page 59.  So Cardinal had in place an

7    excessive orders system.  At the beginning it

8    says:  Cardinal Health Systems early 1990s to

9    2008 was also designed to identify individual

10   orders that appear to be excessive, on a

11   daily basis, and notify the DEA if possible

12   before the order is shipped.

13           Excessive orders are defined by

14   the following dosage limits.  And these

15   limits, among many others, were posted in the

16   cage -- or the vault in the Cardinal

17   facility.

18        Q.    What page are you on?  I'm

19   sorry?

20        A.    59.

21        Q.    Yeah, okay.  All right.  I'm

22   with you.

23        A.    So I applied these amounts, and

24   I -- well, I requested Mr. McCann to apply

25   these amounts into the distribution records

Highly Confidential - Subject to Further Confidentiality Review

1    for Cardinal, and the result of using these

2    amounts for Cuyahoga County was 1,000 --

3    166,869 orders of oxycodone and the

4    corresponding dosage amounts were 88,238,715.

5    Those numbers aren't dependent on due

6    diligence.  Those would be the amount of

7    orders, if Cardinal would have used that

8    system and applied it to their distribution,

9    those were the number of orders that they

10   would have reported to the DEA, and that's

11   the corresponding dosage units.  And they

12   reported none during that time period, using

13   this system.

14          Q.    Have you identified a

15   particular order in the answer you just gave

16   me?

17          A.    Yes, 166,869.  I didn't ask

18   Mr. McCann to give me the list of each of the

19   orders, but each one of those would be a

20   specific order that should have been reported

21   based on the system the registrant had in

22   place.

23               MR. FULLER:  Counsel, just for

24          my clarification.  You're just wanting

25          him to pick out a specific date, a

Highly Confidential - Subject to Further Confidentiality Review

1           specific order out of all those that

2           have been identified?

3  BY MR. NICHOLAS:

4           Q.     I want to understand whether

5  your analysis involved review of specific

6  particular orders on particular days sent to

7  particular -- sent by particular pharmacies

8  to distributors.  I think the answer to that

9  is, no, not that -- it's not that

10 controversial a question.  I'm really just

11 trying to get a simple yes-or-no answer.

12          A.     Well --

13          Q.     Did you look at individual

14 orders that were sent to distributors,

15 individual ones?

16               MR. FULLER:  Object to form.

17          Pharmacies don't send orders to

18          distributors.

19               MR. NICHOLAS:  Okay.

20               MR. FULLER:  Well, I mean y'all

21          chuckle.  The question says for the

22          record --

23          A.     I didn't look on an individual

24 basis --

25               MR. FULLER:  Hold on.  The

Highly Confidential - Subject to Further Confidentiality Review

```
 1              question says, for the record, sent by
 2              particular pharmacies to distributors.
 3              That's the question you asked.
 4              Pharmacies don't send --
 5                      MR. NICHOLAS:  What are you
 6              yelling at me for?  I don't --
 7                      (Simultaneous discussion
 8              interrupted by the reporter.)
 9                      MR. NICHOLAS:  Go ahead.
10                      MR. FULLER:  I'm sorry, I'm
11              just trying to make sure the record is
12              clear.
13                      MR. NICHOLAS:  So you were
14              starting to answer.
15                      THE WITNESS:  Sorry.  Could you
16              ask the question again.
17                      MR. NICHOLAS:  Well, your
18              lawyer managed to interrupt, so I'll
19              have to do it again.  Let's see.
20      BY MR. NICHOLAS:
21              Q.    I want to understand whether
22      your analysis involved review of specific
23      particular orders on particular days, sent to
24      particular -- sent by particular pharmacies
25      to distributors.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     My analysis to form this
2    opinion wasn't specific to looking at each
3    order by order.
4               MR. FULLER:  Object to form.
5    BY MR. NICHOLAS:
6          Q.     For how long does the DEA
7    retain suspicious order reports?
8          A.     Just for clarification of your
9    question, you mean the ones that are
10   submitted to the DEA by registrant?
11         Q.     Yes.
12              MR. FULLER:  Object to form,
13         and I'm going to instruct you not to
14         answer if it is based on information
15         you gained while being an agent and
16         not otherwise known publicly.
17              THE WITNESS:  I guess on the
18         advice of counsel, I won't answer.
19   BY MR. NICHOLAS:
20         Q.     In your review of all of the
21   records in this case that you did review --
22   and I understand you didn't review all of
23   them, but in your review of everything that
24   you saw, can you tell me based on that for
25   how long the DEA retains suspicious order
```

1    reports?

2         A.    No, I cannot answer that

3    question.

4         Q.    In your review of all these

5    records in the case, did you see any

6    instances of the DEA retaining any suspicious

7    order reports?

8         A.    Yes.  And my answer would be in

9    regards to my experience and knowledge, that

10   they're submitted electronically to DEA

11   headquarters and that there's, I'm sure, a

12   retention because they're available for

13   review.

14        Q.    Are suspicious order reports

15   kept in a database by the DEA?

16             MR. FULLER:  Objection.  Same

17        instruction.

18             THE WITNESS:  On advice of

19        counsel, I'm not going to answer that

20        question.

21   BY MR. NICHOLAS:

22        Q.    So you're following your

23   counsel's instruction not to answer the

24   question of whether the DEA keeps suspicious

25   order reports on a database?

```
 1          A.     Well, I guess I'm going to not

 2    answer, not based -- well, based on his

 3    instruction, but it's because whether it's a

 4    fact that's known by -- discoverable by just

 5    the general public, and I -- I don't know, so

 6    that kind of makes me not want to answer that

 7    question because I don't know if a person

 8    could just do some query from the general

 9    public and obtain that answer.

10          Q.     Well, I can tell you that this

11    deposition is designated as a confidential

12    process to which the public does not have

13    access and will not have access.

14                 So with that assurance, can you

15    answer the question now as to whether -- the

16    simple question of whether the DEA keeps

17    suspicious order reports on a database?

18                 MR. FULLER:  No, Counsel, hold

19          on one second.  The Touhy request has

20          no bearing on whether this is kept

21          confidential or not.  Touhy

22          authorization says he can't testify to

23          anything that is not publicly known

24          and that he gained information during

25          his employment.  Touhy authorization
```

1      allows him to testify based on the

2      facts reviewed and provided in this

3      case.  So I'm still going to give him

4      the same instruction.

5              I'll be honest with you, I

6      don't know if it's public knowledge or

7      not, whether it's in a database or

8      not.  It may be.

9              MR. NICHOLAS:  Okay.

10  BY MR. NICHOLAS:

11      Q.    Do you agree with the statement

12  made by Mr. Rannazzisi in his deposition that

13  99% of doctors prescribe opioids for

14  legitimate medical purposes?

15      A.    I don't really have an opinion

16  or I really don't agree or disagree.  I don't

17  have sufficient knowledge or experience or

18  reviewed any studies to be able to make a

19  comment on that.

20      Q.    And do you agree with the

21  statement made by Mr. Patterson of the DEA,

22  formerly of the DEA, testifying in front of

23  Congress that 99.9% of doctors are trying to

24  do the right thing?

25      A.    My answer --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FULLER:  Form.

 2                    Go ahead.

 3          A.      My answer would be the same.

 4   I -- I don't know the pure math of that

 5   question, but with over 1 million doctors,

 6   99.9%, I'm not sure --

 7   BY MR. NICHOLAS:

 8          Q.      Do you think the vast majority

 9   of doctors are trying to do the right thing?

10                    MR. FULLER:  Form, scope.

11                    MR. NICHOLAS:  You can answer.

12          A.      I would agree with that, that I

13   have no experience or knowledge that says,

14   you know, anything otherwise than the vast

15   majority.  I guess we could maybe dispute

16   about what vast majority is, but...

17   BY MR. NICHOLAS:

18          Q.      When do you believe the opioid

19   crisis began?

20          A.      I would probably say the onset

21   would be the Internet pharmacy activity, the

22   illicit Internet pharmacy activity, I think

23   1999, around in that time period.

24          Q.      Okay.  When did you first

25   become aware that there was an opioid crisis?
```

1    Around that time?

2         A.      No.   Probably when I started my

3    employment with the DEA in the academy.

4         Q.      2004?

5         A.      Yes, sir.

6         Q.      Is there a point at which you

7    believe the opioid crisis became common

8    knowledge?

9         A.      Yes.

10        Q.      When is that?

11        A.      Well, could I get a

12   clarification of what you believe is common

13   knowledge?  Because what's common knowledge

14   to me is -- would you -- would your

15   definition of that be just if you were to

16   stop somebody and say what is an opioid?

17        Q.      How about known to government

18   entities, cities, towns, counties, states.

19             MR. FULLER:  Form.

20        A.      Well, I think it's -- I think

21   it probably coincided with when the Internet

22   pharmacy illicit conduct got to --

23   identified.  There was a study that was being

24   done and it was published and showed the

25   conduct of these Internet pharmacies and

1    distributions not pursuant to a prescription.

2            I think when that report was

3    published, I think, at least in regards to --

4    that's my belief, that that's when it pretty

5    much disclosed the scope of that activity.

6    BY MR. NICHOLAS:

7        Q.     When was that study published,

8    roughly?

9        A.     2004-2005.

10       Q.     Okay.

11       A.     Now, just so I can clarify my

12   question, I think the DEA knew about it prior

13   to that.

14       Q.     Yeah.

15       A.     So just the clarification was

16   it would be just like when it really came out

17   and people should have a better awareness of

18   it, that would make -- okay?

19       Q.     Okay.  Yeah, I understand.

20            Now, each year the DEA sets a

21   quota as to the number of controlled

22   substances that are to be made available

23   nationwide; is that correct?

24       A.     Yes, sir.

25       Q.     Okay.

```
1            A.      By law, I believe, and

2    regulation.

3            Q.      And over time, during the --

4    during the past years, there was a period

5    when the number of opioid pills that were

6    reaching various communities in the country

7    was increasing, correct?

8            A.      Yes, sir.

9            Q.      Okay.  In setting quotas each

10   year, did the DEA overestimate the medical

11   needs of the United States?

12           A.      I don't really have sufficient

13   knowledge because I didn't work in the quota

14   section; it was done entirely in the

15   headquarters section.  I really don't --

16   can't give an opinion on that particular

17   question.

18                   I could maybe clarify that a

19   little bit.

20           Q.      Yes, please.

21           A.      Just my experience and

22   knowledge of just hearing about it and not

23   being directly related, that those -- those

24   quota amounts were approved based on

25   information that the DEA received from
```

1    manufacturers and distributors, and that was

2    some of the things they used to guide them in

3    setting the quota for the -- which is the

4    medical and scientific needs of the country.

5             But other than that, I don't

6    know how they evaluated that information.

7        Q.    Well, does the DEA shoulder any

8    responsibility for setting the quotas?  I

9    mean, does it have its own input, do its own

10   analysis, do its own work?

11            MR. FULLER:  Object to form,

12        outside scope.  And if it relates to

13        anything you gained knowledge on while

14        you were there that's not public

15        knowledge, your Touhy authorization

16        does not allow you to testify to it.

17       A.    So -- I don't know, so my

18   answer -- I can't say I won't answer, because

19   I don't have any direct knowledge of that.

20   BY MR. NICHOLAS:

21       Q.    Based on your personal

22   experience and years with the DEA, do you

23   believe that doctors went through a period of

24   time when they were overprescribing opioids?

25       A.    So could you clarify what you

1    would consider to be overprescribing?

2    Because there's a couple of different ways I

3    think I could interpret that.

4         Q.    Did doctors prescribe too many

5    opioid -- well, strike that.  I'll try it

6    again.

7         A.    Let me --

8         Q.    Was there a period of time

9    when -- or do you believe doctors prescribed

10   more opioid pills than were medically

11   necessary for their patients?

12              MR. FULLER:  Object to form.

13        He's not a medical doctor.

14        A.    Well, my investigation into

15   some of them that I detailed as at least

16   bulleted in my report, would say that I would

17   ask -- answer that affirmatively because I

18   have some experience with doctors who did

19   issue illicit or diverted prescriptions.

20              So, you know, just in a general

21   answer would be yes.  Now, I'm not going to

22   qualify that with how many or what, but

23   that's one of the essences of how diversion

24   occurs.

25              ///

```
 1     BY MR. NICHOLAS:

 2          Q.     Are you able to tell -- well,

 3     you wrote on your report on page 46, and we

 4     read this already, that you had been asked to

 5     identify the number of opioid pills that

 6     entered Cuyahoga and Summit Counties

 7     unlawfully, and then you went on to say it's

 8     an impossible task, right?  Page 46, first

 9     full paragraph.

10          A.     Yes.

11          Q.     Okay.  Are you able to tell us

12     the correct number of pills that should have

13     been shipped into Cuyahoga and Summit

14     Counties lawfully?

15          A.     No, sir, I cannot provide that

16     information -- or did I calculate that

17     information or --

18          Q.     Do you have any sense of it at

19     all?

20          A.     Well, I'm supportive of my

21     opinion, and that's the failures by the

22     registrants during the time period was a

23     significant contribution to diversion and the

24     amount of pills.  But to put a calculated

25     number, I can't do that.  My methodology has
```

1    come to some conclusions based on, you know,

2    the due diligence factors.

3        Q.    And in some regards, you'd

4    almost have to be a doctor to know an answer

5    to a question like that, right?

6             MR. FULLER:  Form.

7        A.    Well, I think that would be one

8    aspect, to be a doctor.  But then, you know,

9    there's a lot of other factors that also

10   would be taken into consideration.

11   BY MR. NICHOLAS:

12       Q.    But, I mean, you don't feel

13   qualified to look at a prescription for a

14   patient and know whether that prescription is

15   appropriate or not, correct?

16       A.    Well --

17            MR. FULLER:  Same objection.

18       A.    I don't want to be

19   argumentative, but in my experience of doing

20   some cases, there have been instances where I

21   could look at a prescription, knowing how it

22   was written or the procedure that it was

23   used, and I could say that that was not a

24   legitimate prescription.

25            One example would be in one of

1  the cases I worked, patients would meet

2  doctors -- not patients.  People would meet a

3  doctor in a parking lot, pay a hundred

4  dollars and get a prescription.  So I don't

5  know that I would have to be a doctor to be

6  able to say that wasn't a legitimate

7  prescription.

8  BY MR. NICHOLAS:

9      Q.    Fair enough.  Sounds like

10 you're a little bit of a doctor, a little bit

11 of a lawyer and a little bit of a witness.

12     A.    I just think that that doesn't

13 take either -- any of those quantifications

14 to say that there's something wrong with that

15 prescription.

16     Q.    Okay.  Just a little more, and

17 then I'll be done.

18         Now, you attended DEA basic

19 diversion investigator school in 2004; is

20 that right?

21     A.    Yes, sir.

22     Q.    Was that training at Quantico?

23     A.    Yes, sir, it was -- I don't

24 want to say custodial training.  It was a --

25 you actually stayed at the facility, 12-week

1    training.

2           Q.      As part of your training, did

3    you go to AmerisourceBergen's Richmond

4    distribution center?

5           A.      No, sir, I don't believe so.

6           Q.      Okay.  Are you aware of other

7    diversion investigator trainees who did so?

8           A.      No, I'm not.

9           Q.      Were you aware that

10   AmerisourceBergen in 2004 and 2005 worked

11   with the DEA to train DEA diversion

12   investigators?

13          A.      I was not aware of that.

14          Q.      Were you provided any documents

15   that would have shown you that?

16          A.      I'm sure I was -- I think I was

17   provided access to all documents, but I don't

18   recall reviewing those particular documents.

19          Q.      Okay.  So to your knowledge,

20   the plaintiffs' lawyers didn't send you

21   documents pertaining to that; is that right?

22          A.      I don't think I said that.

23   I -- I think I --

24          Q.      I'm not saying you said it.

25   I'm asking you whether that's right, that to

1    your knowledge, the plaintiffs' lawyers

2    didn't send you those documents?

3         A.    I can't answer affirmatively to

4    that because I believe I had access to all

5    the documents.

6         Q.    Access to all the documents,

7    but I'm talking about what was actually sent

8    to you.

9         A.    I think they were all -- in

10   some form or another, electronically, or I

11   think I had access to all the documents.

12            I guess just so I understand

13   the question, no one physically gave it to me

14   or said here is the document, but I don't

15   think that -- I think somewhere in all of the

16   production that they gave to me, that that

17   document could exist.

18        Q.    Okay.  So --

19        A.    I hope that makes sense.

20        Q.    It makes sense, but I guess now

21   I need to understand.  So if you had

22   access -- if you think -- you don't know, but

23   you think maybe you had access to all the

24   documents in the case?

25            MR. FULLER:  Form.

1    A.    I believe I did.  I don't think

2    there were any documents withheld from me.

3    BY MR. NICHOLAS:

4    Q.    But you don't know one way or

5    the other, right?

6    A.    Yeah, I think we discussed that

7    before lunch.

8    Q.    We went over this, yeah.

9    A.    There's no way that anyone

10   really knows --

11   Q.    Right.

12   A.    -- if -- that everything was

13   turned over.  My belief is that it was.

14   Q.    Okay.  And -- but in all those

15   millions and millions of documents, you would

16   need someone to point you in the direction of

17   what to look at as opposed to what you don't

18   need to look at, right?

19   A.    That's correct.

20   Q.    Okay.

21   A.    And in my earlier testimony, I

22   think I was clear that I didn't look

23   individually at every document.  There were

24   people that assisted me in looking at

25   documents and guiding me and directing me to

1    certain documents, so it would be, I guess,

2    maybe in a lifetime, physically -- I don't

3    even know if it would have been a lifetime to

4    look at 50 million documents, but there had

5    to be some system to be able to look -- to

6    help me form my opinion to look at relevant

7    documents.

8         Q.    Yeah.  And that system was the

9    plaintiffs' lawyers directing you toward the

10   documents that they wanted you to look at?

11            MR. FULLER:  Object to form.

12   BY MR. NICHOLAS:

13        Q.    What other system was there?

14        A.    Well, could you say the

15   question one more time.

16        Q.    The system by which you wound

17   up reviewing some documents and not others

18   was dependent on the plaintiffs' lawyers

19   providing -- you know, directing you to the

20   documents that they believed you should look

21   at, right?

22            MR. FULLER:  Object to form.

23        A.    That's not a correct statement.

24            MR. FULLER:  Contradicts his

25        earlier testimony.

```
 1    BY MR. NICHOLAS:

 2         Q.    Okay.

 3         A.    I believe -- well, I don't

 4    believe.  What I did is I directed people to

 5    look for me on my behalf, and I gave them the

 6    types of documents and the types of

 7    information I would need to form my opinion.

 8              It wasn't that only -- so if I

 9    understand your question, you are trying to

10    say that they only funneled to me certain

11    documents to form my opinion, and I directed

12    them to look for documents in certain areas

13    to meet my objective to give an opinion.

14         Q.    Okay.  And after you directed

15    them to look for those documents and provide

16    them, you were dependent on them to point to

17    the documents that you would ask for, right?

18         A.    In some cases, yes, sir, or I

19    would try to look for them and find them

20    myself.

21         Q.    Right.  But in the instances

22    where when you were asking them to, like,

23    find the documents and send them to you, you

24    were necessarily dependent on them -- you

25    were relying on whatever they did send you as
```

Highly Confidential - Subject to Further Confidentiality Review

1    the stuff that you had asked for, correct?

2         A.    Just so -- and I'm going to

3    answer, but just so I can clarify my answer.

4    So if I said I would have wanted to see all

5    suspicious orders policy for a certain

6    company, it was my belief that somebody

7    looked and helped me locate those documents

8    and sent them to me.

9         Q.    Okay.  I understand.

10             So let's go back to 2004-2005.

11             (Whereupon, Deposition Exhibit

12             Rafalski-7, 10/25/04 CSRA Memo

13             w/Attachment(s), ABDCMDL00315829 -

14             ABDCMDL00315861, was marked for

15             identification.)

16   BY MR. NICHOLAS:

17        Q.    This will be marked as

18   Exhibit 7.

19        A.    Before I look at this, can I

20   make just a clarification?

21        Q.    Uh-huh.

22        A.    So during my training in 2004,

23   I went to the only facility -- we had a

24   couple of offsite visits to registrants, and

25   it's my belief that I think it was some kind

Highly Confidential - Subject to Further Confidentiality Review

1    of a cough syrup manufacturer, but I just

2    wanted to make that clarification.  I don't

3    think it was an AmerisourceBergen facility.

4         Q.    All right.  Can you look at

5    what has been marked as Exhibit 3 -- I'm

6    sorry, Exhibit 7.

7         A.    Yes, sir.

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

16          Q.      Well, we can agree on that.

17                  Can we agree that it's

18      something -- that working with the DEA in

19      this fashion is something that

20      AmerisourceBergen should be proud of?

21          A.      I think the DEA should be proud

22      of it too.

23          Q.      I agree with that.

24                  Can we agree that it's also

25      something that AmerisourceBergen should be

```
 1     proud of?

