```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL           )   MDL No. 2804
      PRESCRIPTION OPIATE       )
 4    LITIGATION                )   Case No.
                                )   1:17-MD-2804
 5                              )
      THIS DOCUMENT RELATES TO  )   Hon. Dan A.
 6    ALL CASES                 )   Polster
                                )
 7
 8
 9                    __ __ __
10             Tuesday, May 14, 2019

                      __ __ __
11
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                      __ __ __
13
14
15
16        Videotaped Deposition of JAMES E.
      RAFALSKI, VOLUME 2, held at Weitz &
17    Luxenburg PC, 3011 West Grand Avenue, Suite
      2150, Detroit, Michigan, commencing at
18    8:25 a.m., on the above date, before
      Michael E. Miller, Fellow of the Academy of
19    Professional Reporters, Registered Diplomate
      Reporter, Certified Realtime Reporter and
20    Notary Public.
21
22
23                    __ __ __
24          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         MCHUGH FULLER LAW GROUP
           BY:  MICHAEL J. FULLER, ESQUIRE
 3              mike@mchughfuller.com
                ALLAN "AJ" ELKINS, JR., ESQUIRE
 4              aj@mchughfuller.com
                AMY QUEZON, ESQUIRE
 5              amy@mchughfuller.com
           97 Elias Whiddon Road
 6         Hattiesburg, Mississippi 39402
           (601) 261-2220
 7         Counsel for MDL Plaintiffs
 8
 9         KELLER ROHRBACK LLP
           BY:  GARY A. GOTTO, ESQUIRE
10              ggotto@kellerrohrback.com
           3101 North Central Avenue
11         Suite 1400
           Phoenix, Arizona 85012
12         (602) 248-0088
           Counsel for MDL Plaintiffs
13
14         BRANSTETTER STRANCH & JENNINGS PLLC
           BY:  TRICIA HERZFELD, ESQUIRE
15              triciah@bsjfirm.com@bsjfirm.com
           223 Rosa L. Parks Boulevard
16         Suite 200
           Nashville, Tennessee 37203
17         (615) 254-8801
           Counsel for Tennessee Plaintiffs
18
19         REED SMITH LLP
           BY:  ABIGAIL M. PIERCE, ESQUIRE
20              abigail.pierce@reedsmith.com
           1717 Arch Street
21         Suite 3100
           Philadelphia, Pennsylvania 19103
22         (215) 851-8100
           Counsel for AmerisourceBergen Drug
23         Corporation
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        WILLIAMS & CONNOLLY LLP
          BY:  STEVEN M. PYSER, ESQUIRE
 3             spyser@wc.com
               BRAD MASTERS, ESQUIRE
 4             bmasters@wc.com
          725 Twelfth Street, N.W.
 5        Washington, D.C. 20005
          (202) 434-5000
 6        Counsel for Cardinal Health Inc.
 7
 8        JONES DAY
          BY:  NEAL J. STEPHENS, ESQUIRE
 9             nstephens@jonesday.com
          1755 Embarcadero Road
10        Palo Alto, California 94303
          (650) 739-3939
11        Counsel for Walmart Corporation
12
13        ROPES & GRAY LLP
          BY:  ANDREW O'CONNOR, ESQUIRE
14             andrew.o'connor@ropesgray.com
               WILLIAM DAVISON, ESQUIRE
15             william.davison@ropesgray.com
          Prudential Tower
16        800 Boylston Street
          Boston, Massachusetts 02199
17        (617) 951-7000
          Counsel for Mallinckrodt Pharmaceuticals
18
19        COVINGTON & BURLING LLP
          BY:  CHRISTOPHER K. EPPICH, ESQUIRE
20             ceppich@cov.com
          1999 Avenue of the Stars
21        Los Angeles, California 90067
          (424) 332-4800
22        Counsel for McKesson Corporation
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2         COVINGTON & BURLING LLP
           BY:  MEGHAN MONAGHAN, ESQUIRE
 3             mmonaghan@cov.com
           One City Center
 4         850 Tenth Street, N.W.
           Washington, D.C. 20001
 5         (202) 662-6000
           Counsel for McKesson Corporation
 6
 7         LOCKE LORD LLP
           BY:  C. SCOTT JONES, ESQUIRE
 8             sjones@lockelord.com
           2200 Ross Avenue
 9         Suite 2800
           Dallas, Texas 75201
10         (214) 740-8000
           Counsel for Henry Schein, Inc. and
11         Henry Schein Medical Systems, Inc.
12
13         FOLEY & LARDNER LLP
           BY:  JAMES W. MATTHEWS, ESQUIRE
14             jmatthews@foley.com
           111 Huntington Avenue
15         Boston, Massachusetts 02199
           (617) 342-4000
16         Counsel for Anda Inc.
17
18         ARNOLD & PORTER KAYE SCHOLER LLP
           BY:  DAVID D. FAUVRE, ESQUIRE
19             david.fauvre@arnoldporter.com
           601 Massachusetts Avenue, N.W.
20         Washington, D.C. 20001
           (202) 942-5000
21         Counsel for Endo Health
           Solutions Inc., Endo
22         Pharmaceuticals Inc., Par
           Pharmaceutical, Inc. and Par
23         Pharmaceutical Companies, Inc.
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        KIRKLAND & ELLIS LLP
          BY:  ERICA B. ZOLNER, ESQUIRE
 3             erica.zolner@kirkland.com
               KAITLYN L. COVERSTONE, ESQUIRE
 4             kaitlyn.coverstone@kirkland.com
          300 North LaSalle
 5        Chicago, Illinois 60654
          (312) 862-2000
 6        Counsel for Allergan Finance LLC
 7
 8        MORGAN LEWIS & BOCKIUS LLP
          BY:  MAUREEN K. BARBER, ESQUIRE
 9             maureen.barber@morganlewis.com
          One Oxford Centre
10        Thirty-Second Floor
          Pittsburgh, Pennsylvania 15219
11        (412) 560-3300
          Counsel for Teva Pharmaceuticals
12        USA Inc., Cephalon Inc., Watson
          Laboratories Inc., Actavis LLC, and
13        Actavis Pharma Inc. f/k/a Watson
          Pharma Inc.
14
15        ZUCKERMAN SPAEDER LLP
          BY:  GRAEME W. BUSH, ESQUIRE
16             gbush@zuckerman.com
               PAUL B. HYNES, JR., ESQUIRE
17             phynes@zuckerman.com
               (via teleconference)
18        1800 M Street, N.W.
          Suite 1000
19        Washington, D.C. 20036
          (202) 778-1800
20        Counsel for CVS Indiana LLC and
          CVS Rx Services Inc.
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         DECHERT LLP
           BY:  ERIK W. SNAPP, ESQUIRE
 3              erik.snapp@dechert.com
           35 West Wacker Drive
 4         Suite 3400
           Chicago, Illinois 60601
 5         (312) 646-5800
           Counsel for Purdue Pharma
 6
 7         O'MELVENY & MYERS LLP
           BY:  AMY R. LUCAS, ESQUIRE
 8              alucas@omm.com
           1999 Avenue of the Stars
 9         8th Floor
           Los Angeles, California 90067
10         (213) 430-6000
           Counsel for Janssen Pharmaceuticals Inc.
11
12         MARCUS & SHAPIRA LLP
           BY:  JOSHUA A. KORBIN, ESQUIRE
13              korbin@marcus-shapira.com
           One Oxford Centre
14         35th Floor
           Pittsburgh, Pennsylvania 15219
15         (412) 471-3490
           Counsel for HBC Services
16
17         BARTLIT BECK HERMAN PALENCHAR &
           SCOTT LLP
18         BY:  KATHERINE M. SWIFT, ESQUIRE
                katherine.swift@bartlit-beck.com
19         54 West Hubbard Street
           Suite 300
20         Chicago, Illinois 60654
           (312) 494-4400
21         Counsel for Walgreens Company
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         BARNES & THORNBURG LLP
           BY:  WILLIAM LEEDER, ESQUIRE
 3              bill.leeder@btlaw.com
           171 Monroe Avenue, N.W.
 4         Suite 1000
           Grand Rapids, Michigan 49503
 5         (616) 742-3930
           Counsel for H.D. Smith
 6
 7         CAVITCH FAMILO & DURKIN CO. L.P.A.
           BY:  ERIC J. WEISS, ESQUIRE
 8              eweiss@cavitch.com
                (via teleconference)
 9         1300 East 9th Street
           Cleveland, Ohio 44114
10         (216) 621-7860
           Counsel for Discount Drug Mart
11
12         FOX ROTHSCHILD LLP
           BY:  STEPHAN A. CORNELL, ESQUIRE
13              scornell@foxrothschild.com
                (via teleconference)
14         2700 Kelly Road
           Suite 300
15         Warrington, Pennsylvania 18976
           (215) 345-7500
16         Counsel for Prescription Supply Inc.
17
18         MORGAN LEWIS & BOCKIUS LLP
           BY:  CAROLYN A. SILANE, ESQUIRE
19              carolyn.silane@morganlewis.com
                (via teleconference)
20         101 Park Avenue
           New York, New York 10178
21         (212) 309-6000
           Counsel for Rite Aid
22
23    VIDEOGRAPHER:
24         David Lane,
           Golkow Litigation Services
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         INDEX
 2
      APPEARANCES                              412
 3
      PROCEEDINGS                              421
 4
 5
      EXAMINATION OF JAMES E. RAFALSKI:
 6
           BY MS. SWIFT                        421
 7
           BY MR. BUSH                         562
 8
           BY MR. O'CONNOR                     630
 9
           BY MS. LUCAS                        703
10
           BY MS. ZOLNER                       740
11
           BY MR. SNAPP                        776
12
           BY MR. FAUVRE                       794
13
           BY MS. BARBER                       810
14
           BY MR. FULLER                       829
15
           BY MR. MATTHEWS                     838
16
17
      CERTIFICATE                             842
18
      ERRATA                                  845
19
      ACKNOWLEDGMENT OF DEPONENT              846
20
      LAWYER'S NOTES                          847
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS
                      JAMES E. RAFALSKI
 2                       May 14, 2019
 3     NUMBER              DESCRIPTION              PAGE
 4     Rafalski-19    5/17/06 Corso Letter,          450
                      WAGMDL00753477 -
 5                    WAGMDL00753479
 6     Rafalski-20    Plaintiffs' Responses to       500
                      the Amended and Clarified
 7                    Discovery Ruling 12
                      Supplemental
 8                    Interrogatory Issued to
                      Plaintiffs
 9
       Rafalski-21    Excerpt from McCann            511
10                    Appendix 10
11     Rafalski-22    E-mail(s),                     519
                      WAGFLDEA00000459 -
12                    WAGFLDEA00000460
13     Rafalski-23    Rafalski Report                533
                      Schedule II
14
       Rafalski-24    Excerpt from McCann            537
15                    Appendix 9
16     Rafalski-25    Excerpt from McCann            546
                      Appendix 11
17
       Rafalski-26    Consumer Value Stores IRR      609
18                    Report,
                      CVS-MDLT1-000100763 -
19                    CVS-MDLT1-000100768
20     Rafalski-27    Consumer Value Stores IRR      622
                      Report,
21                    CVS-MDLT1-000100672 -
                      CVS-MDLT1-000100757
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    DEPOSITION EXHIBITS

2

     Rafalski-28   Actavis SOM Logic              749
3                  Presentation,
                   ALLERGAN_MDL_02181128 -
4                  ALLERGAN_MDL_02181172

5    Rafalski-29   Plaintiff Cardinal Health      833
                   Inc.'s Reply in Support
6                  of Motion for Preliminary
                   Injunction

7

     Rafalski-30   8/13/14 Rocque Letter to       835
8                  Hobart
                   [MCKMDL Bates Obscured]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS
 2              (May 14, 2019 at 8:25 a.m.)
 3              THE VIDEOGRAPHER:  We're now on
 4         the record.  My name is David Lane,
 5         videographer for Golkow Litigation
 6         Services.  Today's date is May 14th,
 7         2019.  Our time is 8:25 a.m.
 8              This deposition is taking place
 9         in Detroit, Michigan in the matter of
10         National Prescription Opiate
11         Litigation.  Our deponent today is
12         James E. Rafalski.  Counsel will be
13         noted on the stenographic record.
14              Our court reporter today is
15         Mike Miller.
16              Mr. Rafalski, I just want to
17         remind you, you're still under oath
18         from yesterday.
19              THE WITNESS:  Yes, sir, I
20         understand.  Thank you.
21                    EXAMINATION
22    BY MS. SWIFT:
23         Q.    Good morning, Mr. Rafalski.
24         A.    Good morning.
25         Q.    We met a moment ago.  My name
```

Highly Confidential - Subject to Further Confidentiality Review

1    is Kate Swift and I represent Walgreens,

2    okay?

3          A.     Yes.

4          Q.     Did you have an opportunity to

5    talk to the plaintiffs' lawyers after we

6    finished yesterday?

7          A.     Yes, went to dinner together.

8          Q.     Did you talk about the

9    substance of your testimony at all?

10         A.     No, ma'am.

11         Q.     What did you talk about with

12   the lawyers last night at dinner?

13         A.     Just Detroit, the restaurant,

14   general personal topics, children,

15   activities, the weather.

16         Q.     You understand that the Court's

17   rules require you to disclose all of your

18   opinions in the report that you provided to

19   us, correct, sir?

20         A.     Yes, sir -- or yes, ma'am.  I'm

21   sorry.  Sorry.

22         Q.     The rules also require you to

23   include the reasons supporting those opinions

24   in your report.

25               Do you understand that?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.     Yes.

2            Q.     That's so we can look at your

3     report in advance of the deposition and then

4     ask you questions about the opinions and what

5     supports your opinions.

6                   Do you understand that?

7            A.     I understand.

8            Q.     If it's not in your report, we

9     can't do any of that.

10                  Do you understand that?

11           A.     I understand that, yes, ma'am.

12           Q.     Are all of your opinions

13    related to the defendants that you've -- you

14    have opinions about included in your report?

15           A.     Yes, ma'am.

16           Q.     Are all of the bases for those

17    opinions also included in your report?

18                  MR. FULLER:  Form.

19           A.     Yes, ma'am.

20    BY MS. SWIFT:

21           Q.     Do you understand what I mean

22    when I say the bases for your opinions?

23                  MR. FULLER:  Same objection.

24           A.     I'll accept an explanation if

25    you want to give that to me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MS. SWIFT:
2         Q.    Are all of the reasons
3    supporting your opinions included in your
4    report?
5         A.    Yes, ma'am.
6               MR. FULLER:  Object to form.
7    BY MS. SWIFT:
8         Q.    Throughout your report you
9    include footnotes citing documents and
10   testimony.  It is fair to say that those
11   documents and testimony that you cite in the
12   footnotes provide the specific support for
13   whatever you've just said in the body of the
14   report?
15              MR. FULLER:  Same objection.
16        A.    Yes, I think that's an accurate
17   description of what -- the use of the
18   footnotes.
19   BY MS. SWIFT:
20        Q.    If we wanted to figure out what
21   your basis or your reason was for a specific
22   point, we could look at what you've cited in
23   the footnote; is that fair?
24              MR. FULLER:  Same objection.
25        A.    I think that's a little
```

Highly Confidential - Subject to Further Confidentiality Review

1    restrictive.  That rules out my experience

2    and my training, so there may be some other

3    factors that I include besides just the

4    footnote information.

5    BY MS. SWIFT:

6         Q.    Setting aside your experience

7    and training, things you couldn't put in a

8    footnote --

9         A.    Correct.

10        Q.    -- is it fair to say that when

11   you include something in a footnote of your

12   report, that's the specific support for

13   whatever you've just said leading up to the

14   footnote?

15        A.    Yes, ma'am.  Generally the

16   footnote actually takes you to the document

17   or to the reference of where that statement

18   occurs.

19        Q.    But the specific support is

20   referred to in the footnote.  Then you have

21   to go look at the document.  I understand

22   that.  But the reference to whatever it is

23   that you are using to support the opinion is

24   found in the footnotes?

25        A.    Yes, ma'am.

Highly Confidential - Subject to Further Confidentiality Review

 1                   MR. FULLER:  I would just state

 2           for the record that his report has

 3           been compiled for an extended period

 4           of time.  There's been ongoing

 5           discovery, still ongoing discovery and

 6           productions.  I think counsel is

 7           correct, there has to be a basis

 8           provided in the report, but he doesn't

 9           have to provide all the examples.

10     BY MS. SWIFT:

11           Q.    Sitting here today, you're not

12     planning to come to trial and offer different

13     support for your opinions than what you've

14     already provided in your report; is that

15     fair?

16                   MR. FULLER:  Object to form.

17           A.    Other than I'm aware and I

18     think I state in the beginning of my report

19     that it's an ongoing discovery, so I think I

20     reserve the right to amend my report if any

21     supplemental documents would add or change my

22     opinion.

23     BY MS. SWIFT:

24           Q.    And that's why I asked you

25     sitting here today, sir.  I'll ask it again.

1          Sitting here today, you're not
2    planning to come to trial and offer different
3    support for your opinions than what you've
4    offered in the report that's marked as
5    Exhibit 16, correct, sir?
6          A.     Well, I want to answer that by
7    saying I currently don't know if there may be
8    a document that has been turned in after my
9    report, which was April 15th, up until today,
10   that may be necessary to be amended.  So
11   there could be some documentation already.
12          As my report stands today, I
13   don't have any information that I know of
14   today that's been provided to me where I
15   would change or edit or provide a
16   supplemental to my report.
17          Q.     So I believe that's a no,
18   right, sir?
19          A.     I think it's a no but I think
20   I'm reserving in case there's something I
21   don't know about that -- up until today.
22          So I guess the question that
23   causes me some concern is that you tend -- I
24   tend to believe the question says that
25   this -- up to today, that I could not

Highly Confidential - Subject to Further Confidentiality Review

1    consider any information that may have been

2    provided that is not in my report.

3                Does that make sense?

4        Q.     It doesn't.  I'm afraid it

5    doesn't.  I'm sorry, sir.  Let me ask the

6    question again.

7        A.     Okay.

8        Q.     Sitting here right now, as of

9    this moment at 8:30 on Tuesday morning,

10   May 14th, 2019, you're not aware of anything

11   that is supportive of your opinions other

12   than what you have cited in your report; is

13   that fair?

14       A.     That's a correct statement, I

15   would --

16              MR. FULLER:  Object to form.

17          That is not the legal standard.  He is

18          only obligated to give you the basis

19          of his opinion, not every example

20          within his report.

21   BY MS. SWIFT:

22       Q.     Sitting here today at 8:30 on

23   May 14th, 2019, you're not aware of anything

24   that is supportive of your opinions other

25   than what you have cited in your report.

Highly Confidential - Subject to Further Confidentiality Review

```
1    Correct, sir?

2         A.      Yes, I would agree with that

3    statement.

4         Q.      You have been instructed a

5    number of times not to answer questions about

6    your personal knowledge of investigations

7    that were conducted while you were at the

8    DEA.

9               Do you recall that yesterday?

10        A.      Well, are you referring to the

11   Touhy letter, the Touhy instruction from the

12   government?

13        Q.      I'm specifically referring to

14   the numerous times when your lawyer

15   instructed you not to answer questions based

16   on your personal knowledge of investigations

17   or other things that you know about, only

18   because of your work at the DEA.

19               Do you recall that?

20        A.      Yes, that occurred yesterday.

21   I recall that.

22        Q.      You're not going to come to

23   trial and offer testimony based on any

24   personal knowledge you've been instructed not

25   to tell us about at the deposition, are you,
```

Highly Confidential - Subject to Further Confidentiality Review

1    sir?

2        A.    I think that's a legal issue.

3   I would operate under the assumption that if

4   I'm not allowed to talk to it today, that

5   there's the possibility I wouldn't be able to

6   talk to it at trial.

7              But I don't know if there's

8   some -- some kind of a legal issue there that

9   would allow that, but that would be my

10  understanding based on what I could say

11  today.

12       Q.    So is it your position that if

13  your lawyers asked you to offer testimony

14  that you were instructed not to give at your

15  deposition, then you would provide that

16  testimony?

17       A.    I would probably say yes, I

18  would offer that testimony.

19       Q.    When you were at the DEA, you

20  sometimes requested reports from the DEA's

21  ARCOS database as part of your diversion

22  investigations, correct, sir?

23       A.    Yes, ma'am, that would be part

24  of my role as a diversion investigator.

25       Q.    You might request an ARCOS

Highly Confidential - Subject to Further Confidentiality Review

```
1    analysis, just as an example, of oxycodone
2    30-milligram products shipped to a particular
3    pharmacy over a particular time period?
4        A.     You've described one of the
5    potential scenarios where you could request
6    information from ARCOS.
7            Just for clarification, some of
8    those I could run myself, so it wouldn't
9    always require me to request it from DEA
10   headquarters.
11       Q.     Did you do that from time to
12   time?
13       A.     Yes, but only -- only if the
14   number of transactions would be able to be
15   displayed at -- on my computer within my
16   system.  So could I explain that a little
17   further?
18       Q.     Sure.
19       A.     So there's some transactions
20   where they're so voluminous that it's
21   impossible for me to look at them.  So, for
22   example, the distribution you talk about, the
23   transactions may be so high that to look at a
24   month, I'd have to look at it a week at a
25   time, or to look at six months, I'd have --
```

Highly Confidential - Subject to Further Confidentiality Review

1    so it would take numerous, numerous

2    transactions.

3              So there's two different ways.

4    One way I just would look at it if it can be

5    processed by my computer.  If it's not, then

6    I make the formal request to the ARCOS

7    division, and then they either send it to me

8    or they open a link where I can view it.

9              It comes down to a computer, I

10   think, hardware issue.

11        Q.    Understood.

12             When you ran reports from the

13   ARCOS database, did you typically look at a

14   particular drug like oxy 30?

15             MR. FULLER:  And, Counsel, I'm

16        assuming you're just asking generally.

17        And I'll remind you of your Touhy

18        obligation as well.

19             MS. SWIFT:  Yes, I'm asking

20        generally.  I'll ask it again.

21   BY MS. SWIFT:

22        Q.    Generally, when you ran ARCOS

23   reports, did you run them on a particular

24   drug, like oxycodone 30 milligrams?

25        A.    Being able to run an ARCOS

Highly Confidential - Subject to Further Confidentiality Review

1    report, you could query any drug by any drug,

2    by any date range, by numerous factors.  Any

3    information that's in an ARCOS report, I

4    could query it by that data field.  So yes.

5        Q.    Okay.  Maybe my question wasn't

6    clear.

7              I'm asking you specifically

8    when you would run your ARCOS reports, was it

9    typical for you to focus on a particular

10   drug?  In other words --

11       A.    No.

12       Q.    -- when you ran your ARCOS

13   reports, did you run a report to show all of

14   the oxycodone and all of the hydrocodone

15   together shipped to a particular pharmacy?

16       A.    A report could be run various

17   different ways.  I guess how I ran my report

18   is dependent on what type of investigation I

19   was conducting.  So there was no set way that

20   I would, you know, request reports.  It would

21   always be depending on what I planned to do

22   with the investigation or what I was

23   investigating and how I was going to utilize

24   it would dictate on how I would run it.

25       Q.    Would an ARCOS analysis of

1    oxycodone 30-milligram products shipped to a

2    particular pharmacy over a particular period

3    of time, either a week or a month or some

4    other period, would that be a typical ARCOS

5    report for you?

6              MR. FULLER:  Counsel, I let it

7         go a little bit.  I think you're

8         encroaching on his Touhy

9         authorization.

10             THE WITNESS:  I'm just

11        considering what my counsel said.  I'm

12        processing whether that's something

13        that would be readily available

14        outside of the --

15             MR. FULLER:  So if it's not

16        readily available --

17             THE WITNESS:  I would say that

18        I can't answer that question based

19        on --

20   BY MS. SWIFT:

21        Q.   Do you recall testifying in a

22   case involving H.D. Smith?

23        A.   I do.

24        Q.   Do you recall in that case you

25   testified about an ARCOS report that you had

Highly Confidential - Subject to Further Confidentiality Review

1    requested involving oxycodone 30-milligram

2    products shipped to a particular pharmacy

3    over a two-year period?

4         A.    I did not run that report.

5         Q.    Did you request that report?

6         A.    No, ma'am.

7         Q.    You -- when you request an

8    ARCOS analysis as a diversion investigator,

9    are you looking to see whether there's a

10   large volume increase in shipments of a

11   particular drug to a particular pharmacy?

12              MR. FULLER:  Counsel --

13   BY MS. SWIFT:

14        Q.    Just in general?

15              MR. FULLER:  -- that

16        specifically goes to investigations

17        conducted as an agent.  It absolutely

18        violates his Touhy obligation.

19              MS. SWIFT:  I'm not asking

20        about any particular investigation.

21              MR. FULLER:  I didn't say you

22        were, but it's an investigative

23        process.  Don't answer that.  If she

24        wants to know, she can ask the 30(b)

25        designee from the DEA on Friday.

1    BY MS. SWIFT:

2         Q.    You testified yesterday that

3    you focused your investigations on particular

4    drug strengths as opposed to drug families.

5              Do you remember that testimony

6    from yesterday that your counsel allowed you

7    to provide?

8         A.    Can you ask the question again?

9         Q.    Sure.

10        A.    This is not in regards to

11   ARCOS, this is just a general question?

12        Q.    Nope, just a general question.

13        A.    Okay.

14        Q.    You testified yesterday you

15   would focus your investigations on particular

16   drug strengths as opposed to drug families.

17             Do you remember that testimony?

18        A.    I remember the testimony.  I'm

19   not sure that's exactly what I testified --

20   how I testified.

21        Q.    I don't mean to say that I'm

22   giving it to you back verbatim, but just

23   generally, that's what you testified

24   yesterday?

25        A.    Generally I would say it's as

Highly Confidential - Subject to Further Confidentiality Review

1    important to look at specific highly abused

2    drugs as it is to look at drugs in a group.

3          Q.    You -- I believe yesterday you

4    mentioned drug strengths like oxycodone 30.

5                Do you remember that?

6          A.    Yes, ma'am.

7          Q.    Is oxycodone 30 more likely to

8    be diverted than lower strengths of

9    oxycodone?

10         A.    Based on my experience as a

11   diversion investigator and the cases that I

12   worked, I would answer yes to that.  But I

13   would also add, that would be kind of an

14   overall opinion.  Sometimes there would be

15   other strengths of oxycodone that may be

16   abused in different geographic areas.

17         Q.    Like oxycodone 80 perhaps?

18         A.    Yes, or oxycodone 5 perhaps.

19         Q.    Uh-huh.  It's your testimony

20   that oxycodone 5 is typically diverted?

21         A.    Not typically diverted, but I

22   have experience in certain geographic areas

23   where that is the more desirable drug to be

24   diverted.

25         Q.    Is it your testimony that

1    oxycodone 30 is more likely to be diverted

2    than oxycodone 5?

3         A.    That would be my testimony

4    based on my experience in the cases I worked

5    on.

6              MR. FULLER:  Object to form.

7    BY MS. SWIFT:

8         Q.    Am I correct, circling back to

9    the ARCOS question just briefly, you can use

10   the ARCOS database to look at the particular

11   drug strength you're concerned about?

12             MR. FULLER:  I would give you

13        the same Touhy reminder.

14        A.    I'm not going to answer based

15   on the DEA's Touhy --

16   BY MS. SWIFT:

17        Q.    Just so I understand, you can't

18   tell me sitting here today whether you can

19   use the DEA's ARCOS database to focus on a

20   particular drug strength?

21             MR. FULLER:  How it's

22        particularly queried for investigative

23        purposes, no, he's not going to

24        answer.

25             MS. SWIFT:  I want to get an

Highly Confidential - Subject to Further Confidentiality Review

1    answer from the witness on this

2    question, Mike, if you don't mind.

3    BY MS. SWIFT:

4         Q.    Sitting here today, you can't

5    testify about whether you can use the DEA's

6    ARCOS database to query it for a particular

7    drug strength such as oxycodone 30; is that

8    correct?

9         A.    What I'd like to say is my

10   understanding of the Touhy letter from the

11   government is that I can't testify to

12   anything that's not readily available as an

13   open source, and I don't believe that

14   particular answer to that particular question

15   would be something that would be readily

16   available, so on the advice of counsel, I'm

17   not going to answer that question.

18        Q.    Would you give the same answer

19   to any other question about how queries can

20   be run on the DEA's ARCOS database?  Would

21   you refuse to answer those questions?

22        A.    I think that would depend on

23   the question.  I know that there's some

24   summary information that the DEA posts on the

25   DEA website, and that's ARCOS data.  So if

Highly Confidential - Subject to Further Confidentiality Review

1    there were questions related to the summary

2    data, I think I could answer any questions

3    related to that data because it's obviously

4    posted on the DEA website.

5         Q.    All right.  I'd like you to

6    turn to page 37 of your report, which I

7    believe you have in front of you.

8         A.    It is.

9         Q.    And I understand it's

10   Exhibit 16.

11        A.    It is.

12        Q.    Pages 37 through 40 of your

13   report are within a section that starts on

14   page 36.

15             Do you see that?

16        A.    Yes, ma'am, titled Maintenance

17   of Effective Controls Against Diversion of

18   Controlled Substances.

19        Q.    Yeah.  And at the top of

20   page 37, just before the bullet list starts,

21   you wrote:  Included below are some key

22   components that one would expect to see an

23   operational system designed to maintain

24   effective controls against diversion.

25             Did I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      You did, ma'am.

 2          Q.      Okay.  Then following that

 3     statement at the top of page 37 of your

 4     report, you've included a list, a

 5     bullet-pointed list, several levels of bullet

 6     points, that carries all the way over to

 7     page 40.

 8                  Would you agree with that?

 9          A.      Yes, ma'am.

10          Q.      Is that list of bullet points

11     on pages 37 to 40, is it your opinion that

12     those are requirements to be included in a

13     distributor's suspicious order monitoring

14     system?

15          A.      No, I wouldn't say they're

16     requirements.  As the initial statement said,

17     they would -- I would expect to see those as

18     components of an operational system, but it's

19     not a -- not dictating or saying that they're

20     a requirement by the government.

21          Q.      You're not saying that any of

22     those bullet points on pages 37 through 40

23     are requirements, not a single one of them?

24          A.      Oh, to meet the maintenance of

25     effective controls, I think they're all
```

1    requirements, but I understood your question

2    to say is this something that would be a

3    regulatory requirement, that something would

4    be in a regulation, these specific things.

5         Q.    Let me --

6         A.    Based on my experience, these

7    are all the things that I believe should be

8    present in a functioning operational

9    suspicious order system.

10        Q.    Let me see if I understand your

11   testimony.

12              You're saying that the list of

13   components on pages 37 to 40 are not

14   requirements under the DEA's suspicious order

15   monitoring regulation; is that correct?

16   That's part one.

17        A.    Well, the word "requirement" is

18   kind of the word that I'm thinking about.  So

19   if you're trying to say that it's a mandate,

20   I would say in order for me to say that it's

21   an operational system, then these things

22   would need to be present.  If they weren't

23   present, it wouldn't be an operational

24   system.

25              So if you were to say that you

1    could take this and say the DEA said you must

2    have these things in your system, there's a

3    possibility that maybe one of them wouldn't

4    be there and it still could function.

5              So I wouldn't say -- I don't

6    want to say that this is dictating exactly

7    what has to be in a system, but in my

8    experience in reviewing a lot of systems,

9    these would be the key components I would

10   expect to see.

11        Q.    All right.  Now I'm more

12   confused than I was before.

13        A.    Okay.

14        Q.    If I understand what you're

15   saying, it seems like you're saying the

16   bullet list at pages 37 to 40 are not

17   required by the DEA's suspicious order

18   monitoring regulation, but they are required

19   by the maintenance of effective controls

20   against diversion?

21        A.    Let me start over.  So --

22        Q.    Just -- can you just say yes or

23   no?  I really want to just know if I'm

24   following you.

25              MR. FULLER:  No, he can explain

Highly Confidential - Subject to Further Confidentiality Review

1          his answer.  Go ahead.

2                  MS. SWIFT:  Before we go any

3          further on that point, my colleagues

4          were very, very patient yesterday.  I

5          just want to remind counsel of Special

6          Master Cohen's ruling that we are

7          actually entitled to seek and obtain

8          yes-or-no answers where that's all we

9          really want.  He put that on the

10          record in the Egilman deposition.  I

11          can give you the citation at a break

12          if you'd like, Mike.

13                  MR. FULLER:  I don't need it.

14     BY MS. SWIFT:

15          Q.    I would just right now -- we

16     can get to the explanation, but for right

17     now, to make sure I'm following you, I would

18     like to know if what you're trying to explain

19     is that the list on pages 37 to 40, that list

20     of components is not required by the DEA's

21     suspicious order monitoring regulation, but

22     that you think it is required under the

23     maintenance of effective controls against

24     diversion.

25          A.    I don't believe that's what I

Highly Confidential - Subject to Further Confidentiality Review

 1    said, and I'd like to correct that.

 2         Q.    Thank you.  Please do.

 3         A.    Okay.  So, first of all, the

 4    maintenance of effective controls is the

 5    large regulation which is above, or the

 6    hierarchy, and then the next regulation would

 7    be the suspicious order monitoring system.

 8         Q.    Can I stop you right there just

 9    to make sure we're on the same page?

10         A.    Yes.

11         Q.    Is it 1301.74(a)?

12         A.    Yes.

13         Q.    Thank you.

14              MR. FULLER:  I'm sorry.  Is

15         what 13 --

16              MS. SWIFT:  The larger --

17              THE WITNESS:  Maintenance of

18         effective controls.

19              MR. FULLER:  No.  Is that CSA?

20              THE WITNESS:  Well, the CSA

21         is -- I'm sorry.

22              MS. SWIFT:  Counsel, did you

23         just correct the witness' testimony on

24         the record?

25              MR. FULLER:  I was trying to

1      clarify.

2              MS. SWIFT:  All right.  Let me

3       see if I can clean this up.

4              MR. FULLER:  Sure.

5   BY MS. SWIFT:

6       Q.     There was a pronoun in the

7   question that I thought Mike was correcting.

8              When you say -- let's see.  The

9   maintenance of effective controls is in the

10  large regulation which is above, or the

11  hierarchy, did you mean 1301.74(a)?

12      A.     Well, that is the regulation.

13  I'm also aware that the laws in 823, USC 823.

14      Q.     As your counsel just reminded

15  you?

16      A.     Well, I've always known that

17  whether counsel reminded me or not.

18      Q.     Understood.  Understood.

19      A.     So that's the regulation, it's

20  both the law regulation and the law.  Only --

21  1301.74(b) is only a regulation, which is

22  part of the security program, which is part

23  of maintenance of effective controls.

24              So it's kind of bulleted so

25  that the top regulation is maintenance of

1    effective controls.  Falling under that is

2    suspicious order system.

3         Q.    So the list on 37 to 40, these

4    are not requirements under 1301.74(b), the

5    suspicious order monitoring regulation,

6    correct?

7         A.    So I'd like to answer that by

8    saying I believe these are all components,

9    which would be necessary to have an effective

10   suspicious monitoring -- a suspicious order

11   monitoring system.

12        Q.    And with respect, sir, that's

13   not what I asked you.

14              Are the bullet list components

15   on pages 37 to 40 of your report required

16   under 1301.74(b), the suspicious order

17   monitoring --

18        A.    Yes, they are.

19        Q.    Okay.  All of them?

20        A.    Yes.

21        Q.    Okay.  Great.  Thanks.

22              Is it possible to have a

23   compliant suspicious order monitoring system

24   without all of these components?

25        A.    Yes, I think it would be

1    possible.

2         Q.     But they are all requirements?

3         A.     Based on -- depending on the

4    scope of the business that's the customer and

5    based on the scope of activity of the

6    distributor, I would say that some of

7    these -- there could be some of these that

8    would not be necessary.  But I'd also say

9    that there may be some that aren't identified

10   on this list.  And also, based on the fact

11   that the distribution activity is not static

12   and it changes.

13        Q.     So if I'm following you, all of

14   the bullet-listed components on pages 37 to

15   40 are, in fact, required under 1301.74(b),

16   but you could have a compliant suspicious

17   order monitoring system without all of these

18   compliant -- components, and, in fact, there

19   may be other components that are required

20   under 1301.74(b) that are not included in

21   this list.

22             Do I have all that, correct,

23   sir?

24        A.     I believe that's correct, yes.

25        Q.     Okay.

Highly Confidential - Subject to Further Confidentiality Review

 1       A.      I'm not saying this is an

 2    exclusive list and there might not be other

 3    things that I have not considered or might

 4    come up based on the type of business

 5    activities that are involved.

 6       Q.      On page 39, if you would take a

 7    look, please.  You say, the top bullet, that:

 8    A robust and well-documented due diligence

 9    program is key.

10             And then it goes on from there

11    and provides components that you say you

12    would like to see in a due diligence

13    compliance program for suspicious orders,

14    correct, sir?

15       A.      Yes, ma'am.

16       Q.      Is it your opinion that a

17    distributor has to do all of the diligence

18    steps listed here in order to comply with the

19    law?

20       A.      Yes, ma'am.

21       Q.      All right.  I want you to hold

22    on to these pages of your report for a

23    minute, please.  And I'm going to hand you a

24    document.  This will be Exhibit 19.

25             (Whereupon, Deposition Exhibit

```
 1              Rafalski-19, 5/17/06 Corso Letter,

 2              WAGMDL00753477 - WAGMDL00753479, was

 3              marked for identification.)

 4                   MR. FULLER:  Are they all the

 5              same?

 6                   MS. SWIFT:  They're all the

 7              same.

 8                   MR. FULLER:  Okay.

 9      BY MS. SWIFT:

10           Q.    Okay.  Exhibit 19 is a

11      May 17th, 2006 letter from the DEA to Todd

12      Polarolo at Walgreens in Perrysburg, Ohio,

13      correct, sir?

14           A.    Yes.

15           Q.    Do you recognize this as a

16      letter the DEA sent to Walgreens after an

17      audit of Walgreens' Perrysburg, Ohio

18      distribution center in 2006?

19           A.    I recognize it only based on my

20      review of documents for preparation of this

21      is the first time I've seen this, from my

22      report.

23           Q.    You're mentioned in the first

24      paragraph of the May 17th, 2006 letter,

25      correct, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I was there, yes, ma'am.

 2              Q.      When you were at the Detroit

 3       field office, you were involved in this audit

 4       of Walgreens' Perrysburg, Ohio distribution

 5       center, correct, sir?

 6              A.      Yes, ma'am.

 7              Q.      This was a routine audit before

 8       Walgreens' Perrysburg distribution center

 9       started distributing Schedule II controlled

10       substances in early 2007, correct, sir?

11              A.      No, that's not correct.

12              Q.      What is the basis of your

13       statement that that's not correct?

14              A.      It's a regulatory audit, but it

15       was just scheduled as part of the work plan

16       program.  It wasn't in response to the second

17       part of your question, Schedule II controlled

18       substance authorization.

19              Q.      Are you offering that testimony

20       based on your personal involvement with an

21       investigation of Walgreens while you were at

22       the DEA?

23                      MR. FULLER:  Again, I remind

24              you, Mr. Rafalski, that your

25              authorization does not and
```

1          specifically addresses the fact that

2          Walgreens was an investigation that

3          you conducted that you're not

4          authorized to talk about it based on

5          your personal knowledge.  Just from

6          what information you gained in this

7          litigation.

8     BY MS. SWIFT:

9          Q.     Do you want to retract the

10    testimony that you gave a moment ago?

11         A.     Yes, thank you.

12         Q.     This 2006 letter that I marked

13    as Exhibit 19 that the DEA sent to Walgreens

14    does not include the three pages of guidance

15    on what Walgreens' suspicious order

16    monitoring system should look like that you

17    included in your report at pages 37 to 40,

18    does it, sir?

19         A.     It does not.

20         Q.     This 2006 letter the DEA sent

21    Walgreens, it says what DEA thought Walgreens

22    was doing wrong.  It doesn't provide an

23    explanation of what we should do to do it

24    right, correct, sir?

25         A.     That's an accurate description

1   of what the letter says, yes, ma'am.

2        Q.     You did not provide to

3   Walgreens the three pages of requirements

4   that are included in your report.  You didn't

5   give those to Walgreens in 2006, correct,

6   sir?

7            MR. FULLER:  Object to form.

8        Don't answer that, that would be based

9        on your own investigation, not

10       knowledge of this case.

11  BY MS. SWIFT:

12       Q.     You're not going to come to

13  trial and say you provided these three pages

14  of guidance to Walgreens in 2006, correct,

15  sir?

16       A.     If the Touhy is still in place,

17  I would say that I would not be able to

18  testify to that.

19       Q.     You worked with the folks at

20  Walgreens' Ohio distribution center for

21  several years, correct, sir?

22       A.     I'll respond to that question

23  by saying as part of my assignments as a

24  diversion investigator, I went on-site to

25  that facility several times.  I'm not sure I

Highly Confidential - Subject to Further Confidentiality Review

1    would agree that I worked with them, but I

2    was present at the registered location.

3          Q.    You worked with Steve Kneller a

4    fair amount?  He works at the Perrysburg

5    distribution center.

6          A.    I know the name Mr. Kneller.  I

7    think it's K-N-E-L-L-E-R?

8          Q.    Correct.

9          A.    I recognize that he was the

10   person that if I was on-site, that he would

11   be the person that I would have contact with,

12   yes, ma'am.

13         Q.    Did you know Justin Joseph as

14   well?

15         A.    There was another -- there was

16   one other person with him, and I don't know

17   that that was Mr. Joseph.  I do remember who

18   Mr. Polarolo was, but I'm not sure.

19         Q.    You never told Steve or Justin

20   or Todd Polarolo or anybody else at the

21   Perrysburg distribution center, here's a list

22   of things your suspicious order monitoring

23   system is supposed to have, did you, sir?

24              MR. FULLER:  Object to form.

25         I'd remind you of your Touhy

Highly Confidential - Subject to Further Confidentiality Review

1       authorization.

2              THE WITNESS:  Based on the

3       Touhy, I'm not going to answer.

4   BY MS. SWIFT:

5       Q.    You don't say anything like

6   that -- strike that.

7              The DEA doesn't say anything

8   like that in this 2006 letter, correct, sir?

9       A.    None of the things that are in

10  the pages we've discussed is present in this

11  letter.

12      Q.    You also don't say in your

13  report that you told Walgreens at any point

14  in time, here's what your suspicious order

15  monitoring system is supposed to look like?

16      A.    My report does not indicate

17  that I told them that, that's a correct

18  statement.

19      Q.    Did anything prevent you from

20  providing these pages of guidance on

21  suspicious order monitoring to Walgreens in

22  2006 or at any other point in time?

23             MR. FULLER:  Object to form.

24      If it would deal with internal DEA

25      policies and what agents were and were

Highly Confidential - Subject to Further Confidentiality Review

1           not allowed to do, you're not

2           authorized to answer that.

3                   THE WITNESS:  I think based on

4           the Touhy, I'm not going to answer

5           that question.

6    BY MS. SWIFT:

7           Q.     Your position today, 13 years

8    after this 2006 letter from the DEA to

9    Walgreens, your position today after you've

10   been hired by the plaintiffs' lawyers and

11   paid to offer opinions in this case is that

12   these pages of your report, these three pages

13   listing these requirements, are all obligated

14   by law; is that right, sir?

15          A.     I think I've always believed

16   they were obligated by the law.  I would

17   probably say in 2006, the environment in

18   regards to the opioid crisis and diversion,

19   probably the environments changed.

20                 So I'm not sure that all of

21   these would have been something that I would

22   have used or been aware of at that time.

23                 I think this is fluid and it's

24   changed over a period of years, but

25   generally, the answer to your question...

1    Q.    It's your testimony that the

2    guidance the DEA has provided on suspicious

3    order monitoring has changed over time?

4    A.    I don't know if it's guidance.

5    I think the environment of how diversion has

6    occurred has changed over time.  So I think

7    my experiences and my opinions on what would

8    be required has changed over time because

9    it's a fluid situation, not static.

10    Q.    You said the environment of how

11    diversion has occurred has changed over time.

12    By that do you mean, at least in part, that

13    the drugs that are typically diverted, those

14    have changed over time?

15    A.    Many things have changed over

16    time.  One is the type of drugs.  Different

17    drugs have become a focus over different

18    periods of time.  How they're diverted,

19    methods of how they're diverted.  All of the

20    things have changed, and I'm sure in the

21    future will continue to change.

22    Q.    As those changes in

23    prescription drug abuse occur over time, does

24    the DEA change how it addresses diversion of

25    those drugs?

```
 1            A.     Well, I don't think they divert

 2     drugs, but I --

 3            Q.     That's not -- I'm sorry.  If

 4     that's what you heard me say, let me ask it

 5     again.

 6            A.     Okay.

 7            Q.     That's not what I said.

 8                   As changes in how prescription

 9     drugs are abused -- strike the question.

10                   Trends in prescription drug

11     abuse have changed over time, fair?

12            A.     That's correct.

13            Q.     As those trends in prescription

14     drug abuse change, does the DEA change how it

15     addresses diversion of prescription drugs?

16            A.     I think that's a logical

17     conclusion.  One example would be the

18     Internet pharmacy epidemic that was started

19     in 1999, so I think there was a period of

20     time where there was a focus, and then

21     passing of the Ryan Haight law and

22     enforcement actions, that diversion --

23     although, I'm not going to say today there's

24     not an illegal Internet pharmacy somewhere in

25     America.  Obviously, the diversion shifted to
```

1    a different kind of methodology, method or

2    type of drug, so yes.

3         Q.    In fact, there are lots of

4    Internet pharmacies that are still operating

5    illegally in this country today, correct,

6    sir?

7              MR. FULLER:  Object to form.

8    BY MS. SWIFT:

9         Q.    If you know?

10        A.    I don't know.

11        Q.    In your report you don't

12   mention any guidance you provided to

13   Walgreens as a diversion investigator about

14   the right way to perform due diligence,

15   correct, sir?

16        A.    My report doesn't say that, no,

17   ma'am.

18        Q.    Your report does not mention

19   any guidance you provided to Walgreens about

20   how long to retain due diligence records,

21   correct, sir?

22        A.    I think my report speaks to

23   that, but I don't think it speaks to it

24   specifically in the Walgreens section.

25        Q.    The Walgreens section of your

1    report doesn't say anything about how long

2    Walgreens was supposed to retain due

3    diligence records, correct?

4         A.    That's correct.  I think that's

5    what I said in my answer.

6         Q.    You're not going to come to

7    trial and say you provided Walgreens guidance

8    on how to perform due diligence for

9    potentially suspicious orders, correct, sir?

10             MR. FULLER:  Object to form,

11         vague.

12        A.    I'm not going to come to trial

13   and maybe say that specifically, but I'm sure

14   that I'm going to come to trial and say that

15   the DEA, through guidance, training,

16   distributor briefings, all registrants have

17   had ample opportunity to have -- come to that

18   same information.

19             But specifically that I would

20   have told Walgreens that, I'm not going to

21   say that at trial because that did not occur.

22             MS. SWIFT:  I think we lost the

23         realtime feed, Mike.

24             THE VIDEOGRAPHER:  Go off the

25         record, 9:00 a.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Recess taken, 9:00 a.m. to
 2        9:03 a.m.)
 3              THE VIDEOGRAPHER:  Back on
 4        record at 9:03 a.m.
 5   BY MS. SWIFT:
 6        Q.    Sir, I believe the end of your
 7   last question was that you are not planning
 8   to come to trial and say that you ever told
 9   Walgreens when you were a diversion
10   investigator monitoring the Perrysburg, Ohio
11   Walgreens facility, you're not going to come
12   and say that you ever told anybody at
13   Walgreens to keep their due diligence records
14   forever, correct?
15        A.    I think my answer was a little
16   longer than that.  I talked about what
17   Walgreens would have known independent, but I
18   believe I concluded that by saying I never --
19   I would never testify that I told them that
20   because it did not occur.
21        Q.    Do you anticipate coming to
22   trial and talking about what Walgreens knew?
23        A.    I think I would come to trial
24   and talk about what every registrant -- I
25   believe every registrant would know based on
```

Highly Confidential - Subject to Further Confidentiality Review

1    my experience and knowledge and training on

2    what was provided to them.

3         Q.    And is that based on your

4    personal knowledge of nonpublic information

5    from your time at the DEA?

6         A.    No, I don't think so.  I think

7    there's public knowledge about the things I'm

8    speaking about today.

9         Q.    But you're not going to come

10   and talk about what registrants knew based on

11   your personal knowledge from any nonpublic

12   investigations; is that fair?

13        A.    If that's still restricted by

14   the Touhy authorization, then that would be a

15   correct statement, yes, ma'am.

16        Q.    If it happens that the Touhy

17   authorization goes out the window, will you

18   agree to come back and answer more questions

19   so that we can get your testimony on these

20   points that you're not providing for us

21   today?

22             MR. FULLER:  Object to form.

23        It will be up to the Special Master.

24        A.    I was going to say, I don't

25   think that's up to my decision, but if it

1    would be required of me, I would certainly do

2    that.

3    BY MS. SWIFT:

4         Q.    All right.  Let's go back to

5    the 2006 DEA letter to Walgreens that I

6    marked as Exhibit 19.

7              Do you have that in front of

8    you?

9         A.    I do.

10        Q.    The DEA's 2006 letter to

11   Walgreens says Walgreens was using a system

12   for suspicious order monitoring based on a

13   customer grouping formula, correct, sir?

14        A.    Yes, ma'am.

15        Q.    That's what you called it in

16   your report, right?

17        A.    Well, this isn't my report.  I

18   didn't author this, but that's what it says

19   in here.

20        Q.    And when I said "your report,"

21   I meant in your actual expert report --

22        A.    Oh, okay, you were talking

23   about this document.  I'm sorry.

24        Q.    The customer grouping formula

25   that is referenced in Exhibit 19, the 2006

Highly Confidential - Subject to Further Confidentiality Review

1   letter to Walgreens, you say at page 125 of

2   your report that Walgreens used that system

3   of reporting suspicious order monitoring --

4   strike the whole question.

5              Turn to page 125, please.  You

6   see where it says Customer Grouping Formula

7   at the top of the page?

8       A.      Yes, ma'am, I do.

9       Q.      That's referring to the formula

10  that Walgreens was using to report suspicious

11  orders to the DEA and it's described in the

12  2006 DEA letter, correct?

13      A.      I would agree, but I would say

14  that that's what they told me they were

15  doing.

16      Q.      Understood.

17      A.      Okay.

18      Q.      That's what you were talking

19  about in your report when you said customer

20  grouping formula, you were talking about this

21  letter?

22      A.      Yeah, but I just understood the

23  question to be that I knew that they were

24  actually doing this.

25      Q.      Okay.  Fine.

Highly Confidential - Subject to Further Confidentiality Review

 1          A.     That's just what they reported

 2     to me that what they were doing.

 3          Q.     I'm just trying to tie what you

 4     said in your report to this 2006 letter.  Is

 5     this -- this is the letter you were using to

 6     write this section of your report on the

 7     customer grouping formula, correct?

 8          A.     Yes.  Yes, ma'am.

 9          Q.     Okay.  You said in your report

10     that Walgreens used this customer grouping

11     formula to report suspicious orders until

12     around 2007, correct?

13          A.     Yes.

14          Q.     Walgreens then changed its

15     system for reporting suspicious orders after

16     receiving this 2006 letter from the DEA?

17          A.     Yes, ma'am.

18          Q.     In around 2007, you said in

19     your report:  Walgreens modified its

20     reporting of suspicious orders to the DEA to

21     use a version of the formula described in

22     Appendix E(3) to the Chemical Handler's

23     Manual.

24                 Correct?

25          A.     That's what my report says,

1    yes, ma'am.

2        Q.    Walgreens used the E(3) formula

3    to report potentially suspicious orders from

4    2007 to 2012, correct?

5        A.    Yes, that's what my report

6    says, yes, ma'am.

7        Q.    Are you aware that those

8    reports are sometimes referred to as

9    excessive purchase records or ingredient

10   limit reports?  There's different names that

11   are used?

12       A.    There are different names, and

13   I'm aware of that.

14       Q.    You would agree that the

15   formula in Appendix E(3) that Walgreens used

16   to report suspicious orders from 2007 to 2012

17   is not the same as the customer grouping

18   formula Walgreens was using in 2006?

19       A.    I would agree, and also I would

20   like to comment on that, that it probably

21   actually was less effective than more

22   effective.

23       Q.    I understand you have lots of

24   comments you'd like to give, and that's fine.

25       A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    My question is simply:  Do you

2    agree with me that the formula in

3    Appendix E(3) that Walgreens used to report

4    suspicious orders from 2007 to 2012 is not

5    the same as the customer grouping formula

6    Walgreens was using in 2006?

7    A.    Well, this statement just goes

8    to say that they used the same multiplier, so

9    the three multiplier is the same as the E(3)

10   as it is in the area referenced in the prior

11   time period.

12   Q.    The two formulas are not the

13   same, correct, sir?

14   A.    The formulas are not, but the

15   multiplier is.

16   Q.    Okay.  That's all I'm trying to

17   get an understanding from you is whether the

18   customer grouping formula that Walgreens was

19   using when it received the 2006 letter from

20   the DEA is the same or different from the

21   formula it changed to use afterwards?

22   A.    There's no customer grouping in

23   the subsequent years --

24   Q.    Thank you.

25   A.    -- starting in 2007.

1          Q.     You didn't do -- well, strike

2     that.

3               You don't say in your report

4     that you or anyone else at the DEA ever told

5     Walgreens not to use the formula found in

6     Appendix E(3) of the Chemical Handler's

7     Manual, correct, sir?

8          A.     Appendix E(3) was never

9     discussed in my presence with Walgreens.

10         Q.     The DEA's 2006 letter to

11    Walgreens doesn't say not to use the E(3)

12    formula, correct?

13         A.     I still stand by my previous

14    statement.  The E(3) appendix was never

15    discussed by me or anyone in my presence the

16    whole time I was at Walgreens.

17         Q.     And it's not mentioned in this

18    letter either?

19         A.     It is not mentioned in that

20    letter.

21         Q.     All right.  I'd like you to

22    turn to page 40 of your report, please.  Is

23    that 40?

24         A.     I'm sorry.

25         Q.     I believe you testified

Highly Confidential - Subject to Further Confidentiality Review

1    yesterday that you did not review any of the

2    flagged orders from Dr. McCann's analysis; is

3    that correct?

4         A.    I think my testimony in that

5    area was any specific orders.  That would be

6    correct of what my testimony was, yes.

7         Q.    You did not do any analysis to

8    see whether any specific suspicious order

9    caused the diversion of any specific pills

10   for nonmedical use, correct?

11        A.    In regards to Dr. McCann's --

12        Q.    Correct.

13        A.    That would be a correct

14   statement.  I didn't do a specific order of a

15   specific drug, if I understand your question

16   properly.

17        Q.    Well, you asked for a

18   clarification of whether I was speaking about

19   Dr. McCann's analysis.

20             You didn't do any analysis to

21   see whether any specific suspicious order

22   caused the diversion of any specific pills,

23   correct?

24             MR. FULLER:  Object to form.

25        A.    I think that's an accurate

Highly Confidential - Subject to Further Confidentiality Review

1    statement.

2    BY MS. SWIFT:

3        Q.    You testified yesterday that

4    you endorsed Flagging Method A, which you can

5    see at the top of page 41 of your report.

6    Because it -- is that correct?

7        A.    I think that's an accurate

8    statement.  It was -- I endorsed it because

9    it was utilized by the Masters

10    Pharmaceutical.

11        Q.    Is that the only reason you

12    endorsed Flagging Method A?

13        A.    No, that wouldn't be the only

14    reason, no, ma'am.

15        Q.    Did any of the plaintiffs'

16    lawyers instruct or suggest to you that you

17    use Flagging Method A?

18        A.    No.

19        Q.    What other reasons did you

20    endorse Flagging Method A?

21        A.    One, it was part of one of the

22    investigations I conducted, so I was familiar

23    with it.  I believe it was discussed at an

24    administrative hearing with the DEA,

25    subsequently reviewed by the D.C. Court, and

1    there was a ruling on it from the D.C. Court

2    and also the one ruling that it was part of

3    this litigation, I think...

4         Q.    Discovery Ruling 12?

5         A.    Yes, Discovery Ruling 12.  So I

6    think it's had some scrutiny.  I think it

7    would be the proper one.  And that's...

8         Q.    What analysis, if any, did you

9    undertake to test each of the five flagging

10   methodologies and their ability to identify

11   suspicious orders?

12        A.    Could you say that one more

13   time, please?

14        Q.    Sure.

15             What analysis, if any, did you

16   do to test the five flagging methodologies in

17   your report and their ability to identify

18   suspicious orders?

19        A.    I didn't personally do any

20   tests.  I'm aware that they could have been

21   done by Dr. McCann, but I didn't personally

22   do them.

23        Q.    Do you know whether Dr. McCann

24   conducted any analysis at all to test the

25   five flagging methodologies and their ability

1    to identify suspicious orders?

2              MR. FULLER:  Object to form.

3         A.    He had an extensive report.

4    I'm not sure on that.  I believe he did, but

5    I'm not sure.

6    BY MS. SWIFT:

7         Q.    Why do you believe Dr. McCann

8    did any analysis at all to test the five

9    flagging methodologies and their ability to

10   identify suspicious orders?

11             MR. FULLER:  Object to form.

12        A.    Well, I think that's what this

13   does.

14   BY MS. SWIFT:

15        Q.    You think that's what what

16   does?

17        A.    I think the methodology of A

18   identifies suspicious orders based on that

19   methodology, and then it provides them in

20   dosage units.  So I think ultimately, for

21   these dosage units to appear on this page,

22   there had to be flagged suspicious orders.

23        Q.    You're pointing to a page of

24   your report, not Dr. McCann's report,

25   correct, sir?

1          A.    Right.  But -- yes.  But for me

2     to see this --

3               MR. FULLER:  Form.

4          A.    -- I would have to know that

5     this methodology had flagged suspicious

6     orders because that's the only way the dosage

7     units could appear on this chart.

8     BY MS. SWIFT:

9          Q.    Did you read Dr. McCann's

10    report?

11         A.    I did.

12         Q.    When did you read Dr. McCann's

13    report?

14         A.    Sometime after he had submitted

15    it and reviewed his charts resulting from his

16    analysis.

17         Q.    Did you read Dr. McCann's

18    report before you put together this section

19    of your report that appears at page 41?

20         A.    No.

21         Q.    Flagging Methodology A -- I'm

22    still at page 41 of your report.  I'm going

23    to focus on the rows of these tables that

24    we've got here that relate to my client,

25    which is Walgreens, okay?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Sure.  Yes, ma'am.
 2            Q.      Flagging Methodology A flagged
 3    ███  of all Walgreens orders by dosage unit of
 4    oxycodone and hydrocodone, correct, sir?
 5            A.      Yes, ma'am.
 6            Q.      Is it your professional opinion
 7    to a reasonable degree of certainty that ███
 8    of Walgreens orders should not have been
 9    shipped?
10            A.      Based on the conduct of
11    Walgreens and the failure to do due diligence
12    on suspicious orders, yes, ma'am.
13            Q.      Is it your opinion to a
14    reasonable degree of certainty that only ███
15    of orders from Walgreens stores should have
16    been shipped and available to fill
17    prescriptions for Walgreens patients?
18            A.      Well, that would be the
19    converse of this statement, but based on
20    their conduct -- I'll go back again, based on
21    their conduct and their failure to do
22    diligence after identification of suspicious
23    orders, the only conclusion I can draw is
24    that subsequent to that act, all of the
25    controlled substances were diverted.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So that's a yes, your opinion

2  is that only ██ of orders from Walgreens

3  stores should have been shipped and available

4  to fill prescriptions for Walgreens patients?

5           MR. FULLER:  Object to form.

6      A.    I really don't know because

7  Walgreens didn't conduct the proper due

8  diligence.  But based on the methodology and

9  how I applied it, that's the results of the

10  methodology.

11  BY MS. SWIFT:

12      Q.    You don't know whether it's

13  true that only ██ of orders from Walgreens

14  stores should have been shipped and available

15  for prescriptions to be filled for Walgreens

16  patients?

17      A.    I guess you would draw that

18  conclusion based on ████ based on the

19  conduct of Walgreens, yes, ma'am.

20      Q.    You would draw the

21  conclusion --

22      A.    I would draw the conclusion

23  based on --

24      Q.    Let me ask the question so the

25  record is clear.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You would draw the conclusion

 2    that only ▉ of Walgreens orders should have

 3    been shipped so that prescriptions could be

 4    filled for Walgreens patients?

 5              MR. FULLER:  Object to form,

 6         asked and answered.  You've asked it

 7         twice now or three times, probably.

 8        A.     Same as my previous statement.

 9    Based on Walgreens' conduct in regards to

10    applying this methodology, that would be a

11    correct statement, yes, ma'am.

12    BY MS. SWIFT:

13        Q.     You didn't do any analysis of

14    how many people would not have gotten their

15    medication if ▉ of Walgreens orders had not

16    shipped, correct, sir?

17        A.     I did not.

18        Q.     You didn't do any analysis of

19    how many legitimate prescriptions would have

20    gone unfilled if ▉ of Walgreens orders had

21    not been shipped, correct, sir?

22        A.     I did not do that analysis, no,

23    ma'am.

24        Q.     In your report, you don't offer

25    an opinion on the legitimacy of any of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    other flagging methods you talk about,

2    correct?

3          A.      That's correct.

4          Q.      You didn't offer any criticisms

5    of any of the five flagging methods in your

6    report, correct, sir?

7          A.      Oh, I think I did.

8          Q.      Where did you offer criticisms

9    of any of the five flagging methods in your

10   report?

11         A.      You're saying the

12   methodology --

13         Q.      Correct.

14         A.      -- for example, the three

15   times?

16         Q.      There are five methodologies --

17               MR. FULLER:  Go ahead and

18         finish your answer, Raf.

19               MS. SWIFT:  Yes, I was

20         answering his question.  There was no

21         pending question.

22         A.      Yes.  Throughout my report, I

23   think there's reviews of these methodologies,

24   and I think I'm critical of each of the

25   methodologies, with the exception of

1   methodology of two times.  I don't recall --

2   or I'm pretty confident that the two times

3   wasn't used by any of the distributors

4   listed.  I used the two times as just a

5   stepdown from the three times to provide that

6   for the -- for the Court.

7   BY MS. SWIFT:

8        Q.    Let me see if I understand what

9   you're saying.

10            When you say throughout your

11  report you provided criticisms of each of the

12  five flagging methodologies, do you mean in

13  the separate sections about the defendants?

14       A.    Yes, ma'am.

15       Q.    And I take it you mean when you

16  offered criticisms about whatever system each

17  defendant was using, that's what you mean by

18  criticizing these five flagging methodologies

19  that are discussed at page 41 through 46?

20       A.    Well, yes, but I'd like to

21  clarify "criticism."  I think my opinion is

22  steady throughout my report that using a

23  three-time methodology or three-time

24  threshold as a trigger point for suspicious

25  order is ineffective as part of a suspicious

1    order system.

2         Q.      You never told anybody that

3    when you were working as a diversion

4    investigator at the DEA, correct, sir?

5                   MR. FULLER:  Object to form.

6    BY MS. SWIFT:

7         Q.      You don't say you did in your

8    report.

9                   MR. FULLER:  You can answer

10        based on your report.

11        A.      Can I check something, one

12   second?

13   BY MS. SWIFT:

14        Q.      If you can do it quickly.

15        A.      I'll do it as quick as I can.

16                  (Document review.)

17        A.      I'm concerned about the Touhy

18   authorization, so I think I could answer that

19   question, but I think it would be something

20   that wouldn't be readily available, so I'm

21   concerned about answering, so...

22   BY MS. SWIFT:

23        Q.      So if I understand you, sir,

24   you are refusing to answer the question

25   whether you ever told anyone, any

```
1    distributor, when you were working as a

2    diversion investigator -- strike the

3    question.  Hold on a second.

4           A.     Can I speak to my counsel about

5    the --

6           Q.     No, that's okay.  We can move

7    on.

8           A.     -- Touhy authorization --

9           Q.     We can move on.

10          A.     -- that I have a question, with

11   him?

12          Q.     I don't have a lot of time, so

13   I'll just withdraw the last partial question

14   that I was just trying to ask --

15          A.     Okay.

16          Q.     -- and we'll move on.

17                 Yesterday I believe you

18   testified that none of the five flagging

19   methods identified in your report are

20   suitable for suspicious order monitoring

21   systems.

22                 Do you remember using the word

23   "suitable"?

24          A.     I do.  And I thought about that

25   testimony after I left yesterday, and I'd
```

1    like to maybe correct it or make a statement

2    in regards to it.

3         Q.    Well, let me just ask you.

4    What did you mean when you said none of the

5    five flagging methods that you identify in

6    your report are suitable for suspicious order

7    monitoring systems?

8         A.    Well, specifically how they

9    would identify a suspicious order, two times,

10   three times, the 8,000 and the pickers and

11   packers program or the -- I think I don't use

12   that particular name -- the one -- the one

13   that I think that statement would indicate

14   that I would say that the Masters was not

15   suitable, and I -- I would disagree.

16             If I made that statement and

17   said that one was, I'd like to correct that

18   and say that I -- this would be a suitable --

19   potentially suitable suspicious order

20   program.

21        Q.    The Masters method that

22   identified ███ of Walgreens orders as

23   suspicious, that one is suitable?  Is that

24   your testimony, sir?  But none of the other

25   ones?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Just the trigger of the

2   six-month threshold, maximum monthly, just

3   the trigger that would identify the

4   suspicious order, that was, I believe, the

5   question I answered.  That methodology, not

6   the subsequent failure to do due diligence

7   and the identification of orders that

8   resulted from that.

9      Q.      My question was whether it's

10  your testimony that the Masters method, the

11  one that identified ██ of Walgreens orders

12  as suspicious, is the only one of your five

13  flagging methods that you believe is suitable

14  for identifying suspicious orders, yes or no,

15  please?

16              MR. FULLER:  Object to form,

17      vague.

18      A.      As a trigger mechanism or

19  threshold to establish that, an order as

20  being potentially suspicious, I would answer

21  yes to that question.

22  BY MS. SWIFT:

23      Q.      You've referred a couple of

24  times to this trigger mechanism, and I take

25  from your testimony that you're referring to

Highly Confidential - Subject to Further Confidentiality Review

1    the aspect of your methodology whereby after

2    the first order is flagged as suspicious, it

3    triggers every subsequent order to be flagged

4    as suspicious; is that correct, sir?

5              MR. FULLER:  Form, misstates

6         his report.

7         A.    No.

8    BY MS. SWIFT:

9         Q.    What do you mean by a trigger

10   mechanism?

11        A.    A threshold event.  Every

12   suspicious order system has to identify an

13   order, so that would be -- and I'm sorry if

14   that terminology is unfamiliar to you.  That

15   would be a trigger event or a threshold event

16   or something that stops the distribution of

17   an order and requires the registrant to take

18   some action; the unusual size, the unusual

19   frequency or deviating from a --

20   substantially from a pattern.

21        Q.    Besides the five flagging

22   methods that you identify in your report,

23   there may be other methods of identifying

24   suspicious orders that registrants use in the

25   real world, correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes, there could be.

2          Q.     And those other methods that

3    are not identified in your report might be

4    perfectly sufficient for identifying

5    suspicious orders, correct, sir?

6          A.     I hope for the sake of

7    diversion they are perfect and they do exist,

8    but yes, that's a possibility.

9          Q.     And, in fact, you testified

10   yesterday, I believe, that it's up to the

11   registrant to design a system that makes

12   sense for that registrant's business,

13   correct, sir?

14         A.     That's correct.

15         Q.     When you were at the DEA, you

16   never advised a registrant to follow any of

17   the five flagging methods that are addressed

18   in your report, correct, sir?

19               MR. FULLER:  Same instruction

20         on Touhy.

21               MS. SWIFT:  Are you going to

22         follow your counsel's instruction not

23         to answer that question, sir?

24               THE WITNESS:  I'd like to think

25         about it first.  Is that okay?

Highly Confidential - Subject to Further Confidentiality Review

 1              MS. SWIFT:  Depends on how long

 2         it takes.

 3              THE WITNESS:  Yeah, I think

 4         I'll use the Touhy letter and not

 5         answer that question.

 6    BY MS. SWIFT:

 7         Q.    Did you analyze any other

 8    flagging methods for identifying suspicious

 9    orders besides the five that are discussed in

10    your report?

11         A.    No, ma'am, I didn't provide any

12    other methodologies to Mr. McCann if that's

13    the question.

14         Q.    Turning back to page 41 of your

15    report, we've got these tables showing a

16    number and a percentage of flagged orders of

17    both oxycodone and hydrocodone by dosage

18    unit, correct, sir?

19         A.    Yes, ma'am.

20         Q.    These tables are broken out by

21    county, correct, sir?

22         A.    Yes, they are.

23         Q.    These tables are further broken

24    out for five of the defendants in this case,

25    right?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes.

2     Q.     You show aggregated numbers for

3    each defendant for oxycodone and hydrocodone,

4    correct?

5     A.     Yes, I do.

6     Q.     All right.  I'm going to focus

7    on Walgreens.  You provide one number for

8    flagged orders of oxycodone into Cuyahoga

9    County, right?

10          MR. FULLER:  Are you looking at

11        the first methodology?

12          MS. SWIFT:  Yeah, the

13        40 million and some odd.

14     A.     Yes, ma'am.

15   BY MS. SWIFT:

16     Q.     Then you do the same thing for

17   Summit County below, correct, sir?

18     A.     Yes, ma'am.

19     Q.     You provide one number for

20   Walgreens shipments of oxycodone into Summit,

21   right?

22     A.     Yes, ma'am.

23     Q.     You provide one number for

24   Walgreens shipments of hydrocodone into

25   Summit, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Yes, ma'am.

 2            Q.      And then you do the same thing

 3    for all five of the flagging methods,

 4    correct?

 5            A.      That's correct.

 6            Q.      You don't break down the

 7    numbers by any individual pharmacy in your

 8    report, correct?

 9            A.      I do not.

10            Q.      You did not perform any

11    analysis to show how many orders were flagged

12    at any individual Walgreens pharmacy,

13    correct?

14            A.      I do not show that in my

15    report, but I know that that has to exist

16    because it's obviously part of the analysis

17    done by Dr. McCann.

18            Q.      Have you seen it?

19            A.      I have not.

20            Q.      Do you know for a fact whether

21    McCann did any flagging analysis on a

22    pharmacy-by-pharmacy basis?

23            A.      So I'd like to answer that by

24    saying -- when you say I know by a fact, I

25    would know through the analysis of the ARCOS
```

1    data that it would have to indicate specific

2    orders which would identify those pharmacies.

3                Now, whether he looked at them

4    specifically to that pharmacy, but based on

5    your question, just the analysis of the ARCOS

6    data, that -- that actually would occur

7    because each order would be specific to a

8    pharmacy.

9                He didn't -- if I understand

10   your question, he didn't look at them in

11   terms of each specific pharmacy, but the

12   nature of the analysis, it is by the pharmacy

13   by the orders.

14        Q.    You did not perform an analysis

15   to see whether Walgreens performed diligence

16   on any of the actual orders that flagged on

17   any of your five methodologies in

18   Mr. McCann's analysis, correct?

19        A.    Well, my investigation and

20   opinion of Walgreens does state that in

21   regards to the due diligence topic.

22        Q.    Listen to my question.  That's

23   not what I'm asking about.

24        A.    Okay.

25        Q.    We'll get to the stuff you say

1    in your report about the due diligence that

2    Walgreens did.

3                  You didn't perform an analysis

4    to see whether Walgreens performed diligence

5    on any of the specific orders that flagged on

6    any of these five methodologies, correct,

7    sir?

8          A.    I'm not aware of any due

9    diligence for those orders, that's correct.

10         Q.    That's not what I asked.

11         A.    I didn't -- I didn't

12   specifically go to McCann's report and look

13   at each order of Dr. McCann's and try to find

14   due diligence.  I just looked at the scope of

15   the due diligence by Walgreens.

16         Q.    You didn't go to Dr. McCann's

17   report and look at any order of -- that

18   flagged on any of the analyses.

19         A.    That's a correct statement.

20         Q.    For any of the five flagging

21   methods that you talk about, did you consider

22   the impact of stocking a new store's shelves?

23         A.    I did not take that specific

24   incident into consideration, but in my review

25   of due diligence records, I didn't find

1    anything that would indicate that that had

2    occurred.

3         Q.    Did you consider whether any of

4    the five flagging methods that you talk about

5    could flag an order for a store before the

6    store even opened for business, just based on

7    the stocking of the store's shelves?  Do you

8    know whether that happened?

9         A.    I'm not aware that that had

10   happened.

11        Q.    Did you read Dr. McCann's

12   testimony from this past Friday that using at

13   least some of these five flagging methods, an

14   order to stock a new store's shelves could be

15   flagged?

16        A.    I don't recall reading that in

17   his testimony, no, ma'am.

18        Q.    Did you read his testimony yet?

19   I know it was just the other day.

20        A.    I've read so many.  I don't

21   believe so.

22        Q.    I will represent to you, and

23   you can check the transcript, that Dr. McCann

24   testified that for low-volume stores, the

25   store might never have another order as big

Highly Confidential - Subject to Further Confidentiality Review

1   as the first order to stock the shelves

2   again; but under all of the flagging methods,

3   once the first order is flagged, every single

4   order after that is also flagged, correct,

5   sir?

6              MR. FULLER:  Form, compound.

7              MS. SWIFT:  Do you understand

8       the question?

9              THE WITNESS:  Yeah, I

10      understand the question.

11      A.     And I think that possible

12  scenario exists, but the issue would be that

13  if that was to occur and it would trigger a

14  suspicious order, there would be a sufficient

15  due diligence to dispel that suspicion.  And

16  if I didn't see that, it couldn't be taken

17  into account by the methodology.

18  BY MS. SWIFT:

19      Q.     If it your opinion that due

20  diligence is required on orders that are

21  needed to stock a new Walgreens store's

22  shelves?

23      A.     Only if it triggers a

24  suspicious order.

25      Q.     Now, this is going to

1  admittedly be a hypothetical question, but

2  I'd like you to assume with me -- we're going

3  to talk about a new Walgreens store.

4         Assume with me, please, sir,

5  that Walgreens had made sure the new store

6  was registered with the DEA and Walgreens

7  understood the customer base of the new store

8  because Walgreens' real estate department had

9  picked the location, and Walgreens' inventory

10  management system had figured out that the

11  new store needed 8500 dosage units of oxy 30

12  to stock its shelves, and that's how many

13  dosage units the store ordered to stock its

14  shelves.

15         Are you with me?

16  A.     I'm following your scenario so

17  far.

18  Q.     In that case, would it be

19  appropriate to flag that first order under

20  any of the five flagging methods that you

21  have discussed in your report?

22  A.     If the order would have

23  triggered the methodology, then it would be

24  appropriate to be flagged.

25  Q.     And in that case, if that first

1    order was flagged when the store was stocking

2    its shelves, is it your opinion that all of

3    the store's later orders should also be

4    flagged after the first order, even if they

5    never exceeded 8,000 units again or any --

6    they never flagged on any methodology ever

7    again?

8         A.    Well, the hypothetical that you

9    provided to me would be one instance, and the

10   methodology and the resulting all orders for

11   lack of due diligence, that's based on the

12   systematic failure by the registrants.  So

13   just one incident, I don't believe would

14   change the numbers or the methodology.

15             For example, as I discussed

16   yesterday, there's a possibility, I guess,

17   that there was one due diligence

18   investigation that might be suitable, but if

19   it was a systematic failure to do due

20   diligence, then, no, it would not change

21   these numbers.

22        Q.    You did not do any analysis of

23   Dr. McCann's charts to see how often a

24   store's first order to stock its shelves

25   flagged under one of the flagging methods,

Highly Confidential - Subject to Further Confidentiality Review

1    correct, sir?

2         A.    I did not, but I also don't

3    recall in looking -- finding any due

4    diligence that would indicate that that

5    occurred.

6              Is that a hypothetical question

7    or --

8         Q.    No.  Maybe you didn't

9    understand my question.

10             I just want to know whether you

11   did any analysis of Dr. McCann's results to

12   see how often a store's very first order to

13   stock its shelves flagged on one of the five

14   flagging methods?

15        A.    It would be impossible to know

16   that by just looking at the ARCOS data.

17        Q.    It's your testimony that it

18   would be impossible to figure out how often a

19   store's first order to stock its shelves

20   flagged on one of the five flagging methods?

21        A.    I believe your question was a

22   new store.

23        Q.    Fair.  Let me reask it.

24             You didn't do any analysis of

25   Dr. McCann's results to see how often the

Highly Confidential - Subject to Further Confidentiality Review

1    first order placed by a store that appears in

2    the ARCOS data flagged under one of the five

3    methodologies, correct?

4        A.    You have to ask that one more

5    time.

6        Q.    You didn't do any analysis of

7    Dr. McCann's results to see how often a

8    store's first order that appears in the ARCOS

9    database flagged on one of the five flagging

10   methods?

11       A.    Well, I'm aware under the

12   flagging mechanisms, a first order wouldn't

13   trigger Methodology A, Methodology B,

14   Methodology C.  If it was over 8,000, it

15   would trigger Methodology D.  And I'd have to

16   go back to the maximum daily dosage units,

17   but I don't think it would trigger an order

18   there.  Because a first order hasn't

19   established the 6- or 12-month average.

20            So I believe under those

21   methodologies, it would not trigger under

22   Dr. McCann's analysis.

23       Q.    You did not do any analysis of

24   Dr. McCann's results to see how often a

25   store's first order that appears in the ARCOS

Highly Confidential - Subject to Further Confidentiality Review

1   database flagged under one of the flagging

2   methods, correct?  Not whether it's possible,

3   just how often that happened?

4        A.     No, I did not.

5        Q.     Okay.

6        A.     Because as my previous answer,

7   under those methodologies, it wouldn't

8   matter.

9        Q.     Let's go to page 46 of your

10  report, please, sir.  You say on page 46 that

11  you only presented data to an economist for

12  Flagging Method A, the Masters method,

13  correct?

14            MR. FULLER:  Where are you

15       reading from, Counsel?

16       A.     I don't think I said that.  I

17  think this statement is in relation to the

18  correction of my testimony that this is the

19  one system that I provide an opinion on that

20  has a reasonable degree of certainty that...

21  BY MS. SWIFT:

22       Q.     Did you provide any of the data

23  that appears in your report to an economist?

24            MR. FULLER:  Object to form.

25       A.     I don't recall doing that.  I

Highly Confidential - Subject to Further Confidentiality Review

1    do not believe so, no.

2    BY MS. SWIFT:

3         Q.    Do you have any understanding

4    about whether any of the data that appears in

5    your report was going to be passed on by the

6    plaintiffs' lawyers to some economist to make

7    use of that data?

8         A.    I believe there's a statement

9    of that in my report somewhere, that it could

10   be used.

11        Q.    Do you know whether that ever

12   happened?

13        A.    I don't believe it's happened.

14   If it has happened, no one's advised me.

15        Q.    Have you ever had a

16   conversation with any economist working for

17   the plaintiffs' lawyers about the data that

18   appears in your report?

19        A.    No, ma'am.

20        Q.    You testified --

21        A.    Can I just correct that a

22   little bit?

23              So in the course of meetings,

24   I've talked to a lot of people.  No one ever

25   I've talked to has identified themselves as

Highly Confidential - Subject to Further Confidentiality Review

 1    an economist or I've never talked to anyone

 2    with the purpose of giving these things to an

 3    economist.  So I don't want to imply my

 4    testimony is I've never talked to an

 5    economist.  I'm not aware of it, but I'm just

 6    kind of protecting the fact that if I did, I

 7    wasn't even aware of it.

 8         Q.     You never explained the data in

 9    your report to anyone for the purpose of them

10    taking that data and using it to calculate

11    damages in this litigation?

12         A.     I have never done that.

13         Q.     You testified yesterday that

14    you provided the five flagging methods

15    discussed in your report -- you provided

16    those to plaintiffs' counsel by phone I

17    believe, you said to -- provided them to

18    Mr. Farrell.

19              Do you remember that testimony?

20         A.     I think that question was the

21    first time that I talked to somebody about

22    it.  So --

23         Q.     I'm trying to get at how the --

24              MR. FULLER:  Object to the form

25         of the last question.  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. SWIFT:

 2         Q.      I'm trying to get at how the

 3    five flagging methods made their way from you

 4    to Dr. McCann.

 5              Do you have any idea how that

 6    happened?

 7         A.      There was a couple of different

 8    discussions with the plaintiff attorneys.

 9    I'm not sure who relayed it to Dr. McCann.  I

10    discussed it with Paul Farrell, Mr. Farrell a

11    couple of times; also with Mr. Fuller.  I'm

12    not sure who relayed it to him, but I

13    discussed the methodologies and how I wanted

14    them applied.

15         Q.      All of those conversations were

16    verbal, is that correct, not in writing?

17         A.      There was nothing in writing,

18    and they were verbal, either in person or on

19    a telephone.

20         Q.      I'm going to hand you what I'll

21    mark as Exhibit 20.

22              MS. SWIFT:  And, Counsel, I

23         apologize, I only have one extra copy.

24         Blame the hotel.  I'm not even going

25         to have a copy for myself.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, Deposition Exhibit

 2            Rafalski-20, Plaintiffs' Responses to

 3            the Amended and Clarified Discovery

 4            Ruling 12 Supplemental Interrogatory

 5            Issued to Plaintiffs, was marked for

 6            identification.)

 7     BY MS. SWIFT:

 8            Q.    Do you have that in front of

 9     you, sir?

10            A.    I do.

11                  THE WITNESS:  Trade you.

12            Sorry.

13     BY MS. SWIFT:

14            Q.    Well, first of all, have you

15     ever seen the document that I've marked as

16     Exhibit 20?

17            A.    I have, yes, ma'am.

18            Q.    The document I marked as

19     Exhibit 20 is a set of interrogatory

20     responses served by the plaintiffs on

21     January 25th, 2019, and if you go to -- I

22     believe it's the sixth page -- there's a list

23     of flagging methodologies prepared at the

24     very end of the written interrogatory

25     response.  Keep going.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FULLER:  It's not page

 2          numbered.

 3                    MS. SWIFT:  I noticed that,

 4          Mike.

 5                    MR. FULLER:  We'll blame

 6          Mr. Moody or Mr. Farrell.

 7     BY MS. SWIFT:

 8          Q.    Do you have a list in front of

 9     you, Mr. Rafalski, that lists five flagging

10     methodologies in the plaintiffs'

11     interrogatory response from January 25th?

12          A.    I do.

13          Q.    Are these your five flagging

14     methodologies?

15          A.    Yes, ma'am.

16          Q.    Which one is based on the

17     Masters case?

18          A.    4.

19          Q.    Am I correct based on your

20     testimony today and yesterday that you're not

21     planning to come to trial and offer testimony

22     about any of the flagging methods except the

23     Masters method?

24          A.    No, I don't think that's my

25     testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  All right.  Turning back
 2      to your report -- you can set that aside,
 3      we're done with it -- page 42, I'd like to
 4      take a look at, please.
 5                  MR. FULLER:  I'm sorry,
 6            Counsel, what page?
 7                  MS. SWIFT:  42.
 8      BY MS. SWIFT:
 9            Q.    If you had picked Flagging
10      Method B that's identified at the top of
11      page 42, instead of Method A, the Masters
12      method, what data would you have presented
13      for Walgreens?
14                  MR. FULLER:  Object to form.
15            A.    I don't understand that
16      question.
17      BY MS. SWIFT:
18            Q.    Fair enough.
19            A.    I think I did pick
20      Methodology B, but so I don't understand.
21            Q.    Well, you said you endorsed
22      Method A and that's the only method you
23      endorsed, correct, because of the Masters
24      case and some other reasons?
25            A.    Well, I think I make that
```

1  statement at the conclusion that we had

2  discussed --

3        Q.     Right.

4        A.     -- in regards to the Masters.

5        Q.     Right.  On page 46 you endorse

6  the Masters method, Method A, correct, sir?

7        A.     Well, I don't know that I

8  endorse the system.  I say that applying the

9  tests set forth in the Masters provides a

10  reasonable estimate and initial trigger.  I

11  say there's a reasonable.  I don't know that

12  I would say that it's an endorsement.  I say

13  that because in my -- extensively in my

14  training and in publications, DEA doesn't

15  endorse suspicious order systems.

16        Q.     You say in your report that you

17  are selecting Methodology A because of your

18  understanding that this litigation will be

19  advanced by selecting a methodology

20  quantifying a volume of pills that entered

21  CT1 jurisdictions, that's Summit and Cuyahoga

22  County, unlawfully and providing this data to

23  an economist to measure the harm caused by

24  this volume.

25              Correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      If you had picked Method B

3    instead of Method A, the data you would have

4    presented would have been very different,

5    correct, sir?

6        A.      I wouldn't have picked that

7    method because it wouldn't be a reasonable

8    degree -- or it wouldn't have been a

9    suspicious order system that I would have

10   ever approved or not made comment on.

11              My opinion is that a fixed two

12   times a 12-month average would not be a

13   methodology that I would ever say to move

14   forward to be considered by the Court.

15       Q.      I'm going to ask you with

16   respect, sir, to please listen to my

17   questions.

18       A.      Okay.

19       Q.      You picked --

20       A.      Can I just --

21       Q.      Go ahead.

22       A.      It would be different results.

23   I would -- if that's the answer you want,

24   then the methodology of the A -- obviously,

25   it would be different results.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Method A, the Masters method,

2    identified ▓ of Walgreens orders for

3    oxycodone and hydrocodone as suspicious,

4    correct, sir?

5        A.      Yes, that's what the chart

6    says.

7        Q.      If you had picked Method B,

8    that method identified just ▓ of Walgreens

9    orders for oxycodone into Cuyahoga County as

10   suspicious, correct, sir?

11       A.      That's what the information

12   says in the analysis.

13       Q.      The number is different for

14   hydrocodone.  If you had picked Method B,

15   that method identified ▓▓▓▓▓▓ of

16   Walgreens hydrocodone orders as suspicious,

17   correct, sir?

18       A.      Yes.  But again, I'm going

19   to restate.  I would not have picked -- I

20   mean, I'm not going to disagree that the

21   figures are different, but I would not have

22   picked that.

23       Q.      I get it.

24       A.      But if I would have picked it,

25   they would be different.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Understood.

2      A.      Okay.  All right.

3      Q.      You didn't pick Method B.  You

4   picked Method A, that it flagged ███ of

5   Walgreens orders.

6      A.      I didn't pick it because of the

7   percentage --

8      Q.      Okay.

9      A.      -- the percentage of how many

10   they flagged was not the factor that I used

11   to pick that.  It was because of the review

12   by the D.C. Court and my familiarity with the

13   case, and the fact that I would see that that

14   could be a viable suspicious order trigger.

15      Q.      If you had picked Method C,

16   which you can see on page 43 of your report,

17   you would have identified just ███ of

18   Walgreens orders for oxycodone in Cuyahoga

19   County as suspicious, correct, sir?

20      A.      I do agree that that's the

21   number that it would have identified, but I

22   also would like to state it would be expected

23   that it would decrease because that's -- as

24   my opinion states, is ineffective three

25   times --

1    Q.    You didn't --

2    A.    -- trigger.

3    Q.    You can't vouch for the

4    accuracy of any of the numbers that appear in

5    these tables at pages 41 to 45 of your

6    report, correct, sir?

7    A.    Mr. McCann would have to

8    testify to the accuracy.  He did the

9    analysis.

10    Q.    You just relied on what

11    Mr. McCann provided, correct, sir?

12    A.    Yes, I did.

13    Q.    You were -- strike that.

14    You don't have an opinion about

15    whether any particular order that you

16    identified or that Dr. McCann identified as

17    suspicious was diverted to an illicit

18    channel, correct, sir?

19    A.    Well, I think based on the

20    methodologies and the lack of due diligence,

21    I think my -- these say that those were

22    diverted.

23    Q.    My question was a little bit

24    different.

25    A.    Okay.

1    Q.    You don't have an opinion about

2    whether any particular order -- you didn't

3    look at any particular order to see whether

4    it was diverted to an illicit channel?

5    A.    I did not --

6    Q.    Okay.

7    A.    -- analyze all the orders and

8    try to find one or locate one that was

9    diverted.

10    Q.    You didn't analyze any of the

11    orders, correct, sir?

12    A.    That's correct.

13    Q.    You have no opinion about

14    whether any particular order that was flagged

15    as suspicious led to someone's addiction,

16    overdose or death, correct, sir?

17    A.    As of today, I have no opinion

18    on that matter.

19    Q.    Do you plan on coming up with

20    that opinion at some point after today?

21    A.    I can't rule that out if I'm

22    asked to look at that or I'm provided some

23    information I could review that would -- that

24    would indicate that.  So I can't rule out

25    that that would occur.

1        Q.      If a prescription was

2    legitimate, the pharmacist was obligated to

3    fill it, correct, sir?

4                MR. FULLER:  Form.

5        A.      I don't think the DEA speaks to

6    that, whether they're obligated to fill a

7    prescription.

8    BY MS. SWIFT:

9        Q.      Do you know one way or the

10   other whether --

11       A.      If the DEA speaks to that

12   topic?

13       Q.      No, sorry.

14               Do you know whether pharmacists

15   are obligated by their professional

16   responsibilities to fill prescriptions that

17   they have determined are legitimate?  Maybe

18   you don't know one way or the other.

19       A.      Let me think.  I don't know

20   that, the answer to that question.

21       Q.      All right.  Turn, if you would,

22   please, to page 114 of your report.

23       A.      Can I qualify my last answer,

24   quickly?

25       Q.      Sure.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Based on my experience in

2    having discussions with pharmacists, I

3    believe its possible for a pharmacist to

4    refuse to fill a prescription.

5          Q.      You don't offer any opinions in

6    your report about a pharmacist's professional

7    obligations, correct, sir?

8          A.      That's correct.

9          Q.      You are not a pharmacist?

10         A.      I'm not a pharmacist.

11         Q.      Have you ever worked at a

12   pharmacy?

13         A.      I have not.

14         Q.      Turn to page 114, please.  This

15   is the start of the section of your report on

16   Walgreens, correct?

17         A.      Okay.  Yes.

18         Q.      Do you see that table about

19   halfway down the page?

20         A.      Yes.

21         Q.      That table shows your

22   understanding of the overall volume of

23   shipments of oxycodone and hydrocodone from

24   Walgreens distribution centers to Walgreens

25   pharmacies, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes, it does.

2        Q.      Do you see footnotes 489 and

3    490?

4        A.      Yes, I do.

5        Q.      You cite in those footnotes to

6    Dr. McCann's Appendix 10 for Walgreens'

7    volume numbers, correct?

8        A.      Yes.

9        Q.      I'm going to hand you what I'll

10   mark as Exhibit 21.

11               (Whereupon, Deposition Exhibit

12               Rafalski-21, Excerpt from McCann

13               Appendix 10, was marked for

14               identification.)

15   BY MS. SWIFT:

16       Q.      And I've put a Post-it on the

17   front of the exhibit version of this that

18   says what it is.  It's an excerpt of McCann's

19   Appendix 10, because his appendices are

20   giant.

21       A.      They are.

22       Q.      What we did was we pulled out

23   the pages that relate to Walgreens.  Okay.

24               You cite in your report to

25   pages 226 of Appendix 10 and page 856 of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Appendix 10, correct?

 2           A.      Yes, I do.

 3           Q.      And you can see the first page

 4    of what I just handed you is page 226 of

 5    1260.  Is that the page that you were citing

 6    in footnote 489?

 7           A.      Yes.

 8           Q.      And then if you'll turn to

 9    page 46 of what I just handed you, can you

10    confirm for me that that is page 856 that you

11    cited in your report?

12           A.      Page 46.  You mean page -- I'm

13    sorry, page 856?

14           Q.      I'm sorry.  To make this

15    easier -- this was the theory, anyway -- we

16    added page numbers at the bottom right.

17           A.      Okay.

18           Q.      So turn to page 46, and it's

19    double sided.

20           A.      Oh, all right.  I was confused

21    when you said -- I was looking for the...

22    okay.

23           Q.      Is page 46 also page 856 of

24    1260?

25           A.      Yes, ma'am.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Is that the page 856 that you

2   cite in your report at page 114?

3      A.      Yes, ma'am.

4      Q.      Okay.  This Appendix 10 from

5   McCann's report is what you relied on to

6   determine total volume of oxycodone and

7   hydrocodone that Walgreens shipped into

8   Cuyahoga and Summit Counties; is that right?

9      A.      Yes, ma'am.

10     Q.      You only talk about oxycodone

11  and hydrocodone in your report, correct?

12     A.      Yes, ma'am.

13     Q.      Am I right that you don't have

14  any opinions about any other opioid pain

15  medications besides oxy and hydro?

16     A.      As of today I do not because I

17  was not requested to do any analysis on those

18  other drugs.

19     Q.      After -- turn back to page 1 of

20  Exhibit 21.  The page 1 of Exhibit 21 is a

21  table that shows overall numbers, Total

22  Shipments to Cuyahoga identified by

23  Methodology, Common Sense Method, Maximum

24  Monthly Trailing Six-Month Pharmacy Specific

25  Threshold, Walgreens to All Buyers, 1996 to

Highly Confidential - Subject to Further Confidentiality Review

1    2018, correct?

2         A.     Yes.

3         Q.     And it's a table that shows

4    numbers broken out by drug and by

5    transaction, dosage units, MME, and base

6    weight, correct?

7         A.     Yes.

8         Q.     After the table on page 1 of

9    Appendix 10, there's a series of bar graphs

10   showing, in the aggregate, Walgreens

11   shipments of oxy and hydro to its pharmacies

12   in the aggregate, correct?

13        A.     Yes, ma'am.

14        Q.     None of these charts shows any

15   data for any individual Walgreens pharmacy,

16   correct?

17               MR. FULLER:  Object to form.

18        A.     That's an accurate statement,

19   but they're all built upon individual orders.

20   BY MS. SWIFT:

21        Q.     I understand.

22        A.     Okay.

23        Q.     I'm just saying, when you're

24   flipping through Dr. McCann's charts that

25   display the results of his flagging

1    methodologies, you can't tell anything about

2    any individual pharmacy, correct?

3          A.    I cannot by looking at these

4    charts.

5          Q.    Do you know how many Walgreens

6    stores there are in Cuyahoga County?

7          A.    I do not.

8          Q.    How about Summit County?

9          A.    I do not.

10         Q.    Do you know anything about the

11   geographic locations of any of Walgreens'

12   pharmacies in Summit or Cuyahoga County,

13   other than the fact that they're in those

14   counties?

15         A.    It doesn't appear in my

16   opinion, but during my review of data, I did

17   at one point take a look by just using the

18   Internet, Googling and looking at some of the

19   locations, but I didn't formulate a report on

20   that.

21              So I won't say that I never did

22   that, but I don't have any records or

23   documents that would record exactly the

24   distances and the locations.

25         Q.    You also didn't include in your

1   report anything about the specific customer

2   base for any individual Walgreens pharmacy,

3   correct, sir?

4        A.    I did not.

5        Q.    Do you know how many of the

6   Walgreens pharmacies in Cuyahoga and Summit

7   County are on corner lots?

8        A.    I do not.

9        Q.    Do you know how many of the

10  Walgreens pharmacy in Summit and Cuyahoga

11  Counties are freestanding locations with

12  their own dedicated parking and a

13  drive-through window?

14       A.    I do not.

15       Q.    Do you know how much oxycodone

16  or hydrocodone Walgreens distribution centers

17  shipped to any one of those Walgreens

18  pharmacies?

19       A.    I do not.  I had not done that

20  analysis up to today.

21       Q.    You can't tell any of that from

22  the charts that are in Appendix 10, correct,

23  sir?

24       A.    That's correct.

25       Q.    All right.  You can set that

Highly Confidential - Subject to Further Confidentiality Review

1    one aside.

2              Turn, if you would, please,

3    sir, to page 117 of your report.  This is a

4    section within the Walgreens section about

5    the due diligence that you believe Walgreens

6    conducted, correct?

7         A.    Yes, ma'am.

8         Q.    Now, as I understand it, it's

9    your opinion that because you only saw a

10   limited number of e-mails about due diligence

11   that Walgreens performed 10, 12, 13 years

12   ago, that that means Walgreens performed no

13   other due diligence; is that correct?

14        A.    Not that was brought to my

15   attention in trying to formulate my opinion.

16        Q.    And in formulating your

17   opinion, you determined that Walgreens had

18   only conducted limited due diligence because

19   you only saw documentation of limited due

20   diligence, correct?

21        A.    That's the only basis I could

22   use to form my opinion.

23        Q.    You based your -- well, let me

24   ask you this.

25              Did you read any of the

Highly Confidential - Subject to Further Confidentiality Review

1    Walgreens depositions where Walgreens

2    witnesses talked about the kind of due

3    diligence that had been done?

4        A.    I read depositions or specific

5    parts of depositions relating to my report.

6    I -- you know, my training and experience has

7    said that if it's not written down, it

8    doesn't exist.  It needs to be documented.

9              So how I would look at that

10   kind of due diligence, if it was not a

11   recorded due diligence and there wasn't a

12   historical record, and it's not available for

13   future review for other incidences, I

14   wouldn't consider -- I mean, I'm not going to

15   deny that it would have occurred or would not

16   have occurred, but it's really not due

17   diligence if it's not recorded in a due

18   diligence file.

19       Q.    Well, there's a couple of

20   things going on in that answer.

21       A.    Sure.

22       Q.    I take from your testimony that

23   you are assuming, if Walgreens no longer

24   retains a document today, that that means

25   that document never existed, correct?

1       A.      In my experience as a diversion

2    investigator, in conducting an investigation

3    or forming an opinion, yes, it doesn't exist.

4       Q.      Are you basing your opinion

5    that Walgreens did limited due diligence on

6    the documents cited in your report at

7    footnotes 499 and 500?

8               MR. FULLER:  Object to form.

9       A.      I believe I also cite 501, but

10   yes, ma'am.

11   BY MS. SWIFT:

12      Q.      Is that it, though, in terms of

13   the support you have for your opinion that

14   Walgreens performed limited due diligence is

15   based on the documents cited in notes 499,

16   500 and 501?

17      A.      Yeah, and the fact that they

18   didn't produce any prior to 2011, yes, ma'am.

19      Q.      I'll hand you one of those

20   documents that we'll mark as Exhibit 22.

21              (Whereupon, Deposition Exhibit

22         Rafalski-22, E-mail(s),

23         WAGFLDEA00000459 - WAGFLDEA00000460,

24         was marked for identification.)

25              ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. SWIFT:
 2        Q.    All right.  I've handed you a
 3   July 8th, 2010 e-mail from -- the one I want
 4   to focus on is from Angela Parlato at
 5   Walgreens.
 6              Do you see that?
 7        A.    To Angela Parlato, yes, ma'am.
 8        Q.    And this is WAGFLDEA00000459,
 9   which you have cited at note 499 of your
10   report, correct, sir?
11        A.    Yes.
12        Q.    You can see from Ms. Parlato's
13   signature line that she was a Pharm.D., a
14   registered pharmacist --
15        A.    Yes.
16        Q.    -- and pharmacy manager,
17   correct, sir?
18        A.    Yes.
19        Q.    You see that she -- it says
20   that she's the pharmacy manager at the
21   bottom?  It's at the bottom of the back page.
22        A.    It does say that on the back
23   page.
24        Q.    She's e-mailing a pharmacy
25   supervisor in Orlando, Florida, correct, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                A.      Yes.

 2                Q.      Do you understand that there

 3      was a known issue with pill mills in Florida

 4      in this time frame, summer 2010?

 5                A.      Yes, I do.

 6                Q.      And Ms. Parlato is writing to

 7      the pharmacy supervisor about concerns she

 8      has had at her pharmacy, correct?

 9                A.      Yes, she is.

10                Q.      All right.  I'm going to focus

11      your attention on the second paragraph of

12      Ms. Parlato's e-mail.  I'm just going to read

13      it so we're on the same page.

14                        Ms. Parlato writes:  Brandon

15      and I have agreed that we will only fill if

16      they produce a driver's license matching name

17      on Rx, write down the diagnosis of patient on

18      Rx, and verify Rx with doctor office.  Every

19      week I increase my order of oxy 30 and every

20      week I run out as more and more people are

21      coming.  I have caught a total of seven

22      fraudulent Rx's from three patients in the

23      last two months.  The last patient was

24      arrested and had a bail set at $50,000.

25                        I have called the Ocala police,
```

Highly Confidential - Subject to Further Confidentiality Review

1    the Marion County Sheriff's Office here, as

2    well as the Broward County Sheriff's Office,

3    the DEA, and to be quite honest, no one

4    really seems to take my reports that

5    seriously, except for this last week when the

6    fake Rx man was arrested.  They promise to

7    come and interview me and look at the data I

8    have collected, but thus far, no follow-up.

9              The bottom line is I want to

10   make sure I'm covering myself so no one

11   thinks I or Brandon are doing anything

12   unethical or illegal.

13             Did I read all that correctly?

14        A.    You did.

15        Q.    The pharmacist here is telling

16   her supervisor that she's checking

17   prescriptions that have red flags.  Would you

18   agree with that?

19        A.    I do.

20        Q.    She says that she's only

21   filling prescriptions for patients who

22   produce a driver's license matching the name

23   on the prescription?

24        A.    Yes, ma'am.

25        Q.    She says she's verifying

1    prescriptions with doctors' offices?

2         A.    Yes, ma'am.

3         Q.    She says she's caught a total

4    of seven fraudulent prescriptions from three

5    patients in the past two months, correct?

6         A.    She does.

7         Q.    She doesn't say she's filling

8    those fraudulent prescriptions, right?

9         A.    She does not.

10        Q.    From this e-mail, it's pretty

11   clear she's not filling the fraudulent

12   prescriptions, right?

13        A.    You could draw that conclusion

14   from this e-mail.

15        Q.    She says she's called the Ocala

16   police, the Marion County Sheriff's Office,

17   and Broward County Sheriff's Office and the

18   DEA, correct, sir?

19        A.    Yes.

20        Q.    She's calling law enforcement

21   whenever she sees something wrong, at least

22   by her own description, correct, sir?

23        A.    She is.

24        Q.    She says no one is taking her

25   reports all that seriously?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      Yes, ma'am.

2            Q.      And she wants to make sure

3    there's not something else that she should be

4    doing, correct?

5            A.      I think she's reaching out for

6    that type of advice, yes, ma'am.

7            Q.      When you worked at the DEA,

8    isn't this exactly the type of thing that you

9    wanted pharmacists to be doing?

10           A.      To call me in this manner?

11   Yes, ma'am.

12           Q.      This is not the type of

13   pharmacist you would accuse of not doing her

14   job, is it, sir?

15                   MR. FULLER:  Object to form,

16           lack of information.

17           A.      I'm sorry, I'm thinking a

18   second about that Touhy.  I have that Touhy

19   issue in mind.

20   BY MS. SWIFT:

21           Q.      I'm not asking based on any

22   investigation you worked on at the DEA.  I'm

23   basing on this --

24           A.      No, I'd like to --

25           Q.      -- this document that was
```

Highly Confidential - Subject to Further Confidentiality Review

1    produced in litigation, whether this is the

2    kind of pharmacist you would say she's not

3    doing her job.

4         A.     I would not say she's not doing

5    her job.

6         Q.     You don't have an opinion in

7    this case that there was anything else this

8    pharmacist should have been doing, correct,

9    sir?

10             MR. FULLER:  Object to form.

11        A.     Well, if I would -- if I would

12   have received this information that's

13   described in here and she called me and I was

14   working as a DEA investigation -- DEA

15   investigator, I would probably have a little

16   more of an extensive conversation with her in

17   regards to the content of the prescriptions,

18   confirm that she's actually doing these

19   things that she's doing.

20             I may have some questions for

21   her in regards to the doctors and the

22   location, how far the patients are traveling

23   within Florida.  I might give her a little --

24   I might ask some questions that might end up

25   being guidance, and I'm not so sure that --

Highly Confidential - Subject to Further Confidentiality Review

1    I'm a little concerned about the statement

2    that no one did anything.  That's troublesome

3    to me.

4    BY MS. SWIFT:

5        Q.     She found it troublesome too,

6    didn't she, sir, at least based on the

7    e-mail?

8        A.     Yeah.  Yes, you know, anytime

9    diversion is not acted upon, I find it

10   troubling.  So I probably would have did a

11   little more than what's in here, but that's

12   just me personally.

13           There's -- when I used this,

14   there was other things that troubled me in

15   this e-mail, but I'm going to answer your

16   question just specific to that.  Yeah, I

17   don't think she did anything wrong.

18           But I think she didn't get

19   sufficient guidance that potentially what she

20   was doing wasn't enough.

21       Q.     Wasn't for lack of trying,

22   though, correct, sir?

23       A.     Understood.  But just reading

24   what she wrote, there is still a potential

25   that filling those prescriptions with the

Highly Confidential - Subject to Further Confidentiality Review

1   situation that was going on in Florida, which

2   she obviously has knowledge of and the people

3   coming from Ohio, I'm a little concerned that

4   maybe she could have probably done a little

5   more as a pharmacist.

6       Q.      You don't offer any opinions in

7   your report about any of that, correct, sir?

8       A.      About her actions?

9       Q.      Correct.

10          MR. FULLER:  Object to form.

11      A.      No, I do not.

12  BY MS. SWIFT:

13      Q.      Let's take a look at the next

14  paragraph of Ms. Parlato's e-mail.  Are you

15  with me?

16      A.      I am.

17      Q.      It says:  This past week, the

18  warehouse called me to inquire about the

19  growing orders of oxy 30 I have been placing

20  and said that it is a red flag of sorts when

21  a store orders more than 30 bottles per

22  order.  I ordered 55 this week and have no

23  doubt I will sell them all before my next

24  order comes in.

25              Did I read that correctly?

1        A.      You did.

2        Q.      Do you think that the DC

3   personnel was doing something wrong here

4   based on this one paragraph?

5        A.      Well, I don't have complete

6   information to make a real firm judgment, but

7   I would say the tone of this and the content

8   would make me question about how quickly the

9   orders increased or the escalation and why it

10  got to such a problem in the previous -- the

11  paragraph above it and now is being called

12  and why it maybe should have been triggered

13  earlier.

14       Q.      But you don't know about any

15  other communications that this person at the

16  distribution center may have had with

17  Ms. Parlato, correct?

18       A.      No, I don't, but I'm just

19  answering your question based on just that

20  paragraph.

21       Q.      The distribution center person

22  who Ms. Parlato spoke with is also checking

23  on red flags, correct, sir?  That's what it

24  says in the paragraph?

25       A.      Well, that's the part that

Highly Confidential - Subject to Further Confidentiality Review

1    concerns me.  I'm not so sure it's a red flag

2    more than a suspicious order.

3         Q.    Okay.  You don't know what else

4    the distribution center did to investigate

5    this order, correct, sir?

6         A.    I do not, but it's concerning

7    to me because in a suspicious order system,

8    there are no -- I've never seen the term "red

9    flag."  The pharmacy conduct would be --

10   those are red flags, so I -- that's why

11   there's some concern with that paragraph.

12        Q.    You don't know whether this

13   particular order that is being discussed in

14   Ms. Parlato's e-mail ever shipped, correct,

15   sir?

16        A.    Well, this doesn't say whether

17   or not it shipped, but that paragraph would

18   lead you to the assumption that she believes

19   it's going to be shipped and she could buy

20   more.

21        Q.    You didn't do anything to

22   confirm that?

23        A.    I did not.

24        Q.    And you haven't done any

25   further inquiry into what was going on at

Highly Confidential - Subject to Further Confidentiality Review

1    Ms. Parlato's pharmacy other than reading

2    this e-mail, correct, sir?

3         A.    As we sit here today, no,

4    ma'am.

5         Q.    You haven't done an ARCOS

6    analysis of the volume of oxy shipped to this

7    pharmacy, anything like that?

8         A.    I have not.

9         Q.    And you have no opinion on how

10   many of the prescriptions that this

11   pharmacist saw were legitimate, correct?

12              MR. FULLER:  Form.

13        A.    No, but I don't have access to

14   the information to be able to form that

15   opinion.

16   BY MS. SWIFT:

17        Q.    Is it your opinion that the

18   distribution center should have cut and

19   reported all orders above 30 bottles of

20   oxycodone?

21              MR. FULLER:  Form, improper

22        hypothetical.

23        A.    Well, that kind of goes to the

24   heart of the failure of due diligence,

25   because -- and I'm just speaking based on

Highly Confidential - Subject to Further Confidentiality Review

1    this and your term of using 30 bottles.

2              I don't know what due diligence

3    existed that they would establish a threshold

4    or what pattern of purchase previously, so

5    just to give me an arbitrary number, I can't

6    make comment on that.

7    BY MS. SWIFT:

8         Q.    Okay.

9         A.    But that's the essential

10   purpose of the due diligence, is to be able

11   to know what the usual order is.

12        Q.    But you don't have an opinion

13   that this particular distribution center

14   should have done something to cut off

15   shipments beyond 30 bottles or anything like

16   that?

17             MR. FULLER:  Object to form,

18        insufficient evidence or facts.

19        A.    I don't have an opinion because

20   I don't have the due diligence or records to

21   make an opinion on that right now.

22   BY MS. SWIFT:

23        Q.    All right.  Turn to page 121,

24   please.  Getting close.

25             The top of page 121 says --

1    I'll wait until you're there.

2         A.    Go ahead.

3         Q.    The top of page 121 says:  The

4    bar graphs identified as Figures 45 to 56 in

5    Schedule II of this report demonstrate a

6    clear escalation of prescription opioids into

7    Cuyahoga County and Summit County by dose,

8    base weight and MME.  The massive increase in

9    prescription opioids without a documented

10   basis is indicative of a failure to maintain

11   effective control.

12              Did I read that correctly?

13        A.    You did.

14        Q.    The charts and figures in

15   Schedule II of your report come from

16   Dr. McCann, the other plaintiffs' expert,

17   correct?

18        A.    Yes, ma'am.

19        Q.    They come from Appendix 9 of

20   Dr. McCann's report; is that right?  You can

21   see that if you look at Schedule II.

22              MR. FULLER:  I don't know the

23        answer.

24        A.    I don't.

25              ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. SWIFT:
 2         Q.     Oh, you don't have the
 3    schedules?  Okay.
 4         A.     I mean I --
 5               MR. FULLER:  Somewhere.
 6               MS. SWIFT:  I've got them.
 7               THE WITNESS:  It will take me a
 8         while.  I don't want to use your time.
 9               MS. SWIFT:  I'm going to mark
10         as Exhibit 23 Schedule II to your
11         report.
12               (Whereupon, Deposition Exhibit
13         Rafalski-23, Rafalski Report
14         Schedule II, was marked for
15         identification.)
16               MR. FULLER:  Thank you.  You
17         said Exhibit 23?
18               MS. SWIFT:  Yep.
19               MR. FULLER:  Thanks.
20    BY MS. SWIFT:
21         Q.     You can see that Schedule II,
22    if you flip through it, these are all charts
23    from Appendix 9 of Dr. McCann's report?
24         A.     Yes, ma'am.
25         Q.     You didn't include all of
```

1    Appendix 9 to Dr. McCann's report, correct?

2    Or do you know?

3         A.    No, I don't believe I included

4    all of the results, no, ma'am.

5         Q.    Who selected the charts that

6    are included in Schedule II of your report?

7         A.    I believe I gave a description

8    of what I wanted the charts to indicate, and

9    they were provided to me.

10        Q.    By plaintiffs' lawyers?

11        A.    I believe they were forwarded

12   to me electronically.  I don't know who gave

13   them to me.  So -- but I believe so.  I

14   believe they're the ones who would

15   communicate back and forth with Mr. McCann.

16        Q.    You have no idea who provided

17   you the charts that you included in the

18   Schedule II?

19        A.    I have a reasonable idea that

20   it would be Mr. Elkins, A.J. Elkins, because

21   that's who I dealt with on a regular basis,

22   but I guess I don't want to be literal with

23   like who actually did it.  It's like how do

24   you really know anything?  So yes,

25   Mr. Elkins.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Mr. Elkins is one of the

 2    plaintiffs' lawyers, correct, sir?

 3          A.      Yes.

 4          Q.      Did you review all of

 5    Appendix 9 to Dr. McCann's report?

 6          A.      I don't recall if I did or not.

 7          Q.      You relied on the charts that

 8    are in Schedule II of your report,

 9    Dr. McCann's charts, to conclude that several

10    of the defendants in this case had a, quote,

11    massive increase or, quote, escalation of

12    opioids distribution, correct?

13          A.      Yes, ma'am.

14          Q.      The charts in Schedule II show

15    the volume of shipments of opioids over time,

16    correct?

17          A.      Yes, ma'am.

18          Q.      The charts in Schedule II do

19    not show the results of Dr. McCann's

20    application of the five flagging

21    methodologies to any of those defendants,

22    correct?  It just shows volume?

23          A.      It shows volume, distribution,

24    as the report indicates.

25          Q.      And it doesn't show which of
```

1    those orders were flagged as suspicious?

2        A.    It does not.

3        Q.    Okay.  The charts in Schedule

4    II don't say anything about which orders

5    shipped by these defendants were suspicious,

6    correct?

7        A.    These charts don't say that,

8    no, ma'am.

9        Q.    The charts in Schedule II also

10   do not show distribution of any particular

11   drug to any particular pharmacy, correct,

12   sir?

13       A.    Well, as I stated previously,

14   it contains that data but it doesn't

15   specifically show it.  I mean, it's built

16   upon those orders to those pharmacies.

17       Q.    Right.  But if you wanted to

18   know how much oxy was shipped to any

19   particular pharmacy, you could not tell that

20   from your charts in Schedule II?

21       A.    That's a correct statement.

22       Q.    When did you receive the charts

23   in Schedule II?

24       A.    I don't recall.

25       Q.    Did you ever speak to

Highly Confidential - Subject to Further Confidentiality Review

 1    Dr. McCann about the charts in Schedule II?

 2         A.    I did not.

 3         Q.    All right.  Other than the

 4    charts included in Schedule II and the -- I

 5    think there are a few pages of your report

 6    where you also cite to Appendix 9 of McCann's

 7    report.

 8         A.    Yes.

 9         Q.    Did you review any other part

10    of Appendix 9 that is not cited in your

11    report or attached in Schedule II?

12         A.    I'm sure I reviewed it.  I

13    don't have direct recollection of that.

14         Q.    I'm going to show you what I'm

15    marking as Exhibit 24.  Might be the last

16    one.

17              (Whereupon, Deposition Exhibit

18         Rafalski-24, Excerpt from McCann

19         Appendix 9, was marked for

20         identification.)

21              MR. FULLER:  Counsel, I'm going

22         to ask how much more you've got.

23         We've been going two hours.

24              MS. SWIFT:  I don't think we've

25         been going quite two hours.  I'm

1          hoping to wrap up at around two hours.

2                    MR. FULLER:  We've been going

3          two hours.

4                    MS. SWIFT:  I don't know if I'm

5          going to quite make it.  But I'm going

6          to be close.

7                    Do you want to take a break,

8          Mr. Rafalski?

9                    MR. FULLER:  I do.  I have to

10         pee.  I'm just being honest.

11                   THE VIDEOGRAPHER:  We're going

12         off the record at 10:19 a.m.

13                   (Recess taken, 10:19 a.m. to

14         10:29 a.m.)

15                   THE VIDEOGRAPHER:  We're back

16         on record, 10:29 a.m.

17     BY MS. SWIFT:

18         Q.    Welcome, Mr. Rafalski.

19         A.    Thank you.

20               (Interruption by the reporter.)

21     BY MS. SWIFT:

22         Q.    I believe that we agreed off

23     the record that you are going to make or your

24     counsel is going to make a copy of your

25     binder that has your report in it and that's

1    going to be marked as Exhibit 16; is that

2    correct?

3        A.    Yeah, it's -- well, it's

4    already marked as Exhibit 16, and I

5    understand that they're going to do that at

6    lunchtime.

7        Q.    That sounds great, thank you.

8              Okay.  Now, if you would,

9    please, take a look at page 36 of --

10       A.    I'm open to 36.

11       Q.    -- Exhibit 24.  Before I ask

12   you questions about Exhibit 24, I just want

13   to tell you what it is.

14             Exhibit 24 is, if you can

15   believe it, an excerpt of Dr. McCann's

16   Appendix 9.

17       A.    I think it's like 900 pages

18   long.

19       Q.    Something like that.  I think

20   it's actually 3877 pages long.

21             MR. FULLER:  It says that at

22        the bottom.

23   BY MS. SWIFT:

24       Q.    As with the other appendices

25   from Dr. McCann's report, what we did was to

Highly Confidential - Subject to Further Confidentiality Review

1    pull out the pages that relate to Walgreens,

2    okay?

3          A.     Sure.

4                 MR. FULLER:  I'm sorry, so this

5          is just all of Walgreens?

6                 MS. SWIFT:  Yeah, I think so.

7          That's what I was told.

8                 MR. FULLER:  Okay.

9    BY MS. SWIFT:

10         Q.     Did you look at all 3877 pages

11   of Appendix 9 to Dr. McCann's report?

12         A.     No.

13         Q.     How much of Appendix 9 did you

14   look at?

15         A.     I'm not really sure exactly how

16   many, but nowhere near 3,877 pages.  I might

17   look at specific charts related to what I

18   cited -- obviously, the ones that I've cited

19   in my report, but I did not review them all.

20   I'm confident of that.

21         Q.     Are you confident that you

22   reviewed anything within Appendix 9 that does

23   not appear in your report?

24         A.     Yes, I believe I've looked at

25   some of these charts and they're not

Highly Confidential - Subject to Further Confidentiality Review

1   commented on in my report.  Yes, I'm sure

2   that I did that.

3        Q.    Are they not included in your

4   report because they didn't bear on your

5   opinions?

6             MR. FULLER:  Object to form.

7        That's not what his testimony was.

8        A.    No, I don't think that's an

9   accurate statement.  I -- you know, I guess

10  the question was did I look at some of the

11  charts.  I did.

12  BY MS. SWIFT:

13       Q.    And then the follow-up question

14  was with respect to the parts of Appendix 9

15  that you did not include in your report, is

16  that because they did not bear on your

17  opinions?

18       A.    I'm not sure how to answer that

19  because I think all of the charts in here

20  are -- in some way bear on my opinion because

21  they're all cumulative of other charts.  So,

22  for example, if I look at just one chart, I

23  don't have a specific opinion of that chart,

24  but I know that that analysis is probably

25  contained or part of a maybe total

```
 1   distribution chart.  I hope that makes sense.
 2              So there isn't anything in here
 3   that would change my opinion.  I have not
 4   reviewed a chart that changed my opinion, but
 5   they're not all commented on in my report.
 6         Q.    Well, to be fair, though, sir,
 7   I believe you testified you didn't review all
 8   of Appendix 9.
 9         A.    That's correct.
10         Q.    Okay.
11         A.    Of those I reviewed.
12         Q.    All right.  And just ballpark
13   it for me.  Did you review half of the charts
14   in Appendix 9?
15         A.    I wouldn't say probably half.
16         Q.    10%?
17         A.    I would say 300.
18         Q.    So 10%?
19         A.    It could be around that or even
20   a little less.  That's 387.  I would say
21   2- to 300 charts.
22         Q.    Okay.  Let's take a look at the
23   chart that appears on page 36 of Exhibit 24.
24   This chart is also page 250 of 3,877.
25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.     Yes.

2            Q.     This chart is a chart for

3     Walgreens Store No. 12444 at 3415 Clark

4     Avenue.

5                   Do you see that at the top

6     left?

7            A.     I do.

8            Q.     The chart shows oxycodone

9     distribution to Walgreens Store No. 12444,

10    correct?

11           A.     Yes.

12           Q.     And you can see that it

13    purports to show distribution to this

14    Walgreens store at 3415 Clark Avenue from

15    AmerisourceBergen Drug, Cardinal Health and

16    Walgreens' own distribution centers, correct,

17    sir?

18           A.     Yes.

19           Q.     Did you review this chart in

20    preparing for your report?

21           A.     I don't have any recollection

22    if I saw this specific chart.

23           Q.     Is it your understanding that

24    this chart is specifically showing

25    distribution of oxycodone to the Walgreens
```

Highly Confidential - Subject to Further Confidentiality Review

1      pharmacy at 3415 Clark Avenue in Cleveland?

2          A.     Of oxycodone?

3          Q.     Yes.

4          A.     The entire family, yes, ma'am.

5          Q.     Do you read this chart to be

6      showing the volume of distribution of

7      oxycodone to this Walgreens at 3415 Clark

8      Avenue from 1996 to 2018?  Is that what that

9      appears to show?

10         A.     It does appear to show that.

11         Q.     Do you know whether this chart

12     for the Walgreens at 3415 Clark Avenue leaves

13     out any shipments of oxycodone for any of

14     these time periods?

15         A.     I'm not aware if it does.

16         Q.     Did you ask anyone about that?

17         A.     No, ma'am.

18         Q.     Do you know whether all of the

19     data on this chart for the Walgreens at 3415

20     Clark Avenue is related to the Walgreens at

21     3415 Clark Avenue?

22         A.     I didn't do this analysis.  It

23     was done by Dr. McCann and it was provided to

24     me, and I would take it as being accurate.

25     And that's what it displays.  So that's --

Highly Confidential - Subject to Further Confidentiality Review

1    that's what it indicates to me.

2          Q.      Okay.

3          A.      I did nothing independent to

4    verify any of this information.  I relied on

5    Dr. McCann's evaluation.

6          Q.      To create the charts like the

7    ones that are in your Schedule II and that

8    also appear in Appendix 9, do you understand

9    that Dr. McCann combined data from the DEA's

10   ARCOS database with some of the defendants'

11   own transactional data?

12              Did you know that?

13         A.      Yes, I remember reviewing that

14   in a document or somewhere.  I don't know the

15   source, but yes, I am aware of that.

16         Q.      Do you understand that the

17   Walgreens data that Dr. McCann used covers

18   one time period and the ARCOS data covers

19   another?

20         A.      I believe -- I have a

21   recollection that I did read or was advised

22   of that, yes, ma'am.

23         Q.      Did you review the computer

24   code underlying Dr. McCann's charts in his

25   report?

```
 1            A.     I did not.

 2            Q.     Do you know that there are

 3   other experts in this litigation who disagree

 4   with many of the things presented in

 5   Dr. McCann's report?

 6            A.     I'm not aware of that.

 7            Q.     Have you had a chance to look

 8   at any of the other expert reports produced

 9   by the defendants in this case?

10            A.     Can I get a -- ask a

11   clarification?

12            Q.     Sure.

13            A.     Are you asking whether they're

14   available to me?  Because I don't know if

15   they were provided.  I have not done that,

16   but I don't know if they may be accessible to

17   me.  But I have not reviewed them.

18            Q.     Okay.  One more set of charts.

19   Sorry.

20            A.     That's all right.

21                   (Whereupon, Deposition Exhibit

22            Rafalski-25, Excerpt from McCann

23            Appendix 11, was marked for

24            identification.)

25                   THE WITNESS:  Are we done with
```

1     this one?

2              MS. SWIFT:  Yep.

3              (Comments off the stenographic

4         record.)

5    BY MS. SWIFT:

6         Q.     I'm marking as Exhibit 25 an

7    excerpt of McCann's Appendix 11, and like

8    with the others today, what we've done is

9    pulled out the pages that relate to

10   Walgreens, okay?

11        A.     Okay.

12        Q.     Have you ever seen the charts

13   that appear in Exhibit 25?

14        A.     I believe I looked at these

15   because they were part of the methodology

16   analysis.

17        Q.     Who shared them with you?

18        A.     I believe Mr. Elkins would have

19   provided them to me.

20        Q.     The plaintiffs' lawyer,

21   Mr. Elkins?

22        A.     Yes.

23        Q.     When did Mr. Elkins share the

24   charts in Exhibit 25 with you?

25        A.     I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.      You didn't cite or attach any
2    of these charts to your report, correct, sir?
3            A.      No, I don't believe I did.
4            Q.      You've never talked to
5    Dr. McCann about any of the charts in his
6    report; am I right about that?
7            A.      That's correct.
8            Q.      Okay.  All right.  You can set
9    those aside.  That's all I was going to do
10   with that one.
11                   Turn, if you would, please, to
12   page 115 of your report.  Page 115 is within
13   the Walgreens section and talks about an
14   investigation of the Jupiter distribution
15   center in Florida, correct, sir?
16           A.      It does at the bottom of the
17   page.
18           Q.      You didn't have any personal
19   involvement in the Jupiter, Florida
20   investigation of Walgreens, correct?
21           A.      No, ma'am, I don't believe so.
22           Q.      To the extent that you have
23   opinions about the Jupiter, Florida
24   investigation, you're relying entirely on the
25   Order to Show Cause and related documents
```

Highly Confidential - Subject to Further Confidentiality Review

1    attached to Walgreens' 2013 settlement

2    agreement with the DEA -- is that right --

3    cited in note 493?

4        A.    Yes, ma'am.

5        Q.    Okay.  Did you -- in preparing

6    for your -- to write your report, did you

7    review any of the documents showing

8    Walgreens' efforts to cooperate with Florida

9    DEA and local law enforcement in 2010 and

10   2011?

11             Do you remember anything like

12   that?

13       A.    I don't remember reviewing any

14   records or communications in regards to that,

15   no, ma'am.

16       Q.    In preparing your report, did

17   you review any of the documents produced by

18   the plaintiffs, Cuyahoga and Summit County,

19   showing Walgreens' pharmacists notifying

20   local law enforcement when they suspected

21   diversion?

22       A.    No, ma'am.

23       Q.    Turn, if you would, please, to

24   page 118.  I'll direct your attention to the

25   last paragraph on the page that starts

1    "Despite having raised."

2                 Do you see that?

3         A.      Yes, ma'am.

4         Q.      This is still in the section

5    talking about what you learned from the Order

6    to Show Cause in the Jupiter matter, correct?

7         A.      Yes.

8         Q.      And you talk in this last

9    paragraph on 118 about Store No. 3836.

10                Do you see that?

11        A.      Yes.

12        Q.      That's one of the stores that's

13   discussed in the Florida Order to Show Cause?

14        A.      Okay.

15        Q.      Do you recall that that's the

16   case?

17        A.      Do you have the memorandum of

18   agreement I could review?  Or I could get it

19   out.

20        Q.      That's okay.  I'll withdraw the

21   question.

22                The statements in that last

23   paragraph on Store No. 3836 about the volume

24   of shipments of oxycodone to that pharmacy,

25   are you relying exclusively on the documents

1    cited in notes 509 and 510 for those numbers?

2              MR. FULLER:  Form, same

3        objection as earlier.

4        A.    You're talking about the

5    statements in the last paragraph?

6    BY MS. SWIFT:

7        Q.    Correct, and in particular the

8    statements about the volume of oxycodone

9    shipments to that store.

10             MR. FULLER:  Same objection.

11       A.    No, I believe it's also in

12   regards to some deposition information and

13   some other documents.

14   BY MS. SWIFT:

15       Q.    You're talking about stuff

16   that's cited in your report though?

17       A.    In a general nature, yes,

18   ma'am.  It's cited.

19       Q.    Just not cited here on the page

20   where you're talking about Store 3836?

21       A.    Yes.  Yes.

22       Q.    You didn't do an ARCOS analysis

23   or request an ARCOS analysis to verify the

24   volume numbers with respect to Store 3836,

25   correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      As I sit here today, I did not

2    do that.

3      Q.      Okay.  Turn to page --

4      A.      I'm -- there's probably a chart

5    in here related to that that Dr. McCann --

6    but it would be an overall volume chart.

7      Q.      But you don't know one way or

8    the other?

9      A.      Well, I'm pretty confident

10   there is one there.

11     Q.      Okay.

12     A.      But I don't positively know.

13     Q.      Turn to page 121, please.  The

14   second full paragraph on page 121 talks about

15   the Florida migration phenomenon.

16             Do you see that?

17     A.      Yes, ma'am.

18     Q.      And that's the idea that

19   prescription opioids dispensed in Florida

20   were then transported north to other states;

21   is that right?

22     A.      Yes, ma'am.

23     Q.      Do you rely on anything other

24   than the documents cited in notes 518, '19

25   and '20 to support your statements that

Highly Confidential - Subject to Further Confidentiality Review

1    Walgreens knew about the Florida migration

2    theory?

3                MR. FULLER:  Same objection and

4         basis as earlier.

5                MS. SWIFT:  Yes or no, please.

6                THE WITNESS:  Okay.  I'm

7         thinking about it.

8         A.    I think I also relied on my

9    experience and my knowledge of what was going

10   on at this time period and the media coverage

11   and the newspaper coverage in Florida.  So I

12   would say that that would also have an impact

13   on that decision.

14   BY MS. SWIFT:

15        Q.    And my question was --

16        A.    But I can't cite you a specific

17   article or specific news show, but it was

18   pretty common in the media at the time.

19        Q.    And my question was

20   specifically with respect to Walgreens'

21   knowledge.

22                Do you rely on anything other

23   than the documents cited in notes 518, '19

24   and '20 to support your statements that

25   Walgreens knew about the Florida migration

1    theory?

2              MR. FULLER:  Same objection and

3         basis.

4         A.    Same answer.  I think by this

5    time period, everybody knew there was a

6    problem in Florida.

7    BY MS. SWIFT:

8         Q.    Did you check the documents

9    that you cite here to see if any of them

10   actually talk about pills migrating from a

11   Florida Walgreens to people in Ohio?

12        A.    I checked the documents.  I

13   don't have a direct recollection if it said

14   out of state or Ohio.

15        Q.    You would agree with me, sir,

16   that based on everything you've reviewed,

17   Walgreens only ever distributed controlled

18   substances to its own pharmacies, correct?

19        A.    I'm not aware of any records

20   which have indicated they distribute anything

21   to other than their own registrants, but I

22   didn't look at some transactions where that

23   may occur, for example, destruction --

24   destruction of drugs may have went to a

25   reverse distributor.  So in my experience,

Highly Confidential - Subject to Further Confidentiality Review

1    there would be some other types of

2    distributions --

3              Q.    You're not offering --

4              A.    -- but not -- but I'm not

5    disagreeing with the question.  Generally,

6    yes, would be the question, but I'm leaving

7    open that there's other distributions that

8    may have occurred.

9              Q.    You're not offering any

10   opinions in this case about suspicious orders

11   connected to destruction of drugs and reverse

12   distribution, correct, sir?

13             A.    No, I don't think -- not to be

14   argumentative, I don't think your question

15   was in regards to suspicious orders.  It was

16   just distribution.

17             Q.    And then I asked another

18   question.

19             A.    Oh, I was still answering the

20   first question.

21             Q.    Understood.

22                   You're not offering any

23   opinions about orders that were shipped by

24   reverse distributors, correct?

25             A.    No, I'm not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  You haven't offered an

2  opinion in this case about how long it was

3  supposed to take for a registrant to get a

4  new suspicious order monitoring system up and

5  running, have you, sir?

6    A.    I think I've made a lot of

7  comments within my report.  I don't think

8  there's a provable time period to not have

9  one.

10    Q.    We talked --

11    A.    It's -- it's a requirement of

12  the registration to have a suspicious order

13  monitoring system, so there's no time period

14  where I'd say they -- I would ever approve

15  where they just couldn't have one.

16    Q.    But you didn't offer an opinion

17  about how long it's supposed to take to get a

18  suspicious order monitoring system up and

19  running?

20    A.    No, because that hypothetically

21  doesn't exist.  They should have one.  They

22  should have one upon registration.  There --

23  I would never -- or the DEA -- or speaking

24  for myself, I would never approve a

25  registrant that didn't have one in place.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     We talked earlier about the
2    fact that Walgreens was reporting for a
3    certain time period using the E(3) formula
4    that's found in the Chemical Handler's
5    Manual.
6               Do you remember that testimony?
7          A.     Yes, I do.
8          Q.     And then Walgreens switched
9    over at a certain point to using a new,
10   different type of suspicious order monitoring
11   system, correct, sir?
12         A.     Yes, ma'am.
13         Q.     You don't offer an opinion
14   about -- well, strike that.
15              Is it your opinion that
16   Walgreens was required to stop reporting
17   using the E(3) formula and start reporting
18   based on the new suspicious order monitoring
19   system as soon as that algorithm was
20   developed, like before any testing had
21   happened or anything like that?
22         A.     Well, typically, my experience
23   would indicate that if there's a system in
24   place, I'm not saying I'm approving that
25   particular system, the E(3) suspicious order
```

1  system, which I don't think was adequate.  If

2  they were developing a new system, if they

3  were beta testing it at the same time, I

4  don't think there would be ever a period of

5  time where, whether it's an approved or not

6  suspicious order system, there was one in

7  place.

8           I don't think I alleged that

9  there never was one in place, and I'm not

10 saying that they should abandon one and not

11 test the other, but certainly, to put one in

12 place that's not beta tested and to work

13 diligently to verify whether it's operating

14 properly would be better than just not to put

15 it in place.

16      Q.     You understand that Walgreens

17 had a system, the E(3) system, and was

18 reporting based on that system for a number

19 of years, correct?

20      A.     I do, but as my opinion says, I

21 don't think that that was a sufficient

22 suspicious order system.

23      Q.     You don't like that system, but

24 you understand that Walgreens had that

25 suspicious order monitoring system in place?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    They had that system in place.

2    And it's not what I like or not; it's what

3    meets the regulatory requirements.

4    Q.    You understand that Walgreens

5    had the E(3) system in place and continued

6    reporting based on that system while it

7    developed its new suspicious order monitoring

8    system, correct?

9    A.    I believe that possibly

10   occurred, yes.

11   Q.    At page 128 of your report, you

12   talk about a number of what you refer to as

13   either gaps or loopholes in the Walgreens

14   suspicious order monitoring system, correct?

15   A.    Yes.

16   Q.    You did not perform an analysis

17   to determine whether any of these so-called

18   gaps or loopholes in the Walgreens system

19   actually led to a suspicious order, correct,

20   sir?

21   A.    So is your question in regards

22   to a specific order?

23   Q.    Yes.

24   A.    I did not do an analysis of a

25   specific order, but the failure to monitor

1    distributions from an outside source, an

2    outside distributor and account that into

3    your system, that was what the -- what some

4    of the gaps and loopholes were in the system,

5    I believe.

6        Q.    But the answer to my question

7    is that you did not do an analysis of any

8    specific order to see whether any of the gaps

9    or loopholes you identified in the Walgreens

10   systems actually led to that suspicious

11   order?

12       A.    As of today, I did not do that

13   analysis.

14       Q.    At page 132 of your report,

15   right before Section 3, do you see the -- are

16   you with me?

17       A.    I am.

18       Q.    You agree with me that

19   Walgreens' last Schedule II shipment as a

20   distributor to Cuyahoga and/or Summit County

21   was on March 4th, 2013?

22       A.    As cited in the footnote, in

23   review of the ARCOS, I believe, but as cited

24   in the footnote excluding the codeine drug

25   code 9050.

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.     You don't have any opinions in

 2     your report about Walgreens' suspicious order

 3     monitoring program after Walgreens stopped

 4     distributing controlled substances, correct,

 5     sir?

 6          A.     I don't believe I offer an

 7     opinion after that point.

 8                 MS. SWIFT:  All right.  I

 9          have -- I'm not going to ask you any

10          other questions at this time, but as

11          my colleagues have done, I'm going to

12          reserve the right to come back and ask

13          you additional questions later, both

14          because we have not had time to ask

15          you everything we needed to ask you

16          and because I understand from your

17          testimony today and yesterday that you

18          may be supplementing your opinions at

19          some later point.  We reserve the

20          right to ask you about those questions

21          later.  Thank you very much, sir.

22                 THE WITNESS:  Thank you very

23          much.  If my attorney approves, I'd be

24          more than happy to sit down again with

25          you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  Off the

 2          record, 10:53 a.m.

 3                    (Recess taken, 10:53 a.m. to

 4          10:56 a.m.)

 5                    THE VIDEOGRAPHER:  Back on the

 6          record at 10:56 a.m.

 7                    EXAMINATION

 8    BY MR. BUSH:

 9          Q.    So, good morning, Mr. Rafalski.

10    I'm Graeme Bush, and I'm representing CVS in

11    this litigation.

12          A.    Good morning, Mr. Bush.

13          Q.    So I want to ask a couple of

14    general questions to just get a few

15    housekeeping matters out of the way.

16                    First of all, are the opinions

17    that are expressed in your report the same

18    opinions that you hold today?

19          A.    They are.

20          Q.    And are there any additional

21    opinions that you've developed since your

22    report was delivered to us?  And actually,

23    let me limit that because I think you've

24    already been asked that question generally.

25                    Are there any additional
```

1    opinions relating to CVS that you've reached

2    since the time that your report was

3    delivered?

4        A.    No, sir.

5        Q.    And have you reviewed -- your

6    report refers to a number of documents and

7    depositions in footnotes throughout the

8    report.

9            Is there any material that is

10   not -- that is not referred to in the report

11   that you've reviewed or come into possession

12   of that bears on your opinions to CVS since

13   the time that your report was provided to us?

14       A.    No, sir.

15       Q.    Okay.  Now, you testified

16   yesterday about the process of drafting the

17   report?

18       A.    Yes.

19       Q.    And in part of your testimony

20   you referred to the interaction between you

21   and the attorneys for plaintiffs.

22       A.    Yes, sir.

23       Q.    Did you receive any input

24   from -- actually, let me withdraw that

25   question.

1          Did you receive drafts of the

2    section of your report relating to CVS from

3    any of plaintiffs' attorneys?

4          A.     I'm not sure I would call it a

5    draft of my report.  I would receive some

6    analysis of some documents or reference me to

7    certain documents, but I'm not so sure I

8    would call it a draft.

9          There were some communications

10   in regards to the -- I recall in the CVS,

11   there was the period of time where the 1.5

12   and 6.5 [sic] and there was some, you know,

13   brief summaries of that which I, in turn,

14   redrafted into my report.  So I received

15   things of that nature.  But it's not like I

16   took apart and just pasted it in there.  This

17   was all my report.

18         Q.     From whom did you receive that

19   kind of work product?

20         A.     That communication either came

21   through Mr. Fuller or Mr. Elkins, so

22   sometimes I don't know who the original

23   author was.

24         Q.     And were some parts of what you

25   received from Mr. Elkins or Mr. Fuller

Highly Confidential - Subject to Further Confidentiality Review

1   describing -- for example, you just gave the

2   example of the 1.5/1.6 scoring issue -- I'm

3   sorry, 1.5/.65 scoring issue.

4           Did you incorporate pieces of

5   that into your report?

6   A.    I can't say that if there was a

7   sentence in that part that I totally agreed

8   with and it was verified by the record, then

9   it's a possibility that would have occurred.

10  But again, it's my report.

11  Q.    How about if there was a whole

12  paragraph that described what happened with

13  the 1.5/.65 scoring issue?

14  A.    I don't recall that occurring

15  in the CVS.  I'm not going to say it didn't

16  happen, but again, if it did, I would read it

17  and make sure that that was consistent with

18  what the document said.

19          It wasn't provided -- it wasn't

20  my opinions that were provided to me, but if

21  there was an analysis of a certain document

22  and I found it to be accurate, I would not

23  change that.

24  Q.    Did -- I take it you received

25  this kind of input in the form of some

1    writing or another.

2              How did you receive it?

3         A.    Yes.

4         Q.    By e-mail?

5         A.    No, not by e-mail.  It would

6    be -- I would do my report in a Google Drive,

7    so it would be a redlined or if something got

8    inserted, you know, I would know that it

9    wasn't part of my original report.  And I may

10   get a notification that it's been updated,

11   but I pretty much was looking at it all the

12   time, so...

13        Q.    You testified yesterday about

14   how much time you spent on each of the

15   defendants in preparing your opinion with

16   respect to them.

17             Do you remember that general

18   subject matter?

19        A.    I remember I kind of gave a

20   general answer to that time.

21        Q.    And you said, I think in

22   response to questions from Mr. Pyser, that

23   you estimated it was maybe 50 or 60 hours per

24   distributor and you made a distinction

25   between distributors and some other of the

Highly Confidential - Subject to Further Confidentiality Review

1    defendants.

2              Do you recall that?

3         A.    Generally, yes.  I don't know

4    if that was exactly what I said, but

5    generally, I did do the distinction.

6         Q.    And do you include -- well, let

7    me just ask it this way:  How much time do

8    you estimate you spent on CVS?

9         A.    I don't really have a specific

10   hour I could give you.  If I broke them up in

11   50 and 60, I would say in just a general

12   statement, I probably spent more time on CVS

13   than I did on some of the other distributors.

14        Q.    Okay.

15        A.    It's just a generalized.  If

16   you were to say did you spend more or less

17   time on CVS, I would say more.  I spent a lot

18   of time trying to understand the Buzzeo

19   complicated suspicious order system.  I spent

20   a considerable time trying to work on that,

21   and then the .15/.65 [sic] scoring, a lot of

22   review of documents there.

23              So probably more than -- it

24   would be 60 -- at the upper range of what I

25   spent on all the other distributors.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     All right.  Thank you.

2             During your time at DEA, did

3     you have any personal involvement with CVS?

4      A.     So in response to your

5     question, when you say "personal

6     involvement," I'm sure that on several

7     occasions I would have went into a

8     CVS Pharmacy, and on a professional basis

9     first --

10     Q.     Okay.

11     A.     -- and a personal basis, but --

12    and pulled documents related to

13    investigations I was conducting, if I was

14    doing -- I know for sure in some of the

15    physicians I investigated, I may go in and

16    pull original prescriptions, I may ask for

17    profiling reports.

18            So, yes, I would have had

19    contact with CVS Pharmacies.

20     Q.     Did you have -- were you

21    involved in any inspection of a CVS

22    distribution center?

23     A.     I was not.

24     Q.     Were you involved in any other

25    kind of enforcement action with respect to a

Highly Confidential - Subject to Further Confidentiality Review

1    CVS distribution center?

2          A.     Not that I can recall at this

3    time, no, sir.

4          Q.     Would it be accurate to say

5    that you are not going to be able to come to

6    the trial and testify about any personal

7    experiences you've had as a DEA agent with

8    regard to investigations of CVS?  And I'm not

9    talking about Touhy here, I'm just talking

10   about you didn't have any personal experience

11   so even if --

12         A.     As I sit here today, I don't

13   have any recollection of anything that would

14   change my opinion or that I could add to my

15   opinion based on my employment and

16   investigations or information.

17                Could I just make one minor

18   correction?  So in -- not that it's a huge

19   deal.  I'm not an agent, because that's --

20   I'm a diversion investigator.  Not to be

21   critical of you calling me --

22         Q.     No, sure.

23         A.     Because I get called that all

24   the time.

25         Q.     Fair enough.  Fair enough.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      But it's a different -- I know
 2   law enforcement --
 3            Q.      But your answer is the same,
 4   correct?
 5            A.      My answer is the same, but I
 6   couldn't come as an agent to do it either
 7   because I'm too old to do that, but I
 8   appreciate it.
 9            Q.      If you take a look at page 41
10   of your opinion, Ms. Swift asked you some
11   questions about the way those numbers were
12   put together and your involvement of them --
13   with them?
14            Do you recall that?
15            A.      Yes.
16            Q.      And at some point she started
17   to ask you questions that were focused on
18   Walgreens, but would it be true that your
19   answers would be the same if I asked you the
20   same questions about CVS, you put the numbers
21   together the same way for CVS as you did for
22   Walgreens?
23            MR. FULLER:  Form.
24            A.      Yes.  If you were to ask the
25   questions the same way -- I can't remember
```

1    her name.

2    BY MR. BUSH:

3        Q.     Ms. Swift.

4               MR. FULLER:  Ms. Swift.  But he

5        has to speak in her same voice too.

6        A.     Then my answers would be the

7    same, except I would insert the CVS data.

8    BY MR. BUSH:

9        Q.     Okay.

10       A.     And of course, CVS didn't have

11   the Schedule II, so we wouldn't discuss that.

12   That would be zero.

13       Q.     Right.  Now, you also -- I want

14   to just touch briefly on the methods.  I

15   think others have covered most of what I

16   would want to ask, but there are a couple of

17   things I want to ask about the five

18   methodologies.

19       A.     Yes.

20       Q.     And I think you clarified one

21   thing that was unclear to me until this

22   morning, that the five methodologies were

23   used by -- as you understood it, in some

24   form, by other registrants, except for one,

25   which was the, what, two times national

1    average?

2         A.    Two times.  It was actually

3    used by another registrant, but it was a

4    manufacturer, so -- so I'm aware it's -- it

5    had been used in the industry, but not used

6    in the group that I'd formed an opinion on.

7         Q.    All right.  And the Method A, I

8    think is the way you've labeled it in your

9    report, which is the six-month trailing

10   average?

11        A.    Yes.

12        Q.    Sometimes referred to as the

13   Masters method here?

14        A.    Yes.

15        Q.    That's the one that you're

16   endorsing as a -- for the purposes that

17   you've used it in your opinion; is that

18   right?

19        A.    Well, I think that's fairly

20   accurate, but I think I pointed out that it's

21   not just my endorsement; it's the fact that

22   it's been litigated and went up to the D.C.

23   Court and there was opinion published on

24   that.

25        Q.    And that methodology did not

1    have as a part of it that if you missed an

2    order that should have been flagged,

3    everything after that would be flagged?

4                 MR. FULLER:  Object to form,

5          misstates his testimony.

6          A.    I don't understand the

7    question.

8    BY MR. BUSH:

9          Q.    Well, the way you have applied

10   all of these methodologies -- but let's focus

11   on the Masters methodology for a moment.

12         A.    Sure.

13         Q.    If an order that should have

14   been flagged as a suspicious order is missed,

15   you're saying every order after that is a

16   suspicious order; that's the way your

17   methodology is applied here, right?

18                MR. FULLER:  Form, misstates

19         his report.

20         A.    I don't say "missed."  I say if

21   a trigger -- if the Masters algorithm is

22   applied and a suspicious order report is

23   triggered or identified, and then there's no

24   due diligence subsequent to that, then all

25   orders after that point are flagged and

1    reported by Dr. McCann.

2    BY MR. BUSH:

3        Q.    And that feature of the way you

4    apply Masters is not a feature of the actual

5    Masters system.  That's something you've

6    added to it, right?

7        A.    That's a confusing question

8    because it would never be part of the Masters

9    system.

10        Q.    Okay.  So it's not part of the

11    Masters system and you've added it because of

12    your interpretation of the way the law would

13    work, right?

14        A.    The regulation would work and

15    the law, the maintenance of effective

16    controls and the Court's opinion and the

17    training and distributor briefings.  Yes, all

18    of those things.

19        Q.    Is there anything in a

20    distributor briefing that says that if a

21    trigger is -- how do you put it, a trigger is

22    missed?  What do you -- what is it that

23    triggers everything afterwards flagging?

24        A.    So the trigger isn't -- if I

25    understand your question, it's not just the

1    trigger.  The trigger or the threshold that

2    gets breached which creates the suspicious

3    order.  That's what the Masters six months

4    trailing.  There's an order that goes back to

5    previous six months greater than the highest

6    monthly order.

7        Q.    Right.

8        A.    That triggers a stop for a

9    suspicious order.  Then subsequent to that

10   suspicious order, before it's shipped, there

11   should be sufficient due diligence to dispel

12   the suspicion.

13          I'm saying if the due diligence

14   doesn't occur, based on my training, guidance

15   and experience, everything subsequent to that

16   also becomes a suspicious order, and that's

17   reported by Dr. McCann.

18       Q.    Right.  And is that in -- or

19   was that part of any distributor briefing,

20   that particular feature of how you look at

21   the world here?

22       A.    I don't know if it's just how I

23   look at the world, but I believe every

24   distributor briefing, there is a comment on

25   that when you identify a suspicious order,

1    you should conduct due diligence prior to

2    shipping that order --

3         Q.    And if --

4         A.    -- or it's a failure of

5    maintenance of effective controls.

6         Q.    And is there a comment that if

7    you don't conduct adequate due diligence,

8    that every order after that flags?

9         A.    No.  But that's not typically

10   anything that would ever be part of a

11   distributor briefing.  That's just outside

12   of, you know, any kind of discussion related

13   to that matter.

14        Q.    Has that been part of any

15   discussion that you know of that DEA has had

16   with any distributor?

17             MR. FULLER:  Objection.

18             If you know.

19             MR. BUSH:  If you know.  Sure.

20   Of course it's if you know.

21        A.    I think it's touched on in the

22   letters by Mr. Rannazzisi.  I think it says

23   if you continue to distribute controlled

24   substance prescriptions and you don't dispel

25   those prescriptions, I think it could lead up

1     to revocation of your DEA registration.

2             So I think there's comments

3     that would apply to that same topic or issue

4     minimally in his letters.

5             I know they're discussed in

6     distributor briefings.  I'm also aware of

7     some industry presentations where it makes

8     that same statement.  It was a pretty

9     consistent statement that the DEA was putting

10    out, for sure after 2005 -- or 2006 letters.

11    BY MR. BUSH:

12        Q.    I want to be really specific

13    about this because I think you've mushed

14    together a whole lot of concepts here.  I'm

15    focused very specifically on if you do

16    inadequate due diligence, everything else

17    after that is a suspicious order.  That's an

18    assumption of your application of these

19    methodologies.  Was that --

20        A.    Did you say inadequate?  I'm

21    sorry.

22        Q.    Yes, I said inadequate.

23        A.    Yes, that's my assumption.

24        Q.    And is there anyplace where

25    DEA, including the Rannazzisi letters, says

1    that's what happens?  That's not the same as

2    what you said that you have an inadequate

3    system of -- to control for diversion or --

4    I'm not talking about that.

5              I'm just saying:  The concept

6    that everything after an inadequate due

7    diligence is flagged as a suspicious order,

8    is that ever said anywhere by DEA to

9    distributors?

10   A.    I want to review something in

11   my report.  Just a second, please.

12   Q.    Sure.

13            MR. FULLER:  If you want to

14         pull the Rannazzisi letters like he

15         suggested, you can.

16            MR. BUSH:  I didn't actually

17         suggest that.

18            MR. FULLER:  You said in the

19         Rannazzisi letters.  He'd have to look

20         at them.

21            MR. BUSH:  I said including.

22         He's mentioned them already.

23            (Document review.)

24   A.    So the Rannazzisi letter, the

25   first one in 2006, he doesn't specifically

Highly Confidential - Subject to Further Confidentiality Review

1   state the same thing as you have stated.

2   BY MR. BUSH:

3           Q.      Right.

4           A.      But he does make the statement

5   that in addition to reporting all suspicious

6   orders, a distributor has a statutory

7   responsibility to exercise due diligence to

8   avoid filling suspicious orders that may be

9   diverted into other than legitimate medical,

10  scientific and industrial channels.  Failure

11  to exercise due diligence could, as

12  circumstances warrant, provide a statutory

13  basis for revocation or suspensions of a

14  distributor's registration.

15          Q.      Right.

16          A.      And although it's not exactly

17  the same statement, I think it addresses the

18  same concept as we're discussing.

19          Q.      It's not even close to the same

20  statement, is it, Mister --

21          A.      Well, I think it is.

22                  MR. FULLER:  Form.

23  BY MR. BUSH:

24          Q.      It doesn't say anything about

25  what flags, if you don't do adequate due

1    diligence on an order.  That -- what you just

2    read says nothing about that, right?

3         A.    It does not say --

4         Q.    Okay.

5         A.    -- that it would flag all

6    subsequent orders, but it does say if you

7    don't do the due diligence, you could lose

8    your DEA registration.

9         Q.    Have you done any calculation

10   of what the impact is of the assumption that

11   everything flags after one failure to do due

12   diligence?

13        A.    I have not.  You mean in terms

14   of denial of controlled substances to the two

15   counties?  Is that --

16        Q.    Well, in terms of the number of

17   orders that are -- or the percentage of

18   orders that are flagged for each one of the

19   distributor defendants in this case.

20        A.    In regards to?

21        Q.    Well, say -- take a look at

22   page 41.

23        A.    Okay.

24        Q.    This is by dosage units, I

25   understand.

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Yes.

 2          Q.      But if you look at the CVS line

 3    for Cuyahoga County on page 41, you've got

 4    ▊▊▊ of the total dosage units are flagged

 5    using the trailing six-month threshold?

 6          A.      I do.

 7          Q.      And you have ▊▊▊ of the total

 8    dosage units in Summit County that are

 9    flagging, right?

10          A.      I do.

11          Q.      And if you remove the

12    assumption that everything after one failed

13    due diligence effort flags, do you know what

14    those numbers go down to?

15          A.      I do not.

16          Q.      You have no clue?

17          A.      I have no clue.

18          Q.      If I told you that in Summit

19    County they go down to ▊▊▊ rather than ▊▊▊

20    and they go down to ▊▊▊ rather than ▊▊ in

21    Cuyahoga, would that surprise you?

22          A.      I wouldn't have a comment on

23    those figures.

24          Q.      Now, you also have testified

25    already a little bit about whether or not you

Highly Confidential - Subject to Further Confidentiality Review

1    reviewed any particular orders, and I think

2    your answer in substance is no, you didn't

3    review any particular orders that might or

4    might not have been suspicious.

5              Is that generally true?

6    A.     That's generally true, that's

7    my recollection is I answered that way

8    previously, too, yes, sir.

9    Q.     And with respect to any of the

10   orders that are flagged by these

11   methodologies under your and Mr. McCann's

12   analysis, you don't know what happened to any

13   of the drugs that were actually shipped and

14   delivered to CVS Pharmacies?

15   A.     I don't have any direct

16   knowledge of what happened to any of the

17   drugs that were distributed to each of the

18   pharmacies.  I didn't conduct any analysis as

19   of today that would give me that knowledge.

20   Q.     And you don't know whether -- I

21   understand that your opinion is that the due

22   diligence was insufficient by CVS, and we'll

23   get to that in a minute.

24              But you don't know whether any

25   of these orders would have cleared a due

Highly Confidential - Subject to Further Confidentiality Review

```
1    diligence investigation that does meet your

2    exacting standards, do you?

3         A.    Could you say that one more

4    time, I'm sorry?

5         Q.    I'm just saying you don't know

6    whether any of the orders that are flagged

7    using your and Mr. McCann's methodologies for

8    CVS would have been cleared using what you

9    would say is an adequate due diligence

10   process.  You haven't done that analysis.

11        A.    So I think what you're asking,

12   is it a hypothetical question?

13        Q.    Yes.

14        A.    Okay.

15        Q.    Well, no, actually it's not.

16   You don't know.  I'm asking you.  You don't

17   know?

18        A.    Well, I guess you're asking me

19   to assume that if CVS had an adequate due

20   diligence system in place and they conducted

21   it?  Is that the question?  Maybe I don't

22   understand the question.

23        Q.    Let's -- if you took your

24   standards for a due diligence system --

25        A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.      -- and you personally, as part

2    of your expert assignment -- I know you

3    weren't asked to do it -- went and looked at

4    each one of the orders that flagged, you

5    don't know today whether it would have passed

6    your own due diligence standards?

7    A.      I didn't review any records

8    that I -- on a consistent application by CVS

9    that would have caused that to occur.

10    Q.      That's a different question.

11          I'm asking if you take your

12    standards and you apply it -- and you went in

13    and you went back in time and you started to

14    look at all these orders, you don't have any

15    idea whether any of these orders would have

16    passed your exacting standards and you would

17    have determined that they weren't suspicious?

18          MR. FULLER:  Object to the

19          question.  It is a hypothetical.

20    A.      Yeah, I'm not sure I can answer

21    that.

22    BY MR. BUSH:

23    Q.      Well, isn't the answer no, you

24    don't know?

25    A.      No, it's not no.  It's just so

1    hypothetical, I'm just not going to answer on

2    a hypothetical whether if I went back in time

3    and applied any standards of due diligence to

4    the orders, whether or not they would be

5    cleared.

6              I -- I don't know all of the

7    criteria necessary to make that decision.  I

8    just -- it's a hypothetical question.  I'm

9    not going to answer it.

10        Q.    Haven't you just spent your

11   report and a bunch of your testimony telling

12   us what the criteria are?  What do you mean

13   you don't know what the criteria are?

14        A.    No, the criteria -- the

15   information -- the distribution information,

16   looking at the due diligence -- or the due

17   diligence files that establish the customer.

18   I mean, there's a whole lot of information

19   other than to just look at an order and apply

20   a due diligence and make a decision on it.

21   It's a more complex analysis than that.

22              So hypothetically, in a

23   hypothetical world, if I went back and I did

24   all of those things, I guess there's always

25   the possibility there could be a different

```
 1    conclusion, but that's hypothetical, and it

 2    didn't occur in this situation.

 3         Q.    You didn't do it.  You didn't

 4    go try to do it?

 5         A.    No, I couldn't do it.

 6              MR. FULLER:  Hey, Mr. Court

 7         Reporter, I think all of our little --

 8         aren't working.

 9              MS. SWIFT:  Mine is working.

10              MR. BUSH:  This one is working.

11              (Comments off the stenographic

12         record.)

13              THE VIDEOGRAPHER:  Going off

14         the record, 11:21 a.m.

15              (Recess taken, 11:21 a.m. to

16         11:23 a.m.)

17              THE VIDEOGRAPHER:  We're back

18         on the record at 11:23 a.m.

19    BY MR. BUSH:

20         Q.    Mr. Rafalski, let me ask you to

21    turn to page 96 of your report.

22              MR. FULLER:  I'm sorry,

23         Counsel, what page?

24              MR. BUSH:  96.

25              MR. FULLER:  Thank you.
```

```
 1    BY MR. BUSH:

 2         Q.    You got -- are you there?

 3         A.    Yes, sir, I am.

 4         Q.    You see the sentence that says:

 5    Although denied by ▇▇▇▇▇, it appears that

 6    the August 25th, 2010 SOM section in the

 7    standard operating procedures was rushed into

 8    place to comply with a DEA request.

 9               Do you see that?

10         A.    Yes, sir.

11         Q.    Who is Mr. ▇▇▇▇▇?

12         A.    You know, I reviewed that.

13    It -- CVS employee.  I don't remember his

14    exact title.

15         Q.    Were you present at his

16    deposition?

17         A.    I was not.

18         Q.    What was his testimony?

19         A.    I don't recall.

20         Q.    Did you --

21               (Telephone interruption.)

22    BY MR. BUSH:

23         Q.    Did you review the testimony of

24    Mr. ▇▇▇▇▇ on the subject of the document

25    that you're referring to here, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    August 25th, 2010 SOM section of the standard

2    operating procedures?

3          A.      His testimony?  I'm sorry.

4          Q.      Yeah.  Did you review his

5    testimony?

6          A.      I don't -- I don't recall that.

7    I don't think I cited it.

8          Q.      Did you review the testimony of

9    Mr. Devlin on that subject?

10         A.      I don't believe so.

11         Q.      So you're contradicting or

12   expressing an opinion on the veracity of

13   Mr. ████████ testimony and you haven't

14   actually read the testimony of people about

15   the same subject and you don't recall who he

16   is?

17         A.      I recall the name.  Exactly who

18   he is, I don't recall.

19         Q.      Okay.

20         A.      And my opinion is also based on

21   the document, but your correct statement on

22   the -- I don't cite the deposition testimony,

23   and I don't have an independent recollection

24   I reviewed it.

25         Q.      Let me ask you -- let me find
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      this here.  Give me a sec.
 2                 So take a look at the top of
 3      page 97, where you refer to the testimony of
 4      ████████████████.  You see where I'm reading?
 5      You see where it's referred to, the very top
 6      of page 97?
 7           A.    Yes.
 8           Q.    It says:  The testimony of ████
 9      ████████████  who admitted that she was listed as
10      the CVS DEA compliance coordinator in the
11      Controlled Drug - DEA Standard Operating
12      Procedures Manuals, but that title was only
13      for reference in the standard operating
14      procedures and was not her real job position.
15                 Do you see that?
16           A.    Yes.
17           Q.    Why was -- first of all, why is
18      that important to you?
19           A.    Well, I think it's indicative
20      of the overall compliance program in place,
21      if she's just in an important position just
22      in title and she's not functioning in that
23      position.
24           Q.    Did you read any of the
25      testimony about what she was actually doing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in that position?
 2         A.    I reviewed the deposition.  I
 3    don't have any independent recollection of
 4    all of the -- of what you just said, but I
 5    did review it.
 6         Q.    And do you know what the
 7    definition of a coordinator is?
 8         A.    Generally speaking, yes.
 9         Q.    Give me your definition.
10         A.    Someone that would oversee
11    or -- I don't want to use the same word,
12    coordinate, but it would oversee and direct
13    individuals or operations.
14         Q.    Did you read the testimony of
15    Ms. ██████ who said that her job was to be
16    a central point of contact and keep a
17    consolidated point of contact for all our
18    DCs, meaning distribution centers, to get
19    information to support them?  Did you read
20    that testimony?  It's not referred to in your
21    report.
22         A.    I know it's not referred to.
23    I'm trying to have -- I don't have an
24    independent recollection that I did.
25         Q.    And did you read the testimony
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    of any of the people -- let's say ███
2    ██████ who worked with her about what he
3    thought she was doing?
4         A.    If I didn't cite it, I'm not
5    sure that I reviewed it.
6         Q.    Okay.  And that would be true
7    of any of the other CVS employees who
8    testified about what they thought ███
9    ████████ job was?
10        A.    I did not review every
11   deposition from CVS.
12        Q.    Do you remember any other
13   deposition that you reviewed from a CVS
14   person on the subject of ████████ job
15   functions?
16        A.    I do not have any independent
17   recollection of that.
18        Q.    Do you think that it is
19   inevitable that every distributor will have
20   some suspicious orders that should be
21   reported to DEA?
22        A.    No, I don't think it's
23   inevitable.
24        Q.    Okay.
25        A.    I draw that conclusion from my
```

1    experience, and again, it's -- I think it's

2    highly dependent on the vetting of customers

3    before you come on, the scope of your

4    business and the type of your business.

5              So I could easily see some

6    business scenarios where it would be a low,

7    very low possibility a suspicious order would

8    occur.

9         Q.    So let me ask you to take a

10   look at your page -- I think it's 104.  Let's

11   go there together.  Maybe it's not.  Hold on.

12   I'm just going to move on with this, except,

13   I think you may remember it yourself, but at

14   some point you say that the increase in the

15   prescription opioids without any due

16   diligence documentary basis is indicative of

17   a failure to maintain effective control

18   against diversion.

19              Is that --

20        A.    Read that one more time, I'm

21   sorry.

22        Q.    Yeah.  The increase in

23   prescription opioids without any due

24   diligence documentary basis is indicative of

25   a failure to maintain effective control

Highly Confidential - Subject to Further Confidentiality Review

```
 1    against diversion.
 2              That was -- I'm sorry, it's not
 3    where I thought it was in here, which is why
 4    I'm not showing it to you.
 5         A.    I don't think I would make that
 6    statement, but if it's in my report, if you
 7    could point it out to me.
 8         Q.    Yeah.  Well, here's -- I'm not
 9    going to do that just because of the
10    shortness of time, but what I do want to talk
11    about is documentary basis, which you've
12    talked about with some other people.
13              But did you read the testimony
14    of ███████████ about his explanation for
15    the absence of his due diligence records?
16         A.    Yes, I believe, but can I --
17         Q.    Let me refresh your
18    recollection if --
19         A.    Well, let me look -- go ahead.
20         Q.    Do you recall that he testified
21    that he kept notes on the IRRs for each IRR
22    that he reviewed, and that he kept them in
23    his office, and then when people asked for
24    them in this case, he went to try and find
25    them, and people at his facility said that
```

1   they had thrown them out because they were

2   way more than three years old?

3        A.    I have a recollection of that

4   general testimony --

5        Q.    Okay.

6        A.    -- that they couldn't be

7   produced, but he said that that -- not

8   agreeing exactly that's what he said, but he

9   did say that he reviewed them, initialled

10   them and then sent them out, and none of them

11   could be disclosed.  I do have a recollection

12   of that.

13        Q.    Okay.  So the inability to

14   disclose the due diligence records, at least

15   during the time that he was there, is because

16   they were being asked for, let's see, some

17   times in 2018, which is nine or ten years

18   after he was actually creating them?

19        A.    Okay.

20        Q.    Okay.  And that's the basis for

21   your conclusion that he actually didn't

22   conduct adequate due diligence?

23        A.    That's one of the actions.  I

24   think it was the -- my opinion is also based

25   on the fact that -- I don't think there's any

Highly Confidential - Subject to Further Confidentiality Review

```
 1    kind of documentation that would indicate

 2    that occurred independent of what he said.

 3         Q.    So let's talk a little bit

 4    about the .15 to .65, the subject that you've

 5    already mentioned once.

 6         A.    Okay.  Yes.

 7         Q.    In that context, didn't

 8    Mr. ████████ testify that he consulted with

 9    field loss prevention people who were being

10    asked to review orders that he was sending

11    out for further investigation?

12         A.    I believe there was a -- some

13    limited communication.

14         Q.    How do you know it was limited?

15    What's the basis for that conclusion?

16         A.    All that I could find was

17    limited.  It wasn't extensive.  I believe I

18    have a recollection that there was a

19    communication or there was some

20    communication, but not to the level of the

21    number of IRRs that were distributed out to

22    the field.

23         Q.    But the fact that

24    Mr. ████████ was consulting with them in

25    connection with trying to calibrate the score
```

1   suggests, does it not, that there was active

2   communication because they didn't want to

3   have to review orders that were false

4   positives?

5        A.    I don't remember the

6   conversation exactly on that context.

7        Q.    Okay.  I'm going to ask you

8   about another subject here.

9            You remember that you've

10  expressed an opinion about outside vendor

11  orders in the CVS SOM system?

12       A.    I did.  Any particular page

13  that --

14       Q.    Yeah.  I'm going to ask you to

15  take a look at page 106, assuming my

16  references here are better than they were

17  before.

18           So if you take a look at the

19  second full paragraph, you say that the IRRs

20  had some specific problems that fit within

21  the time periods below, but it also had one

22  overarching issue that continued from

23  mid-2009 to March 2014 - when performing the

24  calculation of whether the order was

25  suspicious, the IRRs did not consider orders

Highly Confidential - Subject to Further Confidentiality Review

1    delivered to CVS pharmacies by outside

2    vendors.

3            A.      That's correct.

4            Q.      Okay.  And an outside vendor in

5    this context is some distributor other than

6    CVS?

7            A.      That's correct.

8            Q.      And do you know who that

9    distributor was in the Track 1 jurisdictions?

10           A.      I believe I -- it's in my

11   report somewhere.

12           Q.      Well, let me suggest to you

13   that it's Cardinal.

14           A.      I believe it is, but I didn't

15   want to guess.

16           Q.      All right.  And do you have any

17   information whatsoever about what the amount

18   of the orders was that was received by CVS

19   pharmacies in the Track 1 jurisdictions from

20   Cardinal?

21           A.      Well, the amounts wouldn't be

22   of any concern -- well, I shouldn't say of

23   any concern.

24                   The amounts or the total

25   amounts distributed to each pharmacy isn't

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the main concern in regards to my opinion.
 2    It's the fact that they would be distributed
 3    to CVS pharmacies and the accountability or
 4    the suspicious order system doesn't account
 5    for them.
 6              And CVS is aware that their
 7    pharmacies are receiving those additional
 8    same controlled substances, and my opinion
 9    says that they have a responsibility to
10    account for those controlled substances.
11         Q.    And my question is whether you
12    know what the order of magnitude was of the
13    shipments that came from Cardinal and whether
14    it made a difference.
15         A.    Well, that's, I think, a double
16    question.
17         Q.    It is.
18              MR. FULLER:  Object to form
19         then.
20         A.    The first answer I would say
21    is -- I don't know the answer to the first
22    part of your question, but the second part of
23    your question, if it was one bottle, it would
24    be of concern to me.  Because it just
25    fails -- so -- if they could receive one
```

1    bottle, they could receive a thousand

2    bottles, and if you don't monitor that or

3    incorporate that in your suspicious order

4    system, the amount of what they receive

5    doesn't matter to me.  It's just that they

6    receive them and they're unaccounted for.

7    BY MR. BUSH:

8         Q.    But if you receive -- you don't

9    know whether they ever received a thousand

10   bottles from Cardinal?

11        A.    No, that was just a

12   hypothetical or just to show the differences,

13   the amount doesn't matter.  It's the fact

14   that they weren't monitoring that.

15        Q.    And if the amounts were trivial

16   or were consistent over time, it wouldn't

17   have made any difference in the SOM system,

18   would it?

19        A.    I think it does make a

20   difference because you don't account for it.

21   And the possibility that it could be a

22   thousand exists and you wouldn't account for

23   it.  So I don't agree with that statement.

24        Q.    But if the possibility that it

25   could be a thousand never occurred, then it

1    wouldn't have mattered in your hypothetical.

2              Would you agree with me on

3    that?

4              It's a risk of -- maybe we can

5    grant you that, but if the risk never came

6    home to roost, then it doesn't matter, but

7    you don't know that.

8         A.    Well, that's it.  The concept

9    of why we're not agreeing on this is the

10   suspicious order system and the effectiveness

11   of it and the due diligence is all based on

12   the risk of diversion.  It doesn't mean that

13   diversion is going to occur.  Just based on

14   the serious risk, and that's what makes it a

15   maintenance of effective controls requirement

16   by the law.

17        Q.    All right.  Take a look at

18   page 108.  So this -- I want to direct your

19   attention to the top of page 108.  You say:

20   ████████  testified that while he was

21   reviewing the IRR, every HCP order that

22   appeared on the IRR was referred out for

23   additional investigation which he believed

24   was necessary.

25              With me so far?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I do.  That was part of his

2    deposition, yes, sir.

3        Q.      And then down a couple of

4    sentences later, it begins:  Significant

5    evidence exists that calls into question the

6    accuracy of ▓▓▓▓▓▓▓▓  statement.

7              Do you see that?

8        A.      Yes, sir.

9        Q.      So, first of all, you are, as

10   an expert here, expressing an opinion on what

11   the evidence shows in the case.

12             Do you agree with me?

13       A.      I just think it says the

14   evidence exists that calls into question.  I

15   think it questions the evidence because

16   there's conflicting statements.

17       Q.      So you're evaluating the

18   evidence?

19       A.      I'm not evaluating the

20   evidence.  I'm evaluating the veracity of

21   Mr. ▓▓▓▓▓▓▓  statement --

22       Q.      ▓▓▓▓▓▓

23       A.      Okay.  ▓▓▓▓▓▓▓

24       Q.      You're evaluating the veracity

25   of his statement?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Based on the conflicts with his

2     testimony compared to other witnesses.

3          Q.      And one of the items you cite

4     is that he testified he'd contact the loss

5     prevention manager and pharmacy manager of

6     the distribution center and freeze all orders

7     for HCP that flagged.

8               Do you see that?

9          A.      Yes, sir.

10         Q.      And you then say that one of

11    the loss prevention managers at the

12    Indianapolis distribution center told the DEA

13    that he had never received a call from ██████

14    ████████████  right?

15         A.      That's correct.

16         Q.      But we don't know whether or

17    not ████████████ called the pharmacy

18    manager or someone else, do we?

19         A.      We don't.

20         Q.      You don't know that.

21              And you don't know whether or

22    not the orders were, in fact, frozen until

23    they were evaluated, do you?

24         A.      I don't know that.

25         Q.      You also, second, say that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    there are no documents that support this, and

 2    further, that I have been informed that the

 3    only documents that indicate any

 4    investigation was ever done by VIPER analysts

 5    are the IRR.

 6              You see that?

 7    A.      Yes, sir.

 8    Q.      Who informed you?

 9    A.      Well, the documents informed

10    me, but I think that's one of the areas where

11    I was provided the information and I reviewed

12    it and confirmed it.

13    Q.      Do you remember what the

14    information was that you were provided that

15    led you to that conclusion?

16              (Telephone interruption.)

17    A.      I believe I was verbally

18    informed, and then I believe, if my

19    recollection is correct, I reviewed some IRR

20    recaps, and there's only a small number of

21    IRR recaps.  I believe that's the basis for

22    that statement.

23    Q.      And you don't cite anything in

24    a footnote to support that particular

25    sentence that I just --
```

```
 1            A.       There is no cite here, no, sir.

 2            Q.       Okay.   Now, you mentioned the

 3    IRR recaps.   Do you remember the time period

 4    that the IRR recaps existed that you're

 5    referring to?

 6            A.       I do not, but I could review my

 7    report.   It may indicate to you.

 8            Q.       Well, let me suggest to you

 9    it's in the first three months of 2011.

10                     Did you review any of the

11    testimony to determine whether Mr. █████████

12    was, in fact, reviewing IRRs in the first

13    three months of 2011?

14            A.       I believe there was testimony

15    that that is a true statement.

16            Q.       Do you remember what it was?

17            A.       That he was reviewing the IRRs.

18            Q.       Whose testimony?

19            A.       I believe it might have been

20    his, but just from recollection of reviewing

21    his deposition.

22            Q.       Did you review -- I'm sorry.

23                     Did you review anybody else's

24    testimony on the subject?

25            A.       I don't believe so, no, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you review any of the

2    documents that showed that there were some

3    analysts who were hired at the beginning of

4    the year who were reviewing -- beginning of

5    2011 who were reviewing IRRs?

6    A.    At this time, I don't have a

7    direct recollection of that.

8    Q.    Okay.  So let's take a look at

9    the -- on the same page, 108, Algorithm Not

10   Functioning Correctly - Loses Historical

11   Data - Active Ingredient, that subject?

12   A.    Yes.

13   Q.    Now, that's part of your

14   opinion that the CVS SOM system was -- I

15   don't want to put words in your mouth, but

16   inadequate?

17   A.    Yes.  So I actually looked at a

18   considerable volume of those IRRs and

19   observed that the data for the last three to

20   four months was wiped off and it was only

21   zeros, which would affect the calculation or

22   the scoring that would be done.  I started to

23   actually do a list of them, but they're so

24   extensive, I didn't conclude.

25   Q.    And you understand from --

Highly Confidential - Subject to Further Confidentiality Review

1    well, did you understand from what you

2    reviewed that CVS was addressing that issue?

3         A.     Well, I believe Mr. ███████

4    said that he was going back and researching

5    records and entering the data, but the

6    question I would have is why they still were

7    all zeros in the records that I reviewed, if

8    that answers your question.

9         Q.     No, that doesn't exactly answer

10   my question.

11               Do you understand that steps

12   were being taken to include or to report

13   shipments on the IRR by active ingredient to

14   change the Buzzeo system so that it worked by

15   active ingredient?

16        A.     I don't have a direct

17   recollection of that.

18        Q.     Okay.  Now, you did refer to

19   what Mr. Mortelliti said he was able to do,

20   but it don't sound like you have the clearest

21   recollection of what he said he was able to

22   do.

23               You want to try and --

24        A.     Well, I think he was going back

25   and re -- he was reentering the data or --

Highly Confidential - Subject to Further Confidentiality Review

1    that's my recollection.  There was some -- he

2    was taking some action to try to correct the

3    missing data.

4        Q.     Okay.  Do you recall that he

5    went back and reviewed all the IRR reports

6    that he had that had the data on them so that

7    he could fill in the blanks?

8        A.     I do, and that's what I thought

9    I said, but then when I looked at all of

10   these forms and they all had zeros, the

11   blanks weren't filled in, so I'm not sure why

12   the zeros would appear.  But I didn't have a

13   chance to ask Mr. ███████  why that would

14   be.

15       Q.     Well, I don't think he said

16   that they were filled in, but even if they

17   were, it would be on the records that he

18   kept, which no longer exist.

19       A.     Well, I can't speak to that.

20   But all I --

21       Q.     All right.

22       A.     All my opinion was based on was

23   that it was -- that there were decisions

24   being made on those specific IRRs and the

25   algorithm was -- had zeros in there.  So I

Highly Confidential - Subject to Further Confidentiality Review

1    couldn't draw a conclusion that there would

2    be a recalculation if the proper data was

3    entered in them.

4         Q.    What was the effect of the loss

5    of order history?  More flags or fewer flags?

6         A.    I believe that -- and it's a

7    very complex -- before I make a comment on

8    that, it's a pretty complex algorithm, and it

9    takes into effect some binary calculations

10   and different ratios and odds.  But I would

11   say if the zeros appeared, it would probably

12   increase the score of the system, just based

13   on my attempted analysis of it.

14        Q.    And do you recall that that's

15   what Mr. ██████████ testified, that it

16   actually increased the number of flags that

17   he had to review and the loss prevention

18   people had to review?

19        A.    Yes, but I went in and tried to

20   see if that was actually accurate, and I

21   believe by looking at the algorithm, that is

22   probably an accurate statement.

23        Q.    An accurate or inaccurate?

24        A.    An accurate.

25        Q.    Okay.

```
 1           A.     I could explain to you why I
 2     drew that conclusion, or...
 3           Q.     No.
 4           A.     Okay.
 5           Q.     That's fine.  What are we up to
 6     here, 26?
 7                  (Whereupon, Deposition Exhibit
 8           Rafalski-26, Consumer Value Stores IRR
 9           Report, CVS-MDLT1-000100763 -
10           CVS-MDLT1-000100768, was marked for
11           identification.)
12     BY MR. BUSH:
13           Q.     Let me show you what's been
14     marked as Exhibit 26.
15                  MR. BUSH:  My apologies, I gave
16           you -- actually, give that to him.  I
17           need this.
18                  MR. FULLER:  Indian giver.
19     BY MR. BUSH:
20           Q.     I gave you one that has a
21     highlight or two on it, but I put that on
22     there.
23           A.     Okay.
24                  MR. FULLER:  I'm sorry, what
25           number is this, 26?
```

```
 1                    MR. BUSH:  26, yeah.

 2                    MR. FULLER:  Thank you.

 3      BY MR. BUSH:

 4           Q.    Is this at least part of an IRR

 5      that's similar to ones that you reviewed?

 6           A.    Yes, sir.

 7           Q.    Can you take a look at the last

 8      page of the document?

 9           A.    Yes, sir.

10           Q.    Okay.  Can you tell me -- let's

11      walk through this.

12           A.    Which particular order?

13           Q.    Let's pick the first one,

14      store, what's that?

15           A.    That's the store number, 3306.

16           Q.    And what is that?

17           A.    That's the store number of the

18      CVS store, store number 3306.

19           Q.    That's doing what?

20           A.    It's telling CVS which physical

21      location it is.

22           Q.    This is the store that's

23      ordered the drugs, right?

24           A.    Well, yes.  I thought you meant

25      like --
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     What's the next number?

2     A.     I don't know.

3            MR. FULLER:  Form.

4    BY MR. BUSH:

5     Q.     What's the SOM key?

6     A.     So there's a combination of

7    numbers here, just so I can make a

8    clarification.  So there's a number, a

9    six-digit number that's -- I don't know what

10   that would be.  It's possible it's an order

11   number.  But the last number is a 7, and the

12   7.5/200-milligram, that's the strength of the

13   drug.

14    Q.     Okay.

15    A.     It's kind of under the SOM key

16   field.

17    Q.     Uh-huh.

18    A.     Okay.

19    Q.     It's hydrocodone?

20    A.     Yes.

21    Q.     What's the item number?

22    A.     353756, and my experience would

23   indicate to me that that's an item number

24   that's assigned to it by the CVS corporation.

25    Q.     Okay.  Let's skip over a little

Highly Confidential - Subject to Further Confidentiality Review

1    bit to bill quantity.  What's that?

2        A.    That's the billing quantity.

3    That's the order that -- or the amount that's

4    billed internally to CVS and the quantity is

5    five, so it would be five bottles.

6        Q.    Okay.  And the unit of measure

7    is what?

8        A.    A hundred dosage units in a

9    bottle.

10       Q.    Okay.  And the extended

11   quantity is?

12       A.    500.

13       Q.    Which is the --

14       A.    That's the total number of

15   dosage units.  It calculates the five bottles

16   at 100 a bottle.

17       Q.    All right.  What is -- going

18   down to the next line, what does Drug 1

19   signify?

20       A.    Well, we would have to go back

21   to the chart, but I believe that signifies a

22   hydrocodone product, but I'm not exactly

23   sure.  I don't think that information is

24   provided here.

25       Q.    All right.  And what's binary

Highly Confidential - Subject to Further Confidentiality Review

1    day?

2         A.    If I look back at the sheet

3    prior, it describes binary day, it's an

4    indicator that detects if the GNC is subject

5    to frequent ordering.  Possible values,

6    one -- this is a binary calculation.  One, if

7    five days or less has passed since the last

8    order.  Zero for orders six days or more.

9              And then the interpretation,

10   the frequent ordering of a controlled

11   substance could indicate suspicious behavior.

12   And then the model weight, I believe that

13   that's an assignment that was -- or a value

14   that was assigned in doing a calculation in

15   looking at the probability of diversion.

16        Q.    So if I take you through all

17   the rest of the headings on this line, would

18   it be fair to say that you're going to look

19   at the front page and read what it says on it

20   for what that factor is and how it was used?

21        A.    I think that's a good

22   assumption.  I haven't memorized these, but I

23   have spent some time trying to understand and

24   analyze this system.

25        Q.    And you've not reached an

Highly Confidential - Subject to Further Confidentiality Review

1    opinion on whether or not this algorithm was

2    an adequate or an inadequate algorithm for

3    purposes of flagging orders that might be

4    suspicious?

5         A.    I have an opinion that it's

6    inadequate.

7         Q.    And -- okay.  What's the basis

8    for that opinion?

9         A.    Because according to

10   Mr. ████████████ it isn't working.

11        Q.    You're talking about because of

12   the loss of order history?

13        A.    No, I'm talking about there

14   seems to be a problem because it's generating

15   so many orders.  There's not a confirmation

16   that I was able to find if it's generating

17   too many suspicious orders that are

18   suspicious, but it would indicate that this

19   system is generating so many orders that

20   ████████████ in his testimony, is asking for

21   help because he doesn't believe it's working

22   effectively.

23             So the issue why that would be

24   bad as far as for a suspicious order system

25   or maintenance of effective controls is when

Highly Confidential - Subject to Further Confidentiality Review

1    it's defective and it generates a high volume

2    of orders, there is the potential among those

3    that there are real suspicious orders.

4         Q.    So you agree that it was a good

5    thing for CVS to be trying to recalibrate the

6    scoring system so that it was not generating

7    so many false positives?

8         A.    So I'm going to say that

9    something definitely needed -- had to be done

10   to fix the system, but I'm not going to agree

11   that just recalibrate it in the manner that

12   occurred was the proper thing to do.

13        Q.    All right.  Are you a

14   statistician?

15        A.    I am not.

16        Q.    Do you have any idea how an

17   algorithm works?

18        A.    Somewhat.  I've -- I used -- I

19   was a math major for a while, so...

20        Q.    Can you go in and -- could you

21   have gone in and evaluated the algorithm that

22   was used by Buzzeo and reached an opinion on

23   whether or not it was adequate to flag orders

24   for review?

25        A.    Not without a system --

Highly Confidential - Subject to Further Confidentiality Review

1    assistance from a computer programmer,

2    because I think it would take a -- I tried to

3    do it longhand and I could not, so I think it

4    would take a computer programmer.  But if I

5    had one with me and I could tell him exactly

6    what I wanted to do, I think it's possible I

7    could recreate it.

8            Q.    In any event, you haven't done

9    it?

10           A.    I have not.  I have not been

11   able to do it and I tried.

12           Q.    And you have no opinion on

13   whether or not -- well, I guess you said you

14   do have an opinion.

15                 So why do you have an opinion

16   other than that it was flagging too many

17   orders?  Is there any other basis for your

18   opinion that the algorithm itself didn't

19   work?

20           A.    Well, when I -- I think it was

21   confusing to the employees.  I think when

22   they look at an IRR, I don't think they

23   understood it, and I also think they relied

24   on just the data on the IRR, and I think this

25   was only just the trigger for a suspicious

1    order, and I don't think that they even

2    understood what the trigger was, what was

3    causing it, when they -- when this system put

4    the three different size, frequency and

5    pattern into one calculation, my recollection

6    is, is that was confusing to the employees.

7         Q.    That seems to me to be talking

8    about what the employees did with the IRR,

9    and I'm asking you whether or not the IRR

10    itself, the algorithm that produces the IRR,

11    was inadequate for -- in any basis -- for any

12    basis other than the period when it was

13    flagging too many orders.

14         A.    I think it was inadequate when

15    the score was raised without taking into

16    consideration the model weights, and I know

17    that there was a subsequent change that

18    eventually Buzzeo did where he added some

19    attributes and he adjusted the model weights.

20    So there was some attempt at correction,

21    so...

22         Q.    And you've done no -- made no

23    effort to calculate how many orders were

24    flagged before it was recalibrated, how many

25    orders were flagged after the so-called

1    retunement where the factors were adjusted?

2    You've made no calculations along those

3    lines, have you?

4        A.    Well, in forming my opinion, I

5    saw some communications where

6    Mr. ███████ -- I'm going to say his name

7    wrong, I'm sorry -- where he was advised by

8    Buzzeo that if he was to adjust the score, he

9    should run some analysis and do some

10   documentation to show that by just raising

11   the score it didn't change the results or

12   stop the identification of suspicious orders.

13   And I failed.  I looked and I failed to find

14   any of that documentation that that actually

15   occurred.

16       Q.    You saw that in the e-mails

17   where he was actually running -- or asking IT

18   to run the recalibrations, right?

19       A.    I saw that.

20       Q.    Right.

21       A.    But that doesn't answer the

22   question on whether or not the system is

23   effective.  So when the system would generate

24   suspicious orders, it would be the subsequent

25   due diligence that would indicate, yes, we

Highly Confidential - Subject to Further Confidentiality Review

 1    have it right because this is a suspicious

 2    order, or it's still generating orders that

 3    aren't suspicious.

 4              And the other potential problem

 5    is that with -- because all of this

 6    algorithm, complex algorithm, is based on

 7    model weights that by raising the score, it

 8    doesn't fix the problem because if it's

 9    generating too many suspicious orders,

10    there's a problem in the design.

11              I think there was one -- I

12    remember reading either a deposition or a

13    communication where there was a -- one of the

14    issues that they believe was the problem was

15    the first order of a new drug might cause a

16    trigger, and I think that's one of the things

17    that Mr. Buzzeo corrected on subsequent

18    system.

19              MR. BUSH:  When did I start?

20              MR. FULLER:  Plenty of time.

21              (Comments off the stenographic

22       record.)

23    BY MR. BUSH:

24       Q.    I'm going to jump to another

25    page here, if I can ask you to take a look at

Highly Confidential - Subject to Further Confidentiality Review

```
1    PDF 111 -- I'm sorry, 111.
2              MR. FULLER:  Are we done with
3         that exhibit?
4              MR. BUSH:  Maybe.  Maybe.
5              MR. FULLER:  Okay.
6         A.    I'm on page 111, sir.
7    BY MR. BUSH:
8         Q.    Yeah.  And I direct your
9    attention to sub -- or paragraph (c), less
10   than 5%?
11        A.    Okay.
12        Q.    And here you're talking about
13   ███████████████  and you say that he said he
14   probably reviewed less than 5% of all flagged
15   orders.  That's generally the subject matter
16   of that paragraph, right?
17        A.    It is, based on his deposition.
18        Q.    And by the way, the IRR
19   includes more than just hydrocodone, right?
20        A.    Yes, sir.
21        Q.    Hydrocodone products?
22        A.    Yes, sir.
23        Q.    And did you review his
24   testimony?  You cite some of his testimony on
25   footnote 476 and 477, but do you recall
```

1    reviewing his testimony about reviewing 5% of

2    the orders, estimating that he reviewed 5% of

3    the orders?

4           A.    Yes, sir.

5           Q.    Okay.  Do you also recall his

6    testimony looking at specific IRRs about why

7    he could determine from the IRR that no

8    further investigation was necessary?

9           A.    I have a recollection of that

10   being in his deposition, but --

11          Q.    Do you recall what he said?

12          A.    No, I do not.

13          Q.    But you disagreed with him,

14   right?

15          A.    Well, I think that was one of

16   the concerns that -- just looking at the data

17   contained in the IRR and being that it was

18   a -- combined with all three, I'm not really

19   sure that it was sufficient to just look at

20   the IRR and make a decision on a suspicious

21   order.

22          Q.    Apologies, but I only have one

23   of these, so I'm going to show it to you and

24   ask you some questions about it.

25                (Whereupon, Deposition Exhibit

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Rafalski-27, Consumer Value Stores IRR

 2            Report, CVS-MDLT1-000100672 -

 3            CVS-MDLT1-000100757, was marked for

 4            identification.)

 5     BY MR. BUSH:

 6          Q.    So I'm going to show you what's

 7     been marked as Exhibit 27, which is an IRR

 8     from -- I can't even read the damn thing.

 9               MR. FULLER:  Wrong glasses.

10               MR. BUSH:  Yeah, wrong glasses.

11     BY MR. BUSH:

12          Q.    From August 30th, 2013.

13               MR. FULLER:  Glad you're not

14          showing it to me then.

15               MR. BUSH:  Look over his

16          shoulder.  Better than I can do.

17               MR. FULLER:  You don't have any

18          other copies, right?

19               MR. BUSH:  No, I don't, sorry.

20          A.    August 30th, 2013, yes, sir.

21     BY MR. BUSH:

22          Q.    Okay.  And I'd like to direct

23     your attention to the -- I guess it's the

24     Bates page 10693.  It's probably where that

25     blue tab is, I'm just guessing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      It is.  Back side.

 2              Q.      All right.  And there is an

 3     order on there that Mr. ███████ said he

 4     could look at that order and look at the data

 5     on the IRR and determine that it did not need

 6     any further investigation.  He could

 7     determine it was not a suspicious order and

 8     did not need to be reported to the DEA.

 9                      And -- let me look over your

10     shoulder here.  Right.  That's it.

11                      Do you have --

12                      (Interruption by the

13              videographer.)

14                      MR. FULLER:  He was just

15              telling me I'm in the shot, but since

16              we only have one copy.

17                      MR. BUSH:  That's fine.

18                      MR. FULLER:  Thanks.

19     BY MR. BUSH:

20              Q.      Do you disagree with that?

21                      MR. FULLER:  Form.  If you want

22              to show him the testimony.

23                      MR. BUSH:  I'm trying to get

24              through.

25                      MR. FULLER:  I understand.
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I really don't have sufficient

2    information to make an opinion on that.

3    BY MR. BUSH:

4        Q.      All right.  Take a look at

5    page 10696, and there's an order there.

6    Mr. ██████ testified similarly that he

7    could look at that and see that there was no

8    need for any further investigation beyond

9    looking at the data on the IRR.

10              Do you disagree with that?

11              MR. FULLER:  Same objection.

12       A.      Well, the score is below the

13   reporting amount so I don't think it's a

14   suspicious order.

15   BY MR. BUSH:

16       Q.      What's the score?

17       A.      .06.

18       Q.      Okay.  Why was it reported on

19   the IRR?

20       A.      Could be a problem why the

21   system was flawed.

22       Q.      Got it.  But you don't disagree

23   with him that he could tell from -- it was on

24   the IRR.  He looked at it, said that he could

25   tell that it didn't need to be further

Highly Confidential - Subject to Further Confidentiality Review

```
 1    investigated because, from the data on it, it

 2    was not a suspicious order?

 3         A.    Maybe he just looked at the

 4    score.

 5         Q.    Actually, what he said was that

 6    it's one bottle.  What am I supposed to do,

 7    call the pharmacy and say you've ordered one

 8    bottle?  It's too much?

 9         A.    No, I agree with that

10    statement.  But the score didn't -- shouldn't

11    have even triggered it for a review, so I

12    don't -- I don't know if that was his

13    testimony that you characterized, but...

14         Q.    Okay.

15              MS. SWIFT:  I'm sorry to

16         interrupt, but I'll just note that the

17         phone has been disconnected again.

18              MR. BUSH:  Let's go off the

19         record for a second, and I may be

20         pretty much done so that I don't

21         offend any of my colleagues.

22              THE VIDEOGRAPHER:  Going off

23         the record, 12:05 p.m.

24              (Recess taken, 12:05 p.m. to

25         12:07 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  Back on the

 2       record at 12:07 p.m.

 3   BY MR. BUSH:

 4       Q.     Just one or maybe two

 5   questions.

 6              Going back to your testimony

 7   when I was asking you about any basis you had

 8   for concluding that -- withdrawn.

 9              I was asking you about whether

10   any of the methodologies that you have used

11   here, as they were actually used by any

12   registrant, had the feature that once a --

13   once an order was triggered, if there was

14   inadequate due diligence, that everything

15   else after that flagged.

16              And specifically I was asking

17   you whether there was anything that you could

18   point to that DEA had ever said that

19   suggested that was the way it works.

20              And the only thing you pointed

21   me to is one of the Rannazzisi letters.  Is

22   there anything else?

23       A.     I stopped there.  I'm pretty

24   confident if I looked -- if you'd like me to,

25   I could look up the 2007 letter and I believe
```

1    it also will make the same statement.

2         Q.     Anything else?  I'm not going

3    to ask you to do that, but I know what that

4    letter says.

5         A.     I believe it was consistently

6    provided to registrants in training.  I'm

7    confident without having it in front, I could

8    get it out, the Houston training conference

9    that we had discussed earlier for Mr. Mapes,

10   I believe there was a statement in regards to

11   continuing to ship suspicious orders.  So

12   those are a few of the instances.

13              If CVS had a distributor

14   briefing, and I don't have a direct

15   recollection if they did or not, they would

16   have had that same information provided to

17   them.

18        Q.     And just to be clear, because I

19   just want to make sure I understand what

20   you're saying, that the information that

21   registrants would have gotten was that if

22   they did not have an effective system, SOM

23   system, in place, they could lose their

24   license?

25              MR. FULLER:  Object to form,

Highly Confidential - Subject to Further Confidentiality Review

1          misstates prior testimony.

2    BY MR. BUSH:

3          Q.    Or was it something else?

4          A.    Yes.

5          Q.    I'm just asking, what is the

6    something else?

7          A.    I think it -- I think -- and I

8    could read this statement again for you out

9    of the 2006.

10         Q.    No, you don't need to do that.

11         A.    I believe it said if a system

12   identifies a suspicious order and you

13   continue to ship that order without

14   dispelling the potential for diversion, then

15   that act could lead to the removal of your

16   DEA registration.

17         Q.    All right.

18         A.    So --

19         Q.    That's the same -- sorry.

20         A.    -- under -- and so that removal

21   would be as a result of maintenance to

22   maintain effective controls to prevent

23   diversion.

24               Then the conclusion would be if

25   you don't dispel diversion, all the

Highly Confidential - Subject to Further Confidentiality Review

1    subsequent orders could also be diversion

2    because you have no knowledge because you did

3    no due diligence.

4         Q.     But none of the letters or any

5    of the other references that you just gave me

6    actually have that last piece in it, right?

7         A.     They don't specifically say

8    that.

9              MR. BUSH:  Okay.  I am going to

10             conclude.  I'm going to make the same

11             statement that others have made that I

12             was not able to get through everything

13             that I would like to have covered with

14             you.  You have extensive opinions and

15             have covered a lot of different ground

16             related to CVS's SOM system, but in

17             light of the shortness of time, I'm

18             going to conclude here, but I'm

19             reserving my right to come back and

20             ask further questions.

21             THE WITNESS:  It's been a

22             pleasure.  Nice to meet you.

23             THE VIDEOGRAPHER:  Going off

24             the record at 12:10 p.m.

25             (Recess taken, 12:10 p.m. to

Highly Confidential - Subject to Further Confidentiality Review

1          12:52 p.m.)

2               THE VIDEOGRAPHER:  We're back

3     on the record at 12:52 p.m.

4               EXAMINATION

5  BY MR. O'CONNOR:

6          Q.    Mr. Rafalski, good afternoon.

7  I'm Andrew O'Connor.

8          A.    Good afternoon, Mr. O'Connor.

9          Q.    I represent Mallinckrodt in

10  this case.  I'll be asking you some questions

11  on behalf of manufacturers as well as

12  Mallinckrodt in particular.

13               Mr. Rafalski, would you agree

14  that manufacturers primarily sell to

15  wholesale distributors?

16          A.    My experience as a DEA

17  investigator would agree to that statement,

18  but I would add that there's nothing that

19  would restrict a distributor from

20  distributing any of their products to other

21  registrants based on their corresponding --

22  I'm drawing a blank on the name of it --

23  coincidental activities in the CFR, so they

24  could be a distributor.

25               So, yes, that's predominantly

1    what they distribute, but that doesn't mean

2    exclusively, just...

3            Q.    Fair enough.

4                  So in that situation that you

5    described was the predominant situation, when

6    a manufacturer is selling to a distributor,

7    the distributor places an order with the

8    manufacturer in those circumstances, right?

9            A.    Yes, sir.

10           Q.    Okay.  And the manufacturer

11   ships product to the distributor?

12           A.    That's correct.

13           Q.    Now, in your report you

14   describe five suspicious order methodologies,

15   correct?

16           A.    I do.

17           Q.    But your report does not apply

18   any of those five methodologies to orders

19   submitted by distributors to manufacturers,

20   correct?

21           A.    That's correct.

22           Q.    And so your report doesn't

23   identify any orders received by a

24   manufacturer that were suspicious, correct?

25           A.    I don't think that it says

Highly Confidential - Subject to Further Confidentiality Review

1    that.  It's just that I wasn't tasked to

2    provide that methodology in regards to

3    manufacturers at this time.

4         Q.    I understand.  But your report

5    doesn't identify any suspicious orders that

6    were submitted by distributors to

7    manufacturers.

8         A.    My report would only identify

9    those orders that the manufacturers have

10   identified.  I don't make any independent

11   calculations or apply any algorithms to

12   identify it outside of what's in my report

13   stated as I've discovered as part of this

14   discovery.

15        Q.    Okay.  So other than the

16   reports that the manufacturers themselves

17   reported to DEA, you have not identified any

18   suspicious orders submitted by distributors

19   to manufacturers, correct?

20        A.    Can I ask a clarification?  Are

21   you talking about an individual order or are

22   you talking about conduct?

23        Q.    I'm talking about individual

24   orders.

25        A.    I have not done that as we sit

Highly Confidential - Subject to Further Confidentiality Review

1    here today, no, sir.

2        Q.    Okay.  So your report does not

3    identify any shipments by manufacturers to

4    distributors that you claim should have been

5    reported as suspicious?

6        A.    My opinion goes to whether or

7    not there were effective -- or suspicious

8    orders, effective suspicious order systems in

9    place and/or the maintenance of effective

10   controls, the due diligence.  I do not do any

11   calculations that would identify any specific

12   orders.

13       Q.    Okay.  So just to be clear, in

14   response to my question, your report does not

15   identify any shipments by manufacturers to

16   distributors that you claim should have been

17   reported as suspicious, correct?

18       A.    I think there's some instances

19   in my report, there was -- there may be a

20   description of a relationship or some

21   transactions between a -- let me think a

22   second.

23       Q.    Uh-huh.

24       A.    Because I have all of the

25   different companies.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  (Document review.)

 2        A.      I don't believe so, no, sir.

 3   BY MR. O'CONNOR:

 4        Q.      Okay.  And at trial, do you

 5   intend to offer any opinion regarding whether

 6   any particular order submitted to a

 7   manufacturer was suspicious?

 8        A.      If I'm requested to do that

 9   analysis by counsel, I guess that would be a

10   possibility.  I haven't done the analysis as

11   today, so I couldn't offer that opinion.

12        Q.      So as you sit here today, you

13   do not have an opinion on whether any

14   particular order that was shipped by a

15   manufacturer was suspicious?

16        A.      I think I have an opinion.

17        Q.      But you haven't identified any

18   order, correct?

19        A.      I have not identified a

20   specific order, but I have an opinion on the

21   conduct.

22        Q.      And are you offering any

23   opinion in this litigation that any

24   particular order that was shipped into Summit

25   or Cuyahoga Counties was suspicious?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.
2          Q.    Okay.  And are you offering any
3    opinion in this litigation that any
4    particular order shipped by a manufacturer
5    into Summit or Cuyahoga County was
6    suspicious?
7          A.    I'm sorry, shipped by a
8    manufacturer --
9          Q.    Correct.
10         A.    -- to a distributor?
11         Q.    That's right.  To -- to someone
12   in Cuyahoga or Summit County.
13         A.    No, sir.
14         Q.    Okay.  With respect to a
15   manufacturer, what is a suspicious order?
16         A.    Well, if a manufacturer has
17   conducted a sufficient due diligence or
18   onboarding process and they've evaluated the
19   scope of their customers' business and the
20   needs, they would establish a pattern, and
21   that pattern would give them an idea of
22   initially the volume of drugs they need to
23   purchase.
24              Now, if it's brand-new
25   customer -- yours is kind of a hypothetical.
```

Highly Confidential - Subject to Further Confidentiality Review

1   If it's a brand-new customer, there's not a

2   pattern or a frequency, but they would start

3   out with what they assess as a legitimate

4   volume, and they would monitor that volume,

5   and if a customer exceeded that, that should

6   trigger as an unusual size.

7            But to give you just a general

8   definition, it's kind of a broad topic

9   because it depends on the scope of business

10  of the manufacturer, of the customer, the

11  type of products, the needs, so the -- prior

12  to ever shipping an order, the importance is

13  to understand what the legitimate needs is of

14  a customer.

15       Q.    Yesterday you testified that it

16  was important to understand what a usual

17  order was so that you could determine what a

18  suspicious order was.

19            Do you generally recall that

20  testimony?

21       A.    I think that's a general

22  description.  I think we were discussing the

23  size, so I think before you would know an

24  unusual size, you would need to know the

25  usual size.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And I think that's kind of the

 2      simpler way of what I just said, is that if

 3      you don't really have a comprehension of what

 4      is the legitimate needs of your customer,

 5      then you couldn't know an unusual order --

 6      unusual size of an order, I'm sorry.

 7           Q.     What information would you need

 8      to determine what a usual order looked like

 9      for a manufacturer?

10                    MR. FULLER:  Form.

11                    THE WITNESS:  I'm sorry, you

12           said something?

13                    MR. FULLER:  Object to form.

14                    THE WITNESS:  Oh.  Sorry.

15           A.     I think that's dependent on the

16      skill of your compliance employees.  I think

17      you go in and evaluate the distributor.  I

18      don't think the distributor would purchase a

19      manufacturer's product with an idea on how

20      they were going to sell it and market it, and

21      I think you would evaluate what their scope

22      of business is and the type of customers they

23      were; how many pharmacies they could

24      distribute to.

25                    I think you'd have to get some
```

1   baseline information to get a gauge on how

2   much product you'd want to send to them.  I

3   don't think you would just send them an

4   amount of product and hope they distribute

5   it.  I think there should be some kind of a

6   relationship and identification of a

7   legitimate total.

8   BY MR. O'CONNOR:

9        Q.     Besides understanding what type

10  of pharmacy -- or what type of customer or

11  the number of customers a distributor had,

12  what other information would you say a

13  manufacturer needs to know in order to

14  establish a baseline?

15       A.     A baseline in regards to size?

16       Q.     Correct.

17       A.     Well, I think there would be

18  some other factors that they should minimally

19  look at.  That would be the ability for the

20  company to actually handle the volume of

21  product on a security aspect, they had

22  sufficient cage or vault depending on the

23  schedule of controlled substance they were

24  purchasing.

25                I think they may want to do

Highly Confidential - Subject to Further Confidentiality Review

1    some analysis of the identifications of the

2    pharmacies, if possible, because it's a

3    potential that in the case of Mallinckrodt,

4    they might already have information about the

5    distribution amounts or the purchase amounts

6    for those pharmacies and some trends.

7              Might do some comparison to

8    like customers.  Might look into the

9    geographic location of where the product is

10   intended to be distributed.  At least for the

11   Mallinckrodt products, to confirm or deny

12   there might be an issue of a distribution by

13   volume to those specific areas.

14             I think the essential thing is

15   what I said initially.  I think you need to

16   get an idea of how many customers that that

17   distributor intends to distribute.

18             And I think if we're talking

19   about the onboarding or the initial amounts

20   that they'll be distributing, I think that a

21   registrant should follow those pretty closely

22   because my experience would indicate that

23   sometimes other registrants aren't that

24   truthful, and not just because they want to

25   divert, although that's one of the

1    indicators.

2              Sometimes distributors have, in

3    my experience of doing the pre-regs, that

4    they have goals or ideas that they possibly

5    can't meet or are not feasible.  In other

6    words, that they may request a volume of

7    drugs and anticipate ordering -- or I mean,

8    hiring a bunch of new people or they want to

9    order a large volume of drugs and with an

10   intention of shipping it to a new geographic

11   area.  Those would be all things I would

12   consider in deciding on the volume to

13   distribute.

14        Q.    You mentioned pre-reg.  Is that

15   a preregistration inspection by the DEA?

16        A.    Yeah, I'm sorry, that's kind of

17   a term.  Yes, sir, that's going on-site and

18   prior to issuing the DEA registration, making

19   sure that you're confident that the

20   registrant is in compliance with the

21   regulations and has an understanding before

22   you issue the DEA registration.

23        Q.    And during one of these

24   preregistration visits, would you consider

25   all the factors that you just listed that

Highly Confidential - Subject to Further Confidentiality Review

1    manufacturers ought to consider?

2         A.    I don't know that I would -- I

3    wouldn't do that specific analysis, but I

4    would -- I would obviously dig into how

5    they -- the registrant plans to set up their

6    suspicious order monitoring system.

7              So what typically -- typically

8    would happen in this situation, at least with

9    me and the people that I would have worked

10   with in my last career, although I won't tell

11   them how to do a suspicious order system, I

12   might ask them questions and expect

13   responses, and those questions sometimes are

14   teaching moments.

15             So if I ask them the question

16   if they're going to monitor the geographic

17   description of their drugs, I would hope that

18   they would -- that would trigger them to say,

19   wow, we might have to think about it, but I

20   would never tell them of things they had to

21   do.

22        Q.    So before the distributor even

23   gets the registration, DEA has inquired about

24   things like the geographic distribution of

25   the products, correct?

1    A.    They wouldn't have inquired

2  about it, and I wouldn't force those opinions

3  on a distributor.  If they had a viable

4  system, I may ask some questions to trigger

5  some areas that I think maybe needed to be

6  cleaned up.

7         But I wouldn't go in and

8  already do a geographic -- well, there

9  wouldn't be one because the registrant's not

10 registered.  They wouldn't have handled

11 controlled substances.  So really, their

12 distribution trends couldn't be considered

13 because they don't have product.

14    Q.    But you'd ask about their

15 intended geographic distributions?

16    A.    That would be one of the

17 questions.  I'd probably be mostly concerned

18 about just their business model, what they

19 intend to do with the drugs, how they -- who

20 they intend to ship them to.

21         I try to be alert if there were

22 some areas that were more prone for diversion

23 as far as at the current time based on my

24 knowledge.  I'll give you one example.  There

25 was a lengthy period of time where

Highly Confidential - Subject to Further Confidentiality Review

```
 1    hydrocodone was a big issue in Houston, so if
 2    I was going to approve a registrant that said
 3    I'm going to distribute hydrocodone products
 4    exclusive to Houston, that would kind of be a
 5    trigger to me to maybe do some deeper
 6    analysis about it.
 7         Q.    All right.  So I do want to get
 8    back to specifically what you claim
 9    manufacturers should be looking at to
10    determine whether an order is unusual.
11              You mentioned a few things.
12    I'm going to name them, and tell me if I've
13    missed anything, okay?
14              You mentioned the number of
15    customers, the ability to handle the volume
16    ordered, the composition of the customers,
17    the geographic location, and that's all I
18    have.
19              Were there any other factors
20    that you think manufacturers --
21         A.    I think there were some others.
22    I should have probably wrote them down.
23         Q.    As you sit here now, can you
24    think of any others?
25         A.    I could, but could I just get a
```

Highly Confidential - Subject to Further Confidentiality Review

1    clarification?  So I believed that our

2    discussion was about setting that initial

3    threshold just for size.

4         Q.    Okay.

5         A.    And I don't -- I believe we

6    were speaking about a new customer, so just

7    for clarification.

8         Q.    Okay.  What I'm looking for,

9    though, is a list of all the factors that you

10   claim in your opinion manufacturers should

11   consider when determining whether an order is

12   suspicious.

13        A.    Let me ask you a couple of

14   questions if I could.

15        Q.    I'd just like an answer to my

16   question, actually.

17        A.    Well, then I can't answer it

18   because I don't have enough foundation

19   information about the manufacturer, how long

20   they've been in business.  I mean, there's --

21   just to give a hypothetical answer for

22   that --

23        Q.    When you say how long they've

24   been in business, do you mean the

25   manufacturer doing the selling --

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Yes.

2     Q.    -- or the distributor doing the

3     buying?

4     A.    Whether they're new or they've

5     actually been engaged in the business for a

6     period of time.

7     Q.    Okay.  What if they've been

8     engaged in the business for decades, what

9     else would you want to know?

10     A.    Well, I'd want to know if they

11     had access to -- I think IQVIA information,

12     chargeback information.

13     Q.    Okay.  And --

14     A.    I --

15     Q.    When you say IQVIA information,

16     what do you mean by that?

17     A.    It's prescription

18     information --

19     Q.    Okay.

20     A.    -- that they can purchase.

21     Q.    Is there any regulation that

22     you're aware of that requires manufacturers

23     to consider IQVIA data or other prescribing

24     data?

25     A.    Well, I think the maintenance

Highly Confidential - Subject to Further Confidentiality Review

1    of effective controls under -- both in law

2    and the regulation I think could be

3    interpreted that -- now, I'm not going to say

4    under my opinion that it would force a

5    manufacturer to do that, but I think the

6    knowledge that that information exists and is

7    available should be a consideration for a

8    manufacturer.

9         Q.    So your opinion is that the

10   effective controls regulation does not

11   require manufacturers to use IQVIA or

12   prescribing information, correct?

13        A.    I would say no, and my answer

14   would be based on the fact, in my experience,

15   I couldn't take probably an administrative

16   action just based on that.

17        Q.    Okay.

18        A.    The only action I could take is

19   if they did have it and they didn't use it,

20   but just not to order it or purchase it, I

21   couldn't force a manufacturer to do that as a

22   diversion investigator.

23        Q.    Okay.  So in answer to my

24   question, when you say no, you mean no,

25   manufacturers aren't required to use IQVIA

1    data under the regulation?

2              MR. FULLER:  I'm sorry, to use

3         it or purchase it?

4              MR. O'CONNOR:  To use it.

5    A.    Yes, if they have it, under the

6    regulation, I believe they have to use it.

7    BY MR. O'CONNOR:

8    Q.    So just to be clear, your

9    position today is that a manufacturer is not

10   required to purchase IQVIA or prescribing

11   data, but if they have it, they must use it?

12   A.    I believe it provides them with

13   relevant transaction information, and if they

14   have it accessible, they should use it in

15   their compliance program.

16   Q.    Do you think the regulation

17   requires them to use it if they have it?

18   A.    I do.

19   Q.    Which regulation is that?

20   A.    Maintenance of effective

21   controls to prevent diversion.

22   Q.    Does the regulation say

23   anything about prescribing information or

24   IQVIA data?

25   A.    It does not.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And the DEA has never issued

 2    any guidance to manufacturers informing them

 3    that they were to use IQVIA or prescribing

 4    data, did it?

 5          A.     I don't speak for the DEA, but

 6    I'm not aware that they've given any

 7    guidance.

 8          Q.     Okay.  You mentioned chargeback

 9    data a moment ago.  What is chargeback data

10    in your understanding?

11          A.     A manufacturer completes a

12    transaction to a distributor or a customer,

13    and that customer is at a set price, and if

14    the customer would like to send back the

15    transaction data to the manufacturer, they

16    get a rebate from the original price of that

17    distribution or sale.

18               It's my understanding that

19    chargebacks have up to a 30-day period before

20    they can be submitted back for, and I don't

21    know that they -- it's like a cash basis.  I

22    think it might be like a credit basis that

23    goes into their account.  But it's a purchase

24    of the transaction information at a fee or a

25    discount for the sale of that drug.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And is it your opinion that

2  manufacturers are required by statute or

3  regulation to use chargeback data in

4  connection with their suspicious order

5  monitoring program?

6    A.    I believe by both the CSA,

7  maintenance of effective controls to prevent

8  diversion, and that same regulation in the

9  CFR.

10    Q.    And do either the statutory

11  provision or the CFR provision regarding

12  maintenance of effective controls say

13  anything about chargeback data?

14    A.    Not specifically, no.

15    Q.    And DEA has never issued any

16  guidance to manufacturers to the effect that

17  they were to use chargeback data in

18  connection with their suspicious order

19  monitoring program, has it?

20    A.    I believe they have.

21    Q.    And what guidance are you

22  referring to?

23    A.    I believe they've held

24  manufacturer briefings with manufacturers,

25  and they've informed them that if they have

Highly Confidential - Subject to Further Confidentiality Review

```
 1    chargeback information, they should use that.

 2        Q.     When were those briefings?

 3        A.     I believe I cite one in my

 4   report.  It will take me a few minutes,

 5   because I don't want to misstate which...

 6        Q.     Fair to say you don't recall

 7   any off the top of your head here today?

 8             MR. FULLER:  Object to form.

 9        Misstates his testimony.  He already

10        said he does recall one, it's cited in

11        his report.  Just give him a second.

12   BY MR. O'CONNOR:

13        Q.     Fair to say you don't recall

14   any details about any manufacturer briefing?

15        A.     Well, no, I recall there was

16   one.  I just don't know which distributor it

17   was -- I mean, I'm sorry, which manufacturer

18   it was.  I'll get it in a second.

19        Q.     Okay.

20             (Document review.)

21   BY MR. O'CONNOR:
```

Highly Confidential - Subject to Further Confidentiality Review



14      A.      Let me just look one more

15   place.

16              (Document review.)

17      A.      The company I referred to is

18   Actavis, and they received a distributor

19   briefing.  I have independent recollection

20   that it did occur, but I'm going to say no,

21   because I didn't cite it in my report.

22   BY MR. O'CONNOR:

23      Q.      Okay.  And do you have any

24   independent recollection of whether that

25   discussion included a statement by DEA that

1    manufacturers were supposed to use chargeback

2    data in connection with their suspicious

3    order monitoring programs?

4         A.    I don't recall if it did.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      What does that term mean?

2                  MR. FULLER:  Form.

3          A.      Well, manufacturers are in a

4     unique position at the top of the

5     distribution chain, that their products pass

6     through distributors down to pharmacies.

7                  So there's a couple concepts

8     within that know your customer's customer.

9     There's, of course, if you have the

10    information that you already have the ability

11    to know, things like chargebacks and IQVIA,

12    that's an example of information, know

13    your -- you know, you know your customer's

14    customer.

15                 Secondly, a manufacturer would

16    have the responsibility under the maintenance

17    of effective controls to do an analysis of

18    who their customers are, which would be the

19    distributors.

20                 So it would be incomplete to go

21    do an analysis on them when they don't have

22    an understanding of where their products

23    would ultimately go.

24    BY MR. O'CONNOR:

25         Q.      If a manufacturer wanted to

1    understand what this idea of know your

2    customer's customer meant, it couldn't look

3    in the regulations, could it, because it's

4    not there?

5                    MR. FULLER:  Form.

6         A.    I think it's encompassed in the

7    maintenance of effective controls.

8    BY MR. O'CONNOR:

9         Q.    But to be clear, the

10   maintenance of effective controls regulation

11   does not mention anything about knowing your

12   customer's customer, does it?

13        A.    It doesn't give any specific

14   guidance, but I think what it does is it puts

15   a manufacturer or any registrant on notice

16   that their continued use of a DEA

17   registration requires them to take steps to

18   prevent diversion, and I believe that getting

19   that information is one of those steps.

20                    But so just -- just so it --

21   but I guess if your question is does it

22   specifically say that term?  It does not.

23        Q.    And DEA never issued any

24   guidance to manufacturers informing them of

25   their supposed obligation to monitor -- or to

1    know their customer's customers, correct?

2              MR. FULLER:  Form.

3         A.    I know I've reviewed where it

4    was presented at some training, but I'm not

5    sure if that was by an industry or a

6    consultant.

7    BY MR. O'CONNOR:

8         Q.    DEA --

9         A.    So I'll say no.

10        Q.    DEA --

11        A.    I'm not aware of it.  At least

12   I'm not aware they've done it.  I'm not

13   saying they have not done it.

14        Q.    DEA never published guidance in

15   the Federal Register saying anything about

16   knowing your customer's customer, did it?

17        A.    They have not done that.

18        Q.    Okay.  And they never sent a

19   letter to all manufacturers, for example,

20   saying they were to know their customer's

21   customer, did they?

22        A.    I'd like to look at the 2007

23   letter.  I think it may say all relevant

24   transaction information, and I would consider

25   that relevant transaction information.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      But it doesn't say know your

2   customer's customer, does it?

3       A.      It does not specifically say

4   that term, no, sir.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

███ ██████████████████████████████████

███ ██████████████████████████████████

3        Q.     A memorandum of agreement is a

4   contract between a company and the DEA,

5   correct?

6                MR. FULLER:  Object to form.

7        A.     Yes.  It's -- well, it's

8   more -- it's a little more than a contract.

9   BY MR. O'CONNOR:

10       Q.     Okay.

11       A.     But essentially, two parties

12  sign it with some obligations.  So it's an

13  agreement --

14       Q.     It's an agreement.

15       A.     Yes.

16       Q.     It's an agreement between two

17  parties?

18       A.     Yes.

19       Q.     Okay.  And you would agree that

20  it's possible for a party to agree through a

21  memorandum of agreement to do more than

22  what's required strictly by the law, correct?

23       A.     But your question was the

24  legality of that agreement or agreeing to

25  something that -- so if they were to agree to

Highly Confidential - Subject to Further Confidentiality Review

1    something that wasn't legal, in my

2    interpretation, it would be illegal.  It

3    could always require something more, but it's

4    not -- I'm kind of caught up with the fact

5    that you said whether it was legal or not.

6         Q.    I didn't mean to suggest it was

7    illegal.

8         A.    Okay.  That's kind of what I

9    took so --

10        Q.    If that's your opinion, that

11   would be helpful to know.

12             My question was really whether

13   it's possible for a company in a memorandum

14   of agreement to agree to do more than the law

15   requires them to do.

16        A.    No, I don't agree with that.  I

17   don't think you could make somebody more --

18   do more than what's their legal requirement.

19   I think what they acknowledge -- excuse me --

20   is it was part of their responsibility as a

21   registrant, and it acknowledged that.  That's

22   my understanding of what they agreed to.

23        Q.    Well, if a memorandum of

24   agreement didn't obligate the party to do

25   anything more than the law already required

1    of them, there wouldn't be a need for the

2    memorandum of agreement, correct?

3              MR. FULLER:  Object to form.

4         And disagree.

5         A.    No, I don't agree with that.

6    BY MR. O'CONNOR:

7         Q.    So just to be clear, your

8    position is that everything that a party

9    voluntarily agrees to in a memorandum of

10   agreement is something they're also legally

11   required to do?

12             MR. FULLER:  Form.

13        A.    Yes.  I don't think there's

14   anything -- I think we're back to the

15   illegal/legal.  I don't think there's

16   anything there that's not legally required.

17             I don't -- I wouldn't -- I

18   don't understand the question then is that

19   you would write an MOA to somebody that would

20   not be legally required.  If your question is

21   would it be greater responsibilities or

22   greater duties, that would be yes, but they

23   still would be a legal requirement.

24   BY MR. O'CONNOR:

25        Q.    So the duties, though,

1    prescribed in the MOA can be greater than the

2    duties imposed by statute, fair?

3         A.    No, I don't agree with that.  I

4    think under maintenance of effective

5    controls, that's a broad regulation, and I

6    think all of these things fit under there.

7              I think I could -- I could hold

8    another manufacturer, if I was still a DEA

9    diversion investigator.  I think the

10   statements entered because it kind of affirms

11   that that is a -- to me, that they

12   acknowledge that that is their

13   responsibility, because I wouldn't expect

14   them to do it if they didn't think it was.

15        Q.    Just to be clear, are you

16   saying that every duty that's imposed on any

17   registrant through a memorandum of agreement

18   is by definition also required by the law?

19              MR. FULLER:  Form.

20        A.    Yes.

21   BY MR. O'CONNOR:

22        Q.    Are you aware of any DEA

23   guidance that's ever been issued that

24   supports the statement you just made?

25        A.    In regards to the -- whether

Highly Confidential - Subject to Further Confidentiality Review

1    the MOAs are all legal requirements?  No,

2    sir.

3         Q.    Okay.  In connection with your

4    opinion, you examined the suspicious order

5    monitoring programs of seven manufacturers,

6    correct?

7         A.    Yes, sir.

8         Q.    And each of those programs or

9    systems was different from one another,

10   correct?

11        A.    Yes, sir.

12        Q.    And you believe they all fell

13   short of the regulatory responsibilities

14   imposed by the CSA and CFR, correct?

15        A.    Yes, sir.  Just to add the

16   caveat that some of them didn't have systems,

17   but, yes, sir.

18        Q.    Fair to say of the seven you

19   saw, you weren't satisfied with any of them?

20        A.    That's correct.

21        Q.    Have you ever come across a

22   manufacturer's suspicious order monitoring

23   program that you did think satisfied

24   regulatory requirements?

25             MR. FULLER:  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      I can think of one.

2   BY MR. O'CONNOR:

3           Q.      What was that?

4           A.      I'm not sure I can discuss that

5   with the Touhy letter.

6                   MR. FULLER:  Not if it was

7           based on an investigation that you did

8           while an agent.

9                   MR. O'CONNOR:  Sorry, are you

10          not answering that question?

11                  THE WITNESS:  That's what I

12          stated, sir.

13                  MR. O'CONNOR:  Okay.

14                  THE WITNESS:  Because it's not

15          publicly readily available that

16          someone would know that.

17  BY MR. O'CONNOR:

18          Q.      While we're talking about

19  Touhy, you have said and your counsel has

20  stated on a number of occasions yesterday and

21  today that you're not permitted to speak

22  about any particular investigation you were

23  involved in while at the DEA; is that fair?

24          A.      That's not publicly or readily

25  available.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And with respect to

2  Mallinckrodt in particular, given those

3  restrictions, is it fair to say that all of

4  the opinions you express in your report are

5  based on materials that you reviewed in

6  connection with this litigation?

7    A.    Yes, sir.

8    Q.    And your opinions are not based

9  on any other information outside of what

10  you've relayed and referred to in your

11  report?

12    A.    Well, it's difficult to --

13  since I worked the case for a period of

14  years, obviously, that there may be things I

15  know that aren't part of the discovery, but

16  the opinion I wrote is only based on the

17  information contained in my report.

18    Q.    Okay.  And do you intend at

19  trial to offer any information or opinions

20  that are based on something other than what

21  you've cited here in this report?

22        MR. FULLER:  Object to form,

23      based on the same basis earlier.

24    A.    If the Touhy letter is in place

25  and it's restricted by the government, then I

1    would not offer anything outside of what's

2    contained in my report or currently contained

3    in the discovery material.

4    BY MR. O'CONNOR:

5         Q.    In your report, do you express

6    any opinion as to the adequacy of

7    Mallinckrodt's present day suspicious order

8    monitoring program?

9         A.    I do not believe I do.

10        Q.    Okay.  And just so we're clear

11   about the period of time your opinions do

12   relate to, do you have any opinion with

13   respect to Mallinckrodt's suspicious order

14   monitoring program in 2018?

15        A.    I do not.

16        Q.    2017?

17        A.    I don't think my report

18   references any time period after 2011.

19        Q.    Okay.  So fair to say in this

20   litigation, you're not providing any opinion

21   with respect to Mallinckrodt's suspicious

22   order monitoring program after 2011?

23             MR. FULLER:  Form.

24        A.    At the current time based --

25   I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. FULLER:  Form.  I just

2     objected to the form.

3           Go ahead.

4     A.     Based on the report as it

5  stands right here without being amended, it

6  doesn't address any time periods that I can

7  find past 2011, so that would be an accurate

8  statement as of today.

9  BY MR. O'CONNOR:

10    Q.     Do you plan to amend your

11 report to add opinions related to

12 Mallinckrodt's program after 2011?

13    A.     If requested by counsel, I

14 will.

15    Q.     Okay.  As you sit here today,

16 do you have any opinions with respect to

17 Mallinckrodt's suspicious order monitoring

18 program after 2011?

19    A.     No, I do not.

20    Q.     Okay.  And as you sit here

21 today, do you have any opinions with respect

22 to Mallinckrodt's DEA regulatory compliance

23 outside of suspicious order monitoring after

24 2011?

25    A.     It doesn't appear in my report,

Highly Confidential - Subject to Further Confidentiality Review

1    so I wouldn't comment on it.

2          Q.    Okay.  So you have no opinion

3    on that subject?

4          A.    No, I think the Touhy would --

5    if I had an opinion or had knowledge and it's

6    not cited here or it's not a public

7    knowledge, I wouldn't make comment on it.

8          Q.    Mr. Rafalski, would you agree

9    that it's possible to have a suspicious order

10   monitoring program in place without a formal

11   written policy?

12         A.    In a hypothetical sense?

13         Q.    Uh-huh.

14         A.    Depending on the scope of

15   business, the size of the business and the

16   intended customers, I believe it could be

17   done manual -- manually, but that's

18   hypothetically based on those factors and

19   probably others.

20         Q.    Okay.  So just because a

21   company doesn't have a formal written policy

22   does not mean it didn't have a suspicious

23   order monitoring program, fair?

24         A.    Hypothetically, that could

25   occur, yes, sir.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    Q.      Yesterday you made reference to

14  a diversion program manager.  A diversion

15  program manager is in a supervisory capacity

16  within a field office, correct?

17    A.      Typically they're in an upper

18  management office in a divisional office.

19    Q.      In a divisional office.  Okay.

20          Where do they fall on the

21  hierarchy relative to a diversion

22  investigator, for example?

23    A.      If we're looking at a rank in

24  organization, generally speaking, it's two

25  times above.  So there would be an

1  intermediary, generally a group supervisor,

2  in between a diversion investigator and a

3  diversion program manager.

4      Q.    So you'd have a group

5  supervisor and then above that group

6  supervisor, a diversion program manager?

7      A.    Typically, yes.  Not always.

8      Q.    Okay.

9      A.    There may be an office where

10  there isn't a group supervisor, but

11  typically, yes.

12      Q.    Okay.  And are diversion

13  program managers generally familiar with

14  registrants' regulatory obligations?

15      A.    In a general sense, they were

16  originally diversion investigators so I would

17  hope so.  But I always hate to make

18  assumptions on someone else's knowledge.

19      Q.    Are you familiar with a

20  gentleman named Scott Collier?

21      A.    I am.

22      Q.    What is your opinion of

23  Mr. Collier?

24      A.    I've really never reviewed Mr.

25  Collier's work or worked with him or for him,

Highly Confidential - Subject to Further Confidentiality Review

1    so other than to know he's a diversion

2    program manager in St. Louis, I really don't

3    formulate an opinion about him.

4         Q.    Do you have any reason to doubt

5    his competency?

6         A.    No.  As I said, I've never been

7    in a position to make any judgments about

8    him, either good or bad.

Highly Confidential - Subject to Further Confidentiality Review

███

██  █████

███

████

███

6      Q.      So a company could have the

7   best suspicious order monitoring program out

8   there, and in your opinion, that still might

9   not be adequate?

10      A.      No, I'm not saying that.  What

11   I'm saying is they could have the worst

12   suspicious order system out there and because

13   someone in the field tells them it's the best

14   doesn't mean it's the best.

15      Q.      In general, do you think it's

16   fair for a registrant to rely on what DEA

17   personnel in the field say to it?

18      A.      So I want to give some

19   qualifications to my answer.  I think there's

20   certain topics that a registrant would be

21   comfortable with discussing with a diversion

22   investigator and asking for guidance.

23           I think there's other topics,

24   especially with manufacturers and

25   distributors, that they should -- they should

Highly Confidential - Subject to Further Confidentiality Review

1    or they do have knowledge that on high-level

2    policy issues, that they would write or

3    correspond with DEA headquarters, because my

4    experience would indicate that most of them

5    have in the past -- excuse me, lunch -- that

6    most of them have in the past on a serious

7    policy issue, have sent it in writing and

8    requested an answer in writing.

9         Q.    Would you agree if a

10   manufacturer requested advice in writing,

11   that it was -- it was entitled to rely on

12   that answer?

13        A.    If it was issued by the policy

14   section?

15        Q.    Uh-huh.

16        A.    I think they should have some

17   confidence in that, but as I've seen in

18   investigating this case, even some things

19   that come out of policy possibly are in

20   conflict with what I was training and what I

21   believe is the responsible actions of a

22   diversion investigator.  So generally

23   speaking, yes.

24        Q.    And shouldn't a registrant also

25   be entitled to rely on what they're being

1    told by DEA personnel in the field?

2        A.    Again, I'll restate it.  It

3    depends on the topic.

4        Q.    So sometimes a registrant can

5    rely on what DEA is telling them and

6    sometimes they can't?

7        A.    Depending on the subject

8    matter.  For example, the correct way to

9    initial a 222 form when it's arrived.

10   There's some regulatory questions that are

11   clearly spelled out in the CFR, where I could

12   open a manual and I could tell you the

13   content of a required record for a

14   distribution for a C-III, what information

15   has to be there.  If the registrant would ask

16   a question, and I could open a CFR and I

17   could answer that.

18           But to ask a question just

19   about a suspicious order system, if any

20   registrant were to ask me a question whether

21   theirs was sufficient, I wouldn't answer that

22   question.  I'd direct them to headquarters.

23       Q.    And as you sit here today, is

24   there any sort of guidance document a

25   registrant can refer to so it knows when it's

1    appropriate to rely on a DEA personnel's

2    statements and when they shouldn't?

3        A.    No, sir.  I would hope that

4    they would -- what they should rely on is a

5    diversion investigator having knowledge of

6    what things they can provide guidance on,

7    but, no, there's no publication that tells

8    them that.

9        Q.    So it's up to the registrant to

10   figure out when they can listen to the

11   diversion investigator's advice and when they

12   shouldn't?

13       A.    Well, I make that statement

14   because in my years working for diversion,

15   I've told many registrants to write

16   headquarters, and I've done cases where I've

17   reviewed letters that have been sent to DEA

18   headquarters by registrants, especially

19   distributors and manufacturers.

20              And it's my belief that they

21   may get guidance from their HDMA or HDA or

22   HD -- it changed names so much.

23              So I think it's -- there's

24   nothing in writing.  There's no guidance.

25   But I think it's a well-known fact in the

Highly Confidential - Subject to Further Confidentiality Review

1    distributor and manufacturer community that

2    they can seek written guidance at any time

3    from the DEA policy section, and that's based

4    on my experience.

5         Q.    Okay.  But in response to my

6    question, there's nothing that tells a

7    registrant when they can rely on the word of

8    a DEA diversion investigator and when they

9    cannot, correct?

10        A.    No, there is not.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

10      A.      Can I take a minute to look at

11  something?

12      Q.      Very briefly.  Or should we

13  take a break?  We've been going about an

14  hour.

15              MR. FULLER:  Yeah, we can take

16          a break.  He'll check when he comes

17          back.

18              MR. O'CONNOR:  I'll withdraw

19          the question, but we'll come back.

20              THE WITNESS:  If you want to

21          withdraw, we can keep going, but I

22          just -- there's some work that's done

23          by Dr. McCann and I would like a

24          chance to look through it, but it's

25          some charting that might take a little

1          bit.

2                    MR. O'CONNOR:  All right.

3          We'll drop it for now and we'll decide

4          whether to come back to it.  We have

5          been going about an hour, though.

6          Should we take a break?

7                    MR. FULLER:  Sure, quick one.

8                    MR. O'CONNOR:  Quick one.

9                    THE VIDEOGRAPHER:  Going off

10         the record, 1:57 p.m.

11                   (Recess taken, 1:57 p.m. to

12         2:08 p.m.)

13                   THE VIDEOGRAPHER:  We're back

14         on the record at 2:08 p.m.

15    BY MR. O'CONNOR:

16         Q.    Mr. Rafalski, I'd like to

17    direct your attention to page 166 of your

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

█  ████████████████████████████████

█  ████████████████████████████

3          Q.       How much oxycodone would a

4    pharmacy have to purchase for you to conclude

5    that it's diverting oxycodone?

6          A.       I'd have to see their customer

7    file and what their scope of business, who

8    they're supplying to be able to make that

9    determination.  There's not just a --

10         Q.       And that's because you cannot

11   determine whether diversion is occurring

12   simply by looking at the volume, correct?

13         A.       That's not correct.  So if we

14   look at a pharmacy with a population of 1,000

15   people and there's a million pills go

16   there -- and that's an extreme case, but I

17   think I could clearly say there's something

18   occurring, diversion's occurring there.

19               If it's an amount that's not

20   consumable by that geographic area, I would

21   say it's very likely that there's diversion

22   occurring.

23         Q.       Outside of this extreme case

24   that you mention where there's a population

25   of 1,000 getting a million pills, fair to say

Highly Confidential - Subject to Further Confidentiality Review

1   that a manufacturer can't tell if the

2   diversion is occurring simply by looking at

3   the volume of a purchase?

4       A.     Are you saying that if they saw

5   that situation, they would say that diversion

6   is occurring and then outside of that

7   situation?  I think generally speaking, just

8   looking at volume of a pharmacy, I think they

9   would have sufficient data.

10              So let's say, for example,

11  Mallinckrodt, they distribute to many

12  distributors who then distribute to many

13  pharmacies, so I think they have established

14  a pretty good baseline of what a usual order

15  is.  So I think they would identify some

16  pharmacies by volume that would rise to a

17  level of suspicion.

18              I would agree -- generally

19  agree that in most cases the amount of the

20  drug alone wouldn't immediately make them

21  suspicious -- say that that is a suspicious

22  order, but I think there is a point or a

23  volume where it's very likely that is going

24  to occur.  Florida would be an example of

25  that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    With respect to your review of
2   manufacturers' suspicious order monitoring
3   programs, what methodology did you apply in
4   coming to your opinions?
5    A.    The one that was identified or
6   the lack of one that was identified by each
7   manufacturer.
8    Q.    But what methodology did you
9   apply when assessing the suspicious order
10  monitoring programs?
11   A.    Well, I would apply my
12  training, experience, knowledge in doing
13  these kinds of cases, in regards to what I --
14  was provided to me to make judgment and form
15  an opinion.
16   Q.    And when you say "provided to,"
17  you mean by plaintiffs' counsel?
18   A.    No, by -- in discovery.
19   Q.    And you received that
20  discovery -- those discovery materials
21  through plaintiffs' counsel, correct?
22   A.    Yes, but at my direction of
23  what documents I wanted to see.  I know we'll
24  get back to the --
25   Q.    So you --

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      -- the, you know, whether
 2    everything was provided to me, but my opinion
 3    is based on -- which I believe is everything
 4    that was available and the topics I
 5    requested.
 6            Q.      Okay.  So your opinion is based
 7    solely on your review of the documents that
 8    you received and that -- and your experience;
 9    is that fair?
10            A.      Experience and training, yes,
11    sir.
12            Q.      Okay.
13            A.      And legal guidance.
14            Q.      From plaintiffs' counsel?
15            A.      No, from my employment with the
16    DEA.
17            Q.      So your own legal opinions?
18            A.      No, receiving legal guidance
19    from lawyers.
20            Q.      Okay.  At DEA?
21            A.      Yes, sir.
22            Q.      Okay.  Are you familiar with
23    Scott Higham?
24            A.      The Washington Post reporter?
25            Q.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes, sir.

2          Q.      Have you ever had a

3     conversation with Scott Higham?

4          A.      Yes, sir.

5          Q.      How many times?

6          A.      I don't know, four or five.

7          Q.      What was the substance of those

8     communications?

9          A.      Initial were he was writing an

10    article about the DEA and the new -- I think

11    it was a regulation or change in the law --

12    change in regulation or law which was in

13    regards to when a registrant sees some

14    adverse or administrative action, they get to

15    do a correction plan.  And I think he wanted

16    me to make some comments on that, so I

17    provided some comments I believe that he

18    published in an article.

19         Q.      Did you ever discuss

20    Mallinckrodt with Scott Higham?

21         A.      I believe I probably did,

22    postsettlement.

23         Q.      When was your first

24    conversation with Mr. Higham?

25         A.      I don't recall.

1    Q.    Were you still at DEA?

2    A.    No, sir.

3    Q.    After you left DEA?

4    A.    Yes, sir.

5    Q.    Did you ever provide Mr. Higham

6    or anyone else at The Washington Post with

7    any documents?

8    A.    No, sir.  Not that I recall,

9    no, sir.

10   Q.    Aside from any discussions you

11   had with Mr. Higham, did you have any

12   conversations with Mr. Lenny Bernstein?

13   A.    The first time I met Mr. Higham

14   he was present, but these weren't really

15   discussions about any relevant -- it was a

16   beer at a rooftop of a hotel or restaurant.

17   He was introduced to me, but that would be my

18   extent of my conversations with him.

19   Q.    Aside from Mallinckrodt, did

20   you ever discuss any other defendant in this

21   case with Mr. Higham or Mr. Bernstein?

22   A.    No, I don't believe I did.

23   Q.    Have you ever had any

24   discussions with individuals associated with

25   60 Minutes?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Yes, sir.

 2            Q.      How many discussions did you

 3     have with folks at 60 Minutes?

 4            A.      Probably more than ten.

 5            Q.      Okay.

 6            A.      I don't know exactly, but --

 7            Q.      Did any of those discussions

 8     relate to Mallinckrodt?

 9            A.      Yes, sir.

10            Q.      And what was the substance of

11     those conversations?

12            A.      The case against Mallinckrodt,

13     the information that -- in regards to the

14     actions of Mallinckrodt.

15            Q.      Did you receive Touhy

16     authorization before disclosing any of

17     those --

18            A.      No, sir.

19            Q.      -- that information?

20                    Did you clear any of the

21     discussions with the Department of Justice in

22     any form before talking to 60 Minutes?

23            A.      No, sir.

24            Q.      What information did you share

25     with respect to Mallinckrodt?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.       I believe it was information

2    that would be readily available, the -- I

3    think the memorandum of agreement might have

4    been online at that time, some general

5    description of the distributions and the

6    pharmacies.

7                 60 Minutes already had some

8    information.  There were some leaked

9    documents by somebody, so they asked me

10   questions about that information, but...

11       Q.       Did you provide any documents

12   to 60 Minutes?

13       A.       You know, I took a -- I created

14   a couple of charts and a graph and -- I

15   don't -- I believe that I might have gave

16   those to them, but I'm not positive.

17       Q.       Okay.

18       A.       One of the charts -- you want

19   me to explain?

20       Q.       Yes, please.

21       A.       So there was a chart that

22   involved distributions to doctors in all the

23   states of the United States.  There was a

24   chart on the number of pharmacies and

25   distribution to the pharmacies in the United

1   States, and I think there was one graph of

2   the distribution of Mallinckrodt product

3   from -- to the United States and to the state

4   of Florida.

5                MR. O'CONNOR:  Counsel, I'm

6          just going to say on the record, we're

7          going to want copies of those

8          documents.

9   BY MR. O'CONNOR:

10         Q.    Do you still have them in your

11  possession?

12         A.    I think I do.  I don't have

13  them today, but I believe --

14         Q.    Okay.

15         A.    -- that I have them at home,

16  but I'm not positive.

17         Q.    Did you receive any

18  compensation in connection with your

19  discussions with either 60 Minutes or The

20  Washington Post?

21         A.    No, sir.

22         Q.    Did you discuss any other

23  defendants besides Mallinckrodt with

24  60 Minutes?

25         A.    I don't believe so, no, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     You mentioned that 60 Minutes
2   had access to certain documents related to
3   Mallinckrodt; is that correct?
4          A.     I believe both 60 Minutes and
5   The Washington Post, I think they wrote an
6   article about the document.
7          Q.     Okay.  Do you know how they
8   obtained those documents?
9          A.     No, but I wish I did.
10         Q.     Why do you say that?
11         A.     Well, it was a sensitive
12  document during the time I was conducting an
13  investigation, and that would be the main
14  reason.  And second reason would be I think
15  it was not totally accurately described.
16         Q.     What was in the -- what was
17  disclosed publicly in the media was not an
18  accurate reflection of what was in the
19  document?
20         A.     No, it was an internal
21  document, and so it was one of the documents
22  that I had privy to, so obviously it's
23  concerning.  I didn't release it, but it
24  wasn't -- well, I guess when you have a
25  document and others have a document, there's
```

1    no way to know who has access to it, but just

2    the mere fact that somebody would give a

3    document out during -- while an ongoing case.

4         Q.    Because that would be

5    prohibited by Department of Justice rules?

6         A.    Sure.  Yes, sir.

7         Q.    And just getting back to my

8    earlier question, is your testimony today

9    that what was reported in the media with

10   respect to those documents did not accurately

11   reflect some of the content?

12        A.    Well, I think they made some

13   opinions about the -- what was going on with

14   the case or whether people were happy or

15   unhappy.  I don't know that they were

16   specifically directed at me, but just

17   generalized statements that I don't think

18   were accurate.

19        Q.    Okay.  So --

20        A.    And I thought it may

21   influence -- the case was -- I wouldn't

22   say -- there was ongoing discussions in that

23   case, and I had concern that it would affect

24   that.

25        Q.    You were concerned that the

Highly Confidential - Subject to Further Confidentiality Review

 1    statements in the media may influence the

 2    case?

 3           A.    Not so much the case, because

 4    the facts of the case were the facts.  That

 5    it might influence the relationship between

 6    the people that were discussing the case.

 7                 MR. O'CONNOR:  So I'm going to

 8           make the same speech my colleagues

 9           have.  There are many more questions

10           I'd like to ask and we have not had

11           enough time to do it, so I'm going to

12           reserve my right to resume this

13           questioning and ask additional

14           questions, but out of respect for my

15           codefendants here, I'm going to pass

16           the mic so we can go off the record.

17                 THE VIDEOGRAPHER:  Off the

18           record at 2:28 p.m.

19                 (Recess taken, 2:28 p.m. to

20           2:30 p.m.)

21                 THE VIDEOGRAPHER:  We're back

22           on the record at 2:30 p.m.

23                       EXAMINATION

24    BY MS. LUCAS:

25           Q.    Good afternoon, Mr. Rafalski.

Highly Confidential - Subject to Further Confidentiality Review

1    I'm Amy Lucas.  I represent Johnson & Johnson

2    and Janssen.

3            A.      Good afternoon.

4            Q.      Good afternoon.

5                    I have a very short amount of

6    time to ask you questions.

7            A.      Okay.

8            Q.      So I'm going to do my best to

9    ask you a lot of yes-or-no questions, so I'm

10   going to ask that you give me a yes-or-no

11   answer so that we can get this over with as

12   quickly as possible.  Can you do that?

13           A.      Well, if it's possible to

14   answer a yes or no.

15           Q.      Sure.

16                   And I also ask if you don't

17   understand something that I've asked, ask me

18   to clarify it --

19           A.      Okay.

20           Q.      -- and I'll clarify it.  If you

21   answer it though, I will assume that you

22   understood.

23           A.      I understand.

24           Q.      Great.

25                   It says in your report that you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reviewed documents identified in Schedule I,

 2    correct?  It's on page 7.  To be specific, "I

 3    have also reviewed documents identified in

 4    the attachment Schedule I."

 5         A.    Which paragraph are you

 6    speaking on page 7?

 7         Q.    Yes, on page 7 at the bottom,

 8    very last sentence.

 9         A.    Yes.

10         Q.    Okay.  You said earlier that

11    other than your training and experience, the

12    documents and testimony cited in the

13    footnotes in your report provide the specific

14    support for those opinions, correct?

15              MR. FULLER:  Object to form,

16         same basis as earlier.

17         A.    Yes, I would agree with that

18    statement.

19    BY MS. LUCAS:

20         Q.    How long did you spend

21    reviewing the Janssen evidence cited in

22    Schedule I?

23         A.    I don't recall.

24         Q.    Did you see -- did you ask to

25    see any documents other than what's in the
```

1    report or Schedule I for Janssen?

2         A.    I have a recollection I may

3    have looked in some of the discovery material

4    for other documents, but specifically, I

5    don't recall which documents.

6         Q.    What types of documents from

7    Janssen did you believe you needed to see in

8    order to form your opinions in this case?

9         A.    Communications among employees,

10   I believe I looked for, or -- and I think I

11   looked for, just my recollection, maybe due

12   diligence materials.

13        Q.    Did you find any communications

14   among employees or due diligence materials?

15        A.    Not that caused me to place

16   those in my report.

17        Q.    But you did find some?

18        A.    I don't recall.  General

19   recollection, I believe I saw some

20   communications, but I'm not positive.

21        Q.    Did you believe that you didn't

22   need to include those in the report?

23        A.    Well, I don't -- just my

24   recollection, I don't -- I don't believe that

25   they would have had any impact, positive or

Highly Confidential - Subject to Further Confidentiality Review

1    negatively, on the matter I was tasked to

2    make comment on.

3         Q.    For Janssen, what was the

4    matter you were asked to make comment on?

5         A.    Whether or not they had a

6    sufficient -- a sufficient suspicious order

7    system and whether they had an effective

8    maintenance of -- effective maintenance of

9    controls in place.

10        Q.    And you believed that it was

11   not necessary to consider Janssen's due

12   diligence materials in coming to a conclusion

13   for that?

14        A.    Oh, I don't think I said that.

15        Q.    You said:  I don't believe that

16   they would have had any impact, positive or

17   negatively, on the matter I was tasked to

18   make comment on.

19        A.    Only on those documents which I

20   found or reviewed.

21        Q.    I see.

22              Were there additional documents

23   you would have found useful?

24        A.    I don't know if they exist or

25   not.  During my search, I did not find them.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you ask anybody to help you

2    locate them?

3    A.    I didn't make that specific

4    request, but part of my communication of the

5    documents I needed to make my opinion were

6    those documents.  I was hoping they were all

7    there, but I also made -- I recall making a

8    search on my own looking for documents.

9    Q.    So it's correct that you did

10   not make a specific request for Janssen due

11   diligence materials; is that right?

12   MR. FULLER:  Object to form.

13   A.    That's not an accurate

14   statement.  I made a request for specific

15   types of documents to formulate my opinion

16   that would be relative to all the

17   manufacturers.  So just so I understand your

18   question, it wasn't specific to Janssen.  It

19   was these would be the documents I would not

20   want to see, and so I -- my expectation was

21   it would apply to all the manufacturers.

22   BY MS. LUCAS:

23   Q.    Did you say I would not want to

24   see or I want to see?

25   A.    No, I want to see.  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

 1    I misstated if I said that.

 2         Q.    What types of documents did you

 3    tell counsel that you would want to see,

 4    other than communication among employees and

 5    due diligence materials?

 6         A.    Any due diligence materials,

 7    any policies related to suspicious order

 8    systems, any communications -- well, I think

 9    you said that, not those -- communications

10    related to those topics, any studies

11    conducted by outside consultants or

12    consultant agencies, any information that

13    would confirm the existence of chargeback

14    data, IQVIE data -- IQVIA data, I'm sorry.

15              I don't know if that's the

16    complete list, but that's a general idea of

17    the type of documents I would request.  And

18    also I asked for some guidance too in the

19    depositions that would be more indicative of

20    that information.

21         Q.    You asked to be guided towards

22    the depo testimony that would bear on those

23    issues; is that right?

24         A.    Yes.  And in some cases even

25    the specific areas to start with.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Did anybody else write any

2    portion of the Janssen opinion in your

3    report?

4          A.      This is my report.  As I've

5    stated earlier, they might provide me with

6    a -- not an analysis, but a description of

7    some of the material, so I would take the

8    information, check the section of the

9    deposition or the footnote material or the

10   reference they provided me.

11                 I may redraft it, edit it,

12   change it.

13         Q.      Let me ask that again.

14                 Yes or no, did anybody write

15   any portion of the Janssen opinion in your

16   report?

17         A.      No, this is my report.  I wrote

18   it.

19         Q.      Did they write any first draft

20   of the opinion about Janssen in your report,

21   yes or no?

22         A.      Draft, no.  Might they have

23   provided me with some descriptions of some

24   sections, but I wouldn't consider that a

25   draft of my report, no.
```

1      Q.     A description of a section is
2  not a draft?
3      A.     Well, I guess you need to
4  provide me with what your description of --
5  or a definition of what a draft is.  If they
6  provided me a sentence and told me here's the
7  reference document, and the sentence
8  accurately described it, I may change it, I
9  may not change it.  I may edit it.  But --
10  and there's a possibility I may use it.
11      Q.     So you cannot say that you
12  wrote 100% of this report about Janssen
13  without any input from plaintiffs' counsel,
14  correct?
15      A.     That's correct.
16      Q.     Did you personally review all
17  of the Janssen materials cited in your report
18  footnotes, yes or no?
19      A.     Yes, I believe I did.
20      Q.     Okay.  I'd like to put your
21  report aside for a moment because at trial
22  that's not coming in, and I want you to
23  summarize for me your opinions about Janssen.
24          MR. FULLER:  You can use your
25          report.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MS. LUCAS:

2         Q.     Well, first I want to ask, can

3    you do it without referencing your report?

4         A.     No, because of the content and

5    all the different distributors and

6    manufacturers, they all start to blend

7    together, so to just give you a generalized

8    statement and opinion, I'd be reluctant to do

9    that because -- and plus, the fact that I've

10   went over them for the last 12 hours, I

11   couldn't accurately just do that off the top

12   of my head.

13              MR. FULLER:  For the record,

14         the report is 187 pages and cites

15         thousands of documents.  The witness

16         is not going to put aside his report.

17   BY MS. LUCAS:

18         Q.     But the Janssen part is only

19   four pages.  So if you can turn to the

20   Janssen part, since we need to refresh your

21   recollection.  I don't need you to review the

22   entire thing, unless you'd like to go off the

23   record, in which case I'm happy to.

24              MR. FULLER:  We'll do it on the

25         record.
```

```
 1    BY MS. LUCAS:

 2         Q.    But if you'd like to take a

 3    look at that and if that refreshes your

 4    recollection about what your opinions are

 5    about Janssen, I'll wait.

 6         A.    I just read it into the record?

 7    It's written at the conclusion --

 8         Q.    Oh, no, no need, because I want

 9    to know what you're going to say at trial.

10         A.    General statement, I'm going to

11    say that they had insufficient suspicious

12    order system, that it didn't look at all of

13    the factors required as stated in the

14    regulation.  It only looked at size, unusual

15    size; did not look at frequency and pattern.

16         Q.    Okay.  So you have references

17    in your report to the realtime portion of the

18    suspicious order monitoring system.  Is your

19    report an evaluation of Janssen's entire SOMS

20    program or the realtime portion?

21         A.    Could you explain what you mean

22    by realtime?

23         Q.    Well, I was going to ask you

24    that.  So if you turn to page 160,

25    paragraph 8 -- or here, paragraph 4 at the
```

Highly Confidential - Subject to Further Confidentiality Review

1   top.  Janssen only monitored for orders of

2   unusual size and failed to ever monitor for

3   frequency and/or pattern in realtime.

4            And then other parts of your

5   report consistently reference realtime, and

6   what I wanted to know is what you mean when

7   you say realtime suspicious order monitoring

8   system.

9        A.    Realtime would measure orders

10  that were in realtime, that were occurring

11  and were in -- being ordered and then being

12  prepared for shipment.  Those are realtime

13  orders.

14            An example of a nonrealtime

15  order would be potentially some chargeback

16  data that would be received after the

17  distribution.  IQVIA would be after -- not a

18  realtime, but it would be post-distribution.

19       Q.    Does the due diligence -- well,

20  strike that.

21            You understand that Janssen's

22  system had an algorithm, correct?

23       A.    Yes.

24       Q.    And the algorithm flagged

25  potentially suspicious orders based on the

Highly Confidential - Subject to Further Confidentiality Review

```
1    formula, correct?

2         A.    Yes, sir -- yes, ma'am.  Sorry.

3         Q.    That's okay.

4               After the flagged -- the order

5    was flagged, you understand that there was a

6    due diligence process that took place,

7    correct?

8         A.    My recollection is there was

9    some due diligence, but it was insufficient.

10        Q.    What is that recollection based

11   on?

12        A.    My recollection of reviewing

13   documents and reviewing specifically

14   Ms. Dempsey's deposition.

15        Q.    Did you review the entirety of

16   Ms. Dempsey's deposition?  Strike that, I'm

17   sorry.

18               Ms. Dempsey is whom, to your

19   understanding?  I'm not asking for an exact

20   title or role.

21        A.    I think she's a director of

22   compliance, but I think she may have held

23   another title.  My recollection, she might

24   have had during her employment, it was more

25   than just that title.  She may have another
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    title or a different position.

 2         Q.    You understand that she

 3    provided testimony regarding Janssen's

 4    suspicious order monitoring system, correct?

 5         A.    Yes, ma'am.

 6         Q.    Now, did you review all of

 7    Ms. Dempsey's deposition transcript?

 8         A.    Yes, I did.

 9         Q.    Both volumes?

10         A.    Yes.

11         Q.    Did you review all of the

12    exhibits?

13         A.    Yes.

14         Q.    Personally?

15         A.    Yes.

16         Q.    And why then are not all of

17    those exhibits in your Schedule I?

18              MR. FULLER:  Object to form.

19         That misstates his schedule.  He cites

20         her deposition as well as the

21         exhibits, so it's cited.  We did not

22         go through and list them individually.

23              MS. LUCAS:  Just -- I'll wait

24         for him to answer.  You can answer.

25         A.    I reviewed them, and they were
```

Highly Confidential - Subject to Further Confidentiality Review

1    used to formulate my opinion, but I just

2    didn't list each one individually in the

3    report.

4    BY MS. LUCAS:

5         Q.    So when you say realtime

6    suspicious order monitoring system, you're

7    talking about Janssen's algorithm and the due

8    diligence process; is that correct?

9         A.    Well, the due diligence -- no.

10   So the due diligence doesn't necessarily mean

11   in realtime, so there's due diligence that

12   would be conducted as part of your

13   maintenance of effective controls.

14        Q.    Let me back up then.

15             When you say realtime

16   suspicious order monitoring system, you're

17   talking about the algorithm and then the due

18   diligence that occurs prior to shipment of an

19   order that had been flagged?

20        A.    Yes, ma'am.

21        Q.    Got it.

22             Now, a suspicious order

23   monitoring system can also include

24   post-shipping diligence that you were just

25   referencing, right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.       Say that again one more time.

2          Q.       A suspicious order monitoring

3      system can also include post-shipping due

4      diligence that you were just referencing?

5          A.       It could, yes.

6          Q.       Did you consider any

7      post-shipping due diligence that Janssen did?

8          A.       I don't have a recollection if

9      I did or not.

10         Q.       And I have a quick question

11     before we move on.

12                  You said that chargeback data

13     and IQVIA data are not realtime, correct?

14         A.       My experience in conducting

15     investigations, I would make the statement

16     that it's -- because it's a secondary

17     distribution and the dispensing is a

18     secondary action.  It would only be direct

19     information if it was a direct distribution

20     to a pharmacy, but then it wouldn't be

21     chargeback.  It would be an order.

22                  So, yes, that's the reason it's

23     realtime.

24         Q.       Wait.  You just -- now it's

25     realtime?

1      A.      No, it -- it would not be

2   realtime.

3      Q.      Okay.

4      A.      The transaction -- there would

5   be no chargeback if they distributed directly

6   to a pharmacy.

7      Q.      And yes or no, do you believe

8   that IQVIA data and chargeback data can

9   nevertheless be incorporated into a realtime

10  suspicious order monitoring system?

11     A.      Yes, I believe it could.  I

12  think it could -- it could provide -- even

13  though it's post-data, I think historically

14  it could provide some averages and levels and

15  conduct that could be used in a suspicious

16  order monitoring system.

17     Q.      You said that Janssen only

18  monitored for orders of unusual size and

19  failed to ever monitor for frequency and/or

20  pattern in realtime.

21             Can you very succinctly explain

22  what you mean by "pattern"?

23     A.      Well, there's many different

24  aspects to the pattern.  Regulations says

25  substantially deviating.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So succinctly, how drugs are

 2      ordered, so how would be the -- how they're

 3      grouped.  So say, for example, a customer is

 4      ordering drugs in -- they generally in my

 5      experience order drugs in just certain

 6      patterns, certain groups, ten to an order

 7      form, variety of types.  One pattern could be

 8      all of a sudden one particular drug is

 9      showing up on one order form, just one drug.

10      That could be a pattern.

11                    Another pattern -- excuse me --

12      could be the type of drug, so there could be

13      a shift in the pattern.  For example,

14      oxycodone, there's many different kinds of

15      oxycodone.  So if you're not looking

16      specifically to a product, there could be an

17      increase in a pattern of one particular drug

18      within a family.

19                    Specifically looking at for a

20      highly abused drug, for example, oxy 30 or a

21      drug the registrant would know is highly

22      abused, that could be another example.

23           Q.      Could dosage?

24           A.      Dosage, you mean the size of

25      the bottle?
```

1      Q.      Yeah, milligrams, micrograms.

2      A.      Sure, that would be a different

3  drug.  So you would focus on first the highly

4  abused drugs within the family.  Your

5  30-milligram oxycodones, your 10-milligram

6  oxycodones are two of the first before you

7  would look at the others.  They're all

8  relevant because they all could be diverted,

9  but those would be just a couple of examples.

10     Q.      Do you -- you said that

11 Janssen's suspicious realtime order

12 monitoring system did not utilize any

13 downstream customer information available and

14 did not differentiate among NDC codes for

15 drugs with a higher risk of diversion.

16             Yes or no, is it your

17 understanding that Janssen's algorithm did

18 not monitor different NDC codes?

19             MR. FULLER:  Object to form.

20 BY MS. LUCAS:

21     Q.      I'm at page 162.

22     A.      Yeah, I wanted to look at an

23 earlier statement I made.

24             (Document review.)

25     A.      That's my statement, yes,

Highly Confidential - Subject to Further Confidentiality Review

1   ma'am, that it didn't differentiate specific

2   drugs by NDC.

3        Q.    And if the algorithm did

4   differentiate among NDC codes, you'd need to

5   revise your opinion, correct?

6             MR. FULLER:  Object to form,

7        lack of clarity.

8   BY MS. LUCAS:

9        Q.    Well, if that statement is

10  inaccurate, I wouldn't want an inaccurate

11  opinion.  So if it was brought to my

12  attention, I think I would be bound to

13  correct it.

14  BY MS. LUCAS:

15       Q.    What did you mean by "for drugs

16  with a higher risk of diversion"?  Higher

17  than what?

18       A.    Well, the higher risk means

19  that those are drugs that are more frequently

20  targeted by diversion.  Prime example would

21  be the oxycodone 30-milligram at this current

22  time.

23       Q.    Well, Janssen doesn't sell

24  oxycodone 30, so for Janssen, higher than

25  what?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Hydrocodone 10-milligram

2  products.

3      Q.      Okay.  They also don't sell

4  those.  So I'm trying to understand what --

5  what Janssen should have understood this term

6  to mean, "NDC codes for drugs with a higher

7  risk of diversion."

8      A.      I think my reference there was

9  the fentanyl products, the Duragesic patches.

10      Q.      You said earlier that it's

11  DEA's job to enforce the Controlled

12  Substances Act, which it's been delegated

13  that authority by Congress, right?

14      A.      Well, yes, but I think more

15  specifically by the Attorney General.

16      Q.      Fair.

17              One way -- and then the

18  Attorney General has tasked --

19      A.      Delegated it to the DEA, yes,

20  ma'am.

21      Q.      Okay.  The DEA then in turn

22  enforces the CSA and it's implementing

23  regulations by conducting field inspections

24  or audits, right?

25      A.      Could you read that back?

1       Q.      The DEA --

2       A.      Or restate it, I'm sorry.

3       Q.      Yeah.  The DEA, one of the

4    things it does to enforce the CSA and the

5    implementing regulations, is conduct field

6    inspections or audits of manufacturers,

7    right?

8       A.      That's one of the activities

9    they do to ensure that registrants are

10   compliant with the Code of Federal

11   Regulations and the CSA, yes, ma'am.

12      Q.      Another word for those would be

13   diversion inspections?

14      A.      I've never heard that specific

15   term, but they're called all kinds of things

16   so --

17      Q.      What do you call them?

18      A.      Usually it's either a

19   regulatory investigation or a work plan

20   investigation.  A work plan is defined as

21   they come out on October 1st and they are

22   assigned during the work plan year of the

23   DEA, October 1st to September 30th.

24      Q.      How many -- are those

25   synonymous, regulatory investigation and work

1    plan investigation?

2        A.    You could see either one

3    utilized by the DEA.  I think it's probably

4    on their website or readily available for a

5    person to find.

6        Q.    If I say a field inspection,

7    you would understand that that also means --

8        A.    Wouldn't mean the same to me.

9    When you use the word "inspection," you know,

10   there's a form we use, an 82, which is a

11   voluntary compliance to an inspection.  So

12   you would use that form in a lot of different

13   purposes.

14            So I'm -- I wouldn't

15   automatically assume that's a regulatory

16   investigation.

17       Q.    A regulatory investigation

18   happens, you said, once a year?

19       A.    It's up to the management when

20   they assign them.  Typically between every

21   three to five years for certain types of

22   registrants, maybe longer for others, just

23   generally speaking.

24       Q.    And when would a Form 82 be

25   used?

1    A.    Anytime I went to a registered

2  location, before I look at required

3  documents, a registrant has to give me

4  approval to use that form and sign it and

5  voluntarily approve, or I could not look at

6  the required records or make an inspection on

7  the premises.

8    Q.    Now, a form -- I'm trying to

9  understand the world -- define the world that

10  we're living in.

11    A.    I'm going to answer but I'm

12  going to be careful about that Touhy letter.

13    Q.    I understand.

14        The regulatory investigations,

15  how long do those typically last once they're

16  initiated?  A couple days?

17    A.    Well, they could be as quick as

18  a half a day or there's been some

19  circumstances where I've spent the better

20  part of a month or more.

21    Q.    So three days is not unusual

22  for a regulatory investigation?

23    A.    Depending on the type of

24  registrant, it may not be unusual.  But it's

25  all dependent on what type of registrant.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      How many regulatory

 2   investigations have you participated in, or

 3   conducted?  Strike that.

 4                  How many regulatory

 5   investigations for the DEA have you conducted

 6   of manufacturer defendants -- or

 7   manufacturers?

 8          A.      Manufacturers?

 9          Q.      Sure.  Yes.

10          A.      I don't recall, but I would say

11   definitely less than ten, maybe between five

12   and ten, just because it was a long career.

13                  And when you say that I may be

14   on-site with somebody else as the lead, we go

15   in twos, so there would be my investigations

16   that are assigned to me, but I could have

17   been present at one that was somebody else's.

18          Q.      Can you please give me a list

19   of the things that you ask for when you

20   conduct a regulatory investigation?

21          A.      I don't have a list with me.

22   There's really not a list that exists.

23          Q.      What are you looking for?

24          A.      I'm going to look for --

25                  MR. FULLER:  Object to form,
```

Highly Confidential - Subject to Further Confidentiality Review

 1           and I warn you on your Touhy.

 2           Anything that's generally not known to

 3           the public is beyond your

 4           authorization.

 5      A.    I'm not aware that's -- I'm not

 6  aware that that information is publicly

 7  available, but I've never tried to see if I

 8  could Google that.  But I -- now that I'm

 9  aware of it, I probably will not answer that

10  question.

11           MS. LUCAS:  We'll reserve our

12           rights on that.

13           THE WITNESS:  Okay.

14  BY MS. LUCAS:

15      Q.    Are you familiar with the

16  acronym SOP?

17      A.    Yes, standard operating

18  procedure.  Yes, ma'am.

19      Q.    During a regulatory

20  investigation, is it common for the DEA to

21  review the registrant's SOPs for their

22  suspicious order monitoring system?

23      A.    I don't know if the Touhy --

24  thinking about the Touhy, I'm not sure I

25  should answer that question.

```
 1          Q.     What are we doing here?  Are

 2     you saying that you're doing something

 3     here -- you reviewed SOPs for this report,

 4     correct?

 5          A.     Yeah, but not in the capacity

 6     as a diversion investigator.

 7          Q.     Are you saying that you're

 8     doing something in this report that you would

 9     not have done as a diversion investigator?

10               MR. FULLER:  Object to form.

11          That wasn't the question you asked.

12          A.     No, I think you're asking me to

13     comment on my actions that I would conduct at

14     a registrant's location as a diversion

15     investigator, and I'm not sure that that

16     conduct would be readily available, unless I

17     misunderstood your question.

18     BY MS. LUCAS:

19          Q.     I'm not -- I just want a yes or

20     no, whether it's common for DEA investigators

21     to ask for SOPs during a regulatory

22     investigation.

23          A.     I don't -- I don't know.

24          Q.     In your experience.

25          A.     I don't know what's common for
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    all diversion investigators, so I don't know.

2         Q.     Fair.  In your experience?

3         A.     Yes.

4         Q.     Now, during these regulatory

5    investigations, if the DEA in your experience

6    had concerns about a manufacturer's

7    suspicious order monitoring program that they

8    observed during the inspection, the DEA would

9    raise those concerns with the registrant,

10   right?

11              MR. FULLER:  Object to form.

12              Again, it goes to DEA's policy

13         on investigations and their position

14         and what they raise and what they

15         don't raise, so I would say that's

16         outside of your Touhy authorization,

17         Mr. Rafalski.

18              THE WITNESS:  I'd agree with

19         that.  I'm not going to answer based

20         on the Touhy letter.

21   BY MS. LUCAS:

22         Q.     You can't tell me whether in

23   your experience if there were concerns about

24   a suspicious order monitoring program that

25   you observed during a regulatory
```

Highly Confidential - Subject to Further Confidentiality Review

1    investigation, whether you would raise those

2    with the registrant?

3                    MR. FULLER:  Same objection and

4            instruction.  Point out to counsel

5            that we have a 30(b) of the DEA on

6            Friday and you can ask the question.

7                    THE WITNESS:  I'm not going to

8            answer the question because of the

9            Touhy.

10   BY MS. LUCAS:

11       Q.    Well, are you aware that

12   Mr. Prevoznik has testified that if the DEA

13   has concerns about a registrant's suspicious

14   order monitoring written policies, it would

15   raise those concerns with the registrant?

16       A.    I would -- I would either not

17   be surprised or not surprised that he raised

18   those concerns, but I believe he would be, in

19   his position, in a better position to be able

20   to know whether to release that information

21   and the public availability.  I don't.  Or

22   whether he has a Touhy authorization to speak

23   to that or not.

24       Q.    Well, you're not telling me

25   that if a DEA diversion inspector came to

Highly Confidential - Subject to Further Confidentiality Review

1    Janssen and inspected the system, the

2    suspicious order monitoring system, and had

3    concerns about that program, you're not

4    telling me that they would just do nothing,

5    right?

6                    MR. FULLER:  Object to form.

7                    Same Touhy issue.

8         A.      I can't answer that because of

9    the Touhy issue but I'm not making a comment

10   one way or the other on that statement.

11                   Taking the Touhy doesn't mean

12   that I'm not answering affirmatively or

13   negatively.

14   BY MS. LUCAS:

15        Q.      Whether a suspicious order

16   monitoring program is compliant with the CSA

17   depends on the type of company and the scope

18   of the business model and customers you said

19   earlier, correct?

20        A.      Some of the things, yes, ma'am.

21        Q.      Would it also depend on the

22   medications at issue?  Yes or no?

23        A.      That could have a bearing also.

24        Q.      The abuse rates of those

25   medications?

```
 1              A.      Yes, or the nonabuse rates.

 2              Q.      The geographic location or

 3      where they're being sold?

 4              A.      Yes.

 5              Q.      The sales volume in that

 6      geography?

 7              A.      That could be another factor,

 8      yes, ma'am.

 9              Q.      All right.  I'm going to ask

10      you some quick yes or nos and then I need to

11      pass the witness while reserving my rights

12      since I have many, many more questions for

13      you.

14                      Do you know how many customers

15      Janssen had during the time it sold

16      Duragesic?

17              A.      No, I do not.

18              Q.      Do you know how many customers

19      Janssen had during the time it sold Nucynta?

20              A.      I have not evaluated that

21      information as far as the ARCOS, so, no, I do

22      not at this time.

23              Q.      Do you know how many orders per

24      month Janssen received from its customers for

25      Duragesic?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.       No, I do not at this time.

2          Q.       Do you know how many orders per

3    month Janssen received from its customers for

4    Nucynta?

5          A.       No, I do not, not at this time.

6          Q.       Do you know Janssen's market

7    share for its opioid medications sold in the

8    Track 1 jurisdictions?

9          A.       No, I do not at this time.

10         Q.       Do you know the rates of

11   diversion for Duragesic or Nucynta in the

12   Track 1 jurisdictions?

13         A.       I'm not sure there's any

14   analysis or information available to give any

15   concise rate of diversion of any drug.

16         Q.       So is that a no?

17         A.       I think that's a no.

18         Q.       Do you know how many shipments

19   of Duragesic Janssen flagged through its

20   algorithm and investigated as potentially

21   suspicious?

22         A.       Janssen's never reported a

23   suspicious order to the DEA.

24         Q.       My question was different.

25         A.       Oh, I'm sorry.  Misunderstood

Highly Confidential - Subject to Further Confidentiality Review

1    it then.

2         Q.    Do you know how many shipments

3    of Duragesic Janssen's algorithm flagged and

4    Janssen subsequently investigated before

5    releasing?

6         A.    I do not.

7         Q.    Do you know how many shipments

8    of Nucynta Janssen flagged as potentially

9    suspicious and investigated before releasing?

10        A.    I didn't do that type of

11   analysis up to today on that, on the data in

12   regards to those products and that

13   registrant.

14        Q.    Yes or no, did you know that

15   Janssen has reported a physician to the DEA

16   based on a sales representative's tip?

17        A.    I have not reviewed a document

18   that had indicated that to me, no, ma'am.

19        Q.    Do you know of any instance in

20   the Track 1 jurisdictions of Duragesic being

21   diverted?

22        A.    At this time, no, ma'am.

23        Q.    Do you know of any instance in

24   the Track 1 jurisdictions of Nucynta being

25   diverted?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     At this time, no, ma'am.

 2              Q.     Do you know how many

 3    inspection -- or strike that.

 4                     Do you know how many regulatory

 5    investigations Janssen -- strike that again.

 6                     Do you know how many DEA

 7    regulatory investigations of Janssen

 8    distribution centers were conducted during

 9    the relevant time period in this case?

10              A.     I do not because that

11    information would not be available to me.

12              Q.     Are you aware, yes or no, that

13    the DEA conducted multiple regulatory

14    investigations of Janssen using at least 14

15    different DEA diversion investigators since

16    2008?

17              A.     Were those regulatory

18    investigations that -- I'm sorry, with your

19    question --

20              Q.     Were you aware of --

21              A.     Could you answer --

22              Q.     Well, let me --

23              A.     Could you restate that for me?

24    Just whether it was inspections or regulatory

25    investigations, I just need clarification.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Were you aware that the DEA

2   conducted multiple regulatory investigations

3   of Janssen using at least 14 different DEA

4   diversion investigators since 2008?

5      A.     No, I'm not aware of that, but

6   just for clarification purposes, I've been at

7   manufacturers where there were groups of

8   people, so the number, multiple, I would

9   acknowledge is more than one.

10            But when you say 14 people, to

11   go to a manufacturer, sometimes there are

12   large groups of people that go, so...

13      Q.     Is that a no?

14      A.     It's -- so I would answer that

15   with the information you provided me, I

16   wouldn't comment.  I don't know one way or

17   the other.

18      Q.     Were you aware of any

19   regulatory investigations of Janssen by the

20   DEA since 2008?

21      A.     I don't have any direct

22   knowledge of any investigations, ma'am.

23      Q.     Did you ask to see any

24   documents reflecting DEA regulatory

25   investigations of Janssen?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      In my request and my
2   formulation of the opinion, yes, ma'am.
3      Q.      And no --
4      A.      Any actions, any comments, any
5   contact with the DEA, I asked for those
6   things.
7      Q.      When did you ask for that?
8      A.      It was all part -- early on
9   when I first started formulating my opinion,
10   there was a -- I'm sure that was one of the
11   requested documents.  And also at the state
12   level; state inspections, state adverse
13   actions, administrative actions, MOAs, any --
14   and any resulting enforcement action.
15      Q.      Were you aware that DEA
16   diversion investigator Billy Lane told
17   Janssen that he likes coming to places like
18   this during a regulatory investigation of
19   Janssen that he conducted?
20      A.      That doesn't surprise me.
21   There's some registrant locations I like to
22   go to.
23      Q.      Were you aware that despite
24   multiple DEA regulatory investigations of
25   Janssen since 2008, the DEA never once

1    concluded that Janssen was in violation of

2    the Controlled Substances Act?

3          A.    I don't have any information to

4    make comment on that, ma'am.

5          Q.    Is that a no?

6          A.    I'm not aware, no.

7          Q.    And it's also true that DEA has

8    never initiated an enforcement action against

9    Janssen for its suspicious order monitoring

10   program, correct?

11         A.    Not that I'm aware of as I sit

12   here today.

13               MS. LUCAS:  Okay.  I'm going to

14          reserve our rights on your time.  We

15          can go off the record.  Thank you very

16          much, I appreciate it.

17               THE WITNESS:  All right.  Thank

18          you.

19               THE VIDEOGRAPHER:  Going off

20          the record at 3:08 p.m.

21               (Recess taken, 3:08 p.m. to

22          3:13 p.m.)

23               THE VIDEOGRAPHER:  Back on the

24          record at 3:13 p.m.

25               ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    EXAMINATION

 2   BY MS. ZOLNER:

 3         Q.    Good afternoon, Mr. Rafalski.

 4   I just introduced myself to you, but my name

 5   is Erica Zolner and I represent Allergan.

 6   I'm going to be asking you some questions

 7   today on behalf of my client, and again,

 8   because of limited time, I would ask if my

 9   question just asks for a yes-or-no answer,

10   you give me a yes or a no.

11         A.    If it's possible, I'll do that.

12   And good afternoon.

13         Q.    Good afternoon.

14               Are there any additional

15   opinions on Allergan since your report was

16   served on April 15th?

17         A.    No, there is not.

18         Q.    I ask you if you had Exhibit 16

19   in front of you, and I think you do.  Could

20   you look at page 12 and 13 of your report.

21   That's the page-numbered version.

22         A.    Okay.  Thank you.  I'm guessing

23   that since you didn't say 1.

24         Q.    Right.

25         A.    Okay.
```

1    Q.    Do you see at the bottom of

2  page 12, right after you cite

3  Masters Pharmaceutical, you wrote:  Beyond

4  requiring that a distributor must employ some

5  suspicious order monitoring system, SOMS, the

6  federal regulations do not make explicit

7  exactly what algorithms the SOMS must use to

8  identify suspicious orders, or exactly what

9  due diligence efforts are required when

10  investigating an order after it is identified

11  as suspicious.

12         Did I read that correctly?

13         MR. FULLER:  Object to form.

14    That's not what he wrote.  He's

15    quoting something.

16    A.    I think that's my assessment of

17  what's contained in Discovery Ruling No. 12.

18  BY MS. ZOLNER:

19    Q.    Right, and that's your

20  assessment, that's your writing, correct?

21    A.    I wrote it, but it's the

22  assessment of the Discovery Ruling No. 12.

23    Q.    Understood.

24         So is it your understanding

25  that manufacturers are required to use a

Highly Confidential - Subject to Further Confidentiality Review

1    particular algorithm in their suspicious

2    order monitoring system?

3         A.    No, I am not.

4         Q.    Are manufacturers prohibited

5    from using any particular algorithm in their

6    suspicious order monitoring system?

7         A.    Other than one that's not

8    effective to disclose suspicious orders, no,

9    they're not.

10        Q.    Is an SOM system noncompliant

11   if it uses an algorithm that incorporates a

12   multiplier?

13        A.    A multiplier of two or three, I

14   would say yes.

15        Q.    Yes.  What about some other

16   multiplier other than two or three?

17        A.    I've never had a --

18              MR. FULLER:  Form.

19        A.    I've never had the opportunity

20   to evaluate a system, but I guess thinking

21   about some systems that use standard

22   deviations or a couple that I reviewed that

23   have the Tukey box, it doesn't set a firm

24   threshold but gives a range.

25              So I would have to say -- I

1    would say there's probably a possibility that

2    there could be a plus or minus to a

3    threshold, but it just wouldn't be a two or

4    three multiplier.  That's essentially what a

5    standard deviation or a Tukey box is.

6    BY MS. ZOLNER:

7         Q.     In this case, how did you

8    evaluate whether a company set its multiplier

9    at the appropriate level?

10        A.     Based on my experience.

11        Q.     When discussing the Watson

12   Pharmaceuticals suspicious order monitoring

13   system, on page 157 of your report, you said

14   that orders from wholesalers, distributors,

15   and chain pharmacies were regularly allowed

16   at triple the historical average or more.

17               Do you recall that?

18        A.     My report says that?

19        Q.     Yes.

20        A.     Okay.  Let me see.  Page 157?

21        Q.     Correct.

22               (Document review.)

23   BY MS. ZOLNER:

24        Q.     Did you write that or did

25   someone else write that, Mr. Rafalski?

Highly Confidential - Subject to Further Confidentiality Review

```
1                   MR. FULLER:  I'm still looking

2          for what you read from, Counsel.

3                   MS. ZOLNER:  It's footnote 739.

4                   MR. FULLER:  Oh, you're in a

5          footnote.  Okay.  Sorry.

6                   MS. ZOLNER:  No, it's above

7          footnote 739.  I'm sorry, I was just

8          giving you an identifier.

9          A.     It starts on the page before?

10     BY MS. ZOLNER:

11         Q.     It's on page 157.

12         A.     The multiplier?

13         Q.     The sentence that I just read

14     that includes "orders from wholesalers,

15     distributors and chain pharmacies were

16     regularly allowed at triple the historical

17     average or more" is right before you cite to

18     footnote 739.

19                 Did you write that?

20         A.     Yes, I did.

21         Q.     What did you mean by regularly

22     in that sentence?

23                 MR. FULLER:  Maybe I'm just an

24         idiot, but I'm not seeing where she's

25         reading from.  Are you seeing where
```

```
 1           she's reading from?

 2                THE WITNESS:  It starts right

 3           here.

 4                MS. ZOLNER:  And I'm not going

 5           to comment on what you said one way or

 6           another, Mr. Fuller.

 7           A.    I'm not really sure right now.

 8   BY MS. ZOLNER:

 9           Q.    You don't know what you meant

10   by regularly in that sentence?

11           A.    I know what the sentence means,

12   but...

13                My recollection is that the

14   multiplier, when it was set by people in the

15   various trade -- various different trades,

16   there were -- there -- there were regular

17   occurrences where it allowed distributions

18   above the historical average, but that's my

19   recollection.

20                MS. ZOLNER:  Move to strike as

21           nonresponsive.

22   BY MS. ZOLNER:

23           Q.    What does regularly mean in

24   that sentence?  And if you don't recall --

25           A.    Often.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Often.

 2                 Do you know what multiplier

 3    Watson Pharmaceuticals used for wholesalers

 4    in 2004?

 5          A.     It's going to take me a minute

 6    to review my report because of Allergan,

 7    Watson, Actavis --

 8          Q.     Allergan.

 9          A.     Allergan.

10          Q.     Right.

11          A.     The three companies I want to

12    make sure I answer correctly.

13          Q.     I understand, but again, we

14    have very limited time and there are

15    additional questioners waiting in the wings.

16                 So do you know if you cited to

17    that in your report as you sit here today?

18          A.     I believe I did.

19          Q.     You think that you included the

20    multiplier that Watson Pharmaceuticals used

21    for wholesalers in 2004?

22          A.     Oh, no, I believe I made a

23    comment or their system.  I don't know if I

24    quoted.  That's why I want to read it on

25    whether there was a multiplier.
```

```
 1              Q.    We can take a break and go off
 2     the record if you want time to familiarize
 3     yourself with your report.
 4                    MR. FULLER:  He's not going to
 5              do that.  He'll do it on the report.
 6                    MS. ZOLNER:  Counsel,
 7              Mr. Rafalski has taken an
 8              extraordinary amount of time reviewing
 9              his report and giving long answers to
10              questions that only require a yes or a
11              no.
12                    Again, we're trying to be
13              efficient and we're trying to handle
14              this deposition in as -- as efficient
15              of a manner as possible, but to the
16              extent that he needs to look at his
17              report in order to answer these
18              questions and tell me if he included
19              certain facts in his report, we should
20              go off the record to allow him time to
21              review what he says he wrote himself.
22                    MR. FULLER:  No, ma'am.
23                    MS. ZOLNER:  Okay.  Well, then
24              let the record reflect that Mr. Fuller
25              is refusing to allow Mr. Rafalski to
```

Highly Confidential - Subject to Further Confidentiality Review

1           go off the record, and if you could

2           please mark the deposition with the

3           time he's taken to review his report

4           now.

5       A.      So my answer is contained in

6   that similar section, but it's at the

7   beginning.

8   BY MS. ZOLNER:

9       Q.      Okay.

10      A.      I believe my review of the

11  records indicate that there's a multiplier

12  table and it's -- there's a variance

13  dependent on -- it's set by people and it's

14  not a firm multiplier.

15      Q.      Okay.  I think you're talking

16  about the multiplier data table that you cite

17  in your report.  Let's look at that document.

18      A.      The one -- yes.

19      Q.      It's what you cited to in

20  footnote 739?

21      A.      I'm aware of the document.

22      Q.      Okay.  So we're going to mark

23  this --

24      A.      It has a three and a six

25  multiplier.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. ZOLNER:  We need to mark it
 2         as an exhibit.
 3              (Whereupon, Deposition Exhibit
 4         Rafalski-28, Actavis SOM Logic
 5         Presentation, ALLERGAN_MDL_02181128 -
 6         ALLERGAN_MDL_02181172, was marked for
 7         identification.)
 8    BY MS. ZOLNER:
 9         Q.    If you could turn to page 1131.
10    Those are the last four Bates numbers.  This
11    is the document you cited, correct,
12    Mr. Rafalski?
13         A.    It is.
14         Q.    What's the date of this
15    document?
16         A.    I don't see a date.
17         Q.    Is this the only document that
18    you cite in your report that includes
19    multipliers that Watson Pharmaceuticals used
20    in its suspicious order monitoring system?
21         A.    I believe it is, yes, ma'am.
22         Q.    I believe you just told me you
23    don't know the date of the document.  This
24    document that we're looking at right now, or
25    the specific page we're looking at right now
```

 1    at 1131, is this, to your knowledge, a slide

 2    with a computer screenshot?

 3         A.    Or a re-creation of one.

 4         Q.    Do you know what this

 5    screenshot shows?

 6               (Document review.)

 7    BY MS. ZOLNER:

 8         Q.    Again, Mr. Rafalski, you cited

 9    to this in your report.

10         A.    Yes, I just need a second to

11    review it.

12         Q.    Sure.

13         A.    I think it's stated below,

14    tables used to calculate the values

15    displayed.

16         Q.    Mr. Rafalski, I think you're

17    looking at the wrong page.

18         A.    And it provides -- I'm sorry.

19         Q.    No, that's all right.  I'm just

20    looking over your shoulder -- or across the

21    table by your shoulder, and it looks like

22    you're on the wrong page.  So it's 1131.

23         A.    I'm sorry.  It shows the

24    multiplier for SOMS and OMS.

25         Q.    It shows a multiplier for SOMS

1    and OMS, but where did you find this

2    particular document?

3            A.      I know I reviewed it.

4            Q.      How did you come to review it?

5            MR. FULLER:  Counsel, maybe I

6        don't understand.  Are you asking

7        where he obtained the document?

8            A.      I believe it's an exhibit to

9    one of the depositions.

10   BY MS. ZOLNER:

11           Q.      And you found this -- it's your

12   testimony that you found this document

13   attached as an exhibit to a deposition?

14           A.      That's my recollection right

15   now, yes, ma'am.

16           Q.      Did you do any additional

17   research into the background on this

18   screenshot?

19           A.      I don't recall at this time,

20   no, ma'am.

21           Q.      Did you do anything to

22   determine the date of when the screenshot was

23   captured?

24           A.      No, ma'am, I don't recall doing

25   that either.

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.     Do you know whether the

2    multipliers in the screenshot were ever put

3    into effect?

4         A.     I don't have recollection if

5    they were or not, no, ma'am.

6         Q.     Do you know what entity this

7    screenshot is tied to?

8         A.     Entity?

9         Q.     Sure.

10        A.     You mean which company?

11        Q.     Correct.

12        A.     Doesn't -- it doesn't say on

13   this other than Actavis down in the

14   right-hand corner.

15        Q.     Did you do anything to

16   determine what entity this screenshot came

17   from?

18        A.     No, ma'am.

19        Q.     Do you -- do you know when the

20   multipliers in this screenshot were put into

21   effect, if at all?

22        A.     I don't have any recollection

23   right now, no, ma'am.

24        Q.     Do you know how long the

25   multipliers in this screenshot were in place?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    At this time, I don't have any
 2   recollection, no, ma'am.
 3          Q.    Do you know whether the
 4   multipliers in this screenshot were ever used
 5   at all?
 6          A.    I'd like to look up a document.
 7   One second, please.
 8          Q.    What document are you looking
 9   for, Mr. Rafalski?
10          A.    MDL02578082.
11          Q.    Again, Mr. Rafalski, we do not
12   have time to look for documents right now.
13                I'm just going to ask you as
14   you sit here today, do you have any
15   recollection as to whether you have done any
16   investigation into whether these multipliers
17   were ever changed?
18          A.    Independent of not letting me
19   look at this document, no, ma'am.
20          Q.    You can look at the document on
21   a break, and if your testimony changes,
22   please let me know.
23                MR. FULLER:  Counsel won't let
24        the witness finish his investigation.
25                MS. ZOLNER:  Mr. Fuller, I
```

1          suggested that if he does come upon

2          additional information, he can let me

3          know if his answer changes.

4                    MR. FULLER:  No, ma'am.

5     BY MS. ZOLNER:

6          Q.     In your report --

7                    MS. ZOLNER:  No, he can't let

8          me know if his answer changes?

9                    MR. FULLER:  I'm not going to

10         have him go look at a document on a

11         break that you won't provide to him.

12                    MS. ZOLNER:  That's your

13         choice.  That's your choice.  I don't

14         need to argue with you on the record.

15    BY MS. ZOLNER:

16         Q.      In your report, you claim you

17    considered all discovery responses of

18    defendants included in your report, correct?

19         A.      Yes, ma'am.

20         Q.      Did you review Allergan's

21    Responses to Plaintiffs' Fourth Set of

22    Interrogatories from February 25th, 2019?

23         A.      Yes, ma'am.

24         Q.      Do you recall that those listed

25    the multipliers that were used over time?

1          A.      I don't recall that.

2          Q.      You don't recall reviewing

3     that?

4          A.      I recall reviewing it.  I don't

5     recall if I saw that information in the

6     responses.

7          Q.      Would your opinion be affected

8     if the multipliers used by Watson were not

9     used as you described them in your report?

10         A.      If my report is inaccurate,

11    yes, it would change my opinion.

12         Q.      In your report on page 158 and

13    159, I think that's just a couple of pages

14    away.  Let me know when you're there,

15    page 158.

16         A.      I'm there.

17         Q.      You say:  The automated portion

18    of the system did not utilize any downstream

19    customer information available, did not

20    differentiate among NDC codes for drugs with

21    a higher risk of diversion, and only manually

22    stopped orders from shipping.

23              Do you see that?

24         A.      You're on 158 or 159?

25         Q.      It starts at the bottom of 158

Highly Confidential - Subject to Further Confidentiality Review

1    and goes to the top of 159.

2         A.    Yes, I believe my review of the

3    system -- or that comment is referenced to

4    all occurred pre-2012.

5         Q.    Okay.  So does that statement

6    apply to pre-merger Watson?

7         A.    No, ma'am.

8         Q.    You said at the beginning of

9    page 159:  Like the pre-merger Actavis

10   system.

11             Are you referring to another

12   entity other than pre-merger Watson?

13        A.    I don't think so, no, ma'am.

14        Q.    What entity are you referring

15   to?

16        A.    Well, I think the merger was in

17   2012, so...

18        Q.    So you are referring to

19   pre-merger Watson?

20        A.    Well, the statement says that I

21   am, yes, ma'am.

22        Q.    So it's your opinion that

23   pre-merger Watson only manually stopped

24   orders from shipping, correct?

25             (Document review.)

 1    BY MS. ZOLNER:

 2        Q.    Could I ask what you're looking

 3    at, Mr. Rafalski?  I know it's your report

 4    but --

 5        A.    I'm just rereading -- rereading

 6    a section.  I make the statement that only

 7    manually stopped orders from shipping.

 8        Q.    Right.

 9        A.    That's my recollection.

10        Q.    So does that statement apply to

11    post-merger Actavis?

12        A.    It would the way it's written,

13    yes, ma'am.

14        Q.    You talk in your report about

15    pre- and post-merger entities.  Do you know

16    the difference between the pre- and

17    post-merger entities?

18        A.    I do.

19        Q.    So is it your opinion that

20    post-merger Actavis only manually stopped

21    orders from shipping?

22        A.    I'm not sure.

23        Q.    You're not sure?

24              Do you know the difference

25    between the systems that pre-merger Actavis

1    and post-merger Actavis used?

2         A.    I think pre they had a

3    threshold based only related to the size,

4    pre-acquisition, Watson acquisition.  Post, I

5    think it continued for a little bit and then

6    it rolled into the Watson system.

7         Q.    How do you know that?

8         A.    From reviewing the records

9    and -- that's my recollection.

10        Q.    So what do you mean when you

11   say post, it continued for a little bit and

12   then it rolled into the Watson system?

13        A.    It's just my recollection.  Let

14   me review my report, but --

15        Q.    Again --

16        A.    It converted over into the

17   Watson system.  That's just my recollection

18   of doing my opinion.

19        Q.    I understand.  And we have

20   limited time, so my question was specific to

21   whether post-merger Actavis was specifically

22   manually stopping orders.  That was a couple

23   of questions ago, and I believe you said you

24   didn't know.

25             Did you -- so let me just see

Highly Confidential - Subject to Further Confidentiality Review

```
 1    if I can reframe this and see if I can
 2    refresh your recollection.
 3              Did you review the deposition
 4    transcript of Mary Woods in your preparation
 5    of your report?
 6         A.    I did.
 7         Q.    Who is Mary Woods?
 8         A.    I don't have a recollection
 9    right now.  Although I say that I also
10    reviewed that last night.
11         Q.    You reviewed Mary Woods'
12    transcript last night?
13         A.    I did.
14         Q.    So it should be fresh in your
15    memory.  Do you recall who she worked for?
16         A.    I believe Allergan --
17         Q.    Allergan.
18         A.    Sorry I keep mispronouncing it.
19         Q.    Do you recall that she was the
20    corporate representative who testified about
21    pre-merger Watson and post-merger Actavis?
22         A.    I don't have a direct
23    recollection of that.
24         Q.    Okay.  But you did review the
25    transcript last night?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I did.

2       Q.      Do you recall reading from

3   Ms. Woods' transcript that when it came to

4   how the Watson system would pend orders, the

5   system would automatically hold it?

6       A.      I don't have an independent

7   recollection of that.

8       Q.      You don't recall if you read

9   that last night?

10      A.      I may have read it.  I just

11  don't recall it.

12      Q.      Did you read that transcript in

13  its entirety?

14              MR. FULLER:  You mean last

15          night or ever?

16              MS. ZOLNER:  If he needs

17          clarification he would ask.  I would

18          ask for you to quit coaching the

19          witness.

20              MR. FULLER:  Object to form,

21          vague.

22      A.      I read some last night, some

23  this morning.  I believe I read it in its

24  entirety, although I tried to read it quicker

25  than I normally would, and I read it previous

Highly Confidential - Subject to Further Confidentiality Review

1    to last night.

2                    I read it because of the -- the

3    acquisitions and the changes and the multiple

4    systems.  It's a pretty complicated opinion,

5    and I was trying to ensure that I would be

6    prepared to answer these type of questions.

7    And the -- this is a more complicated

8    situation than the individual companies.

9    BY MS. ZOLNER:

10        Q.    What do you mean by it's a

11   pretty complicated opinion?

12        A.    Well, not opinion.  A

13   complicated review, because of the company

14   acquisitions, the use of multiple systems or

15   the overlap of systems.  One system replaced

16   another system.

17                    This was a difficult -- to keep

18   all of it -- to be able to respond quickly to

19   your questions, to keep all of that in

20   sequence, it's --

21        Q.    Did you read this testimony

22   before you wrote your report?

23        A.    Yes, and I also went back to

24   certain specific footnotes also.

25        Q.    Do you have any basis to

1    believe that Watson -- the Watson system only

2    manually held orders given my representation

3    to you that Mary Woods testified otherwise?

4         A.    No, I do not.

5         Q.    On page 158 of your report, you

6    acknowledge that when Watson bought Actavis,

7    the combined company used the Watson system,

8    correct?

9         A.    To save time, you want to tell

10   me --

11        Q.    Sure.  I'm right after

12   footnote 754 in the body of the text:  But

13   the new system was never implemented and when

14   Watson bought Actavis, the combined company

15   reverted to the Watson system until 2015 when

16   it announced it was selling all of its

17   generic drugs and various corporate

18   subsidiaries to Teva, and as Napoli said,

19   Teva already had their own program in place

20   for suspicious order monitoring.

21        A.    Yes.

22        Q.    So that's written directly in

23   your report.

24        A.    Yes.

25        Q.    Given that, why do you claim

1     that the combined company only manually

2     stopped orders?

3          A.     I don't recall.

4          Q.     You don't recall why you make

5     that assertion?

6          A.     Not at this time, no, ma'am.

7          Q.     As you sit here today, can you

8     identify a single document that you reviewed

9     that supports the assertion that Watson

10    pre-merger only manually stopped orders?

11         A.     No, ma'am.

12         Q.     If a customer places an order

13    and then decides to reduce it, does that

14    always indicate diversion?  It's a yes or no.

15         A.     When you use the term "always,"

16    I would answer no.

17         Q.     If a customer places an order

18    and then decides to cancel it, does that

19    always indicate diversion?

20              MR. FULLER:  Let the record

21         reflect counsel cut the witness off

22         and he did not complete his answer.

23              MS. ZOLNER:  It's a yes-or-no

24         question and I'm running out of time.

25         A.     I can't either answer yes or no

1    because there would -- in reviewing this, if

2    it's in response to a triggered order, a

3    suspicious order, and a customer would be

4    contacted, and there's a request to reduce it

5    based on the size and they agree to do that,

6    to fail -- to stop the triggering of a

7    suspicious order, then it would be a yes.

8              Does a registrant -- does any

9    person ordering a controlled substance have

10   the right to change their order?  Yes, within

11   the regulations they could call and say

12   either cancel my order or reduce my order.

13   That's allowed, permissible under

14   regulations.

15   BY MS. ZOLNER:

16        Q.    So your answer to my question

17   would be, no, if a customer places an order

18   and then decides to cancel it, it does not

19   always indicate diversion?

20        A.    My -- my answer would be under

21   certain circumstances the answer would be

22   they could do that.

23              MS. ZOLNER:  Could we take a

24        quick break?  I need -- just need to

25        confer with my colleagues on a couple

Highly Confidential - Subject to Further Confidentiality Review

```
 1          of issues.
 2                  THE VIDEOGRAPHER:  Going off
 3          the record, 3:40 p.m.
 4                  (Recess taken, 3:40 p.m. to
 5          3:47 p.m.)
 6                  THE VIDEOGRAPHER:  We're back
 7          on the record at 3:47 p.m.
 8     BY MS. ZOLNER:
 9          Q.    Mr. Rafalski, before the break
10     we were talking about reducing and canceling
11     orders.  And we've talked a lot about
12     Allergan and pre-merger and post-merger
13     entities, but I want to talk specifically
14     right now about Watson and Watson's SOM
15     policy.
16                  Would your opinion on
17     whether -- actually, let's turn to page 157
18     of your report.  In Section 13 --
19          A.    Yes.
20          Q.    -- the first sentence says:
21     The Watson system affirmatively allowed
22     customers to get around violations by
23     canceling the order or cutting the quantity.
24                  Do you see that?
25          A.    I do.
```

1    Q.    And you say this policy was

2    consistent through 2012, a couple of lines

3    down, and you cite to footnote 742.

4            Do you see that?

5    A.    Yes.

6    Q.    Would your opinion be affected

7    if you found out that even before 2002 [sic],

8    Watson actually required customers to provide

9    legitimate reasons to reduce or cancel

10   orders?

11   A.    So in regards to that, there

12   was -- I reviewed multiple policies that were

13   during this time period.  There was Watson

14   policies that I reviewed.

15           I have a recollection that in

16   that policy I think a statement similar to

17   what you said appeared, but also contained

18   within those policies, also directed

19   employees the availability to either cut or

20   cancel an order, to terminate a suspicious

21   order.

22           MS. ZOLNER:  Move to strike as

23       nonresponsive.

24   BY MS. ZOLNER:

25   Q.    Would your opinion be affected

1    if you found out that even before 2012,

2    Watson actually required customers to provide

3    legitimate reasons for canceling or reducing

4    orders?  It's a yes or no.

5                MR. FULLER:  Object to form,

6         incomplete hypothetical.

7         A.    I'm not aware that that

8    occurred, but if that was something that I

9    missed or is available to me, I would

10   consider it in my opinion.  I'm not sure

11   depending on how it would be written in the

12   context of it, but I would definitely look at

13   it and consider it in regards to my opinion.

14   BY MS. ZOLNER:

15        Q.    Would it make a difference to

16   you?

17        A.    As I stated --

18              MR. FULLER:  Objection, asked

19        and answered.

20        A.    -- it would depend on the --

21   just that comment, it would depend on the

22   totality of the document I reviewed and the

23   context of it or how it would be stated.

24   It's -- it's possible, yes.

25              ///

1    BY MS. ZOLNER:

2         Q.    So as you're sitting here right

3    now, you're leaving open the possibility that

4    it might not make a difference to you whether

5    Watson required customers to provide

6    legitimate reasons for canceling or reducing

7    orders?

8              MR. FULLER:  Same objection.

9         A.    So if that statement appeared

10   along in conjunction with first telling them

11   that their order had triggered a suspicious

12   order and just as hypothetical, so if there

13   was some -- it appeared within a policy or a

14   statement that was combined with the ability

15   to cut or transfer to circumvent a suspicious

16   order and then also have them provide a

17   reason why, I think there's the possibility

18   that -- that's why I answered the question

19   that way.  There is a possibility that it

20   would not influence my opinion.  I hope that

21   answers your question.

22   BY MS. ZOLNER:

23        Q.    Do you know of any particular

24   order that Watson allowed to be reduced or

25   canceled without a legitimate reason?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      No, I do not.

 2              MR. FULLER:  Object to form.

 3              A.      But in reviewing the policies,

 4     just allowing them to do that in regards to

 5     terminating a suspicious order, whether they

 6     did it or not, just the policy to have that

 7     in place would make it an ineffective

 8     suspicious order system.

 9     BY MS. ZOLNER:

10              Q.      Did you understand my question

11     that I asked you?  Because I can repeat it.

12              A.      No, maybe not if I --

13              Q.      Okay.  My question was a very

14     simple one:  Can you identify a single order

15     where Watson allowed -- do you know of any

16     particular order that Watson allowed to be

17     reduced or canceled without a legitimate

18     reason?

19              A.      Not as I sit here today.  I

20     have not reviewed the data for that

21     particular situation.

22              Q.      So you did not review the data

23     to find out if Watson allowed for orders to

24     be reduced or canceled without a legitimate

25     reason?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No, I did not review specific

2    orders to see if I could determine by the

3    order whether or not it had been reduced or

4    terminated.

5    Q.    How do you establish a pattern

6    for understanding how a company investigates

7    orders without looking at the orders

8    themselves?

9         MR. FULLER:  Object to form.

10   A.    Well, I -- I'm not saying that.

11   I'm saying in response to your question, for

12   me to be able to make a determination on a

13   terminated or cut order.  I thought your

14   question was whether I looked at records to

15   determine if --

16   BY MS. ZOLNER:

17   Q.    That's right, Mr. Rafalski.  I

18   asked you a question about whether you looked

19   at any specific orders, and you told me no.

20        As you sit here today, you

21   cannot identify a single order where Watson

22   allowed an order to be reduced or canceled

23   without the customer supplying a legitimate

24   business reason, correct?

25   A.    I didn't see any records where

1   that occurred, so I -- the answer --

2        Q.    So I'm correct?

3        A.    Yes.

4        Q.    So my question is:  How do you

5   establish a pattern for understanding how a

6   company investigates orders without ever

7   looking at specific orders?

8             MR. FULLER:  Object to form.

9        A.    I look at -- I don't look at

10  specific orders.  I look at the due diligence

11  records and what the registrant did.  Just

12  looking at a specific order itself doesn't

13  provide me with that sufficient information.

14  BY MS. ZOLNER:

15       Q.    Would your opinion be affected

16  if you found out that Watson actually

17  reported customers to the DEA if they tried

18  to cancel orders without any justification?

19       A.    Would those be orders that were

20  identified as suspicious orders?

21       Q.    My question is a simple one.

22            MR. FULLER:  And he's just

23       asking for a complete hypothetical.

24  BY MS. ZOLNER:

25       Q.    And I'll repeat it.  Would your

1    opinion be affected if you found out that

2    Watson actually reported customers to the DEA

3    if they tried to cancel orders without

4    providing a justification?

5         A.    Depending on the time frame and

6    the amount of orders and if it was a

7    consistent conduct by Watson, there's a

8    possibility that would be a yes, it would

9    affect my opinion.

10        Q.    I'm still on page 157 of your

11   report, and again, if you're looking

12   around -- right before footnote 746, you

13   point out that from 2009 to 2011 the number

14   of SOMS validations at Watson increased, but

15   the number of administrators did not.

16             Do you see that?

17        A.    Yes, I do.

18        Q.    Do you know how many

19   administrators Watson had on staff to handle

20   SOMS validations between 2009 and 2012?

21        A.    I don't have a direct

22   recollection of that.

23        Q.    Do you have a general

24   recollection?

25        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.      Do you know whether the

2    administrators' other job responsibilities

3    changed in any way?

4           A.      I don't have a recollection of

5    that at this time.

6           Q.      Do you know whether Watson's

7    number of customers increased in that time?

8           A.      I do not.

9           Q.      Do you know if they decreased

10   in that time?

11          A.      I do not.

12          Q.      Do you know whether Watson

13   brought on any new customers during that

14   time?

15          A.      I do not.

16          Q.      Do you know whether any new

17   customers were purchasing controlled

18   substances at that time?

19          A.      I didn't see any records that

20   would give me any guidance on that particular

21   issue, so I do not.

22          Q.      So as you sit here today, do

23   you have any basis to conclude that the

24   administrators' duties were performed any

25   differently from 2009 to 2012?
```

Highly Confidential - Subject to Further Confidentiality Review

1           A.      I think based on my review or
2      the review of the deposition, I make this
3      statement that there was an increase in the
4      average of SOMS that were assigned.
5           Q.      Your review of the deposition.
6      What deposition are you referring to?
7           A.      I think it was Ms. Woods'
8      deposition, I believe.
9           Q.      And what specifically from
10     Ms. Woods' deposition are you using as your
11     basis to conclude that the administrators'
12     duties were performed any differently from
13     2009 to 2012?
14          A.      I didn't say they were
15     performed differently.  I just said that
16     there was an increase in the number of SOM
17     validations that were assigned to them.
18          Q.      And I'm asking you a different
19     question, which is whether there's any reason
20     for you to conclude that the duties were
21     performed any differently from 2009 to 2012.
22     It's a yes or no.
23          A.      No.
24               MS. ZOLNER:  Mr. Rafalski, I
25          thank you very much for your time.

```
 1              Like all of my colleagues that

 2         have gone before me, I just have to

 3         say for the record that there are 86

 4         Allergan and Actavis documents that

 5         you cite in your report and in your

 6         reliance materials.  I obviously

 7         haven't had time to question you on

 8         most, the majority, practically all of

 9         those documents, so I reserve all

10         rights to seek additional time from

11         the Court to continue to question you

12         about your opinions as they relate to

13         Allergan.  But thank you again.

14              THE WITNESS:  All right, thank

15         you.  I hope we do this again.

16              MS. ZOLNER:  I hope we meet

17         again, thanks.

18              THE VIDEOGRAPHER:  Going off

19         the record at 3:56 p.m.

20              (Recess taken, 3:56 p.m. to

21         3:57 p.m.)

22              THE VIDEOGRAPHER:  Back on the

23         record at 3:57 p.m.

24              ///

25              ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     EXAMINATION

 2    BY MR. SNAPP:

 3          Q.     Mr. Rafalski, we met off the

 4    record.  I'm Erik Snapp.  I represent Purdue.

 5          A.     Good afternoon, sir.

 6          Q.     First of all, how much did you

 7    spend on your Purdue section of your report

 8    that starts on page 167 of Exhibit 16?

 9          A.     I don't have a recollection of

10    the exact amount of time.

11          Q.     How about a ballpark?  Was it

12    more than five hours?

13          A.     I believe so, yes.

14          Q.     More than ten hours?

15          A.     I'm not exactly sure.  I

16    believe it probably would be more than

17    10 hours.

18          Q.     Okay.  More than 50 hours?

19          A.     No, sir.

20          Q.     All right.  More than 20 hours?

21          A.     I'm not sure.

22          Q.     All right.  Did you review all

23    the documents and the transcripts that are

24    cited both in this section of the report from

25    pages 167 through 172 and that were included
```

Highly Confidential - Subject to Further Confidentiality Review

1    in your Schedule I, in terms of Purdue

2    documents?

3         A.    I'm not sure in the volume that

4    you've described if I've looked at every

5    document.  I'm confident that I looked at the

6    documents related to my report.

7              And then in regards to the

8    depositions, I'm not sure I completely read

9    them.  May have read the areas that I've

10   cited or the pages before and after the parts

11   I cited, but I'm not sure that I read the

12   entire document --

13        Q.    Fair enough.

14        A.    -- deposition.

15        Q.    You only cite from two

16   depositions.  One is Frank Geraci, the rough

17   transcript, and that's footnotes 820 and 822

18   through 824, and then you cite to one of

19   Mr. Seid's depositions; is that right?

20        A.    Yes, sir.

21        Q.    You didn't review any other

22   depositions, correct?

23        A.    No, sir, I don't believe so.  I

24   don't have a recollection of doing that.

25        Q.    And you didn't search for any

Highly Confidential - Subject to Further Confidentiality Review

```
 1    documents as part of your work in this case
 2    that would disprove your conclusions with
 3    regard to any of the defendants you opined on
 4    in your report, correct?
 5         A.    I just would search for
 6    documents.  If -- not what they're -- whether
 7    they would prove or disprove my opinion.  I
 8    would look for documents to help me formulate
 9    my opinion.  I didn't -- I wasn't biased to
10    look for only certain documents.
11         Q.    Once you reached your
12    conclusions, did you search for documents to
13    make sure that those conclusions were valid?
14    In other words, did you search for documents
15    that might disprove that conclusion?
16         A.    I did not continue searching.
17         Q.    So once you reached your
18    conclusions based on the documents you had
19    reviewed, you stopped searching for
20    additional documents; is that fair?
21         A.    I've continued to look at
22    documents and continued -- you know, in my
23    efforts to -- because it's millions and
24    millions of documents, so I just didn't put
25    my report down and do nothing.
```

1    I don't recall if I looked at

2    Purdue, but I've continued to look at

3    documents since I've submitted my report on

4    April 15th.

5        Q.    Well, have you looked at any

6    additional Purdue documents since April 15th?

7        A.    I don't recall if some of those

8    were Purdue or not.

9        Q.    If you look at page 172, the

10   last paragraph of your section on Purdue, in

11   the middle of the paragraph there's a

12   sentence that reads:  Purdue failed to use

13   consistent algorithms and failed to

14   investigate the suspicious orders identified

15   by the algorithms.

16            Do you see that?

17       A.    Yes.

18       Q.    Is it your testimony today that

19   Purdue failed to investigate all suspicious

20   orders that were identified by the

21   algorithms?

22       A.    No, it's not.  I believe there

23   was some due diligence conducted by the

24   company.

25       Q.    So is that a mistake in your

Highly Confidential - Subject to Further Confidentiality Review

1    report?

2         A.     I say they conducted no due

3    diligence in my report?

4         Q.     Well, you say they failed to

5    investigate the suspicious orders identified

6    by the algorithms.  It doesn't say some

7    suspicious orders.  It says "the" suspicious

8    orders identified by the algorithms.

9         A.     I believe that's not a general

10   statement, but I think the documents I

11   reviewed would say that that happened on a

12   consistent basis.

13              I'm not saying that there might

14   have been due diligence for a customer or two

15   in -- related to the files.  That's my

16   recollection.

17        Q.     Just for a customer or two,

18   that's all?

19        A.     Well, I don't know, one or two,

20   but there was some due diligence done by the

21   company.  It's not -- if that statement to

22   you implies that none occurred, then that

23   wouldn't be accurate because I know there was

24   some due diligence.

25        Q.     You also didn't include any

1   documents in your report with respect to

2   Purdue's efforts to conduct site visits of

3   pharmacies, right?

4        A.    I did not.

5        Q.    And you didn't read the

6   December 12th, 2018 corporate representative

7   deposition of Purdue, did you?

8        A.    The name of the representative?

9        Q.    His name was Stephen Seid.  He

10  was deposed as a fact witness and you cited

11  his fact witness testimony?

12       A.    I believe --

13       Q.    But you didn't actually review

14  his corporate representative deposition, did

15  you?

16       A.    I don't believe so.  I --

17       Q.    He was designated as a witness

18  to testify on identification of Purdue's

19  policies and procedures for and the

20  identities of persons responsible for

21  monitoring suspicious orders --

22       A.    Can I --

23       Q.    -- for potential diversion of

24  opioids or opioid products.

25             Were you aware of that

Highly Confidential - Subject to Further Confidentiality Review

1    testimony?

2           A.     Yes, and I misstated.  I do

3    recall.  I don't know that I read the entire

4    one, but I know I read the sections that I've

5    cited in my report.

6           Q.     You didn't cite any sections of

7    that deposition in your report, sir.

8           A.     I believe 815, is that not it?

9           Q.     No, it's a different

10   deposition, sir.

11          A.     Fact deposition?

12          Q.     That was a fact deposition.  He

13   was deposed as the corporate representative

14   of Purdue.  He was speaking as the company.

15          A.     Then I misspoke.

16          Q.     So if a corporate

17   representative was being offered to testify

18   for the company with respect to the company's

19   special [sic] order monitoring system, isn't

20   that something that you would ask for?

21          A.     I would hope it would be

22   provided to me.

23          Q.     You would hope that plaintiffs'

24   lawyers would provide that testimony to you

25   because it would be important for your

Highly Confidential - Subject to Further Confidentiality Review

1    understanding of Purdue's special order

2    monitoring system to read that testimony,

3    correct?

4              MR. FULLER:  Form.

5         A.    I'm not saying they didn't

6    provide it to me.  I may have it.  I might

7    not have reviewed it.

8    BY MR. SNAPP:

9         Q.    Well, it wasn't cited in your

10   report.

11        A.    I agree, so that means I didn't

12   read it.

13        Q.    If you had read that -- well,

14   first of all, you also, I assume, then,

15   didn't review the exhibits to that

16   deposition, correct, unless they were

17   included otherwise in the documents that

18   plaintiffs' counsel provided to you?

19        A.    If they were just -- if they

20   were just attached to the deposition, then I

21   probably would not have reviewed them.  If

22   they were exhibits that were also provided in

23   discovery outside of the deposition, I may

24   have cited them.

25        Q.    So I can tell you that the one

1    I'm going to ask you about, you -- if you had

2    reviewed the exhibits to that deposition, to

3    the corporate representative deposition, sir,

4    you would know that Purdue met with the DEA

5    in April 2009 and provided an overview of its

6    order monitoring system.

7             You didn't know that, did you?

8    It's not mentioned anywhere in your report, I

9    can tell you that.  Is that true?

10        A.    If it's not in my report, then

11   I wasn't aware of it.

12        Q.    And if you'd read those

13   exhibits, you also would have known that

14   Purdue met again with the DEA in April 2011

15   and provided an overview of its updated order

16   monitoring system after its OxyContin

17   reformulation, but you didn't know that

18   either, did you?

19        A.    I didn't know they met, but --

20        Q.    Okay.

21        A.    -- if the suspicious order

22   monitoring system they described was

23   contained in other documents and it's

24   referenced in my report, then...

25        Q.    You also didn't read Mr. Seid's

```
 1    testimony --
 2              MR. FULLER:  Let him finish his
 3         answer.  He wasn't done, Counsel.  He
 4         can finish his answer.
 5              MR. SNAPP:  Were you done, sir?
 6              THE WITNESS:  Could you read
 7         back my answer for me, please?
 8         Because I was interrupted, I'm --
 9              MR. SNAPP:  I'm sorry, it
10         seemed like a natural break in your
11         testimony so I just continued on,
12         because I have limited time.
13              MR. FULLER:  We all do.
14              (The following portion of the
15         record was read.)
16              "ANSWER:  I didn't know they
17         met, but if the suspicious order
18         monitoring system they described was
19         contained in other documents and it's
20         referenced in my report, then..."
21              (End of readback.)
22    BY MR. SNAPP:
23         Q.    Then what?
24         A.    Then my opinion would be the
25    same, if that is already included in my
```

1    review.

2         Q.    Okay.  But you also didn't read

3    Mr. Seid's testimony or Mr. Crowley's

4    testimony, for that matter, that no one at

5    the DEA ever expressed any critique or

6    complaint about Purdue's suspicious order

7    monitoring system, correct?

8         A.    I don't have a recollection of

9    reviewing either of those statements, no,

10   sir.

11        Q.    So the DEA never told Purdue

12   that it needed to change its system, but in

13   your report here, you have concluded, based

14   on somewhere between 10 and 50 hours of work

15   and review of a handful of documents and two

16   deposition transcripts, that Purdue's order

17   monitoring system was inadequate, correct?

18        A.    I think based on their policies

19   and their actions, I think I could come to

20   that opinion, yes, sir.

21        Q.    Sir, would it ever be

22   appropriate for a DEA employee to use his or

23   her personal e-mail system to communicate

24   with a registrant about the registrant's

25   suspicious order monitoring system?

```
 1                  MR. FULLER:  Object to form.

 2          And as it applies to any internal DEA

 3          policies, you're not authorized to

 4          discuss it.

 5                  THE WITNESS:  I guess if that

 6          would be covered by my Touhy letter,

 7          if it's a DEA policy or procedures not

 8          available to the public, I --

 9   BY MR. SNAPP:

10          Q.    Well, generally speaking, in

11   today's world, would it ever be appropriate

12   for a government employee to use their

13   personal e-mail for government business?

14                  MR. FULLER:  We know it

15          happens.

16          A.    Just a personal statement on

17   that, not --

18   BY MR. SNAPP:

19          Q.    What's your view?  What's your

20   view, sir?

21          A.    I think -- I think there were

22   periods of time where that wasn't an issue or

23   it wasn't stated whether or not that was a

24   problem, and I think there were certain

25   situations where it almost was required
```

1    because of -- I'm trying to answer this

2    without causing a Touhy issue.

3            Q.    I'll strike the question, sir.

4            A.    Okay.

5            Q.    Did you ever use your personal

6    e-mail account to communicate with a

7    registrant in your capacity as a DEA

8    employee?

9            A.    I probably did early in my

10   career.  I'm aware that I used -- I don't

11   recall this until I reviewed the document,

12   that I sent an e-mail to Jack Crowley.

13           Q.    You did.  You sent --

14           A.    A couple.

15           Q.    -- an e-mail to Jack Crowley

16   who was at Purdue, correct?

17           A.    Yeah, I sent it to him and I

18   think I told him it was my personal e-mail

19   and I think I explained a reason why, but...

20           Q.    Well, you didn't give a reason

21   why, but you did explain that it was your

22   personal e-mail.

23                 So why did you send Mr. Crowley

24   an e-mail from your personal e-mail account

25   in 2009?

```
 1            A.     I think I was tasked to contact

 2    him, and I was involved in some kind of

 3    project, and I either forgot or I didn't do

 4    it, and I felt obligated to.  So when I got

 5    home that evening, I sent him an e-mail.

 6            I didn't have -- at that period

 7    of time I didn't have access to send a

 8    government e-mail, unlike today, after hours,

 9    after I left.

10       Q.     So Mr. Crowley had contacted

11    you -- first of all, he was a Purdue

12    employee, right?

13       A.     Yes.

14       Q.     He headed up Purdue's

15    Controlled Substances Act compliance program?

16       A.     At the time of that -- I know

17    that today, but at the time I made that

18    contact, I was asked by someone to give him

19    some guidance and given his information.

20       Q.     Well, you were asked by him,

21    right?

22       A.     No.

23       Q.     You weren't?

24       A.     Well, I wasn't asked by him to

25    contact him.  I was told -- I was asked by
```

Highly Confidential - Subject to Further Confidentiality Review

1    someone else to contact him.

2         Q.    So he didn't send you an e-mail

3    asking for your comments about his outline

4    with respect to making visits on pharmacies?

5         A.    Yes, but the initial contact --

6    I don't believe he was given my e-mail.  I

7    don't have a direct recollection.  I can --

8    if you allow me to look at those documents.

9         Q.    You didn't look at the

10   documents before opining about Purdue's

11   compliance program, right?

12        A.    Those documents?

13        Q.    Any of the documents related to

14   your communications with Mr. Crowley.

15        A.    I've looked at those documents,

16   yes, sir.

17        Q.    You didn't include them in your

18   report.  So is it fair to say you're not

19   going to be testifying at trial about your

20   interactions with Purdue?

21             MR. FULLER:  Object to form.

22        A.    If those letters aren't

23   included in my report, I won't be talking

24   about those letters.

25             MR. SNAPP:  Can we go off the

Highly Confidential - Subject to Further Confidentiality Review

1      record?

2              THE VIDEOGRAPHER:  Off the

3      record at 4:10 p.m.

4              (Recess taken, 4:10 p.m. to

5      4:12 p.m.)

6              THE VIDEOGRAPHER:  Back on the

7      record at 4:12 p.m.

8  BY MR. SNAPP:

9      Q.    Sir, you know that Mr. Crowley

10 was planning to do some site visits of

11 pharmacies in 2009, correct, based on your

12 review of the documents?

13     A.    Yes, sir.  You're discussing in

14 regards to the e-mail communication?

15     Q.    Yes, sir.  And he contacted

16 you, he sent you an outline of questions he

17 intended to ask and his outline for those

18 site visits, correct?

19     A.    I don't recall that.

20     Q.    Well, you think -- you agree

21 that it was a good thing that Mr. Crowley was

22 incorporating site visits, pharmacy site

23 visits into the suspicious order monitoring

24 system at Purdue, correct?

25     A.    Without reviewing the document,

Highly Confidential - Subject to Further Confidentiality Review

1    I know there was a communication, and I knew

2    it was -- it's in regards to a visit to

3    Detroit, and subsequent to those e-mails, I

4    met him in person for a brief period of time.

5              I don't think he did the site

6    visits, based on my conversation when he was

7    in Detroit, but -- so I -- I don't know

8    without reading those documents.

9         Q.    You provided feedback to his --

10   on his outline though, right?

11        A.    Yes, I was asked to answer some

12   questions or give some guidance because he

13   was coming to Detroit.  And that's -- I

14   recall that, but I don't recall an outline or

15   any specific questions.

16        Q.    Okay.  Well, I'm sure your

17   counsel will show those to you before you

18   testify at trial, sir, but let me ask you.

19              What algorithms did Purdue use

20   to identify potentially suspicious orders?

21   You didn't discuss that in your report, did

22   you?

23        A.    I believe I discussed the

24   components, but I don't believe I put the

25   specific algorithm in the report.  That's my

1    recollection.

2        Q.    Well, did the algorithms change

3    over time, sir, in Purdue's system?

4        A.    I don't recall.

5        Q.    Sir, is it fair to say that

6    you're not offering any opinions in this case

7    that Purdue ever shipped an order that it

8    should not have shipped?

9        A.    I think if I make the opinion

10   that they had a failure to maintain effective

11   controls to prevent diversion, and they had

12   ineffective suspicious order systems, I think

13   I'm making that opinion that they shouldn't

14   have shipped the orders they shipped.

15       Q.    You're not offering any

16   opinions in this case that Purdue ever

17   shipped any particular order to Cuyahoga

18   County or Summit County that it should not

19   have shipped, are you?

20       A.    I'm not giving an opinion on a

21   specific order.

22           MR. SNAPP:  Thank you.  We can

23       go off the record.

24           THE VIDEOGRAPHER:  Going off

25       the record at 4:14 p.m.

```
 1                  (Recess taken, 4:14 p.m. to

 2          4:17 p.m.)

 3                  MR. SNAPP:  I'm just going to

 4          make a statement for the record that

 5          Purdue reserves its rights to continue

 6          Mr. Rafalski's deposition in the same

 7          way that all the other defendants have

 8          made a reservation of rights, for the

 9          same reasons.  Thanks.

10                  THE VIDEOGRAPHER:  Back on the

11          record at 4:18 p.m.

12                      EXAMINATION

13  BY MR. FAUVRE:

14          Q.    Mr. Rafalski, my name is David

15  Fauvre.  I'm counsel for Endo and Par in this

16  litigation.

17          A.    Okay.

18          Q.    And I'm going to be asking you

19  questions about your report and the section

20  that you -- of your report regarding Endo and

21  Par is on pages 172 to 178.

22                  You also refer in your report

23  to another entity named Qualitest, and I'll

24  try to refer to those three entities as I'm

25  asking you questions as we go.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          How much time did you spend

 2   writing this section on Endo, Par and

 3   Qualitest?

 4        A.     I'm going to look at the

 5   length.  It's hard for me to just give you an

 6   arbitrary number.

 7        Q.     Six pages.

 8        A.     10 or 15 hours, maybe up to 20,

 9   approximately.

10        Q.     And did plaintiffs' counsel

11   send you any sentences with citations that

12   you used in the section regarding Endo, Par

13   and Qualitest?

14        A.     I think it's a possibility

15   there are some sentences here that were

16   provided to me.  Obviously I reviewed them

17   and they're in my report, but there may be

18   some sentences or some references in

19   footnotes that I utilized, yes, sir.

20        Q.     And what about any whole

21   paragraphs that they drafted that you made

22   your own?

23        A.     I don't believe so, sir.  I

24   don't think there's anything here that's not

25   been either edited or changed or drafted.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you testified earlier that

2    the documents that you reviewed are the

3    documents that are either cited in your

4    report or cited in Schedule I of your report;

5    is that correct?

6    A.    I think that's an accurate

7    statement.

8    Q.    And those documents were

9    provided to you by plaintiffs' counsel based

10   on your request to them for particular

11   categories of documents?

12   A.    Yes, and their assistance in

13   them looking for those type of documents.

14   Q.    And did you request SOPs,

15   standard operating procedures, as part of

16   that request to plaintiffs' counsel?

17   A.    That was one of the original

18   requests, yes.

19   Q.    And if you did not include any

20   SOPs from either Endo, Qualitest or Par in

21   your report, would that be because you did

22   not review those SOPs as part of your

23   analysis?

24       MR. FULLER:  Object to form.

25   A.    I think that could be an

Highly Confidential - Subject to Further Confidentiality Review

1    accurate statement or the SOP wasn't relative

2    to my opinion, but generally speaking, if I

3    didn't cite it, it didn't have an influence

4    either one way or the other on my opinion.

5    Or I missed it, but...

6    BY MR. FAUVRE:

7        Q.    And so SOPs related to either

8    of these companies' suspicious order

9    monitoring programs would not have been

10   relevant to this report; is that your

11   testimony?

12              MR. FULLER:  Form.

13       A.    No, that's not my testimony.

14   BY MR. FAUVRE:

15       Q.    And so if there were SOPs

16   related to the suspicious order monitoring

17   program of any of these companies, you would

18   want to -- you want to have reviewed those;

19   is that correct?

20       A.    Yes, and I hope I did.

21       Q.    And if you didn't, would you

22   want to go back and review those to update

23   your report at some point?

24       A.    If it changed my opinion, I

25   would do that, if it's not accurate.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.    And if there were other

2   presentations that the companies made, either

3   to DEA or internally, about their suspicious

4   order monitoring programs that you did not

5   include in either Schedule I or in your

6   report, would you want to go back and review

7   those to form your opinion for this report?

8   A.    Information that was available

9   in the discovery?

10  Q.    Yes.

11  A.    Sure, if it would have an

12  influence that would change my opinion, I

13  would consider those documents.  I would

14  consider anything that I missed that anyone

15  thought was relevant -- relevant to my

16  opinion because I want my opinion to be

17  accurate based on all of the available facts.

18        The problem I had in this --

19  not in just this instance, but it was the

20  volume of records make it virtually

21  impossible, I think 50 million documents.

22  Q.    Sure.  Understand.

23        And if you omitted certain

24  documents, is it possible that your report

25  might be missing some key elements of

```
 1    analysis?
 2         A.    If there's a record that I
 3    didn't review or I missed, and it was
 4    impactful upon my opinion, I would agree with
 5    that statement.
 6              I'm not aware that I -- I know
 7    I did not intentionally omit documents to
 8    formulate an opinion, but if it's something
 9    that I did not see during my evaluation to
10    form my opinion, then I would obviously want
11    to know that.
12         Q.    It's possible those documents
13    weren't provided to you based on your
14    requests of plaintiffs' counsel; is that
15    correct?
16         A.    Well, I'm not sure I could
17    search 50 million documents, so I'm not going
18    to put that same expectation on someone else.
19         Q.    Sure.  But however the process
20    was, it's possible you missed documents that
21    could be relevant?
22         A.    Yes, I think that's possible.
23         Q.    You've talked a lot today and
24    in your report about the requirements of the
25    Controlled Substances Act and its
```

1    implementing regulations?

2          A.     Yes.

3          Q.     Do those -- does that statute

4    and the regulations apply to companies that

5    do not register with the DEA?

6          A.     That's one of the interesting

7    things that came up with Endo, because they

8    don't hold a DEA registration, and that was a

9    concern of mine when I was requested to

10   provide an opinion.

11             So in response to my question

12   to the plaintiffs' attorneys, I was

13   instructed that -- well, let me first state I

14   reviewed records that brought to my attention

15   they weren't a registrant when there was some

16   agreements with -- and I don't remember

17   exactly who they were.  I think it was with

18   the -- either stating they agreed with the

19   government or it was a document that said

20   they were telling the government that they

21   were going to assume the responsibilities of

22   a registrant; they're a virtual manufacturer.

23             So first I did some research on

24   a virtual manufacturer because that was new

25   to me as a diversion investigator.  So --

1    this is a long story -- I mean, not long

2    story.

3               But so when I brought this

4    situation up with the plaintiffs' attorneys,

5    they told me that that was a legal matter and

6    that was something that would be decided

7    between the attorneys at a later date.

8               So I treated my opinion as if

9    they were a registrant.

10   Q.    So your opinion is based on the

11   assumption that the Controlled Substances Act

12   and its implementing regulations and the

13   requirements to have a suspicious order

14   monitoring program apply to nonregistrants?

15   A.    Yes, knowing that -- I informed

16   the plaintiffs' attorneys about that and they

17   were aware of that, yes, sir.

18   Q.    And if it turns out that those

19   obligations do not apply to nonregistrants,

20   then your opinion as it relates to Endo would

21   not be accurate?

22               MR. FULLER:  Object to form.

23   A.    I don't know that I could draw

24   a legal conclusion.  I think that's some --

25   something that someone at the court would

```
 1    make for me in regards to that matter.

 2              But if a ruling came down it

 3    would make sense if they could not be treated

 4    as a registrant, I couldn't apply the -- I

 5    personally couldn't apply rules and

 6    regulations to them as a registrant.

 7         Q.    And the standards you applied

 8    in coming up with your opinion in this report

 9    and what you intend to testify to at trial is

10    based on an analysis of whether they complied

11    with the Controlled Substances Act and the

12    implementing regulations?

13         A.    That was the standards I

14    applied, yes, sir.

15         Q.    In looking at Endo's program

16    specifically, you reference on page 174 an

17    algorithm in paragraph -- numbered

18    paragraph 5 that says:  The SOM program looks

19    at buying wholesaler customers' 3-month and

20    12-month history and if any order is above

21    the 3- or 12-month, it goes on hold and it is

22    reviewed by customer service.

23              Is that correct?

24         A.    Yes, sir.

25         Q.    Is that the algorithm that you
```

1  reviewed to come up with your opinion as to

2  Endo's sufficiency under the Controlled

3  Substances Act?

4       A.    I think the main concern on

5  using just that to determine suspicious

6  orders, it was an evaluation of only size,

7  and it didn't consider frequency and pattern.

8       Q.    And then Endo later modified

9  its algorithm to include size -- quantity,

10 size and frequency?  That's in your report in

11 the next paragraph.

12      A.    Yes, yes, yes, 2014.  But the

13 opinion above was based on that --

14      Q.    So after 2014, do you believe

15 that the algorithm that Endo employed was

16 sufficient?

17           MR. FULLER:  Somebody that's on

18      the phone, we can hear you.  Can you

19      make sure you're muted, please?

20      Sorry.

21 BY MR. FAUVRE:

22      Q.    Yes or no?

23      A.    No, I think there were other

24 factors that weren't included in the SOM

25 system I think they had access to.

1    Q.    What about the algorithm, just

2    the algorithm itself as a way to flag

3    potentially suspicious orders, is that -- is

4    the system that they employed after 2014 a

5    sufficient system to flag potential

6    suspicious orders?

7    A.    I think my concern is what they

8    compared it to, the 3- and 12-month average.

9    I mean, it's their own purchasing average,

10   but I'm not sure that there was a comparison

11   to, like, customers or just standing on its

12   own, a 3- and a 12-month algorithm was a

13   concern to me.

14   Q.    Isn't that a more restrictive

15   analysis than Methodology A, which looks at

16   the highest month's total in the past six

17   months?  Here they're looking at an average

18   over three months and over 12 months, which

19   necessarily would be below the highest month

20   in either of those periods.

21   A.    It's definitely a layered

22   algorithm, so it looks at two different time

23   spans.  The 3-month algorithm is too short of

24   a period for me to be impactive.  The

25   12-month algorithm, using that as an average,

1    if that's the threshold and there's no

2    multiplier, I think that's a good start to

3    identify a suspicious order.

4          Q.    And are you aware that the FDA

5    approved that very methodology in the risk

6    map that Endo submitted for its Opana ER

7    product?

8                     MR. FULLER:  I'm sorry, FDA?

9                     MR. FAUVRE:  FDA.

10         A.    I'm not aware of that.

11   BY MR. FAUVRE:

12         Q.    Okay.  Moving to Qualitest, you

13   identify in numbered paragraph 9, you say:

14   As late as March 2013, Qualitest's SOM

15   process had multiple deficiencies.

16               And then you list several.

17               Were those deficiencies

18   corrected after March 2011?

19         A.    Well, later in there I report

20   some deficiencies in regards to the ability

21   to stop orders in different tiers.

22         Q.    But the deficiencies you

23   identified in paragraph 9, those were

24   corrected after March 2013; is that correct?

25         A.    I think Qualitest took steps to

Highly Confidential - Subject to Further Confidentiality Review

1    make changes.  I'm not sure they fully

2    integrated -- my recollection is they didn't

3    fully integrate the chargeback.  I think that

4    started to take a look at chargeback

5    information after 2013.

6                So I'm not sure I could make

7    a -- I would be in agreement that they

8    started to make changes, but I don't know

9    that they -- I would say they were fully

10   compliant based on the availability of some

11   other information they could have

12   incorporated.

13        Q.    And is it your opinion that

14   Qualitest's SOMS program was deficient in

15   2014 or does your opinion stop in the 2013

16   period?

17        A.    I don't give -- I don't give a

18   stopping date, but then I also don't make

19   comment on any changes that would be a system

20   that I thought was sufficient.

21                So I'm --

22        Q.    Do you have an opinion as to

23   whether Qualitest's program was sufficient

24   after 2013, so from 2014 forward?

25        A.    I don't make a statement in my

Highly Confidential - Subject to Further Confidentiality Review

1    report, but I believe it was because I don't

2    state otherwise.

3         Q.    So do you plan to offer

4    testimony at trial that Qualitest's program

5    was insufficient from 2014 until the present?

6         A.    I think I'll testify currently

7    to exactly what's in my report.

8         Q.    Which is that it was

9    insufficient up until 2013 and then you take

10   no opinion from 2014 on?

11        A.    Well, I think it says after the

12   spring of 2013, but it doesn't give a date up

13   to some of the -- some of the section of my

14   report give a date up to today or up to the

15   date of submission of my report.

16             I agree that this doesn't have

17   an ending date of my review.  It just

18   concludes after the spring of 2013.

19             I believe my recollection is,

20   is that that statement, it continued on after

21   that date, but I would only testify to the

22   content of my report, if I was...

23        Q.    And so the deficiencies you've

24   identified in your report existed in 2013,

25   but did not exist after 2013?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I'm not sure.

2      Q.      You take no opinion on whether

3  the Qualitest SOMS program was sufficient in

4  2014?

5      A.      I don't make -- well --

6      Q.      And --

7      A.      -- I'm concerned because I

8  don't say that they were -- I would make

9  comment.  If there was a correction and I

10  thought there was a proper or a compliant

11  suspicious order system, I would make comment

12  on that in my report.

13            The failure to make that

14  comment leads me to believe -- because I -- I

15  would take a little bit of time just to

16  review some documents, but I believe that it

17  remained deficient based on the failure for

18  me to say that it was corrected.

19      Q.      But you cite no evidence or

20  support for the belief that it was deficient

21  after 2014; is that correct?

22      A.      In my report, I do not.

23      Q.      And you don't intend to offer

24  any testimony at trial that the program was

25  deficient after 2014; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I think I would probably make

2   the same statement that I made here today.

3       Q.      That you don't have an opinion

4   one way or another as to the program after

5   2014?

6       A.      No, that it would be my opinion

7   that I would have -- if I thought that it was

8   changed, I would give credit to Qualitest

9   that it had a satisfactory suspicious order

10  system, and by that not appearing here, I

11  don't believe that's the case.

12      Q.      And you haven't identified

13  anywhere in your report any suspicious orders

14  that were allowed to ship by either

15  Qualitest, Endo, or Par; is that correct?

16      A.      I have not, no individual

17  orders have been identified up to this point

18  of my report, no, sir.

19      Q.      And you have not identified any

20  orders that were diverted that arose from

21  suspicious orders from either Endo, Par or

22  Qualitest; is that correct?

23      A.      No specific orders have been

24  identified by this report.

25              MR. FAUVRE:  Okay.  I reserve

1    time as well as the other defendants

2    have to come back and question this

3    witness.  We have a lot more to cover.

4    But thank you for your time.

5              THE WITNESS:  Okay.  Thank you.

6              THE VIDEOGRAPHER:  Going off

7    the record.  The time is 4:34 p.m.

8              (Recess taken, 4:34 p.m. to

9    4:36 p.m.)

10             THE VIDEOGRAPHER:  We're back

11   on the record at 4:36 p.m.

12                 EXAMINATION

13   BY MS. BARBER:

14        Q.    Good afternoon, Mr. Rafalski.

15   My name is Maureen Barber and I represent the

16   Teva defendants.  And these defendants are

17   covered on pages 178 to 185 of your report.

18             And I'll represent to you that

19   these defendants consist of Teva, Cephalon

20   and Actavis entities.  Would you agree

21   with that those pages of your report cover

22   your opinions on those particular defendants?

23        A.    Yes, I do.

24        Q.    How much time did you spend

25   reviewing documents related to your opinions

1      for Cephalon, Teva and Actavis entities?  Was

2      it more than ten hours?

3              A.      I believe it was.

4              Q.      More than 20 hours?

5              A.      No, I don't think so.

6              Q.      So somewhere between 10 and

7      20 hours?

8              A.      I believe so.

9              Q.      You mentioned in your report

10     ValueCentric data in the Teva defendants

11     section of your report.

12                     Would you agree?

13             A.      I do.

14             Q.      Are you familiar with

15     ValueCentric data?

16             A.      I've reviewed records and I'm

17     aware that as part of my evaluation, to give

18     you a description and evaluation or a

19     description, at this current time I'm not

20     able to do that, but I have read it in parts

21     of the deposition and other records.

22             Q.      Did you review any ValueCentric

23     867 data in relation to your assessment of

24     Teva's suspicious order monitoring system?

25             A.      I don't recall reviewing the

1    867 data.

2         Q.    Can you tell me what 867 data

3    is, what the source of the data is?  It's in

4    your report, so you must have -- you must

5    have an understanding of what 867 data is; is

6    that correct?

7         A.    The term "867 data," and I

8    believe I have a recollection, but it doesn't

9    describe it, and I don't want to misstate.

10        Q.    But nonetheless, you think that

11   it's important for Teva to have 867 data

12   incorporated in its suspicious order

13   monitoring program, but you don't know what

14   ValueCentric 867 data is?  Is that what

15   you're telling us?

16        A.    I believe it was an internal

17   system that did -- my recollection is it was

18   an inventory type of a system that could look

19   at distributions and on-hand inventory.  And

20   that's my recollection of what it was.

21        Q.    Okay.  So you're not sure what

22   that information would provide to Teva, the

23   Teva defendants, for purposes of

24   incorporating that information into their

25   suspicious order monitoring system?

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.      Well, sure, because I think
2  it -- if my recollection is correct, they
3  would know -- when an order came in from a
4  registrant, they would know how much product
5  the registrant had on hand.
6         Q.      The Value- -- would you agree
7  with me that the ValueCentric 867 data is
8  dependent on the information that the
9  customers provide to ValueCentric?  Would you
10 agree with that statement?
11        A.      Yes, it is.
12        Q.      And some customers might not
13 provide any information to ValueCentric;
14 wouldn't you agree?
15        A.      There is a possibility that
16 some registrants might share the information,
17 but I would hope that if a registrant would
18 not share information that would help prevent
19 diversion, that would be a consideration that
20 a manufacturer or distributor would take into
21 effect before they distribute controlled
22 substances.
23        Q.      You also mentioned in your
24 report IMS and IQVIA data; isn't that right?
25        A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      We discussed that today?

2        A.      Yes.

3        Q.      In your report in the sections

4   related to the Teva defendants, you don't

5   offer any opinion about whether any of the

6   Teva defendants should have used IMS or IQVIA

7   data as part of their suspicious order

8   monitoring systems, correct?

9        A.      I don't recall that they had

10  availability to that data.

11       Q.      You testified earlier also

12  about chargeback data and using chargeback

13  data to detect suspicious orders.

14               Do you remember that testimony

15  today?

16       A.      I do.

17       Q.      Only certain contracts generate

18  chargeback data, correct?

19       A.      Well, that's dependent on each

20  manufacturer and dependent on which products

21  they want to offer chargebacks.

22       Q.      Right.  So you would agree with

23  me that chargeback data would have limited

24  utility in detecting suspicious orders if

25  only a portion of a registrant's customers

Highly Confidential - Subject to Further Confidentiality Review

1    had contracts that generated chargeback data;

2    wouldn't you agree?

3          A.    No, I would not agree because

4    on that particular controlled substance, it

5    would provide additional relevant transaction

6    data.  So if it was a controlled substance --

7    and I know my report focuses on opioids, but

8    any controlled substance where you would be

9    able to have that downstream information, I

10   think it would be impactful on a suspicious

11   order report.

12         Q.    Do you know what percentage of

13   entities who received products from Teva

14   purchased products through contracts that

15   generate chargeback data?

16         A.    I don't recall that

17   information.

18         Q.    So -- and you would also agree

19   with me that downstream pharmacies or

20   downstream registrants that purchase from

21   wholesalers who are likely to redirect the

22   product through illegitimate channels would

23   not want to generate chargeback data.

24   Wouldn't you agree with that?

25         A.    No, I would not agree with

1    that.

2         Q.    So you're telling me that a

3    pharmacy who is likely to redirect the

4    product through illegitimate channels would

5    want to generate chargeback data?

6         A.    Well, my experience in doing

7    these investigations is the chargeback is

8    kind of the amount of profit in a

9    transaction.  So typically, if there was

10   no -- if a chargeback was available, it's

11   built into the price, and if you refuse to

12   accept the chargeback, that discount makes it

13   nonprofitable.

14            So typically, a registrant

15   would not handle a drug where a chargeback is

16   available.

17        Q.    So a pharmacy who is --

18        A.    It's possible, but that would

19   be my experience, that I have not come across

20   where a pharmacy would say I don't care about

21   the chargeback, I still want to make the

22   purchase from you.

23        Q.    Right.  So a pharmacy wouldn't

24   want to create a paper trail; isn't that

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      No.  What I'm saying is because
 2    of the profit -- the income built into the
 3    chargeback, I would say that they probably
 4    wouldn't care about whether or not the
 5    distributor knew about that.
 6           Q.      Did you review any chargeback
 7    data for Cephalon?
 8           A.      I don't believe I did, no.
 9           Q.      How about for any of the
10    Actavis entities?
11           A.      I don't recall that I reviewed
12    specific chargeback data.
13           Q.      And speaking specifically about
14    Cephalon, you're aware that they manufactured
15    Actiq and Fentora and generic Actiq; isn't
16    that correct?
17           A.      I believe that was brought to
18    my attention in reviewing records for this
19    report, yes, ma'am.
20           Q.      You're not offering any
21    opinions about whether any of those products
22    were diverted, are you?
23           A.      I'm offering an opinion about
24    the suspicious order system of the
25    registrants and it's not relative to any
```

1  specific product.

2      Q.     Are you offering any opinions

3  about whether any of those products were

4  improperly shipped?

5      A.     I'm just going to restate.

6  It's whether or not there was an effective

7  suspicious order system in place.  It's not

8  relative to any specific product.  If a -- if

9  the manufacturer sold it and they had no

10  suspicious order in place, that would be the

11  opinion I would place, not whether or not --

12  the scenario you described.

13      Q.     The DEA regulations, including

14  the Controlled Substances Act and the Code of

15  Federal Regulations, do not require that

16  registrants -- they don't state that

17  registrants must audit their own suspicious

18  order monitoring system; isn't that correct?

19      A.     There's nothing directly which

20  tells them that.  That would be a prudent and

21  advisable practice, but I don't think there's

22  nothing specifically that orders them to do

23  that.

24      Q.     And there's nothing in either

25  of those regulations stating that a

Highly Confidential - Subject to Further Confidentiality Review

1    registrant has to retain a third-party

2    consultant to review their suspicious order

3    monitoring system?

4        A.    No, absolutely not.  The

5    requirement puts that burden of compliance

6    directly on the registrant.

7        Q.    Where in the --

8        A.    What steps they take, if they

9    were to go to a third-party consultant,

10   that's strictly at their free choosing.

11       Q.    So it doesn't state that in the

12   regulations?

13       A.    It does not require them to do

14   that or state they should ever do that.  It

15   says they have to do that, not a third party.

16       Q.    Mr. Rafalski, you reviewed a

17   report prepared by Mr. Buzzeo and his

18   consulting firm in conjunction with preparing

19   your report in this case, right?

20       A.    I did.

21       Q.    And Mr. Buzzeo and his

22   consulting firm was retained to review Teva's

23   suspicious order monitoring system in 2012,

24   correct?

25       A.    They did -- they were, and my

1    recollection is they did not implement their

2    system.

3         Q.    What do you mean they didn't

4    implement their system?

5         A.    Buzzeo was not retained as a

6    consultant and the Buzzeo system was not

7    implemented at the company.

8         Q.    And at that time, he was

9    reviewing the Suspicious Orders I system for

10   Teva, correct?

11        A.    I think that's an accurate

12   statement, yes.

13        Q.    And at no point does the report

14   conclude that Teva's suspicious order

15   monitoring system was not compliant with DEA

16   regulations; isn't that a correct statement?

17        A.    Say that again.

18        Q.    At no point in Mr. Buzzeo's

19   report does he conclude that the Teva

20   suspicious order monitoring system was not

21   compliant with DEA regulations; wouldn't you

22   agree?

23        A.    I think -- I think he was

24   critical of the functionality of it, but in

25   reading other reports by Mr. Buzzeo, I don't

1    think he draws -- makes that conclusion.  At

2    least he doesn't put it in his reports,

3    because he's not a DEA representative.

4         Q.    The DEA regulations don't state

5    what type of suspicious order monitoring

6    model a registrant has to use; isn't that

7    correct?

8         A.    No, it's up to the registrant

9    to design their system that meets their

10   business needs and accomplishes the

11   identification of suspicious orders.

12        Q.    And it doesn't state anything

13   about what standard deviations or what number

14   of standard deviations a registrant should

15   use in its algorithm for monitoring

16   suspicious orders?

17        A.    It does not give guidance in

18   that area.

19        Q.    At the time the Buzzeo

20   report -- I'm sorry, strike that.

21             The Buzzeo report concluded

22   that SORDS II, which is an improvement on the

23   SORDS I suspicious order monitoring program,

24   that Teva had in place was an improvement

25   over SORDS I; isn't that correct?

```
 1              A.      I believe he did make that

 2      comment, yes.  He didn't say that it was

 3      sufficient to be compliant, but he did say it

 4      was an improvement.

 5              Q.      But again, he didn't say that

 6      it wasn't compliant with DEA regulations?

 7              A.      No, I didn't say that.

 8              Q.      My question to you is:  He

 9      didn't say that it wasn't compliant with DEA

10      regulations?

11              A.      He never made that exact

12      statement.

13              Q.      Teva also had an internal audit

14      of its own suspicious order monitoring

15      program?

16              A.      I believe so, yes.

17              Q.      And that program was rated

18      overall as effective, correct?

19              A.      Yes, but it's an internal

20      audit.

21              Q.      The DEA regulations don't

22      require that companies actively audit their

23      own programs, correct?

24              A.      No, that's true.  But I only

25      make that statement because sometimes the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    person that does the audit, without knowing

 2    the full information on the audit, is the

 3    person in charge of the system, so they don't

 4    typically give a bad audit to themselves.

 5              So, I mean, I'm not totally

 6    discounting it, but I'm always concerned

 7    about internal audits.

 8         Q.    Mr. Rafalski, in your report

 9    you don't identify any suspicious order that

10    Teva shipped to Summit County or Cuyahoga;

11    isn't that correct?

12         A.    I do not identify any single

13    suspicious order -- any order specifically

14    that was suspicious.

15         Q.    And that goes for Cephalon and

16    the Actavis entities as well, correct?

17         A.    As I sit here today, that's an

18    accurate statement.

19         Q.    And you don't identify any

20    order that Teva failed to flag as suspicious?

21         A.    Is that question a specific

22    order?

23         Q.    Any order that Teva failed to

24    flag as suspicious, you don't have an example

25    of any specific order?

1    A.    No, I think my examples in here

2    are more -- go more to the conduct of the due

3    diligence and it doesn't specifically say

4    that there was a specific order, but I think

5    the totality of the incident that I describe

6    on page 183 I think would include that, but

7    to answer your question, there's no specific

8    order where I state that.

9    Q.    And I want to ask you quickly

10   about that order.

11        You're speaking of the Publix

12   Supermarket pharmacies incident or scenario

13   that we discussed -- that's in your report on

14   page 183?

15   A.    Yes, I am.

16   Q.    The orders involving the Publix

17   Supermarket pharmacies were not orders placed

18   from Publix to Teva, were they?

19   A.    No, they were placed to a

20   distributor, an in-between so --

21   Q.    Right.  They were orders placed

22   from Publix to Anda, correct?

23   A.    Yes.  But so the first concern

24   that I would have with this is that Teva

25   would need a means of effective controls to

Highly Confidential - Subject to Further Confidentiality Review

1    go to Anda and see why this situation

2    occurred.

3           Q.    And it did do that, correct?

4           A.    I don't recall that occurring.

5           Q.    Well, so you read the

6    deposition of Joe Tomkiewicz, didn't you?

7           A.    Yes.

8           Q.    And sitting here today, you

9    don't know whether any of Teva's product was

10   ultimately shipped to one of those Publix

11   Supermarkets that Joe Tomkiewicz identified

12   as entities he wanted to look into, correct?

13          A.    Based on my review, he was

14   looking at the chargebacks, and I believe

15   they were Teva products.

16          Q.    But you would agree with me

17   that Joe Tomkiewicz testified he didn't see

18   any specific orders of Teva's products,

19   correct?

20          A.    Yes, but if they weren't Teva's

21   products, I'm not sure that he would have

22   taken all this action unless he was

23   indicating it was someone else's product that

24   he was going to go investigate.

25          Q.    Well, he could have been

Highly Confidential - Subject to Further Confidentiality Review

 1    looking at those because Anda is his

 2    customer, correct?

 3         A.    Yes.

 4         Q.    Right.  And he was looking at

 5    Publix's forecasting data, correct?

 6         A.    Yes.

 7              MR. FULLER:  Counsel, I believe

 8         the 14 hours is up.

 9              MS. BARBER:  All right.  At

10         this time I am going to reserve my

11         time.  I haven't had -- along with my

12         colleagues, haven't had adequate time

13         to ask questions of Mr. Rafalski,

14         which is a violation of our clients'

15         due process, and we reserve any

16         additional time in the future to

17         examine Mr. Rafalski or reexamine

18         Mr. Rafalski.

19              MS. SWIFT:  Before we break,

20         I'd like to put one additional thing

21         on the record.

22              Mr. Rafalski, you said your

23         method for assessing the defendants'

24         suspicious order monitoring system is

25         based on your experience, training and

```
 1          legal guidance from lawyers at the

 2          DEA.

 3                  Just yes or no, does your Touhy

 4          authorization --

 5                  MR. FULLER:  Don't answer this

 6          question.

 7                  MS. SWIFT:  -- prevent you from

 8          disclosing the legal guidance from DEA

 9          lawyers that supports your opinion?

10                  MR. FULLER:  Don't answer the

11          question.  She's over her time.

12                  Off the record.

13                  THE VIDEOGRAPHER:  Going off

14          the record, 4:52 p.m.

15                  (Recess taken, 4:52 p.m. to

16          4:52 p.m.)

17                  (The following proceedings were

18          conducted off the videotaped record.)

19                  MR. MATTHEWS:  Good afternoon.

20          This is James Matthews.  I represent

21          Anda Inc.  I've sat here for two days

22          at this deposition and have not asked

23          any questions because the name Anda

24          doesn't appear in your report.

25                  However, in the last series of
```

```
 1        questions, for the first time in two

 2        days, the name Anda came up in your

 3        testimony.  However, because of the

 4        limits placed on the defendants for

 5        asking questions at these depositions

 6        and because we have exceeded those

 7        limits at this point in time, I am not

 8        able to ask you questions, and so for

 9        the record, I want to put on the

10        record that we object to that

11        procedure and that we reserve our

12        rights to seek an opportunity to ask

13        you questions should you seek to offer

14        an opinion about Anda at trial.

15             Thank you very much.

16             MS. SWIFT:  And I'll just add

17        that counsel instructed the witness

18        not to answer at 7 hours and one

19        minute.  We were one minute over our

20        time and we were cut off.

21             THE REPORTER:  Done?

22             MR. PYSER:  Mr. Rafalski, can

23        you confirm that you're not going to

24        answer Ms. Swift's question?

25             MR. FULLER:  Don't answer that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Based on the

 2         instruction of counsel, are you going

 3         to answer the question or not?

 4              MR. FULLER:  No, I'm going to

 5         have a couple of minutes, so,

 6         Mr. Pyser, if you want to ask him

 7         after I get my couple of minutes in,

 8         you can.

 9              MR. MATTHEWS:  If you're going

10         to have additional questions, I'd like

11         a --

12              THE REPORTER:  Are we still on

13         the record?  I can't hear down at the

14         end of the table.  I can't hear that.

15              We're off the record.

16              (Recess taken, 4:54 p.m. to

17         4:56 p.m.)

18              (Whereupon the videotaped

19         record resumes.)

20              THE VIDEOGRAPHER:  We're back

21         on record, 4:56 p.m.

22                   EXAMINATION

23    BY MR. FULLER:

24         Q.    Good afternoon, Mr. Rafalski,

25    how are you?
```

1          A.     Good afternoon, Mr. Fuller.

2   I'm fine, thank you.

3          Q.     This is only going to take a

4   few minutes.

5                 In your report on approximately

6   page 40 through 43, 44 identifies several

7   methodologies and the results that Mr. McCann

8   came up with based on those results, applying

9   them to the ARCOS data in the distributors'

10  own information, correct?

11         A.     Yes, sir.

12         Q.     And I want to make sure we're

13  clear, because there was some going back and

14  forth about that.

15                What you have put in your

16  report is the dosage units from those

17  results, correct?

18                MS. SWIFT:  Objection, leading.

19                MR. FULLER:  You can answer.

20         A.     Yes, sir.

21  BY MR. FULLER:

22         Q.     She's going to object; she's

23  just preserving her right for the record.

24         A.     I understand.

25         Q.     Okay.  Underlying those dosage

Highly Confidential - Subject to Further Confidentiality Review

1    units would be individual orders to

2    individual pharmacies within CT1; is that

3    your understanding?

4                 MS. SWIFT:  Objection, leading.

5         A.     That's correct.  Every dosage

6    unit that is listed here would be as the

7    result of an order to a registrant in CT1.

8    BY MR. FULLER:

9         Q.     And of these five

10   methodologies, I think you opined earlier,

11   and correct me if I'm wrong, that the first

12   methodology, which was derived out of the

13   Masters case, was the one that you chose to

14   utilize as being appropriate as an initial

15   trigger, correct?

16                MS. SWIFT:  Objection, leading.

17        A.     I believe that was my --

18                THE WITNESS:  That's okay.  I'm

19           sorry I interrupted you and didn't

20           wait.

21        A.     Yes, that -- that was my

22   earlier testimony.

23   BY MR. FULLER:

24        Q.     And just so the record is

25   clear, because everybody's referred to them

1    as different things, methodologies, SOMS.

2    You're not saying that the methodology

3    selected is a complete SOM system; it's only

4    a system to give initial triggers for

5    suspicious orders, correct?

6         A.    I think that was my previous

7    testimony, but that would be the first part

8    of a suspicious order system, to identify an

9    order, in this case, only -- in size only.

10        Q.    And multiple counsel have asked

11   you today related to -- or asked you

12   questions related to your assumptions or your

13   assumption -- excuse me -- your opinion that

14   once a suspicious order is triggered, if due

15   diligence isn't conducted, the failure to

16   remove that due diligence means all the other

17   orders are suspicious from that point

18   forward?

19            MS. SWIFT:  Objection, vague.

20        A.    I believe I've stated that

21   numerous times over the last two days.

22   BY MR. FULLER:

23        Q.    And I believe you provided some

24   of your bases, but you've also reviewed and

25   read portions of Mr. Prevoznik's testimony as

1    the 30(b) for the DEA in this litigation,

2    right?

3         A.    I did read his section where he

4    speaks to that same -- he doesn't speak to

5    the methodology, but he speaks to the same

6    position from the DEA.

7              MR. FULLER:  A.J., hand me my

8         yellow expandable.

9              So I'm going to hand you and

10        mark as Exhibit -- what exhibit are we

11        up to?

12             (Whereupon, Deposition Exhibit

13        Rafalski-29, Plaintiff Cardinal Health

14        Inc.'s Reply in Support of Motion for

15        Preliminary Injunction, was marked for

16        identification.)

17   BY MR. FULLER:

18        Q.    So Plaintiffs' Exhibit 29, have

19   you seen this document before?

20        A.    I have.

21             MS. SWIFT:  Do you have a copy?

22   BY MR. FULLER:

23        Q.    If you turn to page 17.  And

24   for the record, this is attached to

25   Mr. Prevoznik's depo as either Exhibit 8 or

1     9.

2                    Now, on page 17, it reads:

3     Cardinal Health's policy -- and this is a

4     pleading Cardinal filed in its action in the

5     United States District Court for the District

6     of Columbia against Eric Holder.

7                    It says:  Cardinal Health's

8     policy about which it informed the DEA as

9     early as 2009 was that if a customer order

10    could not be filled because it was

11    suspicious, Cardinal Health would terminate

12    controlled substance sales to the customer

13    and report the termination to the DEA.

14                   Do you see that?

15    A.     Yes, sir, I do.

16    Q.     Is that consistent with your

17    opinion that if you can't clear due

18    diligence, you have to cut off the

19    customer -- or excuse me.

20                   If you can't do -- if you don't

21    do adequate due diligence to dispel the

22    suspicion, that you have to cut off the

23    customer or you can no longer ship controlled

24    substances to them?

25                   MS. SWIFT:  Objection,

1    compound.

2         A.    I would also state that if you

3    cut the order, there would be no requirement

4    for a suspicious order under the Masters

5    ruling.  You could -- you could do due

6    diligence, but if you identified an order and

7    cut it, stopped any future shipment, I

8    believe it wouldn't be necessary to do due

9    diligence.

10   BY MR. FULLER:

11        Q.    Meaning because you're not

12   shipping to them again?

13        A.    Yes.

14        Q.    Okay.  But if you receive a

15   suspicious order and you do not dispel the

16   suspicion, you can't continue to ship to that

17   customer, correct?

18        A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review



19    BY MR. FULLER:

20         Q.    These methodologies that you

21    identified, 1 through 5, they could also be

22    ran on the manufacturers' shipments to its

23    customers, correct?

24              MR. O'CONNOR:  Objection, form.

25         A.    Yes, the methodologies could be

1    applied to any of the persons involved in the

2    CT1 litigation.

3    BY MR. FULLER:

4         Q.    And counsel's asked you several

5    times about know your customer -- customer's

6    customer.

7              Do you recall that line of

8    questioning?

9         A.    Yes, I do.

10        Q.    Is it your opinion that

11   whatever information a registrant has,

12   whether it be in the sales department or any

13   other department within their organization,

14   that if it would be valuable to use for the

15   suspicious order monitoring system, it should

16   be used for that purpose as well?

17             MR. O'CONNOR:  Objection, form.

18        A.    I agree and I believe I've

19   testified to that on numerous occasions in

20   the last two days.

21   BY MR. FULLER:

22        Q.    And that's whether it's

23   chargeback data, IQVIA data,

24   doctor detailing data, pharmacy visits --

25        A.    Any relevant transaction --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. O'CONNOR:  Objection, form.

 2                    MR. FULLER:  I'm sorry, go

 3          ahead.

 4          A.       Any relevant transactions.

 5                    MR. FULLER:  I don't have

 6          anything further.

 7                    THE VIDEOGRAPHER:  Going off

 8          the record, 5:04 p.m.

 9                    (Recess taken, 5:04 p.m. to

10          5:14 p.m.)

11                    THE VIDEOGRAPHER:  We're back

12          on the record at 5:14 p.m.

13                         EXAMINATION

14     BY MR. MATTHEWS:

15          Q.       Good afternoon, Mr. Rafalski.

16     I already introduced myself to you but just

17     for the record, I'm James Matthews.  I

18     represent Anda Inc.

19          A.       Good afternoon.

20          Q.       How are you.

21                    I want to take you back to the

22     beginning of the day.  There were some

23     questions asked of you by Ms. Swift who

24     represented Walgreens.

25                    Do you remember that very
```

Highly Confidential - Subject to Further Confidentiality Review

1    beginning of the day, right in the morning?

2        A.    I recall I was interviewed or

3    deposed about Walgreens.  I don't

4    specifically -- the questions, I don't

5    recall.

6        Q.    Okay.  You issued 183 --

7    180-some-odd-page report, right?

8        A.    Yes, sir.

9        Q.    And in that, you set forth your

10   opinions, and you told Ms. Swift that all of

11   your opinions are in that report, right?

12       A.    Of the companies that I

13   evaluated, the opinion -- of -- yes.

14       Q.    Yes.

15             And the bases for those

16   opinions, except insofar as they're based on

17   your own personal experience and knowledge,

18   are in the footnotes to that report, right?

19             MR. FULLER:  I'm going to

20        object, and if I can have a running

21        objection that this is outside my

22        cross.

23             MR. MATTHEWS:  That's fine, you

24        can have your objection, thank you.

25             MR. FULLER:  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I think it's an accurate

 2    statement.  It was based on the review of the

 3    records that I cited.

 4    BY MR. MATTHEWS:

 5          Q.     Okay.  There's not a single

 6    document created by Anda Inc. cited in any of

 7    the footnotes in your report, right?

 8          A.     That's correct.

 9          Q.     And that means that there's --

10    and there's no depositions of any Anda Inc.

11    employees cited in any of the footnotes of

12    your report, right?

13          A.     There is not.

14          Q.     In fact, you haven't done

15    anything to look at Anda's suspicious order

16    monitoring program, right?

17          A.     I have not.

18          Q.     And since there's no

19    information that would be the basis for any

20    opinions as to Anda's suspicious order

21    monitoring system in your report, it's safe

22    to say that there are no opinions about

23    Anda Inc. in your report, right?

24          A.     There's no opinions of Anda in

25    the current report, right here, no, sir.
```

```
 1              Q.      And so I'd like you, if you
 2      could, to just open your report to page 7.
 3      You know that Anda, Inc. is one of the
 4      defendants in this action, right?
 5              A.      I believe so, yes, sir.
 6              Q.      Okay.  Looking at page 7 of
 7      your report, in the second full paragraph,
 8      you wrote:  I am of the opinion to a
 9      reasonable degree of professional certainty
10      that there was a systematic, prolonged
11      failure over many years by the defendant
12      manufacturers and distributors to maintain
13      effective controls against diversion of
14      legitimate opioid prescriptions into the
15      illicit market.
16                      Did I read that correctly?
17              A.      You did.
18              Q.      So Anda is a defendant, right?
19              A.      Yes, sir.
20              Q.      And that opinion as described
21      on page 7 does not apply to Anda, right?
22              A.      As I sit here today, no, I have
23      not reviewed any records related to Anda.
24              Q.      Okay.  I want to ask one more
25      question following up on your testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                During the course of the

 2      deposition, you've said on several occasions

 3      that your method for assessing the

 4      defendants' suspicious order monitoring

 5      systems is based in part on your experience,

 6      training and guidance from lawyers at DEA; is

 7      that correct?

 8                Do you remember that testimony?

 9          A.    Yes, sir.

10          Q.    Okay.  This is just a yes-or-no

11      answer:  Does the Touhy authorization that

12      you received for today's testimony prevent

13      you from disclosing the legal guidance from

14      DEA lawyers that supports your opinions?

15          A.    So just so I understand the

16      question.  Does the Touhy letter prevent me

17      from answering that question?

18          Q.    Right.

19          A.    I believe it does, yes.

20                MR. MATTHEWS:  Thank you.  I

21          have no further questions.

22                THE VIDEOGRAPHER:  Going off

23          the record, 5:18 p.m.

24                (Proceedings recessed at

25          5:18 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2          I, MICHAEL E. MILLER, Fellow of
     the Academy of Professional Reporters,
 3   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Court Reporter
 4   and Notary Public, do hereby certify that
     prior to the commencement of the examination,
 5   JAMES E. RAFALSKI was duly sworn by me to
     testify to the truth, the whole truth and
 6   nothing but the truth.
 7          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
            I DO FURTHER CERTIFY that pursuant
11   to FRCP Rule 30, signature of the witness was
     not requested by the witness or other party
12   before the conclusion of the deposition.
13          I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
14   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
15   employee of such attorney or counsel, and
     that I am not financially interested in the
16   action.
17
18   _____
     MICHAEL E. MILLER, FAPR, RDR, CRR
19   Fellow of the Academy of Professional Reporters
     NCRA Registered Diplomate Reporter
20   NCRA Certified Realtime Reporter
     Certified Court Reporter
21
     Notary Public
22   My Commission Expires:  7/9/2020
23   Dated: May 15, 2019
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.

10              You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14              It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                           ERRATA

 2      PAGE   LINE   CHANGE

 3      _____  _____  _____

 4             REASON: _____

 5      _____  _____  _____

 6             REASON: _____

 7      _____  _____  _____

 8             REASON: _____

 9      _____  _____  _____

10             REASON: _____

11      _____  _____  _____

12             REASON: _____

13      _____  _____  _____

14             REASON: _____

15      _____  _____  _____

16             REASON: _____

17      _____  _____  _____

18             REASON: _____

19      _____  _____  _____

20             REASON: _____

21      _____  _____  _____

22             REASON: _____

23      _____  _____  _____

24             REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, JAMES E. RAFALSKI, do hereby
        certify that I have read the foregoing pages
 5      and that the same is a correct transcription
        of the answers given by me to the questions
 6      therein propounded, except for the
        corrections or changes in form or substance,
 7      if any, noted in the attached
        Errata Sheet.

 8

 9

10

11

12      _____

        JAMES E. RAFALSKI                     DATE
13

14

15      Subscribed and sworn to before me this

16      _____ day of _____, 20 _____.

17      My commission expires: _____

18

19      _____

20      Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2

 3       PAGE      LINE

 4       _____     _____     _____

 5       _____     _____     _____

 6       _____     _____     _____

 7       _____     _____     _____

 8       _____     _____     _____

 9       _____     _____     _____

10       _____     _____     _____

11       _____     _____     _____

12       _____     _____     _____

13       _____     _____     _____

14       _____     _____     _____

15       _____     _____     _____

16       _____     _____     _____

17       _____     _____     _____

18       _____     _____     _____

19       _____     _____     _____

20       _____     _____     _____

21       _____     _____     _____

22       _____     _____     _____

23       _____     _____     _____

24       _____     _____     _____

25
```