## Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3

      _____
 4

      IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
 5    OPIATE LITIGATION                Case No. 17-md-2804

 6
      This document relates to:        Judge Dan
 7                                      Aaron Polster
 8    The County of Cuyahoga v. Purdue
      Pharma, L.P., et al.
 9    Case No. 17-OP-45005
10    City of Cleveland, Ohio vs. Purdue
      Pharma, L.P., et al.
11    Case No. 18-OP-45132
12    The County of Summit, Ohio,
      et al. v. Purdue Pharma, L.P.,
13    et al.
      Case No. 18-OP-45090
14    _____
15
16
17
18          Videotaped Deposition of Joseph Rannazzisi
19                     Washington, D.C.
20                      April 26, 2019
21                        8:37 a.m.
22
23
24    Reported by:  Bonnie L. Russo
25    Job No. 3301876
```

## Page 2

```
 1    Videotaped Deposition of Joseph Rannazzisi held
 2    at:

 3

 4

 5

 6

 7

 8                  Williams & Connolly, LLP

 9                  725 12th Street, N.W.

10                  Washington, D.C.

11

12

13    Pursuant to Notice, when were present on behalf

14    of the respective parties:

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1    APPEARANCES:
 2
 3    On behalf of the Witness:
      GREGORY M. UTTER, ESQ.
 4    KEATING MUETHING & KLEKAMP, PLL
      One East Fourth Street
 5    Suite 1400
      Cincinnati, Ohio 45202
 6    513-579-6540
 7    On behalf of the U.S. Department of Justice:
      JAMES R. BENNETT, II, ESQ.
 8    UNITED STATES ATTORNEY'S OFFICE
      801 West Superior Avenue
 9    Suite 400
      Cleveland, Ohio 44113
10    216-622-3988
      james.bennett4@usdoj.gov
11
      On behalf of Cuyahoga County:
12    HUNTER J. SHKOLNIK, ESQ.
      NAPOLI SHKOLNIK, PLLC
13    360 Lexington Avenue, 11th Floor
      New York, New York 10017
14    212-397-1000
      sshkolnik@napolilaw.com
15
      On behalf of Summit County:
16    LINDA SINGER, ESQ.
      SARA D. AGUINIGA, ESQ.
17    MOTLEY RICE, LLC
      401 9th Street, N.W.
18    Suite 1001
      Washington, D.C. 20004
19    202-386-9626
      lsinger@motleyrice.com
20    saguiniga@motleyrice.com
21
22
23
24
25
```

## Page 4

```
 1    APPEARANCES (CONTINUED):
      On behalf of Plaintiffs:
 2    PAUL T. FARRELL, JR., ESQ.
      GREENE KETCHUM, LLP
 3    419 Eleventh Street
      Huntington, West Virginia 25701
 4    304-525-9115
      paul@greeneketchum.com
 5       -and-
      MICHAEL J. FULLER, ESQ.
 6    McHUGH FULLER LAW GROUP
      97 Elias Whiddon Road
 7    Hattiesburg, Mississippi 39402
      601-467-0788
 8    mike@mchughfuller.com
         -and-
 9    MILDRED CONROY, ESQ.
      THE LANIER LAW FIRM
10    Tower 56
      126E. 56th Street, 6th Floor
11    New York, New York 10022
      212-421-2800
12    mildred.conroy@lanierlawfirm.com
13    On behalf of Purdue Pharma, L.P.:
      DEBRA D. O'GORMAN, ESQ.
14    DECHERT, LLP
      Three Bryant Park
15    1095 Avenue of the Americas
      New York, New York 10036
16    212-698-3593
      debra.ogorman@dechert.com
17
      On behalf of Johnson & Johnson and Janssen
18    Pharmaceuticals, Inc.:
      EMILIE K. WINCKEL, ESQ.
19    O'MELVENY & MYERS, LLP
      1625 Eye Street, N.W.
20    Washington, D.C. 20006
      202-383-5129
21    ewinckel@omm.com
         -and-
22    JEFFREY C. SINDELAR, JR., ESQ.
      (Via Teleconference)
23    TUCKER ELLIS, LLP
      950 Main Avenue
24    Suite 1100
      Cleveland, Ohio 44113
25    216-592-5000
      jeffrey.sindelar@tuckerellis.com
```

```
                                              Page 5
 1    APPEARANCES (CONTINUED):
 2    On behalf of Walmart, Inc.:
      NEAL J. STEPHENS, ESQ.
 3    JONES DAY
      1755 Embarcadero Road
 4    Palo Alto, California 94303
      650-739-3939
 5    nstephens@jonesday.com
          -and-
 6    PATRICK J. BEISELL, ESQ.
      (Via Teleconference)
 7    JONES DAY
      77 West Wacker
 8    Chicago, Illinois 60601
      312-269-4066
 9    pbeisell@jonesday.com
10    On behalf of Endo:
      MICHAEL S. TYE, ESQ.
11    ARNOLD & PORTER
      601 Massachusetts Avenue, N.W.
12    Washington, D.C. 20001
      202-942-5000
13    michael.tye@arnoldporter.com
14    On behalf of Rite Aid of Maryland:
      KELLY A. MOORE, ESQ.
15    MATTHEW R. LADD, ESQ.
      (Via Teleconference)
16    MORGAN, LEWIS & BOCKIUS, LLP
      101 Park Avenue
17    New York, New York 10178
      212-309-6612
18    kelly.moore@morganlewis.com
      matthew.ladd@morganlewis.com
19
      On behalf of Teva Pharmaceutical Industries:
20    MORGAN LEWIS & BOCKIUS, LLP
      MAUREEN BARBER, ESQ.
21    (Via Teleconference)
      One Oxford Centre
22    Thirty Second Floor
      Pittsburgh, Pennsylvania 15219
23    412-560-7463
24
25
```

```
                                              Page 6
 1    APPEARANCES (CONTINUED):
 2    On behalf of Cardinal Health, Inc.:
      WILLIAMS & CONNOLLY, LLP
 3    ENU MAINIGI, ESQ.
      COLLEEN McNAMARA, ESQ.
 4    JENNIFER WICHT, ESQ.
      725 12th Street, N.W.
 5    Washington, D.C. 20005
      202-434-5000
 6    emainigi@wc.com
      cmcnamara@wc.com
 7    jwicht@wc.com
 8    On behalf of CVS Indiana, LLC and CVS Rx
      Services, Inc.:
 9    ANTHONY M. RUIZ, ESQ.
      ZUCKERMAN SPAEDER, LLP
10    1800 M Street, N.W.
      Suite 1000
11    Washington D.C. 20036
      202-778-1800
12    aruiz@zuckerman.com
13    On behalf of AmerisourceBergen Drug
      Corporation:
14    SHANNON McCLURE, ESQ.
      ROBERT NICHOLAS, ESQ.
15    REED SMITH, LLP
      Three Logan Square, Suite 3100
16    1717 Arch Street
      Philadelphia, Pennsylvania 19103
17    215-241-7910
18    smclure@reedsmith.com
      rnicholas@reedsmith.com
19
20
21
22
23
24
25
```

```
                                              Page 7
 1    APPEARANCES (CONTINUED):
 2
      On behalf of McKesson Corporation:
 3    GEOFFREY E. HOBART, ESQ.
      MEGHAN E. MONAGHAN, ESQ.
 4    COVINGTON & BURLING, LLP
      One CityCenter
 5    850 Tenth Street, N.W.
      Washington, D.C. 20001
 6    202-662-6000
      ghobart@cov.com
 7    mmonaghan@cov.com
          -and-
 8    CHRISTOPHER K. EPPICH, ESQ.
      COVINGTON & BURLING, LLP
 9    1999 Avenue of the Stars
      Los Angeles, California 90067
10    424-332-4764
      ceppich@cov.com
11
      On behalf of Allergan Finance, LLC:
12    CATIE VENTURA, ESQ.
      KIRKLAND & ELLIS, LLP
13    655 Fifteenth Street, N.W.
      Washington, D.C. 20005
14    202-879-5907
      catie.ventura@kirkland.com
15
      On behalf of Mallinckrodt and Specgx, LLC:
16    ANDREW O'CONNOR, ESQ.
      WILLIAM DAVISON, ESQ.
17    ROPES & GRAY, LLP
      Prudential Tower
18    800 Boylston Street
      Boston, Massachusetts 02199
19    617-951-7000
      andrew.o'connor@ropesgray.com
20    william.davison@ropesgray.com
21
      On behalf of H.D. SMITH:
22    WILLIAM E. PADGETT, ESQ.
      (Via Teleconference)
23    BARNES & THORNBURG, LLP
      11 South Meridian Street
24    Indianapolis, Indiana 46204
      317-236-1313
25    william.padgett@btlaw.com
```

```
                                              Page 8
 1    APPEARANCES (CONTINUED):
 2    On behalf of Anda, Inc.:
      JAMES W. MATTHEWS, ESQ.
 3    FOLEY & LARDNER, LLP
      111 Huntington Avenue
 4    Boston, Massachusetts 02199
      617-342-4000
 5    jmatthews@foley.com
 6    On behalf of HBC:
      SCOTT D. LIVINGSTON, ESQ.
 7    MARCUS & SHAPIRA, LLP
      One Oxford Centre, 35th Floor
 8    301 Grant Street
      Pittsburgh, Pennsylvania 15219
 9    412-338-4690
      livingston@marcus-shapira.com
10
      On behalf of Walgreen Co. and Walgreen Eastern
11    Co., Inc.:
      KASPAR STOFFELMAYR, ESQ.
12    BARTLIT BECK, LLP
      54 West Hubbard Street
13    Suite 300
      Chicago, Illinois 60654
14    312-494-4445
      312-494-4434
15    kaspar.stoffelmayr@barlitbeck.com
16    On behalf of Prescription Supply, Inc.
      STEPHAN CORNELL, ESQ.
17    (Via Teleconference)
      FOX ROTHSCHILD, LLP
18    Stone Manor Corporate Center
      2700 Kelly Road, Suite 300
19    Warrington, Pennsylvania 18976
      215-918-3680
20    scornell@foxrothschild.com
21    On behalf of Discount Drug Mart:
      ERIC J. WEISS, ESQ.
22    (Via Teleconference)
      CAVITCH FAMILO & DURKIN, CO., LPA
23    1300 E. 9th Street
      Cleveland, Ohio 44114
24    216-621-7860
      eweiss@cavitch.com
25
```

Page 9

```
1    APPEARANCES (CONTINUED):
2
     ALSO PRESENT:
3    Special Master Cohen
     Larry Feldman, Plaintiffs
4    Renee A. Bacchus, Esq., United States
     Department of Justice, United States Attorney's
5    Office
     David M. Finkelstein, Esq., United States
6    Department of Justice, Civil Fraud Section
     Patrick J. Forrest, United States Department of
7    Justice, Drug Enforcement Administration
     Daniel Russo, Videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 10

```
1              C O N T E N T S
2    EXAMINATION OF JOSEPH RANNAZZISI     PAGE
3    BY MR. EPPICH                          16
4    BY MR. O'CONNOR                        92
     BY MR. STEPHENS                       130
5                                          356
6
7    BY MS. MAINIGI                        226
8
9
10
11             EXHIBITS
12
13   Exhibit 1   Second Amended Notice of    18
                 Videotaped Deposition of
                 Joseph Rannazzisi
14
     Exhibit 2   Aggregate Production Quota   31
15               History for Selected Substances
16   Exhibit 3   Diversion Control Division   34
                 Website Pages
17
18   Exhibit 4   Article entitled "Who is     74
                 Joe Rannazzisi:  The DEA man
19               who fought the drug companies
                 and lost"
20   Exhibit 5   Letter date stamped        100
                 12-29-14
21               US-DEA-00011611-621
22   Exhibit 6   Cover2 Resources Podcast   104
                 Transcript
23
     Exhibit 7   Drug Enforcement           183
24               Administration's Regulation
                 on Medicine Hearing 7-12-07
25
```

Page 11

```
1    EXHIBITS (CONTINUED):
2
3    Exhibit 8   Examining the Growing      190
                 Problems of Prescription
4                Drug and Heroin Abuse
                 Hearing 4-29-14
5    Exhibit 9   Rogue Online Pharmacies:   211
                 The Growing Problem of
6                Internet Drug Trafficking
                 Hearing
7                5-16-07
8    Exhibit 10  Internet Pharmacies        216
                 Slide Deck
9
     Exhibit 11  Prescription Drug Diversion:  218
10               Combating the Scourge
                 Hearing
11               3-1-12
12   Exhibit 12  Letter dated 9-27-06       288
                 CAH_MDL_PRIORPROD_DEA12_00006133-136
13
     Exhibit 13  Letter dated 9-27-07       288
14               CAH_MDL_PRIORPROD_DEA12_00010980-981
15   Exhibit 14  Internet Pharmacies        356
                 Slide Deck
16               US-DEA-00002413
17
18
19   (Exhibits included with transcript.)
20
21
22
23
24
25
```

Page 12

```
1              P R O C E E D I N G S
2
3         THE VIDEOGRAPHER:  Good morning.  We
4    are going on the record at 8:37 a.m. on April
5    26, 2019.
6         Please note that the microphones are
7    sensitive and may pick up whispering, private
8    conversations and cellular interference.
9    Please turn off all cell phones or place them
10   away from the microphones as they can interfere
11   with the deposition audio.  Audio and video
12   recording will continue to take place unless
13   all parties agree to go off the record.
14        This is Media Unit 1 of the
15   video-recorded deposition of Joseph Rannazzisi
16   taken by counsel for defendant in the matter of
17   In Re:  National Prescription Opiate filed in
18   the United States District Court for the
19   Northern District of Ohio, Eastern Division,
20   Case No. 17-MD-2804.
21        This deposition is being held at
22   Williams & Connolly located at 725 12th Street,
23   Northwest, Washington, D.C.
24        My name is Daniel Russo from the
25   firm of Veritext Legal Solutions.  I'm your
```

Page 13

1  videographer today.  The court reporter is
2  Bonnie Russo from the firm Veritext Legal
3  Solutions.
4         Counsel and all present in the room
5  and everyone attending remotely will now state
6  their appearances and affiliations for the
7  record, please.
8         MR. EPPICH:  Chris Eppich of
9  Covington & Burling for McKesson.
10        MS. MONAGHAN:  Meghan Monaghan of
11  Covington & Burling for McKesson.
12        MS. MAINIGI:  Enu Mainigi, Williams
13  & Connolly for Cardinal.
14        MS. McNAMARA:  Colleen McNamara of
15  Williams & Connolly for Cardinal.
16        MS. VENTURA:  Catie Ventura from
17  Kirkland & Ellis for Allergan.
18        MR. LIVINGSTON:  Scott Livingston,
19  Marcus & Shapira for defendant HBC.
20        MR. TYE:  Michael Tye of Arnold &
21  Porter for Endo.
22        MS. WINCKEL:  Emilie Winckel of
23  O'Melveny & Myers for J&J and Janssen.
24        MR. STEPHENS:  Neal Stephens from
25  Jones Day for Walmart.

Page 14

1         MR. DAVISON:  William Davison from
2  Ropes & Gray for Mallinckrodt and Specgx LLC.
3         MR. O'CONNOR:  Andrew O'Connor from
4  Ropes & Gray for Mallinckrodt.
5         MS. O'GORMAN:  Debra O'Gorman from
6  Dechert for Purdue.
7         MS. CONROY:  Mildred Conroy from The
8  Lanier Law Firm for plaintiffs.
9         MR. FULLER:  Mike Fuller for the
10  plaintiffs.
11        MR. FARRELL:  Paul Farrell, Jr., for
12  the plaintiffs.
13        MS. SINGER:  Linda Singer, Motley
14  Rice, for the plaintiffs.
15        MR. FINKELSTEIN:  David Finkelstein,
16  Department of Justice for the DEA.
17        MR. BENNETT:  James Bennett from the
18  U.S. Attorney's Office for the Northern
19  District of Ohio for the United States, the DEA
20  and the witness in his official capacity.
21        MR. UTTER:  Greg Utter here on
22  behalf of Mr. Rannazzisi as his personal
23  counsel.
24        SPECIAL MASTER COHEN:  David Cohen,
25  Special Master.

Page 15

1         MR. FORREST:  Patrick Forrest, Drug
2  Enforcement Administration.
3         MS. BACCHUS:  Renee Bacchus, U.S.
4  Attorney's Office, Northern District of Ohio on
5  behalf of DOJ, DEA and the witness.
6         MS. AGUINIGA:  Sara Aguiniga, Motley
7  Rice on behalf of plaintiffs.
8         MR. FELDMAN:  Larry Feldman on
9  behalf of the plaintiffs.
10        MS. MOORE:  Kelly Moore on behalf of
11  Rite Aid.
12        MR. STOFFELMAYR:  Kaspar
13  Stoffelmayr, Walgreens.
14        MR. HOBART:  Geoffrey Hobart from
15  Covington for McKesson.
16        MS. WICHT:  Jennifer Wicht from
17  Williams & Connolly for Cardinal Health.
18        MR. MATTHEWS:  James Matthews for
19  Anda.
20        MR. RUIZ:  Anthony Ruiz, Zuckerman
21  Spaeder for CVS Indiana, LLC and CVS Rx
22  Services.
23        THE VIDEOGRAPHER:  Anyone on the
24  call that wants to identify themselves, please
25  speak up.

Page 16

1         MR. LADD:  Matthew Ladd from Morgan
2  Lewis on behalf of Rite Aid.
3         MR. PADGETT:  Bill Padgett on behalf
4  of H.D. Smith.
5         MR. BEISELL:  Patrick Beisell from
6  Jones Day on behalf of Walmart.
7         MS. BARBER:  Maureen Barber from
8  Morgan Lewis on behalf of the Teva defendants.
9         THE VIDEOGRAPHER:  Will the court
10  reporter please swear in the witness.
11
12        JOSEPH RANNAZZISI,
13  being first duly sworn to tell the truth, the
14     whole truth and nothing but the truth,
15        testified as follows:
16        THE VIDEOGRAPHER:  You may proceed,
17  Counsel.
18  EXAMINATION BY COUNSEL FOR McKESSON
19        BY MR. EPPICH:
20  Q.   Good morning, Mr. Rannazzisi.  My
21  name is Chris Eppich, I represent McKesson in
22  this litigation and I will be asking you some
23  questions this morning.
24        Please state your full name for the
25  record.

Page 17

```
1        A.    Joseph Thomas Rannazzisi.
2        Q.    Have you been deposed before, Mr.
3  Rannazzisi?
4        A.    I have been through a lot of
5  different types of testimony.  I just don't
6  recall if I have ever been deposed.
7        Q.    That's fair.  Let me -- let me just
8  review some of the ground rules for depositions
9  before we get in.
10             You have probably noticed the court
11 reporter is taking down everything that we say
12 and so to make her record clear and her life a
13 little easier, we will need to talk one at a
14 time.  I will ask my questions and then just
15 ask that you wait before I finish before you
16 start with your answers.
17             Does that make sense?
18       A.    Yes, sir.
19       Q.    Rather than shaking your head or
20 nodding, if you could give a verbal response to
21 my questions.
22       A.    Yes, sir.
23       Q.    If I ask a question and I am not
24 clear, you don't understand, just let me know
25 and if you don't let me know, I will assume you
```

Page 18

```
1  understand the scope of my question.
2             Does that make sense?
3        A.    Yes, sir.
4        Q.    Now is there anything that would
5  prevent you from testifying completely and
6  truthfully today?
7        A.    No, sir.
8             MR. EPPICH:  Let me mark as Exhibit
9  1.
10            (Deposition Exhibit 1 was marked for
11 identification.)
12            MR. EPPICH:  Exhibit 1 is the second
13 amended notice of videotaped deposition of
14 Joseph Rannazzisi.
15            MS. SINGER:  Excuse me one second,
16 Counsel.  Do you have copies for the plaintiffs
17 too?
18 BY MR. EPPICH:
19       Q.    Sir, have you seen Exhibit No. 1
20 before?
21       A.    No, sir.
22       Q.    You haven't seen it?
23            You didn't review it in preparation
24 for today's deposition?
25       A.    No.
```

Page 19

```
1        Q.    If I you could turn with me to the
2  letter that is Exhibit A, four or five pages
3  in.  Now, this letter is prepared by the U.S.
4  Department of Justice.
5             Have you seen this letter before?
6        A.    Yes, I have.
7        Q.    And you understand Exhibit A to be
8  a -- letter from the DEA authorizing your
9  testimony on certain subjects today?
10       A.    Yes.
11       Q.    You were the head of DEA's Office of
12 Diversion Control from 2005 to 2015; is that
13 right?
14       A.    Approximately July of 2005 to '15,
15 yes.
16       Q.    July of 2005 to what month in 2015?
17       A.    October.  October 31st, 2015.
18       Q.    Halloween.  One of my favorite days.
19       A.    Uh-huh.
20       Q.    Now, between 2005 and 2015, you were
21 the senior-most law enforcement official at the
22 DEA responsible for pharmaceutical diversion?
23       A.    Yes, sir.
24       Q.    Was -- was there an opioid crisis
25 the entire time you were the head of the Office
```

Page 20

```
1  of Diversion Control?
2             MR. BENNETT:  Objection.  Calls for
3  speculation.
4             You can answer.
5             MS. SINGER:  Excuse me one second.
6  Can we ask the people on the phone
7  to mute, please.
8             MR. UTTER:  Go ahead.  You can
9  answer.
10            THE WITNESS:  Yes.  Yes.  There was
11 an opioid crisis during that time period.
12 BY MR. EPPICH:
13       Q.    And was the opioid crisis getting
14 worse every year you were the head of the
15 Office of Diversion Control?
16            MR. BENNETT:  Same objection.
17            THE WITNESS:  Overdoses -- overdose
18 deaths increased, yes.
19 BY MR. EPPICH:
20       Q.    As head of the Office of Diversion
21 Control, you were responsible for oversight and
22 control of all regulatory compliance,
23 inspections, and civil and criminal
24 investigations of approximately 1.6 million DEA
25 registrants; isn't that correct?
```

Page 21

1    A.    Yes.
2    Q.    And you provided leadership to a
3  team of 300 personnel?
4    A.    Direct -- direct report,
5  approximately -- you know, in headquarters,
6  approximately 300, yes.
7    Q.    And you controlled and operating
8  budget of approximately $350 million, correct?
9    A.    Yes.
10   Q.    Now, Mr. Rannazzisi, every entity
11 that is involved with getting opioids to
12 patients has to be registered with the DEA,
13 correct?
14   A.    Could you repeat that question.
15   Q.    Every entity that is involved with
16 getting opioids to patients has to be
17 registered with the DEA.
18   A.    No.  That's not correct.
19   Q.    Which entities do not have to be
20 registered?
21   A.    Nurses, pharmacists.  They have
22 no -- they're not registered.
23   Q.    But manufacturers have to be
24 registered?
25   A.    Yes.

Page 22

1    Q.    Distributors have to be registered?
2    A.    Yes.
3    Q.    Pharmacies have to be registered?
4    A.    Yes.
5    Q.    And doctors have to be registered?
6    A.    Yes.
7    Q.    Now, none of those individuals or
8  entities can lawfully handle opioids without
9  DEA registration.
10   A.    Yes.
11   Q.    Now, DEA can, when it determines it
12 is legally appropriate, suspend or revoke a DEA
13 registration.
14   A.    Yes.
15   Q.    For example, that's a way the DEA
16 has to cut off a diverting registrant?
17   A.    Repeat that question again, please.
18   Q.    DEA's authority to suspend or revoke
19 a DEA registration is a way for DEA to cut off
20 a diverting registrant; isn't that correct?
21   A.    That authority, we could stop a
22 registrant from conducting transactions with
23 controlled substances, yes.
24   Q.    Yes.
25         You could cut them off, correct?

Page 23

1    A.    Yeah.  Stopping transactions, yes.
2  Cutting them off.
3    Q.    In fact, it's -- it's DEA's
4  responsibility to do its best to ensure that
5  anyone who is registered to DEA or by DEA is
6  acting appropriately.
7         MS. SINGER:  Objection.  Vague.
8         MR. BENNETT:  Join that objection.
9         THE WITNESS:  It's DEA's
10 responsibility to ensure that the registrant
11 population is complying with the code of
12 federal regulations 21 C.F.R. and also 21 USC,
13 United States code.
14         BY MR. EPPICH:
15   Q.    You're familiar with the ARCOS
16 database?
17   A.    Yes, I am.
18   Q.    Manufacturers and distributors are
19 required to report data to ARCOS on every
20 single controlled substance transaction?
21   A.    Yes.
22   Q.    DEA can then make use of that data,
23 can't it?
24         MR. BENNETT:  Objection.  Vague.
25         THE WITNESS:  DEA does use that

Page 24

1  data.
2         BY MR. EPPICH:
3    Q.    And using ARCOS, DEA monitors the
4  flow of DEA-controlled substances from their
5  point of manufacture through commercial
6  distribution channels to point of sale or
7  distribution to the dispensing retail level?
8         MS. SINGER:  Objection.  Foundation.
9         MR. BENNETT:  Objection.  Vague.
10         THE WITNESS:  DEA can use that
11 system to monitor transactions downstream.
12         BY MR. EPPICH:
13   Q.    And that's downstream from the
14 manufacturers all the way to the retail level,
15 correct?
16   A.    Yes.  I believe so.
17         SPECIAL MASTER COHEN:  Just a
18 minute, please.
19         We're still hearing folks on the
20 phone.  If you are on the phone, please mute
21 yourself.
22         BY MR. EPPICH:
23   Q.    So, Mr. Rannazzisi, using ARCOS, DEA
24 can see the number of opioids sold by
25 manufacturers to distributors?

Page 25

1    A.    Yes.
2    Q.    And using ARCOS, DEA can see the
3  number of opioids distributed by distributors
4  to pharmacies, hospitals and doctors?
5    A.    Yes.
6    Q.    Registrants did not have access to
7  ARCOS data during your -- the time you led the
8  Office of Diversion Control, correct?
9    A.    They had access to their own data
10  that they submitted to ARCOS.  But no, not
11  other.
12    Q.    So registered --
13    A.    From the ARCOS.
14    Q.    Pardon me.
15          Registrants had no access to the
16  ARCOS database, correct?
17    A.    Except for their own entries, yes.
18    Q.    Their own entries that's they
19  submitted?
20    A.    Yes, that they submitted.
21    Q.    But they couldn't access those
22  entries through the ARCOS database, could they?
23    A.    I'm not sure about that.
24    Q.    There was no portal that you were
25  aware of that a registrant could log into to

Page 26

1  see their own data in the ARCOS database?
2    A.    Again, I'm not sure about that.
3    Q.    Registrants requested ARCOS data
4  from DEA at various times, but DEA declined to
5  share it, correct?
6          MR. BENNETT:  Objection.  Compound.
7          MS. SINGER:  Objection.  Foundation.
8          THE WITNESS:  Just answering the
9  question in order --
10          MR. EPPICH:  Yes.
11          THE WITNESS:  -- registrants have
12  requested access to ARCOS that -- for that
13  data.  And they have been declined, yes.
14          BY MR. EPPICH:
15    Q.    But after you left the DEA, it's
16  true that DEA decided registrants should be
17  allowed to access some ARCOS data, correct?
18          MR. BENNETT:  Objection.
19          THE WITNESS:  I wouldn't know about
20  that.
21          BY MR. EPPICH:
22    Q.    You don't read the press releases
23  from the DEA?
24          MR. BENNETT:  Objection.
25          THE WITNESS:  Again, I -- I have no

Page 27

1  direct knowledge of what the DEA did or what
2  information they were allow -- they released.
3          BY MR. EPPICH:
4    Q.    Sitting here today, are you aware
5  that registrants can access some data from the
6  ARCOS database?
7          MR. UTTER:  Object.  Just answer the
8  question.
9          MR. BENNETT:  Objection.
10          MS. SINGER:  Asked and answered.
11          MR. UTTER:  You can answer again.
12          THE WITNESS:  Again, I don't have
13  any direct knowledge of what they have access
14  to.
15          BY MR. EPPICH:
16    Q.    I understand that you're testifying
17  that you have no direct knowledge.  I'm asking
18  you if you have any knowledge.
19          MR. BENNETT:  Objection.
20          MR. UTTER:  Objection.  Speculation.
21  Go ahead.  You can answer.
22          MR. BENNETT:  Objection.  Asked and
23  answered.
24          THE WITNESS:  Again, I understand
25  that there was some information that's been

Page 28

1  provided to the industry.  But I don't know
2  exactly what information that is.
3          BY MR. EPPICH:
4    Q.    And I'm only asking you whether or
5  not you know that some information was provided
6  to registrants in the ARCOS database.
7          MR. UTTER:  For the forth time --
8          MS. SINGER:  Objection.  Asked and
9  answered.
10          MR. UTTER:  -- you can answer the
11  question.  And I'm not going to let you do it
12  again.
13          THE WITNESS:  Again, I'm aware that
14  something from ARCOS has been allowed to be
15  released to the registrants.  Correct.  But I'm
16  not aware of what that is.
17          BY MR. EPPICH:
18    Q.    Do you agree that this is a good
19  change?
20          MS. SINGER:  Objection.
21          MR. BENNETT:  Objection.
22          MR. UTTER:  Object.
23          THE WITNESS:  Again, it's -- I don't
24  know exactly what they're releasing and how
25  they're releasing it.

Page 29

```
1        BY MR. EPPICH:
2        Q.   Would you agree that access to ARCOS
3   helps registrants combat diversion of
4   controlled substances?
5             MR. BENNETT:  Objection.
6             THE WITNESS:  Not necessarily.
7             MR. BENNETT:  Scope.
8             BY MR. EPPICH:
9        Q.   And why not?
10       A.   Because --
11            MS. SINGER:  Objection.  Scope.
12            MR. BENNETT:  Objection.  Scope.
13            THE WITNESS:  I was --
14            MR. UTTER:  Go ahead.
15            THE WITNESS:  Because industry had
16   other tools at their disposal to see downstream
17   transactions that were not listed as business
18   or proprietary.
19            BY MR. EPPICH:
20       Q.   But ARCOS -- strike that.
21            But distributors could not see,
22   without ARCOS, the amount of controlled
23   substances each distributor sold to a
24   particular customer, correct?
25       A.   There were systems that were outside
```

Page 30

```
1   of ARCOS that could be accessed, purchased to
2   see that information.
3        Q.   What systems were those?
4        A.   IMS data.
5             MS. SINGER:  Scope.
6             THE WITNESS:  Any aggregated data.
7             BY MR. EPPICH:
8        Q.   Does the IMS data or aggregated data
9   include all of the information that's contained
10  within the ARCOS database?
11       A.   I don't know if that's correct, no.
12       Q.   DEA established quotas for
13  controlled substances for each year, didn't
14  they?
15       A.   Yes, sir.
16       Q.   Quotas are set based on the
17  estimated medical scientific research and
18  industrial needs of the United States?
19       A.   Yes, sir.
20       Q.   Your office, the Office of Diversion
21  Control, was responsible for setting quotas?
22       A.   Yes, sir.
23       Q.   And as head of the Office of
24  Diversion Control, it was your responsibility
25  to authorize quotas from 2005 to 2015?
```

Page 31

```
1        A.   I authorized the letters.  The
2   actual quota is authorized by the
3   administrator.  It's a delegated function down
4   to me for the letters.
5        Q.   But you're part of the process for
6   authorizing a quota, aren't you?
7        A.   Yes, sir.
8        Q.   And quota levels for opioids
9   constantly increased under your watch, correct?
10       A.   Yes, sir.
11       Q.   And, in fact, quota levers -- quota
12  levels for opioids increased significantly
13  under your watch, correct?
14            MS. SINGER:  Objection.  Vague.
15            MR. BENNETT:  Objection.
16            MR. UTTER:  Same objection.
17            THE WITNESS:  They did increase.
18  But they increased because, by statute, we were
19  required to look at certain things.  So yes.
20            MR. EPPICH:  Let's mark as Exhibit
21  2.
22            (Deposition Exhibit 2 was marked for
23  identification.)
24            BY MR. EPPICH:
25       Q.   Now, sir, Exhibit 2 is a chart dated
```

Page 32

```
1   October 8, 2014, that was posted on DEA's web
2   site titled "Aggregate Production Quota History
3   For Selected Substances."
4             Are you familiar with this document?
5        A.   Yes, sir.
6             MS. SINGER:  Objection.  Foundation
7   for the document.
8             BY MR. EPPICH:
9        Q.   The aggregate production quotas that
10  are reflected in Exhibit 2, these were the
11  quotas while you were the head of the Office of
12  Diversion Control, correct?
13       A.   Yes.
14       Q.   Now, I'd like to look at a couple of
15  these numbers today.  If we -- if we go on the
16  left side under "Controlled Substance" to
17  Hydrocodone.
18            Do you see that, sir?
19       A.   Yes, sir.
20       Q.   And if we look under year 2005, the
21  quota appears to be 37,604 kilograms, correct?
22       A.   Yes.
23       Q.   And as we go across the document to
24  2015, the quota is, in 2015, 99,625 kilograms;
25  is that correct?
```

Page 33

1      A.   Yes.
2      Q.   Now, that's -- that's over a hundred
3  percent increase in the Hydrocodone quota by
4  DEA under your leadership.
5           Do you see that?
6      A.   It is an increase, yes.
7      Q.   It's a -- over a hundred percent
8  increase, isn't it?
9      A.   Yes.
10     Q.   Now, let's look at oxycodone.  In
11 the oxycodone line we'll look at the "Sale"
12 line.  The quota level for 2005 is 50,490
13 kilograms.
14          Do you see that?
15     A.   Yes.
16     Q.   And looking at the year 2015, the
17 quota level is 137,500 kilograms.
18          Do you see that?
19     A.   Yes.
20     Q.   And that's over 150 percent increase
21 in the oxycodone quota under your leadership.
22          Do you see that?
23     A.   Yes, close.  Close to it, yeah.
24     Q.   Now, by increasing the quota year
25 after year, DEA was telling registrants and the

Page 34

1  public pain medication should be available to
2  support the legitimate medical needs; isn't
3  that correct?
4           MS. SINGER:  Objection.  Vague.
5  Objection.  Scope.
6           THE WITNESS:  No.  That's not
7  correct.
8           MR. EPPICH:  Well, let me -- let me
9  -- let me show you a statement from the DEA's
10 web site.
11          And we'll mark this as Exhibit No.
12 3.
13          (Deposition Exhibit 3 was marked for
14 identification.)
15          BY MR. EPPICH:
16     Q.   Now, Exhibit 3 is a printout of the
17 DEA's web site where the DEA posted a joint
18 statement from DEA and 21 health organizations
19 on October 23, 2001.
20          MR. UTTER:  Excuse me a moment.  If
21 you're going to ask the witness about a
22 document, please give him a moment to review
23 the document.
24          MR. EPPICH:  Absolutely.
25          MR. UTTER:  And he'll let you know

Page 35

1  when he's done reviewing the document.
2           Is that all right?
3           MR. EPPICH:  No problem.
4           MR. UTTER:  Thank you.
5           MS. SINGER:  Object to this
6  document.  It doesn't have a date.
7           MR. EPPICH:  The date's on Page 1,
8  Ms. Singer.
9           You see the October 23, 2001 date
10 next to the DEA link?
11          MS. SINGER:  Yes.  But again,
12 there's no source from where this came from.
13          My objection is noted for the
14 record.
15          MR. EPPICH:  Yes, ma'am.
16          BY MR. EPPICH:
17     Q.   Have you had a chance to review
18 Exhibit 3, sir?
19     A.   Yes.
20     Q.   Have you seen Exhibit 3 before?
21     A.   Never.
22     Q.   I'd like to turn to Page 2, the
23 letter -- excuse me -- the joint statement that
24 you've been reviewing.
25     A.   Uh-huh.

Page 36

1      Q.   In the fourth paragraph, the DEA and
2  these 21 health organizations say:  "This
3  consensus statement is necessary based on the
4  following facts."
5           Do you see that?
6      A.   Yes.
7      Q.   And the -- the first bullet
8  underneath that paragraph states:
9  "Undertreatment of pain is a serious problem in
10 the United States, including pain among
11 patients with chronic conditions and those who
12 are critically ill or near death.  Effective
13 pain management is an integral and important
14 aspect of quality medical care, and pain should
15 be treated aggressively."
16          Do you see that?
17     A.   I do see that.
18     Q.   You treat pain aggressively with
19 pain medication, right?
20          MR. BENNETT:  Objection.  Scope.
21 Objection.  Foundation.
22          MR. UTTER:  Just object to whether
23 he has the background to answer the question.
24          But go ahead.
25          THE WITNESS:  Not necessarily.

Page 37

1    BY MR. EPPICH:
2        Q.    Well, let's look at Bullet 2:  "For
3    many patients, opioid analgesics" -- I'm sure I
4    pronounced that wrong.
5        A.    Analgesics.
6        Q.    -- "analgesics, when used as
7    recommended by established pain management
8    guidelines, are the most effective way to treat
9    their pain and often the only treatment option
10   that provides significant relief."
11            This is a statement on the DEA's web
12   site.
13            MR. BENNETT:  Objection.
14            MR. UTTER:  Hold on.
15            MR. BENNETT:  Foundation.
16            MR. UTTER:  Hold on.
17            Is there a question?
18            MR. EPPICH:  I asked him if this was
19   a statement on the DEA's web site.
20            THE WITNESS:  I have no idea.
21            MS. SINGER:  Objection.  Foundation.
22            MR. UTTER:  He's answered it.
23            THE WITNESS:  I have no idea.  I've
24   never seen this document.  And this document
25   does not comport to current or -- or post-2004

Page 38

1    -- I -- I don't -- I've never even seen this.
2    I have no idea where this came from.  I don't
3    know who wrote it.
4            And -- and, quite frankly, there's
5    no DEA signature; there's no DEA -- there's no
6    document that -- this document has no -- I have
7    no idea where this document came from, where in
8    DEA it came from, or who might have signed off
9    on this document.  But it wasn't me.  Because
10   in 2001 I was not in headquarters.
11            BY MR. EPPICH:
12       Q.    Well, I printed this document from
13   the DEA's web site yesterday.
14            MR. UTTER:  Objection.
15            BY MR. EPPICH:
16       Q.    And it --
17            MS. SINGER:  Objection.  Testifying.
18            BY MR. EPPICH:
19       Q.    And I -- and I'll say this statement
20   was on your web site -- I'll strike that.  I'll
21   strike that.
22            Sitting here today, do you have any
23   reason to doubt that this document was posted
24   on the DEA web site during your tenure at the
25   head of the Office of Diversion Control?

Page 39

1            MR. UTTER:  Object.  Foundation.
2            MR. BENNETT:  Objection.
3    Foundation.  Objection.  Scope.
4            THE WITNESS:  I have no idea.
5            BY MR. EPPICH:
6        Q.    Following the distributor initiative
7    -- you're -- you're familiar with the
8    distributor initiative?
9        A.    Yes, I am.
10       Q.    Following the distributor
11   initiative, distributors repeatedly asked DEA
12   for guidance to clarify confusion in the
13   industry, correct?
14            MS. SINGER:  Objection.  Lack of
15   foundation.
16            THE WITNESS:  I --
17            MR. BENNETT:  Objection.  Vague.
18            THE WITNESS:  I have no idea what --
19   what time period, who was asking.  I don't
20   know.
21            BY MR. EPPICH:
22       Q.    But when you were the head of the
23   Office of Diversion Control, it's true that
24   distributors were asking the DEA for guidance
25   for suspicious order monitoring programs,

Page 40

1    correct?
2            MR. BENNETT:  Objection.  Vague as
3    to time.
4            MR. UTTER:  Same objection.
5            THE WITNESS:  Could you kind of
6    narrow that a little?  At what point in time?
7            Is it after the distributors signed
8    their memorandum agreement saying that they
9    would comply with the -- the 1301.74(b)?  Was
10   it after that or before that time?
11            BY MR. EPPICH:
12       Q.    Well, you're aware of the
13   distributor briefings that DEA held with each
14   of the distributors?
15       A.    Yes, I am.
16       Q.    And those began in the fall of 2005,
17   correct?
18       A.    Yes.
19       Q.    And they continued for several
20   years, correct?
21       A.    Yes.
22       Q.    And throughout -- especially the
23   first three or four years after the distributor
24   briefings began, distributors raised questions
25   with the DEA about the changes, correct?

Page 41

```
 1          MR. BENNETT:  Objection.  Vague.
 2          MS. SINGER:  Objection.  Vague.
 3          THE WITNESS:  I'm -- I'm kind of
 4    confused.
 5          What changes are you talking about?
 6    BY MR. EPPICH:
 7      Q.    Well, DEA -- the -- the distributors
 8    raised questions --
 9      A.    Well --
10      Q.    -- to DEA, correct?
11          Questions that relate --
12          MR. BENNETT:  Object.
13    BY MR. EPPICH:
14      Q.    -- to the -- the -- the comments
15    made by DEA in the distributor briefings?
16      A.    And those distributor briefings were
17    pretty extensive.  And they were asked if they
18    had any questions before they left.  And they
19    assured us that they understood what the rules
20    were.
21      Q.    And the distributors continued to
22    ask the DEA questions ever after those
23    distributor briefings ended.
24          MR. BENNETT:  Objection.  Vague as
25    to time.  Objection.  Mischaracterizes
```

Page 42

```
 1    testimony.
 2          MR. UTTER:  Same objection.
 3          Go ahead.
 4          THE WITNESS:  It was years later
 5    before we heard that, that they were confused.
 6    Years later.
 7    BY MR. EPPICH:
 8      Q.    When did DEA hear that the
 9    distributors were confused?
10      A.    Had to be sometime around 2000 --
11    the end of 2010 or early 2011.
12      Q.    And in response to that knowledge,
13    did you provide guidance to distributors?
14      A.    If I remember correctly, there was
15    meetings with individual distributors and also
16    with HDMA.
17      Q.    But isn't it true that you
18    affirmatively stated that it was DEA's policy
19    not to approve any suspicious order monitoring
20    programs?
21      A.    That was the position of the agency.
22    And yes, that was stated in at least two of my
23    letters to industry.
24      Q.    And it was DEA's policy not to tell
25    registrants that an order is or is not
```

Page 43

```
 1    suspicious, correct?
 2      A.    Well, that's a business decision
 3    that only the -- the distributor could make.
 4          They're the only ones who know their
 5    customer.  And they know what their customers
 6    are doing.  And they know the -- the population
 7    around the customer's business.  They know what
 8    is in the area that could warrant an increase
 9    or not.
10          So DEA couldn't make that decision.
11    It had to come as a business decision from the
12    distributor.
13      Q.    So it was DEA's policy not to tell
14    registrants that an order is suspicious?
15          MS. SINGER:  Objection.
16          MR. BENNETT:  Objection.  Asked and
17    answered.
18          MS. SINGER:  Objection.  Scope.
19    Calls for this witness's opinion on DEA policy.
20          MR. UTTER:  Go ahead.
21          THE WITNESS:  It was a business
22    decision that would be made by the distributor
23    whether an order is suspicious.  And DEA made
24    that very clear to the distributors.
25    BY MR. EPPICH:
```

Page 44

```
 1      Q.    During your time as the head of
 2    Office of Diversion Control, it was DEA's
 3    policy not to tell a registrant if they should
 4    stop sales to a customer, correct?
 5          MS. SINGER:  Same objection.
 6          THE WITNESS:  There were due process
 7    concerns.  And after consultation with
 8    counsel's office, we decided that that was not
 9    appropriate because of the due process
10    concerns.
11    BY MR. EPPICH:
12      Q.    So if a distributor came to you in
13    2007 or '8 or '9 or '10 and said, "We -- we
14    can't tell if this order is legitimate or
15    suspicious," DEA would refuse to answer?
16          MR. BENNETT:  Objection.  Compound.
17          MR. UTTER:  Object to the incomplete
18    hypothetical.
19          You can go ahead and answer if you
20    understand all the elements of the
21    hypothetical.
22          THE WITNESS:  Yeah.  I'm trying to.
23          Could you repeat that question,
24    please.
25    BY MR. EPPICH:
```

Page 45

1      Q.    Sure.
2            If a distributor came to you while
3    you were the head of the Office of Diversion
4    Control and said, "We cannot tell if this order
5    is legitimate or suspicious, the DEA would
6    refuse to answer the distributor's question"?
7            MR. UTTER:  Same objection.
8            Go ahead.
9            MS. SINGER:  Objection.
10           THE WITNESS:  Yeah.
11           MS. SINGER:  Calls for speculation.
12           THE WITNESS:  I mean I'd have to
13   have more information than that.
14           BY MR. EPPICH:
15      Q.    But as a general policy --
16      A.    I can't answer.
17      Q.    -- it would be DEA's -- it would be
18   DEA's response to refuse to answer?
19      A.    It's DEA's policy that they do not
20   advise when to ship or when to file a
21   suspicious orders.  That's a business decision
22   that, under the regulations, is maintained by
23   the --
24      Q.    This was the --
25      A.    -- distributor.

Page 46

1      Q.    And this was the policy at DEA the
2    entire time that you were the head of the
3    Office of Diversion Control, correct?
4      A.    It was --
5            MS. SINGER:  Objection.  Scope.
6            THE WITNESS:  It was the policy of
7    the agency.
8            BY MR. EPPICH:
9      Q.    Now, Mr. Rannazzisi, I've listened
10   to a lot of your interviews to prepare for this
11   deposition.  I've heard you blame a lot of
12   people and entities for the opioid crisis.
13           Is that true?
14           MR. BENNETT:  Objection.
15   Argumentative.
16           MS. SINGER:  Objection.  Testifying.
17           MR. UTTER:  Lacks foundation.
18   Compound.
19           Go ahead.
20           THE WITNESS:  Could you -- again,
21   could you repeat the question.
22           BY MR. EPPICH:
23      Q.    Well, it's true that you've blamed
24   distributors for opioid crisis, isn't it?
25           MR. BENNETT:  Objection.

Page 47

1    Argumentative.
2            THE WITNESS:  Based on the
3    violations of the distributors in the past,
4    yes, I have.
5            BY MR. EPPICH:
6      Q.    And it's true that you've blamed the
7    manufacturers for contributing to the opioid
8    crisis?
9            MR. BENNETT:  Same objection.
10           THE WITNESS:  I have discussed the
11   manufacturers' role, yes.
12           BY MR. EPPICH:
13      Q.    And you've blamed the manufacturers,
14   haven't you?
15           MR. BENNETT:  Objection.
16   Argumentative.
17           MS. SINGER:  Objection.  Asked and
18   answered.
19           THE WITNESS:  Yes.
20           BY MR. EPPICH:
21      Q.    And you've blamed pharmacies?
22           MR. BENNETT:  Objection.
23   Argumentative.
24           THE WITNESS:  Yes.
25           BY MR. EPPICH:

Page 48

1      Q.    You've blamed doctors?
2            MR. BENNETT:  Same objection.
3            THE WITNESS:  Yes.
4            BY MR. EPPICH:
5      Q.    I've even heard you blame other
6    divisions and individuals within DEA --
7            MR. BENNETT:  Same objection.
8            BY MR. EPPICH:
9      Q.    Isn't that true?
10      A.    Blame other divisions concerning the
11   opioid crisis.
12      Q.    Yes, sir.
13           MS. SINGER:  Objection.  Scope.
14           THE WITNESS:  I don't recall blaming
15   other divisions.
16           BY MR. EPPICH:
17      Q.    Well, you've blamed the Office of
18   Chief Counsel within the DEA, correct?
19           MS. SINGER:  Objection.
20           MR. BENNETT:  Objection.
21           MS. SINGER:  Scope.
22           THE WITNESS:  We've -- chief
23   counsel, in the normal process of moving cases
24   through, we've had differences in cases, yes.
25           BY MR. EPPICH:

## Page 49

```
 1      Q.    You've criticized the Office of
 2  Chief Counsel.
 3           MR. BENNETT:  Objection.  Scope.
 4           THE WITNESS:  I don't recall ever
 5  openly criticizing the Office of Chief Counsel.
 6           BY MR. EPPICH:
 7      Q.    Well, maybe not openly, but in
 8  communications within the agency, correct?
 9           MR. BENNETT:  Objection.  Scope.
10           This witness is not authorized to
11  disclose attorney-client privileged
12  communications.
13           And to the extent that you can
14  answer that question without disclosing
15  communications that you have had with chief
16  counsel's office, you may answer.  If your
17  answer requires you to disclose communications
18  that you've had with chief counsel's office,
19  then you may not answer.
20           THE WITNESS:  It's communications
21  with chief counsel's office.  I can't answer
22  that question.
23           BY MR. EPPICH:
24      Q.    It's true that DEA controls the
25  closed system of drug distribution, right?
```

## Page 50

```
 1      A.    Yes.
 2           MS. SINGER:  Objection.  Foundation.
 3           MR. BENNETT:  Objection.  Vague.
 4           BY MR. EPPICH:
 5      Q.    DEA registers all persons who handle
 6  Section 2 controlled substances, correct?
 7           MS. SINGER:  Objection.
 8           THE WITNESS:  What is --
 9           MS. SINGER:  Mischaracterizes prior
10  testimony.
11           BY MR. EPPICH:
12      Q.    I'm sorry.  Schedule II controlled
13  substances.
14      A.    And repeat the question, please.
15      Q.    Yes.  Let's strike that.
16           It's true that DEA registers all
17  persons and entities who handle Schedule II
18  controlled substances?
19           MR. UTTER:  Object.  Asked and
20  answered.
21           You may answer it again.
22           MS. SINGER:  Objection.
23  Mischaracterizes prior testimony.
24           THE WITNESS:  That's -- that's not
25  true.
```

## Page 51

```
 1           BY MR. EPPICH:
 2      Q.    It's true the DEA registers all
 3  manufacturers, distributors, pharmacies and
 4  doctors that handle Schedule II controlled
 5  substances?
 6      A.    That's true.  If -- if their
 7  registration allows them to handle
 8  Schedule IIs, yes.
 9      Q.    And DEA inspects the documentation
10  of these registrants?
11           MR. BENNETT:  Objection. Vague.
12           THE WITNESS:  I'm -- I'm not sure
13  what you mean by documentation.
14           BY MR. EPPICH:
15      Q.    Well, DEA -- DEA controls the amount
16  of controlled substances produced, bought, sold
17  or otherwise transferred between these
18  manufacturers, distributors, pharmacies and
19  doctors, correct?
20           MS. SINGER:  Objection.  Vague.
21           MR. BENNETT:  Objection.
22           MR. UTTER:  Objection.  Lacks
23  foundation.
24           Go ahead.
25           THE WITNESS:  I -- I'm not -- I'm
```

## Page 52

```
 1  not -- I'm still not sure what -- what you mean
 2  by -- when you mean -- you said controls the
 3  amount of transaction.  I don't understand
 4  that.
 5           Would you explain?
 6           MR. EPPICH:  I can strike that
 7  question.
 8           THE WITNESS:  Yeah.
 9           BY MR. EPPICH:
10      Q.    When deciding to grant registration
11  to a manufacturer, distributor, pharmacy or
12  doctor, the DEA inspects documentation from
13  each of these potential registrants, correct?
14      A.    You're talking about --
15           MS. SINGER:  Objection.  Vague.
16           THE WITNESS:  You're talking about
17  --
18           MR. BENNETT:  Same Objection.
19           THE WITNESS:  -- registration
20  applications?
21           MR. EPPICH:  Yes, sir.
22           THE WITNESS:  Yes.
23           BY MR. EPPICH:
24      Q.    And all of the materials that each
25  of these potential registrants submits with
```

Page 53

1    their application, correct?
2         A.    Yes.
3         Q.    Are there many ways diversion can
4    occur -- there are many ways diversion can
5    occur, correct?
6         A.    Yes.
7         Q.    Opioids can be stolen from a
8    delivery truck?
9         A.    Yes.
10        Q.    That's diversion, correct?
11        A.    That is.
12        Q.    Someone can use opioids in a way
13   other than how they've been prescribed to them,
14   true?
15        A.    That's not diversion.
16        Q.    Someone can go into their
17   grandmother's cabinet, take the grandmother's
18   opioids that she got for a legitimate reason;
19   and that's diversion, isn't it?
20        A.    Technically, yes, that's diversion.
21        Q.    Someone could take opioids from a
22   friend who got them for a legitimate reason.
23   That's diversion.
24        A.    Yes.
25        Q.    In fact, you -- you would agree that

Page 54

1    the vast majority of diversion occurs when
2    someone takes opioids from a friend or family
3    member?
4              MR. BENNETT:  Objection.
5              MS. SINGER:  Objection.  Scope and
6    vague.
7              MR. BENNETT:  Objection.  Vague.
8    Objection.  Incomplete hypothetical.
9    Objection.  Scope.
10             MR. UTTER:  Same objections.
11             Go ahead.
12             THE WITNESS:  You know, no.  I
13   wouldn't agree to that.  There's many ways that
14   have nothing to do with taking something from a
15   family member.
16             BY MR. EPPICH:
17        Q.    When asked what you would do
18   differently as the head of diversion control in
19   an interview, you said publicly that, "I would
20   not do anything differently.  That's for sure."
21             Is that true?
22             MR. BENNETT:  Objection.
23   Foundation.
24             MR. UTTER:  Same objection.
25             Go ahead.

Page 55

1              THE WITNESS:  I don't remember
2    exactly what the context of that question was
3    when they asked me, what we were discussing at
4    the time.  So I -- I -- I just don't think it's
5    something I could answer without looking at who
6    was interviewing me and what the interview was
7    about.
8              BY MR. EPPICH:
9         Q.    Well, sitting here today, sir,
10   thinking about your career as the head of the
11   Office of Diversion Control, is there anything
12   you would do differently?
13             MR. BENNETT:  Objection.  Scope.
14   Objection.  Vague.
15             MR. UTTER:  Objection.  Calls for
16   speculation.
17             Go ahead.
18             THE WITNESS:  I don't know if -- I
19   don't know if I could answer that right now.  I
20   just don't know.  I mean this -- I would -- I
21   would have to sit back and think about
22   everything we did.  And so I -- I just -- I
23   can't answer that right now.
24             BY MR. EPPICH:
25        Q.    Well, would you give registrants

Page 56

1    access to the ARCOS data?
2              MR. BENNETT:  Objection.  Calls for
3    speculation.  Incomplete hypothetical.
4              MS. SINGER:  Objection.
5              THE WITNESS:  Again, I have no idea
6    how they -- what access they have to ARCOS.
7    And I was under different limitations, it
8    appears, than what they're doing today.
9              BY MR. EPPICH:
10        Q.    But my question was whether or not
11   you would give them any access to ARCOS data if
12   you were to do it again.
13             MR. BENNETT:  Objection.
14             BY MR. EPPICH:
15        Q.    Not what they were doing today.
16             MR. BENNETT:  Objection.
17   Speculation.  Incomplete hypothetical.  And
18   asked and answered.
19             MR. UTTER:  Object.  Assumes he had
20   the authority do that.
21             Go ahead.  You can answer.
22             THE WITNESS:  Again, I could only go
23   with what I could do when I was the head of the
24   Office of Diversion Control based on agency
25   policy in consultation with counsel and

Page 57

1  counsel. And the agency made a decision that
2  ARCOS data was not -- was business proprietary
3  and was not going to be released in that
4  manner.
5         BY MR. EPPICH:
6     Q.    Would you give registrants any more
7  information or guidance about suspicious order
8  monitoring programs and suspicious orders?
9         MR. BENNETT: Objection.
10  Speculation. Objection. Incomplete
11  hypothetical.
12        MR. UTTER: Go ahead.
13        MR. BENNETT: And objection. Scope.
14  Sorry.
15        THE WITNESS: I think that the
16  suspicious order monitoring regulation
17  1301.74(b) was -- the definition of suspicious
18  order is very straightforward.
19        I don't know what other information
20  I could provide to them to clarify what a
21  suspicious orders is without making a business
22  decision for them, which the regulations would
23  not allow me to do.
24        BY MR. EPPICH:
25     Q.    Would you change the regulations --

Page 58

1         MS. SINGER: Objection.
2         BY MR. EPPICH:
3     Q.    -- if you were to go back?
4         MS. SINGER: Objection. Scope.
5         MR. BENNETT: Object --
6         THE WITNESS: I --
7         MR. BENNETT: Hold on.
8         Objection. Scope. Objection.
9  Calls for speculation. Objection. Incomplete
10  hypothetical.
11        I will also instruct the witness
12  that, to the extent there were internal
13  deliberations that were not made public by the
14  DEA during your time there, you are not
15  authorized to disclose those internal
16  deliberations.
17        MR. UTTER: Same objection.
18        Go ahead.
19        THE WITNESS: The problem is -- is
20  the regulation change was not under my
21  authority. The regulation change would be
22  under the authority of the administrator of the
23  Drug Enforcement Administration and Department
24  of Justice.
25        That's -- so whether I make that

Page 59

1  decision or not, the final decision is the
2  Department of Justice and the Drug Enforcement
3  Administration leadership. So I -- I couldn't
4  answer that.
5         BY MR. EPPICH:
6     Q.    And you have no role in that
7  process? You can't suggests a change?
8         MS. SINGER: Objection. Scope.
9         MR. BENNETT: Objection. Scope.
10        You are not authorized to disclose
11  internal deliberative process of the agency.
12  To the extent you can answer without disclosing
13  the internal deliberative process of the
14  agency, you may answer.
15        THE WITNESS: I can't -- I can't
16  answer that question.
17        BY MR. EPPICH:
18     Q.    You've been criticized for your
19  actions by head of Office of Diversion Control.
20        MR. BENNETT: Objection.
21        BY MR. EPPICH:
22     Q.    That's true, correct?
23        MS. SINGER: Objection. Vague.
24        MR. BENNETT: Objection. Vague.
25        THE WITNESS: Do you have any

Page 60

1  specific criticism of me?
2         BY MR. EPPICH:
3     Q.    I'm just asking you if you're aware
4  you've been criticized for your actions as the
5  head of Office of Diversion Control.
6         MR. BENNETT: Objection. Vague.
7  Also vague as to time.
8         THE WITNESS: I -- I think that, if
9  you were more specific, I -- I could give you a
10  better answer.
11        Do you have a specific instance
12  where somebody criticized me.
13     Q.    Well, Chuck Rosenberg became the
14  acting administrator of DEA in 2015, right?
15     A.    Yes, sir.
16     Q.    You were still at DEA at the time
17  that he became the acting administrator?
18     A.    Yes, sir.
19     Q.    He was your boss, right?
20     A.    Yes, sir.
21     Q.    He told Congress shortly after you
22  left that you were not doing enough to give
23  guidance to the industry.
24        MS. SINGER: Objection. Foundation.
25        BY MR. EPPICH:

## Page 61

```
 1        Q.   Are you aware of that?
 2            MR. BENNETT:  Objection.
 3   Foundation.  Objection.  Mischaracterizes
 4   administrator Rosenberg's testimony.
 5            MR. UTTER:  Same objection.
 6            Go ahead.
 7            THE WITNESS:  I am aware that he
 8   made statements like that.  I am also aware
 9   that when he made those statements, he was
10   there for a very brief period of time and never
11   got a briefing on what the Office of Diversion
12   Control actually did.
13            BY MR. EPPICH:
14        Q.   Mr. Rosenberg said to Congress, we
15   have been opaque.  I think we have been slow.
16   I think we have been opaque.  I think we
17   haven't responded to them.  We are trying to
18   issue guidelines for them more quickly.  We are
19   trying to answer their questions.
20            Did you know that Mr. Rosenberg said
21   this to Congress?
22            MS. SINGER:  Objection.  Foundation.
23            If counsel is going to ask the
24   witness about quotations and documents, I think
25   the witness should get to see those documents.
```

## Page 62

```
 1            MR. BENNETT:  I join that objection.
 2            MR. UTTER:  Same objection.  Lack of
 3   foundation.
 4            Go ahead.
 5            THE WITNESS:  I would like to see
 6   what he said exactly.
 7            BY MR. EPPICH:
 8        Q.   Are you aware that he said that the
 9   office was too slow, too opaque, are you ware
10   of that?
11        A.   I'm aware --
12            MS. SINGER:  Objection.  Foundation.
13            MR. BENNETT:  Same objections.
14            MR. UTTER:  Same objection.
15            THE WITNESS:  I am aware that he
16   made statements but I don't have the statements
17   in front of me and unless you can produce the
18   statements that I could look at.
19            BY MR. EPPICH:
20        Q.   Are you aware that Mr. Rosenberg
21   said that I think we are part of the problem,
22   meaning I think DEA has been part of the
23   problem.
24            Are you aware of that?
25            MS. SINGER:  Objection.  Foundation.
```

## Page 63

```
 1            MR. UTTER:  Same objection.
 2            MR. BENNETT:  Same objection.
 3            THE WITNESS:  I have no idea of when
 4   he -- why he said that or in what context he
 5   said that.
 6            Do you have the transcripts?
 7            BY MR. EPPICH:
 8        Q.   But you are aware of that statement,
 9   sir, aren't you?
10        A.   No, I'm not --
11            MS. SINGER:  Objection.
12   Mischaracterizes testimony and lack of
13   foundation.
14            MR. UTTER:  Same objection.
15            Go ahead.
16            MR. EPPICH:  May we take a break.
17            MS. SINGER:  Sure.
18            MR. BENNETT:  Sure.
19            MR. EPPICH:  Let's go off the
20   record.
21            THE VIDEOGRAPHER:  We are going off
22   the record.  This is the end of Media Unit No.
23   1.  The time is 9:25.
24            (A short recess was taken.)
25            THE VIDEOGRAPHER:  We are going back
```

## Page 64

```
 1   on the record.  This is the start of Media Unit
 2   No. 2.  The time is 9:37.
 3            You may proceed, Counsel.
 4            BY MR. EPPICH:
 5        Q.   Mr. Rannazzisi, earlier today you
 6   testified that the suspicious order monitoring
 7   regulation is straightforward; is that correct?
 8        A.   Yes, sir.
 9        Q.   In your opinion, was the -- no
10   update is needed to that statute or regulation,
11   correct?
12            MR. BENNETT:  Objection.
13            MS. SINGER:  Objection.  Foundation.
14   Scope.
15            MR. BENNETT:  Objection.
16            I will instruct the witness that you
17   are not authorized to disclose any internal
18   deliberations that you had within the agency.
19            To the extent you can answer that
20   question without disclosing internal
21   deliberations that you had in the agency, you
22   may answer.
23            THE WITNESS:  I can't answer that
24   question, it's based on.
25            BY MR. EPPICH:
```

Page 65

1    Q.    Well, it's your opinion that no
2  update to the CSA or the C.F.R. were needed for
3  registrants, correct?
4          MR. BENNETT:  Same instruction.
5          MS. SINGER:  Same objections.
6          THE WITNESS:  I go back to my
7  testimony before.  1301.7 -- 1301.74 was very
8  clear on what a suspicious order is and that's
9  all I can say.
10          BY MR. EPPICH:
11    Q.    You are aware that the Controlled
12  Substances Act was enacted in 1971?
13    A.    Yes, about that time, yes, sir.
14    Q.    In 1971, it's true that there were
15  only a handful of Schedule II controlled
16  substances that were registered?
17          MS. SINGER:  Objection.  Scope.
18          THE WITNESS:  There was a lot -- a
19  lot -- a smaller amount of controlled
20  substances, yes, in 1971.
21          BY MR. EPPICH:
22    Q.    It was a much smaller amount, right?
23    A.    Yes.
24          MS. SINGER:  Objection.
25          BY MR. EPPICH:

Page 66

1    Q.    And registrants were using
2  handwritten suspicious order reports to fulfill
3  their obligations under the Controlled
4  Substances Act?
5          MS. SINGER:  Objection.  Scope.
6          MR. BENNETT:  Objection.
7  Foundation.
8          MR. UTTER:  Same objection.
9          THE WITNESS:  I have no idea if they
10  were using handwritten --
11          BY MR. EPPICH:
12    Q.    But there were no computers, were
13  there?
14          MR. BENNETT:  Counsel, could you let
15  him finish his answer, please.  I don't think
16  he was finished.  I think you interrupted him.
17          THE WITNESS:  Again, I have no idea
18  how they were filing suspicious orders either
19  handwritten or otherwise back in the early
20  '70s.
21          BY MR. EPPICH:
22    Q.    But there were no computers
23  involved?
24          MS. SINGER:  Objection.
25          MR. BENNETT:  Objection.

Page 67

1  Foundation.
2          THE WITNESS:  Again, I have no idea
3  how they were filing suspicious orders.
4          BY MR. EPPICH:
5    Q.    This was a time before fax machines.
6          MR. BENNETT:  Objection.
7  Foundation.  Scope.
8          THE WITNESS:  I just -- I can't tell
9  you what was done in the early '70s.
10          BY MR. EPPICH:
11    Q.    Well, you can agree with me that the
12  distribution model that we see today has been
13  updated and improved since 1971?
14          MR. BENNETT:  Objection.
15          MS. SINGER:  Objection.  Foundation.
16  Scope.
17          MR. BENNETT:  Same objection.
18  Vague.
19          MR. UTTER:  Same objection.
20          Go ahead.
21          THE WITNESS:  I don't -- I don't --
22  could you clarify what you are saying.  When
23  you say, "the distribution model," in what part
24  of the distribution model.  What are you --
25          BY MR. EPPICH:

Page 68

1    Q.    The way distributors report
2  suspicious orders to the DEA has changed in the
3  last 40 years-plus since 1971; isn't that
4  correct?
5          MR. BENNETT:  Objection.  Vague.
6  Objection.  Lacks foundation.  Objection.
7  Scope.
8          MR. UTTER:  Same objection.
9          Go ahead.
10          THE WITNESS:  I would say that the
11  regulation hasn't changed.  It's the same
12  regulation but I am sure as technology
13  increases or technology gets better, yes, there
14  was a change in the way they reported, yes.
15          BY MR. EPPICH:
16    Q.    And as technology has improved and
17  changed over time, it's still your opinion that
18  no update to the CSA is needed to account for
19  those changes?
20          MS. SINGER:  Objection.  Foundation.
21  Scope.
22          THE WITNESS:  I have --
23          MR. BENNETT:  Objection.  Again, I
24  will instruct the witness that he is not
25  authorized to disclose any internal

**Page 69**

1  deliberations that occurred at the agency while
2  he was there.
3      To the extent that you can answer
4  this question without disclosing internal
5  deliberations, you may answer.
6      THE WITNESS:  I have no control over
7  the CSA.  The CSA is controlled by Congress and
8  the Administration when the President signs a
9  piece of legislation, so I have no control over
10  what the President or Congress does in relation
11  to legislation.
12      BY MR. EPPICH:
13      Q.  In your personal opinion, do you
14  think that the Controlled Substances Act and
15  its corresponding regulations should be updated
16  to account for the changes in technology and
17  the passage of time since 1971?
18      MS. SINGER:  Same objection and
19  asked and answered.
20      MR. BENNETT:  I will object.  Scope.
21      You are not authorized to give
22  personal opinions regarding nonpublic facts or
23  information you acquired in the performance of
24  your official duties.
25      To the extent that you can form an

**Page 70**

1  opinion that is based on public facts or
2  information you acquired outside of the
3  performance of your official duties, you may
4  answer.
5      THE WITNESS:  Again, I have to go
6  back to -- I have no control over what is
7  legislated by Congress or what is signed by the
8  President, so I can't answer that question.
9      BY MR. EPPICH:
10      Q.  Sitting here today, you have no
11  personal opinion on the subject?
12      MS. SINGER:  Same objections.
13      MR. BENNETT:  Objection.  Same
14  instruction.
15      THE WITNESS:  I have no opinion on
16  that.
17      BY MR. EPPICH:
18      Q.  Before the break, we were discussing
19  some criticism within the DEA.
20      Do you remember that testimony?
21      MS. SINGER:  Objection.
22  Mischaracterizes prior testimony.
23      MR. BENNETT:  Objection.
24      MR. SMITH:  Same objection.
25      BY MR. EPPICH:

**Page 71**

1      Q.  Do you remember that discussion?
2      A.  I remember the discussion that we
3  had prior to taking the break, yes.
4      Q.  Mr. Rannazzisi, are you partially
5  responsible for the opioid crisis?
6      MS. SINGER:  Objection.  Scope.
7      MR. BENNETT:  Objection.
8  Argumentative.  Objection.  Vague.  And
9  objection.  Scope.
10      If you understand the limitations in
11  your scope authorization.
12      MR. UTTER:  Go ahead.
13      THE WITNESS:  I don't believe that I
14  am responsible for the opioid crisis, no.
15      BY MR. EPPICH:
16      Q.  Are you a paid consultant for the
17  plaintiffs' lawyers?
18      MR. BENNETT:  Objection.  Vague.
19      MS. SINGER:  Objection.
20      THE WITNESS:  I'm a paid consultant.
21      BY MR. EPPICH:
22      Q.  You are a paid consultant for
23  plaintiffs' lawyers, correct?
24      MS. SINGER:  Objection.  Vague.
25      MR. UTTER:  Are you asking in this

**Page 72**

1  litigation?
2      MR. EPPICH:  I am asking if he is a
3  consultant for plaintiffs' lawyers that are
4  involved in the opioid litigation.
5      MR. UTTER:  I will instruct you not
6  to answer to the extent it relates to any
7  litigation other than the present litigation.
8      THE WITNESS:  No, I am not a
9  consultant for this present litigation.
10      MS. MAINIGI:  Special Master Cohen,
11  I do believe that that type of question was
12  allowed in Kyle Wright's deposition.  I don't
13  want to interrupt the flow, but I would just
14  ask you make a ruling as to whether we are
15  allowed to ask whether this witness acts as a
16  consultant to any plaintiff in any opioid
17  litigation.
18      MR. UTTER:  That question was not
19  posed in Karl Wright's deposition.  It had to
20  do with him being a consultants to Motley Rice
21  which was the current litigation.
22      MS. MAINIGI:  I do not believe that
23  is correct.  I believe he was identified as a
24  consultant for Rick Fields.  It was not in this
25  litigation.

## Page 73

```
 1        SPECIAL MASTER COHEN:  I don't know
 2   whether -- why don't you ask your question that
 3   tees it up.  I'm not sure that you teed it up
 4   exactly.
 5        BY MR. EPPICH:
 6        Q.   Mr. Rannazzisi, are you a consultant
 7   in -- to the plaintiffs' attorneys that are
 8   involved in the opioid litigation?
 9        MS. SINGER:  Objection.  Vague.
10        MR. UTTER:  Object.  Work product
11   privilege as it relates to litigation not --
12   that is not the present litigation.
13        MS. MAINIGI:  Kyle Wright has
14   identified -- identified himself as a
15   consultant to Rick Fields who is a plaintiff's
16   attorney representing -- a plaintiff's attorney
17   in opioid litigation, but not the MDL.
18        SPECIAL MASTER COHEN:  Well, with
19   Kyle Wright then I'm not sure it's dispositive.
20   It seems to me that the witness is being asked
21   if he is a consulting expert, and normally that
22   is something that is not divulged.
23        MR. EPPICH:  May I introduce an
24   exhibit?
25        SPECIAL MASTER COHEN:  Sure.
```

## Page 74

```
 1        MR. EPPICH:  This will be marked as
 2   Exhibit 4.
 3        (Deposition Exhibit 4 was marked for
 4   identification.)
 5        BY MR. EPPICH:
 6        Q.   Exhibit 4 is a copy of the October
 7   15, 2017 article in the Washington Post titled:
 8   "Who is Joe Rannazzisi, the DEA man who fought
 9   the drug companies and lost."
10        Mr. Rannazzisi, have you seen this
11   document before?
12        A.   I have seen this article before,
13   yes.
14        Q.   Let's turn to the last page of the
15   article.
16        MR. UTTER:  Excuse me.  Could the
17   witness please review the article so he has the
18   context of any questions.
19        MR. EPPICH:  Yes.
20        BY MR. EPPICH:
21        Q.   Mr. Rannazzisi, please take your
22   time with the document.
23        A.   Thank you.
24        Okay.
25        Q.   Mr. Rannazzisi, on Page 3 of this
```

## Page 75

```
 1   document, it is the fifth full paragraph down,
 2   it says:  "Today, Rannazzisi is a consultant
 3   for a team of lawyers suing the opioid
 4   industry.  Separately, 41 state attorney
 5   generals have banded together to investigate
 6   the industry.  Hundreds of counties, cities and
 7   towns are also suing."
 8        Mr. Rannazzisi, you told the
 9   Washington Post that you were a consultant to
10   the opioid industry -- to the team of lawyers
11   suing the opioid industry; is that correct?
12        MS. SINGER:  Objection.  Lack of
13   foundation.  Mischaracterizes what the article
14   says.
15        MR. UTTER:  Same objection.
16        You can answer that question.
17        THE WITNESS:  I don't recall exactly
18   what I told the Post but I believe I did say
19   that I was a consultant but I don't know to
20   what detail I talked about that.
21        BY MR. EPPICH:
22        Q.   So let me ask you my question again:
23   Are you a paid consultant for the plaintiffs'
24   lawyers in the opioid litigation?
25        MS. SINGER:  Same objection.
```

## Page 76

```
 1        MR. UTTER:  Same instruction not to
 2   answer.
 3        SPECIAL MASTER COHEN:  I think you
 4   need to answer that question yes or no.
 5        MR. UTTER:  Go ahead.
 6        THE WITNESS:  Yes.
 7        BY MR. EPPICH:
 8        Q.   Which cases are you a paid
 9   consultant for plaintiffs' lawyers in the
10   opioid litigation?
11        MR. UTTER:  I instruct you not to
12   answer.  Work product privilege, other cases
13   besides this one.
14        SPECIAL MASTER COHEN:  That one I
15   don't think you need to.
16        BY MR. EPPICH:
17        Q.   When did you start becoming a
18   consultant to plaintiffs' lawyers?
19        MS. SINGER:  Objection.  Scope.
20        MR. UTTER:  Go ahead.  You can
21   answer that.
22        THE WITNESS:  Yeah.  I am just
23   trying -- it was sometime I believe in --
24   sometime during 2016.
25        BY MR. EPPICH:
```

Page 77

1      Q.    Are you a paid consultant for any
2  attorney generals that are involved in the
3  opioid litigations?
4            MS. SINGER:  Same objection.
5            To the extent that Mr. Rannazzisi
6  is, I don't know, is working with any attorneys
7  general I believe that is certainly beyond the
8  scope and would reveal confidential law
9  enforcement information that should not be
10  discussed.
11           MS. MAINIGI:  Attorneys general that
12  are suing the opioid industry as reflected in
13  the Washington Post article.
14           MS. SINGER:  First of all, that's
15  not the question.  Second of all, to the extent
16  he is a nondisclosed consulting expert, I don't
17  think he should answer that question.
18           MR. UTTER:  To the extent the
19  question calls for you to disclose you're a
20  consulting expert on a litigation, I will
21  instruct you not to answer.  Otherwise, you can
22  answer the question.
23           MR. LIVINGSTON:  He was hired with
24  knowledge that this person was going to be a
25  key witness, a key fact witness, so I don't

Page 78

1  think that the usual, you know, consultant
2  privilege applies.
3            MR. UTTER:  I appreciate your
4  thought, but I don't -- the rule doesn't say
5  that.
6            SPECIAL MASTER COHEN:  Why don't you
7  ask --
8            MR. LIVINGSTON:  We can just go and
9  hire as many --
10           SPECIAL MASTER COHEN:  There is no
11  argument between counsel.
12           If you can answer the question in
13  the way as your attorney instructed you.
14           THE WITNESS:  Could you repeat the
15  question.
16      Q.    Yes, sir.  Are you a paid consultant
17  for any attorney generals that are involved in
18  the opioid litigation?
19           MR. UTTER:  You can answer the
20  question to the extent it doesn't reveal your
21  consultation in litigation outside the present
22  litigation.
23           THE WITNESS:  My agreement is with
24  Richard Fields.

Page 79

1            BY MR. EPPICH:
2      Q.    Did Mr. Fields approach you or did
3  you approach Mr. Fields?
4            MR. UTTER:  I instruct you not to
5  answer, work product.
6            SPECIAL MASTER COHEN:  I am not
7  overruling that.
8            MS. MAINIGI:  Why is that
9  privileged?
10           SPECIAL MASTER COHEN:  For the same
11  reason that I would not uphold -- for the same
12  reason I wouldn't direct a witness that is
13  yours to divulge the nature of the relationship
14  that the expert or consultant has with you.  I
15  play it the same way.
16           What you are after is information
17  that would go to his credibility and bias.  You
18  have already got it.
19           MS. MAINIGI:  We've already got it,
20  but how -- who approached who is not privileged
21  information.
22           SPECIAL MASTER COHEN:  I'm not going
23  to -- I'm not going to argue over my rulings.
24           BY MR. EPPICH:
25      Q.    Mr. Rannazzisi, did you understand

Page 80

1  that you would get paid for your work with the
2  Fields firm?
3            MR. UTTER:  You can answer that.
4            THE WITNESS:  Yes.
5            BY MR. EPPICH:
6      Q.    Did you sign a contract with them?
7      A.    Yes.
8      Q.    How much are you paid per hour?
9            MR. UTTER:  You can answer.
10           THE WITNESS:  $500 an hour.
11           BY MR. EPPICH:
12      Q.    And how many hours have you billed
13  to date?
14           MR. UTTER:  That I would instruct
15  you not to answer.
16           THE WITNESS:  I don't --
17           MR. UTTER:  That I would instruct
18  you not to answer.
19           SPECIAL MASTER COHEN:  No, you can
20  answer that question.
21           MR. UTTER:  Go ahead.
22           THE WITNESS:  I don't know.
23           BY MR. EPPICH:
24      Q.    Do you know how much money you
25  received from the Fields firm to date?

Page 81

1        MR. UTTER:  Go ahead.
2        THE WITNESS:  I don't know.
3    BY MR. EPPICH:
4    Q.    Is it more than $10,000?
5    A.    Yes.
6    Q.    More than $50,000?
7    A.    Yes.
8    Q.    More than $100,000?
9    A.    I would say yes.
10   Q.    More than a quarter million dollars?
11   A.    No.
12   Q.    Are you billing the Fields firm for
13   your testimony here today?
14   A.    No.
15   Q.    Are you billing the Fields firm for
16   your preparation sessions for this deposition
17   today?
18   A.    No.
19   Q.    Are you being compensated by any
20   lawyer or entity for your testimony here today
21   or the preparations for your testimony here
22   today?
23   A.    Well, I was under the impression I
24   got a witness fee from the defendants.
25   Q.    Other than that?

Page 82

1    A.    No.
2    Q.    Now have you talked with the
3    plaintiffs' firms about the work you did while
4    you were at the DEA?
5        MS. SINGER:  Objection.  Vague.
6        MR. UTTER:  Objection.
7        I instruct you not to answer that.
8    I'm gong to instruct you not to answer that.
9        THE WITNESS:  I didn't hear the
10   question.  Can you repeat the question, please.
11   BY MR. EPPICH:
12   Q.    Have you talked with the plaintiffs'
13   firms that you are hired by about the work you
14   did while you were at the DEA?
15       MR. UTTER:  Objection.
16       I instruct you not to answer.
17   BY MR. EPPICH:
18       SPECIAL MASTER COHEN:  I am not
19   overruling that.
20   BY MR. EPPICH:
21   Q.    Did you get any kind of approval
22   from the United States Government before you
23   agreed to take a consulting role with the
24   plaintiffs' lawyers?
25       MR. UTTER:  You can answer that.

Page 83

1        THE WITNESS:  Yes.
2    BY MR. EPPICH:
3    Q.    And is that approval in writing?
4    A.    Yes.
5    Q.    Do you still have a copy of that
6    approval?
7    A.    I don't -- I don't know if I still
8    have a copy of it.  But the person who did the
9    approval was Roberto Dibella.
10   Q.    Do you recall when that approval was
11   issued?
12   A.    It was right about the time -- right
13   after Mr. Fields approached me.
14   Q.    And that was in 2016?
15   A.    I believe it was in '16, yes.
16   Q.    You have a personal attorney here
17   today?
18   A.    Yes, sir.
19   Q.    Who is paying his fees?
20   A.    I -- we just have an agreement that
21   Mr. Utter would represent me.  There's no fee.
22   There's no fee.
23   Q.    You are not paying Mr. Utter's fee
24   today as he sits here today?
25   A.    No, sir.

Page 84

1    Q.    Are you aware that Mr. Utter
2    represents plaintiffs in the opioid lawsuit?
3    A.    I believe Mr. Utter does represent
4    plaintiffs, yes.
5    Q.    And you have had conversations with
6    Mr. Utter about the opioid lawsuit?
7        MR. UTTER:  I'm going to object and
8    instruct you not to answer.
9        SPECIAL MASTER COHEN:  It's a yes or
10   no question.  You can answer yes or no without
11   going into the substance of those
12   conversations.
13       THE WITNESS:  Could you repeat.
14       MR. UTTER:  Go ahead.
15       THE WITNESS:  Could you repeat the
16   question one more time.
17   BY MR. EPPICH:
18   Q.    Have you had conversations with Mr.
19   Utter about the opioid lawsuit?
20   A.    Yes.
21   Q.    Was Mr. Utter referred to you?
22       MR. UTTER:  I will instruct you not
23   to answer that as part of the consultation work
24   with Mr. Fields.
25       SPECIAL MASTER COHEN:  I actually

Page 85

1    don't understand the question.  I'm sorry.
2         BY MR. EPPICH:
3         Q.    How did you become acquainted with
4    Mr. Utter?  Was he referred to you by the
5    Fields law firm?
6              MR. UTTER:  That you can answer.
7              THE WITNESS:  I was working with Mr.
8    Utter.  I got to know him during several
9    meetings we have had and I asked him.
10             BY MR. EPPICH:
11        Q.    Have you been asked to testify in
12   any of the opioid litigations?
13             MR. UTTER:  You can answer.
14             THE WITNESS:  Asked to testify?
15             BY MR. EPPICH:
16        Q.    Yes, sir.
17        A.    I'm sure people have asked me over
18   the last year or so, two years.
19        Q.    Well --
20             MR. BENNETT:  And I will interject
21   an objection as to vague, whether you mean
22   testify as an expert because he is testifying
23   now.
24             MR. EPPICH:  Fair enough, James.
25   Thank you.

Page 86

1              BY MR. EPPICH:
2         Q.    Have you been asked to testify as an
3    expert in any opioid litigation?
4              MR. UTTER:  I object and instruct
5    you not to answer unless you are aware whether
6    you have been designated as a testifying expert
7    in that case.
8              THE WITNESS:  I have not been
9    designated as a testifying expert, but I am
10   sure I have been asked over the last year or so
11   from many different law firms.
12             BY MR. EPPICH:
13        Q.    In fact, you already appeared before
14   the court in this multidistrict litigation,
15   correct?
16        A.    That's true.
17        Q.    Were you paid for that testimony?
18        A.    Yes, I was paid.
19        Q.    That was part of your consultancy
20   with the Fields firm?
21        A.    It wasn't part of the agreement with
22   Mr. Fields.
23        Q.    Who was -- which agreement was that
24   testimony for?
25        A.    It wasn't really an agreement.  I

Page 87

1    was just asked to appear.  It was with Motley
2    Rice.
3         Q.    Did Motley Rice pay you for your
4    time?
5         A.    Yes.
6         Q.    Do you have an agreement with Motley
7    Rice?
8         A.    I don't believe I have an agreement
9    with Motley Rice, no.
10        Q.    Are you aware that the Motley Rice
11   firm represents plaintiffs in this lawsuit?
12        A.    Yes.
13        Q.    Do you have a current engagement
14   with the Motley Rice firm for purposes of this
15   opioid lawsuit?
16        A.    No.  That was a one-time appearance
17   to explain ARCOS and quotas.  That was it.
18        Q.    Now, in addition to getting paid
19   consultant fees by the plaintiffs' lawyers, you
20   advertise on the Internet as a paid speaker on
21   the opioid crisis; is that true?
22             MS. SINGER:  Objection.
23   Mischaracterizes the witness's testimony.
24             MR. UTTER:  Go ahead.
25             THE WITNESS:  I don't advertise at

Page 88

1    all.
2              BY MR. EPPICH:
3         Q.    But it's true that you are a paid
4    speaker on the opioid crisis?
5         A.    I do paid speaking engagements but
6    there is no advertising.  I also do free
7    speaking engagements.
8         Q.    How much do you get paid for your
9    speaking engagements on the opioid crisis?
10        A.    It depends on the audience.  If it's
11   a parent's group that lost children or loved
12   ones, it's free.  They pay me to come out and
13   talk and -- they pay me my expenses so they
14   will pay my flight.  Generally, I don't even
15   take hotel.  They pay my flight out, I speak
16   and then I leave.
17             If it's a group of doctors, it might
18   be anywhere from 2 to $5,000.  If it's a group
19   of -- another type of group, you know, it just
20   depends on the group and it depends on what
21   they could pay, I mean, that's -- but for the
22   most part, it's really not set in stone.
23        Q.    What is the most you have been paid
24   for a speaking engagement on the opioid crisis?
25        A.    The most?  $5,000.

Page 89

```
 1      Q.    Have you signed any book deals on
 2  the opioid crisis?
 3      A.    No.
 4      Q.    Are you paid for any TV appearances
 5  relating to the opioid crisis?
 6      A.    I don't do television.
 7      Q.    Are you being paid for any radio
 8  appearances, podcasts?
 9      A.    No.  I never take any money for
10  podcasts.
11      Q.    I want to talk to you briefly about
12  your conduct with respect to documents during
13  your time at the DEA.
14      A.    Yes.
15      Q.    You sent e-mails from your
16  government e-mail address to your personal
17  e-mail address; is that true?
18      A.    Uh-huh.  Yes.
19      Q.    You sent work-related e-mails to
20  your personal e-mail address on multiple
21  occasions?
22            MS. SINGER:  Objection.  Scope.
23            BY MR. EPPICH:
24      Q.    Isn't that true?
25      A.    Yes.
```

Page 90

```
 1      Q.    And this was over the course of
 2  several years, wasn't it?
 3      A.    Yes.
 4      Q.    These e-mails would often have
 5  government documents attached to them.
 6      A.    That's true, yes.
 7      Q.    In fact, other DEA employees knew to
 8  send you e-mail at both your work and personal
 9  e-mail addresses, didn't they?
10      A.    Well, I don't know if other
11  employees knew that.  It just depends on where
12  we were.  We were having issues with our
13  phones.  And sometimes it would just be easier
14  to send certain things to my personal account.
15      Q.    Do you still maintain copies of
16  these documents and e-mails in your personal
17  accounts?
18      A.    Everything that I had in the
19  personal account that I found I turned over to
20  the Department of Justice.
21      Q.    But you still have copies of those
22  documents, don't you?
23      A.    Well, I was --
24            MS. SINGER:  Objection.
25  Argumentative.
```

Page 91

```
 1            THE WITNESS:  I was told I couldn't
 2  get rid of them until the end.  So yes.
 3            BY MR. EPPICH:
 4      Q.    And did you share any of these
 5  documents with "60 Minutes" or the Washington
 6  Post?
 7      A.    No, sir.
 8      Q.    You didn't give "60 Minutes" the
 9  Washington Post documents at all?
10      A.    No.
11      Q.    Did you share any of these documents
12  with the plaintiffs' lawyers --
13      A.    No.
14      Q.    -- that you're doing consulting work
15  for?
16      A.    Absolutely not.
17      MR. EPPICH:  Thank you, Mr.
18  Rannazzisi.
19            When pass you to one of my
20  colleagues.
21            Let's go off the record for a
22  minute.
23            THE VIDEOGRAPHER:  We are going off
24  the record.
25            The time is 10:04.
```

Page 92

```
 1            (A short recess was taken.)
 2            THE VIDEOGRAPHER:  We are going back
 3  on the record.
 4            The time is 10:08.
 5            You may proceed, Counsel.
 6    EXAMINATION BY COUNSEL FOR MALLINCKRODT
 7        PHARMACEUTICALS AND SPECGX LLC
 8            BY MR. O'CONNOR:
 9      Q.    Good morning, Mr. Rannazzisi.
10      A.    Good morning.
11      Q.    My name is Andrew O'Connor.  I
12  represent one of the manufacturers in the case.
13  I'll be asking you some questions.
14      A.    Sure.
15      Q.    I want to return to the topic of
16  quotas for a few minutes.
17            DEA considered a number of different
18  factors when determining quotas for controlled
19  substances, correct?
20      A.    Yes.
21      Q.    And those factors are set by statute
22  and regulation, true?
23      A.    Yes.
24      Q.    They include the total net disposal
25  of controlled substances in prior years?
```

Page 93

```
1         A.    Yes.
2         Q.    They include trends in is the
3  national rate of net disposal?
4         A.    Yes.
5         Q.    Total actual or estimated
6  inventories?
7         A.    Yes.
8         Q.    Changes in accepted medical use?
9         A.    Yes.
10        Q.    Economic and physical availability
11 of raw materials?
12        A.    Yes.
13        Q.    Any emergencies that might have
14 occurred?
15        A.    Yes.
16        Q.    And any other factors that the DEA
17 determines to be relevant, correct?
18        A.    Yes.
19        Q.    And in setting quotas for controlled
20 substances, the DEA considers input from a
21 variety of sources, true?
22              MS. SINGER:  Objection.  Vague.
23              MR. BENNETT:  I join that objection.
24              THE WITNESS:  Could you repeat the
25 question.  I'm sorry.
```

Page 94

```
1              BY MR. O'CONNOR:
2         Q.    Sure.
3              In setting quotas for controlled
4  substances, the DEA considers information from
5  multiple sources, correct?
6         A.    Yes.
7              MS. SINGER:  Objection.  Vague.
8              BY MR. O'CONNOR:
9         Q.    Those sources include the Food &
10 Drug Administration?
11        A.    Yes.
12        Q.    And in every year while you were the
13 head of the Office of Diversion Control, DEA
14 considered input from the FDA, correct?
15        A.    We considered -- yes, we did.
16        Q.    In addition to setting quotas
17 regarding the total amount of controlled
18 substances that are allowed to be produced, DEA
19 also sets quotas for individual registrants,
20 correct?
21              MS. SINGER:  Objection.  Compound.
22              THE WITNESS:  Could you rephrase
23 that question.
24              BY MR. O'CONNOR:
25        Q.    Sure.
```

Page 95

```
1              DEA sets quotas for individual
2  manufacturers, correct?
3         A.    Talking about bulk API
4  manufacturers?
5         Q.    Let's start with that.
6         A.    Yes.
7         Q.    Okay.  And DEA also sets individual
8  procurement quota for dosage manufacturers?
9         A.    Yes.  Correct.
10        Q.    Okay.  And in assigning those
11 quotas, DEA must stay within the aggregate
12 production quota that it has set, correct?
13        A.    The aggregate production quota is
14 the ceiling.  We can't go above that by
15 statute.
16        Q.    Understand.
17              And that ceiling reflects the
18 legitimate scientific, medical and industrial
19 needs of the United States, correct?
20        A.    In addition to import, export --
21 export requirements and -- there are a couple
22 other factors, yeah.
23        Q.    When assigning a particular dosage
24 manufacturer a procurement quota, if the DEA
25 knew that that registrant was diverting
```

Page 96

```
1  controlled substances, would it grant the
2  registrant a quota?
3              MR. BENNETT:  Objection.
4              MS. SINGER:  Objection.
5  Hypothetical.
6              MR. BENNETT:  Objection.  Incomplete
7  hypothetical.  And calls for speculation.
8  Scope.
9              MR. UTTER:  Same objections.
10             Go ahead.
11             THE WITNESS:  I -- I can't answer
12 that question.  Because it's -- every -- we --
13 everything is very fact-specific when it comes
14 to manufacturers in quota.
15             BY MR. O'CONNOR:
16        Q.    But if -- if you knew for a fact
17 that a manufacturer is diverting controlled
18 substances, you would not give that
19 manufacturer a quota --
20             MS. SINGER:  Objection.
21             BY MR. O'CONNOR:
22        Q.    -- correct?
23             MS. SINGER:  Hypothetical.
24             MR. BENNETT:  Objection.  Incomplete
25 hypothetical.  Calls for speculation.  And
```

Page 97

```
1    scope.
2              MR. UTTER:  Same objection.
3         Go ahead.
4              THE WITNESS:  I -- I can't answer
5    that.  Because there's -- there's processes in
6    place to review and make a determination that
7    has other -- there's other components involved,
8    not just the Office of Diversion Control.
9         BY MR. O'CONNOR:
10        Q.   Was there ever a time at DEA that
11   the DEA granted a procurement quota to a
12   manufacturer it knew was diverting products?
13             MR. BENNETT:  Objection.  Scope.
14             You're not authorized to disclose
15   information regarding any specific nonpublic
16   DEA investigations or activities.
17             To the extent that there's public
18   information that allows you to answer this
19   question, you may.  But you may not disclose
20   any specific DEA investigations or activities
21   that are nonpublic.
22             THE WITNESS:  I can't answer that
23   question.
24             BY MR. O'CONNOR:
25        Q.   Mr. Rannazzisi, would you agree with
```

Page 98

```
1    me that it's important that the DEA grant
2    enough quota so that legitimate patients have
3    access to necessary medication?
4              MS. SINGER:  Objection.  Vague.
5              MR. BENNETT:  Objection.  Scope.
6              MR. UTTER:  Go ahead.
7              THE WITNESS:  Quota, under 826, is
8    based on legitimate medical, scientific,
9    industrial export needs of the country.
10             BY MR. O'CONNOR:
11        Q.   Would you agree that granting
12   adequate quota is necessary to ensure an
13   adequate and uninterrupted supply of
14   pharmaceutical-controlled substances?
15        A.   I can only agree with what the
16   statute requires.  And the statute requires
17   that we allot quota to meet the needs of the
18   medical, industrial and scientific requirements
19   of the country.
20        Q.   And if you don't grant enough quota,
21   there can be drug shortages, correct?
22             MS. SINGER:  Objection.  Vague.
23   Objection.  Scope.
24             THE WITNESS:  I actually -- no.
25   That's not correct.
```

Page 99

```
1              BY MR. O'CONNOR:
2         Q.   It's not correct that, if there is
3    not enough quota granted, that there could be
4    drug shortages?
5              MR. BENNETT:  Objection.  Form.
6              THE WITNESS:  It -- it's not correct
7    because the Drug Enforcement Administration has
8    no authority to dictate what exactly a
9    manufacturer does once they're issued with
10   quota.
11             So there may be a situation where a
12   manufacturer decides to divert the amount of
13   quota authority he has to another product,
14   therefore creating a shortage.
15             It's not necessarily the amount of
16   quota.  It's what they're doing with the quota
17   that could create the shortage.
18             BY MR. O'CONNOR:
19        Q.   But would you agree that, if the DEA
20   set the quota far too low, that could result in
21   a drug shortage?
22             MS. SINGER:  Objection.
23   Hypothetical.  Calls for speculation.
24             MR. BENNETT:  Objection.  Incomplete
25   hypothetical.  Calls for speculation.  Scope.
```

Page 100

```
1              MR. UTTER:  Go ahead.
2              THE WITNESS:  Again, it -- like
3    everything else, with quota, it -- I have to --
4    I'd have to have a complete set of facts in
5    order to answer that question.
6              MR. O'CONNOR:  Okay.  Mr.
7    Rannazzisi, I'm going to show you a document.
8         Counsel.
9              MR. UTTER:  Is this marked as an
10   exhibit or --
11             MR. O'CONNOR:  Yes.
12        We'll mark that.  I think we're on
13   number --
14             THE REPORTER:  Exhibit 5.
15             MR. O'CONNOR:  -- 6.
16        5 or 6.
17             THE REPORTER:  5.
18        (Deposition Exhibit 5 was marked for
19   identification.)
20             MS. SINGER:  What is the exhibit
21   number?
22             THE REPORTER:  Exhibit 5.
23             MS. SINGER:  Thank you.
24             MR. O'CONNOR:  Just for the record,
25   this is Bates No. US-DEA-00011611.
```

Page 101

1    BY MR. O'CONNOR:
2        Q.    Mr. Rannazzisi, do you recognize
3    this document?
4        A.    Yes, I do.
5        Q.    You wrote it, correct?
6        A.    Yes.
7        Q.    Okay.
8        A.    I was -- I was part of -- I was part
9    of the writing team.
10       Q.    Okay.  And if you flip to the back
11   page, that's your signature or someone signing
12   on your behalf, correct?
13       A.    That was one of my execs signing on
14   my behalf.  Because I was out of town when it
15   was finalized.
16       Q.    But you approved of the letter?
17       A.    Yes.  I -- I had to read it to
18   approve it.
19       Q.    And I'm going to direct your
20   attention to Page 10 of the document.
21             Would you just read for me the first
22   sentence of the conclusion.
23       A.    "There can be no doubt that drug
24   shortages adversely affect the public health."
25       Q.    Based on your knowledge and

Page 102

1    experience at DEA, do you agree with that
2    statement, as you sit here today?
3             MS. SINGER:  Objection.  Scope.
4             THE WITNESS:  Drug shortages can
5    affect the public health.  Absolutely.
6             BY MR. O'CONNOR:
7        Q.    Okay.  And are you aware that the
8    DEA has been criticized for not simply lowering
9    the quota to help address the problem of opioid
10   abuse?
11            MS. SINGER:  Objection.
12            MR. BENNETT:  Vague.
13            MS. SINGER:  Objection.  Foundation.
14            MR. BENNETT:  Vague as to time.
15            MR. UTTER:  Same objection.
16            Go ahead.  You can answer.
17            THE WITNESS:  I'm just -- where did
18   -- I -- I -- I am aware that that has actually
19   -- that people have talked about that, both in
20   Congress and -- and in the private industry,
21   yes.
22            BY MR. O'CONNOR:
23       Q.    But the truth is DEA can't simply
24   turn off the supply of opioids through quota
25   because that would hurt legitimate patients,

Page 103

1    correct?
2             MS. SINGER:  Objection.  Compound.
3    Objection.  Foundation.
4             MR. BENNETT:  Objection.  Form.
5    Calls for legal conclusion.  Scope.
6             THE WITNESS:  DEA is required, under
7    826, to set the quota to meet the legitimate
8    medical, scientific, industrial needs and
9    export needs of the country.  And that's what
10   we're required to do.
11            BY MR. O'CONNOR:
12       Q.    And if you don't set that number
13   high enough, that might prevention legitimate
14   patients from receiving medication, correct?
15            MS. SINGER:  Objection.  Asked and
16   answered.  Vague.
17            MR. BENNETT:  Objection.  Incomplete
18   hypothetical.
19            THE WITNESS:  Again, I can only go
20   back to 826 and tell you exactly what the
21   statute says.
22            BY MR. O'CONNOR:
23       Q.    Okay.  Mr. Rannazzisi, have you ever
24   appeared on a podcast?
25       A.    Yes.  I've appeared on several

Page 104

1    podcasts.
2        Q.    Have you appeared on one called
3    Cover2 Resources?
4        A.    Yes.
5             MR. O'CONNOR:  I'm going to mark
6    Exhibit No. 6.
7             (Deposition Exhibit 6 was marked for
8    identification.)
9             BY MR. O'CONNOR:
10       Q.    This is a certified transcript of an
11   episode of the Cover2 Resources podcast in
12   which you appeared.
13            I'll direct your attention to Page
14   25 of this transcript.
15            At the top of the page you say:
16   "It's very easy to say, 'Well, all DEA has to
17   do is cut the quota.'  The problem is you can't
18   cut the quota.  In a quota system there's a
19   hundred -- well, let's just come up with a
20   number -- 100 kilograms of a certain -- of
21   oxycodone, the basic class, which is what we
22   set the quota in a basic class.  A hundred
23   kilograms of oxycodone in the basic class form
24   is the quota, and that's based on downstream
25   sales, for the most part."

Page 105

1    Now, do you see where I am here?
2    A.    Yeah.  I am following you along.
3    Q.    Okay.  Now, I'd -- I'd like for you
4  to take a look at what you say in the next
5  sentence that begins "So."
6          Could you read that for me?
7          MR. UTTER:  Before you do that, make
8  sure you understand the context in which this
9  is all based at.
10         THE WITNESS:  Yeah.  What I was --
11         MR. UTTER:  And I object to the fact
12  that there's no foundation to -- to the
13  question.  And he's reading the document into
14  the record without that foundation.
15         THE WITNESS:  Could I read a couple
16  of pages before?
17         MR. O'CONNOR:  Sure.
18         THE WITNESS:  Thanks.
19         Okay.
20         BY MR. O'CONNOR:
21   Q.    Okay.  And could you read, please,
22  the sentence that begins "So if I know."
23         MR. UTTER:  Object.  Foundation.
24         THE WITNESS:  What page is that?
25         BY MR. O'CONNOR:

Page 106

1    Q.    Page 25?
2    A.    25.  Oh.
3          "So if I know that a hundred
4  kilograms is the quota, and that's what's going
5  to cover all the downstream sales and all the
6  research and everything else, and I cut the
7  quota, just cut it by 80 -- by 20 percent, say,
8  well, that sound like a great idea.  But
9  remember, you have drug seekers competing" for
10  real life patients -- "with real life patients
11  for that quota."
12   Q.    Do you agree with that statement, as
13  you sit here today?
14         MS. SINGER:  Objection.  The
15  document is out of context.
16         MR. UTTER:  Go ahead.
17         THE WITNESS:  I'm sorry.
18         BY MR. O'CONNOR:
19   Q.    Do you agree with that statement?
20   A.    Yes.
21   Q.    Because if you were to just cut the
22  quota by 80 or even 20 percent, there would be
23  consequences for real life patients, correct?
24   A.    Yes.
25   Q.    Thank you.

Page 107

1          Earlier today you mentioned the
2  distributor initiative.
3          Are you familiar with what that is?
4    A.    Yes.
5    Q.    Fair to say that the distributor
6  initiative involved meetings with distributors
7  on the subject of regulatory compliance?
8          MR. BENNETT:  Objection.
9  Foundation.
10         THE WITNESS:  The distributor
11  initiative was created to -- to reemphasize
12  what requirements under 21 C.F.R. and 21 --
13  the -- the USC were to the distributors to
14  ensure that they were acting appropriately and
15  within -- complying with the act and the
16  regulations.
17         BY MR. O'CONNOR:
18   Q.    During your time as the office -- as
19  the head of the Office of Diversion Control,
20  was there ever a manufacturer initiative?
21         MR. BENNETT:  Objection.  Vague.
22         THE WITNESS:  We -- we -- a
23  manufacturer -- a coincident activity to
24  manufacturing is distributors.  And
25  manufacturers know that they are -- they're

Page 108

1  held to the same standards as distributors.
2          BY MR. O'CONNOR:
3    Q.    So in answer to my question, there
4  was not a manufacturers --
5          MR. BENNETT:  Objection.
6          BY MR. O'CONNOR:
7    Q.    -- initiative, correct?
8          MR. BENNETT:  Objection.
9  Misstates --
10         MS. SINGER:  Argumentative.
11  Mischaracterizes the witness's testimony.
12         THE WITNESS:  Again, a distributor
13  initiative would encompass manufacturers.
14  Because a coincident activity to manufacturing
15  is distributing.
16         BY MR. O'CONNOR:
17   Q.    And during the course of the
18  distributor initiative, did you personally meet
19  with any manufacturers?
20   A.    During the distributor initiative, I
21  only met with one company.
22   Q.    Was that company a manufacturer?
23   A.    It was a distributor.
24   Q.    To your knowledge, did anyone on
25  your team meet personally with a manufacturer

Page 109

1  during the distributor initiative meetings?
2      A.    I don't remember exactly.  It seems
3  to me that Southwood was actually a
4  manufacturer.  And I'm pretty sure they were
5  part of the initiative.
6      Q.    As you sit here today, other than
7  Southwood, you don't recall any meetings with
8  manufacturers as part of the distributor
9  initiative, correct?
10          MS. SINGER:  Objection.
11  Mischaracterizes the witness's testimony.
12          THE WITNESS:  I don't recall -- you
13  know, again, we met with a lot of people.  I
14  don't recall a specific instance or a specific
15  manufacturer.  But that doesn't mean that they
16  weren't.  I just don't recall one.
17          BY MR. O'CONNOR:
18      Q.    Would you agree with me that, when
19  it comes to suspicious order monitoring,
20  providing registrants with clear guidance is
21  important?
22          MS. SINGER:  Objection.  Vague.
23          MR. BENNETT:  Objection.  Vague.
24  Objection.  Scope.
25          THE WITNESS:  The registrants had

Page 110

1  clear guidance.  1301.74(b) specifically says a
2  suspicious order is orders of unusual size,
3  frequency, or substantially deviating from the
4  normal ordering pattern.  I think that's pretty
5  straightforward.
6          BY MR. O'CONNOR:
7      Q.    Are you familiar with the phrase
8  "Know your customer's customer"?
9      A.    I've heard that phrase.  But that
10  phrase was used after I -- I left.
11      Q.    Okay.  So during your time as the
12  head of the Office of Diversion Control, "Know
13  your customer's customer" was not a term that
14  you were familiar with?
15      A.    No.  Due diligence was the term we
16  utilized.  Due diligence on your customers.
17  Making sure you know your customers and know
18  what they're doing.
19      Q.    Okay.  Would you agree that the DEA
20  did not expect manufacturers to police the
21  entire supply chain?
22          MR. BENNETT:  Objection.  Vague.
23  Incomplete hypothetical.  Scope.
24          MR. UTTER:  Go ahead.
25          THE WITNESS:  No.  I -- well, I do

Page 111

1  agree that they should have -- they're --
2  they're required to know their customers.
3  They're required -- they're held to the same
4  standard as a distributor.
5          So yes, they're supposed to know
6  their customers; they're supposed to be able to
7  make a determination that the drugs that
8  they're shipping downstream are not being
9  diverted.  The same obligation as the
10  distributor.
11          BY MR. O'CONNOR:
12      Q.    But manufacturers aren't required to
13  police the entire supply chain, correct?
14          MS. SINGER:  Objection.  Asked and
15  answered.
16          MR. BENNETT:  Objection.  Vague.
17  Incomplete hypothetical.  And scope.
18          THE WITNESS:  Again, they're --
19  they're required to do exactly what
20  distributors do.
21          BY MR. O'CONNOR:
22      Q.    Okay.  Take a look at that same
23  exhibit you have in front of you --
24      A.    Yeah.
25      Q.    -- No. 6.

Page 112

1      A.    Uh-huh.
2      Q.    And I'd like you to turn to pages 18
3  and 19.
4          Bottom of Page 18 you say:  "People
5  always say, 'Well, you can't expect us to
6  police the -- the supply chain.'  And I say, 'I
7  don't expect you to police the supply chain.
8  But I do expect you to police your own
9  customers.'"
10          Do you see that?
11      A.    Yes.
12      Q.    So you expect manufacturers to
13  police their own customers --
14      A.    Absolutely.
15      Q.    -- correct?
16          But you do not expect them to police
17  the entire supply chain.
18          MR. BENNETT:  Object.
19          MS. SINGER:  Objection.
20  Mischaracterizes the document.  Takes
21  statements out of context.  And as you know,
22  the rule requires that you provide whole of the
23  context in the relevant document, like here,
24  Page 18, in the first full paragraph.
25          MS. MAINIGI:  Special Master Cohen,

Page 113

```
 1   could we ask that there not be speaking and
 2   coaching objections of the type that were made.
 3           MS. SINGER:  Rule 106.
 4           SPECIAL MASTER COHEN:  You know, an
 5   objection needs to be succinct.  And that was
 6   more than necessary, please.
 7           BY MR. O'CONNOR:
 8       Q.  Do you need the question again?
 9       A.  Yes.
10       Q.  Okay.  But you do not expect
11   manufacturers to police the entire supply
12   chain, correct?
13           MS. SINGER:  Objection.  Asked and
14   answered.  Mischaracterizes the document.
15           MR. BENNETT:  Objection.  Vague.
16   Objection.  Incomplete hypothetical.
17   Objection.  Scope.
18           THE WITNESS:  Could you clarify what
19   the entire supply chain is.
20           BY MR. O'CONNOR:
21       Q.  The entire supply chain would refer
22   to, in addition to the manufacturers, the
23   distributors, the pharmacies, the doctors and
24   the patient.
25       A.  They absolutely should be looking at
```

Page 114

```
 1   the -- the distributors and the pharmacies.  I
 2   think that that's important.
 3           Obviously they can't look at the
 4   patients unless they actually, you know --
 5   they -- they could look at the
 6   pharmacies, and they look -- they look at the
 7   distributors.  And I think that's a
 8   requirement.
 9           It -- the Controlled Substances Act,
10   the infrastructure is a system of checks and
11   balances.  And for it to work, everybody's got
12   to do what's required of them in their specific
13   role within the supply chain.
14       Q.  In terms of what's required of
15   manufacturers, did DEA ever issue any sort of
16   official guidance informing manufacturers that
17   they were to monitor pharmacies?
18       A.  The guidance was that --
19           MR. BENNETT:  Wait a second.
20           Objection.  Vague.
21           You can answer.
22           THE WITNESS:  The guidance was that
23   they have to comply with the obligations, both
24   the manufacturer and the distributors.  It's in
25   the Code of Federal Regulations.  It's
```

Page 115

```
 1   coincident.
 2           Activity to distribute by a
 3   manufacturer.  Therefore, they are required to
 4   do exactly the same thing that a distributor
 5   did.  That's where the guidance is in the Code
 6   of Federal Regulations.
 7           BY MR. O'CONNOR:
 8       Q.  Beyond the text of the regulation,
 9   though, DEA never sent a letter to registrants
10   informing manufacturers that they needed to
11   monitor the pharmacies distributors were
12   selling to, correct?
13           MR. BENNETT:  Objection.  Vague.
14           You can answer.
15           THE WITNESS:  If I'm not mistaken,
16   every manufacturer got the 2006 and 2007
17   letters that laid out what the obligations were
18   under the Controlled Substances Act in the Code
19   of Federal Regulations.
20           BY MR. O'CONNOR:
21       Q.  But neither of those letters said
22   expressly that manufacturers had to monitor
23   pharmacies that distributors were selling to,
24   did they?
25       A.  The --
```

Page 116

```
 1           MS. SINGER:  Objection.  Lack of
 2   foundation.
 3           THE WITNESS:  The letters were
 4   written and sent to the manufacturers because
 5   they also had a distribution component which
 6   required them to meet the same standards --
 7   legal standards under the Controlled Substances
 8   Act and the Code of Federal Regulations in
 9   1301.74(b).
10           BY MR. O'CONNOR:
11       Q.  DEA never published a formal
12   guidance document informing manufacturers that
13   they were to monitor the pharmacies
14   distributors were selling to, did it?
15           MS. SINGER:  Objection.  Vague.
16           THE WITNESS:  That would be --
17   formal guidance, no.  But they're held to the
18   same standards.  They still have to maintain
19   effective controls against diversion, which is
20   a statutory obligation as well as a regulatory
21   obligation.  And to do that they have to know
22   what is happening with their drugs downstream.
23           BY MR. O'CONNOR:
24       Q.  As you sit here today, could you
25   point me to any guidance in writing provided to
```

Page 117

1   any manufacturer that articulates the duty you
2   just said existed?
3           MR. BENNETT:  Objection.  Scope.
4           You're not authorized to disclose
5   any individual DEA investigations or activities
6   that are nonpublic.  To the extent that you can
7   answer that question without disclosing
8   individual DEA investigations or activities
9   with a particular manufacturer that is
10  nonpublic, then you may answer the question.
11          MS. SINGER:  Objection.
12  Mischaracterizes the witness's testimony.
13          MR. UTTER:  Go ahead.
14          THE WITNESS:  I stand by what I
15  said.  The obligations are in the Code of
16  Federal Regulations and also in 21 USC.  And
17  those have been in place since the early '70s.
18  BY MR. O'CONNOR:
19      Q.   Mr. Rannazzisi, are you familiar
20  with the term "charge-back"?
21      A.   Yes.
22      Q.   What do you understand a charge-back
23  to be?
24          MR. BENNETT:  Objection.  Scope.
25          THE WITNESS:  "Charge-back" means --

Page 118

1   charge-back is -- is referred to by different
2   monikers throughout the supply chain.
3           But from what I understand, it is --
4   is a manufacturer collects data on downstream
5   sales through some sort of compensation
6   agreement with the distributor or the
7   pharmacies.
8   BY MR. O'CONNOR:
9       Q.   When did you first hear the term
10  "charge-back"?
11      A.   A while ago.  Probably sometime
12  before 2010.
13      Q.   Okay.  Do you remember how you first
14  came to hear that term?
15          MR. BENNETT:  Objection.  Scope.
16          You're not authorized to disclose
17  investigative information that you acquired
18  that is nonpublic.  To the extent that you have
19  disclosed publicly when you heard of that or
20  you have public information, you may use that,
21  but not any confidential investigative
22  information.
23          THE WITNESS:  I seem to remember the
24  first time I heard about charge-back
25  information was at a conference.  And it was at

Page 119

1   a -- it was at a conference involving multiple
2   disciplines within industry and the regulated
3   -- the regulators.
4           And it came up in a conversation,
5   but I -- I don't recall exactly when.
6   BY MR. O'CONNOR:
7       Q.   In your understanding, do
8   charge-backs have any role in the suspicious
9   order monitoring process?
10          MR. UTTER:  Go ahead.  You can
11  answer.
12          THE WITNESS:  They may, yes.
13  BY MR. O'CONNOR:
14      Q.   Did DEA ever issue any guidance to
15  manufacturers informing them that charge-backs
16  were to play a role in suspicious order
17  monitoring?
18      A.   D --
19          MR. BENNETT:  Objection.  Vague.
20  And vague as to time.
21          THE WITNESS:  DEA doesn't -- DEA
22  does not tell a registrant or either the man --
23  or a registrant involved in distribution
24  activities what's a suspicious order, besides
25  the -- the definition in 1301.74(b).

Page 120

1           It's up to the -- the distributor or
2   the manufacturer, distributor to make a
3   decision what information they will use to
4   determine a suspicious orders.
5   BY MR. O'CONNOR:
6       Q.   So DEA never issued any guidance to
7   manufacturers informing them that charge-backs
8   were to play a role in suspicious order
9   monitoring, correct?
10          MS. SINGER:  Objection.  Asked and
11  answered.
12  BY MR. O'CONNOR:
13      Q.   I would just like a yes-or-no
14  answer.
15          MS. SINGER:  Objection.
16          MR. BENNETT:  Objection.
17          The witness can answer the question.
18          THE WITNESS:  Besides the
19  regulations and the C.F.R. -- in the CSA, no, I
20  don't know if they ever issued a regulation --
21  any kind of document regarding chargebacks.
22  BY MR. O'CONNOR:
23      Q.   Okay.  When you were head of the
24  Office of Diversion Control, there was a unit
25  within that office that analyzed ARCOS data,

Page 121

1  correct?
2      A.    Yes.
3      Q.    Did that group use ARCOS data to
4  look for leads for investigations?
5      A.    They can, yes.
6      Q.    Did they, in fact, do that?
7      A.    Yes.
8      Q.    And would you agree that analyzing
9  the ARCOS data was helpful to the agency in
10  generating leads for investigations?
11          MR. BENNETT:  Objection.  Vague.
12  And vague as to time.
13          THE WITNESS:  The analysis of ARCOS
14  information can help, yes, leads for
15  investigations.
16          BY MR. O'CONNOR:
17      Q.    Did the DEA use ARCOS for
18  investigative leads in a timely manner in your
19  view?
20          MS. SINGER:  Objection.  Vague.
21          MR. BENNETT:  Objection.  Vague.
22  And objection.  Scope.  Regarding opinions.
23          THE WITNESS:  I don't understand
24  what you mean by "in a timely manner."
25          ARCOS is generally three to six

Page 122

1  months behind because of the reporting
2  requirements under the C.F.R., so if you are
3  asking me if ARCOS is timely reported, the
4  answer is they are always behind, you know.
5          So when the investigators look at
6  ARCOS data, you are always four to six months
7  behind and what was actually shipped
8  downstream.
9          BY MR. O'CONNOR:
10      Q.    Does the fact that the information
11  is received on a slight delay affect its
12  usefulness at identifying diversion?
13      A.    Well --
14          MS. SINGER:  Objection.  Vague.
15          THE WITNESS:  Well, it's not a
16  substitute for suspicious orders if that what
17  you are going.  A suspicious order under
18  1301.74(b) is reported when discovered.  ARCOS
19  is four to six months behind so, therefore, we
20  are always behind.  If we are going solely by
21  ARCOS, that is why there is a suspicious order
22  monitoring requirement in the C.F.R.
23          MR. BENNETT:  Counsel, we didn't
24  take a break when we switched.  When you get to
25  a good point, could we take a break.

Page 123

1          MR. O'CONNOR:  Sure.  We can take a
2  break now.
3          THE VIDEOGRAPHER:  We are going off
4  the record.  This is end of Media Unit No. 2.
5  The time is 10:45.
6          (A short recess was taken.)
7          THE VIDEOGRAPHER:  We are going back
8  on the record.  This is the start of Media Unit
9  No. 3.  The time is 11:00.
10          You may proceed, Counsel.
11          MR. SHKOLNIK:  Special Master Cohen,
12  on behalf of Cuyahoga County, CT1 plaintiff,
13  there was an objection lodged before and there
14  was a series of questions by counsel where he
15  was quoting a specific one sentence from a
16  transcript of an episode of a speech or a
17  podcast that the witness gave and the objection
18  made was under Rule 106 that is entitled:
19  "Remainder of or related to writings or
20  recorded statements.  If a party introduced all
21  or part of a writing or a recorded statement,
22  the adverse party may require the introduction
23  at that time of any other part or any other
24  writing or recorded statement that in fairness
25  ought to be considered at the same time.

Page 124

1          The rule is clear that you don't
2  wait until cross to fill in the next segment.
3  This is not a deposition question answer,
4  question answer, but a running colloquy in an
5  interview, and from the plaintiffs' standpoint,
6  both colloquies, counsel took two sentences out
7  of context, where the next sentence if it was
8  read would truly put some question to the point
9  counsel was making.
10          We ask in the future or even now
11  that counsel be directed to go back and present
12  the question and followup statements to the
13  witnesses.
14          MR. O'CONNOR:  First of all --
15          SPECIAL MASTER COHEN:  Go ahead.
16          MR. O'CONNOR:  First of all, we
17  think the -- that the questions as posed to the
18  witness were clear and didn't require any
19  further context.
20          Second, we did introduce the entire
21  exhibit as an exhibit, the entire document
22  there.
23          Third, if and when this ever gets to
24  be played at trial, we can certainly provide
25  the finder of fact with the entire document.

Page 125

1    SPECIAL MASTER COHEN:  So just an
2    observation.  First of all, counsel is free to
3    make a 106 objection.  I just think that it can
4    be made in five words or less.  We all know
5    what the shorthand is, and so it doesn't need
6    to be a long speaking objection.
7         Second of all, this is a discovery
8    deposition and so what happens at trial which
9    is really more -- I'm not saying that Rule 106
10   isn't directed at depositions, but it's more
11   critical at trial and so I just make that
12   observation.
13        And finally, I agree that if counsel
14   wants to make a Rule 106 objection and ask that
15   additional context be given to the witness,
16   that objection can be made and we can deal with
17   it at that time.
18        All right.  Let's resume.
19        MS. SINGER:  Special Master Cohen,
20   can I just ask a clarifying question about
21   speaking objections, when there is a 106
22   objection, do you want us to point you to the
23   testimony or --
24        SPECIAL MASTER COHEN:  No.  You just
25   need to say we object under Rule 106,

Page 126

1    additional context is necessary, and then we
2    can deal with it at that time.
3         MS. SINGER:  Okay.
4         BY MR. O'CONNOR:
5    Q.    Mr. Rannazzisi, do you know an
6    individual named Lenny Bernstein?
7    A.    Yes.
8    Q.    He's a reporter at the Washington
9    Post, correct?
10   A.    Yes.
11   Q.    And you have spoken with him in the
12   past?
13   A.    Yes.
14   Q.    On multiple occasions, correct?
15   A.    Yes.
16   Q.    Are you familiar with Scott Higham?
17   A.    Yes.
18   Q.    He is also a reporter at the
19   Washington Post, isn't he?
20   A.    Yes.
21   Q.    And you have met with him on
22   multiple occasions?
23   A.    Yes.
24   Q.    And at any time in your meetings
25   with Mr. Bernstein and Mr. Higham, did you

Page 127

1    provide them with any documents?
2    A.    No.
3    Q.    Are you aware of anyone that
4    provided documents belonging to the DEA to Mr.
5    Higham or Mr. Bernstein?
6         MS. SINGER:  Objection.  Scope.
7         THE WITNESS:  I'm not aware of any
8    documents provided to them other than what the
9    department provided to them.
10        BY MR. O'CONNOR:
11   Q.    Are you aware that they received
12   confidential documents that were not provided
13   by the department?
14        MS. SINGER:  Objection.  Foundation.
15        MR. UTTER:  Same objection.
16        Go ahead.
17        THE WITNESS:  No.
18        BY MR. O'CONNOR:
19   Q.    When did you first meet with Mr.
20   Bernstein?
21   A.    It was -- it was probably in late --
22   probably '16, sometime mid-'16, 2016.
23   Q.    Did you meet with Mr. Higham around
24   that same time?
25   A.    I met Mr. Higham later.

Page 128

1    Q.    Do you remember roughly when that
2    was?
3    A.    It was probably a month or two
4    later.
5    Q.    Did you reach out to them?
6    A.    No.
7    Q.    They came to you?
8    A.    Yes.
9    Q.    And at any time in your discussions
10   with Mr. Bernstein and Mr. Higham, did you
11   provide them with any information that you
12   learned in the course of your duties at DEA?
13   A.    Actually, when we talked, I told
14   them specifically that the information can be
15   obtained either through PACER or FOIA, but I
16   didn't.
17   Q.    So you did not provide them with any
18   confidential --
19   A.    No.
20   Q.    -- DEA information.  Okay.
21        MR. BENNETT:  Let him finish the
22   question first, please.
23        THE WITNESS:  Okay.
24        BY MR. O'CONNOR:
25   Q.    When you first consulted with Mr.

Page 129

1  Bernstein, had you already been retained by
2  plaintiffs' lawyers in connection with the
3  opioid investigation?
4          MS. SINGER:  Objection.  Vague.
5          THE WITNESS:  I don't recall.
6          BY MR. O'CONNOR:
7      Q.    When you first spoke with Mr.
8  Higham, had you been retained by plaintiffs'
9  lawyers in connection with the opioid
10 litigation?
11     A.    I think it was right about that
12 time.  I had done -- it was right about that
13 time, because I think they saw that I had done
14 other -- my name was mentioned in other
15 newspaper articles and so that's when -- when
16 Lenny approached me, so I guess it was right
17 about that time, yes.
18     Q.    Are you still in contact with Mr.
19 Bernstein or Mr. Higham today?
20     A.    I haven't talked to Mr. Bernstein in
21 a long time and Mr. Higham, I talked to him,
22 you know, probably once every couple of weeks.
23     Q.    Other than Bernstein or Higham, have
24 you disclosed to any other reporters or
25 journalists any documents from the DEA?

Page 130

1          MR. BENNETT:  Objection.  Form of
2  the question.  Objection to the
3  mischaracterization of the testimony that he
4  did provide documents to Mr. Bernstein or Mr.
5  Higham.
6          MS. SINGER:  Objection.  Scope.
7          THE WITNESS:  What was the question
8  again.  I'm sorry.
9          BY MR. O'CONNOR:
10     Q.    Have you ever provided any reporters
11 or journalists DEA documents?
12     A.    No.  What I generally do is if a
13 reporter asks questions, I basically tell them
14 it's available through FOIA or if it's
15 specific, I tell them to look on PACER.  Almost
16 all of our cases are listed on PACER.
17         MR. O'CONNOR:  We will take a short
18 break and switch questioners.  Go off the
19 record.
20         THE VIDEOGRAPHER:  We are going off
21 the record.  The time is 11:08.
22         (A short recess was taken.)
23         THE VIDEOGRAPHER:  We are back on
24 the record.  The time is 11:11.
25         You may proceed, Counsel.

Page 131

1      EXAMINATION BY COUNSEL FOR WALMART
2          BY MR. STEPHENS:
3      Q.    Mr. Rannazzisi, good morning.  My
4  name is Neal Stephens.  I'm with the Jones Day
5  law firm and I represent Walmart.
6          How are you this morning?
7      A.    Fine, thank you.
8      Q.    I will have some questions for you
9  that relate to the retail chain pharmacies and
10 those will -- in this litigation will include
11 Walmart, CVS, Rite Aid, Walgreens and HBC,
12 Giant Eagle.  Sometimes I will use them all or
13 sometimes I may just use brand retail chain
14 pharmacies.
15     A.    Okay.
16     Q.    All right.  So I'd like to start by
17 asking you a few questions about your general
18 employment history and your general duties in
19 your various positions at DEA, okay?
20     A.    Yes, sir.
21     Q.    All right.  As head of the diversion
22 control unit, your duties would have included
23 the leadership responsibility for the entire
24 group, correct?
25     A.    For the entire division.

Page 132

1      Q.    Of the diversion control group,
2  right?
3      A.    Yes.
4      Q.    Okay.  So you would help set the
5  tone and the culture for how the diversion
6  control group was going to handle every aspect
7  of enforcing the Controlled Substances Act?
8          MR. BENNETT:  Objection.  Vague.
9          THE WITNESS:  When you say, "set the
10 tone," I'm just curious, what does that mean.
11         BY MR. STEPHENS:
12     Q.    So how large is this organization
13 you are running?
14     A.    Well, in headquarters, it was about
15 300 -- between contractors and investigators,
16 employees, about 340, and then in the field,
17 there was probably 600 -- between 5 and 600
18 diversion investigators and support staff and
19 probably about 1200 special agents and task
20 force officers.
21     Q.    So it's a big organization, correct?
22     A.    Uh-huh.
23     Q.    And my point was, as the leader,
24 kind of like a CEO in a company, part of your
25 responsibility and your job duties was to set

1   the tone for how the organization was going to
2   go about doing its business; is that fair?
3           MS. SINGER:  Same objection as to
4   vagueness.
5           MR. BENNETT:  Join that Objection.
6           THE WITNESS:  If you are saying what
7   the priorities are, how -- what the priorities
8   are, our priorities are based on what the field
9   management feels the priorities are and then
10  just following what the violations or -- of the
11  Controlled Substances Act in the code of
12  federal regulations.
13          BY MR. STEPHENS:
14      Q.   As the deputy assistant
15  administrator for the diversion control group,
16  would you agree that you supervised DEA's
17  efforts to identify where diversion was
18  occurring in the United States?
19      A.   I supervised, yes, diversion cases
20  in general.
21      Q.   As part of your duties, do you also
22  agree that you supervised DEA's efforts to
23  identify precisely who was diverting controlled
24  substances?
25          MR. BENNETT:  Objection.  Vague.

1           THE WITNESS:  We basically
2   investigated diversion across the board.
3           BY MR. STEPHENS:
4       Q.   Okay.  And part of the role as the
5   leader was to try and identify who was
6   diverting; is that fair?
7       A.   Investigators identified who was
8   diverting.
9       Q.   And they reported up to you as the
10  leader?
11          MS. SINGER:  Objection.
12          THE WITNESS:  Not every case, no.
13          BY MR. STEPHENS:
14      Q.   Some of the investigators who were
15  trying to identify where diversion was
16  occurring reported up to you, right?
17      A.   Investigations would be reported up
18  to me on an as-needed basis.
19      Q.   Did you help set DEA's practices and
20  policies regarding how DEA would investigate
21  and prosecute diversion matters, including who
22  to target for potential prosecution of
23  criminal, civil or administrative enforcement
24  actions?
25          MS. SINGER:  Objection.  Compound

1   question and vague.
2           MR. BENNETT:  I will join those
3   objections.
4           MR. UTTER:  Same objection.
5           THE WITNESS:  Could you repeat the
6   question one more time, please.
7           BY MR. STEPHENS:
8       Q.   I am just trying to understand, as
9   the leader of the diversion control group, did
10  you help set policies and protocols regarding
11  how DEA was going to conduct its investigation
12  of diversion matters?
13          MS. SINGER:  Same objection.
14          MR. BENNETT:  Same objection.
15          THE WITNESS:  Policies and protocols
16  are set by the agency.  I don't -- I don't
17  unilaterally create policies and protocols.
18  It's done by the agency with my input.
19          BY MR. STEPHENS:
20      Q.   But that would be part of your job
21  duties to provide input to that, correct, sir?
22      A.   Yes.
23      Q.   All right.  And part of your job
24  duties would also involve supervising and
25  proving certain charging decisions in

1   administrative, civil or criminal diversion
2   matters?
3           MS. SINGER:  Objection.  Vague and
4   compound question.
5           MR. BENNETT:  Objection.  Scope.
6           You are not authorized to disclose
7   any information that would reveal the internal
8   deliberative process of the United States
9   Department of Justice and you may not disclose
10  any matters of prosecutorial discretion.
11          To the extent that you can answer
12  the question without disclosing those areas of
13  information, you may answer.
14          MR. UTTER:  Go ahead.
15          THE WITNESS:  Like all
16  investigations, there is levels of review that
17  it must go through, so U.S. attorneys are
18  generally involved in these decisions as is
19  counsel's office and also other individuals
20  within the Drug Enforcement Administration
21  leadership.
22          BY MR. STEPHENS:
23      Q.   Mr. Rannazzisi, I understand that
24  others might be involved.  But my point is,
25  this is part of the general duties that you had

Page 137

```
1    while you were deputy assistant administrator
2    for diversion control to supervise and approve
3    at times certain charging decisions in
4    administrative, civil or criminal matters?
5           MS. SINGER:  Objection.  Vague.
6    Still a compound question.
7           MR. BENNETT:  I join those
8    objections.
9           THE WITNESS:  In administrative
10   cases, I would approve certain things.  In
11   civil and criminal cases, that falls on the
12   shoulders of the U.S. attorney.
13          BY MR. STEPHENS:
14     Q.    Okay.  Would you help establish the
15   manner in which DEA was going to interact with
16   registrants including what information DEA
17   might provide to registrants to reduce
18   diversion?
19          MS. SINGER:  Objection.  Vague.
20          BY MR. STEPHENS:
21     Q.    As part of your general job duties?
22     A.    Any dealings with registrants, any
23   information would -- we would consult with
24   counsel's office and the administrator before
25   we do that.
```

Page 138

```
1      Q.    But it was part of your general
2    duties to be involved in that process; is that
3    fair, sir?
4      A.    I was involved but --
5           MS. SINGER:  Objection.
6    Mischaracterizes the witness's testimony.
7           THE WITNESS:  I was involved but I
8    was not the ultimate decisionmaker on that.
9           BY MR. STEPHENS:
10     Q.    Okay.  But your involvement was part
11   of your general duties; is that fair?
12     A.    Yes.
13     Q.    Thank you.  All right.  A part of
14   your general duties also included speaking on
15   DEA's behalf to Congress or the media or other
16   law enforcement agencies or industry and
17   community groups about diversion issues while
18   you were the deputy assistant administrator for
19   diversion control?
20          MS. SINGER:  Same objection as to
21   compounded question.
22          MR. BENNETT:  Compound and vague.
23          MR. UTTER:  Same objection.
24          Go ahead.
25          THE WITNESS:  One of my requirements
```

Page 139

```
1    was that I would -- I would be assigned to do
2    testimony before Congress or speak to --
3    regulated -- the regulated community,
4    regulatory agencies, law enforcement, community
5    groups, parent's groups and things like that,
6    so yes.
7           BY MR. STEPHENS:
8      Q.    And as part of your duties when you
9    would provide information to Congress, some of
10   that information that you were providing was
11   information on where DEA's diversion group saw
12   diversion occurring in the United States.
13          MS. SINGER:  Objection.  Compound
14   question.
15          THE WITNESS:  I testified over 32
16   times, over a long stretch, a long period of
17   time, so that's changed -- that all changed as,
18   you know, as the drug issues changed, so I
19   provided information, whatever information at
20   that point in time the Drug Enforcement
21   Administration and the Department of Justice
22   thought was appropriate for that particular
23   hearing.
24          BY MR. STEPHENS:
25     Q.    Okay.  And the information that you
```

Page 140

```
1    provided to Congress, that was part of your
2    general duties on behalf of DEA as the leader
3    of diversion control to provide that
4    information through to Congress?
5           MS. SINGER:  Objection.  Compound
6    question.
7           MR. UTTER:  Go ahead.
8           THE WITNESS:  Yes, it was the -- it
9    was the -- my job responsibility to put forth
10   the Department of Justice and the DEA's
11   position on matters related to that particular
12   hearing for Congress.
13          BY MR. STEPHENS:
14     Q.    Okay.  As part of your general
15   duties as the leader of the diversion control
16   group, as deputy assistant administrator, did
17   you also participate in making sure that DEA
18   did not do anything to contribute to the
19   diversion of controlled substances?
20          MS. SINGER:  Objection.  Vague.
21   Compounded question.
22          MR. BENNETT:  Objection.  Vague.
23          THE WITNESS:  DEA follows a
24   requirements under 21 U.S.C. and the code of
25   federal regulations.  We were not in the
```

Page 141

```
1   business of creating diversion.  We are in the
2   business of making sure the registered -- the
3   regulated community is complying with the law
4   and the regulations.
5           BY MR. STEPHENS:
6       Q.   Part of your duties included
7   interacting with field division leadership at
8   the various field offices for DEA around the
9   country?
10      A.   Yes.
11      Q.   And also interacting with United
12  States attorney's offices on matters; is that
13  fair?
14      A.   Yes.
15      Q.   You also would interact with other
16  federal law enforcement agencies and state and
17  local law enforcement agencies regarding
18  diversion issues, correct?
19      A.   That's --
20          MS. SINGER:  Objection.  Vague.
21          THE WITNESS:  That's correct.
22          BY MR. STEPHENS:
23      Q.   And as the leader of your group,
24  would you also at a high level oversee the
25  hiring, training and continuing education of
```

Page 142

```
1   the diversion control group's diversion
2   investigators?
3       A.   No.
4           MR. BENNETT:  Objection.  Vague.
5           THE WITNESS:  I -- I oversee the
6   hiring with the administrator's office.
7   Training is done by a separate training office.
8           BY MR. STEPHENS:
9       Q.   Okay.  Would your group provide
10  information to the training group as to how to
11  train diversion investigators?
12      A.   I'm sure --
13          MR. BENNETT:  Objection.  Scope.
14          You can answer that question "yes"
15  or "no" only.
16          THE WITNESS:  Yes.
17          BY MR. STEPHENS:
18      Q.   So part of your general duties would
19  have been ensuring that the training group who
20  was training DEA's diversion investigators had
21  what you thought was the appropriate
22  information to train up the diversion
23  investigators?
24          MS. SINGER:  Objection.
25  Mischaracterizes the witness's testimony.  And
```

Page 143

```
1   compound.
2           THE WITNESS:  And I'm just trying to
3   think.
4           Could you repeat it one more time.
5           BY MR. STEPHENS:
6       Q.   Yes, sir.
7           Part of your general duties would
8   have been ensuring that the training group
9   responsible for training DEA's diversion
10  investigators had the information that your
11  group, the diversion control group, thought was
12  appropriate for the diversion investigation --
13  diversion investigators to learn during the
14  training.
15          MS. SINGER:  Same objections.
16          THE WITNESS:  I believe that
17  training got information, yes, from my people.
18  But they also reached out to field entities to
19  make sure that what they're -- what they're
20  training -- or their training program is the
21  most up-to-date information.
22          BY MR. STEPHENS:
23      Q.   Okay.  Fair enough, Mr. Rannazzisi.
24  And I'm not suggesting that your group was the
25  only one that provided information through the
```

Page 144

```
1   training of diversion investigators.
2           I'm only trying to make sure that I
3   understand that that was part of the -- the job
4   duties that you supervised for diversion
5   control, that they participated at some level
6   in that process.
7           That's fair, right?
8           MR. BENNETT:  Objection.  Vague.
9           BY MR. STEPHENS:
10      Q.   Yes?  Is that fair?
11      A.   Well, who participated?
12      Q.   That the diversion control group
13  participated at some level in providing
14  information through the training.
15      A.   Yeah.  Certainly.  Certainly people
16  in the diversion control group did, yes.
17      Q.   And would the diversion
18  investigators be trained on how to conduct due
19  diligence on applications for registrations
20  from doctors and pharmacies?
21          MS. SINGER:  Objection.  Scope.
22          MR. BENNETT:  You can answer.
23          THE WITNESS:  I'm not sure what --
24  I -- I know there's training on applicants.  I
25  know there's both formal training and then
```

Page 145

1    training in the field.  I just -- I'm not sure
2    exactly what that training entails.
3            BY MR. STEPHENS:
4        Q.    Okay.  Mr. Rannazzisi, for your
5    benefit, I'm not asking you to know like the 40
6    bullet points that are covered --
7        A.    Right.
8        Q.    -- in the slide deck.
9            All I'm trying to understand is
10   whether diversion control group would have been
11   involved in providing some information about
12   training diversion investigators on how to
13   conduct due diligence on applications for
14   registration by doctors and pharmacies.
15           MS. SINGER:  Objection.  Asked and
16   answered.
17           THE WITNESS:  I'm pretty sure the
18   Office of Diversion Control did provide input
19   on applicants.  We have a whole applicant
20   section, and I know they've trained before.
21           BY MR. STEPHENS:
22       Q.    Okay.  And did part of your job
23   duties also -- again, talking about the
24   training of diversion investigators, another
25   topic that would have been included that

Page 146

1    diversion control would have provided some
2    guidance on was how diversion investigators
3    could use ARCOS data and suspicious order
4    report information in diversion investigations.
5            MS. SINGER:  Objection.  Foundation.
6    Compound question.
7            MR. BENNETT:  Objection.  Scope.
8            To the extent that your answer would
9    reveal investigative or intelligence gathering
10   and the summation techniques whose
11   effectiveness would thereby be impaired, you're
12   not authorized to answer.  To the extent that
13   you can answer without disclosing such
14   information, you may.
15           MR. UTTER:  Same objection.
16           Go ahead.
17           THE WITNESS:  Investigators were
18   trained in ARCOS.
19           BY MR. STEPHENS:
20       Q.    Okay.  And without getting into any
21   details, again, of every bit of information
22   that appear in a slide deck, some of that
23   information would have come through the
24   training from the diversion control group, your
25   group.

Page 147

1        A.    You mean the Office of Diversion
2    Control.
3            And I'm -- I'm not sure.
4        Q.    Your office -- the office -- I'm
5    sorry.  I'll --
6        A.    It's the -- it's the Office of
7    Diversion Control.
8        Q.    Okay.  I apologize to you.  I'll get
9    that right.  Office of Diversion Control.  Got
10   it.
11           The Office of Diversion Control
12   would have -- as far as the training, would
13   have provided some information for diversion
14   investigators as to suspicious order report
15   information; is that fair?
16       A.    Again, that would come from training
17   with input from the field and from the Office
18   of Diversion Control.
19       Q.    Okay.  So let me ask you some kind
20   of basic questions about DEA's org chart so I
21   understand how the Office of Diversion Control
22   fits in.
23           Each DEA field division is run by a
24   special agent in charge.
25       A.    Yes.

Page 148

1        Q.    And there are approximately 23 field
2    divisions in the United States?
3        A.    It's changed over the last three
4    years.  I'm not sure how many --
5        Q.    Okay.
6        A.    -- there is.
7        Q.    During your time, from 2005 to 2015,
8    approximately how many DEA field divisions were
9    there?
10       A.    I believe there was 20 or 21.
11       Q.    Okay.  And a DEA field division can
12   cover several states where there are several
13   major cities in a region, right?
14       A.    Yes.
15       Q.    So, for example, my understanding is
16   that you spent some time in the Detroit field
17   division; is that right?
18       A.    Yes.
19       Q.    The -- the main field division
20   headquarters is in the City of Detroit for the
21   Detroit region, right?
22       A.    The Detroit division office is in
23   Detroit, yes.
24       Q.    Okay.  There are satellite offices
25   in other major cities in the region though,

Page 149

1    correct?
2        A.    Yes.
3        Q.    For example, there's a -- a district
4    office in Cleveland, correct?
5             MR. BENNETT:  Objection.  Vague as
6    the time.
7             BY MR. STEPHENS:
8        Q.    During your time in 2005 and 2015,
9    there was a district office in Cleveland; is
10   that fair?
11       A.    No.  It was a resident office in
12   Cleveland.
13       Q.    Okay.  So --
14       A.    The district office sat in Columbus.
15       Q.    Okay.  So during your time, the
16   district office would have had a resident agent
17   in charge as the number one agent in the -- in
18   that office in Cleveland, right?
19       A.    No.
20            MS. SINGER:  Objection.  Vague.
21            BY MR. STEPHENS:
22       Q.    What was the title of the highest
23   ranking DEA officer in Cleveland during your
24   time as deputy administrator -- assistant
25   administrator?

Page 150

1        A.    He was a resident agent in charge
2    for a resident office.  Cleveland was a
3    resident office.
4        Q.    Okay.  And in DEA terms that's a
5    RAC, right, a resident agent --
6        A.    Right.
7        Q.    -- in charge?
8        A.    Yes.
9        Q.    Now, DEA structures -- typically
10   structures its enforcement group in a separate
11   organization than the diversion group, right?
12            MR. BENNETT:  Objection.  Vague.
13            THE WITNESS:  Not necessarily.
14   Because there are tactical diversion squads
15   that have both special agents, diversion
16   investigators, and task force officers in the
17   same group.
18            BY MR. STEPHENS:
19       Q.    Okay.  Enforcement agents are
20   special agents, correct?
21       A.    Yes.
22       Q.    Enforcement agents carry guns and
23   badges, and they investigate drug
24   trafficking -- typically investigate drug
25   traffic organizations who traffic illegal drugs

Page 151

1    like cocaine.
2             MS. SINGER:  Objection.  Compound
3    question.
4             MR. BENNETT:  Objection.  Vague.
5    And scope.
6             MR. UTTER:  Go ahead.
7             THE WITNESS:  Enforcement agents,
8    special agents, carry guns.  They have arrest
9    authority, arrest powers.  But they investigate
10   all -- all criminal -- all criminal, civil
11   violations of the Controlled Substances Act.
12   They are not limited to what they investigate.
13            BY MR. STEPHENS:
14       Q.    Okay.  The -- in the field there are
15   many diversion investigator squads that are
16   comprised of diversion investigators, correct?
17       A.    Yes.
18            MS. SINGER:  Objection.
19            MR. BENNETT:  Objection.
20            MS. SINGER:  Compound.
21            MR. BENNETT:  And objection.  Vague.
22            BY MR. STEPHENS:
23       Q.    And -- and, Mr. Rannazzisi, in the
24   field offices -- let's take the Miami field
25   office, for example.

Page 152

1             Historically the Miami field office,
2    during your tenure, would have had enforcement
3    groups that are filled with enforcement agents
4    only, correct?
5             MS. SINGER:  Objection.  Compound
6    question.  And vague.
7             MR. BENNETT:  Objection.  Vague.
8    Also objection.  Scope.
9             You can answer.
10            THE WITNESS:  Yes.  There -- there
11   are diversion groups that are strictly
12   diversion investigators with nothing -- they
13   don't have any other type of investigative
14   personnel.
15            BY MR. STEPHENS:
16       Q.    And the flip side of that is there
17   are enforcement groups that are filled only
18   with agents, right?
19       A.    Yes.
20       Q.    And the other group that you
21   mentioned is a TDS squad, which might be a bit
22   of a hybrid where it's got a little bit of both
23   some enforcement agents and some diversion
24   agents and maybe some state and local officers,
25   too, correct?

Page 153

1     MS. SINGER:  Objection.  Compound
2  question.
3     MR. BENNETT:  Objection.  Scope.
4     THE WITNESS:  The tactical -- the
5  tactical diversion squad is generally made up
6  of diversion investigators, special agents and
7  task force officers.
8     BY MR. STEPHENS:
9     Q.   Now, during your ten years running
10  the -- as deputy assistant administrator and
11  running the Office of Diversion you would have
12  interacted with a lot of special agents in
13  charge that were running field divisions; is
14  that fair?
15     MR. BENNETT:  Objection.  Vague.
16     THE WITNESS:  I've met and talked to
17  most, if not all, the special agents in charge
18  during my tenure, yes.
19     BY MR. STEPHENS:
20     Q.   Okay.  And that -- would that be
21  more than a hundred?
22     A.    There's generally 21, when I was
23  there, special agents in charge.  And they
24  rotated in and out, retired.  I don't know.
25  Probably -- I don't know if it was a hundred,

Page 154

1  but a number, probably half that.
2     Q.   About 50?
3     A.   Yeah.
4     Q.   How many of those 50 special agents
5  in charge came up through the ranks as
6  diversion investigators at DEA?
7     MS. SINGER:  Objection.  Scope.
8     MR. BENNETT:  Objection.  Scope.
9     You can answer if you know.
10     THE WITNESS:  I -- I only know of --
11  of one.  I'm sure there are others, but I only
12  know of one in particular.
13     BY MR. STEPHENS:
14     Q.   Would you agree that, of the 50 or
15  so special agents in charge that you had
16  experience working with, they had more
17  experience handling DEA enforcement
18  investigations as opposed to DEA diversion
19  investigations?
20     MS. SINGER:  Objection.  Foundation.
21  And compound question.
22     MR. BENNETT:  Objection.  Vague.
23  And scope.
24     THE WITNESS:  I -- I -- I can't
25  agree to that.  Because I don't know each

Page 155

1  individual's -- each individual special agent
2  in charge's background or what kind of cases he
3  worked --
4     MR. STEPHENS:  Okay.
5     THE WITNESS:  -- during his career.
6     BY MR. STEPHENS:
7     Q.   Is -- an SAC is a level 1811
8  position in DEA terms, correct?
9     MR. BENNETT:  Objection.  Scope.
10     THE WITNESS:  Yes.
11     BY MR. STEPHENS:
12     Q.   A -- a diversion employee can -- can
13  reach an 1801 level, correct?
14     MR. BENNETT:  Objection.  Scope.
15     THE WITNESS:  When you say an 1801
16  level, are you talking -- they're -- they're
17  1801s.
18     MR. STEPHENS:  Okay.
19     THE WITNESS:  Yeah.  They -- they
20  don't cross over.
21     BY MR. STEPHENS:
22     Q.   Right.
23     So to be a SAC, you have to be an
24  1811, correct?
25     A.   Yes.

Page 156

1     Q.   So if a diversion investigator is
2  going to make it all the way to become a SAC,
3  at some point that diversion investigator is
4  going to need to become a special agent, right?
5     A.   Yes.
6     Q.   Okay.
7     MS. SINGER:  Objection.  Compound
8  question.
9     BY MR. STEPHENS:
10     Q.   So is it fair to say then that one
11  of your challenges as deputy administrator was
12  trying to get special agents in charge in the
13  various field divisions to prioritize diversion
14  matters on equal footing with enforcement
15  investigation?
16     MS. SINGER:  Objection.  Compound
17  question.  Lack of foundation.  And vague.
18     MR. BENNETT:  Objection.  Vague.
19  Objection.  Scope.
20     THE WITNESS:  The field divisions
21  are -- they operate autonomously.  So the
22  special agent in charge decides what the
23  priorities field divisions are and their field
24  management plans and just what their senior
25  leadership in the division -- they make that

Page 157

```
1    decision.
2             So -- but I've never really had
3    problems with the field divisions not
4    addressing diversion issues, no.
5        Q.   So the special agent in charge would
6    have some authority as to setting his or her
7    priorities on the investigations that they were
8    going to pursue; is that fair?
9        A.   Yes.
10       Q.   Let me just get the terminology
11   right.
12            A RAC runs a resident office, right?
13       A.   Yes.
14       Q.   Okay.  Would you expect that a RAC
15   who is running a resident office in 2015 would
16   be familiar with a suspicious order report?
17            MR. BENNETT:  Objection.  Scope.
18   Calls for speculation.
19            THE WITNESS:  I would have no idea
20   what each individual RAC knows.  But I do know
21   that it -- most RACs, most special agents in
22   charge, and most, yeah, ASACs, assistant
23   special agents in charge, when they have
24   questions or they want to know the answer to a
25   diversion question, they will go to their --
```

Page 158

```
1    whoever their leadership is, be it a group
2    supervisor or a DPM, within the field division.
3    Or they'll call headquarters and talk to me.
4             BY MR. STEPHENS:
5        Q.   Would you expect a RAC who runs a --
6    a resident office in 2015 to know how many
7    suspicious order reports had come into his or
8    her office that year?
9             MR. BENNETT:  Objection.  Scope.
10   Calls for speculation.
11            THE WITNESS:  I would have no idea.
12            BY MR. STEPHENS:
13       Q.   Would you expect that a RAC who is
14   running a resident office in 2015 to have
15   received training at DEA regarding what DEA
16   might be able to do with a suspicious order
17   report to investigate potential sources of
18   diversion?
19            MS. SINGER:  Object --
20            MR. BENNETT:  Objection.
21            MS. SINGER:  Go ahead.
22            MR. BENNETT:  Objection.  Scope.
23   Objection.  Calls for speculation.
24            MS. SINGER:  And objection.
25   Compound question.
```

Page 159

```
1             THE WITNESS:  The resident agent in
2    charge responsibilities are to run the office.
3    The responsibilities for suspicious order
4    monitoring are -- are that of the diversion
5    investigators and the diversion leadership
6    within that office.
7             BY MR. STEPHENS:
8        Q.   So you would not necessarily expect
9    a RAC or an ASAC to understand how to use a
10   suspicious order report in a diversion
11   investigation?
12            MR. BENNETT:  Objection.
13   Mischaracterizes testimony.  Calls for
14   speculation.
15            THE WITNESS:  I wouldn't know what
16   each individual RAC or ASAC knows or doesn't
17   know about suspicious order monitoring.
18            BY MR. STEPHENS:
19       Q.   As the deputy assistant
20   administrator of the Office of Diversion
21   Control, did you take any steps to ensure that
22   SACs, ASACs and RACs, the lead supervisors in
23   the various field division offices, all
24   received training on how to use a suspicious
25   order report to investigate potential sources
```

Page 160

```
1    of diversion?
2             MS. SINGER:  Objection.  Compound
3    question.  And scope.
4             MR. BENNETT:  I'll join both of
5    those objections.
6             THE WITNESS:  I seem to remember
7    joint supervisory conferences where ASACs,
8    RACs, GSs, and DPMs came in to headquarters
9    and/or did it in the field where we discussed
10   suspicious order monitoring, among other
11   things, yes.
12            BY MR. STEPHENS:
13       Q.   Okay.  Would you expect an -- a
14   resident agent in charge of a resident office
15   in 2015 to know what information ARCOS could
16   generate to support diversion investigations?
17            MR. BENNETT:  Objection.  Scope.
18   Calls for speculation.
19            THE WITNESS:  Again, I can't tell
20   you exactly what the resident agents in charge
21   or the assistant special agents in charge knew
22   about ARCOS.  But they did have more than
23   competent investigators and GSs and DPMs at
24   their disposal to explain that.
25            BY MR. STEPHENS:
```

Page 161

```
 1        Q.    With U.S. Attorney's Offices -- you
 2   would work with U.S. Attorney's Offices who are
 3   running criminal diversion investigations.
 4              Did you have experience doing that
 5   as part of your general duties as deputy
 6   assistant administrator during your tenure?
 7              MR. BENNETT:  Objection.  Scope.
 8              You're not authorized to disclose
 9   any information regarding specific DEA
10   investigations or activities or any matters of
11   prosecutorial discretion involving specific
12   U.S. Attorneys' Offices.  However, you may
13   answer the question generally.
14              THE WITNESS:  I have talked to
15   several U.S. Attorneys -- Assistant United
16   States Attorneys over the years regarding
17   investigations, yes.
18        BY MR. STEPHENS:
19        Q.    Okay.  And -- and I'm -- I'm not
20   going to ask about specific investigations.
21              But did you ever have any
22   experience, just "yes" or "no," with the
23   situation where any prosecutors asked the
24   Office of Diversion Control to hold off on
25   pursuing either administrative or civil relief
```

Page 162

```
 1   during the pendency of a criminal
 2   investigation?
 3              MS. SINGER:  Objection.  Vague.  And
 4   foundation.
 5              MR. BENNETT:  Objection.  Scope.
 6              You are not authorized to disclose
 7   communications that would reveal matters of
 8   prosecutorial discretion or attorney-client
 9   communications.
10              SPECIAL MASTER COHEN:  It is a
11   yes-or-no question.
12              THE WITNESS:  Could you answer the
13   question -- or ask the question again.
14              MR. BENNETT:  Well --
15              MR. UTTER:  His answer suggests a
16   conversation.
17              MR. BENNETT:  Yeah.  I think the
18   answer would -- if he answered "yes," it would
19   suggest what that advice was to hold off.
20              May we speak with the witness?
21   Because if the answer is "no," then that makes
22   it easy.
23              May we speak with the witness out in
24   the hallway for one brief second?
25              SPECIAL MASTER COHEN:  One second.
```

Page 163

```
 1              MR. BENNETT:  So --
 2              SPECIAL MASTER COHEN:  Yes, you may.
 3              MR. BENNETT:  Thank you.
 4              THE VIDEOGRAPHER:  We are going off
 5   the record.
 6              The time is 11:42.
 7              (A short recess was taken.)
 8              THE VIDEOGRAPHER:  We are back on
 9   the record.
10              The time is 11:47.
11              You may proceed, Counsel.
12              MR. BENNETT:  Counsel, Special
13   Master Cohen, thank you for allowing us the
14   opportunity to meet with the witness.
15              After consulting with the witness
16   and speaking to counsel with DEA, we believe
17   that the witness can answer the question
18   whether he personally has had any communication
19   with prosecutors in which he was asked to hold
20   off on pursuing either administrative or civil
21   relief during the pendency of a criminal
22   investigation.
23              Any questions beyond that would
24   implicate attorney-client privileged
25   communications, matters of prosecutorial
```

Page 164

```
 1   discretion, and the internal deliberative
 2   process of the United States Department of
 3   Justice, and we would instruct the witness not
 4   to answer beyond "yes" or "no" to the question
 5   I just stated.
 6              MR. STEPHENS:  He may have changed
 7   my question a little bit.
 8              MR. BENNETT:  I did.  You said
 9   "Office of Diversion Control."  I said him
10   personally.
11              MR. STEPHENS:  Okay.  So, Special
12   Master Cohen, I've got a yes-or-no question
13   about communication that may have also filtered
14   up to him.  And that's my question.
15              SPECIAL MASTER COHEN:  Why don't you
16   start with that one, and we see how far we get.
17              MR. STEPHENS:  Start with the first
18   one?
19              SPECIAL MASTER COHEN:  The first
20   one, yeah.
21              MR. STEPHENS:  Okay.  Yes, sir.
22        BY MR. STEPHENS:
23        Q.    So, Mr. Rannazzisi, did you
24   personally have any communications, during your
25   tenure as deputy assistant administrator, with
```

## Page 165

```
1    members of U.S. Attorney's Offices or the
2    criminal division of the Justice Department
3    related to holding off on civil or
4    administrative diversion matters while the
5    Justice Department or U.S. Attorney's Office
6    ran a criminal investigation?
7              MR. BENNETT:  Objection.  Scope.
8    Attorney-client privilege.
9              You can answer that question "yes"
10   or "no only."
11             THE WITNESS:  No.
12             BY MR. STEPHENS:
13        Q.   Mr. Rannazzisi --
14             MS. SINGER:  I'm sorry to interrupt.
15   But we're not getting it anymore.
16             THE REPORTER:  Okay.  Let's go off
17   the record for a moment.
18             THE VIDEOGRAPHER:  We are going off
19   the record.
20             The time is 11:49.
21             (A short recess was taken.)
22             THE VIDEOGRAPHER:  We are going back
23   on the record.
24             The time is 11:52.
25             You may proceed, Counsel.
```

## Page 166

```
1              BY MR. STEPHENS:
2         Q.   All right.  Mr. Rannazzisi, to
3    follow up on my last question, did you have any
4    communications in the diversion control group
5    related -- that you're familiar with where U.S.
6    Attorney's Offices conducting criminal
7    investigations asked the Office of Diversion
8    Control to hold off on pursuing civil or
9    administrative diversion matters while the U.S.
10   Attorney's Office ran a criminal investigation?
11             MR. BENNETT:  Objection.
12   Attorney-client privilege, matters of
13   prosecutorial discretion, and information that
14   would reveal the internal deliberative process
15   within the United States Department of Justice.
16             Instructing the witness he's not
17   authorized to answer this question at this
18   time.
19             MR. STEPHENS:  It's -- it's a
20   yes-or-no question.  All I'm asking is whether
21   he -- he was briefed, similar to the question
22   that I asked him before, which is whether he
23   had actual personal interaction with U.S.
24   Attorney's Office.
25             MR. BENNETT:  This -- this would go
```

## Page 167

```
1    directly to the heart of attorney-client
2    privileged communications when the U.S.
3    Attorney's Office is discussing with DEA how to
4    conduct criminal, civil and administrative
5    cases.
6              It also goes into prosecutorial
7    discretion as far as need to pursue civil cases
8    versus when to pursue criminal cases and the
9    order of those.
10             And I believe that this witness has
11   not been authorized to answer those questions.
12   And it would involved -- even answering just
13   "yes" or "no" would involve the nature of the
14   advice that was given or the communications by
15   the attorneys and would instruct the witness
16   that he's not authorized to answer that
17   question.
18             SPECIAL MASTER COHEN:  Okay.  So
19   because he specifically asked whether -- you
20   used the word "hold off."  And I think that
21   that would, if the witness answered it, reveal
22   attorney-client communications.
23             There may be something else you can
24   ask that is truly a simple yes-or-no question
25   that wouldn't get into the nature of the
```

## Page 168

```
1    communication.  But that isn't that question.
2              MR. STEPHENS:  Let me try and
3    restate.
4              BY MR. STEPHENS:
5         Q.   Did you have communications with
6    anyone in your diversion control group related
7    to any request from a U.S. Attorney's Office
8    involving the timing of parallel proceedings
9    where the U.S. Attorney's Office was conducting
10   a criminal investigation and the Office of
11   Diversion Control was running a civil or
12   administrative investigation?
13             MR. BENNETT:  Objection.  Scope.
14             That would require revealing that
15   the U.S. Attorney's Office made such a -- a
16   request or there was communications from the
17   U.S. Attorney's Office.
18             So to the extent that your answer
19   would disclose communications either with
20   counsel of the DEA or with attorneys --
21   attorneys at the U.S. Attorney's Office, you're
22   not authorized to answer it.
23             To the extent that you can answer
24   without revealing those communications, you may
25   answer the question.
```

Page 169

1     Do we need to consult out in the
2 hallway?
3          THE WITNESS:  Just briefly.
4          MR. BENNETT:  May we go off the
5 record again to consult with the witness about
6 matters of privilege?
7          THE VIDEOGRAPHER:  We are going off
8 the record --
9          MR. BENNETT:  Wait.
10         MR. STEPHENS:  Yeah.  No.  I don't
11 object to that.  Let him go off the record.
12         THE VIDEOGRAPHER:  We are off the
13 record.  The time is 11:56.
14         (A short recess was taken.)
15         THE VIDEOGRAPHER:  We are back on
16 the record.  The time is 12:03.
17     You may proceed, Counsel.
18         MR. BENNETT:  Thank you.
19     We have had an opportunity to speak
20 with the witness regarding privileged issues
21 and after reviewing the question that was
22 asked, the answer by this witness would reveal
23 privileged attorney-client communications, and
24 as a result, I am instructing the witness he is
25 not authorized to answer those questions.

Page 170

1          MR. STEPHENS:  Special Master Cohen,
2 I would ask for the instruction for the witness
3 to answer the question.
4          SPECIAL MASTER COHEN:  I'm sorry.  I
5 need to find it again.
6          MR. BENNETT:  It's at 11:55:26.
7          SPECIAL MASTER COHEN:  Thank you.
8          MR. BENNETT:  And I think the
9 concern is, it says:  Did you have any
10 communications related to a request from the
11 U.S. attorney's office involving the timing of
12 parallel proceedings, that would -- even a yes
13 or no answer would reveal that there had been a
14 request by the U.S. attorney's office involving
15 the timing of parallel proceedings which would
16 implicate attorney-client privileged
17 communications between the U.S. attorney's
18 office and the DEA, so this would be an
19 indirect way of obtaining the attorney-client
20 privileged communications.
21         SPECIAL MASTER COHEN:  It is on the
22 edge of attorney-client privileged
23 communication and I'm going to have to fall off
24 the fence and say that the witness does not
25 have to answer the question.  I know that you

Page 171

1 are trying to ask questions that don't get into
2 it and I respect that and we will try and let
3 you ask those questions, but I also have to
4 protect the privilege.
5          MR. STEPHENS:  Thank you, Special
6 Master Cohen.
7          SPECIAL MASTER COHEN:  Okay.
8     BY MR. STEPHENS:
9     Q.   Mr. Rannazzisi, did the Office of
10 Diversion Control ever delay filing an
11 administrative action while a criminal
12 investigation was ongoing?
13         MR. BENNETT:  You are authorized to
14 answer that question yes or no only.
15         THE WITNESS:  Yes.
16    BY MR. STEPHENS:
17    Q.   Mr. Rannazzisi, did the Office of
18 Diversion Control ever delay in filing a civil
19 action while a criminal investigation was
20 ongoing?
21         MR. BENNETT:  You may answer that
22 question yes or no.
23     I will object to foundation because
24 the DEA doesn't actually file civil actions.
25         THE WITNESS:  I am not sure about

Page 172

1 that.
2     BY MR. STEPHENS:
3     Q.   Okay.  So let's talk a little bit
4 about administrative actions.
5     One administrative action that the
6 Office of Diversion Control could pursue is an
7 immediate suspension order of a registrant,
8 correct?
9     A.   Yes.
10    Q.   And an immediate suspension order of
11 a physician who is a registrant immediately
12 suspends that doctor's ability to prescribe
13 prescription opioids, true?
14    A.   It prevents the doctor from
15 prescribing any controlled substance.
16    Q.   Okay.  How long, based on your
17 experience with situations where DEA delayed
18 filing an administrative action while a
19 criminal investigation was ongoing, what was
20 the longest amount of time that DEA held off on
21 filing an administrative action?
22         MS. SINGER:  Objection.  Foundation.
23 Compound question.
24         MR. BENNETT:  Objection.  Scope.
25     You can answer.

Page 173

```
1        THE WITNESS:  I am just curious
2   about -- well, my question to clarify is, when
3   you say, "delay," what do you mean by "delay?"
4        Do you mean -- well, I am just
5   curious what delay means.  How are you using
6   that?
7        BY MR. STEPHENS:
8        Q.   In a situation where the Office of
9   Diversion Control was prepared to file an
10  administrative action because its investigation
11  hadn't matured to that point, in a situation
12  where there was a criminal proceeding, I am
13  asking you to identify the longest amount of
14  time DEA held off on filing an administrative
15  action while the criminal investigation was
16  proceeding?
17        MR. BENNETT:  Objection.
18  Foundation.  Compound.  Mischaracterizes prior
19  testimony.
20        THE WITNESS:  The answer is, I don't
21  know, you know, the longest amount of time.
22        BY MR. STEPHENS:
23        Q.   Can you give me an estimate as to a
24  situation that you remember where DEA, their
25  administrative action had ripened to the point
```

Page 174

```
1   where DEA was ready to proceed and DEA held off
2   pending the completion of a criminal
3   investigation?
4        MR. BENNETT:  Objection.
5        MS. SINGER:  Objection.  Foundation
6   and compound question.
7        MR. BENNETT:  Objection.
8   Foundation.  Compound.  Mischaracterizes prior
9   testimony and scope.
10        You can answer.
11        THE WITNESS:  I don't know.  I don't
12  know.
13        BY MR. STEPHENS:
14        Q.   Can you recall a situation where it
15  was more than two months?
16        MS. SINGER:  Objection.  Asked and
17  answered.
18        MR. BENNETT:  Same objections, and I
19  will join the asked and answered.
20        THE WITNESS:  I don't know.  I just
21  don't know.
22        BY MR. STEPHENS:
23        Q.   Can you remember a situation where
24  it was as long as 12 months?
25        MS. SINGER:  Objection.  Asked and
```

Page 175

```
1   answered.
2        MR. BENNETT:  Same objections.
3        THE WITNESS:  I -- again, I don't
4   know.  I mean, I get the immediate -- the
5   orders to show cause and I review them.  I have
6   no idea when the case was done.  All I -- when
7   it's presented to me for review, I just go by
8   what is on the document.
9        BY MR. STEPHENS:
10        Q.   Who on your --
11        A.   Or the document.
12        Q.   I'm sorry, Mr. Rannazzisi.  Who on
13  your team at the Office of Diversion Control
14  during your tenure would have had that
15  information?
16        MS. SINGER:  Objection.  Scope.
17        MR. BENNETT:  Objection.  Vague.
18        THE WITNESS:  The pharmaceutical
19  investigations section, or the exec in charge
20  of handling the pharmaceutical investigations.
21        BY MR. STEPHENS:
22        Q.   Okay.  And what is the title of the
23  head of the pharmaceutical investigation
24  section, is it a section chief?
25        A.   Section chief, yes.
```

Page 176

```
1        Q.   Who was the section chief when you
2   left in 2015?
3        MR. BENNETT:  Objection.  Scope.
4        You can answer.
5        THE WITNESS:  They changed over.
6   I'm not -- I think it might have been Barbara
7   Boockholdt or Cathy Gallagher.
8        BY MR. STEPHENS:
9        Q.   Okay.  Do you recall who was the
10  section chief for the pharmacy --
11        A.   I'm sorry, that was pharmaceutical
12  regulatory.  Okay.  Pharmaceutical
13  investigations was running a different area and
14  so Boockholdt or Gallagher or Carter were in
15  charge of pharmaceutical regulatory
16  investigations at that point in time, and then
17  pharmaceutical investigations section, the
18  other side, that was -- I just don't recall who
19  was running pharmaceutical investigations at
20  that point in time.
21        Q.   Okay.  Do you recall who ran that
22  section, pharmaceutical investigations section
23  at any point in time from -- during your tenure
24  as deputy assistant administrator from '05 to
25  '15?
```

Page 177

1    MR. BENNETT:  Objection.  Scope.
2    You can answer.
3    THE WITNESS:  John Chapinski, Robert
4  Hill, Matt Murphy, I think that pretty much
5  covered it.
6    BY MR. STEPHENS:
7    Q.    Okay.  Mr. Rannazzisi, I would like
8  to transition and ask you some background
9  questions about some of your experience based
10  on other positions you held at DEA during your
11  career.
12    MR. BENNETT:  Counsel, I know we had
13  to step out a couple of times but it is after
14  12:15.  Not sure when you want to take lunch.
15  It sounds like you were going into a new
16  transition area.
17    MR. STEPHENS:  I am going into a new
18  area.  If you folks want to break and that's
19  good with the Special Master and the court
20  reporter and the witness, I am fine with that.
21    MR. BENNETT:  I'll leave it up to
22  the witness.  I am happy to keep going, I'm
23  happy to take our lunch break now, whatever he
24  prefers.
25    THE WITNESS:  How much time do you

Page 178

1  think you have?
2    MR. STEPHENS:  I still have a lot of
3  questions.
4    THE WITNESS:  Okay.  Why don't we
5  break then.
6    THE VIDEOGRAPHER:  We are going off
7  the record.  This is the end of Media Unit No.
8  3.  The time is 12:13.
9    (A short recess was taken.)
10    THE VIDEOGRAPHER:  We are going back
11  on the record.
12    This is the start of Media Unit No.
13  4.
14    The time is 1:05.
15    You may proceed, Counsel.
16    BY MR. STEPHENS:
17    Q.    Mr. Rannazzisi, good afternoon.
18    A.    Good afternoon.
19    Q.    Earlier today you were asked a few
20  questions about ARCOS, and you had mentioned
21  IMS data.
22    Do you are call that?
23    A.    Yes.
24    Q.    Are --
25    A.    Yes.

Page 179

1    Q.    Sir, are you aware whether or not
2  IMS data includes distribution data?
3    MS. SINGER:  Objection.  Vague.
4    THE WITNESS:  It's my understanding
5  that IMS data includes data for dispensing from
6  pharmacies.
7    BY MR. STEPHENS:
8    Q.    Okay.  So your understanding is that
9  IMS data is dispensing data; is that fair?
10    A.    Yes.
11    Q.    You had also -- you mentioned a
12  distributor briefing.
13    Do you recall that?
14    A.    Yes.
15    Q.    Okay.  And you had said something to
16  the effect of, "They assured us that they
17  understood."
18    Do you recall saying that?
19    MR. BENNETT:  Objection.
20  Mischaracterizes past testimony.
21    Go ahead.
22    THE WITNESS:  The -- yeah.  Before
23  they left, they were asked if they understood,
24  and they said yes.
25    BY MR. STEPHENS:

Page 180

1    Q.    Okay.  Did you, sir, personally
2  attend any distributor briefing with any retail
3  chain pharmacy, including Walmart, Walgreens,
4  Rite Aid, CVS, HBC, Giant Eagle?
5    A.    I personally did not.
6    Q.    Are you aware as to whether or not
7  anyone who worked for you conducted a
8  distributor briefing with any of those retail
9  chain pharmacies?
10    MR. BENNETT:  Objection.  Vague.
11    You can answer.
12    THE WITNESS:  There were meetings
13  between some of those companies and staff at
14  DEA but not in the -- in the -- from the format
15  of the distributor briefing.
16    BY MR. STEPHENS:
17    Q.    Okay.  So no --
18    A.    That I know of anyway.
19    Q.    Right.
20    A.    That I know of anyway.
21    Q.    So just so the record's clear,
22  you're not aware, sir, of any distributor
23  briefing conducted by DEA with the retail chain
24  pharmacies that I've just identified; is that
25  fair?

Page 181

1      MR. BENNETT:  Objection.  Misstates
2  testimony.
3      You can answer.
4      THE WITNESS:  I don't -- I -- I
5  don't know personally.  It doesn't mean it
6  didn't happen.  I just am not aware of any.
7      BY MR. STEPHENS:
8      Q.   All right.  Very well.
9      Sir, I'd like to ask you some
10  questions about some Title 21 issues and your
11  responsibility and your experience
12  communicating DEA's position on diversion
13  issues to registrants and Congress and your
14  duties and responsibilities in expressing where
15  diversion was occurring when you spoke with
16  those folks.  Okay?
17      A.   Okay.
18      Q.   And those tasks would have fallen
19  within the scope of your general duties during
20  your career as deputy assistant administrator;
21  is that fair?
22      MS. SINGER:  Objection.  Compound
23  question.  Asked and answered.
24      MR. UTTER:  Same objection.
25      Go ahead.

Page 182

1      THE WITNESS:  Speaking to Congress
2  and speaking to the general public was part of
3  my duties as a deputy assist and administrator,
4  yes.
5      BY MR. STEPHENS:
6      Q.   The prescribers, like manufacturers,
7  distributors and pharmacies, are registrants,
8  true?
9      A.   Yes, sir.
10      Q.   And it's fair to say that the
11  overwhelming majority of prescribing in America
12  during your tenure as deputy assistant
13  administrator was conducted responsibly.
14      MR. BENNETT:  Objection.  Vague.
15      MS. SINGER:  Objection.  Foundation.
16      MR. BENNETT:  Scope.
17      MR. UTTER:  Same objection.
18      Go ahead.
19      THE WITNESS:  I believe that the
20  vast majority of practitioners are doing
21  exactly what they were supposed to be doing,
22  yes.
23      BY MR. STEPHENS:
24      Q.   Would you also agree that good
25  doctors and pharmacists were often the first to

Page 183

1  notify DEA about suspected diverters?
2      MS. SINGER:  Objection.  Vague.
3  Compound question.  Outside of the scope.
4      MR. BENNETT:  Objection.  Vague.
5  Scope.
6      MR. UTTER:  Go ahead.
7      MR. BENNETT:  You can answer.
8      THE WITNESS:  I don't know if it's
9  the first.  I -- we -- we had intelligence come
10  in from physicians.  We've had intelligence
11  come in from pharmacies as well as regulatory
12  boards.  But I don't know if it's the first --
13  you know, the first contact with that
14  particular registrant that they were reporting.
15      BY MR. STEPHENS:
16      Q.   Okay.  Mr. Rannazzisi, what I'd like
17  to do is share with you a copy of some
18  congressional testimony you provided on July
19  12, 2007.  Okay?
20      A.   Okay.
21      MR. STEPHENS:  And, Bonnie, if you
22  could please mark this as the next in order.
23      (Deposition Exhibit 7 was marked for
24  identification.)
25      BY MR. STEPHENS:

Page 184

1      Q.   Mr. Rannazzisi, I direct you to Page
2  218 of the transcript.  Or let -- let's start
3  with Page 217.
4      Are you with me on Page 217?
5      A.   Yes.
6      Q.   Okay.  And just to identify the
7  document, Mr. Rannazzisi, it's dated July 12.
8  These are Questions For the Hearing Record for
9  Joseph T. Rannazzisi, Deputy Assistant
10  Administrator, Office of Diversion Control.
11      Do you see that?
12      A.   Yes.
13      Q.   And can you describe for the record,
14  when you would get these -- these questions you
15  would consider them in providing written
16  responses back that would get inserted into the
17  congressional record?
18      Is that fair and accurate?
19      A.   Yes.
20      MS. SINGER:  Objection.  Vague.
21      BY MR. STEPHENS:
22      Q.   Okay.  Sir, what I'd -- I'd like to
23  do is direct you to the second question, which
24  is on the bottom of 217 and will go to the top
25  of 2 -- Page 218.  And in your response, I'm

Page 185

1  going to direct you to the very first couple of
2  sentences in the response.
3          And, sir, just let me know when
4  you've had an opportunity to read that.
5          Have you had an opportunity to read
6  that paragraph, Mr. Rannazzisi?
7      A.   I just want to read the --
8      Q.   Sure.
9      A.   -- whole response.
10         Okay.
11     Q.   All right.  So, Mr. Rannazzisi, the
12  question framed by Congress, No. 2 there,
13  states, quote:  During the hearing, testimony
14  was offered that indicated investigations of
15  pain management doctors and other doctors by
16  DEA have caused concern that physicians who
17  practice in this area of medicine are being
18  targeted despite the service they provide to a
19  number of pain suffers.  Does DEA believe this
20  characterization is correct?  And what is the
21  process DEA uses to identify and investigate
22  doctors whose practices dispense large
23  quantities of opioids and other pain relievers?
24         Sir, did I --
25         MS. SINGER:  Objection.  Compound

Page 186

1  question.
2      BY MR. STEPHENS:
3      Q.   Sir, did I read that question
4  accurately?
5          MS. SINGER:  Objection.  Vague and
6  compound.
7          THE WITNESS:  Yes.
8      BY MR. STEPHENS:
9      Q.   Okay.  And then, sir, your
10  response -- and I'm quoting from the second
11  sentence under response -- says, quote:  The
12  overwhelming majority of prescribing done by
13  physicians in America is conducted responsibly.
14  Often it is these doctors and pharmacists who
15  dispense the medication who are the first to
16  alert law enforce to potential prescription
17  problems.
18         Do you see that?
19     A.   Yes.
20     Q.   Did I read that accurately?
21     A.   Yes.
22     Q.   Is that your submission back to the
23  committee on the judiciary of the House of
24  Representatives for this hearing on July 12,
25  2007?

Page 187

1          MR. BENNETT:  Objection.  Form.
2  Objection.  It's incomplete reading of his
3  response to the question.  And so I would
4  object under Rule 106.
5          THE WITNESS:  First of all, this is
6  not my response.  It's the Department of
7  Justice and the administration's response.  And
8  everything must be vetted through them.
9          So regardless of what my feelings
10  were at the time, if the department or the --
11  the administration, through the vetting
12  process, felt that that's what they wanted to
13  put in, that's what was put in.
14     BY MR. STEPHENS:
15     Q.   So then, sir, let me ask you this
16  question:  As of July 12, 2007, did you agree
17  with the statement that the overwhelming
18  majority of prescribing done by physicians in
19  America is conducted responsibly?
20         Did you agree with that?
21         MR. BENNETT:  Objection.  Scope.
22         You're not authorized to give
23  personal opinions regarding nonpublic facts or
24  information you acquired in the performance of
25  your duties.  You are not -- not -- you are

Page 188

1  also not authorized to disclose any information
2  regarding internal deliberative process or
3  recommendations that you made.
4          To the extent that you have a
5  personal opinion that it does not rely on
6  internal deliberative process or nonpublic
7  factual information, you may give it on behalf
8  of yourself personally but are not speaking on
9  behalf of DEA.
10         THE WITNESS:  Could -- could you
11  repeat the question one more time.
12     BY MR. STEPHENS:
13     Q.   Yes.
14         As of July 12, 2007, did you agree
15  with the statement that the overwhelming
16  majority of prescribing done by physicians in
17  America is conducted responsibly?
18         MR. BENNETT:  Same instruction.
19         THE WITNESS:  I believe that the
20  vast majority of physicians are prescribing
21  responsibly, yes.
22         BY MR. STEPHENS:
23     Q.   Do you also agree with the statement
24  in the next sentence, Mr. Rannazzisi, that
25  often is it these doctors and pharmacists who

Page 189

```
1    dispense the medication who are the first to
2    alert law enforcement to potential prescription
3    problems?
4              MR. BENNETT:  Objection.  Same
5    instruction.
6              THE WITNESS:  If you're talking
7    about prescription fraud, fraudulent
8    prescriptions, for instance, if a -- a
9    pharmacist receives a prescription and he calls
10   the doctor and the doctor says, "I did not
11   write that prescription," and they make a call
12   to the police, yes.  That -- I would agree.
13   And I think that's what they were getting at at
14   the time.
15             BY MR. STEPHENS:
16        Q.   So you don't disagree with the
17   statement -- with the context you just
18   provided; is that fair, Mr. Rannazzisi?
19        A.   If the context is --
20             MS. SINGER:  Objection.
21             THE WITNESS:  Oh.
22             MS. SINGER:  Mischaracterizes the
23   witness's testimony.
24             THE WITNESS:  If we're talking about
25   a prescription fraud case where someone is
```

Page 190

```
1    passing bad paper to a pharmacist, and the
2    pharmacist calls the doctor, generally the
3    pharmacist or the doctor is going to call and
4    say, "I just got a bad script.  What do you
5    want me to do with it?"  And it either goes to
6    law enforcement, the state board, or DEA.
7              So yes, in that situation,
8    absolutely.
9              BY MR. STEPHENS:
10        Q.   Okay.  Mr. Rannazzisi, I'm finished
11   with that exhibit there, sir.
12             In other testimony that you provided
13   to Congress, you testified about the -- the
14   percentage of prescribers you thought were
15   overprescribed.
16             Do you recall that?
17             MR. UTTER:  Object to form.
18             Go ahead.
19             THE WITNESS:  I -- I've done a lot
20   of testimony to Congress.  Do -- if -- if you
21   have a transcript or...
22             MR. STEPHENS:  Yes, sir.  I do.
23             And if I could please have that
24   marked as the next in order.
25             (Deposition Exhibit 8 was marked for
```

Page 191

```
1    identification.)
2              THE WITNESS:  Thank you.
3              BY MR. STEPHENS:
4         Q.   And here, Mr. Rannazzisi, I'm going
5    to direct you to Page 76.
6         A.   May -- may I go ahead and read it?
7         Q.   Excuse me?
8         A.   May I go ahead and read it.
9         Q.   Yes.  And I'll -- I'll point you to
10   it, Mr. Rannazzisi, just so you have it.
11        A.   Sure.
12        Q.   Towards the bottom of the page,
13   there's a statement by Mr. Burgess.  And then,
14   in the second-to-last paragraph, you have a
15   response.  It is that question and answer that
16   I'll direct your attention to, sir.
17        A.   Okay.
18        Q.   From -- Mr. Burgess says, quote --
19   this is on Page 76.  This is hearing dated
20   April 29, 2014, called "Examining the Growing
21   Problems of Prescription Drug and Heroin Abuse
22   Before the Subcommittee on Oversight and
23   Investigations."
24             And, sir, now picking up on the
25   bottom of Page 76, Mr. Burgess says the
```

Page 192

```
1    following, quote:  I don't want to put words in
2    his mouth, but Mr. Rannazzisi seemed to imply
3    that we are overprescribing.  Is that a fair
4    assessment of your testimony?"
5              Then, sir, it indicates that you
6    responded, quote:  I think that, if you are
7    talking about 99.5 percent of the prescribers,
8    no, they are not overprescribing.  But our
9    focus is in rogue pain clinics and rogue
10   doctors who are overprescribing.
11             Sir, do you see that?
12        A.   Yes.
13        Q.   Did I read that accurately?
14        A.   Yes.
15        Q.   Was that a statement that you made
16   in front of the subcommittee on oversight on
17   April 29, 2014?
18             MR. BENNETT:  Objection.
19             THE WITNESS:  Yes.  Except -- except
20   you didn't include the last line, which it
21   says, actually, they're prescribing -- if
22   they're -- they are prescribing illegally.
23   They are not overprescribing; they're illegally
24   prescribing.
25             BY MR. STEPHENS:
```

Page 193

```
 1      Q.    Right.
 2            And the -- Mr. Rannazzisi, who
 3  you're talk about there prescribing illegally,
 4  that's the one half of 1 percent that was
 5  drawing your focus at rogue pain clinic and
 6  their rogue doctors; is that fair?
 7            MR. BENNETT:  Objection.  Form.
 8            THE WITNESS:  Yes.  I would say so,
 9  yes.
10            BY MR. STEPHENS:
11      Q.    Okay.  So --
12            MS. SINGER:  We'll move to lodge a
13  Rule 106 objection.
14            Mr. Stephens has made the point that
15  this was a small fraction.  But I think you
16  have to read on in this testimony for the full
17  context.
18            BY MR. STEPHENS:
19      Q.    So, Mr. Rannazzisi, it was your
20  testimony that 99.5 percent of prescribers were
21  not overprescribing, true?
22            MR. BENNETT:  Objection.  Form.
23            THE WITNESS:  It -- it was my
24  testimony in this context we were talking
25  about -- and I think later on I say that that
```

Page 194

```
 1  small percentage is doing a huge amount of
 2  harm.
 3            MS. MAINIGI:  Special Master Cohen,
 4  can I just lodge my own objection to continued
 5  coaching of this witness and this time in the
 6  guise of a Rule 106 objection.
 7            MS. SINGER:  It was a legitimate 106
 8  objection if you read on in the record here.
 9            BY MR. STEPHENS:
10      Q.    So, Mr. Rannazzisi, if I could, I
11  will ask you --
12            MR. BENNETT:  Wait a second.  The
13  witness I don't think got a chance to finish
14  his answer when he was interrupted by counsel.
15            MS. MAINIGI:  I'm sorry.  I thought
16  he was done.
17            MR. BENNETT:  Maybe I misunderstood
18  it, but I thought he was still answering the
19  question.
20            SPECIAL MASTER COHEN:  I don't think
21  so.
22            MS. MAINIGI:  I thought he was.
23            MR. BENNETT:  Mr. Rannazzisi, do you
24  need to complete your answer to the last
25  question?
```

Page 195

```
 1            THE WITNESS:  No, that's fine.
 2            MS. MAINIGI:  Sorry.
 3            BY MR. STEPHENS:
 4      Q.    Mr. Rannazzisi, are you good?
 5      A.    Yes.
 6      Q.    Can I move on to my next question,
 7  sir?
 8      A.    Yes.
 9      Q.    All right.  Is it fair to say that a
10  prescription for a controlled substance issued
11  for a legitimate medical purpose by a
12  registered doctor in the usual course of her
13  professional practice is not diversion?
14            MS. SINGER:  Objection.  Vague.
15  Compound question.
16            MR. BENNETT:  Objection.  Scope.
17            THE WITNESS:  If the -- if the
18  doctor has made a determination, a medical
19  determination that that patient needs that
20  controlled substance to treat a specific
21  ailment and the prescription is written
22  appropriately per the requirements in the
23  C.F.R. and the CSA, yes, then I would not think
24  that would be diversion.
25            BY MR. STEPHENS:
```

Page 196

```
 1      Q.    Okay.  And if the pharmacy filled
 2  that same prescription, that also is not
 3  diversion, correct?
 4            MR. BENNETT:  Objection.  Scope.
 5  Incomplete hypothetical.
 6            THE WITNESS:  I can only go back to
 7  the regulations.  If the pharmacist, who has a
 8  corresponding responsibility to ensure that a
 9  prescription is effective and valid, if, a
10  pharmacist fills the prescription based on his
11  corresponding responsibility, his red flags
12  analysis to ensure that that prescription is
13  effective and valid, yes, I don't think that
14  would be diversion as long as he's resolved the
15  red flags that are presented with the
16  prescription.
17            BY MR. STEPHENS:
18      Q.    Now, sir, in your testimony,
19  you had mentioned that DEA's focus was on rogue
20  pain clinics and rogue doctors, correct?
21      A.    Yes.
22      Q.    Those rogue doctors often worked out
23  of rogue pain clinics; is that fair?
24            MS. SINGER:  Objection.  Vague.
25            MR. UTTER:  Object to scope.
```

1    MR. STEPHENS:  I will withdraw the
2  question.
3       BY MR. STEPHENS:
4    Q.   Sir, is it fair that DEA focused its
5  attention in the 2005 to, say, 2009 era on
6  rogue Internet pharmacies?
7       MR. BENNETT:  Objection.  Scope.
8    You can answer.
9       THE WITNESS:  I would say the -- up
10 until at least 2008, after the Ryan Hate Act
11 was passed, it pretty much shut down most of
12 the Internet pharmacies and there was a switch
13 to rogue pain clinics.  There has always been
14 rogue pain clinics but the rogue pain clinics
15 got -- increased in numbers quite a bit right
16 after Ryan Hate was passed.
17      BY MR. STEPHENS:
18   Q.   Okay.  So for general purposes, it's
19 fair that you were focusing your attention on
20 rogue Internet pharmacies which were a
21 significant problem in the 2005 to 2008 era,
22 and then in that era approximately -- that
23 approximate period of time, 2008, 2009,
24 legislation passed and then after the
25 legislation passed, DEA takes enforcement

1  against some of the rogue Internet pharmacies,
2  you started to focus more of your attention on
3  rogue pain clinics; is that fair?
4       MS. SINGER:  Objection.  Compound
5  question.
6       MR. BENNETT:  Objection.  Compound
7  question and vague.
8       THE WITNESS:  Actually, no.  We had
9  taken -- investigated and taken action against
10 rogue Internet pharmacies before Ryan Hate was
11 passed.  Actually, I think Ryan Hate was passed
12 because of all the inactivity we had done in
13 the supply chain related to Internet
14 pharmacies.
15      And to clarify, while we had many
16 Internet pharmacy cases, we were also doing
17 rogue doctors, rogue pharmacies and rogue pain
18 clinics at that point in time, too, so we tried
19 to focus on where the threat was and at that
20 point in time, we had threats but it just
21 seemed that the vast majority of the cases were
22 Internet-based.  However, there were still
23 rogue pain clinics, rogue pharmacies and rogue
24 doctors that were operating independently in
25 the neighborhoods and communities at that time.

1       BY MR. STEPHENS:
2    Q.   Let me say it this way, and just for
3  your benefit, Mr. Rannazzisi, I am just trying
4  to understand what the primary focus was in
5  2005 when you start to after the -- immediately
6  after the passage of the Ryan Hate Act, and
7  then if DEA shifted its focus a bit, what it
8  shifted its focus to, so let me -- do you
9  understand that that's -- I am asking a couple
10 of questions on that, okay?
11      MR. BENNETT:  Objection.  Form.
12      MR. STEPHENS:  Just trying to lay a
13 predicate for him, James.
14      BY MR. STEPHENS:
15   Q.   Now, in the 2005 to 2008 era leading
16 up to the Ryan Hate Act, DEA was focused on
17 rogue Internet pharmacies, true?
18      MR. BENNETT:  Objection.  Asked and
19 answered.
20      MR. UTTER:  Objection.
21      MR. BENNETT:  Form.
22      MR. UTTER:  Same objection, sorry.
23      THE WITNESS:  We were conducting
24 Internet pharmacy investigations because there
25 were quite a few of them, but we were also

1  doing investigations in other areas of
2  diversion, including, you know, rogue pain
3  clinics, rogue doctors and rogue pharmacies
4  that were diverting.
5       BY MR. STEPHENS:
6    Q.   Okay.  Is it safe to say that you
7  focused a greater percentage of your energy on
8  rogue pain clinics after the Ryan Hate Act is
9  passed in 2008 and after DEA goes through a
10 series of enforcement actions against rogue
11 Internet pharmacies; isn't that fair?
12      MR. BENNETT:  Objection.  Vague.
13 Compound.
14      MR. UTTER:  Objection.  Same
15 objections.
16      THE WITNESS:  Our resources shifted
17 to rogue pain clinics because the Internet
18 pharmacy cases pretty much went away.  There
19 was no more domestic brick and mortar
20 pharmacies that were fulfilling Internet orders
21 because Ryan Hate pretty much eliminated them,
22 so the resources were shifted over to rogue
23 pain clinics.
24      BY MR. STEPHENS:
25   Q.   Mr. Rannazzisi, would you agree that

Page 201

```
1    the vast majority of registrants complied with
2    the statutory and regulatory obligations under
3    the Controlled Substances Act?
4            MS. SINGER:  Objection.  Vague and
5    scope.
6            MR. BENNETT:  Objection.  Calls for
7    speculation.  Scope.
8            MR. UTTER:  Same objections.
9            Go ahead.
10           THE WITNESS:  Are you talking about
11   particular groups of registrants or classes of
12   registrants or just the registrants in general,
13   because the doctors make up 1.3 million of the
14   registrant population and more now, so I said a
15   vast majority of doctors are actually acting
16   responsibly.
17           So if you are taking that into
18   account, then yes, because the vast majority of
19   the registrant population are physicians.
20           BY MR. STEPHENS:
21       Q.   So you would agree with the
22   statement that says the vast majority of DEA
23   registrants adhere to their statutory and
24   regulatory obligations under the CSA, true?
25           MR. BENNETT:  Objection.  Asked and
```

Page 202

```
1    answered.
2            MR. UTTER:  Same objection.
3            Go ahead.  You can answer again.
4            THE WITNESS:  Again, yes, because
5    the vast majority of the registrant population
6    are physicians and as I said previously, most
7    of the physicians, a vast majority of the
8    physicians are operating responsibly.
9            BY MR. STEPHENS:
10       Q.   Sir, you had -- in response to some
11   questions from my colleague earlier this
12   morning, there were some questions about
13   diversion and diversion occurring from medicine
14   cabinet involving family and friends.
15           Do you see that -- or do you
16   remember that, I should say.
17       A.   I remember that, yes.
18       Q.   All right.  Is it fair to say that
19   the most -- that the most common method in
20   which controlled substance prescriptions are
21   diverted may be through family and friends?
22           MS. SINGER:  Objection.  Vague.
23   Objection.  Scope.
24           MR. BENNETT:  I would join in both
25   of those objections.  Also object, incomplete
```

Page 203

```
1    hypothetical and calls for speculation.
2            MR. UTTER:  Same objections.
3            Go ahead.
4            THE WITNESS:  That if you are basing
5    that on a survey that was done, yes, but that's
6    not what we were seeing in the Drug Enforcement
7    Administration when we were out there.
8            BY MR. STEPHENS:
9        Q.   Did you ever inform the Congress
10   that as DEA increased its understanding of
11   where abusers acquired prescription drugs, that
12   preliminary data suggested that the most common
13   method in which controlled substance
14   prescriptions are diverted may be through
15   family and friends?
16       A.   That was an administration opinion
17   and again, they were talking about the trading
18   of specific pills.  Somebody got a pill and
19   handed it off, but as far as volume, no.  I
20   mean, that is not what we were seeing.
21       Q.   DEA made that statement from time to
22   time about the most common form of diversion
23   being through family and friends, right?
24       A.   That was the administration --
25           MS. SINGER:  Objection.  Foundation.
```

Page 204

```
1            MR. BENNETT:  I will join the
2    foundation objection.  Objection.  Scope.
3            MR. STEPHENS:  I will re-ask the
4    question.
5            BY MR. STEPHENS:
6        Q.   Mr. Rannazzisi, you are aware that
7    DEA made the statement during your time as
8    deputy assistant administrator, that the
9    preliminary data suggested that the most common
10   method in which controlled substance
11   prescriptions are diverted may be through
12   family and friends?
13           MS. SINGER:  Objection.  Foundation.
14           MR. BENNETT:  Objection.  Vague.
15           THE WITNESS:  Again, that was the
16   administration's position.  DEA could only
17   report what the administration's position is at
18   the time.  We are not autonomous.
19           BY MR. STEPHENS:
20       Q.   Isn't -- by administration, you mean
21   the Drug Enforcement Administration or do you
22   mean the administration of the White House, the
23   executive branch?
24       A.   The executive branch.
25       Q.   Okay.  So if I understand you
```

Page 205

1  correctly, there would have been times where --
2  and stop me if this is not accurate, were there
3  times when you were providing information to
4  Congress under your name where you were making
5  statements that you did not agree with?
6          MS. SINGER:  Objection.  Vague.
7          MR. BENNETT:  Objection.  Scope.
8          You are not authorized to disclose
9  any information regarding the internal
10  deliberative process or recommendation that you
11  made with the Department of Justice.  You also
12  are not authorized to give opinions regarding
13  nonpublic facts or information you acquired in
14  the performance of your official duties and you
15  are not authorized to disclose any nonpublic
16  recommendations you made or you are aware of
17  concerning any proposed agency action or
18  position.
19          To the extent that you can offer an
20  opinion that involves public facts or
21  information you acquired outside of the
22  performance of your official duties, you may
23  give your personal opinion, but you are not
24  speaking on behalf of the DEA.
25          THE WITNESS:  So all this occurred

Page 206

1  when I was working with DEA in my official
2  capacity as a deputy assistant administrator
3  and while I was the witness that testifies, the
4  message comes from the Department of Justice
5  and the White House.
6          You are always told that you are an
7  administration witness, so based on that, that
8  was the administration's position and, you
9  know, I took the position that if that's the
10  administration's position, then that's what it
11  would be.
12          BY MR. STEPHENS:
13      Q.   Okay.  Mr. Rannazzisi, with --
14  someone with a 25 year-plus career with DEA,
15  was it your understanding when you were
16  providing information through to Congress,
17  either through testimony or through the written
18  record, that the accuracy of that information
19  was subject to 18 U.S.C. 1001?
20          MR. BENNETT:  Objection.  Calls for
21  a legal conclusion.  Scope.
22          The witness is not authorized to
23  discuss his opinion regarding what the law says
24  or does not say.  It is also argumentative.
25          The witness can answer if he has an

Page 207

1  answer in his personal capacity, but not on
2  behalf of the DEA.
3          THE WITNESS:  That information was
4  based on a survey, the National Survey on Drug
5  Use and Health, and yes, that's what the survey
6  said.
7          BY MR. STEPHENS:
8      Q.   Okay.  But my question is a little
9  bit different, Mr. Rannazzisi, and it's --
10  whether it was your understanding as deputy
11  assistant administrator from 2005 to 2015, and
12  as someone who's testified repeatedly in front
13  of Congress, that your testimony was subject to
14  Title 18 U.S.C. 1001 which requires an honest
15  response to information provided through law
16  enforcement or to Congress?
17          MS. SINGER:  Objection.
18          MR. BENNETT:  Objection.
19  Argumentative.  Calls for a legal conclusion.
20  Outside the scope of his authorization.
21          MS. SINGER:  Counsel is also
22  testifying.
23          MR. UTTER:  Object to form.
24          Go ahead.
25          THE WITNESS:  Again, that was the

Page 208

1  administration's position based on the
2  information that they had, as a witness for the
3  administration, and I relay and testified to
4  what the administration's position is.
5          BY MR. STEPHENS:
6      Q.   Okay.  So my question is not on that
7  specific fact now.  My question relates to what
8  your understanding was of your obligations and
9  responsibilities when you are testifying in
10  front of Congress, okay?
11          MR. UTTER:  I'm going to object to
12  your characterization as a fact.
13          Go ahead, you can answer.
14          MR. BENNETT:  And I will also
15  object.  Asked and answered.  This is the third
16  time you've asked this question where the
17  witness has answered it each time.
18          BY MR. STEPHENS:
19      Q.   Just yes or no, Mr. Rannazzisi.  Was
20  it your understanding that the information that
21  you provided to Congress when you testified in
22  front of Congress was subject to Title 18
23  U.S.C. 1001?
24          MR. BENNETT:  Objection.  Asked and
25  answered.  Argumentative.

Page 209

1    MS. SINGER:  Objection.  Calls for a
2  legal conclusion.
3    THE WITNESS:  The administration's
4  position and the fed testimony through the
5  administration, that was their position.  It
6  was based on a survey and I presented the
7  administration's position.  I was not
8  testifying on behalf of Joe Rannazzisi, I was
9  testifying on behalf of the administration in
10  2007.
11    MR. STEPHENS:  Special Master Cohen,
12  at this point, I would ask --
13    SPECIAL MASTER COHEN:  You guys are
14  kind of talking past each other.
15    MR. STEPHENS:  I tried to set that
16  up with a predicate to my last question.
17    SPECIAL MASTER COHEN:  You guys are
18  kind of talking past each other.  The last
19  question you asked was a yes or no question for
20  your understanding, and I think you can answer
21  it with yes or no for your understanding.
22    You keep kind of taking that
23  question he is asking and applying it to
24  something else, so I want you to kind of listen
25  to the question as it is asked, and see if you

Page 210

1  can answer with a yes or no, again, regarding
2  your understanding.
3    Let me just add one other thing.  If
4  there is a way that you can ask a question
5  without reference to the statute, maybe you
6  can't, then that might help.
7    BY MR. STEPHENS:
8    Q.    Mr. Rannazzisi, was it your
9  understanding that when you testified in front
10  of Congress, you were testifying under oath and
11  needed to tell the truth?
12    A.    Yes.
13    Q.    So I would like to go back to the
14  start of your tenure, Mr. Rannazzisi, in 2005
15  and 2006.  Okay?
16    A.    Yes.
17    Q.    Now we had talked about rogue
18  Internet pharmacies a few minutes ago, correct?
19    A.    Yes.
20    Q.    Would you agree that not all
21  Internet pharmacies were rogue Internet
22  pharmacies who were diverting opioids?
23    A.    No.  In fact, I can't think of an
24  Internet pharmacy that was operating at that
25  point in time that wasn't rogue.

Page 211

1    MR. STEPHENS:  If I could ask, if
2  you could mark this as next in order, Bonnie.
3  Thank you.
4    (Deposition Exhibit 9 was marked for
5  identification.)
6    BY MR. STEPHENS:
7    Q.    So this has been marked as Exhibit
8  9.  It is a current transcript from May 16,
9  2007, entitled:  "Rogue Online Pharmacies, the
10  growing problem with Internet drug trafficking,
11  a hearing before the Committee of the Judiciary
12  of the United States Senate."
13    And, sir, I would direct your
14  attention to Page 52.
15    So, Mr. Rannazzisi, on Page 52, it's
16  entitled:  "Questions for the hearing record
17  for Joseph Rannazzisi deputy assistant
18  administrator, office of diversion and
19  control."
20    And then the first question states:
21  "At the hearing, witnesses provided testimony
22  about how easy it is for youth and others to
23  obtain prescription drugs illegally on the
24  Internet."
25    And it's then 1 Sub A:

Page 212

1  "Approximately how many websites currently
2  offer to sell controlled substances illegally
3  over the Internet?"
4    Do you see that, sir?
5    A.    Yes.
6    Q.    Okay.  Now I'm going to direct your
7  attention to the -- in the very middle of the
8  response, and there is a sentence there that
9  states:  "It should be noted that there are
10  legitimate pharmacies that provide controlled
11  substances via the Internet and operate daily
12  within the boundaries of the law."
13    Do you see that?
14    MR. UTTER:  Take your time to read
15  the document so you are familiar with it.
16    THE WITNESS:  Okay.
17    BY MR. STEPHENS:
18    Q.    So my question, sir, is:  Did you
19  inform the United States Senate on May 16,
20  2007, that it was the administration's position
21  that it should be noted that there are
22  legitimate pharmacies that provide controlled
23  substances via the Internet and operate daily
24  within the boundaries of the law?
25    A.    Yes, but there is a difference

Page 213

```
1   between the pharmacies we were talking about
2   here and what we consider a rogue Internet
3   pharmacy.
4        Q.    Right.  My point is simply this, Mr.
5   Rannazzisi.
6        There are Internet pharmacies and
7   then, among those Internet pharmacies, there is
8   a subset, however large it may be, that are
9   rogue Internet pharmacies; is that fair?
10            MR. BENNETT:  Objection.  Vague.
11            THE WITNESS:  No.  Because in -- the
12   Internet pharmacies that are legal that you're
13   talking about are generally pharmacies where
14   you could go online and ask the pharmacist via
15   the Internet for a refill on your prescription.
16   That is an Internet pharmacy.
17        The pharmacies that I am dealing
18   with in the rogue context are pharmacies that
19   had a physician that was sitting in New Jersey,
20   a pharmacist that was sitting in Iowa and in
21   that facilitation center that was -- the
22   transaction was being conducted through a
23   survey or a patient questionnaire for cash with
24   no bona fide doctor-patient relationship, no
25   corresponding responsibility review by the
```

Page 214

```
1   pharmacist, the doctor never saw the patient
2   and that's rogue.
3        That's -- I think the legal term is
4   a conspiracy, and that's what we were talking
5   about.  We were not talking about the pharmacy
6   that would be accessed by a patient who had
7   already turned in their prescription and
8   they're just looking for a refill.
9            BY MR. STEPHENS:
10        Q.    Okay.  So then let's focus on these
11   rogue Internet pharmacies that you just
12   described.  Okay?
13        The rogue Internet pharmacies that
14   were diverting controlled substances often had
15   a ratio where they distributed 95 percent
16   controlled substances against 4 percent
17   noncontrolled.  Fair?
18            MS. SINGER:  Objection.  Foundation.
19            MR. BENNETT:  Objection.  Vague.
20            MR. UTTER:  Same objections.
21            Go ahead.
22            THE WITNESS:  I -- 95 percent in
23   some aspects, they were generally high.  I
24   think we have seen rogue Internet pharmacies go
25   60, 70 percent up to 90, 95 percent depending
```

Page 215

```
1   on the pharmacy and what their business was.
2            BY MR. STEPHENS:
3        Q.    Did you view a ratio of 95 percent
4   controlled substances versus 5 percent
5   noncontrolled substances as a possible
6   indication that the Internet pharmacy was
7   diverting?
8            MS. SINGER:  Objection.  Calls for
9   speculation.  Incomplete hypothetical.
10            MR. BENNETT:  Objection.  Vague as
11   to time.
12            BY MR. STEPHENS:
13        Q.    During your tenure as deputy
14   assistant administrator, sir.
15        A.    High volume, high ratio, controlled
16   substance to noncontrolled substance is an
17   indicator of a potential problem, yes.
18        Q.    And these rogue Internet pharmacies
19   that you dealt with, they were not full range
20   pharmacies, like a retail chain pharmacy, like
21   a Walmart or a CVS or Walgreens or Rite Aid or
22   an HBC Giant Eagle, true?
23            MS. SINGER:  Objection.  Compound
24   question.
25            MR. BENNETT:  Objection.  Compound
```

Page 216

```
1   and vague.
2            THE WITNESS:  I don't remember -- I
3   know the vast majority of the pharmacies, the
4   brick and mortar pharmacies that we took action
5   against, were not independent -- they were
6   independent.  They were not chain drug stores.
7        However, I can't say that every --
8   every case we had was an independent.  I just
9   don't remember but I am pretty sure that the
10   vast majority were independent pharmacies.
11            BY MR. STEPHENS:
12        Q.    Sir, during your career as deputy
13   assistant administrator, you gave presentations
14   where you used slide decks that described rogue
15   Internet pharmacies; is that fair?
16        A.    Yes.
17        Q.    I would like to show you one of
18   those.
19            (Deposition Exhibit 10 was marked
20   for identification.)
21            BY MR. STEPHENS:
22        Q.    Sir, I would direct your attention
23   to Slide 50.
24            MR. BENNETT:  Counsel, may I ask,
25   where this was produced from?  It doesn't look
```

Page 217

1  like a DEA document so I am just curious.
2  There is no Bates number.  There's no document
3  number on it.
4      MR. STEPHENS:  Let me suggest this,
5  James, I will move on.  I will come back to
6  this and answer that question for you.  How's
7  that?
8      MR. BENNETT:  That's fine.  Thank
9  you.
10     BY MR. STEPHENS:
11     Q.  Mr. Rannazzisi, let me ask you this:
12  Do you recall giving presentations where, in
13  your description of what a rogue pharmacy was,
14  you told people that they were not chain
15  pharmacies?
16     MR. UTTER:  Don't look -- he is not
17  making a reference to the exhibit, so you are
18  not confused.  He is asking a question
19  independent of the exhibit.
20     THE WITNESS:  If I was reporting
21  what the majority of the pharmacies were, I
22  would say yes, a vast majority of the
23  pharmacies involved in rogue Internet sales are
24  independent pharmacies.
25     BY MR. STEPHENS:

Page 218

1      Q.  And you agree that most, if not all,
2  of the Internet pharmacies operating
3  domestically between 2005 and 2009 were
4  independently owned, fair?
5      MS. SINGER:  Objection.  Scope.
6  Foundation.
7      MR. BENNETT:  Objection.  Scope.
8  Calls for speculation.
9      THE WITNESS:  I'm not sure.  I can
10  tell you the vast majority were independent
11  pharmacies, but I just -- I just don't remember
12  if there was a chain involved in one of the
13  Internet cases or not.
14     MR. STEPHENS:  If we could mark this
15  as the next in order, Bonnie.
16     (Deposition Exhibit 11 was marked
17  for identification.)
18     BY MR. STEPHENS:
19     Q.  Mr. Rannazzisi, I'm going to direct
20  you to Page 2006.
21     MR. STEPHENS:  And for the record,
22  what has been marked as Deposition Exhibit No.
23  11 is hearing testimony from March 1, 2012,
24  entitled:  "Prescription Drug Diversion:
25  Combating the Scourge, a hearing before the

Page 219

1  Subcommittee of Commerce, Manufacturing and
2  Trade, the Committee on Energy and Commerce."
3      BY MR. STEPHENS:
4      Q.  And I would direct your attention to
5  Page 206.
6      Mr. Rannazzisi, I am directing your
7  attention to Question 10 and the last sentence
8  of the first paragraph of the response.
9      A.  The paragraph that starts:  "As
10  previously stated?"
11     Q.  No, it's two sentences just up above
12  it.  I will read it for the record.  Mr.
13  Rannazzisi, take your time reading it.
14     The sentences state:  "For example,
15  between 2005 and 2009, many DEA diversion
16  investigations were initiated against rogue
17  Internet pharmacies.  The results of those
18  investigations revealed that most, if not all,
19  of the domestic-based Internet pharmacies were
20  independently-owned pharmacies."
21     Do you see that?
22     A.  Yes.
23     Q.  My question, sir, is:  You provided
24  on behalf of the Drug Enforcement
25  Administration a response back to Congress

Page 220

1  which indicated that the results of DEA's
2  diversion investigations of rogue Internet
3  pharmacies revealed that most, if not all, of
4  the domestic-based Internet pharmacies were
5  independently owned, true?
6      A.  Yes, with the qualification that
7  most, if not all.
8      Q.  Correct.  Now Walmart, CVS, Rite
9  Aid, Walgreens, HBC Giant Eagle are all chain
10  pharmacies, correct?
11     MS. SINGER:  Objection.  Scope.
12     THE WITNESS:  Yes, that's correct.
13     BY MR. STEPHENS:
14     Q.  Okay.  Mr. Rannazzisi, you mentioned
15  in some of your prior testimony with me after
16  lunch, the Ryan Hate Act in 2008, right?
17     A.  Yes.
18     Q.  And the Ryan Hate Act was
19  legislation that was focused on trying to help
20  combat rogue Internet pharmacies, fair?
21     A.  Yes.
22     Q.  And after the passage of the act, I
23  believe you mentioned DEA got traction in --
24  from the investigation enforcement actions
25  against rogue Internet pharmacies and then

Page 221

1   rogue pain clinics began to become more of an
2   issue and you started to increase
3   investigations into rogue pain clinics?
4           MS. SINGER:  Objection.  Compound
5   question.
6           MR. BENNETT:  Objection.
7   Mischaracterizes testimony.
8           MR. UTTER:  Go ahead.
9           THE WITNESS:  We -- once the rogue
10  Internet pharmacy -- the domestic brick and
11  mortar pharmacies involved in those were shut
12  down, we started moving resources towards the
13  rogue pain clinics.
14          BY MR. STEPHENS:
15      Q.   Okay.  Would you agree that not
16  every pain clinic was a rogue pain clinic?
17          MR. BENNETT:  Objection.  Vague.
18          THE WITNESS:  I would agree that
19  there are pain clinics out there that are truly
20  pain clinics, yes.
21          BY MR. STEPHENS:
22      Q.   And just for our terminology, Mr.
23  Rannazzisi, when you use the word "rogue," like
24  a rogue pain clinic or a rogue Internet
25  pharmacy, you are communicating that that is an

Page 222

1   Internet pharmacy or pain clinic that you think
2   is diverting; is that fair?
3       A.   They are operating illegally.
4       Q.   Now, the rogue pain clinics or some
5   of the rogue pain clinics in the 2008, 2009
6   era, both prescribe and supply oxycodone to
7   their patients at the rogue pain clinic?
8           MR. BENNETT:  Objection.  Vague.
9           THE WITNESS:  Some of them did, yes.
10          BY MR. STEPHENS:
11      Q.   And as to those, they were not
12  sending patients to a pharmacy to fill a
13  prescription.  They were doing the supplying
14  right there at the pain clinic, correct?
15          MS. SINGER:  Objection.  Vague.
16          MR. BENNETT:  Same.
17          THE WITNESS:  In some cases, the
18  clinics were dispensing medication, yes.
19          BY MR. STEPHENS:
20      Q.   All right.  And in response to that,
21  some states passed legislation to require that
22  the prescriptions of controlled substances be
23  filled at a pharmacy, not at a pain clinic?
24          MS. SINGER:  Objection.  Foundation.
25  Beyond the scope of this witness's expertise.

Page 223

1           MR. BENNETT:  I will join both as
2   objection to foundation and scope.
3           MR. UTTER:  Same objections.
4   Go ahead.
5           THE WITNESS:  I don't know about all
6   states, but for instance, Florida did pass two
7   pieces of legislation.  First, the 72 hour rule
8   and then they completely eliminated the
9   dispensing of any controlled substance.
10          BY MR. STEPHENS:
11      Q.   Okay.  And then in response to that
12  legislation, some of the operators of these
13  rogue pain clinics opened up straw pharmacies
14  that were actually controlled by the rogue pain
15  clinic?
16          MS. SINGER:  Objection.  Compound
17  question again.  Beyond the scope of this
18  witness's expertise as a response.
19          MR. BENNETT:  Objection.  Scope.
20  Objection.  Vague.
21          THE WITNESS:  We -- there were
22  instances where rogue clinics purchased
23  pharmacies and started dispensing
24  prescriptions, and then having the pharmacists
25  dispense the medication.

Page 224

1           BY MR. STEPHENS:
2       Q.   Mr. Rannazzisi, have you ever used
3   the term or are you familiar with the term, "a
4   straw purchase?"
5       A.   Yes.
6       Q.   Okay.  Can you please describe what
7   a straw purchase of a pharmacy would be in this
8   scenario?
9       A.   The owner of the clinic would
10  basically pay money for an individual to act as
11  the purchaser of the pharmacy so it doesn't
12  draw attention to the clinic, so you would have
13  -- we got to see all different types of people
14  in Florida that were trying to apply for
15  pharmacy licenses at that point in time, that
16  were not medical -- didn't have a background in
17  medicine.
18      Q.   Okay.  And some of these straw
19  pharmacies did get licensed and registered for
20  a period of time by DEA, correct?
21      A.   We started a program where we
22  actually interviewed and reviewed all the
23  applicants and the vast majority of the
24  applicants, once they realized -- once we
25  started asking questions, they withdrew their

Page 225

1   application.

2        Q.   Okay.  To your recollection,

3   Mr. Rannazzisi, did any straw pharmacy actually

4   get opened and -- such that it was able to

5   dispense prescription controlled substances for

6   a period of time?

7        MS. SINGER:  Objection.  Compound

8   question.

9        MR. BENNETT:  Objection.  Scope.

10       You are not authorized to disclose

11   any information regarding any specific

12   nonpublic DEA investigations or activities.  To

13   the extent that you can answer this question

14   with publicly available information, you may.

15       THE WITNESS:  I -- I don't recall

16   any that got through the system.

17       MR. STEPHENS:  Are you okay if we

18   take a break right now?

19       MR. BENNETT:  That would be fine.

20       MR. STEPHENS:  Yes.

21       MR. BENNETT:  10 minutes?

22       MR. STEPHENS:  Yeah.  10.

23       THE VIDEOGRAPHER:  We are going off

24   the record.

25       This is the end of Media Unit No. 4.

Page 226

1        The time is 1:59.

2        (A short recess was taken.)

3        THE VIDEOGRAPHER:  We are going back

4   on the record.

5        This is the start of the Media Unit

6   No. 5.

7        The time is 2:15.

8        You may proceed, Counsel.

9   EXAMINATION BY COUNSEL FOR CARDINAL HEALTH

10       BY MS. MAINIGI:

11       Q.   Good afternoon, Mr. Rannazzisi.

12       My name is Enu Mainigi.  And I

13   represent Cardinal Health.  And I'll be asking

14   you some additional questions this afternoon on

15   behalf of the distributors.

16       Mr. Rannazzisi, you joined the DEA

17   back in about 1986; is that right?

18       A.   Yes.

19       Q.   And you started as a diversion

20   investigator; is that correct?

21       A.   Yes.

22       Q.   How long did you remain a diversion

23   investigator?

24       A.   From 1986 to 1988.

25       Q.   And did you go through training as a

Page 227

1   diversion investigator?

2        A.   Yes.

3        Q.   That was in 1986?

4        A.   Yes.

5        Q.   And who conducted your training?

6        A.   The diversion training unit at

7   Quantico, Virginia.

8        Q.   Was Michael Mapes conducting the

9   training at that point in time?

10       A.   Michael Mapes was a class

11   coordinator.

12       Q.   And so did you take any training

13   from Mr. Mapes?

14       A.   I don't remember if Mr. Mapes taught

15   or if he was just coordinating the class.  They

16   had instructors, and they had class

17   coordinators.  I don't recall if Mr. Mapes was

18   actually instructing at that time or if he was

19   just the class coordinator.

20       Q.   Then after you were a diversion

21   investigator, you became a special agent; is

22   that correct?

23       A.   Yes.

24       Q.   And you continued to work in -- and

25   a special agent works essentially on the law

Page 228

1   enforcement side of the DEA; is that right?

2        MS. SINGER:  Objection.  Vague.

3        THE WITNESS:  Special agents have

4   full arrest powers, authority to carry a firm.

5   They work all sorts -- they -- they work all

6   criminal investigations related to Title 21.

7        BY MS. MAINIGI:

8        Q.   But the special agents focus on

9   criminal investigations, correct?

10       A.   Yes.

11       Q.   And did you remain a special agent

12   -- well, let me retract that.

13       Did you remain on the law

14   enforcement side of the DEA until you went to

15   headquarters at the end of 2005?

16       MR. BENNETT:  Objection.  Vague.

17       MR. UTTER:  Go ahead.

18       THE WITNESS:  I remain on the law

19   enforcement side.  I'm not -- I'm not sure what

20   you mean by that.

21       BY MS. MAINIGI:

22       Q.   Let me -- let me rephrase.

23       Did you continue to focus on

24   criminal investigations until you arrived at

25   headquarters for your new role at the end of

Page 229

```
1   2005?
2        A.   I arrived to headquarters in 2004.
3   And for a brief period of time in 2004, I was
4   in the Office of Diversion Control.
5        Q.   Okay.  So let's just -- let's take
6   that in bite-size pieces.
7        So from 1988 to 2004, you focused
8   primarily on criminal investigations, correct?
9        A.   Yes.
10       Q.   And from that -- in that time
11  period, 1988 to 2004, you did not regularly
12  interact with wholesale distributors; is that
13  right?
14            MR. BENNETT:  Objection.  Vague.
15            THE WITNESS:  Yes.  That's correct.
16       BY MS. MAINIGI:
17       Q.   And you didn't perform any sort of
18  regulatory inspections of distribution centers,
19  correct?
20            MS. SINGER:  Objection.  Vague.
21            THE WITNESS:  That -- that's
22  correct.
23       BY MS. MAINIGI:
24       Q.   And you didn't provide guidance on
25  suspicious order reporting in that time from
```

Page 230

```
1   1988 to 2004, correct?
2        A.   That's correct.
3        Q.   You didn't review excessive purchase
4   reports in that time period of 1988 to 2004,
5   correct?
6             MR. BENNETT:  Objection.  Vague.
7             THE WITNESS:  I'm excessive purchase
8   reports.  I -- I'm -- I'm sorry.
9        Are you talking about excessive
10  purchase reports or suspicious orders?
11       BY MS. MAINIGI:
12       Q.   You didn't review excessive purchase
13  reports in that time period from 1988 to 2004,
14  did you?
15       A.   No.
16       Q.   Now, you said you arrived in
17  headquarters in 2004, correct?
18       A.   Yes.
19       Q.   And what was your role in 2004?
20       A.   I was the deputy director of the
21  Office of Diversion Control.
22       Q.   And you said in 2004 you were in
23  diversion control briefly.
24            What was the time period,
25  approximately?
```

Page 231

```
1        A.   I think I arrived in -- in March or
2   April of '04, and I departed in August of '04.
3        Q.   And where did you depart to?
4        A.   I was -- I took over as the deputy
5   chief of enforcement operations.  So I ran all
6   enforcement operations during that time.
7        Q.   And so, from August 2004 to the time
8   you returned to the department of antidiversion
9   at the end of 2005, you were in enforcement?
10       A.   I was in enforce --
11            MS. SINGER:  Objection.  Vague.
12            MR. BENNETT:  Objection.  Form.
13            THE WITNESS:  I was in enforcement,
14  but I also had a pharmaceutical -- a deployable
15  pharmaceutical section under my control.
16       BY MS. MAINIGI:
17       Q.   And what did that pharmaceutical
18  section do?  What was its role?
19       A.   To assist the field in diversion
20  investigations.  And they were also deployable.
21  They could be deployed out to actually help
22  or -- or initiate investigations in --
23       Q.   And --
24       A.   -- the field.
25       Q.   I'm sorry.
```

Page 232

```
1        A.   In the field.
2        Q.   The move that you made in August,
3   was that a promotion?
4        A.   They -- they needed -- they needed
5   somebody to help out enforcement operations.
6   So they just decided I was the one.
7             THE REPORTER:  I'm sorry.  They
8   decided...
9             THE WITNESS:  They decided I was the
10  one.  Because I have a very -- my background is
11  in all different types of enforce.  And they
12  needed somebody who had a wide range of
13  background.
14            BY MS. MAINIGI:
15       Q.   So while you were in diversion
16  control for several months in 2004, what --
17  what were your responsibilities primarily?
18       A.   I would assist the deputy assistant
19  administrator in day-to-day functions,
20  meetings, review documents, ensure that -- help
21  him understand where the cases were going, you
22  know, what cases were out there.  Just
23  general -- I was just his deputy.  So I -- I
24  did pretty much whatever he couldn't do or
25  didn't -- you know, delegated down to me.
```

Page 233

1      Q.    And the deputy administrator at that
2  point in time was who?
3      A.    William Walker.
4      Q.    Then in late 2005 you became the
5  acting deputy assistant administrator of the
6  Office of Diversion and Control, right?
7      A.    In -- in July or August of 2005, I
8  was asked to do both jobs.  I was asked to run
9  diversion control.  Because Mr. Walker had been
10  deployed, the military.  So I was asked to
11  handle both enforcement operations and oversee
12  diversion control as well.
13     Q.    And it's in that role as deputy
14  assistant administrator, beginning in that end
15  of 2005, beginning of 2006 time period, that
16  you been to testify in front of Congress; is
17  that right?
18     A.    No.  I started testifying in front
19  of Congress in 2004.
20     Q.    In the -- the first time you were in
21  antidiversion?
22     A.    Yes.
23     Q.    In that 2005, 2006 time period, I
24  think as we've -- we've discussed some already
25  with the prior questioners, you had some

Page 234

1  testimony in front of Congress on the problem
2  of Internet pharmacies; is that right?
3      A.    Yes.
4      Q.    And I think you testified with the
5  prior questioner about the evolution that
6  occurred first for the Internet pharmacies and
7  then the switch over to pain clinics, correct?
8          MR. BENNETT:  Objection.  Misstates
9  testimony.
10         MR. UTTER:  Same objection.  Go
11  ahead.
12         THE WITNESS:  I testified that, you
13  know, we had an Internet pharmacy problem.  And
14  once the Ryan Haight Act was passed, the -- the
15  problem shifted.  Because most of the
16  brick-and-mortars, if not all of the
17  brick-and-mortars, were shut down.
18         And at that point in time, the
19  problem shifted to pain clinics, rogue pain
20  clinics, rogue doctors and pharmacists.
21         BY MS. MAINIGI:
22     Q.    When would you pinpoint the issue of
23  Internet pharmacies really became a problem
24  known to the DEA, approximately?
25         MR. BENNETT:  Objection.  Scope.

Page 235

1  Objection.  Foundation.
2          THE WITNESS:  Probably before I got
3  to headquarters in 2004.  I'm guessing that it
4  was sometime between the end of 2003 and early
5  2004.  I was getting briefings before I
6  arrived, phone briefings.  So I think that's
7  the first time that we -- we discussed Internet
8  pharmacies.
9          BY MS. MAINIGI:
10     Q.    And the phone brief -- briefing that
11  you were getting, were those for your new job
12  in antidiversion, or were they in relation to
13  your role in -- as -- as a special agent?
14     A.    Well --
15         MS. SINGER:  Objection.  Scope.
16         THE WITNESS:  They were preparing me
17  for the deputy director job, which was the
18  number two job in the Office of Diversion
19  Control.  So I was briefed on a number of -- a
20  number of issues related to the Office of
21  Diversion Control.  And I seem to remember that
22  one of the issues was the Internet pharmacies.
23         BY MS. MAINIGI:
24     Q.    At some point in time in the 2005
25  time period, the E-commerce section of

Page 236

1  antidiversion began developing a PowerPoint or
2  a deck related to Internet pharmacies to share
3  with distributors, correct?
4          MR. BENNETT:  Objection.
5  Foundation.
6          MS. SINGER:  Objection.
7          THE WITNESS:  I don't know exactly
8  when in 2005, but there was a -- a PowerPoint
9  presentation prepared for Internet pharmacies.
10         BY MS. MAINIGI:
11     Q.    And it became part of the
12  distributor initiative; is that right?
13     A.    It was a PowerPoint that was given
14  in the distributor initiative, yes.
15     Q.    And I think that the name of the
16  PowerPoint was the Internet Distributor
17  Initiative.
18         Does that sound right to you?
19         MR. BENNETT:  Objection.
20  Foundation.
21         THE WITNESS:  I -- I don't -- I
22  don't recall.
23         BY MS. MAINIGI:
24     Q.    Do you -- the Internet -- or excuse
25  me.

Page 237

1    The distributor initiative concept,
2  was that a concept that the E-commerce section
3  of antidiversion came up with?
4         MR. BENNETT:  Objection.  Scope.
5         You're not authorized to disclose
6  information that would reveal the internal
7  deliberative process within the Department of
8  Justice and DEA.  To the extent that you can
9  answer his question without disclosing the
10  internal deliberative process, you may answer.
11         THE WITNESS:  It was a collaborative
12  effort between the sections.
13         BY MS. MAINIGI:
14    Q.    And which sections; do you recall?
15         MS. SINGER:  Objection.  Scope.
16         MR. BENNETT:  You can answer the
17  question.
18         THE WITNESS:  It was a collaborative
19  effort between E-commerce, pharmaceutical
20  investigations, liaison and policy.
21         BY MS. MAINIGI:
22    Q.    And E-commerce, at that point in
23  time, was headed by Michael Mapes?
24    A.    Yes.
25    Q.    And pharmaceutical investigations

Page 238

1  was headed by who?
2    A.    I don't recall.  I -- I think it was
3  Betsy Willis.
4    Q.    And liaison and policy was headed by
5  who?
6    A.    I don't recall.
7    Q.    Is it fair to say that the two
8  individuals that at least initially developed
9  and then delivered the distributor initiative
10  were Michael Mapes and Kyle Wright?
11         MS. SINGER:  Objection.  Scope.
12         MR. BENNETT:  Objection.  Scope.
13  Foundation.
14         THE WITNESS:  They were the primary
15  -- they delivered the presentation.  And they
16  coordinated the presentation at the
17  headquarters level.
18         But there -- if I'm not mistaken,
19  there were other people that were involved in
20  those presentations.
21         BY MS. MAINIGI:
22    Q.    Were you involved at all in
23  developing the distributor initiative?
24    A.    I reviewed their -- their documents
25  and what they were doing before they actually

Page 239

1  initiated it.  But I was not present at the
2  meetings.
3    Q.    So the individual one-on-one
4  distributor meetings that were held beginning
5  at the end of 2005, for several years
6  thereafter you were not present at those
7  meetings?
8         MS. SINGER:  Objection.  Foundation.
9         THE WITNESS:  No.  It was the
10  E-commerce section, liaison and policy,
11  pharmaceutical investigations, Office of Chief
12  Counsel, and at least one exec from my office.
13         BY MS. MAINIGI:
14    Q.    And by one exec from your office,
15  who do you mean?
16    A.    What -- I had at that time two or
17  three executive assistants.  So one of them
18  would be in the meeting as well.
19    Q.    And your executive assistants at
20  that point in time were who?
21         MR. BENNETT:  Objection.  Vague as
22  to time.
23         BY MS. MAINIGI:
24    Q.    In 2005 time period.
25    A.    It was either Mike Heald or Gary

Page 240

1  Boggs.
2    Q.    Now, the first of the Internet --
3  the distributor initiative briefings were
4  delivered in the fall of 2005.
5         Does that sound right to you?
6    A.    I was thinking some time in August
7  or September, yeah.
8    Q.    And you hadn't arrived back at
9  antidiversion at that point in time, correct?
10    A.    I was doing both jobs.  I was
11  bouncing between one building and the other.
12    Q.    So you had input into what was being
13  presented to the distributors as part of the
14  distributor initiative?
15         MS. SINGER:  Objection.  Foundation.
16  Vague.
17         THE WITNESS:  I reviewed the
18  documents.  But the -- the presentation was
19  created again as a collaborative effort with --
20  with those three units in counsel's office.
21         BY MS. MAINIGI:
22    Q.    Do you recall whether a set -- any
23  set of talking points that the individuals such
24  as Mr. Mapes and Mr. Wright, who were
25  delivering the initiative, would work off of

Page 241

```
 1    when they had their distributor meetings?
 2         MR. BENNETT:  Objection.  Vague.
 3         MR. UTTER:  Go ahead.
 4         THE WITNESS:  I -- I don't recall if
 5    there were talking points.  I know they had
 6    a -- set presentation, PowerPoint
 7    presentation, and individualized sales data for
 8    the particular.  But I don't know if there was
 9    a set of talking points, no.
10         BY MS. MAINIGI:
11         Q.    And with respect to the
12    individualized data, was that that they took
13    the ARCOS data for each distributor that they
14    were planning to meet with and analyzed that
15    data for anomalies?
16         MS. SINGER:  Objection.  Vague.
17         MR. BENNETT:  Same objection.
18         THE WITNESS:  I believe that's what
19    they were doing, yes.
20         BY MS. MAINIGI:
21         Q.    And so they would go over that data
22    with the distributor and show the distributor
23    with the distributor's own data where the DEA
24    had seen some anomalies that were worthy of
25    questioning, fair?
```

Page 242

```
 1         MS. SINGER:  Objection.  Vague.  And
 2    foundation.
 3         THE WITNESS:  Yes.  The -- yes.
 4    That's what they would do.
 5         BY MS. MAINIGI:
 6         Q.    So fair to say that they primarily
 7    worked off of both the ARCOS data and then the
 8    PowerPoint deck that had been prepared in
 9    delivering the distributor initiatives?
10         A.    I don't know if that's all they had.
11    I -- I don't know because I wasn't there.
12         Q.    Okay.  To the best of your
13    knowledge, are you aware of anything else
14    besides those two items, the PowerPoint deck as
15    well as the ARCOS data?
16         A.    I'm aware of the ARCOS data and the
17    PowerPoint.  But I'm not sure what else they
18    were using.
19         Q.    Now, you sent a letter to at least
20    distributor registrants in the September 2006
21    time period, correct?
22         A.    I think the letter went to
23    distributors and manufacturers.
24         Q.    And the topic of the letter was
25    suspicious order reporting and -- and
```

Page 243

```
 1    monitoring, correct?
 2         A.    I don't have the letter handy.
 3         Q.    What do you recall it generally as
 4    being?
 5         A.    It was to inform the -- the
 6    population of distributors and manufacturers
 7    what their obligations were under the
 8    Controlled Substances Act and implementing
 9    regulations.
10         Q.    And fair to say that you sent
11    essentially the same letter out again in
12    February 2007?
13         A.    Yes.
14         Q.    And was that because there was a
15    part of the population that didn't receive the
16    letter?
17              What was the reason for sending the
18    letter out again?
19         A.    I don't recall exactly.  But I think
20    that it was just to ensure that everyone
21    received the letter.  I don't know if they had
22    information that some people didn't get it.
23    But I think they just decided they were just
24    going to resend it again to ensure that
25    everybody had it.
```

Page 244

```
 1         Q.    Now, who -- did you draft the
 2    letter, or did someone help you draft letter?
 3         A.    It was drafted by several people.
 4         Q.    Do you recall who?
 5         MS. SINGER:  Objection.
 6         MR. BENNETT:  Objection.  Scope.
 7              You're not authorized to disclose
 8    the infernal deliberative process within the
 9    United States Department of Justice or DEA.  To
10    the extent that you can answer the question as
11    far as who without disclosing the internal
12    deliberative process, you may answer.
13         THE WITNESS:  I -- I don't recall.
14    I -- I -- it was just a -- a normal letter.  It
15    would be -- go through several people before it
16    got to me.  I would make my corrections.  And
17    it would come back -- go back down.
18         BY MS. MAINIGI:
19         Q.    Now, would it surprise you to learn
20    that Mr. Wright and Mr. Mapes did not get an
21    opportunity to review that letter before it
22    went out?
23         MS. SINGER:  Objection.  Foundation.
24         MR. BENNETT:  Objection.
25    Foundation.  Objection.  Form.  Objection.
```

Page 245

```
1    Scope.
2              MR. UTTER:  Same objection.
3              MR. BENNETT:  Just foundation and
4    form.
5              MR. UTTER:  Same objection.
6              Go ahead.
7              THE WITNESS:  I -- I -- I don't know
8    if they did or not.
9              BY MS. MAINIGI:
10        Q.   Mr. Mapes and Mr. Wright were two of
11   the individuals that were primarily dealing
12   with the distributors at that point in time,
13   correct?
14             MS. SINGER:  Objection.  Foundation.
15   Mischaracterizes the witness's prior testimony.
16             MR. BENNETT:  And objection.  Vague
17   regarding the "dealing with."
18             MR. UTTER:  Go ahead.
19             MR. BENNETT:  Or objection.  Vague.
20             THE WITNESS:  I'm -- I'm not sure.
21   Liaison policy was dealing with the
22   distributors as well.  And if I'm not mistaken,
23   the regulatory section, pharmaceutical
24   investigations, were also.  So I -- I -- and I
25   just -- they were dealing with them, but
```

Page 246

```
1    several components also were dealing with them.
2              BY MS. MAINIGI:
3         Q.   And in liaison and policy, who do
4    you recall was primarily dealing with the
5    distributors, let's say in the '06, '07 time
6    period?
7         A.   I don't recall.  Because liaison
8    policy changed quite a bit.  I mean it changed
9    as people rotated in and retired and left.  So
10   I just don't recall who was there at the time.
11        Q.   And you don't to recall -- well,
12   let's broaden the time period.
13             In the '05 to let's say '09 time
14   period, do you remember anyone in liaison and
15   policy that was dealing with distributors on a
16   regular basis?
17             MR. BENNETT:  Objection.  Vague.
18             THE WITNESS:  Maybe Mark Caverly.
19             BY MS. MAINIGI:
20        Q.   I'm sorry?
21        A.   Mark Caverly.
22        Q.   Did he attend the distributor
23   initiative meetings?
24        A.   I don't know if he did or not.
25        Q.   And then in pharmaceutical
```

Page 247

```
1    investigations, was there any -- I assume, just
2    given the name, there wasn't anyone that was
3    specifically dealing with distributors in that
4    department?
5              MR. BENNETT:  Objection.  Form.
6    Objection.  Vague.
7              THE WITNESS:  I believe they were
8    dealing with distributors.  And at that point
9    in time would have been Matt Murphy.
10             BY MS. MAINIGI:
11        Q.   And was he part of the distributor
12   initiative briefings?
13        A.   I believe he did attend those
14   distributor initiative briefings.
15        Q.   And then the distributor initiative
16   briefings went on, to your recollection, how
17   long?
18             They started, as you said, in August
19   2005 and went to what time period?
20        A.   When I left, they were still going
21   on.
22        Q.   In 2016?
23        A.   '15.
24        Q.   Was there a period of time that they
25   stopped?
```

Page 248

```
1         A.   I don't recall a period of time
2    where they stopped.
3         Q.   Would it surprise you to learn that
4    other folks have testified that they stopped
5    for a period of time because of concern about
6    litigation?
7              MR. BENNETT:  Objection.  Form.
8    Objection.  Misstates testimony.  Objection.
9    Foundation.
10             MR. UTTER:  Same objection.
11             Go ahead.
12             THE WITNESS:  I -- I don't recall if
13   they stopped or not.  But lit -- unless we were
14   in litigation with the whole distribution
15   population, I -- I don't think that would have
16   stopped us from meeting the certain
17   distributors.
18             BY MS. MAINIGI:
19        Q.   So you think the distributor
20   initiative briefings kept going straight
21   through the 2005 through 2016 time period?
22             MS. SINGER:  Objection.
23   Mischaracterizes the witness's testimony.
24             MR. BENNETT:  Same objection.
25             THE WITNESS:  As far --
```

Page 249

1    MR. UTTER:  Same -- same objection.
2    Sorry.  Go ahead.
3    THE WITNESS:  As far as I recall,
4  there was no break in the distributor -- now,
5  they might not have been doing a huge number
6  during certain time period, but that generally
7  is because of resources.
8    But I don't recall any time where we
9  shut down the distributor initiative for a
10  period of time.
11    BY MS. MAINIGI:
12    Q.  And I imagine, with respect to the
13  distributor initiative, just as the focus of
14  the DEA evolved from Internet pharmacies to
15  pain clinics and perhaps on to other issues,
16  that what was being discussed and shared at the
17  distributor initiatives also evolved and
18  changed?
19    MS. SINGER:  Objection.  Compound
20  question.
21    MR. BENNETT:  Objection.  Form.
22    MR. UTTER:  Same objection.
23    Go ahead.
24    THE WITNESS:  I don't recall.  Like
25  I said, I was not in those -- those briefings.

Page 250

1  So I -- I don't know.  I would assume, like any
2  other meeting, that they're going to talk about
3  trends and changes in trends during the
4  briefings, just like they do at the distributor
5  conferences they have.
6    BY MS. MAINIGI:
7    Q.  So going back to your letters, you
8  then sent another letter in December 2007.
9    Do you recall that?
10    A.  Yes.
11    Q.  And what was the purpose of that
12  letter relative to the prior two that you had
13  sent?
14    MR. BENNETT:  Objection.
15    Same instruction regarding internal
16  deliberations.  You can answer without
17  disclosing internal deliberations.
18    THE WITNESS:  The letter was sent to
19  reinforce the previous two letters and also to
20  make note and to pay attention -- ask them to
21  pay attention to the Southwood Pharmaceutical
22  decision that was done in 2007.
23    BY MS. MAINIGI:
24    Q.  And what was it that you wanted
25  attention focused on with respect to Southwood?

Page 251

1    A.  It was a case regarding a
2  manufacturer/distributor and we wanted -- the
3  case outlined what the obligations were and it
4  was just reinforcing what the obligations that
5  we had originally talked about in the
6  distributor initiative and then also in the
7  first two letters that went out.
8    Q.  So coming out of the -- let me
9  unpackage what you said.
10    Coming out of the distributor
11  initiatives, at least some times, the attendees
12  from DEA wrote up a memo of what they
13  discussed, right?
14    A.  No, they always wrote up a memo.
15    Q.  Okay.  They always wrote up a memo,
16  and is that a memo you reviewed usually?
17    A.  Yes, it would be to me.
18    Q.  Okay.  But would you review it?
19    A.  Of course.  I review everything that
20  comes across my desk.
21    Q.  Okay.  So those memos, did you find
22  them to be just a fair and accurate reflection
23  of how the meeting went as far as you were
24  aware?
25    MR. BENNETT:  Objection.

Page 252

1  Foundation.
2    THE WITNESS:  Those memos were just
3  to inform me about the meeting, what was said,
4  what was talked about and who was there.
5  That's what the meeting was.
6    BY MS. MAINIGI:
7    Q.  If you reviewed the memos and
8  thought that those delivering the distributor
9  initiative were not being complete in what they
10  -- the messages they delivered, would you have
11  let them know?
12    MS. SINGER:  Objection.
13  Hypothetical.  Calls for speculation.
14    MR. BENNETT:  Join those objections.
15    MR. UTTER:  Go ahead.
16    THE WITNESS:  I am just trying to
17  think of what was in the memos.
18    If I thought that they were missing
19  something, I would probably add it in at the
20  time, yeah.  I would ask them to include it, or
21  did you talk about this, and if not, why did
22  you not talk about it, but most of the time,
23  they were pretty complete in what they were
24  doing.
25    BY MS. MAINIGI:

Page 253

1      Q.     And again, I imagine that the focus
2  of what was talked about in 2005, 2006 was
3  different than what the focus was in 2010,
4  2011, fair?
5           MS. SINGER:  Objection.  Asked and
6  answered.
7           MR. BENNETT:  Objection.  Form.
8           MR. UTTER:  Same objections.
9           Go ahead.
10          THE WITNESS:  No, because the
11  regulation never changed, and the whole basis
12  of the distributor initiative was to, one, make
13  sure they understand they must maintain
14  effective controls against diversion under 823
15  and then under 1301.71 and then -- and 74, and
16  then also, what a suspicious order is and what
17  their responsibilities were under suspicious
18  order monitoring Provision of 1301.74(b).
19          So the regulation in the statute
20  hasn't changed in over 40 years, so the fact
21  is, as long as they continued to explain what
22  their responsibilities are, they were doing
23  their job.
24          BY MS. MAINIGI:
25      Q.     And where I was going, Mr.

Page 254

1  Rannazzisi, was -- I imagine that the DEA had a
2  different way to deal with Internet pharmacies
3  than they did with pain clinics, for example;
4  would that be fair?
5           MR. BENNETT:  Objection.  Form.
6           MR. UTTER:  Objection.  Form.
7  Vague.
8           Go ahead.
9           THE WITNESS:  They are different
10  types of cases, but it doesn't change what a
11  suspicious order is and a suspicious order over
12  the Internet or for a pharmacy that was
13  facilitating the Internet is pretty much the
14  same as a suspicious order on a pharmacy that
15  is ordering its quantity, you know, unusual
16  order, unusual size, frequency or deviating
17  substantially from the normal ordering pattern.
18  That hasn't changed so it's the same concept.
19          You still have to file suspicious
20  orders regardless of what the method of
21  diversion is.
22          BY MS. MAINIGI:
23      Q.     And so would you -- with DEA in this
24  distributor initiative, just on a regular basis
25  meet maybe every few years with the same

Page 255

1  distributor and then in that context, just
2  reinforce what the regulations said?
3           MS. SINGER:  Objection.  Compound
4  question.  Calls for speculation.
5           MR. BENNETT:  Objection.  Form.
6           MR. UTTER:  Go ahead.
7           THE WITNESS:  We were meeting with
8  distributors that were -- that were not
9  provided with the initial distributor briefing
10  all throughout that time period.  We also had
11  conferences where they came in and we would
12  discuss suspicious orders at the conferences,
13  and they were all invited to attend whether you
14  had the initiative distributor initiative
15  meeting or not.  So we were getting the word
16  out that way as well.
17          BY MS. MAINIGI:
18      Q.     So that makes sense to me, but what
19  -- in terms of -- you said one of the purposes
20  of the distributor initiative was to understand
21  what a suspicious order monitoring system was,
22  for example, right?
23          MS. SINGER:  Objection.
24  Mischaracterizes the witness's past testimony.
25          THE WITNESS:  I think what I said --

Page 256

1           MR. BENNETT:  Misstates testimony.
2           MR. UTTER:  Same objection.
3           BY MS. MAINIGI:
4      Q.     Go ahead.  Tell me what you said.
5  I'm sorry.
6      A.     I think what I said was -- to
7  explain their obligations for suspicious order
8  monitoring under the regulations.
9      Q.     And so beyond providing a
10  distributor with what the regulation said about
11  their obligation for suspicious order
12  monitoring, would you provide, to your
13  knowledge, any additional information or
14  elaboration in these distributor initiative
15  meetings?
16          MR. BENNETT:  Objection.
17  Foundation.  Vague.
18          THE WITNESS:  I am not sure what --
19  I'm not sure where you are going -- what you
20  are looking for.
21          They were provided with what a
22  suspicious order is.  They were provided with
23  examples of suspicious orders.  They were
24  provided with the statute and the regs that
25  identified what their requirements were under

Page 257

```
 1    the act and under the regulations, and they --
 2    that was followed up by three letters that
 3    again reinforced what they were told so, you
 4    know, I think that pretty well covers it.
 5         BY MS. MAINIGI:
 6         Q.    Well, if Mr. -- if Mr. Wright has
 7    testified that he didn't see any of the three
 8    letters before they were sent out, how are you
 9    able to emphasize or reinforce in those three
10    letters what they -- the distributors had been
11    told at these meetings?
12         A.    Because counsel --
13         MR. BENNETT:  Wait.  Objection.
14    Foundation.  Objection.  Form.
15              You can answer.
16         THE WITNESS:  Because counsel's
17    office was in all the distributor meetings and
18    they also assisted in the drafting of those
19    minutes.
20              Now, I'm not sure if Mr. Wright saw
21    those letters or not, but those letters were
22    drafted, redrafted with the distributor
23    initiative in mind and the people that were in
24    that distributor initiative were responsible
25    for drafting those letters.
```

Page 258

```
 1         BY MS. MAINIGI:
 2         Q.    From the counsel's office?
 3         A.    Counsel's office and my staff.
 4         Q.    So what is a suspicious order?
 5         A.    Well, according to 1301.74(b), it's
 6    an order of unusual size, frequency or
 7    substantially deviating from the normal
 8    ordering pattern.
 9         Q.    And so you said one of the things
10    that were told or -- to the distributors, in
11    addition to providing them the regulations at
12    these meetings, you said they were told what a
13    suspicious order is, right?
14         A.    They were.
15         MS. SINGER:  Objection.  Misstates
16    the witness's prior testimony.
17         MR. BENNETT:  Same objection.
18         MR. UTTER:  Same objection.
19              Go ahead.
20         THE WITNESS:  They were provided
21    with the regulation.  They discussed the
22    regulation.  They answered questions related to
23    the regulation, and then they showed specific
24    examples of what a suspicious order would look
25    like based on the transactions conducted by
```

Page 259

```
 1    each individual distributor.
 2         BY MS. MAINIGI:
 3         Q.    So to your understanding -- have you
 4    ever described, and I don't need to know any
 5    names, but just generically, have you ever
 6    described to a registrant what a suspicious
 7    order is?
 8         A.    I have -- I'm sure that I have
 9    spoken to registrants in registrant meetings,
10    you know, in conferences where I have explained
11    what a suspicious order is.
12         Q.    How do you explain it?
13         A.    It's an order of unusual size,
14    frequency or substantially deviating from the
15    normal ordering pattern.
16         Q.    Those are essentially the exact
17    words from the regulation, correct?
18         A.    Yes.
19         Q.    And have you ever provided to a
20    registrant any elaboration on that definition?
21         A.    Definition seems pretty
22    straightforward.
23         Q.    Have registrants asked you for an
24    elaboration on that definition?
25         A.    Yes, and we have explained -- or not
```

Page 260

```
 1    we, the staff has explained to them exactly
 2    what is expected of them.  If I am not
 3    mistaken, it was also in Southwood.
 4         Q.    Okay.  So that is what I am trying
 5    to get to.
 6              When the staff then or you explained
 7    exactly what is expected, tell me what you said
 8    back then.
 9         A.    Well, I wouldn't know.
10         MR. BENNETT:  Objection.
11    Foundation.
12              You can answer.
13         BY MS. MAINIGI:
14         Q.    You wouldn't know?
15         A.    I know this is a suspicious order.
16    I -- what the staff would do is when they'd
17    come in and say, well, we are confused about
18    something or I don't understand this, they
19    would sit down with them and they would say,
20    okay, explain why and explain what you're
21    confused about or whatever it is, and then they
22    would explain what the requirements are under
23    the regulations.  So, you know, again, it's
24    pretty straightforward regulation, unusual
25    size, unusual frequency.
```

Page 261

```
1        Q.     So what is an order of unusual size?
2        A.     An order of unusual size is a
3   pattern, we will say, a pharmacy that has been
4   ordering 5,000 tablets of Hydrocodone every
5   month for the last three years and they all of
6   a sudden bump it up to 20,000, then 50,000,
7   then a hundred thousand and so on.  That's
8   unusual size.
9        Q.     So it's unusual compared to their
10  past practice?
11       A.     Yes.  One of the factors.
12       Q.     What other factors?
13             MR. BENNETT:  Objection.  Scope.
14             THE WITNESS:  They would be looking
15  at other pharmacies that they service in that
16  area, a pharmacy might have an unusually high
17  purchase of a specific controlled substance in
18  an area where everybody else was fairly
19  consistent.  That is unusual size as well.
20       Q.     Just a large size compared to other
21  pharmacies in the area?
22       A.     Yes.
23       Q.     But that large size could perhaps be
24  explained by nonsuspicious reasons, correct?
25       A.     That's due diligence.
```

Page 262

```
1        Q.     Anything else that defined unusual
2   size in your mind?
3             MR. BENNETT:  Objection.  Scope.
4   Objection.  Incomplete hypothetical.
5             THE WITNESS:  I'm sure there are
6   other things but right now at this current
7   moment, I don't have them right off the top of
8   my head.
9             MS. SINGER:  Is this a good time to
10  take a break or sometime soon?
11            BY MS. MAINIGI:
12       Q.     Can you keep going for a few more
13  minutes, Mr. Rannazzisi?
14       A.     Yes, about five more minutes.
15       Q.     Okay.  Let's go a couple more
16  minutes.
17            What is an order deviating
18  substantially from a normal pattern?
19       A.     A pharmacy --
20            MR. BENNETT:  Objection.  Scope.
21            You can answer.
22            THE WITNESS:  A pharmacy that is
23  ordering Hydrocodone on a regular basis and all
24  of a sudden, he starts ordering large
25  quantities of hydromorphone for no apparent
```

Page 263

```
1   reason, and there is no documentation why, and
2   that might exceed the amount of Hydrocodone.
3   That's -- he never ordered it before and now he
4   is ordering quantities that are inconsistent
5   with what he has previously done.
6             BY MS. MAINIGI:
7        Q.     That's kind of the same as unusual
8   size, right?
9        A.     No.
10       Q.     It's different?
11            MR. BENNETT:  Objection.
12            BY MS. MAINIGI:
13       Q.     How are those two different?
14       A.     Well, it's a pattern.  You've
15  established a pattern of purchasing, and now
16  all of a sudden, you are inserting a new drug
17  in that pattern of purchasing.  It doesn't have
18  to be Hydrocodone or hydromorphone.  It could
19  be alprazolam, it could be clonazepam, it could
20  be diazepam, it could be any pattern that --
21  anything that is different from your normal
22  ordering pattern, so if all of a sudden, he
23  starts -- or the person starts ordering 500
24  count bottles of alprazolam 2 milligrams, well,
25  that is not within the normal ordering pattern,
```

Page 264

```
1   or he's ordering carisoprodol, he never ordered
2   carisoprodol before, now all of a sudden he is
3   ordering carisoprodol.  That is an ordering
4   pattern deviation.
5        Q.     And the phraseology is deviating
6   substantially so what -- tell me what
7   substantially means.
8             MR. BENNETT:  Objection.  Scope.
9   Objection.  Incomplete hypothetical.
10            THE WITNESS:  Substantially means
11  just that.  It was -- it is something that
12  triggers an inquiry because it's not something
13  that has happened in the past.  It is not
14  something that was done in the past.
15            BY MS. MAINIGI:
16       Q.     Okay.  And unusual frequency, what
17  does that mean?
18            MR. BENNETT:  Objection.  Scope.
19            THE WITNESS:  A person orders
20  Hydrocodone once a week and all of a sudden, he
21  is ordering it once a day.
22            BY MS. MAINIGI:
23       Q.     And doesn't that overlap with order
24  deviating substantially from a normal pattern?
25       A.     No.  It's a frequency.  It's not a
```

Page 265

1  pattern.  A pattern is drugs and types of drugs
2  they are ordering, a frequency is just that,
3  the frequency of purchases.  Quantity is the
4  quantity of purchases.
5      Q.   Okay.
6           MS. MAINIGI:  Should we go ahead and
7  take a break.
8           THE VIDEOGRAPHER:  We are going off
9  the record.  This is the end of Media Unit No.
10  5.  The time is 2:59.
11           (A short recess was taken.)
12           THE VIDEOGRAPHER:  We are going back
13  on the record.  This is the start of Media Unit
14  No. 6.  The time is 3:13.
15           You may proceed, Counsel.
16           MS. MAINIGI:  Counsel for the
17  government, I just wanted to address some of
18  the scope objections that you made, which I do
19  think are improper.
20           In your authorization letter of
21  December 10, 2018, you authorize, among other
22  areas for Mr. Rannazzisi, your personal
23  recollection of your communications with DEA
24  registrants about what makes an order
25  suspicious under 21 C.F.R. Section 1301.74,

Page 266

1  including the letters you authored in 2006 and
2  2007, and perhaps also No. 4, which I won't
3  waste time reading right now.
4           MR. BENNETT:  The only response I
5  would say, and I know we're not to argue on the
6  record is, you did not ask him what registrants
7  were told about what makes an order suspicious.
8           You asked him what his personal view
9  of suspicion was, not what was told, that's why
10  I believe it was outside the scope, but I'll
11  still let the witness answer the questions
12  based on his personal capacity.
13           MS. MAINIGI:  Well, these are all in
14  his personal capacity, right?  He is not here
15  as a 30(b)(6).
16           MR. BENNETT:  His personal
17  knowledge, not his official Department of
18  Justice information.  He is not a 30(b)(6)
19  witness, but he has been authorized to disclose
20  official Department of Justice information as a
21  former employee, just not on what his official
22  Department of Justice information would be on,
23  the definition of an item, for example, of
24  unusual size.
25           However, he is still able to answer

Page 267

1  that question for you.  You did not ask him,
2  what did you tell registrants about what was an
3  unusual size which is what would be within No.
4  3.
5           BY MS. MAINIGI:
6      Q.   Well, let's make sure we do both,
7  Mr. Rannazzisi.
8           You gave me your definition of
9  unusual size, correct?
10      A.   Yes.
11      Q.   And I think you also told me earlier
12  that you don't recall yourself elaborating for
13  any registrant as you did in this deposition,
14  what unusual size meant to you, correct?
15           MS. SINGER:  Objection.  Misstates
16  prior testimony.
17           MR. BENNETT:  I join that objection.
18           MR. UTTER:  Same objection.
19           Go ahead.
20           THE WITNESS:  I don't -- I haven't
21  had the opportunity -- well, I have never told
22  a registrant what their responsibility is as
23  far as what my definition of a suspicious order
24  is.  That would have come from my staff or the
25  liaison policy section or the pharmaceutical

Page 268

1  investigation section or E-commerce, you know,
2  if they were still there, but it wouldn't have
3  come from my office directly.
4           BY MS. MAINIGI:
5      Q.   And were you ever aware of any
6  definition that could have been offered by one
7  of your staff to registrants?
8      A.   I wasn't aware of what -- they were
9  trained, they are trained to follow what the
10  regulation says, and I'm sure they can give
11  examples just like I just did, but no, I am not
12  aware of any specific guidance that they gave.
13  I mean, we had companies calling in for all
14  different types of issues, not just related to
15  suspicious orders.  They were trained to give
16  guidance based on the regs and the Controlled
17  Substances Act.
18      Q.   Companies would call in, though, I
19  take it, to ask for further elaboration on the
20  definition of a suspicious order, correct?
21           MS. SINGER:  Objection.  Foundation.
22           MR. BENNETT:  Same objection.
23           THE WITNESS:  Companies have called
24  in to liaison and policy and also to -- back
25  when E-commerce was E-commerce and other

Page 269

1    components and they were provided with
2    guidance.
3            BY MS. MAINIGI:
4        Q.    And the guidance they were provided
5    was what, to your understanding?
6            MR. BENNETT:  Objection.  Vague.
7            THE WITNESS:  The guidance they were
8    provided was based on the regulation and they
9    could answer specific questions related to the
10   regulation, specific -- there might be a
11   specific set of facts that they were looking at
12   and they could provide guidance, but generally,
13   the guidance followed the regulation.
14           BY MS. MAINIGI:
15       Q.    And by that, you mean they read the
16   regulation to the registrant?
17       A.    No.
18           MS. SINGER:  Objection.  Foundation.
19           THE WITNESS:  No.  What they did
20   was, they listened to the registrant and then
21   based on what the regulation says, try and help
22   them work through their issue.
23           BY MS. MAINIGI:
24       Q.    So a registrant might call and say,
25   I have got an order that meets the following

---

Page 270

1    description.  Can you help me figure out
2    whether I should report this as a suspicious
3    order?
4            MS. SINGER:  Objection.
5    Hypothetical.  Calls for speculation.
6            MR. UTTER:  Same objections.
7            Go ahead.
8            THE WITNESS:  I don't know, that's
9    never been presented to me before, so I would
10   be -- I would be guessing what the answer was.
11           BY MS. MAINIGI:
12       Q.    You are not aware of whether, as the
13   head of the anti-diversion control, that
14   registrants would call seeking elaboration on
15   whether what they had in front of them was a
16   suspicious order or not to be reported?
17           MS. SINGER:  Objection.
18   Argumentative.
19           MR. BENNETT:  Objection.  Asked and
20   answered.
21           THE WITNESS:  In my role as the head
22   of the Office of Diversion Control, I have a
23   lot of different things going on at once, and
24   I'm sure that if there was a question that they
25   couldn't answer, they would pop their head into

---

Page 271

1    my office and say this is what came about, what
2    do you think.  But no, I don't recall that ever
3    happening before.  So they seemed to be able to
4    handle it.
5            BY MS. MAINIGI:
6        Q.    You don't know what they might have
7    told a registrant about what defines a
8    suspicious order, correct?
9            MR. BENNETT:  Objection.
10   Foundation.
11           MS. SINGER:  Objection.  Foundation.
12           THE WITNESS:  The liaison and policy
13   section, as well as the other sections are
14   trained to provide answers that were in
15   compliance with the regulations in the
16   Controlled Substances Act.
17           BY MS. MAINIGI:
18       Q.    So, for example, you gave -- I asked
19   you before we broke whether pattern and
20   frequency, whether those two terms could
21   overlap, that they could encompass the same
22   type of order, correct?
23       A.    Yes.
24       Q.    And you told me, no, that they are
25   not intended to overlap and you explained to me

---

Page 272

1    why the term pattern and the term frequency
2    were different.
3            Do you recall that?
4        A.    Yes.
5            MS. SINGER:  Objection.  Misstates
6    the witness's prior testimony.
7            THE WITNESS:  Again, I explained to
8    you what an unusual size pattern substantially
9    deviating from the norm or -- and frequency,
10   unusual frequency.
11           BY MS. MAINIGI:
12       Q.    Do you recall, though, I asked you a
13   question about, could pattern and frequency be
14   the same?
15       A.    I don't recall that exact question.
16       Q.    Okay.  Well, do you recall me
17   walking through what normal pattern meant to
18   you and what unusual frequency meant to you?
19       A.    I recall me giving you a definition,
20   my definition of what normal pattern and
21   unusual frequency is.
22       Q.    And then do you recall me following
23   -- do you recall me following up and saying,
24   well, couldn't your definition of frequency or
25   unusual frequency be the same as unusual

Page 273

1  pattern?
2      A.    Again, my answer would be depending
3  on the facts and the suspicious order that had
4  come in, the transaction that had come in, the
5  request for the transaction that had come in.
6  I would have to look at each individual one and
7  see if there is an overlap or not.  But I would
8  have to look at the transaction and the
9  request.
10     Q.    So sometimes, there could be an
11 overlap between unusual frequency and unusual
12 pattern and sometimes, there wouldn't be; is
13 that right?
14         MS. SINGER:  Objection.  Misstates
15 the witness's prior testimony.
16         MR. BENNETT:  Objection.  Incomplete
17 hypothetical.  Calls for speculation.
18         MR. UTTER:  Same objections.
19         Go ahead.
20         THE WITNESS:  Each individual
21 suspicious order, if -- if it rises to a
22 suspicious order, it could meet criteria.  But
23 it -- again, it depends on the facts of that
24 order and that transaction, the -- the -- the
25 pharmacy that's making that purchase.

Page 274

1      But in the end, it's up to the
2  distributor to decide whether they're going to
3  fill the order or not.  It's a business
4  decision.
5  BY MS. MAINIGI:
6      Q.    It's a business decision as to
7  whether something is a suspicious order as
8  well, correct?
9      A.    Yes.
10     Q.    And it may be that one business
11 faced with a particular order makes a different
12 decision on the exact same order than another
13 business, correct?
14         MS. SINGER:  Objection.
15 Hypothetical.  And calls for the witness to
16 speculate.
17         MR. BENNETT:  And objection.  Scope.
18         THE WITNESS:  It depends on the type
19 of due diligence they're doing on their
20 customers; whether they know their customers
21 and what their customers' normal ordering
22 patterns are; where is their customer situated;
23 is the customer close to a hospital; is the
24 customer close to -- is in a rural area.
25         There's so many dynamics that the

Page 275

1  drug enforcement administration doesn't have.
2  Only the business, the distributor, the
3  registrant has that information.
4      So if you're calling the Drug
5  Enforcement Administration to -- to -- to get
6  an okay to release an order, that's not going
7  happen.  Because the Drug Enforcement
8  Administration does not know your customer.
9  You know the customer.
10 BY MS. MAINIGI:
11     Q.    Only the business, at that point in
12 time, looking at the information before it as
13 well as its due diligence, can make the
14 business decision about whether something is a
15 suspicious order, correct?
16         MS. SINGER:  Objection.  Misstates
17 the witness's prior testimony.
18         MR. BENNETT:  And objection.  Scope.
19         THE WITNESS:  Based on the facts of
20 the particular order and the customer, they are
21 required to make a decision on whether to file
22 the suspicious order and not ship or ship.
23         If they ship the order and it's not
24 been deemed to be -- their -- their suspicions
25 have not been resolved, then they're not

Page 276

1  maintaining effective controls against
2  diversion.
3  BY MS. MAINIGI:
4      Q.    How does the DEA then go back after
5  the fact and determine that something was
6  suspicious?
7          MS. SINGER:  Objection.  Lacks
8  foundation.
9          MR. BENNETT:  Objection.  Scope.
10 Also objection.
11         You are not authorized to disclose
12 information regarding any specific DEA
13 investigations or activities or any information
14 that would reveal the internal deliberative
15 process of the DEA.
16         To the extent that you can answer
17 the question without disclosing those, you may
18 answer the question.
19         THE WITNESS:  I can't.  I can't
20 answer it that way.
21 BY MS. MAINIGI:
22     Q.    You can't tell me how the DEA would
23 then go back and figure out whether something
24 is suspicious or not?
25     A.    It's part of the --

Page 277

1      MR. BENNETT:  I'll say --
2      THE WITNESS:  -- investigative
3  process.
4      MR. BENNETT:  And I will say same
5  instruction regarding the scope of your
6  authorization.
7      BY MS. MAINIGI:
8      Q.   So let me come back to -- to this --
9  so you gave me your elaboration and further
10  definition of some of the terminology in 21
11  C.F.R. 1301.74, right?
12     A.   Yes.
13     Q.   But your elaboration, your further
14  definition of unusual size, pattern, frequency,
15  that's not in the regulation itself, right?
16     MR. BENNETT:  Objection.
17     THE WITNESS:  No.
18  Oh.
19     MR. BENNETT:  Form.
20  Go ahead.
21     THE WITNESS:  No, it's not in the
22  regulation.
23     BY MS. MAINIGI:
24     Q.   And the elaboration that you
25  provided me on those terms -- unusual size,

Page 278

1  pattern, and frequency -- that elaboration is
2  not in any sort of written guidance, is it, to
3  your knowledge?
4      A.   With the exception of the three
5  letters that discussed suspicious order
6  monitoring and the fact that we sat down with
7  each individual distributor and talked about
8  it.
9      It was discussed in the Southwood
10  decision.  Other than that, no.
11     Q.   Okay.  Let's go through those.
12     A.   Okay.
13     Q.   Is it fair to say that the way you
14  defined or further defined unusual size for me
15  might be different than the way your deputy at
16  the time might have defined unusual size to a
17  registrant?
18     MS. SINGER:  Objection.  Calls for
19  speculation.
20     MR. BENNETT:  Same objection.
21     MR. UTTER:  Objection.
22  Go ahead.
23     THE WITNESS:  I don't know exactly
24  what my deputy or any of the other people would
25  use as an example.  I used -- I gave you

Page 279

1  examples of what my -- my position of what an
2  unusual size is or an unusual frequency.
3      Deposition is based on, you know,
4  my -- my own personal knowledge of how this
5  works plus other -- plus previous cases that
6  have been made public.
7      BY MS. MAINIGI:
8      Q.   Sitting here today, you can't tell
9  me that your definition of unusual size is the
10  same as Michael Mapes's definition of unusual
11  size, right?
12     MS. SINGER:  Objection.  Calls for
13  speculation.  Argumentative.
14     THE WITNESS:  I don't know --
15     MR. BENNETT:  Objection.  Form.
16  Objection.  Scope.
17     THE WITNESS:  I don't know what Mr.
18  Mapes's definition of unusual size is.  But I'm
19  pretty sure it's pretty consistent with what my
20  definition is.
21     BY MS. MAINIGI:
22     Q.   Have you guys compared notes on
23  that?
24     A.   No.  But based on the previous cases
25  we've done, it's pretty -- pretty easy to see a

Page 280

1  pattern of unusual size.
2      Q.   I thought pattern and size were two
3  different barometers.
4      A.   It -- they are.  But what I'm
5  talking about, unusual size when you have a --
6  a pharmacy that's been ordering a certain
7  amount for a long period of time, and then all
8  of a sudden they bump up their purchases for no
9  reason.
10     They haven't changed their area.
11  They haven't moved near a hospital.  And then
12  they continue to increase without anybody
13  filing a suspicious order, without anybody
14  going out and doing due diligence.
15     Okay.  That -- that's -- that's an
16  unusual size that should be followed up.
17     Q.   And do you think your definition of
18  unusual size would be the same as Mr. Wright's
19  definition of unusual size?
20     A.   I don't --
21     MS. SINGER:  Objection.  Calls for
22  speculation.
23     MR. BENNETT:  Objection.  Form.
24  Objection.  Scope.
25  Go ahead.

Page 281

1    THE WITNESS:  I don't know what Mr.
2    Wright's definition is on unusual size.  But
3    it's pretty straightforward.  Unusual size is
4    just that, an unusual size.
5    BY MS. MAINIGI:
6    Q.    Why did your division never write
7    down the further elaboration of the terms
8    "unusual size," "pattern" or "frequency" --
9    MS. SINGER:  Objection.  Found --
10    BY MS. MAINIGI:
11    Q.    -- for distributors?
12    MS. SINGER:  Sorry.
13    Objection.  Foundation.  And
14    objection.  Scope.
15    MR. BENNETT:  And I would object
16    that it misstates prior testimony.
17    And also I would inform the witness
18    that you are not authorized to disclose the
19    internal deliberative process of DEA or
20    information that would disclose nonpublic
21    recommendations you made or you're aware of
22    concerning any proposed agency action.
23    To the extent that you can answer
24    the question without disclosing that, you may
25    answer.

Page 282

1    THE WITNESS:  In those limitations,
2    I can't answer that question.
3    BY MS. MAINIGI:
4    Q.    Well, let me ask it this way:  Has
5    DEA provided in written form your explanation
6    and elaboration of what a suspicious order is
7    to registrants?
8    A.    Not as far as I'm aware.  But again,
9    I gave you an explanation my opinion of what a
10    suspicious order of unusual size, frequency or
11    deviating substantially from the normal
12    ordering pattern.  That was an -- examples and
13    a nonexhaustive list of what, in my opinion,
14    those are.
15    But in the end, only the distributor
16    could make a decision about what a suspicious
17    order of unusual size is.
18    Q.    And, in fact, under your leadership,
19    you felt so strongly, Mr. Rannazzisi, that only
20    a distributor could decide what an unusual size
21    was or what a suspicious order was that you
22    essentially told your department not to provide
23    explanations and elaborations to registrants,
24    correct?
25    MS. SINGER:  Objection.

Page 283

1    Argumentative.  Lack of foundation.  Compound
2    question.
3    MR. BENNETT:  I join those
4    objections.
5    And I also indicate that the witness
6    is not authorized to disclose any nonpublic
7    recommendations you made or you're aware of
8    regarding any proposed agency action or reveal
9    the internal deliberative process within the
10    Department of Justice or the DEA.
11    MR. UTTER:  Go ahead.
12    THE WITNESS:  I've --
13    MR. BENNETT:  Otherwise you can
14    answer.
15    THE WITNESS:  Yeah.  I've never
16    advised any of my people, while I was the head
17    of the Office of Diversion Control, not to
18    elaborate.  And that wouldn't come from me
19    anyway.  It could come from counsel's office.
20    BY MS. MAINIGI:
21    Q.    And sitting here today, you don't
22    know, Mr. Rannazzisi, when Mr. Mapes or
23    Mr. Wright were asked to elaborate on what they
24    thought a suspicious order was, what they told
25    order registrants at distributor initiative

Page 284

1    meetings, correct?
2    MS. SINGER:  Objection.  Asked and
3    answered.  Lack of foundation.  Calls for
4    speculation.
5    THE WITNESS:  I don't know exactly
6    what they said.  But I know they followed the
7    regulation, which is unusual size, frequency,
8    substantially deviating from the normal
9    ordering pattern.
10    BY MS. MAINIGI:
11    Q.    You mentioned the Southwood decision
12    as being perhaps instructive to the registrant
13    community about what a suspicious order was,
14    correct?
15    A.    Yes.
16    Q.    How was it instructive?
17    A.    It explained what the
18    responsibilities were for suspicious order
19    monitoring.  It explained what the requirements
20    were to maintain effective controls against
21    diversion.  It explained that, you know, using
22    an example of a company that actually was
23    involved in this type of activity, what they
24    did and what the results of what they did were.
25    Q.    Now, Southwood was an Internet

Page 285

```
1   pharmacy?
2       A.    Southwood was a manufacturer -- a
3   repackager, I guess they would be, who supplied
4   Internet, among other types of registrants.
5       Q.    So they were a supplier to an
6   Internet pharmacy?
7       A.    They were a supplier to several
8   different registrant classes.
9       Q.    And so what are some of the specific
10  elaborations of what goes into a suspicious
11  order monitoring system that come from
12  Southwood?
13      A.    I don't have the decision.  And I
14  read that decision a long time ago.  But -- but
15  that's why the decision was included in the
16  December of 2007 letter to the registrant.
17      Q.    And if I go to the Southwood
18  decision, I -- I would learn more about what
19  the DEA wants to see in the suspicious order
20  monitoring system?
21      A.    I think --
22            MS. SINGER:  Objection.  Calls for
23  speculation.
24            THE WITNESS:  I don't --
25            MR. BENNETT:  Objection.  Form.
```

Page 286

```
1   Objection.  Scope.
2             THE WITNESS:  I don't know exactly
3   what you would learn from it.  Everybody takes
4   things away from opinions, decisions
5   differently.
6             But it reinforces what we explained
7   to the registrant community in the distributor
8   initiatives and then the two memos before about
9   what their obligations are, what they're
10  supposed to do, and how they could maintain
11  effective controls against diversion.
12            BY MS. MAINIGI:
13      Q.    The -- the word "pattern" -- could
14  the word "pattern" mean two different things
15  for two different distributors?
16            MS. SINGER:  Objection.  Calls for
17  speculation.
18            MR. BENNETT:  I join that objection.
19  And objection.  Scope.
20            MR. UTTER:  Object.  Speculation.
21            Go ahead.
22            THE WITNESS:  I -- I -- I don't
23  know.  I mean it's up to the distributor to
24  decide how he's going to define what a
25  quote/unquote pattern is as compared to an
```

Page 287

```
1   unusual size or frequency.
2             BY MS. MAINIGI:
3       Q.    Let me go -- you -- you also
4   mentioned, in addition to the Southwood
5   decision -- and if -- if we have time today,
6   we'll go ahead and get that decision marked so
7   we can go through it.
8       A.    Okay.
9       Q.    But you also referenced your
10  letters, right?
11      A.    Uh-huh.
12            MS. MAINIGI:  Is it attached to
13  the...
14            So let me put in front of you your
15  three letters.
16            THE WITNESS:  Okay.
17            MS. MAINIGI:  Let me -- let me
18  correct that.
19            I'm going to put in front of you
20  just the September 27, 2006 letter, which I
21  think is nearly identical to the February 2007
22  letter, as you recall.
23            THE WITNESS:  Yes.  I think you're
24  correct.
25            MS. MAINIGI:  And then I'll also put
```

Page 288

```
1   in front of you the December 27, 2007 letter,
2   Mr. Rannazzisi.
3             THE WITNESS:  Okay.
4             MS. MAINIGI:  Let's go ahead and get
5   those marked as separate exhibits, please.
6             (Deposition Exhibit 12 was marked
7   for identification.)
8             (Deposition Exhibit 13 was marked
9   for identification.)
10            MS. MAINIGI:  Need a break,
11  Mr. Rannazzisi?
12            THE WITNESS:  No.  I'm fine.
13            MS. MAINIGI:  Okay.  The September
14  2006 letter is Exhibit 12.  And the December
15  2007 letter is Exhibit 13.
16            BY MS. MAINIGI:
17      Q.    So, Mr. Rannazzisi, I assume you're
18  still somewhat familiar with these letters,
19  correct?
20      A.    For the most part, yes.
21      Q.    Did you take a look at these letters
22  as part of your preparation for this
23  deposition?
24      A.    Yes.  At the department.
25      Q.    So I'm not necessarily going to
```

Page 289

1    direct you to any particular area.
2            What -- what I'd like you to just
3    direct me to is you indicated that the letters
4    served as further elaboration of what a
5    suspicious order is.
6            And so, if you could point out to me
7    in each letter where that elaboration is, I'd
8    be grateful.
9            MS. SINGER: Objection. Misstates
10   the witness's prior testimony.
11           MR. BENNETT: Objection. Form.
12           MR. UTTER: Go ahead.
13           THE WITNESS: It -- it -- it --
14           BY MS. MAINIGI:
15   Q.    Well, let's start --
16   A.    As far as the definition --
17   Q.    Let's -- let's do one at a time.
18   A.    -- suspicious orders include orders
19   of unusual size, orders deviating substantially
20   from a normal pattern, and orders of unusual
21   frequency.
22   Q.    Okay.  So we're on Exhibit 12?
23   A.    Yes.
24   Q.    And Exhibit 12 is the September 27,
25   2006 letter, right?

Page 290

1    A.    Yes.
2    Q.    And that's identical to the February
3    2007 letter, as you recall?
4    A.    Yes.
5    Q.    Okay.  So we are looking for your
6    further elaboration of what is a suspicious
7    order.
8            Can you direct us to what paragraph
9    you are at?
10           MS. SINGER: Again, objection.
11   Misstates the witness's prior testimony.
12           MR. BENNETT: Objection to form.
13           MR. UTTER: Go ahead.
14           THE WITNESS: Again, it's in the
15   middle of the page.
16           BY MS. MAINIGI:
17   Q.    What page?
18   A.    That's the definition.
19           Page 2.
20   Q.    Page 2.  Okay.  Middle of the page.
21   A.    Suspicious orders include orders of
22   unusual size, order deviating substantially
23   from the normal pattern, and orders of unusual
24   frequency.
25           It's pretty straightforward.

Page 291

1    Q.    Which paragraph were you -- I just
2    want the make sure I didn't miss it.
3    A.    Right -- right in the middle.  One,
4    two, three -- fourth paragraph in the -- right
5    after 21 C.F.R. 1301.74.
6    Q.    Oh, the paragraph that's cut and
7    paste, the regulation itself?
8    A.    The one that basically lists the
9    regulation and what a suspicious order is.
10   Q.    So besides just repeating what the
11   regulation says, does the September 27, 2006
12   letter have any elaboration of what a
13   suspicious order is?
14   A.    By definition, the regulation
15   explains what a suspicious order is.
16           MR. BENNETT: And I will object to
17   vague.
18           BY MS. MAINIGI:
19   Q.    So you had indicated to me that the
20   letters explained further -- just much like
21   your individual definitions, I thought I
22   understood you to say that the letters further
23   elaborated on what a suspicious order was.
24           MS. SINGER: Objection.
25           BY MS. MAINIGI:

Page 292

1    Q.    That's not right?
2            MS. SINGER: Objection. Misstates
3    the witness's prior testimony.
4            THE WITNESS: The -- the letters
5    reinforce what was in the distributor
6    initiative briefings.  And the letters discuss
7    what a suspicious order is.
8            Again, the -- it's just reinforcing
9    that this is a suspicious order.  It's pretty
10   straightforward:  unusual size, frequency, or
11   deviating substantially from the normal
12   ordering pattern.
13           BY MS. MAINIGI:
14   Q.    I found your elaboration of unusual
15   size to be helpful.
16           Why not include those types of
17   elaborations in this letter?
18           MS. SINGER: Objection.  Counsel is
19   testifying.
20           MR. BENNETT: Objection.  Scope.
21           You're not authorized to disclose
22   the internal deliberative process or any
23   nonpublic recommendations you made or you're
24   aware of regarding what does or does not go
25   into the letter.

Page 293

1  To the extent that you can answer
2  counsel question without disclosing that, you
3  may answer.
4  THE WITNESS:  In the distributor
5  initiative briefings, they were presented with
6  a pattern which showed unusual size.
7  BY MS. MAINIGI:
8  Q.  And the presentation of this pattern
9  that was in the ARCOS data that was presented?
10  A.  Yes.
11  Q.  Their own individual ARCOS data?
12  A.  The -- the distributor that was
13  going through the briefing, we used their ARCOS
14  data.
15  Q.  And so a pattern that emerged for
16  one distributor could have been different than
17  a pattern that emerged for another distributor,
18  right?
19  A.  I don't know --
20  MS. SINGER:  Objection.  Calls for
21  speculation.
22  THE WITNESS:  I don't know about
23  pattern.  But we were talking about size at
24  that moment in time.  If I'm not mistaken, the
25  three initial -- the three initial distributor

Page 294

1  briefings, we concentrated on size.
2  There might have been a pattern --
3  there might have been a couple of pattern
4  examples as well, but it was mostly size.
5  BY MS. MAINIGI:
6  Q.  So the goal was to first show
7  distributors what unusual size could mean,
8  correct?
9  A.  Because we went into patterns and
10  showed the -- we -- if I'm -- like I said, I
11  wasn't in the briefing.  But if I remember
12  correctly on what the briefing material had, it
13  showed patterns where we actually saw an
14  Internet pharmacy that was -- in their -- in
15  their patterns they started purchasing
16  carisoprodol or Xanax, alprazolam, 1 and 2
17  milligram tablets, which was not what they did
18  before.
19  So it established a pattern with
20  Hydrocodone.  And it also showed that the
21  hydrocodone increases over a period of time.
22  And that was what was presented -- that's
23  explained to them this is a suspicious order;
24  in our opinion, this is what's suspicious.
25  Q.  But that suspicion could be

Page 295

1  alleviated by some due diligence, right?
2  A.  It could be if they were doing due
3  diligence.  But they weren't.
4  Q.  And how do you know they weren't
5  doing due diligence?
6  MR. BENNETT:  Objection.  Scope.
7  You're not authorized to disclose
8  information regarding any specific DEA
9  investigations or activities that are not
10  public.
11  To the extent that you can answer
12  generally, or if you can answer with publicly
13  available information about DEA, activities you
14  may answer.
15  BY MS. MAINIGI:
16  Q.  I'm not looking for specific
17  distributors.
18  But how can you say across the board
19  that there was -- you know there was no due
20  diligence?
21  A.  On the --
22  MR. UTTER:  Excuse me.
23  Object.  That's not what he said.
24  Go ahead.
25  MR. BENNETT:  And I would join that

Page 296

1  objection.  Misstates testimony.
2  THE WITNESS:  On the distributor
3  briefings, we looked at specific unusual size
4  transactions and patterns.  And we explained to
5  them that these shouldn't -- these were
6  suspicious, in our -- in -- in -- when we
7  looked at them, we believed they were
8  suspicious, and we asked them what they thought
9  of the transactions, is --
10  BY MS. MAINIGI:
11  Q.  And --
12  A.  -- how it was explained to me.  Yes.
13  Q.  I'm sorry.
14  And -- and it's possible that they
15  may have had a justification, through due
16  diligence, for having concluded that that
17  particular order was not suspicious, right?
18  MS. SINGER:  Objection.  Calls for
19  speculation.
20  MR. BENNETT:  I would join that
21  objection.
22  MR. UTTER:  Same objection.
23  Go ahead.
24  THE WITNESS:  If they were doing due
25  diligence, they wouldn't have shipped those

1  drugs.  But regardless, in one particular
2  company, the next go-around -- after we
3  notified them of what suspicious was, they
4  continued to ship in greater quantity
5  downstream than before the meeting.
6          BY MS. MAINIGI:
7      Q.    You mentioned that -- just tell me
8  to the best of your recollection.
9          You -- I think I heard two things
10  from you:  that the distributor briefing
11  initially focused on size, and then I heard you
12  say they focussed on size and pattern.
13          What's your best memory?
14      A.    I believe it was both size and
15  pattern.
16      Q.    Okay.  And so you think that
17  Mr. Mapes, when he did these distributor
18  briefings, may have elaborated on the
19  definition of unusual size and unusual pattern?
20      A.    He had to --
21          MS. SINGER:  Objection.
22          THE WITNESS:  -- because.
23          MS. SINGER:  -- calls for
24  speculation.
25          THE WITNESS:  The transactions were

1  based on size and pattern.  So yes.  And...
2          BY MS. MAINIGI:
3      Q.    But you don't know what that
4  elaboration was?
5      A.    No, I don't what that elaboration --
6      Q.    And that elaboration could have
7  varied from distributor --
8          MR. BENNETT:  Can you let the
9  witness finish his answer, please.
10          MS. MAINIGI:  I'm sorry.
11          THE WITNESS:  I don't --
12          BY MS. MAINIGI:
13      Q.    That --
14          MR. BENNETT:  Hang on.
15          Let her answer -- are you finished
16  with your answer to the previous question?
17          THE WITNESS:  I'm sorry.  Go ahead.
18          MS. MAINIGI:  I'm sorry.
19          MR. BENNETT:  Okay.  Could you
20  please ask the question now.
21          And wait for her to finish --
22          THE WITNESS:  Yes.
23          MR. BENNETT:  -- the question before
24  you answer.
25          THE WITNESS:  Okay.

1          BY MS. MAINIGI:
2      Q.    And the elaboration could have
3  varied from distributor to distributor,
4  correct?
5          MR. BENNETT:  Objection.  Calls for
6  speculation.
7          THE WITNESS:  The elaboration was
8  based on the individual distributor
9  transactions.  So I would guess that it could,
10  based on the transactions they were using at
11  the time, yes.
12      Q.    Now, for guidance, besides the
13  C.F.R., what would a distributor turn to that
14  didn't get their distributor briefing until
15  2009 or 2010?
16      A.    Well, they had the letters.  And
17  they could call in to the local DEA offices;
18  they could call into the liaison and policy
19  section; they could call into the
20  pharmaceutical regulatory section.
21          There was a number of places where
22  they could call to get their questions
23  answered.
24      Q.    So we've already established the
25  letter doesn't give a definition of suspicious

1  order beyond the C.F.R. terminology, right?
2          MR. BENNETT:  Objection.  Misstates
3  prior testimony.
4          THE WITNESS:  The -- the C.F.R.
5  test-- the C.F.R. definition is the official
6  definition of a suspicious order.
7          BY MS. MAINIGI:
8      Q.    So how would a local D -- if they
9  could call a local DEA office, how would a
10  local DEA office know what to tell them versus
11  what headquarters is telling them?
12          MS. SINGER:  Objection.  Calls for
13  speculation.
14          MR. BENNETT:  Objection.  Scope.
15  Calls for speculation.
16          MR. UTTER:  Same objection.
17          Go ahead.
18          THE WITNESS:  The diversion
19  investigators and the headquarters staff are
20  basically told how to answer certain questions.
21          However, if the -- if the staff in
22  the field -- the -- the -- the field office
23  cannot answer the question, is not comfortable
24  answering the question, they would refer the
25  question up to liaison and policy.  And liaison

Page 301

1   and policy would answer the question.
2        BY MS. MAINIGI:
3        Q.   So the field offices, you don't
4   really know what they said in terms of defining
5   what an unusual order was, right?
6            MS. SINGER:  Objection.  Misstates
7   the witness's prior testimony.
8            MR. BENNETT:  Objection.
9   Argumentative.
10           THE WITNESS:  The field office
11  follows the regulations.
12       BY MS. MAINIGI:
13       Q.   Did the field office -- is it fair
14  to say that, after your letters, there were
15  diversion investigators that called
16  headquarters and said they were confused about
17  how to administer or interpret these letters?
18           MS. SINGER:  Objection.  Lack of
19  foundation.
20           MR. BENNETT:  Objection.  Scope.
21           You can answer.
22           THE WITNESS:  I'm not aware of any
23  calls from the field regarding the letters.
24       BY MS. MAINIGI:
25       Q.   The field was not confused about

Page 302

1   what these letters meant?
2            MS. SINGER:  Objection.  Scope.
3   Objection.  Asked and answered.
4            THE WITNESS:  I -- again, I'm not
5   aware of the field being confused.  But I'm
6   pretty sure that, if there was some confusion
7   about the letters, I'd be getting calls from an
8   -- from the assistant special agents in charge,
9   the DPM, or the SACs.
10           And no, those calls never came in.
11       BY MS. MAINIGI:
12       Q.   And registrants, were they confused
13  after receiving the letter -- receiving these
14  letters?
15           MS. SINGER:  Objection.  Vague.
16  Lack of foundation.
17           MR. BENNETT:  Objection.  Calls for
18  speculation.
19           MR. UTTER:  Same objection.
20           Go ahead.
21           THE WITNESS:  Again, I don't know.
22  That -- those calls would go into liaison and
23  policy or division -- or the division offices,
24  the DPMs or pharmaceutical regulatory
25  section.

Page 303

1            And I was not -- I'm not aware of
2   any calls that came in saying everybody's
3   confused.
4            BY MS. MAINIGI:
5        Q.   Taking a look at Exhibit 13, which
6   is your December 2007 letter, does that letter
7   elaborate on the suspicious orders terminology
8   in any way?
9            MR. BENNETT:  Objection.  Vague.
10           MR. UTTER:  Take your time.
11           THE WITNESS:  Well, in the last
12  paragraph it does.
13           BY MS. MAINIGI:
14       Q.   Last paragraph on the first page or
15  the second page?
16       A.   On the first page.
17       Q.   Okay.
18       A.   "These criteria are disjunctive and
19  are not all-inclusive.  For example, if an
20  order deviates substantially from a pattern --
21  a normal pattern, the size of the order does
22  not matter, and the order should be reported as
23  suspicious.  Likewise, a registrant need not
24  wait for a normal pattern to develop over time
25  before determining whether a particular order

Page 304

1   is suspicious.  The size of an order alone,
2   whether or not it deviates from a normal
3   pattern, is enough to trigger the registrant's
4   responsibility to report the order as
5   suspicious.  The determination of whether an
6   order is suspicious depends not only on the
7   ordering patterns or the particular customer
8   but also on the patterns of the registrant's
9   customer base and the patterns throughout the
10  relevant segment of the regulated industry."
11       Q.   To your knowledge, had this been
12  sent, this elaboration that is in the December
13  27, 2011 -- 2007 letter, had that been sent to
14  registrants before in writing?
15       A.   This was -- this letter was sent
16  December 27.  This is the elaboration that was
17  sent in December of 2000 -- of 2007.
18       Q.   And was there, to your knowledge, a
19  prior elaboration of this type that had been
20  provided to registrants?
21           Essentially was this the first time
22  that that elaboration was provided in writing?
23       A.   I don't believe there were any other
24  writings except for the two letters that were
25  sent before the February and the -- it was the

Page 305

```
1    September and the December letter.
2       Q.    And the September and the February
3    letters did not have this elaboration that you
4    just read, right?
5       A.    No.
6       Q.    Do you know what prompted you to
7    include it here in this December 2007 letter?
8          MR. BENNETT:  Objection.
9          MS. SINGER:  Objection.
10         MR. BENNETT:  Scope.
11         You're not authorized to disclose
12   the internal deliberative process.  You are
13   also not allowed to disclose information that
14   would reveal attorney-client privileged
15   communications with internal counsel's office.
16         To the extent that you can answer
17   the question without disclosing that, you may
18   answer.
19         THE WITNESS:  I can't answer the
20   question with those limitations.
21         BY MS. MAINIGI:
22      Q.    Now, the December 2007 letter
23   references excessive purchase reports, right?
24      A.    What -- where are you?
25      Q.    Well, for example, in the third
```

Page 306

```
1    paragraph on the first page.
2       A.    Yes.
3       Q.    And then again on the second page,
4    second paragraph.
5          Do you see that?
6       A.    You said the second paragraph,
7    second page?
8       Q.    Right.
9       A.    Yes.
10      Q.    Now, essentially you were telling
11   registrants in this letter no more excessive
12   purchase reports, right?
13      A.    No.
14         MR. BENNETT:  Objection.
15   Mischaracterizes the letter.  Misstates the
16   letter.
17         THE WITNESS:  We -- we never told
18   anybody not to send in excessive purchase
19   reports.  What we told them was, "The
20   regulation requires you to file suspicious
21   order reports."
22         And then an excessive purchase
23   report is -- is not found when the -- it's not
24   a -- a report that's timely.  It's a report
25   that's done at the end of the month or end of
```

Page 307

```
1    the week.
2          A suspicious order report is one
3    that is done when discovered.  It gives us an
4    opportunity to -- to act on it -- act on that
5    suspicious order fairly quickly.
6          And so all this letter said was,
7    "Look, you could do what you want with the
8    excessive purchases, and we'll gladly accept
9    them.  However, it's not a suspicious order
10   reported.  Land a suspicious order report is
11   what's controlled by the regulation."
12         BY MS. MAINIGI:
13      Q.    You had not made those statements
14   that you just described in your earlier
15   letters, your December 2006 and the February
16   2007 letters, correct?
17      A.    No.  Well, I -- we discussed
18   suspicious ordering -- suspicious order
19   monitoring and when the -- the suspicious
20   orders report were to be filled.  Yes, we did
21   discuss that.  We didn't discuss excessive
22   purchase reports.
23         MS. SINGER:  So we've been going
24   about another hour.  Perhaps we should take
25   another break.
```

Page 308

```
1          MS. MAINIGI:  How long have we been
2    going?
3          THE VIDEOGRAPHER:  I can tell you.
4    We started back at 3:13.  So we've been going
5    about 43 minutes.
6          MS. MAINIGI:  Okay.  I think it's
7    just 43 minutes, Linda.
8          BY MS. MAINIGI:
9       Q.    So with respect to the difference
10   between the first letter -- first set of
11   letters and the second letter, do you recall
12   there being confusion in the industry about the
13   excessive purchase reports?
14         MS. SINGER:  Objection.  Calls for
15   speculation.  Vague.  Foundation.
16         MR. UTTER:  Object to speculation.
17         Go ahead.
18         THE WITNESS:  I don't know exactly
19   about the confusion in the industry regarding
20   excessive purchase reports.  But an excessive
21   purchase report is not a required report under
22   the Code of Federal Regulations or the CSA.
23         And the reason we were sending the
24   letters and did the distributor initiative is
25   to make sure they understood what a suspicious
```

Page 309

```
1    order report is and when it's to be filed.
2              BY MS. MAINIGI:
3        Q.   Now, with respect to suspicious
4    order monitoring systems, your 2006 and 2007
5    letters confirmed that distributors are
6    responsible for coming up with their own
7    suspicious order monitoring systems, correct?
8        A.   It's in the regs.  That's exactly
9    how it's the written.
10       Q.   By the way, did you view your -- any
11   of your letters, your '06 or your '07 letters,
12   as guidance?
13             MS. SINGER:  Objection.  Calls for a
14   legal conclusion.
15             MR. BENNETT:  Objection.  Vague.
16             THE WITNESS:  I'm not sure where
17   you're go -- it -- guidance as to what?
18             BY MS. MAINIGI:
19       Q.   Well, are you familiar with the term
20   "guidance" in the context of the federal
21   government and agencies?
22             MS. SINGER:  Objection.  Vague.
23             MR. BENNETT:  Same objections.
24             THE WITNESS:  If -- if you're --
25   those letters were to reinforce what occurred
```

Page 310

```
1    in the distributor initiative briefings, to
2    reinforce the fact that people -- that entities
3    and registrants must file suspicious orders.
4    That's what those letters were for --
5              BY MS. MAINIGI:
6        Q.   What --
7        A.   -- and how to file them.
8        Q.   I'm sorry.  That wasn't my question.
9    You're -- you're a trained attorney,
10   correct?
11             MR. BENNETT:  Objection.
12   Argumentative.
13             BY MS. MAINIGI:
14       Q.   You're a trained attorney?
15       A.   I'm a trained attorney, yes.
16       Q.   Do you understand, having held a
17   high-level position at the DEA, in addition to
18   being a trained attorney, what the difference
19   is between a regulation and guidance?
20             MS. SINGER:  Objection.
21   Argumentative.  Calls for legal conclusion.
22   Outside the scope of this deposition.
23             MR. UTTER:  Go ahead.
24             THE WITNESS:  A regulation goes
25   through notice and comment.  A guidance is put
```

Page 311

```
1    out by the agency.
2              BY MS. MAINIGI:
3        Q.   And so guidance is not law; correct?
4              MS. SINGER:  Same objections.
5              THE WITNESS:  Well, it is when
6    you're talking about a -- a regulation that's
7    been on the books for 40 years where -- where a
8    value -- where what we're doing is reinforcing
9    that a regulation that's been on the books for
10   40 years needs to be followed and needs to be
11   followed in the manner that the regulation sets
12   up.
13             So all these letters did was say,
14   "This is the regulation.  This is the
15   requirement.  This is what is expected of you."
16             BY MS. MAINIGI:
17       Q.   Well, guidance is not the same as
18   repeating the regulation; guidance is perhaps
19   elaboration on what a regulation means,
20   correct?
21             MR. BENNETT:  Objection.
22             MS. SINGER:  Objection.  Counsel is
23   testifying.  Asking for a legal conclusion.
24             MR. BENNETT:  Objection.  Form.
25             MR. UTTER:  Go ahead.
```

Page 312

```
1              THE WITNESS:  I'm not sure -- I'm
2    not sure exactly -- could you ask -- ask that
3    question again.
4              BY MS. MAINIGI:
5        Q.   Sure.  I can just read back,
6    hopefully, what I said before the objections.
7              Guidance is not the same as the
8    regulation; guidance is an elaboration on what
9    the regulation means, correct?
10             MS. SINGER:  Same objection.
11             MR. BENNETT:  Same objection.
12             THE WITNESS:  I'm not sure if this
13   letter is guidance.  Although the letter was
14   sent out to provide the industry with a
15   reinforcement of what was told to them in the
16   initiative briefings, the distributor
17   initiative briefings.
18             BY MS. MAINIGI:
19       Q.   And by this --
20       A.   So I'm just not sure --
21             MR. BENNETT:  Oh.
22             MS. MAINIGI:  I'm sorry.
23             MR. BENNETT:  Please allow the
24   witness to finish his answer.
25             THE WITNESS:  So --
```

Page 313

1    BY MS. MAINIGI:
2        Q.    Are you done?
3        A.    So I'm just not sure.
4        Q.    Okay.  And by this letter, just for
5    clarity of the record, is it fair to say that
6    you don't know whether the September 2006,
7    February 2007 and December 2007 letters that
8    you wrote to the industry or to the registrants
9    are, in fact, guidance, correct?
10            MR. BENNETT:  Objection.  Misstates
11   testimony.  Objection.  Calls for legal
12   conclusion.
13            MR. UTTER:  Same objection.
14            Go ahead.
15            THE WITNESS:  I guess it would be
16   considered some form of guidance to ensure that
17   they understand what their obligations are
18   under C.F.R.
19            BY MS. MAINIGI:
20       Q.    So you do think they're guidance.
21       A.    They're a --
22            MS. SINGER:  Objection.
23            THE WITNESS:  -- form of guidance.
24            MS. SINGER:  Misstates the witness's
25   prior testimony.

Page 314

1    BY MS. MAINIGI:
2        Q.    Are they guidance in the way that I
3    originally posed the question to you, meaning
4    you are familiar with the concept of federal
5    agencies issuing guidance?
6            MS. SINGER:  Objection.  Compound
7    question.
8            MR. BENNETT:  Objection.  Vague.
9            MS. SINGER:  Calls for a legal
10   conclusion.
11            THE WITNESS:  Are you talking about
12   notice and comment?
13            BY MS. MAINIGI:
14       Q.    Does guidance go through notice and
15   comment?
16       A.    Rulemaking regulations go through
17   notice and comment.
18       Q.    Guidance doesn't go through notice
19   and comment, right?
20       A.    No.
21       Q.    And, in fact, was it around this
22   time that President Bush issued an executive
23   order that essentially stated that guidance is
24   not the same as law?
25            MS. SINGER:  Objection.  Foundation.

Page 315

1    Calls for a legal conclusion.  Scope.
2            MR. BENNETT:  I join those
3    objections.
4            MR. UTTER:  Same objections.
5            Go ahead.
6            THE WITNESS:  I don't know about
7    that particular -- I don't know about what
8    President Bush put out, but I can tell you that
9    there is nothing in these documents that
10   changes what the regulation and the statute
11   said, so if there is nothing in the document
12   that changes what the regulation and the
13   statute is, then, you know, it's just a letter
14   informing the registrant community of what
15   their obligations are.
16            BY MS. MAINIGI:
17       Q.    With respect to coming back to
18   suspicious order monitoring systems, it was the
19   obligation of the registrant to essentially
20   come up with their own suspicious order
21   monitoring system, correct?
22       A.    Yes, to design and operate the
23   system.
24       Q.    And there was not any sort of
25   guidance or checklist that were provided by DEA

Page 316

1    to registrants as to what was required to be in
2    a suspicious order monitoring system, correct?
3            MS. SINGER:  Objection.  Vague.
4            THE WITNESS:  The regulation stands
5    on its own.  I believe the regulation says, the
6    registrant shall design and operate a system
7    that identifies and reports suspicious orders.
8            Again, it's a business decision
9    based on what the registrant's needs are and
10   the Drug Enforcement Administration does not
11   tell a registrant what that specific system
12   should look like.
13            MR. BENNETT:  Counsel, we -- it is
14   after 4:00 and I know we are planning on ending
15   right around 5.  Would this be an appropriate
16   time to take our last break for the day?
17            MS. MAINIGI:  Sure.  We can take a
18   break.
19            THE VIDEOGRAPHER:  We are going off
20   the record.  This is the end of Media Unit No.
21   6.  The time is 4:05.
22            (A short recess was taken.)
23            THE VIDEOGRAPHER:  We are going back
24   on the record.  This is the start of Media Unit
25   No. 7.  The time is 4:18.

Page 317

1    You may proceed, Counsel.
2        BY MS. MAINIGI:
3    Q.   Mr. Rannazzisi, I am just looking
4  for a yes or no on the following question:
5  Does DEA have internal guidance as to what is a
6  suspicious order?
7        MR. BENNETT:  Objection.  Scope.
8        You can answer the question yes or
9  no only.
10       THE WITNESS:  No.
11       BY MS. MAINIGI:
12   Q.   And for clarity, let me focus you on
13  time periods with that same question.
14       Let's say from the 2005 through the
15  time you left DEA in 2016, that is the time
16  period, in that time period of 2005 to 2016,
17  yes or no, did DEA have internal guidance as to
18  what constitutes a suspicious order?
19       MR. BENNETT:  Objection.  Scope.
20       You can answer that question yes or
21  no only.
22       THE WITNESS:  No.
23       BY MS. MAINIGI:
24   Q.   In the time period 2005 to 2016, yes
25  or no, did DEA have internal guidance as to

Page 318

1  what constituted a suspicious order monitoring
2  system that complied with regulations?
3        MR. BENNETT:  Objection.  Scope.
4        You can answer that question yes or
5  no only.
6        THE WITNESS:  I don't know about
7  2016, but for 2005 to 2015, no.
8        BY MS. MAINIGI:
9    Q.   DEA expected registrants to update
10  their suspicious order monitoring systems to
11  adopt to changing environments, correct?
12       MR. BENNETT:  Objection.  Scope.
13  Objection.  Vague.
14       MR. UTTER:  Go ahead.
15       THE WITNESS:  DEA expected the
16  registrant, the distributor registrants and the
17  manufacturing registrants to design and operate
18  a system that will identify and report
19  suspicious orders.
20       BY MS. MAINIGI:
21   Q.   And did DEA expect that a registrant
22  would update their suspicious order monitoring
23  system to adopt to a changing environment?
24       MS. SINGER:  Objection.  Vague.
25       MR. BENNETT:  Objection.  Vague.

Page 319

1  Objection.  Scope.
2        MR. UTTER:  Objection.  Asked and
3  answered.
4        You can answer again.
5        THE WITNESS:  Again, the answer is
6  that we expect them to design and operate a
7  system that identifies suspicious orders.
8        BY MS. MAINIGI:
9    Q.   Would a system that identifies
10  suspicious orders in 2002, in your mind, be an
11  acceptable system in 2010?
12       MS. SINGER:  Objection.  Calls for
13  speculation.
14       MR. BENNETT:  Objection.  Calls for
15  speculation.  Incomplete hypothetical and
16  scope.
17       MR. UTTER:  Go ahead.
18       THE WITNESS:  I don't know because I
19  didn't -- I have never reviewed a 2002
20  suspicious order monitoring system in 2002 or
21  2015.  I mean, I don't know.  I expect that
22  they will design and operate a system that
23  reports, identifies and reports suspicious
24  orders.
25       BY MS. MAINIGI:

Page 320

1    Q.   So you, yourself, have never even
2  inspected a suspicious order monitoring system,
3  fair?
4        MR. BENNETT:  Objection.  Misstates
5  testimony.  Objection.  Scope.
6        THE WITNESS:  I have never gone on
7  site and reviewed a suspicious order monitoring
8  system, no.
9        BY MS. MAINIGI:
10   Q.   Have you ever viewed one on paper?
11       MR. SMITH:  Objection.  Scope.
12       THE WITNESS:  I may have looked
13  years ago at the framework of a suspicious
14  order monitoring system on paper.
15       BY MS. MAINIGI:
16   Q.   Do you have an understanding of what
17  would separate an acceptable compliance
18  suspicious order monitoring system from one
19  that was not compliant with regulations?
20       MS. SINGER:  Objection.  Vague.
21  Foundation.  Scope.
22       MR. BENNETT:  Join the scope
23  objection.
24       MR. UTTER:  Go ahead.
25       THE WITNESS:  Again, the suspicious

Page 321

```
1    order monitoring system has to -- is designed
2    by the distributor -- the registrant, and
3    because it's designed by the registrant, you
4    know, it's their system to design.  So I -- you
5    know, again, I'm not sure -- it's their system
6    to design under the regs.
7              BY MS. MAINIGI:
8        Q.   So how does a registrant know that
9    their system is enough that its compliant with
10   the regulations?
11             MS. SINGER:  Objection.  Calls for
12   speculation.
13             MR. BENNETT:  Objection.  Scope.
14             THE WITNESS:  Because the regs tell
15   them that they must design and operate a system
16   that identifies suspicious orders and they have
17   to report.  How they create that system is a
18   business decision and as long as it identifies
19   and reports suspicious orders, then -- and they
20   are comfortable with that system, then they
21   have a system.
22             BY MS. MAINIGI:
23       Q.    So there is more than one way to
24   design a compliant suspicious order monitoring
25   system?
```

Page 322

```
1              MR. BENNETT:  Objection.  Scope.
2              MR. UTTER:  Asked and answered for
3    the third time.
4              Go ahead.
5              THE WITNESS:  I don't -- I don't
6    know what the different ways of creating a
7    system is.  Again, I can only go by what the
8    regulation says and it is up to the registrant
9    to design and operate a system.
10             BY MS. MAINIGI:
11       Q.   Was there any single feature that
12   made a system compliant?
13       A.   Yes, that they identify suspicious
14   orders or unusual size, frequency or deviating
15   substantially from a normal ordering pattern.
16       Q.   Could two companies have different
17   suspicious order monitoring systems and they
18   were both compliant?
19             MS. SINGER:  Objection.  Calls for
20   the witness to speculate.
21             MR. BENNETT:  Objection.  Scope.
22             THE WITNESS:  Again, I don't -- I
23   don't know.  It's up to them to decide what
24   their systems are and without seeing or knowing
25   about -- knowing about each individual system,
```

Page 323

```
1    I don't know.  I mean, one system could be --
2    could be identifying suspicious orders and
3    another might not identify suspicious orders
4    appropriately.
5              BY MS. MAINIGI:
6        Q.   Well, what would you be looking for
7    between those two systems, Mr. Rannazzisi?
8        A.    What the reg says.  They have to
9    identify suspicious orders.
10       Q.   So if both systems are identifying
11   suspicious orders, companies are reporting
12   suspicious orders, is it possible that two
13   companies that have employed two different
14   systems for suspicious order monitoring could
15   both be compliant?
16             MS. SINGER:  Objection.  Calls for
17   speculation.  The question has been asked and
18   answered.
19             MR. BENNETT:  Objection.  Scope.
20             May I have a continuing objection to
21   -- based on scope to all your questions about
22   suspicious order monitoring systems so I don't
23   have to keep objecting?
24             MS. MAINIGI:  No.
25             MR. BENNETT:  Objection.
```

Page 324

```
1              MR. UTTER:  Object to speculation.
2              Go ahead.
3              THE WITNESS:  Again, without seeing
4    the systems, is it possible, I'm sure anything
5    is possible, but in the end, it falls back to
6    whether the system can identify -- is designed
7    to identify and report suspicious orders.
8              BY MS. MAINIGI:
9        Q.   Well, without naming any company
10   names, Mr. Rannazzisi, as head of diversion
11   control for so many years, were you somehow
12   under the impression that every company had an
13   identical suspicious order monitoring system?
14             MS. SINGER:  Objection.  Foundation.
15   Vague.  Scope.
16             MR. BENNETT:  I'll join the scope
17   objection and also objection.  Argumentative.
18             MR. UTTER:  Go ahead.
19             THE WITNESS:  I never really thought
20   about it.  I just knew that they were supposed
21   to design and operate a system that identifies
22   suspicious orders.  I knew what a suspicious
23   order was by definition, and I expected that
24   they would be the ones to create that system.
25             BY MS. MAINIGI:
```

Page 325

```
 1        Q.    So it's likely then, while you were
 2   head of diversion control, that there were
 3   companies operating in compliance that had
 4   different suspicious order monitoring systems,
 5   right?
 6             MS. SINGER:  Objection.  Calls for
 7   speculation beyond this witness's experience.
 8             MR. BENNETT:  Objection.  Scope.
 9             MR. UTTER:  Objection to whether
10   they were in compliance.
11             But go ahead, you can answer.
12             THE WITNESS:  Could you repeat that
13   one question, please.
14             BY MS. MAINIGI:
15        Q.    Sure.  So it's likely then, while
16   you were head of diversion control, that there
17   were companies operating in compliance that had
18   different suspicious order monitoring systems,
19   correct?
20             MS. SINGER:  Same objections.
21             MR. UTTER:  Same objection.
22             Go ahead.
23             THE WITNESS:  In compliance with
24   what?  In compliance with the suspicious order
25   monitoring reg?
```

Page 326

```
 1             BY MS. MAINIGI:
 2        Q.    Yes.
 3        A.    I don't know.  Because -- just
 4   because you have a system doesn't mean you are
 5   following your protocols in your system.  You
 6   might have the greatest system in the world but
 7   if you are not following your own protocols, if
 8   you are not looking at each individual order
 9   that the system kicks out, doing due diligence,
10   maintaining effective controls against
11   diversion, then the system is worthless because
12   you are not following the protocols that you
13   established, so I can't say that.
14        Q.    So following the protocols that you
15   established, is that some sort of guidance that
16   DEA put out to companies?
17             MS. SINGER:  Objection.  Vague.
18             MR. BENNETT:  Objection.  Vague.
19   Objection.  Scope.
20             THE WITNESS:  It would be -- it
21   would be common sense for a company to
22   establish protocols and then follow their own
23   protocols within their suspicious order
24   monitoring system.
25             BY MS. MAINIGI:
```

Page 327

```
 1        Q.    Does the regulations say to do that?
 2        A.    I don't think the regulation needs
 3   to say that.  That is common sense in your
 4   organization.  Why have protocols if you are
 5   not following them.
 6        Q.    So sitting here today, Mr.
 7   Rannazzisi, you can't tell me what the various
 8   components would be of a successful compliant
 9   suspicious order monitoring system?
10             MS. SINGER:  Objection.  Misstates
11   the witness's testimony.  Asked and answered.
12   Scope.
13             MR. BENNETT:  Objection.  Scope.
14             MR. UTTER:  Asked and answered for
15   about the fourth time.
16             You can go ahead, Mr. Rannazzisi.
17             THE WITNESS:  A system that
18   identifies a suspicious order.  So the company
19   would have to design and operate a system that
20   identifies a suspicious order which is defined
21   as an order of unusual size, frequency, or
22   substantially deviating from normal ordering
23   patent, a regulation that has been in place for
24   over 40 years.
25             BY MS. MAINIGI:
```

Page 328

```
 1        Q.    Anything else that would be a key
 2   component of a suspicious order monitoring
 3   system?
 4        A.    Yes.  That the --
 5             MR. BENNETT:  Objection.  Vague.
 6   Objection.  Scope.
 7             MR. UTTER:  Go ahead.
 8             THE WITNESS:  That the order is
 9   reported when discovered.
10             BY MS. MAINIGI:
11        Q.    Anything else?
12             MR. BENNETT:  Same objection.
13             MS. SINGER:  Objection.  Vague.
14             THE WITNESS:  Off the top of my head
15   right now, I can't think of anything else.
16             BY MS. MAINIGI:
17        Q.    Okay.  Do you recall a time where
18   the distributor trade association came to you
19   and your colleagues seeking additional guidance
20   on reporting suspicious orders and suspicious
21   order monitoring systems?
22             MS. SINGER:  Objection.  Vague.
23   Lack of foundation.
24             THE WITNESS:  Do you have a time
25   period?
```

Page 329

```
 1        BY MS. MAINIGI:
 2     Q.   Say, approximately 2010, '11,
 3   thereabouts.
 4        MR. UTTER:  Go ahead.
 5        THE WITNESS:  Yes.  There was a
 6   meeting.  I was not present but my staff was
 7   present with counsel.
 8        BY MS. MAINIGI:
 9     Q.   And do you recall that the purpose
10   of the meeting was in part to see if DEA would
11   provide any additional guidance on either
12   identification of suspicious orders or what a
13   compliant suspicious order monitoring system
14   would look like?
15        MS. SINGER:  Objection to form.
16   Vague.  Outside the witness's scope and
17   capacity.
18        MR. BENNETT:  Objection.
19   Foundation.
20        MR. UTTER:  Objection.  Speculation.
21   Go ahead.
22        THE WITNESS:  I was not at the
23   meeting so I really can't tell you, but I seem
24   to remember that after that meeting, counsel
25   and some of the people that worked for me came
```

Page 330

```
 1   back and they explained that --
 2        MR. BENNETT:  I'm going to
 3   appropriate and indicate you are not authorized
 4   to disclose things that you discussed with
 5   general counsel or that general counsel advised
 6   you of.
 7        To the extent that you can continue
 8   your answer without disclosing attorney-client
 9   privileged communications, you may continue
10   your answer.
11        THE WITNESS:  I'm sorry.  I can't.
12   I can't.
13        BY MS. MAINIGI:
14     Q.   Let me ask it this way:  To your
15   knowledge, did DEA ever answer HDMA's questions
16   regarding guidance on the definition of a
17   suspicious order?
18        MS. SINGER:  Objection.  Vague and
19   foundation.
20        MR. BENNETT:  Objection.
21   Foundation.
22        MR. UTTER:  Go ahead.
23        THE WITNESS:  I'm not sure if there
24   was a formal request, and I don't know if there
25   was a formal response for a suspicious order.
```

Page 331

```
 1        BY MS. MAINIGI:
 2     Q.   I'm sorry.  Is it fair to say that
 3   DEA, in fact, did not provide HDMA in the 2010,
 4   2011 time period with any additional guidance
 5   on identification of a suspicious order?
 6        MS. SINGER:  Objection.  Asked and
 7   answered.
 8        MR. BENNETT:  Objection.  Misstates
 9   prior testimony.
10        MR. UTTER:  Object to speculation.
11        Go ahead.
12        THE WITNESS:  I don't know.
13        BY MS. MAINIGI:
14     Q.   Sitting here today, do you recall
15   any that was affirmatively provided?
16     A.   I don't.  I just don't recall.
17     Q.   Do you recall any guidance provided
18   to HDMA about a -- what would make up a
19   compliant suspicious order monitoring system in
20   that same time period?
21        MS. SINGER:  Objection.  Scope.
22        MR. UTTER:  Go ahead.
23        THE WITNESS:  I don't recall,
24   generally, HDMA is not a registrant.  Those
25   questions would generally come from the
```

Page 332

```
 1   registrants and the registrants would be
 2   answered.  HDMA is an adequacy group, a
 3   lobbying group for the distributors.
 4        BY MS. MAINIGI:
 5     Q.   It's made up of registrants, right?
 6     A.   Yes.
 7     Q.   Are you saying that if a registrant
 8   had a question about the definition of a
 9   suspicious order or what would make up a
10   compliant suspicious order monitoring system,
11   that those questions would have been answered
12   in this time period?
13        MS. SINGER:  Objection.  Calls for
14   speculation.  Hypothetical.
15        MR. UTTER:  Objection.  Asked and
16   answered.
17        Go ahead.
18        THE WITNESS:  What I am saying is
19   that I don't know if HDMA was answered.  I am
20   sure that when a distributor or a manufacturer
21   or a pharmacy or a physician calls in with
22   questions, their questions would be handled and
23   answered.
24        BY MS. MAINIGI:
25     Q.   Now, during your tenure, it was
```

Page 333

1    DEA's policy not to approve or endorse a
2    particular registrant's suspicious order
3    monitoring system, correct?
4            MS. SINGER:  Objection.  Scope.
5            MR. UTTER:  You can answer.
6            THE WITNESS:  Based on consultation
7    with components within DEA and counsel's
8    office, yes, that's correct.  We did not.
9            BY MS. MAINIGI:
10       Q.   So if a registrant called and said,
11   here is the five components of my suspicious
12   order monitoring system, does that meet your
13   guidelines, you wouldn't answer that question,
14   right?
15           MS. SINGER:  Objection.  Calls for
16   speculation.
17           MR. UTTER:  Object to the form of
18   the question.  There are no guidelines.
19           Go ahead.
20           THE WITNESS:  I -- that was
21   something we would -- we would ask other
22   components to -- including counsel's office, to
23   look at.
24           BY MS. MAINIGI:
25       Q.   And your counsel is right, there

Page 334

1    were no guidelines, right?
2            MS. SINGER:  Objection.
3            THE WITNESS:  I'm not sure.
4            BY MS. MAINIGI:
5        Q.   There were not any guidelines on
6    what made up a successful compliant suspicious
7    order monitoring system, correct?
8            MR. BENNETT:  Objection.  Vague.
9            THE WITNESS:  There didn't need to
10   be guidelines because that was the whole idea
11   behind the regulation, to operate, design and
12   operate a system to identify and report
13   suspicious orders.
14           BY MS. MAINIGI:
15       Q.   Now, that regulation came into place
16   in 1971, right?
17       A.   40-plus years, yes.
18       Q.   Were there opioids in 1971?
19           MR. BENNETT:  Objection.  Scope.
20   Lack of foundation.
21           You can answer.
22           MR. UTTER:  Go ahead.
23           THE WITNESS:  If you're defining
24   opioids as the semisynthetic or synthetic
25   versions, yes, there were opioids.

Page 335

1            BY MS. MAINIGI:
2        Q.   There were opioids in 1971?
3        A.   Yes.
4        Q.   What were they?
5            MR. BENNETT:  Objection.  Scope.
6            THE WITNESS:  Codeine, morphine,
7    hydromorphone, Hydrocodone, but not in the
8    tablet form, opium, Methadone, quite a few.
9            BY MS. MAINIGI:
10       Q.   So no need for additional guidelines
11   because the regulation and the wording of the
12   regulation stood the test of time, right?
13           MS. SINGER:  Objection.  Asked and
14   answered.  Argumentative.
15           MR. BENNETT:  Objection.
16   Argumentative.  Objection.  Scope.
17           MR. UTTER:  Go ahead.
18           THE WITNESS:  Again, the regulation
19   is the regulation.  That's what we followed,
20   yes.
21           BY MS. MAINIGI:
22       Q.   Was there a point in time either
23   before -- right before your departure or right
24   after your departure, that you understood that
25   there was a movement within DEA to amend the

Page 336

1    regulations to provide greater specificity?
2            MS. SINGER:  Objection.  Lack of
3    foundation.
4            BY MS. MAINIGI:
5        Q.   Yes or no.
6            MR. BENNETT:  Objection.  Scope.
7            You are not authorized to disclose
8    any information that would reveal the internal
9    deliberative process within DEA, information
10   that would reveal nonpublic recommendations you
11   made or you're aware of concerning any proposed
12   agency action.
13           To the extent that you are aware of
14   any public recommendations concerning any
15   proposed agency action, you may answer.  To the
16   extent if there is any nonpublic, you may not
17   answer.
18           MR. UTTER:  Go ahead.
19           THE WITNESS:  I -- no.
20           BY MS. MAINIGI:
21       Q.   No, what?
22       A.   You asked me if I knew of any
23   movement within DEA to change the suspicious
24   order monitoring regulation and the answer is
25   no.

Page 337

```
1        Q.    Okay.  Now, in one of your prior
2   answers, you referenced other components
3   including counsel's office.
4             Without detailing for me or telling
5   me at all about any conversations that involved
6   counsel's office, did you mean by that that if
7   someone asked, is my suspicious order
8   monitoring system compliant, that you would
9   refer them to counsel's office for an answer?
10            MS. SINGER:  Objection.  Calls for
11  speculation.
12            MR. BENNETT:  Objection.  Misstates
13  testimony.
14            MR. UTTER:  Go ahead.
15            THE WITNESS:  Counsel's office was
16  always consulted on matters of suspicious
17  orders and other matters like that.  But again,
18  when I am talking about other components, you
19  have an investigative team and pharmaceutical
20  investigations.  You have an investigative
21  regulatory team and regulatory investigations.
22  You have liaison and policy, counsel's office,
23  and the executives that worked in the front
24  office, so all of them generally had some type
25  of input.
```

Page 338

```
1             BY MS. MAINIGI:
2        Q.    I don't think that answered my
3   question.
4             Yes or no, did -- to your knowledge,
5   did counsel's office or any other components of
6   DEA approve suspicious order monitoring
7   systems?
8        A.    Nobody approves suspicious order
9   monitoring systems.  I think the letters were
10  perfectly -- were very clear in the letters
11  that DEA does not approve a suspicious order
12  monitoring system.
13       Q.    Could one call the counsel's office
14  and get some sort of indication that particular
15  components of a suspicious order monitoring
16  system were compliant with regulations or not
17  compliant with regulations?
18            MS. SINGER:  Objection.
19            MR. BENNETT:  Objection.  Vague.
20            To the extent that the question
21  calls for circumstances where DEA executives
22  and officials would seek advice of counsel,
23  you're instructed you're not authorized to
24  answer.
25            To the extent the question calls for
```

Page 339

```
1   third parties outside of DEA to call counsel's
2   office, you may answer.
3             MS. SINGER:  Again, speculate --
4   calls for speculation.
5             MR. UTTER:  Go ahead.
6             THE WITNESS:  So the question is
7   whether outside individuals could call
8   counsel's office?
9             BY MS. MAINIGI:
10       Q.    Or any other component or department
11  of DEA and get advice as to particular
12  components of their suspicious order monitoring
13  system.
14            MR. BENNETT:  Objection.  Scope.
15            Not authorized to disclose any
16  attorney-client privileged communications.
17            To the extent that you can answer
18  without disclosing attorney-client privileged
19  communications, you may answer that question.
20            THE WITNESS:  Again, there's --
21  there's at least two components besides --
22  besides counsel's office that could answer
23  questions related to suspicious order
24  monitoring:  liaison policy and regulatory
25  investigations.
```

Page 340

```
1             BY MS. MAINIGI:
2        Q.    To your knowledge, did any of those
3   departments keep track of the questions that
4   they were asked?
5             MS. SINGER:  Objection.  Scope.
6             THE WITNESS:  I'm not sure.
7             BY MS. MAINIGI:
8        Q.    To your knowledge, did any of those
9   departments have internal guidance on what they
10  could or could not say as to suspicious order
11  monitoring systems?
12       A.    The guidance is the regulations.  We
13  don't vary far from the regulations.
14       Q.    After the December 27, 2007 letter,
15  which went to all registrants, did you send any
16  more letters to registrants related to
17  suspicious orders or suspicious order
18  monitoring systems?
19            MR. BENNETT:  Objection.  Vague.
20  Compound.
21            MR. UTTER:  Go ahead.
22            THE WITNESS:  I don't believe any
23  letters went out after that.
24            BY MS. MAINIGI:
25       Q.    Was there any communication with the
```

Page 341

```
1   industry, whether it's distributors,
2   manufacturers or pharmacies, in 2008, for
3   example, as to what the DEA was looking for
4   when it came to suspicious order monitoring and
5   reporting?
6            MS. SINGER:  Objection.  Vague.
7            MR. UTTER:  You can answer again.
8            THE WITNESS:  There were conferences
9   where we explained suspicious order monitoring.
10  There were conferences where we explained what
11  effective controls against diversion was.  And
12  those conferences were attended by
13  manufacturers and distributors.
14           I think there were -- they -- they
15  happened every couple of years, every two years
16  or so.
17           BY MS. MAINIGI:
18       Q.   Do you recall when those conferences
19  took place, meaning specific years?
20       A.   No.  But I'm sure that, if they
21  haven't taken it down, it's on the DEA web
22  site.
23       Q.   And you said there would be
24  explanations of what constituted a suspicious
25  order at these conferences?
```

Page 342

```
1        A.   They discussed suspicious order
2   monitoring.
3        Q.   And did anyone from DEA memorialize
4   what DEA said as to what was a suspicious
5   order?
6        A.   I don't know.
7        Q.   Did anyone from DEA at these
8   conferences memorialize what was said as to
9   what constituted a suspicious order monitoring
10  system?
11       A.   I don't know.  I wasn't at those
12  conferences.  So I didn't see the
13  presentations.
14       Q.   Who presented at these conferences
15  from DEA?
16       A.   The same components that were
17  discussed:  regulatory investigations,
18  E-commerce, liaison and policy, pharmaceutical
19  investigations.
20       Q.   Do you recall ever seeing any report
21  of what they might have said at these
22  conferences, those departments?
23       A.   I don't recall.
24           Counsel's office presented, too, if
25  I'm not mistaken.
```

Page 343

```
1        Q.   How do you know that they were told,
2   for example, "Here's what a suspicious order
3   looks like"?
4            MS. SINGER:  Objection.  Misstates
5   the witness's testimony.
6            MR. UTTER:  Same objection.
7            MR. BENNETT:  Same objection.
8            THE WITNESS:  They discussed
9   suspicious order monitoring.  I don't know if
10  they discussed this is what it looks like.  I
11  can assume that that's what they discussed.
12           BY MS. MAINIGI:
13       Q.   Now, were you aware of a
14  pharmaceutical industry conference in 2007?
15       A.   They -- I believe they did have one
16  in 2007, yes.
17       Q.   And that conference would have
18  addressed multiple segments of the industry,
19  right?
20       A.   I believe it was distributors and
21  manufacturers.
22       Q.   Okay.  And you already said you
23  didn't attend that conference personally.
24  Okay.
25           Now --
```

Page 344

```
1            MR. BENNETT:  Objection.
2            BY MS. MAINIGI:
3        Q.   -- according to the DEA web site --
4            MR. BENNETT:  Objection.  I don't
5   think he answered your question.
6            THE WITNESS:  That conference I did
7   not attend.
8            MS. MAINIGI:  Okay.  Thank you.
9   Thank you, Mr. Bennett.
10           BY MS. MAINIGI:
11       Q.   According to the DEA web site, I'll
12  represent to you that web site says that there
13  was a pharmaceutical industry conference in
14  2009.
15           Do you recall that conference?
16           MS. SINGER:  Objection to
17  testifying.
18           MR. UTTER:  If you know, go ahead.
19           THE WITNESS:  I -- I just -- I don't
20  recall that -- I don't recall what conferences
21  occurred during those years.  I just know that
22  we've had these conferences.  I know they were
23  scheduled.  But I -- I -- I don't recall if
24  there was a pharmaceutical industry conference
25  at that point in time, no.
```

Page 345

```
1           BY MS. MAINIGI:
2      Q.   Were you aware of the fact that
3  there was not a distributor-specific conference
4  between 2007 and 2013?
5           MS. SINGER:  Objection.  Foundation.
6           MR. BENNETT:  Same objection.
7           MR. UTTER:  Same objection.
8           Go ahead.
9           THE WITNESS:  We wouldn't do a
10  distributor-specific conference.  Because
11  manufacturers also have coincident activities
12  as a distributor, we would always invite them.
13           BY MS. MAINIGI:
14      Q.   Are you saying that the 2013
15  distributor conference was not, in fact, just
16  for distributors?
17      A.   I'm saying that, between the time
18  period we -- you just talked about, we mixed
19  the distributors.
20           Now, I'm sure that that distributor
21  conference had manufacturers as well.  Because,
22  again, a manufacturer has a coincidental
23  activity of distribution.  And because of that,
24  they are held to the same standards.  So they
25  probably -- I'm almost 99 percent that they
```

Page 346

```
1  were there as well.
2      Q.   Were you aware of the fact that
3  there's no conference for distributors or
4  manufacturers between 2009 and 2013?
5           MS. SINGER:  Objection.  Asked and
6  answered.  Lack of foundation.
7           MR. UTTER:  Same objection.
8           MR. BENNETT:  Objection.  Vague.
9           THE WITNESS:  I -- I just don't
10  know.  We had conferences during that time
11  period.  I just don't know what the title of
12  those conference are or who the attendees were.
13           But I'm pretty sure that we didn't
14  go that long a period of time without having
15  some kind of conference that involved
16  distributors.
17           BY MS. MAINIGI:
18      Q.   Well, if the web site doesn't really
19  reflect any conference between 2009 and 2013,
20  do you think the web site is wrong?
21           MS. SINGER:  Objection.  Foundation.
22           THE WITNESS:  I don't know.
23           MS. SINGER:  Argumentative.
24           MR. BENNETT:  Same objection.  Also
25  scope.
```

Page 347

```
1           MR. UTTER:  Same objection.
2           Go ahead.
3           THE WITNESS:  I -- I don't know.
4           BY MS. MAINIGI:
5      Q.   Do you recall a 2015 GAO report
6  relating to DEA's communications with
7  registrants?
8      A.   Yes.
9      Q.   And do you recall one of GAO's
10  recommendations was that DEA needed to provide
11  greater guidance to registrants regarding its
12  regulations?
13           MS. SINGER:  Objection.  Form.
14           MR. BENNETT:  Objection.  Scope.
15           THE WITNESS:  I recall that GAO
16  did -- did an audit of DEA, and they made
17  recommendations, yes.
18           BY MS. MAINIGI:
19      Q.   And do you recall that particular
20  type of recommendation, that DEA ought to
21  provide guidance regarding the Controlled
22  Substances Act and its regulations to
23  registrants?
24           MS. SINGER:  Objection.  Foundation.
25           MR. BENNETT:  Objection.  Scope.
```

Page 348

```
1           MR. UTTER:  Same objection.
2           Go ahead.
3           THE WITNESS:  That -- it might have
4  been.  I don't have the report.  So I -- I mean
5  I -- it's been a few years since I read that
6  report.
7           BY MS. MAINIGI:
8      Q.   Well, did you dis -- do you remember
9  disagreeing with that recommendation?
10      A.   Well --
11           MR. UTTER:  Well --
12           MS. SINGER:  Objection.
13  Argumentative.
14           MR. BENNETT:  Objection.  Scope.
15           To the extent this would require you
16  to reveal any nonpublic recommendations you
17  made or you're aware of or internal
18  deliberative process of the DEA, you're not
19  authorized to disclose that.
20           To the extent that there were public
21  comments regarding the GAO report that you
22  issued, you may testify regarding your personal
23  recollection of such comments.
24           MR. UTTER:  Objection.
25           Going ahead.
```

Page 349

1       MS. SINGER:  Objection.  Foundation.
2       THE WITNESS:  That report had some
3   serious flaws in it.  The report was based on
4   surveys done by manufacturers and distributors
5   who had just come off of investigations
6   conducted by DEA.
7       And all of them -- the complaints,
8   if I remember correctly, were, "DEA was not
9   communicating with us."
10      Even though DEA sat down with them
11  in distributor initiative, even though we sent
12  the letters, even though we had inspectors in
13  their facilities doing their jobs.  But GAO
14  still felt, based on a survey done by -- in the
15  industry, that we were not adequately
16  communicating with them.
17      I remember that.  And I remember we
18  did have responses to each of the GAO
19  recommendations.  But I don't have them here,
20  and I...
21      BY MS. MAINIGI:
22      Q.   Well, maybe -- maybe we'll look at
23  it next time.
24      But -- so you didn't agree with
25  GAO's recommendation that DEA ought to provide

Page 350

1   guidance regarding its regulations to
2   registrants?
3       MS. SINGER:  Objection.  Asked and
4   answered.  Misstates the witness's testimony.
5       MR. BENNETT:  And objection.  Scope.
6       Same instructions regarding the
7   scope of your authorization on what you can and
8   cannot testify about.
9       MR. UTTER:  Go ahead.
10      THE WITNESS:  I'm -- I'm sorry.  You
11  got to repeat the question.
12      BY MS. MAINIGI:
13      Q.   Sure.
14      Did you -- it sounds like -- but
15  tell me if I'm wrong.
16      It sound like you disagreed with the
17  GEAO [sic] recommendation that DEA needed to
18  provide greater guidance to its registrants.
19      MS. SINGER:  Objection.  Foundation.
20      MR. BENNETT:  Same instructions.
21      MR. UTTER:  Go ahead.
22      THE WITNESS:  Like I said, I don't
23  have the report handy.  But it seems to me we
24  outlined all of the -- all of the communication
25  we had with the industry.  We outlined all of

Page 351

1   the avenues that industry could get answers to
2   their questions.  We outlined all of the
3   inspections that were conducted for industry in
4   their manufacturing and distribution sites.
5       We did all of that.  And I -- if I
6   remember correctly, GAO had no specific
7   recommendations other than we should
8   communicate or provide guidance on the regs and
9   the statute.
10      BY MS. MAINIGI:
11      Q.   To your knowledge, did that happen?
12      A.   If I'm not mistaken, I -- I retired
13  before a response was done on that.
14      Q.   Now, do you remember testifying -- I
15  think you were asked about it earlier.
16      Do you remember testifying before
17  the Court in Cleveland in this particular
18  matter in January of last year?
19      A.   Yes.
20      Q.   And I think you testified earlier
21  that you were retained by Motley Rice to come
22  testify there?
23      A.   Yes.
24      Q.   And I think you went over with the
25  Court what was a suspicious orders and what was

Page 352

1   a suspicious pattern.
2       Do you remember that?
3       A.   No.  I don't remember that.
4       Q.   You don't remember that?
5       Do you remember telling the Court
6   that there had been ten years of guidance
7   provided by DEA related to what a suspicious
8   order was?
9       MR. BENNETT:  Object to form.
10      MS. SINGER:  Objection.  Foundation.
11      THE WITNESS:  I -- I don't have any
12  document.  I'd like to see what was said.
13      Do you have --
14      BY MS. MAINIGI:
15      Q.   Do you --
16      A.   -- have a document that shows what I
17  exactly said?
18      Q.   Well, to the extent -- let me ask
19  you this:  Are you aware of ten years of
20  guidance being provide by the DEA to
21  registrants regarding what a suspicious order
22  is?
23      MS. SINGER:  Objection.  Asked and
24  answered repeatedly.
25      MR. BENNETT:  Objection.  Vague.

Page 353

1      MR. UTTER:  Same objection.  Asked
2  and answered.
3          You can tell her again.
4          THE WITNESS:  The -- the guidance
5  has always been the same over the last ten
6  years.
7          BY MS. MAINIGI:
8      Q.   The regulation?
9      A.   The regulation, yes.
10     Q.   You think you told Court that, that
11 there had been ten years of --
12     A.   I -- I don't --
13     Q.   -- ten years of the regulation as
14 guidance?
15         MS. SINGER:  Objection.  Foundation.
16 The witness has asked to be shown the document.
17         THE WITNESS:  I -- I don't recall
18 what I said.  But again, I -- as I said
19 previously, if you have a transcript or -- or
20 presentation or something that I could look at,
21 that would -- that would help me -- help my
22 recollection.
23         BY MS. MAINIGI:
24     Q.   Has there been ten years of guidance
25 provided by the DEA to registrants as to what

Page 354

1  constitutes a suspicious order?
2          MS. SINGER:  Objection.  Asked and
3  answered.
4          MR. BENNETT:  Objection.  Vague.
5          MR. UTTER:  Same objection.
6          One more time.
7          THE WITNESS:  Again, it's the
8  regulation, the meetings, the letters, the
9  Southwood decision.  I mean -- yeah.
10         BY MS. MAINIGI:
11     Q.   The letters meaning your '07 and '06
12 letters, right?
13     A.   Yes.
14     Q.   Any other letters?
15         MS. SINGER:  Objection.  Asked and
16 answered.
17         THE WITNESS:  I'm not aware of any
18 other letters.
19         The Southwood decision.  The
20 inspections where -- where we've had inspectors
21 on site every year going into different
22 facilities.  And the conferences where we
23 talked about suspicious order monitoring.
24         I mean we -- I think that -- that
25 pretty much covers it.

Page 355

1          BY MS. MAINIGI:
2      Q.   You had a slide deck at that
3  conference, right?
4      A.   Yes.
5      Q.   Do you still have that slide deck?
6      A.   I'd have to look.  It was a --
7      Q.   We'd ask that you produce that.
8          Did you have some talking points for
9  that conference?
10     A.   No.
11     Q.   Did you have any handwritten notes
12 that you made in advance to the conference?
13     A.   I don't know if I have any notes.
14 If I had any notes, they wouldn't be -- I
15 didn't keep them.  But I don't recall if I used
16 notes.  I think I went right off the slides.
17         MS. MAINIGI:  Well, Counsel, we'd
18 ask that those slides and any related notes be
19 produced.
20         I'm going to go ahead --
21         MR. UTTER:  I'll take it under
22 advisement.
23         MS. MAINIGI:  -- and stop right now
24 because my colleague --
25         MR. UTTER:  I'm not agreeing to

Page 356

1  that.  I said I'll take it under advisement.
2          MS. MAINIGI:  Understood.
3          My colleague just needs to
4  authenticate a document.  My understanding is
5  he already discussed it with you.
6          MR. BENNETT:  Yeah.  That -- that's
7  fine.
8          MS. MAINIGI:  Thank you very much,
9  Mr. Rannazzisi.
10     FURTHER EXAMINATION BY COUNSEL FOR WALMART
11         BY MR. STEPHENS:
12     Q.   Mr. Rannazzisi --
13     A.   Yes.
14     Q.   -- just very quickly.
15         I showed you a document earlier that
16 was marked as Exhibit 10.  Your counsel asked
17 me for the Bates numbered version of that,
18 which I have here now.  It is Bates No. US --
19 US-DEA-00002413.
20         MR. STEPHENS:  And I'd ask the court
21 reporter to mark it as the next in order,
22 please.
23         (Deposition Exhibit 14 was marked
24 for identification.)
25         BY MR. STEPHENS:

Page 357

1      Q.    So, Mr. Rannazzisi, just very
2   quickly --
3      A.    Yes.
4      Q.    -- I'm just going to ask you if you
5   recognize this document.
6      A.    It's one of the PowerPoints that we
7   did on the Internets.
8      Q.    Okay.  And this is a -- a document
9   that reflects a presentation that you may have
10  given?
11     A.    I may have given it.  Somebody else
12  in my staff may have given it.
13     Q.    Okay.  And the date at the bottom
14  left is March of 2007; is that right?
15     A.    Yes.
16     Q.    Okay.  And it relates to Internet
17  pharmacies?
18     A.    Yes.
19            MR. STEPHENS:  All right.  I have no
20  further questions.  Thank you.
21            THE VIDEOGRAPHER:  We are off the
22  record at 5:02 p.m.
23            And This concludes the test --
24  today's testimony given by Joseph Rannazzisi.
25            The total number of media units used

Page 358

1   was seven and will be retained by Veritext
2   Legal Solutions.
3            MR. BENNETT:  And what was our total
4   time on the record?
5            THE VIDEOGRAPHER:  Five hours -- six
6   hours and three minutes.
7            (Whereupon, the proceeding was
8   adjourned at 5:03 p.m.)

Page 359

1            CERTIFICATE OF NOTARY PUBLIC
2            I, Bonnie L. Russo, the officer before
3   whom the foregoing deposition was taken, do
4   hereby certify that the witness whose testimony
5   appears in the foregoing deposition was duly
6   sworn by me; that the testimony of said witness
7   was taken by me in shorthand and thereafter
8   reduced to computerized transcription under my
9   direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
19
20            Notary Public in and for
21            the District of Columbia
22
23  My Commission expires:  June 30, 2020
24
25

Page 360

1            Veritext Legal Solutions
              1100 Superior Ave
2                 Suite 1820
              Cleveland, Ohio 44114
3             Phone: 216-523-1313
4
   April 28, 2019
5
   To: GREGORY M. UTTER
6
   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 3301876
8
   Witness:  Joseph Rannazzisi      Deposition Date:  4/26/2019
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

## Page 361

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
   ASSIGNMENT REFERENCE NO: 3301876
 3 CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 4/26/2019
 4 WITNESS' NAME: Joseph Rannazzisi
 5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7      I have made no changes to the testimony
   as transcribed by the court reporter.
 8
   _____
 9 Date                    Joseph Rannazzisi
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18    Notary Public
19
   _____
   Commission Expiration Date
20
21
22
23
24
25
```

Veritext Legal Solutions
www.veritext.com                                888-391-3376

## Page 362

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
   ASSIGNMENT REFERENCE NO: 3301876
 3 CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 4/26/2019
 4 WITNESS' NAME: Joseph Rannazzisi
 5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
 8 well as the reason(s) for the change(s).
 9      I request that these changes be entered
   as part of the record of my testimony.
10
11      I have executed the Errata Sheet, as well
   as this Certificate, and request and authorize
12 that both be appended to the transcript of my
   testimony and be incorporated therein.
13 _____
   Date                    Joseph Rannazzisi
14
15      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
16 the referenced witness did personally appear
   and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23
   _____
   Notary Public
24
25 _____
   Commission Expiration Date
```

Veritext Legal Solutions
www.veritext.com                                888-391-3376

## Page 363

```
 1              ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
 2          ASSIGNMENT NO: 3301876
 3 PAGE/LINE(S) /     CHANGE        /REASON
 4 _____
 5 _____
 6 _____
 7 _____
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____

   _____
20 Date                    Joseph Rannazzisi
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20____ .
23 _____
   Notary Public
24 _____
25 Commission Expiration Date
```

Veritext Legal Solutions
www.veritext.com                                888-391-3376

## [& - 2004]    Page 1

| & | 100 10:20 104:20 | 1200 132:19 | 183 10:23 |
|---|---|---|---|
| **&** 2:8 3:4 4:17,19 | **100,000** 81:8 | **126c** 4:10 | **18976** 8:19 |
| 5:11,16,20 6:2 7:4 | **1000** 6:10 | **12:03** 169:16 | **19** 112:3 |
| 7:8,12,17,23 8:3,7 | **1001** 3:18 206:19 | **12:13** 178:8 | **190** 11:2 |
| 8:22 12:22 13:9 | 207:14 208:23 | **12:15** 177:14 | **19103** 6:16 |
| 13:11,13,15,17,19 | **10017** 3:13 | **12th** 2:9 6:4 12:22 | **1971** 65:12,14,20 |
| 13:20,23 14:2,4 | **10022** 4:11 | **13** 11:13 288:8,15 | 67:13 68:3 69:17 |
| 15:17 94:9 | **10036** 4:15 | 303:5 | 334:16,18 335:2 |
| **0** | **101** 5:16 | **130** 10:5 | **1986** 226:17,24 |
| | **10178** 5:17 | **1300** 8:23 | 227:3 |
| **00002413** 11:16 | **104** 10:22 | **1301.7** 65:7 | **1988** 226:24 229:7 |
| 356:19 | **106** 113:3 123:18 | **1301.71** 253:15 | 229:11 230:1,4,13 |
| **0006133-136** | 125:3,9,14,21,25 | **1301.74** 291:5 | **1999** 7:9 |
| 11:12 | 187:4 193:13 | **137,500** 33:17 | **1:05** 178:14 |
| **00010980-981** | 194:6,7 | **14** 11:15 156:23 | **1:59** 226:1 |
| 11:14 | **1095** 4:15 | **1400** 3:5 | **2** |
| **00011611** 100:25 | **10:04** 91:25 | **15** 19:14 74:7 | **2** 10:14 31:21,22 |
| **0001611-621** | **10:08** 92:4 | 176:25 247:23 | 31:25 32:10 35:22 |
| 10:21 | **10:45** 123:5 | **150** 33:20 | 37:2 50:6 64:2 |
| **02199** 7:18 8:4 | **11** 7:23 11:9 | **15219** 5:22 8:8 | 88:18 123:4 |
| **04** 231:2,2 | 218:16,23 329:2 | **16** 10:3 83:15 | 184:25 185:12 |
| **05** 176:24 246:13 | **1100** 4:24 360:1 | 127:22,22 211:8 | 263:24 290:19,20 |
| **06** 246:5 309:11 | **111** 8:3 | 212:19 | 294:16 |
| 354:11 | **11937** 359:19 | **1625** 4:19 | **20** 106:7,22 148:10 |
| **07** 246:5 309:11 | **11:00** 123:9 | **17** 1:5,9 12:20 | 361:16 362:22 |
| 354:11 | **11:08** 130:21 | **1717** 6:16 | 363:22 |
| **09** 246:13 | **11:11** 130:24 | **1755** 5:3 | **20,000** 261:6 |
| **1** | **11:42** 163:6 | **18** 1:11,13 10:12 | **2000** 42:10 304:17 |
| **1** 10:12 12:14 18:9 | **11:47** 163:10 | 112:2,4,24 206:19 | **20001** 5:12 7:5 |
| 18:10,12,19 35:7 | **11:49** 165:20 | 207:14 208:22 | **20004** 3:18 |
| 63:23 193:4 | **11:52** 165:24 | **1800** 6:10 | **20005** 6:5 7:13 |
| 211:25 218:23 | **11:55:26** 170:4 | **1801** 155:13,15 | **20006** 4:20 |
| 294:16 | **11:56** 169:13 | **1801s** 155:17 | **2001** 34:19 35:9 |
| **1.3** 201:13 | **11th** 3:13 | **1811** 155:7 | 38:10 |
| **10** 11:8 44:13 | **12** 11:12 174:24 | **1820** 360:2 | **2002** 319:10,19,20 |
| 101:20 216:19 | 183:19 184:7 | | **2003** 235:4 |
| 219:7 225:21,22 | 186:24 187:16 | | **20036** 6:11 |
| 265:21 356:16 | 188:14 288:6,14 | | **2004** 37:25 229:2,3 |
| **10,000** 81:4 | **12-29-14** 10:20 | | 229:7,11 230:1,4 |
| | | | 230:13,17,19,22 |
| | | | 231:7 232:16 |

Veritext Legal Solutions
www.veritext.com                                888-391-3376

[2004 - 4/26/2019]                                                                 Page 2

| | | | |
|---|---|---|---|
| 233:19 235:3,5 | **2009** 197:5,23 | **21** 23:12,12 34:18 | **3** |
| **2005** 19:12,14,16 | 218:3 219:15 | 36:2 107:12,12 | 3 10:16 34:12,13 |
| 19:20 30:25 32:20 | 222:5 299:15 | 117:16 140:24 | 34:16 35:18,20 |
| 33:12 40:16 148:7 | 344:14 346:4,19 | 148:10 153:22 | 74:25 123:19 178:8 |
| 149:8 197:5,21 | **2010** 42:11 118:12 | 181:10 228:6 | 267:4 |
| 199:5,15 207:11 | 253:3 299:15 | 265:25 277:10 | **3-1-12** 11:11 |
| 210:14 218:3 | 319:11 329:2 | 291:5 | **3-16-12** 11:11 |
| 219:15 228:15 | 331:3 | **211** 11:5 | 359:23 |
| 229:1 231:9 233:4 | **2011** 42:11 253:4 | **212-309-6612** 5:17 | **300** 8:13,18 21:3,6 |
| 237:7,15,23 | 304:13 331:4 | **212-397-1000** 3:14 | 132:15 |
| 235:24 236:8 | **2012** 218:23 | **212-421-2800** 4:11 | **301** 8:8 |
| 239:5,24 240:4 | **2013** 345:4,14 | **212-698-3593** 4:16 | **304-525-9115** 4:4 |
| 247:19 248:21 | 346:4,19 | **215-241-7910** 6:17 | **31** 10:14 |
| 253:2 317:14,16 | **2014** 32:1 191:20 | **215-918-3680** 8:19 | **3100** 6:15 |
| 317:24 318:7 | 192:17 | **216** 11:8 | **312-269-4066** 5:8 |
| **2006** 115:16 | **2015** 19:12,16,17 | **216-523-1313** | **312-494-4434** 8:14 |
| 210:15 218:20 | 19:20 30:25 32:20 | 360:3 | **312-494-4445** 8:14 |
| 233:15,23 242:20 | 32:24 33:16 60:14 | **216-592-5000** 4:25 | **317-236-1313** 7:24 |
| 253:2 266:1 | 148:7 149:8 | **216-621-7860** 8:24 | **31st** 19:17 |
| 287:20 288:14 | 157:15 158:6,14 | **216-622-3988** 3:10 | **32** 139:15 |
| 289:25 299:11 | 160:15 176:2 | **217** 184:3,4,24 | **3301876** 1:25 |
| 307:15 309:4 | 207:11 318:7 | **218** 11:9 184:2,25 | **360:7** 361:2 362:2 |
| 313:6 | 319:21 347:5 | **226** 10:7 | 362:2 |
| **2007** 44:13 115:16 | **2016** 76:24 83:14 | **23** 34:19 35:9 | **34** 10:16 |
| 183:19 186:25 | 127:22 247:22 | 148:1 | **340** 132:16 |
| 187:16 188:14 | 248:21 317:15,16 | **25** 104:14 106:1,2 | **350** 21:8 |
| 209:10 211:19 | 317:24 318:7 | 206:14 | **356** 10:6 11:15 |
| 212:20 243:12 | **2017** 74:7 | **25701** 4:3 | **35th** 8:7 |
| 250:8,22 266:2 | **2018** 265:21 | **26** 1:20 12:5 | **360** 3:13 |
| 285:16 287:21 | **2019** 1:20 12:5 | **27** 287:20 288:1 | **37,604** 32:21 |
| 288:1,15 290:3 | 360:4 | 289:24 291:11 | **39402** 4:7 |
| 303:6 304:13,17 | **202-383-5129** 4:20 | 304:13,16 340:14 | **3:13** 265:14 308:4 |
| 305:7,22 307:16 | **202-386-9626** 3:19 | **2700** 8:18 | |
| 309:4 313:7,7 | **202-434-5000** 6:5 | **28** 360:4 | **4** |
| 340:14 343:14,16 | **202-662-6000** 7:6 | **2804** 1:4,5 12:20 | 4 10:17 74:2,3,6 |
| 345:4 357:14 | **202-778-1800** 6:11 | **288** 11:12,13 | 178:13 214:16 |
| **2008** 197:10,21,23 | **202-879-5907** 7:14 | **29** 191:20 192:17 | 225:25 266:2 |
| 199:15 200:9 | **202-942-5000** 5:12 | **2:15** 226:7 | 296:7 360:8 |
| 220:16 222:5 | **2020** 359:23 | **2:59** 265:10 | **4-29-14** 11:4 |
| 341:2 | **206** 219:5 | | **4/26/2019** 360:8 |
| | | | 361:3 362:3 |

[40 - action]                                                                      Page 3

| | | | | |
|---|---|---|---|---|
| **40** 68:3 145:5 | **5:02** 357:22 | **8:37** 1:21 12:4 | **9** | 27:5,13 29:2 56:1 |
| 253:20 311:7,10 | **5:03** 358:8 | | **9** 11:5 44:13 211:4 | 56:6,11 98:3 |
| 327:24 334:17 | | | 211:8 | **accessed** 30:1 |
| **30** 4:10 | **6** | | **9-27-06** 11:12 | 214:6 |
| **401** 3:17 | 6 10:22 100:15,16 | | **9-27-07** 11:13 | **account** 68:18 |
| **41** 75:4 | 104:6,7 111:25 | | **90** 214:25 | 69:16 90:14,19 |
| **412-338-4690** 8:9 | 265:14 266:15,18 | | **90067** 7:9 | 201:18 |
| **412-560-7463** 5:23 | 316:21 | | **92** 10:4 | **accounts** 90:17 |
| **419** 4:3 | **60** 91:5,8 214:25 | | **94303** 5:4 | **accuracy** 206:18 |
| **424-332-4764** 7:10 | **600** 132:17,17 | | **95** 214:15,22,25 | **accurate** 184:18 |
| **43** 308:5,7 | **601** 5:11 | | 215:3 | 202:5 251:22 |
| **44113** 3:9 4:24 | **601-467-0788** 4:7 | | **950** 4:23 | **accurately** 186:4 |
| **44114** 8:23 360:2 | **60601** 5:8 | | **97** 4:6 | 186:20 192:13 |
| **45005** 1:9 | **60654** 8:13 | | **99** 345:25 | **acknowledge** |
| **45090** 1:13 | **617-342-4000** 8:4 | | **99,625** 32:24 | 361:11 362:16 |
| **45132** 1:11 | **617-951-7000** 7:19 | | **99.5** 192:7 193:20 | **acquainted** 85:3 |
| **45202** 3:5 | **650-739-3939** 5:4 | | **9:25** 63:23 | **acquired** 69:23 |
| **46204** 7:24 | **655** 7:13 | | **9:37** 64:2 | 70:2 118:17 |
| **4:00** 316:14 | **6th** 4:10 | | **9th** 3:17 8:23 | 187:24 203:11 |
| **4:05** 316:21 | | | | 205:13,21 |
| **4:18** 316:25 | **7** | | **a** | **act** 65:12 66:4 |
| | 7 10:23 183:23 | | | 69:14 107:15 |
| **5** | 316:25 | | **a.m.** 1:21 12:4 | 114:9 115:18 |
| 5 10:20 100:14,16 | **7-12-07** 10:24 | | **aaron** 1:17 | 116:8 132:7 |
| 100:17,18,22 | **70** 214:25 | | **ability** 172:12 | 133:11 151:11 |
| 132:17 215:4 | **726** 66:20 67:9 | | **able** 111:6 158:16 | 197:10 199:6,16 |
| 226:6 265:10 | 117:17 | | 225:4 257:9 | 200:8 201:3 |
| 316:15 | **72** 223:7 | | 266:25 271:3 | 220:16,18,22 |
| **5,000** 88:18,25 | **725** 2:9 6:4 12:22 | | **absolutely** 34:24 | 224:10 234:14 |
| 261:4 | **74** 10:17 253:15 | | 91:16 102:5 | 243:8 257:1 |
| **5-16-07** 11:7 | **76** 191:5,19,25 | | 112:14 113:25 | 268:17 271:16 |
| **50** 154:2,4,14 | **77** 5:7 | | 190:8 | 307:4,4 347:22 |
| 216:23 | | | **abuse** 11:3 102:10 | 361:14 362:11 |
| **50,000** 81:6 261:6 | **8** | | 191:21 | **acting** 23:6 60:14 |
| **50,490** 33:12 | 8 11:2 32:1 44:13 | | **abusers** 307:8 | 60:17 107:14 |
| **500** 80:10 263:23 | 190:25 | | **accept** 45:2 | 201:15 233:5 |
| **513-579-6540** 3:6 | **70** 106:7,22 | | **acceptable** 319:11 | **action** 171:11,19 |
| **52** 211:14,15 | **700** 7:18 | | 320:17 | 172:5,18,21 |
| **54** 8:12 | **801** 3:8 | | **accepted** 93:8 | 173:10,15,25 |
| **56** 4:10 | **823** 253:14 | | **access** 25:6,9,15 | 198:9 205:17 |
| **56th** 4:10 | **826** 96:7 103:7,20 | | 25:21 26:12,17 | 216:4 281:22 |
| | **850** 7:5 | | | |

[action - ahead]                                                                   Page 4

| | | | |
|---|---|---|---|
| 283:8 336:12,15 | 59:3 69:8 94:10 | **adversely** 101:24 | 154:4,15 156:12 |
| 359:12,17 | 99:7 136:20 | **advertise** 87:20,25 | 157:21,23 160:20 |
| **actions** 59:19 60:4 | 139:21 187:11 | **advertising** 88:6 | 160:21 228:3,8 |
| 134:24 171:24 | 203:7,16,24 | **advice** 162:19 | 302:8 |
| 172:4 200:10 | 204:20,21,22 | 167:14 338:22 | **aggregate** 10:14 |
| 220:24 | 206:7 208:3 209:5 | 339:11 | 32:2,9 95:11,13 |
| **activities** 97:16,20 | 209:9 219:25 | **advise** 45:20 | **aggregated** 30:6,8 |
| 117:5,8 119:24 | 275:1,5,8 316:10 | **advised** 283:16 | **aggressively** 36:15 |
| 161:10 225:12 | **administration's** | 330:5 | 36:18 |
| 276:13 295:9,13 | 10:24 187:7 | **advisement** | **ago** 118:11 210:18 |
| 345:11 | 204:16,17 206:8 | 355:22 356:1 | 285:14 320:13 |
| **activity** 107:23 | 206:10 208:1,4 | **affect** 101:24 | **agree** 12:13 28:18 |
| 108:14 115:2 | 209:3,7 212:20 | 102:5 122:11 | 29:2 53:25 54:13 |
| 284:23 345:23 | **administrative** | **affiliations** 13:6 | 67:11 97:25 98:11 |
| **acts** 72:15 | 134:23 136:1 | **affirmatively** | 98:15 99:19 102:1 |
| **actual** 31:2 93:5 | 137:4,9 161:25 | 42:18 331:15 | 106:12,19 109:18 |
| 166:23 | 163:20 165:4 | **affixed** 361:15 | 110:19 111:1 |
| **add** 210:3 252:19 | 166:9 167:4 | 362:21 | 121:8 125:13 |
| **addition** 87:18 | 168:12 171:11 | **afternoon** 178:17 | 133:16,22 154:14 |
| 94:16 95:20 | 172:4,5,18,21 | 178:18 226:11,14 | 154:25 182:24 |
| 113:22 258:11 | 173:10,14,25 | **agencies** 138:16 | 187:16,20 188:14 |
| 287:4 310:17 | **administrator** | 139:4 141:16,17 | 188:23 189:12 |
| **additional** 125:15 | 31:3 58:22 60:14 | 309:21 314:5 | 200:25 201:21 |
| 126:1,22 126:14 | 60:17 61:4 133:15 | **agency** 42:21 46:7 | 205:5 210:20 |
| 256:13 328:19 | 137:1,24 138:18 | 49:8 56:24 57:1 | 218:1 221:15,18 |
| 329:11 331:4 | 140:16 149:24,25 | 59:11,14 64:18,21 | 349:24 |
| 335:10 | 153:10 156:11 | 69:1 121:9 135:16 | **agreed** 82:23 |
| **address** 89:16,17 | 159:20 161:6 | 135:18 205:17 | **agreeing** 355:25 |
| 89:20 102:9 | 164:25 176:24 | 281:22 263:8 | **agreement** 40:8 |
| 265:17 360:15 | 181:20 182:3,13 | 331:1 336:12,15 | 78:24 83:20 86:21 |
| **addressed** 343:18 | 184:10 204:8 | **agent** 147:24 | 86:23,25 87:6,8 |
| **addresses** 90:9 | 206:2 207:11 | 149:16,17 150:1,5 | 118:6 |
| **addressing** 157:4 | 211:18 215:14 | 155:1 156:4,22 | **aguiniga** 3:16 15:6 |
| **adequacy** 332:2 | 216:13 232:19 | 157:5 159:1 | 15:6 |
| **adequate** 98:12,13 | 233:1,5,14 | 160:14 227:21,23 | **ahead** 20:8 27:21 |
| **adequately** 149:15 | **administrator's** | 228:11 235:13 | 29:14 36:24 42:3 |
| **adhere** 201:23 | 142:6 | **agents** 13:19 | 43:20 44:19 45:8 |
| **adjourned** 358:8 | **adopt** 318:11,23 | 150:15,19,20,22 | 46:19 51:24 54:11 |
| **administer** 301:17 | **advance** 355:12 | 151:7,8 152:3,18 | 54:25 55:17 56:21 |
| **administration** | **adverse** 123:22 | 152:23,24 153:6 | 57:12 58:18 61:6 |
| 9:7 15:2 58:23 | | 153:12,17,23 | 62:4 63:15 67:20 |

[ahead - answered]                                                                 Page 5

| | | | |
|---|---|---|---|
| 68:9 71:12 76:5 | 334:22 335:17 | **analgesics** 37:3,5,6 | 162:18,21 163:17 |
| 76:20 80:21 81:1 | 336:18 337:14 | **analysis** 121:13 | 164:3 165:19 |
| 84:14 87:24 96:10 | 339:5 340:21 | 196:12 | 167:11 167:11,16 |
| 97:3 98:6 100:1 | 344:18 345:8 | **analyzed** 120:25 | 168:18,22,23,25 |
| 102:16 106:16 | 347:2 348:2,25 | 241:14 | 169:22,25 170:3 |
| 110:24 117:13 | 350:9,21 355:20 | **analyzing** 121:8 | 170:13,25 171:14 |
| 119:10 124:15 | **aid** 5:14 15:11 | **anda** 8:2 15:19 | 171:21 172:25 |
| 127:16 136:14 | 16:2 131:11 180:4 | **andrew** 7:16 14:3 | 173:20 174:10 |
| 138:24 140:7 | 215:21 220:9 | 92:11 | 176:4 177:2 |
| 146:16 151:6 | **ailment** 195:21 | **andrew.o'connor** | 180:11 181:3 |
| 158:21 179:21 | **al** 1:8,10,12,13 | 7:19 | 183:7 191:15 |
| 181:25 182:18 | **alert** 186:16 189:2 | **angeles** 7:9 | 194:14,24 197:8 |
| 183:6 190:18 | **allergan** 7:11 | **anomalies** 241:15 | 200:25 206:25 |
| 191:6,8 201:9 | 13:17 | 241:24 | 207:1 208:13 |
| 202:3 203:3 | **alleviated** 295:1 | **answer** 20:4,9 | 209:20 210:1 |
| 207:24 208:13 | **allot** 98:17 | 27:7,11,21 28:10 | 217:6 225:13 |
| 214:21 221:18 | **allow** 27:2 57:23 | 36:23 44:15,19 | 237:9,10,16 |
| 223:4 228:17 | 312:23 | 45:6,16,18 49:14 | 244:10,12 250:16 |
| 234:11 241:1,3 | 314:11 241:13 | 49:16,17,19,21 | 257:15 260:12 |
| 245:6,18 248:11 | **allowed** 26:17 | 50:21 55:5,19,23 | 262:21 266:11,25 |
| 249:2,23 252:15 | 28:14 72:12,15 | 56:21 59:4,12,14 | 269:9 270:10,25 |
| 253:9 254:8 255:6 | 94:18 305:13 | 59:16 60:10 61:19 | 273:2 276:16,18 |
| 256:4 258:19 | **allowing** 163:13 | 64:19,22,23 66:15 | 276:20 281:23,25 |
| 265:6 267:19 | **allows** 51:7 97:18 | 69:3,5 70:4,8 72:6 | 282:14 284:4 |
| 270:7 273:19 | **alprazolam** | 75:16 76:2,4,12,21 | 293:1,3 295:11,12 |
| 277:20 278:22 | 263:19,24 294:16 | 77:17,21,22 78:12 | 295:14 298:9,15 |
| 280:25 283:11 | **alto** 5:4 | 78:20 79:5 80:3,9 | 298:16,24 300:20 |
| 286:21 287:6 | **amend** 355:25 | 78:20 79:5 80:3,9 | 300:23 301:21 |
| 288:2 289:12,12 | **amended** 10:12 | 80:15,18,20 82:7,8 | 305:16,18,19 |
| 290:13 295:24 | 18:13 | 82:16,25 84:8,10 | 312:24 317:8,20 |
| 296:23 298:17 | **america** 182:11 | 84:23 85:6,13 | 318:4 319:4,5 |
| 300:17 302:20 | 186:13 187:19 | 86:5 96:11 97:4 | 325:11 330:8,10 |
| 308:17 310:23 | 188:17 | 97:18,22 100:5 | 332:3,6 334:1,3 |
| 311:25 313:14 | **americas** 4:15 | 102:16 108:3 | 330:15 333:5,13 |
| 315:5 318:14 | 311:25 313:14 | 114:21 115:14 | 334:21 336:15,17 |
| 319:17 320:24 | 315:5 318:14 | 117:7,10 119:11 | 334:24 339:2,17 |
| 322:4 324:2,18 | 319:17 320:24 | 120:14,17 122:4 | 338:24 339:2,17 |
| 325:11,22 327:16 | 65:22 94:17 99:12 | 124:3,4 136:11,13 | 339:19,22 341:7 |
| 328:7 329:4,21 | 99:15 172:20 | 141:23 142:4 | 27:13 48:17 50:20 |
| 330:22 331:11,22 | 173:13,21 194:1 | 154:9 157:24 | 349:6 |
| 332:17 333:19 | 263:21 | 163:11 162:12,15 | 56:18 69:19 |

**[answered - asked]**

answered 26:8
167:12 194:18
300:24
answers 17:16
271:14 337:2
351:1
anthony 6:9 15:20
anti 270:13
antidiversion
231:8 233:21
235:12 236:1
237:3 240:9
anybody 280:12
280:13 306:18
anymore 165:15
anyway 180:18,20
283:19
api 95:3
apologize 167:8
apparent 262:25
appear 87:1
146:22 361:11
362:15

103:16 111:15
113:14 120:11
145:16 162:18
167:21 174:17,19
175:1 181:23
199:19 202:1
208:15,17,25
253:6 258:22
270:20 284:3
299:23 302:3
319:3 322:2
323:18 327:11,14
331:7 332:2,11,16
332:19,23 335:14
338:2 344:5 346:6
350:4 352:24
353:2 354:3,16

appearance 87:16
appearances 3:1
4:1 5:1 6:1 7:1 8:1
9:1 13:6 89:4,8
appeared 86:13
103:24,25 104:2
104:12
appears 32:21
56:8 359:5
appended 362:11
362:18
applicant 145:19
applicants 144:24
145:19 224:23,24
application 53:1
225:1
applications 52:20
144:19 145:13
applies 78:2
apply 224:14
applying 209:23
appreciate 78:3
approach 79:2,3
approached 79:20
83:13 129:16
appropriate 22:12
44:9 139:22
142:21 143:12
316:15 330:3
appropriately
23:6 107:14
195:22 323:4
approval 82:21
83:3,6,9,10
approve 42:19
101:18 137:2,10
333:1 338:6,11
approved 101:16
approves 338:8
approximate
197:23

approximately
19:14 20:24 21:5
21:6,8 148:1,8
197:22 212:1
230:25 234:24
329:2
april 12:0 12:4
191:20 192:17
231:2 360:4
arch 6:16
arcos 23:15,19
24:3,23 25:2,7,10
25:13,16,22 26:1,3
26:12,17 27:6
26:19 23:22,16,20
30:1,10 56:1,6,11
57:2 87:17 120:25
121:3,9,13,17,25
122:3,6,18,21
146:3,18 160:15
160:22 178:20
241:13 242:7,15
242:16 293:9,11
293:13
area 43:8 176:13
177:16,18 185:17
261:16,18,21
274:24 280:10
289:1
areas 136:12
200:1 265:22
argue 79:23 266:5
argument 78:11
argumentative
46:15 47:1,16,23
71:8 90:25 108:10
206:24 207:19
208:25 270:18
279:13 283:1
301:9 310:12,21
324:17 335:14,16

346:23 348:13
arnold 5:11 13:20
arnoldporter.com
5:13
arrest 151:8,9
228:4
arrived 228:24
229:2 230:16
231:1 235:6 240:8
article 10:17 74:7
74:12,15,17 75:13
77:13
articles 129:15
articulates 117:1
aruiz 6:12
asac 159:9,16
asacs 157:22
159:22 160:7
asked 27:10,22
28:8 37:18 39:11
41:17 43:16 47:17
50:19 54:17 55:3
56:18 69:19 73:20
85:9,11,14,17 86:2
86:10 87:1 103:15
111:14 113:13
120:10 145:15
161:23 163:19
166:7,22 167:19
169:22 174:16,19
174:25 178:19
179:23 181:23
208:15,16,24
209:19,25 233:8,8
233:10 253:5
259:23 266:8
266:22 225:10
237:5 244:7
266:19 276:11
281:18 283:6
291:21 295:7
309:7 316:22
336:7 338:23

---

**[asked - b]**

323:17 327:11,14
331:6 332:15
335:13 336:22
337:7 340:4 346:3
350:1 351:15
352:23 353:1,16
354:2,15 356:16
asking 16:22
27:17 28:4 39:19
39:24 60:3 71:25
72:2 92:13 122:3
131:17 145:5
166:20 173:13
199:9 209:23
211:18 224:25
226:13 311:23
asks 130:13
aspect 36:14 132:6
aspects 214:23
assessment 192:4
assigned 139:1
assigning 95:10,23
assignment 361:2
362:2 363:2
assist 182:3
231:19 232:18
assistant 133:14
137:1 138:18
140:16 149:24
153:10 157:22
159:19 160:21
161:6,15 164:25
176:24 181:20
182:12 184:9
204:8 206:2
207:11 211:17
215:14 216:13
232:18 233:5,14
302:8
assistants 239:17
239:19

assisted 257:18
association 328:18
assume 17:25
247:1 250:1
288:17 343:11
assumes 56:19
assured 41:19
179:16
attached 90:5
287:12 362:7
attend 180:2
246:22 247:13
255:13 343:23
344:7
attended 341:12
attendees 251:11
346:12
attention 71:11 207:20
265:20 277:6
350:7
audience 88:10
audio 12:11,11
audit 347:16
august 231:2,7
232:2 233:7 240:6
247:18
authenticate 356:4
authored 266:1
authority 22:18,21
56:20 58:21,22
99:8,13 151:9
157:6 228:4
authorization
71:11 207:20
265:20 277:6
350:7
authorize 30:5
265:21 362:11
authorized 31:1,2
49:10 58:15 59:10
64:17 68:25 69:21
97:14 117:4
118:16 136:6
146:12 161:8
162:6 166:17
167:11,16 168:22
169:25 171:13
187:22 188:1
205:8,12,15
206:22 225:10
237:5 244:7
266:19 276:11
281:18 283:6
291:21 295:7
309:7 316:22
336:7 338:23

170:11,14,17
attorneys 73:7
77:6,11 136:17
161:12,15,16
167:15 168:20,21
audit 347:16
aware 25:25 27:4
28:13,16 40:12
60:3 61:1,7,8 62:8
62:11,15,20,24
63:8 65:11 84:1
86:5 87:10 102:7
102:18 127:3,7,11
179:1 180:6,22
181:6 204:6
205:16 242:13,16
251:24 268:5,8,12
270:12 281:21
282:8 283:7
292:24 301:22
302:5 303:1
336:11,13 343:13
345:2 346:2
348:17 352:19
354:17

**b**
b  40:9 57:17 110:1
116:9 119:25
122:18 253:18
258:5 266:15,18

339:15 348:19
authorizing 19:8
31:6
autonomous
204:18
autonomously
156:21
availability 93:10
available 34:1
130:14 225:14
295:13
ave 360:1
avenue 3:8,13 4:15
4:23 5:11,16 7:9
8:3
avenues 351:1

---

**[bacchus - bennett]**

bacchus 9:4 15:3,3
back 55:21 58:3
63:25 65:6 66:19
70:6 92:2 101:10
103:20 117:20,22
117:25 118:1,10
118:24 123:7
124:11 130:23
163:8 165:22
169:15 178:10
184:16 186:22
196:6 210:13
217:5 219:25
226:3,17 240:8
244:17,17 250:7
260:8 265:12
268:24 276:4,23
277:8 308:4 312:5
315:17 316:23
324:5 330:1
360:15
background 36:23
155:2 177:8
226:12,20 330:13
backs 119:8,15
120:7
bad 190:1,4
badges 150:23
balances 114:11
banded 75:5
barbara 176:6
barber 5:20 16:7,7
barlitbeck.com
8:15
barnes 7:23
barometers 280:3
bartlit 8:12
base 304:9
based 30:16 36:3
47:2 56:24 64:24
70:1 98:8 101:25

104:24 105:9
133:8 172:16
177:9 196:10
198:22 206:7
207:4 208:1 209:6
219:19 220:4
258:25 266:12
268:16 269:8,21
275:19 279:3,24
298:1 299:8,10
316:9 323:21
333:6 349:3,14
basic 104:21,22,23
147:20
basically 130:13
134:1 224:10
291:8 300:20
basing 203:4
basis 134:18
246:16 253:11
254:24 262:23
356:17,18
beck 8:12
becoming 76:17
began 40:16,24
221:1 236:1
beginning 233:14
234:23 235:1,9
48:2,7,20 49:3,9
50:3 51:11,21
52:18 54:4,7,22
55:13 56:2,13,16
57:9,13 58:5,7
59:9,20,24 60:6
61:2 62:1,13 63:2
63:18 64:12,15
65:4 66:6,14,25
67:6,14,17 68:5,23
69:20 70:13,23
71:7,18 85:20

199:11,18,21
200:1 201:6,25
202:24 204:1,14
205:7 206:20
207:18 208:14,24
213:10 214:19
215:10,25 216:24
217:8 218:7 221:6
221:17 222:8,16
223:1,19 225:9,19
225:21 228:16
229:14 230:6
231:12 234:4,25
236:4,19 237:4,16
238:12 239:21
241:2,17 244:6,24
245:3,16,19
246:17 247:5
248:7,24 249:21
250:14 251:25
252:14 253:7
254:5 255:5 256:1
256:16 257:13
258:12 260:19
261:13 262:3,20
263:11 264:8,18
266:4,16 267:17
268:22 269:6
270:19 271:9
273:16 274:17
275:18 276:9
277:1,4,16,19
278:20 279:15
280:23 281:15
283:3,13 285:25
286:18 289:11
290:12 291:16
296:20 298:8,14
298:19,23 299:5
300:2,14 301:8,20

202:17 303:9
305:8,10 306:14
309:15,23 310:11
311:21,24 312:11
312:21,23 313:10
314:8 315:2
316:13 317:7,19
318:3,12,25
319:14 320:4,22
321:13 322:1,21
323:19,25 324:16
325:8 326:18
327:13 328:5,12
329:18 330:2,20
331:8 334:8,19
335:5,15 336:6
337:12 338:19
339:14 340:19
343:7 344:1,4,9
345:6 346:8,24
347:14,25 348:14
350:5,20 352:9,25
354:4 356:6 358:3
bernstein 126:6,25
127:5,20 128:10
129:1,19,20,23
best 23:4 242:12
297:8,13
betsy 238:3
better 60:10 68:13
beyond 77:7 115:8
163:23 164:4
222:23 223:17
256:9 300:1 325:7
bhan 19:17
big 132:21
bill 16:3
billed 80:12
billing 81:12,15

bit 146:21 152:21
152:22 164:7
172:3 197:15
199:7 207:9 246:8
48:10
blame 46:11 48:5
48:10
blamed 46:23 47:6
47:13,21 48:1,17
blaming 48:14
board 134:2 190:6
295:18
boards 183:12
bockius 5:16,20
boggs 240:1
bona 213:24
bonnie 1:24 13:2
183:21 211:2
218:15 359:2
bookholdt 176:7
176:14
book 89:1
books 311:7,9
boos 16:9
boston 7:18 8:4
bottles 263:24
bottom 112:4
184:24 191:12,25
357:13
bought 151:16
bouncing 240:11
boundaries 212:12
212:24
boycko 7:18
branch 204:23,24
brand 131:13
break 63:16 70:18
71:3 122:24,25
123:2 130:18
177:18,23 178:5
215:18 249:4

262:10 265:7
280:18 307:25
304:10 307:6
brick 200:19
216:4 221:10
234:16,17
brief 61:10 162:24
229:3 235:10
briefed 166:21
briefing 61:11
179:12 180:2,8,15
180:23 235:10
255:9 293:13
294:11,12 297:10
299:14
briefings 40:13,24
41:15,16,23 235:5
235:6 240:3
budget 21:8
building 240:11
bulk 95:3
bullet 36:7 37:2
145:6
bump 261:6 280:8
burgess 191:13,18
191:25
burling 7:4,8 13:9
13:11

---

**[bush - charge]**

bush 314:22 315:8
business 29:17
43:2,7,11,21 45:21
57:2,21 133:2
141:1,2 215:1
274:3,6,10,13
275:2,11,14 316:8
321:18

**c**

c 4:22 10:1 12:1
c.f.r. 25:12 65:2
107:12 120:19
122:2,22 195:23
265:25 277:11
291:5 299:13
300:1,4,5 313:18
ca 360:25
cabinet 53:17
202:14
cah 11:12,14
california 5:4 7:9
148:24 158:3
178:22 189:11
190:3 268:18
269:24 270:14
299:17,18,19,22
300:9 338:13
339:1,7
called 104:2
191:20 268:23
301:15 333:10
calling 268:13
275:4
calls 20:2 43:19
45:11 55:15 56:2
58:9 77:19 96:7
96:25 99:23,25
103:5 157:18
158:10,23 159:13
160:18 189:9
190:2 201:6 203:1

cases 48:23,24
76:8,12 130:16
133:19 137:10,11
155:2 167:5,7,8
198:16,21 200:18
218:13 222:17
232:21,22 254:10
279:5,24
cash 213:23
cathy 176:7
catie 7:12 13:16
catie.ventura 7:14
cause 175:5
caused 185:16
caverly 186:16,21
cavitech 8:22
cavitch.com 8:24
ceiling 95:14,17
cell 12:9
cellular 12:8
center 8:18 213:21
centers 229:18
centre 5:21 8:7
cco 132:24
ceppich 7:10
certain 19:9 31:19
90:14 104:20
135:25 137:3,10
248:16 249:6
280:6 300:20
certainly 77:7
124:24 144:15,15
certificate 359:1
362:11
certification 361:1
362:1
certified 104:10
certify 359:4
chain 110:21
111:13 112:6,7,17
113:12,19,21

114:13 118:2
131:9,13 180:3,9
180:23 198:13
215:20 216:6
217:14 218:12
220:9
challenges 156:11
chance 35:17
194:13
change 28:19
57:25 58:20,21
59:7 68:14 254:10
336:23 360:13,14
362:8 363:3
changed 68:2,11
68:17 139:17,17
139:18 148:3
164:6 176:5 246:8
246:8 249:18
253:11,20 254:18
280:10
changes 40:25
41:5 68:19 69:16
93:8 250:3 315:10
315:12 360:12
361:7 362:7,9
changing 318:11
318:23
channels 24:6
chapinski 177:3
characterization
185:20 208:12
charge 117:20,22
117:25 118:1,10
118:24 119:8,15
120:7 147:24
149:17 150:1,7
153:13,17,23
154:5,15 156:12
156:22 157:5,22
157:23 159:2

---

**[charge - common]**

160:14,20,21
175:19 176:15
302:8
charge's 155:2
chargebacks
120:21
charging 135:25
137:3
chart 31:25
147:20
checklist 315:25
checks 114:10
chicago 5:8 8:13
chief 48:18,22
49:2,5,15,18,21
175:24,25 176:1
176:10 231:5
239:11
children 88:11
chris 13:8 16:21
christopher 7:8
chronic 36:11
chuck 60:13
cincinnati 3:5
circumstances
338:21
cities 75:6 148:13
148:25
city 1:10 148:20
citycenter 7:4
civil 9:6 20:3
134:23 136:1
137:4,11 151:10
161:25 163:20
165:3 166:8 167:4
167:7 168:11
171:18,24 361:5
362:5
clarify 39:12
57:20 67:22
113:18 173:2

198:15
clarifying 125:20
clarity 313:5
317:12
class 104:21,22,23
227:10,15,16,19
classes 201:11
285:8
clear 17:12,24
43:24 65:8 109:20
110:1 124:1,18
180:21 338:10
149:12,18,23
150:2 351:17
360:2
client 45:17 162:8
163:24 165:8
166:12 167:1,22
169:23 170:16,19
170:22 305:14
330:8 339:16,18
345:11
clinic 193:5
221:16,16,24
222:1,7,14,23
223:15 224:9,12
clinics 192:9
196:20,23 197:13
197:14,14 198:3
198:18,23 200:3,8
200:17,23 221:1,3
221:13,19,20
222:4,5,18 223:13
223:22 224:7,19
224:20 249:15
254:3
clonazepam
263:19
close 33:23,23
274:23,24

closed 49:25
cmcnamara 6:6
coaching 113:22
194:5
cocaine 151:1
code 23:11,13
114:25 115:5,18
133:11 140:24
308:22
codeine 335:6
cohen 9:3 14:24,24
24:17 72:10 73:1
73:18,25 76:3,14
78:6,10 79:6,10,22
80:19 82:18 84:9
84:25 112:25
113:4 123:11
124:15 125:1,19
162:3,13 164:12
164:15,19 167:18
170:1,4,7,21 171:6
171:7 194:3,20
181:9,11 217:5
206:4 211:20
309:6 315:17
columbia 359:21
columbus 149:14
combat 29:3
220:20
combating 11:10
216:1,18
come 43:11 88:12
104:19 146:23
147:16 158:7
183:9,11 217:5
213:9 242:8 87:8
283:18,19 285:11
315:20 331:25
349:5 351:21
comes 96:13
109:19 206:4
251:20
comfortable
300:23 321:20
coming 251:8,10
309:6 315:17
comment 310:25
314:12,15,17,19
comments 41:14
348:21,23
commerce 219:1,2
235:25 237:2,19
237:22 239:10
268:1,25,25
342:18
commercial 24:5
commission
359:23 361:19
362:25 363:25
committee 186:23
211:11 219:2
common 202:19
203:12,22 204:9
326:21 327:3

---

**[communicate - congress]**

communicate
351:8
communicating
181:12 221:25
349:9,16
communication
163:18 164:13
168:1 170:23
340:25 350:24
communications
49:8,12,15,17,20
162:7,9 163:25
164:24 166:4
167:2,14,22 168:5
168:16,19,24
169:23 170:10,17
170:20 265:23
305:15 330:9
339:16,19 347:6
communities
198:25
community
138:17 139:3,4
141:3 284:13
286:7 315:14
companies 10:18
74:9 180:13
268:13,18,23
322:16 323:11,13
325:3,17 326:16
company 108:21
108:22 132:24
284:22 297:2
324:9,12 326:21
327:18
compared 261:9
261:20 279:22
286:25
compensated
81:19

compensation
118:5
competent 160:23
competing 106:9
complaints 349:7
complete 100:4
194:24 252:9,23
completed 360:15
completely 18:5
223:8
completion 174:2
compliance 20:22
107:7 271:15
320:17 325:3,10
325:17,23,24
compliant 320:19
321:9,24 322:12
322:18 323:15
327:8 329:13
331:19 332:10
334:6 337:8
338:16,17
complied 201:1
318:2
comply 40:9
114:23
complying 23:11
107:15 141:3
component 116:5
328:2 339:10
components 97:7
246:1 269:1 327:8
333:7,11,22 337:2
337:18 338:5,15
339:12,21 342:16
comport 37:25
compound 26:6
44:16 46:18 94:21
103:2 134:25
136:4 137:6
138:22 139:13

conduct 89:12
135:11 144:18
145:13 167:4
conducted 180:7
180:23 182:13
186:13 187:19
188:17 213:22
227:5 258:25
349:6 351:3
conducting 22:22
166:6 168:9
199:23 227:8
conference 118:25
119:1 343:14,17
343:23 344:6,13
344:15,24 345:5
345:10,15,21
346:3,12,15,19
355:3,9,12
conferences 160:7
250:5 255:11,12
259:10 341:8,10
341:12,18,25
342:8,12,14,22
344:20,22 346:10
354:22
confidential 77:8
118:21 127:12
128:18 261:19
confined 309:5
confused 41:4
42:5,9 217:18
260:17,21 301:16
306:17 316:7
311:23 313:23
contained 30:9
130:7,9
context 55:2 63:4
74:18 105:8
106:15 112:21,23
124:7,19 125:15
126:1 189:17,19
193:17,24 213:18
255:1 309:20

---

**[congress - correct]**

140:1,4,12 181:13
182:1 185:12
190:13,20 203:9
205:4 206:16
207:13,16 208:10
208:21,22 210:10
219:25 233:16,19
234:1
congressional
183:18 184:17
connection 129:2
129:9
connolly 2:8 6:2
12:22 13:13,15
15:17
conroy 4:9 14:7,7
consensus 36:3
consequences
106:23
consider 184:15
213:2
considered 92:17
94:14,15 123:25
considers 93:20
94:4
consistent 261:19
279:19
conspiracy 214:4
253:21 297:4,22
constantly 31:9
constituted 318:1
341:24 342:9
constitutes 317:18
354:1
consult 137:23
169:1,5
consultancy 80:10
control 10:16
19:12 20:1,15,21
20:22 25:8 30:21
330:7,9

76:18 77:1 78:1
78:17 79:14 87:19
90:3 91:20 93:9
205:17 266:14
56:25 78:22 84:23
333:6
consulted 128:25
337:16
consulting 73:21
77:16,20 82:23
91:14 163:15
contact 129:18
183:13
context 55:2 63:4
consultant 71:16
71:20,22 72:3,9,16
72:24 73:6,15
75:2,9,19,23 76:9

46:3 54:18 55:11
56:24 59:19 60:5
61:12 69:6,9 70:6
94:13 97:8 107:19
110:12 120:24
131:22 132:1,6
133:15 135:9
137:2 138:19
140:3,15 142:1
143:11 144:5,12
144:16 145:10,18
146:1,24 147:2,7,9
147:11,18,21
159:21 161:24
164:9 166:4,8
168:6,11 171:10
171:18 172:6
173:9 175:1,3
184:10 211:19
229:4 230:21,23
231:15 232:16
233:6,9,12 235:19
235:21 270:13,22
283:17 324:11
325:2,16
controlled 21:7
22:23 23:20 24:4
29:4,22 30:13
32:16 50:6,12,18
51:4,16 65:11,15
65:19 66:3 69:7
69:14 92:18,25
93:19 94:3,17
113:3 123:4 140:9
151:11 172:15
195:10,20 201:3
202:20 203:13
204:10 212:2,10

212:22 214:14,16
215:6,15 222:22
223:9,14 225:5
243:8 261:17
268:16 271:16
307:11 347:21
controls 49:24
51:15 52:2 116:19
253:14 276:1
284:20 286:11
326:10 341:11
conversation
119:4 162:16
conversations
82:3 84:5,12,18
337:5
coordinated
238:16
coordinating
227:17
coordinator
227:11,19
coordinators
227:17
copies 18:16 90:15
90:21
copy 74:6 83:5,8
183:17
cornell 8:16
corporate 8:18
corporation 6:13
7:2
correct 20:25 21:8
21:13,18 22:20,25
24:15 25:8,16
26:5,17 28:15
28:3,7 39:13 40:1
40:17,20,25 41:10
43:1 44:4 46:3

## Page 14 — [correct - customer]

| | | | |
|---|---|---|---|
| 48:18 49:8 50:6 | 333:3,8 334:7 | 339:22 342:24 | **credibility** 99:17 |
| 51:19 52:13 53:1 | **corrections** 244:16 | **count** 263:24 | **criminal** 20:23 |
| 53:5,10 59:22 | 360:12 362:17 | **counties** 75:6 | 134:23 136:1 |
| 64:7,11 65:3 68:4 | **correctly** 42:14 | **country** 98:9,19 | 137:4,11 151:10 |
| 71:23 72:23 75:11 | 205:1 294:12 | 103:9 141:9 | 151:10 161:3 |
| 86:15 92:19 93:17 | 349:8 351:6 | **county** 1:8,12 3:11 | 162:1 163:21 |
| 94:5,14,20 95:2,9 | **corresponding** | 3:15 123:12 | 165:2,6 166:6,10 |
| 95:12,19 96:22 | 69:15 196:8,11 | 361:10 362:15 | 167:4,8 168:10 |
| 98:21,25 99:2,6 | 213:25 | **couple** 32:14 | 171:11,19 172:19 |
| 101:5,12 103:1,14 | **counsel** 12:16 13:4 | 95:21 105:15 | 173:12,15 174:2 |
| 106:23 108:7 | 14:23 16:17,18 | 129:22 177:13 | 228:6,9,24 229:8 |
| 109:9 111:13 | 18:16 48:18,23 | 185:1 199:9 | **crisis** 19:24 20:11 |
| 112:15 113:12 | 49:2,5 56:25 57:1 | 262:15 294:3 | 20:13 46:12,24 |
| 115:12 120:9 | 61:23 64:3 66:14 | 341:15 | 47:8 48:11 71:5 |
| 121:1 126:9,14 | 78:11 92:5,6 | **course** 90:1 | 71:14 87:21 88:4 |
| 131:24 132:21 | 100:8 122:23 | 108:17 128:12 | 88:9,24 89:2,5 |
| 135:21 141:18,21 | 123:10,14 124:6,9 | 195:12 251:19 | **criteria** 273:22 |
| 149:1,4 150:20 | 124:11 125:2,13 | **court** 1:1 12:18 | 303:18 |
| 151:16 152:4,25 | 130:25 131:1 | 13:1 16:9 17:10 | **critical** 125:11 |
| 155:8,13,24 172:8 | 163:11,12,16 | 86:14 177:19 | **critically** 36:12 |
| 185:20 196:3,20 | 165:25 168:20 | 351:17,25 352:5 | **criticism** 60:1 |
| 210:18 220:8,10 | 169:17 177:12 | 353:10 356:20 | 70:19 |
| 220:12 222:14 | 178:15 194:14 | 361:7 | **criticized** 49:1 |
| 224:20 226:20 | 207:21 216:24 | **cov.com** 7:6,7,10 | 59:18 60:4,12 |
| 227:22 228:9 | 226:8,9 239:12 | **cover** 106:5 | 102:8 |
| 229:8,15,19,22 | 257:12 265:15,16 | 148:12 | **criticizing** 49:5 |
| 230:1,2,5,17 234:7 | 292:18 293:2 | **covered** 10:22 | **cross** 124:2 155:20 |
| 236:3 240:9 | 311:22 316:13 | 104:3,11 | **csa** 65:8 68:16 |
| 242:21 243:1 | 317:1 329:7,24 | **covered** 145:6 | 69:7,7 120:19 |
| 245:13 259:17 | 330:5,5 333:25 | 177:5 | 159:20 263:10 |
| 261:24 267:9,14 | 338:22 355:17 | **covers** 257:4 | 308:22 |
| 268:20 271:8,22 | 356:10,16 359:11 | 354:25 | **ctl** 123:12 |
| 274:8,13 275:15 | 359:15 | **covington** 7:4,8 | **culture** 132:5 |
| 282:24 284:1,14 | **counsel's** 44:8 | 13:9,11 15:15 | **curious** 132:10 |
| 287:18,24 288:19 | 49:16,18,21 | **create** 99:17 | 173:1,5 217:1 |
| 294:8 299:4 | 136:19 137:24 | 135:17 321:17 | **current** 37:25 |
| 307:16 309:7 | 240:20 257:16 | 324:24 | 72:21 87:13 211:8 |
| 310:10 311:3,20 | 258:2,3 283:19 | **created** 107:11 | 262:6 |
| 312:9 313:9 | 305:15 333:7,22 | 240:19 | **currently** 212:1 |
| 315:21 316:2 | 337:3,6,9,15,22 | **creating** 99:14 | **customer** 29:24 |
| 318:11 325:19 | 338:5,13 339:1,8 | 141:1 322:6 | 43:5 44:4 110:8 |

## Page 15 — [customer - deals]

| | | | |
|---|---|---|---|
| 110:13 274:22,23 | **database** 23:16 | 62:22 68:2 70:19 | 265:23 276:4,12 |
| 274:24 275:8,9,20 | 25:16,22 26:1 | 74:8 82:4,14 | 276:15,22 281:19 |
| 304:7,9 | 27:6 28:6 30:10 | 89:13 90:7 92:17 | 282:5 283:10 |
| **customer's** 43:7 | 30:13,25 165:6,9 | 93:16,20 94:4,13 | 285:19 295:8,13 |
| 110:8,13 | 80:13,25 143:21 | 94:18 95:1,7,11,24 | 299:17 300:9,10 |
| **customers** 43:5 | 357:13 360:8 | 97:10,11,16,20 | 310:7 315:25 |
| 110:16,17 111:2,6 | 361:3,9,19 362:3 | 98:1 99:19 100:25 | 317:5,15,17,25 |
| 112:9,13 274:20 | 362:13,25 363:20 | 102:1,8,23 103:6 | 318:9 325:1,20 |
| 274:20,21 | 363:25 | 104:16 110:19 | 326:16 329:10 |
| **date's** 35:7 | 114:15 115:9 | 330:15 331:3 | 330:15 331:3 |
| **dated** 11:12,13 | 116:11 117:5,8 | 333:7 335:25 | 333:7 335:25 |
| 31:25 184:7 | 119:14,21,21 | 336:9,23 338:6,11 | 336:9,23 338:6,11 |
| 191:19 | 120:8 128:10 | 338:21 339:1,11 | 338:21 339:1,11 |
| **david** 9:5 14:15,24 | 127:4 128:12,20 | 341:3,21 342:3,4,7 | 341:3,21 342:3,4,7 |
| 123:1,12 | 129:25 130:11 | 342:18 344:11,19 | 342:18 344:11,19 |
| **cvs** 6:8 8:15 21,21 | 131:19 134:20 | 347:10,16,20 | 347:10,16,20 |
| 131:11 180:4 | 135:11 137:15,16 | 348:18 349:6,8,10 | 348:18 349:6,8,10 |
| 215:21 220:8 | 140:2,17,23 141:8 | 349:25 350:17 | 349:25 350:17 |
| **d** | 147:23 148:8,11 | 352:7,20 353:25 | 352:7,20 353:25 |
| **d** 3:16 4:13 8:6 | 149:23 150:4,9 | 356:19 | 356:19 |
| 12:1 119:18 300:8 | 154:6,17,18 155:8 | **dea's** 19:11 22:18 | **dea's** 19:11 22:18 |
| **d.c.** 1:19 2:10 3:18 | 158:15,15 161:9 | 23:3,9 32:1 34:9 | 23:3,9 32:1 34:9 |
| 4:20 5:12 6:5,14 | 163:16 167:3 | 34:17 37:11,19 | 34:17 37:11,19 |
| 7:5,13 12:23 | 168:20 170:18 | 38:13 42:18,24 | 38:13 42:18,24 |
| **daily** 212:11,23 | 171:24 172:17,20 | 43:13 44:2 45:17 | 43:13 44:2 45:17 |
| **dan** 1:6 | 21:12,17 22:9,11 | 173:14,24 174:1,1 | 45:18,19 133:16 |
| **daniel** 9:7 12:24 | 22:12,15,19,19 | 177:10 180:14,23 | 133:22 134:19 |
| **data** 23:19,22 24:1 | 23:5,5,22,25 24:3 | 183:1 185:16,19 | 138:15 139:11 |
| 25:7,9 26:1,1,3 | 24:4,10,23 25:2 | 185:21 188:9 | 140:10 142:20 |
| 26:17 27:5 30:4,6 | 26:4,4,15,16,23 | 190:6 197:4,25 | 143:9 147:20 |
| 30:8,8 56:1,11 | 27:1 30:12 33:4 | 199:7,16 200:9 | 181:12 196:19 |
| 57:2 118:4 120:25 | 33:25 34:17,18 | 201:22 203:10,21 | 220:1 333:1 347:6 |
| 121:3,9 122:6 | 35:10 36:1 38:5,5 | 204:7,16 205:24 | **dea12** 11:12,14 |
| 146:3 178:21 | 38:8,24 39:11,24 | 206:1,14 207:2 | **deal** 125:16 126:2 |
| 179:2,2,5,5,9,9 | 40:13,25 41:7,10 | 217:1 219:15 | 254:2 |
| 203:12 204:9 | 41:15,22 42:8 | 220:23 224:20 | **dealing** 213:17 |
| 241:7,12,13,15,21 | 43:10,19,23 44:15 | 225:12 226:16 | 245:11,17,21,25 |
| 241:23 242:7,15 | 45:5 46:1 48:6,18 | 228:1,14 234:24 | 246:1,4,15 247:3,8 |
| 242:16 293:9,11 | 49:24 50:5,16 | 237:8 241:23 | **dealings** 137:22 |
| 293:14 | 51:2,9,15,15 52:12 | 244:9 249:14 | **deals** 89:1 |
| | 58:14 60:14,16 | 251:12 254:1,23 | |

## Page 16 — [dealt - description]

| | | | |
|---|---|---|---|
| **dealt** 215:19 | 242:8,14 355:2,5 | **deliberative** 59:11 | **deployed** 231:21 |
| **dear** 360:10 | **decks** 216:14 | 59:13 136:8 164:1 | 233:10 |
| **death** 36:12 | **declined** 26:4,13 | 166:14 188:2,6 | **deposed** 17:2,6 |
| **deaths** 20:18 | **deed** 361:14 | 205:10 237:7,10 | **deposition** 1:18 |
| **debra** 4:13 14:5 | 362:20 | 244:8,12 276:14 | 2:1 10:13 12:11 |
| **debra.ogorman** | **deemed** 275:24 | 281:19 283:9 | 12:15,21 18:10,13 |
| 4:16 | 360:19 | 292:22 305:12 | 18:24 31:22 34:13 |
| **december** 250:8 | **defendant** 12:16 | 336:9 348:18 | 46:11 72:12,19 |
| 265:21 285:16 | 13:19 | **delivered** 238:9,15 | 74:3 81:16 100:18 |
| 288:1,14 303:6 | **defendants** 16:8 | 240:4 252:10 | 104:7 124:3 125:8 |
| 304:12,16,17 | 81:24 | **delivery** 53:8 | 183:23 190:25 |
| 305:1,7,22 307:15 | **define** 286:24 | 242:9 252:8 | 211:4 216:19 |
| 313:7 340:14 | **defined** 262:1 | **delivery** 53:8 | 218:16,22 267:13 |
| **dechert** 4:14 14:6 | 278:14,14,16 | **depart** 231:3 | 279:3 288:6,8,23 |
| **dechert.com** 4:16 | 327:20 | **departed** 231:2 | 310:22 356:23 |
| **decide** 274:2 | **department** 3:7 | **department** 3:7 | 359:3,5,9,13 360:8 |
| 282:20 286:24 | 9:4,6,6 14:16 19:4 | 359:3,5,9,13 360:8 | 360:11 361:1,3 |
| 322:23 | 58:23 59:2 90:20 | 360:11 361:1,3 | 362:1,3 |
| **decided** 26:16 | **definition** 57:17 | 127:9,13 136:9 | **depositions** 17:8 |
| 44:8 232:6,8,9 | 119:25 259:20,21 | 139:21 140:10 | 125:10 |
| 243:23 | 259:24 266:23 | 164:2 165:2,5 | **deputy** 133:14 |
| **decides** 99:12 | 267:8,23 268:6,20 | 166:15 187:6,10 | 137:1 138:18 |
| 156:22 | 272:19,20,24 | 205:11 206:4 | 140:16 149:24 |
| **deciding** 52:10 | 277:10,14 279:9 | 231:8 237:1 244:9 | 153:10 156:11 |
| **decision** 43:2,10 | 279:10,18,20 | 247:4 266:17,20 | 159:19 161:5 |
| 43:11,22 45:21 | 280:17,19 281:2 | 266:22 282:22 | 164:25 176:24 |
| 57:1,22 59:1,1 | 289:16 290:18 | 283:10 288:24 | 181:20 182:3,12 |
| 120:3 157:1 | 291:14 297:19 | 339:10 360:22 | 184:9 204:8 206:2 |
| 250:22 274:4,6,12 | 299:25 300:5,6 | **departments** | 207:10 211:17 |
| 275:14,21 278:10 | 324:23 330:16 | 340:3,9 342:22 | 215:13 216:12 |
| 282:16 284:11 | 332:8 | **departure** 335:23 | 230:20 231:4 |
| 285:13,14,15,18 | **definitions** 291:21 | 335:24 | 232:18,23 233:1,5 |
| 287:5,6 316:8 | **delay** 122:11 | **depending** 214:25 | 233:13 235:17 |
| 322:18 325:19 | 171:10,18 173:3,3 | 273:2 | 278:15,24 |
| **decisionmaker** | 173:5 | **depends** 88:10,20 | **deречive** 184:13 |
| 138:8 | **delayed** 172:17 | 88:20 90:11 | 224:6 |
| **decisions** 135:25 | **delegated** 31:3 | 273:23 274:18 | **described** 241:12 |
| 136:18 137:3 | 232:25 | 304:6 | 216:14 259:4,6 |
| 286:4 | **deliberations** | **deployable** 231:14 | 307:14 |
| **deck** 11:8,15 145:8 | 58:13,16 64:18,21 | 231:20 | **description** 217:13 |
| 146:22 232:6 | 69:1,5 250:16,17 | | 270:1 |

## Page 17 — [design - distributor]

| | | | |
|---|---|---|---|
| **design** 315:22 | **diazepam** 263:20 | **directly** 167:1 | 167:7 |
| 316:6 318:17 | 319:1 | 268:3 | **discuss** 206:23 |
| 319:6,22 321:4,6 | **dibella** 83:9 | **director** 230:20 | 255:12 292:6 |
| 321:15,24 322:9 | **dictate** 99:8 | 235:17 | 307:21,21 |
| 324:21 327:19 | **difference** 212:25 | **dis** 348:8 | **discussed** 47:10 |
| 334:11 | 308:9 310:18 | **disagree** 189:16 | 77:10 160:9 |
| **designated** 86:6,9 | **differences** 48:24 | **disagreed** 350:16 | 172:23 244:23 |
| **designed** 321:1,3 | **different** 17:5 56:7 | **disagreeing** 348:9 | 249:16 251:13 |
| 324:6 | 86:11 92:17 118:1 | **disciplines** 119:2 | 258:21 278:5,9 |
| **desk** 251:20 | 176:13 207:9 | **disclose** 49:11,17 | 307:17 330:4 |
| **despite** 185:18 | 224:13 232:11 | 58:15 59:10 64:17 | 342:1,17 343:8,10 |
| **detail** 75:20 | 253:3 254:2,9 | 68:25 77:19 97:14 | 343:11 356:5 |
| **detailing** 337:4 | 263:10,13,21 | 97:19 117:4 | **discussing** 55:3 |
| **details** 146:21 | 268:14 270:23 | 118:16 136:6,9 | 70:18 167:3 |
| **determination** | 272:2 274:11 | 161:8 162:6 | **discussion** 71:1,2 |
| 97:6 111:7 195:18 | 278:15 280:3 | 168:19 188:1 | **discussions** 128:9 |
| 195:19 304:5 | 285:8 286:14,15 | 205:8,15 225:10 | **disjunctive** 303:18 |
| **determine** 120:4 | 293:16 322:6,16 | 237:5 244:7 | **dispense** 185:22 |
| 276:5 | 354:21 | 266:19 276:11 | 186:15 189:1 |
| **determines** 22:11 | **differently** 54:18 | 281:18,20 283:6 | 223:25 225:5 |
| 93:17 | 54:20 55:12 286:5 | 292:21 295:7 | **dispensing** 24:7 |
| **determining** 92:18 | **diligence** 110:15 | 305:11,13 330:4 | 179:5,9 222:18 |
| 303:25 | 110:16 144:19 | 336:7 339:15 | 223:9,23 |
| **detroit** 148:16,20 | 145:13 261:25 | 348:19 | **disposal** 29:16 |
| 148:21,22,23 | 274:19 275:13 | **disclosed** 118:19 | 92:24 93:3 160:24 |
| **develop** 303:24 | 280:14 295:1,3,5 | 129:24 | **dispositive** 73:19 |
| **developed** 238:8 | 295:20 296:16,25 | **disclosing** 49:14 | **distribute** 115:2 |
| **developing** 236:1 | 326:9 | 59:12 64:20 69:4 | **distributed** 25:3 |
| 238:23 | **direct** 21:4,4 27:1 | 117:7 136:12 | 214:15 |
| **deviates** 303:20 | 27:13,17 79:12 | 146:13 237:9 | **distributing** |
| 304:2 | 101:19 104:13 | 244:11 250:17 | 108:15 |
| **deviating** 110:3 | 184:1,23 185:1 | 276:17 281:24 | **distribution** 24:6 |
| 254:16 258:7 | 191:5,16 211:13 | 293:2 305:17 | 24:7 49:25 67:12 |
| 259:14 262:17 | 212:6 216:22 | 330:8 339:18 | 67:23,24 116:5 |
| 264:5,24 272:9 | 218:19 219:4 | **discount** 8:21 | 119:23 179:2 |
| 282:11 284:8 | 289:1,3 290:8 | **discovered** 122:18 | 229:18 248:14 |
| 289:19 290:22 | **directed** 124:11 | 307:3 328:9 | 345:23 351:4 |
| 292:11 322:14 | 125:10 | **discovery** 125:7 | **distributor** 29:23 |
| **deviation** 264:4 | **directing** 219:6 | **discretion** 136:10 | 39:6,8,10 40:13,23 |
| | **direction** 359:9 | 161:11 162:8 | 41:15,16,23 43:3 |
| | | 164:1 166:13 | 43:12,22 44:12 |

45:2,25 52:11
107:2,5,10 108:12
108:18,20,23
109:1,8 111:4,10
115:4 118:6 120:1
120:2 179:12
180:2,8,15,22
236:12,14,16
237:1 238:9,23
239:4 240:3,14
241:1,13,22,22
242:9,20 246:22
247:11,14,15
248:19 249:4,9,13
249:17 250:4
251:2,6,10 252:8
253:12 254:24
255:1,9,14,20
256:10,14 257:17
257:22,24 259:1
274:2 275:2 278:7
282:15,20 283:25
286:7,23 292:5
293:4,12,16,17,25
296:2 297:10,17
298:7 299:3,3,8,13
299:14 308:24
310:1 312:16
318:16 321:2
328:18 332:20
345:3,10,12,15,20
349:11
distributor's 45:6
241:23
distributors 22:1
23:18 24:25 25:3
29:21 39:11,24
40:7,14,24 41:7,21
42:9,13,15 43:24
46:24 47:3 51:3
51:18 68:1 107:6

107:13,24 108:1
111:20 113:23
114:1,7,24 115:11
115:23 116:14
182:7 226:15
229:12 236:3
240:13 242:23
243:6 245:12,22
246:5,15 247:3,8
248:17 255:8
257:10 258:10
281:11 286:15
294:7 295:17
309:5 332:3 341:1
341:13 343:20
345:16,19 346:3
346:16 349:4
district 1:1,1
12:18,19 14:19
15:4 149:3,9,14,16
359:21
diversion 10:16
11:9 19:12,22
20:1,15,20 25:8
29:3 30:20,24
32:12 38:25 39:23
44:2 45:3 46:3
53:3,4,10,15,19,20
53:23 54:1,18
55:11 56:24 59:19
60:5 61:11 94:13
97:8 107:19
110:2 116:19
120:24 122:12
131:21 132:1,5,18
133:15,17,19
134:2,15,21 135:9
135:12 136:1
137:2,18 138:17
138:19 139:11,12
140:3,15,19 141:1

141:18 142:1,1,11
142:20,22 143:9
143:11,12,13
144:1,4,12,16,17
145:10,12,18,24
146:1,2,4,24 147:1
147:9,11,13,18
147:21 150:11,14
150:15 151:15,16
152:11,12,23
153:5,6,11 154:6
154:18 155:12
156:1,3,13 157:4
157:25 158:18
159:4,5,10,20
160:1,16 161:3,24
164:9 165:4 166:4
166:7,9 168:6,11
171:10,18 172:6
173:9 175:13
181:12,15 184:10
195:13,24 196:3
196:14 200:2
202:13,13 203:22
211:18 218:24
219:15 220:2
226:19,22 227:1,6
227:20 229:4
230:21,23 231:19
232:15 233:6,9,12
235:18,21 253:14
254:21 270:13,22
276:2 283:17
284:21 286:11
300:18 301:15
324:10 325:2,16
326:11 341:11
divert 99:12
diverted 111:9
202:21 203:14
204:11

diverters 183:1
diverting 22:16,20
95:25 96:17 97:12
133:23 134:6,8
200:4 210:22
214:14 215:7
222:2
division 1:2 10:16
12:19 131:25
141:7 147:23
148:11,17,19,22
156:25 158:2
159:23 165:2
281:6 302:23,23
divisions 48:6,10
48:15 148:2,8
153:13 156:13,20
156:23 157:3
divulge 79:13
divulged 73:22
doctor 52:12
172:14 189:10,10
190:2,3 195:12,18
213:24 214:1
doctor's 172:12
doctors 22:5 25:4
48:1 51:4,19
88:17 113:23
144:20 145:14
182:25 185:15,15
185:22 186:14
188:25 192:10
193:6 196:20,22
198:17,24 200:3
201:13,15 234:20
document 16:32:4
32:7,23 34:22,23
35:1,6 37:24,24
38:6,6,7,9,12,23
74:11,22 75:1
100:7 101:3,20

105:13 106:15
112:20,23 113:14
116:12 120:21
124:21,25 175:8
175:11 184:7
212:15 217:1,2
315:11 352:12,16
353:16 356:4,15
357:5,8
documentation
51:9,13 52:12
263:1
documents 6:21
61:25 89:12 90:5
90:16,22 91:3,9,11
127:1,4,8,12
129:25 130:4,11
232:20 238:24
240:18 315:9
doing 43:6 58:6,15
60:22 91:14 99:16
110:18 133:2
161:4 182:20,21
194:1 198:16
200:1 222:13
238:25 240:10
241:19 249:5
252:24 253:22
274:19 280:14
295:2,5 296:24
326:9
doj 15:5
dollars 81:10
domestic 200:19
221:10
domestically
218:3
dosage 95:8,23

doubt 38:23
101:23
downstream
24:11,13 29:16
104:24 106:5
111:8 116:22
118:4 122:8 297:5
dpm 158:2 302:9
302:24
draft 244:1,12
drafted 244:3
257:22
drafting 257:18,25
draw 224:12
drawing 193:5
drug 6:13 8:21 9:7
10:18,23 11:3,6,9
15:1 49:25 58:23
98:21 99:4,7,21
101:23 102:4
106:9 136:20
139:18,20 150:23
150:24 191:21
203:6 204:21
207:4 211:10
216:6 218:24
219:24 263:16
275:1,4,7 316:10
drugs 111:7
116:22 150:25
203:11 211:23
265:1,1 297:1
due 44:6,9 110:15
110:16 144:18
145:13 261:25
274:19 275:13
280:14 295:1,2,5
295:19 296:15,24
326:9

duly 16:13 359:5
durkin 8:22
duties 69:24 70:3
128:12 131:18,22
132:25 133:21
135:21,24 136:25
137:21 138:2,11
138:14 139:8
140:2,15 141:6
142:18 143:7
144:4 145:23
161:5 181:14,19
182:3 187:25
205:14,22
duty 117:1
dynamics 274:7

e
e 7:3,3,22 8:23
10:1 12:1,1 89:15
89:16,17,19,20
90:4,8,9,16 235:25
237:2,19,22
239:10 268:1,25
268:25 342:18
eagle 131:12 180:4
215:22 220:9
earlier 64:5 107:1
178:19 202:11
267:11 307:14
351:15,20 356:15
early 42:11 66:19
67:9 117:17 235:4
easier 17:13 90:13
east 3:4
eastern 1:2 8:10
12:19
easy 104:16
162:12 211:22
279:25
economic 93:10

edge 170:22
education 141:25
effect 179:16
effective 36:12
37:8 116:19 196:9
196:13 253:14
276:1 284:20
286:11 326:10
341:11
effectiveness
146:11
effort 237:12,19
240:19
efforts 133:17,22
either 66:18
119:22 128:15
161:25 163:20
168:19 190:5
206:17 239:25
329:11 335:22
elaborate 283:18
283:23 303:7
elaborated 291:23
297:18
elaborating
267:12
elaboration
256:14 259:20,24
268:19 270:14
277:9,13,24 278:1
281:7 282:6 289:4
289:7 290:6
291:12 292:14
298:4,5,6 299:2,7
304:12,16,19,22
305:3 311:19
312:8
elaborations
282:23 285:10
292:17

elements 44:20
224:8 43:4
elias 4:6
eliminated 200:21
223:8
ellis 4:23 7:12
13:17
email 360:17
emainigi 6:6
embarcadero 5:3
emerged 293:15
293:17
emergencies 93:13
emilie 4:18 13:22
emphasize 257:9
employed 323:13
359:12,15
employee 155:12
266:21 359:14
employees 90:7,11
132:16
employment
131:18
enacted 65:12
enclosed 360:11
encompass 108:13
271:21
ended 41:23
endo 5:13 11:1
endorse 333:1
energy 200:7
219:2
enforce 186:16
231:10 232:11
enforcement 9:7
10:23 15:2 19:21
58:23 59:2 77:9
99:7 134:23
136:20 138:16
139:4,20 141:16
141:17 150:10,19

150:22 151:7
152:2,3,17,23
154:17 156:14
189:2 190:6
197:25 200:10
203:6 204:21
207:16 219:24
220:24 228:1,14
228:19 231:5,6,9
231:13 232:5
233:11 275:1,5,7
316:10
enforcing 132:7
engagement 87:13
88:24
engagements 88:5
88:7,9
ensure 23:4,10
98:12 107:14
159:21 196:8,12
232:20 243:20,24
313:16
ensuring 142:19
143:8
entails 145:12
entered 362:9
entire 19:25 46:2
110:21 111:13
112:17 113:11,19
113:21 124:20,21
124:25 131:23,25
361:5 362:5
entities 21:19 22:8
46:12 50:17
143:18 310:2
entitled 10:17
123:18 211:9,16
218:24
entity 21:10,15
81:20

entries 25:17,18
25:22
enu 6:3 13:12
226:12
environment
318:23
environments
318:11
episode 104:11
123:16
eppich 7:8 10:3
13:8,8 16:19,21
18:8,12,18 20:12
20:19 23:14 24:2
24:12,22 26:10,14
26:21 27:3,15
28:3,17 29:1,8,19
30:7 31:20,24
32:8 34:8,15,24
35:3,7,15,16 37:1
37:18 38:11,15,18
39:5,21 40:11
41:6,13 42:7
43:25 44:11,25
45:14 46:8,22
47:5,12,20,25 48:4
48:8,16,25 49:6,23
50:4,11 51:1,14
52:6,9,21,23 54:16
55:8,24 56:9,14
57:5,24 58:2 59:5
59:17,21 60:2,25
61:13 62:7,19
63:7,16,19 64:4,25
65:10,21,25 66:11
66:21 67:4,10,25
68:15 69:12 70:9
70:17,25 71:15,21
72:2 73:5,23 74:1
74:5,19,20 75:21
76:5,16,25 78:16

79:1,24 80:5,11,23
81:3 82:11,17,20
83:2 84:17 85:2
85:10,15,24 86:1
86:12 88:2 89:23
91:3,17
equal 156:14
era 197:5,21,22
199:3 225:6
eric 8:21
errata 360:13,18
362:7,10,18 363:1
specially 40:22
esg 3:3,7,12,16,16
4:2,5,9,13,18,22
5:2,6,10,14,15,20
6:3,3,4,9,14,14 7:3
7:3,8,12,16,16,22
8:2,6,11,16,20 9:4
9:5
essentially 227:25
243:11 259:16
282:22 304:21
306:10 314:23
315:19
establish 137:14
326:22
established 30:12
37:7 263:15
294:19 299:24
326:13,15
estimate 173:23
estimated 30:17
153:1
et 1:3,8,10,12,13
everybody 243:25
261:18 286:3
everybody's
114:11 303:2
evolution 234:5

evolved 249:14,17
eweiss 8:24
ewinckel 4:21
exact 259:16
272:15 274:12
exactly 28:2,24
55:2 62:6 73:4
75:17 99:8 103:20
109:2 111:19
115:4 119:5 145:2
160:20 182:21
236:7 243:19
260:1 278:23
284:5 286:2
308:18 309:8
312:2 352:17
examination 10:2
16:18 92:6 131:1
226:9 356:10
examining 11:2
191:20
example 22:15
148:15 149:3
151:25 219:14
254:3 255:22
266:23 271:18
278:25 284:22
303:19 305:25
341:3 343:2
examples 256:23
258:24 268:11
279:1 282:12
294:4
exceed 263:2
exception 278:4
excessive 230:3,7
230:9,12 305:23
306:11,18,22
307:8,21 308:13
308:20,20

excuse 18:15 20:5
34:20 35:23 74:16
191:7 236:24
295:22
exec 175:19
239:12,14
execs 101:13
executed 362:10
execution 361:14
362:19
executive 204:23
204:24 239:17,19
86:3,6,9
executives 337:23
338:21
exhibit 10:12,14
10:16,17,20,22,23
11:2,5,8,9,12,13
11:15 18:8,10,12
18:19 19:2,7
31:20,22,25 32:10
34:11,13,16 35:18
35:20 73:24 74:2
74:3,6 100:10,14
100:18,20,22
104:6,7 111:23
124:21,21 183:23
190:11,25 211:4,7
216:19 217:17,19
218:16,22 288:6,8
288:14,15 289:22
289:24 303:5
356:16,23
exhibits 10:11
11:11,19 288:5
existed 117:2
expect 110:20
112:5,7,8,12,16
113:10 157:14
158:5,13 159:8
160:13 318:21

319:6,21
expected 260:2,7
311:15 318:9,15
324:23
expenses 88:13
experience 102:1
154:16,17 161:4
161:22 172:17
177:9 181:11
325:7
expert 73:21 77:16
77:20 79:14 85:22
86:3,6,9
expertise 222:25
223:18
expiration 361:19
362:25 363:25
expires 35:25
explain 52:5 87:17
160:24 253:21
256:7 259:12
260:20,20,22
explained 259:10
259:25 260:1,6
261:24 271:25
272:7 284:17,19
284:21 286:6
291:20 294:23
296:4,12 330:1
341:9,10
explains 291:15
explanation 282:7
282:9
explanations
282:23 341:24
export 95:20,21
98:9 103:9
expressing 181:14
expressly 115:22
extensive 41:17

extent 49:13 58:12
59:12 64:19 69:3
69:25 72:6 77:5
77:15,18 78:21
91:7 117:6
118:18 136:11
146:8,12 168:18
168:23 188:4
205:19 225:13
237:8 244:10
276:16 281:23
293:1 295:11
305:16 330:7
336:13,16 338:20
338:25 339:17
348:15,20 352:18
eye 4:19

f
faced 274:11
facilitating 254:13
facilitation 213:21
facilities 349:13
354:22
fact 23:3 31:11
53:25 77:25 86:13
90:7 96:13,16
105:11 121:6
122:10 124:25
208:7,12 210:23
253:20 276:5
293:1 295:11
303:8 318:8
314:21 331:3
345:2,15 346:2
factors 92:18,21
93:16 95:22
261:11,12
facts 36:4 69:22
70:1 100:4 187:23
205:13,20 269:11
273:3,23 275:19

**factual** 188:7
**fair** 17:7 85:24
  107:5 133:2 134:6
  138:3,11 141:13
  143:23 144:7,10
  147:15 149:10
  153:14 156:10
  157:8 179:9
  180:25 181:21
  190:12 180:18:18
  189:18 192:3
  193:6 195:9
  196:23 197:4,19
  198:3 200:11
  202:18 213:9
  214:17 216:15
  218:4 220:20
  222:2 238:7
  241:25 242:6
  243:10 251:22
  253:4 254:4
  278:13 301:13
  313:5 320:3 331:2
**fairly** 261:18
  307:5
**fairness** 123:24
**fall** 40:16 170:23
  240:4
**fallen** 181:18
**falls** 137:11 324:5
**familiar** 23:15
  32:4 39:7 107:3
  110:7,14 117:19
  126:16 157:16
  166:5 212:15
  224:3 288:18
  309:19 314:4
**familo** 8:22
**family** 54:2,15
  202:14,21 203:15
  203:23 204:12

**far** 99:20 147:12
  164:16 167:7
  203:19 244:11
  248:25 249:3
  251:23 267:23
  282:8 289:16
  340:13
**farrell** 4:2 14:11
  14:11
**favorite** 19:18
**fax** 67:5
**fda** 94:14
**feature** 322:11
**february** 243:12
  287:21 290:2
  304:25 305:2
  307:15 313:7
**fed** 209:4
**federal** 23:12
  114:25 115:6,19
  116:8 117:16
  133:12 140:25
  141:16 308:22
  309:20 314:4
**fee** 81:24 83:21,22
  83:23
**feelings** 187:9
**feels** 133:9
**fees** 83:19 87:19
**feldman** 9:3 15:8,8
**felt** 187:12 282:19
  349:14
**fence** 170:24
**fide** 213:24
**field** 132:16 133:8
  141:7,8 143:18
  145:1 147:17,23
  148:1,8,11,16,19
  151:14,24,24
  152:1 153:13
  156:13,20,23,23

**fields** (see 157:3 158:2)
157:3 158:2
  159:23 160:9
  231:19,24 232:1
  300:22,22 301:3
  301:10,13,23,25
  302:5
**fields** 72:24 73:15
  78:25 79:2,3 80:2
  80:25 81:12,15
  83:13 84:24 85:5
  86:20,22
**fifteenth** 7:13
**fifth** 75:1
**figure** 270:1
  276:23
**file** 45:20 171:24
  173:9 254:19
  275:21 306:20
  310:3,7
**filed** 12:17 309:1
**filing** 66:18 67:3
  171:10,18 172:18
  172:21 173:14
  280:13
**fill** 124:22 222:12
  274:3
**filled** 152:3,17
  196:1 222:23
  307:20
**fills** 196:10
**filtered** 164:13
**final** 59:1
**finalized** 101:15
**finally** 125:13
**finance** 7:11
**financially** 359:16
**find** 170:5 251:21
  360:11
**finder** 124:25
**fine** 131:7 177:20
  195:1 217:8

  225:19 288:12
  356:7
**finish** 17:15 66:15
  128:21 194:13
  298:9,21 312:24
**finished** 66:16
  190:10 298:15
**finkelstein** 9:5
  14:15,15
**firm** 4:9 12:25
  13:2 14:8 80:2,25
  81:12,15 85:5
  86:20 87:11,14
  131:5 228:4
**fish** 82:3,13
  86:11
**first** 16:13 36:7
  40:23 77:14
  101:21 112:24
  118:9,13,24
  124:14,16 125:2
  127:19 128:22,25
  129:7 164:17,19
  182:25 183:9,12
  183:13 185:1
  186:15 187:5
  189:1 211:20
  219:8 223:7
  233:20 234:6
  235:7 240:2 251:7
  294:6 303:14,16
**fits** 147:22
**five** 19:12 125:4
  262:14 333:11
  358:5
**flags** 196:11,15
**flaws** 349:3
**flight** 88:14,15

---

**flip** 101:10 152:16
**floor** 3:13 4:10
  5:22 8:7
**florida** 223:6
  224:14
**flow** 24:4 72:13
**focus** 192:9 193:5
  196:19 198:2,19
  199:4,7,8 214:10
  228:8,23 249:13
  253:1,3 317:12
**focused** 197:4
  199:16 200:7
  220:19 229:7
  279:15 280:23
  282:5 285:25
  289:11 290:12
**focusing** 197:19
**focussed** 297:12
**foia** 128:15 130:14
**foley** 8:5
**folks** 24:19 177:18
  181:16 248:4
**follow** 166:3 268:9
  326:22
**followed** 257:2
  269:13 280:16
  284:6 311:10,11
  335:19
**following** 36:4
  39:6,10 105:2
  133:10 192:1
  269:25 272:22,23
  317:4 326:5,7,12
  326:14 327:5
**follows** 16:15
  140:23 301:11
**followup** 124:12
**food** 94:9
**footing** 156:14
**force** 132:20
  150:16 153:7

**foregoing** 359:3,5
  361:13 362:18
**form** 69:25 99:5
  103:4 104:23
  130:1 187:1
  190:17 193:7,22
  199:11,21 203:22
  207:23 231:12
  244:25 245:4
  247:5 248:7
  249:21 253:7
  254:5,6 255:5
  257:14 277:19
  279:15 280:23
  282:5 285:25
  289:11 290:12
  311:24 313:16,23
  329:15 333:17
  335:8 347:13
  352:9
**formal** 116:11,17
  144:25 330:24,25
**format** 180:14
**former** 266:21
**forrest** 9:6 15:1,1
**forth** 28:7 140:9
**forward** 360:15
**fought** 10:18 74:8
**found** 90:19 281:9
  292:14 306:23
**foundation** 24:8
  26:7 32:6 36:21
  37:15,21 39:1,3,15
  46:17 50:2 51:23
  54:23 60:24 61:3
  61:22 62:3,12,25
  63:13 64:13 66:7
  67:1,7,15 68:6,20
  75:13 102:13
  103:3 105:12,14
  105:23 107:9

  116:2 127:14
  146:5 154:20
  156:17 162:4
  171:23 172:12
  173:18 174:5,8
  182:15 203:25
  204:2,13 214:18
  218:6 222:24
  223:2 235:1 236:5
  236:20 238:13
  239:8 240:15
  242:2 244:23,25
  245:3,14 248:9
  252:1 256:17
  257:24 260:1,19
  261:9 268:3
  271:10,11 276:8
  281:13 283:1
  284:3 301:19
  302:16 308:15
  314:4 328:23
  329:19 330:19,21
  334:20 336:3
  345:5 346:6,21
  347:24 349:1
  350:19 352:10
  353:15
**four** 19:2 40:23
  122:6,19
**fourth** 3:4 36:1
  291:4 327:15
**fox** 8:17
**foxrothschild.com**
  8:20
**fraction** 193:15
**framed** 185:12
**framework**
  320:13
**frankly** 38:4

**fraud** 9:6 189:7,25
**fraudulent** 189:7
**free** 88:6,12 125:2
  361:14 362:20
**frequency** 110:3
  254:16 258:6
  259:14 260:25
  264:16,25 265:2,3
  271:20 272:1,9,10
  272:13,18,21,24
  272:25 273:11
  277:14 278:1
  279:2 281:8
  282:10 284:7
  287:1 289:2
  290:24 292:10
  322:14 327:21
**friend** 53:22 54:2
  203:15,23 204:12
**friends** 202:14,21
  203:15,23 204:12
**front** 62:17 111:23
  192:16 207:12
  208:10,22 210:9
  233:16,18 234:1
  270:15 287:14,19
  288:1 337:23
**fulfill** 66:2
**fulfilling** 200:20
**full** 16:24 75:1
  112:24 193:16
  215:19 228:4
**fuller** 4:5,6 14:9,9
**function** 31:3
**functions** 232:19
**further** 124:19
  268:19 277:9,13
  278:14 281:7
  289:4 290:6
  291:20,22 356:10
  357:20 359:13

---

**future** 124:10

**g**

**g** 12:1
**gallagher** 176:7,14
**gao** 347:5,15
  348:21 349:13,18
  351:6
**gao's** 347:9 349:25
**gary** 239:25
**gathering** 146:9
**geao** 350:17
**general** 45:15 77:7
  77:11 131:17,18
  133:20 136:25
  137:21 138:1,11
  138:14 140:2,24
  142:18 143:7
  161:5 181:19
  182:2 197:18
  201:12 232:23
  330:5,5
**generally** 88:14
  121:25 130:12
  136:18 153:5,22
  161:13 190:2
  213:13 214:23
  243:3 249:6
  269:12 295:12
  331:24,25 337:24
**generals** 75:5 77:2
  78:18
**generate** 160:16
**generating** 121:10
**generically** 259:7
**geoffrey** 7:3 15:14
**getting** 20:13
  21:11,16 87:18
  146:20 165:15
  189:13 235:5,11
  255:15 302:7

**ghobart** 7:6
**giant** 131:12 180:4
  215:22 220:9
**give** 17:20 34:22
  55:25 56:11 57:6
  60:9,22 69:21
  91:8 96:18 173:23
  187:22 188:7
  205:12,23 268:10
  268:15 299:25
**given** 125:15
  167:14 236:13
  247:3 357:10,11
  357:12,24 359:10
**gives** 307:3
**giving** 217:12
  272:19
**gladly** 307:8
**go** 12:13 20:8
  27:21 29:14 32:15
  32:23 36:24 42:3
  43:20 44:19 45:8
  46:19 51:24 53:16
  54:11,25 55:17
  56:21,22 57:12
  58:3,18 61:6 62:4
  63:15,19 65:6
  67:20 68:9 70:5
  71:12 76:5,20
  78:8 79:17 80:21
  81:1 84:14 87:24
  91:21 95:14 96:10
  97:3 98:6 100:1
  102:16 103:19
  106:16 110:24
  117:13 119:10
  124:11,15 127:16
  130:18 133:2
  136:14,17 138:24
  140:7 146:16
  151:6 157:25

  158:21 165:16
  166:25 169:4,11
  175:7 179:21
  181:25 182:18
  183:6 184:24
  190:18 191:6,8
  196:6 201:9 202:3
  203:3 207:24
  208:13 210:13
  213:14 214:21,24
  221:8 223:4
  226:25 228:17
  234:10 241:3,21
  244:15,17 245:6
  245:18 248:11
  249:2,23 252:15
  253:9 254:8 255:6
  256:4 258:19
  262:15 265:6
  267:19 270:7
  273:19 276:4,23
  277:20 278:11,22
  287:25 288:21
  289:12 290:13
  292:24 295:24
  296:23 297:2
  297:17 300:17
  302:20 308:11
  309:17 310:23
  311:25 313:14
  314:4,14,16,18
  315:5 318:14
  319:17 320:24
  322:4,7 324:2,18
  325:11,22 327:16
  328:7 329:4,21
  330:22 331:11,22
  332:17 333:19
  334:22 335:17

  336:18 337:14
  339:5 340:21
  344:18 345:8
  346:14 347:2
  348:2 350:9,21
  355:20
**goal** 294:6
**goes** 167:6 190:5
  200:9 285:10
  310:24
**going** 12:4 28:11
  34:21 57:3 61:23
  63:21,25 77:24
  79:22,23 84:7,11
  91:23 92:2 100:7
  101:19 104:5
  106:4 122:17,20
  123:3,7 130:20
  132:6 133:1
  134:10,14 135:11
  154:2,4 157:8
  161:20 163:4
  165:18,22 169:7
  170:23 177:15,17
  177:22 178:6,10
  185:1 190:3 191:4
  208:11 212:6
  218:19 225:23
  226:3 232:5
  243:24 247:20
  248:20 250:2,7
  253:25 256:19
  262:12 265:8,12
  270:23 274:2
  275:6 280:14
  286:24 287:19
  288:25 293:13
  297:23 308:2,4
  316:19,23 330:23
  348:25 354:21
  354:23 355:1
  357:20 357:4

---

**gong** 82:8
**good** 12:3 16:20
  28:18 92:9,10
  122:25 131:3
  177:19 178:17,18
  182:24 195:4
  226:11 262:9
**government** 82:22
  89:16 90:5 265:17
  309:21
**grandmother's**
  53:17,17
**grant** 8:8 52:10
  96:1 98:1,20
**granted** 97:11
  99:3
**granting** 98:1
**grateful** 289:8
**gray** 7:17 14:2,4
**great** 106:8
**greater** 200:7
  297:4 336:1
  347:11 350:18
**greatest** 326:6
**greene** 4:2
**greeneketchum...**
  4:4
**greg** 14:21
**gregory** 3:3 360:5
**ground** 17:8
**group** 4:6 88:11
  88:17,18,19,20
  121:3 131:24
  132:1,6 133:15
  135:9 139:11
  140:16 141:23
  142:9,10,19 143:8
  143:11,11,24
  144:12,16 145:10
  146:24,25 150:10
  150:11,17 152:20

**guise** 194:6
**guns** 150:22 151:8
**guys** 209:13,17
  279:22

**h**

**h.d.** 7:21 16:4
**haight** 234:14
**half** 154:1 193:4
**halloween** 19:18
**hallway** 162:24
  169:2
**handed** 203:19
**handful** 65:15
**handle** 22:8 50:5
  50:17 51:4,7
  132:6 233:11
  271:4
**handled** 332:22
**handling** 154:17
  175:20
**handwritten** 66:2
  66:10,19 355:11
**handy** 243:2
  350:23
**hang** 298:14
**happen** 181:6
  275:7 351:11
**happened** 264:13
  341:15
**happening** 116:22
  271:3
**happens** 125:8
**happy** 177:22,23
**harm** 194:2
**hate** 197:10,16
  198:10,11 199:6
  199:16 200:8,21
  220:16,18
**hattiesburg** 4:7
**hbc** 8:6 13:19
  13:11 11:1 180:4

**group's** 142:1
**groups** 138:17
  139:5,5 152:3,11
  152:17 201:11
**growing** 11:2,5
  191:20 211:10
**gs** 160:8,23
**guess** 129:16
  285:3 299:9
  313:15
**guessing** 235:3
  270:10
**guidance** 39:12,24
  42:13 57:7 60:23
  109:20 110:1
  114:16,18,22
  115:5 116:12,17
  116:25 119:14
  120:6 146:2
  229:24 268:12,16
  269:2,4,7,12,13
  278:2 299:12
  309:12,17,20
  310:19,25 311:3
  311:17,18 312:7,8
  312:13 313:9,16
  313:20,23 314:2,5
  314:14,18,23
  315:25 317:5,17
  317:25 326:15
  328:19 329:11
  330:16 331:4,17
  340:9,12 347:11
  347:21 350:1,18
  351:8 352:6,20
  353:4,14,24
**guidelines** 37:8
  61:18 333:13,18
  334:1,5,10 335:10

  158:1 166:4 168:6
  332:2,3

**hdma** 42:16 331:3
  331:18,24 332:2
  332:19
**hdma's** 330:15
**he'll** 34:25
**head** 17:19 19:11
  19:25 20:14,20
  30:23 32:11 38:25
  39:22 44:1 45:3
  46:2 54:18 55:10
  56:23 59:19 60:5
  94:13 107:19
  110:12 120:23
  131:21 175:23
  262:8 270:13,21
  270:25 283:16
  324:13 325:2,16
  328:14
**heada** 237:23
  238:1,4
**headquarters** 21:5
  38:10 132:14
  149:20 158:3
  160:8 228:15,25
  229:2 230:17
  235:23 238:17
  300:11,19 301:16
**heald** 239:23
**health** 6:2 15:17
  34:18 36:2 101:24
  102:5 207:5 226:9
  226:13
**hear** 42:8 82:9
  119:14
**heard** 42:5 46:11
  48:5 110:9 118:19
  118:24 297:9,11
**hearing** 10:24
  11:4,6,10 24:19
  139:23 140:12

184:8 185:13
186:24 191:19
211:11,16,21
218:23,25
**heart** 167:1
**held** 2:1 12:21
40:13 108:1 111:3
116:17 172:20
173:14 174:1
177:10 239:4
310:16 345:24
**help** 102:9 121:14
132:4 134:19
135:10 137:14
210:6 220:19
231:21 232:5,20
244:2 269:21
270:1 353:21,21
**helpful** 121:9
292:15
**helps** 29:3
**hereto** 359:16
**heroin** 11:3
191:21
**high** 103:13
141:24 214:23
215:15,15 261:16
310:17
**higham** 126:16,25
127:5,23,25
128:10 129:8,19
129:21,23 130:5
**highest** 149:22
**hill** 177:4
**hire** 78:9
**hired** 77:23 82:13
**hiring** 141:25
142:6
**historically** 152:1
**history** 10:15 32:2
131:18

**hobart** 7:3 15:14
15:14
**hold** 37:14,16 58:7
74:24 162:19
163:19 166:8
167:20
**holding** 165:3
**honest** 207:14
**hopefully** 312:6
**hospital** 274:23
280:11
**hospitals** 25:4
**hotel** 88:15
**hour** 80:8,10
223:7 307:24
**hours** 80:12 358:5
358:6
**house** 186:23
204:22 206:5
**how's** 217:6
**hubbard** 8:12
**huge** 194:1 249:5
**huh** 19:19 35:25
89:18 112:1
132:22 287:11
**hundred** 33:2,7
104:19,22 106:3
153:21,25 261:7
**hundreds** 75:6
**hunter** 3:12
**huntington** 4:3 8:3
**hurt** 102:25
**hybrid** 152:22
**hydrocodone**
32:17 33:3 261:4
262:23 263:2,18
264:20 294:20,21
335:7
**hydromorphone**
262:25 263:18
335:7

**hypothetical**
44:18,21 54:8
56:3,17 57:11
58:10 96:5,7,23,25
99:23,25 103:18
110:23 111:17
113:16 196:5
203:1 215:9
252:13 262:4
264:9 270:5
273:17 274:15
319:15 332:14

**i**

**idea** 37:20,23 38:2
38:7 39:4,18 56:5
63:6 69:3,17 67:2
106:8 157:19
158:11 175:6
334:10
**identical** 287:21
290:2 324:13
**identification**
18:11 31:23 34:14
74:4 100:19 104:8
183:24 191:1
211:5 216:20
218:17 288:7,9
329:12 331:5
356:24
**identified** 72:23
73:14,14 134:7
180:24 256:25
**identifies** 316:7
319:7,9,23 321:16
321:18 324:21
327:18,20
**identify** 15:24
133:17,23 134:5
134:15 173:13
184:6 185:21
318:18 322:13

323:3,9 324:6,7
334:12
**identifying** 122:12
323:2,10
**ii** 3:7 50:12,17
51:4 65:15
**iis** 51:8
**illegal** 150:25
**illegally** 192:22,23
193:3 211:23
212:2 222:3
**illinois** 5:8 8:13
**imagine** 249:12
253:1 254:1
**immediate** 172:7
172:10 175:4
**immediately**
172:11 199:5
**impaired** 146:11
**implementing**
243:8
**implicate** 163:24
170:16
**imply** 192:2
**import** 95:20
**important** 36:13
98:1 109:21 114:2
324:12
**impression** 81:23
324:12
**improper** 265:19
**improved** 67:13
68:16
**ims** 30:4,8 178:21
179:2,5,9
**inactivity** 198:12
**include** 30:9 92:24
93:2 94:9 131:10
192:20 252:20
289:18 290:21
292:16 305:7

**included** 11:19
131:22 138:14
141:6 145:25
285:15 360:13
**includes** 179:2,5
**including** 36:10
134:21 137:16
180:3 200:2 266:1
333:22 337:3
**inclusive** 303:19
**incomplete** 44:17
54:8 56:3,17
57:10 58:9 96:6
96:24 99:24
103:17 110:23
111:17 113:16
187:2 196:5
202:25 215:9
262:4 264:9
273:16 319:15
**inconsistent** 263:4
**incorporated**
362:12
**increase** 31:17
33:3,6,8,20 43:8
221:2 230:12
**increased** 20:18
31:9,12,18 197:15
203:10
**increases** 68:13
294:21
**increasing** 33:24
**independent** 216:5
216:6,8,10 217:19
217:24 218:10
**independently**
198:24 218:4
219:20 220:5
**indiana** 6:8 7:24
15:21

**indianapolis** 7:24
**indicate** 283:5
330:3
**indicated** 185:14
220:1 289:3
291:19
**indicates** 192:5
**indicating** 360:13
**indication** 215:6
338:14
**indicator** 215:17
**indirect** 170:19
**individual** 42:15
94:19 95:1,7
117:5,8 126:6
155:1 157:20
159:16 224:10
239:3 259:1 273:6
273:20 278:7
291:21 294:3
**individual's** 155:1
**individualized**
241:7,12
**individuals** 22:7
48:6 136:19 238:8
240:23 245:11
333:7
**industrial** 30:18
95:18 98:9,18
103:8
**industries** 5:19
**industry** 28:1
29:15 39:13 42:23
60:23 75:4,6,10,11
77:12 102:20
119:2 138:16
304:10 308:12,19
312:14 313:8
341:1 343:14,18

344:13,24 349:15
350:25 351:1,3
**infernal** 244:8
**inform** 203:9
212:19 243:5
252:3 281:17
**information** 27:2
27:25 28:2,5 30:2
30:9 45:13 57:7
57:19 69:23 70:2
77:9 79:16,21
94:4 97:15,18
118:17,20,22,25
120:3 121:14
122:10 128:11,14
128:20 136:7,13
137:16,23 139:9
139:25 140:4
142:10,22 143:10
143:17,21,25
144:14 145:11
146:4,14,21,23
147:13,15 160:15
161:9 166:13
175:15 187:24
188:1,7 205:3,9,13
205:21 206:16,18
207:3,15 208:2,20
225:11,14 237:6
243:22 256:13
266:18,20,22
275:3,12 276:12
276:13 281:20
295:8,13 305:13
336:8,9
**informing** 114:16
115:10 116:12
119:15 120:7
315:14

**infrastructure**
114:10
**initial** 255:9
293:25,25
**initially** 238:8
297:11
**initiate** 231:22
**initiated** 219:16
239:1
**initiative** 39:6,8,11
107:2,6,11,20
108:7,13,18,20
109:1,5,9 236:12
236:14,17 237:1
238:9,23 240:3,14
240:25 246:23
247:12,14,15
248:20 249:9,13
251:6 252:9
252:13 254:24
255:14,14,20
256:14 257:23,24
283:25 292:6
293:5 308:24
310:1 312:16,17
349:11
**initiatives** 242:9
249:17 251:11
286:8
**input** 93:20 94:14
135:18,21 145:18
147:17 240:12
337:25
**inquiry** 264:12
**inserted** 184:16
**inserting** 263:16
**inspected** 320:2
**inspections** 20:23
229:18 351:3
354:20

**inspectors** 349:12
354:20
**inspects** 51:9
52:12
**instance** 60:11
109:14 189:8
223:6
**instances** 223:22
**instruct** 58:11
64:16 68:24 72:5
76:11 77:21 79:4
80:14,17 82:7,8,16
84:8,22 86:4
164:3 167:15
**instructed** 78:13
338:23
**instructing** 166:16
169:24 227:18
**instruction** 65:4
70:14 76:1 170:2
188:18 189:5
250:15 277:5
**instructions** 350:6
350:20
**instructive** 284:12
284:16
**instructors** 227:16
**integral** 36:13
**intelligence** 146:9
183:9,10
**intended** 271:25
**interact** 137:15
141:15 229:12
**interacted** 153:12
**interacting** 141:7
141:11
**interaction** 166:23
**interested** 359:16
**interfere** 12:10
**interference** 12:8

**interject** 85:20
**internal** 58:12,15
59:11,13 64:17,20
68:25 69:4 136:7
164:1 166:14
188:2,6 205:9
237:6,10 244:11
250:15,17 276:14
281:19 283:9
292:22 305:12,15
317:5,17,25 336:8
340:9 348:17
**internet** 11:6,8,15
87:20 197:6,12,20
198:1,10,13,16,22
199:17,24 200:11
210:21,21,24
211:10,24 212:3
212:11,23 213:2,6
213:7,9,12,15,16
214:11,13,24
215:6,18 216:15
217:23 218:2,13
219:17,19 220:2,4
220:20,25 221:10
221:24 222:1
234:2,6,13,23
235:7,22 236:2,9
236:16,24 240:2
249:14 254:2,12
254:13 284:25
285:4,6 294:14
357:16
**internets** 357:7
**interpret** 301:17
**interrupt** 72:13
165:14
**interrupted** 66:16
194:14

**interview** 54:19
55:6 124:5
**interviewed**
224:22
**interviewing** 55:6
**interviews** 46:10
**introduce** 73:23
224:20
**introduced** 123:20
**introduction**
123:22
**inventories** 93:6
**investigate** 75:25
134:20 150:23,24
151:9,12 158:17
159:25 185:21
**investigated** 134:2
198:9
**investigation**
129:3 135:11
143:12 156:15
159:11 162:2
163:22 165:6
166:10 168:10,12
171:12,19 172:19
173:10,15 174:3
175:23 220:24
268:1
**investigations**
20:24 97:16,20
117:5,8 121:4,10
121:15 134:17
136:16 146:4
158:18 191:17
199:24 200:1
301:15
**investigators**
12:25 132:15,18
134:7,14 142:2,11
142:20,23 143:10
143:13 144:1,18
145:12,24 146:2
146:17 147:14
150:16 151:16
152:12 153:6
154:6 159:5
160:23 300:19
301:1

221:3 225:12
228:6,9,24 229:8
231:20,22 237:20
237:25 239:11
245:24 247:1
276:13 295:9
337:20,21 339:25
342:17,19 349:5
**investigative**
118:17,21 121:18
146:9 152:13
277:2 337:19,20
**investigator**
151:15 156:1,3
226:20,23 227:1
227:21
**investigators**
12:25 132:15,18
134:7,14 142:2,11
142:20,23 143:10
143:13 144:1,18
145:12,24 146:2
146:17 147:14
150:16 151:16
152:12 153:6
154:6 159:5
160:23 300:19
301:1
**invite** 345:12
**invited** 255:13
**involve** 135:24
167:13
**involved** 21:11,15
66:23 72:4 73:8
77:2 78:18 97:7
107:6 119:23
136:18,24 138:2,4
138:7 145:11
167:12 217:23
218:12 221:11
238:19,22 284:23

337:5 346:15
**involvement**
138:10
**involves** 205:20
**involving** 119:1
161:11 168:8
170:11,14 202:14
**iowa** 213:20
**issue** 61:18 114:15
119:14 221:2
234:22 269:22
**issued** 83:11 99:9
120:6,20 195:10
314:22 348:22
**issues** 90:12
138:17 139:18
141:18 157:4
169:20 181:10,13
235:20,22 249:15
268:14
**issuing** 314:5
**item** 266:23
**items** 242:14

**j**

**j** 3:12 4:15 5:2,6
8:21 9:6
**j&j** 13:23
**james** 3:7 8:2
14:17 15:18 85:24
199:13 217:5
**james.bennett4**
3:10
**janssen** 4:17 13:23
**january** 351:18
**jeffrey** 4:22
**jeffrey.sindelar**
4:25
**jennifer** 6:4 15:16
**jersey** 213:19
**jmatthews** 6:5

**job** 1:25 132:25
135:20 133:21
140:9 144:3
145:22 235:11,17
235:18 253:23
**jobs** 233:8 240:10
349:13
**joe** 10:18 74:8
209:8
**john** 177:3
**johnson** 4:17,17
**join** 23:6 82:1
93:23 133:5 135:2
137:7 160:4
174:19 202:24
204:1 223:1
252:14 267:17
283:3 286:18
295:25 296:20
315:2 320:22
324:16
**joined** 226:16
**joint** 34:17 35:23
160:7
**jones** 5:3,7 13:25
16:6 131:4
**jonesday.com** 5:5
5:9
**joseph** 1:18 2:1
10:2,13 12:15
16:12 17:1 18:14
184:9 211:17
357:24 360:8
361:4,9 362:4,13
363:20
**journalists** 129:25
130:11
**jr** 4:2,22 14:11
**judge** 1:6
**judiciary** 186:23
211:11

**july** 19:14,16
183:18 184:7
186:24 187:16
188:14 233:7
**june** 359:23
**justice** 3:7 9:4,6,7
14:16 19:4 58:24
59:2 90:20 136:9
139:21 140:10
164:3 165:2,5
166:15 187:7
205:11 206:4
237:8 244:9
256:18,24 259:10
283:10
**justification**
296:15
**jwicht** 6:7

**k**

**k** 4:18 7:8
**karl** 72:19
**kaspar** 8:11 15:12
**kaspar.stoffelma...**
8:15
**keating** 3:4
**keep** 177:22
209:22 262:12
323:23 340:3
355:15
**kelly** 5:14 8:18
11:19
**kelly.moore** 5:18
**kept** 248:20
**ketchum** 4:2
**key** 77:25,25
328:1
**kicks** 326:9
**kilograms** 32:21
32:24 33:13,17
104:20,23 106:4

**kind** 40:5 41:3
82:21 120:21
132:24 147:19
155:2 209:14,18
202:22,24 263:7
346:15
**kirkland** 7:12
13:17
**kirkland.com** 7:14
**klekamp** 3:4
**knew** 90:7,11
95:25 96:16 97:12
162:21 324:20,22
336:22
**know** 17:24,25
21:5 26:19 28:1,5
28:24 30:11 34:25
43:6,7 54:12
55:18,19,20 57:19
61:20 73:1 75:19
77:6 78:1 80:22
80:24 81:2 83:7
85:8 88:19 90:10
105:22 106:3
107:25 109:13
110:8,12,17,17
111:2,5 112:21
116:5,15,17 160:5
120:4 124:8 126:6
122:10 135:9
128:20 129:18
144:24,25 145:5
145:20 153:24,25
154:9,10,12,23
157:20,24 158:6
165:15,17 160:15
170:25 173:21,21
174:11,12,20,21
175:4 177:12
180:18,20 181:5

## Page 30 — [know - letters]

183:8,12,13 185:3
200:2 206:9 216:3
223:5 232:22,25
234:13 236:7
241:5,8 242:10,11
243:21 245:7
246:24 250:1
252:11 254:15
257:4 259:4,10
260:9,14,15,23
266:5 268:1 270:8
271:6 274:20
275:8,9 278:23
279:3,14,17 281:1
282:23 284:5,6,21
286:2,23 293:19
293:22 295:4,19
298:3 300:10
301:4 302:21
305:6 308:18
313:6 315:6,7,13
316:14 318:6
319:18,21 321:4,5
321:8 322:6,23
323:1 326:3
330:24 331:12
332:19 342:6,11
343:1,9 344:18,21
344:22 346:10,11
346:22 347:3
355:13
**knowing** 322:24
322:25
**knowledge** 27:1
27:13,17,18 42:12
77:24 101:25
108:24 242:13
256:13 266:17
278:3 279:4
304:11,18 330:15
338:4 340:2,8

351:11
**known** 224:24
**knows** 157:20
159:16
**kyle** 72:12 73:13
73:19 238:10

**l**
l 1:24 359:2
**l.p.** 1:8,10,12 4:13
**lack** 39:14 62:2
63:12 75:12 116:1
156:17 283:1
284:3 301:18
302:16 328:23
334:20 336:2
346:6
**lacks** 46:17 51:22
68:6 276:7
**ladd** 5:15 16:1,1
**laid** 115:17
**land** 307:10
**lanier** 4:9 14:8
**lanierlawfirm.com**
4:12
**lardner** 8:3
**large** 132:12
185:22 213:8
261:20,23 262:24
**larry** 9:3 15:8
**late** 127:21 233:4
**law** 4:6,9 14:8
19:21 77:8 85:5
86:11 131:5
138:16 139:4
141:3,16,17
186:16 189:2
190:6 206:23
207:15 212:12,24
227:25 228:13,18
311:3 314:24

**lawfully** 22:8
**lawsuit** 84:2,6,19
87:11,15
**lawyer** 81:20
**lawyers** 71:17,23
72:3 75:3,10,24
76:9,18 82:24
87:19 91:12 129:2
129:9
**lay** 199:12
**lead** 159:22
**leader** 132:23
134:5,10 135:9
140:2,15 141:23
**leadership** 21:2
333:4,21 59:3
131:23 136:21
141:7 156:25
158:1 159:5
282:18
**leading** 199:15
**leads** 121:4,10,14
121:18
**learn** 143:13
244:19 248:3
285:18 286:3
**learned** 128:12
**leave** 88:16 177:21
led 25:7
**left** 26:13 32:16
41:18 60:22
110:10 176:2
179:23 246:9
247:20 317:15
357:14
**legal** 12:25 13:2
103:5 116:7
206:21 207:19
209:2 213:12
214:3 309:14
310:21 311:23

313:11 314:9
315:1 358:2 360:1
363:1
**legally** 22:12
**legislated** 70:7
**legislation** 69:9,11
197:24,25 220:19
222:21 223:7,12
**legitimate** 34:2
44:14 45:5 53:18
53:22 95:18 98:2
98:8 102:25 103:7
103:13 194:7
195:11 212:10,22
**lenny** 126:6
129:16
**letter** 10:20 11:12
11:13 19:2,3,5,8
35:23 101:16
115:9 122:19,22
242:24 243:2,11
243:16,18,21
244:2,2,14,21
250:8,12,18
265:20 285:16
287:20,22 288:1
288:14,15 289:7
289:25 290:3
291:12 292:17,25
299:25 302:13
303:6,6 304:13,15
305:1,7,22 306:11
306:15,16 307:6
308:10,11 312:13
312:13 313:4
315:13 340:14
360:19
**letters** 31:1,4
42:23 115:17,21
116:3 250:7,19
251:7 257:2,8,10

## Page 31 — [letters - mainigi]

257:21,21,25
266:1 278:5
287:10,15 288:18
288:21 289:3
291:20,22 292:4,6
299:16 301:14,17
301:23 302:1,7,14
304:24 305:3
307:15,16 308:11
308:24 309:5,11
309:11,25 310:4
311:13 313:7
338:9,10 340:16
340:23 349:12
354:8,11,12,14,18
**level** 24:7,14 33:12
33:17 141:24
144:5,13 155:7,13
155:16 238:17
157:23
**levels** 31:8,12
136:16
**levers** 31:11
**lewis** 5:16,20 16:2
16:8
**lexington** 3:13
**liaison** 237:20
238:4 239:10
245:21 246:3,7,14
267:25 268:24
271:12 299:18
300:25,25 302:22
337:22 339:24
342:18
**licensed** 224:19
**licenses** 224:15
**life** 17:12 106:10
106:10,23
**likewise** 303:23
**limitations** 56:7
71:10 282:1

305:20
**limited** 151:12
**linda** 3:16 14:13
308:7
**line** 33:11,12
192:20 360:13
362:7 363:3
**link** 35:10
**list** 282:13
**listed** 29:17
130:16 362:7,17
**listen** 209:24
**listened** 46:9
269:20
**lists** 291:8
**lit** 248:13
**litigation** 1:5
16:22 72:1,4,7,7,9
72:17,21,25 73:8
73:11,12,17 75:24
76:10 77:20 78:19
78:22,23 86:3,14
129:10 131:10
248:6,14 360:6
361:3 362:3
**litigations** 77:3
85:12
**little** 17:13 40:6
152:22 164:7
172:3 207:8
**livingston** 8:6,9
13:18,18 77:23
78:8
**llc** 3:17 6:8 7:11
7:15 14:2 15:21
92:7
**llp** 2:8 4:2,14,19
4:23 5:16,20 6:2,9
6:15 7:4,8,12,17
7:23 8:3,7,12,17

**lobbying** 332:3
**local** 141:17
152:24 299:17
300:8,9,10
**located** 12:22
**lodge** 193:12
194:4
**lodged** 123:13
**log** 25:25
**logan** 6:15
**long** 125:6 129:21
139:16,16 172:16
174:24 196:14
226:22 247:17
253:21 280:7
285:14 308:1
321:18 346:14
**longest** 172:20
173:13,21
**look** 31:19 32:14
32:20 33:10,11
37:2 62:18 105:4
111:22 114:3,5,6,6
121:4 122:5
123:6,8 132:16
153:15 232:10
333:23 349:22
353:20 355:6
**looked** 296:3,7
320:12
**looking** 33:16 55:5
113:25 214:8
256:20 261:14
269:11 275:12
290:5 295:16
317:3 323:6 326:8
341:3

**looks** 343:3,10
**los** 7:9
**lost** 10:19 74:9
88:11
**lot** 17:4 46:10,11
65:18,19 109:13
153:12 178:2
190:19 270:23
**loved** 88:11
**low** 99:20
**lowering** 102:8
**lpa** 8:22
**lsinger** 3:19
**lunch** 177:14,23
220:16

**m**
m 3:3 6:9,10 9:5
360:5
**ma'am** 35:15
**machines** 67:5
**madam** 360:10
**mail** 89:16,17,20
90:8,9
**mails** 89:15,19
90:4,16
**main** 4:23 148:19
**mainigi** 6:3 10:7
13:12,12 72:10,22
73:13 77:11 79:8
79:19 112:25
194:3,15,22 195:2
226:10,12 228:7
228:21 229:16,23
230:11 231:16
232:14 234:21
235:9,23 236:10
236:23 237:13,21
239:1,23 239:12,3
240:21 241:10,20
242:5 244:18
245:9 246:2,19

## Page 32 — [mainigi - materials]

247:10 248:18
249:11 250:6,23
252:6,25 253:24
254:22 255:17
256:3 257:5 258:1
259:2 260:13
262:11 263:6,12
264:15,22 265:6
265:16 266:13
267:5 268:4 269:3
269:14,23 270:11
271:5,17 272:11
274:5 275:10
276:5,21 277:7,23
279:7,21 281:5,10
282:3 283:20
284:10 286:12
287:2,12,17,25
288:4,10,13,16
289:14 290:16
291:18,25 292:13
293:7 294:5
295:15 296:10
297:6 298:2,10,12
298:18 299:1
300:7 301:2,12,24
302:11 303:4,13
305:21 307:12
308:1,6,8 309:2,18
310:5,13 311:2,16
312:4,18,22 313:1
313:19 314:1,13
315:16 316:17
317:2,11,23 318:8
318:20 319:8,25
320:9,15 321:7,22
322:10 323:5,24
324:8,25 325:14
326:1,25 327:25
328:10,16 329:1,8
330:13 331:1,13

332:4,24 333:9,24
334:4,14 335:1,9
335:21 336:4,20
338:1 339:9 340:1
340:7,24 341:17
343:12 344:8 345:2
345:15,13 346:17
347:4,8 348:21,22
349:21 350:13
351:10 352:14
353:7,23 354:10
355:1,17,23 356:2
356:8
**maintain** 90:15
116:18 253:13
284:20 286:10
**maintained** 45:22
**maintaining** 276:1
326:10
**major** 148:13,25
**majority** 54:1
182:11,20 186:12
187:18 188:16,20
189:21 201:1,15
201:18,22 202:5,7
216:3,10 217:21
217:22 218:10
224:23
**making** 57:21
110:17 124:9
140:17 141:2
205:4 217:17
273:25
**mallinckrodt** 7:15
**man** 10:18 74:8
119:22
**management**
36:13 37:7 133:9
156:24 185:15

**manner** 57:4
121:18,24 137:15
311:11
**manor** 8:18
**manufacture** 24:5
**manufacturer**
52:11 95:24 96:17
96:19 97:12 99:9
99:12 107:20,23
108:22,25 109:4
109:15 114:24
115:3,16 117:1,9
118:4 120:2 251:2
285:2 332:20
345:22
**manufacturers**
21:23 23:18 24:14
24:25 47:7,11,13
51:3,18 92:12
95:2,4,8 96:14
107:25 108:4,13
108:19 109:8
110:20 111:12
112:12 113:11,12
114:15,16 115:10
115:22 116:4,12
119:15 120:7
182:6 242:23
243:3,24 245:11,21
346:4 349:4
**manufacturing**
107:24 108:14
114:19 117:8
351:4
**mapes** 227:8,10,13
227:14,17 237:23
238:10 240:24
244:20 245:10
283:22 297:17

**mapes's** 279:10,18
286:14,23
**march** 218:23
231:1 357:14
**marcus** 8:7,9
13:19
**mark** 18:8 31:20
34:11 100:12
104:5 183:22
211:2 218:14
246:18,21 356:21
**marked** 18:10
31:22 34:13 74:1
74:3 100:9,18
106:7 183:23
190:24,25 211:4,7
216:19 218:16,22
287:6 288:5,6,8
356:16,23
**mart** 8:21
**maryland** 5:14
**massachusetts**
5:11 7:18 8:4
**master** 9:3 14:24
14:25 24:17 72:10
73:1,18,25 76:3,14
78:6,10 79:6,10,22
80:19 82:18 84:9
84:25 112:25
113:4 123:11
124:15 125:1,19
125:24 162:10,25
163:2,13 164:12
164:15,19 167:18
170:1,4,7,21 171:6
171:7 177:19
194:3,20 209:11
209:13,17
**material** 294:12
**materials** 52:24
93:11

## Page 33 — [matt - mischaracterizes]

**matt** 177:4 247:9
**matter** 12:16
303:22 351:18
**matters** 134:21
135:12 136:2,10
137:4 140:11
141:12 156:14
161:10 162:7
163:25 165:4
166:9,12 169:6
337:16,17
**matthew** 5:15 16:1
**matthew.ladd**
5:18
**matthews** 8:2
15:18,18
**matured** 173:11
**maureen** 5:20
16:7
**mcclure** 6:14
**mchugh** 4:6
**mchughfuller.com**
4:8
**mckesson** 7:2 13:9
13:11 15:15 16:18
16:21
**mcnamara** 6:3
13:14,14
**md** 1:5 12:20
**mdl** 1:4 11:12,14
73:17
**mean** 45:12 51:13
52:1,2 55:20
85:21 88:21
109:15 121:24
132:10 147:1
173:3,4 175:4
181:5 203:20
204:20,22 228:20
239:15 246:8
264:17 268:13

269:15 286:14,23
87:10 107:6 109:1
323:1 326:4 337:6
348:4 354:9,24
**meaning** 62:22
314:3 341:19
354:11
**means** 117:25
173:5 264:7,10
311:19 312:9
**meant** 267:14
272:17,18 302:1
**media** 12:14 63:22
64:1 123:4,8
138:15 178:7,12
225:25 226:5
265:9,13 316:20
316:24 357:25
**medical** 30:17
342:3 361:4 93:8
95:18 98:8,18
103:8 195:11,18
224:16
**medication** 34:1
36:19 98:3 103:14
186:15 189:1
222:18 223:25
**medicine** 10:24
185:17 202:13
224:17
**meet** 98:17 103:7
108:18,25 116:6
127:19,23 163:14
241:14 254:25
273:22 333:12
**meeting** 239:18
248:16 250:2
251:23 252:3,5
257:7,15 297:5
329:6,10,23,24

**meetings** 42:15
85:9 107:6 109:1
109:7 126:24
180:12 232:20
239:2,4,7 241:1
246:23 256:15
257:11,17 258:12
259:9 284:1 354:8
**meets** 269:25
**meghan** 7:3 13:10
**member** 54:3,15
**members** 165:1
**memo** 251:11,14
251:15,16
**memorandum**
40:8
**memorialize** 342:3
342:8
**memory** 297:13
**memos** 251:21
252:2,7,17 286:8
**mentioned** 107:1
129:14 152:21
178:24 179:10
196:19 220:14,23
284:11 287:4
297:7
**meridian** 7:23
**message** 206:4
**messages** 252:10
**met** 108:21 109:13
126:21 127:25
153:16
**methadone** 335:8
**method** 202:19
203:13 204:10
254:20
**miami** 151:24
152:1
**michael** 4:5 5:10
11:3,10 227:8,10

237:23 238:10
259:10
**michael.eve** 5:13
**microphones** 12:6
12:10
**mid** 127:22
**middle** 212:7
290:15,20 291:3
**midwest** 360:17
363:1
**mike** 4:8 14:9
239:25
**mildred** 4:9 14:7
**mildred.conroy**
4:12
**military** 233:10
**milligram** 194:17
**milligrams** 263:24
**million** 263:23
263:25 291:20
**mind** 257:23 262:2
319:10
**minute** 24:18
91:22
**minutes** 91:5,8
92:16 210:18
225:21 257:19
262:13,14,16
263:5 357:5,6
**mischaracteriz...**
130:3
**mischaracterizes**
41:25 50:9,23
61:3 63:12 70:22
75:13 87:23
108:11 109:11
112:20 113:14
142:25 159:13
173:18 174:8
179:20 189:22

## Page 34

**[mischaracterizes - neither]**

221:7 245:15
248:23 255:24
306:15
missing 252:18
mississippi 4:7
misstates 108:9
181:1 234:8 248:8
256:1 258:15
267:15 272:5
273:14 275:16
281:16 289:9
290:11 292:2
296:1 300:2 301:6
306:15 313:10,24
324:3 327:10
331:8 337:12
343:4 350:4
mistaken 115:15
238:18 245:22
260:3 293:24
342:25 351:12
misunderstood
194:17
mixed 345:18
mmonaghan 7:7
model 67:12,23,24
moment 34:20,22
165:17 262:7
293:24
monaghan 7:3
13:10,10
money 80:24 89:9
224:10
monikers 118:2
monitor 24:11
114:17 115:11,22
116:13
monitoring 39:25
42:19 57:8,16
64:6 109:19 119:9
119:17 120:9

mortars 234:16,17
motley 3:17 14:13
15:6 72:20 87:1,3
87:6,9,10,14
351:21
motleyrice.com
3:19,20
mouth 192:2
move 193:12
195:6 217:5 232:2
moved 280:11
movement 335:25
336:23
moving 48:23
221:12
muething 3:4
multidistrict
86:14
multiple 89:20
94:5 119:1 126:14
126:22 343:18
murphy 177:4
247:9
mute 267:24 20
myers 4:19 13:23

**n**

n 10:1,1 12:1
n.w. 2:9 3:17 4:19
5:11 6:4,10 7:5,13
name 12:24 16:21
16:24 92:11
129:14 131:4
205:4 226:12
236:15 247:2
360:6 361:3,4,15
362:3,4,21
named 126:6
names 259:5
324:10
naming 324:9

napoli 3:12
napolilaw.com
3:14
narrow 40:6
national 1:4 12:17
93:3 207:4 360:6
361:3 362:3
neal 5:2 13:24
131:4
near 36:12 280:11
nearly 287:21
necessarily 29:6
36:25 99:15
150:13 159:8
288:25
necessary 36:3
98:3,12 113:6
126:1
need 17:13 76:4,15
113:8 125:5,25
156:4 167:7 169:1
170:5 194:24
259:4 288:10
303:23 334:9
335:10
needed 64:10 65:2
68:18 115:10
134:18 210:11
232:4,4,12 347:10
350:17
needs 30:18 34:2
95:19 98:9,17
103:8,9 113:5
195:19 311:10,10
316:9 327:2 356:3
neighborhoods
198:25
neither 115:21
359:11

## Page 35

**[net - objection]**

net 92:24 93:3
never 35:21 37:24
38:1 61:10 89:9
115:9 116:11
120:6 157:2 214:1
253:11 263:3
264:1 267:21
270:9 281:6
283:15 302:10
306:17 319:19
320:1,6 324:19
new 3:13,13 4:11
4:11,15,15 5:17,17
177:15,17 213:19
228:23 235:11
263:16
newspaper 129:15
nicholas 6:14
nodding 17:20
noncontrolled
214:17 215:5,16
nondisclosed
77:16
nonexhaustive
282:13
nonpublic 69:22
97:15,21 117:6,10
118:18 187:23
188:6 205:13,15
225:12 281:20
283:6 292:23
336:10,16 348:16
nonsuspicious
261:24
norm 272:9
normal 48:23
110:4 244:14
254:17 258:7
259:15 262:18
263:21,25 264:14
272:17,20 274:21

**o**

o 10:1 12:1
o'connor 7:16
10:4 14:3,3 92:8
92:11 94:1,8,24
96:15,21 97:9,24
98:10 99:1,18
100:6,11,15,24
101:1 102:6,22
103:11,22 104:5,9
105:17,20,25
106:18 107:17
108:2,6,16 109:17
110:6 111:11,21
113:7,20 115:7,20
116:10,23 117:18
118:8 119:6,13
120:5,12,22
121:16 122:9
123:1 124:14,16
126:4 127:10,18
128:24 129:6
130:9,17
o'gorman 4:13
14:5,5
o'melveny 4:19
13:23
oath 210:10
object 27:7 28:22
35:5 36:22 39:1
41:12 44:17 50:19
56:19 58:5 69:20
73:10 84:7 86:4
105:11,23 112:18
169:11 171:23
187:4 190:17
196:25 202:25
207:23 208:11,15
281:15 286:20
291:16 295:23

282:11 284:8
289:20 290:23
292:11 303:21,24
304:2 322:15
327:22
normally 73:21
northern 1:1
12:19 14:18 15:4
northwest 12:23
notarial 360:14
notary 359:1,20
360:25 361:10,18
362:15,23 363:23
note 12:6 250:20
360:12
noted 35:13 212:9
212:21
notes 279:22
355:11,13,14,16
356:1 15
notice 2:13 10:12
18:13 310:25
314:12,14,17,18
noticed 17:10
notified 297:3
notify 183:1
nstephens 5:5
number 24:24
25:3 92:17 100:13
100:21 103:12
104:20 149:17
154:1 185:19
217:2,3 235:18,19
235:20 249:5
299:21 357:25
360:7,13
numbered 356:17
numbers 32:15
197:15 362:7
nurses 21:21

308:16 324:1
331:10 333:17
352:9
objecting 323:23
objection 20:2,16
27:3,8,24 28:4,9
26:6,7,18,24 27:9
27:19,20,22 28:8
28:20,21 29:5,11
29:12 31:14,15,16
32:6 34:4,5 35:13
36:20,21 37:13,21
38:14,17 39:2,3,14
41:2,24,25 42:2
43:15,16,18 46:5
44:16 45:7,9 46:5
46:14,16,25 47:9
47:15,17,22 48:2,7
48:13,19,20 49:3,9
50:2,3,7,22 51:11
51:20,21,22 52:15
52:18 54:4,5,7,8,9
54:22,24 55:13,14
55:15 56:2,4,13,16
57:9,10,13 58:1,4
58:8,9,17 59:8,9
59:20,23,24 60:6
60:24 61:2,3,5,22
62:1,2,12,14,25
63:1,2,11,14 64:12
64:13,15 65:17,24
66:5,6,8,24,25
67:6,14,15,17,19
68:5,6,6,8,20,23
69:18 70:13,21,23
70:24 71:6,7,8,9
71:18,19,24 73:9
75:12,15,25 76:19
77:4 82:5,6,15
85:21 87:22 89:22

## Page 36

**[objection - objections]**

90:24 93:22,23
94:7,21 96:3,4,6
96:20,24 97:2,13
98:4,5,22,23 99:5
99:22,24 102:3,11
102:13,15 103:2,3
103:4,15,17
106:14 107:8,21
108:5,8 109:10,22
109:23,24 110:22
111:14,16 112:19
113:5,13,15,16,17
114:20 115:13
116:1,15 117:3,11
117:24 118:15
119:19 120:10,15
120:16 121:11,20
121:21,22 122:14
123:13,17 125:3,6
125:14,16,22
127:6,14,15 129:4
130:1,2,6 132:8
133:3,5,25 134:11
134:25 135:4,13
135:14 136:3,5
137:5,19 138:5,20
138:23 139:13
140:5,20,22
142:20 144:2,13
142:24 144:8,21
144:15 146:5,7,15
149:5,20 150:12
151:2,4,18,19,21
152:5,7,8 153:1,3
153:15 154:7,18,20
154:22 155:9,14
156:7,16,18,19
157:17 158:9,20
158:22,23,24
159:12 160:2,17
161:7 162:3,5

165:7 166:11
168:13 172:22,24
173:17 174:4,5,7
174:16,25 175:16
175:17 176:3
177:1 179:3,19
180:10 181:1,22
181:24 182:14,15
182:17 183:2,4
184:20 185:25
186:5 187:1,2,21
189:4,20 192:18
193:7,13,22 194:4
194:6,8 195:14,16
195:22 196:4,17
197:24 198:15
200:4 201:6,25
202:2,22,23
203:25 204:2,2,13
204:14 205:6,7
206:20 207:17,18
208:24 209:1
210:3,12 211:8,14
211:20 212:2,11
213:10 214:18,19
215:8,10,23,25
218:5,7 220:11
221:4,6,17 222:8
222:15,24 223:2
223:16,19,20
223:24 224:25
229:14,20 230:6
231:11,12 234:8
234:10,25 235:1
235:15 236:4,6,19
237:4,15 238:11
238:12 239:8,21
239:16 240:18,19
240:15 241:2,16
241:17 242:1
244:5,6,23,24,25
244:25 245:2,5,14
245:16,19 246:17

247:5,6 248:7,8,8
248:10,22,24
249:1,19,21,22
250:14 251:25
252:12 253:5,7
254:5,6 255:3,5,23
256:2,16 257:13
257:14 258:15,17
258:18 260:10
261:13 262:3,4,20
263:11 264:8,9,18
267:15,17,18
268:21,22 269:6
269:18 270:4,17
270:19 271:9,11
272:5 273:14,16
274:14,17 275:16
275:18 276:7,9,10
277:16 278:18,20
278:21 279:12,15
279:16 280:21,23
280:24 281:9,13
281:14 282:25
283:3,4,20
283:21 284:8
286:1,16,18,19
289:9,11 290:10
290:12 291:24
292:2,18,20
292:20 295:6
296:1,18,21,22
297:21 299:5
300:2,12,14,16
301:6,8,18,20
302:2,3,15,17,19
303:9 305:8,9
306:14 308:14,17
309:11,15,22
310:11,20 311:21
311:22,24 312:10
312:11 313:10,11
313:12,22 314:6,8

314:25 316:3
317:7,19 318:3,12
318:13,24,25
319:1,2,12,14
320:4,5,11,20,23
321:11,13 322:1
322:19,21 323:16
323:19,20,25
324:14,17,17
325:6,8,9,21
326:17,18,19
327:10,13 328:5,6
328:12,13,22
329:15,18,20
330:18,20 331:6,8
331:21 332:13,15
333:4,15 334:2,8
334:19 335:5,13
335:15,16 336:2,6
337:10,12 338:18
338:19 339:14
340:5,19 341:6
343:4,6,7 344:1,4
344:16 345:5,6,7
346:5,7,8,21,24
347:1,13,14,24,25
348:1,12,14,24
349:1 350:3,5,19
350:21,24 351:10
351:12,24,25,24,5
354:15

objections 54:10
62:13 65:7 70:12
96:9 113:2 125:21
135:3 137:8
143:15 160:5
174:18 175:2
200:15 201:8
202:25 203:2
214:20 223:3
252:14 253:8

## Page 37

**[objections - ones]**

265:18 270:6
273:18 283:4
309:23 311:4
312:6 315:3,4
325:20
obligation 111:9
116:20,21 256:11
315:19
obligations 66:3
114:23 115:17
117:15 201:2,24
208:8 243:7 251:3
251:4 256:7 286:9
313:17 315:15
observation 125:2
125:12
obtain 211:23
obtained 128:15
obtaining 170:19
obviously 114:3
occasions 89:21
126:14,22
occur 53:4,5
occurred 69:1
93:14 205:25
234:6 309:25
344:21
occurring 133:18
134:16 139:12
181:15 202:13
occurs 54:1
october 19:17,17
32:1 34:19 35:9
74:6
offer 205:19 212:2
offered 185:14
268:6
office 3:8 9:5
14:18 15:4 19:11
19:25 20:15,20
25:8 30:20,20,23

32:11 38:25 39:23
44:2,8 45:3 46:3
48:17 49:1,5,16,18
49:21 55:11 56:24
59:19 60:5 61:11
62:9 94:13 97:8
107:18,19 110:12
120:24,25 136:19
137:24 142:6,7
145:18 147:1,4,4,6
147:9,11,17,21
148:22 149:4,9,11
149:14,16,18
150:2,3 151:25
152:8 153:11
157:12,15 158:6,8
158:14 159:2,6,20
160:14 161:24
164:9 165:5 166:7
166:10,24 167:3
168:7,9,10,15,17
168:21 170:11,14
170:18 171:9,17
172:6 173:8
175:13 184:10
211:18 229:4
230:21 233:6
235:18,20 239:11
239:12,14 240:20
243:18 250:23
268:3 270:22
271:1 283:17,19
300:9,10,22
301:10,13 305:15
305:21 110:11,19
311:22 311:10
312:1 318:10,20
319:23 327:17,17
328:10 139:25
334:4 137:14
338:10 139:25
340:14 142:9
143:23 145:4,22
146:20 147:8,19
148:5,11,24
149:13,15 150:4
150:19 151:14
153:20 155:4,18

officers 132:20
150:16 152:24
153:7
offices 141:8,12
148:24 151:24
159:23 161:1,2,12
165:1 166:6
169:1 196:22
299:17 301:3
302:23
official 14:20
19:21 69:24 70:3
114:16 205:14,22
206:1 266:12,20
266:21 300:5
361:15 362:21
officials 338:22
oh 106:2 189:21
217:8 291:6
312:21
ohio 1:1,10,12 3:5
3:9 4:24 8:23
12:19 14:19 15:4
360:2
okay 74:24 95:7
95:10 100:6 101:7
101:10 102:7
103:23 105:3,19
105:21 110:11,19
111:22 113:10
118:13 120:23
126:3 128:20,23
131:15,19 132:4
134:4 137:14
138:10 139:25
140:14 142:9
143:23 145:4,22
146:20 147:8,19
148:5,11,24
149:13,15 150:4
150:19 151:14
153:20 155:4,18

156:6 157:14
160:13 161:19
164:11,21 165:16
167:18 171:7
172:3,16 175:22
176:9,12,21 177:7
178:4 179:8,15
180:1,17 181:16
181:17 183:16,19
183:20 184:6,22
185:10 186:9
190:10 191:17
191:19 196:1,18
197:18 199:10
200:6 204:25
206:13 207:8
208:6,10 210:15
212:6,16 214:10
214:12 220:14
224:5,18 225:2,17
229:5 242:12
225:5 242:12
251:15,18,21
260:4,20 262:15
264:14,16 269:5
272:16 275:6
278:11,12 280:15
287:8,16 288:3,13
289:22 290:5,20
297:16 298:19,25
303:17 308:6
313:4 328:17
337:1 343:22,24
344:8 357:8,13,16
omm.com 4:21
once 99:9 129:22
221:9 224:24,24
234:14 264:20,21
270:23
ones 43:4 88:12
324:24

ongoing 171:12,20 172:19
online 11:5 211:9 213:14
op 1:9,11,13
opaque 61:15,16 62:9
opened 223:13 225:4
openly 49:5,7
operate 156:21 212:11,23 315:22 316:6 318:17 319:6,22 321:15 322:9 324:21 327:19 334:11,12
operating 21:7 198:24 202:8 210:24 218:2 222:3 325:3,17
operations 231:5,6 232:5 233:11
operators 223:12
opiate 1:5 12:17 360:6 361:3 362:3
opinion 43:19 64:9 65:1 68:17 69:13 70:1,11,15 188:5 203:16 205:20,23 206:23 282:9,13 294:24
opinions 69:22 121:22 187:23 205:12 286:4
opioid 19:24 20:11 20:13 37:3 46:12 46:24 47:7 48:11 71:5,14 72:4,16 73:8,17 75:3,10,11 75:24 76:10 77:3 77:12 78:19 84:2

84:6,19 85:12 86:3 87:15,21 88:4,9,24 89:2,5 102:9 129:3,9
opioids 21:11,16 22:8 24:24 25:3 31:8,12 53:7,12,18 53:21 54:2 102:24 172:13 185:23 210:22 334:18,24 334:25 335:2
opium 335:8
opportunity 163:14 169:19 185:4,5 244:21 267:21 307:4
opposed 154:18
option 37:9
order 26:9 39:25 42:19,25 43:14,23 44:14 45:4 57:7 57:16,18 64:6 65:8 66:2 100:5 109:19 110:2 119:9,16,24 120:8 122:17,21 146:3 147:14 157:16 158:7,16 159:3,10 159:17,25 160:10 167:9 172:7,10 183:22 190:24 211:2 218:15 229:25 242:25 253:16,18 254:11 254:11,14,16 255:21 256:7,11 256:22 258:4,6,13 258:24 259:7,11 259:13 260:15 261:1,2 262:17 264:23 265:24

266:7 267:23 268:20 269:25 270:3,16 271:8,22 273:3,21,22,24 274:3,7,11,12 275:6,15,20,22,23 278:5 280:13 282:6,10,17,21 283:24,25 284:13 284:18 285:11,19 289:5 290:7,22 291:9,13,15,23 292:7,9 294:23 296:17 300:1,6 300:22,25 304:1,4 304:6 306:21 307:2,5,9,10,18 309:1,4,7 314:23 315:18,20 316:2 317:6,18 318:11,10 318:22 319:20 320:2,7,14,18 321:1,24 322:17 323:14,22 324:13 324:23 325:4,18 325:24 326:8,23 327:9,18,20,21 328:2,8,21 329:13 330:17,25 331:5 331:19 332:9,10 333:2,12 334:7 336:24 337:7 338:6,8,11,15 339:12,23 340:10 340:17 341:4,9,25 342:1,5,9 343:2,9 352:8,21 354:1,23 356:21 361:20 362:1

ordering 110:4 254:15,17 258:8 259:15 261:4 262:23,24 263:4 263:22,23,25 264:1,3,3,21 265:2 274:21 280:6 282:12 284:9 292:12 304:7 307:18 322:15 327:22
orders 45:21 57:8 57:21 66:18 67:3 68:2 110:2 120:4 122:16 175:5 200:20 230:10 254:20 255:12 256:23 264:19 268:15 289:18,18 289:19,20 290:21 290:21,23 303:7 307:20 310:3 316:7 318:19 319:7,10,24 323:2,3,9,11,12 324:7,22 328:20 329:12 334:13 337:17 340:17 351:25
org 147:20
organization 132:12,21 133:1 150:11 327:4
organizations 34:18 36:2 150:25
originally 251:5 314:3
ought 123:25 347:20 349:25

---

outcome 359:17
outlined 251:3 350:24,25 351:2
outside 29:25 70:2 78:22 183:3 205:21 207:20 266:10 310:22 329:16 339:1,7
overdose 20:17
overdoses 20:17
overlap 264:23 271:21,25 273:7 273:11
overprescribed 190:15
overprescribing 192:3,8,10,23 193:21
overruling 79:7 82:19
oversee 141:24 142:5 233:11
oversight 20:21 191:22 192:16
overwhelming 182:11 186:12 187:17 188:15
owned 218:4 219:20 220:5
owner 224:9
oxford 5:21 8:7
oxycodone 33:10 33:11,21 104:21 104:23 222:6

page 10:3 5:7,22 74:14,25 101:11 101:20 104:13,15 105:24 106:1 112:4,24 184:1,3,4 184:25 191:5,12 191:19,25 211:14 211:15 218:20 219:5 290:15,17 290:19,20,20 303:14,15,16 306:1,3,7 360:13 360:15 362:7 363:3
pages 10:16 19:2 105:16 112:2
paid 71:16,20,22 75:23 76:8 77:1 78:17 80:1,8 135:8 137:21 138:1,10,13 139:8 140:1,14 141:6 142:18 144:7 144:11,13
pain 34:1 36:9,10 36:13,14,18,19 37:7,9 185:15,19 185:23 192:9 193:5 196:20,23 197:13,14,14 198:3,17,23 200:2 200:8,17,23 221:1 221:3,13,16,16,19 221:20,24 222:1,4 222:5,7,14,23 223:13,14 234:7 234:19,19 249:15 254:3

**p**

p 12:1
p.m. 357:22 358:8
pacer 128:15 130:15,16
padgett 7:22 16:3 16:3

290:8 291:1,4,6 303:12,14 306:1,4 306:6
parallel 168:8 170:12,15
pardon 25:14
parent's 88:11 139:5
park 4:14 5:16
part 31:5 62:21,22 67:23 84:23 86:19 86:21 88:22 101:8 101:8 104:25 109:5,8 123:21,23 132:24 133:21 134:4 135:20,23 136:25 137:21 138:1,10,13 139:8 140:1,14 141:6 141:20 143:24 144:3 145:22 161:5 182:2 236:11 240:13 243:15 247:11 276:25 288:20,22 329:10 362:9
partially 71:4
participate 140:17
participated 144:5 144:11,13
particular 29:24 95:23 117:9 139:22 140:11 154:12 183:14 201:11 241:8
palo 5:4
paper 190:1 320:10,14
paragraph 36:1,8 75:1 112:24 185:6 191:14 219:8,9

parties 2:14 12:13 339:1 359:12,15
party 123:20,22
pass 91:19 223:6
passage 69:17 196:1 220:23
passed 197:11,16 197:24,25 198:11 198:11 200:9 222:21 234:14
passing 190:1
paste 291:7
patent 327:23
patient 113:24 191:19 213:23,24 214:1,6
patients 21:12,16 36:11 37:3 98:2 102:25 103:14 104:12,16,19,21,2 114:2 222:7,12
patrick 5:6 9:6 15:1 16:5
pattern 110:4 231:4 257:8,8 259:15 261:3 262:18 263:14,15 263:17,20,22,25 264:4,24 265:1,1 271:19 272:1,8,13 272:17,20 273:1 273:12 277:14 278:1 280:1,2 281:8 282:12 284:9 286:13,14 286:25 289:20 290:23 292:12 297:15,19 298:1 303:20,21,24

---

304:3 322:15 352:1
patterns 274:22 294:9,13,15 296:4 304:7,8,9
paul 4:2,4 14:11
pay 87:3 88:12,13 88:14,15,21 224:10 250:20,21
paying 83:19 84:2
pbeisell 5:9
pendency 162:1 163:21
pending 174:2
pennsylvania 5:22 6:16 8:8,19
people 20:6 46:12 85:17 102:19 109:13 112:4 143:17 144:15 217:14 224:13 238:19 243:22 244:3,15 246:9 257:23 278:24 283:16 310:2 329:25
percent 33:3,7,20 106:7,22 192:7 193:4,20 214:15 214:16,22,25,25 215:3,4 345:25
percentage 190:14 194:1 200:7
perfectly 338:10
perform 229:17
performance 69:23 70:3 187:24 205:14,22
period 20:11 39:19 61:10 139:16 197:23

224:20 225:6 229:3,11 230:4,13 230:24 233:15,23 235:25 239:24 242:21 246:6,12 246:14 247:19,24 248:1,5,21 249:6 249:10 255:10 280:7 294:21 317:16,16,24 328:25 331:4,20 332:12 345:18 346:11,14
periods 317:13
person 77:24 83:8 263:23 264:19
personal 14:22 69:13,22 70:11 83:16 89:16,20 90:8,14,16,19 166:23 187:23 188:5 205:23 207:1 265:22 266:8,12,14,16 279:4 348:22
personally 108:18 108:25 163:18 164:10,24 180:1,5 181:5 188:8 343:23 361:11 362:15
personnel 21:3 152:14
persons 50:5,17 272:14 273:19 251:21 355:21
pharma 1:8,10,12 4:13
pharmaceutical 5:19 19:22 98:14 175:18,20,23 176:11,12,15,17 176:19,22 210:14

231:15,17 237:19 182:25 186:14 188:25 223:24 234:20
pharmaceuticals 4:18 92:7
pharmacies 11:5,8 11:15 22:3 25:4 47:21 51:3,18 113:23 114:1,6,17 115:11,23 116:13 118:7 131:9,14 144:20 145:14 176:9 180:9,24 182:7 183:11 197:6,12,20 198:1 198:10,14,17,23 199:17 200:3,11 200:20 210:18,21 210:22 211:9 212:12 213:1,6 213:7,9,12,13,17 213:18 214:11,13 214:24 215:18,20 216:3,4,10,15 217:15,21,23,24 218:2,11 219:17 219:19,20 220:3,4 220:10,20,25 221:11 223:13,23 224:9 234:2,6,23 235:8,9 236:2,3,15 237:22 239:20 240:9 245:12 248:24 249:22 251:1,24 252:2,3

pharmacists 21:21 182:25 186:14 188:25 223:24 234:20
pharmacy 52:11 176:10 180:3 196:1 198:16 199:24 200:18 210:24 213:3,16 214:5 215:1,6,20 217:13 221:10,25 222:1,12,23 224:7 224:11,15 225:3 234:13 254:12,14 261:3,16 262:19 262:22 273:25 280:6 285:1,6 294:14 332:21
phases 264:5
phone 12:9 90:13
phrase 110:7,9,10
phraseology 264:5
physical 93:10
physician 172:11 213:19 332:21
physicians 183:10 185:16 186:13 187:18 188:16,20 201:19 202:6,7,8
pick 12:7
picking 191:24
piece 69:9
pieces 223:7 229:6
pill 203:18
pills 203:18
pinpoint 234:22
pittsburgh 5:22 8:8

---

place 12:9,12 97:6 117:17 327:23 334:15 341:19
places 299:21
plaintiff 72:16 123:12
plaintiff's 73:15 73:16
plaintiffs 4:1 9:3 14:8,10,12,14 15:7 15:9 18:16 71:17 71:23 72:3 73:7 75:23 76:9,18 82:3,12,24 84:2,4 87:11,19 91:12 124:5 129:2,8
planning 241:14 316:14
plans 156:24
play 79:15 119:16 120:8
played 124:21
please 12:6,9 13:7 15:24 16:10,24 20:7 22:17 24:18 24:20 34:22 44:24 50:14 66:15 74:17 74:21 82:10 105:21 113:6 128:22 135:6 183:22 190:23
pll 3:4
pllc 3:12
plus 68:3 206:14 279:5,5 334:17
podcast 10:22 103:24 104:11

123:17
podcasts 89:8,10 104:1
point 24:5,6 40:6 116:25 122:25 124:8 125:22 132:23 136:24 139:20 156:3 173:11,25 176:16 176:20,23 191:9 193:14 198:18,20 209:12 210:25 213:4 224:15 227:9 233:2 234:18 235:24 237:25 238:3
points 145:6 240:23 241:5,9 355:8
police 110:20 111:13 112:6,7,8 112:13,16 113:11 189:12
policies 134:20 135:10,15,17 136:3,9 137:16 138:22 139:6,8
policy 42:18,24 43:13,19 44:3 45:15,19 46:1,6 56:25 237:20 238:24 345:21 267:25 268:24 271:12 299:18 300:25 301:1 302:23 333:1 337:22 339:24 342:18

polster 1:7
pop 270:25
population 23:11 43:6 201:14,19 202:5 243:6,15 248:15
portal 25:24
porter 5:11 13:21
posed 72:19
position 42:21 140:11 155:8 181:12 204:16,17 205:18 206:8,9,10 208:1,4 209:4,5,7 212:20 279:1 310:17
positions 131:19 177:10
possible 215:5 296:14 323:12 324:4,5
post 37:25 74:7 75:9,18 77:13 91:6,9 126:9,19
posted 32:1 34:17 38:23
potential 52:13,25 134:22 158:17 188:16,20 192:21 192:24 193:3
powerpoint 236:1 236:8,13,16 241:6
powerpoints 357:6
powers 151:9 228:4
practice 133:17 195:13 261:10 362:3

practices 134:19 182:20
practitioners 182:20
precisely 133:23
predicate 209:16 209:16
prefers 177:24
preliminary 203:12 204:9
preparation 18:23 81:16 288:22
preparations 81:21
prepare 46:10
prepared 19:3 173:9 236:9 242:8
preparing 235:16
prescribe 172:12 226:6
prescribed 53:13
prescribers 182:6 190:14 192:7 193:20
prescribing 172:15 182:11 189:21 195:20
prescription 1:4 8:16 11:3,9 12:17 112:13 186:16 189:2,7,9,13 191:21 195:10,21 196:2,9,10,12,16 203:11 211:23 213:15 214:7 218:24 222:13 225:5 360:6 361:3 362:3

Veritext Legal Solutions

**[prescriptions - protocols]**  Page 42

prescriptions
189:8 202:20
203:14 204:11
222:22 223:24
present  2:13 9:2
13:4 72:9 73:12
78:22 124:11
239:1,6 329:6,7
presentation
236:9 238:15,16
240:18 241:6,7
293:8 353:20
357:9
presentations
216:13 217:12
238:20 342:13
presented  175:7
196:15 209:6
240:13 270:9
293:5,9 294:22
342:14,24
president  69:8,10
70:8 314:22 315:8
press  26:22
pretty  41:17 109:4
110:4 145:17
177:4 197:11
200:18,21 216:9
232:24 252:23
254:13 257:4
259:21 260:24
279:19,19,25,25
281:3 290:25
292:9 302:6
346:13 354:25
prevent  18:5
prevention  103:13
prevents  172:14
previous  250:19
279:5,24 298:16

previously  202:6
219:10 263:5
353:19
primarily  229:8
232:17 242:6
245:11 246:4
primary  199:4
238:14
printed  38:12
printout  34:16
prior  50:9,23
70:22 71:3 92:25
173:18 174:8
220:15 233:25
234:5 245:15
250:12 258:16
267:16 272:6
273:15 275:17
281:16 289:10
290:11 292:3
300:3 301:7
304:19 313:25
331:9 337:1
priorities  133:7,7
133:8,9 156:23
157:7
prioritize  156:13
priorprod  11:12
11:14
private  12:7
102:20
privilege  73:11
76:12 78:2 165:8
166:12 169:6
171:4
privileged  49:11
79:9,20 163:24
167:2 169:20,23
170:16,20,22
305:14 330:9
339:16,18

previously  17:10
118:11 127:21,22
128:3 129:22
132:17,19 153:25
154:1 235:2
252:19 345:25
problem  11:5 35:3
36:9 58:19 62:21
62:23 102:9
104:17 197:21
211:10 215:17
234:1,13,15,19,23
problems  11:3
157:3 186:17
189:3 191:21
procedure  361:5
362:5
proceed  16:16
64:3 92:5 123:10
130:25 163:11
165:25 169:17
174:1 178:15
226:8 265:15
317:1
proceeding  173:12
173:16 358:7
proceedings  168:8
170:12,15
process  31:5 44:6
44:9 48:23 59:7
59:11,13 119:9
136:8 138:2 144:6
164:2 166:14
185:21 187:12
188:2,6 205:10
237:7,10 244:8,12
276:15 277:3
281:19 283:9
292:22 305:12
336:9 348:18

processes  97:5
procurement  95:8
produce  62:17
355:7
produced  51:16
94:18 216:25
355:19
product  73:10
76:12 79:5 99:13
production  10:14
32:2,9 95:12,13
360:15,17,22
products  97:12
professional
195:13
program  143:20
224:21
programs  39:25
42:20 57:8
promotion  232:3
prompted  305:6
pronounced  37:4
proposed  205:17
281:22 283:8
336:11,15
proprietary  29:18
57:2
prosecute  134:21
prosecution
134:22
prosecutorial
136:10 161:11
162:8 163:25
166:13 167:6
prosecutors
161:23 163:19
protect  171:4
protocols  135:10
135:15,17 326:5,7
326:12,14,22,23

**[protocols - question]**  Page 43

327:4
provide  42:13
57:20 112:22
124:24 127:1
128:11,17 130:4
135:17 137:17
139:9 140:3 142:9
145:18 185:18
212:10,22 229:24
256:12 269:12
271:14 282:22
312:14 329:11
331:3 336:1
347:10,21 349:25
350:18 351:8
352:20
provided  21:2
28:1,5 116:25
127:4,8,9,12
137:16 139:19
140:1 143:25
146:1 147:13
183:18 189:18
190:12 207:15
208:21 211:21
219:23 255:9
256:21,22,24
258:20 259:19
269:1,4,8 277:25
282:5 304:20,22
315:25 331:15,17
352:7 353:25
provides  37:10
providing  109:20
139:10 144:13
145:11 184:15
205:3 206:16
256:9 258:11
proving  135:25
provision  253:18

prudential  7:17
public  34:1 58:13
70:1 97:17 101:24
102:5 118:20
182:2 205:20
279:6 295:10
336:14 348:20
359:1,20 361:10
361:18 362:15,23
363:23
publicly  54:19
118:19 225:14
295:12
published  116:11
204:7 224:4,7
230:3,7,10,12
261:17 273:25
305:23 306:12,18
306:22 307:22
308:13,20,21
purchased  30:1
223:22
purchaser  224:11
purchases  265:3,4
280:8 307:8
purchasing  263:15
263:17 294:15
purdue  1:8,10,12
4:13 14:6
purpose  195:11
250:11 329:9
purposes  87:14
197:18 255:19
pursuant  2:13
pursue  157:8
167:7,8 172:6
pursuing  161:25
put  124:8 140:9
187:13,13 192:1
287:14,19,25

310:25 315:8
326:16

**q**

qualification
220:6
quality  36:14
quantico  227:7
quantities  185:23
262:25 263:4
quantity  254:15
265:3,4 297:4
quarter  81:10
question  17:23
18:1 21:14 22:17
26:9 27:8 28:11
36:23 37:17 44:23
45:6 46:21 49:14
49:22 50:14 52:7
55:2 56:10 59:16
64:20,24 69:4
70:8 72:11,18
73:2 75:16,22
76:4 77:15,17,19
77:22 78:12,15,21
80:20 82:10,10
84:10,16 85:1
93:25 94:23 96:12
97:19,23 100:5,9
105:13 108:3
113:8 117:7,10
120:17 124:3,4,8
124:12 125:20
128:22 130:2,7
135:1,6 136:4,12
137:6 138:21
139:14 140:6,21
142:14 146:6
151:3 152:6 153:2
154:21 156:8,17
157:25 158:25
160:3 161:13

162:11,13,13
163:17 164:4,7,12
164:14 165:9
166:3,17,20,21
167:17,24 168:1
172:7,11 183:14
173:2 174:6
181:23 183:3
184:23 185:12
186:1,3 187:3,16
188:11 191:15
194:19,25 195:6
195:17 197:2
198:5,7 204:4
207:8 208:6,7,16
209:1 209:6,19,23
209:25 210:4
215:24 218:3,16
218:7,11,16
219:17 221:15
217:6 221:20
219:23 224:19
225:4 240:24
226:7 270:14
272:13,15 276:17
276:18 281:24
282:2 283:2 293:2
298:16,20,23
300:23,24,25
301:1 305:17,20
310:8 312:3 314:3
314:7 317:4,8,13
317:20 318:4
323:17 325:13
332:8 333:13,18
333:20,25 339:6
339:19 344:5
350:11

**[questioner - recall]**  Page 44

questioner  234:5
questioners
130:18 233:25
questioning
241:25
questionnaire
213:23
questions  16:23
17:14,21 40:24
41:8,11,18,22
61:19 74:18 92:13
123:14 124:17
130:13 131:8,17
147:20 157:24
163:23 167:11
169:25 171:1,3
177:9 178:3,20
181:10 184:8,14
199:10 202:11,12
211:16 224:25
226:14 258:22
266:11 269:9
299:22 300:20
323:21 330:15
331:25 332:11,22
332:22 339:23
340:3 351:2
357:20
quickly  61:18
307:5 356:14
357:2
quite  38:4 197:15
199:25 246:8
335:8
quota  10:14 31:2,6
31:8,11,11 32:2,21
32:24 33:3,12,17
33:21,24 95:8,12
95:13,24 96:2,14
96:19 97:11 98:2
98:7,12,17,20 99:3

99:10,13,16,16,20
100:3 102:9,24
103:7 104:17,18
104:18,22,24
106:4,7,11,22
quotas  30:12,16
30:21,25 32:9,11
87:17 92:16,18
93:19 94:3,16,19
95:1,11
quotations  61:24
quote  185:13
186:1 191:18
192:1,6 206:15
quoting  123:15
186:10

**r**

r  3:7 5:15 12:1
rac  150:5 157:12
157:14,20 158:5
158:13 159:9,16
racs  157:21
159:22 160:8
radio  89:7
raised  40:24 41:8
ran  165:6 166:10
176:21 231:5
range  215:19
232:12
ranking  149:23
ranks  154:5
rannazzisi  1:18
2:1 10:2,13,18
12:15 14:22 16:12
16:20 17:1,3
18:14 21:10 24:23
46:9 64:5 71:4
73:6 74:8,10,21,25
75:2,8 77:5 79:25
91:18 92:9 97:25
100:7 101:2

103:23 117:19
126:5 131:3
136:23 143:23
145:4 151:23
164:23 165:13
166:2 171:9,17
175:12 177:7
178:7 183:16
184:1,7,9 185:6,11
188:24 189:18
190:10 191:4,10
192:2 193:2,19
194:10,23 195:4
199:3 200:25
204:6 206:13
207:9 208:19
209:8 210:8,14
211:15,17 213:5
217:11 218:19
219:6,13 220:14
221:23 224:2
225:4 254:1,6,8
259:18 262:8
278:21 282:22
288:2,11,17 317:3
323:7 324:10
327:7,16 356:9,12
357:1,24 360:8
361:4,9 362:4,13
363:20
rate  93:3
ratio  214:15 215:3
215:15
raw  193:11
reach  128:5
155:13
reached  143:18
read  26:22 101:17
101:21 105:6,15
125:10 126:18
125:23 124:8

185:4,5,7 186:3,20
191:6,8 192:13
193:16 194:8
212:14 219:12
269:15 285:14
305:4 312:5 348:5
361:5,6,12 362:5,6
362:17
reading  105:13
187:2 219:13
266:3 360:19
ready  174:1
real  106:10,10,23
realized  224:24
really  86:25 88:22
125:9 157:2
234:23 301:4
234:19 329:23
346:18
reason  38:23
53:18,22 79:11,12
243:17 263:1
280:9 308:23
360:14 362:8
363:3
reasons  261:24
recall  17:6 48:14
49:4 75:17 83:10
109:7,12,14,16
119:5 129:5
174:14 176:9,18
176:21 179:13,18
212:2 253:18

**[recall - registrants]**  Page 45

271:2 272:3,12,15
272:16,19,22,23
287:22 290:3
308:11 328:17
329:9 331:14,16
331:17,23 341:18
342:20,23 344:15
344:20,20,23
347:5,9,15,19
353:17 355:15
receipt  360:18
receive  243:15
received  80:25
122:11 127:11
158:15 159:24
243:21
receives  189:9
receiving  103:14
302:13,13
recess  63:24 92:1
123:6 130:22
163:7 165:21
169:14 178:9
243:16 288:19
316:22
recognize  101:2
357:5
recollection  225:2
247:16 265:23
297:8 348:23
353:22
recommendation
205:10 347:20
348:9 349:25
350:17
recommendations
188:3 205:16
281:21 283:7
292:23 336:10,14
347:10,17 348:16
349:19 351:7

recommended
37:7
record  12:4,13
13:7 16:25 17:12
35:14 63:20,22
64:1 91:21,24
92:3 100:24
105:14 123:4,8
130:19,21,24
163:5,9 165:17,19
165:23 169:5,8,11
169:13,16 178:7
184:1 219:1,18,19
206:18 211:16
218:21 219:12
225:24 226:4
265:9,13 266:6
313:5 316:20,24
357:22 358:4
359:10 362:9
record's  180:21
recorded  12:15
123:20,21,24
243:17 250:15
251:2 276:12
277:5 283:8
292:24 295:8
301:23 308:19
330:16 347:11,21
348:21,22 350:1,6
352:21
redacted  257:22
reduce  137:17
reduced  359:8
reed  6:15
reedsmith.com
6:17,18
reemphasize
254:20 297:1
refer  113:21
300:24 337:9
reference  210:5
217:17 360:7
361:2 362:2
referenced  287:7
337:2 361:11

362:15
references  305:23
referred  84:21
85:4 118:1
refill  213:15 214:8
reflect  346:19
reflected  32:10
77:12
reflection  251:22
reflects  95:17
357:9
refuse  44:15 45:6
45:18
reg  323:8 325:25
regarding  69:22
94:17 97:15
120:21 121:22
134:20 135:10
141:17 158:15
161:9,16 169:20
187:23 188:2
205:9,12 206:23
210:1 225:11
245:17 250:15
251:1 276:12
277:5 283:8
292:24 295:8
301:23 308:19
330:16 347:11,21
348:21,22 350:1,6
352:21
regardless  187:9
254:20 297:1
region  148:13,21
148:25
registered  21:12
21:17,20,22,24
22:1,3,5 23:5
25:12 65:16 141:2
195:12 224:19

registers  50:5,16
51:2
registrant  22:16
22:20,22 23:10
24:3,24 95:25
96:2 119:22,23
172:7,11 183:14
201:14,19 202:5
259:6,9,20 267:13
267:22 269:16,20
269:24 271:7
275:3 278:17
284:12 285:8,16
286:7 303:23
315:14,19 316:6
316:11 318:16,21
321:2,3,8 322:8
321:24 332:7
333:10
registrant's  304:3
304:8 316:9 333:2
registrants  20:25
25:6,15 26:3,11,16
27:5 28:6,15 29:3
33:25 42:25 43:14
51:10 52:13,25
55:25 57:6 65:3
66:1 94:19 109:20
109:25 115:9
137:16,17,22
181:13 182:7
187:11 188:2,22
186:22 203:25,25
242:20 259:9,23
246:7 266:6
267:2 268:7
270:14 282:7,23
283:25 285:4
302:12 304:14,20
313:8 316:1 318:9
318:16,17 332:1,1

332:5 340:15,16
347:7,11,23 350:2
350:18 352:21
353:25
registration 22:9
22:13,19 51:7
52:10,19 145:14
registrations
144:19
regs 256:24
268:16 309:8
321:6,14 351:8
regular 246:16
254:24 262:23
regularly 229:11
regulated 119:2
139:3,3 141:3
304:10
regulation 10:24
57:16 58:20,21
64:7,10 68:11,12
92:22 115:4
120:20 253:11,19
256:10 258:21,22
258:23 259:17
260:24 268:10
269:8,10,13,16,21
277:15,22 284:7
291:7,9,11,14
306:20 307:11
310:19,24 311:6,9
311:11,14,18,19
312:8,9 315:10,12
316:4,5 322:8
327:2,23 334:11
334:15 335:11,12
335:18,19 336:24
353:8,9,13 354:8
regulations 23:12
45:22 57:22,25
69:15 107:16

14:25 115:6,19
116:8 117:16
120:19 133:12
140:25 141:4
196:7 243:9 255:2
256:8 257:1
258:11 260:23
271:15 301:11
308:22 314:16
318:2 320:19
321:10 327:1
336:1 338:16,17
340:12,13 347:12
347:22 350:1
regulators 119:3
regulatory 20:22
107:7 116:20
139:4 176:12,15
183:11 201:2,24
229:18 245:23
299:20 302:24
337:21,21 339:24
342:17
reinforce 250:19
255:2 257:9 292:5
309:25 310:2
reinforced 257:3
reinforcement
312:15
reinforces 286:6
reinforcing 251:4
292:8 311:8
relate 41:11 131:9
related 89:19
123:19 140:11
165:3 166:5 168:6
170:10 198:13
228:6 235:20
236:2 258:22
268:14 269:9
339:23 340:16

352:7 355:18
359:11
relates 1:6 72:6
73:11 208:7
357:16
relating 89:5
347:6
relation 49:10
235:12
relationship 79:13
213:24
relative 250:12
359:14
relay 208:3
release 275:6
released 27:2
28:15 57:3
releases 26:22
releasing 28:24,25
relevant 93:17
112:23 304:10
relief 37:10 161:25
163:21
relievers 185:23
rely 188:5
remain 226:22
228:11,13,18
remainder 123:19
remember 42:14
55:11 70:20 71:1,2
106:9 109:2
118:13,23 128:1
160:6 173:24
174:23 202:16,17
216:2,9 218:11
227:14 235:21
246:14 294:11
329:24 348:8
349:8,17,17 351:6
351:14,16 352:2,3
352:4,5

remotely 13:5
rence 9:4 15:3
repackager 285:3
repeat 21:14 22:17
44:23 46:21 50:14
78:14 82:10 84:13
84:15 93:24 135:5
143:4 188:11
325:12 350:11
repeatedly 39:11
207:12 352:24
repeating 291:10
311:18
rephrase 94:22
227:23
report 21:4 23:19
68:1 146:4 147:14
157:16 158:17
159:10,25 204:17
270:2 304:4
306:23,24,24
307:2,10,20
308:21,21 309:1
318:18 321:17
324:7 334:12
348:4,6,21 349:2,3
350:23
reported 1:24
68:14 122:3,18
134:9,16,17
270:16 303:22
307:10 328:9
reporter 13:1
16:10 17:11
100:14,17,22
126:8,18 130:13
165:16 177:20
232:7 356:21
361:7

reporters 129:24
130:10
reporting 12:21
183:14 217:20
229:25 242:25
323:11 328:20
341:5
reports 66:2 158:7
230:4,8,10,13
305:23 306:12,19
306:21 307:22
308:13,20 316:7
319:23,23 321:19
represent 16:21
83:21 84:3 92:12
131:5 226:13
344:12
representatives
186:24
representing
73:16
represents 84:2
87:11
request 168:7,16
170:10,14 273:5,9
330:24 362:9,11
requested 26:3,12
require 123:22
124:18 168:14
222:21 348:15
required 23:19
31:19 103:6,10
111:2,3,12,19
114:12,14 115:3
116:6 275:21
308:21 316:1
360:25
requirement
114:8 122:22
311:15

requirements
95:21 98:18
107:12 122:2
138:25 140:24
195:22 256:25
260:22 284:19
requires 49:17
98:16,16 112:22
207:14 306:20
306:21 307:22
308:13,20 316:7
319:23,23 321:19
resend 243:24
resident 149:11,16
150:1,2,3,5 157:12
157:15 158:6,14
159:1 160:14,14
160:20
resolved 196:14
275:25
resources 10:22
104:3,11 200:16
200:22 221:12
249:7
respect 89:12
171:2 241:11
249:12 250:25
308:9 309:3
315:17
respective 2:14
316:17
responded 61:17
192:6
response 17:20
42:12 45:18
184:25 185:2,9
186:10,11 187:3,6
187:7 191:15
202:10 207:15
212:8 219:8,25
222:20 223:11,18
266:4 330:25
351:13

responses 184:16
349:18
responsibilities
159:2,3 181:14
208:9 232:17
253:17,22 284:18
responsibility
23:4,10 30:24
131:23 132:25
140:9 181:11
196:8,11 213:25
267:22 304:4
responsible 19:22
20:21 30:21 71:5
71:14 143:9
257:24 309:6
responsibly
182:13 186:13
187:19 188:17,21
201:16 202:8
231:6 248:19
result 99:20
169:24
results 219:17
220:1 284:24
resume 125:18
retail 24:7,14
131:9,13 180:2,8
180:23 215:20
retained 129:1,8
351:21 358:1
retired 153:24
246:9 351:12
retract 228:12
return 92:15
returned 231:8
360:18
reveal 77:8 78:21
136:7 146:9 162:7
148:13,17 221:8
169:22 170:13

237:6 276:14
283:8 305:14
336:8,10 348:16
revealed 219:18
220:3
revealing 168:14
168:24
review 17:8 24:23
34:22 35:17 74:17
97:6 136:16 175:5
175:7 213:25
230:3,12 232:20
246:21 251:18,19
360:12 361:1
362:1
reviewed 224:22
238:24 240:17
251:16 252:7
319:19 320:7
362:1
reviewing 35:1,24
169:21
revoke 22:12,18
362:1
rice 3:17 14:14
15:7 72:20 87:2,3
87:7,9,10,14
351:21
richard 78:25
rick 72:24 73:15
rid 91:2
right 19:13 35:2
55:23 60:14,19
65:22 83:12,12
125:18 129:11,12
129:16 131:16,21
132:2 134:16
135:23 138:13
144:7 145:7 147:9
148:13,17,21
149:18 150:5,6,11
152:18 155:22

156:4 157:11,12
166:2 180:19
181:8 185:11
193:1 195:9
197:15 202:18
203:23 213:4
220:16 222:14,20
225:18 226:17
228:1 229:13
233:6,17 234:2
236:12,18 240:5
251:13 255:22
258:13 262:6,7
263:8 266:3,14
273:13 277:11,15
279:11 287:10
289:25 291:3,3,4
292:1 293:18
295:1 296:17
300:1 301:5 305:4
305:23 306:8,12
314:19 316:15
325:5 328:15
333:5 333:14,25
334:1,16 335:12
335:23,23 343:19
354:12 355:3,16
355:23 357:14,19
ripened 173:25
rises 273:21
rite 5:14 15:11
16:2 131:11 180:4
215:21 220:8
rnicholas 6:18
road 4:6 5:3 8:18
robert 6:14 177:3
roberto 83:9
rogue 11:5 192:9,9
193:5,6 196:19,20
196:22,23 197:6
197:13,14,14,20

198:1,3,10,17,17
198:17,23,23,23
199:17 200:2,3,3,8
200:10,17,22
210:17,21,25
211:9 213:2,9,18
214:2,11,13,24
215:18 216:14
217:13,23 219:16
220:2,20,25 221:1
221:3,9,13,16,23
221:24,24 222:4,5
222:7 223:13,14
223:22 234:19,20
role 47:11 59:6
82:23 114:13
119:8,16 120:8
134:4 228:25
230:19 231:18
233:13 235:13
270:21
room 13:4
ropes 7:17 14:2,4
ropesgray.com
7:19,20
rosenberg 60:13
61:14,20 62:20
rosenberg's 61:4
rotated 153:24
246:9
rothschild 8:17
roughly 128:1
ruiz 6:9 15:20,20
rule 78:4 112:22
113:3 123:18
124:1 125:9,14,25
187:4 193:13
194:6 223:7
rulemaking
314:16

rules 17:8 41:19
361:5 362:5
ruling 72:14
rulings 79:23
run 147:23 159:2
233:8
running 124:4
152:13 153:9,11
153:13 157:15
158:14 161:3
168:11 176:13,19
runs 157:12 158:5
rural 274:24
russo 1:24 9:7
12:24 13:2 359:2
rx 6:8 15:21
ryan 197:10,16
198:10,11 199:6
199:16 200:8,21
220:16,18 234:14
**s**
s 5:10 10:1 12:1
360:15 362:8,8
363:3
sac 155:7,23 156:2
sacs 159:22 302:9
safe 200:6
saguiniga 3:20
sale 24:13 56:3
sales 44:4 104:25
106:5 118:5
217:23 241:7
sara 3:16 15:6
sat 149:14 278:6
349:10
satellite 148:24
saw 129:13 139:11
214:1 257:20
294:13
saying 40:8 67:22
155:9,14 156:19

179:18 272:23
303:2 332:7,18
345:14,17
says 75:2,14
103:21 110:1
170:9 186:11
189:10 191:18,25
192:21 201:22
206:23 268:10
269:21 291:11
316:5 322:8 323:8
344:12
scenario 224:8
schedule 50:12,17
51:4,8 65:15
scheduled 344:23
scientific 30:17
95:18 98:8,18
103:8
scope 18:1 29:7,11
29:12 30:5 34:5
36:20 39:3 43:18
46:5 48:13,21
43:3,9 54:5,9
55:13 57:13 58:4
58:8 59:8,9 64:14
65:17 66:5 67:7
67:16 68:7,21
69:20 71:6,9,11
76:19 77:8 89:22
96:8 97:1,13 98:5
98:23 99:25 102:3
103:5 109:24
110:23 111:17
113:17 117:3,24
118:15 121:22
127:6 130:6 136:5
142:13 144:21
146:7 151:5 152:8
153:14:7,8,23
155:9,14 156:19

157:17 158:9,22
160:3,17 161:7
162:5 165:7
168:13 172:24
174:9 175:16
176:3 177:1
181:19 182:16
183:3,5 187:21
195:16 196:4,25
197:7 201:5,7
202:23 204:2
205:7 206:21
207:20 218:5,7
220:11 222:25
223:2,17,19 229:5
234:25 235:15
237:4,15 238:11
238:12 244:6
245:1 261:13
262:3,20 264:8,18
265:18 266:10
274:17 275:18
276:9 277:5
279:16 280:24
281:14 286:1,19
292:20 295:6
300:14 301:20
302:2 305:10
305:17,18,23
317:7,19 318:3,12
319:1,16 320:5,11
320:21,22 321:13
322:1,21 323:19
323:24 329:6
329:16 331:21
333:4 334:19
335:5,16 336:6
339:14 340:5
346:25 347:14,25

348:14 350:5,7
scornell 8:20
scott 8:6 13:18
126:16
scourge 11:10
218:25
script 190:4
seal 361:15 362:21
second 5:22 10:12
18:12,15 20:5
77:15 114:19
124:20 125:7
162:24,25 184:23
186:10 191:14
194:12 303:15
306:3,4,6,7 308:11
section 9:6 50:6
145:20 175:19,24
175:24,25 176:1
176:10,17,22,22
231:15,18 235:25
237:2 239:10
245:23 265:25
267:23 268:1
281:14 286:1,19
292:20 295:6
300:14 301:20
302:2 305:10
303:17 318:13,23
319:1,16 320:5,11
320:21,22 321:13
323:4,6,7 308:11
325:22 343:3
see 24:24 25:2
26:1 29:16,21
30:2 32:18 33:5
33:14,18,22 35:9
36:5,16,17 61:25
62:5 67:12 105:1
112:10 164:16
184:11 186:18
192:11 202:15
209:25 212:4,13
219:21 224:13
257:7 273:7
279:25 285:19

306:5 329:10
342:12 352:12
seeing 203:6,20
322:24 334:3
342:20
seek 338:22
seekers 196:9
seeking 270:14
328:19
seen 18:19,22 19:5
35:20 37:24 38:1
74:10,12 214:24
241:24
segment 124:2
304:10
segments 343:18
selected 10:15
32:3
sell 212:2
selling 115:12,23
116:14
semisynthetic
334:24
senate 211:12
212:19
send 90:8,14
306:18 340:15
sending 222:12
243:17 308:23
senior 19:21
156:24
sense 17:17 18:2
255:18 326:21
327:3
sensitive 12:7
sent 89:15,19
115:9 116:4
242:19 243:10
250:8,13,18 257:8
304:12,13,15,17
304:25 312:14

349:11
sentence 101:22
105:1,22 123:15
124:7 186:11
188:24 212:8
219:7
sentences 124:6
185:2 219:11,14
separate 142:7
150:10 288:5
320:17
separately 75:4
september 240:7
242:20 287:20
288:13 289:24
291:11 305:1,2
313:6
series 123:14
200:10
serious 36:9 349:3
served 289:4
service 185:18
261:15
servicing 6:15 22
sessions 81:16
set 30:16 88:22
92:21 95:12 99:20
100:4 103:7,12
104:22 132:4,9,25
134:19 135:10,16
209:15 240:22,23
241:6,9 269:11
308:10
sets 94:19 95:1,7
311:11
setting 30:21
93:19 94:3,16
157:6
seven 358:1
shaking 17:19

## [shannon - singer]  — Page 50

shannon 6:14
shapira 8:7 13:19
shapira.com 8:9
share 26:5 91:4,11 183:17 236:2
shared 249:16
sheet 360:13 362:7 362:10,18 363:1
shifted 199:7,8 200:16,22 234:15 234:19
ship 45:20 275:22 275:22,23 297:4
shipped 122:7 290:25
shipping 111:8
shkolnik 3:12,12 123:11
short 63:24 92:1 123:6 130:17,22 163:7 165:21 169:14 178:9 226:2 265:11 316:22
shortage 99:14,17 99:21
shortages 98:21 99:4 101:24 102:4
shorthand 125:5 359:7
shortly 60:21
shoulders 137:12
show 34:9 100:7 175:5 216:17 241:22 294:6
showed 258:23 293:6 294:10,13 294:20 356:15
shown 353:16 360:16
shows 352:16
shut 197:11 221:11 234:17 249:9
sic 350:17
side 32:16 152:16 176:18 228:1,14 228:19
sign 80:6
signature 38:5 101:11 359:19 360:14
signed 38:8 40:7 70:7 89:1 361:13 362:18
significant 37:10 197:21
significantly 31:12
signing 101:11,13 360:19
signs 69:8
similar 166:21
simple 167:24
simply 102:8,23 213:4
sincerely 360:21
sindelar 4:22
singer 3:16 14:13 14:13 18:15 20:5 23:7 24:8 26:7 27:10 28:8,20 29:11 30:5 31:14 32:6 34:4 35:5,8 35:11 37:21 38:17 39:14 41:2 43:15 43:18 44:5 45:9 45:11 46:5,16 47:17 48:13,19,21 50:2,7,9,22 51:20 52:15 54:5 56:4 58:1,4 59:8,23 60:24 61:22 62:12 62:25 63:11,17 64:13 65:5,17,24 66:5,24 67:15 68:20 69:18 70:12 70:21 71:6,19,24 73:9 75:12,25 76:19 77:4,14 82:5 87:22 89:22 90:24 93:22 94:7 94:21 96:4,20,23 98:4,22 99:22 100:20,23 102:3 102:11,13 103:2 103:15 106:14 108:10 109:10,22 111:14 112:19 113:3,13 116:1,15 117:11 120:10,15 121:20 122:14 125:19 126:3 127:6,14 129:4 130:6 133:3 134:11,25 135:13 136:3 137:5,19 138:5,20 139:13 140:5,20 141:20 142:24 143:15 144:21 145:15 146:5 149:20 151:2,18,20 152:5 153:1 154:7,20 156:7,16 158:19 158:21,24 160:2 162:3 165:14 172:22 174:5,16 174:25 175:16 179:3 181:22 182:15 183:2 184:20 185:25 186:5 189:20,22 193:12 194:7 195:14 196:24 198:4 201:4 202:22 203:25 204:13 205:6 207:17,21 209:1 214:18 215:8,23 218:5 220:11 221:4 222:15,24 228:2 229:20 231:11 235:15 236:6 237:15 238:11 239:8 240:15 241:16 242:1 244:5,23 245:14 248:22 249:19 252:12 253:5 255:3,23 258:15 262:9 267:15 268:21 269:18 270:4,17 271:11 272:5 273:14 274:14 275:16 276:7 278:18 279:12 280:21 281:9,12 282:25 284:2 285:22 286:16 289:9 290:10 291:24 292:2,18 293:20 296:18 297:21,23 300:12 301:6,18 302:2,15 305:9 307:23 308:14 309:13,22 310:20 311:4,22 312:10 313:22,24 314:6,9,25 316:3 318:24 319:12 320:20 321:11

## [singer - special]  — Page 51

sit 55:21 102:2 106:13 109:6 116:24 260:19
site 32:2 34:10,17 37:12,19 38:13,20 38:24 320:7 341:22 344:3,11 344:12 346:18,20 354:21
sites 351:4
sits 83:24
sitting 27:4 38:22 55:9 70:10 213:19 213:20 279:8 283:21 327:6 331:14
situated 274:22
situation 99:11 161:23 173:8,11 173:24 174:14,23 190:7
situations 172:17
six 121:25 122:6 122:19 358:5
size 110:2 229:6 254:16 258:6 259:13 260:25 261:1,2,8,19,20,23 262:2 263:8 266:24 267:3,9,14 272:8 277:14,25 278:14,16 279:2,9 279:11,18 280:1,2 280:5,16,18,19 281:2,3,4,8 282:10 282:17,20 284:7 287:1 289:19 290:22 292:10,15 293:6,23 294:1,4,7 296:3 297:11,12 297:14,19 298:1
303:21 304:1 322:14 327:21 345:18 355:2 355:2,5
slide 11:8,15 145:8 146:22 216:14,23 355:2,5
slides 355:16,18
slight 122:11
slow 61:15 62:9
small 193:15 194:1
smaller 65:19,22
smclure 6:17
smith 6:15 7:21 16:4 70:24 320:11
sold 241:8 244:2 244:24
solely 122:20
solutions 12:25 13:3 358:2 360:1 363:1
somebody 60:12 203:18 232:5,12 357:11
somewhat 288:18
soon 262:10
sorry 50:12 57:14 85:1 93:25 106:17 175:12 176:11 194:15 195:2 199:22 230:8 246:20 249:2 256:5 281:12 296:13 298:10,17 298:18 310:8 312:22 330:11 331:2 350:10
sort 114:15 118:5 229:17 278:2
315:24 326:15 338:14
sorts 228:5
sound 106:8 250:14 360:5 350:16
sounds 177:15 350:14
source 35:12
sources 93:21 94:5 94:9 158:17 159:25
south 7:23
southwood 109:3 109:7 250:21,25 260:3 278:9 284:11,25 285:2 285:12,17 287:4 354:9,19
speaker 87:20 88:4
speaking 88:5,7,9 88:24 113:1 125:6 125:21 138:14 163:16 182:1,2 188:8 205:24
speegx 7:15 14:2 92:7
special 9:3 14:24 14:25 24:17 72:10 73:1,18,25 76:1,4 78:6,10 79:6,10,22 80:19 82:18 84:9 84:25 112:25 113:4 123:11 124:24 132:19

## [special - stephens]  — Page 52

147:24 150:15,20 151:8 153:6,12,17 153:23 154:4,15 155:1 156:4,12,22 157:5,21,23 160:21 162:10,25 163:2,12 164:11 164:15,19 167:18 170:1,4,7,21 171:5 171:7 177:19 194:3,20 209:11 209:13,17 227:21 227:25 228:3,4,11 235:13 302:8
specific 60:1,9,11 96:13 97:15,20 109:14,14 114:12 123:15 130:15 161:9,11,20 195:20 203:18 208:7 225:11 258:23 261:17 268:12 269:9,10 269:11 276:12 285:9 295:8,16 296:3 316:11 341:19 345:3,10 351:6
specifically 110:1 128:14 167:19 247:3
specificity 336:1
speculate 274:16 322:20 339:3
speculation 20:3 27:20 45:11 55:16 56:3,17 57:10 58:9 96:7,25 99:23,25 157:18 158:10,23 159:14 160:18 201:7
203:1 215:9 218:8 252:13 255:4 270:5 273:17 278:19 279:13 280:22 284:4 285:23 286:17,20 293:21 296:19 297:24 299:6 300:13,15 302:18 308:15,16 319:13 319:15 321:12 323:17 324:1 325:7 329:20 331:10 332:14 333:16 337:11 339:4
speech 123:16
spent 148:16
spoke 129:7 181:15
spoken 126:11 259:9
squad 152:21 153:5
squads 150:14 151:15
square 6:15
sshkolnik 3:14
staff 132:18 180:13 258:3 260:1,6,16 267:24 268:7 300:19,21 329:6 357:12
stamped 10:20
stand 117:14
standard 111:4
standards 108:1 116:6,7,18 345:24
standpoint 124:5
stands 316:4
stars 7:9
start 17:16 64:1 76:17 95:5 123:8 131:16 164:16,17 178:12 184:2 199:5 210:14 226:5 265:13 289:15 316:24
started 198:2 221:2,12 223:23 224:21,25 226:19 233:18 247:18 294:15 308:4
stars 219:9
state 13:5 16:24 75:4 141:16 152:24 190:6 219:14 361:10 362:15
stated 42:18,22 164:5 219:10 314:23
statement 34:9,18 35:23 36:3 37:11 37:19 38:19 63:8 140:13 141:5,22 142:8,17 143:5,22 144:9 145:3,21
statements 61:8,9 62:16,16,18 160:12,25 161:18 164:6,11,17,21,22 165:12 166:1,19 168:2,4 169:10 170:1 171:5,8,16 172:2 173:7,23 174:13,22 175:9
statute 31:18 64:10 92:21 95:15 98:16,16 103:21 210:5 253:19 256:24 315:10,13 351:9
statutory 116:20 201:2,23
stay 95:11
step 177:13
stephan 8:16
stephens 5:2 10:5 13:24,24 131:2,4 132:11 133:13 134:3,13 135:7,19 138:9 139:7,24 140:13 141:5,22 142:8,17 143:5,22 144:9 145:3,21 146:19 149:7,21 150:18 151:13,22 152:15 153:8,19 154:13 155:4,6,11 155:18,21 156:9 158:4,12 159:7,18

## [stephens - sure]  — Page 53

175:21 176:8 177:6,17 178:2,16 179:7,25 180:16 181:7 182:5,23 183:15,21,25 184:21 186:2,8 187:14 188:12,22 189:15 190:9,22 191:3 192:25 193:10,14,18 194:9 195:3,25 196:17 197:1,3,17 199:1,12,14 200:5 200:24 201:20 202:9 203:8 204:3 204:5,19 206:12 207:7 208:5,18 209:11,15 210:7 211:1,6 212:17 214:9 215:2,22 216:11,21 217:4 217:10,25 218:14 218:18,21 219:3 221:2,9,18 222:10 222:10,19 223:10 224:1 225:17,20 225:22 236:11,20 356:25 357:19
straight 248:20
straightforward 57:18 64:7 110:5 259:22 260:24 281:3 290:25 292:10
straw 223:13 224:4,7,18 225:3
street 2:9 3:4,17 4:3,10,19 6:4,10 6:16 7:5,13,18,23 8:8,12,23 12:22
stretch 139:16
strictly 152:11
strike 29:20 38:20 38:21 50:15 52:6
strongly 282:19
structures 150:9 150:10
sub 211:25
subcommittee 191:22 192:16 219:1
subject 70:11 107:7 206:19 207:13 208:22
subjects 19:9
submission 186:22
submits 52:23
submitted 25:10 25:19,20
subscribed 361:10 362:14 363:21
subset 213:8
substance 23:20 32:16 84:11 255:2 355:23
substances 10:15 22:23 24:4 29:4 29:23 30:13 32:3 50:6,13,18 51:5,16 65:12,16,20 66:4 69:14 92:19,25 93:20 94:4,18 96:1,18 98:14 114:9 115:18 116:7 132:7 133:11,24 140:19 151:11 201:3 212:2,11,23 214:14,16 215:4,5 222:22 225:5 243:8 268:17 271:16 347:22
substantially 110:3 254:17 258:7 259:14
substantively 150:10
suck 215:25
subcommittee 262:18 264:6,7,10 264:24 272:8 282:11 284:8 289:19 290:22 292:11 303:20 322:15 327:22
substitute 12:21
successful 327:8 334:6
succinct 113:5
sudden 261:6 262:24 263:16,22 264:2,20 280:8
suffers 185:19
suggest 162:19 217:4
suggested 203:12 204:9
suggesting 143:24 162:15
suggests 59:7 123:1 140:17
suing 75:3,7,11 77:12
suite 3:5,19 4:24 6:10,15 8:13,18 360:2
summation 146:10
summit 1:12 3:15
superior 3:6 360:1
supervise 137:2
supervised 133:16 133:19,22 144:4
supervising 133:14
supervisor 158:2
supervisors 159:22
supervisory 160:7
supplied 285:3
supply 285:5,7
supply 8:16 98:13 102:24 110:21 111:13 112:6,7,17 113:11,19,21 198:13 222:6
supplying 222:13
support 34:2 132:18 160:16
supposed 111:5,6 182:21 286:10 324:20
sure 25:23 26:2 37:3 45:1 51:12 52:1 54:20 63:17 63:18 68:12 73:3 73:19,25 85:17 87:10 94:2 94:25 105:8,17 110:24 114:10 123:1 140:17 141:2 142:12

## [sure - takes]  Page 54

```
143:19 144:2,23        210:2 119:8,16,24      325:4,18,24           338:12,16 339:13
145:1,17 147:3         120:4,8 122:16,17      326:23 327:9,18        342:10
148:4 154:11           122:21 146:3           327:20 328:2,20        systems  29:25
171:25 177:14          147:14 157:16          328:20 329:12,13       30:3 309:4,7
185:8 191:11           158:7,16 159:3,10      330:17,25 331:5        315:18 318:10
216:9 218:9            159:17,24 160:10       331:19 332:9,10        322:17,24 323:7
228:19 242:17          229:25 230:10          333:2,11 334:6,13      323:10,14,22
245:20 253:13          242:25 253:16,17       336:23 337:7,16        324:4 325:4,18
256:18,19 257:20       254:11,11,14,19        338:6,8,11,15          328:21 338:7,9
259:8 262:5 267:6      255:12,21 256:7        339:12,23 340:10       340:11,18
268:10 270:24          256:11,22,23           340:17,17 341:4,9
279:19 291:2           258:4,13,24 259:6      341:24 342:1,4,9                   t
302:6 308:25           259:11 260:15          343:2,9 351:25         t  4:2 10:1,1 184:9
309:16 312:1,2,5       265:25 266:7           352:1,7,21 354:1       tablet  335:8
312:12,20 313:3        267:23 268:15,20       354:23                 tablets  261:4
316:17 321:5           270:2,16 271:8         swear  16:10           294:17
324:4 325:15           273:3,21,22 274:7      switch  130:18         tactical  150:14
330:23 332:20          275:15,22 276:6        197:12 234:7           153:4,5
334:3 340:6            276:24 278:5           switched  122:24       take  12:12 53:17
341:20 345:20          280:13 282:6,10        sworn  16:13 359:6     53:21 63:16 74:21
346:13 350:13          282:16,21 283:24       361:10,13 362:14       82:23 88:15 89:9
surprise  244:19       284:13,18 285:10       362:18 363:21          105:4 111:22
248:3                  285:19 289:5,18        synthetic  334:24      122:24,25 123:1
survey  203:5          290:6,21 291:9,13      system  24:11          130:17 151:24
207:4,4,5 209:6        291:15,23 292:7,9      49:25 104:18           159:21 177:14,23
213:23 349:14          294:23,24 296:6,8      114:10 225:16          212:14 219:13
surveys  349:4         296:17 297:3           255:21 285:11,20       225:18 227:12
suspected  183:1       299:25 300:6           315:21,23 316:2,6      229:5 262:10
suspend  22:12,18      303:7,23 304:1,5,6     316:11 318:2,18        265:7 268:19
suspends  172:12       306:20 307:2,5,9       318:23 319:7,9,11      288:21 303:10
suspension  172:7      307:10,18,18,19        319:20,22 320:2,8      307:24 316:16,17
172:10                 308:25 309:3,7         320:14,18 321:1,4      355:21 356:1
suspicion  266:9       310:3 315:18,20        321:5,9,15,17,20       taken  12:16 63:24
294:25                 316:2,7 317:6,18       321:21,25 322:7,9      92:1 123:6 130:22
suspicions  275:24     318:1,10,19,22        322:12,25 323:1        163:7 165:21
suspicious  39:25      319:7,10,20,23         324:6,13,21,24         169:14 178:9
42:19 43:1,14,23       320:2,7,13,18,25      326:4,5,6,9,11,24      198:9,9 226:2
44:15 45:5,21          321:16,19,24           327:9,17,19 328:3      265:11 316:22
57:7,8,16,17,21        322:13,17 323:2,3      329:13 331:19          341:21 359:3,7,13
64:6 65:8 66:2,15      323:9,11,12,14,22      332:10 333:3,12        110:4 114:2,7
67:3 68:2 109:19       324:7,13,22,22         334:7,12 337:8         124:17 125:3
```

## [talk - think]  Page 55

```
talk  17:13 88:13      7:22 8:17,22          test  300:5 335:12     245:15 248:8,23
89:11 158:3 172:3      television  89:6      357:23                 255:24 256:1
193:3 250:2            tell  16:13 42:24     testified  16:15       258:16 267:16
252:21,22              43:13 44:3,14         64:6 139:15            272:6 273:15
talked  75:20 82:2     45:4 67:8 103:20      190:13 207:12          275:17 281:16
82:12 102:19           119:22 130:13,15      208:3,21 210:9         289:10 290:11
128:13 129:20,21       160:19 210:11         234:4,12 248:4         292:3 296:1 300:3
153:16 161:14          218:10 256:4          257:7 351:20           301:7 313:11,25
210:17 251:5           260:7 264:6 267:2     testifies  206:3       320:5 327:11
252:4 253:2 278:8      276:22 279:8          testify  85:11,14,22   331:9 337:13
345:18 354:23          297:7 300:10          86:2 233:16            343:5 350:4
talking  41:5 52:14    308:3 315:8           348:22 350:8           357:24 359:4,6,10
52:16 95:3 145:23      316:11 321:14         351:22                 361:6,7 362:6,9,12
155:16 189:6,24        327:7 329:23          testifying  18:5       teva  5:19 16:8
192:7 193:24           350:13 353:3          27:16 38:17 46:16      text  115:8
201:10 203:17          350:20 352:5          85:22 86:6,9           thank  35:4 74:23
209:14,18 213:1        300:11 306:10         207:22 208:9           85:25 91:17
213:13 214:4,5         337:4 352:5           209:8,9 210:10         100:23 106:25
230:9 240:23           ten  153:9 352:6,19   233:18 292:19          131:7 138:13
243:4 252:23           311:23 344:17         241:23 245:14          163:3,13 169:18
293:23 311:6           tenth  7:5            351:14,16              170:7 171:5 191:2
314:11 337:18          tenure  38:24         testimony  17:5        211:3 217:8 344:8
355:8                  152:2 153:18          19:9 42:1 50:10        344:9 356:8
target  134:22         161:6 164:25          50:23 61:4 63:12       357:20
targeted  185:18       175:14 176:23         65:7 70:20,22          thanks  105:18
task  132:19           182:12 210:14         81:13,20,21 86:17      thereabouts  329:3
150:16 153:7           215:13 332:25         86:24 87:23            thing  115:4 210:3
tasks  181:18          term  110:13,15       108:11 109:11          things  31:19 90:14
taught  227:14         117:20 118:9,14       117:12 125:23          137:10 139:5
tds  152:21            214:3 224:3,3         130:3 138:6 139:2      160:11 258:9
team  21:3 75:3,10     272:1,1 309:19        142:25 159:13          262:19 290:20
101:9 108:25           terminology           173:19 174:9          286:4,14 297:9
175:13 307:9,11,3      157:10 221:22         179:20 181:2           330:4
technically  53:20     277:10 300:1          183:18 185:13          think  55:4,21
techniques  146:10     303:7                 189:23 190:12,20       57:15 60:8 61:15
technology  68:12      terms  114:14         192:4 193:16,20        61:16,16,24 62:21
68:13,16 69:16         150:4 155:8           193:24 196:18          62:22 66:15,16
teed  73:3             255:19 271:20         206:17 207:13          94:19 76:3,15
tees  73:3             277:25 281:7          209:4 211:21           77:17 78:1 100:12
teleconference         301:4                 218:23 220:15          110:4 114:2,7
4:22 5:6,15,21                               221:7 234:1,9          124:17 125:3
```

## [think - total]  Page 56

```
129:11,13 143:3        thousand  261:7       204:7,18 208:16        timing  168:8
162:17 167:20          threat  198:19        217:10 220:15          170:1
170:8 176:6 177:4      threats  198:20       212:14 215:11          179:1,12 220:19
178:1 189:13           three  4:14 6:15      219:13 224:15,20       181:10 207:14
192:6 193:15,25        40:23 121:25          225:6 226:1,7          208:22 228:6
194:13,20 195:23       148:3 239:17          227:9,18 229:3,10      346:11
196:13 198:11          240:20 257:2,7,9      229:25 230:4,13        titled  32:2 74:7
209:20 210:23          261:5 278:4           230:24 231:6,7         today  13:1 18:6
214:3,24 222:1         287:15 291:4          233:2,15,20,23         19:9 27:4 32:15
231:1 233:24           293:25,25 358:6       234:18 235:7,24        38:22 55:9 56:8
234:4 235:6            time  17:14 19:25     235:25 237:23          56:15 64:5 67:12
236:15 238:2           20:11 25:7 28:7       239:16,20,22,24        70:10 75:2 81:13
242:22 243:19,23       39:19 40:3,6,10       240:6,9 242:21         81:17,20,22 83:17
248:15,19 252:17       41:25 44:1 46:2       245:12 246:5,10        83:24,24 102:2
255:25 256:6           55:4 58:14 60:7       246:12,13 247:9        106:13 107:1
257:4 265:19           60:16 61:10 63:23     247:19,24 248:1,5      109:6 116:24
267:11 271:2           64:2 65:13 67:5       248:21 249:6,8,10      129:19 178:19
280:17 285:21          68:17 69:17 74:22     252:20,22 255:10       279:8 283:21
287:21,23 297:9        83:12 84:16 87:4      262:9 265:10,14        287:5 327:6
297:16 308:6           87:16 89:13 91:25     266:3 275:12           331:14
313:20 327:2           92:4 97:10 102:14     278:16 280:7          today's  18:24
328:15 338:2,9         107:18 110:11         285:14 287:5          357:24
341:14 344:5           118:24 119:20         289:17 293:24          told  60:21 75:8,18
346:20 351:15,20       121:12 123:5,9,23     294:21 299:11          91:1 128:13 206:6
351:24 353:10          123:25 125:17         303:10,24 304:21      217:14 257:3,11
354:24 355:16          126:2,24 127:24       314:12 316:16,21      258:10,12 266:7,9
thinking  55:10        128:9 129:12,13       316:25 317:13,15      267:11,21 271:7
240:6                  129:17,21 130:21      317:15,16,24          271:24 282:22
third  124:23          130:24 135:6         322:3 327:15           287:6 288:3
208:15 305:25          139:17,20 143:4      328:17,24 331:4        288:16 310:16
322:3 339:1            148:7,16 149:6,8     331:20 332:12          313:17
thirty  5:22 360:18    149:15,24 163:6      335:12,22 344:25       understanding
thomas  17:4           163:10 165:20,24     345:17 346:10,14       119:7 148:15
thornburg  7:23        166:18 169:13,16     346:24 352:18          179:4,8 203:10
thought  78:4          172:20 173:14,21     354:5                  206:15 207:10
139:22 142:21          176:16,20,23         timely  121:18,24      208:20 209:20,20
143:11 190:14          177:25 178:8,14      122:3 306:24           259:3 260:9
194:15,18,22           187:10 188:11        times  24:6 137:3      320:16 356:4
252:8,18 280:2         189:14 194:5         139:16 177:13          understood  41:19
283:24 291:21          197:23 198:18,20     205:1,3 251:11         179:17,23 291:22
296:8 324:19           198:25 203:21,22                            308:25 335:24
```

## [tower - understood]  Page 57

```
tower  4:10 7:17       transcription        143:2 144:2 145:9                u
162:17 161:7           359:3                156:12 171:1           u.s.  3:7 14:18 15:3
170:8 176:6 177:4      towns  75:7          199:3,12 220:19        19:3 136:17
track  340:3           track  340:3         219:24 152:16         137:12 161:1,2,12
traction  220:23       transferred  51:17   260:4                 161:15 165:1,5
trade  219:2           transition  177:8    tucker  4:23          166:5,9,23 167:2
328:18                 177:16               tuckerellis.com       168:7,9,15,17,21
trading  203:17        treat  36:18 37:8    4:25                  170:11,14,17
traffic  150:25,25     195:20               turn  12:9 19:1       u.s.c.  140:24
trafficking  11:6      treated  36:15       35:22 74:14           200:16 207:14
150:24 211:10          treatment  37:9      102:24 112:2          208:23
train  142:11,22       trends  93:2 250:3   299:13                uh  19:19 35:25
trained  144:18        250:3                turned  90:19         89:18 112:1
145:20 146:18          trial  124:24 125:8  214:7                 132:22 287:11
268:9,9,15 271:14      125:11               tv  89:4              260:18 310:16
310:9,14,15,18         tried  199:18        two  42:22 85:18      313:17
training  141:25       209:15               124:6 128:3          understanding
142:7,7,10,19,20       trigger  304:3       174:15 219:11        119:7 148:15
143:8,9,14,17,20       triggers  264:12     223:6 235:18         179:4,8 203:10
143:20 144:1,14        truck  53:8          238:7 239:16         206:15 207:10
144:24,25 145:1,2      true  26:16 39:23    242:14 245:10        208:20 209:20,20
145:12,24 146:24       42:17 46:13,23       250:12,19 251:7      259:3 260:9
147:12,16 158:15       47:6 48:9 49:24      263:13 271:20        320:16 356:4
159:24 226:25          50:16,25 51:2,6      280:2 286:8,14,15    understood  41:19
227:5,6,9,12           53:14 54:21 59:22    291:4 297:9          179:17,23 291:22
transaction  23:20     65:14 86:16 87:21    304:24 322:16        308:25 335:24
52:3 213:22 273:4      88:3 89:17,24        323:7,12,13
273:5,8,24             90:6 92:22 93:21     339:21 341:15
transactions  22:22    172:13 182:8         tye  5:10 13:20,20
23:1 24:11 29:17       201:24 215:22        type  72:11 88:19
258:25 296:4,9         220:5 359:9          113:2 152:13
297:25 299:9,16        truly  124:8 167:24  271:22 274:18
transcribed  361:7     221:19               284:23 304:19
transcript  363:6      truth  16:13,14,14   337:24 347:20
11:19 104:10,14        102:23 210:11        types  17:5 224:13
123:16 184:2           truthfully  18:6     232:11 254:10
190:21 211:8           try  134:5 168:2     265:1 268:14
353:19 360:11,12       171:2 269:21         285:4 292:16
362:17                 trying  44:22 61:17  typically  150:9,24
                       61:19 76:23
                       134:15 135:8
```

**[understood - vague]**    Page 58

356:2
undertreatment
  36:9
unilaterally
  135:17
uninterrupted
  98:13
unit 12:14 63:22
  64:1 120:24 123:4
  123:8 131:22
  178:7,12 225:25
  226:5 227:6 265:9
  265:13 316:20,24
united 1:1 3:8 9:4
  9:4,5,6 12:18
  14:19 23:13 30:18
  36:10 82:22 95:19
  133:18 136:8
  139:12 141:11
  148:2 161:15
  164:2 166:15
  211:12 212:19
  244:9
units 240:20
  357:25
unpackage 251:9
unquote 286:25
unusual 110:2
  254:15,16 258:6
  259:13 260:24,25
  261:1,2,8,9,19
  262:1 263:7
  264:16 266:24
  267:3,9,14 272:8
  272:10,18,21,25
  272:25 273:11,11
  277:14,25 278:14
  278:16 279:2,2,9
  279:10,18 280:1,5
  280:16,18,19
  281:2,3,4,8 282:10

282:17,20 284:7
  287:1 289:19,20
  290:22,23 292:10
  292:14 293:6
  294:7 296:3
  297:19,19 301:5
  322:14 327:21
unusually 261:16
update 64:10 65:2
  68:18 318:9,22
updated 67:13
  69:15
uphold 79:11
usc 23:12 107:13
  117:16
usdoj.gov 3:10
use 23:22,25 24:10
  53:12 93:8 118:20
  120:3 121:3,17
  131:12,13 146:3
  159:9,24 207:5
  221:23 278:25
usefulness 122:12
uses 185:21
usual 78:1 195:12
usually 251:16
utilized 110:16
utter 3:3 14:21,21
  20:8 27:7,11,20
  28:7,10,22 29:14
  31:16 34:20,25
  35:4 36:22 37:14
  37:16,22 39:1
  40:3 42:2 43:20
  44:17 45:7 46:17
  50:19 51:22 54:10
  54:24 55:15 56:19
  57:12 58:17 61:5
  62:2,14 63:1,14
  66:8 67:19 68:8
  71:12,25 72:5,18

73:10 74:16 75:15
  76:1,5,11,20 77:18
  78:3,20 79:4 80:3
  80:9,14,17,21 81:1
  82:6,15,25 83:21
  84:1,3,6,7,14,19
  84:21,22 85:4,6,8
  85:13 86:4 87:24
  96:9 97:2 98:6
  100:1,9 102:15
  105:7,11,23
  106:16 110:24
  117:13 119:10
  127:15 135:4
  136:14 138:23
  140:7 146:15
  151:6 162:15
  181:24 182:17
  183:6 190:17
  196:25 199:20,22
  200:14 201:8
  202:2 203:2
  207:23 208:11
  212:14 214:20
  217:16 221:8
  223:3 228:17
  234:10 241:3
  245:2,5,18 248:10
  249:1,22 252:15
  253:8 254:6 255:6
  256:2 258:18
  267:18 270:6
  273:18 278:21
  283:11 286:20
  289:12 290:13
  295:22 296:22
  300:16 302:19
  303:10 308:16
  310:23 311:25
  313:13 315:4
  318:14 319:2,17

320:24 322:2
  324:1,18 325:9,21
  327:14 328:7
  329:4,20 330:22
  331:10,22 332:15
  333:5,17 334:22
  335:17 336:18
  337:14 339:5
  340:21 341:7
  343:6 344:18
  345:7 346:17 347:1
  348:1,11,24 350:9
  350:21 353:1
  354:5 355:21,25
  360:5
utter's 83:23

**v**

v 1:8,12 360:6
  361:3 362:3
vague 23:7,24 24:9
  31:14 34:4 39:17
  40:2 41:1,2,24
  50:3 51:11,20
  52:15 54:6,7
  55:14 59:23,24
  60:6,7 67:18 68:5
  71:8,18,24 73:9
  82:5 85:21 93:22
  94:7 98:4,22
  102:12,14 103:16
  107:21 109:22,23
  110:22 111:16
  113:15 114:20
  115:13 116:15
  119:19,20 121:11
  121:12,20,21
  122:14 129:4
  132:8 133:25
  135:1 136:3 137:5
  139:17 264:21
  140:20,22 141:20


**[vague - went]**    Page 59

142:4 144:8 149:5
  149:20 150:12
  151:4,21 152:6,7
  153:15 154:22
  156:17,18 162:3
  175:17 179:3
  180:10 182:14
  183:2,4 184:20
  186:5 195:14
  196:24 198:7
  200:12 201:4
  202:22 204:14
  205:6 213:10
  214:19 215:10
  216:13 217:20
  222:8,15 223:20
  228:2,16 229:14
  229:20 230:6
  231:11 239:21
  241:24 242:16,19
  246:17 247:6
  254:7 256:17
  269:6 291:17
  302:15 303:9
  308:15 309:15,22
  314:8 316:3
  318:13,24,25
  320:20 324:15
  326:17,18 328:5
  328:13,22 329:16
  330:18 334:8
  338:19 340:19
  341:6 346:8
  352:25 354:4
vagueness 133:4
valid 196:9,13
value 311:8
varied 298:7 299:3
variety 93:21

various 26:4
  131:19 141:8
  136:13 159:23
  327:7
vary 340:13
vast 54:1 182:20
  188:20 198:21
  201:1,15,18,22
  202:5,7 216:3,10
  217:22 218:10
  224:23
ventura 7:12
  13:16,16
verbal 17:20
veritext.com.
  360:17
version 356:17
versions 334:25
versus 167:8 215:4
  300:10
vetted 187:8
vetting 187:11
video 12:11,15
videographer 9:7
  12:3 13:1 15:23
  16:9,16 63:21,25
  91:23 92:2 123:3
  123:7 130:20,23
  163:4,8 165:18,22
  169:7,12,15 178:6
  178:10 225:23
  226:3 265:8,12
  308:3 311:6,8
  357:21 358:5
videotaped 1:18
  2:1 10:13 18:13
view 121:19 215:3
  266:8 309:10

viewed 320:10
violations 47:3
  133:10 151:11
virginia 4:3 227:7
volume 203:19
  215:15
vs 1:10

**w**

w 8:2
wacker 5:7
wait 17:15 114:19
  124:2 169:9
  194:12 257:13
  298:21 303:24
waived 360:19
walgreen 8:10,10
walgreens 15:13
  131:11 180:3
  215:21 220:9
walk 233:3,9
walking 272:17
walmart 5:2 13:25
  16:6 131:1,5,11
  180:3 215:21
  220:8 356:10
want 72:13 89:11
  92:15 125:22
  157:24 177:14,18
  185:7 190:5 192:1
  209:24 291:2
  307:7
wanted 187:12
  250:24 251:2
  265:17
wants 15:24
  125:14 285:19
ware 62:9
warrant 43:8
warrington 8:19
washington 1:19
  2:10 3:18 4:20

5:12 6:5,11 7:5,13
  12:23 74:7 75:9
  77:13 91:5,9
  126:8,19
waste 266:3
watch 31:9,13
way 22:15,19
  24:14 37:8 53:12
  68:1,14 78:13
  79:15 156:2
  170:19 199:2
  210:4 254:2
  255:16 276:20
  278:13,15 282:4
  303:8 309:10
  314:3 321:23
  330:14
ways 53:3,4 54:13
  322:6
wc.com 6:6,6,7
we've 48:22,24
  79:19 183:10
  224:22,24 279:25
  299:24 307:23
  308:4 344:22
  354:20
web 32:1 34:10,17
  37:11,19 38:13,20
  38:24 341:21
  344:3,11,12
  346:18,20
website 10:16
websites 212:1
week 264:20 307:1
weeks 129:22
weiss 8:21
went 200:18
  228:14 242:22
  244:22 247:16,19
  251:7,23 294:9
  340:15,23 351:24


**[went - witness]**    Page 60

355:16
west 3:8 4:3 5:7
  8:12
whiddon 4:6
whispering 12:7
white 204:22
  206:5
wholesale 229:12
wicht 6:4 15:16,16
wide 232:12
william 7:16,22
  14:1 233:3
william.davison
  7:20
william.padgett
  7:25
williams 2:8 6:12
  12:22 13:12,15
  15:17
willis 238:3
winckel 4:18
  13:22,22
withdraw 197:1
withdrew 224:25
witness 3:3 14:20
  15:5 16:10 20:10
  20:17 23:9,25
  24:10 26:8,11,19
  26:25 27:12,24
  28:13,23 29:6,13
  29:15 30:6 31:17
  34:6,21 36:25
  37:20,23 39:4,16
  39:18 40:5 41:3
  42:4 43:21 44:6
  44:22 45:10,12
  46:6,20 47:2,10,19
  47:24 48:3,14,22
  49:4,10,20 50:8,24
  51:12,25 52:8,16
  52:19,22 54:12

55:1,18 56:5,22
  57:15 58:6,11,19
  59:15,25 60:8
  61:7,24,25 62:5,15
  63:3 64:16,23
  65:6,18 66:9,17
  67:2,8,21 68:10,22
  68:24 69:6 70:5
  70:15 71:13,20
  72:8,15 73:20
  74:17 75:17 76:6
  76:22 77:25,25
  78:14,24 79:12
  80:4,10,16,22 81:2
  81:24 82:9 83:1
  84:13,15 85:7,14
  86:8 87:25 91:1
  93:4 94:22 96:11
  97:4,22 98:7,24
  99:6 100:2 102:4
  102:17 103:6,19
  108:12 109:12,25
  110:25 111:18
  113:18 114:22
  115:15 116:3,16
  117:14,25 118:23
  119:12,21 120:17
  120:18 121:13,23
  122:15 123:17
  124:18 125:15
  127:17,19 128:23
  129:5 130:7 132:9
  133:6 134:1,12
  135:5,15 136:15
  137:9 138:7,25
  139:15 140:8,23
  141:21 142:5,16
  143:2,16 144:23
  145:17 146:17

150:13 151:7
  152:10 153:4,16
  154:10,24 155:5
  155:10,15,19
  156:20 157:19
  158:11 159:1,15
  160:6,19 161:14
  162:12,20,23
  163:14,15,17
  164:3 165:11
  166:16 167:10,15
  167:21 169:3,5,20
  169:22,24 170:2
  170:24 171:15,25
  173:1,20 174:11
  174:20 175:3,18
  176:5 177:3,20,22
  177:25 178:4
  179:4,22 180:12
  181:4 182:1,19
  183:8 186:7 187:5
  188:10,19 189:6
  189:21,24 190:19
  191:2 192:19
  193:8,23 194:5,13
  195:1,17 196:6
  197:9 198:8
  199:23 200:16
  201:10 202:4
  203:4 204:15
  205:25 206:3,7,22
  206:25 207:3,25
  208:2,17 209:3
  210:6 211:21
  214:22 216:2
  220:12 221:9,18
  222:9,17 223:5,21
  225:15,21 230:7
  231:10,22 316:4
  317:10,22 318:6

234:12 235:2,16
  236:7,21 237:11
  237:18 238:14
  239:9 240:17
  241:4,18 242:3
  244:13 245:7,20
  246:18 247:7
  248:12,25 249:3
  249:24 250:18
  252:2,16 253:10
  254:9 255:7,25
  256:18 257:16
  258:20 261:14
  262:5,22 264:10
  264:19 266:11,19
  267:20 268:23
  269:7,19 270:8,21
  271:12 272:7
  273:20 274:15,18
  275:19 276:19
  277:2,17,21
  278:23 279:14,17
  281:1,17 282:1
  283:5,12,15 284:5
  285:24 286:2,22
  287:16,23 288:3
  288:12 289:13
  290:14 292:4
  293:4,22 296:2,24
  297:22,25 298:9
  298:11,17,22,25
  299:7 300:4,4,8
  301:10,22 302:4
  302:21 303:11
  305:19 306:17
  308:18 309:16,24
  310:24 311:5
  316:6,14
  317:10,22 318:6


**[witness - zuckerman.com]**    Page 61

318:15 319:5,18
  320:6,12,25
  321:14 322:5,20
  322:22 324:3,19
  325:12,23 326:20
  327:17 328:8,14
  328:24 329:5,22
  330:11,23 331:12
  331:23 332:18
  333:6,20 334:3,9
  334:23 335:6,18
  336:19 337:15
  339:6,20 340:6,22
  341:8 343:8 344:6
  344:19 345:9
  346:9,22 347:3,15
  348:3 349:2
  350:10,22 352:11
  353:4,16,17 354:7
  354:17 359:4,6,10
  360:8,11 361:1,4
  361:11 362:1,4,15

286:13,14
wording 335:11
words 125:4 192:1
  259:17
work 73:10 76:12
  79:5 80:1 82:3,13
  84:23 89:19 90:8
  91:14 114:11
  161:2 227:24
  228:5,5 240:25
  269:22
worked 155:3
  180:7 196:22
  242:7 329:25
  337:23
working 77:6 85:7
  154:16 206:1
works 227:25
  279:5
world 326:6
worse 20:14
worthless 326:11
worthy 241:24
wright 73:13,19
  238:10 240:24
  244:20 245:10
  257:6,20 283:23
wright's 72:12,19
  280:18 281:2
write 189:11 281:6
writing 83:3 101:9
  116:25 123:11,24
  304:14,22
writings 123:19
  304:24
written 116:4
  184:15 195:21
  206:17 278:2
  282:5 309:9
wrong 37:4 346:20
  350:15

wrote 38:3 101:5
  251:12,14,15
  313:8

**x**

xanax 294:16

**y**

yeah 23:11 33:23
  44:22 45:10 52:8
  76:22 95:22 105:2
  105:10 111:24
  144:15 154:3
  155:19 157:22
  162:17 164:20
  169:10 179:22
  225:22 240:7
  252:20 283:15
  354:9 356:6
year 20:14 30:13
  32:20 33:16,24,25
  85:18 86:10 94:12
  158:8 206:14
  351:18 354:21
years 40:20,23
  42:4,6 68:3 85:18
  90:2 92:25 148:4
  153:9 161:16
  239:5 253:20
  254:25 261:5
  311:7,10 320:13
  324:11 327:24
  334:17 341:15,15
  341:19 344:21
  348:5 352:6,19
  353:6,11,13,24
yesterday 38:13
york 3:13,13 4:11
  4:11,15,15 5:17,17
youth 211:22

**z**

zuckerman 6:9
  15:20
zuckerman.com
  6:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.