 2         A.     Sure.

 3         Q.     Okay.

 4               MR. NICHOLAS:  Just give me 30

 5         seconds or maybe one minute, see if I

 6         have any other questions.

 7               THE WITNESS:  I'm not going to

 8         hold you to that.

 9               MR. NICHOLAS:  The bad news for

10         you is that I'm not the only person

11         asking you questions today.

12               THE WITNESS:  I'm sure not

13         everyone came here to watch you and I

14         discuss these matters, so I don't find

15         that surprising.

16               MR. NICHOLAS:  Okay.  Can we go

17         off for one minute?  I'm going to be

18         very fast here.

19               THE VIDEOGRAPHER:  Going off

20         the record, 2:34 p.m.

21               (Recess taken, 2:34 p.m. to

22         2:35 p.m.)

23               THE VIDEOGRAPHER:  Back on

24         record, 2:35 p.m.

25               ///
```

1     BY MR. NICHOLAS:

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

13          Q.     Well, there was some testimony

14     in Steve Mays' deposition about just this

15     subject, but as you've already told us, you

16     didn't read Mr. Mays' deposition, correct?

17          A.     I don't recall reading it, no,

18     sir.

19          Q.     Okay.  Well, let's just talk

20     about that conference for a minute.  The

21     Diversion Control Division of the

22     U.S. Department of Justice I believe

23     sponsored a conference with the

24     pharmaceutical industry -- it was called a

25     pharmaceutical industry conference -- in

Highly Confidential - Subject to Further Confidentiality Review

1    September of 2007 in Houston.

2              Are you familiar with that?

3    Did you attend it, I should say?

4         A.    I did not attend it.  I'm

5    familiar that the conference occurred.  That

6    came up in one of my other cases that I

7    investigated.

8         Q.    Okay.  And were you aware that

9    at that conference in September of 2007 in

10   Houston, Texas, Mike Mapes from the DEA and

11   Chris Zimmerman presented to the entire

12   industry on suspicious order monitoring

13   programs?  Are you aware of that?

14        A.    Just for clarification, I'm

15   aware that the industry training occurred and

16   that there was the discussion or there was

17   some presentation on it.  I don't know the

18   extent of the presentation, but I know there

19   was some presentation in regards to

20   responsibilities in regards to suspicious

21   order systems.

22        Q.    Are you aware that as part of

23   the presentation, Mr. Zimmerman from

24   AmerisourceBergen talked about ABDC's

25   program, new suspicious order monitoring

Highly Confidential - Subject to Further Confidentiality Review

1   program or enhanced program to the entire

2   industry?

3        A.     I believe that somewhere I had

4   reviewed -- or I don't know if it was my

5   previous employment experience or if it was

6   something I reviewed as part of my opinion,

7   but I was aware that it occurred.

8        Q.     So in 2007 at a DEA-sponsored

9   conference, Mr. Zimmerman from

10  AmerisourceBergen was on stage with Mr. Mapes

11  presenting a description of

12  AmerisourceBergen's suspicious order

13  monitoring program to the entire invited

14  industry group, correct?

15       A.     I don't have any information to

16  disagree or agree with you, so -- I don't

17  know that they stood on stage together.  I

18  wasn't there.  So if that's how you represent

19  it, I don't have any knowledge to disagree,

20  but...

21            MR. NICHOLAS:  Okay.  Let's

22       mark one more exhibit.

23            (Whereupon, Deposition Exhibit

24       Rafalski-9, 9/11-12/07 Meeting Agenda,

25       DEA Diversion Control Division

Highly Confidential - Subject to Further Confidentiality Review

```
 1              [No Bates], was marked for

 2         identification.)

 3    BY MR. NICHOLAS:

 4         Q.     Exhibit 9.  This document,

 5    Exhibit 9, Mr. Rafalski, is a brochure, I

 6    guess, or a publication -- I don't know what

 7    you want to call it -- sent around -- or

 8    describing the upcoming -- what is then an

 9    upcoming pharmaceutical industry conference.

10    It's the one we've been talking about.  It

11    took place on September 11th and 12th, 2007

12    in Houston, Texas.

13              Do you see that?

14         A.     I do.

15         Q.     And it's got like a one, two --

16    it's got a two-day agenda, Tuesday and

17    Wednesday, the 11th and the 12th?

18         A.     Yes, sir.

19         Q.     And there is a section on

20    suspicious orders on the agenda on page 1 --

21    you know, on day one.

22              And if you turn to the second

23    page of this document, you can see the

24    description about the suspicious orders.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yep.

2          Q.      Okay.

3          A.      Yes, sir, about halfway down.

4          Q.      Yeah.  And basically, this

5     description just -- this blurb describes --

6     you know what, this makes it pretty clear

7     that this is a report of what happened at the

8     conference.  It was after the fact.

9                  Because it describes how

10    Mr. Mapes, the chief DEA regulatory section,

11    and Chris Zimmerman, vice president,

12    corporate security and regulatory affairs,

13    AmerisourceBergen, updated, past tense,

14    attendees on when suspicious order reports

15    should be submitted to authorities, and then

16    it goes on.

17                 So does this document provide

18    you a little more comfort that what I'm

19    representing to you about the fact that

20    Mr. Mapes and Mr. Zimmerman made a joint

21    presentation to the group, the entire group

22    is, in fact, true?

23         A.      It does.  And it also jogs my

24    memory.  There was a particular slide that

25    occurred during this conference in regards to

1    suspicious orders, and it was whether or not

2    the shipping requirement -- it wasn't called

3    the shipping requirement, but this particular

4    slide had language similar to the 2006

5    Rannazzisi memo, and that was once you

6    identify a suspicious order and continue to

7    ship the suspicious order without dispelling

8    the suspicion, it would be attributed to

9    diversion.

10             And I remember that slide.  It

11   came up in a different investigation.  So way

12   back at this time when this occurred, right

13   after, I think -- and I don't remember

14   exactly what year.

15             I think 2009 or '10, it -- this

16   came to my attention and there was a lot of

17   discussion about that -- the meaning of that

18   particular slide because there wasn't a

19   language where even back then the industry

20   was saying that DEA should just say stop

21   shipping an order, but what they would say is

22   if you failed to stop, it was a failure to

23   have effective controls against diversion.

24        Q.    So it was kind of confusing to

25   the industry?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Well, I don't know if it was

2     confusing to the industry.  It's the same

3     thing I've been saying all along.  If you

4     report a suspicious order, then ship it --

5          Q.      Well, they had a slide about

6     it.  I guess somebody thought it was worth

7     showing people because they needed a slide

8     because it was perhaps not as clear as you're

9     saying it was.

10         A.      No, I think it was stating the

11    same thing that Mr. Rannazzisi stated.  So

12    why I remember it is in the course of how it

13    was used in this case, someone alleged it had

14    a different meaning.  So we had the same

15    discussion back then about whether it meant

16    to stop a shipment or not.

17         Q.      So you're saying this jogged

18    your memory.  Like -- wait, though, does that

19    mean that you were at this presentation?

20         A.      No.

21              MR. FULLER:  Form.

22    BY MR. NICHOLAS:

23         Q.      Oh, you just saw the slide

24    later --

25              MR. FULLER:  Form.

```
 1    BY MR. NICHOLAS:

 2         Q.      -- or something?

 3              MR. FULLER:  Form to the prior

 4         three questions.  Y'all just give me a

 5         little bit of a pause if you don't

 6         mind.

 7              THE WITNESS:  Yes, sir.

 8         A.      It jogged --

 9    BY MR. NICHOLAS:

10         Q.      You weren't at this --

11         A.      I was not.

12         Q.      Okay.  So let's get back to the

13    question I was asking about.  I appreciate

14    the detour there, but what I'm really wanting

15    to know is whether this provides you -- and I

16    think you answered yes -- provides you with

17    some comfort that my telling you that this

18    presentation occurred and that Mr. Mapes and

19    Mr. Zimmerman jointly presented to the entire

20    industry --

21         A.      I could draw that conclusion by

22    reading these two paragraphs.

23         Q.      Okay.  Give me one more minute,

24    and I believe I'm going to --

25              MR. FULLER:  That's what you
```

Highly Confidential - Subject to Further Confidentiality Review

1    said last time.

2           MR. NICHOLAS:  I know.  Yeah,

3    I'm one of those guys, you know.  All

4    lawyers are the same.

5           MS. QUEZON:  But it probably

6    has been an hour if you want to take

7    five minutes.

8           MR. NICHOLAS:  Has it been an

9    hour?

10           MR. FULLER:  Yes.

11           MR. NICHOLAS:  Let's take five

12    minutes.  Good chance I'm done.

13           THE VIDEOGRAPHER:  We're off

14    the record.  The time is 2:51 p.m.

15           (Recess taken, 2:51 p.m. to

16    2:59 p.m.)

17           THE VIDEOGRAPHER:  We're back

18    on the record at 2:59.

19           MR. NICHOLAS:  Mr. Rafalski,

20    that's all the questions I have at

21    this time.  I appreciate your time.

22    Thank you for answering my questions,

23    and in an incredible abundance of

24    caution, I'll reserve the remote right

25    to come back and ask you a few more

Highly Confidential - Subject to Further Confidentiality Review

```
 1              questions later, but I really think

 2              that's unlikely.  I don't think I'll

 3              have any more.

 4                   THE WITNESS:  Thank you very

 5              much.  Pleasure to meet you.

 6                   MR. NICHOLAS:  Same.

 7                        EXAMINATION

 8    BY MR. PYSER:

 9         Q.     Good afternoon, Mr. Rafalski.

10    My name is Steve Pyser.  I'm going to be

11    asking you some questions today for Cardinal

12    Health, okay?

13         A.     Okay.

14         Q.     Have you ever visited any

15    Cardinal Health facility?

16         A.     No, sir.

17         Q.     Have you ever interviewed any

18    Cardinal Health employee?

19         A.     No, sir.

20         Q.     You stated earlier today that

21    in your work to date on this case, going back

22    about two years until today, including the

23    preparation of your report, you'd spent about

24    400 hours roughly on the case?

25         A.     Roughly, yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Now, your report covers about a

2      dozen -- I think actually 13 different

3      defendants.  Can you tell me approximately,

4      of that 400 hours, how much of that time did

5      you spend reviewing documents and depositions

6      related to Cardinal Health?

7                MR. FULLER:  Form.

8      A.      It's difficult for me to

9      answer, to just give you a specific number of

10     hours.  I could say significant, but I know

11     that's not a full answer.

12               Over the last -- probably

13     beginning in the early fall, up until the day

14     I submitted my report, those were -- the

15     majority of hours in regards to the 400 were

16     spent during that time frame researching,

17     preparing the report, reading depositions and

18     looking at documents.

19     BY MR. PYSER:

20     Q.      Maybe my question was unclear.

21               I understand that you spent a

22     large portion of the 400 hours looking at

23     documents and preparing your report.

24     A.      Yes.

25     Q.      I'm asking to break it down by

1    defendant a little bit.

2         A.    Oh, okay.

3         Q.    So if there's 13 defendants, is

4    it roughly spread evenly, divided by 13, you

5    get a rough approximation?

6         A.    Well, I think I spent a little

7    more time on the distributors until I did

8    the -- instead of the manufacturers.  I would

9    say I probably spent more time in totality

10   and individually in -- as far as just at the

11   distributors.

12            I would probably say pretty

13   equal except with Henry Schein, because

14   that's a smaller distributor and there was

15   less documents and less information to

16   review.

17        Q.    So for each of the larger

18   distributors, we're talking something in the

19   range of 50 or 60 hours each; is that fair?

20        A.    I guess that could be a

21   possible --

22            MR. FULLER:  Object to form.

23        A.    I guess it could be a possible

24   approximation.

25   BY MR. PYSER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Have you ever conducted a

2  cyclic investigation of a registrant?

3      A.     Numerous times, yes, sir.

4      Q.     In any of those investigations,

5  did you review a distributor who sent DEA

6  excessive purchase reports on a monthly

7  basis?

8      A.     No, sir, never.

9      Q.     Did you ever conduct a cyclic

10 investigation of Cardinal Health?

11     A.     No, sir.

12     Q.     In the course of your work

13 preparing for this case, did you review the

14 results of any cyclic investigations of

15 Cardinal Health?

16     A.     So the way I'd like to answer

17 that is that I reviewed documents that --

18 communications intercompany that cyclic said

19 occurred or regulatory investigations, but I

20 didn't review the actual documents of the DEA

21 or of the actual conducting of the

22 investigation.  So I hope that answers your

23 question.

24          I know they occurred and I know

25 there were some documents where there was an

1    internal assessment of what the DEA did, but

2    I never reviewed like the actual DEA

3    investigations.

4          Q.      In the documents you did review

5    of the cyclic investigations, did you ever

6    see an indication that DEA had stated that

7    Cardinal Health's practice of sending monthly

8    ingredient limit reports to DEA was improper?

9    Did you ever see that indicated?

10         A.      No, sir.

11         Q.      You state in your report that

12   Cardinal's ingredient limit report system,

13   this monthly report, was premised on guidance

14   from the 1998 DEA report; you call it the

15   Reno report.

16              Do you recall that?

17         A.      Yes, but I don't say that.  I

18   think I provide an opinion because I believe

19   some Cardinal representative said that.

20         Q.      You're aware that Cardinal

21   Health had the same system in place before

22   the Reno report came out?

23         A.      Yes, sir.

24              (Whereupon, Deposition Exhibit

25         Rafalski-10, 10/98 Report to the U.S.

Highly Confidential - Subject to Further Confidentiality Review

1           Attorney General, CAH_HOUSE-002207 -

2           CAH_HOUSE-002298, was marked for

3           identification.)

4    BY MR. PYSER:

5           Q.    I'm showing you a document

6    that's been marked as Exhibit 10.  Is this

7    the Reno report that you refer to in your

8    report?

9                MR. FULLER:  You provided us

10          copies.

11               MR. PYSER:  As we go down

12          through the day, there will be less

13          copies from each person asking

14          questions.

15          A.    Yes, sir.

16               MR. FULLER:  Now I don't feel

17          so bad that I didn't always comply

18          with the protocol.

19   BY MR. PYSER:

20          Q.    Okay.  If you turn with me

21   to -- using the pages in the bottom right,

22   the Bates pages, there's a page

23   CAH_HOUSE-002230.

24          A.    Okay.

25          Q.    Now, you had stated in your

Highly Confidential - Subject to Further Confidentiality Review

1   report that the suspicious order monitoring

2   system recommended in this Reno report from

3   1998 was for List 1 chemicals.  Do you recall

4   that conclusion or opinion?

5         A.    Yes.  Yes, sir.

6         Q.    I want to direct you to the

7   actual report at Bates page 2230.  Under B1,

8   Wholesaler Distributors, it states that those

9   in the wholesale drug distribution supply

10  chain who are able use the DEA-approved

11  suspicious order monitoring system in use by

12  wholesale drug distributors for controlled

13  substances.

14        Do you see that statement?

15        A.    Yes, sir.

16        Q.    So at the time in 1998, you

17  agree with me that there was a DEA-approved

18  suspicious order monitoring system in use by

19  wholesale drug distributors for controlled

20  substances?

21        A.    No, sir.  I agree that that's

22  what this statement says, but this is a task

23  force combined of industry members and there

24  were some DEA officials on there, one -- one

25  diversion investigator or someone from the

Highly Confidential - Subject to Further Confidentiality Review

1    diversion unit.  And so I'm not in

2    agreement -- and I see this is what the

3    document says -- that that's an accurate

4    statement.

5        Q.    So even though it's on a page

6    with letterhead that says United States

7    Department of Justice, Drug Enforcement

8    Administration, you don't believe it's an

9    accurate statement?

10       A.    I do not.

11       Q.    This is six years before you

12   began your career at DEA, correct?

13       A.    Yes, sir.

14       Q.    So you weren't communicating

15   with anyone at DEA about this task force at

16   the time of the report in 1998, were you?

17       A.    No, sir.

18       Q.    It goes on to say --

19       A.    Can I just clarify that?

20       Q.    No.

21       A.    Okay.

22       Q.    It goes on to say --

23            MR. FULLER:  Go ahead.  You can

24       clarify your answer.

25       A.    So just for clarification, and

1    I had testified earlier, but I understand

2    that each person is different.  So at the

3    time that this statement was made in this

4    publication, which I don't believe it was

5    actually acted on.  It was recommendations.

6    I just want to go back to the DEA manual was

7    in place in -- the 1996 DEA manual that would

8    be in conflict with that particular

9    statement.

10   BY MR. PYSER:

11           Q.     This document was --

12           A.     '98.

13           Q.     -- published publicly in 1998,

14   correct?

15           A.     Yes, sir.

16           Q.     And are you aware if in 1998

17   anyone from DEA made a public statement that

18   said actually this report to the

19   U.S. Attorney General is wrong, it has an

20   incorrect statement?  Are you aware of any

21   statement like that from DEA?

22           A.     I am not aware of any statement

23   like that, no.

24           Q.     The second paragraph on

25   page 2230 says:  This is basically what is

1    done for Schedules II through V controlled

2    substances.

3              Do you see that?

4    A.     Yes, sir.

5    Q.     Okay.  And what's being done

6    by -- what the report states is being done

7    for controlled substances on Schedules II

8    through V is a DEA-approved suspicious order

9    monitoring, correct?

10   A.     As I stated earlier, I don't

11   agree with that.

12   Q.     But it is what the report

13   states?

14   A.     That is what the reports

15   states.

16   Q.     And if you go a little bit

17   further in the report to Bates page 2247,

18   it's a document that again, at the top of the

19   document it says United States Department of

20   Justice, Drug Enforcement Administration,

21   Office of Diversion Control.

22              Do you see that?

23   A.     Yes, sir.

24   Q.     Okay.  At the top it says:

25   Suspicious order reporting system of 1998 for

Highly Confidential - Subject to Further Confidentiality Review

1    use in automated tracking systems.

2                Correct?

3    A.    Yes, sir.

4    Q.    And it begins by saying:  The

5    current calculation being used for List 1

6    chemicals on Schedule II through V controlled

7    substances.

8                You see that statement?

9    A.    I see that statement.

10   Q.    Okay.  So according to this

11   document, in 1998, six years before you

12   arrived at DEA, there was a calculation being

13   used for Schedule II through V controlled

14   substances?

15   A.    Well, I'm going to repeat my

16   same answer.  This was an advisory committee

17   that put this document together.  I

18   acknowledge that it's on Department of

19   Justice letterhead, but I'm not aware of ever

20   seeing any approved DEA approval of any

21   system.

22                And I acknowledge that the

23   document says that, but later on it

24   specifically talks about Schedule II or

25   Schedule III through Vs that contain List 1

Highly Confidential - Subject to Further Confidentiality Review

1    chemicals.

2              And when I read the document,

3    the totality of the document is about List 1

4    chemicals, and --

5         Q.    Correct.  The totality of the

6    document --

7              MR. FULLER:  Let him finish his

8         answer, Counsel.  Let him finish his

9         answer.

10             MR. PYSER:  Well, he's not

11        answering my question.

12             MR. FULLER:  Well, you may not

13        like the answer you're getting, but

14        he's going to finish his response.

15             Go ahead.

16             MR. PYSER:  If he's wasting

17        time, I reserve my right to come back

18        for more time.

19             MR. FULLER:  Great.

20             Go ahead, Mr. Rafalski.

21        A.    And so the totality of this

22   document was in response to the new

23   methamphetamine act and the

24   pseudoephedrine -- making pseudoephedrine a

25   List 1 chemical.  So, you know, to me, the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    critical statement here is in 4, the note

 2    under Section 4.

 3    BY MR. PYSER:

 4         Q.    Sir.  I'm not disagreeing with

 5    you --

 6         A.    Okay.

 7         Q.    -- that this document was

 8    prepared related to the Comprehensive

 9    Methamphetamine Control Act of 1996, and what

10    it's saying is that they're going to

11    introduce procedures for List 1 chemicals

12    that are like those already in place for

13    controlled substances on Schedule II through

14    V.  Isn't that what the document is saying?

15              MR. FULLER:  Object to form.

16         A.    Well, what the document says to

17    me is that if registrants, distributors have

18    electronic systems, that a registrant should

19    consider monitoring List 1 chemicals

20    utilizing that same electronic system.

21    BY MR. PYSER:

22         Q.    And it actually speaks at the

23    bottom of this page to electronic systems,

24    and what the Office of Diversion Control says

25    in 1998 is:  Using a computer to manage and
```

1    report on high-volume transaction business

2    activities with extremely short order cycle

3    times receipt to delivery, is the only viable

4    cost-effective methodology for the reporting

5    of orders which may be considered excessive

6    or suspicious.

7              That's what they said, correct?

8        A.    That's what this statement

9    says.  That's what the committee placed in --

10   that's what the statement says.

11       Q.    And nowhere in this 1998

12   suspicious order reporting system that you

13   see on page 2247 is there anything about

14   stopping shipments of Schedule II through V

15   controlled substances.  That's not on this

16   page, is it?

17       A.    Which page are you referring

18   to?

19       Q.    Page 2247, Exhibit 2,

20   Suspicious Order Reporting System of 1998.

21       A.    There's nothing on that

22   particular page.

23       Q.    Should distributors rely on

24   information they receive from DEA?

25       A.    So my general answer to that

1    question would be yes, but I guess I'd have

2    to say it would depend on the topic and the

3    type of question and the information they

4    receive.

5         Q.    Is being told -- strike that.

6              If a distributor is told you're

7    doing the right things and heading in the

8    right direction with respect to a suspicious

9    order monitoring program, is that an implicit

10   approval from DEA of the suspicious order

11   monitoring program that that distributor is

12   using?

13        A.    Well, I think it could be taken

14   as an implicit approval, but then to know the

15   whole totality of what occurred to just have

16   that one statement, it could be a simple

17   aspect of the system.

18              So from -- and so I'll agree

19   but I -- but it depends on what the topic is

20   and what the question is and the complexity

21   of it.

22        Q.    So if someone at DEA reviewed a

23   suspicious order monitoring system and told a

24   distributor you're doing the right things and

25   heading in the right direction, that's

1    implicit approval of the system they just

2    reviewed, correct?

3         A.    It is, but again, in my

4    experience and in doing cases, I've had other

5    cases where a diversion investigator would

6    make a similar type comment to a registrant

7    and the system was not satisfactory.

8              So --

9         Q.    Does that mean the diversion

10   investigator doesn't know what they're doing?

11        A.    That could be one possible

12   explanation.  I can't --

13        Q.    How many diversion

14   investigators do you believe work at DEA and

15   don't know what they're doing?

16             MR. FULLER:  Object to form.

17        A.    I have no idea, sir.

18   BY MR. PYSER:

19        Q.    While you were there, did you

20   believe your colleagues were competent?

21        A.    Would the universe be all

22   diversion investigators?  I would have to say

23   no, because I know of a couple that would

24   make statements that were not within the

25   guidance or the guidelines of what DEA would

1    expect in regards to approving and commenting

2    on suspicious order systems.

3              Generally speaking, yes.

4         Q.    How about Kyle Wright?

5              MR. FULLER:  Object to form,

6         outside the scope.

7         A.    I've worked with Kyle Wright

8    and I've been present at one of his

9    presentations.  I believe he's highly

10   competent.  Sometimes I believe that he

11   doesn't articulate his subjects very well.  I

12   believe his knowledge base is high, but I'm

13   not sure that I would say that his

14   articulation of some of that knowledge is

15   very well.

16   BY MR. PYSER:

17        Q.    Did you ever file a complaint

18   while you were at DEA or complain to a

19   supervisor that you believed things that Kyle

20   Wright was saying in his presentations were

21   inappropriate?

22              MR. FULLER:  Object to form.

23        Don't answer that question based on

24        your Touhy authorization.  Way outside

25        the scope, Counsel.

1          MR. PYSER:  Are you going to

2      refuse to answer that question?

3          THE WITNESS:  Yes, sir, on the

4      advice of my counsel.

5   BY MR. PYSER:

6      Q.    You're relying here today on

7   your experience at DEA, correct?  That's why

8   you consider yourself an expert?

9      A.    That's -- yes, sir, that's one

10  of my strengths, that my experience and then

11  the results of my experience, the Masters

12  case, the subsequent ruling, the Mallinckrodt

13  case.

14     Q.    In your report around page 48,

15  you describe Cardinal Health's suspicious

16  order monitoring system as having two

17  operational aspects.  So the first aspect you

18  talk about is ingredient limit reports?

19     A.    Yes, sir.

20     Q.    And the second one are reports

21  of excessive orders, correct?

22     A.    Yes, sir.

23     Q.    The ingredient limit reports,

24  those are submitted on a monthly basis from

25  each Cardinal distribution center to the

Highly Confidential - Subject to Further Confidentiality Review

1    local DEA office, correct?  That was the

2    practice at the time?

3         A.    Yes.  Post distribution of the

4    drugs, at the conclusion of a month, they

5    would submit the report, yes, sir.

6         Q.    And DEA would receive that

7    report on a monthly basis post distribution

8    of the drugs, correct?

9         A.    I guess I would make that

10   assumption.  I never saw them.  I wasn't

11   there at some of the time period.  I've never

12   received them personally, but I don't have

13   any information to not believe that

14   statement.

15        Q.    Where you were was in Detroit

16   and Cardinal Health didn't have a

17   distribution center in your region, correct?

18        A.    That's correct.

19        Q.    Now, you list some of the

20   ingredient limit reports in your report,

21   correct?

22        A.    Yes, sir.

23             MR. PYSER:  Let me mark this

24        one for you.

25             (Whereupon, Deposition Exhibit

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Rafalski-11, Ingredient Limit Report,
 2      CAH_MDL_PRIOROD_DEA07_01465435 -
 3      CAH_MDL_PRIOROD_DEA07_01465712, was marked
 4      for identification.)
 5      BY MR. PYSER:
 6           Q.    I'm marking Exhibit 11.  This
 7      is the first ingredient limit report that you
 8      mentioned in your report for this case.  This
 9      is a document -- it's a couple hundred pages
10      long?
11           A.    It is.
12           Q.    And this is one month's report
13      from one distribution center, correct?
14           A.    Yes, sir.
15           Q.    So you can multiply this out in
16      terms of the information that Cardinal Health
17      is providing to DEA on a monthly basis for
18      each of its 20-some-odd distribution centers,
19      correct?
20           A.    Yes, sir.
21           Q.    Now, I want to draw your
22      attention to Bates number 1465496.  Are you
23      there with me?
24           A.    I am.
25           Q.    Okay.  Now, on that page
```

Highly Confidential - Subject to Further Confidentiality Review

1    there's a run date, so the date of this

2    report, of September 4th, 2005, right?

3         A.    Yes.

4         Q.    Okay.  And it labels itself an

5    ingredient limit report, and looking again at

6    that Bates page I gave you ending 496?

7              MR. FULLER:  I'm sorry, say the

8         Bates number again.

9              MR. PYSER:  Ending in 496.

10             MR. FULLER:  Oh, I got it,

11        sorry.

12   BY MR. PYSER:

13        Q.    It has factor used of 4.0.

14             Do you see that?

15        A.    Yes, sir.

16        Q.    Okay.  And underneath that,

17   there's a customer name, the Fredrick County

18   Health Department.  And the ingredient?  It's

19   about halfway down the page.

20        A.    Yes.

21        Q.    And the ingredient is

22   buprenorphine hydrochloride?

23        A.    Yes, sir.

24        Q.    And it lists the customer total

25   versus the ingredient limit?

1        A.      Yes, sir.

2        Q.      So the factor that's used, this

3    factor of 4, that's right there on the face

4    of this ingredient limit report sent to DEA,

5    correct?

6        A.      It is.

7        Q.      And to your knowledge, DEA

8    never told Cardinal Health you should use a

9    different factor, use some other factor other

10   than 4?

11       A.      In my research for completing

12   my report and then also based on my

13   experience working there, I'm not aware that

14   anyone ever told them not to use the factor

15   of 4.

16       Q.      Another critique -- you can put

17   the ingredient limit report aside.  It's a

18   big document.  Get in your way otherwise.

19              On page 58 of your report, you

20   level a criticism at Cardinal because there's

21   an increase in the amount of oxycodone from

22   the Wheeling, West Virginia distribution

23   center, correct?

24       A.      Yes, sir.

25       Q.      The DEA field office that

1    received the ingredient limit reports like

2    Exhibit 11 from the Wheeling distribution

3    center, they would have seen those increases

4    as well because it's right there in the

5    document, right?

6         A.    I don't know what the DEA

7    office that received them would have seen or

8    not seen.  I don't know if they would have

9    looked back historically.

10              I offered this opinion in my

11   report because I believe it's something that

12   Cardinal should have seen.

13        Q.    Okay.  So you don't have any

14   reason to think DEA was incapable of looking

15   at the ingredient limit reports like

16   Exhibit 11 and looking at a trend, correct?

17        A.    I don't have any information

18   whether they were or weren't, sir.

19        Q.    Okay.  And DEA also receives

20   ARCOS information from every transaction that

21   every distributor makes of a controlled

22   substance, Schedule II controlled substance,

23   including Cardinal, correct?

24        A.    They do, but in a different

25   way.  So this -- just so clarification, I

Highly Confidential - Subject to Further Confidentiality Review

1   think our discussion was that this would be

2   received at the -- at the office that would

3   be nearest the distribution center.  The

4   ARCOS gets received at headquarters and it's

5   a totally different --

6       Q.    Understood.  So --

7       A.    Okay.  Just clarifying that.

8       Q.    So DEA has at the local field

9   office, they've got the information about

10  distributions from the ingredient limit

11  reports that are reported by Cardinal because

12  they went over the factor 4.

13          And then also, at the national

14  office, DEA has the ARCOS report which has

15  every transaction from a distributor to a

16  pharmacy, correct?

17      A.    It has every Schedule II

18  transaction, Schedule III narcotics and one

19  other -- one other category of drugs.  It's

20  not all transactions.

21      Q.    So any increases could have

22  been seen in the ARCOS data as well?

23              MR. FULLER:  Form.

24              MR. PYSER:  Let me rephrase the

25      question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PYSER:
 2         Q.      So any increases in the amount
 3    of oxycodone being shipped from the Cardinal
 4    distribution center in Wheeling to Cardinal's
 5    customers could have been seen in the ARCOS
 6    data reported to DEA?
 7                 MR. FULLER:  Form.
 8         A.      So --
 9                 MR. FULLER:  Go ahead.
10         A.      Just a clarification.  The
11    ARCOS data gets submitted on a monthly or
12    quarterly basis to the DEA, and it's -- I
13    think they used the term "cleansed," but it's
14    corrected for any potential errors, and then
15    it's deposited into a huge database and it's
16    designed to be queried.
17                 So what you said is potentially
18    true if somebody would -- would query that
19    particular topic, but I just want to make
20    sure that we -- I understand it's not
21    automatically reviewed or there's not a
22    process to do what you said it did.
23    **REDACTED**
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1    **REDACTED**

2    BY MR. PYSER:

3        Q.    During this time when you're

4    criticizing Cardinal for an increase in

5    oxycodone shipments, DEA had also increased

6    the quota of oxycodone available in the

7    United States for legitimate medical

8    purposes, correct?

9            MR. FULLER:  Object to form.

10           If you know.

11       A.    I don't know.

12   BY MR. PYSER:

13       Q.    You don't know when or if DEA

14   increased the quota for oxycodone in the

15   country?

16           MR. FULLER:  Same objection.

17       A.    I didn't review that

18   information, so I don't know.

19   BY MR. PYSER:

20       Q.    Do you think that's something

21   as a diversion investigator you should know?

22           MR. FULLER:  Object to form.

23       A.    No, sir.

24   BY MR. PYSER:

25       Q.    The DEA license held by the

Highly Confidential - Subject to Further Confidentiality Review

```
1    Wheeling distribution center of Cardinal
2    Health, that license has never been suspended
3    or revoked by DEA, correct?
4         A.    That's a correct statement.
5         Q.    Okay.  So we've talked about
6    the ingredient limit reports.  I want to go
7    back to the second aspect of Cardinal
8    Health's pre-2007 system you talked about in
9    your report, and that's the reports of
10   excessive purchase orders on a daily basis to
11   DEA before shipment.
12        A.    Uh-huh.
13        Q.    And that's around page 59 of
14   your report.
15        A.    The pickers and packers?  Yes,
16   sir.
17        Q.    So Cardinal Health's policies
18   instructed personnel to monitor and identify
19   individual orders that appeared excessive
20   before they were shipped, correct?
21        A.    Yes, sir.
22        Q.    Now, you, in your report on
23   page 59, you list a couple dosage limits for
24   select medications, correct?
25        A.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Now, there are some customers,
 2    isn't it true, who are going to consistently
 3    order over these limits because they're large
 4    customers; isn't that right?
 5                  MR. FULLER:  Object to form,
 6          vague.
 7          A.      Well, I guess that is a
 8    possibility.  I didn't see anything that
 9    would not require an employee of Cardinal to
10    follow this procedure that would exempt any
11    type of customers or have them fail to take
12    this appropriate -- or this -- not
13    appropriate -- take this action as required.
14    BY MR. PYSER:
15          Q.      What the policy says is on a
16    daily basis, cage-involved personnel should
17    be policing and identifying individual orders
18    that appear excessive in relation to what
19    other customers are buying and/or the
20    customer's purchase history.  In these
21    situations DEA should be notified if possible
22    before the order is shipped and a copy of all
23    such orders should be maintained in the
24    division's suspicious order file, along with
25    the regulatory agency contact form noting any
```

1    specific instructions from DEA.

2              Correct?

3        A.    Yes, sir.

4              MR. FULLER:  And I don't know

5        what he's reading from, but if you

6        want to pull the policy to make sure

7        he's reading it accurately, you're

8        welcome to do so.  I don't know --

9              MR. PYSER:  Counsel, we can

10        drop the speaking objection.  He's

11        already answered.

12              MR. FULLER:  No, I won't drop

13        the speaking objections.

14   BY MR. PYSER:

15        Q.    So let's take an example, the

16   Cleveland Clinic.  They're in Cleveland,

17   Ohio.  It's a large medical facility.

18              Would you expect the

19   Cleveland Clinic to order, when they order

20   from Cardinal Health, more than 800 capsules

21   of hydrocodone at a time?

22        A.    I don't really have an opinion

23   either way.  It's a possible reasonable

24   assumption, but without seeing the

25   distribution datas or the purchasing

Highly Confidential - Subject to Further Confidentiality Review

1    requests, I don't know.

2        Q.    And you haven't looked at that

3    information.  You haven't gotten to that

4    level of granularity in your work?

5            MR. FULLER:  Form.

6        A.    I didn't review the Cleveland

7    Clinic or the ingredient limit reports for

8    specifically looking for the Cleveland

9    Clinic.  I focused on the retail or the

10   pharmacies.

11   BY MR. PYSER:

12       Q.    Do you believe that Cardinal

13   Health should have stopped shipping

14   hydrocodone and other pain medicine to the

15   Cleveland Clinic based on the fact that there

16   were times when the Cleveland Clinic ordered

17   more than 800 tabs of hydrocodone at a time?

18       A.    So how I'll answer that is that

19   this policy was set up by Cardinal and it's

20   in response to how Cardinal identified the

21   scope of the businesses they supply.

22            So my opinion is based on the

23   policy that Cardinal set up.  I didn't set up

24   this policy for them; they did.  So if their

25   policy requires them to take an act and

Highly Confidential - Subject to Further Confidentiality Review

1    they've set the limit up at 800 tablets, then

2    unless they modify their policy or they have

3    some exception, I -- this is their policy,

4    and this is what they're requiring their

5    employees to do.

6         Q.    Sir, do you think that it would

7    be appropriate to deny cancer patients at the

8    Cleveland Clinic medication based on this

9    absolute limit?  Yes or no?

10              MR. FULLER:  Object to form.

11              That wasn't the same question.

12         A.    Well, I think to answer that

13   question, if that did occur because they had

14   a defective suspicious order system, they

15   should correct that so that doesn't occur.

16              But so -- I guess that's a

17   hypothetical that I don't really want to

18   comment on, but the main thing that I want to

19   make sure is that -- on my statement is that

20   this is Cardinal's policy, and this is what

21   they're requiring their employees to do.

22   BY MR. PYSER:

23        Q.    Sir, where do you get the

24   opinion that there was no flexibility around

25   this policy and Cardinal Health had no choice

Highly Confidential - Subject to Further Confidentiality Review

1  in its policy but to stop shipment of any

2  order above these limits?

3      A.    I didn't see any documents or

4  any policies that gave the employees that

5  flexibility.

6      Q.    You make reference in your --

7  in your report to the deposition of Steve

8  Reardon.

9          Do you recall that?

10     A.    Yes, sir.

11     Q.    Did you read Mr. Reardon's

12  entire deposition?

13     A.    I believe I did, yes, sir.

14     Q.    Every page?

15     A.    Well, yes, sir, I believe so.

16     Q.    No one from the plaintiffs'

17  counsel pointed you to certain pages and told

18  you to read those but not others?

19     A.    No, sir.

20     Q.    Did DEA require a particular

21  form or format to report suspicious orders?

22     A.    No.  The -- how a suspicious

23  order is reported to the DEA is up to the

24  individual registrant.

25     Q.    So suspicious orders can be

1    reported in an ingredient limit report like

2    that, correct?

3         A.    The way they're reported and

4    how they're delivered, that's up to the

5    registrant.

6         Q.    Okay.  And if a registrant

7    wanted, they could report a suspicious order

8    to DEA via a phone call, correct?

9         A.    They could.  If I was to

10   provide them guidance, I wouldn't recommend

11   that because it's difficult to record and

12   document notification, but there would be

13   nothing in the regulations that would

14   prohibit them from doing that.

15        Q.    If DEA didn't want to receive

16   phone calls, they of course could tell

17   registrants don't call us, correct?  They

18   have that ability.

19        A.    Well, if you're asking that

20   based on my last response, that's not what

21   I'm indicating.  I'm not saying that I would

22   advocate to tell them don't call me again.

23             What I'm saying is if they were

24   to call to report a suspicious order, I would

25   take the information and document it and act

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on it, but I would also give some guidance
 2    that they may want to deliver the suspicious
 3    order report in a way that they have
 4    verification.
 5         Q.    Did you ever give that guidance
 6    to Cardinal Health?
 7         A.    No, sir.
 8         Q.    At page -- strike that.
 9               For Cardinal Health, are you
10    aware that excessive order reports that are
11    described in your report were often
12    memorialized in agency contact forms?
13               MR. FULLER:  Object to form.
14         A.    I'm aware -- I'm aware that
15    it's a requirement of the policy, also is --
16    I believe that I've only viewed two completed
17    forms, those agency contact forms, in regards
18    to suspicious -- or suspicious order reports
19    or as far as this activity.
20               Now, I think that form, if I
21    understand it correctly, is a multiuse form,
22    so it could be used by any contact at
23    different agencies, and the two that I'm
24    speaking of are just in regards to notifying
25    the DEA in regards to orders.
```

Highly Confidential - Subject to Further Confidentiality Review

BY MR. PYSER:

Q.    You state at page 60 of your

report, quote, I've not been able to locate

any reports related to orders in excess of

the daily limit for the Wheeling distribution

center produced in this matter.

Do you recall that?

A.    That's a correct statement.

The two that I reviewed I think were a

different distribution center.

Q.    Okay.  How much time did you

personally spend looking for agency contact

forms from the Wheeling distribution center?

A.    I spent considerable time, and

then also I think it was part of the

requirement that in the -- in the response to

discovery to make -- advise on that matter

too, so I think if they existed, there would

have been other documents that would have

indicated they did exist.

Q.    Now, if we're talking about the

pre-2007 system, we're now here in 2019, so

those forms would be 12 or 13 years old at a

minimum, correct?

A.    Yes, sir.

1           Just for clarification, you're

2    talking the agency contact forms or the

3    ingredient limit reports?

4           Q.    Agency contact forms.

5           A.    Okay.

6           Q.    From the pre-2007 time period.

7                 (Whereupon, Deposition Exhibit

8           Rafalski-12, Regulatory Agency Contact

9           Sheet, CAH_MDL_PRIOROD_DEA07_00868973,

10          was marked for identification.)

11   BY MR. PYSER:

12          Q.    So I'm marking as Exhibit 12 an

13   agency contact form dated February 6th, 2007.

14   Was this one of the forms that you reviewed

15   in your preparation for your report?

16          A.    I -- I don't recall seeing this

17   form before.

18          Q.    Okay.  So this is a 2007 agency

19   contact form.  The purpose of the contact is

20   reporting excessive purchases of oxycodone.

21                Do you see that --

22          A.    I do.

23          Q.    -- in the Purpose of Contact

24   section?

25                And the name, address and

1    telephone number of the DEA representative is

2    Jeff Conners.

3            Do you see that?

4    A.      Yes, sir.

5    Q.      Do you know Mr. Conners?

6    A.      I know the name.  I've probably

7    met him once or twice before.  But to say

8    know him, I'm not familiar with him

9    personally.

10   Q.      But you know that he worked for

11   DEA?

12   A.      Yes, I -- I think I indicated

13   that, yes, sir.

14   Q.      And the advice that he gave

15   Cardinal Health or the response that he gave

16   Cardinal Health was, quote:  Advise to keep

17   sending monthly ILR report.

18           Do you see that?

19   A.      I see that statement, and I

20   acknowledge that's what the employee wrote

21   down for Cardinal Health.  I don't know that

22   that's what Mr. Conner said.  And I say that

23   because I've -- in my experience, I have

24   reviewed other documents, even things that I

25   was involved in where people wrote things

Highly Confidential - Subject to Further Confidentiality Review

1    that I didn't say.

2         Q.    Sir, you've not spoken to

3    either Mr. Conners or Ms. Oglesby, who filled

4    out this form, about the form?

5         A.    I have not.

6         Q.    Okay.  Yet, you're questioning

7    the veracity of the statement in here?

8         A.    I'm just saying that -- it's

9    not the veracity.  I'm just -- and I'm going

10   to acknowledge that is what was said, but I

11   just don't know if that's what Mr. Conners

12   said to Ms. Oglesby.

13        Q.    You don't have any specific

14   reason to doubt that that's what's said?

15        A.    No, sir, just based on my

16   experience that there's been other times when

17   statements were made that weren't -- that

18   didn't -- weren't accurate.

19        Q.    It's true that upon receiving a

20   contact of a suspicious order by phone, DEA

21   also sometimes told Cardinal Health to ship

22   the product that it was reporting, correct?

23        A.    I'm not aware that that ever

24   occurred.  Could I ask a question about this?

25              Do you happen to have the order

1    that was required to be attached to it?

2         Q.     I do not have that with me, and

3    it's 13 years ago, so I can't make a

4    representation to you whether or not it still

5    exists.

6         A.     Okay.

7         Q.     Does DEA still have the order?

8         A.     2007?  There -- oxycodone,

9    there would be an ARCOS data entry.

10        Q.     Beyond the ARCOS entry, would

11   DEA have any other record of this

12   transaction?

13        A.     No, sir.

14        Q.     Okay.  Would DEA have any other

15   record of this communication?

16             MR. FULLER:  Object to form,

17        outside of scope.  Counsel, this is

18        also indicated that it's from the

19        Findlay distribution center, which I

20        don't even believe we've been provided

21        transactional data from the Findlay

22        distribution center.

23             MR. PYSER:  The witness has

24        already testified he looked at reports

25        from outside of --

```
 1              MR. FULLER:  No, no, I

 2         understand that.  That brings us back

 3         to the issue that we talked about at

 4         the very beginning, that most of the

 5         distribution into CT1 was from the

 6         Wheeling distribution center.  This

 7         shows that there wasn't, and there

 8         were suspicious orders shipped by

 9         Findlay.

10              And I believe Cardinal now

11         needs to supplement with the Findlay

12         distribution data for CT1, for all

13         Findlay distribution data.

14              MR. PYSER:  Mr. Fuller, first

15         of all, it's a speaking objection.

16              MR. FULLER:  I'm going to

17         move -- I'm going to move for that.

18              MR. PYSER:  Let me explain to

19         you that this is not an order placed

20         by a pharmacy in CT1.  If you'd read

21         the document, you would see the city

22         is Columbus, Ohio, which is not part

23         of CT1.

24              MR. FULLER:  I see that.

25              MR. PYSER:  So you can take
```

1          your objection and you can put it at a

2          more appropriate time.

3    BY MR. PYSER:

4          Q.    Sir, do you know a DEA

5    investigator named Chuck Carpenter?

6          A.    No, sir.

7          Q.    On page 61 of your report, you

8    claim that Cardinal Health was delivering

9    oxycodone illegally to a pharmacy known as

10   Ross Westbank Pharmacy.

11             Do you recall that?

12         A.    What page are you on?

13         Q.    61.

14         A.    Yes, sir.

15         Q.    Where's Ross Westbank Pharmacy

16   located?

17         A.    I don't know.  Let me...

18         Q.    Well, it makes up an entire

19   schedule to your report, Schedule III.

20         A.    I was going to ask to pull

21   those records.

22         Q.    And I'll represent to you that

23   hundreds of times in your very own report, it

24   says Ross Westbank Pharmacy is located in

25   Hudson, Wisconsin.

Highly Confidential - Subject to Further Confidentiality Review

1           A.       Okay.

2           Q.       Sir, do you have any evidence

3    to support a connection between the

4    pharmaceuticals shipped to Ross Westbank in

5    Hudson, Wisconsin and use of those

6    pharmaceuticals in Cuyahoga or Summit County?

7           A.       I don't think that appears in

8    my report to attribute the specific

9    distributions.  I think it goes into my

10   report to the conduct of Cardinal Health,

11   where the regulations and the compliance

12   department was operated centrally out of the

13   headquarters.

14          Q.       So that's a no to my question?

15          A.       Well, I guess you asked me how

16   I used it.  And --

17          Q.       No, I --

18          A.       Could you restate the question?

19   I'm sorry.

20          Q.       Do you have any evidence to

21   support a connection between the

22   pharmaceuticals shipped to Ross Westbank in

23   Hudson, Wisconsin and the use of

24   pharmaceuticals in Cuyahoga or Summit County?

25          A.       No, sir.  Just the conduct by

```
 1     the Cardinal company.

 2                 MR. PYSER:  Move to strike

 3           everything after "No, sir."

 4     BY MR. PYSER:

 5           Q.    Do you know whether Ross

 6     Westbank Pharmacy appeared on Cardinal's

 7     ingredient limit reports to DEA?

 8           A.    I do not know, sir.

 9           Q.    Are you aware that DEA has

10     taken the position that there are some

11     legitimate medical sales that occur over the

12     Internet?

13           A.    What would the time frame for

14     that statement be?

15           Q.    Well, you tell me.  What's

16     DEA's position about --

17           A.    Well, there is -- there was

18     approval eventually of Internet pharmacies.

19           Q.    When did that happen?  Roughly?

20     You don't have to give me an exact date.

21           A.    I really don't want to guess,

22     and I don't have my Code of Federal

23     Regulations here.  It was post the Ryan

24     Haight Act or in conjunction with the Ryan

25     Haight Act.  I don't want to guess at a year.
```

1    Q.    At any time that you're aware

2    of, was there a federal regulation or rule

3    that prevented individuals from ordering

4    noncontrolled substances through the mail,

5    say, blood pressure medication?  Is that okay

6    to receive that through the mail?

7    A.    I never received any guidance

8    or training on acquisition of noncontrolled

9    substances pursuant to a prescription, so I

10   don't know the answer to that.  I never

11   reviewed it as part of this opinion either.

12   Q.    On pages -- I want to go back a

13   little bit in your report, pages 49 through

14   50.  You list a series of enforcement actions

15   against Cardinal Health.

16        Do you see that?

17   A.    Yes, sir.

18   Q.    None of the enforcement actions

19   against Cardinal Health that you list in your

20   report occurred in Cuyahoga or Summit County,

21   correct?

22   A.    The purpose for listing these

23   was to demonstrate the failure to maintain

24   effective controls against diversion.  I do

25   acknowledge that none of them specifically

Highly Confidential - Subject to Further Confidentiality Review

1    are against the distributions to Cuyahoga

2    County.

3         Q.     Okay.  And none of them involve

4    the Wheeling, West Virginia distribution

5    center, correct?

6         A.     That's correct.

7         Q.     On page 52 of your report, you

8    have a paragraph.  The first full paragraph

9    talks about a 2005 New York Attorney General

10   investigation?

11        A.     Yes.

12        Q.     And you write:  The matter

13   involves, amongst other allegations, price

14   diversion with closed-door pharmacies that

15   engaged in contract pricing.

16              Do you see that?

17        A.     Yes, sir.

18        Q.     So this New York Attorney

19   General investigation you're speaking about,

20   it involved pharmacies that were buying

21   medication and reselling it to other

22   pharmacies; is that a correct understanding?

23        A.     Yes, sir.

24        Q.     Okay.  And that wasn't limited

25   in any way to controlled substances; it was

Highly Confidential - Subject to Further Confidentiality Review

1    the buying and selling of medication more

2    generally than that.  That's price diversion,

3    correct?

4                MR. FULLER:  Form.

5         A.    So again, this goes to the

6    conduct of the Cardinal facility, but the

7    answer to your question would be yes.

8    BY MR. PYSER:

9         Q.    In what you've reviewed related

10   to the New York Attorney General

11   investigation from 2005, you've not formed

12   any opinion that opioids were being diverted

13   to any patient without a legitimate

14   prescription, correct?

15        A.    In my review of that, I don't

16   recall that there was any specific reference

17   to opioids.

18        Q.    Sir, do you have your tax

19   returns from 13 years ago, in 2006?

20        A.    Unfortunately, I would probably

21   answer yes.  I believe my wife has my utility

22   records from back at that time.  Although I

23   would -- before you ask me again, I would

24   acknowledge that's not the norm.

25        Q.    So most people don't keep their

```
1    tax returns going back 13 years, right, in

2    your experience?

3         A.    Well, I haven't conducted any

4    surveys or asked any people, but generally

5    speaking, people don't keep those kind of

6    records for that length of time.

7         Q.    They may have paid their taxes

8    even though they no longer have the tax

9    returns from 13 years ago, correct?

10        A.    Well, I think in some of those

11   records, I guess retention -- and I'm not

12   sure why there would be a retention because I

13   think there's some law or regulation on how

14   far the IRS could go back and look at your

15   previous tax returns.  Seem to think seven

16   years comes to mind.

17             So there would be no reason to

18   retain them past that period of time as far

19   as I could see, unless that's just what you

20   wanted to do.

21        Q.    So it's your layman's

22   understanding that the IRS tells taxpayers

23   the length of time they need to retain their

24   tax returns in case there's any further

25   inquiry, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FULLER:  Object to form.
 2       A.     I don't think they tell them
 3   that.  I think that -- and I don't think the
 4   IRS really tells you that either, maybe the
 5   law does.  I believe in conversations with an
 6   accountant, I think they tell you how far
 7   back you're required to keep records for a
 8   possible audit.
 9   BY MR. PYSER:
10       Q.     In your report, you come to the
11   opinion that if a distributor's unable to
12   locate a due diligence file, say, from 2006,
13   that no due diligence was done, correct?
14              If you can't put your hands on
15   it today, you make the assumption that
16   nothing was done; is that right?
17       A.     Yes, sir.
18       Q.     Is it possible that due
19   diligence was done back in 2006 or even
20   earlier, but those records weren't retained?
21       A.     Well, my opinion on that matter
22   is if there were no records retained, then
23   there was no due diligence because there's no
24   record of it.
25              And not just from the
```

1    standpoint of the physical piece of paper,

2    but moving forward even though it's 13 years

3    later, I think there has to be a

4    comprehensive history in a due diligence to

5    make some decisions relative to that

6    pharmacy.

7                    Now, albeit 13 years back is a

8    lot different than the industry is today, but

9    I don't think it would be prudent for any

10   distributor to throw away any record in

11   regards to a pharmacy.

12        Q.    Even a pharmacy that's no

13   longer a customer?

14        A.    Well, I think in regards to

15   that topic, the -- depending on the scenario,

16   if it was a terminated or this customer no

17   longer wanted to do any business with

18   Cardinal, that doesn't mean they could always

19   come back and reapply to be a customer again.

20                    And I think that's one of the

21   critical examples of why you need to retain

22   that, because you would be starting all over

23   again, and you're negating the history,

24   either positive or negative, of the work you

25   did in regards to that registrant.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    When a pharmacy closes its

2    doors, let's say a pharmacy goes out of

3    business, at that point is a distributor free

4    to get rid of the records about that pharmacy

5    or do they have to keep it even after that

6    point in your view?

7    A.    Well, there's no regulatory

8    guidance, the maintenance of effective

9    controls.  I guess if you went to the extreme

10   and the owner pharmacist died, but if he --

11   if he just closed his doors and he moved on

12   and he might potentially open another

13   company, I would say, if it was my decision

14   as a registrant, I would keep the record.

15   Q.    When you were performing cyclic

16   investigations -- is it an investigation or

17   an audit?  What's the right term?

18   A.    Well, some people call them

19   cyclic.  Some people call them work plans.

20   Some call them regulatories.  It goes by all

21   those different names.

22   Q.    So when you were visiting a

23   distributor in your job working as a

24   diversion investigator, did you tell the

25   distributors you visited that it was your

Highly Confidential - Subject to Further Confidentiality Review

1   expectation that all records related to

2   pharmacy due diligence would be kept

3   indefinitely?

4        A.    I believe I would consistently

5   discuss that.  Saying that those aren't

6   required records, so that would be a

7   discussion under security, but yes.  And I

8   was present -- so there would be my training

9   in regards to the distributor briefings.  I

10  was present at a distributor briefing to

11  actually -- because I wanted to learn how

12  they occurred, and Mr. Kyle Wright, we had

13  spoke about him earlier, he would make it

14  clear that -- in pretty common terms that if

15  you don't document it, it doesn't exist.

16       Q.    So while you would inform

17  distributors in your recollection that you

18  believed they should do it, you also told

19  them that it was not a required record to

20  maintain due diligence, correct?

21       A.    I don't know if I would inform

22  them of that --

23            MR. FULLER:  Object to form,

24       misstates his testimony.

25       A.    I don't know if I would

Highly Confidential - Subject to Further Confidentiality Review

1    specifically say it's something they did or

2    didn't do.  I would just give them in some

3    matters guidance.  It would be a guidance

4    that -- because in most regulatory

5    investigations, I may ask to see some due

6    diligence on a specific customer, and

7    sometimes it would come up when I asked for

8    it that they -- the registrant would tell me

9    that it's not a required record.

10              So the option was this is -- as

11   part of a work plan or a regulatory

12   investigation, a registrant wouldn't have to

13   show me the due diligence.  In that case, I'd

14   have to subpoena.

15   BY MR. PYSER:

16        Q.    You're one diversion

17   investigator when you were working at DEA,

18   correct?

19        A.    Yes.

20        Q.    Do you know one way or the

21   other whether the diversion investigators who

22   visited Cardinal Health's facilities ever

23   told them about this indefinite record

24   retention policy that you're putting forward

25   in your expert report?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FULLER:  Objection.  And

2          remind you of your Touhy obligation.

3          Anything that is internal policy at

4          DEA or communicated while you were on

5          the job is outside the scope of what

6          you're authorized to testify to.

7     A.     I'm not aware.

8  BY MR. PYSER:

9     Q.     So on page 50 of your report,

10  you have a chart that talks about suspicious

11  orders reported in the CT1 jurisdictions,

12  right?

13     A.     Yes.

14     Q.     Okay.  And there's two columns,

15  pre-shipment reporting and then -- on the

16  left, and on the right, post-shipment

17  reporting, right?

18     A.     Right.  Yes, sir.

19     Q.     Okay.  On the right side, the

20  post-shipment reporting, it's blank until

21  2005, correct?

22     A.     Yes, sir.

23     Q.     And that's blank there because

24  you know from testimony that Cardinal Health

25  was submitting ingredient limit reports to

1    DEA, but we just no longer have those

2    records; is that right?

3          A.    Sir, I believe my report says

4    that I could not find those -- I could not

5    find -- those weren't provided to me and I

6    did not find those reports.

7          Q.    You also reviewed the testimony

8    of Steve Reardon we talked about earlier

9    today, and he said Cardinal Health was

10   sending ingredient limit reports to the DEA

11   beginning in the early '90s, correct?

12         A.    I don't have a recollection of

13   that exact statement in his deposition.

14         Q.    Did you have any reason to

15   believe Mr. Reardon wasn't telling the truth

16   if that is, in fact, what he said?

17         A.    No, I don't have any

18   independent knowledge of not -- whether to

19   believe him or not to believe him.

20         Q.    So on page 50 we have blanks

21   under post-shipment report, where it's

22   unknown, but you filled in zeros on the left

23   side for pre-shipment reports all the way

24   from 1996 to 2012, correct?

25         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    We talked earlier about these

2    agency contact forms for phone calls to DEA?

3    A.    Yes, sir.

4    Q.    Is it possible that at some

5    point from 1996 through 2012 employees from

6    Cardinal Health may have called DEA before

7    shipping an order that was destined for

8    Cuyahoga or Summit County?

9    A.    If that occurred, I would have

10   an expectation to see one of the agency

11   contact forms.

12   Q.    But knowing that we don't have

13   any agency contact forms from Wheeling, West

14   Virginia, is it possible that people spoke on

15   the phone, but today, from 1996, it's

16   23 years later, so 23 years later, is it

17   possible a phone call was made but we don't

18   have a record of it?

19          MR. FULLER:  Objection,

20      misstates evidence.

21   A.    So I can only comment on the

22   facts of which I know and what records exist.

23   I don't make comments on hypothetical

24   situations of whether it could have occurred

25   and there was no documentation or it's lost

Highly Confidential - Subject to Further Confidentiality Review

1    or --

2    BY MR. PYSER:

3        Q.    Well, sir, you do, because you

4    put a zero there instead of leaving it blank

5    like you did on the other side.

6            So isn't it more accurate that

7    where you don't know, you should leave it

8    blank like you did on the right-hand side,

9    rather than filling in zeros when you don't

10   have any evidence one way or the other?

11   Wouldn't that be a better way to write your

12   report?

13       A.    I guess that's open to your

14   interpretation.  I'm confident with putting

15   zeros because I found no documents.

16       Q.    So when you don't know

17   something, you assume it wasn't done in your

18   report, correct?

19       A.    Well, I -- if I don't see a

20   record that I believe should have been

21   retained, then it -- I guess -- I don't know

22   if that's an assumption.  It doesn't exist.

23   I can't make an opinion of that a record

24   existed when I don't have any documentation

25   that it did exist.

```
 1              MR. PYSER:  We've been going

 2        about an hour.  Let's take a break.

 3              THE WITNESS:  Sure.

 4              THE VIDEOGRAPHER:  Going off

 5        the record at 3:59 p.m.

 6              (Recess taken, 3:59 p.m. to

 7        4:10 p.m.

 8              THE VIDEOGRAPHER:  We're back

 9        on record at 4:10 p.m.

10   BY MR. PYSER:

11        Q.    Welcome back, Mr. Rafalski.

12        A.    Thank you.

13        Q.    Directing your attention to

14   page 52 of your report, in the last

15   paragraph, you make a statement that Cardinal

16   Health provided almost preferential treatment

17   to its chain pharmacy accounts as compared to

18   their retail independent customers.

19              Do you see that opinion?

20        A.    Yes, sir.

21        Q.    And just over on to the next

22   page, you base that on a declaration of

23   Michael Mon?.

24              Do you see that?

25        A.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And, in particular, if you go
 2     to page 13 of this document.
 3                  (Whereupon, Deposition Exhibit
 4            Rafalski-13, Declaration of Michael A.
 5            Mon?, CAH_MDL_PRIOROD_DEA12_00014053 -
 6            CAH_MDL_PRIOROD_DEA12_00014081, was
 7            marked for identification.)
 8     BY MR. PYSER:
 9            Q.    I'm showing you a document now
10     that's been marked as Exhibit 13.
11                  MR. FULLER:  Thank you.
12     BY MR. PYSER:
13            Q.    And on page 13 there's a
14     paragraph, it's paragraph 29.  Do you see
15     that?
16                  MR. FULLER:  What exhibit
17            number is this?
18                  MR. PYSER:  13.
19                  MR. FULLER:  Okay.
20                  You said page 13 as well?
21                  MR. PYSER:  Yes.  Exhibit 13,
22            page 13.
23     BY MR. PYSER:
24            Q.    Are you with me, Mr. Rafalski?
25            A.    I am.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Now, what the paragraph or the
 2     page that you cite in your report for that
 3     statement says is:  In 2009 -- and this is
 4     Michael Mon?, Cardinal Health employee in the
 5     anti-diversion team, he writes:  In 2009, DEA
 6     diversion investigator Michael Arpaio raised
 7     a question about Cardinal Health's due
 8     diligence files on its chain pharmacy
 9     customers.
10              Do you see that?
11         A.      Yes, sir.
12     BY MR. PYSER:
13              Q.      And a little bit later down, it
14     says:  Arpaio told Cardinal Health personnel
15     that he needed to contact DEA's attorney to
16     determine if Cardinal Health's due diligence
17     on chain pharmacies presented any problem.
18     Thereafter, I -- that's Mr. Mon? -- contacted
19     Mr. Arpaio and his supervisor,
20     Ms. Boockholdt, to discuss the question.
21              Do you see that?
22         A.      Yes, sir.
23              Q.      Okay.  And a little bit further
24     down, it says:  **REDACTED**
```

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

9    A.    Yes, sir.

10    Q.    Do you know Ms. Boockholdt and

11   Mr. Arpaio?

12    A.    I know who Mr. Arpaio is, and I

13   think I've met him.  I know who

14   Ms. Boockholdt is.  I probably had some

15   interaction and conversations with her, not

16   in regards to this document, but just in

17   terms of my employment.

18    Q.    And at the very end it states,

19   beginning on the last line:  **REDACTED**

24    A.    Yes.

25    Q.    -- with respect to chain

1    pharmacy customers.  DEA's own inspectors

2    have described Cardinal Health's SOM program

3    as one of the best among wholesale drug

4    distributors nationwide.

5              Do you see that?

6    A.    Yes, sir.

7    Q.    So this is the paragraph you

8    cited in your report, correct?

9    A.    Yes, sir.

10    Q.    Now, Ms. Boockholdt and

11    Mr. Arpaio, who interacted with Mr. Mon? in

12    2009, that was ten years ago, right, 2009?

13    A.    Yes, sir.

14    Q.    Who's in a better position to

15    understand Cardinal Health's suspicious order

16    monitoring process?  Two DEA investigators

17    who spoke to Cardinal Health at the time or

18    yourself ten years later?

19              MR. FULLER:  Object to form,

20         inadequate hypothetical.

21    A.    I don't know what information

22    that either one of these diversion

23    investigators had to cause Mr. Mon? to make

24    this affidavit or --

25              ///

```
 1   BY MR. PYSER:
 2        Q.     You've never spoken to
 3   Ms. Boockholdt or Mr. Arpaio about the
 4   statements in this paragraph, have you?
 5        A.     No, sir.
 6        Q.     You've never seen any statement
 7   from Ms. Boockholdt or Mr. Arpaio
 8   contradicting the statements in this
 9   paragraph, have you?
10        A.     I have not.
11        Q.     In your report, you identify
12   one retail independent customer in Ohio from
13   Cardinal Health and speak about it.  REDA
     CTED
15        A.     Yes, sir.
16        Q.     And your conclusion or your
17   opinion is that the due diligence file as it
18   exists in 2018 does not sufficiently document
19   certain increases in oxycodone distributions
20   between 2004 and 2008, correct?
21        A.     I'd like to get to that
22   section, but I know my --
23        Q.     Take a look at page 53.
24        A.     -- my report does state that.
25   And I think it also states, if I remember
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correctly, there was three changes of
 2    ownership -- actually, let me retract that.
 3              There were three changes of DEA
 4    numbers over a period of years, and that was
 5    alarming to me, and I would have had an
 6    expectation to see some explanation of why
 7    that -- those DEA registration numbers
 8    changed.
 9         Q.    Do you know who owned  R
10                                       E
11         A.    I'm not sure I knew or not.  I
12    don't think it -- I don't -- I don't know.
13         Q.    Do you know where the pharmacy
14    is located, was located?
15         A.    Yes.
16         Q.    Where?
17         A.    It was located in a hospital.
18         Q.    REDACTED
19
20         A.    Yes, sir.
21         Q.    Did you ever visit it?
22         A.    No, sir.
23         Q.    Do you know whether Cardinal
24    Health employees visited REDACTED
25         A.    If they did visit, I don't
```

Highly Confidential - Subject to Further Confidentiality Review

1   recall seeing any documentation of the visit

2   or results of the visit.

3        Q.    Did you see documentation that

4   Mr. Mon?, the head of Cardinal Health's

5   anti-diversion program, personally visited

6   that pharmacy?

7        A.    I don't have a recollection of

8   that.

9        Q.    Is that something you should

10  have considered?

11       A.    If he visited?

12            MR. FULLER:  Form.

13  BY MR. PYSER:

14       Q.    Yes.

15       A.    I guess I'd have to see what

16  the results of that visit was.  If he -- the

17  purpose of his visit and whether he conducted

18  due diligence and what his notations.  I

19  don't recall reviewing any kind of file about

20  documenting the purpose or what occurred

21  during his visit.

22       Q.    If there's a due diligence file

23  that does document Mr. Mon?'s visit, is that

24  something you should have reviewed as part of

25  your opinion?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Yes, sir, I think I would need
2    to consider that.  I don't think it would
3    have changed some of the conduct that
4    occurred with -- in regards to the dosage
5    units and the increases, unless there's
6    something specific in there that I'm not
7    aware of.
8          Q.      Do you know whether REDACT
9    REDA    ever lost its DEA registration?
10         A.      I'm not aware that it lost its
11   DEA registration, no, sir.
12         Q.      Did DEA ever take any adverse
13   action against  REDACTED        ?
14         A.      Not that I'm aware of, no, sir.
15   But that doesn't minimize or alleviate the
16   conduct that I described in my report,
17   whether or not the DEA took action against
18   them.
19              MR. PYSER:  Move to strike
20         everything after "Not that I'm aware
21         of, no, sir."
22              MR. FULLER:  Object to the
23         motion.
24   BY MR. PYSER:
25         Q.      Did you review a due diligence
```

1    file that made clear ███ **REDACT**

2    ███████ from medical staff who are ASAM and

3    pain management certified?

4         A.     I'd like to pull that document,

5    the due diligence file.

6         Q.     Well, if you want to pull a

7    document, we're going to have to go off the

8    record.

9              MR. FULLER:  No, he can do it.

10         You're asking the questions.

11              MR. PYSER:  I asked him a

12         simple question.

13              MR. FULLER:  If you want to

14         give him a due diligence file that's

15         cited in his report, then so be it.

16         He can pull it.  You're the one that's

17         not showing him the documents.

18              Oh, so you had it.

19         Interesting.

20              MR. PYSER:  Enough commentary,

21         Counsel.

22              MR. FULLER:  Nah.

23              (Whereupon, Deposition Exhibit

24         Rafalski-14, 1/10/08 Brantley Memo

25         w/Attachment(s),

Highly Confidential - Subject to Further Confidentiality Review

```
 1          CAH_MDL2804_00000606 -

 2          CAH_MDL2804_00000618, was marked for

 3          identification.)

 4  BY MR. PYSER:

 5      Q.    I'm showing you a document

 6  marked as Exhibit 14.  This is the file that

 7  you reference in your report.

 8              MR. FULLER:  Thank you.

 9  BY MR. PYSER:

10      Q.    On the first page it states

11  that  REDACTED

    ███  ███████████████████████████

13      A.    Yes, sir.

14      Q.    On the second page, third

15  paragraph, it states:  The account was

16  confirmed as being owned by a hospital,

17  again, and services oncology and hospice

18  patients.

19              Mr. Rafalski, in your

20  experience, do oncology and hospice patients

21  use more pain medication than the average

22  population?

23      A.    Well, I'm not a physician, but

24  I would have to say in my experience that

25  that would be a logical assumption.
```

1      Q.      It goes on to say:   In

2   addition, they -- ▓▓▓▓ **REDACT**

    ▓  ▓▓▓▓ -- are inspected **ED** the Board of

4   Pharmacy on a monthly basis.

5              Do you see that?

6      A.      I acknowledge that's what this

7   says, yes, sir.

8      Q.      You don't have any reason to

9   disbelieve the fact that **REDACTED**

10  in this time period was visited by the Ohio

11  Board of Pharmacy on a monthly basis,

12  correct?

13     A.      Well, I would have an

14  expectation that there may be some

15  confirmation of that.

16     Q.      Did you seek the Ohio Board of

17  Pharmacy records for **REDACT** ?

18     A.      I did not.

19     Q.      Would one reason for an

20  increase in orders from a pharmacy be when a

21  pharmacy switches orders over from a

22  secondary wholesaler to a primary

23  distributor?

24     A.      Just so I understand your

25  question, to terminate their receipt of

Highly Confidential - Subject to Further Confidentiality Review

1    product from a secondary and go solely to the

2    primary?  Is that --

3        Q.    Not necessarily terminate.  Let

4    me try to clarify the question a little bit.

5             You're familiar with the fact

6    that many pharmacies have more than one

7    distributor?

8        A.    Yes, sir.

9        Q.    So if a pharmacy shifts its

10   orders of both controlled substances and

11   noncontrolled substances from one distributor

12   to another, the distributor to whom those

13   orders are shifting can expect an increase in

14   volume of controlled substance orders,

15   correct?

16       A.    I don't think I understand the

17   question.  So the distributions are going to

18   shift from distributor A to distributor B?

19       Q.    Yes.

20       A.    I don't know that that would

21   cause an increase of the purchases.

22       Q.    Well, if -- let's take that

23   simple hypothetical --

24       A.    It would be a new distribution.

25       Q.    If a pharmacy used to order 50%

Highly Confidential - Subject to Further Confidentiality Review

1   of its medication from one distributor and

2   50% from another distributor, but then starts

3   ordering 100% from, let's call it distributor

4   X.

5          A.     Okay.  I understand that

6   hypothetical.

7          Q.     Would you expect that

8   distributor X has an increase in the total

9   volume?

10         A.     So if I looked at a due

11  diligence file and that situation would have

12  occurred, there should be some kind of review

13  or explanation or due diligence investigation

14  that would be indicative of that occurring.

15                And the other -- the other tool

16  that I might expect to see because there has

17  to be some kind of a review to set a

18  threshold or have an understanding of the

19  legitimate needs of that pharmacy, so I would

20  expect to see some kind of an investigation,

21  maybe obtaining a utilization report or a

22  dispensing report to get a good gauge on the

23  previous patterns of a pharmacy if it's been

24  in existence.

25         Q.     Sir, in your report you don't

Highly Confidential - Subject to Further Confidentiality Review

```
1    make any reference one way or the other to a
2    shift from secondary distributor to a primary
3    distributor; it's not something that you
4    mention in your report, correct?
5         A.    I do not mention in my report,
6    but I am aware that during the time frame of
7    the three registrations, there was some
8    transfers back and forth between suppliers,
9    multiple suppliers, which would be another
10   concern for me as a diversion investigator or
11   for a registrant because --
12        Q.    Sir, did you --
13        A.    -- that would be --
14             MR. FULLER:  Let him finish his
15        answer.
16        A.    -- that could be another
17   potential way to camouflage or to stop the
18   review of potential diversion.
19             MR. PYSER:  Move to strike the
20        answer as nonresponsive.
21   BY MR. PYSER:
22        Q.    In addition to REDACT
23   REDA   in the next paragraph, you make
24   reference to a pharmacy known as CVS
25   No. 3322.
```

1          Do you see that?

2      A.      Yes, sir.

3      Q.      And are you familiar with how

4   busy of a store CVS 3322 is?

5      A.      I am not.

6      Q.      Do you know where it is?

7      A.      It's not stated in my report,

8   but I believe it was probably on one of the

9   documents I reviewed.

10     Q.      A store that fills between 500

11  and 750 scripts per day of all types of

12  medication, is that a busy store?

13     A.      Yes, sir, that's a busy store.

14     Q.      Did you review any documents

15  that showed the ratio of controlled

16  substances to noncontrolled substances at

17  CVS 3322?

18     A.      So unless you have the due

19  diligence file, I'd like to pull mine out.

20     Q.      Happy to show it to you, sir.

21     A.      Okay.

22     Q.      What's a normal ratio of

23  controlled substances to noncontrolled

24  substances?

25     A.      Kind of changed over a period

Highly Confidential - Subject to Further Confidentiality Review

1    of time.   **REDACTED**

7         Q.     Are you familiar with the fact

8    that other DEA employees have testified that

9    R  is the appropriate percentage and have

10   not -- and haven't changed it over time like

11   you just did?

12        A.     I don't recall reading any of

13   those depositions.  My answer to you would be

14   based on my experience as in the cases and

15   the reviews of records that I've reviewed in

16   regards to those statements by registrants.

17             (Whereupon, Deposition Exhibit

18        Rafalski-18, 7/17/12 Rausch Memo

19        w/Attachment(s),

20        CAH_MDL2804_00000204 -

21        CAH_MDL2804_00000219, was marked for

22        identification.)

23   BY MR. PYSER:

24        Q.     I'm showing you what's been

25   marked as Exhibit 18.  This is the due

Highly Confidential - Subject to Further Confidentiality Review

1    diligence file from the CVS 3322 that you

2    reference in your report.  And it's in Parma,

3    Ohio, correct?

4            A.    Yes, sir.

5            Q.    And it's got a series of

6    reports of investigation by Cardinal Health,

7    surveillance reports.  Do you see those?

8            A.    Yes, sir.

9            Q.    And on Bates page ending 209,

10   it gives the address of the store **RE**

     **DA** in Parma, Ohio.

12           A.    Yes, sir.

13           Q.    Do you know how close that is

14   to **REDACTED**?

15           A.    No, sir.

16           Q.    How about **REDACTED**

18           A.    No, sir.

19           Q.    And take another turn of the

20   page to Bates page ending 211.

21           A.    Yes, sir.

22           Q.    Okay.  And here, Cardinal

23   Health writes that the percentage of

24   controlled from this store is 18.4%, correct?

25           A.    That's what this document says,

1    yes, sir.

2         Q.    You don't have any reason to

3    believe this document is inaccurate, do you?

4         A.    Well, my --

5              MR. PYSER:  Counsel, why did

6         you just raise your hand in the middle

7         of his answer?  He's free to answer

8         the question.

9              MR. FULLER:  Oh, because I

10        wanted to answer.  Sorry.

11             THE WITNESS:  I thought he was

12        going to object.  I apologize.

13        A.    So when I see this document,

14   what I would expect is to see some document

15   that would corroborate this information.  And

16   I don't think in my experience of doing cases

17   that you would just accept that document on

18   face value.

19             I would have -- I would have

20   liked to have seen a confirmation document, a

21   utilization or a dispensing report and some

22   calculations to confirm that these are

23   accurate statements.

24   BY MR. PYSER:

25        Q.    Sir, the memo that we're

Highly Confidential - Subject to Further Confidentiality Review

```
 1    looking at at Bates page 211 states that the
 2    purpose of this memorandum is to outline the
 3    findings derived from the data provided by
 4    CVS, and then it goes on to say the data was
 5    based on store-specific averages.
 6              Isn't it reasonable to say that
 7    Mr. Cameron, who prepared this document, did
 8    actually look at that data?  Isn't that what
 9    he's saying he did there?
10         A.    Well, it says data provided by
11    CVS, but it doesn't say what type of data.
12    It could have been a -- just a list of the
13    same information.  I didn't --
14         Q.    So --
15         A.    I would want to see something
16    independent that could verify that.
17         Q.    So you're basing your
18    identification of this store as a store that
19    you believe Cardinal Health failed to report
20    to DEA as suspicious over the fact that you
21    don't have the actual data breakdown in the
22    due diligence file even though there's a memo
23    explaining what the data shows, correct?
24              MR. FULLER:  Object to form.
25         A.    Well, I only see that -- the
```

1    information provided here.  In my report, the

2    concern was a change from a large increase of

3    controlled substances, and I would expect to

4    see some kind of explanation for that

5    increase.

6    BY MR. PYSER:

7        Q.    Well, the monthly script volume

8    is 16,778, and the percentage of controlled

9    remains below 20%, correct?

10       A.    Yes, but -- but the time frame

11   on this is in November of 2013.  The increase

12   occurs in October of 2012.  I would expect to

13   see some kind of information relative to that

14   specific increase.

15       Q.    You also see the percentage of

16   controlled paid by cash at 2.5%?

17             Do you see that?

18       A.    Yes, sir.

19       Q.    And that's actually lower than

20   the percentage of noncontrolled paid by cash,

21   correct?

22       A.    Yes, sir.

23       Q.    So there's nothing suspicious

24   about that, correct?

25       A.    Again, I'll make the same kind

1    of assessment that I did earlier.  I

2    acknowledge that that is what this says, but

3    I might like to see some kind of other

4    verification that these are accurate.

5              And I make that statement based

6    on my experience with some cases I worked

7    where these type of figures were provided or

8    listed in due diligence but when actually

9    looking at the dispensing reports, that these

10   weren't accurate assessments.

11        Q.    Do you know whether Mr. Cameron

12   did look at the dispensing reports?

13        A.    I do not know if he did or did

14   not look at them.

15        Q.    Do you have any reason to

16   believe that these numbers listed in this

17   document at Bates page 211 of Exhibit 18 are

18   inaccurate?  This particular document.

19        A.    I'm not going to accept them to

20   accurate because I don't see anything that

21   would be used to verify the accuracy of them.

22        Q.    And that's the basis for your

23   criticism, is that the due diligence files

24   don't have all of the information that you

25   believe is appropriate, correct?

1          A.      It's not just what I believe is

2     appropriate; it's what I've learned through

3     my training, guidance, distributor briefings,

4     what requirements are required for making

5     these assessments.

6               I think the Masters decision

7     speaks to that too, in regards to verifying

8     information during due diligence

9     investigations.

10          Q.      The Masters decision came out

11     in 2017, correct?

12          A.      Yes, but that didn't mean --

13          Q.      Sir, that was a simple

14     question.  I asked for the year.  I'm going

15     to ask you to stop opining beyond the

16     question.

17               MR. FULLER:  He can provide the

18          explanation he wants to provide.

19               MR. PYSER:  He's going well

20          beyond the question.  Yes, we have.

21               MR. FULLER:  We have this time

22          in deposition, and your witnesses did

23          it and I let them complete their

24          answers.  You're going to let

25          Mr. Rafalski complete his answers.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  It's a simple

 2        question.

 3   BY MR. PYSER:

 4        Q.     What year --

 5                  MR. FULLER:  He can --

 6   BY MR. PYSER:

 7        Q.     -- did the Masters decision

 8   come out?

 9                  MR. FULLER:  He can complete

10        his answers.

11                  Go ahead, Mr. Rafalski.

12        A.     Do you want me to answer that

13   question or the question prior?

14   BY MR. PYSER:

15        Q.     Sir, what year did the Masters

16   decision come out?

17        A.     2017.

18        Q.     Thank you, sir.

19               Your report also talks about a

20   CVS Pharmacy No. 219 in Florida, correct?

21               We're going to be on pages 62

22   and 63 now, 63 in particular.

23        A.     Yes, sir.

24        Q.     Are you aware of the fact that

25   Cardinal Health asked the DEA to investigate
```

1    CVS Pharmacy 219 in Florida?  Did you

2    consider that in your report?

3            A.      No, I did not.  It doesn't

4    appear in my report.

5            Q.      When DEA investigates a

6    pharmacy, do they have the ability to look at

7    the scripts that were filled by that

8    pharmacy, which would include patient and

9    doctor information?

10           A.      Yes, sir.

11           Q.      When a distributor goes to a

12   customer, to a pharmacy, are they allowed to

13   see the patient information, such as the name

14   of the patient, the doctor, the medical

15   condition for which something might have been

16   prescribed?

17           A.      Well, let me just correct my

18   previous statement.  I'm not sure that if I

19   went into a pharmacy and reviewed

20   prescriptions I'd see the medical condition.

21   Sometimes there might be a notation.  So I

22   want to correct that answer.

23                   In regards to my answer to the

24   CVS is they could ask for that information.

25   They don't -- I'm not sure they have a

Highly Confidential - Subject to Further Confidentiality Review

1    right -- well, they don't have a right to

2    just go in and ask for it.  But they could

3    ask CVS to fashion a prescribing report.

4    I've -- I've obtained them in my experience

5    over the years, and minus the patient

6    information, they could get the same kind of

7    information to lead them to make some due

8    diligence decisions in regards to the

9    pharmacy.

10         Q.    Sir, are distributors allowed

11   to see patient information that's protected

12   from disclosure by the HIPAA laws?

13         A.    No.  But it would be easy for

14   them to request a report and not have that

15   information appear.

16         Q.    On pages -- so let's return to

17   that.

18              So the report that the

19   distributor could ask for from a pharmacy

20   would have less information on it than the

21   report that DEA would have, correct?

22              MR. FULLER:  Form.

23              MR. PYSER:  I'll rephrase in

24        response to --

25              THE WITNESS:  No, I can answer

1      that question.

2              MR. PYSER:  Let me rephrase

3      because your counsel made an

4      objection.

5  BY MR. PYSER:

6      Q.      Are DEA investigators able to

7  ask for information that's not available to a

8  distributor when they want to look at a

9  customer?

10             MR. FULLER:  Same objection.

11     A.      So just the mere ability to go

12  in and look at prescriptions that contain

13  patient information, I would answer yes to

14  that question.

15  BY MR. PYSER:

16     Q.      On pages 64 and 65 you list out

17  five pharmacies in a chart.

18     A.      Yes, sir.

19     Q.      Have you visited any of those

20  pharmacies?

21     A.      I have not.

22     Q.      Do you know whether or not

23  those pharmacies are active today with active

24  DEA licenses?

25     A.      I do not, and I would not have

1    the ability to confirm that.

2         Q.     Really?  Have you ever heard of

3    Google?

4         A.     Yeah, but a Google is not going

5    to give me the DEA registration of those

6    pharmacies.  It might list the pharmacy and

7    the name, but that would be an assumption it

8    would have the same DEA number.

9         Q.     Is there anyplace where you

10   could go to find out whether a DEA license is

11   still active or not?

12        A.     I think there's a service you

13   can subscribe and pay to that you can do

14   that, but I don't pay for that service.

15        Q.     Okay.  You haven't done that

16   for this case?

17        A.     I have not.

18        Q.     Earlier today you mentioned a

19   long-term care -- pharmacies that supply to

20   long-term care facilities, correct?

21        A.     Yes, sir.

22        Q.     Just in simple laymen's terms,

23   what is a long-term care facility?

24        A.     That's usually an in-house --

25   not a hospital, but it could be like a

1 long-term care, assisting living center,

2 incapacitated people, senior people, people

3 unable to fully care for themselves.

4   Q.  Could it also include hospice

5 care?

6     MR. FULLER:  Form.

7   A.  That typically wouldn't be

8 referred to as a long-term care facility

9 because hospice is not long-term care.

10 BY MR. PYSER:

11   Q.  Do long-term care facilities

12 typically have higher distributions of

13 controlled substances than your average

14 retail pharmacy?

15     MR. FULLER:  Form.

16 BY MR. PYSER:

17   Q.  In your experience?

18   A.  I can't comment one way or the

19 other on that because in my experience

20 there's small to very large.  So it's

21 possible for me to answer either way on that.

22   Q.  On kind of a percentage of

23 controlled substances versus noncontrolleds,

24 do long-term care facilities have a higher

25 percentage of controlleds than an average

Highly Confidential - Subject to Further Confidentiality Review

1    retail pharmacy, generally?

2         A.    I would say lower, general

3    statement.

4         Q.    But there may be exceptions to

5    that?

6         A.    Sure, there's always the

7    possibility of an exception.

8         Q.    Are distributors allowed to

9    change their policies over time?

10        A.    Yes, they are.  In fact, I

11   would expect it, as the industry changes and

12   their operations could potentially change.

13        Q.    So if you're looking to compare

14   whether a distributor followed its own

15   policies, it would be important to make sure

16   that the policies you're looking at are from

17   the right time period, correct?

18        A.    Yes, sir.

19        Q.    On page 67 of your report, you

20   discuss 147 suspicious orders for Summit and

21   Cuyahoga Counties from January 1st, 2013 to

22   present.  That's in the last paragraph on

23   page 67.

24        A.    Yes, sir.

25        Q.    Now, in reaching that, you note

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that -- or you claim that Cardinal continued

 2    to ship the same base codes to many of those

 3    customers.

 4              Do you see that?

 5         A.    Yes.

 6         Q.    In reaching that opinion, you

 7    assume that every customer had an accrual

 8    cycle that ends on the 21st of the month?

 9              Do you remember that work?

10         A.    I did state that, and I believe

11    I gained that information through a review of

12    one of the depositions.

13         Q.    So it's your belief that the

14    21st is the dividing line for Cardinal

15    Health, correct?

16         A.    No, sir.  I believe that

17    Cardinal Health had, I think, three different

18    dividing lines so that all of the reports --

19    I believe the statement was so that all of

20    the resets didn't occur at the same time.  So

21    I think the 21st was the one in the

22    deposition I reviewed for that particular

23    facility.

24         Q.    That facility being the

25    Wheeling facility?
```

```
 1              A.      Yes, sir.

 2              Q.      And that's the basis for your

 3      claim here?

 4              A.      Yes.

 5              Q.      Okay.  You also note that in

 6      the 2012 through '15 time frame, a Cardinal

 7      Health employee testified that Cardinal

 8      Health failed to report to the DEA

 9      approximately 14,000 orders it flagged as

10      suspicious across the country.

11                      Do you see that?

12              A.      What page are you on, please?

13              Q.      Fair question.

14                      Well, do you remember making

15      a -- drawing a conclusion that Cardinal

16      Health -- here we go -- page 68, last

17      paragraph.

18                      Also during the 2012 through

19      '15 time frame, Cardinal's employee testified

20      that Cardinal failed to report to the DEA

21      approximately 14,000 separate suspicious

22      orders.

23                      Do you see that?

24              A.      Yes.

25              Q.      Did you review the letter that
```

1    Cardinal Health provided to the DEA informing

2    them of this issue?

3         A.    I do recall reviewing some

4    documentation on that.

5         Q.    So you're aware that not a

6    single one of those orders actually shipped?

7         A.    It was my impression from

8    reviewing the documents that they had shipped

9    and they found out of their failure to

10   monitor and post distribution.

11        Q.    So it's your belief that some

12   or all of those 14,000 suspicious orders did

13   ship on page 68?

14        A.    Hold on one second, please.

15             (Document review.)

16        A.    I'd like to review the

17   deposition with the pages, and I didn't bring

18   the depositions, just the other records.

19   BY MR. PYSER:

20        Q.    Well, you don't cite in your

21   report to the letter that Cardinal Health

22   provided to DEA informing them of this issue,

23   do you?

24        A.    I do not.  I cite the

25   deposition testimony.

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.     And you also don't cite to

 2    Cardinal Health's 30(b)(6) response that also

 3    explained that not a single one of those

 4    14,000 orders shipped?

 5          A.     I don't recall ever reading

 6    that.  I just recall the testimony in the

 7    deposition.

 8          Q.     So you never read the Cardinal

 9    Health testimony on behalf of --

10          A.     I'm not saying --

11          Q.     -- their 30(b)(6) corporate

12    representative on this, correct?

13          A.     I'm not saying I didn't read

14    it.  I don't recall that statement.

15          Q.     Okay.  And you don't cite it in

16    the report?

17               MR. FULLER:  I'm sorry, I just

18          want to clarify.  You said read the

19          deposition testimony.  Ms. Norris

20          didn't testify about 14,000 orders.  I

21          think a written response was included

22          that may have addressed that.

23    BY MR. PYSER:

24          Q.     You never read Cardinal

25    Health's written response that not a single

Highly Confidential - Subject to Further Confidentiality Review

1    one of those 14,000 suspicious orders

2    shipped?

3          A.     I don't have a recollection of

4    reading that document, no, sir.

5          Q.     And do you know how many of

6    those 14,000 unshipped suspicious orders were

7    for customers in Cuyahoga or Summit County?

8          A.     No, sir.  I don't think there

9    was information provided that I could make

10   that determination.

11         Q.     So counsel never told you that

12   there were only four unreported unshipped

13   suspicious orders for customers in Cuyahoga

14   and Summit County?  They never provided you

15   that information?

16         A.     Well, I don't know that it

17   would have or not been provided to me.  I

18   don't recall reviewing it myself, no, sir.

19                MR. PYSER:  Okay.  In deference

20   to my colleagues, I'm going to stop here.

21   I'm not going to ask any more questions.  We

22   did not have time to get through all the

23   questions I had for you.  Your opinion covers

24   13 separate defendants; therefore, I reserve

25   my right to come back and ask you additional

Highly Confidential - Subject to Further Confidentiality Review

1    questions at a later point in time.

2              THE WITNESS:  Thank you, sir.

3              THE VIDEOGRAPHER:  Going off

4       the record, 4:46 p.m.

5              (Recess taken, 4:46 p.m. to

6       4:49 p.m.)

7              THE VIDEOGRAPHER:  We're back

8       on the record at 4:49 p.m.

9                   EXAMINATION

10   BY MR. EPPICH:

11       Q.    Good evening, Mr. Rafalski.  My

12   name is Chris Eppich.  I represent the

13   McKesson defendant in this litigation.

14       A.    Good evening.

15       Q.    Thanks for being here today.

16             Mr. Rafalski, you joined the

17   DEA in 2004, correct?

18       A.    Yes, sir.

19       Q.    Do you have any personal

20   knowledge about McKesson's suspicious order

21   monitoring program from before 2004?

22       A.    No, I have no information or

23   knowledge prior to that date.

24       Q.    Did you attend the distributor

25   briefing given to McKesson?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No, sir, I did not.

2    Q.    Now, you didn't attend DEA's

3  distributor briefing training until 2008,

4  correct?

5    A.    That's correct.

6    Q.    Did you have any personal

7  involvement with McKesson's suspicious order

8  monitoring programs before 2008?

9    A.    No, sir.

10    Q.    What personal knowledge do you

11  have about Mister -- about McKesson's

12  suspicious order monitoring program between

13  2004 and 2007?

14         MR. FULLER:  Counsel, when you

15       say personal knowledge, you mean from

16       outside the scope of this litigation?

17         MR. EPPICH:  I'm talking about

18       his personal knowledge, his own

19       personal knowledge.

20         MR. FULLER:  Object to the

21       form.  Anything that you acquired in

22       the scope of work or internal

23       communications, your Touhy

24       authorization doesn't allow you to

25       discuss, unless it's public

Highly Confidential - Subject to Further Confidentiality Review

1       information.

2           A.      I have no knowledge.

3   BY MR. EPPICH:

4           Q.      Have you ever visited a

5   McKesson distribution center?

6           A.      Yes, sir.

7           Q.      When was the first time you

8   visited a McKesson distribution center?

9           A.      I've only been there once.

10          Q.      When was that, sir?

11          A.      I believe it was in early 2014.

12          Q.      As a diversion investigator

13  have you ever conducted an audit or cyclic

14  investigation of a McKesson distribution

15  center?

16          A.      No, sir.

17          Q.      Have you ever interviewed

18  persons in McKesson's regulatory affairs

19  department?

20          A.      No, sir.  Well, can I maybe

21  make an explanation for that?  So when I was

22  on-site, I had discussions with the

23  regulatory affairs person, so I don't know if

24  that would be considered questioning them.

25          Q.      Did you -- pardon me.

1    A.    But I had some discussion.  I

2    don't want to think that -- make sure I have

3    a complete answer that --

4    Q.    Did you discuss McKesson's

5    suspicious order monitoring program during

6    that visit?

7    A.    I think there was some broad

8    discussion about it.

9    Q.    And when would that have

10   occurred?

11   A.    2014.

12   Q.    So at least for the time period

13   between 2004 and -- or pardon me, strike

14   that.

15        The opinions that you express

16   in your report for McKesson's suspicious

17   order monitoring program from 1997 to 2007,

18   those opinions are based only on the

19   documents and the portions of deposition

20   transcripts that you reviewed as identified

21   in Appendix I to your report?

22   A.    Yes, sir.

23   Q.    Let's go ahead and turn to

24   page 70 of your report, sir.  Are you on

25   page 70?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I am, sir.

2    Q.    I noticed that your report has

3    page numbers on it.  The report produced to

4    us does not have page numbers.  When did you

5    last update your report, sir?

6    A.    Yeah, I'm aware that you

7    probably have one that does have page

8    numbers, but it has page 1.

9    Q.    Yes, sir.  They're page 1 all

10   the way down sequentially throughout the

11   report.

12            MR. FULLER:  So every page is

13      page 1.

14   A.    So when I submitted my report,

15   the explanation that I received, because my

16   original one came back as page 1, is that

17   there was some kind of a conversion to a PDF

18   or something that was done in order to submit

19   it to the court, and that's what caused the

20   pages to change.

21            So subsequent to that, I asked

22   to have one with the page numbers.

23   BY MR. EPPICH:

24   Q.    And other than the update of

25   the page numbers to the proper page numbers,

Highly Confidential - Subject to Further Confidentiality Review

1    are there any other changes between the

2    report that you have in front of you and the

3    report that was produced in this litigation?

4         A.     No, sir, I made no changes.

5              MR. EPPICH:  I'm going to go

6         ahead and mark as Exhibit 15 the

7         report that was produced in this

8         litigation to counsel.

9              (Whereupon, Deposition Exhibit

10         Rafalski-15, Rafalski Expert Report,

11         was marked for identification.)

12              MR. EPPICH:  I'll hand you a

13         copy of that and you can set it aside.

14    BY MR. EPPICH:

15         Q.     And simply because we don't

16    have a copy of that report that's in front of

17    you, let's go ahead and mark your binder as

18    Exhibit 17.  And we can just mark the outside

19    of the binder -- pardon me, Exhibit 16.  And

20    we'll go ahead and give this to the court

21    reporter at the end for copying.

22              Thank you so much.

23         A.     Sure.

24              (Whereupon, Deposition Exhibit

25         Rafalski-16, Witness' Copy of Rafalski

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Expert Report, was marked for

 2              identification.)

 3      BY MR. EPPICH:
```

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



23          Q.      Well, distributors were all

24    receiving guidance from DEA at the same time

25    during presentations and conferences, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Well, that was one of the

 2    sources of some of the decisions.  I also --

 3    my experience says they belong to HDMA, NWDA.

 4    I went over -- had various names over various

 5    time periods.  They were also receiving

 6    guidance, I believe, or conducting meetings

 7    with them where they were maybe collaborating

 8    or sharing information.

 9          Q.     So if McKesson's Section 55

10    program had been out of compliance with

11    federal regulations and DEA was conducting

12    audits of the McKesson facilities, wouldn't

13    DEA have told McKesson during its annual

14    audits that its program was out of

15    compliance?

16          A.     I would have an expectation

17    that if a person was to go on site and

18    actually review the system, that I would have

19    an expectation that there -- maybe should

20    make some comment or do some corrective

21    action.

22               Now, I don't know if an on-site

23    visit, they actually reviewed it and

24    secondly, even if they went on-site and

25    missed it or did review it and issued or made
```

1    some corrective action, that doesn't mitigate

2    the responsibilities of the registrant.

3          Q.     And that's fair, but it's one

4    of the purposes of this audit for DEA to go

5    to the facility of the distributor to review

6    the SOM system and to provide feedback,

7    correction -- corrective feedback to the

8    distributor, if corrective feedback is

9    needed?

10         A.     So can I describe a little bit

11   further what an on-site visit is?  It's not a

12   checklist type of a visit.  It's a

13   three-pronged investigation: security,

14   recordkeeping and accountability.  Every DEA

15   investigator conducts it in whatever manner

16   they see fit as long as they cover those

17   three areas or prongs of activity.

18              So it's -- there's nothing in

19   the DEA's requirement that they would

20   specifically have to look at that or take

21   action, although I would say my expectation

22   is they should.

23         Q.     Now, you were a DEA diversion

24   investigator between 2004 and 2017, correct?

25         A.     Yes, sir.

1        Q.      And between 2004 and 2007, you

2    testified that you didn't visit a McKesson

3    facility?

4        A.      Yes, sir.

5        Q.      Are you aware of any DEA

6    personnel that told McKesson between --

7    between 1997 and 2007 that its Section 55

8    program was violating the CSA and its

9    regulations?

10       A.      I'm not aware that anyone ever

11    told them, made that statement to McKesson.

**REDACTED**

16       Q.      Yes, sir.  And in not telling

17    McKesson that the DEA believed its system was

18    violating the CSA, was the DEA contributing

19    to the cause of the opioid crisis?

20       A.      I don't really have an opinion

21    on that one way or the other.  I just want to

22    go back and reaffirm my earlier statement is

23    what the DEA did or didn't do, that didn't

24    diminish or take away the regulatory and

25    legal -- the law requirements for what

Highly Confidential - Subject to Further Confidentiality Review

1    McKesson should have done.

2         Q.     But you have no opinion sitting

3    here today as to whether or not the DEA's

4    failure to tell distributors whether or not

5    their compliance programs violated the CSA

6    contributed to the opioid crisis; is that

7    correct?

8         A.     That's an accurate statement,

9    yes, sir.

10        Q.     And why haven't you formed that

11   opinion?

12        A.     Well, because the corporations

13   or the companies that distribute drugs, their

14   responsibility is clearly stated in the law

15   and within the regulations.  If the DEA was

16   to come out and make an error, that doesn't

17   mitigate their needs to make compliance.

18              So -- and along the way,

19   there's -- a lot of times where McKesson gets

20   guidance through industry conferences, I

21   think you stated, distributor briefings, they

22   have the ability to write or ask questions to

23   the policy section of the DEA.

24              So just for clarification, I

25   don't know if anyone ever reviewed or

1  commented on that system, and it doesn't

2  diminish their responsibility under the law

3  and under the regulations.

4      Q.    But you agree that DEA is the

5  agency in the federal government that has

6  authority and responsibility for the

7  controlled system of drug distribution in

8  this country, correct?

9      A.    In -- yes, sir.  In regards to

10  the regulation, they're delegated that by the

11  Attorney General, by Congress to the Attorney

12  General, so I agree with that statement, yes,

13  sir.

14      Q.    Let me --

15      A.    And let me just clarify.

16          MR. FULLER:  Go ahead, finish.

17          MR. EPPICH:  I'm really on a

18      limited amount of time here, sir.

19          MR. FULLER:  But you can finish

20      and clarify your answer.

21      A.    Just a quick clarification.  I

22  don't want to misstate.  I believe anybody

23  who had anything to be involved with the

24  distribution of controlled substances during

25  this whole time period should have taken

Highly Confidential - Subject to Further Confidentiality Review

1  positive steps to prevent diversion.  I don't

2  want you to think that I don't believe that

3  no one had that responsibility.

4  BY MR. EPPICH:

5       Q.     And that would include the DEA,

6  correct?

7       A.     Everyone.

8       Q.     Is that a yes, sir?

9       A.     Yes, sir.

10      Q.     And I'd like to go back to our

11  discussion earlier about the do not ship

12  requirements.  You're familiar with

13  21 CFR 1301.74(b), correct?

14      A.     I am, sir.

15      Q.     And that's the one -- that's

16  the one -- that's the -- strike that.

17             This is the regulation that you

18  call the security requirement, correct?

19      A.     I don't call it a security

20  requirement.  It falls under the security

21  requirements of the CFR.

22      Q.     What are the security

23  requirements of the CFR then, if you could

24  list them for us?

25      A.     Well, I'd need a CFR.  I

```
 1    don't -- a corporate relations --

 2         Q.      Is there anything beyond

 3    Section 1301.74(b)?

 4         A.      Well, there's many.  There's a

 5    security requirement just prior to that where

 6    it requires a registrant to make a good

 7    faith -- a good-faith inquiry before

 8    distributing a controlled substance to ensure

 9    that the person has a -- as a registrant has

10    a valid DEA registration.

11              There's extensive amount of

12    regulations in regards to security of cages

13    and vaults, very detailed.  The type of gauge

14    of wire, the distance of the posts, ceilings,

15    self-closing doors.  There's vault

16    requirements, the rebar.

17              It's a whole extensive list of

18    security requirements and the security -- the

19    suspicious order systems within that section.

20         Q.      So on page 9 of your report, if

21    you could turn there, we're in Section B

22    under Regulatory Duty?

23         A.      Yes, sir.

24         Q.      It says:  The "security

25    requirement" at the heart of this case
```

1    mandates the distributors "design and operate

2    a system" to identify "suspicious orders of

3    controlled substances" and report those

4    orders to DEA, quote, the Reporting

5    Requirement, 21 CFR 1301.74(b).

6            In this paragraph, is the

7    security requirement that you're talking

8    about, is that Section 1301.74(b)?

9        A.    Yes.

10       Q.    Okay.  So in the security

11   requirement, my question for you is:  Where

12   in the security department does it state the

13   do not ship requirement?

14            MR. FULLER:  Form.

15       A.    So the overarching right to

16   regulation that's directly controlling this

17   is the maintenance of effective controls to

18   prevent diversion.  It would be within that

19   regulation which the do not ship decision --

20   or the do not ship requirement would fall.

21   BY MR. EPPICH:

22       Q.    But you agree with me that the

23   security requirement itself does not say the

24   words "do not ship," does it?

25       A.    The security requirements do

Highly Confidential - Subject to Further Confidentiality Review

1    not say those specific three words.

2         Q.    And the security requirement

3    does not say "block orders," does it?

4         A.    It doesn't -- the security

5    requirement doesn't specifically say that,

6    but as I stated earlier, those are contained

7    within the maintenance of effective controls

8    to prevent diversion.

9         Q.    And my question, sir, was just

10   that the words are not used.

11        A.    Okay.

12        Q.    Okay.  If we could turn back to

13   page 40 of your report.

14        A.    I'm sorry, what page?

15        Q.    40.  I'd like to turn to our

16   discussion of the five methodologies that

17   Dr. McCann used in his analysis.  And you

18   mentioned earlier today that you came up with

19   the idea to use those five methodologies,

20   correct?

21        A.    Yes, sir.

22        Q.    And when did you come up with

23   each of the five methodologies?

24        A.    I don't have a specific data.

25   I know that I was told that I would have to

Highly Confidential - Subject to Further Confidentiality Review

1    come up with five methodologies, so I elected

2    to use the five that I was aware of in

3    conducting this review for my opinion.

4         Q.    Who told you to come up with

5    the five methodologies?

6         A.    I believe my first conversation

7    about this was with Paul Farrell.

8         Q.    And do you recall when that

9    first conversation was?

10        A.    I do not.

11        Q.    Was it last summer?

12        A.    No, it was a little later than

13   last summer.

14        Q.    Later than last summer.

15             Did you communicate with any

16   attorneys other than Paul Farrell in coming

17   up with these five methodologies?

18        A.    I'm not drawing any direct

19   recollection, but I'm hesitant to just say no

20   because I've talked about this matter, and I

21   would probably say it's more likely than not

22   that I had some conversation about my

23   methodology.

24        Q.    And did you have any written

25   conversations or communications about these

Highly Confidential - Subject to Further Confidentiality Review

1    methodologies with plaintiffs' counsel?

2         A.    I don't believe so, telephone

3    conversations.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

7        Q.      You testified earlier about

8   ARCOS.  Are you familiar with the reports

9   generated from the ARCOS database?

10       A.      What type of reports are you

11  speaking of, sir?  Could you clarify?

12       Q.      The reports that a diversion

13  investigator can request from the ARCOS

14  database?

15       A.      Oh, so generated pursuant to a

16  request?  Yes, sir.

17       Q.      Okay.  And you saw those kind

18  of reports while you were a DEA diversion

19  investigator, correct?

20       A.      I requested those type of

21  reports as a diversion investigator.

22       Q.      On page 15 of your report --

23       A.      15?

24       Q.      15.

25               You discuss ARCOS, and in the

1    third paragraph from the top of the page, you

2    say:  The ARCOS data, defendant transactional

3    data, and the SLCG reports generated

4    therefrom are consistent with the types of

5    data, facts, information, and reports I would

6    typical rely on in conducting the analysis

7    and reaching the opinions contained therein.

8              Do you see that?

9         A.    I do, sir.

10        Q.    Now, is it your opinion that

11   Dr. McCann's five threshold-based

12   methodologies can be used to identify

13   suspicious orders under Section 1301.74?

14             MR. FULLER:  Form, compound.

15        A.    You're asking this question

16   about Dr. McCann in regards to this

17   paragraph?

18   BY MR. EPPICH:

19        Q.    I can rephrase it.

20             Is it your opinion that the

21   five threshold-based methodologies used by

22   Dr. McCann and cited by yourself, that those

23   methodologies can be used to identify

24   suspicious orders under Section 1301.74?

25        A.    No, I think my opinion is clear

Highly Confidential - Subject to Further Confidentiality Review

1   that they aren't suitable suspicious order

2   systems.

3        Q.    Is it your opinion that

4   Dr. McCann's -- and I quote -- "flagged

5   orders" are suspicious orders under

6   Section 1301.74(b)?

7        A.    Are you jumping back to the

8   methodologies?

9        Q.    I'm just asking you a question,

10  sir.

11             MR. FULLER:  You can clarify

12        the question if you don't understand.

13  BY MR. EPPICH:

14        Q.    But, yes, under the

15  methodologies.  Under the methodologies, yes,

16  sir.

17        A.    No, those aren't suspicious

18  orders under the methodologies.  Those are

19  dosage units.

20        Q.    While you were at the DEA, and

21  the DEA was analyzing ARCOS data, did DEA use

22  any of Dr. McCann's five methodologies to

23  identify suspicious orders?

24        A.    When I was at the DEA?

25        Q.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I was gone from the DEA prior

2   to Dr. McCann looking at that data.  I guess

3   I don't understand the question.

4      Q.     **REDACTED**

8      A.     No, sir.

9             DEFENSE COUNSEL:  We understand

10      the phone line has been disconnected.

11             MR. EPPICH:  Let's go off the

12      record.

13             THE VIDEOGRAPHER:  Going off

14      record at 5:13 p.m.

15             (Recess taken, 5:13 p.m. to

16      5:18 p.m.)

17             THE VIDEOGRAPHER:  We're back

18      on the record at 5:18 p.m.

19   BY MR. EPPICH:

20      Q.     Mr. Rafalski, before the break,

21   we were talking about Mr. McCann's analysis

22   on page 40 of your report.  If you could turn

23   there.

24      A.     Sure.

25      Q.     Earlier today -- let me strike

Highly Confidential - Subject to Further Confidentiality Review

1    that.

2              You're aware that Dr. McCann's

3    results rest on the assumption the

4    distributors did not conduct any diligence on

5    the first flagged suspicious order, correct?

6         A.    Yes, sir.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



```
23              Q.      And what is sufficient due

24      diligence in your mind?

25              A.      Well, I think it has to be a
```

1    sufficient investigation to remove any

2    suspicion that the drugs could be potentially

3    diverted and if they're intended for a

4    legitimate source, a legitimate use.  So it

5    would be those actions that they would take

6    to be able to confirm that and document it so

7    I would be able to review it.

8         Q.     And what is sufficient?

9         A.     Well, to merely say increase in

10   volume would not be sufficient due diligence.

11   I think every circumstance is a little bit

12   different, so I guess I would have to look at

13   the records.

14              I don't know that I could say

15   that there's a check -- I could provide a

16   checklist, but I don't know if that would be

17   sufficient, because it's dependent on the

18   scope of the business and what their needs

19   are and what's been established as usual or

20   what's normal.

21        Q.     So if McKesson conducted

22   sufficient due diligence on the first flagged

23   suspicious order under its Section 55

24   program, you'd agree that Dr. McCann's

25   analysis is based on a faulty assumption?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FULLER:  Form.
 2       A.      Well, if that did occur, then
 3   the analysis would stop and it would start
 4   again from that point forward.
 5   BY MR. EPPICH:
 6       Q.      You'd agree that at least
 7   Dr. McCann's results would change in that
 8   circumstance?
 9       A.      Yes, I would agree with that.
10       Q.      And you'd agree that if
11   McKesson conducted sufficient due diligence
12   on the first flagged suspicious order under
13   its LDMP program, that McKesson's results
14   would change, correct?
15       A.      I want to clarify my answer on
16   the last one.
17              So I would suspect that in the
18   course of all of the suspicious orders, that
19   maybe there could be one due diligence file.
20   But I think until there would actually be a
21   consistent review of orders -- so -- and I
22   know that probably needs a little
23   clarification.
24              Just say that one employee
25   became very interested and did a thorough due
```

Highly Confidential - Subject to Further Confidentiality Review

1    diligence, but that wasn't the program, and

2    it was just one occurrence, then I don't

3    think it's really faulty.

4              I think it requires that the

5    company acted -- actually had to have some

6    procedure in place to actually do due

7    diligence investigations, not just one

8    instance.

9        Q.    But in your report you assume

10   that there was no due diligence and that

11   Dr. McCann then relied on that assumption,

12   correct?

13             And so my question is very

14   specific:  If McKesson conducted sufficient

15   due diligence on that first flagged order

16   under its LDMP program, its CSMP program, its

17   Section 55 program, you would agree sitting

18   here today that the results that we see from

19   Dr. McCann's analysis, they would be

20   different?

21             MR. FULLER:  Object to form,

22        misstates the fact.  The witness

23        didn't make the assumption there was

24        no due diligence.  He's testified

25        based on his opinion there's not

1       adequate due diligence.

2           A.      That's hypothetical.  I

3   wouldn't say one -- one due diligence would

4   reset it if the company's conduct continued

5   along the same, the same level, so -- and

6   my -- and my requirement to Dr. McCann was

7   that during the entire time period, I did not

8   see a sufficient due diligence to satisfy the

9   regulatory requirements, so that's why it was

10  ran during the whole time frame.

11  BY MR. EPPICH:

12          Q.      How many due diligence

13  investigations or analyses would be enough to

14  be sufficient due diligence?

15          A.      Every one of the suspicious

16  orders.

17          Q.      Did you review any of the

18  flagged orders from Dr. McCann's analysis of

19  McKesson?

20          A.      No, sir.

21          Q.      Do you intend to offer any

22  opinions on whether the orders flagged by

23  Dr. McCann are legitimate or suspicious?

24          A.       If that requirement is required

25  of me by the attorneys in the case, I would

Highly Confidential - Subject to Further Confidentiality Review

1    complete that analysis.  I don't have any

2    independent intentions of doing that.

3         Q.    Sitting here today, you have no

4    opinions about the legitimacy of the flagged

5    orders from Dr. McCann's analysis, correct?

6              MR. FULLER:  That misstates his

7         report.

8         A.    It's -- Dr. McCann's report

9    doesn't report orders, it just reports dosage

10   units.  It doesn't say how many orders.  It

11   doesn't say there was an analysis of each

12   individual order.

13             It looked at them whether or

14   not they violated the trigger that was

15   provided for each one of them, and if it --

16   and then it moved forward without the --

17   because already knowing that there was

18   insufficient due diligence.

19   BY MR. EPPICH:

20        Q.    And you reviewed -- let me

21   strike that.

22             Let's turn to page 74 of your

23   report.  On page 74, I'm looking at

24   Section 6, the second paragraph in

25   particular.  The first sentence there says:

Highly Confidential - Subject to Further Confidentiality Review

1    There is no more effective control to prevent

2    diversion than blocking a suspicious order

3    before it is shipped.

4            Did I read that correctly?

5    A.      You did, sir.

6    Q.      And that's because a blocked

7    order of opioids remains safely in the vault

8    of the distributor's warehouse, correct?

9    A.      I guess you could make that

10   assumption.  It doesn't leave the control of

11   the distributor and have the potential to be

12   diverted, so I think that's probably the same

13   statement, yes, sir.

14   Q.      You'd agree that reporting the

15   blocked order to DEA in a suspicious order

16   report does not prevent the blocked order

17   from being diverted, correct?

18   A.      Well, that hypothetical

19   wouldn't occur because if you block an order

20   and report it, that doesn't -- unless you're

21   saying that that causes a distribution, and

22   if that causes the distribution without the

23   effective due diligence, then no, that would

24   not be true.

25            I would say that it would

1   probably be more prone to be diverted than

2   not diverted because you've already

3   identified it as a suspicious order.

4        Q.    Would you agree that a

5   suspicious order monitoring program that does

6   not report suspicious orders but blocks

7   suspicious orders can be effective in

8   preventing diversion?

9        A.    It doesn't meet the regulatory

10  requirement.

11       Q.    But can it be effective in

12  preventing diversion?

13       A.    That's a hypothetical I'm not

14  going to comment on.

15       Q.    You don't have any opinion on

16  whether or not a suspicious order monitoring

17  program that does not report suspicious

18  orders but blocks suspicious orders can be

19  effective in preventing diversion?

20            MR. FULLER:  Object to form.

21       A.    I don't really have an opinion

22  because it's -- it wouldn't be something that

23  would be evaluated as regards to the -- to

24  the regulation.

25            If hypothetically the --

Highly Confidential - Subject to Further Confidentiality Review

1    McKesson decided not to ship any more

2    controlled substances, that would -- you

3    know, there would be no diversion, so it's

4    just a hypothetical that --

5    BY MR. EPPICH:

6         Q.     Yes, and you're an expert in

7    this case, sir.

8         A.     I don't have an opinion.

9         Q.     So hypothetically, if there is

10   a suspicious order monitoring program --

11        A.     Okay.

12        Q.     -- that reports a suspicious

13   order -- or excuse me, that does not block --

14   let me strike that.

15             If there is a suspicious order

16   monitoring program that does not report

17   suspicious orders but blocks suspicious

18   orders, that program can be effective in

19   preventing diversion?

20        A.     So the mere act of doing that

21   is in violation of the regulation, but the

22   outcome of blocking the order would obviously

23   keep it from being distributed and it would

24   not lead to diversion.

25        Q.     Blocking the order of the

Highly Confidential - Subject to Further Confidentiality Review

1    opioid pills before shipment is what prevents

2    diversion from occurring, correct?

3         A.    Yes, sir.

4              MR. FULLER:  Form.

5    BY MR. EPPICH:

6         Q.    Not the reporting of the

7    suspicious order to DEA, correct?

8         A.    But we were discussing the

9    regulatory requirement, so it's to design and

10   operate a system to disclose suspicious

11   orders, and upon disclosure, be reported to

12   the DEA.  Under the maintenance of effective

13   controls, it's to stop the shipment.

14             Now, just the mere fact of

15   stopping a shipment when you've identified it

16   as a potential suspicious order would prevent

17   diversion.

18        Q.    My question was a little

19   different, and so let me rephrase it.

20             You'd agree that not reporting

21   the suspicious order to DEA is not what

22   causes diversion?

23        A.    That's correct.

24             MR. FULLER:  Object to form.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

1      BY MR. EPPICH:

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

15        Q.    We're going to move on.  Let's

16    turn to page 15 of your report.

17        A.    15?

18        Q.    Yes, sir.

19              Now, on page 15 of your report,

20    sir, under Section E, the DEA Diversion

21    Investigator's Manual?

22        A.    Yes, sir.

23        Q.    Your first sentence says:  The

24    DEA published a manual which provides further

25    guidance related to the statutory and

1    regulatory duties.

2            Do you see that?

3    A.    Yes, sir.

4    Q.    The manual you're referring to

5    in that sentence, is that the DEA Diversion

6    Investigator's Manual?

7    A.    Yes, sir.

8    Q.    You agree that the DEA

9    Diversion Investigator's Manual is not

10   available to registrants?

11           MR. FULLER:  Form, misstates

12       the evidence.

13   A.    I believe it was provided to

14   registrants.

15   BY MR. EPPICH:

16   Q.    So if a registrant asked in

17   1996 for a copy of DEA's Diversion

18   Investigator's Manual, you as a DEA diversion

19   investigator could hand over that manual; is

20   that what you're saying?

21   A.    I'm not saying that.  I'm

22   saying that I have knowledge that in 1996, a

23   DEA registrant asked -- I believe requested

24   it and it was provided to him.

25   Q.    Which registrant?

```
1              A.      Cardinal.

2              Q.      Do you have any knowledge of

3      McKesson receiving a DEA Diversion

4      Investigator's Manual?

5              A.      No, sir.

6              Q.      Now, I'd like to look at the

7      quote that you have excerpted on page 15 of

8      your report.  You're familiar with that --

9      with that excerpt, aren't you?

10                  MR. FULLER:  I'm sorry, what

11          page, Counsel?

12                  MR. EPPICH:  On page 15.

13             A.      The bold section, the italics?

14     BY MR. EPPICH:

15             Q.      The entire quote, sir.

16             A.      Yes, sir.

17             Q.      Do you know where that quote

18     comes from?

19             A.      The manual.

20             Q.      Which version of the manual,

21     sir?

22             A.      I believe the 1996 manual.

23             Q.      And it's from Section 5126,

24     Requirements to Report Suspicious Orders; is

25     that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1             MR. FULLER:  If you recall.  If

2        not, you can pull the document.

3        A.     I don't recall specifically.

4    BY MR. EPPICH:

5        Q.     Now, the excerpt that you have

6    provided in your report on page 15, this does

7    not say do not ship an order reported to DEA

8    as a suspicious order, does it?

9        A.     Doesn't say the terms "do not

10   ship," if that's your question, no, sir.

11       Q.     Thank you.

12             MR. EPPICH:  Why don't we go

13        off the record for a really quick

14        break.

15             THE VIDEOGRAPHER:  Going off

16        the record at 5:43 p.m.

17             (Recess taken, 5:43 p.m. to

18        5:45 p.m.)

19             THE VIDEOGRAPHER:  We're back

20        on the record at 5:45 p.m.

21   BY MR. EPPICH:

22       Q.     If we could turn to page 10 of

23   your report.  On page 10, the first full

24   paragraph at the top of the page says:  The

25   regulatory duty not difficult to understand,

Highly Confidential - Subject to Further Confidentiality Review

```
1      as one who voluntarily applies to become a

2      registrant must submit an application and

3      undergo a preregistration investigation.  The

4      preregistration investigation involves a

5      thorough on-site inspection of the

6      registrant's facilities as well as extensive

7      discussions of the applicable regulations and

8      the security requirements that must be

9      followed.

10             Did I read that correctly?

11     A.     Yes, you did.

12     Q.     Now, it's true that each

13     pharmacy, distributor and manufacturer must

14     register with the DEA in order to lawfully

15     handle controlled substances in the closed

16     system of distribution, correct?

17     A.     Yes, sir.

18     Q.     Each pharmacy, distributor and

19     manufacturer must submit an application to

20     DEA?

21     A.     Yes, sir.

22     Q.     The DEA then conducts an

23     on-site inspection of each applicant's

24     facilities, correct?

25     A.     They do not conduct on-site
```

Highly Confidential - Subject to Further Confidentiality Review

1    investigations of pharmacies, at least not in

2    the Detroit division.

3         Q.    Your testimony here today is

4    that they conduct on-site inspections of

5    distributors?

6         A.    Yes, sir, and manufacturers

7    prior to approval of a registration.

8         Q.    Why doesn't the DEA conduct

9    on-site inspections of pharmacies?

10             MR. FULLER:  Object to form,

11        remind you of your Touhy obligation

12        and internal conversations.

13             THE WITNESS:  On advice of my

14        counsel, I'm not going to answer that

15        question.

16   BY MR. EPPICH:

17        Q.    Does DEA discuss the

18   regulations and security requirements with

19   each pharmacy, distributor and manufacturer

20   applicant before registration?

21        A.    Affirmative to distributors and

22   manufacturers.  No with pharmacies.

23        Q.    Why doesn't DEA discuss the

24   regulations and security requirements with

25   pharmacy applicants before registration?

```
 1              MR. FULLER:  Objection and the
 2         same Touhy reminder.
 3              THE WITNESS:  On advice of
 4         counsel, I'm not going to answer that
 5         question.
 6    BY MR. EPPICH:
 7         Q.    Now, you're familiar with 21
 8    CFR Section 1301.74(a), correct?
 9         A.    Yes, sir.
10         Q.    Now, Section 1301.74(a)
11    requires registrants to check the
12    registration status of its customers before
13    distributing a controlled substance to that
14    customer, correct?
15         A.    Yes, I believe it says to make
16    a good-faith effort to check.
17         Q.    And DEA conducts all of this
18    diligence on applicants so the distributors
19    can rely on the DEA registrations when
20    complying with 1301.74(a), correct?
21         A.    I'm sorry, you have to say it
22    one more time.
23         Q.    You'd agree with me that DEA
24    conducts diligence on its applicants so that
25    distributors can rely on the DEA
```

1   registrations when complying with 1301.74(a)?

2       A.      Whether or not they posses a

3   valid DEA registration, is that what you're

4   asking?  Yes, sir.

5       Q.      Let me make sure my question

6   was clear.  You would agree that DEA conducts

7   diligence, reviews applications, looks at the

8   background of these applicants so that

9   distributors can rely on the DEA

10  registrations when complying with 1301.74(a)?

11              MR. FULLER:  Object to form.

12      A.      So if your question is in

13  regards to pharmacies, they don't conduct

14  those types of investigations, so I'm --

15  maybe I'm still confused by the question.

16  BY MR. EPPICH:

17      Q.      My apologies for that.

18              It's true that distributors are

19  to rely on active DEA registrations when

20  complying with 1301.74(a)?

21      A.      Yes, sir.  They are required by

22  regulation to make a good-faith effort to

23  confirm that the person that they're going to

24  distribute drugs to has a valid DEA

25  registration.

1        Q.      And that's actually the only

2   requirement under Section 1301.74(a),

3   correct?

4        A.      Yes, it is.

5             MR. EPPICH:  Mr. Rafalski, I

6        appreciate your time today.  It's been

7        short, and there are a lot of

8        questions that McKesson has for you

9        that we won't be able to get in the

10       brief time I have, so we will reserve

11       our right to return and reopen this

12       deposition if need be.  Thank you so

13       much.  We're off the record.

14             THE VIDEOGRAPHER:  Going off

15       the record at 5:50 p.m.

16             (Recess taken, 5:50 p.m. to

17       5:58 p.m.)

18             THE VIDEOGRAPHER:  Back on the

19       record at 5:58 p.m.

20                  EXAMINATION

21   BY MR. JONES:

22       Q.      Good afternoon, Mr. Rafalski.

23   My name is Scott Jones.  I'm going to ask you

24   some questions for my clients, Henry

25   Schein Inc. and Henry Schein Medical

Highly Confidential - Subject to Further Confidentiality Review

 1    Systems Inc.

 2              Do you understand that?

 3    A.     Yes, sir, good evening.

 4    Q.     Good evening.

 5              You mentioned earlier when you

 6    were asked to kind of allot the amount of

 7    time that you've spent in looking at the

 8    various defendants; and you mentioned Henry

 9    Schein earlier.

10              Do you remember that?

11    A.     Yes, sir.

12    Q.     And you mentioned that you

13    hadn't spent as much time looking at them as

14    the other defendants, correct?

15    A.     In proportion to the larger

16    distributors, yes, sir.

17    Q.     And in your report, you make

18    reference to the CT1 cases?

19    A.     Yes, sir.

20    Q.     And it's the Track 1 cases?

21    A.     (Nods head.)

22    Q.     And what do you understand

23    those cases to be?

24    A.     Distributions into the two

25    counties, Cuyahoga County and the other

1    county.

2          Q.      Summit?

3          A.      Yeah, Summit County, thank you.

4          Q.      And you understand that each of

5    those is a separate lawsuit and Henry Schein

6    is only named to one of those lawsuits?

7          A.      Yes, sir.

8          Q.      Do you know which one?

9          A.      I don't recall right off the

10   top of my head, no, sir.

11         Q.      I'll tell you that's the Summit

12   County lawsuit.

13         A.      Okay.

14         Q.      If you would, you've got your

15   report in front of you?

16         A.      Yes, sir.

17         Q.      If you would flip over to

18   page 40 of your report.

19         A.      Back to the methodologies.

20   Okay.

21         Q.      And down there, Roman numeral

22   III, Identifying Suspicious Orders

23   Distributed in CT1.

24                 Do you see that?

25         A.      Yes, sir.

```
 1              Q.      And then on the next page are

 2       these five methodologies, right?

 3              A.      Yes, sir.

 4              Q.      And listening today, I

 5       understand that these are your five

 6       methodologies, correct?

 7              A.      Yes, sir.

 8              Q.      You came up with these?

 9              A.      Yes, sir.

10              Q.      And then you applied them --

11                      MR. FULLER:  Form.

12       BY MR. JONES:

13              Q.      -- to particular defendants,

14       correct?

15              A.      I'm sorry.  Ask that question

16       again.

17              Q.      Sure.

18                      In looking at pages 41, 42, 43,

19       44, 45 --

20              A.      Yes, sir.

21              Q.      -- and part of 46, there's

22       charts here laid out under these five

23       methodologies.

24              A.      Yes, sir.

25              Q.      And these are your
```

Highly Confidential - Subject to Further Confidentiality Review

1    methodologies?

2         A.     Yes, sir.

3         Q.     You came up with these?

4         A.     Yes, sir.  Well, came up based

5    on the suspicious order systems in place by

6    these registrants, but, yes, sir.

7         Q.     Okay.  And then you

8    incorporated these into your report?

9         A.     Yes, sir.

10        Q.     And then you applied them to

11   particular defendants, correct?

12        A.     I requested they be applied to

13   particular defendants, yes, sir.

14        Q.     Okay.  So you -- you selected

15   which defendants are named in each of these

16   tables then?

17             MR. FULLER:  Object to form.

18        A.     Yes.

19   BY MR. JONES:

20        Q.     Okay.  And in none of those

21   tables is Henry Schein mentioned, right?

22        A.     That's correct.

23        Q.     In fact, in each of these

24   methodologies, it's broken out by Cuyahoga

25   County and Summit County, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, sir.

2    Q.    And Henry Schein isn't even

3  named to the Cuyahoga County lawsuit as far

4  as you know, right?

5    A.    That's correct.

6    Q.    And you've been involved in

7  this case, at least as a consultant or

8  otherwise, since 2017?

9    A.    Yes, sir.

10    Q.    Did you ever ask, well, why

11  isn't Henry Schein named to both lawsuits?

12    A.    I did not, sir.

13    Q.    Did anybody come to you and

14  say, hey, do you think we ought to sue Henry

15  Schein in both lawsuits?

16    A.    No, sir.

17    Q.    And when the opportunity came

18  to amend the lawsuit, did you speak up and

19  say, hey, we ought to add Henry Schein to

20  that lawsuit?

21    A.    No.

22    MR. FULLER:  Form.

23    A.    My capacity, I don't make those

24  kind of decisions or statements.

25  BY MR. JONES:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  But you're the -- you're

2    the guy, you're the expert on what's an

3    effective SOM system and what's not an

4    effective SOM system for the plaintiffs,

5    right?

6    A.    I am.

7    Q.    And there's not another

8    individual who's been designated as an expert

9    by the plaintiffs to help you in analyzing

10   whether or not a SOM system is compliant or

11   noncompliant?

12   A.    That is a correct statement,

13   yes, sir.

14   Q.    Okay.  And sitting here today,

15   you don't know the number of suspicious

16   orders that Henry Schein has distributed into

17   Summit County?

18   A.    If you're asking do I have a

19   specific number of orders, I do not.

20   Q.    Okay.  In fact, you don't know

21   if any suspicious orders have been

22   distributed by Henry Schein into Summit

23   County, do you?

24   A.    I don't state that in my

25   report, no, sir.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Okay.  And similarly, you don't

2  know what, if any, orders that Henry Schein

3  distributed into Summit County were diverted?

4          (Document review.)

5     A.    I do not have knowledge of any

6  drugs that were diverted.

7  BY MR. JONES:

8     Q.    As part of your work in this

9  case, you reviewed Henry Schein's standard

10  operating procedures?

11     A.    Yes, sir.

12     Q.    Or SOPs?

13     A.    Yes, sir.

14     Q.    You also reviewed Henry Schein

15  witness deposition testimony?

16     A.    I'm just checking.  I don't

17  have a recollection of that.

18          (Document review.)

19     A.    Yes, sir, I believe I did.

20  BY MR. JONES:

21     Q.    Do you recall whose?

22     A.    Abreu.

23     Q.    Is that a man or a woman, do

24  you know?

25     A.    I don't recall.  I remember the

1    name.

2          Q.      Okay.  And do you know what

3    Abreu's position was within Henry Schein?

4          A.      I don't recall.

5          Q.      Do you remember -- do you

6    remember anything from reading that witness'

7    deposition?

8          A.      I remember the name and looking

9    at some of the -- you know, re-reviewing some

10   of the cites here in the deposition.

11         Q.      Okay.

12         A.      But I don't have any direct

13   recollection without getting out the

14   deposition and reviewing it.

15         Q.      All right.  If you would, would

16   you flip over to page 137 of your report, and

17   if you look down, the last full paragraph

18   starting with Orders.

19                 Do you see that?

20         A.      Yes, sir.

21         Q.      And there -- and you wrote

22   this, correct?

23         A.      Yes, sir.

24         Q.      And there you wrote:  Orders

25   that are, quote, identified as suspicious

Highly Confidential - Subject to Further Confidentiality Review

```
1    will pend for review, closed quote.

2         A.     Yes.

3         Q.     And do you have an

4    understanding as to what "pend" means?

5         A.     Yes, be held or stop.

6         Q.     Okay.  Is that like being

7    blocked?

8         A.     Yes, sir, that could be another

9    term.

10        Q.     Okay.  Which is something that

11   you talked about earlier when being

12   questioned by McKesson's lawyer?

13        A.     I think I've discussed it all

14   day long, but yes, also with McKesson.

15        Q.     I think you have.

16               And if an order is blocked or

17   pend or held, it's not being diverted, is it?

18        A.     That's correct.

19        Q.     And there you cite -- it's

20   footnote 642.

21               Do you see that?

22        A.     Yes, sir.

23        Q.     Do you know what you're

24   referencing there?

25        A.     I have to get the document.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.      Well, I will tell you that

 2    you're referencing a standard operating

 3    procedure for Henry Schein.  Do you remember

 4    the date?

 5          A.      No, I'd like to get the

 6    document.

 7          Q.      Sure.  If you'd like to take a

 8    look at it, that's fine.

 9               (Document review.)

10          A.      404228 or 4226, I'm sorry?

11    BY MR. JONES:

12          Q.      4228.

13          A.      I have 4226.  I do not have

14    that document.  I'll take a look one more

15    time.

16          Q.      I'll tell you what.  I'll just

17    tear mine out and we'll use it as an exhibit,

18    if you don't mind.

19               (Whereupon, Deposition Exhibit

20          Rafalski-17, Henry Schein SOP,

21          HSI-MDL-00404226 - HSI-MDL-00404228,

22          was marked for identification.)

23    BY MR. JONES:

24          Q.      All right.  I'm going to mark

25    as Exhibit 17 kind of a ratty copy --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      That's okay.

 2              Q.      -- of the document that we've

 3      been talking about.  Why don't you take a

 4      look at that, and just so the record is

 5      clear, we're looking at page 137 of your

 6      report in connection with the statement that

 7      you write:  Orders that are, quote,

 8      identified as suspicious will pend for

 9      review, closed quote.

10                      And footnote 642, which

11      references what I've marked as Exhibit 17.

12      Does that comport with your understanding?

13              A.      Yes, sir.

14              Q.      And can you tell us what that

15      is?

16              A.      What this is?

17              Q.      Yeah.

18              A.      The title is Henry Schein Inc.

19      Verifications, and it says Procedures For

20      Controlled Drug Orders.  The date is

21      February 5th, 1998, document number

22      RB-Verification.

23              Q.      Okay.

24              A.      Approved by and there's a

25      signature.
```

1     Q.     Okay.  But that's a 1998

2     standard operating procedure, correct?

3     A.     Yes, sir.

4     Q.     And that's what you refer to as

5     part of Henry Schein's practice of pending

6     orders that are deemed -- that are identified

7     as suspicious, correct?

8     A.     Yes, sir.

9     Q.     Okay.  And your understanding

10    in looking through Henry Schein's policies

11    and procedures and reviewing the deposition

12    testimony is that Henry Schein would also

13    provide monthly reports to DEA that

14    identified all of the orders pended.

15           Do you remember that?

16    A.     Yes, sir.

17    Q.     And you're critical of that

18    because that's not done as promptly as you

19    think it should?

20    A.     That would be one of my

21    criticisms, that those orders are provided at

22    a time that's after the shipment.

23    Q.     No, let's back up a little bit.

24           We just got through talking

25    about how if an order is pended, it doesn't

1    ship, right?

2         A.    Yes, sir, maybe I misunderstood

3    the question.  I'm sorry.

4         Q.    I think you did.  I think you

5    did.

6              When Henry Schein sends their

7    pended order reports to the DEA on a monthly

8    basis, those orders are pended, correct?

9         A.    Held orders?

10        Q.    Yes.

11        A.    Yes, sir.

12        Q.    So they're not being shipped,

13   are they, pending review?

14        A.    That would be a correct

15   assumption of this -- that statement, yes,

16   sir.

17        Q.    Okay.  And do you know how long

18   Henry Schein provided the monthly pended

19   reports to DEA?

20              (Document review.)

21   BY MR. JONES:

22        Q.    If you don't mind, let me help

23   you out just to kind of move things along.

24        A.    Sure.

25        Q.    If I represented to you that

1    Henry Schein provided monthly pended reports

2    to DEA from the mid to late 1990s up until

3    April 2015, sitting here today, do you have

4    any reason to disagree with that?

5        A.    I would have no reason to

6    accept it or disagree with it, sir.

7        Q.    Okay.  And they stopped in

8    April of 2015.  Do you know why?

9        A.    No, sir.

10       Q.    Would it surprise you to know

11   that the reason why they stopped is because

12   the DEA told them to stop sending them the

13   pended reports?

14       A.    That would not -- if your

15   question is would that surprise me --

16       Q.    Right.

17       A.    -- it would not because if it

18   was a communication to the DEA that was not a

19   suspicious order and it was a held order, I

20   would -- I would believe that the DEA would

21   want a report of suspicious orders.

22       Q.    Okay.  Do you know whether or

23   not as part of the pended order reports that

24   were delivered monthly also included a list

25   of those orders deemed suspicious following

Highly Confidential - Subject to Further Confidentiality Review

1    Henry Schein's investigation?

2         A.    Let me see if I state that in

3    my report.  I don't have independent

4    recollection of that.

5         Q.    So you don't know one way or

6    the other?

7         A.    No, I'm not saying that.

8         Q.    Okay.

9         A.    I'm just saying I don't have a

10   direct recollection when you state it that

11   way.

12        Q.    How is that different than what

13   I asked?  Let me back up then.

14             Sitting here today, do you know

15   one way or the other whether or not Henry

16   Schein provided monthly suspicious order

17   reports along with the pended order reports?

18        A.    The statement I make in my

19   report is for the time period of 2009 to

20   2018, that there were no suspicious orders

21   reported in the CT1 jurisdiction.

22        Q.    Well, I know -- I --

23        A.    I --

24        Q.    Mr. Rafalski, I get that.

25        A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     I mean, but that's specific to
 2   Summit County, isn't it?
 3          A.     Yes, sir.
 4          Q.     That doesn't pertain to Henry
 5   Schein and how they do business elsewhere,
 6   does it?
 7          A.     It does not.
 8          Q.     And you're familiar with Craig
 9   McCann's characterization of Henry Schein's
10   business in Summit County, are you not?
11          A.     No, I'm not sure what statement
12   you're making there.
13          Q.     Okay.  Are you familiar with --
14   do you know that he gave a deposition last
15   week?
16          A.     I -- he did give a deposition.
17          Q.     And you probably haven't had a
18   chance to review the testimony yet, have you?
19          A.     I have not.
20          Q.     Have you had a chance to talk
21   to him about it?
22          A.     No, sir.
23          Q.     Would it surprise you to know
24   that he characterized Henry Schein's dealings
25   with Summit County as de minimis?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I would have no reason not to

2    believe your statement that that's what he

3    said.

4    Q.    Do you know if DEA has ever

5    expressed any criticisms about Henry Schein's

6    suspicious order monitoring system?

7    A.    I'm not aware of any

8    communication from the DEA to Henry Schein in

9    regards to that topic.

10    Q.    Mr. Rafalski, can reasonable

11    minds disagree as to whether or not an order

12    is suspicious?

13    A.    I think there's always the

14    potential for a disagreement of -- if you're

15    talking about designing a system and what's

16    suspicious.  I think it's the subsequent due

17    diligence that confirms or not the accuracy

18    of whether or not an order is suspicious.

19         So just the nature of an

20    agreement or disagreement on what defines a

21    suspicious order, you mean the definition of

22    it or what it is, I guess?

23    Q.    Can reasonable minds disagree

24    as to whether or not a particular order is

25    suspicious?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I think, yes, I would answer
 2    yes to that question.
 3                  MR. JONES:  All right.  No
 4          further questions.  I'll pass the
 5          witness.  Thank you.
 6                  THE VIDEOGRAPHER:  Going off
 7          the record at 6:16 p.m.
 8                  (Proceedings recessed at
 9          6:16 p.m.)
10                      --o0o--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE
 2              I, MICHAEL E. MILLER, Fellow of
        the Academy of Professional Reporters,
 3      Registered Diplomate Reporter, Certified
        Realtime Reporter, Certified Court Reporter
 4      and Notary Public, do hereby certify that
        prior to the commencement of the examination,
 5      JAMES E. RAFALSKI was duly sworn by me to
        testify to the truth, the whole truth and
 6      nothing but the truth.
 7              I DO FURTHER CERTIFY that the
        foregoing is a verbatim transcript of the
 8      testimony as taken stenographically by and
        before me at the time, place and on the date
 9      hereinbefore set forth, to the best of my
        ability.
10
                I DO FURTHER CERTIFY that pursuant
11      to FRCP Rule 30, signature of the witness was
        not requested by the witness or other party
12      before the conclusion of the deposition.
13              I DO FURTHER CERTIFY that I am
        neither a relative nor employee nor attorney
14      nor counsel of any of the parties to this
        action, and that I am neither a relative nor
15      employee of such attorney or counsel, and
        that I am not financially interested in the
16      action.
17
18      _____
        MICHAEL E. MILLER, FAPR, RDR, CRR
19      Fellow of the Academy of Professional Reporters
        NCRA Registered Diplomate Reporter
20      NCRA Certified Realtime Reporter
        Certified Court Reporter
21
        Notary Public
22      My Commission Expires:  7/9/2020
23      Dated: May 15, 2019
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.

10              You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14              It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                              ERRATA

 2      PAGE   LINE   CHANGE

 3      _____  _____  _____

 4             REASON: _____

 5      _____  _____  _____

 6             REASON: _____

 7      _____  _____  _____

 8             REASON: _____

 9      _____  _____  _____

10             REASON: _____

11      _____  _____  _____

12             REASON: _____

13      _____  _____  _____

14             REASON: _____

15      _____  _____  _____

16             REASON: _____

17      _____  _____  _____

18             REASON: _____

19      _____  _____  _____

20             REASON: _____

21      _____  _____  _____

22             REASON: _____

23      _____  _____  _____

24             REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, JAMES E. RAFALSKI, do hereby
         certify that I have read the foregoing pages
 5       and that the same is a correct transcription
         of the answers given by me to the questions
 6       therein propounded, except for the
         corrections or changes in form or substance,
 7       if any, noted in the attached
         Errata Sheet.

 8

 9

10

11

12       _____

          JAMES E. RAFALSKI                   DATE
13

14

15       Subscribed and sworn to before me this

16       _____ day of _____, 20 _____.

17       My commission expires: _____

18

19       _____

20       Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2

 3      PAGE      LINE

 4      _____     _____     _____

 5      _____     _____     _____

 6      _____     _____     _____

 7      _____     _____     _____

 8      _____     _____     _____

 9      _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____

25
```